# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  KATRINA CANAL BREACHES | * | CIVIL ACTION |
| CONSOLIDATED LITIGATION | * | |
| | * | NO. 05-4182 |
| | * | and consolidated cases |
| PERTAINS TO: BARGE | * | |
| | * | SECTION "K"  (2) |
| | * | |
| *Boutte v. Lafarge* | 05-5531 | * | JUDGE |
| *Mumford v. Ingram* | 05-5724 | * | STANWOOD R. DUVAL, JR. |
| *Lagarde v. Lafarge* | 06-5342 | * | |
| *Perry v. Ingram* | 06-6299 | * | MAGISTRATE |
| *Benoit v. Lafarge* | 06-7516 | * | JOSEPH C. WILKINSON, JR. |
| *Parfait Family v. USA* | 07-3500 | * | |
| *Lafarge v. USA* | 07-5178 | * | |

* * * * * * * * * * * * * * * * * * * * * * * * *

## MOTION TO STRIKE, EXCLUDE AND/OR LIMIT TESTIMONY, OPINIONS, FINDINGS AND/OR CONCLUSIONS OF DEFENDANT LAFARGE NORTH AMERICA'S EXPERT WITNESS AUSTIN L. DOOLEY, Ph.D.

i

**TABLE OF CONTENTS**

I.     INTRODUCTION……………………………………………..…………....…1

II.    FACTUAL BACKGROUND…………………………………………...…...2

III.   DR. DOOLEY'S OPINIONS……………….......................... ..........................3

IV.    EVIDENTIARY STANDARD FOR THE ADMISSION OF
       EXPERT TESTIMONY...…………………………………………..…………3

V.     DR. DOOLEY'S TESTIMONY IS UNRELIABLE BECAUSE
       IT WAS NOT BASED ON ACTUAL WIND CONDITIONS THAT
       OCCURRED IN THE IHNC …………………………………………………..5

       A.    Dr. Dooley's Conclusions Are Nothing More Than Speculation
             Based On Speculation, As Weather Data Was Not Available For
             The Relevant Area During The Relevant Time Period …………………...………6

       B.    Dr. Dooley's Conclusions Are Unreliable Because They Fail To
             Account For Eyewitness Testimony Of Pertinent Facts ...………………………..9

VI.    DR. DOOLEY'S OPINIONS ABOUT THE MOVEMENT OF ING 4727
       SHOULD BE EXCLUDED BECAUSE HE IS NOT QUALIFIED TO
       RENDER SUCH AN OPINION …………………………………………..….……11

VII.   DR. DOOLEY'S OPINIONS ARE IRRELEVANT BECAUSE THEY
       DO NOT INVALIDATE THE CONCLUSIONS REACHED BY IPET ………..………12

VIII.  CONCLUSION…………………………………………………………..……13

# TABLE OF AUTHORITIES

**CASES**                                                                        **PAGE**

*Barrett* v. *Atlantic Richfield Co.,*
      95 F.3d 375, 382 (5th Cir. 1996) …………………………………………………..11

*Berry* v. *Armstrong Rubber Co.,*
      989 F.2d 822, 828 (5th Cir. 1993) ……………………………..…………..11

*Bourjaily v. United States,*
      483 U.S. 171, 175, 97 L. Ed. 2d 144, 107 S. Ct. 2775 (1987) …………………....….5

*Curtis v. M&S Petroleum, Inc.,*
      174 F.3d 661, 669 (5th Cir. 1999) ……………………………...…………………5

*Daubert v. Merrill Dow Pharmaceuticals, Inc.,*
      509 U.S. 579, 113 S. Ct. 2786; 125 L. Ed. 2d 469 (1993)…………………1, 4, 5, 8, 9, 13

*GE v. Joiner,*
      522 U.S. 136, 147, 118 S. Ct. 512; 139 L. Ed. 2d 508 (1997) …………………………5, 8

*In re: TMI Litigation,*
      193 F.3d 613, 670-672 (3d Cir. 1997) ………………………………………..……..8

*Kumho Tire Co. v. Carmichael,*
      526 U.S. 137, 141, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999) ……………...…….4, 8

*Mathis v. Exxon Corp.,*
      302 F.3d 448, 459-460 (5th Cir. 2002) ……………………………………...……….5

