# Exhibit

# B

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES
CONSOLIDATED LITIGATION
PERTAINS TO:  BARGE              : CIVIL ACTION
                                 : No. 05-4182
                                 : and consolidated
Boutte v Lafarge      05-5531   : Cases
Mumford v Ingram      05-5724   :
Lagarde v Lafarge     06-5342   : SECTION "K" (2)
Perry v Ingram        06-6299   :
Benoit v Lafarge      06-7516   : JUDGE STANWOOD R.
Parfait Family v USA  07-3500   : DUVAL, JR.
Lafarge v USA         07-5178   :
Weber v Lafarge       08-4459   : MAGISTRATE JOSEPH C.
                                 : WILKINSON, JR.
------------------------------X

Wednesday, August 5, 2009
- - -

    Videotaped oral deposition of AUSTIN L. DOOLEY,
PH.D., taken at the offices of Goowin Procter,
901 New York Avenue, N.W. Washington, D.C., beginning
at 10:15 a.m., before Nancy J. Martin, a Registered
Professional Reporter, Certified Shorthand Reporter
License No. 9504.

AUSTIN DOOLEY                                                      8/5/2009

29

1                    AUSTIN L. DOOLEY, PH.D.            29

2          Q.   And did you do that?

3          A.   Yes, I did.

4          Q.   Are your opinions all contained in your

5     report, Exhibit 1?

6          A.   Yes, sir.

7          Q.   There are no other opinions that you intend

8     to render at the time of trial?

9          A.   None at this time.

10         Q.   After the IPET report came out and you were

11    given certain instructions with respect to the barge

12    at issue in this case, how were those instructions

13    conveyed to you?

14         A.   I believe by telephone.

15         Q.   Is that to say you were never given written

16    instructions as to how you were to perform your work?

17         A.   I don't believe I ever got a letter telling

18    me what to do.  We would have meetings, and

19    discussions would be held, and I would be asked to

20    take on an assignment.

21         Q.   Did you take notes of that discussion?

22         A.   No.

23         Q.   Were you ever instructed to, during the

24    course of your work on this case, read or evaluate

25    eyewitness testimony?

JOHNS PENDLETON COURT REPORTERS                     800 562-1285

30

1                    AUSTIN L. DOOLEY, PH.D.                30

2        A.   I have not seen the depositions.  The only

3   comments from eyewitnesses that I saw were in some of

4   the expert reports.

5        Q.   Are you referring to Cushing's report?

6        A.   No.  There were also some there, but most of

7   what I saw were in the Pazos, the Ocean Oil report.

8        Q.   Did you think it was important, when you were

9   doing your meteorological analysis, to check that

10   analysis and/or reconcile that analysis with

11   eyewitness accounts?

12        A.   That's important to do, of course.  But in

13   this particular case, I did not do that.

14        Q.   Why not?

15        A.   Because I wanted to be sure that I relied on

16   the science and scientifically collected and gathered

17   data.

18        Q.   During the course of your work on this case,

19   did you come into knowledge that some of the

20   eyewitness testimony given in this case may have been

21   at odds with your findings?

22        A.   I've been told that, yes, sir.

23        Q.   You've been told that by who?

24        A.   Through the discussions that we've had

25   regarding the case.

AUSTIN DOOLEY                                                8/5/2009

31

1              AUSTIN L. DOOLEY, PH.D.              31

2        Q.  Have you made any effort to reconcile that?

3        A.  No.

4        Q.  Why not?

5        A.  Well, I had my findings.  I had the results.

6   My findings are the result of my research and

7   reviewing all the various different peer reviewed

8   articles and hurricane center reports on Katrina.

9   I've evaluated the science behind those.  I've

10  evaluated the location of this particular storm with

11  regards to Katrina's path, and I feel confident that

12  my answers are correct.

13       Q.  Is the converse of that that you feel

14  confident that the eyewitnesses are incorrect?

15       A.  I feel that the eyewitnesses probably said

16  what they thought they had seen, which people

17  sometimes do, but at the end of the day, I feel that

18  my position, that my findings with regard to wind

19  speed and direction are consistent with the

20  scientifically collected data.

21       Q.  And by extension, therefore, the eyewitnesses

22  are wrong?

23       A.  I didn't say that they're wrong.  I said that

24  they were reporting what they think they saw.

