1

1          UNITED STATES DISTRICT COURT
2          EASTERN DISTRICT OF LOUISIANA
3
4
5
6
7     IN RE:   KATRINA CANAL BREACHES    CIVIL ACTION
      CONSOLIDATED LITIGATION
8                                   NO. 05-4182
                                        "K"  (2)
9
      PERTAINS TO:   BARGE              JUDGE DUVAL
10
                                        MAG. WILKINSON
11
12
      BOUTTE V. LAFARGE        05-5531
13    MUMFORD V. INGRAM        05-5724
      LAGARDE V. LARFARGE      06-5342
14    PERRY V. INGRAM          06-6299
      BENOIT V. LAFARGE        06-7516
15    PARFAIT FAMILY V. USA    07-3500
      LAFARGE V. USA           07-5178
16
17
18
19
20
21
          DEPOSITION OF DANIEL FREDERICK RYAN II,
22    136 Rainbow Drive, Number 3683, Livingston,
      Texas 77399, taken in the offices of Chaffe,
23    McCall, 2500 Energy Centre, 1100 Poydras
      Street, New Orleans, Louisiana 70163, on
24    Thursday, July 9, 2009.
25

**2**

APPEARANCES:
WIEDEMANN & WIEDEMANN
(BY: LAWRENCE WIEDEMANN, ESQ.
   KARL WIEDEMANN, ESQ.)
821 Baronne Street
New Orleans, Louisiana 70113
   ATTORNEYS FOR PLAINTIFFS

MONTGOMERY, BARNETT, BROWN, READ, HAMMOND
& MINTZ
(BY: RONALD J. KITTO, ESQ.)
3200 Energy Center
New Orleans, Louisiana 70163
   ATTORNEYS FOR THE AMERICAN CLUB

CHAFFE, MCCALL LLP
(BY: ROBERT B. FISHER, JR., ESQ.)
2300 Energy Centre
New Orleans, Louisiana 70163
   ATTORNEYS FOR LAFARGE NORTH AMERICA

GOODWIN PROCTER  LLP
(BY: MARK S. RAFFMAN, ESQ.)
901 New York Avenue NW
Washington, D.C. 20001
   ATTORNEYS FOR LAFARGE NORTH AMERICA

SUTTERFIELD & WEBB
(BY: DANIEL A. WEBB, ESQ.)
650 Poydras Street
Suite 2715
New Orleans, Louisiana 70130
   ATTORNEYS FOR LAFARGE NORTH AMERICA

VIDEO BY: KEN HART
   Hart Video of Louisiana
REPORTED BY:  ROGER D. JOHNS, RMR, CRR, CSR
   Certified Court Reporter,
   State of Louisiana

**4**

# INDEX

PAGE

IBCO-0073................................... 49

IBCO-0085................................... 71

DOM-0014................................... 136

00141...................................... 136

1.......................................... 156

2.......................................... 156

3.......................................... 156

4.......................................... 156

5.......................................... 156

6.......................................... 157

EXAMINATION BY MR. LAWRENCE WIEDEMANN:...... 7

**3**

# STIPULATION

It is stipulated and agreed by and between counsel for the parties hereto that the deposition of the aforementioned witness is hereby being taken under the Federal Rules of Civil Procedure, for all purposes, in accordance with law;

That the formality of reading and signing is not waived;

That the formalities of certification and filing are specifically waived;

That all objections, save those as to the form of the question and the responsiveness of the answer, are hereby reserved until such time as this deposition, or any part thereof, may be used or sought to be used in evidence.

* * * *

ROGER D. JOHNS, RDR, CRR Certified Court Reporter, for the State of Louisiana, officiated in administering the oath to the witness.

**5**

VIDEO OPERATOR:

This is the videotaped deposition of Daniel Ryan. This deposition is being taken in the matter of In Re: Katrina Canal Breaches, civil action consolidated litigation. This case is pending in the United States District Court for the Eastern District of Louisiana. We're at the offices of Chaffe, McCall, located at 1100 Poydras Street, Suite 2300, in New Orleans, Louisiana. Today's date is July 9, 2009.

My name is Ken Hart. I'm a Certified Legal Video Specialist with Hart Video of Louisiana. The Court Reporter is Roger Johns with Johns Pendleton and Associates.

Would Counsel please now introduce themselves.

MR. FISHER:

Robert Fisher, Chaffe, McCall, representing Lafarge North America.

MR. RAFFMAN:

Mark Raffman, Goodwin, Procter,

6

1  for Lafarge.
2      MR. WEBB:
3      Dan Webb, Sutterfield and Webb,
4  for Lafarge.
5      MR. KITTO:
6      Ronald Kitto with Montgomery
7  Barnett on behalf of the American
8  Club.
9      MR. LAWRENCE WIEDEMANN:
10     Lawrence Wiedemann with Wiedemann
11  and Wiedemann for the Plaintiffs.
12     MR. KARL WIEDEMANN:
13     And Karl Wiedemann also for the
14  Plaintiffs.
15     VIDEO OPERATOR:
16     Thank you. Would the Court
17  Reporter please swear in the witness.
18     DANIEL FREDERICK RYAN II,
19  136 Rainbow Drive, Number 3683, Livingston,
20  Texas 77399, after having been duly sworn by
21  the before-mentioned court reporter, did
22  testify as follows:
23     MR. LAWRENCE WIEDEMANN:
24     Let the record reflect that Mr.
25  Ryan's deposition is being taken for

7

1  purposes of discovery by the
2  Plaintiffs. And we'll make the usual
3  stipulations?
4      MR. FISHER:
5      Yes, Counsel. Agreed.
6      MR. LAWRENCE WIEDEMANN:
7      You want to reserve the right to
8  read and sign?
9      MR. FISHER:
10     Yes.
11     MR. LAWRENCE WIEDEMANN:
12     Okay.
13  EXAMINATION BY MR. LAWRENCE WIEDEMANN:
14     Q. Mr. Ryan, would you tell me your
15  present employment, sir?
16     A. Presently employed as a maritime
17  consultant, sole proprietor of D. R. Maritime
18  Consulting.
19     Q. And D. R. Maritime Consulting is
20  located at your residence address?
21     A. It is.
22     Q. And who are the owners of D. R.?
23     A. I am the sole owner, proprietor.
24     Q. Okay. And how long has D. R.
25  Maritime Consulting been in business?

8

1      A. Since I retired from the Coast Guard
2  in June of 2004.
3      Q. And after your retirement you formed
4  -- This is a corporation?
5      A. It's not a legal corporation. It's
6  just a business title that I created to --
7      Q. Okay. So it would be Daniel F. Ryan
8  doing business as --
9      A. Yes.
10     Q. -- D. R. Consulting? Is that
11  correct?
12     A. Maritime Consulting, yes.
13     Q. Maritime Consulting. Is that
14  correct?
15     A. Yes.
16     Q. And are there any other employees
17  other than yourself?
18     A. No, there is not.
19     Q. Do you have any secretaries or
20  investigators, any employees at all?
21     A. No, I do not.
22     Q. So insofar as the consulting work,
23  you are the sole person who does whatever's
24  necessary in maritime consulting?
25     A. Yes.

9

1      Q. Have you ever testified in court as
2  a member or as the owner of D. R. Maritime
3  Consulting?
4      A. No, I have not.
5      Q. Have you ever given a deposition in
6  connection with your consulting work?
7      A. Yes.
8      Q. How many times?
9      A. Once.
10     Q. And where was that?
11     A. It was here in New Orleans.
12     Q. Do you remember the name of the
13  case?
14     A. No, I do not. It's an enclosure to
15  my report.
16     Q. Do you know --
17     A. The name of the case, I could look
18  to that and read it specifically.
19     Q. It's in your materials?
20     A. Yes.
21     Q. Okay. That's the only case in which
22  you have given a deposition?
23     A. As --
24     Q. Regarding in your -- I am talking
25  about your consulting services.

10

1  A.  That's correct.
2  Q.  Okay.  In the case of -- That's the
3  Secretary versus Delta Queen?  Is that the one
4  you're talking about?
5  A.  Yes.
6  Q.  And who was the attorney that
7  retained you in that case?
8  A.  Scott Jenkins.
9  Q.  Excuse me?
10  A.  Scott Jenkins.
11  Q.  Where is he located?
12  A.  Here in New Orleans.
13  Q.  And that case did not go to trial?
14  A.  No, it did not.
15  Q.  And have you been retained in other
16  cases as a consultant in which you have not
17  given testimony or appeared as a witness?
18  A.  No.
19  Q.  Is that the only case in which you
20  have been engaged as a consultant?
21  A.  Yes.
22  Q.  And what was the nature of that
23  case?  It indicates it's an OSHA, Occupational
24  Safety & Health Act --
25  A.  That was dealing with -- OSHA was

11

1  citing the company for non-reporting of OSHA
2  casualties, where I gave a deposition that
3  they, the company, needed only to comply with
4  the Coast Guard injury and casualty reporting
5  requirements.
6  Q.  So it was a reporting --
7  A.  Issue.
8  Q.  -- case issue?
9  A.  Yes.
10  Q.  Okay.  And do you advertise either
11  personally or on behalf of D. R. Maritime
12  Consulting as a marine consultant?
13  A.  I do not advertise.
14  Q.  Since you left the Coast Guard in
15  June of 2004, have you held any other jobs
16  other than your job with this company?
17  A.  Yes.
18  Q.  What other jobs have you held?
19  A.  I still have the two other jobs.
20  Q.  And what are they?
21  A.  One is, I am an adjunct instructor
22  and a teacher evaluator for an organization
23  that's called NCBRT, which is a part of LSU in
24  Baton Rouge.  And I am also a teacher
25  evaluator/assessor for a corporation called

12

1  CRA, which is based in Virginia.
2  Q.  Okay.  As an adjunct instructor, who
3  are you connected with?
4  A.  That's with NCBRT, part of LSU in
5  Baton Rouge.  I do two things for them.
6  Adjunct instructor, subject matter expert, and
7  teacher evaluator, instructor evaluator.
8  Q.  And what is NCBRT?  What is that?
9  A.  National Center for Biological
10  Research and Training.
11  Q.  And as an adjunct instructor, your
12  particular role is a teacher evaluator?
13  A.  No.  I was hired as an adjunct
14  instructor based on my Coast Guard career for
15  port security and waterways matters.  I have
16  done that infrequently.  And then I
17  transitioned over to being an instructor
18  evaluator, which I do about once every month
19  or two months.  They will give me a location,
20  I travel to that location, I sit through the
21  course, and evaluate the instructor.
22  Q.  So what type of instructors are you
23  evaluating?
24  A.  They are adjunct instructors.
25  There's not full time employees of LSU.  And

13

1  they will be teaching courses such as tactical
2  operations for law enforcement operators,
3  biological terrorism countermeasures,
4  agricultural safety of the food supply
5  system.  Forensic courses, things like that.
6  Q.  So it would be courses given for
7  industrial organizations?
8  A.  Basically for first responders and
9  -- and local, state, and Federal responders.
10  Q.  So it would be like police officers,
11  firemen, that type of personnel?
12  A.  Yes.
13  Q.  And these would be courses for --
14  A.  Basically courses for
15  counter-terrorism after 9/11.
16  Q.  But they would be courses that are
17  given in a short period of time, two --
18  A.  Yes.
19  Q.  -- weeks, three weeks?
20  A.  Oh, anywhere from one to four days.
21  Q.  Okay.  And they're not accredited
22  courses?  By that I mean in a college system?
23  A.  They get CEUs.  They get equivalency
24  credits.
25  Q.  Okay.  And do they have a published

4  (Pages 10 to 13)

14

1  course curriculum for these courses that you
2  --
3      A.  Yes.
4      Q.  -- put -- Okay?
5      A.  The courses are all approved by the
6  Department of Homeland Security.
7      Q.  And they're approved by -- They're
8  published by LSU?
9      A.  Yes.
10     Q.  And are they also published by
11 NCBRT?
12     A.  NCBRT is part of LSU.  So they're
13 published by NCBRT.  If you went under the
14 website of LSU, the college, you possibly
15 wouldn't find it.  You would have to go to the
16 NCBRT website.
17     Q.  All right.  And you have been doing
18 that since when?
19     A.  2005.
20     Q.  Okay.  And how are you compensated
21 for those services?
22     A.  I am paid an hourly fee and
23 expenses.
24     Q.  Have you ever held any other
25 positions in teaching?

15

1      A.  No.
2      Q.  This is the first time since your --
3  Well, the first time ever that you have been
4  teaching?
5      A.  No.  I will disagree with that.  In
6  the Coast Guard I taught quite a lot.  But not
7  formal recognized continuing education.
8      Q.  Are you recognized as an instructor
9  on the faculty at LSU?
10     A.  As an adjunct instructor.  I am not
11 listed on the faculty at all.
12     Q.  Now, this is the second case where
13 you have been engaged to give an opinion in
14 litigation?
15     A.  Yes.
16     Q.  And that's true since your
17 retirement?
18     A.  Yes.
19     Q.  Of course, during your full time
20 employment with the Coast Guard you could not
21 be engaged as an outside --
22     A.  That's correct.
23     Q.  -- consultant.  Is that correct?
24     A.  That's correct.
25     Q.  So this case involving OSHA was the

16

first case in your career in which you were
engaged as an expert?
     A.  No, I also gave a deposition as an
expert on behalf of the Coast Guard during my
Coast Guard career.
     Q.  Yes.  But I am talking about in
outside litigation, outside of the Coast
Guard, you have never given a deposition.
     A.  That is correct.
     Q.  And you have never --
     A.  This is the second time.
     Q.  Okay.  The time that you gave a
deposition in the Coast Guard, when was that?
Approximately.
     A.  Between the early '90s.
     Q.  And what did that involve?
     A.  That was -- involved the Coast Guard
regulations on inspection, and it's 46 CFR.
     Q.  Inspection with what regard?
     A.  In regard to means of escape on a
small passenger vessel.
     Q.  Was it a personal injury case?
     A.  No, it was not.
     Q.  What was the case about?
     A.  The case was the -- whether -- I

17

have to remember specifics.  But that there
was two means of escape from a compartment and
one of them went directly overboard, was that
acceptable.
     Q.  So how did it arise?  Under what
vehicle?
     A.  I believe that the person who owned
the boat had been instructed to put in an
additional escape that went to another
compartment, and his argument was that he had
a second means of escape even though it went
overboard.
     Q.  Okay.
     A.  So it was based on an appeal, I
believe.
     Q.  Was this person charged with some
kind of civil or criminal violation?
     A.  I don't remember what brought it
about.  I just remember the reason why --
     Q.  Where was the case pending?
     A.  In San Francisco.
     Q.  In a court or in a -- was it an
administrative hearing?
     A.  The deposition was taken on Alameda
Island, or Coast Guard Island in Alameda.

18

1  Q.  But the procedure, was it an
2  administrative procedure or was it in court?
3  Was it a Coast Guard administrative procedure
4  or was it a court matter?
5  A.  It was a court matter.
6  Q.  And in San Francisco, Alameda
7  County?
8  A.  I don't remember.  What I remember
9  was I was contacted to be the expert on behalf
10  of the Coast Guard, I was given some material
11  to review, and my deposition was taken.  And I
12  am sure it was explained to me what court it
13  would be in, but --
14  Q.  But you don't remember at this time?
15  A.  I don't remember.  No.
16  Q.  At this time?  That's not in your --
17  A.  No.
18  Q.  That's the only other time -- So
19  that we'll be clear, you have given one
20  deposition when you were in the Coast Guard
21  and you don't remember in what jurisdiction,
22  so to speak, and another in the OSHA case?
23  A.  Right.
24  Q.  Those are the only two in your whole
25  career that you have given?

19

1  A.  Yes.
2  Q.  And the only time that you have been
3  engaged professionally as an expert was when
4  you testified in the, or gave a deposition in
5  the OSHA case?
6  A.  That's correct.
7  Q.  Other than this case.
8  A.  That's correct.
9  Q.  How were you contacted in this
10  case?
11  A.  Mr. Forbes sent me an email -- Mr.
12  Forbes contacted me on his cell phone.
13  Q.  Let me go back for a minute.  You
14  also said you worked for CRA.  Is that
15  different from NCBRT?
16  A.  Yes, it is.
17  Q.  What is CRA?
18  A.  I don't know what the initials stand
19  for, but it's a private company in Virginia
20  that does a tremendous amount of work with the
21  Federal government; and one of the things that
22  they do is they audit and assess courses that
23  have been approved and funded by the
24  Department of Homeland Security, and so I am
25  an assessor as part of that contract.

20

Q.  Of persons who work for them?
A.  No, people who teach these DHS,
Department of Homeland Security, approved
courses.
Q.  How often do you work for them?
A.  About three times a year.
Q.  That again is on an as needed basis?
A.  Yes.
Q.  And on an hourly basis?
A.  Yes.
Q.  Have you done any other work other
than what we have talked about up until now
since your retirement from the Coast Guard?
A.  No.
Q.  And you say in this case vis-a-vis
--
A.  I have to correct that.  I was a
salvage consultant for the Coast Guard
post-Katrina for five months.  That was
January to May -- or February until June of
2006.
Q.  That was in relation to your Coast
Guard duties?
A.  No, it was not.
Q.  It was after you left the Coast

21

Guard?
A.  Yes.
Q.  So you were hired by the Coast
Guard?
A.  I was hired by T&T Bisso.
Q.  Okay.
A.  And they had a contract from the
Coast Guard.
Q.  And you were engaged in salvage
consultation?
A.  Yes.
Q.  And what did that entail?
A.  That -- There was two weeks of
employment and then two weeks off and then two
weeks for five months in the Loews Building
here in New Orleans.  And that was a salvage
of vessels in the waterways and on the shore
after Katrina.
Q.  Dealing with the cost of salvage or
the --
A.  My portion of it was to review the
salvage plans to make sure they were done
safely.
Q.  Okay.  Did you work with attorneys
on that?

22

1    A.  No.
2    Q.  You worked directly with Bisso?
3    A.  Directly with the Coast Guard.  I
4  was employed by Bisso.
5    Q.  So you were paid by Bisso?
6    A.  Yes.
7    Q.  And was it Bisso that was hired by
8  the Coast Guard and you worked with Bisso?
9    A.  That's correct.
10   Q.  And it was on Coast Guard business?
11   A.  Yes.
12   Q.  Now, other than the -- Let me go
13 back for a minute.  How long were you in the
14 Coast Guard before you retired in June of
15 2004?
16   A.  30 years of active duty and four
17 years as a cadet at the Coast Guard Academy.
18   Q.  And during that period of time, the
19 only time that you testified or gave a
20 deposition is what we already talked about?
21   A.  Yes.
22   Q.  And when you were contacted in this
23 case by Mr. Forbes, what were you tasked to
24 do?
25   A.  He asked me -- He asked me if I

23

1  could help him in this matter with regards to
2  Coast Guard regulations on the waterways and
3  expert reports that they had received up to
4  that point.  I said that I was interested and
5  that I thought that I could do it, but I would
6  like to see the reports.  That's how we
7  started.
8    Q.  Were you requested to deal with one
9  particular issue by Mr. Forbes?
10   A.  No.
11   Q.  Did he describe to you one
12 particular issue that you should be -- to find
13 out whether you were qualified to --
14   A.  He did describe in general terms the
15 mooring of the barge called the ING-4727.
16   Q.  So you knew from the inception in
17 talking to Mr. Forbes that mooring was the
18 issue that you were to concern yourself with?
19   A.  That would be one general at least.
20 At least one general area.
21   Q.  Okay.  When were you contacted by
22 Mr. Forbes?
23   A.  I believe it was January or February
24 of 2007.
25   Q.  Am I correct, Mr. Ryan, that in

24

connection with your engagement by Mr. Forbes
that you never personally inspected the
Lafarge facility?
   A.  I have visited the Lafarge facility.
   Q.  Since you were engaged?
   A.  Yes.
   Q.  Did you ever inspect the Barge 4727,
ING Barge 4727 that's involved?
   A.  Not as part of this matter, but I
actually did see it and walk around it as part
of the salvage operation with the Coast
Guard.
   Q.  Did you have anything to do with the
salvage of the 4727?
   A.  I did not.
   Q.  You say you walked around it.  Was
it just out of curiosity?
   A.  It was out of curiosity, yes.
   Q.  It was not in any official capacity?
   A.  That is correct.
   Q.  You made no official inspection of
it?
   A.  That is correct.
   Q.  When Mr. Forbes indicated to you
that he was concerned about your engagement

25

regarding mooring, did he discuss with you the
type of mooring that he was concerned with?
   A.  No, he did not.
   Q.  And is that the first time you spoke
with Mr. Forbes?
   A.  Yes.
   Q.  When was that?
   A.  It was January or February of --
   Q.  I'm sorry, you already told me
that.
   A.  -- 2007.
      MR. FISHER:
         Asked and answered.
EXAMINATION BY MR. LAWRENCE WIEDEMANN:
   Q.  January or February of 2007?
   A.  Yes.
   Q.  And do you know who Mr. Forbes is
connected with?
   A.  At that time, no, I did not.
   Q.  Do you know now?
   A.  Yes.
   Q.  With whom?
   A.  The firm called Chaffe, McCall in
New Orleans.
   Q.  And following your conversation with

26

1   Mr. Forbes you received certain materials --
2       A.  Yes.
3       Q.  -- from him?
4       A.  Yes.
5       Q.  What did you receive?
6       A.  There were expert reports; I think
7   there was maybe -- I can't remember the exact
8   number. Six or seven.
9       Q.  I see you have a lot of -- On page
10  12, you have "Information reviewed".
11  Obviously it's more than six or seven
12  documents. Did you receive all of these at
13  one time or --
14      A.  No, I did not. Probably the top
15  five I received initially.
16      Q.  That would be Wiggins, Whiteley,
17  Klotz and Sherer, Budwine?
18      A.  Yes.
19      Q.  And Whiteley, a second report.
20      A.  Right. Yes. That's correct.
21      Q.  That would be the ones you received
22  from Mr. Forbes?
23      A.  Yes.
24      Q.  All right. Before sending these
25  reports, did Mr. Forbes indicate to you that

27

1   your role insofar as mooring would be directed
2   at any particular Coast Guard regulation?
3       A.  No. It was no specific Coast Guard
4   regulation that was called out. If I remember
5   correctly, what was asked of me was to look at
6   the reports in regards to what Coast Guard
7   regulations would be applicable, if any, and
8   if there was a requirement to double up the
9   mooring system and, if so, had it been met.
10      Q.  So in your initial conversation with
11  him, the question of doubling up was an
12  issue?
13      A.  Not in the initial conversation.
14  When I was informed that these materials were
15  going to be mailed to me. And I don't know
16  when that conversation took place. And I
17  don't even remember exactly when they were
18  mailed to me. But when we had our initial
19  conversation, it was just a general
20  conversation about the mooring of the barge, a
21  barge pre-Katrina in preparation for a
22  hurricane.
23      Q.  How did the issue of doubling up
24  come about --
25      A.  That was in a --

28

    Q.  -- between you and Mr. Forbes?
    A.  That was another subsequent
discussion, that I don't remember the specific
time and place of that discussion, on the
phone, in preparation for mailing these
materials to me.
    Q.  Now, subsequent to the time that you
got the first five or so reports of experts,
did you receive other materials from him?
    A.  No. I received other materials
after having received those reports.
    Q.  So you got the ones that I
referenced, Whiteley, Budwine, Sherer, Klotz,
Global -- Whiteley Global and Wiggins, you got
those first?
    A.  Yes.
    Q.  All right. Then, of course, there
was another report from Klotz on September
26. Did you get that originally?  Do you
recall?
    A.  No. That did not -- I did not read.
    Q.  So it was the first two Global,
which is September 23rd, were the ones you got
originally?
    A.  To -- Not including Global.

29

    Q.  Okay.  Global wasn't one of the
originals?
    A.  No.
    Q.  Okay. And so then you got the rest
of them from time to time?
    A.  Yes.
    Q.  Okay. And do you recall when you
got the second report from Whiteley?
    A.  I do not, no.
    Q.  And the second report from Klotz?
    A.  No.
    Q.  Okay. And these others that I
assume were reports and depositions, did they
come at one time or they came just piecemeal?
    A.  Piecemeal.
    Q.  Okay.
    A.  Some things were handed to me when I
came in for meetings, and some things were
emailed to me and I printed them out, and some
things were mailed to me. And I didn't keep a
record of --
    Q.  So you came in for meetings here in
New Orleans?
    A.  Yes.
    Q.  How often?

30

1    A.  Four times in 2007 and twice in
2    2009.
3        Q.  Who did you meet with on those
4    occasions?
5        A.  Usually Mr. Forbes.  Mr. Fisher.
6        Q.  Okay.
7        A.  Sometimes Mr. Raffman was there.
8    Sometimes Mr. Webb was there.
9        Q.  Okay.  When you say you came four
10   times, were there four separate times?
11       A.  Yes.
12       Q.  How long on each occasion did you
13   stay?
14       A.  Most of them were one hour.  There
15   was one that might have been two to three
16   hours.
17       Q.  Okay.  So you would fly in, meet
18   with them, and return home?
19       A.  At that time I was living in Houma,
20   so I drove.
21       Q.  On the four occasions that you came
22   in 2007, you were living in Houma?
23       A.  Yes.
24       Q.  Where at in Houma?
25       A.  210 Tiger Tail Drive.

31

1        Q.  Why were you in Houma?
2        A.  Because the last seven years of my
3    Coast Guard career were in Louisiana and
4    that's where I purchased a house.
5        Q.  So you were still living there when
6    you retired?
7        A.  Yes.
8        Q.  And the two times -- Were they two
9    separate times that you came in in 2009?
10       A.  Yes.
11       Q.  And you met again with -- You named
12   who you met with.
13       A.  Yes.
14       Q.  Were the two visits in 2009
15   immediately before you wrote the report of
16   June 12, 2009?
17       A.  The first meeting was sometime
18   before I wrote that report, and the second
19   meeting was yesterday.
20       Q.  So the first meeting in 2009 was
21   before you wrote the report?
22       A.  Yes.
23       Q.  And then the second meeting in 2009
24   was yesterday.  I assume in preparation for
25   this deposition.

32

    A.  That's correct.
    Q.  Did you prepare a preliminary report
before the report of June 12, 2009?
    A.  No, I did not.
    Q.  Did you retain preliminary notes of
what you did prior to preparing the report?
    A.  No, I did not.
    Q.  So the only thing you have in your
record is the reports and depositions sent to
you by Counsel?
    A.  That's correct.
    Q.  And you have no notes?  Is that
correct?
    A.  That's correct.
    Q.  And the only other thing you have is
the report of 10/12/2008?
    A.  That's correct.
    Q.  Now, do you have bills that you
rendered for your --
    A.  Yes, I do.
    Q.  Okay.  You have copies of your
bills?
    A.  Yes, I do.
    Q.  Do you have them with you?
    A.  No, I don't.

33

    Q.  Okay.  Do you recall how much you
billed for the services rendered in this case
as of your last billing?
    A.  I estimate that over two and a half
years it might be $20,000.
    Q.  That would be up to the present
time?
    A.  That is correct.
    Q.  When would be the final billing?  I
mean, when was your last billing?
    A.  I believe two months ago.
    Q.  Okay.  So you billed $20,000, not
including your conference yesterday and your
testimony here today?
    A.  That's correct.
    Q.  And as I understand it, your hourly
rate is for research is $150?
    A.  That's correct.
    Q.  And your preparing a report, $200 an
hour?
    A.  Yes.
    Q.  And your deposition and testimony,
which would be what you're doing here today,
$300 an hour?
    A.  Yes.

34

1    Q.  So the 20,000 that you billed as of
2  a month ago would be research and review and
3  preparing a report on June 12th, 2009?
4    A.  That's correct.
5    Q.  Okay.  You do not include in your
6  documentation the deposition of Don Green
7  dated June 25, 2009.
8       MR. FISHER:
9         Counsel, let the record show that
10      his report is dated prior to the date
11      of that deposition.
12      MR. LAWRENCE WIEDEMANN:
13        It's done before today and we
14      haven't gotten supplements, so I am
15      asking --
16      MR. FISHER:
17        Fair enough.
18      THE WITNESS:
19        When I prepared the report I had
20      his deposition of 21 November, '08.
21 EXAMINATION BY MR. LAWRENCE WIEDEMANN:
22    Q.  All right.  You have not reviewed
23  his deposition of June 25, 2009?
24    A.  Yes, I have.
25    Q.  You have?

