1    Q.   So a 2-inch mooring rope can be used
2  to moor a barge or a ship?
3    A.   Certainly.
4    Q.   Okay.  With regard to mooring of a
5  barge in hurricane conditions, would you agree
6  that the barge is affected by wind forces?
7    A.   It would be affected by wind forces,
8  yes.
9    Q.   Wave action?
10   A.   Yes.
11   Q.   Okay.  Would you -- what about storm
12 surge, tide?
13   A.   Storm surge, certainly.
14   Q.   Okay.  Do you have any knowledge or
15 are you going to give any opinion with regard
16 to the loads associated with a vessel moored in
17 hurricane conditions?
18   A.   No.
19   Q.   When an end user, or a facility, in
20 its rope selection process -- do you have any
21 opinion as to what the factors are that should
22 be considered?
23   A.   I think that's still, again, the end
24 user's decision.  He has to know what his
25 conditions are, he has to know the size of the

```
 1        Q.   With regards to mooring, what in your
 2   opinion is the appropriate factor?
 3        A.   I don't know that there is an
 4   appropriate factor.  I see cases where it
 5   appears that they go down as low as 2:1, 3:1,
 6   often.
 7        Q.   So you don't have an opinion in this
 8   case what the appropriate factor is.
 9        A.   No, I don't.
10        Q.   Okay.  So you don't have an opinion in
11   this case what the safe working load limit of
12   the lines used in this mooring is, is that
13   correct?
14        A.   The safe working load limit --
15        Q.   Well, let me rephrase that.
16        A.   Yeah.  It's --
17        Q.   You have no opinion as to what the
18   working load limit is for the ropes involved in
19   this case; is that correct?
20        A.   I don't think anyone does.  But yes.
21        Q.   Okay.  And it's fair to say that the
22   working load limit should never be exceeded.
23        A.   Working load limits should never be
24   exceeded.  They are every day, especially in
25   marine applications.
```

50

1    that safety is paramount?
2              MR. WALKER:
3                   Objection.
4         A.   In theory, yes.
5    EXAMINATION BY MR. SANDERS:
6         Q.   Okay.  Let me ask you about -- I think
7    I know the answer, but with regard to Hurricane
8    Katrina you have no opinion or knowledge as to
9    the winds which may have affected the barges in
10   the Industrial Canal?
11        A.   No, I do not.
12        Q.   No knowledge of any of the factors
13   involved in a hurricane in that area.
14        A.   No.
15        Q.   Okay.  So you have no knowledge of the
16   surge?
17        A.   Direct amount of surge, no.
18        Q.   Wave action?
19        A.   No.
20        Q.   Winds involved?
21        A.   I'm not sure of the wind velocity, no.
22        Q.   Okay.  And you didn't review any
23   weather or wind records, is that correct?
24        A.   No, I did not.
25        Q.   Okay.  Let me ask you about mooring

```
 1    lines in general.  Is it fair to say that they
 2    are strongest when horizontal?
 3         A.   By horizontal, do you mean in a direct
 4    line of pull?
 5         Q.   Correct.
 6         A.   Theoretically, yes.
 7         Q.   What is theoretical -- what's the
 8    opposite; practically?  You say practically
 9    they're not strongest?
10         A.   They are, but if you get a slight --
11    it's called a fleet angle when you get off, a
12    very modest fleet angle is not going to change
13    the strength of the rope.
14         Q.   What was the fleet angle between the
15    4745 and 4727?
16         A.   From what I understand, and the
17    diagrams and the information presented to me,
18    they were all opposite, one cavel to another,
19    straight across, no angles.
20         Q.   Okay.  You mentioned the diagrams and
21    information provided to you.  What diagrams did
22    you review?
23         A.   Well, these have been given to me --
24    drawn up by personnel here.
25         Q.   So they were hand drawn diagrams.
```

```
 1            MR. WALKER:
 2                If any were done they were
 3            destroyed.  It's attorney work product
 4            and it was something drawn in a
 5            consultation with him, if it was in
 6            fact --
 7            MR. SANDERS:
 8                Just so long as I don't waive any
 9            rights that --
10       A.   I kept none of them for my records.
11   EXAMINATION BY MR. SANDERS:
12       Q.   But they were diagrams of the vessels?
13       A.   We were just -- we were sketching
14   things out to show me so I would know.
15       Q.   Okay.
16            MR. WALKER:
17                Can we take a break?
18            MR. SANDERS:
19                You're not going to consult with
20            him, are you?  No, let's move forward.
21            MR. WALKER:
22                No, I want to take a break.
23            MR. SANDERS:
24                You can't break in a deposition
25            and coach the witness.
```

```
 1      A.   I don't remember.  I didn't see the
 2  barge.  But looking at another barge I saw
 3  recently there were approximately five.
 4      Q.   Okay.  How many bitts were there?
 5      A.   I don't remember bitts on that.  On
 6  the barge I recently looked at there were two
 7  bitts.
 8      Q.   So just in general, if there were
 9  three lines currently on the vessels, and if we
10  added three more separate lines --
11      A.   Are we referring to our vessel?
12           MR. WALKER:
13               Is there a question there?
14  EXAMINATION BY MR. SANDERS:
15      Q.   Let me give you a hypothetical.  If
16  we've got three lines rated at 100,000 pounds
17  each at three separate mooring points, and if
18  we add three more lines at three separate
19  mooring points, we would have approximately
20  600,000 pounds of load capacity, is that
21  correct?
22      A.   That's correct.
23      Q.   Okay.  So for each line we add
24  additional strength.
25      A.   That is correct.
```

```
1        Q.   So we'll attach the front page as
2   Exhibit 4 but attach the rest of it by
3   reference as each side has a copy.
4            (Exhibit 4 was marked for
5   identification and is attached hereto.)
6   EXAMINATION BY MR. SANDERS:
7        Q.   Number 5 is the photographs supplied
8   by Mr. Walker today.  There are nine.  I'm
9   going did attach those in globo.
10           MR. WALKER:
11                There are nine sheets so that's
12           eighteen photographs.
13           MR. SANDERS:
14                I'm sorry.  There are eighteen
15           photographs on nine sheets.  We're
16           going to make that in globo Number 5.
17                Can I get another color copy
18           today?
19                Okay.  The nine sheets of
20           photographs will be Exhibit 5.
21           (Exhibit 5 was marked for
22   identification and is attached hereto.)
23  EXAMINATION BY MR. SANDERS:
24       Q.   A drawing --
25           MR. SANDERS:
```

```
 1                    Of Mr. Forbes, I take it.
 2           MR. WALKER:
 3                Yes.
 4   EXAMINATION BY MR. SANDERS:
 5       Q.   -- will be Exhibit 6.
 6                (Exhibit 6 was marked for
 7   identification and is attached hereto.)
 8   EXAMINATION BY MR. SANDERS:
 9       Q.   A drawing by me to which the witness
10   testified, on yellow paper, of the side view of
11   two vessels, barges, with a rope attached, will
12   be Exhibit 7.
13                (Exhibit 7 was marked for
14   identification and is attached hereto.)
15           MR. SANDERS:
16                Anything else?
17           MR. WALKER:
18                (Shakes head negatively.)
19           MR. SANDERS:
20                No.
21   EXAMINATION BY MR. SANDERS:
22       Q.   Okay.  Back to the use of rope and
23   wire rope.  They both have different stretch
24   characteristics; is that correct?
25       A.   That is correct.
```

```
 1        Q.   Should a barge be able to be moored
 2   safely for 75 miles per hour winds?
 3        A.   Again --
 4        Q.   If you have no opinion, say.
 5        A.   Under ordinary conditions?  No.  Under
 6   hurricane conditions?  You should make an
 7   attempt, yes.
 8        Q.   Okay.  How about for 100-miles per
 9   hour winds; same thing?
10             MR. WALKER:
11                  Objection.
12        A.   I mean, we're kind of just --
13   EXAMINATION BY MR. SANDERS:
14        Q.   See, you're giving an opinion that you
15   felt it would have broken away anyway when you
16   don't even know what the wind speed was.  Is
17   that correct?
18        A.   That is correct.
19        Q.   And you don't know what the wave
20   action was, is that correct?
21        A.   That is correct.
22        Q.   You don't know the height of the surge
23   is that correct?
24        A.   That's correct.
25        Q.   And all of these are factors which
```

