# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| IN RE:  KATRINA CANAL BREACHES | * | |
| CONSOLIDATED LITIGATION | * | CIVIL ACTION |
| | * | |
| | * | NO. 05-4182 |
| PERTAINS TO:  BARGE | * | and consolidated cases |
| | * | |
| | * | SECTION "K"  (2) |
| | * | |
| *Boutte v. Lafarge*     05-5531 | * | |
| *Mumford v. Ingram*     05-5724 | * | |
| *Lagarde v. Lafarge*     06-5342 | * | JUDGE |
| *Perry v. Ingram*     06-6299 | * | STANWOOD R. DUVAL, JR. |
| *Benoit v. Lafarge*     06-7516 | * | |
| *Parfait Family v. USA*     07-3500 | * | MAGISTRATE JUDGE |
| *Lafarge v. USA*     07-5178 | * | JOSEPH C. WILKINSON, JR. |
| *Weber v. Lafarge*     08-4459 | * | |

# BARGE PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO EXCLUDE IN WHOLE OR IN PART THE TESTIMONY OF DEFENDANT'S EXPERT ROBERT BEA

## Table of Contents

A.   Statement of Facts ...................................................................................................... 1

   1.   Dr. Bea Has a Personal Interest in Finding that the Corps of Engineers, Not the Barge, was Responsible for the North and South Breaches .................................... 1

   2.   Dr. Bea Reached Exaggerated Conclusions that Exceeded His Analysis ................ 4

   3.   Dr. Bea's Exaggerated Conclusions from Other Barge Impacts ............................. 6

   4.   Dr. Bea's Exaggerated Conclusions on Physical Evidence ..................................... 7

   5.   Dr. Bea's Exaggerated Reliance on "High-Jumping the School Bus" .................... 9

   6.   Dr. Bea's Exaggerated Descriptions of Others' Analyses ...................................... 10

   7.   Dr. Bea Failed to Give Serious Consideration to the Barge as the Actual or Contributing Cause of the North or South Breaches ............................................. 12

   8.   Dr. Bea Based His Asserted Analysis of Causation on the Unexamined Assumption that the Barge Could Not Have Traversed the IHNC and Been in Position to Cause the Breaches ........................................................................................................... 14

   9.   Dr. Bea Has Stated Opinions on the Credibility of Eyewitness Testimony ........... 15

   10.   Dr. Bea Has Relied on His Own Work in the Independent Levee Investigation Team, His Role in Limiting its Inquiries, and His Role in Co-Authoring Reports

with Authorship Described Only as "Seed et al" as Proving the Reliability of His
Own Conclusions ............................................................................................... 16

11.    Dr. Bea Has Attempted to Glorify His Investigations and Conclusions, and Mislead
the Finder of Fact, By Calling Them "Forensic" ..................................................... 19

B.    Argument ............................................................................................................................. 20

## Table of Authorities

### 1.    Cases

*Christophersen v. Allied-Signal Corp.*,
939 F.2d 1106 (5th Cir. 1991) (*en banc*), *cert. denied*, 503 U.S. 912 (1992) ........................23

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993)........................................................................................................22

*General Electric Co. v. Joiner*,
522 U.S. 136 (1997)........................................................................................................22

*Hathaway v. Bazany*,
507 F.3d 312 (5th Cir. 2007) ...........................................................................................23

*Moore v. Ashland Chemical Inc.*,
151 F.3d 269 (5th Cir. 1998) (*en banc*), *cert. denied*, 526 U.S. 1064 (1999) ........................22

*Munoz v. Orr*,
200 F.3d 291 (5th Cir.), *cert. denied*, 531 U.S. 812 (2000)................................................23

*Newport Ltd. v. Sears, Roebuck & Co.*,
1995 WL 328158 (E.D.La. May 30, 1995) (No. CIV.A. 86-2319) ........................................24

*Nichols v. American National Insurance Co.*,
154 F.3d 875 (8th Cir. 1998) ...........................................................................................24

*Rodriguez v. Pacificare of Texas, Inc.*,
980 F.2d 1014 (5th Cir. 1993), *cert. denied*, 508 U.S. 956 (1993)........................................23

*Viterbo v. Dow Chemical Co.*,
826 F.2d 420 (5th Cir. 1987) ...........................................................................................21

### 2.    Rules

Rule 403, Fed. R. Evid...................................................................................................23

Rule 702, Fed. R. Evid...................................................................................................20

A.  **Statement of Facts**

1.   **Dr. Bea Has a Personal Interest in Finding that the Corps of Engineers, Not the Barge, was Responsible for the North and South Breaches**

Dr. Bea admitted in his September 14, 2009 deposition in this case that he had a personal interest in the causation of the North and South breaches of the East wall of the IHNC, and that this interest would have been frustrated by a conclusion that the barge was a cause of either failure.

He testified that he had spent in excess of 10,000 unpaid hours in the investigation of the levee failures.[1]  He has produced five thousand pages of technical reports.[2]  He had never produced anything like that volume of work on any other matter.  "This case has absorbed far more time, far more intensity, than any of the previous cases I have worked on."[3]  "This is the biggest one in my entire 56 years of engineering."[4]  He explained that his motive in making this unprecedented effort was that "I care."[5]  When asked to elaborate, he responded:[6]

> A   This is the largest, most destructive, catastrophic failure of a civil engineered structure in the history of the United States, if not the world.
>     I'm at the close of my career.   One of the things I would like to do, as I close my career, is contribute what I'm able to contribute in ways of insight and information to those who will follow me.  And that's because I don't want them to repeat the horrible collection of mistakes that we made in the causation of this catastrophe.
>     I care.

Dr. Bea agreed that, "to fulfill this goal," it is "necessary that the Corps of Engineers build flood wall protection systems differently in the future than it has in the past."[7]  He testified that others

---

[1] Plaintiffs' Exhibit 2, September 14, 2009 Deposition of Dr. Bea, Tr. 23 lines 16-20.  Plaintiffs' Exhibit 1 is a List of Exhibits.  Plaintiffs' Exhibit 6 is the Errata Sheet for Dr. Bea's deposition.
[2] Plaintiffs' Exhibit 2, September 14, 2009 Deposition of Dr. Bea, Tr. 217, lines 2-5.
[3] *Id.* Tr. 217, lines 10-12.
[4] *Id.*, Tr. 218, lines 8-9.
[5] *Id.*, Tr. 218, lines 10-14.
[6] *Id.*, Tr. 218 line 14 to Tr. 219 line 3.
[7] *Id.*, Tr. 219, lines 11-16.

on his Independent Levee Investigation Team had discussed this goal with him and that most of them shared it. [8]  Certainly, Dr. Professor Raymond Seed and Dr. Professor David Rogers shared that goal. [9]  He testified that these colleagues remained with him on what he called "this caring trail of tears." [10]  Dr. Bea testified that he had spoken about his goals with investigators on other teams, and thought that they generally shared those goals. [11]  Dr. Bea added that he could do more than the others: "Their ability to act on those kinds of goals are different than my abilities." [12]

Dr. Bea was a principal expert witness for the defendant in this action.  None of the other original investigators is a principal expert witness for the defendant in this action.  Dr. Bea was also a principal expert witness for the *Robinson* plaintiffs, as shown in the November 18, 2009 Findings of Fact and Conclusions of Law (Doc. # 19415).

Dr. Bea admitted in his deposition in this case that his goal would have been frustrated by any finding that the barge broke the floodwalls on the East bank of the IHNC, or was a contributing cause:[13]

> Q   If the barge had been a cause of the failure of the North Breach and/or the South Breach, that would interfere with those goals, wouldn't it?
> A   Yes.

