```
0001
 1            IN THE UNITED STATES DISTRICT COURT
 2          FOR THE EASTERN DISTRICT OF LOUISIANA
 3
 4   IN RE: KATRINA CANAL BREACHES )
     CONSOLIDATED LITIGATION       )
 5                                 )
                                   ) CIVIL ACTION
 6   PERTAINS TO:  BARGE           ) NO. 05-4182
                                   ) and consolidated cases
 7   FILED IN:                     )
                                   )
 8   Boutte v. Lafarge      05-5531)
     Mumford v. Ingram      05-5724) SECTION "K" (2)
 9   Lagarde v. Lafarge     06-5342)
     Perry v. Ingram        06-6299) JUDGE
10   Benoit V. Lafarge      06-7516) STANWOOD R. DUVAL, JR.
     Parfait Family v. USA  07-3500)
11   Lafarge v. USA         07-5178) MAGRISTRATE
                                   ) JOSEPH C. WILKINSON,
12   _____) JR.
13
14
     VIDEOTAPED DEPOSITION OF ROBERT GLENN BEA, PhD., P.E.
15
                MONDAY, SEPTEMBER 14, 2009
16
17
18
19
20
21
22
23
24
25   PAGES 1 - 228
0002
 1   VIDEOTAPED DEPOSITION OF ROBERT GLENN BEA, PhD., P.E.
 2               SAN FRANCISCO, CALIFORNIA
 3                 SEPTEMBER 14, 2009
 4   The videotaped deposition of ROBERT GLENN BEA, PhD.,
 5   P.E., was convened on Monday, September 14, 2009, at
 6   Three Embarcadero Center, Suite 2400, San Francisco,
 7   California, on Monday, September 14, 2009, commencing
 8   at 9:04 a.m., before Linda Vaccarezza, CLR, CRP, RPR,
 9   CSR NO. 10201.
10
11
12                  -    -    -    -    -
13
14
15
16
17
```

```
18
19
20
21
22
23
24
25
0003
 1                    A P P E A R A N C E S
 2
 3   ON BEHALF OF THE BARGE PLAINTIFFS:
 4           RICHARD T. SEYMOUR, ATTORNEY AT LAW
 5            LAW OFFICES OF RICHARD T. SEYMOUR, L.L.C.
 6           1150 Connecticut Avenue N.W., Suite 900
 7           Washington, D.C., 20036
 8           (202) 862-4320
 9            Rick@rickseymourlaw.net
10
11   ON BEHALF OF LAFARGE NORTH AMERICA, INC.
12           MARK S. RAFFMAN, ATTORNEY AT LAW
13           JOHN ALDOCK, ATTORNEY AT LAW
14           GOODWIN PROCTER, LLP
15           901 New York Avenue, N.W.
16           Washington, D.C. 20001  94104
17           (202) 346-4000
18           Mraffman@goodwinprocter.com
19
20
21   ALSO PRESENT:
22           Peter L. Keeley, Lafarge North America, Inc.;
23           John Shelonko, Lafarge North American, Inc.
24           Benjamin Gerald, Videographer
25
0004
 1                    C O N T E N T S
 2
 3   ROBERT  GLENN BEA, PhD., P.E.        EXAMINATION
 4   BY MR. SEYMOUR...............................7
 5   BY MR. RAFFMAN............................221
 6   BY MR. SEYMOUR............................225
 7
 8
 9   AFTERNOON SESSION..........................110
10
11
12
13
14
15
16
17
18
19
```

```
20
21
22
23
24
25
0005
```

1                      E X H I B I T S

2

3     BEA EXHIBIT NO:                        PAGE NO.

4

5     Exhibit Number 1..............................9
6     Exhibit Number 2..............................9
7     Exhibit Number 3..............................9
8     Exhibit Number 4..............................9
9     Exhibit Number 5..............................9
10    Exhibit Number 6..............................9
11    Exhibit Number 7.............................49
12    Exhibit Number 8.............................59
13    Exhibit Number 9.............................79
14    Exhibit Number 10...........................109
15    Exhibit Number 11...........................147
16    Exhibit Number 12...........................203
17    Exhibit Number 13...........................203
18    Exhibit Number 14...........................211

```
19
20
21
22
23
24
25
0006
```

1               P R O C E E D I N G S

2

3        THE VIDEOGRAPHER:  Good morning.  My name is
4     Benjamin Gerald of Veritext Deposition Services.
5     The date today is September 14th, 2009, the time          09:04
6     is approximately 9:04 a.m.
7            This deposition is being held in the
8     office of Goodwin Procter, located at Three
9     Embarcadero Center, San Francisco, California.
10    The caption of this case is:  In Re:  Katrina            09:04
11    Canal Breaches Consolidated Litigation, held in
12    the United States District Court for the Eastern
13    District of Louisiana.  The name of the witness
14    is Dr. Robert Bea.
15           At this time the attorneys will identify          09:04
16    themselves and the parties they represent, after
17    which our court reporter, Linda Vaccarezza,
18    of Veritext Deposition Services, will swear in
19    the witness.
20       MR. SEYMOUR:  Richard Seymour, for                    09:04
21    plaintiffs, from Washington D.C.

```
22       MR. RAFFMAN:  Mark Raffman, Goodwin Procter,
23  for Lafarge North America.  With me today from my
24  law firm is John Aldock, who will be joining us.
25  And also from Lafarge North America, Mr. Peter        09:05
0007
1   Keeley and Mr. John Shelonko.
2        THE VIDEOGRAPHER:  And I understand there is
3   no one participating remotely?
4        MR. RAFFMAN:  Correct.
5        (The witness was duly sworn.)                     09:05
6        THE VIDEOGRAPHER:  Thank you.  Please
7   proceed.
8
9             ROBERT GLENN BEA, PhD., P.E.
10                                                         09:05
11  having been duly sworn, by the Certified
12  Shorthand Reporter, was examined and testified as
13  follows:
14
15                   EXAMINATION                           09:05
16
17  BY MR. SEYMOUR:
18       Q    Dr. Bea, I know that you're not a
19  stranger to litigation -- excuse me -- to
20  providing your testimony in the barge case, but I     09:05
21  still need to go over these preliminaries.
22            I'll be asking you a number of questions
23  and you'll be providing answers.  It's very
24  difficult for the court reporter to take down
25  your information correctly if you're speaking at      09:05
0008
1   the same time that I'm speaking and vice versa.
2   So I'll try to make sure that I wait to ask my
3   next question until you're finished with the
4   answer to the last question; and I'd ask that you
5   let me finish asking my question even if you          09:06
6   think you can get to what I'm after faster than
7   I'm getting to it.  Is that satisfactory?
8        A    Yes.
9        Q    If I ask a question and the question
10  uses terminology that simply does not compute in      09:06
11  your field, or seems ambiguous to you so that
12  there may be a question about what the question
13  means, will you let me know?
14       A    Yes.
15       Q    If I ask a question that you do not         09:06
16  understand, perhaps because I put it poorly, will
17  you let me know?
18       A    Yes.
19       Q    Would it be fair to say, then, that when
20  I ask a question and you give an answer, that you     09:06
21  don't have a problem with the question, you
22  understand it as it's stated?
23       A    Correct.
```

```
24      Q    Have you taken any medication or drugs
25   that would -- or do you have any physical            09:06
0009
 1   condition that would make it difficult for you to
 2   remember accurately and to testify today?
 3      A    No.
 4      Q    Is there any reason why you cannot give
 5   a deposition today and state accurately what         09:06
 6   occurred?
 7      A    No.
 8      MR. SEYMOUR:  Okay.  I've asked the court
 9   reporter to mark as Exhibit 1 to the deposition
10   your expert report dated July 10th, 2009.            09:07
11      (Exhibit 1 marked for identification.)
12      MR. RAFFMAN:  I object to the introduction of
13   this report.  This is a draft report, it was
14   represented to us.  It was actually recalled by
15   us and it was represented to us by Mr. Gilbert       09:07
16   that the copies had been destroyed.  Pursuant to
17   case management order number four, draft reports
18   are not admissible and may not be used to
19   question a witness.
20      MR. SEYMOUR:  Let's go off the record.            09:07
21      THE VIDEOGRAPHER:  The time is 9:08 a.m. and
22   we are off the record.
23      (Recess taken from 9:08 a.m. to 9:46 a.m.)
24      (Exhibits 1 through 6 marked for
25   identification.                                      09:16
0010
 1      THE VIDEOGRAPHER:  The time is 9:46 a.m. and
 2   we are back on the record.
 3      MR. SEYMOUR:  While we were off the record,
 4   it developed that there was an inadvertent
 5   production of a draft report.  There's an            09:46
 6   agreement that the draft report is not to be used
 7   and all copies of this thing are to be
 8   destroyed.
 9         We have now marked the actual final
10   exhibit, which is dated August 3rd of 2009, as       09:46
11   Exhibit 1 in place of the other exhibit.  We have
12   gone through and made sure that we've got the
13   correct copies of all the appendices, and those
14   have been pre-marked.  Appendix A is Exhibit 2,
15   Appendix B is Exhibit 3, Appendix C is Exhibit 4,    09:46
16   Appendix D is Exhibit 5, and the supplemental
17   report, which is dated September 2009 --
18   September 4th, 2009, is marked as Exhibit 6.
19         And now that our housekeeping is out
20   of the way, let me ask you a few questions.          09:47
21   BY MR. SEYMOUR:
22      Q    Please state your full name for the
23   record.
24      A    Robert Bea.
25      Q    And what is your business address?           09:47
```

```
0011
 1      A     University of California-Berkeley, Room
 2   212, McLaughlin Hall, Berkeley, California
 3   94720.
 4      Q     One of the things that I did not cover
 5   in the preliminary is that civility requires that      09:47
 6   we take breaks for the benefit of the witness and
 7   the court reporter from time to time.  And so,
 8   generally, we'll take a break every hour.  But if
 9   there's any time that you need to take a break or
10   need to have anything to drink or anything like        09:47
11   that, just let us know, so long as it's not in
12   the middle of a question.
13      A     Thank you.
14      Q     Let me first ask you to turn to Exhibit
15   2, the statement of your qualifications in             09:48
16   Appendix A.
17            Are you an active professor right now or
18   are you retired?
19      A     I'm active.
20      Q     Are you still teaching classes?              09:48
21      A     Yes.
22      Q     For how many years have you been
23   teaching classes?
24      A     Since January 1989.
25      Q     Did you take any breaks in teaching          09:48
0012
 1   classes while you were doing your work on the
 2   Katrina investigation?
 3      A     Yes.
 4      Q     And what were the periods that you took
 5   breaks?                                                 09:48
 6      A     They were in the fall of 2000 -- 2007, a
 7   sabbatical leave for one semester.  Summer leave
 8   breaks extend from the 1st of May through the 1st
 9   of September for all of those years.  In
10   addition, breaks from the 1st of December through      09:49
11   mid-January for all of those years.
12      Q     That's a regular school time break?
13      A     Correct.
14      Q     I have to say I was a little stunned
15   when I went through and counted up the number          09:49
16   of publications that you had, including all the
17   writings at conferences and so forth.
18            Just if you turn to the various
19   categories of Appendix A.  There's a category
20   of Refereed Archival Journals with 91                  09:50
21   publications, and the next category is Refereed
22   Conference and Symposium Proceedings with 197.
23   Then we have Non-refereed Technical Reports with
24   237 of those.  Articles in Non-archival -- excuse
25   me -- Non-refereed Conference Proceedings, 92 of       09:50
0013
 1   those.  Articles in Non-archival Magazines or
```

```
 2   Journals, I counted eight.  Then you have books
 3   and chapters in books.  My count was six books
 4   and seven chapters in books; is that correct?
 5       A    That's correct.                              09:50
 6       Q    And then you had two other publications,
 7   for a total of 640 publications?
 8       A    That's approximately correct.
 9       Q    I understand that you have co-authors on
10   a number of these but you're the lead author on     09:51
11   most of the publications?
12       A    That's right.
13       Q    Did you have the assistance of the
14   university graduate students, undergraduate
15   students or postgraduate students, with respect     09:51
16   to any of these publications?
17       A    Yes.
18       Q    I believe that somewhere -- and I
19   apologize, I don't remember whether it was in
20   either version of the report, or whether it was     09:51
21   in testimony in another case -- but is it right
22   that you have 21 articles or writings on the
23   subject of Katrina?
24       A    Correct.
25       Q    Or has that number increased since --       09:51
0014
 1       A    21 is fixed.
 2       Q    Did you have assistance of any
 3   undergraduate, graduate or postgraduate students
 4   in doing your Katrina investigation?
 5       A    Yes.                                         09:52
 6       Q    How many?  Approximately.
 7       A    Eight.
 8       Q    Does the University of California, or
 9   its Berkeley campus, have any rules constraining
10   you at all in the use of students for projects      09:52
11   like this?
12       A    Yes.
13       Q    What are those rules, briefly?
14       A    Essentially, that the engagement should
15   not detract from their academic programs, or        09:52
16   limited by the number of days that faculty can
17   devote to this type of work during the academic
18   periods.  That's it.
19       Q    Are there any constraints on your
20   serving as an expert witness when some of the       09:53
21   work is being done by students of the university?
22       A    No.
23       Q    Are there any constraints on being paid
24   for outside work, whether it's consulting or
25   expert witness work, when some of the work on the   09:53
0015
 1   project is done by undergraduate, graduate or
 2   postgraduate students?
 3       A    No.
```

```
 4      Q    What were the compensation arrangements
 5   for this case?                                        09:53
 6      MR. RAFFMAN:  Referring to the barge matter,
 7   correct, Counsel?
 8      MR. SEYMOUR:  Referring to the case against
 9   Lafarge, this one specifically.
10      THE WITNESS:  I executed a contract with          09:54
11   Goodwin Proctor for this work.
12   BY MR. SEYMOUR:
13      Q    And what were the terms of the contract
14   with respect to compensation?
15      A    Could you be more specific with regard        09:54
16   to the terms of "compensation"?
17      Q    Are you being paid --
18      A    Hourly rate?
19      Q    Yes, hourly rate.
20      A    $300 per hour for travel, $600 per hour       09:54
21   for technical work, $900 per hour for legal
22   testimony, plus expenses.
23      Q    How much have you been paid by Goodwin
24   Procter, or by others acting on behalf of Lafarge
25   North America, for your work in this case?            09:55
0016
 1      A    Approximately $220,000.  That includes
 2   invoiced work from the supporting graduate
 3   students.
 4      Q    How much of the $220,000 went to the
 5   graduate students and how much to you?                09:55
 6      A    Approximately $30,000 to the graduate
 7   students; the balance to me.
 8      Q    When did you begin your work for Lafarge
 9   in this case?
10      A    March 1st of 2009.                            09:56
11      Q    When were you first contacted by someone
12   on behalf of Lafarge North America?
13      A    Approximately six months before that
14   time.
15      Q    Could you tell me who contacted you?          09:56
16      A    John Aldock.
17      Q    What happened in that conversation?
18      A    The discussion concerned my ability,
19   willingness to serve as an expert witness in this
20   case.                                                 09:56
21      Q    At that time were you already serving as
22   an expert witness in the case involving the
23   Mississippi River-Gulf Outlet?
24      A    Yes.
25      Q    And were you already serving -- I'm not       09:57
0017
 1   sure when the Robinson case was decided upon as a
 2   bellwether case, was that before or after the
 3   Robinson case was separated from the main
 4   Mississippi River-Gulf Outlet litigation?
 5      MR. RAFFMAN:  Objection.                           09:57
```

```
 6      THE WITNESS:  I don't understand the
 7  question.  Please reframe.
 8  BY MR. SEYMOUR:
 9      Q    Did there come a time when someone told
10  you that there was going to be a Robinson case?        09:57
11      A    Yes.
12      Q    Okay.  Was it before or after you were
13  told there was going to be a Robinson case?
14      MR. RAFFMAN:  Objection.
15      THE WITNESS:  What is "it"?                        09:57
16  BY MR. SEYMOUR:
17      Q    The conversations with Mr. Aldock.
18      A    That came afterwards.  The Robinson case
19  initiated my work May the 1st, 2007.  That work
20  was preceded by the Katrina Canal Breaches             09:58
21  Litigation.  That work initiated April the 1st,
22  2007.
23      Q    I assume that you were working with the
24  same lawyers on the Robinson case as you were
25  with the Mississippi River-Gulf Outlet case; is        09:58
0018
 1  that correct?
 2      A    Yes.
 3      Q    After you were contacted by Mr. Aldock,
 4  did you speak to the lawyers in the Mississippi
 5  River-Gulf Outlet case, or in the Robinson case,       09:58
 6  about your being asked to be an expert in the
 7  Lafarge case?
 8      A    Yes.
 9      Q    Who did you speak with?
10      A    Mr. Joseph Bruno.                             09:59
11      Q    And tell me how that conversation went.
12      A    Essentially, he questioned if I would be
13  able to supply the requested expert consulting
14  associated with the barge case.
15      Q    And what did he tell you?                     09:59
16      A    Yes.
17      Q    When you were preparing any of your
18  reports in the Mississippi River-Gulf Outlet
19  case, or in the Robinson case, was any counsel
20  for Lafarge involved?                                  09:59
21      A    Not during the preparation, but during
22  the depositions and trial testimony they were
23  present.
24      Q    Were counsel for Lafarge present during
25  any of the preparation sessions for your trial        10:00
0019
 1  testimony of your depositions?
 2      A    For which?
 3      Q    For the Mississippi River-Gulf Outlet or
 4  the Robinson cases.
 5      A    Would you please explain what you mean        10:00
 6  by preparations for that case?  Preparations
 7  could mean a preparation of the report or
```

```
 8   preparation could mean discussion of the details
 9   involved in the testimony; which do you refer to?
10       Q    Right now, my question relates to                10:01
11   preparation to give the testimony.
12       A    No, they were not present.
13       Q    Were they present on the telephone, or
14   participating by e-mail, or physically in the
15   same room when you were putting your report into        10:01
16   final shape in the Mississippi River-Gulf Outlet
17   case, or in the Robinson case?
18       A    No, they were not.
19       Q    Were any of the counsel for the
20   Mississippi River-Gulf Outlet case, or the              10:01
21   Robinson case, in the room, or participating by
22   telephone, or participating by e-mail with
23   respect to the preparation of your report in this
24   action against Lafarge?
25       A    No, they were not.                              10:01
0020
 1       Q    Were any of the counsel in the
 2   Mississippi River-Gulf Outlet case, or the
 3   Robinson case, present physically, or by
 4   telephone, or by e-mail in the preparation of
 5   your testimony today?                                   10:02
 6       A    No.
 7       Q    What were your arrangements for
 8   compensation in the Robinson case?
 9       A    The same as for the Lafarge barge case.
10       Q    Same hourly rates?                             10:02
11       A    Correct.
12       Q    And was that also true for the
13   Mississippi River-Gulf Outlet case?
14       A    That's correct.
15       Q    How much were you paid in the Robinson        10:02
16   case?
17       A    Approximately $1,200,000 during the
18   period April 1st through September -- April 1st,
19   2007, through September 1st, 2009.
20       Q    Of that amount, was there some that went      10:02
21   to graduate students?
22       A    Yes.
23       Q    How much went to graduate students?
24       A    Approximately $250,000.
25       Q    How much were you paid in the                 10:03
0021
 1   Mississippi River-Gulf Outlet case prior to the
 2   Robinson case?
 3       A    The total of $1,200,000 includes both
 4   the canal litigation and the Mississippi
 5   River-Gulf Outlet litigation.                           10:03
 6       Q    When you refer to the canal litigation,
 7   are you referring to Robinson, or what are you
 8   referring to?
 9       A    Judge Duvall organized that work in two
```

```
10    or three principal areas of litigation.  The       10:03
11    first one that was -- at least that I worked on,
12    pertained to the breaches of the drainage canals
13    in the metropolitan area of New Orleans.  The
14    second case is the Mississippi River-Gulf Outlet
15    case, commonly known as Robinson, et al.           10:04
16        Q    You're not referring to the Inner Harbor
17    Navigation Canal?
18        A    That's correct.
19        Q    And the figure of 1,200,000 that you
20    mentioned from April 1st, 2007, to September 1st,  10:04
21    2009, covered Robinson and the Mississippi
22    River-Gulf Outlet and the Metropolitan New
23    Orleans canals?
24        A    Correct.
25        Q    Was there anything else that you did      10:04
0022
1     outside of that description of work?
2         A    Oh, yes.
3         Q    Was there another area of expert
4     activity for which you were compensated that we
5     haven't talked about the figures for?             10:04
6         A    Yes.
7         Q    What was that?
8         A    In what I term as Phase 1 of my
9     involvement in this investigation, our work was
10    sponsored by the National Science Foundation.      10:05
11    The National Science Foundation compensated us
12    for our in-the-field expenses for a team of 36
13    investigators.  The total compensation was
14    approximately $330,000, that covers the period
15    of September 2005 through May 14th, 2006.          10:06
16           In addition, the University of
17    California at Berkeley would supply $60,000 to
18    support the investigation during that initial
19    phase, and during the following Phase 2 that
20    characterized additional work performed after May  10:06
21    14th, 2006.
22        Q    Did the University of California pay
23    your salary while you were doing this
24    investigation?
25        A    Yes.                                       10:06
0023
1         Q    And were all your out-of-pocket expenses
2     reimbursed by one means or another?
3         A    By whom?
4         Q    By the National Science Foundation or by
5     the University of California?                       10:07
6         A    Yes.
7         Q    Was there any category of expert work
8     that you did for counsel in the Mississippi
9     River-Gulf Outlet case, or in the Robinson case,
10    that we haven't talked about for which you          10:07
11    received compensation that we've not talked
```

```
12   about?
13       A    No.
14       Q    So we've covered the waterfront, so to
15   speak?                                              10:07
16       A    Well, not completely.  In the litigation
17   side of this work I've expended approximately
18   2,500 paid hours.  In addition, I have expended
19   in excess of 10,000 unpaid hours in this
20   investigation.                                      10:08
21       Q    When you refer to "investigation," are
22   you referring to everything from September 2005
23   to the present, or are you referring to something
24   different?
25       A    I am referring from September 2005         10:08
0024
 1   through the present.
 2       Q    When did you expend these unpaid hours?
 3       A    It started on August 29 -- pardon me --
 4   August 24th, 2005, through today.
 5       Q    Well, I understand that.  But was the     10:08
 6   bulk of this during the period of time before the
 7   Independent Levee Investigation Team report was
 8   issued in final, or was the bulk of it later?
 9       A    The bulk of it was later.
10       Q    What was the work that you were doing,    10:09
11   these 10,000 hours that you're describing that
12   were unpaid?
13       A    Well, first, our Independent Levee
14   Investigation was -- none of the participants,
15   with the exception of the graduate students,       10:09
16   received compensation for other than direct field
17   expenses.  Now, at the same time we were devoting
18   hours of acting and working on other parts of the
19   work and that was not paid.
20       Q    But you were receiving your salary from   10:09
21   the University of California, weren't you?
22       A    Not during summer times; that's three
23   months.  Not during winter break; that's one
24   month.  During those times there was no
25   compensation from the University.                   10:10
0025
 1       Q    Aren't you paid on a 12-month basis?
 2       A    Yes.  But I am hired on a nine-month
 3   basis.  So I receive checks 12 months, but it's
 4   prorated based on nine months of employment.  And
 5   I'm only employed by the university nine months    10:10
 6   per year.  That is my official appointment and
 7   contract.
 8       Q    It means that you're not required to
 9   perform work for the university for three months?
10       A    No.  I'm not paid by the university       10:10
11   during those three months.
12       Q    Okay.  What is your annual salary at the
13   university?
```

```
14      A    $156,000 per year, that means for the
15 nine-month appointment.  That does not include      10:11
16 health care and the other indirect items.  That's
17 current salary.
18      Q    Are there any indirect items, other than
19 one we have with most large employers; health
20 care benefits, vacation?                             10:11
21      A    No.  There's nothing other than the
22 normal.
23      Q    Okay.  There is a center that was
24 described in your expert report that you were
25 involved in establishing.  Can you tell me a         10:11
0026
 1 little bit about that?
 2      A    The center's name is the Center for
 3 Catastrophic Risk Management.  That center was
 4 formed approximately November 2005, in the early
 5 days after our national work in New Orleans          10:12
 6 following Hurricanes Katrina and Rita.
 7           The primary investigators returned from
 8 New Orleans to Berkeley and talked to our
 9 colleagues and agreed that what we were learning
10 in the investigation in New Orleans needed to        10:12
11 have a life and a span that was much broader than
12 Katrina and New Orleans.
13           So the faculty agreed to form the
14 center.  And it was at that point returned to the
15 university and asked for their support, both         10:13
16 financial support and time release, and other
17 forms of support, to foster the goals and
18 objectives of the Center for Catastrophic Risk
19 Management.
20           That center is still underway, still      10:13
21 exists.  We have expanded the work from New
22 Orleans, very substantially, so the lessons had
23 from Katrina and New Orleans have been taken to
24 other important parts of the United States and
25 internationally.                                     10:13
0027
 1      Q    If you turn to these 640 publications in
 2 Appendix A, can you point me to the earliest
 3 publication that has to do with the failure
 4 of flood walls and hurricanes?
 5      A    That would be the Independent Levee        10:14
 6 Investigation report dated May 14th, 2005.
 7      Q    Prior to that, had you had any
 8 publications or writings on the failures of flood
 9 walls, without regard to whether it's a hurricane
10 or something else, but just the failures of flood    10:14
11 walls?
12      A    Yes.  An American Society of Civil
13 Engineers' report dealing with flood walls for
14 the protection of coastal -- Gulf Coast
15 refineries, co-authored with now-Dr. Tony Dover,     10:15
```

```
16   spelled D-o-v-e-r.  That publication dealt with
17   the design criteria for flood walls, earth and
18   flood protection structures, defending Gulf Coast
19   refineries.  The date is approximately 1978.
20        Q    Okay.  Have you testified as an expert          10:15
21   witness in any case prior to the Katrina cases?
22        A    Yes.
23        Q    Please tell me about that.
24        A    The primary one concerned a port
25   facility, and I was acting on behalf of the           10:16
0028
 1   defendants in an engineering contracting firm in
 2   Chicago, Illinois.  The plaintiffs were
 3   represented by a Norweigian contracting company.
 4   That case and the expert work that I did
 5   concerning it occupied approximately three years.     10:16
 6        Q    When was that?  An approximate answer is
 7   fine.
 8        A    That would be approximately 1990 through
 9   1993.
10        Q    Had you ever served as an expert witness       10:17
11   in a case before that one?
12        A    Several.  And they date back to the --
13   the first case concerned a mobile offshore
14   drilling unit that caused the collapse of a major
15   offshore facility.  The name of the case is Shell      10:17
16   versus Mecom, John W. Mecom, the owner of the
17   mobile offshore drilling unit.  The time period
18   is approximately 1970 through 1973.  The case is
19   in a civil court, New Orleans.  And I've worked
20   as an expert witness on cases since that time         10:18
21   period through the ones I have described for you.
22        Q    Did any of the cases that you worked on
23   as an expert witness involve hurricane
24   conditions?
25        A    All have involved hurricane or, as they       10:19
0029
 1   are known in other parts of the world, tropical
 2   cyclone conditions.
 3        Q    Did any of them involve the failure
 4   of flood walls?
 5        A    No.                                            10:19
 6        Q    Has any court ever barred your expert
 7   testimony, to your knowledge?
 8        A    No.
 9        Q    Since you began -- well, I withdraw
10   that.                                                   10:20
11             Since Hurricane Katrina, have you served
12   as an expert witness in any case that we've not
13   talked about yet?
14        A    No.
15        Q    Do you understand that when I ask if          10:20
16   you've served as an expert witness, I mean both
17   giving a deposition or an affidavit to be filed
```

