# Expert Report

### of

# Robert Glenn Bea, Ph.D., P.E.

Prepared for

## Goodwin Procter LLP

901 New York Avenue NW

Washington, D.C. 20001

Moraga, California

August 3, 2009

Robert G. Bea, under penalty of perjury, states as follows:

1.      This Expert Report has been prepared for Goodwin Procter LLP and contains my forensic engineering findings, opinions and conclusions relative to the causes of the two breaches (North Breach and South Breach) that occurred in the New Orleans Hurricane Protection System (NOHPS) along the east bank of the Inner Harbor Navigation Canal (IHNC) adjacent to the Lower 9th Ward during Hurricane Katrina on August 29, 2005. In particular, this Expert Report will address allegations concerning the cargo barge ING 4727 which I conclude was not a cause of either of the two breaches. If called to testify, I could and would testify competently as follows:

2.      My Expert Report is divided into four sections. Section I provides an overview of my qualifications to serve as an expert on the issues discussed herein. This section also provides a history of my involvement in forensic engineering studies of the failures in the NOHPS during hurricane Katrina. Section II provides a summary of engineering forensic analyses to determine the causes of the breaches, failures, overtopping, and flooding that developed with respect to the hurricane protection structures along the Mississippi River Gulf Outlet (MRGO) adjacent to St. Bernard Parish (Reach 2) during Hurricane Katrina (Figure 1).  Section III summarizes the primary reasons for causation of the North Breach and South Breach at the Lower 9th Ward that developed during Hurricane Katrina. Section IV summarizes my forensic engineering investigation into the role of the cargo barge ING 4727 in development of the North Breach and South Breach at the Lower 9th Ward. The following table of contents will serve as a guide to help reading this Expert Report.

1



**Figure 1: MR-GO Reach 1 and Reach 2 (after USACE IPET 2007).**

## TABLE OF CONTENTS

**I.   BACKGROUND** .................................................................................................. **3**

   **Qualifications**................................................................................................ **3**

   **History & Summary of Forensic Engineering Investigations**.................... **8**

**II.   FORENSIC ENGINEERING INVESTIGATIONS OF THE MRGO REACH 2
FLOOD PROTECTION STRUCTURES**..................................................... **22**

   **Field Studies** ............................................................................................. **22**

   **Deleterious Effects of the MRGO** ............................................................ **23**

   **Performance of the MRGO Reach 2 Flood Protection Structures**.............. **35**

**III.  FORENSIC ENGINEERING INVESTIGATIONS OF THE LOWER 9TH WARD
FLOOD PROTECTION STRUCTURES**..................................................... **39**

Summary ...................................................................................................................... 39

Multi-Modal Failure & Uncertainty Analyses .............................................. 41

North Breach Development ........................................................................... 45

South Breach Development ........................................................................... 48

IV.  FORENSIC ENGINEERING INVESTIGATIONS AND CONCLUSIONS
REGARDING CARGO BARGE ING 4727 ....................................................... 50

Failure Modes Involved in Development of the North and South Breaches ............... 50

The Role of the ING 4727 Cargo Barge ........................................................ 52

Other Cargo Barges Impact Floodwalls and Do Not Cause Breaches ........................ 57

V.  REFERENCES ..................................................................................................... 68

# I.  BACKGROUND

## Qualifications

3.      I have devoted the past two decades of my professional career to research associated with the catastrophic failure of engineered systems. This work has involved detailed studies and investigations of more than 600 major accidents, failures, and disasters associated with complex engineered systems. The research has focused primarily on interactions of engineering and organizational–institutional mechanics associated with catastrophic failures. A primary objective of this work has been development, validation, and application of advanced methods for Risk Assessment and Management (RAM) of complex engineered systems during their life-cycles (concept development through decommissioning). This work has been built on my more than five decades of experience with the design, construction, operation, maintenance, and decommissioning of major engineered systems around the world.

4.      Of particular importance to my testimony is the work I have performed since August 29, 2005 to study developments associated with Hurricane Katrina and to investigate the failures of the hurricane flood protection system for the Greater New Orleans area associated with Hurricanes Katrina. During the past 47 months, I have spent approximately 10,000 pro bono hours assisting in the forensic engineering studies of the breaches, failures and gaps in the hurricane flood protection system that led to the catastrophic flooding of Greater New Orleans during and after Hurricane Katrina. In addition, I have performed studies of the USACE repairs and improvements to the existing hurricane flood protection system, their ongoing studies of the risks associated with future hurricane flood protection systems and the associations of these proposed protection systems with coastal environmental restoration.

(a)      This work has involved multiple field studies (starting 30 September 2005) in Greater New Orleans, interviews of people with extensive knowledge of the history of the New Orleans flood protection system (how it was designed, constructed, operated, and maintained), and review of the primary investigations and studies that have documented this failure, including, but not limited to the following reports: (a) USACE Interagency Performance Evaluation Task Force, *Performance Evaluation of the New Orleans and Southeast Louisiana Hurricane Protection System*, 2007; (b) D. Woolley and L. Shabman, *Decision-Making Chronology For the Lake Pontchartrain & Vicinity Hurricane Protection Project*, Report to Institute for Water Resources of the U.S. Army Corps of Engineers, June 2008; (c) Team Louisiana, *The Failure of the New Orleans Levee System During Hurricane Katrina,* Report to Louisiana Department of Transportation and Development, 2007; (d) American Society of Civil Engineers, *The New Orleans Hurricane Protection System: What Went Wrong and Why*, 2007; (e) National Academy of Engineering and National Research Council, Committee on New

4

Orleans Regional Hurricane Protection Projects, Third Report, 2006; (f) Independent Levee Investigation Team, *Investigation of the Performance of the New Orleans Flood Protection Systems in Hurricane Katrina on 29 August 2005*, 2006; (g) National Institute of Standards and Technology, *Performance of Physical Structures in Hurricane Katrina and Hurricane Rita: A Reconnaissance Report*, 2006; (h) Federal Emergency Management Agency, *Hurricane Katrina in the Gulf Coast*, 2006; (i) Committee on Homeland Security and Governmental Affairs, *U.S. Senate, Hurricane Katrina A National Still Unprepared*, 2006; and (j) The Committee to Investigate the Preparation for and Response to Hurricane Katrina, U.S. House of Representatives, *A Failure of Initiative*, Feb. 2006.

(b)     I was a co-leader of the Independent Levee Investigation Team (ILIT) that conducted a 10-month intensive forensic study of this failure. During this time, I made eight separate inspections of the NOHPS. Since completion of the report (May 2006), I have made an additional eight inspections of the NOHPS.

(c)     I co-authored the report titled *Investigation of the Performance of the New Orleans Flood Protection Systems in Hurricane Katrina on 29 August 2005* (http://www.ce.berkeley.edu/~new_orleans/, November 2005 Preliminary Report, May 2006 Draft Final Report, July 2006 Final Report). I have authored and co-authored 21 refereed professional conference and journal papers  documenting this forensic engineering work.

5.     I am a professor in the Department of Civil and Environmental Engineering, and Associate Director of the Center for Catastrophic Risk Management, University of California, Berkeley. I have held this position since January of 1989. My current responsibilities include teaching at the graduate and undergraduate levels, research, and university, professional and public service. Prior to that, for seven years I held the position of Vice President and Senior

International Consultant at PMB - Bechtel's Ocean Engineering Division located in San Francisco, California. Attached hereto as Appendix A is my curriculum vitae. This is attached to support my competency to attest to the matters stated herein.

6.     I began my career in 1954 as an engineer-in-training for the U.S. Army Corps of Engineers. I was assigned to the Southern Florida Flood Control District and worked on engineering and construction of flood protection facilities (levees, drainage canals, pump stations) in the areas around Lake Okeechobee and the Everglades.

7.      In 1960, I was employed by Shell Oil Company as a coastal - offshore civil engineer. During my career with Shell Oil Company, Shell Development Company and Royal Dutch Shell Company, I worked in exploration, drilling, production, refining, transportation, engineering, construction, operations, and research.

8.     In 1965, I was Chief Offshore Civil Engineer and Manager of the Central Engineering Division for Shell Oil Company located in New Orleans. It was during that year my family lost our home in New Orleans East (Pines Village). This loss included all of our belongings due to flooding from breaches in the putative levees along the Inner Harbor Navigation Canal (IHNC) and the MR-GO – Gulf Intracoastal Waterway (GIWW) that developed during Hurricane Betsy in September 1965. At this time, I was leading engineering teams working on development of risk and reliability based criteria for design and requalification of offshore platforms and pipelines subjected to hurricanes in the vicinity of the Mississippi River Delta and elsewhere in the Gulf of Mexico.

9.     In 1977, I was appointed vice president and chief engineer of an international consulting engineering and contracting company (Woodward-Clyde Ocean Services [now URS Corporation]) that provided coastal and offshore engineering services, including hurricane

forecasting, development of reliability based design criteria, and engineering flood protection facilities for refineries and chemical processing plants along the Gulf coast.

10.     In 1981, I founded the Ocean Engineering Services Division of PMB and became vice president and senior international consultant for PMB – Bechtel. The Ocean Engineering Services Division offered a wide variety of engineering services world-wide that included concept development, design, construction, maintenance, and decommissioning of marine systems. Of particular importance was work performed by this Division in arctic and sub-arctic areas in development and testing of innovative systems to work in this very challenging environment. This work included development of risk and reliability based engineering design criteria for these systems.

11.     I joined the faculty of the University of California Berkeley in 1989. Currently, I am responsible for one senior capstone design course (Engineering Systems) and two graduate courses (Margins of Quality for Engineered Systems, Human & Organizational Factors in the Reliability of Engineered Systems). During the past 2 decades, my research has been focused on development of technology to address human and organizational factors in the reliability of engineered systems. This research has involved detailed analyses of more than 600 major accidents and disasters involving engineered systems, including the flooding of the Greater New Orleans area during Hurricane Katrina.

12.     I have published more than 450 technical papers in refereed journals and conferences and a similar number of technical papers, reports, and book chapters in non-refereed publications. This includes 21 refereed journal and conference papers that have addressed engineering and organizational causes of the major breaches that developed in the Greater New Orleans Area during Hurricane Katrina.

