## WIND DATA

Wind data during Hurricane Katrina is a critical source of information to determine the timing and direction of the movements of the barge ING 4727 during Hurricane Katrina. Because the barge was empty and therefore riding high in the water, its movements would have been predominantly governed by the wind. Therefore, Dooley SeaWeather Analysis, Inc. was commissioned to determine the wind velocity and direction at the Inner Harbor Navigation Canal site during Hurricane Katrina.

To accomplish this, Dooley SeaWeather Analysis, Inc. obtained hindcast data from Ocean Weather, Inc. for various points in the New Orleans area. Dooley SeaWether Analysis, Inc. then used the data from these points as boundary conditions and calculated the wind speed and direction at the IHNC during the Hurricane Katrina event. More information about Dooley SeaWeather Analysis' work in this area can be found in the report submitted by Dr. Austin Dooley.[54]

The results of Dr. Dooley's work are presented, in summary form, at pages 41-45 above. A more detailed treatment of the wind speeds and directions throughout the morning of August 29 can be found in the timeline in the appendices of this report.

Hurricanes are defined by their prevailing wind patterns. In a hurricane, the prevailing winds closely follow isobar lines around the eye of the storm in a counterclockwise direction. The winds at a specific location do not deviate very far from the prevailing wind direction. Hurricane winds are not erratic and they do not rapidly or frequently change direction. Instead, they gradually change direction as the hurricane's eye changes position with respect to the location in question.

As described above, Hurricane Katrina approached New Orleans from the south and passed to the east of the city. As the storm approached, the winds blew with an east-to-west component at the IHNC. As the storm passed, the winds shifted around and passed through a north-to-south vector and began to blow with a west-to-east component. These west-to-east winds occurred only after the center of Katrina was north of the city.

To visualize how these winds are oriented relative to the Inner Harbor Navigation Canal and the Lower Ninth Ward, Figure 52 superimposes the wind vectors on the original position of barge ING 4727 at the Lafarge Terminal. The wind early in the morning was acting on barge ING 4727 from an east and then north-east direction, tending to push the barge toward the wharf and later to the south. The winds at this time, combined with the presence of the Namasco gantry that projected into the south end of the basin, would have prevented barge ING 4727 from entering the canal proper if it had broken free early in the morning.

---

[54] Dooley SeaWeather Analysis Report, 2009.

In the 0200 – 0700 (2:00 to 7:00 AM) timeframe, barge ING 4727 would have been subject to the wind free stream, meaning there were no close obstructions upstream of the barge.  The nearest upstream obstructions in the 0200 – 0700 timeframe were the Florida Ave lift bridge and other smaller structures in its vicinity.  These obstructions were approximately 1500 feet away from the barge at the Lafarge Terminal, a large distance compared with the size of the obstructions.  Research shows that free stream flow re-establishes itself a distance downstream from an obstruction that is approximately equal to the size of the object. [55]  Given that the barge was located much further from the obstructions than a distance approximately equal to the size of the obstructions, the winds acting on the barge at the Lafarge Terminal would have had the same direction as indicated in the hindcast data and would have been unencumbered by obstructions.

It was not until approximately 0730 (7:30 AM) on the morning of the 29th of August that Katrina's winds were acting almost completely parallel with the orientation of the canal. If the barge had broken free at this time, it would have been blown to the south end of the terminal basin and would have been confined in the "pocket" at the Namasco unloading gantry shed.  (As noted, before this time the winds were holding the barge against the dock).

As the morning progressed, the wind direction came from a more north-northwesterly direction.  After 0800 (8:00 AM), the winds began to have a component blowing from the west toward the east (though still predominantly from north to south).  Taking note of the orientation of the wind vector on the canal, the earliest the barge could have been pushed into the canal by the wind, without interference from the Namasco gantry, would have been in the 0900 (9:00 AM) to 1000 (10:00 AM) timeframe.  It is also worthwhile to note that this is the time when the wind would have had the first chance to act on the barge without the barge being sheltered in the lee of the silos and warehouses on the wharf.  Of course, the breaches had already occurred by this time.

The strong winds present during Hurricane Katrina had an effect on the waters in the IHNC – specifically, waves were created.  The height of waves is determined by well-known relationships relating to the distance over which the wind blows over water (fetch) and the length of time that the wind blows from a single direction (duration). Wave building is also a function of the character of the surface over which the wind blows, such that waves build more readily over open water and less so over irregular urban land structures such as houses, floodwalls, warehouses, silos, etc.  The height of waves in the IHNC would have been very limited because of the short fetch of the wind. In the canal, the maximum uninterrupted fetch length would be about 1,400 feet when the wind is blowing approximately west to east.

---

[55] Ozgoren, Muammer.  Flow Structure in the Downstream of Square and Circular Cylinders, Selcuk University, 2005.

There are methods for calculating the properties of waves given a specific wind speed and fetch length. Among the most widely used is the SMB (Sverdrup, Munk and Brentschneider) method.[56] With a 1,400 foot fetch and a 68 mph wind speed, this method calculates a maximum wave height of about 2 feet. These waves would be of short wavelength, steep and choppy, as seen in Figure 28.

