

Figure 86: The failed floodwall at the south end of the south breach as it would have appeared before barge ING 4727 entered the Lower Ninth Ward.  Note that the panel in the foreground is inclined at a severe angle, with the crest of the wall on the left side at a higher elevation than the wall crest on the right side.  With this diagram it can be visualized that a barge moving from right to left will ground on this inclined floodwall panel at the point denoted by the green arrow, which is what happened when barge ING 4727 entered the Lower Ninth Ward from the IHNC.



Figure 87: The barge grounds on the floodwall panel in the foreground.  The abrasion caused by the bottom of the barge moving up the crest of the wall causes the top 6 inches of concrete to crumble, exposing the tops of the vertical rebar.  The barge is able to pass over the exposed rebar stubs on the right side of this panel without contacting them.  The rebar stubs on the left side of this panel are higher because of the wall panel being inclined from the previous failure and are therefore bent by the bottom of the barge passing over them.  As the barge moved to the left, it placed more of its weight on the inclined panel in the foreground, forcing it to rotate further downward as shown by the curved green arrow until it lay at nearly a 90 degree angle with respect to its original position in the intact floodwall.  When overturning the rest of the way, it tugged on the sheetpiling, forcing the sheetpiling to be pulled out of the adjacent concrete panel, although the sheetpile remained connected to the sheetpile within that panel.  This figure shows the configuration of the floodwall after these events occurred.



Figure 88: The barge continues to move to the south (left in this figure) and strikes the floodwall panel in the background, causing pieces of concrete from that panel located above the construction joint to break off and fall into the gap created between the concrete panel and the sheetpiling (shown by the curved green arrow). While this concrete is being fractured, the vertical rebar that had been encased in the concrete are bent horizontally, perpendicular to the floodwall panel. The rebar is unable to be bent in the direction the barge is traveling because the intact concrete above the construction joint prevents fractured pieces of concrete encasing the rebar to be pushed or rotated in that direction.

119



Figure 89: After the barge grinds to a halt in the southward direction, it slides off into the Lower Ninth Ward, creating the scratch marks that were visible on its bottom.   This figure shows the configuration of the wall at the southern periphery of the south breach as it was after Hurricane Katrina.

Once the barge was free from the wall, the currents entering from the canal pushed the barge sideways toward the south.  As the barge moved gently south, the stern came into contact with a home on Jourdan Ave. that lay just north of N. Roman St.  This house stopped the stern of the barge, while the bow continued to move south, rotating the barge into a more north – south alignment.  Eventually, the barge swung around and the bow contacted the homes on the south side of N. Roman St., which brought the barge to a rest.  In the course of this process, the barge rode up and over overhead wires that were dangling from a utility pole to the south along Jourdan Ave.  The barge was held in this position by the wreckage of the houses until the water drained, which left barge ING 4727 sitting on the ground at the intersection of Jourdan Ave. and N. Roman St.  As the water drained, the barge was lowered onto wires that had been under the floating barge.



Figure 90: The bow of the barge in its pre-Rita position adjacent to the houses that stopped it from moving further in the landward direction.  Note the wires running under the barge indicating the direction of travel of the barge (southward toward the photographer) before it grounded and the water level as the barge floated into the neighborhood (high enough to be on top of these wires, which were raised at their normal height).

When Hurricane Rita re-flooded the Lower Ninth Ward, barge ING 4727 became buoyant and slid to the starboard in a westerly direction where it fetched up against the front of a school bus.

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**

This Page Intentionally Left Blank

## WITNESS ACCOUNTS

C.R. Cushing & Co., Inc. has been provided with and has reviewed deposition testimony from a number of individuals who were in the Lower Ninth Ward during Hurricane Katrina. Appendix I provides details regarding the deposition testimony of these individuals and analysis of it.

Many witnesses that lived in the vicinity of a floodwall failure described hearing a loud boom. This included those living in the Lower Ninth Ward as well as those who lived near the 17th Street and London Ave. drainage canal failures. It can be concluded that these loud booms were the result of the floodwalls failing and large quantities of water rushing into the respective neighborhoods, and not an object striking a floodwall as some persons have surmised.

Of the witnesses who lived in the Lower Ninth Ward near either of the breaches, very few claim to have seen the barge. The only witnesses that made mention of seeing the barge before being rescued were Wilson Simmons, Terry Adams, Arthur Murph, William Villavasso and Sidney Williams.

Wilson Simmons claims to have seen the barge while standing on his roof. Depending on the time, this may be possible because of Mr. Simmon's location. He can not verify what time he saw the barge. He says that he saw it just floating near the southern end of the south breach, where it came to rest.

Terry Adams claims to have seen the barge break the floodwall at the south breach site. Mr. Adams states that he was standing on his roof near the north breach at this time. At the time he claims to have seen the barge knock the floodwall down, it was dark (before dawn) under hurricane conditions (i.e. heavy rain and wind). The distance from Mr. Adams' home to the south breach site was over one-half mile, with many trees between his house and the south breach. A survey conducted after the storm in ideal conditions (daylight, clear weather) shows that an unobstructed line of sight did not exist due to trees, houses and other obstructions. Thus Mr. Adams could not have seen what he claims to have seen at night during a hurricane.

Arthur Murph lived in one of the houses just to the south of the south breach that was actually struck by the barge. Although the timing of the first sighting of the barge is not known, the fact that he was in the attic of the house when it was struck by the barge means that it is possible that he could have seen the barge. According to Mr. Murph, well over an hour passed between the time of the flooding and the time he first saw the barge.

William Villavasso was operating pump station OP-5 near the Florida Ave. Bridge at the time of Hurricane Katrina. Mr. Villavasso claims to have looked out of the pump station door toward the north breach. While doing so, he saw something lodged in the breach

"one to one and one-half, not more than two feet" high, and says that it looked like the tip of a barge.  It is impossible that Mr. Villavasso saw the barge ING 4727 at this location, because there was no way for the barge to ever have traveled to the north breach site during Katrina.  Moreover, it is geometrically impossible because the size of the object does not match the size of the barge.  The barge's hull is 12 feet deep, with a 5 foot high coaming atop the hull, and fiberglass covers about 4 feet above the coaming, for a total of 21 feet from top of the barge to the bottom.  If it is assumed that the barge is adjacent to the floodwall at the north breach, with the hatch covers 2 feet above the top of the intact floodwall, then the barge must extend 19 feet below the top of the floodwall.  This situation is impossible, because there is at most 8 feet of space available below the crest of the floodwall.  In order for the barge to have 2 feet visible above the floodwall, 11 feet of the barge must be below ground level, as the following figures show.  Thus if the object that Mr. Villavasso saw protruding 2 feet above the floodwall was indeed the barge ING 4727, the barge would not have been able to strike the floodwall because it would have grounded a great distance from the wall, as shown in Figure 92.



Figure 91: Barge dimensions.

But, if the barge had indeed been adjacent to the floodwall at the north breach site (which it could not ever have been), it would have been protruding at least 13 feet above the top of the floodwall, which is not consistent with Mr. Villavasso's statements. The object described by Mr. Villavasso cannot have been the barge ING 4727.  Instead, it is most likely that what Mr. Villavasso saw was the inverted sheetpiling that was pointing upward at the north breach site (see Figure 41); in any case, it certainly was not barge ING 4727.



