This Page Intentionally Left Blank

**C. R. CUSHING & CO., INC.**                                        **7/29/2009**

### ANALYSIS OF A HYPOTHETICAL BARGE IMPACT

Because the plaintiffs in this case have alleged that the barge caused the IHNC floodwall failure, it is fair to ask whether impact from a barge could have knocked the wall down even if an impact were to have occurred prior to failure.

In order to carry out this analysis, it is necessary to carry out the following steps:

1.  Calculate the wind load exerted on the barge ING 4727.
2.  Calculate the velocity that the barge would attain if subjected to the previously determined wind load.
3.  Calculate the amount of energy that the moving barge would transfer to the floodwall.
4.  Calculate the effects that this amount of energy will have on the floodwall under different scenarios.
5.  Determine, for each of the scenarios considered, whether the wall would be expected to overturn as a result of the impact or something else will occur.

Step 1:

In order to determine wind loads on the barge, a time had to have been selected as wind direction and velocity changed with the passage of time that morning.  For the purposes of this hypothetical analysis, the wind at 0800 (8:00 AM) was selected to be analyzed because at this time the wind had some west-to-east component acting in the direction of the floodwall and because the time needs to be before the levee failure was reported by the National Weather Service at 0814 (8:14 AM) on 29 August.  Even though there is much evidence that supports the floodwall failed earlier when the wind was blowing from the east toward the Lafarge dock, this analysis is intended to provide a worst case scenario concerning the barge impacting the floodwall.

The wind velocity at 0800 was adjusted to account for altitude.  This is necessary because all wind speeds reported by anemometers or predicted by models are located at an elevation of 10 meters (32.8 feet) above ground level.  These values have to be adjusted to the elevation of the barge's centroid.  Making this adjustment reduces the wind velocity that is used in this hypothetical analysis.

The steps used to calculate the wind load on the barge are outlined in the appendices.  Three principal methods for calculating wind load were used.  It is felt that that Hughes' method, a method for calculating wind loads on vessels for a variety of different angles of incidence, produces the most reliable results.  A free floating barge acted on by wind will tend to be rotated to an angle perpendicular to the wind direction.  This is because wind acting on the barge at an angle other than 90 degrees will produce a moment that will turn the barge perpendicular to the wind, much the same way that a moment is

158

**C. R. CUSHING & CO., INC.**                                      **7/29/2009**

induced on an airfoil with an angle of attack.  The wind acting on the barge at a 90 degree angle also exerts the maximum amount of force on the barge.

The results of these calculations show that for a sustained wind speed of 58.51 knots (67.37 mph), the maximum wind load on the barge would have been 35,932 pounds when the wind acts directly on the side of the barge.

Step 2:

Appendix E uses the wind load determined for 0800 (8:00 AM) and calculates the velocity of the barge under these wind conditions.  These calculations take into account all phenomena that would affect drag on the barge and concludes that the winds at 0800 (8:00 AM) on 29 August 2005 on the Inner Harbor Navigation Canal would have imparted a velocity of 7.73 feet per second or 4.57 knots (5.27 mph) on the barge, moving sideways.

Importantly for this analysis, this calculated velocity is the maximum that the barge could have achieved in the direction of the IHNC floodwall at any time up to and including 0800 (8:00 AM) on 29 August 2005.  Therefore, a barge strike at 0800 represents the worst possible scenario with respect to the potential for damage to the floodwall.  Any time appreciably earlier will not have a wind direction that is capable of carrying the barge toward the Lower Ninth Ward floodwall on the east side of the IHNC.

Based on this calculated speed, it is possible to theoretically analyze the impact of a barge with an intact floodwall.

Step 3:

To analyze a theoretical barge strike on the floodwall along the IHNC, several assumptions have to be made.  One assumption is that the barge's corner will contact the floodwall.  This is a worst case scenario because of the concentrated loading.[73]  A special case was analyzed that assumed a line drawn perpendicular to the floodwall at the point where the barge's corner made contact with the wall will pass directly through the barge's center of gravity.  Under this assumption, 100% of the barge's energy will be transferred to the floodwall in a single impact, rather than one corner glancing off the floodwall followed by the other corner, which will distribute the barge's energy between the two impact locations.  This assumption of 100% of energy being transferred in a single impact is extremely improbable and was chosen to analyze the maximum possible energy impact and test the maximum effect that a hypothetical impact could have had.  In all likelihood, about half of the barge's total kinetic energy will be

---

[73] The IPET Report (Volume V, Appendix 17) analyzed a hypothetical barge impact using different assumptions. IPET acknowledged, however, that the assumptions used in the report did not reflect conditions as they existed in Hurricane Katrina and the report did not analyze whether the barge could have or did cause the breaches under the conditions present during the storm.

transferred to the floodwall in a single impact, and as such this more realistic scenario will have a substantially less severe consequence to the floodwall.



