**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF LOUISIANA**

|  |  |
|---|---|
| IN RE:  KATRINA CANAL BREACHES<br>CONSOLIDATED LITIGATION | *<br>*<br>*   CIVIL ACTION<br>* |
| PERTAINS TO:  BARGE | *   NO. 05-4182<br>*   and consolidated cases<br>*<br>*   SECTION "K"  (2) |
| *Boutte v. Lafarge*           05-5531<br>*Mumford v. Ingram*      05-5724<br>*Lagarde v. Lafarge*        06-5342<br>*Perry v. Ingram*             06-6299<br>*Benoit v. Lafarge*           06-7516<br>*Parfait Family v. USA*   07-3500<br>*Lafarge v. USA*              07-5178<br>*Weber v. Lafarge*          08-4459 | *<br>*<br>*   JUDGE<br>*   STANWOOD R. DUVAL, JR.<br>*<br>*   MAGISTRATE JUDGE<br>*   JOSEPH C. WILKINSON, JR.<br>* |

# BARGE PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO EXCLUDE IN WHOLE OR IN PART THE TESTIMONY OF DEFENDANT'S EXPERT CHARLES CUSHING

**Table of Contents**

A.   Statement of Facts ................................................................................................... 1
  1.   Dr. Cushing's Testimony About Dr. Daggett's Report ............................ 1
  2.   Dr. Cushing Based His Asserted Analysis of Causation on the Unexamined
       Assumption that the Barge Could Not Have Traversed the IHNC and Been the
       Location of Either Breach Prior to that Breach ........................................................ 6
  3.   Absence of Evidence................................................................................. 6
  4.   Dr. Cushing Failed to Provide Information on His Compensation.......................... 7
B.   Argument................................................................................................................... 7

**Table of Authorities**

*Christophersen v. Allied-Signal Corp.*,
   939 F.2d 1106 (5th Cir. 1991) (*en banc*), *cert. denied*, 503 U.S. 912 (1992) ......................... 11

*Bryan v. John Bean Division of FMC Corp.*,
   566 F.2d 541 (5th Cir. 1978) ................................................................................................. 9

*Newport Ltd. v. Sears, Roebuck & Co.*,
   1995 WL 328158 (E.D.La. May 30, 1995) (No. CIV.A. 86-2319) ....................................... 11

*Mike's Train House, Inc. v. Lionel, L.L.C.*,
   472 F.3d 398 (6th Cir. 2006) ................................................................................................ 10

*Polythane Systems, Inc. v. Marina Ventures Intern., Ltd.*,
   993 F.2d 1201 (5th Cir. 1993), *cert. denied*, 510 U.S. 1116 (1994) .................................... 10

*Taylor v. B. Heller & Co.*,
   364 F.2d 608 (6th Cir. 1966) ................................................................................................ 10

*United States v. Tran Trong Cuong*,
   18 F.3d 1132 (4th Cir. 1994) ................................................................................................ 10

*United States v. Grey Bear*,
   883 F.2d 1382, 1392-93 (8th Cir. 1989), *cert. denied*, 493 U.S. 1047 (1990) ..................... 10

**2.     Rules**

Rule 703, Fed. R. Evid. ................................................................................................... 7, 8, 10

Rule 801(c), Fed. R. Evid. ..................................................................................................... 10

**3.     Treatises and Other Authorities**

Note of the Advisory Committee on the Rules of Evidence (1972) ............................................. 8

MICHAEL H. GRAHAM, 3 HANDBOOK OF FEDERAL EVIDENCE, 6TH ED.
   (Thomson West, 2006) ......................................................................................................... 10

WRIGHT & MILLER, 29 FEDERAL PRACTICE AND PROCEDURE, § 6274 ........................................ 9

WRIGHT & MILLER, 29 FEDERAL PRACTICE AND PROCEDURE, § 6275 ........................................ 8

A. **Statement of Facts**

1. **Dr. Cushing's Testimony About Dr. Daggett's Report**

Dr. Cushing's July 29, 2009 Report[1] contains an Appendix B, which is actually a 74-page July 25, 2009 Report prepared by Dr. Larry L. Daggett and J. Christopher Hewlett of Waterway Simulation Technology, Inc., on hydrological modeling of the current in the IHNC during Hurricane Katrina and the effect of the currents on the barge.[2]

