# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| IN RE:  KATRINA CANAL BREACHES | * | |
| CONSOLIDATED LITIGATION | * | CIVIL ACTION |
| | * | |
| | * | NO. 05-4182 |
| PERTAINS TO:  BARGE | * | and consolidated cases |
| | * | |
| | * | SECTION "K"  (2) |
| *Boutte v. Lafarge*            05-5531 | * | |
| *Mumford v. Ingram*         05-5724 | * | |
| *Lagarde v. Lafarge*         06-5342 | * | JUDGE |
| *Perry v. Ingram*              06-6299 | * | STANWOOD R. DUVAL, JR. |
| *Benoit v. Lafarge*           06-7516 | * | |
| *Parfait Family v. USA*     07-3500 | * | MAG. |
| *Lafarge v. USA*_____07-5178_____ | * | JOSEPH C. WILKINSON, JR |
| *Weber v. Lafarge*           08-4459_____ | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## OPPOSITION  TO MOTION OF LAFARGE TO STRIKE THE TESTIMONY OF PLAINTIFFS' EXPERT, ROBERT D. BARTLETT, P.E.

MAY IT PLEASE THE COURT:

Lafarge moves to exclude the testimony of metallurgical engineer Robert Bartlett, P.E. concerning the causes of the North Breach of the eastern Industrial Canal floodwall.  As purported grounds for its motion, Lafarge posits that his testimony concerning the North Breach is devoid of scientific support or analysis.  Lafarge's bid to exclude Mr. Bartlett's testimony fails for several reasons.

- First, Dr. Bartlett's opinion as to the North Breach is based upon the same (or even greater) scientific support and analysis ***which Lafarge itself actually endorses and adopts*** relative to Dr. Bartlett's findings that the barge caused damage observed at the South Breach.

- Second, Lafarge actually misrepresents Mr. Bartlett's testimony concerning physical evidence of barge contact at the North Breach.  While Lafarge claims that Dr. Bartlett found none, in reality, Dr. Bartlett discussed this evidence in his deposition.

1

• Third, Lafarge disputes the reliability of Mr. Bartlett's opinion, which is not so vulnerable to attack by motion to exclude pursuant to Federal Rule of Evidence 702, or under *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993) or its progeny.

• Fourth, Lafarge frames its complaints in terms of a purported absence of "scientific support or analysis." But it is not Mr. Bartlett's analysis with which Lafarge actually takes issue, merely his conclusion that the barge could have played a role in the North Breach failure. This is not the proper subject of a Motion to Exclude.

## ARGUMENT

### A. Standard for Exclusion of Expert Testimony, Generally

"Under *Daubert*, Rule 702 charges trial courts to act as 'gate-keepers,' making a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *See Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243 (5th Cir., 2002). In this gate-keeping role, the court's overarching objective is "to ensure that only reliable and relevant expert testimony is presented to the jury." *See Rushing v. Kansas City Southern Ry*., 185 F.3d 496, 506 (5th Cir., 1999); *Pipitone,* 288 F.3d at 243.

Importantly, and contrary to Defendant's approach, a motion to exclude is not intended to be an all-purpose vehicle to rid itself of expert testimony that relies on competing versions of the facts and/or arrives at competing conclusions. Such conflict exists in all litigation, and as such, the Advisory Committee Notes to Rule 702 specifically rejects this construction:

> When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in the amendment on "sufficient facts or data" is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.

*See Fed. R. Evid. 702* (Notes of Advisory Committee on 2000 amendments); *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 249 (5th Cir. La. 2002).

2

In making its determination, a court must be mindful that "the rejection of expert testimony is the **exception** rather than the rule" *See Fed. R. Evid. 702* (Notes of Advisory Committee on 2000 amendments). The "court's role as gatekeeper is **not** intended to serve as a replacement for the adversary system: 'Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *See United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1078 (5th Cir., 1996) (quoting *Daubert*, 509 U.S. at 596); *Pipitone*, 288 F.3d at 250.

