June 27, 2008

Mr. Lawrence D. Wiedemann
Wiedemann & Wiedemann
Attorneys and Counsellors at Law
821 Baronne Street
New Orleans, LA 70113

      Subject:   **Evaluation of IHNC Floodwall, Eastbank Breaches**
                       **BARTLETT** Project No. 1046

Dear Mr. Wiedemann;

We have completed our evaluation of the IHNC floodwall and ING4727 barge.

## BACKGROUND INFORMATION

Background information was provided through numerous conversations with Mr. Hector Pazos, Ray Helmer and during several inspections of the barge and floodwall as well as through review of the following documents which are listed with their corresponding document control number (DCN):

June 27, 2008
**Wiedemann & Wiedemann**
Page 2

| DCN | Description |
|---|---|
| 1 | Deposition of Mr. William Villavasso dated December 18, 2007 with exhibits, |
| 2 | US Army Corps of Engineers - Performance Evaluation of the New Orleans and Southeast Louisiana Hurricane Protection System - (IPET Report, with technical appendices), |
| 3 | As-Built Drawing, I.H.N.C. East and West Levee and Citrus Back Levee Capping Floodwall, 1983, |
| 4 | "The Failure of the New Orleans Levee System during Hurricane Katrina," Team Louisiana Report, |
| 5 | "Investigation of the Performance of the New Orleans Flood Protection Systems in Hurricane Katrina on August 29, 2005," Final Report, July 31, 2006, by Independent Levee Investigation Team, |
| 6 | Photographs and various information from New Orleans Hurricane Protection Projects Data website (HTTPS://IPET.WES.ARMY.MIL/), |
| 7 | Documents produced by LaFarge, North America (Bates Numbers LNA001066–LNA001390), |
| 8 | Declaration of Dr. Robert Glenn Bea, dated April 16, 2006, |
| 9 | Photos taken by Mr. Hector Pazos of Ocean-Oil Expert Witness, Inc., |
| 10 | Various photographs of barge ING4727 and IHNC Levee Breaches produced by Mr. Ashton O'Dwyer and Mr. Lawrence Wiedemann, |
| 11 | Photographs taken by Getty Images, Inc., |
| 12 | Photographs taken by Attorney Robert Evans, |
| 13 | Photographs produced by Ingram Barge Co. |

Hurricane Katrina made landfall on the morning of August 29, 2005 as a category 3 storm. The resulting wind and storm surge caused numerous levee breaches throughout the Greater New Orleans area. After the passage of the storm, it was discovered that a hopper barge had traversed the eastern floodwall of the Inner Harbor Navigation Canal (IHNC, also known as the Industrial Canal), between the N. Claiborne Avenue bridge and the Florida Avenue bridge. After the water subsided, the barge was resting approximately at the intersection of Jourdan Avenue and N. Roman St. in the 9th Ward neighborhood of New Orleans. During Hurricane Rita, new flood water re-floated the barge, but it remained in the same neighborhood.

June 27, 2008
**Wiedemann & Wiedemann**
Page 3

There were two distinct breaches in the eastern floodwall between these two bridges. The northern breach was near the Florida Avenue bridge and was approximately 180 feet wide (IPET Volume IV, Appendix 9, Page IV-9-12). The southern breach was approximately 793 feet wide (IPET Volume IV, Appendix 9, page IV-9-13). It is believed that the barge entered the 9th Ward through the southern breach (ILIT Report, Figure 6.20, page 6-36). The IHNC runs in a general north-south direction, connecting the Mississippi river to Lake Ponchartrain and the Intercoastal Waterway.

Mr. William Villavasso was the chief operator of Pumping Station No. 5 in August of 2005. Pumping Station No. 5 is approximately located at Florida Blvd. and the Industrial Canal, near where the north breach of the eastern floodwall occurred. Mr. Villavasso was on duty at the station when Katrina struck, and has been deposed on his observations during Katrina. In his deposition he states:

> [page 64] "...I am watching the water, it's getting more intense splashing over the wall. Then I heard like an explosion. Boom. And I heard the explosion, I said what – what could that be? I am still looking in that direction. And then I seen the levee wall partially – sections, it's – The levee walls are like in sections. I saw it tumble over (indicating). A couple of sections looked like they tumbled over. And I am looking real good, I am squinting my eyes because it's raining, too. Imagine it was still dark, but I could see that. Because it looked like a mouth with a tooth out. That's what went through my mind. And then I seen what appear to be metal structure like a barge, only the tip of it. Couldn't tell you I seen a whole barge, because I didn't. I – That's what I seen."

