# CASE #1



LEXSEE 2008 U.S. DIST. LEXIS 28744

**ATLANTIC SPECIALTY INSURANCE COMPANY A/S/O ALLSTAR ELECTRONICS, INC., Plaintiff, VERSUS GOLD COAST DEVELOPMENTS, INC. & GOLD COAST DEVELOPMENT CORP., Defendants.**

**No 05-CV-4863 (JFB) (WDW)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

*2008 U.S. Dist. LEXIS 28744; 76 Fed. R. Evid. Serv. (Callaghan) 92*

**April 8, 2008, Decided
April 8, 2008, Filed**

**COUNSEL:** [*1] For Atlantic Specialty Insurance Company, a/s/o Allstar Electronics, Inc., Plaintiff: Robert C. Sheps, LEAD ATTORNEY, Sheps Law Group, P.C., Melville, NY.

For Gold Coast Developments, Inc., Defendant: Daniel Joel Friedman, LEAD ATTORNEY, Thomas Robert Maeglin, Abrams, Gorelick, Friedman & Jacobson, P.C., New York, NY.

For Gold Coast Development Corp., Defendant: Daniel Joel Friedman, LEAD ATTORNEY, Abrams, Gorelick, Friedman & Jacobson, P.C., New York, NY.

**JUDGES:** JOSEPH F. BIANCO, United States District Judge.

**OPINION BY:** JOSEPH F. BIANCO

**OPINION**

MEMORANDUM AND ORDER

Plaintiff Atlantic Specialty Insurance Company (hereinafter, "Atlantic") brought the instant case against defendants Gold Coast Developments Inc. and Gold Coast Development Corp. (collectively, the "defendants" or "Gold Coast"), alleging negligence, breach of contract,

and breach of warranty. The lawsuit arises from water damage to property of New York D-Ram Exchange (hereinafter, "D-Ram") on January 11, 2004, allegedly caused by a freeze-up and rupture of a sprinkler system in the building where D-Ram was a tenant. This suit was filed by Altantic as property insurer and subrogee of Allstar Electronics, Inc. (hereinafter, "Allstar"), who was a named insurer [*2] under the same insurance policy as D-Ram, to recover the $ 322,000 that it paid Allstar as a result of the water damage.

Defendants moved for (1) the exclusion of the testimony of plaintiff's experts under *Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)*; and (2) summary judgment on all three of plaintiff's claims. At oral argument, because it was undisputed that there was no written or oral lease agreement with defendants, counsel for plaintiff agreed to withdraw Count Two (breach of contract) and Count Three (breach of warranty) in the complaint. For the reasons stated below, defendants' motion to exclude the testimony of experts Steven Pietropaolo and Alec Hicks, Jr. is denied and the motion for summary judgment as to the negligence claim is denied. Because the defendants' motion to exclude the testimony of expert Paul Willigan relates only to damages and has no relevance to the summary judgment motion, the Court will not decide that motion at this juncture, but rather will address that

Case 2:05-cv-04182-SRD-JCW   Document 19485-1   Filed 12/18/09   Page 3 of 119

Page 2

2008 U.S. Dist. LEXIS 28744, *2; 76 Fed. R. Evid. Serv. (Callaghan) 92

motion in conjunction with any other *in limine* motions made once a trial date has been set.

## I. BACKGROUND

The facts described below are taken from the parties' depositions, affidavits, exhibits, [*3] and *Local Rule 56.1* statement of facts. Upon consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party. *See Capobianco v. City of New York, 422 F.3d 47, 50 (2d Cir. 2001).*

A. Factual Background [1]

1   When one party's *Rule 56.1* Statement is cited, the opposing party does not dispute that fact or has offered no evidence to controvert that fact.

Gold Coast, Allstar, and D-Ram are all closely held corporations owned and controlled by the same principal, Tom Laviano. (Defs.' 5 6.1 PP 7,8,9.) Gold Coast's sole business was owning the premises located at 87 Bethpage Road, Hicksville, New York ("the premises"). (Defs.' 56.4 Mont. 513, 1 P 11.) D-Ram and Allstar were both in the business of buying and selling surplus computer hardware, specifically computer "chips." (Defs.' 56.1 P 10.) D-Ram operated its business from the premises until mid-January 2004. (Defs.' 56.1 P 18.) There was no written lease between Gold Coast and D-Ram or Allstar. (Defs.' 56.1 P 12.)

Within the drop ceiling or ceiling cavity above D-Ram's occupancy was a wet sprinkler system. (Defs.' 5 6.1 P 21.) The heat supplied to rooms in the building warmed the space between [*4] the drop ceiling and the roof, where air was circulated back to the building's heating system though a "plenum" system. (Defs.' (Pietropaolo Dep. at 88-93). Defendants note that this was also the area where the building's "wet" sprinkler system was located. The "wet" sprinkler system of the type in place at this location is kept in proper order by, among other things, maintaining adequate ambient temperature in the building, which would also warm the sprinklers and prevent freeze-up. (Defs.' 56.1 P 23.) Plaintiff notes that additional methods may be employed to prevent freeze-ups including anti-freeze, insulation, or heating tape. (Pietropaolo Aff. at 2.) Defendants contend that there is a direct correlation between the heat in D-Ram's premises and the heat in the immediate vicinity of the sprinkler heads and system. (Defs.' 56.1 P 25.)

Plaintiff, however, denies that there is any direct correlation.

In the fall of 2003, D-Ram began moving its operation from 87 Bethpage Road, Hicksville, New York to the location of Allstar, at 20 Oser Avenue, Hauppauge, New York. (Defs.' 56.1 P 17.) On January 11, 2004, this moving process was still underway. (Defs.' 56.1 P 18.) Much of the equipment [*5] and stock owned by D-Ram had been moved to the Happauge location. (Defs.' 56.1 P 18.) However, D-Ram continued to store some computer chips in the 87 Bethpage location. (Defs.' 56. 1 P 19.)

In January of 2004, D-Ram occupied the premises. (Defs.' 56.1 P 5.) Allstar did not occupy the premises during this time period. (Defs.' 56.1 P 6.) In the several days prior to January 11, 2004, the New York/Long Island region was struck by record low temperatures. 56. 1 P 27.) These low temperatures caused freeze-ups in buildings across Long Island and the New York metropolitan area. (Defs.' 56. 1 P 27.) On January 11, 2004, water unintendedly discharged from a sprinkler system located on the premises, causing water damage to business and property. (Defs.' 56.1 P 2.)

A dispute exists as to whether the freeze-up was a result of a defect in construction or maintenance of the building or the sprinkler system, or resulted from D-Ram's alleged failure to maintain the heat at a suitable temperature. Maintenance of the heat was handled by D-Ram employees Al Orlando and Tom Laviano. (Defs.' 56.1 P 13.) Defendants assert that D-Ram paid for electric gas and heating at the premises. (Defs.' 56.1 P 14.) Defendants [*6] also assert that D-Ram was responsible for the heating equipment, *i.e.*, maintaining a minimal level of heat in the space. (Defs.' 56. 1 P 15.) Plaintiff argues, however, that there is no testimony as to whether D-Ram had any responsibility to heat the area in the ceiling level where the sprinkler is located. (Graff Dep. Tr. at 19-20.) Defendants assert that, if there was a problem with the heating, D-Ram would pay for the repair. (*Id.*) Plaintiff argues, however, that D-Ram was only responsible for repairing the heating system in the usable tenant space and not the space above the ceiling area where the building sprinklers are located. (*Id.*)

There is no evidence of the actual temperature within D-Ram's premises at the time of the loss, but the evidence indicates that the heating system was in working order at that time. (Defs.' 56.1 P 20.) There is no evidence as to

Case 2:05-cv-04182-SRD-JCW   Document 19485-1   Filed 12/18/09   Page 4 of 119

Page 3

2008 U.S. Dist. LEXIS 28744, *6; 76 Fed. R. Evid. Serv. (Callaghan) 92

who last set the temperature of the thermostat before the loss. (Defs.' 56.1P 34.) Although D-Ram was in control of the thermostat on the user level of the premises, D-Ram denies that they were in control of the temperature in the ceiling space. (Defs.' 56.1 P 31.) Defendants contend that there was nothing atypical regarding [*7] the installation of the sprinkler system nor the configuration of the heating system. (Defs.' 56.1 P 29.) Defendants further argue that the sprinkler failure could have been the result of the thermostat temperature being lowered during the period when D-Ram had ceased its operations up to and including the loss date. (Defs.' 56.1 P 30.)

Atlantic was a business and property insurance carrier for Allstar and D-Ram. (Defs.' 56., 1 P 1.) Allstar submitted the insurance claim that is the basis of Atlantic's subrogation claim. (Defs.' 56.1 P 38.) The goods that were allegedly damaged were owned by D-Ram. (Defs.' 56. 1 P 36.) Defendants assert, therefore, that subrogor Allstar did not sustain a loss. (Defs.' 56.1 P 35.) Plaintiff argues, however, that Allstar did sustain a loss as evidenced by the claim prepared for and submitted through Allstar's insurance policy with plaintiff. (Sheps Aff., Ex. 2, 3.) Tom Laviano worked with Mark Adler, a public adjuster, to prepare the insurance claim which was submitted to Atlantic. (Defs.' 5 6.1 P 39.) Atlantic engaged NICE Networks to obtain values for the claim. (Defs.' 56.1 P 40.) NICE Networks assigned Paul Willigan to the "Allstar Claim." (Id.) Willigan, [*8] in turn engaged Seville Electronic Trading Corp. to obtain prices for the computer chips in the insurance claim. (Defs.' 56. 1 P 41.) Steele adjusted upward of 15% the computer chip values Willigan provided. (Defs.' 56.1 P 42.) Based upon a report from Steele dated, April 20, 2004, as a result of the January 11th loss, Atlantic paid Allstar $ 322,915. (Defs.' 56.1 P 3.)

B. Procedural History

On October 17, 2005, Atlantic filed a complaint against Gold Coast alleging damages resulting from Gold Coast's negligence, gross negligence, or careless and/or negligent omissions in installing and maintaining the sprinkler system on the premises. Additionally, Atlantic brought claims for breach of contract and breach of warranty. On March 20, 2006, Atlantic filed an Amended Complaint. On June 28, 2006, defendants answered the Amended Complaint. On November 9, 2007, defendants filed a motion for summary judgment and for an order

precluding plaintiff's expert opinion testimony. The motion was fully submitted on January 4, 2007 and oral argument was held on February 12, 2008.

II. STANDARD OF REVIEW

Pursuant to *Federal Rule of Civil Procedure 56(c)*, a court may not grant a motion for summary judgment [*9] unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*; *Globecon Group, LLC v. Hartford Fire Ins. Co., 434 F.3d 165, 170 (2d Cir. 2006)*. The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones, 396 F.3d 53, 69 (2d Cir. 2005)*. The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of West Hartford, 361 F.3d 113, 122 (2d Cir. 2004)*; *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)* (noting that summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving [*10] party must come forward with specific facts showing that there is a *genuine issue for trial."* *Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002)* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986))*. As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson, 477 U.S. at 249-50* (internal citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id. at 247-48.* Thus, the nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *R. G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 77 (2d Cir. 1984)* (internal quotations omitted). Accordingly, it is insufficient for a party opposing summary judgment

Case 2:05-cv-04182-SRD-JCW   Document 19485-1   Filed 12/18/09   Page 5 of 119

Page 4

2008 U.S. Dist. LEXIS 28744, *10; 76 Fed. R. Evid. Serv. (Callaghan) 92

"merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms. v. W.R. Grace & Co., 77 F.3d 603, 615 (2d Cir. 1996)* (internal quotations omitted).

III. DISCUSSION

Defendants have moved to exclude the testimony of plaintiff's [*11] two liability experts and for summary judgment on the negligence claim. The Court will address those issues in turn.

A. Expert Testimony

Plaintiff asserts in its complaint that defendants' negligence in installing and maintaining the sprinkler system led to the freeze-up and property loss. As part of its proof, plaintiff offers the expert reports of Steve Pietropaolo, a mechanical engineer, and Alec Hicks, Jr., a property management expert.

Mr. Pietropaolo identified the following instances of defendants' alleged negligence, including: (1) the sprinkler piping was installed in an unheated area; (2) the system was not protected in any manner from the hazards of freezing; and (3) the landlord failed to properly protect the building from excess heat loss and allowed the system to remain installed in a non-code compliant fashion.

Mr. Hicks also identified the following instances of defendants' alleged negligence, including: (1) Gold Coast provided minimal maintenance for the sprinkler system; (2) inspections were minimal, and limited to those necessary to comply with insurance and code requirements; and (3) defendants' failure to check the building and advise tenants to raise thermostats in [*12] preparation for expected cold weather.

Defendants argue that the expert testimony and reports of Hicks and Pietropaolo are inadmissible under *Daubert*. In particular, defendants contend that Pietropaolo's opinions are unreliable because they are not based on sufficient factual information and he has not identified a technique, theory, methodology, or reasoning behind his conclusions. Similarly, defendants assert that Hicks's opinions are unreliable, speculative, lack principles or methodology, and are unhelpful to the jury. As set forth below, the Court disagrees and finds that their opinions are admissible under *Daubert* and are sufficient, in conjunction with the other evidence in the record, to create material issues of fact as to whether

Gold Coast was negligent in installing and maintaining the sprinkler system. [2]

2   Although a *Rule 104(a)* pretrial evidentiary hearing is often necessary to address *Daubert* issues, such hearings are unnecessary if the objections to the testimony being raised do not turn on factual issues and, thus, can be decided based on the written submissions and evidence. *See generally* Michael H. Graham, 2 *Handbook of Fed. Evidence* § 702.5 (5th ed. 2002) ("In light [*13] of the Supreme Court's emphasis of broad discretion granted to trial courts in assessing the relevance and reliability of expert testimony, and in the absence of any authority mandating such a hearing, we conclude that trial courts are not compelled to conduct pretrial hearings in order to discharge the gatekeeping function."). Here, neither party requested such a hearing. Moreover, the objections to the expert testimony dealt with qualifications and methodology, and raised legal arguments based on undisputed facts about such qualifications and methodology. Thus, these *Daubert* issues could be decided based on the written record, which included reports, depositions, and an affidavit. Accordingly, the Court determined that a hearing was unnecessary under the particular circumstances of this case. *See, e.g., Nelson v. Tennessee Gas Pipeline Co., 243 F.3d 244, 248-49 (6th Cir. 2001)* (holding that district court was not required to hold *Daubert* hearing before excluding evidence); *Oddi v. Ford Motor Co., 234 F.3d 136, 154-55 (3d Cir. 2000)* (rejecting argument that *Daubert* hearing was required where court had reviewed record which included two depositions, a declaration, and an expert report); [*14] *see also Colon v. BIC USA, Inc., 199 F. Supp. 2d 53, 71 (S.D.N.Y. 2001)* ("Nothing in *Daubert*, or any other Supreme Court or Second Circuit case, mandates that the district court hold a *Daubert* hearing before ruling on the admissibility of expert testimony, even where such ruling is dispositive of a summary judgment motion.").

In deciding whether a motion for summary judgment should be granted, a district court may only consider admissible evidence. *See Nora Bevs., Inc., v. Perrier Group of Am., Inc., 164 F.3d 736, 746 (2d Cir. 1998)* (stating that on summary judgment motion, "[a] district

Case 2:05-cv-04182-SRD-JCW   Document 19485-1   Filed 12/18/09   Page 6 of 119

Page 5

2008 U.S. Dist. LEXIS 28744, *14; 76 Fed. R. Evid. Serv. (Callaghan) 92

court properly considers only evidence that would be admissible at trial"); *accord Tamarin v. Adam Caterers, 13 F.3d 51, 53 (2d Cir. 1993)*. Thus, as the Second Circuit has explained, it is the proper role of the district court to consider the admissibility of expert testimony in determining whether summary judgment is warranted:

> Because the purpose of summary judgment is to weed out cases in which 'there is no genuine issue as to any material fact and . . . . the moving party is entitled to a judgment as a matter of law,' *Fed. R. Civ. P. 56(c)*, it is appropriate for district courts to decide questions [*15] regarding the admissibility of evidence on summary judgment. Although disputes as to the validity of the underlying data go to the weight of the evidence, and are for the fact-finder to resolve, questions of admissibility are properly resolved by the court. The resolution of evidentiary questions on summary judgment conserves the resources of the parties, the court, and the jury.

*Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997)* (internal citations and footnotes omitted). In other words, "[t]he court performs the same role at the summary judgment phase as at trial; an expert's report is not a talisman against summary judgment." *Id. at 66*. Thus, if the expert testimony is excluded as inadmissible under the *Rule 702* framework articulated in *Daubert* and its progeny, the summary judgment determination is made by the district court on a record that does not contain that evidence. *Id. at 66-67*. Such an analysis must be conducted even if precluding the expert testimony would be outcome determinative. *See G.E. v. Joiner, 522 U.S. 136, 142-43, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997)*. Accordingly, pursuant to *Rule 104 of the Federal Rules of Evidence*, the Court must examine the admissibility of plaintiff's expert testimony [*16] in ruling on defendants' motion for summary judgment.

The admissibility of expert testimony is analyzed under *Rule 702 of the Federal Rules of Evidence*, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

*Fed. R. Evid. 702*. "While the proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of *Rule 702* are satisfied, *see Daubert, 509 U.S. at 593 n.10*, the district court is the ultimate 'gatekeeper.'" *United States v. Williams, 506 F.3d 151, 160 (2d Cir. 2007)*. Under *Daubert*, the district court must perform the gatekeeping function to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." [*17] *509 U.S. at 589*; *see also Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999)* (holding that whether the witness' area of expertise was technical, scientific, or more generally "experience-based," the district court, in its "gatekeeping" function, must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field"); *Nimely v. City of New York, 414 F.3d 381, 396 (2d Cir. 2005)* ("The shift under the Federal Rules to a more permissive approach to expert testimony . screening function traditionally played by trial judges.").

Thus, under *Rule 702*, the district court must make several determinations before allowing expert testimony: (1) whether the witness is qualified to be an expert; (2) whether the opinion is based upon reliable data and methodology; and (3) whether the expert's testimony on a particular issue will assist the trier of fact. *See Nimely, 414 F.3d at 396-97*. Moreover, if the requirements of *Rule 702* are met, the district court must also analyze the testimony under *Rule 403* and may exclude the testimony [*18] "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Fed. R. Evid. 403*; *accord Nimely, 414 F.3d at 397*.

Under the *Daubert* standards, the Court must first

Case 2:05-cv-04182-SRD-JCW   Document 19485-1   Filed 12/18/09   Page 7 of 119

Page 6
2008 U.S. Dist. LEXIS 28744, *18; 76 Fed. R. Evid. Serv. (Callaghan) 92

determine whether the expert has sufficient qualifications to testify. *See Zaremba v. GMC, 360 F.3d 355, 360 (2d Cir. 2004)* (stating that, where the witness lacked qualifications, an analysis of the remaining *Daubert* factors "seems almost superfluous"). Specifically, under *Rule 702*, the Court must determine whether the expert is qualified "by knowledge, skill, experience, training, or education." *Fed. R. Evid. 702*. A court should look at the totality of the witness' qualifications in making this assessment. *See, e.g., Rosco, Inc. v. Mirror Lite Co., 506 F. Supp. 2d 137, 144-45 (E.D.N.Y. 2007)* ("A court must consider the 'totality of a witness'[] background when evaluating the witness'[] qualifications to testify as an expert.") (quoting 29 Wright & Gold, Fed. Prac. & Proc. § 6265, at 246 (1997)); *accord Keenan v. Mine Safety Appliances Co., No. CV-03-0710 (TCP) (ARL), 2006 U.S. Dist. LEXIS 65735, 2006 WL 2546551, at *2 (E.D.N.Y. Aug. 31, 2006)*. In addition, the Court must ensure [*19] that the expert will be proffering opinions on issues or subject matter that are within his or her area of expertise. *See Stagl v. Delta Air Lines, 117 F.3d 76, 80 (2d Cir. 1997)*.

With respect to reliability, "'the district court should consider the indicia of reliability identified in *Rule 702*, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case.'" *Williams, 506 F.3d at 160* (quoting *Amorgianos v. AMTRAK., 303 F.3d 256, 266 (2d Cir. 2002)* (internal quotation marks omitted)). As the Second Circuit has explained, the *Daubert* Court "has identified a number of factors bearing on reliability that district courts may consider, such as (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) a technique's known or potential rate of error, and the existence and maintenance of standards controlling the technique's operation; and (4) whether a particular technique or theory has gained general acceptance in the [*20] relevant scientific community." *Amorgianos, 303 F.3d at 266* (citations and internal quotations omitted); *accord Nimely, 414 F.3d at 396*. These criteria are designed to be instructive, but do not constitute a definitive test in every case. *Kumho, 526 U.S. at 151; Nimely, 414 F.3d at 396*. Moreover, in addition to these criteria for determining whether the methodology is reliable, *Rule 702* also requires that there be a sufficiently reliable connection between the methodology and the expert's conclusions for such conclusions to be admissible. *See Gen. Elec. Co., 522 U.S. at 146, 118 S. Ct. 512, 139 L. Ed. 2d 508* ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."); *see also Amorgianos, 303 F.3d at 266* ("[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and *Rule 702* mandate the exclusion of that unreliable opinion testimony.").

With respect to whether the expert's testimony will assist [*21] the trier of fact, the Second Circuit has repeatedly emphasized that "expert testimony that usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it, . . . by definition does not aid the jury in making a decision; rather, it undertakes to tell the jury what result to reach, and thus attempts to substitute the expert's judgment for the jury's." *Nimely, 414 F.3d at 397* (citations and quotation marks omitted).

The proponent of the expert testimony bears the burden of establishing the admissibility of such testimony under the *Daubert* framework by a preponderance of the evidence standard. *See Daubert, 509 U.S. at 592 n.10* ("These matters should be established by a preponderance of proof.") (citing *Bourjaily v. United States, 483 U.S. 171, 175-76, 107 S. Ct. 2775, 97 L. Ed. 2d 144 (1987)); see also Fed. R. Evid. 702* advisory committee's note ("[T]he admissibility of all expert testimony is governed by the principles of *Rule 104(a)*. Under that Rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence."); *Lust v. Merrell Dow Pharms., Inc., 89 F.3d 594, 598 (9th Cir. 1996)* [*22] ("It is the proponent of the expert who has the burden of proving admissibility."); *accord Baker v. Urban Outfitters, Inc., 254 F. Supp. 2d 346, 353 (S.D.N.Y. 2003)* (same).

1. Steven Pietropaolo

Defendants argue that Pietropaolo's opinions are inadmissible because they are unreliable. Specifically, defendants argue the following: (1) "Pietropaolo's opinions are unreliable because they are not based upon

2008 U.S. Dist. LEXIS 28744, *22; 76 Fed. R. Evid. Serv. (Callaghan) 92

sufficient factual information to support them, and he has not identified any technique, theory, methodology, or reasoning behind his conclusions" (Defs.' Memorandum of Law, at 26); and (2) he "cannot provide reliable or helpful opinion testimony because he accepts various alternative explanations for the cause of the loss" (*id.* at 30). As set forth below, applying the *Daubert* standard, there is no basis to exclude Pietropaolo's testimony.

Defendants argue that Pietropaolo's methodology was flawed in a number of ways, including, among other things, that he did not have personal knowledge of the setting of the thermostat, did not inspect the loss site until two months after the accident, and could not recall if he was wearing a coat during the inspection. However, the Court does not view [*23] any of the articulated deficiencies in testing and methodology sufficient to render Pietropaolo's opinion inadmissible under *Daubert*. Specifically, the Court has reviewed Pietropaolo's affidavit, report, and deposition in which he explained, among other things, he surveyed the area, examined the burst pipe, photographed the sprinkler system and damage, and physically experienced a draft under the door. (*See* Pietropaolo Dep. 41:1 - 42:3; 51:10-25; 53:3-11; 62:12-17 Aug. 9, 2007.) Based upon that inspection, he concluded the sprinkler system was installed in an unheated area, that the area was non-conditioned and the pipes were not insulated. (*See* Pietropaolo Dep. 94:12-16; 95:5-8 Aug. 9, 2007.) Pietropaolo further concluded that the sprinkler system froze because ice developed in the lines due to the pipes' location in a non-conditioned and unheated area. (Friedman Aff., Exh. 7.) In addition, Pietropaolo concluded that the sprinkler system was not compliant with New York State's Uniform Fire Prevention and Building Code 850.7. (*See* Pietropaolo Dep. 96:8 - 97:14 Aug. 9, 2007); (Friedman Aff., Exh. 7.) In short, Pietropaolo's description of his methodology, which formed the basis for [*24] his conclusions, is sufficiently reliable under *Daubert* to allow his opinions to be admitted.

Defendants' argument that Pietropaolo's opinion must be excluded because he accepts the possibility of other alternative causes for the loss is similarly unavailing. As noted above, Pietropaolo concluded (1) "the water damage was a direct result of a sprinkler freeze-up"; (2) that "[t]he sprinkler heads froze and activated due to ice within the lines, which developed within the piping in the unheated, unconditioned space";

and (3) the accident was, in part, caused by the failure to protect the building from excessive heat loss and by the failure to install the system pursuant to Code. (Defs.' Ex. 7, at 2-3.) Although defendants correctly note that Pietropaolo also concluded that "a low thermostat setting could have also contributed to the event," the failure to eliminate the low thermostat as a potential contributing cause does not render his conclusion unreliable. *See, e.g., U.S. Info. Sys., Inc. v. IBEW Local Union Number 3, AFL-CIO, 313 F. Supp. 2d 213, 238 (S.D.N.Y. 2004)* ("Before a conclusion on causation can be reliably drawn, the expert must make some reasonable attempt to eliminate [*25] some of the most obvious causes. An expert is not required, however, to categorically exclude each and every possible alternative cause."); *see also Ambrosini v. Labarraque, 322 U.S. App. D.C. 19, 101 F.3d 129, 140 (D.C. Cir. 1996)* ("The fact that several possible causes might remain 'uneliminated' . . . only goes to the accuracy of the conclusion, not the soundness of the methodology.") (citation omitted). Accordingly, Pietropaolo's proposed testimony satisfies the requirements of *Daubert*.

2. Alec Hicks, Jr.

Defendants argue that the testimony of Hicks should also be precluded because: (1) Hicks's testimony *is ipse dixit*; (2) any opinion Hicks might give upon who was responsible for the heat would go to the ultimate legal issue; (3) Hicks's opinion is unreliable because it is based on his experience and not on his qualifications as an engineer or the application of technical knowledge; (4) Hicks's opinion is entirely speculative; (5) Hicks's opinion does not assist the trier of fact in understanding the data. (Defs.' Memorandum of Law, at 32-33.) However, after reviewing the record related to Hicks, the Court concludes that there is no basis to exclude his testimony under *Daubert*.

As a threshold matter, the [*26] Court notes that Mr. Hicks has spent over 35 years managing, operating, and maintaining real estate and has testified in both federal and state courts around the nation. (Friedman Aff., Exh. 8.) Mr. Hicks also has a degree in Mechanical Engineering and is registered as a professional engineer. (*Id.*) Hicks's educational background and professional experience qualifies his testimony under the requirements of *Federal Rule of Evidence 702*, as he has gained "specialized knowledge" through "experience, training, or education." *See, e.g. McCullock v. H.B. Fuller Co., 61*

Case 2:05-cv-04182-SRD-JCW   Document 19485-1   Filed 12/18/09   Page 9 of 119

Page 8

2008 U.S. Dist. LEXIS 28744, *26; 76 Fed. R. Evid. Serv. (Callaghan) 92

*F.3d 1038 (2d Cir. 1995)* (holding a clinician's extensive experience sufficient to permit him to opine that the plaintiff's medical condition was caused by exposure to a toxin).

After a review of deposition testimony and expert reports, Mr. Hicks concluded that Gold Coast: (1) "was responsible for maintenance of the sprinkler system, including assuring adequate heat was available to prevent freezing"; (2) "failed to maintain the sprinkler system and to ensure that adequate heat was available to prevent freezing"; and (3) thereby caused the freeze-up. (*Id.*)

Although defendants contend that Hicks's testimony will not assist the [*27] trier of fact, the Court disagrees. It is not within the common knowledge of an average juror as to what steps and/or procedures that a landlord can utilize in the design and maintenance of a sprinkler system to avoid freezing in cold weather. Hicks is qualified, based on his educational and professional experience and review of the basic factual information in the instant case, to testify about what measures, as outlined in his report, could be taken to avoid freezing, including building insulation, door and window weather stripping, and heating sources. (*Id.*) It would also assist the jury to understand how, consistent with insurance and code requirements, commercial property owners can conduct periodic inspections, including with the use of gauges, to address this potential problem. (*Id.*) In short, the Court concludes that Hicks is qualified to testify about such measures, his testimony regarding such measures is sufficiently reliable to be admissible, and would assist the trier of fact. Thus, the motion to exclude his entire testimony is denied [3]

> 3   Although the Court concludes that Hicks's testimony regarding steps or procedures available to a landlord (in connection with preventing [*28] freeze-ups of sprinkler systems) will assist the trier of fact in determining the issue of negligence, the Court will not permit Hicks (or any other witness) to provide an ultimate legal conclusion as to whether the defendants were negligent. As the Second Circuit noted, in finding that the district had erred in allowing a witness to testify that the defendant was negligent:
>
> > Although testimony that embraces an ultimate issue to be decided by the jury is not

inadmissible *per se*, *Fed. R. Evid. 704*, it should not be received if it is based on inadequately explored legal criteria. . . . The problem with testimony containing a legal conclusion is in conveying the witness' unexpressed, and perhaps erroneous, legal standards to the jury.

*Andrews v. Metro North Commuter R. Co., 882 F.2d 705, 709 (2d Cir. 1989); see also Hygh v. Jacobs, 961 F.2d 359, 363 (2d Cir. 1992)* ("This circuit is in accord with other circuits in requiring exclusion of expert testimony that expresses a legal conclusion."); *Strong v. E.I. DuPont de Nemours Co., 667 F.2d 682, 685-86 (8th Cir. 1981)* (holding that question of whether lack of warnings rendered product unreasonably dangerous was for jury to decide, and should [*29] not be the subject of expert testimony). Thus, the Court will not allow Hicks or other experts to express their ultimate opinion on the legal conclusion of negligence.

In sum, the Court recognizes that defendants have pointed potential flaws in Pietropaolo's and Hicks's methodology and opinions. However, given that there is sufficient indicia of reliability to allow admission of their testimony, "vigorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert, 509 U.S. at 596* (citations and quotations omitted); *accord Borawick v. Shay, 68 F.3d 597, 610 (2d Cir. 1995)* (noting that Daubert "advanced a bias in favor of admitting evidence short of that solidly and indisputably proven to be reliable"); *McCullock, 61 F.3d at 1044* (finding expert testimony properly admitted where "[d]isputes as to the strength of his credentials, faults in his use of differential etiology as a methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony").

B.  *Res Ipsa Loquitur* Defendants seek summary judgment on plaintiff's [*30] negligence claim on the ground that, among other things, there is insufficient evidence to support such a claim. In response to defendants' summary judgment motion, plaintiff argues that summary judgment is precluded by the doctrine of

2008 U.S. Dist. LEXIS 28744, *30; 76 Fed. R. Evid. Serv. (Callaghan) 92

*res ipsa loquitur*. Defendants, however, contend that, as a matter of law, plaintiff cannot meet the requirements of *res ipsa loquitur*. As set forth below, the Court finds defendants' position unpersuasive and concludes, viewing the evidence most favorable to plaintiff and drawing all reasonable inferences in its favor, there is sufficient evidence from which a reasonable jury could find the application of the *res ipsa loquitur* doctrine in this case.

The doctrine of *res ipsa loquitur* may be applied where "(1) the event must be of a kind which ordinarily does not occur in the absence of negligence; (2) it must be caused by an agency or instrumentality within the exclusive control of the defendant; and (3) it must not have been due to any voluntary action or contribution on the part of the plaintiff." *Payless Discount Ctrs, Inc. v. 25-29 N. Broadway, 83 A.D.2d 960, 443 N.Y.S.2d 21, 21 (App. Div. 1981).* Thus, "[t]he doctrine permits a plaintiff to establish a prima facie [*31] case of negligence without proving elements usually necessary to state a negligence claim." *St. Paul Fire and Marine Ins. Co. v. Tag 380, LLC, No. 05 Civ. 4917 (DC), 2007 U.S. Dist. LEXIS 74112, 2007 WL 2872464, at * 5 (S.D.N.Y. Sept. 27, 2007).*

In fact, this doctrine has been applied to instances where sprinkler systems have failed or water pipes have burst. *See, e.g., Reade v. SL Green Operating P'ship, LP, 30 A.D.3d 189, 817 N.Y.S.2d 230 (App. Div. 2006); Payless Discount Ctrs, Inc., 443 N.Y.S.2d at 21, 83 A.D.2d 960; Pandozy v. Kalmen, 250 A.D.2d 480, 250 A.D.2d 481, 673 N.Y.S.2d 121 (App. Div. 1998); Dillenberger v. Fifth Ave. Owners Corp., 155 A.D.2d 327, 547 N.Y.S.2d 296 (App. Div. 1989)* (water pipes burst); *see also De Witt Props. v. City of New York, 44 N.Y.2d 417, 426, 377 N.E.2d 461, 406 N.Y.S.2d 16 (N.Y. 1978)* ("The doctrine has been applied to water main breaks. . . . and this type of event has frequently been cited as a typical example of case where the doctrine is commonly applicable."). Specifically, New York courts have held, that "where the owner is in exclusive possession and control of the system, it is reasonable to presume that any break in the system was caused by the owner's neglect." *Payless Discount Ctrs, Inc., 83 A.D.2d at 961*. In other words, "[s]prinkler pipes do not ordinarily break if they [*32] are properly installed and maintained." *Id.; accord Ever Win, Inc. v. 1-10 Indus. Assoc., LLC, 33 A.D.3d 845, 827 N.Y.S.2d 63 (App. Div. 2006).*

Although defendants make several arguments as to why summary judgment on the *res ipsa loquitur* claim is warranted, the Court finds those arguments unpersuasive. First, defendants argue that *res ipsa loquitur* does not apply here as a matter of law because "the New York metropolitan area was subject to a record-breaking cold snap" in January 2004 and "[g]iven the period of unusually low temperatures, it cannot be said that a freeze-up would not have occurred absent someone's negligence." (Defs.' Reply Memorandum, at 6.) According to defendants, "[h]igh temperature in the area on the day of the loss and two preceding days were between 12 [degrees] and 28 [degrees] F; lows were between 1 [degrees] and 6 [degrees] F." (*Id.*) Plaintiff counters that the cold spell in January 2004 was well-publicized before it occurred and thousands of buildings in the New York area did not experience freeze-ups. (Pl.'s Opposition Memorandum, at 9.)

In *St. Paul Fire Fire and Marine Insurance Company,* this precise argument was made in connection with a negligence claim arising from [*33] a freeze-up and rupture of pipes in a building in Manhattan on the exact date as the events in this lawsuit - namely, January 11, 2004. In denying defendants' summary judgment motion on the *res ipsa loquitur* issue, the court explicitly rejected the argument that it was so cold in New York City in January 2004 that the doctrine should not apply:

> The Owners . . . argue that they are entitled to summary judgment dismissing the *res ipsa* claim because the damage was the result of an "act of God" - unusually cold weather. This claim fails because the temperature here were not unexpected for a New York City winter.

*2007 U.S. Dist. LEXIS 74112, 2007 WL 2872464, at *6.* In this case, the Court also concludes that there is insufficient evidence in the record from which to conclude, as a matter of law, that the cold weather on January 11, 2004 was so extreme and so unanticipated that the *res ipsa loquitur* doctrine cannot be applied.

Second, defendants contend that *res ipsa loquitur* cannot apply because they did not have exclusive control of both the sprinkler system *and* the heating system. In particular, defendants argue that D-Ram had control over the thermostat and the heat. However, New York courts have been clear that "the [*34] concept of exclusive

2008 U.S. Dist. LEXIS 28744, *34; 76 Fed. R. Evid. Serv. (Callaghan) 92

control does not require rigid application since the general purpose of this element is to indicate from the circumstances that it probably was the defendant's negligence which caused the accident." *Payless Discount Ctrs, Inc., 443 N.Y.S.2d at 21*; *see also Corcoran v. Banner Super Market, 19 N.Y.2d 425, 432, 227 N.E.2d 304, 280 N.Y.S.2d 385 (N.Y. 1967)* ("The exclusive control requirement is thus subordinated to its general purpose, that of indicating that it probably was the defendant's negligence which caused the accident.") Here, as conceded at oral argument, there is no dispute that the defendants had complete control of the installation and maintenance of the sprinkler system. Although defendants assert that D-Ram may have turned down the thermostat and caused the pipes to freeze (Defs.' Reply Br., at 8), defendants have not pointed to any evidence to establish that D-Ram turned down the thermostat, nor have they provided evidence to indicate at what temperature the thermostat was set on the day of the incident. The mere possibility that D-Ram could have made the building colder is not sufficient to conclude, as a matter of law, that defendants did not have a level of exclusive control over [*35] the sprinkler system to allow for the application of *res ipsa loquitur.* If that were the rule, *res ipsa loquitur* could never have been applied in the above-referenced cases, including *Payless Discount Centers,* because there is always the possibility that, despite a landlord's exclusive control over the sprinkler system, a third party (including a tenant) could do something to lower the temperature in the building. Instead, given it is undisputed that Gold Coast had exclusive control over the sprinkler system, plaintiff should be able to argue *res ipsa loquitur* to the jury.

This type of issue was addressed by the Second Circuit in *Stone v. Courtyard Management Corporation, 353 F.3d 155 (2d Cir. 2003).* In *Stone,* the defendant hotel argued that the automatic doors were not in its exclusive control because, among other things, the public passed through them every day. In reversing the court's decision to grant summary judgment for the defendant, the Court explained how public access to the doors did not eviscerate the potential application of the doctrine of *res ipsa loquitur:*

> We turn first to the failure of plaintiff to proffer any "evidence to exclude the possibility that the operation [*36] of the automatic doors could have been affected adversely by the many persons passing in

and out of the entrance of the Hotel every day." The district court applied the wrong standard. It was not necessary for the plaintiff to altogether eliminate the possibility of other causes of the injury - causing malfunction, but "only that their likelihood must be so reduced that the greater probability lies at defendant's door." *Dermatossian v. New York City Transit Auth., 67 N.Y.2d 219, 227, 501 N.Y.S.2d 784, 492 N.E.2d 1200 (1986)* (quoting 2 Harper and James, Torts § 19.7, at 1086).

*Stone, 353 F.3d at 157-58.* Here, as in *Stone,* there is sufficient evidence from which plaintiff is able to argue to the jury that the likelihood of any lowering of the thermostat by D-Ram was so reduced that the greater probability for the incident lies at Gold Coast's door.

In sum, as the Court found in *St. Paul Fire and Marine Insurance Company,* this Court concludes that defendants' motion for summary judgment on the *res ipsa loquitur* claim must be denied. [4]

> 4   Even if the doctrine of *res ipsa loquitur* was not applied, genuine issues of material fact would still exist as to plaintiff's claim of negligence. In order [*37] to defeat a motion for summary judgment in a negligence action, plaintiff must "introduce adequate evidence on each element of negligence sufficient to support a favorable jury verdict [,and]. . . . in cases where proof of any essential element falls short the case should go no further." *Basso v. Miller, 40 N.Y.2d 233, 242, 352 N.E.2d 868, 386 N.Y.S.2d 564 (N.Y. 1976).* Under New York law, a plaintiff must establish the following elements to prove negligence: (1) that a duty of care was owed by the defendant to the plaintiff; (2) that the defendant breached that duty; (3) that the defendant's breach was a proximate cause of the plaintiff's injuries; and (4) that plaintiff was damaged. *See Van Nostrand v. Froehlich, 44 A.D.3d 54, 844 N.Y.S.2d 293, 293 (App. Div. 2007)*; *Luina v. Katharine Gibbs School N.Y., Inc., 37 A.D.3d 555, 830 N.Y.S.2d 263, 263 (App. Div. 2007)*; *Talbot v. N.Y. Inst. of Tech., 225 A.D.2d 611, 639 N.Y.S.2d 135, 135 (App. Div. 1996).* Under New York law, "[i]t is well established that a landowner is under a duty

Case 2:05-cv-04182-SRD-JCW   Document 19485-1   Filed 12/18/09   Page 12 of 119

Page 11

2008 U.S. Dist. LEXIS 28744, *37; 76 Fed. R. Evid. Serv. (Callaghan) 92

to maintain its property in a reasonably safe condition . . . . In order to subject a property owner to liability for an alleged breach of this duty, the plaintiff must demonstrate that the owner created, or had actual notice or constructive [*38] notice of the hazardous condition which precipitated the injury. Liability based on constructive notice may only be imposed where a defect is visible and apparent and has existed for a sufficient length of time prior to the accident to permit defendant's employees to discover and remedy it." *Trano v. Federated Dep't Stores, Inc., 831 N.Y.S.2d 363, 13 Misc. 3d 1245A, 2006 WL 3524377, at * 1 (N.Y. City Civ. Ct. 2006).* In this instance, genuine issues of material fact exist as to both actual and constructive notice. Specifically, plaintiff has offered evidence about cold air infiltration due to a lack of molding. Defendants argue, however, that the molding was likely removed after D-Ram left the premises. Further, genuine issues of material fact exist as to whether D-Ram assumed the risk. Defendants argue that, because Laviano had a role with both D-Ram and Gold Coast, any knowledge Tom Laviano had as the owner of Gold Coast would be imputed to D-Ram. Defendants further argue Laviano had knowledge of the particulars of the sprinkler system and, therefore, knew the effect of raising or lowering the heat. Plaintiffs assert, however, that there were multiple employees who did not work for both Gold Coast [*39] and Allstar or D-Ram. Further, there is no conclusive proof that Mr. Laviano adjusted the temperature. Therefore, material issues of fact exist as to whether D-Ram assumed the risk. Finally, other arguments that defendants have raised regarding the absence of evidence of proximate cause cannot be decided as a matter of law in this case given the disputed facts discussed *supra*. Accordingly, defendants' motion for summary judgment is similarly denied on these grounds.

C. Volunteer Doctrine and Request to Amend the Complaint

Subrogation "allows an insurer to stand in the shoes of its insured and seek indemnification from third parties whose wrongdoing has caused a loss for which the insurer is bound to reimburse." *Kaf-Kaf, Inc. v. Rodless Decorations, 90 N.Y.2d 654, 660, 687 N.E.2d 1330, 665*

*N.Y.S.2d 47 (N.Y. 1997).* However, "an insurer which pays a loss for which it is not liable thereby becomes a mere volunteer, and is not entitled to subrogation, in the absence of an agreement therefor." *Nat'l Union Fire Ins. Co. v. Ranger Ins. Co., 190 A.D.2d 395, 599 N.Y.S.2d 347, 347 (App. Div. 1993)* (citations and quotations omitted). As one court noted, "[t]he volunteer doctrine is not automatic, and an insurer does not lose the right to recover [*40] simply because it settled noncovered claims." *Ams. Ins. Co. v. Stolt-Nielsen, Inc., No. 97 Civ. 8013 (RCC), 2004 U.S. Dist. LEXIS 28913, 2004 WL 2199497, at *6 (S.D.N.Y. Sept. 30, 2004).* In particular, "[a]n insurer is not a volunteer when it makes a good-faith payment under a reasonable belief that such payment is necessary to protect itself." *Id.*

Defendants argue that "[t]he undisputed evidence shows that Atlantic is not entitled to maintain a claim in subrogation against Gold Coast because its subrogor Allstar did not incur any property damage as a result of the subject loss." (Defs.' Memorandum of Law, at 21.) In other words, the property damage in connection with the loss was to D-Ram and not Allstar, which was the corporation to which Atlantic made payment. Defendants contend, given Allstar has no rights against Gold Coast and Atlantic voluntarily paid Allstar for losses incurred by D-Ram, Atlantic did not become subrogated to any rights when it paid Allstar.

Plaintiff counters that this is, at best, a technical defect. Specifically, plaintiff explains:

> Allstar presented a claim to their property insurer contending the damages were to their own goods. As noted extensively in the defendants motion papers, there [*41] was a great interrelation between Allstar Electronics and D-Ram. Perhaps it was just easier for them to submit a claim under Allstar's name, but the fact is this issue is irrelevant, because D-Ram was covered under the very same policy of insurance, policy number, and the exact same coverages and ultimate payments would have been made. All claims and allegations are identical.

Pl.'s Memorandum of Law, at 20 (emphasis in original). Thus, plaintiff contends that it acted in good faith under a

Case 2:05-cv-04182-SRD-JCW   Document 19485-1   Filed 12/18/09   Page 13 of 119

Page 12

2008 U.S. Dist. LEXIS 28744, *41; 76 Fed. R. Evid. Serv. (Callaghan) 92

reasonable belief that such payment was necessary. In any event, in its opposition, and again during oral argument on February 12, 2008, plaintiff requested permission to amend the complaint to include D-Ram as a named party to this action to correct this purported defect.

*Federal Rule of Civil Procedure 15(a)* allows a party to amend its pleadings by leave of the court, and further directs that "leave shall be freely given when justice so requires." *Fed. R. Civ. P. 15(a)*. Indeed, "it is within the sound discretion of the district court to grant or deny leave to amend." *McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 200 (2d Cir. 2007)*. Absent "undue delay, bad faith, or dilatory motive on the part [*42] of movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. - the leave sought should, as the rules require, be 'freely given.'" *Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962)*; *see also McCarthy, 482 F.3d at 200* ("A district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party. However, '[o]utright refusal to grant the leave without any justifying reason for the denial is an abuse of discretion.'") (quoting *Min Jin v. Metro. Life Ins. Co., 310 F.3d 84, 101 (2d Cir. 2002)*) (internal citation omitted).

The Court finds that there has been no "undue delay, bad faith or dilatory motive" by plaintiff, nor does the Court find that defendants will suffer undue prejudice from the amendment. There would be no additional discovery because all the documents, witnesses, allegations, and legal issues in the case are the same if the amendment is allowed. To the extent that defendants argue that any such amendment would be futile, the Court disagrees. There is no basis for concluding, as a matter [*43] of law, that plaintiff is barred from pursuing recovery for payments made under a valid policy merely because the payments were issued to Allstar, another named insured under the same policy of insurance. *See Ocean Accident and Guarantee Corp. v. Hooker*

*Electro-chemical Co., 240 N.Y. 37, 147 N.E. 351 (N.Y. 1925)* ("subrogation ought to be liberally applied for the protection of those who are its natural benficiaries"); *accord Fed. Ins. Co. v. Arthur Andersen & Co., 75 N.Y.2d 366, 552 N.E.2d 870, 553 N.Y.S.2d 291 (N.Y. 1990)*. Instead, this is an issue for the trier of fact. Moreover, plaintiff can also argue, based on the evidence of interrelatedness between Allstar and D-Ram, that it had a reasonable basis for relying on the existence of an agency relationship between Allstar and D-Ram, such that there is no basis for invalidation of its right to subrogation.

In sum, plaintiff's request to amend the complaint to include D-Ram as a named party to this action is granted and defendants' request for summary judgment on the basis of the volunteer doctrine is denied.

IV. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment and to preclude the testimony of Atlantic's experts, Steve Pietropaolo and Alec Hicks, Jr., [*44] is DENIED. Plaintiff's request to amend the complaint is GRANTED. Plaintiff shall file and serve the Amended Complaint by April 21, 2008.

SO ORDERED.

JOSEPH F. BIANCO

United States District Judge

Dated: April 8, 2008

Central Islip, New York

* * *

The attorney for plaintiff is Robert Sheps, of Sheps Law Group P.C., 35 Pinelawn Road, Suite 106E, Melville, NY, 11747. The attorney for the defendants are Daniel J. Friedman, of Abrams, Gorelick, Friedman, & Jacobson, P.C., One Battery Park Plaza, 4th Floor, New York, NY 10004.

# CASE #2



LEXSEE 1986 U.S. DIST. LEXIS 17605

**BEKER SHIPPING COMPANY v. GRAMERCY FLEET AND HARBOR SERVICE**

**CIVIL ACTION Nos. 85-1042, 85-1285, 86-625 (Consolidated)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA**

*1986 U.S. Dist. LEXIS 17605*

**November 17, 1986, Decided; December 10, 1986, Filed**

**OPINION BY:** [*1] SEAR

**OPINION**

MEMORANDUM AND ORDER

These consolidated cases arise from a collision on the Mississippi River on February 16, 1985 between the barge EROL BEKER in tow of the M/V APRIL T. BEKER and the bulk cargo carrier M/V RAYNA. As a result of the collision, both the BEKER barge and the RAYNA sustained heavy damage. The cargo of soybeans aboard the RAYNA was also damaged. Claims have been asserted by Beker Shipping Company, the owner of the barge, Epos Marine, Inc., the owner of the RAYNA, and Compania Industrial Y De Abastecimientos S.A. - Madrid, the owner of the cargo, and its subrogated cargo underwriters.

By agreement of the parties and consent of the Court, the issues of liability and damages were bifurcated. This trial was limited to the issue of liability in the collision cases. Trial of the cargo claim and collision damages will take place at a later date.

I.

The collision between the vessels occurred in the predawn darkness under clear skies at approximately 5:36 a.m. The collision took place in a bend of the River known as Twelve Mile Point. Twelve Mile Point extends from Mile 108 to Mile 109.5 Lower Mississippi River (LMR). The River changes its course approximately [*2] 110 degrees at Twelve Mile point. The river channel is roughly 1800 feet. The point in the curve of the river is located on the left descending or east bank. Pelican barge fleet is situated along this point and extends 200 feet into the channel. An eddy exists on the point and extends outward from the fleet, the degree to which was not established by evidence at trial. The river current at Twelve Mile Point is quickest in the bend on the right descending or west bank.

The BEKER argues that Twelve Mile Point is a "narrow channel" for purposes of Rule 9 of the Inland Navigation Rules. [1] Application of the narrow channel rule is based on the physical dimensions of the body of water and the character of the navigational use to which the water is put. [2] Considering the physical dimensions of Twelve Mile Point and the overall size of the vessels involved, [3] I find that Twelve Mile Point is not a narrow channel.

1   *33 U.S.C. § 2001 et seq.*
2   *Weathers Towing, Inc v. M/V HERMAN POTT, 570 F.2d 1294 (5th Cir. 1978).*
3   See footnotes 4-6, infra.

The RAYNA [4] had departed a grain elevator above

the port of New Orleans at approximately 2:00 a.m. on February 16th and was [*3] headed downriver for sea. The pilot of the RAYNA was Robert M. Karr, a licensed New Orleans - Baton Rouge river pilot for eleven years. Karr's radio designation was NOBRA 50. He had twenty years prior experience as a river tugboat operator. The RAYNA'S helmsman, Dimitrios Patakos, was in the wheelhouse with Karr at the time of the collision.

> 4    The RAYNA is a Greek registered 747 foot long, dry bulk carrier. It has a breadth of 105 feet and a depth of 68 feet. At the time of the collision, it had a draft of 39 to 40 feet.

The BEKER [5] was proceeding upriver, bound for the Beker Industries plant at Taft, Louisiana. The barge EROL BEKER was loaded with phosphate rock. The APRIL T. BEKER was being operated by Leander Jones. Jones held a United States Coast Guard license which permitted him to operate uninspected towing vessels within 200 miles of shore. This was Jones' third trip on the BEKER in the Mississippi River. It was the first time Jones had operated the vessel alone in darkness. The captain of the BEKER, L. O. Montgomery, was not in the wheelhouse at the time of the collision. Jones was not assisted by a lookout.

> 5    The barge EROL BEKER is 610 feet long. It has a breadth of 78 feet and a depth of 51 feet. The M/V APRIL T. BEKER is 145 feet long. It has a breadth of 42 feet and a depth of 21 feet. When the APRIL T. BEKER is fitted into the notched stern of the EROL BEKER, the total length of the BEKER flotilla is approximately 700 feet. At the time of the collision, the draft of the barge was approximately 32-1/2 feet.

[*4] At 5:18 a.m., the APRIL T. BEKER was heading upriver above the Huey P. Long Bridge near the Avondale Shipyard. At that time, the BEKER was traveling eight or nine statute miles per hour against a two to three mile per hour current. Jones radioed the United States Coast Guard Vessel Traffic Service (VTS) to check for any southbound traffic above Twelve Mile Point.

At approximately 5:20 a.m., the RAYNA was heading downriver from the vicinity of Kenner Bend (Mile 112.2 LMR). Pilot Karr radioed VTS for a routine check-in. According to Karr's testimony, VTS informed him he would meet the upbound APRIL T. BEKER

above Twelve Mile Point. Thereafter, RAYNA continued to move downriver at approximately thirteen statute miles per hour.

At 5:25 a.m., Jones contacted the M/V RAMBLER. [6] The RAMBLER was proceeding downriver ahead of the RAYNA above Twelve Mile Point. It had a tow of six loaded grain barges, three long and two abreast. The RAMBLER was piloted by Lindsey Martin, a licensed second class operator of uninspected towing vessels in inland waters. At the time of the collision, the captain of the RAMBLER was below the wheelhouse. A deckhand was in the wheelhouse with Martin, but did not [*5] act as a lookout. The RAMBLER approached Twelve Mile Point at full throttle, approximately seven statute miles per hour.

> 6    The RAMBLER is an uninspected towing vessel measuring 84 feet long and 30 feet wide. The RAMBLER and its tow measure 679 feet. Its total breadth is 70 feet. Its depth is 9.5 feet.

The evidence shows that each of the vessels was equipped with, and using, radar devices.

At 5:25 a.m., Martin and Jones spoke on the radio and agreed to a one-whistle, port-to-port passing. They were not in visual contact. Pilot Karr, on board the RAYNA, overheard the agreement on the radio. The RAYNA was still proceeding downriver on the east side of the river channel.

Two minutes later, Karr contacted Martin and proposed to overtake the RAMBLER on RAYNA's port side. Karr testified he wanted to "take the bend" at Twelve Mile Point, because the deeper water existed there. In order to take the bend, the RAYNA had to cross the channel from the east bank of the river to a position off the west bank. Karr ordered Patakos to steer twenty degrees to starboard when the vessel was approximately 1300 feet from the west bank.

Martin informed Karr that another smaller tow, the MITTIE LOUISE, [*6] [7] was deep in the bend ahead of both the RAMBLER and the RAYNA. Martin then stated that another vessel (the BEKER) was northbound near Avondale. Martin told Karr that he "would get it [the RAMBLER] up on the point . . ."

> 7    The MITTIE LOUISE was towing two barges downriver at the time of the collision.

Karr told Martin to ". . . just hold the middle . . ." According to Karr, it was his understanding that RAMBLER would navigate the middle of the channel and pass the BEKER on the port side. Karr was to take the bend and meet both vessels on the port side. According to Karr, he realized then that he would overtake the RAMBLER and pass the BEKER at roughly the same time. He also knew the meeting would take place somewhere near Twelve Mile Point. He stated that he knew the RAMBLER and BEKER were manned by relatively inexperienced operators and that the RAMBLER was less maneuverable than his vessel.

Karr also testified that he was familiar with Twelve Mile Point. He was aware, for example, of the presence of Pelican fleet on the east bank. He also operated RAYNA from a high vantage point, which allowed him to view RAMBLER as it headed downriver. He testified, however, that he saw [*7] no reason to slow down or delay the overtaking.

At 5:29 a.m., BEKER continued to proceed at full throttle toward Twelve Mile Point. Jones testified that he had been instructed by the captain to transit bends in the river at full speed to maintain maneuverability. However, Captain Montgomery and Jim Thomas, a former operator of the BEKER, testified that the BEKER could run river bends at less than full speed.

The MITTIE LOUISE informed Jones that the RAMBLER was "holding on the point pretty good there." Jones replied that the BEKER was going to "hug the point and pass everything on the one."

Sensing trouble, the MITTIE LOUISE radioed to the RAMBLER to ". . . get together with that APRIL T. BEKER. . . he says he is going to be on the point."

Martin, however, replied that he could see BEKER was not on the point. In fact, the evidence indicates that BEKER was positioned closer to midchannel at the time. The vessels were then approximately one mile apart. Shortly thereafter, Martin radioed Jones and proposed a starboard-to-starboard passing. Jones assented to a two whistle agreement with the RAMBLER and confirmed a one whistle agreement with the RAYNA.

At approximately 5:31 a.m. the [*8] RAMBLER was pushing its tow downstream toward the point on the east bank. The RAYNA was upriver from the RAMBLER and continued downstream at full throttle.

The BEKER was proceeding upstream also at full throttle. Jones applied a steady one to two degree port rudder to shape up for the starboard passing with RAMBLER.

Jones then radioed Martin and inquired whether RAMBLER was pushing anything. Upon Martin's reply that he had six loads, Jones stated, ". . . I didn't see you like that" and confirmed the two whistle passing. The evidence established that Jones was not wearing his glasses at the time, nor was he using binoculars.

As the RAMBLER began to round the point, its stern swung out toward midchannel, due to the force of the downward current. According to Martin's testimony, the head of his tow was then approximately 200 to 300 feet off the Pelican fleet.

At 5:32 a.m., Jones radioed Martin concerning the RAMBLER's swing in the channel. The following communications took place:

Jones: "Say you're kinda swing around there huh?"

Martin: "I'm driving on her, straighten her out right now."

Jones: "Yeah, roger on that there, I don't want to get too close to that ship there." [*9] (referring to the RAYNA)

Martin: "Yeah, I hear that well, we just driving her straight now, trying to straighten her out."

Jones: "Yeah, roger, roger, O.K. there, I can't slow down either then, I'm keep on going like I'm going."

Karr admitted during his testimony that he overheard the communications between the RAMBLER and the BEKER.

According to Jones' testimony, he was not overly concerned about the risk of collision. He thought that Martin would straighten out. Jones continued to apply minimum port rudder at full throttle.

By 5:34 a.m., it was apparent that the RAMBLER could not straighten out its tow. The angle of the RAMBLER's swing was not definitively established by the evidence. However, Haruzo Eda, and expert in naval architecture and marine engineering called by RAMBLER, testified that the maximum angle of the

RAMBLER's swing was fifteen to twenty degrees. Regardless of the angle of swing, the clear weight of the evidence was that the stern of the RAMBLER was located approximately at midchannel. The distance between the RAMBLER and the BEKER was closing quickly.

At this time, Jones realized the immediacy of the situation and applied twenty-five to thirty degrees [*10] port rudder. He did not, however, attempt to slow down. The RAMBLER and the BEKER passed within fifty feet of each other. Neither vessel sounded a danger signal.

The RAYNA, then approximately a half mile upriver from the BEKER, continued down the bend at full speed. Karr was able to see both vessels from his vantage point on the bridge of the RAYNA. Karr testified that he thought the BEKER would "steer on out" and accomplish the agreed upon passings. Jones himself testified that he thought he could meet the RAYNA on one whistle, even after he made the hard to port steer.

Jones also testified that after missing the RAMBLER, he turned the wheel of the BEKER hard to starboard. However, the BEKER continued to shear off toward the west bank. into the path of the oncoming RAYNA.

RAYNA's expert navigator, J. B. Kleinpeter, testified that a navigator could have taken the BEKER between the RAMBLER and the RAYNA. Kleinpeter based his opinion partly on his estimate that the RAYNA was 300 feet from the west bank at the time of collision.

Karr did not realize there was a risk of collision until approximately 30 seconds before impact. At that time according to Karr, he merely sounded a one whistle [*11] blast to confirm the port-to-port passing with BEKER, ordered the helmsman to steer hard to starboard, and stopped all engines. Karr testified that he was already carrying twenty degrees starboard rudder to compensate for "bank effect," the build-up of water pressure on the west bank. Seconds after ordering the engines stopped, he ordered them half astern. Jones also stopped his engines.

At approximately 5:36 a.m., the starboard bow of the EROL BEKER passed to the starboard of the RAYNA and collided with her starboard bow. Neither vessel sounded a warning signal before impact. The angle of impact was stipulated at thirty degrees. The EROL BEKER slightly grounded on the west bank near the Waggaman light. She was taken off the ground by Captain Montgomery without assistance. The RAYNA continued downstream to General Anchorage.

*The Course of the M/V RAYNA*

The parties dispute RAYNA's location off the west bank at the time of the collision. Karr testified that RAYNA was 300 feet from the bank. In deposition testimony, RAYNA's helmsman, Patakos, and the chief mate, Vlasios Akriotis, both swore that RAYNA was 100 meters, approximately 328 feet, off the bank. Under cross examination, [*12] Martin agreed that the distance could have been 300 feet. Jones, on the other hand, testified that RAYNA was 600 feet from the bank.

Hector Pazos, an expert offered by BEKER, positioned the RAYNA 600 feet from the bank. He based his estimate partly on the fact witnesses' testimony. However, Pazos incorrectly interpreted Patakos' testimony on this issue as positioning the RAYNA 300 to 400 meters from the west bank at the time of the collision.

Arthur Sargent, an expert naval architect called by RAYNA, indicated that positioning the RAYNA 300 feet from the bank would not be inconsistent with the principles of bank effect. Sargent admitted, however, that he conducted no study of the bank effect RAYNA would feel in this particular bend.

Unfortunately, none of the experts who testified at trial offered a definitive trajectory of the RAYNA's course. Dr. Eda testified that the RAYNA's location in the channel could have been determined by compiling data on the ship's handling characteristics, the amount of bank effect in this particular bend, the slope of the river bottom, the current and other hydrodynamic forces existing at the time. Sargent agreed such calculations are possible. None [*13] of the experts made this calculation.

The parties having failed to offer adequate expert testimony on this issue, I must determine the location of RAYNA from the west bank from the testimony of all of the witnesses and the physical evidence.

Karr contended that his vessel was 300 feet from the bank. To support his statement, he claims he ordered twenty degrees starboard rudder because of the bank effect RAYNA experienced so close to the west bank.

Karr testified that he would have applied only five degrees starboard rudder if he were 600 feet off the bank, because RAYNA would have experienced less pressure from the water. His testimony as to bank effect is not in doubt and is supported by Kleinpeter, who testified that a vessel experiencing bank effect should apply steady rudder to prevent shearing into the channel.

Nevertheless, I am unconvinced by Karr's testimony that he was only 300 feet from the bank. Contrary to Karr's assertions, Patakos stated that Karr gave the following rudder orders within a minute of impact: twenty degrees to starboard (less than a minute before impact), midships (approximately thirty-five seconds before impact) and all starboard (approximately twenty [*14] seconds before impact). Furthermore, Patakos testified that the vessel responded when he steered twenty degrees to starboard. This indicates that the RAYNA was still maneuvering toward the west bank within a minute of collision. The vessel was not merely maintaining its position against pressure from the bank.

Considering the 700 foot length of the BEKER, the fact that she passed between RAYNA and the west bank, the physical dimensions of the barge EROL BEKER and the RAYNA and the fact the barge grounded only slightly, I am convinced that RAYNA was more likely 600 feet from the west bank than 300 feet.

Moreover, the demeanor, evasiveness and cavalier attitude of Captain Karr during his testimony, and his eagerness to exaggerate his position and to place RAYNA virtually on the levee when asked to locate his vessel on charts and photographs, lead me to discredit his testimony. I simply do not believe him.

Even though Jones' testimony at the trial was in one particular inconsistent with his prior deposition testimony, [8] I find his location of RAYNA at 600 feet off the west bank to be far more probable than that of Karr and to be consistent with the physical evidence.

8   In his deposition Jones testified that BEKER grounded two to three seconds after the collision. At trial, he stated that BEKER grounded ten to fifteen seconds after the collision. The trial testimony is more probable, as evidenced by the testimony of RAYNA's expert, Sargent. Sargent candidly stated that the collision would have taken place nearly on the west bank itself had BEKER grounded within three seconds.

[*15] Furthermore, Martin testified that, after the collision, the RAYNA continued across the river toward the RAMBLER's stern. According to Karr, Martin radioed Karr shortly after the collision and voiced concern that the RAYNA would "run over" the RAMBLER. Given the fact that the RAMBLER's stern was midchannel, this testimony supports my finding that the RAYNA was located more than 300 feet from the west bank.

II.

To determine the liability of the parties, it is necessary to look to the Inland Navigational Rules, local custom and the requirements of good seamanship and due care. G. Gilmore and C. Black, The Law of Admiralty at 489 (2d Ed. 1975).

## A. The Fault of the RAMBLER

Turning first to the fault of the RAMBLER, I find that the RAMBLER failed to maintain an adequate lookout in violation of Inland Rule 5. [9] However, I find that RAMBLER's failure to maintain an adequate lookout would not have altered the events which preceeded or caused the collision. *Ellis Towing & Transportation Co. v. Socony Mobil Oil Co., 292 F.2d 91 (5th Cir. 1961)*.

9   *33 U.S.C. 2005* states: "Every vessel shall at all times maintain a proper lookout by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision."

[*16]  Rule 14(a) of the Inland Navigational Rules provides that two vessels meeting on nearly reciprocal courses so as to involve a risk of collision shall alter their courses to pass port-to-port. [10] Rule 14(d) [11] gives the downbound vessel a right-of-way over the upbound vessel. The Rule also requires the downbound vessel to propose the manner of passage and to sound the appropriate signal.

10   *33 U.S.C. 2014*.
11   Rule 14(d) states in part: "Notwithstanding paragraph (a) of this Rule, a power-driven vessel operating on . . the Western Rivers . . . and proceeding downbound with a following current shall have the right-of-way over an upbound vessel, shall propose the manner of passage, and

shall initiate the maneuvering signals prescribed by Rule 34(a)(i), as appropriate."

I find that the RAMBLER and the BEKER were on nearly reciprocal courses so as to involve a risk of collision, due to the fact that both vessels were headed to the point of the curve in the river from midchannel. Once RAMBLER perceived that BEKER was still midchannel, its duty was to propose a manner of passage. A port-to-port passing would have allowed the upbound BEKER to take the point in accordance with [*17] the local point-bend custom. Instead, the RAMBLER changed the agreed upon one whistle passage to a two whistle passage.

However, the RAMBLER's failure to propose a port-to-port passing does not necessarily establish culpability. Jones, the operator of BEKER, testified that he agreed to the starboard passing because he thought the BEKER could accomplish it. Considering Jones' testimony, I find that the RAMBLER was not at fault for proposing a starboard passing, in contravention of the pointbend custom. The proposal was not a contributing cause of the collision. *Board of Commissioners of the Port of New Orleans v. M/V Farmsum, 574 F.2d 289 (5th Cir. 1978)*; *Canal Barge v. China Ocean Shipping Co., 579 F.Supp. 243 (E.D. La. 1984)*; aff'd, *770 F.2d 1357 (5th Cir. 1985)*.

Nevertheless, I find that Martin was culpably negligent in the way in which he operated the RAMBLER. Even though he had the right-of-way under Inland Rule 14, Martin was also required to navigate in a prudent manner. Inland Oil Transport Co. v. Ark- *White Towing Co., 514 F.Supp. 500 (E.D. La. 1981)*. I find that Martin proposed the starboard-to-starboard agreement, then failed to properly shape up for it. [*18] It is certainly true that, due to the force of the current, the RAMBLER would experience some degree of swing as she rounded the point. Even accepting Dr. Eda's estimate the RAMBLER's maximum swing was twenty degrees, the fact remains that her stern was midchannel. This indicates that Martin did not take the RAMBLER far enough into the point. I find that the RAMBLER's position left little room for the BEKER to safely maneuver and pass the RAMBLER and still make a port-to-port meeting with the RAYNA. I further find that Martin's negligent operation was a contributing cause of the collision.

*B. The Fault of the M/V RAYNA*

Turning to the fault of the RAYNA, I find that Captain Karr was guilty of violations of the Inland Rules and was grossly negligent in his operation of RAYNA. I find that Captain Karr was grossly negligent in attempting to overtake the RAMBLER, based on a number of factors. First, Karr was aware of the crowded situation in which the overtaking would occur. He knew he would overtake RAMBLER and pass BEKER at roughly the same time somewhere near Twelve Mile Point. He also was aware that the MITTIE LOUISE was maneuvering in the same vicinity. Second, Karr testified [*19] that he knew the RAMBLER was less maneuverable than the RAYNA. Furthermore, he is charged with the knowledge that the RAMBLER would be difficult to navigate in the bend and that due allowance must be made for the RAMBLER's debilities. *California Transport Corporation v. The ACCENTOR, 183 F.Supp. 817 (E.D. La. 1960)*; aff'd, *289 F.2d 822 (5th Cir. 1961)*.

Third, Karr also testified that he knew the operators on board the BEKER and the RAMBLER were less skilled than he and were not licensed river pilots. In light of these factors, Karr was grossly negligent in failing to sooner recognize the danger that existed and continuing ahead at full speed, with hopeless disregard of, and even contempt for, the other vessels whom RAYNA would pass.

Accordingly, for these reasons, I find that the RAYNA was grossly negligent. RAYNA also violated Inland Rule 6 [12] for failing to slow her speed and postpone the overtaking. The RAYNA continued downriver at thirteen statute miles per hour and stopped her engines only seconds before impact.

> 12   *33 U.S.C. 2006* states in part: "Every vessel shall at all times proceed at a safe speed so that she can take proper and effective action to avoid collision and be stopped within a distance appropriate to the prevailing circumstances and conditions.

[*20] I further find that RAYNA's negligence in attempting the overtaking, Karr's negligence in failing to recognize the peril, and RAYNA's failing to maintain a safe speed were contributing causes of the collision. RAYNA created the peril by forcing RAMBLER and BEKER into a difficult passing situation which Karr could plainly see from his vantage point and leaving too little space for BEKER to pass between the two downbound vessels.

RAYNA also culpably violated Inland Rule 8(a) [13] because the actions she took to avoid the collision were not made in ample time, nor were they made with due regard to good seamanship. The RAYNA's decision to steer hard to starboard and to stop all engines came too late to avoid the collision. I find that the collision could have been avoided had RAYNA taken evasive measures earlier.

13   *33 U.S.C. 2008(a).*

RAYNA contends that, as the downbound vessel, she was privileged with respect to the BEKER and was required to maintain her course and speed. [14] However, I am not persuaded by this argument. There is no privilege provided by the Inland Rules which exempts a vessel from the dictates of common sense and due care. [15] The RAYNA simply cannot rely on [*21] the right to maintain her course and speed when to do so results in an increased risk of collision. To find otherwise would subvert the very purpose for which the Inland Rules were enacted.

14   *33 U.S.C. 2017(a)(i)* states: "Where one of two vessels is to keep out of the way, the other shall keep her course and speed."
15   *33 U.S.C. 2002* states: "Nothing in these Rules shall exonerate any vessel, or the owner, master, or crew thereof, from the consequences of any neglect to comply with these Rules or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case."

I also find that Karr violated Rule 34(d) of the Inland Rules by not sounding a danger signal after he perceived the risk of collision. However, I find that the failure to sound a danger signal could not have been a contributing cause of the accident.

*C. The Fault of the M/V APRIL T. BEKER*

Finally, it is necessary to consider the fault of the APRIL T. BEKER. I find that Jones was also culpably guilty of several violations of the Inland Rules. He was likewise generally guilty of negligence in the operation of his vessel. Rule 5 requires [*22] a vessel to maintain a proper lookout. With the aid of a proper lookout, Jones may have more quickly determined the size and make-up of the RAMBLER's tow. A lookout could have informed Jones of RAYNA's position before and during the

difficult passing with RAMBLER. Such information could have guided Jones in deciding how to maneuver his vessel. The BEKER failed to establish that the lack of a proper lookout could not have contributed to the collision.

I also find that the BEKER was negligent and violated Inland Rules 14 and 16 [16] by failing to keep well clear of the RAYNA and RAMBLER. I find that the BEKER could have kept clear of both vessels and avoided the collision by slackening her speed when she approached the bend. At the very least, slackening her speed would have enabled Jones to more carefully assess the situation. Nevertheless, even after Jones perceived RAMBLER's swing into midchannel, he continued to plow ahead at full throttle. Jones kept at full speed under the belief that he would have otherwise lost maneuverability. Yet the testimony of other credible witnesses indicates that the BEKER could have been safely maneuvered at less than full speed. I find that BEKER was [*23] negligent and violated Rules 6 and 8(e) by failing to slacken her speed. Had she decreased her speed, the BEKER could have better shaped up to meet both vessels.

16   *33 U.S.C. 2016* states: "Every vessel which is directed to keep out of the way of another vessel shall, so far as possible, take early and substantial action to keep well clear."

Jones was grossly negligent in the manner in which he maneuvered the BEKER. Jones negligently continued to apply minimal port rudder until he was dangerously close to the RAMBLER. He then steered hard to port to avoid hitting the RAMBLER and began to sheer off to the west bank. His last minute effort to steer hard to starboard came much too late to avert a collision with the RAYNA. These actions clearly violated Rule 8(a), which requires that evasive actions be made in ample time and with due regard to good seamanship. I also find that Jones' actions were a contributing cause of the collision.

Finally, Jones violated Rules 34(d) by failing to blast a warning signal. However, I find that BEKER's failure to give a warning signal did not contribute to the collision.

Having determined that each of the parties was at fault, it is necessary under [*24] the mandate of *United States v. Reliable Transfer Co., Inc., 421 U.S. 397 (1975)*, to determine the percentage of each party's fault. Reducing contributory fault into a mathematical formula

is a difficult task. In this case, I find that the RAYNA was 40% at fault. The BEKER was 35% at fault, and the RAMBLER was 25% at fault.

Consistent with the foregoing, I now make the following conclusions of law:

Conclusions of Law

1. This court has jurisdiction under the General Maritime Law and venue is proper.

2. The RAMBLER was guilty of statutory fault in failing to have a proper lookout, but this fault was not a cause of the collision.

3. The RAMBLER was guilty of negligence in failing to shape up for a starboard-to-starboard passing with the BEKER and in extending her stern into midchannel.

4. The RAYNA was guilty of gross negligence in attempting t overtake the RAMBLER under the circumstances and for failing to reduce her speed.

5. The RAYNA was guilty of statutory fault in violating Inland Rules 6 and 8(a).

6. The BEKER was guilty of negligence in failing to reduce her speed and properly maneuver under the circumstances.

7. The BEKER was guilty of statutory fault in violating [*25] Inland Rules 5, 6, 8(e), 14 and 16.

8. Both the RAYNA and the BEKER were guilty of statutory fault for violating Inland Rule 34(d) but these faults were not causes of the collision.

9. The collision was caused by the negligence of the three vessels and the statutory fault of the BEKER and the RAYNA.

10. The RAYNA was 40% at fault. The BEKER was 35% at fault, and the RAMBLER was 25% at fault.

MOREY L. SEAR, UNITED STATES DISTRICT JUDGE

CASE #3



LEXSEE 2004 U.S. DIST. LEXIS 30740

**BIOMET ORTHOPEDICS, INC., Plaintiff, v. TACT MEDICAL INSTRUMENTS, INC., d/b/a TACT MEDICAL, INC., Defendant.**

**Case No. 3:01cv895PS**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF INDIANA, HAMMOND DIVISION**

*2004 U.S. Dist. LEXIS 30740*

**November 2, 2004, Decided
November 2, 2004, Filed**

**SUBSEQUENT HISTORY:** Motions ruled upon by, Motion denied by *Biomet Inc. v. Tact Med. Instruments Inc., 2005 U.S. Dist. LEXIS 44737 (N.D. Ind., 2005)*

**PRIOR HISTORY:** *Biomet Orthopedics, Inc. v. Tact Med. Instruments, Inc., 2004 U.S. Dist. LEXIS 30739 (N.D. Ind., Nov. 2, 2004)*

**COUNSEL:** [*1] For Biomet Inc, Plaintiff: Brian W Lewis, H Roderic Heard, Nicole Nocera, LEAD ATTORNEYS, Wildman Harrold Allen & Dixon LLP - Chi/IL/3000, Chicago, IL.

For Tact Medical Instruments Inc, dba Tact Medical Inc, Defendant: Carl Pipoly PHV, LEAD ATTORNEY, Pipoly Law Offices, San Antonio, TX; Kevin W Marshall, LEAD ATTORNEY, Smith and Marshall, Hammond, IN; Whitney White Soergel, LEAD ATTORNEY, Bingham McHale LLP - Mkt/Ind/IN, Indianapolis, IN.

**JUDGES:** PHILIP P. SIMON, JUDGE.

**OPINION BY:** PHILIP P. SIMON

**OPINION**

ORDER

Plaintiff Biomet Orthopedics, Inc., moves the Court to exclude certain opinions and testimony of Dr. Warren J. Keegan pursuant to *Federal Rules of Evidence 702* and *1006*. TACT did not respond to the motion in writing, choosing instead simply to argue the matter at the hearing that was held. Because TACT's earlier successful opposition to Biomet's motion to compel was based on the fact that sales data was irrelevant, and because the sales data that TACT's expert relies on is not based on sufficient facts or data, Biomet's motion is granted.

I. BACKGROUND

TACT has identified Dr. Warren J. Keegan as an expert witness who will give his opinion about TACT's performance as Biomet's distributor in Japan. Part of this [*2] opinion includes or is based on data regarding TACT's sales of Biomet products in Japan. Specifically, Biomet objects to three of Keegan's opinions: (1) that Tact increased its sales of Biomet products in Japan; (2) that TACT's sales margins were compressed by Biomet's pricing structure, thereby hindering TACT's ability to market and distribute Biomet products; and (3) that Biomet's expert should have used TACT's sales in his expert analysis. Biomet claims that these opinions are inadmissible because he based his opinions and testimony upon:

(1) incomplete, unreliable, and

Case 2:05-cv-04182-SRD-JCW   Document 19485-1   Filed 12/18/09   Page 25 of 119

Page 2
2004 U.S. Dist. LEXIS 30740, *2

unverifiable data in direct contravention of *Federal Rule of Evidence 702*; and

(2) inadmissible summaries failing to meet the requirements of *Federal Rule of Evidence 1006*.

The fight over this evidence began long before trial, in November 2002, when Biomet filed a motion to compel evidence about TACT's sales of Biomet products in Japan. Biomet sought the discovery relating to TACT's sales of Biomet products to assist it in proving its breach of contract counterclaim that TACT had failed to use its best efforts to promote and sell Biomet products in Japan. TACT opposed the motion on the basis that its sales were irrelevant [*3] to the case. Judge Sharp denied the motion to compel on December 2, 2002. As a result, Biomet never received any discovery relating to TACT's sales into the Japanese market.

Because sales data was unavailable, Biomet's expert, Ray Sims, used the only information that Biomet had regarding TACT's performance under the contract: TACT's purchases of Biomet products. Sims testified that TACT's purchases of Biomet products was a reasonable proxy for its sales of those same products. If anything, using the purchases from Biomet instead of the actual sales into the market would be a more conservative approach because it would assume that all of the product was sold instead of sitting in TACT inventory.

Meanwhile, after claiming its sales were irrelevant to the case, TACT gave a one page summary of that very data to their expert, Dr. Keegan. The one page summary sets out TACT's sales of Biomet's products in Japan for each fiscal year during the twelve years of the contract. (The one page summary is attached to Biomet's Motion as Exhibit A). Dr. Keegan then used that information to form a number of opinions about TACT's efforts in Japan, including the aforementioned opinions that TACT's sales [*4] of Biomet products increased each year, that Biomet's pricing structure compressed TACT's sales margins of Biomet products, and that Sims's expert analysis of TACT's sales performance was faulty for not using TACT's sales data.

This case was previously scheduled to begin June 2, 2004. At the May 27 trial management conference, Biomet moved to bar TACT from introducing at trial any evidence of its sales of Biomet products in Japan, citing

several grounds, including: (1) TACT's failure to satisfy its discovery obligations; (2) the inequity in permitting TACT's expert to opine about sales and sales margins when Biomet could not test the reliability of the underlying data; and (3) the inequity in allowing TACT's expert to criticize Mr. Sims's opinions on the grounds that his analysis failed to consider sales data - the very sales data that TACT prevented Biomet from obtaining in the first place.

Because of this issue, the Court postponed trial and ordered TACT to produce its records and sales data. The Court held that Biomet had the right to test the underlying data on which TACT had based the one page sales summary that it had given Keegan, and that Biomet could re-depose TACT's president, [*5] Keiichi Yamagishi, to verify the underlying data. Producing the sales data would also enable Sims - Biomet's expert - an opportunity to analyze the same sales data that TACT's expert Dr. Keegan was relying on.

TACT resisted some of this additional discovery, and Biomet filed a motion to compel TACT to produce the sales data. On June 10, 2004, the Court granted that motion in part, ordering TACT to produce any sales data relied upon in creating the sales summary given to Keegan, all records, logs, and source data used to capture the sales data, and all audited financial statements that related to the sale of Biomet products for the years 1989-2001. The Court emphasized that TACT was to produce the data, not just summaries, that TACT used to calculate its sales of Biomet products.

TACT responded to this order by producing heavily redacted bank statements and another summary - this one three pages in length - that purported to demonstrate what its sales were. TACT did not produce any tax returns, balance sheets, audited financial statements, internal ledgers or invoices that would substantiate what its sales actually were. According to TACT, the bank statements demonstrate what its sales [*6] of Biomet products were in the following way: TACT claims that they had a contract with TMA, a management company, whereby they paid TMA four percent of their sales of Biomet products. Thus, they argue, one can back into the monthly sales figures by looking at the bank transfers that TACT made to TMA and dividing by .04.

On July 21, 2004, the Court held a hearing on Biomet's third motion to compel. TACT claimed that Yamagishi created the one page sales summary that

Keegan used in his report using the three page summary and bank statements provided to Biomet. The Court did not compel additional production, but warned TACT that unless there exists additional data that supports the sales summary, Keegan's testimony would not be based on sufficient facts and data to be admissible at trial.

On August 11, 2004, Yamagishi admitted in a deposition that he relied on records that resided on his personal computer to create the sales summary given to Keegan, not the bank statements, as TACT had previously indicated. He explained that the method of backing into the numbers using the bank statements had been devised after the fact in order to verify the data because the data from which he created [*7] the sales summary for Keegan was kept as a personal reference and could not be substantiated. As mentioned, the data on his personal computer was derived from a now-missing hand written ledger book that he and an employee named Takeshi Izaki passed back and forth. The basis and exact contents of this handwritten document are unclear.

On September 15, 2004, the Court heard oral argument on Biomet's motion for sanctions. The Court specifically asked where the backup data supporting the summaries Keegan relied on was, and TACT's counsel responded that he did not know. TACT was given another opportunity to produce all of the sales data used to create, calculate, or compare the sales summary, and was ordered to produce any audited financial statements for the years 1989-2001, if they existed, that relate to the sale of Biomet products. Other than the three pages from Mr. Yamagishi's personal computer and the redacted bank records, no other information was provided to substantiate the one page summary of sales.

In sum, Dr. Keegan's opinion relating to TACT's sales of Biomet products is based on a one page summary which was taken from Mr. Yamagishi's personal computer. TACT's handwritten ledger [*8] book which is the alleged source of the summary has been lost and thus Dr. Keegan did not review it. Dr. Keegan also did not review any of TACT's tax returns, audited financial statements, other internal sales ledgers, balance sheets, or the available invoices which would have firmly established TACT's sales. Thus, TACT used a confusing, circuitous route to try to establish its sales of Biomet products instead of simply compiling their invoices or using some other record kept in the ordinary course of business. Yamagishi claims that this unilateral decision

was made because TACT does not have a document retention policy, and because their invoices are "all mixed up."

## II. DISCUSSION

To be admissible under *Federal Rule of Evidence 702*, expert testimony must "not only [be] relevant but reliable." *Daubert v. Merrell Dow Pharmacueticals, 509 U.S. 579, 589, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)*. Even qualified experts may only testify if the proffered opinion or testimony: (1) is based upon sufficient facts or data; (2) is the product of reliable principles and methods; and (3) is a result of the expert applying the principles and methods reliably to the facts of the case. *Fed. R. Evid. 702*. The District Court plays a "gatekeeping" [*9] role with respect to admitting expert testimony and has broad discretion to decide whether to admit or exclude expert testimony at trial. *Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1997)*. "Reliability is the touchstone for expert testimony." *Elliott v. CFTC, 202 F.3d 926, 933 (7th Cir. 2000)*. "Proposed testimony must be supported by appropriate validation-i.e., 'good grounds,' based on what is known." *Daubert, 509 U.S. at 590*. The Seventh Circuit has observed that "experts' opinions are worthless without data and reasons." *Kenosha v. Heublein, 895 F.2d 418, 420 (7th Cir. 1990)*.

Biomet does not challenge the reliability of Keegan's opinions under *Rule 702(2)*. Instead, they argue under *Rule 702(1)* that Keegan's opinions concerning TACT's sales are not based upon sufficient facts or data. In placing the focus there, we are mindful of the fact that *Daubert* did not work a "seachange over federal evidence law," and "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." *United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi, 80 F.3d 1074, 1078 (5th Cir. 1996)*. As the *Daubert* Court stated, "Vigorous cross-examination, [*10] presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *509 U.S. at 595*.

TACT's one page summary of its sales of Biomet products in Japan upon which Keegan based his opinion is not based on sufficient facts or data to be admissible. The source data for the summary is three pages of information taken from Yamagishi's personal computer, which in turn was based on a handwritten ledger book

that he and an employee passed back and forth. Apparently, Yamagishi would receive that document every month, and he would manually copy the relevant data onto his computer, then return the document. Since that document is now missing, there is no way to objectively verify the contents of the summary. This is not sufficient data upon which to base an expert opinion.

TACT tries to bolster their one page sales summary by pointing to the bank records. According to TACT, the bank records confirm the numbers in the summary because, by contract, when TACT sold Biomet product, they owed 4% of the sales price to TMA. This contention is not persuasive. Yamagishi testified that the 4% he paid to TMA [*11] was only on sales of Biomet products, but the contract specifically says that TACT was to pay TMA 4% for both imported and domestic medical devices, implying that it would encompass non-Biomet products. Such a glaring inconsistency makes it very difficult to see how the summary is reliable enough on which to base an expert opinion.

In addition to the demonstrable flaws in the sales summary and the attempt to rehabilitate the data with the bank records, TACT's source of sales data is defective because they had other, more reliable ways of obtaining the data. Specifically, TACT has not demonstrated why Dr. Keegan could not use tax returns, financial statements, internal ledgers, balance sheets, internal documentation that tracks sales, or the actual invoices to determine what its sales of Biomet products were. Indeed, Dr. Keegan testified at that *Daubert* hearing that reviewing and tabulating the invoices would be proof positive of TACT's sales. Yet this was not done. Instead, Dr. Keegan relied upon a one page summary from Mr. Yamagishi's personal computer, a document that was not even kept as part of TACT's business records.

As one court put it, "[t]here is no point in climbing through [*12] the attic window when the front door is open." *U.S. v. R. J. Reynolds Tobacco Co.*, 416 F.Supp. 316, 325 (D.C.N.J. 1976). More formally, *Rule 702(1)*'s requirement that the testimony be "based upon sufficient facts or data" does not allow for the admission of testimony when there are a number of better ways of obtaining data. As one commentator explained:

The Advisory Committee's Note to *Rule 702(1)* states that this calls for a quantitative rather than qualitative

analysis. The question is whether the expert considered enough information to make the proffered opinion reliable. This is different from the question posed by *Rule 703*: Is the opinion based on evidence of a type that is reliable? Included in the analysis under *Rule 702(1)* is whether the expert considered all the pertinent physical and eyewitness evidence. For example, assume that in an auto accident case plaintiff calls an accident reconstruction expert who testifies defendant must have been traveling over the speed limit. The expert bases her opinion entirely upon the extent of damage to the vehicles and admits she did not measure the skid marks, consider the extent of the personal injuries, or examine any other physical evidence [*13] pertinent to estimating speed. This opinion may be challenged under *Rule 702(1)* on the ground it is not based on sufficient facts or data.

Charles Alan Wright & Victor James Gold, Federal Practice and Procedure § 6266, at 41 (Supp. 2004). *See e.g. United States v. Mamah, 332 F.3d 475, 477 (7th Cir. 2003)* (the exclusion of expert testimony was proper where not based on sufficient facts or data under *Rule 702(1)*).

TACT's expert bases parts of his opinion entirely upon a sales summary of dubious origin when there were a number of other ways of obtaining the information. It is hard for this Court to understand why TACT would give their expert the summary of a summary of a now-missing paper document instead of simply tabulating a more accurate number from the available invoices.

Finally, it is difficult to ignore the fact that TACT successfully resisted Biomet's efforts to obtain discovery of TACT's sales and yet that is the very information on which Dr. Keegan is partly basing his opinions. In other words, TACT originally took the position that the sales data was not relevant to this case, and yet they have hired an expert to opine on that very subject. They cannot have it both ways.

In any [*14] event, Keegan's opinion that TACT increased its sales of Biomet products is not based on sufficient facts or data to aid the jury in determining any

issue in the case or understanding the evidence, so Biomet's Motion to Exclude is granted with respect to that opinion. Likewise, because Keegan's opinion relating to TACT's sales margins is based on the same data, it is also inadmissible. The sales summary is the only document related to sales or sales margins that TACT gave its expert, and Keegan has not identified any additional information that he procured related to TACT's sales, costs, or margins. Hence, for the same reasons that his opinion that TACT's sales increased are inadmissible, Keegan's opinion regarding TACT's sales margins cannot be used at trial.

Biomet also seeks to prevent Keegan from criticizing their expert, Sims, for not using TACT's sales in his expert analysis. This part of the motion merits very little additional discussion. Suffice it to say that it is somewhat odd that TACT would refuse to provide data to Biomet, then criticize them for not using it in their expert report. Biomet's motion is granted with respect to Keegan's opinion that Sims should have used [*15] TACT's sales data in his report.

Finally, Biomet moves to exclude the sales summary itself under *Federal Rule of Evidence 1006*. In order to admit evidence under *Rule 1006*, "the proponent must lay a proper foundation as to the admissibility of the material

that is summarized and show that the summary is accurate." *Needham v. White Laboratories, Inc., 639 F.2d 394, 403 (7th Cir. 1981)*. All of the problems with the one page summary discussed above are relevant to this inquiry, but it is enough that the original document on which this summary was based, the paper document passed back and forth between Yamagishi and an employee, is not available, and that the original records on which that paper document was based, presumably the invoices, are not available. Without any actual source data, TACT's one page summary is inadmissible at trial.

III. CONCLUSION

For the foregoing reasons, Biomet's Motion to Exclude Certain Opinions and Testimony of Dr. Warren J. Keegan [Docket No. 220] is **GRANTED** in full.

**SO ORDERED.**

ENTERED: November 2, 2004

s/ Philip P. Simon

PHILIP P. SIMON, JUDGE

UNITED STATES DISTRICT COURT

# CASE #4



LEXSEE 2009 U.S. DIST. LEXIS 60018

**BRUCE E. DEVILLE VERSUS COMAR MARINE CORPORATION ET AL**

**CIVIL ACTION NO: 08-4104 SECTION: J(2)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA**

*2009 U.S. Dist. LEXIS 60018*

**June 25, 2009, Decided
June 25, 2009, Filed**

**COUNSEL:** [*1] For Bruce E. Deville, Plaintiff: Patrick H. Yancey, LEAD ATTORNEY, Law Office of Patrick H. Yancey, APLC, Houma, LA.

For Comar Marine Corporation, Crusader Marine Offshore, LLC, Centurion Marine Offshore, L.L.C., Defendants: Rufus C. Harris, III, LEAD ATTORNEY, Alfred Jackson Rufty, III, Harris & Rufty, LLC, New Orleans, LA.

**JUDGES:** CARL J. BARBIER, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** CARL J. BARBIER

**OPINION**

**ORDER**

Before the Court are the Defendants' **Motion to Exclude Report and Prospective Testimony of Captain Timothy Torrence (Rec. Doc. 25)**, seeking an order excluding expert testimony under *Rule 702 of the Federal Rules of Evidence* and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1998)*; and **Motion to Strike Supplemental Expert Report of Captain Timothy Torrence (Rec. Doc. 28)**. The Court has reviewed the record, the memoranda of

counsel, and the applicable law, and finds that the motions should be denied.

The purpose of *Daubert* is "to ensure that only reliable and relevant expert testimony is presented to the jury." *Rushing v. Kansas City Southern Ry. Co., 185 F.3d 496, 506 (5th Cir. 1999)* (superseded by rule on other grounds), citing *Daubert, 509 U.S. at 590-93*. [*2] Thus, "[m]ost of the safeguards provided for in *Daubert* are not as essential in a case such as this where a district judge sits as the trier of fact in place of a jury." *Gibbs v. Gibbs, 210 F.3d 491, 500 (5th Cir. 2000)*. "*Daubert* requires a binary choice -admit or exclude- and a judge in a bench trial should have discretion to admit questionable technical evidence, though of course he must not give it more weight than it deserves." *SmithKline Beecham Corp. v. Apotex Corp., 247 F. Supp. 2d 1011, 1042 (N.D. Ill. 2003)*.

Given that this case is a bench trial, and thus that the objectives of *Daubert*, upon which Defendants' motion to exclude is premised, are no longer implicated, the Court finds that the motion to exclude expert testimony should be denied at this time. Furthermore, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert, 509 U.S. at 596*.

Likewise, the Court finds that Defendants' motion to

strike the supplemental report for failure to comply with the Court's Scheduling Order and *Rule 26* should also be denied. Accordingly,

**IT** [*3] **IS ORDERED** that Defendants' **Motion to Exclude Report and Prospective Testimony of Captain Timothy Torrence (Rec. Doc. 25)** and **Motion to Strike Supplemental Expert Report of Captain Timothy Torrence (Rec. Doc. 28)** are hereby **DENIED**.

New Orleans, Louisiana this 25th day of June, 2009.

/s/ Carl J. Barbier

CARL J. BARBIER

UNITED STATES DISTRICT JUDGE

CASE #5



LEXSEE 2009 U.S. DIST. LEXIS 97976

**LENA TURNER GAFFNEY WIFE OF/AND JAMES L. GAFFNEY, III VERSUS
STATE FARM FIRE AND CASUALTY COMPANY**

**CIVIL ACTION NO: 06-8143 SECTION: R(5)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
LOUISIANA**

*2009 U.S. Dist. LEXIS 97976*

**July 15, 2009, Decided
July 15, 2009, Filed**

**COUNSEL:** [*1] For Lena Turner Gaffney, Wife, James L. Gaffney, III, Husband, Plaintiffs: Chris M. Trepagnier, LEAD ATTORNEY, Shanda Redmon, Trepagnier Law Firm, APLC, Madisonville, LA.

For James L. Gaffney, III, on behalf of the minors Amanda Rose Gaffney and Rebecca Ann Gaffney, Lena Turner Gaffney, wife of, Consol Plaintiffs: Chris M. Trepagnier, LEAD ATTORNEY, Shanda Redmon, Trepagnier Law Firm, APLC, Madisonville, LA.

For State Farm Fire and Casualty Company, Defendant: Tara Lavel Mason, LEAD ATTORNEY, Brant J. Cacamo, Burt K. Carnahan, Charles Robert Rumbley, Eric B. Berger, Heather Cheesbro, Joseph Mark Messina, Pamela K. Richard, Lobman, Carnahan, Batt, Angelle & Nader, New Orleans, LA.

For State Farm Fire and Casualty Company, Consol Defendant: Tara Lavel Mason, LEAD ATTORNEY, Charles Robert Rumbley, Eric B. Berger, Heather Cheesbro, Pamela K. Richard, Lobman, Carnahan, Batt, Angelle & Nader, New Orleans, LA.

**JUDGES:** SARAH S. VANCE, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** SARAH S. VANCE

**OPINION**

**ORDER**

State Farm Fire and Casualty Company has moved to exclude Plaintiff's engineering expert, Ronald Cressy. State Farm's Motion is DENIED for the following reasons.

**I. Background**

Lena and James Gaffney's New Orleans home was damaged [*2] in Hurricane Katrina. At the time, their house was insured by State Farm. The Gaffneys assert that State Farm did not adequately adjust their claim, and they sued State Farm for damages and bad-faith penalties in August 2006. State Farm removed the case to the Eastern District of Louisiana in October 2006.

The Gaffneys hired a civil engineer, Ronald Cressy, "to determine the most probable cause of the damage of the house at 210 Hay Place after Hurricane Katrina." (R. Doc. 102-4 at 1.) Cressy reviewed videos and photographs of the house and surrounding area, several depositions, and media coverage of the 17th Street canal failures. (*Id*.) Cressy also made his own inspection of the Gaffneys' property and neighborhood, though the Gaffneys' home had been demolished before Cressy's

Case 2:05-cv-04182-SRD-JCW   Document 19485-1   Filed 12/18/09   Page 34 of 119

Page 2
2009 U.S. Dist. LEXIS 97976, *2

visit. (*Id.*) From this information, Cressy opined that the Gaffney's home was severely impacted by "winds and/or tornadic activity" before the house flooded. (*Id.*) State Farm seeks to exclude Cressy's report and testimony for several reasons. Several of State Farm's objections have no merit and the remaining can be addressed through cross-examination. The Court therefore denies State Farm's motion.

## II. [*3] Legal Standard

*Federal Rule of Evidence 702* gives the district court considerable discretion to admit or exclude expert testimony. *See General Electric Co. v. Joiner, 522 U.S. 136, 151 fn. 1, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997).* *Rule 702* provides that an expert witness "qualified . . . by knowledge, skill, experience, training, or education," may testify when scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue. *Fed. R. Evid. 702.* For the testimony to be admissible, *Rule 702* requires that (1) the testimony be based on sufficient facts or data, (2) the testimony be the product of reliable principles and methods, and (3) the witness apply the principles and methods reliably to the facts of the case. *Id.*

In *Daubert v. Merrell Dow Pharmaceuticals,* the Supreme Court held that *Rule 702* requires the district court to act as a gatekeeper to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." *509 U.S. 579, 589, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). See also Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999)* (clarifying that the *Daubert* gatekeeping function applies to all forms of expert testimony). The Court's [*4] gatekeeping function thus involves a two-part inquiry into reliability and relevance. First, the Court must determine whether the proffered expert testimony is reliable. The party offering the testimony bears the burden of establishing its reliability by a preponderance of the evidence. *See Moore v. Ashland Chemical Inc., 151 F.3d 269, 276 (5th Cir. 1998).* The reliability inquiry requires the Court to assess whether the reasoning or methodology underlying the expert's testimony is valid. *See Daubert, 509 U.S. at 593.* The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation. *See id. at 590.* Second, the Court must determine whether the expert's reasoning or methodology "fits" the facts of the

case and whether it will thereby assist the trier of fact to understand the evidence, in other words, whether it is relevant. *See id. at 591.*

## III. Analysis

### a. Cressy's Credentials

State Farm first attacks Cressy's qualifications. State Farm argues that Cressy "has never passed an engineering exam in Louisiana or any other state" after receiving his license (R. Doc. 102-2 at 7-8.), and "has authored no papers that would subject his opinion and methods to peer-review [*5] (*id.* at 8)." Further, State Farms emphasizes that "[t]he only professional organizations he belongs to deal with non-technical aspects of the engineering profession." (*Id.*)

"[T]he heart of *Daubert* is relevance and reliability. As long as some reasonable indication of qualifications is adduced, the court may admit the evidence without abdicating its gatekeeping function. After that, qualifications become an issue for the trier of fact rather than for the court in its gate-keeping capacity." *Rushing v. Kansas City S. Ry. Co., 185 F.3d 496, 507 (5th Cir. 1999)* (citing *Daubert, 509 U.S. at 596*). As the Supreme Court noted in *Daubert,* "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *509 U.S. at 596* (*citing Rock v. Arkansas, 483 U.S. 44, 61, 107 S. Ct. 2704, 97 L. Ed. 2d 37 (1987)*).

Mr. Cressy obtained a Bachelors of Science degree in engineering from Tulane University in 1952 and has been a licensed civil engineer and land surveyor for over fifty-five years. Further, Cressy's deposition indicates that he has been qualified as an expert in civil engineering on at least one occasion. [*6] (*See* R. Doc. 111-2 at 3)("Q: And I've also noticed in one recorded case . . . it represents you were an expert witness in civil engineering in soil study. . . . A: I don't know why I'm put down there as an expert in soils. I've always been qualified as an expert in civil engineering.") The grounds State Farm gives for disqualification, that Cressy has not taken post-license examinations, published peer-reviewed papers, or joined certain organizations, are all "fodder for cross examination." *United States v. 14.38 Acres of Land, More or Less Situated in Lefore County, Miss., 80 F.3d 1074, 1079 fn. 4 (5th Cir .1996).* They not reasons to preclude Cressy's testimony outright.

State Farm further challenges Cressy's credentials because he lacks any specialty applicable to this case. State Farm notes that Mr. Cressy has "no [s]peciality in civil engineering" and argues that his background does not qualify him to opine on matters of forensic or geotechnical engineering. (R. Doc. 102-2.) A witness qualified as an expert is not strictly confined to his area of practice but may testify concerning related applications; "a lack of specialization does not affect the admissibility of the opinion, [*7] but only its weight." *Wheeler v. John Deere Co., 935 F.2d 1090, 1100 (10th Cir. 1991)* (collecting cases); *see also Lavespere v. Niagra Mach. & Tool Works, Inc., 910 F.2d 167, 176-77 (5th Cir. 1990)*, abrogated on other grounds by *Little v. Liquid Air. Corp., 37 F.3d 1069 (5th Cir. 1996)* (permitting mechanical engineer who had never designed a press brake to testify as to safety of brake design). The Court has reviewed Cressy's credentials and finds that his education and extensive experience in the field of engineering qualify him to testify about the potential causes of the damage to the Gaffneys' home. His lack of specialization is not enough to disqualify him. *See Rushing, 185 F.3d at 507* ("The 'emphasis on qualifications over reliability of the expert testimony reflect[s] a pre-*Daubert* sensibility.' ").

### b. Cressy's Methodology

Next, State Farm questions the reliability of Cressy's methodology. The reliability inquiry requires the Court to assess whether the reasoning or methodology underlying the expert's testimony is valid. *See Daubert, 509 U.S. at 590.* The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation. *See id. at 590.* Again, *Rule 702* [*8] requires that (1) the testimony be based on sufficient facts or data, (2) the testimony be the product of reliable principles and methods, and (3) the witness apply the principles and methods reliably to the facts of the case. As the 2000 advisory committee's note to *Rule 702* observes, "no single factor is necessarily dispositive of the reliability of a particular expert's testimony." And not all of the *Daubert* factors apply to every type of expert testimony. *See Kumho Tire, 526 U.S. at 150.* Instead, courts "must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire, 526 U.S. at 152.*

The Supreme Court has emphasized that a *Rule 702* inquiry is "flexible" and that the Court's focus "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert, 509 U.S. at 594-95.* As the Fifth Circuit has explained, the court must not apply the reliability test so stringently as to "transform a *Daubert* hearing into a trial on the merits." *Pipitone v. Biomatrix, Inc., 288 F.3d 239, 250 (5th Cir. 2002).*

State Farm argues that "Mr. Cressy failed to consider any number of alternative [*9] causes, including the likelihood that flooding, pre-existing damage, or pre-existing soil conditions may have been responsible for any of the knocking Plaintiffs' house off its foundation and the structural failure of Plaintiffs' house." (R. Doc. 102-2 at 4.) State Farm asserts that "Mr. Cressy did nothing to test his hypothesis concerning the cause for Plaintiffs' house being knocked off of its foundation during Hurricane Katrina." (*Id.*) According to State Farm, these deficiencies reveal "little familiarity with, or fidelity to, the generally accepted engineering method." (*Id.* at 6.)

The Court has reviewed Cressy's report and finds its methodology sufficiently reliable. Cressy's report explicitly rules out the most likely competing cause in this Hurricane Katrina case. His report states:

> The damage noted at this house could not have been done by rising water. The neighboring houses in the area have been engulfed in flood waters and have not [in contrast to the Gaffneys' home] been moved off of their foundations. Other houses in this area had not been damaged as this house was, including those standing between the house at 210 Hay Place and the 17th Street Canal Levee Breach.

(R. Doc. [*10] 102-4 at 2.) Further, Cressy conducted an inspection of the Gaffneys' property and surrounding area to test his hypothesis that the Gaffney home was destroyed by wind and/or tornado activity before it was flooded. Cressy observes in his report that:

> The house behind the house at 210 Hay Place and the house to the northwest of 210 Hay Place were also destroyed by Hurricane Katrina. The path of this destruction indicated that a tornado most probably struck this area. Damage to the tree in the path and damage on the roof

vents support that conclusion.

(*Id.*) In addition, Cressy reviewed photographs and videos of the Gaffney home and the deposition of one of the Gaffneys' neighbors, as well as media accounts of the 17th Street Canal breach. Cressy's report does not rule out other potential causes that State Farm identifies, such as pre-existing soil conditions, but State Farm's brief does not provide evidence that it is customary for engineers to examine soil conditions in this type of case.

The Court therefore finds that the methods underlying Cressy's report are valid.

### c. Cressy's Weather Opinions

"State Farm strongly contends that this Court should prohibit Plaintiffs from introducing into [*11] evidence Plaintiff's engineering expert's report on [Cressy's] opinion or conclusions regarding weather patterns, and flood trends in and around Plaintiff's Lakeview neighborhood during Hurricane Katrina." (R. Doc. 102-2 at 12-13.) State Farm asserts that these opinions must be excluded because the only document on which Cressy relied for weather information was an eye-witness's deposition. State Farm also charges that Cressy's report simply parrots the opinions of this deposition.

Cressy's report opines on potential causes of damage to the Gaffney home and lists wind, including wind-borne debris such as trees, and flooding as potential causes. To the extent that State Farm construes these to be opinions on "weather conditions, patterns and flood trends," they are clearly supported by more than a single eye-witness's deposition. It is apparent from Cressy's report that he relies heavily on his own inspection of the Gaffney's neighborhood to conclude that the Gaffney home was damaged by wind or tornadic activity. *See, e.g., supra*, Section III. *b.* Facts "perceived by" an expert may form the basis of an expert opinion. *Fed. R. Evid. 703.*

"As a general rule, questions relating [*12] to the

bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *14.38 Acres of Land, 80 F.3d at 1077* (quoting *Viterbo v. Dow Chemical Co., 826 F.2d 420, 422 (5th Cir. 1987)*). Though State Farm criticizes Cressy's failure to include "comparative data or analysis regarding . . . wind speeds," (R. Doc. 102-2 at 18), Cressy's inspection and review of depositions, media accounts, and pictures/videos of the Gaffneys' property are enough to make Cressy's report sufficiently reliable, as noted above. State Farm's objections "are matters properly to be tested in the crucible of adversarial proceedings; they are not the basis for truncating the process." *14.38 Acres of Land, 80 F.3d at 1079.*

### d. Relevance to Contents Claim

The Court has ruled that the Gaffneys cannot recover additional amounts for structural damage and State Farm argues for the first time in its Reply brief that Cressy's report is not relevant to the Gaffneys' remaining claims for contents and living expenses. Cressy's report is relevant to the extent that Cressy opines that the Gaffneys' home suffered extensive wind damage [*13] that could have caused wind-driven rain to enter the Gaffneys' home. Like the Gaffneys' dwelling coverage, their contents coverage excludes flood damage making the issue of wind versus flood damage central to this litigation.

## IV. Conclusion

For the reasons stated above, State Farm's Motion in Limine in DENIED.

New Orleans, Louisiana, this **15th** day of July, 2009.

/s/ Sarah S. Vance

SARAH S. VANCE

UNITED STATES DISTRICT JUDGE

CASE #6



LEXSEE 1996 U.S. DIST. LEXIS 8189

**IN THE MATTER OF AROSITA SHIPPING COMPANY, LTD., as Owner of the M/V KAVO KALIAKRA and GROMAR SHIPPING CO., LIMITED and GOURDOMICHALIS MARITIME S.A. as owners pro hac vice of the M/V KAVO KALIAKRA, Praying for Exoneration From or Limitation of Liability**

**CIVIL ACTION NO. 92-1103 and Consolidated Cases SECTION "T"**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA**

*1996 U.S. Dist. LEXIS 8189*; *1997 AMC 627*

**June 10, 1996, Decided**
**June 10, 1996, FILED; June 11, 1996, ENTERED**

**COUNSEL:** [*1] For AMER RIVER TRANS CO, TULANE FLEETING, plaintiffs: Andre J. Mouledoux, Georges M. Legrand, Charles Michael Parks, Hebert, Mouledoux & Bland, New Orleans, LA. For NEW ORLEANS SHIPYARD, INC., ARCHER DANIELS MIDLAND COMPANY, plaintiffs: Andre J. Mouledoux, Charles Michael Parks, Hebert, Mouledoux & Bland, New Orleans, LA.

For UNITED KINGDOM MUTUAL STEAMSHIP ASSURANCE ASSOCIATION (BERMUDA) LTD., in personam, defendant: Ashton Robert O'Dwyer, Jr., Brandon E. Mary, Lemle & Kelleher, New Orleans, LA. Joseph Dwight Leblanc, III, Frilot, Partridge, Etal, New Orleans, LA.

For AROSITA SHIPPING COMPANY, LTD., claimant: Ashton Robert O'Dwyer, Jr., Lemle & Kelleher, New Orleans, LA. Andrew Struben deKlerk, Patrick J McShane, Frilot, Partridge, Etal, New Orleans, LA.

**JUDGES:** G. THOMAS PORTEOUS, JR., UNITED STATES DISTRICT COURT. MAG. CHASEZ

**OPINION BY:** G. THOMAS PORTEOUS, JR.

**OPINION**

*FINDINGS OF FACT AND CONCLUSIONS OF LAW*

The trial of these consolidated cases commenced on July 24, 1995, and again on November 30, 1995, strictly on the issue of liability. The Court, having considered the testimony and the evidence adduced at trial, the proposed findings of fact and conclusions of law submitted [*2] on behalf of all parties, and the briefs and arguments of counsel, now makes the following:

*FINDINGS OF FACT*

Arosita Shipping Company, Ltd., Gromar Shipping Co., Limited and Gourdomichalis Maritime S. A. ("Arosita," "Gromar" and "Gourdomichalis," respectively) are foreign corporations, and the M/V KAVO KALIAKRA is a foreign flag vessel of Cypriot registry. At all material times, Arosita was the owner of the vessel, Gromar was the bareboat (demise) charterer and owner *pro hac vice* of the vessel, and Gourdomichalis was the manager, operator and owner *pro hac vice* of the vessel. The United Kingdom Mutual Steam Ship Assurance Association (Bermuda) Ltd. was, at all times pertinent, an insurer of Arosita, Gromar,

1996 U.S. Dist. LEXIS 8189, *2; 1997 AMC 627

Gourdomichalis and the M/V KAVO KALIAKRA. At all material times, American River Transportation Co., Archer Daniels Midland Company, Tulane Fleeting, Inc. and New Orleans Shipyard, Inc. ("ARTCO"), were the owners and/or operators of the aforesaid Tulane Fleeting Facility located at approximately Mile 111.3 AHP, Lower Mississippi River. Compass Condo Corporation ("Compass") was the employer of individuals working at the said facility.

At all material times, the M/V [*3] KAVO KALIAKRA was and is a steel ocean going vessel. At and prior to the casualty being the subject of this litigation, defendants and complainants in limitation, Arosita, Gromar and Gourdomichalis, exercised due diligence to make the M/V KAVO KALIAKRA in all respects seaworthy and fit for her intended voyage, and the vessel was, in fact, tight, staunch, strong, and properly manned, equipped and supplied, and in all respects seaworthy.

During the late morning hours of March 30, 1992, the M/V KAVO KALIAKRA, after having sailed from Greece, was downbound on the Lower Mississippi River, a navigable waterway of the United States, on a voyage from the United States to Estonia. During this voyage, the M/V KAVO KALIAKRA was under the command of a competent, experienced Master, and was fully manned by an appropriately licensed and competent crew. In addition, the vessel was equipped in accordance with all applicable laws, regulations and conventions. The vessel was being conned by a compulsory river pilot, James Strahan, who had served approximately 24 years as a river pilot as a member of the New Orleans-Baton Rouge Steamship Pilots Association.

The vessel was proceeding on its voyage without [*4] incident and was responding promptly and properly to all helm and engine orders. However, in the vicinity of Mile 111.3 A.H.P., while the vessel was proceeding at approximately 11 to 12 knots, the M/V KAVO KALIAKRA suddenly and without warning lost all power. At the time of the loss of power the vessel was in a slight turn to starboard because of the curvature of the River. This loss of power affected both propulsion and steering. Captain Strahan ordered a hard to port command which could not be followed due to the loss of steering. At this time, the vessel was holding its course, and there was no immediate cause for alarm as Captain Strahan had experienced such failures on approximately 10 to 12

occasions in his career, and he was waiting for the engine room to re-establish power. As a precaution, however, Captain Strahan ordered the crew to stand by on the anchors for further instructions, which order was followed promptly. Additionally, Captain Strahan made contact via his hand-held VHF radio with the fleet boat Jerry Aragon in an effort to apprise traffic in the area of the nature of the problem. Further, Captain Strahan also continuously sounded the emergency signal on the ship's [*5] horn to warn those downriver, and particularly, those individuals working at the Tulane Fleeting Facility, of his approach.

Ultimately, Captain Strahan was faced with the fact that power was not going to be restored. At this time, the vessel was at least 1500 feet above the Tulane Fleeting Facility, and her course began to head toward the facility. Captain Strahan ordered that two (2) shots (180 feet) of starboard anchor chain be dropped. This had the effect of slowing the vessel, and it then began rotating clockwise. Approximately 1000 feet above the facility, Captain Strahan ordered that four (4) shots (360 feet) of the port anchor chain be dropped, as well as an additional two (2) shots on the starboard chain. This had the effect of further slowing and rotating the vessel.

Notwithstanding all prudent efforts by Captain Strahan and the crew of the vessel to avoid making contact with fixed or floating objects, the M/V KAVO KALIAKRA ultimately struck a glancing blow to the down-river-most, outboard barge in the upriver fleet of barges moored in the Tulane Fleeting Facility. The facility consisted of an upriver fleet of twenty (20) barges moored in two (2) tiers of ten (10) barges [*6] outboard of the CONDO [1] barge, and a downriver fleet, consisting of two (2) tiers of four (4) barges moored to anchor chains. [2] The vessel made contact with the upriver fleet at an approximate 45 [degrees] angle, scraping alongside the outermost barge, Barge XL-146. Captain Strahan estimated the vessel's speed at the time to be less than one (1) mile per hour.

> 1   ARTCO's Fleet included a barge washing and repair facility located on the right descending (west) bank of the Mississippi River at approximately 111.3 A.H.P. The facility consisted of ARTCO's CONDO I ("CONDO"), a 240 foot long by 50 foot wide, permanently-moored dock barge. On a daily basis, ARTCO's barges were temporarily moored to the CONDO for cleaning

Case 2:05-cv-04182-SRD-JCW   Document 19485-1   Filed 12/18/09   Page 40 of 119

Page 3
1996 U.S. Dist. LEXIS 8189, *6; 1997 AMC 627

and minor repairs.

2   The CONDO was held stationary with two steel spuds; on each inboard corner. Each spud was 71 feet long and was constructed for 14-inch flanged beams with one-half inch plates of reinforcement on each side to form a box. The spuds were driven into the river bottom near the bank to hold the CONDO in place; the CONDO was also connected to shore with various cables and a short walkway platform.

[*7] Tommy Mitchell is a Coast Guard licensed tugboat captain who piloted the ARTCO fleetboat, the M/V TERREBONE, on the day of the allision. Mitchell had worked at the ARTCO fleet for several months. It was his job to help build tows and to fleet barges. He also transported dirty/clean barges to and from the CONDO on a daily basis. Mitchell saw the initial impact. He estimated that the ship was travelling at a speed of approximately 2 to 3 knots when its starboard bow allided with the starboard bow of Barge XL-146. Mitchell saw the CONDO and its barges pushed in and rotate toward the west bank as a result of the ship's impact.

Despite the CONDO's heavy steel spuds and its distance 350 feet away from the point of impact, the force of the collision was so great that it caused the CONDO to be moved inward, approximately 20 feet towards shore. Both of the CONDO's spuds were severely deformed and bent at an angle of 60-70 degrees. Various compartments of the CONDO were flooded and its shoreside access walkway was twisted, distorted and partially sunk.

After striking Barge XL-146, the ship continued moving downriver and closer to the bank. Approximately 300 feet immediately downriver from [*8] the CONDO was another cluster of moored barges. Mitchell saw the ship continue downriver and strike one of the outside barges in the downriver tier of barges, Barge ART-485.

The Court finds that the ship first allided Barge XL-146 on the CONDO, and then with Barge ART-485 in the downstream barge tier. The Court does not accept the testimony of Captain Strahan that the ship's bow did not strike the ART-485. Strahan was admittedly 650-700 feet away from the ship's bow; also, Strahan admitted that his view in front of the bow was blocked.

Keith Winsley, the foreman of the Compass wash crew, and Hector Pazos, Arosita's liability expert, both corroborated Tommy Mitchell's testimony that the ship also struck the barges situated downstream from the CONDO. Winsley gave a handwritten statement on the day of the allision indicating that after the ship had travelled downriver past the CONDO's barges, he saw that "... the ship had struck another blue top barge and was pushing it into the bank."

ARTCO's marine surveyor Jimmy Johnson testified that the post collision damage to the starboard side of Barge ART-485 was consistent with it having been struck by the M/V KAVO KALIAKRA. Arosita's surveyor, [*9] Norman Dufour, disagreed; he surmised that one of the CONDO'S barges had broken loose and struck the ART-485. However, Mitchell, the eyewitness with the best view of the collision, did not see any barges break away from the CONDO and fall down in between the bow of the M/V KAVO KALIAKRA and any other barges.

Captain Strahan never intended to navigate his vessel near the CONDO or its barges. He admitted that, without a power failure, he would have passed the ARTCO facility near the middle of the Mississippi River, at a distance of approximately 1,000 feet. When the power blackout occurred, the ship was travelling downriver at full throttle, 11-12 mph, with the current speed at 1 1/2 to 2 1/2 knots.

Prior to the collision, the CONDO and ARTCO's barge washing operation had been at that site for approximately 1-1/2 years. ARTCO entered into a land lease on September 1, 1990 with Victor J. Phillips, the landowner. The lease specifically indicated that its purpose was "to moor barges ..." and for the "top side repair, cleaning and pumping of barges moored along the Leased Premises." Also, the Lessor agreed that "it had obtained all necessary permits and/or letters of no objection from [*10] the Corps of Engineers and West Jefferson Levee District ("WJLD")..." Indeed, the Lessor had obtained Corps Permit No. 849 and WJLD Permit No. 148. Although these permits were technically in the name of the Phillips brothers, ARTCO's lease makes it a third-party beneficiary of these permits. ARTCO presented uncontroverted testimony that barges moored to the CONDO were inspected on numerous occasions by Coast Guard representatives. ARTCO was never cited for any violation, by either the Corps, the WJLD or the Coast Guard, regarding the CONDO or the barges moored to it.

### POST-TRIAL CONCLUSIONS OF LAW

1996 U.S. Dist. LEXIS 8189, *10; 1997 AMC 627

When a moving vessel collides with an anchored vessel or a fixed object, there is a presumption that the moving vessel is at fault. *The Oregon, 158 U.S. 186, 197, 15 S. Ct. 804, 809, 39 L. Ed. 943, 949 (1895)*; *Patterson Oil Terminals Inc. v. The Port Covington, 205 F.2d 694, 696 (3d Cir. 1953)*; *The Victor, 153 F.2d 200, 202-203 (5th Cir. 1946)*. The presumption suffices to make a prima facie case of negligence against the moving vessel. *Brown & Root Marine Operators, Inc. v. Zapata Off-Shore Co., 377 F.2d 724, 726 (5th Cir. 1967)*.

Captain Strahan was familiar with [*11] the presence and location of ARTCO's barge facility, and he intended to steer well clear of it. He was unable to do so because the ship lost all power and steering. It is therefore appropriate to apply the presumption of fault against the ship and Arosita for causing the collision. *Brunet v. United Gas Pipeline Co., 15 F.3d 500, 503 (5th Cir. 1994)*. Arosita had the burden of rebutting the presumption of its negligence and fault, and this it failed to do. *The Oregon, supra; Brown & Root Marine Operators, Inc., supra.*

This presumption operates to shift the burden of producing evidence and the burden of persuasion onto the moving vessel. The moving vessel may rebut the presumption by showing, with a preponderance of the evidence, that the allision was the fault of the stationary object, that the moving ship acted with reasonable care, or that the allision was an unavoidable [or inevitable] accident. *Brunett, 15 F.3d at 503*. (citations omitted).

The burden of proving the defense of unavoidable or inevitable accident is heavily upon the vessel asserting such a defense. *Brown & Root Marine Operators, Inc., 377 F.2d at 726*. The vessel 'must exhaust every reasonable possibility [*12] which the circumstances admit and show that in each they did all that reasonable care required.' *Id. at 726, quoting Boudoin v. J. Ray McDermott & Co., 281 F.2d 81, 88 (5th Cir. 1960)*. In order for the defense of inevitable accident to be upheld, the proof must be convincing that the defect was really latent and that it could not have been discovered by the exercise of due diligence. Griffin, The American Law of Collision, 241(5).

The Court rejects Arosita's defense of "inevitable accident" because Arosita failed to convincingly prove that any "latent defect" existed. *Petition of M/V ELAINE JONES, 480 F.2d 11, 17-18 (5th Cir. 1973), cert. den. 423 U.S. 840 (1975)*. The Court finds that the credible

evidence does not support Arosita's "latent defect" defense. First, the testimony of Fernando de Brito directly contradicts Arosita's theory. Arosita retained de Brito, a senior ship and engine surveyor with Lloyd's Register classification society, to survey the ship on its behalf. Mr. de Brito's purpose was to verify the cause of the ship's power loss, to certify that the condition was corrected, and to notify the U.S. Coast Guard of this correction so that the ship could [*13] sail.

Mr. de Brito boarded the vessel within three hours of the collision. He spoke with both the ship's master and its chief engineer. Mr. de Brito was advised by the ship's chief engineer that the subject valve had closed because it had been adjusted too tight, to the extent that any vibration or a person accidentally touching it could inadvertently close it.

Mr. de Brito personally tested the subject valve three times that day. First, he pulled on the valve handle by hand, and it opened and closed without any problem. Second, he stood in front of it while one of the ship's crew operated the remote lever from another deck; again, the valve worked fine. The valve was tested a third time in front of the Coast Guard representatives and again the valve performed well. Mr. de Brito noted that whenever the valve handle was down, the valve's internals were correctly in the open position; likewise, whenever the valve handle was pulled up, he could hear the valve close internally, as it was supposed to do. Because the subject valve was working satisfactorily, de Brito recommended that the ship's crew put additional slack in the remote cable so that the voyage could be completed without [*14] any repeat complications.

Some time after the casualty, the ship's crew detached the remote cable from the valve handle, and wired the valve handle down in the open position. All witnesses agreed that the purpose of "cancelling" the cable and wiring down the handle was to prevent the valve from being closed accidentally. The cancellation of the valve is consistent with the conclusion that the valve handle was erroneously manipulated up, into the closed position, either by improper adjustment, vibration or by being accidentally touched. No one ever notified Mr. de Brito of a suspected internal defect in the valve; he accepted and passed on to the Coast Guard the chief engineer's logical explanation that the valve had been wired too tightly, causing it to accidentally close. Had Mr. de Brito been aware of a possible internal valve

1996 U.S. Dist. LEXIS 8189, *14; 1997 AMC 627

defect, he would have reported it to the Coast Guard, who would have required the defect to be remedied before the ship could sail.

The Coast Guard reports corroborate de Brito's testimony. The Coast Guard's senior investigating officer, Lt. Callan J. Brown, confirmed that he relied upon the advice of Mr. de Brito in formulating his report and conclusions.

[*15] The engineer's and/or vessel's logs are the official records required by law to be maintained aboard a vessel to describe the occurrence, nature and causes of any material engine, power, steering or other similar types of failures. Yet, for the day of this casualty, the ship's Engine Log Book is blank and the deck log extract contains no reference to the subject valve. The crew's cancellation of the valve is not referenced in any logs, which is unusual, considering the March 31, 1992 entries which reference work on pumps for Engines 1 and 3. Arosita's representative, Stamatakis, agreed that although the chief engineer is expected to reference items in the ship's logs such as valve defects and power losses, that was not done. Arosita could not explain the absence of information in its logs regarding the cause of the power blackout. Notably, not a single log or other contemporaneous record aboard the ship identifies an internal valve defect as being even a suspected cause of the blackout. No one ever informed the Coast Guard or Mr. de Brito that a possible cause of the power blackout was an internal, latent valve defect.

The M/V KAVO KALIAKRA returned to New Orleans in August and November [*16] of 1992. For over six (6) months, from March 30, 1992 until early October, 1992, it continued to sail with no changes or repairs to the subject valve. No other power blackouts occurred. The valve's latent defect never manifested itself, other than, allegedly, at the time of the casualty. All testimony confirmed that whenever the subject valve was operated manually, it worked properly--before and after the casualty.

The ship's second engineer, Mr. Ventouris, testified that following the collision, he found the valve handle in the down (open) position and after he moved the valve handle up and down a few times, fuel flow through the valve was restored. However, the Court does not accept Ventouris' testimony. First, Ventouris' "account" was never provided to de Brito, the Coast Guard, or to anyone else until Stamatakis was supposedly told this six months

after the casualty. Ventouris' testimony does not explain why Arosita's crew cancelled the valve, which would have been useless if the cause of the valve's closure was an internal defect.

The circumstances surrounding Arosita's surreptitious dismantling of the valve in The Netherlands in October of 1992 also leads this Court to reject [*17] Ventouris' testimony. ARTCO was not invited to attend the testing and the testing by Francis Ducote, a mechanical engineer, and Stamatakis was very questionable. For example, Ducote testified that after the valve was dismantled, he found a set-screw which was partially backed out from its hole. However, he did not photograph the setscrew in that condition, nor did he measure the distance or extent to which the set-screw was backed out. Ducote was admittedly unfamiliar with this particular type of valve design and construction and he was unaware of the presence of the "small balls" which fell out of the valve when Stamatakis pulled apart the disc stem and the disc seat.

Ducote's testimony contradicts Arosita's claim that because the set screw was backed out, the small balls migrated from their normal position, thereby allowing the disc seat to easily drop off the disc stem. Ducote admitted during his deposition, and reconfirmed at trial, that Stamatakis had to twist, tug and pull "very hard" to separate the disc stem from the disc seat. Arosita's witnesses never recreated the scenario of the disc seat falling off of the disc stem, such that the valve would close internally without [*18] the valve handle being manipulated.

Given Arosita's burden of proof, it is unnecessary for this Court to determine exactly how or why the subject valve closed. Rather, Arosita was required to come forward with convincing evidence to establish how the valve closed, and why it is free from fault. Arosita did not do this. The Court rejected Arosita's theory that the valve closed because the internal set-screw backed out of its hole. The most reasonable and likely cause of the valve's closing was that found by the impartial investigators, i.e., Mr. de Brito and the U.S. Coast Guard. The valve handle was forced upward either through maladjustment of the valve, the handle, its cable, through vibration by a crewmember or through a combination of these.

In sum, this Court concludes that the subject valve closed due to the negligence of Arosita, or through the unseaworthiness of its vessel, and not because of any

Case 2:05-cv-04182-SRD-JCW   Document 19485-1   Filed 12/18/09   Page 43 of 119

Page 6

1996 U.S. Dist. LEXIS 8189, *18; 1997 AMC 627

"latent defect".

## REASONABLE CARE

A compulsory pilot "must be held to an unusually high standard of care because he 'is selected for his personal knowledge of the topography through which he steers his vessel ... he must ... be familiar with all dangers that are permanently [*19] located in the course of the river ... all this he must know and remember and avoid'." *Bunge Corporation v. M/V FURNESS BRIDGE, 558 F.2d 790, 798, n.6 (5th Cir. 1977), cert. den., 435 U.S. 924, 55 L. Ed. 2d 518, 98 S. Ct. 1488 (1978), quoting Atlee v. The Nw. Union Packet Co., 88 U.S. 389, 396, 22 L. Ed. 619, 621 (1875).* The apparent belief by Captain Strahan and/or the master that the ship's power would return at some time, as the vessel drifted with the current for over two miles, was unwarranted and unreasonable given the facts and circumstances surrounding the power blackout. Given the admitted absence of a suitable backup power source for steering, the Court finds that the ship should have proceeded down the Mississippi River at a slower speed, which would have allowed the dropping of the ship's anchors as soon as any emergency loss of power occurred. The Court concludes that given the condition of the ship, the M/V KAVO KALIAKRA should not have operated in the Port of New Orleans at the rate of speed which precluded the only available means to control the ship, i.e. its anchors.

## FAULT OF A STATIONARY OBJECT

The Court also rejects Arosita's claim that its [*20] ship struck ARTCO's barges, because those barges were moored in violation of the Rivers and Harbor's Act, *33 U.S.C. 401, et seq.* The Court finds that ARTCO in no way caused this allision. The Court finds it unnecessary to decide what types of permits ARTCO had or was required to have. The ship intended to pass 1000 feet away from ARTCO's barges. ARTCO's stationary barges, did not, in fact, obstruct the navigable channel, thus rebutting any presumption of fault due to the purported violation by ARTCO of any statutory rules as alleged by Arosita. ARTCO's facility "neither obstructed navigation nor was inherently dangerous, and ... a different design or placement of the structure[s] could not necessarily have avoided the collision". *Nunley v. M/V DAUNTLESS COLOCOTRONIS, 863 F.2d 1190, 1197 (5th Cir. 1989).* "The record refutes any suggestion that the [ARTCO's barges] 'caused or contributed to' the collision simply by being there." *Nunley, 863 F.2d at 1197, quoting Dow*

*Chemical Company v. Dixie Carriers, Inc., 463 F.2d 120, 122 (5th Cir. 1972).*

The evidence established that ARTCO had authority to operate its barge washing facility at Mile 111.3 A.H.P. pursuant to the WJLD [*21] Permit No. 148 and Corps Permit No. 849. The WJLD Permit No. 148 authorized ARTCO's barge fleeting operations and the Corps' Permit No. 849 specifically authorized the mooring of a dock barge, i.e., the CONDO. The Corps and Coast Guard were aware of the presence of the CONDO and ARTCO's other barges at Mile 111.3 A.H.P., and they never issued objections thereto.

Arosita failed to sustain its burden of proving, by a preponderance of the evidence, that ARTCO was in violation of any permits. Arosita failed to call any Corps or Levee District representative to support its contentions. Arosita failed to produce any substantive evidence that the WJLD permit was insufficient to meet the permit requirements under the Rivers & Harbors Act. The Court finds that the Corps at least implicitly, authorized ARTCO's barge washing/fleeting operation because the Corps continually received notices of barge fleeting permits issued by Lafourche Basin and WJLD, and it never raised any objections. In fact, the Corps, in its own permits, referred to the existing levee district permits. In sum, Arosita failed to prove that the permits in favor of ARTCO were insufficient and/or violated.

"The mere presence [*22] of an object in a navigable river does not necessarily require a finding that the object is in violation of the Rivers & Harbors Act, nor does it amount to negligence on the part of the owners, when their objects are struck by a ship." *Dow Chemical Company v. Dixie Carriers, Inc., 463 F.2d 120, 122 (5th Cir. 1972); see also, Pillsbury, 715 F. Supp. 738, 761.* Because Arosita failed to provide sufficient evidence "that no permit had been issued or that plaintiff's structures were otherwise 'obstructions' under the law, defendants are entitled to no relief on this point." *Id., at 762.*

## CONCLUSION

For the reasons set forth above, Arosita, Gromar, Gourdomichalis and U.K. Mutual Steamship are jointly and severally liable in personam, and the M/V KAVO KALIAKRA is liable in rem to plaintiffs ARTCO, New Orleans Shipyard, Inc., Tulane Fleeting, Inc., Archer Daniels Midland Company, and Compass Condo

1996 U.S. Dist. LEXIS 8189, *22; 1997 AMC 627

Corporation.                                    G. THOMAS PORTEOUS, JR.

    New Orleans, Louisiana, this 10th day of June, 1996.        UNITED STATES DISTRICT COURT

# CASE #7



LEXSEE 2001 U.S. DIST. LEXIS 26084

**JISA FARMS, INC., a Nebraska Corporation, Plaintiff, vs. FARMLAND INDUSTRIES, INC., a Kansas Corporation, Defendant.**

**4:99CV3294**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEBRASKA**

*2001 U.S. Dist. LEXIS 26084*

**June 8, 2001, Decided**
**June 8, 2001, Filed**

**COUNSEL:** [*1] For Jisa Farms, Inc., a Nebraska corporation, Plaintiff: David A. Domina, DOMINA LAW FIRM, Omaha, NE; Pamela J. Dahlquist, KUTAK ROCK, LLP, Omaha, NE.

For Farmland Industries, Inc., a Missouri corporation, Defendant: Brien M. Welch, Michael D. Reisbig, CASSEM, TIERNEY LAW FIRM, Omaha, NE; Gregory S. Slemp, John E. Jackson, Kelley Sears, Kirk J. Goza, SHOOK, HARDY LAW FIRM, Kansas City, MO.

**JUDGES:** Warren K. Urbom, United States Senior District Judge.

**OPINION BY:** Warren K. Urbom

**OPINION**

MEMORANDUM AND ORDER ON DEFENDANT'S MOTIONS TO EXCLUDE OR TO LIMIT THE TESTIMONY OF PLAINTIFF'S EXPERT WITNESSES

The plaintiff Jisa Farms, Inc. (hereinafter Jisa Farms) brings the present action claiming that the defendant Farmland Industries, Inc. (hereinafter Farmland) acted negligently in advising the plaintiff on nutritional issues and in formulating/preparing the plaintiff's feed rations during a period from August/September of 1996 to September of 1997. The case is scheduled for trial on September 17, 2001. *See* filing 110. The defendant Farmland has filed several motions seeking either to exclude or to limit the testimony of the following individuals: (1) the plaintiff's banker, Brad Wagner (filing [*2] 94); (2) the plaintiff's nutritionist, Cecelia Dorn (filing 96); (3) the plaintiff's veterinarian, Dr. Randall Schawang (filing 98); (4) the plaintiff's veterinarian, Dr. Randall Pedersen (filing 100); (5) the plaintiff's nutritionist, Doug Weich (filing 102); and (6) the plaintiff's consulting veterinarian, Dr. Wallace Wass (filing 104). The defendant has also submitted separate evidentiary indices and separate briefs with respect to each individual motion. *See* filings 95, 97, 99, 101, 103, 105. In response, the plaintiff has filed a single brief and evidentiary index. *See* filing 106. After carefully reviewing the submissions of both parties, I find that (1) the defendant's motion will be granted with respect to Brad Wagner; (2) the defendant's motions will be denied with respect to Ceclia Dorn, Dr. Randall Schawang, and Doug Weich; and (3) the defendant's motions will be granted in part and denied in part with respect to Dr. Randall Pedersen and Dr. Wallace Wass.

I. *Standard for Admissibility of Expert Testimony*

The admissibility of expert testimony is governed by Federal Rule of Evidence (hereinafter Rule) 702, which provides as follows:

If scientific, technical, [*3] or other

specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

*FED. R. EVID.* 702. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* the United States Supreme Court explained that trial courts, when evaluating scientific testimony, must act as "gatekeepers" to ensure that such testimony is "not only relevant, but reliable." *See Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597, 589, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)*; *see also id. at 592-93* (instructing district courts to conduct "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue"). The Court [*4] set forth the following four factors to guide trial courts in making this preliminary reliability assessment: (1) whether the expert's methodology has been tested; (2) whether the expert's theory or technique has been subjected to peer review and publication; (3) whether the technique has a known or potential rate of error; and (4) whether the technique has been generally accepted in the proper scientific community. *See id. at 593-94*. The Court emphasized, however, that the inquiry envisioned by *Rule 702* remained a flexible one, and that the above factors should not be regarded as "a definitive checklist or test." *Id. at 594, 593*; *see also Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999)* ("We also conclude that a trial court may consider one or more of the more specific factors that *Daubert* mentioned when doing so will help determine that testimony's reliability. But, as the Court stated in *Daubert,* the test of reliability is 'flexible,' and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case.").

Although *Daubert* advised district courts that the [*5] reliability inquiry should focus "solely on principles and methodology, not on the conclusions that they generate," the Court later recognized in *General Electric*

*Company v. Joiner* that "conclusions and methodology are not entirely distinct from one another." *Daubert, 509 U.S. at 595*; *General Elec. Co. v. Joiner, 522 U.S. 136, 146, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997)*. Noting that "[t]rained experts commonly extrapolate from existing data," the Court determined that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Id.* Thus, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered," and exclude an expert's testimony. *Id.*

In a recent decision, the Supreme Court extended the *Daubert* analysis to all "non-scientific" expert testimony, noting that the language of *Rule 702* "makes no relevant distinction between 'scientific' knowledge and 'technical' or 'other specialized' knowledge." *Kumho Tire Co., 526 U.S. at 147*. According to the Court, the objective [*6] of *Daubert's* "gatekeeping" requirement "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id. at 152*. Thus, district courts are now obliged to ensure that *all* expert testimony "is not only relevant, but reliable.'" *Id. at 147* (quoting *Daubert, 509 U.S. at 589*).

Finally, the Eighth Circuit recognizes that "*Rule 702* favors admissibility if the testimony will assist the trier of fact." *Clark v. Heidrick, 150 F.3d 912, 915 (8th Cir. 1998)* (citing *Justice v. Carter, 972 F.2d 951, 957 (8th Cir.1992))*. In addition, "doubts regarding '"whether an expert's testimony will be useful should generally be resolved in favor of admissibility."'" *Id.* (citing *Larabee v. MM & L Int'l Corp., 896 F.2d 1112, 1116 n.6 (8th Cir.1990)* (quoting J. WEINSTEIN & M. BERGER, WEINSTEIN'S EVIDENCE P 702[02], at 702-30 (1988)))*; *see Sphere Drake Ins. PLC v. Trisko, 226 F.3d 951, 954-55 (8th Cir. 2000). [*7]

II. *Discussion*

A. *Brad Wagner*

In filing 94, the defendant Farmland requests that I limit the testimony of the plaintiff's purported expert, Brad Wagner, and exclude his opinions regarding the following: (1) the difficulties experienced at Jisa Dairy; (2) the financial steps taken by Jisa Dairy to mitigate its

alleged damages; and (3) the specific damages alleged by the plaintiff in its complaint. According to the defendant Farmland, such opinions are not supported by "sufficient facts or data" as required by *Rule 702*. The plaintiff, in its response, does not specifically address the challenges raised by the defendant. Instead, the plaintiff simply asserts that (1) Wagner, as the Jisa Farms' banker, is "undisputedly the most knowledgeable witness regarding the financial strengths and losses of Jisa Farms"; (2) Wagner's testimony is limited to his knowledge as the plaintiff's banker; and (3) this limited testimony "is essential evidence regarding financial steps taken by Jisa Farms to avoid losses and the level of financial losses from lost milk production." Plaintiff's Brief at 14. After reviewing the submissions of both parties, I will grant the defendant's motion.

### 1. [*8] *Difficulties Experienced at Jisa Dairy*

In his report, Wagner indicates that Jisa Farms had plans to expand, and that he and David Jisa discussed the financial possibility of expansion. Wagner also states that he "was aware that these plans were abandoned." Filing 95, Ex. A at 1. According to Wagner, Jisa informed him that "these plans were abandoned as a result of financial difficulties [Jisa] suffered as a result of a feed related incident, wherein he experienced some cow death, cow loss, lost milk production and the like." *Id.* at 1-2. The defendant Farmland challenges Wagner's ability to testify as to the reason why Jisa Farms did not pursue its plans to expand. The defendant also seeks to prevent Wagner from referring to the plaintiff's alleged experiences with "cow death, cow loss, [and] lost milk production." *See id.* According to the defendant, the challenged statements should be excluded for the following reasons: (1) Wagner admitted in his deposition that he had no knowledge as to the specific reasons why the plaintiff abandoned the expansion plan; (2) any "opinions" Wagner may have regarding the plaintiff's alleged losses and its reasons for abandoning the expansion [*9] plan are mere reiterations of factual allegations related to him by David Jisa, and, as such, are not "opinions" as envisioned by *Rule 702*; and (3) even if the challenged statements are regarded as "opinions," they should still be excluded because "Wagner's sole bases are unverified information received from Dave Jisa, an interested party." *See* Plaintiff's Brief at 8, 10. After reviewing the challenged statements, I find that they must be excluded. Such statements are hearsay, not falling within any exception. Thus, Wagner will not be permitted to testify as to what David Jisa related to

him regarding Jisa's reasons for abandoning the expansion plans.

### 2. *Financial Steps Taken by the Plaintiff to Mitigate Alleged Damages*

In his report, Wagner states that "I am certain that Dave Jisa has taken all the appropriate financial steps to mitigate any financial damage he occurred [sic] as a result of the Farmland feed incident . . . ." Filing 95, Ex. A at 2. According to the defendant, however, Wagner admitted in his deposition that he knew of no actual steps taken by Jisa to mitigate his alleged damages. Thus, the defendant concludes, Wagner's "opinion" that Jisa took "all the [*10] appropriate steps" should be excluded. I agree.

The following passage from Wagner's deposition transcript reveals foundational problems with his opinion regarding Jisa Farms' efforts to mitigate damages:

> Q. Okay. But in terms of what he did to mitigate his financial damages, other than switch feed companies, you're not aware of any steps that he's taken? And I'm not so sure you're saying in this sentence that you are. *You're just saying that you know him and that you believe that he would take appropriate steps?*
>
> A. That would be correct.
>
> Q. Okay. I just want to make sure my reading of it was the same, *that you're not going to list out for us what he did to mitigate his damages.* You're saying you know Dave Jisa and you think he would take those things--
>
> A. That's correct.

Filing 95, Ex. B at 46:4-17 (emphasis supplied). Based on the above testimony, it appears to me that Wagner is simply speculating as to whether the plaintiff did, indeed, take appropriate steps to mitigate his damages. Such speculation does not satisfy *Rule 702*'s requirement that expert testimony be based on "sufficient facts or data." *FED. R. EVID. 702* [*11] ; *J.B. Hunt Transp., Inc. v. General Motors Corp., 243 F.3d 441, 444 (8th Cir. 2001)* ("'Expert testimony that is speculative is not competent proof and contributes nothing to a legally sufficient

evidentiary basis.'" (citation omitted)); *Jaurequi v. Carter Mfg. Co., Inc., 173 F.3d 1076, 1084 (8th Cir. 1999)* (affirming district court's exclusion of expert testimony where the expert "provided no basis for [the court] to believe that his opinions are anything more than unabashed speculation"); *Hose v. Chicago Northwestern Transp. Co., 70 F.3d 968, 972 (8th Cir. 1995)* ("Reliability means the evidence must be based upon scientific knowledge, i.e., 'ground[ed] in the methods and procedures of science,' and must represent 'more than [a] subjective belief or [an] unsupported speculation.'" (citing *Daubert, 509 U.S. at 590*)); *Loudermill v. Dow Chem. Co., 863 F.2d 566, 570 (8th Cir. 1988)* ("As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination. [*12] . . . However, if an expert opinion is so fundamentally unsupported that it can offer no assistance to the jury, then the testimony should not be admitted." (citations omitted)). The plaintiff has offered nothing to contradict the above testimony or to clarify the basis for Wagner's opinion. Thus, in the absence of a sufficient factual foundation, Wagner's "opinion" that David Jisa took "all the appropriate steps to mitigate any financial damages he occurred [sic] as a result of the Farmland feed incident," must be excluded.

### 3. *Opinions Regarding Plaintiff's Specific Damages*

The defendant also asserts that Wagner should be precluded from offering any opinions regarding the plaintiff's damages, including the damages alleged in the plaintiff's complaint. *See* filing 1 at 7-8 (alleging special damages in the amount of $ 1,338,804). In its *Rule 26(a)(2)* Expert Witness Disclosure, the plaintiff states that Wagner will testify about Jisa Farm's "economic damages," based in part on "the Plaintiff's records including bank records, tax returns, milk checks, death loss records, and information relied upon by agricultural economists . . . ." Filing 95, Ex. C at 7. The plaintiff, in [*13] its brief, also indicates that Wagner will testify as to "the level of financial losses from lost milk production." Plaintiff's Brief at 14. During his deposition, however, Wagner acknowledged that he (1) has no opinion, and no basis on which to form an opinion, as to the plaintiff's special damages, and (2) does not intend to testify at trial regarding such damages:

Q: And then I need to know your factual

basis, any computations that you did, that type of thing. From your report, it doesn't appear to me that you're going to be expressing any opinions specifically with respect to damages and numbers.

A: Yes.

A. Okay. So I would be correct in assuming that you don't have any opinions with respect specifically to numbers and damages and how those numbers and damages are arrived at; is that true?

A. With regard to specific numbers, no.

Q. Okay. So you--you're not going to take the witness stand and say they lost X amount of cows and the value of those cows are this much and this is how much their damage is? You're not prepared to do that and you haven't been asked to do that, I take it?

A. Correct.

Q. Okay. And you don't have any information, at least [*14] that I saw within your file, on which to base any of those opinions on, do you?

A. No.

Filing 95, Ex. B at 22:3-24. Thus, although the plaintiff asserts that Wagner will testify as to his opinions regarding Jisa Farms' "economic damages," Wagner, himself, has denied that he holds such opinions. Wagner will therefore be precluded from offering opinions relating to the special damages alleged in the plaintiff's complaint.

### B. *Cecelia Dorn*

The defendant Farmland also seeks to limit the testimony of Cecelia Dorn. *See* filing 96. According to the defendant, Dorn's opinion regarding the use of bakery products and finely-ground corn in rations, as well as her opinion regarding the rations and ration advice provided by Farmland, should be excluded as baseless. After reviewing the arguments of both parties, I find that the defendant's motion will be denied.

1. *Opinion Regarding the Use of Bakery Products and Finely-Ground Corn in Dairy Rations*

In her report, Dorn indicates that the use of finely-ground corn and bakery products as feedstuffs may lead to herd health problems. She also states that she "personally do[es] not recommend feeding bakery products at any level [*15] due to their variability in nutrition content (moisture, sugar, fat, salt) and certainly not in conjunction with extremely finely ground corn." Filing 97, Ex. A at 1. According to the defendant, these opinions are baseless and should be excluded because they are contrary to dairy nutrition industry standards. In support of its claim, the defendant first refers me to the following deposition testimony:

Q. [Y]ou have expressed a personal opinion that feeding fine-ground corn and bakery products of inconsistent and variable quality can create health problems?

A. Yes

Q. And what you mean there is that it's okay to feed ground corn and bakery products as long as the ration is balanced properly?

. . . .

A. I personally do not believe in feeding finely ground corn and bakery products. I've never fed bakery products. And I would not really want to feed bakery products. Some people feel its an acceptable practice.

Q. The opinion that you have is a personal opinion; is that right?

A. That's right.

Q. And it's also true that it's generally accepted within your industry, the nutrition industry, based on authoritative sources in your industry, that it is [*16] proper to feed finely ground corn and/or bakery products to dairy animals; is that right?

. . . .

A. There are a number of people who think that it is okay, yes.

. . . .

Q. That's the reason that finely ground corn is finely ground, is to increase the rate of fermentation, isn't it?

A. Yes.

Q. The reason for that is to increase energy level in the animals?

A. Increase the availability of the energy, yes.

Q. And the purpose of increasing the availability of the energy is for greater milk production, isn't it?

A. Yes, that's true.

Q. And that's all an accepted practice in the nutrition industry, isn't it?

A. Yes, it is.

. . . .

Q. It's true, isn't it, that authoritative sources in the nutrition industry recognize that fine-ground corn is acceptable for rations for dairy animals?

A. It would be true depending on the other ration ingredients and the ration makeup.

Q. It's also true that authoritative sources in the nutrition industry recognize that bakery products are acceptable for rations for dairy animals?

A. There are a number of people that do feel bakery products are fine to use in rations.

Filing 97, Ex. [*17] B at 10:24-12:2, 19:20-20:9, 43:12-23 (objections omitted). The defendant characterizes the above testimony as an "admission" by Dorn that dairy nutrition industry standards, as well as authoritative sources within that industry, allow for the

use of both finely-ground corn and bakery products. Thus, the defendant concludes, it is merely Dorn's *personal opinion* and practice to restrict the use of these products, and such an opinion is therefore improper expert testimony. I disagree.

Contrary to the defendant's assertions, I am not convinced that Dorn has "admitted" to anything regarding "general industry standards." In fact, in a portion of the deposition transcript omitted by the defendant, Dorn indicated that she didn't know how "generally accepted" it is to include finely-ground corn and/or bakery products in dairy rations. *See id.* at 12:3-7. This testimony, as well as other materials submitted by the parties in connection with the defendant's motions, suggest that there may be some disagreement within the dairy nutrition industry as to the proper use of these products. *See* filing 106, Ex. 2 at 156:2-157:25 (testimony of Dr. Randall Pedersen in *Dodds v. Farmland Industries,* [*18] *Inc.*) (explaining how rations consisting of finely-ground materials, such as corn and bakery products, may lead to rapid fermentation and, as a result, acidosis); filing 105, Ex. B at 109:6-110:13 (Deposition of Dr. Wallace Wass) (stating that although he "think[s] it should be okay" to include bakery products in dairy rations, other experts are hesitant to use such products "primarily for the reason that they say you don't know what's in there"). The defendant has not submitted any evidence suggesting otherwise. In addition, Dorn's statements regarding the potential effects of these products, when used in excess or in a ration that is not properly balanced, appear to be based on scientific principles recognized by the dairy nutrition community. *See* filing 106, Ex. 5 at 171 ("Amount and *composition* of the diet are external variables that affect rate of digestion, rate of passage and, therefore, turnover of the rumen contents" (emphasis supplied)); filing 106, Ex. 8 at 2 ("Another common cause of acidosis is having diets too low in effective fiber . . . or too small particle size."); *id.* at 1 ("One of the most common causes of acidosis occurs when switching from a high [*19] fiber to high concentrate diet that is rich in fermentable carbohydrates (starches and sugars)."); *see also* filing 106, Ex. 2 at 156:8-9 (testimony of Dr. Randall Pedersen in *Dodds v. Farmland Industries, Inc.*) (explaining that bakery products "are very fine also"). Thus, I see no indication that Dorn's opinions fall outside the industry standards into the realm of "mere speculation and preference [that] are not grounded in the scientific method." Defendant's Brief at 7 (filing 96). [1] In short, I agree with the plaintiff that Dorn's opinion regarding the

grind of corn and the use of bakery products is a point subject to cross-examination, and not a basis for limiting Dorn's testimony on these topics. The defendant's motion will therefore be denied, to the extent that it seeks to prevent Dorn from testifying as to her opinions regarding the use of finely-ground corn and/or bakery products in dairy feed rations.

    1   The defendant's briefs will be referenced by the file number of the motion that the brief supports.

[*20]   2. *Opinion Regarding the Rations or Ration Advice Provided by Farmland*

The defendant also challenges Dorn's ability to offer any opinion as to the rations or ration advice provided by Farmland. According to the defendant, Dorn's deposition testimony reveals that she "possesses no information and holds no opinions regarding those rations." Defendant's Brief at 11 (filing 96). Thus, the defendant concludes, her "opinions" as to these issues "should be excluded because they are not 'based upon sufficient facts or data' as required by *Rule 702*." *Id.* at 13 (citations omitted). I disagree.

As an initial matter, I note that the defendant refers to several pages of Dorn's deposition transcript that are not included within the defendant's index of evidence. *Compare* Defendant's Brief at 13 (filing 96), *with* filing 97, Ex. B. Furthermore, although the properly-supported testimony demonstrates Dorn's lack of personal knowledge, at the time of her deposition, as to the content of the Farmland rations, this fact does not necessarily bar Dorn from offering her opinion as to the quality or appropriateness of Farmland's rations and ration advice. *See FED. R. EVID. 703* [*21] ("The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by *or made known to the expert at* or before *the hearing* . . . ." (emphasis supplied)); *see also Kemp v. Balboa, 23 F.3d 211, 213 (8th Cir. 1994)* (recognizing the distinction between a lay witness, "who may testify only about matters within his or her personal knowledge," and an expert witness, "who may give his or her opinion about a matter within the witness' expertise"). Dorn could testify as to the appropriateness of the rations based on her review of the ration sheets or any other reliable evidence presented at trial regarding the content of the rations. *See FED. R. EVID. 703*. Hypothetical inquiry would also appear to permit Dorn to offer her opinion as to this issue, based on

Case 2:05-cv-04182-SRD-JCW   Document 19485-1   Filed 12/18/09   Page 52 of 119

Page 7
2001 U.S. Dist. LEXIS 26084, *21

her prior education, training, and experience as a dairy nutritionist, as well as her observations regarding the plaintiff's herd health after she resumed her position as the plaintiff's nutritionist. *See, e.g., FED. R. EVID. 702* advisory committee's note ("The language 'facts or data' is [*22] broad enough to allow an expert to rely on hypothetical facts that are supported by the evidence." (citing *FED. R. EVID. 703* original advisory committee note)). Thus, the defendant's motion will be denied, to the extent that it seeks to preclude Dorn from testifying as to her opinions regarding the rations or ration advice provided by Farmland.

## C. *Dr. Randall Schawang*

The defendant also challenges the expert opinions offered by Dr. Randall Schawang, one of the plaintiff's veterinarians. In his report, Dr. Schawang states the following: "It is my opinion to a reasonable degree of veterinary certainty, that the difficulties experienced on the Jisa Farm, which caused production loss, death loss, calf loss and other financial damage, were a direct and proximate result of the Farmland rations and feedstuffs." Filing 99, Ex. A at 2. According to the defendant, "[t]he given bases for this opinion are so unsound and inadequate that the opinion should be rendered scientifically unreliable and excluded." Defendant's Brief at 5 (filing 98). In support of its claim, the defendant refers me to the transcript of Dr. Schawang's deposition, in which he indicated [*23] that he based the above-quoted opinion on the following: (1) the alleged occurrence of laminitis in the Jisa Farms' herd; (2) David Jisa's assertion that the Farmland rations consisted of up to 70% concentrate; and (3) mineral testing performed on the herd in 1998. *See* filing 99, Ex. B at 114:21-115:18, 115:23-116:8. After reviewing each of these three bases, the defendant concludes that Dr. Schawang's opinion is unreliable and must therefore be excluded. I disagree.

First, with respect to the appearance of laminitis in the plaintiff's herd, the defendant refers me to the following deposition testimony:

> Q. What is the normal level of laminitis in a dairy herd producing at the level that the Jisa herd produces?
>
> A. You had to put that qualifier in there, producing at that level. Otherwise, it would have been easy to answer. I don't know. They're the only herd I have

worked for at that level.

*Id.* at 88:12-19. The defendant characterizes the above testimony as an "admission" by Dr. Schawang that he was not familiar with the level of laminitis normally occurring in herds such as the plaintiff's. Thus, the defendant argues, if Dr. Schawang does not know the [*24] typical level of laminitis found in comparable herds, he has no basis for opining that the level he allegedly observed in the plaintiff's herd was in any way abnormal. This leads the defendant to conclude that Dr. Schawang's alleged observance of laminitis is an inadequate basis for supporting his opinion regarding the cause of the plaintiff's herd health difficulties. In addition, the defendant attacks Dr. Schawang's ability to testify as to the cause of the laminitis, noting that in the following deposition testimony, Dr. Schawang admitted that he could only *infer* the cause:

> Q. Did you determine the cause for the laminitis that you were-reflected in your records September 5, '97, and after?
>
> A. Did I determine the cause?
>
> Q. Yes.
>
> A. No. I can infer the cause.
>
> Q. And your inference would be acidosis, I assume?
>
> A. Yes.

*Id.* at 91:15-20. Thus, the defendant concludes, since "[Dr.] Schawang admits he never determined the cause of the alleged laminitis but, rather, simply inferred that acidosis was the source, his resulting opinion that the alleged laminitis was caused by Farmland feeds is unreliable and should be excluded." Defendant's [*25] Brief at 8 (filing 98). I disagree.

Despite the defendant's suggestion to the contrary, an expert witness is permitted to make inferences, so long as such inferences are based on sufficient "facts or data." *See FED. R. EVID 703.* It appears to me that Dr. Schawang, in inferring the cause of the laminitis he allegedly observed in the plaintiff's herd, satisfied this requirement. During his deposition, Dr. Schawang. explained that he reached his conclusion that acidosis was the cause by excluding other potential causes. *See* filing 106, Ex. 4 at 89:21-92:2. This method of reaching a

diagnoses is generally accepted within the medical community. *See, e.g., Turner v. Iowa Fire Equip. Co., 229 F.3d 1202, 1208 (8th Cir. 2000)* (recognizing "that a causation opinion based upon a proper differential diagnosis (one that systematically rules out other possible causes) satisfies *Daubert* . . ."); *Hose, 70 F.3d at 973* ("Indeed, ruling out alternative explanations for injuries is a valid medical method." (citation omitted)). Thus, I see no reason to exclude Dr. Schawang's opinion simply because he "inferred" the cause [*26] of the laminitis in the plaintiff's herd rather than "determining" it. *See* Defendant's Brief at 7-8 (filing 98). Nor am I convinced that Dr. Schawang's opinion should be excluded based on his "admission" that he is not familiar with the level of laminitis normally occurring in herds such as the plaintiff's. During his deposition, Dr. Schawang testified that based on his records, there was an increased *incidence* of laminitis in the Jisa Farms' herd during the time period from August to October 1997. *See* filing 106, Ex. 4 at 89:4-10, 100:25-101:3. The record indicates that Jisa Farms discontinued the Farmland feed rations in approximately September of 1997. *See* filing 82 at 2 (Memorandum and Order on Motion for Summary Judgment by Defendant Farmland Industries, Inc.). Thus, while Dr. Schawang may not be able to opine as to whether the *level* of laminitis in the Jisa Farms' herd was abnormal at one time after the herd began the Farmland rations, he can certainly testify as to the increased *incidence* of laminitis that seemed to correspond with the plaintiff's use of Farmland feeds. I therefore find that Dr. Schawang's testimony regarding the alleged appearance of [*27] laminitis in the Jisa Farms herd is not so "unsound and inadequate that the [causation] opinion should be rendered scientifically unreliable and excluded." *See* Defendant's Brief at 5 (filing 98).

The defendant also challenges Dr. Schawang's reliance on (1) blood tests that allegedly revealed a mineral imbalance in the Jisa Farms herd, and (2) statements by David Jisa that the Farmland rations contained up to 70% concentrate. According to the defendant, Dr. Schawang admitted during his deposition that (1) he did not know whether the Farmland rations themselves contained a mineral imbalance because he had not seen the rations on paper; (2) although there is a mineral imbalance in a single cow, this does not necessarily mean that the ration is improper; and (3) he could not determine whether the trace mineral problems detected in 1998 were the result of the Farmland feed rations. *See* filing 99, Ex. B at 74:20-76:3, 106:4-107:13.

In addition, the defendant also refers me to the affidavit of Dr. Robert M. Cook, who indicates that he reviewed the dairy nutrition rations prepared by Farmland for Jisa Farms and found that the highest concentrate level in any of the rations was 58%. [*28] *See* filing 99, Ex. C PP 3-4. Based on the evidence outlined above, I agree that there may be some foundational problems with Dr. Schawang's reliance on (1) the blood tests, and (2) David Jisa's statements regarding concentrate levels. If these were the *sole* bases for Dr. Schawang's opinion, I may be inclined to exclude his testimony as to causation. However, in both his report, and during his deposition, Dr. Schawang refers to other objective medical factors leading him to conclude that there were problems with the Farmland rations. *See* filing 99, Ex. A at 1 ("The Jisa herd was experiencing increasing death loss--for a period of time as many as two cows per week, as well as increasing rates of displaced abomasums, laminitis, loose stools, poor body condition, decreased milk production, and, in general, declining herd health."); *id.* at 2 ("The animals became restless and lethargic and began an array of difficult health symptoms including, as noted above, decreased milk production, rumen acidosis, laminitis and other feed difficulties, reproductive difficulties, and death."); filing 99, Ex. B at 119:13-18 ("Q: And you feel there was a problem with the rations because [*29] of the discussion with Mr. Jisa about 70 percent concentrate; is that right? A: Plus the fact that he had some significant problems, very significant problems with the cows during the period of time '97 and '98."). Thus, while the defendant may challenge Dr. Schawang during cross-examination regarding his reliance on the blood tests and David Jisa's statements, the foundational issues raised by the defendant do not require me to exclude the doctor's causation opinion altogether. *See Hose, 70 F.3d at 973-74* ("'As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination.' . . . Only if an expert's opinion is 'so fundamentally unsupported that it can offer no assistance to the jury' must such testimony be excluded." (citing *Loudermill v. Dow Chem. Co., 863 F.2d 566, 570 (8th Cir. 1988)*; FED. R. EVID. 703)); *see also Daubert, 509 U.S. at 596* (recognizing that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction [*30] on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence" (citing *Rock v. Arkansas, 483 U.S. 44, 61, 107 S. Ct. 2704, 97 L. Ed. 2d 37 (1987)*)). For the

same reason, I find that the defendant's remaining challenges as to the sufficiency of the factual basis for Dr. Schawang's opinion must also fail. *See* Defendant's Brief at 14 (filing 98) (noting that "Schawang admits he does not know whether the Farmland rations were inappropriate, and that the alleged problems experienced by [the] plaintiff's herd could have been caused by non-Farmland rations"); *id.* at 15 (arguing that "Schawang's reliance on the findings of an outside dairy specialist as a basis for his opinion is misplaced as the findings of that dairy specialist contradict Schawang's opinion").

Finally, the defendant argues that Dr. Schawang's causation opinion must be excluded because, by his own admission, Dr. Schawang failed to rule out other possible causes for the alleged herd health problems. In support of its claim, the defendant refers me to the following excerpt from Dr. Schawang's deposition:

> Q. And you go on to say there that you, "Ruled out every other possibility [*31] for these difficulties." Is that true? I mean, did you rule out all other possibilities for the DAs in November of '97 to February of '98? Did you rule out all possibilities as to the sluggishness that you don't know when it occurred and did you rule out all possibilities as to the laminitis in September of '97?

> A. Did I rule out all of the possibilities?

> Q. For those difficulties that you said existed.

> A. I guess we did not rule out *every other possibility.*

Filing 99, Ex. B at 105:15-106:3 (emphasis supplied). Thus, the defendant argues that since Dr. Schawang failed to address and negate all other possible causes for the herd health conditions he allegedly observed, his opinion that such conditions were caused by Farmland rations must be excluded. I disagree.

In his report, Dr. Schawang alludes to potential alternative causes for the plaintiff's herd health difficulties, including facility deficiencies, poor management practices, stray voltage, vaccination problems, and genetics. *See* filing 99, Ex. A. Dr. Schawang also refers to the steps he and Dr. Pedersen took to negate these potential alternative causes, including an examination of the plaintiff's [*32] facilities, and a review of David Jisa's management practices, vaccination program, and reproductive program. In addition, Dr Schawang notes that he and Dr. Pedersen "performed . . . liver biopsies [and] checked selenium levels and vitamin E levels . . . ." *Id.* at 2. Thus, it does appear that Dr. Schawang considered and ruled out alternative causes for the plaintiff's herd health problems. Furthermore, despite the defendant's suggestion to the contrary, Dr. Schawang's "admission" that he "did not rule out *every* other possibility," does not necessarily render his opinion as to causation inadmissible. Filing 99, Ex. B at 106:2-3 (emphasis supplied); *see, e.g., Daubert, 509 U.S. at 590* ("[I]t would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty; arguably, there are no certainties in science."); *Sorensen v. Shaklee Corp., 31 F.3d 638, 650 (8th Cir. 1994)* ("*Daubert* does not require proof with certainty."); *Jahn v. Equine Servs., PSC, 233 F.3d 382, 390 (6th Cir. 2000)* ("In order to be admissible on the issue of causation, an expert's testimony need not eliminate all other [*33] possible causes of the injury." (citation omitted)); *Ambrosini v. Labarraque, 322 U.S. App. D.C. 19, 101 F.3d 129, 140 (D.C. Cir. 1996), cert. dismissed, 520 U.S. 1205, 117 S. Ct. 1572, 137 L. Ed. 2d 716 (1997)* ("The fact that several possible causes might remain 'uneliminated' . . . only goes to the accuracy of the conclusion, not the soundness of the methodology." (citation omitted)); *Viterbo v. Dow Chem. Co., 826 F.2d 420, 424 (5th Cir. 1987)* ("We do not hold, of course, that admissibility of an expert opinion depends upon the expert disproving or discrediting every possible cause other than the one espoused by him."); *Lakie v. Smith-Kline Beecham, 965 F. Supp. 49, 57 (D.D.C. 1997)* ("The differential diagnosis methodology, based on the scientific method, requires that alternate causes of the condition be eliminated. However, an expert must not eliminate each and every possible alternative cause."); *Turner, 229 F.3d at 1208* (agreeing that "a medical opinion about causation, based upon a proper differential diagnosis [one that systematically rules out other possible causes] is sufficiently reliable to satisfy *Daubert*"). Thus, the defendant's motion must [*34] fail, to the extent it is based on a claim that Dr. Schawang failed to exclude *all* possible alternative causes for the plaintiff's alleged herd health problems.

For the reasons outlined above, I find that there is a sufficient factual basis to support Dr. Schawang's opinion as to causation. The defendant's motion to exclude or to limit Dr. Schawang's testimony will therefore be denied.

### D. *Dr. Randall Pedersen*

The defendant also challenges the opinion as to causation offered by Dr. Randall Pedersen, another one of the plaintiff's veterinarians. In his report, Dr. Pedersen asserts the following:

> It is my opinion, to a reasonable degree of scientific certainty, that the Farmland ration formulation did cause damage to the Jisa dairy farm and, furthermore, Farmland knew of this dangerous ration and failed to warn the farmer, failed to disclose to the farmer that the ration had been found to be negligent and unreasonably dangerous as a matter of law and failed to protect the farmer from further harm.

Filing 101, Ex. A at 3. According to the defendant, this opinion must be excluded because (1) Dr. Pedersen is not qualified under *Rule 702* to opine that the plaintiff's [*35] alleged herd health problems were nutritionally based; (2) even if he is so qualified, Dr. Pedersen has insufficient information regarding the rations at issue on which to base his opinion; (3) contrary to the assertions included in Pedersen's report, the timing of the alleged herd health problems does not support his opinion; and (4) Dr. Pedersen's reliance on the testing done at Kansas State University College of Veterinary Medicine is misplaced, as such testing does not establish that it was the Farmland feeds that caused the maladies described in the University's report. In response, the plaintiff asserts that "Dr. Pedersen's testimony relies on principles well-known, and well-respected in the scientific community." Plaintiff's Brief at 3. After reviewing the submissions of both parties, I find that Dr. Pedersen's testimony will be limited.

As an initial matter, however, the defendant's first ground for exclusion must fail. According to the defendant, Dr. Pedersen is not qualified to opine as to whether a particular dairy ration is so nutritionally inadequate that it would cause herd health problems. The defendant argues that Dr. Pedersen "all but conceded this

point" during his [*36] deposition, where he admitted that he was not an expert in formulating or balancing nutritional rations for dairy cattle. *See* filing 101, Ex. B at 108:8-20; *see also id.* at 106:23-107:1, 108:21-109:10, 119:19-120:4, 176:2-7. Thus, the defendant concludes, "[g]iven [Dr.] Pedersen's complete lack of knowledge regarding ration formulation and nutritional requirements for dairy animals, he is not qualified to opine that the Farmland rations at issue were inadequate and led to herd health problems." Defendant's Brief at 8 (filing 100). I disagree.

In his report, Dr. Pedersen states that he has been a dairy consultant and veterinarian for the last twenty years. He also indicates that he has performed the herd health and reproductive work for the Jisa Farms herd "for a number of years." Filing 101, Ex. A at 1. Thus, I agree with the plaintiff that Dr. Pedersen has the requisite knowledge, skill, and experience to determine when medical conditions, such as chronic acidosis, are caused by nutritional imbalances in a particular diet. In short, I simply am not convinced that one must be an "expert" in formulating or balancing rations to make such diagnoses. *See, e.g.,* filing [*37] 106, Ex. 2 at 167:12 (Dr. Pedersen's testimony in *Dodds v. Farmland Industries, Inc.*) (stating that "I don't balance rations, but I certainly check rations"). Thus, the defendant's motion will be denied, to the extent it is based on a claim that Dr. Pedersen is not qualified to offer his opinion as to the cause of the plaintiff's alleged herd health problems.

Next, it seems to me that the defendant's second, third, and fourth grounds for exclusion, as listed above, may be considered together as foundational challenges. In his report, Dr. Pedersen indicates that he is basing his opinion regarding causation on the following: (1) the clinical signs he observed after the plaintiff had switched to the Farmland rations; (2) the testing performed by Kansas State University College of Veterinary Medicine, which apparently revealed that the plaintiff's herd was suffering from sub-acute rumen acidosis; and (3) Dr. Pedersen's involvement with other Nebraska dairy herds that had been exposed to the Farmland rations. *See* filing 101, Ex. A. In its motion, the defendant specifically challenges the first and second bases as insufficient to support Dr. Pedersen's opinion. After reviewing all [*38] three of the bases, I find that Dr. Pedersen's testimony must be limited.

First, there is no indication that Dr. Pedersen can

connect the clinical signs he observed to the Farmland feed rations. David Jisa, the owner of the plaintiff dairy, testified during his deposition that he believed Farmland ceased formulating rations for his dairy in mid-September of 1997. *See* filing 101, Ex. C at 74:24-75:7; *see also* filing 82 at 2 (Memorandum and Order on Motion for Summary Judgment by Defendant Farmland Industries, Inc.). Immediately thereafter, nutritionist Mike Bettle formulated the plaintiff's rations for approximately thirty to sixty days, at the end of which time Cecelia Dorn began formulating rations. *See* filing 101, Ex. C at 69:23-70:17. It appears that Dr. Pedersen's causation theory is based, in part, on an alleged temporal relationship between the feeding of the Farmland rations and the occurrence of several "difficulties," including (1) lameness and laminitis; (2) sudden death; (3) animals going down; (4) diarrhea or loose stools; (5) increased incidences of displaced abomasums; (6) reproductive difficulties; (7) cows bouncing on and off feed; (8) increased somatic [*39] cell counts; (9) cows eating sand; (10) abomasol ulcers; (11) increased culling; and (12) cows "not making it." *See* filing 101, Ex. A at 1-2. As the defendant correctly notes in its brief, however, Dr. Pedersen admitted during his deposition that he could not recall when *any* of the alleged conditions outlined above first appeared in the Jisa Farms' herd. *See* filing 101, Ex. B. at 175:18-21 (stating that he could not give "specific dates" as to when the problems surfaced with milk fever, laminitis, and acidosis); *id.* at 67:4-6 (stating that he "[did] not know" when the acute deaths occurred); *id.* at 68:19-20 (agreeing that he did not know when the plaintiff's cows started "going down"); *id.* at 142:4-8 (stating that he "[couldn't] put a date on" when the diarrhea/loose stool problem surfaced); *id.* at 75:3-5 (admitting that he did not know when the increased incidence of displaced abomasums occurred); *id.* at 86:10-24 (indicating that he could not "put a time" on when the plaintiff's reproductive difficulties first occurred); *id.* at 143:5-13 (agreeing that he could not pin point when the incidence of "bouncing on and off feed" began increasing); [*40] *id.* at 69:19-24 (admitting that there was actually no problem with the herd's somatic cell counts); *id.* at 144:5-13 (stating that he "[couldn't] give . . . a time" as to when certain animals were observed eating sand); *id.* at 81:23-25 (acknowledging that he did not know when abomasol ulcers began appearing in the plaintiff's herd); *id.* at 87:5-7 (indicating that he could not answer when the increased culling started); *id.* at 149:15-150:19 (admitting that the cows that "did not make it" were exposed to Farmland's rations, Mike

Bettle's rations, Cecelia Dorn's rations, and Doug Weich's 2 rations). More specifically, the defendant notes that Dr. Pedersen admittedly does not know whether any of these conditions surfaced before October 1997, while the Jisa Farms' herd was still on the Farmland feed rations. [3] *See id.* at 140:1-12; *see also id.* at 142:2-13 (referring specifically to the diarrhea/loose stool problem); *id.* at 86:10-15 (referring specifically to the decreased heat intensities). In terms of timing, Dr. Pedersen could only state that the problems allegedly experienced by the plaintiff occurred *sometime* after Farmland rations were started. [*41] *See id.* at 140:7-9 ("[T]he only thing I can say is most of these [difficulties] would have started after Farmland started in."). Thus, while Dr. Pedersen's alleged clinical observations may justifiably lead him to conclude that a nutritional imbalance was the cause of the plaintiff's herd health difficulties, there is no indication that Dr. Pedersen made any effort whatsoever to exclude alternative sources of this imbalance. In short, Dr. Pedersen simply has not explained why he attributes his finding of a nutritional imbalance to the Farmland rations, and not to the rations prepared by either Mike Bettle or Cecelia Dorn. *See, e.g., General Elec. Co., 522 U.S. at 146* ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." (citation omitted)); *Hose, 70 F.3d at 973* ("In determining the cause of a person's injuries, it is relevant that other possible sources of his injuries, argued for by defense [*42] counsel, have been ruled out by his treating physicians. Indeed, ruling out alternative explanations for injuries is a valid medical method." (citation omitted)); *Thurman v. Missouri Gas Energy, 107 F. Supp. 2d 1046, 1050 (W.D. Mo. 2000)* (recognizing that "only if [the] expert utterly fails to consider alternative causes or fails to explain why the opinion remains sound in light of alternative causes is an expert's opinion unreliable for failure to account for all potential causes" (citing *Westberry v. Gummi AB, 178 F.3d 257, 265 (4th Cir. 1999), In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 764-65 (3rd Cir. 1994)*)); *id.* at 1059 ("[The expert's] conclusion was reached without eliminating other causes. The opinion will not meet the *Daubert/Kumho* test for reliability since the expert did not provide the Court with a suitable explanation for how the opinion was arrived at."). I therefore agree with the defendant that Dr. Pedersen has not demonstrated a temporal relationship between the feeding of the

Farmland rations and the appearance of the alleged herd health problems. Accordingly, I find that this alleged temporal relationship [*43] does not sufficiently support Dr. Pedersen's opinion as to causation.

2   Doug Weich was the plaintiff's nutritionist for approximately eighteen months before the plaintiff switched to Farmland feeds in the fall of 1996. *See* filing 103, Ex. A. In April of 1999, Weich returned to Jisa Farms and, along with Cecelia Dorn, continues to provide the plaintiff with nutritional services. *See id.;* filing 103, Ex. D at 30:25-31:03.

3   The plaintiff has not suggested that additional evidence submitted at trial will enable Dr. Pedersen to connect the clinical signs he allegedly observed to the Farmland rations. *See, e.g., infra* Part II.E; *see also* FED. R. EVID. 703 (permitting experts to base their opinions on "facts or data . . . perceived by or made known to the expert at or before the hearing").

The defendant also challenges Dr. Pedersen's reliance on the testing performed by the Kansas State University College of Veterinary Medicine (hereinafter University). In his [*44] report, Dr. Pedersen indicates that he and Dr. Schawang sent four live cows to the University "to be killed and autopsied." *See* filing 101, Ex. A at 2. According to Dr. Pedersen, the University concluded that the animals were suffering from sub-acute rumen acidosis. *Id.* Dr. Pedersen asserts that "[t]he primary causal factor for this condition is ration that is improperly balanced and causes diminished rumen function, lack of rumination, and ultimately rumen acidosis." *Id.* In challenging Dr. Pedersen's reliance on the University testing, which was conducted almost two years after Farmland stopped providing the plaintiff's rations, the defendant asserts that the results simply do not support Dr. Pedersen's opinion that the Farmland rations caused the alleged nutritional imbalance and resulting acidosis. I agree with the defendant.

Apparently, the University testing revealed an old abomasal ulcer, renal infarcts, pulmonary thrombosis, myocarditis, fatty liver, and chronic laminitis. *See* filing 101, Ex. B at 47:10-14, 53:9-14, 54:15-20. As the defendant notes, however, Dr. Pedersen admitted during his deposition that there was no way to tie these alleged conditions to [*45] the Farmland feed. *See id.* at 45:20-22 (agreeing that the four cows were sent to the University for testing in June or July of 1999); *id.* at 48:25-49:3 (agreeing that there was no way he knew of to tie the abomasal ulcer that appeared in July of 1999 to the Farmland feed); *id.* at 50:16-21 (acknowledging that there was no way to tie the renal infarct to the Farmland feed); *id.* at 51:4-8, 51:17-52:4 (admitting that there was no way to tie the pulmonary thrombosis to the Farmland feed); *id.* at 52:17-19 (acknowledging that there was no way to tie the myocarditis to the Farmland feed); *id.* at 53:19-25 (agreeing that there was no way to tie the abscesses, renal infarcts, or fatty liver to the Farmland feed); *id.* at 54:18-55:2 (admitting that there was no way to tie the chronic laminitis diagnosis to the Farmland feed). Thus, here again Dr. Pedersen has failed to explain why he attributes the University's findings to the Farmland rations, and not to the rations supplied by either Mike Bettle or Cecelia Dorn. Furthermore, as demonstrated by the following excerpt from his deposition, Dr. Pedersen can opine only in terms of "possibilities" with respect to the connection [*46] between the University's findings and the Farmland rations:

Q. Doctor, we talked about, earlier when we reviewed the case, Exhibits 3, 4 and 5, certain diagnoses that were made at [the University] on some animals that had been submitted to them for evaluation. Specifically we talked about abomasal insult, renal infarcts and interstitial myocarditis. Do you recall giving testimony about those?

A. Yes.

Q. And isn't it true that each of those three episodes could have been caused by the Farmland ration which you've testified about as being improper?

. . . .

A. *It's possible.*

*Id.* at 170:24-171:13 (objection omitted) (emphasis supplied). However, as the defendant notes in its brief, "'[m]ere possibilities or conjecture cannot establish a probability.'" *Thomas v. FAG Bearings Corp., 846 F. Supp. 1382, 1394 (W.D. Mo. 1994)* (citing *Renaud v. Martin Marietta Corp., 749 F. Supp. 1545, 1553 (D. Colo.1990)*; *see also id.* ("It is central to the concept of

expert testimony that such testimony is only admissible if it speaks in terms of probabilities instead of possibilities." (citing *Lanza v. Poretti, 537 F. Supp. 777, 786 n.14 (E.D. Pa.1982))).* [*47] Thus, for the reasons outlined above, I agree with the defendant that the results of the University's 1999 testing do not sufficiently support Dr. Pedersen's causation theory.

Finally, it also appears that Dr. Pedersen is basing his causation opinion on his involvement "with a number of dairy herds across the State of Nebraska that were exposed to the *same* Farmland ration which inappropriately introduces a diet excessively high in concentrate as contrasted to effective fiber and causes this condition [*i.e.,* acidosis]." Filing 101, Ex. A at 3 (emphasis supplied). Although neither the defendant nor the plaintiff specifically address this basis in their respective briefs, the plaintiff has submitted a transcript of Dr. Pedersen's trial testimony in the *Dodds v. Farmland Industries, Inc.* case that seems to be relevant. *See* filing 106, Ex. 2. During the *Dodds* trial, Dr. Pedersen indicated that he examined the Farmland feed supplied to the Dodd herd and concluded that there were problems with the rations. *See id.* at 154:21-159:16, 162:23-164:2, 214:12-19. However, in this case, Dr. Pedersen admits that he did not examine either the rations themselves or the ration [*48] sheets formulated by Farmland for Jisa Farms. See filing 101, Ex. B. at 123:11-124:5; filing 106, Ex. 3 at 161:6-12. The only indication that Dr. Pedersen has any basis for equating the Farmland rations prepared for Jisa Farms with the "inappropriate" Farmland rations prepared for other Nebraska dairies is the following deposition excerpt, in which Dr. Pedersen said that he visited with a nutritionist, although he is not sure which one, who had seen both the Dodds and Jisa Farms rations:

Q. Where is it that the ration that Jisa fed to his animals was found to be negligent and unreasonably dangerous as a matter of law?

A. Comparing it to Randy Dodds' herd, it was a very similar ration.

Q. You haven't seen the rations in Jisa, have you?

A. The symptoms that we were seeing in the herd and it was-and visiting with Dave was similar-type ration.

Q. But you haven't seen the rations, have you?

A. No, I have not.

Q. You don't know whether they're similar or not, do you?

A. I know that they were similar.

Q. How do you know that?

A. Just visiting with the nutritionists.

Q. Which nutritionist?

A. Celia [sic] would be one.

Q. [*49] And would you disagree with Ms. Dorn's testimony that she has no recollection of the content of any ration Farmland fed to-fed to the Jisa herd?

A. I --

. . . .

A. No, I don't know

Q. Assuming her testimony was that she thought she had seen one ration at Jisa that Farmland had prepared but she couldn't remember what was in that ration, would it be your testimony that she has told you that the rations that Farmland prepared were-for Jisa were similar to the rations that you were talking about in the Dodds case?

. . . .

A. I thought it was possibly-I did talk to a nutritionist that had seen both rations. Whether it was Celia [sic] or not, I can't tell you.

Q. Who else would it have been?

A. There was another nutritionist. I'd have to check and see. I can't--but this went through the court. And I'd have to see who it was.

Filing 106, Ex. 3 at 161:1-162:17; *see also* filing 97, Ex. B at 9:1-10:21, 17:2-18:9 (indicating that Cecelia Dorn has "no personal knowledge" as to the content of the Farmland ration). This excerpt, however, does little to advance the plaintiff's cause. Dr. Pedersen's bare assertion that an unnamed nutritionist told [*50] him the Farmland and Dodd rations were similar is simply not enough to demonstrate that "a number of dairy herds across the State of Nebraska . . . were exposed to the *same* [inappropriate] Farmland ration . . . ." *See* filing 101, Ex. A at 3 (emphasis supplied); filing 101, Ex. B at 123:11-124:5. In short, although Dr. Pedersen implies in his report that he was able to compare the Farmland rations prepared for the plaintiff with the Farmland rations prepared for other Nebraska dairies, the record before me suggests otherwise. Finally, even if the plaintiff's herd was, indeed, exposed to the "same" rations that Farmland formulated for other Nebraska dairies, I am not persuaded that this fact--either alone or in conjunction with Dr. Pedersen's alleged observations and the results of the University's 1999 testing--provides a sufficient basis for Dr. Pedersen's causation opinion. I therefore find that Dr. Pedersen's experiences with other dairy herds in Nebraska exposed to "the same Farmland ration" do not sufficiently support his opinion as to causation.

Thus, for the reasons outlined above, I find that the Dr. Pedersen will be barred from testifying that the plaintiff's alleged [*51] herd health difficulties were caused by the Farmland feed rations. *See, e.g., Loudermill, 863 F.2d at 570* (providing that an expert's opinion may be excluded when it is "so fundamentally unsupported that it can offer no assistance to the jury"); *Thomas, 846 F. Supp. at 1394* (recognizing that "[a] factual basis may be so lacking for an opinion so as to render it scientifically unreliable"). Dr. Pedersen may testify as to general principles regarding dairy health. He may also testify regarding his experiences with the Jisa Farms' herd before its exposure to the Farmland feeds, his clinical observations after the herds' exposure to the Farmland feeds, his efforts to treat the animals, and his reasons for ruling out other, non-nutritional causes for the alleged difficulties. All are relevant to the case. In short, he will not be permitted to state his ultimate opinion that the alleged nutritional imbalances were caused by the Farmland feeds.

E. *Doug Weich*

Next, the defendant challenges the expert testimony of dairy nutritionist Doug Weich. Weich was the plaintiff's nutritionist for approximately eighteen months before the plaintiff switched to [*52] Farmland feeds in the fall of 1996. *See* filing 103, Ex. A. Weich returned to Jisa Farms in April of 1999 and apparently continues to provide the plaintiff with nutritional services. *See id.;* filing 103, Ex. D at 30:25-31:3. In his report, Weich states the following:

It is my opinion that the rations being utilized during the Farmland service compromised sound herd health.

. . . .

. . . [T]here is no doubt in my mind that the difficulties Jisa Farms was experiencing with previously described [symptoms of] [4] rumen acidosis and other deleterious health effects, were a direct and proximate result of the inappropriately balanced rations.

Filing 103, Ex. A at 1-2. It appears that Weich is basing the above opinions on the following: (1) observations he made at the plaintiff's dairy in April of 1999; (2) conversations with David Jisa regarding the level of non-fiber carbohydrates in the rations prepared by Farmland; (3) conversations with David Jisa regarding the July 1999 testing performed by the Kansas State University College of Veterinary Medicine (hereinafter University); [5] and (4) the results of a particle separation test performed by Cecelia Dorn. [6] According [*53] to the defendant, none of these bases, taken either individually or together, provides a sufficient foundation for Weich's conclusions. I disagree. [7]

4   During his deposition, Weich indicated that this phrase should have been added to his opinion. *See* filing 103, Ex. D at 116:16-22.
5   The results of this testing are described in Part II.D above.
6   In his report, Weich also explains that he excluded alternative, non-nutritional causes for the plaintiff's alleged herd health problems: "Their overall management, herd health, cropping practices, and heifer raising were appropriately managed. They had good products available in their equipment and facilities. Their equipment was in good shape [and] their milking process was

extremely well-organized . . . ." Filing 103, Ex. A at 2.

7   In doing so, however, I note that there appears to be foundational problems with some of the grounds on which Weich bases his opinion. For example, when questioned about his conversations with David Jisa regarding the July 1999 testing performed by the University, Weich admits that he does not know whether the University's diagnosis and findings could be tied to the Farmland feed. *See* filing 103, Ex. D at 70:6-23 (indicating that this was not a matter within his area of expertise). In addition, with respect to the particle separation test, Weich acknowledges that he does not know whether Dorn performed the test on the Farmland or the Bettle rations. Weich could only state that this test was done when Dorn first started with Jisa Farms in October of 1997. *See id.* at 97:10-16. Given Dorn's deposition testimony that she has no personal knowledge regarding the content of the Farmland rations, it seems likely that this test was conducted on the rations prepared by Bettle. *See* filing 97, Ex. B at 9:1-10:21, 17:2-18:9 (indicating that Dorn "was not on the [Jisa] farm when Farmland was there" and therefore had no "personal knowledge" with respect to the contents of the rations). Thus, neither of these two bases, alone or together, appears to provide a sufficient foundation for Weich's opinion regarding the cause of the plaintiff's alleged herd health problems.

[*54] In supporting his opinions, Weich refers to, *inter alia,* the herd health conditions he observed upon returning to Jisa Farms in April of 1999. [8] *See id.* Weich asserts that these conditions included abscessed and swollen hoof pads and joints, a decline in overall body condition and hair coats, reproductive difficulty, reduced milk production potential, oscillating dry matter intakes, and a sensitivity to higher energy diets. As the defendant notes in its brief, however, Weich admitted during his deposition that the conditions he observed could have surfaced at any time after he left the plaintiff's dairy in the fall of 1996. *See* filing 103, Ex. D at 105:6-22 (referring to the abscessed and swollen hoof pads and joints); 105:23-106:24 (referring to the decline in overall body condition and hair coats); 106:25-107:22, 112:21-113:05 (referring to reproductive difficulty and reduced milk production potential); 113:06-25 (referring

to oscillating dry matter intakes); 121:14-122:4 (referring to the sensitivity to high energy diets). Weich also acknowledged that because he had not reviewed any of the rations formulated by Farmland, Bettle, or Dorn, and, therefore, did not know [*55] the content of such rations, he could not connect the symptoms he observed in April of 1999 to the Farmland rations utilized by the plaintiff in 1996 and 1997. *See id.* at 78:2-8, 111:13-112:20, 113:21-25, 121:14-122:4. Thus, the defendant concludes, Weich's observations do not support his opinion that the plaintiff's alleged herd health difficulties were caused by the Farmland rations. I disagree.

8   During his deposition, Weich explained that he observed "a certain series of cows upon [his] first visits" to Jisa Farms. Filing 103, Ex. D at 75:23-25. According to Weich:

[T]he bases of my opinions were that I was present as a nutritionist in '96. I was able to see many of these animals in this series. There were certain rations that were fed between the time that I was there and came back, and there were symptoms of ruminal acidosis and the effects, the lameness and the effects of acidosis.

*Id.* at 76:9-16.

In challenging Weich's observations, the defendant notes the following: (1) Weich admitted that he did not know the percent of cows from the referenced series that were present in the herd both in 1996 when he left and in April of 1999 when he returned, and (2) Weich acknowledged that he is not sure whether additional cows were added to those series after he left the dairy in 1996. *See id.* at 50:5-9, 104:15-20, 49:21-50:4. Thus, the defendant argues that "since Weich may not have observed a number of these cows prior to his leaving plaintiff's dairy in 1996, and since he does not know the number of cows remaining from 1996 and in the herd in April of 1999, his observational premise is fatally flawed." Defendant's Brief at 12 n.3 (filing 102). I disagree. During his deposition, Weich indicated on more than one occasion that the "DHIA records" would confirm the percentage of cattle

that were a part of the plaintiff's herd both in the fall 1996, when he left Jisa Farms, and April of 1999, when he returned to Jisa Farms. Filing 103, Ex. D at 50:10-13, 104:15-18. I therefore am not persuaded that Weich's observational premise is rendered "fatally flawed" by his inability to speak in terms of percentages at the time of his deposition.

[*56] During his deposition, Weich suggested that if he were afforded an opportunity to review those rations utilized by the plaintiff from the fall of 1996 to April of 1999, he could, indeed, tie the symptoms he observed to the Farmland feed. *See id.* at 77:18-24 ("If I was able to see the diets to demonstrate the high level of nonstructural carbohydrate, I am certain we could tie [the symptoms to the Farmland feed]"); 112:2-6 ("But it's a matter of when you look at the diets prepared by Cecilia [sic] Dorn and Bettle[,] I can't speak [as to these] because I haven't seen them, I think there is a high correlation between the incidence of the low rumen Ph and what was being fed by Farmland."). In its brief, the plaintiff indicates that "feed tests" as well as "testimony from other witnesses who did see the forages" are available. *See* Plaintiff's Brief at 15. Noting that *Rule 703* permits expert witnesses to base their opinions on "facts or data" presented at trial, the plaintiff is apparently arguing that this additional evidence will enable Weich to connect his observations to the Farmland feed, thus providing a sufficient foundation to support his opinion regarding the cause [*57] of the plaintiff's alleged herd health problems. *See id.* I am inclined to agree. It appears that Weich's knowledge, experience, and education would allow him to base his causation opinion on a review of the feed tests, witness testimony, ration sheets, or any other reliable evidence presented at trial regarding the content of the Farmland, Bettle, and/or Dorn rations. Such evidence, if received at the trial, may very well provide the necessary "link" between the Farmland rations and the conditions Weich observed in April of 1999. Thus, given the plaintiff's assertions, I am hesitant to limit Weich's testimony as to the cause of the plaintiff's herd health problems. At this point, Weich's opinion simply does not appear to be "so fundamentally unsupported that it can offer no assistance to the jury." *See Loudermill, 863 F.2d at 570*. The defendant's motion will therefore be denied.

F. *Dr. Wallace Wass*

Finally, the defendant challenges several opinions contained in the report of Dr. Wallace Wass, a consulting veterinarian retained by the plaintiff. In this report, Dr. Wass opines, *inter alia,* that "[t]he Farmland rations, as furnished to Jisa Farms, [were] [*58] deficient, inappropriate, and contrary to the standard of care to which persons formulating dairy rations for dairy animals are held." Filing 105, Ex. A P 1(c). In challenging this opinion, the defendant first attacks Dr. Wass' qualifications. Noting that Dr. Wass has repeatedly confessed, during his deposition in this case and other cases involving Farmland feeds, that he is not a dairy nutritionist, the defendant contends that Dr. Wass "is not qualified under *Rule 702* to give an opinion that the rations at issue were 'deficient, inappropriate and contrary to the standard of care' of a nutritionist in the dairy industry." Defendant's Brief at 6 (filing 104); *see* filing 105, Ex. B at 92:14-16 (deposition in the present case); filing 105, Ex. C at 5:8, 5:23-6:2 (deposition in *Lazy H Farm, Inv. v. Farmland Industries, Inc.*); filing 105, Ex. D at 36:18-19 (deposition in *Racicky v. Farmland Industries, Inc.*). I disagree.

Dr. Wass' curriculum vitae indicates that he holds two advanced degrees and has published extensively in his field. *See* filing 106, Ex. 1 (curriculum vitae); *see also* filing 106, Ex. 1 at 29:19-30:5 (stating that he received a DVM degree and a PhD [*59] degree in medicine from the University of Minnesota). He also has over forty years of experience in private practice and academics. Thus, I agree with the plaintiff that Dr. Wass has the requisite knowledge, skill, experience, and education to testify as to the appropriateness of particular rations, as well as to the effect of inappropriate rations on the rumen. As was the case with Dr. Pedersen, I am simply not convinced that one must be an "expert" in formulating or balancing rations to offer such testimony. *See supra* Part II.D. Thus, the defendant's motion for exclusion must fail, to the extent it is based on Dr. Wass' alleged lack of qualifications.

The defendant also argues that even if Dr. Wass is qualified to offer his opinion regarding the appropriateness of the rations at issue, "the basis for [his] opinion is so lacking in substance that it should be excluded." Defendant's Brief at 6 (filing 104). In support of its claim, the defendant notes that during his deposition, Dr. Wass admitted that he had not reviewed any of the rations formulated by Farmland. *See* filing 105, Ex. B at 15:25-16:12, 16:16-17:1, 27:7-16, 95:4-11,

96:9-16. The defendant therefore concludes [*60] that since Dr. Wass conducted no analysis of the rations at issue, "[his] opinion that the Farmland rations were inappropriate and contrary to the dairy nutrition standard of care should be excluded . . . ." Defendant's Brief at 8 (filing 104). I disagree. As noted above, *Rule 703* permits experts to base their opinions on "facts or data . . . perceived by or made known to the expert at or before the hearing." *FED. R. EVID. 703*; *see also Kemp, 23 F.3d at 213* (recognizing the distinction between a lay witness, "who may testify only about matters within his or her personal knowledge," and an expert witness, "who may give his or her opinion about a matter within the witness' expertise")). Thus, Dr. Wass may base his opinion regarding the appropriateness of the Farmland rations on his review of the reports provided by other experts retained by the plaintiff, his review of the plaintiff's DHI records, or his review of any other reliable evidence presented at trial relating to (1) the alleged decline of the plaintiff's herd health, and (2) the content of the rations prepared by the plaintiff's nutritionists. *See* filing 105, Ex. A P [*61] 2 (indicating that Dr. Wass based his opinion on, *inter alia,* the reports rendered by the plaintiff's other experts and the plaintiff's DHI records). I therefore am not persuaded that Dr. Wass' failure to examine the rations prepared by Farmland necessarily bars him from offering his opinion as to the appropriateness of such rations. [9] Accordingly, the defendant's motion to exclude will be denied, to the extent it is based on a claim that Dr. Wass has not reviewed the Farmland rations.

9      In challenging Dr. Wass' opinion, the defendant also refers to the following excerpt from his deposition:

Q. And Exhibit No. 20, is that a ration?

A. Summary of suggested rations. That's what that is.

Q. All right. And you don't know when it was fed or for how long it was fed or if it was even fed?

A. No, I don't intend to testify on that because you have two other nutritionists who will testify on it.

Filing 105, Ex. B at 95:4-11. The defendant

apparently characterizes the above passage as an "admission" by Dr. Wass that he has no opinions regarding the rations. *See* Defendant's Brief at 8 (filing 104) ("[Dr. Wass] states that he does not intend to testify regarding the rations because two other nutritionists will testify on behalf of plaintiff."). I disagree. It appears to me that Dr. Wass is simply acknowledging that other persons involved in the plaintiff's case will be able to pinpoint the time frame during which the plaintiff utilized Farmland feeds.

[*62] Next, the defendant challenges Dr. Wass' opinion regarding Farmland's use of "excessive" grain. According to Dr. Wass, "[t]he Farmland ration advice was inappropriate in that it provide[d] for: (i) [e]xcessive grain in the ration of the dairy cows." Filing 105, Ex A P 1(d)(i). Noting that Dr. Wass admitted during his deposition that he did not know the amount of grain used in the Farmland rations or the percentage of grain used compared to the percentage of forage used, the defendant contends that this opinion should be excluded as baseless. *See* filing 105, Ex. B at 107:22-108:16. I disagree.

During his deposition, Dr. Wass indicated that he was basing his opinion regarding Farmland's "excessive" use of grain "primarily on what [he was] told by the farmer [David Jisa] and the herdsman [Terry Doneff] about the ration and what was happening to the cows." *Id.* at 108:4-7. If this were the only basis available for Dr. Wass' opinion, I may be inclined to exclude it. *See, e.g., In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 762 (3rd Cir. 1994), cert. denied, 513 U.S. 1190, 115 S. Ct. 1253, 131 L. Ed. 2d 134 (1995)* ("We do not doubt the propriety of a medical report prepared [*63] just for litigation purposes, but a physician who evaluates a patient in preparation for litigation should seek more than a patient's self-report of symptoms or illness and hence should either examine the patient or review the patient's medical records simply in order to determine that a patient is ill and what illness the patient has contracted."); *In re Agent Orange Prod. Liab. Litig., 611 F. Supp. 1223, 1247 (D.C.N.Y. 1985), aff'd, 818 F.2d 187 (2nd Cir. 1987), and cert. denied, 487 U.S. 1234, 108 S. Ct. 2898, 101 L. Ed. 2d 932 (1988)* (concluding that a consulting physician's source of information was unreliable where "the usual inducement to candor with a physician--the hope of successful treatment or diagnosis--was wholly lacking," and, instead, the plaintiffs "had every incentive to be overinclusive in describing their symptoms . . .").

As discussed above, however, Dr. Wass indicates that he also relied on, *inter alia,* the reports of the plaintiff's other experts in forming his opinions. *See* filing 105, Ex. B P 2(c). Dr. Schawang's report, in particular, would appear to aid the plaintiff in demonstrating a sufficient foundation for Dr. Wass' opinion. Dr. [*64] Schawang's observations relating to the decline in the plaintiff's herd health, which appeared to correspond with the plaintiff's use of Farmland feed, combined with (1) Dr. Schawang's reported efforts to exclude alternative causes for the plaintiff's herd health problems, and (2) the statements by David Jisa and Terry Doneff to Dr. Wass regarding the content of the rations, appear to provide a sufficient minimum foundation for Dr. Wass to infer, based on his knowledge, experience, and education, that the plaintiff's difficulties were caused by a nutritional imbalance, such as the excessive use of grain and/or other concentrates. Thus, the defendant's motion will be denied, to the extent it is based on Dr. Wass' alleged lack of knowledge regarding the percentage of grain actually contained in the Farmland rations. [10]

> 10   In addition, I also note that although the parties have not submitted the actual ration formulations in connection with the motions at issue, there is evidence in the record that appears to provide additional support for Dr. Wass' opinion. During his deposition, Dr. Wass stated that as "a rule of thumb," the ratio of forage to concentrates in a dairy ration should be 50/50. *See* filing 105, Ex. B at 108:14-18. The defendant, in connection with its motion to exclude or, in the alternative, to limit the testimony of Dr. Randall Schawang, included the affidavit of Dr. Robert M. Cook, who apparently reviewed the Farmland rations prepared for the plaintiff. *See* filing 99, Ex. C P 3. Dr. Cook stated that "the highest concentrate level contained in the rations reviewed was 58%." *Id.* P 4. Thus, there does appear to be additional evidence that the level of concentrates in at least some of the Farmland rations was "excessive," based on Dr. Wass' "rule of thumb."

[*65] The defendant also challenges the following opinion regarding Farmland's alleged use of bakery products in its rations:

> The Farmland ration advice was inappropriate in that it provide[d] for:

> . . . .

> (ii) Use of bakery products. The quality, consistency and utility of these bakery products varies so significantly that they introduce substantial risks.

Filing 105, Ex. A P 1(d)(ii). In moving to exclude this opinion, the defendant refers me to the following passage from Dr. Wass' deposition:

> Q. If I understand what you're telling me, you don't have a problem in and of itself with bakery products being used in the ration?

> A. No, I don't, but some of the other experts that you're going to see quoted seem to be opposed to the use of those, primarily for the reason that they say you don't know what's in there.

> Q. But let's talk about what Wally Wass thinks.

> A. Yeah, I think it should be okay to feed those to cows.

Filing 105, Ex. B at 110:4-13. The defendant characterizes the above passage as a "concession" by Dr. Wass "that the use of bakery products in a dairy ration is acceptable . . . ." Defendant's Brief at 10 (filing 104). Thus, [*66] the defendant concludes, "although [Dr.] Wass contends the rations were inappropriate in that they contained bakery products, his own testimony refutes that position." *Id.* at 11. I agree with the defendant. Dr. Wass' opinion and deposition are, indeed, contradictory. Thus, while I will permit Dr. Wass to testify as to the "risks" that may accompany the use of bakery products in dairy rations, he will not be permitted to testify that the inclusion of bakery products, in and of itself, rendered the Farmland rations inappropriate. Given Dr. Wass' deposition testimony, there is simply no basis for such an opinion.

Next, the defendant challenges the following opinion included in Dr. Wass' expert report:

> The feeds furnished to Jisa Farms were consistent with the nutritional recommendations, but were inappropriate

because the grains were ground too finely for use in dairy rations, and the ingredients delivered were not appropriate because they were not incorporated into a proper ration.

Filing 105, Ex. A P 1(e). While the defendant agrees with that portion of Dr. Wass' opinion stating that the rations were "consistent with the nutritional recommendations" of the dairy [*67] nutrition industry, it contends that "there exists no reasonable basis for the continuation of [Dr.] Wass' opinion that the rations were otherwise inappropriate." Defendant's Brief at 12 (filing 104). In challenging Dr. Wass' opinion, the defendant notes that during his deposition, Dr. Wass stated that, other than the alleged inclusion of bakery products and the alleged favoring of concentrate in the ration, the rations at issue were appropriate. *See* filing 105, Ex. B at 115:18-25. According to the defendant, however, Dr. Wass' opinion regarding the inclusion of bakery products and the favoring of concentrate over forage directly contradicts his testimony that he has no knowledge regarding these two aspects of the ration. *See* Defendant's Brief at 13 (filing 104). Thus, the defendant concludes, there is no basis for Dr. Wass' opinion, and it should be excluded. I agree with the defendant in part.

Dr. Wass will not be permitted to opine that Farmland's use of bakery products, in and of itself, rendered its rations "inappropriate." As discussed above, Dr. Wass conceded during his deposition that he believed "it should be okay" to include such products in dairy rations. *See* [*68] filing 105, Ex. B. at 110:4-13. With respect to Farmland's alleged favoring of concentrate in its rations, however, I have already concluded that a sufficient minimum foundation exists for Dr. Wass to infer, based on his knowledge, experience, and education, that the plaintiff's difficulties were caused by a nutritional imbalance, such as the excessive use of grain and/or other concentrates. [11] It seems to me that same may be said regarding Farmland's alleged use of grains that were ground too finely. [12] Thus, Dr. Wass may opine that Farmland's alleged favoring of concentrate in the rations and alleged use of finely-ground grain rendered its feeds "inappropriate."

11   *See supra* note 10 and accompanying text.

12   I also note that the defendant does not raise any specific argument for exclusion with respect to Dr. Wass' references, in P 1(d)(ii) an P 1(e) of

his report, to grain that was allegedly ground too finely.

The defendant also attempts to exclude the following opinion included in Dr. Wass' expert [*69] report:

As a proximate cause of the Jisa Farms dairy animals ingesting feeds formulated pursuant to the Farmland rations, virtually all animals in the lactating herd contracted rumen acidosis and were damaged.

Filing 105, Ex. A P 1(g). According to the defendant, the sole bases for Dr. Wass' conclusion regarding the number of animals allegedly affected by rumen acidosis are statements by David Jisa and his herdsman to the effect that "they continued to have problems with all of those cows." Filing 105, Ex. B at 120:10-11. [13] The defendant contends that such statements do not provide an adequate basis for Dr. Wass' opinion that "virtually all animals in the lactating herd" contracted rumen acidosis. The plaintiff, in opposing the defendant's motion, asserts that Dr. Wass also relied on the reports of the plaintiff's treating veterinarians in forming his opinion. A review of these reports reveals that Dr. Schawang observed symptoms of rumen acidosis with respect to the plaintiff's *entire* herd. *See* filing 99, Ex. A at 2 ("All the animals had visibly deteriorating body conditions during this period of time and their general appearance and demeanor was very poor. [*70] The animals became restless and lethargic and began an array of difficult health symptoms including, as noted above, decreased milk production, rumen acidosis, laminitis and other feed difficulties, reproductive difficulties, and death."). Thus, Dr. Schawang's observations, combined with the information supplied by David Jisa and his herdsman, [14] appear to provide a minimally sufficient basis for Dr. Wass' testimony regarding the number of animals allegedly afflicted by rumen acidosis. Accordingly, the defendant's motion will be denied, insofar as it seeks to exclude Dr. Wass' opinion that "virtually all animals in the lactating herd contracted rumen acidosis and were damaged."

13   The defendant does not appear to be challenging Dr. Wass' diagnosis, *i.e.,* rumen acidosis. Instead, the plaintiff seems to focus on Dr. Wass' conclusion regarding the *number* of animals allegedly afflicted by this condition. *See* Defendant's Brief at 14-16 (filing 104). Thus, I,

eNpjYGBg5ODwSMksSM7MzyvOT01PdM3MSTcxMjHTLU6tLElIzUspTUzO0c/NTHGsKi0uzTdy

2001 U.S. Dist. LEXIS 26084, *70

too, will focus my analysis on this aspect of Dr. Wass' opinion, and not on the diagnosis itself.

14   It seems to me that statements by an animal's owner regarding the animal's physical condition are, indeed, the type of information "reasonably relied upon" by consulting veterinarians in forming opinions. *See FED. R. EVID. 703.* As noted above, however, I am not convinced that such statements, alone, will provide a sufficient factual foundation for the consulting expert's opinion relating to the cause of the animal's condition. *See, e.g., In re Paoli R.R. Yard PCB Litig., 35 F.3d at 762* ("We do not doubt the propriety of a medical report prepared just for litigation purposes, but a physician who evaluates a patient in preparation for litigation should seek more than a patient's self report of symptoms or illness and hence should either examine the patient or review the patient's medical records simply in order to determine that a patient is ill and what illness the patient has contracted."); *In re Agent Orange Prod. Liab. Litig., 611 F. Supp. at 1247* (concluding that a consulting physician's source of information was unreliable where "the usual inducement to candor with a physician--the hope of successful treatment or diagnosis--was wholly lacking," and, instead, the plaintiffs "had every incentive to be overinclusive in describing their symptoms . . .").

[*71]   Finally, the defendant seeks to exclude the following opinion offered by Dr. Wass:

> All abnormal changes in milk production and herd health are reasonably believed to have been related to the adverse dairy rations. On May 1, 1997[,] eleven cows died in a single day. As a result of the history obtained from Mr. Jisa, it is *suspected* that these cows died from acute hypomagnesemia, a condition often referred to as "grass tetany", that occurs under sometimes bizarre circumstances. It is entirely *possible* that the existing subacute rumen acidosis played a significant role in the loss of these cows as well.

Filing 104; Ex. A P 1(i) (emphasis supplied). [15] According to the defendant, "[t]his opinion, stated in terms chosen by [Dr.] Wass himself, does not meet the required level of scientific reliability necessary for the proffering of an expert opinion." Defendant's Brief at 17 (filing 104). I agree with the defendant. In discussing the alleged incidence of acute hypomagnesemia and its potential cause, Dr. Wass speaks only in terms of "suspicions" and "possibilities." Such speculation simply does not satisfy *Rule 702*'s requirement that expert testimony be based [*72] on "sufficient facts or data." *FED. R. EVID. 702; see J.B. Hunt Transp., Inc., 243 F.3d at 444* ("'Expert testimony that is speculative is not competent proof and contributes nothing to a legally sufficient evidentiary basis.'" (citation omitted)); *Jaurequi, 173 F.3d at 1084* (affirming district court's exclusion of expert testimony where the expert "provided no basis for [the court] to believe that his opinions are anything more than unabashed speculation"); *Hose, 70 F.3d at 972* ("Reliability means the evidence must be based upon scientific knowledge, i.e., 'ground[ed] in the methods and procedures of science,' and must represent 'more than [a] subjective belief or [an] unsupported speculation.'" (citing *Daubert, 509 U.S. at 590*)); *Loudermill, 863 F.2d at 570* ("As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross- examination. . . . However, if an expert opinion is so fundamentally unsupported that it [*73] can offer no assistance to the jury, then the testimony should not be admitted." (citations omitted)). [16] In addition, Dr. Wass conceded during his deposition that his theory regarding the possibility of a connection between hypomagnesemia and rumen acidosis was not supported by any literature in his field. *See* filing 105, Ex. B at 26:21-23 ("I don't think there is any literature that would associate hypomagnesemia . . . with rumen acidosis . . . ."). Thus, for the reasons outlined above, Dr. Wass will not be permitted to testify as to the opinions contained in P 1 (i) of his report.

15   In a supplemental report, Dr. Wass indicates that the sudden deaths due to hypomagnesemia actually occurred in 1995, not in May of 1997 as he stated in his original report and during his deposition. *See* filing 105, Ex. G at 1. Thus, it does not appear that Dr. Wass continues to hold this opinion. Nevertheless, to avoid confusion, I will briefly address the arguments for exclusion raised in the defendant's brief.

In addition, the defendant attempts to strike Dr. Wass' supplemental report on the grounds that it (1) gives no opinion, (2) does not change any opinion set forth in his original report, and (3) is not the type of "expert report" as envisioned by *Rule 26*. *See* Defendant's Brief at 18-19 n.8 (filing 104). It appears to me, however, that this supplemental report explains the misunderstanding that led Dr. Wass to form the opinion found in P 1(i) of his original report, and, as a result, alters this opinion. Thus, I see no need to strike the supplement.

[*74]

16   As the defendant notes in its brief, the speculative nature of Dr. Wass' opinion is further demonstrated by his deposition testimony, in which Dr. Wass again limited his opinion to the "possibility" of a connection between the Farmland ration and the alleged incidences of acute hypomagnesemia:

> And apparently the cows developed acute hypomagnesemia, and I'm sure they had hypocalcemia at the time. We talked a little bit about that disease, and I think there was an initial tendency to think, well, that's something else and this problem may not be related to the Farmland ration, but the more I thought about it, I began to believe possibly it is.

Filing 105, Ex. B at 23:18-25.

IT IS ORDERED that:

1. the Defendant Farmland Industries, Inc.'s Motion to Exclude or, in the Alternative, to Limit the Testimony of Plaintiff's Purported Expert, Brad Wagner, filing 94, is granted;

2. the Defendant Farmland Industries, Inc.'s Motion to Limit the Testimony of --

Plaintiff's Purported Expert, Cecelia Dorn, filing 96, is denied;

3. the Defendant Farmland Industries, Inc.'s Motion [*75] to Exclude or, in the Alternative, to Limit the Testimony of Plaintiff's Purported Expert, Randall Schawang, filing 98, is denied;

4. the Defendant Farmland Industries, Inc.'s Motion to Exclude or, in the Alternative, to Limit the Testimony of Plaintiff's Purported Expert, Randall Pedersen, filing 100, is granted in part and denied in part; Dr. Pedersen will not be permitted to testify as to his opinion that the alleged nutritional imbalances in the plaintiff's herd were caused by the Farmland rations;

5. the Defendant Farmland Industries, Inc.'s Motion to Exclude or, in the Alternative, to Limit the Testimony of Plaintiff's Purported Expert, Doug Weich, filing 102, is denied;

6. the Defendant Farmland Industries, Inc.'s Motion to Limit the Testimony of Plaintiffs Purported Expert, Wallace Wass, filing 104, is granted in part and denied in part; Dr. Wass will not be permitted to testify to his opinion that the inclusion of bakery products, in and of itself, rendered the Farmland rations inappropriate, or to his opinion appearing in paragraph 1(i) of his report of December 2000 (otherwise undated).

Dated June 8, 2001.

BY THE COURT

Warren K. Urbom

United States [*76] Senior District Judge

# CASE #8



LEXSEE 2008 U.S. DIST. LEXIS 35316

**JOHN JOHNSON, ET. AL. VERSUS BIG LOTS STORES, INC.**

**CIVIL ACTION NO: 04-3201 c/w 05-6627 SECTION: R(1)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA**

*2008 U.S. Dist. LEXIS 35316; 76 Fed. R. Evid. Serv. (Callaghan) 372; 13 Wage & Hour Cas. 2d (BNA) 992*

**April 29, 2008, Decided**
**April 29, 2008, Filed**

**SUBSEQUENT HISTORY:** Motion granted by *Johnson v. Big Lots Stores, Inc., 251 F.R.D. 213, 2008 U.S. Dist. LEXIS 56983 (E.D. La., 2008)*

**COUNSEL:** [*1] For John Johnson, Robert Charles Burden, Patty Hecker, Paul Wagner, Plaintiffs: Philip Bohrer, LEAD ATTORNEY, Bohrer Law Firm, Baton Rouge, LA; John B. MacNeill, Kevin E. Gay, MacNeill & Buffington, PA, Flowood, MS; Michael A. Josephson, Fibich, Hampton & Leebron, LLP, Houston, TX; Michael Thomas Tusa, Jr., Peter Joseph Wanek, McCranie, Sistrunk (Metairie), Metairie, LA; Sam M. Brand, Jr., Sam M. Brand, Jr., Attorney at Law, Jackson, MS.

For Judy Vail, Johnathon Pride, Eulogio Salas Cruz, III, Ernestine J. Branch, Stephani Carole Stine, Plaintiffs: Michael Thomas Tusa, Jr., LEAD ATTORNEY, Peter Joseph Wanek, McCranie, Sistrunk (Metairie), Metairie, LA; Kevin E. Gay, MacNeill & Buffington, PA, Flowood, MS; Philip Bohrer, Bohrer Law Firm, Baton Rouge, LA.

For John Robert Scales, Mark Evan Richards, Jr, Plaintiffs: Philip Bohrer, LEAD ATTORNEY, Bohrer Law Firm, Baton Rouge, LA; Kevin E. Gay, MacNeill & Buffington, PA, Flowood, MS; Michael Thomas Tusa, Jr., Peter Joseph Wanek, McCranie, Sistrunk (Metairie), Metairie, LA.

For Joe Tarkington, Renee Christine Mohnen, Chad Morton, Plaintiffs: Philip Bohrer, LEAD ATTORNEY, Bohrer Law Firm, Baton Rouge, LA; Kevin E. Gay, MacNeill & Buffington, [*2] PA, Flowood, MS; Michael Thomas Tusa, Jr., McCranie, Sistrunk (Metairie), Metairie, LA.

For James O. Alford, III, 05-6627, Victor S. Allen, 05-6627, Frank Casale, 05-6627, Robert A. Charles, 05-6627, Hataciae D. Clark, 05-6627, Demetrius Dickerson, 05-6627, Barbara Johnson, 05-6627, Jarah Gail King, 05-6627, Rebekah Lee Walley, 05-6627, Cynthia K. Lawrence, 05-6627, Penny S. Mackey, 05-6627, Brian P. Matherne, 05-6627, Rita A. Miskimins, 05-6627, Veronica E. Mosley, 05-6627, Glenn W. Muhlheim, 05-6627, Christina Nelson, 05-6627, Carol J. Schneider, 05-6627, Victoria L. Slater, 05-6627, Sherry Suzann Walden, 05-6627, Daniel R. Williams, 05-6627, Ronald B. Wyatt, 05-6627, Hazel Ranee Kirkland, 05-6627, Lindy L. Blackwell, 05-6627, Lagina Yvette Allen, 05-6627, Julie D. Bricker, 05-6627, Gumecindo M. Casanova, 05-6627, Henrietta L. Tilton, 05-6627, Jose C. Chavez, 05-6627, Sonja Anita Kitchens, 05-6627, Consol Plaintiffs: Michael Thomas Tusa, Jr., LEAD ATTORNEY, Andre Jude Lagarde, McCranie, Sistrunk (Metairie), Metairie, LA; James C. Rather, Jr., McCranie, Sistrunk (Covington), Covington, LA; Kevin E. Gay, MacNeill & Buffington, PA, Flowood, MS; Philip Bohrer, Bohrer Law Firm, Baton Rouge, [*3] LA.

2008 U.S. Dist. LEXIS 35316, *3; 76 Fed. R. Evid. Serv. (Callaghan) 372;
13 Wage & Hour Cas. 2d (BNA) 992

For Jerry W. Laird, 05-6627, Bill L. Flint, 05-6627, Consol Plaintiffs: Michael Thomas Tusa, Jr., LEAD ATTORNEY, Andre Jude Lagarde, McCranie, Sistrunk (Metairie), Metairie, LA; Kevin E. Gay, MacNeill & Buffington, PA, Flowood, MS; Philip Bohrer, Bohrer Law Firm, Baton Rouge, LA.

For Big Lots Stores Inc, Defendant: Judy Y. Barrasso, LEAD ATTORNEY, Stephen H. Kupperman, Barrasso Usdin Kupperman Freeman & Sarver, LLC, New Orleans, LA; David A. Scott, Elizabeth K. Deardorff, Paul E. Hash, Rachel D. Ziolkowski, Jackson Lewis, LLP (Dallas), Dallas, TX; James E. Davidson, John P. Gilligan, John J. Krimm, Jr., John C. McDonald, Paul L. Bittner, Schottenstein Zox & Dunn Co., LPA, Columbus, OH.

For Big Lots Stores Inc, 05-6627, Consol Defendant: Judy Y. Barrasso, LEAD ATTORNEY, Stephen H. Kupperman, Barrasso Usdin Kupperman Freeman & Sarver, LLC, New Orleans, LA; James E. Davidson, John P. Gilligan, John J. Krimm, Jr., John C. McDonald, Paul L. Bittner, Schottenstein Zox & Dunn Co., LPA, Columbus, OH; Paul E. Hash, Rachel D. Ziolkowski, Jackson Lewis, LLP (Dallas), Dallas, TX.

**JUDGES:** SARAH S. VANCE, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** SARAH S. VANCE

**OPINION**

**ORDER AND REASONS**

Before the Court is defendant's motion [*4] to exclude the report and related testimony of plaintiffs' expert economist and statistician, Professor Gordon Rausser, and their expert witness on compliance with overtime exemption regulations under the Fair Labor Standards Act (FLSA), William Cutler. Also before the Court are plaintiffs' motions to exclude the report and related testimony of defendant's expert economist, Jonathan Walker, Ph. D., and defendant's FLSA compliance Expert, Dan Bremer. For the following reasons, the Court DENIES defendant's motion concerning Rausser and Cutler; DENIES plaintiffs' motion concerning Walker; and GRANTS plaintiffs' motion concerning Bremer.

**I. BACKGROUND**

This case involves claims of 936 former and current assistant store managers (ASMs) of defendant Big Lots Stores, Inc. for unpaid overtimes wages under the Fair Labor Standards Act (FLSA), *29 U.S.C. § 1001, et seq.* The Court certified this case as a collective action under § 16(b) of the FLSA, *29 U.S.C. § 216(b).* Plaintiffs contend that Big Lots has maintained a corporate policy and practice of misclassifying the ASM job position as an executive employee that is exempt from the maximum hour/overtime wage provisions of the FLSA. The facts and [*5] procedural posture of this case are well known to the parties and set forth in earlier orders of the Court. Accordingly, the Court turns to plaintiffs' and Big Lots' respective *Daubert* motions to exclude certain expert reports and related testimony.

**II. LEGAL STANDARD**

*Federal Rule of Evidence 702* gives the district court considerable discretion to admit or exclude expert testimony. *See General Electric Co. v. Joiner, 522 U.S. 136, 138-39, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997).* *Rule 702* provides that an expert witness "qualified . . . by knowledge, skill, experience, training or education," may testify when scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue. *Fed. R. Ev. 702.* For the testimony to be admissible, *Rule 702* requires that (1) the testimony be based on sufficient facts or data, (2) the testimony be the product of reliable principles and methods, and (3) the witness apply the principles and methods reliably to the facts of the case. *Fed. R. Ev. 702.*

In *Daubert v. Merrell Dow Pharmaceuticals,* the Supreme Court held that *Rule 702* requires the district court to act as a "gatekeeper" to ensure that "any and all scientific [*6] evidence admitted is not only relevant, but reliable." *509 U.S. 579, 589, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). See also Kumho Tire Co. v. Carmichael, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999)* (clarifying that *Daubert* gatekeeping function applies to all forms of expert testimony). The Court's gatekeeping function thus involves a two-part inquiry into reliability and relevance. First, the Court must determine whether the proffered expert testimony is reliable. The party offering the testimony bears the burden of establishing its reliability by a preponderance of the evidence. *See Moore v. Ashland Chemical Inc., 151 F.3d 269, 276 (5th Cir. 1998).* The reliability inquiry requires the Court to assess

whether the reasoning or methodology underlying the expert's testimony is valid. *See Daubert, 509 U.S. at 589*. The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation. *See id. at 590*. In assessing the reliability of an expert's methodology, the Court may consider several factors, including (1) whether the expert's theory or technique can be tested, that is, whether it is falsifiable; (2) whether the theory or technique has been subjected to peer review or publication; (3) the known or potential rate [*7] of error in any study and the existence and maintenance of standards to control the study's operation and minimize potential errors; and (4) whether the theory or technique used is generally accepted. *See id. at 593-94*.

Second, the Court must determine whether the expert's reasoning or methodology "fits" the facts of the case and whether it will thereby assist the trier of fact to understand the evidence, in other words, whether it is relevant. *See id. at 591*. *Federal Rule of Evidence 401* provides that evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

The Supreme Court has emphasized that a *Rule 702* inquiry is "flexible" and that the Court's focus "must be solely on principles and methodology, not on the conclusions that they generate." *Id. at 594-95*. As the Fifth Circuit has explained, the trial court's ruling should be supported by "adequately supported findings," *St. Martin v. Mobil Exploration & Producing U.S. Inc., 224 F.3d 402, 406 (5th Cir. 2000)*, but the court must not apply the reliability test so stringently as to "transform [*8] a *Daubert* hearing into a trial on the merits." *Pipitone v. Biomatrix, Inc., 288 F.3d 239, 250 (5th Cir. 2002)*. Further, *Federal Rule of Evidence 703* provides that expert opinions based on otherwise inadmissible hearsay are to be admitted only if the facts or data are "of a type reasonably relied upon by experts in the particular field forming opinions or inferences upon the subject." *Id. at 595*.

The Court also considers the parties' motions recognizing that this case involves a nonjury trial. In *Daubert,* the Supreme Court's overriding concern was with the problem of exposing the jury to confusing and unreliable expert testimony. *See Daubert, 509 U.S. at 595-97*. In the wake of *Daubert,* several courts have recognized that in the context of a bench trial, as is the case here, "the *Daubert* gatekeeping obligation is less pressing" because the gatekeeper and trier of fact are the same. *Volk v. United States, 57 F. Supp. 2d 888, 896 n.5 (N.D. Cal. 1999)*. *See also Seaboard Lumber Co. v. United States, 308 F.3d 1283, 1301-02 (Fed. Cir. 2002)* (explaining that in the context of a bench trial the *Daubert* standard must still be applied but the concerns about expert evidence misleading a jury "are [*9] of lesser import"); *Gibbs v. Gibbs, 210 F.3d 491, 500 (5th Cir. 2000)* ("Most of the safeguards provided for in *Daubert* are not as essential in a case such as this where a district judge sits as the trier of fact in place of a jury."); *Magistrini v. One Hour Martinizing Dry Cleaning, 180 F. Supp. 2d 584, 596 n.10 (D.N.J. 2002)* ("[W]here the court itself acts as the ultimate trier of fact at a bench trial, the Court's role as a gatekeeper is arguably less essential."); *Fierro v. Gomez, 865 F. Supp. 1387, 1395 n.7 (N.D. Cal. 1994), aff'd, 77 F.3d 301 (9th Cir. 1996), vacated and remanded on other grounds, 519 U.S. 918, 117 S. Ct. 285, 136 L. Ed. 2d 204 (1996), modified on other grounds on remand, 147 F.3d 1158 (9th Cir. 1998)* (concluding that, in the context of a nonjury trial, under *Daubert* it is better to "allow 'vigorous cross-examination, presentation of contrary evidence' and careful weighing of the burden of proof to test 'shaky but admissible evidence'" than to exclude expert evidence altogether (quoting *Daubert*)). And as Judge Posner has observed: "*Daubert* requires a binary choice -- admit or exclude -- and a judge in a bench trial should have discretion to admit questionable technical evidence, though of course [*10] he must not give it more weight than it deserves." *SmithKline Beecham Corp. v. Apotex Corp., 247 F. Supp. 2d 1011, 1042 (N.D. Ill. 2003)* (sitting by designation), *aff'd on other grounds, 403 F.3d 1331 (Fed. Cir. 2005)*.

## III. BIG LOTS' MOTION TO EXCLUDE DR. GORDON RAUSSER AND WILLIAM CUTLER

Plaintiffs seek to admit the opinion of Gordon Rausser, a chaired Professor of Economics at the University of California, Berkeley, and the survey data on which Rausser's opinion is based. With the assistance of William Cutler, who served as a Compliance Officer in the Wage and Hour Division of the U.S. Department of Labor for roughly three decades and now runs a private consulting firm that advises employers about how to comply with the FLSA, Rausser developed a four-page questionnaire that included seven sets of questions about the nature of Big Lots ASMs' job duties and experiences.

2008 U.S. Dist. LEXIS 35316, *10; 76 Fed. R. Evid. Serv. (Callaghan) 372;
13 Wage & Hour Cas. 2d (BNA) 992

Rausser mailed surveys to all 936 opt-in ASM plaintiffs and received responses from 558 individuals or 59.6 percent of those surveyed. Based on survey respondent's answers, Rausser concluded that the reported job duties of nearly all respondents failed to include all of the kinds of the activities that Labor Department [*11] regulations require in order for an employee to qualify as a bona fide executive employee exempt from the FLSA's overtime wage provision. (*See* Rausser Report Addendum at 3, 17.)

In addition to asking respondents to provide personal contact information and indicate at which Big Lots store location and during what time period they were employed as ASMs, the four-page survey covered seven topics about the respondents' job duties as ASMs. First, the survey asked respondents to indicate whether they regularly performed certain duties while employed as ASMs (*e.g.*, whether they hired or fired employees) and if so, whether they performed those duties without receiving directions and instructions. Second, it asked respondents whether they were consulted with respect to functions such as employee hiring, approving or creating advertising, and setting merchandise prices and if so to account for how much weight they believed that their supervisors accorded to their views on such functions. Third, respondents were asked to account for the percentage of time that they spent on various tasks (*e.g.*, training employees, manually stocking shelves, checking store inventory) and to ensure that the total [*12] time for all of their activities totaled 100 percent. Fourth, respondents were asked to indicate for a range of job activities whether they were the only Big Lots employees to perform such tasks or whether other employees also performed those functions. Fifth, the survey asked respondents to identify how many full-time and part-time employees they regularly supervised and whether they shared supervisory duties with co-workers. Sixth, the survey asked respondents to account for the approximate number of hours per week they worked during the holiday shopping season, a non-holiday week that involved inventory work, and a non-holiday, non-inventory workweek. Finally, the survey asked respondents to indicate how many weeks per year they spent working inventory. Respondents were then asked to sign and date their responses under penalty of perjury.

Rausser summarized the results of his survey as follows. Rausser derived the figures discussed below after calculating the mean, standard deviation, and 95 percent confidence interval for all responses, which is an accepted technique in statistical analysis. *See* Federal Judicial Center, *Reference Manual on Scientific Evidence* at 117-21, 242-44 (2d ed. 2000). [*13] On average, respondents indicated that they spent 79.3 percent of their time on "non-management activities," for example, stocking shelves or cleaning the store. (Rausser Report Addendum at 4, 6.) Approximately two-dozen respondents reported, however, that they spent a majority of their time on management activities. With respect to recommendations that respondents made to upper management personnel on such matters as hiring or promoting employees and setting rates of pay, responding ASMs believed that 36.8 percent of their recommendations were given some weight, a large amount of weight, or were almost always followed. (*See id.* at 4, 10.) Further, 28.5 percent of respondents reported that on a regular basis they supervised at least two full-time employees or their equivalent who were not supervised by someone else. (*See id.* at 4, 13.) And 52.4 percent of respondents reported that they could regularly and customarily hire or fire on an independent basis, or that their hiring and firing recommendations were given particular weight by upper management. (*See id.* at 5.) Based on the responses, Rausser concluded that only 3.6 percent of the 558 respondents (21 individuals) devoted more [*14] than 50 percent of their time to management duties, regularly and customarily supervised two or more employees who were not supervised by someone else, and regularly hired or fired employees without receiving direction from a higher authority or gave recommendations about hiring and firing that were accorded particular weight by upper management. (*See id.* at 3, 17.)

Plaintiffs also seek to introduce the report of Cutler, whom they proffer as an expert on compliance with FLSA exemption requirements. Relying on survey data gathered and compiled by Rausser, Cutler opines that survey respondents were misclassified as exempt executive employees.

Big Lots now moves to exclude the survey data and the reports and related testimony of both Rausser and Cutler. Big Lots contends that Rausser's conclusions are invalid and the methodology that he employed in surveying opt-in plaintiffs about their job experiences is unreliable because the survey responses are hearsay and the survey format was flawed. It also argues that the surveys and Rausser's opinion are irrelevant because they

concern the statements of only opt-in ASMs and not the broader group of ASMs who were eligible to opt into this lawsuit. [*15] Because Cutler's report was based on Rausser's research, Big Lots maintains that it, too, is unreliable and should be excluded.

The Court rejects Big Lots' contention that Rausser's survey is unreliable and irrelevant. Courts have long applied the basic *Daubert* standard to survey evidence: it is admissible at trial when there is a showing of reliability. The Fifth Circuit has instructed in the context of consumer confusion that surveys "are admissible, if they are pertinent to the inquiry, upon a showing that the poll is reliable and was compiled in accordance with accepted survey methods." *C.A. May Marine Supply Co. v. Brunswick Corp., 649 F.2d 1049, 1054 (5th Cir. 1981)* (internal citations omitted). *See also Baumholser v. Amax Coal Co., 630 F.2d 550, 552 (7th Cir. 1980)* (explaining that survey reliability is determined according to (1) whether the survey was "conducted in accordance with generally accepted scientific principles" and (2) whether "the results [were] used in a statistically correct manner"). The *May* court also indicated that technical inadequacies in a survey, such as the format of the question or the manner in which the survey was taken, do not affect admissibility, [*16] but rather bear on the weight that the factfinder, in this case the Court, should accord the data. *See id. at 1055 n.10.* In addition, under *Federal Rule of Evidence 703*, the surveys facts and data need not be independently admissible at trial for an expert to testify as to an opinion based on them, so long as the methodology is "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject."

In determining whether a survey was conducted in accordance with "accepted survey principles," most courts look to the Federal Judicial Center's *Reference Manual on Scientific Evidence,* which identifies several reliability factors, including: (1) the survey's purposes and design: Was it designed to address relevant questions?; (2) population definition and sampling: Was an appropriate population identified?; and (3) the survey questions and structure: Were the questions framed to be clear, precise, and unbiased? Were filter questions provided to reduce guessing? What limitations are associated with the mode of questioning? *See* Federal Judicial Center, *Reference Manual on Survey Research,* 229-76 (2d ed. 2000). [1]

1   The *Reference Manual* also identifies [*17] a fourth factor -- the adequacy of the training of survey interviewers -- that is not relevant here. Rausser conducted a mail survey, and the respondents did not have any contact with interviewers. No party raises any concerns about that adequacy of the training that Rausser's staff have in coding data. Accordingly, the Court does not examine this factor.

Big Lots' chief objection to the survey and Rausser's report is that they are based on inadmissible hearsay. Big Lots relies heavily on the Third Circuit's 1978 decision in *Pittsburgh Press Club v. United States, 579 F.2d 751,* in which the court excluded an expert report based on survey responses because of hearsay concerns. But the current Rules of Evidence allow the admission of opinions based on hearsay survey data. As noted, *supra, Rule 703* provides that "[i]f of a type reasonably relied upon by experts in the particular field in forming opinions or inferences based upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted." When *Rule 703* was proposed in 1972, the Advisory Committee observed that the rule "offers a more satisfactory basis for ruling upon the admissibility [*18] of public opinion poll evidence. Attention is directed to the validity of the techniques employed rather than to relatively fruitless inquiries whether hearsay is involved." *Fed. R. Ev. 703* advisory committee's note (1972). *Rule 703* was further amended in 2000 to provide that "[f]acts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value substantially outweighs their prejudicial effect." The Advisory Committee's Note explaining the significance of the 2000 amendment, clarifies that

> [w]hen information is reasonably relied upon by an expert and yet is admissible only for the purpose of assisting the jury in evaluating an expert's opinion, a trial court applying this Rule must consider the information's probative value in assisting the jury to weigh the expert's opinion on the on hand, and the risk of prejudice resulting from the jury's potential misuse of the information for substantive purposes on the other. The information may be disclosed to the jury, upon

2008 U.S. Dist. LEXIS 35316, *18; 76 Fed. R. Evid. Serv. (Callaghan) 372;
13 Wage & Hour Cas. 2d (BNA) 992

objection, only if the trial court finds that the probative value of the information in assisting the jury to [*19] evaluate the expert's opinion substantially outweighs its prejudicial effect.

. . .

The amendment governs only the disclosure to the jury of information that is reasonably relied on by an expert, when that information is not admissible for substantive purposes. It is not intended to affect the admissibility of an expert's testimony. Nor does the amendment prevent an expert from relying on information that is inadmissible for substantive purposes.

*Fed. R. Ev. 703* advisory committee's note (2000). It should also be noted that the rule and the advisory committee's notes focus on screening from the *jury.* Commentary upon which the Advisory Committee has relied has noted that "a court sitting without a jury will seldom hesitate to admit a survey in evidence," giving the survey and related report whatever weight they are worth. Hans Zeisel, *The Uniqueness of Survey Evidence,* 45 Cornell L.Q. 322, 339 (1960). Here, the survey is the foundation for Rausser's opinion. Because the Court finds that Rausser's survey methodology did not contain flaws that render his opinion inadmissible under *Daubert,* the survey data itself is admissible for the purpose of allowing the Court to evaluate Rausser's opinion. [*20] The probative value of the survey information in assisting the Court to evaluate Rausser's opinion substantially outweighs any possible prejudicial effect. Further the Court notes that other courts have accepted survey data of employees in employment discrimination cases. *See, e.g., E.E.O.C. v. Sears, Roebuck & Co., 628 F. Supp. 1264, 1308 (N.D. Ill. 1986), aff'd, 839 F.2d 302 (7th Cir. 1988); Stender v. Lucky Stores, Inc., 803 F. Supp. 259, 326 (N.D. Cal. 1992); Richardson v. Quik Trip Corp., 591 F. Supp. 1151, 1153 (S.D. Iowa 1984). See also Reference Manual* at 234.

First, Rausser's survey was designed to address multiple relevant issues in this case, including the ultimate issue of whether ASMs had job duties that qualified them as executive employees. Whether there is evidence of a trend of ASMs whose primary job duties

entail non-management activities goes to whether their job functions satisfy the criteria for exempt executives under regulations promulgated by the Department of Labor. As discussed, *supra,* the survey consists of several questions that pertain to respondents' job experiences and duties while employed as ASMs. Therefore, the survey is relevant for the purposes of [*21] this case. Although Big Lots has challenged the wording and content of particular questions, those objections are the stuff of cross-examination.

Second, Big Lots' contention that Rausser's opinion must be excluded because the survey population is fatally unrepresentative of ASMs is unavailing. Big Lots argues that the survey population is problematic because it consists entirely of ASMs who are opt-in plaintiffs and does not include ASMs who did not join this lawsuit as plaintiffs. The Court certified this matter as a collective action because the plaintiffs put forth strong evidence that they were similarly situated. Big Lots does not demonstrate that the group of over 900 opt-in ASMs is unrepresentative of the roughly 4,000 ASMs employed as a whole. No one suggests that the survey is flawed because it is skewed in terms of geography, race, gender, age, or amount of work experience. Other than its assertion of underinclusion, Big Lots offers nothing to show that the opt-in ASMs surveyed are systematically different from or unrepresentative of individuals employed as assistant managers. Big Lots' argument that the opt-in ASMs are unrepresentative is inconsistent with the position that [*22] it has taken throughout this litigation that all ASMs are subject to the same corporate policies, job descriptions, and have the same kinds of job duties. Big Lots points to nothing that suggests that the survey was skewed as to types of stores or that the ASMs who were surveyed had atypical job responsibilities or that the number of individuals surveyed is in some way inadequate. Big Lots has not introduced any survey evidence that shows ASMs who are not opt-in plaintiffs respond differently to Rausser's survey questions. Big Lots makes no attempt to measure how or the degree to which Rausser's survey results are flawed because of the survey pool's composition. Big Lots' criticism of the survey pool is also insufficient to exclude Rausser's opinion in light of Big Lots' refusal to allow plaintiffs access to non-opt-in ASMs before their expert reports were due and only afer a motion to compel was granted, and in light of its refusal to participate in a joint survey of opt-in and non-opt-in ASMs. It comes with ill grace for Big Lots to withhold access to the very people who,

according to Big Lots' argument, were necessary to a proper survey and then rely on the absence of data from [*23] those people as a basis for exclusion. Again, the composition of the survey population is a proper subject of cross-examination, but it does not render Rausser's opinion inadmissible.

Big Lots' related argument that the survey respondents were biased is also insufficient to exclude Rausser's report. Big Lots essentially argues that the survey respondents, because they are plaintiffs, had a self-interested motivation to lie about their work experiences or tailor their responses to support their claims of misclassification. But the respondents' potential bias does not render Rausser's survey technique invalid. As he points out in his declaration in response to Big Lots' motion, statistical experts frequently employ surveys in which respondents have a potential interest in the outcome of the survey. (*See* Rausser Decl. at 9 (citing numerous academic studies relying on surveys of potentially biased respondents).) Potential bias by the survey respondents may affect the ultimate weight that should be accorded to Rausser's opinion, but it does not render his study unreliable. Big Lots does not offer a statistical analysis of the degree or extent of the potential bias. Rather, Big Lots points [*24] to Kelly Foltz, who provided inconsistent statements in his survey response and deposition, as an example that the survey responses are untrustworthy. But that is the only instance of apparent false reporting that Big Lots provides. The respondents were required to sign the surveys under penalty of perjury. One instance of inconsistent responses does not mean that there was systematic fabrication or slanting of answers that would render the survey unreliable. One data point of inconsistency does not totally taint the entire survey, especially when the survey responses are largely consistent with other depositions. In addition, the degrees of variations in responses and descriptions of job experiences undermines the idea that the respondents answered the surveys in a lockstep, uniformly self-serving manner. For instance, according to Rausser, roughly a third of respondents reported that they independently hired and/or fired other employees. (*See* Rausser Report at 28.) Again, this potential bias is a fertile ground for cross-examination and may be the subject of contrary expert opinion and evidence, but it does not doom the admissibility of Rausser's testimony.

Further, Big Lots asserts [*25] that Rausser's survey is fatally flawed because it suffers from non-response

bias, a situation in which only persons with a self-interested motivation in a survey's results respond, whereas persons who stand to gain nothing from a survey do not respond. Rausser has furnished evidence suggesting that the survey does not suffer from non-response bias. Rausser has attempted to account for the possibility of non-response bias by employing the academically recognized technique of filtering out the survey responses of late-respondents -- persons whose surveys were received after the request deadline -- and comparing them to the responses of early or on-time respondents. There were 399 early or on-time respondents and 159 late respondents. Rausser's analysis shows that the types of answers do not differ significantly between the two groups of respondents. Big Lots offers nothing in the way of an alternative measurement or statistical analysis that shows the existence of non-response bias.

Nor does the Court find any fatal deficiency in the size of the survey population that Rausser used to conduct the survey or the response rate. Significantly, Rausser surveyed the *entire group* of opt-in ASMs. [*26] Of those surveyed, approximately 60 percent responded. Citing *United States v. Dentsply Int'l, Inc.,* 277 F. Supp. 2d 387, 437 (D. Del. 2003), Big Lots argues that when a survey response rate falls below 70 percent, then it is incumbent upon a survey proponent to prove the absence of a non-response bias. The *Reference Manual* provides a similar instruction and warns that survey responses with rates below 50 percent should be regarded with "significant caution" as a basis for precise quantitative conclusions about the whole. *Reference Manual* at 3040-43. As plaintiffs point out, however, the *Reference Manual* addresses the issue of non-response rates within sample populations that are smaller than the whole population about which the survey is designed to provide information. Here, Rausser mailed surveys to the *entire* group of opt-in plaintiffs, not a subset. He received responses from over 500 of the 936 persons surveyed. Rausser points out in his declaration offered in response to Big Lots' *Daubert* motion that the bright line rules in the *Reference Manual* do not apply to a survey, such as Rausser's, in which the entire population is surveyed. (*See* Rausser Decl. at 9-10.) In addition, [*27] Rausser points to academic articles finding that most mailed surveys that are deemed acceptable under professional standards exhibit a much lower response rate than the 59.6 percent response rate here. (*See* Rausser Decl. at 11 (citing L. Carley-Baxter, *et al., Changes in Response*

2008 U.S. Dist. LEXIS 35316, *27; 76 Fed. R. Evid. Serv. (Callaghan) 372;
13 Wage & Hour Cas. 2d (BNA) 992

*Rate Standards and reports of Response Rate over the Past Decade* (2005); D. Roe, Y. Baruch, and S. Twiddy, *Response Rate in Academic Studies -- A Comparative Analysis,* 424 *Human Relations* 421 (1999); D. Asch, K. Jedriziewski, and N. Christakis, *Response Rates to Mail Surveys Published in Medical Journals,* 50 Journal Of Clinical Epidemiology 1129 (1997).) One of the considerations for determining the admissibility of an expert opinion is whether the technique employed is generally accepted by other experts in the field. The plaintiffs have provided evidence that Rausser's technique is consistent with accepted methodology for survey research. Accordingly, Rausser's survey is sufficiently broad and the responses are sufficiently high to satisfy *Daubert.*

Third, the Court finds the questions that Rausser posed to respondents sufficiently clear, precise, and unbiased for his survey and report to survive Big Lots' [*28] *Daubert* motion. Big Lots argues that the survey asked respondents a range of questions about their job duties that Big Lots claims were not part of the consideration in determining the propriety of exemption status under the pre-2004 regulations. Big Lots also criticizes the survey's use of the term "regularly," questions about whether respondents hired or fired other employees as opposed to whether they had the authority to do so, and questions about the extent to which respondents supervised other employees. Such questions, Big Lots argues, are ambiguous and/or irrelevant to whether respondents had job duties that qualified them as exempt under administrative regulations. Potential flaws in the survey such as those are not grounds to exclude it altogether. They do present grounds, however, for vigorous cross-examination at trial. Courts have recognized that "slanted, leading, and ambiguous" survey questions pertain to the *weight* and not the admissibility of a survey, provided that the survey topic is relevant. *See, e.g., Harold Stores, Inc. v. Dillard Dep't Stores, Inc., 82 F.3d 1533, 1546 n.9 (10th Cir. 1996)* (citing *Brunswick Corp. v. Spring Reel Co., 832 F.2d 513, 522 (10th Cir. 1987)*; [*29] *Harolds Stores, 82 F.3d at 1544* ("Technical and methodological deficiencies in the survey, including the sufficiency of the universe sampled, bear on the weight of the evidence, not the survey's admissibility."); *Keith v. Volpe, 858 F.2d 467, 480 (9th Cir. 1988)*; *Jellibeans, Inc. v. Skating Clubs of Georgia, Inc., 716 F.2d 833, 844-45 n.24 (11th cir. 1983).*

Big Lots argues that the survey is inadequate because

it does not take into account concurrent responsibilities. Big Lots is correct that Rausser's survey fails to account for this in a direct way. But that does not render the survey inadmissible; it goes to how much weight the Court should accord Rausser's findings. To the extent that the concept of concurrent duties, in which an employee fulfills management duties while not working exclusively on a management activity, such as by training employees by showing them an efficient way to stock shelves, is important to determining exempt status, the Court will take that into account in weighing the value of Rausser's testimony. And Big Lots may develop that criticism through cross-examination and its own questioning of witnesses.

The Court finds that plaintiffs have met their burden [*30] in establishing the reliability of Rausser's research and survey findings under *Daubert.* Further, because Big Lots' arguments concerning the reliability of Cutler's report are dependent upon a finding that Rausser's report is unreliable, the Court's finding with respect to Rausser's survey renders Big Lots' arguments about Cutler without merit. None of this is to say that Rausser's survey and his opinions are without their flaws. Nor is it necessarily the case that Rausser's survey establishes that Big Lots maintained a corporate policy of misclassification. As the Court noted repeatedly here, Big Lots can attack Rausser's conclusions through "[v]igorous cross-examination [and] presentation of contrary evidence." *Daubert, 509 U.S. at 596.*

## IV.  PLAINTIFFS'  MOTION  TO  EXCLUDE JONATHAN WALKER

Big Lots seeks to introduce the opinion and report of Jonathan L. Walker, who holds a Ph. D. in Economics from the Massachusetts Institute of Technology and currently runs a national economic consulting firm. Walker's report covers three topics: (1) whether Big Lots had a profit motive to avoid paying assistant managers overtime wages and therefore willfully misclassified the ASM position as an exempt [*31] executive; (2) alleged flaws in the design of the survey conducted by plaintiffs' economic and statistical expert, Gordon Rausser; and (3) the validity of Rausser's conclusions based on the survey responses. No one disputes Walker's qualifications. But plaintiffs seek to exclude Walker's opinion and report in their entirety on the grounds that an employer's economic motives are irrelevant to the question of willfulness and because Walker did not conduct an independent study of

ASM job responsibilities and instead only criticizes Rausser's study.

## A. Walker's Opinion on Big Lots' Profit Motive

Walker opines that it would be irrational, economically speaking, for Big Lots to pay ASMs as salaried employees with benefits if the primary job duties of ASMs are the same as subordinate associate employees such as stockers and cashiers. (*See* Walker Report at 4.) It would be more profitable, Walker concludes, for Big Lots just to hire associate employees. (*See id.*) Walker estimates that the value of benefits that Big Lots provides to full-time ASMs that it does not provide to part-time associate employees (*e.g.,* health insurance, dental insurance) is approximately 30 percent of cash compensation. [*32] The minimum ASM salary is $ 24,000 per year. Taking into account the value of employee benefits, Walker calculates that the average pay for opt-in plaintiffs who worked for the entire 2006 fiscal year is equivalent to $ 44,192, with a high range of $ 55,478. (*See id.* at 5-6.) Walker calculates that this average is more than double the amount Big Lots pays an hourly associate at the low end of the pay scale ($ 5.15 per hour) who works an assumed 59 hours per week for 52 weeks after accounting for payroll taxes and other benefits: $ 17,475.02. (*See id.* at 6.) Given this large differential in cost to Big Lots, Walker concludes that it makes no sense for Big Lots to pay ASMs more than twice the amount that it pays hourly employees if their job functions consist primarily of hourly employee tasks.

Plaintiffs argue that Big Lots' profit motive is irrelevant to whether it willfully misclassified the assistant manager position as an exempt executive employee. Plaintiffs correctly state the legal standard for determining whether an employer willfully violated the FLSA. In *McLaughlin v. Richland Shoe Co., 486 U.S. 128, 108 S. Ct. 1677, 100 L. Ed. 2d 115 (1988)*, the Supreme Court explained that in order to find that an employer [*33] willfully violated the FLSA, the plaintiff must show that "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [FLSA]." *Id. at 133* (internal quotations omitted). *See also Hillstrom v. Best Western TLC Hotel, 354 F.3d 27, 33 (1st Cir. 2003); Reich v. Bay, Inc., 23 F.3d 110, 117 (5th Cir. 1994).* Willfulness in this context, the Supreme Court explained, is conduct that is "not merely negligent" but instead closer to the word's ordinary meaning: "voluntary," "deliberate," and

"intentional." *Id.*

The Court does not find reason to exclude this aspect of Walker's report as irrelevant. Evidence is relevant if it has "the tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Fed. R. Ev. 401.* The plaintiffs assert at various points in their filings with the Court that Big Lots is large publicly traded corporation that employs thousands of people and does more than $ 5 billion in business annually. The shear number of store locations and employees it must hire to run its operations mean that the amount of money devoted [*34] to employee compensation affects its profitability. Whether Big Lots would have an incentive to short-change a significant number of employees (there are at least 4,000 ASMs) certainly goes to whether it intentionally or deliberately crafted a corporate policy of misclassification in violation of the FLSA. As Big Lots' points out, whether it had a profit incentive to misclassify the position is not dispositive of the issue of willfulness, but it is related to whether the corporation acted in reckless disregard of the statute.

Further, in urging that evidence about profit motives and compensation structure is irrelevant to the issue of willfulness, plaintiffs overlook an important factor that the Court must consider in determining whether the ASM position was misclassified as a matter of corporate practice and the attendant question of willfulness. The regulations on the executive exemption promulgated by the Department of Labor instruct that courts should consider "the relationship between the employee's salary and wages paid to other employees for the kind of nonexempt work performed by the employee" in determining the nature of an employee's primary duty. *29 C.F.R. § 541.700(a).* Walker [*35] opines that when an ASM's benefits are considered, the rate of compensation for an ASM greatly exceeds that paid to hourly associate employees. The compensation structure for ASMs is a consideration on the issue of liability. Whether it would have been irrational for Big Lots to pay ASMs more than associate hourly employees for essentially the same work potentially bears on whether Big Lots willfully misclassified ASMs. Further, because differences in compensation for similar work is a factor to consider in determining the primary duties of an employee's job, Big Lots' decision to pay ASMs more than hourly associates might demonstrate that it was aware of its responsibilities

2008 U.S. Dist. LEXIS 35316, *35; 76 Fed. R. Evid. Serv. (Callaghan) 372;
13 Wage & Hour Cas. 2d (BNA) 992

under the FLSA and therefore did not recklessly disregard the statute and regulations. Again, the existence *vel non* of a profit motive is not dispositive, and the Court will give Walker's view on this subject no more weight than it deserves.

Finally, plaintiffs argue that Walker's comments in his report that it is more likely that the position of associate manager is misclassified as non-exempt than it is that the ASM position is misclassified as exempt are irrelevant and not based on any study of the associate [*36] manager position. Although the Court agrees that whether the position of associate manager is properly classified is not at issue, Walker's observation about the associate manager position arises in the context of comparing the compensation and job functions of ASMs to the compensation of hourly employees who perform similar duties, which, as noted, the regulations identify as a factor in determining an employee's primary duty. *See 29 C.F.R. § 541.700(a)*. Walker does not seek to show that the associate manager position is more properly classified as an exempt executive and therefore the ASM position, which entails greater supervisory authority, must be properly classified as exempt. Walker merely opines that the ASM position is not *necessarily* misclassified because the job duties of ASMs overlap with some of the job duties of associate managers, who might be compensated at comparatively higher hourly rate. Plaintiffs may explore the merit of Walker's opinion on cross-examination.

**B. Walker's Criticism of the Rausser Survey and Report**

Walker raises several criticisms of the Rausser survey that were discussed earlier in this opinion. Plaintiffs spill a lot ink in arguing that Walker should [*37] be excluded from testifying as to these opinions because he has not conducted an independent study and/or survey of ASM job responsibilities. In so doing, they overlook the purposes for which Big Lots seeks to introduce him as an expert witness. As an initial matter, Big Lots offers Walker to comment upon the results of the survey that Rausser conducted and to critique Rausser's survey methodology and interpretation of the data. Walker, relying on the same responses that Rausser used, which plaintiffs assert elsewhere is trustworthy and accurate, analyzes the survey data in different ways from Rausser. For instance, he assesses respondents' reported job duties in light of their length of tenure and also

isolates instances where individuals reported fulfilling duties in one part of the survey but denied that they completed the same tasks in others. Further, plaintiffs point to no requirement that Walker had to conduct an independent survey. He uses the data gathered by Rausser to extrapolate on different issues. If Big Lots chooses to put on its exemption defense without a survey of its own, it may certainly choose to do so. The Court finds no reliability issue with allowing Walker [*38] to attempt to show that plaintiffs' own data tends to establish that the nature of the assistant manager job qualifies as an exempt executive.

Plaintiffs also object to Walker's report and his observations about design and interpretation flaws because much of his criticisms are contingent on the existence of biases. Because Walker cannot show conclusively that such biases exist, plaintiffs argue, he should not be permitted to testify about the potential negative effects of such flaws. The Court finds, however, that Big Lots may introduce Walker for the purpose of pointing out gaps in Rausser's survey design and any failure to minimize the risk of errors. In the face of the defendant's criticism of Rausser's work, the Court observed multiple times here that the alleged flaws go to the ultimate weight to be accorded to Rausser's work and that his work is properly subject to vigorous cross-examination and Big Lots' questioning of its own witnesses. Walker, as an MIT-educated economist, is certainly qualified to critique survey design and data interpretation. Whether there are severe design flaws in Rausser's survey that undermine the credibility of his opinion is of vital importance in [*39] this case. Walker's proffered testimony on those issues is certainly relevant, well within his expertise, and does not exhibit reliability problems that warrant exclusion.

**C. Timeliness of the Addendum to Walker's Report**

Plaintiffs also move to exclude the addendum to Walker's report as untimely. Big Lots submitted Walker's original report to plaintiffs on January 25, 2008 according to the scheduling order in this case. It submitted Walker's addendum on March 31, 2008. Plaintiffs' counsel deposed Walker on April 4, 2008 after rescheduling the deposition due to defense counsel's illness. Walker's addendum addresses the addendum that Rausser prepared for his report. Rausser's report was due on December 21, 2007, and plaintiffs submitted his report in accordance with the scheduling order. They submitted the addendum to

2008 U.S. Dist. LEXIS 35316, *39; 76 Fed. R. Evid. Serv. (Callaghan) 372;
13 Wage & Hour Cas. 2d (BNA) 992

Rausser's report on January 22, 2008. Plaintiffs contend that Big Lots and Walker had the Rausser addendum before Walker completed his original report and that, in any event, Big Lots' counsel delayed in asking Walker to prepare an addendum in response to Rausser's addendum.

The Court finds no reason to exclude Walker's addendum. Although Big Lots' counsel submitted it to [*40] plaintiffs in late March, there is no indication that plaintiffs suffered any prejudice because Big Lots submitted the addendum at that time. Indeed, they do not even argue that they have suffered any prejudice. The addendum reaches the same conclusions as the original report. The revisions reflect the changes that Rausser made in his addendum, namely the revision of statistical findings in light of the late survey responses that he received. Accordingly, Big Lots may introduce Walker's testimony reflecting opinions contained in his original report and his addendum.

## V. PLAINTIFFS' MOTION TO EXCLUDE DAN BREMER

Big Lots also seeks to introduce the opinion and report of Dan Bremer, whom Big Lots proffers as an expert on compliance with the executive employee exemption regulations promulgated by the Department of Labor. Bremer opines that Big Lots ASMs are properly classified as executive employees who are exempt from the FLSA's overtime wage provision and that even if Big Lots misclassified the ASM job position, it did not do so willfully. He bases his opinion on a series of interviews that he and two other interviewers conducted with 70 ASMs who are not part of the group of opt-in plaintiffs. [*41] Bremer also criticizes the opinions and research of plaintiffs' experts, William Cutler and Professor Gordon Rausser. Plaintiffs move to exclude the opinion and testimony of Bremer on the ground that he is unqualified to offer an opinion on whether the job functions of Big Lots ASMs complied with executive exemption regulations and because Bremer's research methodology was seriously flawed rendering it unreliable.

### A. Bremer's Report and Interviews of ASMs

In his report, Bremer summarizes the relevant executive exemption regulations promulgated by the Department of Labor and then applies those regulatory standards to the experiences of currently employed ASMs who are not plaintiffs in this lawsuit. Although Bremer does not purport to engage in a statistical analysis of the sort conducted by Professor Rausser, he does draw broad inferences about whether Big Lots has properly classified the ASM job position as an exempt executive as a matter of corporate policy. Bremer's analysis is based on a total of 70 interviews with current ASMs that he and two other researchers who worked as Labor Department Compliance Officers, Lyndel Erwin and George Holt, conducted. [2] Big Lots First tasked Erwin [*42] with the responsibility of conducting interviews, and he began interviewing current ASMs on October 7, 2007. Big Lots then retained Bremer on December 27, 2007, and contracted with Holt shortly thereafter. (*See* Bremer Dep. at 124-25.) It is undisputed that Erwin conducted almost 80 percent of the interviews on which Bremer based his report before Bremer even became involved in this case. Bremer does not know how many people Erwin interviewed, (*see* Bremer Dep. at 125-28), but judging from the dates of the interview narrative summaries on which Bremer based his report, it appears that Erwin interviewed at least 55 ASMs before Bremer entered this case as an expert and that the three researchers interviewed 15 ASMs after Big Lots retained Bremer.

> 2   Bremer did not state in his report how many ASMs he interviewed, and he could not state the number in his deposition. The Court counted 70 individuals designated as ASMs in interview narrative summaries that Bremer attached to his report and that plaintiffs attached to their motion. Two of these individuals were recently promoted from assistant store manager to store manager. Plaintiffs also state in their motion, and Big Lots does not dispute, [*43] that Bremer interviewed an additional six to eight people but that he did not attach notes from those interviews to his report. The Court has seen notes from only the interviews of 70 ASMs and therefore examines the content of those notes and Bremer's report in evaluating the reliability of Bremer's methods.

The manner in which the interviewees and store locations were selected is something of mystery. Bremer states in his report that Erwin visited over 40 store locations in eight different states. But he does not know how Erwin selected those locations other than that Erwin visited locations where no opt-in plaintiffs had worked. (*See* Bremer Dep. at 150.) One thing is certain: Bremer played no role in the selection of those interview locations. Plaintiffs have presented evidence that Big Lots former counsel, David Scott, identified which store

locations and which individuals Erwin should interview. Correspondence between Scott and Erwin indicates that Scott helped set Erwin's interview schedule and that he also interviewed ASMs in advance of Erwin. (*See* Pls.' Ex. 4.) In addition, in some cases District Managers accompanied Erwin on his interview visits. (*See* Pls.' Ex. 15 at 51, R. [*44] Doc. 283-10 at 5.) Bremer explains that when he became involved he sought to interview personnel in store locations where opt-in plaintiffs had worked. (*See* Bremer Report at 5.) But it is not clear how he settled on the stores locations that he and the other interviewers visited once he became responsible for overseeing the interview process.

The manner in which interviews were conducted also varied. Two different questionnaires, each of which covered different ground, were used by Bremer, Erwin, and Holt. [3] Plaintiffs point to many undisputed differences in the content of the questions on these forms. For instance, the questionnaire that Erwin used before Big Lots retained Bremer included questions about whether ASMs completed new employee paperwork, handled employee complaints, directed and assigned the work of other store employees, set goals for store employees, and recommended promotion and termination, whereas the questionnaire employed after Bremer became involved did not. (*See* Pls.' Ex. 13, Qs 4, 14-16, 22, 23.)

> [3]   There was a third questionnaire titled "Questions for the Manager." (*See* Pls.' Ex. 30.) This form appears to have been used to interview store managers. It is not clear [*45] whether Bremer relied on answers given on this form in forming his opinion and report.

## B. Bremer's Qualifications as an Expert

Under *Federal Rule of Evidence 702*, "a witness qualified as an expert by knowledge, skill, experience, training, or education" may testify in the form of an opinion or otherwise. The Fifth Circuit has explained that a court must find "some reasonable indications of qualifications" in order to fulfill its gatekeeping function under *Daubert. Rushing v. Kansas City So. Ry. Co., 185 F.3d 496, 507 (5th Cir. 1999), superseded by statute on other grounds as noted in Mathis v. Exxon Corp., 302 F.3d 448, 459 n.16 (5th Cir. 2002)*. To qualify as an expert, the witness "must have such knowledge or experience in [his] field or calling as to make it appear that his opinion or inference will probably aid the trier in

his search for truth." *United States v. Hicks, 389 F.3d 514, 524 (5th Cir. 2004)* (internal quotations omitted).

For 23 years between 1974 and 1997, Bremer worked in the Wage and Hour Division of the U.S. Department of Labor between 1974 and 1997, first as a Compliance Officer (1974-1983) and later as Assistant District Director (1983-1989), Executive Assistant to [*46] the Regional Administrator (1989-1990), and finally District Director (1990-1997). As a Compliance Officer, Bremer completed approximately 50 to 60 investigations per year in the 1970s and early 1980s. (*See* Bremer Dep. at 69-71.) Some, but not all, of those investigations involved application of the executive exemption. (*See id.* at 71.) But Bremer could not recall how many or specific details about such investigations. (*See id.* at 71-73.) As Bremer was promoted to executive positions within the Department of Labor, his firsthand investigative work subsided, but he still remained involved in compliance investigations in a supervisory role. As an Assistant District Director, he supervised the work of other investigators and was directly involved in follow-up investigations. (*See id.* at 74.) As Executive Assistant, he handled Department of Labor personnel matters and compiled statistics for the Regional Administrator. He was not involved in any investigations. (*See id.* at 75.) As District Director, Bremer was largely engaged in charting a plan for his district and was not involved directly in supervising investigations. But in complex or large-scale investigations, he would take more [*47] of an active role. (*See id.* at 77-78.) Bremer retired from government service in 1997 and started a series of consulting firms that have primarily advised employers in the agricultural field in obtaining work visas for seasonal workers. Bremer's current firm, Agworks, spends 90 percent of its time in servicing agricultural clients. (*See id.* at 47.).

The Court finds that Bremer is marginally qualified to offer an opinion on compliance with the executive exemption regulations. Although Bremer worked for the Department of Labor for many years, he appears to have overstated his investigative experience. While he may be literally correct that he "conducted and supervised" thousands of investigations, his description of his responsibilities as Executive Assistant and District Director indicate that his significant involvement with investigations ended in 1989. In addition, Bremer has not published any articles or presented any lectures on the executive exemption regulations. (*See id.* at 21.) Bremer's

2008 U.S. Dist. LEXIS 35316, *47; 76 Fed. R. Evid. Serv. (Callaghan) 372;
13 Wage & Hour Cas. 2d (BNA) 992

recent focus on immigration work visas is not relevant to the issues in this case. Bremer's qualifications as an expert on FLSA compliance have been questioned in an earlier case. *See Davis v. City of Loganville, Ga., No. 3:04-CV-068 (CAR), 2006 U.S. Dist. LEXIS 20798, 2006 WL 826713, at *6 (M.D. Ga. Mar. 28, 2006)* [*48] . But as the *Davis* court observed, questions about his experience "go to his credibility, not to the threshold issue of his qualifications." *Id. See also Rushing, 185 F.3d at 507 n.10* (explaining that after an individual satisfies the relatively low threshold for qualification, the depth of one's qualification may be the subject of vigorous cross-examination). Although Bremer is removed from working closely with the FLSA regualtions, his two decades of experience with the Department of Labor "reasonably indicate" that he qualifies as an expert, albeit marginally so. The reliability of Bremer's opinion and report, however, is a different matter.

## C. Flaws in Bremer's Research Methodology

Under *Rule 702, Daubert,* and *Kumho Tire,* the Court still must assess the reliability of Bremer's methods and his opinion as an expert. Again, *Rule 702* requires that (1) the testimony be based on sufficient facts or data, (2) the testimony be the product of reliable principles and methods, and (3) the witness apply the principles and methods reliably to the facts of the case. As the 2000 advisory committee's note [*49] to *Rule 702* observes, "no single factor is necessarily dispositive of the reliability of a particular expert's testimony." And not all of the *Daubert* factors apply to every type of expert testimony. *See Kumho Tire, 526 U.S. at 149*; *Tyrus v. Urban Search Mgm't, 102 F.3d 256, 263 (7th Cir. 1996)* (noting, in the context of a social science expert, that *Daubert's* basic framework applies to for all kinds of experts but that "the measure of intellectual rigor will vary by the field of expertise and the way of demonstrating expertise will also vary.") Instead, courts "must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire, 526 U.S. at 152*. Of particular importance when a witness's expertise or testimony is based on professional experience is to ensure that the witness "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id. See also Sheehan v. Daily Racing Form, Inc., 104 F.3d 940, 942 (7th Cir. 1997)* (explaining the under

*Daubert* the trial court must satisfy itself that the expert "is being as careful as he would be [*50] in his regular professional work outside his paid litigation consulting").

Two sources are particularly instructive on whether Bremer's opinion is based on reliable methods: the Department of Labor's *Wage and Hour Division Field Operations Handbook* and the *Reference Manual* discussed *supra.* Bremer's qualifications as an expert rest on his investigative work with the Wage and Hour Division of the Department of Labor. In light of the need to ensure that Bremer employed the same level of rigor in his research methods here as he would have in conducting investigations for the Labor Department, the Court considers the requirements for such investigations set forth in the *Field Operations Handbook.* In examining the *Handbook,* the Court notes that neither Bremer nor Big Lots points to any other set of professional standards or methods upon which to evaluate the reliability of Bremer's research. In addition, the Court considers the nature of the research upon which Bremer relies in formulating his opinion. Bremer and his co-researchers essentially conducted a survey of current ASMs. They visited a variety of locations and asked interviewees questions about their job experiences and summarized [*51] the answers and descriptions in narrative form. For simplicity, the Court refers to their effort as the "Bremer survey." Bremer, relying on those summaries, then drew general conclusions about what the job position of assistant store manager entails. Although he does not purport to conduct a statistical analysis of the data gathered in the way that Rausser did, his research and report purport to serve the same essential purpose: to describe the characteristics of the assistant manager position based on data gathered from a subset of the population of assistant managers. Therefore, many of the same factors that the Court considered in assessing the reliability of the techniques that Rausser used are also relevant in this context.

The main differences in concept between Rausser's survey and report and the Bremer survey and report are that Bremer's opinion is based on in-person interviews of a much smaller sample size of the population of ASMs, the responses of which were converted into narrative summaries, whereas Rausser extrapolated about job duties based on raw data gathered through a mail survey. Considering the nature of the Bremer survey, the factors to consider in assessing its [*52] reliability as outlined by the *Reference Manual* include: (1) the purpose and

2008 U.S. Dist. LEXIS 35316, *52; 76 Fed. R. Evid. Serv. (Callaghan) 372;
13 Wage & Hour Cas. 2d (BNA) 992

design of the survey; (2) population definition and sampling; (3) survey questions and structure;(4) the role that the interviewers played; and (5) the process of recording the data gathered.

First, the role that Big Lots' former counsel played in directing how the interviews were conducted casts doubt on the reliability of the interviews and the gathered data. As discussed, *supra,* plaintiffs have submitted unrebutted evidence that Big Lots' attorney identified individual employees to whom Erwin (who conducted the lion's share of interviews) spoke, and the attorney actually interviewed those individuals before Erwin questioned them. The Court recognizes that some attorney involvement in the design of an interview questionnaire may be necessary to ensure that the questions asked cover facts pertinent to the legal issues involved in the case. Attorney involvement in the "carrying out of the survey," however, should be avoided. *Reference Manual* at 237. *See also Pittsburgh Press Club v. United States, 579 F.2d 751, 758 (3d Cir. 1958)*; *Upjohn Co. v. Am. Home Prods. Corp., 1996 U.S. Dist. LEXIS 8049, 1996 WL 33322175, at *14 (W.D. Mich. Apr. 5, 1996)*; [*53] *Boerhinger Ingelheim G.mb.H. v. Pharmadyne Lab, 532 F. Supp. 1040, 1058 (D.N.J. 1980)*. The Court also recognizes that Rausser mailed his survey under the cover of a letter signed by plaintiffs' counsel explaining that the survey was part of the litigation effort and requesting that individuals respond in a timely manner. But that is all that letter said. There is no suggestion that plaintiffs' counsel hand-picked or pre-screened the individuals that Rausser surveyed. Indeed, Rausser mailed surveys to all 936 opt-in plaintiffs. In the case of the Bremer survey, however, the evidence suggests that Big Lots' counsel had deeper contact than merely informing the chosen ASMs that someone would be coming to speak with them. The burden of demonstrating reliability of an expert's methodology lies with the party seeking to admit an expert opinion, and here Big Lots has not even addressed the role that counsel played in identifying interviewees or the contact that he had with them.

Second, the relatively small size of the population interviewed detracts from the reliability of Bremer's methods. The *Reference Manual* recognizes that in-person interviews can make probability sample surveys -- a survey [*54] in which the sample population size is selected so that every element of the population (*e.g.,* race, geographic location, age) has some chance of being included in the sample -- prohibitively expensive

and that nonprobability samples can still be meritorious. *Reference Manual* at 244. But when an expert opinion is based on a nonprobability sample survey, "[s]pecial precautions are required to reduce the likelihood of biased samples." Id. Here, Bremer's opinion about the job duties of a position held by approximately 4,000 persons is based on interviews of 70 respondents or 1.75 percent of the total population of ASMs. (By contrast, the number of respondents to the Rausser survey, 558, equals approximately 14 percent of the total population.) Courts have rejected the use of statements from such a low proportion of the overall population as representative evidence. *See, e.g., Reich v. So. Md. Hosp., Inc., 43 F.3d 949, 951 (4th Cir. 1995)* (rejecting testimony from only 1.6 percent of the total employee population in overtime pay case as insufficient). That case involved the propriety of drawing an inference about the amount of overtime pay due based on the trial testimony of only 54 witnesses [*55] out of 3,368 employees about how many overtime hours they worked. The Court recognizes that Bremer's survey does not involve trial testimony, but he draws conclusions about a large group based on a similarly small proportion of statements from the relevant universe.

Even more problematic than the small number of individuals, however, is the lack of any professionally identifiable standard by which the ASMs interviewed were identified. This Court has recognized that the nature of plaintiffs' claim -- that Big Lots has maintained a corporate practice of misclassification -- makes the experiences of non-opt-in ASMs who hold the same job position as plaintiffs relevant to the issue of misclassification. Therefore, the responses of non-opt-in ASMs to the questions in the Bremer survey are relevant, but neither Bremer nor Big Lots has demonstrated that the survey population was selected to reduce the likelihood of a biased sample. As explained, *supra,* 55 of the 70 interviews on which Bremer bases his opinion were conducted by Erwin before Big Lots retained Bremer. All Bremer states about the selection process for those interviews is that Erwin spoke to people at store locations where opt-in [*56] plaintiffs had not worked. (Bremer Report at 3.) There is no identifiable method by which the stores were selected, and the only thing that is clear is that Big Lots' counsel played some role in identifying store locations and individuals that Erwin interviewed. Interviewing a hand-picked, pre-screened, minuscule subset of a relatively large population of employees hardly constitutes a reliable method for gathering representative data. Big Lots, as a large

corporate employer, certainly had the capacity to conduct a wider-reaching survey of its employees, and it could have done so either by telephone or by using a mailed questionnaire or even an Internet survey. Big Lots' decision not to conduct a larger survey means that it has to live with the legal consequences of the slipshod work done by Bremer and its own decision to unduly enmesh its lawyer in the survey process.

Third, the lack of assurance that Bremer, Erwin, and Holt interviewed assistant managers in essentially the same manner and under conditions to ensure candor and consistency across interviews renders Bremer's opinion unreliable. The *Reference Manual* emphasizes that survey respondents should be "asked [*57] the same set of questions," *Reference Manual* at 236, and that survey data are trustworthy only if gathered through "sound interview procedures [that] were followed by competent interviewers." *Id.* (quoting *Toys "R" Us, Inc. v. Canarsie Kiddie Shop, Inc., 559 F. Supp. 1189, 1205 (E.D.N.Y. 1983))*. Bremer's late entry into the litigation, well after Erwin conducted the bulk of the interviews that serve as the basis for his opinion, poses an acute problem. The *Reference Manual* stresses that "[p]roperly trained interviewers [must] receive detailed written instructions on everything that they are to say to respondents." *Reference Manual* at 264. Plaintiffs have also pointed to another generally used text, the *Handbook of Interview Research,* that outlines procedures to ensure the reliability of data gathered from a large number of in-person interviews conducted by multiple interviewers. The *Handbook* states that the "supervisor's role involves three interrelated sets of activities: managing the work of the interviewers, monitoring interviewer performance, and administering quality control procedures." Royce A. Singleton, Jr. and Bruce C. Straits, "Survey Interviewing" in Jaber F. Gubrium and [*58] James. A. Holstein, *Handbook of Interview Research: Context & Method,* 76 (Sage Publications: 2001). In addition, the *Reference Manual* recommends that the research supervisor should monitor interviews to ensure consistency between interviews and verify that interviews took place. *See Reference Manual* at 267. Such validation is especially important when interviews are "conducted at the request of a party for litigation rather than in the normal course of business." *Id.* Here, Big Lots does not dispute that Bremer failed to take quality control steps, such as discussing the content of the questionnaires and the format for interviewing before the interviews took place, sitting in on interviews conducted by Erwin and Holt, or

interviewing some of the same individuals that Holt and Erwin interviewed to see if those persons gave the same responses in different interviews. Instead, Bremer relied heavily on responses to a questionnaire that he did not design and that was used in interviews that he did not supervise. At a minimum Erwin interviewed 55 ASMs before Bremer entered this case as an expert. But it is also not clear whether Erwin accounted for, or provided information from, all the interviews [*59] that he conducted. Bremer offers no verification whatsoever. Bremer repeatedly states in his report that he supervised the research of Erwin and Holt. But those statements are false or grossly exaggerated in light of the fact that he was hired after Erwin completed most of the research that serves as the foundation for Bremer's opinion. Bremer's flagrant mischaracterization of his supervision over the entire interview process and the work of Erwin and Holt seriously undermines the reliability of his methods.

Further, Bremer concedes that the questionnaires used were not standardized and did not include the same questions for each interviewee. (*See* Bremer Dep. at 187-88.) Bremer offers broad conclusions about the job duties and experiences of the individuals that Holt, Erwin, and he interviewed, but he does not know whether all interviewees were asked questions on the same topics. Several of the interview narratives are silent on topics such as interviewing and/or hiring new employees, an important management function under the regulations. (*See* Bremer Dep. at 174, 179.) As plaintiffs point out, when in-person interviews are conducted, it is imperative "to expose each respondent to the [*60] same interview experience, so that any difference in recorded answers can be assumed to be due to differences among respondents rather than differences in the process that produced the answer." *Handbook of Interview Research* at 69 (internal quotations omitted). The Court takes care not to overstate the dissimilarity between the questionnaires used; they do cover much of the same ground. But Bremer does not indicate that he based his opinion on only the questions that were common to each form. Here, it is undisputed that Bremer used data collected from different questionnaires to draw conclusions about the universe as a whole. Bremer's reliance on interviews that employed different questionnaires makes it impossible to determine whether his conclusions about the ASM job position are based on interviews in which only a particular questionnaire was used, which then raises a question about the sufficiency of that sample group, or, worse, whether he made

2008 U.S. Dist. LEXIS 35316, *60; 76 Fed. R. Evid. Serv. (Callaghan) 372;
13 Wage & Hour Cas. 2d (BNA) 992

assumptions about how other respondents would have answered or imputed answers from other respondents into those interviews. The cumulative effect of such deficiencies compound the unreliability of Bremer's methods.

The location of the interviews [*61] also casts doubt on the reliability of Bremer's investigative methods. The Department of Labor *Field Operations Handbook* provides that employees "must be given the opportunity to be interviewed under conditions which assure privacy" and identifies a series of suitable, neutral locations off the employment premises to conduct interviews. (*See* Pls.' Ex. 29.) Bremer relies on his experience with the Labor Department as the basis for his qualifications and the investigative techniques that he used. Yet there is no indication on any of the questionnaires or on the narrative summaries that interviewees were ever given the option of being interviewed in a location other than a Big Lots store. Also, plaintiffs point to the presence of the District Manager at some interview locations and that some interviews were conducted in the district manager's office. Although the Court does not jump to the conclusion that ASMs interviewed were coerced during their interviews, Bremer provides no explanation or assurance that the interviews were conducted under conditions in which interviewees would feel at ease to give candid responses.

Plaintiffs also object that the interviewers did not disclose to the [*62] interviewees the purpose of the interviews as an information-gathering exercise for this litigation. The Department of Labor's *Field Operations Handbook* requires investigators to disclose the purpose of any interviews, but the *Reference Manual* provides a survey's objectivity may be maintained by not disclosing the survey's purpose to the respondents. *Compare* Pls.' Ex. 31 *with Reference Manual* at 266. Regardless of whether the interviewers should have disclosed to respondents their connection with this litigation, the interviewers were inconsistent in how they introduced themselves to respondents. Plaintiffs have submitted evidence, and Big Lots does not deny, that individuals interviewed by Erwin were told that he was an "efficiency expert." (*See* McCloy Dep. at 53.) At the suggestion of Big Lots' counsel, Bremer -- the individual responsible for constructing and carrying out the interviews -- told people he interviewed that he was a "consultant." (Bremer Dep. at 138-39.) He also stated that it would be inappropriate for an interviewer to tell the

ASMs interviewed in this context that he was an "efficiency expert." This variation between interviews is yet another example of Bremer's [*63] failure to control the quality of the bulk of the interviews that inform his opinion.

Finally, the way in which data are compiled and results interpreted is important. *See Reference Manual* at 268. Bremer draws sweeping yet indeterminate conclusions about the nature of ASMs' job experiences, using terms such as "many," "most," "usually," and "a majority." He acknowledged in his deposition that he made no attempt to determine what percentage of the ASMs interviewed performed certain job functions. The terms that Bremer uses are vague and, in some instances, downright misleading. For instance, as plaintiffs point out, and Big Lots does not dispute, Bremer states in his report that "[a] few assistant managers said they did not do any hiring of employees" and that "[a]lmost all depositions and interviews and facts I reviewed showed that assistant managers have hired employees." (Bremer Report at 2, 16.) But according to the interview narrative summaries, 19 of the 70 ASMs ASMs interviewed by Bremer, Erwin, and Holt, or roughly 27 percent, did not do any hiring. Although a majority of interviewees may have had hiring responsibilities, Bremer's account of the interviews indicates that a much [*64] higher proportion of ASMs interviewed reported that they engaged in hiring than is true in reality. Nineteen, certainly when that figure constitutes more than a quarter of the whole, is not a few. Bremer has assessed the results of the interviews in such indeterminate terms that it makes it difficult to tell what the ASMs interviewed actually reported about their job experiences. That unreliability together with all of the deficiencies previously noted makes his opinion inadmissible.

The Court concludes that the flaws in Bremer's methodology are legion and cumulative, and they render his opinion inadmissible. On the whole, the Court finds Bremer's work remarkably haphazard and devoid of any systematic methodology. Notably, this is not the first time that a court has excluded Bremer's opinion because of flawed and unreliable research methodology. *See Davis, 2006 U.S. Dist. LEXIS 20798, 2006 WL 826713, at *7-*12.* Indeed, similar to the situation in the *Davis* case, although Bremer might qualify as an expert, the Court's separate inquiry into the soundness of his research methodology as required by *Rule 702* reveals fatal flaws. Bremer became involved at the tail end of Big

2008 U.S. Dist. LEXIS 35316, *64; 76 Fed. R. Evid. Serv. (Callaghan) 372;
13 Wage & Hour Cas. 2d (BNA) 992

Lots' investigation. He played no supervisory [*65] role in a large majority of interviews that serve as the basis of his opinion, and the selection process for those interviews is suspect. Further, the interviews that were conducted under his watch proceeded under different questionnaires from those used in the first round of interviews conducted by Erwin. There is no indication that Bremer made an effort to verify the interview responses. Bremer's late entry seriously inhibited his ability to exercise quality control over the interview process. Tellingly, Big Lots does not dispute directly most of the plaintiffs' factual assertions in plaintiffs' critique. Nor does Big Lots offer any argument that the interviews conformed to professional interview practices. When research "is so flawed in its methodology that [it] proves little," it should be excluded. *Malletier v. Dooney & Bourke, Inc., 525 F. Supp. 2d 576, 581 (S.D.N.Y. 2007)*. Accordingly, the Court excludes Bremer's opinion about whether assistant managers' job duties make them properly classified as exempt executives.

Bremer also offers opinions criticizing the work of Rausser and Cutler. The Court finds no basis to admit his opinions on those matters in light of the fatally unreliable [*66] work he has done in this case. When an expert uses his supposed expertise to serve up such dross as Bremer has offered here, this Court is under no obligation to entertain any of his opinions, including his views on the interpretation of regulations that he has not regularly worked with in ten years. Furthermore, the defendant has offered an admissible and highly professional critique of Dr. Rausser's work through the work of Dr. Walker. Accordingly, the Court excludes Bremer as an expert witness altogether.

## VI. CONCLUSION

For the foregoing reasons, the Court DENIES Big Lots' motion concerning Dr. Gordon Rausser and William Cutler; it DENIES plaintiffs' motion concerning Dr. Jonathan Walker; and it GRANTS plaintiffs' motion concerning Dan Bremer.

New Orleans, Louisiana, this 29th day of April 2008.

/s/ Sarah S. Vance

SARAH S. VANCE

UNITED STATES DISTRICT JUDGE

# CASE #9



LEXSEE 2008 U.S. DIST. LEXIS 54387

**LUANA M. MARAVI, as a natural tutrix of her minor child, AARON B. SMITH
VS. UNITED STATES OF AMERICA**

**DOCKET NO. 2:05 CV 1917**

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF
LOUISIANA, LAKE CHARLES DIVISION**

*2008 U.S. Dist. LEXIS 54387*

**July 11, 2008, Decided
July 11, 2008, Filed**

**SUBSEQUENT HISTORY:** Findings of fact/conclusions of law at, Judgment entered by *Maravi v. United States, 2008 U.S. Dist. LEXIS 101534 (W.D. La., Dec. 13, 2008)*

**COUNSEL:** [*1] For Luana M Maravi, as natural tutrix of her minor child, of, Aaron B Smith, Plaintiff: Charles Raleigh Newman, LEAD ATTORNEY, Corlissa Nash, John Lee Hoffoss, Jr, Office of Raleigh Newman, Lake Charles, LA.

For U S A, Defendant: Karen J King, LEAD ATTORNEY, U S Attorneys Office, Lafayette, LA; Craig N Jenkins, Staff Judge Adv/Mag Ct HQS JRTC & Ft Polk, Ft Polk, LA.

**JUDGES:** PATRICIA MINALDI, UNITED STATES DISTRICT JUDGE. MAGISTRATE JUDGE KAY.

**OPINION BY:** PATRICIA MINALDI

**OPINION**

**MEMORANDUM RULING**

Before the Court is a *Daubert* Motion in Limine to Limit the Report and Testimony of Robert D. Voogt, Ph.D, filed by the defendant, the United States of America, [doc. 36]. The plaintiff, Luana M. Maravi (hereinafter "Maravi"), on behalf of her minor child, Aaron B. Smith, filed an Opposition [doc. 38]. The United States filed a Reply [doc. 46]. The case is set for a bench trial starting on May 28, 2008.

*RULE 702*

*FED. R. EVID. 702* provides that:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion [*2] or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court granted the federal district courts with a gatekeeper function to exclude unreliable expert testimony from evidence. *509 U.S. 579, 589, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)*. The *Daubert* Court

Case 2:05-cv-04182-SRD-JCW   Document 19485-1   Filed 12/18/09   Page 87 of 119

Page 2
2008 U.S. Dist. LEXIS 54387, *2

espoused a non-exclusive and non-dispositive checklist for federal district courts to use when evaluating the reliability of expert testimony. *Id.* This gate-keeping function applies to all expert testimony, regardless of the field. *Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999).* Trial judges have "considerable leeway in...determining whether particular expert testimony is reliable." *Id. at 155.* "Both the determination of reliability and the factors taken in to account are left to the discretion of the district court consistent with its gatekeeping function" under *FED. R. EVID. 702. Munoz v. Orr, 200 F.3d 291, 301-02 (5th Cir. 2000).*

In the context of a bench trial, "'the *Daubert* gatekeeping obligation is less pressing' because [*3] the gatekeeper and the trier of fact are the same." *Johnson v. Big Lots Stores, Inc., 2008 U.S. Dist. LEXIS 35316, 2008 WL 1930681, *2 (E.D. La. 4/29/08)* (quoting *Volk v. United States, 57 F. Supp.2d 888, 896 n.5 (N.D. Cal. 1999)).* The Fifth Circuit has also noted that *Daubert's* safeguards are not as critical in a bench trial. *See Gibbs v. Gibbs, 210 F.3d 491, 500 (5th Cir. 2000).* In bench trials, it is preferable to admit "shaky but admissible evidence and permit vigorous cross-examination, presentation of contrary evidence, and careful weighing of the burden of proof to test" such evidence. *Johnson, 2008 U.S. Dist. LEXIS 35316, 2008 WL 1930681 at *2* (citing *Fierro v. Gomez, 865 F. Supp. 1387, 1395 n.7 (N.D. Cal. 1994)*; *SmithKline Beecham Corp. v. Apotex Corp., 247 F. Supp.2d 1011, 1042 (N.D. Ill. 2003)).*

## ANALYSIS

Maravi brings suit against the United States pursuant to the Federal Tort Claims Act for injuries Aaron sustained at the Fort Polk Army Base pool. Maravi retained Dr. Voogt to prepare a life care plan for Aaron. [1] Dr. Voogt is "engaged in rehabilitation, in long-term care planning for people with disabilities." [2] Dr. Voogt holds a master's degree in vocational rehabilitation counseling and is a licensed vocational rehabilitation [*4] counselor in Louisiana and Virginia. [3] Dr. Voogt was certified as an expert in this field in all but one out of 300 appearances. [4] The United States does not object to Dr. Voogt's certification as an expert, but seeks to limit Dr. Voogt's testimony. Specifically, the United States moves to exclude Dr. Voogt's recommendations for pediatrics and internal medicine, [5] pulmonology, gastroenterology, an Ear, Nose, and Throat (hereinafter "ENT") physician, a

personal care attendant and educational consultant services because the United States argues these recommendations are not based in sufficient facts or data. [6]

1   Def.'s Mem. in Support of Motion in Limine and/or *Daubert* Motion, at 1 [doc. 36].
2   Def.'s Ex. A, p. 5 (Dr. Voogt Dep.)
3   *Id.* at 5-6.
4   *Id.* at 14.
5   The plaintiff concedes that the costs associated with this care should be excluded from the life care plan. Pl.'s Mem. in Opp. to Def's Motion in Limine and/or *Daubert* Motion, at 8 [doc. 38]. Accordingly, testimony on pediatrics and internal medicine costs are excluded.
6   The United States relies heavily on *Norwest Bank v. Kmart Corp., 1997 U.S. Dist. LEXIS 3426, 1997 WL 33479072 (N.D. Ind. 1/29/97),* an unpublished opinion from the Northern District of Indiana that excluded [*5] Dr. Voogt's testimony. The *Norwest* court excluded Dr. Voogt's testimony because the court found that a jury would be unable to distinguish between his opinions for the plaintiff in terms of a "forecast" rather than a "prognosis," and because Dr. Voogt apparently based his life care plan on medical opinions based on his own experience, rather than the opinions of medical professionals. Thus, the *Norwest* court found that Dr. Voogt's opinions had no foundation.

This Court finds that *Norwest* has little precedential value, both because it is an unpublished case outside of this Circuit and because it is factually distinguishable. The *Daubert* motion in *Norwest* was raised in the context of a jury trial, whereas this motion arises in the less stringent context of a bench trial. Furthermore, as discussed *infra,* this Court finds that Dr. Voogt's testimony has a medical foundation in the record. Thus, after considering the defendant's arguments on *Norwest* and reviewing the record, this Court is unpersuaded.

This Court shall admit Dr. Voogt's inclusion of various services into Aaron's life plan so long as they are based on sufficient facts or data in the record. Merely admitting evidence does not [*6] mean this Court has accepted such evidence as fact. Under the *Daubert*

Case 2:05-cv-04182-SRD-JCW   Document 19485-1   Filed 12/18/09   Page 88 of 119

Page 3
2008 U.S. Dist. LEXIS 54387, *6

guidelines for bench trials, it is preferable to admit "shaky but admissible evidence and permit vigorous cross-examination, presentation of contrary evidence, and careful weighing of the burden of proof' to test such evidence. *See Johnson, 2008 U.S. Dist. LEXIS 35316, 2008 WL 1930681 at *2.*

### A.) Pulmonology

The United States seeks to exclude Dr. Voogt's life care plan as it pertains to pulmonology care because Aaron's last visit to a pulmonologist was in 2005 and Dr. Voogt testified he was unaware of any medical referral to pulmonology. [7] Thus, the United States argues that there is no medical basis for Dr. Voogt's recommendation of a pulmonologist. Maravi opposes this request because Dr. Daniel Tolson, Aaron's pediatrician for more than two years, stated that Aaron would require the services of a pulmonologist on a bi-annual basis to treat his asthma. [8] Accordingly, this Court finds that Dr. Voogt has a sufficient medical basis for including bi-annual visits to a pulmonologist in Aaron's life care plan.

7   Def.'s Ex. A, pp. 43-44 (Dr. Voogt Dep.)
8   Pl.'s Ex. 1, pp. 2-3. Dr. Tolson stated that Aaron has mild persistent asthma. *Id.* at 3.

### B.)   [*7] Gastroenterology

The United States seeks to exclude Dr. Voogt's life care plan as it pertains to the services of a gastroenterologist because it argues Dr. Voogt recommended the services of a gastroenterologist without knowing if any of Aaron's current doctors have referred him to a gastroenterologist. [9] Thus, the United States argues that there is no medical basis for Dr. Voogt's recommendation of a gastroenterologist. The plaintiff argues that there are strong medical reasons for Dr. Voogt's inclusion of a gastroenterologist in the life care plan. Aaron suffers from stomach pain, acid reflux, and esophageal reflux, and has had several documented medical visits for stomach ailments. [10]

9   Def.'s Ex. A, p. 47 (Dr. Voogt Dep.)
10   *See* Pl.'s Ex. 5.

This Court's own review of the medical records revealed that Dr. Tolson referred Aaron to a gastroenterologist on December 6, 2006 and again on February 7, 2007. [11] It appears that by March 20, 2007, Aaron saw a gastroenterologist. [12] Accordingly, this

Court finds that Dr. Voogt had a medical basis for including visits to a gastroenterologist in Aaron's life care plan.

11   *Id.*
12   *Id.*

### C.) ENT

The United States argues that there is no medical basis for Dr.  [*8] Voogt's recommendation of an ENT physician because Dr. Voogt recommended the services of an ENT without knowing if Aaron had a current medical referral for an ENT. [13] Maravi argues that Aaron's medical records are replete with the problems Aaron has with excess saliva, swallowing, drooling, all of which she argues an ENT would ordinarily treat. [14] Although Aaron's records do address his problems with excess saliva, the plaintiff did not cite, nor did this Court find, any referral to an ENT or a medical basis for the opinion that an ENT may be needed for Aaron; accordingly, the Court finds that there is no factual basis for Dr. Voogt's recommendation of an ENT.

13   Def.'s Ex. A, p. 44-46 (Dr. Voogt Dep.)
14   Aaron's medical records contain statements like "continues with trouble with saliva." Pl.'s Ex. 5.

### D.) Personal Care Attendant

The United States argues that there is no medical basis for Dr. Voogt's recommendation of a 24-hour personal care attendant for life because Dr. Voogt recommended the services of a round-the-clock attendant without a medical basis. Maravi argues that Dr. Voogt recommended 24-hour care based upon Dr. Harvey Jacobs' recommendations for treatment. Dr. Jacobs recommended  [*9] treatment in a comprehensive residential adolescent brain injury program to address Aaron's behavioral and emotional challenges, which he estimated would take two to four years, followed by a home and school transition program. [15] Dr. Jacobs stated that "determination of long-term community based living support as an adult" could range from ten hours per week to 24-hour supervision, depending on Aaron's response to the treatment. [16] Accordingly, this Court finds that Dr. Voogt has a medical basis for including 24-hour supervision in Aaron's life care plan.

15   Pl.'s Ex. 6. Dr. Jacobs is a licensed clinical

psychologist and behavior analyst. *Id.* His report was prepared November 17, 2007 based on a review of several school and medical records, as well as an initial meeting, home visit, and the child behavior checklist. *Id.*

16  *Id.*

**E.) Educational Consultant Services**

The United States argues that Dr. Voogt recommended the services of an educational consultant when Aaron is a good student who receives As without knowing what services Aaron currently receives, and without knowing whether his current school meets those needs. Maravi argues that Dr. Jacobs recommended that Aaron receive forty hours [*10] annually of treatment from an educational consultant with specific experience in brain injury to coordinate school curriculum and services throughout his academic career. [17] Dr. Tolson also stated he expected Aaron to have some difficulty with school, especially as the subject matter becomes more difficult. [18]

17  *Id.* at 11.
18  Pl.'s Ex. 1, at 3.

Moreover, although Dr. Voogt did testify that he does not know what services Aaron receives at his current school, Dr. Voogt's recommendation for educational consultant services was based on Dr. Jacobs' assessment, which was prepared November 17, 2007.

Thus, this Court finds that Dr. Voogt's inclusion of forty hours annually with an educational consultant has a sufficient factual basis, given that Dr. Jacobs made the recommendation after reviewing school and medical records, and meeting with Aaron.

**CONCLUSION**

Mindful that this Court will serve as both gatekeeper and factfinder, this Court shall admit much of Dr. Voogt's testimony and will rely on the adversarial process to test such testimony; accordingly,

IT IS ORDERED that the defendant's *Daubert* Motion in Limine to Limit the Report and Testimony of Robert D. Voogt, Ph.D [doc. 36] is hereby GRANTED [*11] in part and DENIED in part. The Motion is GRANTED insofar as Dr. Voogt's inclusion of pediatrics, internal medicine, and ENT services in Aaron's life care plan are EXCLUDED. The Motion is DENIED insofar as Dr. Voogt's inclusion of pulmonology, gastroenterology, a personal care attendant, and educational consultant services in Aaron's life care plan are ADMISSIBLE.

Lake Charles, Louisiana, this 11 day of July, 2008.

/s/ Patricia Minaldi

PATRICIA MINALDI

UNITED STATES DISTRICT JUDGE

# CASE #10



LEXSEE 2003 U.S. DIST. LEXIS 19052

**JOHN SCORDILL, III, and his wife CYNTHIA SCORDILL VERSUS LOUISVILLE LADDER GROUP, LLC ET AL**

**CIVIL ACTION NO. 02-2565 SECTION "R" (5)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA**

*2003 U.S. Dist. LEXIS 19052*

**October 23, 2003, Decided
October 24, 2003, Filed, Entered**

**SUBSEQUENT HISTORY:** Motions ruled upon by, Objection overruled by, Objection sustained by *Scordill v. Louisville Ladder Group, LLC, 2004 U.S. Dist. LEXIS 2359 (E.D. La., Feb. 17, 2004)*

**PRIOR HISTORY:** *Scordill v. Louisville Ladder Group, LLC, 2003 U.S. Dist. LEXIS 12842 (E.D. La., June 24, 2003)*

**DISPOSITION:** [*1] Defendants' motion to exclude expert testimony of Greg Garic denied. Defendants' motion for partial summary judgment granted; plaintiffs' inadequate warning and design defect claims dismissed with prejudice. Defendant's motion for summary judgment on plaintiffs' manufacturing defect claim denied.

**COUNSEL:** For John Scordill, III, Cynthia Scordill, PLAINTIFFS: Edward J Castaing, Jr, Crull, Castaing, Lilly & Herman, New Orleans, LA USA.

For Louisville Ladder Group, LLC, Home Depot USA Inc, DEFENDANTS: Francis Horatio Brown, III, Carl E Hellmers, III, Frilot, Partridge, Kohnke & Clements, LC, New Orleans, LA USA.

**JUDGES:** SARAH S. VANCE, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** SARAH S. VANCE

**OPINION**

**ORDER AND REASONS**

Before the Court are the motions of defendant, Louisville Ladder Group, LLC, to exclude the expert testimony of Greg Garic and for summary judgment. Defendant Louisville Ladder filed two motions for summary judgment. In the first, Louisville Ladder moves for summary judgment on plaintiffs' design defect and inadequate warning claims. In the second, the defendant moves for summary judgment on plaintiffs' manufacturing defect claim. For the following reasons, the Court denies [*2] defendant's motion to exclude the expert testimony of Greg Garic, grants defendant's motion for summary judgment on plaintiffs' inadequate warning and design defect claims, and denies defendant's motion for summary judgment on plaintiffs' manufacturing defect claim.

**I. Background**

John Scordill is a welder. He purchased two stepladders at a Home Depot in 1997 or 1998. Both ladders were Davidson Model 592-61 stepladders, ladders that stand six feet tall and that are made of

2003 U.S. Dist. LEXIS 19052, *2

fiberglass rails and aluminum steps. The ladders were manufactured in 1996 by Louisville Ladder at a manufacturing facility in Monterrey, Mexico. While working on a job in Orleans Parish on February 16, 2002, Scordill placed one of the stepladders - the incident ladder - alongside a wall. He climbed up to the second rung of the ladder and turned around so that his back was to the ladder. He then reached up with his right hand to weld an I-beam to metal plates that had been installed the day before. He leaned his left elbow against the wall to steady himself, his left hand grabbing his right wrist to support the welding gun in his right hand. Scordill avers that the ladder then buckled beneath him. Scordill [*3] fell and sustained numerous injuries.

Plaintiffs, John and Cynthia Scordill, sued defendant Louisville Ladder in state court, alleging claims of unreasonably dangerous manufacturing, unreasonably dangerous design, and failure to adequately warn. Plaintiffs assert that the ladder failed along its left front rail, just below the first rung of the ladder. [1] Defendant removed the case to this Court. Defendant moves the Court to exclude the report and testimony of plaintiffs' expert witness, Greg Garic. Defendant also moves the Court for summary judgment on each of plaintiffs' claims.

> 1   The "left" rail refers to the rail on the left when one faces the ladder. Because Scordill had his back to the ladder when the incident occurred, the alleged place of failure was to his right.

## II. Motion To Exclude Expert Testimony

The Federal Rules of Evidence govern defendant's motion to exclude the report and testimony of plaintiffs' expert, Greg Garic. *See Mathis v. Exxon Corporation, 302 F.3d 448, 459 (5th Cir. 2002).* [*4] *Rule 702* provides:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the

> witness has applied the principles and methods reliably to the facts of the case.

*FED. R.EVID. 702.* This rule applies not only to testimony based on scientific knowledge, but also to testimony of engineers and other experts that is based on technical or specialized knowledge. *See Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141, 143 L. Ed. 2d 238, 119 S. Ct. 1167 (1999).* The rule requires the trial court to act as a "gate-keeper," ensuring that any scientific or technical expert testimony is not only relevant, but also reliable. *See Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993).*

Defendants [*5] assert, first, that Greg Garic is not qualified to be an expert and, second, that his proffered testimony is not reliable. As to his qualifications as an expert, Garic concedes that he has neither designed nor manufactured a ladder. (Motion To Exclude Expert Testimony, Ex. D, Dep. of Greg Garic, at 129-131.) Garic is only vaguely familiar with the standards that American National Standards Institute ("ANSI") has set for ladders, (*Id.,* Ex. F, ANSI Standards), and he has never tested a ladder for compliance with these standards. (Dep. of Garic, at 211-15.) Indeed, Garic has never tested a ladder, period. (*Id.* at 190.) Further, the rails of the ladder - which is where the alleged failure occurred - are made of fiberglass, and Garic testified that he has no expertise in fiberglass manufacturing. (*Id.* at 42.)

On the other hand, Garic does have knowledge and experience that bears on why the ladder collapsed. Garic has a master's degree in mechanical engineering. He worked for NASA for 15 years, where he was honored for his contributions to the space shuttle program. (Opp. to Mot. To Exclude Expert Testimony, Ex. K, Greg Garic C.V.) He is currently employed by Stress Engineering [*6] Services, Inc. (*Id.*), and he has significant experience in stress analysis. (Dep. of Garic, at 131.) Garic's primary areas of practice are stress analysis, fracture mechanics, finite element modeling, and fitness for service assessment. (*Id.*) He has published extensively in these areas. (Greg Garic C.V.) Defendants do not dispute Garic's expertise in stress analysis. (Mot. To Exclude Expert Testimony, at 10.) Accordingly, the Court finds that Garic is qualified to testify as an expert in mechanical engineering and stress analysis.

Next, the Court turns to defendant's argument that

Garic's expert report and testimony are not reliable. In *Daubert,* the Supreme Court identified factors that bear on the issue of reliability, including: "(1) whether the expert's theory can be or has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community." *Moore v. Ashland Chem. Inc., 151 F.3d 269, 275 (5th Cir. 1998)* [*7] (citing *Daubert, 509 U.S. at 593-95*)); *see also Mathis, 302 F.3d at 460*. A *Rule 702* inquiry into the reliability of expert testimony is a flexible and necessarily fact-specific inquiry. *See Seatrax, Inc. v. Sonbeck Int'l, Inc., 200 F.3d 358, 372 (5th Cir. 2000)*. The above list of factors "neither necessarily nor exclusively applies to all experts in every case." *Kumho Tire, 526 U.S. at 141*. Plaintiffs, as the party offering the expert, bear the burden of proving by a preponderance of the evidence that the proffered testimony is reliable. *See Mathis, 302 F.3d at 459-60*.

The Court notes that its role as a gatekeeper does not replace the traditional adversary system and the place of the jury within the system. *See Daubert, 509 U.S. at 596*. As the *Daubert* Court noted, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (citing *Rock v. Arkansas, 483 U.S. 44, 61, 97 L. Ed. 2d 37, 107 S. Ct. 2704 (1987)*). The Fifth Circuit [*8] has added that, in determining the admissibility of expert testimony, a district court must defer to "'the jury's role as the proper arbiter of disputes between conflicting opinions. As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration.'" *United States v. 14.38 Acres of Land, More or Less Sit. in Leflore County, Miss., 80 F.3d 1074, 1077 (5th Cir. 1996)* (quoting *Viterbo v. Dow Chemical Co., 826 F.2d 420, 422 (5th Cir.1987)*).

## A. Testimony of Greg Garic

To prepare his expert report in this case, Garic examined the ladder involved in the incident - the incident ladder. Garic reviewed Scordill's deposition testimony and also met with Scordill to further clarify his description of the accident and the events leading up to it.

Garic also examined the second ladder - the exemplar ladder - that Scordill purchased in 1997 or 1998 along with the incident ladder. Garic measured the amount of force on the ladder created when Scordill leaned against the wall with his left elbow. Specifically, Garic [*9] stood on the second rung of the exemplar ladder and leaned his left elbow against a wall. He placed a scale under his elbow to measure the force of the elbow, which would be equal and opposite to the force placed on the ladder. (Dep. of Garic, at 209-10.) Garic concluded that Scordill placed approximately 15-25 pounds of pressure on the incident ladder. He concedes that this figure represents only an estimate of the side force Scordill placed on the incident ladder overall; Garic did not calculate the force specifically borne by the place of failure. (*Id.* at 135.) Garic did not otherwise test the incident ladder or the exemplar ladder to determine the amount of force that the ladder can bear. Garic measured the dimensions of both ladders and compared his measurements to the manufacturer's specifications. Garic reviewed the results of tests performed by Strongwell, the fiberglass manufacturer, on a sample, or "coupon," of the fiberglass taken from the incident ladder's rail. Garic conducted two telephone conferences with Dr. George Ross, a colleague with expertise in fiberglass. (*Id.* at 43.) Dr. Ross inspected photographs of the incident ladder, and Garic consulted with Dr. [*10] Ross when he needed to understand fiberglass material and manufacturing issues. (*Id.* at 43-44.) Garic also conferred with another colleague, Dr. Joe Fowler, regarding this case. (*Id.* at 114-16.) Dr. Fowler had previously worked on another ladder case, involving a different type of ladder.

In his expert report and deposition testimony, Garic identifies three manufacturing defects. (Mot. To Exclude Expert Testimony, Ex. C, Garic's Expert Report.) First, Garic determined that the step-rivets for the bottom two steps of the incident ladder were closer to the edge of the fiberglass flange than allowed by the manufacturer's specification. Garic observed that the exemplar ladder contains the same alleged manufacturing defect. (Garic's Expert Report.) Second, Garic observed a split in the incident ladder rail's flange-to-web junction. It is undisputed that the incident ladder did not exhibit such a split on the morning of the incident. (Def.'s Mot. for Summ. J., Ex. D, Dep. of Charles Untz, at 10.) The exemplar ladder, however, exhibits cracking in the fiberglass in the same area where the fiberglass of the incident ladder split. (Garic's Expert Report.) As a result,

Garic concluded [*11] that the cracking is the result of poor manufacturing practices and that even if the cracking was not visible in the incident ladder before the incident, its flange-to-web junction did not comply with manufacturing specifications. Third, Garic observed that at several points along the left rail, the height of the flange fell slightly below the lower tolerance limit of 1.109 inches. [2] (*Id.*)

> 2   Defendant argues that Garic's determination that the flange height was out of specification was based on his review of incorrect design drawings. (Def.'s Suppl. Memo. to their Mot. for Summ. J. and Mot. to Exclude the Testimony of Greg Garic, at p. 15.)

Garic opined that the step-rivets exhibited decreased resistence of pull-out as a result of their placement, and this decreased resistence contributed to the ultimate collapse of the ladder. Garic also asserted that the separation in the flange-to-web junction noted on the incident ladder resulted in increased flexing of the rail below the bottom step. He noted that [*12] this flexing increased the stress on the second step-rivet on the left rail, which was already weakened by virtue of its out-of-specification placement. Garic concluded that "the ladder contained multiple manufacturing defects, which are observed in both the incident ladder and the exemplar, and indicate deficient manufacturing quality control and a pattern of defective products produced in April 1996 at the Mexico manufacturing facility."

As noted above, Garic calculated the overall side force Scordill generated as he leaned against the wall. Garic did not, however, calculate the exact forces acting on the various points of the ladder, such on the step-rivets. Garic indicated in his deposition that such forces could be calculated using finite element analysis. (Dep. of Garic, at 31-32.) He also noted that consideration of performing such an analysis had been postponed until the parties had completed further discovery. At oral argument on defendant's motions to exclude Garic's testimony and for summary judgment, the Court granted plaintiffs additional time to consider the feasibility of such an analysis and to submit supplemental memoranda on the issues. As a result, Garic prepared [*13] a supplemental expert report. (Pla.'s Note of Evid., Ex. 1, Garic's Suppl. Expert Report.) Garic addresses three issues in his supplemental report. First, he discusses why meaningful finite element analysis is not feasible in

this case. (*Id.*) He estimates the costs involved to perform such an analysis and concludes that performing such an analysis is prohibitively expensive. Further, he indicates that performing meaningful analysis is not practical because of the difficulties in making reasonable and defensible assumptions regarding the condition of the incident ladder at the time of the accident. The second part of Garic's supplemental report provides further detail regarding the logic and engineering principles he employed to reach his conclusions. (*Id.*) He describes his application of generally accepted engineering principles. He also explains how the observed damage is consistent with the plaintiff's description of the sequence of events surrounding the accident. In both his deposition and supplemental expert report, Garic describes how he considered and eliminated other possible explanations for the observed damage. (Garic's Suppl. Expert Report; Dep. of Garic, at 90-93.) [*14] Lastly, Garic's supplemental report clarifies how he utilized his knowledge, skill, experience, training and education to connect the facts of this case to his conclusions. (Garic's Suppl. Expert Report.) He identifies several specific engineering principles that he utilized, citing to various engineering textbooks and classes he has either attended or taught. He also describes a number of specific projects in which he was involved that contained issues relevant to his analysis in this case.

In his supplemental report, Garic ultimately concludes that "the likely root cause of the failure is the cracking of the fiberglass in the inside corner of the rail, as was observed in the exemplar ladder." (*Id.*) He further opines that "had the rivet been solidly positioned, additional support would have been provided to the step, which could have prevented or slowed its deflection and ultimate failure." (*Id.*)

## B. Reliability

To determine whether an expert's testimony is sufficiently reliable, the Court should first consider whether the *Daubert* factors noted above are appropriate, and then it can consider whether other factors are relevant to the case at hand. *See Black v. Food Lion, Inc., 171 F.3d 308, 311-12 (5th Cir. 1999);* [*15] *see also Watkins v. Telsmith, 121 F.3d 984, 991 (5th Cir.1997)* (regardless of basis of expert's opinion, *Daubert's* non-exclusive factors are relevant to initial reliability assessment). Defendant argues that Garic failed to apply the scientific method by not properly testing his hypotheses regarding

Case 2:05-cv-04182-SRD-JCW   Document 19485-1   Filed 12/18/09   Page 95 of 119

Page 5
2003 U.S. Dist. LEXIS 19052, *15

the cause of Scordill's accident. As Garic noted in his deposition, however, he developed and then analyzed various hypotheses regarding the initial point of failure of Scordill's accident. (Dep. of Garic, at 73-75.) He applied generally accepted engineering principles to project the logical sequence of events from each potential initial point of failure and then determined whether the observed damage was consistent with the mechanics of each potential accident scenario. (Id.) He indicated that through this process, he eliminated certain hypotheses and refined his conclusions as much as possible given the informational constraints. (Id.) Also, as discussed above, Garic concluded that additional testing, such as finite element analysis, would not be feasible or meaningful in this case. Plaintiffs further contend that they cannot reasonably conduct meaningful [*16] testing of the incident ladder because it was destroyed in the accident, and any subject ladder utilized in testing would materially differ from the incident ladder, thus producing irrelevant results. Addressing the second Daubert factor, the defendant contends that nothing Garic has done could withstand peer review. Because Garic's opinion is based on the very specific facts of this case, it does not lend itself to peer review. Garic has not generated a study that is subject to repetition but instead has applied generally accepted engineering principles and concepts utilized in stress analysis to the facts of this accident. As a result, the Court concludes that the second Daubert factor does not apply. The Court also finds that the third and fourth Daubert factors are inapplicable, because they involve the known or potential rate of error of the technique utilized by the expert and whether there exist standards controlling the technique's operations. In this case, Garic did not develop a particular scientific procedure to reach his conclusions. The fifth standard is applicable to the extent that Garic's analysis applied generally accepted engineering principles, in addition [*17] to his own training and experience in the field of stress analysis, to the factual situation specific to this case.

The Kumho Court emphasized "Daubert's description of the Rule 702 inquiry as 'a flexible one.'" 526 U.S. at 150 (quoting Daubert, 509 U.S. at 594). The Daubert factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." Id. (citation and internal quotation marks omitted). Therefore, in addition to analyzing Garic's testimony in light of the Daubert factors, the Court turns to other indicia of reliability of Garic's testimony.

In his supplemental expert report, Garic describes how he reached his conclusions by applying his education, skill and experience to Scordill's description of the sequence of events and his observations of the incident ladder. The Court notes that the expert in Babcock v. General Motors Corp. employed a similar procedure to formulate his opinion regarding how fast plaintiff's vehicle was traveling at the time of the accident. See 299 F.3d 60, 68-69 (1st Cir. 2002). [*18] The First Circuit found no error in the district court's admission of the expert's testimony, noting that the expert applied technology generally accepted by accident reconstruction specialists to photos and other material given to him, using a methodology accepted by the National Highway Traffic Safety Administration. Id.; see also McCullock v. H. B. Fuller Co., 61 F.3d 1038, 1043 (2nd Cir. 1995) (finding that expert's testimony "easily qualifies for admission under Daubert" when opinion was based on expert's application of his academic and practical experience to the specific facts of plaintiff's case). In a similar manner, Garic applied generally accepted engineering concepts to the evidence in this case. Garic's supplemental report provides a meaningful and reasonable explanation of how he employed his expert judgment utilizing reliable engineering principles and how his judgment related to the available physical evidence. (Garic's Suppl. Expert Report.) See Thorndike v. Daimlerchrysler Corp., 266 F. Supp.2d 172, 180 (D.Me. 2003). After reviewing the reasoning behind Garic's conclusions, the Court concludes that the opinion evidence that plaintiffs [*19] seek to admit is connected to existing data by sufficiently reliable engineering analysis. Cf. General Electric Company v. Joiner, 522 U.S. 136, 146, 139 L. Ed. 2d 508, 118 S. Ct. 512 (1997) (noting that district court need not admit opinion evidence that is connected to existing data by only the ipse dixit of the expert). The Court finds that Garic's testimony can assist the jury in understanding the evidence and in making its finding of facts in this case.

Louisville Ladder quarrels with the bases and sources of Garic's opinions and offers conflicting expert testimony. As noted above, however, the questions raised by the defendant should affect the weight that the jury gives to the testimony rather than its admissibility. See 14.38 Acres of Land, 80 F.3d at 1077; see also Hynes v. Energy West, 211 F.3d 1193, 1205 (10th Cir. 2000) (upholding district court's admission of expert testimony when primary dispute regarded the application of reliable scientific principles to the facts of the case, which the

court considered "largely a matter of cross-examination and impeachment"). The Court finds that Garic's testimony is sufficiently [*20] relevant and reliable to reach the jury. As a result, the Court denies defendant's motion to exclude Garic's testimony.

### III. Motions For Summary Judgment

#### A. Legal Standard

Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law. *FED. R. CIV. P. 56(c)*; see also *Celotex Corp. v. Catrett, 477 U.S. 317, 322-3, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*. The court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, "that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor." *Lavespere v. Niagara Mach. & Tool Works, Inc., 910 F.2d 167, 178 (5th Cir. 1990)*; see also *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. The moving party bears the burden of establishing that there are no genuine issues of material fact. *Krim v. BancTexas Group, Inc., 989 F.2d 1435, 1445 (5th Cir. 1993)*.

If the dispositive issue is one [*21] for which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim. See *Celotex, 477 U.S. at 325*; *Lavespere, 910 F.2d at 178*. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. See *Celotex, 477 U.S. at 324*.

#### B. The Louisiana Products Liability Act

Defendant moves for summary judgment on each of plaintiffs' claims. In its first motion, Louisville Ladder moves for summary judgment on plaintiffs' claims that the ladder was unreasonably dangerous due to (1) an inadequate warning and (2) a defective design. In its second motion, Louisville Ladder moves for summary judgment on plaintiffs' claim that the ladder suffered from a manufacturing defect.

Each of plaintiffs' claims arise under the Louisiana Products Liability Act ("LPLA"). *LA. REV. STAT. §§ 9:2800.51-.59 (2003)*. The LPLA provides "the exclusive theories [*22] of liability for manufacturers for damage caused by their products." *LA. REV. STAT. § 9:2800.52*. A product manufacturer is liable to a claimant "for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product ...." *LA. REV. STAT. § 9:2800.54*. Plaintiffs assert that the ladder was unreasonably dangerous in that it did not carry an adequate warning, *§ 2800.54(B)(3)*; was defectively designed, *§ 2800.54(B)(2)*, and was defectively manufactured, *§ 2800.54(B)(1)*. Before examining each of these allegations, the Court will first consider Louisville Ladder's argument that Scordill's use of the incident ladder was not a "reasonably anticipated use."

#### 1. Reasonably Anticipated Use

If Scordill's injuries did not arise from a reasonably anticipated use of the incident ladder, the Court need not reach whether the product is "unreasonably dangerous." See *Kampen v. American Isuzu Motors, Inc., 157 F.3d 306, 309 (5th Cir. 1998)* (en banc). A reasonably anticipated use is "a use or handling of a product [*23] that the product's manufacturer should reasonably expect of an ordinary person in the same or similar circumstances." *LA. REV. STAT. § 9:2800.53(7)*. Determination of whether a particular use was "reasonably anticipated" is a question of fact. See *Ellis v. Weasler Eng'g Inc., 258 F.3d 326, 331-32 (5th Cir. 2001)*; *Calvit v. Procter & Gamble Mfg. Co., 207 F. Supp.2d 527, 530 (M.D.La. 2002)*; *Dunne v. Wal-Mart Stores, 679 So. 2d 1034, 1036-37 (La. App. 1 Cir. 9/10/96)* (applying manifestly erroneous standard to trial court's finding that plaintiff's use of product was not reasonably anticipated). The "reasonable use" determination requires an objective inquiry into those uses that a product manufacturer should have reasonably expected at the time of manufacture. See *Kampen, 157 F.3d at 309*. A reasonably foreseeable *misuse* is not necessarily a reasonably anticipated use, and a product manufacturer will not be held responsible for every conceivable foreseeable use of a product. *Id.* A manufacturer's warning against product misuse is relevant to an assessment of what uses the manufacturer [*24] reasonably anticipates. *Id. at 314*; see also *Chambers v. AJC Tools & Equipment, Inc., 2002 U.S. Dist. LEXIS 16807, 2002 WL 31015600, *2 (E.D.La. 2002)* (noting that "reasonably anticipated use is

intertwined with the character and adequacy of warnings although an adequate warning will not always be dispositive of reasonably anticipated use" (emphasis in original)); *Butz v. Lynch, 762 So.2d 1214 (La. App. 1 Cir. 6/23/00)*.

Louisville Ladder argues that Scordill's use of the ladder at the time of the accident was contrary to the express instructions on the ladder. The instructions provided:

PROPER CLIMBING AND USE

...

3. Face ladder when climbing up or down; keep body centered between side rails.

...

6. Do not over reach; move ladder when needed.

...

(Pls.' Supp. Memo of Apr. 16, 2003, Ex. J.) Scordill says he complied in all respects with these instructions. It is undisputed that when he climbed up to the second rung of the ladder, he was facing the ladder. Scordill states that he turned around to perform welding after he finished climbing up the ladder. The instructions do not specifically warn against doing this. Further, the record does not [*25] indicate that Scordill over-reached. The parties dispute whether Scordill kept his body centered between the side rails while welding. Based on the evidence before it, the Court cannot conclude that Scordill clearly failed to comply with the ladder's instructions. The Court therefore rejects defendant's assertion that Scordill's use was not reasonably anticipated because he failed to comply with the instructions.

Defendant also argues that it did not reasonably anticipate that anyone would use the ladder backwards. In support of this argument, defendant cites to the affidavit of Michael Van Bree, a Product Safety Officer/Engineer with Louisville Ladder, who attests that the manufacturer anticipated that the product would be used only while facing forward. Plaintiff contends, however, that turning around on the ladder is a reasonably anticipated use.

Turning one's back to the ladder to perform work is not obviously dangerous, *Kampen, 157 F.3d at 310*, and absent an express warning not to use the ladder backwards, the Court cannot state as a matter of law that it is unreasonable to do so. Defendant's reliance on *Kampen* is off the mark, for in that case the plaintiff [*26] used a car jack in direct contravention of the manufacturer's clear and explicit instructions and warnings. *See id. at 313*. Defendant's reliance on *Butz* is similarly off the mark, for in that case the plaintiff not only ignored the explicit warnings on the side of a canister of air brush propellant, but intentionally abused the product by inhaling its contents for an intoxicating effect. *See Butz, 762 So.2d at 1218*. The Court finds that there exists an issue of fact regarding whether Scordill's use of the ladder is a reasonably anticipated use, and summary judgment on this issue is inappropriate.

2. Inadequate Warnings

Plaintiffs claim that the incident ladder is unreasonably dangerous because its instructions do not warn against using the ladder backwards. *LA. REV. STAT. §§ 9:2800.54(B)(3)and 2800.57*. Assuming without deciding that the warning provided was inadequate, the manufacturer is liable only if such a defect proximately caused Scordill's injuries. *LA. REV. STAT. § 9:2800.54(A); see also Wheat v. Pfizer, 31 F.3d 340, 342 (5th Cir. 1994)*. Scordill bears the burden [*27] of establishing that "but for" the inadequate warning the accident would not have occurred. *See Brown v. Parker-Hannifin Corp., 919 F.2d 308, 311 (5th Cir. 1990)*. Scordill, however, testified that he did not read the instructions and warnings on the ladder before the incident occurred. (Def.'s Mot. for Summ. J., Ex. B, Dep. of John Scordill, at 110.) Thus, even if the instructions and warnings had been adequate, the accident would have still occurred because Scordill, not having read them, would have proceeded to use the ladder in the same manner in which he did. Scordill has therefore failed to create an issue of fact as to whether an inadequate warning is the proximate, but-for cause of his injury. As a result, the Court grants defendant's motion for summary judgment on plaintiffs' inadequate warning claim.

3. Design Defect

Plaintiffs also claim that the ladder was defectively designed. *LA. REV. STAT. § 9:2800.54(B)(2)*. The LPLA provides:

A product is unreasonably dangerous in design if, at the time the product left its manufacturer's control:

(1) There existed an alternative design for the product that was capable [*28] of preventing the claimant's damage; and

(2) The likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product. An adequate warning about a product shall be considered in evaluating the likelihood of damage when the manufacturer has used reasonable care to provide the adequate warning to users and handlers of the product.

*LA. REV. STAT. § 9:2800.56.* To succeed on their design defect claim, the plaintiffs must establish that the alleged design defect proximately caused their injuries. *LA. REV. STAT. § 9:2800.54(A).* The Scordills "must prove not only causation in fact, but also that the product defect was 'the most probable cause' of the injury." *Wheat, 31 F.3d at 342* (quoting *Parker-Hannifin, 919 F.2d at 311 and n.9, 312).*

Plaintiffs present as an existing, alternative design heavy-duty ladders manufactured by defendant in 1992, four years before it manufactured the incident [*29] ladder. Plaintiffs posit that the heavy-duty ladders are safer than the incident ladder by virtue of a stiffener, a boot, and a protective collar. (Pls.' Supp. Memo. in Opp. to Def.'s First Mot. for Summ. J., Ex. G.)

To begin with, the Court notes that plaintiffs fail to clearly identify a specific alternative design. Plaintiffs point only to pictures of the heavy-duty ladder manufactured by Louisville Ladder, but do not clarify how a stiffener, boot, or collar would apply to the incident ladder model. Nowhere do plaintiffs identify how tall or strong such a boot would be or where on the ladder a stiffener or protective collar would be placed to prevent an accident like Scordill's.

Further, plaintiffs' expert failed to identify a specific alternative design for the product that would have

prevented the plaintiffs' alleged damages. See *LA. REV. STAT. § 9:2800.56(1).* In his initial report, Garic states only that "[a] more robust design could easily have been achieved in order to prevent this failure .... This collapse could have been prevented by any one of numerous minor design changes, including, but not limited to: (a) addition of a stiffened plate [*30] to the side rail, (b) strengthening the diagonal stiffeners, or (c) adding an additional stiffener to connect the left and right rails, below the bottom step." (Opp. to Def.'s Mot. for Partial Summ. J., Ex. D, Garic's Expert Report.) Garic's conclusory statement fails to allege a design defect or identify a specific alternative design. Significantly, Garic conceded in his deposition, "I'm not alleging that there is a design defect." (Dep. of Garic, at 14.) Moreover, Garic concludes in his supplemental expert report that the cracking and failure of the fiberglass in the inside corner of the ladder's rail and the misplacement of the rivet caused the ladder's collapse. Garic concluded that these problems resulted from a manufacturing defect. The plaintiffs do not contend that these problems occurred because the ladder lacked a stiffener, boot, or protective collar and merely conclusorily assert that the addition of a stiffener, boot, or protective collar would have prevented Scordill's accident. The Court concludes that the plaintiffs failed to present any reliable evidence that a design defect was a proximate cause of the Scordills' injuries.

Even if the Court had concluded the incident [*31] ladder's lack of a stiffener, boot, and protective collar did constitute a design defect, defendants would still be entitled to summary judgment on plaintiffs' design defect claim. The plaintiffs failed to present evidence "concerning the extent of the risk that the alternative design would have avoided, the economic costs entailed by those accidents, or the extent of the reduction in frequency of those accidents that would have followed on the use of [the] proposed alternative design." *Kampen v. American Isuzu Motors, Inc., 119 F.3d 1193, 1202-03 (5th Cir. 1997), rev'd on other grounds 157 F.3d at 306.* In *Lavespere v. Niagara Machine & Tool Works, Inc., 910 F.2d 167, 183 (5th Cir. 1990),* the Fifth Circuit affirmed a grant of summary judgment in favor of a product manufacturer when the claimant offered no evidence concerning the extent of the risk that the alternative design would have avoided, little evidence concerning the burden of switching to the alternative design, and no evidence on the loss of product utility that use of the alternative design would have occasioned. Like

the claimants in *Lavespere,* the Scordills bring [*32] no evidence as to the increased cost of manufacturing the proposed alternative design, no evidence as to the extent of the risk that the alternative design would have avoided, and no evidence of the alternative design's potential effect on product utility. Instead, plaintiffs assert that no risk-utility is required for the ladder because it is an "uncomplicated product."

In *Lavespere,* the Fifth Circuit suggested that "there may be cases in which the judge or the jury, by relying on background knowledge and 'common sense,' can 'fill the gaps' in the plaintiff's case, estimating the extent of the risk avoided, the costs of implementing the proposed design change, or the adverse effects of the design modification on the utility of the machine." *Lavespere, 910 F.2d at 184*. Despite plaintiffs' contention that a ladder is an "uncomplicated product," the Court finds that a jury would be unable to merely "fill the gaps" in the plaintiffs' argument. The general knowledge and common sense of the average juror would not enable him to estimate the extent of risk avoided by adding a stiffener, boot, and protective collar to a ladder. A layperson would not know how frequent [*33] this type of ladder accident is, nor the extent to which the suggested modifications would prevent such accidents. Plaintiffs have also failed to present any evidence of the additional costs associated with the alternative design, a subject outside the realm of knowledge of the average person. Plaintiff merely makes the conclusory allegation that such costs would be "negligible." (Pla.'s Supp. Opp. to Def.'s Mot. for Partial Summ. J. at 2) Further, plaintiffs provide no support for their assertion that the alternative design would have little if any impact on the utility of the ladder. The alternative design identified by the plaintiffs is currently found on Louisville Ladder's heavy-duty ladder. Plaintiffs present no evidence as to what effect the addition of a stiffener, boot, and protective collar would have on the weight, utility and mobility of a ladder designed to be lightweight. Because plaintiffs failed to identify a specific design defect as the proximate cause of plaintiffs' injury and failed to conduct any risk/utility analysis of their suggested alternate design, defendant is entitled to summary judgment on plaintiffs' design defect claim.

4. Manufacturing Defect

[*34] Plaintiffs allege that the ladder was defectively manufactured. *LA. REV. STAT. § 9:2800.54(B)(1)*. A manufacturing defect exists when, "at the time the product left its manufacturer's control, the product deviated in a material way from the manufacturer's specifications or performance standards for the product or from otherwise identical products manufactured by the same manufacturer." *LA. REV. STAT. § 9:2800.55*. To survive a motion for summary judgment, plaintiffs must create an issue of fact as to whether the alleged manufacturing defect was a proximate cause of the failure. *LA. REV. STAT. § 9:2800.54*.

Scordill contends that he was using the ladder to support himself while welding, and the ladder suddenly collapsed beneath him. In his supplemental expert report, Garic concludes that the collapse of the ladder occurred as a result of the cracking and failure of the fiberglass in the inside corner of the ladder's rail, compounded by the misplaced rivet. Garic observed cracking in the fiberglass in the same area on the exemplar ladder. The two ladders were manufactured around the same time in the [*35] same manufacturing facility. Plaintiffs contend that the cracking in the exemplar ladder in the same location at which the incident ladder split apart supports Garic's opinion that the cracking resulted from a manufacturing defect. As noted, Garic also found that the step rivet is positioned outside of the manufacturer's specifications, and proper placement of the rivet could have prevented or slowed the ladder's deflection and ultimate failure. Garic observed similar out-of-specification rivet placement on the exemplar ladder. Garic's analysis and deposition testimony describe how he utilized his expertise to rule out competing hypotheses regarding the cause of Scordill's accident. The logic underlying Garic's conclusion that a manufacturing defect caused Scordill's accident is not facially unreasonable. Although the defendant disputes Garic's reasoning and conclusions, the Court finds that Garic's reports and testimony, supported by other evidence submitted by the plaintiffs, create a material issue of fact regarding whether a manufacturing defect proximately caused the plaintiffs' alleged injuries. Accordingly, the Court denies Louisville Ladder's motion for summary judgment on [*36] plaintiffs' manufacturing defect claim.

IV. Conclusion

For the foregoing reasons, the Court denies defendants' motion to exclude the expert testimony of Greg Garic. Further, the Court grants defendants' motion for partial summary judgment and dismisses with

2003 U.S. Dist. LEXIS 19052, *36

prejudice plaintiffs' inadequate warning and design defect claims, and the Court denies defendant's motion for summary judgment on plaintiffs' manufacturing defect claim.

New Orleans, Louisiana, this 23rd day of October,

2003.

SARAH S. VANCE

UNITED STATES DISTRICT JUDGE

CASE #11



LEXSEE 2001 U.S. DIST. LEXIS 9164

**IN THE MATTER OF THE COMPLAINT OF TUG DANIELLE M. BOUCHARD VERSUS ORYX ENERGY CO., INC., ET AL.**

**CIVIL ACTION NO: 98-485 c/w 98-923 AND 00-692 SECTION: "R"(5)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA**

*2001 U.S. Dist. LEXIS 9164*

**June 25, 2001, Decided**
**June 25, 2001, Filed; June 25, 2001, Entered**

**DISPOSITION:** [*1] NETEC's motion in limine to exclude testimony of plaintiff's expert Michael Kennedy DENIED.

**COUNSEL:** For DANIELLE M. BOUCHARD CORP. TUG, BOUCHARD COASTWISE MANAGEMENT CORP., petitioners: George Moore Gilly, William Joseph Riviere, Phelps Dunbar, LLP, New Orleans, LA.

For RON WORKS INC, third-party defendant: David S. Bland, James W. Noe, King, LeBlanc & Bland, LLP, New Orleans, LA.

For RON WORKS INC, third-party defendant: Jon Daniel Picou, Larzelere, Picou & Wells, LLC, Metairie, LA.

For ORYX ENERGY COMPANY, ANADARKO PETROLEUM CORPORATION, BURLINGTON RESOURCES OFFSHORE INC., C.M.S. NOMECO OIL & GAS COMPANY, MARATHON PIPE LINE COMPANY, claimants: George Moore Gilly, William Joseph Riviere, Phelps Dunbar, LLP, New Orleans, LA.

For ORYX ENERGY COMPANY, ANADARKO PETROLEUM CORPORATION, BURLINGTON RESOURCES OFFSHORE INC., C.M.S. NOMECO OIL & GAS COMPANY, MARATHON PIPE LINE COMPANY, claimants: Peter L. Hilbert, Jr., Darnell Bludworth, Dorothy S. W. Lawrence, Sher Garner Cahill Richter, Klein McAlister & Hilbert, LLC, New Orleans, LA.

For MARATHON PIPE LINE COMPANY, MARATHON OIL COMPANY, MARATHON ASHLAND LLC, MARATHON PIPE LINE LLC, movants: George Moore Gilly, William [*2] Joseph Riviere, Phelps Dunbar, LLP, New Orleans, LA.

For MARATHON PIPE LINE COMPANY, MARATHON OIL COMPANY, MARATHON ASHLAND LLC, MARATHON PIPE LINE LLC, movants: Jean Paul Picou Overton, Burke & Mayer, New Orleans, LA.

For MARATHON PIPE LINE COMPANY, MARATHON OIL COMPANY, MARATHON ASHLAND LLC, MARATHON PIPE LINE LLC, movants: Peter L. Hilbert, Jr., Darnell Bludworth, Sher Garner Cahill Richter, Klein McAlister & Hilbert, LLC, New Orleans, LA.

For DANIELLE M. BOUCHARD CORP. TUG, BOUCHARD COASTWISE MANAGEMENT CORP., third-party plaintiffs: George Moore Gilly, William Joseph Riviere, Phelps Dunbar, LLP, New Orleans, LA.

2001 U.S. Dist. LEXIS 9164, *2

For NETEC INC, third-party defendant: John Donellan Fitzmorris, Jr., Francis A. Courtenay, Jr., Donald J. Volpi, Jr., Courtenay, Forstall, Hunter & Fontana, New Orleans, LA.

For NETEC INC, third-party defendant: Philip S. Brooks, Jr., Montgomery, Barnett, Brown, Read, Hammond & Mintz, New Orleans, LA.

For NETEC INC, third-party defendant: Edward V. Cattell, Jr., Hollstein, Keating, Cattell, Johnson & Goldstein, PC, Philadelphia, PA.

For NETEC INC, claimant: John Donellan Fitzmorris, Jr., Francis A. Courtenay, Jr., Donald J. Volpi, Jr., [*3] Courtenay, Forstall, Hunter & Fontana, New Orleans, LA.

For NETEC INC, claimant: Philip S. Brooks, Jr., Montgomery, Barnett, Brown, Read, Hammond & Mintz, New Orleans, LA.

For NETEC INC, claimant: Edward V. Cattell, Jr., Hollstein, Keating, Cattell, Johnson & Goldstein, PC, Philadelphia, PA.

**JUDGES:** SARAH S. VANCE, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** SARAH S. VANCE

**OPINION**

**ORDER AND REASONS**

Before the Court is defendant NETEC, Inc.'s, motion *in limine* to exclude the testimony of plaintiff's expert, Michael Kennedy. NETEC asserts that the testimony of this expert fails to meet the standards set forth in *Federal Rule of Evidence 702* and *Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)*. For the following reasons, NETEC's motion *in limine* to exclude the testimony of plaintiff's expert is DENIED.

**I. Background**

In the predawn hours of December 24, 1997, a 12,000 pound anchor released from its stowed position aboard the Barge B. No. 245 while the barge and its tug, the M/V DANIELLE BOUCHARD, were underway

from Lake Charles to Florida. The dragged anchor caused damage to several pipelines [*4] owned by various oil companies. Bouchard Coastwise Management Corporation (the owner of the tug and barge) and Gretna Machine and Iron Works Corporation (the contractor who built the tug and barge) settled the oil companies' damages claims for $ 10.4 million. Plaintiff's Bouchard and Gretna now seek recovery from NETEC, the manufacturer of the anchor windlass. The allegations against NETEC are that the anchor windlass had a defective braking mechanism and that NETEC was responsible for damage to the safety chain bolt.

NETEC contests these allegations and asserts that any problems encountered with the anchor windlass were not the result of any design flaw or negligence of NETEC, but instead due to Bouchard and Gretna's operational negligence in the care and maintenance of the anchor windlass. The crew has testified that the band brake was tightened and the windlass was in gear during the voyage in question. NETEC contends the windlass' clutch, if engaged, can never allow an anchor and chain to slip, and therefore the windlass could not have been in gear. Accordingly, NETEC asserts the crew's testimony that the clutch was engaged during the voyage is incorrect because even if the band [*5] brake had failed, a disc brake inside the windlass would have either held the anchor or else evidenced considerable damage. Plaintiffs, however, maintain that the proximate cause of the accident was the failure of the band brake to hold, and that the accident could have occurred with the windlass in gear as testified by the crew.

NETEC now moves to exclude the testimony of Michael Kennedy, an expert in hydraulic engineering, on the grounds that Kennedy's testimony does not meet the requisite burden of proof needed to support causation.

**II. Discussion**

**A. Legal Standard**

The district court has considerable discretion to admit or exclude expert testimony under *Federal Rule of Evidence 702* and will be reviewed on appeal only for abuse of that discretion. *See General Electric Co. v. Joiner, 522 U.S. 136, 138-39, 118 S. Ct. 512, 515, 139 L. Ed. 2d 508 (1997); Seatrax, Inc. v. Sonbeck Int'l, Inc., 200 F.3d 358, 371 (5th Cir. 2000)* (citations omitted). *Rule 702*, which governs the admissibility of expert witness testimony, provides that an expert witness

2001 U.S. Dist. LEXIS 9164, *5

"qualified . . . by knowledge, skill, experience, training or education," may testify [*6] when specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue. *FED. RULE. EVID. 702. See also Daubert, 509 U.S. at 587, 113 S. Ct. at 2794.* In *Daubert,* the Supreme Court held that *Rule 702* requires the district court to act as a "gatekeeper" to ensure that "any and all scientific evidence admitted is not only relevant, but reliable." *509 U.S. at 589, 113 S. Ct. at 2795. See also Kumho Tire Co. v. Carmichael, 526 U.S. 137, 119 S. Ct. 1167, 1174, 143 L. Ed. 2d 238 (1999)*(clarifying that *Daubert* gatekeeping function applies to all forms of expert testimony). The Court's gatekeeping function thus involves a two-part inquiry into reliability and relevance.

First, the court must determine whether the proffered expert testimony is reliable. The party offering the testimony bears the burden of establishing its reliability by a preponderance of the evidence. *See Moore v. Ashland Chemical Inc., 151 F.3d 269, 276 (5th Cir. 1998) (citing In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717 (3rd Cir. 1994)).* The reliability inquiry requires the Court to assess whether [*7] the reasoning or methodology underlying the expert's testimony is valid. *See Daubert, 509 U.S. at 589, 113 S. Ct. at 2795.* The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation. *See id. at 590, 113 S. Ct. at 2795.*

*Daubert* identified a number of factors useful in analyzing reliability of an expert's testimony, including testing, peer review and publication, evaluation of known rates of error, and general acceptance within the scientific community. *See id. at 592-94, 113 S. Ct. at 2796-97.* In *Kumho Tire,* the Supreme Court emphasized that the test of reliability is "flexible" and that *Daubert*'s list of specific factors does not necessarily nor exclusively, apply to all experts in every case. *526 U.S. 137, 119 S. Ct. at 1175. See also Seatrax, 200 F.3d at 372* (reliability is a fact-specific inquiry and application of *Daubert* factors depends on "nature of the issue at hand, the witness's particular expertise and the subject of the testimony"). Nevertheless, in the vast majority of cases, the district court should first consider the *Daubert* factors [*8] before addressing whether other factors are relevant to the particular case. *See Black v. Food Lion, Inc., 171 F.3d 308, 311-12 (5th Cir. 1999). See also Watkins v. Telsmith, 121 F.3d 984, 991 (5th Cir. 1997)* (regardless of basis of expert's opinion, *Daubert's* non-exclusive

factors are relevant to initial reliability assessment). The overarching goal "is to make certain that an expert, whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire, 526 U.S. at 152, 119 S. Ct. at 1176.*

Second, the Court must determine whether the expert's reasoning or methodology "fits" the facts of the case and whether it will thereby assist the trier of fact to understand the evidence, in other words, whether it is relevant. *See Daubert, 509 U.S. at 591, 113 S. Ct. at 2795-96; FED. R. EVID. 702.* The Federal Rules of Evidence define "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more [*9] probable or less probable than it would be without the evidence." *FED. R. EVID. 401.*

In assessing the expert's qualifications, the Court notes that its gatekeeping function does not replace the traditional adversary system and the role of the jury within the system. *See Daubert, 509 U.S. at 596, 113 S. Ct. at 2798.* As the Supreme Court noted in *Daubert,* "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id. (citing Rock v. Arkansas, 483 U.S. 44, 61, 107 S. Ct. 2704, 2714, 97 L. Ed. 2d 37 (1987)).* The Fifth Circuit has added that, in determining the admissibility of expert testimony, a district court must defer to "the jury's role as the proper arbiter of disputes between conflicting opinions." As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *United States v. 14.38 Acres of Land, More or Less Sit. in Lefore County, Miss., 80 F.3d 1074, 1077 (5th Cir. 1996)* [*10] (quoting *Viterbo v. Dow Chemical Co., 826 F.2d 420, 422 (5th Cir. 1987)).* Thus, a witness qualified as an expert in a products liability action "is not strictly confined to his area of practice, but may testify concerning related applications; a lack of specialization does not affect the admissibility of the opinion, but only its weight." *Wheeler v. John Deere Co., 935 F.2d 1090, 1100 (10th Cir. 1991)*(collecting cases). *See also Lavespere v. Niagara Mach. & Tool Works, Inc., 910 F.2d 167, 176-77 (5th Cir. 1990), abrogated on other grounds by*

*Little v. Liquid Air. Corp., 37 F.3d 1069 (5th Cir. 1996)*(permitting mechanical engineer who had never designed a press brake to testify as to safety of brake design).

### B. Application

NETEC argues that the Court should exclude the testimony of plaintiff's proposed expert, Michael Kennedy, because his testimony that the motor brake "possibly could" have failed is not probative. (*See* NETEC's Mem. Supp. Mot. Lim. Kennedy, at 2.) Since NETEC does not challenge the reliability of Kennedy's testimony, the Court will focus exclusively on the relevancy prong of the *Daubert* [*11] test.

The Court finds that Kennedy's testimony is relevant. The determination of failure of the hydraulic system for a barge anchor requires technical expertise beyond the common knowledge and experience of the average juror.

NETEC argues that Kennedy's testimony should be excluded because he cannot affirmatively establish, more probably than not, the issue of causation. In support, NETEC relies on *Goode v. Herman Miller, Inc.*, in which the Fifth Circuit held that under Louisiana law, the mere proof that something is possible is of little probative value as to an ultimate issue of fact, unless it can be established with reasonable certainty that all other alternatives are impossible. *811 F.2d 866 (5th Cir. 1987). See also, Gideon v. Johns-Manville Sales Corp., 761 F.2d 1129, 1137 (5th Cir. 1985)* (possibility alone cannot serve as the basis for recovery, for mere possibility does not meet the preponderance of the evidence standard.)

NETEC's reliance on *Goode* is misplaced. The *Goode* decision did not involve a determination of the admissibility of expert opinions under *Daubert* but rather the plaintiff's burden in proving causation. *Goode*, 811 F.2d at 871-872. [*12] As such, the analysis in *Goode* is relevant in determining the weight to be given to expert opinions, not the threshold inquiry of whether the expert's opinion is admissible. The reasoning of *Goode* does not apply in the present case because Kennedy's opinions are not being offered to prove liability *per se*, but rather to rebut NETEC's claim that the crew's testimony is false because the windlass' clutch, if engaged, can never allow an anchor and chain to slip.

The Federal Rules of Evidence defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *FED. R. EVID. 401*. Here, Kennedy has opined that it is possible that the band brake could fail even with the windlass in gear. (Pl.'s Mem. Opp'n Mot. Lim. Kennedy, Ex. B.) In doing so, his testimony tends to rebut NETEC's attack on the crew's testimony. While his testimony could not alone be the basis for a plaintiff's verdict on causation, this does not make it irrelevant.

### III. Conclusion

For the foregoing reasons, the Court DENIES NETEC's motion *in* [*13] *limine* to exclude the testimony of plaintiff's expert, Michael Kennedy.

New Orleans, Louisiana, this 25th day of June, 2001.

SARAH S. VANCE

UNITED STATES DISTRICT JUDGE

# CASE #12



LEXSEE 2009 U.S. DIST. LEXIS 18479

## KATHRYN VOTH VERSUS STATE FARM FIRE AND CASUALTY INSURANCE COMPANY

### CIVIL ACTION NO. 07-4393 SECTION "K"(2)

### UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA

*2009 U.S. Dist. LEXIS 18479*; *78 Fed. R. Evid. Serv. (Callaghan) 1093*

**February 17, 2009, Decided**
**February 17, 2009, Filed**

**SUBSEQUENT HISTORY:** Partial summary judgment granted by, in part *Voth v. State Farm Fire & Cas. Ins. Co., 2009 U.S. Dist. LEXIS 13303 (E.D. La., Feb. 19, 2009)*

**PRIOR HISTORY:** *Voth v. State Farm Fire & Cas. Ins. Co., 2009 U.S. Dist. LEXIS 18732 (E.D. La., Feb. 16, 2009)*

**COUNSEL:** [*1] For Kathryn Voth, Plaintiff: Remy Voisin Starns, LEAD ATTORNEY, Remy V. Starns, Attorney at Law, New Orleans, LA; Ryan Patrick Reece, The Reece Law Firm, Metairie, LA.

For State Farm Fire and Casualty Insurance Company, Defendant: Peter Joseph Wanek, LEAD ATTORNEY, McCranie, Sistrunk (Metairie), Metairie, LA; Adam Patrick Massey, David A. Strauss, King, Krebs & Jurgens, PLLC (New Orleans), New Orleans, LA; Charles Devin Fadaol, Kevin Paul Kress, Mark Emerson Hanna, McCranie, Sistrunk (Metairie), Metairie, LA.

**JUDGES:** STANWOOD R. DUVAL, JR., UNITED STATES DISTRICT JUDGE.

**OPINION BY:** STANWOOD R. DUVAL, JR.

**OPINION**

**ORDER AND OPINION**

Before the Court is a "Motion to Exclude Testimony of Neil Hall" filed on behalf of defendant State Farm Fire and Casualty Company ("State Farm") (Doc. 28). Having reviewed the pleadings, memoranda, and relevant law, the Court, for the reasons assigned, **DENIES** the motion.

BACKGROUND

Kathryn Voth owned a home at 7201 Patricia Street in Arabi, Louisiana. The house, which was supported by masonry piers about 3 feet above grade, sustained damage rendering it a total loss as a result of Hurricane Katrina. The house floated off of its pier foundation, traveled across the yard, and stopped when it [*2] hit a tree. The house has been demolished, and was demolished before it was inspected by expert witnesses.

On August 29, 2005, State Farm entities provided both flood insurance and homeowner's insurance on the property. Following the hurricane, Ms. Voth filed claims with State Farm under both policies. Under the flood policy, State Farm paid Ms. Voth the coverage limits, i.e., $ 40,000.00 dwelling damages and $ 27,500.00 for personal property. Under the homeowner's policy, State Farm paid Ms. Voth $ 12,306.57 for dwelling damages, $ 500.00 for contents damages, and $ 1,471.25 for prohibited use. State Farm denied the remainder of Ms.

2009 U.S. Dist. LEXIS 18479, *2; 78 Fed. R. Evid. Serv. (Callaghan) 1093

Voth's claim under the homeowner's policy on the basis that the damages for which recovery was sought resulted from flood, an excluded peril under the homeowner's policy.

Thereafter Ms. Voth filed suit against State Farm seeking to recover the policy limits under her homeowner's policy as well as statutory penalties, interest and attorney' fees pursuant to *La. Rev. Stat. 22:658* and La. Rev. Stat. 22:1220 [*3] for failure to timely initiate adjustment of her claim and for arbitrary and capricious failure to timely pay the amounts due under the homeowner's policy.

Plaintiff's counsel retained Neil Hall, a certified professional engineer in the state of Texas, as an expert "to determine the extent of the damage caused by the wind and flood during Hurricane Katrina." Report of Neil Hall, Doc. 28-4. Dr. Hall issued a report based on his interview with Ms. Voth, review of three sets of photographs (some of which were taken in 2006), an inspection of the area where the house had previously been located, meteorological data, and review of an expert report issued by Nash Roberts, III for the house located at 209 Genet Street, approximately 1/3 mile ESE of Ms. Voth's house. Dr. Hall's report notes the following damage to Ms. Voth's house: 1) most if not all of the windows were broken; 2) the interior of the home was inundated with water; 3) roof shingles were missing; 4) roof vents were wind damaged; 5) the roof ridge was broken; 6) the roofing over an addition to the house was almost totally missing; and 7) there was damage to the vinyl soffit. In his report Dr. Hall stated:

. field conditions in  [*4] the vicinity of the Voth residence suggest that peak wind gust speed approached 115 mph;

. the FEMA inundation map shows a stillwater height of 10.2 10.8 feet above mean sea level near the Voth home;

. "flooding just west of the Voth residence did not reach 3' until about 0730 CDT and 6.5' until 0815 CDT;

. overtopping of the Forty Arpent levee moved south into Arabi between 0800 CDT and 0830 CDT";

. by 0800 and 0900 CDT flood water

from the Inner Harbor Navigational Canal breach and the levee overtopping combined to inundate the Arabi area; and

. "If flood water did not reach the finished floor above the crawl space of the Voth resident until 0830 CDT then wind reached 95 mph sustained/125 mph gusts according to the Roberts timeline. Since the house was pushed slightly east of south into a tree trunk, it is most probable that flood water reached by finished floor at or after 0830 CDT";

Dr. Hall then concluded:

Using the EF scale for Residential Dwellings, it is concluded that the threshold for window damage was at a time when wind speed was between 79-96 mph; the threshold for shingle blow-off was at a time when wind speed was between 63-79 mph, and the threshold for rolled roof blow-off [*5] was at a time when wind speed was between 8197 mph. All of this damage could have occurred between 0600 CDT and 0700 CDT using the Nash Robert's timeline, or 1-2 hours before flood water crossed the railroad berm or Forty Arpent levee. It is concluded that wind damage to the roofs occurred prior to the rise of the storm surge. The attic and ceiling were damaged by water leaking through the roof and by wind pressure from wind entering along the north side of the sloped roof.

There is no indication that flood water in Arabi, after overtopping the railroad berm or Forty Arpent levee, attained a current velocity greater than 5 fps. The direction which the building moved off its foundation was slightly east of west indicating a force attacking slightly west of north. This direction does not align with current flow either from the Channel breach (crossing the railroad berm) or from the Forty Arpent overflow. The direction that the building moved and the severity of impact damage is consistent with wind. The building first floated off its

2009 U.S. Dist. LEXIS 18479, *5; 78 Fed. R. Evid. Serv. (Callaghan) 1093

foundation and was pushed into the tree trunk by the force of the wind between 0830 CDT and 0900 CDT using the wind direction in the Roberts's timeline.

Doc. [*6] 28, Exhibit 1. Based on that analysis, Dr. Hall created a list of the damages caused by the wind.

State Farm moves to exclude Dr. Hall's testimony contending that his opinions are based on insufficient and incorrect facts and data and that his opinions are unreliable, speculative and therefore fail to meet the standards required under *Rule 702 of the Federal Rules of Evidence* and *Daubert*.

LAW AND ANALYSIS

A. *Daubert* Standard

"Trial courts have 'wide discretion' in deciding whether or not a particular witness qualifies as an expert under the Federal Rules of Evidence." *Hidden Oaks Limited v. City of Austin, 138 F. 3d 1036, 1050 (5th Cir. 1998). Federal Rule of Evidence 702* states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The [*7] rule reflects the Supreme Court's decisions in *Daubert, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)* and *Kumho Tire Co. v. Carmichael, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999). Daubert* charges trial courts to act as "gate-keepers" to ensure that the proffered expert testimony is both relevant and reliable. *Daubert, 509 U.S. at 589, 592-93, 113 S. Ct. at 2795, 2796.* The relevant and reliable standard announced in *Daubert* for scientific expert testimony applies to all types of expert testimony. *Kumho Tire Co. v. Carmichael, 526 U.S. at 147, 119 S. Ct. at 1171.*

*Daubert* provides a two-prong test for determining the admissibility of expert testimony. The court "must determine at the outset, pursuant to *Rule 104(a)*, whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert, 509 U.S. at 592, 113 S. Ct. at 2796.* Both prongs of the *Daubert* test must be satisfied before the proffered expert testimony may be admitted. *Id. at 595, 113 S. Ct. at 2796.* This analysis "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that [*8] reasoning or methodology properly can be applied to the facts in issue." *Id.*

Thus, the first prong of *Daubert* focuses on whether the expert testimony is based on a reliable methodology. In determining an expert's reliability, the Court's focus "must be solely on principles and methodology, not on the conclusions that they generate." *Id. at 595, 113 S. Ct. at 2797, 125 L.Ed.2d at 484.* The second prong, i.e., whether the proposed testimony will assist the trier of fact to understand or determine a fact in issue, goes primarily to the issue of relevancy. *Daubert, 509 U.S. at 591.* Indeed, this examination is described in *Daubert* as whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute. *Id., citing United States v. Downing, 753 F.2d 1224, 1242 (3rd Cir. 1985). Federal Rule of Evidence 401* defines "relevant evidence" as that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

When expert testimony is challenged under *Daubert*, the burden of proof rests with the party seeking [*9] to present the testimony. *Moore v. Ashland Chemical, Inc., 151 F.3d 269 (5th Cir. 1998).* To meet this burden, a party cannot simply rely on its expert's assurances that he has utilized generally accepted scientific methodology. Rather, some objective, independent validation of the expert's methodology is required. *Id.* Nonetheless, as Judge Vance stated in *Scordill v. Louisville Ladder Group, L.L.C., 2003 U.S. Dist. LEXIS 19052, 2003 WL 22427981 at *3 (E.D. La. October 24, 2003)*:

> The Court notes that its role as a gatekeeper does not replace the traditional adversary system and the place of the jury

2009 U.S. Dist. LEXIS 18479, *9; 78 Fed. R. Evid. Serv. (Callaghan) 1093

within the system. See *Daubert, 509 U.S. at 596*. As the *Daubert* Court noted, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (citing *Rock v. Arkansas, 483 U.S. 44, 61, 107 S. Ct. 2704, 97 L.Ed.2d 37 (1987)*). The Fifth Circuit has added that, in determining the admissibility of expert testimony, a district court must defer to "'the jury's role as the proper arbiter of disputes between conflicting opinions. As a general rule, questions relating to the bases and sources [*10] of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration.'" *United States v. 14.38 Acres of Land, More or Less Sit. in Leflore County, Miss. 80 F.3d 1074, 1077 (5th Cir. 1996) (quoting Viterbo v. Dow Chemical Co., 826 F.2d 420, 422 (5th Cir. 1987).*

B. Methodology and Reliability

State Farm urges that Dr. Hall's methodology is flawed because he began his analysis with a presumption that wind, not flood, caused the damages to the Voth house. State Farm also challenges Dr. Hall's reliance on the analytical method contained in NFPA 921, a "Guide for Fire and Explosion Investigations, contending that method is unreliable because the NFPA 921 protocol is inapplicable to hurricane damages.

The use of the scientific method described in NFPA 912, a document directed toward the investigation of arson and explosion cases, does not invalidate the methodology used by Dr. Hall. The "Basic Methodology" section of NFPA 921 states that "[t]he systematic approach recommended is that of the scientific method, which is used in the physical sciences . . . The scientific method is a principle of inquiry that forms a basis [*11] for legitimate scientific and engineering processes, including fire incident investigation." Doc. 28, Exhibit 6-B. It is clear that the scientific method described in NFPA 921 is not specific to fire or explosion

investigation, and is applicable in this case involving hurricane damage.

During his deposition, Dr. Hall testified that he used the "scientific method" to determine what damage was caused by wind and what damage was caused by flood. Document 35, Exhibit 5, p. 49. He described that method as follows:

> The scientific method I employ as always begins with an understanding of a hypothesis which we call the research hypothesis, which is an -- which is a possible cause of the damage. And then there are other hypotheses listed, which are called null hypotheses, which are opposite causes that are to be considered. Then an analysis is performed.
>
> The initial determination to pick those hypotheses is based on data collection, which may be data that's collected before going to the field or data collected after going to the field. At this point in time, I generally pick the hypotheses before I go to the field based on my familiarity with the area and with Hurricane Katrina. After the analysis, [*12] the determination is reached, after both inductive reasoning and deductive reasoning as to what is the cause and as to what is not the cause.

*Id.* at 50. Thereafter Dr. Hall further explained:

> In the beginning of Katrina, that is exactly how I performed the analysis. At a point in time I realized it doesn't matter whether I start with wind or start with flood, because at the end of the day, I have to provide an analysis of both, you might as well plug in wind or flood just to get the analyses moving.
>
> Based on my experience in the field and the reports I've written, I created a presumption that there was wind damage as No. 1 on the top of the short list, which was wind and flood as the two causes. But you still have to confirm wind, you still have to deconfirm flood. The same analysis would be conducted if you started

Case 2:05-cv-04182-SRD-JCW   Document 19485-1   Filed 12/18/09   Page 111 of 119

Page 5
2009 U.S. Dist. LEXIS 18479, *12; 78 Fed. R. Evid. Serv. (Callaghan) 1093

with flood and then added wind as the null hypothesis.

*Id.* at 51-52. Dr. Hall concedes that where both wind and flood acted on a house during Hurricane Katrina, he begins his damage causation analysis with the presumption that wind damaged the house. However, he noted that such a presumption is "without prejudice because I am knowledgeable that during the course of the analysis, [*13] if the first decision to put wind over flood is incorrect, it will come out in the analysis. *Id.* at 52.

Dr. Hall's decision to begin his analysis with a research hypothesis of wind damage and a null hypothesis of flood damage does not corrupt his use of the scientific method or render his methodology flawed and unreliable. Identifying wind as the research hypothesis does not mandate a finding that wind caused the damage being analyzed. Even when wind damage is the research hypothesis, before reaching a conclusion of wind damage, Dr. Hall must still find facts which support that conclusion and are not wholly inconsistent with a finding of flood damage and must "deconfirm" that flood is not the cause of the damage. It is within the province of the jury, not the *Daubert* gatekeeper, to analyze and weigh an expert's findings to determine whether they do in fact support his conclusion." *See Daubert, 509 U.S. at 595, 113 S. Ct. at 2797, 125 L.Ed.2d at 484.* The methodology used by Dr. Hall is acceptable under *Daubert*.

State Farm also contends that Dr. Hall's opinions should be excluded because they are based on speculation and "bad facts." Dr. Hall formulated his opinions after speaking with [*14] Ms. Voth, reviewing photos of the house taken after the storm in 2005 and 2006, and reviewing weather event data collected and analyzed by others, including Nash Robert, III and the Corps of Engineers. State Farms faults Dr. Hall for not taking field notes, not documenting his "inspection" of the property where the Voth house was located, not recalling at his deposition when the inspection took place, having no specific recollection of the inspection of the Voth home, and doing nothing "scientific."

Neither *Rule 702 of the Federal Rules of Evidence* nor *Daubert* require specific actions to be taken to validate the investigation done by an "expert" witness. State Farm's criticisms of the investigation go to the weight to be accorded to Dr. Hall's testimony, not the admissibility of the testimony. As noted previously, the Court's role as gatekeeper:

> does not replace the traditional adversary system and the place of the jury within the system. *See Daubert, 509 U.S. at 596.* As the *Daubert* Court noted, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." [*15] *Id.* (citing *Rock v. Arkansas, 483 U.S. 44, 61, 107 S. Ct. 2704, 97 L.Ed.2d 37 (1987)).* The Fifth Circuit has added that, in determining the admissibility of expert testimony, a district court must defer to "'the jury's role as the proper arbiter of disputes between conflicting opinions. As a general rule, questions relating to the bases and sources of an expert's opinion rather than its admissibility and should be left for the jury's consideration.'" *United States v. 14.38 Acres of Land, More or Less Sit. in Leflore County, Miss. 80 F.3d 1074, 1077 (5th Cir. 1996)* (quoting *Viterbo v. Dow Chemical Co., 826 F.2d 420, 422 (5th Cir. 1987).*

*Scordill v. Louisville Ladder Group, L.L.C., 2003 U.S. Dist. LEXIS 19052, 2003 WL 22427981 at *3.* The jury will have the opportunity to determine whether Dr. Hall's alleged omissions with respect to his investigation of the causation of the damage to Ms. Voth's home warrant disregarding Dr. Hall's trial testimony or lessening the weight to be accorded to that testimony.

The same analysis applies to State Farm's contention that Dr. Hall's testimony should be excluded because his conclusions are based in part on incorrect facts. Relying in part on photographs indicating that almost [*16] all of the windows of Ms. Voth's were broken, Dr. Hall opined that damage to the windows was caused by Hurricane Katrina. He then used that conclusion to determine that other damages to the house resulted from wind driven rain which entered the house due to the broken windows. During Dr. Hall's deposition, State Farm pointed out him that photographs of the house taken in September 2005 and November 2005 show fewer broken windows than do the photographs taken in 2006. Thereafter Dr. Hall stated

Case 2:05-cv-04182-SRD-JCW   Document 19485-1   Filed 12/18/09   Page 112 of 119

Page 6

2009 U.S. Dist. LEXIS 18479, *16; 78 Fed. R. Evid. Serv. (Callaghan) 1093

that "it looks like the majority [of the windows] were not broken in 2005" and conceded that some force after the storm broke windows in the house. Based on that information he altered his opinion with respect to damages caused by wind driven rain stating that his opinion would not be that all of the damage to window glazing was due to wind damage.

Although it is clear that Dr. Hall relied on incorrect information in forming some of his opinions, that does not render all of his opinions inadmissible, especially, where as here, he has modified his opinion to take into account the actual facts. The original reliance on the incorrect facts goes to the weight of his testimony not the admissibility [*17] of the testimony itself.

State Farm further challenges Dr. Hall's testimony contending that his opinions regarding causation of damages are based on "rank speculation." Specifically, State Farm focuses on the fact that Dr. Hall's report states that he doesn't know how much damage could have been caused by wind independent of flood because flood water was also involved, but that for estimating purposes, he attributes the cost of sealing and repainting all walls in the house to wind. When questioned at his deposition regarding that statement in his report he testified:

> I don't know exactly, but I know that the amount of wind damage was greater than zero; and in my experience, reasonably, the cost of sealing and repainting the walls would be an approximate cost of the wind damage that was caused before flood water got there. Therefore, to provide guidance to a cost estimator, I added that sentence. But I made it clear it wasn't based on a factual understanding. It was based on my experience in the field.

Doc. 28, Exhibit 2, pg. 56-59. The fact that Dr. Hall cannot pinpoint the specific damage resulting from the wind does not mandate excluding his entire testimony. The jury is entitled to [*18] rely on Dr. Hall's expertise should it elect to do so. Additionally, there may well be other evidence at trial that will enlighten the jury on this point. The jury will ultimately reach a decision as to whether Ms. Voth's house sustained wind driven damage, and if so, the amount of that damage, but it will make that

decision after hearing all of the evidence, not just the testimony of Dr. Hall.

State Farm's motion contends that because Dr. Hall is not a licensed professional engineer in Louisiana and is rendering "engineering" opinions in this case, that he is engaged in the unlawful practice of professional engineering in Louisiana in violation of *La. Rev. Stat. 37:681-703*, and therefore his opinions are unreliable. State Farm points to the fact that Giddings Emery, a professional engineer in Louisiana, has affixed his professional engineer stamp to the report in this case to support its claim that in offering his expert opinion in this case, Dr. Hall has engaged in the unlawful practice of engineering. State Farm further asserts that the use of Mr. Emery's professional engineering stamp on Dr. Hall's expert report cannot rehabilitate that report and render it reliable.

Nothing in *Rule 702* [*19] or *Daubert* requires that an expert be licensed in a state to provide expert testimony in that state. State Farm has not cited a single case where Dr. Hall, or any other expert, has not been accepted as an expert witness, due to the lack of a license in the state where he is sought to be recognized as an expert witness. In fact, the opposite is seemingly true with respect to Dr. Hall, who plaintiff notes has never been rejected as an expert witness in any court and has been accepted as such more than 30 times. Although the lack of a lack of a professional engineering license in Louisiana is a factor that the jury is free to consider in determining the weight to accord to Dr. Hall's testimony, it is not determinative of the admissibility of that testimony under *Daubert*. Moreover, this case is not the proper venue in which to determine whether Dr. Hall is engaged in the unlawful practice of professional engineering and whether Mr. Emery is properly placing his stamp on Dr. Hall's reports. Accordingly, the motion is DENIED.

New Orleans, Louisiana, this 17th day of February, 2009.

/s/ Stanwood R. Duval, Jr.

STANWOOD R. DUVAL, JR.

UNITED STATES DISTRICT JUDGE

# CASE #13



LEXSEE 1999 U.S. DIST. LEXIS 12353

**WILLIE MAY YOUNG, ET AL VERSUS AMERICAN RELIABLE INS. CO., ET AL**

**CIVIL ACTION NO. 98-2210 SECTION "T"(5)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA**

*1999 U.S. Dist. LEXIS 12353*

**August 6, 1999, Decided**
**August 9, 1999, Filed; August 9, 1999, Entered**

**COUNSEL:** [*1] For WILLIE MAE YOUNG, ROSEMARY WILSON, DENNIS - YOUNG, IRENE HALL, JOHNNY YOUNG, plaintiffs: Wendell H. Gauthier, Gauthier, Downing, LaBarre, Beiser & Dean, Metairie, LA.

For WILLIE MAE YOUNG, ROSEMARY WILSON, DENNIS - YOUNG, IRENE HALL, JOHNNY YOUNG, plaintiffs: Lewis Stephen Kahn, Lewis S. Kahn, Attorney at Law, Metairie, LA.

For AMERICA RELIABLE INSURANCE COMPANY, JAMES - SMITH dba J & R Trucking, RUTH SMITH dba J & R Trucking, RONALD HINTON, defendants: Matthew J. Ungarino, William Harry Eckert, Nicholas J. Lorusso, Ungarino & Eckert, LLC, Metairie, LA.

**JUDGES:** G. THOMAS PORTEOUS, JR., UNITED STATES DISTRICT JUDGE.

**OPINION BY:** G. THOMAS PORTEOUS, JR.

**OPINION**

These motions in limine came for hearing on a previous date upon motion of the parties. Oral argument was waived and the matters were taken under submission on the briefs only.

The Court, having studied the record, the applicable law and the memoranda submitted by the parties, is fully advised in the premises and ready to rule.

**ORDER AND REASONS**

**I. BACKGROUND**

This cause of action arose from an incident that occurred on June 23, 1998, when John C. Young was killed in a pedestrian/truck accident in Bogalusa, [*2] Louisiana. Decedent's wife and four children have filed suit for wrongful death, survival damages, and for coming upon the scene and viewing the body, alleging negligence on the part of the defendants.

**MOTIONS IN LIMINE**

(i) *Motion to (a) Admit Statements Made to Investigator and (b) to Exclude Photographs*

In Document # 37, the defendants move the Court to find that the coroner investigator, Ms. Denise Galloway, may testify at trial regarding certain statements regarding the decedent's suicidal tendencies allegedly made by the sister of the decedent to Ms. Galloway. The defendants contend that these statements, although technically hearsay, fall under the exceptions to the hearsay rules provided in the Federal Rules of Evidence. Specifically, the defendants maintain that the statements by the

Case 2:05-cv-04182-SRD-JCW   Document 19485-1   Filed 12/18/09   Page 115 of 119

Page 2
1999 U.S. Dist. LEXIS 12353, *2

decedent to the sister fall under Rule 803(3) as a statement of the decedent's then existing state of mind. Furthermore, the defendants assert that the sister's statements to Ms. Galloway are admissible under Rule 803(1), which provides that an excited utterance to another may be admissible. Here, the defendants maintain that at the time of the sister's statement to Ms. Galloway, [*3] she was clearly in an excited state evidenced by her crying, having just seen her brother's body.

The plaintiffs oppose this motion on the following grounds. They argue that the decedent's statements to his sister did not express his state of mind at the time, but were reflective upon how he felt on the prior day. In the alternative, the plaintiffs argue that if the Court finds the statements admissible under the hearsay exception rule, then the Court should nevertheless find the statements inadmissible under Rule 403, since they will allegedly prejudice the plaintiffs and mislead the jury concerning the current mental state of the decedent.

The Court finds that decedent's statement was not close enough in time to reflect his state of mind at the time of the accident. Even if it qualified for admission under the "excited utterance" exception, the probative value does not outweigh the potential prejudice. The Court does not rule out the possibility that the decedent's statements may be admissible in some other manner.

In this motion, the defendants also argue that photographs of the decedent taken after the subject accident are prejudicial and have no probative value. Alternatively, [*4] the defendants argue for exclusion of the photographs because their potential for prejudicial effect on the jury far outweighs any probative value they may have.

In their opposition, the plaintiffs contend that while the photographs may not be relevant to the issue of causation, they are relevant to other issues. Namely, the plaintiffs contend that the photographs will be used as evidence to rebut the claims of the defendants that the decedent would have desired to commit suicide in such a manner (*i.e.*, the gruesome nature of the event rebutting the idea that the decedent would try to kill himself that way). Moreover, the plaintiffs claim that the nature of the injuries suffered tend to show that the driver of the truck was traveling at a speed greater than the twenty-file miles per hour that he claims. Also, the plaintiffs contend that the photographs are direct evidence of what the plaintiffs Irene Hall and Johnny Young viewed when arriving at

the scene of the accident. These two plaintiffs have asked for damages due to their viewing this traumatic scene. The plaintiffs contend that the photographs are necessary to prove this element of their emotional damages.

The photographs [*5] of the decedent taken at the scene of the accident (before his body was moved) will be admitted for the sole purpose of the testimony of Irene Hall and Johnny Young regarding their claim for damages. Any photographs of the decedent taken after his body was moved are inadmissible.

The plaintiffs' claims that the photographs are relevant to the issue of the decedent's post-accident pain and suffering are moot because this Court has dismissed the plaintiffs' claims for survival damages.

### (ii) *Motion to Exclude Driver's Criminal Record*

Next the defendants argue that Ronald Hinton's criminal record, including any references to his designation as a "habitual offender," should be ruled inadmissible under *Federal Rules of Evidence 609*. The plaintiffs submit that because at the very heart of this case will be the testimony of Mr. Hinton (the individual driving the truck that killed the decedent and the only person alive who personally witnessed the accident), whose credibility will be crucial to the case, all evidence of his prior criminal record should be admissible in view of his continuous criminal activity and his willingness to lie about his criminal record in deposition testimony. [*6] Furthermore, along with the plaintiffs' arguments that the criminal record of Mr. Hinton should be admissible at trial, the plaintiffs argue as well that, dependent upon Mr. Hinton's testimony at trial, the plaintiffs may have the right to impeach Mr. Hinton's credibility under *FRE 607* because of his denial in deposition testimony of the existence of other arrests.

First, Mr. Hinton was convicted of multiple counts of writing bad checks in 1977; of burglary and grand larceny in 1985; and of burglary in 1988. As stated by the defendants, these convictions fall outside of the ten year time limitation set forth in *Rule 609(b)*. However, the plaintiffs argue that the probative value of these convictions outweigh their prejudicial effect because they involved fraud and dishonesty and remain pertinent in light of Mr. Hinton's continued criminal activity. The court agrees. Evidence of Mr. Hinton's honesty and willingness perjure himself on the stand about what he witnessed is crucial to the jury's determination. These

1999 U.S. Dist. LEXIS 12353, *6

convictions may be established at trial.

Defendants argue that Mr. Hinton's convictions for "no child restraint," "open beer," "littering," "disorderly conduct," and "shoplifting, [*7] " although they are less than ten years old, were misdemeanors, punishable by no more than one year. *FRE 609(a)(1)* states that such convictions (except the "shoplifting" conviction) are inadmissible. However, the plaintiffs argue that Mr. Hinton's misrepresentations in his deposition testimony about these convictions should allow the plaintiffs to introduce his false statements as evidence of his willingness to perjure himself. Again, the court agrees. While the convictions themselves are not relevant to this case, the fact that Mr. Hinton lied about them at his deposition is relevant. Plaintiffs may establish at the trial the fact that Mr. Hinton was deposed and that he lied about being convicted of those crimes. However, the plaintiffs may only refer to these crimes in a generic manner, a "misdemeanors" followed by the date or dates upon which the "misdemeanors" occurred. Further, the conviction for "shoplifting" involves dishonesty and thus falls under *FRE 609(a)(2)*; it is therefore admissible.

Finally, in 1994 Mr. Hinton was convicted for commercial burglary, which he had committed the previous year. The defendants argue that evidence of this conviction should not be allowed because [*8] the risk of prejudice outweighs its probative value. The plaintiffs assert that this crime falls under both *FRE 609(a)(1)* and *(2)*. Plaintiffs claim that dishonesty is an element of commercial burglary. Moreover, the plaintiffs claim that the probative value of this evidence, tending to display Mr. Hinton's lack of credibility, outweighs its potential prejudicial effect. The Court rules that the evidence of Hinton's conviction for this crime is admissible as well.

However, there will be no references at trial to Mr. Hinton being a "habitual offender." The jury can look at the evidence and draw their own conclusions as to Mr. Hinton's criminal record.

(iii) Motion to Exclude Certain Expert Testimony

The defendants argue that the Court should disallow the plaintiffs' purported expert (Mike Sunseri) from testifying concerning truck driving practices and procedures in this matter since his training and expertise does not meet the standards of *Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)*, or *Kumho Tire Company, Ltd. v.*

*Carmichael, 526 U.S. 137, 143 L. Ed. 2d 238, 119 S. Ct. 1167 (1999)*. The defendants argue in [*9] the alternative that the expert's opinion is cumulative and will not aid the jury, and should thus be excluded under *FRE 702*.

The plaintiffs maintain that Mr. Sunseri will only be called upon to testify about general driving principles and duties which apply to any driver on the road. Furthermore, Mr. Sunseri will be called upon to render his opinion as an accident reconstructionist, for which he is eminently qualified. The plaintiffs assert that these opinions are not specific to truck driving practices and involve the same type of analysis no matter what type of vehicle is involved. Moreover, the plaintiffs claim that they will not be relying on Mr. Sunseri's opinion as to any specific truck driving practices. Those opinions will be reserved for Jack Ramirez, who is an alleged trucking expert. Also, plaintiffs contend that Mr. Sunseri's expert opinions will not be cumulative, because he will be reconstructing the accident, while Mr. Ramirez will be rendering opinions on specific truck driving practices. Mr. Sunseri will be limited to testimony concerning accident reconstruction. No testimony by Mr. Sunseri concerning general driving practices or truck driving practices will be allowed.

[*10] (iv) Motion to Strike Defendants' Supplemental Witness List Listing Mrs. Ronald Hinton

Plaintiffs contend that the defendants have sought to introduce the testimony of Mrs. Ronald Hinton several weeks after the June 8, 1999 discovery cut-off date as set in the Court's scheduling order. The plaintiffs claim that the defendants have failed to show good cause why they should be able to supplement their witness list. Moreover, plaintiffs state that pursuant to FRCP 37(c)(1), the defendants should not be allowed to introduce the testimony of Mrs. Hinton because they had not previously disclosed their intention of utilizing her testimony and her testimony will in fact be prejudicial to the plaintiffs. The plaintiffs claim that having to take Mrs. Hinton's deposition at such a late date may have an adverse affect on their trial preparation and may cause problems in the creation of the pre-trial order. However, the defendants claim that they inadvertently left Mrs. Hinton off the initial witness list. The defendants state that Mrs. Hinton will only be testifying as to the mental anguish suffered by her husband as a result of the accident. Moreover, the defendants attempt to alleviate [*11] the plaintiffs' concerns that Mrs. Hinton's

testimony may add to or be different from Mr. Hinton's version of how the accident occurred by maintaining that such testimony will not be presented. Finally, the defendants state that Mrs. Hinton can be made immediately available for deposition. The court does not view the testimony of Mrs. Hinton as relevant in these proceedings. Because her testimony would not aid the jury, any testimony by her is barred.

(v) Motion to Strike Expert Report Not Timely Disclosed

The defendants ask the Court to strike the expert report of Dr. Sarah DeLand (expert witness for plaintiff) on the grounds that the defendants were not given proper notice, she was not listed on the witness list, and her export reports were not given to defendants within the ordered deadlines. Furthermore, defendants assert that Dr. DeLand is not a "rebuttal" witness in any sense of the term, since the plaintiffs were already well aware that the defendants were going to argue that the accident was really a result of decedent's suicide. The defendants maintain that the plaintiffs can show no good cause why Dr. DeLand's testimony should be ruled admissible at such a late date.

[*12] The plaintiffs claim that upon receiving the expert opinions of defendants' experts, Dr. Kevin Blanchard and Dr. Harold Ginzburg, the expert opinion of Dr. DeLand was needed to specifically rebut the findings of defendants' experts. Furthermore, the plaintiffs claim that they would be extremely prejudiced if they were not allowed to present the expert opinion of Dr. DeLand. The plaintiffs state that they should not be forced to have anticipated the affirmative defenses of the defendants before the defendants served a report stating that the decedent was suicidal. Pursuant to FRCP 26(a)(2), the plaintiffs assert that they followed the proper procedure for rebutting expert opinions on the defendants affirmative defense of suicide. The Court rules that Dr. DeLand is not a true rebuttal witness. The plaintiffs knew that the defendants were going to utilize a suicide defense well enough in advance whereby a so-called "rebuttal" witness is not appropriate. Therefore, the expert testimony of Dr. DeLand will not be allowed at trial.

(vi) Plaintiffs' Motion in Limine to Exclude Certain Defendants' Expert Testimony

The plaintiffs seek to have the testimony of four of the defendants' expert [*13] witnesses declared inadmissible under the standards set forth in *Daubert, 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786,* and *Kumho Tire, 526 U.S. 137, 143 L. Ed. 2d 238, 119 S. Ct. 1167,* on the grounds that this testimony rests upon invalid methodology, speculation and assumptions, and has no reliable basis in the knowledge and experience of the experts' respective disciplines. The defendants contend that there witnesses utilized proper methodology and complied with the appropriate standards.

(a) Jack Buck

The defendants have retained Jack Buck as an expert safety consultant. Mr. Buck considers himself an expert in motor carrier safety and the operating techniques of the driver. The plaintiffs assert that Mr. Buck is not qualified to render any other types of opinions, including those regarding the reconstruction of this accident. Moreover, the plaintiffs claim that Mr. Bucks' opinions about how Mr. Hinton responded at the time of the accident are not based on facts, but are merely baseless speculation (the assumptions that are most notable are the speed of the truck and Mr. Hinton's braking). Furthermore, the plaintiffs state that Mr. Buck developed his opinions [*14] without reviewing the deposition testimony of either Tim Stewart (investigating police officer) or Barbara Bell (alleged eye witness).

The defendants assert that Mr. Buck is clearly an expert in truck driving practices and safety. Furthermore, they state that Mr. Buck has vast experience in the realm of accident investigation (although the defendants concede that Mr. Buck is not qualified as an expert in accident reconstruction). The defendants maintain that Mr. Buck based his opinions upon assumptions that were reasonable in light of the information available to him at the time. Moreover, the defendants claim that Mr. Buck's reliance on the accident report of the investigating police officer and on the deposition testimony of Mr. Hinton was appropriate. The Court believes that plaintiffs' complaints about the information that Mr. Hinton relied upon can be addressed during the plaintiffs' cross-examination of the expert witness. One of the plaintiffs' chief complaints is that Mr. Buck did not take into account the alleged eye-witness testimony of Ms. Bell. However, there remains a dispute over the validity of Ms. Bell's testimony; therefore, credibility will affect the weight given [*15] to Mr. Buck's opinions. The fact that the plaintiffs have a different version of how the

accident occurred should not prevent Mr. Buck from presenting his opinions on the defendants' version of the accident.

(b) Charles Prewitt

Charles Prewitt, a mechanical engineer, has been retained by the defendants as their accident reconstructionist. The plaintiffs claim that all of Mr. Prewitt's testimony is based upon his reliance on the statements of Mr. Hinton, stating that he was only traveling twenty-five miles per hour at the time of the accident. The plaintiffs assert that Mr. Prewitt's reliance on these statements is faulty because of the alleged inconsistencies between those statements and others made by Mr. Hinton, as well as alleged eye witness testimony.

The defendants claim that Mr. Prewitt utilized the correct methodology in reaching his conclusions. The basic argument of the plaintiffs seems to be that Mr. Prewitt relied on the speed estimates of Mr. Hinton and ignored the speed estimates of Ms. Bell. However, the defendants contest the credibility of Ms. Bell's testimony. The Court finds that the conclusions of Mr. Prewitt, in light of the testimony of Mr. Hinton, are rationally [*16] based. The plaintiffs' argument that Ms. Bell's testimony should be considered can be raised in cross-examination.

(c) Dr. Kevin Bianchini

Dr. Bianchini has been retained by the defendants to render a "psychological autopsy" report on the decedent. The plaintiffs contend that Dr. Bianchini is not qualified to render such a report. Plaintiffs state that Dr. Bianchini is not specifically trained with regards to "suicide." Also, plaintiffs assert that Dr. Bianchini has never done such a "psychological autopsy" before. Plaintiffs state that as a psychologist, as opposed to a psychiatrist, Dr. Bianchini has no experience in dispensing medications and should not be allowed to testify concerning psychopharmacology issues. Furthermore, plaintiffs contend that Dr. Bianchini failed to follow the methodology that he himself alluded to in his own deposition. The plaintiffs cite to a lack of appropriate investigation/evaluation of the decedent's alleged suicidal tendencies.

The defendants contend that Dr. Bianchini is eminently qualified as an expert in the field of psychology. They point to his education as well as his experience as clinical psychologist and a neuropsychologist. The defendants [*17] submit that Dr. Bianchini has had years of experience in dealing with patients with depression with suicidal risk. Furthermore, the defendants state that Dr. Bianchini has performed a psychological autopsy before (although not related to suicide). The defendants assert that Dr. Bianchini is qualified as an expert in the field on psychology (including suicide). Moreover, the defendants contend that Dr. Bianchini utilized proper methodology when employing secondary sources (such as the police report, the medical records of the decedent, and the depositions of the relevant individuals in this case) instead of directly speaking to the family of the decedent. The Court will conduct a pre-trial Daubert hearing as to Dr. Bianchini. The parties shall contact the Court by telephone conference call to set up a date for the hearing.

(d) Dr. Harold Ginsberg

Dr. Ginsberg was retained by the defendants to render a psychiatric evaluation of the decedent's son, plaintiff Johnny Young, Jr. The plaintiffs do not contest that evaluation, but they do contest a reference in Dr. Ginsberg's evaluation that John Young's (the decedent) death appeared to have a "significant volitional component." The [*18] plaintiffs maintain that pursuant to FRCP 26(a)(2)(B), this reference should be ruled inadmissible because Dr. Ginsberg failed to articulate the basis for that opinion. Furthermore, the plaintiffs state that Dr. Ginsberg first presented this opinion to them in his deposition taken just six days before the discovery deadline and nearly one month after his expert opinion was due. The plaintiffs claim that if Dr. Ginsberg's testimony regarding the decedent's alleged suicide, they will be prejudiced due to a lack of time within which to cross-examine Dr. Ginsberg concerning this opinion. Moreover, the plaintiffs assert the same arguments of improper methodology that they claim taint the opinion of Dr. Bianchini.

The defendants maintain that Dr. Ginsberg followed proper methodological procedures by interviewing the decedent's son and engaging in a detailed review of the decedent's medical history, including the traffic accident report and the coroner's report. The Court believes that the methodology followed by Dr. Ginsberg was appropriate pursuant to FRCP 26. The plaintiffs will not be prejudiced by the late date of the deposition because they had ample opportunity to question Dr. Ginsberg [*19] at his deposition, and they will be able to

cross-examine him at the trial.

However, the Court limits Dr. Ginsberg from making a final conclusion of a "significant volitional component" in John Young's death. Dr. Ginsberg may present his findings (that lead to his own conclusion), but the Court is going to let the jury draw their own final conclusions.

Finally, the Court orders that since the trial of this matter was continued on the eve of trial (due to scheduling conflicts of the Court), and considering that discovery in this case should have been completed, the discovery cut-offs in effect at the time the trial was last continued remain in effect. Accordingly, discovery in this matter is closed.

New Orleans, Louisiana, this 6th day of August, 1999.

**G. THOMAS PORTEOUS, JR.**

**UNITED STATES DISTRICT JUDGE**