# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| | * | |
| IN RE: KATRINA CANAL | * | |
| BREACHES | | |
| CONSOLIDATED LITIGATION | * | CIVIL ACTION |
| | * | |
| | * | NO. 05-4182 |
| | * | and consolidated cases |
| PERTAINS TO: BARGE | * | |
| | * | SECTION "K" (2) |
| *Boutte v. Lafarge*     05-5531 | * | |
| *Mumford v. Ingram*     05-5724 | * | |
| *Lagarde v. Lafarge*     06-5342 | * | JUDGE |
| *Perry v. Ingram*     06-6299 | * | STANWOOD R. DUVAL, JR. |
| *Benoit v. Lafarge*     06-7516 | * | |
| *Parfait Family v. USA*     07-3500 | * | MAGISTRATE |
| *Weber v. Lafarge*     08-4459 | * | JOSEPH C. WILKINSON, JR. |

## LAFARGE NORTH AMERICA INC.'S OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE IN WHOLE OR IN PART THE TESTIMONY OF DEFENDANT'S EXPERT ROBERT BEA

Defendant Lafarge North America Inc. ("LNA") opposes plaintiffs' motion (Doc. 19450) to exclude the expert testimony of Robert Bea, Ph.D., P.E., an expert in geotechnical and forensic engineering who has spent thousands of hours studying the causes of the New Orleans levee and floodwall failures, and whose work on these subjects has been accepted and relied on by this Court in the *Robinson* case. Doc. 19415. Though Dr. Bea carried out the bulk of his investigation as co-leader of the Independent Levee Investigation Team (ILIT), plaintiffs' motion derides him as a "credentialed cheerleader" who "start[ed] out with the desired conclusion and then ignore[d] all evidence and analysis that could lead to a different result." Pl. Mem. at 21. Though Dr. Bea's conclusions regarding the causes of the levee and floodwall failures have been published in numerous peer-reviewed journal articles, plaintiffs assert – based only on arguments of counsel – that those conclusions "far outstrip his analysis." Pl. Mem. at 20.

Plaintiffs' motion is utterly meritless.  As this Court knows, nobody has spent more time, effort, and care in getting to the bottom of what caused the levee and floodwall breaches than Dr. Bea.  Nobody has more rigorously applied scientific principles and methods in addressing that problem than he has.  At most, plaintiffs' tangential attacks on Dr. Bea are merely fodder for cross-examination at trial, particularly since this Court has already rejected similar objections to the testimony of Dr. Bea.  Plaintiffs' motion to exclude his testimony should be denied.

## BACKGROUND

Robert Bea is a Professor of Civil and Environmental Engineering at the University of California – Berkeley.  Exhibit 1 hereto, Report of Robert Glenn Bea, Ph.D., P.E. ("Bea Report") Appendix A at 1.[1]  Dr. Bea has spent approximately 10,000 pro bono hours assisting in the forensic engineering studies of the failures of the hurricane flood protection system that led to the flooding of New Orleans during Hurricane Katrina.  *Id.* at 4 ¶ 4.  He served as co-leader of the Independent Levee Investigation Team ("ILIT") sponsored by the National Science Foundation, and co-authored the ILIT team's preliminary and final reports.  *Id.* at 5 ¶ 4(c).  Dr. Bea has authored and co-authored no fewer than twenty-one refereed conference and journal papers documenting his forensic engineering work regarding the causes of the levee and floodwall breaches in and around New Orleans.  *Id.* at 7 ¶ 12.

Dr. Bea's peer-reviewed publications include his analysis of the causes of the North and South Breaches on the eastern side of the IHNC, specifically encompassing his conclusion –

---

[1] For purposes of completeness and the convenience of the Court, Dr. Bea's entire report, including appendices, is attached as Exhibit 1 to this opposition (to be submitted manually).  Dr. Bea's deposition transcript is attached as Exhibit 2.  With respect to other exhibits referenced in this memorandum, LNA refers the Court to the exhibits submitted with LNA's motion for summary judgment (Doc. 19309), which were manually attached in tabbed notebooks for the Court's convenience.  LNA is, of course, willing to re-submit any of these exhibits at the Court's request.  LNA has also included, with this opposition, a declaration from Dr. Bea addressing the allegations in plaintiffs' motion.  Exhibit 3 hereto.  Though Dr. Bea's declaration is not necessary to LNA's opposition (and thus is not cited herein), LNA considered it important to provide Dr. Bea with an opportunity to respond to plaintiffs' baseless attacks on his work.

reached before he was ever retained as an expert by LNA or any other party in litigation – that

the Barge ING 4727 was not a cause of the IHNC floodwall breaches.  *See id.* at 8-13 ¶¶ 17-23

(ILIT investigation and conclusions published in 2006); *id.* at 15-22 ¶¶ 27-29 (peer-reviewed

journal articles published in 2007 and 2008).[2]  Dr. Bea arrived at his conclusions regarding the

causes of the IHNC floodwall breaches on the basis of the following sorts of data and analyses,

among others:

● Multiple personal visits and inspections of the hurricane protection system including

the floodwall on the east side of the IHNC.  Exh. 1, Bea Report at 5 ¶ 4(b); Exh. 2, Bea Dep. at

77 ("We walked every inch of that North Breach repeatedly.").

● Examination of the barge and floodwall damage at the south end of the South Breach

where the barge passed through the breached floodwall.  Exh. 1, Bea Report at 10 ¶ 21.

● Comprehensive soil stability and seepage analyses based on painstaking soil study and

characterization, including records of excavations at the East Bank Industrial Area (EBIA) and

soil sampling conducted by the ILIT team itself.  Exh. 1, Bea Report at 39 ¶¶ 43-44 and

Appendix C; Exhibit 4 hereto, Bea Supplemental Report (Sept. 4, 2009).

● Review of multiple sources of additional data, such as weather data from IPET

regarding wind in the IHNC on the morning of August 29, 2005 and information regarding barge

impacts at other New Orleans area locations resulting in no more than localized floodwall

damage.  Exh. 1, Bea Report at 13 ¶ 24, 57 ¶ 66.

As Dr. Bea explained in his report, these multiple sources of data and analyses led him to

the conclusion that the floodwalls on the east side of the IHNC failed for multiple reasons having

nothing to do with a barge.  Among the failure mechanisms identified by Dr. Bea at the IHNC

---

[2] Dr. Bea was retained as an expert by the plaintiffs in the MRGO litigation in 2007 (Exh. 2, Bea Dep. at 17) and by
counsel for LNA in March 2009 (*id.* at 16), long after he had reached his conclusions about the causes of the
floodwall failures and non-involvement of the barge.

east floodwall breaches were:  (1) seepage and hydraulic pressures leading to localized

"blowouts;" (2) hydraulic uplift pressures exacerbated by poorly backfilled EBIA excavations;

(3) overtopping erosion of soils on the protected side; (4) development of "tension gaps" due to

hydrostatic pressure, leading to additional seepage and uplift pressure; and (5) failures at vertical

water stops and/or sheet pile/floodwall connections.  Exh. 1, Bea Report at 50-51 ¶ 47 and

Appendix C.  None of these failure mechanisms involved impact by a barge.  Dr. Bea concluded,

based on the abundant evidence of multiple causes having nothing to do with a barge, together

with physical and other evidence showing the barge was not a cause, that the barge was not a

substantial contributor to either of the two IHNC east floodwall breaches.  *Id.* at 56-57 ¶¶ 64, 65.

