# EXHIBIT 2

Deposition of Robert Bea

1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2            FOR THE EASTERN DISTRICT OF LOUISIANA
 3
 4   IN RE: KATRINA CANAL BREACHES )
     CONSOLIDATED LITIGATION        )
 5                                  )
                                    ) CIVIL ACTION
 6   PERTAINS TO:  BARGE            ) NO. 05-4182
                                    ) and consolidated cases
 7   FILED IN:                      )
                                    )
 8   Boutte v. Lafarge      05-5531)
     Mumford v. Ingram      05-5724) SECTION "K" (2)
 9   Lagarde v. Lafarge     06-5342)
     Perry v. Ingram        06-6299) JUDGE
10   Benoit V. Lafarge      06-7516) STANWOOD R. DUVAL, JR.
     Parfait Family v. USA  07-3500)
11   Lafarge v. USA         07-5178) MAGRISTRATE
                                    ) JOSEPH C. WILKINSON,
12   _____) JR.
13
14
     VIDEOTAPED DEPOSITION OF ROBERT GLENN BEA, PhD., P.E.
15
                  MONDAY, SEPTEMBER 14, 2009
16
17
18
19
20
21
22
23
24
25   PAGES 1 - 228
```

**2**

1 VIDEOTAPED DEPOSITION OF ROBERT GLENN BEA, PhD., P.E.

2         SAN FRANCISCO, CALIFORNIA

3         SEPTEMBER 14, 2009

4 The videotaped deposition of ROBERT GLENN BEA, PhD.,

5 P.E., was convened on Monday, September 14, 2009, at

6 Three Embarcadero Center, Suite 2400, San Francisco,

7 California, on Monday, September 14, 2009, commencing

8 at 9:04 a.m., before Linda Vaccarezza, CLR, CRP, RPR,

9 CSR NO. 10201.

10

11

12      -   -   -   -

13

14

15

16

17

18

19

20

21

22

23

24

25

**4**

# C O N T E N T S

ROBERT GLENN BEA, PhD., P.E.    EXAMINATION

BY MR. SEYMOUR.................................7

BY MR. RAFFMAN............................221

BY MR. SEYMOUR.............................225


AFTERNOON SESSION...........................110

**3**

# A P P E A R A N C E S

ON BEHALF OF THE BARGE PLAINTIFFS:

    RICHARD T. SEYMOUR, ATTORNEY AT LAW

     LAW OFFICES OF RICHARD T. SEYMOUR, L.L.C.

    1150 Connecticut Avenue N.W., Suite 900

    Washington, D.C., 20036

    (202) 862-4320

    Rick@rickseymourlaw.net

ON BEHALF OF LAFARGE NORTH AMERICA, INC.

    MARK S. RAFFMAN, ATTORNEY AT LAW

    JOHN ALDOCK, ATTORNEY AT LAW

    GOODWIN PROCTER, LLP

    901 New York Avenue, N.W.

    Washington, D.C. 20001  94104

    (202) 346-4000

    Mraffman@goodwinprocter.com


ALSO PRESENT:

    Peter L. Keeley, Lafarge North America, Inc.;

    John Shelonko, Lafarge North American, Inc.

    Benjamin Gerald, Videographer

**5**

# E X H I B I T S

BEA EXHIBIT NO:               PAGE NO.

Exhibit Number 1.............................9

Exhibit Number 2.............................9

Exhibit Number 3.............................9

Exhibit Number 4.............................9

Exhibit Number 5.............................9

Exhibit Number 6.............................9

Exhibit Number 7...........................49

Exhibit Number 8...........................59

Exhibit Number 9...........................79

Exhibit Number 10.........................109

Exhibit Number 11.........................147

Exhibit Number 12.........................203

Exhibit Number 13.........................203

Exhibit Number 14.........................211

6

1    P R O C E E D I N G S

2

3    THE VIDEOGRAPHER:  Good morning.  My name is

4    Benjamin Gerald of Veritext Deposition Services.

5    The date today is September 14th, 2009, the time      09:04

6    is approximately 9:04 a.m.

7        This deposition is being held in the

8    office of Goodwin Procter, located at Three

9    Embarcadero Center, San Francisco, California.

10   The caption of this case is:  In Re:  Katrina      09:04

11   Canal Breaches Consolidated Litigation, held in

12   the United States District Court for the Eastern

13   District of Louisiana.  The name of the witness

14   is Dr. Robert Bea.

15       At this time the attorneys will identify      09:04

16   themselves and the parties they represent, after

17   which our court reporter, Linda Vaccarezza,

18   of Veritext Deposition Services, will swear in

19   the witness.

20       MR. SEYMOUR:  Richard Seymour, for      09:04

21   plaintiffs, from Washington D.C.

22       MR. RAFFMAN:  Mark Raffman, Goodwin Procter,

23   for Lafarge North America.  With me today from my

24   law firm is John Aldock, who will be joining us.

25   And also from Lafarge North America, Mr. Peter      09:05

7

1    Keeley and Mr. John Shelonko.

2        THE VIDEOGRAPHER:  And I understand there is

3    no one participating remotely?

4        MR. RAFFMAN:  Correct.

5        (The witness was duly sworn.)      09:05

6        THE VIDEOGRAPHER:  Thank you.  Please

7    proceed.

8

9        ROBERT GLENN BEA, PhD., P.E.

10                                              09:05

11   having been duly sworn, by the Certified

12   Shorthand Reporter, was examined and testified as

13   follows:

14

15           EXAMINATION      09:05

16

17   BY MR. SEYMOUR:

18       Q   Dr. Bea, I know that you're not a

19   stranger to litigation -- excuse me -- to

20   providing your testimony in the barge case, but I      09:05

21   still need to go over these preliminaries.

22       I'll be asking you a number of questions

23   and you'll be providing answers.  It's very

24   difficult for the court reporter to take down

25   your information correctly if you're speaking at      09:05

8

the same time that I'm speaking and vice versa.

So I'll try to make sure that I wait to ask my

next question until you're finished with the

answer to the last question; and I'd ask that you

let me finish asking my question even if you      09:06

think you can get to what I'm after faster than

I'm getting to it.  Is that satisfactory?

    A   Yes.

    Q   If I ask a question and the question

uses terminology that simply does not compute in      09:06

your field, or seems ambiguous to you so that

there may be a question about what the question

means, will you let me know?

    A   Yes.

    Q   If I ask a question that you do not      09:06

understand, perhaps because I put it poorly, will

you let me know?

    A   Yes.

    Q   Would it be fair to say, then, that when

I ask a question and you give an answer, that you      09:06

don't have a problem with the question, you

understand it as it's stated?

    A   Correct.

    Q   Have you taken any medication or drugs

that would -- or do you have any physical      09:06

9

condition that would make it difficult for you to

remember accurately and to testify today?

    A   No.

    Q   Is there any reason why you cannot give

a deposition today and state accurately what      09:06

occurred?

    A   No.

    MR. SEYMOUR:  Okay.  I've asked the court

reporter to mark as Exhibit 1 to the deposition

your expert report dated July 10th, 2009.      09:07

    (Exhibit 1 marked for identification.)

    MR. RAFFMAN:  I object to the introduction of

this report.  This is a draft report, it was

represented to us.  It was actually recalled by

us and it was represented to us by Mr. Gilbert      09:07

that the copies had been destroyed.  Pursuant to

case management order number four, draft reports

are not admissible and may not be used to

question a witness.

    MR. SEYMOUR:  Let's go off the record.      09:07

    THE VIDEOGRAPHER:  The time is 9:08 a.m. and

we are off the record.

    (Recess taken from 9:08 a.m. to 9:46 a.m.)

    (Exhibits 1 through 6 marked for

identification.      09:16

10

1   THE VIDEOGRAPHER: The time is 9:46 a.m. and
2   we are back on the record.
3   MR. SEYMOUR: While we were off the record,
4   it developed that there was an inadvertent
5   production of a draft report. There's an                09:46
6   agreement that the draft report is not to be used
7   and all copies of this thing are to be
8   destroyed.
9   We have now marked the actual final
10  exhibit, which is dated August 3rd of 2009, as          09:46
11  Exhibit 1 in place of the other exhibit. We have
12  gone through and made sure that we've got the
13  correct copies of all the appendices, and those
14  have been pre-marked. Appendix A is Exhibit 2,
15  Appendix B is Exhibit 3, Appendix C is Exhibit 4,       09:46
16  Appendix D is Exhibit 5, and the supplemental
17  report, which is dated September 2009 --
18  September 4th, 2009, is marked as Exhibit 6.
19  And now that our housekeeping is out
20  of the way, let me ask you a few questions.             09:47
21  BY MR. SEYMOUR:
22  Q   Please state your full name for the
23  record.
24  A   Robert Bea.
25  Q   And what is your business address?                  09:47

11

1   A   University of California-Berkeley, Room
2   212, McLaughlin Hall, Berkeley, California
3   94720.
4   Q   One of the things that I did not cover
5   in the preliminary is that civility requires that      09:47
6   we take breaks for the benefit of the witness and
7   the court reporter from time to time. And so,
8   generally, we'll take a break every hour. But if
9   there's any time that you need to take a break or
10  need to have anything to drink or anything like        09:47
11  that, just let us know, so long as it's not in
12  the middle of a question.
13  A   Thank you.
14  Q   Let me first ask you to turn to Exhibit
15  2, the statement of your qualifications in             09:48
16  Appendix A.
17  Are you an active professor right now or
18  are you retired?
19  A   I'm active.
20  Q   Are you still teaching classes?                     09:48
21  A   Yes.
22  Q   For how many years have you been
23  teaching classes?
24  A   Since January 1989.
25  Q   Did you take any breaks in teaching                 09:48

12

1   classes while you were doing your work on the
2   Katrina investigation?
3   A   Yes.
4   Q   And what were the periods that you took
5   breaks?                                                 09:48
6   A   They were in the fall of 2000 -- 2007, a
7   sabbatical leave for one semester. Summer leave
8   breaks extend from the 1st of May through the 1st
9   of September for all of those years. In
10  addition, breaks from the 1st of December through      09:49
11  mid-January for all of those years.
12  Q   That's a regular school time break?
13  A   Correct.
14  Q   I have to say I was a little stunned
15  when I went through and counted up the number          09:49
16  of publications that you had, including all the
17  writings at conferences and so forth.
18  Just if you turn to the various
19  categories of Appendix A. There's a category
20  of Refereed Archival Journals with 91                  09:50
21  publications, and the next category is Refereed
22  Conference and Symposium Proceedings with 197.
23  Then we have Non-refereed Technical Reports with
24  237 of those. Articles in Non-archival -- excuse
25  me -- Non-refereed Conference Proceedings, 92 of       09:50

13

1   those. Articles in Non-archival Magazines or
2   Journals, I counted eight. Then you have books
3   and chapters in books. My count was six books
4   and seven chapters in books; is that correct?
5   A   That's correct.                                     09:50
6   Q   And then you had two other publications,
7   for a total of 640 publications?
8   A   That's approximately correct.
9   Q   I understand that you have co-authors on
10  a number of these but you're the lead author on        09:51
11  most of the publications?
12  A   That's right.
13  Q   Did you have the assistance of the
14  university graduate students, undergraduate
15  students or postgraduate students, with respect        09:51
16  to any of these publications?
17  A   Yes.
18  Q   I believe that somewhere -- and I
19  apologize, I don't remember whether it was in
20  either version of the report, or whether it was        09:51
21  in testimony in another case -- but is it right
22  that you have 21 articles or writings on the
23  subject of Katrina?
24  A   Correct.
25  Q   Or has that number increased since --              09:51

**14**

1    A    21 is fixed.
2    Q    Did you have assistance of any
3  undergraduate, graduate or postgraduate students
4  in doing your Katrina investigation?
5    A    Yes.                                    09:52
6    Q    How many?  Approximately.
7    A    Eight.
8    Q    Does the University of California, or
9  its Berkeley campus, have any rules constraining
10 you at all in the use of students for projects    09:52
11 like this?
12   A    Yes.
13   Q    What are those rules, briefly?
14   A    Essentially, that the engagement should
15 not detract from their academic programs, or      09:52
16 limited by the number of days that faculty can
17 devote to this type of work during the academic
18 periods.  That's it.
19   Q    Are there any constraints on your
20 serving as an expert witness when some of the     09:53
21 work is being done by students of the university?
22   A    No.
23   Q    Are there any constraints on being paid
24 for outside work, whether it's consulting or
25 expert witness work, when some of the work on the  09:53

**15**

1  project is done by undergraduate, graduate or
2  postgraduate students?
3    A    No.
4    Q    What were the compensation arrangements
5  for this case?                                   09:53
6    MR. RAFFMAN:  Referring to the barge matter,
7  correct, Counsel?
8    MR. SEYMOUR:  Referring to the case against
9  Lafarge, this one specifically.
10   THE WITNESS:  I executed a contract with      09:54
11 Goodwin Proctor for this work.
12 BY MR. SEYMOUR:
13   Q    And what were the terms of the contract
14 with respect to compensation?
15   A    Could you be more specific with regard   09:54
16 to the terms of "compensation"?
17   Q    Are you being paid --
18   A    Hourly rate?
19   Q    Yes, hourly rate.
20   A    $300 per hour for travel, $600 per hour  09:54
21 for technical work, $900 per hour for legal
22 testimony, plus expenses.
23   Q    How much have you been paid by Goodwin
24 Procter, or by others acting on behalf of Lafarge
25 North America, for your work in this case?        09:55

**16**

1    A    Approximately $220,000.  That includes
2  invoiced work from the supporting graduate
3  students.
4    Q    How much of the $220,000 went to the
5  graduate students and how much to you?           09:55
6    A    Approximately $30,000 to the graduate
7  students; the balance to me.
8    Q    When did you begin your work for Lafarge
9  in this case?
10   A    March 1st of 2009.                       09:56
11   Q    When were you first contacted by someone
12 on behalf of Lafarge North America?
13   A    Approximately six months before that
14 time.
15   Q    Could you tell me who contacted you?     09:56
16   A    John Aldock.
17   Q    What happened in that conversation?
18   A    The discussion concerned my ability,
19 willingness to serve as an expert witness in this
20 case.                                            09:56
21   Q    At that time were you already serving as
22 an expert witness in the case involving the
23 Mississippi River-Gulf Outlet?
24   A    Yes.
25   Q    And were you already serving -- I'm not  09:57

**17**

1  sure when the Robinson case was decided upon as a
2  bellwether case, was that before or after the
3  Robinson case was separated from the main
4  Mississippi River-Gulf Outlet litigation?
5    MR. RAFFMAN:  Objection.                      09:57
6    THE WITNESS:  I don't understand the
7  question.  Please reframe.
8  BY MR. SEYMOUR:
9    Q    Did there come a time when someone told
10 you that there was going to be a Robinson case?   09:57
11   A    Yes.
12   Q    Okay.  Was it before or after you were
13 told there was going to be a Robinson case?
14   MR. RAFFMAN:  Objection.
15   THE WITNESS:  What is "it"?                    09:57
16 BY MR. SEYMOUR:
17   Q    The conversations with Mr. Aldock.
18   A    That came afterwards.  The Robinson case
19 initiated my work May the 1st, 2007.  That work
20 was preceded by the Katrina Canal Breaches        09:58
21 Litigation.  That work initiated April the 1st,
22 2007.
23   Q    I assume that you were working with the
24 same lawyers on the Robinson case as you were
25 with the Mississippi River-Gulf Outlet case; is   09:58

5 (Pages 14 to 17)

**18**

1  that correct?
2     A   Yes.
3     Q   After you were contacted by Mr. Aldock,
4  did you speak to the lawyers in the Mississippi
5  River-Gulf Outlet case, or in the Robinson case,    09:58
6  about your being asked to be an expert in the
7  Lafarge case?
8     A   Yes.
9     Q   Who did you speak with?
10    A   Mr. Joseph Bruno.                          09:59
11    Q   And tell me how that conversation went.
12    A   Essentially, he questioned if I would be
13  able to supply the requested expert consulting
14  associated with the barge case.
15    Q   And what did he tell you?                  09:59
16    A   Yes.
17    Q   When you were preparing any of your
18  reports in the Mississippi River-Gulf Outlet
19  case, or in the Robinson case, was any counsel
20  for Lafarge involved?                             09:59
21    A   Not during the preparation, but during
22  the depositions and trial testimony they were
23  present.
24    Q   Were counsel for Lafarge present during
25  any of the preparation sessions for your trial   10:00

**19**

1  testimony of your depositions?
2     A   For which?
3     Q   For the Mississippi River-Gulf Outlet or
4  the Robinson cases.
5     A   Would you please explain what you mean    10:00
6  by preparations for that case?  Preparations
7  could mean a preparation of the report or
8  preparation could mean discussion of the details
9  involved in the testimony; which do you refer to?
10    Q   Right now, my question relates to         10:01
11  preparation to give the testimony.
12    A   No, they were not present.
13    Q   Were they present on the telephone, or
14  participating by e-mail, or physically in the
15  same room when you were putting your report into  10:01
16  final shape in the Mississippi River-Gulf Outlet
17  case, or in the Robinson case?
18    A   No, they were not.
19    Q   Were any of the counsel for the
20  Mississippi River-Gulf Outlet case, or the        10:01
21  Robinson case, in the room, or participating by
22  telephone, or participating by e-mail with
23  respect to the preparation of your report in this
24  action against Lafarge?
25    A   No, they were not.                         10:01

**20**

1     Q   Were any of the counsel in the
2  Mississippi River-Gulf Outlet case, or the
3  Robinson case, present physically, or by
4  telephone, or by e-mail in the preparation of
5  your testimony today?                             10:02
6     A   No.
7     Q   What were your arrangements for
8  compensation in the Robinson case?
9     A   The same as for the Lafarge barge case.
10    Q   Same hourly rates?                         10:02
11    A   Correct.
12    Q   And was that also true for the
13  Mississippi River-Gulf Outlet case?
14    A   That's correct.
15    Q   How much were you paid in the Robinson    10:02
16  case?
17    A   Approximately $1,200,000 during the
18  period April 1st from September -- April 1st,
19  2007, through September 1st, 2009.
20    Q   Of that amount, was there some that went   10:02
21  to graduate students?
22    A   Yes.
23    Q   How much went to graduate students?
24    A   Approximately $250,000.
25    Q   How much were you paid in the             10:03

**21**

1  Mississippi River-Gulf Outlet case prior to the
2  Robinson case?
3     A   The total of $1,200,000 includes both
4  the canal litigation and the Mississippi
5  River-Gulf Outlet litigation.                     10:03
6     Q   When you refer to the canal litigation,
7  are you referring to Robinson, or what are you
8  referring to?
9     A   Judge Duvall organized that work in two
10  or three principal areas of litigation.  The      10:03
11  first one that was -- at least that I worked on,
12  pertained to the breaches of the drainage canals
13  in the metropolitan area of New Orleans.  The
14  second case is the Mississippi River-Gulf Outlet
15  case, commonly known as Robinson, et al.          10:04
16    Q   You're not referring to the Inner Harbor
17  Navigation Canal?
18    A   That's correct.
19    Q   And the figure of 1,200,000 that you
20  mentioned from April 1st, 2007, to September 1st,  10:04
21  2009, covered Robinson and the Mississippi
22  River-Gulf Outlet and the Metropolitan New
23  Orleans canals?
24    A   Correct.
25    Q   Was there anything else that you did      10:04

**22**

1  outside of that description of work?
2      A   Oh, yes.
3      Q   Was there another area of expert
4  activity for which you were compensated that we
5  haven't talked about the figures for?        10:04
6      A   Yes.
7      Q   What was that?
8      A   In what I term as Phase 1 of my
9  involvement in this investigation, our work was
10  sponsored by the National Science Foundation.      10:05
11  The National Science Foundation compensated us
12  for our in-the-field expenses for a team of 36
13  investigators.  The total compensation was
14  approximately $330,000, that covers the period
15  of September 2005 through May 14th, 2006.        10:06
16      In addition, the University of
17  California at Berkeley would supply $60,000 to
18  support the investigation during that initial
19  phase, and during the following Phase 2 that
20  characterized additional work performed after May  10:06
21  14th, 2006.
22      Q   Did the University of California pay
23  your salary while you were doing this
24  investigation?
25      A   Yes.                    10:06

**23**

1      Q   And were all your out-of-pocket expenses
2  reimbursed by one means or another?
3      A   By whom?
4      Q   By the National Science Foundation or by
5  the University of California?            10:07
6      A   Yes.
7      Q   Was there any category of expert work
8  that you did for counsel in the Mississippi
9  River-Gulf Outlet case, or in the Robinson case,
10  that we haven't talked about for which you        10:07
11  received compensation that we've not talked
12  about?
13      A   No.
14      Q   So we've covered the waterfront, so to
15  speak?                    10:07
16      A   Well, not completely.  In the litigation
17  side of this work I've expended approximately
18  2,500 paid hours.  In addition, I have expended
19  in excess of 10,000 unpaid hours in this
20  investigation.                10:08
21      Q   When you refer to "investigation," are
22  you referring to everything from September 2005
23  to the present, or are you referring to something
24  different?
25      A   I am referring from September 2005    10:08

**24**

1  through the present.
2      Q   When did you expend these unpaid hours?
3      A   It started on August 29 -- pardon me --
4  August 24th, 2005, through today.
5      Q   Well, I understand that.  But was the    10:08
6  bulk of this during the period of time before the
7  Independent Levee Investigation Team report was
8  issued in final, or was the bulk of it later?
9      A   The bulk of it was later.
10      Q   What was the work that you were doing,    10:09
11  these 10,000 hours that you're describing that
12  were unpaid?
13      A   Well, first, our Independent Levee
14  Investigation was -- none of the participants,
15  with the exception of the graduate students,    10:09
16  received compensation for other than direct field
17  expenses.  Now, at the same time we were devoting
18  hours of acting and working on other parts of the
19  work and that was not paid.
20      Q   But you were receiving your salary from    10:09
21  the University of California, weren't you?
22      A   Not during summer times; that's three
23  months.  Not during winter break; that's one
24  month.  During those times there was no
25  compensation from the University.        10:10

**25**

1      Q   Aren't you paid on a 12-month basis?
2      A   Yes.  But I am hired on a nine-month
3  basis.  So I receive checks 12 months, but it's
4  prorated based on nine months of employment.  And
5  I'm only employed by the university nine months    10:10
6  per year.  That is my official appointment and
7  contract.
8      Q   It means that you're not required to
9  perform work for the university for three months?
10      A   No.  I'm not paid by the university    10:10
11  during those three months.
12      Q   Okay.  What is your annual salary at the
13  university?
14      A   $156,000 per year, that means for the
15  nine-month appointment.  That does not include    10:11
16  health care and the other indirect items.  That's
17  current salary.
18      Q   Are there any indirect items, other than
19  one we have with most large employers; health
20  care benefits, vacation?            10:11
21      A   No.  There's nothing other than the
22  normal.
23      Q   Okay.  There is a center that was
24  described in your expert report that you were
25  involved in establishing.  Can you tell me a    10:11

26

1   little bit about that?
2       A    The center's name is the Center for
3   Catastrophic Risk Management.  That center was
4   formed approximately November 2005, in the early
5   days after our national work in New Orleans      10:12
6   following Hurricanes Katrina and Rita.
7          The primary investigators returned from
8   New Orleans to Berkeley and talked to our
9   colleagues and agreed that what we were learning
10  in the investigation in New Orleans needed to    10:12
11  have a life and a span that was much broader than
12  Katrina and New Orleans.
13         So the faculty agreed to form the
14  center.  And it was at that point returned to the
15  university and asked for their support, both      10:13
16  financial support and time release, and other
17  forms of support, to foster the goals and
18  objectives of the Center for Catastrophic Risk
19  Management.
20         That center is still underway, still      10:13
21  exists.  We have expanded the work from New
22  Orleans, very substantially, so the lessons had
23  from Katrina and New Orleans have been taken to
24  other important parts of the United States and
25  internationally.                                 10:13

27

1       Q    If you turn to these 640 publications in
2   Appendix A, can you point me to the earliest
3   publication that has to do with the failure
4   of flood walls and hurricanes?
5       A    That would be the Independent Levee      10:14
6   Investigation report dated May 14th, 2005.
7       Q    Prior to that, had you had any
8   publications or writings on the failures of flood
9   walls, without regard to whether it's a hurricane
10  or something else, but just the failures of flood 10:14
11  walls?
12      A    Yes.  An American Society of Civil
13  Engineers' report dealing with flood walls for
14  the protection of coastal -- Gulf Coast
15  refineries, co-authored with now-Dr. Tony Dover,  10:15
16  spelled D-o-v-e-r.  That publication dealt with
17  the design criteria for flood walls, earth and
18  flood protection structures, defending Gulf Coast
19  refineries.  The date is approximately 1978.
20      Q    Okay.  Have you testified as an expert    10:15
21  witness in any case prior to the Katrina cases?
22      A    Yes.
23      Q    Please tell me about that.
24      A    The primary one concerned a port
25  facility, and I was acting on behalf of the        10:16

28

1   defendants in an engineering contracting firm in
2   Chicago, Illinois.  The plaintiffs were
3   represented by a Norweigian contracting company.
4   That case and the expert work that I did
5   concerning it occupied approximately three years. 10:16
6       Q    When was that?  An approximate answer is
7   fine.
8       A    That would be approximately 1990 through
9   1993.
10      Q    Had you ever served as an expert witness  10:17
11  in a case before that one?
12      A    Several.  And they date back to the --
13  the first case concerned a mobile offshore
14  drilling unit that caused the collapse of a major
15  offshore facility.  The name of the case is Shell 10:17
16  versus Mecom, John W. Mecom, the owner of the
17  mobile offshore drilling unit.  The time period
18  is approximately 1970 through 1973.  The case is
19  in a civil court, New Orleans.  And I've worked
20  as an expert witness on cases since that time     10:18
21  period through the ones I have described for you.
22      Q    Did any of the cases that you worked on
23  as an expert witness involve hurricane
24  conditions?
25      A    All have involved hurricane or, as they   10:19

29

1   are known in other parts of the world, tropical
2   cyclone conditions.
3       Q    Did any of them involve the failure
4   of flood walls?
5       A    No.                                       10:19
6       Q    Has any court ever barred your expert
7   testimony, to your knowledge?
8       A    No.
9       Q    Since you began -- well, I withdraw
10  that.                                              10:20
11         Since Hurricane Katrina, have you served
12  as an expert witness in any case that we've not
13  talked about yet?
14      A    No.
15      Q    Do you understand that when I ask if      10:20
16  you've served as an expert witness, I mean both
17  giving a deposition or an affidavit to be filed
18  in court or to be provided in court?
19      A    Correct.
20      Q    Have you been involved in any of the      10:21
21  investigations of the events in Katrina other
22  than the lawsuits that we've already talked about
23  and your work for the Independent Levee
24  Investigation Team?
25      A    Yes.                                       10:22

30

1   Q   Please tell me what those were.
2   A   I served as a reviewer to the National
3   Institute of Standards and Technology in review
4   of their forensic engineering investigations in
5   the Greater New Orleans area following Hurricane   10:22
6   Katrina.
7   Q   Did you write any part of any of their
8   technical papers?
9   A   No.
10   Q   Did you review any of their draft   10:22
11   technical papers?
12   A   Yes.
13   Q   Did you provide comments on any of
14   those?
15   A   Yes.   10:22
16   Q   And were your comments reflected in the
17   final versions?
18   A   Many were.
19   Q   Were you compensated for that work?
20   A   No.  That's part of the pro bono work.   10:23
21   Q   Were you involved in commenting on any
22   parts of the NIST technical papers that discussed
23   the barge?
24   A   Yes.
25   Q   In your report, have you quoted any   10:23

31

1   portions of any of the NIST reports?
2   A   To the best of my recollection, I have
3   not quoted any portions of those -- of that
4   report, but I have referenced that report
5   relative to key conclusions that I have reached   10:24
6   as a result of my forensic engineering studies.
7   Q   Cited but not quoted; is that fair?
8   A   That's correct.
9   Q   And did you cite, for support of your
10   study, any part of the NIST reports that you had   10:24
11   helped midwife into their final form?
12   A   No.
13   Q   Had you provided any comments on any
14   of the portions of any of the NIST papers that
15   you cited?   10:24
16   A   Please repeat your question.
17   Q   Have you provided any comments to NIST
18   on any of the portions of their reports that you
19   cited?
20   MR. RAFFMAN:  Objection, asked and answered.   10:25
21   THE WITNESS:  Yes.
22   BY MR. SEYMOUR:
23   Q   Do you know whether, as to those
24   particular comments, they were accepted or
25   rejected?   10:25

32

1   A   Well, in some cases the comments were
2   cooperation with our investigation -- "our"
3   meaning the Independent Levee Investigation
4   Team -- corroborated their independent
5   investigation of those elements.  So in most   10:25
6   cases, it was what I call triangulation of
7   results from groups of experts considering
8   elements involved in development of failures and
9   breaches.
10   Most of my comments to the National   10:26
11   Institute of Standards and Technology regarded
12   their recommendations for future improvements to
13   codes and guidelines employed in rebuilding Gulf
14   Coast facilities.
15   Q   Do you recall providing any comments on   10:26
16   the causation of the Inner Harbor Navigation
17   Canal breaches?
18   A   Please repeat your question.
19   MR. SEYMOUR:  Read that back, please.
20   (Record read as follows:   10:27
21   Question:  Do you recall providing
22   any comments on the causation
23   of the Inner Harbor Navigation
24   Canal breaches?)
25   THE WITNESS:  To whom?   10:27

33

1   MR. SEYMOUR:  To NIST.
2   THE WITNESS:  Yes.  The observation was that
3   their conclusions agreed with the conclusions
4   that we had reached as a part of the Independent
5   Levee Investigation, or through May 14, 2006.   10:27
6   BY MR. SEYMOUR:
7   Q   Did you provide to NIST any comments as
8   to the causation of either the North or the South
9   Breach in the eastern wall of the Inner Harbor
10   Navigation Canal before they had reached their   10:28
11   own conclusion?
12   A   Nothing before.
13   Q   Did you provide any comments to NIST
14   with respect to how they should describe their
15   conclusion as to the cause of the breaches in the   10:28
16   Inner Harbor Navigation Canal east wall?
17   A   No, I did not.
18   Q   You referred a moment ago to
19   triangulation.  What do you mean by that?
20   A   I am a mariner, an avid sailboater.   10:28
21   When at sea, to find out where I am, I have to
22   triangulate, which means I take a bearing on a
23   particular point of reference that I'm sighting.
24   So that I know the direction from that bearing to
25   my location, I can determine the distance from   10:29

9  (Pages 30 to 33)

34

1  that reference point to my location.  I do that
2  once, twice and three times to determine where I
3  am located.  And it's because I can't depend on
4  any single point of reference to tell me where
5  I'm at because of potential errors and          10:29
6  variabilities in those bearings and distances.  I
7  term it "triangulation," it's a term common to
8  surveying.
9       Q   We'll get to surveying in a minute but I
10  just want to make sure I understand the marine   10:30
11  part of your description.  You're on the water,
12  you're in some kind of vessel.  And are you
13  looking at three measurements of the same
14  sighting, or measurements of two or three
15  different things?                               10:30
16       A   At least three different things.  Those
17  could be stars, or they could be a land
18  lighthouse, or they could be radio beacons from a
19  known radio beacon in a known position.
20       Q   And you just mentioned surveying and   10:30
21  triangulation there, does that work any
22  differently than you described for the marine
23  application?
24       A   Works the same way, just terrestrial
25  versus marine.                                  10:30

35

1       Q   How does that work with respect to
2  reaching scientific conclusions?
3       A   It is the same thing.  In essence, one
4  group, one set of eyes, looks at something and
5  draws a conclusion.  But what they're looking at  10:31
6  and what they are seeing is filtered by a number
7  of perceptual elements and hence, there's a
8  variability to that set of conclusions.  A good
9  forensic engineer, and I think a good lawyer, I
10  think a good newspaper person, will turn to a    10:31
11  second independent source, attempt to triangulate
12  to that same location using different
13  information, perceptual information, and will
14  turn to even a third or a fourth one, but
15  recognizing a potential variability in those     10:32
16  sources.
17       When you have triangulated to an area
18  that allows you to draw conclusions, you have
19  confidence in your ability to think that those
20  conclusions represent the truth in reality.     10:32
21       Q   I had always thought of a scientific
22  conclusion as being the result of an individual
23  or a team looking at a particular problem and
24  testing hypotheses and coming up with their
25  conclusions?                                     10:32

36

1       A   That's good so far.
2       Q   What needs to be done to make it
3  complete?
4       A   Well, to expose it, then, to the
5  scientific community, and at that point have      10:33
6  other independent viewpoints test those analyses,
7  deductions and conclusions.  That's one of the
8  principal reasons in the scientific community for
9  peer-reviewed journal publication.  That's one
10  of the reasons that, as you were questioning and  10:33
11  observing, I spent more time than I would like to
12  remember exposing what I'm thinking to my peers
13  so that they can examine it, test its veracity,
14  see if they triangulate to the same set of
15  conclusions.                                     10:33
16       If we do, that's a good thing.  If we
17  don't, that means we have to keep working to
18  resolve the differences.  At the point in time in
19  which we have resolved these differences, then
20  we've got a conclusion set of so-called          10:34
21  scientific facts that are reliable for the
22  purposes envisioned for that work.
23       Q   Is this an activity that the other teams
24  that were involved in the Katrina investigations
25  were also following, this triangulation?         10:34

37

1       A   I really don't know since I wasn't a
2  member of those teams.
3       The evidence that I have been able to
4  gather indicates that, in most cases, they, too,
5  attempted to land a potentially erroneous         10:35
6  analysis and conclusions in their work.
7       MR. SEYMOUR:  I think this is probably a good
8  time to take a break.
9       THE VIDEOGRAPHER:  The time is 10:35 a.m. and
10  we are off the record.                           10:35
11       MR. RAFFMAN:  Read and sign.
12       (Recess taken from 10:35 a.m. to 10:44 a.m.)
13       THE VIDEOGRAPHER:  The time is 10:44 a.m.,
14  and we are back on the record.
15  BY MR. SEYMOUR:                                  10:44
16       Q   Dr. Bea, you used a phrase in your
17  earlier testimony, "forensic engineer."  What
18  does it take to become a forensic engineer?
19       A   Knowledge, training and experience.
20       Q   Is there a certification?             10:44
21       A   No, there is not.
22       Q   Is there a professional society of
23  forensic engineers that one must belong to in
24  order to be a forensic engineer?
25       A   No, there is not.  But there is such a   10:44

10  (Pages 34 to 37)

1    society of the American Society of Civil
2    Engineers, of which I'm an emeritus member. A
3    fellow has a committee on forensic engineer, I am
4    a member of that committee.
5        Q    Does that committee set any, at least          10:45
6    aspirational certification standards, to be a
7    forensic engineer?
8        A    Yes.
9        Q    And of the persons who call themselves
10   forensic engineers, do you have any idea of the       10:45
11   proportion who go through some kind of
12   certification process?
13       A    In the United States or international?
14       Q    United States.  If you don't know that's
15   fine.                                                  10:45
16       A    In my experience I have not met any
17   engineers who have formal certification in the
18   area of forensic engineering.
19       Q    Is the title of forensic engineer
20   something that some states regulate and require       10:45
21   that you do something in particular in order to
22   call yourself a forensic engineer?
23       A    Not to my knowledge.
24       Q    I think if I remember the number
25   correctly, that there were 36 team members on the     10:46

1    Independent Levee Investigation Team?
2        A    Yes, sir.
3        Q    Were those 36 persons who were
4    university faculty members or did that include
5    graduate students?                                    10:46
6        A    That includes graduate students.  And we
7    had some members that were not faculty members;
8    they were practicing engineers.
9        Q    Do you remember what the breakdown was
10   between practicing engineers and faculty members?     10:46
11       A    Roughly three to one, three academic
12   faculty to one practicing engineer.
13       Q    How did the Independent Levee
14   Investigation Team make decisions?
15       MR. RAFFMAN:  Objection.                           10:47
16       THE WITNESS:  Would you expand on decisions
17   concerning what?
18       MR. SEYMOUR:  Decisions concerning exactly
19   how the investigation was to be done, for
20   instance.  We'll start with that.                     10:47
21       THE WITNESS:  Now, please repeat your
22   question.
23       MR. SEYMOUR:  How did the Independent Levee
24   Investigation Team make decisions on how the
25   investigation was to be done?                         10:47

1        THE WITNESS:  We sat down together, talked
2    about how each of the members, senior members,
3    particularly, of the investigation thought we
4    should proceed.  And we operated primarily on the
5    basis of consensus so that, again, a form of         10:48
6    triangulation or cooperation.  When we were
7    unable to reach that consensus, then, if the
8    decision was in the area of the leader of that
9    area, then the leader of that area reached the
10   decision.                                             10:48
11   BY MR. SEYMOUR:
12       Q    36 seems like a large number for --
13       A    Oh, it is.
14       Q    I've been involved in projects, I know.
15       Was there some kind of executive board          10:48
16   or executive committee that tried to thrash
17   things out and bring order to the proceedings by
18   suggesting what should be done?
19       A    Yes.
20       Q    Were you on that group?                      10:48
21       A    Yes.
22       Q    How large was that group?
23       A    Three.
24       Q    And the members of that group were you,
25   Dr. Sneed?                                             10:49

1        A    Seed.
2        A    Seed.  Excuse me.
3        And who was the other one?
4        A    David Rogers.  Dr. David Rogers.
5        Q    And where is he from?                        10:49
6        A    University of Missouri-Rolla.
7        Q    Did the members of the team ordinarily
8    follow what the three of you suggested?
9        A    Ordinarily.  However, the team members
10   were given discretionary action powers by the        10:49
11   team, so that if we went to the field with a plan
12   in mind, and the group that was involved in a
13   particular portion of that field study thought
14   that a departure from the previous plan was
15   appropriate, the departure was made.                  10:50
16       Q    You have to follow up on leads?
17       A    Yes.
18       Q    Was the process any different for
19   reaching decisions on the conclusions that were
20   to be drawn?                                           10:50
21       A    It was a very, very similar process.
22       Q    Do you know how the decision making was
23   done for the NIST reports?
24       A    No, I do not.
25       Q    Were you involved in any of that?           10:50

**42**

1    A    Only as a consultant reviewer of their
2  draft final report, as I explained previously.
3    Q    Do you know how the Interagency
4  Performance Evaluation Team made its decisions?
5    A    No, I do not.  I was not a member of          10:51
6  that team, nor asked to comment or offer input.
7    Q    Did any members of the Interagency
8  Performance Evaluation Team discuss with you how
9  they made their decisions?
10   A    Yes.                                           10:51
11   Q    Who was that?
12   A    Mr. George Sills, a member of the U.S.
13  Army Corps of Engineers, Vicksburg District, a
14  member of the Interagency Performance Evaluation
15  Task Force.  These discussions were held during    10:51
16  the time period September 29th through October
17  the 15th, 2005.
18   Q    That was quite a while before they
19  reached their own conclusions, wasn't it?
20   A    They were in the field at the same time       10:52
21  we were, so like we were reaching our
22  conclusions, they also had personnel in the field
23  and were reaching their conclusions.
24   Q    Did you discuss with Dr. Sills, or
25  anybody else on the Interagency Performance        10:52

**43**

1  Evaluation Team, any views as to the role of the
2  barge as a potential cause of one or both of the
3  breaches in the east wall of the Inner Harbor
4  Navigational Canal?
5    MR. RAFFMAN:  Objection, vague as to time.         10:53
6    MR. SEYMOUR:  Ever.
7    THE WITNESS:  Yes.  We were in the field at
8  the same time that I cited previously, and
9  discussed between members of the two different
10  teams the potential roles of the ING 4727 barge    10:53
11  in the Lower 9th Ward breach development.
12  BY MR. SEYMOUR:
13   Q    During that period of time, weren't you
14  of the view that the barge was the cause?
15    MR. RAFFMAN:  Objection, vague as to time.         10:54
16    THE WITNESS:  Please repeat your question.
17  BY MR. SEYMOUR:
18   Q    During that period of time that you've
19  previously identified as being between September
20  29 and October 15, 2005, weren't you of the view   10:54
21  that the barge was a cause of the -- one or both
22  of the breaches in the Inner Harbor Navigational
23  Canal east wall?
24   A    We were still deliberating the
25  roles/participation of the barge in development    10:54

**44**

1  of the breaches at that early stage.  No analyses
2  had been -- formal analyses had been performed at
3  that time, so it was a potential participant and
4  we were still hotly deliberating the potential
5  role of that barge in other breach development.     10:55
6    Q    Dr. Bea, do you recall giving an
7  interview in which you stated that you thought
8  that the barge was a cause of the breach --
9    MR. RAFFMAN:  Objection.
10  BY MR. SEYMOUR:                                     10:55
11   Q    -- of one or both breaches?
12    MR. RAFFMAN:  Objection.
13    THE WITNESS:  Repeat your question, please.
14    MR. SEYMOUR:  Read it back, please.
15    (Record read as follows:                          10:55
16    Question: Dr. Bea, do you recall
17    giving an interview in which you
18    stated that you thought that the
19    barge was a cause of the breach --
20    of one or both breaches?)                         10:55
21    THE WITNESS:  I gave an interview on October
22  the 3rd, 2005, to Mr. Bob Sanders and commented
23  in that interview that the barge was a potential
24  participant player/causative element in the
25  development of the South Breach.                    10:56

**45**

1  BY MR. SEYMOUR:
2    Q    Is the best of your recollection that
3  you only said it was a potential cause?
4    A    I don't recall the exact wording but the
5  transcription of the video will clearly describe    10:56
6  that.  I would comment that the transcription
7  of that video done by Mr. Pasos, and his expert
8  report on page 28, both inaccurately quotes the
9  transcript from the video as well as inaccurately
10  defines the time of that video.                     10:57
11   Q    On page 28 of his report.  Do you have a
12  photographic recollection?
13   A    I don't need to.  I have his report
14  here.
15   Q    Well, I understand that.  I've got a lot       10:57
16  of things here, too, but that doesn't give me the
17  page number or anything on it.
18   A    Yes.
19   Q    Do you have a photographic memory?
20   A    No, I don't.  I wish I did.                    10:57
21   Q    What is the inaccuracy quotation that
22  you think that the Pasos report stated?
23   A    Well, I looked at what he put in
24  quotation marks, went back to the video, wrote
25  down what I said in the video and it didn't match   10:58

**46**

1   the quotation.
2       Q    Was it an error of substance, an error
3   of style?
4       A    It was an error of substance and it's
5   back to this element of causation participation.    10:58
6   That's one.  The second one, and it's a very
7   important one, is the element of the timing
8   of the interview relative to the subsequent
9   documentation of the causative elements behind
10  the North and South Breaches at the Lower 9th    10:58
11  Ward.  The interview was made very, very early,
12  approximately 50 hours into the investigation.
13  We had been in the Lower 9th Ward the previous
14  afternoon, had seen what was there to see,
15  examined the barge, examined the flood wall and    10:59
16  the damage in the surrounding community.  This
17  video was made the morning after that afternoon
18  visit.
19          The report that Mr. Pasos references is
20  a 2007/2008 documentation.  He contrasts the    10:59
21  conclusions as of 2008 with the conclusions that
22  he obtained from listening, transcribing that
23  video done October the 3rd, 2005, two years
24  before.
25      Q    He had a seven where there should have    11:00

**47**

1   been a five?
2       A    No.
3       Q    Well, did he have the date right?
4       A    He cited the report correctly but then
5   he said -- inferred, said, that the video    11:00
6   followed those reports.  The video preceded them
7   by more than two years.
8       Q    Did you ever say publicly that you had
9   changed your mind about the potential causative
10  role of the barge after that October 3, 2005,    11:00
11  interview before the ILIT report came out?
12      MR. RAFFMAN:  Objection.  But for
13  clarification, himself, personally, or as part
14  of --
15      MR. SEYMOUR:  Personally.  Okay.  For    11:01
16  purposes of clarification, I'm making the
17  assumption that you subscribed to the ILIT report
18  when it came out and did not identify the barge
19  as a cause of the breaches.
20      THE WITNESS:  Well, there was a report that    11:01
21  was a public release to the Independent Levee
22  Investigation report, November 2005, that
23  declared publicly that the barge was a victim,
24  not a cause.
25          That conclusion was brought forth in    11:02

**48**

1   congresional testimony by my colleague,
2   Professor -- Dr. Raymond Seed.
3   BY MR. SEYMOUR:
4       Q    The barge was a victim.  That's rather
5   striking.  One tends to think of a victim as    11:02
6   being something alive.
7           Have you previously used a phrase like
8   that to describe something inanimate?
9       A    Sure.
10      Q    Have you described the levees as    11:02
11  victims?
12      A    Yes.
13      Q    When did you do that?
14      A    Through many of both the public
15  statements I made as well as    11:03
16  information/documentation that I've provided in
17  this four-year time period.
18      Q    How does a failed levee become a victim?
19      A    It can become a victim of neglect.  It
20  can become a victim of poor design.  It can    11:03
21  become a victim of poor construction.  So the
22  inadequate object is being victimized by things,
23  in general, that people do or don't do.
24      Q    Have you said publicly that the levees
25  were not faulty -- the levees that failed were    11:03

**49**

1   not faulty?
2       MR. RAFFMAN:  Objection.
3       THE WITNESS:  I have not said publicly that
4   the levees which failed were not faulty.
5       MR. SEYMOUR:  I'll ask the reporter to mark    11:04
6   as Exhibit 7 to the deposition a passage from
7   Dr. Bea's testimony in the Robinson trial,
8   transcript pages 1094 through 1097.
9       (Exhibit 7 marked for identification.)
10  BY MR. SEYMOUR:    11:05
11      Q    You see at the bottom of -- or the top
12  of page 1094 that Mr. O'Donnell asked you:  Some
13  levees failed, didn't they?  And you said, yes.
14          And then on line 9 he asked:  Isn't that
15  proof that the levees were faulty and contributed    11:05
16  to the flooding?
17      MR. RAFFMAN:  Objection to the reading of the
18  transcript.  It's -- you've ellipsized the
19  passage that could be important.
20      MR. SEYMOUR:  I'm sorry?    11:05
21      MR. RAFFMAN:  You've ellipsized words that
22  may matter to the question.
23  BY MR. SEYMOUR:
24      Q    Do you see, quote, Isn't that proof that
25  the levees were faulty and contributed to the    11:05

**50**

1  flooding, close quote.  Do you see that?
2      A   Uh-huh.
3      Q   On lines 9 and 10?
4      MR. RAFFMAN:  I'm sorry.  All right.  I'm
5  reading from the bottom of the page.          11:05
6  BY MR. SEYMOUR:
7      Q   Okay.  Then after a dispute among the
8  lawyers that need not concern us, as so many
9  disputes among lawyers need not concern anyone,
10  he got back to it again on line 23, and said:   11:06
11  Some levees failed, didn't they?  And you
12  answered, yes.
13      A   Yes.
14      Q   Then on line 25 he asked:  Isn't that
15  proof in and of itself that the levees were     11:06
16  faulty and contributed to the flooding?  And you
17  said:  No, it is not.
18      Do you see that?
19      A   Yes.
20      Q   Moving on to page 1095, he asked:  Why   11:06
21  not?  And your answer is:  That's because what
22  was built was built and the Corps has maintained
23  that those were properly built flood-protection
24  structures, close quote.
25      Do you see that?                            11:06

**51**

1      A   Yes.
2      Q   And then the next question is:
3  According to the Corps, once overtopped, the
4  erosion failed; is that what was expected when
5  that happened?                                  11:06
6      And you see that you said in your
7  answer:  Given no backside protection, that's
8  correct.
9      A   That's correct.
10      Q   Then the question:  Then so where lies  11:07
11  the fault?  And the answer is:  The fault lies
12  with the MR-GO.  The levees were a victim, not a
13  cause, quote, unquote.
14      Do you see that?
15      A   Yes.                                    11:07
16      Q   Were you there saying that the levees
17  were not faultily designed or faultily
18  maintained?
19      A   I wasn't being asked to deliver expert
20  testimony concerning either the demand or       11:07
21  construction.
22      Q   Do you see at the bottom of page 1095
23  that you testified that -- well, the question
24  begins on line 16, quote, Now you know the
25  government says that Katrina was the big one,    11:07

**52**

1  that by herself, without the MRGO's alleged
2  flaws, she overwhelmed the system; is that
3  correct?  And you answered:  That's not correct.
4      A   That's correct.
5      Q   Did I read it correctly?               11:08
6      A   You did.
7      Q   Then the question is:  Why not?  And
8  your answer was that Katrina itself, without the
9  MR-GO, was not severe enough to have caused that
10  wave-side attack and erosion on Reach 2.  The   11:08
11  incremental surge developed in Reach 1 in the
12  Industrial Canal.  Katrina had a helper, the
13  MR-GO.
14      A   Correct.
15      Q   Now, on line 23 when you referred to the  11:08
16  Industrial Canal, do you mean that Katrina by
17  itself would not have breached the Industrial
18  Canal?
19      A   If we had Katrina and had properly
20  mitigated the negative effects of the MR-GO,    11:08
21  Mississippi River-Gulf Outlet, then my conclusion
22  was we would not have breached the Industrial
23  Canal flood walls and levees.
24      Q   Whatever the faults in the design or
25  maintenance, or neglect in caring for the east   11:09

**53**

1  flood wall of the IHNC, they would not have
2  breached?
3      MR. RAFFMAN:  Objection.
4      THE WITNESS:  Please repeat your question.
5      (Record read as follows:                   11:09
6      Question:  Whatever the faults in
7      the design or maintenance, or
8      neglect in caring for the east
9      flood wall of the IHNC, they would
10      not have breached?)                         11:09
11      THE WITNESS:  Would you please repeat the
12  question.
13      MR. SEYMOUR:  Let me try to put it again.
14      THE WITNESS:  Okay.
15      MR. SEYMOUR:  When you ask it twice, I think  11:10
16  there's a problem with the question, not a
17  problem with the answer.
18      MR. RAFFMAN:  So stipulated.
19      MR. SEYMOUR:  Now, now.
20  BY MR. SEYMOUR:                                 11:10
21      Q   Are you saying in your answer on Page
22  1095 of the transcript of the Robinson trial,
23  lines 21 through 24, that whatever the faults in
24  the design, construction and maintenance of the
25  Inner Harbor Navigation Canal eastern flood wall,  11:10

54

1  without the Mississippi River-Gulf Outlet they
2  would not have breached?
3      A    No, that's not what I'm saying.  The
4  Mississippi-Gulf Outlet had a definitive role in
5  the breaching at the Lower 9th Ward.  And that      11:10
6  role involved maintenance activities that were
7  associated, operational as well, with the
8  Mississippi River-Gulf Outlet.
9      Q    If the Mississippi River-Gulf Outlet had
10  never been built, would Katrina have resulted in      11:11
11  any breach of the eastern flood wall of the Inner
12  Harbor Navigational Canal?
13      A    Repeat your question, please.  I'm
14  collecting all of the parts.
15      MR. SEYMOUR:  Would you read it back, please?      11:11
16      (Record read as follows:
17      Question:  If the Mississippi-Gulf
18      Outlet had never been built, would
19      Katrina have resulted in any
20      breach of the eastern flood wall      11:11
21      of the Inner Harbor Navigational
22      Canal?)
23      MR. RAFFMAN:  Objection.
24      THE WITNESS:  I find that an impossible
25  question to answer because I would have to infer      11:12

55

1  the history that would follow or ensue if MR-GO
2  had never been built, and that's a supposition
3  that would require a great deal of speculation on
4  my part.
5  BY MR. SEYMOUR:      11:12
6      Q    What did you mean, then, when you said
7  in this transcript that, quote, Katrina itself,
8  without the MR-GO, was not severe enough to have
9  caused that wave-side attack and erosion on Reach
10  2, the incremental surge developed in Reach 1 and      11:12
11  the Industrial Canal?
12      A    Well, if we had properly mitigated the
13  effects of MR-GO, we would not have had breaching
14  of the earthen flood protection structures
15  adjacent to St. Bernard Parish, identified as      11:13
16  Reach 2 of the Mississippi River-Gulf Outlet.
17      Similar kinds of inferences are given to
18  the breaches at the Lower 9th Ward predicated on
19  the mitigation of MR-GO being the construction
20  of a flood gate at the mouth of the often-quoted      11:13
21  funnel representing the intersection of the
22  Mississippi River-Gulf Outlet with the Gulf
23  Intercoastal Waterway.
24      Q    Please help me understand how there
25  would have been mitigating measures for the      11:14

56

1  Mississippi River-Gulf Outlet required if there'd
2  never been a Mississippi River-Gulf Outlet?
3      MR. RAFFMAN:  Objection.
4      THE WITNESS:  I'm not predicating that there
5  had never been one.  I'm saying that there was      11:14
6  one.  And that the duty, the responsibility,
7  of the engineering activities, management
8  activities, were to mitigate the negative effects
9  recognized by the presence of the Mississippi
10  River-Gulf Outlet.      11:14
11      So I'm not predicating that it never
12  existed, because it did exist, and that
13  counterfactual argument is one that I'm not
14  addressing.
15  BY MR. SEYMOUR:      11:15
16      Q    Would it be fair to say, from this
17  testimony that we've been talking about, that you
18  believe that Katrina, all by itself, would not
19  have caused the under-seepage that you think is
20  the cause of the collapse of the walls?      11:15
21      A    That depends on how Katrina's
22  defenses -- or the flood defense system was
23  configured at the time of Katrina.
24      Q    Please explain.
25      A    Well, Katrina is just a tropical cyclone      11:15

57

1  and it's bringing those environmental conditions
2  to an area of people constructed/designed flood
3  protection facilities.  The performance of the
4  system, including Katrina, is a function of the
5  characteristics of those flood protection      11:16
6  elements.
7      Q    In your answers to these questions, are
8  you assuming any particular wind speed at surface
9  level over the Inner Harbor Navigational Canal?
10      A    None.      11:16
11      Q    No assumption as to wind speed?
12      A    Correct.
13      Q    Any belief or conclusion as to wind
14  speed?
15      A    Could you reframe your question, please?      11:16
16      Q    Does your answer -- would your answer
17  vary depending upon the wind speed at the surface
18  level over the Inner Harbor Navigational Canal?
19      A    Given the potential wind speeds over the
20  surface of water at the Inner Harbor Navigation      11:17
21  Canal, no, I don't think it would change the
22  conclusions at all.
23      Q    What is the range of wind speeds that
24  you have in mind?
25      A    Well, the range of wind speeds are the      11:17

**58**

1  wind speeds that characterized the history of the
2  hurricane that we have identified as Hurricane
3  Katrina.
4      Q   I'm talking about over the Inner Harbor
5  Navigational Canal, do you have any understanding      11:17
6  of the wind speed at surface level of the Inner
7  Harbor Navigational Canal preceding the South
8  Breach?
9      A   Yeah.
10     Q   And what is that understanding?              11:18
11     A   That there was wind at varying
12  velocity.  It varies in terms of speeds, meaning
13  both maximum and average wind speeds.  It varies
14  as a function of elevation that wind speeds
15  during Hurricane Katrina were variable.           11:18
16     Q   I asked you before for your
17  understanding of the range of wind speeds over
18  the Inner Harbor Navigational Canal --
19     A   Right.
20     Q   -- say before the South Breach.             11:18
21     A   Right.
22     Q   What is the range?
23     A   I'll reference wind speeds at 10 meter
24  elevation that are 10-minute average wind speeds,
25  and I'm referencing the Inner Harbor Navigation   11:19

**59**

1  Canal between 12:00 a.m. and 7:00 a.m., August
2  the 29th, 2005.  Those wind speeds range from 41
3  miles per hour to 77 miles per hour.
4      Q   What paper are you looking at?
5      A   I'm looking at a summary that I prepared   11:19
6  to help me recollect these kinds of details
7  describing the time history of elements that
8  accompanied the principal features that developed
9  at the Lower 9th Ward during the evolution of the
10  two breaches.                                     11:20
11     Q   May I see the document?
12     MR. SEYMOUR:  Do you have a copy that you
13  could pass to the court reporter and mark it as
14  Exhibit 8?
15     (Exhibit 8 marked for identification.)        11:20
16  BY MR. SEYMOUR:
17     Q   What is the source of the information on
18  Exhibit 8?
19     A   There are multiple sources, all of which
20  I've referenced in my expert report.             11:21
21     Q   In the line for 7:00 a.m., there's
22  information on the surge height as being 12 feet
23  and the column says, NAVD 88.  What does the NAVD
24  88 stand for?
25     A   North American Vertical Data 88, 2004,    11:21

**60**

1  point 65.
2      Q   Is that the scale by which you
3  determined it was 12 feet?
4      A   That's the scale by which I identified
5  the reference elevation for the water -- mean      11:22
6  water level.
7      Q   And that's above sea level, right?
8      A   Yes.  Above sea level, correct.
9      Q   And where does the 12 feet come from?
10  Is that from the IPET report?                     11:22
11     A   The 12 feet comes from the data provided
12  during the IPET studies, the documented water
13  level elevations along the Industrial Canal as a
14  function of time.
15     Q   And where do you have the -- where did     11:22
16  you get the information on the significant wave
17  height as being 2 to 3 feet at 7:00 a.m.?
18     A   The same source.
19     Q   IPET?
20     A   IPET, that's correct.                       11:22
21         That's their report, Volume IV, in
22  the appendix regarding height resolution wave
23  modeling.
24     Q   And that wave modeling was done as a
25  result of a computer program?                      11:23

**61**

1      A   As a result of people operating a
2  computer program and interpreting its result,
3  yes.
4      Q   Do you know the name of the program?
5  Was that the ADCIRC or a different program?        11:23
6      A   No.  This is Boussinesq multi-layer high
7  resolution wave modeling program.
8      Q   Would you please spell that first word?
9      A   B-o-u-s-s-n-e-q-e-s.  Boussneqes is a
10  fluid dynamics God.                               11:24
11     MR. SEYMOUR:  We'll let the record stipulate
12  that plaintiffs will follow whatever spelling
13  Mr. Raffman put on the Post-it that was just
14  passed.
15  BY MR. SEYMOUR:                                    11:24
16     Q   And the wind speed of 77 miles per hour,
17  what is the source of that?
18     A   That came from that report provided by
19  Mr. Dooley in this litigation.
20     Q   Do you happen to know which particular    11:24
21  anemometers Mr. Dooley relied upon to get his
22  figure?
23     A   Mr. Dooley relied on a series of
24  anemometers because there were no anemometers
25  located in the immediate vicinity of the Lower    11:25

**62**

1  9th Ward.  Ocean Weather, Incorporated, under the
2  direction of Dr. Vincent Cardone, performed
3  oceanographic/meterologic hindcast, which took
4  advantage of the field of observational
5  data-recording anemometers and constructed those          11:25
6  into a generalized wind field time history for
7  the propagation of Hurricane Katrina.  Mr. Dooley
8  refers to several of the grid points in the
9  immediate vicinity of the Industrial Canal to
10  determine and document these figures.                      11:26
11      Q    Do you know whether Mr. Dooley included
12  the anemometer from the NASA Michou facility,
13  either of the anemometers there?
14      A    I do not recall.
15      Q    And would your answers be the same with      11:26
16  respect to wind direction?
17      A    Correct.
18      Q    Speaking of wind vanes, not anemometers,
19  obviously.
20      A    Well, anemometers today not only tell        11:26
21  velocity as a function of time, they also output
22  direction.
23      Q    If the wind speed at the surface of the
24  Inner Harbor Navigational Canal, prior to
25  7:00 a.m., had been in excess of 100 miles an          11:26

**63**

1  hour, would you still have the same conclusion
2  that Katrina would not have been strong enough on
3  its own to take advantage of any flaws in the
4  eastern flood wall of the Inner Harbor
5  Navigational Canal and result in a breach?             11:27
6      A    Given proper mitigation, the negative
7  things that had been put into the flood
8  protection structures, that would be a valid
9  conclusion to draw.
10      Q    Okay.  A wind of 100 miles an hour, or       11:27
11  in excess of 100 miles an hour, could have driven
12  the barge with a great force against the flood
13  wall, couldn't it?
14      MR. RAFFMAN:  Objection, vague as to
15  direction.                                              11:27
16      THE WITNESS:  Repeat your question.
17      MR. SEYMOUR:  Read it back.
18          (Record read as follows:
19          Question:  A wind of 100 miles an
20          hour, or in excess of 100 miles an      11:28
21          hour, could have driven the barge
22          with a great force against the
23          flood wall, couldn't it?)
24      MR. RAFFMAN:  Time of day.  Same objection.
25      THE WITNESS:  If the barge were still moored   11:28

**64**

1  at the Lafarge Terminal where the wind is 100
2  miles per hour, or 150 miles per hour, there is
3  no collision between the purported barge and the
4  purported flood wall.
5      BY MR. SEYMOUR:                                    11:28
6      Q    And if the barge were adrift when the
7  winds were that high, wouldn't the winds have
8  been capable of driving the barge with a great
9  force against the flood wall?
10      MR. RAFFMAN:  Same objection.                      11:28
11      THE WITNESS:  Please specify what "great"
12  means?  In excess of 1 pound, 10 pounds, 3,500
13  hundred pounds?  Please quantify "great."
14      BY MR. SEYMOUR:
15      Q    Do you disagree with the finding of IPET      11:28
16  that if the barge had impacted the flood wall, it
17  would have been with a force sufficient to breach
18  the flood wall?
19      MR. RAFFMAN:  Objection.
20      Go ahead.                                           11:29
21      THE WITNESS:  I don't believe that IPET drew
22  such a conclusion.
23      BY MR. SEYMOUR:
24      Q    I believe I inadvertently misstated it.
25  It could have breached the flood wall, that it      11:29

**65**

1  would have had enough impact that that was
2  possible?
3      A    I don't think they even reached that
4  conclusion but we could check by reading the
5  document.                                               11:29
6      Q    Are you familiar -- did you -- do you
7  remember reading that part of the IPET report
8  discussing the impact of the barge on the flood
9  wall?
10      A    Yes.  Several times.                           11:29
11      Q    Did you disagree -- I'll re-characterize
12  it.  Did you disagree with that part of the IPET
13  report?
14      MR. RAFFMAN:  I'll disagree.  I'll object to
15  your characterization of the IPET report.            11:29
16      Go ahead.
17      THE WITNESS:  Well, I neither agreed or
18  disagreed.  I read it for what they had done and
19  drew no conclusions -- or they drew no
20  conclusions from those calculations.                   11:30
21      BY MR. SEYMOUR:
22      Q    They drew no conclusions as to what did
23  happen but did they not draw a conclusion as to
24  what could have happened?
25      A    As I testified earlier, I would need to    11:30

**66**

1  consult that document to corroborate that
2  conclusion.
3    Q   Is it your testimony here today that
4  winds of 100 miles per hour operating on a barge
5  that was adrift in the Inner Harbour Navigational     11:30
6  Canal, those winds bringing the barge into
7  contact with the flood wall would not have had
8  enough impact to cause a breach in the flood
9  wall?
10    MR. RAFFMAN:  Objection, it's vague as to     11:30
11  time.
12    MR. SEYMOUR:  At any time that the winds
13  would be in excess of 100 miles per hour in
14  bringing the barge into contact with the flood
15  wall.     11:31
16    MR. RAFFMAN:  Then it's an improper
17  hypothetical.
18    THE WITNESS:  First, I'm not an expert in
19  naval architecture.  Second, I'm not an expert in
20  meteorology.  Third, I have performed no forensic     11:31
21  engineering analyses to answer the question
22  hypothetical you have posed.  I would have to
23  speculate to answer.
24  BY MR. SEYMOUR:
25    Q   What would naval architecture have to do     11:31

**67**

1  with it?
2    A   Naval architecture involves the motions
3  of floating bodies.
4    Q   We're talking about a floating body
5  that's driven by wind of that velocity up against     11:31
6  the flood wall.
7    A   Right.
8    Q   And it's there.  So we are beyond naval
9  architecture, the vessel is there at the flood
10  wall.     11:32
11    A   Oh, no, we're not.  Because the impact
12  characteristics of that vessel at the wall depend
13  very heavily on the naval architecture
14  characteristics of the vessel, and the
15  meteorologic/oceanographic characteristics that     11:32
16  the vessel is embedded in.  That's a complex
17  issue.
18    Q   Isn't it rather more simple, like the
19  force with which a cannonball strikes a castle
20  wall?     11:32
21    MR. RAFFMAN:  Same objection.
22    THE WITNESS:  No.
23  BY MR. SEYMOUR:
24    Q   Okay.  And again, what does meteorology
25  have to do with it since we've already posited     11:32

**68**

1  winds of 100 miles an hour?
2    A   For how long and from what directions?
3    Q   The question that you were asked has to
4  do with the wind bringing the barge against the
5  flood wall.  It doesn't matter whether it did     11:32
6  that in a due east or northeast direction;
7  whether it did it in angle or whatever.  Can you
8  say anything at all about the impact of the barge
9  on the flood wall if the wind had been such --
10  had been of that speed and had brought the barge     11:33
11  up against the flood wall?
12    MR. RAFFMAN:  Same objection, improper
13  hypothetical.
14    THE WITNESS:  Your question is embedded with
15  flaws.     11:33
16    MR. SEYMOUR:  I could not hear the word.
17    THE WITNESS:  Your question is embedded with
18  flaws, f-l-a-w-s.  The direction of ocean on the
19  vessel, or the characteristics of the wind acting
20  on the vessel, have important effects as to the     11:33
21  impact time history that the vessel develops with
22  its intersection with the flood wall.  In
23  addition, the response characteristics of the
24  flood wall also influence the effective dynamic
25  forces that are transmitted to the flood wall.     11:34

**69**

1  You posited that these things made no
2  difference.  They do.  Very meaningful
3  differences.
4  BY MR. SEYMOUR:
5    Q   In reaching the conclusion that the     11:34
6  barge did not cause the breach, what assumptions
7  did you make about the wind speed and the
8  direction and the time of the barge impacting the
9  flood wall?
10    A   None.     11:34
11    Q   None whatsoever?
12    A   None.
13    Q   But if they make a difference, then
14  aren't there some wind speeds, directions and
15  times in which they would have made a difference     11:34
16  and caused a breach?
17    A   Not that we can tell.
18    Q   Was there anybody in particular in the
19  Independent Levee Investigation Team who had the
20  responsibility of analyzing that?     11:34
21    A   No.
22    Q   Who made the decision that nobody on the
23  Independent Levee Investigation Team should
24  analyze that?
25    A   No one.     11:34

18  (Pages 66 to 69)

70

1   Q   Was there anybody, to your knowledge, on
2   the NIST working body that had the responsibility
3   of analyzing that question?
4   A   I would not know since I was not a
5   member of that investigation.          11:35
6   Q   Are you aware of anyone on the
7   Interagency Performance Evaluation Team that had
8   the responsibility of investigating that
9   question?
10  A   Well, obviously, because the study      11:35
11  of barge potential impact forces are contained in
12  the IPET report, so someone had the
13  responsibility to investigate that point.  They
14  came to the conclusion that the barge played no
15  role in the development of the breaches.    11:35
16  Q   Do you know who?
17  A   Who what?
18  Q   You said obviously someone on the
19  Interagency Performance Evaluation Team had that
20  responsibility --                        11:36
21  A   Right.
22  Q   -- and I want to know who.
23  A   I do not know.
24  Q   Do you know what they did?
25  A   Only as documented in their report.    11:36

71

1   Q   Do you know of anyone of the Team
2   Louisiana Group that had the responsibility
3   of analyzing that question?
4   MR. RAFFMAN:  Objection.
5   THE WITNESS:  I do not know of anyone on the   11:36
6   Team Louisiana Group that had the responsibility
7   to answer that question, any motional impact
8   characteristics of the barge.
9   BY MR. SEYMOUR:
10  Q   So when you triangulated the          11:36
11  conclusion -- as you described triangulation, the
12  conclusion that the barge was not a cause, you're
13  dealing with a group of investigative bodies that
14  didn't look at the question?
15  MR. RAFFMAN:  Objection.              11:36
16  THE WITNESS:  That's not what I am trying to
17  communicate with you.
18  BY MR. SEYMOUR:
19  Q   Is that a fact?
20  MR. RAFFMAN:  Objection.              11:37
21  THE WITNESS:  No, I don't think that's a
22  fact.
23       Would you like an explanation?  Would
24  that be helpful?
25  MR. SEYMOUR:  I'd be interested in any   11:37

72

explanation that will help in this.
THE WITNESS:  For example, as we looked at
the North Breach, our analyses of the evolution
development of the North Breach, and I'll refer
to the Independent Levee Investigation Task Force   11:37
study, showed that that breach developed very
early the morning of Hurricane Katrina, meaning
in the 4:00 to 5:00 a.m. time period.  We
concluded that the barge played no role in that
evolution and development.  We used photographic   11:38
information to help us arrive at that conclusion,
photographs that showed that the barge plausibly
could not have contacted the wall.  We used our
forensic engineering experience, that is on site
examining the flood wall detailed characteristics   11:38
at the North Breach.  There were no signs of
barge impact, general or local.
     And by that time, we had asked the
question:  Where did this damn barge come from?
The answer had come, well, it only could come   11:39
from the Lafarge Terminal.  We were still
concerned, well, could it have come from other
parts of the Industrial Canal?  By the time we
learned the Florida Avenue Bridge would not have
allowed that, then the question came, well, could   11:39

73

it have come across the Industrial Canal,
actually driving to the northeast by that time in
the morning?  And the answer was no, not unless
it was magic.
     So we were using a variety of other forensic   11:39
engineering clues to help us understand the
potential role of the ING 4727 barge at North
Breach.  We repeated the same process at the
South Breach.
BY MR. SEYMOUR:                           11:40
Q   What conclusion or assumption leads you
to say that the barge could not plausibly have
moved from the Lafarge facility to the site
of the North Breach?
A   Because the wind wouldn't blow it there.   11:40
Q   All right.  And what do you rely upon
for your wind information; just this information
which is on this chart that's identified as
Exhibit 8?
A   Oh, no.  At that time we had the early   11:40
information coming from the IPET investigation.
They had gathered this anemometer information,
had ocean weather, Dr. Vincent Cardone, working
on the hindcast studies, so we were able to
access that information to help us understand   11:40

74

1  what the wind plausibly was doing at the time.
2      Q   Did you rely at all on Dr. Dooley's
3  information in reaching that conclusion or didn't
4  you have that yet?
5      A   We didn't have that yet because the time   11:41
6  period referencing was 2005 to May 14th, 2006.
7      Q   And if the wind could be shown to have
8  moved in a direction different from that posited
9  by the Interagency Performance Evaluation Team
10  and by Mr. Dooley, and had blown in a   11:41
11  northeasterly direction, would your conclusion
12  then change?
13      MR. RAFFMAN:  Objection.
14      THE WITNESS:  Which conclusion -- please
15  specify which conclusion you're referring to.   11:41
16      MR. SEYMOUR:  Your conclusion that the barge
17  could only have moved to the North Breach by
18  magic.
19      THE WITNESS:  Well, certainly, if I'm
20  presented with reliable information that   11:42
21  indicates that the previous information, thought
22  to be, is not correct, I have to reexamine the
23  conclusion in light of that new information.
24  BY MR. SEYMOUR:
25      Q   That's the job of a scientist, isn't it?   11:42

75

1      A   That's exactly right, sir.
2      Q   Now, you mentioned that there was
3  nothing at the site of the North Breach that
4  would indicate that the barge made impact.  Isn't
5  it correct that a great deal of the concrete that   11:42
6  the barge would have impacted was pulverized?
7      A   No.
8      Q   Okay.
9      A   It was cracked.  And we walked the
10  entire spiral of the North Breach.  We examined   11:42
11  video photography done September the 14th
12  overflying the North Breach.  We used aerial
13  photographs, both NOAA and the Corps, done
14  shortly after Hurricane Katrina had departed the
15  scene.  None of that information gave us any   11:43
16  suspicion for local contact between a barge and
17  the flood wall.
18      Q   Is it your testimony that the concrete
19  at the site of the North Breach was intact and
20  just down?   11:43
21      A   No.  I said it was cracked.
22      Q   Cracked, but intact.  There were no
23  chunks of concrete lying around; is that your
24  testimony?
25      A   No, there were chunks of concrete lying   11:43

76

1  around.  When concrete cracks, it tends to be
2  brittle and if it's not connected to reinforcing
3  steel, it will go where it will go.  There was
4  rubble concrete in the area.
5      Q   Okay.  Did you examine -- did you turn   11:43
6  over and lift all the rubble to examine all sides
7  to see if there was any indication, such as paint
8  scrapings, rust scrapings and so on, that would
9  indicate whether the barge had come in contact
10  with that concrete?   11:44
11      A   Repeat your question.
12      MR. SEYMOUR:  Please read it back.
13      (Record read as follows:
14      Question:  Did you examine -- did
15      you turn over and lift all the   11:44
16      rubble to examine all sides to see
17      if there was any indication, such
18      as paint scrapings, rust scrapings
19      and so on, that would indicate
20      whether the barge had come in   11:44
21      contact with that concrete?)
22  THE WITNESS:  No.
23  BY MR. SEYMOUR:
24      Q   Do you know of anyone who did?
25      A   No.   11:44

77

1      The key word is that word "all."  We
2  were able to access much of the area and
3  features, as were the photographs.  That word
4  "all" means everything.  Some pieces of concrete
5  were not on the surface, some pieces of concrete   11:44
6  were buried.  We could not deal with those
7  things, not accessible.
8      Q   How much of the concrete did you lift?
9      A   I lifted, personally, what I could lift,
10  which was probably limited to less than 150   11:45
11  pounds.  I walked the entire edge, along with my
12  Corps of Engineers, and I led the Independent
13  Levee Investigation Team members and the members
14  of the American Society of Civil Engineers
15  Investigation, we walked every inch of that North   11:45
16  Breach repeatedly.
17      Q   But I didn't mean that you would be
18  personally lifting up concrete.  That's what
19  graduate students are for.
20      A   No, that's not true.  I never used --   11:45
21      Q   That was a joke.  You don't need to
22  respond to that, sir.
23      A   I'm not very good at jokes.  And I never
24  use graduate students as slaves.
25      Q   Did anyone from the Independent Levee   11:46

78

1  Investigation Team or, to your knowledge, anybody
2  from the Interagency Performance Evaluation Team
3  use any mechanical contrivances to lift up the
4  concrete that was buried, and to do the kind
5  of examination that would be thorough, to          11:46
6  indicate whether there were signs of the barge
7  coming into contact with any of that concrete?
8      A   During what period of time, please?
9      Q   During any period of time.
10     MR. RAFFMAN:  Objection, characterization.      11:46
11     THE WITNESS:  The term "any" is
12  all-inclusive.  I can only comment where I've got
13  direct personal knowledge.
14  BY MR. SEYMOUR:
15     Q   Well, the rubble has already been          11:46
16  removed, hasn't it?
17     A   At what time?  It was not removed at the
18  time we were first there.
19     Q   Prior to the removal, are you aware
20  of anyone who examined all faces of the rubble to  11:46
21  see whether there were signs of the barge
22  impacting that wall?
23     A   I'm aware of some experts that were able
24  to examine faces of the concrete wall and panels
25  that we could not access.  That documentation has  11:47

79

1  been included primarily in Mr. Cushing's expert
2  report.
3      MR. SEYMOUR:  We're taking a tape-change
4  time.
5      THE VIDEOGRAPHER:  This marks the end of Disc  11:47
6  No. 1 in the deposition of Dr. Robert Bea.  The
7  time is 11:48 a.m., and we are off the record.
8      (Recess taken from 11:48 a.m. to 11:57 a.m.)
9      THE VIDEOGRAPHER:  This marks the beginning
10  of Disk No. 2 in the deposition of Dr. Robert      11:56
11  Bea.  The time is 11:57 a.m., and we are back on
12  the record.
13     MR. SEYMOUR:  I ask the reporter to mark as
14  Exhibit 9 to the deposition, something called the
15  NIST Technical Note 1476, some particular pages    11:56
16  from that technical note.
17     (Exhibit 9 marked for identification.)
18  BY MR. SEYMOUR:
19     Q   Have you seen this document before?
20     A   Yes.                                        11:57
21     Q   We spent a little time talking about the
22  difficulties of knowing the force that a barge
23  can exert on a physical structure it comes up
24  against.  On the second page of the exhibit,
25  which is page 43 of the technical report, there's  11:57

80

1  a picture in the upper-left corner of a parking
2  garage that simply had the rocking motion of a
3  floating barge move alongside it and caused a
4  partial collapse of one of the corners of the
5  garage.  Do you see that?                          11:58
6      A   Yes.
7      Q   Did that surprise you?
8      A   No.
9      Q   If you turn to the last page of the
10  exhibit, this is a picture of the bridge carrying  11:58
11  US Route 90 over the Pascagoula River.  And you
12  see there's some feet of a displaced span,
13  saying, the caption is:  "Due to the barge's
14  impact."  Do you see that?
15     A   Yes.                                        11:58
16     Q   You would agree that that would take
17  considerable force?
18     A   Yes.
19     Q   And on page 96 of the report, which is
20  right in the middle here, there's a section        11:59
21  called 4.1.2.6, the IHNC/Lower 9th Ward -- excuse
22  me, I'm on the wrong page.  It's the third page
23  of the exhibit, page 94, which is headed at the
24  top, 4.1.2.5, the IHNC/Lower 9th Ward/North
25  Breach.  And I want to direct your attention to    11:59

81

1  the middle portion, the middle paragraph on the
2  page, where it says, six lines down, quote, the
3  failed sections of the flood wall close to the
4  south edge of the breach appeared to have been
5  overturned and then uprooted with the concrete     11:59
6  I-walls pointing toward the protected side
7  direction and the steel sheet piles pointing
8  toward the canal.  However, its sections closer
9  to the middle and north edge of the breach, the
10  concrete I-walls were pointing toward the canal    12:00
11  while the sheet piles were pointing toward the
12  protected side, as if the system had been pushed
13  out from under.  Do you see that?
14     A   Yes.
15     Q   And you've read that before, haven't       12:00
16  you?
17     A   Yes.
18     Q   Was this particular technical report one
19  of the ones that you provided comments on?
20     A   Yes.                                        12:00
21     Q   Do you remember if you provided any
22  comments on this page?
23     A   Yes.
24     Q   What were your comments?
25     A   That it corroborated the conclusions we    12:00

82

1    had reached at the time I was asked to review
2    this report.
3        Q    Now, you are aware, are you not, that
4    the manager of the Pump Station No. 5 that was
5    located in the Lower 9th Ward, Mr. Villavaso, had        12:00
6    testified that he had seen what to him appeared
7    to be the tip of a barge protruding -- you know,
8    having gotten stuck in the wall with a tip coming
9    out and he saw the tip.  He didn't see the rest
10   of the barge but he saw the tip of that.  Do you        12:01
11   remember that?
12       A    Yes.
13       Q    Now, if that, in fact, had got the
14   barge and it had got its tip stuck in the wall,
15   and then there was some movement of wave or             12:01
16   water, wouldn't the barge have pushed the wall on
17   one side of the tip in one direction and the wall
18   on the other side of the tip in a different
19   direction, like a pry bar?
20       MR. RAFFMAN:  Objection, improper               12:01
21   hypothetical.
22       THE WITNESS:  I can't answer your question
23   since I haven't analyzed such a scenario.
24   BY MR. SEYMOUR:
25       Q    Do you know how a pry bar works?           12:01

83

1        A    Yes.
2        Q    And isn't that exactly how a pry bar
3    works?
4        A    No.
5        MR. RAFFMAN:  Same.                            12:02
6        THE WITNESS:  A pry bar has a fulcrum, and
7    it's moving one thing relative to something
8    that's not moving.
9    BY MR. SEYMOUR:
10       Q    It pushes one element in one direction     12:02
11   and the other element that it's stuck into in the
12   opposite direction, doesn't it?
13       A    Well, I hope -- if it does, you're not
14   going to open up a crack.  Because for every
15   action there's an equal and opposite reaction.        12:02
16   And to get this opening force, you've got to have
17   a reactive element.
18       Q    If the barge is moving in the water,
19   it's -- right now it's stuck in the wall in this
20   hypothetical, and the water then moves it, and        12:02
21   you've got a large length of barge; isn't that
22   going to shove the wall at the point of --
23   remember, the wall is broken where the tip has
24   through?
25       A    Right.                                     12:03

84

1        Q    And it's going to shove one part of the
2    wall outwards and towards the canal, and one part
3    of the wall inward toward the protected side.
4        MR. RAFFMAN:  Objection.
5        THE WITNESS:  Okay.                            12:03
6        MR. SEYMOUR:  Pardon?
7        THE WITNESS:  Okay.  Now, what's your
8    conclusion?
9    BY MR. SEYMOUR:
10       Q    Isn't that the same thing that is         12:03
11   described here?
12       A    No.
13       Q    What would you see differently from the
14   description on page 94 of this technical report?
15       A    The wall north of the north end of the     12:03
16   North Breach was not significantly displaced.  A
17   separation had occurred at that point, and the
18   wall south of that juncture had displaced toward
19   the protected side and it went through this very
20   unusual flipping motion.  So the prying action       12:04
21   that you're envisioning would require a
22   significant motion north of the place where the
23   purported barge knows a pry bar is focusing,
24   there was no motion or damage there.
25       Q    I refer you to the two sentences again     12:04

85

1    that I read.  Quote, The Failed sections of the
2    flood wall close to the south edge of the breach
3    appear to have been overturned and then uprooted
4    with the concrete I-walls pointing toward the
5    protected side direction and the steel sheet        12:04
6    piles pointing toward the canal.  However, its
7    section closer to the middle and north edge
8    of the breach, the concrete I-walls were pointing
9    toward the canal while the sheet piles were
10   pointing toward the protected side, as if the       12:04
11   system had been pushed out from under.
12       A    Uh-huh.
13       Q    Doesn't that describe adjacent sections
14   of walls pushed in opposite directions?
15       A    No.                                       12:05
16       Q    They are pointing in opposite
17   directions, aren't they?
18       A    Right.
19           Would you like me to explain?
20       Q    If you have an explanation I'd like to     12:05
21   hear it.
22       A    I do have an explanation.  As we best
23   understand the development of the North Breach,
24   the entire breach section was experiencing severe
25   stress under the bottom of the sheet pile, caused   12:05

86

1  by seepage.  The distress was concentrated toward
2  the north end of the North Breach, so the entire
3  wall is moving toward the protected side.  The
4  majority of the motions are in the center, and
5  the minor motions are at the two ends of this V.      12:06
6        We think there was a sudden tearing and
7  ripping at the north end of the North Breach
8  which allowed it to fly open like an opening
9  door.  The entire section laid down with the top
10  of the flood wall facing the protected side.  The      12:06
11  in-rushing water comes under the north end of
12  that section, lifts it and flips it much like a
13  ribbon would flap in the wind.  It was that
14  separated end that allowed this unusual flipping
15  action that was not found at any other breach      12:07
16  of any other location in the Greater New Orleans
17  area.
18     Q    So this is --
19     A    The flip happened after it breached.
20     Q    You think?      12:07
21     A    Everything we have analyzed and been
22  able to determine leads to that conclusion.
23     Q    And if the barge had operated as I had
24  described in my hypothetical, what would you see
25  different?      12:07

87

1        MR. RAFFMAN:  Objection, asked and answered.
2        THE WITNESS:  Well, of course, because I
3  haven't examined quantitatively the information
4  from the basis of your hypothetical, I can't
5  possibly answer it without speculating.      12:07
6  BY MR. SEYMOUR:
7     Q    That's fair.  That's fair.  I don't want
8  you to guess.
9        You referred to this section of wall as
10  "flapping like a ribbon."  How much weight was      12:07
11  there in that section of the wall?
12     A    Well, I'd have to do the calculations to
13  answer that, and could, since steel and concrete
14  have known weight.  But it's not the weight in
15  the section that solely determines how the      12:08
16  section behaves.  Water, with the density of
17  600/800 times of air, is a tremendous forcing
18  function.  And so it can easily get under this
19  heavy section, flip it and twist it.  And at
20  least in my ocean engineering experience, now      12:08
21  spanning 56 years, we have seen repeated
22  instances of this kind of destructive action from
23  water acting on very, very heavy structures.
24     Q    Have you seen repeated instances of
25  these adjacent sections pointing in different      12:08

88

1  directions or is that unique there, too?
2     A    This is unique to New Orleans North
3  Breach, north end.
4     Q    And if something causes part of the wall
5  to lean, it's much easier for water to get      12:09
6  underneath, isn't it?
7        MR. RAFFMAN:  Objection.
8        THE WITNESS:  To get underneath what?
9        MR. SEYMOUR:  Underneath the flood wall.
10        THE WITNESS:  Yes.  That's a crack, tension      12:09
11  crack.
12  BY MR. SEYMOUR:
13     Q    And if a barge pushes the wall so that
14  it leans, the barge then makes it much easier for
15  the water to get underneath and for the wall to      12:09
16  then fail the rest of the way, doesn't it?
17        MR. RAFFMAN:  Objection, improper
18  hypothetical.
19        Go ahead.
20        THE WITNESS:  If you are referring to this      12:09
21  case, in this scenario, the answer is the wall
22  was leaning very, very early that morning due to
23  the rising surge waters.  Once the water is able
24  to get of the order of two feet above the earthen
25  crown of the supporting soil levee, it begins to      12:10

89

1  incline.  And because the sheet pile are rigid
2  relative to the soil, that inclination propagates
3  directly to the bottom of the sheet piling.  It's
4  like working a shovel; where you are trying
5  to open a clod of dirt with a shovel and you push      12:10
6  the handle over, a little bit of push of that
7  handle propagates a crack, always at the bottom
8  of the rigid shovel.
9  BY MR. SEYMOUR:
10     Q    And a barge pushing against a wall is      12:10
11  going to speed that up a great deal, isn't it?
12        MR. RAFFMAN:  Objection.
13        THE WITNESS:  Well, if it's already present
14  and it's at the bottom, the barge doesn't matter.
15  BY MR. SEYMOUR:      12:10
16     Q    I'm not positing a wall that's already
17  fallen down.
18     A    I'm not either.  The wall is inclined.
19     Q    And the barge hitting against it is
20  going to make it more inclined, isn't it?      12:11
21     A    No.  The initial inclination in the
22  manner I described is sufficient to crack -- to
23  open a tension crack to the bottom of the sheet
24  pile.  You do not need a barge.
25     Q    I'm sorry.  My questions don't relate to      12:11

90

1 whether you need a barge --
2    A   Okay.
3    Q   -- my questions do not relate to whether
4 it is conceivable that the thing might have
5 happened without the barge.                    12:11
6    A   Right.
7    Q   My question is a very simple and direct
8 question.  Can the barge create the problem?  Not
9 whether the problem can arise independently, but
10 can the barge create the problem?              12:11
11    A   What is the problem?
12    Q   The problem is making the wall lean,
13 creating a gap underneath through which water can
14 go, further weakening the wall.  That's part one
15 of the problem.                                12:11
16    A   Theoretically it's possible.
17        Is it plausible in this case?  I don't
18 think so.
19    Q   And why do you say that?
20    A   Well, because we investigated the       12:12
21 performance of both the North and the South
22 Breaches and they breach without a barge, so the
23 barge didn't ever need to leave the Lafarge
24 terminal.
25    Q   That's what I just said.               12:12

91

1    A   Okay.
2    Q   My question does not have to do with
3 whether --
4    A   Then we're in agreement.
5    Q   -- with whether it is conceivable that  12:12
6 the breaches can occur without a barge.  That's
7 not my question at all.
8    A   Okay.  I misunderstood it.
9    MR. RAFFMAN:  Well, I think you're now --
10 BY MR. SEYMOUR:                                12:12
11    Q   Because -- because perhaps other people
12 might think it's conceivable that it would occur
13 without the weight of the water and only the
14 barge.
15        My question to you is, sir:  If the     12:12
16 barge is adrift in the canal, and if the barge is
17 being pushed by any combination of wind and water
18 up against the flood wall, is that not a force
19 that will help to push the wall down and create a
20 gap underneath?                                12:13
21    MR. RAFFMAN:  Objection, he's answered that
22 question.
23        Go ahead, answer it again.
24    THE WITNESS:  Let's go to the South --
25    MR. SEYMOUR:  Objection to coaching.       12:13

92

1    Please continue.
2    THE WITNESS:  Let's go to the South Breach.
3 BY MR. SEYMOUR:
4    Q   I'm asking a hypothetical question about
5 any barge hitting against a flood wall in the     12:13
6 Inner Harbor Navigational Canal.  It's not
7 specific to place --
8    A   Right.
9    Q   -- it's just a simple question of
10 physics.                                       12:13
11    A   It may be a simple question of physics
12 to you, but it's a practical exercise in
13 understanding the mechanics that can lead to
14 failure and breaching.  And that's why I said,
15 take for example the South Breach.  We know the  12:13
16 barge impacted at the south end of the South
17 Breach.  The rubbling, the rust streaks left as
18 signature features on the flood wall, the
19 features that, at least I could observe
20 personally on the barge, says it was there.      12:14
21        But that wall had failed before the
22 barge ever got there.  And so the barge exerting
23 additional prying forces, et cetera, played no
24 substantial role in the evolution development
25 of the breach.                                 12:14

93

1    Q   How do you know that?
2    A   Well, for one thing, a barge couldn't
3 have gotten where it got unless it played high
4 jump over that school bus.  The water had to be
5 above the top of the school bus, which means I    12:14
6 got water at the elevations that we think are
7 inside the Lower 9th Ward at 8:00 to 9:00 a.m.
8 But the breach was developed at 7:00 to 8:00,
9 based on all of the mechanics that we can
10 mobilize that allows water in, allows the barge   12:15
11 to impact the south end of the breach, and force
12 its way in, float over the top of that school
13 bus, not performing a high jump, and as the water
14 recedes, goes down and that's where we found it.
15    Q   Are you talking about the barge being on  12:15
16 top of the school bus?
17    A   No.  It had to high jump the school bus
18 because it was found on a protected east side
19 of the school --
20    Q   Finish your answer.                      12:15
21    A   -- it was found on the east side of the
22 school bus.  It didn't come to rest on the school
23 bus until Hurricane Rita.
24    Q   Okay.  Dr. Bea, are you aware that there
25 are witnesses in the Lower 9th Ward that heard    12:16

**94**

1  something banging repeatedly and scraping against
2  the flood wall prior to the failure of the South
3  Breach?
4      A   Yes.
5      Q   If they were accurately describing what       12:16
6  they heard, and the object creating those big
7  sounds -- they described big sounds -- with the
8  barge shoving against the flood wall, then the
9  barge would have caused the South Breach before
10  it got to the point where it hit what's then an    12:16
11  end of the flood wall; isn't that correct?
12      MR. RAFFMAN:  Objection, improper
13  hypothetical.
14      THE WITNESS:  I think it's not correct.  And
15  the rationale I'm using is we found many           12:17
16  instances where similar barges contacted similar
17  flood walls, imparting similar localized damage,
18  but those barges did not cause failure breaching
19  of those flood walls.  It caused localized damage
20  but did not precipitate an open breach flooding    12:17
21  the protected side.
22  BY MR. SEYMOUR:
23      Q   And did those flood walls, where the
24  barge did not create a breach, exist where the
25  levee was as weak as it was in the Inner Harbor    12:17

**95**

1  Navigational Canal?
2      MR. RAFFMAN:  Objection.
3      THE WITNESS:  I cannot answer that question
4  because I have not studied, quantitatively, the
5  soil characteristics under all of the locations    12:18
6  where we experienced barge impact with concrete
7  I-walls.
8  BY MR. SEYMOUR:
9      Q   So at this point in time, it's not
10  possible for you to say -- to rely upon what the   12:18
11  barges did in other areas to say that the barge
12  could not have played a causative role in
13  knocking down the flood wall at the South Breach?
14      MR. RAFFMAN:  Objection.
15      MR. SEYMOUR:  Is that correct?               12:18
16      THE WITNESS:  I think that's not correct.
17  But you correct me if I don't respond to your
18  question.
19      All of the analyses that we have done to
20  this point in time are saying, with the South      12:18
21  Breach, clearly show that the barge had no role
22  in the causation of the breach.
23  BY MR. SEYMOUR:
24      Q   Part of that analysis that you've
25  described is that barges elsewhere that came into  12:19

**96**

1  contact with flood walls did not knock the flood
2  walls down.  But we don't know if that's a fair
3  comparison because you don't know whether the
4  levee was as weak as the levee in the Inner
5  Harbor Navigation Canal.  So what else is there    12:19
6  to show that the barge could not have played a
7  causative role in knocking down the flood wall at
8  the South Breach?
9      MR. RAFFMAN:  Object to the characterization
10  and the argumentation.                             12:19
11      You can answer the question.
12      THE WITNESS:  I'll make another attempt at
13  clearly answering your question.
14      We analyzed the performance of the flood
15  wall at the South Breach several times, four,     12:19
16  five.  Those analyses show the South Breach would
17  develop, with its characteristics, without the
18  contribution of any sort from the barge.
19  BY MR. SEYMOUR:
20      Q   Do you mean would or do you mean could?   12:20
21      A   Would.  Our plausible conclusions from
22  these multiple forensic engineering analyses say
23  this is the most plausible answer for the
24  development of the South Breach.
25      Q   What's the margin of error on that?       12:20

**97**

1      A   The coefficient variation expressing the
2  margin of error is 30 percent.  That represents
3  our analysis of the uncertainty associated with
4  the development of the South Breach.  Those
5  analyses are documented in my expert report.       12:20
6  They include two kinds of uncertainties:
7  Uncertainties associated with natural
8  variability; for example, shear strength and
9  permeabilities, natural variabilities from things
10  like the weight of the water in the Industrial    12:21
11  Canal, and, explicitly, the uncertainties
12  associated with our analytical models.
13      To my knowledge, these are the only
14  forensic engineering analyses that have done
15  disciplined, analytical analyses of the margin    12:21
16  and rate of error.
17      Q   Didn't you testify in the Robinson trial
18  that the margin was between 50 and 100 percent?
19      A   Different performance, different
20  location, different mechanics.  And indeed, those  12:21
21  numbers are correct for the performance of the
22  earth and flood protection structures wayside
23  breaching on Reach 2.
24      Q   And what makes them correct there and
25  not correct for the Inner Harbor Navigational      12:21

98

1  Canal, where much of the soil that made up the
2  levee was washed away in the collapse?
3     A   A good way to respond to you is the
4  uncertainties in the water mechanics involved at
5  the Reach 2, MR-GO earth and flood protection     12:22
6  structures, are far greater than the water
7  mechanics represented at the Lower 9th Ward.
8        In addition, the propagation of
9  breaching due to the wave actions is considerably
10 more uncertain than the understanding of seepage   12:22
11 effects and lateral stability effects at the
12 Lower 9th Ward.
13    Q   You have a lot of similarities, too, in
14 those two areas, don't you?
15    A   Certainly.                                   12:22
16    Q   You're using the same analytical model,
17 so you'd have the same margin of error from the
18 analytical model?
19    A   That is incorrect.
20    Q   Why is it incorrect?                         12:22
21    A   Because we're not using the same
22 analytical models.
23    Q   What analytical model were you using for
24 the Inner Harbor Navigational Canal; does it have
25 a scientific name?                                 12:23

99

1     A   An analytical model consists of two
2  major components.  One component, I will call,
3  the human component.  The other one is a
4  computational component frequently embedded in
5  computer programs.  The analytical models that we  12:23
6  used on the Reach 2 earthen flood protection
7  structures are decidedly different from than
8  those used at the Lower 9th Ward.  Different
9  model to address different kinds of mechanics.
10    Q   The human factor is the same, isn't it?     12:23
11 The human factor is the same?
12    A   Oh, no, it's not.  This is why I draw so
13 much attention to the human factor because the
14 human factor has to be calibrated just like the
15 computer program needs to be calibrated.  If the   12:24
16 human factor is, for example, inappropriately
17 determining things like shear strength, like
18 permeability, then that garbage goes into the
19 computer program and you already know the output
20 is garbage.  So the computer program is            12:24
21 essentially doing what the human tells it to do.
22        The question for the forensic engineer
23 is does his combination of the human and the
24 analytical computer thing make sense?  Is it
25 trustworthy?  Is it something that we can carry    12:24

100

1  forward to Judge Duval in this trial and say,
2  convincingly, we understand this.  The only way
3  that we know that we can be close is when we
4  compare with field prototype information.
5        So we have access things like the           12:25
6  Atchafalaya levee test performed by the Corps in
7  the early 1980s.  The EIEI and flood wall
8  performance test, full scale, performed by the
9  Corps in the Atchafalaya Basin mid-1980s.  We
10 accessed failures like those at the 17th Street    12:25
11 Canal to ensure that our analytical models are
12 telling the truth, the whole truth and nothing
13 but the truth, with a defined margin of error, as
14 required by the Daubert criteria.
15    Q   All right.  You've referred to three        12:25
16 things, if my counting is correct, involving
17 things that happened in the 1980s, the 1990s and
18 a failure elsewhere in New Orleans.  Both of
19 those are going to be the same for Reach 2 and
20 for the Inner Harbor Navigational Canal.  Shear    12:26
21 strength, that's something objective that you
22 talked about.  If somebody makes a mistake in
23 shear strength, that's going to change the margin
24 of error.
25        So what did you do to make the shear        12:26

101

1  strength measurement more accurate in Reach 2 --
2  or excuse me -- less accurate in Reach 2 than it
3  is in the Inner Harbor Navigational Canal?
4        MR. RAFFMAN:  Objection.
5        THE WITNESS:  Because the dominant failure   12:26
6  mechanics in Reach 2, the earth and flood
7  protection structures, is not the same set of
8  mechanics that dominate the formation of the
9  breaches at the Lower 9th Ward.
10        Now, we were concerned with failure         12:26
11 of concrete/steel elements within Reach 2 of the
12 Mississippi River-Gulf Outlet.  For example,
13 those at Bayou Bienvenue, B-i-e-n-v-e-n-u-e, and
14 Bayou Dupre, D-u-p-r-e, there we used both
15 under-base seepage and global lateral stability.   12:27
16 Those models are identical to the ones that we
17 used at the Lower 9th Ward.  But those were not
18 the areas of breaching that you referred to as
19 you quoted that 65-percent coefficient of
20 variation error rate associated with that          12:27
21 particular set of breaches.
22 BY MR. SEYMOUR:
23    Q   In the Reach 2 breaches, you still had
24 levee left to test and examine, didn't you?
25    A   Yes.                                         12:28

1  Q   And at the area of the South Breach the
2  levee was washed away?
3  A   No.  We had levees both north and south
4  of the South Breach.
5  Q   Where the wall did not fail.  But for        12:28
6  the part of the wall that failed, the levee
7  wasn't left, was it?
8  MR. RAFFMAN:  Objection.
9  THE WITNESS:  Well, part of the levee was
10 left.  The photographs clearly show it.  Early    12:28
11 after the passage of the storm, a segment of the
12 levee close to the main bow section in the South
13 Breach had been shoved out in front of it like a
14 bulldozer pushing out part of dirt soil.
15 BY MR. SEYMOUR:                                    12:28
16 Q   And there's a part of the levee where
17 the wall is absolutely flat and there is no
18 amount of earth left?
19 A   Exactly.  It's been washed away by the
20 hydraulic action.                                  12:28
21 Q   How did you get a higher margin of error
22 where you've got levee left to test for shear
23 strength than you do in an area in which the
24 levee has been washed away?
25 A   Well, because in the area where the        12:29

1  levee was washed away, we had tests before
2  Katrina.  Those tests were performed at the time
3  of the design and, hence, we can go back there,
4  if we're worried about what is exactly at that
5  point, corroborate what we think was there before  12:29
6  the storm, based on available soil testing data,
7  to give us insight to what was actually there at
8  the time of Katrina.  So that soil information is
9  there only because we made tests before the
10 storm.  The same is true on these other areas     12:29
11 that we studied.
12 Q   Did you have soil boring information for
13 the specific area that was washed away?
14 A   Yeah.
15 Q   Old soil boring information?                12:29
16 A   Yes.
17 Q   And did you have soil boring information
18 for the parts of Reach 2 where the flood wall
19 failed?
20 A   Yes.                                        12:30
21 Q   So that's the same?
22     You've got soil boring information, and
23 I'm still trying to understand why you can have a
24 higher -- so much higher a margin of error where
25 the levee is still standing than you do at the    12:30

area of the greatest breach where the levee was
washed away.
MR. RAFFMAN:  Objection.
THE WITNESS:  First of all, the margin of
error being quoted here is the margin of error        12:30
associated with the breaching, not the "not
breaching."  That's step 1.
    Step 2, I explained that for the earth
and flood protection structures that it had
breached on Reach 2, their performance mechanics      12:30
is decidedly different, therefore involved
decidedly different soil and
oceanographic/hydrodynamic parameters than those
at the North and South Breaches at the Lower 9th
Ward.                                                 12:31
    So that if the mechanics are different,
the uncertainties have to be different.
BY MR. SEYMOUR:
Q   You've got a theory of under-seepage
being increased because of sand-filled borrow         12:31
pits; is that a fair description?
A   The under-seepage is in response to a
number of elements.  The sand-filled borrow pits
associated with the MR-GO lock expansion project
adjacent to the Lower 9th Ward and the East Bank      12:31

Industrial Area Site-Clearing, we think those
were important contributing elements to the
seepage.  The seepage, however, was a potential
conduit already there naturally, because when we
built the Lower 9th Ward, we built it on top          12:32
of a series of highly organic swamps and marshes.
    Those materials are buried, they're
highly water conductive.  So that when you match
the sand-filled borrow pits with this conductive
layer, you now have a recipe for high likelihood      12:32
of seepage-induced failure.
Q   You referred before to triangulation in
trying to reach a consensus to the other
researchers.  Isn't it a fact that the
Interagency Performance Evaluation Team disagrees     12:32
with your conclusion, or conversely, that you
disagree with their conclusion?
A   Conclusion regarding what?
Q   Whether under-seepage was a problem.
A   The independent --                           12:32
Q   Interagency, is that the word?
A   I think you're beginning to be able to
read my mind and that's delightful.  I want to be
sure I had the right group.  The Independent
Levee or the Interagency Performance Task Force.      12:33

106

1  Q   I understand and share the problem.
2  A   Thank you.
3      The Interagency Performance Task Force
4  arrives at the same conclusion that we arrived at
5  concerning the North and South Breaches.  That        12:33
6  is, it was a global lateral instability issue
7  that's responsible for the breaches.  Both of us
8  have concluded that the ING 4727 barge played no
9  role in those breaches.  The United States Army
10 Interagency Performance Task Force contributes       12:34
11 the breaching mechanics primarily to global
12 lateral stability at both locations.
13     Our analysis says that at the North
14 Breach, there were two competing horses in this
15 photo-finish horse race.  One was under-base         12:34
16 seepage resulting in a blowout loss of stability,
17 and at the same time a loss of global lateral
18 stability.
19     So we killed that breaches with two
20 bullets at the same time.  They only needed one.     12:34
21     When we go to the South Breach, we both
22 conclude that the primary instability mechanics
23 were tied up with global lateral stability
24 seepage; in their view it played no important
25 role, in our view it did play an important role      12:35

107

1  because it helped us explain why the breaches
2  happened where they did.
3      Q   Are you aware -- well, you're aware
4  of Dr. Reed Mosher, aren't you?
5      A   Yes.                                          12:35
6      Q   You're aware that he was the head of the
7  Interagency Performance Evaluation Team?
8      A   That is an incorrect positioning of
9  Dr. Mosher.
10     Q   He was the head of the part dealing with      12:35
11 the failure of the levees?
12     A   That's correct.  Dr./Professor Ed Link
13 had the Interagency Performance Evaluation Task
14 Force.
15     Q   Are you aware that Dr. Mosher has            12:35
16 testified in this case that they did not perform
17 any forensic investigation as to whether the
18 barge played a causative role in the collapse
19 of the flood walls at either breach?
20     MR. RAFFMAN:  Objection.                          12:36
21     THE WITNESS:  Please repeat your question.
22     (Record read as follows:
23     Question:  Are you aware that
24     Dr. Mosher has testified in this
25     case that they did not perform any     12:36

108

forensic investigation as to
whether the barge played a
causative role in the collapse
of the flood walls at either
breach?)                                  12:36
THE WITNESS:  No, I am not.  I have not
reviewed Dr. Mosher's testimony nor observed the
videotape from that testimony.
BY MR. SEYMOUR:
     Q   Are you aware whether officials called       12:36
by the government in the Robinson case disagreed
with your theory of under-seepage as being a
causative element?
     A   I find that question difficult to answer
until you specify which expert at what time.         12:37
     Q   Are you aware of whether any of the
government's experts so testified?
     MR. RAFFMAN:  With respect to the Inner
Harbor Navigation Canal dispute?
     MR. SEYMOUR:  Yes.                                12:37
     MR. RAFFMAN:  All right.
     THE WITNESS:  No, I'm not aware.
BY MR. SEYMOUR:
     Q   Would you please refresh me on when it
was that you were first contacted to become an       12:37

109

expert in the Mississippi River-Gulf Outlet
litigation?
     A   Approximately May 1st, 2007.
     Q   And all of the Independent Levee
Investigation Team work had been done by that        12:38
point, hadn't it?
     A   Correct.
     Q   May we know what you're reading from?
     A   A document I sent to Mark Raffman dated
July 24th, 2009.  Subject:  Rule 26 expert           12:38
disclosures, legal proceedings, expert consulting
during past five years.
     Q   May I see that?  Thank you.
     A   You can have it.
     Q   Thank you.                                    12:38
     MR. SEYMOUR:  I ask the reporter to mark this
as Exhibit 10.
     (Exhibit 10 marked for identification.)
     MR. SEYMOUR:  Off the record.
     THE VIDEOGRAPHER:  The time is 12:40 p.m.,        12:39
and we are off the record.
     (Luncheon recess was taken from 12:40 p.m. to
2:17 p.m.)

                          02:16

110

1       AFTERNOON SESSION
2          (2:17 p.m.)
3       THE VIDEOGRAPHER.  The time is 2:17 p.m., and
4    we are back on the record.
5    BY MR. SEYMOUR:                          02:17
6       Q   Dr. Bea, I'd like to ask you some
7    questions that are in your report.  If you look
8    at Exhibit 1 and turn to page 9.
9       A   Yes.
10      Q   In the very last line of the page, you    02:17
11   say that with respect to the Independent Levee
12   Investigation Team, you finally received, quote,
13   permission, close quote, from the Army Corps or
14   Engineers.
15      Why is the word "permission" in quotes?     02:17
16      A   Because the Corps had told us that we
17   needed their permission to access the breach
18   sites.  We found this unusual.  And to draw
19   attention to that unusual requirement, I put it
20   in single quotation marks.                   02:18
21      Q   When you saw the breach sites, it was
22   after Hurricane Rita had already passed, hadn't
23   it?
24      A   Yes.
25      Q   And what remediation work did you see    02:18

111

1    along the east side of the Inner Harbor
2    Navigational Canal when you did your first visit?
3       A   We saw the defensive berm that the Corps
4    had put in place in attempt to reestablish flood
5    protection following Hurricane Katrina.        02:19
6       Q   Did you see alterations made in the
7    specific areas that you wished to look at --
8       A   Yes.
9       Q   -- other than trying to close up some
10   of the gaps so they wouldn't re-flood?         02:19
11      A   Yes, we did.
12      Q   What did you see?
13      A   Well, for example, to facilitate the
14   construction of the repair berm on the Industrial
15   Canal side of the flood wall at the South Breach,  02:19
16   they had constructed a rock earthen access ramp.
17   That ramp went over part of the breach site.
18      Q   Did any of those interfere, in a way
19   that you regarded as significant, with your
20   ability to observe the conditions?             02:19
21      A   Well, for example, this rock earthen
22   ramp buried under a panel that we would have
23   liked to have seen directly, so we couldn't see.
24   In other cases, the protective berm itself had
25   filled mysterious holes that we could not tell   02:20

112

what was the characteristics of those holes.
They were also obliterated.
    Q   Were these holes filled by the areas
of wall that were still standing or by the areas
of wall that had fallen?                    02:20
    A   By the fallen walls.
    Q   Were they numerous?
    A   Yes.
    Q   Was it possible for you to tell what
they had been like before?                   02:20
    A   At this point in time, meaning in the
early days of the excavation, we didn't have that
knowledge.  But as the forensic engineering
studies unfold, we do have the knowledge of how
the holes got where they were, what the backfill   02:21
material had been in many instances.
    Q   How did you get that knowledge?
    A   Reviewing documentation, for example,
that was provided as part of the U.S. Army Corps
of Engineers, East Bank Industrial Area          02:21
Site-Clearing Project.  These are multiple
reports written by the Washington Group
International.
    Q   And WGI was working with the Corps while
they were doing this?                        02:22

113

    A   That's correct.
    Q   And did WGI record what those holes --
what had been in those holes before they were
filled?
    A   In some cases they did because they took   02:22
very detailed photographs of the history of the
important excavations.  So you could see what was
being brought out of the holes, visually, from
this photographic documentation.  In some cases,
they had reasonably detailed information as to     02:22
the nature of material that was being taken out.
In those cases it was focused on highly polluted
materials.
    Q   Highly polluted?
    A   Highly polluted, correct.              02:22
    Q   Did they take any sand out?
    A   Please be more specific of where you're
referring to to help me answer your question.
    Q   Before they filled these holes, was
there any record of their having taken sand out    02:23
of any of these holes?
    A   Yes.
    Q   And where was the sand?
    A   Well, my focus and my attention in this
were primarily two sites:  The Boland Marine site  02:23

29 (Pages 110 to 113)

**114**

1  to the north, that's adjacent to the North
2  Breach, and the Saucier Marine site that spans
3  the South Breach location.
4      Q   Do you have a map of the area in
5  Appendix C --                                     02:24
6      A   Yes.
7      Q   -- which is Exhibit 4 to the
8  deposition?
9      I believe it's on page -- well, the low
10  40s.  There's a map on page 41 from 1996, and    02:24
11  then later maps, 2002 on page 42, 2005 on page
12  43, and post-Katrina and before Rita on page 44.
13      Which map is the easiest to tell?
14      The one on page 41?
15      A   The easiest map --               02:24
16      Q   The easiest to tell where these things
17  came from or these sand --
18      A   The easiest to tell are Figures 19A and
19  19B, pages 27 and 28.
20      Q   Okay.  That makes it pretty easy to   02:25
21  tell.
22      Now, how do you tell from this figure?
23      A   Well, the figure identifies with those
24  white circle numbers, it identifies specific
25  excavations that were made in that area in the   02:25

**115**

1  course of clearing the site.  Those numbers tie
2  to characterizations of those specific locations,
3  and those numbers are then tied to the specific
4  photographic documentation of the activities
5  concerned with those excavations.              02:25
6      Q   Could you read the numbers on your copy?
7      A   In general.  On 1, 2, 9, 10, 11, 19.  So
8  you can read them on the original documentation.
9  Due to the digitization of the graphic, they are
10  much more legible.  The report from which this   02:26
11  figure was taken is referenced in a legend
12  citation of the figure.
13      Q   All right.  I think a magnifying glass
14  would be able to do it.
15      Are the numbers that you mentioned the   02:26
16  numbers where the sand was taken out?
17      A   Well, various materials were involved
18  with various locations.  So I would have to trace
19  the number to the location to then determine
20  whether or not it was sand or other kinds of   02:27
21  materials.
22      Q   If I were the person that wanted to find
23  out where the sand was being taken out, where, in
24  here, would I look to get the numbers that
25  correspond to these locations?              02:27

**116**

1      A   You could not.  You would have to trace,
2  from this figure, to the Washington Group
3  reference 2005 report.  You would then have to
4  trace, from that report, to the photographic
5  documentation that accompanies that report to   02:27
6  each of those specific sites.
7      I have given you examples of that
8  photographic information in this expert report.
9      Q   Okay.  Would the WGI information, like
10  WGI 2005, is going to be in your Reliance   02:27
11  materials?
12      A   Yes.
13      Q   Do you remember which disc?  There are
14  22 of them.
15      A   No.  My memory is not that good.   02:28
16      Q   And would the photograph that goes along
17  with that also be in the Reliance materials?
18      A   Certainly.
19      Q   I'll do the hunting then.
20      And then would your answers be the same   02:28
21  for the map on page 28?
22      A   Correct.
23      One other element I would offer is some
24  of these excavation holes were not backfilled.
25  For example, where they were excavating a pile,   02:28

**117**

1  pull it from the ground, there was no formal
2  documentation of any backfill put into those
3  holes.
4      Q   Were they just left as holes?
5      A   In some cases we think they were.  In   02:28
6  other cases we think there may have been surface
7  material put over the holes to prevent people,
8  animals, from falling into the holes.
9      Q   On page 29 there's a copy of a WGI
10  photograph from 2005, excavation for soil borrow   02:29
11  pit adjacent to flood wall.
12      Your report states -- your report of one
13  of your attachments, one of the many things
14  you've written, states that there was some kind
15  of lining that was put in the borrow pits that   02:29
16  made them not of concern for under-seepage?
17      A   Correct.
18      Q   What kind of lining was that?
19      A   Clay.
20      Q   Clay.  Can you see any evidence of a   02:29
21  clay lining in this?
22      A   Yes.
23      Q   And where is it?
24      A   And it shows up at the -- in the figure
25  as a darker material being put -- do you see the   02:29

118

1  bottom of the excavation with the tread marks
2  from the bulldozers?
3      Look to the right in the shaded area and
4  in color it's much better.  There's a dark
5  material there.  That's imported clay that they      02:30
6  are putting into the site of this particular
7  excavation.
8      They made a great -- or they paid a
9  great deal of attention to this excavation
10 because the Corps of Engineers were concerned     02:30
11 with the proximity of the excavation to the flood
12 wall and the underlying negative materials,
13 because this excavation was going to be
14 subsequently flooded by water from the Industrial
15 Canal.                                             02:30
16     Q   Do we know when in 2005 this photograph
17 was taken?
18     A   The when is connected to that
19 identification number, shown at the bottom left-
20 hand corner of the photograph, and maintained all   02:31
21 of the legend.  That number connects you with a
22 specific location and date.
23     Q   The number 222110904-05?
24     A   Yes.
25     Q   Are you familiar enough with the           02:31

119

1  numbering system to know whether this means it
2  was taken on September 4, 2005?
3      A   No, I'm not.  But that sounds plausible.
4      Q   Now, if this was -- picture was in fact
5  taken after Hurricane Katrina, that protection      02:32
6  against water getting in close to the wall would
7  have been absent?
8      A   Well, this photograph was taken before
9  Hurricane Katrina.  The work was concluded by,
10 essentially, March-April of 2005.                   02:32
11     Q   So that is not going to be September 4,
12 2005, then?
13     A   That's correct.
14     Q   Do you know the thickness of that clay
15 coating on the side of the borrow pit?              02:32
16     A   Not to any quotable, definitive
17 thickness.  We can only get each from the
18 photographic evidence and the approval of the
19 lining by the U.S. Army Corps of Engineers
20 inspectors.                                         02:33
21     Q   Do you know whether the forces of
22 Katrina washed out what was in that borrow pit?
23     A   The information that we have, following
24 Hurricane Katrina, of this location indicates
25 that the materials there before are the materials   02:33

120

1  there after.  There were no significant signs of
2  disturbance in this area.
3      Q   If you look on page 43 of Appendix C and
4  then compare it with page 44 of Appendix C.  Both
5  of those show the borrow pit as being completely    02:34
6  underwater; was that the plan?
7      A   Yes.  The plan for the site clearing.
8  They were using materials excavated from this
9  area to fill other excavations on the East Bank
10 Industrial Area.                                    02:34
11     Q   Do you know if anyone looked underneath
12 the water to find out whether that layer of clay
13 was still there doing anything to seal the thing
14 off or had it failed?
15     A   When?                                       02:34
16     Q   After Katrina.
17     A   I have no knowledge that anyone looked
18 under the water, after Katrina, to determine if
19 that clay layer was still there.
20     Q   Is your answer the same for after          02:34
21 Hurricane Rita?
22     A   Correct.
23     Q   And to the present day?
24     A   I think that's correct.
25     Q   If you turn to page 11 of your report.      02:35

121

1  And this comes up on several other locations that
2  I just would like to ask you a couple questions
3  now and have done with it.
4      In your experience, how often does
5  overtopping lead to flood wall failure, just        02:35
6  based on your experience in New Orleans?
7      MR. RAFFMAN:  Objection.
8      THE WITNESS:  I will attempt to answer your
9  complex answering -- or your question is complex
10 to answer in a short way.                           02:36
11     There were many instances of flood walls
12 overtopped in New Orleans that did not fail in
13 the sense of opening a breach.  But those flood
14 walls did fail in the sense of significant final
15 plastic inclination deformation.  That's another    02:36
16 form of failure.
17     In almost all cases where the flood
18 walls experienced significant overtopping and
19 development of a trench on the back side, and I'm
20 referring to I-walls, those flood walls            02:37
21 subsequently had to be either repaired or
22 replaced, they were no longer suitable for
23 continued service in that condition.
24     In many cases they breached and those
25 turned into some of the most damaging breaches      02:37

31 (Pages 118 to 121)

122

1  that we investigated that infected the flood
2  protection system for the greater New Orleans
3  area.
4  BY MR. SEYMOUR:
5      Q   I want to be sure that I understand your      02:37
6  terms.  You referred to a wall becoming plastic
7  and developing.  Do you mean it started to lean?
8      A   Yes.
9      Q   Isn't it true that even though it's not
10 good to have a leaning wall, a leaning wall is     02:38
11 obviously not as strong as a wall that's
12 vertical, it can still keep the water out?
13     A   Yes.  That's why I had to carefully
14 define failure.
15     Q   If you turn to page 13 of your report.     02:38
16 And we come again to this language about
17 suggesting that because the demonstrated impact
18 of the barge with flood wall at the southern end
19 of the breach was at the extreme end, that impact
20 was not the cause of the breach and failure.      02:38
21     And I'm not sure whether we are the same
22 generation or not, but do you remember playing a
23 children's game in which you lean cards against
24 each other, sometimes making a very long wall
25 that's held up only by the cards leaning against   02:39

123

1  each other?
2      A   No.
3      Q   Have you ever heard or seen such a
4  thing?
5      A   No.                                         02:39
6      Q   Does it strike you as reasonable that
7  when you have such a wall of weakly balanced
8  forces, any tap anywhere brings the whole thing
9  down?
10     A   Yes.  That would be called a domino        02:39
11 effect.
12     Q   And flood walls in fact are a balancing
13 act, aren't they?
14     A   No.
15     Q   You've got forces that are trying to       02:39
16 keep the wall upright, the back side earth trying
17 to keep the thing stable; you've got the water
18 that's trying to push the wall forward; and even
19 though the water is at flood stage, as long as
20 you have a balance the wall does not fail; is      02:39
21 that right?
22     MR. RAFFMAN:  Objection.
23     THE WITNESS:  That will depend on the
24 specifics of the scenario that you're
25 constructing.                                       02:40

124

1      The difference between the imposed
2  forces at the time of your scenario and the
3  resistance -- resisting forces, there's a factor
4  of safety that the engineer explicitly introduces
5  into the process to make the resisting forces     02:40
6  significantly greater than the imposed
7  destabilizing forces.
8  BY MR. SEYMOUR:
9      Q   You want to have some comfort zone?
10     A   Exactly.  Called a margin of quality.      02:40
11     Q   In this case, isn't it true that there
12 is a substantial variation in the calculated
13 margin of safety, or safety factors?
14     MR. RAFFMAN:  Objection.
15     THE WITNESS:  Could you be more specific in    02:40
16 your question, whose and where and what?
17 BY MR. SEYMOUR:
18     Q   Well, did your Independent Levee
19 Investigation Team calculate factors of safety?
20     A   Yes.                                        02:41
21     Q   Were your calculations showing the same
22 result for the Inner Harbor Navigational Canal
23 that the Corps of Engineers calculations did?
24     A   In some cases, yes.
25     Q   And in some cases not?                      02:41

125

1      A   Correct.
2      Q   And Dr. Marino calculated different
3  factors of safety than either of you?
4      A   Yes.
5      Q   Did the Team Louisiana calculate factors  02:41
6  of safety?
7      A   Not really.  Team Louisiana devoted most
8  of their work to characterization of the
9  Hurricane Katrina meteorological/oceanographic/
10 hydrodynamic characteristics to characterizations  02:41
11 based chiefly on visual observation and design
12 drawings.  A few are not detailed forensic
13 engineering quantitative analyses of the
14 breaches.
15     They collected some eyewitness               02:42
16 information and stop clock information, and then
17 were able to answer the questions posed in their
18 investigation by the Louisiana Department of
19 Transportation and Development.
20     Q   Is there anyone else that calculated      02:42
21 safety factors for the Inner Harbor Navigational
22 Canal's east wall, that you're aware of?
23     A   There are the factors of safety for the
24 Inner Harbor Navigation Canal flood walls
25 computed by the Interagency Performance          02:43

32  (Pages 122 to 125)

126

1   Evaluation Task Force, by the Independent Levee
2   Investigation Team, Phase I, and by the
3   Independent Levee Investigation Team, Phase II,
4   and a subsequent series of analyses of those
5   factors which other experts have calculated.        02:43
6        Q    Isn't it correct that those calculations
7   of safety factors depend upon determinations
8   of what the underlying soil is?
9        A    Yes.
10       Q    And there are not always borings            02:44
11  available to show that information, are there?
12       MR. RAFFMAN:  Objection.
13       THE WITNESS:  In the areas of investigation
14  that we participated in here -- for example, at
15  the Lower 9th Ward -- there were borings            02:44
16  available.  And when we felt, during the
17  investigation, that there was not sufficient
18  geotechnical information, we performed additional
19  soil borings and in situ soil tests.
20  BY MR. SEYMOUR:                                     02:44
21       Q    Did the Independent Levee Investigation
22  Team perform those borings themselves or did they
23  team up with Washington Group International, or
24  some other groups, to do the borings?
25       A    The Independent Levee Investigation        02:45

127

1   Team, during the Phase I studies, took a portion
2   of the funds provided by the National Science
3   Foundation and we subcontracted the work to Soil
4   Testing Engineers-Louisiana, they performed the
5   borings and in situ test under our supervision.    02:45
6        Q    Dr. Mosher testified in this case that
7   he thought that the Cone Penetrometer Tests were
8   much more reliable than the soil borings.  Do you
9   have a position on that?
10       A    Yes, I do.  It depends on what you're      02:45
11  attempting to characterize in this process.  The
12  Cone Penetrometer Test, as its name describes, is
13  simply the pushing of a probe, under known force,
14  and the probe has known geometric
15  characteristics, and you're sensing the            02:46
16  resistance of the soil.
17       For example, that resistance versus
18  depth characterization can be very, very useful
19  in giving you definitive information on the types
20  of soil and on the layering of the soil            02:46
21  subsurface.
22       There are several additional steps that
23  are required to take that information and begin
24  to do some important soil behavior
25  characteristics.  So it's good for some things.   02:46

128

1        Other types of testing laboratories, for
2   example, can be used to provide other insights
3   into other soil characteristics that the Cone
4   Penetrometer Test can't provide.
5        Q    The specific purpose for which he was      02:47
6   testifying about the superiority, as he saw it,
7   of the Cone Penetrometer Test, was for purposes
8   of determining shear strength in calculating
9   factors of safety.
10       A    Okay.                                       02:47
11       Q    Would you agree with him, that it's
12  superior for that purpose?
13       A    No, I would not.
14       Q    Why would that be?
15       A    Well, the cone penetration test, as I       02:47
16  described, essentially gives you one measurement
17  and that's resistance.  You then have to take the
18  geometric characteristics of the cone, and the
19  rate at which it's being pushed into the soil, to
20  reach a deduction concerning the soil's peak         02:48
21  shear strength.
22       Soil has many different strengths that
23  are a function of the strain imposed on the soil
24  that bring it both to its peak and after its
25  peak.                                                02:48

129

1        The cone penetration test, for example,
2   can't tell you anything about the pre-peak
3   strength nor about the post-peak strength.  Both
4   of those strengths figure importantly in a
5   forensic engineering analysis of the performance    02:48
6   of earthen structures.
7        Q    Are you aware that -- withdraw that.
8        My recollection from going through
9   Volume 5 of the Interagency Performance
10  Evaluation Team of volume, was that there were       02:49
11  only a small number of Cone Penetrometer Tests in
12  the Inner Harbor Navigational Canal on the east
13  side.  The number I'm thinking of is four but I
14  may be off by one or two.
15       Does that sound within the same ballpark         02:49
16  as your recollection?
17       MR. RAFFMAN:  Objection.
18       THE WITNESS:  For the independent evaluation
19  task force, sounds reasonable.  But that's not
20  reasonable for the total because we gathered         02:49
21  additional soils' information that they did not
22  access or integrate into their work.
23  BY MR. SEYMOUR:
24       Q    Did you do Cone Penetrometer Tests?
25       A    Yes.                                         02:49

130

1  Q   How many did you do?
2  A   That information is documented in my
3  expert report.  I will attempt to recollect in
4  the area of the North and South Breaches.
5      In the area of the North Breach, my          02:50
6  recollection is it was four.  In the area of the
7  South Breach, five.
8  Q   You mentioned before that there was an
9  earthen ramp that covered over part of the area
10 that you would like to see.  Was that at the     02:50
11 North Breach or the South Breach?
12 A   South Breach.
13 Q   What was the width?
14 A   The width of a normal size dump truck.
15 It would be the normal width of one lane of a    02:51
16 highway, for example.
17 Q   And that was the width at the top; what
18 about the base?
19 A   Same there.  They had constructed as
20 narrow a roadway as could serve -- safely         02:51
21 transport the trucks to the top to deposit
22 materials and then turn those trucks around and
23 bring them back into the interior of the Lower
24 9th Ward.
25 Q   Was the material being deposited on the   02:51

131

1  site of the old levee or somewhere else?
2  A   Well, it was being deposited both on the
3  site of the old levee, outside of the old levee
4  and in front of the old levee.
5      Most of the material was being deposited   02:51
6  outside of the old levee, and that was a
7  temporary flood protection berm that the Corps
8  initiated building after Hurricane Katrina.  It
9  re-failed in Hurricane Rita.
10     So they were busy at the time we got      02:52
11 there reconstructing the defensive berm.
12 Q   On page 13, paragraph 2, you're quoting
13 here from the Independent Levee Investigative
14 Team.
15 A   You're referring to Exhibit 1?           02:52
16 Q   Exhibit 1, page 13, first paragraph,
17 quoting from the Outlet report.  Actually, if you
18 look at paragraph 2, you notice that it says that
19 there are other modes of failure that would have
20 been expected to fail this section without any    02:53
21 need for help from the barge.
22 MR. RAFFMAN:  Page 13?
23 THE WITNESS:  Okay.  I'm prepared to answer
24 your question.  Please repeat it.
25 BY MR. SEYMOUR:                                  02:53

132

1  Q   Just, do you see that language?
2  A   Please repeat your question.
3  Q   Okay.  On paragraph 2, in the middle
4  of the paragraph, do you see it says that there
5  are other modes of failure that would have been  02:53
6  expected to fail this section without any need
7  for help from the barge?
8  A   Yes.  I underlined that section.
9  Q   And then if you turn to page 16, in
10 Exhibit 1, and look at the carryover paragraph.   02:54
11 A   Please repeat your developing question
12 relative to page 16.
13 Q   It's the carryover paragraph, the
14 penultimate sentence states:  Finally,
15 geo-forensic studies clearly show that this       02:55
16 section would have failed without barge impact.
17 A   I am reading this and it reads:
18 Finally, as described later, geo-forensic studies
19 performed, as part of our investigation, showed
20 that this section would have been expected to     02:55
21 fail without barge impact.
22 Q   You're two paragraphs below.  Right up
23 at the top of the page, the carryover paragraph.
24 A   Start me again, please.
25 Q   Finally, geo-forensic studies clearly     02:55

133

1  show that this section would have failed --
2  A   Yes, I see that.
3  Q   -- without barge impact.
4      I would like to know what the difference
5  is when you say on one page that a section would  02:55
6  have been expected to fail, which is one level
7  of hypothetical intensity.  And when you say,
8  clearly shows that the section would have failed,
9  it sounds a lot more emphatic.
10 A   This means we have learned more.          02:56
11 Q   Between page 13 and page 16?
12 A   Correct.  And that's because additional
13 time has transpired, additional information has
14 been gathered, and this is reflecting the
15 additional surety with which that conclusion was  02:56
16 being drawn.
17 Q   On page 13, that's a 2006 -- May 14,
18 2006, final draft report?
19 A   Correct.
20 Q   And on page 16, it is a May 2008 report.  02:57
21 A   Correct.  That -- it was not a report.
22 It was a series of peer-reviewed journal
23 publication papers that detailed the additional
24 forensic engineering studies.
25 Q   In paragraph 28, also on page 16, we      02:57

134

1  have a comparable sentence, but again it reverts
2  to the "would have been expected to fail without
3  barge impact."  That was the sentence you read by
4  mistake before but we are now up to it.
5      A   Yes.                                02:57
6      Q   So that goes back to the weaker form
7  of putting it, but it's also from the same 2008
8  paper that Professor Seed, et al, were
9  presenting.  I don't understand what the
10 difference is in what you knew within the same    02:58
11 paper.
12     A   Nothing.  There's no differences, as you
13 stated.  The emphasis with which those words are
14 different, are different in that way that you
15 have cited.  The information base is the same.     02:58
16 The emphasis with which it's stated is different.
17     Q   Can we agree that a scientific
18 conclusion is not made stronger simply because
19 the adverbs are stronger?
20     A   It, of course, depends on the adverbs    02:58
21 involved.
22     Q   As a scientific matter, how is it
23 possible to conclude that a given section of
24 flood wall would clearly have failed when an
25 adjoining section of flood wall did not fail?      02:59

135

1      A   If the forensic engineer has evaluated,
2  and a good one does, two adjacent sections, one
3  of which failed and the other of which didn't
4  fail, it's incumbent on the forensic engineer to
5  be able to explain both in a reasonable,          02:59
6  logical -- reasonably unambiguous way.
7      In fact, we attempted to do that in
8  these cases.  One of the cases you were
9  interested, concerned the excavations adjacent to
10 the flood wall between the North and South         03:00
11 Breaches.
12     The Industrial Canal had been allowed to
13 flood that area, following when they opened up
14 the borrow pit.  And one of the questions we had
15 was:  Well, if that area is open, and open to the  03:00
16 water, why didn't it fail before, or instead
17 of, the south bridge?
18     The clay lining, that you were
19 developing questions about, proved to us the
20 answer to that question.  The water could not      03:01
21 penetrate early to those underlining layers and
22 the flood wall did not fail there.  Meanwhile, it
23 failed at the adjacent section to the south.
24     Q   Isn't it true that different types
25 of clay have very different properties in terms    03:01

136

1  of how permeable they are to water?
2      A   In general, that is not a correct
3  statement.
4      Clay refers to a size of fraction of
5  soil.  There are different kinds of minerals that  03:01
6  make up those small fractions, montmorillonite,
7  kaolinite, for example, which make up that small
8  fraction.
9      Once we're in a fraction of material,
10 whether it's montmorillonite or kaolinite, has no  03:02
11 demonstrable effect on things like picture
12 strength or permeability.  Permeability is a
13 function of the void ratio of the material.
14     If these two different enterology clays
15 have the same void ratio, they have essentially    03:02
16 the same permeability.
17     Q   Are you aware that in the Interagency
18 Performance Evaluation Team report, Volume No. 5
19 of the IPET report, they distinguish between fat
20 and other clays, and say that fat clays are much   03:02
21 more permeable to water than other clays?
22     A   Yes, I'm aware of that.
23     Q   Do you disagree with them?
24     A   I have some disagreement.  And the
25 disagreement is we discovered that in several      03:03

137

1  very important cases soils were being
2  characterized as being fat clay when they
3  contained very significant fractions of silt and
4  sand.
5      The interesting thing was, you couldn't    03:03
6  look at the soil boring until -- or the soil
7  boring log, and tell whether or not is was truly
8  fat clay because that soil boring log represents
9  a drawing characterization done by a human.
10     You had to access the detailed            03:03
11 laboratory testing to find out that that fat clay
12 contained very significant amounts of sand and
13 silt.  That additional piece of information tells
14 the forensic engineer the permeability of those
15 two materials are very, very different.            03:04
16     Q   How do we know what kind of soil was
17 actually being put in to line the borrow pit?
18     A   Other than the observations that I
19 referred to, and other than the information --
20 additional information that Dr. Marino developed   03:04
21 and described in his expert report, you don't
22 know.
23     You have to be able to take samples
24 of one type or another, or have such samples and
25 correlate them with in situ testing to be able to  03:05

138

1  deduce what's actually there.
2      Q   Was any boring taken of that lining?
3      A   That's a very interesting question that
4  I have not yet had time to investigate, because
5  it involves the additional soil cores that were          03:05
6  identified by Dr. Marino in his expert report.
7      The original Reliance information did
8  not include that important soil characterization
9  testing information.  Later, Reliance production
10  has produced that information.  I have not had          03:06
11  time, to this point in time, to use that
12  additional information to answer your question
13  concerning characteristics of that liner
14  material.
15      Q   Is it your understanding that Dr. Marino        03:06
16  had found some boring that included the lining
17  of that borrow pit?
18      A   Potentially, he has located soil
19  information that would give us insight into that
20  lining.  Not having been able to access that           03:06
21  information, to this point in time, I don't know
22  whether or not it actually did.
23      Q   So you mean you have the information but
24  you haven't had the time?
25      A   Correct.                                        03:06

139

1      Q   And I gather that the Independent Levee
2  Investigation Team did not do any boring that
3  included the lining?
4      A   Correct.
5      Q   At the bottom of page 16, it states:  In        03:07
6  the end, it is our investigation conclusion that
7  a fully definitive determination cannot be made
8  between the multiple available competing
9  potential failure mechanisms at this site, based
10  solely on these conventional geotechnical              03:07
11  analyses.
12      Doesn't that same sentence apply equally
13  to the barge?
14      A   No.
15      Q   Why not?                                        03:07
16      A   It's not included in the horse race
17  that's being referenced here.
18      Q   I understood that you took it out of the
19  horse race.  But isn't it --
20      A   No.  It eliminated itself from the horse        03:07
21  race.
22      Q   Let me finish my question.
23      A   Okay.  I'm sorry.  My apologies.
24      Q   I understand that you blocked it at the
25  starting gate from being your horse race.              03:07

140

1      But since you have not done that kind of
2  forensic analysis of the barge that we talked
3  about earlier, isn't it true that you cannot be
4  any more definite about the barge than you are
5  about these other things?                               03:08
6      MR. RAFFMAN:  Objection.
7      THE WITNESS:  No, that's not so.
8  BY MR. SEYMOUR:
9      Q   Why not?
10      A   The geo-forensic analyses, uncertainties        03:08
11  that are being reflected on here, pertain to
12  three highly plausible mechanisms contributing to
13  the reference failure.  Information factors
14  of safety were very close to each other.  All
15  three of those plausible mechanisms indicate that      03:08
16  the barge was not involved in the development
17  of the breaches.
18      It happens independent of the barge, and
19  it happens before, plausibly, the barge can
20  arrive.  And they have the signature that             03:09
21  indicates when the barge did arrive that the
22  barge was able to do the local damage at the
23  south end of the South Breach, enter the 9th Ward
24  in deep water on the protected side, float over
25  the top of the school bus that I described before      03:09

141

1  our break today, and come to rest.  And that led
2  to the observation that the barge was a victim,
3  not a cause.
4      Q   And as we discussed this morning,
5  doesn't that depend upon the accuracy of the           03:10
6  information about the surface level wind speeds
7  and the motion of the water --
8      MR. RAFFMAN:  Objection.  Go ahead.
9      MR. SEYMOUR:  -- and whether the barge was
10  adrift much earlier than your report thinks it        03:10
11  was adrift?
12      THE WITNESS:  Certainly those factors
13  Are important to consider.  But if the flood wall
14  itself shows no signature at that time, that
15  primary play by the barge in the formation of the     03:10
16  breach, then it doesn't figure prominently in
17  drawing conclusions.
18  BY MR. SEYMOUR:
19      Q   I don't want to repeat all the
20  conversation that we had earlier about the barge      03:10
21  banging against the flood wall and making the
22  thing lean and causing these other mechanisms to
23  operate more quickly.  But -- so let me go on.
24      At the bottom of page 17, you're
25  quoting, now, work that you've done in              03:11

**142**

1  litigation?
2     A   Correct.
3     Q   And you published some of this
4  litigation work in the Electronic Journal of
5  Geotechnical Engineering?                    03:11
6     A   In the American Society of Civil
7  Engineering's Journal of Geotechnical
8  Engineering, correct.
9     Q   Is that who publishes the Electronic
10  Journal?                                    03:11
11     A   No.  Those are two different
12  peer-reviewed journals and two different
13  professional organizations.
14     Q   Well, the only one here in paragraph 29
15  that's mentioned is the Electronic Journal.   03:11
16     A   Correct.
17     Q   Who publishes that?
18     A   A group formed at the University of
19  Oklahoma.  The professional editor is
20  Dr./Professor Meter Oner.  O-n-e-r.  He has an   03:12
21  editorial board and a publication review board
22  that handles peer review of the journal articles
23  that are published under that society.
24     Q   Directing your attention to the second
25  paragraph of the quotation, where you have     03:12

**144**

1  work that was done by other experts retained by
2  the plaintiffs in that case?
3     A   Oh, certainly.
4     Q   Were these times that are set forth at
5  the bottom of page 17, and there are other     03:14
6  specific times in the pages following, based upon
7  the work that other experts had done in that
8  case?
9     A   Well, they were based on the timing that
10  we had identified as of the date of this        03:14
11  publication.
12     Q   If you relied on the testimony of other
13  experts in the Robinson and the Mississippi
14  River-Gulf outlet cases as to the time when
15  breaches developed and surges occurred, and so   03:15
16  forth, are you publishing articles with different
17  times in them in this Electronic Journal or other
18  publications?
19     MR. RAFFMAN:  Objection, mischaracterizes
20  prior testimony.                               03:15
21     MR. SEYMOUR:  I'm asking the question.
22     THE WITNESS:  I find your question
23  confusing.  Would you reframe your question?
24  BY MR. SEYMOUR:
25     Q   I'll be happy to break it down.  And I    03:15

**143**

1  allotted times.
2     A   Yes.
3     Q   The North Breach initiated before the
4  wall was overtopped (about 5:00 a.m.) with the
5  breach fully developing between 6:00 and 7:00.   03:12
6  And then you cite references 5, 7, 9, 10 and 11,
7  and figure 7.
8        How do I find references 5, 7, 9, 10 and
9  11, or is that something you could only know if
10  you had the litigation document in front of you?   03:13
11     A   No.  The quotation is from the paper,
12  the published paper.  If you had the published
13  paper, and you do because I supplied it, you go
14  to the reference list in the publication paper
15  and you can identify all of the necessary details   03:13
16  associated with the references you cited, and in
17  addition find figure 7.
18     Q   Do these references refer to papers that
19  you've written or papers that others have
20  written, do you remember?                       03:13
21     A   I would have to consult the article
22  before I could respond definitively.
23     Q   When you were doing your work in the
24  Mississippi River-Gulf Outlet litigation and the
25  Robinson litigation, were you relying upon the   03:14

**145**

1  think it's good and clear.
2        As you said, in the litigation for the
3  Mississippi River-Gulf Outlet and Robinson, you
4  relied upon the work of other experts?
5     A   Yes.                                      03:15
6     Q   And did that include the times when
7  surges occurred, the time when peak levels
8  occurred?
9     A   In some cases, yes.
10     Q   And when you published an article in the   03:15
11  Electronic Journal of Geotechnical Engineering,
12  at the same time that you're doing this work, are
13  you using different times?
14     A   In some cases, yes.  If our analysis
15  of the available data indicates a different      03:16
16  timing, that's what we have to publish under our
17  name and provide the associated information that
18  justifies those times.
19     Q   This electronic journal was published in
20  November of 2008, and you gave depositions both   03:16
21  before and after that date, didn't you?
22     A   Correct.
23     Q   When you gave a deposition in one of
24  those cases after the article had appeared, which
25  tile did you use?                               03:16

146

1    MR. RAFFMAN:  Objection.
2    THE WITNESS:  Which deposition and which time
3  are you referring to?
4  BY MR. SEYMOUR:
5    Q   A deposition after the publication          03:17
6  of this article.
7    A   In some cases the answer is yes.  And,
8  in fact, there's a sequence paper to this paper
9  in the same Journal of Electronic Geotechnical
10  Engineering where we not only did two-dimensional    03:17
11  seepage analyses, we did three-dimensional
12  seepage analyses that indicate intensification
13  of the seepage effect and earlier onset of
14  hydraulic failure.
15    So the timing change in response to the      03:17
16  information available at the time, the time is
17  quoted.
18    Q   And if you give a deposition, talking
19  about some of these same topics, after the
20  journal article is published, do you testify --    03:18
21  did you testify in your deposition about what was
22  in the journal article or what the other experts
23  had concluded?
24    MR. RAFFMAN:  Objection.
25    THE WITNESS:  Well, in fact it could be     03:18

147

1  different, either of those two.  If, in this
2  question that you've asked, we have done
3  additional analytical work that says a revision
4  in a timing is appropriate, we made the
5  additional -- or we made the change in the      03:18
6  timing.
7    MR. SEYMOUR:  I ask the reporter to mark as
8  Exhibit 11 a passage from the Robinson trial
9  testimony of Dr. Bea at pages 1099 and 1100
10    (Exhibit 11 marked for identification.)     03:19
11  BY MR. SEYMOUR:
12    Q   If you would please take a look on Page
13  1099, starting at line 22.
14    The question is, quote:  I want to ask
15  you if you have opinions that overlap those     03:19
16  of other experts, and we are not going to have
17  you opine on those, but have you in fact relied
18  upon conclusions reached by other members of the
19  Katrina expert team with regard to the MRGO's
20  effect on the environment --                    03:20
21    And then you cut him off and said:
22  Certainly.
23    Then he continued his question.
24    -- and habitat and topography of the
25  area?                                           03:20

148

1    And you said:  Correct.
2    Then on line 5 on page 1100, he asked:
3  Secondly, have you relied upon the conclusions
4  of members of the plaintiffs' expert team on what
5  oceanographic stresses were created by those     03:20
6  defects during Katrina?
7    And the answer is:  Correct.
8    And then beginning on line 9, the
9  question is asked, quote:  And have you also
10  accepted the opinions and figures of the         03:20
11  plaintiffs' experts with regard to surge waves,
12  time of onset of overtopping or breaching, the
13  rate of overtopping and the duration of
14  overtopping?
15    And the answer was:  Yes.              03:20
16    A   Yes.
17    Q   What happened if you reached a different
18  conclusion in your journal articles we have been
19  talking about than the other experts have reached
20  in the litigation?                               03:21
21    It doesn't say anything here about your
22  reaching independent conclusions based upon
23  research you've done on journal articles.
24    MR. RAFFMAN:  Objection to the question.  I
25  think it mischaracterizes what was written as it    03:21

149

1  relates to what the testimony is.
2    MR. SEYMOUR:  Please answer.
3    THE WITNESS:  Please repeat your question.
4    (Record read as follows:  What
5    happened if you reached a                   03:21
6    different conclusion in your
7    journal articles we have been
8    talking about than the other
9    experts have reached in the
10    litigation?                               03:21
11    It doesn't say anything here
12    about your reaching independent
13    conclusions based upon research
14    you've done on journal articles.)
15  THE WITNESS:  Well, that's correct.        03:22
16  BY MR. SEYMOUR:
17    Q   I asked you what you did, so you tell me
18  that's correct.
19    A   In which case?
20    Q   What did you do?                       03:22
21    A   In which case?
22    The MR-GO Reach 2 case where we are
23  discussing oceanographic information,
24  hydrodynamic information, which served as input
25  to our analyses, or are you referring to the     03:22

150

1  forensic engineering analyses of development at
2  the breaches at the Lower 9th Ward?
3         Both of those are mixed into your
4  question, as I understand it.  Which are you
5  asking about?                              03:23
6       Q    I continue to ask about the language
7  that was on Page 1099 where we had very specific
8  times --
9       A    Right.
10      Q    -- for when those -- the peak levels    03:23
11  were obtained, for example.
12         And on page 1100 of the testimony, we
13  have got the surge waves, time of onset of
14  overtopping or breaching, the rate of
15  overtopping, duration of overtopping.  Those are    03:23
16  things -- those are the things that I'm talking
17  about; the times, the durations and so forth.
18         You're doing your own research and
19  you're testifying that you're relying upon what
20  the other experts are saying.  What if there's a    03:23
21  disagreement?
22      MR. RAFFMAN:  Objection.
23      THE WITNESS:  The potential conflict that you
24  have cited is not present.  The testimony here
25  you're referring to, in the case of Robinson, I    03:24

151

1  did no independent oceanographic/hydrodynamic
2  analysis work.  I had to rely on other experts
3  for those input characterizations.
4         And as the testimony shows, I took those
5  at face value, based on the background that those    03:24
6  experts had been -- had provided, as input into
7  the analytical work that I did subsequently.
8  BY MR. SEYMOUR:
9       Q    On page 17 of your report setting forth
10  this article, you say:  For example, Overtopping    03:24
11  started about 6:00 a.m., referring to the South
12  Breach.  Did you derive that figure, or did an
13  expert in the MR-GO or Robinson litigation derive
14  that figure?
15      MR. RAFFMAN:  Objection.  It would be --    03:25
16      MR. SEYMOUR:  Don't coach him, please.
17      MR. RAFFMAN:  Trust me, I'm not trying to
18  coach him.
19      I would like to cut through the Gordian
20  knot of misunderstanding, but I will remain    03:25
21  silent.
22      MR. SEYMOUR:  How do we tell?  I appreciate
23  that.
24      THE WITNESS:  Please repeat your question.
25  BY MR. SEYMOUR:                              03:25

152

1       Q    On page 17 of your report, it says, in
2  the fifth line from the bottom of the page,
3  referring to the South Breach, overtopping
4  started about 6:00 a.m.  And on page 1100 of your
5  testimony in the Robinson case it says that you    03:25
6  relied on the opinions and figures of the
7  plaintiffs' experts with regards to the time
8  of onset of overtopping, among other things.
9      MR. RAFFMAN:  I will -- go ahead and ask your
10  question.                                    03:26
11      Objection.
12      THE WITNESS:  The latter case that you are
13  referring to concerns overtopping of Reach 2
14  earthen flood protection structures during
15  Hurricane Katrina.  This is referring to the    03:26
16  onset of overtopping at the Lower 9th Ward  Inner
17  Harbor Navigation Canal location.
18         The overtopping that is being referenced
19  here is that associated with the mean water level
20  reference to the undisturbed on pre-Katrina    03:26
21  elevation of the flood wall at this location.
22  BY MR. SEYMOUR:
23      Q    If you look on Page 1099 of the
24  testimony, you're referring to Reach 1 in the
25  Industrial Canal on line 7 and 8.  And then it    03:27

153

1  talks about, on line 10, excavation at the East
2  Bank Industrial Area for the MR-GO lock expansion
3  project.  Isn't that the Inner Harbor
4  Navigational Canal lock expansion project?
5       A    Please repeat your question.  I've    03:27
6  caught up with where you're reading.
7       Q    I was directing your attention to the
8  reference to the Industrial Canal and Reach 1 on
9  line 7 and 8.  And directing your attention to
10  the -- what's said here, the MR-GO lock expansion    03:28
11  project and I -- on lines 10 and 11.  And I've
12  asked you immediately, is that the lock expansion
13  project on the Inner Harbor Navigational Canal?
14      MR. RAFFMAN:  I'll object to a line of
15  questions that doesn't include questions.    03:28
16      MR. SEYMOUR:  I asked him, is that.
17      THE WITNESS:  Yes.
18      MR. RAFFMAN:  I'll object to a partial
19  transcript that doesn't include the question that
20  elicited the answer that's being quoted.    03:28
21      MR. SEYMOUR:  I can show that on my screen.
22  But moving on.
23         The discussion here on Page 1099 and
24  1100 refers to Reach 1 in the Inner Harbor
25  Navigational Canal, not Reach 2.  And it still    03:28

154

1  says that -- on page 1100, that you're relying on
2  the views of other experts with respect to the
3  time of onset of overtopping.
4      MR. RAFFMAN:  Objection.  He's told you what
5  1100 refers to.  You've misquoted his testimony.      03:29
6      THE WITNESS:  The premise of your statement
7  question is not correct.
8      The general questioning at this stage
9  regards the effect of MR-GO, Reach 2 and Reach 1,
10  with regard to hydrodynamic oceanographic      03:29
11  characterizations.
12  BY MR. SEYMOUR:
13      Q   Do you see on Page 1099 -- excuse me --
14  on page 1100, lines 10 and 11, time of onset
15  of overtopping?      03:29
16      A   Yes.
17      Q   And do you see on page 17 of your
18  report, overtopping started about 6:00 a.m.
19      My question is a very simple one.  Does
20  this time of 6:00 a.m. reflect your own      03:29
21  independent analysis or does it reflect the
22  opinions and work of the other experts in the
23  Robinson and MR-GO cases?
24      MR. RAFFMAN:  I'll object to the preamble.
25      Answer the question.      03:30

155

1      THE WITNESS:  The 6:00 a.m. represents my
2  best estimate of the time of surge overtopping at
3  the time this paper was written.
4  BY MR. SEYMOUR:
5      Q   And does your own best estimate reflect      03:30
6  the work of the other experts, or do you stand
7  independently on that?
8      A   Oh, no.  I'm trying to take into account
9  input from the other experts that are cited in
10  these references you have identified.      03:30
11      Q   Did you do your own personal work to
12  come up with the 6:00 a.m. figure --
13      A   Yes.
14      Q   -- or did you take their figure?
15      A   I did my own personal work.      03:31
16      MR. SEYMOUR::  Okay.  I understand we are
17  about to run out of the tape, so let's take a
18  break.
19      THE VIDEOGRAPHER:  This the end of Tape No. 2
20  in the deposition of Dr. Robert Bea.  The time is      03:31
21  3:31 p.m. and we are off the record.
22      (Recess taken from 3:31 p.m. to 3:43 p.m.)
23      THE VIDEOGRAPHER:  This marks the beginning
24  of Disc No. 3 in the deposition of Dr. Robert
25  Bea.  The time is 3:43 p.m. and we are back on      03:42

156

1  the record.
2  BY MR. SEYMOUR:
3      Q   Please turn to Exhibit 1, your report,
4  page 17, down toward the bottom.
5      A   Yes.      03:43
6      Q   I would like to point out some of the
7  language.  There are several pieces of language I
8  want to point out.  There will be a question at
9  the end.
10      A   Okay.      03:43
11      Q   At the bottom of page 17, you say it can
12  take several hours for flood wall or levee
13  breaches to fully develop.  Does that mean that
14  sometimes it takes several hours and sometimes
15  it's shorter?      03:43
16      A   Correct.
17      Q   At the top of page 18 it says,
18  development of a breach is most often a
19  progressive process.  Does that mean sometimes it
20  is not a progressive process involving multiple      03:43
21  factors?
22      A   Correct.
23      Q   On line 4, it refers to the seepage will
24  take time to develop significant water conduits
25  and weaken or remove soil.  Is there any range of      03:44

157

1  time in which this happens or is it too
2  uncertain?
3      MR. RAFFMAN:  Objection.
4      THE WITNESS:  It will depend upon the
5  specific geologic, geotechnical and hydrodynamic      03:44
6  conditions.  There's no generalization possible.
7  BY MR. SEYMOUR:
8      Q   A little further down it says, that in
9  response to these effects there can be associated
10  movement of a supporting levee.  That means it      03:44
11  starts to lean?
12      MR. RAFFMAN:  Objection.
13      THE WITNESS:  Leans, displace, more
14  importantly.
15  BY MR. SEYMOUR:      03:44
16      Q   That means it could also move side to
17  side?
18      A   Yes.
19      Q   Then these movements can open the
20  vertical joints.  Sometimes it opens the vertical      03:45
21  joints and sometimes it doesn't?
22      A   Correct.
23      Q   Into the carryover paragraph, water
24  flowing through the water stops and sheet piling
25  interlocks can act to erode the supporting soil      03:45

158

1   levee.

2     A   Correct.

3     Q   Does it sometimes not so act?

4     A   Correct.

5     Q   How is that possible?          03:45

6     A   If the water velocity is not high

7   enough, and if the levee is composed of highly

8   cohesive, potentially armored, soil material,

9   there would be insignificant erosion.

10     Q   In the next paragraph, the first full    03:45

11   paragraph on page 18, it says, flooding can be

12   initiated with the combination of water coming

13   under the levee and through the open water

14   stops.  I take it that sometimes it's not

15   initiated that way?                 03:45

16     A   Correct.

17     Q   Next paragraph.  There can be similar

18   developments when the progressive failure process

19   is initiated by, or accompanied by, overtopping

20   and sometimes different developments occur?    03:46

21     A   Correct.

22     Q   What kind of different developments?

23     A   There could be a case where you had a

24   significant failure mode initiating the breaching

25   that doesn't involve overtopping.         03:46

159

1       Similarly, you could have overtopping,

2   you have absence of other causative mechanisms

3   and there's no breaching.

4     Q   In the next sentence it says,

5   overtopping a levee or flood wall can lead to    03:46

6   erosion on the back or protected side.  Sometimes

7   it does not lead to erosion?

8     A   Correct.

9     Q   What would prevent it leading to erosion

10   on the back side?               03:46

11     A   Concrete.  Paving.

12     Q   But does it then start to erode at the

13   end of the concrete?

14     A   It would depend on the width of the

15   concrete apron and its geometric shape.      03:47

16     Q   Third line from the bottom, it says that

17   erosion can act to remove supporting soils and

18   sometimes it does not.

19     A   Correct.

20     Q   Is that when you've got the concrete    03:47

21   apron?

22     A   Or a very erosion-resistant soil with

23   intense vegetative covering.

24     Q   Then on page 19 it says, if the erosion

25   process removes enough of the supporting soils.   03:47

160

1   So I take it sometimes it doesn't?

2     A   Correct.

3     Q   And it says, the flood wall supporting

4   sheet piling projected the lateral forces from

5   the water can tip over, but sometimes it      03:47

6   doesn't.

7     A   Correct.

8     Q   The overtopping mechanisms can interact

9   with the previously discussed mechanisms and

10   sometimes they don't?             03:47

11     A   Correct.

12     Q   Then down at the last paragraph on the

13   page, these observations and analytical results

14   clearly show that the EBIA excavations and marsh

15   permeabilities played key roles in the hydraulic   03:48

16   behavior and instability of the breaches along

17   the east levee of the IHNC Lower 9th Ward.

18       Now, I've counted 14 uncertainties in

19   the paragraphs leading up to that, from which the

20   conclusion is, it clearly shows something.  Can   03:48

21   you explain that?

22     A   Well, not knowing what 14 things that

23   you've counted up are the logic of your synthesis

24   of the 14, I can't possibly answer that question.   03:48

25     Q   They are the same ones identified in 14

161

1   questions about what these various uncertainties

2   were.  There were 14 of them.

3     A   I will be more than happy to answer your

4   question if you can summarize for me the 14

5   factors and how you want me to respond to your   03:49

6   analysis and synthesis of those 14 factors.

7     Q   The 14 -- we're at -- it can take

8   several hours for the breaches to fully develop.

9   It's most often, but not always, a progressive

10   process.  It will take time, but the time is not   03:49

11   known.  There can be associated movements, but

12   sometimes they are not.  It can open the vertical

13   joints, and sometimes not.  It can act to erode

14   the supporting soil levee, and sometimes not.

15   Flooding can be initiated with the combination,   03:49

16   and sometimes not.  There can be similar

17   developments, and sometimes not.  Overtopping can

18   lead to erosion, but sometimes not.  Erosion can

19   act to remove supporting soils, but sometimes

20   not.  If the erosion process removes enough, then  03:49

21   it can tip over, the flood wall and supporting

22   sheet piling can tip over, and sometimes not.

23   The overtopping mechanisms can interact, but

24   sometimes not.  And all these clearly show.

25       You see my problem?              03:50

162

1   A   And that's because you're making a leap
2   between a set of generalizations concerning
3   potential failure modes and their interaction to
4   a conclusion that is specifically examining the
5   effect of the features you cite in the          03:50
6   conclusion.  There's no direct link between the
7   two.
8        These are the uncertainties that a
9   forensic engineer has to work through to
10  understand the formation and development of     03:50
11  breaches, the 14 factors that you cited.
12  Q   At the top of page 20, you refer to
13  modelling using a two-dimensional finite element
14  in limit equilibrium analysis.  Is that generally
15  accepted as a standard within your professional?  03:51
16  A   Yes.
17  Q   Is there any treatise, or learned
18  article, that discusses the use of that
19  particular type of analysis?
20  A   Many.                                      03:51
21  Q   Is there any disagreement over the
22  propriety of using that type of analysis?
23  A   Yes.
24  Q   And please describe the disagreement.
25  A   The disagreement concerns what the         03:51

163

1   analysis is used to conclude.  Limit equilibrium,
2   as those terms imply, is searching for conditions
3   in which you're at the point where the demand
4   forces equal the resisting forces.  Such analysis
5   does not give you information on displacement,    03:52
6   deformations and movements.
7   Q   You have a number of references that are
8   cited at the end of the report itself, on pages
9   67 through 70.
10       Are there any treatises, or scholarly     03:52
11  articles, that discuss this particular type
12  of analysis listed among these references?
13  A   Yes.
14  Q   Can you direct me to a couple?
15  A   The first one would be American Society    03:53
16  of Civil Engineers, 2006 External Review Panel,
17  Progress Report Nos. 1, 2 and 3.
18  Q   That should be enough because it's going
19  to have other citations in it, I assume.
20  A   And there are others that are cited        03:53
21  here.
22  Q   Could you name just one more?
23       Would Guidelines for Failure
24  Investigation be one of them, the first item in
25  your references?                               03:53

164

1   A   No, not for limit equilibrium analysis.
2        Another good one it references and
3   discusses there would be the Interagency
4   Performance Evaluation Task Force reports cited
5   here as 2007.                                  03:54
6   Q   Would that be Volume 5 or Volume 2?
7   A   Volume 5.
8        Another --
9   Q   That's enough.  That's enough.
10  A   Okay.                                      03:54
11  Q   On page 20, first full paragraph, line
12  4, you refer to previous analyses, not including
13  the effect of the very deep excavations along the
14  EBIA during the early 1990s.  How deep?
15  A   I don't find the section you are --        03:55
16  Q   Page 20.
17  A   Exhibit 1?
18  Q   Yes.  Page 20.
19  A   20.  I thought you said 28.
20       Please repeat your question.             03:55
21  Q   First full paragraph, line 4.  Previous
22  analyses did not include the effect of the very
23  deep excavations that took place along the EBIA
24  during the 1990s.  I just want to know how deep.
25  A   25 to 35 feet.                            03:55

165

1   Q   The next paragraph on the page says, the
2   seepage analyses show that pore pressures develop
3   quickly and near-steady state conditions are
4   reached within less than 30 hours of the
5   initiation of the surge starting on August 28,   03:56
6   2005.  When did the surge start?
7   A   That's when we started the analysis,
8   approximately 10:00 p.m. on August the 28th,
9   2005.
10  Q   That would be Central Daylight Time?      03:56
11  A   Correct.  All times that I reference are
12  Central Daylight Time.  All elevations are cited
13  on NAVD, all cap letters, 88.
14  Q   In the second sentence of that paragraph
15  it says, calculated pore pressures and hydraulic  03:56
16  radiant that was in 20 percent to 30 percent of
17  those computed for hypothetical steady state at
18  the water elevation at time of failure.
19       Is it possible to put that in language
20  that I might understand?                       03:57
21  A   Sure.  There are two ways you can
22  perform a seepage analysis.  One way is to put
23  the water level at a given elevation and compute
24  what the soil on pore pressure characteristics
25  would be at time infinity, which means at a very  03:57

**166**

1 long time the soil reaches so-called steady
2 state, which means the pressures won't change.
3    Q    They are saturated?
4    A    Well, the soil could be saturated or
5 partially saturated. What the analysis is          03:57
6 reflecting is for the prescribed water level in
7 other conditions, there will be no future changes
8 in those water pressure characteristics.
9         The other way to perform the analysis is
10 a transient seepage analysis, which doesn't        03:58
11 presume steady state, but moves over a long
12 period of time how water pressure is changing
13 until you reach that prescribed water elevation.
14         We performed both types of seepage          03:58
15 analysis.
16    Q    In the third line, where it says that
17 the calculated pore pressures and hydraulic
18 radiants are within 20 to 30 percent, does that
19 mean that's the variation between the two methods
20 of calculating it?                                 03:58
21    A    Yes.
22    Q    A little further down the page it
23 says -- uses the phrase, results from recent
24 studies. Which studies?
25    A    There were studies -- and I should have    03:59

**167**

1 cited them specifically for you here -- but they
2 are cited specifically in the reference that is
3 quoted here: Study two-dimensional versus
4 three-dimensional seepage analyses for
5 excavations placed adjacent to levee flood wall    03:59
6 systems.
7         It was a result from those analyses that
8 precipitated our studies of three-dimensional
9 seepage effects.
10    Q    And that's -- those are listed in the      03:59
11 references at the end? You don't need to look at
12 it right now. You know that?
13    A    Yes, they are there.
14    Q    Page 21, middle paragraph. You're
15 referring in this paragraph, as I understand it,   04:00
16 to the Independent Levee Investigation Team 2006
17 report, and the Interagency Performance
18 Evaluation Team 2007 report, in saying the main
19 differences between them are the recognition
20 of the presence of the EBIA excavations in the     04:00
21 transient seepage model.
22         And stopping right there. That would be
23 ILIT's recognition, not the IPET's recognition?
24    MR. RAFFMAN: Objection.
25    THE WITNESS: The differences --                 04:00

**168**

BY MR. SEYMOUR:
1    Q    Actually, excuse me. Your study right
2 there is different from those other two studies?
3    A    That's correct.
4    Q    Okay. And you're saying that your study   04:01
5 is different because it recognized these things?
6    A    That's correct.
7    Q    What is a water head?
8    A    It's an elevation of water reference to
9 a particular point. You take the elevation, or     04:01
10 this distance, multiply it times the effective
11 unit weight of water and calculate a pressure
12 head.
13    Q    What does it mean, then, when it says,
14 transporting water heads directly to the back      04:01
15 of the sheet pile?
16    A    It means that whatever is happening on
17 the flood side of the sheet pile is being
18 reflected on the protected side of the sheet
19 pile, directly and instantaneously.                04:01
20    Q    Same elevation?
21    A    Yeah.
22    Q    And the phrase, a percentage of the
23 steady state pressures are developed within the
24 system, what does that mean?                       04:02

**169**

1    A    Well, it means the previously discussed
2 thing of transient versus steady state now are
3 reflecting to the entire range of soil geometry
4 conditions that we studied and are the subject
5 of this quotation.                                 04:02
6    Q    So a transient state is much closer to
7 the steady state --
8    A    Correct.
9    Q    -- with this analysis?
10    A    Correct.                                   04:02
11    Q    It may take a while but I'm trying to
12 get there.
13    A    You're there.
14    Q    The last paragraph on page 21 talks
15 about the breaches being influenced in major ways  04:03
16 by the EBIA excavations performed for the lock
17 expansion project. Is it all of the EBIA
18 excavations or only some of them?
19    A    Some. I'm referring to the breaches.
20 So it would be the excavations in the vicinity     04:03
21 of the North and South Breaches.
22    Q    Could you direct me to a map that shows
23 which ones had this effect and which ones did
24 not?
25    A    We looked at that map earlier today in     04:04

43 (Pages 166 to 169)

170

1  Appendix C.
2      Q   Okay.
3      A   It was the two illustrations extracted
4  from the Washington Group International report
5  detailing excavations at the Boland marine site    04:04
6  adjacent to the North Breach and the Saucier site
7  adjacent to the South Breach.
8      Q   And I can find it by looking at the WGI
9  backup and the relevant Reliance materials?
10     A   Yes, sir.                                  04:04
11     Q   Good enough.
12         On page 24 of your report, it states in
13  line 4 that the -- well, lines 2 to 4-- the
14  adverse effects of the MR-GO Reach 2 flood
15  protection facilities added 4 to 12 feet of        04:05
16  additional flood water in the Lower 9th Ward.
17  And you're citing Wit, et al, 2008, and that's
18  one of the references.  Is Mr., or Dr., Wit one
19  of the experts in the Robinson or MR-GO cases?
20     A   Yes.                                       04:05
21     Q   Do you have any source other than --
22  I'll call him Dr. Wit.  I don't know --
23     A   He is a doctor.
24     Q   Do you have any source, other than
25  Dr. Wit, for this information?                      04:05

171

1      A   Yes.
2      Q   Who?
3      A   The Interagency Performance Evaluation
4  Task Force also examined this question and their
5  oceanography developed other characterizations     04:06
6  of the contribution of the flooding.
7      Q   Did you do any work yourself on this
8  question?
9      A   Which question?
10     Q   Whether the MR-GO Reach 2 water added 4    04:06
11  to 12 feet of additional flood water in the Lower
12  9th Ward?
13     A   No, I didn't.
14     Q   Do you recall having testified in the
15  Robinson case that something like 88 percent to    04:06
16  90 percent -- maybe it's 80 percent to 90
17  percent -- of the flood water in the Lower 9th
18  Ward came from Reach 2?
19     A   Correct.
20     Q   Did you do any work of your own to lead   04:07
21  you to that figure or were you relying on
22  Dr. Wit?
23     A   Relying on Dr. Wit, Professor Vrijling
24  and the cited experts in that testimony.
25     Q   Did you ever look at the deposits of      04:07

172

1  marsh grass?
2      A   Where?  When?
3      A   West of Paris Road.  Excuse me.
4          East of Paris Road versus west of Paris
5  Road.                                              04:07
6          Did marsh grass ever come up?
7      A   Did marsh grass ever come up from the
8  bottom or in discussions?
9      Q   You have nailed me, and justly so, with
10  that one.  Let me rephrase the question.  It's     04:08
11  getting late in the day.
12     A   And I don't recall there's any marsh
13  grass to the west of Paris Road but there is
14  marsh grass to the east of Paris Road.  And, yes,
15  I have examined the vegetation in that area.       04:08
16     Q   Has it ever come to your attention that
17  uprooted marsh grass was deposited generally
18  through the flooded areas west of Paris Road, and
19  that it just is not seen -- excuse me -- east of
20  Paris Road, and is generally not seen west of      04:08
21  Paris Road?
22     A   In which folder are you referring, New
23  Orleans East, St. Bernard?
24     Q   Only in the area that we say was flooded
25  by the Inner Harbor Navigational Canal, which is   04:09

173

1  from the canal itself through the Lower 9th Ward
2  and covering St. Bernard Parish up to Paris
3  Road.
4      A   And if you would, now that you've
5  oriented me geographically, please repeat your     04:09
6  question.
7      Q   Did it ever come to your attention that
8  there were deposits of uprooted marsh grass
9  generally throughout the flooded parts of
10  St. Bernard Parish east of Paris Road but not in   04:09
11  the Lower 9th Ward and not in the parts of
12  St. Bernard Parish west of Paris Road?
13     A   Correct.  Yes, it did.  And we observed
14  that ourselves.
15     Q   Did that provide any information that     04:09
16  you considered useful in determining where the
17  flood water came from?
18     A   No, not really.  It just provided some
19  interesting insight into where the drifting marsh
20  grass stopped.                                     04:10
21     Q   Did it ever come to your attention that
22  there were eyewitnesses who saw water coming only
23  from the Inner Harbor Navigational Canal, the
24  direction of New Orleans, eyewitnesses in
25  St. Bernard Parish, until relatively late in the   04:10

174

1  morning, which is going to be different for
2  different locations, before the first water from
3  Reach 2 reached them?
4      MR. RAFFMAN:  Objection.
5      You can answer.                    04:10
6      THE WITNESS:  Could you specify for me what
7  location and how early in the morning?
8  BY MR. SEYMOUR:
9      Q    St. Bernard Courthouse.
10     A    Okay.                        04:10
11     Q    Did you ever see the videotape showing
12 the water coming in the direction from which it
13 was coming?
14     A    Yes.  That was shown to me by Sheriff
15 Jack Stephens.                         04:10
16     Q    Did you draw any conclusions from that
17 as to the source of the flood water?
18     A    No.
19     Q    Is there a reason for that?
20     A    Sure.  I was relying on other experts    04:11
21 whose area of expertise was understanding sources
22 and timing of flood water.  That was not an area
23 of my forensic engineering work or studies.
24     Q    Which particular experts were you
25 relying on?                            04:11

175

1      A    Primarily the experts from the
2  Netherlands.  We can collectively identify them
3  as represented by Dr./Professor Vrijling.
4      Q    I think that's V-r-i-j-l-i-n-g?
5      A    Vrijling.                     04:11
6      Q    And is Dr. Wit also from the
7  Netherlands?
8      A    Yes.  He works with Dr. Vrijling.
9      Q    Did either of them ever discuss with
10 you, or in your presence, why they were drawing    04:11
11 the conclusions that they were drawing as to the
12 source of the flood water and 88 to 90 percent
13 of it coming from --
14     A    Yes.
15     Q    -- Reach 2?                   04:12
16     A    Yes, they did.
17     Q    And what did they say?
18     A    Well, they were relating the results
19 from their engineering analyses of the flooding.
20     Q    Did they give any explanation?     04:12
21     A    Well, the explanation to how the
22 modelling had been developed, how it had been
23 validated and uncertainties that they had with
24 regard to those results.
25     Q    On page 24 of your report, paragraph 32,   04:12

176

1  the last sentence states that the cumulative
2  adverse effects, speaking of the Mississippi
3  River-Gulf Outlet, were primary causes of the
4  breaching of man-made flood protection structures
5  in the vicinity of the Mississippi River-Gulf     04:13
6  Outlet.
7      Does the government agree with that?
8      A    No.
9      Q    Page 26, paragraph 35.  What is a wave
10 regeneration basin?                    04:13
11     A    A good example would be if you have been
12 to a beach, waves are propagating in toward the
13 beach.  Frequently there's an offshore sandbar.
14 The waves will break on the sandbar.  And then
15 another area, if the wind is blowing, the waves    04:14
16 that had broken can be regenerated in that new
17 area.
18     Fishermen who like to fish in coastal
19 areas frequently fish in that intermediate area
20 because the bottom is being stirred, the water is  04:14
21 deeper, fish can swim there; and where fish are
22 fishermen like to be.  So that MR-GO formed as a
23 wave regeneration component.
24     Q    Was the Inner Harbor Navigational Canal
25 too small to be a wave regeneration basin?         04:15

177

1      A    Yes.
2      Q    And is there any wave regeneration basin
3  anywhere near the Inner Harbor Navigation Canal?
4      A    Well, for example, if you would carry
5  the Inner Harbor Navigation Canal to Lake         04:15
6  Pontchatrain -- Lake Pontchatrain is itself a
7  potential wave generation, or regeneration,
8  basin -- that got a direct connection to the
9  Inner Harbor Navigation Canal.
10     Q    In paragraph 36, the third line refers    04:15
11 to the loss of levee crest elevation.  Is this
12 for the levees along the Mississippi River-Gulf
13 Outlet or are you including the Inner Harbor
14 Navigation Canal levees in there?
15     MR. RAFFMAN:  Objection.          04:16
16     THE WITNESS:  What you reference is primarily
17 directed at the Reach 2 levees along the
18 Mississippi River-Gulf Outlet segment adjacent to
19 Lake Borgne and St. Bernard Parish.
20 BY MR. SEYMOUR:                         04:16
21     Q    On page 27, paragraph 37, you're
22 referring to a deepwater channel that served as a
23 conduit during the storm surge water into
24 St. Bernard Parish, New Orleans East, Inner
25 Harbor Navigation Canals, areas earlier, more      04:16

**178**

1  rapidly, in greater volumes and for a longer time
2  period than natural vegetation would have
3  allowed.  Are you referring to water coming in
4  from Reach 2?
5      A   Correct.                                        04:17
6      Q   On page 35, paragraph 40.  In the middle
7  of the paragraph it says:  This early initiation
8  and exploitation of the breaches by waves in
9  rising surge waters -- it's referring to Reach 2
10 of reaches -- explains how hurricane flood waters    04:17
11 were able to penetrate in very large volumes at
12 early times and at Chalmette and St. Bernard
13 Parish.  What is the early time that you're
14 referring to?
15     A   Approximately 8:00 a.m. when significant    04:18
16 water was reported in the central area of
17 St. Bernard Parish.
18     Q   Were you ever involved in a conversation
19 with Dr. Vrijling, or Dr. Wit, in which there was
20 a discussion of the witnesses who saw water        04:18
21 coming from the direction of the Inner Harbor
22 Navigational Canal towards Paris Road instead of
23 the other way around?
24     A   Witnesses located where?
25     Q   Located west of Paris Road in              04:18

**179**

1  St. Bernard Parish.
2      A   No, I did not.
3      Q   In paragraph 41, on that same page 35,
4  you state:  Had the man-made flood protection
5  structures adjacent to Reach 2 of the Mississippi  04:19
6  River-Gulf Outlet been overtopped without
7  breaching, the Chalmette/St. Bernard Parish area
8  would not have been flooded by Hurricane Katrina
9  storm surge waters.
10         Does that assume that there were no        04:19
11 waters flooding Chalmette, and parts of
12 St. Bernard Parish, from the Inner Harbor
13 Navigation Canal?
14     A   Repeat your question.
15     Q   Does the statement in the first sentence    04:19
16 of paragraph 41 assume that there are no flood
17 waters coming into Chalmette and St. Bernard
18 Parish from the Inner Harbor Navigation Canal?
19     A   Yes.
20     Q   On page 39, paragraph 43, third line.      04:20
21 You say on the first line of the paragraph, your
22 fundamental conclusion is the breaches that
23 developed in the man-made flood protection
24 structures adjacent to the Lower 9th Ward during
25 Hurricane Katrina was most probably initiated     04:20

**180**

1  with surge water pressures.
2          When you say "most probably initiated"
3  -- I'm not sure quite how to put the question --
4  but is there a percentage confidence level you
5  have in mind?  It sounds as if there's an area     04:20
6  of uncertainty.  Can you quantify it?
7      A   We have quantified it.
8          The most probable in the quantifications
9  that follow this statement indicate that the most
10 probable, also the expected, and also the mean or  04:21
11 average values, are almost the same.
12         The plus or minus of one standard
13 deviation values from the utmost probable mean
14 average expected value is approximately 30
15 percent.                                           04:21
16     Q   If you look on the bottom of page 43, at
17 the end of paragraph 50.  Do you see that you've
18 said that the computed coefficients of variation
19 of the computed factors of safety are in the
20 range of 30 percent to 40 percent?                 04:22
21     A   Correct.
22     Q   Does that, then, also apply to what you
23 say in paragraph 43?
24     A   Where in paragraph 43?
25     Q   The phrase that we were talking about     04:22

**181**

1  before, "most probably initiated."
2      A   That's correct.
3      Q   At the bottom of paragraph 44, you say
4  that the cargo barge ING 4727 found inside the
5  Lower 9th Ward adjacent to the South Breach after  04:23
6  Hurricane Katrina entered after the North Breach
7  and South Breach had fully developed.  Do you
8  base that on anything we've not already talked
9  about in this deposition?
10     A   Yes.                                        04:23
11     Q   What?
12     A   For example, the expert work documented
13 by Mr. Cushing, C-u-s-h-i-n-g, as part of the
14 expert report that has been done on behalf of the
15 defense.                                           04:23
16     Q   Was there any part of Dr. Cushing's
17 report that you found improbable?
18     A   Nothing that I can recall that was
19 significant.
20         Initially, when I reviewed his report, I   04:24
21 was delighted in a positive way with the depth,
22 insight and extent that he developed in his
23 forensic engineering studies.  There were details
24 that I was concerned with, and those details
25 turned out not to be substantiated.  And in one    04:24

182

1 case he had it right and I had it wrong.
2    Q   Is there anything else that you rely on
3 for that statement that we have not previously
4 talked about in this deposition?
5    A   I've relied on the work done by Reda    04:25
6 Baker. I relied on his work, as well, to help
7 triangulate or corroborate the conclusions that I
8 had reached concerning the geotechnical
9 engineering performance aspects of the flood
10 wall.       04:25
11      I relied on the expert report produced
12 by Dr. Marino in the same context.
13      I relied on and studied the expert
14 report by Mr. Pasos in the same context.
15      These latter reports we have not    04:26
16 discussed in any extensive way.
17    Q   In paragraph 45, on page 41, of your
18 report. Is it fair to say that you are referring
19 generally to the difficulty of knowing things
20 with certainty when you're doing an    04:26
21 after-the-fact investigation of a catastrophic
22 failure?
23    A   Yes.
24    Q   Is that generally accepted within your
25 field?    04:26

183

1    A   Yes.
2    Q   And if I asked you the same questions
3 about the failure to include the barge, would you
4 give me the same answers you've given every time
5 I've asked those questions before?    04:27
6    A   Yes.
7    Q   Actually, that's a sentence, it's not
8 just that one particular paragraph, but it goes
9 on to paragraph 51 on page 45, doesn't it?
10    A   Yes.    04:27
11    Q   At the end of paragraph 51 on page 45,
12 you state, quote, I have focused my linguistic
13 terms (e.g., "would or did deveop") on those
14 results of my assessments indicate as 'best
15 estimates,' possessing the highest likelihoods of    04:28
16 occurrence." Is that correct?
17    A   That's correct.
18    Q   Does that mean that where you say
19 "would" it means could?
20    MR. RAFFMAN: Objection.    04:28
21    THE WITNESS: There are too many potential
22 applications of that question to specifics and
23 I'm unable to respond to that question.
24 BY MR. SEYMOUR:
25    Q   Does this mean that when you say    04:28

184

1 "clearly" in the report it means maybe?
2    MR. RAFFMAN: Objection.
3    THE WITNESS: As I attempt to convey here,
4 the forensic engineer, as the lawyer does, has to
5 deal with the wonderful world of uncertainties.    04:29
6    I, unlike any other expert that I have
7 encountered during the past four years, have
8 chosen to deal with these uncertainties
9 explicitly, tracking them, quantifying them and
10 expressing them.    04:29
11    When I have used terms that say, my
12 expert opinion is that this is the most
13 plausible, most probable mechanism or outcome,
14 I'm referring to this most likely result.
15    In addition, I have quantified the    04:29
16 potential error bands around those results to be
17 responsive to the Daubert rate of error
18 requirements.
19    Q   Would it be fair to say that when your
20 report says "clearly," what it really means is,    04:30
21 in my judgment, this is the most plausible?
22    A   Yes.
23    Q   Is there an area of subjective judgment
24 in your quantification of these error bands, like
25 the 30 percent to 40 percent we talked about    04:30

185

1 earlier?
2    A   In all analyses there is a portion that
3 can be called subjective, there is a portion that
4 can be called objective. What I have come to
5 learn in the process of 56 years of dealing with    04:30
6 this set of questions concerning of uncertainty,
7 all are subjective.
8    Subjective elements in data that is
9 chosen to be analyzed, how that data is analyzed,
10 and the interpretation of the results from that    04:31
11 data.
12    Subjective judgment is not a dirty
13 term. It is an extremely important term, because
14 with that subjectiveness should come true
15 expertise. And I've tried to be very careful, as    04:31
16 I render expert opinion, to stay within my area
17 of expertise. Quantify where the subjective
18 elements are, explain how I attempt to validate
19 those subjective judgments with field test data,
20 performance information, other results from other    04:32
21 experts.
22    Q   So the answer to my question is yes?
23    A   Please repeat your question.
24    Q   Was there an element of subjective
25 judgment in setting those error bands?    04:32

186

1     A   Yes.
2     Q   On page 45 --
3     A   I apologize for being a professor.
4     Q   On page 45, paragraphs 52 and 53, we
5  have these specific times again.  And I wanted to        04:32
6  know whether you were relying upon the work
7  of any other expert for those specific times?
8     A   The answer is, yes, of course.  And
9  that's because I diligently try not to eliminate
10 any important information from other experts;          04:33
11 that's a signature of my work.
12    Q   And that on page -- is that same true
13 for paragraph 54 on page 48?
14    A   Yes.
15    Q   And is the same true for paragraph --     04:33
16 the times in paragraph 56 on page 50?
17    MR. RAFFMAN:  Objection.  I'm concerned an
18 element of vagueness is creeping into the
19 question.
20    Go ahead and answer.                     04:34
21    MR. SEYMOUR:  We have quashed all vagueness.
22 BY MR. SEYMOUR:
23    Q   I relate it only to time.  Are you
24 relying on other work of other experts as to
25 time?                                       04:34

187

1     A   Yes.
2     MR. RAFFMAN:  Same objection.
3  BY MR. SEYMOUR:
4     Q   On page 51, in paragraph 58, you refer
5  to differences in the expert opinions documented     04:34
6  in the Interagency Performance Evaluation Team
7  investigation, the Team Louisiana investigation,
8  the Independent Levee Investigation Team
9  investigation and subsequent studies, and the
10 National Institute of Standards and Technology       04:35
11 investigation.
12    Then you have a sentence:  The
13 primary -- quote, the primary method I've used to
14 help me neutralize a wide variety -- I think the
15 word "of" should be there -- cognitive biases       04:35
16 that can exert important influences on results
17 from forensic engineering investigations is one
18 I've termed "triangulation."  What cognitive
19 biases are you referring to?
20    A   In the area of social science             04:35
21 psychology, those experts have identified of the
22 order of 20 critically important cognitive
23 biases.
24    For example, hindsight, would I expect
25 to see with what I see?  That's a bias.  That's     04:36

188

one of the things I was referring to that
influences results.
    Another is organizational bias.  I see
what I can see within the constraints provided by
the organizations within which I work.              04:36
    Another is called small sample bias.
That means one point is enough.  I don't need two
data points to draw a valid conclusion.
    There's a whole series of these
social/cultural biases that enter this challenge.     04:36
    Q   On page 52, in paragraph 59, referring
to the Interagency Performance Evaluation Team,
Independent Litigation Investigation Team --
Independent Levee Investigation Team, Team
Louisiana, NIST, NRC and ASCE.                      04:37
    Did any of those investigations involve
a forensic examination of whether the barge could
have caused either the North Breach or the South
Breach, or both, or was it simply a process of
elimination in coming up with a mechanism that      04:38
seemed easy to understand?
    MR. RAFFMAN:  Objection.
    THE WITNESS:  All of the studies that I
referenced used acceptable forensic engineering
processes to arrive at their conclusions.  They      04:38

189

were different.  They used different processes,
different data and information to arrive at their
conclusions, but they were acceptable forensic
engineering processes.
BY MR. SEYMOUR:                                     04:38
    Q   We talked about what the Interagency
Performance Evaluation Team did and did not do,
we talked about what the Independent Levee
Investigation Team did or did not do, we have
talked about what Team Louisiana did and did not     04:39
do; did the National Institute of Standards and
Technology conduct any forensic examination
of the role of the barge?
    A   Yes.
    Q   In which technical report is that          04:39
captured?
    A   It's in the one that you referred to
this morning that contain the picture of the
barge opposite the southern end of the South
Breach in the Lower 9th Ward.  The National          04:39
Institute of Standards and Technology based their
forensic engineering conclusions, as they state
in their report, on observations made by
experienced engineers at the site of the
breaches.  They document the reasons that they      04:39

190

1   draw their conclusions, and those were the ones
2   you were citing sections from earlier today.
3       Q   And are those dependent upon the
4   information about wind speeds and wind directions
5   of the type that you've relied upon?          04:40
6       MR. RAFFMAN:  Objection.
7       THE WITNESS:  The National Institute of
8   Standards and Technology did not involve their
9   work -- did not involve those kinds of forensic
10  engineering analyses, as they state.          04:40
11  BY MR. SEYMOUR:
12      Q   And did the National Research Council
13  conduct any forensic investigation of the role
14  of the barge?
15      A   They conducted forensic engineering     04:40
16  investigations within the confines that the
17  statement of work that the National Research
18  Council was given by the Department of Defense in
19  behalf of the U.S. Army Corps of Engineers
20  Interagency Performance Evaluation Task Force.    04:41
21      Q   In fact, didn't they tell the Corps
22  of Engineers that they should look at other
23  causes?
24      A   Yes.
25      Q   The American Society of Civil Engineers,  04:41

191

1   did they do a forensic examination of the
2   causative role of the barge in the North and/or
3   South Breaches?
4       A   Yes.
5       Q   And what was that?                     04:41
6       A   They reviewed information, it was at the
7   time of the various stages of their study, coming
8   from the forensic engineering team studies that
9   we cited earlier today.  In addition, they put
10  into the field people -- personnel from that      04:42
11  committee to investigate the breach sites and
12  conduct associated forensic engineering analysis.
13      Q   Did they look at the barge specifically?
14      A   Yes.
15      Q   What did they do to the barge           04:42
16  specifically?
17      A   In one case -- well, in the case where I
18  was present in the background when the American
19  Society of Civil Engineers drove up in the school
20  bus, they did what we had done months before,    04:42
21  which was to go and look at the barge, go and
22  look at the breach sites, take that information,
23  both visual and photographic, back, supplement it
24  with the input information being provided by the
25  other investigative teams, and then draw          04:42

192

1   conclusions and make recommendations to the
2   Interagency Performance Evaluation Task Force
3   that had paid for, authorized and engaged the
4   American Society of Civil Engineers to oversee,
5   peer review the Interagency Performance           04:43
6   Evaluation Task Force forensic engineering
7   studies.
8       Q   They didn't do an investigation of their
9   own, they just had used what the Interagency
10  Performance Evaluation Team had done?            04:43
11      MR. RAFFMAN:  Objection.
12      THE WITNESS:  I think I said they went
13  physically, personally, to the site, conducted
14  the inspections that I related; that was on their
15  own.                                              04:43
16  BY MR. SEYMOUR:
17      Q   Did they do anything other than come to
18  the site and make an inspection and review what
19  the IPET had done?
20      A   I can't respond in any high level of      04:44
21  detail, but my correspondence and discussions
22  with members of the team said that they also
23  performed corroborating or non-corroborating
24  analyses of breaching mechanics, not only at the
25  Lower 9th Ward but at the other important breach  04:44

193

1   sites.
2       Q   You mentioned that you had a
3   relationship with the National Institute of
4   Standards and Technology with respect to the
5   investigation.  Did Professor Seed have such a    04:44
6   relationship?
7       A   No, he did not.
8       Q   Did either of you have any -- any of you
9   on the sort of executive committee of the
10  Independent Levee Investigation Team have such a  04:45
11  relationship with the National Research Council?
12      A   Yes, we did.
13      Q   And did any of you on that executive
14  committee have such a relationship with the
15  American Society of Civil Engineers?             04:45
16      A   Yes, we did.
17      All of the cited people are professional
18  colleagues, whom most of us have known for
19  several decades.
20      Q   On page 56, paragraph 64, you cite the    04:45
21  Cushing report -- where you cite Cushing 2009 as
22  the source for the barge breaking from its
23  moorings as of 9:00 a.m. Central Time.  Is that
24  Dr. Cushing's expert report in this case?
25      A   Yes.                                      04:46

194

1  Q   Do you have any other source for that?
2  A   For Dr. Cushing's report?
3     This is the only one.
4  Q   Dr. Cushing's report is the only source?
5  A   Correct.                                    04:46
6  Q   At the bottom of page 57, in paragraph
7  66.
8  A   66?
9  Q   Paragraph 66.
10     You say, based on these forensic         04:47
11 engineering observations and analyses, the
12 conclusion is if a barge strikes a flood wall
13 that is not already failing for independent
14 reasons, then the barge impact is not sufficient
15 to cause a failure and breaching should not be   04:47
16 expected to occur.
17     Do you recall the photograph of the U.S.
18 90 Bridge in Mississippi that was knocked -- on
19 which a span was knocked several feet to the side
20 after a barge impact?                            04:47
21 A   Correct.  You showed that to me earlier
22 today.
23 Q   And if a similar impact occurred on a
24 flood wall, is it your testimony that that could
25 not cause the flood wall to lean or breach?      04:47

195

1  MR. RAFFMAN:  Objection.
2  THE WITNESS:  It appears as though similar
3  impact occurred at the sites that I have included
4  in my expert report.
5  BY MR. SEYMOUR:                                  04:48
6  Q   So would it be true -- withdraw that.
7     Is it your testimony that no matter how
8  weak a levee supporting a flood wall may be, a
9  barge striking it with any amount of force will
10 not cause failure?                               04:48
11 MR. RAFFMAN:  Objection.
12 THE WITNESS:  I would never render an expert
13 opinion on a combination of factors that clearly
14 would indicate I wasn't telling you the truth.
15 If that wall is weak enough, and if the barge is  04:48
16 strong enough and hits forcefully enough it can
17 cause failure of such a wall.
18 BY MR. SEYMOUR:
19 Q   Please turn to page 62.  I'm referring
20 to paragraph 71.                                 04:49
21     You refer to documented poor visibility
22 due to darkness, rain and distance; acoustic
23 conditions because of loud multi-frequency
24 noises; psychological conditions of apprehension,
25 panic and beliefs.  Have you ever found          04:49

196

1  eyewitness testimony useful in determining the
2  cause of catastrophic failure?
3  A   Yes.
4  Q   Have you ever made a mistake in
5  determining the cause of catastrophic failure?    04:50
6  A   Yes.
7  Q   Do you understand that there are a
8  number of eyewitnesses testifying to what they
9  heard that said that they thought it was another
10 dynamiting of the Inner Harbor Navigation Canal  04:50
11 flood wall like what had occurred during
12 Hurricane Betsy?
13 MR. RAFFMAN:  Objection.
14 THE WITNESS:  Please repeat your question.
15 BY MR. SEYMOUR:                                  04:51
16 Q   Let me back up.
17     Do you understand that the flood wall
18 was dynamited during Hurricane Betsy?
19 A   No, I did not.  I was there during
20 Hurricane Betsy.  I recall, as a citizen of the   04:51
21 area, an area that was flooded.  I have no
22 recollection of reports of dynamiting; and it
23 includes both media reports, chiefly radio at
24 that time, newspaper reports.  However, I was not
25 a member of the African-American community in the 04:51

197

1  Lower 9th Ward that might have such reports or
2  circulation of those reports.
3  Q   I wasn't there myself.
4     But do you understand that when they
5  refer to it sounding as if the levees were being  04:52
6  dynamited they are talking about a very large
7  explosive event?
8  A   Yes.
9  Q   Do you think it is at all worthwhile to
10 pay attention to what witnesses heard and saw on  04:52
11 the morning of August the 29th in trying to
12 determine the cause of the Inner Harbor
13 Navigational Canal flood wall breaches?
14 MR. RAFFMAN:  Objection.
15 THE WITNESS:  That would depend on the        04:53
16 variety of conditions surrounding the eyewitness
17 reports.
18     Because of the impediments, as cited
19 here, and the cognitive biases that we discussed
20 and identified earlier, the forensic engineer,   04:53
21 much like a lawyer, has to be very, very careful
22 with the understanding and conclusions drawn from
23 eyewitness reporting.
24 BY MR. SEYMOUR:
25 Q   Is it your testimony that the best       04:53

198

1  course is to ignore the information that
2  eyewitnesses report?
3      A   Absolutely not.
4      Q   Did you do anything, before forming your
5  conclusions, to find out what the eyewitnesses --    04:53
6  what all the eyewitnesses in this case have said?
7      A   That, of course, is a question that
8  transcends four years.
9          Let's look at the first year.  We
10  attempted to contact people, or to the other such    04:54
11  eyewitness reports, and both were unable to close
12  those contacts and had insufficient resources to
13  follow them up.
14          During that stage we were relying
15  primarily on the eyewitness report coming from    04:54
16  the Interagency Performance Evaluation Task Force
17  and from Team Louisiana.
18          As we moved through to the latter stages
19  of the four years, thanks to this work, I did ask
20  for and obtain the eyewitness testimony of    04:55
21  Mr. Villavaso and Mr. Terry Adams.
22      Q   Is that the only eyewitness testimony
23  that you've reviewed?
24      A   Yes.
25      Q   On page 63, in paragraph 73, you refer    04:55

199

1  to the CTE report.  I don't believe that this has
2  been identified earlier in the report.  What does
3  CTE stand for?
4      A   That's the name of one of the expert
5  consulting firms that were involved in the MR-GO    04:56
6  Reach 2 litigation.
7          At this point, my memory does not allow
8  me to remember what CTE stands for.
9      Q   Could it be Civil Tech Engineering?
10     A   I think that's correct.  Thank you.    04:56
11     Q   I just want to be sure.
12     A   Your brain is faster and fresher than
13  mine.
14     Q   This is my one chance to find out.
15     A   Thank You.    04:56
16     Q   Please turn to Appendix D.  It should be
17  Exhibit 5.
18         MR. RAFFMAN:  Is this a good time for a
19  break?  Or if you have a very short amount of
20  questions --    04:57
21         MR. SEYMOUR:  This is fine time for a break.
22         THE WITNESS:  Okay.
23         THE VIDEOGRAPHER:  The time is 4:57 p.m. and
24  we are off the record.
25         (Recess taken from 4:57 p.m. to 5:11 p.m.)    05:11

200

1          THE VIDEOGRAPHER:  The time is 5:11 p.m. and
2  we are back on the record.
3  BY MR. SEYMOUR:
4      Q   Dr. Bea, do you have before you Exhibit
5  5 to your deposition, Appendix D to your report?    05:11
6      A   Yes.
7      Q   I would like you to also have out
8  Exhibit 1 to your deposition, your own report,
9  and turn to page 60.
10     A   Yes.    05:11
11     Q   On pages 60 to 65 of your own expert
12  report, it's under the heading of "Critique
13  of Engineering Investigations performed by
14  Marino, Engineering Associates, Mr. Hector Pasos
15  and Civil Tech Engineering."    05:12
16     A   Yes, sir.
17     Q   And Exhibit D is headed, "Reviews of
18  July 2009, Expert Reports by Marino Engineering
19  Associates, Mr. Hector Pasos and Civil Tech
20  Engineering."    05:12
21         What's the relationship between what's
22  in Exhibit D -- excuse me -- Appendix D, Exhibit
23  5 to the deposition, and what's in this portion
24  of your report?
25     A   The portion of my report under the    05:12

201

1  Critique summarizes information that is
2  additionally detailed in Appendix D.  So I'm
3  providing additional information in the appendix
4  that's not in the summary of the primary expert
5  report.    05:13
6      Q   And do you have Exhibit 6 to your
7  deposition, the supplemental analyses, dated
8  September 4, 2009?
9      A   Yes.
10     Q   What is the purpose of the supplemental    05:13
11  report?
12     A   The purpose of the supplemental report
13  is to examine analytically the potential
14  implications of the additional soil coring
15  information that was identified by Dr. Marino in    05:13
16  his expert report.
17     Q   Does any of the information in Exhibit 6
18  replace information that is in Exhibit 1 on the
19  appendices?
20     A   It adds to it.  It doesn't replace it.    05:14
21     Q   If you take a look at page 15 on
22  Deposition Exhibit 6, the supplemental report.
23     A   (Witness complies.)
24     Q   You have a chart of the IHCN.  I think
25  it should be IHNC.    05:14

202

1    A    Yes, sir.
2    Q    North Breach, Factor of Safety.  Is
3  there not a similar chart in Exhibit 1?
4    A    Yes.
5    Q    Does the chart on page 15 of your          05:14
6  supplemental report replace the similar chart in
7  Exhibit 1?
8    A    Yes.
9    Q    Could you take a quick look at the
10  remainder of the supplemental report and let me    05:14
11  know if there's any other information that we
12  should consider as replacing information in your
13  original report?
14    A    Yes.  Figure 11, which shows a computed
15  hydraulic gradient at the North Breach location,   05:15
16  that should be taken to replace the earlier work
17  for the North Breach on that topic, Figures 12
18  and 13 as well.
19    Q    So it's 11, 12, 13 and 15?
20    A    Correct.                                    05:15
21    Q    Earlier in your deposition I referred to
22  testimony in the -- that you gave in the Robinson
23  case, stating that 88 to 90 percent of all the
24  water that ends up in the Lower 9th Ward came
25  from the reaches along Reach 2, through the        05:16

203

1  central wetlands unit and over the flood wall at
2  the north edge of the Lower 9th Ward.
3    MR. SEYMOUR::  Just for the completion of the
4  record, I ask the reporter to mark as Exhibit 12
5  to the deposition pages 1259 and 1260 of the       05:16
6  Robinson transcript.
7    (Exhibit 12 marked for identification.)
8    THE WITNESS:  Yes, sir.
9  BY MR. SEYMOUR:
10    Q    Did I fairly describe Exhibit 12?          05:17
11    A    Please repeat your description.
12    Q    Okay.  Does this show that you took from
13  Dr. Vrijling the information that 88 to 90
14  percent of all the water that ended up in the
15  Lower 9th Ward came from the reaches along Reach   05:17
16  2 through the central wetlands unit and over the
17  flood wall at the north edge of the Lower 9th
18  Ward?
19    A    That is correct.
20    MR. SEYMOUR:  I ask the reporter to mark as     05:18
21  Exhibit 13, a part of the Robinson transcript
22  beginning at page 1224 and ending with page 1232.
23    (Exhibit 13 marked for identification.)
24  BY MR. SEYMOUR:
25    Q    Do you see on page 1224 that you're        05:19

204

1  agreeing with Mr. O'Donnell that 88 to 90 percent
2  of the water, depending on the expert, came from
3  Reach 2 through St. Bernard into the Lower 9th
4  Ward refers up to the question at lines 12 to 14?
5    A    Yes.                                        05:19
6    Q    And I want to pass over several pages
7  and turn to page 1229.
8    If you want to take a moment just to
9  orient yourself on what was said on page 1228
10  with the preceding question, please do so.         05:20
11    A    Yes.
12    Q    What is Katrina Neutral?
13    A    Katrina Neutral consists of a set of
14  conditions that neutralize the acknowledged
15  negative impacts of the Mississippi River-Gulf     05:21
16  Outlet.
17    Q    By "acknowledged negative impacts," who
18  are you saying acknowledged them?
19    A    The U.S. Army Corps of Engineers.
20    Q    And you have a time of failure for the     05:21
21  North Breach initiates at 4:00 a.m.
22    Now, would 4:00 a.m. be the time that
23  there starts to be a problem but before the
24  actual failure, or would 4:00 a.m. be the time
25  of failure?                                        05:21

205

1    A    It would be the time of initiation of a
2  failure.
3    Q    And the failure itself would be?
4    A    Approximately 5:00 a.m., an hour later.
5    Q    And did you get that time from Dr. Wit?    05:21
6    A    No.
7    Q    Where did you get the time from?
8    A    The time comes from our forensic
9  engineering analyses of the development of the
10  North Breach.                                       05:22
11    Q    The next sentence states, for the
12  Katrina Surge Condition, the water level is nine
13  feet.
14    Please tell me, first, what the Katrina
15  Surge Condition is.                                 05:22
16    A    That's the surge condition at this time
17  based on the water level record at the Lock
18  Master location.
19    Q    Were you relying upon another expert in
20  the case for that or were you relying on your own   05:22
21  work for that?
22    A    Please define "that."
23    Q    The statement we just read, for the
24  Katrina Surge Condition, the water level is nine
25  feet.                                               05:22

206

1   A   I'm relying on work done by other
2   experts.
3   Q   Would that be Dr. Wit?
4   A   In part.  The principal source of the
5   hydro graphs, as they are known, water elevation        05:23
6   as a function of time, came from the Interagency
7   Performance Evaluation Task Force.
8   Q   Did any of it come from Dr. Vrijling?
9   A   Dr. Vrijling was a conveyer of
10  information that came from Dr. Wit, Dr. Mathias        05:23
11  Kok and others on the so-called Dutch Team.
12  Q   Does the phrase "Katrina Surge
13  Condition" mean what actually happened?
14  A   Yes.
15  Q   And Katrina Neutral Condition would be        05:23
16  what would have happened or what should have
17  happened if the proper mitigating measures had
18  been taken?
19  A   Correct.
20  Q   The rest of the answer states, the        05:24
21  difference is four feet of water.  If you count
22  the time from the initiation of the North Breach
23  to the time the water level reaches six feet,
24  it's nine hours for Katrina and five hours for
25  Katrina Neutral.  Please explain what that means.        05:24

207

1   A   It means that the time period over which
2   those excessive water levels would have been
3   acting at this location.
4   Q   So it's four hours for that duration
5   of that amount of flooding?        05:24
6   A   Or more.
7       One element I would like to add
8   regarding the Katrina Neutral Condition.  During
9   the trial on Friday, Judge Duval asked that we
10  replace our characterization of the Katrina        05:25
11  Neutral Condition with the presence of an actual
12  MR-GO channel because previous characterizations
13  of a Katrina Neutral Condition had removed the
14  channel, primarily because of its wave
15  regeneration characteristics that you questioned        05:25
16  earlier and, secondarily, because of the water
17  induction characteristics into the Gulf
18  Intercoastal Waterway and the Inner Harbor
19  Navigation Canal.
20      His instructions during the weekend were        05:26
21  that I needed to put the channel back into the
22  analyses and evaluate a second neutralized MR-GO
23  set of conditions.
24      I did so, and brought those results
25  forward on Monday morning, in response to the        05:26

208

instructions from the court.
    That second set of conditions, unlike
the first set of conditions, involved the
placement of a surge protection gate in the
general vicinity of the Paris Road Bridge.        05:27
    If that mitigation were put in place,
the surge water elevations would have not been
significant in either the Gulf Coast -- the Gulf
Intercoastal Waterway or the Inner Harbor
Navigation Canal.        05:27
    So these are all referencing the first
neutralized MR-GO set of conditions.
    Q   Are you assuming that -- well, you say
on page 1232, that if you don't have funnel
surge, it's your opinion the North and South        05:28
Breaches would not have occurred.
    A   Correct.
    Q   And would this gate have stopped the
funnel surge?
    A   Correct.  The Corps of Engineers is        05:28
currently constructing that funnel gate.
    Q   And how high would the water have gotten
in the Inner Harbor Navigation Canal if there had
been such a funnel gate?
    A   A matter of a few feet, based on the        05:28

209

oceanographic modelling that was done both by the
Corps of Engineers and by the Dutch Team.
    The rise in surge comes through Lake
Pontchatrain.
    Q   And where exactly would the gate be        05:28
located?
    A   At the general vicinity of the Paris
Road Bridge, which is the intersection of the
east-west trending Gulf Intercoastal Waterway.
The Mississippi River-Gulf Outlet on the trending        05:29
northwest-southeast intersects at approximately
the Paris Road Bridge.  That's known as the neck
of the funnel.
    The two waterways at the adjacent flood
protection structures form the primary bell        05:29
of the funnel.  It concentrates its flow to the
Inner Harbor Navigation Canal intersection, on
the other side of which is the Port of New
Orleans.
    Q   And is it your testimony that Lake        05:29
Pontchatrain would not have filled up the Inner
Harbor Navigation Canal?
    A   Well, normally, of course, Lake
Pontchatrain fills up the Inner Harbor Navigation
Canal to normal water levels because these two        05:30

## 210

1  water bodies are directed -- directly connected.
2      Q   Can you show me on a map where this gate
3  is so that I can understand the mechanics of what
4  you're describing?
5      I believe you've got a picture of the          05:30
6  funnel in one of your maps?
7      A   Oh, yes.
8      Perfect.
9      Q   What page number are you on?
10     A   Perfect.  This is the expert -- my          05:30
11  expert report dated August the 3rd, 2009.  It's
12  Figure 1, page 2.  So that would be our Exhibit
13  1.
14      So let's go to Exhibit 1 again.
15  Perfect.  Page 2, Figure 1, shows the funnel.      05:31
16  Here's the Gulf Intercoastal Waterway.  Here's
17  the Mississippi River-Gulf Outlet identified as
18  Reach 2.  That's the bell of the funnel.  It
19  intersects at approximately the Paris Road Bridge
20  and that's where the Reach 1 continues into the    05:31
21  Inner Harbor Navigation Canal.  So the gate would
22  be placed at that intersection -- is being placed
23  at that intersection.  Unfortunately, too late.
24      MR. SEYMOUR:  I'll ask the reporter to mark
25  as Exhibit 14 pages 1503 and 1504 of the Robinson  05:32

## 211

1  testimony.
2      (Exhibit 14 marked for identification.)
3  BY MR. SEYMOUR:
4      Q   We discussed uncertainty before.  And I
5  want to direct your attention to the top of the    05:33
6  page 1503, where you were asked:  Before Katrina,
7  was there any uniform way to apply criteria from
8  existing manuals to ascertain erosion rates.  And
9  you said you could not find that.
10      Now, is the calculation of erosion rates       05:33
11  equally important for the levees at the Inner
12  Harbor Navigation Canal as they were for Reach 2?
13     A   No.
14     Q   Please explain.
15     A   Well, the Reach 2 structures are            05:33
16  entirely earthen structures.  So one of their
17  potential breaching modes involves wave-side
18  attack, erosion overtopping attack, erosion so
19  that complex breaching mechanics becomes a
20  dominant mechanism for that structure -- those     05:34
21  structures, contrasted with the concrete sheet
22  pile flood wall supported with an earthen flood
23  protection levee subjected to minor wave attack
24  and current attack of the structures on Reach 2
25  because of their proximity to open water.  Wave    05:34

## 212

1  attack was of particular importance in that
2  breaching mechanism.
3      The complication of a wave attack and
4  the erosion propagation is what's responsible for
5  the greater uncertainties associated with the      05:35
6  forensic engineering breaching analysis of that
7  flood protection structure contrasted with those
8  at the Lower 9th Ward.
9      Q   Could you turn to page 1504, the second
10  page of that exhibit?                              05:35
11     A   (Witness complies.)
12     Q   The court asked a question about soil.
13  And your answer on lines 11 to 16 says:  Well,
14  the soil shear strength, for example, in a highly
15  uniform material like a clay, would be expected    05:35
16  to have a coefficient variation between 25 and 35
17  percent.  If I go to a calcareous soil --
18     A   Correct.
19     Q   -- which would be like the beaches in
20  the Yucatan Peninsula because it's much more       05:35
21  variable, the soil has coefficient variations
22  from 50 to in excess of 100 percent.
23      Now, we are talking about erosion.  Your
24  under-seepage theory involves erosion from the
25  inside of the levee; is that correct?             05:36

## 213

1  A   That's only partially correct.
2      As I explained in my expert report,
3  there are two categories of potentially important
4  hydraulic effects.
5      One category involves the velocity            05:36
6  of transmission of fluid through the soils.  If
7  that velocity is high enough it can result in
8  removal of the soil, creation of things that
9  levee engineers term "sand boils" on the
10  protected side.  If that process is allowed it     05:37
11  can undermine the entire earthen flood protection
12  structure, levee hopefully, and cause breaching.
13      The second category is the effect of the
14  water pressures, not velocity but pressure.  So
15  it means the water does not have to move but       05:37
16  pressures have to be transmitted.
17      A soils strength is dependent on pore
18  pressure.  The higher the pore pressure of water
19  the lower the strength of the soil.  In fact,
20  Hollywood's characterization of sinking into       05:37
21  quicksand is a characterization -- actually a
22  cartoon one -- of that pressure effect in which
23  the hydraulic uplift pressures equal the downward
24  pressure exerted by the soil and it turns to a
25  so-called liquid.                                  05:38

214

1    There is another category of pressure
2  which, if generated in a subterranean underlying
3  layer, and overlaying by much less permeable
4  materials, those upward pressures can act on that
5  overlying less permeable material, for example       05:38
6  the clay, comprising a well-engineered levee.
7  That uplift pressure acts to destabilize the
8  resisting forces from the soil component of that
9  flood protection structure.
10    So in our analysis, as I documented and         05:39
11  explained, we tracked both of these categories
12  of hydraulic effects.  That was the point where
13  we found first in our studies, Independent Levee
14  Investigation studies to May 14, 2006, we had
15  missed it.                                           05:39
16    But we then tracked those of the
17  Interagency Evaluation Performance Task Force.
18  They had missed the pressure uplift effect
19  because they performed hydraulic analyses, they
20  performed stability analyses, they did not          05:39
21  perform a combination where you picked up this
22  hydraulic uplift.
23    We didn't claim to be particularly smart
24  because we learned this lesson through the
25  forensic engineering studies that we conducted at   05:40

215

1  the 17th Street Canal.
2    No one, prior to the work we did, which
3  brought in the uplift pressures, had correctly
4  identified the time and water level, observed
5  both, of breaching at that location.  So we          05:40
6  brought that knowledge/information to this
7  location and sharpened our forensic engineering
8  analyses in the later stages of work done here.
9    Q   You mentioned earlier that the Corps
10  of Engineers, or Washington Group International,     05:40
11  I don't know who, had misclassified some soils as
12  clay when they should have been classified as
13  something else because it was a high proportion
14  of silt and sand in them.  Was that true for the
15  Inner Harbor Navigation Canal?                       05:41
16    A   In some cases the information that we
17  had indicated it was potentially true.  But as we
18  were relying on their Katrina -- or pre-Katrina
19  soil borings and that precipitated our
20  expenditure of funds in an effort to re-perform     05:41
21  coring at critical locations, both North and
22  South Breaches.
23    Q   Given what you found about the soil
24  adjacent to the breaches, did you calculate the
25  coefficient of variation for the soil at the        05:41

216

1  breaches?
2    A   Yes.
3    Q   What was your calculations?
4    A   That's detailed in my expert reports.
5    Q   Is that the 30- to 40-percent figure          05:42
6  that we talked about?
7    A   That's a result in uncertainties that
8  came from those explicit calculations and an
9  explicit detail behind those calculations are
10  contained in Appendix C to my expert report.        05:42
11    Q   There was a passage in the Robinson
12  trial in which Mr. O'Donnell referred to your
13  having performed a very large number of -- well,
14  2300 pages of reports.  And counsel for the
15  government objected strenuously and gave a figure   05:42
16  that was, I think, something like 3700 pages.
17  And the judge said he was going to go with
18  counsel for the government.
19    A   That was Mr. Richardson.
20    Q   Which of them was correct?                    05:43
21    A   A good marine.
22    Q   Which of them was correct in terms
23  of the number of pages of reports you turned out
24  in the case?
25    A   3700 for the MR-GO that doesn't include      05:43

217

1  the canal and that doesn't include this work.
2    Q   Has there been any other cases in which
3  you've served as an expert witness in which you
4  produced anything like --
5    A   5,000 pages.                                   05:43
6    Q   Eight reams of paper is what I'm
7  thinking of, or ten reams.
8    A   No, never.  I've worked on some 630,
9  personally.
10    This case has absorbed far more time,            05:43
11  far more intensity, than any of the previous
12  cases I have worked on.
13    Q   You never found that degree of output
14  necessary in any other cases that you served as
15  an expert on?                                        05:44
16    A   In many of the other cases I served as
17  expert on, for example the Columbia Accident
18  Investigation Board investigation, I was
19  accompanied by other experts who were able to
20  supply information that did not require me to        05:44
21  investigate into those areas.  So I was able to
22  restrict the extent of my investigation much more
23  in that particular case.
24    In other cases, where I was not assisted
25  by other very qualified experts, my domain was      05:44

55 (Pages 214 to 217)

218

1  much wider, but the extent and depth of the
2  investigations were less, frequently because the
3  problem was easier to understand, and analyze and
4  document.
5      So this extent depends very, very widely        05:45
6  on the complexity of the problem, the resources
7  available to address those problems.
8      This is the biggest one in my entire 56
9  years of engineering.
10     Q   Were there any other reasons for your        05:45
11 producing so much in this matter?
12     A   Yes.
13     Q   Please explain.
14     A   I care.
15     Q   Please elaborate.                             05:46
16     A   This is the largest, most destructive,
17 catastrophic failure of a civil engineered
18 structure in the history of the United States, if
19 not the world.
20     I'm at the close of my career.  One           05:46
21 of the things I would like to do, as I close my
22 career, is contribute what I'm able to contribute
23 in ways of insight and information to those who
24 will follow me.  And that's because I don't want
25 them to repeat the horrible collection of        05:46

219

1  mistakes that we made in the causation of this
2  catastrophe.
3      I care.
4      Q   To serve that goal the cause has to be
5  something that can be addressed by geotechnical    05:47
6  engineering in your field; is that right?
7      A   No, that's not right.  My expertise goes
8  far beyond geotechnical engineering.  So, no,
9  geotechnical engineering is only one component in
10 this kind of forensic engineering study.           05:47
11     Q   Let me rephrase that then, in light
12 of what you said.  In order to fulfill this goal,
13 isn't it necessary that the Corps of Engineers
14 build flood wall protection systems differently
15 in the future than it has in the past?             05:47
16     A   Yes.
17     Q   And what do you see is the prescriptions
18 that the Corps of Engineers should follow?
19     A   Well, they have recently, in the past
20 couple of months, in response to Congress's        05:48
21 charge for a national levee safety program,
22 issued draft guidelines for future levee
23 re-qualification, reconstruction and
24 construction.  Those guidelines are incorporating
25 many of the lessons that I think all of us         05:48

220

1  experts have picked up in coming through this
2  past four years.
3      Q   Did others on the Independent Levee
4  Investigation Team talk with you about your goal?
5      A   Yes.                                          05:48
6      Q   Did they share that goal?
7      A   In almost all cases, yes.  Certainly, in
8  the case of Dr./Professor Raymond Seed and
9  Dr./Professor Dave Rogers.  Those two engineers,
10 forensic engineers, geologic and geotechnical,     05:49
11 remain on this caring trail of tears.
12     Q   Did you ever talk with people involved
13 in the other investigative efforts about those
14 goals?
15     A   Yes.                                          05:49
16     Q   Did they also share your motivation?
17     A   In general, I think yes.  Their ability
18 to act on those kinds of goals are different than
19 my abilities.
20     Q   If the barge had been a cause of the         05:49
21 failure of the North Breach and/or the South
22 Breach, that would interfere with those goals,
23 wouldn't it?
24     A   Yes.
25     MR. SEYMOUR:  No further questions.              05:50

221

1      MR. RAFFMAN:  I have a few.
2      Don't face me.  You can face the camera.
3
4      EXAMINATION
5                                                        05:50
6  BY MR. RAFFMAN:
7      Q   Professor Bea, in answer to the last
8  question you gave, did any part of your
9  analysis -- of the issue of whether the barge had
10 been a cause of the failure, was any part of your  05:50
11 analysis or your scientific conclusions motivated
12 by your desire to see that the levee system
13 improve?
14     A   No.  It's the knowledge and background
15 understanding that comes from these                05:51
16 investigations.  So if we can portray that
17 convincingly and logically to our younger
18 colleagues, then hopefully they will not repeat
19 our mistakes.
20     Q   And, in fact, isn't it the case that --    05:51
21 well, strike that question.
22     Let me ask you to return to Exhibit 6,
23 page 11.  This is the seepage analysis you did in
24 your supplemental report?
25     A   Yes, sir.                                    05:51

**222**

1    Q   At what time did you begin the running
2  of the model -- well, let me ask you this
3  question this way.  There's a reference here to
4  August 28th, 2005, six o'clock a.m.  Do you see
5  that reference?                                05:52
6    A   Correct.
7    Q   What does that represent?
8    A   That represents the point in time at
9  which we initiated the calculations of hydraulic
10  effects at the North Breach.  That's the same    05:52
11  time reference that we have used previously for
12  both North and South Breaches.
13    Q   And it's the same reference in your
14  seepage analysis throughout your previous --
15    A   Correct.                                 05:52
16    Q   Okay.
17    A   By the way, that's an important thing to
18  do because you have to have the buildup of water
19  level over time to correctly capture the
20  hydraulic effects that are important in the time  05:53
21  close to breaching.
22       If you tried to start the analysis very
23  close to that time, the hydraulic effects will be
24  incorrect, they'll be distorted, because the soil
25  has not had sufficient time to react to that     05:53

**223**

1  progressive increase in water pressure.
2    MR. RAFFMAN:  All right.  I only have two --
3  yeah, let's keep going.
4  BY MR. RAFFMAN:
5    Q   Dr. Bea, you had said in one of your     05:53
6  answers to Mr. Seymour's questions that
7  theoretically, at least, if the wall is weak
8  enough and the barge is strong enough, then a
9  barge can cause failure of a wall.  Do you
10  remember the thrust of that testimony?           05:53
11    A   Oh, yes.
12    Q   All right.  Professor Bea, could a barge
13  have caused the failure of a wall in the manner
14  that you observed at the North Breach on the
15  Inner Harbor Navigation Canal?                   05:54
16    A   No.
17    Q   Could a barge have caused a failure
18  of a wall in the manner you observed at the South
19  Breach of the Industrial -- the Inner Harbor
20  Navigation Canal?                                05:54
21    A   No.  In both cases, that's what has been
22  documented in my expert reports and testimony.
23    MR. RAFFMAN:  I have no other questions.
24    MR. SEYMOUR:  I do need to follow up on
25  that.                                            05:54

**224**

       Do you need to change the tape?
    THE VIDEOGRAPHER:  This marks the end of Disc
No. 3 in the deposition of Dr. Robert Bea.  The
time is 5:55 p.m. and we are off the record.
    (Recess taken from 5:55 p.m. to 6:01 p.m.)     05:54
    THE VIDEOGRAPHER:  This marks the beginning
of Disc No. 4 in the deposition of Dr. Robert
Bea.  The time is 6:01 p.m. and we are back on
the record.
    MR. RAFFMAN:  Mr. Seymour has done me the      06:00
courtesy of allowing me one additional question.

            EXAMINATION (Continued)

BY MR. RAFFMAN:                                    06:00
    Q   Professor Bea, you've heard throughout
the day questions about rates of error and then
uncertainty that you've included in your
analysis.  Have you got those questions in mind?
    A   Yes.                                       06:01
    Q   When you reviewed the reports of
Mr. Pasos and Dr. Marino, did you find in those

**225**

reports any discussion of the known or potential
rate of error of the techniques or theories that
they applied?
    A   No, I did not.
    MR. RAFFMAN:  Now I have no other questions.   06:01

            EXAMINATION

BY MR. SEYMOUR:
    Q   Dr. Bea, you testified just a moment ago   06:01
that it would not have been possible for a barge
to have caused the North Breach or the South
Breach under any conditions.  Do I have it right,
under any conditions?
    A   No.                                        06:01
    Q   Okay.  Could a barge have caused the
damage that you observed on the North Breach?
    A   No.
    Q   No?
    A   No.                                        06:02
    Q   No.
    A   And I documented the reason why.

**226**

1  Q   Tell me the reasons.

2  A   The reasons concern our forensic engineering

3  studies of the development of the North Breach.  Those

4  studies converge on a primary causative element

5  related to the discussed/identified seepage, hydraulic   06:02

6  effects and lateral instability effects.

7      Other information in the vicinity of North

8  Breach lead to the conclusion that the barge wasn't

9  there and couldn't have been there.

10     And so the barge does not enter my expert   06:02

11  opinion as a causative/contributing/ participating

12  element in the case of North Breach.

13  Q   Would it be fair to say that your answers to

14  Mr. Raffman's question mean that once you have already

15  ruled the barge out of consideration it could not   06:03

16  possibly have caused any damage?

17  A   At the North Breach?

18  Q   Yes.

19  A   That is correct.

20  Q   Okay.  Is your answer the same with respect   06:03

21  to the South Breach?

22  A   Yes, for very similar reasons.

23  MR. SEYMOUR:  Okay.  No further questions.

24  MR. RAFFMAN:  I have one other question.

25  No, I think I'll stop there, too.      06:03

**227**

1  MR. SEYMOUR:  No further questions.

2  THE VIDEOGRAPHER:  This marks the end of Disc No.

3  4 of 4, and concludes today's deposition of Dr. Robert

4  Bea.  The time is 6:04 p.m. and we are off the record.

5  (Deposition concluded at 6:04 p.m.)      06:19

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**228**

CERTIFICATE OF WITNESS

I, the undersigned, declare under penalty of

perjury that I have read the foregoing transcript, and

I have made any corrections, additions or deletions

that I was desirous of making; that the foregoing is a

true and correct transcript of my testimony contained

therein.

EXECUTED this _____ day of _____, 2009, at

_____, _____.


_____

W I T N E S S

**229**

STATE OF CALIFORNIA      )

COUNTY OF SAN FRANCISCO )

I, Linda Vaccarezza, Certified Shorthand

Reporter, Certificate No. 10201, for the State of

California, hereby certify:

I am the deposition officer that

stenographically recorded the testimony in the

foregoing deposition; prior to being examined the

deponent was first duly sworn by me.  The

foregoing transcript is a true record of the

testimony given;

Before completion of the deposition, review

of the transcript [] was [] was not requested.

if requested, any changes made by the deponent

(and provided to the reporter) during the period

allowed are appended hereto.

Dated September 21, 2009.


_____

LINDA VACCAREZZA, CSR. 10201

## A

**abilities** 220:19
**ability** 16:18 35:19
111:20 220:17
**able** 18:13 37:3 73:24
77:2 78:23 86:22 88:23
105:22 115:14 125:17
135:5 137:23,25 138:20
140:22 178:11 217:19
217:21 218:22
**absence** 159:2
**absent** 119:7
**absolutely** 102:17 198:3
**absorbed** 217:10
**academic** 14:15,17 39:11
**acceptable** 188:24 189:3
**accepted** 31:24 148:10
162:15 182:24
**access** 73:25 77:2 78:25
100:5 110:17 111:16
129:22 137:10 138:20
**accessed** 100:10
**accessible** 77:7
**Accident** 217:17
**accompanied** 59:8
158:19 217:19
**accompanies** 116:5
**account** 155:8
**accuracy** 141:5
**accurate** 101:1,2
**accurately** 9:2,5 94:5
**acknowledged** 204:14,17
204:18
**acoustic** 195:22
**act** 123:13 157:25 158:3
159:17 161:13,19 214:4
220:18
**acting** 15:24 24:18 27:25
68:19 87:23 207:3
**action** 1:5 19:24 41:10
83:15 84:20 86:15
87:22 102:20
**actions** 98:9
**active** 11:17,19
**activities** 54:6 56:7,8

115:4
**activity** 22:4 36:23
**acts** 214:7
**actual** 10:9 204:24
207:11
**Adams** 198:21
**ADCIRC** 61:5
**add** 207:7
**added** 170:15 171:10
**addition** 12:10 22:16
23:18 68:23 98:8
143:17 184:15 191:9
**additional** 22:20 92:23
126:18 127:22 129:21
133:12,13,15,23 137:13
137:20 138:5,12 147:3
147:5 170:16 171:11
201:3,14 224:11
**additionally** 201:2
**additions** 228:5
**address** 10:25 99:9 218:7
**addressed** 219:5
**addressing** 56:14
**adds** 201:20
**adjacent** 55:15 85:13
87:25 104:25 114:1
117:11 135:2,9,23
167:5 170:6,7 177:18
179:5,24 181:5 209:14
215:24
**adjoining** 134:25
**admissible** 9:18
**adrift** 64:6 66:5 91:16
141:10,11
**advantage** 62:4 63:3
**adverbs** 134:19,20
**adverse** 170:14 176:2
**aerial** 75:12
**affidavit** 29:17
**African-American**
196:25
**afternoon** 4:9 46:14,17
110:1
**after-the-fact** 182:21
**ago** 33:18 225:10
**agree** 80:16 128:11

134:17 176:7
**agreed** 26:9,13 33:3
65:17
**agreeing** 204:1
**agreement** 10:6 91:4
**ahead** 64:20 65:16 88:19
91:23 141:8 152:9
186:20
**air** 87:17
**al** 21:15 134:8 170:17
**Aldock** 3:13 6:24 16:16
17:17 18:3
**alive** 48:6
**alleged** 52:1
**allotted** 143:1
**allow** 199:7
**allowed** 72:25 86:8,14
135:12 178:3 213:10
229:17
**allowing** 224:11
**allows** 35:18 93:10,10
**all-inclusive** 78:12
**alongside** 80:3
**alterations** 111:6
**ambiguous** 8:11
**America** 3:11,22 6:23,25
15:25 16:12
**American** 3:23 27:12
38:1 59:25 77:14 142:6
163:15 190:25 191:18
192:4 193:15
**amount** 20:20 102:18
195:9 199:19 207:5
**amounts** 137:12
**analyses** 36:6 44:1,2
66:21 72:3 95:19 96:16
96:22 97:5,14,15
125:13 126:4 139:11
140:10 146:11,12
149:25 150:1 164:12,22
165:2 167:4,7 175:19
185:2 190:10 192:24
194:11 201:7 205:9
207:22 214:19,20 215:8
**analysis** 37:6 95:24 97:3
106:13 129:5 140:2

145:14 151:2 154:21
161:6 162:14,19,22
163:1,4,12 164:1 165:7
165:22 166:5,9,10,15
169:9 191:12 212:6
214:10 221:9,11,23
222:14,22 224:19
**analytical** 97:12,15
98:16,18,22,23 99:1,5
99:24 100:11 147:3
151:7 160:13
**analytically** 201:13
**analyze** 69:24 218:3
**analyzed** 82:23 86:21
96:14 185:9,9
**analyzing** 69:20 70:3
71:3
**and/or** 191:2 220:21
**anemometer** 62:12 73:22
**anemometers** 61:21,24
61:24 62:5,13,18,20
**angle** 68:7
**animals** 117:8
**annual** 25:12
**answer** 8:4,20 28:6 50:21
51:7,11 52:8 53:17,21
54:25 57:16,16 66:21
66:23 71:7 72:20 73:3
82:22 87:5,13 88:21
91:23 93:20 95:3 96:11
96:23 108:14 113:18
120:20 121:8,10 125:17
131:23 135:20 138:12
146:7 148:7,15 149:2
153:20 154:25 160:24
161:3 174:5 185:22
186:8,20 206:20 212:13
221:7 226:20
**answered** 31:20 50:12
52:3 87:1 91:21
**answering** 96:13 121:9
**answers** 7:23 57:7 62:15
116:20 183:4 223:6
226:13
**anybody** 42:25 69:18
70:1 78:1

**apologies** 139:23
**apologize** 13:19 186:3
**appear** 85:3
**appeared** 81:4 82:6
   145:24
**appears** 195:2
**appended** 229:17
**appendices** 10:13 201:19
**appendix** 10:14,15,15,16
   11:16 12:19 27:2 60:22
   114:5 120:3,4 170:1
   199:16 200:5,22 201:2
   201:3 216:10
**application** 34:23
**applications** 183:22
**applied** 225:3
**apply** 139:12 180:22
   211:7
**appointment** 25:6,15
**appreciate** 151:22
**apprehension** 195:24
**appropriate** 41:15 147:4
**approval** 119:18
**approximate** 28:6
**approximately** 6:6 13:8
   14:6 16:1,6,13 20:17,24
   22:14 23:17 26:4 27:19
   28:5,8,18 46:12 109:3
   165:8 178:15 180:14
   205:4 209:11 210:19
**April** 17:21 20:18,18
   21:20
**apron** 159:15,21
**architecture** 66:19,25
   67:2,9,13
**Archival** 12:20
**area** 21:13 22:3 30:5
   35:17 38:18 40:8,9,9
   57:2 76:4 77:2 86:17
   102:1,23,25 103:13
   104:1 105:1 112:20
   114:4,25 118:3 120:2,9
   120:10 122:3 130:4,5,6
   130:9 135:13,15 147:25
   153:2 172:15,24 174:21
   174:22 176:15,17,19

178:16 179:7 180:5
   184:23 185:16 187:20
   196:21,21
**areas** 21:10 95:11 98:14
   101:18 103:10 111:7
   112:3,4 126:13 172:18
   176:19 177:25 217:21
**argument** 56:13
**argumentation** 96:10
**armored** 158:8
**Army** 42:13 106:9
   110:13 112:19 119:19
   190:19 204:19
**arrangements** 15:4 20:7
**arrive** 72:11 140:20,21
   188:25 189:2
**arrived** 106:4
**arrives** 106:4
**article** 143:21 145:10,24
   146:6,20,22 151:10
   162:18
**articles** 12:24 13:1,22
   142:22 144:16 148:18
   148:23 149:7,14 163:11
**ASCE** 188:15
**ascertain** 211:8
**asked** 9:8 18:6 26:15
   31:20 42:6 49:12,14
   50:14,20 51:19 58:16
   68:3 72:18 82:1 87:1
   147:2 148:2,9 149:17
   153:12,16 183:2,5
   207:9 211:6 212:12
**asking** 7:22 8:5 92:4
   144:21 150:5
**aspects** 182:9
**aspirational** 38:6
**assessments** 183:14
**assistance** 13:13 14:2
**assisted** 217:24
**associated** 18:14 54:7
   97:3,7,12 101:20 104:6
   104:24 143:16 145:17
   152:19 157:9 161:11
   191:12 212:5
**Associates** 200:14,19

**assume** 17:23 163:19
   179:10,16
**assuming** 57:8 208:13
**assumption** 47:17 57:11
   73:11
**assumptions** 69:6
**Atchafalaya** 100:6,9
**attachments** 117:13
**attack** 52:10 55:9 211:18
   211:18,23,24 212:1,3
**attempt** 35:11 96:12
   111:4 121:8 130:3
   184:3 185:18
**attempted** 37:5 135:7
   198:10
**attempting** 127:11
**attention** 80:25 99:13
   110:19 113:24 118:9
   142:24 153:7,9 172:16
   173:7,21 197:10 211:5
**ATTORNEY** 3:4,12,13
**attorneys** 6:15
**August** 10:10 24:3,4 59:1
   165:5,8 197:11 210:11
   222:4
**author** 13:10
**authorized** 192:3
**available** 103:6 126:11
   126:16 139:8 145:15
   146:16 218:7
**Avenue** 3:6,15 72:24
**average** 58:13,24 180:11
   180:14
**avid** 33:20
**aware** 70:6 78:19,23
   82:3 93:24 107:3,3,6,15
   107:23 108:10,16,22
   125:22 129:7 136:17,22
**a.m** 2:8 6:6 9:21,23,23
   10:1 37:9,12,12,13 59:1
   59:1,21 60:17 62:25
   72:8 79:7,8,8,11 93:7
   143:4 151:11 152:4
   154:18,20 155:1,12
   178:15 193:23 204:21
   204:22,24 205:4 222:4

| **B** |
| --- |

**B** 5:1 10:15
**back** 10:2 28:12 32:19
   37:14 44:14 45:24 46:5
   50:10 54:15 63:17
   76:12 79:11 103:3
   110:4 121:19 123:16
   130:23 134:6 155:25
   159:6,10 168:15 191:23
   196:16 200:2 207:21
   224:8
**backfill** 112:15 117:2
**backfilled** 116:24
**background** 151:5
   191:18 221:14
**backside** 51:7
**backup** 170:9
**Baker** 182:6
**balance** 16:7 123:20
**balanced** 123:7
**balancing** 123:12
**ballpark** 129:15
**bands** 184:16,24 185:25
**banging** 94:1 141:21
**Bank** 104:25 112:20
   120:9 153:2
**bar** 82:19,25 83:2,6
   84:23
**barge** 1:6 3:3 7:20 15:6
   18:14 20:9 30:23 43:2
   43:10,14,21,25 44:5,8
   44:19,23 46:15 47:10
   47:18,23 48:4 63:12,21
   63:25 64:3,6,8,16 65:8
   66:4,6,14 68:4,8,10
   69:6,8 70:11,14 71:8,12
   72:9,12,17,19 73:7,12
   74:16 75:4,6,16 76:9,20
   78:6,21 79:22 80:3
   82:7,10,14,16 83:18,21
   84:23 86:23 88:13,14
   89:10,14,19,24 90:1,5,8
   90:10,22,23 91:6,14,16
   91:16 92:5,16,20,22,22
   93:2,10,15 94:8,9,24

95:6,11,21 96:6,18
106:8 107:18 108:2
122:18 131:21 132:7,16
132:21 133:3 134:3
139:13 140:2,4,16,18
140:19,21,22 141:2,9
141:15,20 181:4 183:3
188:17 189:13,19
190:14 191:2,13,15,21
193:22 194:12,14,20
195:9,15 220:20 221:9
223:8,9,12,17 225:11
225:16 226:8,10,15
**barges** 94:16,18 95:11,25
**barge's** 80:13
**barred** 29:6
**base** 130:18 134:15
181:8
**based** 25:4 93:9 103:6
121:6 125:11 139:9
144:6,9 148:22 149:13
151:5 189:21 194:10
205:17 208:25
**basin** 100:9 176:10,25
177:2,8
**basis** 25:1,3 40:5 87:4
**Bayou** 101:13,14
**Bea** 1:14 2:1,4 4:3 5:3
6:14 7:9,18 10:24
37:16 44:6,16 79:6,11
93:24 110:6 147:9
155:20,25 200:4 221:7
223:5,12 224:3,8,16
225:10 227:4
**beach** 176:12,13
**beaches** 212:19
**beacon** 34:19
**beacons** 34:18
**bearing** 33:22,24
**bearings** 34:6
**Bea's** 49:7
**becoming** 122:6
**began** 29:9
**beginning** 79:9 105:22
148:8 155:23 203:22
224:6

**begins** 51:24 88:25
**behalf** 3:3,11 15:24
16:12 27:25 181:14
190:19
**behaves** 87:16
**behavior** 127:24 160:16
**belief** 57:13
**beliefs** 195:25
**believe** 13:18 56:18
64:21,24 114:9 199:1
210:5
**bell** 209:15 210:18
**bellwether** 17:2
**belong** 37:23
**benefit** 11:6
**benefits** 25:20
**Benjamin** 3:24 6:4
**Benoit** 1:10
**Berkeley** 11:2 14:9 22:17
26:8
**berm** 111:3,14,24 131:7
131:11
**Bernard** 55:15 172:23
173:2,10,12,25 174:9
177:19,24 178:12,17
179:1,7,12,17 204:3
**best** 31:2 45:2 85:22
155:2,5 183:14 197:25
**Betsy** 196:12,18,20
**better** 118:4
**beyond** 67:8 219:8
**bias** 187:25 188:3,6
**biases** 187:15,19,23
188:10 197:19
**Bienvenue** 101:13
**big** 51:25 94:6,7
**biggest** 218:8
**bit** 26:1 89:6
**blocked** 139:24
**blow** 73:15
**blowing** 176:15
**blown** 74:10
**blowout** 106:16
**board** 40:15 142:21,21
217:18
**Bob** 44:22

**bodies** 67:3 71:13 210:1
**body** 67:4 70:2
**boils** 213:9
**Boland** 113:25 170:5
**bono** 30:20
**books** 13:2,3,3,4
**Borgne** 177:19
**boring** 103:12,15,17,22
137:6,7,8 138:2,16
139:2
**borings** 126:10,15,19,22
126:24 127:5,8 215:19
**borrow** 104:20,23 105:9
117:10,15 119:15,22
120:5 135:14 137:17
138:17
**bottom** 49:11 50:5 51:22
85:25 89:3,7,14,23
118:1,19 139:5 141:24
144:5 152:2 156:4,11
159:16 172:8 176:20
180:16 181:3 194:6
**Boussinesq** 61:6
**Boussneqes** 61:9
**Boutte** 1:8
**bow** 102:12
**brain** 199:12
**breach** 33:9 43:11 44:5,8
44:19,25 54:11,20 58:8
58:20 63:5 64:17 66:8
69:6,16 72:3,4,6,16
73:8,9,14 74:17 75:3,10
75:12,19 77:16 80:25
81:4,9 84:16 85:2,8,23
85:24 86:2,7,15 88:3
90:22 92:2,15,17,25
93:8,11 94:3,9,20,24
95:13,21,22 96:8,15,16
96:24 97:4 102:1,4,13
104:1 106:14,21 107:19
108:5 110:17,21 111:15
111:17 114:2,3 121:13
122:19,20 130:5,7,11
130:11,12 140:23
141:16 143:3,5 151:12
152:3 156:18 170:6,7

181:5,6,7 188:18,19
189:20 191:11,22
192:25 194:25 202:2,15
202:17 204:21 205:10
206:22 220:21,22
222:10 223:14,19
225:12,13,17 226:3,8
226:12,17,21
**breached** 52:17,22 53:2
53:10 54:2 64:25 86:19
104:10 121:24
**breaches** 1:4 6:11 17:20
21:12 32:9,17,24 33:15
43:3,22 44:1,11,20
46:10 47:19 55:18
59:10 70:15 90:22 91:6
101:9,21,23 104:14
106:5,7,9,19 107:1
121:25 125:14 130:4
135:11 140:17 144:15
150:2 156:13 160:16
161:8 162:11 169:15,19
169:21 178:8 179:22
189:25 191:3 197:13
208:16 215:22,24 216:1
222:12
**breaching** 54:5 55:13
92:14 94:18 97:23 98:9
101:18 104:6,7 106:11
148:12 150:14 158:24
159:3 176:4 179:7
192:24 194:15 211:17
211:19 212:2,6 213:12
215:5 222:21
**break** 11:8,9 12:12 24:23
37:8 141:1 144:25
155:18 176:14 199:19
199:21
**breakdown** 39:9
**breaking** 193:22
**breaks** 11:6,25 12:5,8,10
**bridge** 72:24 80:10
135:17 194:18 208:5
209:8,12 210:19
**briefly** 14:13
**bring** 40:17 128:24

130:23
**bringing** 57:1 66:6,14
  68:4
**brings** 123:8
**brittle** 76:2
**broader** 26:11
**broken** 83:23 176:16
**brought** 47:25 68:10
  113:8 207:24 215:3,6
**Bruno** 18:10
**build** 219:14
**building** 131:8
**buildup** 222:18
**built** 50:22,22,23 54:10
  54:18 55:2 105:5,5
**bulk** 24:6,8,9
**bulldozer** 102:14
**bulldozers** 118:2
**bullets** 106:20
**buried** 77:6 78:4 105:7
  111:22
**bus** 93:4,5,13,16,17,22
  93:23 140:25 191:20
**business** 10:25
**busy** 131:10
**B-i-e-n-v-e-n-u-e** 101:13
**B-o-u-s-s-n-e-q-e-s** 61:9

---

**C**

**C** 1:11 3:1 4:1 6:1 10:15
  114:5 120:3,4 170:1
  216:10
**calcareous** 212:17
**calculate** 124:19 125:5
  168:12 215:24
**calculated** 124:12 125:2
  125:20 126:5 165:15
  166:17
**calculating** 128:8 166:20
**calculation** 211:10
**calculations** 65:20 87:12
  124:21,23 126:6 216:3
  216:8,9 222:9
**calibrated** 99:14,15
**California** 2:2,7 6:9 11:2
  14:8 22:17,22 23:5

24:21 229:1,6
**California-Berkeley**
  11:1
**call** 32:6 38:9,22 99:2
  170:22
**called** 79:14 80:21
  108:10 123:10 124:10
  185:3,4 188:6
**camera** 221:2
**campus** 14:9
**canal** 1:4 6:11 17:20 21:4
  21:6,17 32:17,24 33:10
  33:16 43:4,23 52:12,16
  52:18,23 53:25 54:12
  54:22 55:11 57:9,18,21
  58:5,7,18 59:1 60:13
  62:9,24 63:5 66:6
  72:23 73:1 81:8,10
  84:2 85:6,9 91:16 92:6
  95:1 96:5 97:11 98:1
  98:24 100:11,20 101:3
  108:19 111:2,15 118:15
  124:22 125:24 129:12
  135:12 152:17,25 153:4
  153:8,13,25 172:25
  173:1,23 176:24 177:3
  177:5,9,14 178:22
  179:13,18 196:10
  197:13 207:19 208:10
  208:23 209:17,22,25
  210:21 211:12 215:1,15
  217:1 223:15,20
**canals** 21:12,23 177:25
**Canal's** 125:22
**cannonball** 67:19
**cap** 165:13
**capable** 64:8
**caption** 6:10 80:13
**capture** 222:19
**captured** 189:16
**Cardone** 62:2 73:23
**cards** 122:23,25
**care** 25:16,20 218:14
  219:3
**career** 218:20,22
**careful** 185:15 197:21

**carefully** 122:13
**cargo** 181:4
**caring** 52:25 53:8 220:11
**carry** 99:25 177:4
**carrying** 80:10
**carryover** 132:10,13,23
  157:23
**cartoon** 213:22
**case** 6:10 7:20 9:17 13:21
  15:5,8,25 16:9,20,22
  17:1,2,3,10,13,18,24,25
  18:5,5,7,14,19,19 19:6
  19:17,17,20,21 20:2,3,8
  20:9,13,16 21:1,2,14,15
  23:9,9 27:21 28:4,11,13
  28:15,18,19 32:12 88:21
  90:17 107:16,25 108:11
  124:11 127:6 144:2,8
  149:19,21,22 150:25
  152:5,12 158:23 171:15
  182:1 191:17,17 193:24
  198:6 202:23 205:20
  216:24 217:10,23 220:8
  221:20 226:12
**cases** 1:6 19:4 27:21
  28:20,22 32:1,6 37:4
  111:24 113:5,9,12
  117:5,6 121:17,24
  124:24,25 135:8,8
  137:1 144:14 145:9,14
  145:24 146:7 154:23
  170:19 215:16 217:2,12
  217:14,16,24 220:7
  223:21
**castle** 67:19
**catastrophe** 219:2
**catastrophic** 26:3,18
  182:21 196:2,5 218:17
**categories** 12:19 213:3
  214:11
**category** 12:19,21 23:7
  213:5,13 214:1
**caught** 153:6
**causation** 32:16,22 33:8
  46:5 95:22 219:1
**causative** 46:9 47:9

95:12 96:7 107:18
  108:3,13 159:2 191:2
  226:4
**causative/contributing**
  226:11
**cause** 33:15 43:2,14,21
  44:8,19 45:3 47:19,24
  51:13 56:20 66:8 69:6
  71:12 94:18 122:20
  141:3 194:15,25 195:10
  195:17 196:2,5 197:12
  213:12 219:4 220:20
  221:10 223:9
**caused** 28:14 52:9 55:9
  56:19 69:16 80:3 85:25
  94:9,19 188:18 223:13
  223:17 225:12,16
  226:16
**causes** 88:4 176:3 190:23
**causing** 141:22
**center** 2:6 6:9 25:23 26:2
  26:3,14,18,20 86:4
**center's** 26:2
**central** 165:10,12 178:16
  193:23 203:1,16
**certainly** 74:19 98:15
  116:18 141:12 144:3
  147:22 220:7
**certainty** 182:20
**Certificate** 228:1 229:5
**certification** 37:20 38:6
  38:12,17
**Certified** 7:11 229:4
**certify** 229:6
**cetera** 92:23
**challenge** 188:10
**Chalmette** 178:12
  179:11,17
**Chalmette/St** 179:7
**chance** 199:14
**change** 57:21 74:12
  100:23 146:15 147:5
  166:2 224:1
**changed** 47:9
**changes** 166:7 229:15
**changing** 166:12

channel 177:22 207:12
207:14,21
chapters 13:3,4
characteristics 57:5
67:12,14,15 68:19,23
71:8 72:15 95:5 96:17
112:1 125:10 127:15,25
128:3,18 138:13 165:24
166:8 207:15,17
characterization 65:15
78:10 96:9 125:8
127:18 137:9 138:8
207:10 213:20,21
characterizations 115:2
125:10 151:3 154:11
171:5 207:12
characterize 127:11
characterized 22:20 58:1
137:2
charge 219:21
chart 73:18 201:24 202:3
202:5,6
check 65:4
checks 25:3
Chicago 28:2
chiefly 125:11 196:23
children's 122:23
chosen 184:8 185:9
chunks 75:23,25
circle 114:24
circulation 197:2
citation 115:12
citations 163:19
cite 31:9 143:6 162:5
193:20,21
cited 31:7,15,19 43:8
47:4 134:15 143:16
150:24 155:9 162:11
163:8,20 164:4 165:12
167:1,2 171:24 191:9
193:17 197:18
citing 170:17 190:2
citizen 196:20
civil 1:5 27:12 28:19 38:1
77:14 142:6 163:16
190:25 191:19 192:4

193:15 199:9 200:15,19
218:17
civility 11:5
claim 214:23
clarification 47:13,16
classes 11:20,23 12:1
classified 215:12
clay 117:19,20,21 118:5
119:14 120:12,19
135:18,25 136:4 137:2
137:8,11 212:15 214:6
215:12
clays 136:14,20,20,21
clear 145:1
clearing 115:1 120:7
clearly 45:5 95:21 96:13
102:10 132:15,25 133:8
134:24 160:14,20
161:24 184:1,20 195:13
clock 125:16
clod 89:5
close 50:1,24 81:3 85:2
100:3 102:12 110:13
111:9 119:6 140:14
198:11 218:20,21
222:21,23
closer 81:8 85:7 169:6
CLR 2:8
clues 73:6
coach 151:16,18
coaching 91:25
Coast 27:14,18 32:14
208:8
coastal 27:14 176:18
coating 119:15
codes 32:13
coefficient 97:1 101:19
212:16,21 215:25
coefficients 180:18
cognitive 187:15,18,22
197:19
cohesive 158:8
collapse 28:14 56:20
80:4 98:2 107:18 108:3
colleague 48:1
colleagues 26:9 193:18

221:18
collected 125:15
collecting 54:14
collection 218:25
collectively 175:2
collision 64:3
color 118:4
Columbia 217:17
column 59:23
combination 91:17 99:23
158:12 161:15 195:13
214:21
come 17:9 60:9 72:19,20
72:20,22 73:1 76:9,20
93:22 122:16 141:1
155:12 172:6,7,16
173:7,21 185:4,14
192:17 206:8
comes 60:11 79:23 86:11
121:1 205:8 209:3
221:15
comfort 124:9
coming 35:24 73:21 78:7
82:8 158:12 173:22
174:12,13 175:13 178:3
178:21 179:17 188:20
191:7 198:15 220:1
commencing 2:7
comment 42:6 45:6
78:12
commented 44:22
commenting 30:21
comments 30:13,16
31:13,17,24 32:1,10,15
32:22 33:7,13 81:19,22
81:24
committee 38:3,4,5
40:16 191:11 193:9,14
common 34:7
commonly 21:15
communicate 71:17
community 36:5,8 46:16
196:25
company 28:3
comparable 134:1
compare 100:4 120:4

comparison 96:3
compensated 22:4,11
30:19
compensation 15:4,14,16
20:8 22:13 23:11 24:16
24:25
competing 106:14 139:8
complete 36:3
completely 23:16 120:5
completion 203:3 229:13
complex 67:16 121:9,9
211:19
complexity 218:6
complication 212:3
complies 201:23 212:11
component 99:2,3,4
176:23 214:8 219:9
components 99:2
composed 158:7
comprising 214:6
computational 99:4
compute 8:10 165:23
computed 125:25 165:17
180:18,19 202:14
computer 60:25 61:2
99:5,15,19,20,24
conceivable 90:4 91:5,12
concentrated 86:1
concentrates 209:16
concern 50:8,9 117:16
226:2
concerned 16:18 27:24
28:13 72:22 101:10
115:5 118:10 135:9
181:24 186:17
concerning 28:5 39:17
39:18 51:20 106:5
128:20 138:13 162:2
182:8 185:6
concerns 152:13 162:25
conclude 106:22 134:23
163:1
concluded 72:9 106:8
119:9 146:23 227:5
concludes 227:3
conclusion 33:11,15 35:5

35:22 36:20 47:25
52:21 57:13 63:1,9
64:22 65:4,23 66:2
69:5 70:14 71:11,12
72:11 73:11 74:3,11,14
74:15,16,23 84:8 86:22
105:16,17,18 106:4
133:15 134:18 139:6
148:18 149:6 160:20
162:4,6 179:22 188:8
194:12 226:8
**conclusions** 31:5 33:3,3
35:2,8,18,20,25 36:7,15
37:6 41:19 42:19,22,23
46:21,21 57:22 65:19
65:20,22 81:25 96:21
141:17 147:18 148:3,22
149:13 174:16 175:11
182:7 188:25 189:3,22
190:1 192:1 197:22
198:5 221:11
**concrete** 75:5,18,23,25
76:1,4,10,21 77:4,5,8
77:18 78:4,7,24 81:5,10
85:4,8 87:13 95:6
159:11,13,15,20 211:21
**concrete/steel** 101:11
**condition** 9:1 121:23
205:12,15,16,24 206:13
206:15 207:8,11,13
**conditions** 28:24 29:2
57:1 111:20 157:6
163:2 165:3 166:7
169:4 195:23,24 197:16
204:14 207:23 208:2,3
208:12 225:13,14
**conduct** 189:12 190:13
191:12
**conducted** 190:15
192:13 214:25
**conductive** 105:8,9
**conduit** 105:4 177:23
**conduits** 156:24
**cone** 127:7,12 128:3,7,15
128:18 129:1,11,24
**Conference** 12:22,25

**conferences** 12:17
**confidence** 35:19 180:4
**configured** 56:23
**confines** 190:16
**conflict** 150:23
**confusing** 144:23
**congressional** 48:1
**Congress's** 219:20
**connected** 76:2 118:18
210:1
**Connecticut** 3:6
**connection** 177:8
**connects** 118:21
**consensus** 40:5,7 105:13
**consider** 141:13 202:12
**considerable** 80:17
**considerably** 98:9
**consideration** 226:15
**considered** 173:16
**considering** 32:7
**consists** 99:1 204:13
**consolidated** 1:4,6 6:11
**constraining** 14:9
**constraints** 14:19,23
188:4
**constructed** 62:5 111:16
130:19
**constructed/designed**
57:2
**constructing** 123:25
208:21
**construction** 48:21 51:21
53:24 55:19 111:14
219:24
**consult** 66:1 143:21
**consultant** 42:1
**consulting** 14:24 18:13
109:11 199:5
**contact** 66:7,14 75:16
76:9,21 78:7 96:1
198:10
**contacted** 16:11,15 18:3
72:13 94:16 108:25
**contacts** 198:12
**contain** 189:18
**contained** 70:11 137:3

137:12 216:10 228:7
**context** 182:12,14
**continue** 92:1 150:6
**continued** 121:23 147:23
224:13
**continues** 210:20
**contract** 15:10,13 25:7
**contracting** 28:1,3
**contrasted** 211:21 212:7
**contrasts** 46:20
**contribute** 218:22,22
**contributed** 49:15,25
50:16
**contributes** 106:10
**contributing** 105:2
140:12
**contribution** 96:18 171:6
**contrivances** 78:3
**convened** 2:5
**conventional** 139:10
**converge** 226:4
**conversation** 16:17
18:11 141:20 178:18
**conversations** 17:17
**conversely** 105:16
**convey** 184:3
**conveyer** 206:9
**convincingly** 100:2
221:17
**cooperation** 32:2 40:6
**copies** 9:16 10:7,13
**copy** 59:12 115:6 117:9
**cores** 138:5
**coring** 201:14 215:21
**corner** 80:1 118:20
**corners** 80:4
**Corps** 42:13 50:22 51:3
75:13 77:12 100:6,9
110:13,16 111:3 112:19
112:24 118:10 119:19
124:23 131:7 190:19,21
204:19 208:20 209:2
215:9 219:13,18
**correct** 7:4 8:23 10:13
12:13 13:4,5,8,24 15:7
18:1 20:11,14 21:18,24

29:19 31:8 51:8,9 52:3
52:3,4,14 57:12 60:8,20
62:17 74:22 75:5 94:11
94:14 95:15,16,17
97:21,24,25 100:16
107:12 109:7 113:1,15
116:22 117:17 119:13
120:22,24 125:1 126:6
133:12,19,21 136:2
138:25 139:4 142:2,8
142:16 145:22 148:1,7
149:15,18 154:7 156:16
156:22 157:22 158:2,4
158:16,21 159:8,19
160:2,7,11 165:11
168:4,7 169:8,10
171:19 173:13 178:5
180:21 181:2 183:16,17
194:5,21 199:10 202:20
203:19 206:19 208:17
208:20 212:18,25 213:1
216:20,22 222:6,15
226:19 228:7
**corrections** 228:5
**correctly** 7:25 38:25 47:4
52:5 215:3 222:19
**correlate** 137:25
**correspond** 115:25
**correspondence** 192:21
**corroborate** 66:1 103:5
182:7
**corroborated** 32:4 81:25
**corroborating** 192:23
**Council** 190:12,18
193:11
**counsel** 15:7 18:19,24
19:19 20:1 23:8 216:14
216:18
**count** 13:3 206:21
**counted** 12:15 13:2
160:18,23
**counterfactual** 56:13
**counting** 100:16
**COUNTY** 229:2
**couple** 121:2 163:14
219:20

**course** 87:2 115:1 134:20 186:8 198:1,7 209:23
**court** 1:1 6:12,17 7:24 9:8 11:7 28:19 29:6,18 29:18 59:13 208:1 212:12
**courtesy** 224:11
**Courthouse** 174:9
**cover** 11:4
**covered** 21:21 23:14 130:9
**covering** 159:23 173:2
**covers** 22:14
**co-authored** 27:15
**co-authors** 13:9
**crack** 83:14 88:10,11 89:7,22,23
**cracked** 75:9,21,22
**cracks** 76:1
**create** 90:8,10 91:19 94:24
**created** 148:5
**creating** 90:13 94:6
**creation** 213:8
**creeping** 186:18
**crest** 177:11
**criteria** 27:17 100:14 211:7
**critical** 215:21
**critically** 187:22
**Critique** 200:12 201:1
**crown** 88:25
**CRP** 2:8
**CSR** 2:9 229:21
**CTE** 199:1,3,8
**cumulative** 176:1
**current** 25:17 211:24
**currently** 208:21
**Cushing** 181:13 193:21 193:21
**Cushing's** 79:1 181:16 193:24 194:2,4
**cut** 147:21 151:19
**cyclone** 29:2 56:25
**C-u-s-h-i-n-g** 181:13

**D**

**D** 6:1 10:16 199:16 200:5 200:17,22,22 201:2
**damage** 46:16 84:24 94:17,19 140:22 225:17 226:16
**damaging** 121:25
**damn** 72:19
**dark** 118:4
**darker** 117:25
**darkness** 195:22
**data** 59:25 60:11 103:6 145:15 185:8,9,11,19 188:8 189:2
**data-recording** 62:5
**date** 6:5 27:19 28:12 47:3 118:22 144:10 145:21
**dated** 9:10 10:10,17 27:6 109:9 201:7 210:11 229:19
**Daubert** 100:14 184:17
**Dave** 220:9
**David** 41:4,4
**day** 63:24 120:23 172:11 224:17 228:9
**Daylight** 165:10,12
**days** 14:16 26:5 112:12
**deal** 55:3 75:5 77:6 89:11 118:9 184:5,8
**dealing** 27:13 71:13 107:10 185:5
**dealt** 27:16
**decades** 193:19
**December** 12:10
**decided** 17:1
**decidedly** 99:7 104:11,12
**decision** 40:8,10 41:22 69:22
**decisions** 39:14,16,18,24 41:19 42:4,9
**declare** 228:3
**declared** 47:23
**deduce** 138:1
**deduction** 128:20

**deductions** 36:7
**deep** 140:24 164:13,14 164:23,24
**deeper** 176:21
**deepwater** 177:22
**defects** 148:6
**defendants** 28:1
**defending** 27:18
**defense** 56:22 181:15 190:18
**defenses** 56:22
**defensive** 111:3 131:11
**define** 122:14 205:22
**defined** 100:13
**defines** 45:10
**definite** 140:4
**definitive** 54:4 119:16 127:19 139:7
**definitively** 143:22
**deformation** 121:15
**deformations** 163:6
**degree** 217:13
**deletions** 228:5
**deliberating** 43:24 44:4
**delighted** 181:21
**delightful** 105:23
**deliver** 51:19
**demand** 51:20 163:3
**demonstrable** 136:11
**demonstrated** 122:17
**density** 87:16
**departed** 75:14
**Department** 125:18 190:18
**departure** 41:14,15
**depend** 34:3 67:12 123:23 126:7 141:5 157:4 159:14 197:15
**dependent** 190:3 213:17
**depending** 57:17 204:2
**depends** 56:21 127:10 134:20 218:5
**deponent** 229:10,15
**deposit** 130:21
**deposited** 130:25 131:2,5 172:17

**deposition** 1:14 2:1,4 6:4 6:7,18 9:5,9 29:17 49:6 79:6,10,14 114:8 145:23 146:2,5,18,21 155:20,24 181:9 182:4 200:5,8,23 201:7,22 202:21 203:5 224:3,7 227:3,5 229:7,9,13
**depositions** 18:22 19:1 145:20
**deposits** 171:25 173:8
**depth** 127:18 181:21 218:1
**derive** 151:12,13
**describe** 33:14 45:5 48:8 85:13 162:24 203:10
**described** 25:24 28:21 34:22 48:10 71:11 84:11 86:24 89:22 94:7 95:25 128:16 132:18 137:21 140:25
**describes** 127:12
**describing** 24:11 59:7 94:5 210:4
**description** 22:1 34:11 84:14 104:21 203:11
**design** 27:17 48:20 52:24 53:7,24 103:3 125:11
**designed** 51:17
**desire** 221:12
**desirous** 228:6
**destabilize** 214:7
**destabilizing** 124:7
**destroyed** 9:16 10:8
**destructive** 87:22 218:16
**detail** 192:21 216:9
**detailed** 72:15 113:6,10 125:12 133:23 137:10 201:2 216:4
**detailing** 170:5
**details** 19:8 59:6 143:15 181:23,24
**determination** 139:7
**determinations** 126:7
**determine** 33:25 34:2 62:10 86:22 115:19

120:18 197:12
**determined** 60:3
**determines** 87:15
**determining** 99:17 128:8
   173:16 196:1,5
**detract** 14:15
**develop** 96:17 156:13,24
   161:8 165:2
**developed** 10:4 52:11
   55:10 59:8 72:6 93:8
   137:20 144:15 168:24
   171:5 175:22 179:23
   181:7,22
**developing** 122:7 132:11
   135:19 143:5
**development** 32:8 43:11
   43:25 44:5,25 70:15
   72:4,10 85:23 92:24
   96:24 97:4 121:19
   125:19 140:16 150:1
   156:18 162:10 205:9
   226:3
**developments** 158:18,20
   158:22 161:17
**develops** 68:21
**deveop** 183:13
**deviation** 180:13
**devote** 14:17
**devoted** 125:7
**devoting** 24:17
**difference** 69:2,13,15
   124:1 133:4 134:10
   206:21
**differences** 36:18,19
   69:3 134:12 167:19,25
   187:5
**different** 23:24 34:15,16
   35:12 41:18 43:9 61:5
   74:8 82:18 86:25 87:25
   97:19,19,20 99:7,8,9
   104:11,12,16,17 125:2
   128:22 134:14,14,16
   135:24,25 136:5,14
   137:15 142:11,12
   144:16 145:13,15 147:1
   148:17 149:6 158:20,22

168:3,6 174:1,2 189:1,1
   189:2 220:18
**differently** 34:22 84:13
   219:14
**difficult** 7:24 9:1 108:14
**difficulties** 79:22
**difficulty** 182:19
**digitization** 115:9
**diligently** 186:9
**direct** 24:16 78:13 80:25
   90:7 162:6 163:14
   169:22 177:8 211:5
**directed** 177:17 210:1
**directing** 142:24 153:7,9
**direction** 33:24 62:2,16
   62:22 63:15 68:6,18
   69:8 74:8,11 81:7
   82:17,19 83:10,12 85:5
   173:24 174:12 178:21
**directions** 68:2 69:14
   85:14,17 88:1 190:4
**directly** 89:3 111:23
   168:15,20 210:1
**dirt** 89:5 102:14
**dirty** 185:12
**disagree** 64:15 65:11,12
   65:14 105:17 136:23
**disagreed** 65:18 108:11
**disagreement** 136:24,25
   150:21 162:21,24,25
**disagrees** 105:15
**disc** 79:5 116:13 155:24
   224:2,7 227:2
**disciplined** 97:15
**disclosures** 109:11
**discovered** 136:25
**discretionary** 41:10
**discuss** 42:8,24 163:11
   175:9
**discussed** 30:22 43:9
   141:4 160:9 169:1
   182:16 197:19 211:4
**discussed/identified**
   226:5
**discusses** 162:18 164:3
**discussing** 65:8 149:23

**discussion** 16:18 19:8
   153:23 178:20 225:1
**discussions** 42:15 172:8
   192:21
**Disk** 79:10
**displace** 157:13
**displaced** 80:12 84:16,18
**displacement** 163:5
**dispute** 50:7 108:19
**disputes** 50:9
**distance** 33:25 168:11
   195:22
**distances** 34:6
**distinguish** 136:19
**distorted** 222:24
**distress** 86:1
**District** 1:1,2 6:12,13
   42:13
**disturbance** 120:2
**doctor** 170:23
**document** 59:11 62:10
   65:5 66:1 79:19 109:9
   143:10 189:25 218:4
**documentation** 46:9,20
   78:25 112:18 113:9
   115:4,8 116:5 117:2
**documented** 60:12 70:25
   97:5 130:2 181:12
   187:5 195:21 214:10
   223:22 225:22
**doing** 12:1 14:4 22:23
   24:10 74:1 99:21
   112:25 120:13 143:23
   145:12 150:18 182:20
**domain** 217:25
**dominant** 101:5 211:20
**dominate** 101:8
**domino** 123:10
**Dooley** 61:19,21,23 62:7
   62:11 74:10
**Dooley's** 74:2
**door** 86:9
**Dover** 27:15
**downward** 213:23
**Dr** 6:14 7:18 37:16 40:25
   41:4 42:24 44:6,16

48:2 49:7 62:2 73:23
   74:2 79:6,10 93:24
   107:4,9,12,15,24 108:7
   110:6 125:2 127:6
   137:20 138:6,15 142:20
   147:9 155:20,24 170:18
   170:22,25 171:22,23
   175:3,6,8 178:19,19
   181:16 182:12 193:24
   194:2,4 200:4 201:15
   203:13 205:5 206:3,8,9
   206:10,10 220:8,9
   223:5 224:3,7,22
   225:10 227:3
**draft** 9:13,17 10:5,6
   30:10 42:2 133:18
   219:22
**drainage** 21:12
**draw** 35:18 63:9 65:23
   99:12 110:18 174:16
   188:8 190:1 191:25
**drawing** 137:9 141:17
   175:10,11
**drawings** 125:12
**drawn** 41:20 133:16
   197:22
**draws** 35:5
**drew** 64:21 65:19,19,22
**drifting** 173:19
**drilling** 28:14,17
**drink** 11:10
**driven** 63:11,21 67:5
**driving** 64:8 73:2
**drove** 191:19
**drugs** 8:24
**due** 68:6 80:13 88:22
   98:9 115:9 195:22
**duly** 7:5,11 229:10
**dump** 130:14
**Dupre** 101:14
**duration** 148:13 150:15
   207:4
**durations** 150:17
**Dutch** 206:11 209:2
**duty** 56:6
**Duval** 1:10 100:1 207:9

**Duvall** 21:9
**dynamic** 68:24
**dynamics** 61:10
**dynamited** 196:18 197:6
**dynamiting** 196:10,22
**D-o-v-e-r** 27:16
**D-u-p-r-e** 101:14
**D.C** 3:7,16 6:21

**E**

**E** 3:1,1 4:1 5:1 6:1,1
   228:14
**earlier** 37:17 65:25 140:3
   141:10,20 146:13
   169:25 177:25 185:1
   190:2 191:9 194:21
   197:20 199:2 202:16,21
   207:16 215:9
**earliest** 27:2
**early** 26:4 44:1 46:11
   72:7 73:20 88:22 100:7
   102:10 112:12 135:21
   164:14 174:7 178:7,12
   178:13
**earth** 27:17 97:22 98:5
   101:6 102:18 104:8
   123:16
**earthen** 55:14 88:24 99:6
   111:16,21 129:6 130:9
   152:14 211:16,22
   213:11
**easier** 88:5,14 218:3
**easiest** 114:13,15,16,18
**easily** 87:18
**east** 33:16 43:3,23 52:25
   53:8 68:6 93:18,21
   104:25 111:1 112:20
   120:9 125:22 129:12
   153:1 160:17 172:4,14
   172:19,23 173:10
   177:24
**eastern** 1:2 6:12 33:9
   53:25 54:11,20 63:4
**east-west** 209:9
**easy** 114:20 188:21
**EBIA** 160:14 164:14,23

   167:20 169:16,17
**Ed** 107:12
**edge** 77:11 81:4,9 85:2,7
   203:2,17
**editor** 142:19
**editorial** 142:21
**effect** 123:11 136:11
   146:13 147:20 154:9
   162:5 164:13,22 169:23
   213:13,22 214:18
**effective** 68:24 168:11
**effects** 52:20 55:13 56:8
   68:20 98:11,11 157:9
   167:9 170:14 176:2
   213:4 214:12 222:10,20
   222:23 226:6,6
**effort** 215:20
**efforts** 220:13
**EIEI** 100:7
**eight** 13:2 14:7 217:6
**either** 13:20 33:8 51:20
   62:13 89:18 107:19
   108:4 121:21 125:3
   147:1 175:9 188:18
   193:8 208:8
**elaborate** 218:15
**electronic** 142:4,9,15
   144:17 145:11,19 146:9
**element** 44:24 46:5,7
   83:10,11,17 108:13
   116:23 162:13 185:24
   186:18 207:7 226:4,12
**elements** 32:5,8 35:7
   46:9 57:6 59:7 101:11
   104:23 105:2 185:8,18
**elevation** 58:14,24 60:5
   152:21 165:18,23
   166:13 168:9,10,21
   177:11 206:5
**elevations** 60:13 93:6
   165:12 208:7
**elicited** 153:20
**eliminate** 186:9
**eliminated** 139:20
**elimination** 188:20
**ellipsized** 49:18,21

**Embarcadero** 2:6 6:9
**embedded** 67:16 68:14
   68:17 99:4
**emeritus** 38:2
**emphasis** 134:13,16
**emphatic** 133:9
**employed** 25:5 32:13
**employers** 25:19
**employment** 25:4
**encountered** 184:7
**ended** 203:14
**ends** 86:5 202:24
**engaged** 192:3
**engagement** 14:14
**engineer** 35:9 37:17,18
   37:24 38:3,7,19,22
   39:12 99:22 124:4
   135:1,4 137:14 162:9
   184:4 197:20
**engineered** 218:17
**engineering** 28:1 30:4
   31:6 38:18 56:7 66:21
   72:14 73:6 87:20 96:22
   97:14 112:13 125:13
   129:5 133:24 142:5,8
   145:11 146:10 150:1
   174:23 175:19 181:23
   182:9 187:17 188:24
   189:4,22 190:10,15
   191:8,12 192:6 194:11
   199:9 200:13,14,15,18
   200:20 205:9 212:6
   214:25 215:7 218:9
   219:6,8,9,10 226:2
**Engineering's** 142:7
**engineers** 27:13 37:23
   38:2,10,17 39:8,10
   42:13 77:12,14 110:14
   112:20 118:10 119:19
   124:23 163:16 189:24
   190:19,22,25 191:19
   192:4 193:15 204:19
   208:20 209:2 213:9
   215:10 219:13,18 220:9
   220:10
**Engineers-Louisiana**

   127:4
**ensue** 55:1
**ensure** 100:11
**enter** 140:23 188:10
   226:10
**entered** 181:6
**enterology** 136:14
**entire** 75:10 77:11 85:24
   86:2,9 169:3 213:11
   218:8
**entirely** 211:16
**environment** 147:20
**environmental** 57:1
**envisioned** 36:22
**envisioning** 84:21
**equal** 83:15 163:4
   213:23
**equally** 139:12 211:11
**equilibrium** 162:14
   163:1 164:1
**erode** 157:25 159:12
   161:13
**erosion** 51:4 52:10 55:9
   158:9 159:6,7,9,17,24
   161:18,18,20 211:8,10
   211:18,18 212:4,23,24
**erosion-resistant** 159:22
**erroneous** 37:5
**error** 46:2,2,4 96:25 97:2
   97:16 98:17 100:13,24
   101:20 102:21 103:24
   104:5,5 184:16,17,24
   185:25 224:17 225:2
**errors** 34:5
**essence** 35:3
**essentially** 14:14 18:12
   99:21 119:10 128:16
   136:15
**establishing** 25:25
**estimate** 155:2,5
**estimates** 183:15
**et** 21:15 92:23 134:8
   170:17
**evaluate** 207:22
**evaluated** 135:1
**evaluation** 42:4,8,14

R. BEA

43:1 70:7,19 74:9 78:2
105:15 107:7,13 126:1
129:10,18 136:18 164:4
167:18 171:3 187:6
188:12 189:7 190:20
192:2,6,10 198:16
206:7 214:17
**events** 29:21
**evidence** 37:3 117:20
119:18
**evolution** 59:9 72:3,10
92:24
**exact** 45:4
**exactly** 39:18 75:1 83:2
102:19 103:4 124:10
209:5
**examination** 4:3 7:15
78:5 188:17 189:12
191:1 221:4 224:13
225:7
**examine** 36:13 76:5,6,14
76:16 78:24 101:24
201:13
**examined** 7:12 46:15,15
75:10 78:20 87:3 171:4
172:15 229:9
**examining** 72:15 162:4
**example** 72:2 92:15 97:8
99:16 101:12 111:13,21
112:18 116:25 126:14
127:17 128:2 129:1
130:16 136:7 150:11
151:10 176:11 177:4
181:12 187:24 212:14
214:5 217:17
**examples** 116:7
**excavated** 120:8
**excavating** 116:25
**excavation** 112:12
116:24 117:10 118:1,7
118:9,11,13 153:1
**excavations** 113:7
114:25 115:5 120:9
135:9 160:14 164:13,23
167:5,20 169:16,18,20
170:5

**exception** 24:15
**excess** 23:19 62:25 63:11
63:20 64:12 66:13
212:22
**excessive** 207:2
**excuse** 7:19 12:24 41:2
80:21 101:2 154:13
168:2 172:3,19 200:22
**executed** 15:10 228:9
**executive** 40:15,16 193:9
193:13
**exercise** 92:12
**exert** 79:23 187:16
**exerted** 213:24
**exerting** 92:22
**exhibit** 5:3,5,6,7,8,9,10
5:11,12,13,14,15,16,17
5:18 9:9,11 10:10,11,11
10:14,15,15,16,18
11:14 49:6,9 59:14,15
59:18 73:19 79:14,17
79:24 80:10,23 109:17
109:18 110:8 114:7
131:15,16 132:10 147:8
147:10 156:3 164:17
199:17 200:4,8,17,22
200:22 201:6,17,18,22
202:3,7 203:4,7,10,21
203:23 210:12,14,25
211:2 212:10 221:22
**Exhibits** 9:24
**exist** 56:12 94:24
**existed** 56:12
**existing** 211:8
**exists** 26:21
**expand** 39:16
**expanded** 26:21
**expansion** 104:24 153:2
153:4,10,12 169:17
**expect** 187:24
**expected** 51:4 131:20
132:6,20 133:6 134:2
180:10,14 194:16
212:15
**expend** 24:2
**expended** 23:17,18

**expenditure** 215:20
**expenses** 15:22 22:12
23:1 24:17
**experience** 37:19 38:16
72:14 87:20 121:4,6
**experienced** 95:6 121:18
189:24
**experiencing** 85:24
**expert** 9:10 14:20,25
16:19,22 18:6,13 22:3
23:7 25:24 27:20 28:4
28:10,20,23 29:6,12,16
45:7 51:19 59:20 66:18
66:19 79:1 97:5 108:15
109:1,10,11 116:8
130:3 137:21 138:6
147:19 148:4 151:13
181:12,14 182:11,13
184:6,12 185:16 186:7
187:5 193:24 195:4,12
199:4 200:11,18 201:4
201:16 204:2 205:19
210:10,11 213:2 216:4
216:10 217:3,15,17
223:22 226:10
**expertise** 174:21 185:15
185:17 219:7
**experts** 32:7 78:23
108:17 126:5 144:1,7
144:13 145:4 146:22
147:16 148:11,19 149:9
150:20 151:2,6 152:7
154:2,22 155:6,9
170:19 171:24 174:20
174:24 175:1 185:21
186:10,24 187:21 206:2
217:19,25 220:1
**explain** 19:5 56:24 85:19
107:1 135:5 160:21
185:18 206:25 211:14
218:13
**explained** 42:2 104:8
213:2 214:11
**explains** 178:10
**explanation** 71:23 72:1
85:20,22 175:20,21

**explicit** 216:8,9
**explicitly** 97:11 124:4
184:9
**exploitation** 178:8
**explosive** 197:7
**expose** 36:4
**exposing** 36:12
**expressing** 97:1 184:10
**extend** 12:8
**extensive** 182:16
**extent** 181:22 217:22
218:1,5
**External** 163:16
**extracted** 170:3
**extreme** 122:19
**extremely** 185:13
**eyes** 35:4
**eyewitness** 125:15 196:1
197:16,23 198:11,15,20
198:22
**eyewitnesses** 173:22,24
196:8 198:2,5,6
**e-mail** 19:14,22 20:4
**e.g** 183:13

---

**F**
**face** 151:5 221:2,2
**faces** 78:20,24
**facilitate** 111:13
**facilities** 32:14 57:3
170:15
**facility** 27:25 28:15
62:12 73:13
**facing** 86:10
**fact** 71:19,22 82:13
105:14 119:4 123:12
135:7 146:8,25 147:17
190:21 213:19 221:20
**factor** 99:10,11,13,14,16
124:3 202:2
**factors** 124:13,19 125:3
125:5,21,23 126:5,7
128:9 140:13 141:12
156:21 161:5,6 162:11
180:19 195:13
**facts** 36:21

**faculty** 14:16 26:13 39:4
  39:7,10,12
**fail** 88:16 102:5 121:12
  121:14 123:20 131:20
  132:6,21 133:6 134:2
  134:25 135:4,16,22
**failed** 48:18,25 49:4,13
  50:11 51:4 81:3 85:1
  92:21 102:6 103:19
  120:14 132:16 133:1,8
  134:24 135:3,23
**failing** 194:13
**failure** 27:3 29:3 92:14
  94:2,18 100:18 101:5
  101:10 105:11 107:11
  121:5,16 122:14,20
  131:19 132:5 139:9
  140:13 146:14 158:18
  158:24 162:3 163:23
  165:18 182:22 183:3
  194:15 195:10,17 196:2
  196:5 204:20,24,25
  205:2,3 218:17 220:21
  221:10 223:9,13,17
**failures** 27:8,10 32:8
  100:10
**fair** 8:19 31:7 56:16 87:7
  87:7 96:2 104:21
  182:18 184:19 226:13
**fairly** 203:10
**fall** 12:6
**fallen** 89:17 112:5,6
**falling** 117:8
**familiar** 65:6 118:25
**Family** 1:10
**far** 36:1 98:6 217:10,11
  219:8
**faster** 8:6 199:12
**fat** 136:19,20 137:2,8,11
**fault** 51:11,11
**faultily** 51:17,17
**faults** 52:24 53:6,23
**faulty** 48:25 49:1,4,15,25
  50:16
**features** 59:8 77:3 92:18
  92:19 162:5

**feet** 59:22 60:3,9,11,17
  80:12 88:24 164:25
  170:15 171:11 194:19
  205:13,25 206:21,23
  208:25
**fellow** 38:3
**felt** 126:16
**field** 8:11 24:16 41:11,13
  42:20,22 43:7 62:4,6
  100:4 182:25 185:19
  191:10 219:6
**fifth** 152:2
**figure** 21:19 61:22
  114:22,23 115:11,12
  116:2 117:24 129:4
  141:16 143:7,17 151:12
  151:14 155:12,14
  171:21 202:14 210:12
  210:15 216:5,15
**figures** 22:5 62:10
  114:18 148:10 152:6
  202:17
**filed** 1:7 29:17
**fill** 120:9
**filled** 111:25 112:3 113:4
  113:19 209:21
**fills** 209:24
**filtered** 35:6
**final** 10:9 19:16 24:8
  30:17 31:11 42:2
  121:14 133:18
**finally** 110:12 132:14,18
  132:25
**financial** 26:16
**find** 33:21 54:24 108:14
  115:22 120:12 137:11
  143:8,17 144:22 164:15
  170:8 198:5 199:14
  211:9 224:22
**finding** 64:15
**fine** 28:7 38:15 199:21
**finish** 8:5 93:20 139:22
**finished** 8:3
**finite** 162:13
**firm** 6:24 28:1
**firms** 199:5

**first** 11:14 16:11 21:11
  24:13 28:13 61:8 66:18
  78:18 104:4 108:25
  111:2 131:16 158:10
  163:15,24 164:11,21
  174:2 179:15,21 198:9
  205:14 208:3,11 214:13
  229:10
**fish** 176:18,19,21,21
**fishermen** 176:18,22
**five** 47:1 96:16 109:12
  130:7 206:24
**fixed** 14:1
**flap** 86:13
**flapping** 87:10
**flat** 102:17
**flaws** 52:2 63:3 68:15,18
**flip** 86:19 87:19
**flipping** 84:20 86:14
**flips** 86:12
**float** 93:12 140:24
**floating** 67:3,4 80:3
**flood** 27:4,8,10,13,17,18
  29:4 46:15 52:23 53:1
  53:9,25 54:11,20 55:14
  55:20 56:22 57:2,5
  63:4,7,12,23 64:4,9,16
  64:18,25 65:8 66:7,8,14
  67:6,9 68:5,9,11,22,24
  68:25 69:9 72:15 75:17
  81:3 85:2 86:10 88:9
  91:18 92:5,18 94:2,8,11
  94:17,19,23 95:13 96:1
  96:1,7,14 97:22 98:5
  99:6 100:7 101:6
  103:18 104:9 107:19
  108:4 111:4,15 117:11
  118:11 121:5,11,13,17
  121:20 122:1,18 123:12
  123:19 125:24 131:7
  134:24,25 135:10,13,22
  141:13,21 152:14,21
  156:12 159:5 160:3
  161:21 167:5 168:18
  170:14,16 171:11,17
  173:17 174:17,22

  175:12 176:4 178:10
  179:4,16,23 182:9
  194:12,24,25 195:8
  196:11,17 197:13 203:1
  203:17 209:14 211:22
  211:22 212:7 213:11
  214:9 219:14
**flooded** 118:14 172:18
  172:24 173:9 179:8
  196:21
**flooding** 49:16 50:1,16
  94:20 158:11 161:15
  171:6 175:19 179:11
  207:5
**flood-protection** 50:23
**Florida** 72:24
**flow** 209:16
**flowing** 157:24
**fluid** 61:10 213:6
**fly** 86:8
**focus** 113:24
**focused** 113:12 183:12
**focusing** 84:23
**folder** 172:22
**follow** 41:8,16 55:1
  61:12 180:9 198:13
  218:24 219:18 223:24
**followed** 47:6
**following** 22:19 26:6
  30:5 36:25 111:5
  119:23 135:13 144:6
**follows** 7:13 32:20 44:15
  53:5 54:16 63:18 76:13
  107:22 149:4
**force** 42:15 63:12,22
  64:9,17 67:19 72:5
  79:22 80:17 83:16
  91:18 93:11 105:25
  106:3,10 107:14 126:1
  127:13 129:19 164:4
  171:4 190:20 192:2,6
  195:9 198:16 206:7
  214:17
**forcefully** 195:16
**forces** 68:25 70:11 92:23
  119:21 123:8,15 124:2

R. BEA

124:3,5,7 160:4 163:4,4
214:8
**forcing** 87:17
**foregoing** 228:4,6 229:9
229:11
**forensic** 30:4 31:6 35:9
37:17,18,23,24 38:3,7
38:10,18,19,22 66:20
72:14 73:5 96:22 97:14
99:22 107:17 108:1
112:13 125:12 129:5
133:24 135:1,4 137:14
140:2 150:1 162:9
174:23 181:23 184:4
187:17 188:17,24 189:3
189:12,22 190:9,13,15
191:1,8,12 192:6
194:10 197:20 205:8
212:6 214:25 215:7
219:10 220:10 226:2
**form** 26:13 31:11 40:5
121:16 134:6 209:15
**formal** 38:17 44:2 117:1
**formation** 101:8 141:15
162:10
**formed** 26:4 142:18
176:22
**forming** 198:4
**forms** 26:17
**forth** 12:17 47:25 144:4
144:16 150:17 151:9
**forward** 100:1 123:18
207:25
**foster** 26:17
**found** 86:15 93:14,18,21
94:15 110:18 138:16
181:4,17 195:25 214:13
215:23 217:13
**Foundation** 22:10,11
23:4 127:3
**four** 9:17 96:15 129:13
130:6 184:7 198:8,19
206:21 207:4 220:2
**fourth** 35:14
**four-year** 48:17
**fraction** 136:4,8,9

**fractions** 136:6 137:3
**Francisco** 2:2,6 6:9
229:2
**frequently** 99:4 176:13
176:19 218:2
**fresher** 199:12
**Friday** 207:9
**front** 102:13 131:4
143:10
**fulcrum** 83:6
**fulfill** 219:12
**full** 10:22 100:8 158:10
164:11,21
**fully** 139:7 143:5 156:13
161:8 181:7
**function** 57:4 58:14
60:14 62:21 87:18
128:23 136:13 206:6
**fundamental** 179:22
**funds** 127:2 215:20
**funnel** 55:21 208:14,19
208:21,24 209:13,16
210:6,15,18
**further** 90:14 157:8
166:22 220:25 226:23
227:1
**future** 32:12 166:7
219:15,22
**f-l-a-w-s** 68:18

### G

**G** 6:1
**game** 122:23
**gap** 90:13 91:20
**gaps** 111:10
**garage** 80:2,5
**garbage** 99:18,20
**gate** 55:20 139:25 208:4
208:18,21,24 209:5
210:2,21
**gather** 37:4 139:1
**gathered** 73:22 129:20
133:14
**general** 48:23 72:17
115:7 136:2 154:8
208:5 209:7 220:17

**generalization** 157:6
**generalizations** 162:2
**generalized** 62:6
**generally** 11:8 162:14
172:17,20 173:9 182:19
182:24
**generated** 214:2
**generation** 122:22 177:7
**geographically** 173:5
**geologic** 157:5 220:10
**geometric** 127:14 128:18
159:15
**geometry** 169:3
**George** 42:12
**geotechnical** 126:18
139:10 142:5,7 145:11
146:9 157:5 182:8
219:5,8,9 220:10
**geo-forensic** 132:15,18
132:25 140:10
**Gerald** 3:24 6:4
**getting** 8:7 119:6 172:11
**Gilbert** 9:15
**give** 8:20 9:4 19:11 45:16
103:7 138:19 146:18
163:5 175:20 183:4
**given** 41:10 51:7 55:17
57:19 63:6 116:7
134:23 165:23 183:4
190:18 215:23 229:12
**gives** 128:16
**giving** 29:17 44:6,17
127:19
**glass** 115:13
**GLENN** 1:14 2:1,4 4:3
7:9
**global** 101:15 106:6,11
106:17,23
**go** 7:21 9:20 38:11 64:20
65:16 76:3,3 88:19
90:14 91:23,24 92:2
103:3 106:21 141:8,23
143:13 152:9 186:20
191:21,21 210:14
212:17 216:17
**goal** 219:4,12 220:4,6

**goals** 26:17 220:14,18,22
**God** 61:10
**goes** 93:14 99:18 116:16
134:6 183:8 219:7
**going** 17:10,13 83:14,22
84:1 89:11,20 100:19
100:23 116:10 118:13
119:11 129:8 147:16
163:18 174:1 216:17
223:3
**good** 6:3 35:8,9,10 36:1
36:16 37:7 77:23 98:3
116:15 122:10 127:25
135:2 145:1 164:2
170:11 176:11 199:18
216:21
**Goodwin** 3:14 6:8,22
15:11,23
**Gordian** 151:19
**gotten** 82:8 93:3 208:22
**government** 51:25
108:11 176:7 216:15,18
**government's** 108:17
**gradient** 202:15
**graduate** 13:14 14:3
15:1 16:2,5,6 20:21,23
24:15 39:5,6 77:19,24
**graphic** 115:9
**graphs** 206:5
**grass** 172:1,6,7,13,14,17
173:8,20
**great** 55:3 63:12,22 64:8
64:11,13 75:5 89:11
118:8,9
**greater** 30:5 86:16 98:6
122:2 124:6 178:1
212:5
**greatest** 104:1
**grid** 62:8
**ground** 117:1
**group** 35:4 40:20,22,24
41:12 71:2,6,13 105:24
112:22 116:2 126:23
142:18 170:4 215:10
**groups** 32:7 126:24
**guess** 87:8

**guidelines** 32:13 163:23
219:22,24
**Gulf** 27:14,18 32:13
55:22 207:17 208:8,8
209:9 210:16

**H**

**H** 5:1
**habitat** 147:24
**Hall** 11:2
**hand** 118:20
**handle** 89:6,7
**handles** 142:22
**happen** 61:20 65:23
**happened** 16:17 51:5
65:24 86:19 90:5
100:17 107:2 148:17
149:5 206:13,16,17
**happening** 168:17
**happens** 140:18,19 157:1
**happy** 144:25 161:3
**Harbor** 21:16 32:16,23
33:9,16 43:3,22 53:25
54:12,21 57:9,18,20
58:4,7,18,25 62:24 63:4
92:6 94:25 96:5 97:25
98:24 100:20 101:3
108:19 111:1 124:22
125:21,24 129:12
152:17 153:3,13,24
172:25 173:23 176:24
177:3,5,9,13,25 178:21
179:12,18 196:10
197:12 207:18 208:9,23
209:17,22,24 210:21
211:12 215:15 223:15
223:19
**Harbour** 66:5
**head** 107:6,10 168:8,13
**headed** 80:23 200:17
**heading** 200:12
**heads** 168:15
**health** 25:16,19
**hear** 68:16 85:21
**heard** 93:25 94:6 123:3
196:9 197:10 224:16

**heavily** 67:13
**heavy** 87:19,23
**Hector** 200:14,19
**height** 59:22 60:17,22
**held** 6:7,11 42:15 122:25
**help** 55:24 59:6 72:1,11
73:6,25 91:19 113:18
131:21 132:7 182:6
187:14
**helped** 31:11 107:1
**helper** 52:12
**helpful** 71:24
**hereto** 229:17
**high** 61:6 64:7 93:3,13
93:17 105:10 158:6
192:20 208:22 213:7
215:13
**higher** 102:21 103:24,24
213:18
**highest** 183:15
**highly** 105:6,8 113:12,14
113:15 140:12 158:7
212:14
**highway** 130:16
**hindcast** 62:3 73:24
**hindsight** 187:24
**hired** 25:2
**history** 55:1 58:1 59:7
62:6 68:21 113:6
218:18
**hit** 94:10
**hits** 195:16
**hitting** 89:19 92:5
**holes** 111:25 112:1,3,15
113:2,3,8,19,21 116:24
117:3,4,7,8
**Hollywood's** 213:20
**hope** 83:13
**hopefully** 213:12 221:18
**horrible** 218:25
**horse** 106:15 139:16,19
139:20,25
**horses** 106:14
**hotly** 44:4
**hour** 11:8 15:20,20,21
59:3,3 61:16 63:1,10,11

63:20,21 64:2,2 66:4,13
68:1 205:4
**hourly** 15:18,19 20:10
**hours** 23:18,19 24:2,11
24:18 46:12 156:12,14
161:8 165:4 206:24,24
207:4
**housekeeping** 10:19
**human** 99:3,10,11,13,14
99:16,21,23 137:9
**hundred** 64:13
**hunting** 116:19
**hurricane** 27:9 28:23,25
29:11 30:5 58:2,2,15
62:7 72:7 75:14 93:23
110:22 111:5 119:5,9
119:24 120:21 125:9
131:8,9 152:15 178:10
179:8,25 181:6 196:12
196:18,20
**hurricanes** 26:6 27:4
**hydraulic** 102:20 146:14
160:15 165:15 166:17
202:15 213:4,23 214:12
214:19,22 222:9,20,23
226:5
**hydro** 206:5
**hydrodynamic** 125:10
149:24 154:10 157:5
**hypotheses** 35:24
**hypothetical** 66:17,22
68:13 82:21 83:20
86:24 87:4 88:18 92:4
94:13 133:7 165:17

**I**

**idea** 38:10
**identical** 101:16
**identification** 9:11,25
49:9 59:15 79:17
109:18 118:19 147:10
203:7,23 211:2
**identified** 43:19 55:15
58:2 60:4 73:18 138:6
144:10 155:10 160:25
187:21 197:20 199:2

201:15 210:17 215:4
**identifies** 114:23,24
**identify** 6:15 47:18
143:15 175:2
**ignore** 198:1
**IHCN** 201:24
**IHNC** 53:1,9 160:17
201:25
**IHNC/Lower** 80:21,24
**II** 126:3
**ILIT** 47:11,17
**ILIT's** 167:23
**Illinois** 28:2
**illustrations** 170:3
**immediate** 61:25 62:9
**immediately** 153:12
**impact** 65:1,8 66:8 67:11
68:8,21 70:11 71:7
72:17 75:4 80:14 93:11
95:6 122:17,19 132:16
132:21 133:3 134:3
194:14,20,23 195:3
**impacted** 64:16 75:6
92:16
**impacting** 69:8 78:22
**impacts** 204:15,17
**imparting** 94:17
**impediments** 197:18
**implications** 201:14
**imply** 163:2
**importance** 212:1
**important** 26:24 46:7
49:19 68:20 69:2 105:2
106:24,25 113:7 127:24
137:1 138:8 141:13
185:13 186:10 187:16
187:22 192:25 211:11
213:3 222:17,20
**importantly** 129:4
157:14
**imported** 118:5
**imposed** 124:1,6 128:23
**impossible** 54:24
**improbable** 181:17
**improper** 66:16 68:12
82:20 88:17 94:12

**improve** 221:13
**improvements** 32:12
**inaccuracy** 45:21
**inaccurately** 45:8,9
**inadequate** 48:22
**inadvertent** 10:4
**inadvertently** 64:24
**inanimate** 48:8
**inappropriately** 99:16
**inch** 77:15
**inclination** 89:2,21
 121:15
**incline** 89:1
**inclined** 89:18,20
**include** 25:15 39:4 97:6
 138:8 145:6 153:15,19
 164:22 183:3 216:25
 217:1
**included** 62:11 79:1
 138:16 139:3,16 195:3
 224:18
**includes** 16:1 21:3 39:6
 196:23
**including** 12:16 57:4
 164:12 177:13
**Incorporated** 62:1
**incorporating** 219:24
**incorrect** 98:19,20 107:8
 222:24
**increase** 223:1
**increased** 13:25 104:20
**incremental** 52:11 55:10
**incumbent** 135:4
**independent** 24:7,13
 27:5 29:23 32:3,4 33:4
 35:11 36:6 39:1,13,23
 47:21 69:19,23 72:5
 77:12,25 105:20,24
 109:4 110:11 124:18
 126:1,3,21,25 129:18
 131:13 139:1 140:18
 148:22 149:12 151:1
 154:21 167:16 187:8
 188:13,14 189:8 193:10
 194:13 214:13 220:3
**independently** 90:9

 155:7
**indicate** 75:4 76:9,19
 78:6 140:15 146:12
 180:9 183:14 195:14
**indicated** 215:17
**indicates** 37:4 74:21
 119:24 140:21 145:15
**indication** 76:7,17
**indirect** 25:16,18
**individual** 35:22
**induction** 207:17
**Industrial** 52:12,16,17
 52:22 55:11 60:13 62:9
 72:23 73:1 97:10 105:1
 111:14 112:20 118:14
 120:10 135:12 152:25
 153:2,8 223:19
**infected** 122:1
**infer** 54:25
**inferences** 55:17
**inferred** 47:5
**infinity** 165:25
**influence** 68:24
**influenced** 169:15
**influences** 187:16 188:2
**information** 7:25 35:13
 35:13 59:17,22 60:16
 72:11 73:17,17,21,22
 73:25 74:3,20,21,23
 75:15 87:3 100:4 103:8
 103:12,15,17,22 113:10
 116:8,9 119:23 125:16
 125:16 126:11,18
 127:19,23 129:21 130:2
 133:13 134:15 137:13
 137:19,20 138:7,9,10
 138:12,19,21,23 140:13
 141:6 145:17 146:16
 149:23,24 163:5 170:25
 173:15 185:20 186:10
 189:2 190:4 191:6,22
 191:24 198:1 201:1,3
 201:15,17,18 202:11,12
 203:13 206:10 215:16
 217:20 218:23 226:7
**information/documen...**

 48:16
**ING** 43:10 73:7 106:8
 181:4
**Ingram** 1:8,9
**initial** 22:18 89:21
**Initially** 181:20
**initiated** 17:19,21 131:8
 143:3 158:12,15,19
 161:15 179:25 180:2
 181:1 222:9
**initiates** 204:21
**initiating** 158:24
**initiation** 165:5 178:7
 205:1 206:22
**Inner** 21:16 32:16,23
 33:9,16 43:3,22 53:25
 54:11,21 57:9,18,20
 58:4,6,18,25 62:24 63:4
 66:5 92:6 94:25 96:4
 97:25 98:24 100:20
 101:3 108:18 111:1
 124:22 125:21,24
 129:12 152:16 153:3,13
 153:24 172:25 173:23
 176:24 177:3,5,9,13,24
 178:21 179:12,18
 196:10 197:12 207:18
 208:9,23 209:17,21,24
 210:21 211:11 215:15
 223:15,19
**input** 42:6 149:24 151:3
 151:6 155:9 191:24
**inside** 93:7 181:4 212:25
**insight** 103:7 138:19
 173:19 181:22 218:23
**insights** 128:2
**insignificant** 158:9
**inspection** 192:18
**inspections** 192:14
**inspectors** 119:20
**instability** 106:6,22
 160:16 226:6
**instance** 39:20
**instances** 87:22,24 94:16
 112:16 121:11
**instantaneously** 168:20

**Institute** 30:3 32:11
 187:10 189:11,21 190:7
 193:3
**instructions** 207:20
 208:1
**insufficient** 198:12
**intact** 75:19,22
**integrate** 129:22
**intense** 159:23
**intensification** 146:12
**intensity** 133:7 217:11
**interact** 160:8 161:23
**interaction** 162:3
**Interagency** 42:3,7,14,25
 70:7,19 74:9 78:2
 105:15,21,25 106:3,10
 107:7,13 125:25 129:9
 136:17 164:3 167:17
 171:3 187:6 188:12
 189:6 190:20 192:2,5,9
 198:16 206:6 214:17
**Intercoastal** 55:23
 207:18 208:9 209:9
 210:16
**interested** 71:25 135:9
**interesting** 137:5 138:3
 173:19
**interfere** 111:18 220:22
**interior** 130:23
**interlocks** 157:25
**intermediate** 176:19
**international** 38:13
 112:23 126:23 170:4
 215:10
**internationally** 26:25
**interpretation** 185:10
**interpreting** 61:2
**intersection** 55:21 68:22
 209:8,17 210:22,23
**intersects** 209:11 210:19
**interview** 44:7,17,21,23
 46:8,11 47:11
**introduces** 124:4
**introduction** 9:12
**investigate** 70:13 138:4
 191:11 217:21

**investigated** 90:20 122:1
**investigating** 70:8
**investigation** 12:2 14:4
  22:9,18,24 23:20,21
  24:7,14 26:10 27:6
  29:24 32:2,3,5 33:5
  39:1,14,19,24,25 40:3
  46:12 47:22 69:19,23
  70:5 72:5 73:21 77:13
  77:15 78:1 107:17
  108:1 109:5 110:12
  124:19 125:18 126:2,3
  126:13,17,21,25 132:19
  139:2,6 163:24 167:16
  182:21 187:7,7,8,9,11
  188:13,14 189:9 190:13
  192:8 193:5,10 214:14
  217:18,18,22 220:4
**investigations** 29:21 30:4
  36:24 187:17 188:16
  190:16 200:13 218:2
  221:16
**investigative** 71:13
  131:13 191:25 220:13
**investigators** 22:13 26:7
**invoiced** 16:2
**involve** 28:23 29:3
  158:25 188:16 190:8,9
**involved** 18:20 19:9
  25:25 28:25 29:20
  30:21 32:8 36:24 40:14
  41:12,25 54:6 98:4
  104:11 115:17 134:21
  140:16 178:18 199:5
  208:3 220:12
**involvement** 22:9
**involves** 67:2 138:5
  211:17 212:24 213:5
**involving** 16:22 100:16
  156:20
**inward** 84:3
**in-rushing** 86:11
**in-the-field** 22:12
**IPET** 60:10,12,19,20
  64:15,21 65:7,12,15
  70:12 73:21 136:19

192:19
**IPET's** 167:23
**issue** 67:17 106:6 221:9
**issued** 24:8 219:22
**item** 163:24
**items** 25:16,18
**IV** 60:21
**I-walls** 81:6,10 85:4,8
  95:7 121:20

**J**

**Jack** 174:15
**January** 11:24
**job** 74:25
**John** 3:13,23 6:24 7:1
  16:16 28:16
**joining** 6:24
**joints** 157:20,21 161:13
**joke** 77:21
**jokes** 77:23
**Joseph** 1:11 18:10
**journal** 36:9 133:22
  142:4,7,10,15,22
  144:17 145:11,19 146:9
  146:20,22 148:18,23
  149:7,14
**journals** 12:20 13:2
  142:12
**JR** 1:10,12
**judge** 1:9 21:9 100:1
  207:9 216:17
**judgment** 184:21,23
  185:12,25
**judgments** 185:19
**July** 9:10 109:10 200:18
**jump** 93:4,13,17
**juncture** 84:18
**justifies** 145:18
**justly** 172:9

**K**

**K** 1:8
**kaolinite** 136:7,10
**Katrina** 1:4 6:10 12:2
  13:23 14:4 17:20 26:6
  26:12,23 27:21 29:11

29:21 30:6 36:24 51:25
  52:8,12,16,19 54:10,19
  55:7 56:18,23,25 57:4
  58:3,15 62:7 63:2 72:7
  75:14 103:2,8 111:5
  119:5,9,22,24 120:16
  120:18 125:9 131:8
  147:19 148:6 152:15
  179:8,25 181:6 204:12
  204:13 205:12,14,24
  206:12,15,24,25 207:8
  207:10,13 211:6 215:18
**Katrina's** 56:21
**Keeley** 3:22 7:1
**keep** 36:17 122:12
  123:16,17 223:3
**key** 31:5 77:1 160:15
**killed** 106:19
**kind** 34:12 38:11 40:15
  78:4 87:22 117:14,18
  137:16 140:1 158:22
  219:10
**kinds** 55:17 59:6 97:6
  99:9 115:20 136:5
  190:9 220:18
**knew** 134:10
**knock** 96:1
**knocked** 194:18,19
**knocking** 95:13 96:7
**knot** 151:20
**know** 7:18 8:13,17 11:11
  31:23 33:24 37:1 38:14
  40:14 41:22 42:3 51:24
  61:4,20 62:11 70:4,16
  70:22,23,24 71:1,5
  76:24 82:7,25 92:15
  93:1 96:2,3 99:19
  100:3 109:8 118:16
  119:1,14,21 120:11
  133:4 137:16,22 138:21
  143:9 164:24 167:12
  170:22 186:6 202:11
  215:11
**knowing** 79:22 160:22
  182:19
**knowledge** 29:7 37:19

38:23 70:1 78:1,13
  97:13 112:13,14,17
  120:17 221:14
**knowledge/information**
  215:6
**known** 21:15 29:1 34:19
  34:19 87:14 127:13,14
  161:11 193:18 206:5
  209:12 225:1
**knows** 84:23
**Kok** 206:11

**L**

**L** 3:22
**laboratories** 128:1
**laboratory** 137:11
**Lafarge** 1:8,9,10,11 3:11
  3:22,23 6:23,25 15:9,24
  16:8,12 18:7,20,24
  19:24 20:9 64:1 72:21
  73:13 90:23
**Lagarde** 1:9
**laid** 86:9
**Lake** 177:5,6,19 209:3
  209:20,23
**land** 34:17 37:5
**lane** 130:15
**language** 122:16 132:1
  150:6 156:7,7 165:19
**large** 25:19 40:12,22
  83:21 178:11 197:6
  216:13
**largest** 218:16
**late** 172:11 173:25
  210:23
**lateral** 98:11 101:15
  106:6,12,17,23 160:4
  226:6
**law** 3:4,5,12,13 6:24
**lawsuits** 29:22
**lawyer** 35:9 184:4
  197:21
**lawyers** 17:24 18:4 50:8
  50:9
**layer** 105:10 120:12,19
  214:3

R. BEA

**layering** 127:20
**layers** 135:21
**lead** 13:10 92:13 121:5
 159:5,7 161:18 171:20
 226:8
**leader** 40:8,9
**leading** 159:9 160:19
**leads** 41:16 73:11 86:22
**lean** 88:5 90:12 122:7,23
 141:22 157:11 194:25
**leaning** 88:22 122:10,10
 122:25
**leans** 88:14 157:13
**leap** 162:1
**learn** 185:5
**learned** 72:24 133:10
 162:17 214:24
**learning** 26:9
**leave** 12:7,7 90:23
**led** 77:12 141:1
**left** 92:17 101:24 102:7
 102:10,18,22 117:4
 118:19
**legal** 15:21 109:11
**legend** 115:11 118:21
**legible** 115:10
**length** 83:21
**lesson** 214:24
**lessons** 26:22 219:25
**letters** 165:13
**let's** 9:20 91:24 92:2
 155:17 198:9 210:14
 223:3
**levee** 24:7,13 27:5 29:23
 32:3 33:5 39:1,13,23
 47:21 48:18 69:19,23
 72:5 77:13,25 88:25
 94:25 96:4,4 98:2
 100:6 101:24 102:2,6,9
 102:12,16,22,24 103:1
 103:25 104:1 105:25
 109:4 110:11 124:18
 126:1,3,21,25 131:1,3,3
 131:4,6,13 139:1
 156:12 157:10 158:1,7
 158:13 159:5 160:17

161:14 167:5,16 177:11
 187:8 188:14 189:8
 193:10 195:8 211:23
 212:25 213:9,12 214:6
 214:13 219:21,22 220:3
 221:12
**levees** 48:10,24,25 49:4
 49:13,15,25 50:11,15
 51:12,16 52:23 102:3
 107:11 177:12,14,17
 197:5 211:11
**level** 57:9,18 58:6 60:6,7
 60:8,13 133:6 141:6
 152:19 165:23 166:6
 180:4 192:20 205:12,17
 205:24 206:23 215:4
 222:19
**levels** 145:7 150:10
 207:2 209:25
**lies** 51:10,11
**life** 26:11
**lift** 76:6,15 77:8,9 78:3
**lifted** 77:9
**lifting** 77:18
**lifts** 86:12
**light** 74:23 219:11
**lighthouse** 34:18
**liked** 111:23
**likelihood** 105:10
**likelihoods** 183:15
**limit** 162:14 163:1 164:1
**limited** 14:16 77:10
**Linda** 2:8 6:17 229:4,21
**line** 49:14 50:10,14 51:24
 52:15 59:21 110:10
 137:17 147:13 148:2,8
 152:2,25 153:1,9,14
 156:23 159:16 164:11
 164:21 166:16 170:13
 177:10 179:20,21
**liner** 138:13
**lines** 50:3 53:23 81:2
 153:11 154:14 170:13
 204:4 212:13
**linguistic** 183:12
**lining** 117:15,18,21

119:19 135:18 138:2,16
 138:20 139:3
**link** 107:12 162:6
**liquid** 213:25
**list** 143:14
**listed** 163:12 167:10
**listening** 46:22
**litigation** 1:4 6:11 7:19
 17:4,21 21:4,5,6,10
 23:16 61:19 109:2
 142:1,4 143:10,24,25
 145:2 148:20 149:10
 151:13 188:13 199:6
**little** 12:14 26:1 79:21
 89:6 157:8 166:22
**LLP** 3:14
**local** 72:17 75:16 140:22
**localized** 94:17,19
**located** 6:8 34:3 61:25
 82:5 138:18 178:24,25
 209:6
**location** 33:25 34:1
 35:12 86:16 97:20
 114:3 115:19 118:22
 119:24 152:17,21 174:7
 202:15 205:18 207:3
 215:5,7
**locations** 95:5 106:12
 115:2,18,25 121:1
 174:2 215:21
**lock** 104:24 153:2,4,10
 153:12 169:16 205:17
**log** 137:7,8
**logic** 160:23
**logical** 135:6
**logically** 221:17
**long** 11:11 68:2 122:24
 123:19 166:1,11
**longer** 121:22 178:1
**look** 71:14 110:7 111:7
 115:24 118:3 120:3
 131:18 132:10 137:6
 147:12 152:23 167:11
 171:25 180:16 190:22
 191:13,21,22 198:9
 201:21 202:9

**looked** 45:23 72:2
 120:11,17 169:25
**looking** 34:13 35:5,23
 59:4,5 170:8
**looks** 35:4
**loss** 106:16,17 177:11
**lot** 45:15 98:13 133:9
**loud** 195:23
**Louisiana** 1:2 6:13 71:2
 71:6 125:5,7,18 187:7
 188:15 189:10 198:17
**low** 114:9
**lower** 43:11 46:10,13
 54:5 55:18 59:9 61:25
 82:5 93:7,25 98:7,12
 99:8 101:9,17 104:14
 104:25 105:5 126:15
 130:23 150:2 152:16
 160:17 170:16 171:11
 171:17 173:1,11 179:24
 181:5 189:20 192:25
 197:1 202:24 203:2,15
 203:17 204:3 212:8
 213:19
**Luncheon** 109:22
**lying** 75:23,25
**L.L.C** 3:5

## M

**Magazines** 13:1
**magic** 73:4 74:18
**magnifying** 115:13
**MAGRISTRATE** 1:11
**main** 17:3 102:12 167:18
**maintained** 50:22 51:18
 118:20
**maintenance** 52:25 53:7
 53:24 54:6
**major** 28:14 99:2 169:15
**majority** 86:4
**making** 41:22 47:16
 90:12 122:24 141:21
 162:1 228:6
**management** 9:17 26:3
 26:19 56:7
**manager** 82:4

manner 89:22 223:13,18
manuals 211:8
man-made 176:4 179:4
179:23
map 114:4,10,13,15
116:21 169:22,25 210:2
maps 114:11 210:6
March 16:10
March-April 119:10
margin 96:25 97:2,15,18
98:17 100:13,23 102:21
103:24 104:4,5 124:10
124:13
marine 34:10,22,25
113:25 114:2 170:5
216:21
mariner 33:20
Marino 125:2 137:20
138:6,15 182:12 200:14
200:18 201:15 224:22
mark 3:12 6:22 9:9 49:5
59:13 79:13 109:9,16
147:7 203:4,20 210:24
marked 9:11,24 10:9,18
49:9 59:15 79:17
109:18 147:10 203:7,23
211:2
marks 45:24 79:5,9
110:20 118:1 155:23
224:2,6 227:2
marsh 160:14 172:1,6,7
172:12,14,17 173:8,19
marshes 105:6
Master 205:18
match 45:25 105:8
material 112:16 113:11
117:7,25 118:5 130:25
131:5 136:9,13 138:14
158:8 212:15 214:5
materials 105:7 113:13
115:17,21 116:11,17
118:12 119:25,25 120:8
130:22 137:15 170:9
214:4
Mathias 206:10
matter 15:6 49:22 68:5

89:14 134:22 195:7
208:25 218:11
maximum 58:13
McLaughlin 11:2
mean 19:5,7,8 29:16
33:19 52:16 55:6 60:5
77:17 96:20,20 122:7
138:23 152:19 156:13
156:19 166:19 168:14
168:25 180:10,13
183:18,25 206:13
226:14
meaning 32:3 58:12 72:7
112:11
means 8:13 23:2 25:8,14
33:22 36:17 64:12 77:4
93:5 119:1 133:10
157:10,16 165:25 166:2
168:17 169:1 183:19
184:1,20 188:7 206:25
207:1 213:15
measurement 101:1
128:16
measurements 34:13,14
measures 55:25 206:17
mechanical 78:3
mechanics 92:13 93:9
97:20 98:4,7 99:9
101:6,8 104:10,16
106:11,22 192:24 210:3
211:19
mechanism 184:13
188:20 211:20 212:2
mechanisms 139:9
140:12,15 141:22 159:2
160:8,9 161:23
Mecom 28:16,16
media 196:23
medication 8:24
member 37:2 38:2,4 42:5
42:12,14 70:5 196:25
members 38:25 39:4,7,7
39:10 40:2,2,24 41:7,9
42:7 43:9 77:13,13
147:18 148:4 192:22
memory 45:19 116:15

199:7
mentioned 21:20 34:20
75:2 115:15 130:8
142:15 193:2 215:9
met 38:16
meteorological/oceano...
125:9
meteorologic/oceanog...
67:15
meteorology 66:20 67:24
meter 58:23 142:20
method 187:13
methods 166:19
metropolitan 21:13,22
Michou 62:12
middle 11:12 80:20 81:1
81:1,9 85:7 132:3
167:14 178:6
midwife 31:11
mid-January 12:11
mid-1980s 100:9
miles 59:3,3 61:16 62:25
63:10,11,19,20 64:2,2
66:4,13 68:1
mind 41:12 47:9 57:24
105:23 180:5 224:19
mine 199:13
minerals 136:5
minor 86:5 211:23
minus 180:12
minute 34:9
mischaracterizes 144:19
148:25
misclassified 215:11
misquoted 154:5
missed 214:15,18
Mississippi 16:23 17:4
17:25 18:4,18 19:3,16
19:20 20:2,13 21:1,4,14
21:21 23:8 52:21 54:1
54:8,9 55:16,22 56:1,2
56:9 101:12 109:1
143:24 144:13 145:3
176:2,5 177:12,18
179:5 194:18 204:15
209:10 210:17

Mississippi-Gulf 54:4,17
Missouri-Rolla 41:6
misstated 64:24
mistake 100:22 134:4
196:4
mistakes 219:1 221:19
misunderstanding
151:20
misunderstood 91:8
mitigate 56:8
mitigated 52:20 55:12
mitigating 55:25 206:17
mitigation 55:19 63:6
208:6
mixed 150:3
mobile 23:18,17
mobilize 93:10
mode 158:24
model 98:16,18,23 99:1,9
167:21 222:2
modeling 60:23,24 61:7
modelling 162:13 175:22
209:1
models 97:12 98:22 99:5
100:11 101:16
modes 131:19 132:5
162:3 211:17
moment 33:18 204:8
225:10
Monday 1:15 2:5,7
207:25
month 24:24
months 16:13 24:23 25:3
25:4,5,9,11 191:20
219:20
montmorillonite 136:6
136:10
moored 63:25
moorings 193:23
morning 6:3 46:17 72:7
73:3 88:22 141:4 174:1
174:7 189:18 197:11
207:25
Mosher 107:4,9,15,24
127:6
Mosher's 108:7

**motion** 80:2 84:20,22,24
  141:7
**motional** 71:7
**motions** 67:2 86:4,5
**motivated** 221:11
**motivation** 220:16
**mouth** 55:20
**move** 80:3 157:16 213:15
**moved** 73:13 74:8,17
  198:18
**movement** 82:15 157:10
**movements** 157:19
  161:11 163:6
**moves** 83:20 166:11
**moving** 50:20 83:7,8,18
  86:3 153:22
**Mraffman@goodwinp...**
  3:18
**MRGO's** 52:1 147:19
**MR-GO** 51:12 52:9,13
  52:20 55:1,8,13,19 98:5
  104:24 149:22 151:13
  153:2,10 154:9,23
  170:14,19 171:10
  176:22 199:5 207:12,22
  208:12 216:25
**multiple** 59:19 96:22
  112:21 139:8 156:20
**multiply** 168:11
**multi-frequency** 195:23
**multi-layer** 61:6
**Mumford** 1:8
**mysterious** 111:25

**N**

**N** 3:1 4:1,1 6:1 228:14
**nailed** 172:9
**name** 6:3,13 10:22 26:2
  28:15 61:4 98:25
  127:12 145:17 163:22
  199:4
**narrow** 130:20
**NASA** 62:12
**national** 22:10,11 23:4
  26:5 30:2 32:10 127:2
  187:10 189:11,20 190:7

190:12,17 193:3,11
  219:21
**natural** 97:7,9 178:2
**naturally** 105:4
**nature** 113:11
**naval** 66:19,25 67:2,8,13
**NAVD** 59:23,23 165:13
**Navigation** 21:17 32:16
  32:23 33:10,16 53:25
  57:20 58:25 96:5
  108:19 125:24 152:17
  177:3,5,9,14,25 179:13
  179:18 196:10 207:19
  208:10,23 209:17,22,24
  210:21 211:12 215:15
  223:15,20
**Navigational** 43:4,22
  54:12,21 57:9,18 58:5,7
  58:18 62:24 63:5 66:5
  92:6 95:1 97:25 98:24
  100:20 101:3 111:2
  124:22 125:21 129:12
  153:4,13,25 172:25
  173:23 176:24 178:22
  197:13
**near** 177:3
**near-steady** 165:3
**necessary** 143:15 217:14
  219:13
**neck** 209:12
**need** 7:21 11:9,10 45:13
  50:8,9 65:25 77:21
  89:24 90:1,23 131:21
  132:6 167:11 188:7
  223:24 224:1
**needed** 26:10 106:20
  110:17 207:21
**needs** 36:2 99:15
**negative** 52:20 56:8 63:6
  118:12 204:15,17
**neglect** 48:19 52:25 53:8
**neither** 65:17
**Netherlands** 175:2,7
**Neutral** 204:12,13
  206:15,25 207:8,11,13
**neutralize** 187:14 204:14

**neutralized** 207:22
  208:12
**never** 54:10,18 55:2 56:2
  56:5,11 77:20,23
  195:12 217:8,13
**new** 3:15 21:13,22 26:5,8
  26:10,12,21,23 28:19
  30:5 74:23 86:16 88:2
  100:18 121:6,12 122:2
  172:22 173:24 176:16
  177:24 209:18
**newspaper** 35:10 196:24
**nine** 25:4,5 205:12,24
  206:24
**nine-month** 25:2,15
**NIST** 30:22 31:1,10,14
  31:17 33:1,7,13 41:23
  70:2 79:15 188:15
**NOAA** 75:13
**noises** 195:24
**Non-archival** 12:24 13:1
**non-corroborating**
  192:23
**Non-refereed** 12:23,25
**normal** 25:22 130:14,15
  209:25
**normally** 209:23
**north** 3:11,22,23 6:23,25
  15:25 16:12 33:8 46:10
  59:25 72:3,4,16 73:7,14
  74:17 75:3,10,12,19
  77:15 81:9 84:15,15,16
  84:22 85:7,23 86:2,2,7
  86:7,11 88:2,3 90:21
  102:3 104:14 106:5,13
  114:1,1 130:4,5,11
  135:10 143:3 169:21
  170:6 181:6 188:18
  191:2 202:2,15,17
  203:2,17 204:21 205:10
  206:22 208:15 215:21
  220:21 222:10,12
  223:14 225:12,17 226:3
  226:7,12,17
**northeast** 68:6 73:2
**northeasterly** 74:11

**northwest-southeast**
  209:11
**Norweigian** 28:3
**Nos** 163:17
**note** 79:15,16
**notice** 131:18
**November** 26:4 47:22
  145:20
**now-Dr** 27:15
**NRC** 188:15
**number** 5:5,6,7,8,9,10,11
  5:12,13,14,15,16,17,18
  7:22 9:17 12:15 13:10
  13:25 14:16 35:6 38:24
  40:12 45:17 104:23
  115:19 118:19,21,23
  129:11,13 163:7 196:8
  210:9 216:13,23
**numbering** 119:1
**numbers** 97:21 114:24
  115:1,3,6,15,16,24
**numerous** 112:7
**N.W** 3:6,15

**O**

**O** 4:1 6:1
**object** 9:12 48:22 65:14
  94:6 96:9 153:14,18
  154:24
**objected** 216:15
**objection** 17:5,14 31:20
  39:15 43:5,15 44:9,12
  47:12 49:2,17 53:3
  54:23 56:3 63:14,24
  64:10,19 66:10 67:21
  68:12 71:4,15,20 74:13
  78:10 82:20 84:4 87:1
  88:7,17 89:12 91:21,25
  94:12 95:2,14 101:4
  102:8 104:3 107:20
  121:7 123:22 124:14
  126:12 129:17 140:6
  141:8 144:19 146:1,24
  148:24 150:22 151:15
  152:11 154:4 157:3,12
  167:24 174:4 177:15

183:20 184:2 186:17
187:2 188:22 190:6
192:11 195:1,11 196:13
197:14
**objective** 100:21 185:4
**objectives** 26:18
**obliterated** 112:2
**observation** 33:2 125:11
141:2
**observational** 62:4
**observations** 137:18
160:13 189:23 194:11
**observe** 92:19 111:20
**observed** 108:7 173:13
215:4 223:14,18 225:17
**observing** 36:11
**obtain** 198:20
**obtained** 46:22 150:11
**obviously** 62:19 70:10,18
122:11
**occupied** 28:5
**occur** 91:6,12 158:20
194:16
**occurred** 9:6 84:17
144:15 145:7,8 194:23
195:3 196:11 208:16
**occurrence** 183:16
**ocean** 62:1 68:18 73:23
87:20
**oceanographic** 148:5
149:23 154:10 209:1
**oceanographic/hydro...**
104:13 151:1
**oceanographic/metero...**
62:3
**oceanography** 171:5
**October** 42:16 43:20
44:21 46:23 47:10
**offer** 42:6 116:23
**office** 6:8
**officer** 229:7
**OFFICES** 3:5
**official** 25:6
**officials** 108:10
**offshore** 28:13,15,17
176:13

**often-quoted** 55:20
**Oh** 22:2 40:13 67:11
73:20 99:12 144:3
155:8 210:7 223:11
**Okay** 9:8 17:12 25:12,23
27:20 47:15 50:7 53:14
63:10 67:24 75:8 76:5
84:5,7 90:2 91:1,8
93:24 114:20 116:9
128:10 131:23 132:3
139:23 155:16 156:10
164:10 168:5 170:2
174:10 199:22 203:12
222:16 225:16 226:20
226:23
**Oklahoma** 142:19
**old** 103:15 131:1,3,3,4,6
**once** 34:2 51:3 88:23
136:9 226:14
**Oner** 142:20
**ones** 28:21 81:19 101:16
160:25 169:23,23 190:1
**onset** 146:13 148:12
150:13 152:8,16 154:3
154:14
**open** 83:14 86:8 89:5,23
94:20 135:15,15 157:19
158:13 161:12 211:25
**opened** 135:13
**opening** 83:16 86:8
121:13
**opens** 157:20
**operate** 141:23
**operated** 40:4 86:23
**operating** 61:1 66:4
**operational** 54:7
**opine** 147:17
**opinion** 184:12 185:16
195:13 208:15 226:11
**opinions** 147:15 148:10
152:6 154:22 187:5
**opposite** 83:12,15 85:14
85:16 189:19
**order** 9:17 37:24 38:21
40:17 88:24 187:22
219:12

**ordinarily** 41:7,9
**organic** 105:6
**organizational** 188:3
**organizations** 142:13
188:5
**organized** 21:9
**orient** 204:9
**oriented** 173:5
**original** 115:8 138:7
202:13
**Orleans** 21:13,23 26:5,8
26:10,12,22,23 28:19
30:5 86:16 88:2 100:18
121:6,12 122:2 172:23
173:24 177:24 209:19
**outcome** 184:13
**outlet** 16:23 17:4,25 18:5
18:18 19:3,16,20 20:2
20:13 21:1,5,14,22 23:9
52:21 54:1,4,8,9,18
55:16,22 56:1,2,10
101:12 109:1 131:17
143:24 144:14 145:3
176:3,6 177:13,18
179:6 204:16 209:10
210:17
**output** 62:21 99:19
217:13
**outside** 14:24 22:1 131:3
131:6
**outwards** 84:2
**out-of-pocket** 23:1
**overflying** 75:12
**overlap** 147:15
**overlaying** 214:3
**overlying** 214:5
**oversee** 192:4
**overtopped** 51:3 121:12
143:4 179:6
**overtopping** 121:5,18
148:12,13,14 150:14,15
150:15 151:10 152:3,8
152:13,16,18 154:3,15
154:18 155:2 158:19,25
159:1,5 160:8 161:17
161:23 211:18

**overturned** 81:5 85:3
**overwhelmed** 52:2
**owner** 28:16
**o'clock** 222:4
**O'Donnell** 49:12 204:1
216:12
**O-n-e-r** 142:20

**P**

**P** 3:1,1 6:1
**page** 5:3 45:8,11,17
49:12 50:5,20 51:22
53:21 79:24,25 80:9,19
80:22,22,23 81:2,22
84:14 110:8,10 114:9
114:10,11,11,12,14
116:21 117:9 120:3,4
120:25 122:15 131:12
131:16,22 132:9,12,23
133:5,11,11,17,20,25
139:5 141:24 144:5
147:12 148:2 150:7,12
151:9 152:1,2,4,23
153:23 154:1,13,14,17
156:4,11,17 158:11
159:24 160:13 162:11
164:11,16,18 165:1
166:22 167:14 169:14
170:12 175:25 176:9
177:21 178:6 179:3,20
180:16 182:17 183:9,11
186:2,4,12,13,16 187:4
188:11 193:20 194:6
195:19 198:25 200:9
201:21 202:5 203:22,22
203:25 204:7,9 208:14
210:9,12,15 211:6
212:9,10 221:23
**pages** 1:25 49:8 79:15
114:19 144:6 147:9
163:8 200:11 203:5
204:6 210:25 216:14,16
216:23 217:5
**paid** 14:23 15:17,23
20:15,25 23:18 24:19
25:1,10 118:8 192:3

**paint** 76:7,18
**panel** 111:22 163:16
**panels** 78:24
**panic** 195:25
**paper** 59:4 134:8,11
143:11,12,13,14 146:8
146:8 155:3 217:6
**papers** 30:8,11,22 31:14
133:23 143:18,19
**paragraph** 81:1 131:12
131:16,18 132:3,4,10
132:13,23 133:25
142:14,25 157:23
158:10,11,17 160:12
164:11,21 165:1,14
167:14,15 169:14
175:25 176:9 177:10,21
178:6,7 179:3,16,20,21
180:17,23,24 181:3
182:17 183:8,9,11
186:13,15,16 187:4
188:11 193:20 194:6,9
195:20 198:25
**paragraphs** 132:22
160:19 186:4
**parameters** 104:13
**pardon** 24:3 84:6
**Parfait** 1:10
**Paris** 172:3,4,4,13,14,18
172:20,21 173:2,10,12
178:22,25 208:5 209:7
209:12 210:19
**Parish** 55:15 173:2,10,12
173:25 177:19,24
178:13,17 179:1,7,12
179:18
**parking** 80:1
**part** 30:7,20 31:10 33:4
34:11 47:13 55:4 65:7
65:12 84:1,2 88:4
90:14 95:24 102:6,9,14
102:16 107:10 111:17
112:19 130:9 132:19
181:13,16 203:21 206:4
221:8,10
**partial** 80:4 153:18

**partially** 166:5 213:1
**participant** 44:3,24
**participants** 24:14
**participated** 126:14
**participating** 7:3 19:14
19:21,22 226:11
**participation** 46:5
**particular** 31:24 33:23
35:23 38:21 41:13 57:8
61:20 69:18 79:15
81:18 101:21 118:6
162:19 163:11 168:10
174:24 183:8 212:1
217:23
**particularly** 40:3 214:23
**parties** 6:16
**parts** 24:18 26:24 29:1
30:22 54:14 72:23
103:18 173:9,11 179:11
**Pascagoula** 80:11
**Pasos** 45:7,22 46:19
182:14 200:14,19
224:22
**pass** 59:13 204:6
**passage** 49:6,19 102:11
147:8 216:11
**passed** 61:14 110:22
**Paving** 159:11
**pay** 22:22 197:10
**peak** 128:20,24,25 145:7
150:10
**peer** 142:22 192:5
**peers** 36:12
**peer-reviewed** 36:9
133:22 142:12
**penalty** 228:3
**penetrate** 135:21 178:11
**penetration** 128:15
129:1
**Penetrometer** 127:7,12
128:4,7 129:11,24
**Peninsula** 212:20
**penultimate** 132:14
**people** 48:23 57:2 61:1
91:11 117:7 191:10
193:17 198:10 220:12

**percent** 97:2,18 165:16
165:16 166:18 171:15
171:16,16,17 175:12
180:15,20,20 184:25,25
202:23 203:14 204:1
212:17,22
**percentage** 168:23 180:4
**perceptual** 35:7,13
**Perfect** 210:8,10,15
**perform** 25:9 107:16,25
126:22 165:22 166:9
214:21
**performance** 42:4,8,14
42:25 57:3 70:7,19
74:9 78:2 90:21 96:14
97:19,21 100:8 104:10
105:15,25 106:3,10
107:7,13 125:25 129:5
129:9 136:18 164:4
167:17 171:3 182:9
185:20 187:6 188:12
189:7 190:20 192:2,5
192:10 198:16 206:7
214:17
**performed** 22:20 44:2
62:2 66:20 100:6,8
103:2 126:18 127:4
132:19 166:14 169:16
192:23 200:13 214:19
214:20 216:13
**performing** 93:13
**period** 20:18 22:14 24:6
28:17,21 42:16 43:13
43:18 48:17 72:8 74:6
78:8,9 166:12 178:2
207:1 229:16
**periods** 12:4 14:18
**perjury** 228:4
**permeabilities** 97:9
160:15
**permeability** 99:18
136:12,12,16 137:14
**permeable** 136:1,21
214:3,5
**permission** 110:13,15,17
**Perry** 1:9

**person** 35:10 115:22
**personal** 78:13 155:11
155:15
**personally** 47:13,15 77:9
77:18 92:20 192:13
217:9
**personnel** 42:22 191:10
**persons** 38:9 39:3
**pertain** 140:11
**pertained** 21:12
**PERTAINS** 1:6
**Peter** 3:22 6:25
**phase** 22:8,19,19 126:2,3
127:1
**PhD** 1:14 2:1,4 4:3 7:9
**photograph** 116:16
117:10 118:16,20 119:8
194:17
**photographic** 45:12,19
72:10 113:9 115:4
116:4,8 119:18 191:23
**photographs** 72:12
75:13 77:3 102:10
113:6
**photography** 75:11
**photo-finish** 106:15
**phrase** 37:16 48:7
166:23 168:23 180:25
206:12
**physical** 8:25 79:23
**physically** 19:14 20:3
192:13
**physics** 92:10,11
**picked** 214:21 220:1
**picture** 80:1,10 119:4
136:11 189:18 210:5
**piece** 137:13
**pieces** 77:4,5 156:7
**pile** 85:25 89:1,24 116:25
168:16,18,20 211:22
**piles** 81:7,11 85:6,9
**piling** 89:3 157:24 160:4
161:22
**pit** 117:11 119:15,22
120:5 135:14 137:17
138:17

**pits** 104:21,23 105:9
  117:15
**place** 10:11 84:22 92:7
  111:4 164:23 208:6
**placed** 167:5 210:22,22
**placement** 208:4
**plaintiffs** 3:3 6:21 28:2
  61:12 144:2 148:4,11
  152:7
**plan** 41:11,14 120:6,7
**plastic** 121:15 122:6
**plausible** 90:17 96:21,23
  119:3 140:12,15 184:13
  184:21
**plausibly** 72:12 73:12
  74:1 140:19
**play** 106:25 141:15
**played** 70:14 72:9 92:23
  93:3 95:12 96:6 106:8
  106:24 107:18 108:2
  160:15
**player/causative** 44:24
**playing** 122:22
**please** 7:6 10:22 17:7
  19:5 27:23 30:1 31:16
  32:18,19 39:21 43:16
  44:13,14 53:4,11 54:13
  54:15 55:24 56:24
  57:15 61:8 64:11,13
  74:14 76:12 78:8 92:1
  107:21 108:24 113:17
  131:24 132:2,11,24
  147:12 149:2,3 151:16
  151:24 153:5 156:3
  162:24 164:20 173:5
  185:23 195:19 196:14
  199:16 203:11 204:10
  205:14,22 206:25
  211:14 218:13,15
**plus** 15:22 180:12
**point** 26:14 27:2 33:23
  34:1,4 36:5,18 60:1
  70:13 83:22 84:17
  94:10 95:9,20 103:5
  109:6 112:11 138:11,21
  156:6,8 163:3 168:10

  188:7 199:7 214:12
  222:8
**pointing** 81:6,7,10,11
  85:4,6,8,10,16 87:25
**points** 62:8 188:8
**polluted** 113:12,14,15
**Pontchatrain** 177:6,6
  209:4,21,24
**poor** 48:20,21 195:21
**poorly** 8:16
**pore** 165:2,15,24 166:17
  213:17,18
**port** 27:24 209:18
**portion** 41:13 81:1 127:1
  185:2,3 200:23,25
**portions** 31:1,3,14,18
**portray** 221:16
**posed** 66:22 125:17
**posited** 67:25 69:1 74:8
**positing** 89:16
**position** 34:19 127:9
**positioning** 107:8
**positive** 181:21
**possessing** 183:15
**possible** 65:2 90:16
  95:10 112:9 134:23
  157:6 158:5 165:19
  225:11
**possibly** 87:5 160:24
  226:16
**postgraduate** 13:15 14:3
  15:2
**Post-it** 61:13
**post-Katrina** 114:12
**post-peak** 129:3
**potential** 34:5 35:15 43:2
  43:10 44:3,4,23 45:3
  47:9 57:19 70:11 73:7
  105:3 139:9 150:23
  162:3 177:7 183:21
  184:16 201:13 211:17
  225:1
**potentially** 37:5 138:18
  158:8 213:3 215:17
**pound** 64:12
**pounds** 64:12,13 77:11

**powers** 41:10
**practical** 92:12
**practicing** 39:8,10,12
**preamble** 154:24
**preceded** 17:20 47:6
**preceding** 58:7 204:10
**precipitate** 94:20
**precipitated** 167:8
  215:19
**predicated** 55:18
**predicating** 56:4,11
**preliminaries** 7:21
**preliminary** 11:5
**premise** 154:6
**preparation** 18:21,25
  19:7,8,11,23 20:4
**preparations** 19:6,6
**prepared** 59:5 131:23
**preparing** 18:17
**prescribed** 166:6,13
**prescriptions** 219:17
**presence** 56:9 167:20
  175:10 207:11
**present** 3:21 18:23,24
  19:12,13 20:3 23:23
  24:1 89:13 120:23
  150:24 191:18
**presented** 74:20
**presenting** 134:9
**pressure** 165:24 166:8
  166:12 168:12 213:14
  213:18,18,22,24 214:1
  214:7,18 223:1
**pressures** 165:2,15 166:2
  166:17 168:24 180:1
  213:14,16,23 214:4
  215:3
**presume** 166:11
**pretty** 114:20
**prevent** 117:7 159:9
**previous** 41:14 46:13
  74:21 164:12,21 207:12
  217:11 222:14
**previously** 42:2 43:8,19
  48:7 160:9 169:1 182:3
  222:11

**pre-Katrina** 152:20
  215:18
**pre-marked** 10:14
**pre-peak** 129:2
**primarily** 40:4 79:1
  106:11 113:25 175:1
  177:16 198:15 207:14
**primary** 26:7 27:24
  106:22 141:15 176:3
  187:13,13 201:4 209:15
  226:4
**principal** 21:10 36:8
  59:8 206:4
**prior** 21:1 27:7,21 62:24
  78:19 94:2 144:20
  215:2 229:9
**pro** 30:20
**probable** 180:8,10,13
  184:13
**probably** 37:7 77:10
  179:25 180:2 181:1
**probe** 127:13,14
**problem** 8:21 35:23
  53:16,17 90:8,9,10,11
  90:12,15 105:19 106:1
  161:25 204:23 218:3,6
**problems** 218:7
**proceed** 7:7 40:4
**proceedings** 12:22,25
  40:17 109:11
**process** 38:12 41:18,21
  73:8 124:5 127:11
  156:19,20 158:18
  159:25 161:10,20 185:5
  188:19 213:10
**processes** 188:25 189:1,4
**Procter** 3:14 6:8,22
  15:24
**Proctor** 15:11
**produced** 138:10 182:11
  217:4
**producing** 218:11
**production** 10:5 138:9
**professional** 37:22
  142:13,19 162:15
  193:17

**professor** 11:17 48:2
107:12 134:8 142:20
171:23 175:3 186:3
193:5 220:8,9 221:7
223:12 224:16
**program** 60:25 61:2,4,5
61:7 99:15,19,20
219:21
**programs** 14:15 99:5
**Progress** 163:17
**progressive** 156:19,20
158:18 161:9 223:1
**project** 15:1 104:24
112:21 153:3,4,11,13
169:17
**projected** 160:4
**projects** 14:10 40:14
**prominently** 141:16
**proof** 49:15,24 50:15
**propagates** 89:2,7
**propagating** 176:12
**propagation** 62:7 98:8
212:4
**proper** 63:6 206:17
**properly** 50:23 52:19
55:12
**properties** 135:25
**proportion** 38:11 215:13
**propriety** 162:22
**prorated** 25:4
**protected** 81:6,12 84:3
84:19 85:5,10 86:3,10
93:18 94:21 140:24
159:6 168:19 213:10
**protection** 27:14,18 51:7
55:14 57:3,5 63:8
97:22 98:5 99:6 101:7
104:9 111:5 119:5
122:2 131:7 152:14
170:15 176:4 179:4,23
208:4 209:15 211:23
212:7 213:11 214:9
219:14
**protective** 111:24
**prototype** 100:4
**protruding** 82:7

**proved** 135:19
**provide** 30:13 33:7,13
128:2,4 145:17 173:15
**provided** 29:18 31:13,17
48:16 60:11 61:18
81:19,21 112:19 127:2
151:6 173:18 188:4
191:24 229:16
**providing** 7:20,23 32:15
32:21 201:3
**proximity** 118:11 211:25
**pry** 82:19,25 83:2,6
84:23
**prying** 84:20 92:23
**psychological** 195:24
**psychology** 187:21
**public** 47:21 48:14
**publication** 27:3,16 36:9
133:23 142:21 143:14
144:11 146:5
**publications** 12:16,21
13:6,7,11,16 27:1,8
144:18
**publicly** 47:8,23 48:24
49:3
**publish** 145:16
**published** 142:3,23
143:12,12 145:10,19
146:20
**publishes** 142:9,17
**publishing** 144:16
**pull** 117:1
**pulverized** 75:6
**Pump** 82:4
**purported** 64:3,4 84:23
**purpose** 128:5,12 201:10
201:12
**purposes** 36:22 47:16
128:7
**Pursuant** 9:16
**push** 89:5,6 91:19 123:18
**pushed** 81:12 82:16
85:11,14 91:17 128:19
**pushes** 83:10 88:13
**pushing** 89:10 102:14
127:13

**put** 8:16 45:23 53:13
61:13 63:7 110:19
111:4 117:2,7,15,25
137:17 165:19,22 180:3
191:9 207:21 208:6
**putting** 19:15 118:6
134:7
**P.E** 1:14 2:1,5 4:3 7:9
**p.m** 109:20,22,23 110:2
110:3 155:21,22,22,25
165:8 199:23,25,25
200:1 224:4,5,5,8 227:4
227:5

---

## Q

**qualifications** 11:15
**qualified** 217:25
**quality** 124:10
**quantification** 184:24
**quantifications** 180:8
**quantified** 180:7 184:15
**quantify** 64:13 180:6
185:17
**quantifying** 184:9
**quantitative** 125:13
**quantitatively** 87:3 95:4
**quashed** 186:21
**question** 8:3,4,5,9,9,12
8:12,15,20,21 9:19
11:12 17:7 19:10 31:16
32:18,21 39:22 43:16
44:13,16 49:22 51:2,10
51:23 52:7 53:4,6,12,16
54:13,17,25 57:15
63:16,19 66:21 68:3,14
68:17 70:3,9 71:3,7,14
72:19,25 76:11,14
82:22 90:7,8 91:2,7,15
91:22 92:4,9,11 95:3,18
96:11,13 99:22 107:21
107:23 108:14 113:18
121:9 124:16 131:24
132:2,11 135:20 138:3
138:12 139:22 144:21
144:22,23 147:2,14,23
148:9,24 149:3 150:4

151:24 152:10 153:5,19
154:7,19,25 156:8
160:24 161:4 164:20
171:4,8,9 172:10 173:6
179:14 180:3 183:22,23
185:22,23 186:19
196:14 198:7 204:4,10
212:12 221:8,21 222:3
224:11 226:14,24
**questioned** 18:12 207:15
**questioning** 36:10 154:8
**questions** 7:22 10:20
57:7 89:25 90:3 110:7
121:2 125:17 135:14,19
153:15,15 161:1 183:2
183:5 185:6 199:20
220:25 223:6,23 224:17
224:19 225:5 226:23
227:1
**quick** 202:9
**quickly** 141:23 165:3
**quicksand** 213:21
**quite** 42:18 180:3
**quotable** 119:16
**quotation** 45:21,24 46:1
110:20 142:25 143:11
169:5
**quote** 49:24 50:1,24
51:13,24 55:7 81:2
85:1 110:12,13 147:14
148:9 183:12 187:13
**quoted** 30:25 31:3,7
101:19 104:5 146:17
153:20 167:3
**quotes** 45:8 110:15
**quoting** 131:12,17
141:25

---

## R

**R** 1:10 3:1 6:1
**race** 106:15 139:16,19,21
139:25
**radiant** 165:16
**radiants** 166:18
**radio** 34:18,19 196:23
**Raffman** 3:12 4:5 6:22

6:22 7:4 9:12 15:6 17:5
17:14 31:20 37:11
39:15 43:5,15 44:9,12
47:12 49:2,17,21 50:4
53:3,18 54:23 56:3
61:13 63:14,24 64:10
64:19 65:14 66:10,16
67:21 68:12 71:4,15,20
74:13 78:10 82:20 83:5
84:4 87:1 88:7,17
89:12 91:9,21 94:12
95:2,14 96:9 101:4
102:8 104:3 107:20
108:18,21 109:9 121:7
123:22 124:14 126:12
129:17 131:22 140:6
141:8 144:19 146:1,24
148:24 150:22 151:15
151:17 152:9 153:14,18
154:4,24 157:3,12
167:24 174:4 177:15
183:20 184:2 186:17
187:2 188:22 190:6
192:11 195:1,11 196:13
197:14 199:18 221:1,6
223:2,4,23 224:10,15
225:5 226:24
**Raffman's** 226:14
**rain** 195:22
**ramp** 111:16,17,22 130:9
**range** 57:23,25 58:17,22
59:2 156:25 169:3
180:20
**rapidly** 178:1
**rate** 15:18,19 97:16
101:20 128:19 148:13
150:14 184:17 225:2
**rates** 20:10 211:8,10
224:17
**ratio** 136:13,15
**rationale** 94:15
**Raymond** 48:2 220:8
**reach** 40:7 52:10,11 55:9
55:10,16 97:23 98:5
99:6 100:19 101:1,2,6
101:11,23 103:18

104:10 105:13 128:20
149:22 152:13,24 153:8
153:24,25 154:9,9
166:13 170:14 171:10
171:18 174:3 175:15
177:17 178:4,9 179:5
199:6 202:25 203:15
204:3 210:18,20 211:12
211:15,24
**reached** 31:5 33:4,10
40:9 42:19 65:3 82:1
147:18 148:17,19 149:5
149:9 165:4 174:3
182:8
**reaches** 166:1 178:10
202:25 203:15 206:23
**reaching** 35:2 41:19
42:21,23 69:5 74:3
148:22 149:12
**react** 222:25
**reaction** 83:15
**reactive** 83:17
**read** 32:19,20 37:11
44:14,15 52:5 53:5
54:15,16 63:17,18
65:18 76:12,13 81:15
85:1 105:23 107:22
115:6,8 134:3 149:4
205:23 228:4
**reading** 49:17 50:5 65:4
65:7 109:8 132:17
153:6
**reads** 132:17
**reality** 35:20
**really** 37:1 125:7 173:18
184:20
**reams** 217:6,7
**reason** 9:4 174:19
225:22
**reasonable** 123:6 129:19
129:20 135:5
**reasonably** 113:10 135:6
**reasons** 36:8,10 189:25
194:14 218:10 226:1,2
226:22
**rebuilding** 32:13

**recall** 32:15,21 44:6,16
45:4 62:14 171:14
172:12 181:18 194:17
196:20
**recalled** 9:14
**recedes** 93:14
**receive** 25:3
**received** 23:11 24:16
110:12
**receiving** 24:20
**recess** 9:23 37:12 79:8
109:22 155:22 199:25
224:5
**recipe** 105:10
**recognition** 167:19,23,23
**recognized** 56:9 168:6
**recognizing** 35:15
**recollect** 59:6 130:3
**recollection** 31:2 45:2,12
129:8,16 130:6 196:22
**recommendations** 32:12
192:1
**reconstructing** 131:11
**reconstruction** 219:23
**record** 9:20,22 10:2,3,23
32:20 37:10,14 44:15
53:5 54:16 61:11 63:18
76:13 79:7,12 107:22
109:19,21 110:4 113:2
113:20 149:4 155:21
156:1 199:24 200:2
203:4 205:17 224:4,9
227:4 229:11
**recorded** 229:8
**Reda** 182:5
**Reed** 107:4
**reestablish** 111:4
**reexamine** 74:22
**refer** 19:9 21:6 23:21
72:4 84:25 143:18
162:12 164:12 187:4
195:21 197:5 198:25
**Refereed** 12:20,21
**reference** 33:23 34:1,4
58:23 60:5 116:3
140:13 143:14 152:20

153:8 165:11 167:2
168:9 177:16 222:3,5
222:11,13
**referenced** 31:4 59:20
115:11 139:17 152:18
188:24
**references** 46:19 143:6,8
143:16,18 155:10 163:7
163:12,25 164:2 167:11
170:18
**referencing** 58:25 74:6
208:11
**referred** 33:18 52:15
87:9 100:15 101:18
105:12 122:6 137:19
189:17 202:21 216:12
**referring** 15:6,8 21:7,8
21:16 23:22,23,25
74:15 88:20 113:18
121:20 131:15 146:3
149:25 150:25 151:11
152:3,13,15,24 167:15
169:19 172:22 177:22
178:3,9,14 182:18
184:14 187:19 188:1,11
195:19
**refers** 62:8 136:4 153:24
154:5 156:23 177:10
204:4
**refineries** 27:15,19
**reflect** 154:20,21 155:5
**reflected** 30:16 140:11
168:19
**reflecting** 133:14 166:6
169:3
**reframe** 17:7 57:15
144:23
**refresh** 108:24
**regard** 15:15 27:9
147:19 148:11 154:10
175:24
**regarded** 32:11 111:19
**regarding** 60:22 105:18
207:8
**regards** 152:7 154:9
**regenerated** 176:16

regeneration 176:10,23
176:25 177:2,7 207:15
regular 12:12
regulate 38:20
reimbursed 23:2
reinforcing 76:2
rejected 31:25
relate 89:25 90:3 186:23
related 192:14 226:5
relates 19:10 149:1
relating 175:18
relationship 193:3,6,11
193:14 200:21
relative 31:5 46:8 83:7
89:2 132:12
relatively 173:25
release 26:16 47:21
relevant 170:9
reliable 36:21 74:20
127:8
Reliance 116:10,17
138:7,9 170:9
relied 61:21,23 144:12
145:4 147:17 148:3
152:6 182:5,6,11,13
190:5
rely 73:16 74:2 95:10
151:2 182:2
relying 143:25 150:19
154:1 171:21,23 174:20
174:25 186:6,24 198:14
205:19,20 206:1 215:18
remain 151:20 220:11
remainder 202:10
remediation 110:25
remember 9:2 13:19
36:12 38:24 39:9 65:7
81:21 82:11 83:23
116:13 122:22 143:20
199:8 223:10
remotely 7:3
removal 78:19 213:8
remove 156:25 159:17
161:19
removed 78:16,17
207:13

removes 159:25 161:20
render 185:16 195:12
repair 111:14
repaired 121:21
repeat 31:16 32:18 39:21
43:16 44:13 53:4,11
54:13 63:16 76:11
107:21 131:24 132:2,11
141:19 149:3 151:24
153:5 164:20 173:5
179:14 185:23 196:14
203:11 218:25 221:18
repeated 73:8 87:21,24
repeatedly 77:16 94:1
rephrase 172:10 219:11
replace 201:18,20 202:6
202:16 207:10
replaced 121:22
replacing 202:12
report 9:10,13,13 10:5,6
10:17 13:20 19:7,15,23
24:7 25:24 27:6,13
30:25 31:4,4 42:2 45:8
45:11,13,22 46:19 47:4
47:11,17,20,22 59:20
60:10,21 61:18 65:7,13
65:15 70:12,25 79:2,25
80:19 81:18 82:2 84:14
97:5 110:7 115:10
116:3,4,5,8 117:12,12
120:25 122:15 130:3
131:17 133:18,20,21
136:18,19 137:21 138:6
141:10 151:9 152:1
154:18 156:3 163:8,17
167:17,18 170:4,12
175:25 181:14,17,20
182:11,14,18 184:1,20
189:15,23 193:21,24
194:2,4 195:4 198:2,15
199:1,2 200:5,8,12,24
200:25 201:5,11,12,16
201:22 202:6,10,13
210:11 213:2 216:10
221:24
reported 178:16

reporter 6:17 7:12,24
9:9 11:7 49:5 59:13
79:13 109:16 147:7
203:4,20 210:24 229:5
229:16
reporting 197:23
reports 9:17 12:23 18:18
31:1,10,18 41:23 47:6
112:22 164:4 182:15
196:22,23,24 197:1,2
197:17 198:11 200:18
216:4,14,23 223:22
224:21 225:1
represent 6:16 35:20
222:7
represented 9:14,15 28:3
98:7 175:3
representing 55:21
represents 97:2 137:8
155:1 222:8
requested 18:13 229:14
229:15
require 38:20 55:3 84:21
217:20
required 25:8 56:1
100:14 127:23
requirement 110:19
requirements 184:18
requires 11:5
research 148:23 149:13
150:18 190:12,17
193:11
researchers 105:14
resistance 124:3 127:16
127:17 128:17
resisting 124:3,5 163:4
214:8
resolution 60:22 61:7
resolve 36:18
resolved 36:19
resources 198:12 218:6
respect 13:15 15:14
19:23 33:14 35:1 62:16
108:18 110:11 154:2
193:4 226:20
respond 77:22 95:17

98:3 143:22 161:5
183:23 192:20
response 68:23 104:22
146:15 157:9 207:25
219:20
responsibility 56:6 69:20
70:2,8,13,20 71:2,6
responsible 106:7 212:4
responsive 184:17
rest 82:9 88:16 93:22
141:1 206:20
restrict 217:22
result 31:6 35:22 60:25
61:1,2 63:5 124:22
167:7 184:14 213:7
216:7
resulted 54:10,19
resulting 106:16
results 32:7 160:13
166:23 175:18,24
183:14 184:16 185:10
185:20 187:16 188:2
207:24
retained 144:1
retired 11:18
return 221:22
returned 26:7,14
reverts 134:1
review 30:3,10 82:1
142:21,22 163:16 192:5
192:18 229:13
reviewed 108:7 181:20
191:6 198:23 224:21
reviewer 30:2 42:1
Reviewing 112:18
Reviews 200:17
revision 147:3
re-characterize 65:11
re-failed 131:9
re-flood 111:10
re-perform 215:20
re-qualification 219:23
ribbon 86:13 87:10
Richard 3:4,5 6:20
Richardson 216:19
Rick@rickseymourla...

3:9
**right** 11:17 13:12,21
19:10 47:3 50:4 58:19
58:21 60:7 67:7 70:21
73:16 75:1 80:20 83:19
83:25 85:18 90:6 92:8
100:15 105:24 108:21
115:13 118:3 123:21
132:22 150:9 167:12,22
168:2 182:1 219:6,7
223:2,12 225:13
**rigid** 89:1,8
**ripping** 86:7
**rise** 209:3
**rising** 88:23 178:9
**Risk** 26:3,18
**Rita** 26:6 93:23 110:22
114:12 120:21 131:9
**River** 80:11
**River-Gulf** 16:23 17:4
17:25 18:5,18 19:3,16
19:20 20:2,13 21:1,5,14
21:22 23:9 52:21 54:1
54:8,9 55:16,22 56:1,2
56:10 101:12 109:1
143:24 144:14 145:3
176:3,5 177:12,18
179:6 204:15 209:10
210:17
**Road** 172:3,4,5,13,14,18
172:20,21 173:3,10,12
178:22,25 208:5 209:8
209:12 210:19
**roadway** 130:20
**Robert** 1:14 2:1,4 4:3
6:14 7:9 10:24 79:6,10
155:20,24 224:3,7
227:3
**Robinson** 17:1,3,10,13
17:18,24 18:5,19 19:4
19:17,21 20:3,8,15 21:2
21:7,15,21 23:9 49:7
53:22 97:17 108:11
143:25 144:13 145:3
147:8 150:25 151:13
152:5 154:23 170:19

171:15 202:22 203:6,21
210:25 216:11
**rock** 111:16,21
**rocking** 80:2
**Rogers** 41:4,4 220:9
**role** 43:1 44:5 47:10 54:4
54:6 70:15 72:9 73:7
92:24 95:12,21 96:7
106:9,25,25 107:18
108:3 189:13 190:13
191:2
**roles** 43:10 160:15
**roles/participation**
43:25
**room** 11:1 19:15,21
**Roughly** 39:11
**Route** 80:11
**RPR** 2:8
**rubble** 76:4,6,16 78:15
78:20
**rubbling** 92:17
**Rule** 109:10
**ruled** 226:15
**rules** 14:9,13
**run** 155:17
**running** 222:1
**rust** 76:8,18 92:17

---

**S**

**S** 3:1,12 4:1 5:1 6:1
228:14,14
**sabbatical** 12:7
**safely** 130:20
**safety** 124:4,13,13,19
125:3,6,21,23 126:7
128:9 140:14 180:19
202:2 219:21
**sailboater** 33:20
**salary** 22:23 24:20 25:12
25:17
**sample** 188:6
**samples** 137:23,24
**San** 2:2,6 6:9 229:2
**sand** 113:16,20,23
114:17 115:16,20,23
137:4,12 213:9 215:14

**sandbar** 176:13,14
**Sanders** 44:22
**sand-filled** 104:20,23
105:9
**sat** 40:1
**satisfactory** 8:7
**saturated** 166:3,4,5
**Saucier** 114:2 170:6
**saw** 82:9,10 110:21
111:3 128:6 173:22
178:20 197:10
**saying** 51:16 53:21 54:3
56:5 80:13 95:20
150:20 167:18 168:5
204:18
**says** 51:25 59:23 81:2
92:20 106:13 131:18
132:4 147:3 152:1,5
154:1 156:17 157:8
158:11 159:4,16,24
160:3 165:1,15 166:16
166:23 168:14 178:7
184:20 212:13
**scale** 60:2,4 100:8
**scenario** 82:23 88:21
123:24 124:2
**scene** 75:15
**scholarly** 163:10
**school** 12:12 93:4,5,12
93:16,17,19,22,22
140:25 191:19
**science** 22:10,11 23:4
127:2 187:20
**scientific** 35:2,21 36:5,8
36:21 98:25 134:17,22
221:11
**scientist** 74:25
**scraping** 94:1
**scrapings** 76:8,8,18,18
**screen** 153:21
**sea** 33:21 60:7,8
**seal** 120:13
**searching** 163:2
**second** 21:14 35:11 46:6
66:19 79:24 142:24
165:14 207:22 208:2

212:9 213:13
**secondarily** 207:16
**Secondly** 148:3
**section** 1:8 80:20 85:7,24
86:9,12 87:9,11,15,16
87:19 102:12 131:20
132:6,8,16,20 133:1,5,8
134:23,25 135:23
164:15
**sections** 81:3,8 85:1,13
87:25 135:2 190:2
**see** 36:14 46:14 49:11,24
50:1,18,25 51:6,14,22
59:11 76:7,16 78:21
80:5,12,14 81:13 82:9
84:13 86:24 109:13
110:25 111:6,12,23
113:7 117:20,25 130:10
132:1,4 133:2 154:13
154:17 161:25 174:11
180:17 187:25,25 188:3
188:4 203:25 219:17
221:12 222:4
**Seed** 41:1,2 48:2 134:8
193:5 220:8
**seeing** 35:6
**seen** 46:14 79:19 82:6
87:21,24 111:23 123:3
172:19,20
**seepage** 86:1 98:10
101:15 105:3,3 106:16
106:24 146:11,12,13
156:23 165:2,22 166:10
166:14 167:4,9,21
221:23 222:14 226:5
**seepage-induced** 105:11
**segment** 102:11 177:18
**semester** 12:7
**senior** 40:2
**sense** 99:24 121:13,14
**sensing** 127:15
**sent** 109:9
**sentence** 132:14 134:1,3
139:12 159:4 165:14
176:1 179:15 183:7
187:12 205:11

**sentences** 84:25
**separated** 17:3 86:14
**separation** 84:17
**September** 1:15 2:3,5,7
  6:5 10:17,18 12:9
  20:18,19 21:20 22:15
  23:22,25 42:16 43:19
  75:11 119:2,11 201:8
  229:19
**sequence** 146:8
**series** 61:23 105:6 126:4
  133:22 188:9
**serve** 16:19 130:20 219:4
**served** 28:10 29:11,16
  30:2 149:24 177:22
  217:3,14,16
**service** 121:23
**Services** 6:4,18
**serving** 14:20 16:21,25
**SESSION** 4:9 110:1
**sessions** 18:25
**set** 35:4,8 36:14,20 38:5
  101:7,21 144:4 162:2
  185:6 204:13 207:23
  208:2,3,12
**setting** 151:9 185:25
**seven** 13:4 46:25
**severe** 52:9 55:8 85:24
**Seymour** 3:4,5 4:4,6 6:20
  6:20 7:17 9:8,20 10:3
  10:21 15:8,12 17:8,16
  31:22 32:19 33:1,6
  37:7,15 39:18,23 40:11
  43:6,12,17 44:10,14
  45:1 47:15 48:3 49:5
  49:10,20,23 50:6 53:13
  53:15,19,20 54:15 55:5
  56:15 59:12,16 61:11
  61:15 63:17 64:5,14,23
  65:21 66:12,24 67:23
  68:16 69:4 71:9,18,25
  73:10 74:16,24 76:12
  76:23 78:14 79:3,13,18
  82:24 83:9 84:6,9 87:6
  88:9,12 89:9,15 91:10
  91:25 92:3 94:22 95:8

95:15,23 96:19 101:22
  102:15 104:18 108:9,20
  108:23 109:16,19 110:5
  122:4 124:8,17 126:20
  129:23 131:25 140:8
  141:9,18 144:21,24
  146:4 147:7,11 149:2
  149:16 151:8,16,22,25
  152:22 153:16,21
  154:12 155:4,16 156:2
  157:7,15 168:1 174:8
  177:20 183:24 186:21
  186:22 187:3 189:5
  190:11 192:16 195:5,18
  196:15 197:24 199:21
  200:3 203:3,9,20,24
  210:24 211:3 220:25
  223:24 224:10 225:9
  226:23 227:1
**Seymour's** 223:6
**shaded** 118:3
**shape** 19:16 159:15
**share** 106:1 220:6,16
**sharpened** 215:7
**shear** 97:8 99:17 100:20
  100:23,25 102:22 128:8
  128:21 212:14
**sheet** 81:7,11 85:5,9,25
  89:1,3,23 157:24 160:4
  161:22 168:16,18,19
  211:21
**Shell** 28:15
**Shelonko** 3:23 7:1
**Sheriff** 174:14
**short** 121:10 199:19
**shorter** 156:15
**Shorthand** 7:12 229:4
**shortly** 75:14
**shove** 83:22 84:1
**shoved** 102:13
**shovel** 89:4,5,8
**shoving** 94:8
**show** 95:21 96:6,16
  102:10 120:5 126:11
  132:15 133:1 153:21
  160:14 161:24 165:2

203:12 210:2
**showed** 72:6,12 132:19
  194:21
**showing** 124:21 174:11
**shown** 74:7 118:19
  174:14
**shows** 117:24 133:8
  141:14 151:4 160:20
  169:22 202:14 210:15
**side** 23:17 81:6,12 82:17
  82:18 84:3,19 85:5,10
  86:3,10 93:18,21 94:21
  111:1,15 119:15 121:19
  123:16 129:13 140:24
  157:16,17 159:6,10
  168:18,19 194:19
  209:18 213:10
**sides** 76:6,16
**sighting** 33:23 34:14
**sign** 37:11
**signature** 92:18 140:20
  141:14 186:11
**significant** 60:16 84:22
  111:19 120:1 121:14,18
  137:3,12 156:24 158:24
  178:15 181:19 208:8
**significantly** 84:16 124:6
**signs** 72:16 78:6,21
  120:1
**silent** 151:21
**Sills** 42:12,24
**silt** 137:3,13 215:14
**similar** 41:21 55:17
  94:16,16,17 158:17
  161:16 194:23 195:2
  202:3,6 226:22
**similarities** 98:13
**Similarly** 159:1
**simple** 67:18 90:7 92:9
  92:11 154:19
**simply** 8:10 80:2 127:13
  134:18 188:19
**single** 34:4 110:20
**sinking** 213:20
**sir** 39:2 75:1 77:22 91:15
  170:10 200:16 202:1

203:8 221:25
**site** 72:14 73:13 75:3,19
  111:17 113:25 114:2
  115:1 118:6 120:7
  131:1,3 139:9 170:5,6
  189:24 192:13,18
**sites** 110:18,21 113:25
  116:6 191:11,22 193:1
  195:3
**Site-Clearing** 105:1
  112:21
**situ** 126:19 127:5 137:25
**six** 13:3 16:13 81:2
  206:23 222:4
**size** 130:14 136:4
**slaves** 77:24
**small** 129:11 136:6,7
  176:25 188:6
**smart** 214:23
**Sneed** 40:25
**social** 187:20
**social/cultural** 188:10
**society** 27:12 37:22 38:1
  38:1 77:14 142:6,23
  163:15 190:25 191:19
  192:4 193:15
**soil** 88:25 89:2 95:5 98:1
  102:14 103:6,8,12,15
  103:17,22 104:12
  117:10 126:8,19,19
  127:3,8,16,20,20,24
  128:3,19,22,23 136:5
  137:6,6,8,16 138:5,8,18
  156:25 157:25 158:8
  159:22 161:14 165:24
  166:1,4 169:3 201:14
  212:12,14,17,21 213:8
  213:19,24 214:8 215:19
  215:23,25 222:24
**soils** 129:21 137:1
  159:17,25 161:19 213:6
  213:17 215:11
**soil's** 128:20
**solely** 87:15 139:10
**somebody** 100:22
**sorry** 49:20 50:4 89:25

139:23
**sort** 96:18 193:9
**sound** 129:15 197:7
**sounding** 197:5
**sounds** 94:7,7 119:3
129:19 133:9 180:5
**source** 35:11 59:17 60:18
61:17 170:21,24 174:17
175:12 193:22 194:1,4
206:4
**sources** 35:16 59:19
174:21
**south** 33:8 44:25 46:10
58:7,20 73:9 81:4
84:18 85:2 90:21 91:24
92:2,15,16,16 93:17
94:2,9 95:13,20 96:8,15
96:16,24 97:4 102:1,3,4
102:12 104:14 106:5,21
111:15 114:3 130:4,7
130:11,12 135:10,17,23
140:23,23 151:11 152:3
169:21 170:7 181:5,7
188:18 189:19 191:3
208:15 215:22 220:21
222:12 223:18 225:12
226:21
**southern** 122:18 189:19
**so-called** 36:20 166:1
206:11 213:25
**span** 26:11 80:12 194:19
**spanning** 87:21
**spans** 114:2
**speak** 18:4,9 23:15
**speaking** 7:25 8:1 62:18
176:2
**specific** 15:15 92:7
103:13 111:7 113:17
114:24 115:2,3 116:6
118:22 124:15 128:5
144:6 150:7 157:5
186:5,7
**specifically** 15:9 162:4
167:1,2 191:13,16
**specifics** 123:24 183:22
**specify** 64:11 74:15

108:15 174:6
**speculate** 66:23
**speculating** 87:5
**speculation** 55:3
**speed** 57:8,11,14,17 58:6
61:16 62:23 68:10 69:7
89:11
**speeds** 57:19,23,25 58:1
58:12,13,14,17,23,24
59:2 69:14 141:6 190:4
**spell** 61:8
**spelled** 27:16
**spelling** 61:12
**spent** 36:11 79:21
**spiral** 75:10
**sponsored** 22:10
**St** 55:15 172:23 173:2,10
173:12,25 174:9 177:19
177:24 178:12,17 179:1
179:12,17 204:3
**stability** 98:11 101:15
106:12,16,18,23 214:20
**stable** 123:17
**stage** 44:1 123:19 154:8
198:14
**stages** 191:7 198:18
215:8
**stand** 59:24 155:6 199:3
**standard** 162:15 180:12
**standards** 30:3 32:11
38:6 187:10 189:11,21
190:8 193:4
**standing** 103:25 112:4
**stands** 199:8
**STANWOOD** 1:10
**stars** 34:17
**start** 39:20 132:24
159:12 165:6 222:22
**started** 24:3 122:7
151:11 152:4 154:18
165:7
**starting** 139:25 147:13
165:5
**starts** 157:11 204:23
**state** 9:5 10:22 165:3,17
166:2,11 168:24 169:2

169:6,7 179:4 183:12
189:22 190:10 229:1,5
**stated** 8:22 44:7,18 45:22
134:13,16
**statement** 11:15 136:3
154:6 179:15 180:9
182:3 190:17 205:23
**statements** 48:15
**states** 1:1 6:12 26:24
38:13,14,20 106:9
117:12,14 132:14 139:5
170:12 176:1 205:11
206:20 218:18
**stating** 202:23
**Station** 82:4
**stay** 185:16
**steady** 165:17 166:1,11
168:24 169:2,7
**steel** 76:3 81:7 85:5
87:13
**stenographically** 229:8
**step** 104:7,8
**Stephens** 174:15
**steps** 127:22
**stipulate** 61:11
**stipulated** 53:18
**stirred** 176:20
**stop** 125:16 226:25
**stopped** 173:20 208:18
**stopping** 167:22
**stops** 157:24 158:14
**storm** 102:11 103:6,10
177:23 179:9
**strain** 128:23
**stranger** 7:19
**streaks** 92:17
**Street** 100:10 215:1
**strength** 97:8 99:17
100:21,23 101:1 102:23
128:8,21 129:3,3
136:12 212:14 213:17
213:19
**strengths** 128:22 129:4
**strenuously** 216:15
**stress** 85:25
**stresses** 148:5

**strike** 123:6 221:21
**strikes** 67:19 194:12
**striking** 48:5 195:9
**strong** 63:2 122:11
195:16 223:8
**stronger** 134:18,19
**structure** 79:23 211:20
212:7 213:12 214:9
218:18
**structures** 27:18 50:24
55:14 63:8 87:23 97:22
98:6 99:7 101:7 104:9
129:6 152:14 176:4
179:5,24 209:15 211:15
211:16,21,24
**stuck** 82:8,14 83:11,19
**students** 13:14,15,15
14:3,10,21 15:2 16:3,5
16:7 20:21,23 24:15
39:5,6 77:19,24
**studied** 95:4 103:11
169:4 182:13
**studies** 31:6 60:12 73:24
112:14 127:1 132:15,18
132:25 133:24 166:24
166:24,25 167:8 168:3
174:23 181:23 187:9
188:23 191:8 192:7
214:13,14,25 226:3,4
**study** 31:10 41:13 70:10
72:6 167:3 168:2,5
191:7 219:10
**stunned** 12:14
**style** 46:3
**subcontracted** 127:3
**subject** 13:23 109:10
169:4
**subjected** 211:23
**subjective** 184:23 185:3
185:7,8,12,17,19,24
**subjectiveness** 185:14
**subscribed** 47:17
**subsequent** 46:8 126:4
187:9
**subsequently** 118:14
121:21 151:7

substance 46:2,4
substantial 92:24 124:12
substantially 26:22
substantiated 181:25
subsurface 127:21
subterranean 214:2
sudden 86:6
sufficient 64:17 89:22
  126:17 194:14 222:25
suggested 41:8
suggesting 40:18 122:17
suitable 121:22
Suite 2:6 3:6
summarize 161:4
summarizes 201:1
summary 59:5 201:4
summer 12:7 24:22
superior 128:12
superiority 128:6
supervision 127:5
supplement 191:23
supplemental 10:16
  201:7,10,12,22 202:6
  202:10 221:24
supplied 143:13
supply 18:13 22:17
  217:20
support 22:18 26:15,16
  26:17 31:9
supported 211:22
supporting 16:2 88:25
  157:10,25 159:17,25
  160:3 161:14,19,21
  195:8
supposition 55:2
sure 8:2 10:12 17:1
  34:10 48:9 105:24
  122:5,21 165:21 174:20
  180:3 199:11
surety 133:15
surface 57:8,17,20 58:6
  62:23 77:5 117:6 141:6
surge 52:11 55:10 59:22
  88:23 148:11 150:13
  155:2 165:5,6 177:23
  178:9 179:9 180:1

205:12,15,16,24 206:12
  208:4,7,15,19 209:3
surges 144:15 145:7
surprise 80:7
surrounding 46:16
  197:16
surveying 34:8,9,20
suspicion 75:16
swamps 105:6
swear 6:18
swim 176:21
sworn 7:5,11 229:10
Symposium 12:22
synthesis 160:23 161:6
system 52:2 56:22 57:4
  81:12 85:11 119:1
  122:2 168:25 221:12
systems 167:6 219:14

---

**T**

T 3:4,5 4:1,1 5:1 228:14
take 7:24 11:6,8,9,25
  33:22 37:8,18 63:3
  80:16 92:15 113:16
  127:23 128:17 137:23
  147:12 155:8,14,17
  156:12,24 158:14 160:1
  161:7,10 168:10 169:11
  191:22 201:21 202:9
  204:8
taken 8:24 9:23 26:23
  37:12 79:8 109:22
  113:11,20 115:11,16,23
  118:17 119:2,5,8 138:2
  155:22 199:25 202:16
  206:18 224:5
takes 156:14
talk 220:4,12
talked 22:5 23:10,11
  26:8 29:13,22 40:1
  100:22 140:2 181:8
  182:4 184:25 189:6,8
  189:10 216:6
talking 56:17 58:4 67:4
  79:21 93:15 146:18
  148:19 149:8 150:16

180:25 197:6 212:23
talks 153:1 169:14
tap 123:8
tape 155:17,19 224:1
tape-change 79:3
task 42:15 72:5 105:25
  106:3,10 107:13 126:1
  129:19 164:4 171:4
  190:20 192:2,6 198:16
  206:7 214:17
teaching 11:20,23,25
team 22:12 24:7 29:24
  32:4 35:23 38:25 39:1
  39:14,24 41:7,9,11 42:4
  42:6,8 43:1 69:19,23
  70:7,19 71:1,6 74:9
  77:13 78:1,2 105:15
  107:7 109:5 110:12
  124:19 125:5,7 126:2,3
  126:22,23 127:1 129:10
  131:14 136:18 139:2
  147:19 148:4 167:16,18
  187:6,7,8 188:12,13,14
  188:14 189:7,9,10
  191:8 192:10,22 193:10
  198:17 206:11 209:2
  220:4
teams 36:23 37:2 43:10
  191:25
tearing 86:6
tears 220:11
Tech 199:9 200:15,19
technical 12:23 15:21
  30:8,11,22 79:15,16,25
  81:18 84:14 189:15
techniques 225:2
Technology 30:3 32:11
  187:10 189:12,21 190:8
  193:4
telephone 19:13,22 20:4
tell 16:15 18:11,15 25:25
  27:23 30:1 34:4 62:20
  69:17 111:25 112:9
  114:13,16,18,21,22
  129:2 137:7 149:17
  151:22 190:21 205:14

226:1
telling 100:12 195:14
tells 99:21 137:13
temporary 131:7
ten 217:7
tends 48:5 76:1
tension 88:10 89:23
term 22:8 34:7,7 78:11
  185:13,13 213:9
termed 187:18
terminal 64:1 72:21
  90:24
terminology 8:10
terms 15:13,16 58:12
  122:6 135:25 163:2
  183:13 184:11 216:22
terrestrial 34:24
Terry 198:21
test 36:6,13 100:6,8
  101:24 102:22 127:5,12
  128:4,7,15 129:1
  185:19
testified 7:12 27:20
  51:23 65:25 82:6
  107:16,24 108:17 127:6
  171:14 225:10
testify 9:2 97:17 146:20
  146:21
testifying 128:6 150:19
  196:8
testimony 7:20 13:21
  15:22 18:22 19:1,9,11
  20:5 29:7 37:17 48:1
  49:7 51:20 56:17 66:3
  75:18,24 108:7,8
  144:12,20 147:9 149:1
  150:12,24 151:4 152:5
  152:24 154:5 171:24
  194:24 195:7 196:1
  197:25 198:20,22
  202:22 209:20 211:1
  223:10,22 228:7 229:8
  229:12
testing 35:24 103:6
  127:4 128:1 137:11,25
  138:9

**tests** 103:1,2,9 126:19 127:7 129:11,24
**Thank** 7:6 11:13 106:2 109:13,15 199:10,15
**thanks** 198:19
**theoretically** 90:16 223:7
**theories** 225:2
**theory** 104:19 108:12 212:24
**thickness** 119:14,17
**thing** 10:7 35:3 36:16 83:7 84:10 90:4 93:2 99:24 120:13 123:4,8 123:17 137:5 141:22 169:2 222:17
**things** 11:4 34:15,16 40:17 45:16 48:22 63:7 69:1 77:7 97:9 99:17 100:5,16,17 114:16 117:13 127:25 136:11 140:5 150:16,16 152:8 160:22 168:6 182:19 188:1 213:8 218:21
**think** 8:6 35:9,10,19 37:7 38:24 45:22 48:5 53:15 56:19 57:21 65:3 71:21 86:6,20 90:18 91:9,12 93:6 94:14 95:16 103:5 105:1,22 115:13 117:5 117:6 120:24 145:1 148:25 175:4 187:14 192:12 197:9 199:10 201:24 216:16 219:25 220:17 226:25
**thinking** 36:12 129:13 217:7
**thinks** 141:10
**third** 35:14 66:20 80:22 159:16 166:16 177:10 179:20
**thorough** 78:5
**thought** 35:21 40:3 41:13 44:7,18 74:21 127:7 164:19 196:9
**thrash** 40:16
**three** 2:6 6:8 21:10 24:22

25:9,11 28:5 34:2,13,14 34:16 39:11,11 40:23 41:8 100:15 140:12,15
**three-dimensional** 146:11 167:4,8
**thrust** 223:10
**tie** 115:1
**tied** 106:23 115:3
**tile** 145:25
**time** 6:5,15 8:1 9:21 10:1 11:7,7,9 12:12 16:14,21 17:9 24:6,17 26:16 28:17,20 36:11,18 37:8 37:9,13 42:16,20 43:5,8 43:13,15,18 44:3 45:10 48:17 56:23 59:7 60:14 62:6,21 63:24 66:11,12 68:21 69:8 72:8,18,23 73:2,20 74:1,5 78:8,9 78:17,18 79:4,7,11,21 82:1 95:9,20 103:2,8 106:17,20 108:15 109:20 110:3 112:11 124:2 131:10 133:13 138:4,11,11,21,24 141:14 144:14 145:7,12 146:2,16,16 148:12 150:13 152:7 154:3,14 154:20 155:2,3,20,25 156:24 157:1 161:10,10 165:10,12,18,25 166:1 166:12 178:1,13 183:4 186:23,25 191:7 193:23 196:24 199:18,21,23 200:1 204:20,22,24 205:1,5,7,8,16 206:6,22 206:23 207:1 215:4 217:10 222:1,8,11,19 222:20,23,25 224:4,8 227:4
**times** 24:22,24 34:2 65:10 69:15 87:17 96:15 143:1 144:4,6,17 145:6,13,18 150:8,17 165:11 168:11 178:12 186:5,7,16

**timing** 46:7 144:9 145:16 146:15 147:4,6 174:22
**tip** 82:7,8,9,10,14,17,18 83:23 160:5 161:21,22
**title** 38:19
**today** 6:5,23 9:2,5 20:5 24:4 62:20 66:3 141:1 169:25 190:2 191:9 194:22
**today's** 227:3
**told** 17:9,13 110:16 154:4
**Tony** 27:15
**top** 49:11 80:24 86:9 93:5,12,16 105:5 130:17,21 132:23 140:25 156:17 162:12 211:5
**topic** 202:17
**topics** 146:19
**topography** 147:24
**total** 13:7 21:3 22:13 129:20
**trace** 115:18 116:1,4
**tracked** 214:11,16
**tracking** 184:9
**trail** 220:11
**training** 37:19
**transcends** 198:8
**transcribing** 46:22
**transcript** 45:9 49:8,18 53:22 55:7 153:19 203:6,21 228:4,7 229:11,14
**transcription** 45:5,6
**transient** 166:10 167:21 169:2,6
**transmission** 213:6
**transmitted** 68:25 213:16
**transpired** 133:13
**transport** 130:21
**Transportation** 125:19
**transporting** 168:15
**travel** 15:20
**tread** 118:1

**treatise** 162:17
**treatises** 163:10
**tremendous** 87:17
**trench** 121:19
**trending** 209:9,10
**trial** 18:22,25 49:7 53:22 97:17 100:1 147:8 207:9 216:12
**triangulate** 33:22 35:11 36:14 182:7
**triangulated** 35:17 71:10
**triangulation** 32:6 33:19 34:7,21 36:25 40:6 71:11 105:12 187:18
**tried** 40:16 185:15 222:22
**tropical** 29:1 56:25
**truck** 130:14
**trucks** 130:21,22
**true** 20:12 77:20 103:10 122:9 124:11 135:24 140:3 185:14 186:12,15 195:6 215:14,17 228:7 229:11
**truly** 137:7
**Trust** 151:17
**trustworthy** 99:25
**truth** 35:20 100:12,12,13 195:14
**try** 8:2 53:13 186:9
**trying** 71:16 89:4 103:23 105:13 111:9 123:15,16 123:18 151:17 155:8 169:11 197:11
**turn** 11:14 12:18 27:1 35:10,14 76:5,15 80:9 110:8 120:25 122:15 130:22 132:9 156:3 195:19 199:16 200:9 204:7 212:9
**turned** 121:25 181:25 216:23
**turns** 213:24
**twice** 34:2 53:15
**twist** 87:19
**two** 13:6 21:9 34:14 43:9

46:23 47:7 59:10 84:25
86:5 88:24 97:6 98:14
99:1 106:14,19 113:25
129:14 132:22 135:2
136:14 137:15 142:11
142:12 147:1 162:7
165:21 166:19 168:3
170:3 188:7 209:14,25
213:3 220:9 223:2
**two-dimensional** 146:10
162:13 167:3
**type** 14:17 137:24
162:19,22 163:11 190:5
**types** 127:19 128:1
135:24 166:14

---

**U**

**Uh-huh** 50:2 85:12
**unable** 40:7 183:23
198:11
**unambiguous** 135:6
**uncertain** 98:10 157:2
**uncertainties** 97:6,7,11
98:4 104:17 140:10
160:18 161:1 162:8
175:23 184:5,8 212:5
216:7
**uncertainty** 97:3 180:6
185:6 211:4 224:18
**undergraduate** 13:14
14:3 15:1
**underlined** 132:8
**underlining** 135:21
**underlying** 118:12 126:8
214:2
**undermine** 213:11
**underneath** 88:6,8,9,15
90:13 91:20 120:11
**undersigned** 228:3
**understand** 7:2 8:16,22
13:9 17:6 24:5 29:15
34:10 45:15 55:24 73:6
73:25 85:23 100:2
103:23 106:1 122:5
134:9 139:24 150:4
155:16 162:10 165:20

167:15 188:21 196:7,17
197:4 210:3 218:3
**understanding** 58:5,10
58:17 92:13 98:10
138:15 174:21 197:22
221:15
**understood** 139:18
**underwater** 120:6
**underway** 26:20
**under-base** 101:15
106:15
**under-seepage** 56:19
104:19,22 105:19
108:12 117:16 212:24
**undisturbed** 152:20
**unfold** 112:14
**Unfortunately** 210:23
**uniform** 211:7 212:15
**unique** 88:1,2
**unit** 28:14,17 168:12
203:1,16
**United** 1:1 6:12 26:24
38:13,14 106:9 218:18
**university** 11:1 13:14
14:8,21 22:16,22 23:5
24:21,25 25:5,9,10,13
26:15 39:4 41:6 142:18
**unpaid** 23:19 24:2,12
**unquote** 51:13
**unusual** 84:20 86:14
110:18,19
**uplift** 213:23 214:7,18,22
215:3
**upper-left** 80:1
**upright** 123:16
**uprooted** 81:5 85:3
172:17 173:8
**upward** 214:4
**USA** 1:10,11
**use** 14:10 77:24 78:3
138:11 145:25 162:18
**useful** 127:18 173:16
196:1
**uses** 8:10 166:23
**utmost** 180:13
**U.S** 42:12 112:19 119:19

190:19 194:17 204:19

---

**V**

**v** 1:8,8,9,9,10,10,11 86:5
**vacation** 25:20
**Vaccarezza** 2:8 6:17
229:4,21
**vague** 43:5,15 63:14
66:10
**vagueness** 186:18,21
**valid** 63:8 188:8
**validate** 185:18
**validated** 175:23
**value** 151:5 180:14
**values** 180:11,13
**vanes** 62:18
**variabilities** 34:6 97:9
**variability** 35:8,15 97:8
**variable** 58:15 212:21
**variation** 97:1 101:20
124:12 166:19 180:18
212:16 215:25
**variations** 212:21
**varies** 58:12,13
**variety** 73:5 187:14
197:16
**various** 12:18 115:17,18
161:1 191:7
**vary** 57:17
**varying** 58:11
**vegetation** 172:15 178:2
**vegetative** 159:23
**velocity** 58:12 62:21 67:5
158:6 213:5,7,14
**veracity** 36:13
**Veritext** 6:4,18
**versa** 8:1
**version** 13:20
**versions** 30:17
**versus** 28:16 34:25
127:17 167:3 169:2
172:4
**vertical** 59:25 122:12
157:20,20 161:12
**vessel** 34:12 67:9,12,14
67:16 68:19,20,21

**vice** 8:1
**vicinity** 61:25 62:9
169:20 176:5 208:5
209:7 226:7
**Vicksburg** 42:13
**victim** 47:23 48:4,5,18
48:19,20,21 51:12
141:2
**victimized** 48:22
**victims** 48:11
**video** 45:5,7,9,10,24,25
46:17,23 47:5,6 75:11
**Videographer** 3:24 6:3
7:2,6 9:21 10:1 37:9,13
79:5,9 109:20 110:3
155:19,23 199:23 200:1
224:2,6 227:2
**videotape** 108:8 174:11
**videotaped** 1:14 2:1,4
**view** 43:14,20 106:24,25
**viewpoints** 36:6
**views** 43:1 154:2
**Villavaso** 82:5 198:21
**Vincent** 62:2 73:23
**visibility** 195:21
**visit** 46:18 111:2
**visual** 125:11 191:23
**visually** 113:8
**void** 136:13,15
**volume** 60:21 129:9,10
136:18 164:6,6,7
**volumes** 178:1,11
**Vrijling** 171:23 175:3,5
175:8 178:19 203:13
206:8,9
**V-r-i-j-l-i-n-g** 175:4

---

**W**

**W** 28:16 228:14
**wait** 8:2
**walked** 75:9 77:11,15
**wall** 33:9,16 43:3,23
46:15 53:1,9,25 54:11
54:20 63:4,13,23 64:4,9
64:16,18,25 65:9 66:7,9
66:15 67:6,10,12,20

68:5,9,11,22,24,25 69:9
72:13,15 75:17 78:22
78:24 81:3 82:8,14,16
82:17 83:19,22,23 84:2
84:3,15,18 85:2 86:3,10
87:9,11 88:4,9,13,15,21
89:10,16,18 90:12,14
91:18,19 92:5,18,21
94:2,8,11 95:13 96:7,15
100:7 102:5,6,17
103:18 111:15 112:4,5
117:11 118:12 119:6
121:5 122:6,10,10,11
122:18,24 123:7,16,18
123:20 125:22 134:24
134:25 135:10,22
141:13,21 143:4 152:21
156:12 159:5 160:3
161:21 167:5 182:10
194:12,24,25 195:8,15
195:17 196:11,17
197:13 203:1,17 211:22
219:14 223:7,9,13,18
**walls** 27:4,9,11,13,17
29:4 52:23 56:20 85:14
94:17,19,23 96:1,2
107:19 108:4 112:6
121:11,14,18,20 123:12
125:24
**want** 34:10 70:22 80:25
87:7 105:23 122:5
124:9 141:19 147:14
156:8 161:5 164:24
199:11 204:6,8 211:5
218:24
**wanted** 115:22 186:5
**Ward** 43:11 46:11,13
54:5 55:18 59:9 62:1
80:21 82:5 93:7,25
98:7,12 99:8 101:9,17
104:15,25 105:5 126:15
130:24 140:23 150:2
152:16 160:17 170:16
171:12,18 173:1,11
179:24 181:5 189:20
192:25 197:1 202:24

203:2,15,18 204:4
212:8
**Ward/North** 80:24
**washed** 98:2 102:2,19,24
103:1,13 104:2 119:22
**Washington** 3:7,16 6:21
112:22 116:2 126:23
170:4 215:10
**wasn't** 37:1 42:19 51:19
102:7 195:14 197:3
226:8
**water** 34:11 57:20 60:5,6
60:12 82:16 83:18,20
86:11 87:16,23 88:5,15
88:23 90:13 91:13,17
93:4,6,10,13 97:10 98:4
98:6 105:8 118:14
119:6 120:12,18 122:12
123:17,19 135:16,20
136:1,21 140:24 141:7
152:19 156:24 157:23
157:24 158:6,12,13
160:5 165:18,23 166:6
166:8,12,13 168:8,9,12
168:15 170:16 171:10
171:11,17 173:17,22
174:2,12,17,22 175:12
176:20 177:23 178:3,16
178:20 180:1 202:24
203:14 204:2 205:12,17
205:24 206:5,21,23
207:2,16 208:7,22
209:25 210:1 211:25
213:14,15,18 215:4
222:18 223:1
**waterfront** 23:14
**waters** 88:23 178:9,10
179:9,11,17
**Waterway** 55:23 207:18
208:9 209:9 210:16
**waterways** 209:14
**wave** 60:16,22,24 61:7
82:15 98:9 176:9,23,25
177:2,7 207:14 211:23
211:25 212:3
**waves** 148:11 150:13

176:12,14,15 178:8
**wave-side** 52:10 55:9
211:17
**way** 10:20 34:24 88:16
93:12 98:3 100:2
111:18 121:10 134:14
135:6 158:15 165:22
166:9 178:23 181:21
182:16 211:7 222:3,17
**ways** 165:21 169:15
218:23
**wayside** 97:22
**weak** 94:25 96:4 195:8
195:15 223:7
**weaken** 156:25
**weakening** 90:14
**weaker** 134:6
**weakly** 123:7
**weather** 62:1 73:23
**weekend** 207:20
**weight** 87:10,14,14 91:13
97:10 168:12
**well-engineered** 214:6
**went** 12:15 16:4 18:11
20:20,23 41:11 45:24
84:19 111:17 192:12
**weren't** 24:21 43:13,20
**west** 172:3,4,13,18,20
173:12 178:25
**wetlands** 203:1,16
**we'll** 11:8 34:9 39:20
61:11
**we're** 67:4,11 79:3 91:4
98:21 103:4 136:9
161:7
**we've** 10:12 23:11,14
29:12,22 36:20 56:17
67:25 181:8
**WGI** 112:24 113:2 116:9
116:10 117:9 170:8
**whatsoever** 69:11
**white** 114:24
**wide** 187:14
**widely** 218:5
**wider** 218:1
**width** 130:13,14,15,17

159:14
**WILKINSON** 1:11
**willingness** 16:19
**wind** 57:8,11,13,17,19,23
57:25 58:1,6,11,13,14
58:17,23,24 59:2 61:16
62:6,16,18,23 63:10,19
64:1 67:5 68:4,9,19
69:7,14 73:15,17 74:1,7
86:13 91:17 141:6
176:15 190:4,4
**winds** 64:7,7 66:4,6,12
68:1
**winter** 24:23
**wish** 45:20
**wished** 111:7
**Wit** 170:17,18,22,25
171:22,23 175:6 178:19
205:5 206:3,10
**withdraw** 29:9 129:7
195:6
**witness** 6:13,19 7:5 9:19
11:6 14:20,25 15:10
16:19,22 17:6,15 27:21
28:10,20,23 29:12,16
31:21 32:25 33:2 39:16
39:21 40:1 43:7,16
44:13,21 47:20 49:3
53:4,11,14 54:24 56:4
63:16,25 64:11,21
65:17 66:18 67:22
68:14,17 71:5,16,21
72:2 74:14,19 76:22
78:11 82:22 83:6 84:5
84:7 87:2 88:8,10,20
89:13 91:24 92:2 94:14
95:3,16 96:12 101:5
102:9 104:4 107:21
108:6,22 121:8 123:23
124:15 126:13 129:18
131:23 140:7 141:12
144:22 146:2,25 149:3
149:15 150:23 151:24
152:12 153:17 154:6
155:1 157:4,13 167:25
174:6 177:16 183:21

184:3 188:23 190:7
192:12 195:2,12 196:14
197:15 199:22 201:23
203:8 212:11 217:3
228:1
**witnesses** 93:25 178:20
178:24 197:10
**wonderful** 184:5
**word** 61:8 68:16 77:1,1,3
105:21 110:15 187:15
**wording** 45:4
**words** 49:21 134:13
**work** 12:1 14:17,21,24
14:25,25 15:11,21,25
16:2,8 17:19,19,21 21:9
22:1,9,20 23:7,17 24:10
24:19 25:9 26:5,21
28:4 29:23 30:19,20
34:21 35:1 36:22 37:6
109:5 110:25 119:9
125:8 127:3 129:22
141:25 142:4 143:23
144:1,7 145:4,12 147:3
151:2,7 154:22 155:6
155:11,15 162:9 171:7
171:20 174:23 181:12
182:5,6 186:6,11,24
188:5 190:9,17 198:19
202:16 205:21 206:1
215:2,8 217:1
**worked** 21:11 28:19,22
217:8,12
**working** 17:23 24:18
36:17 70:2 73:23 89:4
112:24
**works** 34:24 82:25 83:3
175:8
**world** 29:1 184:5 218:19
**worried** 103:4
**worthwhile** 197:9
**wouldn't** 64:7 73:15
82:16 111:10 220:23
**write** 30:7
**writings** 12:17 13:22
27:8
**written** 112:22 117:14

143:19,20 148:25 155:3
**wrong** 80:22 182:1
**wrote** 45:24

---

### X

**X** 5:1

---

### Y

**yeah** 58:9 103:14 168:22
223:3
**year** 25:6,14 198:9
**years** 11:22 12:9,11 28:5
46:23 47:7 87:21
109:12 184:7 185:5
198:8,19 218:9 220:2
**York** 3:15
**younger** 221:17
**Yucatan** 212:20

---

### Z

**zone** 124:9

---

### $

**$1,200,000** 20:17 21:3
**$156,000** 25:14
**$220,000** 16:1,4
**$250,000** 20:24
**$30,000** 16:6
**$300** 15:20
**$330,000** 22:14
**$60,000** 22:17
**$600** 15:20
**$900** 15:21

---

### 0

**02:16** 109:25
**02:17** 110:5,10,15
**02:18** 110:20,25
**02:19** 111:5,10,15,20
**02:20** 111:25 112:5,10
**02:21** 112:15,20
**02:22** 112:25 113:5,10,15
**02:23** 113:20,25
**02:24** 114:5,10,15
**02:25** 114:20,25 115:5
**02:26** 115:10,15
**02:27** 115:20,25 116:5,10

**02:28** 116:15,20,25 117:5
**02:29** 117:10,15,20,25
**02:30** 118:5,10,15
**02:31** 118:20,25
**02:32** 119:5,10,15
**02:33** 119:20,25
**02:34** 120:5,10,15,20
**02:35** 120:25 121:5
**02:36** 121:10,15
**02:37** 121:20,25 122:5
**02:38** 122:10,15,20
**02:39** 122:25 123:5,10,15
123:20
**02:40** 123:25 124:5,10,15
**02:41** 124:20,25 125:5,10
**02:42** 125:15,20
**02:43** 125:25 126:5
**02:44** 126:10,15,20
**02:45** 126:25 127:5,10
**02:46** 127:15,20,25
**02:47** 128:5,10,15
**02:48** 128:20,25 129:5
**02:49** 129:10,15,20,25
**02:50** 130:5,10
**02:51** 130:15,20,25 131:5
**02:52** 131:10,15
**02:53** 131:20,25 132:5
**02:54** 132:10
**02:55** 132:15,20,25 133:5
**02:56** 133:10,15
**02:57** 133:20,25 134:5
**02:58** 134:10,15,20
**02:59** 134:25 135:5
**03:00** 135:10,15
**03:01** 135:20,25 136:5
**03:02** 136:10,15,20
**03:03** 136:25 137:5,10
**03:04** 137:15,20
**03:05** 137:25 138:5
**03:06** 138:10,15,20,25
**03:07** 139:5,10,15,20,25
**03:08** 140:5,10,15
**03:09** 140:20,25
**03:10** 141:5,10,15,20
**03:11** 141:25 142:5,10,15
**03:12** 142:20,25 143:5

**03:13** 143:10,15,20
**03:14** 143:25 144:5,10
**03:15** 144:15,20,25 145:5
145:10
**03:16** 145:15,20,25
**03:17** 146:5,10,15
**03:18** 146:20,25 147:5
**03:19** 147:10,15
**03:20** 147:20,25 148:5,10
148:15
**03:21** 148:20,25 149:5,10
**03:22** 149:15,20,25
**03:23** 150:5,10,15,20
**03:24** 150:25 151:5,10
**03:25** 151:15,20,25 152:5
**03:26** 152:10,15,20
**03:27** 152:25 153:5
**03:28** 153:10,15,20,25
**03:29** 154:5,10,15,20
**03:30** 154:25 155:5,10
**03:31** 155:15,20
**03:42** 155:25
**03:43** 156:5,10,15,20
**03:44** 156:25 157:5,10,15
**03:45** 157:20,25 158:5,10
158:15
**03:46** 158:20,25 159:5,10
**03:47** 159:15,20,25 160:5
160:10
**03:48** 160:15,20,25
**03:49** 161:5,10,15,20
**03:50** 161:25 162:5,10
**03:51** 162:15,20,25
**03:52** 163:5,10
**03:53** 163:15,20,25
**03:54** 164:5,10
**03:55** 164:15,20,25
**03:56** 165:5,10,15
**03:57** 165:20,25 166:5
**03:58** 166:10,15,20
**03:59** 166:25 167:5,10
**04:00** 167:15,20,25
**04:01** 168:5,10,15,20
**04:02** 168:25 169:5,10
**04:03** 169:15,20
**04:04** 169:25 170:5,10

| | | | |
|---|---|---|---|
| **04:05** 170:15,20,25 | **04:50** 196:5,10 | **05:46** 218:15,20,25 | 156:3 163:17 164:17 |
| **04:06** 171:5,10,15 | **04:51** 196:15,20,25 | **05:47** 219:5,10,15 | 200:8 201:18 202:3,7 |
| **04:07** 171:20,25 172:5 | **04:52** 197:5,10 | **05:48** 219:20,25 220:5 | 210:12,13,14,15,20 |
| **04:08** 172:10,15,20 | **04:53** 197:15,20,25 198:5 | **05:49** 220:10,15,20 | **1st** 12:8,8,10 16:10 17:19 |
| **04:09** 172:25 173:5,10,15 | **04:54** 198:10,15 | **05:50** 220:25 221:5,10 | 17:21 20:18,18,19 |
| **04:10** 173:20,25 174:5,10 | **04:55** 198:20,25 | **05:51** 221:15,20,25 | 21:20,20 109:3 |
| 174:15 | **04:56** 199:5,10,15 | **05:52** 222:5,10,15 | **1,200,000** 21:19 |
| **04:11** 174:20,25 175:5,10 | **04:57** 199:20 | **05:53** 222:20,25 223:5,10 | **10** 5:14 50:3 58:23 64:12 |
| **04:12** 175:15,20,25 | **05-4182** 1:6 | **05:54** 223:15,20,25 224:5 | 109:17,18 115:7 143:6 |
| **04:13** 176:5,10 | **05-5531** 1:8 | **06-5342** 1:9 | 143:8 153:1,11 154:14 |
| **04:14** 176:15,20 | **05-5724** 1:8 | **06-6299** 1:9 | **10th** 9:10 |
| **04:15** 176:25 177:5,10 | **05:11** 199:25 200:5,10 | **06-7516** 1:10 | **10,000** 23:19 24:11 |
| **04:16** 177:15,20,25 | **05:12** 200:15,20,25 | **06:00** 224:10,15 | **10-minute** 58:24 |
| **04:17** 178:5,10 | **05:13** 201:5,10,15 | **06:01** 224:20 225:5,10,15 | **10:00** 18:25 19:5 165:8 |
| **04:18** 178:15,20,25 | **05:14** 201:20,25 202:5,10 | **06:02** 225:20 226:5,10 | **10:01** 19:10,15,20,25 |
| **04:19** 179:5,10,15 | **05:15** 202:15,20 | **06:03** 226:15,20,25 | **10:02** 20:5,10,15,20 |
| **04:20** 179:20,25 180:5 | **05:16** 202:25 203:5 | **06:19** 227:5 | **10:03** 20:25 21:5,10 |
| **04:21** 180:10,15 | **05:17** 203:10,15 | **07-3500** 1:10 | **10:04** 21:15,20,25 22:5 |
| **04:22** 180:20,25 | **05:18** 203:20 | **07-5178** 1:11 | **10:05** 22:10 |
| **04:23** 181:5,10,15 | **05:19** 203:25 204:5 | **09:04** 6:5,10,15,20 | **10:06** 22:15,20,25 |
| **04:24** 181:20,25 | **05:20** 204:10 | **09:05** 6:25 7:5,10,15,20 | **10:07** 23:5,10,15 |
| **04:25** 182:5,10 | **05:21** 204:15,20,25 205:5 | 7:25 | **10:08** 23:20,25 24:5 |
| **04:26** 182:15,20,25 | **05:22** 205:10,15,20,25 | **09:06** 8:5,10,15,20,25 9:5 | **10:09** 24:10,15,20 |
| **04:27** 183:5,10 | **05:23** 206:5,10,15 | **09:07** 9:10,15,20 | **10:10** 24:25 25:5,10 |
| **04:28** 183:15,20,25 | **05:24** 206:20,25 207:5 | **09:16** 9:25 | **10:11** 25:15,20,25 |
| **04:29** 184:5,10,15 | **05:25** 207:10,15 | **09:46** 10:5,10,15 | **10:12** 26:5,10 |
| **04:30** 184:20,25 185:5 | **05:26** 207:20,25 | **09:47** 10:20,25 11:5,10 | **10:13** 26:15,20,25 |
| **04:31** 185:10,15 | **05:27** 208:5,10 | **09:48** 11:15,20,25 12:5 | **10:14** 27:5,10 |
| **04:32** 185:20,25 186:5 | **05:28** 208:15,20,25 209:5 | **09:49** 12:10,15 | **10:15** 27:15,20 |
| **04:33** 186:10,15 | **05:29** 209:10,15,20 | **09:50** 12:20,25 13:5 | **10:16** 27:25 28:5 |
| **04:34** 186:20,25 187:5 | **05:30** 209:25 210:5,10 | **09:51** 13:10,15,20,25 | **10:17** 28:10,15 |
| **04:35** 187:10,15,20 | **05:31** 210:15,20 | **09:52** 14:5,10,15 | **10:18** 28:20 |
| **04:36** 187:25 188:5,10 | **05:32** 210:25 | **09:53** 14:20,25 15:5 | **10:19** 28:25 29:5 |
| **04:37** 188:15 | **05:33** 211:5,10,15 | **09:54** 15:10,15,20 | **10:20** 29:10,15 |
| **04:38** 188:20,25 189:5 | **05:34** 211:20,25 | **09:55** 15:25 16:5 | **10:21** 29:20 |
| **04:39** 189:10,15,20,25 | **05:35** 212:5,10,15,20 | **09:56** 16:10,15,20 | **10:22** 29:25 30:5,10,15 |
| **04:40** 190:5,10,15 | **05:36** 212:25 213:5 | **09:57** 16:25 17:5,10,15 | **10:23** 30:20,25 |
| **04:41** 190:20,25 191:5 | **05:37** 213:10,15,20 | **09:58** 17:20,25 18:5 | **10:24** 31:5,10,15 |
| **04:42** 191:10,15,20,25 | **05:38** 213:25 214:5 | **09:59** 18:10,15,20 | **10:25** 31:20,25 32:5 |
| **04:43** 192:5,10,15 | **05:39** 214:10,15,20 | | **10:26** 32:10,15 |
| **04:44** 192:20,25 193:5 | **05:40** 214:25 215:5,10 | **1** | **10:27** 32:20,25 33:5 |
| **04:45** 193:10,15,20 | **05:41** 215:15,20,25 | **1** 1:25 5:5 9:9,11,24 | **10:28** 33:10,15,20 |
| **04:46** 193:25 194:5 | **05:42** 216:5,10,15 | 10:11 22:8 52:11 55:10 | **10:29** 33:25 34:5 |
| **04:47** 194:10,15,20,25 | **05:43** 216:20,25 217:5,10 | 64:12 79:6 104:7 110:8 | **10:30** 34:10,15,20,25 |
| **04:48** 195:5,10,15 | **05:44** 217:15,20,25 | 115:7 131:15,16 132:10 | **10:31** 35:5,10 |
| **04:49** 195:20,25 | **05:45** 218:5,10 | 152:24 153:8,24 154:9 | **10:32** 35:15,20,25 |

**10:33** 36:5,10,15
**10:34** 36:20,25
**10:35** 37:5,9,10,12
**10:44** 37:12,13,15,20,25
**10:45** 38:5,10,15,20
**10:46** 38:25 39:5,10
**10:47** 39:15,20,25
**10:48** 40:5,10,15,20
**10:49** 40:25 41:5,10
**10:50** 41:15,20,25
**10:51** 42:5,10,15
**10:52** 42:20,25
**10:53** 43:5,10
**10:54** 43:15,20,25
**10:55** 44:5,10,15,20
**10:56** 44:25 45:5
**10:57** 45:10,15,20
**10:58** 45:25 46:5,10
**10:59** 46:15,20
**100** 62:25 63:10,11,19,20
 64:1 66:4,13 68:1
 97:18 212:22
**10201** 2:9 229:5,21
**109** 5:14
**1094** 49:8,12
**1095** 50:20 51:22 53:22
**1097** 49:8
**1099** 147:9,13 150:7
 152:23 153:23 154:13
**11** 5:15 115:7 120:25
 143:6,9 147:8,10
 153:11 154:14 202:14
 202:19 212:13 221:23
**11:00** 46:25 47:5,10
**11:01** 47:15,20
**11:02** 47:25 48:5,10
**11:03** 48:15,20,25
**11:04** 49:5
**11:05** 49:10,15,20,25
 50:5
**11:06** 50:10,15,20,25
 51:5
**11:07** 51:10,15,20,25
**11:08** 52:5,10,15,20
**11:09** 52:25 53:5,10
**11:10** 53:15,20,25 54:5

**11:11** 54:10,15,20
**11:12** 54:25 55:5,10
**11:13** 55:15,20
**11:14** 55:25 56:5,10
**11:15** 56:15,20,25
**11:16** 57:5,10,15
**11:17** 57:20,25 58:5
**11:18** 58:10,15,20
**11:19** 58:25 59:5
**11:20** 59:10,15
**11:21** 59:20,25
**11:22** 60:5,10,15,20
**11:23** 60:25 61:5
**11:24** 61:10,15,20
**11:25** 61:25 62:5
**11:26** 62:10,15,20,25
**11:27** 63:5,10,15
**11:28** 63:20,25 64:5,10
 64:15
**11:29** 64:20,25 65:5,10
 65:15
**11:30** 65:20,25 66:5,10
**11:31** 66:15,20,25 67:5
**11:32** 67:10,15,20,25
 68:5
**11:33** 68:10,15,20
**11:34** 68:25 69:5,10,15
 69:20,25
**11:35** 70:5,10,15
**11:36** 70:20,25 71:5,10
 71:15
**11:37** 71:20,25 72:5
**11:38** 72:10,15
**11:39** 72:20,25 73:5
**11:40** 73:10,15,20,25
**11:41** 74:5,10,15
**11:42** 74:20,25 75:5,10
**11:43** 75:15,20,25 76:5
**11:44** 76:10,15,20,25
 77:5
**11:45** 77:10,15,20
**11:46** 77:25 78:5,10,15
 78:20
**11:47** 78:25 79:5
**11:48** 79:7,8
**11:56** 79:10,15

**11:57** 79:8,11,20,25
**11:58** 80:5,10,15
**11:59** 80:20,25 81:5
**110** 4:9
**1100** 147:9 148:2 150:12
 152:4 153:24 154:1,5
 154:14
**1150** 3:6
**12** 5:16 25:3 59:22 60:3,9
 60:11 170:15 171:11
 202:17,19 203:4,7,10
 204:4
**12-month** 25:1
**12:00** 59:1 81:10,15,20
 81:25 82:5
**12:01** 82:10,15,20,25
**12:02** 83:5,10,15,20
**12:03** 83:25 84:5,10,15
**12:04** 84:20,25 85:5,10
**12:05** 85:15,20,25
**12:06** 86:5,10
**12:07** 86:15,20,25 87:5
 87:10
**12:08** 87:15,20,25
**12:09** 88:5,10,15,20
**12:10** 88:25 89:5,10,15
**12:11** 89:20,25 90:5,10
 90:15
**12:12** 90:20,25 91:5,10
 91:15
**12:13** 91:20,25 92:5,10
 92:15
**12:14** 92:20,25 93:5
**12:15** 93:10,15,20
**12:16** 93:25 94:5,10
**12:17** 94:15,20,25
**12:18** 95:5,10,15,20
**12:19** 95:25 96:5,10,15
**12:20** 96:20,25 97:5
**12:21** 97:10,15,20,25
**12:22** 98:5,10,15,20
**12:23** 98:25 99:5,10
**12:24** 99:15,20,25
**12:25** 100:5,10,15
**12:26** 100:20,25 101:5,10
**12:27** 101:15,20

**12:28** 101:25 102:5,10,15
 102:20
**12:29** 102:25 103:5,10,15
**12:30** 103:20,25 104:5,10
**12:31** 104:15,20,25
**12:32** 105:5,10,15,20
**12:33** 105:25 106:5
**12:34** 106:10,15,20
**12:35** 106:25 107:5,10,15
**12:36** 107:20,25 108:5,10
**12:37** 108:15,20,25
**12:38** 109:5,10,15
**12:39** 109:20
**12:40** 109:20,22
**1224** 203:22,25
**1228** 204:9
**1229** 204:7
**1232** 203:22 208:14
**1259** 203:5
**1260** 203:5
**13** 5:17 122:15 131:12,16
 131:22 133:11,17
 202:18,19 203:21,23
**14** 1:15 2:3,5,7 5:18 33:5
 133:17 160:18,22,24,25
 161:2,4,6,7 162:11
 204:4 210:25 211:2
 214:14
**14th** 6:5 22:15,21 27:6
 74:6 75:11
**147** 5:15
**1476** 79:15
**15** 43:20 201:21 202:5,19
**15th** 42:17
**150** 64:2 77:10
**1503** 210:25 211:6
**1504** 210:25 212:7
**16** 51:24 132:9,12 133:11
 133:20,25 139:5 212:13
**17** 141:24 144:5 151:9
 152:1 154:17 156:4,11
**17th** 100:10 215:1
**18** 156:17 158:11
**19** 115:7 159:24
**19A** 114:18
**19B** 114:19

**197** 12:22
**1970** 28:18
**1973** 28:18
**1978** 27:19
**1980s** 100:7,17
**1989** 11:24
**1990** 28:8
**1990s** 100:17 164:14,24
**1993** 28:9
**1996** 114:10

**2**

**2** 1:8 5:6 10:14 11:15
  22:19 52:10 55:10,16
  60:17 79:10 97:23 98:5
  99:6 100:19 101:1,2,6
  101:11,23 103:18 104:8
  104:10 115:7 131:12,18
  132:3 149:22 152:13
  153:25 154:9 155:19
  163:17 164:6 170:13,14
  171:10,18 174:3 175:15
  177:17 178:4,9 179:5
  199:6 202:25 203:16
  204:3 210:12,15,18
  211:12,15,24
**2,500** 23:18
**2:17** 109:23 110:2,3
**20** 162:12 164:11,16,18
  164:19 165:16 166:18
  187:22
**2000** 12:6
**20001** 3:16
**2002** 114:11
**20036** 3:7
**2004** 59:25
**2005** 22:15 23:22,25 24:4
  26:4 27:6 42:17 43:20
  44:22 46:23 47:10,22
  59:2 74:6 114:11 116:3
  116:10 117:10 118:16
  119:2,10,12 165:6,9
  222:4
**2006** 22:15,21 33:5 74:6
  133:17,18 163:16
  167:16 214:14

**2007** 12:6 17:19,22 20:19
  21:20 109:3 164:5
  167:18
**2007/2008** 46:20
**2008** 46:21 133:20 134:7
  145:20 170:17
**2009** 1:15 2:3,5,7 6:5
  9:10 10:10,17,18 16:10
  20:19 21:21 109:10
  193:21 200:18 201:8
  210:11 228:9 229:19
**202** 3:8,17
**203** 5:16,17
**21** 13:22 14:1 53:23
  167:14 169:14 229:19
**211** 5:18
**212** 11:2
**22** 116:14 147:13
**221** 4:5
**222110904-05** 118:23
**225** 4:6
**228** 1:25
**23** 50:10 52:15
**2300** 216:14
**237** 12:24
**24** 53:23 170:12 175:25
**24th** 24:4 109:10
**2400** 2:6
**25** 50:14 164:25 212:16
**26** 109:10 176:9
**27** 114:19 177:21
**28** 45:8,11 114:19 116:21
  133:25 164:19 165:5
**28th** 165:8 222:4
**29** 24:3 43:20 117:9
  142:14
**29th** 42:16 59:2 197:11

**3**

**3** 5:7 10:15 47:10 60:17
  155:24 163:17 224:3
**3rd** 10:10 44:22 46:23
  210:11
**3,500** 64:12
**3:31** 155:21,22
**3:43** 155:22,25

**30** 97:2 165:4,16 166:18
  180:14,20 184:25 216:5
**32** 175:25
**346-4000** 3:17
**35** 164:25 176:9 178:6
  179:3 212:16
**36** 22:12 38:25 39:3
  40:12 177:10
**37** 177:21
**3700** 216:16,25
**39** 179:20

**4**

**4** 5:8 10:15 114:7 119:2
  119:11 156:23 164:12
  164:21 170:13,13,15
  171:10 201:8 224:7
  227:3,3
**4th** 10:18
**4.1.2.5** 80:24
**4.1.2.6** 80:21
**4:00** 72:8 204:21,22,24
**4:57** 199:23,25
**40** 178:6 180:20 184:25
**40s** 114:10
**40-percent** 216:5
**41** 59:2 114:10,14 179:3
  179:16 182:17
**42** 114:11
**43** 79:25 114:12 120:3
  179:20 180:16,23,24
**44** 114:12 120:4 181:3
**45** 182:17 183:9,11 186:2
  186:4
**4727** 43:10 73:7 106:8
  181:4
**48** 186:13
**49** 5:11

**5**

**5** 5:9 10:16 82:4 129:9
  136:18 143:6,8 148:2
  164:6,7 199:17 200:5
  200:23
**5,000** 217:5
**5:00** 72:8 143:4 205:4

**5:11** 199:25 200:1
**5:55** 224:4,5
**50** 46:12 97:18 180:17
  186:16 212:22
**51** 183:9,11 187:4
**52** 186:4 188:11
**53** 186:4
**54** 186:13
**56** 87:21 185:5 186:16
  193:20 218:8
**57** 194:6
**58** 187:4
**59** 5:12 188:11

**6**

**6** 5:10 9:24 10:18 201:6
  201:17,22 221:22
**6:00** 143:5 151:11 152:4
  154:18,20 155:1,12
**6:01** 224:5,8
**6:04** 227:4,5
**60** 200:9,11
**600/800** 87:17
**62** 195:19
**63** 198:25
**630** 217:8
**64** 193:20
**640** 13:7 27:1
**65** 60:1 200:11
**65-percent** 101:19
**66** 194:7,8,9
**67** 163:9

**7**

**7** 4:4 5:11 49:6,9 143:6,7
  143:8,17 152:25 153:9
**7:00** 59:1,21 60:17 62:25
  93:8 143:5
**70** 163:9
**71** 195:20
**73** 198:25
**77** 59:3 61:16
**79** 5:13

**8**

**8** 5:12 59:14,15,18 73:19

R. BEA

152:25 153:9
**8:00** 93:7,8 178:15
**80** 171:16
**862-4320** 3:8
**88** 59:23,24,25 165:13
171:15 175:12 202:23
203:13 204:1

---

**9**

**9** 5:5,6,7,8,9,10,13 49:14
50:3 79:14,17 110:8
115:7 143:6,8 148:8
**9th** 43:11 46:10,13 54:5
55:18 59:9 62:1 80:21
80:24 82:5 93:7,25
98:7,12 99:8 101:9,17
104:14,25 105:5 126:15
130:24 140:23 150:2
152:16 160:17 170:16
171:12,17 173:1,11
179:24 181:5 189:20
192:25 197:1 202:24
203:2,15,17 204:3
212:8
**9:00** 93:7 193:23
**9:04** 2:8 6:6
**9:08** 9:21,23
**9:46** 9:23 10:1
**90** 80:11 171:16,16
175:12 194:18 202:23
203:13 204:1
**900** 3:6
**901** 3:15
**91** 12:20
**92** 12:25
**94** 80:23 84:14
**94104** 3:16
**94720** 11:3
**96** 80:19