# EXHIBIT 3

Declaration of Robert Bea

## DECLARATION OF ROBERT BEA REGARDING:

## REVIEW OF BARGE PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO EXCLUDE IN WHOLE OR IN PART THE TESTIMONY OF DEFENDANT'S EXPERT ROBERT BEA

**Professor Robert Bea**

**Risk Assessment & Management Services**

**Moraga, California**

December 16, 2009

# **Table of Contents**

1.  Introduction ................................................................................................................. 1

   a.  Reliance Facts and Data ......................................................................................... 1

   b.  Scientific Methods Used ......................................................................................... 2

2.  Discussion of "Statement of Facts" .......................................................................... 3

   a.  "1. Dr. Bea Has a Personal Interest in Finding that the Corps of Engineers, Not the Barge, was Responsible for the North and South Breaches" (pp 1-4) ........................................... 3

   b.  "2. Dr. Bea Reached Exaggerated Conclusions that Exceeded His Analysis" (pp 4 – 6) .. 5

   c.  "3. Dr. Bea's Exaggerated Conclusions from Other Barge Impacts" (pp 6-7) .................. 6

   d.  "4. Dr. Bea's Exaggerated Conclusions on Physical Evidence" (pp 7-9) ......................... 7

   e.  "5. Dr. Bea's Exaggerated Reliance on "High-Jumping the School Bus"" (pp 9-10) ........ 8

   f.  "6. Dr. Bea's Exaggerated Descriptions of Others' Analyses" (pp 10-11) ....................... 9

   g.  "7. Dr. Bea Failed to Give Serious Consideration to the Barge as the Actual or Contributing Cause of the North or South Breaches" (pp12-14) ...................................... 11

   h.  "8. Dr. Bea Based His Asserted Analysis of Causation on the Unexamined Assumption that the Barge Could Not Have Traversed the IHNC and Been in Position to Cause the Breaches" (pp 14-15) ................................................................................................... 13

   i.  "9. Dr. Bea Has Stated Opinions on the Credibility of Eyewitness Testimony" (pp 15-16) ............................................................................................................................. 14

   j.  "10. Dr. Bea Has Relied on His Own Work in the Independent Levee Investigation Team, His Role in Limiting its Inquiries, and His Role in Co-Authoring Reports with Authorship Described Only as "Seed et al" as Proving the Reliability of His Own Conclusions" (pp 16-17) ........................................................................................... 17

   k.  "11. Dr. Bea Has Attempted to Glorify His Investigations and Conclusions, and Misled the Finder of Fact, By Calling Them "Forensic"(pp 16-19) ........................................... 18

**1.    Introduction**

In this declaration, I will address and refute each of the 11 "Statement of Facts" cited in the *Barge Plaintiffs' Memorandum in Support of Their Motion to Exclude in Whole or in Part The Testimony of Defendant's Expert Robert Bea* (Case 2:05-cv-04 182-SRD-JCW, Document 19450-2, Filed 12/01/2009). As a preliminary matter, I will summarize the scientific methods, facts, and data I have relied upon during my forensic engineering investigations.

*a.    Reliance Facts and Data*

During my investigations, I have relied upon the following sources of facts and data:

1.  Multiple visits to the Lower 9th Ward (September 29, 2005 – March 2007, approximately 100 hours, on the ground and in the air) making personal observations, photographing details of the breaches, and obtaining and testing samples (soil, floodwall, water);

2.  Photographic evidence gathered by other individuals and groups after the passage of Hurricane Katrina  including video surveys performed by the USACE;

3.  Multiple engineering analyses I have performed of the performance characteristics of the floodwall – levee sections at the North and South Breaches and the other major breaches that developed in the flood protection system for the Greater New Orleans Area (17th Street Canal, London Avenue Canal, MR-GO Reach 2) during Hurricane Katrina (November 2005 – September 2009);

4.  Results from other engineering team investigations including Team Louisiana, the National Science Foundation (NSF) sponsored Independent Levee Investigation Team (ILIT), the U.S. Army Corps of Engineers (USACE) Interagency Performance Evaluation

