# EXHIBIT 1

Report of Daniel Ryan

DR Maritime Consulting
136 Rainbow Drive, 3683
Livingston, TX  77399

Thomas D. Forbes
Chaffe McCall, LLP
2300 Energy Centre
1100 Poydras Street
New Orleans, LA  70163-2300

12 June 2009

IN RE:  KATRINA CANAL BREACHES
        CONSOLIDATED LITIGATION
        CIVIL ACTION
        NO. 05-4182

PERTAINS TO:  BARGE ING 4727, O.N. 955868

Dear Mr. Forbes:

At your request I have been engaged by your firm to render
opinions regarding the circumstances of the mooring of the
barge ING 4727 at the waterfront facility Lafarge North
American, in the Inner Harbor Navigation Canal, New
Orleans, Louisiana, from on our about 26 August 2005, to 29
August 2005.  In addition, this letter contains my opinions
on the KDON Marine Consulting's "Declaration" of Donald J.
Green, dated 13 June 2008, and KDON Marine Consulting's
letter dated March 11, 2009.  Also, there is an Appendix
concerning Mr. Green's deposition taken 21 November 2008,
in Houston, Texas.


**1. – CAREER SUMMARY:**

I completed thirty-four years in the U.S. Coast Guard as a
Captain; which included twenty-four years in Marine Safety,
Security and Environmental Protection.  My last position in
the Coast Guard was Chief of Marine Safety, Security and
Environmental Protection for the entire Eighth Coast Guard
District, headquartered in New Orleans, from 04 September
2001 until 30 June 2004.  In this capacity I was
responsible for overseeing commercial vessel safety,
waterways management, port security, and environmental
protection missions throughout the District's twenty-six
state geographical area; as well as the licensing of

Mariners, and investigations of maritime casualties.  This included supervising the activities of twelve Marine Safety Offices (MSOs), four Marine Safety Units (MSUs), seven Marine Safety Detachments (MSDs), four Regional Examination Centers (RECs), and three Vessel Traffic Services (VTSs); as well as being the Co-Chair of Regional Response Teams (RRTs) 6, 7, and 8; and Co-Chair of the Mexican/United States (MEXUS) Joint Response Team (JRT).

During my career I also served as Commanding Officer/Captain of the Port of Marine Safety Office Morgan City, LA, from July 1997 to August 2001.  Previous to that, I served two years as Executive Officer, Activities Europe/Marine Inspection Office Europe located in Rotterdam, the Netherlands.  I also served as a Marine Inspector and Marine Investigator at the Marine Inspection Office in Seattle, Washington; the Marine Inspection Office in New York City; and the Marine Inspection Office in Rotterdam, the Netherlands.  In addition, I was the Chief of the Inspection Department at the Marine Safety Office in San Francisco Bay where I was eventually selected to become the Executive Officer/Alternate Captain of the Port.  I also served as Chief of the Major Vessel Branch at the Marine Safety Center (MSC) in Washington, DC.  I started my career as a Student Engineer and Damage Control Assistant aboard the Coast Guard Cutter MUNRO.

Over the course of my career, I have become familiar with and have applied the U.S. Coast Guard's regulations and recommendations concerning maritime procedures and waterways management, including preparations in advance of severe weather; in addition to high water river conditions, low water river conditions, and river icing.

I am a native of Seattle, Washington, and graduated with honors from the US Coast Guard Academy, New London, Connecticut, with a BSE in 1974.  I attended two years of postgraduate studies at the University of Michigan, where I received a MSE in Naval Architecture/Marine Engineering; and a MSE in Mechanical Engineering.  I am a registered Professional Engineer in the state of Michigan.

## 2.a. - ING 4727 VESSEL INFORMATION:

| | |
|---|---|
| USCG Documentation Number: | 955868 |
| Vessel Service: | Freight Barge |
| Trade Indicator: | Coastwise Unrestricted |
| Hull Material: | Steel |
| Ship Builder: | Equitable Shipyards |
| Hailing Port: | St. Louis, Missouri |
| Hull Number: | 1942-10 |
| Year Built: | 1990 |
| Length: | 200 feet |
| Hull Depth: | 12 feet |
| Hull Breadth: | 35 feet |
| Gross Tonnage: | 705 tons |
| Net Tonnage: | 705 tons |
| Previous Name: | RW 504B |
| Previous Owner: | Riverway Company |

The ING 4727 was an uninspected freight barge, commonly
called a "hopper" barge by the marine industry.  Since the
ING 4727 did not carry oil or hazardous materials, it was
not required to be inspected and certificated under 46
United States Code (USC), Title 46, by the United States
Coast Guard (USCG).  Therefore, the ING 4727 did not have a
USCG issued Certificate of Inspection.  However, the ING
4727 was documented by the USCG and had a valid Certificate
of Documentation for service as a Freight Barge.

## 2.b. - ING 4745 VESSEL INFORMATION:

| | |
|---|---|
| USCG Documentation Number: | 964681 |
| Vessel Service: | Freight Barge |
| Trade Indicator: | Coastwise Unrestricted |
| Hull Material: | Steel |
| Ship Builder: | Equitable Shipyards |
| Hailing Port: | St. Louis, Missouri |
| Hull Number: | 1949-3 |
| Year Built: | 1990 |
| Length: | 192 feet |
| Hull Depth: | 12 feet |
| Hull Breadth: | 35 feet |
| Gross Tonnage: | 978 tons |
| Net Tonnage: | 771 tons |

Previous Name:                          RW 522B
Previous Owner:                         Riverway Company


## 3. - FACILITY INFORMATION:

The Lafarge North America (LNA) Terminal is located at 2315
France Road, New Orleans, Louisiana, on the west side of
the Inner Harbor Navigation Canal (IHNC), between the
Florida Avenue Bridge to the north, and the Claiborne
Avenue Bridge to the south.  The IHNC is also known as the
"Industrial Canal".  The IHNC was completed in 1923 and
offers a deepwater connection between the Mississippi River
and Lake Pontchartrain, a distance of about 5.5 miles.  In
addition, the first portion of the IHNC from the
Mississippi River to just north of the Florida Avenue
Bridge is also a part of the Gulf Intracoastal Waterway
(GIWW).  The Lafarge facility has 600 feet of pier face,
with an 11 foot depth of water alongside, and a pier height
of 10 feet.  The Lafarge dock is located in an inset that
formerly served as a turning basin; the dock is well
removed from the IHNC channel itself.  There facility has a
cement storage capacity of 60,000 tons.


## 4. - TIMELINE:

| | | |
|---|---|---|
| 25AUG, 2235 | | ING 4727 Shifted from Algiers Fleet (MM 95 AHP) |
| | | -Whiteley Report 13FEB07, page 3[1] |
| | | -Whiteley Report 23SEP07, page 3 |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| 26AUG, 1125 | | ING 4727 Arrives at Lafarge |
| | | -Whiteley Report 13FEB07, page 3 |
| | | -Whiteley Report 23SEP07, page 3 |
| | 1200 | -Budwine Report 16FEB07, page 3 |
| 26AUG, 1220 | | ING 4727 Commences Unloading |
| | | -Whiteley Report 13FEB07, page 4 |
| | Evening | -Klotz Report 15FEB07, page 5 |
| **26AUG, 2031** | | **Port Condition WHISKEY Set** |
| | | -Redacted Unsigned and Undated USCG |
| | | Investigative Report "Grounding of Hopper |
| | | Barge ING 4727" (15 pages), page 7 |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

---

[1] Reports of Whiteley, Budwine and Klotz are referenced for underlying facts derived from deposition
testimony which I have also reviewed, as reflected below.

```
27AUG, 0900-1000    ING 4727 Unloaded
                    -Whiteley Report 13FEB07, pages 3 & 4
                    -Whiteley Report 23SEP07, page 4
        0900        -Klotz Report 15FEB07, page 5

27AUG, 0900         Lafarge Personnel Told Katrina Track Shifted
                    -Klotz Report 15FEB07, page 5

27AUG, 0954         Zito Fleets Close
                    -Budwine Report 16FEB07, page 3
                    -Whiteley Report 23SEP07, page 8

27Aug, 1425-1500    ING 4727 Shifted (topped around)
                    -Whiteley Report 13FEB07, page 4
        Afternoon   -Klotz Report 15FEB07, page 3
        1500        -Klotz Report 15FEB07, page 7
```

**27AUG, 1615        Port Condition X-RAY Set**
```
                    -Redacted Unsigned and Undated USCG
                     Investigative Report "Grounding of Hopper
                     Barge ING 4727" (15 pages), page 7
```

**********************************************************************

```
28AUG, 0400         Industrial Canal Locks Closed
                    -ACOE Report: LPMS 2a
```

**28AUG, 1200        Port Condition ZULU Set**
```
                    -Redacted Unsigned and Undated USCG
                     Investigative Report "Grounding of Hopper
                     Barge ING 4727" (15 pages), page 7
```

```
28AUG, 1200         Port Condition ZULU Set
                    -Whiteley Report 13FEB07, page 7
                    -Whiteley Report 23SEP07, page 6
        1500        -Klotz Report 26SEP07, page 7
```

