# EXHIBIT 3

Deposition of D. Philip Skaer

1

1       UNITED STATES DISTRICT COURT

2        EASTERN DISTRICT OF LOUISIANA

3

4   IN RE: KATRINA CANAL BREACHES  * CIVIL ACTION

5                                   * NO. 05-4182

6   PERTAINS TO: BARGES             * Consolidated

7                                   * SECTION "K(2)"

8   Boutte v. Lafarge       05-5531 *

9   Mumford v. Ingram       05-5724 * JUDGE DUVAL

10  Lagarde v. Lafarge      06-5342 *

11  Perry v. Ingram         06-6299 * MAG. WILKINSON

12  Benoit v. Lafarge       06-7516 *

13  Parfait Family v. USA   07-3500 *

14  Lafarge v. USA          07-5178 *

15     *  *  *  *  *  *  *  *  *  *  *

16

17          Deposition of D. PHILIP SKAER, II,

18  given at Chaffe McCall, LLP, 2300 Energy

19  Centre, 1100 Poydras Street, New Orleans,

20  Louisiana 70163-2300, on July 15th, 2009.

21

22

23  REPORTER BY:

24          JOSEPH A. FAIRBANKS, JR., CCR, RPR

25          CERTIFIED COURT REPORTER #75005

**2**

```
 1  APPEARANCES:
 2  REPRESENTING THE BARGE PSLC:
 3      PATRICK J. SANDER, ATTORNEY AT LAW
 4      (BY:  PATRICK J. SANDERS, ESQUIRE)
 5      3123 Ridgelake Drive, Suite B
 6      Metairie, Louisiana 70002
 7      504-834-0646
 8  - and -
 9      WIEDEMANN & WIEDEMANN
10      (BY:  KARL WIEDEMANN, ESQUIRE)
11      821 Baronne Street
12      New Orleans, Louisiana 70113
13      504-581-6180
14
15  REPRESENTING LAFARGE NORTH AMERICA:
16      CHAFFE, MCCALL, L.L.P.
17      (BY:  DEREK WALKER, ESQUIRE)
18      (BY:  ROBERT FISHER, ESQUIRE)
19      2300 ENERGY CENTRE
20      1100 Poydras Street.
21      New Orleans, Louisiana 70163-2300
22      504-585-7000
23  - AND -
24
25
```

**3**

```
 1      GOODWIN PROCTOR, L.L.P.
 2      (BY:  MARK S. RAFFMAN, ESQUIRE)
 3      901 New York Avenue, NW
 4      Washington, D.C. 20001
 5      202-346-4000
 6
 7  REPRESENTING AMERICAN CLUB:
 8      MONTGOMERY, BARNETT, BROWN, READ,
 9      HAMMOND & MINTZ, L.L.P.
10      (BY:  RONALD J. KITTO, ESQUIRE)
11      3200 Energy Centre
12      1100 Poydras Street
13      New Orleans, Louisiana 70163
14      504-585-3200
15
16
17
18
19
20
21
22
23
24
25
```

**4**

E X A M I N A T I O N   I N D E X

EXAMINATION BY:                        PAGE

MR. SANDERS ................................6

E X H I B I T   I N D E X

EXHIBIT NO.                           PAGE
Exhibit 1    ................................75
Exhibit 2    ................................75
Exhibit 3    ................................76
Exhibit 4    ................................77
Exhibit 5    ................................77
Exhibit 6    ................................78
Exhibit 7    ................................78
Exhibit 8    ................................123

**5**

S T I P U L A T I O N

IT IS STIPULATED AND AGREED by and among counsel for the parties hereto that the deposition of the aforementioned witness may be taken for all purposes permitted within the Louisiana Code of Civil Procedure, in accordance with law, pursuant to notice;

That the formalities of reading, signing, filing, sealing and certification are hereby specifically waived;

That all objections, save those as to the form of the question and the responsiveness of the answer, are reserved until such time as this deposition, or any part thereof, is used or sought to be used in evidence.

* * *

JOSEPH A. FAIRBANKS, JR., CCR, RPR, Certified Court Reporter in and for the State of Louisiana, officiated in administering the oath to the witness.

**6**

1        D. PHILIP SKAER, II
2    10712 Scioto Lane,  Austin, Texas 78747, a
3    witness named in the above stipulation, having
4    been first duly sworn, was examined and
5    testified on his oath as follows:
6    EXAMINATION BY MR. SANDERS:
7        Q.   Mr. Skaer, would you give us your name
8    and address?
9        A.   Dick Philip Skaer, II, 10712 Scioto
10   Lane, Austin, Texas.
11       Q.   We're here to take your deposition.  I
12   take it you've given a deposition before.  Is
13   that correct?
14       A.   I have.
15       Q.   Approximately how many times?
16       A.   Four or five.
17       Q.   Okay.  I would venture to say what's
18   going to happen today is probably the same as
19   what happened in those other depositions.  I'm
20   going to ask you some questions.  If you don't
21   know an answer, it's okay to say so.
22           Do you understand?
23       A.   I understand.
24       Q.   Do you understand that you just swore
25   to tell the truth?

**7**

1        A.   I do.
2        Q.   Okay.  Now, sir, you indicated that
3    you live in Texas, is that correct?
4        A.   That is correct.
5        Q.   Did you live in Texas at the time of
6    Hurricane Katrina?
7        A.   I did.
8        Q.   Were you in the New Orleans area for
9    Hurricane Katrina?
10       A.   No.
11       Q.   Did you in any way experience the
12   effects of Hurricane Katrina?
13       A.   Not in Austin, Texas.
14       Q.   Okay.  I didn't know if you may have
15   been traveling near here or anything like that.
16       A.   No.
17       Q.   Okay.  Now, let's start with your
18   background.  Could you give us your educational
19   experience.
20       A.   Yes.  I have a college degree, and a
21   BA in political science, um -- geology.
22       Q.   What year did you earn those degrees?
23       A.   1953.
24       Q.   Okay.  Do you have any engineering
25   training?

**8**

1        A.   No.
2        Q.   Okay.  Do you have any training in
3    hydrodynamics?
4        A.   No.
5        Q.   Okay.  So I take it you don't hold
6    yourself out to have any expertise in
7    engineering or hydrodynamics.  Is that correct?
8        A.   No direct expertise.
9        Q.   Okay.  What about military experience?
10       A.   I was in the United States Navy.
11       Q.   And when did you get out of the United
12   States Navy?
13       A.   1958, I believe.
14       Q.   And what was your position or job in
15   the United States Navy?
16       A.   I was a weather officer.
17       Q.   Okay.  And as a weather officer is it
18   fair to say that you had no experience with
19   mooring vessels?
20       A.   That is true.
21       Q.   And is it fair to say that you
22   have no expertise or you do not hold yourself
23   out as an expert in mooring of vessels?
24       A.   That is correct.
25       Q.   Okay.  And as such is it true that

**9**

1    you've never performed a mooring analysis?
2        A.   I have not.
3        Q.   Okay.  Have you ever published any
4    articles?
5        A.   No.
6        Q.   You've testified in four or five other
7    cases.  Is that the extent of your legal
8    consulting, or have you consulted in many more
9    cases?
10       A.   I have consulted in many more cases.
11       Q.   Okay.  Approximately how many?
12       A.   Probably thirty.
13       Q.   Have you ever given opinions in any
14   prior cases whereby there were issues of
15   mooring and hurricane force winds?
16       A.   Yes.
17       Q.   And what case was that?
18       A.   It was a case in New York City.  There
19   is an attachment to my résumé that states it.
20       Q.   Okay.  Any other cases?
21           MR. WALKER:
22               I'm sorry.  You're referring to
23           hurricane force winds and mooring.
24           MR. SANDERS:
25               Mooring.

3  (Pages 6 to 9)

10

1   A.   You didn't mention hurricane force
2   winds.  You just said mooring.
3   EXAMINATION BY MR. SANDERS:
4   Q.   Okay.  Let me ask the question again.
5   A.   Please do.
6   Q.   With regard to your prior consulting,
7   have you ever been involved in any cases
8   involving mooring and hurricane force winds?
9   A.   No.
10   Q.   Okay.  So this is the first one.
11   A.   Yes.
12   Q.   With regard to your prior cases, have
13   you ever been involved in any cases involving
14   the parting of mooring lines?
15   A.   Yes.
16   Q.   And how many cases was that?
17   A.   Two.
18   Q.   The oldest case, could you tell us
19   what that was?
20   A.   That was in -- it was a mooring line
21   on a container ship in the Baltimore harbor.
22   It was an 8-1/2 or 9-inch, I can't remember at
23   the moment, line.  The line was purchased from
24   Bear in Europe, and it was a very -- it's not
25   something we commonly see in United States.

11

1   The rope broke, a seaman -- laborer on the dock
2   was injured.
3   Q.   Was that a single-part line?
4   A.   It was a bowline.
5   Q.   Single-part?
6   A.   Yes.
7   Q.   And what was your opinion, in summary,
8   in that case?
9   A.   Um -- the angle at which the line left
10   the ship was a severe angle.  It didn't have to
11   be, they just tied it up to the wrong bollard,
12   as far as I was concerned.  The rope had been
13   worn, it broke.
14       The engineering people, the marine
15   engineer, felt that the effect of the offshore
16   breezes helped push the container ship away
17   from the dock.
18   Q.   And was it your opinion that the line
19   was defective or that the line was sufficient?
20   A.   The line, had it been in good
21   condition, would have been sufficient.
22   Q.   What was your opinion in that case,
23   that -- you testified on behalf of the victim
24   or --
25   A.   I just stated my opinion.

12

1   Q.   Okay, let me ask you this:  Did you
2   testify on behalf of the victim 's case?
3   A.   No, on the defense.
4   Q.   Okay.
5   A.   Actually, it was neither.  It was
6   trying to determine where the damages were
7   being -- who was going to pay the damages after
8   the verdict had already been -- the award had
9   been made to the man.  We were determining
10   which company was going to be responsible for
11   the damages.
12   Q.   So who hired you in that case?
13   A.   The defense for --
14   Q.   The ship owner?
15   A.   Yes.
16   Q.   Okay.  What was the name of that case,
17   do you recall?
18   A.   Yes, it's right there in the first --
19   Q.   Well, there's four or five here.
20       Oh, it's the first case?
21       MR. WALKER:
22           Look at it.  Let's make sure.
23   A.   It's in Jury Trials, it's under Joseph
24   Criscuolo versus Atlantic Container Lines,
25   Cunard Line, Turecamo Marine.

13

1   EXAMINATION BY MR. SANDERS:
2   Q.   The other case you indicated -- you
3   said -- you indicated you testified in two
4   cases then when mooring lines parted.
5   A.   I did not give a deposition on the
6   other case.  I wasn't asked to.
7   Q.   And what case was that, though, if you
8   can tell me?
9   A.   It was under Number N on the second
10   page, Gardner Bond Trabolsi, et cetera.  It was
11   a 3-inch diameter, high-strength polypropylene,
12   8-strand rope.  And when I investigated the
13   rope I found a cut in the rope.  The rope
14   failed at that point and the rope snapped back
15   and killed the seaman.
16   Q.   Okay.  But you did not give a
17   deposition in that case?
18   A.   No.
19   Q.   Okay.  Now, did you issue a report in
20   that case?
21   A.   I probably have a report in my file
22   somewhere.  I don't remember it, quite
23   candidly.
24   Q.   Okay.  Now, in what areas in the past
25   have you been qualified as an expert?

14

1    A.  All types of ropes.
2    Q.  So when someone offers you as an
3  expert, it's been as an expert in all types of
4  ropes.
5    A.  Basically, if someone comes to me and
6  asks -- presents me with a problem, I evaluate
7  it in my own mind to start with and decide
8  whether I have the expertise or the experience
9  to handle the case for them.
10   Q.  Okay.  Have you testified in trial
11 before?
12   A.  Yes.
13   Q.  And how many times?
14   A.  There are three -- under Jury Trials,
15 there are three shown.
16   Q.  And in the Joseph Criscuolo case, in
17 what area of expertise were you offered as an
18 expert?  As an expert in --
19   A.  Mooring line.
20   Q.  -- mooring line.  And the Sharp versus
21 Strongbuilt?
22   A.  Sharp versus Strongbuilt was actually
23 a case of a knot slipping, so I was a knot
24 expert and rope.
25   Q.  Okay.  How about Petruzzi versus Penn

15

1  Marine?
2    A.  That was a large diameter, 8-braid
3  rope that broke on board a tugboat.
4    Q.  And what was your area of expertise in
5  that?
6    A.  To determine what the cause of the
7  break of the rope was.
8    Q.  Okay.  Have you ever been denied
9  qualification as an expert?
10   A.  No.
11   Q.  Okay.  And with regard to this case,
12 when were you first contacted?
13   A.  I was contacted by, um -- Dan Webb
14 back in, I believe, 2008 or so.  Early.  I
15 don't remember exactly.
16   Q.  Okay.  Around 2008?
17   A.  Yes, approximately.
18   Q.  And it was Mr. Webb, is that correct?
19   A.  That's correct.
20   Q.  Since such time, have you met with any
21 attorneys?
22   A.  Yes.  I've meet with the Chaffe McCall
23 people.
24   Q.  Okay.  And they represent Lafarge, is
25 that correct?

16

1    A.  That's what I -- correct.
2    Q.  Do you remember when you first met
with them?
3    A.  It would have been in 2008.
4    Q.  Okay.  And since that first visit, how
many times have you met with them?
5    A.  Um -- this will be the third.
6    Q.  Okay.  With regard to -- what did they
ask you to do when they retained your services?
7    A.  They asked me basically to investigate
the ropes, look at the ropes and determine
whether the ropes in my estimation were
adequate for handling the barge at that time.
8    Q.  Okay.  Did you at any time visit the
Lafarge facility?
9    A.  Yes.
10   Q.  Okay.  Did you in fact inspect the
ropes?
11   A.  Yes.
12   Q.  What did you do in connection with
your inspection of the ropes?
13   A.  As carefully as possible, we laid out
the ropes in a warehouse and went over all of
the ropes as they were tagged, and I looked at
the various breaks, the condition of the ropes,

17

1  and that's what I do.
2    Q.  Did you do any type of strength test?
3    A.  No.
4    Q.  Did you do any engineering analysis
with regard to the ropes?
5    A.  Engineering analysis?  There is very
little you can do, engineering analysis of a
rope such as this, unless you think there is
some chemical problems or something like that.
We knew what the ropes were, the type of rope,
the only test that really could have been made
would have been a break test which I did not
consider to be necessary.
6    Q.  And why is that, sir?
7    A.  Because the ropes -- it was after the
fact, the ropes -- I could see them, I have
probably forty years of experience of looking
at ropes, and it was my professional opinion
that it didn't need to be done.
8    Q.  Okay.  When you visited the Lafarge
facility, did you take photographs?
9    A.  I did not, no.
10   Q.  But that would have been after, that
would have been sometime in 2008?
11   A.  No, it was actually this year.

18

1    Q.   In 2009.
2    A.   '9.
3    Q.   Okay.  Did you take any measurements?
4    A.   No, I didn't.  It's very hard to take
5  measurements.  There were other barges there at
6  the time.
7    Q.   Okay.  What was the purpose of your
8  visiting the site?
9    A.   Well, I thought I needed to get a
10  firsthand view of exactly how they explained
11  that the barges were set up at the time of the
12  accident.
13    Q.   And did they display that for you?
14    A.   Well, there's no way to display it
15  with the barges there, they weren't the barges.
16  But to get an idea of the docking facilities
17  and all, yes, I could get a pretty good idea.
18    Q.   The barges there, were they full or
19  empty?
20    A.   Um -- the only barge there was half
21  and half, being unloaded.
22    Q.   Okay.  So if you took no measurement,
23  is it fair to say -- do you know the height of
24  the wharf off the water?
25    A.   I didn't take a measurement of it.  I

19

1  just took a rough look at it, standing on the
2  edge.
3    Q.   Do you know the height of the wharf
4  off the water?
5    A.   Directly, no.
6    Q.   Okay.  In this case, did you recommend
7  to Chaffe McCall that you do any type of break
8  test?
9    A.   No.
10    Q.   Okay.  And why is that?
11    A.   I believe I answered it before, that
12  in my opinion it wasn't necessary and it
13  wouldn't do any good.
14    Q.   Okay.  But wouldn't it tell you how
15  strong the ropes were?
16    A.   It would tell me what the residual
17  strength of the ropes were after they had gone
18  through Katrina, yes.
19    Q.   Would it be fair to say that it would
20  tell you the strength of the ropes at the time
21  the barge broke away?
22    A.   No, because the ropes were brand new,
23  and I have the manufacturer's, um -- chart that
24  shows what the strengths are, and I called the
25  manufacturer, talked to them, I know them, and

20

1  they guaranteed that they met those breaking
2  strengths.  And I believe they do from other
3  experiences with them.
4    Q.   Let me ask you about your knowledge of
5  the incident in question.  At the time of
6  Hurricane Katrina how many barges were moored
7  at the Lafarge facility?
8    A.   As I understand, seven.
9    Q.   You indicated seven barges were at the
10  facility.
11    A.   Yes.
12    Q.   How were they moored, do you know?
13    A.   As I understand, there were five at
14  one end, moored one after another like the
15  fingers on your hand, and then there was --
16  there were two slightly down, eight or ten feet
17  or so away, from what I've been told, and the
18  empty barge was -- had been topped out and put
19  on the outside, and the full barge was against
20  the dock.
21    Q.   Okay.  And with regard -- let's talk
22  about the five barges.  Let's call it the five
23  tier of barges.  Do you know how that tier was
24  moored to the dock?
25    A.   No, I do not.

21

1    Q.   Okay.  Do you know how the five barges
2  were moored to each other?
3    A.   Only by what I have overheard from
4  comments.  And I believe --
5    Q.   From who?
6    A.   I believe -- just from people talking
7  back and forth, I believe I heard they were --
8  that together they were done with wire rope.
9    Q.   Okay.  And did you consult with any --
10    A.   But I'm not sure of that statement.
11    Q.   Yeah, I saw the attorney look at you.
12       So you only talked to the attorneys,
13  is that correct?
14    A.   Yes.
15    Q.   You didn't consult with any of the
16  people that did the mooring, is that correct?
17    A.   I have not met with any of those.
18    Q.   Okay.  And with regard to the tier of
19  two barges, how was that moored to the dock?
20    A.   That was moored with synthetic rope.
21    Q.   And do you know how many ropes were
22  used?
23    A.   I'm not sure.
24    Q.   And with regard to the two barges, how
25  they were moored together, how many ropes were

22

1  used?
2      A.   Three.
3      Q.   Okay.  And what type of rope?
4      A.   They were high-tenacity, 8-strand
5  polypropylene.
6      Q.   Is it fair to say that your knowledge
7  with regard to the ropes used for the mooring
8  and the mooring configuration is based upon
9  your discussions with the attorneys?
10     A.   Yes, that's what my knowledge is based
11 on.
12     Q.   Now, you inspected ropes, is that
13 correct?
14     A.   Right.
15     Q.   And where was these ropes located when
16 you inspected them?
17     A.   The ropes were in a warehouse.
18     Q.   And in what city was the warehouse?
19     A.   New Orleans.
20     Q.   Okay.  And you laid the ropes out?  Is
21 that correct?
22     A.   Yes.
23     Q.   How many ropes were there?
24     A.   Well, there were quite a few.  Some of
25 them were not germane to the thing, they just

23

1  pulled in all the ropes they could.  So some
2  were just pieces of trash that were up there.
3  So the ones that we looked at probably were six
4  or seven that had any real meaning, that we
5  could really relate to the barges.
6      Q.   So just to get this straight, there
7  was more than six or seven ropes, I take it.
8      A.   Yes.
9      Q.   Do you have any idea how many ropes
10 were there?
11     A.   Ten or twelve.
12     Q.   Okay.  And how did you determine what
13 three ropes were used to moor the two barges at
14 issue involving the ING 4727?
15     A.   Well, there was remnants of rope left
16 on the barges, as I understand.  I was shown
17 what was left on the barge, the loaded barge,
18 and we married those up with the other.  And we
19 also, from the reports that I heard from the
20 people at Lafarge which ropes they used.
21     Q.   Okay.  You reviewed some reports from
22 people at Lafarge?
23     A.   Um -- no.  That is secondhand
24 information.
25     Q.   So the information with regard to what

24

1  mooring ropes were used was supplied to you by
2  words from the Lafarge attorneys, is that
3  correct?
4      A.   That's correct.
5      Q.   You didn't review any photographs
6  which show a barge with ropes hanging or
7  anything like that.
8      A.   Yes.
9      Q.   You did.
10     A.   Yes.
11     Q.   So from those photos --
12     A.   They showed me those photos, and I
13 also -- from those photos, I developed what
14 ropes were on the -- they used.
15     Q.   Okay.  And these photographs you saw,
16 that's how you could determine what ropes were
17 used?
18     A.   Yes.
19     Q.   Okay.  So these photographs had ropes
20 hanging from the barge?  Is --
21     A.   Basically, they had -- and these ropes
22 had been taken off and then put in this
23 warehouse.
24     Q.   Okay.  The photograph of the barge
25 with the rope, was that the ING 4727 or was

25

1  that the barge that did not break away where
2  the ropes were hanging?
3      A.   I don't remember.  But I believe it
4  was the barge that did not break away.
5      Q.   So that would have been the barge at
6  the dock?
7      A.   Yes.
8      Q.   With regard to any other photos, other
9  than photos -- was there more than one photo?
10     A.   There were several that were shown to
11 me.
12     Q.   And this involved photos of the dock?
13     A.   Yes.
14     Q.   And did you review any photos of how
15 the ropes were tied to the various barges?
16     A.   No, because they had already broken,
17 so I wouldn't be sure how they had.
18     Q.   Okay.  So you have no knowledge, then,
19 of how the ropes were actually tied to each
20 barge.  Is that correct?
21     A.   No.
22     MR. SANDERS:
23         May I see the photos he just
24     testified to?  Mr. Walker?
25     MR. WALKER:

**26**

```
1            I have no idea what photos he's
2       referring to at this point in time.
3       A.  They were just a broad -- they threw
4   some photographs out, we looked at them, a year
5   and a half ago.
6   EXAMINATION BY MR. SANDERS:
7       Q.  Okay.
8       A.  And so if I saw the photographs again
9   today I'm not sure that I would pick out the
10  same ones.
11      Q.  But they were Lafarge photos of the
12  facility and where the ropes were hanging
13  off --
14      A.  Yes.
15      Q.  And that's how you determined what
16  ropes broke.
17      A.  Well --
18      MR. WALKER:
19          Object to the mischaracterization
20      of his testimony.
21  EXAMINATION BY MR. SANDERS:
22      Q.  Well, tell me.  Was it the attorneys
23  that told you which ropes broke, or did you
24  know from the photos?
25      A.  I did not know directly from the
```

**27**

```
1   photos, I had to use the information that they
2   also supplied me.
3       Q.  Okay.  In addition to the photos.
4       A.  Right.
5       MR. SANDERS:
6           Obviously, the witness has
7       reviewed various photos of unknown
8       number of the Lafarge facility, and
9       the ING 4745 which was the barge which
10      broke away.  We hereby call for
11      production of all photos.
12          Mr. Walker?  Is it fair to say
13      that we're going to resolve this with
14      the Court?  Or are you going to supply
15      the photos?
16      MR. WALKER:
17          No, I don't know if that's fair.
18      I would believe, subject to
19      confirmation, that every photo that
20      Mr. Skaer has seen has already been
21      produced to you in response to
22      requests for production.
23      MR. SANDERS:
24          We have no photos of the barge
25      4745, the barge which did not break
```

**28**

```
1   away with ropes hanging off of it, and
2   do not have any to photos of the barge
3   at the dock.
4       MR. WALKER:
5           Well, maybe --
6       MR. SANDERS:
7           Do you as degree?
8       MR. WALKER:
9           Well, maybe he's mistaken.  He
10      qualified his answer saying he wasn't
11      sure.
12      A.  I'm not sure.
13  EXAMINATION BY MR. SANDERS:
14      Q.  You say that now after hearing the
15  argument; is that correct, sir?
16      MR. WALKER:
17          No, he said that previously.
18      A.  I said it previously, I believe.
19  EXAMINATION BY MR. SANDERS:
20      Q.  All right.  Let's move on then.
21      MR. WALKER:
22          I'm going to stand by my request.
23      I'm not waiving my request, we'll just
24      take it up with the Magistrate.  Fair
25      enough?
```

**29**

```
1   EXAMINATION BY MR. SANDERS:
2       Q.  So when you first saw those
3   photographs a year and a half ago, did you see
4   them again?
5       A.  I have not seen them again.
6       Q.  So when you went to see the lines in
7   the garage, when was that?
8       A.  Probably the same day I saw the
9   photographs for the first time.
10      Q.  Oh.  Okay.  And you said there were
11  ten the twenty ropes, if I'm not mistaken?
12      A.  Something in that range.
13      Q.  And you were able to determine which
14  ropes were used that were involved in the break
15  away.
16      A.  From what I understood from -- and I
17  assume it must be testimony that I was given
18  privy to, that the -- I was shown invoices from
19  Shipyard Supply, I was told that that was the
20  ropes that they changed to before Katrina, and
21  that would be the ropes -- the 2-inch ropes
22  that they used, and those were the ropes I was
23  looking for.
24      Q.  All right.
25      A.  Plus the original inch and a half
```

30

1  rope.
2      Q.   Let me ask you about that.  How did
3  you determine the size of the ropes which
4  moored the two barges together?
5      A.   I measured them.
6      Q.   After someone pointed them out?
7      A.   They told me they were 2-inch, um --
8  diameter ropes.
9      Q.   Who told you?
10     A.   The invoices that I was shown showed
11 that they had purchased these ropes, or had
12 these ropes on hand to use.
13     Q.   Okay.  So you didn't use any
14 deposition testimony or anything in that regard
15 to determine the identity of the ropes used to
16 moor these two barges, is that correct?
17     A.   At this moment I don't remember where
18 or when I was informed or how I was informed
19 that the 2-inch ropes were there, but that was
20 the assumption that I was led to believe, and
21 those are the ropes that I was told Lafarge had
22 replaced the others, the original ropes, with.
23     Q.   Now, who told you that?
24     A.   I'd have to say I imagine it came
25 through my attorneys.

