## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | | |
|---|---|---|---|
| **IN RE:  KATRINA CANAL BREACHES** | | * | **CIVIL ACTION** |
| **CONSOLIDATED LITIGATION** | | * | |
| | | * | **NO. 05-4182** |
| | | * | **and consolidated cases** |
| **PERTAINS TO: BARGE** | | * | |
| | | * | **SECTION "K"  (2)** |
| | | * | |
| *Boutte v. Lafarge* | 05-5531 | * | **JUDGE** |
| *Mumford v. Ingram* | 05-5724 | * | **STANWOOD R. DUVAL, JR.** |
| *Lagarde v. Lafarge* | 06-5342 | * | |
| *Perry v. Ingram* | 06-6299 | * | **MAGISTRATE** |
| *Benoit v. Lafarge* | 06-7516 | * | **JOSEPH C. WILKINSON, JR.** |
| *Parfait Family v. USA* | 07-3500 | * | |
| *Lafarge v. USA* | 07-5178 | * | |

* * * * * * * * * * * * * * * * * * * * * * * * *

## BARGE PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO STRIKE, EXCLUDE AND/OR LIMIT TESTIMONY, OPINIONS, FINDINGS AND/OR CONCLUSIONS OF DEFENDANT LAFARGE NORTH AMERICA'S EXPERT WITNESS AUSTIN L. DOOLEY, Ph.D.

i

**TABLE OF CONTENTS**

I.     INTRODUCTION……………………………………………………… ……………...1

II.    STANDARD FOR THE ADMISSION OF EXPERT TESTIMONY
       UNDER RULE 702 ……………………………………………………………………….2

III.   DR. DOOLEY'S OPINIONS REGARDING MAXIMUM WIND SPEED
       AND A CONTINUOUS WIND DIRECTION ARE NOT SUPPORTED BY A
       RELIABLE METHODOLOGY …………………………………………………… 3

       A.   Dr. Dooley Lacked Any Basis To Render Opinions Regarding
            Continuity Of Wind Direction And Maximum Wind Speed ……………………..4

       B.   Dr. Dooley Intentionally Disregarded All Facts Concerning The
            Conditions At The IHNC, Including Facts That Conflicted With
            His Conclusions Regarding The Continuity Of Wind Direction
            And Maximum Wind Speed …………………………………………………... 6

       C.   That Dr. Dooley Relied On Data Which Other Experts Have Relied
            Upon Does Not Make His Testimony Reliable Or Relevant To
            Disputed Fact Issues ………………………………………………………………. 10

IV.    LNA ADMITS THAT DR. DOOLEY'S OPINIONS ABOUT THE
       MOVEMENT OF ING 4727 MUST BE EXCLUDED ………………………………... 11

V.     CONCLUSION………………………………………………………….. …………...…13

## **TABLE OF AUTHORITIES**

**CASES**                                                                                                              **PAGE**

*Biomet Orthopedics, Inc. v. Tact Med. Instruments, Inc.*,
   2004 U.S. Dist. LEXIS 30740, 12 (N.D. Ind. Nov. 2, 2004) ……………………………..2

*Bourjaily v. United States*,
   483 U.S. 171, 175, 97 L. Ed. 2d 144, 107 S. Ct. 2775 (1987) ……………………...….2

*Buzzerd v. Flagship Carwash of Port St. Lucie, Inc.*,
   2009 U.S. Dist. LEXIS 100685, 25-26 (M.D. Pa. Oct. 29, 2009)………………………..10

*Daubert v. Merrill Dow Pharmaceuticals, Inc.*,
   509 U.S. 579, 113 S. Ct. 2786; 125 L. Ed. 2d 469 (1993)…………………………..1, 4, 6

*GE v. Joiner*,
   522 U.S. 136, 147, 118 S. Ct. 512; 139 L. Ed. 2d 508 (1997) …………..……………10

