# EXHIBIT G

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


IN RE: KATRINA CANAL BREACHES
CONSOLIDATED LITIGATION
PERTAINS TO:  BARGE            : CIVIL ACTION
                              : No. 05-4182
                              : and consolidated
Boutte v Lafarge       05-5531 : Cases
Mumford v Ingram       05-5724 :
Lagarde v Lafarge      06-5342 : SECTION "K" (2)
Perry v Ingram         06-6299 :
Benoit v Lafarge       06-7516 : JUDGE STANWOOD R.
Parfait Family v USA 07-3500 : DUVAL, JR.
Lafarge v USA          07-5178 :
Weber v Lafarge        08-4459 : MAGISTRATE JOSEPH C.
                              : WILKINSON, JR.
----------------------------X


Wednesday, August 5, 2009
- - -

    Videotaped oral deposition of AUSTIN L. DOOLEY,
PH.D., taken at the offices of Goowin Procter,
901 New York Avenue, N.W. Washington, D.C., beginning
at 10:15 a.m., before Nancy J. Martin, a Registered
Professional Reporter, Certified Shorthand Reporter
License No. 9504.

AUSTIN DOOLEY                                                    8/5/2009

                                                                    29

1              AUSTIN L. DOOLEY, PH.D.              29

2       Q.  And did you do that?

3       A.  Yes, I did.

4       Q.  Are your opinions all contained in your

5   report, Exhibit 1?

6       A.  Yes, sir.

7       Q.  There are no other opinions that you intend

8   to render at the time of trial?

9       A.  None at this time.

10      Q.  After the IPET report came out and you were

11  given certain instructions with respect to the barge

12  at issue in this case, how were those instructions

13  conveyed to you?

14      A.  I believe by telephone.

15      Q.  Is that to say you were never given written

16  instructions as to how you were to perform your work?

17      A.  I don't believe I ever got a letter telling

18  me what to do.  We would have meetings, and

19  discussions would be held, and I would be asked to

20  take on an assignment.

21      Q.  Did you take notes of that discussion?

22      A.  No.

23      Q.  Were you ever instructed to, during the

24  course of your work on this case, read or evaluate

25  eyewitness testimony?

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

AUSTIN DOOLEY                                                    8/5/2009

                                                                        30

1                    AUSTIN L. DOOLEY, PH.D.              30

2        A.   I have not seen the depositions.  The only

3   comments from eyewitnesses that I saw were in some of

4   the expert reports.

5        Q.   Are you referring to Cushing's report?

6        A.   No.  There were also some there, but most of

7   what I saw were in the Pazos, the Ocean Oil report.

8        Q.   Did you think it was important, when you were

9   doing your meteorological analysis, to check that

10   analysis and/or reconcile that analysis with

11   eyewitness accounts?

12        A.   That's important to do, of course.  But in

13   this particular case, I did not do that.

14        Q.   Why not?

15        A.   Because I wanted to be sure that I relied on

16   the science and scientifically collected and gathered

17   data.

18        Q.   During the course of your work on this case,

19   did you come into knowledge that some of the

20   eyewitness testimony given in this case may have been

21   at odds with your findings?

22        A.   I've been told that, yes, sir.

23        Q.   You've been told that by who?

24        A.   Through the discussions that we've had

25   regarding the case.

40

1               AUSTIN L. DOOLEY, PH.D.        **40**

2       MR. RAFFMAN:  Objection to the way the question

3   is framed.

4         If you understand the question, you can

5   answer it.

