# CASE #1



LEXSEE 2004 U.S. DIST. LEXIS 30740

**BIOMET ORTHOPEDICS, INC., Plaintiff, v. TACT MEDICAL INSTRUMENTS, INC., d/b/a TACT MEDICAL, INC., Defendant.**

**Case No. 3:01cv895PS**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF INDIANA, HAMMOND DIVISION**

*2004 U.S. Dist. LEXIS 30740*

**November 2, 2004, Decided**
**November 2, 2004, Filed**

**SUBSEQUENT HISTORY:** Motions ruled upon by, Motion denied by *Biomet Inc. v. Tact Med. Instruments Inc., 2005 U.S. Dist. LEXIS 44737 (N.D. Ind., 2005)*

**PRIOR HISTORY:** *Biomet Orthopedics, Inc. v. Tact Med. Instruments, Inc., 2004 U.S. Dist. LEXIS 30739 (N.D. Ind., Nov. 2, 2004)*

**COUNSEL:** [*1] For Biomet Inc, Plaintiff: Brian W Lewis, H Roderic Heard, Nicole Nocera, LEAD ATTORNEYS, Wildman Harrold Allen & Dixon LLP - Chi/IL/3000, Chicago, IL.

For Tact Medical Instruments Inc, dba Tact Medical Inc, Defendant: Carl Pipoly PHV, LEAD ATTORNEY, Pipoly Law Offices, San Antonio, TX; Kevin W Marshall, LEAD ATTORNEY, Smith and Marshall, Hammond, IN; Whitney White Soergel, LEAD ATTORNEY, Bingham McHale LLP - Mkt/Ind/IN, Indianapolis, IN.

**JUDGES:** PHILIP P. SIMON, JUDGE.

**OPINION BY:** PHILIP P. SIMON

**OPINION**

ORDER

Plaintiff Biomet Orthopedics, Inc., moves the Court to exclude certain opinions and testimony of Dr. Warren J. Keegan pursuant to *Federal Rules of Evidence 702* and *1006*. TACT did not respond to the motion in writing, choosing instead simply to argue the matter at the hearing that was held. Because TACT's earlier successful opposition to Biomet's motion to compel was based on the fact that sales data was irrelevant, and because the sales data that TACT's expert relies on is not based on sufficient facts or data, Biomet's motion is granted.

**I. BACKGROUND**

TACT has identified Dr. Warren J. Keegan as an expert witness who will give his opinion about TACT's performance as Biomet's distributor in Japan. Part of this [*2] opinion includes or is based on data regarding TACT's sales of Biomet products in Japan. Specifically, Biomet objects to three of Keegan's opinions: (1) that Tact increased its sales of Biomet products in Japan; (2) that TACT's sales margins were compressed by Biomet's pricing structure, thereby hindering TACT's ability to market and distribute Biomet products; and (3) that Biomet's expert should have used TACT's sales in his expert analysis. Biomet claims that these opinions are inadmissible because he based his opinions and testimony upon:

(1) incomplete, unreliable, and

unverifiable data in direct contravention of *Federal Rule of Evidence 702*; and

(2) inadmissible summaries failing to meet the requirements of *Federal Rule of Evidence 1006*.

The fight over this evidence began long before trial, in November 2002, when Biomet filed a motion to compel evidence about TACT's sales of Biomet products in Japan. Biomet sought the discovery relating to TACT's sales of Biomet products to assist it in proving its breach of contract counterclaim that TACT had failed to use its best efforts to promote and sell Biomet products in Japan. TACT opposed the motion on the basis that its sales were irrelevant [*3] to the case. Judge Sharp denied the motion to compel on December 2, 2002. As a result, Biomet never received any discovery relating to TACT's sales into the Japanese market.

Because sales data was unavailable, Biomet's expert, Ray Sims, used the only information that Biomet had regarding TACT's performance under the contract: TACT's purchases of Biomet products. Sims testified that TACT's purchases of Biomet products was a reasonable proxy for its sales of those same products. If anything, using the purchases from Biomet instead of the actual sales into the market would be a more conservative approach because it would assume that all of the product was sold instead of sitting in TACT inventory.

Meanwhile, after claiming its sales were irrelevant to the case, TACT gave a one page summary of that very data to their expert, Dr. Keegan. The one page summary sets out TACT's sales of Biomet's products in Japan for each fiscal year during the twelve years of the contract. (The one page summary is attached to Biomet's Motion as Exhibit A). Dr. Keegan then used that information to form a number of opinions about TACT's efforts in Japan, including the aforementioned opinions that TACT's sales [*4] of Biomet products increased each year, that Biomet's pricing structure compressed TACT's sales margins of Biomet products, and that Sims's expert analysis of TACT's sales performance was faulty for not using TACT's sales data.

This case was previously scheduled to begin June 2, 2004. At the May 27 trial management conference, Biomet moved to bar TACT from introducing at trial any evidence of its sales of Biomet products in Japan, citing

several grounds, including: (1) TACT's failure to satisfy its discovery obligations; (2) the inequity in permitting TACT's expert to opine about sales and sales margins when Biomet could not test the reliability of the underlying data; and (3) the inequity in allowing TACT's expert to criticize Mr. Sims's opinions on the grounds that his analysis failed to consider sales data - the very sales data that TACT prevented Biomet from obtaining in the first place.

Because of this issue, the Court postponed trial and ordered TACT to produce its records and sales data. The Court held that Biomet had the right to test the underlying data on which TACT had based the one page sales summary that it had given Keegan, and that Biomet could re-depose TACT's president, [*5] Keiichi Yamagishi, to verify the underlying data. Producing the sales data would also enable Sims - Biomet's expert - an opportunity to analyze the same sales data that TACT's expert Dr. Keegan was relying on.

TACT resisted some of this additional discovery, and Biomet filed a motion to compel TACT to produce the sales data. On June 10, 2004, the Court granted that motion in part, ordering TACT to produce any sales data relied upon in creating the sales summary given to Keegan, all records, logs, and source data used to capture the sales data, and all audited financial statements that related to the sale of Biomet products for the years 1989-2001. The Court emphasized that TACT was to produce the data, not just summaries, that TACT used to calculate its sales of Biomet products.

TACT responded to this order by producing heavily redacted bank statements and another summary - this one three pages in length - that purported to demonstrate what its sales were. TACT did not produce any tax returns, balance sheets, audited financial statements, internal ledgers or invoices that would substantiate what its sales actually were. According to TACT, the bank statements demonstrate what its sales [*6] of Biomet products were in the following way: TACT claims that they had a contract with TMA, a management company, whereby they paid TMA four percent of their sales of Biomet products. Thus, they argue, one can back into the monthly sales figures by looking at the bank transfers that TACT made to TMA and dividing by .04.

On July 21, 2004, the Court held a hearing on Biomet's third motion to compel. TACT claimed that Yamagishi created the one page sales summary that

Keegan used in his report using the three page summary and bank statements provided to Biomet. The Court did not compel additional production, but warned TACT that unless there exists additional data that supports the sales summary, Keegan's testimony would not be based on sufficient facts and data to be admissible at trial.

On August 11, 2004, Yamagishi admitted in a deposition that he relied on records that resided on his personal computer to create the sales summary given to Keegan, not the bank statements, as TACT had previously indicated. He explained that the method of backing into the numbers using the bank statements had been devised after the fact in order to verify the data because the data from which he created [*7] the sales summary for Keegan was kept as a personal reference and could not be substantiated. As mentioned, the data on his personal computer was derived from a now-missing hand written ledger book that he and an employee named Takeshi Izaki passed back and forth. The basis and exact contents of this handwritten document are unclear.

On September 15, 2004, the Court heard oral argument on Biomet's motion for sanctions. The Court specifically asked where the backup data supporting the summaries Keegan relied on was, and TACT's counsel responded that he did not know. TACT was given another opportunity to produce all of the sales data used to create, calculate, or compare the sales summary, and was ordered to produce any audited financial statements for the years 1989-2001, if they existed, that relate to the sale of Biomet products. Other than the three pages from Mr. Yamagishi's personal computer and the redacted bank records, no other information was provided to substantiate the one page summary of sales.

In sum, Dr. Keegan's opinion relating to TACT's sales of Biomet products is based on a one page summary which was taken from Mr. Yamagishi's personal computer. TACT's handwritten ledger [*8] book which is the alleged source of the summary has been lost and thus Dr. Keegan did not review it. Dr. Keegan also did not review any of TACT's tax returns, audited financial statements, other internal sales ledgers, balance sheets, or the available invoices which would have firmly established TACT's sales. Thus, TACT used a confusing, circuitous route to try to establish its sales of Biomet products instead of simply compiling their invoices or using some other record kept in the ordinary course of business. Yamagishi claims that this unilateral decision

was made because TACT does not have a document retention policy, and because their invoices are "all mixed up."

## II. DISCUSSION

To be admissible under *Federal Rule of Evidence 702*, expert testimony must "not only [be] relevant but reliable." *Daubert v. Merrell Dow Pharmacueticals, 509 U.S. 579, 589, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)*. Even qualified experts may only testify if the proffered opinion or testimony: (1) is based upon sufficient facts or data; (2) is the product of reliable principles and methods; and (3) is a result of the expert applying the principles and methods reliably to the facts of the case. *Fed. R. Evid. 702*. The District Court plays a "gatekeeping" [*9] role with respect to admitting expert testimony and has broad discretion to decide whether to admit or exclude expert testimony at trial. *Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1997)*. "Reliability is the touchstone for expert testimony." *Elliott v. CFTC, 202 F.3d 926, 933 (7th Cir. 2000)*. "Proposed testimony must be supported by appropriate validation-i.e., 'good grounds,' based on what is known." *Daubert, 509 U.S. at 590*. The Seventh Circuit has observed that "experts' opinions are worthless without data and reasons." *Kenosha v. Heublein, 895 F.2d 418, 420 (7th Cir. 1990)*.

Biomet does not challenge the reliability of Keegan's opinions under *Rule 702(2)*. Instead, they argue under *Rule 702(1)* that Keegan's opinions concerning TACT's sales are not based upon sufficient facts or data. In placing the focus there, we are mindful of the fact that *Daubert* did not work a "seachange over federal evidence law," and "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." *United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi, 80 F.3d 1074, 1078 (5th Cir. 1996)*. As the *Daubert* Court stated, "Vigorous cross-examination, [*10] presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *509 U.S. at 595*.

TACT's one page summary of its sales of Biomet products in Japan upon which Keegan based his opinion is not based on sufficient facts or data to be admissible. The source data for the summary is three pages of information taken from Yamagishi's personal computer, which in turn was based on a handwritten ledger book

that he and an employee passed back and forth. Apparently, Yamagishi would receive that document every month, and he would manually copy the relevant data onto his computer, then return the document. Since that document is now missing, there is no way to objectively verify the contents of the summary. This is not sufficient data upon which to base an expert opinion.

TACT tries to bolster their one page sales summary by pointing to the bank records. According to TACT, the bank records confirm the numbers in the summary because, by contract, when TACT sold Biomet product, they owed 4% of the sales price to TMA. This contention is not persuasive. Yamagishi testified that the 4% he paid to TMA [*11] was only on sales of Biomet products, but the contract specifically says that TACT was to pay TMA 4% for both imported and domestic medical devices, implying that it would encompass non-Biomet products. Such a glaring inconsistency makes it very difficult to see how the summary is reliable enough on which to base an expert opinion.

In addition to the demonstrable flaws in the sales summary and the attempt to rehabilitate the data with the bank records, TACT's source of sales data is defective because they had other, more reliable ways of obtaining the data. Specifically, TACT has not demonstrated why Dr. Keegan could not use tax returns, financial statements, internal ledgers, balance sheets, internal documentation that tracks sales, or the actual invoices to determine what its sales of Biomet products were. Indeed, Dr. Keegan testified at that *Daubert* hearing that reviewing and tabulating the invoices would be proof positive of TACT's sales. Yet this was not done. Instead, Dr. Keegan relied upon a one page summary from Mr. Yamagishi's personal computer, a document that was not even kept as part of TACT's business records.

As one court put it, "[t]here is no point in climbing through [*12] the attic window when the front door is open." *U.S. v. R. J. Reynolds Tobacco Co., 416 F.Supp. 316, 325 (D.C.N.J. 1976).* More formally, *Rule 702(1)*'s requirement that the testimony be "based upon sufficient facts or data" does not allow for the admission of testimony when there are a number of better ways of obtaining data. As one commentator explained:

> The Advisory Committee's Note to *Rule 702(1)* states that this calls for a quantitative rather than qualitative

analysis. The question is whether the expert considered enough information to make the proffered opinion reliable. This is different from the question posed by *Rule 703*: Is the opinion based on evidence of a type that is reliable? Included in the analysis under *Rule 702(1)* is whether the expert considered all the pertinent physical and eyewitness evidence. For example, assume that in an auto accident case plaintiff calls an accident reconstruction expert who testifies defendant must have been traveling over the speed limit. The expert bases her opinion entirely upon the extent of damage to the vehicles and admits she did not measure the skid marks, consider the extent of the personal injuries, or examine any other physical evidence [*13] pertinent to estimating speed. This opinion may be challenged under *Rule 702(1)* on the ground it is not based on sufficient facts or data.