*Moore v. Ashland Chem., Inc.,*
      151 F.3d 269, 276 (5th Cir. 1998) ………………………………………… …...5, 6

*Pipitone v. Biomatrix, Inc.,*
      288 F.3d 239, 243 (5th Cir. 2002) …………………………………..………….4

*Seatrax, Inc. v. Hudson,*
      200 F.3d 358, 372 (5th Cir. 2000) ………………………………………….12

*United States v. Hicks,*
      389 F.3d 514, 525 (5th Cir. 2004) …………………………….…………11

*Viterbo v. Dow Chemical Co.,*
      826 F.2d 420, 424 (5th Cir. 1987) ……………………..………………….9

*Wilson v. Woods*,
    163 F.3d 935, 937 (5th Cir. 1999) ………………………………...…………………11, 13


**STATUTES**

Fed. R. Evid. 702 ………………………………………………...…………1, 3, 4, 5, 9. 11, 12, 13

Fed. R. Evid. 703 …………………………….………………………………………...……………..9


**REPORTS**

U.S. Army Corps of Engineers, <u>IPET REPORT: Performance Evaluation of the
New Orleans and Southeast Louisiana Hurricane Protection System, Final Report
of the Interagency Performance Evaluation Task Force,</u> Volume IV The Storm,
Technical Appendix 17, March 26, 2007, pp. IV-17-1 to IV-17-15, *available at*
http://www.usace.army.mil/CECW/Documents/cecwe/ipet/v4_append_7-9.pdf...............2, 12, 13

## I.      INTRODUCTION

Defendant LaFarge North America ("LNA") designated Austin L. Dooley, Ph.D. as a meteorology expert to testify as to the wind conditions present in New Orleans during Hurricane Katrina, particularly in the area of the Inner Harbor Navigation Canal ("IHNC").  However, Dr. Dooley did not himself ascertain the wind speeds that occurred in the IHNC.  Rather, he obtained wind speed and wind direction <u>estimates</u> from meteorological research entities for <u>locations other than the IHNC</u>, then used those estimates to create his own estimates of wind speeds that occurred in the IHNC.  As a result, Dr. Dooley's opinions were highly speculative and based on an unreliable methodology that not only lacked sufficient factual support, but also excluded pertinent factual evidence that contradicted LNA's theory.  The Court should exclude those portions of Dr. Dooley's report and testimony concerning wind speed and wind direction for failing to satisfy the standards imposed by the United States Supreme Court in *Daubert v. Merrill Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S. Ct. 2786; 125 L. Ed. 2d 469 (1993).

Dr. Dooley also went beyond merely opining as to wind/weather elements and expressed opinions as to the movement of Barge ING 4727 ("barge" or "ING 4727") through the IHNC and the validity of IPET's conclusions regarding the barge's role in the failure of the IHNC floodwall.  Dr. Dooley is a meteorologist and lacks the qualifications necessary to render opinions regarding the barge's movement.  Dr. Dooley also lacks the qualifications necessary to render opinions regarding IPET's mathematical calculations of the barge's potential velocity, momentum, and energy.  As such, the Court should exclude those portions of Dr. Dooley's report and testimony that concern the movement of the barge or the validity of IPET's conclusions because they fail to satisfy the standards imposed by Rule 702 of the Federal Rules of Evidence.

## II.    FACTUAL BACKGROUND

On August 26, 2005, days before Hurricane Katrina made landfall, ING 4727 transported a load of cement to a facility owned by LNA.  At some time between the delivery of the barge to LNA's facility and the early morning hours of August 29, 2005, the barge broke free of its moorings.  Subsequently, the floodwall on the eastern edge of the IHNC was breached in two locations.  The North Breach was observed by one eyewitness (William Villavasso, with whom the Court is familiar after briefing/argument on the Motion for Summary Judgment) and numerous residents heard the "booming" of the empty barge banging against the floodwall prior to the South Breach.  Additionally, other eyewitnesses observed the barge come through the floodwall at the time the South Breach occurred, coming to rest 180 feet inside of the floodwall.