25       Q.  Well, that's just a euphemism for they were

AUSTIN DOOLEY                                                8/5/2009

32

1                    AUSTIN L. DOOLEY, PH.D.          32

2   incorrect, isn't that true?

3        MR. RAFFMAN:  I think -- I'll let you answer.  Go

4   ahead and answer the question.

5            But I think your questions are beginning to

6   get vague.  I think you ought to specify which

7   eyewitnesses you're talking about and then ask for

8   whether the eyewitness is wrong or not instead of

9   doing it generally.  Some of the eyewitnesses may be

10  correct.  Such as Don McCrosky and others.

11       THE WITNESS:  As I said, my findings are what

12  they are.  They're in the report.  They're based on

13  the scientific analysis of the system, and I feel that

14  those are the numbers that I would go with.

15  BY MR. POLLARD:

16       Q.  Okay.  One of the eyewitness.

17           By the way, I like to start generally and go

18  specifically.

19       MR. RAFFMAN:  Right.  I just think it's not a

20  fair -- it begins to get unfair.

21  BY MR. POLLARD:

22       Q.  One of the eyewitnesses of importance to this

23  case is a gentleman by the name of William Villavaso.

24  Have you heard of him?

25       A.  Yes.

33

                    AUSTIN L. DOOLEY, PH.D.              33

1

2      Q.  Do you know where he claims to have been at

3  the time when he made observations with respect to

4  vessels in the IHNC?

5      A.  I understand that he was at the pump house.

6      Q.  Where is the pump house located?

7      A.  Right towards the north end of the IHNC near

8  the Florida Avenue bridge, I believe, on the north

9  side of the entrance to that bridge.

10     Q.  And do you have an understanding that

11  Mr. Villavaso, in the early morning hours of

12  August 29, 2005, claims he saw a barge bumping up

13  against the north end of the IHNC flood wall?

14     MR. RAFFMAN:  Objection.

15         You can answer.

16     THE WITNESS:  I understand that's what he said he

17  saw, yes, sir.

18  BY MR. POLLARD:

19     Q.  Have you come into any information or do you

20  have any opinion as to the accuracy of his

21  observations?

22     A.  I have an opinion on the wind conditions that

23  existed at the time.  I have an opinion as to whether

24  or not those wind conditions could have moved the

25  barge from its position on the western side to the

AUSTIN DOOLEY                                               8/5/2009

34

1                   AUSTIN L. DOOLEY, PH.D.          34

2      eastern side.  Whether or not Mr. Villavaso actually

3      saw the barge, I have -- I don't know what the

4      gentleman saw, but I have an opinion as to the weather

5      conditions as the cause of that event.

6           Q.  Well, let me ask this to you in the form of a

7      hypothetical.  If Mr. Villavaso did in fact see a

8      barge or other vessel bumping up against the north

9      side of the IHNC flood wall, that would be at odds

10     with your conclusions as to wind direction and what

11     effect that would have had on vessels going from the

12     west to the east?

13          MR. RAFFMAN:  Objection to the question.

14          THE WITNESS:  If he said that he saw it, his

15     report would be at odds with my findings.

16     BY MR. POLLARD:

17          Q.  To your knowledge, aside from the barge,

18     4727, at issue in this case, are you aware of any

19     other vessels that were within the IHNC at the time

20     Katrina came or made landfall?

21          A.  The only -- I understand there were some

22     other barges alongside the dock as well, but the only

23     one that I've been focusing on has been the barge of

24     interest.

25          Q.  I should have asked the question a little bit

AUSTIN DOOLEY                                                    8/5/2009

                                                                    39

1                    AUSTIN L. DOOLEY, PH.D.              39

2               Exhibit 2 for identification.)

3          MR. POLLARD:  Why don't you take a look at this.

4               (The witness reviewed Exhibit No. 2.)

5    BY MR. POLLARD:

6          Q.  When you testified about the notch, you're

7    referring to the indentation where the barges are

8    parked that's depicted on Page 22?

9          A.  Yes, sir.  I wouldn't say "parked."

10         Q.  Okay.  What term would you use?

11         A.  Moored.

12         Q.  Moored.  By the way, Dr. Dooley, do you have

13   an opinion as to why the barge broke free of its

14   mooring?

15         A.  Why it broke free.  It broke sometime during

16   the day, which means, obviously, the lines gave way.