35

1    A.  Yes.
2    Q.  But you have not encompassed that in
3  your report.
4    A.  I have not been asked to.
5       MR. FISHER:
6         Again, the report, from the face
7      of it, it was generated prior to the
8      taking of the most recent Green
9      deposition, Counsel.
10      MR. LAWRENCE WIEDEMANN:
11        I know, but today is June 9th and
12      we haven't gotten -- we have no idea
13      of what his opinion is regarding the
14      report of Don Green, which was
15      rendered sometime ago.
16      MR. FISHER:
17        I don't want to belabor this,
18      Counsel, but I don't think Mr. Green
19      amended his report prior to the taking
20      of the deposition.
21      MR. LAWRENCE WIEDEMANN:
22        His deposition, he says he
23      reviewed the deposition.  The
24      deposition is 242 pages.  Six hours in
25      total.

36

      THE WITNESS:
        But my report only dealt with his
      reports, and my comments on his
      deposition were an enclosure.  The
      prior deposition.  November.
EXAMINATION BY MR. LAWRENCE WIEDEMANN:
    Q.  I understand.  But you just told me
you reviewed his deposition testimony of June
25th.  Is that correct?
    A.  That's correct.
    Q.  But you haven't rendered an opinion
regarding that deposition.
    A.  I haven't been asked to.  And it was
not part of the report either.  Of my report.
    Q.  So as I understand it, you do not
intend to give an opinion regarding Commander
Green's June 25th deposition?
      MR. FISHER:
        Object to form.
EXAMINATION BY MR. LAWRENCE WIEDEMANN:
    Q.  Is that correct?
    A.  Not unless I am asked.
    Q.  Have you been asked to give an
opinion on that?
    A.  No, I have not.

37

      MR. FISHER:
        Just for the sake of the record,
      Counsel, Captain Ryan has testified
      that he's reviewed the deposition, the
      most recent deposition from Mr. Green;
      so that in the course of the
      deposition today if you want to ask
      him about anything that he saw that
      was in any way different from Mr.
      Green's previous reports or
      depositions, you're welcome to do so.
      MR. LAWRENCE WIEDEMANN:
        That's very kind, but I'm not
      furnished with any report regarding
      what he is going --
      MR. FISHER:
        Asked and answered.  He just
      stated that he hasn't generated any
      supplemental reports with respect to
      having reviewed the new Green
      deposition.
      MR. LAWRENCE WIEDEMANN:
        Well, the purpose of taking
      expert depositions is to find out what
      their final opinion is regarding

38

1  whatever they have reviewed, and I am
2  just going to say for the record if
3  he's going to say something regarding
4  Green's deposition of June 25th, 2009,
5  I am going to reserve the right to
6  take his deposition again.
7      MS. RAFFMAN:
8      I'll tell you what. Let me just
9  go on the record for a second. This
10 is Mark Raffman.
11     VIDEO OPERATOR:
12     You want to go off the record?
13     MS. RAFFMAN:
14     Go off the record.
15     VIDEO OPERATOR:
16     Off the record.
17     (Whereupon a discussion was held
18 off the record.)
19     VIDEO OPERATOR:
20     We're now back on the record.
21 EXAMINATION BY MR. WIEDEMANN:
22     Q.  Okay. What other materials in
23 preparation for the deposition today have you
24 reviewed as of yesterday?
25     A.  I was handed -- not -- I was emailed

39

1  some excerpts from a gentleman named Mr.
2  Pazos. I am not sure I have that name right.
3  And that was it.
4      Q.  From Cashio?
5      A.  Pazos.
6      Q.  What?
7      A.  Pazos. Pazos. Pazos.
8      MR. KARL WIEDEMANN:
9      Pazos?
10     THE WITNESS:
11     Yes. Pazos.
12 EXAMINATION BY MR. LAWRENCE WIEDEMANN:
13     Q.  Hector Pazos. Is that the one?
14     A.  That's correct.
15     Q.  I'm not criticizing your
16 pronunciation. I am just trying to --
17     A.  That's correct.
18     Q.  That's the one you're talking about?
19     A.  Yes.
20     Q.  So as of yesterday you got a report
21 from Hector Pazos?
22     A.  I got excerpts from his report.
23     Q.  You didn't get a complete report?
24 You got what Counsel sent to you as excerpts?
25     A.  I -- I was -- I received excerpts

40

1  which I read once, and then yesterday I was
2  handed the complete report which I have not
3  looked at.
4      Q.  In the reports that you have listed
5  in your report, to what extent did you rely on
6  those reports from other experts other than
7  Don Green?
8      A.  Primarily to develop a time line.
9      Q.  And you developed a time line from
10 the expert reports that were furnished to you?
11     A.  The expert reports and the
12 unpublished redacted Coast Guard
13 investigation.
14     Q.  Did you rely on what's in the report
15 of Wiggins Marine, Whiteley Global, Klotz,
16 Sherer, Budwine, Whiteley Global the second
17 report? Did you rely on those in any way
18 other than to prepare a time line?
19     A.  If they mentioned a Coast Guard
20 regulation or guidance document of some sort,
21 I would go look to see, one, if they had the
22 right citation and, two, what it said. But
23 other than that, I didn't rely on them.
24     Q.  So insofar as those people that I
25 just named, if they rendered an opinion

41

1  concerning their opinion of what happened and
2  who was responsible, you didn't rely on that?
3      A.  No.
4      Q.  You don't accept their reports as
5  being authoritative insofar as their
6  conclusions of responsibility?
7      A.  I'm not sure I understand the
8  question. I relied -- I accepted their
9  reports as authoritative. I don't remember
10 the specifics. There was some opinions that
11 they came to that I disagreed with and some
12 that I agreed with.
13     Q.  All right. But in your report, the
14 only expert that you dealt with insofar as
15 disagreeing was Don Green.
16     A.  Yes. That's what I was asked to do,
17 was to render an opinion on Mr. Green's
18 report.
19     Q.  You were asked by Mr. Forbes to
20 render an opinion on Don Green's report?
21     A.  Yes.
22     Q.  But did Mr. Forbes did not ask you
23 to critique the reports of the other experts?
24     A.  No, he did not.
25     Q.  And you did not include any critique

42

1 in your report concerning them?
2   A.   That's correct.
3   Q.   So we don't know which ones you
4 agree with insofar as their conclusions or
5 which ones you disagree with insofar as their
6 conclusions?
7   A.   That's correct.
8   Q.   Can you tell us at this time which
9 ones you accept and which ones you do not
10 accept?
11   A.   I would have to reread the reports.
12   Q.   So you don't --
13   A.   I don't have it committed to memory.
14   Q.   What?
15   A.   I don't have it committed to memory.
16   Q.   So the only one that we have
17 available insofar as your particulars is Don
18 Green?
19   A.   Yes.
20   Q.   What Coast Guard regulations do you
21 consider applicable to the occurrence, that
22 is, the breakaway of ING-4727?
23   A.   Well, I approached it from what
24 regulations were applicable to the mooring of
25 the 4727 at the Lafarge terminal.  I am not

43

1 sure that there's a Coast Guard regulation
2 that addresses breakaways, except in fleeting
3 arrangements.
4   Q.   Okay.  Well, what Coast Guard
5 regulations do you consider applicable to the
6 mooring of 4727 on the occasion of the
7 incident?
8   A.   In general, to the mooring of the
9 barge, 33 -- Code of Federal Regulations --
10 Federal Regulations 33 CFR.  Let me be sure I
11 get the exact citation right.  162.75.
12   Q.   And that deals with what?
13   A.   The mooring of vessels in the New
14 Orleans area, or in the Captain of the Port
15 Zone of New Orleans outside of the Mississippi
16 River.
17   Q.   And that section, 162.75, deals with
18 mooring in general?
19   A.   Yes.
20   Q.   Does that deal with mooring in
21 hurricane conditions or storm conditions?
22   A.   It does not.
23   Q.   So since we're dealing with a
24 hurricane condition, how does 162.75 become
25 applicable?

44

1   A.   It becomes applicable in the
2 original mooring of the vessel.  Was it moored
3 properly before the arrival of Katrina.
4   Q.   You're talking about this section of
5 the CFR that requires a bow and a stern line
6 on a barge such as the 4727?
7   A.   That's correct.
8   Q.   And that provision vis-a-vis a bow
9 and a stern line is applicable to normal
10 day-by-day conditions, is it not?
11   A.   Well, I would say it's applicable to
12 any condition that is not a hurricane.  So if
13 you have a summer thunderstorm that comes
14 through and the winds go up to 40 or 50 miles
15 an hour, it's applicable to that.
16   Q.   Is it applicable to a condition such
17 as we're dealing with here?
18   A.   To a hurricane, no.
19   Q.   So when a hurricane becomes an
20 issue, that goes out the window?
21   A.   No, it does not.  It's still
22 applicable as --
23   Q.   So you can still use a bow and stern
24 line and go through the hurricane and it's
25 okay?

45

1   A.   There are no regulations that deal
2 with it.
3   Q.   Well, does not -- Are you familiar
4 with the Sector New Orleans Maritime Hurricane
5 Contingency Port Plan?
6   A.   Yes.  That's not a regulation.
7   Q.   Well, is it passed under an act of
8 Congress?
9   A.   I don't believe so.
10   Q.   Well, let me show you some --
11     MR. FISHER:
12       Could we identify that document
13     that you have handed him?
14     MR. LAWRENCE WIEDEMANN:
15       I will in a moment.  It's not one
16     document.  It's more than one
17     document.
18 EXAMINATION BY MR. LAWRENCE WIEDEMANN:
19   Q.   The first document is a statement of
20 policy, 33 USC 1221, Statement of Policy.  Do
21 you see that?
22   A.   Yes.
23   Q.   Okay.  And that provision provides
24 "That navigation and vessel safety,
25 protection of the marine environment, and

46

1  safety and security of the United States ports
2  and waterways are matters of major national
3  importance; that increased vessel traffic in
4  the nation's ports and waterways creates
5  substantial hazard to life, property, and the
6  marine environment; that increased supervision
7  of vessel and port operations is necessary in
8  order to reduce the possibility of vessel or
9  cargo loss, or damage to life, property, or
10  the marine environment; prevent damage to
11  structures in, on, or immediately adjacent to
12  the navigable waters of the United States or
13  the resources within such waters."
14      MR. FISHER:
15          Excuse me, Counsel. Do you have
16      an extra copy of that document you're
17      reading from?
18      MR. LAWRENCE WIEDEMANN:
19          I gave -- I have got a copy. He
20      has it. You want to make a copy of
21      it?
22      MR. FISHER:
23          Yes, let's make a copy of it.
24      MR. LAWRENCE WIEDEMANN:
25          Okay.

47

1      MR. KARL WIEDEMANN:
2          Let's go off the record a
3      moment.
4      VIDEO OPERATOR:
5          Off the record.
6          (Whereupon a discussion was held
7      off the record.)
8      VIDEO OPERATOR:
9          We're back on the record.
10  EXAMINATION BY MR. WIEDEMANN:
11      Q.  Mr. Ryan, before we broke to get
12  copies for everybody, I was -- and I believe
13  you have it in front of you, the enabling
14  statute, 33 USC 1221, Statement of Policy from
15  the Congress, do you have that in front of
16  you?
17      A.  Yes, I do.
18      Q.  And you will see, going down to the
19  third, it says that "To ensure that vessels
20  operating in the navigable waters of the
21  United States shall comply with all applicable
22  standards and requirements for vessel
23  construction, equipment, manning, and
24  operational procedures." Do you see that?
25      A.  Yes, I do.

48

      Q.  The next document, which is 33 CFR
160.1, the purpose is -- "This subchapter
contains regulations implementing the Ports
and Waterways Safety Act", which is 33 USC
1221 that we just read from, and related
statutes. Do you understand that?
      A.  Yes.
      Q.  And you understand that, or do you
not, that the Sector New Orleans Hurricane
Plan, Maritime Hurricane Contingency Plan was
enacted under CFR parts 160? Is that
correct?
          MR. FISHER:
              Objection to Counsel's
          interpretation of the statute.
          THE WITNESS:
              I disagree. It's not enacted.
          It's written, and that's a reference
          that they used to write that plan.
  EXAMINATION BY MR. LAWRENCE WIEDEMANN:
      Q.  Let me -- Do you have a copy of the
  New Orleans Sector Plan?
      A.  Yes, I do.
      Q.  All right. You have that in front
  of you?

49

      A.  Yes, I do.
      Q.  Would you look at D? It's D? It
  also has on it IBCO-0073 if it's the same
  thing.
      A.  Yes, I have it.
      Q.  You have that?
      A.  Yes.
      Q.  It says "Authority. The provisions
  of Title 33, Code of Federal Regulations,
  Parts 160 and 165, describe the authority that
  Coast Guard Captains of the Port can use to
  ensure the safety of their ports.
  Specifically COTPC -- COTPs are authorized to
  establish," and it goes on to say the things
  that they can establish. Okay?
          Is this not the authority for the
  enactment of this Maritime Hurricane
  Contingency Port Plan?
      A.  No, it is not.
          MR. FISHER:
              I object to the form.
  EXAMINATION BY MR. LAWRENCE WIEDEMANN:
      Q.  Why do they say it's the port
  authority?
      A.  It's the reference in the authority

50

1  for the writing of the plan.  This plan is not
2  enacted and it's specifically saying that the
3  Captains of the Port have only three legal
4  instruments that they can issue to direct
5  people to do things.  And those are safety
6  zones, which are formally published; regulated
7  navigation areas, which end up being in the
8  regulations; and Captain of the Port orders.
9  And none of those things were done in relation
10  to a requirement to double up.  There were no
11  Captain of the Port orders issued --
12      Q.  It says the authority --
13      MR. FISHER:
14          He's still answering, Counsel.
15  EXAMINATION BY MR. LAWRENCE WIEDEMANN:
16      Q.  Oh, I'm sorry.
17      A.  There were no Captain of the Port
18  orders issued for doubling up.  There were no
19  regulated navigation area issues for doubling
20  up, and there were no safety zones issued for
21  doubling up.  They were marine safety
22  information bulletins giving recommendations.
23      Q.  I haven't asked you anything about
24  doubling up.  I asked you that the authority
25  for passing this Maritime Hurricane

51

1  Contingency Port Plan was the United States
2  Congressional authorization in USC 1221 -- 33
3  USC 1221, was it not?
4      MR. FISHER:
5          Objection.  Same objection.
6  Continuing.
7      THE WITNESS:
8          It was for writing the plan.  The
9      plan was never passed or enacted.
10          Those are the words you used.
11  EXAMINATION BY MR. LAWRENCE WIEDEMANN:
12      Q.  Okay.  Passed or enacted.  All
13  right.
14          The United States Congress
15  authorized the United States Coast Guard to
16  prepare plans for contingencies, did it not?
17      A.  It gave the Captains of the Port
18  authorities to take actions, and writing a
19  plan is an action.  Yes.
20      Q.  All right.  And this plan, that is,
21  the Maritime Hurricane Contingency Port Plan,
22  was one of the plans that the Coast Guard
23  prepared in conformity with the United States
24  Congress' authorization, is it not?
25      MR. FISHER:

52

Object to the form.
    THE WITNESS:
        Yes.
EXAMINATION BY MR. LAWRENCE WIEDEMANN:
    Q.  Okay.  And when you say the
authority, it says "not only to establish
safety zones, but to direct the handling,
loading, unloading, storage and movement of
dangerous cargos aboard waterfront facilities,
and to order vessels to operate or anchor in
whatever manner is necessary to protect life,
property, and the environment".  Isn't that
the authority given to them?
    A.  Yes.
    Q.  Okay.  And the Congressional order
or the Congressional Act 33 USC 1221 says that
"to ensure that vessels operating in the
navigable waters of the United States shall
comply with all applicable standards and
requirements for vessel construction,
equipment, manning, and operational
procedures", does it not?
    A.  Yes.
    MR. FISHER:
        Counsel, could you please

53

identify the document that you just
were reading from before?
    MR. LAWRENCE WIEDEMANN:
        I believe I did.  33 USC 1221.
    MR. FISHER:
        All right.  But there was
something else that you had in your
hand, too, that you read from just
before 33 USC --
    MR. LAWRENCE WIEDEMANN:
        I read from the, I believe I
mentioned, Maritime Hurricane
Contingency Port Plan.
    MR. FISHER:
        Okay.
    MR. LAWRENCE WIEDEMANN:
        Or the authority that I
mentioned.  That's D-1 of that
document.
    MR. FISHER:
        D-1?
    MR. LAWRENCE WIEDEMANN:
        D-1 was the document -- the
authority --
    MR. FISHER:

14  (Pages 50 to 53)

54

1  Okay.
2  MR. LAWRENCE WIEDEMANN:
3  -- that I referred to. Okay?
4  EXAMINATION BY MR. LAWRENCE WIEDEMANN:
5  Q.  And, Mr. Ryan, the next document you
6  have is a definition document pertaining to
7  USC -- 33 CFR 160.1 and it defines "Vessels"
8  on the second page of that document. Do you
9  see that?
10  A.  Yes.
11  Q.  And "Vessels" under this document
12  are -- "Vessel" means every description of
13  watercraft or other artificial contrivance
14  used, or capable of being used, as a means of
15  transportation on water." Do you understand
16  that?
17  A.  Yes.
18  Q.  And the incorporation of that in the
19  Maritime Hurricane Contingency Port Plan, that
20  is, that definition is what is applicable to
21  that plan, is it not?
22  MR. FISHER:
23  Object to the form.
24  THE WITNESS:
25  I would have to look at every

55

1  specific section, because they use the
2  word "vessel" in different sections
3  for different things. They don't go
4  strictly by that definition.
5  EXAMINATION BY MR. LAWRENCE WIEDEMANN:
6  Q.  Well, the definitions article, 33
7  CFR 160.3, pertains to the CFR in which the
8  Maritime Hurricane Contingency Port Plan was
9  enacted, does it not?
10  MR. FISHER:
11  I object to the form.
12  THE WITNESS:
13  Yes, it does, but they don't use
14  the word solely limited to that
15  definition throughout the plan. So I
16  -- When I did my report, I had to
17  look at each section and see what they
18  were talking about.
19  EXAMINATION BY MR. LAWRENCE WIEDEMANN:
20  Q.  But in the section which is
21  specifically applicable to the Maritime
22  Hurricane Contingency Port Plan which they
23  reference as their authority, 33 CFR 160.1 and
24  160.3 has the definition of what is a vessel
25  vis-a-vis this Maritime Hurricane Contingency

56

1  Port Plan, does it not?
2  A.  My answer is still the same. Yes.
3  But during the plan when they wrote it, they
4  didn't consistently go with that definition.
5  Q.  But the New Orleans Maritime
6  Hurricane Contingency Port Plan does not
7  reference any other document other than 160 as
8  its authority.
9  A.  It references 165.
10  Q.  Yes.
11  VIDEO OPERATOR:
12  Excuse me. I need to change
13  tapes. That's the end of tape 1.
14  We're going off the record.
15  (Whereupon a discussion was held
16  off the record.)
17  VIDEO OPERATOR:
18  This is the beginning of tape 2.
19  We're back on the record.
20  EXAMINATION BY MR. WIEDEMANN:
21  Q.  Are you saying that the definition
22  of "Vessel" in 160.3 is not applicable to the
23  Maritime Hurricane Contingency Port Plan?
24  A.  No, I am not.
25  Q.  Then is it applicable?

57

1  A.  Yes, it is.
2  Q.  Okay. And do you agree that the
3  Maritime Hurricane Contingency Port Plan is
4  applicable to a circumstance that occurred in
5  New Orleans, that is, Hurricane Katrina?
6  A.  Yes.
7  Q.  And that goes into effect when the
8  various periods are established by the Coast
9  Guard, that is, Whiskey, X-ray and Zulu?
10  A.  Yes.
11  Q.  So then when you say that the
12  Article 33 CFR 162.75 requiring a bow line and
13  a stern line on a barge, when this happens,
14  when these other things occur, that goes out
15  the window?
16  A.  No, I did not say that.
17  MR. FISHER:
18  I object to the form.
19  THE WITNESS:
20  I said it was still applicable.
21  EXAMINATION BY MR. LAWRENCE WIEDEMANN:
22  Q.  In other words, you can still have a
23  bow and a stern line as the hurricane comes in
24  and meet the requirements of the United States
25  Coast Guard?

58

1   A.  You meet the requirements of 33 CFR
2   162.75.
3   Q.  Do you meet the requirements of the
4   United States Coast Guard for a hurricane that
5   is hitting this area, to stick by and say a
6   bow and a stern line is all you need?
7   A.  You meet the regulations.  Any
8   additional things are recommendations from the
9   Coast Guard.
10  Q.  Recommendations from the Coast
11  Guard, a recommendation from the Coast Guard
12  is this plan, the Maritime Hurricane
13  Contingency Port Plan for Sector New Orleans,
14  for New Orleans; right?
15  A.  That's correct.
16  Q.  Was this originated when you were
17  with the Coast Guard?
18  A.  I was in the District office and we
19  had an Atlantic Area instruction which was
20  very similar to that.
21  Q.  It's not much different than that,
22  is it?
23  A.  The Atlantic Area instruction was
24  actually written first and the --
25  Q.  Well, the Atlantic Area instruction

59

1   was written I believe you said -- I believe it
2   was enacted in May of 2006.
3   A.  That's Revision A.  I tried to get
4   the original and I can't find the original
5   one.  The original one was written in either
6   1999 or 2000.
7   Q.  But the plan from the Atlantic Area
8   Port Operations Hurricane Guidance, Atlantic
9   Area, the copy that I have which is the only
10  one you have apparently, --
11  A.  Right.
12  Q.  -- May 19, 2006, --
13  A.  Yes.
14  Q.  -- is the basis for the New Orleans
15  plan?
16  A.  That is correct.
17  Q.  Because there was an earlier plan --
18  A.  Yes.
19  Q.  -- in the Atlantic Area?
20  A.  Yes.
21  Q.  Okay.  So you knew when you were
22  there when they were going to use the Atlantic
23  Area Plan to enact the New Orleans Sector
24  Plan, or to -- to enact it, okay, to --
25  MR. FISHER:

60

Object to the form.
EXAMINATION BY MR. LAWRENCE WIEDEMANN:
Q.  -- to draft the New Orleans Sector
Plan in anticipation of hurricanes, you knew
that it was going to be similar to what you
already knew existed?
A.  I assumed it would be, yes.
Q.  Did you have any objection to it?
A.  No.
Q.  Did you have any objection to the
authority for passing it?
A.  For writing it?  No.
Q.  Okay.  Did you have any objection to
the authority for writing the Atlantic Area
Port Operation Plan?
A.  No.
Q.  And that, too, is written, as it
says, under authority of the United States
Congress, 33 USC 1221.
A.  That is correct.
Q.  And it was written under authority
of 33 CFR 160, et cetera, was it not?
A.  That's correct.
Q.  The same as the New Orleans Plan?
A.  That's correct.

61

Q.  Okay.  Prior to the enactment or the
-- I keep saying "enactment" --
MR. FISHER:
Counsel, we have a problem with
your continuing use of that word.
It's incorrect use of it, as you know.
EXAMINATION BY MR. LAWRENCE WIEDEMANN:
Q.  Prior to the drafting of the New
Orleans Maritime Hurricane Contingency Port
Plan, and if I say otherwise, it's "drafting",
okay, --
MR. FISHER:
All right?  Okay.
MR. LAWRENCE WIEDEMANN:
"Enactment" doesn't mean to me
that somebody went before a body and
had a law passed.  Okay?
MR. FISHER:
Okay.
MR. LAWRENCE WIEDEMANN:
We understand that.
MR. FISHER:
Let's move on.
EXAMINATION BY MR. LAWRENCE WIEDEMANN:
Q.  Okay.  The Maritime Hurricane

62

1  Contingency Plan, that was drafted I believe
2  in June of 2005. Is that correct?
3      A.  That's correct.
4      Q.  About a year after you retired?
5      A.  That's correct.
6      Q.  Just a year, as a matter of fact.
7      A.  Yes.
8      Q.  Was there a Hurricane Contingency
9  Port Plan in existence before this was
10 drafted?
11     A.  I don't know that.
12     Q.  You don't know from when you were
13 here in New Orleans?
14     A.  I was in the District office. That
15 was written by the Marine Safety Office, which
16 is now called the Sector.
17     Q.  The Marine Safety Office where?
18     A.  New Orleans, which is -- at that
19 time was located across from the Superdome in
20 the McMoran Building.
21     Q.  All right. But you were aware that
22 this was being done?
23     A.  No, I wasn't.
24     Q.  Were you aware that one was done in
25 the Atlantic Area?

63

1      A.  I was aware of the Atlantic Area
2  one.
3      Q.  And before when you left in June of
4  2004, you were not aware that they were
5  drafting one, a procedure similar to the --
6      A.  I was not aware, no.
7      Q.  Have you had a chance to review that
8  plan?
9      A.  The plan that you have, yes.
10     Q.  Yes.
11     A.  I have it and I cited it in my
12 report several times.
13     Q.  Okay. And is that plan, is that
14 applicable, or was it applicable to Hurricane
15 Katrina on August 29, 2005?
16     A.  Yes.
17     Q.  What?
18     A.  Yes.
19     Q.  You acknowledge that?
20     A.  Yes.
21     Q.  Do you acknowledge the background
22 that is reflected on page D-1?
23     A.  Yes.
24     Q.  "From June 1 to November 30 each
25 year, the community and ports of the Gulf

64

Coast face the threat of hurricanes. In fact,
Gulf Coast hurricanes routinely make landfall
and adversely impact shoreline communities.
On average, hurricanes can kill over 50 people
and cause more than $100 million in property
damage each year. The New Orleans area is
particularly vulnerable to the hazards
associated with hurricanes. Flooding and
hurricane force winds can combine to cause
substantial damage and problems in our port."
You agree with that?
    A.  Yes.
    Q.  And then it goes on to say,
"Threatened as we are by these hazards, it is
important that the entire port community share
a common understanding of the measures
required to increase our hurricane
readiness." Do you agree with that?
    A.  Yes.
    Q.  You are aware that these
publications, that this publication is
available to the marine industry in general
and distributed by the United States Coast
Guard?
    A.  They say that it's available on the

65

Internet, and that if you want to a written
one you have to request it. So I don't think
it's --
    Q.  Well, is --
    A.  -- distributed.
    Q.  Is it you are saying that the Coast
Guard did not do everything within its power
to get this plan out to protect 50 people and
100 million in damage?
    A.  I don't know what actions they took
to get that plan out other than what they
published there that was available on the
Internet.
    Q.  So you can acquire it on the
Internet if you wish. Is that your --
    A.  If you know it exists, yes.
    Q.  Well, I mean, is this some secret
document that the Coast Guard enacted -- or
not enacted -- the Coast Guard published for
hurricanes and just kept it to themselves?
    A.  I don't know what actions they took
other than what they wrote there in the plan.
    Q.  So you were not involved in the
dissemination of the plan?
    A.  No. And I did no research to

17 (Pages 62 to 65)

66

1    determine how it was disseminated.
2        Q.  Are you aware that this plan, again
3    I am speaking about the Maritime Hurricane
4    Contingency Port Plan, that it provides
5    minimum recommendations?
6            MR. FISHER:
7                Object to the form.
8            THE WITNESS:
9                It requires recommendations.  I
10           am not sure that I would agree that
11           they're the minimum recommendations.
12   EXAMINATION BY MR. LAWRENCE WIEDEMANN:
13       Q.  Well, let me refer you to page D-7.
14   This part of the plan, it's talking about --
15   "General, this part of the plan contains
16   general recommended precautionary measures
17   that vessels and waterfront facilities can
18   take to reduce the potential for loss of life,
19   injury, or property damage from a hurricane.
20   The safety precautions contained in this part
21   are not the only precautions that may be
22   necessary to fully prepare a vessel or
23   facility.  The unique characteristics of the
24   vessel or facility, and the unique attributes
25   of the storm may dictate the need for

67

1    additional measures and/or modifications to
2    the measures contained in these
3    recommendations."  You understand that?
4        A.  Yes.
5        Q.  Do you not understand that these are
6    minimum standards and that the people to whom
7    the standards are issued understand --
8            MR. FISHER:
9                Objection.
10   EXAMINATION BY MR. LAWRENCE WIEDEMANN:
11       Q.  -- that they have to do what is
12   necessary when circumstances change?
13           MR. FISHER:
14               Objection to the amended --
15           THE WITNESS:
16               I understand that they're general
17           recommendations and, as such, they
18           should be considered by the operators
19           and owners of facilities and vessels
20           and that they can modify them.
21   EXAMINATION BY MR. LAWRENCE WIEDEMANN:
22       Q.  Aren't they instructed in fact to
23   modify them in the general statement?
24           MR. FISHER:
25               I object to the form.