1   affect whether a barge breaks away, is that
2   correct?
3       A.   That is correct.
4       Q.   So is that opinion that it would have
5   broken away anyway, is that speculation or is
6   that a guess?
7       A.   It's looking at the ropes and the way
8   they broke and how they melted and fused.  It
9   was the worse situation on a piece of rope I've
10  ever seen.  And I -- from that, and having
11  looked at hundreds of ropes in my life, I
12  decided that probably nothing could have saved
13  it at that point.
14      Q.   What saved the other six barges?
15      A.   I have no idea.  They were loaded.
16      Q.   So that's a factor, having a loaded
17  barge versus an empty?
18      A.   I don't know that.
19      Q.   You don't know.
20      A.   I don't know.  It would appear --
21      Q.   So let me get this straight:  You feel
22  there's no amount of rope that could have
23  stopped this break away, but we have six barges
24  all within twenty feet that did not break away.
25  Is that correct?

1    A.   That's correct.
2    Q.   And you base your opinion solely upon
3    looking at the broken ropes.
4    A.   Right.
5         MR. WALKER:
6              Remember to let each other
7              finish.  Pat, that applies to you, as
8              well, if you would.
9         MR. SANDERS:
10             Right.
11   EXAMINATION BY MR. SANDERS:
12   Q.   From looking at the ropes, can you
13   tell me what the wind velocity was or wave
14   action or anything like that?
15   A.   I am not a magician, no.
16   Q.   And from looking at the ropes is it
17   fair to say that you can only say that the
18   forces involved was the breaking strength?
19   A.   The force was extraordinary on the
20   ropes, yes, and it broke the ropes.
21   Q.   And that would have been at the break
22   strength.
23   A.   Yes.
24   Q.   So when the storm -- the barge put
25   forces of 178,500 pounds on the barge, it

(Counsel Product)

DOCK

N / S compass (N up, S down, W left, E right)

ING 5882

SC 204 B
D-10
found here

ING 4745'   |   ING 4727'

"STRSN"   |   "STRSN"

(5) D#13 we here   |   (6) 15 mgH
Nothing → ← found   |   (left side)

(4) Nothing → ← found

(3)   |   (2) 1st H semomts Nothing has

D-4 found here
on 9/11

(1) we here D#6   |   (0) Nothing found (possibly it # 9)

"Bow"   |   "Bow"