Dr. Bea claimed in response to a question from defense counsel that his goal did not affect his investigation or conclusions, but then added language underscoring the importance of

---

[8] *Id.*, Tr. 220, lines 3-7.
[9] *Id.*, Tr. 220, lines 6-9.
[10] *Id.*, Tr. 220, lines 9-11.
[11] *Id.*, Tr. 220, lines 12-17.
[12] *Id.*, Tr. 220, lines 17-19.
[13] *Id.*, Tr. 220, lines 21-24.

his goal.[14]  As Dr. Bea's own answer suggested, there is ample evidence that his personal goal affected his fundamental approach, blinding him to:

(a) the difference between a conclusion that the floodwalls at the North and South Breaches could hypothetically have failed on their own — which is the furthest conclusion his analysis could support — and his statement that the floodwalls at the North and South Breaches would inevitably have failed on their own;[15]

(b) the difference between a conclusion that the floodwalls at the North and South Breaches could hypothetically have failed on their own and a conclusion that the Barge ING 4727 could not have been a primary cause of the North and South Breaches;[16]

(c) the failure to perform even a minimal investigation of the role of the Barge ING 4727 as a primary or contributing cause of the North and South Breaches; [17]

(d) the assumption that he could rule out the barge as a primary or contributing cause of the North and South Breaches because of unexamined underlying assumptions that only the force of Hurricane Katrina could have set the barge adrift, and that it would have had to go directly from the Lafarge dock to the site of the North or South Breaches;[18]

(e) the overstatement of his findings;[19] and

---

[14] *Id.*, Tr. 221, lines 6-19: "BY MR. RAFFMAN: Q   Professor Bea, in answer to the last question you gave, did any part of your analysis -- of the issue of whether the barge had been a cause of the failure, was any part of your analysis or your scientific conclusions motivated by your desire to see that the levee system  improve?  A    No. It's the knowledge and background understanding that comes from these investigations.  So if we can portray that  convincingly and logically to our younger colleagues, then hopefully they will not repeat our mistakes."

[15] See Parts 2, 3, 4, 5, 6, 7, and 10 of the Statement of Facts below.

[16] See Parts 2, 3, 4, 5, 6, 7, and 10 of the Statement of Facts below.

[17] See Part 8 of the Statement of Facts below.

[18] See Part 8 of the Statement of Facts below.

[19] See Parts 2 and 9 of the Statement of Facts below.

3

(f) the glorification of his investigation and findings, and those of others who did not disagree with him, by calling them by the scientifically meaningless term "forensic."[20]

## 2. <u>Dr. Bea Reached Exaggerated Conclusions that Exceeded His Analysis</u>

Dr. Bea stated unequivocal conclusions that the Barge ING 4727 was not a cause of either the North Breach or the South breach of the East wall of the IHNC.  His August 3, 2009 Report[21] stated: "In particular, this Expert Report will address allegations concerning the cargo barge ING 4727 which I conclude was not a cause of either of the two breaches."[22]

However, Dr. Bea's investigation was limited to what he considered the *primary* causes of the North and South Breaches.  His Report stated: "Section III summarizes the *primary* reasons for causation of the North Breach and South Breach at the Lower 9th Ward that developed during Hurricane Katrina."[23]  (Emphasis added.)  It stated that the "cumulative adverse effects" of the MRGO "were a *primary* cause for the failure of the man-made flood protection structures along Reach 2 of the MRGO," including those "that defended the eastern perimeter of the Lower 9th Ward – St Bernard 'polder'."[24]  (Emphasis added.)  He discussed independent investigations of "the 'primary mechanisms' participating in development of the North and South Breaches at the Lower 9th Ward."[25]

---

[20] See Parts 6, 10, and 11 of the Statement of Facts below.
[21] Plaintiffs' Exhibit 3, August 3, 2009 Report of Dr. Bea.
[22] *Id.*, p. 1, ¶ 1.
[23] *Id.*, p. 1, ¶ 2.
[24] *Id.*, pp. 23-24, ¶ 31.  *See also* p. 24, ¶ 32.
[25] *Id.*, pp. 51, ¶ 58.

Notwithstanding Dr. Bea's emphasis on the "primary" causes of the breaches in question, and his admission that the other investigations focused on the primary causes of the breaches, he stated that their conclusion was that "<u>the cargo barge ING 4727 did not play any substantial role in development of these breaches and did not cause any flooding</u>."  (Emphasis in original.)[26]

Dr. Bea's analysis of causation was that factors other than the barge might have caused the failure of the floodwalls at the North and South Breaches independently of the barge, that the other factors therefore did cause the North and South Breaches independently of the barge, and the barge was therefore proven not to have been a cause of the failures.  His Report put it exactly that way:[27]

> 65. <u>The forensic investigations indicate that if the ING 4727 cargo barge had remained moored at the Lafarge Terminal, the North Breach and South Breach at the Lower 9th Ward would still have developed during Hurricane Katrina</u>.  That is, conditions during Hurricane Katrina were clearly sufficient to cause the IHNC floodwall failures – and did cause those failures – without assistance from the ING 4727 cargo barge.

(Emphasis in original.)

Dr. Bea's Report made very clear that he could not say whether underseepage or overtopping "'won the photo finish horse race' to develop the South Breach," but that "these modes of failure did not involve interactions with or forces from the ING 4727 barge."[28]  It stated: "Regardless of any barge impact, our investigation's view is that there are other models of failure that would have been expected to fail this section without any need for help from the barge."[29]  It stated that "conditions during Hurricane Katrina were clearly sufficient to cause the

---

[26] *Id.*, p. 52, ¶ 59.  *See also* p. 57, ¶ 64.
[27] *Id.*, p. 57, ¶ 65.
[28] *Id.*, p. 50, ¶ 56.
[29] *Id.*, p. 56, ¶ 63.

IHNC floodwall failures – and did cause those failures – without assistance from the ING 4727 cargo barge."[30]  Dr. Bea testified to the same effect.[31]

Dr. Bea quoted the ILIT report he co-authored, concluding that the barge was not a cause of the South Breach because "*there are other modes of failure that would have been expected to fail this section without any need for help from the barge, so that the likelihood is that the barge slipped its moorings and was eventually drawn in through a breach that was already well developed.* (Underline added for emphasis)."[32]  He quoted another section of the ILIT Report, stating: "*this section would have been expected to fail without barge impact.*"[33]  He quoted yet another section, stating: "*this section would have failed without barge impact.*"[34]

See also Part 7 below, discussing Dr. Bea's failure to analyze the barge as a force causing the floodwalls to lean and underseepage—and failure—to begin or to accelerate.

### 3.    Dr. Bea's Exaggerated Conclusions from Other Barge Impacts

Dr. Bea's Report referred to other instances of barges hitting floodwalls that survived, and drew the general conclusion: "Based on these forensic engineering observations and analyses, the conclusion is if a barge strikes a floodwall that is not already failing for

---

[30] *Id.*, p. 57, ¶ 65.

[31] Plaintiffs' Exhibit 2, September 14, 2009 Deposition of Robert Bea, Tr. 225 line 10 to Tr. 226 line 22 ("Q Dr. Bea, you testified just a moment ago that it would not have been possible for a barge to have caused the North Breach or the South Breach under any conditions.  Do I have it right, under any conditions?  A  No.  Q  Okay. Could a barge have caused the damage that you observed on the North Breach?  A  No.  Q No?  A  No.  Q  No. A  And I documented the reason why.  Q  Tell me the reasons.  A  The reasons concern our forensic engineering studies of the development of the North Breach.  Those studies converge on a primary causative element related to the discussed/identified seepage, hydraulic effects and lateral instability effects.  Other information in the vicinity of North Breach lead to the conclusion that the barge wasn't there and couldn't have been there.  And so the barge does not enter my expert opinion as a causative/contributing/participating element in the case of North Breach.  Q  Would it be fair to say that your answers to Mr. Raffman's question mean that once you have already ruled the barge out of consideration it could not possibly have caused any damage?  A  At the North Breach?  Q  Yes.  A  That is correct. Q  Okay.  Is your answer the same with respect to the South Breach?  A  Yes, for very similar reasons.").