18  in court or to be provided in court?
19      A    Correct.
20      Q    Have you been involved in any of the          10:21
21  investigations of the events in Katrina other
22  than the lawsuits that we've already talked about
23  and your work for the Independent Levee
24  Investigation Team?
25      A    Yes.                                           10:22
0030
1       Q    Please tell me what those were.
2       A    I served as a reviewer to the National
3   Institute of Standards and Technology in review
4   of their forensic engineering investigations in
5   the Greater New Orleans area following Hurricane   10:22
6   Katrina.
7       Q    Did you write any part of any of their
8   technical papers?
9       A    No.
10      Q    Did you review any of their draft         10:22
11  technical papers?
12      A    Yes.
13      Q    Did you provide comments on any of
14  those?
15      A    Yes.                                       10:22
16      Q    And were your comments reflected in the
17  final versions?
18      A    Many were.
19      Q    Were you compensated for that work?
20      A    No.  That's part of the pro bono work.    10:23
21      Q    Were you involved in commenting on any
22  parts of the NIST technical papers that discussed
23  the barge?
24      A    Yes.
25      Q    In your report, have you quoted any       10:23
0031
1   portions of any of the NIST reports?
2       A    To the best of my recollection, I have
3   not quoted any portions of those -- of that
4   report, but I have referenced that report
5   relative to key conclusions that I have reached   10:24
6   as a result of my forensic engineering studies.
7       Q    Cited but not quoted; is that fair?
8       A    That's correct.
9       Q    And did you cite, for support of your
10  study, any part of the NIST reports that you had  10:24
11  helped midwife into their final form?
12      A    No.
13      Q    Had you provided any comments on any
14  of the portions of any of the NIST papers that
15  you cited?                                         10:24
16      A    Please repeat your question.
17      Q    Have you provided any comments to NIST
18  on any of the portions of their reports that you
19  cited?

```
20      MR. RAFFMAN:  Objection, asked and answered.      10:25
21      THE WITNESS:  Yes.
22 BY MR. SEYMOUR:
23      Q    Do you know whether, as to those
24 particular comments, they were accepted or
25 rejected?                                              10:25
0032
 1      A    Well, in some cases the comments were
 2 cooperation that our investigation -- "our"
 3 meaning the Independent Levee Investigation
 4 Team -- corroborated their independent
 5 investigation of those elements.  So in most          10:25
 6 cases, it was what I call triangulation of
 7 results from groups of experts considering
 8 elements involved in development of failures and
 9 breaches.
10      Most of my comments to the National            10:26
11 Institute of Standards and Technology regarded
12 their recommendations for future improvements in
13 codes and guidelines employed in rebuilding Gulf
14 Coast facilities.
15      Q    Do you recall providing any comments on   10:26
16 the causation of the Inner Harbor Navigation
17 Canal breaches?
18      A    Please repeat your question.
19      MR. SEYMOUR:  Read that back, please.
20          (Record read as follows:                   10:27
21          Question:  Do you recall providing
22          any comments on the causation
23          of the Inner Harbor Navigation
24          Canal breaches?)
25      THE WITNESS:  To whom?                          10:27
0033
 1      MR. SEYMOUR:  To NIST.
 2      THE WITNESS:  Yes.  The observation was that
 3 their conclusions agreed with the conclusions
 4 that we had reached as a part of the Independent
 5 Levee Investigation, or through May 14, 2006.        10:27
 6 BY MR. SEYMOUR:
 7      Q    Did you provide to NIST any comments as
 8 to the causation of either the North or the South
 9 Breach in the eastern wall of the Inner Harbor
10 Navigation Canal before they had reached their       10:28
11 own conclusion?
12      A    Nothing before.
13      Q    Did you provide any comments to NIST
14 with respect to how they should describe their
15 conclusion as to the cause of the breaches in the    10:28
16 Inner Harbor Navigation Canal east wall?
17      A    No, I did not.
18      Q    You referred a moment ago to
19 triangulation.  What do you mean by that?
20      A    I am a mariner, an avid sailboater.        10:28
21 When at sea, to find out where I am, I have to
```

22  triangulate, which means I take a bearing on a
23  particular point of reference that I'm sighting.
24  So that I know the direction from that bearing to
25  my location, I can determine the distance from          10:29
0034
1  that reference point to my location.  I do that
2  once, twice and three times to determine where I
3  am located.  And it's because I can't depend on
4  any single point of reference to tell me where
5  I'm at because of potential errors and              10:29
6  variabilities in those bearings and distances.  I
7  term it "triangulation," it's a term common to
8  surveying.
9       Q    We'll get to surveying in a minute but I
10  just want to make sure I understand the marine          10:30
11  part of your description.  You're on the water,
12  you're in some kind of vessel.  And are you
13  looking at three measurements of the same
14  sighting, or measurements of two or three
15  different things?                           10:30
16       A    At least three different things.  Those
17  could be stars, or they could be a land
18  lighthouse, or they could be radio beacons from a
19  known radio beacon in a known position.
20       Q    And you just mentioned surveying and           10:30
21  triangulation there, does that work any
22  differently than you described for the marine
23  application?
24       A    Works the same way, just terrestrial
25  versus marine.                           10:30
0035
1       Q    How does that work with respect to
2  reaching scientific conclusions?
3       A    It is the same thing.  In essence, one
4  group, one set of eyes, looks at something and
5  draws a conclusion.  But what they're looking at       10:31
6  and what they are seeing is filtered by a number
7  of perceptual elements and, hence, there's a
8  variability to that set of conclusions.  A good
9  forensic engineer, and I think a good lawyer, I
10  think a good newspaper person, will turn to a          10:31
11  second independent source, attempt to triangulate
12  to that same location using different
13  information, perceptual information, and will
14  turn to even a third or a fourth one, but
15  recognizing a potential variability in those          10:32
16  sources.
17          When you have triangulated to an area
18  that allows you to draw conclusions, you have
19  confidence in your ability to think that those
20  conclusions represent the truth in reality.          10:32
21       Q    I had always thought of a scientific
22  conclusion as being the result of an individual
23  or a team looking at a particular problem and

```
24    testing hypotheses and coming up with their
25    conclusions?                                        10:32
0036
 1      A    That's good so far.
 2      Q    What needs to be done to make it
 3    complete?
 4      A    Well, to expose it, then, to the
 5    scientific community, and at that point have        10:33
 6    other independent viewpoints test those analyses,
 7    deductions and conclusions.  That's one of the
 8    principal reasons in the scientific community for
 9    peer-reviewed journal publication.  That's one
10    of the reasons that, as you were questioning and    10:33
11    observing, I spent more time than I would like to
12    remember exposing what I'm thinking to my peers
13    so that they can examine it, test its veracity,
14    see if they triangulate to the same set of
15    conclusions.                                         10:33
16          If we do, that's a good thing.  If we
17    don't, that means we have to keep working to
18    resolve the differences.  At the point in time in
19    which we have resolved these differences, then
20    we've got a conclusion set of so-called             10:34
21    scientific facts that are reliable for the
22    purposes envisioned for that work.
23      Q    Is this an activity that the other teams
24    that were involved in the Katrina investigations
25    were also following, this triangulation?            10:34
0037
 1      A    I really don't know since I wasn't a
 2    member of those teams.
 3          The evidence that I have been able to
 4    gather indicates that, in most cases, they, too,
 5    attempted to land a potentially erroneous          10:35
 6    analysis and conclusions in their work.
 7      MR. SEYMOUR:  I think this is probably a good
 8    time to take a break.
 9      THE VIDEOGRAPHER:  The time is 10:35 a.m. and
10    we are off the record.                              10:35
11      MR. RAFFMAN:  Read and sign.
12      (Recess taken from 10:35 a.m. to 10:44 a.m.)
13      THE VIDEOGRAPHER:  The time is 10:44 a.m.,
14    and we are back on the record.
15    BY MR. SEYMOUR:                                     10:44
16      Q    Dr. Bea, you used a phrase in your
17    earlier testimony, "forensic engineer."  What
18    does it take to become a forensic engineer?
19      A    Knowledge, training and experience.
20      Q    Is there a certification?                    10:44
21      A    No, there is not.
22      Q    Is there a professional society of
23    forensic engineers that one must belong to in
24    order to be a forensic engineer?
25      A    No, there is not.  But there is such a       10:44
```

```
0038
 1    society of the American Society of Civil
 2    Engineers, of which I'm an emeritus member.  A
 3    fellow has a committee on forensic engineer, I am
 4    a member of that committee.
 5         Q    Does that committee set any, at least        10:45
 6    aspirational certification standards, to be a
 7    forensic engineer?
 8         A    Yes.
 9         Q    And of the persons who call themselves
10    forensic engineers, do you have any idea of the      10:45
11    proportion who go through some kind of
12    certification process?
13         A    In the United States or international?
14         Q    United States.  If you don't know that's
15    fine.                                                10:45
16         A    In my experience I have not met any
17    engineers who have formal certification in the
18    area of forensic engineering.
19         Q    Is the title of forensic engineer
20    something that some states regulate and require      10:45
21    that you do something in particular in order to
22    call yourself a forensic engineer?
23         A    Not to my knowledge.
24         Q    I think if I remember the number
25    correctly, that there were 36 team members on the    10:46
0039
 1    Independent Levee Investigation Team?
 2         A    Yes, sir.
 3         Q    Were those 36 persons who were
 4    university faculty members or did that include
 5    graduate students?                                   10:46
 6         A    That includes graduate students.  And we
 7    had some members that were not faculty members;
 8    they were practicing engineers.
 9         Q    Do you remember what the breakdown was
10    between practicing engineers and faculty members?    10:46
11         A    Roughly three to one, three academic
12    faculty to one practicing engineer.
13         Q    How did the Independent Levee
14    Investigation Team make decisions?
15         MR. RAFFMAN:  Objection.                         10:47
16         THE WITNESS:  Would you expand on decisions
17    concerning what?
18         MR. SEYMOUR:  Decisions concerning exactly
19    how the investigation was to be done, for
20    instance.  We'll start with that.                    10:47
21         THE WITNESS:  Now, please repeat your
22    question.
23         MR. SEYMOUR:  How did the Independent Levee
24    Investigation Team make decisions on how the
25    investigation was to be done?                        10:47
0040
 1         THE WITNESS:  We sat down together, talked
```

```
 2    about how each of the members, senior members,
 3    particularly, of the investigation thought we
 4    should proceed.  And we operated primarily on the
 5    basis of consensus so that, again, a form of          10:48
 6    triangulation or cooperation.  When we were
 7    unable to reach that consensus, then, if the
 8    decision was in the area of the leader of that
 9    area, then the leader of that area reached the
10    decision.                                             10:48
11    BY MR. SEYMOUR:
12        Q    36 seems like a large number for --
13        A    Oh, it is.
14        Q    I've been involved in projects, I know.
15             Was there some kind of executive board       10:48
16    or executive committee that tried to thrash
17    things out and bring order to the proceedings by
18    suggesting what should be done?
19        A    Yes.
20        Q    Were you on that group?                       10:48
21        A    Yes.
22        Q    How large was that group?
23        A    Three.
24        Q    And the members of that group were you,
25    Dr. Sneed?                                            10:49
0041
 1        A    Seed.
 2        Q    Seed.  Excuse me.
 3             And who was the other one?
 4        A    David Rogers.  Dr. David Rogers.
 5        Q    And where is he from?                         10:49
 6        A    University of Missouri-Rolla.
 7        Q    Did the members of the team ordinarily
 8    follow what the three of you suggested?
 9        A    Ordinarily.  However, the team members
10    were given discretionary action powers by the        10:49
11    team, so that if we went to the field with a plan
12    in mind, and the group that was involved in a
13    particular portion of that field study thought
14    that a departure from the previous plan was
15    appropriate, the departure was made.                 10:50
16        Q    You have to follow up on leads?
17        A    Yes.
18        Q    Was the process any different for
19    reaching decisions on the conclusions that were
20    to be drawn?                                          10:50
21        A    It was a very, very similar process.
22        Q    Do you know how the decision making was
23    done for the NIST reports?
24        A    No, I do not.
25        Q    Were you involved in any of that?            10:50
0042
 1        A    Only as a consultant reviewer of their
 2    draft final report, as I explained previously.
 3        Q    Do you know how the Interagency
```

```
 4   Performance Evaluation Team made its decisions?
 5       A    No, I do not.  I was not a member of          10:51
 6   that team, nor asked to comment or offer input.
 7       Q    Did any members of the Interagency
 8   Performance Evaluation Team discuss with you how
 9   they made their decisions?
10       A    Yes.                                          10:51
11       Q    Who was that?
12       A    Mr. George Sills, a member of the U.S.
13   Army Corps of Engineers, Vicksburg District, a
14   member of the Interagency Performance Evaluation
15   Task Force.  These discussions were held during       10:51
16   the time period September 29th through October
17   the 15th, 2005.
18       Q    That was quite a while before they
19   reached their own conclusions, wasn't it?
20       A    They were in the field at the same time      10:52
21   we were, so like we were reaching our
22   conclusions, they also had personnel in the field
23   and were reaching their conclusions.
24       Q    Did you discuss with Dr. Sills, or
25   anybody else on the Interagency Performance           10:52
0043
 1   Evaluation Team, any views as to the role of the
 2   barge as a potential cause of one or both of the
 3   breaches in the east wall of the Inner Harbor
 4   Navigational Canal?
 5       MR. RAFFMAN:  Objection, vague as to time.         10:53
 6       MR. SEYMOUR:  Ever.
 7       THE WITNESS:  Yes.  We were in the field at
 8   the same time that I cited previously, and
 9   discussed between members of the two different
10   teams the potential roles of the ING 4727 barge       10:53
11   in the Lower 9th Ward breach development.
12   BY MR. SEYMOUR:
13       Q    During that period of time, weren't you
14   of the view that the barge was the cause?
15       MR. RAFFMAN:  Objection, vague as to time.         10:54
16       THE WITNESS:  Please repeat your question.
17   BY MR. SEYMOUR:
18       Q    During that period of time that you've
19   previously identified as being between September
20   29 and October 15, 2005, weren't you of the view      10:54
21   that the barge was a cause of the -- one or both
22   of the breaches in the Inner Harbor Navigational
23   Canal east wall?
24       A    We were still deliberating the
25   roles/participation of the barge in development       10:54
0044
 1   of the breaches at that early stage.  No analyses
 2   had been -- formal analyses had been performed at
 3   that time, so it was a potential participant and
 4   we were still hotly deliberating the potential
 5   role of that barge in other breach development.       10:55
```

```
 6      Q    Dr. Bea, do you recall giving an
 7  interview in which you stated that you thought
 8  that the barge was a cause of the breach --
 9      MR. RAFFMAN:  Objection.
10  BY MR. SEYMOUR:                                       10:55
11      Q    -- of one or both breaches?
12      MR. RAFFMAN:  Objection.
13      THE WITNESS:  Repeat your question, please.
14      MR. SEYMOUR:  Read it back, please.
15      (Record read as follows:                         10:55
16          Question:  Dr. Bea, do you recall
17          giving an interview in which you
18          stated that you thought that the
19          barge was a cause of the breach --
20          of one or both breaches?)                     10:55
21      THE WITNESS:  I gave an interview on October
22  the 3rd, 2005, to Mr. Bob Sanders and commented
23  in that interview that the barge was a potential
24  participant player/causative element in the
25  development of the South Breach.                      10:56
0045
 1  BY MR. SEYMOUR:
 2      Q    Is the best of your recollection that
 3  you only said it was a potential cause?
 4      A    I don't recall the exact wording but the
 5  transcription of the video will clearly describe     10:56
 6  that.  I would comment that the transcription
 7  of that video done by Mr. Pasos, and his expert
 8  report on page 28, both inaccurately quotes the
 9  transcript from the video as well as inaccurately
10  defines the time of that video.                       10:57
11      Q    On page 28 of his report.  Do you have a
12  photographic recollection?
13      A    I don't need to.  I have his report
14  here.
15      Q    Well, I understand that.  I've got a lot    10:57
16  of things here, too, but that doesn't give me the
17  page number or anything on it.
18      A    Yes.
19      Q    Do you have a photographic memory?
20      A    No, I don't.  I wish I did.                  10:57
21      Q    What is the inaccuracy quotation that
22  you think that the Pasos report stated?
23      A    Well, I looked at what he put in
24  quotation marks, went back to the video, wrote
25  down what I said in the video and it didn't match    10:58
0046
 1  the quotation.
 2      Q    Was it an error of substance, an error
 3  of style?
 4      A    It was an error of substance and it's
 5  back to this element of causation participation.     10:58
 6  That's one.  The second one, and it's a very
 7  important one, is the element of the timing
```

```
 8   of the interview relative to the subsequent
 9   documentation of the causative elements behind
10   the North and South Breaches at the Lower 9th      10:58
11   Ward.  The interview was made very, very early,
12   approximately 50 hours into the investigation.
13   We had been in the Lower 9th Ward the previous
14   afternoon, had seen what was there to see,
15   examined the barge, examined the flood wall and    10:59
16   the damage in the surrounding community.  This
17   video was made the morning after that afternoon
18   visit.
19           The report that Mr. Pasos references is
20   a 2007/2008 documentation.  He contrasts the        10:59
21   conclusions as of 2008 with the conclusions that
22   he obtained from listening, transcribing that
23   video done October the 3rd, 2005, two years
24   before.
25      Q    He had a seven where there should have       11:00
0047
 1   been a five?
 2      A    No.
 3      Q    Well, did he have the date right?
 4      A    He cited the report correctly but then
 5   he said -- inferred, said, that the video           11:00
 6   followed those reports.  The video preceded them
 7   by more than two years.
 8      Q    Did you ever say publicly that you had
 9   changed your mind about the potential causative
10   role of the barge after that October 3, 2005,       11:00
11   interview before the ILIT report came out?
12      MR. RAFFMAN:  Objection.  But for
13   clarification, himself, personally, or as part
14   of --
15      MR. SEYMOUR:  Personally.  Okay.  For            11:01
16   purposes of clarification, I'm making the
17   assumption that you subscribed to the ILIT report
18   when it came out and did not identify the barge
19   as a cause of the breaches.
20      THE WITNESS:  Well, there was a report that      11:01
21   was a public release to the Independent Levee
22   Investigation report, November 2005, that
23   declared publicly that the barge was a victim,
24   not a cause.
25           That conclusion was brought forth in         11:02
0048
 1   congressional testimony by my colleague,
 2   Professor -- Dr. Raymond Seed.
 3   BY MR. SEYMOUR:
 4      Q    The barge was a victim.  That's rather
 5   striking.  One tends to think of a victim as        11:02
 6   being something alive.
 7           Have you previously used a phrase like
 8   that to describe something inanimate?
 9      A    Sure.
```

```
10      Q    Have you described the levees as        11:02
11 victims?
12      A    Yes.
13      Q    When did you do that?
14      A    Through many of both the public
15 statements I made as well as                      11:03
16 information/documentation that I've provided in
17 this four-year time period.
18      Q    How does a failed levee become a victim?
19      A    It can become a victim of neglect.   It
20 can become a victim of poor design.   It can       11:03
21 become a victim of poor construction.   So the
22 inadequate object is being victimized by things,
23 in general, that people do or don't do.
24      Q    Have you said publicly that the levees
25 were not faulty -- the levees that failed were     11:03
0049
 1 not faulty?
 2      MR. RAFFMAN:   Objection.
 3      THE WITNESS:   I have not said publicly that
 4 the levees which failed were not faulty.
 5      MR. SEYMOUR:   I'll ask the reporter to mark   11:04
 6 as Exhibit 7 to the deposition a passage from
 7 Dr. Bea's testimony in the Robinson trial,
 8 transcript pages 1094 through 1097.
 9      (Exhibit 7 marked for identification.)
10 BY MR. SEYMOUR:                                     11:05
11      Q    You see at the bottom of -- or the top
12 of page 1094 that Mr. O'Donnell asked you:   Some
13 levees failed, didn't they?   And you said, yes.
14      And then on line 9 he asked:   Isn't that
15 proof that the levees were faulty and contributed   11:05
16 to the flooding?
17      MR. RAFFMAN:   Objection to the reading of the
18 transcript.   It's -- you've ellipsized the
19 passage that could be important.
20      MR. SEYMOUR:   I'm sorry?                      11:05
21      MR. RAFFMAN:   You've ellipsized words that
22 may matter to the question.
23 BY MR. SEYMOUR:
24      Q    Do you see, quote, Isn't that proof that
25 the levees were faulty and contributed to the       11:05
0050
 1 flooding, close quote.   Do you see that?
 2      A    Uh-huh.
 3      Q    On lines 9 and 10?
 4      MR. RAFFMAN:   I'm sorry.   All right.   I'm
 5 reading from the bottom of the page.               11:05
 6 BY MR. SEYMOUR:
 7      Q    Okay.   Then after a dispute among the
 8 lawyers that need not concern us, as so many
 9 disputes among lawyers need not concern anyone,
10 he got back to it again on line 23, and said:       11:06
11 Some levees failed, didn't they?   And you
```

12   answered, yes.
13       A    Yes.
14       Q    Then on line 25 he asked:  Isn't that
15   proof in and of itself that the levees were            11:06
16   faulty and contributed to the flooding?  And you
17   said:  No, it is not.
18            Do you see that?
19       A    Yes.
20       Q    Moving on to page 1095, he asked:  Why        11:06
21   not?  And your answer is:  That's because what
22   was built was built and the Corps has maintained
23   that those were properly built flood-protection
24   structures, close quote.
25            Do you see that?                              11:06
0051
 1       A    Yes.
 2       Q    And then the next question is:
 3   According to the Corps, once overtopped, the
 4   erosion failed; is that what was expected when
 5   that happened?                                         11:06
 6            And you see that you said in your
 7   answer:  Given no backside protection, that's
 8   correct.
 9       A    That's correct.
10       Q    Then the question:  Then so where lies        11:07
11   the fault?  And the answer is:  The fault lies
12   with the MR-GO.  The levees were a victim, not a
13   cause, quote, unquote.
14            Do you see that?
15       A    Yes.                                          11:07
16       Q    Were you there saying that the levees
17   were not faultily designed or faultily
18   maintained?
19       A    I wasn't being asked to deliver expert
20   testimony concerning either the demand or             11:07
21   construction.
22       Q    Do you see at the bottom of page 1095
23   that you testified that -- well, the question
24   begins on line 16, quote, Now you know the
25   government says that Katrina was the big one,          11:07
0052
 1   that by herself, without the MRGO's alleged
 2   flaws, she overwhelmed the system; is that
 3   correct?  And you answered:  That's not correct.
 4       A    That's correct.
 5       Q    Did I read it correctly?                      11:08
 6       A    You did.
 7       Q    Then the question is:  Why not?  And
 8   your answer was that Katrina itself, without the
 9   MR-GO, was not severe enough to have caused that
10   wave-side attack and erosion on Reach 2.  The         11:08
11   incremental surge developed in Reach 1 in the
12   Industrial Canal.  Katrina had a helper, the
13   MR-GO.

```
14      A     Correct.
15      Q     Now, on line 23 when you referred to the      11:08
16 Industrial Canal, do you mean that Katrina by
17 itself would not have breached the Industrial
18 Canal?
19      A     If we had Katrina and had properly
20 mitigated the negative effects of the MR-GO,          11:08
21 Mississippi River-Gulf Outlet, then my conclusion
22 was we would not have breached the Industrial
23 Canal flood walls and levees.
24      Q     Whatever the faults in the design or
25 maintenance, or neglect in caring for the east       11:09
0053
 1 flood wall of the IHNC, they would not have
 2 breached?
 3      MR. RAFFMAN:  Objection.
 4      THE WITNESS:  Please repeat your question.
 5          (Record read as follows:                    11:09
 6          Question:  Whatever the faults in
 7          the design or maintenance, or
 8          neglect in caring for the east
 9          flood wall of the IHNC, they would
10          not have breached?)                          11:09
11      THE WITNESS:  Would you please repeat the
12 question?
13      MR. SEYMOUR:  Let me try to put it again.
14      THE WITNESS:  Okay.
15      MR. SEYMOUR:  When you ask it twice, I think     11:10
16 there's a problem with the question, not a
17 problem with the answer.
18      MR. RAFFMAN:  So stipulated.
19      MR. SEYMOUR:  Now, now.
20 BY MR. SEYMOUR:                                       11:10
21      Q     Are you saying in your answer on Page
22 1095 of the transcript of the Robinson trial,
23 lines 21 through 24, that whatever the faults in
24 the design, construction and maintenance of the
25 Inner Harbor Navigation Canal eastern flood wall,    11:10
0054
 1 without the Mississippi River-Gulf Outlet they
 2 would not have breached?
 3      A     No, that's not what I'm saying.  The
 4 Mississippi-Gulf Outlet had a definitive role in
 5 the breaching at the Lower 9th Ward.  And that       11:10
 6 role involved maintenance activities that were
 7 associated, operational as well, with the
 8 Mississippi River-Gulf Outlet.
 9      Q     If the Mississippi River-Gulf Outlet had
10 never been built, would Katrina have resulted in     11:11
11 any breach of the eastern flood wall of the Inner
12 Harbor Navigational Canal?
13      A     Repeat your question, please.  I'm
14 collecting all of the parts.
15      MR. SEYMOUR:  Would you read it back, please?    11:11
```

```
16              (Record read as follows:
17              Question:  If the Mississippi-Gulf
18              Outlet had never been built, would
19              Katrina have resulted in any
20              breach of the eastern flood wall          11:11
21              of the Inner Harbor Navigational
22              Canal?)
23      MR. RAFFMAN:  Objection.
24      THE WITNESS:  I find that an impossible
25 question to answer because I would have to infer      11:12
0055
1 the history that would follow or ensue if MR-GO
2 had never been built, and that's a supposition
3 that would require a great deal of speculation on
4 my part.
5 BY MR. SEYMOUR:                                         11:12
6      Q    What did you mean, then, when you said
7 in this transcript that, quote, Katrina itself,
8 without the MR-GO, was not severe enough to have
9 caused that wave-side attack and erosion on Reach
10 2, the incremental surge developed in Reach 1 and      11:12
11 the Industrial Canal?
12      A    Well, if we had properly mitigated the
13 effects of MR-GO, we would not have had breaching
14 of the earthen flood protection structures
15 adjacent to St. Bernard Parish, identified as         11:13
16 Reach 2 of the Mississippi River-Gulf Outlet.
17           Similar kinds of inferences are given to
18 the breaches at the Lower 9th Ward predicated on
19 the mitigation of MR-GO being the construction
20 of a flood gate at the mouth of the often-quoted      11:13
21 funnel representing the intersection of the
22 Mississippi River-Gulf Outlet with the Gulf
23 Intercoastal Waterway.
24      Q    Please help me understand how there
25 would have been mitigating measures for the           11:14
0056
1 Mississippi River-Gulf Outlet required if there'd
2 never been a Mississippi River-Gulf Outlet?
3      MR. RAFFMAN:  Objection.
4      THE WITNESS:  I'm not predicating that there
5 had never been one.  I'm saying that there was         11:14
6 one.  And that the duty, the responsibility,
7 of the engineering activities, management
8 activities, were to mitigate the negative effects
9 recognized by the presence of the Mississippi
10 River-Gulf Outlet.                                     11:14
11           So I'm not predicating that it never
12 existed, because it did exist, and that
13 counterfactual argument is one that I'm not
14 addressing.
15 BY MR. SEYMOUR:                                        11:15
16      Q    Would it be fair to say, from this
17 testimony that we've been talking about, that you
```