13.     I have been recognized by the National Academy of Engineering, the International Energy Center, the Academy of Management, the American Society of Civil Engineers (ASCE), and American Society of Mechanical Engineers (ASME) for my pioneering contributions to development and application of advanced methods for risk assessment and management including human, organizational, and institutional factors.

14.     In May 2007, I received the first University of California Berkeley Chancellor's award for research in the public interest for my work in development of understanding of the causes of the failure of the flood protection system for Greater New Orleans and for my proposals for preventing and mitigating such failures in the future. In December 2007, I received a Proclamation from the New Orleans City Council in gratitude for "research and efforts in promotion flood protection and to aid in the recovery of New Orleans and Louisiana."

15.     I am a registered professional civil, structural, and geotechnical engineer (retired) in Louisiana, Texas, Florida, California, Washington, Oregon, and Alaska.

16.     Additional information regarding my qualifications to perform these forensic engineering investigations is contained in my 2009 Vita (Appendix A).

## History & Summary of Forensic Engineering Investigations

17.     The history of my forensic engineering investigations into the failures of the NOFPS that developed during hurricane Katrina has been divided into 4 primary phases:

a.  **Phase 1** - August 2005 – November 2005 (Independent Levee Investigation Team – ILIT - initial field investigations and forensic engineering analyses),

b.  **Phase 2** - November 2005 – May 2006 (ILIT additional field investigations and forensic engineering analyses),

c. **Phase 3** - May 2006 – March 2007 (University of California Berkeley Center for Catastrophic Risk Management field investigations and forensic engineering analyses), and

d. **Phase 4** - March 2007 – March 2009 (New Orleans Federal District Court Consolidated Katrina Litigation Expert field investigations and forensic engineering analyses).

18.     **Phase 1 -** I first learned about Hurricane Katrina on August 24, 2005 as the storm crossed the tip of Florida and headed into the Gulf of Mexico. I received a telephone call from a former student who lived in the French Quarter of New Orleans. He told me the offshore oil and gas fields had begun securing the offshore platforms and pipelines and evacuating personnel from the fields. He knew I was interested in this operation because for the previous 6 years I had been conducting research for the Gulf of Mexico oil and gas facilities operators about securing and evacuating these facilities in advance of severe hurricanes. I received another call from this former student and he told me the offshore facilities had been fully secured and evacuated by midnight August 27th – all without incident. I received another call from this same former student the afternoon of August 29th and learned that the NOHPS had failed – water was rapidly entering the French Quarter and other parts of the city.

19.     Soon thereafter, I contacted my colleague – Professor Raymond Seed – to learn what he knew about the flooding and failure of the New Orleans Flood Protection System (NOFPS). I learned that Professor Seed was organizing an investigation team to go to New Orleans and was seeking funding from the National Science Foundation (NSF) to send the first forensic engineering team to New Orleans. I asked if I could join the team and Professor Seed agreed. After repeated attempts to collaborate with the U.S. Army Corps of Engineers (USACE) in investigation of the failures of the NOFPS we finally received 'permission' from the U.S.

Army Corps of Engineers to come to New Orleans following the passage of Hurricane Rita (September 23rd). We arrived in the Greater New Orleans area on September 29th and began our forensic engineering investigations into the failures of the NOFPS. We were joined by colleagues representing the American Society of Civil Engineers (ASCE) and Team Louisiana (science and engineering team sponsored by Louisiana Department of Transportation and Development).

20.     Our initial investigations focused on the breaches that developed at the 17th Street Canal, along the London Canal, and along the IHNC (east and west sides). Subsequently, we were able to obtain access to the breaches that had developed along the MRGO, the GIWW, and the hurricane flood protection structures in New Orleans East (NOE) and Plaquemines Parish. The timing of our investigations was critical because repair and dewatering operations following Hurricanes Katrina and Rita were rapidly eradicating and obscuring evidence important to development of analyses and understanding of the causes of the failures and breaches.

21.     It was during the first week of our field investigations that we were able to obtain access to the breaches that developed at the Lower 9th Ward. The North Breach (near Florida Avenue Bridge) had a very different appearance than the South Breach (near Caliborne Avenue Bridge). Most remarkable was the large cargo barge that was inside the Lower 9th Ward adjacent to the South Breach. The first question associated with the cargo barge ING 4727 was "did it cause the failure?" During the first week of the investigation, this was a question hotly debated among members of the ILIT. The barge showed the signs of collision with the floodwall (dents and scrapes on the barge hull) and the floodwall at the south end of the South Breach clearly showed the signs of having been impacted by the barge (crushing of the concrete at the top of the wall, rust rub streaks from the hull of the cargo barge).

22.      **Phase 2 –** Following completion of the first phase of field investigations, the ILIT began assembly of background information and documentation that related to the many failures that developed in the NOFPS. This included assembly of documentation that related to the history of development – evolution of the NOFPS dating back to the early 1800's. At the same time, qualitative and quantitative analyses were initiated to further investigate the multiple potential causes of the failures and breaches. These analyses focused on both the 'engineering mechanics' and the 'organizational – political mechanics' important to development of a comprehensive understanding of the causes of the failures. By early November 2005, the Phase 2 work was completed and a preliminary report issued to the National Science Foundation (Seed et al 2005) and other sponsors of the investigation (including the University of California Berkeley the American Society of Civil Engineers). On November 2, 2005, a summary of the results from the ILIT investigations was presented to the Committee on Homeland Security and Government Affairs, U.S. Senate by Professor Raymond Seed, Principal Investigator of the ILIT (Seed 2005). Professor Seed stated:

"*Overtopping was lesser in magnitude along the Inner Harbor Navigation Channel and along the western portion of the MRGO channel, but the consequences of this overtopping were again severe. This overtopping again produced erosion and caused numerous additional levee failures. This photo shows the well know breach at the west end of the Ninth Ward. <u>We spent some time figuring out the answer to the chicken and the egg question, and it is our preliminary opinion that the infamous large barge was drawn in through a breach that was already open.</u>*" (Underline added for emphasis.)

23.      The Phase 2 work was completed on May 14, 2006 with delivery of the final draft report summarizing the ILIT studies of the failures of the NOFPS that developed during

Hurricane Katrina (ILIT 2006). Relative to the cargo barge found inside the Lower 9th Ward, this report concluded:

"*Figure 6.19 also shows a large steel barge that passed inward through this section, and came to rest near the southern end of the breach.  This raised the question as to which came first; the barge or the breach?*"

"*Figure 6.20 shows the large barge, in its final resting position (prior to being cut apart with torches to remove it) atop a small yellow bus.  This was not the initial resting location of this barge immediately after hurricane Katrina, however.  Initially, after Katrina, the barge had come to rest a bit farther to the east.  It was then re-floated several weeks later when the temporary breach repair failed during the second hurricane surge produced by hurricane Rita on September 24, 2005 (see Chapter 11), and came to rest at its current position at that time.  The small yellow school bus also arrived between hurricanes Katrina and Rita, having been appropriated and used for interim transport and then abandoned in its location as shown.*"

"*There is a single large dent low on the side of the barge just around the left side of the bow (not quite visible in Figure 6.20), and a pronounced scrape on the bottom of the barge at that same location.  Most of the concrete floodwall was failed in extension and flexure, with its reinforcing steel (rebar) fairly extended.  There was one single section of wall which clearly evinced a major impact, however, and that was at the extreme southern end of the breach.  Figure 6.21 shows a close-up view of the floodwall at this location.  The rebar is compressed and bent, and the concrete crushed at this location.  It was the consensus view of our investigation team that the barge had scraped along the wall and then impacted the end of the wall at this location.*"

"*As this was the extreme southern end of the very long breach; this impact was not the cause of the breach and failure.  Instead, the barge was apparently traveling southwards along the IHNC (driven by the prevailing storm winds at that time) and was drawn into the breach by the inflowing waters.  The barge did not enter cleanly into the breach, but struck at the south end before passing in.*"

"*That does not mean that the barge might not have struck the floodwall twice (or more times) before finally impacting the southern end of the breach, but our investigation's view is that there are other modes of failure that would have been expected to fail this section without any need for help from the barge, so that the likelihood is that the barge slipped its moorings and was eventually drawn in through a breach that was already well developed.*"(Underline added for emphasis).

24.     **Phase 3** – The Phase 1 and 2 ILIT work continued under the auspices of a research center founded by myself and Professor Seed at the University of California Berkeley after Hurricane Katrina – The Center for Catastrophic Risk Management (CCRM). Shortly after the founding of CCRM, the National Institute of Standards and Technology issued the report summarizing their forensic engineering investigations (NIST 2006). It was during this phase that we learned that the ING 4727 barge had been moored at the Lafarge terminal on the west side of the IHNC opposite the location of the North Breach. Examination of the wind velocity and direction records in the USACE IPET report indicated that until about 9:00 – 10:00 am (CDT), the wind direction in this area was not such that the barge could be driven by the wind across the IHNC to either of the breach locations (IPET 2007). The forensic engineering analyses indicated this time was well after the two breaches had fully developed and thus the barge could not have

participated in the development of the breaches. Regarding the Lower 9th Ward South Breach, this report concluded (p. 96):

> "*Also shown in Figure 4-24 is a barge that was drawn through the breach and settled on the protected side of the canal near the south end of the breach. This barge apparently impacted the floodwall at the south end of the breach (rust stain marks from the barge were observed by the ASCE team on the canal side of the floodwall), causing the concrete I-walls at this end to be broken into smaller pieces. The rest of the concrete I-walls that were part of the breached section appear to remain fully connected to the steel sheet pile even when overturned and uprooted from the embankment (Figures 4-26 and 4-27). The entire failed floodwall was pushed toward the protected side (in direction of pressure), with the concrete I-walls pointed toward the protected side direction and the steel sheet piles pointing toward the canal. This suggests rotational failure caused by full outboard pressure and increased cantilever action from the loss of the supporting soil along the inboard toe due to overtopping scour as the likely mode of failure.*" (Underline added for emphasis).