Another important property of wind-generated waves is that they travel in the same direction as the prevailing wind. This means that if the wind is blowing a barge one way, wind-generated waves would only add to the load exerted on the barge, and could not possibly move any floating object in a direction counter to the wind. In no way would the wind driven waves have a direction that varied by more than a few degrees from the prevailing wind direction, especially in a waterway of limited fetch such as the Inner Harbor Navigation Canal.

Wind-generated waves were the only waves present in the IHNC during Hurricane Katrina. Waves from the open Gulf of Mexico were damped out by the confined channels leading to the IHNC.

There has been some speculation that reflected waves could have had an effect on the barge movement. Reflected waves lose energy when reflection takes place. Also, the waves quickly decay and give up more energy because they are not being driven by the wind. A reflected wave can never have as much energy as the primary wave, and reflected waves can never force a floating object in the direction from which the primary wave is coming.

In summary:

(1) Barge ING 4727 could not have been present at the north breach. At no time during Hurricane Katrina would the wind would have carried it in that direction.

(2) The direction of the winds in the 0730 to 0900 (7:30 to 9:00 AM) time frame, coupled with the presence of the Namasco gantry, would not have permitted the barge to exit the Lafarge terminal basin in time for it to have been present at the time the south breach occurred, which must have been before 0814 (8:14 AM) when the National Weather Service reported its occurrence. Indeed, the latest that any report has placed the timing of the southern breach was around 0730 (7:30 AM), when the wind still had an east-to-west component.

(3) Waves in the IHNC were created by the wind, were relatively small and acted in the same direction as the wind. Thus, any waves in the IHNC would not have been able to propel the barge in any direction other than the direction in which the wind was blowing.

---

[56] The Rock Manual, Chapter 4 Page 369.

**C. R. CUSHING & CO., INC.**                                        **7/29/2009**

(4) Reflected waves could not have carried the barge to the north breach site, and they would not have been able to overcome the wind and incoming waves to carry it to the south breach site.



Figure 52: Wind Directions acting on barge ING 4727 during Hurricane Katrina from 0200 to 1000 (2:00 to 10:00 AM) on August 29.

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**

## THE BARGE GROUNDING

After the waters from Hurricane Katrina subsided, barge ING 4727 grounded in New Orleans' Lower Ninth Ward at the intersection of Jourdan Ave. and N. Roman St.  This location is approximately 150 feet inland of the IHNC floodwall as well as slightly south of the very southern end of the south breach.  Before the hurricane, the barge had been moored at the Lafarge Terminal located across the IHNC from the Lower Ninth Ward. On the morning of 29 August 2005, the barge was empty and was tied up outboard of the loaded barge ING 4745 that was, in turn, tied up to the wharf.  Immediately to the north of barge ING 4727 there were five loaded barges tied up to the wharf.  Of the seven barges at the terminal, ING 4727 was the only one to break from its moorings.

In order to determine how the barge might have ended up at its resting location inside the Lower Ninth Ward, the surrounding area and the barge itself were searched for any evidence relating to the passage of the barge.  Our team inspected the failed floodwall as well as the area near the Lafarge Terminal where the barge was originally moored. The purpose of the inspection was to collect evidence regarding how barge ING 4727 left the Lafarge Terminal and arrived in the Lower Ninth Ward.

**Barge ING 4727's Exit from the Lafarge Wharf Area**

The following figure shows the position of barge ING 4727 moored at the Lafarge Terminal along with several loaded barges at the time of Hurricane Katrina.  This wharf is situated off of the canal's main channel in a basin that measures approximately 1200 by 700 feet.  The Lafarge cement terminal is located on a wharf that occupies the southern half of the west side of this basin.

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**



Figure 53: The IHNC basin, Lafarge Terminal and barges.  The Namasco gantry roof is the white square object at the southern end of the slip.

In Figure 53, the original location of barge ING 4727 during Hurricane Katrina is shown in red and the location of the loaded barges moored at the wharf is shown in green. Although the exact timing of the breakaway and movement across the canal is not known, it is clear that the barge was transported across the canal after both breaches had already occurred, and there is evidence that allows a reasonable deduction of the timing of these events.

The following photograph (Figure 54) was taken by a member of the IHNC lock staff and was time stamped by the digital camera at 1503 (3:03 PM) on the afternoon of 29 August.  This photo shows the south breach at a time when water was draining from the Lower Ninth Ward and back into the IHNC.  Shown on the right side of the photo is a portion of the floodwall that is still standing at the lower (southern) end of the breach. The end of the floodwall shows a notch where part of the concrete panel has been cracked off (An explanation of this damage is provided a few pages below).  The barge had already been washed through the breach by this time and is just out of view on the right side of this photograph.

82

**C. R. CUSHING & CO., INC.**                                      **7/29/2009**



Figure 54: Photo of IHNC south breach taken by IHNC Lock staff time stamped 1503 (3:03 PM) on 29 August 2005.  The arrow shows the south end of the south breach.