Figure 92: The barge could not have come close to the floodwall if only 2 feet was exposed above the crest of the wall.



Figure 93: If the barge was next to the floodwall, it would have protruded a minimum of 13 feet above the floodwall and not "Two feet at most."

**C. R. CUSHING & CO., INC.**                              **7/29/2009**

Other employees at Pump Station OP-5 during Katrina did not report ever seeing anything resembling a barge at the north breach site, and Mr. Villavasso apparently never mentioned to the other employees of the pump station like Wallace Rainey and Richard Riess that he had seen something that he thought looked like a barge.

Sidney Williams is the final witness that testified that he saw the barge before being rescued.  Mr. Williams claims that he was forced to his roof by rising water.  While on his roof, he testifies:

> I heard the first bang we got on the roof.  I looked around.  That's when I seen the barge hit the wall, bounced off – the water was real rough – and it hit the wall again.

Sidney Williams Deposition 1, Page 41 Line 12-15

While Mr. Williams testifies that he saw the barge strike the floodwall during his deposition, Mr. Williams had spoken with an investigator over the telephone on an earlier date.  During this conversation, which was recorded, Mr. Williams was asked whether or not he had seen the barge; he told the investigator that he had not.  Given this change of story, Mr. Williams' testimony that he saw the barge strike the floodwall cannot be credited.

 The deposition testimony, taken as a whole, does not undermine the conclusions set forth in this report or the scientific data on which those conclusions are based.

126

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**

## COMMENTS ON PLAINTIFF'S EXPERTS

Expert reports sponsored by the plaintiffs were forwarded by the defense counsel. This section consists of comments on some of these reports.

### Report by Robert D. Bartlett

Robert D. Bartlett, a metallurgist, submitted a report that was largely focused on the scratch marks on the bottom of the barge and the damage to the floodwall cap at the south end of the south breach. Comments on his report can best be accomplished by commenting on each of Mr. Bartlett's conclusions.

Bartlett's Conclusion 1:

> Hydrostatic pressure alone would be insufficient to cause the fracture features and rebar deformations observed at the south end of the south breach of the IHNC 4727 east floodwall.

This statement is worded confusingly, *ING* 4727 is the barge and the floodwall along the IHNC has no 4727 suffix. It is agreed that hydrostatic pressure could not have created the localized damage at the south end of the south breach. This is the only damage, however, that is associated with a barge impact or contact.

Bartlett's Conclusion 2:

> The locations of the scratches on the bottom of the ING 4727 are consistent with the spacing of the exposed, bent vertical rebars at the south end of the south breach of the IHNC east floodwall.

Since the beginning, it has been the view of this investigation that the scratch marks on the bottom of the barge were consistent with the orientation of rebar within the floodwall and occurred long after the south breach occurred.

Bartlett's Conclusion 3:

> The features of the damage at the south end of the south breach of the IHNC east floodwall are indicative of damage being caused by contact from the ING 4727.

This investigation does not completely disagree with this statement, but it should be recognized that the damage was caused after the floodwall had already failed, and the damage referred to applies only to the limited local damage, which occurred when the barge passed over the already failed floodwall.

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**

Bartlett's Conclusion 4:

> The cited information is compelling evidence that the damage to the south
> end of the south breach of the IHNC east floodwall was due, more likely
> than not, to an impact by the ING 4727.

Again, our investigation doesn't disagree with Mr. Bartlett as long as it is clearly
understood that this damage which Mr. Bartlett refers to is damage to the already fallen
floodwall and this localized damage had to have been created well after the initial south
breach and floodwall failure had already taken place.

Bartlett's Conclusion 5:

> The evidence demonstrating that the ING 4727 created a breach at the
> south end of the IHNC east floodwall confirms the plausibility of the
> testimony by Mr. Villavaso that he observed a barge create the initial
> damage to the north breach of the IHNC east floodwall.

In the previous conclusions, Mr. Bartlett opined that the ING 4727 caused the localized
damage at the south end of the south breach.  However, this conclusion expands that
conclusion, without any basis, to conclude that the barge caused the entire south
breach.  There is no information in Mr. Bartlett's report that can justify this conclusion.
Mr. Bartlett also takes the stance that if the barge could have been at the south breach
site, it could have been present at the north breach site.  Such a conclusion requires
one to ignore a vast amount of evidence and relies solely on the observations of Mr.
Villavasso that he saw the tip of a metallic structure.  As noted above, the object that
Mr. Villavasso reported seeing cannot have been the barge ING 4727.  Overall, nothing
in Conclusion 5 is supported in Mr. Bartlett's own report.  This investigation does not
agree with that conclusion.

128

### Report by Hector V. Pazos

Hector V. Pazos is a naval architect who produced a report that deals primarily with his claim that the barge ING 4727 was the cause of both the north and south breaches in the IHNC east floodwall.

<u>Wind Direction</u>

Mr. Pazos has the opinion that barge ING 4727 broke free from its moorings, traveled first in a north-east direction to the site of the north breach, and then traveled south to the site of the south breach.  It is an indisputable fact that when a hurricane in the northern hemisphere travels northward and its center is east of a specific site, as Katrina did, the winds at that site would blow first from east-to-west as the storm approaches and not south-to-north as Mr. Pazos suggests. More relevant to Mr. Pazos' claim, the winds during Hurricane Katrina at the IHNC would never have had a south-to-north component given the passage of the storm to the east of the city.  This makes it *impossible* that barge ING 4727 could have been blown north from its slip before it was blown south as Mr. Pazos concluded.  Additionally, in order for the winds to blow from west-to-east (i.e. in the direction of the floodwall), the eye of the storm had to have been north of New Orleans.  At all times when the IHNC east breaches developed, the eye of Katrina was south of the city, thus the winds would have been blowing the barge toward the dock and away from the site of the breaches.



Figure 94: Diagram showing a typical hurricane wind field, with the position of the barge shown relative to the center of the storm.

129

Mr. Pazos even acknowledges on page 37 of his report that the eye of the hurricane passed to the east of New Orleans, and that the winds blow counter-clockwise.  Hence the winds could not have blown the barge to the north, and could not have blown it to the east until long after the eye of the hurricane passed by the city.

<u>Superpositioned and Reflected Waves</u>

Mr. Pazos theorizes that wave action would have had an effect on moving barge ING 4727.  Mr. Pazos incorrectly suggests that reflected waves would have superimposed on top of incoming waves to create exceptionally high and steep waves that could have acted on the barge.  In section O on page 40 of his report, Mr. Pazos attempts to use a reference in Hydrodynamics in Ship Design to support his theory, but selectively chooses the information he places in his report.  The actual quote[69] by Saunders reads as follows:

> A devastating combination of gale-size wind waves bucking a water current, shallow water, and reflection from man-made boundaries can produce waves of incredible steepness…

In the IHNC, there were no "gale-size wind waves" and there was no water current.  Mr. Pazos leaves this information out of his misquotation.  Production of waves of "incredible steepness" is a rare event that requires many different factors to coincide. These factors simply were not present in the IHNC.

---

[69] Hydrodynamics in Ship Design, Vol. III Page 188 by Harold Saunders.