Figure 108: Single, more severe but highly unrealistic impact (left) compared with a more probable but less severe case where the energy of the moving barge is transmitted to the floodwall in two impacts.

Acting under the influence of the winds occurring at 0800 (8:00 AM), the barge will attain the previously mentioned velocity of 7.73 feet per second.  If the barge traveled the same direction as the wind at this time, it would have a course of 355°.  Because the Inner Harbor Navigation Canal is oriented 15° east of north, this means the barge will be traveling on a path 10° oblique to the wall.  As such, it will only be traveling at a relative velocity of 1.342 feet per second in the direction of the wall.  The remaining velocity is directed parallel to the wall, given the wind direction at this time.  This produces an energy of 15,660 lb-ft that the floodwall will have to absorb in order to stop the barge.

Step 4:

For the purposes of this analysis, it is assumed that all deflection of the floodwall in the landward direction due to the strike will be due to the elasticity of the soil and that the floodwall itself will remain perfectly rigid.   A further assumption is that the top of the concrete floodwall panel will not crack as a result of the impact loading – that is, it assumes the entire panel would remain rigid rather than cracking at the joint between the sheetpile and the cap.  (The validity of this last assumption is discussed below; as it turns out, the concrete cap will crack off before the sheetpile fails).

160

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**

The calculations of the floodwall impact are outlined in Appendix F.  In summary, a barge striking the top of the concrete panel, as it would have to have done considering the water level in the canal, would tend to cause the floodwall to rotate in the landward direction about a point somewhere below the surface of the ground.  Thus the top of the wall would move in the landward direction and the bottom of the sheetpiling that would move in the direction of the canal.  The energy contained in the moving barge would have to be compared with the work required to compress the soil of the levee embankment.

As explained in Appendix F, the amount of energy absorbed by the wall depends on where the barge strikes in relation to the concrete panels comprising the floodwall.  The floodwall consists of individually poured 30 foot long concrete panels poured on top of the sheetpiling.  There is no rebar continuous between these panels and a small gap of around one inch exists between the panels.  This gap contained a rubber water stop embedded in the two adjacent panels which contributed negligible strength to the floodwall system.

For the purposes of this analysis, three different scenarios were considered for impact.  The first assumes that the corner of the barge strikes directly in the center of a concrete panel, causing the panel to be pushed backwards, which in turn drags the two adjacent panels along with it.  The second scenario is that the corner of the barge strikes the joint between two floodwall panels, causing the ends of those two floodwall panels to be pushed inland.  The third scenario is that the barge corner strikes the center of a floodwall panel and cracks the panel in half, producing a pattern of deformation similar to the second scenario except the impact is distributed over half of the distance.

The following two tables list the expected floodwall deformations and impact forces associated with the three scenarios.  Passive failure (i.e. soil shearing) would occur only after a deflection of 15.201 inches is experienced.  Refer to Appendix F to review how these figures were obtained.

| Collision Scenario: | Expected Deflection, in |
|---|---|
| 1 | 3.64 |
| 2 | 5.76 |
| 3 | 8.15 |

Table 4: Expected deflections of floodwall for different hypothetical collision scenarios.

Step 5:

The values shown in table 4 are the net distances that the crest of the floodwall will deflect inland as the result of a hypothetical pre-failure barge impact.  These values do not include any displacement that would have been present from hydrostatic pressure acting on the wall.  As explained in Appendix F, hydrostatic pressure could have

imparted a deflection of 8.4 inches on the floodwall.  When combined with the loading due to hydrostatic pressure, collision scenario 3 could cause a portion of the levee embankment to exceed the displacement associated with passive failure, if the force acted on a part of the wall that was strong enough to resist the loads generated by the impact.  While a passive failure is a necessary step in order for an impacting projectile to overturn a floodwall because the soil mass behind the floodwall must be broken up before the sheetpiling can be pulled out of the ground by a lateral force, a passive failure does not by any means indicate that an overturning failure will take place.  On the contrary, in the case of collision scenario 3, the soil embankment is pushed about 1.3 inches beyond the passive failure point.  In order to initiate overturning, it would be necessary to push the wall much further beyond the passive failure point.  Something on the order of 10 feet beyond the passive failure point would be necessary for overturning to become a possibility.  What this would mean is that if collision scenario 3 had occurred, a small portion of the embankment would be pushed permanently in the landward direction and the wall would take on a permanent lean of about an inch at this location.