Lafarge had listed Dr. Daggett as one of its expert witnesses on its August 1, 2009 Final Witness List (Doc. # 18392):[3]

| Witness and Contact Information | Topic of Testimony |
| --- | --- |
| 59. Larry Daggett<br>Waterway Simulation Technology, Inc.<br>2791 Burnt House Rd.<br>Vicksburg, MS 39180 | Will provide expert testimony regarding the hydrologic effects in the IHNC resulting from Hurricane Katrina and their potential effect on Barge ING 4727 and its transit. |

Lafarge's April 1, 2009 Final Expert Witness List did not list Dr. Cushing as providing any similar expert testimony:

| 56. Charles Cushing<br>C.R. Cushing & Co., Inc.<br>30 Vesey Street<br>7th Floor<br>New York, NY 10007 | Will provide expert testimony regarding the causes of the North and South breaches, the sequence of events leading up to the North and South breaches, the transit of the Barge ING 4727, and the effects of a hypothetical barge impact. |
| --- | --- |

Lafarge withdrew Dr. Daggett as an expert witness when plaintiffs sought a schedule for deposing him.[4] Lafarge has never sought leave to amend its April 1, 2009 Final Witness List, or to substitute Dr. Cushing for Dr. Daggett, or to expand the description of the scope of Dr.

---

[1] Plaintiffs' Exhibit 2. Plaintiffs' Exhibit 1 is a List of Exhibits.
[2] Plaintiffs' Exhibit 3, Appendix B to Dr. Cushing's Report.
[3] Plaintiff's Exhibit 4, Lafarge's April 1, 2009 Final Witness List (Doc. # 18392), pp. 1 and 15.
[4] Plaintiffs' Exhibit 5, Declaration of Dylan Pollard. However, Dr. Daggett was in the room when Dr. Cushing was deposed. Plaintiffs' Exhibit 6, August 6, 2009 Deposition of Dr. Charles Cushing, Tr. 3, line 16; Statement of Mark Raffman, counsel for Lafarge, at Tr. 7, lines 7-8 ("We also have in the room . . . Larry Daggett, who is an expert.").

Cushing's expected testimony to cover the subjects Dr. Daggett was to testify about. Dr. Cushing testified that he was informed he would be testifying to Dr. Daggett's report and conclusions, instead of Dr. Daggett, "several months ago," but he could not remember if it was before or after March 1, 2009, or whether it was before or after May 1, 2009.[5]

Dr. Daggett's statement of credentials in Appendix C of his Report shows that he has experience as a hydraulics engineer, in hydraulic modeling, and in hydrodynamic modeling.[6]

Dr. Cushing's Report,[7] its Appendix L (stating his personal qualifications and those of his company),[8] and its Appendix M (statement of testimony),[9] do not provide any information qualifying Dr. Cushing to testify as a hydraulics engineer, or in hydraulic or hydrodynamic modeling. Dr. Cushing stated in his deposition that he had previously modeled water movement as to a barge allision with a fixed structure in the James River, which he testified was about as wide as the IHNC, but over 100 miles long, without any high wind conditions, and no wash of water from one side to another other than the ordinary wake between the tow and the barge and the washing of the wake on the shore.[10] He had never modeled wind and water conditions in an enclosed canal like the IHNC with lock gates at one end and the bridge down at the other.[11] Dr. Cushing chose to use Dr. Daggett to perform the modeling in this case, instead of doing it himself, because of Dr. Daggett's "extensive experience in modeling using various computer

---

[5] Plaintiffs' Exhibit 6, August 6, 2009 Deposition of Dr. Charles Cushing, Tr. 44, lines 8 to 25.
[6] Plaintiffs' Exhibit 3, Daggett Report, pp. B45-B49, Appendix B to Cushing Report. For example, he stated: "WST is a private engineering consulting company specializing in navigation studies involving port, harbor, and channel design, systems behavior, ship and/or tow maneuvering simulations, prototype measurements of ship and/or tow behavior, and hydrodynamic modeling." *Id.*, p. B45.
[7] Plaintiffs' Exhibit 2, Cushing Report.
[8] Plaintiffs' Exhibit 8, Appendix L to Cushing Report, "C.R. Cushing C.V. and Corporate Resume."
[9] Plaintiffs' Exhibit 9, Appendix M to Cushing Report, "C.R. Cushing Testimony in the Last 4 Years."
[10] Plaintiffs' Exhibit 6, August 6, 2009 Deposition of Dr. Charles Cushing, Tr. 37 line 2 to Tr. 39 line 5.
[11] *Id.*, Tr. 36, lines 19-25.