Moreover, the Fifth Circuit has concluded that where, as here, the judge is to sit as the trier of fact, court's overarching objective to pre-screen expert testimony is diminished. *See Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir., 2000) ("Most of the safeguards provided for in *Daubert* are not as essential in a case such as this where a district judge sits as the trier of fact in place of a jury."). In this context, "the Daubert gatekeeping obligation is less pressing because the gatekeeper and the trier of fact are the same[,]" and as such, "it is preferable to admit 'shaky but admissible evidence and permit vigorous cross-examination, presentation of contrary evidence, and careful weighing of the burden of proof to test' such evidence." *See Maravi v. United States*, 2008 U.S. Dist. LEXIS 54387, at 3-4 (W.D. La. July 11, 2008). "Daubert requires a binary choice – admit or exclude – and a judge in a bench trial should have discretion to admit questionable technical evidence, though of course he must not give it more weight than it deserves." *See Deville v. Comar Marine Corp.*, 2009 U.S. Dist. LEXIS 60018, 2 (E.D. La. June 25, 2009) (citing *SmithKline Beecham Corp. v. Apotex Corp.*, 247 F. Supp.2d 1011, 1042 (N.D. Ill. 2003)).

## B. Mr. Bartlett's Testimony - Scientific Analysis and Support - Physical Evidence and Corroboration

Both the Plaintiffs' and Lafarge's experts agree that a large section of rebar at the South Breach, bent perpendicularly in a more-or-less common plane and direction, coupled with corresponding scrape marks on the bottom of the barge, is proof positive that ING 4727 came into contact with the eastern IHNC floodwall at this location.  This is where commonality of opinion ends.  While Barge Plaintiffs will prove that the barge caused the South Breach, Lafarge will seek to portray the barge as the "victim," drawn through the preexisting South Breach.   Lafarge, however, cannot circumvent or deny the "telltale signs of contact between the barge and the bent rebar." (LNA Memo., p. 3).  Faced with this grim reality, Lafarge posits the view, therefore, that the bent rebar is the only physical evidence of contact between ING 4727 and the floodwall that Mr. Bartlett considered.  This is plainly and patently false, and such a view can only be countenanced by a selective rendering of Mr. Bartlett's testimony.

In arriving at the *quite conservative* opinion that ING 4727 is the *plausible* cause of the North Breach, Mr. Bartlett considered both the testimony of Sewerage and Water Board pump station operator William Villavasso - who, as the Court will recall, testified fluently and confidently that he saw the tip of a barge through a gap in the floodwall adjacent to the pumping station - and physical evidence - photographs depicting rust-colored scrape marks on the canal-side of this area of the floodwall.  ING 4727 was rust-colored.  In his deposition, at pages 97 - 100, not addressed in Lafarge's motion, Mr. Bartlett testified:[1]

97

---

[1]See Exhibit 1, Deposition of Robert Bartlett.

4

21     Q.   Have you seen any photographic or
22  other evidence of any contact below the cap or
23  three-foot mark in the northern breach area?
24     A.   I do have photographs of scrape marks
25  on the wall, and I believe that they were below

98

1   the construction joint.  And those scrape marks
2   I would expect to have also been caused by the
3   barge because that is ordinarily dry land in
4   front of the floodwall.
5      Q.   Do you know when those photographs
6   were taken of those scrape marks?
7      A.   No.
8      Q.   Do you know how much activity had been
9   undertaken at the floodwall at the time those
10  photographs were taken?
11     A.   Probably a lot.
12     Q.   Okay.  And did those scrape marks
13  appear fresh to you?
14     A.   They -- I wasn't making a comment
15  about freshness.  They were rusty colored, and
16  they were not what I would have expected from,
17  for example, a vehicle which would have been
18  working in the area because they were too
19  straight.
20     Q.   And this is based on observing the
21  photographs.
22     A.   Correct.
23     Q.   You've not been out there yourself to
24  see this at the time.
25     A.   I have not seen that.  Strict him

99

1   photographs, that's correct.
2      Q.   And you haven't been able to make any
3   correlation as between any physical evidence on
4   the barge and those scratch marks on the wall.
5      A.   No, but I would not expect there to
6   be.  If we're just talking about a scrubbing
7   off a little bit of rust or a little -- even
8   iron for that matter, I would not have expected
9   that to have left a mark that would persist
10  given the amount of time after -- that went by

5

11  before we were able to go look at the barge.
12    Q.   Other than the scratch marks, did you
13  see any evidence anywhere along the floodwall
14  from the northern breach to the southern breach
15  of any impact points, dents, fractures,
16  anything like that, that you attribute to
17  barge?
18    A.   No.
19    Q.   Would you have expected, if the barge
20  was moving down the wall, bumping from the
21  northern breach to the southern breach, to see
22  some evidence of impacts?
23    A.   On the wall or the barge?
24    Q.   Let's start with the wall.  For
25  instance, on the concrete cap.