> [page 68] "After I seen that wall break, I seen massive amounts of water pouring through the wall, which [sic] a lot of street flooding. I mean, the water was really coming through. Water elevations start coming up real high. My first response was to run in the station, call Central Control and tell them to drop out the power, because we have high voltage, 6,600 volts going through that station, and we have what you call motor pits. And when water gets in there, that's it for us. We could get electrocuted to death. So I'd told them to drop us out."

During the Villavoso deposition, [p. 148] Mr. Treeby reported that the Central Station log book indicates that the call from Station No. 5 to shut off the power came at 6:10 AM on the morning of August 29, 2005 (the log book for Station 5 was lost in the resulting flood, according to the Villavasso deposition).

June 27, 2008
**Wiedemann & Wiedemann**
Page 4

The hopper barge, ING4727, which was owned by Ingram Barge Company, was docked at the LaFarge North America Terminal prior to and at the time that Hurricane Katrina made landfall on August 29, 2005. The LaFarge terminal is located at 2315 France Street, which is on the west side of the IHNC near the Florida Avenue bridge (USCG MISLE Incident Investigation Activity Number 2516389).

Wiedemann & Wiedemann, Attorneys and Counsellors at Law and Brian Gilbert Law desired a review of our observations of this barge, and the other evidence listed above for the purpose of evaluating the involvement of this barge in these particular floodwall failures.

## OBSERVATIONS

### As-Built Drawings of Floodwall

An as-built drawing of the floodwall provided by the U.S. Army Corps. of Engineers (Dwg. H-4-25157) is included as Appendix A. The two details from this drawing which apply to the subject section of the IHNC floodwall are shown on the referenced drawing as "Typical Wall Section" and "Section A-A". These details were re-drawn by Bartlett Engineering and attached to this report as Appendix B, drawings 1046_01_-1 and 1046_02_-0. The "Typical Wall Section" detail shows that the vertical reinforcing bars (rebars) were No. 6 (i.e. - 3/4" diameter), and passed through holes in the upper end of the sheet piling. The "Typical Wall Section" detail also states that the sheet piling was Z 27. The "Section A-A" detail prescribes that the holes through which the vertical rebars were passed were on 9 inch centers.

### North Breach

The north breach of the eastern floodwall was located in the vicinity of the Florida Avenue bridge and New Orleans Sewerage and Water Board Pumping Station No. 5 (Figure 1). The northern end of the sheet pile floodwall appears to have separated at one of the watertight joints in the concrete (Figure 2). Pumping Station No. 5 can been seen in the background of this figure. This end of the sheet pile wall was displaced some distance from its normal location and appears to have rotated approximately 270 degrees (Figure 3, arrow 1). At the southern end of the north breach, the sheet pilings were still interlocked with the intact wall (Figure 3, arrow 2).

### Southern End of South Breach

The barge came to rest on the protected side of the floodwall near the southern end of the south breach (Figure 4, background). A portion of the floodwall in this area is partially leaning towards the protected side of the levee (Figure 4). At the southern end of the south breach, approximately 3 feet of the upper portion of the concrete floodwall separated from the lower portion (Figure 4, arrow 1). The concrete below this fracture has cracks, but the concrete pieces do not appear to have

June 27, 2008
**Wiedemann & Wiedemann**
Page 5

separated from the sheet pile (Figure 4, arrow 2). The horizontal fracture extends several feet past a vertical watertight joint in the concrete cap of the floodwall (Figure 4, arrow 3). This horizontal fracture is also aligned with a construction joint chamfer in the floodwall (Figure 4, arrow 4) that is at the location identified as a construction joint in the "Typical Wall Section" of USACE Dwg. H-4-25157. This location coincides with the location where the wall transitions between the upper tapered portion of the wall and the lower rectangular section (Figure 5).