## ARGUMENT

### I.  Dr. Bea's Analysis Satisfies *Daubert* and Rule 702.

Plaintiffs' memorandum consists of an eleven-point "statement of facts" that goes on for

twenty pages, followed by five pages of "argument" that asserts, without any analysis, that Dr.

Bea's opinions do not qualify for admission under Federal Rule of Evidence 702.  Below, this

memorandum addresses each of the eleven elements in plaintiffs' "statement of facts" as it

pertains to the criteria established in Rule 702 and in *Daubert v. Merrell Dow Pharm., Inc.*, 509

U.S. 579 (1993), and shows that none of those supposed "facts" supports the exclusion of Dr.

Bea's testimony.  Before turning to the specific points raised in plaintiffs' memorandum,

however, a brief overview is in order to show the overwhelming number of ways in which Dr.

Bea's study conforms to the standards for admissibility set forth in Federal Rule of Evidence 702

and *Daubert*, most of which are ignored in plaintiffs' motion papers.

Dr. Bea's study easily meets the requirements for admissibility under Rule 702.  First,

with regard to the requirement that the study be based on "sufficient facts or data," Dr. Bea has

relied on a wide array of data including his own observations of the failed floodwall and the barge, a comprehensive set of soil data including measurements taken by the ILIT team, and a wealth of other investigative data from his own investigation and others.  *See* Exh. 1, Bea Report at 39-59 & Appendix C.  Second, regarding the need for "reliable principles and methods," Dr. Bea has utilized recognized geotechnical methods for carrying out his seepage and stability analyses and other analytical studies.  *See id.*  Finally, regarding the need to apply those principles and methods "reliably" to the facts of the case, Dr. Bea has faithfully carried out his analyses based on the best available data and has consistently tested his conclusions against the results of other studies to ensure that the application of his methods to the facts of this case yields reliable results.  *E.g., id.* at 51-52 ¶ 58 (describing process of "triangulation").

Similarly, Dr. Bea's study meets the *Daubert* criteria for admissibility.  He has shown that his methodology "can be (and has been) tested," including in full scale field tests such as the floodwall performance test in the Atchafalaya basin referenced in his report and deposition.[3]  His analysis has been "subjected to peer review and publication" on more than twenty occasions.[4]  He has expressly addressed the "known or potential rate or error" in his analysis.[5]  And he has used techniques that are "generally accepted" and utilized "independent of the litigation," as shown by the fact that they were used by the Independent Levee Investigation Team.[6]

In sum, Dr. Bea's analysis and conclusions are not merely "beliefs and speculations" as plaintiffs argue (Pl. Mem. at 23).  Instead, they are the product of the most painstaking sort of

---

[3] *Daubert*, 509 U.S. at 593; Exh. 1, Bea Report Appendix D at 11-12 ¶ 9; Exh. 2, Bea Dep. at 100.

[4] *Daubert*, 509 U.S. at 593; Exh. 1, Bea Report at 7 ¶ 12; Exh. 2, Bea Dep. at 133.  Not one of plaintiffs' experts has subjected his analysis to peer review and publication.  *See* LNA SJ Exh. 8, Marino 2009 Dep. 48-49; LNA SJ Exh. 6, Pazos Dep. at 29-30.

[5] *Daubert*, 509 U.S. at 594; Exh. 1, Bea Report at 41-45 ¶¶ 45-51.  Plaintiffs' causation experts did not analyze the uncertainty or rate of error in their analyses.  *See, e.g.,* LNA SJ Exh. 8, Marino 2009 Dep. at 223; LNA SJ Exh. 12, Pazos Report.

[6] *Daubert*, 509 U.S. at 594; Fed. R. Evid. 702 advisory committee's notes.

scientific inquiry, carried out over a four-year period, the majority of which was spent working in the public interest.  In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), the Supreme Court held that the purpose of inquiring into the admissibility of expert testimony is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Id.* at 152.  If any expert has ever satisfied that standard, it is Dr. Bea.

## II.   Plaintiffs' Allegation that Dr. Bea Has a "Personal Interest" In Finding the Corps of Engineers Responsible Is Contrary to the Record and Irrelevant Under *Daubert*.

Plaintiffs' leading argument derides Dr. Bea as a "credentialed cheerleader" who has a "personal interest" in the outcome of this case, based on the fact that Dr. Bea has carried out his investigation of the causes of the floodwall failures with the purpose of protecting the public interest.  *See, e.g.*, Pl. Mem. at 1-4, 20-22.  According to plaintiffs, Dr. Bea's testimony should be excluded because he is motivated by a desire to avoid a repetition of "the horrible collection of mistakes that we made in the causation of this catastrophe," which his investigation revealed to be the result of failings by the United States Army Corps of Engineers.  Pl. Mem. at 1.

The idea that this Court should ***exclude*** the testimony of an expert whose investigation was motivated by a desire to serve the public interest is audacious, to say the least.  Apparently plaintiffs believe it would be preferable for the Court to hear only from experts who make a career hiring themselves out to lawyers for money, like plaintiffs' expert Mr. Pazos.[7]  Such a conception stands *Daubert* on its head.  As the Fifth Circuit has held, the *Daubert* inquiry seeks to distinguish the "hired gun" from the expert "whose opinion in the courtroom will withstand

_____

[7] *See* LNA SJ Exh. 6, Pazos Dep. at 19 (Pazos has handled "in the neighborhood of 1200 litigation cases").

the same scrutiny that it would among his professional peers." *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 991 (5th Cir. 1997).[8]   This distinction favors Dr. Bea, not the plaintiffs.

In any event, plaintiffs admit that an expert's personal interest in the outcome of a proceeding does ***not*** disqualify the expert from testifying under *Daubert.*  Pl. Mem. at 23.  The Fifth Circuit has so held on more than one occasion.  *See Rodriguez v. Pacificare of Tex., Inc.*, 980 F.2d 1014, 1019 (5th Cir. 1993) (party could serve as his own expert); *Hathaway v. Bazany*, 507 F.3d 312, 317 n.1 (5th Cir. 2007) (bias would not be grounds for disqualifying expert who was decedent's father and a party to the suit); *Gideon v. Johns-Manville Sales Corp.*, 761 F.2d 1129, 1135-36 (5th Cir. 1985) (medical doctor's alleged bias did not foreclose expert testimony).  Thus, by plaintiffs' own admission, controlling case authority forecloses their lead argument.