1

Taskforce (IPET), the National Institute of Standards and Technology (NIST), the American Society of Civil Engineers (ASCE), and the National Research Council (NRC);

5. Results from other formal investigations of the reasons for the failures and breaches that developed in the Greater New Orleans Area during Hurricane Katrina including those of the White House, the House of Representatives, and the Senate;

6. Documentation relating to the concept development, design, construction, operation and maintenance of the flood protection structures,

7. Documentation relating to analytical modeling and analyses of performance characteristics of levees and floodwalls including full scale load tests,

8. Transcripts and summaries of eyewitness testimony, and

9. Results from other engineering investigations associated with litigation concerning the Lower 9th Ward and other locations in the flood defense system for the Greater New Orleans Area.

**b.   *Scientific Methods Used***

During my investigations I have used the following scientific methods:

1. Gathered facts and data from multiple sources using multiple methods as prescribed in accepted accident and incident investigation and forensic engineering guidelines (civil and mechanical engineering, nuclear power, commercial aviation, aerospace, chemical processing, offshore – marine operations, transportation, mining);

2. Applied accepted first principles based engineering analytical methods (physics, mechanics) to evaluate the performance of the flood protection structures which have been tested and validated with prototype scale experimental (USACE E99 floodwall and

Atchafalaya levee tests) and field performance tests (e.g. simulations of floodwall and levee sections that breached and were at the point of breaching);

3. Applied accepted advanced state-of-the-art first principles based engineering analytical methods to evaluate plausible modes of performance involved in development of the failures – breaches;

4. Compared results from my analyses with those from other investigators and reconciled the differences (bias neutralization and corroboration);

5. Revised my first principles based analyses based on new information gathered during the history of my investigations (updating);

6. Through application of classical statistical and probabilistic reliability methods, quantitatively analyzed the variabilities and uncertainties associated with input information and analytical methods to determine their potential rates of 'error' (uncertainties associated with important structure performance characteristics); and

7. Published results from the analyses in public reports (two) and peer reviewed conference and technical journal papers (twenty one).

**2.    Discussion of "Statement of Facts"**

 **a.    *"1. Dr. Bea Has a Personal Interest in Finding that the Corps of Engineers, Not the Barge, was Responsible for the North and South Breaches" (pp 1-4)***

In my deposition, I testified that "it is necessary that the Corps of Engineers build flood wall protection systems differently in the future than it has in the past." This statement does not place responsibility for the North and South Breaches. Based on what has been learned as a result of the 'tests' of the Greater New Orleans Area flood protection system performed during Hurricane Katrina, this is a statement of fact about how flood protection systems should be built

in the future. To be sure, my colleagues in these investigations have shared the goal of learning how and why the failures happened and how not to repeat the mistakes of the past. This includes the USACE who have publicly acknowledged their responsibility and accountability for the floodwall failures ("Army Corps Admits Flaws in New Orleans Levees", The New York Times, June 1, 2006)). The USACE has dramatically revised the design and construction of these systems in re-building the flood protection structures for the Greater New Orleans Area, including those at the Lower 9th Ward. The USACE has embarked on a national program to revise its engineering guidelines and standards for flood protection structures.

I have not had and do not have a personal bias in favor of finding that the barge was not responsible for the breaches at the Lower 9th Ward.  In the very early days of my investigation, I was concerned that the barge might have been a cause of the South Breach. In early October 2005, just after I began my investigation, I gave a video interview in which I expressed this very concern. It was only after a lot of additional information and data were assembled and detailed analyses performed that it became evident that the 'barge was a victim, not a cause' (November 2005). Since that time, as additional information has been brought forward regarding the alleged involvement of the barge, I have re-examined the available information, data and analytical results and revised my analyses and conclusions accordingly. I have documented this 'continual learning process' throughout my investigation.

I have spent a very large number of hours to 'get this right' (during the past 51 months more than 12,000 hours; 10,000+hours pro bono) – to properly understand why and how the breaches developed at the Lower 9th Ward and elsewhere in the Greater New Orleans Area. This has been my primary personal goal. The other major investigations that preceded this litigation (Team Louisiana, ILIT), the USACE IPET, ASCE, NRC, and NIST) also have endeavored to

reach this same goal.  If the evidence showed that the barge had in fact been a cause of the breaches, then a finding to that effect would not 'frustrate' such a goal. Because the evidence shows that the barge was not a cause, however, a finding that the Barge ING 4727 caused the breaches would be contrary to scientific fact and in that sense would be very 'frustrating.'