## 5. - Findings:

a. The barge ING 4727 arrived at the Lafarge North America
(LNA) Terminal located at 2315 France Road, New Orleans,
Louisiana, the morning of Friday, 26 August 2005.  The LNA
Terminal is a "waterfront facility" as defined by 33 Code
of Federal Regulations (CFR), Part 6.01-4 (33CFR6.01-4).

b. The LNA Terminal is located on the west side of the
Inner Harbor Navigation Canal (IHNC), between the Florida
Avenue Bridge to the north, and the Claiborne Avenue Bridge
to the south.  The IHNC is a "navigable water of United
States" as defined by 33CFR2.36(a)(2).

c. Captain of the Port New Orleans, as defined in
33CFR3.40-15, has jurisdiction over the IHNC and the
waterfront facilities located on the IHNC in accordance
with 33CFR6.01-3 and 33CFR6.04-1.

d. In accordance with 33CFR6.19-1 the primary
responsibility for the protection and security of vessels
or waterfront facilities lies with the masters, owners,
operators, and agents,

e. At approximately 1220 (all times Central Daylight Time),
26 August 2005, the ING 4727 was moored at the LNA Terminal
on the IHNC and unloading of its cargo had commenced.

f. At approximately 2030, 26 August 2005, "Port Condition
WHISKEY" was set by the USCG COTP New Orleans in accordance
with Enclosure (11), "Sector New Orleans Maritime Hurricane
Contingency Port Plan" (MHCPP), of CGSECTORNOLAINST 3006,
dated 01 June 2005.  Port Condition WHISKEY is set when
gale force winds (sustained winds of 39mph) are predicted
to arrive at Southwest Pass Entrance Sea Buoy within 72
hours.  The USCG Sector New Orleans Marine Safety Bulletin,
Volume V, Issue XXXV, was issued in regards to Port
Condition WHISKEY and modified the specific actions
contained in CGSECTORNOLAINST 3006; but also states the
modifications are precautionary measures provided for
consideration.  However, the specific recommended actions
of the MHCPP in regards to Port Condition WHISKEY are
applicable to self-propelled oceangoing vessels over 500GT,
and all oceangoing barges and their support tugs; not the
ING 4727.

g. On Saturday morning, 27 August 2005, at approximately
0930, the unloading of the ING 4727 was completed.  At this
time the ING 4727 was moored to the LNA Terminal wharf, and
the laden ING 4745 was moored to the outboard side of the
ING 4727.  During the morning of 27 August 2005, LNA
employees added and replaced mooring connections between
the ING 4727 and the ING 4745.

h. Between approximately 1425 and 1500 on 27 August 2005,
the ING 4727 with the ING 4745 moored to it, was topped
around such that the ING 4745 was now moored to the wharf
at the LNA Terminal, and the ING 4727 was outboard of the
ING 4745.  The ING 4727 was topped around specifically in
preparation for hurricane Katrina, to protect it and the
wharf from anticipated storm surge.

i. On 27 August 2005, at approximately 1615 "Port Condition X-RAY" was set by the USCG COTP New Orleans in accordance with Enclosure (11), "Sector New Orleans Maritime Hurricane Contingency Port Plan", of CGSECTORNOLAINST 3006, dated 01 June 2005. Port Condition X-RAY is set when gale force winds (sustained winds of 39mph) are predicted to arrive at Southwest Pass Entrance Sea Buoy within 48 hours. The USCG Sector New Orleans Marine Safety Bulletin, Volume V, Issue XXXVI, was issued in regards to port condition X-RAY. The specific recommended actions of the MHCPP in regards to Port Condition X-RAY are for self-propelled oceangoing vessels over 500GT, and all oceangoing barges and their support tugs; these recommendations are not applicable to the ING 4727. At this time there were no personnel at the LNA Terminal. There were no requirements for LNA personnel to remain at the terminal.

j. It is not clear from the information provided to me whether "Port Condition YANKEE" was officially set by the USCG COTP New Orleans in accordance with Enclosure (11), "Sector New Orleans Maritime Hurricane Contingency Port Plan", of CGSECTORNOLAINST 3006, dated 01 June 2005. Port Condition YANKEE should have been set when gale force winds (sustained winds of 39mph) were predicted to arrive at Southwest Pass Entrance Sea Buoy within 24 hours. However, the specific recommended actions of the MHCPP in regards to Port Condition YANKEE are applicable to self-propelled oceangoing vessels over 500GT, and all oceangoing barges and their support tugs; not the ING 4727.

k. Sunday, 28 August 2005, at approximately 1200 "Port Condition ZULU" was set by the USCG COTP New Orleans in accordance with Enclosure (11), "Sector New Orleans Maritime Hurricane Contingency Port Plan", of CGSECTORNOLAINST 3006, dated 01 June 2005. Port Condition ZULU is set when gale force winds (sustained winds of 39mph) are predicted to arrive at Southwest Pass Entrance Sea Buoy within 12 hours. The USCG Sector New Orleans Marine Safety Bulletin, Volume V, Issue XXVII (sic), was issued in regards to port condition ZULU. In accordance with CGSECTORNOLAINST 3006, at Port Condition ZULU all vessel traffic in the port is stopped, and the transfer of bulk liquid dangerous cargoes, cargoes of particular hazard and certain dangerous cargoes must cease. Although not applicable to the LNA Terminal, LNA had already ceased cargo operations on 27 August 2005. In addition, the

Marine Safety Bulletin had additional recommendations for vessels and facilities not contained in Enclosure (11) of CGSECTORNOLAINST 3006 for Port Condition ZULU.  One recommendation was "Mooring lines doubled up with due consideration given to the effects of predicted storm surge."  Doubling up lines is a common marine industry term that in general means to double the strength of the mooring connections, as by doubling up the number of lines being used to moor the vessel.  Doubling up is usually accomplished by running additional lines, or using the excess length of the original mooring line.  The ING 4727 was moored with extra lines of double strength, and with due consideration for the predicted storm surge. Therefore, the ING 4727 was in compliance with the Marine Safety Bulletin for Port Condition ZULU.

l. The last section of Enclosure (11), "Sector New Orleans Maritime Hurricane Contingency Port Plan", of CGSECTORNOLAINST 3006, dated 01 June 2005, "...contains general recommended precautionary measures that vessels and waterfront facilities can take to reduce the potential for loss of life, injury, or property damage from a hurricane." One of the recommendations is that only barges and ships incapable of operating under their own power should remain moored to wharves.  Therefore, in compliance with this recommendation it was proper that the ING 4745 was moored to LNA Terminal wharf and the ING 4727 was moored outboard of the 4745, as neither of these vessels was capable of operating under its own power.

## 6. - COMMENTS CONCERNING KDON MARINE CONSULTING DECLARATION DATED 13 JUNE 2008, AND LETTER DATED 11 MARCH 2009:

a. In Section 3, "CIRCUMSTANCES", on page 3, the ING 4727 is described as "undocumented" with an "unknown" "Registration/VIN".  This is not correct.  On 29 August 2005, the ING 4727 was documented by the USCG, had a Certificate of Documentation issued by the USCG, and had an Official Number of 955868.  The Declaration also states in this section that the Gross Tons for the ING 4727 was 960 tons (Estimated), and the Net Tons was 960 tons (Estimated).  It is not clear how these numbers were estimated, or if they are a weight calculation or a volume calculation.  For USCG vessel documentation Gross Tons and Net Tons are volume measurements based on one ton equals

one hundred cubic feet.  The ING 4727 had a documented gross tonnage and a documented net tonnage of 705 tons.

b. Section 4, "APPLICABLE STANDARDS AND REGULATIONS", on page 6, second paragraph is incorrect.  The second paragraph cites 33CFR6.14-2 and 33CFR6.19-1 and states "Both regulations cite conditions under which the Captain of the Port finds that mooring of any vessel to a wharf, dock, pier, or other waterfront structure would endanger such vessel, or the harbor or any facility...".  The conditions cited are discussed in 33CFR6.14-2, not 33CFR6.19-1.  Regulation 33CFR6.19-1 only discusses the primary responsibility for the protection and security of vessels and waterfront facilities.

c. It is my opinion that the Greater New Orleans Barge Fleeting Association (GNOBFA) "Barge Fleeting Standard of Care & Streamlined Program Guide Book"; with USCG Cover Letter dated 17JUN96, cited in Section 4, "APPLICABLE STANDARDS AND REGULATIONS", on page 6, third paragraph, is not applicable to the mooring of the ING 4727.  The promulgation letter signed by the President of GNOBFA and the COTP MSO New Orleans states "The objective of this team was to develop consistent policy interpretations, institute necessary changes to inspection standards and clarify the regulations in Title 33, Code of Federal Regulations, Part 165.803."  33CFR165.803 is titled "Mississippi River-regulated navigation area.", and is only applicable to the waters of the Mississippi River between miles 88 and 240 above Head of Passes; and therefore is not applicable to the IHNC or to the waterfront facilities located on the IHNC.  Furthermore, even if the GNOBFA document were applicable (which it is not), the preface of the GNOBFA Guide Book states "These are not intended to establish a particular standard of care, or impose a legal or regulatory duty, beyond the requirements set forth in applicable statutes and regulations."  In addition, there is no regulatory prohibition, or recommendation, in USCG Sector New Orlean's MHCPP against mooring a light barge to a loaded barge.