31

1      Q.   Okay.  Now, with regard to the size of
2  the ropes, how did you determine the size --
3  you said there were two 2-inch ropes.  Is that
4  correct?
5      A.   Yes.
6      Q.   And one --
7      A.   1-1/2 inch rope.
8      Q.   1-1/2.  How did you determine that,
9  was it by measuring the rope?
10     A.   Yes.
11     Q.   And this was measuring the ropes that
12 the Lafarge attorneys directed you to, is that
13 correct?
14     A.   Measuring the ropes that were told to
15 me to have been the ropes on the barge.
16     Q.   Okay.  And the only people there,
17 though, were the Lafarge attorneys, is that
18 correct?
19     A.   That is correct.
20     Q.   Okay.  Now, sir, did you ever meet
21 with Lafarge experts, a Mr. Ryan?
22     A.   I met him, just was introduced to him.
23     Q.   When and where was that?
24     A.   Oh, several months ago.  We happened
25 to be in the office at the same day.  We said

32

1  hello and that was it.
2      Q.   Did you talk about this case?
3      A.   No.
4      Q.   Okay.  How did you know it was him,
5  were y'all at a Lafarge office or --
6      A.   No.  Mr. Ryan, if I understand it, is
7  an expert for --
8      Q.   Lafarge.
9      A.   -- Lafarge.  I met him in this
10 office --
11     Q.   Oh.
12     A.   -- for two minutes.
13     Q.   Okay.  I didn't know it was this
14 office.
15         What about a Mr. Strouse; have you --
16     A.   Never met Mr. Strouse.
17     Q.   Okay.  Now, sir, you've worked many
18 years in the rope industry for a rope company,
19 is that correct?
20     A.   That is correct.
21     Q.   And just to get things straight,
22 you've once worked for a wire rope company, is
23 that correct?
24     A.   What is correct.
25     Q.   When did you leave -- what was the

33

1  name of the company and when did you leave the
2  wire rope company?
3      A.   The name of the company was Broderick
4  & Bascom Rope Company, and I believe I left
5  them in 1971.
6      Q.   And since such time you've worked with
7  rope, is that correct?
8      A.   That is correct.
9      Q.   Okay.  Do you ever do testing which
10 determines the breaking strength of rope?
11     A.   Every day we did it in the plant.
12     Q.   Okay.  But in connection with your
13 consulting duties, have you done it?
14     A.   I've had ropes tested, yes.
15     Q.   Oh, you've sent them out to have
16 tested?
17     A.   Oh, certainly.
18     Q.   Okay.  What about wire rope, have you
19 ever had wire rope tested in connection with
20 your consulting duties?
21     A.   No, I don't really solicit wire rope
22 cases.
23     Q.   So you don't hold yourself out as an
24 expert in wire rope.
25     A.   I think I'm an expert in wire rope but

34

1 there have been some changes in wire ropes
2 through the years. We've gone to so many new
3 constructions for very special purposes that
4 I'm not as familiar with those. Like these
5 tall towering crane ropes, those were all
6 coming in, they all came in from Europe and
7 all. So I'm not what I consider an expert
8 except in basic wire ropes, like 619, 637,
9 those kind of things.
10    Q. Well, let's say since 1971, has there
11 been tremendous changes in the development of
12 rope?
13       MR. WALKER:
14          Rope or wire?
15 EXAMINATION BY MR. SANDERS:
16    Q. Rope.
17    A. What rope?
18    Q. 2-inch polypropylene --
19    A. We were talking about rope, that's why
20 I asked. Then you all of a sudden said rope.
21    Q. Yeah.
22    A. Do you mean wire rope or rope?
23    Q. Rope.
24    A. Cordage?
25    Q. Nylon rope. Let's use that as an

35

1 example.
2    A. Okay. Let's call it cordage, what it
3 is.
4    Q. Okay.
5    A. There have been dramatic developments.
6    Q. And would you say the same for wire
7 rope?
8    A. Absolutely not.
9    Q. Okay. It stayed the same.
10    A. It has, except for some specialty
11 ropes such as maining ropes and things like
12 that where they've developed some new type
13 types of lays.
14    Q. Now, I've been reading in some of the
15 literature here, and is it fair to say that a
16 rope company -- the person using the rope picks
17 the rope he wants to buy; is that correct?
18    A. I think that's a correct statement,
19 yes.
20    Q. Yeah. So you as a rope maker don't
21 recommend rope to people, is that correct?
22    A. We don't -- no, we don't, because we
23 never know the end usage exactly.
24    Q. And in determining what rope should be
25 used, industry or the customer should make that

36

1 determination using various determination which
2 includes engineering properties, is that
3 correct?
4    A. Well, I don't know what you mean by
5 engineering properties.
6    Q. Okay. How does a company decide what
7 type of rope they need?
8    A. An end user?
9    Q. Yes.
10    A. I think that probably they -- it may
11 be trial and error for a while until they find
12 something they like. There are various ropes
13 that can do various jobs. Not every
14 representation can do the same job for the same
15 thing. For instance, in mooring, there's only
16 probably two choices in mooring, one of them
17 the one they used and there's another more
18 expensive one that they didn't see fit to use.
19 And it's not used very often. It's used mainly
20 on pleasure boats and things like that.
21    Q. But don't they have different sizes of
22 rope and different strengths of rope?
23    A. Oh, of course. Every rope has a
24 different strength. Every type of construction
25 has a slightly different strength, and every

37

1 type of construction has a different physical
2 characteristic.
3    Q. And isn't it incumbent upon the end
4 user to determine what size, strength of rope
5 he should pick based upon the forces that the
6 rope would encounter?
7    A. Yes. I think I previously answered
8 that, but yes, the end user -- we can't be
9 responsible for that.
10    Q. Okay. And the end user -- there are
11 companies that do this, is that correct,
12 they'll determine what ropes are appropriate?
13    A. Um --
14    Q. Engineering companies.
15    A. I'm not aware of those companies.
16    Q. Okay. Would you say it is an
17 engineering determination for an end user in
18 determining what rope to use based upon the
19 vessels being moored, the expected
20 environmental factors, the expected movements
21 of the vessels and things of that nature?
22       MR. WALKER:
23          Object to the compound and vague
24       nature of the question.
25    A. I think there's more questions than

38

1  one in there, but, um -- I think it's the end
2  user 's responsibility to determine which rope
3  he's going to use.  He gets advice often from
4  the distributor he buys the rope from.  The
5  distributor generally just orders a
6  representative from manufacturer.  We don't
7  sell directly to end users, we sell through
8  national -- most rope companies, I believe,
9  sell all through national distributors.  So
10  they hardly ever know who the end user is or
11  what the conditions are.
12     Q.   With regard to selection of a mooring
13  rope, does the type of vessel being moored
14  matter in the determination?
15        MR. WALKER:
16           Objection.
17     A.   I don't know the answer to that mainly
18  because I don't think there is a real direct
19  answer to it.  But I don't think in my opinion,
20  that the type of vessel has anything to do with
21  the type of rope.  It's strictly the choice of
22  the end user whether he wants to buy a piece of
23  this type of rope or a piece of something else
24  that might be more expensive, period.
25  EXAMINATION BY MR. SANDERS:

39

1     Q.   So a 2-inch mooring rope can be used
2  to moor a barge or a ship?
3     A.   Certainly.
4     Q.   Okay.  With regard to mooring of a
5  barge in hurricane conditions, would you agree
6  that the barge is affected by wind forces?
7     A.   It would be affected by wind forces,
8  yes.
9     Q.   Wave action?
10     A.   Yes.
11     Q.   Okay.  Would you -- what about storm
12  surge, tide?
13     A.   Storm surge, certainly.
14     Q.   Okay.  Do you have any knowledge or
15  are you going to give any opinion with regard
16  to the loads associated with a vessel moored in
17  hurricane conditions?
18     A.   No.
19     Q.   When an end user, or a facility, in
20  its rope selection process -- do you have any
21  opinion as to what the factors are that should
22  be considered?
23     A.   I think that's still, again, the end
24  user's decision.  He has to know what his
25  conditions are, he has to know the size of the

40

vessel he's doing, so therefore he has to
balance one thing to the other.  And I think
what's happened in that in common usage certain
ropes have gotten very popular for certain
applications, and it's pretty much what the
distributors stock for those types of
operations.
   Q.   I just want to know whether you're
going to give an opinion as to what factors a
facility should consider when choosing a rope.
Do you have any such opinion in this case?
   A.   No.
   Q.   Okay.  So you have no opinion, then,
as to what the size and weight of the various
vessels which may be moored at the Lafarge
dock, is that correct?
   A.   That is correct.
   Q.   And you have no opinion as to the
possible wind forces which may affect a vessel
at the Lafarge dock, is that correct?
   A.   Yes.
   Q.   And you have no opinion as to the
storm surge or tide levels which may affect
vessels at the Lafarge dock, is that correct?
   A.   I have no knowledge of what wind would

41

be, was, or the surge.
   Q.   Okay.  Is it fair to say that in
selecting a rope for use that one should be
conservative in your selection?
   A.   I think that's logical.
   Q.   What is working load limit?
   A.   Working load limit.  It depends on the
safety factor.
   Q.   Correct.  For mooring, would you agree
that the safety factor is generally about 12?
   A.   I doubt that very seriously.
   Q.   Let me just say this:  Would you agree
that the working load limit is generally about
one fifth the tensile strength?
   A.   For steel wire rope, yes.
   Q.   How about for rope?
   A.   It ranges between 5 and 12 for
synthetic ropes, depending on the
application --
   Q.   Okay.
   A.   -- and whether there is possible
injury to people, i.e., 12 would be -- or
higher, would be if someone were under a
scaffolding or something or they were lifting
overhead.

42

1    Q.   With regards to mooring, what in your
2  opinion is the appropriate factor?
3    A.   I don't know that there is an
4  appropriate factor.  I see cases where it
5  appears that they go down as low as 2:1, 3:1,
6  often.
7    Q.   So you don't have an opinion in this
8  case what the appropriate factor is.
9    A.   No, I don't.
10    Q.   Okay.  So you don't have an opinion in
11  this case what the safe working load limit of
12  the lines used in this mooring is, is that
13  correct?
14    A.   The safe working load limit --
15    Q.   Well, let me rephrase that.
16    A.   Yeah.  It's --
17    Q.   You have no opinion as to what the
18  working load limit is for the ropes involved in
19  this case; is that correct?
20    A.   I don't think anyone does.  But yes.
21    Q.   Okay.  And it's fair to say that the
22  working load limit should never be exceeded.
23    A.   Working load limits should never be
24  exceeded.  They are every day, especially in
25  marine applications.

43

1    Q.   Are you saying that's okay?
2    A.   I'm not saying it's okay.  I'm saying
3  what happens in practical life.
4    Q.   Are you saying that should happen?
5    A.   No, I'm saying what happens is that
6  often they do not take into consideration load
7  limits because working load limits are seldom
8  considered a part, in my opinion, of mooring
9  vessels.
10    Q.   But you would agree that the end user,
11  a facility, has the responsibility to choose
12  the proper ropes, is that correct?
13    A.   He should choose the proper ropes,
14  yes.
15    Q.   Choose the proper ropes for the uses
16  expected.  Is that correct?
17    A.   That's --
18    Q.   Choose the proper ropes for the
19  expected forces involved.  Is that correct?
20    A.   We have agreed with that, yes.
21    Q.   And with regard to used ropes, is it
22  fair to say that a facility should keep a rope
23  log?
24    A.   They should.
25    Q.   Did Lafarge supply to you a rope log

44

in this case?
   A.   No.
   Q.   So you don't know how old at least one
of these ropes was, is that correct?
   A.   The rope that I inspected that was
reportedly the one line we left on -- they left
on, was virtually brand new.
   Q.   I thought you put in your report it
had a strength of -- there were two ropes used,
one had a strength of 20,000-pounds and the
other 38,500.
   A.   That's correct.
   Q.   And first off, which one of those --
   A.   The 38,500 was the one -- was the inch
and a half that remained on board -- on --
   Q.   And that's from discussions with your
attorney?
      MR. WALKER:
            Remember, let him finish his
      question.
EXAMINATION BY MR. SANDERS:
   Q.   And that's from discussions with the
Lafarge attorneys?
   A.   That's -- from the information I had,
yes.

45

   Q.   What is the -- what is this company
right here, the Cordage Institute?
   A.   The Cordage Institute is basically the
trade association for all North American rope
manufacturers.  It's sets all of the
guidelines, the -- it makes the tests and sets
the standards for all types of ropes.  It's a
75-year-old organization, it has a technical
committee made up of members of the industry,
and members of the various suppliers such as
Dupont Nylon and the various polyester and
polypropylene producers.
   Q.   Are you involved with that Cordage
Institute?
   A.   I'm on the technical committee, yes.
   Q.   Okay.  To this day?
   A.   Yes.
   Q.   And how long have you been involved
with the Cordage Institute?
   A.   Thirty years.
   Q.   Okay.  Let me ask you --
   A.   I'm also the past presidents or one of
the presidents of it for two years.
   Q.   I'm going to say a phrase and ask you
if you agree with it.  "The problem of

46

1  improving safety in the use of cordage and rope
2  is not really much different than what is found
3  with many other products."
4      Do you agree with that?
5      A.  Read it again.
6      Q.  "The problem of improving safety in
7  the use of cordage and rope is not really much
8  different than what is found with many other
9  products."
10     MR. WALKER:
11         Object to the vague, overbroad
12         statement and the context in which
13         it's being used.
14     A.  May I see where it's from?
15  EXAMINATION BY MR. SANDERS:
16     Q.  First sentence of the Cordage
17  Institute manual on Page -- (Tendering.)  On
18  Chapter 17.
19     A.  Yes.  I think I agree with it.
20     Q.  Okay.
21     A.  Especially when you read the remainder
22  of this paragraph.
23     Q.  Yeah.  "And safety programs should be
24  developed with warnings displayed, instructions
25  repeated and so on."  Is that correct?

47

1      A.  Yes.
2      Q.  Okay.  "Unfortunately," comma, "much
3  of this is forgotten or ignored and accidents
4  continue to happen."  Is that correct?
5      A.  I believe I spoke of that just a few
6  minutes ago.
7      Q.  Okay.  "Safety must center around risk
8  reduction."  Is that correct?
9      A.  Yes.
10     Q.  Okay.  "The key to risk reduction
11  begins with identifying basic safe use
12  requirements then developing a plan to apply
13  them."  Is that correct?
14     A.  Yes.
15     Q.  Okay.  With regard to your duties or
16  your consulting with Lafarge, did you review
17  any safety plans with regard to rope usage?
18     A.  No, I did not see those safety plans.
19     Q.  Did you review any mooring or tie off
20  diagrams supplied by Lafarge?
21     A.  No.
22     Q.  And you did not review any rope logs,
23  is that correct?
24     A.  None were presented to me.
25     Q.  And what is a rope log?

48

1      A.  Well, it can be many things.
2      Q.  In general.
3      A.  In general, a rope log most often
4  occurs on board ships, and sometimes in other
5  applications such as where rope usage is
6  critical.  But a rope log is something where
7  you log in when the rope was purchased, you try
8  and get the purchaser 's name, the company, the
9  description of the rope.  And, of course, a
10  good rope log also has when it was put into
11  usage, how much of it was put into usage,
12  because you don't always use a coil of rope --
13  I mean, 1220 feet of rope you don't use at one
14  time, you use maybe 70 or 80 feet.  How it has
15  been stored, how long it's been in use, and a
16  periodic inspection.  And the inspection should
17  be -- on board ship, for instance, inspections
18  should probably be at least every time they go
19  into port and use the rope.
20     Q.  Okay.
21     A.  And when it was discarded.  And if it
22  had any other usage, such as being used as a
23  towline prior to being used as a mooring line.
24     Q.  You mentioned the phrase when rope use
25  is critical.  What do you mean by that?

49

1      A.  You're taking something out of
2  context.  I don't know where you're talking
3  about.
4      Q.  Okay.  Do you have any opinion when
5  rope use is critical versus non critical?
6      A.  Well, obviously it depends on the
7  situation.  Rope use is critical, obviously,
8  when you have a rope hoisting something and
9  there are people working below.  For instance,
10  you take a tower, a radio tower that's 400 feet
11  tall and you're lifting up an antenna, the rope
12  use is highly critical, and the scene should be
13  cleared in that case.
14     In other cases, you might go to a
15  safety factor -- working load as you want to
16  call it, but we call it safety factors,
17  normally -- of maybe 20:1.  There or other
18  critical applications, yes.
19     Q.  Okay.  So where there's great
20  danger --
21     A.  Generally, it's called danger of --
22  to, um -- to personnel or to surrounding
23  buildings or something that might be hurt by
24  it.
25     Q.  Okay.  All right.  Would you agree

13  (Pages 46 to 49)

50

1  that safety is paramount?
2      MR. WALKER:
3          Objection.
4      A.  In theory, yes.
5  EXAMINATION BY MR. SANDERS:
6      Q.  Okay.  Let me ask you about -- I think
7  I know the answer, but with regard to Hurricane
8  Katrina you have no opinion or knowledge as to
9  the winds which may have affected the barges in
10 the Industrial Canal?
11     A.  No, I do not.
12     Q.  No knowledge of any of the factors
13 involved in a hurricane in that area.
14     A.  No.
15     Q.  Okay.  So you have no knowledge of the
16 surge?
17     A.  Direct amount of surge, no.
18     Q.  Wave action?
19     A.  No.
20     Q.  Winds involved?
21     A.  I'm not sure of the wind velocity, no.
22     Q.  Okay.  And you didn't review any
23 weather or wind records, is that correct?
24     A.  No, I did not.
25     Q.  Okay.  Let me ask you about mooring

51

1  lines in general.  Is it fair to say that they
2  are strongest when horizontal?
3      A.  By horizontal, do you mean in a direct
4  line of pull?
5      Q.  Correct.
6      A.  Theoretically, yes.
7      Q.  What is theoretical -- what's the
8  opposite; practically?  You say practically
9  they're not strongest?
10     A.  They are, but if you get a slight --
11 it's called a fleet angle when you get off, a
12 very modest fleet angle is not going to change
13 the strength of the rope.
14     Q.  What was the fleet angle between the
15 4745 and 4727?
16     A.  From what I understand, and the
17 diagrams and the information presented to me,
18 they were all opposite, one cavel to another,
19 straight across, no angles.
20     Q.  Okay.  You mentioned the diagrams and
21 information provided to you.  What diagrams did
22 you review?
23     A.  Well, these have been given to me --
24 drawn up by personnel here.
25     Q.  So they were hand drawn diagrams.

52

1      A.  Yes.
2      Q.  Okay.
3      A.  And they drew them from what -- when
4  though went out and inspected the barge.
5      Q.  Do you know if they drew it or some
6  other surveyor or other person --
7      A.  No, they drew it.
8      Q.  Okay.  And you used that information
9  to determine the angle of the mooring line?
10     A.  There was no angle.
11     Q.  Or you used that information to
12 determine that there was no angle in the
13 mooring lines.
14     A.  Correct.
15     Q.  Okay.  And you said and other
16 information you were provided.  What other
17 information?
18     A.  I don't -- I don't remember any other
19 information other than just comments that these
20 were the way it was set up.
21     Q.  Okay.  I'm going to ask for production
22 of the diagrams provided to you.
23     A.  They're just little hand drawings.
24     MR. SANDERS:
25          May I have them?

53

1      MR. WALKER:
2          If any were done they were
3  destroyed.  It's attorney work product
4  and it was something drawn in a
5  consultation with him, if it was in
6  fact --
7      MR. SANDERS:
8          Just so long as I don't waive any
9  rights that --
10     A.  I kept none of them for my records.
11 EXAMINATION BY MR. SANDERS:
12     Q.  But they were diagrams of the vessels?
13     A.  We were just -- we were sketching
14 things out to show me so I would know.
15     Q.  Okay.
16     MR. WALKER:
17          Can we take a break?
18     MR. SANDERS:
19          You're not going to consult with
20 him, are you?  No, let's move forward.
21     MR. WALKER:
22          No, I want to take a break.
23     MR. SANDERS:
24          You can't break in a deposition
25 and coach the witness.

54

MR. WALKER:
    Who said I'm going to coach the witness?
MR. SANDERS:
    I asked if you were going to consult with him and you didn't answer my question so I assume you were.
MR. WALKER:
    No, I said I can take a break anytime I want.  And if you want your questions answered then it would help if we took a break.
MR. SANDERS:
    I don't want to take a break. Let's move on.
MR. WALKER:
    I'm taking a break and so is the witness.
MR. SANDERS:
    You're taking the witness in the other room?
MR. WALKER:
    You bet.
MR. SANDERS:
    I'm calling the magistrate.

55

MR. WALKER:
    You can do that all you want.
MR. SANDERS:
    I'm calling the magistrate and I asked Mr. Walker not to remove the witness from the room until we get a ruling from the magistrate.
MR. WALKER:
    A ruling on what?
MR. SANDERS:
    On whether you can consult with a witness during a deposition.
MR. WALKER:
    Who said I was consulting with him?  That's your assumption because you interrupt everything everybody is saying.  You asked about a diagram.
MR. SANDERS:
    Derek, are you going to take him out of the room?
MR. WALKER:
    Yes, I am.
    Let's go to the bathroom, Mr. Skaer.
MR. SANDERS:

56

I'm still objecting.
    Mr. Skaer --
    I'm calling the judge, Walker. I'm asking you to wait.
MR. WALKER:
    Sanders, call the judge.
MR. SANDERS:
    Will you wait for the judge?
MR. WALKER:
    No.
MR. SANDERS:
    You will not.
MR. WALKER:
    Unplug yourself.
MR. SANDERS:
    You don't want to talk to the judge.
MR. WALKER:
    I've already answered you.
MR. SANDERS:
    All right.
    (Whereupon the deponent and his counsel left the room and the magistrate's office was contacted by Mr. Sanders.)