*In re Paoli R.R. Yard Pcb Litig.*,
   35 F.3d 717, 742-743 (3d Cir. 1994)……………………………………………………6

*Knight v. Kirby Inland Marine Inc.*,
   482 F.3d 347, 355 (5th Cir. 2007) …………………………………………………….11

*Mathis v. Exxon Corp.*,
   302 F.3d 448, 459-460 (5th Cir. 2002) …………………………………….....  …….2

*Meadows v. Anchor Longwall & Rebuild, Inc.*,
   306 Fed. Appx. 781, 790 (3d Cir. Pa. 2009)…………………………………………... 6

*United States v. Downing*,
   753 F.2d 1224, 1237 (3d Cir. 1985) …………………………………………………...6

*Viterbo v. Dow Chemical Co.*,
   826 F.2d 420, 424 (5th Cir. 1987) …………………………………… ……………….2

**STATUTES**

Fed. R. Evid. 702 ………………………………………….......................…………2, 3, 4, 6

**I.     INTRODUCTION**

Defendant Lafarge North America ("LNA") opposes the instant Motion to exclude Dr. Austin L. Dooley by strategically concealing the infirmities of Dr. Dooley's opinion within his generalized analysis of wind speed and direction. The basis of Dr. Dooley's general estimates of wind speed and wind direction rest on his interpretations and manipulations of a hindcast study, which itself was based on extremely limited weather data that was collected intermittent and at irregular intervals. From that information, Dr. Dooley testifies that he could not only estimate generalized wind speed and direction, but also the precise speed and specific direction of the wind at every point in time. Indeed, Dr. Dooley's opinions purport to conclusively identify maximum wind speeds and absolute continuity of wind direction for extended periods of time. However, Dr. Dooley's testimony in this regard is unreliable, not only because Dr. Dooley readily admits that he did not conduct the appropriate analysis to draw such absolute conclusions in his modeling, but also because his analysis intentionally disregarded **all** "local" facts of the conditions at the IHNC necessary in forming such a specific opinion. Significantly, Dr. Dooley has made clear that he excluded all local evidence, not because of conflicting testimony, but because local facts conflicted with his conclusions. *See Deposition of Austin Dooley ("Dooley Depo.")*, selected excerpts of which are attached hereto as Exhibit G, p. 103:5-6 (testifying that "if observer's observations do not fit in the model of the hurricane, then you must exclude them"). Boiled to its essence, Dr. Dooley constructed a purely hypothetical model, generated by pure speculation, that is completely divorced from the specific facts of this case. Such testimony is wholly unreliable and irrelevant under standards of *Daubert* and must be excluded.

Additionally, LNA's Opposition concedes that Dr. Dooley's testimony is confined to providing opinions about the direction and speed of the winds, "*not on the movement of the*

*barge* itself." *LNA Opposition*, p. 14.  Dr. Dooley also refused to answer questions at deposition on Barge movement on the grounds that this was outside the scope of his opinion. *See Dooley Depo.*, Exh. G, p. 41:11-15, 98:23-24, 100:13-15.  Based thereon, Dr. Dooley has himself conceded that he is not competent to render an opinion on Barge movement, and as such, all analysis and opinions by Dr. Dooley relating to movement of the Barge must be excluded.

Based on the forgoing, as detailed herein, Dr. Dooley's proffered expert testimony and opinions must be excluded.  Even if not excluded in whole, Dr. Dooley must be precluded from testifying on (1) on continuity of wind speed and wind direction, and (2) movement of the Barge.