6       THE WITNESS:  Can you restate that a little bit?

7   BY MR. POLLARD:

8       **Q.  Would you show me the exhibit.**

9       **A.  Sure.**

10      **Q.  I'm circling the barge at issue in this case.**

11 **Do you see that?  (Indicating)**

12      **A.  Yes, sir.**

13      **Q.  Do you agree that's the barge at issue in**

14 **this case?**

15      **A.  I agree that's what you circled.**

16      **Q.  Okay.  Do you assume, for purposes of the**

17 **conclusions that you reach or that you describe in**

18 **your report, that the barge at issue remained in that**

19 **approximate location until such time as the wind**

20 **shifted from west to east?**

21       MR. RAFFMAN:  I think it's an unfair question.

22        But go ahead.

23       THE WITNESS:  Well, again, you have to come back

24   to what my report is.  The first thing that I did is I

25   analyzed the wind direction.  The second thing I did

41

```
1              AUSTIN L. DOOLEY, PH.D.              41

2    is I looked at the IPET report.  The IPET report said

3    100 mile-per-hour wind broadside to the barge, and I

4    evaluated whether or not that could have happened, and

5    the third thing that I did is I looked at the analyzed

6    location of the barge according to the Pazos and

7    Marino reports, where Pazos has the barge at the north

8    breach between, I believe, 4:00 and 5:00 o'clock in

9    the morning, and Marino then comments on the wind

10   directions.

11             So my report never makes any assumptions

12   about what happens to the barge.  I'm simply talking

13   about wind conditions as they occurred on the morning

14   of the 29th.  What happened to the barge is someone

15   else's problem, not mine.

16        MR. POLLARD:  Let's take a quick break.

17        THE WITNESS:  Okay.

18        THE VIDEOGRAPHER:  We're going off the record at

19   11:06:10.

20             (A recess was taken from 11:06 a.m. to

21             11:18 p.m.)

22        THE VIDEOGRAPHER:  Back on record.  Tape 2 of the

23   video deposition of Dr. Austin Dooley.

24   BY MR. POLLARD:

25        Q.  Dr. Dooley, right before we broke, I was
```

42

1                    AUSTIN L. DOOLEY, PH.D.              42

2      asking you questions about Exhibit 2, which is the

3      graphic exhibit that's right in front of you, which

4      depicts the area of interest in this case.  I want to

5      ask you a question.  If the barge happened to be at

6      some other location other than in the notch directly

7      adjacent to the Lafarge facility prior to the first

8      reading that you found where there was a westerly

9      wind, does that impact any of your conclusions?

10          MR. RAFFMAN:  Objection.  Vague.

11              You can answer.

12          THE WITNESS:  Again, I have to bring you back to

13      what my report talked about, the wind direction.  So

14      where the barge was is independent of my analysis of

15      wind directions and speeds in the IHNC that morning.

16      With regards to the 100 knot wind speed acting

17      broadside to a barge on the western side as indicated

18      in the IPET report, basically there was never 100 knot

19      or 100 mile-per-hour wind speed on the western side of

20      the IHNC to have impacted a barge.  With regards to my

21      comments on the Ocean Oil or the Marino Engineering

22      evaluations of wind directions, the -- that -- the

23      location of the barge would have no impact on those

24      decisions either.  My work was based on the scientific

25      analysis of the reports from verifiable sources, and

AUSTIN DOOLEY                                          8/5/2009

46

1                    AUSTIN L. DOOLEY, PH.D.          46

2        Q.  But they were still strong.  You agree with

3    that?

4        A.  I have shown the values in Tables 6B and C.

5        Q.  And distilling those values down to a

6    layperson's description as to the strength of the

7    wind, you would agree with me that those values are

8    strong; correct?

9        A.  They were greater than 64 knots, which is

10   hurricane status.  Hurricane winds.

11       Q.  And you agree that -- or do you agree that

12   those winds were at least in part, if not fully,

13   responsible for causing Barge 4727 to break away from

14   its moorings?

15       A.  I don't know what caused the barge to break

16   away from its moorings, sir.

17       Q.  You don't -- you don't have any opinion as to

18   whether wind was any sort of causative factor?

19       A.  I have no opinion.  I have not done that

20   analysis.

21       Q.  Okay.  Have you made any effort, in the

22   course of your analysis, to reconcile your

23   interpolations of wind speed with the mechanics of how

24   the barge broke away from its moorings?

25       A.  Can you -- I -- I don't quite understand your

47

```
                    AUSTIN L. DOOLEY, PH.D.          47
1
2    question.
3         Q.  Well, part of your conclusions are
4    interpolations; is that correct?
5         A.  Yes, sir.
6         Q.  Okay.  And why don't you define what -- what
7    you mean, because you've used that term in your
8    report.  What do you mean when you say,
9    "interpolations"?
10        A.  Well, we have values at grid points.  The
11   barge was not at the grid point.  So we must evaluate
12   a value at the location of the barge, depending upon
13   the values upon the grid point, and that process is
14   interpolation.
15        Q.  Okay.  And I think what you're -- you're
16   trying to say is there was no data collection point or
17   official data collection point in the IHNC?
18        A.  The only -- the only point that we have are
19   the four surrounding grid points shown in the map in
20   my report.
21        Q.  Those aren't in the IHNC or immediately
22   adjacent to it, are they?
23        A.  They surround it.  If I could refer you to
24   the map on Page 22.  Nothing exactly in the -- that
25   portion of the IHNC.  We have B up there in the MRGO
```

AUSTIN DOOLEY                                           8/5/2009

48

1              AUSTIN L. DOOLEY, PH.D.          48

2      portion of it, just at the turn.