Charles Alan Wright & Victor James Gold, Federal Practice and Procedure § 6266, at 41 (Supp. 2004). *See e.g. United States v. Mamah, 332 F.3d 475, 477 (7th Cir. 2003)* (the exclusion of expert testimony was proper where not based on sufficient facts or data under *Rule 702(1)*).

TACT's expert bases parts of his opinion entirely upon a sales summary of dubious origin when there were a number of other ways of obtaining the information. It is hard for this Court to understand why TACT would give their expert the summary of a summary of a now-missing paper document instead of simply tabulating a more accurate number from the available invoices.

Finally, it is difficult to ignore the fact that TACT successfully resisted Biomet's efforts to obtain discovery of TACT's sales and yet that is the very information on which Dr. Keegan is partly basing his opinions. In other words, TACT originally took the position that the sales data was not relevant to this case, and yet they have hired an expert to opine on that very subject. They cannot have it both ways.

In any [*14] event, Keegan's opinion that TACT increased its sales of Biomet products is not based on sufficient facts or data to aid the jury in determining any

issue in the case or understanding the evidence, so Biomet's Motion to Exclude is granted with respect to that opinion. Likewise, because Keegan's opinion relating to TACT's sales margins is based on the same data, it is also inadmissible. The sales summary is the only document related to sales or sales margins that TACT gave its expert, and Keegan has not identified any additional information that he procured related to TACT's sales, costs, or margins. Hence, for the same reasons that his opinion that TACT's sales increased are inadmissible, Keegan's opinion regarding TACT's sales margins cannot be used at trial.

Biomet also seeks to prevent Keegan from criticizing their expert, Sims, for not using TACT's sales in his expert analysis. This part of the motion merits very little additional discussion. Suffice it to say that it is somewhat odd that TACT would refuse to provide data to Biomet, then criticize them for not using it in their expert report. Biomet's motion is granted with respect to Keegan's opinion that Sims should have used [*15] TACT's sales data in his report.

Finally, Biomet moves to exclude the sales summary itself under *Federal Rule of Evidence 1006*. In order to admit evidence under *Rule 1006*, "the proponent must lay a proper foundation as to the admissibility of the material

that is summarized and show that the summary is accurate." *Needham v. White Laboratories, Inc., 639 F.2d 394, 403 (7th Cir. 1981)*. All of the problems with the one page summary discussed above are relevant to this inquiry, but it is enough that the original document on which this summary was based, the paper document passed back and forth between Yamagishi and an employee, is not available, and that the original records on which that paper document was based, presumably the invoices, are not available. Without any actual source data, TACT's one page summary is inadmissible at trial.

III. CONCLUSION

For the foregoing reasons, Biomet's Motion to Exclude Certain Opinions and Testimony of Dr. Warren J. Keegan [Docket No. 220] is **GRANTED** in full.

**SO ORDERED.**

ENTERED: November 2, 2004

s/ Philip P. Simon

PHILIP P. SIMON, JUDGE

UNITED STATES DISTRICT COURT

# CASE #2



LEXSEE 2009 U.S. DIST. LEXIS 100685

**THOMAS BUZZERD and KRISTI COURTNEY, Plaintiffs v. FLAGSHIP CARWASH OF PORT ST. LUCIE, INC.; U-HAUL CO. OF FLORIDA; and U-HAUL CO. OF ARIZONA, Defendants**

**CIVIL ACTION NO. 3:CV-06-0981**

**UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

*2009 U.S. Dist. LEXIS 100685*

**October 29, 2009, Filed**

**PRIOR HISTORY:** *Buzzerd v. Flagship Carwash of Port St. Lucie, Inc., 2009 U.S. Dist. LEXIS 4398 (M.D. Pa., Jan. 16, 2009)*

**COUNSEL:** [*1] For Thomas Buzzerd, Kristi Courtney, Plaintiffs: Matthew A. Cartwright, LEAD ATTORNEY, Munley, Munley & Cartwright, Plains, PA.

For Flagship Carwash of Port St. Lucie, Inc., Defendant: Kevin M. Conaboy, LEAD ATTORNEY, Abramsen, Moran & Conaboy, P.C., Scranton, PA; Randy J. Soriano, LEAD ATTORNEY, Harness, Dickey & Pierce, St. Louis, MO; Stephen G. Strauss, LEAD ATTORNEY, Bryan Cave LLP, St. Louis, MO.

For U-Haul Co. of Florida, U-Haul Co. of Arizona, U-Haul International, Inc., Defendants: Joseph M. Toddy, LEAD ATTORNEY, Zarwin, Baum, DeVito, Kaplan, O'Donnell, Schaer, P.C., Philadelphia, PA; Kevin M. Conaboy, LEAD ATTORNEY, Abramsen, Moran & Conaboy, P.C., Scranton, PA; Randy J. Soriano, LEAD ATTORNEY, Harness, Dickey & Pierce, St. Louis, MO; Stephen G. Strauss, LEAD ATTORNEY, Bryan Cave LLP, St. Louis, MO.

For AMERCO, Defendant: Joseph M. Toddy, LEAD ATTORNEY, Zarwin, Baum, DeVito, Kaplan, O'Donnell, Schaer, P.C., Philadelphia, PA; Randy J. Soriano, LEAD ATTORNEY, Harness, Dickey & Pierce,

St. Louis, MO; Stephen G. Strauss, LEAD ATTORNEY, Bryan Cave LLP, St. Louis, MO.

**JUDGES:** Thomas I. Vanaskie, United States District Judge.

**OPINION BY:** Thomas I. Vanaskie

**OPINION**

***MEMORANDUM***

This is a personal injury action removed [*2] to this Court based upon diversity of citizenship jurisdiction. *See 28 U.S.C. § 1332* and *28 U.S.C. § 1441.* [1] Plaintiffs, Thomas Buzzerd and Kristi Courtney, claim to have suffered permanent cognitive, behavioral and personality problems as a result of carbon monoxide (CO) poisoning while driving a U-Haul truck from Florida to Pennsylvania in November of 2004. Plaintiffs assert that vehicle defects attributable to negligent maintenance allowed levels of carbon monoxide to accumulate in the truck's passenger compartment during their 30-hour trip. Presently before the Court is the remaining Defendants' motions to preclude Plaintiffs' experts from offering opinion testimony to the effect that during their trip Plaintiffs were exposed to harmful levels of carbon monoxide sufficient to cause permanent brain injury.

Defendants contend, *inter alia*, that the experts' opinions are not grounded in reliable scientific methodology. For the reasons that follow, Defendants' motions will be granted.

> 1   For the convenience of the reader of this Memorandum opinion in electronic format, hyperlinks to the Court's record and to authority cited herein have been inserted. The Court accepts no responsibility [*3] for, and does not endorse, any product, organization, or content at any hyperlinked site, or at any site to which that site might be linked. The Court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the Court.

## I. BACKGROUND

Plaintiffs leased a U-Haul truck from Defendant Flagship Carwash of Port St. Lucie, Inc. in November of 2004. While driving the truck from Florida to Pennsylvania on November 28 and 29, 2004, plaintiffs experienced headaches, nausea, disorientation, and confusion. Mr. Buzzerd had hallucinations of deer in the roadway near the end of the trip, which was completed around 9:00 p.m. on November 29th.

The service engine light was illuminated for the entire 30-hour duration of the non-stop trip. Exhaust fumes were visible, and Plaintiffs claim that there was a leak in the vehicle's emissions system. Photographs of the vehicle's exhaust fumes were taken.

Upon arriving at their destination in Pennsylvania on November 29, 2004, Plaintiffs went to sleep. Mr. Buzzerd went to work the next day, and Ms. Courtney stayed home. At approximately [*4] 5:30 p.m. on November 30, 2004, after unpacking the truck, Plaintiffs went to the emergency room at the Tyler Memorial Hospital, complaining of nausea, headaches, and flu-like symptoms that they attributed to their exposure to exhaust fumes during their journey. An emergency room physician made a notation of "carbon monoxide exposure" as his diagnostic impression. No objective testing, however, confirmed carbon monoxide poisoning. Carbon monoxide exhale breath tests administered at the Tyler Memorial Hospital revealed carbon monoxide levels of 1 and 2 parts per million ("ppm") for Mr. Buzzerd and Ms. Courtney, respectively, well within normal limits. No

carboxyhemoglobin test results appeared in the hospital records, even though this test was ordered.

Evidently, Plaintiffs' acute symptoms abated with the administration of oxygen. Plaintiffs were prescribed Tylenol and told to return to the emergency room if their symptoms recurred.

Plaintiffs noticed cognitive and behavioral changes after their Florida trip. On November 23, 2005, almost one year after the onset of acute symptoms, Plaintiffs were examined by Dr. William Jeffreys upon referral from Dr. Lisa Robertson. Dr. Jeffreys, a neurologist, [*5] found that reports of magnetic resonance imaging ("MRI"), CT scans, and EEG tests for both Plaintiffs were within normal limits. [2]

> 2   Dr. Jeffreys acknowledged that these objective exams can be used as diagnostic tools for determining carbon monoxide exposure.

Dr. Jeffreys referred both Plaintiffs for a neuropsychological evaluation by Michael S. Driscoll, Ph.D. Plaintiffs were seen by Dr. Driscoll in February of 2006 and November of 2007. Dr. Driscoll found that Mr. Buzzerd had a cognitive disorder and adjustment reaction involving depressed mood, which Dr. Driscoll attributed to carbon monoxide exposure during the trip from Florida. As to Ms. Courtney, although finding that neuropsychological testing was essentially normal, Dr. Driscoll concluded that she suffered cognitive impairment due to carbon monoxide exposure based upon Ms. Courtney's report of the sequence of symptoms.

Dr. Jeffreys saw Plaintiffs for the second and last time in November of 2007, about two (2) years after he first examined them. [3] Based upon Ms. Courtney's reports, Dr. Jeffreys found that she had suffered personality and behavior problems associated with her exposure to carbon monoxide. As to Mr. Buzzerd, Dr. [*6] Jeffreys diagnosed encephalopathy secondary to carbon monoxide exposure with residual cognitive and language impairments. [4] (Jeffreys Dep., at 23.)

> 3   Plaintiffs had re-located to North Carolina. There is no evidence in the record of healthcare treatment while Plaintiffs were in North Carolina.
>
> 4   According to the National Institute of Neurological Disorders and Strokes, encephalopathy is:

a term for any diffuse disease of the brain that alters brain function or structure. Encephalopathy may be caused by infectious agent (bacteria, virus, or prion), metabolic or mitochondrial dysfunction, brain tumor or increased pressure in the skull, prolonged exposure to toxic elements (including solvents, drugs, radiation, paints, industrial chemicals, and certain metals), chronic progressive trauma, poor nutrition, or lack of oxygen or blood flow to the brain. The hallmark of encephalopathy is an altered mental state. Depending on the type and severity of encephalopathy, common neurological symptoms are progressive loss of memory and cognitive ability, subtle personality changes, inability to concentrate, lethargy, and progressive loss of consciousness. Blood tests, spinal fluid examination, imaging [*7] studies, electroencephalograms, and similar diagnostic studies may be used to differentiate the various causes of encephalopathy.

National Institute of Neurological Disorders and Strokes, http://www.ninds.nih.gov/disorders/encephalopathy/encephalopathy.htm (last visited Oct. 28, 2009). In this case, Plaintiffs have not presented evidence of any diagnostic study that would support a determination that carbon monoxide poisoning is the cause of encephalopathy.

Drs. Jeffreys and Driscoll relied upon the emergency room records and the temporal connection between Plaintiffs' reports of illness and their exposure to vehicle fumes on their drive from Florida in November of 2004 to attribute carbon monoxide as the cause of their alleged brain injuries. Neither doctor, of course, could say that Plaintiffs inhaled harmful levels of carbon monoxide during the trip, especially in light of the absence of carboxyhemoglobin testing. [5]

5   In this regard, Plaintiffs, in responding to Defendants' Statement of Material Facts in support of Defendants' summary judgment motion, admitted that carboxyhemoglobin levels increase based on the degree and duration of exposure. (Def's Statement of Material Facts, Dkt. [*8] 63, P 17, Plfs' Response, Dkt. 87, P 17.) Plaintiffs also admitted that mild carbon monoxide exposure is not associated with neurological problems. (*Id*. at P 21.) Carboxyhemoglobin levels would have been very illuminating in terms of the degree of Plaintiffs' alleged exposure to carbon monoxide.