As a result, the IPET report analyzed the barge's potential role in the failure of the eastern IHNC floodwall. *See* Exhibit C (IPET Volume IV, The Storm, Technical Appendix 17).[1]  Therein, mathematical calculations were performed to determine the barge's potential role in the failure of the floodwall, using a number of variables. *Id*.  One of these variables was a wind speed of 100 miles per hour, broadside to the barge. *Id*. at IV-17-4, IV-17-5.  Ultimately, IPET's calculations demonstrated that "the barge terminal momentum and energy could have been considerable and thus possible contributors to the levee failure at the Lower Ninth Ward." *Id*. at IV-17-14.

---

[1]    *See* U.S. Army Corps of Engineers, <u>IPET REPORT: Performance Evaluation of the New Orleans and Southeast Louisiana Hurricane Protection System, Final Report of the Interagency Performance Evaluation Task Force,</u> Volume IV The Storm, Technical Appendix 17, March 26, 2007, pp. IV-17-1 to IV-17-15, *available at* http://www.usace.army.mil/CECW/Documents/cecwe/ipet/v4_append_7-9.pdf.

### III.   DR. DOOLEY'S OPINIONS

Dr. Dooley was designated by LNA to opine on the wind conditions present during

Hurricane Katrina.  In his July 27, 2009 report, Dr. Dooley opined the following:

1. Katrina:
   a. Katrina was a Category 5 storm while in the Gulf of Mexico.
   b. Hurricane conditions had reduced to a Category 3 at the time of landfall.
   c. A hurricane watch was issued for parts of Louisiana at 1000 CDT (1500 GMT) on August 27.
   d. A hurricane warning was issued for the north central Gulf from Morgan City eastward to the Alabama / Florida border at 2200 CDT on August 27 (0300 GMT August 28).
   e. On making landfall, Katrina passed to the east of the area of [the] Inner Harbor Navigation Canal.
2. Prevailing wind directions (wind from a predominantly single general direction) in the IHNC turned from easterly (i.e. from the east) to northerly (i.e. from the north) to westerly (i.e. from the west) as Katrina moved north along its track passing to the east of New Orleans.
3. There were no southerly (i.e. from the south) winds at the IHNC during Katrina.
4. Interpolation of the wind directions at the surrounding grid points indicates the winds at the IHNC came from a direction of 015° between about 0730 and 0745 CDT, then coming from the north between 0800 and 0815 CDT.
5. My calculations show that up until 0742 CDT, the wind direction would push the barge toward the dock.
6. Maximum sustained winds were between 75 and 79 knots (86 and 91 mph) and this occurred between 0730 CDT and 0745 CDT.
7. A 100 mph sustained wind, broadside to a barge on the western side of the IHNC (which lays on a heading of 015°) was not attained in the area of the incident.
8. Observation data confirms that there were no westerly winds in the IHNC until sometime after 0653 CDT (instruments stopped recording at that time). Illustrations showing a westerly wind between 0400 and 0500 CDT are incorrect with regards to wind direction. Likewise, winds were not parallel to the IHNC but had a continuous cross canal component (from east to west) during the morning from 0400 to 0500 CDT.

*Expert Report of Austin L. Dooley ("Dooley Report")*, attached hereto as Exhibit A, p. 35.

### IV.   EVIDENTIARY STANDARD FOR THE ADMISSION OF EXPERT TESTIMONY

The standard for admitting expert testimony regarding scientific or technical matters is

well established.  Federal Rule of Evidence 702 provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The Supreme Court's decision in *Daubert v. Merrill Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993) provides "the analytical framework for determining whether expert testimony is admissible under Rule 702." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243 (5th Cir. 2002).  In *Daubert*, the Supreme Court held that trial courts should serve as the gatekeeeper for expert testimony and should not admit such testimony without first determining that the testimony is both "reliable" and "relevant." *Daubert*, 509 U.S. at 589.  Interpreting *Daubert* and Fed. R. Evid. 702, the Court in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999) explained that the District Court's gatekeeping role should govern not only the admission of scientific, but "technical" and "other specialized knowledge" as well.

Expert testimony is reliable when it is grounded in the methods and procedures of science and must constitute knowledge, meaning something more than speculation. *See Daubert*, 509 U.S. at 590.  *Daubert's* reliability prong set forth four guideposts that a District Court may consider in assessing the reliability of the expert testimony, which include, but are not limited to:

> (1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the technique has been subjected to peer review and publication; (3) the known and potential error rate of the methodology; and (4) whether the technique has been generally accepted in the proper scientific community.