17         Q.  What is your understanding as to when the

18   barge broke free?

19         A.  That, I don't really know.

20         Q.  Do you assume, for purposes of the

21   conclusions that you reach in your report, that the

22   barge stayed in the approximate position in which it

23   was moored or in that approximate location until such

24   time as the winds shifted and started to flow from

25   west to east?

AUSTIN DOOLEY                                                      8/5/2009

                                                                      41

1                    AUSTIN L. DOOLEY, PH.D.              41

2    is I looked at the IPET report.  The IPET report said

3    100 mile-per-hour wind broadside to the barge, and I

4    evaluated whether or not that could have happened, and

5    the third thing that I did is I looked at the analyzed

6    location of the barge according to the Pazos and

7    Marino reports, where Pazos has the barge at the north

8    breach between, I believe, 4:00 and 5:00 o'clock in

9    the morning, and Marino then comments on the wind

10   directions.

11         So my report never makes any assumptions

12   about what happens to the barge.  I'm simply talking

13   about wind conditions as they occurred on the morning

14   of the 29th.  What happened to the barge is someone

15   else's problem, not mine.

16         MR. POLLARD:  Let's take a quick break.

17         THE WITNESS:  Okay.

18         THE VIDEOGRAPHER:  We're going off the record at

19   11:06:10.

20         (A recess was taken from 11:06 a.m. to

21         11:18 p.m.)

22         THE VIDEOGRAPHER:  Back on record.  Tape 2 of the

23   video deposition of Dr. Austin Dooley.

24   BY MR. POLLARD:

25         Q.  **Dr. Dooley, right before we broke, I was**

46

```
 1              AUSTIN L. DOOLEY, PH.D.          46
 2       Q.  But they were still strong.  You agree with
 3  that?
 4       A.  I have shown the values in Tables 6B and C.
 5       Q.  And distilling those values down to a
 6  layperson's description as to the strength of the
 7  wind, you would agree with me that those values are
 8  strong; correct?
 9       A.  They were greater than 64 knots, which is
10  hurricane status.  Hurricane winds.
11       Q.  And you agree that -- or do you agree that
12  those winds were at least in part, if not fully,
13  responsible for causing Barge 4727 to break away from
14  its moorings?
15       A.  I don't know what caused the barge to break
16  away from its moorings, sir.
17       Q.  You don't -- you don't have any opinion as to
18  whether wind was any sort of causative factor?
19       A.  I have no opinion.  I have not done that
20  analysis.
21       Q.  Okay.  Have you made any effort, in the
22  course of your analysis, to reconcile your
23  interpolations of wind speed with the mechanics of how
24  the barge broke away from its moorings?
25       A.  Can you -- I -- I don't quite understand your
```

47

1                    AUSTIN L. DOOLEY, PH.D.              47

2    question.

3         Q.  Well, part of your conclusions are

4    interpolations; is that correct?

5         A.  Yes, sir.

6         Q.  Okay.  And why don't you define what -- what

7    you mean, because you've used that term in your

8    report.  What do you mean when you say,

9    "interpolations"?

10        A.  Well, we have values at grid points.  The

11   barge was not at the grid point.  So we must evaluate

12   a value at the location of the barge, depending upon

13   the values upon the grid point, and that process is

14   interpolation.

15        Q.  Okay.  And I think what you're -- you're

16   trying to say is there was no data collection point or

17   official data collection point in the IHNC?

18        A.  The only -- the only point that we have are

19   the four surrounding grid points shown in the map in

20   my report.

21        Q.  Those aren't in the IHNC or immediately

22   adjacent to it, are they?

23        A.  They surround it.  If I could refer you to

24   the map on Page 22.  Nothing exactly in the -- that

25   portion of the IHNC.  We have B up there in the MRGO

AUSTIN DOOLEY                                          8/5/2009

                                                              48

1              AUSTIN L. DOOLEY, PH.D.           48

2    portion of it, just at the turn.

3         Q.   And do you have any factual knowledge as to

4    how far away from the IHNC the closest grid point

5    that's depicted on Page 22 was?

6         A.   I've done those measurements, but I've --

7    right now I -- I can't remember what they -- what that

8    answer is.

9         Q.   Can you give me an estimate just based upon

10   your -- all the hours you spent on this report?