68

EXAMINATION BY MR. LAWRENCE WIEDEMANN:
    Q.  "The safety precautions contained in
this part are not the only precautions that
may be necessary to fully prepare a vessel or
facility.  The unique characteristics of the
vessel or facility, and the unique attributes
of the storm may dictate the need for
additional measures and/or modifications to
the measures contained in these
recommendations."  You don't interpret that to
mean that the people in charge of facilities
and vessels have to do something even greater
if things change?
    A.  Or modify them.
    Q.  Well, you wouldn't think you would
modify them in the face of a hurricane to make
them less, would you?
    A.  I would assume they would, and hope
they would make them the equivalent level of
safety.
    Q.  The greater --
    A.  Equivalent level of safety.
    Q.  The greater the wind, the greater
the surge, the more you have to protect;
right?

69

    A.  The Coast Guard, as Captain of the
Port, doesn't deal in degrees of the storm.
The entire instruction never addresses
Category 1 through Category 5 storms.  What it
addresses is the arrival of gale force winds
at certain times periods.
    Q.  So when the Coast Guard is saying in
the general description the unique
characteristics of the vessel and the
attributes of the storm dictate additional
measures or modifications, you don't
understand that they're supposed to do
something better or more?  Is that right?
    A.  It's a -- should be --
            MR. FISHER:
                Same objection.
            THE WITNESS:
                Should be considered in making
        your preparations.
    EXAMINATION BY MR. LAWRENCE WIEDEMANN:
    Q.  And then the third paragraph down,
it says "Nothing in these recommendations
shall be construed as relieving the masters,
owners, operators, and agents of vessels or
the owners, operators, and persons in charge

18  (Pages 66 to 69)

70

1  of waterfront facilities from their primary
2  responsibility for the safety of such vessels
3  or waterfront facilities during a hurricane."
4  Do you understand that?
5      A.  Yes.
6      Q.  That even if they comply with what
7  the basic remedies of the -- that are
8  recommended by the Coast Guard or the greater
9  remedies required by the hurricane and by the
10  vessels themselves, they are still not
11  relieved of responsibility.  Isn't that so?
12          MR. FISHER:
13             Object to the form.
14          THE WITNESS:
15             That is correct.
16  EXAMINATION BY MR. LAWRENCE WIEDEMANN:
17      Q.  Okay.
18      A.  That is correct.
19      Q.  Okay.  Would you agree also in the
20  last paragraph of D-7 that all vessels that
21  decide to remain in port or are determined "to
22  remain in port should consider the
23  appropriateness of taking on additional
24  ballast or cargo to improve their stability.
25  Vessels in a fully loaded condition normally

71

1  fare better than light vessels in
2  hurricanes"?  Do you agree with that?
3      A.  Yes.
4      Q.  What?
5      A.  Yes.
6      Q.  So that if you have a hurricane
7  approaching, it would be better to have your
8  vessel loaded than empty?
9      A.  Yes.
10      Q.  Either loaded with cargo or loaded
11  with water or loaded with something that keeps
12  it down in the water; is that correct?
13          MR. FISHER:
14             Object to the form.
15          THE WITNESS:
16             If the vessel has capability to
17  ballast, yes.
18  EXAMINATION BY MR. LAWRENCE WIEDEMANN:
19      Q.  Well, that's a recommendation of the
20  Coast Guard in this document pertaining to
21  hurricanes.
22      A.  Yes.
23      Q.  Now let's get to I -- I don't have a
24  page number, but it's IBCO-0085.  Do you have
25  that?

72

          MR. FISHER:
             You referring to Appendix --
excuse me, Annex B, Counsel?
          THE WITNESS:
             Yes.
          MR. LAWRENCE WIEDEMANN:
             Its Annex B.  Yes.  And I think
y'all have the same page numbers?  I
mean the Bates numbers, I believe.  Is
that correct?
          MR. FISHER:
             IBCO-0085?
          MR. LAWRENCE WIEDEMANN:
             Yes.  I am referring to that.  I
assume that everybody has the same
numbers.
EXAMINATION BY MR. LAWRENCE WIEDEMANN:
      Q.  Appendix 2 says -- is titled
"Recommended precautionary measures for
barges."  Is that correct?
      A.  Yes.
      Q.  And the 4727 was a barge.  Is that
correct?
      A.  Yes.
      Q.  And so this would be applicable to

73

it?
      A.  As a recommendation, yes.
      Q.  Yes.  And the recommendation is that
moorings -- "Mooring lines doubled up with due
consideration given to the effects of
predicted storm surge.  Special attention
should be paid -- should be paid to barges
moored in the proximity of bridges."  Do you
understand that?
      A.  Yes.
      Q.  All right.  And just above that is
the same recommendation when it talks about
ships.  You see that?
      A.  Yes.
      Q.  "Mooring lines doubled up with due
consideration given to the effects of
predicted storm surge."
      A.  Yes.
      Q.  And that goes back to the general
provision that says you have got to take into
consideration what may happen, what is the
surge, what is the storm going to do, that you
may have to do something greater.  Isn't that
what it says?
          MR. FISHER:

74

1    Object to Counsel's
2    characterization of "something else"
3    that's indefinite, not specifically
4    referred to in this page that you're
5    talking about.
6        MR. LAWRENCE WIEDEMANN:
7        Okay. Well, if you're saying
8    that Hurricane Katrina is indefinite,
9    well, I will take exception to that.
10       But be that as it may.
11   EXAMINATION BY MR. LAWRENCE WIEDEMANN:
12       Q. The "Mooring lines doubled up with
13   due consideration given to the effects of
14   predicted storm surge." It's again telling
15   the people for whom this is put out that
16   doubling up may not be sufficient depending on
17   conditions. Isn't that what it's saying?
18       A. That's not what it says to me.
19       Q. Okay. What does it talk about the
20   effects of predicted storm surge?
21       A. How you may consider how you leave
22   the lines to the mooring stations. How you
23   arrange them. You may want to leave some
24   slack in them if there's a tremendous amount
25   of surge. If you don't believe there's going

75

1    to be a surge, you may want to tighten them.
2        Q. "Special attention should be paid to
3    barges moored in the proximity of bridges."
4        A. Yes.
5        Q. You realize that 4727 was between
6    two bridges, the Florida Avenue bridge and the
7    Claiborne Avenue bridge?
8        A. Yes. But it wasn't in close
9    proximity. There has to be a balance of how
10   distant. Every barge on the Mississippi River
11   is in proximity to a bridge. If it's five
12   miles away --
13       Q. So you don't consider the Florida
14   Avenue bridge and the Claiborne Avenue bridge
15   to be in a proximity of this barge as
16   referenced by this particular --
17       A. Not close proximity.
18       Q. What's the distance of proximity?
19       A. I'd would say a couple of hundred
20   feet and directly moored and in a line with
21   the bridge on a channel. These were --
22       Q. You're saying proximity is a hundred
23   feet? Is that what you said?
24       A. No, I was saying that close
25   proximity would be 100 or 200 feet. These

76

were moored in a protected slip maybe a
quarter of a mile away.
    Q. The statement does not say "close
proximity". It says "in proximity".
    A. And that's what I said. I said
there has to be a balance of the distance.
Because every bridge -- every vessel moored
anywhere in the world would be in proximity if
there's no distance.
    Q. Oh, you mean -- You don't -- You can
put a barge here if it's -- If they got a
bridge in England, you don't have to worry
about it?
    A. No.
    Q. Is that what you're saying?
    A. No, what I am saying is if you don't
balance it with a distance consideration, then
any vessel that's moored technically could be
in proximity to a bridge.
    Q. Where does the public that gets this
document know when my barge is in proximity to
a bridge? How do they know that?
    A. They don't, because this document
doesn't give any guidance.
    Q. And it doesn't say "close

77

proximity". Is that right?
    A. That's right.
    Q. Is not the reason that they put that
in there because a barge that breaks loose may
hit a bridge and knock it off its foundation
and maybe injure a lot of people? Isn't that
the reason for it?
        MR. FISHER:
        Object to the form.
        THE WITNESS:
        Yes.
EXAMINATION BY MR. LAWRENCE WIEDEMANN:
    Q. So if it's in proximity of a bridge
where it can break loose and hit a bridge that
people are traveling over and may cause a
disaster as what happened in Florida a number
of years ago, then that's what it's concerned
about, isn't it?
    A. Yes.
    Q. So whatever that proximity is,
that's what you've got to worry about.
    A. You have to make a decision based on
a distance.
    Q. "Sufficient personnel are available
ashore to respond to emergencies." What does

78

1  that mean?
2      A.   What it -- Should have people
3  available until the point that they evacuate.
4      Q.   It doesn't say anything about
5  evacuation.
6      A.   Well, it says that the overall
7  writing of this instruction is the safety of
8  life.  And the Coast Guard would never require
9  a facility to keep people there to monitor a
10  barge or a vessel.
11     Q.   Well, --
12     A.   That's not the intent.
13     Q.   -- the concern of the United States
14  Congress is to prevent damage to structures in
15  or immediately adjacent to the navigable
16  waters of the United States or the resources
17  within such waters.  That's what the Congress
18  was concerned with.
19     A.   But I don't think Congress meant at
20  the sake of somebody's life.
21     Q.   Okay.  Well, you don't think when
22  they said in here that "double up".
23  we have 50 people killed in hurricanes and
24  $100 million in damages, that that requires
25  people to be available to prevent something

79

1  like that from happening?
2      A.   Not at the risk of their life.
3      Q.   Okay.  So if you are at risk, you
4  take off and just leave the barges as they
5  are?
6      A.   No.
7      Q.   Okay.  Now, "doubled up" is used in
8  this document on both ships and barges.  And
9  that means -- "doubled up" means two lines or
10  multiple lines, does it not?
11     A.   It can mean.
12     Q.   Isn't that what it means?
13     A.   I disagree.
14     Q.   You mean you're telling people you
15  have to double up lines and they are supposed
16  to understand something other than increasing
17  by one the line?
18     A.   They're -- As you -- The assumption
19  would be that they would double the lines, but
20  that's not the only way it could be achieved.
21     Q.   Okay.  If it's going to be achieved
22  some other way, why would they just put
23  "doubling up" and not put "or increasing the
24  strength" or some other term --
25     A.   Because double --

80

Q.   -- if they required anything but
doubling up regarding ships or barges?
    A.   Because that is a common
understanding and it's easy to communicate.
    Q.   Tell me one thing that you have in
writing that says "doubled up" means something
other than what it says in this document.
        MR. FISHER:
            Objection.  Argumentative.
        THE WITNESS:
            It doesn't say how it's to be
        achieved in here.
EXAMINATION BY MR. LAWRENCE WIEDEMANN:
    Q.   Show me, tell me any other Coast
Guard document that will support the theory
that "doubled up" means something other than
what it says.
        MR. FISHER:
            The same objection.
        THE WITNESS:
            It doesn't say how it's achieved
        in here.  It just says "double up".
EXAMINATION BY MR. LAWRENCE WIEDEMANN:
    Q.   You understand that "doubled up"
means to the common man that it's two instead

81

of one?
        MR. FISHER:
            Object to the form.
EXAMINATION BY MR. LAWRENCE WIEDEMANN:
    Q.   Or four instead of two?  Isn't that
what it means to the ordinary person?
    A.   Or it could be the same line re-led
back to a different mooring point.
    Q.   It requires more than one line if
you have one; it requires more than two if you
have two?
    A.   Or you can use the same lines.
    Q.   How do you expect, if you take the
position, as you say, that "double up",
"doubling up" doesn't mean doubling the
lines, it means changing the -- accepting the
nature of the lines?  Where do you get that
from?  Tell me one Coast Guard thing, one
document, one anything in writing that says
you are correct.
    A.   There's nothing in writing.
    Q.   You can't point to anything that
supports your conclusion?
    A.   I can say that there are different
definitions of what "doubling up" means.  Some

82

1  nautical dictionaries say it's doubling the
2  lines. And some don't even mention that and
3  they say it's using the same line again.
4      Q.  You were with the United States
5  Coast Guard until 2004. Did you ever suggest
6  to anyone that this phrase in this document,
7  "doubling up", was confusing?
8      A.  No.
9      Q.  Did you ever suggest that it be
10 clarified?
11     A.  No.
12     Q.  Do you know that it came from the
13 Atlantic Area publication?
14     A.  Yes.
15     Q.  So it wasn't just -- it didn't just
16 originate in New Orleans. It originated in
17 the Atlantic Area.
18     A.  That's correct.
19     Q.  I have reviewed numerous
20 publications, U.S. Navy, U. S. Coast Guard,
21 and others, and I can't find any definition
22 that says "doubling up" means anything but
23 what I interpret it to mean in this document.
24 That it requires increasing the lines by -- if
25 it's one, by one. If it's two, by two.

83

1      MR. FISHER:
2          Object to the form.
3  EXAMINATION BY MR. LAWRENCE WIEDEMANN:
4      Q.  Can you tell me of anything that
5  supports any other conclusion?
6      A.  Just my years in the Coast Guard and
7  my expertise in interpreting the regulations.
8      Q.  Well, what regulation -- You didn't
9  write this regulation --
10     A.  Right.
11     Q.  -- or --
12     MR. LAWRENCE WIEDEMANN:
13         He used the word "regulation". I
14     am sorry.
15     MR. FISHER:
16         "Recommendation".
17     MR. LAWRENCE WIEDEMANN:
18         Okay. And we understand that the
19     same thing he says is like I said.
20     Okay?
21 EXAMINATION BY MR. LAWRENCE WIEDEMANN:
22     Q.  But in any event, you have never
23 sought to have anything changed in -- You
24 didn't write this document.
25     A.  That's correct.

84

1      Q.  You didn't write the one on the East
2  Coast?
3      A.  That's correct. But I wrote similar
4  documents in Morgan City as when I was Port
5  Captain.
6      Q.  And you used the term "doubling up"?
7      A.  Yes.
8      Q.  How do you expect a deckhand, when
9  he sees this document, when it says "doubling
10 up", to understand other than what it would
11 mean to an average deckhand?
12     A.  I would not expect a deckhand or
13 even a master to -- I would expect them to
14 take the common practice of either doubling
15 the lines or using the same line twice. But
16 if somebody approached me as Captain of the
17 Port and my authority is Captain of the Port
18 and said that they wanted to increase the
19 strength of the mooring lines and not go with
20 double lines, for whatever reason, if I was
21 approached with that request as Captain of the
22 Port I would grant it because it achieves the
23 same thing.
24     Q.  But the Captain of the Port wasn't
25 at the Lafarge facility when this barge was

85

1  moored to tell them that "Doubling up don't
2  mean doubling up. You can do something else."
3  This was common, ordinary workmen. And you
4  expect them to understand that "doubling up"
5  is what you -- what it obviously means?
6      MR. FISHER:
7          Object to the form.
8      THE WITNESS:
9          I was -- The scenario that I was
10     given was if it was requested
11     beforehand. After the fact, the same
12     conclusion would be reached as a
13     Captain of the Port that they had
14     doubled the strength of their mooring
15     system.
16 EXAMINATION BY MR. LAWRENCE WIEDEMANN:
17     Q.  When you determined the tensile
18 strength of the ropes, you utilized an expert
19 to determine that, did you not?
20     A.  I depended on the expert, yes.
21     Q.  So in order to determine whether the
22 tensile strength is adequate, the deckhand
23 would have to have, like you had, a cordage
24 expert to tell you, "Look, fellows, this is
25 good enough"? Is that right?

86

MR. FISHER:
    I object to the form.
THE WITNESS:
    If the -- If the person doing the
    -- that was directed to make those
    moorings wanted to know that
    information, yes.
EXAMINATION BY MR. LAWRENCE WIEDEMANN:
    Q.  In other words, you, as a retired
Coast Guard officer, in order to determine
whether the tensile strength was sufficient,
had to get an expert.
    A.  An expert report was provided to me.
    Q.  And you had to use that to determine
that.
    A.  I depended on it, yes.
    Q.  Yes.  You couldn't do it on your
own?
    A.  No, not with my expertise, no.
    Q.  Is it not true that the first time
that you ever expressed a definition of
"doubling up" other than increasing the lines
by multiples was when you talked to the
attorneys for Lafarge?
    A.  I didn't -- I didn't express a

87

definition.  What I expressed was that they
had complied with the recommendations of -- of
the Captain of the Port of New Orleans by
using lines of greater strength and increasing
the number of lines that were mooring the
barge.  So what I was saying was they had
achieved an equivalent level of safety to the
common definition of "doubling up".
    Q.  These recommendations are published
by the Coast Guard so that people doing
day-by-day duties in the marine industry,
deckhands, captains, people working on vessels
in and out of the city of New Orleans would
know what it means.  Isn't that so?
    A.  I would not assume a deckhand would
be aware of that contingency plan.  The Coast
Guard Captain of the Port assumes that that
plan will be known by the facility
owner-operator or the vessel's master, or
maybe the agent know about it and not the
master.
    Q.  And you expect the owner to, in
reading this document, to say, "Look, 'doubled
up' don't mean doubled, so you all do whatever
you think is necessary"?

88

MR. FISHER:
    Object to the form.
EXAMINATION BY MR. LAWRENCE WIEDEMANN:
    Q.  Is that what you expect?
    A.  I don't make that assumption.
    Q.  Is it your understanding that the
responsibility to allow a vessel to remain
moored to a facility during -- for the
duration of a hurricane rests primarily with
the facility owner-operator and/or person in
charge?
    A.  Yes.
    Q.  And that would in this case be
Lafarge?
    A.  Yes.
    Q.  Have you reviewed the report of
Captain Larry Strauss?
    A.  The June 12th report, yes.
    Q.  June 12th report.  Is that right?
    A.  Yes.
    Q.  You reviewed that?
    A.  Yes.
    Q.  What is different from his report
than your role in this case?
    A.  I believe he was -- I was not told

89

exactly what his area of expertise was and the
matters he was addressing, but I believe it
was the mooring arrangement of the 4727.
    Q.  Well, isn't that what you are
talking about?
    A.  No, I am talking about what were the
regulatory requirements to be moored at the
facility and what actions needed to be taken
in light of the Coast Guard Hurricane Plan.
    Q.  Well, let me ask you, he says LNA's
dock falls under Federal -- 33 Federal
Regulations part 30.40-15, which establishes
the New Orleans Captain of the Port
boundaries.  Is that not part of your role?
    A.  Yes.  I am not sure why he cited it,
but it didn't -- except it's a piece of
information that was useful for him.
    Q.  In paragraph 2 he talks about the
mooring of the barge and the type of rope and
the diameter of the rope.  Is that not what
you're talking about?
    A.  No.
    Q.  Well, didn't you use the report of
the expert to make those conclusions?
    A.  Yes.

23  (Pages 86 to 89)

90

1   Q.  That is, the cordage expert?
2   A.  Yes.
3   Q.  Isn't that the same thing he's
4   doing?
5   A.  It appears to be, yes.
6        MR. FISHER:
7           I object to the form.
8   EXAMINATION BY MR. LAWRENCE WIEDEMANN:
9   Q.  Okay.  He talks about in paragraph 1
10  the composition of the Lafarge facility.
11  That's not anything different than you said,
12  huh?
13  A.  No.
14  Q.  It says in paragraph 3 that "the
15  barge was adequately moored in accordance with
16  hurricane preparations."  Isn't that what
17  you're saying?
18  A.  Yes.
19  Q.  He talks about Captain Green saying
20  that the high and low mooring line
21  arrangements are proper.  You are saying the
22  lines were proper, are you not?
23  A.  I'm saying the lines met the
24  regulatory requirement and the recommendations
25  of the Coast Guard Hurricane Plan.

91

1   Q.  All right.  In reading his report,
2   do you see anything different from what you
3   are testifying to that enhanced anything you
4   said?
5   A.  I don't see him addressing the
6   regulations specifically like I did.
7   Q.  I just read to you a regulation that
8   he addressed.
9   A.  Yes, but I don't believe he
10  addressed 162.75.
11  Q.  He's addressing mooring, which you
12  are addressing as well.  Is that not so?
13  A.  Mooring in relation to regulatory
14  compliance is what I addressed.
15  Q.  Is there a difference between
16  regulatory requirements and you talking about
17  the contingency plan?
18  A.  No, I am talking about 32 -- 33 CFR,
19  Code of Federal Regulations and the guidance
20  of the Hurricane Plan.
21  Q.  Well, is mooring different from your
22  standpoint than it is from his?
23  A.  It shouldn't be, no.
24  Q.  Do you need anything from him to
25  come to your conclusions?

92

1   A.  Yes, I used his information as a
2   master mariner that it was properly moored as
3   opposed to improperly moored.
4   Q.  How did you use that?  Tell me how
5   you used his -- anything in his report that
6   said it was properly moored that you needed to
7   use.
8   A.  Well, if -- if a barge is moored in
9   accordance with 33 CFR 162.75, it could still
10  be moored improperly and meet the regulatory
11  requirement.
12  Q.  How would it be moored improperly?
13  A.  I don't -- I would -- That would be
14  speculation on my part to come up with a
15  scenario.  I can't think of a scenario.
16  Q.  You just --
17  A.  But I used the -- the opinion of a
18  master mariner to say it was properly moored.
19  Q.  That's a conclusion you made.
20  A.  No, I made the conclusion that it
21  was moored in compliance with the regulation.
22  Q.  Is that not properly moored?
23  A.  Again, I would have to come up with
24  a scenario.  But it could probably be -- If --
25  If somebody used sewing thread, the regulation

93

1   doesn't talk to the size of the line.  So if
2   someone used sewing thread, that would be
3   improperly moored.
4   Q.  So he can't talk to the size of the
5   line when the regulation is requiring doubling
6   up?
7        MR. FISHER:
8           Object to the form.
9        THE WITNESS:
10          I'm not sure what the question
11  is.
12  EXAMINATION BY MR. LAWRENCE WIEDEMANN:
13  Q.  Well, you are talking about a
14  thread.  Tell me what you see from his report
15  that in any way helps you in this case.
16  A.  That it was properly moored.
17  Q.  And your decision is that -- your
18  testimony is that it was properly moored?
19  A.  In compliance with the regulations
20  and the recommendations of the Hurricane
21  Plan.  That's the specific approach that I was
22  reviewing.
23  Q.  What other way could it not be
24  properly moored?  Give me another example.
25  A.  It could be -- It could have the

24 (Pages 90 to 93)

94

1  line arranged in such a way that it would slip
2  off its mooring point. It would take somebody
3  -- It would almost take a conscious act, but
4  if someone put the line on the bollard wrong,
5  it could come off. That would be improperly
6  moored.
7      Q. But that didn't happen in this
8  case.
9      A. But you asked for an example you
10 wanted from the expert --
11     Q. I am asking you for an example about
12 this case, Hurricane Katrina. And we're not
13 talking about a line slipping off, unless you
14 knew a line slipped off or he said a line
15 slipped off. I want to know what the
16 distinction --
17        MR. FISHER:
18          Objection.
19 EXAMINATION BY MR. LAWRENCE WIEDEMANN:
20     Q. -- between improperly moored from
21 your testimony and improperly moored from his
22 testimony. Give me a difference.
23        MR. FISHER:
24          Argumentative.
25        THE WITNESS:

95

1      He said it was properly --
2        MR. FISHER:
3          Asked and answered, Counsel.
4        THE WITNESS:
5          Properly moored. If he had said
6      it was improperly moored, then it
7      would not have met the recommendations
8      of the Hurricane Plan. And then I
9      would have said that. I would have
10     taken his piece of information and
11     looked at the Hurricane Plan and said
12     it didn't comply with it because we
13     have a mariner saying that it was not
14     properly moored. But this mariner
15     said it was properly moored. That was
16     my starting point, was it properly
17     moored.
18 EXAMINATION BY MR. LAWRENCE WIEDEMANN:
19     Q. In other words, if he had said
20 doubling up the line was not done in this
21 case, therefore, they violated the Contingency
22 Plan, you would have accepted what he said?
23     A. No. I was accepting that it was
24 properly moored. That's what I wanted to be
25 provided to me.

96

1      Q. Only if he said it was properly
2  moored. If he said it was improperly moored,
3  you wouldn't accept it?
4        MR. FISHER:
5          Objection. Argumentative.
6        THE WITNESS:
7          That's correct.
8  EXAMINATION BY MR. LAWRENCE WIEDEMANN:
9      Q. Is that right? Okay.
10     A. That's how I used his report. It
11 was properly moored.
12     Q. If he told you that this line, the
13 way it was rigged, violated the doubling up
14 requirement of the Maritime Hurricane
15 Contingency Port Plan, you would not have
16 accepted that?
17     A. I would have looked at why he said
18 that.
19     Q. Would you accept it?
20     A. If -- I would have to see the
21 example of what he wrote.
22     Q. Well, you have what he wrote. What
23 is different from what you decided? Tell me.
24        MR. FISHER:
25          Asked and answered.

97

1        THE WITNESS:
2          I did not make a determination
3      that it was properly moored as regards
4      -- as a seamanship. I made a
5      determination that it was properly
6      moored in compliance with the
7      regulations and the recommendations of
8      the Hurricane Plan. But I wanted an
9      expert opinion was it properly moored
10     in regards seamanship.
11 EXAMINATION BY MR. LAWRENCE WIEDEMANN:
12     Q. So there's a differential in
13 interpreting the Maritime Contingency --
14 Hurricane Contingency Plan as to what a
15 mariner says and what you say as a Coast Guard
16 man, that you all can make two different
17 conclusions. Is that what you're saying?
18        MR. FISHER:
19          Object to the form.
20        THE WITNESS:
21          No.
22 EXAMINATION BY MR. LAWRENCE WIEDEMANN:
23     Q. Well, how can a seaman come in and
24 say this means something different than what
25 you say it is and then that's acceptable?

98

1  MR. FISHER:
2      The same objection.
3  THE WITNESS:
4      I don't believe that this
5  gentleman is saying it's different. I
6  only looked at his report as to his
7  master mariner's experience, was it
8  properly moored. Then I took the step
9  was it in compliance with the
10 regulations and did it meet the
11 intent, the equivalent level of safety
12 of the Hurricane Plan.
13 MR. LAWRENCE WIEDEMANN:
14     Can we take a break for lunch?
15 MR. FISHER:
16     Sure. How much more you got?
17 VIDEO OPERATOR:
18     Off the record.
19 (Recess.)
20 VIDEO OPERATOR:
21     This is the beginning of tape 3.
22 We're back on the record.
23 EXAMINATION BY MR. WIEDEMANN:
24     Q.  Mr. Ryan, I want to ask you a couple
25 of questions about the Atlantic Area Port

99

1  Operation Hurricane Guidance, which you said
2  was the predecessor of the Maritime Hurricane
3  Contingency Plan for Sector New Orleans;
4  right?
5      A.  Yes.
6      Q.  And that this is, although this says
7  May 19, 2006, it was published earlier.
8      A.  Yes.  This is Revision A.
9      Q.  It's what?
10     A.  This is Revision A.
11     Q.  Revision A.  Okay.
12     A.  Yes.
13     Q.  Were there any material changes in
14 it that you know?
15     A.  I don't believe so, but I could not
16 locate the original document to go line by
17 line.
18     Q.  Right.
19     A.  But I don't think there were any
20 material changes.
21     Q.  Okay. Let me ask you, on page 2, C,
22 paragraph C, it says "The average error for
23 storm track predictions 72 hours in advance is
24 on the order of 250 nautical miles.  This
25 uncertainty creates a significant challenge

100

1  for COTPs as well as for vessel and facility
2  owners and operators when deciding upon an
3  appropriate course of action in advance of a
4  hurricane's predicted landfall at a port."  Do
5  you agree with that?
6      A.  Yes.
7      Q.  So that the United States Coast
8  Guard is saying that people in the port of New
9  Orleans or in a port wherever applicable in
10 the Atlantic Area, that they should be aware
11 that there is a variance and not depend on a
12 prediction 72 hours out?
13     A.  No, I would read it to say that
14 taking significant actions such as curtailing
15 port operations and ordering vessels out of
16 port at the 72 hour point should not be taken
17 because of the uncertainty.
18     Q.  But the average error for storm
19 track predictions you agree 72 hours in
20 advance is in the order of 250 nautical miles?
21     A.  Yes.
22 MR. FISHER:
23     Object to the form.
24 EXAMINATION BY MR. LAWRENCE WIEDEMANN:
25     Q.  And then on page 3, E, paragraph E,

101

1  the last sentence says "Facility operators in
2  particular need to recognize that one of the
3  natural consequences of their decision to
4  engage in commerce during the hurricane
5  season, especially with tug and barge units,
6  is that a vessel may need to remain moored at
7  their facility before, during, and after a
8  hurricane."  Do you agree with that?
9      A.  Yes.
10     Q.  So that it's the operators of
11 facilities and barges that should take into
12 consideration when a hurricane is approaching
13 when they should stop operations?
14     A.  I don't read that in that sentence.
15     Q.  Okay.
16     A.  It just says that the operation
17 should be aware of the fact that if they are
18 engaging in commercial operations, they may
19 have a vessel at their pier during a
20 hurricane.
21     Q.  Sure. So that if you, in the face
22 of an approaching hurricane, continue to
23 offload cement, you may get caught with barges
24 at your dock that you're going to have to take
25 care of.