[32] Plaintiffs' Exhibit 3, August 3, 2009 Report of Dr. Bea, p. 13, ¶ 23.

[33] *Id.* at p. 16, ¶ 28.

independent reasons, then the barge impact is not sufficient to cause a failure and breaching should not be expected to occur."[35]  In his deposition, however, he admitted that he had not studied the strength of the levees in those other barge-impact situations.[36]

### 4.   Dr. Bea's Exaggerated Conclusions on Physical Evidence

Dr. Bea's Report repeatedly referred to the lack of physical evidence of the impact of the barge on any of the floodwalls other than at the South end of the South breach — where the barge admittedly pulverized part of a floodwall and bent rebar — as evidence that the Barge ING 4727 had not struck any other part of the floodwall.[37]  Dr. Bea testified to the same effect.[38]

---

[34] *Id.* at p. 16, ¶ 27.

[35] *Id.* at p. 57 ¶ 66.

[36] Plaintiffs' Exhibit 2, September 14, 2009 Deposition of Dr. Bea, Tr. 94 line 14 to Tr. 96 line 18.  The critical testimony was at Tr. 94 line 23 to Tr. 95 line 7: "Q  And did those flood walls, where the barge did not create a breach, exist where the levee was as weak as it was in the Inner Harbor Navigational Canal?  MR. RAFFMAN: Objection.  THE WITNESS:  I cannot answer that question because I have not studied, quantitatively, the soil characteristics under all of the locations where we experienced barge impact with concrete I-walls."

[37] Plaintiffs' Exhibit 3, August 3, 2009 Report of Dr. Bea, p. 10, ¶ 21 (clear barge impact on floodwall at South end of South breach); *id.*, p. 12, ¶ 23 (quoting ILIT Report to same effect and stating this was "one single section of wall"); *id.*, p. 14, ¶ 24 (quoting NIST Report about barge impact on floodwall at South end of South breach); *id.*, p. 15, ¶ 25 (quoting Team Louisiana report on same impact); *id.*, p. 16, ¶ 27 (quoting ILIT Report as saying "*The south end of the breach (Figure 3) was the only location where the concrete floodwall, and its rebar, were crushed by compressive impact.*") (italics in original); *id.*, p. 16, ¶ 28 ("'*In addition, a large dent on the left side of the barge, near the bow, and a scrape on its base at that location, appeared to correlate well with the south end impact site shown in Fig. 10. . . . It was concluded by this investigation that the barge was most likely drawn in through a breach that was already open, and that it impacted at the extreme south end of the breach as it passed inland through the (already open) breach.*' (underline added for emphasis)."); *id.*, p. 54, ¶ 62 ("Whereas most of the concrete floodwall was failed in extension and flexure, there was one single section of wall which clearly evinced a major impact, and that was the extreme southern end of the breach.  The rebar is compressed and bent (Figure 22), and the concrete crushed at this location (Figure 23).  It is important to note that forensic engineering examinations of the concrete panels at the North Breach did not disclose any evidence of local barge impact features such as were found at the south end of the South Breach."); *id.*, p. 55 ("Figure 22: View of crushed – impacted – concrete floodwall at the south end of the south breach at the east bank of the IHNC at the Lower 9th Ward.  Scraping motion of barge over top of floodwall results in reinforcing bars pointing in direction of final location of ING 4727 cargo barge."); *id.*, p. 56, ¶ 63 ("As this was the extreme southern end of the very long breach, available evidence and analyses indicate that this impact was not the cause of the breach and failure (ILIT 2006; Team Louisiana 2007; USACE IPET 2007).  Instead, the barge was apparently traveling southwards along the IHNC (driven by the prevailing storm winds at that time) and was drawn into the breach by the inflowing waters. The barge did not enter cleanly into the breach, but struck at the south end before passing in.").

[38] Plaintiffs' Exhibit 2, September 14, 2009 Deposition of Dr. Bea, Tr. 72 lines 10-17 ("We used photographic information to help us arrive at that conclusion, photographs that showed that the barge plausibly

After first denying that there was any rubble and claiming that the downed floodwalls at the North Breach were intact for examination, he admitted that there were a lot of concrete chunks lying about, that had been pulverized.[39]

Dr. Bea's first observation of conditions in the areas of floodwall failures was on September 29, 2005, a full month after Hurricane Katrina and after Hurricane Rita had occurred.[40]  Some remediation work had already been done, creating a defensive berm,[41] and that "to facilitate the construction of the repair berm on the Industrial Canal side of the flood wall at the South Breach, they had constructed a rock earthen access ramp.  That ramp went over part of the breach site."[42]  These changes interfered with the ILIT team's ability to make observations, burying a flood wall panel, filling holes with fallen floodwalls, and obliterating evidence of what had happened during Hurricane Katrina.[43]  While it was possible to obtain information about what type of fill had been used and what had previously been in some of the holes near the breach sites, there was no testimony suggesting that the buried floodwall elements had been made accessible to inspection.[44]

---

could not have contacted the wall.  We used our forensic engineering experience, that is on site examining the flood wall detailed characteristics at the North Breach.  There were no signs of barge impact, general or local."); Tr. 141, lines 4-17 (after admitting that wind and water conditions and whether the barge was adrift earlier than he thought were important, stating at lines 13-17: "But if the flood wall itself shows no signature at that time, that primary play by the barge in the formation of the breach, then it doesn't figure prominently in drawing conclusions.").

[39] *Id.*, Tr. 75 line 2 to Tr. 76 line 4.

[40] Plaintiffs' Exhibit 3, August 3, 2009 Report of Dr. Bea, pp. 9-10; Plaintiffs' Exhibit 2, September 14, 2009 Deposition of Dr. Bea, Tr. 110, lines 21-24.

[41] Plaintiffs' Exhibit 2, September 14, 2009 Deposition of Dr. Bea, Tr. 111, lines 3-5.

[42] *Id.*, Tr. 111, lines 12-17.

[43] *Id.*, Tr. 111 line 18 to Tr. 112 line 8.

[44] *Id.*, Tr. 112 line 9 to Tr. 113 line 13.

Similarly, much of the levee in the South Breach had been washed away when Dr. Bea conducted his examination.[45]

Dr. Bea admitted that he did not arrange to turn over any of the remaining floodwalls that had been buried at the time of his inspection, that he did not arrange to turn over any rubble he did not personally move, that no one on the ILIT team had done so, that he thought Dr. Cushing's report might have included examinations of what he and his team could not see,[46] and that otherwise he did not know of anyone on any team who made such arrangements, to inspect such fragments and see what evidence of barge impact might lie on their undersides.[47]

Dr. Bea's Report contains no reference, when he discusses the lack of physical evidence on the floodwalls of a barge impact, to the fact that he could not see numerous floodwall panels in the areas of the breaches that might have contained such evidence, or the fragments that might have contained such evidence.

### 5. Dr. Bea's Exaggerated Reliance on "High-Jumping the School Bus"

Dr. Bea testified in his September 14, 2009 deposition that he knew the South Breach occurred before the Barge ING 4727 was in position to cause it, because otherwise the barge "had to high jump the school bus,"[48] which he thought impossible. Dr. Bea referred to the Barge

---

[45] *Id.*, Tr. 102, lines 1-20.