18  believe that Katrina, all by itself, would not
19  have caused the under-seepage that you think is
20  the cause of the collapse of the walls?                    11:15
21       A    That depends on how Katrina's
22  defenses -- or the flood defense system was
23  configured at the time of Katrina.
24       Q    Please explain.
25       A    Well, Katrina is just a tropical cyclone    11:15
0057
1  and it's bringing those environmental conditions
2  to an area of people constructed/designed flood
3  protection facilities.  The performance of the
4  system, including Katrina, is a function of the
5  characteristics of those flood protection          11:16
6  elements.
7       Q    In your answers to these questions, are
8  you assuming any particular wind speed at surface
9  level over the Inner Harbor Navigational Canal?
10       A    None.                                       11:16
11       Q    No assumption as to wind speed?
12       A    Correct.
13       Q    Any belief or conclusion as to wind
14  speed?
15       A    Could you reframe your question, please?   11:16
16       Q    Does your answer -- would your answer
17  vary depending upon the wind speed at the surface
18  level over the Inner Harbor Navigational Canal?
19       A    Given the potential wind speeds over the
20  surface of water at the Inner Harbor Navigation     11:17
21  Canal, no, I don't think it would change the
22  conclusions at all.
23       Q    What is the range of wind speeds that
24  you have in mind?
25       A    Well, the range of wind speeds are the    11:17
0058
1  wind speeds that characterized the history of the
2  hurricane that we have identified as Hurricane
3  Katrina.
4       Q    I'm talking about over the Inner Harbor
5  Navigational Canal, do you have any understanding   11:17
6  of the wind speed at surface level of the Inner
7  Harbor Navigational Canal preceding the South
8  Breach?
9       A    Yeah.
10       Q    And what is that understanding?           11:18
11       A    That there was wind at varying
12  velocity.  It varies in terms of speeds, meaning
13  both maximum and average wind speeds.  It varies
14  as a function of elevation that wind speeds
15  during Hurricane Katrina were variable.            11:18
16       Q    I asked you before for your
17  understanding of the range of wind speeds over
18  the Inner Harbor Navigational Canal --
19       A    Right.

```
20      Q      -- say before the South Breach.          11:18
21      A      Right.
22      Q      What is the range?
23      A      I'll reference wind speeds at 10 meter
24   elevation that are 10-minute average wind speeds,
25   and I'm referencing the Inner Harbor Navigation     11:19
0059
 1   Canal between 12:00 a.m. and 7:00 a.m., August
 2   the 29th, 2005.  Those wind speeds range from 41
 3   miles per hour to 77 miles per hour.
 4      Q      What paper are you looking at?
 5      A      I'm looking at a summary that I prepared   11:19
 6   to help me recollect these kinds of details
 7   describing the time history of elements that
 8   accompanied the principal features that developed
 9   at the Lower 9th Ward during the evolution of the
10   two breaches.                                        11:20
11      Q      May I see the document?
12      MR. SEYMOUR:  Do you have a copy that you
13   could pass to the court reporter and mark it as
14   Exhibit 8?
15      (Exhibit 8 marked for identification.)           11:20
16   BY MR. SEYMOUR:
17      Q      What is the source of the information on
18   Exhibit 8?
19      A      There are multiple sources, all of which
20   I've referenced in my expert report.                11:21
21      Q      In the line for 7:00 a.m., there's
22   information on the surge height as being 12 feet
23   and the column says, NAVD 88.  What does the NAVD
24   88 stand for?
25      A      North American Vertical Data 88, 2004,    11:21
0060
 1   point 65.
 2      Q      Is that the scale by which you
 3   determined it was 12 feet?
 4      A      That's the scale by which I identified
 5   the reference elevation for the water -- mean       11:22
 6   water level.
 7      Q      And that's above sea level, right?
 8      A      Yes.  Above sea level, correct.
 9      Q      And where does the 12 feet come from?
10   Is that from the IPET report?                       11:22
11      A      The 12 feet comes from the data provided
12   during the IPET studies, the documented water
13   level elevations along the Industrial Canal as a
14   function of time.
15      Q      And where do you have the -- where did    11:22
16   you get the information on the significant wave
17   height as being 2 to 3 feet at 7:00 a.m.?
18      A      The same source.
19      Q      IPET?
20      A      IPET, that's correct.                     11:22
21             That's in their report, Volume IV, in
```

```
22    the appendix regarding height resolution wave
23    modeling.
24         Q    And that wave modeling was done as a
25    result of a computer program?                        11:23
0061
 1         A    As a result of people operating a
 2    computer program and interpreting its result,
 3    yes.
 4         Q    Do you know the name of the program?
 5    Was that the ADCIRC or a different program?          11:23
 6         A    No.  This is Boussinesq multi-layer high
 7    resolution wave modeling program.
 8         Q    Would you please spell that first word?
 9         A    B-o-u-s-s-n-e-q-e-s.  Boussneqes is a
10    fluid dynamics God.                                  11:24
11         MR. SEYMOUR:  We'll let the record stipulate
12    that plaintiffs will follow whatever spelling
13    Mr. Raffman put on the Post-it that was just
14    passed.
15    BY MR. SEYMOUR:                                       11:24
16         Q    And the wind speed of 77 miles per hour,
17    what is the source of that?
18         A    That came from that report provided by
19    Mr. Dooley in this litigation.
20         Q    Do you happen to know which particular    11:24
21    anemometers Mr. Dooley relied upon to get his
22    figure?
23         A    Mr. Dooley relied on a series of
24    anemometers because there were no anemometers
25    located in the immediate vicinity of the Lower      11:25
0062
 1    9th Ward.  Ocean Weather, Incorporated, under the
 2    direction of Dr. Vincent Cardone, performed
 3    oceanographic/meterologic hindcast, which took
 4    advantage of the field of observational
 5    data-recording anemometers and constructed those    11:25
 6    into a generalized wind field time history for
 7    the propagation of Hurricane Katrina.  Mr. Dooley
 8    refers to several of the grid points in the
 9    immediate vicinity of the Industrial Canal to
10    determine and document these figures.               11:26
11         Q    Do you know whether Mr. Dooley included
12    the anemometer from the NASA Michou facility,
13    either of the anemometers there?
14         A    I do not recall.
15         Q    And would your answers be the same with   11:26
16    respect to wind direction?
17         A    Correct.
18         Q    Speaking of wind vanes, not anemometers,
19    obviously.
20         A    Well, anemometers today not only tell     11:26
21    velocity as a function of time, they also output
22    direction.
23         Q    If the wind speed at the surface of the
```

```
24    Inner Harbor Navigational Canal, prior to
25    7:00 a.m., had been in excess of 100 miles an        11:26
0063
 1    hour, would you still have the same conclusion
 2    that Katrina would not have been strong enough on
 3    its own to take advantage of any flaws in the
 4    eastern flood wall of the Inner Harbor
 5    Navigational Canal and result in a breach?          11:27
 6        A    Given proper mitigation, the negative
 7    things that had been put into the flood
 8    protection structures, that would be a valid
 9    conclusion to draw.
10        Q    Okay.  A wind of 100 miles an hour, or      11:27
11    in excess of 100 miles an hour, could have driven
12    the barge with a great force against the flood
13    wall, couldn't it?
14        MR. RAFFMAN:  Objection, vague as to
15    direction.                                           11:27
16        THE WITNESS:  Repeat your question.
17        MR. SEYMOUR:  Read it back.
18            (Record read as follows:
19            Question:  A wind of 100 miles an
20            hour, or in excess of 100 miles an           11:28
21            hour, could have driven the barge
22            with a great force against the
23            flood wall, couldn't it?)
24        MR. RAFFMAN:  Time of day.  Same objection.
25        THE WITNESS:  If the barge were still moored      11:28
0064
 1    at the Lafarge Terminal where the wind is 100
 2    miles per hour, or 150 miles per hour, there is
 3    no collision between the purported barge and the
 4    purported flood wall.
 5    BY MR. SEYMOUR:                                      11:28
 6        Q    And if the barge were adrift when the
 7    winds were that high, wouldn't the winds have
 8    been capable of driving the barge with a great
 9    force against the flood wall?
10        MR. RAFFMAN:  Same objection.                    11:28
11        THE WITNESS:  Please specify what "great"
12    means?  In excess of 1 pound, 10 pounds, 3,500
13    hundred pounds?  Please quantify "great."
14    BY MR. SEYMOUR:
15        Q    Do you disagree with the finding of IPET    11:28
16    that if the barge had impacted the flood wall, it
17    would have been with a force sufficient to breach
18    the flood wall?
19        MR. RAFFMAN:  Objection.
20            Go ahead.                                     11:29
21        THE WITNESS:  I don't believe that IPET drew
22    such a conclusion.
23    BY MR. SEYMOUR:
24        Q    I believe I inadvertently misstated it.
25    It could have breached the flood wall, that it       11:29
```

```
0065
 1   would have had enough impact that that was
 2   possible?
 3        A    I don't think they even reached that
 4   conclusion but we could check by reading the
 5   document.                                           11:29
 6        Q    Are you familiar -- did you -- do you
 7   remember reading that part of the IPET report
 8   discussing the impact of the barge on the flood
 9   wall?
10        A    Yes.  Several times.                      11:29
11        Q    Did you disagree -- I'll re-characterize
12   it.  Did you disagree with that part of the IPET
13   report?
14        MR. RAFFMAN:  I'll disagree.  I'll object to
15   your characterization of the IPET report.          11:29
16        Go ahead.
17        THE WITNESS:  Well, I neither agreed or
18   disagreed.  I read it for what they had done and
19   drew no conclusions -- or they drew no
20   conclusions from those calculations.               11:30
21   BY MR. SEYMOUR:
22        Q    They drew no conclusions as to what did
23   happen but did they not draw a conclusion as to
24   what could have happened?
25        A    As I testified earlier, I would need to  11:30
0066
 1   consult that document to corroborate that
 2   conclusion.
 3        Q    Is it your testimony here today that
 4   winds of 100 miles per hour operating on a barge
 5   that was adrift in the Inner Harbour Navigational  11:30
 6   Canal, those winds bringing the barge into
 7   contact with the flood wall would not have had
 8   enough impact to cause a breach in the flood
 9   wall?
10        MR. RAFFMAN:  Objection, it's vague as to     11:30
11   time.
12        MR. SEYMOUR:  At any time that the winds
13   would be in excess of 100 miles per hour in
14   bringing the barge into contact with the flood
15   wall.                                              11:31
16        MR. RAFFMAN:  Then it's an improper
17   hypothetical.
18        THE WITNESS:  First, I'm not an expert in
19   naval architecture.  Second, I'm not an expert in
20   meteorology.  Third, I have performed no forensic  11:31
21   engineering analyses to answer the question
22   hypothetical you have posed.  I would have to
23   speculate to answer.
24   BY MR. SEYMOUR:
25        Q    What would naval architecture have to do 11:31
0067
 1   with it?
```

```
 2      A    Naval architecture involves the motions
 3  of floating bodies.
 4      Q    We're talking about a floating body
 5  that's driven by wind of that velocity up against      11:31
 6  the flood wall.
 7      A    Right.
 8      Q    And it's there.  So we are beyond naval
 9  architecture, the vessel is there at the flood
10  wall.                                                  11:32
11      A    Oh, no, we're not.  Because the impact
12  characteristics of that vessel at the wall depend
13  very heavily on the naval architecture
14  characteristics of the vessel, and the
15  meteorologic/oceanographic characteristics that       11:32
16  the vessel is embedded in.  That's a complex
17  issue.
18      Q    Isn't it rather more simple, like the
19  force with which a cannonball strikes a castle
20  wall?                                                  11:32
21      MR. RAFFMAN:  Same objection.
22      THE WITNESS:  No.
23  BY MR. SEYMOUR:
24      Q    Okay.  And again, what does meteorology
25  have to do with it since we've already posited        11:32
0068
 1  winds of 100 miles an hour?
 2      A    For how long and from what directions?
 3      Q    The question that you were asked has to
 4  do with the wind bringing the barge against the
 5  flood wall.  It doesn't matter whether it did         11:32
 6  that in a due east or northeast direction;
 7  whether it did it in angle or whatever.  Can you
 8  say anything at all about the impact of the barge
 9  on the flood wall if the wind had been such --
10  had been of that speed and had brought the barge      11:33
11  up against the flood wall?
12      MR. RAFFMAN:  Same objection, improper
13  hypothetical.
14      THE WITNESS:  Your question is embedded with
15  flaws.                                                 11:33
16      MR. SEYMOUR:  I could not hear the word.
17      THE WITNESS:  Your question is embedded with
18  flaws, f-l-a-w-s.  The direction of ocean on the
19  vessel, or the characteristics of the wind acting
20  on the vessel, have important effects as to the       11:33
21  impact time history that the vessel develops with
22  its intersection with the flood wall.  In
23  addition, the response characteristics of the
24  flood wall also influence the effective dynamic
25  forces that are transmitted to the flood wall.        11:34
0069
 1  You posited that these things made no
 2  difference.  They do.  Very important
 3  differences.
```

```
 4   BY MR. SEYMOUR:
 5       Q    In reaching the conclusion that the        11:34
 6   barge did not cause the breach, what assumptions
 7   did you make about the wind speed and the
 8   direction and the time of the barge impacting the
 9   flood wall?
10       A    None.                                      11:34
11       Q    None whatsoever?
12       A    None.
13       Q    But if they make a difference, then
14   aren't there some wind speeds, directions and
15   times in which they would have made a difference   11:34
16   and caused a breach?
17       A    Not that we can tell.
18       Q    Was there anybody in particular in the
19   Independent Levee Investigation Team who had the
20   responsibility of analyzing that?                  11:34
21       A    No.
22       Q    Who made the decision that nobody on the
23   Independent Levee Investigation Team should
24   analyze that?
25       A    No one.                                    11:34
0070
 1       Q    Was there anybody, to your knowledge, on
 2   the NIST working body that had the responsibility
 3   of analyzing that question?
 4       A    I would not know since I was not a
 5   member of that investigation.                      11:35
 6       Q    Are you aware of anyone on the
 7   Interagency Performance Evaluation Team that had
 8   the responsibility of investigating that
 9   question?
10       A    Well, obviously, because the study        11:35
11   of barge potential impact forces are contained in
12   the IPET report, so someone had the
13   responsibility to investigate that point.  They
14   came to the conclusion that the barge played no
15   role in the development of the breaches.           11:35
16       Q    Do you know who?
17       A    Who what?
18       Q    You said obviously someone on the
19   Interagency Performance Evaluation Team had that
20   responsibility --                                  11:36
21       A    Right.
22       Q    -- and I want to know who.
23       A    I do not know.
24       Q    Do you know what they did?
25       A    Only as documented in their report.       11:36
0071
 1       Q    Do you know of anyone of the Team
 2   Louisiana Group that had the responsibility
 3   of analyzing that question?
 4       MR. RAFFMAN:   Objection.
 5       THE WITNESS:   I do not know of anyone on the   11:36
```

```
 6    Team Louisiana Group that had the responsibility
 7    to answer that question, any motional impact
 8    characteristics of the barge.
 9    BY MR. SEYMOUR:
10        Q    So when you triangulated the                   11:36
11    conclusion -- as you described triangulation, the
12    conclusion that the barge was not a cause, you're
13    dealing with a group of investigative bodies that
14    didn't look at the question?
15        MR. RAFFMAN:  Objection.                             11:36
16        THE WITNESS:  That's not what I am trying to
17    communicate with you.
18    BY MR. SEYMOUR:
19        Q    Is that a fact?
20        MR. RAFFMAN:  Objection.                             11:37
21        THE WITNESS:  No, I don't think that's a
22    fact.
23             Would you like an explanation?  Would
24    that be helpful?
25        MR. SEYMOUR:  I'd be interested in any               11:37
0072
 1    explanation that will help in this.
 2        THE WITNESS:  For example, as we looked at
 3    the North Breach, our analyses of the evolution
 4    development of the North Breach, and I'll refer
 5    to the Independent Levee Investigation Task Force   11:37
 6    study, showed that that breach developed very
 7    early the morning of Hurricane Katrina, meaning
 8    in the 4:00 to 5:00 a.m. time period.  We
 9    concluded that the barge played no role in that
10    evolution and development.  We used photographic    11:38
11    information to help us arrive at that conclusion,
12    photographs that showed that the barge plausibly
13    could not have contacted the wall.  We used our
14    forensic engineering experience, that is on site
15    examining the flood wall detailed characteristics  11:38
16    at the North Breach.  There were no signs of
17    barge impact, general or local.
18             And by that time, we had asked the
19    question:  Where did this damn barge come from?
20    The answer had come, well, it only could come       11:39
21    from the Lafarge Terminal.  We were still
22    concerned, well, could it have come from other
23    parts of the Industrial Canal?  By the time we
24    learned the Florida Avenue Bridge would not have
25    allowed that, then the question came, well, could  11:39
0073
 1    it have come across the Industrial Canal,
 2    actually driving to the northeast by that time in
 3    the morning?  And the answer was no, not unless
 4    it was magic.
 5        So we were using a variety of other forensic    11:39
 6    engineering clues to help us understand the
 7    potential role of the ING 4727 barge at North
```

```
 8   Breach.  We repeated the same process at the
 9   South Breach.
10   BY MR. SEYMOUR:                                        11:40
11        Q    What conclusion or assumption leads you
12   to say that the barge could not plausibly have
13   moved from the Lafarge facility to the site
14   of the North Breach?
15        A    Because the wind wouldn't blow it there.    11:40
16        Q    All right.  And what do you rely upon
17   for your wind information; just this information
18   which is on this chart that's identified as
19   Exhibit 8?
20        A    Oh, no.  At that time we had the early      11:40
21   information coming from the IPET investigation.
22   They had gathered this anemometer information,
23   had ocean weather, Dr. Vincent Cardone, working
24   on the hindcast studies, so we were able to
25   access that information to help us understand       11:40
0074
 1   what the wind plausibly was doing at the time.
 2        Q    Did you rely at all on Dr. Dooley's
 3   information in reaching that conclusion or didn't
 4   you have that yet?
 5        A    We didn't have that yet because the time   11:41
 6   period referencing was 2005 to May 14th, 2006.
 7        Q    And if the wind could be shown to have
 8   moved in a direction different from that posited
 9   by the Interagency Performance Evaluation Team
10   and by Mr. Dooley, and had blown in a             11:41
11   northeasterly direction, would your conclusion
12   then change?
13        MR. RAFFMAN:  Objection.
14        THE WITNESS:  Which conclusion -- please
15   specify which conclusion you're referring to.       11:41
16        MR. SEYMOUR:  Your conclusion that the barge
17   could only have moved to the North Breach by
18   magic.
19        THE WITNESS:  Well, certainly, if I'm
20   presented with reliable information that          11:42
21   indicates that the previous information, thought
22   to be, is not correct, I have to reexamine the
23   conclusion in light of that new information.
24   BY MR. SEYMOUR:
25        Q    That's the job of a scientist, isn't it?   11:42
0075
 1        A    That's exactly right, sir.
 2        Q    Now, you mentioned that there was
 3   nothing at the site of the North Breach that
 4   would indicate that the barge made impact.  Isn't
 5   it correct that a great deal of the concrete that   11:42
 6   the barge would have impacted was pulverized?
 7        A    No.
 8        Q    Okay.
 9        A    It was cracked.  And we walked the
```

10   entire spiral of the North Breach.  We examined          11:42
11   video photography done September the 14th
12   overflying the North Breach.  We used aerial
13   photographs, both NOAA and the Corps, done
14   shortly after Hurricane Katrina had departed the
15   scene.  None of that information gave us any          11:43
16   suspicion for local contact between a barge and
17   the flood wall.
18        Q    Is it your testimony that the concrete
19   at the site of the North Breach was intact and
20   just down?          11:43
21        A    No.  I said it was cracked.
22        Q    Cracked, but intact.  There were no
23   chunks of concrete lying around; is that your
24   testimony?
25        A    No, there were chunks of concrete lying          11:43
0076
 1   around.  When concrete cracks, it tends to be
 2   brittle and if it's not connected to reinforcing
 3   steel, it will go where it will go.  There was
 4   rubble concrete in the area.
 5        Q    Okay.  Did you examine -- did you turn          11:43
 6   over and lift all the rubble to examine all sides
 7   to see if there was any indication, such as paint
 8   scrapings, rust scrapings and so on, that would
 9   indicate whether the barge had come in contact
10   with that concrete?          11:44
11        A    Repeat your question.
12   MR. SEYMOUR:  Please read it back.
13             (Record read as follows:
14             Question:  Did you examine -- did
15             you turn over and lift all the          11:44
16             rubble to examine all sides to see
17             if there was any indication, such
18             as paint scrapings, rust scrapings
19             and so on, that would indicate
20             whether the barge had come in          11:44
21             contact with that concrete?)
22        THE WITNESS:  No.
23   BY MR. SEYMOUR:
24        Q    Do you know of anyone who did?
25        A    No.          11:44
0077
 1             The key word is that word "all."  We
 2   were able to access much of the area and
 3   features, as were the photographs.  That word
 4   "all" means everything.  Some pieces of concrete
 5   were not on the surface, some pieces of concrete          11:44
 6   were buried.  We could not deal with those
 7   things, not accessible.
 8        Q    How much of the concrete did you lift?
 9        A    I lifted, personally, what I could lift,
10   which was probably limited to less than 150          11:45
11   pounds.  I walked the entire edge, along with my

```
12   Corps of Engineers, and I led the Independent
13   Levee Investigation Team members and the members
14   of the American Society of Civil Engineers
15   Investigation, we walked every inch of that North      11:45
16   Breach repeatedly.
17        Q    But I didn't mean that you would be
18   personally lifting up concrete.  That's what
19   graduate students are for.
20        A    No, that's not true.  I never used --        11:45
21        Q    That was a joke.  You don't need to
22   respond to that, sir.
23        A    I'm not very good at jokes.  And I never
24   use graduate students as slaves.
25        Q    Did anyone from the Independent Levee         11:46
0078
1    Investigation Team or, to your knowledge, anybody
2    from the Interagency Performance Evaluation Team
3    use any mechanical contrivances to lift up the
4    concrete that was buried, and to do the kind
5    of examination that would be thorough, to           11:46
6    indicate whether there were signs of the barge
7    coming into contact with any of that concrete?
8         A    During what period of time, please?
9         Q    During any period of time.
10        MR. RAFFMAN:  Objection, characterization.       11:46
11        THE WITNESS:  The term "any" is
12   all-inclusive.  I can only comment where I've got
13   direct personal knowledge.
14   BY MR. SEYMOUR:
15        Q    Well, the rubble has already been           11:46
16   removed, hasn't it?
17        A    At what time?  It was not removed at the
18   time we were first there.
19        Q    Prior to the removal, are you aware
20   of anyone who examined all faces of the rubble to    11:46
21   see whether there were signs of the barge
22   impacting that wall?
23        A    I'm aware of some experts that were able
24   to examine faces of the concrete wall and panels
25   that we could not access.  That documentation has    11:47
0079
1    been included primarily in Mr. Cushing's expert
2    report.
3         MR. SEYMOUR:  We're taking a tape-change
4    time.
5         THE VIDEOGRAPHER:  This marks the end of Disc   11:47
6    No. 1 in the deposition of Dr. Robert Bea.  The
7    time is 11:48 a.m., and we are off the record.
8         (Recess taken from 11:48 a.m. to 11:57 a.m.)
9         THE VIDEOGRAPHER:  This marks the beginning
10   of Disk No. 2 in the deposition of Dr. Robert       11:56
11   Bea.  The time is 11:57 a.m., and we are back on
12   the record.
13        MR. SEYMOUR:  I ask the reporter to mark as
```

```
14    Exhibit 9 to the deposition, something called the
15    NIST Technical Note 1476, some particular pages        11:56
16    from that technical note.
17         (Exhibit 9 marked for identification.)
18    BY MR. SEYMOUR:
19         Q    Have you seen this document before?
20         A    Yes.                                          11:57
21         Q    We spent a little time talking about the
22    difficulties of knowing the force that a barge
23    can exert on a physical structure it comes up
24    against.  On the second page of the exhibit,
25    which is page 43 of the technical report, there's      11:57
0080
 1    a picture in the upper-left corner of a parking
 2    garage that simply had the rocking motion of a
 3    floating barge move alongside it and caused a
 4    partial collapse of one of the corners of the
 5    garage.  Do you see that?                              11:58
 6         A    Yes.
 7         Q    Did that surprise you?
 8         A    No.
 9         Q    If you turn to the last page of the
10    exhibit, this is a picture of the bridge carrying      11:58
11    US Route 90 over the Pascagoula River.  And you
12    see there's some feet of a displaced span,
13    saying, the caption is:  "Due to the barge's
14    impact."  Do you see that?
15         A    Yes.                                          11:58
16         Q    You would agree that that would take
17    considerable force?
18         A    Yes.
19         Q    And on page 96 of the report, which is
20    right in the middle here, there's a section            11:59
21    called 4.1.2.6, the IHNC/Lower 9th Ward -- excuse
22    me, I'm on the wrong page.  It's the third page
23    of the exhibit, page 94, which is headed at the
24    top, 4.1.2.5, the IHNC/Lower 9th Ward/North
25    Breach.  And I want to direct your attention to        11:59
0081
 1    the middle portion, the middle paragraph on the
 2    page, where it says, six lines down, quote, the
 3    failed sections of the flood wall close to the
 4    south edge of the breach appeared to have been
 5    overturned and then uprooted with the concrete        11:59
 6    I-walls pointing toward the protected side
 7    direction and the steel sheet piles pointing
 8    toward the canal.  However, its sections closer
 9    to the middle and north edge of the breach, the
10    concrete I-walls were pointing toward the canal       12:00
11    while the sheet piles were pointing toward the
12    protected side, as if the system had been pushed
13    out from under.  Do you see that?
14         A    Yes.
15         Q    And you've read that before, haven't         12:00
```

```
16    you?
17        A    Yes.
18        Q    Was this particular technical report one
19    of the ones that you provided comments on?
20        A    Yes.                                            12:00
21        Q    Do you remember if you provided any
22    comments on this page?
23        A    Yes.
24        Q    What were your comments?
25        A    That it corroborated the conclusions we        12:00
0082
1     had reached at the time I was asked to review
2     this report.
3         Q    Now, you are aware, are you not, that
4     the manager of the Pump Station No. 5 that was
5     located in the Lower 9th Ward, Mr. Villavaso, had  12:00
6     testified that he had seen what to him appeared
7     to be the tip of a barge protruding -- you know,
8     having gotten stuck in the wall with a tip coming
9     out and he saw the tip.  He didn't see the rest
10    of the barge but he saw the tip of that.  Do you   12:01
11    remember that?
12        A    Yes.
13        Q    Now, if that, in fact, had been the
14    barge and it had got its tip stuck in the wall,
15    and then there was some movement of wave or        12:01
16    water, wouldn't the barge have pushed the wall on
17    one side of the tip in one direction and the wall
18    on the other side of the tip in a different
19    direction, like a pry bar?
20        MR. RAFFMAN:  Objection, improper              12:01
21    hypothetical.
22        THE WITNESS:  I can't answer your question
23    since I haven't analyzed such a scenario.
24    BY MR. SEYMOUR:
25        Q    Do you know how a pry bar works?          12:01
0083
1         A    Yes.
2         Q    And isn't that exactly how a pry bar
3     works?
4         A    No.
5         MR. RAFFMAN:  Same.                            12:02
6         THE WITNESS:  A pry bar has a fulcrum, and
7     it's moving one thing relative to something
8     that's not moving.
9     BY MR. SEYMOUR:
10        Q    It pushes one element in one direction    12:02
11    and the other element that it's stuck into in the
12    opposite direction, doesn't it?
13        A    Well, I hope -- if it does, you're not
14    going to open up a crack.  Because for every
15    action there's an equal and opposite reaction.    12:02
16    And to get this opening force, you've got to have
17    a reactive element.
```

```
18      Q    If the barge is moving in the water,
19  it's -- right now it's stuck in the wall in this
20  hypothetical, and the water then moves it, and        12:02
21  you've got a large length of barge; isn't that
22  going to shove the wall at the point of --
23  remember, the wall is broken where the tip has
24  through?
25      A    Right.                                        12:03
0084
1       Q    And it's going to shove one part of the
2   wall outwards and towards the canal, and one part
3   of the wall inward toward the protected side.
4       MR. RAFFMAN:   Objection.
5       THE WITNESS:   Okay.                               12:03
6       MR. SEYMOUR:   Pardon?
7       THE WITNESS:   Okay.  Now, what's your
8   conclusion?
9   BY MR. SEYMOUR:
10      Q    Isn't that the same thing that is            12:03
11  described here?
12      A    No.
13      Q    What would you see differently from the
14  description on page 94 of this technical report?
15      A    The wall north of the north end of the       12:03
16  North Breach was not significantly displaced.  A
17  separation had occurred at that point, and the
18  wall south of that juncture had displaced toward
19  the protected side and it went through this very
20  unusual flipping motion.  So the prying action       12:04
21  that you're envisioning would require a
22  significant motion north of the place where the
23  purported barge knows a pry bar is focusing,
24  there was no motion or damage there.
25      Q    I refer you to the two sentences again       12:04
0085
1   that I read.  Quote, The Failed sections of the
2   flood wall close to the south edge of the breach
3   appear to have been overturned and then uprooted
4   with the concrete I-walls pointing toward the
5   protected side direction and the steel sheet        12:04
6   piles pointing toward the canal.  However, its
7   section closer to the middle and north edge
8   of the breach, the concrete I-walls were pointing
9   toward the canal while the sheet piles were
10  pointing toward the protected side, as if the       12:04
11  system had been pushed out from under.
12      A    Uh-huh.
13      Q    Doesn't that describe adjacent sections
14  of walls pushed in opposite directions?
15      A    No.                                           12:05
16      Q    They are pointing in opposite
17  directions, aren't they?
18      A    Right.
19           Would you like me to explain?
```

```
20      Q    If you have an explanation I'd like to        12:05
21   hear it.
22      A    I do have an explanation.  As we best
23   understand the development of the North Breach,
24   the entire breach section was experiencing severe
25   stress under the bottom of the sheet pile, caused    12:05
0086
 1   by seepage.  The distress was concentrated toward
 2   the north end of the North Breach, so the entire
 3   wall is moving toward the protected side.  The
 4   majority of the motions are in the center, and
 5   the minor motions are at the two ends of this V.    12:06
 6           We think there was a sudden tearing and
 7   ripping at the north end of the North Breach
 8   which allowed it to fly open like an opening
 9   door.  The entire section laid down with the top
10   of the flood wall facing the protected side.  The   12:06
11   in-rushing water comes under the north end of
12   that section, lifts it and flips it much like a
13   ribbon would flap in the wind.  It was that
14   separated end that allowed this unusual flipping
15   action that was not found at any other breach       12:07
16   of any other location in the Greater New Orleans
17   area.
18      Q    So this is --
19      A    The flip happened after it breached.
20      Q    You think?                                   12:07
21      A    Everything we have analyzed and been
22   able to determine leads to that conclusion.
23      Q    And if the barge had operated as I had
24   described in my hypothetical, what would you see
25   different?                                           12:07
0087
 1      MR. RAFFMAN:  Objection, asked and answered.
 2      THE WITNESS:  Well, of course, because I
 3   haven't examined quantitatively the information
 4   from the basis of your hypothetical, I can't
 5   possibly answer it without speculating.             12:07
 6   BY MR. SEYMOUR:
 7      Q    That's fair.  That's fair.  I don't want
 8   you to guess.
 9           You referred to this section of wall as
10   "flapping like a ribbon."  How much weight was      12:07
11   there in that section of the wall?
12      A    Well, I'd have to do the calculations to
13   answer that, and could, since steel and concrete
14   have known weight.  But it's not the weight in
15   the section that solely determines how the          12:08
16   section behaves.  Water, with the density of
17   600/800 times of air, is a tremendous forcing
18   function.  And so it can easily get under this
19   heavy section, flip it and twist it.  And at
20   least in my ocean engineering experience, now       12:08
21   spanning 56 years, we have seen repeated
```