25.     In December 2006, a report prepared for the Louisiana Department of Transportation and Development was issued by Team Louisiana. Relative to the 2 breaches that developed adjacent to the Lower 9th Ward, this investigation concluded:

> "*Because the breaches occurred before the peak of the surge, the Lower 9th Ward neighborhood four feet below sea level drowned by water as high as 14 feet above sea level. Many homes were washed off their piles, while hundreds flooded almost to the roofline and thousands of people were trapped. The wave of water coming through these breaches explains the total devastation of the homes within five blocks of the breaches – devastation very similar to that, that was occurring on the Mississippi shoreline at about the same time.*

*Hundreds drowned in the space of about 90 minutes. <u>An empty barge floated into the south</u>* <u>*breach knocking the top 9 inches of the concrete wall that had already failed.*</u>" (Underline added for emphasis).

26.     The investigations performed by the U.S. Army Corps of Engineers (USACE) sponsored Interagency Performance Evaluation Task Force (IPET) forensic engineering analyses concluded (Vol. V, p. 55):

*"In summary, <u>the foundation failure at the north breach on the east side of the IHNC</u>* <u>*was a result of differences between the actual conditions and assumptions used as the basis*</u> <u>*for the design.*</u> *Those differences are (1) the ground surface beyond the toe of the levee at the north breach location was lower than the landside ground surface in the design cross section, and (2) the design analyses did not consider the possibility of a gap forming behind the wall, allowing water to run into the gap and increase the load on the wall. <u>The other</u>* <u>*three breaches on the IHNC were due to overtopping and erosion.*</u>" (Underline added for emphasis).

The IPET forensic engineering analyses did not conclude that the cargo barge ING 4727 played any significant role in development of the breaches at the Lower 9th Ward.

27.     **Phase 4** – The ILIT forensic engineering investigations of the breaches that developed at the Lower 9th Ward during Hurricane Katrina continued until May 2008. The first part of the additional studies performed by the ILIT were summarized in an ASCE conference paper (Seed et al 2007):

*"One question to answer here was whether the barge caused the breach, or it was drawn in through a breach that was already open. Figure 3 shows a close-up view of the top of the concrete floodwall at the south end of the breach. The concrete floodwall along the top of the*

*sheetpile curtain across the rest of the breach was largely spalled off the tops of the sheetpiles in extension. The south end of the breach (Figure 3) was the only location where the concrete floodwall, and its rebar, were crushed by compressive impact. In addition, a large dent on the left side of the barge, near the bow, and a scrape on its based at that location, appeared to correlate well with the south end impact site. Finally, geo-forensic studies clearly show that this section would have failed without barge impact. <u>It was concluded by this investigation that the barge most likely was drawn in through a breach that was already open</u>.*" (Underline added for emphasis.)

28.    The second part of the additional studies performed by the ILIT addressed 4 different modes of failure potentially involved in development of the South Breach at the Lower 9th Ward. The results were summarized in an ASCE conference paper (Seed et al 2008):

*"The south end of the breach (Fig. 10) was the only location where the concrete floodwall was crushed by compressive impact. In addition, a large dent on the left side of the barge, near the bow, and a scrape on its base at that location, appeared to correlate well with the south end impact site shown in Fig. 10. Finally as described later, geo-forensic studies performed as part of our investigation show that this section would have been expected to fail without barge impact. <u>It was concluded by this investigation that the barge was most likely drawn in through a breach that was already open, and that it impacted at the extreme south end of the breach as it passed inland through the (already open) breach.</u>*"(underline added for emphasis).

*"In the end, it is our investigation's conclusion that a fully definitive determination cannot be made between the multiple available competing potential failure mechanisms at this site based solely on these conventional geotechnical analyses. The two leading potential*

*candidate mechanisms are: (1) overtopping, producing erosion of a trench on the rear face of the concrete I-wall, and resultant lateral instability of the I-wall; and (2) underseepage-induced reduction of strength in the foundation soils, and resultant lateral stability failure of the inboard half of the levee embankment pushed by lateral water forces exerted against the sheet pile curtain and I-wall."*

29.     In parallel with the ILIT studies performed during Phase 4, additional forensic engineering studies were conducted by the writer for the Plaintiffs in the U.S. Federal District Court Consolidated Katrina Litigation. Results from these additional investigations were published in the Electronic Journal of Geotechnical Engineering in November 2008 (Bea and Cobos-Roa 2008):

*"Hurricane Katrina surge waters produced two massive breaches on the east bank of the IHNC (at the western edge of the Lower 9th Ward) (Figures 5 and 6). The larger of these two breaches was the South Breach. This was a very long breach, nearly 900 ft (274 m) in length, and the inrushing waters entered the adjacent Lower 9th Ward with great force, sweeping many of the nearby homes from their foundations."*

*"The majority of available evidence indicates the North Breach initiated before the wall was overtopped (about 5:00 am), with the breach fully developing between 6:00 and 7:00 am on August 29, 2005 (Refs. 5, 7, 9, 10, 11) (Figure 7). Available evidence indicates the South Breach also initiated its development about 5:00 am (overtopping started about 6:00 am). The South Breach fully developed between 7:30 and 8:00 am on the same day (Refs. 5, 7, 9, 10, 11)."*

*"This evidence and that associated with other breaches in this area that developed during hurricane Katrina indicates that it can take several hours for floodwall or levee*

breaches – failures - to fully develop. Development of a breach is most often a progressive process involving multiple interactive modes of failure and does not develop instantaneously. For example, if the process is initiated by seepage – hydraulic effects developed under the floodwall and supporting levee, the seepage will take time to develop significant water conduits and weaken or remove soil. At the same time, in response to these effects, there can be associated movements of the supporting levee. These movements can open the vertical joints in a concrete floodwall (water stops) allowing water to enter the protected area. If the supporting levee – soils differential horizontal motions are great enough these can result in separation of the steel sheet piling interlocks. Water flowing through the water stops and sheet piling interlocks can act to erode the supporting soil levee."

"Flooding can be initiated with a combination of water coming under the levee and through the opened water stops. This process was captured by a video camera during development of the breach at the 17th Street Canal (Refs. 1, 2, 3). This breach took approximately 3 hours to develop. Similar processes have been photographed during development of breaches in soil levees in other areas initiated by seepage and under-base hydraulic effects."

"There can be similar developments when the progressive failure process is initiated by or accompanied by overtopping. Overtopping a levee or floodwall can lead to erosion on the back or protected side. If the protected side of the floodwall is not provided with erosion protection (as was the case for all of the flood protection I-walls in the Greater New Orleans Area – including those at the Lower 9th Ward), erosion can act to remove supporting soils. Many such features were observed along the flood protection structures bordering the IHNC. The erosion takes significant time (hours) to develop in depth and width (Refs. 5,7,8,9). The

18

*time to develop significant erosion will be function of the impact of the water on the soil (water vertical velocity and pressure effects developed in the soils) and the soil erosion resistance characteristics (well compacted cohesive soils are highly erosion resistant; loosely compacted sandy soils are highly erosive). If the floodwall is progressively tipping under the water forces and levee – supporting soil movements, there will be a progressive widening in the erosion or scour trench. If the erosion process removes enough of the supporting soils, the floodwall and supporting sheet piling subjected to lateral forces from the water can tip over. The overtopping mechanisms can interact with the previously discussed mechanisms that are not dependent on overtopping."*

*"Available information indicates that all of the foregoing mechanisms were operative in development of both breaches at the eastern side of the Lower 9th Ward. <u>In addition, another mechanism – contributor[1] – was present: the Ingram barge (ING 4727) found inside the South Breach at the Lower 9th Ward. Although this mechanism is not a primary subject of this paper, the work summarized herein, and the forensic investigations of the U.S. Army Corps of Engineers (USACE, Ref. 5), Independent Levee Investigation Team (ILIT, Ref. 7), and Team Louisiana (Ref. 11) indicate that the ING 4727 barge was a victim, not a cause of the South Breach.  This evidence indicates the barge arrived in the last stages of development of the South Breach.</u>"* (Underline added for emphasis).

*"These observations and analytical results clearly show that the EBIA excavations and Marsh permeabilities played key roles in the hydraulic behavior and instability of the breaches along the East levee of the IHNC-Lower 9th Ward.  Because of the inherent uncertainties associated with the Marsh permeability a wide range of permeabilities ($10^{-3}$ to*

---

[1] Contributor – participating and resulting in localized damage at south end of South Breach after it had formed.

19

$10^{-6}$ cm/s) were used to characterize the Marsh deposit and compute the response of the levee
and underlying materials."

"The South and North breaches were modeled using two-dimensional finite element and
limit equilibrium analyses and incorporated two main differences with published analyses
(ILIT, IPET). The first was the presence of excavations on the EBIA side of the levee -
floodwall.  Previous analyses did not include the effect of the very deep excavations that took
place along the EBIA during the 1990s. The influences of the EBIA excavations on the levee
response to the storm surge is that it brings the IHNC effectively to the waterside toe of the
levee.  The 100 ft to 200 ft (30.5 m to 61 m) between the levee and the shore of the canal were
effectively reduced to a couple of tens of feet, meaning that the full hydraulic load of the
surge in IHNC was directly applied below the toe of the levee. The second was generation of
pore pressure and associated seepage through the waterside gap formed between the sheet
pile and the embankment as the surge rose in the IHNC."

"The seepage analyses show that pore pressures develop quickly and near-steady state
conditions are reached within less than 30 hours of the initiation of the surge starting on
August 28, 2005.  Calculated pore pressures and hydraulic gradients are within 20% to 30%
of those computed for a hypothetical steady state at the water elevation at time of failure -
between +9 ft and +10 ft (2.8 and 3.1 m) for the North Breach, and between +12 ft and +14
ft (3.7 m and 4.3 m) for the South Breach. Results from recent studies indicate that the two-
dimensional seepage analyses will produce conservative results compared with the three-
dimensional conditions – the two-dimensional analyses will produce underestimates of the
hydraulic effects."