Another critical piece of evidence that has been considered when establishing the time of barge ING 4727's departure from the Lafarge Terminal is the barge unloading gantry that juts north into the basin from the warehouse on the basin's south side wharf.  This structure is part of the Namasco Corp. Wharf and can be seen as the object with the bright white roof in Figure 53.

The gantry, seen from ground level in Figure 55, is a steel truss structure built on pilings and cantilevered over the basin.  The structure is clad in corrugated steel sheets which would show signs of damage if the barge had been blown into the structure.  If the barge had broken free of its moorings before 0900 (9:00 AM) it would have been blown south, and the only way it could have entered the canal's main channel would have been to float under the gantry housing.  But Katrina's storm surge raised the water levels to a height such that the barge could not have floated beneath the gantry if the barge was blown to the south during Katrina without scraping and otherwise damaging the barge's fiberglass covers.  Additionally, the water level would have allowed the

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**

unloaded barge to float over any of the pilings at the south end of the basin, strike the Namasco warehouse and ground in that location.  The fact that there is no damage consistent with a barge strike on the right side of the photo or to the gantry itself shows the barge was not blown south from its initial position at the Lafarge Terminal Wharf.



Figure 55: The gantry at the Namasco Corp. facility.



Figure 56: An image of barge ING 4727 elevated and superimposed over a photo of the Namasco Facility Gantry at the water level at 0600 (6:00 AM) on 29 August.  Note that there is insufficient clearance for the barge to float under the structure.

The evidence showing the barge was not blown to the south end of the basin means that the wind had to have a strong west-to-east component at the time that the barge broke free.  As shown in Figure 52, the earliest that the wind had a feasible direction was after 0900 (9:00 AM).

In Appendix B, the report prepared by Waterway Simulation Technology, Inc. there are several scenarios of the barge moving across the IHNC from the Lafarge Terminal toward the south breach, moved by winds and currents existing after the occurrence of the breach.  The scenarios demonstrate that before 0900 (9:00 AM) the barge would not have been able to exit the IHNC Basin.[57]  Because both breaches were well developed before 0900 (9:00 AM), the barge did not exit the IHNC basin until after the breaches had occurred.

---

[57] <u>Water Flow and Wind Conditions Affecting Movement of ING 4727 Barge in the IHNC During Hurricane Katrina on August 29, 2005</u> by Waterway Simulation Technology, Inc (Appendix B).

C. R. CUSHING & CO., INC.                                        7/29/2009



Figure 57: The most probable path of barge ING 4727 across the IHNC.  The red arrow shows the wind direction at 0900 (9:00 AM) and the white arrows show the current direction.  Based on the barge's large sail area and shallow draft, wind forces would have predominated over current forces when influencing the movement of the barge.

**C. R. CUSHING & CO., INC.**                                        **7/29/2009**

**Damage to Barge ING 4727**

As described above, on 27 September 2005 and on numerous subsequent dates, Dr. Cushing and other expert colleagues visited the site of the levee breaches and the grounding site of the barge ING 4727 in the Lower Ninth Ward. The team members photographed the barge in place and inspected the top and sides of the barge at that time.

Removal of barge ING 4727 from the Lower Ninth Ward took place during early March, 2006, ,when the upper portion of the barge was removed, while the bottom from the keel to approximately 50 inches in height was cut into 19 sections and transported to a warehouse for examination. Once the bottom of the barge was salvaged, it was possible to inspect for damage that may show how it entered the Lower Ninth Ward.

Inspection of the bottom of barge ING 4727 shows numerous parallel scratch marks aligned approximately parallel with the barge's longitudinal axis. The scratch marks are concentrated on the barge's port side and run from the bow for approximately one third of the barge's length. Additionally, some scratch marks wrap around the turn of the bilge on the forward end of the barge. Although the spacing of these scratch marks found on the barge's bottom is not uniform, most of the scratches are parallel and are spaced between approximately 7 and 11 inches on centers. Appendix H shows photos that were taken of the bottom sections of the barge. Several of these photos show examples of scratch marks.

There was some additional damage to the barge, most notably several indentations on the sides and on the bottom. There were also two locations where the hull was punctured, one location just above the turn of the bilge and the other just below deck level, both on the starboard side. Additionally, patches of light abrasion were found on the bottom, which were noticeably less severe than the other scratch marks described above. These indentations and punctures are not characteristic of ones that would be made by a collision with an intact floodwall. Other minor dents and scratches on the barge are typical of inland barges and the conditions under which they operate, and it is likely that this was pre-existing damage.

There was no damage on the barge that is consistent with the barge having caused the failure of the levee such as crushing damage, which could have been apparent if a major collision had occurred. There was no evidence of a major impact between the barge and an intact floodwall. Further, there was no damage to the bottom of the barge other than the parallel scratches which, as will be explained below, were created when the barge passed over the floodwall after it had already failed.

No damage was found on the fiberglass covers of the barge. This is further proof that the barge did not come into contact with the Namasco gantry shed.

87

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**



Figure 58: The fiberglass covers of barge ING 4727 (Note lack of damage).