Mr. Pazos advances the implausible theory that westbound waves reflected off of structures on the west side of the IHNC, superimposing themselves on the westbound waves, and somehow "pushing" barge ING 4727 eastward and northward, against the wind and wind-driven waves.  The waves present in the IHNC during Katrina were caused by winds.  Wind-driven waves can achieve considerable height, but there are several requirements in order for this to happen.  The most significant requirement is that the wind must blow across a wide, open body of water.  Large waves in the ocean or the Gulf of Mexico, for example, developed because wind blew across hundreds or thousands of miles of open water.  This distance over which the waves build is called the fetch.  The longer the fetch, the more energy can be transferred by the wind to the waves, and the higher the waves will become.

The Inner Harbor Navigation Canal did not have a large fetch.  With the wind blowing from east to west, the fetch would have been approximately a quarter mile in the vicinity of the Lafarge Terminal.  This small fetch would lead to only small waves being created.

 The wind-driven waves on the morning of 29 August, 2005 followed the wind and together with the wind were pushing the barge ING 4727 against the wharf on the west side of the IHNC until the center of the storm passed the city, and long after the breaches had occurred.

While waves that superimpose on top of each other can increase the wave height if two crests meet (or conversely cancel each other out if a crest meets the trough of another wave), waves can not be amplified in this manner infinitely.  There is a limit of wave steepness beyond which a wave will collapse due to gravity's restoring force, creating a white capping effect.  The fact that white caps were seen in photos taken of the IHNC during Katrina indicates that those waves had reached their maximum possible height, and there would not be waves appreciably higher or steeper than the white capped waves captured in photographs.  (See, e.g., Figure 28).  These waves would have had insufficient energy associated with them to have any capability to propel a barge counter to the prevailing wind direction.

Further, superpositioned waves exist for only a very short period before dying out.  As the movement of the barge across the canal is something that would have required considerable time, a wave lasting a few seconds cannot have had an appreciable effect.  Also, if a reflected wave were to superposition on top of an incoming wave, the resultant wave would have very little or no forward velocity, as the opposing directions of the two component waves would cancel out each other's velocity.  This makes it impossible that superpositioned waves comprised of two component waves traveling in opposite directions could move a floating object.

Mr. Pazos' theory that reflected waves could have had an effect on the barge, and perhaps overpowered the wind and incoming waves is also fundamentally flawed.  A

131

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**

reflected wave will *always* have *less* energy than an incoming wave, and thus will *never* be able to overpower an incoming wave, let alone the powerful force of the hurricane wind. When a wave reflects off of a structure, less than 100% of the incoming wave's energy is transferred to the reflected wave, with the remainder of the energy being dissipated. Mr. Pazos' scenario is scientifically impossible.

In a related matter, it has been mentioned before in this report that these wind-generated waves act in the same direction as the wind, thus any force that they impart to the barge would have been in the same direction as the wind, only adding to the force that prevents the barge from crossing the IHNC and reaching the east floodwall until the wind shifted later in the morning and long after the floodwall failure occurred.

Mr. Pazos further contradicts himself in the drawing he labels sketch #1, a cropping of which is shown below. This drawing shows the waves moving southerly and the wind blowing from another direction, which is not possible. If the wind and waves were acting in the direction Mr. Pazos shows in this drawing, the barge could not have moved from the Lafarge Terminal to the site of the north breach.



Figure 96:[70] Cropping of one of Mr. Pazos' drawings, showing waves acting in a different direction than the wind. The wind would not be blowing in the direction shown by Mr. Pazos until approximately 1000 (10:00 AM).

The wave conditions in the IHNC were not a mystery during Hurricane Katrina. There exist several photos that show an example of what the wave conditions were like. These include photos taken by the IHNC Lock staff, one of which is included in this report as Figure 28. In addition, there are photos that were taken during Hurricanes Rita and Gustav that show similar waves.

Figure 97 for instance, is a photo that was taken from the Lafarge Terminal during Hurricane Rita. This photo shows wind driven waves moving across the IHNC under

---

[70] Note that there is no Figure 95.

132

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**

wind conditions that were similar for Hurricane Katrina.   Despite the waves moving toward the wharf face, there are no gigantic waves formed as reflected waves superimpose on incoming waves.  This is a good indication of how the wave conditions would have been in the early morning of 29 August, 2005.



Figure 97: Looking toward the Lower Ninth Ward from the Lafarge Terminal during Hurricane Rita.  This gives an idea of the wave conditions that would have been present in the IHNC during Hurricane Katrina.

<u>Barge Pitching and Heaving</u>

Another of Mr. Pazos' theories is that the steep, choppy waves in the canal caused the barge to pitch and heave, and led to the barge's bottom coming to rest on top of the wall at the south breach.  While vessels certainly do pitch and heave in heavy seas, the very small wave conditions in the IHNC cannot have caused the barge ING 4727 to exhibit such behavior.  Pitching and heaving is most pronounced in waves of long wavelength such as 0.75 to 1.0 times the length of the barge.  The wind-generated waves would have been short and small, only a fraction of the length of the barge.  The 200 foot long

133

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**

barge would have ridden across many wave crests, meaning that pitching and heaving would have been minimal, unnoticeable and barely measurable, if at all.

Mr. Pazos' theory that the barge developed "a substantial heave and pitch" sufficient to lift the end of the barge and deposit it "on top of the floodwall" is erroneous in the extreme and defies the basic laws of naval architecture. Bhattacharyya[71] tells us that:

> When the effective wave length is less than half the ship's length, the pitching movement is small.

The Principles of Naval Architecture[72] similarly states that:

> Only the wave components of about ¾ ship length and above have appreciable effects on motions in head seas because the excitation in very short waves is very much reduced, even at resonance.

The pitching motion of the barge can be determined by performing tank testing or a computer seakeeping simulation. Barring these two rather elaborate methods, there are empirical methods to predict ship motions that are based on research and sound scientific principle. Bhattacharyya outlines one of these methods in his book. However, from analyzing figure 4.24 on page 70 of Bhattacharyya, coefficients for the pitching exciting moment are not even given for wave lengths less than half of the vessel length because pitching is not significant for such short wave lengths. As the waves created in the IHNC during Hurricane Katrina would have had a wave length very much less than half of barge ING 4727's 200 foot length, the pitching actions would have been miniscule, let alone sufficient to lift the barge onto the floodwall. Mr. Pazos provides no calculations or model basin tests to support his claim.

<u>Scrape Marks on the Floodwall</u>

On page 42 of his report, Mr. Pazos makes note of horizontal scrape marks on the flood side of the floodwall panels, and attributes those scrapes to the barge moving along the canal side of the floodwall. There are two problems with Mr. Pazos' theory. One is that those scrape marks appear at about the same elevation all along the floodwall. If the south breach happened about 90 minutes after the north breach, which Mr. Pazos theorizes, and the barge traveled from the north breach site to the south breach site in that time as the water was rising, then the scrape marks closer to the south breach should be a couple of feet higher on the wall than at the north breach. They are not, which means that Mr. Pazos' theory is wrong. The other problem with theorizing that the barge made these scrapes is that the scrapes existed prior to Hurricane Katrina. The scrape marks are visible in photos taken of the East Bank Industrial Area (EBIA) during the remediation work that was done there before Katrina. These photos show

---

[71] Bhattacharyya, R. <u>Dynamics of Marine Vehicles</u>, Page 71, Wiley International Publications, John Wiley & Sons, 1978.
[72] Principles of Naval Architecture, Society of Naval Architects and Marine Engineers, Vol III, Page 105, 1989.