Another way to test the hypothesis as to whether the barge could have caused the floodwall failure is to ask whether impact from a barge would cause the concrete cap to crack at the top rather than pulling the sheetpile out of the ground as occurred.

| Collision Scenario: | Maximum Expected Force (lb) | Maximum Expected Moment (k-ft) |
|---|---|---|
| 1 | 103,290 | 542.3 |
| 2 | 65,240 | 188.3 |
| 3 | 46,100 | 66.6 |

Note: k = kilopound (kip) = 1000 lb.

Table 5: Expected force and floodwall moments created by impact loading.

With the maximum expected moments known, it can be determined whether or not a panel might crack.  This is done by comparing the maximum expected moments for each scenario with the flexural strength of the reinforced concrete wall panels.

The purpose of evaluating the floodwall panel for longitudinal bending strength is to evaluate whether Scenario 1 or Scenario 3 is more realistic, that is, would the concrete panel be expected to crack in a vertical plane if impacted.  Summarizing the calculations in Appendix F, it is shown that the floodwall panel has a bending strength of about 205 k-ft.  This shows that Scenario 1 is not realistic because it requires the panel accept a bending moment about three times greater than its calculated capacity.  Therefore, if the barge struck the floodwall and the rest of the assumptions held true, the deformation would be expected to be between 6 and 8.5 inches in the landward direction and the impact force 46,000 to 65,000 pounds.

162

With these forces known, it is necessary to test the assumption that the top of the floodwall above the sheetpiling will not crack off.  This is accomplished in the bending analysis in Appendix F.  This analysis calculates the bending strength in the vertical direction of a 9-inch long segment of wall containing one piece of rebar on each face.  The result of this analysis shows that in order for the floodwall panel not to crack off above the sheetpiling, the impact would have to spread evenly over a 6'-5" long segment of wall.  This distribution of loading would not be possible if the corner of the barge struck the wall as that scenario would concentrate the impact force in a very small area, on the order of a few inches.

Therefore if a barge were to strike the concrete cap, it would fracture the concrete in one of a number of ways – e.g., by cracking the cap at the construction joint, or by punching a notch in the cap – but would not cause (and could not cause) the sheetpile to dislodge in the manner that occurred.  This manner of damage is seen at the south end of the south breach as well as at locations where other barges struck floodwalls.

A barge striking the concrete cap of the floodwall could not cause the sheetpile to fail.  The concrete panel would crack or notch, leaving the sheetpile intact.  This is analogous to trying to push a table across the floor by applying a force to a book that is laying on the table.  No matter how much force is applied to the book, the table will not move; the book will simply slide across the surface of the table.  No projectile, regardless of the amount of energy it contained, could cause the sheetpiling to be removed from the earthen embankment, just as no force could slide the table across the floor by pushing on the book.

A hypothetical barge impact would not, therefore, have caused the IHNC floodwall failure during Hurricane Katrina, even if such an impact had occurred prior to the failure.  For independent reasons discussed above, such an impact did not occur prior to the failure.  Nevertheless, the calculations presented in this section provide separate confirmation that impact from a barge, in the conditions of Hurricane Katrina, could not have caused the IHNC floodwall failures.

**C. R. CUSHING & CO., INC.**                                      **7/29/2009**

## CALCULATION OF PITCHING MOTION OF BARGE ING 4727

Mr. Pazos makes the claim that the barge in the IHNC was pitching to the extent that the barge's bow was lifted out of the water and landed on top of the floodwall. He further claims that the waves were 8 to 10 feet high, and that the draft of the barge was 2 feet 4 inches. He is wrong on three counts. First, the draft of the empty barge was 1 foot 4 inches. Second, it was impossible for the waves to be 8 to 10 feet high. This is a gross exaggeration. Third, the following calculation shows that the pitching motion of the barge would not be anywhere near enough to achieve Mr. Pazos' unbelievable assertion.

The pitching motions have been calculated for two conditions. First, for the barge in its correct draft of 1"-4" (1.33 feet) and in 2'-0" high waves. Second, the pitching motion was calculated for Mr. Pazos' allegations, i.e. a draft of 2'-4" (2.33 feet) and 10 foot waves.