programs," experience with the Corps of Engineers, local roots, possible "local knowledge," and the fact that Dr. Daggett was "maybe even more qualified" than Dr. Cushing.[12] Dr. Cushing stated that Dr. Daggett was more qualified than Dr. Cushing because of Dr. Daggett's "experience which I felt was more focused on the flow of water and simulation of vessels in bodies of water," a factor that Dr. Cushing described as "pretty significant."[13]

      Dr. Cushing stated that he did not write or co-author any part of Dr. Daggett's Report, and did not recall even having made any suggestions with respect to revisions to the draft he saw in advance of the final Report.[14] Dr. Daggett used computer programs Dr. Cushing did not have, and he could not check any of the results of those computer programs, but instead relied on Dr.l Daggett's experience.[15] Dr. Cushing did not know the accuracy of the programs used by Dr. Daggett but relied on the fact that the Corps of Engineers used the programs, admitted that he did not have any personal knowledge whether the Corps of Engineers used any of Dr. Daggett's programs but simply took Dr. Daggett's word for it, did not know the margin of error in the computer programs used by Dr. Daggett in terms of numbers of standard deviations, stated that the margin of error was within 2% or 3% "in all hydraulic computer programs," stated that he arrived at that figure because the inputs were similar, admitted that he had never used Dr. Daggett's programs, had no direct experience with their degree of accuracy, said again that "all of these hydraulic programs and simulations" would have "universal" inputs, and could not cite

---

[12] *Id.*, Tr. 39, lines 6-19.
[13] *Id.*, Tr. 42 line 19 to Tr. 43 line 23.
[14] *Id.*, Tr. 43 line 24 to Tr. 44 line 6 (no memory of suggesting revisions to the draft he saw); Tr. 45, lines 12-18 (did not write or co-author any suggestions); Tr. 49, lines 14-21 (no recollection that he ever suggested that Dr. Daggett modify any findings, or that Dr. Daggett ever suggested that Dr. Cushing modify any findings.
[15] *Id.*, Tr. 49 line 22 to Tr. 50 line 12.

3

any treatise or scholarly article saying that "a computer program using the same inputs will have the same accuracy in this field of water movement."[16]

Dr. Cushing could not answer questions as to the significance of Dr. Daggett's Report's statement that he used a "dual frequency GPS survey."[17] Dr. Cushing stated that he could answer some questions about the methodologies used by Dr. Daggett in compiling his report in general terms, but not specifically.[18]

Dr. Cushing stated that he could not state whether Dr. Daggett's Report conformed in all respects to the commonly used standards in civil engineering, because he was a marine engineer and not a civil engineer, and therefore could have an opinion on the quality of Dr. Daggett's work only where the two fields overlapped and not otherwise.[19]

Prior to their work for Lafarge, Dr. Cushing and Dr. Daggett had never worked together on any particular project.[20]

Dr. Cushing testified that Dr. Daggett's Report was important to his conclusions on the currents in the IHNC, the motion of the barge, the movement of the barge, the timing of the movement of the barge, and the surveying of the levee. Dr. Daggett's results are used throughout Dr. Cushing's Report.[21]

---

[16] *Id.*, Tr. 50 line 7 to Tr. 53 line 17.
[17] *Id.*, Tr. 55 line 18 to Tr. 57 line 14.
[18] *Id.*, Tr. 59, lines 8-13.
[19] *Id.*, Tr. 59 lines 14-24.
[20] *Id.*, Tr. 30, lines 3-5; Tr. 31 line 21 to Tr. 32 line 6 (other than projects for the marine board, Dr. Cushing never previously worked with Dr. Daggett on any question involving design or construction, and never worked with J. Christopher Hewlett).
[21] *Id.*, Tr. 65 line 17 to Tr. 68 line 4. Dr. Cushing testified that he would have come to the same conclusions as to the movement of the barge even without Dr. Daggett's Report, based on his "knowledge, training and experience." *Id.*, Tr. 68 line 5 to Tr. 70 line 9.