                          100
1     A.   It would depend on how far the barge
2  went going back and forth against the wall.
3     Q.   You mean how much impetus it got?
4     A.   Yeah.  How much of a running start it
5  got before it touched.  And, um -- remembering
6  or recalling the scratches, they were somewhat
7  continuous, which would indicate to me the
8  barge was not losing contact and reestablishing
9  contacted with the wall, so I would not expect
10  shock loads there.  And like I say, I would not
11  have expected that kind of a contact to have
12  left a mark on the barge.
13    Q.   So whatever made the scratches that
14  you see on the wall in your opinion was some
15  kind of continuous motion.
16    A.   A drag, yes.

     Mr. Bartlett opined in his report, at page 7, as follows:[2]

     "The reason the barge did not travel through the floodwall at the north breach could
be related top the water depth at the time of impact. According to eye-witness
testimony, at the time of the barge impact at the north breach (early AM of August
29, 2005), water was not yet continuously overtopping the flood wall. If the barge
impacted lower on the flood wall, the toughness of the sheetpile reinforced portion

_____

     [2]Exhibit 2.

                          6

of the wall, would have reduced the likelihood that a barge strike would be able to make a large clean penetration.

The photos containing the scrape marks are attached as Exhibit 3, Photos and Figures attached to Mr. Bartlett's report.  Please note especially Figure 2, showing scrape marks at the North Breach, and Figures 4 and 5 showing the same type of marks near the South Breach.  Also attached is Exhibit 4, the As-Built levee drawings Mr. Bartlett studied, as well as Exhibit 5, a typical I-wall section rendering produced by Mr. Bartlett in furtherance of his analysis.  These exhibits not only corroborate his conclusions, but demonstrate that his analysis is much more in-depth than Lafarge represents in its Motion.

In espousing its position that Mr. Bartlett's conclusion  - plausibility that ING 4727 caused the North Breach - is speculative, Lafarge has no choice but to give short-shrift to his testimony, and to the inescapable recognition of corroborating data weighed into his analysis, and contained in this testimony.  Such corroboration is the acid-test of a fair and scientifically rigorous analysis.  Lafarge does not analyze this for the Court's benefit. Contrary to Lafarge's insinuation in its Motion, it is not only visible *damage* which is the hallmark of ING 4727's involvement in the breaches, but *other telltale signs* that the barge was there, and that it made contact with the floodwall.

First, Mr. Bartlett sees scrape marks on the inside of the wall, bearing no resemblance to those possibly caused by a vehicle.  Second, these marks are visible in photographic documentation of the area after the breach.  Third, the marks are continuous.  Fourth, they are the same color as the barge.  Fifth, Mr. Villavasso testified under oath that he heard a boom and saw a barge in this location at the time the North Breach occurred.  Sixth, the marks are at a height Mr. Bartlett expects the barge to have been, given the water height at the time of the North Breach, and the fact that there

is ordinarily dry land there such that any barge could not have been at that height at other times.[3]
Seventh, the South Breach occurred after the North Breach, so if the barge caused both, it had to
have traveled from the latter to the former, in a direction that could (and would) leave scrape marks
on the wall if the barge traveled against it. Eighth, numerous persons heard scraping and banging
sounds from the wall for a period of time before the South Breach occurred. Ninth, it is undisputed
that the barge made contact with the wall at the South Breach. Tenth, it is undisputed that ING 4727
was the only barge, vessel or other large object known to have been adrift in the IHNC between the
Florida Avenue and N. Claiborne Avenue Bridges (between which the two breaches occurred). It
is hardly speculative based upon these considerations that it is plausible that ING 4727 caused the
North Breach.[4]

### C.  Legal Analysis of Lafarge's Motion

Under Federal Rule of Evidence 702, an opponent of expert testimony may challenge
admissibility on three independent grounds: **(1)** whether a witness is "qualified as an expert by
knowledge, skill, experience, training, or education…."[*See Fed. R. Evid. 702*], **(2)** whether the
evidence or testimony is relevant, in that it will "'assist the trier of fact to understand the evidence
or to determine a fact in issue'" [*Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 591 (1993)], and
**(3)** whether the testimony or evidence is reliable. *See id.*, at 589.  Lafarge does not challenge Mr.
Bartlett's expertise or qualifications (but necessarily concedes them through endorsement of his

---

[3]See also Bartlett report, page 7, as quoted above.