The vertical rebar projecting from the fractured concrete floodwall were deformed from their original straight shape. Many of the vertical rebars were sharply bent at the location where they exited the concrete fracture surface (Figure 6, arrow, and Figure 7, arrow 1). By scaling objects in the photos, the curved lengths of some of the tightly bent rebars were observed to be approximately 2 to 3 inches. Their bend angle was uniform; and their bend radius was uniform, small and sharply bent towards the protected side of the floodwall.

The fracture of the wall exposed the smaller horizontal reinforcing bars (Figure 5, arrow and Figure 7, arrow 2). These small horizontal bars were observed to have similar bends where they exited the concrete as was observed with the vertical bars. Both the vertical and horizontal rebars are visible in Figure 7. Also visible in Figure 7 are the location tops of the sheet pilings with respect to the fracture surface (arrow 3). A portion of the horizontal fracture surface was observed to be smooth, horizontal and flat in Figure 7.

The outline of the fracture where the fracture transitioned from horizontal to vertical has a somewhat rounded corner as observed in Figure 7 and Figure 4.

### Barge Observations

The barge was salvaged using a mutually agreed upon protocol. The barge was lifted in place using air bags so the bottom of the hull could be examined before salvaging. The barge was then cut into smaller sections and placed in a covered warehouse in the inverted position so the bottom could be more thoroughly observed. The bottom of the barge had scratches on its under side (Figures 8, 9, and 10). Some of these scratches were at the top of the turn of the bilge (Figure 9, arrow). Most of the scratches were somewhat uniformly spaced approximately 8 to 10 inches apart. Some larger spaces up to 16 inches were also observed. In Figure 11, six scratches (5 spaces) are observed over a distance of 40 inches. Some of the observed scratches extended three fourths of the length of the barge. The scratches were not perfectly straight, but rather, had a slight curve or arc as they extended across the bottom of the barge (Figure 10, arrow).

June 27, 2008
**Wiedemann & Wiedemann**
Page 6

| **DISCUSSION** |
|:---:|

The southern end of the south breach has a partially upright portion of the floodwall with uniformly bent reinforcing bars exposed as seen in Figures 5, 6, and 7.  Because these bars were evenly bent at a sharp angle towards the protected side of the floodwall, this indicates that they were likely bent over by a large, flat object.

In order to determine the loads necessary to cause the observed deformation of the rebar, the concepts of the "yield moment" and a "plastic hinge" were used.  The "yield moment" is that bending moment which causes only the outer fibers of a member to begin to "yield."  The "plastic moment" is that bending moment which causes permanent stretching of the entire cross section of the member.  When a bar is bent to a radius that is only several times its diameter, it is nearly a plastic hinge.  For the purpose of this "plastic hinge" evaluation, these rebars can be considered to be 3/4 inch diameter non-work hardening material with a yield strength of 36000 psi.  For such a round bar the ratio of the plastic moment to the yield moment has been mathematically determined to be 1.7 (i.e. - the plastic moment is 1.7 times the yield moment). [Ref: "Roark's Formulas for Stress and Strain." Roark & Young, 6th Ed., P. 66].  Since the  moment due to an applied load increases linearly with distance from the load, and because of this relationship between yield moment and plastic moment, the distance from the plastic hinge to the point where load was applied was determined to be 2.4 times the distance from the plastic hinge to the point on the rod where the permanent bend ends.  By determining the location of the applied load and knowing the moment required to cause a "plastic hinge" the force required to create the observed bend can be calculated.  For the condition where the distance from the start of the bend to the point where the bar is straight (i.e. - not permanently bent) is between 2 and 3 inches as cited above, the force required to bend the bars as observed would be 520 and 350 lbs., respectively.

For comparison, the maximum hydrostatic force on the top three feet of a 9 inch long flood wall section which has water to the top of the flood wall would be 212 lbs.  If the construction joint at that elevation had zero strength so that this horizontal force were resisted only by the two vertical rebars in that 9 inch section (one flood side and one protected side rebar) the force per rebar would be 106 lbs. per rebar.  The available hydrostatic force alone is, therefore, insufficient to cause the observed bending of the rebar.