Furthermore, this Court has already considered and rejected arguments that Dr. Bea is a biased advocate against the Army Corps of Engineers.  In its Findings of Fact and Conclusions of Law in the *Robinson* case (Doc. 19415), the Court relied on Dr. Bea's testimony or expert report in support of no fewer than sixteen points.[9]  On several occasions, this Court explicitly noted that Dr. Bea's testimony was either competent or more persuasive than the government's expert on the same issue.[10]  The Court adopted Dr. Bea's conclusions despite vituperative cross-examination and briefing by the Army Corps accusing Dr. Bea of "outcome-oriented manipulation" (Doc. 19140 at 113) and a host of other vices.[11]

---

[8] *See* Fifth Circuit Pattern Jury Instructions-Civil Cases, Pattern Instruction 2.19, p 23 (2006) (factfinders should consider possible bias of expert witness including portion of income derived from testifying).

[9] Doc. 19415 at 18, 33, 45-46, 46-47, 47-48, 48, 49, 50, 62, 64-66, 66, 67, 79, 84, 90, 153.

[10] *Id.* at 62 (Dr. Bea and other experts "provided clear and competent evidence"); 66 (testimony found "credible"); 66 (Dr. Bea's model "corresponds directly with the flooding witnesses in the 40 Arpent Levee video"); 66 (Dr. Bea's "assumption about levee heights is well-founded"); 67 ("this conclusion is also supported by Dr. Bea's testimony"); 79 (adopting Dr. Bea's opinion); 84 (rejecting assertion that Bea's "modeling is replete with conjecture").

[11] *See also, e.g.*, Doc. 19176 at 120-21 (Army Corps accusation that "[a]t virtually every step, Dr. Bea adopted unsupported facts, applied biased reasoning, and misused established protocols and procedures to reach conclusions

Finally, the record amply refutes plaintiffs' accusation that Dr. Bea conducted a biased investigation. While plaintiffs accuse Dr. Bea of having "form[ed] an opinion before he beg[an] his research" into whether the barge was a cause of the floodwall breaches, Pl. Mem. at 21, plaintiffs know this accusation to be false. In his report and his deposition, Dr. Bea testified that he began his investigation in September 2005 by asking whether the barge was a potential cause of the floodwall, with the understanding that the barge "was a potential participant."[12] In fact, Dr. Bea testified that he "gave an interview on October the 3rd, 2005, to Mr. Bob Sanders and commented in that interview that the barge was a potential player/causative element in the development of the South Breach." Exh. 2, Bea Dep. at 44.[13] Thus, Dr. Bea began his investigation with an open mind and ruled out the barge as a cause of the breaches based on his **independent forensic investigation**, not a pre-conceived notion of what he wanted the result to be.[14] Indeed. Dr. Bea arrived at the conclusion that the barge did not cause the breaches as a co-leader of the ILIT investigation, which – according to plaintiffs' expert Dr. Spinks – was performed to "provide credible and objective scientific and engineering answers" to questions about why the hurricane protection system protecting the New Orleans metropolitan area failed during Hurricane Katrina. LNA SJ Exh. 16, Spinks Report at 11. In short, even if bias were germane to a *Daubert* inquiry (which plaintiffs admit it is not), there is no substance to plaintiffs' allegations of bias on the part of Dr. Bea.

---

[12] not supported by the evidence, science, or logic. Consequently, his modeling efforts simply are not trustworthy to predict or to describe any part of the occurrence of any event related to levee breaching during Hurricane Katrina."); *id.* at 93, 99 n.25, 108 (alleging that Dr. Bea and his results were "biased").

[12] Exh. 2, Bea Dep. at 43-44; *see also* Exh. 1, Bea Report at 10 ¶ 21 (barge involvement was "hotly debated among members of ILIT").

[13] Plaintiffs submitted this interview to the Court as an exhibit to their opposition to LNA's summary judgment motion. *See* Doc. 19352, Exh. 55.

[14] *See, e.g.*, Exh. 2, Bea Dep. at 47 (ILIT public release in November 2005 "declared publicly that the barge was a victim, not a cause"); *id.* at 140-41 (explaining why breaches "happen[] independent of the barge").

### III.   Dr. Bea's Conclusions Flow Directly From His Analysis.

Plaintiffs argue (at 4-6) that Dr. Bea's conclusions do not flow from his analysis.  Though somewhat difficult to parse, this argument appears to contend that Dr. Bea's conclusion that the barge did not cause the floodwall breaches does not flow from his identification of other causes of the breaches.  Pl. Mem. at 5 (portraying Dr. Bea as having concluded that other factors "did cause" the breaches only because those factors "might have caused" the breaches).

As an initial matter, this challenge is directed at Dr. Bea's conclusions, not his methodology, and thus is outside the proper boundaries of a *Daubert* challenge.  As this Court has observed, "the Court's focus [in a *Daubert* challenge] 'must be solely on principles and methodology, not on the conclusions that they generate.'"  *Papusha v. Murphy Exploration & Prod. Co. USA,* 2009 U.S. Dist. LEXIS 7585, at *6 (E.D. La. February 2, 2009) (Duval, J.) (quoting *Daubert*, 509 U.S. at 595); *see also Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004) ("Although the *Daubert* analysis is applied to ensure expert witnesses have employed reliable principles and methods in reaching their conclusions, the test does *not* judge the expert conclusions themselves.") (emphasis in original).

Moreover, plaintiffs' argument rests on a willful mischaracterization of what Dr. Bea concluded.  Dr. Bea said that there were multiple mechanisms of failure at work during Katrina, any of which were sufficient to cause the wall to fail without a barge.  Exh. 1, Bea Report at 45-52 and Appendix C (summarizing causes of North Breach and South Breach).  This analysis goes far beyond a discussion of what "might have" caused the wall to fail – it identifies the actual causes of the failure.  *Id.*[15]  Dr. Bea's identification of "obvious alternative explanations" for the

---

[15]  Indeed, plaintiffs ignore the very language they quote from Dr. Bea's report that these other factors "did cause those failures" of the floodwall.  Pl. Mem. at 5 (quoting Exh. 1, Bea Report at 57 ¶ 65).  Dr. Bea did not merely say, as plaintiffs contend, that these other causes *might* have caused the breaches but he actually said that these other causes *did* cause the breaches.

floodwall failures (*i.e.*, non-barge causes) is critical to understanding causation in this case.[16] Indeed, in *Michaels v. Avitech,* 202 F.3d 746 (5th Cir. 2000), the Fifth Circuit held that the existence of multiple alternative causes of contamination in an airplane fuel line warranted the entry of summary judgment against a plaintiff whose expert was unable to rule them out.  *Id.* at 753-54.  Dr. Bea's identification of the reasons why the floodwalls failed having nothing to do with a barge is both helpful and relevant for that reason alone.