### b.  "2. Dr. Bea Reached Exaggerated Conclusions that Exceeded His Analysis" (pp 4 – 6)

It is true my investigations have been limited to what my analyses of the available evidence indicates were the plausible potential causes of the North Breach and South Breach at the Lower 9th Ward. These analyses have included the potential participation of the ING 4727 barge in causation of the breaches. The reasons for eliminating the ING 4727 barge as a plausible reason for causation of the North and South Breaches have been documented in my previous Declarations and Technical Reports associated with the Federal District Court Consolidated Katrina Litigation. These reasons can be summarized as follows:

(1) Due to meterologic and hydrodynamic conditions associated with Hurricane Katrina, it was not plausible that the ING 4727 barge would have been present at the site of the North Breach and interacted with the floodwall during development of the breach at 4:00 am to 5:00 am (CDT) on August 29, 2005. Seepage and lateral instability effects caused by the rising surge water associated with Hurricane Katrina interacting with poorly backfilled excavations immediately adjacent to the flood protection structure explained the location and very early development of floodwall movements and consequent flooding in this part of the Lower 9th Ward. Photographic evidence corroborated the implausibility of the presence of the ING 4727 barge at this location during this time (e.g., telephone pole on canal side near the breach location). Eyewitness reports were conflicting and implausible explanations were put forth concerning how the ING 4727 barge might have contributed to causation of the North Breach.

(2) Due to meterologic and hydrodynamic characteristics associated with Hurricane Katrina, it was not plausible that the ING 4727 barge would have been present and interacted with the floodwall during development of the breach at 7:00 am to 8:00 am (CDT) on August 29, 2005. Seepage, floodwall surge overtopping erosion and lateral instability effects caused by the rising surge water associated with Hurricane Katrina interacting with poorly backfilled excavations immediately adjacent to the flood protection structure explained the location and later development of floodwall movements and consequent flooding in this part of the Lower 9th Ward. Onsite investigation and photographic evidence corroborated the presence of the ING 4727 barge at the far southern end of the South Breach <u>after the breach had developed</u>. This evidence indicated the barge arrived after the breach had developed and that the barge was drawn into the south end of the South Breach by the inrushing floodwater. Eyewitness reports regarding the barge at this location were conflicting and implausible explanations were put forth concerning how the ING 4727 barge might have contributed to causation of the South Breach.

It is true my analyses indicate the "cumulative adverse effects" of the MRGO "were a primary cause for the failure of the man-made flood protection structures along Reach 2," including those "that defended the eastern perimeter of the Lower 9th Ward – St Bernard 'polder'." Results of these analyses have been affirmed in the Federal District Court's ruling of November 18, 2009 (Robinson C.A. No 06-2268).

### c.     "3. Dr. Bea's Exaggerated Conclusions from Other Barge Impacts" (pp 6-7)

This "Statement of Fact" quotes the following passage from my Report: "Based on these forensic engineering observations and analyses, the conclusion is if a barge strikes a floodwall that is not already failing for independent reasons, then the barge impact is not sufficient to cause a failure and breaching should not be expected to occur." While it is true I did not study the

strength of the levees in those other barge-impact situations, the environmental conditions developed during Hurricane Katrina interacting with the cargo barges impacting the flood protection structures provided whatever tests were needed. Even though the walls clearly showed the local effects of the barge impacts (scraping and gouging features, rubbled upper portions of concrete floodwalls), the entire flood protection structure showed no signs of distress. In several cases, it was clear that these floodwalls had been overtopped and this overtopping happened during the time the barge struck the floodwall. Observations and photographic evidence clearly showed these floodwalls and supporting soil levees survived without any significant signs of instability. Conversely, there are many examples of floodwall failures that did not involve any impacts from barges (e.g. 17th Street Canal and London Canal breaches). My investigations and forensic engineering studies show these floodwall failures have many of the same 'signatures' as those at the Lower 9th Ward. These investigations have involved extensive validations of the analytical models used to evaluate the levee and floodwall performance with prototype field experimental data (USACE E99 flood wall tests and Atchafalaya levee tests) and with performance characteristics of floodwall and levee sections in the Greater New Orleans Area that failed and did not fail during Hurricane Katrina.