d. I disagree with Opinion 5.2, page 7, which states that LNA "...failed to properly moor the ING 4727 to the ING 4745 to withstand the hurricane force winds and predicted storm surge...".  The three one-part lines actually used by LNA to moor the ING 4727 to the ING 4745 in preparation for hurricane Katrina had more than double the strength of the

normal mooring, which had been rigged using two lines as
called for by 33CFR162.75(b)(3)(ii).

e. The regulatory requirements of 33CFR162.75 are
applicable to the ING 4727 as a vessel defined by
33CFR162.75(a)(3), not as a tow.  As a vessel the ING 4727
was properly moored in accordance with 33CFR162.75(b)(1)
and 33CFR162.75(b)(3)(i).  The ING 4727 was individually
moored to the ING 4745, and therefore only required to be
moored by bow and stern lines, in accordance with
33CFR162.75(b)(3)(ii).  By using three one-part lines of
greater strength to moor the ING 4727 to the ING 4745, LNA
had doubled the strength of the mooring.  While
33CFR162.75(b)(3)(ii) states that "Tows" shall be secured
at sufficiently frequent intervals to insure their not
being drawn away form (sic) the bank by winds, currents, or
the suction of passing vessels; this is not applicable to
the ING 4727 since it was not a part of a tow.  The
requirements of 33CFR162.75 do not address the mooring of
vessels or tows to withstand anticipated severe weather or
hurricanes.

f. It is my opinion that LNA complied with the primary
responsibility requirements of 33CFR6.19 to insure
protection and security of its facility and the ING 4727.
This is shown by the fact that the ING 4727 was moored by
LNA with more lines than required by 33CFR162.75b(3)(ii);
LNA had the ING 4727 topped around to protect it from
anticipated storm surge; and that LNA ceased all cargo
operations well in advance of USCG Sector New Orleans
closing the port of New Orleans.

g. It is my opinion that LNA complied with the
**recommendations** (emphasis added) of Appendix 2, to Annex B,
Enclosure (11) of CGSECTORNOLAINST 3006, "Coastal Severe
Weather/Hurricane Plan", dated 01JUN05.  LNA had doubled up
the lines mooring the ING 4727 to the ING 4745 by using
more lines than required, with at least double the total
strength over the required two mooring lines.  In addition,
LNA had the ING 4727 topped around in anticipation of a
storm surge.  Lastly, the ING 4727 was moored in a
protected slip well away from the IHNC channel and
therefore not in close proximity to the Florida Avenue
Bridge to the north, or the Claiborne Avenue Bridge to the
south.

h. It is my opinion that although not applicable, LNA
complied with task requirement (a) of Port Condition X-RAY
listed in ANNEX C of Enclosure (11), CGSECTORNOLAINST 3006,
"Coastal Severe Weather/Hurricane Plan", dated 01JUN05.
LNA had addressed the needs and intentions of the ING
4727's mooring by having three one-part mooring lines
including added and replaced lines of greater strength, and
by topping around the ING 4727 in preparation for hurricane
Katrina.

i. It is my opinion that the task requirement (b) of Port
Condition X-RAY listed in ANNEX C of Enclosure (11),
CGSECTORNOLAINST 3006, "Coastal Severe Weather/Hurricane
Plan", dated 01JUN05, is not applicable to the ING 4727.
Although not clearly stated, it is my opinion that this
task (i.e. determining whether vessels will be allowed to
remain in port) is applicable to self propelled vessels,
and/or oceangoing barges with supporting tugs, and not
inland river barges.

j. It is my opinion that Enclosure (11) of CGSECTORNOLAINST
3006, "Coastal Severe Weather/Hurricane Plan", dated
01JUN05, is only a recommended guidance to the marine
industry of New Orleans.  The majority of recommendations
in Enclosure (11) for vessels are applicable to self-
propelled oceangoing vessels over 500 GT, and oceangoing
barges and their supporting tugs.  These recommendations
are not applicable to the ING 4727.

k. In regards to Opinion 5.10, as discussed above, the
cargo operations at LNA involving the ING 4727 were
completed before the Coast Guard recommended ceasing of
cargo operations involving **hazardous materials** (emphasis
added).  It is my opinion that there were no Coast Guard
requirements to move or ballast the ING 4727, let alone
sink it.  Lastly, it is my opinion that the ING 4727 was
moored with doubled mooring lines in accordance with the
applicable regulations, and the recommendations of the
Sector New Orleans Hurricane Plan.

l. I disagree with Opinion 5.11.  LNA had adequately
addressed the suitability of the ING 4727's mooring by
having three one-part mooring lines, including added and
replaced lines of greater strength, and by topping around
the ING 4727 in preparation for hurricane Katrina.  Nothing
in the applicable regulations or Sector New Orleans
Hurricane Plan requires or recommends using all available

mooring points.   (And it is quite possible that Lafarge in fact used all available mooring points; no witness has said that the kevels on the two barges were aligned at every single point.)   It is also my opinion that LNA complied with the regulations of 33CFR6.19 and 33CFR162.75(b)(3)(ii), and the **recommendations** (emphasis added) of Appendix 2, to Annex B, Enclosure (11) of CGSECTORNOLAINST 3006, "Coastal Severe Weather/Hurricane Plan", dated 01JUN05.   LNA had doubled up the lines mooring the ING 4727 to the ING 4745 by using more lines than required, with at least double the total strength over the required two mooring lines.   In addition, LNA had the ING 4727 topped around in anticipation of a storm surge. Lastly, the ING 4727 was moored in a protected slip.


## 7. - INFORMATION REVIEWED:

- Report from Wiggins Marine Surveying, dated 18FEB04
- Report from Whiteley Global, LLC, dated 13FEB07
- Report from CAPT John W. Klotz, dated 15FEB07
- Report from Shearer & Assoc., dated 15FEB07
- Report from Budwine & Associates, INC., dated 16FEB07
- Report from Whiteley Global, LLC, dated 23SEP07
- Report from CAPT John W. Klotz, dated 26SEP07
- Report from Shearer & Assoc., dated 28SEP07
- Report from KDON Marine Consulting, dated 17JAN07
- Report from KDON Marine Consulting, dated 10SEP07
- Report from KDON Marine Consulting, dated 13JUN08
- Report from KDON Marine Consulting, dated 11MAR09
- Report from RopeTech Inc., dated 12JUN09
- Report from Dufour Laskey & Strouse Inc, dated 12JUN09
- Deposition of Donald J. Green, taken 21NOV08
- Deposition of Edward L. Busch, taken 14NOV06
- Deposition of Earl J. Smith, taken 14NOV06
- Deposition of Louis Robin, taken 19JUN08
- Deposition of Roland K. Johnson Jr., taken 09JAN08
- Board of Commissioners of the Port of New Orleans, TARIFF No. 5 containing Rules & Regulations for the Operation & Navigation of the Inner Harbor – Navigation Canal, adopted 28MAR44, reissued 01OCT61, effective 15OCT61 (cancels TARRIFF (sic) No.4)
- Greater New Orleans Barge Fleeting Association (GNOBFA) "Barge Fleeting Standard of Care &

Streamlined Program Guide Book"; with USCG Cover Letter dated 17JUN96

- Redacted USCG Report of Investigation into the Circumstances Surrounding the Incident Involving Hurricane Katrina ING4727/Breakaway-Grounding/??? on 08/29/2005; MISLE Activity Number: 2516389; MISLE Case Number: 262324
- Redacted Unsigned and Undated USCG Investigative Report "Grounding of Hopper Barge ING 4727" (15 pages)
- Redacted USCG Form CG-2692, "Report of Marine Accident, Injury or Death", dated 10/14/05
- Redacted Witness Statement from MISS ENOLA Crew Member, dated 10-18-05
- Redacted Gulf Coast Mariners Association (GCMA) Letter to MSU Morgan City, dated 05OCT05
- Redacted GCMA Letter to Senator Mary Landrieu, dated 05OCT05
- 17 Miscellaneous Photos ING 4727 & Levee Damage
- 5 Pages Miscellaneous Weather Maps
- Miscellaneous Redacted FOIA Requests
- USCG Atlantic Area Instruction 16601.1A, "Atlantic Area Port Operations Hurricane Guidance, dated 19MAY06
- CGSECTORNOLAINST 3006, "Coastal Severe Weather/Hurricane Plan", dated 01JUN05, Including 24 Enclosures & Hurricane Traffic Flow Map
- USCG Sector New Orleans Marine Safety Bulletin, Volume V, Issue XXXIII, AUG05, "Hurricane Information for the Marine Industry"
- USCG Sector New Orleans Marine Safety Bulletin, Volume V, Issue XXXV, AUG05, "Set Port Condition WHISKEY"
- USCG Sector New Orleans Marine Safety Bulletin, Volume V, Issue XXXVI, AUG05, "Set Port Condition X-RAY"
- USCG Sector New Orleans Marine Safety Bulletin, Volume V, Issue XXVII (sic), AUG05, "Set Port Condition ZULU"
- E-mail from LCDR Shannon Gilreath to Frank Johnson, dated 27AUG05
- ACOE Report: LPMS 2a, for 08/27/2005 0001 to 08/29/2005 2359 (two pages)
- Plan View of Lafarge Bulk Terminal, 3/17/06
- 25 Pages Miscellaneous Construction Details, Equitable Shipyards, Inc.
- United States Code (USC) Annotated, 2004, Title 46 "Shipping", Published by Thomson/West