57

MR. WALKER:
    Please put it on the record that you'd like a restroom break.
MR. SANDERS:
    Put this on the record, too.
MR. WALKER:
    I haven't finished.  Are you denying the court reporter his entitlement to a break right now?
MR. SANDERS:
    No.
MR. WALKER:
    Well, that's precisely what I asked for, but you don't have the courtesy to allow me to finish why I wanted a break nor anything else with respect to that.
MR. SANDERS:
    Finished?
MR. WALKER:
    I'm finished.
MR. SANDERS:
    Mr. Walker, breaks are usually taken by agreement, not when the questioning is going wrong for your

58

1　witness.  I asked you to stay in the
2　room and resolve the matter with
3　regard to Mr. Skaer or at least leave
4　Mr. Skaer in the room while you went
5　to the bathroom.  You refused.
6　　　　As for the court reporter going
7　to the bathroom, I think that's fine.
8　But I would ask that the court
9　reporter avoid the witness and not
10　talk to him.
11　　　　Thank you.
12　　　(Brief restroom break taken at the
13　court reporter's request.)
14　EXAMINATION BY MR. SANDERS:
15　　Q.　Mr. Skaer, we just took a break; is
16　that correct?
17　　A.　Yes, I did.
18　　Q.　Okay.  Did you speak to Mr. Walker?
19　　A.　Only to ask where the men's room was.
20　　Q.　Did you speak to him about anything
21　else?
22　　A.　No.
23　　Q.　Did you speak to Mr. Raffman.
24　　A.　No.
25　　Q.　Did you speak to any attorneys from

59

1　Chaffe McCall?
2　　A.　No.
3　　Q.　Okay.  Did you review any documents?
4　　A.　No.
5　　Q.　Any photographs or drawings?
6　　A.　No.
7　　Q.　Okay.
8　　MR. WALKER:
9　　　　On the record, if you want to
10　potentially avoid disturbing the
11　magistrate I can address with you why
12　I wanted to take a break and provide
13　to you the information that I obtained
14　during the break.  Do you want that?
15　　MR. SANDERS:
16　　　　Not really.  I want the
17　magistrate to call to order that no
18　more unilateral breaks be taken.  So
19　if that was the case, you could have
20　said, Pat, I'm going to get the
21　documents and I'll let you see them.
22　　MR. WALKER:
23　　　　You could have done that easily,
24　but you don't allow people to speak.
25　You jumped on the word coaching, as

60

1　the record reflects, you didn't allow
2　me to tell you I wasn't coaching him,
3　that I was going to talk to Tom Forbes
4　who was the attorney who met with him
5　to see what diagrams he had made and
6　if he retained any and also to look
7　for the photographs that he was
8　referring to, all of which I now have.
9　So if you would, rather than jump to
10　your conclusions about people or
11　things, things would go much more
12　smoothly.  And it was not unilateral
13　break.  You again jumped on the issue
14　of your assumption that I was going to
15　coach him about something.
16　　MR. SANDERS:
17　　　　Mr. Walker, I apologize, then.  I
18　just merely asked if you'd leave the
19　witness in the room, and you said no.
20　I asked if you want to be present when
21　we call the magistrate, and you said
22　no.  I think my assumption was
23　correct.
24　　　　That all being said, if you want
25　to produce something that we were

61

1　discussing let's have it.
2　　MR. WALKER:
3　　　　That's fine.  And by the way,
4　unilateral breaks are not that
5　unusual.  If somebody needs go to the
6　bathroom and the other 99 percent do
7　not, you still take a break.  It's a
8　matter of courtesy.
9　　MR. SANDERS:
10　　　　I'm sorry, but I disagree that
11　most attorneys take their witness out
12　of the room with them when they do
13　that.
14　　MR. WALKER:
15　　　　That's not what I was doing.  I
16　wasn't taking him with me, I suggested
17　instead that he could levee as well.
18　I didn't mean he was going with me.
19　　MR. SANDERS:
20　　　　The record speaks.
21　　MR. WALKER:
22　　　　Now, do you want these?
23　　MR. SANDERS:
24　　　　I'll look at them.
25　　MR. WALKER:

62

1  What we have are -- well, first
2  of all, I did need to speak to him and
3  would have consulted with him
4  previously to make sure that these are
5  the photographs that he was referring
6  to so I could produce them for you.
7  Mr. Skaer, I'm showing you a
8  group of seven sheets of photographs,
9  two photographs on each.  Are those --
10  do those refresh your recollection
11  regarding the photographs you might
12  have looked at with Mr. Forbes?
13  THE WITNESS:
14  I believe these are the ones I
15  looked at, yes.
16  MR. WALKER:
17  Okay.
18  These are photographs that I
19  believe have been produced in
20  connection with Max Hardberger 's
21  deposition.
22  MR. SANDERS:
23  There's two other photographs
24  that aren't included in Mr --
25  MR. WALKER:

63

1  Right.  Here are the seven I'm
2  referring to.  And I'm going to see
3  what those are.  Those depict the
4  ropes or barges.  Now you have eight,
5  and let me find the last one.  Okay.
6  And count them, Pat.
7  MR. SANDERS:
8  That's nine.
9  MR. WALKER:
10  Let's make sure we've got them
11  all.
12  MR. SANDERS:
13  Nine.
14  MR. WALKER:
15  Nine.  Now, secondly, I was
16  wanting to consult with Tom Forbes,
17  and I'm going to show you a document,
18  Mr. Skaer.  (Tendering.)
19  Is that the document or similar
20  to the document that was drawn by
21  Mr. Forbes and shown to you?
22  THE WITNESS:
23  That is correct.
24  MR. WALKER:
25  Okay.  (Tendering.)  I produce

64

1  that for you, as well.
2  And you didn't refer to it by
3  name, but you also were shown,
4  recently, Mr. Flory's diagram, were
5  you not?
6  THE WITNESS:
7  Yes, I was.
8  MR. WALKER:
9  And I'm showing you a copy of
10  that report -- two-page report
11  previously marked Green C.
12  And you were shown that, as well,
13  weren't you?
14  THE WITNESS:
15  Yes.  Just recently.
16  MR. WALKER:
17  All right.  You have a copy of
18  that, too.
19  MR. SANDERS:
20  Well, let's make a copy and
21  attach it.
22  MR. WALKER:
23  All right.  I'll do that later.
24  Do you have that handy for today?
25  MR. SANDERS:

65

1  No, I don't.
2  MR. WALKER:
3  Okay.
4  MR. SANDERS:
5  Anything else?
6  MR. WALKER:
7  We're checking with respect to
8  any other photographs that may have
9  been shown, but to the present extent
10  of our knowledge and understanding
11  these are the materials that were
12  shown to Mr. Skaer that he didn't
13  retain.
14  I think as a matter of courtesy
15  to the Magistrate, if we've resolved
16  our differences and we can agree on
17  future breaks --
18  MR. SANDERS:
19  Can we agree on future breaks?
20  MR. WALKER:
21  -- he would probably appreciate
22  not having to --
23  MR. SANDERS:
24  I'm not sure this is everything.
25  I know you say it is.  Trust me for

66

1  not trusting you.  But the magistrate
2  need not call us back if we agree to
3  take breaks.
4  MR. WALKER:
5      Agreed.
6  MR. SANDERS:
7      All right.
8      You want to make a phone call?
9  MR. WIEDEMANN:
10     Yeah.
11 EXAMINATION BY MR. SANDERS:
12     Q.  Okay.  Mr. Skaer, back to the issue of
13 lines, horizontal lines are their strongest or
14 at their strongest rated limit when stretched
15 out in a straight line, is that correct?
16     A.  Yes.
17     Q.  And angles affect the strength of
18 lines, is that correct?
19     A.  They can, yes.
20     Q.  To as much as 50 percent, is that
21 correct?
22 MR. WALKER:
23     I'm sorry.  Could you repeat the
24 question?
25     (Whereupon the previous two

67

1  questions were read back.)
2      A.  Yes.
3  EXAMINATION BY MR. SANDERS:
4      Q.  Okay.  And knots affect lines, is that
5  correct?
6      A.  That is correct.
7      Q.  Now, when those barges were moored,
8  you said that the mooring lines were -- there
9  was no angle as they were straight across.  Is
10 that correct?
11     A.  As I understood it, no.
12     Q.  Okay.  Do you have any opinion as to
13 at what angle does a rope lose a certain
14 percentage of strength, meaning at 90 degree
15 angle how much strength does a rope lose?
16     A.  Are you referring to a 90~degree such
17 as this to this?  (Indicating.)
18     Q.  Yeah.
19     A.  It would probably lose 50 percent.
20     Q.  Okay.
21 MR. WALKER:
22     For the record, since we have a
23 written record, you're referring to a
24 90 degree bend.
25 MR. SANDERS:

68

1      Correct.
2  EXAMINATION BY MR. SANDERS:
3      Q.  And wear and tear reduces strength, is
4  that correct?
5      A.  Definitely.
6      Q.  Age?
7      A.  It can.  Depends how it was stored.
8      Q.  Now, in your analysis you've added up
9  the strengths of the rope to be like
10 178,000 pounds, is that correct?
11     A.  That is correct.
12     Q.  Now, is it fair to say that if you add
13 additional ropes the strength would increase by
14 the strength of the additional ropes?
15 MR. WALKER:
16     Objection.
17     A.  As long as there -- as long as the
18 ropes are the same ropes.  Are you talking
19 about the process of doubling up a rope or are
20 you talking about just adding more ropes?
21     Q.  Adding ropes?
22     A.  Adding ropes is going to increase the
23 overall strength of the system.
24     Q.  How many cavels were on the barge ING
25 4727?

69

1      A.  I don't remember.  I didn't see the
2  barge.  But looking at another barge I saw
3  recently there were approximately five.
4      Q.  Okay.  How many bitts were there?
5      A.  I don't remember bitts on that.  On
6  the barge I recently looked at there were two
7  bitts.
8      Q.  So just in general, if there were
9  three lines currently on the vessels, and if we
10 added three more separate lines --
11     A.  Are we referring to our vessel?
12 MR. WALKER:
13     Is there a question there?
14 EXAMINATION BY MR. SANDERS:
15     Q.  Let me give you a hypothetical.  If
16 we've got three lines rated at 100,000 pounds
17 each at three separate mooring points, and if
18 we add three more lines at three separate
19 mooring points, we would have approximately
20 600,000 pounds of load capacity, is that
21 correct?
22     A.  That's correct.
23     Q.  Okay.  So for each line we add
24 additional strength.
25     A.  That is correct.

70

1    Q.   Okay.  Do you have an opinion as to
2  whether rope lines can be used with wire rope?
3    A.   They are, often.
4    Q.   Okay.  So there's no reason that can't
5  be done, is that correct?
6    A.   There's no reason it can't be done as
7  long as the tensions can be -- are
8  adequately --
9        MR. WALKER:
10        You need to finish your answer.
11    A.   As long as the tensions -- or the
12  lines are tensioned adequately.
13  EXAMINATION BY MR. SANDERS:
14    Q.   Do you agree there was additional rope
15  available to Lafarge personnel to add lines to
16  the 4727?
17    A.   After they had added the two new
18  lines?
19    Q.   Correct.
20    A.   I don't know.
21    Q.   Okay.  Do you agree that there was
22  wire rope available to the Lafarge personnel?
23    A.   I have absolutely no idea.
24    Q.   Well, I'm looking at these photos.
25  What is that laying under the nylon rope?  Is

71

1  that wire rope?
2    A.   I could be.  It could be also a hatch
3  line.  I don't have any idea what it is.
4    Q.   Okay.  If the angle of a rope, let's
5  say, is at 45 degrees, would you agree that it
6  loses about 25 percent of its strength?
7    A.   I'm trying to think back on sling
8  angles at this moment.  Um -- at 45 percent it
9  would probably lose a little bit more.
10    Q.   At 45 degrees.
11    A.   I believe.
12    Q.   It would lose a little bit --
13    A.   I'd have to look back in my records.
14  I don't have those records with me.
15    Q.   Okay.
16    A.   But I might say there are definitive
17  angles --
18        MR. WALKER:
19        Excuse me, Pat.
20    A.   There are definitive angles and their
21  relationship to the ability of the rope to lift
22  a certain object.
23  EXAMINATION BY MR. SANDERS:
24    Q.   Right.  And I think you've testified
25  in a past case where the angle of the rope

72

affected the mooring strength.  Is that
correct?  And you likened it to a sling.
    A.   Well, basically, that's what it is, a
sling.
    Q.   Right.
    A.   One half of a sling.
    Q.   Right.  And the angle or the bend
includes the angle and bend off of a mooring
cleat, is that correct?
    A.   It starts with what would be the fleet
angle, as we go -- and that's the angle as it
starts to bend, and that angle goes like this.
So the angle is actually this angle, not what
most people conceive as to be this angle in
here. (Indicating.)
    Q.   So it would be the angle coming off the
vessel.
    A.   Right.
    Q.   Okay.
    A.   But in the case that I've shown in the
diagrams I've shown, there was no angle so I
certainly didn't take it into consideration.
    Q.   Right.  I'm just trying to get an idea
in general.  If two vessels were moored like
that, would you agree that that is about a

73

45-degree angle of that line?  (Tendering.)
    A.   No.
    Q.   No?
    A.   No.  It's going to be virtually a
straight pull.
    Q.   Okay.  That's a straight pull.
    A.   That's a straight pull.
    Q.   So the angle off the cleat or the
button doesn't matter.
    A.   The angle -- well, the rope will set
itself up around here so it goes down and comes
out at that.  That's a straight pull.
    Q.   Okay.  So if the button is straight up
and down, or the cleat, and the rope is tied
horizontal, at some point the rope angles down.
Is that correct?
    A.   The pull from the cleat to the other
cleat is a straight pull.  (Indicating.)
    Q.   Okay.
    A.   I mean, it's really -- if you're
trying to say that it's going over an edge,
then I don't know, if it went over an edge.
Those cavels and all are very close to the edge
so the chances of it having any effect on it
hardly at all.  It would be just very modest.

74

MR. WALKER:

Can I make an interruption, Pat? Are you going to attach his report?

MR. SANDERS:

Yeah.

MR. WALKER:

And these photographs that I've produced?

MR. SANDERS:

Everything.

MR. WALKER:

I don't know what order you want to do it in, but so that there's some sequence in terms of the testimony I'd like to attach in connection with his testimony right now that drawing. I don't know what number you want to give it, if you want to start from there or --

MR. SANDERS:

Okay. Let's put the report as Number 1.

EXAMINATION BY MR. SANDERS:

Q.   Sir, that's your report; is that

75

correct?

A.   Yes.

Q.   Okay. We're going to attach that at Exhibit 1.

(Exhibit 1 was marked for identification and is attached hereto.)

EXAMINATION BY MR. SANDERS:

Q.   Exhibit 2 is the follow-up documents. See, some of the documents you reviewed we had, others we did not, and we requested those of Mr. Walker. And he supplied those documents we didn't have in two letters, one dated July 8th and one dated July 13th. The letter of July 8th indicates that he supplied the Garware Wall rope specs, the Garware rope test certificate, the Shipyard Supply receipts, and the Cordage Institute documents and Broderick Bascom Rope Company specs. We're going to make that Exhibit 2.

(Exhibit 2 was marked for identification and is attached hereto.)

MR. WALKER:

And are you attaching the documents plus the letter?

MR. SANDERS:

76

Correct.

EXAMINATION BY MR. SANDERS:

Q.   The documents are attached to the letter; is that correct?

A.   That is correct.

Q.   And the same thing with regard to the letter of July 13, which is a Cordage Institute document CI 1900-07, and the Cordage Institute manual they supplied later, and I'll going to show you that. This is Exhibit 3.

(Exhibit 3 was marked for identification and is attached hereto.)

A.   Yes.

EXAMINATION BY MR. SANDERS:

Q.   Okay. Now the Cordage Institute manual I'm going to attach by reference. Is that the Cordage Institute Manual?

A.   That is it, yes.

MR. WALKER:

What you might want to do, Pat, is attach the front page.

EXAMINATION BY MR. SANDERS:

Q.   It's the second edition, January, 1971.

A.   That's correct.

77

Q.   So we'll attach the front page as Exhibit 4 but attach the rest of it by reference as each side has a copy.

(Exhibit 4 was marked for identification and is attached hereto.)

EXAMINATION BY MR. SANDERS:

Q.   Number 5 is the photographs supplied by Mr. Walker today. There are nine. I'm going did attach those in globo.

MR. WALKER:

There are nine sheets so that's eighteen photographs.

MR. SANDERS:

I'm sorry. There are eighteen photographs on nine sheets. We're going to make that in globo Number 5.

Can I get another color copy today?

Okay. The nine sheets of photographs will be Exhibit 5.

(Exhibit 5 was marked for identification and is attached hereto.)

EXAMINATION BY MR. SANDERS:

Q.   A drawing --

MR. SANDERS:

78

1    Of Mr. Forbes, I take it.
2    MR. WALKER:
3        Yes.
4    EXAMINATION BY MR. SANDERS:
5    Q.  -- will be Exhibit 6.
6        (Exhibit 6 was marked for
7    identification and is attached hereto.)
8    EXAMINATION BY MR. SANDERS:
9    Q.  A drawing by me to which the witness
10   testified, on yellow paper, of the side view of
11   two vessels, barges, with a rope attached, will
12   be Exhibit 7.
13       (Exhibit 7 was marked for
14   identification and is attached hereto.)
15   MR. SANDERS:
16       Anything else?
17   MR. WALKER:
18       (Shakes head negatively.)
19   MR. SANDERS:
20       No.
21   EXAMINATION BY MR. SANDERS:
22   Q.  Okay.  Back to the use of rope and
23   wire rope.  They both have different stretch
24   characteristics; is that correct?
25   A.  That is correct.

79

1    Q.  But they can be used as mooring
2    together as long as someone knows the different
3    stretch characteristics of each, is that
4    correct?
5    A.  Well, yes, it's very -- there's no
6    real stretch characteristic to wire rope.  It
7    has, you know, like 1-1/2 percent maximum
8    stretch.  So to use them together is very
9    difficult, to get an even tension on all the
10   lines.
11   Q.  But it's done all the time, is that
12   correct?
13   A.  I seldom see wire rope used anymore on
14   a boat -- for tying up a barge.  90 percent of
15   the ropes are synthetic now.  It's easier to
16   handle, easier --
17   Q.  What facilities have you been to where
18   you've seen that?
19   A.  Well, I've been down to the Port of
20   Houston, and I've talked to other people, and
21   as far as our business goes marketing-wise, the
22   salesmen and all the distributors that I talk
23   to say that wire hope is out for that thing,
24   and synthetics -- because synthetics got so
25   much stronger lately, and they're so much

80

lighter and so much easier to handle.
Q.  I've got to explore this.  Forgive me.
A.  Sure.
Q.  Do you know of any facility that does
not use wire rope?
A.  In some way or another?  No, I
probably don't.
Q.  Yes.
A.  I have not seen any ships or vessels
moored, when I see them, that have -- you know,
walking along the docks in Houston I have not
seen anything but synthetic ropes.
Q.  How about mooring of barges together
end to end?  When was the last time that you've
been to a fleet?
A.  It's been quite a while.  But since
that time, synthetics have taken over
dramatically in the tying of barges together.
There are some new ropes out that are very,
very strong and have the same stretch
characteristics as wire rope.  And so therefore
being much lighter and has equal strength and
stretch, they're being used.
Q.  All things -- is a one-inch nylon rope
the same strength as a one-inch cable, wire

81

rope?
A.  No.
Q.  What's stronger?
A.  Wire rope, size for size, is always
stronger.
Q.  Okay.  So let me get -- have you, in
the last five years, been to any facility that
fleets barges?
A.  No.
Q.  Okay.  In the last ten years have you
been to any facilities that fleets barges?  And
if so, will you tell me the name.
A.  I doubt if I have been.  I haven't
been called upon to do it.
Q.  Okay.  With regard to marine ropes, is
it fair to say that when a rope reaches its
residual strength of 75 percent it should be
replaced?
MR. WALKER:
    Objection.
A.  In other words, are you asking me if a
rope has 75 percent of its original strength
left that it should be replaced?
EXAMINATION BY MR. SANDERS:
Q.  Yes.

82

1    A.   No, not necessarily.
2    Q.   Should it be -- well, what is residual
3  strength and what is the cutoffs?
4    A.   Well, any rope that is put into use
5  starts to lose its original strength almost
6  immediately.  And most used ropes, according --
7  and in the report of Mr. Flory, says that a
8  rope with 25 percent, a used rope would have
9  25 percent of its strength left.
10       If the application is such that
11 25 percent is not a significant reduction in
12 the overall requirements of that tie up, then
13 the rope could go down to much less than that.
14 So 75 percent has nothing to do with when a
15 rope should be retired.  A rope should be
16 retired when strands are cut, when it's, um --
17 beginning to show sunlight degradation, where
18 we think the residual strength is not enough
19 for the operation being used.
20       At 75 percent, virtually every rope in
21 use today would be discarded.  It's not a
22 meaningful number.  It's just a number that
23 means what a used rope generally has left as
24 its tenacity.
25    Q.   Can you point to any publication that

83

1  says what you just said?
2    A.   Well, you have an expert in Mr. Flory
3  that just says it in his report.  Um --
4    Q.   I'm sorry, but Mr. Flory didn't issue
5  a report.  Did you see a report from
6  Mr.{ }Flory?
7    A.   No.  I saw that little diagram where
8  he says used rope is 75 percent -- or loses
9  25 percent.  Um --
10    Q.   Let me see it?
11       MR. WALKER:
12          (Tendering.)
13    A.   I have -- since I wasn't asked the
14 question this way previously in this, I have in
15 another case shown where ropes that have been
16 used, other manufacturers have warned that once
17 they go into use they lose about 20 percent.
18 And I've always historically said that once we
19 put a rope into use it lost 15 percent almost
20 immediately, just -- and that's what we taught
21 our salesmen and everything else through the
22 years.  And that's just kind of an industry
23 standard.
24       Now, to say -- I don't know that there
25 is any 25 percent -- and I don't know the

84

1  meaning of what you're asking.  It's not a
2  reasonable question in rope usage.  So it's
3  never come up.
4    Q.   Okay.
5    A.   It may be meaningful to you, but it's
6  certainly not meaningful to the rope user.
7  He's not going to go out and say when the rope
8  comes to 25 percent loss I'm going to take the
9  rope off.  That's just not meaningless -- it's
10 meaningless.
11    Q.   Have you ever heard of a publication
12 Mooring Equipment Guidelines?
13    A.   No.
14    Q.   You have not?
15    A.   I'm not sure I have.
16    Q.   How about publications by the OCIMF?
17    A.   Yes, I have read some parts of theirs,
18 but it's been quite a while.
19    Q.   Now, I know you might not know about
20 Mooring Equipment Guidelines because you said
21 you may not have seen it, but OCIMF, they
22 publish residual strength recommendations with
23 regard to when ropes should be discarded, is
24 that correct?
25    A.   I don't know.