## II.  STANDARD FOR THE ADMISSION OF EXPERT TESTIMONY UNDER RULE 702

"The party offering the expert must prove by a preponderance of the evidence that the proffered testimony satisfies the Rule 702 test." *Mathis v. Exxon Corp.*, 302 F.3d 448, 459-460 (5th Cir. 2002) (*citing Bourjaily v. United States*, 483 U.S. 171, 175, 97 L. Ed. 2d 144, 107 S. Ct. 2775 (1987)).  Pursuant to Rule 702(1), even qualified experts may only testify if the proffered opinion or testimony is "based upon sufficient facts or data."  In determining whether an expert's testimony is based upon sufficient facts or data, "Rule 702 calls for a quantitative rather than qualitative analysis." *See id*. (Advisory Committee Notes).  The court must determine "whether the expert considered enough information to make the proffered opinion reliable." *Biomet Orthopedics, Inc. v. Tact Med. Instruments, Inc.*, 2004 U.S. Dist. LEXIS 30740, 12 (N.D. Ind. Nov. 2, 2004).  Included in this analysis is "whether the expert considered **all the pertinent physical and eyewitness evidence**." *Id*. (emphasis added).  "In some cases the source upon which an expert's opinion relies is of such little weight that the jury should not be permitted to receive that opinion. *Viterbo v. Dow Chemical Co*. 826 F.2d 420, 422 (5th Cir. 1987).  "If an opinion is fundamentally unsupported, then it offers no expert assistance to the jury." *Id*.

**III.** **DR. DOOLEY'S OPINIONS REGARDING MAXIMUM WIND SPEED AND A CONTINUOUS WIND DIRECTION ARE NOT SUPPORTED BY A RELIABLE METHODOLOGY**

LNA's argument in opposition avoids the key issue in play by ignoring the fact that Dr. Dooley's theoretical model on wind direction is incapable of supporting his conclusions in a reliable manner. The fundamental component of Dr. Dooley's opinion is not simply the identification of a generalized wind direction, but rather, Dr. Dooley attempts to offer an opinion regarding precise speed and the continuity of wind direction (i.e. that the wind blew only in a singular direction, without exception, for extended periods of time). Indeed, Dr. Dooley concluded in absolute terms that (1) there were no southerly winds at the IHNC during Katrina, (2) there were no westerly winds in the IHNC until sometime after 6:53 CDT, and (3) that maximum sustained winds were between 75 and 79 knots. *See Dooley Report,* Exh. A, p. 35.

Yet, while LNA claims that Dr. Dooley's report was based on a "consistent picture of the wind conditions in the IHNC on the morning of August 29," LNA fails to identify any data that could support an opinion regarding the wind speed and continuity of wind direction at all relevant times. *See LNA Opposition*, p. 3, 6-10. In fact, not only does such data not exist, Dr. Dooley conceded that his model did not even evaluate wind characteristics on this level. However, even if Dr. Dooley's methodology regarding maximum wind speed and continuity of wind direction was reliable – which it is not – his opinions would still add no value to this case, as Dr. Dooley: **(1)** intentionally disregarded all "local" facts that would bear on wind speed and continuity of wind direction in the IHNC during the relevant period; and **(2)** intentionally disregarded, rather than reconciled, substantial facts which directly conflicted with his unsupported conclusions.

3

In short, rather than creating a model capable of meeting the objectives of Rule 702 by assisting the trier of fact to understand the facts and evidence in this case, Dr. Dooley constructed a purely hypothetical model, generated by pure speculation, that is completely divorced from the local facts relevant to this case.  Needless to say, Dr. Dooley cannot create a hypothetical model devoid of any "fit" that requires the trier of fact to disregard any and all local facts and evidence that conflict with his opinion. *See Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592, 113 S. Ct. 2786; 125 L. Ed. 2d 469 (1993) ("Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."). Accordingly, Dr. Dooley's methodology fails to meet even the most minimal requirements of *Daubert*.  At a minimum, Dr. Dooley's opinion testimony and conclusions regarding the maximum wind speed and continuity of wind direction must be excluded.