3          Q.  And do you have any factual knowledge as to

4      how far away from the IHNC the closest grid point

5      that's depicted on Page 22 was?

6          A.  I've done those measurements, but I've --

7      right now I -- I can't remember what they -- what that

8      answer is.

9          Q.  Can you give me an estimate just based upon

10     your -- all the hours you spent on this report?

11         A.  Between A and C, it is three miles.  Between

12     B and D, it's three miles, nautical miles, because C

13     is at 29.95, and A is at 30.0.  So that's about three

14     miles.  So the distance from E to B would probably be

15     about a mile and a half.

16         Q.  And what -- and if you would describe for me

17     what the importance of these miscellaneous grid points

18     are in your interpolations.

19         A.  Well, those are the values from the hindcast

20     that I consulted in obtaining wind directions.  So

21     that's the value of those grid points.

22         Q.  And are you saying that there were wind

23     measurements taken from each of these grid points at

24     regular intervals?

25         A.  There were calculations of wind directions

51

                    AUSTIN L. DOOLEY, PH.D.              51

1

2    science of the case.  I relied upon the observations

3    as defined through official observing sites or sites

4    that were reliable and deemed reliable and used within

5    the hindcast study.

6         Q.  And just so we're clear, there were no such

7    sites in or immediately adjacent to the IHNC?

8         A.  The closest one that I found and was able to

9    use was up at the Lakefront Airport, which was about 4

10   to 4.2 miles away.

11        Q.  And were you aware that the data collection

12   point at that airport failed at 6:53 a.m. Central time

13   on August 29?

14        A.  Yes, I make mention of that in my report.

15        Q.  What happened?

16        A.  The anemometer stopped functioning.

17        Q.  Why?

18        A.  I can only assume it was due to some type of

19   a -- consequences of the hurricane.  Either the power

20   supply was lost or the instrument itself somehow or

21   another malfunctioned.

22        Q.  Okay.  And in scientific terms, what was the

23   net effect of that failure?

24        A.  Well, what it did, it deprived us of a

25   continuing observation point, but we had good data up

AUSTIN DOOLEY                                                    8/5/2009

                                                                    52

1              AUSTIN L. DOOLEY, PH.D.          52

2    until that time.

3         Q.  And no data after it?

4         A.  No data from that Lakefront Airport that was

5    recorded, yes, sir.

6         Q.  Okay.  And given the failure of that data

7    point, how did that affect the model, if at all?

8         A.  Well, again, that was -- that's one of the --

9    one of the data point that goes into the model.  There

10   are many others, and the model results have to be

11   consistent with all of the reports from the other

12   stations that may or may not have been immediately

13   there as close as Lakefront but were still within the

14   Louisiana/Mississippi region.

15        Q.  When you talk about an MMS study, define the

16   term for the record.

17        A.  MMS, of course, is the government agency, the

18   Mineral Management Service, and they contracted with

19   Oceanweather, Inc. to do a hindcast on the winds,

20   waves and currents in the Northern Gulf of Mexico in

21   Hurricane Katrina.

22        Q.  And Oceanweather, Inc. is -- why don't you

23   describe to me your relationship with Oceanweather,

24   Inc.  It looked like you have some sort of partnership

25   or synergistic relationship with that company.

AUSTIN DOOLEY                                                8/5/2009

                                                                    60

1                 AUSTIN L. DOOLEY, PH.D.              60

2    direction of the predominant flow.

3         Q.   When you talk about "predominant flow," are

4    you referring to prevailing winds?

5         A.   Yes, sir.

6         Q.   And when we talk about prevailing winds in

7    the context of a hurricane, what are we talking about?

8    Where are those winds located?  They're at

9    stratospheric level; right?

10        A.   Well, a hurricane has three depth -- three

11   dimensional structure, and the wind speeds that we're

12   talking about here are 10 meter winds, wind speeds

13   that are determined at a height of 10 meters.

14        Q.   Would you agree with me generally that wind

15   flow during a hurricane is unpredictable?

16        A.   No, sir.

17        Q.   You believe it's predictable?

18        A.   Yes, sir.

19        Q.   Do you believe that wind flow over a

20   particular area is affected in any way by its

21   topography, natural topography?