To show that Plaintiffs were exposed to elevated levels of carbon monoxide during their trip from Florida, Plaintiffs retained Joseph Cocciardi, an industrial hygienist, to perform carbon monoxide and emissions testing on the U-Haul truck in question. Mr. Cocciardi designed a test regimen to determine "exposure quantification" and to predict carbon monoxide levels to which Plaintiffs were exposed during their trip. Over the course of more than 28 hours of stationary testing conducted by Mr. Cocciardi, the carbon monoxide level never exceeded 1.8 ppm, well below the 9 ppm National Ambient Air Quality Standard published by the U.S. Environmental Protection Agency. The highest carbon monoxide reading during one of the three 45-minute road tests performed by Mr. Cocciardi was in the range of 5 to 6 ppm, but lasted for no more then one minute, with all other readings between 0 to 1 ppm. Mr. Cocciardi [*9] also analyzed the vehicle emissions at the exhaust system outlet, which he found to be at levels well below the emission standard for the type of vehicle in question.

Plaintiffs also retained Mr. George Meinschein, a mechanical engineer and former automobile mechanic, to inspect the vehicle for possible pathways for vehicle emissions to enter the truck's passenger compartment. He observed several possible pathways attributable to negligent maintenance of the truck, but did not identify any particular pathway by which emissions would have entered the vehicle's cab. Mr. Meinschein also opined that carbon monoxide emissions would have been greater during the trip from Florida than the levels measured by Mr. Cocciardi, but did not articulate any basis for estimating the carbon monoxide levels during the trip.

Defendants contend that the opinions of Plaintiffs' experts on probable exposure to harmful levels of carbon

monoxide during the 2004 trip from Florida do not meet the standard of admissibility articulated in *Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)*, and codified in *Federal Rule of Evidence 702*. In particular, Defendants assail the absence of reliable scientific [*10] methodology underpinning the experts' opinions that carbon monoxide accumulated in the passenger compartment at levels that caused permanent cognitive, behavioral, and personality impairments.

## II. DISCUSSION

### A. Standard of Review

The admissibility of expert witness opinions is governed by *Federal Rule of Evidence 702*, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Under *Rule 702*, the trial judge serves as a "gatekeeper" to insure that expert opinion testimony is both relevant and reliable. *See Daubert, 509 U.S. at 589*. Where, as here, a party challenges the admissibility of a proffered expert opinion, the trial court must inquire into: (1) the qualifications of the expert, (2) the reliability of the process [*11] or technique the expert used in formulating the opinion, and (3) the "fit" between the opinion and the facts in dispute. *See In Re Paoli R.R. Yard PCB Litigation, 35 F.3d 717, 741-47 (3d Cir. 1994)* ("*Paoli II*").

As explained in *Jaasma v. Shell Oil Co., 412 F.3d 501, 513 (3d Cir. 2005)*, a qualified expert's "testimony (1) must be based on sufficient facts and data; (2) must be the product of a reliable methodology; and (3) must demonstrate a relevant connection between that

methodology and the facts of the case." In this regard, scientific or technical knowledge "must be supported by appropriate validation -- *i.e.*, 'good grounds' based on what is known." *Daubert, 509 U.S. at 592*. "Put differently, an expert opinion must be based on reliable methodology and must reliably flow from that methodology and the facts at issue -- but it need not be so persuasive as to meet a party's burden of proof or even necessarily its burden of production." *Heller v. Shaw Industries, Inc., 167 F.3d 146, 152 (3d Cir. 1999)*. "[A]dmissibility under *Rule 702* is governed by *Rule 104(a)*, which requires the judge to conduct preliminary factfinding, to make 'a preliminary assessment of whether the reasoning or methodology [*12] underlying the testimony is scientifically valid,' and thus enables the judge to exclude evidence presented in plaintiff's prima facie case." *Paoli II, 35 F.3d at 743* (quoting *Daubert, 509 U.S. at 592-93*).

To establish a *prima facie* case, Plaintiffs must show that harmful levels of carbon monoxide entered the truck's passenger compartment as a result of defects in the condition of the truck; that they inhaled the carbon monoxide at harmful levels for a sufficient period of time as to cause permanent brain injury; that they have suffered injury; and that carbon monoxide accumulating in the truck's cab is the cause of the injury. *See Heller, 167 F.3d at 153*. It is also clear that to establish a *prima facie* case Plaintiffs must present admissible expert opinion testimony because no measurements of carbon monoxide levels in the vehicle or in Plaintiffs' blood were made during or immediately after their trip.

Plaintiffs premise their *prima facie* case on the opinions of Mr. Meinschein, Mr. Cocciardi, Dr. Jeffreys, and Dr. Driscoll. Mr. Meinschein, a former automobile mechanic and a registered professional engineer in New Jersey and Connecticut with a Bachelor's Degree in Mechanical Engineering, [*13] opines that there were pathways by which vehicle emissions could have passed into to the truck's passenger compartment. Mr. Cocciardi, although conceding that his testing of the vehicle over a prolonged period did not produce harmful levels of carbon monoxide in the vehicle cab, opines that the truck's emissions included carbon monoxide, there were pathways for exposure to carbon monoxide, there was potential for carbon monoxide levels in the truck's cab and box to increase during the road operation by approximately 50%, and that an overexposure to carbon monoxide during the trip "is apparent." (Cocciardi

Report, at 19-20.) Dr. Jeffreys opines that Mr. Buzzerd suffered from an encephalopathy and that Ms. Courtney suffered changes in her personality and behavior secondary to exposure to carbon monoxide that he attributed to the trip based on information Plaintiffs gave him more than one year after the incident. Finally, Dr. Driscoll opines that Plaintiffs suffered carbon monoxide poisoning during the trip based on the sequence of events reported to him and the data collected during examinations he conducted more than one year after the incident.

### B. Meinschein's Opinions

Mr. Meinschein, [*14] a former automobile mechanic who owned and operated a service station, lists on his curriculum vitae as pertinent experience the following:

> Automotive systems failure analysis, product failure/liability and defect analysis, vehicle examinations, improper repair procedures, seat belt/air bag restraints, ABS brake failures, vehicle fire cause & origin investigation, NHTSA recalls, hydraulic lifts & jacks, machine design, BOCA & New York City building codes, residential & commercial construction, HVAC Failures, slips/trips/falls, stairways/ramps/handrails.

(C.V. for George H. Meinschein, P.E., Ex. No. 2 to Meinschein Dep.)

Mr. Meinschein conducted visual examinations of the truck on September 9, 2005, and September 12, 2007. [6] (Meinschein Report at 2, Ex. No. 3 to Meinschein Dep.) Meinschein observed "evidence of exhaust leaks at the connection between the muffler and the front pipes," and a broken hanger at the rear of the exhaust system. (Id.) He also noticed that "[t]he rear-most bolt for holding the left side exhaust manifold to the cylinder head was broken." (Id.) These observations supported his conclusion that there were leaks in the exhaust system. (Id. at 3.)

> 6  There is no dispute [*15] that the condition of the vehicle as it existed during Plaintiffs' trip was preserved intact.

Meinschein also observed an opening in the left side

of the firewall, near a wiring harness, where it passed from the engine compartment to the passenger cabin. He noticed that a trim screw in the right door sill was missing, presenting "a hole from the passenger cab to the underside of the cab floor." (Id. at 2.) He further noticed that a "weather strip seal at the rear of the hood was distorted in the area directly adjacent to the cab's fresh air inlet opening." (Id.) These observations supported his conclusion that there were "multiple paths for exhaust gases to flow into the passenger cabin . . . ." (Id. at 3.)

Finally, Mr. Meinschein stated that, based upon his operation of the vehicle on the road during both inspections, an "engine miss" was present on September 9, 2005, but not on September 12, 2007. (Id.) He also stated that "[t]he left side exhaust manifold was leaking audibly when the truck was started on September 12, 2007." (Id.) Observing that the "service engine soon" lamp was illuminated throughout his examinations of the vehicle, he asserted that "the engine's computerized control [*16] system . . . recognized a defect in the system." (Id. at 3.) He further stated that "[d]efects in the computerized engine controls typically result in poor engine performance and excessive exhaust emissions." (Id. at 3.)

Mr. Meinschein's report states that emissions testing was conducted by Cocciardi & Associates during the September 12, 2007 vehicle inspection. Mr. Meinschein claims that the Cocciardi testing "yielded valuable information," but does not explain what valuable information was obtained.

The testing conducted by Cocciardi over a prolonged period of time never yielded levels of carbon monoxide in the cab that exceeded applicable federal standards. Air samples taken near the fresh air inlet did not show elevated amounts of carbon monoxide, discounting the alleged defect in that part of the vehicle as an exposure source. Moreover, emission samples taken from the exhaust outlet yielded carbon monoxide levels substantially below emission standards for carbon monoxide for that type of truck, contrary to Mr. Meinschein's opinion that the poor performing engine would yield higher levels of carbon monoxide.

Mr. Meinschein discounts the test results by asserting that "[r]unning the [*17] engine at a high idle under no load typically produces very little emissions compared to running the engine at highway speeds under load." (Meinschein Report, at 3.) He concludes that "the

2009 U.S. Dist. LEXIS 100685, *17

exhaust emission test results gathered on September 12th and 13th of 2007 understate the values that would have existed during the . . . Florida to Pennsylvania trip." [7] (*Id.*) Based upon his observations and experience, Mr. Meinschein, within a reasonable degree of engineering probability and scientific certainty, opined:

> 1. The subject 1993 GMC Top Kick truck contains exhaust system leaks, multiple paths for exhaust gases to flow into the passenger cabin, and a poorly performing engine.

> 2. The conditions that are consistent with the presence of carbon monoxide in the passenger compartment while the vehicle was being driven on a long trip at highway speeds exist in the subject 1993 GMC Top Kick Truck.

> 3. The continuous illumination of the Service Engine Soon lamp in the subject truck indicates a defect in the operation of the computerized engine controls system.

> 4. The exhaust emissions test results gathered on September 12th and 13th of 2007 understate the values that would have existed during the . [*18] . . trip.

(Meinschein Report, at 4.)

7   Carbon monoxide testing conducted on behalf of the Defendants in February of 2008 addressed the assertion that emission levels detected during the Cocciardi testing understated the levels that would have existed while the vehicle was being driven from Florida to Pennsylvania under load. In this regard, the defense expert loaded the truck with approximately 2,400 pounds of material and drove it under highway conditions for approximately five hours. The peak levels of carbon monoxide in the cab of the truck over the five hour period did not exceed 2 parts per million, and the time weighted average for the entire trip was .1 parts per million. Both the maximum level observed and the time weighted average are substantially below federal standards for carbon monoxide in ambient air.

In assailing Mr. Meinschein's opinions, Defendants

contest his qualifications and methodology, as well as the relevance of his opinions. Each of the elements of admissibility will be addressed.

**1. *Qualifications***

Our Court of Appeals has "eschewed imposing overly rigorous requirements of expertise and [has] been satisfied with more generalized qualifications." *Paoli II, 35 F.3d at 741.* [*19] That is, "an expert's qualifications should be assessed 'liberally,' recognizing that 'a broad range of knowledge, skills, and training qualify an expert as such.'" *Thomas v. CMI Terex Corp., Civil No. 07-3597, 2009 U.S. Dist. LEXIS 86623, 2009 WL 3068242 at *5 (D.N.J. Sept. 21, 2009)* (quoting *Paoli II, 35 F.3d at 741*).

An expert is not to be excluded from testifying "simply because [the court] does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate." *Holbrook v. Lykes, Bros. S.S. Co., 80 F.3d 777, 782 (3d Cir. 1996).* On the other hand, "'[t]he issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question.'" *Rose v. Truck Centers, Inc., 611 F.Supp. 2d 745, 749 (N.D. Ohio 2009)* (quoting *Berry v. City of Detroit, 25 F.3d 1342, 1351 (6th Cir. 1994)*). Stated otherwise, the expert's credentials must be assessed in the context of the issue on which the proponent of the expert testimony carries the burden of proof.

In this case, Mr. Meinschein is well qualified to testify about the maintenance  [*20] and integrity of an automobile emissions system. He is also qualified to testify that certain defective conditions in an automobile provide a possible pathway by which vehicle emissions may be transmitted to the occupant cabin of the vehicle. In this regard, his background as a certified master auto technician coupled with his years of experience as an automobile mechanic afford an ample foundation of technical and specialized knowledge for the expression of opinions related to vehicle condition and engine performance.

Thus, at least as Plaintiffs have framed the subject matter of Mr. Meinschein's testimony -- how exhaust fumes *could* have entered the passenger compartment (Pls.' Br. Opp'n Defs.' Mot. Excld., Dkt. 92 at 4) -- Mr.