*Id*. at 593-94.  Whether some or all of these factors apply in a particular case depends on the facts, the expert's particular expertise, and the subject of his testimony. *Kumho Tire*, 526 U.S. at 138.

In order to be relevant, the expert testimony must be "relevant to the task at hand." *Daubert,* 590 U.S. at 591. The relevance requirement is not satisfied where the proffered testimony does not "assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert*, 590 U.S. at 597; Fed. R. Evid. 702. The relationship must be an appropriate "fit" with respect to the opinion offered and the facts of the case. *See Daubert*, 509 U.S. at 591. Under *Daubert*, scientific testimony does not assist the trier of fact unless the testimony has a justified scientific relationship to the pertinent facts. *See Daubert*, 509 U.S. at 591.

Accordingly, LNA must prove by a preponderance of the evidence that the proffered testimony satisfies Rule 702. *Mathis v. Exxon Corp.*, 302 F.3d 448, 459-460 (5th Cir. 2002) (*citing Bourjaily v. United States*, 483 U.S. 171, 175, 97 L. Ed. 2d 144, 107 S. Ct. 2775 (1987)). LNA also bears the burden of establishing by a preponderance of the evidence that the proposed expert testimony is reliable under *Daubert* and its progeny. *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998).

## V.   DR. DOOLEY'S TESTIMONY IS UNRELIABLE BECAUSE IT WAS NOT BASED ON ACTUAL WIND CONDITIONS THAT OCCURRED IN THE IHNC

In order to be reliable, expert testimony must be grounded in the methods and procedures of science and must be more than speculation or subjective belief. *Curtis v. M&S Petroleum, Inc*., 174 F.3d 661, 669 (5th Cir. 1999). District Courts "must evaluate whether there is an adequate "fit" between the data and the expert opinion proffered." *Moore*, 151 F.3d at 279 (*citing GE v. Joiner*, 522 U.S. 136, 147, 118 S. Ct. 512; 139 L. Ed. 2d 508 (1997) ("Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a District Court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an

analytical gap between the data and the opinion proffered").   Under the *Daubert* standard, speculative opinion testimony is not reliable opinion testimony. *See Moore*, 151 F.3d at 179 ("Under the *Daubert* regime, trial courts are encouraged to exclude…speculative testimony as lacking any scientific validity.")

In formulating the opinions in his report, Dr. Dooley did not: (A) ascertain the wind speeds that occurred in the IHNC; or (B) consider eyewitness testimony.   Instead, Dr. Dooley obtained wind speed and wind direction <u>estimates</u> from meteorological research entities for locations other than the IHNC, then used those estimates to create his own estimates of wind speeds that occurred in the IHNC. *See Deposition of Austin Dooley ("Dooley Depo.")*, selected excerpts of which are attached hereto as Exhibit B, pp. 47:3-49:12.  Since Dr. Dooley's wind-related estimates are themselves <u>based on estimates of wind speed at other locations</u>, generated by other scientists, they are highly speculative and unreliable and will not assist any fact-finder to understand the evidence or determine a fact in issue.

**A.   <u>Dr. Dooley's Conclusions Are Nothing More Than Speculation Based On Speculation, As Weather Data Was Not Available For The Relevant Area During The Relevant Time Period</u>**

It is undisputed that weather data for the New Orleans area was extremely limited during Hurricane Katrina. *Dooley Report,* Exh. A, p. 17 ("wind reports from the hurricane were limited to due to instrument failure at many of the observing stations."); *Dooley Report*, Exh. A, p. 18 ("The strongest sustained wind in New Orleans is subject to speculation since observations are sparse, due in part to the power failures that disabled ASOS stations in the area before peak wind conditions occurred.").   Indeed, the lack of data in the wind speed chart in Table 4 of Dr. Dooley's report evidences the lack of wind speed data that was available from August 29, 2005. *See Dooley Report*, Exh. A, p. 17, Table 4.  Among the data collection stations listed in Table 4,

most of these sites were not even near the location of the IHNC and/or were disabled during the

relevant time period. *See id.*

Additionally, there was no collection station for weather data in the area of the IHNC.