11        A.   Between A and C, it is three miles.  Between

12   B and D, it's three miles, nautical miles, because C

13   is at 29.95, and A is at 30.0.  So that's about three

14   miles.  So the distance from E to B would probably be

15   about a mile and a half.

16        Q.   And what -- and if you would describe for me

17   what the importance of these miscellaneous grid points

18   are in your interpolations.

19        A.   Well, those are the values from the hindcast

20   that I consulted in obtaining wind directions.  So

21   that's the value of those grid points.

22        Q.   And are you saying that there were wind

23   measurements taken from each of these grid points at

24   regular intervals?

25        A.    There were calculations of wind directions

AUSTIN DOOLEY                                          8/5/2009

49

1              AUSTIN L. DOOLEY, PH.D.          49

2    and speed made at those grid points at regular

3    intervals.

4         Q.  And at any point in time, to your knowledge,

5    did the collection of data at any of these grid points

6    fail?

7         A.  The --

8    MR. RAFFMAN:  Objection.

9    THE WITNESS:  The grid points here that we're

10   looking at, A, B, C and D, are values obtained from a

11   numerical hindcast of the wind field surrounding

12   Katrina.

13   BY MR. POLLARD:

14        Q.  Define what you mean when you say, "numerical

15   hindcast."

16        A.  That is given in my report, starting on

17   Page 6, where I talk about the MMS hindcast study

18   conducted by Oceanweather, Inc.

19        Q.  All right.

20        A.  And the hindcast is the numerical calculation

21   of the wind field surrounding the storm based upon

22   collection of data which can consist of surface

23   reports, airplane reports, satellite measurements of

24   wind speed, buoy reports and other station reports.

25        Q.  Can you -- can you distill that last

AUSTIN DOOLEY                                            8/5/2009

                                                              50

1                AUSTIN L. DOOLEY, PH.D.            50

2    explanation down to a -- into layman's language any

3    further than what you've already done?

4         A.  Well, the -- what happens is the --

5         Q.  You get a lot of information from a lot of

6    different sources?

7         A.  Yes, sir.

8         Q.  You try to piece all that together to project

9    what would have been going on --

10        A.  Well, it's not a projection.  We know --

11   again, my report is based upon science.  So we -- we

12   must look at the scientific facts of the case, look at

13   the quantifiable and evaluative reports.  We have --

14   you mentioned before -- you mentioned witness reports.

15   Those reports are coming from people probably of the

16   most devastating event that has ever hit their lives.

17   They're in the middle of high winds.  They're in the

18   middle of driving rain.  They're in the middle of

19   rising water.  They really are so confused.  But --

20        Q.  And do you -- let me just ask you a question

21   on that point.  Do you discount their observations

22   because of those factors?

23        A.  Well, those are factors that have to be taken

24   into consideration when evaluating them.  But to reach

25   my conclusions, what I did is I relied upon the

51

1              AUSTIN L. DOOLEY, PH.D.              51

2      science of the case.  I relied upon the observations

3      as defined through official observing sites or sites

4      that were reliable and deemed reliable and used within

5      the hindcast study.

6           Q.  And just so we're clear, there were no such

7      sites in or immediately adjacent to the IHNC?

8           A.  The closest one that I found and was able to

9      use was up at the Lakefront Airport, which was about 4

10     to 4.2 miles away.

11          Q.  And were you aware that the data collection

12     point at that airport failed at 6:53 a.m. Central time

13     on August 29?

14          A.  Yes, I make mention of that in my report.

15          Q.  What happened?

16          A.  The anemometer stopped functioning.

17          Q.  Why?

18          A.  I can only assume it was due to some type of

19     a -- consequences of the hurricane.  Either the power

20     supply was lost or the instrument itself somehow or

21     another malfunctioned.

22          Q.  Okay.  And in scientific terms, what was the

23     net effect of that failure?

24          A.  Well, what it did, it deprived us of a

25     continuing observation point, but we had good data up

AUSTIN DOOLEY                                                    8/5/2009

52

1              AUSTIN L. DOOLEY, PH.D.          52

2      until that time.

3          Q.  And no data after it?

4          A.  No data from that Lakefront Airport that was

5      recorded, yes, sir.

6          Q.  Okay.  And given the failure of that data

7      point, how did that affect the model, if at all?