102

1   A. It's a possibility, but you may have
2  barges at your dock even without commercial
3  operations.
4   Q. But not cement barges that are
5  coming in on a daily basis.
6   MR. FISHER:
7   Object to the form.
8   THE WITNESS:
9   I don't know that I would agree
10  with that. It could be any barge.
11  EXAMINATION BY MR. LAWRENCE WIEDEMANN:
12   Q. You agree that during the period of
13  time 72 hours before a hurricane that Lafarge
14  was in possession of the Barge 4727?
15   A. I'm not sure of the exact time, but
16  I think they had it two days -- They received
17  it on the 25th, so it might have been 72
18  hours.
19   Q. In any event, they were in
20  possession of the barge during the course of
21  the -- when the hurricane hit?
22   A. Yes.
23   Q. And it was their responsibility as
24  the company in possession of the barge, so to
25  speak, to take whatever precautions were

103

1  necessary to protect the barge?
2   A. To take precautions. I don't know
3  that I would agree with "whatever
4  precautions". That seems open ended.
5   Q. Well, the reason why I say
6  "whatever", because the Coast Guard
7  regulations say that you should take action
8  appropriate to the tidal surge and to
9  conditions that are presenting themselves. So
10  when I say "whatever", I mean whatever is
11  necessary to meet those impending problems
12  would be their responsibility.
13   A. It's their responsibility to comply
14  with the Coast Guard regulations and to take
15  the recommendations under advisement and
16  prepare properly for the storm.
17   Q. Okay. So I am correct that Lafarge
18  was in possession of the barge and they had
19  the responsibility to take whatever
20  precautions that the Coast Guard regulations
21  prescribed.
22   A. Or come up with an equivalent way of
23  achieving the same goal.
24   Q. And they may also, under the Coast
25  Guard regulations, be required to take

104

additional actions as the weather conditions
present themselves, because that's what the
Coast Guard regulations say?
 MR. FISHER:
  Object to the form.
 THE WITNESS:
  No, there's not a regulation that
  says that. There is a
  recommendation. There is a
  recommendation that they should
  consider. And, in fact, the marine
  safety information bulletins that the
  Coast Guard published quite clearly
  said take into consideration these
  recommendations.
EXAMINATION BY MR. LAWRENCE WIEDEMANN:
 Q. Okay. And it also says in the -- in
the contingency plan that -- I hate to repeat
it again, but I guess I will. I'll read again
what I read to you earlier. It's a general
thing on page D-7. "This part of the plan
contains general recommended precautionary
measures that vessels and waterfront
facilities can take to reduce the potential
for loss of life, injury, or property damage

105

from a hurricane. The safety precautions
contained in this part are not only -- are not
the only precautions that may be necessary to
fully prepare a vessel or facility. The
unique characteristics of the vessel or
facility, and the unique attributes of the
storm may dictate the need for additional
measures and/or modifications to the measures
contained in these recommendations." Do you
agree with that?
 A. Yes.
 Q. Okay. It's pretty clear English, is
it not?
 A. Yes.
 MR. FISHER:
  Counsel, all of that reading that
  you just have given us again is
  totally redundant, because you did
  this before we took our break. I am
  going to object to that as being asked
  and answered several times.
 MR. LAWRENCE WIEDEMANN:
  All right.
EXAMINATION BY MR. WIEDEMANN:
 Q. On page 4, paragraph J --

27 (Pages 102 to 105)

1    A. Of the Atlantic Area instruction?
2    Q. Yes. It says "COTPs are not
3 expected to condone actions by vessel masters
4 and owners or facility operators or managers
5 that compromise safety to life or property in
6 order to avoid incurring the economic impacts
7 of taking early and substantive action to
8 protect the safety of life or property." You
9 agree with that?
10    A. Yes.
11    Q. In other words, that the COTP is not
12 going to tolerate someone continuing to do
13 things because of economic reasons that may
14 present a safety hazard to property or
15 people.
16    A. That's correct.
17    Q. And are you aware that -- Let me
18 show you what is Zito fleet records.
19    MR. FISHER:
20       What is this document that you're
21    just handing to Captain Ryan,
22    Counsel? Can you identify it?
23    MR. LAWRENCE WIEDEMANN:
24       What I am handing to him?
25    MR. FISHER:

1       Yes.
2    MR. LAWRENCE WIEDEMANN:
3       That's what I said. It's Zito
4 fleet records.
5    MR. FISHER:
6       Is this the entire document?
7    MR. LAWRENCE WIEDEMANN:
8       That's the one that was supplied
9 to me.
10    MR. FISHER:
11       From Zito's records, or just part
12 of the records?
13    MR. LAWRENCE WIEDEMANN:
14       It's what was supplied to me by
15 Zito's Fleeting for the period in
16 question, which is 8/17 to 8/28.
17    MR. FISHER:
18       And is this document a deposition
19 exhibit to Zito's deposition?
20    MR. LAWRENCE WIEDEMANN:
21       It was produced during the
22 earlier stage in the Prippity case.
23    THE WITNESS:
24       No, I have never seen this.
25 EXAMINATION BY MR. LAWRENCE WIEDEMANN:

1       Q. This is a document from the fleeting
2 operation of Zito Algiers fleet from which,
3 just for your information, 4727 and 4745
4 originated, and records pertaining to their
5 operations on the 26th and 27th.
6    MR. FISHER:
7       I would just like to interpose an
8    objection in response to that,
9    Counsel, that this document may be an
10    incomplete record of the records
11    surrounding the fleeting of not only
12    these barges, but other barges before
13    the storm.
14    MR. LAWRENCE WIEDEMANN:
15       This is what they produced under
16    subpoena. If I had other records, I
17    would give them to you.
18       That's it. But in any event, I
19    have them.
20 EXAMINATION BY MR. LAWRENCE WIEDEMANN:
21    Q. Okay. I am just going to ask you a
22 few questions. If you want to look through
23 them first --
24    A. I have never seen this.
25    MR. FISHER:

1       You have never seen that
2    particular document before, have you,
3    Captain?
4    THE WITNESS:
5       No. I'm not sure I understand
6    it.
7 EXAMINATION BY MR. LAWRENCE WIEDEMANN:
8    Q. The first document is a document
9 that shows on 8/24 at 1435 the ING-4745 and
10 4727 were shifted to Lafarge. Okay? And went
11 through the Industrial Locks at 2300. Do you
12 know what "hot" means?
13    A. No, I don't.
14    Q. It has been testified that "hot"
15 means that this is for immediate delivery.
16 Does that ring a bell to you?
17    MR. FISHER:
18       Object to the form.
19    THE WITNESS:
20       No.
21 EXAMINATION BY MR. LAWRENCE WIEDEMANN:
22    Q. Doesn't mean anything to you?
23    A. No.
24    Q. All right. And then the next
25 document, which is Zito's log for the fleet of

110

1  8/26/05, at the top left, you see that?
2     A. Yes.
3     Q. "ZAF" is Zito Algiers Fleet, which
4  is also at the top. And you see that the --
5  again, it reflects that the 4745 and the 4727
6  were taken to Lafarge by CONNIE Z, which is a
7  vessel, at 2300. Can you see that?
8     A. Yes.
9     Q. Okay. So it's the same as the first
10  document except it's a different log just in
11  general. Okay?
12     A. Yes.
13     Q. All right. Now, you also see on the
14  third page that there's a notation that the
15  fleet closed at 12:00 o'clock to any incoming
16  traffic on the 27th. Do you see that?
17     A. Yes.
18     Q. In your report you said it closed at
19  9:30.
20     A. I didn't have this available to me.
21  I think that was in another expert's report.
22     Q. I understand. But you see on this
23  document, assuming that the fleet closed at
24  12:00 o'clock on the 27th.
25     A. Right. Yes.

111

1     Q. All right. You also see on the
2  second document that -- excuse me, it would be
3  the third document, that the CONNIE Z
4  continued to deliver barges and other -- and
5  the LOCKMASTER on the 27th from 1530 through
6  1945. That would be from 3:30 to 7:45 on the
7  27th.
8     A. Yes.
9     Q. What?
10     A. Yes.
11     Q. Okay? You see that?
12     A. Yes.
13     Q. Okay. Were you aware that the
14  REGINA H did a turnaround of the barges at the
15  Lafarge facility at 1425 on the 27th?
16     A. Yes.
17     Q. And that it cleared the Industrial
18  Avenue -- excuse me, the Industrial Canal Lock
19  I should say, at 1510. Are you aware of that?
20     A. No, I am not.
21     MR. FISHER:
22        Which line are you reading from,
23  Counsel.
24     MR. LAWRENCE WIEDEMANN:
25        Well, let me give him these

112

documents.
   MR. FISHER:
      It's a different document, isn't
it?
   MR. LAWRENCE WIEDEMANN:
      Oh, yes. It's --
   MR. FISHER:
      I object.
   MR. LAWRENCE WIEDEMANN:
      These are the Unique Towing, Inc.
logs.
   MR. FISHER:
      Have you seen this, Captain Ryan?
   THE WITNESS:
      No.
EXAMINATION BY MR. LAWRENCE WIEDEMANN:
   Q. Look at the third page, which is on
the 27th. Okay?
   A. Yes.
   Q. It shows that the REGINA H came
through the Industrial Lock, Industrial Canal
Lock light boat at 1400. Do you see that?
   A. Yes.
   Q. The second entry?
   A. I see that.

113

   Q. That it arrived at the Lafarge
facility at 1425 and topped around the two
barges, and at 1510 it arrived at the
Industrial Lock, and cleared the Industrial
Lock at 1700. Do you see that?
   A. Yes.
   Q. Are you aware that the captain of
the REGINA H, Raymond Graber, said that he
could have taken the barge out, that is, the
empty 4727, if he had been requested to do
so?
   A. I am not aware of that.
      MR. FISHER:
         Object to the form.
EXAMINATION BY MR. LAWRENCE WIEDEMANN:
   Q. I ask you to assume that that's what
he testified to.
   A. And it -- if he testified to it,
yes.
   Q. Do you know --
      MR. FISHER:
         Object to the form, Counsel, as
incomplete hypothetical with respect
to what the captain of that tug
testified to.

114

1  EXAMINATION BY MR. LAWRENCE WIEDEMANN:
2     Q.  Do you not -- Well, assuming that
3  the barge would have been authorized, the
4  empty barge would have been authorized to be
5  removed from the Lafarge facility by the
6  REGINA H and taken through the Industrial
7  Canal Locks to the Algiers -- to the Zito
8  fleet, would that not have been a wiser move?
9        MR. FISHER:
10         Continuing objection.
11       THE WITNESS:
12         It's beyond my expertise.
13  EXAMINATION BY MR. LAWRENCE WIEDEMANN:
14     Q.  Okay.  Well, as a Coast Guard
15  retired officer, is it not a problem to moor
16  an empty barge to a full barge in weather
17  conditions?
18     A.  It's beyond my expertise, but I
19  don't believe so.
20     Q.  Okay.  Well, if it's beyond your
21  expertise, then just say so.  If you're going
22  to answer, I'm going to have to ask you about
23  it.
24     A.  All right.
25     Q.  Okay?  If you're going to give an

115

1  opinion, then you give an opinion which is
2  within your expertise.
3     A.  Yes.
4     Q.  Okay?  So it's your testimony then
5  that you are not in a position to say it is
6  right or wrong to moor an empty barge to a
7  full barge?
8     A.  That's correct.
9     Q.  But you do know, because you already
10  answered, that a full barge fares better in
11  bad weather than an empty barge.
12     A.  In general, yes.
13     Q.  And you know that from your
14  experience as a Coast Guard --
15     A.  Yes.
16     Q.  So that if you have a barge loaded
17  with whatever full and an impending hurricane,
18  it would be better off, if you can, not to
19  empty it out?
20       MR. FISHER:
21         I object to the form.
22  EXAMINATION BY MR. LAWRENCE WIEDEMANN:
23     Q.  Is that correct?
24     A.  I don't agree with that, no.
25     Q.  Okay.  Is that within your

116

expertise?
   A.  Yes.
   Q.  So you believe that in carrying on
commerce and continuing to empty the barge and
putting property at risk, that's okay?
       MR. FISHER:
         Object to the form.
       THE WITNESS:
         It does not put property to
risk.  It's regular course of
commerce.  And the Hurricane Plan from
Sector New Orleans and from the
Atlantic Area is specifically written
not to impede commerce in the course
of an approaching storm.  That's why
there's different actions taken at the
72 hour mark, the 48 hour mark, the 24
hour mark, and the 12 hour mark; and
only at the 12 hour mark are all port
operations ceased.  The Lafarge cargo
operations were almost 40 hours before
the Captain of the Port ordered
ceasing all cargo operations.
EXAMINATION BY MR. LAWRENCE WIEDEMANN:
   Q.  Well, you said earlier you agree

117

with the statement on page 4 that COTPs --
"COTPs are not expected to condone actions by
vessel masters and owners or facility
operators or managers that compromise safety
to life or property in order to avoid
incurring the economic impacts of taking early
and substantive action to protect the safety
or life of property."  You agree with that,
don't you?
       MR. FISHER:
         Objection.  It's been asked and
         answered several times, Counsel.  You
         know that.
       THE WITNESS:
         Yes, I agree with that statement.
EXAMINATION BY MR. LAWRENCE WIEDEMANN:
   Q.  You don't find that inconsistent
with what you just said?
   A.  No, I don't.  Because the rest of
this instruction clearly states that economic
-- or interfering with commerce is not the
intent of this instruction.
   Q.  You would agree, from what I read to
you of the Unique Towing records and the --
and the Zito fleeting records that the Barge

118

1   4727 could have been taken out --
2       MR. FISHER:
3           Object.
4   EXAMINATION BY MR. LAWRENCE WIEDEMANN:
5       Q.  -- on the afternoon of the 27th?
6       A.  If Mr. Graber testified to it, yes.
7       MS. RAFFMAN:
8           That's an incomplete
9   hypothetical.
10      MR. FISHER:
11          Counsel, if you're going to give
12  the witness a hypothetical, I insist
13  that you give him the complete
14  surrounding facts and testimony that
15  comes from the deposition that you are
16  conveniently paraphrasing from in
17  part.
18      MR. LAWRENCE WIEDEMANN:
19          I asked him to assume, and that's
20  part of a hypothet.
21      MR. FISHER:
22          Yes, but you are not giving him
23  the complete set of facts.
24      MR. LAWRENCE WIEDEMANN:
25          I didn't give him any incomplete

119

1   facts.
2       MS. RAFFMAN:
3           It assumes there's a
4   destination. Get on the record.
5       MR. FISHER:
6           Does that assume that there's
7   also a place such as a fleet that is
8   available to take a barge, Counsel?
9       MR. LAWRENCE WIEDEMANN:
10          Yes.
11  EXAMINATION BY MR. LAWRENCE WIEDEMANN:
12      Q.  As a matter of fact, I am going to
13  show you another document, which is the lock
14  log for the Inner Harbor Navigational Canal
15  Lock.
16      MR. FISHER:
17          You see this?
18  EXAMINATION BY MR. LAWRENCE WIEDEMANN:
19      Q.  Do you have that? Do you have that
20  in your records?
21      A.  I have this lock report. It was
22  provided to me earlier.
23      Q.  You had that before? Okay. You see
24  between -- starting on the 27th at 4:13 --
25  actually, on -- yes, at 4:13 -- Excuse me.

120

1       MR. FISHER:
2           Where are you, Counsel?
3       MR. LAWRENCE WIEDEMANN:
4           I am looking here.
5   EXAMINATION BY MR. LAWRENCE WIEDEMANN:
6       Q.  If you go down the list, you will
7   see they're in order. It's starting on the
8   right side in order by time. Okay? The date
9   and time, the EOL. Do you see that?
10      A.  Yes.
11      Q.  Okay. That's the date and time --
12  and to the left, you have got three time
13  elements. The arrival at the lock, the
14  entering of the lock, and the clearing of the
15  lock. Do you see that at the top?
16      A.  Yes.
17      Q.  Arrival date -- Arrival date and
18  time, SOL is the date and time in the lock,
19  and the EOL is the date and time that it
20  exited the lock. Okay?
21      A.  Yes.
22      Q.  Do you understand?
23      A.  Yes.
24      Q.  Okay. So between 5:13 on the 27th,
25  starting with the LULU, which is the vessel to

121

1   the far left, do you see that? 713.
2       A.  Yes.
3       Q.  And then they've got to the far left
4   is the name of the vessel, LULU.
5       A.  Yes.
6       Q.  Okay? Down to the 27th at 2332,
7   which is 11:30. Okay? You see that? The
8   COURTNEY LYNN?
9       A.  Yes. I see that.
10      Q.  Six barges were taken through the
11  locks if you count them to the right. The far
12  right is the number of barges.
13      A.  Yes. Yes.
14      Q.  Okay. And if you go down to the
15  28th, the following day, starting at eight
16  minutes after midnight starting with the JOHN
17  P, okay?
18      A.  Yes.
19      Q.  Nine barges went through the locks
20  between 11:32 on the 28th -- excuse me, --
21  eight minutes after midnight on the 28th, to
22  3:44 on the 28th. Nine barges went through.
23      A.  Yes.
24      Q.  A total of 15 barges went through
25  the locks. Okay?

31 (Pages 118 to 121)

122

1  A.  Yes.
2  Q.  Including vessels.  Right?
3      MR. FISHER:
4        What's the question, Counsel?
5  You asking him to testify or interpret
6  a U.S. Army Corps of Engineers
7  lockmaster's log?  Is that what you're
8  asking him to do?  What is the
9  question?  Either you ask a question
10  or you don't ask a question.  What is
11  it?
12      MR. LAWRENCE WIEDEMANN:
13        Well, let me first say that this
14  witness has this document in his
15  possession in his documents that were
16  given to him apparently by your office
17  and he knows about it.
18      THE WITNESS:
19        And it's listed in my report
20  EXAMINATION BY MR. LAWRENCE WIEDEMANN:
21  Q.  That's correct.
22      MR. LAWRENCE WIEDEMANN:
23        So I don't know what you are
24  objecting to.  Why does he have it and
25  why isn't it in his report if it's

123

1  shocking to you?
2      MR. FISHER:
3        Are you about to ask another
4  incomplete hypothetical?  Because we
5  all know the Zito fleet closed at
6  12:00 noon on Saturday, the 27th.  So
7  this barge could not be brought back
8  or returned to the Zito fleet --
9      MR. LAWRENCE WIEDEMANN:
10        That's argumentative.
11      MR. FISHER:
12        -- at that point in time.
13      MR. LAWRENCE WIEDEMANN:
14        And I ask that it be stricken,
15  and that is not factually correct, as
16  a matter of fact.
17      MR. FISHER:
18        Just looking at the document that
19  you handed to the witness a few
20  minutes ago.
21      MR. LAWRENCE WIEDEMANN:
22        Okay.  Well, we'll go over the
23  document.
24  EXAMINATION BY MR. LAWRENCE WIEDEMANN:
25  Q.  I ask you to assume, as you know

124

from this document that's in your record.
That 14 -- 15 barges cleared the locks on the
28th -- the afternoon of the 28th and the
morning of the 29th.
    MR. FISHER:
        Object to the form.
EXAMINATION BY MR. LAWRENCE WIEDEMANN:
    Q.  Excuse me.  The afternoon of the
27th and the morning of the 28th.  That's what
it shows, doesn't it?
    MR. FISHER:
        Misinterpreting the log.  I don't
see 15 barges at all.
    MR. LAWRENCE WIEDEMANN:
        Well, Counsel, obviously if you
add to the right, the two at the
bottom, three, four, six, eight,
nine.  Okay?
    MR. FISHER:
        Okay.  That's nine.  That's not
15.
    MR. LAWRENCE WIEDEMANN:
        And then there's six above it.
That makes 15.
    MR. FISHER:

125

        That's on the preceding day,
though.
    MR. LAWRENCE WIEDEMANN:
        I said the 28th and -- the 27th
and the 28th.
    MR. FISHER:
        You said the 28th, Counsel.
    MR. LAWRENCE WIEDEMANN:
        No.  I'll repeat my question.
EXAMINATION BY MR. LAWRENCE WIEDEMANN:
    Q.  I ask you to assume that between the
27th as reflected on this document and the
28th, the day before the hurricane, 15 tugs
went through the locks.
    A.  I agree with that.
    Q.  You agree with that.  Okay?
    MR. FISHER:
        Object to the form.
EXAMINATION BY MR. LAWRENCE WIEDEMANN:
    Q.  I ask you to assume that the REGINA
H, which made the turnaround, went through the
locks, exited the locks at 1412, 2:12 on the
27th.
    A.  I agree with that.
    Q.  And that was the one that turned

126

1  around the two vessel -- the two barges. Do
2  you understand?
3      A.  Yes.
4      Q.  Okay. And I ask you to assume that
5  Zito Fleeting took in -- took in eight barges
6  on the 27th, including four barges from
7  Ingram, Ingram 7530, Ingram 4722, Ingram, it
8  looks like 2885, and Ingram 7530.
9          MR. FISHER:
10             What page and what document are
11         you reading from, Counsel?
12         MR. LAWRENCE WIEDEMANN:
13             This is the Zito fleeting
14         document that he saw earlier.
15         MR. FISHER:
16             At what time?
17  EXAMINATION BY MR. LAWRENCE WIEDEMANN:
18      Q.  It took through -- It took on the
19  28th at 1530 -- On the 27th. I'm sorry. At
20  1530, the CONNIE Z took four barges into the
21  fleet. At 1920 an Ingram barge was taken in
22  also by the CONNIE Z. I'm sorry. The
23  LOCKMASTER took in a barge -- took in actually
24  three barges at 1945, and the CONNIE Z went in
25  light boat at 1855.

127

1      A.  Well, the page you provided me also
2  has a notation that says the fleet was closed
3  at 1200.
4      Q.  But the document, I ask you to
5  assume that the document shows these vessels
6  going into the Zito Fleet. That is, including
7  Ingram barge vessels -- Ingram barges well
8  after noon. Does that not say so?
9      A.  It doesn't make sense to me.
10     Q.  Huh?
11     A.  I'm sorry, this document doesn't
12  make sense to me. It has one notation that
13  says the fleet is closed and it appears to
14  have other notations that barges were going
15  in. So I would ask what the "fleet closed"
16  writing means from whoever authored it.
17     Q.  I ask you to assume that barges went
18  into the locks as shown on the barge lock
19  document; that the -- that the REGINA H was at
20  Lafarge and went through the locks. Okay? Is
21  there any reason that you can explain why the
22  REGINA H did not take out the barge --
23         MR. FISHER:
24             Object to the form.
25  EXAMINATION BY MR. LAWRENCE WIEDEMANN:

128

1      Q.  -- when it left?
2      A.  I don't know -- They were not
3  requested to take it out.
4      Q.  But there was no restriction, at
5  least from these documents, to it taking the
6  barge out?
7      A.  This document says the fleet was
8  closed.
9          MR. FISHER:
10             The same objection, Counsel.
11         THE WITNESS:
12             You handed me a piece of paper
13         that says the fleet was closed.
14  EXAMINATION BY MR. LAWRENCE WIEDEMANN:
15     Q.  Well, look at what I just showed
16  you.
17     A.  I am.
18         MR. FISHER:
19             The hypothetical is incomplete.
20  EXAMINATION BY MR. LAWRENCE WIEDEMANN:
21     Q.  You think that the fleet is closed
22  when it's taking barges in?
23     A.  I would like to see the author of
24  this piece of paper and ask him why there's
25  two different notations.

129

1      Q.  Are you aware that Ingram Barge had
2  a contract with Zito Fleet?
3      A.  No, I am not.
4      Q.  Are you aware that they had 40
5  reserved berths at the Zito fleet that they
6  could use at any time without paying for it?
7          MR. FISHER:
8             Object to the form.
9          THE WITNESS:
10             I do not know that.
11  EXAMINATION BY MR. LAWRENCE WIEDEMANN:
12     Q.  Okay. Mr. Ryan, in your report you
13  said, I believe, that, at page 6-F --
14         MR. LAWRENCE WIEDEMANN:
15             Is that right?
16         MR. KARL WIEDEMANN:
17             Yes.
18         MR. LAWRENCE WIEDEMANN:
19             Is that F?
20  EXAMINATION BY MR. LAWRENCE WIEDEMANN:
21     Q.  In the report, page 6-F, that
22  condition Whiskey, condition X-ray, and
23  condition Zulu -- Yankee. I'm sorry. And
24  Zulu were not applicable to Ingram Barge
25  4727.

130

1    A. In paragraph F, I was talking only
2  about port condition Whiskey.
3    Q. And you said port condition Whiskey
4  is not applicable to Ingram 4727?
5    A. The requirements of port condition
6  Whiskey were not applicable -- were only
7  applicable to ocean-going vessels and ocean
8  tugs, ocean barges and their assist tugs, and
9  the Ingram 4727 was neither of those.
10   Q. Well, I ask you to look at the Annex
11 B of the Maritime Hurricane Contingency Plan.
12 Do you have that?
13   A. Yes.
14   Q. You see at the top of Annex B it
15 says "Appendices 1 and 2 to this Annex contain
16 detailed precautionary measures appropriate to
17 ships and barges, respectively, which intend
18 to shelter in port either at anchor or
19 moored." Do you see that?
20   A. Yes.
21   Q. And that's above all of the
22 conditions, condition Whiskey, X-ray, Yankee,
23 and Zulu. And the Appendix B, Annex B talks
24 about recommended precautionary measures for
25 barges.

131

1    A. That's correct.
2    Q. So it incorporates that within all
3  of these conditions.
4    A. That is correct.
5    Q. Okay. Well, how do you reconcile
6  your opinion to the fact that it is not
7  applicable?
8    A. What I said was that the specific
9  recommendations which are preceding this,
10 under the section of the plan starting on page
11 D-3, where it says "Captain of the Port
12 actions and decisions". And these are the
13 specific things that the Captain of the Port
14 can order. And that was the part that I was
15 addressing. That these parts which clearly
16 state a self-propelled ocean-going vessel over
17 500 gross tons and ocean-going barges and
18 their supporting tugs were not applicable. I
19 further said, in addition, there are
20 recommendations, but they are only
21 recommendations.
22   Q. But it does apply to barges, all of
23 these conditions.
24   MR. FISHER:
25   Object to the form.

132

THE WITNESS:
    The recommendations apply to
vessels and barges according to the
appendices in the annex, yes, but they
are recommendations and in the -- and
when they issued the marine safety
information bulletin for port
condition Whiskey, they clearly said
"for consideration."
EXAMINATION BY MR. LAWRENCE WIEDEMANN:
    Q. But am I correct, so there won't be
any mistake, Annex B incorporates appendices 1
and 2? Right?
    A. Yes.
    Q. And it says that the precautionary
measures appropriate to ships and barges,
respectively, which intend to shelter in port
either at anchor or moored, and that's the
things they have to do that's put in Appendix
B?
    A. They don't have to do.
    Q. They're recommended --
    A. Recommended.
    Q. -- to do it?
    A. To be considered, yes.

133

    Q. And that is --
    A. The ING-4727 complied with it.
    Q. Mooring lines doubled with due
consideration given to the effects of
predicted storm surge, special attention
should be paid to barges moored in the
proximity of bridges. That applies to all of
these conditions, does it not?
    A. Yes. And the 4727 complied with
those recommendations. Exceeded those
recommendations.
    Q. And I am correct that during all of
these conditions, that is, Whiskey through
Zulu, the barge was in the possession of
Lafarge? Is that correct?
    A. Yes.
    Q. And that it had whatever
responsibilities are set forth in these
documents -- in this document with regard to
that barge?
    A. To take into consideration, yes,
which they did.
    Q. Do you know what the surge was
predicted?
    A. I believe 25 feet.