[46] While Dr. Cushing's Report was cited as one of Dr. Bea's sources, this was only as to the movement of the barge. Plaintiffs' Exhibit 3, August 3, 2009 Report of Dr. Bea, p. 56, ¶ 64; p. 68 (list of references). Dr. Cushing's Report does not include any discussion of the inspection of floodwall segments or rubble greater than that described by Dr. Bea, other than to indicate the distribution of debris in the debris field. Plaintiffs' Exhibit 5, July 29, 2009 Report of Dr. Cushing.

[47] Plaintiffs' Exhibit 2, September 14, 2009 Deposition of Dr. Bea, Tr. 76 line 5 to Tr. 79 line 2.

[48] Dr. Bea testified: "But that wall had failed before the barge ever got there. And so the barge exerting additional prying forces, et cetera, played no substantial role in the evolution development of the breach. Q How do you know that? A Well, for one thing, a barge couldn't have gotten where it got unless it played high jump over that school bus. The water had to be above the top of the school bus, which means I got water at the elevations that we think are inside the Lower 9th Ward at 8:00 to 9:00 a.m. But the breach was developed at 7:00 to 8:00, based on all

ING 4727 floating over the top of the school bus as one of the major indicators that "the barge was a victim, not a cause" of the South Breach.[49]  However, Dr. Bea's own Report admitted that the school bus was driven into the area after Hurricane Katrina, and was abandoned there after Hurricane Rita.[50]  Dr. Bea admitted his personal knowledge of when the school bus arrived in the area, because he saw it driven into the area.[51]

### 6.   Dr. Bea's Exaggerated Descriptions of Others' Analyses

Dr. Bea's Report relies on the conclusions of other investigations, on which he did not work, as supporting his conclusion that the Barge ING 4727 was not a cause of the North or South Breaches: "The IPET forensic engineering analyses did not conclude that the cargo barge ING 4727 played any significant role in development of the breaches at the Lower 9th Ward."[52] He quoted the Team Louisiana Report as stating: "'*An empty barge floated into the south breach knocking the top 9 inches of the concrete wall that had already failed*.'  (Underline added for emphasis)."[53] He cited the Corps of Engineers in the IPET Report, as well as ILIT and Team

---

of the mechanics that we can mobilize that allows water in, allows the barge to impact the south end of the breach, and force its way in, float over the top of that school bus, not performing a high jump, and as the water recedes, goes down and that's where we found it.  Q  Are you talking about the barge being on top of the school bus? A  No. It had to high jump the school bus because it was found on a protected east side of the school -- Q  Finish your answer.  A  -- it was found on the east side of the school bus.  It didn't come to rest on the school bus until Hurricane Rita.  *Id.*, Tr. 92 line 21 to Tr. 93 line 23.

[49] *Id.*, Tr. 140 line 18 to Tr. 141 line 3.

[50] Plaintiffs' Exhibit 3, August 3, 2009 Report of Dr. Bea, at p. 12, quoting the ILIT Report of which Dr. Bea was a major author ("*The small yellow school bus also arrived between hurricanes Katrina and Rita, having been appropriated and used for interim transport and then abandoned in its location as shown.*").

[51] Plaintiffs' Exhibit 2, September 14, 2009 Deposition of Dr. Bea, Tr. 191 lines 17-20 ("In one case -- well, in the case where I was present in the background when the American Society of Civil Engineers drove up in the school bus . . . .").

[52] Plaintiffs' Exhibit 3, August 3, 2009 Report of Dr. Bea, p. 15, ¶ 26.

[53] *Id.*, p. 15, ¶ 25.

Louisiana, as indicating "*that the ING 4727 barge was a victim, not a cause of the South Breach*."[54]

However, Dr. Bea admitted in his deposition that he did not know of anyone on any of the other investigative teams that had looked at the question whether the wind and water conditions, and the time when the barge was adrift, could have resulted in the barge ING 4727 having been a primary or contributing cause of the North or South Breaches.[55] Dr. Bea then denied that, when he said he was "triangulating" his conclusion that the barge was not a cause of the breaches, he was dealing with a group of investigative bodies that did not look at the question.[56]

---

[54] *Id.*, p. 19, ¶ 29. (Underlining and italics in original.) *See also* the Report at p. 52, ¶ 59 ("Even though there are differences among the engineering experts involved in the major forensic engineering studies of the failures of the hurricane flood protection structures in the Greater New Orleans area during Hurricane Katrina (USACE IPET, ILIT, Team Louisiana, NIST, NRC, ASCE) concerning how and why the North and South Breaches developed, there is a unanimous opinion concerning the role played by the cargo barge ING 4727 in development of the North Breach or the South Breach - the cargo barge ING 4727 did not play any substantial role in development of these breaches and did not cause any flooding.") (underlining in original).

[55] Plaintiffs' Exhibit 2, September 14, 2009 Deposition of Robert Bea, Tr. 68 line 17 to Tr. 69 line 3 ("THE WITNESS: Your question is embedded with flaws, f-l-a-w-s. The direction of ocean on the vessel, or the characteristics of the wind acting on the vessel, have important effects as to the impact time history that the vessel develops with its intersection with the flood wall. In addition, the response characteristics of the flood wall also influence the effective dynamic forces that are transmitted to the flood wall. You posited that these things made no difference. They do. Very important differences."); Tr. 69 lines 4-17 (Dr. Bea made no assumptions about these matters and did not think they made any difference); Tr. 69, lines 18-25 (no one on ILIT investigated those questions, and no one made the decision not to investigate them); Tr. 70, lines 1-5 (not aware if anyone on the NIST team investigated that); Tr. 70, lines 6-25 (not aware of anything IPET did except what is in their report); Tr. 71, lines 1-8 (not aware of anyone in Team Louisiana who investigated these matters).

[56] *Id.*, Tr. 71, lines 10-15. Dr. Bea then attempted to explain by stating that he relied upon the lack of evidence of physical impact (see Part 4 above), and on the inability of the barge to travel to the site of the breaches. (See Part 8 below.) He did not explain his reliance, to shore up his own conclusions, on groups that did not investigate the matter.

**7.** **Dr. Bea Failed to Give Serious Consideration to the Barge as the Actual or Contributing Cause of the North or South Breaches**

Dr. Bea's Report quoted the ILIT report he co-authored, recognizing that the Barge ING 4727 might have struck the floodwall multiple times.[57]  In his September 14, 2009 deposition, Dr. Bea admitted that a floodwall could fail if a barge hit it with sufficient force.[58]  As discussed below, Dr. Bea admitted that it was "theoretically possible" but "implausible" for the barge to have pushed against the IHNC East floodwall, causing it to lean, and causing or speeding up the underseepage that he thought was one of the factors leading to the failures of the North Breach and South Breach.[59]

However, Dr. Bea decided that it was not necessary to analyze the role of the barge as a primary or contributing cause of either breach, in part because his calculations showed that each breach could or would have failed without the barge, and in part because he assumed the Barge ING 4727 could not have been present at the site of either breach before it failed.  These are discussed in this Part and the next Part.

While Dr. Bea's Report is very firm that erosion of the soil on the protected side of the IHNC floodwall caused the South Breach, he quoted the ILIT Report he co-authored as saying it

---

[57] Plaintiffs' Exhibit 3, August 3, 2009 Report of Dr. Bea, at p. 13, ¶ 23 (After discussing the evidence of the barge's impact on the floodwall at the South end of the Southern breach, quoting the ILIT report's statement: "*That does not mean that the barge might not have struck the floodwall twice (or more times) before finally impacting the southern end of the breach*). . . .").