22  instances of this kind of destructive action from
23  water acting on very, very heavy structures.
24       Q    Have you seen repeated instances of
25  these adjacent sections pointing in different          12:08
0088
1   directions or is that unique there, too?
2        A    This is unique to New Orleans North
3   Breach, north end.
4        Q    And if something causes part of the wall
5   to lean, it's much easier for water to get            12:09
6   underneath, isn't it?
7        MR. RAFFMAN:  Objection.
8        THE WITNESS:  To get underneath what?
9        MR. SEYMOUR:  Underneath the flood wall.
10       THE WITNESS:  Yes.  That's a crack, tension       12:09
11  crack.
12  BY MR. SEYMOUR:
13       Q    And if a barge pushes the wall so that
14  it leans, the barge then makes it much easier for
15  the water to get underneath and for the wall to       12:09
16  then fail the rest of the way, doesn't it?
17       MR. RAFFMAN:  Objection, improper
18  hypothetical.
19       Go ahead.
20       THE WITNESS:  If you are referring to this        12:09
21  case, in this scenario, the answer is the wall
22  was leaning very, very early that morning due to
23  the rising surge waters.  Once the water is able
24  to get of the order of two feet above the earthen
25  crown of the supporting soil levee, it begins to      12:10
0089
1   incline.  And because the sheet pile are rigid
2   relative to the soil, that inclination propagates
3   directly to the bottom of the sheet piling.  It's
4   like working a shovel; where you are trying to
5   open a clod of dirt with a shovel and you push        12:10
6   the handle over, a little bit of push of that
7   handle propagates a crack, always at the bottom
8   of the rigid shovel.
9   BY MR. SEYMOUR:
10       Q    And a barge pushing against a wall is        12:10
11  going to speed that up a great deal, isn't it?
12       MR. RAFFMAN:  Objection.
13       THE WITNESS:  Well, if it's already present
14  and it's at the bottom, the barge doesn't matter.
15  BY MR. SEYMOUR:                                        12:10
16       Q    I'm not positing a wall that's already
17  fallen down.
18       A    I'm not either.  The wall is inclined.
19       Q    And the barge hitting against it is
20  going to make it more inclined, isn't it?             12:11
21       A    No.  The initial inclination in the
22  manner I described is sufficient to crack -- to
23  open a tension crack to the bottom of the sheet

```
24   pile.  You do not need a barge.
25        Q    I'm sorry.  My questions don't relate to      12:11
0090
 1   whether you need a barge --
 2        A    Okay.
 3        Q    -- my questions do not relate to whether
 4   it is conceivable that the thing might have
 5   happened without the barge.                            12:11
 6        A    Right.
 7        Q    My question is a very simple and direct
 8   question.  Can the barge create the problem?  Not
 9   whether the problem can arise independently, but
10   can the barge create the problem?                      12:11
11        A    What is the problem?
12        Q    The problem is making the wall lean,
13   creating a gap underneath through which water can
14   go, further weakening the wall.  That's part one
15   of the problem.                                        12:11
16        A    Theoretically it's possible.
17             Is it plausible in this case?  I don't
18   think so.
19        Q    And why do you say that?
20        A    Well, because we investigated the           12:12
21   performance of both the North and the South
22   Breaches and they breach without a barge, so the
23   barge didn't ever need to leave the Lafarge
24   terminal.
25        Q    That's what I just said.                     12:12
0091
 1        A    Okay.
 2        Q    My question does not have to do with
 3   whether --
 4        A    Then we're in agreement.
 5        Q    -- with whether it is conceivable that      12:12
 6   the breaches can occur without a barge.  That's
 7   not my question at all.
 8        A    Okay.  I misunderstood it.
 9        MR. RAFFMAN:  Well, I think you're now --
10   BY MR. SEYMOUR:                                        12:12
11        Q    Because -- because perhaps other people
12   might think it's conceivable that it would occur
13   without the weight of the water and only the
14   barge.
15             My question to you is, sir:  If the         12:12
16   barge is adrift in the canal, and if the barge is
17   being pushed by any combination of wind and water
18   up against the flood wall, is that not a force
19   that will help to push the wall down and create a
20   gap underneath?                                        12:13
21        MR. RAFFMAN:  Objection, he's answered that
22   question.
23             Go ahead, answer it again.
24        THE WITNESS:  Let's go to the South --
25        MR. SEYMOUR:  Objection to coaching.             12:13
```

```
0092
 1            Please continue.
 2        THE WITNESS:  Let's go to the South Breach.
 3    BY MR. SEYMOUR:
 4        Q     I'm asking a hypothetical question about
 5    any barge hitting against a flood wall in the          12:13
 6    Inner Harbor Navigational Canal.  It's not
 7    specific to place --
 8        A     Right.
 9        Q     -- it's just a simple question of
10    physics.                                               12:13
11        A     It may be a simple question of physics
12    to you, but it's a practical exercise in
13    understanding the mechanics that can lead to
14    failure and breaching.  And that's why I said,
15    take for example the South Breach.  We know the        12:13
16    barge impacted at the south end of the South
17    Breach.  The rubbling, the rust streaks left as
18    signature features on the flood wall, the
19    features that, at least I could observe
20    personally on the barge, says it was there.            12:14
21            But that wall had failed before the
22    barge ever got there.  And so the barge exerting
23    additional prying forces, et cetera, played no
24    substantial role in the evolution development
25    of the breach.                                         12:14
0093
 1        Q     How do you know that?
 2        A     Well, for one thing, a barge couldn't
 3    have gotten where it got unless it played high
 4    jump over that school bus.  The water had to be
 5    above the top of the school bus, which means I         12:14
 6    got water at the elevations that we think are
 7    inside the Lower 9th Ward at 8:00 to 9:00 a.m.
 8    But the breach was developed at 7:00 to 8:00,
 9    based on all of the mechanics that we can
10    mobilize that allows water in, allows the barge        12:15
11    to impact the south end of the breach, and force
12    its way in, float over the top of that school
13    bus, not performing a high jump, and as the water
14    recedes, goes down and that's where we found it.
15        Q     Are you talking about the barge being on     12:15
16    top of the school bus?
17        A     No.  It had to high jump the school bus
18    because it was found on a protected east side
19    of the school --
20        Q     Finish your answer.                          12:15
21        A     -- it was found on the east side of the
22    school bus.  It didn't come to rest on the school
23    bus until Hurricane Rita.
24        Q     Okay.  Dr. Bea, are you aware that there
25    are witnesses in the Lower 9th Ward that heard         12:16
0094
 1    something banging repeatedly and scraping against
```

 2    the flood wall prior to the failure of the South
 3    Breach?
 4        A    Yes.
 5        Q    If they were accurately describing what        12:16
 6    they heard, and the object creating those big
 7    sounds -- they described big sounds -- with the
 8    barge shoving against the flood wall, then the
 9    barge would have caused the South Breach before
10    it got to the point where it hit what's then an        12:16
11    end of the flood wall; isn't that correct?
12        MR. RAFFMAN:  Objection, improper
13    hypothetical.
14        THE WITNESS:  I think it's not correct.  And
15    the rationale I'm using is we found many            12:17
16    instances where similar barges contacted similar
17    flood walls, imparting similar localized damage,
18    but those barges did not cause failure breaching
19    of those flood walls.  It caused localized damage
20    but did not precipitate an open breach flooding        12:17
21    the protected side.
22    BY MR. SEYMOUR:
23        Q    And did those flood walls, where the
24    barge did not create a breach, exist where the
25    levee was as weak as it was in the Inner Harbor        12:17
0095
 1    Navigational Canal?
 2        MR. RAFFMAN:  Objection.
 3        THE WITNESS:  I cannot answer that question
 4    because I have not studied, quantitatively, the
 5    soil characteristics under all of the locations        12:18
 6    where we experienced barge impact with concrete
 7    I-walls.
 8    BY MR. SEYMOUR:
 9        Q    So at this point in time, it's not
10    possible for you to say -- to rely upon what the        12:18
11    barges did in other areas to say that the barge
12    could not have played a causative role in
13    knocking down the flood wall at the South Breach?
14        MR. RAFFMAN:  Objection.
15        MR. SEYMOUR:  Is that correct?            12:18
16        THE WITNESS:  I think that's not correct.
17    But you correct me if I don't respond to your
18    question.
19            All of the analyses that we have done to
20    this point in time are saying, with the South        12:18
21    Breach, clearly show that the barge had no role
22    in the causation of the breach.
23    BY MR. SEYMOUR:
24        Q    Part of that analysis that you've
25    described is that barges elsewhere that came into        12:19
0096
 1    contact with flood walls did not knock the flood
 2    walls down.  But we don't know if that's a fair
 3    comparison because you don't know whether the

```
 4  levee was as weak as the levee in the Inner
 5  Harbor Navigation Canal.  So what else is there        12:19
 6  to show that the barge could not have played a
 7  causative role in knocking down the flood wall at
 8  the South Breach?
 9      MR. RAFFMAN:  Object to the characterization
10  and the argumentation.                                 12:19
11          You can answer the question.
12      THE WITNESS:  I'll make another attempt at
13  clearly answering your question.
14          We analyzed the performance of the flood
15  wall at the South Breach several times, four,          12:19
16  five.  Those analyses show the South Breach would
17  develop, with its characteristics, without the
18  contribution of any sort from the barge.
19  BY MR. SEYMOUR:
20      Q    Do you mean would or do you mean could?       12:20
21      A    Would.  Our plausible conclusions from
22  these multiple forensic engineering analyses say
23  this is the most plausible answer for the
24  development of the South Breach.
25      Q    What's the margin of error on that?           12:20
0097
 1      A    The coefficient variation expressing the
 2  margin of error is 30 percent.  That represents
 3  our analysis of the uncertainty associated with
 4  the development of the South Breach.  Those
 5  analyses are documented in my expert report.          12:20
 6  They include two kinds of uncertainties:
 7  Uncertainties associated with natural
 8  variability; for example, shear strength and
 9  permeabilities, natural variabilities from things
10  like the weight of the water in the Industrial        12:21
11  Canal, and, explicitly, the uncertainties
12  associated with our analytical models.
13          To my knowledge, these are the only
14  forensic engineering analyses that have done
15  disciplined, analytical analyses of the margin       12:21
16  and rate of error.
17      Q    Didn't you testify in the Robinson trial
18  that the margin was between 50 and 100 percent?
19      A    Different performance, different
20  location, different mechanics.  And indeed, those     12:21
21  numbers are correct for the performance of the
22  earth and flood protection structures wayside
23  breaching on Reach 2.
24      Q    And what makes them correct there and
25  not correct for the Inner Harbor Navigational         12:21
0098
 1  Canal, where much of the soil that made up the
 2  levee was washed away in the collapse?
 3      A    A good way to respond to you is the
 4  uncertainties in the water mechanics involved at
 5  the Reach 2, MR-GO earth and flood protection         12:22
```

```
 6   structures, are far greater than the water
 7   mechanics represented at the Lower 9th Ward.
 8          In addition, the propagation of
 9   breaching due to the wave actions is considerably
10   more uncertain than the understanding of seepage        12:22
11   effects and lateral stability effects at the
12   Lower 9th Ward.
13       Q    You have a lot of similarities, too, in
14   those two areas, don't you?
15       A    Certainly.                                     12:22
16       Q    You're using the same analytical model,
17   so you'd have the same margin of error from the
18   analytical model?
19       A    That is incorrect.
20       Q    Why is it incorrect?                           12:22
21       A    Because we're not using the same
22   analytical models.
23       Q    What analytical model were you using for
24   the Inner Harbor Navigational Canal; does it have
25   a scientific name?                                      12:23
0099
 1       A    An analytical model consists of two
 2   major components.  One component, I will call,
 3   the human component.  The other one is a
 4   computational component frequently embedded in
 5   computer programs.  The analytical models that we      12:23
 6   used on the Reach 2 earthen flood protection
 7   structures are decidedly different from than
 8   those used at the Lower 9th Ward.  Different
 9   model to address different kinds of mechanics.
10       Q    The human factor is the same, isn't it?       12:23
11   The human factor is the same?
12       A    Oh, no, it's not.  This is why I draw so
13   much attention to the human factor because the
14   human factor has to be calibrated just like the
15   computer program needs to be calibrated.  If the       12:24
16   human factor is, for example, inappropriately
17   determining things like shear strength, like
18   permeability, then that garbage goes into the
19   computer program and you already know the output
20   is garbage.  So the computer program is                12:24
21   essentially doing what the human tells it to do.
22          The question for the forensic engineer
23   is does his combination of the human and the
24   analytical computer thing make sense?  Is it
25   trustworthy?  Is it something that we can carry         12:24
0100
 1   forward to Judge Duval in this trial and say,
 2   convincingly, we understand this.  The only way
 3   that we know that we can be close is when we
 4   compare with field prototype information.
 5          So we have access things like the             12:25
 6   Atchafalaya levee test performed by the Corps in
 7   the early 1980s.  The EIEI and flood wall
```

```
 8   performance test, full scale, performed by the
 9   Corps in the Atchafalaya Basin mid-1980s.  We
10   accessed failures like those at the 17th Street        12:25
11   Canal to ensure that our analytical models are
12   telling the truth, the whole truth and nothing
13   but the truth, with a defined margin of error, as
14   required by the Daubert criteria.
15        Q    All right.  You've referred to three         12:25
16   things, if my counting is correct, involving
17   things that happened in the 1980s, the 1990s and
18   a failure elsewhere in New Orleans.  Both of
19   those are going to be the same for Reach 2 and
20   for the Inner Harbor Navigational Canal.  Shear      12:26
21   strength, that's something objective that you
22   talked about.  If somebody makes a mistake in
23   shear strength, that's going to change the margin
24   of error.
25             So what did you do to make the shear         12:26
0101
 1   strength measurement more accurate in Reach 2 --
 2   or excuse me -- less accurate in Reach 2 than it
 3   is in the Inner Harbor Navigational Canal?
 4        MR. RAFFMAN:  Objection.
 5        THE WITNESS:  Because the dominant failure        12:26
 6   mechanics in Reach 2, the earth and flood
 7   protection structures, is not the same set of
 8   mechanics that dominate the formation of the
 9   breaches at the Lower 9th Ward.
10             Now, we were concerned with failure          12:26
11   of concrete/steel elements within Reach 2 of the
12   Mississippi River-Gulf Outlet.  For example,
13   those at Bayou Bienvenue, B-i-e-n-v-e-n-u-e, and
14   Bayou Dupre, D-u-p-r-e, there we used both
15   under-base seepage and global lateral stability.      12:27
16   Those models are identical to the ones that we
17   used at the Lower 9th Ward.  But those were not
18   the areas of breaching that you referred to as
19   you quoted that 65-percent coefficient of
20   variation error rate associated with that            12:27
21   particular set of breaches.
22   BY MR. SEYMOUR:
23        Q    In the Reach 2 breaches, you still had
24   levee left to test and examine, didn't you?
25        A    Yes.                                         12:28
0102
 1        Q    And at the area of the South Breach the
 2   levee was washed away?
 3        A    No.  We had levees both north and south
 4   of the South Breach.
 5        Q    Where the wall did not fail.  But for       12:28
 6   the part of the wall that failed, the levee
 7   wasn't left, was it?
 8        MR. RAFFMAN:  Objection.
 9        THE WITNESS:  Well, part of the levee was
```

```
10   left.  The photographs clearly show it.  Early        12:28
11   after the passage of the storm, a segment of the
12   levee close to the main bow section in the South
13   Breach had been shoved out in front of it like a
14   bulldozer pushing out part of dirt soil.
15   BY MR. SEYMOUR:                                         12:28
16        Q    And there's a part of the levee where
17   the wall is absolutely flat and there is no
18   amount of earth left?
19        A    Exactly.  It's been washed away by the
20   hydraulic action.                                      12:28
21        Q    How did you get a higher margin of error
22   where you've got levee left to test for shear
23   strength than you do in an area in which the
24   levee has been washed away?
25        A    Well, because in the area where the          12:29
0103
 1   levee was washed away, we had tests before
 2   Katrina.  Those tests were performed at the time
 3   of the design and, hence, we can go back there,
 4   if we're worried about what is exactly at that
 5   point, corroborate what we think was there before     12:29
 6   the storm, based on available soil testing data,
 7   to give us insight to what was actually there at
 8   the time of Katrina.  So that soil information is
 9   there only because we made tests before the
10   storm.  The same is true on these other areas         12:29
11   that we studied.
12        Q    Did you have soil boring information for
13   the specific area that was washed away?
14        A    Yeah.
15        Q    Old soil boring information?                 12:29
16        A    Yes.
17        Q    And did you have soil boring information
18   for the parts of Reach 2 where the flood wall
19   failed?
20        A    Yes.                                          12:30
21        Q    So that's the same?
22             You've got soil boring information, and
23   I'm still trying to understand why you can have a
24   higher -- so much higher a margin of error where
25   the levee is still standing than you do at the        12:30
0104
 1   area of the greatest breach where the levee was
 2   washed away.
 3        MR. RAFFMAN:  Objection.
 4        THE WITNESS:  First of all, the margin of
 5   error being quoted here is the margin of error        12:30
 6   associated with the breaching, not the "not
 7   breaching."  That's step 1.
 8             Step 2, I explained that for the earth
 9   and flood protection structures that it had
10   breached on Reach 2, their performance mechanics      12:30
11   is decidedly different, therefore involved
```

```
12   decidedly different soil and
13   oceanographic/hydrodynamic parameters than those
14   at the North and South Breaches at the Lower 9th
15   Ward.                                              12:31
16          So that if the mechanics are different,
17   the uncertainties have to be different.
18   BY MR. SEYMOUR:
19      Q    You've got a theory of under-seepage
20   being increased because of sand-filled borrow      12:31
21   pits; is that a fair description?
22      A    The under-seepage is in response to a
23   number of elements.  The sand-filled borrow pits
24   associated with the MR-GO lock expansion project
25   adjacent to the Lower 9th Ward and the East Bank   12:31
0105
 1   Industrial Area Site-Clearing, we think those
 2   were important contributing elements to the
 3   seepage.  The seepage, however, was a potential
 4   conduit already there naturally, because when we
 5   built the Lower 9th Ward, we built it on top       12:32
 6   of a series of highly organic swamps and marshes.
 7          Those materials are buried, they're
 8   highly water conductive.  So that when you match
 9   the sand-filled borrow pits with this conductive
10   layer, you now have a recipe for high likelihood   12:32
11   of seepage-induced failure.
12      Q    You referred before to triangulation in
13   trying to reach a consensus to the other
14   researchers.  Isn't it a fact that the
15   Interagency Performance Evaluation Team disagrees  12:32
16   with your conclusion, or conversely, that you
17   disagree with their conclusion?
18      A    Conclusion regarding what?
19      Q    Whether under-seepage was a problem.
20      A    The independent --                         12:32
21      Q    Interagency, is that the word?
22      A    I think you're beginning to be able to
23   read my mind and that's delightful.  I want to be
24   sure I had the right group.  The Independent
25   Levee or the Interagency Performance Task Force.   12:33
0106
 1      Q    I understand and share the problem.
 2      A    Thank you.
 3          The Interagency Performance Task Force
 4   arrives at the same conclusion that we arrived at
 5   concerning the North and South Breaches.  That     12:33
 6   is, it was a global lateral instability issue
 7   that's responsible for the breaches.  Both of us
 8   have concluded that the ING 4727 barge played no
 9   role in those breaches.  The United States Army
10   Interagency Performance Task Force contributes     12:34
11   the breaching mechanics primarily to global
12   lateral stability at both locations.
13          Our analysis says that at the North
```

```
14    Breach, there were two competing horses in this
15    photo-finish horse race.  One was under-base          12:34
16    seepage resulting in a blowout loss of stability,
17    and at the same time a loss of global lateral
18    stability.
19            So we killed that breaches with two
20    bullets at the same time.  They only needed one.      12:34
21            When we go to the South Breach, we both
22    conclude that the primary instability mechanics
23    were tied up with global lateral stability
24    seepage; in their view it played no important
25    role, in our view it did play an important role       12:35
0107
 1    because it helped us explain why the breaches
 2    happened where they did.
 3        Q    Are you aware -- well, you're aware
 4    of Dr. Reed Mosher, aren't you?
 5        A    Yes.                                          12:35
 6        Q    You're aware that he was the head of the
 7    Interagency Performance Evaluation Team?
 8        A    That is an incorrect positioning of
 9    Dr. Mosher.
10        Q    He was the head of the part dealing with    12:35
11    the failure of the levees?
12        A    That's correct.  Dr./Professor Ed Link
13    had the Interagency Performance Evaluation Task
14    Force.
15        Q    Are you aware that Dr. Mosher has            12:35
16    testified in this case that they did not perform
17    any forensic investigation as to whether the
18    barge played a causative role in the collapse
19    of the flood walls at either breach?
20        MR. RAFFMAN:  Objection.                          12:36
21        THE WITNESS:  Please repeat your question.
22            (Record read as follows:
23            Question:  Are you aware that
24            Dr. Mosher has testified in this
25            case that they did not perform any            12:36
0108
 1            forensic investigation as to
 2            whether the barge played a
 3            causative role in the collapse
 4            of the flood walls at either
 5            breach?)                                      12:36
 6        THE WITNESS:  No, I am not.  I have not
 7    reviewed Dr. Mosher's testimony nor observed the
 8    videotape from that testimony.
 9    BY MR. SEYMOUR:
10        Q    Are you aware whether officials called      12:36
11    by the government in the Robinson case disagreed
12    with your theory of under-seepage as being a
13    causative element?
14        A    I find that question difficult to answer
15    until you specify which expert at what time.         12:37
```

```
16      Q    Are you aware of whether any of the
17  government's experts so testified?
18      MR. RAFFMAN:  With respect to the Inner
19  Harbor Navigation Canal dispute?
20      MR. SEYMOUR:  Yes.                                    12:37
21      MR. RAFFMAN:  All right.
22      THE WITNESS:  No, I'm not aware.
23  BY MR. SEYMOUR:
24      Q    Would you please refresh me on when it
25  was that you were first contacted to become an           12:37
0109
1  expert in the Mississippi River-Gulf Outlet
2  litigation?
3      A    Approximately May 1st, 2007.
4      Q    And all of the Independent Levee
5  Investigation Team work had been done by that            12:38
6  point, hadn't it?
7      A    Correct.
8      Q    May we know what you're reading from?
9      A    A document I sent to Mark Raffman dated
10  July 24th, 2009.  Subject:  Rule 26 expert              12:38
11  disclosures, legal proceedings, expert consulting
12  during past five years.
13      Q    May I see that?  Thank you.
14      A    You can have it.
15      Q    Thank you.                                       12:38
16      MR. SEYMOUR:  I ask the reporter to mark this
17  as Exhibit 10.
18      (Exhibit 10 marked for identification.)
19      MR. SEYMOUR:  Off the record.
20      THE VIDEOGRAPHER:  The time is 12:40 p.m.,           12:39
21  and we are off the record.
22      (Luncheon recess was taken from 12:40 p.m. to
23  2:17 p.m.)
24
25                                                            02:16
0110
1                    AFTERNOON SESSION
2                    (2:17 p.m.)
3      THE VIDEOGRAPHER.  The time is 2:17 p.m., and
4  we are back on the record.
5  BY MR. SEYMOUR:                                            02:17
6      Q    Dr. Bea, I'd like to ask you some
7  questions that are in your report.  If you look
8  at Exhibit 1 and turn to page 9.
9      A    Yes.
10      Q    In the very last line of the page, you          02:17
11  say that with respect to the Independent Levee
12  Investigation Team, you finally received, quote,
13  permission, close quote, from the Army Corps or
14  Engineers.
15          Why is the word "permission" in quotes?          02:17
16      A    Because the Corps had told us that we
17  needed their permission to access the breach
```

```
18   sites.  We found this unusual.  And to draw
19   attention to that unusual requirement, I put it
20   in single quotation marks.                          02:18
21        Q    When you saw the breach sites, it was
22   after Hurricane Rita had already passed, hadn't
23   it?
24        A    Yes.
25        Q    And what remediation work did you see    02:18
0111
 1   along the east side of the Inner Harbor
 2   Navigational Canal when you did your first visit?
 3        A    We saw the defensive berm that the Corps
 4   had put in place in attempt to reestablish flood
 5   protection following Hurricane Katrina.             02:19
 6        Q    Did you see alterations made in the
 7   specific areas that you wished to look at --
 8        A    Yes.
 9        Q    -- other than trying to close up some
10   of the gaps so they wouldn't re-flood?              02:19
11        A    Yes, we did.
12        Q    What did you see?
13        A    Well, for example, to facilitate the
14   construction of the repair berm on the Industrial
15   Canal side of the flood wall at the South Breach,   02:19
16   they had constructed a rock earthen access ramp.
17   That ramp went over part of the breach site.
18        Q    Did any of those interfere, in a way
19   that you regarded as significant, with your
20   ability to observe the conditions?                  02:19
21        A    Well, for example, this rock earthen
22   ramp buried under a panel that we would have
23   liked to have seen directly, so we couldn't see.
24   In other cases, the protective berm itself had
25   filled mysterious holes that we could not tell      02:20
0112
 1   what was the characteristics of those holes.
 2   They were also obliterated.
 3        Q    Were these holes filled by the areas
 4   of wall that were still standing or by the areas
 5   of wall that had fallen?                            02:20
 6        A    By the fallen walls.
 7        Q    Were they numerous?
 8        A    Yes.
 9        Q    Was it possible for you to tell what
10   they had been like before?                          02:20
11        A    At this point in time, meaning in the
12   early days of the excavation, we didn't have that
13   knowledge.  But as the forensic engineering
14   studies unfold, we do have the knowledge of how
15   the holes got where they were, what the backfill    02:21
16   material had been in many instances.
17        Q    How did you get that knowledge?
18        A    Reviewing documentation, for example,
19   that was provided as part of the U.S. Army Corps
```

```
20      of Engineers, East Bank Industrial Area          02:21
21      Site-Clearing Project.  These are multiple
22      reports written by the Washington Group
23      International.
24          Q    And WGI was working with the Corps while
25      they were doing this?                             02:22
0113
 1          A    That's correct.
 2          Q    And did WGI record what those holes --
 3      what had been in those holes before they were
 4      filled?
 5          A    In some cases they did because they took  02:22
 6      very detailed photographs of the history of the
 7      important excavations.  So you could see what was
 8      being brought out of the holes, visually, from
 9      this photographic documentation.  In some cases,
10      they had reasonably detailed information as to    02:22
11      the nature of material that was being taken out.
12      In those cases it was focused on highly polluted
13      materials.
14          Q    Highly polluted?
15          A    Highly polluted, correct.                02:22
16          Q    Did they take any sand out?
17          A    Please be more specific of where you're
18      referring to to help me answer your question.
19          Q    Before they filled these holes, was
20      there any record of their having taken sand out   02:23
21      of any of these holes?
22          A    Yes.
23          Q    And where was the sand?
24          A    Well, my focus and my attention in this
25      were primarily two sites:  The Boland Marine site 02:23
0114
 1      to the north, that's adjacent to the North
 2      Breach, and the Saucier Marine site that spans
 3      the South Breach location.
 4          Q    Do you have a map of the area in
 5      Appendix C --                                     02:24
 6          A    Yes.
 7          Q    -- which is Exhibit 4 to the
 8      deposition?
 9          I believe it's on page -- well, the low
10      40s.  There's a map on page 41 from 1996, and     02:24
11      then later maps, 2002 on page 42, 2005 on page
12      43, and post-Katrina and before Rita on page 44.
13          Which map is the easiest to tell?
14          The one on page 41?
15          A    The easiest map --                       02:24
16          Q    The easiest to tell where these things
17      came from or these sand --
18          A    The easiest to tell are Figures 19A and
19      19B, pages 27 and 28.
20          Q    Okay.  That makes it pretty easy to      02:25
21      tell.
```