*"The different relative permeabilities considered between Marsh and surrounding soils yield differences of pore pressure in the weaker soil layers that control lateral stability (e.g. Marsh layers).   Higher permeabilities in the Marsh layers give slightly larger pore pressures, and consequently reduce the effective stresses that control soil shear strengths. Another factor influenced by increased pore pressures is the potential for "blowout" failures.  This type of failure can be produced by uplift pressures that are equal or larger than the in-situ overburden stresses; the case was evidenced more critically at the North breach, at the thin clay layer located on the landside toe of the levee."*

*"The analytical results developed as a result of this study differ from the ILIT (2006) and IPET (2007) results.  The main differences are the recognition of the presence of the EBIA excavations and the transient seepage model considered the gap being opened and transporting water heads directly to the back of the sheet-pile, thus applying "instant" pressures at the tip of the sheet-piles.  This is why more than 80% of the steady state pressures are developed within the system, compared with the 60% to 70% calculated by the IPET.  Seepage modeling performed by the ILIT did not consider the formation of the gap in the subsurface soil seepage and pressure calculations (it was only considered as a lateral force for stability calculations)".*

*"The breaches along the East side of the IHNC-Lower Ninth Ward during Hurricane Katrina were influenced in major ways by the EBIA excavations performed for the USACE IHNC navigation Lock Expansion Project. These excavations resulted in facilitating significant increases in the hydraulic conductivity and porewater pressure development paths. This led to much quicker and greater increases in seepage pressures and hydraulic gradients and led to decreases in the lateral resistance of the levee – floodwall sections."*

21

*"Due to the large influences of hydraulic conductivity and lower lateral stability of the floodwall – levee section, the North Breach developed well before overtopping. The results summarized herein and detailed by Bea and Cobos-Roa (Ref. 3) indicate that the North Breach initiated its development at approximately 5:00 am. These results also indicate that the North Breach completed its development with the surge elevation at +9 to +10 ft (2.8 to 3.1 m) at 6:00 am to 7:00 am. The peak surge of + 14.5 ft (4.4 m) during Hurricane Katrina developed about 9:00 am."*

*"The South Breach developed after overtopping. The results summarized herein and detailed by Bea and Cobos-Roa (Ref. 3) indicate that the South Breach initiated its development at approximately 5:00 am. These results also indicate that the South Breach completed its development with the surge elevation at +13 to +14 ft (4.0 to 4.3 m) at 7:30 am to 8:00 am."*

## II.   FORENSIC ENGINEERING INVESTIGATIONS OF THE MRGO REACH 2 FLOOD PROTECTION STRUCTURES

### Field Studies

30.     I first arrived in New Orleans as a member of the National Science Foundation and University of California sponsored Independent Levee Investigation Team (ILIT) on September 30 2005.  Figure 2 depicts the locations of the major breaches and failures that I have studied (ILIT 2006). During the past three and one half years, I have made multiple field trips and performed investigations of the major breaches and failures responsible for flooding the Greater New Orleans area. These trips have included study and investigations of the repair and re-construction work that has been performed on these breaches and failures. I am not aware of any other civil engineer who has devoted more time to, or written more professional articles and

papers concerning the performance of the man-made flood protection features along Reach 1 and Reach 2 of the MRGO.



Figure 2: Summary of principal failures, breaches, and distress features with identification of the two breaches at the Lower 9th Ward adjacent to the IHNC (base map provided by USACE, ILIT 2006).

## Deleterious Effects of the MRGO

31.      It is my conclusion, based on my experience, my observations and analyses, and my forensic engineering studies, that the cumulative adverse effects associated with design, construction, maintenance, and operation of the MRGO Deep Draft Navigation Channel from 1958 to the date of Hurricane Katrina were a primary cause for the failure of the man-made flood

23

protection structures along Reach 2 of the MRGO. Analyses of the contributions to flooding of the Lower 9th Ward of these failures indicate that the adverse effects of the MR-GO Reach 2 flood protection facilities that defended the eastern perimeter of the Lower 9th Ward – St Bernard 'polder' added 4 to 12 feet of additional floodwater at the Lower 9th Ward (Wit et al 2008). Given that the historic adverse effects of the MR-GO had been mitigated including a surge protection gate installed at the 'throat of the funnel' (intersection of MR-GO and GIWW), the forensic engineering work summarized in this declaration, shows there would not have been breaching of the floodwalls at the Lower 9th Ward and there would not have been any significant flooding from St Bernard Parish.

32.     The MRGO Deep Draft Navigation Channel's cumulative negative effects, included loss and repression of natural wetland buffer and vegetation buffers, the magnification of the waves in the deep channel, the accelerated and increased subsidence of the levee's crest elevation, and the rapid storm surge delivery (elevations, volumes, durations). These cumulative adverse effects were primary causes of the breaching of man-made flood protection structures in the vicinity of the MR-GO (Figure 3).



Figure 3: MRGO Deep Water Navigation Channel's cumulative negative effects (Times Picyaune graphic 2006).

33.    **Loss of Existing Wetlands** - Selection of land route for the MRGO Deep Draft Navigation Channel and subsequent salt water intrusion and channel erosion caused catastrophic damage to existing trees, swamp, and wetland vegetation, ground cover, and inhibited the natural sustenance of these features after channel construction was completed (Figure 4).  This damage

and the absence of sufficient sustenance significantly reduced the areas natural ability to reduce surge heights and wave action.

34.     **Channel Growth** – The MRGO channel was allowed to grow to several times its originally authorized width (Figure 5). Maintenance dredging and dredging to provide a source of material for construction of the earthen man-made flood protection structures contributed to this growth as did wave erosion of the channel banks. The growth of the channel had multiple negative environmental impacts including development of a hydrologic system that facilitated salt water intrusion, encroachment of the channel banks into areas near the man-made flood protection structures thereby threatening their performance, and development of a wide and deep water body that would intensify hurricane surge, currents, and waves.

35.     **Wave Magnification** - The fact that the channel was allowed to grow to several times the authorized size caused it to serve as a wave regeneration basin during Hurricane Katrina.   The regenerated waves at the MRGO Reach 2 flood protection structures were significantly larger and more powerful than they would have been had the pre-channel wetlands and vegetation been present (Figure 6).   The contribution to the destruction of the man-made flood protection structures caused by waves, which were larger and more powerful than they would have been had the natural vegetation be present, was a direct cause of flooding due to the MRGO channel.

36.     **Accelerated and Increased Settlement** - The close proximity of the deep water MRGO navigation channel to the MRGO hurricane flood protection structures increased settlement (due to soil creep and 'squeezing') and loss of levee crest elevation (Figure 7).   The proximity of the MR-GO channel to the hurricane flood protection structures also threatened their stability. The low areas of the levee crest had an increased exposure to both erosive wave

action and overtopping.  Many of the portions of the levee that were the lowest at the time of Katrina experienced the most breaching.  This series of connections provides a direct link between the MRGO channel and the flooding of populated areas.

37.     **Intensified Storm Surge Delivery** - The route selection of the MR-GO Deep Draft Navigation Channel created an artificial 'Funnel' shape, and served as a direct deep water conduit to the open ocean (Figure 8).  The direct connection and funnel geometry caused earlier, increased, and prolonged propagation of storm surge.  The deep water channel served as a conduit which carried the storm surge water into the St. Bernard Parish, New Orleans East, and IHNC areas earlier, more rapidly, in greater volumes, and for a longer time period than the natural vegetation would have allowed in absence of the MR-GO channel.

38.     **The Legacies of the MRGO -** It is important to note that had the Reach 2 of the MRGO Levee merely been overtopped, without major breaching, Chalmette and St. Bernard Parish would not have been flooded by storm surge waters (Figure 9).  The volume of water from overtopping would not have overtopped the Forty Arpent levee.  Peak storm surge heights, above the height of the MRGO Levee, only existed for a few hours.  If the Reach 2 MRGO earthen hurricane flood protection structures had withstood this brief peak water level, as did many other levees in the area which were not subjected to all of the negative impacts of the MRGO channel, much of the flooding of the populated areas would not have occurred.

39.     The cumulative and multiple adverse effects of the MRGO resulted in exposing the man-made flood protection structures adjacent to Reach 2 of the MRGO to the open waters of the Gulf of Mexico. These man-made flood protection structures were originally designed and constructed as a 'backwater' protected hurricane flood protection system. The dramatic changes in the natural environment in which the Reach 2 man-made hurricane flood protection system

was designed and constructed were not properly recognized and mitigated before the arrival of

Hurricane Katrina.  Since the painful experiences associated with Hurricane Katrina, there have

been dramatic changes in how this hurricane flood protection system is 'viewed' and how the

current environment is being properly 'accommodated' in design and construction of the

facilities to 'Close the MRGO' and to re- engineer the '100-year hurricane flood protection' that

was authorized by Congress following Hurricane Betsy in 1965.



Figure 4: Destruction of wetlands caused by MRGO.



Figure 5: MRGO channel expansion.



Figure 6: Wave magnification due to MRGO.



Figure 7: Accelerated and increased settlements caused by encroachment of MRGO channel.



Figure 8: The MRGO Channel and Funnel effects on hurricane surge, waves, and currents





Figure 9: Flooding of St Bernard Parish due to Hurricane Katrina and due to Hurricane Katrina with a Neutral MRGO.

## Performance of the MRGO Reach 2 Flood Protection Structures

40.     Based on my forensic engineering studies, my fundamental conclusion is that much of (not all) the extensive (wide and deep) breaching in the Reach 2 earthen flood protection structures (Earthen Berm – Spoil Banks; EBSBs) developed during Hurricane Katrina was (most probably) initiated with water side wave erosion propagated to the final observed conditions with a combination of overflow exploitation of the wave action induced breaches by the rising surge waters and waves (Figure 10).  This early initiation and exploitation of the breaches by waves and rising surge waters explains how hurricane flood waters were able to penetrate in very large volumes at early times into Chalmette and St Bernard Parish. The breach that developed at the Bayou Dupre navigation – water control structure developed as a result of erosion and scour caused by surge waters overtopping the adjacent EBSBs. The breach that developed at Bayou Bienvenue navigation – water control structure developed as a result of hydraulic seepage and uplift pressures which caused 'blow out' conditions in the underlying shell fill and lateral instability of the sheet pile interface with the adjacent EBSB. The forensic engineering analyses I have performed concerning the failures that developed in the Reach 2 hurricane flood protection structures are summarized in Appendix B.