**Examination of Impact Damage to Floodwall**

Early in this investigation, it was noted that the extreme southern end of the south breach displays damage that appears to be the result of an impact.  In this location, the floodwall panels transition from an upright position away from the breach to an overturned position in the breach.  This transition does not, by itself, suggest impact.  However, these transitioning panels also show fracturing done to the concrete floodwall cap as well as steel reinforcing bars that are bent at a sharp angle.  Figures 59 and 60 are photos of this damage.

At the transition at the upper (northern) end of the south breach, the panels incline at increasing angles the closer to the breach they lie, but do not show any fracturing of the concrete.  At the north breach, the transition at the south end is also similar in that the panels are inclined but show no horizontal fracturing.  This discounts the possibility that torsional or other stresses associated with the failing floodwall could have caused the pattern of fracturing at the south end of the southern breach, and it shows that damage from impact is visibly different from the damage created by the initial failure and the damage at every other location along the failed floodwall.



Figure 59: Damage at the lower (southern) end of the south breach, looking north.

The USACE as-built drawings of the floodwall show that the floodwall contained vertical pieces of rebar that were spaced at approximately nine inches on center. This rebar was ASTM No. 6 (3/4" diameter) on the flood side face of the wall and No. 4 (1/2") on the land side face. As with any concrete structure, there were small variations in the spacing of the rebar, but the spacing would have averaged 9 inches. An as-built drawing of the floodwall obtained from IPET is included in Appendix H and shows the position of the reinforcing bars.[58]

After the survey of the bottom of the barge was completed and all damage recorded, the striations were drawn on a scale drawing of the bottom of the barge according to their observed position and orientation. This drawing was compared with parallel lines spaced at 9 inches on center representing the average spacing of the reinforcement. It was found that the expected number of bars in a given length of wall based on a 9 inch spacing almost exactly matched the number of scratch marks found on a portion of

---

[58] IPET File DACW-29-70-B-0126 AB Drawing No. H-4-25157 Dated Nov. 1969.

barge of the same width.  Where there were fewer scratch marks than one would expect to see based on the construction of the wall, there was often a space where a piece of reinforcement may have existed but not made contact with the bottom of the barge. The drawing of scratch marks on the bottom of the barge is shown in Appendix H. Given this physical evidence, there is little doubt that the scratch marks on the barge were created when the bottom of the barge came into contact with the rebar as the barge passed over and across the top of the already failed floodwall.

Figure 60 shows a floodwall panel in the foreground lying in a nearly horizontal position while the panel in the background is inclined at a less severe angle.  This photo provides important evidence that the floodwall had already failed when the barge came into contact with the concrete cap and passed over the rebar.  The detail that explains in which direction the damage progressed is the sheetpiling that has separated from the concrete on the more upright panel.  Large pieces of concrete (D) have fallen into this gap (B) between the sheetpile (A) (on the left) and the concrete panel it had separated from.  This indicates that the gap between the sheetpile and the concrete panel had formed before the concrete on top of the more upright panel was cracked off and knocked into the gap.



Figure 60: Damage at south end of breach, looking west.

The angle of the concrete panel in the foreground of this figure, and the damage to that panel, shows that the wall had failed before contact was made by the barge.  This evidence indicates that the initial contact between the wall and barge was made at the panel in the foreground, which in the photo is lying in a nearly horizontal position (C).

90

**C. R. CUSHING & CO., INC.**                                        **7/29/2009**

Approximately 6 inches of concrete is missing from the uppermost part of this panel. The short rebar stubs protruding through the failure plane nearest the photographer are unbent, but the bars become more bent as they progress away from the photographer. The near end of the panel, however, does not manifest this type of damage. This indicates that this panel was in an inclined position before being struck, with the far end of the panel sitting at a higher elevation than the near end. In other words, the wall was already down before the barge first made contact.

Quite likely, this panel was pushed further back into its final position due to the scraping of the barge as it first contacted the panel at point E and then cracked the concrete off the top 6 inches and bending the rebar ends (F) at the far end of the failed wall panel. The separation of the concrete panel from the sheetpile in the adjacent panel may also have occurred at that time. Again, this is localized damage of a type not found anywhere else on the failed floodwall, and superimposed on pre-existing unrelated breaching and damage of a type similar to that found elsewhere in the breaches. (The separation shown in the Figure 60 was between concrete monoliths; the steel sheetpile remained continuous and intact).



Figure 61: Cross section of the concrete portion of the floodwall, showing the two different concrete pours separated by a construction joint (left) and the floodwall cracking at the construction joint as the result of being impacted (right).

91

The adjacent panel, which is inclined at approximately a 45 degree angle, experienced failure at the construction joint – that is, the place where the concrete for the tapered floodwall cap was poured against the already cured concrete of the lower, rectangular shaped portion of the floodwall.  This is a natural plane of weakness in concrete.  The rebar in this section is bent horizontally, making it consistent with the flat bottom of a barge moving over the rebar.  The angle of the bent rebar – virtually parallel to the ground -- shows that the water level in the Lower Ninth Ward must have been approximately equal with the water level in the canal when the barge passed over the rebar.  If the water level in the neighborhood had been significantly lower than the water level in the canal, then the rebar that made the scratch marks on the barge would have been bent downward at a sharp angle as the barge transited into a lower level of water instead of being bent almost perfectly horizontal as seen in Figures 59 and 60.