**C. R. CUSHING & CO., INC.**                                        **7/29/2009**

scratch marks, which were likely created by heavy equipment either before or during the remediation.

Further evidence that contradicts Mr. Pazos' theory about the barge scraping the canal side of the flood wall includes:

A. The height of the scratch marks at the north end of the north breach and the south breach are at the same level, whereas Mr. Pazos also believes that it took 90 minutes for the barge to go from the north breach (where it never could have been) to the south breach.  In this time, the water level would have risen significantly, but the scratch marks are level along the entire length of the floodwall.

B. Mr. Pazos proposes that the barge made scratches at the base of the floodwall at the south end of the south breach, which would require the water level to be very low, and then collide with the top of the floodwall in the same location.  This proposition is contrary to the laws of physics.



Figure 98: The EBIA remediation in progress prior to Hurricane Katrina, with scrape marks visible on the floodwall.

135

**C. R. CUSHING & CO., INC.** 7/29/2009



Figure 99: Scrape marks on the lower portion of the floodwall at the south end of the south breach. The object that made these marks could not have fractured the upper part of the wall.

<u>"Scraped Concrete Panels"</u>

Mr. Pazos theorizes that photos of "scraped concrete panels" included in his attachment 4 can only be explained by the abrasion of the barge scraping across the panel while the wall was still vertical like "a big machine tool (planer)" (See Pazos Report, page 43). I do not concur with Mr. Pazos' conclusion. What these photos show is that the concrete is largely disintegrated in patterns that correspond with the corrugations in the sheetpiling. The concrete is cracked and disintegrated where there is only thin cover on top of the sheetpiling, leaving only "fingers" of concrete within the deep corrugations intact. This is analogous to flexing a frozen ice cube tray that has been filled to the brim. The ice cracks where it is thin (over the tray's partitions) but the individual ice cubes remain intact. Note that the portion of the concrete slabs that did not have the sheet piling imbedded within them did not experience this kind of damage. Abrasion has nothing to do with this pattern of damage, and if the failed floodwall were flipped over, the same pattern would be observed on what had been the land side.

136



Figure 100: An aerial photo of the same concrete panels in the photo from Mr. Pazos'
attachment, showing the floodwall panel with disintegrated concrete where the concrete
cover was thin over the sheetpiling alternating with intact "fingers" of concrete.

Even Dr. Marino concludes that this damage was caused by flexure of the floodwall
structure.  In fact, photo 4.31 in Dr. Marino's report shows the same section of floodwall
that Mr. Pazos says exhibits abrasion.  Dr. Marino, correctly, attributes this damage to
tensile stresses caused by flexure.

Underseepage and Gapping

In section R on page 43 of his report, Mr. Pazos attributes gapping to the force of the
barge against the wall.  This implies that gapping is a phenomenon that is unique to
floodwalls that are impacted by an object.  This is absolutely not so.  Gapping has been
observed not only at the IHNC, but also elsewhere in New Orleans such as at the
drainage canals, the 1985 E-99 sheetpile tests conducted by the Corps of Engineers
and centrifuge testing of floodwalls.  In short, gapping is something that one would
expect to occur given the forces and soils present, and an impact is not required to
initiate gapping.  Mr. Pazos offers no evidence that promotes his theory that the barge
created the waterside gap, and does not even consider that water pressure alone could
have caused the gap.

137

On page 44, Mr. Pazos cites a statement from the IPET report that has to do with why the IPET investigation dismissed the possibility of underseepage at the south breach site.  Mr. Pazos then states that "The above statement is based primarily on the "short duration of the storm," but it did not consider the creation of the gaps by the action of the barge."  Mr. Pazos is mistaken here.  IPET did consider the gap (which was NOT created by the barge); the point that IPET made was that they understood that the tip of the sheetpiling was embedded in low-permeability clay, so the presence of the gap was moot because water would have a difficult time flowing through this clay layer to reach the opposite side of the floodwall.  In short, IPET felt that gap or not, the clay that the sheetpile tip was embedded in would mitigate underseepage.

<u>"Rubber Band" Theory</u>

On page 45-46 of his report, Mr. Pazos states his "rubber band" theory that the barge striking the south end of the south breach caused the sheetpiling to disconnect, initiating the entire breach.  To make this statement, one has to ignore the debris field inside of the south breach that clearly shows that the breach initiated at the bulge at the north end, and it also requires one to ignore the fact that the sheet piling interlocks did not fail *anywhere* at the south breach.  Numerous photos (e.g., Figures 42, 99, 101) show the sheetpile interlocks remained connected.  This makes Mr. Pazos' rubber band theory impossible.

Besides the two reasons stated above, which by themselves disprove Mr. Pazos' rubber band theory, one must also question how Mr. Pazos theorized that the barge impacting the floodwall initiated a breach approximately 800 feet to the north.  Impacting a floodwall will contain all forces and reactions locally.  In fact, due to the relative fragility of the concrete monoliths of the floodwall, there is a limited amount of force that can be transferred to the sheetpiling.  This fact aside, there is simply no way that the floodwall structure could transmit a traumatic impact force a long distance to what Mr. Pazos theorizes is the weakest portion of the floodwall.  This is another case where Mr. Pazos ignores the evidence at hand and all scientific principle, in devising his breach theory.

<u>Portions of the Floodwall That Did Not Fail</u>

Section V of Mr. Pazos' report on page 47 pertains to why some portions of the IHNC east floodwall remained standing while other portions failed.  According to Mr. Pazos, the most reasonable explanation is that the portions that failed are where the barge struck the floodwall and weakened the soils.  This erroneous conclusion requires one to ignore evidence such as that at the London Ave. Drainage Canal.  This canal had approximately 5 miles of floodwalls, of which about 1200 feet failed in two full breaches and one partial breach.  This means that more than 95% of the floodwall along the London Ave. Canal survived the same loading that caused the other 5% of the wall to fail.  The point of this is that the entire 5 miles of floodwall along the London Ave. Canal did not fail, as Mr. Pazos surmises they should have due to hydrostatic pressure.  In

short, failed sections of floodwall were not subjected to different forces than surviving sections of a floodwall.  A floodwall will fail at its weakest link, as occurred at the London Ave. Canal as well as the IHNC.



Figure 101: The south end of the south breach.  The sheetpile interlocks did not fail at this location, contradicting Mr. Pazos' "rubber band theory".

<u>Cracked Concrete Panels</u>

On page 49, Mr. Pazos states that the cracked concrete panels at the ends of the breaches along the IHNC are evidence that they were struck by a barge, his reasoning being that other concrete panels, in locations where a barge was not a factor, do not exhibit this vertical cracking.  Like Mr. Pazos' other theories, this theory is flawed.  One flaw is that the only way that a vertical crack could be created is if part of the panel had some degree of lateral support, while the other end was located where the landside embankment had failed.  In other words, vertical cracking is indicative of being created at the time of a breach, not at sometime before the breach as Mr. Pazos theorizes.  The other reason that disproves Mr. Pazos' theory is that there were indeed vertical cracks

found in concrete floodwall panels at other breaches where it is undisputed that no barge was present.