The method used is R. Bhattacharyya. The results are:

| Wave Height | Pitch Angle | Vertical Bow Motion | |
|:---:|:---:|:---:|:---:|
| ft | degree | ft | in |
| 2 | -0.087 | 0.152 | 1.822 |
| 4 | -0.174 | 0.304 | 3.644 |
| 6 | -0.261 | 0.455 | 5.465 |
| 8 | -0.348 | 0.607 | 7.287 |
| 10 | -0.435 | 0.759 | 9.109 |

Table 6: Pitching motions of ING 4727 at a 1.33 foot draft.

| Wave Height | Pitch Angle | Vertical Bow Motion | |
|:---:|:---:|:---:|:---:|
| ft | degree | ft | in |
| 2 | -0.153 | 0.266 | 3.196 |
| 4 | -0.305 | 0.533 | 6.391 |
| 6 | -0.458 | 0.799 | 9.587 |
| 8 | -0.611 | 1.065 | 12.783 |
| 10 | -0.763 | 1.332 | 15.979 |

Table 7: Pitching motions of ING 4727 at a 2.33 foot draft.

The maximum vertical motion is slightly more than one foot. Under the most favorable assumptions to Mr. Pazos' theory, the actual pitching motion would be insufficient to lift the barge and place it on top of the floodwall. .

164

**C. R. CUSHING & CO., INC.**                                        **7/29/2009**

This Page Intentionally Left Blank

## REASONS THE BARGE DID NOT BREACH THE FLOODWALL

Certain plaintiffs have alleged that the barge ING 4727 caused one or both of the breaches in the IHNC floodwall.  Our analysis concludes that it is simply not possible that barge ING 4727 caused either breach.

This report has explained in detail the various reasons why the barge could not have and did not cause the breaches.  These conclusions are supported by the data in this report and appendices, and are corroborated by the works of others including Dooley SeaWeather Analysis, Waterway Simulation Technology, IPET, ILIT, LSU, ASCE and others.

For purposes of summary, the reasons the barge did not breach the IHNC levee are:

1. Neither the wind nor the current flowed towards the north breach on the morning of 29 August 2005.  At all times prior to the north breach, the wind was blowing from east to west and could not have moved the barge away from the Lafarge Terminal across the canal and to the north to the site of the breach.  The same is true of the water current – it could not have brought the barge to the site of the breach.  It is impossible for the winds in Hurricane Katrina to have moved the barge north before moving it south.  Winds at the IHNC did not blow to the north until after the storm had passed New Orleans.



Figure 109: The wind direction on the morning of 29 August, 2005.  The wind could not have carried the barge to the North Breach at any time shown here.

166

2.  The barge could not have moved from the Lafarge Terminal to cause the south breach because the wind was blowing from the east or had an easterly component until after the wall was already down at that location.



Figure 110: The wind direction on the morning of 29 August, 2005.  The wind could not have carried the barge to the South Breach until 0900 (9:00 AM) or later.

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**

3.  The water currents in the IHNC were not flowing in the direction of the south breach prior to its occurrence.



Figure 111: Currents in the IHNC before breaching occurs.  Note that the currents are very nearly zero (turquoise).

4.  There was no wave action in the IHNC that could have moved the barge across the canal from its slip at the Lafarge Terminal before the floodwall failed.



Figure 112: The small amplitude waves present in the IHNC during Katrina.  They are moving in the same direction as the wind.

5.  The Namasco Terminal gantry shed would have trapped the barge at the southern wharf area if the barge had been loose and moved by the prevailing winds before 0900 (9:00 AM).  Also the fiberglass hatch covers of the barge, the barge itself or the gantry shed would have shown damage if the barge had transited prior to that time.  No such damage was observed, further confirming the barge did not exit the slip prior to 0900 (9:00 AM) under the prevailing wind and water conditions.



Figure 113: The wind directions at given times superimposed over an aerial photo showing the Lafarge Terminal and Namasco Gantry.

6.  The south breach was sudden and catastrophic, carrying the sheetpiling hundreds of feet inland.  The deluge obliterated houses in the North Johnson St. area of the Lower Ninth Ward.  If the barge had caused the breach, it would have immediately been drawn into and propelled in an easterly direction, deep into the Lower Ninth Ward.  There is no evidence on the barge nor in the debris field that this happened.  If it had happened, the results would have been readily apparent.

169

**C. R. CUSHING & CO., INC.**                          **7/29/2009**



Figure 114: The barge was located immediately adjacent to the floodwall after Katrina, not far inland.

7.  If the barge had entered the Lower Ninth Ward toward the northern end of the southern breach, or within the center of the breached area, it would have lodged itself several blocks due east of Jourdan Ave. in the vicinity of N. Johnson St. which it did not.