Dr. Cushing testified that he would have come to the same conclusions as to the movement of the barge even without Dr. Daggett's Report, based on his "knowledge, training and experience."[22]  However, Dr. Cushing could not say whether Dr. Daggett had performed any calculations on the effect of the 20-foot high floodwall, from the ground level to the top of the floodwall at the North Breach, on the movement of wind over the IHNC when the wind was generally blowing from West to East.  Dr. Cushing thought it was insignificant but had done no calculations himself and did know if Dr. Daggett had performed any such calculations.[23]  Dr. Cushing's statements about the movement of the barge and the effect of the wind stated that the currents were negligible, and he relied on Dr. Daggett for that conclusion.[24]  Dr. Cushing similarly relied on Dr. Daggett for the information on current directions set forth in Figure 57 on p. 86 of Dr. Cushing's Report.[25]

The photograph on p. 46 of Dr. Cushing's Report,[26] assertedly showing the poor visibility at the time of the photograph, has a stated time that Dr. Cushing obtained from Dr. Daggett, who assertedly obtained it from interviews with the lock staff.[27]  The photograph in Dr. Cushing's Report is changed from the original: the horizontal axis has been compressed, and the picture is darker than the original produced to plaintiffs in discovery.[28]  Another photograph taken by the lock staff is much clearer.[29]  Apparently, only Dr. Daggett can explain these questions.

---

[22] *Id.*, Tr. 68 line 5 to Tr. 70 line 9.
[23] *Id.*, Tr. 78 line 13 to Tr. 79 line 24 (approximately 20-foot difference in height); Tr. 80 line 3 to Tr. 85 line 20 (discussion of calculations, if any).
[24] *Id.*, Tr. 124 line 10 to Tr. 125 line 2.
[25] *Id.*, Tr. 255, lines 8-13.
[26] Exhibit 10 hereto.
[27] Plaintiffs' Exhibit 6, August 6, 2009 Deposition of Dr. Charles Cushing, Tr. 140 line 2 to Tr. 142 line 5. No such interviews were produced.
[28] See Plaintiffs' Exhibit 12 hereto.
[29] See Plaintiffs' Exhibit 13 hereto.

### 2. Dr. Cushing Based His Asserted Analysis of Causation on the Unexamined Assumption that the Barge Could Not Have Traversed the IHNC and Been the Location of Either Breach Prior to that Breach

Dr. Cushing's Report concluding that the Barge ING 4727 could not have caused either the North breach or the South breach was based on the assumptions that the barge could not have become loose before 9:00 A.M. on Monday, August 29, 2005, and that there were not enough wind or waves to move the barge to the East side of the IHNC before 9:00 A.M. on Monday, August 29, 2005.[30] Dr. Cushing singled out Dr. Daggett's Report as being "very useful" as to the movement of the barge.[31]

Dr. Cushing's assumption is contrary to eyewitness testimony known to Lafarge three years before Dr. Cushing signed his Report.[32]

### 3. Absence of Evidence

Dr. Cushing's Report contains no information on the general practice of persons in his profession, with respect to reliance on the types of evidence exemplified by Dr. Daggett's Report, or on any guarantees of trustworthiness in such reliance.

---

[30] Plaintiffs' Exhibit 2, Cushing Report at p. 78 ("Taking note of the orientation of the wind vector on the canal, the earliest the barge could have been pushed into the canal by the wind, without interference from the Namasco gantry, would have been in the 0900 (9:00 AM) to 1000 (10:00 AM) timeframe.  It is also worthwhile to note that this is the time when the wind would have had the first chance to act on the barge without the barge being sheltered in the lee of the silos and warehouses on the wharf.  Of course, the breaches had already occurred by this time."); Plaintiffs' Exhibit 6, August 6, 2009 Deposition of Dr. Charles Cushing, Tr. 179, lines 6-17 ("Q. . . . You state in your report the earliest time that the barge could have crossed -- based on your calculations and assumptions, the earliest time the barge could have crossed from the west bank to the east bank of the Inner Harbor Navigational Canal; isn't that right?  A.  I'm saying that it couldn't have crossed over before 9:00 o'clock.  It would have to be sometime after 9:00 clock.").