[4]It should also be recalled that the IPET reported at Technical Appendix 17 (See Barge
Plaintiffs' Opp. Mot. S.J. Exhibit 65 that physical contact between ING 4727 and the eastern
IHNC floodwall would cause it to fail, and that the Florida Avenue drawbridge was down at the
North and the locks closed at the South - confining the area and allowing admission of no other
large objects.

conclusions as to the South Breach).

Lafarge does not state whether its position is that Mr. Bartlett's testimony as to the North Breach will or will not assist the trier of fact, and the Court is asked first to assume that Lafarge has *abandoned* such a challenge, and to hold that Lafarge is precluded from raising one.[5]

Lafarge questions the reliability of Mr. Bartlett's opinions by impugning his analysis, support and reasoning as unscientific. Here, Lafarge challenges Mr. Bartlett's methodology underlying his conclusions as to the North Breach - that it is plausible that ING 4727 caused the breach - claiming that Mr. Bartlett's analysis is not scientific, but speculative. The argument is specious, however, when Lafarge heartily endorses Mr. Bartlett's conclusions about the damage at the South Breach, and, necessarily in doing so, his qualifications to render them. Mr. Bartlett's conclusions about the South Breach result from visual analysis of the physical evidence there, in light of his expertise, and in light of the scientific data found in the attached exhibits, which Lafarge would concede is the same methodology employed by its own proposed experts.

Logically, Lafarge is out on a limb when it attacks this methodology relative to the North Breach, but endorses it relative to the South Breach. These analyses differ in little respect - but with one glaring difference - corroboration by someone the Court has already recognized as a highly reliable and credible witness - Sewerage and Water Board pump operator William Villavasso - whose account of having seen the barge cause the North Breach, if credited, is summarily and gravely fatal to Lafarge's liability defenses. This is key to Lafarge's strategy in attacking Mr. Bartlett. Clearly, Lafarge's fate rests heavily on Mr. Villavasso, who Lafarge has chosen to attack

---

[5]Barge Plaintiffs expressly reserve the right to rebut any challenge as to whether Mr. Bartlett's opinions will assist the trier of fact in the event that Lafarge is permitted to present one.

obliquely, through Mr. Bartlett, rather than risk the offense of impugning Mr. Villavasso directly. Lafarge cannot sustain its objection to Mr. Bartlett's methods while simultaneously condoning them as scientific where they coincide with Lafarge's own experts'.  Lafarge's challenge must fail in light of the extensive analysis and corroboration described above.

At its heart, "[t]he reliability inquiry requires the Court to assess whether the reasoning or methodology underlying the expert's testimony is valid" and as such, the court's "focus 'must be solely on principles and methodology, not on the conclusions that they generate.'" *See Gaffney v. State Farm Fire & Cas. Co.*, 2009 U.S. Dist. LEXIS 97976, 7-8 (E.D. La. July 15, 2009) (citing *Daubert*, 509 U.S. at 590, 594-95).

In conducting its analysis, the court also must be mindful that "questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *See United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir., 1996).  The same is true as to criticisms concerning accuracy of the evidence relied upon [*Pipitone*, 288 F.3d at 250 ("[t]he fact-finder is entitled to hear Dr. Coco's testimony and decide whether it should accept or reject that testimony after considering all factors that weigh on credibility, **including whether the predicate facts on which Dr. Coco relied are <u>accurate</u>**."); *Transcon. Gas Pipeline Corp. v. Societe d'Exploitation du Solitaire, S.A.*, 2007 U.S. Dist. LEXIS 67691, 13 (E.D. La. Sept. 11, 2007) ("Defendants' attack on the data used by Alexander and Karpathy is not a ground for exclusion.")], and criticisms levied at a failure to consider specific evidence. *See Gaffney v. State Farm Fire & Cas. Co.*, 2009 U.S. Dist. LEXIS 97976, 13 (E.D. La. July 15, 2009) ("Though State Farm  criticizes Cressy's failure to include 'comparative data or analysis regarding . . . wind speeds,'[] Cressy's inspection and review of

depositions, media accounts, and pictures/videos of the Gaffneys' property are enough to make Cressy's report sufficiently reliable").