The flat surface of the concrete fracture plane seems to be at the location of the construction joint identified on the USACE as-built drawings (Figure 4, arrow 1).  This construction joint was 3 ft. below the top of the wall.  This would indicate that the wall was struck within 36 inches of the top of the wall.  The smoothness of the horizontal fracture surface in Figure 7 likely indicates that the upper tapered portion of the wall was constructed after the lower section.  The fact that the wall fractured at this location demonstrates that when the impact occurred, the wall foundation had sufficient strength to resist the force required to cause the fracture, rather than fall over.

June 27, 2008
**Wiedemann & Wiedemann**
Page 7

The horizontal bars that were also bent at the southern-most edge of the fracture indicate that the cause of the fracture of the wall at this location had a shape that extended vertically up at least to the top of the floodwall (Figures 4, 5, and 7).  The shape of the striking object is further identified by the fact that the fractured area extended across the vertical watertight joint as shown in Figure 4, arrow 3.  A fracture in one wall panel would not be expected to continue across a vertical joint into the next wall panel unless the cause of the fracture also transcended the vertical joint.  Crack propagation would be expected to either halt or become offset at the joint.  An example of a cause that would transcend the vertical joint would be the turn of the bilge of a barge as it strikes these two adjacent wall panels.

The unique contour of the fracture in the southern corner of the fractured area (Figure 7) has a profile similar to the bottom corner of a barge.  The non-straight fracture in the panel at the south end of the south break provides information about the loading that caused this fracture. Considering that the concrete in the area of this curved fracture has similar properties in all directions, then fractures will tend to form and grow along the plane of greatest tensile stress.  Hydrostatic loading on the floodwall would not cause a "plane of greatest tensile stress" which had the shape of the observed fracture.  The concave curved fracture shape indicates that the fracture was caused by contact with a foreign object.

The scratches on the bottom of the barge are spaced at intervals that agree with the 9 inch design spacing of the vertical rebars in one face of the floodwall, (as described in the "as built"drawings of the floodwall) assuming the barge traveled in a somewhat straight path through the wall at a slight angle off perpendicular to the live of the wall.  Some of the scratches on the bottom of the barge extended approximately three-fourths the length of the barge.

The reason the barge did not travel through the floodwall at the north breach could be related to the water depth at the time of impact.  According to eye-witness testimony, at the time of the barge impact at the north breach (early AM of August 29, 2005), water was not yet continuously overtopping the floodwall.  If the barge impacted lower on the floodwall, the toughness of the sheetpile reinforced portion of the wall, would have reduced the likelihood that a barge strike would be able to make a large clean penetration.

Testimony also indicated that the "corner" of the barge impacted the floodwall at the north breach area.  This would mean that the force of the barge impact would have been absorbed by a narrower portion of the wall, and therefore damaged a smaller section of the wall causing it to look like "...a mouth with a tooth out" as described by Mr. Villavasso.

June 27, 2008
**Wiedemann & Wiedemann**
Page 8

## CONCLUSIONS

Hydrostatic pressure alone would be insufficient to cause the fracture features and rebar deformations observed at the south end of the south breach of the IHNC 4727 east floodwall.

The locations of the scratches on the bottom of the ING 4727 are consistent with the spacing of the exposed, bent vertical rebars at the south end of the south breach of the IHNC east floodwall.

The features of the damage at the south end of the south breach of the IHNC east floodwall are indicative of damage being caused by contact from the ING 4727.

The cited information is compelling evidence that the damage to the south end of the south breach of the IHNC east floodwall was due, more likely than not, to an impact by the ING 4727.

The evidence demonstrating that the ING 4727 created a breach at the south end of the IHNC east floodwall confirms the plausibility of the testimony by Mr. Villavaso that he observed a barge create the initial damage to the north breach of the IHNC east floodwall.

## CLOSING

We respectfully request to reserve the right to review our findings and conclusions should new information become available.

                                                       Sincerely,
                                                      **BARTLETT ENGINEERING**

                                                      Robert D. Bartlett, P.E.
                                                      Principal Engineer