Finally, Dr. Bea's conclusion that the barge did not cause the floodwall breaches flows directly from his analysis.  In addition to identifying the multiple non-barge factors that actually caused the floodwall to fail, Dr. Bea concluded that the barge did not cause the floodwall to fail based on his inspection of the floodwall, his observations of other barge impacts, his review of photographs of the damaged floodwall, his review of weather data, and a host of other factors, all of which Dr. Bea explained in his report and deposition.  *See* Exh. 1, Bea Report at 52-60; Exh. 2, Bea Dep. at 72-74 (reasons why barge did not cause North Breach); 92-94 (reasons why barge did not cause South Breach).  Only by willfully ignoring Dr. Bea's testimony could plaintiffs argue that his conclusions do not flow from his analysis.

## IV.   Dr. Bea Drew Legitimate Conclusions from Other Barge Impacts.

Plaintiffs argue that Dr. Bea's analysis of other barge impacts is invalid because he did not know whether the soil at those other locations was "as weak as it was in the Inner Harbor Navigation Canal."  Pl. Mem. at 6-7.  At his deposition, Dr. Bea testified that "we found many instances where similar barges contacted similar floodwalls, imparting similar localized damage, but those barges did not cause failure breaching of those flood walls."  Exh. 2, Bea Dep. at 94. From this, Dr. Bea concluded that "if a barge strikes a floodwall that is not already failing for

---

[16] Fed. R. Evid. 702 advisory committee's note (crucial to Daubert is "[w]hether the expert has adequately accounted for obvious alternative explanations") (citing *Claar v. Burlington N.R.R.,* 29 F.3d 499 (9th Cir. 1994)).

independent reasons," the barge will not cause the wall to fail.  *Id.* at 194; Exh. 1, Bea Report at 57 ¶ 66.  Dr. Bea provided pictures showing the effects of those barge impacts, which were typically confined to localized damage to the concrete cap of the floodwall.  Exh. 1, Bea Report at 58-60 Figs. 24-28.  Dr. Bea's conclusion about the expected effect of a barge impact on a floodwall flows directly from his analysis.  Obviously, the floodwalls depicted in the pictures were not "already failing for independent reasons," and the barge impacts did not cause the floodwalls to fail.

Dr. Bea's observations and conclusions on this point track the testimony of Dr. Cushing and other witnesses.  Dr. Cushing concluded – in a portion of his report that plaintiffs did not move to exclude – that a barge impact with the concrete cap of a floodwall will cause the cap to crack or puncture without disturbing the underlying sheet pile or causing it to fail.  LNA SJ Exh. 1, Cushing Report at 149, 158-63, 173.  Dr. Mosher characterized this as "very local damage to the wall" and not something that "cause[d] the collapse" of the wall.  LNA SJ Exh. 11, Mosher Dep. at 91-92, 267.  Plaintiffs' expert Dr. Marino admitted at his deposition that the construction joint in the concrete cap is a "point of weakness" and thus he "would expect the wall to shear at the construction joint" if the force was applied at or above the joint.  LNA SJ Exh. 8, Marino 2009 Dep. at 59-60.

Dr. Bea's examination of other barge impacts, and the inferences he drew from them, are both analytically sound and relevant to disproving plaintiffs' expert evidence.  According to plaintiffs' expert Dr. Marino, "the I-walls were not designed to protect against barge impact."[17] If that is so, then barges would be expected to have caused those other floodwalls to fail regardless of whether the soil at those locations was "as weak as in the Inner Harbor Navigation

---

[17] Doc. 19352, Exh. 43, Marino Declaration at 18; *see also* LNA SJ Exh. 9, Marino 2008 Dep. at 97-98 (floodwall "has no design capacity for impact loads" from a barge).

Canal" (Pl. Mem. at 6), just as Dr. Marino implies in his statement.  The experience of those other floodwalls that did not fail when struck by barges supports Dr. Bea's conclusion that a barge impact will not cause a floodwall to fail when it is not "already failing for independent reasons" and disproves Dr. Marino's implication that a floodwall failure is somehow a "natural" or "expected" result of a barge impact.

In this regard, Dr. Bea's analysis of other barge impacts is similar to the expert testimony that was upheld by the Fifth Circuit in *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239 (5th Cir. 2002).  There, the question was whether plaintiff's salmonella was caused by an unsterile injection, or by the specific product injected into plaintiff's knee.  A medical expert testified that if an unsterile injection technique could cause salmonella (as opposed to the specific product at issue), then he would have expected to see cases of salmonella reported in instances where a different injected product was used.  *Id.* at 248-49.  The Fifth Circuit held that this testimony should have been admitted because it was probative of the cause of the plaintiff's salmonella.  *Id.*  Similarly here, if barge impacts are as catastrophic as plaintiffs claim, then breaches would have been expected from impacts at other locations, but the evidence showed no such instances occurred.[18]

**V.   Dr. Bea Drew Appropriate Conclusions from Physical Evidence.**

Plaintiffs argue that Dr. Bea's conclusions from his inspection of the physical evidence at the breach sites are invalid because ***some portions*** of the failed floodwall had been covered over by remediation work when he made his field visits, and because he did not "arrange to turn over any of the remaining floodwalls" or "rubble" that he encountered.  Pl. Mem. at 7-9, 20.  This

---

[18] In fact, as discussed in LNA's summary judgment motion and in Dr. Bea's report, the reaction of the IHNC floodwall at the extreme southern end of the South Breach was exactly what would be expected – cracking at the concrete cap without affecting the buried sheet pile.  *See* Doc. 19309-2 at 27 & n.100, 40; Exh. 1, Bea Report at 54-55 ¶¶ 62, 63.  This evidence refutes any suggestion that the barge impact at the IHNC caused a different result due to "weaker soil" at that location.  Moreover, as a matter of law, the fact that soil conditions at the IHNC were sufficient to cause the floodwall to fail, and that a barge impact was not sufficient to cause the wall to fail, rules out the barge as a cause of the breaches.  Restatement (Second) of Torts § 432.

argument is specious.  Dr. Bea testified that he inspected the entire failed floodwall, most of which was available for observation, and saw no damage consistent with a barge impact.  Exh. 2, Bea Dep. at 77 ("We walked every inch of that North Breach repeatedly.").  This is powerful evidence that barge did not impact the wall at the locations he observed.  Thus, Dr. Bea's testimony was unequivocal:

> Q: "Could a barge have caused the damage that you observed on the North Breach?"
> A: "No."