### d.    "4. Dr. Bea's Exaggerated Conclusions on Physical Evidence" (pp 7-9)

I do not believe that any expert in this case has spent more time than I have inspecting the physical evidence at the North Breach and South Breach.  It is true that at the time of my early examinations of the floodwall panels in the vicinity of the North and South Breaches, some of the panels were buried under debris, soil and water. I was able to access these panels to the limit I was able to move the soils and debris to expose the important sections of the panels (e.g. top 2 to 3 feet and connections to sheet piles). I did not, however, have access to equipment or

personnel who could excavate the panels that were not accessible. At that time, due to the potential interference with emergency operations underway to temporarily plug the breaches, it would not have been feasible to stop those operations. Regardless, I estimate that the sections of floodwall panels I could not access was less than 10% of the panels involved in the breaches.

To address the panels that could not be accessed during my field studies, I relied on photographic evidence taken before the emergency operations had covered panel sections and after initial dewatering operations had been completed (e.g. USACE video surveys performed on and after September 11, 2005).

### e.    "5. Dr. Bea's Exaggerated Reliance on "High-Jumping the School Bus"" (pp 9-10)

In my September 14, 2009 deposition, I testified that the South Breach fully developed before the Barge ING 4727 was in position to cause the breach because otherwise the barge "had to high jump the school bus." I referred to the Barge ING 4727 floating over the top of the school bus as one of the indicators "the barge was a victim, not a cause" of the South Breach. Given the position and elevation of the school bus (in the direct line of movement of the barge as it entered the south end of the South Breach), there must have been more than 11 to 12 feet of water inside this part of the Lower 9th Ward. There were clear signs the barge struck the top of the floodwall (elevation approximately +12.5 feet NAVD 88) at the south end of the South Breach – indicating that the water surface elevation in the Inner Harbor Navigation Canal (IHNC) at the time of impact was approximately +12 feet (barge had a draft of approximately 2 feet). If the barge had arrived inside the Lower 9th Ward earlier, there would have not been sufficient water inside the Lower 9th Ward for the barge to float over the top of the school bus.

In challenging my testimony, this Statement of Fact confuses 'school buses' and the information developed at different stages in my investigation. The quotation cited in this

Statement of Fact from the ILIT Report ("The small yellow school bus also arrived between hurricanes Katrina and Rita, having been appropriated and used for interim transport and then abandoned in its location as shown." ) is from the ILIT report published May 14, 2006. Subsequent to that report, I obtained additional photographic information that clearly showed that the small yellow school bus had been at the location during Hurricane Katrina (August 29, 2005) and before Hurricane Rita (September 23, 2005) (e.g. USACE video surveys time stamped September 11, 2005). This Statement of Fact takes a quotation from the ILIT study published in <u>May 2006</u> and brings it forward to my deposition in <u>September 2009</u> to suggest I currently thought that "the school bus was driven into the area after Hurricane Katrina, and was abandoned there after Hurricane Rita."  That is incorrect; by the time of my deposition, I knew the small yellow school bus had been present during Hurricane Katrina.

This confusion of the facts is further compounded by the statement that "Dr. Bea admitted his personal knowledge of when the school bus arrived in the area, because he saw it driven into the area." To justify this assertion, the Plaintiffs' Exhibit 2, September 14, 2009 Deposition of Dr. Bea, Tr. 191 lines 17-20 are quoted: "In one case – well, in the case where I was present in the background when the American Society of Civil Engineers drove up in the school bus….".  This deposition testimony refers to a different – much larger 50 passenger – school bus driven <u>into and out of</u> the Lower 9th Ward during a site tour conducted by the American Society of Civil Engineer External Review Panel in <u>March 2006</u>.