- Visited Lafarge Terminal, IHNC, New Orleans, LA, 27FEB09
- http://www.gpoaccess.gov/cfr/index.html
- http://www.uscg.mil/
- http://www.nauticalcharts.noaa.gov/mcd/OnLineViewer.html
- http://www.st.nmfs.noaa.gov/st1/CoastGuard/VesselByID.html
- http://www.trans-inst.org/
- http://www.m-i-link.com/home/default.asp
- http://www.deckskills.com/index.html
- http://www.uscg.mil/history/katrina/katrinaindex.asp
- http://www.nhc.noaa.gov/archive/2005/KATRINA.shtml
- http://www.usmm.org/
- http://en.wikipedia.org/


Subject to receiving additional information or records the above are my findings and/or opinions regarding the circumstances of the mooring of the barge ING 4727 at the waterfront facility Lafarge North American, in the Inner Harbor Navigation Canal, New Orleans, Louisiana, from on our about 26 August 2005, to 29 August 2005; and KDON Marine Consulting's "Declaration" of Donald J. Green, dated 13 June 2008 and letter dated 11 March 2009.


Respectfully,


D. F. Ryan II, PE
CAPT, USCG Ret.

Appendix A:   Comments Concerning Deposition of DONALD J. GREEN, KDON Marine Consulting, taken 21NOV08
Appendix B:   Career History
Appendix C:   Trials, Depositions, Presentations
Appendix D:   Education
Appendix E:   Compensation

**COMMENTS/OPINIONS CONCERNING DEPOSITION OF DONALD J. GREEN, KDON MARINE CONSULTING, TAKEN 21 NOVEMBER 2008:**

**a. Page 64, Lines 4 to 13** - Mr. Green states "...and it's been pointed out in Coast Guard procedures that loaded barges are much safer in hurricane force winds and in hurricane conditions than are light barges.  And they even recommend that barges be ballasted -- or not barges, but vessels be ballasted to reduce their sail area, as such, not be as influenced by the wind as an empty barge or an empty vessel could be."  Mr. Green also asserts that the ING 4727 should have been ballasted on Page 81, Lines 2 to 20.  There is no cite given for the "Coast Guard procedures" in the deposition.

In the information available to me, I have found one Coast Guard procedure that discusses ballasting in preparation for a hurricane.  That is Enclosure (11) to USCG Sector New Orleans Instruction 3006 (CGSECTORNOLAINST 3006), dated 01 June 2005.  Enclosure (11) discusses ballasting twice. First on page D-7 under "Recommended Storm Preparations - Vessels", stating "All vessels that intend to remain in port should consider the appropriateness of taking on additional ballast or cargo to improve their stability." In my opinion this general recommendation is directed at self-propelled oceangoing vessels over 500 GT, and oceangoing barges and their supporting tugs; not inland river barges like the ING 4727.  In addition, this general recommendation addresses improving stability, not reducing sail area.  Lastly, it is my opinion that Enclosure (11) of CGSECTORNOLAINST 3006, "Coastal Severe Weather/Hurricane Plan", dated 01JUN05, is only a recommended guidance to the marine industry of New Orleans.  The majority of recommendations in Enclosure (11) for vessels are applicable to self-propelled oceangoing vessels over 500 GT, and oceangoing barges and their supporting tugs.  These recommendations are not applicable to an inland river barge such as the ING 4727.

The second mention of ballast in Enclosure (11) is in Appendix 1 entitled "Recommended Precautionary Measures for Ships", of Annex B.  Item 4 of this Appendix states "Vessel ballasted to ensure maximum safety."  This Appendix applies to ships and is not applicable to barges.  Appendix 2 entitled "Recommended Precautionary Measures for Barges" of Annex B is applicable to barges and makes no mention of ballasting of barges, whether oceangoing or inland.

Therefore in my opinion there is no Coast Guard procedure recommending inland barges such as the ING 4727 to ballast in preparation for severe weather.

In addition, potential free surface effects of liquid ballast could decrease the stability of the ING 4727.

**b. Page 65, Lines 6 and 7; Page 77, Line 22; Page 78, Lines 18 and 19; Page 125, Line 125 to Page 129, Line 17; and Page 160, Lines 4 to 19** – Mr. Green states that the mooring lines of the ING 4727 were not doubled up.  Mr. Green specifically states that doubling up means using the same line twice, not adding additional lines.  In my opinion Mr. Green's definition of doubling up lines is only one of several used by the marine industry.  Doubling up is a common marine industry term that in general means to double the strength of the mooring connections, as by doubling up the number of lines being used to moor the vessel.  Doubling up can be accomplished by running additional lines, as well as using the excess length of the original mooring line.  In my opinion any mooring method that maintains one line on the bow and one line on the stern, as well as "doubling" the strength of the original moorings meets the intent of any guidance recommending double up mooring lines in anticipation of severe weather.  The ING 4727 was moored with extra lines of at least double strength, and therefore satisfied the intent of any guidance to double up mooring lines.

**c. Page 70, Line 23; and Page 71, Lines 10-13** – Mr. Green states that the ING 4727 was not documented by the United States government, and that the ING 4727 was not issued an official number.  The ING 4727 was documented by the USCG and had an Official Number of 955868.

**d. Page 71, Lines 18-23** – The deposition states "...it's not a seagoing barge, its an inland barge, and there's no regulations that cover inland barges other than basic uninspected vessel safety rules...".  Numerous inland barges require significant compliance with Coast Guard regulations under 46 Code of Federal Regulations, Title 33 and Title 46; specifically all inland barges that transport oil or hazardous materials, either in bulk or as package cargoes.  Since the ING 4727 did not carry oil or hazardous materials, it was not required to be inspected and certificated by the USCG; and therefore did not have a USCG

Certificate of Inspection. Although it is highly unlikely, but should the ING 4727 operate beyond the Boundary Line, it would then be a "seagoing barge" in accordance with 46 United States Code Title 46, Subtitle II, Part A, Section 2101(32).

**e. Page 82, Lines 24 and 25; Page 83, Lines 1 to 9; and Page 161, Lines 3 to 6** – Mr. Green discusses the recommendations of Greater New Orleans Barge Fleeting Association (GNOBFA) "Barge Fleeting Standard of Care & Streamlined Program Guide Book"; with USCG Cover Letter dated 17JUN96, and that the procedures contained in this book should be taken to comply with the regulations of 33CFR165.803. In my opinion the regulations in 33CFR165.803, entitled "Mississippi River-regulated navigation area.", are not applicable to the mooring of the ING 4727 in preparation for hurricane Katrina. These regulations are only applicable to the waters of the Mississippi River between miles 88 and 240 above Head of Passes; and therefore are not applicable to the IHNC or to the waterfront facilities located on the IHNC. Furthermore, the preface of the GNOBFA Guide Book states "These are not intended to establish a particular standard of care, or impose a legal or regulatory duty, beyond the requirements set forth in applicable statutes and regulations."

**f. Page 105, Line 21 to Page 108, Line 9** – Discusses the regulations in 33CFR162.75 and Mr. Green's opinions that the mooring of the ING 4727 did not comply because in his opinion the mooring lines were not doubled up, and the ING 4727 was not moored in such a manner to withstand the expected forces of wind, current and passing vessels. The regulatory requirements of 33CFR162.75 are applicable to the ING 4727 as a vessel defined by 33CFR162.75(a)(3), not as a tow. 33CFR162.75 does not discuss doubling up mooring lines. As a vessel the ING 4727 was properly moored in accordance with 33CFR162.75(b)(1) and 33CFR162.75(b)(3)(i). The ING 4727 was individually moored to the ING 4745, and therefore only required to be moored by bow and stern lines, in accordance with 33CFR162.75(b)(3)(ii). By using three one-part lines of greater strength to moor the ING 4727 to the ING 4745, LNA had doubled the strength of the mooring. While 33CFR162.75(b)(3)(ii) states that "Tows" shall be secured at sufficiently frequent intervals to insure their not being drawn away form (sic) the bank by winds, currents, or the suction of passing vessels; this is

not applicable to the ING 4727 since it was not a part of a tow.  The requirements of 33CFR162.75 do not address the mooring of vessels or tows to withstand anticipated severe weather or hurricanes.