85

1    Q.   Okay.  So you don't know whether that
2  publication says that at 80 percent it should
3  be discarded.
4    A.   It does not.
5    Q.   It does not.  Okay.  How about Mooring
6  Equipment Guidelines?
7    A.   I don't know.
8    Q.   Okay.  Have you ever testified that
9  when a rope loses 25 percent and only has
10 75 percent of its residual strength that it
11 should be taken out of service?
12    A.   Completely depends on the application.
13    Q.   How about with regard to a barge
14 that's moored in the face of a Category 5
15 hurricane; should the rope be discarded if it's
16 at 75 percent of its residual strength?
17    A.   It would be reasonable, yes, to put a
18 new rope on.
19    Q.   Okay.  Would it be prudent to put a
20 new rope on?
21    A.   Not necessary.  You could just add
22 extra ropes.
23    Q.   So if there were no extra ropes, or if
24 there was one -- you wouldn't take a rope out
25 of service if you had additional ropes to

86

1  replace it with?
2      A.  If I did, yes.
3      Q.  Okay.  Now, let me talk to you about
4  your report.  Do you have it?
5      A.  Yes.
6      Q.  Okay.  You say that the barge 4727 was
7  tied with two 4-1/2 inch circumference,
8  8-strand, high-tenacity, copolymer
9  polypropylene lines; is that correct?
10     A.  That was -- originally that's the
11  information I was given.
12     Q.  And that was given to you by the
13  Chaffe McCall people, is that correct?
14     A.  Through what they said they got from
15  Lafarge.
16     Q.  Okay.  You didn't review any
17  depositions of the dock workers or any of the
18  personnel?
19     A.  I was not presented those.
20     Q.  Okay.  And you say the new tensile
21  strength of this rope is approximately
22  55,000 pounds each.  Is that correct?
23     A.  That's true.
24     Q.  I notice you supplied some tensile
25  strength charts.

87

1      A.  Yes.
2      Q.  From which chart did you get that
3  information?
4      A.  Garware.  Theoretically it's das Wall,
5  W-A-L-L, Rope Company.
6      Q.  Can I see which one it is?
7      A.  Sure.  I'll hand it to you.
8  (Tendering.)
9          MR. WALKER:
10             Can I see that, Pat?
11     A.  That's my work.  He's got a copy of it
12  there.
13  EXAMINATION BY MR. SANDERS:
14     Q.  I'm entitled to see your work.
15         MR. WALKER:
16             Is that the same one?
17         MR. SANDERS:
18             Yes.
19         MR. WALKER:
20             This is your handwriting?
21         THE WITNESS:
22             Yes.
23         MR. WALKER:
24             (Tendering.)
25  EXAMINATION BY MR. SANDERS:

88

1      Q.  Now, what is Garfil.  Is that a model
2  of rope?
3      A.  It's somebody's name for rope.
4  Everyone had to have some unique name for their
5  rope so that everyone would know it was theirs.
6  All manufacturers made the same product with
7  different names on it.
8      Q.  So it's not like a generic type of
9  rope like nylon or manila.
10     A.  No.
11     Q.  It's a name of manufacturer.
12     A.  Just a name.
13     Q.  How did you know the two 4-1/2 inch
14  circumference ropes were Garfil?
15     A.  I called Shipside Supply and talked to
16  them.
17     Q.  And they told you it was Garfil?
18     A.  Yes.  That's the only one they handle.
19     Q.  Okay.
20     A.  And I also called Garware Wall ropes
21  and talked to their vice president of, um --
22  operations here in the United States who I
23  happen know, and he said that's all they sold
24  them.  So I have to make the assumption that
25  that's what it was.

89

1      Q.  So you made an assumption that the
2  rope on the vessel was Garfil.
3      A.  Well, the ropes I inspected, there
4  were some -- and I looked at those and they
5  appeared to be.
6      Q.  Garfil?
7      A.  Yeah.
8      Q.  How do you determine a Garfil versus
9  another manufacturer's 8-strand braided rope?
10     A.  They happened to have a marker in the
11  center that said Garware Ropes.
12     Q.  So you identified the ropes as Garfil,
13  not by calling the manufacturer --
14     A.  Both.
15     Q.  Okay.  And let's see.  Circumference
16  4-1/2.  And these are in kilograms, the
17  strength, is that correct?
18     A.  That's correct.
19     Q.  And if we take a calculator -- how
20  many kilograms in a pound?
21     A.  2.2 is the common multiplier.
22     Q.  2.2.  So if -- you say it was this
23  Garfil Maxiflex; is that correct?
24     A.  That's what they told me.
25     Q.  That's what they told you, but you

23  (Pages 86 to 89)

90

1   didn't determine that from your investigation.
2       A.   It appeared to be.  I've been told by
3   two different people that's what they sold.
4       Q.   Okay.  And it says here -- you
5   reviewed the condition of the lines and
6   based -- their tensile strength would have
7   been, on one of them, 38,500; is that correct?
8       A.   That's correct.
9       Q.   Why 38,500 and not 38,000?  I mean, it
10  seems like an exact number.  How did you arrive
11  at that?
12      A.   Maybe you should put an approximate in
13  front of that.
14      Q.   Okay.  Did you take a percentage and
15  multiply it by the original strength?
16      A.   I took the original strength and
17  reduced the value for knots.
18      Q.   How many knots?
19      A.   A knot is a knot.  It doesn't depend
20  on how many knots.  The rope was knotted.  It
21  loses some strength.  I estimated 30 percent.
22      Q.   So if it's knotted, if it's got a
23  boland on each end?
24      A.   Sorry.  It just doesn't work that way.
25  No.

91

1       Q.   So it's just one deduction.
2       A.   That is correct.
3       Q.   You could have ten knots, it's one
4   deduction.
5       A.   There wouldn't be ten knots in a rope.
6   If you started knotting a rope up it would be
7   an entirely different thing.  There would be
8   other points.  We're talking about a rope
9   that's attached to one end and another end.
10  The reduction is 30 percent.
11      Q.   For the two knots.
12      A.   For the two knots.  For knotting a
13  rope.
14      Q.   Okay.  In the other rope you reached a
15  lower number of about 20,000 pounds.
16      A.   I was -- in some of ropes we looked at
17  in the warehouse I was told, and I believed,
18  from the pictures and everything, that that
19  was -- or from what I saw there in the
20  warehouse, that was described to me as the
21  other rope that they took off.  And so I looked
22  at it, it's condition, and I -- they're not in
23  the pictures I don't believe.
24      Q.   The rope you're talking about is not
25  in the pictures.

92

1       A.   No, I think it was in the warehouse
2   only.
3       Q.   So you went by what the Chaffe McCall
4   people told you, is that correct?
5       A.   What I was -- and it's rather
6   immaterial because they took the rope off
7   anyhow.
8       Q.   Right.  So the answer to the question
9   is yes, you went by what Chaffe McCall people
10  told you?
11      A.   Yes.
12      Q.   Okay.
13      A.   And my inspection of the rope.
14      Q.   You make a statement, "Nevertheless,
15  for purposes of hurricane preparation it was
16  appropriate for Lafarge terminal personnel to
17  provide additional strength through the
18  addition or substitution of new lines."
19           Why do you say that?
20           MR. WALKER:
21               Objection.  Unless you read the
22           prior sentence it doesn't give it any
23           context.
24  EXAMINATION BY MR. SANDERS:
25      Q.   You have the report in front of you.

93

1           Why do you say that last sentence on
2   the Paragraph 3?
3           MR. WALKER:
4               You have to read the first --
5       A.   Because I said first lines were
6   appropriate for mooring under ordinary
7   conditions, where there was no wind or severe
8   wind, wave, anything, and therefore to get
9   ready for the hurricane you would have to
10  increase the strength, the overall system.
11  EXAMINATION BY MR. SANDERS:
12      Q.   So the approach of the of the
13  hurricane was not an ordinary mooring
14  situation, is that correct?
15      A.   Definitely not.
16      Q.   Okay.  Why do you say definitely?  It
17  was extraordinary?
18      A.   Well, it would be extraordinary
19  compared to just standard.
20      Q.   Okay.  Now you say they replaced one
21  of the existing lines with a brand new 6-inch,
22  high-tenacity, 8-strand Garfil Maxiflex.
23      A.   That's correct.
24      Q.   And how do you know that, again from
25  Chaffe McCall?

94

1    A.    Chaffe McCall.  It shows, I believe,
2  in the pictures.  If you look at them you'll
3  see what looks like brand new rope.  And the
4  ropes that I saw that were supposed to tie up
5  to the ends of those ropes that we saw on there
6  we could see in the warehouse, therefore I
7  physically tried to marry up the ones with the
8  ones in the warehouse, and it was also as
9  Lafarge people told Chaffe that that's what
10  they did.
11    Q.    I got to ask where you got the
12  information because I want to know whether
13  someone showed up there or if you talked to
14  someone after.  I know the answer, I just want
15  to let you know.  But the fact that they
16  replaced one of the lines, you did not derive
17  that from any deposition or discussion with any
18  dock personnel, is that correct?
19    A.    No.
20    Q.    Okay.  "And they added a third line of
21  new 6-inch line."
22       Is that the same type of line you
23  mentioned earlier in that paragraph?
24    A.    Yes.
25    Q.    Okay.  So we now have an older line

95

1  with two new 2-inch lines.
2    A.    The older line was virtually new when
3  I inspect it after the fact.
4    Q.    But the two new lines have
5  102,000 pounds holding strength.
6    A.    That's correct.
7    Q.    Is that each?
8    A.    Each.
9    Q.    But the other line, you said, which
10  was virtually new, only had a holding strength
11  of 55,000-pounds?
12    A.    That's correct.
13    Q.    Why is that?
14    A.    Because that's the catalog breaking
15  strength of the rope.
16    Q.    They were two different types of rope,
17  then?
18    A.    No.  They were two different sizes.
19    Q.    Oh, two different sizes.  Okay.  So
20  they were the same type of rope except two of
21  them were 2-inch and one was inch and a half.
22    A.    That's correct.
23    Q.    Okay.  Of the two lines, the inch and
24  a half lines, how do you know which one was
25  replaced?  Again, was it from Chaffe McCall?

96

1       One was that 38,500, one was at
2  20,000.  How did you arrive at which one had
3  been replaced?
4    A.    The way it was -- they were tied up,
5  the one -- the lesser strength one had to be
6  replaced to put the new one on there, because
7  there was one -- they were on each end of the
8  barge, and so the good one was still on the
9  other end of the barge, that's where it broke,
10  and the new ones were in the -- spaced in one
11  at the end and one at the other -- another
12  cavel.
13    Q.    So you're saying one of these two
14  lines, inch and half, was at an end of the
15  barge.
16    A.    Yes, it was.
17    Q.    Okay.  Now, back again, how did you
18  know whether the 38,500 was replaced or the
19  20,000 was replaced when you're looking at them
20  in the garage?
21    A.    Well, number one, the 38,000 one was
22  new.  The other one was older.
23    Q.    Right.
24    A.    And to replace -- they wouldn't ever
25  logically replace a new line and not replace --

97

1  to replace -- if they were going to take one
2  off they're going to take one off at the other
3  end, which is what I was informed that they
4  did -- that Lafarge did.  And this information
5  comes certainly through Chaffe, but it comes
6  from them through Lafarge.
7    Q.    Okay.  That's all I got to know.  If
8  you got it from the attorneys, that's fine.
9  But if you got it from somewhere else I want to
10  know.
11    A.    No.
12    Q.    Did that information come from the
13  attorneys?
14    A.    It came from their discussions with
15  Lafarge, yes.
16    Q.    Okay.  It says, these lines had test
17  certifications.  Was that, these test
18  certificates you got from the scene, or where
19  did you get them?
20    A.    I asked for test certificates from
21  Garware Wall because we thought it would be
22  interesting to see when they tested it.
23  Unfortunately, they did not send me the proper
24  test certificates.  And I asked for them again,
25  and by the time I had written the report I had

98

1  never gotten them.  I had gotten these false --
2  not false, but I got test certificates sent by
3  Shipyard Supply for different ropes.  And so in
4  my report that actually is an inaccuracy based
5  on when I arrived -- when these reports arrived
6  to me.  I'm still waiting for them.
7     Q.  I'm looking at the test certificate
8  here, and it says, 8-strand Garfil Maxima,
9  breaking load 65,500.
10    A.  It's an entirely different rope, I
11 just said.
12    Q.  Oh, it's a different rope.
13    A.  It's not the ropes in question.  They
14 did not have current test reports for them.
15    Q.  So you don't have test certificates.
16    A.  They did not have test certificates,
17 no.
18    Q.  And as we sit here today you've not
19 seen any test certificates.
20    A.  No.
21    Q.  Okay.
22    A.  You seldom see test certificates.
23    Q.  Well, I'm just saying you put in your
24 report --
25    A.  I know.

99

1     Q.  -- that these lines had test
2  certificates.  That's not correct, is it?
3     A.  No.
4     Q.  Okay.  The ropes that were not new,
5  did you inspect it just by looking at them?
6     A.  Which ropes are you talking about?
7     Q.  The two ropes, the inch and a half
8  ropes that were not knew.
9     A.  The one inch and a half rope that they
10 left on was virtually new, as I've said before.
11 And I did look at it, yes.
12    Q.  Okay.
13    A.  It was in excellent condition, other
14 than the fact that it broke.
15    Q.  Did you take it from the garage or did
16 you perform your inspection?
17    A.  In the garage.
18    Q.  In the garage.  So I take it you
19 didn't have access to any equipment such as
20 microscope, anything like that.
21    A.  Oh.  I brought a magnifying glass and
22 an eyeglass along, and I took the normal things
23 that I would do at a rope.
24    Q.  What is that?
25    A.  Just take a look at the break, try and

100

1  see what -- um -- if there is any real cutting
2  or anything like that that might have caused
3  the break.
4     Q.  Okay.  Now, with regard to those two
5  ropes, is it fair to say you did not know when
6  they were put in service?
7     A.  The original two ropes are you
8  speaking of?
9     Q.  The inch and a half.
10    A.  I don't know when they were put into
11 service.  I only could look at them and assume
12 that one was virtually brand new and the other
13 was not.
14    Q.  And you did not have access to any
15 rope record information that would normally be
16 included in those such records, is that
17 correct?
18    A.  I don't know that normally would be
19 included is a fair statement.  Um -- I would
20 say if rope records were included it would
21 be -- it certainly wouldn't be the rule, it
22 would be the exception to the rule, because I
23 see very few times where proper records are
24 kept by anybody.
25    Q.  Does that make it right?

101

1     A.  No.  Of course not.
2     Q.  Okay.  And the Cordage Institute
3  recommends a rope record.
4     A.  Definitely we do.
5     Q.  And it gives you an example of what a
6  rope record should be, is that correct?
7     A.  Right.  But -- but, I doubt seriously
8  whether Lafarge or anyone else like that ever
9  sees the Cordage Institute 's regulations or
10 specifications or recommendations.  Those
11 things don't get passed down there.  They come
12 to the manufacturers and they then go often to
13 the distributor, and if the distributor
14 distributes them and shows them, then you might
15 get it.  But we can't counsel the end user.
16    Q.  No.  But you also have testified in
17 the past, is it correct, that it's the end
18 user's responsibility to investigate the
19 effective usages of the rope they select, is
20 that correct?
21    A.  To investigate?  I'm not sure that's
22 proper word.
23    Q.  I'm entitled to a yes or no answer and
24 then your explanation.
25       MR. WALKER:

26 (Pages 98 to 101)

102

1      Or you can explain and answer.
2      A.   Repeat it, please.
3   EXAMINATION BY MR. SANDERS:
4      Q.   Have you testified in the past that it
5   is the responsibility of the end user to
6   investigate the proper selection of ropes?
7      A.   Yes.
8      Q.   Have you testified in the past that it
9   is the responsibility of the end user to
10  investigate the proper load capacities of the
11  ropes they select?
12     A.   I don't believe I ever testified to
13  load capacities, but I have testified that they
14  should, as you said before, yes.
15     Q.   Shouldn't they get the available
16  literature produced by the manufacturer on a
17  rope they use?
18        MR. WALKER:
19           Objection.
20     A.   If that manufacturer has information
21  like that available.  But to my knowledge most
22  don't.  What we provide is specifications as to
23  tenacity and size and weight and nothing more.
24        (Brief recess.)
25  EXAMINATION BY MR. SANDERS:

103

1      Q.   Mr. Skaer, you indicated that when you
2   inspected the ropes you could tell by looking
3   at the rope the model or manufacturer of the
4   rope; is that correct?
5      A.   Often ropes have a tape in the center
6   of the rope that gives the name of the
7   manufacturer and the type of rope.
8      Q.   And on the two one and a half inch
9   ropes, they had a tape indicating Garfil
10  Maxima?
11     A.   I believe -- as my memory serves me,
12  yes.
13     Q.   And on the 2-inch new ropes,
14  essentially, they had a tape saying Garfil
15  Maxima.
16     A.   Yes.
17     Q.   Did you remove any of these tapes?
18     A.   If I remember, I took a little short
19  piece.
20     Q.   But the tape runs the entire length of
21  the rope?
22     A.   Entire length of the rope.
23     Q.   Okay.  So you didn't remove all the
24  tape.
25     A.   No.

104

1      Q.   I just have to ask.
2      A.   No.
3      Q.   Do you hold yourself out as having
4   expertise in interpreting U.S. Coast Guard
5   recommendations?
6      A.   No.
7      Q.   Okay.  What about definitions of U.S.
8   Coast Guard terms?
9      A.   You'd have to be much more specific
10  than that.  So I can't answer.
11     Q.   Lafarge has retained the services of a
12  Mr. Ryan who testified as to Coast Guard rules,
13  recommendations, et cetera.  Would you defer
14  any testimony as to the interpretation of U.S.
15  Coast Guard recommendations to him?
16     A.   Absolutely, I'd refer all of them.
17     Q.   Okay.  Now, what does the term
18  doubling up mean to you in the marine industry?
19        MR. WALKER:
20           Objection.
21  EXAMINATION BY MR. SANDERS:
22     Q.   If you have an opinion.
23     A.   I have an opinion, yes.
24     Q.   Okay.
25     A.   Doubling up is the event of trying to

105

1   increase the strength of a specific system,
2   tie-up system.  And there are more than one way
3   to double up.  Because you really talking
4   strength, not necessarily more ropes.
5      Q.   Uh-huh.
6      A.   So in the case of adding another rope
7   of the same size and type, it would be simply
8   doubling the ropes and making sure -- making
9   sure that each end of that doubled up is figure
10  8'd or something so that if one side breaks or
11  gets cut or something like that the whole
12  system doesn't come untied.
13        The other method of doubling up is to
14  put two ropes side by side, again of similar
15  size and of similar strength and diameter.
16        And another way would be to double the
17  strength by simply adding larger ropes.
18     Q.   Can you point me to any publication
19  whereby it indicates that doubling up means
20  doubling the strength?
21     A.   I think it's been an industry
22  standard -- no, offhand I can't.  I've read
23  about doubling up, but the concept is
24  strengths, that's all it is.
25     Q.   So the answer is no to my question as

106

1  to any publication.
2      A.  Not that I have my hands on at this
3  moment.
4      Q.  Okay.  Well, for the trial I'm going
5  to ask you the same question.  And between now
6  and then I would ask that you, you know, look
7  through any literature you have and see if you
8  can produce for us that definition.  Okay?
9      A.  Yeah.
10     Q.  Okay.  You make a comment on Page 2,
11 the second paragraph, the last sentence, about
12 doubling up, et cetera, "The configuration used
13 to more than double the strength of the lines
14 was as efficient as any that might have been
15 used."
16         What other configurations did you
17 consider that could have been used?
18     A.  What we just talked about, actually
19 doubling the lines.
20     Q.  Did you consider doubling or tripling
21 lines at each mooring point?  I think I
22 know the answer but I got to know.
23     A.  Obviously not because it had already
24 been done.  It's after the fact.
25     Q.  So you have no opinion on whether

107

1  doubling the lines at each mooring point would
2  have prevented the break away.
3      A.  It depends on what lines you used.
4  Obviously if you've got ridiculously large and
5  many lines, it might have helped.
6      Q.  Okay.  Let's refine it, then, to the
7  Garfil Maxima which they had available.  If
8  they had doubled the lines at each mooring
9  point on the barges, do you have any opinion as
10 to whether it would have broken away.
11     A.  The force of the wind blowing at that
12 time, coupled with surge, wave action,
13 whatever, was very significant.  When I looked
14 at the ropes, it was my opinion that they
15 probably wouldn't have saved the barge by
16 putting any more ropes on it.  That's simply my
17 professional opinion, looking at the melting of
18 those large ropes under the tension and strain
19 that was put upon them.  And I don't know that
20 there is any way that we could ever determine
21 that.
22     Q.  Okay.  Should a barge be able to be
23 moored for fifty mile per hour winds?
24     A.  I think this barge was probably moored
25 for fifty mile per hour winds.

108

1      Q.  Should a barge be able to be moored
2  safely for 75 miles per hour winds?
3      A.  Again --
4      Q.  If you have no opinion, say.
5      A.  Under ordinary conditions?  No.  Under
6  hurricane conditions?  You should make an
7  attempt, yes.
8      Q.  Okay.  How about for 100-miles per
9  hour winds; same thing?
10         MR. WALKER:
11            Objection.
12     A.  I mean, we're kind of just --
13 EXAMINATION BY MR. SANDERS:
14     Q.  See, you're giving an opinion that you
15 felt it would have broken away anyway when you
16 don't even know what the wind speed was.  Is
17 that correct?
18     A.  That is correct.
19     Q.  And you don't know what the wave
20 action was, is that correct?
21     A.  That is correct.
22     Q.  You don't know the height of the surge
23 is that correct?
24     A.  That's correct.
25     Q.  And all of these are factors which

109

1  affect whether a barge breaks away, is that
2  correct?
3      A.  That is correct.
4      Q.  So is that opinion that it would have
5  broken away anyway, is that speculation or is
6  that a guess?
7      A.  It's looking at the ropes and the way
8  they broke and how they melted and fused.  It
9  was the worse situation on a piece of rope I've
10 ever seen.  And I -- from that, and having
11 looked at hundreds of ropes in my life, I
12 decided that probably nothing could have saved
13 it at that point.
14     Q.  What saved the other six barges?
15     A.  I have no idea.  They were loaded.
16     Q.  So that's a factor, having a loaded
17 barge versus an empty?
18     A.  I don't know that.
19     Q.  You don't know.
20     A.  I don't know.  It would appear --
21     Q.  So let me get this straight:  You feel
22 there's no amount of rope that could have
23 stopped this break away, but we have six barges
24 all within twenty feet that did not break away.
25 Is that correct?

110

1   A.   That's correct.
2   Q.   And you base your opinion solely upon
3   looking at the broken ropes.
4   A.   Right.
5        MR. WALKER:
6            Remember to let each other
7        finish.  Pat, that applies to you, as
8        well, if you would.
9        MR. SANDERS:
10           Right.
11  EXAMINATION BY MR. SANDERS:
12  Q.   From looking at the ropes, can you
13  tell me what the wind velocity was or wave
14  action or anything like that?
15  A.   I am not a magician, no.
16  Q.   And from looking at the ropes is it
17  fair to say that you can only say that the
18  forces involved was the breaking strength?
19  A.   The force was extraordinary on the
20  ropes, yes, and it broke the ropes.
21  Q.   And that would have been at the break
22  strength.
23  A.   Yes.
24  Q.   So when the storm -- the barge put
25  forces of 178,500 pounds on the barge, it

111

1   broke.
2   A.   It did.
3   Q.   Is it fair to say that one should use
4   the same type and strength of mooring lines in
5   a mooring system?
6        MR. WALKER:
7            Objection.  Incomplete
8        hypothetical.
9   A.   Are you meaning the same type and
10  construction?
11  EXAMINATION BY MR. SANDERS:
12  Q.   Correct.
13  A.   These were the same type and
14  construction in this case.
15  Q.   But they had different strengths, is
16  that correct?
17  A.   They had a different size, yes.
18  Q.   Are you saying that it's okay to moor
19  a vessel with different strength lines?
20       MR. WALKER:
21           Objection.
22  A.   It probably would be better if they
23  had all the same, but how significant it was in
24  this case I can't comment.
25  EXAMINATION BY MR. SANDERS:

112

1   Q.   And of the three lines, which of these
2   three lines were most crucial in holding the
3   vessel?
4   A.   I'm not sure.
5   Q.   So you have no opinion on whether it
6   was the bow or stern line or the middle line,
7   is that correct?
8   A.   That's correct.
9   Q.   But you would agree that it is prudent
10  to use the same strength lines in -- it would
11  have been prudent to use the same strength
12  lines in all three lines.
13  A.   If it was available, it would probably
14  have been --
15  EXAMINATION BY MR. WALKER:
16  Q.   Did you furnish your answer?
17  A.   Yes, I did.  I finished my answer.  It
18  would have been prudent.
19  EXAMINATION BY MR. SANDERS:
20  Q.   Great.  You make a comment on Page 2
21  that the strain would have been greatest when
22  the winds were blowing from the west.  Why is
23  that?
24  A.   Well, if the winds were blowing from
25  the east it would have been blowing the barge

113

1   against the dock.
2   Q.   Okay.
3   A.   And as the hurricane moved and the
4   winds came around from first the northeast to
5   the northwest to the west, that would have been
6   the strongest in the way the barge was lined up
7   north/south, that would have put the most sail
8   effect against the barge, and I would assume as
9   a layman in that that that's where the greatest
10  force would be.
11  Q.   What -- you just mentioned sail
12  effect.  What is that?
13  A.   Well, the sail effect is the one barge
14  being light, above the other.  That's what I'm
15  referring to as the sail effect.  It had an
16  area that it could blow against.  I remember
17  when we were at sea we were on a sea plane
18  tender and we used that comment, sail effect,
19  because of the side of the ships.  It acted
20  like a sail and caught the wind.
21  Q.   Oh, the side of the ship catches the
22  wind.  Is that correct?
23  A.   Yes.
24  Q.   So that increases the effect of the
25  wind upon the vessel.