### A. Dr. Dooley Lacked Any Basis To Render Opinions Regarding Continuity Of Wind Direction And Maximum Wind Speed

While LNA dedicates four pages of its Opposition to explaining that Dr. Dooley had sufficient basis to render a reliable opinion regarding general wind direction, LNA undertakes no effort to demonstrate what basis Dr. Dooley relied upon to support his conclusions that the wind blew only in a singular direction without exception for extended periods of time, or how Dr. Dooley was able to conclusively determine maximum wind speeds.  This is not surprising, as Dr. Dooley testified that modeling on this level is not widely accepted as reliable, but in any event, his modeling did **not** even attempt to account for features necessary to evaluate continuity in wind direction and maximum wind speed:

> Q: The wind perturbations, which would include the downdrafts, the eddies, the swirls, what we've been talking about, is there a way to model that?
>
> A: With regards to those types of turbulent motions, that's where the gust factors come into consideration.  To account for those factors within -- as being

>    embedded within the dominant prevailing wind direction.  Can you model
>    convective activity at each individual grid point, no.
>
> Q: It's not possible to do it, or no one did it?
>
> A: The state of the art of these types of microscale convective models, I have
>    seen some in -- in the literature where people talk about these types of things.
>    Whether anybody did it for Katrina, I do not know.
>
> Q: And you never did it?
>
> A: I never did it.

*See Dooley Depo.*, Exh. G, pp. 69:6-24.

Moreover, this issue aside, Dr. Dooley failed to identify any data that would support opinions seeking to conclusively identify maximum wind speeds or proving absolute continuity of wind direction.  Dr. Dooley's report made it abundantly clear that weather data for the New Orleans area was extremely limited during Hurricane Katrina, and thus, the subject of "speculation." *Dooley Report,* Exh. A, p. 17 ("wind reports from the hurricane were limited to due to instrument failure at many of the observing stations."); *Dooley Report*, Exh. A, p. 18 ("The strongest sustained wind in New Orleans is subject to speculation since observations are sparse, due in part to the power failures that disabled ASOS stations in the area before peak wind conditions occurred.").  An examination of Tables 4 and 8 from Dr. Dooley's report show that in the rare occasions when weather data was collected, it was **collected only intermittently, at sparse and irregular intervals**. *See Dooley Report*, Exh. A, pp. 17-18, 34.  Specifically, there was no collection station for weather data in the area of the IHNC and the closest weather data collection station was located at the Lakefront Airport, which was 4 to 4.2 miles away from the IHNC. *See Dooley Depo.*, Exh. G, pp. 47:15-48:2; 51:6-10; *Dooley Report*, Exh. A, pp. 17-18, 34.  Moreover, the weather data collection station at Lakefront Airport was not even functional after 6:53 a.m. and made only one reading after 6:05 a.m., meaning that no data was collected

from the source closest to the IHNC after that time. *Dooley Depo.*, Exh. G, pp. 51:11-52:5; *Dooley Report*, Exh. A, p. 34, Table 8. Without consistent, regularly recorded weather data, Dr. Dooley lacked any basis (other than speculation) to provide an opinion that the wind blew in a continuous sustained singular direction at all time periods during Katrina.

Thus, Dr. Dooley fails to offer any legitimate basis for his absolute conclusions regarding the continuity of wind direction. In fact, Dr. Dooley has no basis, other than rank speculation, to support the absolute conclusion that there were no westerly winds in the IHNC until sometime after 6:53 CDT. Based thereon, Dr. Dooley's testimony and opinions on continuity of wind direction must be excluded.

> **B.    Dr. Dooley Intentionally Disregarded All Facts Concerning The Conditions At The IHNC, Including Facts That Conflicted With His Conclusions Regarding The Continuity Of Wind Direction And Maximum Wind Speed**