22        A.   Yes, sir.

23        Q.   How about artificial topography, such as

24   structures?

25        A.   Yes, sir.

AUSTIN DOOLEY                                                    8/5/2009

61

1                     AUSTIN L. DOOLEY, PH.D.          61

2          Q.   In what way does natural topography affect

3      wind flow?

4          A.   Well, the natural topography would introduce

5      some degradation of the speed due to friction so that

6      it would turn the currents a little bit more.  So we

7      have a situation like that.

8          Q.   And when you say, "turn the currents" --

9          A.   Or turn the winds.

10         Q.   Turn the winds.  Make the wind go in some

11     other direction than the prevailing direction;

12     correct?

13         A.   No.  You have to be careful.  It's not going

14     to turn the wind 180 degrees opposite to the

15     prevailing wind direction.  That's not going to

16     happen.

17         Q.   I said in some other direction.  I didn't say

18     the opposite direction.  I said it's -- well, it's

19     going to modify the direction of the wind; correct?

20         A.   It's going to be -- it's going to adjust the

21     direction, but in this particular case, those factors

22     are taken into consideration.

23         Q.   How do you take those factors into

24     consideration?

25         A.   Well, in this report, what we can do is we

AUSTIN DOOLEY                                                    8/5/2009

                                                                    62

1                    AUSTIN L. DOOLEY, PH.D.              62

2       can take a look at the Lakefront values.  When you

3       look at the Lakefront direction, you can see

4       throughout the morning of the 29th, up until the time

5       the anemometer stopped reporting, we had all north

6       easterly winds.  So we're looking at -- we're looking

7       at wind directions there.  We can compare that to the

8       model, and we can see that things are consistent.

9            Q.  Do you know how high the flood wall on the

10      east side of the IHNC was?

11           A.  Exactly how high, no, sir.

12           Q.  Just roughly?

13           A.  I had heard that it's something between 12

14      and 13 feet, but I don't know.

15           Q.  It's since been rebuilt, obviously, but at

16      the time, you believe it was 12 to 13 feet?

17           MR. RAFFMAN:  Objection to --

18           THE WITNESS:  I have no scientific basis upon

19      which to base the height of the flood wall because I

20      did not measure it.

21           MR. POLLARD:  It's too late, Mark.  He's already

22      testified.  You can state your objection.

23           MR. RAFFMAN:  I'll make my objection that the

24      question was not clear, when we're talking about the

25      height of the flood, whether we're talking about the

69

                    AUSTIN L. DOOLEY, PH.D.        69

1     expertise as a meteorologist to model the possible

2     effects that these wind perturbations -- is that the

3     right term to use?

4          A.   It's a good word.

5          Q.   Okay.  I did a little bit of studying before

6     the deposition.  All right.  The wind perturbations,

7     which would include the downdrafts, the eddies, the

8     swirls, what we've been talking about, is there a way

9     to model that?

10         A.   With regards to those types of turbulent

11    motions, that's where the gust factors come into

12    consideration.  To account for those factors within --

13    as being embedded within the dominant prevailing wind

14    direction.  Can you model convective activity at each

15    individual grid point, no.

16         Q.   It's not possible to do it, or no one did it?

17         A.   The state of the art of these types of

18    microscale convective models, I have seen some in --

19    in the literature where people talk about these types

20    of things.  Whether anybody did it for Katrina, I do

21    not know.

22         Q.   And you never did it?

23         A.   I never did it.

24         Q.   Now, you mentioned to me a few pages ago in

AUSTIN DOOLEY                                                8/5/2009

70

1              AUSTIN L. DOOLEY, PH.D.              70

2    this deposition that you would expect to see some

3    turbulence at the surface level.  Do you recall that?

4    You mentioned turbulence?

5         A.  In reply to your question about the wall.

6         Q.  Generally speaking, do you expect to see some

7    sort of wind turbulence at the surface level, meaning

8    at levels less than 10 meters high?

9         A.  Yes.

10        Q.  And define what type of turbulence you would

11   expect to see and how it would manifest itself on the

12   wind direction.

13        A.  Well, you'd see the interaction of the wind

14   with whatever structures it may have encountered.  So

15   you'd see some turbulence, and nevertheless, whatever

16   particle or debris that may have been lifted by that

17   turbulence will eventually be carried with the

18   prevailing wind direction.

19        Q.  So you're not aware of any circumstance or

20   circumstances wherein turbulence could result in a

21   vessel moving in a direction against the prevailing

22   winds?