Meinschein indeed possesses the requisite qualifications to meet the admissibility standard of *Federal Rule of Evidence 702*. But the issue on which Plaintiffs carry the burden of proof is not whether there were *possible* pathways by which emissions *could* enter the passenger compartment. Instead, the dispositive question is whether it is *probable* that vehicle emissions *would* enter the passenger compartment under operating conditions.

There is nothing in Mr. Meinschein's [*21] education, training or background that suggest any foundation to express an expert opinion that emissions would have passed through the orifices he identified while the vehicle was in motion at highway rates of speed. His deposition testimony acknowledged that the transmission of vehicle exhaust into the passenger compartment "depends on . . . the truck and the aerodynamics of the truck," (Meinschein Dep., at 77-78), but he articulated no expertise in the field of aerodynamics or air flow.

It is one thing to opine that exhaust fumes *could* be transmitted into the vehicle's passenger compartment. It is quite another matter to opine that toxic levels of exhaust fumes *would* have been transmitted to the passenger compartment under operating conditions. Viewed liberally, Mr. Meinschein's credentials do not qualify him to opine that engine emissions would have been transmitted at harmful levels to the vehicle compartment under conditions where the vehicle was being operated at highway speeds. *See Rose, 611 F.Supp. 2d at 749-50* (concluding that an ASE-certified master technician was not qualified to offer opinions on whether a motor vehicle accident was caused by a defective steering gear); [*22] *Sigler v. Am. Honda Motor Co., 532 F.3d 469, 478-79 (6th Cir. 2008)* (automobile mechanic not qualified to express opinion as to the speed at which plaintiff's vehicle was traveling when the accident occurred). For this reason alone, Mr. Meinschein's proffered testimony is subject to exclusion.

### 2. Reliability

Reflecting the absence of relevant qualifications, Mr. Meinschein has not shown a reliable methodology to support an opinion that carbon monoxide would have accumulated in the passenger compartment as a result of defective conditions in the truck attributable to negligent maintenance. Although "the standard for determining reliability 'is not that high,'" *In re TMI Litigation, 193 F.3d 613, 665 (3d Cir. 1999)*, the proponent of expert testimony must show both that the expert's methodology as well as the application of that methodology are reliable. *See Heller, 167 F.3d at 152*. Our Court of Appeals has identified the following non-exclusive list of eight factors pertaining to reliability, which may or may not be relevant depending upon the case: (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential [*23] rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put. *Paoli II, 35 F.3d at 742 n.8*.

In this case, Mr. Meinschein did not articulate any methodology by which to assess the likelihood that vehicle emissions would have been transmitted to the passenger compartment under operating conditions. He simply observed conditions that *could* have served as pathways. While he claimed in his deposition that "there's been work [on air flow around a moving truck] that he could reference, he never did so. (Meinschein Dep,. at 78-79.) His assertion of carbon monoxide entering the vehicle cab is unadulterated and prohibited "*ipse dixit*." *See In re TMI, 193 F.3d at 675*.

Significantly, when confronted with carbon monoxide level testing conducted by Mr. Cocciardi that failed to show elevated levels of carbon monoxide under operating conditions, Mr. Meinschein baldly asserted [*24] that the test results likely "understated" levels of carbon monoxide present during plaintiffs' trip. Mr. Meinschein offered no verifiable methodology for his conclusion. Moreover, his failure to reassess his opinion in light of actual test results is "the antithesis of good science." *In re TMI, 193 F.3d at 676*.

Consideration of the first factor of reliability, a testable hypothesis, militates against admission of Meinschein's opinions. It is clear that the hypothesis that emissions entered the vehicle during the Florida to Pennsylvania trip is subject to verification by testing. Indeed, Mr. Cocciardi proposed to do just that. In this case, the testing did not confirm the hypothesis, and Mr. Meinschein responded to this fact by the unsubstantiated assertion that the testing did not sufficiently approximate the conditions of the trip. All that is left then is Mr.

Meinschein's bald assertion.

As defendants observe, Mr. Meinschein offered no quantification for the "understatement" of the Cocciardi test results. In *Heller*, our Court of Appeals held that extrapolations from known data must be based upon scientifically sound principles. *Heller, 167 F. 3d at 162.* In this case, as in *Heller*, [*25] Mr. Meinschein's opinion of an un-quantified "understatement" is based on speculation, and is not the product of a reliable methodology. [8]

> 8   Also lacking any reliable foundation is Mr. Meinschein's assertion that a poorly performing engine would emit higher levels of carbon monoxide than an efficiently running motor, as well as his claim that an illuminated check engine light indicates a vehicle that "typically" has excessive exhaust emission. Moreover, as Defendants note, the fact of increased emissions does not mean that more carbon monoxide entered the passenger compartment. (Defs.' Reply Br., Dkt. 97 at 5 n.1.)

### 3. *Fit*

In the end, Mr. Meinschein can only offer an opinion that he "observed conditions that would be consistent with the presence of carbon monoxide in the passenger compartment . . . ." (Meinschein Report, at 3.) But the issue for the jury is not whether vehicle emissions could accumulate in the cab, but whether it is likely that they did. And Mr. Meinschein offers nothing helpful on this crucial point. Although existence of conditions that could allow for the passage of emissions into the cab of the truck is relevant, Plaintiffs must show more. An opinion that something [*26] is possible, even to a degree of scientific probability, is a far cry from an opinion that the theorized happening probably occurred during the incident in question. *See Paoli II, 35 F.3d at 751* ("[I]f the plaintiff's . . . expert cannot form an opinion with sufficient certainty so as to make a [professional] judgment, there is nothing on the record with which a [factfinder] can make a decision with sufficient certainty so as to make a legal judgment."). Mr. Meinschein never addresses the relevant issue, and his opinion is thus subject to exclusion on that ground as well because it will not "assist the trier of fact to understand the evidence or to determine a fact in issue . . . ." *Fed. R. Evid. 702.*

### C. *Cocciardi's Opinions*

As noted above, Mr. Cocciardi is an industrial hygienist. He devised and implemented a testing plan to determine whether carbon monoxide from vehicle emissions would enter the passenger compartment of the truck under operating conditions. The testing protocol called for the truck to run for approximately 30 hours, with air samples taken at several locations, including inside the cab, the air intake (identified at the junction of the passenger side window and the [*27] engine hood), and the vehicle exhaust system (located beneath the driver's side rear compartment box, approximately midpoint). (Cocciardi Rep., at 4.) The testing included three road trips, each with a duration of approximately 45 minutes, with samples collected and analyzed during the road trips.

The sample results were remarkable for showing that the vehicle's exhaust had carbon monoxide at levels well below the expected amounts for this type of truck. The results also were remarkable in that levels of carbon monoxide within the cab were consistent with naturally-occurring levels of that chemical compound.

Undaunted by these results, Mr. Cocciardi authored a report in which he minimized the significance of the test results because his protocol, for safety reasons, had not approximated the incident in question in terms of fuel consumption, rate of speed, load, and engine performance. He opined that carbon monoxide levels during driving events "have the potential to increase," estimating that the amount of increase may be as much as 50% based upon an assertion that a CO level of 4 ppm was observed during stationary testing and a level of 6 ppm was observed during the road trip part of [*28] the testing. (Cocciardi Rep., at 19.) Mr. Cocciardi's penultimate conclusion is that "an overexposure to CO is apparent for the Buzzerd trip. Levels of exposure could not be quantified by test, but may be medically predicted by linear regression." (*Id.* at 20. )

As in the case of Mr. Meinschein, Defendants assail the admissibility of Mr. Cocciardi's opinions based upon an absence of requisite qualifications, reliable methodology, and connection to the matters at issue. Each aspect of Defendants' challenge will be considered in turn.

### 1. *Qualifications*

Defendants argue that Mr. Cocciardi is not qualified because he has never worked on a carbon monoxide case,

has never written any scholarly articles on the topic, and he is not a medical doctor. (Defs.' Br. Supp. Mot. Excld., Dkt. 78 at 2). Therefore, Defendants claim, he has no ability to opine on the cause of Plaintiffs' injuries. (*Id.*)

Plaintiffs contend that Mr. Cocciardi is an industrial hygienist [9] who has written peer review articles in the area of "exposure assessments." (Pls.' Br. Opp'n Defs.' Mot. Excld., Dkt. 89 at 7). Furthermore, Plaintiffs assert that Mr. Cocciardi has worked on multiple carbon monoxide exposure events. (*Id.*)

9   According [*29] to the American Industrial Hygiene Association's website:

> A professional industrial hygienist is a person possessing either a baccalaureate degree in engineering, chemistry, or physics or a baccalaureate degree in a closely related biological or physical science from an accredited college or university, who also has a minimum of three years of industrial hygiene experience. A completed doctoral in a related physical, biological or medical science or in related engineering can be substituted for two years of the three-year requirement. A completed master's degree in a related physical or biological science or in related engineering can be substituted for one year of the three-year requirement.

American Industrial Hygiene Association, http://www.aiha.org/aboutaiha/Pages/WhatIsanIH.aspx (last visited Oct. 28, 2009).

Mr. Cocciardi is qualified by education, training, and knowledge to opine on causation issues in toxic tort cases of this kind. In this regard, he has written peer-reviewed articles in the area of exposure assessments. As noted above, our Court of Appeals has "eschewed imposing overly rigorous requirements of expertise and [has] been satisfied with more generalized qualifications." [*30] *Paoli II, 35 F.3d at 741* (citations omitted). Furthermore, exclusion of an expert is not proper because the expert

does not have the degree or training the district court believes to be the most appropriate. *Id.* In this case, Mr. Cocciardi has the credentials to serve as an expert witness on the question of exposure to toxic levels of carbon monoxide.

### 2. *Reliability*

As Defendants observe, there are three bases for Mr. Cocciardi's opinion that Plaintiffs had an "overexposure" to carbon monoxide: (1) the truck's internal combustion engine emitted carbon monoxide; (2) there were pathways for the vehicle's exhaust to enter the passenger compartment; and (3) Plaintiffs' reported symptoms are consistent with Mr. Cocciardi's understanding of the effects of carbon monoxide poisoning. (Defs.' Br. Supp. Mot. Excld., Dkt. 78 at 6 n.8; Cocciardi Dep., at 140-42.) Notably, no part of this syllogism depends upon the test results obtained by Mr. Cocciardi. In this regard, there is no dispute that internal combustion engines produce carbon monoxide, and it is also undisputed that no passenger compartment in a vehicle is airtight. Mr. Cocciardi dismisses the absence of empirical data that corroborates [*31] his conclusion of CO "overexposure" with the observation that half of industrial hygiene is "qualitative analysis." (Cocciardi Dep., at 141-42.) Defendants contend that such an approach lacks any reliable methodology. Plaintiffs contend that Cocciardi's opinions are based on reliable methodology, that it was unsafe to formulate a test that replicated plaintiffs' trip from Florida to Pennsylvania, and that it was not necessary to state the precise level of carbon monoxide exposure in order to give an opinion that plaintiffs were overexposed. (Pls.' Br. Opp'n Defs.' Mot. Excld., Dkt. 89 at 8-9).

Mr. Cocciardi explained the basis for his opinion of "overexposure" as follows:

> When you have a source, then you have a route to an occupant's breathing zone and you measure some materials from that source in the occupant's breathing zone and then you have occupants who report independently of those two tests that they have symptomatology of exposures, it makes perfect sense to any professional to make an opinion that there was an exposure --there was an apparent exposure to carbon monoxide such as in the

Buzzerd trip.

(Cocciardi Dep., at 138-39.)

It is one thing to draw logical inferences from facts, [*32] but quite another to make giant leaps to reach a conclusion that fits one's theory, especially where known facts make the leap improbable. One key component of Mr. Cocciardi's reasoning is that vehicle emissions made their way into the truck's cab. The testing he conducted, however, undermines this foundation of his opinion. There was only an isolated, one time reading of carbon monoxide in the cab in the range of 5.0 to 6.0 ppm. (Cocciardi Report, at 5-6.) Significantly, the vehicle was occupied at this time, and the level of carbon monoxide in exhaled breath of a typical non-smoker is 0 to 6 ppm. Thus, it cannot be said that the source of this one-time reading of carbon monoxide was vehicle emissions, and the fact that all other readings were no greater than 1.8 ppm undercuts the premise that vehicle emissions would enter the cab at unsafe levels during normal operation.

Indeed, the levels observed during Mr. Cocciardi's testing do not support an opinion of "overexposure" to carbon monoxide. The United States Environmental Protection Agency's National Ambient Air Quality Standards designate the primary standard for carbon monoxide, which sets limits to protect public health, at 9 [*33] ppm for an average time of eight (8) hours, and 35 ppm for an average time of one (1) hour. *See* Environmental Protection Agency, http://www.epa.gov/air/criteria.html (last visited Oct. 29, 2009.) [10] Furthermore, Cocciardi's tests revealed that the truck emitted carbon monoxide at 2,256 ppm on average, significantly lower than 7,000 ppm "which we generally consider typical carbon monoxide emission[s] of trucks to be . . . ." (Cocciardi Dep., at 163).