*Dooley Depo.*, Exh. B, pp. 47:15-48:2; *Dooley Report*, Exh. A, pp. 17-18.  The closest weather

data collection station to the IHNC was located at the Lakefront Airport, which was located 4 to

4.2 miles away from the IHNC. *Dooley Depo.*, Exh. B, p. 51:6-10.  Significantly, the weather

data collection station at Lakefront Airport was not even functional after 6:53 a.m. CDT and

made only one reading after 6:05 a.m. CDT on August 29, 2005. *Dooley Depo.*, Exh. B, pp.

51:11-52:5; *Dooley Report*, Exh. A, p. 34, Table 8.  As a result, no data was collected from the

source closest to the IHNC after that time. *Id.*

Due to this lack of raw data from the New Orleans area, Dr. Dooley relied on wind speed

and wind direction estimates obtained from Oceanweather, Inc., which performed a hindcast

study of the wind conditions that occurred during Hurricane Katrina.[2] *See Dooley Report*, Exh.

A, pp. 21-28; *Dooley Depo.*, Exh. B, pp. 48:16-49:12.  A "hindcast" is essentially the opposite of

a forecast, a backward looking estimation of what weather conditions were or are believed to

have been at a particular point in time.[3]  The creation of a hindcast entails feeding raw weather

data into a computer model to create estimates of weather conditions for time periods or

locations where no data existed.  The hindcast becomes more and more speculative when raw

---

[2]      Oceanweather, Inc.'s hindcast does not necessarily offer an accurate portrayal of the wind
conditions in New Orleans during Hurricane Katrina because the wind fields identified "represent the
effective over-water 30-minute average winds at a height of 10 meters above sea level." *Dooley Report*, p.
22.  Since the IHNC area was not "over-water," the strength and direction of the wind was necessarily
modified by the turbulence created by the structures in the proximity of the IHNC, such as the Florida
Avenue Bridge, the levee wall, and local buildings.  Dr. Dooley has not cited any support for the
application of an "over-water" model to a study involving events that occurred over land.
[3]      Dr. Dooley described a hindcast as "the numerical calculation of the wind field surrounding the
storm based upon collection of data which can consist of surface reports, airplane reports, satellite
measurements of wind speed, buoy reports and other station reports." *Dooley Depo.*, Exh. B, p. 49:20-24.

data is limited because more assumptions must be fed into the model.  Thus, a shortage of accurate weather data will more likely result in an inaccurate hindcast.

In order to disguise this lack of data, Dr. Dooley commissioned Oceanweather, Inc. to create wind speed and wind direction estimates for four points surrounding the IHNC. *See Dooley Report*, Exh. A, p. 22, Map 3.  Significantly, Points A, B, C, and D from Map 3 of Dr. Dooley's report are not weather data collection stations, but four randomly selected points from which to serve as a basis for Dr. Dooley to estimate the wind speed and wind direction occurring inside the IHNC. *See Dooley Depo*., Exh. B, pp. 48:16-49:12.  They could more accurately be described as "phantom data points" created for the purpose of Dr. Dooley's report.  Next, Dr. Dooley used these phantom data points to estimate the wind speed and wind direction at Point E. *See Dooley Depo*., Exh. B, pp. 47:3-49:12; *Dooley Report*, Exh. A, pp. 22-29.  Similar to Points A-D, Point E is not a weather data collection station. *See id.*

As a result, Dr. Dooley's opinions are misleading and nothing more than speculation based on speculation.  Dr. Dooley's opinions do not state the actual weather conditions at the IHNC during Hurricane Katrina, or even the actual weather conditions at locations near the IHNC during Hurricane Katrina.  Dr. Dooley's conclusion cannot be accepted because only he says it is so, as expert testimony that reaches conclusions *ipse dixit* is inadmissible.[4] *See GE v. Joiner*, 522 U.S. at 147.  This lack of scientific data and observation fails to meet the requisite standard of reliability set forth in *Daubert* and *Kumho Tire Co*.  Accordingly, the portions of Dr. Dooley's report and testimony concerning conclusions about wind speed and wind direction should be excluded under *Daubert* and its progeny of related cases. *See e.g., In re: TMI Litigation*, 193 F.3d 613, 670-672 (3d Cir. 1997) (upholding exclusion of meteorologist's testimony where such

---

[4]     "Ipse dixit" is a Latin phrase meaning "he himself said it."

testimony was speculative in nature, lacked fit, and would not assist the fact finder in understanding the evidence or determining an issue of fact).