8          A.  Well, again, that was -- that's one of the --

9      one of the data point that goes into the model.  There

10     are many others, and the model results have to be

11     consistent with all of the reports from the other

12     stations that may or may not have been immediately

13     there as close as Lakefront but were still within the

14     Louisiana/Mississippi region.

15         Q.  When you talk about an MMS study, define the

16     term for the record.

17         A.  MMS, of course, is the government agency, the

18     Mineral Management Service, and they contracted with

19     Oceanweather, Inc. to do a hindcast on the winds,

20     waves and currents in the Northern Gulf of Mexico in

21     Hurricane Katrina.

22         Q.  And Oceanweather, Inc. is -- why don't you

23     describe to me your relationship with Oceanweather,

24     Inc.  It looked like you have some sort of partnership

25     or synergistic relationship with that company.

AUSTIN DOOLEY                                                8/5/2009

97

1                  AUSTIN L. DOOLEY, PH.D.              97

2    interpolation?

3         A.   No.   It's straight linear interpolation.

4         Q.   Define linear interpolation for a non-math

5    person such as myself.

6         A.   Straight line values.

7         Q.   Okay.  Let's move -- well, I'm sorry.  Before

8    we get to your summary of findings, which will be the

9    last area that we discuss today, I want to ask you,

10   Dr. Dooley, if you have an opinion as to how, if at

11   all, the barge traversed the canal from west to east?

12        A.   My report is based upon the wind, and what I

13   can say is that basis, the parameters that I examined,

14   the barge did not move to the northern breach because

15   of the wind.  I do not understand the correct timing

16   of the southern breach.  So I can't explain what

17   happened to the southern breach.  Others may take this

18   wind information and coordinate all that with timing

19   values, but in terms of the northern breach, it did

20   not occur because of the wind blowing the barge from

21   the west towards the east.

22        Q.   Are you saying that at some point in time,

23   the barge was blown by wind from the west to the east?

24        A.   Well, I'm saying that at some point in time,

25   if the barge was on that western side of the IHNC and

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

AUSTIN DOOLEY                                                    8/5/2009

102

1                AUSTIN L. DOOLEY, PH.D.              102

2       reports, and that's why I refer to the term

3       "observation data," which is primarily -- that

4       sentence refers exactly to Table 8 on Page 34.

5            Eyewitness accounts -- as I said before,

6       people are in the middle of great distress.  There is

7       wind.  There is waves.  There are rain.  There's

8       things happening about them.  I based my findings --

9       not that those people should be made light of, but

10      this study is based upon the science and the

11      observations from calibrated stations.

12          Q.  Well, how would you go about, as a scientist,

13      reconciling or meshing eyewitness accounts with hard

14      signs to make sure that you get the most accurate

15      report possible?

16          MR. RAFFMAN:  Objection.  Assumptions -- making

17      unfound assumptions.

18               But go ahead and answer the question.

19          THE WITNESS:  Well, sometimes individuals

20      involved in an event report what they see.  Sometimes,

21      due to personal distress, they report what they think

22      they saw.  I mean, that's fairly common.  It's up to

23      the scientist to base the conclusions on data that can

24      be documented and that fit into the laws of science.

25      In this particular case, a low pressure center,

103

```
1                AUSTIN L. DOOLEY, PH.D.        103
2     northern hemisphere, counterclockwise rotating winds,
3     wind speed increasing as you near the center of the
4     storm, precipitation events, cloud pattern events, and
5     if observer's observations do not fit in the model of
6     the hurricane, then you must exclude them.
7     BY MR. POLLARD:
8          Q.  But that was beyond the scope of what you did
9     for this report?
10         A.  I based my report on the scientific studies
11    done, reviewing the -- as you see the bibliography,
12    some of the -- some of the peer reviewed work, some of
13    the research by the NH- -- NHC and by the HRD and by
14    Oceanweather and by examining values observed during
15    Katrina.
16         Q.  I think that's a nice way of saying you
17    didn't take into account the eyewitnesses?
18         A.  I did not take into account the eyewitnesses.
19         Q.  Okay.  Did you do any studies -- or did you
20    look into whether or not there was any thunderstorm
21    activity or other convective areas within the bands
22    surrounding the iWall?
23         A.  Surrounding the iWall.  If you look on
24    Page 34, the last column -- the last two columns -- or
25    three columns, I'm sorry.  So you see the -- No. 65
```