134

1    Q.  And what is the special attention to
2    be paid to barges in a predicted surge like
3    that?
4    A.  The Coast Guard doesn't set a
5    standard for that.  They leave that to the
6    mariners.
7    Q.  Did the Coast Guard, to your
8    knowledge, in 2005, at the time of the
9    hurricane, designate safe harbors for barges
10   and vessels?
11   A.  I don't think the Coast Guard's ever
12   designated safe harbors.
13   Q.  Do you know that the -- Are you
14   familiar with the American Waterways Operators
15   Responsible Carrier Program?
16   A.  Yes, I am.
17   Q.  Is that an accepted organization?
18   A.  It's recognized by the Coast Guard,
19   yes.
20   Q.  Are you aware that they have
21   published safe harbors?
22   A.  No, I am not.
23   Q.  Okay.  Let me show you a document.
24   I have the entire document, but I just took
25   part of it.  That the safe harbor recognized

135

1    by the American Waterways Operators
2    Responsible Carriers Program incorporated in
3    the Joseph C. Domino, Incorporated policies
4    and procedures manual, only recognizes the
5    Harvey Canal as a safe harbor in the New
6    Orleans area.  Are you aware of that?
7         MR. FISHER:
8            Counsel, can you further identify
9         that document as to what deposition --
10        THE WITNESS:
11           No, I am not aware of that.
12   EXAMINATION BY MR. LAWRENCE WIEDEMANN:
13      Q.  What?
14        MR. FISHER:
15           As to where that came from?
16        THE WITNESS:
17           I am not aware of that.
18        MR. FISHER:
19           Is that a deposition exhibit,
20      Counsel?
21        MR. LAWRENCE WIEDEMANN:
22           What?
23        MR. FISHER:
24           Is that a deposition exhibit?
25        MR. LAWRENCE WIEDEMANN:

136

         No, it's a document produced by a
      Defendant in this case.
        MR. FISHER:
           That would be which Defendant?
        MR. LAWRENCE WIEDEMANN:
           What?
        MR. FISHER:
           That would be which Defendant?
        MR. LAWRENCE WIEDEMANN:
           Domino.
        MR. FISHER:
           Okay.
   EXAMINATION BY MR. LAWRENCE WIEDEMANN:
      Q.  Let me show you the document if I
   might, and it's identified as Joseph C.
   Domino, Incorporated policies and procedures
   manual, and it's marked DOM-0014 for purpose
   of identification in an earlier -- and on page
   00141, which is a continuation of the previous
   page which deals with safe harbors.
        MR. FISHER:
           Well, let me note my objection to
        this document which appears to be an
        incomplete copy of some document, but
        it's an internal -- part of an

137

        internal policy and procedure manual
        of Joseph C. Domino, Inc. and it's not
        an American Waterways Operators
        document.
   EXAMINATION BY MR. LAWRENCE WIEDEMANN:
      Q.  If you will look at the first page
   --
        MR. FISHER:
           So what's the question, Counsel?
        MR. LAWRENCE WIEDEMANN:
           Well, I am going to get the whole
        thing for you so you won't be having
        an objection.
        MR. FISHER:
           Well, one of your preparatory
        remarks or questions was about the
        American Waterways Operators, and this
        is a Domino internal document, or part
        of one I should say.
   EXAMINATION BY MR. LAWRENCE WIEDEMANN:
      Q.  This is the entire document and it
   -- in the introduction it says that "The
   policy and procedures contained in this manual
   have been developed by Joseph C. Domino as a
   marine broker for chartered vessels.  The

138

1  manual is designed -- These management
2  procedures in conjunction with vessel
3  operating procedures were written to meet
4  and/or exceed the elements of the American
5  Waterways Operators Responsible Carriers
6  Program."
7      MR. FISHER:
8      Continuing objection.  What does
9  that have to do with Lafarge North
10 America's terminal, Counsel, which is
11 what we're talking about here today?
12     MR. LAWRENCE WIEDEMANN:
13     What I am talking about is safe
14 harbors.
15 EXAMINATION BY MR. LAWRENCE WIEDEMANN:
16     Q.  So I'll give you the whole document,
17 and -- give me back that piece right there.
18     MR. FISHER:
19     (Counsel hands document to
20 Counsel.)
21     I want to continue my objection
22 to you asking the witness questions
23 about something that is definitely not
24 a U.S. Coast Guard regulation,
25 recommendation, guideline or anything

139

1  else.  In fact, it's some kind of
2  internal policy and procedures manual
3  from Joseph Domino and not even an
4  American Waterways Operators
5  document.
6  EXAMINATION BY MR. LAWRENCE WIEDEMANN:
7      Q.  I am going to show you page 00140,
8  which I have just taken out, which -- that you
9  can -- which designates safe harbors.
10     MR. FISHER:
11     Again, the same objection.
12     What's the question?
13 EXAMINATION BY MR. LAWRENCE WIEDEMANN:
14     Q.  The second --
15     MR. FISHER:
16     Or is there a question?
17 EXAMINATION BY MR. LAWRENCE WIEDEMANN:
18     Q.  If you look at that document
19 designating safe harbors, the only safe harbor
20 in the area of the Lafarge facility is the
21 Harvey Canal.
22     MR. FISHER:
23     Well, let me make --
24 EXAMINATION BY MR. LAWRENCE WIEDEMANN:
25     Q.  Is that not --

140

MR. FISHER:
    -- the objection continuing to
--
    MR. LAWRENCE WIEDEMANN:
    You can let him answer the
question.
    MR. FISHER:
    The use of a part of a policy and
procedure manual from Joseph Domino,
which everyone knows is located on the
west bank around Harvey, Louisiana and
Marrero on the Harvey Canal, so it's
certainly not surprising to me or
anyone else in this room that they
would designate their own backyard as
a safe harbor.  What does it have to
do with this case, Counsel?  Let's
move on.
    MR. LAWRENCE WIEDEMANN:
    It's the American Waterways
Operators Responsible Carriers program
which he recognizes that designates
safe harbors all over America.  Okay?
And that's accepted by the United
States Coast Guard, because they don't

141

designate safe harbors.
    THE WITNESS:
    But this is submitted by Domino
and may not list all safe harbors.
They may exclude certain areas because
of economic considerations.
EXAMINATION BY MR. LAWRENCE WIEDEMANN:
    Q.  I ask you to assume that this
document is in compliance with the American
Waterways Operators Responsible Carriers
program which you have recognized as a
legitimate organization.  Is that correct?
    A.  That is correct.
    MR. FISHER:
    Object to form.
EXAMINATION BY MR. LAWRENCE WIEDEMANN:
    Q.  Okay.  And I ask you to assume that
that is a representative document designating
the safe harbors not only in this area, but
also in Brownsville, Texas, Corpus Christi,
Houston, Lake Charles, Morgan City, New
Orleans, the whole area around here.
    A.  I would assume that that doesn't
list all safe harbors, and there's no Coast
Guard acceptance of the term "safe harbor".

142

1   So for Domino to call out safe harbors for
2   their vessels is a company decision, not a
3   regulatory decision.
4       Q.  Do you accept that the American
5   Waterways Operators Responsible Carriers
6   program designates a safe harbor?
7           MR. FISHER:
8               The same objection.
9           THE WITNESS:
10              I am not sure that it's called
11          for under the Responsible Carrier
12          program.  I would have to get the
13          documentation and see --
14  EXAMINATION BY MR. LAWRENCE WIEDEMANN:
15      Q.  My question was, if that
16  organization designates a safe harbor, do you
17  accept that as being a legitimate
18  designation?
19          MR. FISHER:
20              The same objection.
21          THE WITNESS:
22              And I -- My answer was going to
23          be, I don't think that their program
24          calls for the designation of safe
25          harbors.  I would have to see their

143

1       program and find out if they call for
2       safe harbors.  And what that
3       letterhead means to me is they have
4       accepted that policy and procedure
5       manual, that it meets their -- the
6       content requirements of their form and
7       --
8   EXAMINATION BY MR. LAWRENCE WIEDEMANN:
9       Q.  I ask you to assume, and I will
10  repeat it again, that the -- that that
11  organization lists safe harbors and lists in
12  the metropolitan New Orleans area Harvey Canal
13  as a safe harbor.
14      A.  I don't think the American Waterways
15  Operators does.  Domino does.
16      Q.  I am asking you, and I will ask you
17  again, I ask you to assume that it does.
18  Okay?
19      A.  I am not willing to assume that.  I
20  would like to see it in writing.  I don't
21  think they do.
22      Q.  Well, I think you have to.  You have
23  --
24          MR. KITTO:
25              Do you have an AWO listing?

144

EXAMINATION BY MR. LAWRENCE WIEDEMANN:
    Q.  -- to --
        MR. FISHER:
            Assuming facts that are not in
        evidence.  There's nothing from AWO in
        front of us.
EXAMINATION BY MR. LAWRENCE WIEDEMANN:
    Q.  I'm going to repeat it again.  I'll
repeat it as long as we have to stay here.  I
ask you to assume, and whether -- If we can't
prove it's true, then it's wrong.  You assume
that they do list safe harbors and they do
list Harvey Canal as a safe harbor.
    A.  I know for a fact Domino lists
them.  I don't know that the American
Waterways does.
    Q.  I ask you to assume.
    A.  I'll assume it then.
    Q.  Okay.  If they do that, and only if
they do that, is that acceptable to you?
        MR. FISHER:
            The same objection, Counsel.
        Just because there is the Harvey Canal
        listed on that, which is certainly not
        on its face endorsed by AWO or the

145

        Coast Guard or anybody except to
        Domino, that doesn't mean that other
        harbors in this area, this region are
        unsafe.
EXAMINATION BY MR. LAWRENCE WIEDEMANN:
    Q.  Can you answer the question?
    A.  I can assume it.  I don't -- I
wouldn't want to assume it for as a matter of
fact, but I can assume it for hypothetical,
yes.
    Q.  And if they do designate that, is
that acceptable to you from that
organization?
    A.  Yes.
    Q.  Thank you.  Do you not know from
your experience in the 8th Coast Guard
District that, personally, that in storm
conditions, vessels are instructed to go to
the Harvey Canal?
    A.  Not by the Coast Guard.
        MR. FISHER:
            Object to the form.
EXAMINATION BY MR. LAWRENCE WIEDEMANN:
    Q.  Do you not know that vessels went to
the Harvey Canal during Katrina?

146

1    A.  I don't know that as a fact, no.
2    Q.  Do you know anybody that designated
3    the Inner Harbor Navigational Canal as a safe
4    harbor?
5        A.  No.
6        Q.  Are you aware that Lafarge had
7    published on its wall, on the exterior wall on
8    the wharf its mooring requisites for its
9    employees?  Were you aware of that?
10       A.  No.
11       Q.  Were you aware that they required
12   wire -- mooring with wire slings?
13           MR. FISHER:
14               Object to the form.
15       EXAMINATION BY MR. LAWRENCE WIEDEMANN:
16       Q.  Were you aware of that?
17       A.  No.
18       Q.  As a Coast Guard officer, do you not
19   believe that a marine operator such as Lafarge
20   should have a published safety program?
21       A.  There's no Coast Guard requirement,
22   no.
23       Q.  That wasn't my question.  Do you
24   believe that it is a good policy to have a
25   safety --

147

1        A.  You asked me as a Coast Guard
2    officer.
3        Q.  Yes.
4        A.  And I answered as a Coast Guard
5    officer, there's no requirement.
6        Q.  So it's your testimony that since
7    the Coast Guard does not require a safety
8    program, a published safety program, that
9    there is no reason to have one?
10       A.  No.
11       Q.  Huh?
12       A.  That is not my --
13       Q.  What is your answer?
14       A.  My answer is there's no Coast Guard
15   requirement, and if a company develops one,
16   that is good.
17       Q.  Would you agree that extraordinary
18   danger requires extraordinary care?
19       A.  As a Captain of the Port, I didn't
20   deal in degrees of extraordinary danger.
21       Q.  Huh?
22       A.  As a Captain of the Port and a
23   District Marine Safety Officer, I didn't deal
24   in terms such as extraordinary danger.
25       Q.  Okay.  So you don't -- you've never

148

had occasion to deal with extraordinary
danger?
    A.  No.
        VIDEO OPERATOR:
            Change tapes.  That's the end of
    tape 3.  We're going off record.
            (Whereupon a discussion was held
    off the record.)
        VIDEO OPERATOR:
            This is the beginning of tape 4.
    (Discussion off the record.)
        VIDEO OPERATOR:
            We're back on the record.
EXAMINATION BY MR. LAWRENCE WIEDEMANN:
    Q.  Do you agree that a facility such as
Lafarge should continually monitor marine
safety bulletins issued by the United States
Coast Guard and others?
    A.  Yes.
    Q.  Would you agree that a facility
should monitor and adhere to safety bulletins
of Federal and state authorities?
    A.  If they're directive in nature.  If
they're recommendations, they should take them
for consideration.

149

    Q.  Right.  Would you agree that a
facility such as Lafarge, which is totally out
of communication with the Coast Guard, with
weather reports, with any communication except
by cell phones with their family members, is
not in a position to obtain this type of
information?
        MR. FISHER:
            Object to the form.
        THE WITNESS:
            I don't know that they were out
    of commun- -- totally out of
    communications.
EXAMINATION BY MR. LAWRENCE WIEDEMANN:
    Q.  Well, I ask you to assume that they
were and that they only found out about the
hurricane when a spouse called in on a cell
phone.  How would you expect them to know
what's going on from the Coast Guard or from
State officials or from outside authorities?
        MR. FISHER:
            Continuing objection.
        THE WITNESS:
            I assume they had car radios.
EXAMINATION BY MR. LAWRENCE WIEDEMANN:

150

1    Q.   Does the Coast Guard put
2    communications over car radio?
3    A.   They issue releases to the media,
4    newspapers, radios, TVs.
5    Q.   The Lafarge terminal is a waterfront
6    facility as described in the Code of Federal
7    Regulations, is it not?
8    A.   Yes.
9    Q.   The Inner Harbor Navigational Canal
10   is a navigable body of water?
11   A.   Yes.
12   Q.   The Captain of the Port has
13   jurisdiction over the Inner Harbor
14   Navigational Canal?
15   A.   The Captain of the Port for New
16   Orleans, yes.
17   Q.   Yes.  Okay.  You indicated in your
18   report that during the morning of August 27,
19   2004, Lafarge employees added and replaced
20   mooring connections between the 4727 and the
21   4745.
22   A.   Yes.
23   Q.   Where did you get that information?
24   A.   From the deposition of Mr. Bush and
25   I believe Mr. Smith and from the report of Mr.

151

1    Scare from Rope Tech, and Mr. Strauss' report.
2    Q.   What was replaced?
3    A.   One --
4    Q.   Between the two barges?
5    A.   One two-inch line was replaced.
6    Q.   What do you understand were the
7    lines between the two barges?
8    A.   Originally there was two two-inch
9    lines.
10   Q.   A bow and a --
11   A.   And a stern.
12   Q.   A stern line?  And what was the
13   third line?
14   A.   Was added in preparation for the
15   hurricane.
16   Q.   Did you understand that the third
17   line was a spring line?
18   A.   I believe it was a breast line.
19   Q.   A breast line is what?
20   A.   Straight between the two barges, 90
21   -- running perpendicular to the hull.
22   Q.   What is a spring line?
23   A.   Runs at an angle to the hull.
24   Q.   And a spring line is to keep the
25   barges from moving in opposite directions; is

152

that correct?
    A.   Its primary purpose.  It can also
keep them from moving away from each other,
too.
    Q.   But it's not a line designed to keep
barges from moving away from -- more than it
is to keep them from moving in opposite
directions?
    A.   That is correct.
    Q.   A spring line is not as strong as a
straight line?
        MR. FISHER:
            Object to the form.
EXAMINATION BY MR. LAWRENCE WIEDEMANN:
    Q.   Insofar as the barges moving away
from one another?
    A.   I don't think I'm qualified to
answer that.
    Q.   Okay.  Are you aware that there were
five barges moored to the dock, to the Lafarge
dock to the north of the other two barges,
4727 and 4745?
    A.   Yes.
    Q.   Are you aware that those barges
moved to the south during the hurricane, in

153

the direction of the two barges?
        MR. FISHER:
            I object to the form.
        THE WITNESS:
            I have seen that in Mr. Green's
        deposition.
EXAMINATION BY MR. LAWRENCE WIEDEMANN:
    Q.   Have you seen pictures that show
that?
    A.   No, I haven't.
    Q.   Are you aware that the, or did you
see that the barges that were moored to the --
the five barges that were moored to the north
had anything to do with the breaking away of
the 4727?
    A.   I don't know that, no.
    Q.   You don't know?  Did you look at
anything about the mooring of the five
barges?
    A.   No, I did not.
    Q.   You weren't asked to determine
whether they were properly or improperly
moored?
    A.   That's correct.
    Q.   So you are not going to give any

154

1  opinion in that regard?
2      A.  I don't know their mooring
3  arrangement at all.
4      Q.  Huh?
5      A.  I don't know their mooring
6  arrangement at all.
7      Q.  You have not been requested to give
8  any opinion with regard to the five barges?
9  Is that correct?
10     A.  That's correct.
11     Q.  You have not been requested to give
12 any opinion about the mooring of the five
13 barges?
14     A.  That's correct.
15     Q.  You have not been requested to give
16 any opinion concerning the involvement of the
17 five barges with the breakaway?
18     A.  That's correct.
19     MR. LAWRENCE WIEDEMANN:
20         Can we take a few minutes?
21     MR. FISHER:
22         Sure.
23     VIDEO OPERATOR:
24         Off the record.
25         (Whereupon a discussion was held

155

1  off the record.)
2      VIDEO OPERATOR:
3          We're now back on the record.
4  EXAMINATION BY MR. WIEDEMANN:
5      Q.  Mr. Ryan, would you agree with
6  Captain Whiteley's conclusion that Lafarge
7  North America was the person in charge of the
8  ING-4727 and was solely responsible for its
9  safekeeping?
10     A.  Which Whiteley report is that?
11     Q.  That's a report of -- That's the
12 report of September 27, 2007.
13     A.  I have a September 23rd.
14     Q.  23rd. I'm sorry. Yes.
15     A.  And which page?
16     Q.  It's the comments. Page 11. He
17 says, and I just quote, "Lafarge North America
18 was the person in charge of the ING-4727 and
19 was solely responsible for its safekeeping."
20 Do you agree with that?
21     A.  I agree with that.
22     Q.  Okay.
23     MR. LAWRENCE WIEDEMANN:
24         I have no further questions
25         subject to I am going to offer those

156

exhibits.  I'll have to mark them.
    MR. FISHER:
        Are you going to mark them now?
We can take a few minutes to talk for
a minute.
    MR. LAWRENCE WIEDEMANN:
        Yes.  Okay.  I am just going to
mark them.
    MR. FISHER:
        Go ahead and mark them.
    VIDEO OPERATOR:
        Off the record.
        (Whereupon a discussion was held
off the record.)
    MR. LAWRENCE WIEDEMANN:
        The three CFR records which are
CFR 33 CFR 160, 33 CFR 160 part A are
1.  The Gulf Coast Waterway, Inner
Harbor Navigational Lock is 2.  The
Unique Towing, Inc. logs is 3.  The
Zito fleeting documents as 4.  The
U.S. Department of Homeland -- United
States Coast Guard Atlantic Area
instruction as 5.  The Sector New
Orleans Maritime Hurricane Contingency

157

Plan as 6.  I believe that's it.
    MR. KARL WIEDEMANN:
        Yes.
            *    *    *

158

WITNESS'S CERTIFICATE

I, DANIEL FREDERICK RYAN II, read or have
had the preceding testimony read to me, and
hereby certify that it is a true and correct
transcription of my testimony, with the
exception of any attached corrections or
changes.

_____
(Witness' Signature)

_____
DATE SIGNED

DEPONENT PLEASE INITIAL ONE:

_____ Read with no corrections

_____ Read and correction sheet attached

DATE TAKEN: JULY 9, 2009

159

REPORTER'S CERTIFICATE

I, ROGER D. JOHNS, RMR, RDR, CRR,
Certified Court Reporter, do hereby certify
that the above-named witness, after having
been first duly sworn by me to testify to the
truth, did testify as hereinabove set forth;
that the testimony was reported by me in
shorthand and transcribed under my personal
direction and supervision, and is a true and
correct transcript, to the best of my ability
and understanding; that I am not of counsel,
not related to counsel or the parties hereto,
and not in any way interested in the outcome
of this matter.


ROGER D. JOHNS
CERTIFIED COURT REPORTER
STATE OF LOUISIANA

DANIEL F. RYAN, II

## A

ability 159:12
aboard 52:9
above-named 159:6
Academy 22:17
accept 41:4 42:9,10 96:3
  96:19 142:4,17
acceptable 17:4 97:25
  144:20 145:12
acceptance 141:25
accepted 41:8 95:22
  96:16 134:17 140:24
  143:4
accepting 81:16 95:23
accredited 13:21
achieved 79:20,21 80:12
  80:21 87:7
achieves 84:22
achieving 103:23
acknowledge 63:19,21
acquire 65:14
act 10:24 45:7 48:4 52:16
  94:3
action 1:7 5:5 51:19
  100:3 103:7 106:7
  117:7
actions 51:18 65:10,21
  89:8 100:14 104:1
  106:3 116:16 117:2
  131:12
active 22:16
add 124:16
added 150:19 151:14
addition 131:19
additional 17:9 58:8
  67:1 68:8 69:10 70:23
  104:1 105:7
address 7:20
addressed 91:8,10,14
addresses 43:2 69:3,5
addressing 89:2 91:5,11
  91:12 131:15
adequate 85:22
adequately 90:15
adhere 148:21
adjacent 46:11 78:15

adjunct 11:21 12:2,6,11
  12:13,24 15:10
administering 3:23
administrative 17:23
  18:2,3
advance 99:23 100:3,20
adversely 64:3
advertise 11:10,13
advisement 103:15
aforementioned 3:5
afternoon 118:5 124:3,8
agent 87:20
agents 69:24
ago 33:11 34:2 35:15
  77:17 123:20
agree 42:4 57:2 64:11,18
  66:10 70:19 71:2 100:5
  100:19 101:8 102:9,12
  103:3 105:10 106:9
  115:24 116:25 117:8
  117:15,23 125:15,16,24
  147:17 148:15,20
  149:1 155:5,20,21
agreed 3:3 7:5 41:12
agricultural 13:4
ahead 156:10
Alameda 17:24,25 18:6
Algiers 108:2 110:3
  114:7
allow 88:7
amended 35:19 67:14
America 2:12,15,20 5:23
  140:23 155:7,17
American 2:8 6:7 134:14
  135:1 137:3,17 138:4
  139:4 140:20 141:9
  142:4 143:14 144:15
America's 138:10
amount 19:20 74:24
anchor 52:10 130:18
  132:18
and/or 67:1 68:8 88:10
  105:8 138:4
angle 151:23
annex 72:3,7 130:10,14
  130:15,23 132:4,12

answer 3:15 56:2 114:22
  140:5 142:22 145:6
  147:13,14 152:18
answered 25:13 37:17
  95:3 96:25 105:21
  115:10 117:12 147:4
answering 50:14
anticipation 60:4
anybody 145:1 146:2
apparently 59:10 122:16
appeal 17:14
APPEARANCES 2:1
appeared 10:17
appears 90:5 127:13
  136:23
appendices 130:15 132:4
  132:12
Appendix 72:2,18
  130:23 132:19
applicable 27:7 42:21,24
  43:5,25 44:1,9,11,15,16
  44:22 47:21 52:19
  54:20 55:21 56:22,25
  57:4,20 63:14,14 72:25
  100:9 129:24 130:4,6,7
  131:7,18
applies 133:7
apply 131:22 132:2
approach 93:21
approached 42:23 84:16
  84:21
approaching 71:7
  101:12,22 116:15
appropriate 100:3 103:8
  130:16 132:16
appropriateness 70:23
approved 14:5,7 19:23
  20:3
Approximately 16:14
area 23:20 43:14 50:19
  58:5,19,23,25 59:7,9,19
  59:23 60:14 62:25 63:1
  64:6 82:13,17 89:1
  98:25 100:10 106:1
  116:13 135:6 139:20
  141:19,22 143:12

145:3 156:23
areas 50:7 141:5
argument 17:10
argumentative 80:9
  94:24 96:5 123:10
Army 122:6
arrange 74:23
arranged 94:1
arrangement 89:3 154:3
  154:6
arrangements 43:3
  90:21
arrival 44:3 69:5 120:13
  120:17,17
arrived 113:1,3
article 55:6 57:12
artificial 54:13
ashore 77:25
asked 22:25,25 25:13
  27:5 35:4 36:13,22,23
  37:17 41:16,19 50:23
  50:24 94:9 95:3 96:25
  105:20 117:11 118:19
  147:1 153:21
asking 34:15 94:11 122:5
  122:8 138:22 143:16
assess 19:22
assessor 19:25
assist 130:8
associated 64:8
Associates 5:18
assume 29:13 31:24
  68:18 72:15 87:15
  113:16 118:19 119:6
  123:25 125:11,20
  126:4 127:5,17 141:8
  141:17,23 143:9,17,19
  144:10,11,17,18 145:7
  145:8,9 149:15,24
assumed 60:7
assumes 87:17 119:3
assuming 110:23 114:2
  144:4
assumption 79:18 88:5
Atlantic 58:19,23,25
  59:7,8,19,22 60:14

DANIEL F. RYAN, II

62:25 63:1 82:13,17
98:25 100:10 106:1
116:13 156:23
**attached** 158:8,18
**attention** 73:6 75:2
133:5 134:1
**attorney** 10:6
**attorneys** 2:4,8,12,15,20
21:24 86:24
**attributes** 66:24 68:6
69:10 105:6
**audit** 19:22
**August** 63:15 150:18
**author** 128:23
**authored** 127:16
**authoritative** 41:5,9
**authorities** 51:18 148:22
149:20
**authority** 49:8,10,16,24
49:25 50:12,24 52:6,13
53:17,24 55:23 56:8
60:11,14,18,21 84:17
**authorization** 51:2,24
**authorized** 49:13 51:15
114:3,4
**available** 42:17 64:22,25
65:12 77:24 78:3,25
110:20 119:8
**Avenue** 2:14 75:6,7,14
75:14 111:18
**average** 64:4 84:11
99:22 100:18
**avoid** 106:6 117:5
**aware** 62:21,24 63:1,4,6
64:20 66:2 87:16
100:10 101:17 106:17
111:13,19 113:7,12
129:1,4 134:20 135:6
135:11,17 146:6,9,11
146:16 152:19,24
153:11
**AWO** 143:25 144:5,25

**B**

**B** 2:10 72:3,7 130:11,14
130:23,23 132:12,20
**back** 19:13 22:13 38:20

47:9 56:19 73:19 81:8
98:22 123:7 138:17
148:13 155:3
**background** 63:21 78:22
**backyard** 140:15
**bad** 115:11
**balance** 75:9 76:6,17
**ballast** 70:24 71:17
**bank** 140:11
**barge** 1:9 23:15 24:7,8
27:20,21 43:9 44:6
57:13 72:22 75:10,15
76:11,21 77:4 78:10
84:25 87:6 89:19 90:15
92:8 101:5 102:10,14
102:20,24 103:1,18
113:9 114:3,4,16,16
115:6,7,10,11,16 116:4
117:25 119:8 123:7
126:21,23 127:7,18,22
128:6 129:1,24 133:14
133:20
**barges** 72:20 73:7 75:3
79:4,8 80:2 101:11,23
102:2,4 108:12,12
111:4,14 113:3 121:10
121:12,19,22,24 124:2
124:13 126:1,5,6,20,24
127:7,14,17 128:22
130:8,17,25 131:17,22
132:3,16 133:6 134:2,9
151:4,7,20,25 152:6,15
152:20,21,24 153:1,12
153:13,19 154:8,13,17
**Barnett** 2:6 6:7
**Baronne** 2:3
**based** 12:1,14 17:14
77:22
**basic** 70:7
**Basically** 13:8,14
**basis** 20:7,9 59:14 102:5
**Bates** 72:9
**Baton** 11:24 12:5
**before-mentioned** 6:21
**beginning** 56:18 98:21
148:10

**behalf** 6:7 11:11 16:4
18:9
**belabor** 35:17
**believe** 17:7,15 23:23
33:11 45:9 47:12 53:4
53:11 59:1,1 62:1 72:9
74:25 88:25 89:2 91:9
98:4 99:15 114:19
116:3 129:13 133:25
146:19,24 150:25
151:18 157:1
**bell** 109:16
**BENOIT** 1:14
**berths** 129:5
**best** 159:12
**better** 69:13 71:1,7
115:10,18
**beyond** 114:12,18,20
**billed** 33:2,12 34:1
**billing** 33:3,9,10
**bills** 32:18,22
**biological** 12:9 13:3
**Bisso** 21:5 22:2,4,5,7,8
**boat** 17:8 112:22 126:25
**body** 61:16 150:10
**bollard** 94:4
**bottom** 124:17
**boundaries** 89:14
**BOUTTE** 1:12
**bow** 44:5,8,23 57:12,23
58:6 151:10
**Breaches** 1:7 5:5
**break** 77:14 98:14
105:19
**breakaway** 42:22 154:17
**breakaways** 43:2
**breaking** 153:14
**breaks** 77:4
**breast** 151:18,19
**bridge** 75:6,7,11,14,14
75:21 76:7,12,19,22
77:5,13,14
**bridges** 73:8 75:3,6
133:7
**broke** 47:11
**broker** 137:25