[58] Plaintiffs' Exhibit 2, September 14, 2009 deposition of Dr. Bea, Tr. 195 lines 7-17: "Q . . . Is it your testimony that no matter how weak a levee supporting a flood wall may be, a barge striking it with any amount of force will not cause failure?  MR. RAFFMAN:  Objection.  THE WITNESS:  I would never render an expert opinion on a combination of factors that clearly would indicate I wasn't telling you the truth.  If that wall is weak enough, and if the barge is strong enough and hits forcefully enough it can cause failure of such a wall."

[59] Plaintiffs' Exhibit 2, September 14, 2009 Deposition of Robert Bea, Tr. 90 lines 7-18: "Q  My question is a very simple and direct question.  Can the barge create the problem?  Not whether the problem can arise independently, but can the barge create the problem?  A  What is the problem?  Q   The problem is making the wall lean, creating a gap underneath through which water can go, further weakening the wall.  That's part one of the

was impossible to say whether overtopping or underseepage caused by the pushing effect of the water on the canal side of the floodwall predominated as the cause.[60]

As shown below, Dr. Bea admitted in his deposition that he had never considered the pushing effect of the barge on the floodwall as a contributing cause of either breach.

Dr. Bea severely resisted answering the question whether a tip of the Barge ING 4727, having been stuck into the floodwall as Mr. Villavasso described, would have acted as a pry bar and caused the unusual results in which one part of the floodwall collapsed with its top pointing towards the canal and the adjoining part collapsed with its top pointing to the Lower Ninth Ward.[61]  Dr. Bea admitted that this pattern of failure was unique.[62]  When Dr. Bea was asked what he would have seen differently if the barge had in fact operated as a pry bar on those parts of the wall, his answer was "Well, of course, because I haven't examined quantitatively the information from the basis of your hypothetical, I can't possibly answer it without speculating."[63]  Dr. Bea testified that he was unable to answer whether winds in excess of 100 miles per hour could possibly have brought the barge into contact with the flood wall and caused a breach.[64]  Nevertheless, he found no difficulty in ruling out the barge as a cause of either breach.

---

problem.  A   Theoretically it's possible.  Is it plausible in this case?  I don't think so."

[60] Plaintiffs' Exhibit 3, August 3, 2009 Report of Dr. Bea, at pp. 16-17, ¶ 28 ("'*In the end, it is our investigation's conclusion that a fully definitive determination cannot be made between the multiple available competing potential failure mechanisms at this site based solely on these conventional geotechnical analyses.  The two leading potential candidate mechanisms are: (1) overtopping, producing erosion of a trench on the rear face of the concrete I-wall, and resultant lateral instability of the I-wall; and (2) underseepage induced reduction of strength in the foundation soils, and resultant lateral stability failure of the inboard half of the levee embankment pushed by lateral water forces exerted against the sheet pile curtain and I-wall.*'").

[61] September 14, 2009 Deposition of Dr. Bea, Tr. 80 line 19 to Tr. 108 line 22.

[62] *Id.*, Tr. 87 line 24 to Tr. 88 line 3: "Q  Have you seen repeated instances of these adjacent sections pointing in different directions or is that unique there, too?  A  This is unique to New Orleans North Breach, north end."

[63] *Id.*, Tr. 86 line 23 to Tr. 87 line 5.

[64] *Id.*, Tr. 66 lines 3 to 23.  "I would have to speculate to answer."  *Id.*, lines 22-23.

Dr. Bea admitted with great reluctance in his deposition that it was "theoretically possible" for the barge to have pushed against the IHNC East floodwall, causing it to lean, and causing or speeding up the underseepage that he thought was one of the factors leading to the failures of the North Breach and South Breach, but it was "implausible" because he calculated that the wall would or could have failed without the barge, and because the barge would not have been there in time, and because the presence of a school bus the barge would have had to "high jump" proved the barge was not there in time.[65]  Dr. Bea's decision not to analyze the barge as a possible primary or contributing cause of the North or South Breaches because he could envision the failure of the floodwalls at these locations without a "need" for the barge is discussed in Part 2 above.  Dr. Bea's admission in his Report that the school bus was not present at the time of Hurricane Katrina, but that he saw it driven into the area later, is discussed in Part 5 above.

**8.**   **Dr. Bea Based His Asserted Analysis of Causation on the Unexamined Assumption that the Barge Could Not Have Traversed the IHNC and Been in Position to Cause the Breaches**

Dr. Bea's conclusion that the Barge ING 4727 could not have caused either the North breach or the South breach was based on the assumption that the barge could not have become loose before 9:00 A.M. on Monday, August 29, 2005, and that there was not enough wind or waves to move the barge to the East side of the IHNC before 9:00 A.M. on Monday, August 29,

---

[65] *Id.*, Tr. 88 line 4 to Tr. 93 line 23.  Dr. Bea's admission it was theoretically possible that the barge could cause or contribute to underseepage and thus wall failure was at Tr. 90 lines 7-18: "Q  My question is a very simple and direct question.  Can the barge create the problem?  Not whether the problem can arise independently, but can the barge create the problem?  A  What is the problem?  Q    The problem is making the wall lean, creating a gap underneath through which water can go, further weakening the wall.  That's part one of the problem.  A  Theoretically it's possible.  Is it plausible in this case?  I don't think so."

2005.[66]  This assumption is contrary to eyewitness testimony known to Lafarge three years

before Dr. Bea signed his Report.[67]

Dr. Bea testified that his conclusion that the barge was not a cause of the North or South

Breaches was based on his having first ruled the barge out of consideration.[68]

### 9.    Dr. Bea Has Stated Opinions on the Credibility of Eyewitness Testimony

Dr. Bea's Report criticizes plaintiffs' experts for relying on eyewitness testimony, and

states his opinion that eyewitnesses who saw the Barge ING 4727 at the site of the North or

South Breaches, and causing those breaches, and witnesses who heard the barge scraping and

pushing and grinding against the East IHNC floodwall on the way from the North to the South

breach should not be believed because of poor visibility, poor hearing, and because of a

---

[66] Plaintiffs' Exhibit 3, August 3, 2009 Report of Dr. Bea, pp. 13-14, ¶ 24: "It was during this phase that we learned that the ING 4727 barge had been moored at the Lafarge terminal on the west side of the IHNC opposite the location of the North Breach.  Examination of the wind velocity and direction records in the USACE IPET report indicated that until about 9:00 – 10:00 am (CDT), the wind direction in this area was not such that the barge could be driven by the wind across the IHNC to either of the breach locations (IPET 2007).  The forensic engineering analyses indicated this time was well after the two breaches had fully developed and thus the barge could not have participated in the development of the breaches."  See also pp. 56-57, ¶ 64 ("Given that the cargo barge ING 4727 most probably was able to break from its moorings at the Lafarge Terminal on the west side of the IHNC as of 9:00 am (CDT) (Cushing 2009), and that the North Breach had fully developed on the east side of the IHNC as of 5:00 am (CDT) and the South Breach had fully developed as of 7:00 to 8:00 am (CDT), then the ING 4727 barge could not have played any substantial role in development of either of the breaches at the Lower 9th Ward.  In any event, regardless of the time of the breakaway, the forensic engineering evidence and breach development analytical results indicate the barge was not a substantial contributor to either of the breaches.") (underlining in original).  The source identified as "Cushing 2009" is identified in the list of references on p. 68 of Dr. Bea's Report as "Cushing (2009).  'Analysis of the Transit of the Barge ING 4727 During Hurricane Katrina and Reasons Why It Did Not Cause the Failure of the Inner Harbor Navigation Canal Floodwall,' Project No. 2581, C.R. Cushing & Co., Inc., NY."  This is Plaintiffs' Exhibit 5, Dr. Cushing's Report in this litigation.