22        Now, how do you tell from this figure?
23     A    Well, the figure identifies with those
24   white circle numbers, it identifies specific
25   excavations that were made in that area in the        02:25
0115
1   course of clearing the site.  Those numbers tie
2   to characterizations of those specific locations,
3   and those numbers are then tied to the specific
4   photographic documentation of the activities
5   concerned with those excavations.                      02:25
6      Q    Could you read the numbers on your copy?
7      A    In general.  On 1, 2, 9, 10, 11, 19.  So
8   you can read them on the original documentation.
9   Due to the digitization of the graphic, they are
10   much more legible.  The report from which this        02:26
11   figure was taken is referenced in a legend
12   citation of the figure.
13     Q    All right.  I think a magnifying glass
14   would be able to do it.
15        Are the numbers that you mentioned the           02:26
16   numbers where the sand was taken out?
17     A    Well, various materials were involved
18   with various locations.  So I would have to trace
19   the number to the location to then determine
20   whether or not it was sand or other kinds of          02:27
21   materials.
22     Q    If I were the person that wanted to find
23   out where the sand was being taken out, where, in
24   here, would I look to get the numbers that
25   correspond to these locations?                        02:27
0116
1      A    You could not.  You would have to trace,
2   from this figure, to the Washington Group
3   reference 2005 report.  You would then have to
4   trace, from that report, to the photographic
5   documentation that accompanies that report to         02:27
6   each of those specific sites.
7        I have given you examples of that
8   photographic information in this expert report.
9      Q    Okay.  Would the WGI information, like
10   WGI 2005, is going to be in your Reliance            02:27
11   materials?
12     A    Yes.
13     Q    Do you remember which disc?  There are
14   22 of them.
15     A    No.  My memory is not that good.               02:28
16     Q    And would the photograph that goes along
17   with that also be in the Reliance materials?
18     A    Certainly.
19     Q    I'll do the hunting then.
20        And then would your answers be the same          02:28
21   for the map on page 28?
22     A    Correct.
23        One other element I would offer is some

```
24    of these excavation holes were not backfilled.
25    For example, where they were excavating a pile,        02:28
0117
 1    pull it from the ground, there was no formal
 2    documentation of any backfill put into those
 3    holes.
 4       Q     Were they just left as holes?
 5       A     In some cases we think they were.  In         02:28
 6    other cases we think there may have been surface
 7    material put over the holes to prevent people,
 8    animals, from falling into the holes.
 9       Q     On page 29 there's a copy of a WGI
10    photograph from 2005, excavation for soil borrow        02:29
11    pit adjacent to flood wall.
12            Your report states -- your report of one
13    of your attachments, one of the many things
14    you've written, states that there was some kind
15    of lining that was put in the borrow pits that         02:29
16    made them not of concern for under-seepage?
17       A     Correct.
18       Q     What kind of lining was that?
19       A     Clay.
20       Q     Clay.  Can you see any evidence of a          02:29
21    clay lining in this?
22       A     Yes.
23       Q     And where is it?
24       A     And it shows up at the -- in the figure
25    as a darker material being put -- do you see the        02:29
0118
 1    bottom of the excavation with the tread marks
 2    from the bulldozers?
 3            Look to the right in the shaded area and
 4    in color it's much better.  There's a dark
 5    material there.  That's imported clay that they         02:30
 6    are putting into the site of this particular
 7    excavation.
 8            They made a great -- or they paid a
 9    great deal of attention to this excavation
10    because the Corps of Engineers were concerned          02:30
11    with the proximity of the excavation to the flood
12    wall and the underlying negative materials,
13    because this excavation was going to be
14    subsequently flooded by water from the Industrial
15    Canal.                                                  02:30
16       Q     Do we know when in 2005 this photograph
17    was taken?
18       A     The when is connected to that
19    identification number, shown at the bottom left-
20    hand corner of the photograph, and maintained all      02:31
21    of the legend.  That number connects you with a
22    specific location and date.
23       Q     The number 222110904-05?
24       A     Yes.
25       Q     Are you familiar enough with the              02:31
```

```
0119
 1    numbering system to know whether this means it
 2    was taken on September 4, 2005?
 3         A    No, I'm not.  But that sounds plausible.
 4         Q    Now, if this was -- picture was in fact
 5    taken after Hurricane Katrina, that protection          02:32
 6    against water getting in close to the wall would
 7    have been absent?
 8         A    Well, this photograph was taken before
 9    Hurricane Katrina.  The work was concluded by,
10    essentially, March-April of 2005.                       02:32
11         Q    So that is not going to be September 4,
12    2005, then?
13         A    That's correct.
14         Q    Do you know the thickness of that clay
15    coating on the side of the borrow pit?                  02:32
16         A    Not to any quotable, definitive
17    thickness.  We can only get each from the
18    photographic evidence and the approval of the
19    lining by the U.S. Army Corps of Engineers
20    inspectors.                                             02:33
21         Q    Do you know whether the forces of
22    Katrina washed out what was in that borrow pit?
23         A    The information that we have, following
24    Hurricane Katrina, of this location indicates
25    that the materials there before are the materials      02:33
0120
 1    there after.  There were no significant signs of
 2    disturbance in this area.
 3         Q    If you look on page 43 of Appendix C and
 4    then compare it with page 44 of Appendix C.  Both
 5    of those show the borrow pit as being completely       02:34
 6    underwater; was that the plan?
 7         A    Yes.  The plan for the site clearing.
 8    They were using materials excavated from this
 9    area to fill other excavations on the East Bank
10    Industrial Area.                                        02:34
11         Q    Do you know if anyone looked underneath
12    the water to find out whether that layer of clay
13    was still there doing anything to seal the thing
14    off or had it failed?
15         A    When?                                         02:34
16         Q    After Katrina.
17         A    I have no knowledge that anyone looked
18    under the water, after Katrina, to determine if
19    that clay layer was still there.
20         Q    Is your answer the same for after          02:34
21    Hurricane Rita?
22         A    Correct.
23         Q    And to the present day?
24         A    I think that's correct.
25         Q    If you turn to page 11 of your report.      02:35
0121
 1    And this comes up on several other locations that
```

```
 2    I just would like to ask you a couple questions
 3    now and have done with it.
 4             In your experience, how often does
 5    overtopping lead to flood wall failure, just          02:35
 6    based on your experience in New Orleans?
 7         MR. RAFFMAN:  Objection.
 8         THE WITNESS:  I will attempt to answer your
 9    complex answering -- or your question is complex
10    to answer in a short way.                             02:36
11             There were many instances of flood walls
12    overtopped in New Orleans that did not fail in
13    the sense of opening a breach.  But those flood
14    walls did fail in the sense of significant final
15    plastic inclination deformation.  That's another     02:36
16    form of failure.
17             In almost all cases where the flood
18    walls experienced significant overtopping and
19    development of a trench on the back side, and I'm
20    referring to I-walls, those flood walls             02:37
21    subsequently had to be either repaired or
22    replaced, they were no longer suitable for
23    continued service in that condition.
24             In many cases they breached and those
25    turned into some of the most damaging breaches       02:37
0122
 1    that we investigated that infected the flood
 2    protection system for the greater New Orleans
 3    area.
 4    BY MR. SEYMOUR:
 5         Q    I want to be sure that I understand your    02:37
 6    terms.  You referred to a wall becoming plastic
 7    and developing.  Do you mean it started to lean?
 8         A    Yes.
 9         Q    Isn't it true that even though it's not
10    good to have a leaning wall, a leaning wall is        02:38
11    obviously not as strong as a wall that's
12    vertical, it can still keep the water out?
13         A    Yes.  That's why I had to carefully
14    define failure.
15         Q    If you turn to page 13 of your report.      02:38
16    And we come again to this language about
17    suggesting that because the demonstrated impact
18    of the barge with flood wall at the southern end
19    of the breach was at the extreme end, that impact
20    was not the cause of the breach and failure.         02:38
21             And I'm not sure whether we are the same
22    generation or not, but do you remember playing a
23    children's game in which you lean cards against
24    each other, sometimes making a very long wall
25    that's held up only by the cards leaning against     02:39
0123
 1    each other?
 2         A    No.
 3         Q    Have you ever heard or seen such a
```

```
 4  thing?
 5      A    No.                                        02:39
 6      Q    Does it strike you as reasonable that
 7  when you have such a wall of weakly balanced
 8  forces, any tap anywhere brings the whole thing
 9  down?
10      A    Yes.  That would be called a domino        02:39
11  effect.
12      Q    And flood walls in fact are a balancing
13  act, aren't they?
14      A    No.
15      Q    You've got forces that are trying to       02:39
16  keep the wall upright, the back side earth trying
17  to keep the thing stable; you've got the water
18  that's trying to push the wall forward; and even
19  though the water is at flood stage, as long as
20  you have a balance the wall does not fail; is      02:39
21  that right?
22      MR. RAFFMAN:  Objection.
23      THE WITNESS:  That will depend on the
24  specifics of the scenario that you're
25  constructing.                                       02:40
0124
 1          The difference between the imposed
 2  forces at the time of your scenario and the
 3  resistance -- resisting forces, there's a factor
 4  of safety that the engineer explicitly introduces
 5  into the process to make the resisting forces      02:40
 6  significantly greater than the imposed
 7  destabilizing forces.
 8  BY MR. SEYMOUR:
 9      Q    You want to have some comfort zone?
10      A    Exactly.  Called a margin of quality.      02:40
11      Q    In this case, isn't it true that there
12  is a substantial variation in the calculated
13  margin of safety, or safety factors?
14      MR. RAFFMAN:  Objection.
15      THE WITNESS:  Could you be more specific in     02:40
16  your question, whose and where and what?
17  BY MR. SEYMOUR:
18      Q    Well, did your Independent Levee
19  Investigation Team calculate factors of safety?
20      A    Yes.                                        02:41
21      Q    Were your calculations showing the same
22  result for the Inner Harbor Navigational Canal
23  that the Corps of Engineers calculations did?
24      A    In some cases, yes.
25      Q    And in some cases not?                      02:41
0125
 1      A    Correct.
 2      Q    And Dr. Marino calculated different
 3  factors of safety than either of you?
 4      A    Yes.
 5      Q    Did the Team Louisiana calculate factors   02:41
```

```
 6   of safety?
 7       A    Not really.  Team Louisiana devoted most
 8   of their work to characterization of the
 9   Hurricane Katrina meteorological/oceanographic/
10   hydrodynamic characteristics to characterizations    02:41
11   based chiefly on visual observation and design
12   drawings.  A few are not detailed forensic
13   engineering quantitative analyses of the
14   breaches.
15           They collected some eyewitness              02:42
16   information and stop clock information, and then
17   were able to answer the questions posed in their
18   investigation by the Louisiana Department of
19   Transportation and Development.
20       Q    Is there anyone else that calculated       02:42
21   safety factors for the Inner Harbor Navigational
22   Canal's east wall, that you're aware of?
23       A    There are the factors of safety for the
24   Inner Harbor Navigation Canal flood walls
25   computed by the Interagency Performance             02:43
0126
 1   Evaluation Task Force, by the Independent Levee
 2   Investigation Team, Phase I, and by the
 3   Independent Levee Investigation Team, Phase II,
 4   and a subsequent series of analyses of those
 5   factors which other experts have calculated.        02:43
 6       Q    Isn't it correct that those calculations
 7   of safety factors depend upon determinations
 8   of what the underlying soil is?
 9       A    Yes.
10       Q    And there are not always borings           02:44
11   available to show that information, are there?
12       MR. RAFFMAN:  Objection.
13       THE WITNESS:  In the areas of investigation
14   that we participated in here -- for example, at
15   the Lower 9th Ward -- there were borings            02:44
16   available.  And when we felt, during the
17   investigation, that there was not sufficient
18   geotechnical information, we performed additional
19   soil borings and in situ soil tests.
20   BY MR. SEYMOUR:                                     02:44
21       Q    Did the Independent Levee Investigation
22   Team perform those borings themselves or did they
23   team up with Washington Group International, or
24   some other groups, to do the borings?
25       A    The Independent Levee Investigation        02:45
0127
 1   Team, during the Phase I studies, took a portion
 2   of the funds provided by the National Science
 3   Foundation and we subcontracted the work to Soil
 4   Testing Engineers-Louisiana, they performed the
 5   borings and in situ test under our supervision.     02:45
 6       Q    Dr. Mosher testified in this case that
 7   he thought that the Cone Penetrometer Tests were
```

```
 8    much more reliable than the soil borings.  Do you
 9    have a position on that?
10         A    Yes, I do.  It depends on what you're        02:45
11    attempting to characterize in this process.  The
12    Cone Penetrometer Test, as its name describes, is
13    simply the pushing of a probe, under known force,
14    and the probe has known geometric
15    characteristics, and you're sensing the            02:46
16    resistance of the soil.
17              For example, that resistance versus
18    depth characterization can be very, very useful
19    in giving you definitive information on the types
20    of soil and on the layering of the soil            02:46
21    subsurface.
22              There are several additional steps that
23    are required to take that information and begin
24    to do some important soil behavior
25    characteristics.  So it's good for some things.     02:46
0128
 1              Other types of testing laboratories, for
 2    example, can be used to provide other insights
 3    into other soil characteristics that the Cone
 4    Penetrometer Test can't provide.
 5         Q    The specific purpose for which he was      02:47
 6    testifying about the superiority, as he saw it,
 7    of the Cone Penetrometer Test, was for purposes
 8    of determining shear strength in calculating
 9    factors of safety.
10         A    Okay.                                      02:47
11         Q    Would you agree with him, that it's
12    superior for that purpose?
13         A    No, I would not.
14         Q    Why would that be?
15         A    Well, the cone penetration test, as I      02:47
16    described, essentially gives you one measurement
17    and that's resistance.  You then have to take the
18    geometric characteristics of the cone, and the
19    rate at which it's being pushed into the soil, to
20    reach a deduction concerning the soil's peak        02:48
21    shear strength.
22              Soil has many different strengths that
23    are a function of the strain imposed on the soil
24    that bring it both to its peak and after its
25    peak.                                               02:48
0129
 1              The cone penetration test, for example,
 2    can't tell you anything about the pre-peak
 3    strength nor about the post-peak strength.  Both
 4    of those strengths figure importantly in a
 5    forensic engineering analysis of the performance   02:48
 6    of earthen structures.
 7         Q    Are you aware that -- withdraw that.
 8              My recollection from going through
 9    Volume 5 of the Interagency Performance
```

```
10    Evaluation Team of volume, was that there were        02:49
11    only a small number of Cone Penetrometer Tests in
12    the Inner Harbor Navigational Canal on the east
13    side.  The number I'm thinking of is four but I
14    may be off by one or two.
15            Does that sound within the same ballpark      02:49
16    as your recollection?
17        MR. RAFFMAN:  Objection.
18        THE WITNESS:  For the independent evaluation
19    task force, sounds reasonable.  But that's not
20    reasonable for the total because we gathered          02:49
21    additional soils' information that they did not
22    access or integrate into their work.
23    BY MR. SEYMOUR:
24        Q    Did you do Cone Penetrometer Tests?
25        A    Yes.                                          02:49
0130
 1        Q    How many did you do?
 2        A    That information is documented in my
 3    expert report.  I will attempt to recollect in
 4    the area of the North and South Breaches.
 5            In the area of the North Breach, my            02:50
 6    recollection is it was four.  In the area of the
 7    South Breach, five.
 8        Q    You mentioned before that there was an
 9    earthen ramp that covered over part of the area
10    that you would like to see.  Was that at the          02:50
11    North Breach or the South Breach?
12        A    South Breach.
13        Q    What was the width?
14        A    The width of a normal size dump truck.
15    It would be the normal width of one lane of a         02:51
16    highway, for example.
17        Q    And that was the width at the top; what
18    about the base?
19        A    Same there.  They had constructed as
20    narrow a roadway as could serve -- safely             02:51
21    transport the trucks to the top to deposit
22    materials and then turn those trucks around and
23    bring them back into the interior of the Lower
24    9th Ward.
25        Q    Was the material being deposited on the       02:51
0131
 1    site of the old levee or somewhere else?
 2        A    Well, it was being deposited both on the
 3    site of the old levee, outside of the old levee
 4    and in front of the old levee.
 5            Most of the material was being deposited       02:51
 6    outside of the old levee, and that was a
 7    temporary flood protection berm that the Corps
 8    initiated building after Hurricane Katrina.  It
 9    re-failed in Hurricane Rita.
10            So they were busy at the time we got           02:52
11    there reconstructing the defensive berm.
```

```
12      Q     On page 13, paragraph 2, you're quoting
13 here from the Independent Levee Investigative
14 Team.
15      A     You're referring to Exhibit 1?              02:52
16      Q     Exhibit 1, page 13, first paragraph,
17 quoting from the Outlet report.  Actually, if you
18 look at paragraph 2, you notice that it says that
19 there are other modes of failure that would have
20 been expected to fail this section without any     02:53
21 need for help from the barge.
22      MR. RAFFMAN:  Page 13?
23      THE WITNESS:  Okay.  I'm prepared to answer
24 your question.  Please repeat it.
25 BY MR. SEYMOUR:                                     02:53
0132
 1      Q     Just, do you see that language?
 2      A     Please repeat your question.
 3      Q     Okay.  On paragraph 2, in the middle
 4 of the paragraph, do you see it says that there
 5 are other modes of failure that would have been   02:53
 6 expected to fail this section without any need
 7 for help from the barge?
 8      A     Yes.  I underlined that section.
 9      Q     And then if you turn to page 16, in
10 Exhibit 1, and look at the carryover paragraph.    02:54
11      A     Please repeat your developing question
12 relative to page 16.
13      Q     It's the carryover paragraph, the
14 penultimate sentence states:  Finally,
15 geo-forensic studies clearly show that this        02:55
16 section would have failed without barge impact.
17      A     I am reading this and it reads:
18 Finally, as described later, geo-forensic studies
19 performed, as part of our investigation, showed
20 that this section would have been expected to      02:55
21 fail without barge impact.
22      Q     You're two paragraphs below.  Right up
23 at the top of the page, the carryover paragraph.
24      A     Start me again, please.
25      Q     Finally, geo-forensic studies clearly    02:55
0133
 1 show that this section would have failed --
 2      A     Yes, I see that.
 3      Q     -- without barge impact.
 4      I would like to know what the difference
 5 is when you say on one page that a section would   02:55
 6 have been expected to fail, which is one level
 7 of hypothetical intensity.  And when you say,
 8 clearly shows that the section would have failed,
 9 it sounds a lot more emphatic.
10      A     This means we have learned more.        02:56
11      Q     Between page 13 and page 16?
12      A     Correct.  And that's because additional
13 time has transpired, additional information has
```