41.     Had the man-made flood protection structures adjacent to Reach 2 of the MR-GO been overtopped without breaching, the Chalmette/St Bernard Parish area would not have been flooded by Hurricane Katrina storm surge waters.  The volume of water from overtopping would not have overtopped the Forty Arpent levee.  Peak storm surge heights, above the height of the MRGO Reach 2 flood protection structures, only existed for a limited amount of time.  If the Reach 2 MRGO flood protection structures had withstood this brief peak water level, as did many other flood protection structures in the area which were not subjected to all of the negative

impacts of the MRGO Deep Draft Navigation Channel, much of the flooding of the populated areas would not have occurred. Because of the reduced elevations of large sections of the Reach 2 man-made earthen flood protection structures caused by the MRGO channel widening and because of the early water side wave induced breaching, the surge waters had many more hours to enter the St Bernard – Lower 9th Ward Polder causing the disastrous flooding experienced during Hurricane Katrina.

42.    To examine the impact of wave action on performance of the earthen flood protection structures one should look at the impact of overtopping without wave action on nearby flood protection structures (Figure 11).  Overtopping alone does not mean that a flood protection structure (e.g. earthen levee) will be breached or fail, as the following examples illustrate.

• The hurricane protection earthen levee south of Reach 2, in the area where the levee does not front along the deepwater navigation channel, suffered no breaching even though significant overtopping occurred in this area.  It should be noted that this section of levee is fronted by natural wetlands.

• The hurricane protection levee that fronts the eastern side of New Orleans East west of the Paris Road Bridge was severely overtopped and did not fail. This levee was protected from hurricane waves by the fronting wetlands.

• The south side of the Intracoastal Waterway levees were exposed to significant overtopping, yet no breaching occurred.

Although overtopping will contribute to flooding, overtopping alone can explain the timing, duration, and volumes of flood waters that entered the St Bernard Parish – Lower 9th Ward Polder and the New Orleans East Polder during Hurricane Katrina. This catastrophic flooding had its roots firmly embedded in the Legacies of the MRGO.



Figure 10: Initiation and development of wave-induced erosion and breaching of Reach 2 EBSBs.



Figure 11: Overtopping without breaching.

## III.   FORENSIC ENGINEERING INVESTIGATIONS OF THE LOWER 9TH WARD FLOOD PROTECTION STRUCTURES

### Summary

43.     Based on my forensic engineering studies, my fundamental conclusion is that the breaches that developed in the man-made flood protection structures adjacent to the Lower 9th Ward during Hurricane Katrina was most probably initiated with surge water pressures developed on the water side of the flood protection structures (concrete floodwall and supporting sheet piling) and hydraulic seepage and uplift pressures generated in the marsh layers under the soil levee (Figure 12).  Early development of the high hydraulic seepage and uplift pressures was further abetted by the nearby backfilled excavations developed during the USACE Lock Expansion Project East Bank Industrial Area (EBIA) site clearing activities (Figure 12). The North Breach fully developed early (0400 – 0500 am CDT) and before overtopping by the surge waters, and the South Breach fully developed later after overtopping by the surge waters (0700 – 0800 am CDT).

44.     As the breaches evolved, differential movements of the man-made flood protection structures resulted in opening the vertical joints (water stops) between sections of the concrete floodwall.  These openings allowed flood waters to enter early into the adjacent Lower 9th Ward.  As the breach development – failure process further developed there were failures of some interlocks – joints – between sections of the sheet piling. <u>The cargo barge ING 4727 found inside the Lower 9th Ward adjacent to the South Breach after Hurricane Katrina entered after the North Breach and South Breach had fully developed (Figure 12).</u>



Figure 12: Mechanics of breach development at the Lower 9th Ward.

## Multi-Modal Failure & Uncertainty Analyses

45.     Associated with my forensic engineering analyses of the breaches that developed at the Lower 9th Ward during Hurricane have been explicit considerations of multi-modal time-dependent failure development processes and uncertainties associated with these processes. My experience associated with forensic engineering studies of failures of engineered structures and systems clearly indicates that in the vast majority cases, many 'modes' of failure are involved during development of a failure. A failure can be initiated by a certain mode of failure (e.g. failure of an element or component that comprises the engineered system). As the failure continues to develop and propagate within the system, other modes of failure can be activated and involved. By the conclusion of the failure, many interacting modes of failure can be involved. This sequence of interacting failure modes can be very difficult to properly understand after the failure has occurred. I have expressed this difficulty with the observation that "you can not tell which way a train went by looking at the tracks." That observation is intended to point out that other 'clues' and evidence must be gathered and properly analyzed to determine which way the train went. This is a diagnostic process focused on 'connecting the proper dots properly' to develop plausible and probable deductions of 'causes and effects' (Hale et al 1997). Developing a reasonable understanding of the failure development process is not so much about gathering data and information as it is about properly analyzing and understanding the data and information.

46.     Another part of this challenge is associated with identifying the multiple modes of failure that can be active or activated during development of a failure. Rarely is only one mode of failure present in development of failure of a complex system. I have likened this process to a 'photo finish horse race without a camera.' There are many horses (failure modes) involved

during the race (development of the failure), and at the end of the race (completed failure), there can be one or more horses that win the race. The forensic engineer does not have a camera that shows which horses were involved nor which horse or horses 'won' the failure race. As a result, generally it is not possible to develop 'unambiguous' – deterministic – characterizations of failures of complex engineered systems, particularly when they are embedded in similarly complex natural environmental systems and settings. All of the potentially active modes of failure must be recognized and analyzed to develop a realistic understanding of how a system failure develops. In addition, their potential interactions also must be recognized and analyzed. Plausibility – and coherent – bias neutralized - diagnosis processes should dominate this process.

47.     The time dependent characteristics of development of failures of engineered systems (e.g. breaches in flood protection structures) also must be understood. The last phase in development of failure of a complex engineered system can be very abrupt and happen very quickly. Generally, it is this last phase in development of the system failure that is most evident after the failure. However, analyses of the failure of many types of engineered systems – including coastal, offshore, and ocean engineered systems – clearly shows that generally the failure sequence starts with a long 'incubation period' followed by a long 'propagation period' that culminates in the abrupt final phase in evolution of the failure (Bea 2000, 2009).

48.     Uncertainties associated with forensic engineering analyses are a natural by-product associated with such investigations. Based on my previous 4 decades of work regarding the uncertainties associated with performance of engineered systems, I have organized these uncertainties into four general categories (Bea 2000, 2005, 2009): 1) Type I – inherent or natural variabilities (information insensitive), 2) Type II – model, parametric, state (information

sensitive), 3) Type III – human and organizational performance, and 4) Type IV – information development and utilization.

49.     Examples of Type I uncertainties are the strength characteristics of soils and the heights of waves (at given times and places). Examples of Type II uncertainties result from 'model limitations' (frequently expressed as 'assumptions') such as those associated with 2-dimensional analytical models when applied to 3-dimensional processes and those developing from 'static' (not time varying) analyses when applied to 'dynamic' time-dependent processes. Examples of Type III uncertainties are those associated with human and organization 'errors' (performance malfunctions) such as mistakes, cognitive malfunctions, breakdowns in communications, and intentional and unintentional violations. Examples of Type IV uncertainties include malfunctions in access, development and use of knowledge (unknown knowables) and lack of information (unknown unknowables).

50.     My work has addressed Type I and Type II uncertainties associated with the analyses of development of the North Breach and South Breach at the Lower 9th Ward . For example, the uncertainties associated with computed lateral stability Factors of Safety (ratio of system 'capacity' to 'design loading') have been explicitly analyzed; the Factors of Safety which have been reported are the Mean (average, 'best estimate') Factors of Safety. The uncertainties associated with this Mean Factor of Safety have been reported to help develop an understanding of the uncertainties associated with results from the analytical models; the computed Coefficients of Variation (ratio of Standard Deviation to Mean value) of the computed Factors of Safety are in the range of 30% to 40% (Figures 13 and 14).



Figure 13: Type I uncertainties associated with computed lateral stability Factors of Safety at the South Breach (Mean Factor of Safety = 0.91, Coefficient of Variation = 28%).



Figure 14: Type I uncertainties associated with computed lateral stability Factors of Safety at the North Breach for storm surge at 8 feet (Mean Factor of Safety = 1.2, Coefficient of Variation = 25%).

51.     This discussion is intended to highlight difficulties associated with 'deterministic' (did or did not, would or would not, is or is not) interpretations of results from analyses (inductive, deductive, qualitative, quantitative) of development of the breaches in the man-made flood protection structures during Hurricane Katrina. Instead, interpretations that incorporate adequate understanding of the uncertainties that are associated with the results from the ALL of the analyses should be developed – this represents "The End of Certainty". I have focused my linguistic terms (e.g. "would or did develop") on those results that my assessments indicate as 'best estimates' – possessing the highest likelihoods of occurrence.

## North Breach Development

52.     Figure 15 shows results of the lateral stability factor of safety (ratio of 'driving' force to 'resisting' force) for the North Breach. These factors of safety are based on the use of mean (average, expected, best estimate) values for all of the material parameters. For the case where the gap has formed and the excavation is either 60 feet from the levee – floodwall or at the toe of the levee, the factor of safety becomes less than unity (probability of failure of 50%) at a surge elevation of about + 9 to +10 feet (NGVD 88) – or about 4:00 to 5:00 am (CDT) on August 29, 2005 (Figure 16).

53.     Consideration of the multiple modes of failure involved in development of this breach, it is likely that this breach began its development two or more hours before its culmination about 5:00 am (CDT) (Figure 17). The forensic engineering analyses of the development of the North Breach (Appendix C) indicate that this breach likely initiated very early the morning of August 29, 2005 (before 3:00 am) due to underbase seepage and hydraulic uplift effects which resulted in differential movements of the concrete floodwall and opening up

of the vertical joints between the floodwall panels thereby admitting the first floodwaters to enter the Lower 9th Ward. As the sequence further developed, there was tearing of the sheet piling at the north end of the North Breach and further lateral displacement of the supporting soil levee. This sequence continued until there was a total loss of lateral stability and the breach fully developed.