When the scratch marks on the bottom of the barge are superimposed over the damaged floodwall at the lower (southern) end of the breach, it is apparent that the barge could not have passed over the floodwall bow first, as the damage is concentrated on the other side of the barge.  The barge would have been traveling in a south-eastward direction while the bow was angled slightly toward the north.  While moving in this direction, the port side came into contact with the inclined wall panel on the already failed floodwall. The barge rode up on this floodwall panel, cracking off the topmost 6 inches of concrete.  This panel was pushed further back as the barge went over and became separated from the adjacent floodwall panel.  As the barge continued to move toward the south, it cracked the next concrete floodwall panel at the construction joint, causing debris to fall into the gap between the lower portion of the panel and the separated sheetpile.  Once the barge grounded on this panel to the point where it could no longer continue moving south, it appears to have rotated slightly and slid off the floodwall backwards into the Lower Ninth Ward, creating the longitudinal scratch marks.  As the bow cleared the floodwall, some of the rebar that had been bent horizontal by the weight of the barge above sprang back up slightly, creating scratch marks that wrapped around the turn of the bilge at the barge's bow.

Figures 62 and 63 show the barge damage superimposed over an aerial photo of the lower (southern) end of the breach.  The scratch marks support this scenario, as the scratches furthest to the stern are at a greater angle relative to the barge's longitudinal axis than the scratch marks closer to the bow.  This is evidence that the barge rotated as the scratch marks were being made.

Because the barge had to have grounded on the inclined floodwall panel, the floodwall had already failed before the barge arrived.  Indeed, in order for the scratch marks that are present to have occurred where they did, the barge must have had two-thirds of its length inside the Lower Ninth Ward (on the protected side of the floodwall) before coming into contact with the floodwall.  This evidence confirms the barge entered the Lower Ninth Ward after the floodwall had already failed.

92

Some of the water flowing into the Lower Ninth Ward through the breach would have been flowing southward along Jourdan Ave.  Current from this flow would have caused the barge to rotate.

After the barge slid off of the fractured floodwall, it rotated approximately 90 degrees in order to come to rest adjacent to the rubble of two ruined houses on either side of N. Roman St.  Several weeks later during Hurricane Rita, the Lower Ninth Ward was re-flooded when the temporary levee sealing the south breach was overtopped and eroded.  This flooding caused the barge to re-float and come to rest slightly to the west of its original position.

The presence of upright telephone poles, trees and houses immediately to the east of the final grounding spot indicate that the barge could only have followed this path. Fallen telephone lines extended from an upright pole to the south of the barge in a northerly direction along Jourdan Ave. and under the barge.

The houses on which barge ING 4727 came to a rest provide additional proof that the barge must have arrived a considerable amount of time after the levee had failed. These houses are wood framed structures and have limited capability to resist the forces associated with being struck by a large, heavy object.  Research shows that a wood frame house with diagonal bracing is only able to resist approximately 280 pounds of lateral load per linear foot of exterior wall.[59]  This is nowhere near enough strength to stop a barge if it were being carried by strong currents.  The fact that the houses were able to stop the barge rather than being totally demolished by it indicates that the barge had very little velocity when it contacted the houses.  This limited velocity indicates that the water on the protected side of the floodwall was nearly equalized with the water on the canal side when the barge floated in; otherwise the barge would have had a much higher velocity when it struck the houses and the homes would have been completely demolished.  Thus the barge did not enter the Lower Ninth Ward at the time of or immediately after the breach occurred.

Figures 64 – 71 show the path barge ING 4727 had to have taken over the floodwall in order to produce the pattern of scratch marks on its bottom.

---

[59] Shear Resistance of Wood Frame Walls by A.T. Hansen, 1985.

**C. R. CUSHING & CO., INC.**                    **7/29/2009**



Figure 62: Scratch marks from bottom of barge superimposed over aerial photo of south end of breach, position 1.  The red arrow indicates the direction the barge is traveling.



Figure 63: Scratch marks from bottom of barge superimposed over aerial photo of south end of breach, position 2. The red arrow indicates the direction the barge is traveling.

94

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**



Figure 64.  Note that houses that are shaded are homes that were not washed away by the breaching.  Houses that are outlines had been destroyed by the time the barge arrived.  The red arrows indicate current.



Figure 65.

95

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**



Figure 66.



Figure 67.

**C. R. CUSHING & CO., INC.**                    **7/29/2009**



Figure 68.



Figure 69.

**C. R. CUSHING & CO., INC.**                                     **7/29/2009**



Figure 70.



Figure 71.