Figure 102: Floodwall breach on the west side of the IHNC.  Note that there are vertical cracks in this floodwall panel, which is located at the end of the breach.

<u>Localized Damage at the South Breach</u>

Mr. Pazos' explanation of how the barge created the localized damage at the south end of the south breach is completely implausible.  Mr. Pazos states that the barge was sliding along the wall, when wave reflection caused the barge to leave the wall, then slam into the wall, creating the damage.  The problems with this theory are many.  First, if Mr. Pazos' theory was correct, which it isn't, the barge would tend to slide along the wall with its 200 foot length alongside the wall.  In order to create the short length of localized damage at the south breach, the barge would have to turn nearly 90 degrees. There is simply no way for the barge to have done this in such a short distance.  The second problem with this theory is the position of the scratch marks on the bottom of the barge.  The scratch marks are concentrated toward the port side, from the bow to about 1/3 of the barge's length aft of the bow.  To explain why this makes Mr. Pazos' theory impossible, the following series of figures was prepared along with the below narrative.

Mr. Pazos theorizes that the barge impacted the floodwall when it was intact at what would become the south end of the south breach.  Mr. Pazos' theory includes the barge impacting the wall after pitching and heaving, cracking the concrete off of the uppermost portion of the wall and then coming to rest on the fracture surface of the floodwall.  This is shown in position 1 of the following figure.

140

Mr. Pazos theorizes that the barge then moved inland, creating the scratch marks on the bottom of the barge from the rebar embedded in the concrete floodwall.  This is shown in positions 2 and 3.  Position 3 shows approximately one-third of the barge's length on the land side of the floodwall, which corresponds to the portion of the barge that was found to have scratch marks on them created by the rebar in the floodwall.  At this point, because no scratch marks were found on the remaining two-thirds of the barge, the barge would somehow have to continue its journey into the Lower Ninth Ward without further contacting the floodwall.

However, Mr. Pazos' theory requires the barge to continue moving into the Lower Ninth Ward, which will require that scratch marks be created on the portions of the barge that were found to be undamaged.  Position 4 shows the barge halfway on the land side of the floodwall.  At this point, the barge would tend to balance like a seesaw on the floodwall.  Once slightly more of the barge entered the Lower Ninth Ward, it would rotate with the bow coming to rest on the ground surface in the Lower Ninth Ward, which is shown in position 5.  Once in this position, the rest of the barge would still have to be dragged over the damaged floodwall's exposed rebar, which would lead to the creation of scratch marks all the way to the barge's stern.

Thus, if Mr. Pazos' theory of how the barge entered the Lower Ninth Ward was true, evenly distributed scratch marks would have been found over the entire length of the barge.  In reality, scratch marks were found only on the forward most third of the barge.  The only possible way for this to have occurred, as explained above, is for the barge to have entered the Lower Ninth Ward stern first and riding with the wind sideways (see Figure 57) onto the already-failed floodwall.  The trailing forward end of the barge would have dragged over the southern end of the south breach floodwall once most of the barge had already entered the Lower Ninth Ward.

Mr. Pazos also indicated that the barge was moving in all six degrees of freedom while crossing over into the Lower Ninth Ward.  If there were significant movements in all degrees of freedom, the scratch marks on the bottom of the barge would indicate this.  Because the scratch marks are straight, this theory of Mr. Pazos can be discounted.

**C. R. CUSHING & CO., INC.**                    **7/29/2009**



Figure 103: Mr. Pazos' theory of how the barge passed from the IHNC into the Lower Ninth Ward.  This theory is not possible because of the orientation and extent of scratch marks found on the bottom of the barge.

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**

Also, if the Lower Ninth Ward had not been flooded at the time the barge entered, it would have lodged on the flood wall before entering, and would not have been able to fully enter the Lower Ninth Ward until the neighborhood was completely flooded. There are no damage marks on the bottom to indicate that the barge grounded on the floodwall. Rather, the scratch marks show that the barge passed cleanly over the already fallen floodwall long after the flooding in the Lower Ninth Ward began. Similarly, no other marks appear on the barge that suggest any other sort of significant impact during Katrina. There was, moreover, no buckling damage as would have been expected if the barge had been suspended and then tipped over Mr. Pazos' "waterfall." Furthermore, the waves in the IHNC were too short to somehow propel the barge off the rebar once it had supposedly lodged there.

On page 53, Mr. Pazos states that his theory of the formation of the south breach is the only way that accounts for the scratch marks on the barge, his reasoning being that the water would have been too high for the scratch marks to be created at a later time. This theory ignores that the water level peaked, and that there was ample opportunity for the scratch marks on the bottom of the barge to be created later when the water receded and the localized damage at the south end of the south breach occurred.


Impact Analysis

Mr. Pazos conducted an analysis of the impact loads that contains many errors. The first error in his analysis, outlined in attachment 5 of his report, is that the weight of the barge is incorrect.

In his analysis on wind loads on the barge, Mr. Pazos gives a detailed explanation of the boundary layer effects in place and explains how this phenomenon will cause a lower wind speed to act on the barge than the wind gauges would indicate. In the next paragraph, Mr. Pazos completely disregards this explanation and chooses 100 mph as an arbitrary value of wind speed on the barge, even though the data from the morning of 29 August show the wind speed at a level of 10m above the ground was less, even before correcting for the boundary layer effect. Mr. Pazos' statement that the wind velocity exceeded 100 mph is not correct for the IHNC site.

In calculating the impact forces exerted by the barge, it is important to carefully analyze the deflections of the floodwall. Mr. Pazos did not do this. Instead he chose an arbitrary value of 10 feet based on his interpretation of William Villavasso's testimony. 10 feet is an extremely large deformation, and would require unrealistically soft and compressible soils. Mr. Pazos' analysis of what he thinks happens to a floodwall under impact is completely unrealistic.

143

Eyewitness Testimony

Mr. Pazos places considerable emphasis on the testimony of Lower Ninth Ward witnesses. If a witness heard a boom, Mr. Pazos attributed the boom to the barge striking the floodwall, disregarding the fact that the boom was probably not a barge striking the floodwall, given that witnesses at other breaches also heard boom noises even though no barges were present. In this sense, Mr. Pazos misstates the testimony of the witnesses. Most of the witnesses, such as Andrew Sartin and Kendrick Pounds, heard a boom or heard from others that they heard a boom, but never said that they believed the booming sound was a barge striking the wall. In his summary of the witness accounts in section P of his report, Mr. Pazos states that the witnesses heard the sounds of the barge colliding with the floodwall. This statement is false. It is merely Mr. Pazos' speculation that the booms reported by the witnesses was the barge striking the floodwall. To make this attribution, Mr. Pazos also had to have ignored the accounts of other witnesses throughout New Orleans that also heard booms where there were no barges. Also, Marenthia Lagarde reported hearing a boom during the levee failure during Hurricane Betsy. These accounts suggest that a boom does not correlate with a barge impact.