Figure 115: The direction that the barge would have taken had it been present at the time the breach occurred.

170

**C. R. CUSHING & CO., INC.**                                                        **7/29/2009**

8.  The position and orientation of the barge as it came to rest near N. Roman St., nestled against two homes to the east of the barge, demonstrates that it must have approached from the direction of the canal.  Thus, the barge cannot have entered the neighborhood at N. Johnson St., and then drifted back toward the canal when the Lower Ninth Ward drained.  The arrival of the barge in its final position could only have happened late in the flooding phase and not during the draining phase.



Figure 116: The barge in its post-Katrina resting place.  The homes and trees would have prevented the barge from floating from the right side of this photo to its position on the left side of the photo, which is nearer to the canal.

9.  The presence, location and condition of trees, telephone pole and wires indicates the barge reached its grounding spot during the flood and not during the draining of the water from the Lower Ninth Ward.

**C. R. CUSHING & CO., INC.**                              **7/29/2009**



Figure 117: Obstructions such as houses and trees existed on the landward side (left side in this photo) of the barge, which would have prevented the barge from reaching its position by floating toward the canal when water was draining from the 9th Ward.

10. The barge impact on the house at 1739 Jourdan Ave. indicates that it did so during very low flow into the protected side of the floodwall, meaning that the barge entered the Lower Ninth Ward late in the flooding period and not when the levee first breached.



Figure 118: The barge adjacent to a semi-standing house (1739 Jourdan Ave.), which indicated the barge did not impact the house very hard.

172

**C. R. CUSHING & CO., INC.**                                        **7/29/2009**

11. The velocity and direction of the wind at 0800 (8:00 AM), and at any time before 0800 (8:00 AM), was not sufficient to impart enough energy to the barge to cause the floodwall to fail.

12. The barge could not strike the sheetpiling with sufficient energy to cause overturning.  In any event, the concrete cap on top of the wall would have cracked before the barge could have affected the anchoring of the sheetpile.

13. The damage to the concrete cap and exposed reinforcing bar provide evidence that the barge entered the Lower Ninth Ward at the south end of the south breach, well away from the location where the breach initiated.



Figure 119: The localized damage to the floodwall, proving that the concrete will crack before the sheetpiling is torn from the embankment.

14. The scratch marks on the bottom of the barge match the exposed rebar at the lower (southern) end of the south breach, proving that the barge did not enter the Lower Ninth Ward at the upper (northern) end of the south breach, where the initial failure occurred.

15. The scratch marks on the barge indicate that the barge floated into the Lower Ninth Ward when it was already flooded, well after the initial failure of the south breach.

**C. R. CUSHING & CO., INC.**                    **7/29/2009**



Figure 120: The scratch marks on the barge indicate that 2/3 of the barge must have floated across the failed floodwall before the barge contacted the floodwall at the south end of the breach.

16. The concrete cap and rebar at the lower (southern) end of the south breach in the already failed levee had to be sitting at an angle (i.e. already failed) before the passing barge came into contact with them.



Figure 121: The position of the floodwall at the south end of the south breach compared with its orientation before being struck, showing the end closer to the photographer was originally at a lower elevation.

**C. R. CUSHING & CO., INC.**                                           **7/29/2009**

17. There is no damage to the barge or the floodwall consistent with the barge causing the failure of the floodwall.

18. The fact that barge impacts do not equate with levee failures is demonstrated by the many other locations where barges came into contact with floodwalls and did not cause them to fail. The damage seen at those locations is similar to the concrete cap damage found at the localized area near the very end of the southern breach, which had nothing to do with the failure of the wall.



Figure 122: Damage resulting from the impact of a barge with a floodwall near the Bayou Bienvenue Control Structure. Despite the cracked concrete (similar to the local damage at the IHNC south breach), the floodwall did not fail.

19. The floodwalls failed at the IHNC, as they failed at other locations, for reasons having nothing to do with a barge. The floodwall along the east bank of the IHNC was poorly designed and improperly maintained. No barge impact was needed for the floodwall to fail. For these reasons and not because of the barge, the floodwall failed.

175

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**

20. After exhaustive analysis, neither IPET, ILIT, ASCE nor the LSU studies concluded that the barge played a role in the failure of the levee.  No experts, apart from paid experts hired by the plaintiffs in this case, have concluded that the barge played a causative role in the IHNC floodwall failure.

**C. R. CUSHING & CO., INC.**                    **7/29/2009**

The undersigned reserves the right to amend this report in the event that new information is made available.

29 July, 2009

Date                    Charles R. Cushing, Ph.D., P.E.