[31] Plaintiffs' Exhibit 6, August 6, 2009 Deposition of Dr. Cushing, Tr. 66 line 21 to Tr. 67 line 17.

[32] See Plaintiffs' Exhibit 13, the Affidavit of Gertrude LeBlanc; Plaintiffs' Exhibit 14, the Transcript of Centanni's July 31, 2006 Centanni Interview with Gertrude LeBlanc; Plaintiffs' Exhibit 15, the Affidavit of Frazier Tompkins; and Plaintiffs' Exhibit 16, the Transcript of Centanni's December 2, 2005 Interview with Frazier Tompkins.

### 4. Dr. Cushing Failed to Provide Information on His Compensation

Dr. Cushing's expert report states in Appendix O, under the heading "BILLING RATES," only the following: "Dr. Cushing is compensated $290 per hour for his time."[33]

There is no information about the compensation of Dr. Cushing's company, or of the other persons in his company who worked on the project.

In his August 6, 2009 deposition, Dr. Cushing said he was unable to remember how much he was paid for his work on this case in 2005, in 2006, in 2007, in 2008, or in 2009 through the date of the deposition, or in total.[34] He said he thought it would have been under a million dollars, but said he did not know if it would have been over or under $500,000, or over or under $750,000.[35] He said that he did not know the percentage of his firm's income that came from his work for Lafarge in 2009, 2008, 2007, 2006, or 2005.[36]

### B. Argument

Dr. Daggett is not testifying as an expert, and his Report is inadmissible hearsay unless some rule of evidence allows its admission. Fed. R. Evid. 703, the only possible source of admissibility, allows an expert to rely on inadmissible information only where it is "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Rule 703 states:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are

---

[33] Plaintiffs' Exhibit 17.
[34] Plaintiffs' Exhibit 6, August 6, 2009 Deposition of Dr. Charles Cushing, Tr. 27 line 18 to Tr. 28 line 8.
[35] *Id.*, Tr. 28, lines 9-21.
[36] *Id.*, Tr. 28, lines 9-21.

7

>   otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

The 1972 Notes of the Advisory Committee on the Rules of Evidence with respect to the original rule made clear that this provision was not an authorization to employ an expert as a kind of Reader's Digest of other experts' work:

>   Facts or data upon which expert opinions are based may, under the rule, be derived from three possible sources. . . . The third source contemplated by the rule consists of presentation of data to the expert outside of court and other than by his own perception. In this respect the rule is designed to broaden the basis for expert opinions beyond that current in many jurisdictions and to bring the judicial practice into line with the practice of the experts themselves when not in court. Thus a physician in his own practice bases his diagnosis on information from numerous sources and of considerable variety, including statements by patients and relatives, reports and opinions from nurses, technicians and other doctors, hospital records, and X rays. Most of them are admissible in evidence, but only with the expenditure of substantial time in producing and examining various authenticating witnesses. <u>The physician makes life-and-death decisions in reliance upon them. His validation, expertly performed and subject to cross-examination, ought to suffice for judicial purposes</u>. Rheingold, supra, at 531; McCormick § 15. A similar provision is California Evidence Code § 801(b).

(Emphasis supplied.)

Defendant has the burden of establishing the legitimacy under Rule 703 of Dr. Cushing's reliance on Dr. Daggett's Report, and his transmission of Dr. Daggett's testimony. WRIGHT & MILLER, 29 FEDERAL PRACTICE AND PROCEDURE, § 6275 ("First, the proponent must show what the expert relied upon in forming his opinion. Second, the proponent must demonstrate that Rule 703 recognizes that this basis for the opinion is legitimate.") (Footnote omitted.) There is no warrant in the legislative history of the Rule, or in Dr. Cushing's Report, for the use by a marine engineer and naval architect of a report like Dr. Daggett's, where he had no role in collaborating with Dr. Daggett as Dr. Daggett performed his work, where he did not and could not check the

8

calculations of Dr. Daggett, where he was unable to use the same computer software, and where he simply did not know what Dr. Daggett did other than as stated in Dr. Daggett's Report.