In any event, analyzing all available proof germane to Mr. Bartlett's area of expertise yields a reliable and appropriately scientific inquiry and opinion, which is not to be subject to scrutiny so rigorous that the Court actually delves into the weight and credit to be given Mr. Bartlett's conclusions. "[T]he standard for determining reliability 'is not that high'" [*In re TMI Litig.*, 193 F.3d 613, 665 (3d Cir. Pa. 1999)], as "[t]he aim is to exclude expert testimony based merely on subjective belief or unsupported speculation." *See Gaffney v. State Farm Fire & Cas. Co.*, 2009 U.S. Dist. LEXIS 97976, 7 (citing *Daubert*, 509 U.S. at 590). Indeed, as the Fifth Circuit has explained, the trial court must take care not to apply the reliability test so stringently so as to "transform a Daubert hearing into a trial on the merits." *See Pipitone*, 288 F.3d at 250. "[Q]uestions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." See *United States v. 14.38 Acres of Land*, 80 F.3d at 1077. Thus, criticisms concerning accuracy of the data relied upon must be evaluated by the trier of fact. See *Pipitone*, 288 F.3d at 250 ("[t]he fact-finder is entitled to hear Dr. Coco's testimony and decide whether it should accept or reject that testimony after considering all factors that weigh on credibility...").

## CONCLUSION

For the foregoing reasons, Lafarge North America, Inc.'s Motion to Exclude Expert Testimony By Robert Bartlett must be denied.

11

Respectfully submitted,


Brian A. Gilbert, Esq.(21297)
Law Office Of Brian A. Gilbert, P.L.C.
Best Koeppel Traylor
2030 St. Charles Avenue
New Orleans, Louisiana 70130
Telephone: (504) 598-1000
Facsimile: (504) 524-1024
E-mail: bgilbert@briangilbertlaw.com;
 bgilbert@bestkoeppel.com



Shawn Khorrami (CA SBN #14011)
Dylan Pollard (CA SBN #180306)
Matt C. Bailey (CA SBN #218685)
Khorrami, Pollard & Abir, LLP
444 S. Flower Street, 33rd Floor
Los Angeles, California 90071
Telephone: (213) 596-6000
Facsimile: (213) 596-6010
e-mail: Skhorrami@kpalawyers.com,
Dpollard@kpalawyers.com
Mbailey@kpalawyers.com


/s/ Lawrence D. Wiedemann
Lawrence D. Wiedemann (#13457)
Karl Wiedemann (18502)
Wiedemann and Wiedemann
821 Baronne Street
New Orleans, Louisiana 70113
Telephone: 504-581-6180
Facsimile: 504-581-4336
e-mail: ldwiedeman@aol.com
karlwied@bellsouth.net

12

Patrick J. Sanders (18741)
3316 Ridgelake Drive, Suite 100
Metairie, Louisiana 70002
Telephone: (504) 834-0646
e-mail: pistols42@aol.com


Richard T. Seymour (D.C. Bar #28100)
Law Office of Richard T. Seymour, P.L.L.C.
1150 Connecticut Avenue N.W., Suite 900
Washington, D.C. 20036-4129
Telephone: 202-862-4320
Cell: 202-549-1454
Facsimile: 800-805-1065 and 202-828-4130
e-mail: rick@rickseyourlaw.net


Lawrence A. Wilson (N.Y.S.B.A. #2487908)
David W. Drucker (N.Y.S.B.A. #1981562)
Wilson, Grochow, Drucker & Nolet
Woolworth Building
233 Broadway 5th Floor
New York, NY 10279-0003
Telephone: 212-608-4400
Facsimile: 212-227-5159
e-mail: lwilson@wgdnlaw1.com, ddrucker@wgdnlaw1.com


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing document has been served upon counsel of record, by United States Mail, postage prepaid and properly addressed, facsimile and/or ECF upload, this 18th day of December, 2009.

/s/ Lawrence D. Wiedemann

13