Exh. 2, Bea Dep. at 225; *see id.* at 223 (same answer for South Breach).

In this respect as well, Dr. Bea's analysis is analogous to the expert testimony upheld by the Fifth Circuit in *Pipitone*.  There, the medical expert had personally examined the plaintiff and found him lacking in symptoms that would have been expected if the other side's theory of causation were correct.  288 F.3d at 246-47 ("Dr. Coco personally examined Pipitone in the hospital and found him to be lacking the symptoms that a physician would expect if salmonella had been introduced into the body through one of these alternative routes.").  The court held that this testimony should have been admitted.  So here, Dr. Bea personally examined the floodwall and found it lacking in evidence that would have been expected if plaintiffs' impact-and-breaching scenario were correct.[19]

Dr. Bea's conclusions clearly did not "outstrip his analysis," as plaintiffs argue (at 20).  Plaintiff's speculation that some portions of the failed floodwall ***might have*** revealed different evidence, had they also been available for inspection, does not render Dr. Bea's methodology or conclusions unreliable as to the vast majority of the failed floodwall that he was able to inspect.

---

[19] In fact Dr. Bea has done far more to examine the failed floodwall than any expert on the plaintiffs' side.  *See* LNA SJ Exh. 8, Marino 2009 Dep. at 125-26 (did not visit breach site for forensic purposes); LNA SJ Exh. 30, Bartlett Dep. at 11 (never visited until "months" after Hurricane Rita); LNA SJ Exh. 6, Pazos Dep. at 79 (police restrictions limited access to North Breach).  This is a critical difference in the testimony of the two sides' experts.  *See Fairley v. Clarke*, 2004 WL 877102 at *5 (E.D. La. April 22, 2004) (expert testimony regarding accident reconstruction excluded because expert used "only photographs" and "never inspected the vehicles or the actual damage caused").

**VI.   Dr. Bea Drew Appropriate Conclusions from the Presence of the School Bus.**

Plaintiffs argue that Dr. Bea erred when he testified that it was implausible for the barge to have been present at the time the south breach occurred because the barge would have had to "high jump the school bus" to arrive at the location where it ultimately grounded.  Pl. Mem. at 9-10, 21.  In his September 2009 deposition, Dr. Bea testified that one reason he had concluded that the barge could not have been present when the South Breach initially occurred was that the barge could not have passed through the floodwall and entered the neighborhood until the water in the neighborhood was already high enough for the barge to float over the small yellow school bus, which ended up intact on the canal side of the barge when the water receded.  Exh. 2, Bea Dep. at 93, 140.

Plaintiffs argue that the barge did not, in fact, float over the top of the school bus.  Instead, citing a passage from the May 2006 ILIT draft report quoted in Dr. Bea's report, plaintiffs assert that the school bus "arrived between hurricanes Katrina and Rita" and thus was not present in the initial Katrina flooding.  Pl. Mem. at 10 n.50; *see* Exh. 1, Bea Report at 12 (quoting May 2006 ILIT draft report).  Plaintiffs' argument ignores, however, that during the intervening period between the May 2006 ILIT draft report and the development of Dr. Bea's testimony in this case, photographic evidence was adduced which demonstrated that the school bus must have been present during Hurricane Katrina.  The report of plaintiffs' own expert, Dr. Marino, contains two such photographs showing that the school bus was present near the barge, and closer to the floodwall, before Hurricane Katrina's floodwaters had receded.[20]  Indeed, Dr. Marino's report expressly adverts to a photograph showing floodwater from Katrina reaching "to

---

[20] LNA SJ Exh.2, Marino Report at 4-20, 4-21, 4-25 (Figs. 4.15, 4.16, 4.20).

the top of the school bus."[21]  Had plaintiffs inquired about this subject at Dr. Bea's deposition, he

would have explained how he arrived at his conclusions regarding the school bus,

notwithstanding what had been initially written in the May 2006 draft ILIT report.[22]

**VII.  Dr. Bea Accurately Characterized the IPET, ILIT, and Team Louisiana Analyses.**

Plaintiffs argue that Prof. Bea "exaggerated" his descriptions of the reports generated by

IPET, ILIT, and Team Louisiana.  Pl. Mem. at 10-11.  This is an attack on Dr. Bea's conclusions,

not his methodology, and as such is beyond the scope of a *Daubert* motion.  *See above* at 9-10;

*Daubert*, 509 U.S. at 595.  Furthermore, Dr. Bea accurately quoted and cited the IPET, ILIT, and

Team Louisiana studies, as well as all of the other studies referenced in his report.  Dr. Bea

testified that these investigations included "forensic examination of the causative role of the

barge in the North and/or South Breaches" and explained what he meant by that testimony.  Exh.

2, Bea Dep. 190-91.  Indeed, the leaders of both the IPET and Team Louisiana efforts have

testified ***in this case*** about their grounds for concluding that the barge did not cause the floodwall

breaches.[23]

As Dr. Bea explained, there were multiple factors that permitted the investigations to

triangulate to the conclusion that the barge did not cause the breaches, including photographic

information, meteorological information (from IPET), aerial photographs, and physical

inspection.  Exh. 2, Bea Dep. at 72-77.  As Dr. Bea further explained, the investigations arrived

---

[21] *Id.* at 4-20 (discussing Fig. 4.15); *see also* LNA SJ Exh. 1, Cushing Report at 170 Fig. 114.

[22] Plaintiffs butcher Dr. Bea's testimony to suggest that he "observed it [the school bus] driven into the area."  Pl. Mem. at 10.  Dr. Bea testified that "months" after he and his team began investigating the floodwall failures, he was present when members of the American Society of Civil Engineers "drove up in the school bus."  Exh. 1, Bea Dep. at 191.  Obviously, the school bus in which those engineers arrived was not, and could not have been, the same one that was present in the flooded Lower Ninth Ward at or around the time of Hurricanes Katrina and Rita in August and September 2005.

[23] LNA SJ Exh. 11, Mosher Dep. at 78:  (Q:  "And that – if I understood you right, IPET at least briefly considered whether the barge was a cause of the failure?"  A:  "Right, that's correct."  Q:  "And rejected that conclusion?"  A: "Correct.");  Exh. 5 hereto, Kemp Dep. at 46 (Team Louisiana concluded "the barge clipped the side of the breach on the south side of the south breach as it went through the breach.  That's a lot different than causing the breach.").

at similar conclusions regarding the Barge ING 4727 not having played a role, based on multiple non-barge causative mechanisms that were active at the same time. *Id.* at 106-07. Dr. Bea added: "All of the studies that I referenced used acceptable forensic engineering processes to arrive at their conclusions. They were different. They used different processes, different data and information to arrive at their conclusions, but they were acceptable forensic engineering processes." *Id.* at 188-89.[24]

In short, Dr. Bea did not "exaggerate" the findings of the public studies, nor would his opinions be subject to exclusion even if he had done so.