### f.     *"6. Dr. Bea's Exaggerated Descriptions of Others' Analyses" (pp 10-11)*

Contrary to this Statement of Fact, I was a co-leader of the Independent Levee Investigation Team (ILIT) whose work is quoted in this Statement of Fact. I served as an external reviewer of the National Institute of Science and Technology (NIST) draft investigation

report. I contributed an appendix to the Team Louisiana investigation report (review of USACE IPET investigation).

This Statement of Fact asserts: "he was dealing with a group of investigative bodies that did not look at the question." The questions in this section of my deposition testimony regarded conditions that could have caused the Barge ING 4727 to impact the flood protection structures at the locations of the North and South Breaches. My response was that we (ILIT) and I had not done any formal quantitative analyses of the aerodynamic, hydrodynamic, and structural interactions that could have been involved with the movements and impact characteristics of the Barge ING 4727. Only one of the cited investigations addressed 'part' of this very complex analytical modeling challenge; the USACE IPET. This investigation discarded the Barge ING 4727 as a primary contributor to development of the North and South Breaches for many of the same reasons cited by the other major investigations. Even though quantitative analytical modeling of the motion and impact characteristics of the Barge ING 4727 had not been undertaken during any of these investigations, other evidence was used to consider the potential roles of the Barge ING 4727 in causation of the North and South Breaches. The assertion made in the Statement of Fact that "he was dealing with a group of investigative bodies that did not look at the question" clearly is not true. These investigative groups involved engineers with substantial experience in investigation of failures of many different types of engineered systems including flood protection structures. This dismissive statement fails to acknowledge the qualifications, motivations, methods, and professional integrity of the members of these investigative groups.

g.     *"7. Dr. Bea Failed to Give Serious Consideration to the Barge as the Actual or Contributing Cause of the North or South Breaches" (pp12-14)*

This Statement of Fact asserts: "However, Dr. Bea decided that it was not necessary to analyze the role of the barge as a primary or contributing cause of either breach, in part because his calculations showed that each breach could or would have failed without the barge, and in part because he assumed the Barge 4727 could not have been present at the site of either breach before it failed." The key incorrect word in this statement is "assumed" – "supposition, guesswork, a fact or statement taken for granted" (Webster's Dictionary). I and my colleagues did not 'assume the barge away.' We used multiple sources of evidence, recorded data, means of analysis (qualitative), and lines of reasoning to conclude that the North and South Breaches developed without any significant assistance from the Barge ING 4727.

Another incorrect assertion developed in this part of the Statement of Fact: "While Dr. Bea's Report is very firm that erosion of the soil on the protected side of the IHNC flood wall caused the South Breach…" My report does not make any such assertion. In the case of the North Breach, my analyses show it was a combination of water pressure acting on the floodwall, seepage and hydraulic uplift effects that exceeded the soil's resisting forces that were responsible for this breach.  In the case of the South Breach, my analyses show that the same 'demand' and 'capacity' forces were responsible for the breach. In addition, the formation of the erosion trench on the protected side of the floodwall after overtopping by the elevated surge water in the IHNC, could have reduced the soil capacity to the point where this mode of failure would be become dominant. For this breach, it was a close photo-finish horse race without a camera – and it is not possible to definitively determine which horse or horses (modes of failure) won the race: seepage, uplift, lowered soil strength, and or erosion. None of these modes of failure involved a barge.

This Statement of Fact points to a feature of the North Breach that was unique compared with all of the other floodwall failures – the twisted shape with the top of the floodwall at the north end facing toward the IHNC – and facing the other way at the other end. Rather than the postulated "pry bar" action, the analyses – in particular those documented in my Supplemental Report dated August 29, 2005 – showed that the subterranean action of the water combined with the sandy soils at this location developed a local 'blowout' under the sheet piling. This removal of support and the associated hydrostatic pressures developed sufficient local forces to tear the sheet piling at the north end intersection between the 1960s floodwall to the south and the stronger 1980s floodwall to the north. This tearing of the connection between the sheet piles separated the floodwall from the adjacent section at the north end of the North Breach. This allowed in the inrushing floodwater acting on the bottoms of the unrestrained sheet piling to flip the structure 270 degrees so the top of the floodwall faced the IHNC. The other part of this section was not acted on by this combination of twisting forces and leaned over in the direction of the Lower 9th Ward. The combination of these two actions explained the unique twisted shape and the direction of twist of the structure at the North Breach.