**g. Page 108, Lines 10 to 17** - Mr. Green states that the LNA violated 33CFR6.19 because LNA failed to insure the ING 4727 was secure and safe.  It is my opinion that LNA complied with the primary responsibility requirements of 33CFR6.19 to insure protection and security of its facility and the ING 4727.  This is shown by the fact that the ING 4727 was moored by LNA with more lines than required by 33CFR162.75b(3)(ii); LNA had the ING 4727 topped around to protect it from anticipated storm surge; and that LNA ceased all cargo operations well in advance of USCG Sector New Orleans closing the port of New Orleans.

**h. Page 111, Lines 7 to 15** - Discusses the recommendations contained in CGSECTORNOLAINST 3006, "Coastal Severe Weather/Hurricane Plan", dated 01JUN05, Enclosure (11), Annex B, Appendix 2; and Mr. Green's opinion that LNA failed to double up the mooring lines on the ING 4727, and the ING 4727 was in close proximity to bridges.  It is my opinion that LNA complied with the **recommendations** (emphasis added) of Appendix 2, to Annex B, Enclosure (11) of CGSECTORNOLAINST 3006, "Coastal Severe Weather/Hurricane Plan", dated 01JUN05.  LNA had doubled up the lines mooring the ING 4727 to the ING 4745 by using more lines than required, with at least double the total strength over the required two mooring lines.  In addition, LNA had the ING 4727 topped around in anticipation of a storm surge.  Lastly, the ING 4727 was moored well away from the IHNC channel and therefore not in close proximity to the Florida Avenue Bridge to the north, or the Claiborne Avenue Bridge to the south.

**i. Page 108, Lines 16 to 25; and Page 147, Lines 4 to 18** - It is my opinion that although not applicable, LNA complied with task requirement (a) of Port Condition X-RAY listed in ANNEX C of Enclosure (11), CGSECTORNOLAINST 3006, "Coastal Severe Weather/Hurricane Plan", dated 01JUN05.  LNA had addressed the needs and intentions of the ING 4727's mooring by having three one-part mooring lines that were at least double the strength of the standard two mooring lines and topping around the ING 4727 in preparation for hurricane Katrina; and the ING 4727 was moored well away from the IHNC channel and therefore not in close proximity

to the Florida Avenue Bridge to the north, or the Claiborne Avenue Bridge to the south.

**j. Page 112, Lines 3 to 6** – Mr. Green states that LNA was required to notify the USCG that the ING 4727 would remained moored at the LNA Terminal.  It is not clear but it appears that Mr. Green is citing Task Requirement (b), Port Condition X-RAY of Annex C of Enclosure (11), CGSECTORNOLAINST 3006, "Coastal Severe Weather/Hurricane Plan", dated 01JUN05.  In my opinion this is only applicable to self-propelled oceangoing vessels over 500 GT and oceangoing barges and their supporting tugs, not an inland river barge like the ING 4727.

**k. Page 124, Line 3 to Page 125 Line 6** – It is my opinion that the language all vessels operating below Huey P. Long Bridge only applies to the Mississippi River below the bridge, and not to any tributaries and/or adjacent waterways such as the IHNC.

Subject to receiving additional information or records the above are my findings and/or opinions regarding the deposition of Mr. DONALD J. GREEN, KDON MARINE CONSULTING, taken 21 November 2008, regarding the circumstances of the mooring of the barge ING 4727 at the waterfront facility Lafarge North American, in the Inner Harbor Navigation Canal, New Orleans, Louisiana, from on our about 26 August 2005, to 29 August 2005.

**6/70 - 6/74: Cadet, U.S. Coast Guard Academy, New London, CT**

<u>Description</u> - Full time student during academic year, with emphasis on general engineering and electrical engineering.  During summer months received special training on Coast Guard vessels and at Coast Guard shore units.

<u>Significant Accomplishments</u> - Graduated with honors ... sat for and received an "Engineer-in-Training" certificate from Pennsylvania ... one of only four Cadets picked to train at a Coast Guard marine safety unit for three months senior year.  Member of sailing Barque EAGLE crew that sailed vessel back to Germany for first visit since vessel claimed as war prize after WWII, for 1972 Olympics.  Commissioned as an Ensign in the U.S. Coast Guard 05JUN74.

\* \* \* \* \* \* \* \* \* \*

**6/74 - 12/76: Assistant Engineering Officer/Damage Control Officer, Auxiliary Branch Officer, and Electrical Branch Officer on board the Coast Guard Cutter MUNRO, Seattle, WA**

<u>Description</u> - Second in charge of the Engineering Department (60 people) on board a Coast Guard 378 foot high endurance cutter.  Department responsible for the operation, maintenance and repair of all engineering systems and sub-systems to ensure that the vessel could respond to its missions of search and rescue, law enforcement, and military readiness.  Given direct responsibility of the Damage Control Branch (6 people), Auxiliary Branch (12 people) and Electrical Branch (5 people).

<u>Collateral Duties</u> - Drug Exemption Representative, Movie Officer, Voting Officer, Laundry Officer, Gas Free Officer, NBC Defense Officer, Fire Prevention Officer, Fueling Officer

<u>Significant Accomplishments</u> - Completed comprehensive and thorough Student Engineer qualification program ... also qualified as inport and at sea Engineering Watch Officer.  Directly supervised the preparation and writing of shipyard specifications for two major shipyard drydockings/availabilities ... given complete responsibility for day-to-day management for two yard periods ... both yard contracts involved month long periods and totaled million (plus) dollars.

<u>Recognition</u> - Received a CG Achievement Medal from the 13th District Commander, RADM Richmond, for the above two yard periods; and for the attainment of the MUNRO's third "Cutter Achievement Award in Engineering" at Naval Refresher Training in San Diego, CA, SEP76.  Promoted to Lieutenant (junior grade) on 05MAR76.

\* \* \* \* \* \* \* \* \* \*

**1/77 - 10/79: Marine Inspector & Investigating Officer, Marine Inspection Office, Seattle, WA**

<u>Description</u> - Inspect US and foreign vessels for compliance with
international treaties, US laws, federal regulations, various class
society rules, CG policies, and industry standards.  Inspection were
conducted on tankships, cargo vessels, passenger vessels, barges and
foreign vessels; evaluating these vessels for ship structure, strength,
pollution compliance, resistance to flooding, fire protection, fire
fighting systems, steering gear, machinery systems, navigational gear,
lifesaving, and overall design.  Conducted casualty investigations
involving US and/or foreign vessels.

<u>Collateral Duties</u> - Transportation Officer

<u>Significant Accomplishments</u> - Completed qualifications for Drydock
Inspector, Small Passenger (T-Boat & K-Boat) Inspector, Barge
Inspector, Foreign Vessel Inspector, Control Verification Inspector,
Assistant Hull Inspector, Assistant Machinery Inspector, Casualty
Investigator, Suspension & Revocation Investigator, Violation
Investigator, Investigating Officer, License & Seaman Document
Examiner, License and Seaman Document Evaluator, and ending as one of
handful of personnel at MIO Seattle to receive dual qualification as
Hull & Machinery (Diesel & Boiler) Inspector.  Investigative report of
significant marine casualty involving major passenger vessel recognized
by CG Headquarters and included in selected marine casualty reports to
be used for training future CG Investigating Officers.  Deployed to
Singapore for six weeks to assist with overwhelming inspection
workload, and to assist in closing CG office.  Conducted first CG
inspections of foreign tankships in Puget Sound under the new
authorities of the Ports and Waterways Safety Act.

<u>Recognition</u> - Because of professional knowledge, technical expertise
and unique dual qualification as Hull & Machinery Inspector, selected
by CG Headquarters Personnel Division for demanding overseas
assignment.  Promoted to full Lieutenant on 01JUN78.

* * * * * * * * *

**11/79 - 5/82: Marine Inspector & Investigating Officer, Marine
Inspection Office, Rotterdam, The Netherlands**

<u>Description</u> - Similar duties to above at MIO Seattle.

<u>Collateral Duties</u> - Security Officer

<u>Significant Accomplishments</u> - Completed qualifications for Mobile
Offshore Drilling Unit (MODU) Inspector, Offshore Supply Vessel (OSV)
Inspector, Liferaft Servicing Inspector, and Factory Inspector.
Conducted and documented numerous inspections on US tankships, cargo
vessels, passenger vessels, drilling units (MODUs), OSVs, barges, etc,
in Scandinavia, Europe, Middle East and Africa ... inspections often
conducted in remote, third world, ports with little or no direct
support from home office.  Lead inspector on new construction of US
Ro/Ro vessels in Germany, US OSVs in Norway, US jack-up MODUs in
France, and US semi-submersible MODUs in Finland.

* * * * * * * * *

**6/82 - 5/84: Marine Inspector, Investigating Officer & Plan Review Officer, Marine Inspection Office, New York, NY**

Description - Similar duties to above at MIO Seattle and MIO Rotterdam, but also tasked with reviewing vessel plans and specifications deemed capable of being reviewed at local level rather than the marine safety technical offices of the Commandant.