29 (Pages 110 to 113)

114

1    A.   It allows the wind to affect the
2  vessel.  That's what I'm saying.
3    Q.   In a much greater degree than if it
4  was riding lower in the water, is that correct?
5    A.   I would assume so, yes.
6    Q.   Okay.  And if the winds were blowing
7  out of the north, you would not expect the
8  strain to be as great on the ropes than when it
9  was blowing out of the west.
10    A.   Well, having seen the basin and all,
11  it is protected slightly by a building, and the
12  effect of the wind, in my estimation, would be
13  more like the effect of the wind over the hood
14  of the car, over the hood of a car, because it
15  was sloped, those tops are sloped, so I don't
16  think it would have been as great as if it had
17  been blowing directly against the side of it.
18  That's my opinion.
19    Q.   Okay.
20    A.   And it's a lay opinion.
21    Q.   I want to go back to the residual
22  strength issues.  You disagreed with, correct
23  me if I'm wrong, my assertion that when a rope
24  reaches 75 percent it should be taken out of
25  service.

115

1    A.   That's absolutely incorrect, in my
2  opinion.
3    Q.   You disagree with that statement.
4    A.   I disagree with your statement.
5    Q.   Is there any residual strength that
6  you feel when a rope reaches it that it should
7  be taken --
8    A.   I believe I answered that before when
9  I said it would be the condition of the rope
10  and the conditions under which the rope was
11  being used; i.e., if the rope was down at
12  25 percent, it probably would be prudent to get
13  rid of it, even though it might have -- if it
14  was a big rope, it might have 40,000 pounds
15  left.  And if the potential strain on that rope
16  under normal conditions was 10,000 pounds, then
17  it could be used.  But that's why inspection of
18  ropes is so important.
19    Q.   So if we have a 2-inch rope as in this
20  case, at what percentage loss of strength would
21  you recommend that it be taken out of service
22  with regard to mooring for hurricanes?
23                MR. WALKER:
24                     Objection.
25  EXAMINATION BY MR. SANDERS:

116

1    Q.   Do you have an opinion?
2    A.   No.  These were brand new ropes.
3    Q.   Not all three.
4    A.   The third one was, in my opinion,
5  virtually new as I said numerous times.
6    Q.   Okay.  At what percentage of residual
7  strength loss would you recommend that that
8  rope be removed from service?  When the rope is
9  being used for hurricane conditions.
10                MR. WALKER:
11                     Same objection.
12    A.   I don't think that there is any direct
13  answer to that because, number one, are you
14  talking about the 2-inch ropes?
15    Q.   The inch and a half ropes.
16    A.   I believe you said 2 inch earlier.
17  Didn't you?
18    Q.   Inch and a half.
19    A.   That it should be taken out.  I don't
20  really know.  I think that the ropes were
21  virtually -- two were new, and one was
22  virtually new, so we're talking about original
23  strength.  So.
24    Q.   No.
25    A.   That would have to be someone's --

117

1                MR. WALKER:
2                     Someone's what?
3    A.   It would have to be somebody other's
4  estimate of the, um -- as to what they thought
5  was adequate to withstand the hurricane.
6  EXAMINATION BY MR. SANDERS:
7    Q.   So you have no opinion in this case as
8  to whether the inch and a half rope used for
9  hurricane conditions should have been removed
10  from service given any residual loss of
11  strength.
12    A.   I didn't see any residual loss of
13  strength in that.  They did replace the other
14  one, which showed that they were prudent in
15  that respect.
16    Q.   I'm sorry, but I thought -- one of the
17  roaches had a 20,000 pound strength, and it
18  started out at 50,000, 55,000 pounds.  Is that
19  correct?
20    A.   That's correct.
21    Q.   Would you agree that it lost -- what
22  percentage is that?  Let's see.
23    A.   It's like 40 percent.
24    Q.   So it's lost 60 percent of its
25  strength.

118

1    A.  Right.
2    Q.  You have no opinion on whether that
3  rope should have been used to moor for a
4  hurricane or not; is that correct?
5    A.  It was not used, it was taken out of
6  service.
7    Q.  Okay.  And you feel that was a good
8  decision.
9    A.  Certainly.
10    Q.  All right.  Now let's go the other
11  rope.  It had a original strength of
12  55,000 pounds?
13    A.  Uh-huh.
14    Q.  And you said it's down to 38,500.
15  That's a loss of 30 percent; is that correct?
16    A.  That is correct.
17    Q.  And do you think it was prudent -- no,
18  do you think it would have been prudent not to
19  use that line?
20    A.  The loss of strength was due to the
21  use of knots.  It had nothing to do with the
22  condition of the rope or its original strength.
23    Also, if you'll remember, the other
24  ropes I reduced by the same 30 percent.  So it
25  did not have, as you want to say, a residual

119

1  strength of that, it had a physical strength of
2  that.  So it's apples and oranges here.  It
3  doesn't mean anything.
4    Q.  The 2-inch ropes, did you reduce their
5  strength --
6    A.  Yes.
7    Q.  -- 20 percent for knots?
8    A.  30.
9    Q.  30 percent.  So at 102,000 pounds, the
10  strength would have been 71,400 pounds, is that
11  correct?
12    A.  Yes.  I believe that's what I used.
13    Q.  Oh, and that's how you come up with
14  71,400 times 2 --
15    A.  Or whatever it was, yes.
16    Q.  -- equals 142,800, plus 38 --
17    A.  38,500.
18    Q.  And that's how you come up with the
19  178, is that correct?
20    A.  That's -- yes.
21    Q.  Okay.  I'm sorry, but when would
22  you -- if you were advising Lafarge, when would
23  you advise them to take a rope out of service,
24  when it loses what percentage of strength?
25    MR. WALKER:

120

Objection.  Asked and answered.
EXAMINATION BY MR. SANDERS:
    Q.  You can go ahead.
    A.  Under normal conditions?
    Q.  Yeah.
    A.  Under normal conditions, with a rope
that had -- I don't really know the answer.  It
may be that those ropes could be used down to
when they were 50 percent of strength, very
easily.
    Q.  Okay.
    A.  It's very possible.  Again, the
condition of the rope.
    Q.  So you wouldn't have a recommendation
for Lafarge if they asked you?
    A.  No, I would not.
    Q.  Okay.  Now, with regard to rope used
for hurricane conditions, likewise you would
not have a recommendation as to when they
should take a rope out of service?
    A.  I think under hurricane conditions
they would want to review all the ropes, either
increase the strengths of the ropes or double
up, whichever was available and convenient, and
obviously take out any ropes that were old and

121

worn, which is I guess what they did.
    Q.  There were three ropes; correct?
    A.  Correct.
    Q.  Two were 102,000 pounds original
strength.
    A.  (Nods affirmatively.)
    Q.  One was 55,000 pounds.
    A.  Correct.
    Q.  They did not replace that one of
55,000 pounds with one of 102,000 pounds; is
that correct?
    A.  That's what I understand, yes.
    Q.  Would that have been prudent?
    A.  If the rope was available, it would
help.
    Q.  Okay.  Would it have been prudent?
    A.  I believe I said it was prudent
earlier.
    Q.  Okay.  Would you agree that if the
barge -- well, let ask you this:  Do you think
a facility should have the knowledge as to when
they can safely moor a barge and when they
cannot?
    MR. WALKER:
        Objection.

122

1      A.   Under normal conditions?
2  EXAMINATION BY MR. SANDERS:
3      Q.   Yeah.
4      A.   I think from experience they probably
5  think they know that, yes.
6      Q.   They should know; is that correct?
7      A.   I think they should know, yes.
8      Q.   Now, if an area such as the Port of
9  New Orleans is prone to hurricanes, would you
10 agree that they should know when they can moor
11 a barge for a hurricane and when they cannot?
12     A.   I don't know that.  That's -- that
13 would be their decision, not mine.
14     Q.   So you have no opinion on whether it's
15 important for them to know whether they can
16 moor a barge safely for a hurricane and when
17 they cannot.
18         MR. WALKER:
19             Objection.  Outside of his area
20         of expertise.
21     A.   That's what I was going to say.  It's
22 not my area.
23 EXAMINATION BY MR. SANDERS:
24     Q.   Okay.  All right.  You indicated that
25 you reviewed the two pages, which we're going

123

1  to mark as Exhibit 8.  Exhibit 8 is the
2  analysis of Mr. Flory.
3          Do you know Mr. Flory?
4          (Exhibit 8 was marked for
5  identification and is attached hereto.)
6      A.   Yes.
7  EXAMINATION BY MR. SANDERS:
8      Q.   You've met him before personally?
9      A.   Yes.
10     Q.   Do you have anything negative to say
11 about his professional performance in ropes?
12     A.   I don't know much about his
13 professional performance in ropes, really.
14     Q.   Okay.
15     A.   I don't simply agree with that, but --
16     Q.   You might disagree with his opinions
17 but you don't know of how he reached his
18 opinions, is that correct?
19     A.   That is correct.
20     Q.   And therefore, you don't know whether
21 what he did was right or wrong.
22     A.   That is correct.
23     Q.   Okay.  Now, you reviewed what is
24 Exhibit 8, the analysis of the IHNC 4727
25 mooring arrangement.  Do you know how he came

124

up with these determinations?
    A.   He has a formula in his computer that
I don't know.
    Q.   He is an engineer; is that correct?
    A.   He is.
    Q.   And this is what he does for a living,
is that correct?  Mooring analyses.
    A.   I don't know that for a fact.  I know
that they design tension technology, has been
designing single-point mooring systems and
those type of things for years.  And getting
into the rope end of it has been a relatively
new process for him, I think.
    Q.   So you say he works for various
members of industry in determining --
    A.   They design, um -- single-point
mooring systems a lot for the oil rigs and
things like that.
    Q.   Is it only single-point mooring
systems?
    A.   Oh, no.  They have a broad -- I'm sure
they have a broad business.
    Q.   Okay.  So they design essentially
mooring systems for members of industry.  Is
that correct?

125

    A.   I don't know that to be true.
    Q.   Okay.  But you're not saying it's only
single-point mooring.
    A.   No.  I'm saying that's what they
started out doing.  And they were well known
for that up on the North Sea.
    Q.   Okay.  If he says that this barge
could have been moored to prevent break away,
you would disagree with that?
    A.   Within reason, I don't know how much
lines we'd have to put on.  It would have to be
a lot, in my opinion.
    Q.   Well, he gives examples here.  Have
you looked at them?
    A.   I looked at the examples.  And it's
how it's moored -- I mean how the tie ups are
done.  I don't know if those numbers are
meaningful.
    Q.   Okay.
    A.   I have --
    Q.   Is it true that -- you said line is
strongest when stretched out in a straight
line.  Is that true for wire rope also?
    A.   Certainly.
    Q.   Okay.  So the more straight -- if you

126

1  were using wire rope, the more straight or
2  horizontal the rope were to -- between two
3  points would maximize the strength of the
4  configuration.
5      A.  I've never heard the term horizontal
6  used before.  It's in a straight pull is what
7  we say.
8      Q.  So the more straight a cable is
9  between two mooring points is stronger.
10      A.  Yes.
11      Q.  Okay.  If I were going to suggest to
12  you that -- well, have you determined or
13  considered whether mooring the outside barge
14  ING 4727 with cable directly to the dock, would
15  that have prevented the break away?
16      A.  I don't know.
17      Q.  Okay.
18      MR. SANDERS:
19          That's all the questions I have.
20      MR. WALKER:
21          Give me two minutes and we'll see
22  if we have any.
23  (Off the record.)
24      MR. WALKER:
25          No questions.

127

1      WITNESS' CERTIFICATE
2
3      I, D. Philip Skaer, II, do hereby
4  certify that the foregoing testimony was given
5  by me, and that the transcription of said
6  testimony, with corrections and/or changes, if
7  any, is true and correct as given by me on the
8  aforementioned date.
9
10  _____   _____
11  DATE SIGNED        D. Philip Skaer, II
12
13  _____ Signed with corrections as noted.
14
15  _____ Signed with no corrections noted.
16
17
18
19
20
21
22
23
24
25  DATE TAKEN: July 15th, 2009

128

REPORTER'S CERTIFICATE
     I, JOSEPH A. FAIRBANKS, JR., CCR, RPR,
Certified Court Reporter in and for the State
of Louisiana, do hereby certify that the
aforementioned witness, after having been first
duly sworn by me to testify to the truth, did
testify as hereinabove set forth;
     That said deposition was taken by me
in computer shorthand and thereafter
transcribed under my supervision, and is a true
and correct transcription to the best of my
ability and understanding.
     I further certify that I am not of
counsel, nor related to counsel or the parties
hereto, and am in no way interested in the
result of said cause.


_____
JOSEPH A. FAIRBANKS, JR., CCR, RPR
CERTIFIED COURT REPORTER #75005

D. PHILIP SKAER, II

7/15/2009

Page 1

## A

**ability** 71:21 128:12
**able** 29:13 107:22 108:1
**absolutely** 35:8 70:23
  104:16 115:1
**access** 99:19 100:14
**accident** 18:12
**accidents** 47:3
**acted** 113:19
**action** 1:4 39:9 50:18
  107:12 108:20 110:14
**add** 68:12 69:18,23
  70:15 85:21
**added** 68:8 69:10 70:17
  94:20
**adding** 68:20,21,22
  105:6,17
**addition** 27:3 92:18
**additional** 68:13,14
  69:24 70:14 85:25
  92:17
**address** 6:8 59:11
**adequate** 16:13 117:5
**adequately** 70:8,12
**administering** 5:24
**advice** 38:3
**advise** 119:23
**advising** 119:22
**affect** 40:19,23 66:17
  67:4 109:1 114:1
**affirmatively** 121:6
**aforementioned** 5:4
  127:8 128:5
**Age** 68:6
**ago** 26:5 29:3 31:24 47:6
**agree** 39:5 41:9,12 43:10
  45:25 46:4,19 49:25
  65:16,19 66:2 70:14,21
  71:5 72:25 112:9
  117:21 121:19 122:10
  123:15
**agreed** 5:2 43:20 66:5
**agreement** 57:24
**ahead** 120:3
**allow** 57:15 59:24 60:1
**allows** 114:1

**AMERICA** 2:15
**American** 3:7 45:4
**amount** 50:17 109:22
**analyses** 124:7
**analysis** 9:1 17:4,6,7
  68:8 123:2,24
**and/or** 127:6
**angle** 11:9,10 51:11,12
  51:14 52:9,10,12 67:9
  67:13,15 71:4,25 72:7,8
  72:11,11,12,13,13,14
  72:16,21 73:1,8,10
**angles** 51:19 66:17 71:8
  71:17,20 73:15
**answer** 5:13 6:21 28:10
  38:17,19 50:7 54:6
  70:10 92:8 94:14
  101:23 102:1 104:10
  105:25 106:22 112:16
  112:17 116:13 120:7
**answered** 19:11 37:7
  54:11 56:19 115:8
  120:1
**antenna** 49:11
**anybody** 100:24
**anymore** 79:13
**anytime** 54:10
**anyway** 108:15 109:5
**apologize** 60:17
**appear** 109:20
**APPEARANCES** 2:1
**appeared** 89:5 90:2
**appears** 42:5
**apples** 119:2
**application** 41:19 82:10
  85:12
**applications** 40:5 42:25
  48:5 49:18
**applies** 110:7
**apply** 47:12
**appreciate** 65:21
**approach** 93:12
**appropriate** 37:12 42:2
  42:4,8 92:16 93:6
**approximate** 90:12
**approximately** 6:15 9:11

15:17 69:3,19 86:21
**area** 7:8 14:17 15:4
  50:13 113:16 122:8,19
  122:22
**areas** 13:24
**argument** 28:15
**arrangement** 123:25
**arrive** 90:10 96:2
**arrived** 98:5,5
**articles** 9:4
**asked** 13:6 16:10 34:20
  54:5 55:5,17 57:14
  58:1 60:18,20 83:13
  97:20,24 120:1,15
**asking** 56:4 81:21 84:1
**asks** 14:6
**assertion** 114:23
**associated** 39:16
**association** 45:4
**assume** 29:17 54:7
  100:11 113:8 114:5
**assumption** 30:20 55:15
  60:14,22 88:24 89:1
**Atlantic** 12:24
**attach** 64:21 74:3,15
  75:3 76:16,21 77:1,2,9
**attached** 75:6,21 76:3,12
  77:5,22 78:7,11,14 91:9
  123:5
**attaching** 75:23
**attachment** 9:19
**attempt** 108:7
**attorney** 2:3 21:11 44:17
  53:3 60:4
**attorneys** 15:21 21:12
  22:9 24:2 26:22 30:25
  31:12,17 44:23 58:25
  61:11 97:8,13
**Austin** 6:2,10 7:13
**available** 70:15,22
  102:15,21 107:7 112:13
  120:24 121:14
**Avenue** 3:3
**avoid** 58:9 59:10
**award** 12:8
**aware** 37:15

## B

**B** 2:5 4:6
**BA** 7:21
**back** 13:14 15:14 21:7
  66:2,12 67:1 71:7,13
  78:22 96:17 114:21
**background** 7:18
**balance** 40:2
**Baltimore** 10:21
**barge** 2:2 16:13 18:20
  19:21 20:18,19 23:17
  23:17 24:6,20,24 25:1,4
  25:5,20 27:9,24,25 28:2
  31:15 39:2,5,6 52:4
  68:24 69:2,2,6 79:14
  85:13 86:6 96:8,9,15
  107:15,22,24 108:1
  109:1,17 110:24,25
  112:25 113:6,8,13
  121:20,22 122:11,16
  125:7 126:13
**barges** 1:6 18:5,11,15,15
  18:18 20:6,9,22,23 21:1
  21:19,24 23:5,13,16
  25:15 30:4,16 50:9
  63:4 67:7 78:11 80:13
  80:18 81:8,11 107:9
  109:14,23
**BARNETT** 3:8
**Baronne** 2:11
**Bascom** 33:4 75:18
**base** 110:2
**based** 22:8,10 37:5,18
  90:6 98:4
**basic** 34:8 47:11
**basically** 14:5 16:10
  24:21 45:3 72:3
**basin** 114:10
**bathroom** 55:23 58:5,7
  61:6
**Bear** 10:24
**beginning** 82:17
**begins** 47:11
**behalf** 11:23 12:2
**believe** 8:13 15:14 19:11
  20:2 21:4,6,7 25:3

JOHNS PENDLETON COURT REPORTERS

800 562-1285

27:18 28:18 30:20 33:4
38:8 47:5 62:14,19
71:11 91:23 94:1
102:12 103:11 115:8
116:16 119:12 121:17
**believed** 91:17
**bend** 67:24 72:7,8,12
**Benoit** 1:12
**best** 128:11
**bet** 54:23
**better** 111:22
**big** 115:14
**bit** 71:9,12
**bitts** 69:4,5,7
**blow** 113:16
**blowing** 107:11 112:22
112:24,25 114:6,9,17
**board** 15:3 44:15 48:4,17
**boat** 79:14
**boats** 36:20
**boland** 90:23
**bollard** 11:11
**Bond** 13:10
**Boutte** 1:8
**bow** 112:6
**bowline** 11:4
**braided** 89:9
**brand** 19:22 44:7 93:21
94:3 100:12 116:2
**BREACHES** 1:4
**break** 15:7 17:12 19:7
25:1,4 27:25 29:14
53:17,22,24 54:9,12,14
54:17 57:3,9,16 58:12
58:15 59:12,14 60:13
61:7 99:25 100:3 107:2
109:23,24 110:21 125:8
126:15
**breaking** 20:1 33:10
95:14 98:9 110:18
**breaks** 16:25 57:23
59:18 61:4 65:17,19
66:3 105:10 109:1
**breezes** 11:16
**Brief** 58:12 102:24
**broad** 26:3 124:21,22

**Broderick** 33:3 75:17
**broke** 11:1,13 15:3 19:21
26:16,23 27:10 96:9
99:14 109:8 110:20
111:1
**broken** 25:16 107:10
108:15 109:5 110:3
**brought** 99:21
**BROWN** 3:8
**building** 114:11
**buildings** 49:23
**Burt** 13:16
**business** 79:21 124:22
**button** 73:9,13
**buy** 35:17 38:22
**buys** 38:4

### C

**C** 64:11
**cable** 80:25 126:8,14
**calculator** 89:19
**call** 20:22 27:10 35:2
49:16,16 56:6 59:17
60:21 66:2,8
**called** 19:24 49:21 51:11
81:14 88:15,20
**calling** 54:25 55:4 56:3
89:13
**Canal** 1:4 50:10
**candidly** 13:23
**capacities** 102:10,13
**capacity** 69:20
**car** 114:14,14
**carefully** 16:22
**case** 9:17,18 10:18 11:8
11:22 12:2,12,16,20
13:2,6,7,17,20 14:9,16
14:23 15:11 19:6 32:2
40:11 42:8,11,19 44:1
49:13 59:19 71:25
72:20 83:15 105:6
111:14,24 115:20 117:7
**cases** 9:7,9,10,14,20 10:7
10:12,13,16 13:4 33:22
42:4 49:14
**catalog** 95:14
**catches** 113:21

**Category** 85:14
**caught** 113:20
**cause** 15:6 128:16
**caused** 100:2
**cavel** 51:18 96:12
**cavels** 68:24 73:23
**CCR** 1:24 5:22 128:2,24
**center** 47:7 89:11 103:5
**Centre** 1:19 2:19 3:11
**certain** 40:3,4 67:13
71:22
**certainly** 33:17 39:3,13
72:22 84:6 97:5 100:21
118:9 125:24
**certificate** 75:16 98:7
127:1 128:1
**certificates** 97:18,20,24
98:2,15,16,19,22 99:2
**certification** 5:9
**certifications** 97:17
**Certified** 1:25 5:23
128:3,25
**certify** 127:4 128:4,13
**cetera** 13:10 104:13
106:12
**Chaffe** 1:18 2:16 15:22
19:7 59:1 86:13 92:3,9
93:25 94:1,9 95:25
97:5
**chances** 73:24
**change** 51:12
**changed** 29:20
**changes** 34:1,11 127:6
**Chapter** 46:18
**characteristic** 37:2 79:6
**characteristics** 78:24
79:3 80:21
**chart** 19:23 87:2
**charts** 86:25
**checking** 65:7
**chemical** 17:9
**choice** 38:21
**choices** 36:16
**choose** 43:11,13,15,18
**choosing** 40:10
**CI** 76:8