In addition to failing to identify data or methodology capable of shedding light on the maximum wind speed and continuity of wind direction, Dr. Dooley also intentionally disregarded **all** "local" facts that would bear on these issues at the IHNC during the relevant period. This is material, as admissibility depends on the "connection between the scientific research or test result to be presented and particular disputed factual issues in the case." *United States v. Downing*, 753 F.2d 1224, 1237 (3d Cir. 1985); *see Daubert*, 509 U.S. at 591 (citing *Downing* for the proposition that "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."). "Thus, even if an expert's proposed testimony constitutes scientific knowledge, his or her testimony will be excluded if it is not scientific knowledge for purposes of the case." *In re Paoli R.R. Yard Pcb Litig.*, 35 F.3d 717, 742-743 (3d Cir. 1994). "In other words, expert testimony based on

6

assumptions lacking factual foundation in the record is properly excluded." *See Meadows v. Anchor Longwall & Rebuild, Inc.*, 306 Fed. Appx. 781, 790 (3d Cir. Pa. 2009).

Here, although Dr. Dooley testified that it was important under accepted standards to reconcile local facts with his meteorological analysis, Dr. Dooley inexplicably did not perform this function in the instant case. *See Dooley Depo.*, Exh. G, p. 30:8-13 ("Q: Did you think it was important, when you were doing your meteorological analysis, to check that analysis and/or reconcile that analysis with eyewitness accounts?  A: That's important to do, of course.  But in this particular case, I did not do that.").  Thus, LNA's post hoc attempt to explain away this defect by arguing that experts are not required to accept disputed eyewitness testimony misses the point – Dr. Dooley not only confirmed that he intentionally excluded **all** eyewitness testimony from his model in the first instance [*Dooley Depo.*, Exh. G, p. 29:23-30:22; Exh. G, p. 103:16-18 ("I did not take into account the eyewitnesses.")], but that his basis for exclusion was due to conflict with his conclusions, not competing testimony. *Dooley Depo.*, Exh. G, p. 103:5-6 (testifying that "if observer's observations do not fit in the model of the hurricane, then you must exclude them").

Even if Dr. Dooley did disregard eyewitness testimony based on a conflict with other eyewitness testimony as LNA maintains – which he did not –[1] the four purported "conflicting" witnesses cited by LNA in its *post hoc* argument[2] do not even present a conflict with the testimony of witnesses such as William Villavasso, Gertrude LeBlanc, and Frazier Tompkins.

---

[1]   In fact, Dr. Dooley's Report does not even identify that he considered, let alone excluded such information.

[2]   LNA's attempt to circumvent the inadequacies of Dr. Dooley's analysis to allow Dr. Dooley to "back into" his speculative conclusions necessarily must fail.  Dr. Dooley has already testified that he did not consider local facts in his analysis and also has confirmed that his report is final. *See Dooley Depo.*, Exh. G, p. 100:16-23 ("Unless I'm given additional research between

7

For example, witness Andrew Sartin never testified that the barge was **not** present in the IHNC on Sunday, August 28, 2005. In fact, Andrew Sartin unambiguously testified that he did not even see the Barge until after the storm. *See Deposition of Andrew Sartin ("Sartin Depo.")*, selected excerpts of which are attached hereto as Exhibit H, p. 66:14-24 ("Q: When did you first see the barge? Was it still while you were rescuing people or was it days later? A: I don't know. It was days later before I saw the barge. You know something about that barge? Whenever I went to the bridge, I was so messed up I don't remember seeing it. I don't remember looking over there. I'm serious. I don't remember looking over there. By the time I got ready to go, honest truth, I didn't see that barge until I got back."). Sartin also testified that he witnessed winds blowing from the Northwest in the early morning hours on Monday, August 29, 2005. *See Sartin Depo*, Exh. H, pp. 40:9-41:19; 42:12-43:2.