23        A.  As I mentioned before, it depends upon the

24   bank -- the difference in speed or magnitude of the

25   two vectors.  If the turbulence is greater and of

71

| | |
|---|---|
| 1 | AUSTIN L. DOOLEY, PH.D.            71 |
| 2 | longer lasting than the prevailing wind, you might get |
| 3 | some movement, but in this situation, we had a |
| 4 | continuous wind from the northeast and momentary |
| 5 | eddies or turbulence that may have been sent up, but |
| 6 | overall, anything set in motion by that turbulence |
| 7 | would have eventually moved in the direction of the |
| 8 | prevailing winds. |
| 9 | Q.  What type of circumstances would you have to |
| 10 | see in order to get turbulence that is greater or |
| 11 | longer lasting than the prevailing winds?  Give me an |
| 12 | example. |
| 13 | A.  An example would be a mid afternoon |
| 14 | thunderstorm on a calm day, much like today, where |
| 15 | convective activity has caused a thunderstorm to |
| 16 | develop.  The thunderstorm develops.  Particles start |
| 17 | to fall from the cloud, and downdrafts develop.  They |
| 18 | turn upon hitting the surface and they spread out, and |
| 19 | there's a very weak inflow against that, and that's |
| 20 | the type of situation that I would envision happening |
| 21 | to cause a downdraft to go against the prevailing |
| 22 | wind.  I don't see that here. |
| 23 | Q.  Did you make any conclusive and affirmative |
| 24 | effort to rule that out in this case? |
| 25 | A.  Well, we know what the wind speeds were |

AUSTIN DOOLEY                                                        8/5/2009

                                                                          72

1                    AUSTIN L. DOOLEY, PH.D.              72

2       throughout the approach of Katrina that morning.  As I

3       said in the report, we see wind speeds increasing

4       gradually throughout the morning, getting up into that

5       maximum range that I reported.  So I don't see any --

6       any down burst like that occurring long enough to

7       propel an object from the western side of the IHNC all

8       the way over into the northeast direction, directly

9       opposite to the prevailing wind direction.  I don't

10      see that.

11          Q.  Okay.  Does your report expressly rule out

12      that possibility?

13          A.  Turbulence is -- is -- those types of

14      turbulent eddies are not discussed in my report.  I

15      think I might make a mention or two of prevailing wind

16      direction.

17              (The witness reviewed the document.)

18          THE WITNESS:  And on Page 8 where I talk about

19      the prevailing wind direction within the storm.  But,

20      otherwise, I did not address that issue.

21      BY MR. POLLARD:

22          Q.  At some point in your report, you indicated

23      that -- and specifically on Page 10, fourth bullet

24      heading, that "No tornadoes were reported in the

25      New Orleans area or anywhere in Louisiana on

AUSTIN DOOLEY                                                    8/5/2009

73

1                AUSTIN L. DOOLEY, PH.D.           73

2      August 29."  Do you see that?

3          A.  Yes, sir.

4          Q.  What is the significance of that observation

5      to your report as a whole?

6          A.  Well, that's a weather phenomenon that is

7      sometimes associated with tor- -- with hurricanes.

8      Usually, we find them on the right-hand side, and

9      tornadoes have been known to make landfall or touch

10     during hurricanes, and that is a -- a microscale

11     phenomenon within the larger scale flow of the

12     hurricane, and tornadoes might very well be a

13     phenomenon that -- such as what you're describing.

14         Q.  Are you saying that, because there was an

15     absence of tornadoes during Katrina on August 29, that

16     there was an absence of other lesser phenomena such as

17     microswirls or eddies?

18         MR. RAFFMAN:  I'll object to the question as

19     vague.

20         THE WITNESS:  What I'm saying is that no

21     tornadoes were reported in the New York -- New Orleans

22     area.  That does not discount the presence of

23     turbulence, but as I've already testified, turbulence

24     is embedded within the prevailing wind direction and

25     would move ultimately with -- in the direction of

74

 1                   AUSTIN L. DOOLEY, PH.D.           74

 2      the -- of the net force, which is downwind.

 3      BY MR. POLLARD:

 4          Q.  Unless you had a circumstance, the likes of

 5      which you described, with a thunderstorm on a calm

 6      day?

 7          A.  Well, again, what I just described in the

 8      example that you've given me is exactly what I said.

 9      The prevailing wind on that calm day is zero.  So the

10      down burst from the thunderstorm would spread outward

11      in whatever direction it may very well intend to.