> 10   Mr. Cocciardi referenced the California Air Resources Board ("CARB") standard, which sets carbon monoxide standards at 9 ppm for an average time of eight (8) hours, 20 ppm for an average time of one (1) hour, and 6 ppm for an average time of eight (8) hours in the Lake Tahoe region.       *See*       CARB, http://www.arb.ca.gov/research/aaqs/aaqs2.pdf (last visited Oct. 28, 2009). Even these more stringent limits do not support a conclusion of "overexposure" based upon the Cocciardi testing results. It should also be noted that the

Occupational Safety and Health Administration's standards for carbon monoxide is 50 ppm for an eight (8) hour time average, and the National Institute for Occupational Safety and Health has established a recommended exposure [*34] limit for carbon monoxide of 35 ppm for an eight (8) hour time average. *See* OSHA, http://www.osha.gov/SLTC/healthguidelines/carbonmonoxide/reco (last visited Oct. 28, 2009).

In short, the test results simply do not fit the hypothesis to which Mr. Cocciardi clings so tenaciously. As in the case of Mr. Meinschein, Mr. Cocciardi's approach appears to be the antithesis of good science. *See In re TMI, 193 F.3d at 675* (where expert's theory was undermined by testing and the expert failed to modify or explain theory given the contradictory test results, exclusion of expert was not abuse of discretion).

Plaintiffs rely on *Westley v. Ecolab, Inc., No. Civ.A.03-CV-1372, 2004 U.S. Dist. LEXIS 9936, 2004 WL 1068805 (E.D. Pa. May 12, 2004)*, in which the court admitted the testimony of an expert whose conclusions contradicted test results. Significantly, however, and unlike this case, the contradictory test results were obtained by the defendant, and not by the plaintiff's expert. Moreover, the expert, a toxicologist, testified as to the cause of chemical burns based upon the components of the cleaning substance at issue in that case and the Material Safety Data Sheet for the substance, which warned of the possibility [*35] of chemical burns. Although the expert's opinions regarding the cause of chemical burns did not rely on any testing and the expert did not rule out any other causes of plaintiff's injuries, the court found the expert's testimony admissible under *Daubert* because the expert "relied on his general experience, scientific knowledge and medical and scientific reports in forming his opinion." *2004 U.S. Dist. LEXIS 9936, [WL] at *7*. That the defendant could produce contradictory test results did not render the toxicologist's methodology unreliable, but merely presented a question for the jury. *Id*.

Plaintiffs' reliance on *Westley* is clearly misplaced. Mr. Cocciardi devised and conducted his own testing protocol, but now essentially disavows the results of the testing. A professional who repudiates his own objective methodology in favor of a qualitative assessment will be hard pressed to show that his conclusions are the product of "good science." *See In re TMI, 193 F.3d at 675*.

The test of admissibility is whether "the particular opinion is based on valid reasoning and reliable methodology." *Heller, 167 F.3d at 153* (quoting *Kannankeril v. Terminix Int'l, Inc., 128 F.3d 802, 806 (3d Cir. 1997))*. "While '[t]he focus, of course, [*36] must be solely on principles and methodology, not on the conclusions that they generate,' a district court must examine the expert's conclusions in order to determine whether they could reliably follow from the facts known to the expert and the methodology used." *Id.* (citing *Daubert, 509 U.S. at 595*). Here, Mr. Cocciardi's conclusion that Plaintiffs were overexposed to carbon monoxide does not reliably flow from his testing. Indeed, in this case "there is simply too great a gap between the data and the opinion proffered," *General Electric Co. v. Joiner, 522 U.S. 136, 146, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997)*, to sustain its admissibility.

Nor can the opinions of Mr. Cocciardi be sustained on the basis of the Plaintiffs' reports of symptoms during their 30-hour sojourn. While *Federal Rule of Evidence 703* [11] permits experts to rely on hearsay, it must be the kind of hearsay that is reasonably relied upon in their field. Mr. Cocciardi, according to Defendants, is an industrial hygienist who lacks the training and skill to evaluate plaintiffs' hearsay statements regarding their symptoms and makes no showing that this practice is reasonably relied upon by professionals in his field. Plaintiffs counter that their statements [*37] regarding their trip and symptoms were appropriately considered by Mr. Cocciardi, their "treating physicians" agree that they suffered carbon monoxide exposure, and their symptoms are those that would be expected from carbon monoxide exposure. (Pls.' Br. Opp'n Defs.' Mot. Excld., Dkt. 89 at 13.)

> 11  *Rule 703* states:
>
> > The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or

> data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

The proper inquiry under *Federal Rule of Evidence 703* is whether the hearsay is of a nature deemed to be reliable by experts in the appropriate field. *See Paoli II, 35 F.3d at 747-48* (proper inquiry [*38] is what experts in relevant field deem to be reliable). No such showing has been made here. Moreover, Plaintiffs have not shown that an industrial hygienist is qualified to express an opinion on causation, but that is essentially what Mr. Cocciardi purports to do. [12] He takes Plaintiffs' reported symptoms, concludes that they are consistent with carbon monoxide poisoning, and then opines that there was "overexposure" to carbon monoxide during their trip. Such an approach has not been shown by Plaintiffs to be reliable, and is rendered utterly unreliable when objective testing conducted by the expert refutes his articulated conclusion.

> 12  In *Heller*, the Third Circuit expressed doubt that an industrial hygienist could express an opinion as to the cause of someone's illness. *Heller, 167 F.3d at 159*.

Mr. Cocciardi's statement that there were pathways for exhaust to enter the cab does not make it probable that exhaust fumes entered the cab at such levels that carbon monoxide poisoning occurred. Mr. Cocciardi never tested to determine whether exhaust actually was flowing through the supposed pathways into the cab. Defendants observe that he did not perform freon or tracer gas testing, an assertion [*39] to which Plaintiffs do not respond.

The pathway theory remains unsubstantiated speculation. Mr. Cocciardi testified "I can't tell you the specific pathway, but it could be the air flows have caused that increase. It could also be the movement opens and closes mechanically cracks and things of that nature. So I'm not capable to give [sic] you an opinion at this minute on the air flow characteristics during any highway transport." (Cocciardi Dep., at 172). Clearly, Mr.

Cocciardi's pathway theory, on which his overexposure opinion is based, is not the product of any scientific methodology.

The fact that carbon monoxide was found in the vehicle cab during Mr. Cocciardi's testing does not support the pathway theory. As noted above, carbon monoxide exists naturally. Mr. Cocciardi was unaware of the Center for Disease Control studies that showed levels of carbon monoxide in a non-smoker's exhaled breath of up to 6 ppm. (Cocciardi Dep., at 43-44.) The testing conducted by Mr. Cocciardi failed to account for this fact, and thus does not provide a reliable method for determining whether harmful levels of carbon monoxide accumulated in the passenger compartment.

Also compelling rejection of Mr. [*40] Cocciardi as an expert in this case is his unsubstantiated assertion that carbon monoxide levels have the potential to increase during the truck's operation on highways and under load by approximately fifty percent. There appears to be no basis in the testing results for this conclusion. Mr. Cocciardi purported to measure the difference between the highest value obtained during stationary testing and the highest value recorded during road testing to opine that levels may increase by 50% during driving events. He used 4 ppm as the maximum purportedly observed during stationary testing, and compared it to the one-time level of 6 ppm during driving, but the 4 ppm figure is nowhere recorded. (Cocciardi Dep., at 153.)

Mr. Cocciardi's claim that carbon monoxide levels have the potential to increase during operation by 50% is not the product any reliable method. His rudimentary formula compared a number with unknown origins -- 4 ppm -- to 6 ppm, which is one of eight recordings made during road testing. Had he used any other result obtained during the road testing, his formula would have yielded a conclusion that there was a potential for carbon monoxide levels to drop substantially during [*41] vehicle use at highway speeds. In conclusion, there does not appear to be a sound reason for the formula that Cocciardi employed, and, thus, his opinion on carbon monoxide levels increasing in the cab while the truck is being operated at highway speeds is not supported by reliable methodology.

### 3. *Fit*

The "fit" requirement of *Rule 702* mandates that expert testimony "assist the trier of fact to understand the

evidence or determine a fact in issue. This condition goes primarily to relevance." *In re TMI, 193 F.3d at 663* (quoting *Daubert, 509 U.S. at 590-91*). Additionally, *Rule 702's* "'helpfulness' standard requires a valid scientific[, technical, or other specialized] connection to the pertinent inquiry as a precondition to admissibility." *Id.*

Although Mr. Cocciardi's expert opinions may be relevant, they do not satisfy the helpfulness standard. The pertinent inquiry is whether plaintiffs were overexposed to carbon monoxide. Here, Mr. Cocciardi conducted scientific testing, then ignored his test results and concluded that plaintiffs were overexposed based upon their self-reported symptoms. The only way he gets harmful levels of carbon monoxide into the cab is the Plaintiffs' reports and the [*42] existence of potential pathways. But the existence of actual pathways is testable, and no expert has done so. It is true that Plaintiffs need not show the precise levels of carbon monoxide present during their trip in order to prevail in this case. *See Kannankeril, 128 F.3d at 809.* There must, however, be other evidence of exposure. For instance, in *Kannankeril* there were pesticide application records available. In this case, no such evidence exists. Mr. Cocciardi asserted that levels of carbon monoxide exposure could be "medically predicted through linear regression," (Cocciardi Report, at 20), but no such analysis was presented to support his conclusion of carbon monoxide "overexposure." [13] Therefore, Mr. Cocciardi's overexposure opinion lacks a valid scientific connection to the ultimate issue, and he thus fails to satisfy the "fit" precondition of admissibility.

> 13   The medical records do not provide any basis for Mr. Cocciardi's overexposure conclusion. Carbon monoxide levels in exhaled breath about 20 hours after the trip ended were within normal limits, and the most definitive test, a carboxyhemoglobin analysis, apparently was not conducted.

### D.   *The Opinions of Drs. Jeffreys and* [*43] *Driscoll*

The opinions of Drs. Jeffreys and Driscoll -- that Plaintiffs have sustained an encephalopathy as a result of carbon monoxide exposure during their November, 2004 trip -- are dependent upon Plaintiffs establishing that they were exposed to harmful levels of carbon monoxide during that journey. In this regard, there is no dispute that

there are multiple causes of encephalopathy, including viral infections and sleep apnea. Plaintiffs contend that both their neurologist and neuropsychologist provide admissible opinion evidence that their chronic neurological impairments stem from the trip from Florida.

The causation opinions of the health care professionals rest almost exclusively on the temporal connection of the Plaintiffs' reported acute symptoms with their use of the truck. [14] But even Plaintiffs quote with approval a court's observation that "'temporal connection standing alone is entitled to little weight in determining causation.'" (Pls.' Br. Opp'n Defs.' Mot. Excld., Dkt. 91, at 8, quoting *Curtis v. M&S Petroleum, Inc., 174 F.3d 661, 670 (5th Cir. 1999).) There must be some competent evidence of exposure of such degree and duration as to cause the chronic conditions of [*44] which Plaintiffs complain. *Westberry v. Gislaved Gummi AB, 178 F.3d 257, 264 (4th Cir. 1999).* In this case, there is no competent evidence that carbon monoxide accumulated in the truck cab at levels sufficient to cause any injury, let alone permanent neurological deficits.

> 14   Plaintiffs' opposition briefs observe that both healthcare professionals relied upon the exhaled breath test conducted at the Tyler Memorial Hospital emergency room. In this regard, Dr. Driscoll referenced the results as showing "elevated" levels of carbon monoxide. But Dr. Driscoll never reviewed the hospital records, instead apparently relying on Plaintiffs' characterization of the test results. (Driscoll Dep. at 15, 47-48.) Furthermore, while Defendants have presented evidence that up to 6 ppm of carbon monoxide in exhaled breath of a non-smoker is not abnormal, Plaintiffs have failed to present any countervailing evidence to make their doctors' reliance upon this evidence reasonable.

Plaintiffs argue that the health care professionals have an adequate foundation for their causation opinions because their reported symptoms are consistent with the effects of exposure to elevated levels of carbon monoxide. But the [*45] symptoms -- nausea, fatigue, headaches, and hallucinations -- have numerous causes, including viral infections, sleep deprivation, and depression.