> **B.      Dr. Dooley's Conclusions Are Unreliable Because They Fail To Account For Eyewitness Testimony Of Pertinent Facts**

Dr. Dooley's testimony lacks foundation insofar as his expert opinion was not based upon sufficient facts or data. *See* Fed. R. Evid. 702, 703.   Expert testimony that lacks a factual foundation because it ignores pertinent eyewitness testimony cannot be said to assist the trier of fact. *See Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 424 (5th Cir. 1987) (upholding the exclusion of an expert opinion where the court did not dispute the expert's qualifications but rather the foundation and reliability of his expert testimony).  An unsupported opinion "does not serve the purposes for which it is offered, that is, objectively to assist the jury in arriving at its verdict." *Id*.

Here, Dr. Dooley did not consider eyewitness accounts of wind direction when forming his conclusions, despite acknowledging that they are an "important" tool in meteorological analysis:

> Q:  Did you think it was important, when you were doing your meteorological analysis, to check that analysis and/or reconcile that analysis with eyewitness accounts?
> A:  That's important to do, of course.  But in this particular case, I did not do that.

*Dooley Depo*., Exh. B, pp. 30:8-13; 102:12-103:7; 103:16-18.  Furthermore, despite the fact that Dr. Dooley was aware that the eyewitness testimony regarding wind direction was at odds with his findings, he made no effort to reconcile his conclusions to these facts. *Dooley Depo*., Exh. B, pp. 29:23-31:12.  Most significantly, Dr. Dooley ignored the testimony of eyewitness William Villavasso, who witnessed winds blowing from the Northwest at the time of the initiation of the North breach, rather than from the East as concluded by Dr. Dooley. *See Dooley Depo.*, Exh. B,

9

pp. 32:21-34:16 (admitting that he was aware that William Villavasso's testimony was at odds with his findings). That a strong wind was blowing from the Northwest at the time of the initiation of the North Breach is evidenced by the fact that up to five feet of water was splashing over the levee and the fact the doors at Pump Station #5 were pulled off their hinges as a result of the strong winds. *See Deposition of William Villavasso*, selected excerpts of which are attached hereto as Exhibit D, pp. 57:18-60:9; 63:7-64:24.

Additionally, Dr. Dooley's conclusion that "up until 0742 CDT, the wind direction would push the barge toward the dock" is also conflicted by eyewitness testimony. *Dooley Report*, Exh. A, p. 35. Despite the fact that two Lower Ninth Ward residents, from whom LNA's investigators obtained statements very early on in this litigation, testified that ING 4727 had already crossed over to the eastern side of the IHNC before the breaches occurred, Dr. Dooley refused to reconcile his analysis with these eyewitness accounts. *Dooley Depo.*, Exh. B, pp. 29:23-31:12; *See also Affidavit of Frazier Tompkins*, attached hereto as Exhibit E, p. 2 (Frazier Tompkins, a resident of the Lower Ninth Ward, testified that he saw ING 4727 "on the east side of the canal…in the vicinity of Derbigny, Roman and Prieur streets on the east side of the canal" on Sunday, August 28, 2005 between 10:30 a.m. and 11:00 a.m.); *see also Affidavit of Gertrude LeBlanc*, attached hereto as Exhibit F, p. 2. (Gertrude LeBlanc, a resident of the Lower Ninth Ward, testified that she saw ING 4727 "right up against the floodwall on the Lower Ninth Ward side…about mid-way between the Florida Avenue Bridge and the Claiborne Avenue Bridge" on Sunday, August 28, 2005 between 11:00 a.m. and noon). Dr. Dooley's failure to account for or explain contradictory eyewitness testimony (other than to generalize it as unreliable) indicates that the factual underpinnings of his opinions were not sound. *See Dooley Depo.*, Exh. B, pp. 30:8-13; 50:10-19; 102:12-103:7. As a result, those portions of Dr. Dooley's report and

testimony concerning wind speed and wind direction should be excluded because they lack factual foundation and cannot assist the trier of fact to understand the evidence or to determine a fact in issue.