**brought** 17:18 123:7
**BROWN** 2:6
**Brownsville** 141:20
**Budwine** 26:17 28:13
40:16
**Building** 21:15 62:20
**bulletin** 132:7
**bulletins** 50:22 104:12
148:17,21
**Bush** 150:24
**business** 7:25 8:6,8 22:10

**C**

**C** 99:21,22 135:3 136:15
137:2,24
**cadet** 22:17
**call** 142:1 143:1
**called** 11:23,25 23:15
25:23 27:4 62:16
142:10 149:17
**calls** 142:24
**Canal** 1:7 5:5 111:18
112:21 114:7 119:14
135:5 139:21 140:12
143:12 144:13,23
145:19,25 146:3 150:9
150:14
**capability** 71:16
**capable** 54:14
**capacity** 24:19
**captain** 37:3 43:14 50:8
50:11,17 69:1 84:5,16
84:17,21,24 85:13 87:3
87:17 88:17 89:13
90:19 106:21 109:3
112:13 113:7,24
116:22 131:11,13
147:19,22 150:12,15
155:6
**captains** 49:11 50:3
51:17 87:12
**car** 149:24 150:2
**care** 101:25 147:18
**career** 12:14 16:1,5
18:25 31:3
**cargo** 46:9 70:24 71:10
116:20,23

DANIEL F. RYAN, II

cargos 52:9
Carrier 134:15 142:11
Carriers 135:2 138:5
 140:21 141:10 142:5
carrying 116:3
case 5:6 9:13,17,21 10:2
 10:7,13,19,23 11:8
 15:12,25 16:1,22,24,25
 17:20 13:22 19:5,7,10
 20:15 22:23 33:2 88:13
 88:24 93:15 94:8,12
 95:21 107:22 136:2
 140:17
cases 10:16
Cashio 39:4
casualties 11:2
casualty 11:4
Category 69:4,4
caught 101:23
cause 64:5,9 77:15
ceased 116:20
ceasing 116:23
cell 19:12 149:5,17
cement 101:23 102:4
Center 2:7 12:9
Centre 1:23 2:11
certain 26:1 69:6 141:5
certainly 140:13 144:24
CERTIFICATE 158:2
 159:2
certification 3:11
Certified 2:23 3:21 5:15
 159:5,21
certify 158:6 159:5
cetera 60:22
CEUs 13:23
CFR 16:18 43:10 44:5
 48:1,11 54:7 55:7,7,23
 57:12 58:1 60:22 91:18
 92:9 156:16,17,17,17
Chaffe 1:22 2:10 5:10,22
 25:23
challenge 99:25
chance 63:7
change 56:12 67:12
 68:13 148:5

changed 83:23
changes 99:13,20 158:9
changing 81:16
channel 75:21
characteristics 66:23
 68:5 69:9 105:5
characterization 74:2
charge 68:11 69:25
 88:11 155:7,18
charged 17:16
Charles 141:21
chartered 137:25
Christi 141:20
circumstance 57:4
circumstances 67:12
citation 40:22 43:11
cited 63:11 89:15
citing 11:1
city 84:4 87:13 141:21
civil 1:7 3:7 5:5 17:17
Claiborne 75:7,14
clarified 82:10
clear 18:19 105:12
cleared 111:17 113:4
 124:2
clearing 120:14
clearly 104:13 117:20
 131:15 132:8
close 75:8,17,24 76:3,25
closed 110:15,18,23
 123:5 127:2,13,15
 128:8,13,21
Club 2:8 6:8
Coast 8:1 11:4,14 12:14
 15:6,20 16:4,5,7,13,17
 17:25 18:3,10,20 20:13
 20:18,22,25 21:3,8
 22:3,8,10,14,17 23:2
 24:11 27:2,3,6 31:3
 40:12,19 42:20 43:1,4
 49:11 51:15,22 57:8,25
 58:4,9,10,11,17 64:1,2
 64:23 65:6,18,19 69:1
 69:7 70:8 71:20 78:8
 80:14 81:18 82:5,20
 83:6 84:2 86:10 87:10

87:16 89:9 90:25 97:15
 100:7 103:6,14,20,24
 104:3,13 114:14
 115:14 134:4,7,11,18
 138:24 140:25 141:24
 145:1,16,20 146:18,21
 147:1,4,7,14 148:18
 149:3,19 150:1 156:18
 156:23
Code 43:9 49:9 91:19
 150:6
college 13:22 14:14
combine 64:9
come 27:24 29:14 91:25
 92:14,23 94:5 97:23
 103:22
comes 44:13 57:23
 118:15
coming 102:5
Commander 36:16
comments 36:3 155:16
commerce 101:4 116:4
 116:11,14 117:21
commercial 101:18
 102:2
committed 42:13,15
common 64:16 80:3,25
 84:14 85:3 87:8
commun 149:12
communicate 80:4
communication 149:3,4
communications 149:13
 150:2
communities 64:3
community 63:25 64:15
company 11:1,3,16
 19:19 102:24 142:2
 147:15
compartment 17:2,10
compensated 14:20
complete 39:23 40:2
 118:13,23
compliance 91:14 92:21
 93:19 97:6 98:9 141:9
complied 87:2 133:2,9
comply 11:3 47:21 52:19

70:6 95:12 103:13
composition 90:10
compromise 106:5 117:4
concern 23:18 78:13
concerned 24:25 25:2
 77:17 78:18
concerning 41:1 42:1
 154:16
conclusion 81:23 83:5
 85:12 92:19,20 155:6
conclusions 41:6 42:4,6
 89:24 91:25 97:17
condition 43:24 44:12,16
 70:25 129:22,22,23
 130:2,3,5,22 132:8
conditions 43:21,21
 44:10 74:17 103:9
 104:1 114:17 130:22
 131:3,23 133:8,13
 145:18
condone 106:3 117:2
conference 33:13
conformity 51:23
confusing 82:7
Congress 45:8 47:15
 51:14,24 60:19 78:14
 78:17,19
Congressional 51:2
 52:15,16
conjunction 138:2
connected 12:3 25:18
connection 9:6 24:1
connections 150:20
CONNIE 110:6 111:3
 126:20,22,24
conscious 94:3
consequences 101:3
consider 42:21 43:5
 70:22 74:21 75:13
 104:11
consideration 73:5,16,21
 74:13 76:17 101:12
 104:14 132:9 133:4,21
 148:25
considerations 141:6
considered 67:18 69:18

DANIEL F. RYAN, II

132:25
consistently 56:4
consolidated 1:7 5:6
construction 47:23 52:20
construed 69:23
consultant 7:17 10:16,20
  11:12 15:23 20:18
consultation 21:10
consulting 7:18,19,25
  8:10,12,13,22,24 9:3,6
  9:25 11:12
contacted 18:9 19:9,12
  22:22 23:21
contain 130:15
contained 66:20 67:2
  68:2,9 105:2,9 137:23
contains 48:3 66:15
  104:22
content 143:6
contingencies 51:16
contingency 45:5 48:10
  49:18 51:1,21 53:13
  54:19 55:8,22,25 56:6
  56:23 57:3 58:13 61:9
  62:1,8 66:4 87:16
  91:17 95:21 96:15
  97:13,14 99:3 104:18
  130:11 156:25
continually 148:16
continuation 136:19
continue 101:22 138:21
continued 111:4
continuing 15:7 51:6
  61:5 106:12 114:10
  116:4 138:8 140:2
  149:22
contract 19:25 21:7
  129:2
contrivance 54:13
conveniently 118:16
conversation 25:25
  27:10,13,16,19,20
copies 32:21 47:12
copy 46:16,19,20,23
  48:21 59:9 136:24
cordage 85:23 90:1

corporation 8:4,5 11:25
Corps 122:6
Corpus 141:20
correct 8:11,14 10:1
  15:22,23,24 16:9 19:6
  19:8 20:17 22:9 23:25
  24:20,23 26:20 32:1,11
  32:13,14,17 33:8,15,18
  34:4 36:9,10,21 39:14
  39:17 42:2,7 44:7
  48:12 58:15 59:16
  60:20,23,25 62:2,3,5
  70:15,18 71:12 72:10
  72:20,23 81:20 82:18
  83:25 84:3 96:7 103:17
  106:16 115:8,23
  122:21 123:15 131:1,4
  132:11 133:12,15
  141:12,13 152:1,9
  153:24 154:9,10,14,18
  158:6 159:12
correction 158:18
corrections 158:8,16
correctly 27:5
cost 21:19
COTP 106:11
COTPC 49:13
COTPs 49:13 100:1
  106:2 117:1,2
counsel 3:4 5:19 7:5
  32:10 34:9 35:9,18
  37:3 39:24 46:15 50:14
  52:25 61:4 72:3 95:3
  105:16 106:22 108:9
  111:23 113:22 117:12
  118:11 119:8 120:2
  122:4 124:15 125:7
  126:11 128:10 135:8
  135:20 137:9 138:10
  138:19,20 140:17
  144:22 159:13,14
Counsel's 48:14 74:1
count 121:11
countermeasures 13:3
counter-terrorism 13:15
County 18:7

couple 75:19 98:24
course 12:21 14:1 15:19
  28:17 37:6 100:3
  102:20 116:10,14
courses 13:1,5,6,13,14
  13:16,22 14:1,5 19:22
  20:4
court 1:1 2:23 3:21 5:8
  5:16 6:16,21 9:1 17:22
  18:2,4,5,12 159:5,21
COURTNEY 121:8
CRA 12:1 19:14,17
created 8:6
creates 46:4 99:25
credits 13:24
criminal 17:17
criticizing 39:15
critique 41:23,25
CRR 2:23 3:21 159:4
CSR 2:23
curiosity 24:17,18
curriculum 14:1
curtailing 100:14

         D
D 2:23 3:21 4:1 7:17,19
  7:22,24 8:10 9:2 11:11
  49:2,2 159:4,20
daily 102:5
damage 46:9,10 64:6,10
  65:9 66:19 78:14
  104:25
damages 78:24
Dan 6:3
danger 147:18,20,24
  148:2
dangerous 52:9
Daniel 1:21 2:18 5:3 6:18
  8:7 158:4
date 5:12 34:10 120:8,11
  120:17,17,18,19 158:13
  158:20
dated 34:7,10
day 121:15 125:1,13
days 13:20 102:16
day-by-day 44:10 87:11
deal 23:8 43:20 45:1 69:2

147:20,23 148:1
dealing 10:25 21:19
  43:23 44:17
deals 43:12,17 136:20
dealt 36:2 41:14
decide 70:21
decided 96:23
deciding 100:2
decision 77:22 93:17
  101:3 142:2,3
decisions 131:12
deckhand 84:8,11,12
  85:22 87:15
deckhands 87:12
Defendant 136:2,4,8
defines 54:7
definitely 138:23
definition 54:6,20 55:4
  55:15,24 56:4,21 82:21
  86:21 87:1,8
definitions 55:6 81:25
degrees 69:2 147:20
deliver 111:4
delivery 109:15
Delta 10:3
Department 14:6 19:24
  20:3 156:22
depend 100:11
depended 85:20 86:16
depending 74:16
DEPONENT 158:15
deposition 1:21 3:5,16
  5:2,3 6:25 9:5,22 11:2
  16:3,8,13 17:24 18:11
  18:20 19:4 22:20 31:25
  33:22 34:6,11,20,23
  35:9,20,22,23,24 36:4,5
  36:8,12,17 37:4,5,7,21
  38:4,6,23 107:18,19
  118:15 135:9,19,24
  150:24 153:6
depositions 29:13 32:9
  37:11,24
describe 23:11,14 49:10
described 150:6
description 54:12 69:8

JOHNS PENDLETON COURT REPORTERS

DANIEL F. RYAN, II

designate 134:9 140:15
141:1 145:11
designated 134:12 146:2
designates 139:9 140:22
142:6,16
designating 139:19
141:18
designation 142:18,24
designed 138:1 152:5
destination 119:4
detailed 130:16
determination 97:2,5
determine 66:1 85:19,21
86:10,14 153:21
determined 70:21 85:17
develop 40:8
developed 40:9 137:24
develops 147:15
DHS 20:2
diameter 89:20
dictate 66:25 68:7 69:10
105:7
dictionaries 82:1
difference 91:15 94:22
different 19:15 37:9 55:2
55:3 58:21 81:8,24
88:23 90:11 91:2,21
96:23 97:16,24 98:5
110:10 112:3 116:16
128:25
differential 97:12
direct 50:4 52:7
directed 27:1 86:5
direction 153:1 159:11
directions 151:25 152:8
directive 148:23
directly 17:3 22:2,3
75:20
disagree 15:5 42:5 48:17
79:13
disagreed 41:11
disagreeing 41:15
disaster 77:16
discovery 7:1
discuss 25:1
discussion 28:3,4 38:17

47:6 56:15 148:7,11
154:25 156:13
disseminated 66:1
dissemination 65:24
distance 75:18 76:6,9,17
77:23
distant 75:10
distinction 94:16
distributed 64:23 65:5
District 1:1,2 5:7,8 58:18
62:14 145:17 147:23
dock 89:11 101:24 102:2
152:20,21
document 40:20 45:12
45:16,17,19 46:16 48:1
53:1,19,23 54:5,6,8,11
56:7 65:18 71:20 76:21
76:23 79:8 80:7,15
81:19 82:6,23 83:24
84:9 87:23 99:16
106:20 107:6,18 108:1
108:9 109:2,8,8,25
110:10,23 111:2,3
112:3 119:13 122:14
123:18,23 124:1
125:12 126:10,14
127:4,5,11,19 128:7
133:19 134:23,24
135:9 136:1,14,23,24
137:4,18,21 138:16,19
139:5,18 141:9,18
documentation 34:6
142:13
documents 26:12 84:4
112:1 122:15 128:5
133:19 156:21
doing 8:8 14:17 33:23
86:4 87:10 90:4
Domino 135:3 136:10,16
137:2,18,24 139:3
140:9 141:3 142:1
143:15 144:14 145:2
DOM-0014 4:5 136:17
Don 34:6 35:14 40:7
41:15,20 42:17
double 27:8 50:10 79:15

79:19,25 80:22 81:14
84:20
doubled 73:4,15 74:12
79:7,9 80:6,16,24
85:14 87:23,24 133:3
doubling 27:11,23 50:18
50:19,21,24 74:16
79:23 80:2 81:15,15,25
82:1,7,22 84:6,9,14
85:1,2,4 86:22 87:8
93:5 95:20 96:13
draft 60:3
drafted 62:1,10
drafting 61:8,10 63:5
Drive 1:22 6:19 30:25
drove 30:20
due 73:4,15 74:13 133:3
duly 6:20 159:7
duration 88:9
duties 20:23 87:11
duty 22:16
DUVAL 1:9
D-1 53:18,21,23 63:22
D-3 131:11
D-7 66:13 70:20 104:21
D.C 2:15

E

E 4:1 100:25,25
earlier 59:17 99:7
104:20 107:22 116:25
119:22 126:14 136:18
early 16:15 106:7 117:6
East 84:1
Eastern 1:2 5:8
easy 80:4
economic 106:6,13 117:6
117:20 141:6
education 15:7
effect 57:7
effects 73:5,16 74:13,20
133:4
eight 121:15,21 124:17
126:5
either 11:10 36:14 59:5
71:10 84:14 122:9
130:18 132:18

elements 120:13 138:4
email 19:11
emailed 29:19 38:25
emergencies 77:25
employed 7:16 22:4
employees 8:16,20 12:25
146:9 150:19
employment 7:15 15:20
21:14
empty 71:8 113:10 114:4
114:16 115:6,11,19
116:4
enabling 47:13
enact 59:23,24
enacted 48:11,17 50:2
51:9,12 55:9 59:2
65:18,19
enactment 49:17 61:1,2
61:15
enclosure 9:14 36:4
encompassed 35:2
ended 103:4
endorsed 144:25
Energy 1:23 2:7,11
enforcement 13:2
engage 101:4
engaged 10:20 15:13,21
16:2 19:3 21:9 24:5
engagement 24:1,25
engaging 101:18
Engineers 122:6
England 76:12
English 105:12
enhanced 91:3
ensure 47:19 49:12
52:17
entail 21:12
entering 120:14
entire 64:15 69:3 107:6
134:24 137:21
entry 112:24
environment 45:25 46:6
46:10 52:12
EOL 120:9,19
equipment 47:23 52:21
equivalency 13:23

DANIEL F. RYAN, II

7/9/2009

Page 6

**equivalent** 68:19,22 87:7
 98:11 103:22
**error** 99:22 100:18
**escape** 16:20 17:2,9,11
**especially** 101:5
**ESQ** 2:2,3,7,10,14,18
**establish** 49:14,15 52:6
**established** 57:8
**establishes** 89:12
**estimate** 33:4
**et** 60:22
**evacuate** 78:3
**evacuation** 78:5
**evaluate** 12:21
**evaluating** 12:23
**evaluator** 11:22 12:7,7
 12:12,18
**evaluator/assessor** 11:25
**event** 83:22 102:19
 108:18
**everybody** 47:12 72:15
**evidence** 3:17 144:5
**exact** 26:7 43:11 102:15
**exactly** 27:17 89:1
**EXAMINATION** 4:18
 7:13 25:14 34:21 36:6
 36:20 38:21 39:12
 45:18 47:10 48:20
 49:22 50:15 51:11 52:4
 54:4 55:5,19 56:20
 57:21 60:2 61:7,24
 66:12 67:10,21 68:1
 69:20 70:16 71:18
 72:17 74:11 77:12
 80:13,23 81:4 83:3,21
 85:16 86:8 88:3 90:8
 93:12 94:19 95:18 96:8
 97:11,22 98:23 100:24
 102:11 104:16 105:24
 107:25 108:20 109:7
 109:21 112:16 113:15
 114:1,13 115:22
 116:24 117:16 118:4
 119:11,18 120:5
 122:20 123:24 124:7
 125:10,19 126:17

127:25 128:14,20
 129:11,20 132:10
 135:12 136:13 137:5
 137:20 138:15 139:6
 139:13,17,24 141:7,16
 142:14 143:8 144:1,7
 145:5,23 146:15
 148:14 149:14,25
 152:14 153:7 155:4
**example** 93:24 94:9,11
 96:21
**exceed** 138:4
**Exceeded** 133:10
**exception** 74:9 158:8
**excerpts** 39:1,22,24,25
**exclude** 141:5
**excuse** 10:9 46:15 56:12
 72:3 111:2,18 119:25
 121:20 124:8
**exhibit** 107:19 135:19,24
**exhibits** 156:1
**existed** 60:6
**existence** 62:9
**exists** 65:16
**exited** 120:20 125:22
**expect** 81:13 84:8,12,13
 85:4 87:22 88:4 149:18
**expected** 106:3 117:2
**expenses** 14:23
**experience** 98:7 115:14
 145:16
**expert** 12:6 16:2,4 18:9
 19:3 23:3 26:6 37:24
 40:10,11 41:14 85:18
 85:20,24 86:12,13
 89:24 90:1 94:10 97:9
**expertise** 83:7 86:19
 89:1 114:12,18,21
 115:2 116:1
**experts** 28:8 40:6 41:23
**expert's** 110:21
**explain** 127:21
**explained** 18:12
**express** 86:25
**expressed** 86:21 87:1
**extent** 40:5

**exterior** 146:7
**extra** 46:16
**extraordinary** 147:17,18
 147:20,24 148:1

**F**

**F** 8:7 129:19 130:1
**face** 35:6 64:1 68:16
 101:21 144:25
**facilities** 52:9 66:17
 67:19 68:11 70:1,3
 101:11 104:24
**facility** 24:3,4 66:23,24
 68:5,6 78:9 84:25
 87:18 88:8,10 89:8
 90:10 100:1 101:1,7
 105:4,6 106:4 111:15
 113:2 114:5 117:3
 139:20 148:15,20
 149:2 150:6
**fact** 62:6 64:1 67:22
 85:11 101:17 104:11
 119:12 123:16 131:6
 139:1 144:14 145:9
 146:1
**facts** 118:14,23 119:1
 144:4
**factually** 123:15
**faculty** 15:9,11
**Fair** 34:17
**falls** 89:11
**familiar** 45:3 134:14
**family** 1:15 149:5
**far** 121:1,3,11
**fare** 71:1
**fares** 115:10
**February** 20:20 23:23
 25:8,15
**Federal** 3:7 13:9 19:21
 43:9,10 49:9 89:11,11
 91:19 148:22 150:6
**fee** 14:22
**feet** 75:20,23,25 133:25
**fellows** 85:24
**filing** 3:12
**final** 33:9 37:25
**find** 14:15 23:12 37:24

59:4 82:21 117:17
 143:1
**firemen** 13:11
**firm** 25:23
**first** 13:8 15:2,3 16:1
 25:4 28:8,15,22 31:17
 31:20 45:19 58:24
 86:20 108:23 109:8
 110:9 122:13 137:6
 159:7
**Fisher** 2:10 5:21,22 7:4,9
 25:12 30:5 34:8,16
 35:5,16 36:18 37:1,16
 45:11 46:14,22 48:13
 49:20 50:13 51:4,25
 52:24 53:5,14,20,25
 54:22 55:10 57:17
 59:25 61:3,12,18,22
 66:6 67:8,13,24 69:15
 70:12 71:13 72:1,11
 73:25 77:8 80:8,18
 81:2 83:1,15 85:6 86:1
 88:1 90:6 93:7 94:17
 94:23 95:2 96:4,24
 97:18 98:1,15 100:22
 102:6 104:4 105:15
 106:19,25 107:5,10,17
 108:6,25 109:17
 111:21 112:2,7,12
 113:13,21 114:9
 115:20 116:6 117:10
 118:2,10,21 119:5,16
 120:1 122:3 123:2,11
 123:17 124:5,11,19,25
 125:6,17 126:9,15
 127:23 128:9,18 129:7
 131:24 135:7,14,18,23
 136:3,7,11,21 137:8,14
 138:7,18 139:10,15,22
 140:1,7 141:14 142:7
 142:19 144:3,21
 145:21 146:13 149:8
 149:21 152:12 153:2
 154:21 156:2,9
**five** 20:19 21:15 26:15
 28:8 75:11 152:20

DANIEL F. RYAN, II

153:13,18 154:8,12,17
**fleet** 106:18 107:4 108:2
 109:25 110:3,15,23
 114:8 119:7 123:5,8
 126:21 127:2,6,13,15
 128:7,13,21 129:2,5
**fleeting** 43:2 107:15
 108:1,11 117:25 126:5
 126:13 156:21
**Flooding** 64:8
**Florida** 75:6,13 77:16
**fly** 30:17
**following** 25:25 121:15
**follows** 6:22
**food** 13:4
**Forbes** 19:11,12 22:23
 23:9,17,22 24:1,24
 25:5,17 26:1,22,25
 28:1 30:5 41:19,22
**force** 64:9 69:5
**Forensic** 13:5
**form** 3:14 36:19 49:21
 52:1 54:23 55:11 57:18
 60:1 66:7 67:25 70:13
 71:14 77:9 81:3 83:2
 85:7 86:2 88:2 90:7
 93:8 97:19 100:23
 102:7 104:5 109:18
 113:14,22 115:21
 116:7 124:6 125:18
 127:24 129:8 131:25
 141:15 143:6 145:22
 146:14 149:9 152:13
 153:3
**formal** 15:7
**formalities** 3:11
**formality** 3:9
**formally** 50:6
**formed** 8:3
**forth** 133:18 159:8
**found** 149:16
**foundation** 77:5
**four** 13:20 22:16 30:1,9
 30:10,21 81:5 124:17
 126:6,20
**Francisco** 17:21 18:6

**FREDERICK** 1:21 6:18
 158:4
**front** 47:13,15 48:24
 144:6
**full** 12:25 15:19 114:16
 115:7,10,17
**fully** 66:22 68:4 70:25
 105:4
**funded** 19:23
**furnished** 37:14 40:10
**further** 131:19 135:8
 155:24

**G**

**gale** 69:5
**general** 23:14,19,20
 27:19 43:8,18 64:22
 66:15,16 67:16,23 69:8
 73:19 104:20,22
 110:11 115:12
**generated** 35:7 37:18
**gentleman** 39:1 98:5
**give** 12:19 15:13 36:16
 36:23 76:24 93:24
 94:22 108:17 111:25
 114:25 115:1 118:11
 118:13,25 138:16,17
 153:25 154:7,11,15
**given** 9:5,22 10:17 13:6
 13:17 16:8 18:10,19,25
 52:13 73:5,16 74:13
 85:10 105:17 122:16
 133:4
**giving** 50:22 118:22
**Global** 28:14,14,22,25
 29:1 40:15,16
**go** 10:13 14:15 19:13
 22:12 38:9,12,14 40:21
 44:14,24 47:2 55:3
 56:4 84:19 99:16 120:6
 121:14 123:22 145:18
 156:10
**goal** 103:23
**goes** 44:20 49:14 57:7,14
 64:13 73:19
**going** 27:15 37:15 38:2,3
 38:5 47:18 56:14 59:22

60:5 73:22 74:25 79:21
 101:24 105:20 106:12
 108:21 114:21,22,25
 118:11 119:12 127:6
 127:14 137:11 139:7
 142:22 144:8 148:6
 149:19 153:25 155:25
 156:3,7
**good** 85:25 146:24
 147:16
**Goodwin** 2:13 5:25
**gotten** 34:14 35:12
**government** 19:21
**Graber** 113:8 118:6
**grant** 84:22
**greater** 68:12,21,23,23
 70:8 73:23 87:4
**Green** 34:6 35:8,14,18
 37:5,20 40:7 41:15
 42:18 90:19
**Green's** 36:17 37:10
 38:4 41:17,20 153:5
**gross** 131:17
**Guard** 8:1 11:4,14 12:14
 15:6,20 16:4,5,8,13,17
 17:25 18:3,10,20 20:13
 20:18,23 21:1,4,8 22:3
 22:8,10,14,17 23:2
 24:12 27:2,3,6 31:3
 40:12,19 42:20 43:1,4
 49:11 51:15,22 57:9,25
 58:4,9,11,11,17 64:24
 65:7,18,19 69:1,7 70:8
 71:20 78:8 80:15 81:18
 82:5,20 83:6 86:10
 87:10,17 89:9 90:25
 97:15 100:8 103:6,14
 103:20,25 104:3,13
 114:14 115:14 134:4,7
 134:18 138:24 140:25
 141:25 145:1,16,20
 146:18,21 147:1,4,7,14
 148:18 149:3,19 150:1
 156:23
**Guard's** 134:11
**guess** 104:19

**guidance** 40:20 59:8
 76:24 91:19 99:1
**guideline** 138:25
**Gulf** 63:25 64:2 156:18

**H**

**H** 111:14 112:20 113:8
 114:6 125:21 127:19
 127:22
**half** 33:4
**HAMMOND** 2:6
**hand** 53:8
**handed** 29:17 38:25 40:2
 45:13 123:19 128:12
**handing** 106:21,24
**handling** 52:7
**hands** 138:19
**happen** 73:21 94:7
**happened** 41:1 77:16
**happening** 79:1
**happens** 57:13
**harbor** 119:14 134:25
 135:5 139:19 140:16
 141:25 142:6,16
 143:13 144:13 146:3,4
 150:9,13 156:19
**harbors** 134:9,12,21
 136:20 138:14 139:9
 139:19 140:23 141:1,4
 141:19,24 142:1,25
 143:2,11 144:12 145:3
**Hart** 2:21,22 5:14,16
**Harvey** 135:5 139:21
 140:11,12 143:12
 144:13,23 145:19,25
**hate** 104:18
**hazard** 46:5 106:14
**hazards** 64:7,14
**Health** 10:24
**hearing** 17:23
**Hector** 39:13,21
**held** 11:15,18 14:24
 38:17 47:6 56:15 148:7
 154:25 156:13
**help** 23:1
**helps** 93:15
**hereinabove** 159:8