[67] See Plaintiffs' Exhibit 7, the Affidavit of Gertrude LeBlanc; Plaintiffs' Exhibit 8, the Transcript of Centanni's July 31, 2006 Centanni Interview with Gertrude LeBlanc; Plaintiffs' Exhibit 9, the Affidavit of Frazier Tompkins; and Plaintiffs' Exhibit 10, the Transcript of Centanni's December 2, 2005 Interview with Frazier Tompkins.

[68] Plaintiffs' Exhibit 2, September 14, 2009 Deposition of Robert Bea, Tr. 226, lines 10 to 22 (". . . And so the barge does not enter my expert opinion as a causative/contributing/participating element in the case of North Breach.  Q  Would it be fair to say that your answers to Mr. Raffman's question mean that once you have already ruled the barge out of consideration it could not possibly have caused any damage?  A  At the North Breach?  Q  Yes.  A  That is correct.  Q  Okay.  Is your answer the same with respect to the South Breach?  A  Yes, for very similar reasons.").

newspaper article discussing the mistaken beliefs of others that the levees and floodwalls had been blown up.[69]  All of this has to do with ordinary perceptions, and is without any scientific basis.

> **10.   Dr. Bea Has Relied on His Own Work in the Independent Levee Investigation Team, His Role in Limiting its Inquiries, and His Role in Co-Authoring Reports with Authorship Described Only as "Seed et al" as Proving the Reliability of His Own Conclusions**

Dr. Bea described his involvement with the Independent Levee Investigation Team under Dr. Professor Raymond Seed at pp. 9-13 of his Report, ¶¶ 19-23.  He was on the executive committee of ILIT, one of three persons making decisions what should be followed up upon, and one of three persons making decisions on ILIT's conclusions.[70]  Although his report cites or quotes a number of articles merely as "Seed et al." followed by a year and sometimes a letter,[71] he was a co-author of those articles.[72]  Dr. Bea's Report cited or quoted Technical Reports of the

---

[69] Plaintiffs' Exhibit 3, August 3, 2009 Report of Dr. Bea, p. 62, ¶ 71 (after discussing early witness interviews not having turned up witnesses who saw the breaches, stating: "These investigations did not document a single eyewitness report of the ING 4727 barge impacting the hurricane flood protection structures during the early morning hours of August 29, 2005.  I do not find this surprising given the documented poor visibility (shown by the photographs taken by the IHNC lock master — very poor due to darkness, rain, and distance), acoustic conditions (loud multi-frequency noise due to wind, rain, waves, failing infrastructure components), and psychological conditions (apprehension, panic, beliefs) that existed at the time of initiation of development of the North Breach and later the South Breach.  In the early days following the flooding, there were widespread reports that the flood protection structures at the Lower 9th Ward had been 'blown up' (Tara Young, *Rumor of levee dynamite persists*, The Times-Picayune, December 12, 2005).  Such intentional breaching of the flood Lower 9th Ward protection structures with explosives have proven not to be true.").

[70] Plaintiffs' Exhibit 2, September 14, 2009 Deposition of Dr. Bea, Tr. 40 line 15 to Tr. 41 line 21.

[71] Plaintiffs' Exhibit 3, August 3, 2009 Report of Dr. Bea, p. 11, ¶ 22 ("preliminary report issued to the National Science Foundation (Seed et al 2005)"); *id.*, p. 15, ¶ 27 "ASCE conference paper (Seed et al 2007)"); *id.*, p. 16, ¶ 28 ("ASCE conference paper (Seed et al 2008)"); *id.*, p. 51, ¶ 58 ("the ILIT investigation and subsequent studies (ILIT 2006, Seed et al 2008); *id.*, p. 59 (list of sources not mentioning his involvement)."

[72] Plaintiffs' Exhibit 4, Appendix A to Dr. Bea's Report, p. 31, showing that the "preliminary report issued to the National Science Foundation (Seed et al 2005)" is # 236 on Dr. Bea's list of co-authored papers; "(Seed 2005)"); p. 17, showing that "ASCE conference paper (Seed et al 2007)" consists of three co-authored papers appearing as ## 193, 194, and 195 on Dr. Bea's list of co-authored papers; and p. 6, showing that "ASCE conference paper (Seed et al 2008)" and "subsequent studies ( . . . Seed et al 2008)" are collectively ## 79 and 80 on Dr. Bea's list of co-authored papers.

National Institute of Standards and Technology ("NIST"),[73] but did not mention that he provided comments to NIST that were often followed in the Technical Reports he cited or quoted.[74]

Dr. Bea's Report stated that this team was initially concerned with the barge as a cause of one or both breaches: "Most remarkable was the large cargo barge that was inside the Lower 9th Ward adjacent to the South Breach.  The first question associated with the cargo barge ING 4727 was 'did it cause the failure?'  During the first week of the investigation, this was a question hotly debated among members of the ILIT.  The barge showed the signs of collision with the floodwall (dents and scrapes on the barge hull) and the floodwall at the south end of the South Breach clearly showed the signs of having been impacted by the barge (crushing of the concrete at the top of the wall, rust rub streaks from the hull of the cargo barge)."[75]  He quoted the language of Prof. Seed in testifying to a Congressional committee about the ILIT analysis: "_We spent some time figuring out the answer to the chicken and the egg question, and it is our preliminary opinion that the infamous large barge was drawn in through a breach that was_

---

[73] Plaintiffs' Exhibit 3, August 3, 2009 Report of Dr. Bea, p. 5, ¶ 4(a) (stating that he reviewed NIST reports but not that he was responsible for any of their comments); p. 13, ¶ 24; p. 51, ¶ 58 (stating that he used NIST as a source of ideas for formulating his diagnoses but not that he was responsible for any of these ideas); p. 52, ¶ 59 (citing NIST conclusions to buttress his own); and p. 69 (list of sources).

[74] Plaintiffs' Exhibit 2, September 14, 2009 Deposition of Dr. Bea, Tr. 29 line to Tr. 30 line 18: "Q  Have you been involved in any of the investigations of the events in Katrina other than the lawsuits that we've already talked about and your work for the Independent Levee Investigation Team?  A  Yes.  Q  Please tell me what those were.  A  I served as a reviewer to the National Institute of Standards and Technology in review of their forensic engineering investigations in the Greater New Orleans area following Hurricane Katrina.  Q  Did you write any part of any of their technical papers?  A  No.  Did you review any of their draft technical papers?  A  Yes.  Q  Did you provide comments on any of those?  A  Yes.  Q  And were your comments reflected in the final versions?  A  Many were."

[75] Plaintiffs' Exhibit 3, August 3, 2009 Report of Dr. Bea, p. 10, ¶ 21.

*already open.'*  (Underline added for emphasis.)"[76]  Dr. Bea's Report quoted from the final ILIT Report: [77]

> *"That does not mean that the barge might not have struck the floodwall twice (or more times) before finally impacting the southern end of the breach, <u>but our investigation's view is that there are other modes of failure that would have been expected to fail this section without any need for help from the barge,</u> so that the likelihood is that the barge slipped its moorings and was eventually drawn in through a breach that was already well developed."*  (Underline added for emphasis).

Similarly, Dr. Bea's Report quoted from his co-authored ILIT Report on the other modes of failure of the South Breach.[78]

Dr. Bea also quoted stronger language in the ILIT Report he co-authored: "'*Finally, geo-forensic studies clearly show that this section would have failed without barge impact.  <u>It was concluded by this investigation that the barge most likely was drawn in through a breach that was already open</u>.*' (Underline added for emphasis.)"[79]

Dr. Bea similarly quoted strong language in his co-authored conclusions from a paper described in his Report as "Seed, et al. 2007."[80]

---

[76] *Id.*, p. 11, ¶ 22.