14    been gathered, and this is reflecting the
15    additional surety with which that conclusion was          02:56
16    being drawn.
17         Q    On page 13, that's a 2006 -- May 14,
18    2006, final draft report?
19         A    Correct.
20         Q    And on page 16, it is a May 2008 report.        02:57
21         A    Correct.  That -- it was not a report.
22    It was a series of peer-reviewed journal
23    publication papers that detailed the additional
24    forensic engineering studies.
25         Q    In paragraph 28, also on page 16, we            02:57
0134
1    have a comparable sentence, but again it reverts
2    to the "would have been expected to fail without
3    barge impact."  That was the sentence you read by
4    mistake before but we are now up to it.
5         A    Yes.                                             02:57
6         Q    So that goes back to the weaker form
7    of putting it, but it's also from the same 2008
8    paper that Professor Seed, et al, were
9    presenting.  I don't understand what the
10    difference is in what you knew within the same         02:58
11    paper.
12         A    Nothing.  There's no differences, as you
13    stated.  The emphasis with which those words are
14    different, are different in that way that you
15    have cited.  The information base is the same.         02:58
16    The emphasis with which it's stated is different.
17         Q    Can we agree that a scientific
18    conclusion is not made stronger simply because
19    the adverbs are stronger?
20         A    It, of course, depends on the adverbs          02:58
21    involved.
22         Q    As a scientific matter, how is it
23    possible to conclude that a given section of
24    flood wall would clearly have failed when an
25    adjoining section of flood wall did not fail?          02:59
0135
1         A    If the forensic engineer has evaluated,
2    and a good one does, two adjacent sections, one
3    of which failed and the other of which didn't
4    fail, it's incumbent on the forensic engineer to
5    be able to explain both in a reasonable,               02:59
6    logical -- reasonably unambiguous way.
7              In fact, we attempted to do that in
8    these cases.  One of the cases you were
9    interested, concerned the excavations adjacent to
10    the flood wall between the North and South            03:00
11    Breaches.
12              The Industrial Canal had been allowed to
13    flood that area, following when they opened up
14    the borrow pit.  And one of the questions we had
15    was:  Well, if that area is open, and open to the     03:00

```
16   water, why didn't it fail before, or instead
17   of, the south bridge?
18          The clay lining, that you were
19   developing questions about, proved to us the
20   answer to that question.  The water could not        03:01
21   penetrate early to those underlining layers and
22   the flood wall did not fail there.  Meanwhile, it
23   failed at the adjacent section to the south.
24      Q    Isn't it true that different types
25   of clay have very different properties in terms      03:01
0136
1    of how permeable they are to water?
2       A    In general, that is not a correct
3    statement.
4           Clay refers to a size of fraction of
5    soil.  There are different kinds of minerals that    03:01
6    make up those small fractions, montmorillonite,
7    kaolinite, for example, which make up that small
8    fraction.
9           Once we're in a fraction of material,
10   whether it's montmorillonite or kaolinite, has no    03:02
11   demonstrable effect on things like picture
12   strength or permeability.  Permeability is a
13   function of the void ratio of the material.
14          If these two different enterology clays
15   have the same void ratio, they have essentially      03:02
16   the same permeability.
17      Q    Are you aware that in the Interagency
18   Performance Evaluation Team report, Volume No. 5
19   of the IPET report, they distinguish between fat
20   and other clays, and say that fat clays are much     03:02
21   more permeable to water than other clays?
22      A    Yes, I'm aware of that.
23      Q    Do you disagree with them?
24      A    I have some disagreement.  And the
25   disagreement is we discovered that in several        03:03
0137
1    very important cases soils were being
2    characterized as being fat clay when they
3    contained very significant fractions of silt and
4    sand.
5           The interesting thing was, you couldn't       03:03
6    look at the soil boring until -- or the soil
7    boring log, and tell whether or not it was truly
8    fat clay because that soil boring log represents
9    a drawing characterization done by a human.
10          You had to access the detailed                03:03
11   laboratory testing to find out that that fat clay
12   contained very significant amounts of sand and
13   silt.  That additional piece of information tells
14   the forensic engineer the permeability of those
15   two materials are very, very different.              03:04
16      Q    How do we know what kind of soil was
17   actually being put in to line the borrow pit?
```

```
18      A    Other than the observations that I
19 referred to, and other than the information --
20 additional information that Dr. Marino developed     03:04
21 and described in his expert report, you don't
22 know.
23           You have to be able to take samples
24 of one type or another, or have such samples and
25 correlate them with in situ testing to be able to   03:05
0138
1 deduce what's actually there.
2       Q    Was any boring taken of that lining?
3       A    That's a very interesting question that
4 I have not yet had time to investigate, because
5 it involves the additional soil cores that were     03:05
6 identified by Dr. Marino in his expert report.
7           The original Reliance information did
8 not include that important soil characterization
9 testing information.  Later, Reliance production
10 has produced that information.  I have not had      03:06
11 time, to this point in time, to use that
12 additional information to answer your question
13 concerning characteristics of that liner
14 material.
15      Q    Is it your understanding that Dr. Marino  03:06
16 had found some boring that included the lining
17 of that borrow pit?
18      A    Potentially, he has located soil
19 information that would give us insight into that
20 lining.  Not having been able to access that        03:06
21 information, to this point in time, I don't know
22 whether or not it actually did.
23      Q    So you mean you have the information but
24 you haven't had the time?
25      A    Correct.                                   03:06
0139
1       Q    And I gather that the Independent Levee
2 Investigation Team did not do any boring that
3 included the lining?
4       A    Correct.
5       Q    At the bottom of page 16, it states:  In  03:07
6 the end, it is our investigation conclusion that
7 a fully definitive determination cannot be made
8 between the multiple available competing
9 potential failure mechanisms at this site, based
10 solely on these conventional geotechnical           03:07
11 analyses.
12           Doesn't that same sentence apply equally
13 to the barge?
14      A    No.
15      Q    Why not?                                   03:07
16      A    It's not included in the horse race
17 that's being referenced here.
18      Q    I understood that you took it out of the
19 horse race.  But isn't it --
```

```
20      A    No.  It eliminated itself from the horse        03:07
21  race.
22      Q    Let me finish my question.
23      A    Okay.  I'm sorry.  My apologies.
24      Q    I understand that you blocked it at the
25  starting gate from being your horse race.                03:07
0140
 1         But since you have not done that kind of
 2  forensic analysis of the barge that we talked
 3  about earlier, isn't it true that you cannot be
 4  any more definite about the barge than you are
 5  about these other things?                                03:08
 6      MR. RAFFMAN:  Objection.
 7      THE WITNESS:  No, that's not so.
 8  BY MR. SEYMOUR:
 9      Q    Why not?
10      A    The geo-forensic analyses, uncertainties       03:08
11  that are being reflected on here, pertain to
12  three highly plausible mechanisms contributing to
13  the reference failure.  Information factors
14  of safety were very close to each other.  All
15  three of those plausible mechanisms indicate that       03:08
16  the barge was not involved in the development
17  of the breaches.
18         It happens independent of the barge, and
19  it happens before, plausibly, the barge can
20  arrive.  And they have the signature that               03:09
21  indicates when the barge did arrive that the
22  barge was able to do the local damage at the
23  south end of the South Breach, enter the 9th Ward
24  in deep water on the protected side, float over
25  the top of the school bus that I described before       03:09
0141
 1  our break today, and come to rest.  And that led
 2  to the observation that the barge was a victim,
 3  not a cause.
 4      Q    And as we discussed this morning,
 5  doesn't that depend upon the accuracy of the            03:10
 6  information about the surface level wind speeds
 7  and the motion of the water --
 8      MR. RAFFMAN:  Objection.  Go ahead.
 9      MR. SEYMOUR:  -- and whether the barge was
10  adrift much earlier than your report thinks it          03:10
11  was adrift?
12      THE WITNESS:  Certainly those factors
13  Are important to consider.  But if the flood wall
14  itself shows no signature at that time, that
15  primary play by the barge in the formation of the       03:10
16  breach, then it doesn't figure prominently in
17  drawing conclusions.
18  BY MR. SEYMOUR:
19      Q    I don't want to repeat all the
20  conversation that we had earlier about the barge        03:10
21  banging against the flood wall and making the
```

```
22   thing lean and causing these other mechanisms to
23   operate more quickly.  But -- so let me go on.
24           At the bottom of page 17, you're
25   quoting, now, work that you've done in              03:11
0142
1    litigation?
2        A    Correct.
3        Q    And you published some of this
4    litigation work in the Electronic Journal of
5    Geotechnical Engineering?                          03:11
6        A    In the American Society of Civil
7    Engineering's Journal of Geotechnical
8    Engineering, correct.
9        Q    Is that who publishes the Electronic
10   Journal?                                           03:11
11       A    No.  Those are two different
12   peer-reviewed journals and two different
13   professional organizations.
14       Q    Well, the only one here in paragraph 29
15   that's mentioned is the Electronic Journal.        03:11
16       A    Correct.
17       Q    Who publishes that?
18       A    A group formed at the University of
19   Oklahoma.  The professional editor is
20   Dr./Professor Meter Oner.  O-n-e-r.  He has an     03:12
21   editorial board and a publication review board
22   that handles peer review of the journal articles
23   that are published under that society.
24       Q    Directing your attention to the second
25   paragraph of the quotation, where you have         03:12
0143
1    allotted times.
2        A    Yes.
3        Q    The North Breach initiated before the
4    wall was overtopped (about 5:00 a.m.) with the
5    breach fully developing between 6:00 and 7:00.     03:12
6    And then you cite references 5, 7, 9, 10 and 11,
7    and figure 7.
8            How do I find references 5, 7, 9, 10 and
9    11, or is that something you could only know if
10   you had the litigation document in front of you?   03:13
11       A    No.  The quotation is from the paper,
12   the published paper.  If you had the published
13   paper, and you do because I supplied it, you go
14   to the reference list in the publication paper
15   and you can identify all of the necessary details  03:13
16   associated with the references you cited, and in
17   addition find figure 7.
18       Q    Do these references refer to papers that
19   you've written or papers that others have
20   written, do you remember?                          03:13
21       A    I would have to consult the article
22   before I could respond definitively.
23       Q    When you were doing your work in the
```

```
24   Mississippi River-Gulf Outlet litigation and the
25   Robinson litigation, were you relying upon the          03:14
0144
 1   work that was done by other experts retained by
 2   the plaintiffs in that case?
 3        A    Oh, certainly.
 4        Q    Were these times that are set forth at
 5   the bottom of page 17, and there are other             03:14
 6   specific times in the pages following, based upon
 7   the work that other experts had done in that
 8   case?
 9        A    Well, they were based on the timing that
10   we had identified as of the date of this              03:14
11   publication.
12        Q    If you relied on the testimony of other
13   experts in the Robinson and the Mississippi
14   River-Gulf outlet cases as to the time when
15   breaches developed and surges occurred, and so        03:15
16   forth, are you publishing articles with different
17   times in them in this Electronic Journal or other
18   publications?
19        MR. RAFFMAN:  Objection, mischaracterizes
20   prior testimony.                                       03:15
21        MR. SEYMOUR:  I'm asking the question.
22        THE WITNESS:  I find your question
23   confusing.  Would you reframe your question?
24   BY MR. SEYMOUR:
25        Q    I'll be happy to break it down.  And I       03:15
0145
 1   think it's good and clear.
 2             As you said, in the litigation for the
 3   Mississippi River-Gulf Outlet and Robinson, you
 4   relied upon the work of other experts?
 5        A    Yes.                                          03:15
 6        Q    And did that include the times when
 7   surges occurred, the time when peak levels
 8   occurred?
 9        A    In some cases, yes.
10        Q    And when you published an article in the     03:15
11   Electronic Journal of Geotechnical Engineering,
12   at the same time that you're doing this work, are
13   you using different times?
14        A    In some cases, yes.  If our analysis
15   of the available data indicates a different           03:16
16   timing, that's what we have to publish under our
17   name and provide the associated information that
18   justifies those times.
19        Q    This electronic journal was published in
20   November of 2008, and you gave depositions both       03:16
21   before and after that date, didn't you?
22        A    Correct.
23        Q    When you gave a deposition in one of
24   those cases after the article had appeared, which
25   tile did you use?                                      03:16
```

```
0146
 1        MR. RAFFMAN:  Objection.
 2        THE WITNESS:  Which deposition and which time
 3   are you referring to?
 4   BY MR. SEYMOUR:
 5        Q    A deposition after the publication          03:17
 6   of this article.
 7        A    In some cases the answer is yes.  And,
 8   in fact, there's a sequence paper to this paper
 9   in the same Journal of Electronic Geotechnical
10   Engineering where we not only did two-dimensional    03:17
11   seepage analyses, we did three-dimensional
12   seepage analyses that indicate intensification
13   of the seepage effect and earlier onset of
14   hydraulic failure.
15             So the timing change in response to the    03:17
16   information available at the time, the time is
17   quoted.
18        Q    And if you give a deposition, talking
19   about some of these same topics, after the
20   journal article is published, do you testify --      03:18
21   did you testify in your deposition about what was
22   in the journal article or what the other experts
23   had concluded?
24        MR. RAFFMAN:  Objection.
25        THE WITNESS:  Well, in fact it could be          03:18
0147
 1   different, either of those two.  If, in this
 2   question that you've asked, we have done
 3   additional analytical work that says a revision
 4   in a timing is appropriate, we made the
 5   additional -- or we made the change in the           03:18
 6   timing.
 7        MR. SEYMOUR:  I ask the reporter to mark as
 8   Exhibit 11 a passage from the Robinson trial
 9   testimony of Dr. Bea at pages 1099 and 1100
10        (Exhibit 11 marked for identification.)         03:19
11   BY MR. SEYMOUR:
12        Q    If you would please take a look on Page
13   1099, starting at line 22.
14             The question is, quote:  I want to ask
15   you if you have opinions that overlap those          03:19
16   of other experts, and we are not going to have
17   you opine on those, but have you in fact relied
18   upon conclusions reached by other members of the
19   Katrina expert team with regard to the MRGO's
20   effect on the environment --                         03:20
21             And then you cut him off and said:
22   Certainly.
23             Then he continued his question.
24             -- and habitat and topography of the
25   area?                                                03:20
0148
 1             And you said:  Correct.
```

```
 2            Then on line 5 on page 1100, he asked:
 3      Secondly, have you relied upon the conclusions
 4      of members of the plaintiffs' expert team on what
 5      oceanographic stresses were created by those         03:20
 6      defects during Katrina?
 7            And the answer is:  Correct.
 8            And then beginning on line 9, the
 9      question is asked, quote:  And have you also
10      accepted the opinions and figures of the             03:20
11      plaintiffs' experts with regard to surge waves,
12      time of onset of overtopping or breaching, the
13      rate of overtopping and the duration of
14      overtopping?
15            And the answer was:  Yes.                       03:20
16      A    Yes.
17      Q    What happened if you reached a different
18      conclusion in your journal articles we have been
19      talking about than the other experts have reached
20      in the litigation?                                    03:21
21            It doesn't say anything here about your
22      reaching independent conclusions based upon
23      research you've done on journal articles.
24      MR. RAFFMAN:  Objection to the question.  I
25      think it mischaracterizes what was written as it     03:21
0149
 1      relates to what the testimony is.
 2      MR. SEYMOUR:  Please answer.
 3      THE WITNESS:  Please repeat your question.
 4            (Record read as follows:  What
 5             happened if you reached a                      03:21
 6             different conclusion in your
 7             journal articles we have been
 8             talking about than the other
 9             experts have reached in the
10             litigation?                                    03:21
11                It doesn't say anything here
12             about your reaching independent
13             conclusions based upon research
14             you've done on journal articles.)
15      THE WITNESS:  Well, that's correct.                  03:22
16      BY: MR. SEYMOUR:
17      Q    I asked you what you did, so you tell me
18      that's correct.
19      A    In which case?
20      Q    What did you do?                                03:22
21      A    In which case?
22            The MR-GO Reach 2 case where we are
23      discussing oceanographic information,
24      hydrodynamic information, which served as input
25      to our analyses, or are you referring to the         03:22
0150
 1      forensic engineering analyses of development at
 2      the breaches at the Lower 9th Ward?
 3            Both of those are mixed into your
```

```
 4   question, as I understand it.  Which are you
 5   asking about?                                        03:23
 6       Q    I continue to ask about the language
 7   that was on Page 1099 where we had very specific
 8   times --
 9       A    Right.
10       Q    -- for when those -- the peak levels        03:23
11   were obtained, for example.
12            And on page 1100 of the testimony, we
13   have got the surge waves, time of onset of
14   overtopping or breaching, the rate of
15   overtopping, duration of overtopping.  Those are     03:23
16   things -- those are the things that I'm talking
17   about; the times, the durations and so forth.
18            You're doing your own research and
19   you're testifying that you're relying upon what
20   the other experts are saying.  What if there's a     03:23
21   disagreement?
22       MR. RAFFMAN:  Objection.
23       THE WITNESS:  The potential conflict that you
24   have cited is not present.  The testimony here
25   you're referring to, in the case of Robinson, I      03:24
0151
 1   did no independent oceanographic/hydrodynamic
 2   analysis work.  I had to rely on other experts
 3   for those input characterizations.
 4            And as the testimony shows, I took those
 5   at face value, based on the background that those    03:24
 6   experts had been -- had provided, as input into
 7   the analytical work that I did subsequently.
 8   BY MR. SEYMOUR:
 9       Q    On page 17 of your report setting forth
10   this article, you say:  For example, Overtopping     03:24
11   started about 6:00 a.m., referring to the South
12   Breach.  Did you derive that figure, or did an
13   expert in the MR-GO or Robinson litigation derive
14   that figure?
15       MR. RAFFMAN:  Objection.  It would be --         03:25
16       MR. SEYMOUR:  Don't coach him, please.
17       MR. RAFFMAN:  Trust me, I'm not trying to
18   coach him.
19            I would like to cut through the Gordian
20   knot of misunderstanding, but I will remain          03:25
21   silent.
22       MR. SEYMOUR:  How do we tell?  I appreciate
23   that.
24       THE WITNESS:  Please repeat your question.
25   BY MR. SEYMOUR:                                      03:25
0152
 1       Q    On page 17 of your report, it says, in
 2   the fifth line from the bottom of the page,
 3   referring to the South Breach, overtopping
 4   started about 6:00 a.m.  And on page 1100 of your
 5   testimony in the Robinson case it says that you      03:25
```

```
 6    relied on the opinions and figures of the
 7    plaintiffs' experts with regards to the time
 8    of onset of overtopping, among other things.
 9         MR. RAFFMAN:  I will -- go ahead and ask your
10    question.                                                03:26
11         Objection.
12         THE WITNESS:  The latter case that you are
13    referring to concerns overtopping of Reach 2
14    earthen flood protection structures during
15    Hurricane Katrina.  This is referring to the             03:26
16    onset of overtopping at the Lower 9th Ward  Inner
17    Harbor Navigation Canal location.
18         The overtopping that is being referenced
19    here is that associated with the mean water level
20    reference to the undisturbed on pre-Katrina              03:26
21    elevation of the flood wall at this location.
22    BY MR. SEYMOUR:
23    Q    If you look on Page 1099 of the
24    testimony, you're referring to Reach 1 in the
25    Industrial Canal on line 7 and 8.  And then it          03:27
0153
 1    talks about, on line 10, excavation at the East
 2    Bank Industrial Area for the MR-GO lock expansion
 3    project.  Isn't that the Inner Harbor
 4    Navigational Canal lock expansion project?
 5    A    Please repeat your question.  I've            03:27
 6    caught up with where you're reading.
 7    Q    I was directing your attention to the
 8    reference to the Industrial Canal and Reach 1 on
 9    line 7 and 8.  And directing your attention to
10    the -- what's said here, the MR-GO lock expansion       03:28
11    project and I -- on lines 10 and 11.  And I've
12    asked you immediately, is that the lock expansion
13    project on the Inner Harbor Navigational Canal?
14         MR. RAFFMAN:  I'll object to a line of
15    questions that doesn't include questions.               03:28
16         MR. SEYMOUR:  I asked him, is that.
17         THE WITNESS:  Yes.
18         MR. RAFFMAN:  I'll object to a partial
19    transcript that doesn't include the question that
20    elicited the answer that's being quoted.               03:28
21         MR. SEYMOUR:  I can show that on my screen.
22    But moving on.
23         The discussion here on Page 1099 and
24    1100 refers to Reach 1 in the Inner Harbor
25    Navigational Canal, not Reach 2.  And it still          03:28
0154
 1    says that -- on page 1100, that you're relying on
 2    the views of other experts with respect to the
 3    time of onset of overtopping.
 4         MR. RAFFMAN:  Objection.  He's told you what
 5    1100 refers to.  You've misquoted his testimony.        03:29
 6         THE WITNESS:  The premise of your statement
 7    question is not correct.
```

```
 8            The general questioning at this stage
 9    regards the effect of MR-GO, Reach 2 and Reach 1,
10    with regard to hydrodynamic oceanographic          03:29
11    characterizations.
12    BY MR. SEYMOUR:
13        Q    Do you see on Page 1099 -- excuse me --
14    on page 1100, lines 10 and 11, time of onset
15    of overtopping?                                     03:29
16        A    Yes.
17        Q    And do you see on page 17 of your
18    report, overtopping started about 6:00 a.m.
19            My question is a very simple one.  Does
20    this time of 6:00 a.m. reflect your own            03:29
21    independent analysis or does it reflect the
22    opinions and work of the other experts in the
23    Robinson and MR-GO cases?
24        MR. RAFFMAN:  I'll object to the preamble.
25            Answer the question.                        03:30
0155
 1        THE WITNESS:  The 6:00 a.m. represents my
 2    best estimate of the time of surge overtopping at
 3    the time this paper was written.
 4    BY MR. SEYMOUR:
 5        Q    And does your own best estimate reflect  03:30
 6    the work of the other experts, or do you stand
 7    independently on that?
 8        A    Oh, no.  I'm trying to take into account
 9    input from the other experts that are cited in
10    these references you have identified.               03:30
11        Q    Did you do your own personal work to
12    come up with the 6:00 a.m. figure --
13        A    Yes.
14        Q    -- or did you take their figure?
15        A    I did my own personal work.               03:31
16        MR. SEYMOUR::  Okay.  I understand we are
17    about to run out of the tape, so let's take a
18    break.
19        THE VIDEOGRAPHER:  This the end of Tape No. 2
20    in the deposition of Dr. Robert Bea.  The time is  03:31
21    3:31 p.m. and we are off the record.
22        (Recess taken from 3:31 p.m. to 3:43 p.m.)
23        THE VIDEOGRAPHER:  This marks the beginning
24    of Disc No. 3 in the deposition of Dr. Robert
25    Bea.  The time is 3:43 p.m. and we are back on     03:42
0156
 1    the record.
 2    BY MR. SEYMOUR:
 3        Q    Please turn to Exhibit 1, your report,
 4    page 17, down toward the bottom.
 5        A    Yes.                                       03:43
 6        Q    I would like to point out some of the
 7    language.  There are several pieces of language I
 8    want to point out.  There will be a question at
 9    the end.
```

```
10      A    Okay.                                    03:43
11      Q    At the bottom of page 17, you say it can
12  take several hours for flood wall or levee
13  breaches to fully develop.  Does that mean that
14  sometimes it takes several hours and sometimes
15  it's shorter?                                     03:43
16      A    Correct.
17      Q    At the top of page 18 it says,
18  development of a breach is most often a
19  progressive process.  Does that mean sometimes it
20  is not a progressive process involving multiple   03:43
21  factors?
22      A    Correct.
23      Q    On line 4, it refers to the seepage will
24  take time to develop significant water conduits
25  and weaken or remove soil.  Is there any range of 03:44
0157
 1  time in which this happens or is it too
 2  uncertain?
 3      MR. RAFFMAN:  Objection.
 4      THE WITNESS:  It will depend upon the
 5  specific geologic, geotechnical and hydrodynamic  03:44
 6  conditions.  There's no generalization possible.
 7  BY MR. SEYMOUR:
 8      Q    A little further down it says, that in
 9  response to these effects there can be associated
10  movement of a supporting levee.  That means it    03:44
11  starts to lean?
12      MR. RAFFMAN:  Objection.
13      THE WITNESS:  Leans, displace, more
14  importantly.
15  BY MR. SEYMOUR:                                   03:44
16      Q    That means it could also move side to
17  side?
18      A    Yes.
19      Q    Then these movements can open the
20  vertical joints.  Sometimes it opens the vertical 03:45
21  joints and sometimes it doesn't?
22      A    Correct.
23      Q    Into the carryover paragraph, water
24  flowing through the water stops and sheet piling
25  interlocks can act to erode the supporting soil   03:45
0158
 1  levee.
 2      A    Correct.
 3      Q    Does it sometimes not so act?
 4      A    Correct.
 5      Q    How is that possible?                    03:45
 6      A    If the water velocity is not high
 7  enough, and if the levee is composed of highly
 8  cohesive, potentially armored, soil material,
 9  there would be insignificant erosion.
10      Q    In the next paragraph, the first full    03:45
11  paragraph on page 18, it says, flooding can be
```

```
12   initiated with the combination of water coming
13   under the levee and through the open water
14   stops.  I take it that sometimes it's not
15   initiated that way?                                03:45
16        A    Correct.
17        Q    Next paragraph.  There can be similar
18   developments when the progressive failure process
19   is initiated by, or accompanied by, overtopping
20   and sometimes different developments occur?        03:46
21        A    Correct.
22        Q    What kind of different developments?
23        A    There could be a case where you had a
24   significant failure mode initiating the breaching
25   that doesn't involve overtopping.                  03:46
0159
 1             Similarly, you could have overtopping,
 2   you have absence of other causative mechanisms
 3   and there's no breaching.
 4        Q    In the next sentence it says,
 5   overtopping a levee or flood wall can lead to       03:46
 6   erosion on the back or protected side.  Sometimes
 7   it does not lead to erosion?
 8        A    Correct.
 9        Q    What would prevent it leading to erosion
10   on the back side?                                   03:46
11        A    Concrete.  Paving.
12        Q    But does it then start to erode at the
13   end of the concrete?
14        A    It would depend on the width of the
15   concrete apron and its geometric shape.             03:47
16        Q    Third line from the bottom, it says that
17   erosion can act to remove supporting soils and
18   sometimes it does not.
19        A    Correct.
20        Q    Is that when you've got the concrete      03:47
21   apron?
22        A    Or a very erosion-resistant soil with
23   intense vegetative covering.
24        Q    Then on page 19 it says, if the erosion
25   process removes enough of the supporting soils.     03:47
0160
 1   So I take it sometimes it doesn't?
 2        A    Correct.
 3        Q    And it says, the flood wall supporting
 4   sheet piling projected the lateral forces from
 5   the water can tip over, but sometimes it            03:47
 6   doesn't.
 7        A    Correct.
 8        Q    The overtopping mechanisms can interact
 9   with the previously discussed mechanisms and
10   sometimes they don't?                               03:47
11        A    Correct.
12        Q    Then down at the last paragraph on the
13   page, these observations and analytical results
```

14    clearly show that the EBIA excavations and marsh
15    permeabilities played key roles in the hydraulic          03:48
16    behavior and instability of the breaches along
17    the east levee of the IHNC Lower 9th Ward.
18             Now, I've counted 14 uncertainties in
19    the paragraphs leading up to that, from which the
20    conclusion is, it clearly shows something.  Can          03:48
21    you explain that?
22        A    Well, not knowing what 14 things that
23    you've counted up are the logic of your synthesis
24    of the 14, I can't possibly answer that question.
25        Q    They are the same ones identified in 14         03:48
0161
1     questions about what these various uncertainties
2     were.  There were 14 of them.
3         A    I will be more than happy to answer your
4     question if you can summarize for me the 14
5     factors and how you want me to respond to your           03:49
6     analysis and synthesis of those 14 factors.
7         Q    The 14 -- we're at -- it can take
8     several hours for the breaches to fully develop.
9     It's most often, but not always, a progressive
10    process.  It will take time, but the time is not         03:49
11    known.  There can be associated movements, but
12    sometimes they are not.  It can open the vertical
13    joints, and sometimes not.  It can act to erode
14    the supporting soil levee, and sometimes not.
15    Flooding can be initiated with the combination,          03:49
16    and sometimes not.  There can be similar
17    developments, and sometimes not.  Overtopping can
18    lead to erosion, but sometimes not.  Erosion can
19    act to remove supporting soils, but sometimes
20    not.  If the erosion process removes enough, then        03:49
21    it can tip over, the flood wall and supporting
22    sheet piling can tip over, and sometimes not.
23    The overtopping mechanisms can interact, but
24    sometimes not.  And all these clearly show.
25             You see my problem?                             03:50
0162
1         A    And that's because you're making a leap
2     between a set of generalizations concerning
3     potential failure modes and their interaction to
4     a conclusion that is specifically examining the
5     effect of the features you cite in the                   03:50
6     conclusion.  There's no direct link between the
7     two.
8              These are the uncertainties that a
9     forensic engineer has to work through to
10    understand the formation and development of             03:50
11    breaches, the 14 factors that you cited.
12        Q    At the top of page 20, you refer to
13    modelling using a two-dimensional finite element
14    in limit equilibrium analysis.  Is that generally
15    accepted as a standard within your professional?        03:51

```
16      A    Yes.
17      Q    Is there any treatise, or learned
18 article, that discusses the use of that
19 particular type of analysis?
20      A    Many.                                    03:51
21      Q    Is there any disagreement over the
22 propriety of using that type of analysis?
23      A    Yes.
24      Q    And please describe the disagreement.
25      A    The disagreement concerns what the      03:51
0163
1  analysis is used to conclude.  Limit equilibrium,
2  as those terms imply, is searching for conditions
3  in which you're at the point where the demand
4  forces equal the resisting forces.  Such analysis
5  does not give you information on displacement,     03:52
6  deformations and movements.
7       Q    You have a number of references that are
8  cited at the end of the report itself, on pages
9  67 through 70.
10           Are there any treatises, or scholarly   03:52
11 articles, that discuss this particular type
12 of analysis listed among these references?
13      A    Yes.
14      Q    Can you direct me to a couple?
15      A    The first one would be American Society 03:53
16 of Civil Engineers, 2006 External Review Panel,
17 Progress Report Nos. 1, 2 and 3.
18      Q    That should be enough because it's going
19 to have other citations in it, I assume.
20      A    And there are others that are cited      03:53
21 here.
22      Q    Could you name just one more?
23           Would Guidelines for Failure
24 Investigation be one of them, the first item in
25 your references?                                   03:53
0164
1       A    No, not for limit equilibrium analysis.
2            Another good one it references and
3  discusses there would be the Interagency
4  Performance Evaluation Task Force reports cited
5  here as 2007.                                      03:54
6       Q    Would that be Volume 5 or Volume 2?
7       A    Volume 5.
8            Another --
9       Q    That's enough.  That's enough.
10      A    Okay.                                    03:54
11      Q    On page 20, first full paragraph, line
12 4, you refer to previous analyses, not including
13 the effect of the very deep excavations along the
14 EBIA during the early 1990s.  How deep?
15      A    I don't find the section you are --      03:55
16      Q    Page 20.
17      A    Exhibit 1?
```

```
18      Q     Yes.  Page 20.
19      A     20.  I thought you said 28.
20            Please repeat your question.                03:55
21      Q     First full paragraph, line 4.  Previous
22  analyses did not include the effect of the very
23  deep excavations that took place along the EBIA
24  during the 1990s.  I just want to know how deep.
25      A     25 to 35 feet.                              03:55
0165
1       Q     The next paragraph on the page says, the
2   seepage analyses show that pore pressures develop
3   quickly and near-steady state conditions are
4   reached within less than 30 hours of the
5   initiation of the surge starting on August 28,     03:56
6   2005.  When did the surge start?
7       A     That's when we started the analysis,
8   approximately 10:00 p.m. on August the 28th,
9   2005.
10      Q     That would be Central Daylight Time?       03:56
11      A     Correct.  All times that I reference are
12  Central Daylight Time.  All elevations are cited
13  on NAVD, all cap letters, 88.
14      Q     In the second sentence of that paragraph
15  it says, calculated pore pressures and hydraulic    03:56
16  radiant that was in 20 percent to 30 percent of
17  those computed for hypothetical steady state at
18  the water elevation at time of failure.
19            Is it possible to put that in language
20  that I might understand?                            03:57
21      A     Sure.  There are two ways you can
22  perform a seepage analysis.  One way is to put
23  the water level at a given elevation and compute
24  what the soil on pore pressure characteristics
25  would be at time infinity, which means at a very    03:57
0166
1   long time the soil reaches so-called steady
2   state, which means the pressures won't change.
3       Q     They are saturated?
4       A     Well, the soil could be saturated or
5   partially saturated.  What the analysis is         03:57
6   reflecting is for the prescribed water level in
7   other conditions, there will be no future changes
8   in those water pressure characteristics.
9             The other way to perform the analysis is
10  a transient seepage analysis, which doesn't         03:58
11  presume steady state, but moves over a long
12  period of time how water pressure is changing
13  until you reach that prescribed water elevation.
14            We performed both types of seepage
15  analysis.                                           03:58
16      Q     In the third line, where it says that
17  the calculated pore pressures and hydraulic
18  radiants are within 20 to 30 percent, does that
19  mean that's the variation between the two methods
```

```
20  of calculating it?                               03:58
21      A    Yes.
22      Q    A little further down the page it
23  says -- uses the phrase, results from recent
24  studies.  Which studies?
25      A    There were studies -- and I should have  03:59
0167
 1  cited them specifically for you here -- but they
 2  are cited specifically in the reference that is
 3  quoted here:  Study two-dimensional versus
 4  three-dimensional seepage analyses for
 5  excavations placed adjacent to levee flood wall   03:59
 6  systems.
 7          It was a result from those analyses that
 8  precipitated our studies of three-dimensional
 9  seepage effects.
10      Q    And that's -- those are listed in the    03:59
11  references at the end?  You don't need to look at
12  it right now.  You know that?
13      A    Yes, they are there.
14      Q    Page 21, middle paragraph.  You're
15  referring in this paragraph, as I understand it,
16  to the Independent Levee Investigation Team 2006  04:00
17  report, and the Interagency Performance
18  Evaluation Team 2007 report, in saying the main
19  differences between them are the recognition
20  of the presence of the EBIA excavations in the    04:00
21  transient seepage model.
22          And stopping right there.  That would be
23  ILIT's recognition, not the IPET's recognition?
24      MR. RAFFMAN:  Objection.
25      THE WITNESS:  The differences --             04:00
0168
 1  BY MR. SEYMOUR:
 2      Q    Actually, excuse me.  Your study right
 3  there is different from those other two studies?
 4      A    That's correct.
 5      Q    Okay.  And you're saying that your study  04:01
 6  is different because it recognized these things?
 7      A    That's correct.
 8      Q    What is a water head?
 9      A    It's an elevation of water reference to
10  a particular point.  You take the elevation, or   04:01
11  this distance, multiply it times the effective
12  unit weight of water and calculate a pressure
13  head.
14      Q    What does it mean, then, when it says,
15  transporting water heads directly to the back     04:01
16  of the sheet pile?
17      A    It means that whatever is happening on
18  the flood side of the sheet pile is being
19  reflected on the protected side of the sheet
20  pile, directly and instantaneously.              04:01
21      Q    Same elevation?
```