Figure 15:  Factor of safety (mean values) versus storm surge elevation for the North Breach.



Figure 16: Hydrographs showing measured (and photographed) water levels at gage stations along the IHNC (USACE IPET 2007)



Figure 17: Stage interior hydrographs based on eyewitness accounts and stopped clock data in Lower 9th Ward and Chalmette (IPET 2007). Site 1 is Jackson Barracks (see inset map). Sites C1 and C2 are stopped clocks along the north border of the Lower 9th Ward (lowest elevation area). Site OP-5 is the pump station located on the north side of the Lower 9th Ward.

47

## South Breach Development

54.     Figure 18 shows the calculated factors of safety (ratio of lateral 'driving forces' to 'resisting forces') based on mean (expected, average) values for all of the parameters for the South Breach for the cases of no gap formed, and the gap fully formed. Results from the analyses show that factors of safety drop below unity (probability of failure of 50%) for all cases between elevations +12 feet and +14 feet - or between 7:00 am and 8:00 am on August 29, 2005 (Figures 16 and 17). These analytical results are in agreement with available information on the response of this levee - floodwall during hurricane Katrina (IPET 2007, ILIT 2006, Team Louisiana 2007).

55.     These results indicate that the sequence of events leading to complete development of the South Breach developed after the similar sequence of events at the North Breach.  Given the elevation of the floodwall, these analytical results indicate overtopping would have been occurring during the development of this breach. Forensic engineering observations clearly indicated the erosion 'trench' adjacent to the floodwall on the protected side (ILIT 2006; IPET 2007; Team Louisiana 2007). The forensic engineering investigations (Appendix C) indicate formation of this erosion trench and its effect on lateral stability likely also played roles in development of the South Breach. However, there were similar erosion trenches along other portions of this floodwall that did not breach. Similarly, there were similar floodwalls and erosion trenches just to the north of the Lower 9th Ward (Citrus Back Levee) that did not breach. The combination of the lack of presence of the permeable buried marsh – swamp layers (Citrus Back Levee) and the lack of presence of nearby 'un-sealed' EBIA excavations (between North and South Breach sites) explained why the North and South Breaches had developed where and when they did.



Figure 18: Factors of Safety (based on mean values of input parameters) versus storm surge elevation.

56.     These analyses indicate that the lateral instability mode of failure involving the floodwall and supporting levee 'won the photo finish horse race' to develop the South Breach, this race involved several other interacting modes of failure. The factors of safety of the seepage, floodwall and supporting levee lateral stability, and the floodwall – overtopping erosion trench lateral stability modes of failure were all very close to unity at the same time (7:00 to 8:00 am). Without a 'camera' to tell which failure mode won this race, it is not possible with certainty to say which failure mode won (dominant at the time of full development of the breach). However, the outcome of this race is the same; the South Breach fully developed between 7:00 and 8:00 am as a result of the unique local conditions (Hurricane Katrina and geological – geotechnical – floodwall design, construction, and maintenance); these modes of failure did not involve interactions with or forces from the ING 4727 barge.

## IV.  FORENSIC ENGINEERING INVESTIGATIONS AND CONCLUSIONS REGARDING CARGO BARGE ING 4727

### Failure Modes Involved in Development of the North and South Breaches

57.     My forensic engineering analyses (Appendix C) of development of the North and South Breaches at the Lower 9th Ward during Hurricane Katrina show that there were multiple modes of failure involved in development of these failures (Bea and Cobos Roa 2008, Cobos Roa and Bea 2008). These failure modes include:

a)   under levee seepage and hydraulic pressure – flow gradients that could lead to localized 'blowouts',

b)   under levee hydraulic uplift pressures exacerbated by the poorly backfilled EBIA site clearing excavations,

c) overtopping erosion of the soils on the protected sides reducing the lateral capacity of the flood protection structures,

d) development of 'tension gaps' between the supporting soils and floodwall supporting sheet piling as they inclined toward the protected side under the rising surge waters in the IHNC leading to dramatic increases in the hydrostatic pressures acting on the floodwall and at the same time providing new paths for seepage and hydraulic uplift pressures

e) failure of the concrete flood wall panels and the vertical joints (water stops), and

f) failure of the sheet pile – floodwall connections or the sheet piles and their interlocks.

58.    These multiple mechanisms have been identified by the cited forensic engineering investigations of the breaches that developed at the Lower 9th Ward during Hurricane Katrina. As should be expected, there are differences in the expert opinions documented in the USACE IPET investigation (2007), the Team Louisiana investigation (2007), the ILIT investigation and subsequent studies (ILIT 2006, Seed et al 2008), and the NIST investigation (2007) concerning the 'primary mechanisms' participating in development of the North and South Breaches at the Lower 9th Ward. The primary method I have used to help me neutralize a wide variety cognitive biases that can exert important influences on results from forensic engineering investigations is one I have termed 'triangulation' (reference to the process used by surveyors and navigators to determine geographic locations). This method is based on using data, information, knowledge, analyses and conclusions (diagnoses) from as many reliable and credible sources as possible (Bea 2009). In my triangulation I have attempted to use at least 3 'independent' (not involving the same important potential biases) sources of diagnoses to help formulate and corroborate my deductions and conclusions (e.g. results from the USACE IPET, National Institute of Standards and Technology, and Congressional and White House investigations and studies of failures of the

51

New Orleans flood protection system during Hurricane Katrina). Given the independent sources of data, information knowledge, analyses and conclusions, if I was not able to triangulate my deductions and conclusions, then I examined the potential deficiencies that could pervade my and the other deductions and conclusions. If those deductions and conclusions were reasonable and justifiable, then I revised my deductions and conclusions and repeated the diagnostic process until I had achieved 'reasonable' agreement. I changed my diagnoses and conclusions given improved knowledge and confirmation of this knowledge by other qualified forensic engineering experts.

59.     Even though there are differences among the engineering experts involved in the major forensic engineering studies of the failures of the hurricane flood protection structures in the Greater New Orleans area during Hurricane Katrina (USACE IPET, ILIT, Team Louisiana, NIST, NRC, ASCE) concerning how and why the North and South Breaches developed, there is a unanimous opinion concerning the role played by the cargo barge ING 4727 in development of the North Breach or the South Breach - <u>the cargo barge ING 4727 did not play any substantial role in development of these breaches and did not cause any flooding.</u>

## The Role of the ING 4727 Cargo Barge

60.     Figure 19 shows the sheetpile curtain that had supported the floodwall at crest of the earthen levee in the vicinity of the South Breach. Note that the sheetpiles (which were cold-rolled steel sections) remained interlocked throughout the failure. The concrete floodwall is largely absent from the tops of these sheetpiles, as the sheetpiles have been stretched out (like an accordion), flattening their bent flanges in order to accommodate the extension imposed on them by the inrushing flow of surge water from the IHNC.

61.     Figure 19 also shows the cargo barge ING 4727 that passed inward through this section, and came to rest near the southern end of the South Breach. This raised the question as to which came first; the barge or the breach? Figure 20 shows the large barge, in its final resting position (prior to being cut apart with torches to remove it) atop a small yellow bus. This was not the initial resting location of this barge immediately after Hurricane Katrina, however. Initially, after Katrina, the barge had come to rest a bit farther to the east. It was then re-floated several weeks later when the temporary breach repair failed during the second hurricane surge produced by hurricane Rita on September 24, 2005, and came to rest at its current position at that time.



Figure 19: View of the south levee break at the IHNC at the Lower 9th Ward (video frame from USACE aerial survey September 14, 2005).



Figure 20: View of the large barge that entered through the south breach at the east bank of the IHNC at the south end of the Lower 9th Ward.

62.     There is a single large dent low on the side of the barge just around the left side of the bow and a pronounced scrape on the bottom of the barge at that same location (Figure 21). Whereas most of the concrete floodwall was failed in extension and flexure, there was one single section of wall which clearly evinced a major impact, and that was the extreme southern end of the breach. The rebar is compressed and bent (Figure 22), and the concrete crushed at this location (Figure 23). It is important to note that forensic engineering examinations of the concrete panels at the North Breach did not disclose any evidence of local barge impact features such as were found at the south end of the South Breach.



Figure 21: Dent port side near bow of ING 4727.



Figure 22: View of crushed – impacted – concrete floodwall at the south end of the south breach at the east bank of the IHNC at the Lower 9th Ward. Scraping motion of barge over top of floodwall results in reinforcing bars pointing in direction of final location of ING 4727 cargo barge.



Figure 23: Close up photograph of crushed top of floodwall at south end of South Breach at Lower 9th Ward.

63.    As this was the extreme southern end of the very long breach, available evidence and analyses indicate that this impact was not the cause of the breach and failure (ILIT 2006; Team Louisiana 2007; USACE IPET 2007). Instead, the barge was apparently traveling southwards along the IHNC (driven by the prevailing storm winds at that time) and was drawn into the breach by the inflowing waters. The barge did not enter cleanly into the breach, but struck at the south end before passing in. Regardless of any barge impact, our investigation's view is that there are other models of failure that would have been expected to fail this section without any need for help from the barge. The most probable forensic engineering scenario is the barge slipped its moorings and was eventually drawn in through an already well developed breach.

64.    Given that the cargo barge ING 4727 most probably was able to break from its moorings at the Lafarge Terminal on the west side of the IHNC as of 9:00 am (CDT) (Cushing 2009), and that the North Breach had fully developed on the east side of the IHNC as of 5:00 am

(CDT) and the South Breach had fully developed as of 7:00 to 8:00 am (CDT), then the ING 4727 barge could not have played any substantial role in development of either of the breaches at the Lower 9th Ward. In any event, regardless of the time of the breakaway, the forensic engineering evidence and breach development analytical results indicate the barge was not a substantial contributor to either of the breaches.