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**

The examination of the floodwall for impact damage answers the question of whether impact with the top of the concrete floodwall panels would result in damage to the concrete cap, or failure of the underlying embedded sheetpiling.  As is shown in the above photos, both shearing of the top of the tapered cap and fracture at the construction joint did occur.  However, nowhere was the concrete panel cracked at the top of the sheetpiling, and nowhere did the sheetpiling fail in any other manner as a result of such impact.  This corroborates that shearing off of the top of tapered cap and fracture of the construction joint are what would occur if the concrete floodwall were struck.  In other words, impacting the concrete cap atop the floodwall does ***not*** cause the sheetpile below the cap to fail.

Interestingly, the south breach along Jourdan Ave. is not the only location where this fact can be verified.  During Hurricane Katrina, there were reports of barges striking other floodwalls of near identical design to the one in question.  One wall was located in New Orleans East in the vicinity of the Michoud Canal.  As can be seen from the photo below from IPET, the tapered cap of the wall was sheared off, leaving stubs of rebar exposed.  This is exactly what happened when barge ING 4727 came into contact with the first panel at the south end of the breach along Jourdan Ave.  As is apparent in the photo, the floodwall remained standing following the barge strike.  There was another barge impact of the floodwall near the Paris Road Bridge along the MRGO.  As can be seen from Figure 73, barge ING 5848 did not cause this floodwall to fail.

These photos show that a barge impact with the concrete cap of a floodwall does not cause the floodwall to fail.  Rather, the concrete cap gives way and the sheetpile remains intact.

By contrast, the IHNC floodwall breaches resulted from deep-seated sheetpile failure.  This failure could not have been caused by a barge impact with the concrete cap of the wall.

99

**C. R. CUSHING & CO., INC.**                              **7/29/2009**



Figure 72: Damage to a floodwall in New Orleans East due to a barge impact. [60]

---

[60] IPET Report Vol. V Chapter 12 Figure 12-53.

**C. R. CUSHING & CO., INC.**                                     **7/29/2009**



Figure 73: A barge strike along the MRGO under the Paris Road Bridge. [61]

---
[61] IPET website.

**C. R. CUSHING & CO., INC.**                              **7/29/2009**



Figure 74: A barge that impacted and came to rest on a floodwall near the Bayou
Bienvenue Control Structure.  The concrete cap was damaged, but the floodwall did not
fail.[62]

---

[62] IPET website.

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**

## SEQUENCE OF EVENTS

The evidence presented in this report establishes the sequence of events related to the failure of the Lower Ninth Ward floodwall and subsequent barge transition from the Lafarge terminal across the IHNC and through the existing breach.

The first event required to start that chain of events that led to the flooding of the Lower Ninth Ward was the hurricane itself. Hurricane Katrina approached slightly east of the city of New Orleans causing storm surge waters to pile up and inundate the marshlands surrounding Lake Borgne. This storm surge allowed two things to happen with regard to the Lower Ninth Ward and St. Bernard Parish. Initially the storm surge overtopped the levee fronting the MRGO causing breaching of this inadequately constructed levee to occur and flooding of the unpopulated marshlands in the north east portion of the polder. These waters eventually rose to a level where they began to overtop the Forty Arpent Levee and spill into the populated regions to the south and west.

The second result of Katrina's storm surge building in Lake Borgne was that these waters were funneled between the MRGO and the GIWW levees and driven up the combined MRGO / GIWW canal into the Inner Harbor Navigation Canal. This storm surge in the IHNC is what caused the rising water that was recorded by several gauges maintained in that canal. This rising water caused hydrostatic pressure on the floodwalls to increase. At some point the water level rose to a point where waves began to splash over the wall, which had an uneven crest height, and began the scouring process.

There is evidence in the IPET report and witness depositions that the north breach occurred as early as 0430 (4:30 AM),[63] and certainly by the 0530 to 0600 (5:30 to 6:00 AM) time frame. This breach washed away homes in the Florida Ave. vicinity and began the flooding of the Lower Ninth Ward. The breach occurred prior to overtopping, as a result of foundation instability, resulting from one or a combination of the following mechanisms: 1: Development of a tension crack between the canal side embankment and floodwall causing increased hydraulic pressure; 2: Lack of adequate soil support on land side toe; 3: Breaking of the transition between the old and new sheetpiling sections.

Of note at the north breach was the transition between the 1960s sheetpiling installed by the Corp of Engineers and the deeper 1980s sheetpiling installed as part of the Florida Ave. floodgate project. A weakness at this joint is what caused the sheetpiling to detach and caused the manner of the failure. However, it is the opinion of this investigation that the detachment of the sheetpiling was the result of the breach, and not vice-versa, meaning the loss of lateral resistance provided by the landside embankment is what caused tension to be put on the transition, which in turn caused the detachment. If the transition between the different lengths of sheetpiling had held, the north end of

---

[63] IPET Report, page IV-194.

103

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**

the north breach would have had a gradual transition between the failed floodwall to the south and the intact floodwall to the north, just as was seen at the periphery of other breaches.

As described above (see Figure 31), the formation of a "gap" between the canal side levee and the sheetpile caused added hydrostatic pressure on the wall that contributed to the formation of the breach at this location.