Overall, Mr. Pazos has numerous omissions from his report. In order to produce a complete analysis of the events and reach a reasonable conclusion, it is necessary to take certain items into consideration. The most significant omissions of Mr. Pazos include:

-Mr. Pazos' report does not have any information on actual wind data. Wind direction is of huge importance in this matter, and a report that does not make any mention of actual wind speeds or directions is at best incomplete. Had Mr. Pazos taken wind direction into consideration, he would have concluded that the wind would have prevented the barge from creating the breaches.

-Mr. Pazos has the opinion that the wave conditions in the IHNC were completely random during Hurricane Katrina. Had Mr. Pazos applied scientific principles to the formation and propagation of waves in the IHNC, he would have concluded that the waves would have been traveling in the direction of the prevailing wind and were not coming from all directions.

-Mr. Pazos does not give any explanation about how the barge was transported from the Lafarge Terminal to the north breach. Had Mr. Pazos taken all information into account, he would have concluded that the barge could not have reached the site of the north breach.

-Mr. Pazos' report contains a description of the scratch marks. His survey of the scratch marks is very similar to those in Appendix H of this report. However, Mr. Pazos does not use this information to conclude that the floodwall had to have failed before the

144

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**

scratch marks were made on the barge.  Instead, Mr. Pazos theorizes that the barge passed over the floodwall in a longitudinal motion, a process which would have created scratch marks on the entire length of the barge.  But the fact that the scratch marks only are present on 1/3 of the barge's length, which even Mr. Pazos admits, means that his scenario is impossible.

-Mr. Pazos does not provide any explanation of how he quantified the pitching motions of the barge, or how he actually put a value on this pitching motion.  Had Mr. Pazos analyzed the effect of very short choppy waves on a 200 foot long barge, he would have concluded that the pitching of the barge would have been insignificant.

-Mr. Pazos does not have an explanation of the relationship between wind and waves. Had Mr. Pazos explicitly stated that wind-generated waves move in the same direction as the wind, he would not have concluded that wave action had a significant effect on the barge movement against the wind.

-Mr. Pazos does not mention the orientation of any debris in the Lower Ninth Ward, which does not support his theory that the south breach originated at the south end. Had Mr. Pazos carefully and accurately surveyed the orientation of the debris field, he would have concluded that the south breach originated at the northern end of the break and not the southern end.

-Mr. Pazos makes several false statements to support his theories.  These statements include the separation of the sheet pile interlock at the south breach (which did not occur) and the lack of cracking of the concrete floodwall panels at other floodwall breaches (which in fact did occur).  Had Mr. Pazos checked his facts, he would have concluded that the "rubber band theory" was wrong, and that the IHNC breaches exhibit features typical to many other floodwall failures.

-Mr. Pazos incorrectly concludes that a boom that a witness heard was the barge striking the floodwall.  Had Mr. Pazos taken into account the testimony of witnesses that lived near the drainage canals, he would have concluded that booms are indicative of a failing floodwall and that a barge does not make these sounds.

-Mr. Pazos theorizes that the reflected waves contained more energy than the incoming wind driven waves.  Mr. Pazos' theory is scientifically impossible and contrary to various physical laws.

Consequently, most of Mr. Pazos' causation theories are impossible and the author of this report does not agree with Mr. Pazos' explanation concerning the causation of the IHNC breaches.

145

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**

**Report by Gennaro G. Marino**

Gennaro G. Marino, a geotechnical engineer, produced a report for the plaintiffs that focuses on causation issues with the IHNC east breaches.

Initial Location of Barge ING 4727

Dr. Marino's report contains numerous inaccuracies.  The first major inaccuracy is in figure 2.15, which is an aerial view of the Lafarge terminal taken immediately after Hurricane Katrina.  The red box representing the location of barge ING 4727 prior to breakaway is incorrect.  ING 4727 was not tied outboard of the five barges to the north, but rather was tied outboard of the single barge to the south.  Barge ING 4727's actual position prior to Katina would have made it much more difficult for it to exit the "pocket" of the IHNC at the Lafarge Terminal.

Wind Data

Section 3.2 of Dr. Marino's report pertains to wind speed and direction.  While this information is not exactly the same as the wind data provided by Dooley SeaWeather Analysis, Inc. that was used in this report (which shows that the wind between 0530 and 0630 (5:30 to 6:30 AM) was blowing from 040° to 032°, respectively), the wind data in Dr. Marino's report nonetheless shows that it was impossible for the wind to have propelled barge ING 4727 to the IHNC east floodwall when the breaches occurred. Interestingly, after the presentation of the wind data in Dr. Marino's report, there is no further mention of wind data.  Despite the wind data showing that barge ING 4727 never reached the north breach site and did not reach the south breach site until hours after the failure, Dr. Marino's conclusions do not address the fact that wind could not have carried the barge to the south breach location until several hours after the failure occurred and the wind could not have carried the barge to the north breach.

The wind data in his own report shows that Dr. Marino made the same error as was made by Mr. Pazos, namely theorizing that the barge broke away from the Lafarge Terminal, traveled to the north breach site, then to the south breach.  For the same reasons as listed in the analysis of the Pazos report, this scenario is impossible.  Dr. Marino's own referenced wind shows that it is impossible for the barge to be transferred by wind to the north breach site.

Likewise, Dr. Marino's referenced wind data shows that the wind was blowing parallel to the canal at all times prior to 1000 (10:00 AM).  This would make it impossible for the wind to impart any velocity on the barge in the direction of the Lower Ninth Ward floodwall, thus preventing any kinetic energy to be imparted on the barge and negating the possibly of a collision, let alone one with a substantial amount of energy.

146

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**

Wave Action

Like Mr. Pazos, Dr. Marino also places emphasis on wave action as a possible contributor to the barge movement.  In his report, Dr. Marino gives various accounts of wave heights in the IHNC during Hurricane Katrina.  These wave heights range from 1.3 feet as shown in a photo taken by the IHNC Lock staff, to 20 plus feet, as reported by witnesses.

The witness accounts of wave heights are based on the testimony of three witnesses.  One of these witnesses was D'Antionette Johnson.  Ms. Johnson's exact testimony about wave height was:

> Well, it's like a big old wave.  I know it was tall.  I would say at least, and I am not over-exaggerating, at least 15 or 20 feet.

D'Antionette Johnson Deposition, Page 36, Line 2-5.

Ms. Johnson goes on to say that:

> It was coming towards me.  It was coming, going toward St. Bernard Parish, Chalmette.

D'Antionette Johnson Deposition, Page 36, Line 12-14.

While Dr. Marino theorizes that this wave was in the IHNC, it appears this is a description of the massive surge of water flowing through one of the IHNC floodwall breaches.

Another witness who Dr. Marino says reported a 5 to 8 foot wave was located at the 17th Street Canal, not the IHNC.  It is not known the specifics of this wave, such as whether it was in fact a surge associated with a breach or the witness actually thought he saw the wave in the actual canal.  Either way, this account is not useful for establishing conditions at the IHNC.

Another Lower Ninth Ward witness that Dr. Marino cites is from the IPET report.  This witness reported that water was traveling from St. Bernard Parish west toward New Orleans.  If this testimony is correct, then this would not have been water from the IHNC, as the IHNC was to the east of this location.  The water reported by this witness likely was coming from the MRGO, and as such the accounts of this witness do not prove anything with regard to wave conditions in the IHNC.