Indeed, even if there had hypothetically been an adequate showing that an expert like Dr. Cushing traditionally relies on the expertise of an expert like Dr. Daggett, that does not mean that the reliance is reasonable in this case, where the warp and woof of Dr. Cushing's Report is made up of the missing expert, and plaintiffs have been deprived of cross-examination of that expert. *Cf. Bryan v. John Bean Division of FMC Corp.*, 566 F.2d 541, 547 (5th Cir. 1978) ("Moreover, to admit the hearsay opinion of an expert not subject to cross-examination goes against the natural reticence of courts to permit expert opinion unless the expert has been qualified before the jury to render an opinion."). Referring to the "reasonably relied upon" language of Rule 703, Professors Wright and Miller state: "This means the court may exclude expert opinion on the grounds its basis is not "reasonably relied upon" under the specific facts of the case even if experts in the field typically rely on the same type of data." *Id.*, § 6274.

Professors Wright and Miller have also stated that it is improper for one expert to rely on another in circumstances in which "A court also may reject expert testimony under Rule 703 where the witness relies on the findings of an expert in a different field and, because the witness is not an expert in that field, can only parrot and not critically evaluate those findings." *Id.* (footnote omitted).

A leading treatise, MICHAEL H. GRAHAM, 3 HANDBOOK OF FEDERAL EVIDENCE, 6TH ED. (Thomson West, 2006) (Pocket part, 2008, at pp. 84-85, addition to text of note 12), states:

> An expert witness, even a super-expert, is not permitted to testify that other experts have reached the identical conclusion, i.e., formed the same ultimate opinion being testified to in open court. See *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d

398, 409 (6th Cir. 2006) ("Stein's testimony as to Lee's report and conclusions, which were not admitted into evidence, was based on hearsay. See Fed.R.Evid. 801(c) ("'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."). Other circuits have squarely rejected any argument that Rule 703 extends so far as to allow an expert to testify about the conclusions of other experts. See *U.S. v. Tran Trong Cuong*, 18 F.3d 1132, 1143 (4th Cir. 1994) (holding that an expert witness could not bolster his opinion testimony by testifying that a non-testifying expert's conclusions were essentially the same as the expert witness's); *U.S. v. Grey Bear*, 883 F.2d 1382, 1392-93 (8th Cir. 1989), *cert. denied*, 493 U.S. 1047, 110 S. Ct. 846, 107 L. Ed. 2d 840 (1990) ("We are persuaded that Fed.R.Evid. 703 does not permit an expert witness to circumvent the rules of hearsay by testifying that other experts, not present in the courtroom, corroborate his views."). We have also held that a district court erred by admitting expert testimony that was based "upon the opinion of others who were not even qualified as experts, nor present at the trial." *Taylor v. B. Heller & Co.*, 364 F.2d 608, 613, 9 Ohio Misc. 104, 37 Ohio Op. 2d 365 (6th Cir. 1966). Stein's testimony regarding Lee's conclusions was therefore improperly admitted.").

The Fifth Circuit has held that the use of the opinions of non-testifying experts is inadmissible where there is no independent guarantee of trustworthiness. *Polythane Systems, Inc. v. Marina Ventures Intern., Ltd.*, 993 F.2d 1201, 1207-08 (5th Cir. 1993), *cert. denied*, 510 U.S. 1116 (1994) (stating that the rule has been similar both before and after the adoption of the Federal Rules of Evidence); *Bryan v. John Bean Division of FMC Corp.*, 566 F.2d at 547 ("We hold only that, under the circumstances of this case, the conclusions of nontestifying experts were inadmissible under rule 705 either as the facts and data on which the testifying expert based his opinion or as impeachment evidence. The cases cited above admitted otherwise hearsay evidence under special circumstances with external guarantees of reliability and strong limiting instructions to prohibit the jury from considering the evidence substantively. Here, however, the purposes of the hearsay rule would suffer if the evidence were admitted.") (footnote omitted).