## VIII. Dr. Bea Did Not Fail to Give "Serious Consideration" to the Barge as a Potential Cause.

In a virtually incoherent section of their memorandum (Pl. Mem. at 12-14), plaintiffs appear to argue that Dr. Bea failed to give "serious consideration" to the barge because he did not consider (a) whether the barge could have acted as a "pry bar" at the north breach (p.13), (b) whether winds "in excess of 100 miles per hour could possibly have brought the barge into contact with the floodwall" (p.13) ; or (c) whether the barge could have "pushed against the IHNC East floodwall, causing it to lean, and causing or speeding up the underseepage" (p.14). In actuality, Dr. Bea's analysis accounted for and explained each of those three supposed scenarios.

With regard to whether the barge could have acted as a "pry bar" at the North Breach, Dr. Bea explained that "the wall north of the north end of the North Breach was not significantly displaced" as would be observed if the barge had acted as a "pry bar." Exh. 2, Bea Dep. 84. The

---

[24] Plaintiffs question the completeness of the investigation conducted by IPET, ILIT, and Team Louisiana by quoting testimony to the effect that nobody at ILIT, IPET, or other investigative bodies investigated whether "there [were] some wind speeds, directions, and times" that "would have made a difference" if they had acted on the barge. Pl. Mem. at 11 & n.55, quoting Exh. 1, Bea Dep. at 69. This is irrelevant to any issue at hand because, among other things, there was no obligation on the independent investigations to spend public money investigating implausible hypothetical scenarios that had no basis in the evidence or data to determine what might have occurred but did not.

16

concept of the barge acting as a "pry bar" is so far-fetched that not one of plaintiffs' own experts has ever espoused or even mentioned it.[25]

With regard to Dr. Bea's supposed failure to consider "whether winds in excess of 100 miles per hour could possibly have brought the barge into contact with the floodwall and caused a breach" (Pl. Mem. at 13), Dr. Bea has expressly considered and rejected such a scenario.  In particular, Dr. Bea examined weather data adduced by IPET and others and concluded that the winds present in the IHNC on the morning of August 29 could not have brought the barge into contact with the floodwall at any time before the breaches occurred.  Exh. 1, Bea Report at 13 ¶ 24, 56 ¶ 54; Exh. 2, Bea Dep. at 73 (Q: "What conclusion or assumption leads you to say that the barge could not plausibly have moved from the Lafarge facility to the site of the North Breach?" A:  "Because the wind wouldn't blow it there.").

With regard to Dr. Bea's supposed failure to consider whether the barge could have "pushed against the floodwall" and created "gaps," Dr. Bea explained why this is a highly implausible scenario.  In particular, he explained that tension cracks (gaps) formed due to hydrostatic pressure "very, very early that morning," as the water rose to "to the order of two feet above the earthen crown of the supporting soil levee," to a degree that was "sufficient to crack – to open a tension crack to the bottom of the sheet pile."  Exh. 2, Bea Dep. at 88-89.  Thus, the tension crack already existed before the barge could even have come into contact with the wall.  *Id.*  ("If it's already present and it's at the bottom, the barge doesn't matter.").[26]

---

[25] The concept of a "pry bar" does not appear in any of the expert reports and testimony adduced by plaintiffs' experts.  It appears to have been made up on the spot by plaintiffs' counsel at Dr. Bea's deposition.

[26] *See also* LNA SJ Exh. 11, Mosher Dep. at 59-64 (gap between the sheet pile and canal side soil formed, splitting the levee in half and depriving it of canal-side soil resistance; gaps formed at multiple locations (including at the 17th Street Canal) and no loading from a barge was needed for such a gap to form).

Finally, plaintiffs misstate Dr. Bea's testimony when they assert he made a "decision not to analyze the barge as a possible primary or contributing cause." Pl. Mem. at 14. To the contrary, Dr. Bea concluded the barge was not a primary or contributing cause **on the basis of his analysis**. *E.g.*, Exh. 2, Bea Dep. at 72-77, 223.

## IX. Dr. Bea Did Not Rely on "Unexamined Assumptions" About the Barge Breakaway.

Relying on the testimony of two "impeachment/rebuttal witnesses" whom plaintiffs had not even bothered to include on their witness list at the time Dr. Bea issued his report, plaintiffs now argue that Dr. Bea's testimony should be excluded because he did not include their accounts in his analysis. Pl. Mem. at 14-15 & n.67 (citing testimony of Frazier Tompkins and Gertrude Leblanc); *see* Doc. 19419 (listing Tompkins and Leblanc as "impeachment/rebuttal" witnesses). This argument is without merit because the witnesses' accounts are irrelevant to Dr. Bea's analysis, and because there was no requirement for him to adopt or account for their testimony.[27]

The central premise of plaintiffs' argument is that Dr. Bea's opinions are supposedly "based on the assumption that the barge could not have become loose before 9:00 a.m. on Monday, August 29, 2009." Pl. Mem. at 14. That premise is incorrect, as Dr. Bea's opinions are based on no such assumption. In fact, Dr. Bea made clear in his report that his conclusions and opinions are valid "regardless of the time of the breakaway." Exh. 1 Bea Report at 56-57 ¶ 64 ("[R]egardless of the time of the breakaway, the forensic engineering evidence and breach

---

[27] Such an argument is also an abuse of "impeachment/rebuttal witness" testimony, which by definition is not admissible or usable until after the defendant has presented its case in chief. *United States v. Rayborn*, 495 F.3d 328, 344 (6th Cir. 2007) (citations omitted) (The purpose of rebuttal testimony is to "rebut new evidence or new theories proffered in the defendant's case in chief."); *Marmo v. IBP, Inc.*, 360 F. Supp. 2d 1019, 1022 (D. Neb. 2005) (not permitting expert to rely on rebuttal witnesses in forming the basis of expert's opinion); *Larson v. Tyson Fresh Meats, Inc.*, 2005 WL 6038741, at *4 (D. Neb. May 4, 2005) (same). *See also Kanida v. Gulf Coast Med. Personnel LP*, 363 F.3d 568, 583 (5th Cir. 2004) (affirming refusal to allow rebuttal witnesses who were available during plaintiff's case-in-chief and who would not have testified about "evidence previously unavailable").

development analytical results indicate the barge was not a substantial contributor to either of the breaches.").