The concluding parts of this Statement of Fact are mixtures of truth and fiction as illustrated by this quotation: "When Dr. Bea was asked what he would have seen differently if the barge had in fact operated as a pry bar on those parts of the wall, his answer was "Well, of course, because I haven't examined quantitatively the information from the basis of your hypothetical, I can't possible answer it without speculating"." My investigations did not indicate the presence of any localized contact between the Barge ING 4727 and the floodwall at the north end of the North Breach. I did not analyze the hypothetical and implausible 'pry bar' action. I analyzed the plausible interactions of soil and water with the flood protection structure.

It is true that "Dr. Bea testified he was unable to answer whether winds in excess of 100 miles per hour could possibly have brought the barge into contact with the floodwall land caused a breach." There was no evidence such winds existed at this location during Hurricane Katrina. Based on the evidence I assembled and evaluated, it was not necessarily to analytically model the barge aerodynamic and hydrodynamic interactions and movements. There was no reason to analytically model things that were not plausible.

The Statement of Fact asserts: "Nevertheless, he found no difficulty in ruling out the barge as a cause of either breach." To the extent this Statement implies that I did not investigate and analyze the issue, it is false. As I gathered all of the available evidence, organized that evidence, repeatedly analyzed that evidence, and corroborated the evidence and conclusions based on the analyses of the evidence, it was evident that the Barge ING 4727 had not caused either the North Breach or the South Breach. While considerable effort was needed to reach that conclusion, I have no difficulty defending it now based on my work and that of others.

### h.    "8. Dr. Bea Based His Asserted Analysis of Causation on the Unexamined Assumption that the Barge Could Not Have Traversed the IHNC and Been in Position to Cause the Breaches" (pp 14-15)

I did not 'assume' that the barge could not have become loose before 9:00 a.m. on Monday, August 29, 2005. As documented in my Expert Reports, the available evidence indicated this 'fact' was plausible. This evidence has been corroborated with results from the detailed analytical models employed in the analyses performed by Dr. Cushing (2009). Eyewitness testimony adduced after I submitted my report is not conclusive (see below). Also, my conclusions about the cause of the floodwall breaches do not depend on the timing of the barge breakaway.

i.   *"9. Dr. Bea Has Stated Opinions on the Credibility of Eyewitness Testimony" (pp 15-16)*

This Statement of Fact states "Dr. Bea's Report criticizes plaintiffs' experts for relying on eyewitness testimony, and states his opinion that the eyewitnesses who saw the Barge ING 4727 at the site of the North or South Breaches, and causing those braches, and witnesses who heard the barge scraping and pushing and grinding against the East IHNC floodwall on the way from the North to the South breach should not be believed because of poor visibility, poor hearing, and because of newspaper article discussing the mistaken beliefs of others that the levees and floodwalls had been blown up. All of this has to do with ordinary perceptions and is without any scientific basis."

The following quotation from my Expert Report summarizes my conclusions about the eyewitness reports referenced: "In both cases, MEA and Mr. Pazos rely principally on eyewitness testimony to support their analyses and conclusions regarding the role of the ING 4727 barge in causation of the North Breach and South Breach. The multiple on-site forensic engineering investigations I and others performed in the early days after we were able to gain access to the breach sites (September and October 2005) and the other forensic engineering investigations cited in this Declaration did not develop any similar eyewitness testimony. The very extensive and intensive investigations performed by the USACE IPET and Team Louisiana involved early interviews (September 2005) of some of the same eyewitnesses cited by MEA and Mr. Pazos. These investigations did not document a single eyewitness report of the ING 4727 barge impacting the hurricane flood protection structures during the early morning hours of August 29, 2005. I do not find this surprising given the documented poor visibility (shown by the photographs taken by the IHNC lock master - very poor due to darkness, rain, and distance), acoustic conditions (loud multi-frequency noise due to wind, rain, waves, failing infrastructure

14

components), and psychological conditions (apprehension, panic, beliefs) that existed at the time of initiation of development of the North Breach and later the South Breach. In the early days following the flooding, there were widespread reports that the flood protection structures at the Lower 9th Ward had been "blown up" (Tara Young, *Rumor of levee dynamite persists*, The Times-Picayune, December 12, 2005). Such intentional breaching of the flood Lower 9th Ward protection structures with explosives have proven not to be true."