Collateral Duties - Building Administrator, Parking Officer, Education Officer, DANTES Test Control Officer, 900 Property Custodian, C3 Computer System Assistant, Assistant Fire Warden

Significant Accomplishments - Assumed duties as Plan Review Officer, reviewing many plans and/or projects normally handled by postgraduate trained officers.  Supervised major renovation of building and heat/AC system.  Installed first CG standard computer work station system (C3) without any IT support ... personnel trained and system online months in advance of IT timeline.  Competed for and was selected for post graduate education/training in Naval Architecture.

**********

**6/84 - 5/86: Post Graduate Student, University of Michigan, Ann Arbor, MI**

Description - Selected by Coast Guard to attain a post graduate degree in Naval Architecture.

Significant Accomplishments - Received a MSE in Naval Architecture & Marine Engineering; as well as a separate MSE in Mechanical Engineering.  Sat for and received license as Professional Engineer in the state of Michigan.

Recognition - Promoted to Lieutenant Commander on 01JUL84.

**********

**6/86 - 5/88: Staff Engineer, Major Vessel Branch, Hull Division, Marine Safety Center, Washington, D.C.**

Description - Key person in start up of new CG centralized plan review unit, that took place of three separate technical units.  Reviewed plans of US and foreign vessels for compliance with international treaties, US laws, federal regulations, various class society rules, CG policies, and industry standards.  Reviews were conducted on tankships, cargo vessels, passenger vessels, mobile offshore drilling units, barges and foreign vessels; evaluating these vessels for ship structure, strength, pollution compliance, resistance to flooding, fire protection, fire fighting systems, steering gear, machinery systems, navigational gear, lifesaving, and overall design.

Collateral Duties - ABS Oversight Coordinator

<u>Significant Accomplishments</u> - Completed CG plan review of the US
tankships EXXON LONG BEACH and EXXON VALDEZ.  Project officer and lead
plan reviewer for the Kuwaiti tankship reflagging "team" ... 1800 plans
reviewed, none taking more than thirty days.  Discovery of major
inconsistencies in previous small passenger vessel (T-Boats) structural
fire protection plan review resulted in major revision of Commandant
policy and consolidation of all such plan review at Marine Safety
Center.  Consolidated and completed plan review of naval TAO tankship
new construction project.

<u>Recognition</u> - Selected in house to replace Major Vessel Branch Chief.

* * * * * * * * *

**6/88 - 6/90: Chief Major Vessel Branch, Hull Division, Marine Safety
Center, Washington, D.C.**

<u>Description</u> - Supervised branch of seven personnel responsible for
reviewing and approving plans for US and foreign vessels for compliance
with international treaties, US laws, federal regulations, various
class society rules, CG policies, and industry standards.  Branch
tasked with assessing and evaluating structural strength, stability,
lifesaving, and fire protection on tankships, cargo vessels, passenger
vessels and barges.  Also, Assistant Hull Division Chief.

<u>Significant Accomplishments</u> - Increased productivity by 50%, and
reduced backlog by 55%.  Branch annually reviewed 3300 plans and wrote
1200 letters.  Handled all review of industry and class society
calculations and proposals on the stability and structural strength of
the EXXON VALDEZ after its grounding ... conducted significant and
detailed analysis of the vessel's stability and strength for senior CG
personnel and subsequently personally briefed the Commandant and/or his
representatives.  Reviewed first proposal for transport of "spent"
nuclear reactor to Hanford, WA ... successful trial transport
determined CG policies and procedures.  Key person in Commandant's re-
focus on foreign cruise ship structural fire protection and development
of new guidelines for Marine Safety Offices (ie the field).

<u>Recognition</u> - Received a CG Commendation Medal from CG Headquarters
Chief of Staff, RADM Beran, for entire tour as Major Vessel Branch
Chief.  Also received Letter of Commendation from the Commandant, ADM
Yost, and a Special Operations Service Ribbon for EXXON VALDEZ
stability and damage analysis.  In addition, the Marine Safety Center
received a CG Meritorious Unit Commendation from the headquarter's
Chief of Marine Safety, RADM Henn; as well as a second CG Meritorious
Unit Commendation from CG Headquarters Chief of Staff, RADM Beran.

* * * * * * * * *

**7/90 - 4/93: Chief Inspection Department, Marine Safety Office San
Francisco Bay, Alameda, CA**

<u>Description</u> - Supervised Department of 18 people responsible for
inspecting US and foreign vessels for compliance with international
treaties, US laws, federal regulations, various class society rules, CG

policies, and industry standards.  Inspections were conducted on tankships, cargo vessels, passenger vessels, mobile offshore drilling units, barges and foreign vessels; evaluating these vessels for ship structure, strength, pollution compliance, resistance to flooding, fire protection, fire fighting systems, steering gear, machinery systems, navigational gear, lifesaving, and overall design.

Collateral Duties - TQM Coordinator

Significant Accomplishments - Processed over 1700 inspection cases annually ... reduced backlog from over one year to two months. Implemented new commercial fish vessel safety regulations (46 Code of Federal Regulations, Part 28) in area stretching from Oregon border, south to San Luis Obisbo ... fisherman strongly resisted implementation ... consensus built, CG goals achieved.  Developed and implemented inspection procedures for new tankship vapor recovery systems regulations (46 Code of Federal Regulations, Part 39) ... first time systems used between deep draft vessels and refineries ... locally developed guidance and check sheets adopted by Commandant for national use.  Discovered major hull fractures on Sun Class tankships ... discovery resulted in immediate internal inspection of "sister" vessels ... all vessels required drydocking and steel repairs.  Discovered major structural problems on only US flag cruise ship ... Commandant told owners fix or scrap vessel ... significant steel renewals required to insure safety.  Oversaw reactivation of ten mothballed Ready Reserve Fleet (RRF) vessels and hospital ship MERCY in preparation for Desert Storm/Shield ... each vessel to be reactivated within five days... although vessels had not been used for five to twenty years, all reactivated safely and ready to accomplish their mission.  Requested by Commandant to help develop "new" CG training course for all future Inspection Department Chiefs.  Participated in 1992 Commanders promotion panel ... 335 records reviewed for 162 allowed promotions.

Recognition - Selected in house to replace unit's Executive Officer. Promoted to full Commander on 01AUG90.

\* \* \* \* \* \* \* \* \*

**5/93 - 6/95: Executive Officer, Marine Safety Office San Francisco Bay, Alameda, CA**

Description - Second in command of the second largest Marine Safety Office zone (area of responsibility) in the continental US ... direct control and responsibility for one hundred officers, enlisted and civilian personnel, plus seventy-five reservists; with a budget of $342K.  Duties also included Acting Commanding Officer, Alternate Captain of the Port (COTP), Alternate Officer in Charge, Marine Inspection (OCMI), and Alternate Federal On Scene Coordinator (FOSC).

Collateral Duties - Safety Officer, Training Officer

Significant Accomplishments - Oversight and implementation of three distinct and comprehensive Oil Spill Contingency Plans for Northern California and San Francisco Bay in accordance with the Oil Pollution Act of 1990 (OPA 90).  Engaging marine industry and conducting some of

the first large scale spill drills required by OPA 90 (include first official PREP drill on west coast) ... included first training and use of the Incident Command System (ICS) for spill management by CG personnel.  FOSC for medium Pacheco Creek pipeline spill.  Raised issue of "liberty" ship JEREMIAH O'BRIEN's planned trip to Normandy for 50 year D-Day anniversary ... Commandant agreed significant safety issues needed to be addressed for this vessel and several other WWII vessels considering same.  Annually collected over $300K in user fees for transfer to US Treasury.

Recognition - Received second CG Commendation Medal from 11th CG District Commander, RADM Appelbaum, for entire tour as Chief of the Inspection Department and Executive Officer at Marine Safety Office San Francisco Bay.  In addition Marine Safety Office San Francisco Bay received the CG Unit Commendation from the Pacific Area Commander, VADM Daniell; and a Special Operations Service Ribbon from the Commandant, for direct support of Desert Shield/Storm.  Because of professional knowledge, technical expertise and unique "field" qualifications in combination with post graduate training selected by CG Headquarters Personnel Division to move and reorganize CG's largest overseas unit. As one of 137 volunteer recreational soccer coaches in the Novato Youth Soccer League was one of 29 nominated as Coach of the Year, and was one of two selected for 1994.

\* \* \* \* \* \* \* \* \* \*

## 7/95 - 6/97: Executive Officer, Activities Europe/Marine Inspection Office Europe, Rotterdam, The Netherlands

Description - Second in command of the CG's largest "foreign" office and only European office ... direct control and responsibility for fifteen officers and enlisted personnel; with a budget of $172K. Office responsible for insuring US tankships, cargo vessels, passenger vessels, drilling units (MODUs), OSVs, barges, etc, in Scandinavia, Europe, Middle East and Africa comply with international treaties, US laws, federal regulations, various class society rules, CG policies, and industry standards ... inspections often conducted in remote, third world, ports with little or no guidance from CG support offices located in US.  Often CG's sole European representative to present/explain CG missions and policies to foreign government representatives and/or international maritime business leaders.  Duties also included Acting Commanding Officer, and Alternate Officer in Charge, Marine Inspection (OCMI).