**circumference** 86:7
88:14 89:15
**city** 9:18 22:18
**Civil** 1:4 5:6
**cleared** 49:13
**cleat** 72:9 73:8,14,17,18
**close** 73:23
**CLUB** 3:7
**coach** 53:25 54:2 60:15
**coaching** 59:25 60:2
**Coast** 104:4,8,12,15
**Code** 5:6
**coil** 48:12
**college** 7:20
**color** 77:17
**come** 84:3 97:12 101:11
105:12 119:13,18
**comes** 14:5 73:11 84:8
97:5,5
**coming** 34:6 72:16
**comma** 47:2
**comment** 106:10 111:24
112:20 113:18
**comments** 21:4 52:19
**committee** 45:9,15
**common** 40:3 89:21
**commonly** 10:25
**companies** 37:11,14,15
38:8
**company** 12:10 32:18,22
33:1,2,3,4 35:16 36:6
45:1 48:8 75:18 87:5
**compared** 93:19
**Completely** 85:12
**compound** 37:23
**computer** 124:2 128:9
**conceive** 72:14
**concept** 105:23
**concerned** 11:12
**conclusions** 60:10
**condition** 11:21 16:25
90:5 91:22 99:13 115:9
118:22 120:13
**conditions** 38:11 39:5,17
39:25 93:7 108:5,6
115:10,16 116:9 117:9

120:4,6,18,21 122:1
**configuration** 22:8
106:12 126:4
**configurations** 106:16
**confirmation** 27:19
**connection** 16:20 33:12
33:19 62:20 74:15
**conservative** 41:4
**consider** 17:13 34:7
40:10 106:17,20
**consideration** 43:6 72:22
**considered** 39:22 43:8
126:13
**Consolidated** 1:6
**construction** 36:24 37:1
111:10,14
**constructions** 34:3
**consult** 21:9,15 53:19
54:6 55:11 63:16
**consultation** 53:5
**consulted** 9:8,10 62:3
**consulting** 9:8 10:6
33:13,20 47:16 55:14
**contacted** 15:12,13 56:24
**container** 10:21 11:16
12:24
**context** 46:12 49:2 92:23
**continue** 47:4
**convenient** 120:24
**copolymer** 86:8
**copy** 64:9,17,20 77:3,17
87:11
**cordage** 34:24 35:2 45:2
45:3,13,19 46:1,7,16
75:17 76:7,8,15,17
101:2,9
**correct** 6:13 7:3,4 8:7,24
15:18,19,25 16:1 21:13
21:16 22:13,21 24:3,4
25:20 28:15 30:16 31:4
31:13,18,19 32:19,20
32:23,24 33:7,8 35:17
35:18,21 36:3 37:11
40:16,17,20,24 41:9
42:13,19 43:12,16,19
44:4,12 46:25 47:4,8,13

47:23 50:23 51:5 52:14
58:16 60:23 63:23
66:15,18,21 67:5,6,10
68:1,4,10,11 69:21,22
69:25 70:5,19 72:2,9
73:16 75:1 76:1,4,5,25
78:24,25 79:4,12 84:24
86:9,13,22 89:17,18,23
90:7,8 91:2 92:4 93:14
93:23 94:18 95:6,12,22
99:2 100:17 101:6,17
101:20 103:4 108:17,18
108:20,21,23,24 109:2
109:3,25 110:1 111:12
111:16 112:7,8 113:22
114:4,22 117:19,20
118:4,15,16 119:11,19
121:2,3,8,11 122:6
123:18,19,22 124:4,7
124:25 127:7 128:11
**corrections** 127:6,13,15
**counsel** 5:3 56:23 101:15
128:14,14
**count** 63:6
**coupled** 107:12
**course** 36:23 48:9 101:1
**court** 1:1,25 5:23 27:14
57:8 58:6,8,13 128:3,25
**courtesy** 57:15 61:8
65:14
**crane** 34:5
**Criscuolo** 12:24 14:16
**critical** 48:6,25 49:5,5,7
49:12,18
**crucial** 112:2
**Cunard** 12:25
**current** 98:14
**currently** 69:9
**customer** 35:25
**cut** 13:13 82:16 105:11
**cutoffs** 82:3
**cutting** 100:1

---

### D

**D** 1:17 4:1,6 6:1 127:3,11
**damages** 12:6,7,11
**Dan** 15:13

**danger** 49:20,21
**das** 87:4
**date** 127:8,11,25
**dated** 75:12,13
**day** 29:8 31:25 33:11
42:24 45:16
**decide** 14:7 36:6
**decided** 109:12
**decision** 39:24 118:8
122:13
**deduction** 91:1,4
**defective** 11:19
**defense** 12:3,13
**defer** 104:13
**definitely** 68:5 93:15,16
101:4
**definition** 106:8
**definitions** 104:7
**definitive** 71:16,20
**degradation** 82:17
**degree** 7:20 28:7 67:14
67:24 114:3
**degrees** 7:22 71:5,10
**denied** 15:8
**denying** 57:8
**depend** 90:19
**depending** 41:18
**depends** 41:7 49:6 68:7
85:12 107:3
**depict** 63:3
**deponent** 56:22
**deposition** 1:17 5:4,14
6:11,12 13:5,17 30:14
53:24 55:12 62:21
94:17 128:8
**depositions** 6:19 86:17
**Derek** 2:17 55:19
**derive** 94:16
**described** 91:20
**description** 48:9
**design** 124:9,16,23
**designing** 124:10
**destroyed** 53:3
**determination** 36:1,1
37:17 38:14
**determinations** 124:1

**determine** 12:6 15:6
16:11 23:12 24:16
29:13 30:3,15 31:2,8
37:4,12 38:2 52:9,12
89:8 90:1 107:20
**determined** 26:15
126:12
**determines** 33:10
**determining** 12:9 35:24
37:18 124:15
**developed** 24:13 35:12
46:24
**developing** 47:12
**development** 34:11
**developments** 35:5
**diagram** 55:17 64:4 83:7
**diagrams** 47:20 51:17,20
51:21,25 52:22 53:12
60:5 72:21
**diameter** 13:11 15:2 30:8
105:15
**Dick** 6:9
**differences** 65:16
**different** 36:21,22,24,25
37:1 46:2,8 78:23 79:2
88:7 90:3 91:7 95:16
95:18,19 98:3,10,12
111:15,17,19
**difficult** 79:9
**direct** 8:8 38:18 50:17
51:3 116:12
**directed** 31:12
**directly** 19:5 26:25 38:7
114:17 126:14
**disagree** 61:10 115:3,4
123:16 125:9
**disagreed** 114:22
**discarded** 48:21 82:21
84:23 85:3,15
**discussing** 61:1
**discussion** 94:17
**discussions** 22:9 44:16
44:22 97:14
**display** 18:13,14
**displayed** 46:24
**distributes** 101:14

D. PHILIP SKAER, II

7/15/2009

**distributor** 38:4,5
  101:13,13
**distributors** 38:9 40:6
  79:22
**DISTRICT** 1:1,2
**disturbing** 59:10
**dock** 11:1,17 20:20,24
  21:19 25:6,12 28:3
  40:16,20,24 86:17
  94:18 113:1 126:14
**docking** 18:16
**docks** 80:11
**document** 63:17,19,20
  76:8
**documents** 59:3,21 75:8
  75:9,11,17,24 76:3
**doing** 40:1 61:15 125:5
**double** 105:3,16 106:13
  120:23
**doubled** 105:9 107:8
**doubling** 68:19 104:18
  104:25 105:8,13,19,20
  105:23 106:12,19,20
  107:1
**doubt** 41:11 81:13 101:7
**dramatic** 35:5
**dramatically** 80:18
**drawing** 74:16 77:24
  78:9
**drawings** 52:23 59:5
**drawn** 51:24,25 53:4
  63:20
**drew** 52:3,5,7
**Drive** 2:5
**due** 118:20
**duly** 6:4 128:6
**Dupont** 45:11
**duties** 33:13,20 47:15
**DUVAL** 1:9
**D.C** 3:4

**E**

**E** 4:1,1,6,6
**earlier** 94:23 116:16
  121:18
**Early** 15:14
**earn** 7:22

**easier** 79:15,16 80:1
**easily** 59:23 120:10
**east** 112:25
**EASTERN** 1:2
**edge** 19:2 73:21,22,23
**edition** 76:23
**educational** 7:18
**effect** 11:15 73:24 113:8
  113:12,13,15,18,24
  114:12,13
**effective** 101:19
**effects** 7:12
**efficient** 106:14
**eight** 20:16 63:4
**eighteen** 77:12,14
**either** 120:22
**empty** 18:19 20:18
  109:17
**encounter** 37:6
**ends** 94:5
**Energy** 1:18 2:19 3:11
**engineer** 11:15 124:4
**engineering** 7:24 8:7
  11:14 17:4,6,7 36:2,5
  37:14,17
**entire** 103:20,22
**entirely** 91:7 98:10
**entitled** 87:14 101:23
**entitlement** 57:9
**environmental** 37:20
**equal** 80:22
**equals** 119:16
**equipment** 84:12,20 85:6
  99:19
**error** 36:11
**especially** 42:24 46:21
**ESQUIRE** 2:4,10,17,18
  3:2,10
**essentially** 103:14
  124:23
**estimate** 117:4
**estimated** 90:21
**estimation** 16:12 114:12
**et** 13:10 104:13 106:12
**Europe** 10:24 34:6
**evaluate** 14:6

**event** 104:25
**everybody** 55:16
**evidence** 5:15
**exact** 90:10
**exactly** 15:15 18:10
  35:23
**EXAMINATION** 4:3
  6:6 10:3 13:1 26:6,21
  28:13,19 29:1 34:15
  38:25 44:21 46:15 50:5
  53:11 58:14 66:11 67:3
  68:2 69:14 70:13 71:23
  74:23 75:7 76:2,14,22
  77:6,23 78:4,8,21 81:24
  87:13,25 92:24 93:11
  102:3,25 104:21 108:13
  110:11 111:11,25
  112:15,19 115:25 117:6
  120:2 122:2,23 123:7
**examined** 6:4
**example** 35:1 101:5
**examples** 125:13,15
**exceeded** 42:22,24
**excellent** 99:13
**exception** 100:22
**Excuse** 71:19
**Exhibit** 4:8,9,10,11,12
  4:13,14,15,16 75:4,5,8
  75:19,20 76:10,11 77:2
  77:4,20,21 78:5,6,12,13
  123:1,1,4,24
**existing** 93:21
**expect** 114:7
**expected** 37:19,20 43:16
  43:19
**expensive** 36:18 38:24
**experience** 7:11,19 8:9
  8:18 14:8 17:17 122:4
**experiences** 20:3
**expert** 8:23 13:25 14:3,3
  14:18,18,24 15:9 32:7
  33:24,25 34:7 83:2
**expertise** 8:6,8,22 14:8
  14:17 15:4 104:4
  122:20
**experts** 31:21

**explain** 102:1
**explained** 18:10
**explanation** 101:24
**explore** 80:2
**extent** 9:7 65:9
**extra** 85:22,23
**extraordinary** 93:17,18
  110:19
**eyeglass** 99:22

**F**

**face** 85:14
**facilities** 18:16 79:17
  81:11
**facility** 16:15 17:21 20:7
  20:10 26:12 27:8 39:19
  40:10 43:11,22 80:4
  81:7 121:21
**fact** 16:17 17:16 53:6
  94:15 95:3 99:14
  106:24 124:8
**factor** 41:8,10 42:2,4,8
  49:15 109:16
**factors** 37:20 39:21 40:9
  49:16 50:12 108:25
**failed** 13:14
**fair** 8:18,21 18:23 19:19
  22:6 27:12,17 28:24
  35:15 41:2 42:21 43:22
  51:1 68:12 81:16 100:5
  100:19 110:17 111:3
**FAIRBANKS** 1:24 5:22
  128:2,24
**false** 98:1,2
**familiar** 34:4
**Family** 1:13
**far** 11:12 79:21
**feel** 109:21 115:6 118:7
**feet** 20:16 48:13,14 49:10
  109:24
**felt** 11:15 108:15
**fifth** 41:14
**fifty** 107:23,25
**figure** 105:9
**file** 13:21
**filing** 5:9
**find** 36:11 63:5

JOHNS PENDLETON COURT REPORTERS

800 562-1285

D. PHILIP SKAER, II

7/15/2009

**fine** 58:7 61:3 97:8
**fingers** 20:15
**finish** 44:19 57:15 70:10
   110:7
**finished** 57:7,19,21
   112:17
**first** 6:4 10:10 12:18,20
   15:12 16:2,5 29:2,9
   44:13 46:16 62:1 93:4
   93:5 113:4 128:5
**firsthand** 18:10
**FISHER** 2:18
**fit** 36:18
**five** 6:16 9:6 12:19 20:13
   20:22,22 21:1 69:3
   81:7
**fleet** 51:11,12,14 72:10
   80:15
**fleets** 81:8,11
**Flory** 82:7 83:2,4,6 123:2
   123:3
**Flory's** 64:4
**follows** 6:5
**follow-up** 75:8
**Forbes** 60:3 62:12 63:16
   63:21 78:1
**force** 9:15,23 10:1,8
   107:11 110:19 113:10
**forces** 37:5 39:6,7 40:19
   43:19 110:18,25
**foregoing** 127:4
**Forgive** 80:2
**forgotten** 47:3
**form** 5:12
**formalities** 5:8
**formula** 124:2
**forth** 21:7 128:7
**forty** 17:17
**forward** 53:20
**found** 13:13 46:2,8
**four** 6:16 9:6 12:19
**front** 76:21 77:1 90:13
   92:25
**full** 18:18 20:19
**furnish** 112:16
**further** 128:13

**fused** 109:8
**future** 65:17,19

### G

**garage** 29:7 96:20 99:15
   99:17,18
**Gardner** 13:10
**Garfil** 88:1,14,17 89:2,6
   89:8,12,23 93:22 98:8
   103:9,14 107:7
**Garware** 75:14,15 87:4
   88:20 89:11 97:21
**general** 48:2,3 51:1 69:8
   72:24
**generally** 38:5 41:10,13
   49:21 82:23
**generic** 88:8
**geology** 7:21
**germane** 22:25
**getting** 124:11
**give** 6:7 7:18 13:5,16
   39:15 40:9 69:15 74:18
   92:22 126:21
**given** 1:18 6:12 9:13
   29:17 51:23 86:11,12
   117:10 127:4,7
**gives** 101:5 103:6 125:13
**giving** 108:14
**glass** 99:21
**globo** 77:9,16
**go** 42:5 48:18 49:14
   55:23 60:11 61:5 72:11
   82:13 83:17 84:7
   101:12 114:21 118:10
   120:3
**goes** 72:12 73:11 79:21
**going** 6:18,20 12:7,10
   27:13,14 28:22 38:3
   39:15 40:9 45:24 51:12
   52:21 53:19 54:2,5
   55:19 57:25 58:6 59:20
   60:3,14 61:18 63:2,17
   68:22 73:4,21 74:3
   75:3,18 76:9,16 77:9,16
   84:7,8 97:1,2 106:4
   122:21,25 126:11
**good** 11:20 18:17 19:13

   48:10 96:8 118:7
**GOODWIN** 3:1
**gotten** 40:4 98:1,1
**great** 49:19 112:20 114:8
   114:16
**greater** 114:3
**greatest** 112:21 113:9
**Green** 64:11
**group** 62:8
**guaranteed** 20:1
**Guard** 104:4,8,12,15
**guess** 109:6 121:1
**guidelines** 45:6 84:12,20
   85:6

### H

**H** 4:6
**half** 18:20,21 26:5 29:3
   29:25 44:15 72:6 95:21
   95:24 96:14 99:7,9
   100:9 103:8 116:15,18
   117:8
**HAMMOND** 3:9
**hand** 20:15 30:12 51:25
   52:23 87:7
**handle** 14:9 79:16 80:1
   88:18
**handling** 16:13
**hands** 106:2
**handwriting** 87:20
**handy** 64:24
**hanging** 24:6,20 25:2
   26:12 28:1
**happen** 6:18 43:4 47:4
   88:23
**happened** 6:19 31:24
   40:3 89:10
**happens** 43:3,5
**harbor** 10:21
**hard** 18:4
**Hardberger** 62:20
**hatch** 71:2
**head** 78:18
**heard** 21:7 23:19 84:11
   126:5
**hearing** 28:14
**height** 18:23 19:3 108:22

**hello** 32:1
**help** 54:11 121:15
**helped** 11:16 107:5
**hereinabove** 128:7
**hereto** 5:3 75:6,21 76:12
   77:5,22 78:7,14 123:5
   128:15
**higher** 41:23
**highly** 49:12
**high-strength** 13:11
**high-tenacity** 22:4 86:8
   93:22
**hired** 12:12
**historically** 83:18
**hoisting** 49:8
**hold** 8:5,22 33:23 104:3
**holding** 95:5,10 112:2
**hood** 114:13,14
**hope** 79:23
**horizontal** 51:2,3 66:13
   73:15 126:2,5
**hour** 107:23,25 108:2,9
**Houston** 79:20 80:11
**hundreds** 109:11
**hurricane** 7:6,9,12 9:15
   9:23 10:1,8 20:6 39:5
   39:17 50:7,13 85:15
   92:15 93:9,13 108:6
   113:3 116:9 117:5,9
   118:4 120:18,21 122:11
   122:16
**hurricanes** 115:22 122:9
**hurt** 49:23
**hydrodynamics** 8:3,7
**hypothetical** 69:15 111:8

### I

**idea** 18:16,17 23:9 26:1
   70:23 71:3 72:23
   109:15
**identification** 75:6,21
   76:12 77:5,22 78:7,14
   123:5
**identified** 89:12
**identifying** 47:11
**identity** 30:15
**ignored** 47:3

**IHNC** 123:24
**II** 1:17 6:1,9 127:3,11
**imagine** 30:24
**immaterial** 92:6
**immediately** 82:6 83:20
**important** 115:18 122:15
**improving** 46:1,6
**inaccuracy** 98:4
**inch** 29:25 31:7 44:14
  86:7 88:13 95:21,23
  96:14 99:7,9 100:9
  103:8 116:15,16,18
  117:8
**incident** 20:5
**included** 62:24 100:16
  100:19,20
**includes** 36:2 72:8
**Incomplete** 111:7
**incorrect** 115:1
**increase** 68:13,22 93:10
  105:1 120:23
**increases** 113:24
**incumbent** 37:3
**indicated** 7:2 13:2,3 20:9
  103:1 122:24
**indicates** 75:14 105:19
**indicating** 67:17 72:15
  73:18 103:9
**Industrial** 50:10
**industry** 32:18 35:25
  45:9 83:22 104:18
  105:21 124:15,24
**information** 23:24,25
  27:1 44:24 51:17,21
  52:8,11,16,17,19 59:13
  86:11 87:3 94:12 97:4
  97:12 100:15 102:20
**informed** 30:18,18 97:3
**ING** 23:14 24:25 27:9
  68:24 126:14
**Ingram** 1:9,11
**injured** 11:2
**injury** 41:22
**inspect** 16:17 95:3 99:5
**inspected** 22:12,16 44:5
  52:4 89:3 103:2

**inspection** 16:21 48:16
  48:16 92:13 99:16
  115:17
**inspections** 48:17
**instance** 36:15 48:17
  49:9
**Institute** 45:2,3,14,19
  46:17 75:17 76:7,8,15
  76:17 101:2,9
**instructions** 46:24
**interested** 128:15
**interesting** 97:22
**interpretation** 104:14
**interpreting** 104:4
**interrupt** 55:16
**interruption** 74:2
**introduced** 31:22
**investigate** 16:10 101:18
  101:21 102:6,10
**investigated** 13:12
**investigation** 90:1
**invoices** 29:18 30:10
**involved** 10:7,13 25:12
  29:14 42:18 43:19
  45:13,18 50:13,20
  110:18
**involving** 10:8,13 23:14
**issue** 13:19 23:14 60:13
  66:12 83:4
**issues** 9:14 114:22
**i.e** 41:22 115:11

---

**J**

**J** 2:3,4 3:10
**January** 76:23
**job** 8:14 36:14
**jobs** 36:13
**Joseph** 1:24 5:22 12:23
  14:16 128:2,24
**JR** 1:24 5:22 128:2,24
**judge** 1:9 56:3,6,8,17
**July** 1:20 75:12,13,14
  76:7 127:25
**jump** 60:9
**jumped** 59:25 60:13
**Jury** 12:23 14:14

---

**K**

**KARL** 2:10
**Katrina** 1:4 7:6,9,12
  19:18 20:6 29:20 50:8
**keep** 43:22
**kept** 53:10 100:24
**key** 47:10
**killed** 13:15
**kilograms** 89:16,20
**kind** 34:9 83:22 108:12
**KITTO** 3:10
**knew** 17:10 99:8
**knot** 14:23,23 90:19,19
**knots** 67:4 90:17,18,20
  91:3,5,11,12 118:21
  119:7
**knotted** 90:20,22
**knotting** 91:6,12
**know** 6:21 7:14 18:23
  19:3,25 20:12,23 21:1
  21:21 26:24,25 27:17
  32:4,13 35:23 36:4
  38:10,17 39:24,25 40:8
  42:3 44:3 49:2 50:7
  52:5 53:14 65:25 70:20
  73:22 74:12,17 79:7
  80:4,10 83:24,25 84:19
  84:19,25 85:1,7 88:5,13
  88:23 93:24 94:12,14
  94:15 95:24 96:18 97:7
  97:10 98:25 100:5,10
  100:18 106:6,22,22
  107:19 108:16,19,22
  109:18,19,20 116:20
  120:7 122:5,6,7,10,12
  122:15 123:3,12,17,20
  123:25 124:3,8,8 125:1
  125:10,17 126:16
**knowledge** 20:4 22:6,10
  25:18 39:14 40:25 50:8
  50:12,15 65:10 102:21
  121:21
**known** 125:5
**knows** 79:2
**K(2)** 1:7

**L**

**L** 5:1
**laborer** 11:1
**Lafarge** 1:8,10,12,14
  2:15 15:24 16:15 17:20
  20:7 23:20,22 24:2
  26:11 27:8 30:21 31:12
  31:17,21 32:5,8,9 40:15
  40:20,24 43:25 44:23
  47:16,20 70:15,22
  86:15 92:16 94:9 97:4
  97:6,15 101:8 104:11
  119:22 120:15
**Lagarde** 1:10
**laid** 16:22 22:20
**Lane** 6:2,10
**large** 15:2 107:4,18
**larger** 105:17
**lately** 79:25
**law** 2:3 5:7
**lay** 114:20
**laying** 70:25
**layman** 113:9
**lays** 35:13
**leave** 32:25 33:1 58:3
  60:18
**led** 30:20
**left** 11:9 23:15,17 33:4
  44:6,6 56:23 81:23
  82:9,23 99:10 115:15
**legal** 9:7
**length** 103:20,22
**lesser** 96:5
**letter** 75:13,24 76:4,7
**letters** 75:12
**let's** 7:17 12:22 20:21,22
  28:20 34:10,25 35:2
  53:20 54:15 55:23 61:1
  63:10 64:20 71:4 74:21
  89:15 107:6 117:22
  118:10
**levee** 61:17
**levels** 40:23
**life** 43:3 109:11
**lift** 71:21
**lifting** 41:24 49:11