Similarly, witness Michael Bickham testified that he observed water splashing over the floodwall from west to east [*See Deposition of Michael Bickham*, selected excerpts of which are attached hereto as Exhibit I, pp. 53-56; 56:6-18 (Q: Okay. And correct me if I'm not saying things correctly. What I thought you said was as you looked down Prieur toward the levee you saw wind-whipped splashing? A: The water coming over the levee. A: But the wind had it where it was moving and you could see the water as it popped. It wasn't like it was a constant flow of water, but you could see the water as the wind -- as it hit that wall coming up.")], a fact which plausibly indicates that winds were blowing from the Northwest, rather than from the East as asserted by LNA. The same wind pattern was witnessed by Arthur Murph, who described seeing water blown from west to east over eastern IHNC floodwall. *See Transcription of January 25, 2006 audio statement of Arthur Murph*, selected excerpts of which are attached hereto as

---

now and trial, which I don't think will happen, this will be my final report for trial.").

8

Exhibit J, pp. 6-7 (in describing water blown from west to east over eastern IHNC floodwall Murph stated that "[i]t was high up on the concrete wall, and you know high as I ever saw it. But you know it wasn't running…flowing over top, you know, constantly. It was just from the water flowing back and forth, you know, with the wind blowing and everything and splashing up against it and spraying over the top.").[3]

Indeed, LNA readily concedes that Dr. Dooley did not even care about facts evidencing how the wind actually impacted the Barge – perhaps the most relevant fact in rendering an opinion on actual wind direction in this case. *See LNA Opposition*, pp. 13-14 ("Dr. Dooley expressly testified that 'where the barge was is independent of my analysis of wind directions and speeds in the IHNC that morning.'").

Moreover, in addition to failing to account for localized weather or wind phenomenon such as tornadoes, wind shear, microbursts, squall line activity, swirls and eddies [*See Dooley Depo.*, Exh. G, pp. 69:6-77:9], Dr. Dooley also failed to consider the effect of the geographic area of the IHNC and/or structures on wind speed, direction and continuity. *See Dooley Depo.*, Exh. G, pp. 60:19-62:8 (testifying that turbulence created by natural topography affects wind direction, but admitting that this was not considered in his analysis); *see also* Exh. G, pp. 93:10-95:13 (admitting that he also did not analyze the storm surge or waves).

Thus, Dr. Dooley not only failed to consider **any** facts regarding the local conditions at the IHNC to support his conclusions, he specifically avoided all local facts because they

---

[3] Similarly, Dr. Dooley also failed to consider the testimony of eyewitness William Villavasso, who witnessed winds blowing *from the Northwest* at the time of the initiation of the North breach, as evidenced by the fact that up to five feet of water was splashing over the levee and the fact the doors at Pump Station #5 were pulled off their hinges as a result of the strong winds. *See Deposition of William Villavasso*, Exhibit D, pp. 57:18-60:9; 63:7-64:24. Mr. Villavasso also observed an estimated 20 foot "wall of water…coming from Southern Scrap towards the Florida Ave. Bridge…going towards the Claiborne Bridge" before the breach. *See id.,* pp. 186:19-187:23; 205:8-24.

conflicted with his conclusions. It goes without saying that expert testimony which offers only theoretical possibilities without examining whether such theories apply to the facts of the case must be excluded:

> In the end, Mr. Meinschein can only offer an opinion that he "observed conditions that would be consistent with the presence of carbon monoxide in the passenger compartment…" (Meinschein Report, at 3.) But the issue for the jury is not whether vehicle emissions could accumulate in the cab, but whether it is likely that they did. And Mr. Meinschein offers nothing helpful on this crucial point. Although existence of conditions that could allow for the passage of emissions into the cab of the truck is relevant, Plaintiffs must show more. **An opinion that something is possible, even to a degree of scientific probability, is a far cry from an opinion that the theorized happening probably occurred during the incident in question**. [] Mr. Meinschein never addresses the relevant issue, and his opinion is thus subject to exclusion on that ground as well because it will not "assist the trier of fact to understand the evidence or to determine a fact in issue..."

*See Buzzerd v. Flagship Carwash of Port St. Lucie, Inc.*, 2009 U.S. Dist. LEXIS 100685, 25-26 (M.D. Pa. Oct. 29, 2009).