12      Usually, you'll see it go out on the leading edge,

13      perhaps as much as 180 degrees.

14          Q.  Can you think of any wind phenomena that

15      would have been present over the IHNC on August 29,

16      2005 that would have created some sort of a vacuum

17      effect over the IHNC?

18          MR. RAFFMAN:  Are you talking about at any time?

19      BY MR. POLLARD:

20          Q.  Well, let me -- let me limit it from

21      12:00 a.m. to approximately 9:00 a.m.

22          A.  And where would this vacuum have been?

23          Q.  At any portion of the actual canal ranging

24      from the western wharf, which is Lafarge's facility,

25      to the eastern flood wall.  Let me also limit it

AUSTIN DOOLEY                                                    8/5/2009

                                                                      75

1                   AUSTIN L. DOOLEY, PH.D.          75

2        north -- you know, to the north.  The same boundaries

3        we're talking about, the Florida Avenue bridge to the

4        north, Claiborne Avenue bridge to the south.

5            A.  I can't -- given the circumstances of

6        Katrina, given the existing pressure field, giving

7        the -- given the results of the model studies, given

8        the results of all of the other literature that I've

9        reviewed in preparing this study, I can't -- I cannot

10       imagine such an event as you've described.

11           Q.  You can't imagine the effect of the wind

12       hitting the flood wall from the east moving west

13       creating any sort of a vacuum effect on the canal side

14       of the flood wall?

15           A.  There -- there is no vacuum that develops.

16       There may be some turbulence as the wind whips around

17       the corner, but there is no vacuum that develops.

18           Q.  Okay.  All right.

19           A.  There is atmosphere.

20           Q.  Okay.  So maybe "vacuum" is the wrong word.

21       You used the word "turbulence"?

22           A.  Right.

23           Q.  Is there any other word that would describe a

24       wind-related effect on the canal side other than

25       "vacuum" or "turbulence" that you can think of?

AUSTIN DOOLEY                                          8/5/2009

                                                              76

1              AUSTIN L. DOOLEY, PH.D.          76

2        A.   Well, I wouldn't use the word "vacuum."   I

3   would use the word "turbulence," and the word we used

4   before was "eddies."

5        Q.   Okay.  Now, are you aware that on the Lafarge

6   side of the canal, the western side where their

7   concrete facility was, there were structures there?

8        A.   Yes, sir.

9        Q.   And one of the structures is a cement silo?

10        A.   Yes, sir.

11        Q.   Actually, I think there's more than one.   I

12   think there's two.

13        A.   Yes, sir.  I've seen them there.

14        Q.   In your analysis, did the presence of those

15   structures on the western side of the canal impact

16   your wind analysis in any way?

17        A.   With regards to the prevailing wind

18   directions over the canal, since those structures were

19   on the leeward side of the canal, meaning the side

20   toward which the wind was blowing, until it turned

21   into kind of a westerly component, those structures

22   would have no impact on the wind blowing from the

23   northeast toward the southwest across the IHNC.

24        Q.   Are you saying that they wouldn't deflect any

25   of the wind back towards the IHNC in a westerly

77

1                    AUSTIN L. DOOLEY, PH.D.           77

2    direction?

3         A.  They would deflect -- they would have some

4    buffering effect.  There would likely be some type of

5    an intensification of the wind on the upwind side and

6    some diminution of the wind on the downwind side.  But

7    then as the wind passed over and around that

8    structures, the wind would resume and go back to its

9    prevailing wind direction.

10        Q.  Okay.  Do you make any calculations as to how

11   long it would take the barge to travel from west to

12   east with the westerly wind?

13        A.  No, sir.

14        Q.  Now, you indicate on Page 1 of your executive

15   summary, second paragraph from the bottom, last

16   sentence of that paragraph, "At any time during the

17   exposure to Katrina prior to about 1100 o'clock

18   August 29, winds could not have blown the barge toward

19   the north since the system passed east of the IHNC."

20   Do you see that?

21        A.  Yes, sir.

22        Q.  Where do you derive that 11:00 o'clock time

23   for that conclusion?

24        A.  Look at the Table 6 alpha.

25        Q.  Which is on page?

AUSTIN DOOLEY                                                    8/5/2009

                                                                      93

1                    AUSTIN L. DOOLEY, PH.D.              93

2      surge" --

3           A.  Yes.

4           Q.  -- as it relates to hurricanes?

5           A.  Yes, sir.

6           Q.  And you know there was a storm surge in

7      effect during Katrina which affected the area at issue

8      in this case?