Furthermore, the critical inquiry here pertains to the

chronic symptoms of encephalopathy, and there is no dispute that there are multiple causes of encephalopathy. The health care professionals failed to provide rational explanations for ruling out other potential causes of Plaintiffs' neurologic impairments. "'A differential diagnosis that fails to take serious account of other potential causes may be so lacking that it cannot provide a reliable basis for an opinion on causation.'" *Heck v. City of Lake Havasu, No. Civ. A. 04-1810, 2006 U.S. Dist. LEXIS 64007, 2006 WL 2460917, at *11 (D. Ariz. Aug. 24, 2006).* In *Heck,* the court excluded testimony that carbon monoxide poisoning was the cause of death because the physician's differential diagnosis failed to take into account other alternative possible causes and was inconsistent with other objective evidence. Likewise here, Plaintiffs' healthcare experts failed to give adequate consideration to alternative causes of Plaintiffs' purported cognitive, behavioral and personality changes, such as Mr. Buzzerd's diagnosed sleep [*46] apnea and Ms. Courtney's diagnosed depression, and completely discounted the objective evidence that ruled out carbon monoxide as a causative factor, such as the MRI, EEG, and CT Scan results.

Undoubtedly, the healthcare professionals in this case are hampered in their ability to perform a proper differential diagnosis by the absence of objective testing to confirm their causation hypothesis, such as carboxyhemoglobin results. But the uncertainty caused by the absence of objective testing is not to be borne by Defendants. Moreover, Plaintiffs cannot reconcile the causation opinions of their doctors with the Cocciardi test results, which failed to show accumulation of harmful levels of carbon monoxide in the cab under operating conditions. Indeed, it does not appear that the doctors were even told of the Cocciardi test results. (Jeffrey Dep., at 73-74; Driscoll Dep. at 103.) Unlike *Kannankeril,* where the physician was presented with pesticide application records as evidence of substantial exposure, the doctors in this case have not been presented with any evidence of exposure to harmful levels of carbon monoxide.

"[I]t is . . . within the court's province to ensure that . . . a medical [*47] expert's ultimate conclusion on causation 'fits' with the data alleged to support it." *Heller, 167 F.3d at 158.* In this case, the healthcare professionals' opinions on causation do not reliably flow from the data collected by Mr. Cocciardi. Nor do they reliably flow from any objective medical procedures or tests. Under

these circumstances, the doctors' opinions on causation of chronic neurologic impairments are not admissible.

## III. CONCLUSION

The key issue in this case is whether Plaintiffs were exposed to harmful levels of carbon monoxide during their move from Florida to Pennsylvania. Testing did not corroborate such a conclusion, and Plaintiffs failed to offer any expert opinion based upon a reliable methodology to support their claim that permanent neurological problems were triggered by exposure to carbon monoxide during their trip from Florida. Accordingly, the motions to exclude Plaintiffs' experts from testifying on causation will be granted.

By Order dated September 30, 2009, this Court had denied, without prejudice, Defendants' summary judgment motion because, *assuming* the admissibility of Plaintiffs' expert witness opinions, there were genuine disputes of facts material to [*48] the causation issue. (Dkt. 115.) Because that assumption is no longer valid, there is no evidentiary foundation for a causation conclusion in Plaintiffs' favor. That is, Plaintiffs are unable to substantiate a *prima facie* case against the remaining Defendants. Accordingly, it is appropriate to have the Clerk of Court enter judgment in Defendants' favor. *See Fabrizi v. Rexall Sundown, Inc., No. Civ. A. 01-289, 2004 U.S. Dist. LEXIS 9859, 2004 WL 1202984, at *12 (W.D. Pa. June 2, 2004)* (Report and Recommendation adopted June 24, 2004, granting

judgment as a matter of law where, as here, *Daubert* motion challenging causation opinion was granted and court had previously denied, without prejudice, a summary judgment motion pending resolution of *Daubert* motion, as "requiring the Defendant to renew its request for summary judgment would be a matter of mere formality"). An appropriate Order follows.

### /s/ **Thomas I. Vanaskie**

Thomas I. Vanaskie

United States District Judge

### *ORDER*

**NOW THIS 29th DAY OF OCTOBER, 2009**, for the reasons set forth in the foregoing Memorandum, **IT IS HEREBY ORDERED THAT**:

1. Defendants' Motions to Exclude Plaintiffs' Experts (Dkt. 74, Dkt. 77, Dkt. 80, Dkt. 83) are **GRANTED**.

2. The Clerk of Court shall enter [*49] judgment in favor of Defendants, and mark this matter **CLOSED**.

### /s/ **Thomas I. Vanaskie**

Thomas I. Vanaskie

United States District Judge

# CASE #3



LEXSEE 306 FED. APPX. 781

**DONALD E. MEADOWS, JR.; AMANDA MEADOWS, husband and wife v.
ANCHOR LONGWALL AND REBUILD, INC., a West Virginia corporation v.
LEWIS-GOETZ CO. INC., successor-in-interest of Gooding & Shields Rubber Co.;
SYSTEM STECKO, a Division of Dayco Europe, Ltd., Third Party Defendants,
Donald E. Meadows, Jr., Amanda Meadows, Appellants**

No. 07-2580

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

*306 Fed. Appx. 781*; *2009 U.S. App. LEXIS 521*; *78 Fed. R. Evid. Serv. (Callaghan)
434*

**December 2, 2008, Argued
January 13, 2009, Filed**

**NOTICE:** NOT PRECEDENTIAL OPINION UNDER THIRD CIRCUIT INTERNAL OPERATING PROCEDURE RULE 5.7. SUCH OPINIONS ARE NOT REGARDED AS PRECEDENTS WHICH BIND THE COURT.

PLEASE REFER TO FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1 GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**PRIOR HISTORY:** [**1]
On Appeal from the United States District Court For the Western District of Pennsylvania. (D.C. Civil No. 02-cv-02062). District Judge: The Honorable Katharine S. Hayden. Magistrate Judge: The Honorable Amy Reynolds Hay.
*Meadows v. Anchor Longwall & Rebuild, Inc., 2007 U.S. Dist. LEXIS 32764 (W.D. Pa., May 3, 2007)*
*Meadows v. Anchor Longwall & Rebuild, Inc., 2006 U.S. Dist. LEXIS 21617 (W.D. Pa., Apr. 17, 2006)*
*Meadows v. Anchor Longwall & Rebuild, Inc., 455 F. Supp. 2d 391, 2006 U.S. Dist. LEXIS 61009 (W.D. Pa., 2006)*
*Meadows v. Anchor Longwall & Rebuild, Inc., 2006 U.S. Dist. LEXIS 51514 (W.D. Pa., July 27, 2006)*

**COUNSEL:** Richard J. Schubert, Esquire (Argued), AlpernSchubert P.C., Pittsburgh, PA, Counsel for Appellants.

Kathleen S. McAllister, Esquire (Argued), DiBella, Geer, McAllister & Best, Pittsburgh, PA, Counsel for Appellees.

Stanley A. Winikoff, Esquire (Argued), Michael C. Hamilton, Esquire, Pittsburgh, PA, Counsel for Third-Party Appellees.

**JUDGES:** Before: AMBRO and GREENBERG, Circuit Judges, and O'NEILL, [*] District Judge.

[*] The Honorable Thomas N. O'Neill, Jr., United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

**OPINION BY:** O'NEILL

**OPINION**

[*782] O'NEILL, District Judge

Appellants Donald E. Meadows, Jr. and Amanda Meadows appeal the final judgment entered by the

306 Fed. Appx. 781, *782; 2009 U.S. App. LEXIS 521, **1;
78 Fed. R. Evid. Serv. (Callaghan) 434

District Court [1] in favor of appellee Anchor Longwall and Rebuild, Inc. (Anchor). Appellants contend the District Court erred in its May 3, 2007 final order excluding appellants' expert witness' testimony. Appellants also challenge the District Court's grant of Anchor's motion for partial summary judgment dismissing [**2] appellants' claims for strict liability against Anchor under *Restatement (Second) of Torts § 402A*. Finally, appellants challenge the District Court's sua sponte grant of summary judgment in favor of third-party defendant System Stecko as to Anchor's claim of contribution against Stecko. For the following reasons, we will affirm the District Court's orders.

> 1   By consent of the parties, Magistrate Judge Hay conducted all proceedings in this case as provided for by the *28 U.S.C. § 636(c)* and *Federal Rule of Civil Procedure 73*.

**I.**

Because we write only for the parties, our factual summary is brief. Appellants filed a civil complaint on November 29, 2002, asserting claims against appellee Anchor for strict liability, negligence, breach of warranty, emotional distress and loss of consortium for Meadows' injuries that occurred while pressurizing a mine shield against the roof of the Maple Creek Mines where he was employed. Appellants allege that a shut-off valve fitting replaced by Anchor during a refurbishing project malfunctioned, pulled loose from the valve assembly housing due to the pressure of the hydraulic fluid, and struck Meadows on the right side of his face. As a result of the accident, [**3] Meadows lost use of his right eye.

The accident occurred on December 6, 2000 while Meadows was installing 800-ton longwall shields originally manufactured and designed by Meco-Dowty in the Mine. Meadows was employed by the Mine as a longwall helper/longwall utility man. Longwall shields are placed in succession and after each shield is in place its leg jacks (hydraulic lift cylinders) are pressurized [*783] to raise the canopy of the shield to the mine roof. Meadows was engaged in manually pressurizing a shield, likely the shield known as Longwall International 045 (Shield # 45), which required him to stand close to the hydraulic system when a shut-off valve fitting pulled loose from the valve assembly housing and struck him in the face.

Shortly before the accident, the Mine contracted with

Montgomery Equipment Company to repair approximately 189 of its longwall shields. Montgomery subcontracted with several repair companies, including Anchor, to refurbish and/or repair the shields. Anchor repaired 39 of the 189 longwall shields repaired for the Mine, including Shield # 45, which discovery revealed was likely the shield on which Meadows was working at the time of his accident. As part of the [**4] repair and refurbishment project, Anchor replaced hoses and valves and installed new hose kits, including Stecko valves of a type that Meadows alleges caused his injury. Anchor's paperwork revealed that Shield # 45 was missing a base lift jack at the time it was received and that the Mine elected not to replace it.

Appellants hired Mark A. Sokalski, P.E., to investigate the cause of the valve malfunction and testify as an expert witness as to liability and causation. Sokalski testified in his deposition that the accident occurred when Meadows started "using manual levers . . . he ended up a little out of sequence when he was doing it manually and left the ram bar down," which created a "spike" in the pressure that over-pressurized a defective valve. Sokalski testified that the valve "exploded" because Anchor omitted a check valve when it refurbished the shield that was part of the original shield design and would have relieved the over-pressurization. In hydraulic systems, the check valve is a safety feature built into the device to sense and relieve excessive pressure by allowing the over-pressurized fluid to flow back into the system to a relief valve, which is another safety device [**5] on the system. After examining a number of Stecko valves, Sokalski found that the threads of the male and female connections of the valve were incorrectly cut, rendering the valve subject to failure at pressures below its expected failure pressure. Though he admitted that he could not replicate the exact conditions of the mine shield's hydraulic system when it failed in his testing, he testified that, using principles of physics, a pressure spike was caused in the hydraulic fluid within the shield system that contributed to the failure of the Stecko valve.

Invoking the District Court's diversity jurisdiction, appellants filed, on November 29, 2002, a multi-count complaint against Anchor alleging negligence and strict liability under the *Restatement (Second) of Torts § 402A*. Once discovery showed that the shield in question was likely Shield # 45, Anchor filed a third-party complaint joining Lewis Goetz and Company and Stecko, respectively the supplier and the manufacturer of the

valve in question, seeking indemnity/and or contribution. The District Court granted Lewis-Goetz's unopposed motion for summary judgment because no party could prove that the valve in appellants' counsel's custody [**6] was supplied by Lewis-Goetz.

Anchor then filed a motion for partial summary judgment with regard to appellants' strict liability claim which the District Court granted on April 17, 2006 on the basis that Anchor did not sell or supply a product but rather provided a service which is not subject to strict liability claims. On August 28, 2006, the Court granted Stecko's motion for partial summary judgment with regard to any claim of Anchor against Stecko for indemnity, finding that none of the theories of [*784] liability Anchor asserted against Stecko would support such a claim. Next, on January 5, 2007 the Court sua sponte granted summary judgment as to any claims for contribution by Anchor against Stecko, finding that no evidence identified by Anchor supported a claim for strict liability against Stecko.

Appellants' negligence claim against Anchor was the only remaining claim. After the close of discovery, Anchor filed a motion in limine to exclude the testimony of appellants' only expert on liability and causation, Sokalski. After a hearing on February 1, 2007, the District Court made a determination that the proposed testimony did not meet the requirements for expert testimony under *Federal Rule of Evidence 702* [**7] and the factors outlined by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)*, because it was insufficient, not based on an appropriate foundation, and inadequately tied to the facts of the case. After excluding Sokalski's testimony, the District Court granted final judgment in favor of Anchor on May 3, 2007. Appellants filed a timely notice of appeal on May 23, 2007.