**VI.    DR. DOOLEY'S OPINIONS ABOUT THE MOVEMENT OF ING 4727 SHOULD BE EXCLUDED BECAUSE HE IS NOT QUALIFIED TO RENDER SUCH AN OPINION**

In order to testify as an expert, a witness must be "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702; *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999) ("District courts must be assured that the proffered witness is qualified to testify by virtue of his 'knowledge, skill, experience, training or education.'").  Additionally, "to qualify as an expert, the witness must have such knowledge or experience in [his] field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth." *United States v. Hicks*, 389 F.3d 514, 525 (5th Cir. 2004).  "A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Wilson*, 163 F.3d at 937.  Indeed, the Fifth Circuit routinely upholds the exclusion of experts offered to opine on subjects outside of their area of expertise. *See, e.g., Barrett* v. *Atlantic Richfield Co.,* 95 F.3d 375, 382 (5th Cir. 1996) (trial court did not abuse discretion in excluding expert in animal toxicology from testifying as to the chemical's effect on humans); *Berry* v. *Armstrong Rubber Co.,* 989 F.2d 822, 828 (5th Cir. 1993) (trial court did not abuse discretion in disallowing expert testimony of professor of geotechnical engineering who attempted to testify as a geochemist or hydrogeologist); *Wilson,* 163 F.3d at 937-938 (holding that witness did not qualify as auto accident reconstruction expert where experience was in fire reconstruction and investigation).

Here, any aspect of Dr. Dooley's proposed testimony that speaks to the mooring of ING 4727, the breakaway of ING 4727, or the movement of ING 4727 is clearly outside his area of expertise. *See Dooley Report*, Exh. A, pp. 31-32; 35; *Dooley Depo.*, Exh. B, pp. 39:12-19.  In fact, Dr. Dooley repeatedly admitted as much in his deposition testimony:

> So my report never makes any assumptions about what happens to the barge.  I'm simply talking about wind conditions as they occurred on the morning of the 29th.  What happened to the barge is someone else's problem, not mine.

*Dooley Depo.*, Exh. B, p. 41:11-15; *see also Dooley Depo.*, Exh. B, pp. 97:7-21; 46:11-20. While Dr. Dooley may be qualified to testify about weather events as a meteorological expert, he is not qualified to opine on other matters related to the movement of ING 4727. *See Dooley Report,* Exh. A, pp. 36-42 (Dr. Dooley's Curriculum Vitae).  Such testimony would be based on conjecture and speculation, not on Dr. Dooley's professional knowledge.  As such, the Court should exclude those portions of Dr. Dooley's report and testimony that concern the movement of the barge because they fail to satisfy the standard imposed by Rule 702. *See e.g., Seatrax, Inc. v. Hudson*, 200 F.3d 358, 372 (5th Cir. 2000) (upholding exclusion of expert testimony regarding the effect an alleged trademark infringement had on a company's gross profits where the expert did not have any formal or professional training in accounting and failed to conduct an independent analysis of sales figures).

## VII.   DR. DOOLEY'S OPINIONS ARE IRRELEVANT BECAUSE THEY DO NOT INVALIDATE THE CONCLUSIONS REACHED BY IPET

The IPET report analyzed the barge's potential role in the failure of the eastern IHNC floodwall, using a complex mathematical equation with a literally countless number of variables. *See* Exhibit C.[5]  IPET concluded that "the barge terminal momentum and energy could have been

---

[5]      *See* U.S. Army Corps of Engineers, IPET REPORT: Performance Evaluation of the New Orleans and Southeast Louisiana Hurricane Protection System, Final Report of the Interagency Performance

considerable and thus possible contributors to the levee failure at the Lower Ninth Ward," using

a variable of 100 mile per hour wind speed, broadside to the barge in its equation. *Id*. at IV-17-4,

IV-17-5, IV-17-14.

In his report, Dr. Dooley attempted to invalidate IPET's conclusion by stating that he

disagreed with the wind speed variable used in the mathematical calculation. *See Dooley Report*,

Exh. A, p. 29.  However, Dr. Dooley's opinions on this topic are irrelevant, as a variation in one

variable does not invalidate the whole equation.  IPET's conclusions about the barge's potential

role in the failure of the eastern IHNC floodwall could only be challenged by showing that a

change in the wind speed variable leads to the conclusion that the barge could **not** have

contributed to the levee failure.  As this analysis was not conducted, Dr. Dooley's testimony

amounts to nothing more than unverified statements, unsupported by scientific methodology.