DANIEL F. RYAN, II

7/9/2009

Page 8

hereto 3:4 159:14
high 90:20
hired 12:13 21:3,5 22:7
hit 77:5,14 102:21
hitting 58:5
home 30:18
Homeland 14:6 19:24
  20:3 156:22
hope 68:18
hot 109:12,14
Houma 30:19,22,24 31:1
hour 30:14 33:20,24
  44:15 100:16 116:17
  116:17,18,18,19
hourly 14:22 20:9 33:16
hours 30:16 35:24 99:23
  100:12,19 102:13,18
  116:21
house 31:4
Houston 141:21
huh 90:12 127:10 147:11
  147:21 154:4
hull 151:21,23
hundred 75:19,22
hurricane 27:22 43:21
  43:24 44:12,18,19,24
  45:4 48:9,10 49:17
  50:25 51:21 53:12
  54:19 55:8,22,25 56:6
  56:23 57:3,5,23 58:4
  58:12 59:8 61:9,25
  62:8 63:14 64:9,17
  66:3,19 68:16 70:3,9
  71:6 74:8 88:9 89:9
  90:16,25 91:20 93:20
  94:12 95:8,11 96:14
  97:8,14 98:12 99:1,2
  101:4,8,12,20,22
  102:13,21 105:1
  115:17 116:11 125:13
  130:11 134:9 149:17
  151:15 152:25 156:25
hurricanes 60:4 64:1,2,4
  64:8 65:20 71:2,21
  78:23
hurricane's 100:4

hypothet 118:20
hypothetical 113:23
  118:9,12 123:4 128:19
  145:9

I
IBCO-0073 4:3 49:3
IBCO-0085 4:4 71:24
  72:12
idea 35:12
identification 136:18
identified 136:15
identify 45:12 53:1
  106:22 135:8
II 1:21 6:18 158:4
immediate 109:15
immediately 31:15 46:11
  78:15
impact 64:3
impacts 106:6 117:6
impede 116:14
impending 103:11
  115:17
implementing 48:3
importance 46:3
important 64:15
improperly 92:3,10,12
  93:3 94:5,20,21 95:6
  96:2 153:22
improve 70:24
inception 23:16
incident 43:7
include 34:5 41:25
including 28:25 33:13
  122:2 126:6 127:6
incoming 110:15
incomplete 108:10
  113:23 118:8,25 123:4
  128:19 136:24
inconsistent 117:17
incorporated 135:2,3
  136:16
incorporates 131:2
  132:12
incorporation 54:18
incorrect 61:6
increase 64:17 84:18

increased 46:3,6
increasing 79:16,23
  82:24 86:22 87:4
incurring 106:6 117:6
indefinite 74:3,8
indicate 26:25
indicated 24:24 150:17
indicates 10:23
industrial 13:7 109:11
  111:17,18 112:21,21
  113:4,4 114:6
industry 64:22 87:11
information 26:10 50:22
  86:7 89:17 92:1 95:10
  104:12 108:3 132:7
  149:7 150:23
informed 27:14
infrequently 12:16
ING 24:8
Ingram 1:13,14 126:7,7
  126:7,7,8,21 127:7,7
  129:1,24 130:4,9
ING-4727 23:15 42:22
  133:2 155:8,18
ING-4745 109:9
initial 27:10,13,18
  158:15
initially 26:15
initials 19:18
injure 77:6
injury 11:4 16:22 66:19
  104:25
Inner 119:14 146:3
  150:9,13 156:18
insist 118:12
insofar 8:22 27:1 40:24
  41:5,14 42:4,5,17
  152:15
inspect 24:7
inspected 24:2
inspection 16:18,19
  24:21
instructed 17:8 67:22
  145:18
instruction 58:19,23,25
  69:3 78:7 106:1 117:20

117:22 156:24
instructor 11:21 12:2,6,7
  12:11,14,17,21 15:8,10
instructors 12:22,24
instruments 50:4
intend 36:16 130:17
  132:17
intent 78:12 98:11
  117:22
interested 23:4 159:15
interfering 117:21
internal 136:25 137:1,18
  139:2
Internet 65:1,13,15
interpose 108:7
interpret 68:10 82:23
  122:5
interpretation 48:15
interpreting 83:7 97:13
introduce 5:20
introduction 137:22
investigation 40:13
investigators 8:20
involve 16:16
involved 16:17 24:8
  65:23
involvement 154:16
involving 15:25
Island 17:25,25
issue 11:7,8 23:9,12,18
  27:12,23 44:20 50:4
  150:3
issued 50:11,18,20 67:7
  132:6 148:17
issues 50:19

J
J 2:7 105:25
January 20:20 23:23
  25:8,15
Jenkins 10:8,10
job 11:16
jobs 11:15,18,19
JOHN 121:16
Johns 2:23 3:21 5:17,17
  159:4,20
Joseph 135:3 136:15

DANIEL F. RYAN, II

7/9/2009

137:2,24 139:3 140:9
**JR** 2:10
**JUDGE** 1:9
**July** 1:24 5:13 158:20
**June** 8:2 11:15 20:20
22:14 31:16 32:3 34:3
34:7,23 35:11 36:8,17
38:4 62:2 63:3,24
88:18,19
**jurisdiction** 18:21
150:13

**K**

**K** 1:8
**Karl** 2:3 6:12,13 39:8
47:1 129:16 157:2
**Katrina** 1:7 5:5 21:18
44:3 57:5 63:15 74:8
94:12 145:25
**keep** 29:20 61:2 78:9
151:24 152:3,5,7
**keeps** 71:11
**Ken** 2:21 5:14
**kept** 65:20
**kill** 64:4
**killed** 78:23
**kind** 17:17 37:13 139:1
**Kitto** 2:7 6:5,6 143:24
**Klotz** 26:17 28:13,18
29:10 40:15
**knew** 23:16 59:21 60:4,6
94:14
**knock** 77:5
**know** 9:16 19:18 25:17
25:20 27:15 35:11 42:3
61:6 62:11,12 65:10,16
65:21 76:21,22 82:12
86:6 87:14,20 94:15
99:14 102:9 103:2
109:12 113:20 115:9
115:13 117:13 122:23
123:5,25 128:2 129:10
133:23 134:13 144:14
144:15 145:15,24
146:1,2 149:11,18
153:16,17 154:2,5
**knowledge** 134:8

**known** 87:18
**knows** 122:17 140:10

**L**

**L** 3:1
**Lafarge** 1:12,14,15 2:12
2:15,20 5:23 6:1,4 24:3
24:4 42:25 84:25 86:24
88:14 90:10 102:13
103:17 109:10 110:6
111:15 113:1 114:5
116:20 127:20 133:15
138:9 139:20 146:6,19
148:16 149:2 150:5,19
152:20 155:6,17
**LAGARDE** 1:13
**Lake** 141:21
**landfall** 64:2 100:4
**LARFARGE** 1:13
**Larry** 88:17
**law** 3:8 13:2 61:17
**Lawrence** 2:2 4:18 6:9
6:10,23 7:6,11,13
25:14 34:12,21 35:10
35:21 36:6,20 37:12,22
39:12 45:14,18 46:18
46:24 48:20 49:22
50:15 51:11 52:4 53:3
53:10,16,22 54:2,4
55:5,19 57:21 60:2
61:7,14,20,24 66:12
67:10,21 68:1 69:20
70:16 71:18 72:6,13,17
74:6,11 77:12 80:13,23
81:4 83:3,12,17,21
85:16 86:8 88:3 90:8
93:12 94:19 95:18 96:8
97:11,22 98:13 100:24
102:11 104:16 105:22
106:23 107:2,7,13,20
107:25 108:14,20
109:7,21 111:24 112:5
112:9,16 113:15 114:1
114:13 115:22 116:24
117:16 118:4,18,24
119:9,11,18 120:3,5
122:12,20,22 123:9,13

123:21,24 124:7,14,22
125:3,8,10,19 126:12
126:17 127:25 128:14
128:20 129:11,14,18,20
132:10 135:12,21,25
136:5,9,13 137:5,10,20
138:12,15 139:6,13,17
139:24 140:4,19 141:7
141:16 142:14 143:8
144:1,7 145:5,23
146:15 148:14 149:14
149:25 152:14 153:7
154:19 155:23 156:6
156:15
**leave** 74:21,23 79:4
134:5
**left** 11:14 20:25 63:3
110:1 120:12 121:1,3
128:1
**legal** 5:15 8:5 50:3
**legitimate** 141:12 142:17
**letterhead** 143:3
**let's** 46:23 47:2 61:23
71:23 140:17
**level** 68:19,22 87:7 98:11
**life** 46:5,9 52:11 66:18
78:8,20 79:2 104:25
106:5,8 117:5,8
**light** 71:1 89:9 112:22
126:25
**limited** 55:14
**line** 40:8,9,18 44:5,9,24
57:12,13,23 58:6 75:20
79:17 81:7,9 82:3
84:15 90:20 93:1,5
94:1,4,13,14,14 95:20
96:12 99:16,17 111:22
151:5,12,13,17,17,18
151:19,22,24 152:5,10
152:11
**lines** 73:4,15 74:12,22
79:9,10,15,19 81:12,16
81:17 82:2,24 84:15,19
84:20 86:22 87:4,5
90:22,23 133:3 151:7,9
**list** 120:6 141:4,24

144:12,13
**listed** 15:11 40:4 122:19
144:24
**listing** 143:25
**lists** 143:11,11 144:14
**litigation** 1:7 5:6 15:14
16:7
**living** 30:19,22 31:5
**Livingston** 1:22 6:19
**LLP** 2:10,13
**LNA's** 89:10
**loaded** 70:25 71:8,10,10
71:11 115:16
**loading** 52:8
**local** 13:9
**locate** 99:16
**located** 5:10 7:20 10:11
62:19 140:10
**location** 12:19,20
**lock** 111:18 112:21,22
113:4,5 119:13,15,21
120:13,14,15,18,20
127:18 156:19
**LOCKMASTER** 111:5
126:23
**lockmaster's** 122:7
**locks** 109:11 114:7
121:11,19,25 124:2
125:14,22,22 127:18,20
**Loews** 21:15
**log** 109:25 110:10 119:14
122:7 124:12
**logs** 112:11 156:20
**long** 7:24 22:13 30:12
144:9
**look** 9:17 27:5 40:21
49:2 54:25 55:17 85:24
87:23 108:22 112:17
128:15 130:10 137:6
139:18 153:17
**looked** 40:3 95:11 96:17
98:6
**looking** 120:4 123:18
**looks** 126:8
**loose** 77:4,14
**loss** 46:9 66:18 104:25

JOHNS PENDLETON COURT REPORTERS

800 562-1285

DANIEL F. RYAN, II

lot 15:6 26:9 77:6
Louisiana 1:2,23 2:4,8
  2:11,19,22,24 3:22 5:9
  5:12,16 31:3 140:11
  159:22
low 90:20
LSU 11:23 12:4,25 14:8
  14:12,14 15:9
LULU 120:25 121:4
lunch 98:14
LYNN 121:8

**M**

MAG 1:10
mailed 27:15,18 29:20
mailing 28:5
major 46:2
making 69:18
man 80:25 97:16
management 138:1
managers 106:4 117:4
manner 52:11
manning 47:23 52:21
manual 135:4 136:17
  137:1,23 138:1 139:2
  140:9 143:5
marine 11:12 40:15
  45:25 46:6,10 50:21
  62:15,17 64:22 87:11
  104:11 132:6 137:25
  146:19 147:23 148:16
mariner 92:2,18 95:13
  95:14 97:15
mariners 134:6
mariner's 98:7
maritime 7:16,17,19,25
  8:12,13,24 9:2 11:11
  45:4 48:10 49:17 50:25
  51:21 53:12 54:19 55:8
  55:21,25 56:5,23 57:3
  58:12 61:9,25 66:3
  96:14 97:13 99:2
  130:11 156:25
mark 2:14 5:25 38:10
  116:17,17,18,18,19
  156:1,3,8,10
marked 136:17

Marrero 140:12
master 84:13 87:19,21
  92:2,18 98:7
masters 69:23 106:3
  117:3
material 18:10 99:13,20
materials 9:19 26:1
  27:14 28:6,9,10 38:22
matter 5:4 12:6 18:4,5
  23:1 24:9 62:6 119:12
  123:16 145:8 159:16
matters 12:15 46:2 89:2
McCall 1:23 2:10 5:10
  5:22 25:23
McMoran 62:20
mean 13:22 33:10 61:15
  65:17 68:11 72:9 76:10
  78:1 79:11,14 81:15
  82:23 84:11 85:2 87:24
  103:10 109:22 145:2
means 16:20 17:2,11
  54:12,14 79:9,9,12
  80:6,16,25 81:6,16,25
  82:22 85:5 87:14 97:24
  109:12,15 127:16
  143:3
meant 78:19
measures 64:16 66:16
  67:1,2 68:8,9 69:11
  72:19 104:23 105:8,8
  130:16,24 132:16
media 150:3
meet 30:3,17 57:24 58:1
  58:3,7 92:10 98:10
  103:11 138:3
meeting 31:17,19,20,23
meetings 29:18,22
meets 143:5
member 9:2
members 149:5
memory 42:13,15
mention 82:2
mentioned 40:19 53:12
  53:18
met 27:9 31:11,12 90:23
  95:7

metropolitan 143:12
midnight 121:16,21
mile 76:2
miles 44:14 75:12 99:24
  100:20
million 64:5 65:9 78:24
minimum 66:5,11 67:6
MINTZ 2:6
minute 19:13 22:13
  156:5
minutes 121:16,21
  123:20 154:20 156:4
Misinterpreting 124:12
Mississippi 43:15 75:10
mistake 132:12
modifications 67:1 68:8
  69:11 105:8
modify 67:20,23 68:14
  68:16
moment 45:15 47:3
monitor 78:9 148:16,21
Montgomery 2:6 6:6
month 12:18 34:2
months 12:19 20:19
  21:15 33:11
moor 114:15 115:6
moored 44:2 73:8 75:3
  75:20 76:1,7,18 85:1
  88:8 89:7 90:15 92:2,3
  92:6,8,10,12,18,21,22
  93:3,16,18,24 94:6,20
  94:21 95:5,6,14,15,17
  95:24 96:2,2,11 97:3,6
  97:9 98:8 101:6 130:19
  132:18 133:6 152:20
  153:12,13,23
mooring 23:15,17 25:1,2
  27:1,9,20 42:24 43:6,8
  43:13,18,20 44:2 73:4
  73:15 74:12,22 81:8
  84:19 85:14 87:5 89:3
  89:19 90:20 91:11,13
  91:21 94:2 133:3 146:8
  146:12 150:20 153:18
  154:2,5,12
moorings 73:4 86:6

Morgan 84:4 141:21
morning 124:4,9 150:18
move 61:23 114:8 140:18
moved 152:25
movement 52:8
moving 151:25 152:3,6,7
  152:15
multiple 79:10
multiples 86:23
MUMFORD 1:13

**N**

N 3:1 4:1
name 5:14 9:12,17 39:2
  121:4
named 31:11 39:1 40:25
national 12:9 46:2
nation's 46:4
natural 101:3
nature 10:22 81:17
  148:23
nautical 82:1 99:24
  100:20
navigable 46:12 47:20
  52:18 78:15 150:10
navigation 45:24 50:7,19
Navigational 119:14
  146:3 150:9,14 156:19
Navy 82:20
NCBRT 11:23 12:4,8
  14:11,12,13,16 19:15
necessary 8:24 46:7
  52:11 66:22 67:12 68:4
  87:25 103:1,11 105:3
need 56:12 58:6 66:25
  68:7 91:24 101:2,6
  105:7
needed 11:3 20:7 89:8
  92:6
neither 130:9
never 16:8,10 24:2 51:9
  69:3 78:8 83:22 107:24
  108:24 109:1 147:25
new 1:23 2:4,8,11,14,19
  5:11 9:11 10:12 21:16
  25:24 29:23 37:20
  43:13,15 45:4 48:9,22

DANIEL F. RYAN, II                                                                                         7/9/2009

56:5 57:5 58:13,14
59:14,23 60:3,24 61:8
62:13,18 64:6 82:16
87:3,13 89:13 99:3
100:8 116:12 135:5
141:21 143:12 150:15
156:24
newspapers 150:4
nine 121:19,22 124:18,20
non-reporting 11:1
noon 123:6 127:8
normal 44:9
normally 70:25
north 2:12,15,20 5:23
138:9 152:21 153:13
155:7,17
notation 110:14 127:2,12
notations 127:14 128:25
note 136:22
notes 32:5,12
November 34:20 36:5
63:24
number 1:22 6:19 26:8
71:24 77:16 87:5
121:12
numbers 72:8,9,16
numerous 82:19
NW 2:14

**O**

O 3:1
oath 3:23
object 36:19 49:21 52:1
54:23 55:11 57:18 60:1
66:7 67:25 70:13 71:14
74:1 77:9 81:3 83:2
85:7 86:2 88:2 90:7
93:8 97:19 100:23
102:7 104:5 105:20
109:18 112:8 113:14
113:22 115:21 116:7
118:3 124:6 125:18
127:24 129:8 131:25
141:15 145:22 146:14
149:9 152:13 153:3
objecting 122:24
objection 48:14 51:5,5

60:8,10,13 67:9,14
69:16 80:9,19 94:18
96:5 98:2 108:8 114:10
117:11 128:10 136:22
137:13 138:8,21
139:11 140:2 142:8,20
144:22 149:22
objections 3:13
obtain 149:6
obviously 26:11 85:5
124:15
occasion 30:12 43:6
148:1
occasions 30:4,21
Occupational 10:23
occur 57:14
occurred 57:4
occurrence 42:21
ocean 130:7,8
ocean-going 130:7
131:16,17
offer 155:25
office 58:18 62:14,15,17
122:16
officer 86:10 114:15
146:18 147:2,5,23
officers 13:10
offices 1:22 5:9
official 24:19,21
officials 149:20
officiated 3:23
offload 101:23
Oh 13:20 50:16 76:10
112:6
okay 7:12,24 8:7 9:21
10:2 11:10 12:2 13:21
13:25 14:4,20 16:12
17:13 21:6,24 23:21
29:1,4,7,12,16 30:6,9
30:17 32:21 33:1,12
34:5 38:22 43:4 44:25
45:23 46:25 49:15
51:12 52:5,15 53:15
54:1,3 57:2 59:21,24
60:13 61:1,11,13,17,19
61:25 63:13 70:17,19

74:7,19 78:21 79:3,7
79:21 83:18,20 90:9
96:9 99:11,21 101:15
103:17 104:17 105:12
108:21 109:10 110:9
110:11 111:11,13
112:18 114:14,20,25
115:4,25 116:5 119:23
120:8,11,20,24 121:6,7
121:14,17,25 123:22
124:18,20 125:16
126:4 127:20 129:12
131:5 134:23 136:12
140:23 141:17 143:18
144:19 147:25 150:17
152:19 155:22 156:7
once 9:9 12:18 40:1
ones 26:21 28:12,23 42:3
42:5,9,9
open 103:4
operate 52:10
operating 47:20 52:17
138:3
operation 24:11 60:15
99:1 101:16 108:2
operational 47:24 52:21
operations 13:2 46:7
59:8 100:15 101:13,18
102:3 108:5 116:20,21
116:23
operator 5:1 6:15 38:11
38:15,19 47:4,8 56:11
56:17 98:17,20 146:19
148:4,9,12 154:23
155:2 156:11
operators 13:2 67:18
69:24,25 100:2 101:1
101:10 106:4 117:4
134:14 135:1 137:3,17
138:5 139:4 140:21
141:10 142:5 143:15
opinion 15:13 35:13
36:11,16,24 37:25
40:25 41:1,17,20 92:17
97:9 115:1,1 131:6
154:1,8,12,16

opinions 41:10
opposed 92:3
opposite 151:25 152:7
order 46:8 52:10,15
85:21 86:10 99:24
100:20 106:6 117:5
120:7,8 131:14
ordered 116:22
ordering 100:15
orders 50:8,11,18
ordinary 81:6 85:3
organization 11:22
134:17 141:12 142:16
143:11 145:13
organizations 13:7
original 44:2 59:4,4,5
99:16
originally 28:19,24
151:8
originals 29:2
originate 82:16
originated 58:16 82:16
108:4
Orleans 1:23 2:4,8,11,19
5:12 9:11 10:12 21:16
25:24 29:23 43:14,15
45:4 48:9,22 56:5 57:5
58:13,14 59:14,23 60:3
60:24 61:9 62:13,18
64:6 82:16 87:3,13
89:13 99:3 100:9
116:12 135:6 141:22
143:12 150:16 156:25
OSHA 10:23,25 11:1
15:25 18:22 19:5
outcome 159:15
outside 15:21 16:7,7
43:15 149:20
overall 78:6
overboard 17:3,12
owned 17:7
owner 7:23 9:2 87:22
owners 7:22 67:19 69:24
69:25 100:2 106:4
117:3
owner-operator 87:19

DANIEL F. RYAN, II

88:10
o'clock 110:15,24

**P**

P 3:1 121:17
page 4:2 26:9 54:8 63:22
   66:13 71:24 72:8 74:4
   99:21 100:25 104:21
   105:25 110:14 112:17
   117:1 126:10 127:1
   129:13,21 131:10
   136:18,20 137:6 139:7
   155:15,16
pages 35:24
paid 14:22 22:5 73:7,7
   75:2 133:6 134:2
paper 128:12,24
paragraph 69:21 70:20
   89:18 90:9,14 99:22
   100:25 105:25 130:1
paraphrasing 118:16
PARFAIT 1:15
part 3:16 11:23 12:4
   14:12 19:25 24:9,10
   36:14 66:14,15,20 68:3
   89:12,14 92:14 104:21
   105:2 107:11 118:17
   118:20 131:14 134:25
   136:25 137:18 140:8
   156:17
particular 12:12 23:9,12
   27:2 75:16 101:2 109:2
particularly 64:7
particulars 42:17
parties 3:4 159:14
parts 48:11 49:10 131:15
passed 45:7 51:9,12
   61:17
passenger 16:21
passing 50:25 60:11
paying 129:6
Pazos 39:2,5,7,7,7,9,11
   39:13,21
pending 5:7 17:20
Pendleton 5:18
people 20:2 40:24 50:5
   64:4 65:8 67:6 68:11

74:15 77:6,15 78:2,9
   78:23,25 79:14 87:10
   87:12 100:8 106:15
period 13:17 22:18
   102:12 107:15
periods 57:8 69:6
perpendicular 151:21
PERRY 1:14
person 8:23 17:7,16 81:6
   86:4 88:10 155:7,18
personal 16:22 159:10
personally 11:11 24:2
   145:17
personnel 13:11 77:24
persons 20:1 69:25
pertaining 54:6 71:20
   108:4
pertains 1:9 55:7
phone 19:12 28:5 149:18
phones 149:5
phrase 82:6
pictures 153:8
piece 89:16 95:10 128:12
   128:24 138:17
piecemeal 29:14,15
pier 101:19
place 27:16 28:4 119:7
Plaintiffs 2:4 6:11,14 7:2
plan 45:5 48:10,10,19,22
   49:18 50:1,1 51:1,8,9
   51:19,20,21 53:13
   54:19,21 55:8,15,22
   56:1,3,6,23 57:3 58:12
   58:13 59:7,15,17,23,24
   60:4,15,24 61:10 62:1
   62:9 63:8,9,13 65:8,11
   65:22,24 66:2,4,14,15
   87:16,18 89:9 90:25
   91:17,20 93:21 95:8,11
   95:22 96:15 97:8,14
   98:12 99:3 104:18,21
   116:11 130:11 131:10
   157:1
plans 21:22 51:16,22
please 5:19 6:17 52:25
   158:15

point 23:4 78:3 81:8,22
   94:2 95:16 100:16
   123:12
police 13:10
policies 135:3 136:16
policy 45:20,20 47:14
   137:1,23 139:2 140:8
   143:4 146:24
port 12:15 43:14 45:5
   46:7 49:11,18,23 50:3
   50:8,11,17 51:1,17,21
   53:13 54:19 55:8,22
   56:1,6,23 57:3 58:13
   59:8 60:15 61:9 62:9
   64:10,15 66:4 69:2
   70:21,22 84:4,17,17,22
   84:24 85:13 87:3,17
   89:13 96:15 98:25
   100:4,8,9,15,16 116:19
   116:22 130:2,3,5,18
   131:11,13 132:7,17
   147:19,22 150:12,15
portion 21:21
ports 46:1,4 48:3 49:12
   63:25
position 81:14 115:5
   149:6
positions 14:25
possession 102:14,20,24
   103:18 122:15 133:14
possibility 46:8 102:1
possibly 14:14
post-Katrina 20:19
potential 66:18 104:24
power 65:7
Poydras 1:23 2:18 5:11
practice 84:14
precautionary 66:16
   72:19 104:22 130:16
   130:24 132:15
precautions 66:20,21
   68:2,3 102:25 103:2,4
   103:20 105:1,3
preceding 125:1 131:9
   158:5
predecessor 99:2

predicted 73:6,17 74:14
   74:20 100:4 133:5,24
   134:2
prediction 100:12
predictions 99:23 100:19
preliminary 32:2,5
preparation 27:21 28:5
   31:24 38:23 151:14
preparations 69:19
   90:16
preparatory 137:15
prepare 32:2 40:18
   51:16 66:22 68:4
   103:16 105:4
prepared 34:19 51:23
preparing 32:6 33:19
   34:3
prescribed 103:21
present 7:15 33:6 104:2
   106:14
presenting 103:9
Presently 7:16
pretty 105:12
prevent 46:10 78:14,25
previous 37:10 136:19
pre-Katrina 27:21
primarily 40:8 88:9
primary 70:1 152:2
printed 29:19
prior 32:6 34:10 35:7,19
   36:5 61:1,8
Prippity 107:22
private 19:19
probably 26:14 92:24
problem 61:4 114:15
problems 64:10 103:11
procedure 3:7 18:1,2,3
   63:5 137:1 140:9 143:4
procedures 47:24 52:22
   135:4 136:16 137:23
   138:2,3 139:2
Procter 2:13 5:25
produced 107:21 108:15
   136:1
professionally 19:3
program 134:15 135:2

DANIEL F. RYAN, II

138:6 140:21 141:11
142:6,12,23 143:1
146:20 147:8,8
**pronunciation** 39:16
**proper** 90:21,22
**properly** 44:3 92:2,6,18
92:22 93:16,18,24 95:1
95:5,14,15,16,24 96:1
96:11 97:3,5,9 98:8
103:16 153:22
**property** 46:5,9 52:12
64:5 66:19 104:25
106:5,8,14 116:5,9
117:5,8
**proprietor** 7:17,23
**protect** 52:11 65:8 68:24
103:1 106:8 117:7
**protected** 76:1
**protection** 45:25
**prove** 144:11
**provided** 86:13 95:25
119:22 127:1
**provides** 45:23 66:4
**provision** 44:8 45:23
73:20
**provisions** 49:8
**proximity** 73:8 75:3,9,11
75:15,17,18,22,25 76:4
76:4,8,19,21 77:1,13,20
133:7
**public** 76:20
**publication** 64:21 82:13
**publications** 64:21 82:20
**published** 13:25 14:8,10
14:13 50:6 65:12,19
87:9 99:7 104:13
134:21 146:7,20 147:8
**purchased** 31:4
**purpose** 37:23 48:2
136:17 152:2
**purposes** 3:8 7:1
**put** 14:4 17:8 74:15
76:11 77:3 79:22,23
94:4 116:9 132:19
150:1
**putting** 116:5

## Q

**qualified** 23:13 152:17
**quarter** 76:2
**Queen** 10:3
**question** 3:14 27:11 41:8
93:10 107:16 122:4,9,9
122:10 125:9 137:9
139:12,16 140:6
142:15 145:6 146:23
**questions** 98:25 108:22
137:16 138:22 155:24
**quite** 15:6 104:13
**quote** 155:17

## R

**R** 7:17,19,22,24 8:10 9:2
11:11
**radio** 150:2
**radios** 149:24 150:4
**Raffman** 2:14 5:24,25
30:7 38:7,10,13 118:7
119:2
**Rainbow** 1:22 6:19
**rate** 33:17
**Raymond** 113:8
**RDR** 3:21 159:4
**reached** 85:12
**read** 2:6 7:8 9:18 28:21
40:1 48:5 53:8,11 91:7
100:13 101:14 104:19
104:20 117:23 158:4,5
158:16,18
**readiness** 64:18
**reading** 3:9 46:17 53:2
87:23 91:1 105:16
111:22 126:11
**realize** 75:5
**reason** 17:19 77:3,7
84:20 103:5 127:21
147:9
**reasons** 106:13
**recall** 28:20 29:7 33:1
**receive** 26:5,12 28:9
**received** 23:3 26:1,15,21
28:10,11 39:25 102:16
**Recess** 98:19

**recognize** 101:2
**recognized** 15:7,8
134:18,25 141:11
**recognizes** 135:4 140:22
**recommendation** 58:11
71:19 73:2,3,12 83:16
104:9,10 138:25
**recommendations** 50:22
58:8,10 66:5,9,11 67:3
67:17 68:10 69:22 87:2
87:9 90:24 93:20 95:7
97:7 103:15 104:15
105:9 131:9,20,21
132:2,5 133:10,11
148:24
**recommended** 66:16
70:8 72:19 104:22
130:24 132:22,23
**reconcile** 131:5
**record** 6:24 29:21 32:9
34:9 37:2 38:2,9,12,14
38:16,18,20 47:2,5,7,9
56:14,16,19 98:18,22
108:10 119:4 124:1
148:6,8,11,13 154:24
155:1,3 156:12,14
**records** 106:18 107:4,11
107:12 108:4,10,16
117:24,25 119:20
156:16
**redacted** 40:12
**reduce** 46:8 66:18
104:24
**redundant** 105:18
**refer** 66:13
**reference** 48:18 49:25
55:23 56:7
**referenced** 28:13 75:16
**references** 56:9
**referred** 54:3 74:4
**referring** 72:2,14
**reflect** 6:24
**reflected** 63:22 125:12
**reflects** 110:5
**regard** 16:19,20 133:19
154:1,8