[77] *Id.*, p. 13, ¶ 23.

[78] *Id.*, p. 14, ¶ 24.  "'<u>This suggests rotational failure caused by full outboard pressure and increased cantilever action from the loss of the supporting soil along the inboard toe due to overtopping scour as the likely mode of failure.</u>'  (Underline added for emphasis)."  Dr. Bea also quoted the IPET conclusion: "'*In summary, <u>the foundation failure at the north breach on the east side of the IHNC was a result of differences between the actual conditions and assumptions used as the basis for the design.</u>  Those differences are (1) the ground surface beyond the toe of the levee at the north breach location was lower than the landside ground surface in the design cross section, and (2) the design analyses did not consider the possibility of a gap forming behind the wall, allowing water to run into the gap and increase the load on the wall.  The other three breaches on the IHNC were due to overtopping and erosion.*' (Underline added for emphasis)."  *Id.*, p. 15, ¶ 26.

[79] *Id.*, p. 16, ¶ 27.

[80] The quotation stated in part, as to the South breach: "*Finally, geo-forensic studies performed as part of our investigation show that this section would have been expected to fail without barge impact.  <u>It was concluded by this investigation that the barge was most likely drawn in through a breach that was already open, and that it impacted at the extreme south end of the breach as it passed inland through the (already open) breach.</u>*"  (Underline added for emphasis)."  *Id.*

Dr. Bea testified to a number of factors that would affect the result of the impact of a barge on a floodwall, even at winds of 100 miles per hour, and stated that these factors made "[v]ery important differences."[81]  He testified that he made no assumptions about any of those factors in concluding that the Barge ING 4727 did not cause a breach, that there were no combinations of wind speeds, direction, or timing that could have resulted in the barge making a breach in the floodwall, that no one on the ILIT team had the responsibility of analyzing that question, and that no one had made that decision not to analyze that question.[82]

### 11.   Dr. Bea Has Attempted to Glorify His Investigations and Conclusions, and Mislead the Finder of Fact, By Calling Them "Forensic"

Dr. Bea's Report is laced with references to his investigation and conclusions, and the investigations and conclusions of others on the various investigative teams as "forensic," a term suggesting that they are as irrefutable as evidence of blood types and fingerprints.  His Report repeatedly refers to his investigations and conclusions, and the investigations and conclusions of people who agreed with him, as "forensic," and competing views as not being "forensic."[83]

In reality, there is no certification requirement to be a "forensic engineer."[84]  One does not need to belong to any professional society to be called a "forensic engineer." [85]  While there

---

[81] Plaintiffs' Exhibit 2, September 14, 2009 Deposition of Dr. Bea, Tr. 66 line 3 to Tr. 69 line 3.
[82] *Id.*, Tr. 69 lines 5-25.
[83] Plaintiffs' Exhibit 3, August 3, 2009 Report of Dr. Bea, p. 1, ¶ 1; p. 1, ¶ 2 (three times); p. 2 (Table of Contents, three times), p. 3 (Table of Contents); p. 4, ¶ 4; p. 5, ¶ 4(b); p. 5, ¶ 4(c); p. 8, ¶ 16; p. 8 (title); p. 8, ¶ 17; p. 8, ¶ 17(a); p. 8, ¶ 17(b); p. 9 ¶ 17(c); p. 9, ¶ 17(d); p. 9, ¶ 19; p. 10, ¶ 19; p. 13 ¶ 14 (twice); p. 15, ¶ 26 (IPET investigation)(twice); p. 15, ¶ 27 (ILIT); p. 16, ¶ 27 (ILIT); p. 16, ¶ 28 (ILIT); p. 17, ¶ 29 (citing an article Dr. Bea co-authored); p. 19, ¶ 29 (same); p. 22 (title of Part II of the Report); p. 23, ¶ 31; p. 24, ¶ 31; p. 35, ¶ 40; p. 39 (title of Part III of Report); p. 39, ¶ 43; p. 41, ¶ 45 (twice); p. 48, ¶ 55 (twice); p. 50 (title of Part IV or Report); p. 50, , ¶ 57; p. 51, ¶ 58 (multiple investigations) (twice); p. 52, ¶ 58 same); p. 53, ¶ 59 (same); p. 54, ¶ 62; p. 56, ¶ 63; p. 57, ¶ 64; p. 57, ¶ 65; p. 57, ¶ 66; p. 60 ¶ 67; p. 61, ¶ 70 (Plaintiffs' expert Hector Pazos did not perform a forensic report); p. 62, ¶ 71 (multiple investigations) (twice); p. 62, ¶ 72 (multiple investigations); p. 63, ¶ 74.
[84] Plaintiffs' Exhibit 2, September 14, 2009 Deposition of Dr. Bea, Tr. 37, lines 20-21.
[85] *Id.*, Tr. 37, lines 22-25.

is committee on forensic engineering of the American Society of Civil Engineers of which Dr.

Bea is an emeritus member,[86] it has only aspirational standards.[87]  Dr. Bea does not know of a

single engineer in the United States who calls himself or herself a "forensic engineer" and who

has a formal certification as a forensic engineer.[88]  He does not know of any States that "regulate

and require that you do something in particular in order to call yourself a forensic engineer."[89]

## B.  Argument

### 1.  Dr. Bea's Testimony Does Not Meet the Standards of Rule 702, Fed. R. Evid.

Rule 702, Fed. R. Evid., states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Plaintiffs do not challenge Dr. Bea's technical qualifications, but challenge his testimony as

an expert because he has failed to meet any of the requirements stated in subparts (1), (2), or (3).

The above Statement of Facts shows that he has offered conclusions as to causation of the

North and South Breaches in the Eastern flood wall of the IHNC that far outstrip his analysis, such

that his conclusions are not "based upon sufficient facts or data."  He has testified that his opinion is

based on the absence of physical evidence, when he did not take steps to examine the physical

evidence available to him and did not consider the very real possibility that the physical evidence he

chose not to examine, and/or the physical evidence that was no longer accessible to him when he

---

[86] *Id.*, Tr. 37 line 25 to Tr. 38 line 4.
[87] *Id.*, Tr. 38, lines 5-8.
[88] *Id.*, Tr. 38, lines 9-18.
[89] *Id.*, Tr. 38, lines 19 to 23.

began his post-Rita, post-remediation inspection would have contained the physical evidence in question.  He has testified that his opinion is based on his belief that the barge had to break away from the Lafarge dock at the time of Hurricane Katrina, when he has no analysis of his own supporting that inability, and where is eyewitness testimony that the barge was adrift on the East side of the IHNC on Sunday, a full day before the hurricane, known to Lafarge long before his analysis was completed.  He has testified that his opinion is based on his belief that the barge had no means of getting to the East side of the IHNC before Hurricane Katrina's prevailing winds blew from West to East, when he has no analysis of his own supporting that inability, and where eyewitness testimony to the contrary was known to Lafarge more than three years before his analysis was completed.

He has testified that his opinion is based on his belief that the barge would have had to "high-jump" a school bus if it had caused the breach, when he well knew that the school bus was not present at the time.  He has testified that he did not even consider the barge as causing the floodwalls to lean or accelerating the process of leaning, and thus the process of failure, and could not answer questions about this.

The Statement of Facts similarly shows that his testimony is not the product of reliable principles and methods.  The scientific method does not start out with the desired conclusion and then ignore all evidence and analysis that could lead to a different result.   Similarly, the scientific method does not simply stop looking when the possibility of the desired conclusion becomes "plausible."  In *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 423 note 2 (5th Cir. 1987), the court stated in *dictum*: "We agree that an expert who forms an opinion before he begins his research is biased and lacking in objectivity."