22      A      Yeah.
23      Q      And the phrase, a percentage of the
24 steady state pressures are developed within the
25 system, what does that mean?                      04:02
0169
1       A      Well, it means the previously discussed
2 thing of transient versus steady state now are
3 reflecting to the entire range of soil geometry
4 conditions that we studied and are the subject
5 of this quotation.                                04:02
6       Q      So a transient state is much closer to
7 the steady state --
8       A      Correct.
9       Q      -- with this analysis?
10      A      Correct.                              04:02
11      Q      It may take a while but I'm trying to
12 get there.
13      A      You're there.
14      Q      The last paragraph on page 21 talks
15 about the breaches being influenced in major ways  04:03
16 by the EBIA excavations performed for the lock
17 expansion project.  Is it all of the EBIA
18 excavations or only some of them?
19      A      Some.  I'm referring to the breaches.
20 So it would be the excavations in the vicinity     04:03
21 of the North and South Breaches.
22      Q      Could you direct me to a map that shows
23 which ones had this effect and which ones did
24 not?
25      A      We looked at that map earlier today in  04:04
0170
1 Appendix C.
2       Q      Okay.
3       A      It was the two illustrations extracted
4 from the Washington Group International report
5 detailing excavations at the Boland marine site    04:04
6 adjacent to the North Breach and the Saucier site
7 adjacent to the South Breach.
8       Q      And I can find it by looking at the WGI
9 backup and the relevant Reliance materials?
10      A      Yes, sir.                              04:04
11      Q      Good enough.
12              On page 24 of your report, it states in
13 line 4 that the -- well, lines 2 to 4-- the
14 adverse effects of the MR-GO Reach 2 flood
15 protection facilities added 4 to 12 feet of        04:05
16 additional flood water in the Lower 9th Ward.
17 And you're citing Wit, et al, 2008, and that's
18 one of the references.  Is Mr., or Dr., Wit one
19 of the experts in the Robinson or MR-GO cases?
20      A      Yes.                                   04:05
21      Q      Do you have any source other than --
22 I'll call him Dr. Wit.  I don't know --
23      A      He is a doctor.

```
24      Q    Do you have any source, other than
25   Dr. Wit, for this information?                        04:05
0171
 1      A    Yes.
 2      Q    Who?
 3      A    The Interagency Performance Evaluation
 4   Task Force also examined this question and their
 5   oceanography developed other characterizations       04:06
 6   of the contribution of the flooding.
 7      Q    Did you do any work yourself on this
 8   question?
 9      A    Which question?
10      Q    Whether the MR-GO Reach 2 water added 4      04:06
11   to 12 feet of additional flood water in the Lower
12   9th Ward?
13      A    No, I didn't.
14      Q    Do you recall having testified in the
15   Robinson case that something like 88 percent to      04:06
16   90 percent -- maybe it's 80 percent to 90
17   percent -- of the flood water in the Lower 9th
18   Ward came from Reach 2?
19      A    Correct.
20      Q    Did you do any work of your own to lead      04:07
21   you to that figure or were you relying on
22   Dr. Wit?
23      A    Relying on Dr. Wit, Professor Vrijling
24   and the cited experts in that testimony.
25      Q    Did you ever look at the deposits of         04:07
0172
 1   marsh grass?
 2      A    Where?  When?
 3      Q    West of Paris Road.  Excuse me.
 4           East of Paris Road versus west of Paris
 5   Road.                                                 04:07
 6           Did marsh grass ever come up?
 7      A    Did marsh grass ever come up from the
 8   bottom or in discussions?
 9      Q    You have nailed me, and justly so, with
10   that one.  Let me rephrase the question.  It's       04:08
11   getting late in the day.
12      A    And I don't recall there's any marsh
13   grass to the west of Paris Road but there is
14   marsh grass to the east of Paris Road.  And, yes,
15   I have examined the vegetation in that area.         04:08
16      Q    Has it ever come to your attention that
17   uprooted marsh grass was deposited generally
18   through the flooded areas west of Paris Road, and
19   that it just is not seen -- excuse me -- east of
20   Paris Road, and is generally not seen west of        04:08
21   Paris Road?
22      A    In which folder are you referring, New
23   Orleans East, St. Bernard?
24      Q    Only in the area that we say was flooded
25   by the Inner Harbor Navigational Canal, which is     04:09
```

```
0173
 1    from the canal itself through the Lower 9th Ward
 2    and covering St. Bernard Parish up to Paris
 3    Road.
 4        A    And if you would, now that you've
 5    oriented me geographically, please repeat your        04:09
 6    question.
 7        Q    Did it ever come to your attention that
 8    there were deposits of uprooted marsh grass
 9    generally throughout the flooded parts of
10    St. Bernard Parish east of Paris Road but not in     04:09
11    the Lower 9th Ward and not in the parts of
12    St. Bernard Parish west of Paris Road?
13        A    Correct.  Yes, it did.  And we observed
14    that ourselves.
15        Q    Did that provide any information that       04:09
16    you considered useful in determining where the
17    flood water came from?
18        A    No, not really.  It just provided some
19    interesting insight into where the drifting marsh
20    grass stopped.                                       04:10
21        Q    Did it ever come to your attention that
22    there were eyewitnesses who saw water coming only
23    from the Inner Harbor Navigational Canal, the
24    direction of New Orleans, eyewitnesses in
25    St. Bernard Parish, until relatively late in the     04:10
0174
 1    morning, which is going to be different for
 2    different locations, before the first water from
 3    Reach 2 reached them?
 4        MR. RAFFMAN:  Objection.
 5        You can answer.                                  04:10
 6        THE WITNESS:  Could you specify for me what
 7    location and how early in the morning?
 8    BY MR. SEYMOUR:
 9        Q    St. Bernard Courthouse.
10        A    Okay.                                       04:10
11        Q    Did you ever see the videotape showing
12    the water coming in the direction from which it
13    was coming?
14        A    Yes.  That was shown to me by Sheriff
15    Jack Stephens.                                       04:10
16        Q    Did you draw any conclusions from that
17    as to the source of the flood water?
18        A    No.
19        Q    Is there a reason for that?
20        A    Sure.  I was relying on other experts       04:11
21    whose area of expertise was understanding sources
22    and timing of flood water.  That was not an area
23    of my forensic engineering work or studies.
24        Q    Which particular experts were you
25    relying on?                                          04:11
0175
 1        A    Primarily the experts from the
```

```
 2   Netherlands.  We can collectively identify them
 3   as represented by Dr./Professor Vrijling.
 4        Q    I think that's V-r-i-j-l-i-n-g?
 5        A    Vrijling.                                   04:11
 6        Q    And is Dr. Wit also from the
 7   Netherlands?
 8        A    Yes.  He works with Dr. Vrijling.
 9        Q    Did either of them ever discuss with
10   you, or in your presence, why they were drawing    04:11
11   the conclusions that they were drawing as to the
12   source of the flood water and 88 to 90 percent
13   of it coming from --
14        A    Yes.
15        Q    -- Reach 2?                                 04:12
16        A    Yes, they did.
17        Q    And what did they say?
18        A    Well, they were relating the results
19   from their engineering analyses of the flooding.
20        Q    Did they give any explanation?             04:12
21        A    Well, the explanation to how the
22   modelling had been developed, how it had been
23   validated and uncertainties that they had with
24   regard to those results.
25        Q    On page 24 of your report, paragraph 32,   04:12
0176
 1   the last sentence states that the cumulative
 2   adverse effects, speaking of the Mississippi
 3   River-Gulf Outlet, were primary causes of the
 4   breaching of man-made flood protection structures
 5   in the vicinity of the Mississippi River-Gulf      04:13
 6   Outlet.
 7             Does the government agree with that?
 8        A    No.
 9        Q    Page 26, paragraph 35.  What is a wave
10   regeneration basin?                                 04:13
11        A    A good example would be if you have been
12   to a beach, waves are propagating in toward the
13   beach.  Frequently there's an offshore sandbar.
14   The waves will break on the sandbar.  And then
15   another area, if the wind is blowing, the waves     04:14
16   that had broken can be regenerated in that new
17   area.
18             Fishermen who like to fish in coastal
19   areas frequently fish in that intermediate area
20   because the bottom is being stirred, the water is   04:14
21   deeper, fish can swim there; and where fish are
22   fishermen like to be.  So that MR-GO formed as a
23   wave regeneration component.
24        Q    Was the Inner Harbor Navigational Canal
25   too small to be a wave regeneration basin?          04:15
0177
 1        A    Yes.
 2        Q    And is there any wave regeneration basin
 3   anywhere near the Inner Harbor Navigation Canal?
```

```
 4        A    Well, for example, if you would carry
 5   the Inner Harbor Navigation Canal to Lake            04:15
 6   Pontchatrain -- Lake Pontchatrain is itself a
 7   potential wave generation, or regeneration,
 8   basin -- that got a direct connection to the
 9   Inner Harbor Navigation Canal.
10        Q    In paragraph 36, the third line refers     04:15
11   to the loss of levee crest elevation.  Is this
12   for the levees along the Mississippi River-Gulf
13   Outlet or are you including the Inner Harbor
14   Navigation Canal levees in there?
15        MR. RAFFMAN:  Objection.                        04:16
16        THE WITNESS:  What you reference is primarily
17   directed at the Reach 2 levees along the
18   Mississippi River-Gulf Outlet segment adjacent to
19   Lake Borgne and St. Bernard Parish.
20   BY MR. SEYMOUR:                                      04:16
21        Q    On page 27, paragraph 37, you're
22   referring to a deepwater channel that served as a
23   conduit during the storm surge water into
24   St. Bernard Parish, New Orleans East, Inner
25   Harbor Navigation Canals, areas earlier, more        04:16
0178
 1   rapidly, in greater volumes and for a longer time
 2   period than natural vegetation would have
 3   allowed.  Are you referring to water coming in
 4   from Reach 2?
 5        A    Correct.                                   04:17
 6        Q    On page 35, paragraph 40.  In the middle
 7   of the paragraph it says:  This early initiation
 8   and exploitation of the breaches by waves in
 9   rising surge waters -- it's referring to Reach 2
10   of reaches -- explains how hurricane flood waters   04:17
11   were able to penetrate in very large volumes at
12   early times and at Chalmette and St. Bernard
13   Parish.  What is the early time that you're
14   referring to?
15        A    Approximately 8:00 a.m. when significant   04:18
16   water was reported in the central area of
17   St. Bernard Parish.
18        Q    Were you ever involved in a conversation
19   with Dr. Vrijling, or Dr. Wit, in which there was
20   a discussion of the witnesses who saw water         04:18
21   coming from the direction of the Inner Harbor
22   Navigational Canal towards Paris Road instead of
23   the other way around?
24        A    Witnesses located where?
25        Q    Located west of Paris Road in              04:18
0179
 1   St. Bernard Parish.
 2        A    No, I did not.
 3        Q    In paragraph 41, on that same page 35,
 4   you state:  Had the man-made flood protection
 5   structures adjacent to Reach 2 of the Mississippi    04:19
```

```
 6    River-Gulf Outlet been overtopped without
 7    breaching, the Chalmette/St. Bernard Parish area
 8    would not have been flooded by Hurricane Katrina
 9    storm surge waters.
10         Does that assume that there were no           04:19
11    waters flooding Chalmette, and parts of
12    St. Bernard Parish, from the Inner Harbor
13    Navigation Canal?
14         A    Repeat your question.
15         Q    Does the statement in the first sentence  04:19
16    of paragraph 41 assume that there are no flood
17    waters coming into Chalmette and St. Bernard
18    Parish from the Inner Harbor Navigation Canal?
19         A    Yes.
20         Q    On page 39, paragraph 43, third line.     04:20
21    You say on the first line of the paragraph, your
22    fundamental conclusion is the breaches that
23    developed in the man-made flood protection
24    structures adjacent to the Lower 9th Ward during
25    Hurricane Katrina was most probably initiated      04:20
0180
 1    with surge water pressures.
 2         When you say "most probably initiated"
 3    --  I'm not sure quite how to put the question --
 4    but is there a percentage confidence level you
 5    have in mind?  It sounds as if there's an area     04:20
 6    of uncertainty.  Can you quantify it?
 7         A    We have quantified it.
 8         The most probable in the quantifications
 9    that follow this statement indicate that the most
10    probable, also the expected, and also the mean or  04:21
11    average values, are almost the same.
12         The plus or minus of one standard
13    deviation values from the utmost probable mean
14    average expected value is approximately 30
15    percent.                                           04:21
16         Q    If you look on the bottom of page 43, at
17    the end of paragraph 50.  Do you see that you've
18    said that the computed coefficients of variation
19    of the computed factors of safety are in the
20    range of 30 percent to 40 percent?                 04:22
21         A    Correct.
22         Q    Does that, then, also apply to what you
23    say in paragraph 43?
24         A    Where in paragraph 43?
25         Q    The phrase that we were talking about     04:22
0181
 1    before, "most probably initiated."
 2         A    That's correct.
 3         Q    At the bottom of paragraph 44, you say
 4    that the cargo barge ING 4727 found inside the
 5    Lower 9th Ward adjacent to the South Breach after  04:23
 6    Hurricane Katrina entered after the North Breach
 7    and South Breach had fully developed.  Do you
```

```
 8   base that on anything we've not already talked
 9   about in this deposition?
10       A    Yes.                                      04:23
11       Q    What?
12       A    For example, the expert work documented
13   by Mr. Cushing, C-u-s-h-i-n-g, as part of the
14   expert report that has been done on behalf of the
15   defense.                                           04:23
16       Q    Was there any part of Dr. Cushing's
17   report that you found improbable?
18       A    Nothing that I can recall that was
19   significant.
20            Initially, when I reviewed his report, I  04:24
21   was delighted in a positive way with the depth,
22   insight and extent that he developed in his
23   forensic engineering studies.  There were details
24   that I was concerned with, and those details
25   turned out not to be substantiated.  And in one    04:24
0182
 1   case he had it right and I had it wrong.
 2       Q    Is there anything else that you rely on
 3   for that statement that we have not previously
 4   talked about in this deposition?
 5       A    I've relied on the work done by Reda       04:25
 6   Baker.  I relied on his work, as well, to help
 7   triangulate or corroborate the conclusions that I
 8   had reached concerning the geotechnical
 9   engineering performance aspects of the flood
10   wall.                                              04:25
11            I relied on the expert report produced
12   by Dr. Marino in the same context.
13            I relied on and studied the expert
14   report by Mr. Pasos in the same context.
15            These latter reports we have not          04:26
16   discussed in any extensive way.
17       Q    In paragraph 45, on page 41, of your
18   report.  Is it fair to say that you are referring
19   generally to the difficulty of knowing things
20   with certainty when you're doing an                04:26
21   after-the-fact investigation of a catastrophic
22   failure?
23       A    Yes.
24       Q    Is that generally accepted within your
25   field?                                             04:26
0183
 1       A    Yes.
 2       Q    And if I asked you the same questions
 3   about the failure to include the barge, would you
 4   give me the same answers you've given every time
 5   I've asked those questions before?                 04:27
 6       A    Yes.
 7       Q    Actually, that's a sentence, it's not
 8   just that one particular paragraph, but it goes
 9   on to paragraph 51 on page 45, doesn't it?
```

```
10      A    Yes.                                          04:27
11      Q    At the end of paragraph 51 on page 45,
12 you state, quote, I have focused my linguistic
13 terms (e.g., "would or did deveop") on those
14 results of my assessments indicate as 'best
15 estimates,' possessing the highest likelihoods of   04:28
16 occurrence."  Is that correct?
17      A    That's correct.
18      Q    Does that mean that where you say
19 "would" it means could?
20      MR. RAFFMAN:  Objection.                         04:28
21      THE WITNESS:  There are too many potential
22 applications of that question to specifics and
23 I'm unable to respond to that question.
24 BY MR. SEYMOUR:
25      Q    Does this mean that when you say          04:28
0184
 1 "clearly" in the report it means maybe?
 2      MR. RAFFMAN:  Objection.
 3      THE WITNESS:  As I attempt to convey here,
 4 the forensic engineer, as the lawyer does, has to
 5 deal with the wonderful world of uncertainties.     04:29
 6          I, unlike any other expert that I have
 7 encountered during the past four years, have
 8 chosen to deal with these uncertainties
 9 explicitly, tracking them, quantifying them and
10 expressing them.                                     04:29
11          When I have used terms that say, my
12 expert opinion is that this is the most
13 plausible, most probable mechanism or outcome,
14 I'm referring to this most likely result.
15          In addition, I have quantified the          04:29
16 potential error bands around those results to be
17 responsive to the Daubert rate of error
18 requirements.
19      Q    Would it be fair to say that when your
20 report says "clearly," what it really means is,      04:30
21 in my judgment, this is the most plausible?
22      A    Yes.
23      Q    Is there an area of subjective judgment
24 in your quantification of these error bands, like
25 the 30 percent to 40 percent we talked about         04:30
0185
 1 earlier?
 2      A    In all analyses there is a portion that
 3 can be called subjective, there is a portion that
 4 can be called objective.  What I have come to
 5 learn in the process of 56 years of dealing with    04:30
 6 this set of questions concerning of uncertainty,
 7 all are subjective.
 8          Subjective elements in data that is
 9 chosen to be analyzed, how that data is analyzed,
10 and the interpretation of the results from that      04:31
11 data.
```

```
12              Subjective judgment is not a dirty
13    term.  It is an extremely important term, because
14    with that subjectiveness should come true
15    expertise.  And I've tried to be very careful, as      04:31
16    I render expert opinion, to stay within my area
17    of expertise.  Quantify where the subjective
18    elements are, explain how I attempt to validate
19    those subjective judgments with field test data,
20    performance information, other results from other      04:32
21    experts.
22       Q    So the answer to my question is yes?
23       A    Please repeat your question.
24       Q    Was there an element of subjective
25    judgment in setting those error bands?                 04:32
0186
 1       A    Yes.
 2       Q    On page 45 --
 3       A    I apologize for being a professor.
 4       Q    On page 45, paragraphs 52 and 53, we
 5    have these specific times again.  And I wanted to      04:32
 6    know whether you were relying upon the work
 7    of any other expert for those specific times?
 8       A    The answer is, yes, of course.  And
 9    that's because I diligently try not to eliminate
10    any important information from other experts;          04:33
11    that's a signature of my work.
12       Q    And that on page -- is that same true
13    for paragraph 54 on page 48?
14       A    Yes.
15       Q    And is the same true for paragraph --         04:33
16    the times in paragraph 56 on page 50?
17       MR. RAFFMAN:  Objection.  I'm concerned an
18    element of vagueness is creeping into the
19    question.
20              Go ahead and answer.                         04:34
21       MR. SEYMOUR:  We have quashed all vagueness.
22    BY MR. SEYMOUR:
23       Q    I relate it only to time.  Are you
24    relying on other work of other experts as to
25    time?                                                  04:34
0187
 1       A    Yes.
 2       MR. RAFFMAN:  Same objection.
 3    BY MR. SEYMOUR:
 4       Q    On page 51, in paragraph 58, you refer
 5    to differences in the expert opinions documented      04:34
 6    in the Interagency Performance Evaluation Team
 7    investigation, the Team Louisiana investigation,
 8    the Independent Levee Investigation Team
 9    investigation and subsequent studies, and the
10    National Institute of Standards and Technology        04:35
11    investigation.
12              Then you have a sentence:  The
13    primary -- quote, the primary method I've used to
```

```
14   help me neutralize a wide variety -- I think the
15   word "of" should be there -- cognitive biases          04:35
16   that can exert important influences on results
17   from forensic engineering investigations is one
18   I've termed "triangulation."  What cognitive
19   biases are you referring to?
20        A    In the area of social science                04:35
21   psychology, those experts have identified of the
22   order of 20 critically important cognitive
23   biases.
24             For example, hindsight, would I expect
25   to see with what I see?  That's a bias.  That's        04:36
0188
 1   one of the things I was referring to that
 2   influences results.
 3             Another is organizational bias.  I see
 4   what I can see within the constraints provided by
 5   the organizations within which I work.                 04:36
 6             Another is called small sample bias.
 7   That means one point is enough.  I don't need two
 8   data points to draw a valid conclusion.
 9             There's a whole series of these
10   social/cultural biases that enter this challenge.      04:36
11        Q    On page 52, in paragraph 59, referring
12   to the Interagency Performance Evaluation Team,
13   Independent Litigation Investigation Team --
14   Independent Levee Investigation Team, Team
15   Louisiana, NIST, NRC and ASCE.                         04:37
16             Did any of those investigations involve
17   a forensic examination of whether the barge could
18   have caused either the North Breach or the South
19   Breach, or both, or was it simply a process of
20   elimination in coming up with a mechanism that         04:38
21   seemed easy to understand?
22        MR. RAFFMAN:  Objection.
23        THE WITNESS:  All of the studies that I
24   referenced used acceptable forensic engineering
25   processes to arrive at their conclusions.  They        04:38
0189
 1   were different.  They used different processes,
 2   different data and information to arrive at their
 3   conclusions, but they were acceptable forensic
 4   engineering processes.
 5   BY MR. SEYMOUR:                                        04:38
 6        Q    We talked about what the Interagency
 7   Performance Evaluation Team did and did not do,
 8   we talked about what the Independent Levee
 9   Investigation Team did or did not do, we have
10   talked about what Team Louisiana did and did not       04:39
11   do; did the National Institute of Standards and
12   Technology conduct any forensic examination
13   of the role of the barge?
14        A    Yes.
15        Q    In which technical report is that            04:39
```

```
16  captured?
17      A    It's in the one that you referred to
18  this morning that contain the picture of the
19  barge opposite the southern end of the South
20  Breach in the Lower 9th Ward.  The National        04:39
21  Institute of Standards and Technology based their
22  forensic engineering conclusions, as they state
23  in their report, on observations made by
24  experienced engineers at the site of the
25  breaches.  They document the reasons that they     04:39
0190
1   draw their conclusions, and those were the ones
2   you were citing sections from earlier today.
3       Q    And are those dependent upon the
4   information about wind speeds and wind directions
5   of the type that you've relied upon?              04:40
6       MR. RAFFMAN:  Objection.
7       THE WITNESS:  The National Institute of
8   Standards and Technology did not involve their
9   work -- did not involve those kinds of forensic
10  engineering analyses, as they state.              04:40
11  BY MR. SEYMOUR:
12      Q    And did the National Research Council
13  conduct any forensic investigation of the role
14  of the barge?
15      A    They conducted forensic engineering      04:40
16  investigations within the confines that the
17  statement of work that the National Research
18  Council was given by the Department of Defense in
19  behalf of the U.S. Army Corps of Engineers
20  Interagency Performance Evaluation Task Force.     04:41
21      Q    In fact, didn't they tell the Corps
22  of Engineers that they should look at other
23  causes?
24      A    Yes.
25      Q    The American Society of Civil Engineers,  04:41
0191
1   did they do a forensic examination of the
2   causative role of the barge in the North and/or
3   South Breaches?
4       A    Yes.
5       Q    And what was that?                        04:41
6       A    They reviewed information, it was at the
7   time of the various stages of their study, coming
8   from the forensic engineering team studies that
9   we cited earlier today.  In addition, they put
10  into the field people -- personnel from that       04:42
11  committee to investigate the breach sites and
12  conduct associated forensic engineering analysis.
13      Q    Did they look at the barge specifically?
14      A    Yes.
15      Q    What did they do to the barge             04:42
16  specifically?
17      A    In one case -- well, in the case where I
```

```
18   was present in the background when the American
19   Society of Civil Engineers drove up in the school
20   bus, they did what we had done months before,          04:42
21   which was to go and look at the barge, go and
22   look at the breach sites, take that information,
23   both visual and photographic, back, supplement it
24   with the input information being provided by the
25   other investigative teams, and then draw             04:42
0192
 1   conclusions and make recommendations to the
 2   Interagency Performance Evaluation Task Force
 3   that had paid for, authorized and engaged the
 4   American Society of Civil Engineers to oversee,
 5   peer review the Interagency Performance             04:43
 6   Evaluation Task Force forensic engineering
 7   studies.
 8        Q    They didn't do an investigation of their
 9   own, they just had used what the Interagency
10   Performance Evaluation Team had done?              04:43
11        MR. RAFFMAN:   Objection.
12        THE WITNESS:   I think I said they went
13   physically, personally, to the site, conducted
14   the inspections that I related; that was on their
15   own.                                               04:43
16   BY MR. SEYMOUR:
17        Q    Did they do anything other than come to
18   the site and make an inspection and review what
19   the IPET had done?
20        A    I can't respond in any high level of     04:44
21   detail, but my correspondence and discussions
22   with members of the team said that they also
23   performed corroborating or non-corroborating
24   analyses of breaching mechanics, not only at the
25   Lower 9th Ward but at the other important breach   04:44
0193
 1   sites.
 2        Q    You mentioned that you had a
 3   relationship with the National Institute of
 4   Standards and Technology with respect to the
 5   investigation.  Did Professor Seed have such a     04:44
 6   relationship?
 7        A    No, he did not.
 8        Q    Did either of you have any -- any of you
 9   on the sort of executive committee of the
10   Independent Levee Investigation Team have such a   04:45
11   relationship with the National Research Council?
12        A    Yes, we did.
13        Q    And did any of you on that executive
14   committee have such a relationship with the
15   American Society of Civil Engineers?               04:45
16        A    Yes, we did.
17             All of the cited people are professional
18   colleagues, whom most of us have known for
19   several decades.
```

```
20      Q     On page 56, paragraph 64, you cite the        04:45
21  Cushing report -- where you cite Cushing 2009 as
22  the source for the barge breaking from its
23  moorings as of 9:00 a.m. Central Time.   Is that
24  Dr. Cushing's expert report in this case?
25      A     Yes.                                           04:46
0194
 1      Q     Do you have any other source for that?
 2      A     For Dr. Cushing's report?
 3            This is the only one.
 4      Q     Dr. Cushing's report is the only source?
 5      A     Correct.                                       04:46
 6      Q     At the bottom of page 57, in paragraph
 7  66.
 8      A     66?
 9      Q     Paragraph 66.
10            You say, based on these forensic              04:47
11  engineering observations and analyses, the
12  conclusion is if a barge strikes a flood wall
13  that is not already failing for independent
14  reasons, then the barge impact is not sufficient
15  to cause a failure and breaching should not be        04:47
16  expected to occur.
17            Do you recall the photograph of the U.S.
18  90 Bridge in Mississippi that was knocked -- on
19  which a span was knocked several feet to the side
20  after a barge impact?                                   04:47
21      A     Correct.  You showed that to me earlier
22  today.
23      Q     And if a similar impact occurred on a
24  flood wall, is it your testimony that that could
25  not cause the flood wall to lean or breach?             04:47
0195
 1      MR. RAFFMAN:  Objection.
 2      THE WITNESS:  It appears as though similar
 3  impact occurred at the sites that I have included
 4  in my expert report.
 5  BY MR. SEYMOUR:                                          04:48
 6      Q     So would it be true -- withdraw that.
 7            Is it your testimony that no matter how
 8  weak a levee supporting a flood wall may be, a
 9  barge striking it with any amount of force will
10  not cause failure?                                      04:48
11      MR. RAFFMAN:  Objection.
12      THE WITNESS:  I would never render an expert
13  opinion on a combination of factors that clearly
14  would indicate I wasn't telling you the truth.
15  If that wall is weak enough, and if the barge is      04:48
16  strong enough and hits forcefully enough it can
17  cause failure of such a wall.
18  BY MR. SEYMOUR:
19      Q     Please turn to page 62.  I'm referring
20  to paragraph 71.                                        04:49
21            You refer to documented poor visibility
```

22  due to darkness, rain and distance; acoustic
23  conditions because of loud multi-frequency
24  noises; psychological conditions of apprehension,
25  panic and beliefs.  Have you ever found                04:49
0196
1   eyewitness testimony useful in determining the
2   cause of catastrophic failure?
3       A    Yes.
4       Q    Have you ever made a mistake in
5   determining the cause of catastrophic failure?        04:50
6       A    Yes.
7       Q    Do you understand that there are a
8   number of eyewitnesses testifying to what they
9   heard that said that they thought it was another
10  dynamiting of the Inner Harbor Navigation Canal       04:50
11  flood wall like what had occurred during
12  Hurricane Betsy?
13      MR. RAFFMAN:  Objection.
14      THE WITNESS:  Please repeat your question.
15  BY MR. SEYMOUR:                                       04:51
16      Q    Let me back up.
17           Do you understand that the flood wall
18  was dynamited during Hurricane Betsy?
19      A    No, I did not.  I was there during
20  Hurricane Betsy.  I recall, as a citizen of the       04:51
21  area, an area that was flooded.  I have no
22  recollection of reports of dynamiting; and it
23  includes both media reports, chiefly radio at
24  that time, newspaper reports.  However, I was not
25  a member of the African-American community in the     04:51
0197
1   Lower 9th Ward that might have such reports or
2   circulation of those reports.
3       Q    I wasn't there myself.
4            But do you understand that when they
5   refer to it sounding as if the levees were being      04:52
6   dynamited they are talking about a very large
7   explosive sound?
8       A    Yes.
9       Q    Do you think it is at all worthwhile to
10  pay attention to what witnesses heard and saw on      04:52
11  the morning of August the 29th in trying to
12  determine the cause of the Inner Harbor
13  Navigational Canal flood wall breaches?
14      MR. RAFFMAN:  Objection.
15      THE WITNESS:  That would depend on the            04:53
16  variety of conditions surrounding the eyewitness
17  reports.
18           Because of the impediments, as cited
19  here, and the cognitive biases that we discussed
20  and identified earlier, the forensic engineer,        04:53
21  much like a lawyer, has to be very, very careful
22  with the understanding and conclusions drawn from
23  eyewitness reporting.

```
24   BY MR. SEYMOUR:
25       Q    Is it your testimony that the best        04:53
0198
 1   course is to ignore the information that
 2   eyewitnesses report?
 3       A    Absolutely not.
 4       Q    Did you do anything, before forming your
 5   conclusions, to find out what the eyewitnesses --   04:53
 6   what all the eyewitnesses in this case have said?
 7       A    That, of course, is a question that
 8   transcends four years.
 9            Let's look at the first year.  We
10   attempted to contact people, or to the other such   04:54
11   eyewitness reports, and both were unable to close
12   those contacts and had insufficient resources to
13   follow them up.
14            During that stage we were relying
15   primarily on the eyewitness report coming from      04:54
16   the Interagency Performance Evaluation Task Force
17   and from Team Louisiana.
18            As we moved through to the latter stages
19   of the four years, thanks to this work, I did ask
20   for and obtain the eyewitness testimony of          04:55
21   Mr. Villavaso and Mr. Terry Adams.
22       Q    Is that the only eyewitness testimony
23   that you've reviewed?
24       A    Yes.
25       Q    On page 63, in paragraph 73, you refer     04:55
0199
 1   to the CTE report.  I don't believe that this has
 2   been identified earlier in the report.  What does
 3   CTE stand for?
 4       A    That's the name of one of the expert
 5   consulting firms that were involved in the MR-GO    04:56
 6   Reach 2 litigation.
 7            At this point, my memory does not allow
 8   me to remember what CTE stands for.
 9       Q    Could it be Civil Tech Engineering?
10       A    I think that's correct.  Thank you.        04:56
11       Q    I just want to be sure.
12       A    Your brain is faster and fresher than
13   mine.
14       Q    This is my one chance to find out.
15       A    Thank You.                                 04:56
16       Q    Please turn to Appendix D.  It should be
17   Exhibit 5.
18       MR. RAFFMAN:  Is this a good time for a
19   break?  Or if you have a very short amount of
20   questions --                                        04:57
21       MR. SEYMOUR:  This is fine time for a break.
22       THE WITNESS:  Okay.
23       THE VIDEOGRAPHER:  The time is 4:57 p.m. and
24   we are off the record.
25       (Recess taken from 4:57 p.m. to 5:11 p.m.)      05:11
```

```
0200
 1        THE VIDEOGRAPHER:  The time is 5:11 p.m. and
 2   we are back on the record.
 3   BY MR. SEYMOUR:
 4        Q    Dr. Bea, do you have before you Exhibit
 5   5 to your deposition, Appendix D to your report?        05:11
 6        A    Yes.
 7        Q    I would like you to also have out
 8   Exhibit 1 to your deposition, your own report,
 9   and turn to page 60.
10        A    Yes.                                          05:11
11        Q    On pages 60 to 65 of your own expert
12   report, it's under the heading of "Critique
13   of Engineering Investigations performed by
14   Marino, Engineering Associates, Mr. Hector Pasos
15   and Civil Tech Engineering."                           05:12
16        A    Yes, sir.
17        Q    And Exhibit D is headed, "Reviews of
18   July 2009, Expert Reports by Marino Engineering
19   Associates, Mr. Hector Pasos and Civil Tech
20   Engineering."                                          05:12
21        What's the relationship between what's
22   in Exhibit D -- excuse me -- Appendix D, Exhibit
23   5 to the deposition, and what's in this portion
24   of your report?
25        A    The portion of my report under the          05:12
0201
 1   Critique summarizes information that is
 2   additionally detailed in Appendix D.  So I'm
 3   providing additional information in the appendix
 4   that's not in the summary of the primary expert
 5   report.                                                05:13
 6        Q    And do you have Exhibit 6 to your
 7   deposition, the supplemental analyses, dated
 8   September 4, 2009?
 9        A    Yes.
10        Q    What is the purpose of the supplemental     05:13
11   report?
12        A    The purpose of the supplemental report
13   is to examine analytically the potential
14   implications of the additional soil coring
15   information that was identified by Dr. Marino in       05:13
16   his expert report.
17        Q    Does any of the information in Exhibit 6
18   replace information that is in Exhibit 1 on the
19   appendices?
20        A    It adds to it.  It doesn't replace it.       05:14
21        Q    If you take a look at page 15 on
22   Deposition Exhibit 6, the supplemental report.
23        A    (Witness complies.)
24        Q    You have a chart of the IHCN.  I think
25   it should be IHNC.                                     05:14
0202
 1        A    Yes, sir.
```