65. The forensic investigations indicate that if the ING 4727 cargo barge had remained moored at the Lafarge Terminal, the North Breach and South Breach at the Lower 9th Ward would still have developed during Hurricane Katrina. That is, conditions during Hurricane Katrina were clearly sufficient to cause the IHNC floodwall failures – and did cause those failures – without assistance from the ING 4727 cargo barge.

## Other Cargo Barges Impact Floodwalls and Do Not Cause Breaches

66. Cargo barges impacted several comparable floodwalls in the Greater New Orleans Area during Hurricane Katrina (e.g. Figures 24 - 28). While in many cases, these barge impacts clearly caused localized damage, the forces were not sufficient to cause breaching or failure of the concrete floodwalls. Note that the crushing of the top of concrete wall by the cargo barge impaled on the floodwall on the north side of Bayou Bienveune (Figure 27) closely resembles the crushing of the top of the concrete wall by the cargo barge ING 4727 at the Lower 9th Ward (Figure 23). Based on these forensic engineering observations and analyses, the conclusion is if a barge strikes a floodwall that is not already failing for independent reasons, then the barge impact is not sufficient to cause a failure and breaching should not be expected to occur.



Figure 24: Four cargo barges piled against floodwall on south side of MRGO – GIWW west of Paris Road Bridge following Hurricane Katrina (looking west).



Figure 25: Four cargo barges stranded against damaged and overtopped I-wall on south side of MRGO – GIWW just south of the Paris Road Bridge (looking east, USACE IPET 2007).



Figure 26: Cargo barge impaled on top of floodwall on north side of Bayou Bienvenue navigation – water control structure.



Figure 27: Close up photograph of cargo barge at Bayou Bievenue showing crushed top of floodwall.



Figure 28: Cargo barge shoved by surge water against concrete flood wall in Plaquimines Parish.

## Critique of Engineering Investigations Performed by Marino Engineering Associates, Mr. Hector Pazos, and CivilTech Engineering

67.     Following completion of my forensic engineering studies of the performance of the hurricane flood protection structures at the Lower 9th Ward during Hurricane Katrina, I received reports authored by Marino Engineering Associates (MEA 2009), Mr. Hector Pazos (Pazos 2009), and CivilTech Engineering (CTE) that address the performance of these flood protection structures. I have summarized my critique of these reports in Appendix D.

68.     Based on geotechnical engineering analyses, MEA arrives at the conclusion that the North Breach and South Breach did not develop due to insufficient support provided by the soils that supported the floodwalls at these two locations. MEA analyses conclude that large 'factors-of-safety' of the floodwall – supporting soil system at the presumed times of failure. Given these results, MEA concludes on the basis of eyewitness testimony that the ING 4727

barge must have caused the North Breach and the South Breach. MEA does not provide any quantitative engineering analyses that are able to show that the ING 4727 barge was actually capable of causing either of the two breaches.

69.     My review of the MEA geotechnical engineering analyses of hydraulic effects and stability of the hurricane flood protection structures at the location of the North Breach and South Breach indicates they are deeply flawed. These flaws have been detailed in this Appendix. Hydraulic effects have been underestimated resulting in significant underestimates in 'demands' (imposed loadings) and overestimates of 'capacities' (resistance provided by supporting soils). In a similar ways, the MEA analyses of stability of the flood protection structures involve important underestimates of 'demands' and overestimates of 'capacities.' The end results are substantial overestimates of the associated factors-of-safety.

70.     The engineering analyses provided by Mr. Pazos are based primarily on 'selected' results he has 'extracted' from other forensic engineering studies of the development of the North Breach and South Breach. Mr. Pazos, a qualified naval architect and marine engineer, does not provide any quantitative engineering analyses showing that the ING 4727 barge was able to exert sufficient impact on the wall to cause the wall to be pushed back into the neighborhood at either the North Breach or South Breach. Instead, based on his assembly of information from other forensic engineering studies and eyewitness testimony, Mr. Pazos concludes that the ING 4727 barge impact created "gaps or openings" which in turn led to "underseepage" and then "sliding" (lateral displacement)of the soil and floodwall (page 69-70, Pazos 2009).  Again, Mr. Pazos fails to provide or perform any quantitative forensic engineering analyses that substantiate his 'inferences' (speculations).

71.     In both cases, MEA and Mr. Pazos rely principally on eyewitness testimony to support their analyses and conclusions regarding the role of the ING 4727 barge in causation of the North Breach and South Breach. The multiple on-site forensic engineering investigations I and others performed in the early days after we were able to gain access to the breach sites (September and October 2005) and the other forensic engineering investigations cited in this Declaration did not develop any similar eyewitness testimony. The very extensive and intensive investigations performed by the USACE IPET and Team Louisiana involved early interviews (September 2005) of some of the same eyewitnesses cited by MEA and Mr. Pazos. These investigations did not document a single eyewitness report of the ING 4727 barge impacting the hurricane flood protection structures during the early morning hours of August 29, 2005. I do not find this surprising given the documented poor visibility (shown by the photographs taken by the IHNC lock master - very poor due to darkness, rain, and distance), acoustic conditions (loud multi-frequency noise due to wind, rain, waves, failing infrastructure components), and psychological conditions (apprehension, panic, beliefs) that existed at the time of initiation of development of the North Breach and later the South Breach. In the early days following the flooding, there were widespread reports that the flood protection structures at the Lower 9th Ward had been "blown up" (Tara Young, *Rumor of levee dynamite persists*, The Times-Picayune, December 12, 2005). Such intentional breaching of the flood Lower 9th Ward protection structures with explosives have proven not to be true.

72.     I have personally been in such terrifying conditions during my life (e.g. in our home in New Orleans East during the Hurricane Betsy flooding). Given the very extensive multiple forensic engineering investigations that have been conducted during the past 4 years to determine how these breaches developed, it is difficult for me to understand how the activities

(features, actions, noises) attributed by the cited eyewitnesses to the ING 4727 barge causation of the North Breach and South Breach could be determined by MEA and Mr. Pazos to provide sufficient reliable evidence to conclude that the ING 4727 barge fundamentally caused these breaches. Other more plausible mechanisms have been developed, validated, and corroborated to explain how and why these breaches developed. The conclusion of these investigations is that the ING 4727 barge was a victim of the breaches, not a cause.

73.     My review of the CTE report focused primarily on the characterizations of the performance of the MRGO "Reach 2" hurricane flood protection structures adjacent to St. Bernard Parish. CTE defines a total of 35,200 feet of various sections along the "MRGO Levee" (Table 1, page 17) that initiated breaching at 5:30 am. Details are not provided in the CTE report concerning the locations, breach development times, and after breaching elevations of the Reach 2 flood protection structures. The CTE flooding analysis results indicate these details of the MRGO Reach 2 "Levee" performance are very important because the MRGO Reach 2 breaches contribute very significantly to the maximum flooding in the Lower 9th Ward (Figure 15, page 34). CTE relies on the USACE IPET evaluations of the performance of the MRGO Reach 2 hurricane flood protection structures in which the IPET attributes development of the breaches to 'surge overtopping' (IPET 2007). It is important to note that IPET had to 'adjust' the Reach 2 surge hydrographs for Hurricane Katrina to develop interior flooding hydrographs that were in reasonable agreement with the reported flooding. These 'adjusted' IPET surge hydrographs are used in the CTE flooding analyses (Figure 8, page 23).

74.     Based on my extensive forensic engineering analyses of the breaches that developed in the MRGO Reach 2 flood protection structure, Figure 29 summarizes the predominant types of breaching mechanisms involved (see Appendix B for details). The element

of importance to the CTE flooding analyses is associated with the flood-side wave attack induced breaching that developed very early (6:00 am) in these structures (identified as "front-to-back" breaching). My analyses (summarized in Appendix B) indicate that about 45% of the "Levees" breached in this manner. This breaching developed well before surge overtopping of these Reach 2 "Levees" (identified in my analyses as "EBSBs" – Earthen Berm – Spoil Banks – because they were constructed with uncompacted dredge spoil soils). This distinction is important because it explains how the large 'polder' between the Reach 2 structures and the 40 Arpent levee was able to fill very early during the onset of Hurricane Katrina. When the peak Hurricane Katrina surge arrived, very large amounts of floodwater were able to flow through the major breaches that had already developed in the "Levees", quickly overtop the 40 Arpent levee and flow rapidly into St Bernard Parish and the Lower 9th Ward.



Figure 29: Breach mechanism classification.

I declare under the penalty of perjury under the laws of the United States of American that the foregoing is true and correct.

Executed on August 3, 2009 in Moraga, California.

Robert G. Bea, Ph.D, PE

# V.   REFERENCES

American Society of Civil Engineers (1989). <u>Guidelines for Failure Investigation</u>, Task Committee on Guidelines for Failure Investigation, Technical Council on Forensic Engineering, ASCE, Herndon, VA.

American Society of Civil Engineers (2006). "External Review Panel Progress Reports Numbers 1, 2, and 3," Letters to LTG Carl A. Strock, Herndon, VA.

American Society of Civil Engineers (2007). *The New Orleans Hurricane Protection System: What Went Wrong and Why*, Report by the American Society of Civil Engineers Hurricane Katrina External Review Panel, ASCE, Herndon, VA.

Bea, R.G. (2000). <u>Human & Organizational Factors in Design & Reliability of Offshore Structures</u>, Centre for Oil & Gas Engineering, The University of Western Australia, Nedlands, WA.

Bea, R.G. (2005). "Reliability and Human Factors in Geotechnical Engineering," Journal of Geotechnical and Geoenvironmental Engineering, Paper No. GT/04/23943m American Society of Civil Engineers, Herndon, VA.

Bea, R.G. (2006b). Human and Organizational Factors: Quality & Reliability of Engineered Systems, Vick Copy Publishers, Berkeley, CA.

Bea, R.G. (2008). "Failure of the New Orleans 17th Street Canal Levell & Floodwall During Hurricane Katrina," *From Research to Practice in Geotechnical Engineering* (Eds. J.E. Laier, D. K. Crapps, and M. H. Hussein, Geotechnical Special Publication No 180, American Society of Civil Engineers, Herndon, VA.