This water entering the north breach quickly spread to other areas of the Lower Ninth Ward, although the water flow of high enough energy to wash away houses was confined to a small area north of N. Rocheblave St.  The water entering through this breach is likely what first alerted residents of the Lower Ninth Ward to flooding in their neighborhood.

The IPET Report states:

> Eyewitness reports indicate that the water level in the 9th Ward near Florida Avenue was rising as early as 5:00 AM.[64]

ASCE's report states:

> At about 5 AM, a breach in the east bank I-wall contributed the first flow of flood waters to the Lower Ninth Ward in St. Bernard Parish.[65]

This breach, together with water flowing over the MRGO and Forty Arpent Levees, began inundating houses in the protected area.[66]

The north breach failed in a sudden and violent manner and would have produced a tremendous amount of noise, both from the breaking of concrete and twisting of steel and the rushing water and movement of houses and debris.  It is likely that the noises that witnesses reported as "booming" sounds were caused by breaking concrete, rushing waters, collapsing houses and other moving debris.   Witnesses of other breaches where concrete walls failed also reported boom sounds.

Figures 75 – 81 show the progression of the north breach.

During the early morning hours of August 29 (0400 to 0600), when the north breach occurred, the wind was blowing with a significant component from the east.  At the Lafarge Terminal, this wind would have been blowing barge ING 4727 toward the dock, and into the barge alongside.  This wind prevented the barge from moving to the north breach site.

---

[64] IPET report, Page V-11-1.
[65] ASCE report, Page 27.
[66] ILIT report, Chapter 6 Page 6.

104

**C. R. CUSHING & CO., INC.**                                      **7/29/2009**



Figure 75: Because of inadequate soil resistance, hydrostatic pressure (blue arrows) on the canal side of the floodwall causes the landside embankment to fail which allows the floodwall at the north breach site to lean in the landward direction.  This causes the crest height of the wall to become lowered and makes this area more prone to overtopping.  Note that the sheetpiling just to the north of where the breach will develop is substantially longer than the sheetpiling supporting the 1960's floodwall to the south. This additional length of sheetpiling makes the newer, 1980's wall much better able to resist lateral loading.

**C. R. CUSHING & CO., INC.**                              **7/29/2009**



Figure 76: Once the land side of the levee embankment can no longer resist the increasing hydrostatic pressure from the canal side, the sheetpiling and concrete cap are pushed in the landward direction.  Because the deeper sheetpiling to the north is well embedded and holding strong, great tension is placed on the sheetpiling at the joints between the old and new floodwall segments.  It is only this tension that allows the floodwall behind the failed embankment to remain standing.

106

**C. R. CUSHING & CO., INC.**                              **7/29/2009**



Figure 77: As more of the landside embankment fails, more tension is placed on the sheetpiling at the transition between the 1960s and the 1980s wall.  Ultimately this tension becomes too great and the shorter 1960s sheetpiling detaches from the longer 1980s sheetpiling that was keeping it upright.  After detaching, a massive torrent of water (red arrow) is released into the Lower Ninth Ward and the sheetpiling and floodwall is washed inland.

107



Figure 78: The loose end of the floodwall overturns 90 degrees in the landward direction.

**C. R. CUSHING & CO., INC.**                    **7/29/2009**



Figure 79: More floodwall overturns as water continues to rush through the north breach.

**C. R. CUSHING & CO., INC.**                              **7/29/2009**



Figure 80: The strong current (red arrow) flowing into the Lower Ninth Ward gets under the overturned and detached sheetpiling and lifts the sheetpiling while leaving the heavy concrete panels on the ground.

110

**C. R. CUSHING & CO., INC.**                              **7/29/2009**



Figure 81: The detached end of the floodwall at the north breach is ultimately rotated 270 degrees from its initial upright position, leaving a helical twist in the sheetpiling.

Even as water entered the Lower Ninth Ward through the north breach, the storm surge continued to cause the waters in the IHNC to rise and the floodwalls began to be overtopped by a continuous flow of water.  Overtopping would have first occurred at the portions of the wall that had subsided the most and then spread to higher portions of the wall as the canal water level rose.  Continuous overtopping greatly increased the amount of scour occurring on the land side of the floodwall, removing soil from the base of the floodwall and creating a deep trench.  At some point pressure from the rising waters caused the sheetpiling to lean a small distance toward the land side, creating a narrow crevasse which allowed water to infiltrate to the tip of the sheetpiling and placing a much larger hydrostatic load on the wall, and possibly facilitating more or quicker overtopping and scour.  This gap also would have created a more direct path for water to seep under the sheetpiling, had permeable soil existed at the pile's tip.  If water was able to permeate under the sheetpiling, it would have caused an uplift force on the overlying landside soil embankment and reduced the factor of safety with respect to sliding.