This leaves William Villavasso as the only witness who gave testimony that he saw an actual wave in the IHNC.  However, Mr. Villavasso's testimony is that the wave was moving from north to south before the north breach occurred.  Even if this wave did

147

exist, and there is no way it could have, it was traveling the wrong direction to carry barge ING 4727 to the north breach site.

As was stated before in this report, the IHNC was sheltered from waves that were present in open waters. Dr. Marino fails to apply any scientific principle or calculations to determine the wave heights and instead relies solely on eye witness accounts of people on the land side of the levee in the dark during driving rain and under terrible personal and physical stress to conclude that waves of up to 20 feet were in the IHNC.

As such, the only waves present in the southern portion of the IHNC were wind driven waves. These waves would have been no higher than about two feet due to the limited fetch in the canal. There is absolutely no way that a wave approaching 20 feet in height could have been present in the canal. There is ample photographic evidence, including the one taken by the IHNC Lock staff that Dr. Marino references, that show that the waves were of limited height.

Dr. Marino had previously stated that exceptional wave action was responsible for carrying the barge to the north breach site. His updated report omits this conclusion, possibly suggesting that Dr. Marino no longer concludes that exceptional wave action had a role in the transit of barge ING 4727.

Barge Impact

Dr. Marino takes a very different stance than Mr. Pazos when it comes to the actual failure of the floodwall. Mr. Pazos states that his belief is that the barge contacted the wall, dislodging it just enough to create a gap on the flood side. After this occurrence, Mr. Pazos theorizes that it took some time for the actual breach to develop by means of underseepage.

Dr. Marino takes a very different opinion on this matter. He theorizes that the barge struck the floodwall and caused the wall to overturn on the spot. This theory appears to be largely based on the permeability study performed by Dr. Marino. This study helped Dr. Marino reach the conclusion that the soil conditions were such that permeation of water from the IHNC under the sheetpiling was not something that was significant enough to be considered as a potential cause of the failure. This being the case, Dr. Marino then concluded that the barge striking the floodwall is what caused it to fail.

In his previous report, Dr. Marino had begun to outline a barge impact analysis based on the IPET method. However, this analysis was far from being complete or accurate. No barge impact analysis at all was included in Dr. Marino's most recent report. Without an accurate barge impact analysis, it is not known how Dr. Marino reached his conclusion that the two breaches along the IHNC were caused by the barge.

**C. R. CUSHING & CO., INC.**                                        **7/29/2009**

Mr. Pazos did perform a barge impact analysis. The conclusions of this analysis are not explicitly stated in his report. However, the fact that Mr. Pazos has the wall displaced a small distance in the landward direction following impact – just enough to create a narrow, water-filled gap – indicates that Mr. Pazos does not believe that a barge impact would cause the floodwall to overturn. Thus, Mr. Pazos did perform a barge impact analysis, the results of which apparently showed that a barge impact would not overturn the sheetpiling. This presumably led to Mr. Pazos' postulation that underseepage then caused the floodwall failure once the gap occurred, despite not being a geotechnical engineer and not performing a seepage analysis. This contrasts with Dr. Marino, who did perform a seepage analysis, the results of which showed that water would not have flowed under the sheetpiling in a manner that would come close to causing a failure. Presumably, this led to Dr. Marino's postulation that the floodwall failure must have therefore been caused by a barge strike, despite not being an expert on barges and not having carried out a complete barge impact analysis.

By not performing any calculations of the expected loads created when a barge strikes a floodwall, Dr. Marino overlooks a significant fact; that a barge striking a floodwall will just crack the concrete cap and not pull down the sheetpile. This has been confirmed both by calculations that were prepared by C.R. Cushing & Co., Inc. staff and by observing other floodwalls that were struck by barges. Two figures contained in Dr. Marino's report, 4.1 and 4.3, show an "Impact Load" acting on the top of the concrete floodwall, which causes the floodwall to overturn. The scenario shown in these figures is impossible. As calculations show and evidence of other barge impacts prove, a barge or any other object impacting a concrete floodwall will cause the concrete that receives the impact load to crack before the load will cause the entire sheetpiling to overturn or be uprooted (exhumed). This is analogous to a book placed on a table. No matter how much force one exerts on the book, the table will not slide across the floor; the book will simply slide across the surface of the table.



Figure 104: Causing the IHNC floodwall to overturn by applying an impact load to the top of the concrete cap is like pushing a table across the floor by pushing on a book that is lying on the surface of the table.  Both of these scenarios are impossible.

Even though Dr. Marino did not perform any calculations that support his theory that the barge impact caused the floodwall to overturn, by acknowledging that the barge caused the top of the concrete floodwall at the south end of the south breach to be sheared off, Dr. Marino acknowledges that the concrete floodwall cap will not accept large impact loads and transmit them to the underlying sheetpile.  Clearly, even neglecting that the concrete cap will not transmit an impact load to the sheetpile, there is no way that a barge impact could have dislodged the sheetpiling as was observed.  Pushing this enormous mass of earth inland would require so much force and energy that there is no way that a barge could have caused the failure that was observed.  An object impacting the floodwall at the location of the bulge in the sheetpiling at the north end of the south breach would be like a bulldozer with a 400 foot wide blade attempting to push a mound of earth forward.  The resistance provided by the 400 linear feet of earthen embankment would be far too great for any bulldozer to overcome, just as a barge would be unable to overcome the resistance of such an embankment.  Also, the enormous force required to displace the landside embankment would have caused readily apparent damage to the barge; none was observed.



Figure 105: In reality, an impact load applied to the top of the IHNC floodwall will cause the concrete to crack and prevent the floodwall from overturning or being exhumed, just like the book sliding across the surface of a table will prevent the force applied to the book from causing the table to slide across the floor.

What is more, Dr. Marino's figures 4.1 and 4.3 show that the impact load exerted on the top of the floodwall causes the floodwall to rotate in the landward direction, then the floodwall becomes vertical again after traveling some distance inland.  There is no way that a force applied to the top of the floodwall would be able cause the floodwall to move in the manner shown by Dr. Marino.  There is no explanation of the forces that helped the floodwall re-acquire a vertical orientation after moving inland provided in Dr. Marino's report.



Figure 106: Figure 4.3 from Dr. Marino's report.  In this figure, the floodwall is shown first overturning as a result of being impacted, then the floodwall re-attains a vertical position once it travels a distance inland.  Dr. Marino does not explain how the floodwall manages to right itself.

151

**C. R. CUSHING & CO., INC.**                                          **7/29/2009**

Thus, it is without a doubt impossible that the barge could have caused the failure that was observed at the south breach as Dr. Marino theorizes it did.  Even if the barge had been present at the floodwall when the breach occurred, the strong inrush of water into the Lower Ninth Ward would have caused the barge to be "blasted" deep into the Lower Ninth Ward; there is no evidence that this happened.  Therefore, it can be concluded that the barge could not have caused the south breach, the barge could not have been present when the south breach occurred, and that Dr. Marino is incorrect in his theories regarding the causation of the south breach.