Dr. Cushing's assumption that the barge was securely moored on the West side of the IHNC, and could only have become adrift in the midst of Hurricane Katrina, is contrary to facts

10

known years ago by defendant. When they allowed Dr. Bea to base his opinion on an assumption they knew to be contrary to fact, they made his testimony flowing from that assumption inadmissible. *Christophersen v. Allied-Signal Corp.*, 939 F.2d 1106, 1114 (5th Cir. 1991) (*en banc*), *cert. denied*, 503 U.S. 912 (1992). The Fifth Circuit held: "District judges may reject opinions founded on critical facts that are plainly untrustworthy, principally because such an opinion cannot be helpful to the jury." *Accord*, *Newport Ltd. v. Sears, Roebuck & Co.*, 1995 WL 328158 (E.D.La. May 30, 1995) (No. CIV.A. 86-2319) ("The Court was not satisfied in the hearing that certain of the underlying assumptions—access to railroads, Interstate Highways, waterways, grants, dock facilities and the like—were present. . . . Instead, the Court will require that Newport satisfy the Court of a significant number of these factors prior to Dr. Conte taking the stand.").[37]

Finally, Rule 26(a)(2)(B)(vi), Fed. R. Civ. Pro., require that the party offering an expert disclose the expert's compensation. Plaintiffs submit that the proper remedy is for defendants to submit such information now, or be ordered to submit it as a condition of being allowed to offer Dr. Cushing's testimony. It is easy to rectify this situation.

Wherefore, plaintiffs pray that their Motion be granted.

> Respectfully submitted,
>
> /s/_____
> SHAWN KHORRAMI  (CA Bar #180411)
> DYLAN POLLARD  (CA Bar #180306)
> MATT BAILEY  (CA Bar #218685)
> 444 S. Flower St., Thirty-Third Floor
> Los Angeles, California 90071
>     Telephone:    (213) 596-6000

---

[37] A copy of this decision is attached hereto as Exhibit 18.

11

>Facsimile:     (213) 596-6010
>skhorrami@kpalawyers.com
>dpollard@kpalawyers.com
>mbailey@kpalawyers.com

/s/ Brian A. Gilbert
Brian A. Gilbert, Esq. (21297)
LAW OFFICE OF BRIAN A. GILBERT, P.L.C.
821 Baronne Street
New Orleans, Louisiana 70113
>Telephone: (504) 885-7700
>Telephone: (504) 581-6180
>Facsimile: (504) 581-4336
>e-mail: bgilbert@briangilbertlaw.com

/s/ Lawrence D. Wiedemann,
Lawrence D. Wiedemann.(13457)
Karl Wiedemann (18502)
Karen Wiedemann (21151)
WIEDEMANN & WIEDEMANN
821 Baronne Street
New Orleans, Louisiana 70113
>Telephone: (504) 581-6180
>Facsimile: (504) 581-4336
>e-mail: lawrence@wiedemannlaw.com,
>karl@wiedemannlaw.com, karen@wiedemannlaw.com,

12

        /s/ Patrick J. Sanders
        Patrick J. Sanders (18741)
        3316 Ridgelake Drive
        Suite 100
        Metairie, LA 70002
            Telephone: 504-834-0646
            e-mail: pistols42@aol.com

        /s/ Richard T. Seymour
        Richard T. Seymour (D.C. Bar #28100)
        Law Office of Richard T. Seymour, P.L.L.C.
        1150 Connecticut Avenue N.W., Suite 900
        Washington, D.C.  20036-4129
            Voice: 202-862-4320
            Cell:    202-549-1454
            Facsimile:  800-805-1065 and 202-828-4130
            e-mail: rick@rickseymourlaw.net

                Attorneys for Barge Plaintiffs

Dated: December 1, 2009

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above and foregoing document and its attachments, the accompanying proposed form of Order, and the accompanying Notice, have been served upon counsel of record, by ECF upload, this 2nd day of December, 2009.

/s/ _____
Richard T. Seymour (D.C. Bar #28100)
Law Office of Richard T. Seymour, P.L.L.C.
1150 Connecticut Avenue N.W., Suite 900
Washington, D.C.  20036-4129
    Voice: 202-862-4320
    Cell:   202-549-1454
    Facsimile:  800-805-1065 and 202-828-4130
    e-mail: rick@rickseymourlaw.net,