Moreover, and in any event, Dr. Bea was not required to credit and adopt the testimony of Mr. Tompkins and Ms. Leblanc regarding the barge's supposed presence in the IHNC on Sunday, August 28.  There are other witnesses in this case, listed on plaintiffs' witness list, who testified that the barge was **not** present in the IHNC on Sunday August 28.[28]  As stated in the comments to Rule 702, the rule is "not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other."[29]

**X.  Dr. Bea Did Not Impermissibly Opine on Witness Credibility.**

Plaintiffs argue that Dr. Bea should be barred from "criticiz[ing] plaintiffs' experts for relying on eyewitness testimony" from individuals who were hampered by poor visibility and other extreme conditions present in the IHNC on the morning of August 29.  Pl. Mem. at 15-16, 24.  To the contrary, such criticism of plaintiffs' experts is entirely legitimate.  The Fifth Circuit has held that experts who uncritically accept implausible or incomplete witness accounts, as plaintiffs' experts have done here, are not only subject to criticism, but also to exclusion. *Christophersen v. Allied-Signal Corp.*, 939 F.2d 1106, 1113-14 (5th Cir. 1991) (en banc); *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987).  In *Christophersen*, the Fifth Circuit held that the trial court had properly excluded the testimony of an expert whose opinion was based on an "inaccurate and incomplete" witness affidavit regarding the extent of the

---

[28] LNA SJ Reply Exh. 4, Sartin Dep. at 36-38, 66-67 (Sartin walked on the levee and Claiborne Street bridge on Sunday around 7:30 p.m. but did not see the barge until "days later"; "[w]hen I looked off that bridge, all you see is water"); LNA SJ Reply Exh. 5, Bickham Dep. at 54-55, 81 (Bickham visited the levee after midnight on Sunday, but "didn't see the barge"); LNA SJ Exh. 32, Murph Dep. at 61, 107 (Murph visited levee on Sunday of Katrina and looked at the canal but did not see anything in the water; did not see the barge until it was "on [his] house").

[29] *See also Legier & Materne v. Great Plains Software, Inc.*, No. 03-0278, 2005 WL 2037346 at *4 (E.D. La. Aug. 3, 2005) (Duval, J.) ("A large majority of the fact issues and legal issues in this case are unresolved which makes it more likely that the parties will rely upon their own version of the facts … which necessarily influences the expert reports before the Court;" refusing to strike expert report for relying on certain witnesses and not others).

decedent's chemical exposures.  939 F.2d at 1113.  Similarly in *Viterbo*, the Fifth Circuit upheld

the trial court's exclusion of a medical expert who relied solely on the plaintiff's oral history in

making a diagnosis, but did not assess the completeness of that history or whether "objective

evidence" (*i.e.*, medical tests) would support it.  *Id.* at 423.[30]  In pointing out that plaintiffs'

experts have misused and drawn inappropriate conclusions from eyewitness testimony, Dr. Bea

is engaging in legitimate criticism of the type sanctioned by the Fifth Circuit in *Christopherson*

and *Viterbo.*[31]

Plaintiffs' attack on Dr. Bea is particularly ill-founded in light of the express credibility

determinations proffered by their own expert, Mr. Pazos.  Where witness testimony supported his

desired version of the facts, Mr. Pazos directly vouched for the credibility of the witness.  LNA

SJ Exh. 12, Pazos Report at 10 (Villavasso is a "reliable professional").  By contrast, where

witness testimony did not support his desired version, Mr. Pazos opined that the witness was not

credible.  *E.g.*, LNA SJ Exh. 12, Pazos Report at 20 (Stanley Cook account "does not appear

realistic").  As Dr. Bea testified, the forensic engineer "has to be very, very careful with the

understanding and conclusions drawn from eyewitness reporting."  Exh. 2, Bea Dep. at 197.  Dr.

Bea cannot be faulted for pointing out the failure of plaintiffs' experts to adhere to that maxim.

Finally, and in any event, experts are not subject to exclusion for refusing to credit the

accounts of particular witnesses in forming their conclusions.  *Billiot v. Kim Susan, Inc.,* No. 01-

0457, 2002 WL 34376794 at *1 (E.D. La., March 1, 2002) (Duval, J.) ("Moreover, the fact that

Pazos chose to ignore conflicting testimony and accept plaintiff's version of the accident is

---

[30] Plaintiffs' citation of *Viterbo* for the opposite proposition – that experts must uncritically adhere to whatever testimony a fact witness may give (Pl. Mem. at 9) – is incorrect.  In *Viterbo* the expert's testimony was excluded because it uncritically relied on fact witness testimony (the plaintiff's oral history) without considering additional information needed for a valid medical diagnosis.  826 F.2d at 423.

[31] Plaintiffs' reference to *Nichols v. American Nat. Ins. Co.*, 154 F.3d 875 (8th Cir. 1998) is inapposite.  There, the Eighth Circuit held that a psychiatrist should not have been allowed to testify about the plaintiff's credibility "in the guise of a medical opinion."  *Id.* at 884.

certainly not a grounds for disqualifying him as that would virtually eliminate all expert testimony").[32]   Indeed, plaintiffs' own experts admitted that it is proper to evaluate the plausibility of witness accounts by reference to scientific precepts.[33]

## XI.   Dr. Bea Did Not Impermissibly Rely on his Work on ILIT and Follow-Up Studies.

Plaintiffs quote at length from peer-reviewed studies and journal articles that Dr. Bea co-authored, in which he and his co-authors concluded that the barge did not cause the floodwall breaches.  Pl. Mem. at 16-18.  Plaintiffs suggest these publications somehow detract from the reliability of Dr. Bea's opinions in this case, but their sole support for this argument is a citation to testimony by Dr. Bea that he and his co-authors made "no assumptions" about what might have happened if a barge had impacted a floodwall "at winds of 100 miles per hour," or whether there were some "wind speeds, directions and times" that "would have made a difference" to the hypothetical effect of a barge impact.  Pl. Mem. at 19 (citing Exh. 2, Bea Dep. at 66-69).

This argument is simply a repetition of plaintiffs' previous argument about Dr. Bea's failure to consider a hypothetical 100 mph wind.  *See* Pl. Mem. at 13 (citing same testimony by Dr. Bea).  As noted above (at 17), Dr. Bea testified that the wind could not have blown the barge toward the floodwall on the morning of August 29 until after the breaches had already occurred.  Exh. 2, Bea Dep. at 73.  Plaintiffs have no basis to challenge Dr. Bea's testimony on the basis of a counter-factual hypothetical scenario such as this.

---

[32] *See also Legier & Materne,* No. 03-0278, 2005 WL 2037346, at *4 (Duval, J.) (refusing to disqualify expert based on acceptance of one version of facts); *Farragut v. Nationwide Mut. Fire Ins. Co.*, No. 1:06CV0636 LTS-JMR, 2007 WL 2956396, at *1 (S.D. Miss. Oct. 9, 2007) ("[E]xperts are not disqualified because their conclusions are in conflict with the testimony of an eyewitness.  All witnesses, both lay and expert, are susceptible to errors and miscalculations, and all witnesses, both lay and expert, are subject to cross-examination to test the validity of their testimony.  It is for the finder of fact to resolve conflicts in testimony on a full record, and such a conflict is not grounds for the disqualification of an otherwise qualified expert witness.").