After I completed the majority of my investigations, Lafarge North America (LNA) provided me a copy of the Deposition of Mr. Villivasso. I reviewed this deposition and concluded Mr. Villavasso's descriptions of the barge did not fit the physical aspects of the environment and barge at the time it could have been interacting with the floodwall in the vicinity of the North Breach. The preponderance of evidence showed the North Breach reached the last stages of its development when the water elevation in the IHNC was in the range of +9 feet to +10 feet (about 4:00 am to 5:00 am; dark and raining; impaired line of vision). At this time, had the Barge ING 4727 been present at the North Breach, it would have projected more than 14 feet above the top of the floodwall, not "two feet at most" as reported by Mr. Villavasso. In addition, others present at the same time and location did not report the presence of the barge and there was no evidence indicating the barge had impacted the floodwall at this location – there were no signs of one or more 'missing tooth' panels in this section of the floodwall.

LNA also provided a copy of the Deposition of Mr. Terry Adams. I reviewed this deposition and concluded the timing of the purported collision of the ING 4727 barge with the floodwall (approximately 5:30 to 6:00 a.m., dark, raining, 1.5+ miles away from breach location, impaired line of sight) and the consequent development of the South Breach did not match the timing of the reported massive flooding which was significantly later. Also, the motions of the

Barge ING 4727 as described by Mr. Adams could not be corroborated with the observed damage and final location of the barge. The physical observations of the breach characteristics and analytical modeling results would not 'fit' with (triangulate, corroborate) the barge interactions described by Mr. Adams.

Recently (December 2009), LNA provided me with additional the eyewitness testimony of Frazier Tompkins and Gertrude Leblanc identifying and placing a barge "on the east side of the canal" during the morning of August 28, 2005. On that Sunday morning, "around 11:00 am or noon" Ms. Leblanc describes "a large reddish-orange barge in the Industrial Canal, very close to the floodwall that runs along the Lower Ninth Ward." "The barge was sitting about mid-way between the Florida Avenue Bridge and the Claiborne Avenue Bridge." "The barge was right up against the floodwall on the Lower Ninth Ward side."

The IHNC Lock Master and U.S. Geological Survey gage records show a water surface elevation of +1.5 feet to +2.0 feet (all elevations NAVD 88) in the IHNC at 12 Noon on August 28, 2005. The elevation of the ground surface on the IHNC side of the floodwall at the Lower 9th Ward in the vicinity of the eyewitness purported sightings is + 2 feet to + 4 feet to the toe of the soil levee. The crest of the levee is at elevation +6 feet to +8 feet. The Barge ING 4727 has a draft of approximately 2 feet. For the barge to be "right up against the floodwall" the water elevation in the IHNC would have to be +8 feet to +10 feet, not the recorded +1.5 to +2.0 feet. Even if the barge were grounded at the toe of the soil levee and hence not right up against the floodwall, the water elevation in the IHNC would need to be approximately +4 to +6 feet. My analyses indicate this eyewitness testimony cannot be corroborated with available information on the conditions that existed at this time and place.

This Statement of Fact concludes: "All of this has to do with ordinary perceptions, and is without any scientific basis." Given the conditions under which these eyewitness accounts were developed, as an experienced engineer in investigations of incidents, accidents, and disasters, I find this statement surprising. For example, Buckhout (*Scientific American*, "Eyewitness Testimony", December 1974) concludes: "Numerous experiments show, however, that it (eyewitness testimony) is remarkably subject to error. Perception and memory are decision-making processes affected by the totality of a person's abilities, background, attitudes, motives and beliefs, by the environment and by the way his recollection is eventually tested." Contrary to the assertion made in this Statement of Fact, as amply demonstrated during my investigations of the development of the breaches at the Lower 9th Ward, there are substantial reasons why I have been and continued to be very careful with the understanding and conclusions drawn from eyewitness reporting.