Collateral Duties - Safety Officer, Training Officer, Senior Investigating Officer

Significant Accomplishments - Directly responsible for flawless relocation of CG Activities Europe office from London, UK, to Rotterdam, while incorporating new Marine Safety duties ... start-up of office was four weeks ahead of schedule ... did same job with half the personnel as previously assigned.  Placed major drilling company, major tankship company and major supply vessel company on notice with dissatisfaction with their vessel's compliance with applicable regulations and safety standards ... resulted in face-to-face meetings

and partnership to dramatically improve overall compliance.  Worked with several major US vessel operators with "overseas" vessels that had not been CG inspected for years and were not in compliance with applicable minimum safety standards, to bring vessels back into inspected status and improve safety.  Held the line on major steel repairs on one of few US flag ULCCs ... owner's appeal denied, vessel scrapped.  New CG/ABS "Alternate Compliance Program" implemented with little or no field guidance ... letters noting over 120 non-conformities resulted in high level CG/ABS meetings and program improvements.  Personally inspected first vessel under brand new Congressional "Maritime Security Program" ... met with top Danish maritime officials, senior ABS and company personnel ... after action report resulted in national policy being issued by Commandant.  Oversaw $1B plus in oil/gas projects being built for the Gulf of Mexico; and over $2B worth of new cruise ships for the US market.  Keynote presenter representing CG at major international trade fairs and/or forums.  Annually collected over $440K in user fees for transfer to US Treasury.  Laid ground work with American Embassy and Dutch government for Presidential visit for 50th year anniversary for Marshall Plan.

Recognition - Received third CG Commendation Medal from 1st District Commander, RADM Linnon. In addition, Activities Europe/Marine Inspection Office Rotterdam received a Meritorious Unit Commendation from RADM Larrabee.  Because of professional knowledge, technical expertise and superior record, selected by CG Headquarters Personnel Division for assignment to Command.  Promoted to Captain on 01SEP96.

*********

## 7/97 - 8/01: Commanding Officer, Marine Safety Office, Morgan City, LA

Description - Command of Marine Safety Office Morgan City with an area of operation covering nine parishes of southern Louisiana, and extending two hundred nautical miles offshore.  Solely responsible for the health and safety of one hundred-two officers, enlisted and civilians, plus fifteen reservists; with a budget of $376K.  Unit CG missions included commercial vessel safety, recreational boating safety, commercial fish vessel safety, marine environmental protection/response, port security, search and rescue, marine law enforcement, and waterways management.

Collateral Duties - Coast Guard Mutual Assistance

Significant Accomplishments - Marine Safety Office Morgan City annually handled the most pollution reports (over 2K); the most waterfront facilities (1/5 national total); largest number of new US vessels under construction (over 60); largest fleet of US vessels to be inspected and certificated (over 1.3K); and was the 2nd busiest investigative Marine Safety Office annually.  In addition, Marine Safety Office Morgan City has the only full time "direct control" vessel traffic control system in the CG; and the nation's only offshore deepwater port (Louisiana Offshore Oil Platform).  Started and completed $250K re-capitalization of the vessel traffic system with no impact on the 300 to 500 vessels a day that utilized system.  FOSC for two government led PREP drills mandated under OPA 90; as well as Chevron's "world" spill drill in

1998.  FOSC for many medium and large spills: STONE FUELER, Poseidon Pipeline, Wax Lake well blowout, Thibodaux #2 well blowout, hurricane and tropical storm "clean ups", etc, ... in 1998 FOSC for largest spill that calender year (300 personnel, 15 agencies), with second largest dispersant use ever.  FOSC for large scale clean up of abandoned site that hadn't been dealt with in over twenty years ... 90 tanks removed, 13K barrels of oil disposed of, four miles of pipe removed, HazMat (including asbestos and radioactive material) disposed of, and seventy-four abandoned oil and gas wells plugged.  Nationally policy developed and forwarded to Commandant on Streamlined Inspections of Barges; and Floating Offshore Installations (Morgan City had seen number of deep water floating platforms increase from four to twelve).  Y2K.

Recognition - Received Meritorious Service Medal from 8th District Commander, RADM Casto.  Also awarded the CG "m-pin" as meeting the field operation and qualification criteria of a designated Marine Safety and Environmental Protection Professional by RADM Casto.  In addition, Marine Safety Office Morgan City was awarded a Unit Commendation from the Atlantic Area Commander, VADM Shkor, in 2000; the Commandant's Simpson Award for public affairs each of the four years while assigned to Morgan City; the Commandant's 1999 Partnership in Education Award; as well as several Commandant Bronze & Silver Awards for total quality management.  Honorary Lifetime Member of Shrimp & Petroleum Festival, given the "key" to St Mary Parish, given the "key" to Morgan City, and appointed an Admiral of the Atchafalaya.

**********

**9/01 - 6/04: Chief of Marine Safety, Security and Environmental Protection Division, Eighth Coast Guard District, New Orleans, LA**

Description - Responsible for overseeing commercial vessel safety, waterways management, port security, and environmental protection missions throughout the Eighth Coast Guard District's twenty-six state geographical area.  Included supervising the activities of twelve Marine Safety Offices, four Marine Safety Units, seven Marine Safety Detachments, four Regional Exam Centers, and three Vessel Traffic Systems.  Also, served as CG's co-chair to Regional Response Teams (RRTs) 6, 7, & 8; as well as CG co-chair of the Mexican/U.S. (MEXUS) Joint Response Team (JRT) for the Gulf of Mexico.  Included oversight of a $5.1M budget.

Significant Accomplishments - Reported to the job 04SEP01 and had five work days on the job before 11SEP.  Entire tour was "short" 10% to 33% of personnel assigned.  Planning Officer for first Spill of National Significance (SONS) drill in the Gulf of Mexico ... since drill post 11SEP, last minute terrorist/port security elements had to be added. After taking almost twenty years to finalize and sign Mexico/USA (MEXUS) treaty on joint spill response in the Gulf of Mexico, co-chaired first ever Joint Response Team (JRT) between the Eighth Coast Guard District and the First Mexican Naval Zone, and planned first joint MEXUS drill ever ... initial actions built on to include semi-annual JRT meetings and annual MEXUS drills over three years. Immediately after 11SEP01 brought on board and deployed throughout the District 915 Reservists (one quarter of nation's total recalled) to increase port security.  Developed unique "security" committees to

holistically look at port security on the entire western river system, and the offshore Gulf of Mexico ... initiatives adopted by Commandant and codified into the Marine Transportation Security Act (MTSA) regulations (33 Code of Federal Regulations, Parts 101 to 106). Received "immediate" tasking to develop and implement a system to track real time hazardous material movements on western river system ... resulting system received Secretary of DHS praise and won CG IT innovation award.  Key player in revised Memorandum of Agreement between the USCG and MMS, new Commandant policy on offshore LNG terminals, new Commandant policy on proposed floating offshore storage and/or processing of oil facilities, etc.  Developed Gulf Safety Committee to treat the offshore Gulf of Mexico as one continuous "harbor" ... recognized as Harbor Safety Committee of the year for 2002. This and much more accomplished post 11SEP along with the shift from Department of Transportation to the Department of Homeland Security, and the passage and implementation of the Maritime Transportation Security Act (MTSA) of 2002.

Recognition - Received the Legion of Merit from Secretary Department of Homeland Security from Secretary Ridge; and the Department of Transportation "9-11 Medal" from Secretary Mineta.  Also commissioned as a Kentucky Colonel.

**********

**7/04 - Present:  DR Maritime Consulting**

Description - Independent Maritime Consultant fully qualified to assist maritime companies in navigation safety, vessel safety, marine environmental protection and port security issues, such as:  regulatory compliance, planning, drills, response, etc.

Significant Accomplishments - Provided on site assistance/advise to Oil Spill Response Organization (OSRO), responding to ATHOS II spill, Philadelphia, PA.  Provided long term advise to major Offshore Supply Vessel (OSV) company in federal regulatory matters covering navigation safety, waterways management, maintaining a Coast Guard Certificate of Inspection, appealing Coast Guard requirements, etc.

**********

**11/05 - Present:  SME, Adjunct Instructor & Instructor Assessor, LSU NCBRT-ACE, Baton Rouge, LA**

Description - The National Center for Biomedical Research & Training/Academy of Counter-Terrorist Education (NCBRT-ACE) was established in 1998 to provide a national training program to prevent and prepare for terrorism and  other all-hazard events, including man-made and natural disasters.  Subject Matter Expert in the areas of Coast Guard Navigation & Marine Safety Regulations, Port Security, Marine Environmental Protection, and Marine Industry.  Adjunct Instructor for Instructor Development Workshop Course; course is required for all new Adjunct Instructors hired by NCBRT-ACE.  One of ten Instructor Assessors who audit various NCBRT-ACE Adjunct

Instructors throughout the year as they deliver DHS approved NCBRT-ACE courses.