D. PHILIP SKAER, II

**light** 113:14
**lighter** 80:1,22
**likened** 72:2
**likewise** 120:18
**limit** 41:6,7,13 42:11,14
    42:18,22 66:14
**limits** 42:23 43:7,7
**line** 10:20,23,23 11:3,9
    11:18,19,20 12:25
    14:19,20 44:6 48:23
    51:4 52:9 66:15 69:23
    71:3 73:1 94:20,21,22
    94:25 95:2,9 96:25
    112:6,6 118:19 125:21
    125:23
**lined** 113:6
**lines** 10:14 12:24 13:4
    29:6 42:12 51:1 52:13
    66:13,13,18 67:4,8 69:9
    69:10,16,18 70:2,12,15
    70:18 79:10 86:9 90:5
    92:18 93:5,21 94:16
    95:1,4,23,24 96:14
    97:16 99:1 106:13,19
    106:21 107:1,3,5,8
    111:4,19 112:1,2,10,12
    112:12 125:11
**literature** 35:15 102:16
    106:7
**little** 17:7 52:23 71:9,12
    83:7 103:18
**live** 7:3,5
**living** 124:6
**LLP** 1:18
**load** 41:6,7,13 42:11,14
    42:18,22,23 43:6,7
    49:15 69:20 98:9
    102:10,13
**loaded** 23:17 109:15,16
**loads** 39:16
**located** 22:15
**log** 43:23,25 47:25 48:3,6
    48:7,10
**logical** 41:5
**logically** 96:25
**logs** 47:22

**long** 45:18 48:15 53:8
    68:17,17 70:7,11 79:2
**look** 12:22 16:11 19:1
    21:11 60:6 61:24 71:13
    94:2 99:11,25 100:11
    106:6
**looked** 16:24 23:3 26:4
    62:12,15 69:6 89:4
    91:16,21 107:13 109:11
    125:14,15
**looking** 17:17 29:23 69:2
    70:24 96:19 98:7 99:5
    103:2 107:17 109:7
    110:3,12,16
**looks** 94:3
**lose** 67:13,15,19 71:9,12
    82:5 83:17
**loses** 71:6 83:8 85:9
    90:21 119:24
**loss** 84:8 115:20 116:7
    117:10,12 118:15,20
**lost** 83:19 117:21,24
**lot** 124:17 125:12
**Louisiana** 1:2,20 2:6,12
    2:21 3:13 5:6,24 128:4
**low** 42:5
**lower** 91:15 114:4
**L.L.P** 2:16 3:1,9

_____

## M

**M** 4:1
**MAG** 1:11
**magician** 110:15
**magistrate** 28:24 54:25
    55:4,7 59:11,17 60:21
    65:15 66:1
**magistrate's** 56:24
**magnifying** 99:21
**maining** 35:11
**maker** 35:20
**making** 105:8,8
**man** 12:9
**manila** 88:9
**manual** 46:17 76:9,16,17
**manufacturer** 19:25
    38:6 88:11 89:13
    102:16,20 103:3,7

**manufacturers** 45:5
    83:16 88:6 101:12
**manufacturer's** 19:23
    89:9
**marine** 11:14 12:25 15:1
    42:25 81:15 104:18
**mark** 3:2 123:1
**marked** 64:11 75:5,20
    76:11 77:4,21 78:6,13
    123:4
**marker** 89:10
**marketing-wise** 79:21
**married** 23:18
**marry** 94:7
**materials** 65:11
**matter** 38:14 58:2 61:8
    65:14 73:9
**Max** 62:20
**Maxiflex** 89:23 93:22
**Maxima** 98:8 103:10,15
    107:7
**maximize** 126:3
**maximum** 79:7
**McCall** 1:18 2:16 15:22
    19:7 59:1 86:13 92:3,9
    93:25 94:1 95:25
**mean** 34:22 36:4 48:13
    48:25 51:3 61:18 73:20
    90:9 104:18 108:12
    119:3 125:16
**meaning** 23:4 67:14 84:1
    111:9
**meaningful** 82:22 84:5,6
    125:18
**meaningless** 84:9,10
**means** 82:23 105:19
**measured** 30:5
**measurement** 18:22,25
**measurements** 18:3,5
**measuring** 31:9,11,14
**meet** 15:22 31:20
**melted** 109:8
**melting** 107:17
**members** 45:9,10 124:15
    124:24
**memory** 103:11

**mention** 10:1
**mentioned** 48:24 51:20
    94:23 113:11
**men's** 58:19
**merely** 60:18
**met** 15:20 16:2,6 20:1
    21:17 31:22 32:9,16
    60:4 123:8
**Metairie** 2:6
**method** 105:13
**microscope** 99:20
**middle** 112:6
**mile** 107:23,25
**miles** 108:2
**military** 8:9
**mind** 14:7
**mine** 122:13
**MINTZ** 3:9
**minutes** 32:12 47:6
    126:21
**mischaracterization**
    26:19
**mistaken** 28:9 29:11
**model** 88:1 103:3
**modest** 51:12 73:25
**moment** 10:23 30:17
    71:8 106:3
**MONTGOMERY** 3:8
**months** 31:24
**moor** 23:13 30:16 39:2
    111:18 118:3 121:22
    122:10,16
**moored** 20:6,12,14,24
    21:2,19,20,25 30:4
    37:19 38:13 39:16
    40:15 67:7 72:24 80:10
    85:14 107:23,24 108:1
    125:8,16
**mooring** 8:19,23 9:1,15
    9:23,25 10:2,8,14,20
    13:4 14:19,20 21:16
    22:7,8 24:1 36:15,16
    38:12 39:1,4 41:9 42:1
    42:12 43:8 47:19 48:23
    50:25 52:9,13 67:8
    69:17,19 72:1,8 79:1

80:13 84:12,20 85:5
93:6,13 106:21 107:1,8
111:4,5 115:22 123:25
124:7,10,17,19,24
125:3 126:9,13
**move** 28:20 53:20 54:15
**moved** 113:3
**movements** 37:20
**multiplier** 89:21
**multiply** 90:15
**Mumford** 1:9

**N**

**N** 4:1,1,1,6 5:1 13:9
**name** 6:7 12:16 33:1,3
48:8 64:3 81:12 88:3,4
88:11,12 103:6
**named** 6:3
**names** 88:7
**national** 38:8,9
**nature** 37:21,24
**Navy** 8:10,12,15
**near** 7:15
**necessarily** 82:1 105:4
**necessary** 17:13 19:12
85:21
**need** 17:19 36:7 62:2
66:2 70:10
**needed** 18:9
**needs** 61:5
**negative** 123:10
**negatively** 78:18
**neither** 12:5
**never** 9:1 32:16 35:23
42:22,23 84:3 98:1
126:5
**Nevertheless** 92:14
**new** 1:19 2:12,21 3:3,13
7:8 9:18 19:22 22:19
34:2 35:12 44:7 70:17
80:19 85:18,20 86:20
92:18 93:21 94:3,21
95:1,2,4,10 96:6,10,22
96:25 99:4,10 100:12
103:13 116:2,5,21,22
122:9 124:13
**nine** 63:8,13,15 77:8,11

77:15,19
**Nods** 121:6
**non** 49:5
**normal** 99:22 115:16
120:4,6 122:1
**normally** 49:17 100:15
100:18
**north** 2:15 45:4 114:7
125:6
**northeast** 113:4
**northwest** 113:5
**north/south** 113:7
**noted** 127:13,15
**notice** 5:7 86:24
**number** 13:9 27:8 74:17
74:22 77:7,16 82:22,22
90:10 91:15 96:21
116:13
**numbers** 125:17
**numerous** 116:5
**NW** 3:3
**nylon** 34:25 45:11 70:25
80:24 88:9

**O**

**O** 4:1 5:1
**oath** 5:25 6:5
**object** 26:19 37:23 46:11
71:22
**objecting** 56:1
**objection** 38:16 50:3
68:16 81:20 92:21
102:19 104:20 108:11
111:7,21 115:24 116:11
120:1 121:25 122:19
**objections** 5:11
**obtained** 59:13
**obviously** 27:6 49:6,7
106:23 107:4 120:25
**occurs** 48:4
**OCIMF** 84:16,21
**offered** 14:17
**offers** 14:2
**offhand** 105:22
**office** 31:25 32:5,10,14
56:24
**officer** 8:16,17

**officiated** 5:24
**offshore** 11:15
**Oh** 12:20 29:10 31:24
32:11 33:15,17 36:23
95:19 98:12 99:21
113:21 119:13 124:21
**oil** 124:17
**okay** 6:17,21 7:2,14,17
7:24 8:2,5,9,17,21,25
9:3,11,20 10:4,10 12:1
12:4,16 13:16,19,24
14:10,25 15:8,11,16,24
16:5,8,14,17 17:20 18:3
18:7,22 19:6,10,14
20:21 21:1,9,18 22:3,20
23:12,21 24:15,19,24
25:18 26:7 27:3 29:10
30:13 31:1,16,20 32:4
32:13,17 33:9,12,18
35:2,4,9 36:6 37:10,16
39:4,11,14 40:13 41:2
41:20 42:10,21 43:1,2
45:16,21 46:20 47:2,7
47:10,15 48:20 49:4,19
49:25 50:6,15,22,25
51:20 52:2,8,15,21
53:15 58:18 59:3,7
62:17 63:5,25 65:3
66:12 67:4,12,20 69:4
69:23 70:1,4,21 71:4,15
72:19 73:6,13,19 74:21
75:3 76:15 77:19 78:22
81:6,10,15 84:4 85:1,5
85:8,19 86:3,6,16,20
88:19 89:15 90:4,14
91:14 92:12 93:16,20
94:20,25 95:19,23
96:17 97:7,16 98:21
99:4,12 100:4 101:2
103:23 104:7,17,24
106:4,8,10 107:6,22
108:8 111:18 113:2
114:6,19 116:6 118:7
119:21 120:11,17
121:16,19 122:24
123:14,23 124:23 125:2

125:7,19,25 126:11,17
**old** 44:3 120:25
**older** 94:25 95:2 96:22
**oldest** 10:18
**once** 32:22 83:16,18
**ones** 23:3 26:10 62:14
94:7,8 96:10
**one-inch** 80:24,25
**operation** 82:19
**operations** 40:7 88:22
**opinion** 11:7,18,22,25
17:18 19:12 38:19
39:15,21 40:9,11,13,18
40:22 42:2,7,10,17 43:8
49:4 50:8 67:12 70:1
104:22,23 106:25 107:9
107:14,17 108:4,14
109:4 110:2 112:5
114:18,20 115:2 116:1
116:4 117:7 118:2
122:14 125:12
**opinions** 9:13 123:16,18
**opposite** 51:8,18
**oranges** 119:2
**order** 59:17 74:12
**orders** 38:5
**ordinary** 93:6,13 108:5
**organization** 45:8
**original** 29:25 30:22
81:22 82:5 90:15,16
100:7 116:22 118:11,22
121:4
**originally** 86:10
**Orleans** 1:19 2:12,21
3:13 7:8 22:19 122:9
**other's** 117:3
**outside** 20:19 122:19
126:13
**overall** 68:23 82:12
93:10
**overbroad** 46:11
**overhead** 41:25
**overheard** 21:3
**owner** 12:14

**P**

**P** 5:1

D. PHILIP SKAER, II

7/15/2009

Page 9

**page** 4:3,8 13:10 46:17
76:21 77:1 106:10
112:20
**pages** 122:25
**paper** 78:10
**paragraph** 46:22 93:2
94:23 106:11
**paramount** 50:1
**Parfait** 1:13
**part** 5:14 43:8
**parted** 13:4
**parties** 5:3 128:14
**parting** 10:14
**parts** 84:17
**passed** 101:11
**Pat** 59:20 63:6 71:19
74:2 76:20 87:10 110:7
**PATRICK** 2:3,4
**pay** 12:7
**Penn** 14:25
**people** 1:14 15:23 21:6
21:16 23:20,22 31:16
35:21 41:22 49:9 59:24
60:10 72:14 79:20
86:13 90:3 92:4,9 94:9
**percent** 61:6 66:20 67:19
71:6,8 79:7,14 81:17,22
82:8,9,11,14,20 83:8,9
83:17,19,25 84:8 85:2,9
85:10,16 90:21 91:10
114:24 115:12 117:23
117:24 118:15,24 119:7
119:9 120:9
**percentage** 67:14 90:14
115:20 116:6 117:22
119:24
**perform** 99:16
**performance** 123:11,13
**performed** 9:1
**period** 38:24
**periodic** 48:16
**permitted** 5:5
**Perry** 1:11
**person** 35:16 52:6
**personally** 123:8
**personnel** 49:22 51:24

70:15,22 86:18 92:16
94:18
**PERTAINS** 1:6
**Petruzzi** 14:25
**Philip** 1:17 6:1,9 127:3
127:11
**phone** 66:8
**photo** 25:9 27:19
**photograph** 24:24
**photographs** 17:21 24:5
24:15,19 26:4,8 29:3,9
59:5 60:7 62:5,8,9,11
62:18,23 65:8 74:7
77:7,12,15,20
**photos** 24:11,12,13 25:8
25:9,12,14,23 26:1,11
26:24 27:1,3,7,11,15,24
28:2 70:24
**phrase** 45:24 48:24
**physical** 37:1 119:1
**physically** 94:7
**pick** 26:9 37:5
**picks** 35:16
**pictures** 91:18,23,25
94:2
**piece** 38:22,23 103:19
109:9
**pieces** 23:2
**plan** 47:12
**plane** 113:17
**plans** 47:17,18
**plant** 33:11
**please** 10:5 57:2 102:2
**pleasure** 36:20
**plus** 29:25 75:24 119:16
**point** 13:14 26:2 73:15
82:25 105:18 106:21
107:1,9 109:13
**pointed** 30:6
**points** 69:17,19 91:8
126:3,9
**political** 7:21
**polyester** 45:11
**polypropylene** 13:11
22:5 34:18 45:12 86:9
**popular** 40:4

**port** 48:19 79:19 122:8
**position** 8:14
**possible** 16:22 40:19
41:21 120:12
**potential** 115:15
**potentially** 59:10
**pound** 89:20 117:17
**pounds** 68:10 69:16,20
86:22 91:15 95:5
110:25 115:14,16
117:18 118:12 119:9,10
121:4,7,10,10
**Poydras** 1:19 2:20 3:12
**practical** 43:3
**practically** 51:8,8
**precisely** 57:13
**preparation** 92:15
**present** 60:20 65:9
**presented** 47:24 51:17
86:19
**presents** 14:6
**president** 88:21
**presidents** 45:22,23
**pretty** 18:17 40:5
**prevent** 125:8
**prevented** 107:2 126:15
**previous** 66:25
**previously** 28:17,18 37:7
62:4 64:11 83:14
**prior** 9:14 10:6,12 48:23
92:22
**privy** 29:18
**probably** 6:18 9:12
13:21 17:17 23:3 29:8
36:10,16 48:18 65:21
67:19 71:9 80:7 107:15
107:24 109:12 111:22
112:13 115:12 122:4
**problem** 14:6 45:25 46:6
**problems** 17:9
**Procedure** 5:6
**process** 39:20 68:19
124:13
**PROCTOR** 3:1
**produce** 60:25 62:6
63:25 106:8

**produced** 27:21 62:19
74:8 102:16
**producers** 45:12
**product** 53:3 88:6
**production** 27:11,22
52:21
**products** 46:3,9
**professional** 17:18
107:17 123:11,13
**programs** 46:23
**prone** 122:9
**proper** 43:12,13,15,18
97:23 100:23 101:22
102:6,10
**properties** 36:2,5
**protected** 114:11
**provide** 59:12 92:17
102:22
**provided** 51:21 52:16,22
**prudent** 85:19 112:9,11
112:18 115:12 117:14
118:17,18 121:13,16,17
**PSLC** 2:2
**publication** 82:25 84:11
85:2 105:18 106:1
**publications** 84:16
**publish** 84:22
**published** 9:3
**pull** 51:4 73:5,6,7,12,17
73:18 126:6
**pulled** 23:1
**purchased** 10:23 30:11
48:7
**purchaser** 48:8
**purpose** 18:7
**purposes** 5:5 34:3 92:15
**pursuant** 5:7
**push** 11:16
**put** 20:18 24:22 44:8
48:10,11 57:2,5 74:21
82:4 83:19 85:17,19
90:12 96:6 98:23 100:6
100:10 105:14 107:19
110:24 113:7 125:11
**putting** 107:16

**Q**

D. PHILIP SKAER, II

**qualification** 15:9
**qualified** 13:25 28:10
**question** 5:12 10:4 20:5
  37:24 44:20 54:7 66:24
  69:13 83:14 84:2 92:8
  98:13 105:25 106:5
**questioning** 57:25
**questions** 6:20 37:25
  54:11 67:1 126:19,25
**quite** 13:22 22:24 80:16
  84:18

**R**
**radio** 49:10
**Raffman** 3:2 58:23
**range** 29:12
**ranges** 41:17
**rated** 66:14 69:16
**reached** 91:14 123:17
**reaches** 81:16 114:24
  115:6
**read** 3:8 46:5,21 67:1
  84:17 92:21 93:4
  105:22
**reading** 5:8 35:14
**ready** 93:9
**real** 23:4 38:18 79:6
  100:1
**really** 17:11 23:5 33:21
  46:2,7 59:16 73:20
  105:3 116:20 120:7
  123:13
**reason** 70:4,6 125:10
**reasonable** 84:2 85:17
**recall** 12:17
**receipts** 75:16
**recess** 102:24
**recollection** 62:10
**recommend** 19:6 35:21
  115:21 116:7
**recommendation** 120:14
  120:19
**recommendations** 84:22
  101:10 104:5,13,15
**recommends** 101:3
**record** 57:2,5 59:9 60:1
  61:20 67:22,23 100:15

101:3,6 126:23
**records** 50:23 53:10
  71:13,14 100:16,20,23
**reduce** 119:4
**reduced** 90:17 118:24
**reduces** 68:3
**reduction** 47:8,10 82:11
  91:10
**refer** 64:2 104:16
**reference** 76:16 77:3
**referring** 9:22 26:2 60:8
  62:5 63:2 67:16,23
  69:11 113:15
**refine** 107:6
**reflects** 60:1
**refresh** 62:10
**refused** 58:5
**regard** 10:6,12 15:11
  16:8 17:5 20:21 21:18
  21:24 22:7 23:25 25:8
  30:14 31:1 38:12 39:4
  39:15 43:21 47:15,17
  50:7 58:3 76:6 81:15
  84:23 85:13 100:4
  115:22 120:17
**regarding** 62:11
**regards** 42:1
**regulations** 101:9
**relate** 23:5
**related** 128:14
**relationship** 71:21
**relatively** 124:12
**remainder** 46:21
**remained** 44:15
**remember** 10:22 13:22
  15:15 16:2 25:3 30:17
  44:19 52:18 69:1,5
  103:18 110:6 113:16
  118:23
**remnants** 23:15
**remove** 55:5 103:17,23
**removed** 116:8 117:9
**repeat** 66:23 102:2
**repeated** 46:25
**rephrase** 42:15
**replace** 86:1 96:24,25,25

97:1 117:13 121:9
**replaced** 30:22 81:18,23
  93:20 94:16 95:25 96:3
  96:6,18,19
**report** 13:19,21 44:8
  64:10,10 74:3,21,25
  82:7 83:3,5,5 86:4
  92:25 97:25 98:4,24
**reportedly** 44:6
**reporter** 1:23,25 5:23
  57:8 58:6,9 128:3,25
**reporter's** 58:13 128:1
**reports** 23:19,21 98:5,14
**represent** 15:24
**representation** 36:14
**representative** 38:6
**REPRESENTING** 2:2
  2:15 3:7
**request** 28:22,23 58:13
**requested** 75:10
**requests** 27:22
**requirements** 47:12
  82:12
**reserved** 5:13
**residual** 19:16 81:17
  82:2,18 84:22 85:10,16
  114:21 115:5 116:6
  117:10,12 118:25
**resolve** 27:13 58:2
**resolved** 65:15
**respect** 57:17 65:7
  117:15
**response** 27:21
**responsibility** 38:2 43:11
  101:18 102:5,9
**responsible** 12:10 37:9
**responsiveness** 5:12
**rest** 77:2
**restroom** 57:3 58:12
**result** 128:16
**retain** 65:13
**retained** 16:9 60:6
  104:11
**retired** 82:15,16
**review** 24:5 25:14 47:16
  47:19,22 50:22 51:22

59:3 86:16 120:22
**reviewed** 23:21 27:7
  75:9 90:5 122:25
  123:23
**rid** 115:13
**Ridgelake** 2:5
**ridiculously** 107:4
**riding** 114:4
**right** 12:18 22:14 27:4
  28:20 29:24 45:2 49:25
  56:21 57:9 63:1 64:17
  64:23 66:7 71:24 72:5
  72:7,18,23 74:16 92:8
  96:23 100:25 101:7
  110:4,10 118:1,10
  122:24 123:21
**rights** 53:9
**rigs** 124:17
**risk** 47:7,10
**roaches** 117:17
**ROBERT** 2:18
**RONALD** 3:10
**room** 54:21 55:6,20
  56:23 58:2,4,19 60:19
  61:12
**rope** 11:1,12 13:12,13,13
  13:13,14 14:24 15:3,7
  17:8,10 21:8,20 22:3
  23:15 24:25 30:1 31:7
  31:9 32:18,18,22 33:2,4
  33:7,10,18,19,21,24,25
  34:12,14,16,17,19,20
  34:22,22,23,25 35:7,16
  35:16,17,20,21,24 36:7
  36:22,22,23 37:4,6,18
  38:2,4,8,13,21,23 39:1
  39:20 40:10 41:3,15,16
  43:22,25 44:5 45:4
  46:1,7 47:17,22,25 48:3
  48:5,6,7,9,10,12,13,19
  48:24 49:5,7,8,11 51:13
  67:13,15 68:9,19 70:2,2
  70:14,22,25 71:1,4,21
  71:25 73:10,14,15
  75:15,15,18 78:11,22
  78:23 79:6,13 80:5,21

JOHNS PENDLETON COURT REPORTERS

800 562-1285

D. PHILIP SKAER, II

7/15/2009

Page 11

80:24 81:1,4,16,22 82:4
82:8,8,13,15,15,20,23
83:8,19 84:2,6,7,9 85:9
85:15,18,20,24 86:21
87:5 88:2,3,5,9 89:2,9
90:20 91:5,6,8,13,14,21
91:24 92:6,13 94:3
95:15,16,20 98:10,12
99:9,23 100:15,20
101:3,6,19 102:17
103:3,4,6,7,21,22 105:6
109:9,22 114:23 115:6
115:9,10,11,14,15,19
116:8,8 117:8 118:3,11
118:22 119:23 120:6,13
120:17,20 121:14
124:12 125:23 126:1,2
**ropes** 14:1,4 16:11,11,12
16:18,21,23,24,25 17:5
17:10,15,16,18 19:15
19:17,20,22 21:21,25
22:7,12,15,17,20,23
23:1,7,9,13,20 24:1,6
24:14,16,19,21 25:2,15
25:19 26:12,16,23 28:1
29:11,14,20,21,21,22
30:3,8,11,12,15,19,21
30:22 31:2,3,11,14,15
33:14 34:1,5,8 35:11,11
36:12 37:12 40:4 41:18
42:18 43:12,13,15,18
43:21 44:4,9 45:7 63:4
68:13,14,18,18,20,21
68:22 79:15 80:12,19
81:15 82:6 83:15 84:23
85:22,23,25 88:14,20
89:3,11,12 91:16 94:4,5
98:3,13 99:4,6,7,8
100:5,7 102:6,11 103:2
103:5,9,13 105:4,8,14
105:17 107:14,16,18
109:7,11 110:3,12,16
110:20,20 114:8 115:18
116:2,14,15,20 118:24
119:4 120:8,22,23,25
121:2 123:11,13

**rough** 19:1
**RPR** 1:24 5:22 128:2,24
**rule** 100:21,22
**rules** 104:12
**ruling** 55:7,9
**runs** 103:20
**Ryan** 31:21 32:6 104:12
**résumé** 9:19