Accordingly, even if Dr. Dooley's opinions regarding wind speed and continuity of wind direction were based on sound methodology – which they are not – Dr. Dooley's refusal to apply that methodology to the specific facts of this case requires that his opinion be excluded.

### C. That Dr. Dooley Relied On Data Which Other Experts Have Relied Upon Does Not Make His Testimony Reliable Or Relevant To Disputed Fact Issues

LNA contends that because Dr. Dooley relied on data relied upon by other experts, Dr. Dooley's opinions must be deemed per se admissible for all purposes. LNA's argument is fallacious, and fundamentally mischaracterizes Plaintiffs' position. Plaintiffs do not challenge the reliability of underlying data obtained from weather data collection stations. Rather, Plaintiffs contend that there was simply too great an analytical gap between the data collected and the opinions proffered by Dr. Dooley – a basis on which the Supreme Court has concluded exclusion may be legitimately predicated. *See GE v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512;

139 L. Ed. 2d 508 (1997) ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered"); *Knight v. Kirby Inland Marine Inc*., 482 F.3d 347, 355 (5th Cir. 2007) (concluding "that the district court did not abuse its discretion in excluding Dr. Levy's testimony upon reasonably concluding that the analytical gap between the studies on which he relied and his conclusions was simply too great and that his opinions were thus unreliable.")

This criticism has special applicability to Dr. Dooley's speculative conclusions regarding absolute continuity in wind direction and maximum wind speed, as Dr. Dooley not only conceded that these features were not even a consideration under his model, but also that he knew of nobody who attempted to render such an opinion based on the limited and sporadic data available. *See Dooley Depo.*, Exh. G, pp. 69:6-24.  Dr. Dooley's admission that he did not conduct evaluation or testing to confirm absolute continuity in wind direction and maximum wind speed by necessity confirms a complete absence of analytical support, and as such, requires exclusion of Dooley's unqualified conclusions in that regard.

**IV.     LNA ADMITS THAT DR. DOOLEY'S OPINIONS ABOUT THE MOVEMENT OF ING 4727 MUST BE EXCLUDED**

As LNA concedes in its Opposition that "Dr. Dooley's testimony is confined to providing opinions about the direction and speed of the winds acting on the barge, and not on the movement of the barge itself" [ *LNA Opposition*, p. 14; *see also* p. 13-14 ("Indeed, Dr. Dooley expressly testified that 'where the barge was is independent of my analysis of wind directions and speeds in the IHNC that morning.'")], all opinions by Dr. Dooley relating to movement of the Barge must be excluded.

In fact, Dr. Dooley repeatedly refused to answer questions at deposition on this issue based on his express disclaimer that that his opinions were unrelated to the movement of the barge in any way:

> So my report never makes any assumptions about what happens to the barge. I'm simply talking about wind conditions as they occurred on the morning of the 29th. What happened to the barge is someone else's problem, not mine.

*Dooley Depo.*, Exh. G, p. 41:11-15; *see also* Exh. G, p. 98:23-24 ("whether or not that means that's when the barge moved, I - I don't know").

Moreover, Dr. Dooley also admitted that he never considered other forces acting on the barge. *See Dooley Depo.*, Exh. G, p. 98:8-12 ("I have not done any of the studies on the other forces.  I have only looked at the wind."); Exh. G, p. 100:13-15 ("What would have happened between the forces generated by that wind and the barge, that is a matter for the dynamicist."); Exh. G, p. 93:10-15 (admitting that he did not analyze the effect of the storm surge on the IHNC waterway and the movement of the barge).  He also failed to consider the location of the barge. *See Dooley Depo.*, Exh. G, p. 42:14-15 ("where the barge was is independent of my analysis of wind directions and speeds in the IHNC that morning").  Additionally, he failed to consider the mooring of the barge and admitted that he did not analyze how the barge could travel from west to east with the westerly wind. *See Dooley Depo.*, Exh. G, p. 46:15-16 ("I don't know what caused the barge to break away from its moorings"); Exh. G, p. 77:10-13.