9           A.  Yes, sir.

10          Q.  Were the effects of that storm surge at all

11     relevant to your analysis on whether the barge could

12     have moved from west to east?

13          A.  My analysis was based upon the wind

14     conditions.  The movement of the -- of the water I did

15     not do.

16          Q.  Okay.  All right.  So I think what you're

17     trying to tell me is you're not willing -- willing to

18     say it was impossible for the barge to move from west

19     to east as a result of factors other than wind?

20          A.  What I'm saying, sir, is that if that barge

21     moved from west to east at 4:00 o'clock in the

22     morning, as I found in some of the reports, between

23     4:00 and 5:00 in the morning, it was not the wind, in

24     my opinion, that did that.

25          Q.  Do you, Dr. Dooley, rule out wave action as

AUSTIN DOOLEY                                              8/5/2009

94

1                  AUSTIN L. DOOLEY, PH.D.            94

2       causing such a movement if it did happen?

3            A.  In -- on Page 32 of my report, there's a

4       graphic showing wave conditions, applying the basic

5       understanding of -- of wind generated waves to the

6       situation.  Any waves that may have been produced

7       within the IHNC in this time period would have flowed

8       with the direction of the dominant wind or the

9       prevailing wind.  So wave action would have largely

10      been from the north towards the south that morning.

11      So I -- I do not see this barge moving from the

12      southeast to the northeast into the direction of the

13      wind, and basis the question you just asked me, could

14      the waves have done this.  Independent of the wind, my

15      answer would be no.

16           Q.  When you make that conclusion, do you take

17      into consideration at all the phenomena of wave

18      reflection?

19           A.  Wave reflection is important, depending upon

20      the type of surface that the waves hit.  As the waves

21      hit, they lose energy.  So the reflected height is not

22      as great as the incident height.  They may interfere

23      with incoming waves and increase in height slightly,

24      but that tends to be standing wave rather than a

25      propagating wave.  As a consequence, an object would

AUSTIN DOOLEY                                                    8/5/2009

                                                                    95

1                    AUSTIN L. DOOLEY, PH.D.              95

2      move up and down.  Those waves may propagate, then,

3      further into the upstream direction, but again,

4      they've lost energy again.  So they would very quickly

5      dissipate.

6              So I can't see reflected waves from the

7      western side propelling a barge all the way to the

8      eastern side.

9         Q.  Okay.  Did you indicate that -- that

10     explanation inside of your report, or was that just

11     something that you were explaining in response to my

12     question?

13        A.  The latter, sir.

14        Q.  At the time of trial, if you're called as a

15     witness, are you going to render opinions with respect

16     to whether waves could have -- or would not have been

17     able to explain the movement of the barge in any

18     fashion within the IHNC?

19        A.  If you ask me that question, I will render an

20     answer.

21        Q.  On Page 33, there's a table in the middle of

22     the report.  You took this table out of the Marino

23     report?

24        A.  Yes, sir.

25        Q.  And you see that there are various points in

```
                  AUSTIN L. DOOLEY, PH.D.          98
```

1    then we found it on the eastern side of the morning

2    after Katrina, somehow it moved from west to east.

3    That could be a result of all of the forces that we

4    talked about before.  Certainly, wind is one of them.

5         Q.  Okay.

6         A.  I can't deny that.

7         Q.  But are you affirmatively stating that wind

8    was the most important force in moving the barge?

9         A.  No, because I have not done any of the

10   studies on the other forces.  I have only looked at

11   the wind.

12        Q.  Okay.  And do you have any opinion as to the

13   time that the barge moved from east to west -- I'm

14   sorry.  Strike that.

15             Do you have any opinion as to the time the

16   barge moved from west to east?

17        A.  Again, my results show the turning of the

18   wind past 015, which is the direction of the IHNC,

19   occurred I think at 0742 that morning.  So the first

20   time it took on a west to east component was after

21   that wind passed that northern -- northerly direction

22   of the IHNC.  But whether or not that means that's

23   when the barge moved, I -- I don't know.

24        Q.  Well, in your report on Page 33, you state

AUSTIN DOOLEY                                                    8/5/2009

                                                                      99

1                    AUSTIN L. DOOLEY, PH.D.            99

2      that the table, or at least you're referring to

3      Marino's "table indicates that at no time was there a

4      westerly wind between 3:00 and 9:00 AM."  You're not

5      taking that harsh of a position today in this

6      deposition?  You're saying that there was a turning of

7      the wind at 7:42; correct?