## II.

The District Court had jurisdiction over this diversity action under *28 U.S.C. § 1332*. We have jurisdiction over the final orders of the District Court pursuant to *28 U.S.C. § 1291*.

We exercise plenary review over the District Court's decision to grant summary judgment. *NBT Bank Nat'l Assoc. v. First Nat'l Comm. Bank, 393 F.3d 404, 409 (3d Cir. 2004)*. "Affirming the grant of summary judgment is proper where there are no genuine issues of material fact

and the moving party is entitled to judgment as a matter of law." *Id.* (citation omitted). We resolve all factual doubts and draw all reasonable inferences in favor of the nonmoving party. *See DL Res. Inc. v. FirstEnergy Solutions Corp., 506 F.3d 209, 216 (3d Cir. 2007)*.

In reviewing the exclusion of expert testimony under *Daubert,* [**8] we must determine whether the District Court abused its discretion. *Pineda v. Ford Motor Co., 520 F.3d 237, 243 (3d Cir. 2008)*. "An abuse of discretion arises when the District Court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *In re TMI Litig., 193 F.3d 613, 666 (3d Cir. 1999)* (internal quotation marks omitted). This Court does not interfere with the District Court's decision "unless there is a definite and firm conviction that the [District Court] committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *Id.* (internal quotation marks omitted). To the extent that the District Court's decision involved a legal interpretation of the Rules of Evidence, the review is plenary. *See id.*

## III.

### A. *Strict Liability Claim*

The District Court properly granted summary judgment on appellant's claim for strict liability against Anchor, finding that Anchor serviced but did not manufacture or redesign the allegedly defective product. Meadows' complaint, inter alia, alleged that Anchor was liable on a theory of strict liability under the *Restatement (Second) of Torts § 402A.* [**9] Specifically, Meadows alleged that Anchor did not engage solely in servicing the longwall shield that caused his injury but defectively redesigned, refurbished, re-manufactured and reconditioned it. The District Court granted summary judgment in favor of Anchor and found that *§ 402A* does not apply to a defendant such as Anchor who [*785] neither sold nor manufactured the allegedly defective valve.

*Restatement (Second) of Torts § 402A* states that:

(1) One who sells any product in a defective condition unreasonably dangerous to the seller or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his

property, if

> (a) the seller is engaged in the business of selling such a product, and

> (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

> (a) the seller has exercised all possible care in the preparation and sale of his product, and

> (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Pennsylvania adopted this provision in *Webb v. Zern, 422 Pa. 424, 220 A.2d 853 (1966).* [**10] *Comment f to Section 402A* further explains that the section "applies to any manufacturer of such a product, to any wholesale or retail dealer or distributor . . . . It is not necessary that the seller be engaged solely in the business of selling such products." *See also Malloy v. Doty Conveyor, 820 F. Supp. 217, 220 (E.D. Pa. 1993), quoting Burch v. Sears, Roebuck & Co., 320 Pa. Super. 444, 467 A.2d 615, 621 (Pa. Super. Ct. 1983),* noting that a "seller" includes "all suppliers of a defective product in the chain of distribution, whether retailers, partmakers, assemblers, owners, sellers, lessors or any other relevant category." *See also Salvador v. Atlantic Steel Boiler Co., 224 Pa. Super. 377, 307 A.2d 398 (Pa. Super. Ct. 1973),* noting that a manufacturer of a defective product is liable under *402A* regardless of whether the manufacturer is involved in the item's sale.

Service providers have long been excluded from strict liability. *See La Rossa v. Scientific Design Co., 402 F.2d 937, 942-43 (3d Cir. 1968)* (interpreting New Jersey

law and holding that, unlike mass produced goods, services are not marketed to a wide variety of the general public, so parties injured by poor services are in a better position to locate the tortfeasor [**11] and identify the defect caused by the tortfeasor's negligence); *Lemley v. J & B Tire Co., 426 F. Supp. 1378, 1379-80 (W.D. Pa. 1977)* (noting that there had been no expansion of *Section 402A* to include persons who supply a service).

Appellants argue that the District Court erred in determining that Anchor was not a manufacturer or seller of a product under *§ 402A* because they allege that Anchor, in repairing and refurbishing the longwall shields, "redesigned" the hydraulic system and "sold" the redesigned system back to the Mine. Appellants point to the deposition testimony of the chief engineer at Anchor at the time of the longwall shield repair project, Edmond Groff that he made changes to the circuit or hydraulic drawings of Shield # 45 as evidence that his drawings constituted a modification of the original manufacturer's drawings of the hydraulic system. Appellants argue that Anchor performed a design function by modifying the original manufacturer's drawings and therefore engaged in an act that put itself in a position of a manufacturer. Anchor contends that, while Groff made a drawing of the hydraulic system, the hydraulic system was designed by the original equipment manufacturer, [**12] Meco-Dowty, and that any changes or modifications to the system were specifically requested and approved by the Mine. Anchor argues and presented evidence that it did not manufacture, purchase, [*786] sell or supply the shield at issue or the allegedly faulty valve that caused the injuries but merely attached the component to the shield unaltered from the way it was received from the manufacturer, appellee Stecko, and that the shields themselves were at all times owned by the Mine.

Pennsylvania law does recognize strict liability for a manufacturer of a product regardless of whether the manufacturer was involved in the sale. *See Webb v. Zern, 422 Pa. 424, 220 A.2d 853 (Pa. 1966).* But adopting Meadows' theory that, by refurbishing and repairing the longwall shield, Anchor "redesigned," manufactured and sold a product to the Mine would effectively swallow the distinction between sellers of products and those that simply provide a service for the products after manufacturing. From the evidence in the record, Anchor did not hold itself out to be the seller of products such as valves or longwall shields. No evidence was presented to contradict that any changes in the drawings at issue were

made at the request [**13] of the Mine and ultimately approved by the Mine. Further, no evidence was presented to contradict that the parts that Anchor used in refurbishing and repairing the shields were purchased in cooperation with the Mine.

Appellants also claim that Anchor is a "seller" under *Section 402A* because it played a role in requesting additional parts. However, this claim fails because any such requests by Anchor were merely incidental to servicing the shields as specified by the Mine and appellants have presented no evidence that the parts requested are the allegedly defective products at issue here. Finally, there is no evidence that Anchor was paid for any alleged redesign by the Mine as part of the repair project. Appellants provide no case law to support their theory that repairing and refurbishing constitutes "re-manufacturing" and "re-designing" under Pennsylvania law. [2] Anchor provided a service: the repair and refurbishment of 39 of the Mines' longwall shields. We decline to hold that in repairing a longwall shield Anchor was involved in "re-designing" or "re-manufacturing."

> 2  Appellants also attempt to get around the seller distinction by arguing that Anchor was a bailee of the longwall shield [**14] and that bailment can give rise to a claim under *§ 402A. See Berkebile v. Brantly Helicopter Corp., 462 Pa. 83, 337 A.2d 893, 898 n.3 (Pa. 1975).* Appellants cite *Kalumetals, Inc. v. Hitachi, 21 F. Supp.2d 510 (W.D. Pa. 1998),* for support that *§ 402A* applies in a bailment relationship. However, the *Kalumetals* analogy would apply only if an Anchor employee had been injured while working on a defective longwall shield. We fail to see how *Kalumetals* applies to Meadows' accident. Once the longwall shields were returned to the Mine, the bailer/bailee relationship terminated. *See American Enka Co. v. Wicaco Mach. Corp., 686 F.2d 1050, 1053 (3d Cir. 1982),* holding that "[a] bailment is a delivery or deposit of personalty under an implied or express agreement that at the termination of the bailment the personalty will be redelivered to the bailor, otherwise dealt with according to the bailor's directions, or kept until the bailor reclaims it."

The public policy considerations underlying strict liability also argue against holding that Anchor was a "seller" of products. The controlling question in whether someone qualifies as a seller, as Pennsylvania courts have pointed out, is the relationship between the [**15] defective product and the overall chain of distribution. *See Frey v. Harley Davidson Motor Co., 1999 PA Super 130, 734 A.2d 1, 17 (Pa. Super. Ct. 1999).* The Pennsylvania Supreme Court has followed a four-part test in determining whether public policy requires the imposition of strict liability on a supplier of an allegedly defective product: (1) whether defendant is the only member of the marketing chain available [*787] to injured plaintiff; (2) whether the imposition of strict liability would serve as an incentive to safety; (3) whether defendant is in a better position than the consumer to prevent the circulation of defective products; and (4) whether defendant can distribute the cost of compensating for injuries resulting from defective products by charging for it in its business. *Franconi v. Gibsonia Truck Corp., 472 Pa. 362, 372 A.2d 736, 739-40 (Pa. 1977).*

First, as Anchor points out, appellants could have sued Meco-Dowty, the manufacturer of the longwall shield, or Stecko, the manufacturer of the allegedly defective valve. Second, imposing liability on Anchor would not serve as an incentive to safety since Anchor is not in the business of building, designing or manufacturing the shields or valves and therefore does [**16] not have control over the safety of the products. Similarly, Anchor is in no better position than the consumer to influence the manufacturing of safer mining products or prevent circulation of defective mining products because it acquired the products from the consumer for repair and was not in the original or direct chain of distribution. Anchor repaired only 39 of the Mine's shields; it was not mass producing the shields and valves. Finally, although Anchor could charge extra for its services to cover the potential cost of compensation for injuries, it ought not be required to distribute the cost of defects in products it did not design or manufacture.

Thus, the District Court properly granted summary judgment on the strict liability claim, as Meadows' allegations involved Anchor's service activities as a repairer rather than as a "seller" and such a claim sounds in negligence. *See La Rossa, 402 F.2d at 942-43; Lemley, 426 F. Supp. at 1379-80.*

### B. *Exclusion of Expert Witness Testimony*

The District Court did not abuse its discretion in

Case 2:05-cv-04182-SRD-JCW   Document 19532-1   Filed 12/30/09   Page 28 of 31

Page 6

306 Fed. Appx. 781, *787; 2009 U.S. App. LEXIS 521, **16;
78 Fed. R. Evid. Serv. (Callaghan) 434

excluding the testimony of appellants' expert witness, Sokalski. His testimony was Meadows' sole evidence of negligence. The Court found that Sokalski's [**17] testimony was not reliable under *Rule 702* and so excluded his testimony and granted final judgment in favor of Anchor because the negligence claim was the only claim remaining after the Court granted Anchor's motion for partial summary judgment on strict liability.

Sokalski's opinion is based on several conclusions. First, Sokalski testified that the Stecko valve that struck Meadows in the eye was defective because its male threads were over-cut, which reduced its ability to fully and tightly grip the female threads, thereby reducing the burst pressure to approximately one-half of its published design. Second, Sokalski concluded that the mine's hydraulic system, which normally operates at between 1700 pounds per square inch ("psi") and 3200 psi, experienced a "spike" in pressure exceeding 100,000 psi on the Stecko valve. Third, Sokalski concluded that the spike was generated due to the ram bar on the shield being in the "down" position. Fourth, Sokalski concluded that there was no check valve between the two hoses that would have connected into the valve assembly and would have prevented the pressure spike. Lastly, he concluded that because the ball in the allegedly malfunctioning valve [**18] was "ovalled" and dented, extremely high pressure occurred there. Essentially, Sokalski alleged two defects in the shield after Anchor's repairs were completed that caused the accident: the presence of the ram bar in the down position that generated the spike in pressure and the absence of a check valve that [*788] would have prevented the valve from separating when the alleged spike occurred.

Sokalski testified regarding the tests he used to reach his conclusions. He purchased three Stecko ball valves from the lot that was the source of the allegedly defective valve. He then connected the valves to a metal pipe filed with water and slowly increased the pressure on the water pipe with an air pump. He tested two of the valves in both the "open" and the "closed" positions. According to his tests, the valves failed at the 13,000 and 15,000 psi range by "an infinitesimal leak" of water escaping from the valve.

Meadows argues that the District Court abused its discretion in precluding Sokalski's testimony under *Fed. R. Evid. 702* and *Daubert*. *Rule 702* has three requirements: (1) the proffered witness must be an expert,

i.e., must be qualified; (2) the expert must testify about matters requiring scientific, [**19] technical or specialized knowledge, i.e., must be reliable; and (3) the expert's testimony must assist the trier of fact, i.e., must be fit. *See Pineda, 520 F.3d at 244; In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741-42 (3d Cir. 1994).*

First, to qualify as an expert under the rule, under our liberal standard, a witness must possess sufficient qualifications in the form of knowledge, skills and training. *Pineda, 520 F.3d at 244, citing In re Paoli, 35 F.3d at 741.* The District Court found that Sokalski has sufficient qualifications as a professional engineer to testify as an engineering expert under *Rule 702* and the parties do not contest this finding.