Dr. Dooley's testimony is therefore irrelevant and inadmissible *Daubert*.

Additionally, as a meteorologist rather than a mathematician or engineer, Dr. Dooley is

not even qualified to opine on the validity of IPET's mathematical calculations.  Dr. Dooley's

testimony is therefore inadmissible under Rule 702. *See* Fed. R. Evid. 702; *Wilson*, 163 F.3d at

937.  Consequently, the Court should exclude those portions of Dr. Dooley's report and

testimony that concern IPET's conclusions because they fail to satisfy the standards imposed by

both *Daubert* and Rule 702.

## VIII.   CONCLUSION

The foregoing analysis reveals that Dr. Dooley did not rely on sufficient facts to reach his

conclusions regarding wind speed and wind direction and opined on matters outside his area of

expertise.  His opinions were based on speculation and thus, a significant portion of Dr. Dooley's

---

Evaluation Task Force, Volume IV The Storm, Technical Appendix 17, March 26, 2007, pp. IV-17-1 to
IV-17-15, *available at* http://www.usace.army.mil/CECW/Documents/cecwe/ipet/v4_append_7-9.pdf.

proffered testimony is unreliable and inadmissible.  As such, the Court should grant Plaintiffs'

motion to exclude relevant portions of the report and testimony of LNA's meteorology expert,

Dr. Dooley.


Date:   December 1, 2009                        Respectfully submitted,

                                                */s/ Dylan Pollard_____              _____*

                                                Shawn Khorrami (CA SBN #14011)
                                                Dylan Pollard (CA SBN # 180306)
                                                Matt C. Bailey (CA SBN #218685)
                                                Michael Forman (CA SBN #260224)
                                                Khorrami, Pollard & Abir, LLP
                                                444 S. Flower Street, 33rd Floor
                                                Los Angeles, California 90071
                                                Telephone: (213) 596-6000
                                                Facsimilie: (213) 596-6010
                                                e-mail: Skhorrami@kpalawyers.com;
                                                        Dpollard@kpalawyers.com;
                                                        Mbailey@kpalawyers.com;
                                                        Mforman@kpalawyers.com.


                                                Brian A. Gilbert (21297)
                                                Law Office of Brian A. Gilbert, P.L.C.
                                                821 Baronne Street
                                                New Orleans, Louisiana 70113
                                                Telephone: (504) 885-7700
                                                Telephone: (504) 581-6180
                                                Facsimile: (504) 581-4336
                                                e-mail: bgilbert@briangilbertlaw.com


                                                Lawrence D. Wiedemann.(13457)
                                                Karl Wiedemann (18502)
                                                Wiedemann & Wiedemann
                                                821 Baronne Street
                                                New Orleans, Louisiana 70113
                                                Telephone: (504) 581-6180
                                                Facsimile: (504) 581-4336
                                                e-mail: lawrence@wiedemannlaw.com;
                                                karl@wiedemannlaw.com

Patrick J. Sanders (18741)
3316 Ridgelake Drive
Suite 100
Metairie, LA 70002
Telephone: 504-834-0646
e-mail: pistols42@aol.com


Richard T. Seymour (D.C. Bar #28100)
Law Office of Richard T. Seymour, P.L.L.C.
1150 Connecticut Avenue N.W., Suite 900
Washington, D.C. 20036-4129
Voice: 202-862-4320
Cell: 202-549-1454
Facsimile: 800-805-1065 and 202-828-4130
e-mail: rick@rickseymourlaw.net


Lawrence A. Wilson (N.Y.S.B.A. #2487908)
David W. Drucker (N.Y.S.B.A. #1981562)
Wilson, Grochow, Druker & Nolet
Woolworth Building
233 Broadway, 5th Floor
New York, NY 10279-0003
Telephone: (212) 608-4400
Facsimile: (212) 227-5159
e-mail: lwilson@wgdnlaw1.com

15

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing document has been served upon counsel of record, by United States Mail, postage prepaid and properly addressed, facsimile, and/or ECF upload, this 1st day of December, 2009.


\s\ Brian Gilbert, Esq.

16