**regarding** 9:24 25:1
35:13 36:12,16 37:14
37:25 38:3 80:2
**regards** 23:1 27:6 97:3
97:10
**REGINA** 111:14 112:20
113:8 114:6 125:20
127:19,22
**region** 145:3
**regular** 116:10
**regulated** 50:6,19
**regulation** 27:2,4 40:20
43:1 45:6 83:8,9,13
91:7 92:21,25 93:5
104:7 138:24
**regulations** 16:18 23:2
27:7 42:20,24 43:5,9
43:10 45:1 48:3 49:9
50:8 58:7 83:7 89:12
91:6,19 93:19 97:7
98:10 103:7,14,20,25
104:3 150:7
**regulatory** 89:7 90:24
91:13,16 92:10 142:3
**related** 48:5 159:14
**relation** 20:22 50:9
91:13
**releases** 150:3
**relied** 41:8
**relieved** 70:11
**relieving** 69:23
**rely** 40:5,14,17,23 41:2
**remain** 70:21,22 88:7
101:6
**remarks** 137:16
**remedies** 70:7,9
**remember** 9:12 17:1,18
17:19 18:8,8,14,15,21
26:7 27:4,17 28:3 41:9
**removed** 114:5
**render** 41:17,20
**rendered** 32:19 33:2
35:15 36:11 40:25
**repeat** 104:18 125:9
143:10 144:8,9
**replaced** 150:19 151:2,5

DANIEL F. RYAN, II

report 9:15 26:19 28:18
  29:8,10 31:15,18,21
  32:2,3,6,16 33:19 34:3
  34:10,19 35:3,6,14,19
  36:2,14,14 37:14 39:20
  39:22,23 40:2,5,14,17
  41:13,18,20 42:1 55:16
  63:12 86:13 88:16,18
  88:19,23 89:23 91:1
  92:5 93:14 96:10 98:6
  110:18,21 119:21
  122:19,25 129:12,21
  150:18,25 151:1
  155:10,11,12
reported 2:23 159:9
reporter 2:23 3:22 5:17
  6:17,21 159:5,21
REPORTER'S 159:2
reporting 11:4,6
reports 23:3,6 26:6,25
  27:6 28:8,11 29:13
  32:9 36:3 37:10,19
  40:4,6,10,11 41:4,9,23
  42:11 149:4
representative 141:18
representing 5:23
request 65:2 84:21
requested 23:8 85:10
  113:10 128:3 154:7,11
  154:15
require 78:8 147:7
required 64:17 70:9 80:1
  103:25 146:11
requirement 27:8 50:10
  90:24 92:11 96:14
  146:21 147:5,15
requirements 11:5 47:22
  52:20 57:24 58:1,3
  89:7 91:16 130:5 143:6
requires 44:5 66:9 78:24
  81:9,10 82:24 147:18
requiring 57:12 93:5
requisites 146:8
reread 42:11
research 12:10 33:17
  34:2 65:25

reserve 7:7 38:5
reserved 3:15 129:5
residence 7:20
resources 46:13 78:16
respect 37:19 113:23
respectively 130:17
  132:17
respond 77:25
responders 13:8,9
response 108:8
responsibilities 133:18
responsibility 41:6 70:2
  70:11 88:7 102:23
  103:12,13,19
responsible 41:2 134:15
  135:2 138:5 140:21
  141:10 142:5,11 155:8
  155:19
responsiveness 3:14
rest 29:4 117:19
restriction 128:4
rests 88:9
retain 32:5
retained 10:7,15
retired 8:1 22:14 31:6
  62:4 86:9 114:15
retirement 8:3 15:17
  20:13
return 30:18
returned 123:8
review 18:11 21:21 34:2
  63:7
reviewed 26:10 34:22
  35:23 36:8 37:4,20
  38:1,24 82:19 88:16,21
reviewing 93:22
Revision 59:3 99:8,10,11
re-led 81:7
rigged 96:13
right 7:7 14:17 18:23
  26:20,24 28:17 34:22
  38:5 39:2 40:22 41:13
  43:11 48:24 51:13,20
  53:6 58:14 59:11 61:13
  62:21 68:25 69:13
  73:11 77:1,2 83:10

85:25 88:19 91:1 96:9
  99:4,18 105:23 109:24
  110:13,25 111:1
  114:24 115:6 120:8
  121:11,12 122:2
  124:16 129:15 132:13
  138:17 149:1
ring 109:16
risk 79:2,3 116:5,10
River 43:16 75:10
RMR 2:23 159:4
Robert 2:10 5:22
Roger 2:23 3:21 5:17
  159:4,20
role 12:12 27:1 88:24
  89:14
Ronald 2:7 6:6
room 140:14
rope 89:19,20 151:1
ropes 85:18
Rouge 11:24 12:5
routinely 64:2
Rules 3:7
running 151:21
Runs 151:23
Ryan 1:21 5:3 6:18 7:14
  8:7 23:25 37:3 47:11
  54:5 98:24 106:21
  112:13 129:12 155:5
  158:4
Ryan's 6:25

_____ S _____

S 2:14 3:1 82:20
safe 134:9,12,21,25
  135:5 136:20 138:13
  139:9,19,19 140:16,23
  141:1,4,19,24,25 142:1
  142:6,16,24 143:2,11
  143:13 144:12,13
  146:3
safekeeping 155:9,19
safely 21:23
safety 10:24 13:4 45:24
  46:1 48:4 49:12 50:5
  50:20,21 52:7 62:15,17
  66:20 68:2,20,22 70:2

78:7 87:7 98:11 104:12
  105:1 106:5,8,14 117:4
  117:7 132:6 146:20,25
  147:7,8,23 148:17,21
sake 37:2 78:20
salvage 20:18 21:9,16,19
  21:22 24:11,14
San 17:21 18:6
Saturday 123:6
save 3:13
saw 37:8 126:14
saying 50:2 56:21 61:2
  65:6 69:7 74:7,17
  75:22,24 76:15,16 87:6
  90:17,19,21,23 95:13
  97:17 98:5 100:8
says 35:22 47:19 49:8
  50:12 52:6,16 60:18
  69:22 72:18 73:20,24
  74:18 76:4 78:6 80:6,7
  80:17,22 81:19 82:22
  83:19 84:9 89:10 90:14
  97:15 99:6,22 101:1,16
  104:8,17 106:2 127:2
  127:13 128:7,11
  130:15 131:11 132:15
  137:22 155:17
Scare 151:1
scenario 85:9 92:15,15
  92:24
Scott 10:8,10
seaman 97:23
seamanship 97:4,10
season 101:5
second 15:12 16:11
  17:11 26:19 29:8,10
  31:18,23 38:9 40:16
  54:8 111:2 112:24
  139:14
secret 65:17
secretaries 8:19
Secretary 10:3
section 43:17 44:4 55:1
  55:17,20 131:10
sections 55:2
Sector 45:4 48:9,22

58:13 59:23 60:3 62:16
99:3 116:12 156:24
security 12:15 14:6
19:24 20:3 46:1
see 23:6 24:10 26:9 40:21
45:21 47:18,24 54:9
55:17 73:13 91:2,5
93:14 96:20 110:1,4,7
110:13,16,22 111:1,11
112:22,25 113:5
119:17,23 120:7,9,15
121:1,7,9 124:13
128:23 130:14,19
142:13,25 143:20
153:12
seen 107:24 108:24
109:1 112:13 153:5,8
sees 84:9
self-propelled 131:16
sending 26:24
sense 127:9,12
sent 19:11 32:9 39:24
sentence 101:1,14
separate 30:10 31:9
September 28:18,23
155:12,13
services 9:25 14:21 33:2
set 118:23 133:18 134:4
159:8
seven 26:8,11 31:2
sewing 92:25 93:2
share 64:15
sheet 158:18
shelter 130:18 132:17
Sherer 26:17 28:13
40:16
shifted 109:10
ships 73:13 79:8 80:2
130:17 132:16
shocking 123:1
shore 21:17
shoreline 64:3
short 13:17
shorthand 159:10
show 34:9 45:10 80:14
106:18 119:13 134:23

136:14 139:7 153:8
showed 128:15
shown 127:18
shows 109:9 112:20
124:10 127:5
side 120:8
sign 7:8
Signature 158:12
SIGNED 158:13
significant 99:25 100:14
signing 3:9
similar 58:20 60:5 63:5
84:3
sir 7:15
sit 12:20
six 26:8,11 35:24 121:10
124:17,23
size 93:1,4
slack 74:24
slings 146:12
slip 76:1 94:1
slipped 94:14,15
slipping 94:13
small 16:21
Smith 150:25
SOL 120:18
sole 7:17,23 8:23
solely 55:14 155:8,19
somebody 61:16 84:16
92:25 94:2
somebody's 78:20
sorry 25:9 50:16 83:14
126:19,22 127:11
129:23 155:14
sort 40:20
sought 3:17 83:23
south 152:25
speak 18:22 102:25
speaking 66:3
special 73:6 75:2 133:5
134:1
Specialist 5:15
specific 27:3 28:3 55:1
93:21 131:8,13
specifically 3:12 9:18
49:13 50:2 55:21 74:3

91:6 116:13
specifics 17:1 41:10
speculation 92:14
spoke 25:4
spouse 149:17
spring 151:17,22,24
152:10
stability 70:24
stage 107:22
stand 19:18
standard 134:5
standards 47:22 52:19
67:6,7
standpoint 91:22
started 23:7
starting 95:16 119:24
120:7,25 121:15,16
131:10
state 2:24 3:22 13:9
131:16 148:22 149:20
159:22
stated 37:18
statement 45:19,20
47:14 67:23 76:3 117:1
117:15
states 1:1 5:7 46:1,12
47:21 51:1,14,15,23
52:18 57:24 58:4 60:18
64:23 78:13,16 82:4
100:7 117:20 140:25
148:17 156:23
stations 74:22
statute 47:14 48:15
statutes 48:6
stay 30:13 144:9
step 98:8
stern 44:5,9,23 57:13,23
58:6 151:11,12
stick 58:5
stipulated 3:3
stipulations 7:3
stop 101:13
storage 52:8
storm 43:21 66:25 68:7
69:2,10 73:6,17,22
74:14,20 99:23 100:18

103:16 105:7 108:13
116:15 133:5 145:17
storms 69:4
straight 151:20 152:11
Strauss 88:17 151:1
Street 1:23 2:3,18 5:11
strength 79:24 84:19
85:14,18,22 86:11 87:4
stricken 123:14
strictly 55:4
strong 152:10
structures 46:11 78:14
subchapter 48:2
subject 12:6 155:25
submitted 141:3
subpoena 108:16
subsequent 28:2,7
substantial 46:5 64:10
substantive 106:7 117:7
sufficient 74:16 77:24
86:11
suggest 82:5,9
Suite 2:19 5:11
summer 44:13
Superdome 62:19
supervision 46:6 159:11
supplemental 37:19
supplements 34:14
supplied 107:8,14
supply 13:4
support 80:15
supporting 131:18
supports 81:23 83:5
supposed 69:12 79:15
sure 18:12 21:22 39:2
41:7 43:1,10 66:10
89:15 93:10 98:16
101:21 102:15 109:5
142:10 154:22
surge 68:24 73:6,17,22
74:14,20,25 75:1 103:8
133:5,23 134:2
surprising 140:13
surrounding 108:11
118:14
Sutterfield 2:17 6:3

DANIEL F. RYAN, II

7/9/2009

Page 16

swear 6:17
sworn 6:20 159:7
system 13:5,22 27:9
  85:15

**T**

T 3:1,1
tactical 13:1
Tail 30:25
take 38:6 51:18 66:18
  73:20 74:9 79:4 81:13
  84:14 94:2,3 98:14
  101:11,24 102:25
  103:2,7,14,19,25
  104:14,24 119:8
  127:22 128:3 133:21
  148:24 154:20 156:4
taken 1:22 3:6 5:4 6:25
  17:24 18:11 89:8 95:10
  100:16 110:6 113:9
  114:6 116:16 118:1
  121:10 126:21 139:8
  158:20
talk 74:19 93:1,4 156:4
talked 20:12 22:20 86:23
talking 9:24 10:4 16:6
  23:17 39:18 44:4 55:18
  66:14 74:5 89:5,6,21
  91:16,18 93:13 94:13
  130:1 138:11,13
talks 73:12 89:18 90:9
  90:19 130:23
tape 56:13,18 98:21
  148:6,10
tapes 56:13 148:5
tasked 22:23
taught 15:6
teach 20:2
teacher 11:22,24 12:7,12
teaching 13:1 14:25 15:4
Tech 151:1
technically 76:18
tell 7:14 38:8 42:8 80:5
  80:14 81:18 83:4 85:1
  85:24 92:4 93:14 96:23
telling 74:14 79:14
tensile 85:17,22 86:11

term 79:24 84:6 141:25
terminal 42:25 138:10
  150:5
terms 23:14 147:24
terrorism 13:3
testified 9:1 19:4 22:19
  37:3 109:14 113:17,18
  113:25 118:6
testify 6:22 122:5 159:7
  159:8
testifying 91:3
testimony 10:17 33:14
  33:22 36:8 93:18 94:21
  94:22 115:4 118:14
  147:6 158:5,7 159:9
Texas 1:22 6:20 141:20
Thank 6:16 145:15
theory 80:15
thereof 3:16
thing 32:8,15 49:4 80:5
  81:18 83:19 84:23 90:3
  104:21 137:12
things 12:5 13:5 19:21
  29:17,18,20 49:14 50:5
  50:9 55:3 57:14 58:8
  68:13 106:13 131:13
  132:19
think 26:6 35:18 65:2
  68:15 72:7 78:19,21
  87:25 92:15 99:19
  102:16 110:21 128:21
  134:11 142:23 143:14
  143:21,22 152:17
third 47:19 69:21 110:14
  111:3 112:17 151:13
  151:16
thought 23:5
thread 92:25 93:2,14
threat 64:1
Threatened 64:14
three 13:19 20:6 30:15
  50:3 120:12 124:17
  126:24 156:16
thunderstorm 44:13
Thursday 1:24
tidal 103:8

Tiger 30:25
tighten 75:1
time 3:16 12:25 13:17
  15:2,3,19 16:11,12
  18:14,16,18 19:2 22:18
  22:19 25:4,19 26:13
  28:4,7 29:5,5,14 30:19
  33:7 40:8,9,18 42:8
  62:19 86:20 102:13,15
  120:8,9,11,12,18,18,19
  123:12 126:16 129:6
  134:8
times 9:8 20:6 30:1,10,10
  31:8,9 63:12 69:6
  105:21 117:12
title 8:6 49:9
titled 72:18
today 33:14,23 34:13
  35:11 37:7 38:23
  138:11
Today's 5:12
told 25:9 36:7 88:25
  96:12
tolerate 106:12
tons 131:17
top 26:14 110:1,4 120:15
  130:14
topped 113:2
total 35:25 121:24
totally 105:18 149:2,12
Towing 112:10 117:24
  156:20
track 99:23 100:19
traffic 46:3 110:16
Training 12:10
transcribed 159:10
transcript 159:12
transcription 158:7
transitioned 12:17
transportation 54:15
travel 12:20
traveling 77:15
tremendous 19:20 74:24
trial 10:13
tried 59:3
true 15:16 86:20 144:11

  158:6 159:11
truth 159:8
trying 39:16
tug 101:5 113:24
tugs 125:13 130:8,8
  131:18
turnaround 111:14
  125:21
turned 125:25
TVs 150:4
twice 30:1 84:15
two 11:19 12:5,19 13:17
  17:2 18:24 21:13,14,14
  28:22 30:15 31:8,8,14
  33:4,11 40:22 75:6
  79:9 80:25 81:5,10,11
  82:25,25 97:16 102:16
  113:2 124:16 126:1,1
  128:25 151:4,7,8,20
  152:21 153:1
two-inch 151:5,8
type 12:22 13:11 25:2
  89:19 149:6
T&T 21:5

**U**

U 3:1 82:20
uncertainty 99:25
  100:17
understand 33:16 36:7
  36:15 41:7 48:6,8
  54:15 61:21 67:3,5,7
  67:16 69:12 70:4 73:9
  79:16 80:24 83:18
  84:10 85:4 109:5
  110:22 120:22 126:2
  151:6,16
understanding 64:16
  80:4 88:6 159:13
unique 66:23,24 68:5,6
  69:8 105:5,6 112:10
  117:24 156:20
United 1:1 5:7 46:1,12
  47:21 51:1,14,15,23
  52:18 57:24 58:4 60:18
  64:23 78:13,16 82:4
  100:7 140:24 148:17

DANIEL F. RYAN, II

156:22
units 101:5
unloading 52:8
unpublished 40:12
unsafe 145:4
USA 1:15,15
USC 45:20 47:14 48:4
  51:2,3 52:16 53:4,9
  54:7 60:19
use 44:23 49:11 55:1,13
  59:22 61:5,6 81:12
  86:14 89:23 92:4,7
  129:6 140:8
useful 89:17
usual 7:2
Usually 30:5
utilized 85:18
U.S 82:20 122:6 138:24
  156:22

**V**

V 1:12,13,13,14,14,15,15
variance 100:11
various 57:8
vehicle 17:6
versus 10:3
vessel 16:21 44:2 45:24
  46:3,7,8 47:22 52:20
  54:12 55:2,24 56:22
  66:22,24 68:4,6 69:9
  71:8,16 76:7,18 78:10
  88:7 100:1 101:6,19
  105:4,5 106:3 110:7
  117:3 120:25 121:4
  126:1 131:16 138:2
vessels 21:17 43:13
  47:19 52:10,17 54:7,11
  66:17 67:19 68:12
  69:24 70:2,10,20,25
  71:1 87:12 100:15
  104:23 122:2 127:5,7
  130:7 132:3 134:10
  137:25 142:2 145:18
  145:24
vessel's 87:19
Video 2:21,22 5:1,15,16
  6:15 38:11,15,19 47:4

47:8 56:11,17 98:17,20
  148:4,9,12 154:23
  155:2 156:11
videotaped 5:2
violated 95:21 96:13
violation 17:17
Virginia 12:1 19:19
visited 24:4
visits 31:14
vis-a-vis 20:15 44:8
  55:25
vulnerable 64:7

**W**

waived 3:10,12
walk 24:10
walked 24:16
wall 146:7,7
want 7:7 35:17 37:7
  38:12 46:20 65:1 74:23
  75:1 94:15 98:24
  108:22 138:21 145:8
wanted 84:18 86:6 94:10
  95:24 97:8
Washington 2:15
wasn't 29:1 62:23 75:8
  82:15 84:24 146:23
water 54:15 71:11,12
  150:10
watercraft 54:13
waterfront 52:9 66:17
  70:1,3 104:23 150:5
waters 46:12,13 47:20
  52:18 78:16,17
Waterway 156:18
waterways 12:15 21:17
  23:2 46:2,4 48:4
  134:14 135:1 137:3,17
  138:5 139:4 140:20
  141:10 142:5 143:14
  144:16
way 37:9 40:17 79:20,22
  93:15,23 94:1 96:13
  103:22 159:15
weather 104:1 114:16
  115:11 149:4
Webb 2:17,18 6:2,3,3

30:8
website 14:14,16
weeks 13:19,19 21:13,14
  21:15
welcome 37:11
went 14:13 17:3,9,11
  61:16 109:10 121:19
  121:22,24 125:14,21
  126:24 127:17,20
  145:24
weren't 153:21
west 140:11
we'll 7:2 18:19 123:22
we're 5:9 38:20 43:23
  44:17 47:9 56:14,19
  94:12 98:22 138:11
  148:6,13 155:3
wharf 146:8
whatever's 8:23
Whiskey 57:9 129:22
  130:2,3,6,22 132:8
  133:13
Whiteley 26:16,19 28:13
  28:14 29:8 40:15,16
  155:10
Whiteley's 155:6
Wiedemann 2:2,2,2,3
  4:18 6:9,10,10,11,12,13
  6:23 7:6,11,13 25:14
  34:12,21 35:10,21 36:6
  36:20 37:12,22 38:21
  39:8,12 45:14,18 46:18
  46:24 47:1,10 48:20
  49:22 50:15 51:11 52:4
  53:3,10,16,22 54:2,4
  55:5,19 56:20 57:21
  60:2 61:7,14,20,24
  66:12 67:10,21 68:1
  69:20 70:16 71:18 72:6
  72:13,17 74:6,11 77:12
  80:13,23 81:4 83:3,12
  83:17,21 85:16 86:8
  88:3 90:8 93:12 94:19
  95:18 96:8 97:11,22
  98:13,23 100:24
  102:11 104:16 105:22

105:24 106:23 107:2,7
  107:13,20,25 108:14,20
  109:7,21 111:24 112:5
  112:9,16 113:15 114:1
  114:13 115:22 116:24
  117:16 118:4,18,24
  119:9,11,18 120:3,5
  122:12,20,22 123:9,13
  123:21,24 124:7,14,22
  125:3,8,10,19 126:12
  126:17 127:25 128:14
  128:20 129:11,14,16,18
  129:20 132:10 135:12
  135:21,25 136:5,9,13
  137:5,10,20 138:12,15
  139:6,13,17,24 140:4
  140:19 141:7,16
  142:14 143:8 144:1,7
  145:5,23 146:15
  148:14 149:14,25
  152:14 153:7 154:19
  155:4,23 156:6,15
  157:2
Wiggins 26:16 28:14
  40:15
WILKINSON 1:10
willing 143:19
wind 68:23
window 44:20 57:15
winds 44:14 64:9 69:5
wire 146:12,12
wiser 114:8
wish 65:15
witness 3:6,24 6:17
  10:17 34:18 36:1 39:10
  48:16 51:7 52:2 54:24
  55:12 57:19 66:8 67:15
  69:17 70:14 71:15 72:4
  77:10 80:10,20 85:8
  86:3 93:9 94:25 95:4
  96:6 97:1,20 98:3
  102:8 104:6 107:23
  109:4,19 112:14
  114:11 116:8 117:14
  118:12 122:14,18
  123:19 128:11 129:9

DANIEL F. RYAN, II                                                                           7/9/2009

Page  18

132:1 135:10,16
138:22 141:2 142:9,21
149:10,23 153:4
158:12 159:6
**WITNESS'S** 158:2
**word** 55:2,14 61:5 83:13
**words** 51:10 57:22 86:9
95:19 106:11
**work** 8:22 9:6 19:20 20:1
20:5,11 21:24
**worked** 19:14 22:2,8
**working** 87:12
**workmen** 85:3
**world** 76:8
**worry** 76:12 77:21
**wouldn't** 14:15 68:15
96:3 145:8
**write** 48:19 83:9,24 84:1
**writing** 50:1 51:8,18
60:12,14 78:7 80:6
81:19,21 127:16
143:20
**written** 48:18 58:24 59:1
59:5 60:17,21 62:15
65:1 116:13 138:3
**wrong** 94:4 115:6 144:11
**wrote** 31:15,18,21 56:3
65:22 84:3 96:21,22

### X

**X** 4:1
**X-ray** 57:9 129:22
130:22

### Y

**Yankee** 129:23 130:22
**year** 20:6 62:4,6 63:25
64:6
**years** 22:16,17 31:2 33:5
77:17 83:6
**yesterday** 31:19,24
33:13 38:24 39:20 40:1
**York** 2:14
**y'all** 72:8

### Z

**Z** 110:6 111:3 126:20,22

126:24
**ZAF** 110:3
**Zito** 106:18 107:3 108:2
110:3 114:7 117:25
123:5,8 126:5,13 127:6
129:2,5 156:21
**Zito's** 107:11,15,19
109:25
**Zone** 43:15
**zones** 50:6,20 52:7
**Zulu** 57:9 129:23,24
130:23 133:14

### $

**$100** 64:5 78:24
**$150** 33:17
**$20,000** 33:5,12
**$200** 33:19
**$300** 33:24

### 0

**00140** 139:7
**00141** 4:6 136:19
**05-4182** 1:8
**05-5531** 1:12
**05-5724** 1:13
**06-5342** 1:13
**06-6299** 1:14
**06-7516** 1:14
**07-3500** 1:15
**07-5178** 1:15
**08** 34:20

### 1

**1** 4:7 56:13 63:24 69:4
90:9 130:15 132:12
156:18
**10/12/2008** 32:16
**100** 65:9 75:25
**11** 155:16
**11:30** 121:7
**11:32** 121:20
**1100** 1:23 5:10
**12** 26:10 31:16 32:3
116:18,19
**12th** 34:3 88:18,19
**12:00** 110:15,24 123:6

**1200** 127:3
**1221** 45:20 47:14 48:5
51:2,3 52:16 53:4
60:19
**136** 1:22 4:5,6 6:19
**14** 124:2
**1400** 112:22
**1412** 125:22
**1425** 111:15 113:2
**1435** 109:9
**15** 121:24 124:2,13,21,24
125:13
**1510** 111:19 113:3
**1530** 111:5 126:19,20
**156** 4:7,8,9,10,11
**157** 4:12
**160** 48:11 49:10 56:7
60:22 156:17,17
**160.1** 48:2 54:7 55:23
**160.3** 55:7,24 56:22
**162.75** 43:11,17,24 57:12
58:2 91:10 92:9
**165** 49:10 56:9
**1700** 113:5
**1855** 126:25
**19** 59:12 99:7
**1920** 126:21
**1945** 111:6 126:24
**1999** 59:6

### 2

**2** 1:8 4:8 56:18 72:18
89:18 99:21 130:15
132:13 156:19
**2:12** 125:22
**20,000** 34:1
**200** 75:25
**2000** 59:6
**20001** 2:15
**2004** 8:2 11:15 22:15
63:4 82:5 150:19
**2005** 14:19 62:2 63:15
134:8
**2006** 20:21 59:2,12 99:7
**2007** 23:24 25:11,15 30:1
30:22 155:12
**2009** 1:24 5:13 30:2 31:9

31:14,16,20,23 32:3
34:3,7,23 38:4 158:20
**21** 34:20
**210** 30:25
**23rd** 28:23 155:13,14
**2300** 2:11 5:11 109:11
110:7
**2332** 121:6
**24** 116:17
**242** 35:24
**25** 34:7,23 133:25
**25th** 36:9,17 38:4 102:17
**250** 99:24 100:20
**2500** 1:23
**26** 28:19
**26th** 108:5
**27** 150:18 155:12
**27th** 108:5 110:16,24
111:5,7,15 112:18
118:5 119:24 120:24
121:6 123:6 124:9
125:4,12,23 126:6,19
**2715** 2:19
**28th** 121:15,20,21,22
124:3,3,9 125:4,5,7,13
126:19
**2885** 126:8
**29** 63:15
**29th** 124:4

### 3

**3** 4:9 90:14 98:21 100:25
148:6 156:20
**3:30** 111:6
**3:44** 121:22
**30** 22:16 63:24
**30.40-15** 89:12
**32** 91:18
**3200** 2:7
**33** 43:9,10 45:20 47:14
48:1,4 49:9 51:2 52:16
53:4,9 54:7 55:6,23
57:12 58:1 60:19,22
89:11 91:18 92:9
156:17,17
**3683** 1:22 6:19

DANIEL F. RYAN, II

**4**
**4** 4:10 105:25 117:1
   148:10 156:21
**4:13** 119:24,25
**40** 44:14 116:21 129:4
**46** 16:18
**4722** 126:7
**4727** 24:7,8,14 42:25
   43:6 44:6 72:22 75:5
   89:3 102:14 108:3
   109:10 110:5 113:10
   118:1 129:25 130:4,9
   133:9 150:20 152:22
   153:15
**4745** 108:3 110:5 150:21
   152:22
**48** 116:17
**49** 4:3

**5**
**5** 4:11 69:4 156:24
**5:13** 120:24
**50** 44:14 64:4 65:8 78:23
**500** 131:17

**6**
**6** 4:12 157:1
**6-F** 129:13,21
**650** 2:18

**7**
**7** 4:18
**7:45** 111:6
**70113** 2:4
**70130** 2:19
**70163** 1:23 2:8,11
**71** 4:4
**713** 121:1
**72** 99:23 100:12,16,19
   102:13,17 116:17
**7530** 126:7,8
**77399** 1:22 6:20

**8**
**8th** 145:16
**8/17** 107:16
**8/24** 109:9

**8/26/05** 110:1
**8/28** 107:16
**821** 2:3

**9**
**9** 1:24 5:13 158:20
**9th** 35:11
**9/11** 13:15
**9:30** 110:19
**90** 151:20
**90s** 16:15
**901** 2:14