21

Finally, the Statement of Facts shows that Dr. Bea has not applied scientific or technical principles and methods reliably to the facts of the case.  The Fifth Circuit has held that an expert report is inadmissible if it fails to consider fundamental questions that would have to be considered in any scientific analysis.  In *Viterbo v. Dow Chemical Co.*, 826 F.2d at 423-24, the plaintiff's expert ignored the obviously important matter of obtaining an accurate medical history, and ignored the limitations of the data on which he relied.  The court held that his testimony was properly excluded, and stated: "Here, however, Dr. Johnson has admitted that Viterbo's symptoms could have numerous causes and, without support save Viterbo's oral history, simply picks the cause that is most advantageous to Viterbo's claim.  Indeed, Dr. Johnson's testimony is no more than Viterbo's testimony dressed up and sanctified as the opinion of an expert.  Without more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible."  The factors ignored by Dr. Bea because of his preference that the barge not be a primary or contributing factor for the North or South Breaches comparably reduce his testimony to saying "it is so because I say it is so."

Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), Dr. Bea's testimony must be considered that of a credentialed cheerleader, not that of an expert qualified to testify to causation under Rule 702.  *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997), cautioned: "Trained experts commonly extrapolate from existing data.  But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."

Similarly, *Moore v. Ashland Chemical Inc.*, 151 F.3d 269, 278 (5th Cir. 1998) (*en banc*), *cert. denied*, 526 U.S. 1064 (1999), quoted with approval a Seventh Circuit decision stating that

"'[u]nder the regime of *Daubert* a district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist.'"

Dr. Bea's admission of a strong personal interest in the outcome of this case does not by itself require his disqualification, under the pre-*Daubert* decision in *Rodriguez v. Pacificare of Texas, Inc.*, 980 F.2d 1014, 1019 (5th Cir. 1993), *cert. denied*, 508 U.S. 956 (1993), which held that a party may testify as an expert in his own case,"[90] but even that decision stated the requirement "that the relevant qualifying criteria (statutory or otherwise) are met."  Where a highly-credentialed expert simply offers his beliefs and speculations instead of a scientific or technical analysis, it is proper to bar the testimony.  *Hathaway v. Bazany*, 507 F.3d 312, 318-19 (5th Cir. 2007).  Where the expert's personal bias amounts to a preconceived notion that taints his or her objectivity, and makes numerous mistakes, the expert is properly disqualified.  *Munoz v. Orr*, 200 F.3d 291, 301 (5th Cir.), *cert. denied*, 531 U.S. 812 (2000) ("Dr. Benz began his analysis with the assumption that Kelly's promotion system discriminated against Hispanic males, an indicator that he lacked the necessary objectivity to make his analyses credible.").

Dr. Bea's assumption that the barge was securely moored on the West side of the IHNC, and could only have become adrift in the midst of Hurricane Katrina, is contrary to facts known years ago by defendant.  When they allowed Dr. Bea to base his opinion on an assumption they knew to be contrary to fact, they made his testimony flowing from that assumption inadmissible.

---

[90] Plaintiffs recognize that the Court is bound by that opinion with respect to the exclusion of Dr. Bea's testimony as an expert, but preserve their position that the admission of a personal interest such as Dr. Bea's should disqualify the expert's testimony, or render it more prejudicial than probative under Rule 403, Fed. R. Evid.  It does not assist the finder of fact to have an interested opinion in a case involving a field so far outside their common experience that it is difficult for them to make judgments on the degree to which the opinion has been affected by the

*Christophersen v. Allied-Signal Corp.*, 939 F.2d 1106, 1114 (5th Cir. 1991) (*en banc*), *cert. denied*, 503 U.S. 912 (1992).  The Fifth Circuit held: "District judges may reject opinions founded on critical facts that are plainly untrustworthy, principally because such an opinion cannot be helpful to the jury."  *Accord*, *Newport Ltd. v. Sears, Roebuck & Co.*, 1995 WL 328158 (E.D.La. May 30, 1995) (No. CIV.A. 86-2319) ("The Court was not satisfied in the hearing that certain of the underlying assumptions—access to railroads, Interstate Highways, waterways, grants, dock facilities and the like—were present. . . . Instead, the Court will require that Newport satisfy the Court of a significant number of these factors prior to Dr. Conte taking the stand.").[91]

Finally, Dr. Bea's attempt to cast a scientific veil over his rejection of eyewitness testimony on the ordinary perceptual grounds of poor visibility, poor hearing, and a newspaper article, of all things, is a naked invasion of the province of the jury.  The admission of such testimony would be "plain error."  *Nichols v. American Nat. Ins. Co.*, 154 F.3d 875, 884 (8th Cir. 1998).  Credibility determinations based on such factors are well within the competence of a jury, and would not assist it in reaching a determination.  Moreover, Dr. Bea's views on the credibility of such witnesses have no scientific basis, making his views unhelpful.  *Daubert*, 509 U.S. at 591-92 ("Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.").

Wherefore, plaintiffs pray that their Motion be granted.

---

expert's bias.
[91] A copy of this decision is attached hereto as Exhibit 11.

Respectfully submitted,

/s/ _____
SHAWN KHORRAMI  (CA Bar #180411)
DYLAN POLLARD  (CA Bar #180306)
MATT BAILEY  (CA Bar #218685)
444 S. Flower St., Thirty-Third Floor
Los Angeles, California 90071
     Telephone:   (213) 596-6000
     Facsimile:   (213) 596-6010
     skhorrami@kpalawyers.com
     dpollard@kpalawyers.com
     mbailey@kpalawyers.com


/s/ Brian A. Gilbert
Brian A. Gilbert, Esq. (21297)
LAW OFFICE OF BRIAN A. GILBERT, P.L.C.
821 Baronne Street
New Orleans, Louisiana 70113
     Telephone: (504) 885-7700
     Telephone: (504) 581-6180
     Facsimile: (504) 581-4336
     e-mail: bgilbert@briangilbertlaw.com


/s/ Lawrence D. Wiedemann,
Lawrence D. Wiedemann.(13457)
Karl Wiedemann (18502)
Karen Wiedemann (21151)
WIEDEMANN & WIEDEMANN
821 Baronne Street
New Orleans, Louisiana 70113
     Telephone: (504) 581-6180
     Facsimile: (504) 581-4336
     e-mail: lawrence@wiedemannlaw.com,
     karl@wiedemannlaw.com, karen@wiedemannlaw.com,


/s/ Patrick J. Sanders
Patrick J. Sanders (18741)
3316 Ridgelake Drive
Suite 100
Metairie, LA 70002
     Telephone: 504-834-0646
     e-mail: pistols42@aol.com

/s/ Richard T. Seymour
Richard T. Seymour (D.C. Bar #28100)
Law Office of Richard T. Seymour, P.L.L.C.
1150 Connecticut Avenue N.W., Suite 900
Washington, D.C.  20036-4129
    Voice: 202-862-4320
    Cell:   202-549-1454
    Facsimile:  800-805-1065 and 202-828-4130
    e-mail: rick@rickseymourlaw.net

      Attorneys for Barge Plaintiffs

Dated: December 1, 2009

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the above and foregoing document, the accompanying

Memorandum and its attachments, the accompanying proposed form of Order, and the

accompanying Notice, have been served upon counsel of record, by ECF upload, this 1st day of

December, 2009.

/s/ _____
Richard T. Seymour (D.C. Bar #28100)
Law Office of Richard T. Seymour, P.L.L.C.
1150 Connecticut Avenue N.W., Suite 900
Washington, D.C.  20036-4129
        Voice: 202-862-4320
        Cell:   202-549-1454
        Facsimile:  800-805-1065 and 202-828-4130
        e-mail: rick@rickseymourlaw.net,