2       Q     North Breach, Factor of Safety.  Is
3  there not a similar chart in Exhibit 1?
4       A     Yes.
5       Q     Does the chart on page 15 of your                05:14
6  supplemental report replace the similar chart in
7  Exhibit 1?
8       A     Yes.
9       Q     Could you take a quick look at the
10  remainder of the supplemental report and let me       05:14
11  know if there's any other information that we
12  should consider as replacing information in your
13  original report?
14      A     Yes.  Figure 11, which shows a computed
15  hydraulic gradient at the North Breach location,      05:15
16  that should be taken to replace the earlier work
17  for the North Breach on that topic, Figures 12
18  and 13 as well.
19      Q     So it's 11, 12, 13 and 15?
20      A     Correct.                                     05:15
21      Q     Earlier in your deposition I referred to
22  testimony in the -- that you gave in the Robinson
23  case, stating that 88 to 90 percent of all the
24  water that ends up in the Lower 9th Ward came
25  from the reaches along Reach 2, through the           05:16
0203
1  central wetlands unit and over the flood wall at
2  the north edge of the Lower 9th Ward.
3       MR. SEYMOUR::  Just for the completion of the
4  record, I ask the reporter to mark as Exhibit 12
5  to the deposition pages 1259 and 1260 of the          05:16
6  Robinson transcript.
7       (Exhibit 12 marked for identification.)
8       THE WITNESS:  Yes, sir.
9  BY MR. SEYMOUR:
10      Q     Did I fairly describe Exhibit 12?           05:17
11      A     Please repeat your description.
12      Q     Okay.  Does this show that you took from
13  Dr. Vrijling the information that 88 to 90
14  percent of all the water that ended up in the
15  Lower 9th Ward came from the reaches along Reach      05:17
16  2 through the central wetlands unit and over the
17  flood wall at the north edge of the Lower 9th
18  Ward?
19      A     That is correct.
20      MR. SEYMOUR:  I ask the reporter to mark as       05:18
21  Exhibit 13, a part of the Robinson transcript
22  beginning at page 1224 and ending with page 1232.
23      (Exhibit 13 marked for identification.)
24  BY MR. SEYMOUR:
25      Q     Do you see on page 1224 that you're         05:19
0204
1  agreeing with Mr. O'Donnell that 88 to 90 percent
2  of the water, depending on the expert, came from
3  Reach 2 through St. Bernard into the Lower 9th

```
 4    Ward refers up to the question at lines 12 to 14?
 5    A    Yes.                                          05:19
 6    Q    And I want to pass over several pages
 7  and turn to page 1229.
 8         If you want to take a moment just to
 9  orient yourself on what was said on page 1228
10  with the preceding question, please do so.       05:20
11    A    Yes.
12    Q    What is Katrina Neutral?
13    A    Katrina Neutral consists of a set of
14  conditions that neutralize the acknowledged
15  negative impacts of the Mississippi River-Gulf   05:21
16  Outlet.
17    Q    By "acknowledged negative impacts," who
18  are you saying acknowledged them?
19    A    The U.S. Army Corps of Engineers.
20    Q    And you have a time of failure for the     05:21
21  North Breach initiates at 4:00 a.m.
22         Now, would 4:00 a.m. be the time that
23  there starts to be a problem but before the
24  actual failure, or would 4:00 a.m. be the time
25  of failure?                                       05:21
0205
 1    A    It would be the time of initiation of a
 2  failure.
 3    Q    And the failure itself would be?
 4    A    Approximately 5:00 a.m., an hour later.
 5    Q    And did you get that time from Dr. Wit?    05:21
 6    A    No.
 7    Q    Where did you get the time from?
 8    A    The time comes from our forensic
 9  engineering analyses of the development of the
10  North Breach.                                     05:22
11    Q    The next sentence states, for the
12  Katrina Surge Condition, the water level is nine
13  feet.
14         Please tell me, first, what the Katrina
15  Surge Condition is.                               05:22
16    A    That's the surge condition at this time
17  based on the water level record at the Lock
18  Master location.
19    Q    Were you relying upon another expert in
20  the case for that or were you relying on your own 05:22
21  work for that?
22    A    Please define "that."
23    Q    The statement we just read, for the
24  Katrina Surge Condition, the water level is nine
25  feet.                                             05:22
0206
 1    A    I'm relying on work done by other
 2  experts.
 3    Q    Would that be Dr. Wit?
 4    A    In part.  The principal source of the
 5  hydro graphs, as they are known, water elevation 05:23
```

```
 6    as a function of time, came from the Interagency
 7    Performance Evaluation Task Force.
 8        Q    Did any of it come from Dr. Vrijling?
 9        A    Dr. Vrijling was a conveyer of
10    information that came from Dr. Wit, Dr. Mathias          05:23
11    Kok and others on the so-called Dutch Team.
12        Q    Does the phrase "Katrina Surge
13    Condition" mean what actually happened?
14        A    Yes.
15        Q    And Katrina Neutral Condition would be         05:23
16    what would have happened or what should have
17    happened if the proper mitigating measures had
18    been taken?
19        A    Correct.
20        Q    The rest of the answer states, the             05:24
21    difference is four feet of water.  If you count
22    the time from the initiation of the North Breach
23    to the time the water level reaches six feet,
24    it's nine hours for Katrina and five hours for
25    Katrina Neutral.  Please explain what that means.       05:24
0207
 1        A    It means that the time period over which
 2    those excessive water levels would have been
 3    acting at this location.
 4        Q    So it's four hours for that duration
 5    of that amount of flooding?                             05:24
 6        A    Or more.
 7             One element I would like to add
 8    regarding the Katrina Neutral Condition.  During
 9    the trial on Friday, Judge Duval asked that we
10    replace our characterization of the Katrina            05:25
11    Neutral Condition with the presence of an actual
12    MR-GO channel because previous characterizations
13    of a Katrina Neutral Condition had removed the
14    channel, primarily because of its wave
15    regeneration characteristics that you questioned        05:25
16    earlier and, secondarily, because of the water
17    induction characteristics into the Gulf
18    Intercoastal Waterway and the Inner Harbor
19    Navigation Canal.
20             His instructions during the weekend were       05:26
21    that I needed to put the channel back into the
22    analyses and evaluate a second neutralized MR-GO
23    set of conditions.
24             I did so, and brought those results
25    forward on Monday morning, in response to the           05:26
0208
 1    instructions from the court.
 2             That second set of conditions, unlike
 3    the first set of conditions, involved the
 4    placement of a surge protection gate in the
 5    general vicinity of the Paris Road Bridge.              05:27
 6             If that mitigation were put in place,
 7    the surge water elevations would have not been
```

```
 8    significant in either the Gulf Coast -- the Gulf
 9    Intercoastal Waterway or the Inner Harbor
10    Navigation Canal.                                    05:27
11          So these are all referencing the first
12    neutralized MR-GO set of conditions.
13      Q    Are you assuming that -- well, you say
14    on page 1232, that if you don't have funnel
15    surge, it's your opinion the North and South       05:28
16    Breaches would not have occurred.
17      A    Correct.
18      Q    And would this gate have stopped the
19    funnel surge?
20      A    Correct.  The Corps of Engineers is         05:28
21    currently constructing that funnel gate.
22      Q    And how high would the water have gotten
23    in the Inner Harbor Navigation Canal if there had
24    been such a funnel gate?
25      A    A matter of a few feet, based on the         05:28
0209
 1    oceanographic modelling that was done both by the
 2    Corps of Engineers and by the Dutch Team.
 3          The rise in surge comes through Lake
 4    Pontchatrain.
 5      Q    And where exactly would the gate be         05:28
 6    located?
 7      A    At the general vicinity of the Paris
 8    Road Bridge, which is the intersection of the
 9    east-west trending Gulf Intercoastal Waterway.
10    The Mississippi River-Gulf Outlet on the trending  05:29
11    northwest-southeast intersects at approximately
12    the Paris Road Bridge.  That's known as the neck
13    of the funnel.
14          The two waterways at the adjacent flood
15    protection structures form the primary bell        05:29
16    of the funnel.  It concentrates its flow to the
17    Inner Harbor Navigation Canal intersection, on
18    the other side of which is the Port of New
19    Orleans.
20      Q    And is it your testimony that Lake          05:29
21    Pontchatrain would not have filled up the Inner
22    Harbor Navigation Canal?
23      A    Well, normally, of course, Lake
24    Pontchatrain fills up the Inner Harbor Navigation
25    Canal to normal water levels because these two     05:30
0210
 1    water bodies are directed -- directly connected.
 2      Q    Can you show me on a map where this gate
 3    is so that I can understand the mechanics of what
 4    you're describing?
 5          I believe you've got a picture of the        05:30
 6    funnel in one of your maps?
 7      A    Oh, yes.
 8          Perfect.
 9      Q    What page number are you on?
```

```
10      A    Perfect.  This is the expert -- my          05:30
11 expert report dated August the 3rd, 2009.  It's
12 Figure 1, page 2.  So that would be our Exhibit
13 1.
14           So let's go to Exhibit 1 again.
15 Perfect.  Page 2, Figure 1, shows the funnel.         05:31
16 Here's the Gulf Intercoastal Waterway.  Here's
17 the Mississippi River-Gulf Outlet identified as
18 Reach 2.  That's the bell of the funnel.  It
19 intersects at approximately the Paris Road Bridge
20 and that's where the Reach 1 continues into the      05:31
21 Inner Harbor Navigation Canal.  So the gate would
22 be placed at that intersection -- is being placed
23 at that intersection.  Unfortunately, too late.
24      MR. SEYMOUR:  I'll ask the reporter to mark
25 as Exhibit 14 pages 1503 and 1504 of the Robinson    05:32
0211
1  testimony.
2       (Exhibit 14 marked for identification.)
3  BY MR. SEYMOUR:
4       Q    We discussed uncertainty before.  And I
5  want to direct your attention to the top of the      05:33
6  page 1503, where you were asked:  Before Katrina,
7  was there any uniform way to apply criteria from
8  existing manuals to ascertain erosion rates.  And
9  you said you could not find that.
10           Now, is the calculation of erosion rates   05:33
11 equally important for the levees at the Inner
12 Harbor Navigation Canal as they were for Reach 2?
13      A    No.
14      Q    Please explain.
15      A    Well, the Reach 2 structures are           05:33
16 entirely earthen structures.  So one of their
17 potential breaching modes involves wave-side
18 attack, erosion overtopping attack, erosion so
19 that complex breaching mechanics becomes a
20 dominant mechanism for that structure -- those       05:34
21 structures, contrasted with the concrete sheet
22 pile flood wall supported with an earthen flood
23 protection levee subjected to minor wave attack
24 and current attack of the structures on Reach 2
25 because of their proximity to open water.  Wave      05:34
0212
1  attack was of particular importance in that
2  breaching mechanism.
3            The complication of a wave attack and
4  the erosion propagation is what's responsible for
5  the greater uncertainties associated with the       05:35
6  forensic engineering breaching analysis of that
7  flood protection structure contrasted with those
8  at the Lower 9th Ward.
9       Q    Could you turn to page 1504, the second
10 page of that exhibit?                                05:35
11      A    (Witness complies.)
```

```
12      Q    The court asked a question about soil.
13  And your answer on lines 11 to 16 says:  Well,
14  the soil shear strength, for example, in a highly
15  uniform material like a clay, would be expected          05:35
16  to have a coefficient variation between 25 and 35
17  percent.  If I go to a calcareous soil --
18      A    Correct.
19      Q    -- which would be like the beaches in
20  the Yucatan Peninsula because it's much more            05:35
21  variable, the soil has coefficient variations
22  from 50 to in excess of 100 percent.
23           Now, we are talking about erosion.  Your
24  under-seepage theory involves erosion from the
25  inside of the levee; is that correct?                   05:36
0213
 1      A    That's only partially correct.
 2           As I explained in my expert report,
 3  there are two categories of potentially important
 4  hydraulic effects.
 5           One category involves the velocity            05:36
 6  of transmission of fluid through the soils.  If
 7  that velocity is high enough it can result in
 8  removal of the soil, creation of things that
 9  levee engineers term "sand boils" on the
10  protected side.  If that process is allowed it         05:37
11  can undermine the entire earthen flood protection
12  structure, levee hopefully, and cause breaching.
13           The second category is the effect of the
14  water pressures, not velocity but pressure.  So
15  it means the water does not have to move but           05:37
16  pressures have to be transmitted.
17           A soils strength is dependent on pore
18  pressure.  The higher the pore pressure of water
19  the lower the strength of the soil.  In fact,
20  Hollywood's characterization of sinking into          05:37
21  quicksand is a characterization -- actually a
22  cartoon one -- of that pressure effect in which
23  the hydraulic uplift pressures equal the downward
24  pressure exerted by the soil and it turns to a
25  so-called liquid.                                     05:38
0214
 1           There is another category of pressure
 2  which, if generated in a subterranean underlying
 3  layer, and overlaying by much less permeable
 4  materials, those upward pressures can act on that
 5  overlying less permeable material, for example        05:38
 6  the clay, comprising a well-engineered levee.
 7  That uplift pressure acts to destabilize the
 8  resisting forces from the soil component of that
 9  flood protection structure.
10           So in our analysis, as I documented and      05:39
11  explained, we tracked both of these categories
12  of hydraulic effects.  That was the point where
13  we found first in our studies, Independent Levee
```

```
14   Investigation studies to May 14, 2006, we had
15   missed it.                                            05:39
16           But we then tracked those of the
17   Interagency Evaluation Performance Task Force.
18   They had missed the pressure uplift effect
19   because they performed hydraulic analyses, they
20   performed stability analyses, they did not           05:39
21   perform a combination where you picked up this
22   hydraulic uplift.
23           We didn't claim to be particularly smart
24   because we learned this lesson through the
25   forensic engineering studies that we conducted at    05:40
0215
1    the 17th Street Canal.
2            No one, prior to the work we did, which
3    brought in the uplift pressures, had correctly
4    identified the time and water level, observed
5    both, of breaching at that location.  So we          05:40
6    brought that knowledge/information to this
7    location and sharpened our forensic engineering
8    analyses in the later stages of work done here.
9        Q    You mentioned earlier that the Corps
10   of Engineers, or Washington Group International,      05:40
11   I don't know who, had misclassified some soils as
12   clay when they should have been classified as
13   something else because it was a high proportion
14   of silt and sand in them.  Was that true for the
15   Inner Harbor Navigation Canal?                        05:41
16       A    In some cases the information that we
17   had indicated it was potentially true.  But as we
18   were relying on their Katrina -- or pre-Katrina
19   soil borings and that precipitated our
20   expenditure of funds in an effort to re-perform      05:41
21   coring at critical locations, both North and
22   South Breaches.
23       Q    Given what you found about the soil
24   adjacent to the breaches, did you calculate the
25   coefficient of variation for the soil at the         05:41
0216
1    breaches?
2        A    Yes.
3        Q    What was your calculations?
4        A    That's detailed in my expert reports.
5        Q    Is that the 30- to 40-percent figure       05:42
6    that we talked about?
7        A    That's a result in uncertainties that
8    came from those explicit calculations and an
9    explicit detail behind those calculations are
10   contained in Appendix C to my expert report.         05:42
11       Q    There was a passage in the Robinson
12   trial in which Mr. O'Donnell referred to your
13   having performed a very large number of -- well,
14   2300 pages of reports.  And counsel for the
15   government objected strenuously and gave a figure    05:42
```

16    that was, I think, something like 3700 pages.
17    And the judge said he was going to go with
18    counsel for the government.
19         A    That was Mr. Richardson.
20         Q    Which of them was correct?                    05:43
21         A    A good marine.
22         Q    Which of them was correct in terms
23    of the number of pages of reports you turned out
24    in the case?
25         A    3700 for the MR-GO that doesn't include       05:43
0217
1     the canal and that doesn't include this work.
2          Q    Has there been any other cases in which
3     you've served as an expert witness in which you
4     produced anything like --
5          A    5,000 pages.                                  05:43
6          Q    Eight reams of paper is what I'm
7     thinking of, or ten reams.
8          A    No, never.  I've worked on some 630,
9     personally.
10              This case has absorbed far more time,         05:43
11    far more intensity, than any of the previous
12    cases I have worked on.
13         Q    You never found that degree of output
14    necessary in any other cases that you served as
15    an expert on?                                           05:44
16         A    In many of the other cases I served as
17    expert on, for example the Columbia Accident
18    Investigation Board investigation, I was
19    accompanied by other experts who were able to
20    supply information that did not require me to           05:44
21    investigate into those areas.  So I was able to
22    restrict the extent of my investigation much more
23    in that particular case.
24              In other cases, where I was not assisted
25    by other very qualified experts, my domain was          05:44
0218
1     much wider, but the extent and depth of the
2     investigations were less, frequently because the
3     problem was easier to understand, and analyze and
4     document.
5               So this extent depends very, very widely      05:45
6     on the complexity of the problem, the resources
7     available to address those problems.
8               This is the biggest one in my entire 56
9     years of engineering.
10         Q    Were there any other reasons for your         05:45
11    producing so much in this matter?
12         A    Yes.
13         Q    Please explain.
14         A    I care.
15         Q    Please elaborate.                             05:46
16         A    This is the largest, most destructive,
17    catastrophic failure of a civil engineered

```
18    structure in the history of the United States, if
19    not the world.
20         I'm at the close of my career.  One              05:46
21    of the things I would like to do, as I close my
22    career, is contribute what I'm able to contribute
23    in ways of insight and information to those who
24    will follow me.  And that's because I don't want
25    them to repeat the horrible collection of           05:46
0219
 1    mistakes that we made in the causation of this
 2    catastrophe.
 3         I care.
 4         Q    To serve that goal the cause has to be
 5    something that can be addressed by geotechnical    05:47
 6    engineering in your field; is that right?
 7         A    No, that's not right.  My expertise goes
 8    far beyond geotechnical engineering.  So, no,
 9    geotechnical engineering is only one component in
10    this kind of forensic engineering study.           05:47
11         Q    Let me rephrase that then, in light
12    of what you said.  In order to fulfill this goal,
13    isn't it necessary that the Corps of Engineers
14    build flood wall protection systems differently
15    in the future than it has in the past?             05:47
16         A    Yes.
17         Q    And what do you see is the prescriptions
18    that the Corps of Engineers should follow?
19         A    Well, they have recently, in the past
20    couple of months, in response to Congress's        05:48
21    charge for a national levee safety program,
22    issued draft guidelines for future levee
23    re-qualification, reconstruction and
24    construction.  Those guidelines are incorporating
25    many of the lessons that I think all of us         05:48
0220
 1    experts have picked up in coming through this
 2    past four years.
 3         Q    Did others on the Independent Levee
 4    Investigation Team talk with you about your goal?
 5         A    Yes.                                      05:48
 6         Q    Did they share that goal?
 7         A    In almost all cases, yes.  Certainly, in
 8    the case of Dr./Professor Raymond Seed and
 9    Dr./Professor Dave Rogers.  Those two engineers,
10    forensic engineers, geologic and geotechnical,     05:49
11    remain on this caring trail of tears.
12         Q    Did you ever talk with people involved
13    in the other investigative efforts about those
14    goals?
15         A    Yes.                                      05:49
16         Q    Did they also share your motivation?
17         A    In general, I think yes.  Their ability
18    to act on those kinds of goals are different than
19    my abilities.
```

```
20     Q   If the barge had been a cause of the        05:49
21 failure of the North Breach and/or the South
22 Breach, that would interfere with those goals,
23 wouldn't it?
24     A   Yes.
25     MR. SEYMOUR:  No further questions.           05:50
0221
 1     MR. RAFFMAN:  I have a few.
 2     Don't face me.  You can face the camera.
 3
 4                   EXAMINATION
 5                                                   05:50
 6 BY MR. RAFFMAN:
 7     Q   Professor Bea, in answer to the last
 8 question you gave, did any part of your
 9 analysis -- of the issue of whether the barge had
10 been a cause of the failure, was any part of your  05:50
11 analysis or your scientific conclusions motivated
12 by your desire to see that the levee system
13 improve?
14     A   No.  It's the knowledge and background
15 understanding that comes from these               05:51
16 investigations.  So if we can portray that
17 convincingly and logically to our younger
18 colleagues, then hopefully they will not repeat
19 our mistakes.
20     Q   And, in fact, isn't it the case that --   05:51
21 well, strike that question.
22         Let me ask you to return to Exhibit 6,
23 page 11.  This is the seepage analysis you did in
24 your supplemental report?
25     A   Yes, sir.                                 05:51
0222
 1     Q   At what time did you begin the running
 2 of the model -- well, let me ask you this
 3 question this way.  There's a reference here to
 4 August 28th, 2005, six o'clock a.m.  Do you see
 5 that reference?                                   05:52
 6     A   Correct.
 7     Q   What does that represent?
 8     A   That represents the point in time at
 9 which we initiated the calculations of hydraulic
10 effects at the North Breach.  That's the same     05:52
11 time reference that we have used previously for
12 both North and South Breaches.
13     Q   And it's the same reference in your
14 seepage analysis throughout your previous --
15     A   Correct.                                  05:52
16     Q   Okay.
17     A   By the way, that's an important thing to
18 do because you have to have the buildup of water
19 level over time to correctly capture the
20 hydraulic effects that are important in the time  05:53
21 close to breaching.
```

```
22              If you tried to start the analysis very
23    close to that time, the hydraulic effects will be
24    incorrect, they'll be distorted, because the soil
25    has not had sufficient time to react to that          05:53
0223
 1    progressive increase in water pressure.
 2         MR. RAFFMAN:  All right.  I only have two --
 3    yeah, let's keep going.
 4    BY MR. RAFFMAN:
 5         Q    Dr. Bea, you had said in one of your         05:53
 6    answers to Mr. Seymour's questions that
 7    theoretically, at least, if the wall is weak
 8    enough and the barge is strong enough, then a
 9    barge can cause failure of a wall.  Do you
10    remember the thrust of that testimony?                 05:53
11         A    Oh, yes.
12         Q    All right.  Professor Bea, could a barge
13    have caused the failure of a wall in the manner
14    that you observed at the North Breach on the
15    Inner Harbor Navigation Canal?                         05:54
16         A    No.
17         Q    Could a barge have caused a failure
18    of a wall in the manner you observed at the South
19    Breach of the Industrial -- the Inner Harbor
20    Navigation Canal?                                      05:54
21         A    No.  In both cases, that's what has been
22    documented in my expert reports and testimony.
23         MR. RAFFMAN:  I have no other questions.
24         MR. SEYMOUR:  I do need to follow up on
25    that.                                                  05:54
0224
 1              Do you need to change the tape?
 2         THE VIDEOGRAPHER:  This marks the end of Disc
 3    No. 3 in the deposition of Dr. Robert Bea.  The
 4    time is 5:55 p.m. and we are off the record.
 5         (Recess taken from 5:55 p.m. to 6:01 p.m.)        05:54
 6         THE VIDEOGRAPHER:  This marks the beginning
 7    of Disc No. 4 in the deposition of Dr. Robert
 8    Bea.  The time is 6:01 p.m. and we are back on
 9    the record.
10         MR. RAFFMAN:  Mr. Seymour has done me the         06:00
11    courtesy of allowing me one additional question.
12
13              EXAMINATION (Continued)
14
15    BY MR. RAFFMAN:                                        06:00
16         Q    Professor Bea, you've heard throughout
17    the day questions about rates of error and then
18    uncertainty that you've included in your
19    analysis.  Have you got those questions in mind?
20         A    Yes.                                         06:01
21         Q    When you reviewed the reports of
22    Mr. Pasos and Dr. Marino, did you find in those
0225
```

```
 1  reports any discussion of the known or potential
 2  rate of error of the techniques or theories that
 3  they applied?
 4      A    No, I did not.
 5      MR. RAFFMAN:  Now I have no other questions.      06:01
 6
 7                    EXAMINATION
 8
 9  BY MR. SEYMOUR:
10      Q    Dr. Bea, you testified just a moment ago    06:01
11  that it would not have been possible for a barge
12  to have caused the North Breach or the South
13  Breach under any conditions.  Do I have it right,
14  under any conditions?
15      A    No.                                          06:01
16      Q    Okay.  Could a barge have caused the
17  damage that you observed on the North Breach?
18      A    No.
19      Q    No?
20      A    No.                                          06:02
21      Q    No.
22      A    And I documented the reason why.
0226
 1      Q    Tell me the reasons.
 2      A    The reasons concern our forensic engineering
 3  studies of the development of the North Breach.  Those
 4  studies converge on a primary causative element
 5  related to the discussed/identified seepage, hydraulic  06:02
 6  effects and lateral instability effects.
 7           Other information in the vicinity of North
 8  Breach lead to the conclusion that the barge wasn't
 9  there and couldn't have been there.
10           And so the barge does not enter my expert    06:02
11  opinion as a causative/contributing/ participating
12  element in the case of North Breach.
13      Q    Would it be fair to say that your answers to
14  Mr. Raffman's question mean that once you have already
15  ruled the barge out of consideration it could not      06:03
16  possibly have caused any damage?
17      A    At the North Breach?
18      Q    Yes.
19      A    That is correct.
20      Q    Okay.  Is your answer the same with respect   06:03
21  to the South Breach?
22      A    Yes, for very similar reasons.
23      MR. SEYMOUR:  Okay.  No further questions.
24      MR. RAFFMAN:  I have one other question.
25           No, I think I'll stop there, too.             06:03
0227
 1      MR. SEYMOUR:  No further questions.
 2      THE VIDEOGRAPHER:  This marks the end of Disc No.
 3  4 of 4, and concludes today's deposition of Dr. Robert
 4  Bea.  The time is 6:04 p.m. and we are off the record.
 5      (Deposition concluded at 6:04 p.m.)                06:19
```

```
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
0228
 1                    CERTIFICATE OF WITNESS
 2
 3
              I, the undersigned, declare under penalty of
 4
    perjury that I have read the foregoing transcript, and
 5
    I have made any corrections, additions or deletions
 6
    that I was desirous of making; that the foregoing is a
 7
    true and correct transcript of my testimony contained
 8
    therein.
 9
    EXECUTED this _____  day of _____, 2009, at
10
    _____, _____.
11
12
13
                 _____
14                        W I T N E S S
15
16
17
18
19
20
21
22
23
24
```

```
25
0229
 1   STATE OF CALIFORNIA      )
 2   COUNTY OF SAN FRANCISCO )
 3
 4        I, Linda Vaccarezza, Certified Shorthand
 5   Reporter, Certificate No. 10201, for the State of
 6   California, hereby certify:
 7        I am the deposition officer that
 8   stenographically recorded the testimony in the
 9   foregoing deposition; prior to being examined the
10   deponent was first duly sworn by me.  The
11   foregoing transcript is a true record of the
12   testimony given;
13        Before completion of the deposition, review
14   of the transcript [] was [] was not requested.
15   if requested, any changes made by the deponent
16   (and provided to the reporter) during the period
17   allowed are appended hereto.
18
19   Dated September 21, 2009.
20
                          _____
21
                          LINDA VACCAREZZA, CSR. 10201
22
23
24
25
```