Bea, R.G. (2009). <u>Human & Organizational Factors: Quality & Reliability of Engineered Systems</u>, Vick Copy Publishers, Berkeley, CA.

Bea, R.G. <u>Reliability Based Design Criteria for Coastal and Ocean Structures</u>, The Institution of Engineers, Australia, Barton, ACT, Australia, 1990.

Bea, R.G. and Cobos-Roa D. (2008). "Failure of the I-Wall Flood Protection Structures at the New Orleans Lower 9th Ward During Hurricane Katrina," Electronic Journal of Geotechnical Engineering, Stillwater, OK.

Bea, R. G. and O'Reilly, D. (2008). "Discussion fo Analysis of the Stability of I-Walls with Gaps Between the I-Wall and the Levee Fill," Journal of Geotechnical and Geoenvironmental Engineering (In Press), American Society of Civil Engineers, Herndon, VA.

Bea, R.G. and Cobos-Roa, D. (2008). "Discussion of Stability of I-Walls in New Orleans During Hurricane Katrina," Journal of Geotechnical and Geoenvironmental Engineering (In Press), American Society of Civil Engineers, Herndon, VA.

Bea, R.G. and Storesund, R. (2008). "Breaching of the Mississippi River Gulf Outlet Huricane Flood Protection During Hurricane Katrina," (In Publication) Coastal Engineering Journal, Japan Society of Civil Engineers, Tokyo, Japan.

Bea, R.G., Cobos-Roa, D., and Storesund, R. (2008): "Discussion of Overview of new Orleans Levee Failures: Lessons Learned and Their Impact on Natioinal Levee Design and

Assessment," Journal of Geotechnical and Geoenvironmental Engineering (In Press), American Society of Civil Engineers, Herndon, VA.

Cobos-Roa, D. and Bea, R.G. (2008). "Three-Dimensional Seepage Effects at Three New Orleans Levee Breaches During Hurricane Katrina," (In Publication), Electronic Journal of Geotechnical Engineering, Stillwater, OK.

Committee on Homeland Security and Governmental Affairs (2006). Hurricane Katrina – A National Still Unprepared. United States Senate, Washington, DC.

Cushing  (2009). "Analysis of the Transit of the Barge ING 4727 During Hurricane Katrina and Reasons Why It Did Not Cause the Failure of the Inner Harbor Navigation Canal Floodwall," Project No. 2581, C.R. Cushing & Co., Inc., NY.

Federal Emergency Management Agency (FEMA) (2006). *Hurricane Katrina in the Gulf Coast*, FEMA 549, Washington DC, July.

Independent Levee Investigation Team (ILIT).  2006.  "Investigation of the Performance of the New Orleans Flood Protection System in Hurricane Katrina on August 29, 2005." University of California, Berkeley.  Dated July 31, 2006.  Available from: www.ce.berkeley.edu/~new_orleans.  Date accessed:  August 20, 2007.

Interagency Performance Evaluation Team (IPET).  "Post-Katrina LiDAR (Chance 2005)." Available from: https://erdcpw.erdc.usace.army.mil/LDR/mapapp/. 2005.

Interagency Performance Evaluation Team.  2007a.  "Performance Evaluation of the New Orleans and Southeast Louisiana Hurricane Protection System.  Final Report of the Interagency Performance Evaluation Task Force.  Volume IV – The Storm. Final." Dated March 29, 2006.  Available from:  https://ipet.wes.army.mil/.

IPET – Interagency Performance Evaluation Task Force (2007), Final Report on the Interagency Performance Evaluation Task Force, Volume V, The Performance – Internal Drainage and Pumping.

IPET – Interagency Performance Evaluation Task Force (2007), Final Report on the Interagency Performance Evaluation Task Force, Volume II, Geodetic Vertical and Water Elevation Datums.

Kardon, J. B., Bea, R.G., and Williamson, R.B. (2006): "Validity and Reliability of Forensic Engineering Methods and Processes," Proceedings 4th Forensic Congress, American Society of Civil Engineers.

Marino Engineering Associates (MEA) (2009): *Failure Investigation of The North and South Brteaches* Along *The IHNC During Hurricane Katrina, St. Bernard Parish*, New Orleans, LA. Report to Mr. Larry Widemann prepared by Gennaro G. Marino, July 1, 2009, Urbana, IL.

National Academy of Engineering and National Research Council (NAE / NRC) (2008). Report of the National Academy of Engineering / National Research Council Committee on New Orleans Regional Hurricane Protection Projects, The National Academies Press, Washington, DC.

National Institute for Standards and Technology (2006). *Performance of Physical Structures in Hurricane Katrina and Hurricane Rita: A Reconnaissance Repor*t, NIST Technical Note 1476, Gaithersburg, MD.

Pazos, H. (2009): "Barge Case, Katrina Levee Breaches Civil Action Njo. 05-4419, OOEW Job No. 1450," Report to Gilbert, Widemann, Sanders, Khorrami & Pollard, Ocean-Oil Expert Witness, Inc, Naval Architects and Marine Engineers Marine Consultants, June 29, 2009, Neew Orleans, LA.

Seed, R.B., Nicholson, P.G., Dalrymple, R.A., Battjes, J.A., Bea, R.G., Boutwell, G.P., Bray, J;.D., Collins, B.D., Harder, LF., Headland, J.R., Inamine, M.S., Kayen, R.E., Kuhr, R.A., Poestana, J.M., Silva-Tulla, F., Storesund, R., Tanaka, S., Wartman, J., Wolff, T.F., Wooten, R.L., and Zimmie, T.F. (2005). *Preliminary Report on the Performance of the New Orleans Levee Systems in Hurricane Katrina on August 29, 2005,* Report No. UCB/CITRIS –05/01, November 17, University of California Berkeley.

Seed, Raymond, B. (2005). "Hurricane Katrina: Performance of the Flood Control System," Testimony on behalf of the NSF-Sponsored Levee Investigation Team Before the Committee on Homeland Security and Government Affairs, U.S. Senate, November 2, 2005, Washington, DC.

Seed, R. B., Bea, R. G., Abdelmalak, R. I., Athanasopoulos, A. G., Boutwell, G. P., Bray, J. D., Briaud, J. L., Cheung, C., Cobos-Roa, D., Cohen-Waeber, J., Collins, B. D., Ehrensing, L., Farber, D., Hanemann, M., Harder, L. F., Inkabi, K. S., Kammerer, A. M., Karadeniz, D., Kayen, R.E., Moss, R. E. S., Nicks, J., Nimmala, S., Pestana, J. M., Porter, J., Rhee, K., Riemer, M. F., Roberts, K., Rogers, J. D., Storesund, R., Govindasamy, A. V., Vera-Grunauer, X., Wartman, J. E., Watkins, C. M., Wenk Jr., E., and Yim, S. C. (2006), *Investigation of the Performance of the New Orleans Flood Protection Systems in Hurricane Katrina on August 29, 2005,* Final Report to the National Science Foundation, under Grants CMS-0413327 and CMS-0611632, July 31, 2006, 742 p.

Seed, R.B, et al (2008). "New Orleans and Hurricane Katrina. I: Introduction, Overview, and the East Flank," J. of Geotechnical and Geoenvironmental Engineering, American Society of Civil Engineers, Vol. 134, No. 5, Herndon, VA.

Seed, R.B. et al (2008a), "New Orleans and Hurricane Katrina. I: Introduction, Overview, and the East Flank," Journal of Geotechnical and Geoenvironmental Engineering, Vol. 134, No 5, ASCE.

Seed, R.B. et al (2008b), "New Orleans and Hurricane Katrina. II: The Central Region and the Lower 9th Ward," Journal of Geotechnical and Geoenvironmental Engineering, Vol. 134, No 5, ASCE.

Seed, R.B.,  et al (2008). "New Orleans and Hurricane Katrina. II: The Centrral Region and the Lower Ninth Ward," J. of Geotechnical and Geoenvironmental Engineering, American Society of Civil Engineers, Vol. 134, No. 5, Herndon, VA.

Storesund, R., Bea, R.G., and Huang, Y. (2008). "Simulated Wave-Induced Erosion of the Mississippi River – Gulf Outlet Levees During Hurriane Katrina," (In Publication)

Journal of Water Ways, Ports and Harbors, and Coastal Engineering, American Society of Civil Engineers, Herndon, VA.

Select Bipartisan Committee to Investigate the Preparation for and Response to Hurricane Katrina (2006). *A Failure of Initiative*. U.S. Government Printing Office, Washington, DC, <http://www.gpoaccess.gov/congress/index.html> (Mar. 15, 2006).

Senate Committee on Homeland Security and Governmental Affairs (2006). Hurricane Katrina: *A Nation Still Unprepared*, Washington DC.

Team Louisiana (2006). The Failure of the New Orleans Levee System during Hurricane Katrina, Report to Louisiana Department of Transportation and Development, State Project No. 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,20, Baton Rouge, LA.

Townsend, F. F. (2006). *The Federal Response to Hurricane Katrina, Lessons Learned*, Report to The President of the United States, The White House, Washington, DC.

U.S. Army Corps of Engneers (USACE 2007) Interagency Performance Evaluation Task Force (IPET) (2007). Performance Evaluation of the New Orleans and Southeast Louisiana Hurricane Protection System. USACE, Washington DC.

United States Army Corps of Engineers (USACE).  "Helicopter Video Footage (Recorder Up, Recorder Down), Run 1, Run 2, Run 3, Run 4."  Flight No. 050914X1.  Flight Date:  09-14-2005.

Wit, L., B. de, Maaskant, Kok, M., and Vrijling, J.K. (2008). Flow Modeling New Orleans-Mississippi River Gulf Outlet, Hurricane Katrina, TU Delft and SVASEK. Final Report to Consolidated Katrina Litigation Group, Delft, The Netherlands.

Woolley D. and Shabman, L. (2008). Decision-Making Chronology For the Lake Pontchartrain & Vicinity Hurricane Protection Project, Final Report for the Headquarters, U.S. Army Corps of Engineers, Institute for Water Resources of the U.S. Army Corps of Engineers, Washington, DC.