Ultimately, either through landside scour and possibly aided by sliding of the embankment due to pore water pressure increases, the floodwall at the south breach site failed in the vicinity of N. Johnson St. and released a destructive torrent of water into the Lower Ninth Ward.  The water entering through the south breach spread from the location of the sheetpiling's inward bulge and radiated out in all directions into the residential neighborhood.  The failed and blown in sheetpiling which absorbed the brunt of the deluge dragged down the other already unstable floodwall further south to N. Roman St.  The water entering from the south breach caused many objects to be overturned and oriented in the direction of the rushing flood waters, creating a record of the water's flow pattern.  The progression of the south breach is shown in Figures 82 – 84.



Figure 82: The sheetpile supported floodwall begins to move in the landward direction just south of N. Johnson St.



Figure 83: The sheetpiling overturns completely at the bulge near N. Johnson St, releasing a torrent of water into the Lower Ninth Ward.  Blue arrows represent vertical objects such as utility poles, trees, fence posts, etc, that were laid flat generally in the direction of the rushing water.

**C. R. CUSHING & CO., INC.**                                      **7/29/2009**



Figure 84: The southern portion of the south breach fails, but the sheetpiling in this location is not displaced as far inland.  Objects directly inland of the southern portion of the breach had already been displaced by the waters that first came through the upper (northern) part of the breach and as such they are not affected by water flowing through the lower (southern) portion of the breach later on.

The south breach added to the waters already present in the Lower Ninth Ward from the north breach.  By 0800 (8:00 AM) water was observed to be several feet deep in the vicinity of Jackson Barracks.[67]  At this time, the wind was blowing from north to south. At 0814 (8:14 AM) the National Weather Service issued a report stating that there had been a breach in the IHNC Levee.  For these reasons, both IPET and ILIT conclude that the south breach occurred in the 0730 (7:30 AM) timeframe.[68]  While the exact timing of the south breach is not known, it is clear that the breach had to have occurred before the winds had a west-to-east component.

---

[67] IPET Report Volume IV.
[68] IPET Report Vol. IV and ILIT Report Chapter 6.

114

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**

The storm surge peaked in the IHNC at 0900 (9:00 AM) and began to drop thereafter.  It was not until after this time that the winds began to back to a direction that could have carried the barge away from the Lafarge Terminal and into the canal's main channel without interference from the gantry at the Namasco facility.

It is most likely that barge ING 4727 broke free at about 0900 (9:00 AM) or shortly after, as the wind backed around to blow the barge away from its mooring.  (In any case, the wind would not have blown the barge away from the dock before 9:00 AM.) Once the wind had carried the barge into the main channel of the IHNC, the presence of the already formed south breach caused currents in the main channel of the canal, which in combination with the wind, carried the barge toward the south breach.

The barge was traveling in the athwartship (sideways) direction when its stern crossed over the location where the now-failed floodwall had stood a few hours previously.  The stern crossed over to the land side of the fallen floodwall first and the barge continued to enter the Lower Ninth Ward as it moved south.  At the point when about two-thirds of the barge had entered the land side of the levee through the existing breach, the port side grounded on the inclined floodwall panel at the southern periphery of the breach. As the barge slid over this panel the top part of the concrete cap was cracked off, exposing stubs of vertical rebar.  Because the panel was inclined, with the southern end being higher than the north end, the last few pieces of rebar on the southern end of the panel were bent over by the bottom of the barge passing over them.

As the barge slid toward the south end of the panel, it broke off portions of the concrete cap atop the southern end of the panel, which were higher in the water than the rest of the failed panel.  The weight of the barge pushed downward on the already failed floodwall panel, causing it to overturn the rest of the way.

As the barge continued to move south, it came into contact with the concrete cap on top of the next concrete panel.  Because this panel was less inclined than the first panel the barge had struck, the barge contacted more of the cap than just the top few inches.  As a result the panel cracked at the construction joint (i.e., the location where wet concrete was poured against already hardened concrete), which was the weakest part.   This action is depicted in Figure 87.  When this portion of the concrete cap cracked off, the rubble from the cap fell into the gap between the sheetpiling and what remained of the lower portion of the concrete floodwall.  Once the concrete was broken off, the moving barge bent the canal-side rebar over into the horizontal position as it floated across. The sequence of the concrete floodwall panels cracking can be seen in Figures 85-89.

115

**C. R. CUSHING & CO., INC.**                    **7/29/2009**



Figure 85: Underwater illustration of the concrete cap cracking as a result of a barge strike.

The barge continued to move south over the next panel, knocking off pieces of the concrete cap and bending over pieces of rebar until the barge temporarily came to a halt on the wall.  Because water was still flowing through the south breach into the Lower Ninth Ward, the current produced by this flow acted on the two-thirds of the barge that was already on the land side of the floodwall and caused to barge to rotate slightly, pivoting about the point where it was grounded on the floodwall.  Once the barge had been rotated by the current, it became dislodged and slid backwards into the neighborhood.  It was at this point when the scratch marks on the bottom of the barge were made by the barge moving over the bent pieces of rebar that had originally been located on the canal side face of the floodwall.  Once the bow of the barge cleared the floodwall, some of the pieces of rebar that had been bent horizontal from the weight of the barge sprung back up slightly, creating the scratch marks that wrap around the turn of the bilge on the barge's bow.

116