<u>Creation of the South Breach</u>

Section 4.2 of Dr. Marino's report contains photos of the south breach and attempts to use these photos to establish a chronology of the failure at this site.  Dr. Marino claims that photo 4.14 in his report is the earliest available photo of the south breach.  Dr. Marino's justification of why this is the earliest photo of the south breach is because the water was still flowing into the Lower Ninth Ward and it had not yet reached the top of the school bus.  However, a closer examination of this photo reveals the emergency levee repairs placed by the US Army Corp of Engineers after Katrina as well as the stone ramp running toward the canal that was used to unload the material for the breach closure from barges.  This emergency closure was placed over the breach in the weeks after Katrina and was breached during Hurricane Rita in late September, which is what the photo shows.  Despite the caption in the IPET report, photo 4.14 was taken during Hurricane Rita, not Katrina, and as such is of no use trying to establish a timeline for the breach.  (Note how photo 4.15 in Dr. Marino's report does not show the emergency repair berm.  This is because photo 4.15 was taken the day after Katrina, and the repairs had not yet been made.  Photos 4.21 and 4.22 do show the emergency repair, as those two photos were taken during Rita.)

152

**C. R. CUSHING & CO., INC.**                          **7/29/2009**



Figure 14-23. During Katrina; View to East Side of IHNC South of GIWW. Breach began approximately
            300 ft north of Claiborne Ave.

Figure 107: Photo and caption taken from IPET report, Volume V, Appendix 14.  Dr.
Marino places the same photo in his report as photo 4.14.  Despite what IPET's caption
says, this photo was taken during Hurricane Rita.  Note the presence of the emergency
breach repair, which has been breached itself at the northern end of the breach.  This
repair was only placed in this location in the weeks following Katrina.

On page 4-55, Dr. Marino attempts to explain how the barge collided with the floodwall
at the south breach site.  Dr. Marino states "with sufficient southward wind and/or
eastward wave action, the barge made its "second" primary collision against the wall in
the southern part of the breach…"  However, as Dr. Marino's own wind direction
graphics show, there was no wind that could have propelled the barge in the direction of
the breach at the time that the breach occurred.  And as has been stated before, wave
action was a non-issue, as the waves were generated by the wind and hence moved in
the same direction as the wind.

153

From reading Dr. Marino's report, it appears he has formulated the theory that the south breach occurred in the following manner:

1. Barge ING 4727 strikes the floodwall near N. Johnson St. (north end of breach) with its corner.
2. The floodwall overturns, bulges and fails as a result of this concentrated impact.
3. The wall near N. Prieur St. remains standing.
4. The barge rotates and applies its side (distributed load) against the wall at the vicinity of N. Prieur St.
5. The barge then rotates 90 degrees and impacts the floodwall at the south end of the south breach, shearing off the top of the wall and creating the scratch marks on the bottom of the barge.

The problems with this scenario are many. First, there was no mechanism to carry the barge to the south breach during the 0600 to 0700 (6:00 to 7:00 AM) timeframe when the south breach allegedly occurred. Secondly, the barge would not have been able to remain in the canal in the presence of the water rushing into the Lower Ninth Ward through the initial break near N. Johnson St; it would have been driven by the floodwater far to the east. Third, the barge could not have possibly have acquired enough energy in such a short distance to be able to knock the wall down near N. Prieur St. by striking it broadside. Fourth, there is no way that the barge could have executed a 90 degree turn in such a short distance in order to shear off the top of the floodwall at the south end of the breach. Lastly, there is no damage to the barge that suggests that more than one impact could have occurred (the one impact that did occur being the scratch marks created as the barge grounded on the floodwall while entering the Lower Ninth Ward in the post 0900 (9:00 AM) timeframe).

Like Mr. Pazos, Dr. Marino places considerable reliance on witnesses. Dr. Marino does not take into account the testimony of witnesses located near the drainage canal floodwall failures that heard booms similar to those heard by Lower Ninth Ward witnesses. The testimony of these witnesses shows that what the Lower Ninth Ward witnesses heard were sounds associated with a floodwall failing and that they had nothing to do with a barge or barge impact.

The Barge's Arrival In the Lower Ninth Ward

When it comes to how the barge exited the IHNC and entered the Lower Ninth Ward, Dr. Marino's theory has several flaws. In paragraph 4.52, page 4-65, Dr. Marino states that the scratch marks were on the southern two-thirds of the barge as it lay in the Lower Ninth Ward, when in actuality they existed on only about one-third of the barge. Dr. Marino theorizes that the end with the scrapes had to have passed over the failed floodwall first, creating the scrape marks on the bottom. However, if this was the case, the scrape marks should have been continuous over the entire barge's length. Also, the scratch marks are concentrated on the port side of the barge. If the barge had passed

over the floodwall bow first, the scratch marks would have been concentrated on the starboard side. As explained in this report, the end of the barge that received the scratch marks from the floodwall rebar is the last part of the barge that passed into the Lower Ninth Ward; two-thirds of the barge having crossed over to the land side of the floodwall before contacting the failed floodwall.

Other Floodwall Failures

Dr. Marino also examines other floodwall failure, with the apparent goal of showing how different they are from the IHNC east breaches. One of the differences between the IHNC breaches and other breaches that Dr. Marino points out is a feature that he calls a "slough". Dr. Marino's "slough" is nothing more than a trench created when the tip of the sheetpiling was forced in the landward direction by the water pressure while failure was occurring. This caused soil that was in front of the sheetpile tip to be pushed in the landward direction, which in turn created a trench behind the sheetpiling. Several other floodwall failures show this trench, such as those shown photos 4.58 and 4.59 in Dr. Marino's report. This confirms that this feature is just a result of the void left as a deeply embedded sheetpile is pushed landward, and has nothing to do with the presence of a barge.

In summary, Dr. Marino's report contains several flaws and omissions. The most significant of these are:

-Dr. Marino does not use the wind data he obtained in any of his conclusions. At the very least, his report should have mentioned that the wind direction at the times he theorizes the breaches occurred on the morning of August 29, 2005 would have prevented barge ING 4727 from being carried to the site of either breech, and consequently it would have been impossible that the barge played a role in the breaches based on this fact alone.

-Dr. Marino never actually explains how the barge could have reached either of the breaches, especially after explicitly showing that the wind could not have transported the barge.

-Dr. Marino never explains how the barge could have been prevented from being washed deep into the Lower Ninth Ward if it had been present when the breaches occurred.

-Dr. Marino concludes that a barge impact could have caused the floodwall to overturn, but he provides no calculations to support this claim. All available evidence shows that a barge impact is incapable of "exhuming" a sheetpile supported floodwall.

-Dr. Marino makes no mention of other floodwalls that were impacted by barges during Hurricane Katrina. There were several barge strikes that occurred, none of which

155

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**

resulted in a failed or "exhumed" floodwall.  However, all floodwalls that were struck by barges displayed only very localized damage to the top of the concrete with respect to impact loading.

-Dr. Marino never considers that a witness might be mistaken.  As shown in the witness accounts section above, Mr. Villavasso, on whom Dr. Marino relied heavily, could not have possibly have seen the barge at the location of the north breach.

-Dr. Marino incorrectly states that the Lower Ninth Ward breaches exhibited traits that were not seen in any other breaches.  This is not so.  Many other breaches exhibit features such as trenches ("sloughs") where the sheetpiling had been forced in the landward direction and cracked or otherwise damaged concrete floodwall monoliths.