[33] LNA SJ Exh. 8, Marino 2009 Dep. 24-25 (Q: "And as an expert, you need to evaluate the witness's report of time against the scientific observations that you consider more reliable.  Isn't that fair?"  A:  "Yeah.  Yes."); *id.* at 172 (Q: "You had to decide which accounts were credible given the facts that you know to exist, right?"  A:  "Yes."); LNA SJ Exh. 15, Spinks 2009 Dep. 71 (Q: "And in those instances where discrepancies were noted [in witness accounts], as an expert you would go where science points you?"  A:  "Yes.").

In fact, plaintiffs' extended quotations in this section of their brief from studies co-authored by Dr. Bea emphasize the reliability of Dr. Bea's conclusions set forth in those peer-reviewed publications, each providing that the barge did not cause the breaches. *Schafer v. State Farm & Fire Cas. Co.*, No. 06-8262, 2009 WL 799978, at *1 (E.D. La, March 25, 2009) (Duval, J.) (stressing importance to *Daubert* analysis of "whether the theory has been subjected to peer review and publication") (citing *Knight v. Kirby Inland Marine Inc.,* 482 F.3d 347, 351 (5th Cir. 2007)).  Similarly, the fact that Dr. Bea carried out his analyses for purposes other than litigation provides added assurance of the reliability of those conclusions.  *See* Fed. R. Evid. 702 advisory committee's notes (reliability enhanced where opinions "grow naturally and directly out of research … conducted independent of the litigation" and are not "developed … expressly for purposes of testifying").

## XII.  Dr. Bea Did Not Misuse The Word "Forensic".

Plaintiffs' final argument is that Dr. Bea misused the term "forensic" to describe his studies.  Pl. Mem. at 19-20 (accusing Dr. Bea of attempting to "mislead the finder of fact").  Though plaintiffs cite the lack of "certification requirement[s]" or regulations governing who can be a "forensic engineer," they are forced to admit that Dr. Bea is an emeritus member of the American Society of Civil Engineers' committee on forensic engineering.  Pl. Mem. at 20 (citing Exh. 2, Bea Dep. at 37-38).  Regardless of whether a less qualified expert might abuse the label, Dr. Bea has clearly earned the right to refer to himself as a forensic engineer.[34]

Beyond that, the term "forensic engineer" is well understood to apply to scientific efforts to understand the causes of damage to structures, including in connection with Hurricane

---

[34] *See, e.g.*, *Dixon v. Int'l Harvester Co.*, 754 F.2d 573, 579-80 (5th Cir. 1985) (expert's membership on committee of an automotive engineers group was one basis for qualification as expert); *Lappe v. Am. Honda Motor Co.*, 857 F. Supp. 222, 227 (N.D.N.Y. 1994) (admitting expert in part because he was a member of relevant professional societies); *Trumps v. Toastmaster, Inc.*, 969 F. Supp. 247, 252 (S.D.N.Y. 1997) (court excluded witness in part because he did not belong to his area's professional societies).

22

Katrina.  For instance, in *Grilletta v. Lexington Ins. Co.*, 558 F.3d 359 (5th Cir. 2009), the Fifth

Circuit affirmed the admission of testimony from a "forensic engineer" regarding the cause of

damage to a home during Hurricane Katrina, noting that his testimony had been also allowed by

the Louisiana Court of Appeal.  *Id.* at 365.[35]  Dr. Bea's use of the term "forensic engineering"

falls comfortably within what the courts have described using that term, and plaintiffs' attempt to

diminish his work as something else is simply wrong.

## CONCLUSION

At bottom, plaintiffs argue that Dr. Bea brings nothing to the Court except an axe to grind

against the Corps of Engineers which caused him to dispense with scientific inquiry and become

a "credentialed cheerleader."  Pl. Mem. at 21.  In the *Robinson* case, this Court encountered

similar scornful and derisive attacks on Dr. Bea and his conclusions (*e.g.*, Doc. 19140 at 113

(accusing Dr. Bea of "outcome-oriented manipulation"), and rejected those attacks in endorsing

Dr. Bea's conclusions.  *See, generally,* Doc. 19451 (Court's findings in *Robinson*).  The record

conclusively shows that Dr. Bea undertook his investigation without any pre-conceived notion of

what caused the floodwall failures, and indeed that he considered the barge a potential cause

***until his independent scientific analysis proved otherwise***.  Naturally, Dr. Bea's concern for the

public interest now leads him to defend his scientific conclusions emphatically, particularly

against efforts to mislead the court and the public by parties and experts whose sole interest in

the matter is the pursuit of financial gain, not the pursuit of the truth.  This is not a ground to

exclude Professor Bea's opinions – rather, it is a reason to pay them special attention, as the

Court has done in *Robinson*.

---

[35] *See also, e.g., Imperial Trading Co. v. Travelers Prop. Cas. Co. of America,* No. 06-4262, 2009 WL 2356292, at
*4 (E.D. La. July, 28 2009) (noting that witness had "over thirty years of experience as a forensic engineer"
including "physical loss causation determinations in connection with Hurricane Katrina, Hurricane Floyd, and
Hurricane Isabel, as well as other hurricanes").

The Court should deny plaintiffs' motion to exclude the testimony of Robert Bea.

Dated: December 18, 2009                     Respectfully submitted,

                                             Robert B. Fisher, Jr., T.A. (#5587)
                                             Derek A. Walker (#13175)
                                             **CHAFFE MCCALL, L.L.P.**
                                             2300 Energy Centre
                                             1100 Poydras Street
                                             New Orleans, LA  70163-2300
                                             Telephone:  (504) 585-7000
                                             Facsimile:  (504) 585-7075
                                             Fisher@chaffe.com
                                             Walker@chaffe.com

                                              /s/ John D. Aldock
                                             John D. Aldock
                                             Richard M. Wyner
                                             Mark S. Raffman
                                             **GOODWIN PROCTER LLP**
                                             901 New York Avenue, N.W.
                                             Washington, DC  20001
                                             Telephone:  (202) 346-4240
                                             jaldock@goodwinprocter.com
                                             rwyner@goodwinprocter.com
                                             mraffman@goodwinprocter.com

                                             Daniel A. Webb (#13294)
                                             **SUTTERFIELD & WEBB, LLC**
                                             Poydras Center
                                             650 Poydras Street, Suite 2715
                                             New Orleans, LA  70130
                                             Telephone:  (504) 598-2715

                                             *Attorneys for Lafarge North America Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on December 18, 2009.

                    /s/ John D. Aldock

LIBW/1725604.3