### j.   "10. Dr. Bea Has Relied on His Own Work in the Independent Levee Investigation Team, His Role in Limiting its Inquiries, and His Role in Co-Authoring Reports with Authorship Described Only as "Seed et al" as Proving the Reliability of His Own Conclusions" (pp 16-17)

It is true I have relied on the work I performed during the ILIT investigation (September 2005 – March 2007). Contrary to this Statement of Fact, I did nothing to limit the inquiries of the ILIT nor did I make decisions as to what should followed up on. The ILIT was comprised of 35 senior researchers, practitioners, and doctoral researchers whose fields of expertise included engineering, law, public policy, building construction, and organizational behavior. Decisions about what was pursued and how it was pursued were developed through collaborative processes. All of the senior researchers and practitioners supplied their time for this investigation on a pro-bono basis; only our in-the-field expenses were paid by the funding agencies.

The primary sources of validations and corroborations (what I term as 'triangulation' – referring to navigation or surveying to determine geographic location or position) of the ILIT investigations were provided by investigative groups that were truly 'independent' – primarily those of the USACE IPET and the ASCE and NRC panels - committees that reviewed the IPET studies. The investigation results provided by Team Louisiana, NIST, the Congressional Committees (House and Senate) and White House also provided useful and important corroborating information that was integrated into the ILIT reports. The technical papers published as a result of the ILIT work (15 papers), were very strenuously peer reviewed; thus, providing additional validations. All of this work was completed before I undertook any investigations associated with the Barge ING 4727 litigation.

The work I have performed following completion of the ILIT work (March 2007) has continued to go through the same corroborating processes. I have compared the analyses I have performed with those of the ILIT and the other investigations I have cited. The journal and conference publications I have authored following those resulting from the ILIT investigations (6 papers) have been strenuously peer reviewed; thus providing additional validations.

### k.    "11. Dr. Bea Has Attempted to Glorify His Investigations and Conclusions, and Misled the Finder of Fact, By Calling Them "Forensic"(pp 16-19)

"**Forensic** [fo-ren'sik] belonging to courts of law; used in law pleading." (Webster's Dictionary). "**Forensic engineering**. The application of the principles and practice of engineering to the elucidation of questions before courts of law. Practice by legally qualified professional engineers who are experts in their field, by both education and experience, and who have experience in the courts and an understanding of jurisprudence" (Blacks Law Dictionary, Sixth Edition).

"**The forensic engineer** differs from other expert witnesses in that he is a technical professional 'by design.' He is a licensed Professional Engineer (PE) in one or more states, as required by State's law before one is allowed to proclaim himself an 'Engineer.' The title Forensic Engineer, as opposed to Civil, Mechanical, Chemical Engineers, etc., implies a higher level of specialty. Herein, a PE previously skilled in the design of new products and systems, has further studied the procedures of analysis and jurisprudence. In function, he has developed the ability to dissect the components of existing products and systems; analyzing them for physical points of failure. He also understands contractual obligations and professional liability in order to determine infractions to contracts and regulatory statutes by parties of the respective dispute. The successful forensic engineer effectively coordinates engineering and law throughout the case; and above all, conveys technical information into litigation with the communication skills to present complex facts in layman's terms.' (Barrentine, M.D., "Forensic Engineering: The Integration of Engineering Analysis and Law into a Specialized Profession," *Forensic Engineering,* The National Academy of Forensic Engineers).

Given my extensive background in engineering (practice, research, management, teaching), investigation of incidents, accidents, and disasters (more than 600 including the Exxon Valdez tanker and the NASA Columbia shuttle), and in the investigations of the failures of the flood protection system for the Greater New Orleans Area prior to March 2007 (ILIT) and after March 2007 (in connection with the district court proceedings), I do not think I have incorrectly used the words "forensic engineering" as they apply to the work I have done as part of the litigation proceedings. I have not attempted to glorify my investigations and conclusions and I have not misled the finder of fact by calling them "Forensic."