Significant Accomplishments - Assisted in preliminary development of two new courses.  First course dealt with security of offshore oil & gas facilities, preventing & preparing for significant emergencies of all types, and then responding to major incidents.  Second, course involved a scenario based training for large jurisdictions starting with intelligence of a WMD be transported through the jurisdiction, and escalating to a full response to the WMD; course intent was to train key personnel in intelligence fusion, decision making, command/control/communications, contingency planning and operational tactics.  Completed NCBRT-ACE's Instructor certification process, becoming fully qualified and certificated as Adjunct Instructor.  Selected as one of ten Instructor Assessors to assess all NCBRT-ACE Adjunct Instructors as part of LSU's NCBRT-ACE Instructor Certification process.

**********

**1/06 - 5/06:  Salvage Technical Advisor, T&T/Bisso, Houston, TX**

Description - USCG contracted T&T/Bisso to provide technical salvage expertise to the On-scene Commander charged with removing hundreds of sunk vessels from commercial waterways, and vessels aground on levees as a result of hurricane Katrina.  Was one of two Salvage Technical Advisors employed by T&T/Bisso, located at the USCG Incident Command for day-to-day operations.

Significant Accomplishments - Reviewed hundreds of salvage plans submitted by multiple sub-contractors on proposed salvage methods for each vessel.  All vessels removed safely.

**********

**9/07 - Present:  SME & Instructor Assessor, CRA, Alexandria, VA**

Description - Subject Matter Expert in the areas of Coast Guard Navigation & Marine Safety Regulations, Port Security, Marine Environmental Protection, and Marine Industry.

Significant Accomplishments - Provided SME review of two Port Security courses being developed for DHS acceptance and funding.

**Complete Work History Summary:**

| | | |
|---|---|---|
| Cadet | USCG Academy, New London, CT | 06/70-05/74 |
| Assistant Eng/DCA | USCGC MUNRO, Seattle, WA | 06/74-12/76 |
| Marine Inspector | MIO Seattle, WA | 01/77-10/79 |
| Marine Inspector | MIO Rotterdam, NL | 11/79-05/82 |
| Marine Inspector | MIO New York, NY | 06/82-05/84 |
| Postgraduate Student | Univ of Michigan, Ann Arbor, MI | 06/84-05/86 |
| Plan Reviewer/Staff Eng | Marine Safety Center, Washington, DC | 06/86-05/88 |
| Chief, Major Vsl Branch | Marine Safety Center, Washington, DC | 06/88-06/90 |
| Chief, Inspection Dept | MSO San Francisco Bay, Alameda, CA | 07/90-04/93 |
| Executive Officer | MSO San Francisco Bay, Alameda, CA | 05/93-06/95 |
| Executive Officer | Activities/MIO Europe, Rotterdam, NL | 07/95-06/97 |
| Commanding Officer | MSO Morgan City, LA | 07/97-08/01 |
| Chief, Marine Safety Div | 8th CG District, New Orleans, LA | 09/01-06/04 |
| Maritime Consultant | DR Maritime Consulting | 07/04-Present |
| SME, Adjunct Instructor & Instructor Assessor | NCBRT-ACE, LSU, Baton Rouge, LA | 11/05-Present |
| Salvage Technical Advisor | T&T/Bisso, Houston, TX | 01/06-05/06 |
| SME & Instructor Assessor | CRA, Alexandria, VA | 09/07-Present |

**TRAIL/DEPOSITIONS Daniel F. Ryan II:**

28MAR06 Deposition for Jones-Walker, New Orleans, LA, Re Secretary v. Delta Queen Steamboat Company, OSHRC Docket No. 05-1825, OSHA Inspection No. 309078814, RSOL Case No. 06-00126

**PRESENTATIONS Daniel F. Ryan II:**

"Salvage: Who's Responsible for What?", Tulane Law School Eighteenth New Orleans Maritime Seminar, 20/21 January 1999, New Orleans, LA

"Eighth Coast Guard District (D8) - An Overview", Briefing to the House Energy & Commerce Staff, 03 May 2002, New Orleans, LA

"Safe Distribution of Potassium & Sodium Cyanide", DuPont Chemical Solutions Enterprise, 16 May 2002, Memphis, TN

"USCG Regulation re Fire & Blast for Offshore Facilities", International Workshop - Fire & Blast Considerations in the Future Design of Offshore Facilities, 13 June 2002, Houston, TX

"Eighth Coast Guard District (D8) - An Overview", Senator M. Landrieu, 07 September 2002, New Orleans, LA

"Eighth Coast Guard District (D8) - An Overview", Nuclear Regulatory Commission Region IV Training/Outreach/Planning Workshop, 10 October 2002, Dallas, TX

"Eighth Coast Guard District (D8) - An Overview", Gulf/Rivers Intermodal Partnership (GRIP) - Freight Intermodal Executive Learning Demonstration, 23 October 2002, Mobile, AL

"Eighth Coast Guard District (D8) - An Overview", Regional Response Team (RRT) 7, 29/30 October 2002, Kansas City, MO

"Maritime Security Requirements", Offshore Marine Service Association, 23 January 2003, New Orleans, LA

"The Homeland Security Act & the Marine Transportation Security Act", Regional Response Team (RRT) 6, 30 January 2003, New Orleans, LA

"Presentation on Homeland Security Act; Marine Transportation Security Act; & LNG Deepwater Ports", Mineral Management Service (MMS) Industry SAFE Awards, 29 April 2003, Houston, TX

"Substandard Vessels - USCG Overview", Journal of Commerce's 14th Annual Breakbulk Conference, 26 September 2003, New Orleans, LA

"Eighth Coast Guard District (D8) - An Overview", International Association for Safety & Survival Training, 21 October 2003, Lafayette, LA

"Eighth Coast Guard District (D8) - An Overview", International Marine Contractors Association, 06 November 2003, Houston, TX

"The Regional Response Team (RRT)", MEXUS Gulf of Mexico Joint Response Team (JRT) Meeting, 03/04 February 2004, Tampico, Tamaulipas, Mexico

"The Maritime Threat to Ports & Shipping (with a Focus on the Gulf of Mexico and the Western Rivers)", LSU National Center for Biomedical Research & Training (NCBRT)/Academy of Counter-Terrorist Education (ACE) 4th Annual Instructor Professional Development Conference, 17 August 2006, Baton Rouge, LA

6/70: Redmond Senior High School, Redmond, WA --- Diploma

6/70-6/74: U.S. Coast Guard Academy, New London, CT --- BSE with Honors

13/6/74: Certificated Engineer-in-Training, State of Pennsylvania

5/84-5/86: H.H. Rackham School of Graduate Studies, University of Michigan, Ann Arbor, MI --- MSE Naval Architecture & Marine Engineering; MSE Mechanical Engineering

25/7/86: Licensed Professional Engineer, State of Michigan

## Short Term Non-Academic Resident Courses:

LSU/NCBRT-ACE Instructor Development Workshops (2006/07/08) ... Spill of National Significance (SONS) ... Coastal Oil Spill Control ... On-Scene Coordinator Crisis Management (I-400) ... Multi-Agency Team Building Enhancement System (MATES) ... Executive Officer (XO) ... Incident Command System (ICS) Orientation (I-100) ... ICS Advanced Training (I-200 & I-300) ... Chief Inspection Department ... Civil Rights Training ... Total Quality Management (TQM) Facilitator ... Preventing Sexual Harassment ... Drug Free Workplace ... Military Civil Rights ... Fracture & Fatigue Control in Structures ... Leadership Skills for Supervisors ... Civilian Personnel Procedures for Supervisors ... How to Brief Your Boss ... Vessel Officer Seminar II (VOS II) ... "GIFTS" Finite Element Program ... Senior Marine Inspector ... Outer Continental Shelf/Mobile Offshore Drilling Units Inspector ... Safety & Security of the Port (Packages, Vessels & Facilities) ... Bulk Liquid Cargoes ... Aluminum Welding ... Ultrasonic Inspection ... Marine Inspector ... Investigation Officer ... Non Destructive Testing (NDT) Techniques ... Damage Control Assistant (DCA) ... Shipboard Fire Fighting ... Shipboard Damage Control ... Pratt & Whitney Gas Turbine ... Hydrogen Sulfide Safety ... Lifesaving Appliances & Water Survival ... California "F", "E" & "D/E" Soccer Coaching License ... Top Rope Safety Instructor

## FEMA – Emergency Management Institute – Internet Courses

IS-001 Emergency Program Manager ... IS-139 Exercise Design ... IS-230 Principles of Emergency Management ... IS-235 Emergency Planning ... IS-240 Leadership & Influence ... IS-241 Decision Making & Problem Solving ... IS-242 Effective Communication ... IS-244 Developing & Managing Volunteers ... IS-700 National Incident Management System (NIMS) an Introduction ... IS-800 National Response Plan (NRP) an Introduction

24JUL08 - Received a Professional Development Series (PDS) Certificate of Achievement from EMI.  The Certificate is given to those students that complete the requisite seven EMI courses (IS139, IS230, IS235, IS240, IS241, IS242, & IS244).  These courses provide a well rounded set of fundamentals for those in the emergency management profession.

Research & Review                    $150/hour

Preparing Report                     $200/hour

Deposition & Testimony               $300/hour