——————————
**S**
——————————

**s** 3:2 5:1 12:2 38:2 48:8
62:20 101:9
**safe** 42:11,14 47:11
**safely** 108:2 121:22
122:16
**safety** 41:8,10 46:1,6,23
47:7,17,18 49:15,16
50:1
**sail** 113:7,11,13,15,18,20
**salesmen** 79:22 83:21
**SANDER** 2:3
**Sanders** 2:4 4:5 6:6 9:24
10:3 13:1 25:22 26:6
26:21 27:5,23 28:6,13
28:19,21 29:1 34:15
38:25 44:21 46:15 50:5
52:24 53:7,11,18,23
54:4,13,19,24 55:3,10
55:18,25 56:6,7,11,15
56:20,25 57:4,10,18,22
58:14 59:15 60:16 61:9
61:19,23 62:22 63:7,12
64:19,25 65:4,18,23
66:6,11 67:3,25 68:2
69:14 70:13 71:23 74:4
74:9,20,23 75:7,25 76:2
76:14,22 77:6,13,23,25
78:4,8,15,19,21 81:24
87:13,17,25 92:24
93:11 102:3,25 104:21
108:13 110:9,11 111:11
111:25 112:19 115:25
117:6 120:2 122:2,23
123:7 126:18
**save** 5:11
**saved** 107:15 109:12,14
**saw** 21:11 24:15 26:8

29:2,8 69:2 83:7 91:19
94:4,5
**saying** 28:10 43:1,2,2,4,5
55:17 96:13 98:23
103:14 111:18 114:2
125:2,4
**says** 82:7 83:1,3,8 85:2
90:4 97:16 98:8 125:7
**scaffolding** 41:24
**scene** 49:12 97:18
**science** 7:21
**Scioto** 6:2,9
**sea** 113:17,17 125:6
**sealing** 5:9
**seaman** 11:1 13:15
**second** 13:9 76:23
106:11
**secondhand** 23:23
**secondly** 63:15
**SECTION** 1:7
**see** 10:25 17:16 25:23
29:3,6 36:18 42:4
46:14 47:18 59:21 60:5
63:2 69:1 75:9 79:13
80:10 83:5,10 87:6,10
87:14 89:15 94:3,6
97:22 98:22 100:1,23
106:7 108:14 117:12,22
126:21
**seen** 27:20 29:5 79:18
80:9,12 84:21 98:19
109:10 114:10
**sees** 101:9
**seldom** 43:7 79:13 98:22
**select** 101:19 102:11
**selecting** 41:3
**selection** 38:12 39:20
41:4 102:6
**sell** 38:7,7,9
**send** 97:23
**sent** 33:15 98:2
**sentence** 46:16 92:22
93:1 106:11
**separate** 69:10,17,18
**sequence** 74:14
**seriously** 41:11 101:7

**serves** 103:11
**service** 85:11,25 100:6
100:11 114:25 115:21
116:8 117:10 118:6
119:23 120:20
**services** 16:9 104:11
**set** 18:11 52:20 73:10
128:7
**sets** 45:5,6
**seven** 20:8,9 23:4,7 62:8
63:1
**severe** 11:10 93:7
**Shakes** 78:18
**Sharp** 14:20,22
**sheets** 62:8 77:11,15,19
**ship** 10:21 11:10,16
12:14 39:2 48:17
113:21
**ships** 48:4 80:9 113:19
**Shipside** 88:15
**Shipyard** 29:19 75:16
98:3
**short** 103:18
**shorthand** 128:9
**show** 24:6 53:14 63:17
76:10 82:17
**showed** 24:12 30:10
94:13 117:14
**showing** 62:7 64:9
**shown** 14:15 23:16 25:10
29:18 30:10 63:21 64:3
64:12 65:9,12 72:20,21
83:15
**shows** 19:24 94:1 101:14
**side** 77:3 78:10 105:10
105:14,14 113:19,21
114:17
**Signed** 127:11,13,15
**significant** 82:11 107:13
111:23
**signing** 5:9
**similar** 63:19 105:14,15
**simply** 105:7,17 107:16
123:15
**single-part** 11:3,5
**single-point** 124:10,16

D. PHILIP SKAER, II

124:19 125:3
**sir** 7:2 17:14 28:15 31:20
  32:17 74:25
**sit** 98:18
**site** 18:8
**situation** 49:7 93:14
  109:9
**six** 23:3,7 109:14,23
**size** 30:3 31:1,2 37:4
  39:25 40:14 81:4,4
  102:23 105:7,15 111:17
**sizes** 36:21 95:18,19
**Skaer** 1:17 6:1,7,9 27:20
  55:24 56:2 58:3,4,15
  62:7 63:18 65:12 66:12
  103:1 127:3,11
**sketching** 53:13
**slight** 51:10
**slightly** 20:16 36:25
  114:11
**sling** 71:7 72:2,4,6
**slipping** 14:23
**sloped** 114:15,15
**smoothly** 60:12
**snapped** 13:14
**sold** 88:23 90:3
**solely** 110:2
**solicit** 33:21
**somebody** 61:5 117:3
**somebody's** 88:3
**someone's** 116:25 117:2
**sorry** 9:22 61:10 66:23
  77:14 83:4 90:24
  117:16 119:21
**sought** 5:15
**spaced** 96:10
**speak** 58:18,20,23,25
  59:24 62:2
**speaking** 100:8
**speaks** 61:20
**special** 34:3
**specialty** 35:10
**specific** 104:9 105:1
**specifically** 5:10
**specifications** 101:10
  102:22

**specs** 75:15,18
**speculation** 109:5
**speed** 108:16
**spoke** 47:5
**stand** 28:22
**standard** 83:23 93:19
  105:22
**standards** 45:7
**standing** 19:1
**start** 7:17 14:7 74:18
**started** 91:6 117:18
  125:5
**starts** 72:10,12 82:5
**State** 5:23 128:3
**stated** 11:25
**statement** 21:10 35:18
  46:12 92:14 100:19
  115:3,4
**states** 1:1 8:10,12,15
  9:19 10:25 88:22
**stay** 58:1
**stayed** 35:9
**steel** 41:15
**stern** 112:6
**STIPULATED** 5:2
**stipulation** 6:3
**stock** 40:6
**stopped** 109:23
**stored** 48:15 68:7
**storm** 39:11,13 40:23
  110:24
**straight** 23:6 32:21
  51:19 66:15 67:9 73:5
  73:6,7,12,13,18 109:21
  125:22,25 126:1,6,8
**strain** 107:18 112:21
  114:8 115:15
**strands** 82:16
**Street** 1:19 2:11,20 3:12
**strength** 17:2 19:17,20
  33:10 36:24,25 37:4
  41:14 44:9,10 51:13
  66:17 67:14,15 68:3,13
  68:14,23 69:24 71:6
  72:1 80:22,25 81:17,22
  82:3,5,9,18 84:22 85:10

85:16 86:21,25 89:17
  90:6,15,16,21 92:17
  93:10 95:5,10,15 96:5
  105:1,4,15,17,20
  106:13 110:18,22 111:4
  111:19 112:10,11
  114:22 115:5,20 116:7
  116:23 117:11,13,17,25
  118:11,20,22 119:1,1,5
  119:10,24 120:9 121:5
  126:3
**strengths** 19:24 20:2
  36:22 68:9 105:24
  111:15 120:23
**stretch** 78:23 79:3,6,8
  80:20,23
**stretched** 66:14 125:22
**strictly** 38:21
**strong** 19:15 80:20
**Strongbuilt** 14:21,22
**stronger** 79:25 81:3,5
  126:9
**strongest** 51:2,9 66:13
  66:14 113:6 125:22
**Strouse** 32:15,16
**subject** 27:18
**substitution** 92:18
**sudden** 34:20
**sufficient** 11:19,21
**suggest** 126:11
**suggested** 61:16
**Suite** 2:5
**summary** 11:7
**sunlight** 82:17
**supervision** 128:10
**supplied** 24:1 27:2 47:20
  75:11,14 76:9 77:7
  86:24
**suppliers** 45:10
**supply** 27:14 29:19
  43:25 75:16 88:15 98:3
**supposed** 94:4
**sure** 12:22 21:10,23
  25:17 26:9 28:11,12
  50:21 62:4 63:10 65:24
  80:3 84:15 87:7 101:21

105:8,9 112:4 124:21
**surge** 39:12,13 40:23
  41:1 50:16,17 107:12
  108:22
**surrounding** 49:22
**surveyor** 52:6
**swore** 6:24
**sworn** 6:4 128:6
**synthetic** 21:20 41:18
  79:15 80:12
**synthetics** 79:24,24
  80:17
**system** 68:23 93:10
  105:1,2,12 111:5
**systems** 124:10,17,20,24

---

**T**

**T** 4:1,6 5:1,1
**tagged** 16:24
**take** 6:11,12 8:5 17:21
  18:3,4,25 23:7 28:24
  43:6 49:10 53:17,22
  54:9,14 55:19 59:12
  61:7,11 66:3 72:22
  78:1 84:8 85:24 89:19
  90:14 97:1,2 99:15,18
  99:25 119:23 120:20,25
**taken** 5:5 24:22 57:24
  58:12 59:18 80:17
  85:11 114:24 115:7,21
  116:19 118:5 127:25
  128:8
**talk** 20:21 32:2 56:16
  58:10 60:3 79:22 86:3
**talked** 19:25 21:12 79:20
  88:15,21 94:13 106:18
**talking** 21:6 34:19 49:2
  68:18,20 91:8,24 99:6
  105:3 116:14,22
**tall** 34:5 49:11
**tape** 103:5,9,14,20,24
**tapes** 103:17
**taught** 83:20
**tear** 68:3
**technical** 45:8,15
**technology** 124:9
**tell** 6:25 10:18 13:8

D. PHILIP SKAER, II

19:14,16,20 26:22 60:2
81:12 103:2 110:13
**ten** 20:16 23:11 29:11
81:10 91:3,5
**tenacity** 82:24 102:23
**tender** 113:18
**Tendering** 46:17 63:18
63:25 73:1 83:12 87:8
87:24
**tensile** 41:14 86:20,24
90:6
**tension** 79:9 107:18
124:9
**tensioned** 70:12
**tensions** 70:7,11
**term** 104:17 126:5
**terminal** 92:16
**terms** 74:14 104:8
**test** 17:2,11,12 19:8
75:15 97:16,17,20,24
98:2,7,14,15,16,19,22
99:1
**tested** 33:14,16,19 97:22
**testified** 6:5 9:6 11:23
13:3 14:10 25:24 71:24
78:10 85:8 101:16
102:4,8,12,13 104:12
**testify** 12:2 128:6,7
**testimony** 26:20 29:17
30:14 74:14,16 104:14
127:4,6
**testing** 33:9
**tests** 45:6
**Texas** 6:2,10 7:3,5,13
**Thank** 58:11
**theirs** 84:17 88:5
**theoretical** 51:7
**Theoretically** 51:6 87:4
**theory** 50:4
**thereof** 5:14
**thing** 22:25 36:15 40:2
76:6 79:23 91:7 108:9
**things** 32:21 34:9 35:11
36:20 37:21 48:1 53:14
60:11,11 80:24 99:22
101:11 124:11,18

**think** 17:8 33:25 35:18
36:10 37:7,25 38:1,18
38:19 39:23 40:2 41:5
42:20 46:19 50:6 58:7
60:22 65:14 71:7,24
82:18 92:1 105:21
106:21 107:24 114:16
116:12,20 118:17,18
120:21 121:20 122:4,5
122:7 124:13
**third** 16:7 94:20 116:4
**thirty** 9:12 45:20
**thought** 18:9 44:8 97:21
117:4,16
**three** 14:14,15 22:2
23:13 69:9,10,16,17,18
69:18 112:1,2,12 116:3
121:2
**threw** 26:3
**tide** 39:12 40:23
**tie** 47:19 82:12 94:4
125:16
**tied** 11:11 25:15,19
73:14 86:7 96:4
**tier** 20:23,23 21:18
**tie-up** 105:2
**time** 5:13 7:5 15:20
16:13,14 18:6,11 19:20
20:5 26:2 29:9 33:6
48:14,18 79:11 80:14
80:17 97:25 107:12
**times** 6:15 14:13 16:6
100:23 116:5 119:14
**today** 6:18 26:9 64:24
77:8,18 82:21 98:18
**told** 20:17 26:23 29:19
30:7,9,21,23 31:14
88:17 89:24,25 90:2
91:17 92:4,10 94:9
**Tom** 60:3 63:16
**topped** 20:18
**tops** 114:15
**tower** 49:10,10
**towering** 34:5
**towline** 48:23
**Trabolsi** 13:10

**trade** 45:4
**training** 7:25 8:2
**transcribed** 128:10
**transcription** 127:5
128:11
**trash** 23:2
**traveling** 7:15
**tremendous** 34:11
**trial** 14:10 36:11 106:4
**Trials** 12:23 14:14
**tried** 94:7
**tripling** 106:20
**true** 8:20,25 86:23 125:1
125:21,23 127:7 128:10
**Trust** 65:25
**trusting** 66:1
**truth** 6:25 128:6
**try** 48:7 99:25
**trying** 12:6 71:7 72:23
73:21 104:25
**tugboat** 15:3
**Turecamo** 12:25
**twelve** 23:11
**twenty** 29:11 109:24
**two** 10:17 13:3 20:16
21:19,24 23:13 30:4,16
31:3 32:12 36:16 44:9
45:23 62:9,23 66:25
69:6 70:17 72:24 75:12
78:11 86:7 88:13 90:3
91:11,12 95:1,4,16,18
95:19,20,23 96:13 99:7
100:4,7 103:8 105:14
116:21 121:4 122:25
126:2,9,21
**two-page** 64:10
**tying** 79:14 80:18
**type** 17:2,10 19:7 22:3
35:12 36:7,24 37:1
38:13,20,21,23 88:8
94:22 95:20 103:7
105:7 111:4,9,13
124:11
**types** 14:1,3 35:13 40:6
45:7 95:16

---
**U**
---

**U** 5:1
**Uh-huh** 105:5 118:13
**um** 7:21 11:9 15:13 16:7
18:20 19:23 23:23 30:7
37:13 38:1 49:22 71:8
82:16 83:3,9 88:21
100:1,19 117:4 124:16
**understand** 6:22,23,24
20:8,13 23:16 32:6
51:16 121:12
**understanding** 65:10
128:12
**understood** 29:16 67:11
**Unfortunately** 47:2
97:23
**unilateral** 59:18 60:12
61:4
**unique** 88:4
**United** 1:1 8:10,11,15
10:25 88:22
**unknown** 27:7
**unloaded** 18:21
**Unplug** 56:14
**untied** 105:12
**unusual** 61:5
**ups** 125:16
**USA** 1:13,14
**usage** 35:23 40:3 47:17
48:5,11,11,22 84:2
**usages** 101:19
**use** 27:1 30:12,13 34:25
36:18 37:18 38:3 41:3
46:1,7 47:11 48:12,13
48:14,15,19,24 49:5,7
49:12 78:22 79:8 80:5
82:4,21 83:17,19
102:17 111:3 112:10,11
118:19,21
**user** 36:8 37:4,8,10,17
38:2,10,22 39:19 43:10
84:6 101:15 102:5,9
**users** 38:7
**user's** 39:24 101:18
**uses** 43:15
**usually** 57:23
**U.S** 104:4,7,14

**V**

**v** 1:8,9,10,11,12,13,14
**vague** 37:23 46:11
**value** 90:17
**various** 16:25 25:15 27:7
  36:1,12,13 40:14 45:10
  45:11 124:14
**velocity** 50:21 110:13
**venture** 6:17
**verdict** 12:8
**versus** 12:24 14:20,22,25
  49:5 89:8 109:17
**vessel** 38:13,20 39:16
  40:1,19 69:11 72:17
  89:2 111:19 112:3
  113:25 114:2
**vessels** 8:19,23 37:19,21
  40:15,24 43:9 53:12
  69:9 72:24 78:11 80:9
**vice** 88:21
**victim** 11:23 12:2
**view** 18:10 78:10
**virtually** 44:7 73:4 82:20
  95:2,10 99:10 100:12
  116:5,21,22
**visit** 16:5,14
**visited** 17:20
**visiting** 18:8

**W**

**wait** 56:4,8
**waiting** 98:6
**waive** 53:8
**waived** 5:10
**waiving** 28:23
**Walker** 2:17 9:21 12:21
  25:24,25 26:18 27:12
  27:16 28:4,8,16 34:13
  37:22 38:15 44:18
  46:10 50:2 53:1,16,21
  54:1,8,16,22 55:1,5,8
  55:13,21 56:3,5,9,13,18
  57:1,6,12,20,23 58:18
  59:8,22 60:17 61:2,14
  61:21,25 62:16,25 63:9
  63:14,24 64:8,16,22

65:2,6,20 66:4,22 67:21
  68:15 69:12 70:9 71:18
  74:1,6,11 75:11,22
  76:19 77:8,10 78:2,17
  81:19 83:11 87:9,15,19
  87:23 92:20 93:3
  101:25 102:18 104:19
  108:10 110:5 111:6,20
  112:15 115:23 116:10
  117:1 119:25 121:24
  122:18 126:20,24
**walking** 80:11
**Wall** 75:15 87:4 88:20
  97:21
**want** 40:8 49:15 53:22
  54:10,10,14 55:2 56:16
  59:9,14,16 60:20,24
  61:22 66:8 74:12,17,18
  76:20 94:12,14 97:9
  114:21 118:25 120:22
**wanted** 57:16 59:12
**wanting** 63:16
**wants** 35:17 38:22
**warehouse** 16:23 22:17
  22:18 24:23 91:17,20
  92:1 94:6,8
**warned** 83:16
**warnings** 46:24
**Washington** 3:4
**wasn't** 13:6 19:12 28:10
  60:2 61:16 83:13
**water** 18:24 19:4 114:4
**wave** 39:9 50:18 93:8
  107:12 108:19 110:13
**way** 7:11 18:14 52:20
  61:3 80:6 83:14 90:24
  96:4 105:2,16 107:20
  109:7 113:6 128:15
**wear** 68:3
**weather** 8:16,17 50:23
**Webb** 15:13,18
**weight** 40:14 102:23
**went** 16:23 29:6 52:4
  58:4 73:22 92:3,9
**weren't** 18:15 64:13
**west** 112:22 113:5 114:9

**we'll** 28:23 77:1 126:21
**we're** 6:11 27:13 65:7
  75:3,18 77:15 91:8
  108:12 116:22 122:25
**we've** 34:2 63:10 65:15
  69:16
**wharf** 18:24 19:3
**whichever** 120:24
**WIEDEMANN** 2:9,9,10
  66:9
**WILKINSON** 1:11
**wind** 39:6,7 40:19,25
  50:21,23 93:7,8 107:11
  108:16 110:13 113:20
  113:22,25 114:1,12,13
**winds** 9:15,23 10:2,8
  50:9,20 107:23,25
  108:2,9 112:22,24
  113:4 114:6
**wire** 21:8 32:22 33:2,18
  33:19,21,24,25 34:1,8
  34:14,22 35:6 41:15
  70:2,22 71:1 78:23
  79:6,13,23 80:5,21,25
  81:4 125:23 126:1
**withstand** 117:5
**witness** 5:4,25 6:3 27:6
  53:25 54:3,18,20 55:6
  55:12 58:1,9 60:19
  61:11 62:13 63:22 64:6
  64:14 78:9 87:21 127:1
  128:5
**word** 99:25 101:22
**words** 24:2 81:21
**work** 53:3 87:11,14
  90:24
**worked** 32:17,22 33:6
**workers** 86:17
**working** 41:6,7,13 42:11
  42:14,18,22,23 43:7
  49:9,15
**works** 124:14
**worn** 11:13 121:1
**worse** 109:9
**wouldn't** 19:13,14 25:17
  85:24 91:5 96:24

**100:21** 107:15 120:14
**written** 67:23 97:25
**wrong** 11:11 57:25
  114:23 123:21
**W-A-L-L** 87:5

**X**

**X** 4:1,1,6,6

**Y**

**Yeah** 21:11 34:21 35:20
  42:16 46:23 66:10
  67:18 74:5 89:7 106:9
  120:5 122:3
**year** 7:22 17:25 26:4
  29:3
**years** 17:17 32:18 34:2
  45:20,23 81:7,10 83:22
  124:11
**yellow** 78:10
**York** 3:3 9:18
**y'all** 32:5

**#**

**#75005** 1:25 128:25

**0**

**05-4182** 1:5
**05-5531** 1:8
**05-5724** 1:9
**06-5342** 1:10
**06-6299** 1:11
**07-3500** 1:13
**07-5178** 1:14

**1**

**1** 4:9 74:22 75:4,5
**1-1/2** 31:7,8 79:7
**10,000** 115:16
**100,000** 69:16
**100-miles** 108:8
**102,000** 95:5 119:9 121:4
  121:10
**10712** 6:2,9
**1100** 1:19 2:20 3:12
**12** 41:10,17,22

D. PHILIP SKAER, II

7/15/2009

**1220** 48:13
**123** 4:16
**13** 76:7
**13th** 75:13
**142,800** 119:16
**15** 83:19
**15th** 1:20 127:25
**17** 46:18
**178** 119:19
**178,000** 68:10
**178,500** 110:25
**1900-07** 76:8
**1953** 7:23
**1958** 8:13
**1971** 33:5 34:10 76:24

---

**2**

**2** 4:10 75:8,19,20 106:10
  112:20 116:16 119:14
**2-inch** 29:21 30:7,19
  31:3 34:18 39:1 95:1
  95:21 103:13 115:19
  116:14 119:4
**2.2** 89:21,22
**2:1** 42:5
**20** 83:17 119:7
**20,000** 91:15 96:2,19
  117:17
**20,000-pounds** 44:10
**20:1** 49:17
**20001** 3:4
**2008** 15:14,16 16:4 17:24
**2009** 1:20 18:1 127:25
**202-346-4000** 3:5
**2300** 1:18 2:19
**25** 71:6 82:8,9,11 83:9,25
  84:8 85:9 115:12

---

**3**

**3** 4:11 76:10,11 93:2
**3-inch** 13:11
**3:1** 42:5
**30** 90:21 91:10 118:15,24
  119:8,9
**3123** 2:5
**3200** 3:11
**38** 119:16

**38,000** 90:9 96:21
**38,500** 44:11,14 90:7,9
  96:1,18 118:14 119:17

---

**4**

**4** 4:12 77:2,4
**4-1/2** 86:7 88:13 89:16
**40** 117:23
**40,000** 115:14
**400** 49:10
**45** 71:5,8,10
**45-degree** 73:1
**4727** 23:14 24:25 51:15
  68:25 70:16 86:6
  123:24 126:14
**4745** 27:9,25 51:15

---

**5**

**5** 4:13 41:17 77:7,16,20
  77:21 85:14
**50** 66:20 67:19 120:9
**50,000** 117:18
**504-581-6180** 2:13
**504-585-3200** 3:14
**504-585-7000** 2:22
**504-834-0646** 2:7
**55,000** 86:22 117:18
  118:12 121:7,10
**55,000-pounds** 95:11

---

**6**

**6** 4:5,14 78:5,6
**6-inch** 93:21 94:21
**60** 117:24
**600,000** 69:20
**619** 34:8
**637** 34:8
**65,500** 98:9

---

**7**

**7** 4:15 78:12,13
**70** 48:14
**70002** 2:6
**70113** 2:12
**70163** 3:13
**70163-2300** 1:20 2:21
**71,400** 119:10,14

**75** 4:9,10 81:17,22 82:14
  82:20 83:8 85:10,16
  108:2 114:24
**75-year-old** 45:8
**76** 4:11
**77** 4:12,13
**78** 4:14,15
**78747** 6:2

---

**8**

**8** 4:16 123:1,1,4,24
**8th** 75:12,14
**8'd** 105:10
**8-braid** 15:2
**8-strand** 13:12 22:4 86:8
  89:9 93:22 98:8
**8-1/2** 10:22
**80** 48:14 85:2
**821** 2:11

---

**9**

**9** 18:2
**9-inch** 10:22
**90** 67:14,24 79:14
**90~degree** 67:16
**901** 3:3
**99** 61:6