Based on the forgoing, Dr. Dooley has himself admitted that he has absolutely no basis on which to offer competent admissible testimony relating to movement of the Barge, and as such, Dr. Dooley must be precluded from offering expert testimony on such matters, including the following portions of his report:

- "For the barge to <u>move</u> from the western side toward the northeast, a force would be necessary to move it in that direction." *Dooley Report,* Exh. A, p. 31 (emphasis added);

- "This would then keep the barge on the western side of the IHNC with a tendency to <u>move</u> toward the southwest." *Dooley Report,* Exh. A, p. 32 (emphasis added);

- "My calculations show that up until 0742 CDT, the wind direction would push the barge toward the dock." *Dooley Report,* Exh. A, p. 35.

### V.     **CONCLUSION**

The foregoing analysis reveals that Dr. Dooley did not rely on sufficient facts to reach his conclusions regarding wind speed and wind direction and opined on matters outside his area of expertise. His opinions were based on speculation and thus, a significant portion of Dr. Dooley's proffered testimony is unreliable and inadmissible. As such, the Court should grant Plaintiffs' motion to exclude relevant portions of the report and testimony of LNA's meteorology expert, Dr. Dooley.

Date:   December 30, 2009                                Respectfully submitted,

***/s/ Dylan Pollard***

Shawn Khorrami (CA SBN #14011)
Dylan Pollard (CA SBN # 180306)
Matt C. Bailey (CA SBN #218685)
Michael Forman (CA SBN #260224)
Khorrami, Pollard & Abir, LLP
444 S. Flower Street, 33rd Floor
Los Angeles, California 90071
Telephone: (213) 596-6000
Facsimilie: (213) 596-6010
e-mail:Skhorrami@kpalawyers.com;
          Dpollard@kpalawyers.com;
          Mbailey@kpalawyers.com;
          Mforman@kpalawyers.com.

>Brian A. Gilbert (21297)
>Best Koeppel Traylor
>2030 St. Charles Ave.
>New Orleans, Louisiana 70130
>Telephone: (504) 598-5000
>Facsimile: (504) 524-1024
>e-mail: bgilbert@briangilbertlaw.com;
>       bgilbert@bestkoeppel.com.
>
>
>Lawrence D. Wiedemann.(13457)
>Karl Wiedemann (18502)
>Wiedemann & Wiedemann
>821 Baronne Street
>New Orleans, Louisiana 70113
>Telephone: (504) 581-6180
>Facsimile: (504) 581-4336
>e-mail: lawrence@wiedemannlaw.com;
>karl@wiedemannlaw.com
>
>Patrick J. Sanders (18741)
>3316 Ridgelake Drive
>Suite 100
>Metairie, LA 70002
>Telephone: 504-834-0646
>e-mail: pistols42@aol.com
>
>Richard T. Seymour (D.C. Bar #28100)
>Law Office of Richard T. Seymour, P.L.L.C.
>1150 Connecticut Avenue N.W., Suite 900
>Washington, D.C. 20036-4129
>Voice: 202-862-4320
>Cell: 202-549-1454
>Facsimile: 800-805-1065 and 202-828-4130
>e-mail: rick@rickseymourlaw.net
>
>Lawrence A. Wilson (N.Y.S.B.A. #2487908)
>David W. Drucker (N.Y.S.B.A. #1981562)
>Wilson, Grochow, Druker & Nolet
>Woolworth Building
>233 Broadway, 5th Floor
>New York, NY 10279-0003
>Telephone: (212) 608-4400
>Facsimile: (212) 227-5159
>e-mail: lwilson@wgdnlaw1.com

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above and foregoing document has been served upon counsel of record, by United States Mail, postage prepaid and properly addressed, facsimile, and/or ECF upload, this 30th day of December, 2009.

\s\ Brian Gilbert, Esq.