8           A.  Let me look at this for a second, please.

9               (The witness reviewed the document.)

10          THE WITNESS:  All I'm saying is what this table,

11     that paragraph, which I believe the paragraph that

12     you're referring to is the paragraph beneath the

13     table.  Is that right, sir?

14     BY MR. POLLARD:

15          Q.  Yes.

16          A.  And what I'm saying is reading this table,

17     this table, not my data, but this table shows that

18     between 3:00 and 9:00 a.m., the wind was parallel to

19     the orientation of the IHNC.  That's all I'm saying in

20     that paragraph.

21          Q.  Okay.  But earlier in your report, on Page 1

22     you indicate that the wind did not blow fully out of

23     the west.  You used the term "fully" -- out of the

24     west until between 10:15 and 10:30.  When you say

25     that, are you also saying that the barge could not

JOHNS PENDLETON COURT REPORTERS                        800 562-1285

100

1                AUSTIN L. DOOLEY, PH.D.              100

2      have, based on your understanding of how -- how the

3      wind would have affected an object such as a barge,

4      moved from west to east prior to 10:15 and 10:30,

5      because there wouldn't have been enough of a forceful

6      westerly wind to accomplish that?

7          A.   No.  I'm not saying anything about the --

8      about the effect of -- forces produced by the wind on

9      the barge.  What I'm saying is that the -- according

10     to my calculations, between 7:30 and 7:45 that morning

11     is when the wind turned sufficiently so that it was

12     now coming from the western side of the barge rather

13     than the eastern side of the barge.  What would have

14     happened between the forces generated by that wind and

15     the barge, that is a matter for the dynamicist.

16         Q.   Okay.  All right.  Let's turn to Page 35 of

17     your report, which is the summary of your findings.

18     You have eight findings here -- or eight summaries.

19     So is this the extent of the findings that you intend

20     to offer at the time of trial on -- on this case?

21         A.   Unless I'm given additional research between

22     now and trial, which I don't think will happen, this

23     will be my final report for trial.

24         Q.   As of today, you have eight conclusions or

25     eight findings?

102

1            AUSTIN L. DOOLEY, PH.D.          102

2    reports, and that's why I refer to the term

3    "observation data," which is primarily -- that

4    sentence refers exactly to Table 8 on Page 34.

5            Eyewitness accounts -- as I said before,

6    people are in the middle of great distress.  There is

7    wind.  There is waves.  There are rain.  There's

8    things happening about them.  I based my findings --

9    not that those people should be made light of, but

10   this study is based upon the science and the

11   observations from calibrated stations.

12        Q.  Well, how would you go about, as a scientist,

13   reconciling or meshing eyewitness accounts with hard

14   signs to make sure that you get the most accurate

15   report possible?

16        MR. RAFFMAN:  Objection.  Assumptions -- making

17   unfound assumptions.

18            But go ahead and answer the question.

19        THE WITNESS:  Well, sometimes individuals

20   involved in an event report what they see.  Sometimes,

21   due to personal distress, they report what they think

22   they saw.  I mean, that's fairly common.  It's up to

23   the scientist to base the conclusions on data that can

24   be documented and that fit into the laws of science.

25   In this particular case, a low pressure center,

103

                    AUSTIN L. DOOLEY, PH.D.        103

1                 AUSTIN L. DOOLEY, PH.D.        103

2    northern hemisphere, counterclockwise rotating winds,

3    wind speed increasing as you near the center of the

4    storm, precipitation events, cloud pattern events, and

5    if observer's observations do not fit in the model of

6    the hurricane, then you must exclude them.

7    BY MR. POLLARD:

8        Q.  But that was beyond the scope of what you did

9    for this report?

10       A.  I based my report on the scientific studies

11   done, reviewing the -- as you see the bibliography,

12   some of the -- some of the peer reviewed work, some of

13   the research by the NH- -- NHC and by the HRD and by

14   Oceanweather and by examining values observed during

15   Katrina.

16       Q.  I think that's a nice way of saying you

17   didn't take into account the eyewitnesses?

18       A.  I did not take into account the eyewitnesses.

19       Q.  Okay.  Did you do any studies -- or did you

20   look into whether or not there was any thunderstorm

21   activity or other convective areas within the bands

22   surrounding the iWall?

23       A.  Surrounding the iWall.  If you look on

24   Page 34, the last column -- the last two columns -- or

25   three columns, I'm sorry.  So you see the -- No. 65