The second requirement is that of reliability. According to *Rule 702*, "an expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable. *Pineda, 520 F.3d at 247, citing Daubert, 509 U.S. at 589.* While a litigant must make more than a prima facie showing that his expert's methodology is reliable, we have cautioned that "[t]he evidentiary requirement of reliability is lower than the merits standard of correctness." *Id. at 248.* The admissibility decision must focus on the expert's [**20] methods and reasoning, and credibility decisions should not be considered until after admissibility has been determined. *Id., citing In re Paoli, 35 F.3d at 744.* The language of *Rule 702* requiring the expert to testify to scientific knowledge means that the expert's opinion must be based on the "methods and procedures of science" rather than on "subjective belief or unsupported speculation"; the expert must have "good grounds" for his or her belief. *In re Paoli, 35 F.3d at 742, citing Daubert, 509 U.S. at 589.* In sum, *Daubert* holds that an inquiry into the reliability of scientific evidence under *Rule 702* requires a determination as to its scientific validity. *Id., citing Daubert, 509 U.S. at 589 n.9.*

A trial court may consider several factors in evaluating whether a methodology is reliable, including but not limited to: (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error, (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be [**21] reliable; (7) the qualifications of the expert

306 Fed. Appx. 781, *788; 2009 U.S. App. LEXIS 521, **21;
78 Fed. R. Evid. Serv. (Callaghan) 434

witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put. *Pineda, 520 F.3d at 247-48* (citations omitted). Additionally, in cases involving technical subjects like engineering, trial courts may consider relevant literature, evidence of industry practice, product design and accident history in evaluating reliability. *Id. at 248, citing Milanowicz v. The Raymond Corp., 148 F. Supp.2d 525, 536 (D. N.J. 2001).* "The inquiry [*789] envisioned by Rule 702 is . . . a flexible one." *Id., citing Daubert, 509 U.S. at 594.* The *Daubert* Court noted that the District Court's focus "must be solely on principles and methodology, not on the conclusions that they generate." *509 U.S. at 595.* However, the Supreme Court has held that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Elec. Co. v. Joiner, 522 U.S. 136, 146, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997)* (citations omitted).

Appellants assert [**22] that the District Court abused its discretion by, in effect, holding the expert to a higher standard of admissibility than required under our case law. Specifically, appellants contend that because Sokalski's testimony concluding that excessive pressure caused hydraulic system failure was based on generally accepted principles of basic physics (recognized since the time of Sir Isaac Newton), it should have been deemed reliable. Appellants note that this Court affirmed the decision of a District Court not to exclude testimony based in part upon general engineering principles. *Stecyk v. Bell Helicopter Textron, Inc., 1998 U.S. Dist. LEXIS 14081, 1998 WL 599256, at *3 (E.D. Pa. Sept. 8, 1998), aff'd Stecyk v. Bell Helicopter Textron, Inc., 295 F.3d 408, 412 (3d Cir. 2002).* In *Stecyk,* defendant General Motors argued that plaintiffs' expert utilized general engineering principles to address leakage in the allegedly defective seal without any actual proof of a defect. *Stecyk, 1998 U.S. Dist. LEXIS 14081, 1998 WL 599256, at *7.* In addition to general engineering principles, however, the expert supported his theory with substantial physical and reliable documentary evidence. Thus, the Court allowed the testimony because the expert supplemented his [**23] conclusions based on general engineering principles with reliable methodology. *1998 U.S. Dist. LEXIS 14081, [WL] at *8.*

In this case, as the District Court points out, Sokalski's methodology was not reliable. Sokalski did not attempt to replicate the conditions in the longwall shield at the time of the accident; instead, he tested the valves without the hoses or connectors and slowly increased pressure. Sokalski did not examine the specific shield that Meadows was working on at the time of the accident because it was returned to service in the Mine so he could not say definitively whether the shield contained a check valve. Further, there was no reference to material, publication or literature describing the failure scenario he presented, no evidence that his methodology was subjected to peer review or that it is generally accepted, no outside documentary evidence, aside from his own report, supporting his conclusions, no evidence concerning any known or potential error rates in his testing, and no control standards. Finally, Sokalski conceded that his pressure tests did not replicate the accident as he hypothesized that it had occurred because he tested the valve by increasing the pressure slowly using a pump instead [**24] of generating the dynamic spike he conceded occurred at the time of the accident; also his tests did not replicate the assembly of the hoses, connectors and Stecko block valve that existed in the mine because he did not use any hoses or connectors in his tests. Moreover, he did not research the maximum burst pressure of the hoses or connectors or otherwise test them with or without a check valve. The District Court noted that he speculated that had he used hoses and created a dynamic spike in pressure like the one he opines occurred in the accident the valve would have separated before the hoses would have blown. As the District Court noted, the expert's own [*790] testing did not support his hypothesis. [3] Thus it was not the "general physics principles" with which the District Court took issue, but rather the method by which Sokalski applied the principles to the facts of Meadows' accident. Here, the analytical gap between the data and the opinion proffered is too great and is connected only by the ipse dixit of the expert, not by any evidence. *General Elec. Co., 522 U.S. at 146.* [**25] Thus, the District Court properly excluded Sokalski's testimony because it failed to meet the reliability standard.

[3] As appellant correctly noted, testing need only be reasonably similar to the actual events. Substantial similarity does not require perfect identity between actual and experimental conditions. *Stecyk, 295 F.3d at 412.* Experimental evidence may be admitted even if conditions do

306 Fed. Appx. 781, *790; 2009 U.S. App. LEXIS 521, **25;
78 Fed. R. Evid. Serv. (Callaghan) 434

not perfectly correspond to the conditions at issue in litigation; dissimilarities may affect the weight of the evidence, but not its admissibility. *Id., citing Glick v. White Motor Co., 458 F.2d 1287, 1294 (3d Cir. 1972)*; *Ramseyer v. Gen. Motors Corp., 417 F.2d 859, 864 (8th Cir. 1969).* A ruling on substantial similarity is committed to the sound discretion of the trial judge. *Id.* Here, based on the record, it was not an abuse of discretion for the District Court to find that the testing was not substantially similar to the incident.

The third element under *Rule 702*, namely, whether the expert testimony would assist the trier of fact, "goes primarily to relevance." *Lauria v. Amtrak, 145 F. 3d 593, 599 (3d Cir. 1998), quoting Daubert, 509 U.S. at 591.* The expert's testimony must "fit" under the facts [**26] of the case so that "it will aid the jury in resolving a factual dispute." *Id.* The standard for the factor is not high; it is met when there is a clear "fit" connecting the issue in the case with the expert's opinion that will aid the jury in determining an issue in the case. *Lauria, 145 F.3d at 600, quoting Paoli, 35 F.3d at 745.* "*Rule 702's* 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id., citing Daubert, 509 U.S. at 591-92.* In other words, expert testimony based on assumptions lacking factual foundation in the record is properly excluded. *See Stecyk, 295 F.3d at 414.*

Appellants assert that the District Court wrongly rejected Sokalski's opinion that the accident was caused by Anchor's failure to install a check valve on Shield # 45. Sokalski testified that the original manufacturer's specifications and Anchor's schematics indicated that a check valve was to be installed in order to allow the hydraulic fluid to flow back into the system to a relief valve if the pressure on the base lift jack exceeded acceptable limits. Sokalski testified that he examined the drawings done by Anchor and observed that no check [**27] valves were indicated on Anchor's schematics, but Groff's uncontroverted testimony established that the diagram Sokalski relied upon represented a layout of the location of the hoses in the hydraulic system and that the original schematic by Meco-Dowty contains all of the component parts, including the check valves. Moreover, the District Court found that, as Anchor ordered 50 check valves for the 39 machines they refurbished for the Mine and as Sokalski admitted that he did not know first-hand whether a check valve was installed in the shield at issue

because he did not inspect it, Sokalski's testimony regarding the absence of the check valve did not fit with the otherwise uncontroverted evidence before the Court.

Additionally, there was no "fit" between Sokalski's testing of the Stecko valve and the facts. As previously noted, the testing did not replicate the hose assembly and he did not subject the valves to the dynamic pressure spike he alleges occurred. Neither did the tests he conducted on the [*791] Stecko valve duplicate the results that occurred in the mine, as no valve separated in these tests - a small amount of water leaked instead - and there was no evidence of any ovalling or [**28] indentation on the ball portion of the valve. The District Court correctly noted that "[g]iven the lack of resemblance Sokalski's tests have to the events in the mine, it is difficult to say how, if at all, these tests could assist the jury in determining what caused the accident."

Appellants also argue that the District Court made a "de facto Summary Judgment" decision on whether the longwall shield on which Meadows was working was equipped with a base lift cylinder. Sokalski's theory was that the "spike" in pressure was generated by the base lift jack/cylinder portion of the shield because the ram bar was in the "down" position. However, the evidence shows that when Shield # 45 was delivered to Anchor it did not contain a base lift ram bar or a base lift jack housing. According to Anchor's records, Anchor did not put in a new base lift ram bar or a new base lift housing during its repairs and refurbishment of Shield # 45. Testimony by an inspector present at the Mine on the date of the incident indicates that the shield Meadows was working on at the time of the accident did not contain a base lift jack. No evidence was presented that the Mine supplied or paid for a new base lift jack. [**29] Additionally, no evidence was presented to contradict that the shield did not require a base lift jack to function.

The only evidence that appellants point to in order to prove the existence of a base lift cylinder in Shield # 45 was the equivocal deposition testimony of Groff that he thought that the base lift ram bar would have been replaced before the longwall shield was sent back to the Mine, not that he knew that it was replaced on Shield # 45. Thus, Sokalski's opinion, which depended on the existence of a base lift jack on Shield # 45 to cause the pressure increase, lacked a factual foundation in the record to satisfy the fit requirement and was properly excluded by the District Court. *See Stecyk, 295 F.3d at*

306 Fed. Appx. 781, *791; 2009 U.S. App. LEXIS 521, **29;
78 Fed. R. Evid. Serv. (Callaghan) 434

*414.*

Appellants argue that a factual dispute existed as to whether a base lift jack was attached to Shield # 45 because Anchor's paperwork was not correct or that a shield other than Shield # 45 was involved in the accident. However, as the District Court properly noted, appellants produced no evidence at the *Daubert* hearing that the paperwork was incorrect or that the incorrect shield had been identified in discovery. The photograph that appellants allege supports that a [**30] base lift jack was on Shield # 45 at best suggests that the incorrect shield had been identified. However, as Anchor only refurbished 39 of the 189 shields in the Mine repair project, Meadows would have had to also identify that the malfunctioned shield was refurbished by Anchor because it would have been possible that Anchor did not repair the relevant shield if it was not Shield # 45. Thus, if Shield # 45 was correctly identified, it did not have a base lift jack so it could not have malfunctioned in the way that Sokalski opined caused the accident. If Shield # 45 was not correctly identified as the mine shield at issue, no evidence existed that this unidentified shield was one that Anchor repaired.

For the foregoing reasons, we find that the District Court did not abuse its discretion in excluding the testimony of appellants' expert witness. Sokalski's testimony failed to meet the reliability and fit requirements for admitting expert testimony and was therefore properly excluded under both, although either would have been sufficient.

[*792] C. *Dismissal of System Stecko*

Appellants' challenge of the District Court's sua sponte grant of summary judgment in favor of third-party defendant Stecko [**31] is moot. On January 5, 2007,

the District Court sua sponte granted summary judgment for Stecko on Anchor's contribution claims against Stecko. Anchor did not oppose the summary judgment, as its expert had found no manufacturing defects in the Stecko valve components. [4] Anchor does not now appeal the grant of summary judgment in favor of Stecko.

> 4   Stecko has filed an unopposed motion to file a surreply brief. That motion is granted.

Appellants argue, as they did before the District Court, that because their expert found a defect in the Stecko valve there was a genuine issue of material fact precluding the dismissal of Stecko because the jury could find that the Stecko valve was defective and caused the failure resulting in Meadows' injury. Appellants are here seeking to admit evidence against a party they did not sue in support of a claim abandoned by the party who raised it. Pursuant to *Federal Rule of Civil Procedure 14*, a plaintiff cannot recover against a third-party defendant unless the plaintiff amends his complaint and files a direct action against the third-party defendant. *See Fed. R. Civ. P. 14(b)*; *see also George v. Brehm, 246 F. Supp. 242, 246 (W.D. Pa. 1965)*. Here, despite [**32] being given an opportunity to do so, appellants failed to amend their complaint or to seek to amend their complaint out of time to bring an action against Stecko under *Rule 14*. We therefore need not consider whether the District Court should have taken Sokalski's testimony into account in granting summary judgment for Stecko against Anchor. Because we affirmed the Court's exclusion of Sokalski's testimony and appellants have not filed a claim against Stecko or amended their complaint to bring an action against Stecko, the issue is moot.

For the foregoing reasons, we affirm the judgment of the District Court in its entirety.