# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

|  |  |
|---|---|
| | * |
| | * |
| **IN RE: KATRINA CANAL BREACHES** | * |
| **CONSOLIDATED LITIGATION** | * **CIVIL ACTION** |
| | * |
| | * **NO. 05-4182** |
| **PERTAINS TO:   BARGE** | * **and consolidated cases** |
| | * |
| *Boutte v. Lafarge*          **05-5531** | * **SECTION "K" (2)** |
| *Mumford v. Ingram*          **05-5724** | * |
| *Lagarge v. Lafarge*         **06-5342** | * |
| *Perry v. Ingram*            **06-6299** | * |
| *Benoit v. Lafarge*          **06-7516** | * **JUDGE** |
| *Parfait Family v. USA*      **07-3500** | * **STANWOOD R. DUVAL, JR.** |
| *Lafarge v. USA*             **07-5178** | * |
| | * **MAG. JOSEPH C. WILKINSON, JR.** |
| | * |
| | * |

## PLAINTIFFS' PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

i

Plaintiffs Josephine Richardson, John Alford, Jerry Alford and Holiday Jewelers, Inc. (collectively "Plaintiffs") set forth below their Proposed Findings of Fact and Conclusions of Law based on the record existing before trial. Wherever appropriate, a proposed finding is supported by a pin citation to exhibits, depositions, expert reports, and/or judicially noticeable evidence. Plaintiffs will supplement their Proposed Findings of Fact and Conclusions of Law based on additional evidence introduced at trial.

## SUMMARY OF PLAINTIFFS' NEGLIGENCE CLAIM

1.       Plaintiffs pursue a single claim of negligence, based on both Louisiana State law and Maritime law, arising out of Lafarge's inappropriate handling of Barge ING 4727. (*Mumford Complaint*).

2.       Plaintiffs allege that Lafarge's cumulative decisions and negligent conduct leading up to and through Hurricane Katrina resulted in Barge ING 4727 to become unmoored – permitting the ING 4727 to float adrift during the course of the Hurricane – causing two separate breaches to the eastern floodwall of the Inner Harbor Navigation Canal ("IHNC").

3.       Plaintiffs allege that Lafarge's negligent conduct led to the catastrophic flooding of New Orleans' Lower Ninth Ward and St. Bernard Parish, (**1**) on the _West_ by the Industrial Canal, (**2**) on the _North_ by the Public Belt or other Railway adjacent to and immediately north of Florida Avenue, and the east-west channel or canal extending from the aforesaid railway to Paris Road (Florida Walk Canal and Forty Arpent Canal), and (**3**) on the _South_ by the Mississippi River. In so doing, Lafarge's negligent conduct caused Plaintiffs to incur damage, as set forth herein.

4.       For the reasons discussed below, Plaintiffs have proven by a preponderance of

evidence that Lafarge's negligence caused the southern and northern breaches of the IHNC, which resulted in catastrophic flooding of each Plaintiffs' property, and therefore is responsible for each Plaintiffs' loss.

## ELEMENTS OF PLAINTIFFS' CLAIMS

5.      "The analysis of a maritime tort [of negligence] is guided by general principles of negligence law."  *See Consolidated Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d 65, 67 (5th Cir. La. 1987).  "To establish maritime negligence, a plaintiff must 'demonstrate that there was **[a]** a duty owed by the defendant to the plaintiff, **[b]** breach of that duty, **[c]** injury sustained by [the] plaintiff, and **[d]** a causal connection between the defendant's conduct and the plaintiff's injury.'" *See Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. La. 2000).

### Duty and Breach

6.      "Whether a defendant owes a plaintiff a legal duty is a question of law."  *See Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. La. 2000). "[T]he determination of whether a party owes a duty to another depends on a variety of factors, 'most notably the foreseeability of the harm suffered by the complaining party.'" *See id*. at 377.   "A harm is a foreseeable consequence of an act or omission if harm of a general sort to persons of a general class might have been anticipated by a reasonably thoughtful person, as a probable result of the act or omission, considering the interplay of natural forces and likely human intervention."  *See Pledger v. Phil Guilbeau Offshore, Inc.*, 2003 U.S. Dist. LEXIS 7416 (E.D. La. Apr. 30, 2003).

7.      "Whether a defendant has breached a duty owed is a question of fact."  *See Florida Fuels v. Citgo Petroleum Corp.*, 6 F.3d 330, 333 (5th Cir. La. 1993).

8.     Notwithstanding the forgoing, however, "[u]nder maritime law, when a vessel breaks free from its moorings and drifts into an allision with a stationary object, the moving vessel is presumed at fault." *See Signal Int'l LLC v. Miss. DOT*, 579 F.3d 478, 490 n.11 (5th Cir., 2009); *The Louisiana*, 70 U.S.164 (1865); *James v. River Parishes Co., Inc.*, 686 F.2d 1129. 1132 (5th Cir. 1982). "This inference or presumption of negligence is a rule of law based on the logical deduction that a vessel found floating loose was improperly moored." *See James*, 686 F.2d at 1133. "The drifting vessel is presumptively liable for damages unless it can 'show that her drifting was the result of an inevitable accident or a vis major, which human skill and precaution and a proper display of nautical skill could not have prevented.'" *See Signal*, 579 F.3d at 490 n.11.[1]

## Causation

9.     Causation has the "sub-elements of: (a) cause in fact and (b) proximate or legal cause." *In re Mid-South Towing Co.*, 418 F.3d 526, 532 (5th Cir. 2005).

10.     With regard to the first element, "[a] defendant's actions must be the cause in fact of a plaintiff's injuries in order for the plaintiff to be able to recover." *See Moser v. Texas Trailer Corp.*, 623 F.2d 1006, 1013 (5th Cir. 1980). "Cause-in-fact is generally a 'but for' inquiry, which tests whether the accident would or would not have occurred but for the defendant's substandard conduct." *See In re Katrina Canal Breaches Consol. Litig.*, 2009 U.S. Dist. LEXIS 72288, 268 (E.D. La. Apr. 15, 2009) (citing *Bonin v. Ferrellgas, Inc.*, 877 So.2d 89 (La. 2004)). It is well settled that "[t]here can be more than one cause in fact, making multiple wrongdoers liable." *Hennigan v. Cooper/T. Smith Stevedoring Co., Inc.*, 837 So. 2d 96, 102 (La.App. 2002).

---

[1] Plaintiffs' legal contentions regarding the applicability of the "Louisiana Rule" in this case are set forth in detail in Plaintiffs' *Contentions of Law* below.

"However, where there are concurrent causes of an accident, the proper inquiry is whether the conduct in question was a substantial factor in bringing about the accident." *See id.* "In considering the substantial factor test, … cause-in-fact clearly exists when the plaintiff's harm would not have occurred absent the specific defendant's conduct." *See id.* (citing *Bonin v. Ferrellgas, Inc.*, 877 So.2d 89 (La. 2004)).

11.     The second element – proximate cause – "is ultimately a question of policy as to whether the particular risk falls within the scope of the duty" and "asks 'whether the enunciated rule or principle of law extends to or is intended to protect this plaintiff from this type of harm arising in this manner.'" *See Roberts v. Benoit*, 605 So. 2d 1032, 1044-45 (La. 1991).  Under maritime law, "[t]he task of defining the proper reach or thrust of a rule in its policy aspects is one that must be undertaken by the court in each case as it arises" and, in making this determination, "[f]oreseeability obviously marks the limits placed on a defendant's duty…." *See Consolidated Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d at 67.

12.     Generally, the burden rests on the Plaintiff to establish causation.  "But when, as in this case, a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster." *See The Pennsylvania*, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874).[2]  "The rule of The Pennsylvania concerns … the burden of proof for showing causation[.]" *See Pennzoil Producing Co. v. Offshore Express, Inc.,* 943 F.2d 1465, 1472 (5th Cir., 1991). When implicated, "[t]he rule allocates the burden of proof, transferring it to the party in violation of a statute or regulation." *See Pennzoil*, 943 F.2d at 1472.

---

[2] "Though The Pennsylvania involved a collision, the Pennsylvania rule has been held to apply not only to fact scenarios involving collisions or allisions, but also to 'violations of statutes intended to prevent the injury that actually occurred.'" *In re Quality Marine Servs.*, 2005 U.S. Dist. LEXIS 9201, 8 (E.D. La. 2005).

In so doing, "[t]he Pennsylvania rule applies a higher standard of proof" [*In re Quality Marine Servs.*, 2005 U.S. Dist. LEXIS 9201, 7 (E.D. La. 2005)], which "imposes a heavy burden" on the defendant.  *See Pennzoil*, 943 F.2d at 1472. "In simplest terms, that rule states that where a vessel is guilty of a statutory violation, the defaulting ship must show 'not merely that her fault might not have been one of the causes, or that it probably was not, **but that it could not have been**.'"  *See Candies Towing Co. v. M/V B & C Eserman*, 673 F.2d 91, 94 (5th Cir., 1982).[3]

### Damage

13.     Under the applicable maritime rule of joint and several liability, "a person whose negligence is a substantial factor in the plaintiff's indivisible injury is entirely liable even if other factors concurred in causing the injury."  *See Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 260 n.8, 273 n.30 (1979) .  The rule is applicable "in any situation where two or more causes concur to produce harm, even when one cause is an act of God."  *See Wm. G. Roe & Co. v. Armour & Co.*, 414 F.2d 862, 869 (5th Cir., 1969).  The rule relieves a plaintiff of any obligation to prove a defendant's degree of fault for an indivisible harm, as a "plaintiff can collect his entire judgment from a single defendant, leaving to the defendants allocation of fault among themselves."  *See Coats v. Penrod Drilling Corp.*, 61 F.3d 1113, 1116 (5th Cir. Miss. 1995).

14.     Thus, if Plaintiffs carry their burden of proving **any** negligence on the part of the Defendant, even if the Defendant is only 1% at fault, Defendant is liable for 100% of the damages sustained by the Plaintiffs.  *See e.g. Latulas v. Montco Offshore, Inc.*, 2006 U.S. Dist. LEXIS 20066, at 10 (E.D. La. Mar. 29, 2006) ("concluding that '[i]If an employer is found to be

---

[3] Plaintiffs' legal contentions regarding the applicability of the "Pennsylvania Rule" in this case are set forth in detail in Plaintiffs' *Contentions of Law* below.

99% at fault for an injury to a longshoreman, and a vessel owner 1% at fault, the vessel becomes liable for 100% of the damages sustained by the plaintiff.").[4]

## DISCUSSION OF THE KEY EVIDENCE

### Conditions At Lafarge Before Hurricane Katrina

15.     At the time before Hurricane Katrina, Lafarge had no written hurricane preparation plan, in violation of standard practices and Coast Guard requirements.  [*Testimony Edward VanderMuelen* (Lafarge Area Distribution Supervisor and FRCP 30(b)(6) designee); *Plaintiffs' Exh. 371* (VanderMuelen Depo.);  *Testimony of  Jennifer Arnold* (LNA Area Safety Advisor )].

16.     Lafarge had a one-page "New Orleans Terminal Hurricane Preparation Checklist" that consists mostly of blank space ("Name of Hurricane: ____") and contains a few very elementary precautions ("Cable all barges to shore," etc.). [*Plaintiffs' Exh. 37* (Lafarge "Hurricane Preparation Checklist.")].

17.     Lafarge's one-page "New Orleans Terminal Hurricane Preparation Checklist" fell far short of the requirements of a written hurricane preparation plan, and was no longer in effect by the time of Hurricane Katrina.  [*Testimony of VanderMuelen; Plaintiffs' Exh. 371* (VanderMuelen Depo.); *Testimony of Arnold*].

18.     In addition, the Lafarge France Road terminal lacked communications, and had disabled its equipment receiving weather reports, due to an ongoing construction project.

---

[4]  *See also Foulk v. Donjon Marine Co.*, 963 F. Supp. 427, 430 (D.N.J. 1997) ("To avoid any liability to Mr. Foulk, Donjon must thus convince a jury that Donjon was not at all at fault in causing Mr. Foulk's injuries. If the jury concludes otherwise, for example finding Donjon one percent at fault, joint and several liability will require that Donjon compensate Mr. Foulk for its role in the accident and for Breakwaters' role in the accident, however large that may be."); *Kirksey v. P&O Ports Tex., Inc.*, 488 F. Supp. 2d 579, 591 (S.D. Tex. 2007) ("Even if Tonghai was negligent partly as a vessel owner and Plaintiff's employer was partly negligent as well, Tonghai's negligence as vessel owner -- even if 1% - supports a judgment against it for all of Patrick Kirksey's damages"), rev'd on other grounds in *Kirksey v. Tonghai Mar.*, 535 F.3d 388 (5th Cir. Tex. 2008).

[*Testimony of Edward Busch* (Lafarge North America Asst. Terminal Manager)].

19.     Lafarge did nothing to remedy this defect during the 2005 hurricane season, not even when a possibility emerged that New Orleans was in a zone that Hurricane Katrina might reach.  [*Testimony of Edward Busch*].

20.     Although public information advising of the nature and approach of Hurricane Katrina was available as early as Friday, August 26, 2005 [*Plaintiffs' Exh. 19* (Proclamation by Gov.  Kathleen Blanco); *Plaintiffs' Exh. 18* (National Hurricane Center Advisories and tracking maps); *Plaintiffs' Exh. 15*(Impact Weather Advisories)], Lafarge did not notify its personnel before Saturday, August 27, of the increased risk or provide any instructions as the predicted track of Hurricane Katrina focused more tightly on the New Orleans area.  [*Testimony of Busch*].

21.     The personnel working at the Lafarge France Road terminal dock did not receive notice of Hurricane Katrina's approach until around 9:00 a.m. on Saturday, August 27, 2005, in the form of phone calls from employees' family members.  [*Testimony of  Busch*].

22.     Around 9:00 or 10:00 A.M. on Saturday, August 27, 2005, Lafarge Safety Manager Jennifer Arnold called Mr. Busch, which Busch described as follows: "She was more not telling me about the storm, she was calling to ask if our employees, how many employees we had at the plant, what we were doing, how long we were going to be there, and basically said do what you got to do to get that plant tied up, locked up, and get the hell out of there." [*Testimony of Busch*].

23.     Mr. Busch testified that he told Jennifer Arnold that he had "released the barge," but no further details were discussed.  [*Testimony of Busch*].

24.     Mr. Busch did not inform Jennifer Arnold, or any other Lafarge official, that the terminal's weather reporting service had been disabled.  [*Testimony of Busch*].

**Lafarge's Negligent Failure To Remove or Secure Barge ING 4727**

25.     On Friday, August 26, 2005, Lafarge proceeded to unload Barge ING 4727, continuing overnight despite the prior issuance of governmental and weather service warnings of the impending storm, and completed the unloading at 9:00 a.m. on Saturday, August 27, 2005. [*Plaintiffs' Exh. 62* (Lafarge North America Barge Unloading Report); *Testimony of VanderMuelen*; *Plaintiffs' Exh. 371*(VanderMuelen Depo.)].

26.     The unloaded barge was much more susceptible to winds, in a situation in which winds could reasonably be expected to be high. [*Testimony of Maritime Expert, Don Green*].

27.     Lafarge did not make a reasonable, timely effort to remove the unloaded Barge ING 4727 from the IHNC and get it out of harm's way.  Lafarge Assistant Manager, Edward Busch, claims to have left a voice mail message without speaking to a live person.  [*Testimony of Busch*].  However, Zito denies receiving any such call, denies voicemail capability exists such that Mr. Busch could have left a message, and has provided an automated telephone system log reflecting the absence of a call from Mr. Busch.  [*Testimony of Barry Boudreaux*; *Plaintiffs' Exh. 425* (Nextel invoice of calls by Ed Busch); *Plaintiffs' Exh. 50* (Daily Calling Log of Zito)].

28.     Mr. Boudreaux testified in the trial of the limitation action that if Zito had been notified of a desire to move Barge ING 4727 out of the IHNC and fleet it, this would have been possible. [*Testimony of Boudreaux*].

29.     Had Lafarge ordered Joseph C. Domino, Inc., to remove the ING 4727 from the facility and tow it to a fleet in the Mississippi River rather than top the two barges around, Lafarge would have prevented the breakaway. [*Testimony of Donald Green* (Plaintiff Maritime Expert); *Plaintiffs' Exh. 386* (Green Report); *Plaintiffs' Exh. 389* (Green Declaration)].

30.     Despite a height differential of about eight feet above water level between the empty Barge ING 4727 and the loaded Barge ING 4745, Lafarge moored these barges together with three single strands of rope (single part lines). [*Testimony of Earl Smith* (Lafarge Maintenance Supervisor); *Testimony of Eric Thigpen* (Unique Towing deckhand)].

31.     Lafarge's mooring violated the United States Coast Guard Sector New Orleans Hurricane Plan (mooring lines to be doubled up) and accepted standards of maritime care. [*Testimony of Donald Green* (Plaintiff Maritime Expert); *Plaintiffs' Exh. 386* (Green Report); *Plaintiffs' Exh. 389* (Green Declaration)].

32.     Lafarge did not perform or request any mooring of the Barge ING 4727 to the dock (per its own Hurricane Checklist "cable all barges to shore"), and did not perform or request any examination or strengthening of any connection such as would increase the moorings affixed to ING 4727.  [*Testimony of Busch*].

33.     To avoid damage to its dock in the event of a hurricane surge, Lafarge decided to unmoor the unloaded Barge ING 4727 from the dock, and switch the two barges around. [*Testimony of Smith; Testimony of Bush*].

34.     Lafarge Manager, Ed Busch, called Joe Domino, Inc./Unique Towing on the morning of Saturday, August 27, 2005 to have the empty Barge ING 4727 moved outboard of the Barge ING 4745.  Busch did not request any mooring of the Barge ING 4727 to the dock, or any examination or strengthening of any connection between other services such as would increase the moorings affixed to ING 4727.  Domino was not instructed to modify, or even to check, the moorings between the two barges. [*Testimony of Raymond Grabert* (Captain of the REGINA H); *Testimony of Busch*].

35.     Lafarge abandoned its facility on Saturday, August 27, prior to the arrival of

tugboat Regina H. [*Testimony of VanderMuelen*; *Testimony of Grabart*].

36.     On Saturday, August 27, 2005 at approximately 2:25 p.m., The REGINA H tug boat arrived at the Lafarge France Road facility.  Unique Towing employee, Raymond Grabert, Captain of the REGINA H, testified that he would have taken the empty 4727 out of the Industrial Canal on the 27th if he had been requested to do so. [*Testimony of Earl Smith*; *Testimony of Thigpen*].

37.     Lafarge did not instruct Unique Towing to secure the resulting outboard Barge ING 4727 to the dock, in violation of Lafarge's own Terminal Hurricane Preparation Checklist. [*Testimony of Louis Robin* (Lafarge Terminal Attendant); *Testimony of Thigpen*].

38.     Prior to Lafarge abandoning its facility, Lafarge made no arrangement for anyone to monitor the barges it had left in the IHNC, or instruct any towing company to station a tug in the IHNC to monitor the barges it had in the IHNC, to ensure that none would become loose and endanger lives and property.  [*Testimony of Earl Smith*].

39.     Unique Towing's deck hand saw three single strands of two-inch line connecting Barge 4727 and Barge 4745, two ropes at the ends and one at an angle in the middle.  [*Testimony of Thigpen*].

40.     Although Lafarge employee Earl Smith testified that extra line was left out for Unique Towing to use [*Testimony of Earl Smith*], Unique Towing personnel saw no such line. [*Testimony of Thigpen*].

41.     Lafarge also did not authorize Unique Towing to use the extra lines it carried on its vessel, to secure the Barge 4727 more effectively.  [*Testimony of Grabert*].

42.     Lafarge's failure to order Joseph C. Domino, Inc. to provide additional rigging violated the United States Coast Guard Sector New Orleans Hurricane Plan (mooring lines to be

doubled up) and accepted standards of maritime care. [*Testimony of Donald Green* (Plaintiff Maritime Expert); *Plaintiffs' Exh. 386* (Green Report); *Plaintiffs' Exh. 389* (Green Declaration)].


### Observations Of Wind Direction and Wave Height Prior to Breaches

43.     Within the time of the North and South breaches, at times when Lafarge asserts that wind was not blowing from west to east, water was observed splashing over the eastern IHNC floodwall, from west to east.  [*Testimony of Michael Bickham*; *TestimonyTerry Adams*; *Plaintiffs' Exh.372* (December 18, 2007 Deposition of William Villavasso ); *Plaintiffs' Exh.372*; *Plaintiffs' Exh. 264* (Transcription of January 25, 2006 audio statement of Lower Ninth Ward resident Arthur Murph to attorney Richard Joseph Guidry)].

44.     Wind was observed blowing Southeast to Northwest in the Lower Ninth Ward at a time when Lafarge asserts that it was from the Northeast. [Testimony of *Andrew Sartin*]

45.     South-to-north wind was observed in Chalmette, west of Paris Road, at a time when Lafarge asserts that wind direction was from north to south. [*Testimony of Dennis Martinez*].

46.     Unpowered vessels in the Intracoastal Waterway were observed being blown from west to east at times at which Lafarge asserts that wind was not blowing from west to east. [*Testimony of Capt. James Hall*].

47.     "Prevailing wind" was not the only force capable of motivating ING 4727; ING 4727 could move in directions other than "prevailing wind." [Testimony of *Cmdr. (Ret.) Don Green*; *Testimony of Hector Pazos, PE*].

48.     William Villavasso, a 23-year employee of the Water and Sewer Board and Chief Operator of Pump Station 5 at the time of Hurricane Katrina, testified to seeing four to five foot

high waves splashing over the INHC at Pump Station 5 (located at Florida Avenue and the Industrial Canal) during the time leading up to the North Breach.  [*Plaintiffs' Exh.372 (December 18, 2007 Deposition of William Villavasso )*].

## The North Breach

49.     The North Breach occurred in f1oodwalls along the east bank of the south segment of the IHNC, between east-west streets Florida Ave. and Law Street, just south of the Florida Ave. Bridge, and was about 250 ft long.  [*Testimony of Marino*; *Plaintiffs' Exh. 397* (July 1, 2009 Report of Marino)].

50.     The IHNC North breach occurred at or before 4:30 a.m. CDT.  [*Testimony of Spinks*;  *Plaintiffs' Exh. 421* (Spinks Report at p. 37); *Plaintiffs' Exh. 424* (Spinks Decl. at ¶ 12)].

51.     That the IHNC North breach occurred at or before 4:30 a.m. CDT is corroborated by two eyewitnesses who reported seeing Barge ING 4727 in the IHNC on Sunday afternoon, August 28, 2005, the day before the breach. [*Testimony of Gertrude LeBlanc*; *Plaintiffs' Exh. 375* (Centanni Investigative Agency Transcription of July 31, 2006 Recorded Telephone Conversation With LeBlanc); *Testimony of Frazier Tompkins*; *Plaintiffs' Exh. 376* (Centanni Investigative Agency Transcription of December 2, 2005 Recorded Telephone Conversation With Tompkins)].

52.     The first witness, Gertrude LeBlanc attested that she saw the barge in the IHNC on Sunday morning, August 28, 2005, while she was on the Claiborne Avenue Bridge crossing the IHNC.  [*Testimony of LeBlanc*].  According to her account, the Barge was near the East side (the Lower Ninth Ward side), between the Claiborne Avenue and Florida Avenue.  [*Testimony of*

*LeBlanc*].  Ms. LeBlanc's October 21, 2009 Affidavit stated that she saw the Barge next to the East floodwall for the Lower Ninth Ward, between the Claiborne Avenue and Florida Avenue bridges, between 11:00 A.M. and Noon on Sunday, August 28, 2005.  [*Testimony of LeBlanc*].

53.     Frazier Tompkins, the second witness, stated that on Sunday, August 28, 2005, he saw an unattended barge by itself in the vicinity of Derbigny, Roman and Prieur streets on the east side of the canal. [*Testimony of Frazier* Tompkins; *Plaintiffs' Exh. 376*].

54.     In addition to this eyewitness testimony, a total of 20 different people have been identified as having perceived sounds, such as booms, explosions, grinding and metallic screeching on the Eastern side of the IHNC on the day in question between the time period of 3:00a.m.  and 7:00 a.m. [*Testimony of Arthur M. Anderson*; *Testimony of Arcola Sutton*; *Testimony of Patrina Peters*; *Testimony of Dakeia Johnson; Testimony of Anthony Dunn*; *Testimony of Dolores St. Cyr – Butler*; *Testimony of Ronald McGill*; *Testimony of Ernest Edwards*; *Testimony of Daniel Weber*; *Testimony of Earl Lackings*; *Testimony of Andrew Sartin*; *Testimony of Christopher Weaver*; *Testimony of Kevin McFarland*; *Testimony of Arthur Murph*; *Testimony of Michael Bickham*; *Testimony of Carolyn Berryhill*; *Testimony of Towanda Schexnayder*; *Testimony of Joe Edwards; Testimony of Wm. Villavasso; Testimony of Terry Adams*].

55.     Most compelling is the testimony of William Villavasso – an individual who routinely observed barges on the INHC during his 23 years working for the Sewerage and Water Board – who testified repeatedly at deposition that he personally witnessed the tip of a barge impact and cause the Northern floodwall breach.  [*Testimony of William Villavasso*; *Plaintiffs' Exh. 372* (December 18, 2007 Depo. of Villavasso at 24:9-25:13, 64:21-24, 71:5-9, 81:12-22, 85:2-8, 86:2-5, 86:9-16, 89:3-20, 97: 6-16, 98:14-17, 128:2-24, 186:23 -187:18, 191:12-25,

202:6-203:7, 203:8-204:18)].

56.     Defendant's contention that Mr. Villavasso's testimony is not plausible because "the object [he] allegedly saw was sticking up out of the water only one to four feet above the top of the floodwall," is incorrect.  Contrary to Defendant's assertion, Mr. Villavasso's testimony repeatedly refers to the fact he only saw what he perceived was the tip of the barge protruding from the floodwall, not to the height of the barge above the water.  [*Testimony of Villavasso*; *Plaintiffs' Exh. 372* (Depo. of Villavasso at 24:9-25:13, 64:21-24, 71:5-9, 81:12-22, 85:2-8, 86:2-5, 86:9-16, 89:3-20, 97: 6-16, 98:14-17, 128:2-24, 186:23 -187:18, 191:12-25, 202:6-203:7, 203:8-204:18)].


### The South Breach

57.     The South Breach occurred in floodwalls along the east bank of the south segment of the IHNC, between east-west streets N. Galvez St. and N. Prieur St., and was about 850 ft long.  [*Testimony of Marino*; *Plaintiffs' Exh. 397* (July 1, 2009 Report of Marino)].

58.     The IHNC South breach occurred at or before 6:00 a.m. CDT on Monday, August 29, 2005.  [*Testimony of Spinks*; *Plaintiffs' Exh. 421* (Spinks Report at p. 37); *Plaintiffs' Exh. 424* (Spinks Decl. at  ¶ 12)].

59.     This fact is first corroborated by two eyewitnesses who reported seeing Barge ING 4727 in the IHNC on Sunday afternoon, August 28, 2005, the day before the breach. [*Testimony of Gertrude LeBlanc*; *Plaintiffs' Exh. 375* (Centanni Investigative Agency Transcription of July 31, 2006 Recorded Telephone Conversation With LeBlanc); *Testimony of Frazier Tompkins*; *Plaintiffs' Exh. 376* (Centanni Investigative Agency Transcription of December 2, 2005 Recorded Telephone Conversation With Tompkins)].

14

60.     The first witness, Gertrude LeBlanc attested that she saw the barge in the IHNC on Sunday morning, August 28, 2005, while she was on the Claiborne Avenue Bridge crossing the IHNC.  [*Testimony of LeBlanc*]. According to her account, the Barge was near the East side (the Lower Ninth Ward side), between the Claiborne Avenue and Florida Avenue Bridges. [*Testimony of LeBlanc*].  Ms. LeBlanc's October 21, 2009 Affidavit stated that she saw the Barge next to the East floodwall for the Lower Ninth Ward, between the Claiborne Avenue and Florida Avenue bridges, between 11:00 A.M. and Noon on Sunday, August 28, 2005.  [*Testimony of LeBlanc*].

61.     Frazier Tompkins, the second witness, stated that on Sunday, August 28, 2005, he saw an unattended barge by itself in the vicinity of Derbigny, Roman and Prieur streets on the east side of the canal. [*Testimony of Frazier Tompkins*].

62.     In addition to this eyewitness testimony, a total of 21 different people have been identified as having perceived sounds, such as booms, explosions, grinding and metallic screeching on the Eastern side of the IHNC on the day in question between the time period of 3:00a.m. and 7:00 a.m. [*Testimony of Arthur M. Anderson*; *Testimony of Arcola Sutton*; *Testimony of Patrina Peters*; *Testimony of Dakeia Johnson; Testimony of Anthony Dunn*; *Testimony of Dolores St. Cyr – Butler*; *Testimony of Ronald McGill*; *Testimony of Ernest Edwards*; *Testimony of Daniel Weber*; *Testimony of Earl Lackings*; *Testimony of Andrew Sartin*; *Testimony of Christopher Weaver*; *Testimony of Kevin McFarland*; *Testimony of Arthur Murph*; *Testimony of Michael Bickham*; *Testimony of Carolyn Berryhill*; *Testimony of Towanda Schexnayder*; *Testimony of Joe Edwards; Testimony of Wm. Villavasso; Testimony of Terry Adams*].

63.     Moreover, the direct eyewitness testimony of Lower Ninth Ward resident Terry

Adams who testified at deposition that he personally witnessed the Barge impact and cause the Southern floodwall breach is persuading.  Adams, who had evacuated to the roof of his home at 2604 Deslonde Street between 5:30 A.M. and 6:00 A.M. on Monday, August 29, 2005, witnessed the Barge impact and break through the floodwall from about five blocks away. [*Testimony of Terry Adams*].

64.     Additionally, two other eyewitnesses, Arthur Murph and Sidney Williams, both rendered statements that they witnessed the Barge impact and penetrate the floodwall as the location or the Southern breach.  [*Testimony of Sidney Williams*; *Testimony of Arthur Murph*; *Plaintiffs' Exh. 264* (Arthur Murph's January 25, 2006 recorded statement to Attorney Richard Joseph Guidry)].

### Physical Evidence of Barge Impact

65.     While concrete monoliths on the London and 17th Street Canals fell intact, concrete monoliths at the eastern Inner Harbor Navigation Canal breaches display significant pulverization of concrete. [*Testimony of Hector Pazos*, P.E.; *Plaintiffs' Exh. 402*].   This distinction is unique to the eastern IHNC floodwall breaches.  [*Testimony of Hector Pazos*, P.E.; *Plaintiffs' Exh. 402*].

66.     Exposed rebar protruding from area where concrete floodwall cap was at southern end of South Breach is a feature not present at any other breach. [*Testimony of Pazos*; *Plaintiffs' Exh. 402; Testimony of Marino; Plaintiffs' Exh. 397*; *Testimony of Bartlett; Plaintiffs' Exh. 378*].  This rebar left a corresponding pattern on the bottom of ING 4727.  [Plaintiffs' Exh. 419 (Harbor Photo of ING 4727); *Testimony of Pazos*; *Plaintiffs' Exh. 402; Testimony of Marino; Plaintiffs' Exh. 397*; *Testimony of Bartlett; Plaintiffs' Exh. 378*].  This feature is unique to the

South Breach of the Eastern IHNC floodwall.  [*Testimony of Pazos*; *Plaintiffs' Exh. 402;*
*Testimony of Marino; Plaintiffs' Exh. 397*; *Testimony of Bartlett; Plaintiffs' Exh. 378*].

67.    Barge ING 4727 contains scratches on its bottom which are spaced at intervals
consistent with the 9 inch design spacing of the vertical rebars in one face of the floodwall,
assuming the barge traveled in a somewhat straight path through the wall at a slight angle off
perpendicular to the live of the wall.  [*Testimony of Robert Bartlett, P.E.*; *Plaintiffs' Exh. 378*
(Report of Robert Bartlett, P.E.)].  Some of the scratches on the bottom of the barge extended
approximately three-fourths the length of the barge." [*Testimony of Bartlett*; *Plaintiffs' Exh.
378*].

68.    Dr. Reed Mosher of the Corps of Engineers, who was in charge of Volume V of
the IPET Report, admitted in his deposition that it appeared the barge had struck part of the
floodwall at the South breach, and that there was evidence on the barge that it had scraped
against a floodwall.  [*Plaintiffs' Exh. 364* (July 22, 2009 Deposition of Reed Mosher, at 90:23-
91:6)].

69.    Moreover, scrape marks also appear along the inner expanse of the eastern IHNC
floodwall from a point north of both the North Breach to the location of the South Breach.
[*Testimony of Hector Pazos*, P.E.; *Plaintiffs' Exh. 402*;  *Plaintiffs' Exh. 241* (ABC News video
interview of Joseph Edwards)].  This is consistent with witnesses who heard scraping, screeching
and grinding noises. [*Testimony of Michael Bickham; Testimony of Carolyn Berryhill; Testimony
of Towanda Schexnayder*].

**Accident Reconstruction Analysis Confirms Barge Impact was the Cause**

70.    Plaintiffs' Expert, Gennaro G. Marino, Ph.D., P.E. ("Dr. Marino"), conducted a

forensic investigation of the failure of the North and South breaches, and as a result of that investigation, "ruled-in" the Barge as a direct cause.  The relevant factors considered by Dr. Marino included:

- An examination of the failure manifestations of the North breach, including the tearing of the I-wall and the relationship of such tearing to the lack of significant scouring of the landside levee, and the relationship of overall failure relative to eyewitness observations;

- An examination of the failure manifestations of the South breach, including the wall displacement and other characteristics (such as the exceptionally bent ends, bowed or coiled wall at the south end, and an unusual irregular shape of the laid out I-wall), examination of the sheetpile, and the relationship of overall failure relative to eyewitness observations;

- Comparative analysis of the failure manifestations of the North and South breaches in relation to other breaches attributed to soil related causes; AND

- An examination of the reported damage of the ING4727 in relation to the failure manifestations at the South breach.

[*Testimony of Marino*; *Plaintiffs' Exh. 397* (July 1, 2009 Report of Marino); *Plaintiffs' Exh. 401* (October 30, 2009 Declaration of Gennaro Marino)].

71.    Prior to Katrina, the floodwalls along the south segment of the navigational canal consisted mainly of T-wall along the west bank and I-wall along the east bank.  The I-wall is essentially made of steel sheetpile driven to a design l depth, with upper floodwall of reinforced concrete. The steel sheets are embedded into the concrete to provide a structural connection.  The constructed I-wall is based on the design analyses which considered seepage effects and lateral support of floodwater. The I-wall was not designed, however, for barge impact(s).  [*Testimony of Marino*; *Plaintiffs' Exh. 397* (July 1, 2009 Report of Marino)].

72.    Dr. Marino concludes that the floodwall damage at the North Breach is consistent with witness observations/reports of Barge impact.  At the North Breach location, the I-wall was

torn out of the ground and twisted 270$^o$ to the south end of the breach. [*Testimony of Marino*; *Plaintiffs' Exh. 397* (July 1, 2009 Report of Marino, Photo 4.10)]. To cause the sheetpile to be displaced out of the ground would require significant upper force on the wall, such as a barge impact. At the time of failure there was no overtopping and, thus, no significant backside scour to undermine the floodwall, although there is no evidence that if there was overtopping at the time of failure that undermining would result. [*Testimony of Marino*; *Plaintiffs' Exh. 397* (July 1, 2009 Report of Marino, Sections 4.1 and 5.6.3)].

73.     Similarly, Dr. Marino also concludes that the floodwall damage at the North Breach is consistent with witness observations/reports of Barge impact. Because of the bowed and "linear" deformed layout of the displaced floodwall, it is likely that the failure occurred in two main stages. [*Testimony of Marino*; *Plaintiffs' Exh. 397* (July 1, 2009 Report of Marino, Photo 4.24)]. As with the North Breach, the floodwall was displaced out of the ground as much as 195 ft which would require an upward impact force on the wall. [*Testimony of Marino*; *Plaintiffs' Exh. 397* (July 1, 2009 Report of Marino)]. At the south end of the breach, the floodwall was literally sheared off, a result that would require a significant impact force consistent with impact by a barge. [*Testimony of Marino*; *Plaintiffs' Exh. 397* (July 1, 2009 Report of Marino)]. Consequently, from the general nature of the damage, there would have been several areas of impact. [*Testimony of Marino*; *Plaintiffs' Exh. 397* (July 1, 2009 Report of Marino,Section 4.2)]. This is consistent with the number of impact-like noises heard and barge observations by those in the area. [*Testimony of Marino*; *Plaintiffs' Exh. 397* (July 1, 2009 Report of Marino)].

74.     Moreover, unlike other I-wall breaches that were examined, which revealed the floodwall remained in the ground and tended to settle and exhibit little concrete wall damage,

the contrary was the case for the North and South Breaches. [*Testimony of Marino*; *Plaintiffs'*
*Exh. 397* (July 1, 2009 Report of Marino, Section 4.4)]. Moreover, several of these other I-wall
breaches, where the protection level was reduced from tilting, contained significant washout of
the levee on the inboard side from overtopping.  [*Testimony of Marino*; *Plaintiffs' Exh. 397* (July
1, 2009 Report of Marino)].  At the time of failure, however, no overtopping would be expected
at the North and South Breaches. [*Testimony of Marino*; *Plaintiffs' Exh. 397* (July 1, 2009 Report
of Marino)].

75.    The potential for significant seepage to result under the f1oodwall during the
storm was assessed for both the North Breach and South Breach, and subsequently, seepage-
induced instability was ruled out as a potential factor.  [*Testimony of Marino*; *Plaintiffs' Exh. 397*
(July 1, 2009 Report of Marino, Sections 5.6.1 and 5.7.1)]. Based on the modeled conditions for
both the North and South Breaches, it was determined that the permabilities of the subsoils are
too low to allow surge seepage pressures to reach the earth on the supporting (protection) side
during the limited time of the storm induced surge. [*Testimony of Marino*; *Plaintiffs' Exh. 397*
(July 1, 2009 Report of Marino)].

76.    Moreover, it is well established that impact by or contact with ING 4727 was
sufficient to cause the eastern IHNC floodwall failures. [*Testimony of Pazos*; *Plaintiffs' Exh.*
*402; Testimony of Marino; Plaintiffs' Exh. 397*; *Testimony of Bartlett; Plaintiffs' Exh. 378;*
*Plaintiffs' Exh. 252* (IPET Final Report Vol. IV (March 26, 2007), Technical Appendix 17,
"Consideration of Wind-Induced Barge Motions and Associated Forces in the Inner Harbor
Navigation Canal");  *Plaintiffs' Exh. 256* (National Institute of Standards and Technology,
Technology Administration, U.S. Department of Commerce (hereinafter "NIST"), Technical
Note 1746, "Performance of Physical Structures in Hurricane Katrina and Hurricane Rita: A

Reconnaissance Report" (June 2006));   *Plaintiffs' Exh. 257* (NIST Technical Note 1746, "Performance of Physical Structures in Hurricane Katrina and Hurricane Rita: A Reconnaissance Report" (June 2006), Chapter 3, pp. 42-44);   *Plaintiffs' Exh. 258* (NIST Technical Note 1746, "Performance of Physical Structures in Hurricane Katrina and Hurricane Rita: A Reconnaissance Report" (June 2006), Chapter 4, pp. 98-99)].

### Subsequent Flooding Caused By North and South Breaches

77.   The IHNC North breach occurred at or before 4:30 a.m. CDT and the South breach occurred at or before 6:00 a.m. CDT on Monday, August 29, 2005.  [*Testimony of Spinks*; *Plaintiffs' Exh. 421* (*Spinks Report*); *Plaintiffs' Exh. 424* (October 28, 2009 Declaration of Spinks)].

78.   Witness accounts described the flooding to forceful and sudden, similar to tidal wave or tsunami.  [*Testimony of Daniel Weber*; *Testimony of Terry Adams*].

79.   Prior to 9:00 a.m. CDT, the North and South breaches along the IHNC floodwall accounted for over 90% of the total water in the Lower Ninth Ward and St. Bernard Parish. [*Testimony of Spinks*; *Plaintiffs' Exh. 421*].  After 9:00 a.m. CDT, the IHNC floodwaters and MRGO floodwaters combined to contribute to the maximum flood levels experienced in the Lower Ninth Ward and St. Bernard Parish during Hurricane Katrina.  [*Testimony of Spinks*; *Plaintiffs' Exh. 421*].

80.   Flooding resulting from the North and South Breaches in the East wall of the Industrial Canal was confined (**1**) on the *West* by the Industrial Canal, (**2**) on the *North* by the Public Belt or other Railway adjacent to and immediately north of Florida Avenue, and the east-west channel or canal extending from the aforesaid railway to Paris Road (Florida Walk Canal

and Forty Arpent Canal), and (3) on the *South* by the Mississippi River. [*Testimony of Spinks*; *Plaintiffs' Exh. 421*].

81.     Although water from the MRGO levee breaches was *theoretically capable* of causing the massive flooding in the Lower Ninth Ward and St. Bernard Parish, *in reality*, the maximum level of flooding was achieved through a combination of waters from both the IHNC levee breaches and the MRGO levee breaches.  [*Testimony of Spinks*; *Plaintiffs' Exh. 421*].

### Damages of Plaintiff Josephine Richardson

82.     Plaintiff Josephine Richardson was born on March 19, 1928.  Joseph Richardson, Sr. was born on March 28, 1928.  [*Plaintiffs' Exh.341* (Death Certificate of Joseph Richardson)]. Joseph Richardson, Sr. and Josephine Richardson were married on October 8, 1947.  [*Plaintiffs' Exh. 320* (Marriage Certificate); *Testimony of Josephine Richardson*].  They purchased their home at 1321 Egania Street in the Lower Ninth Ward in 1954.  [*Testimony of Richardson, Plaintiffs' Exh. 318* (Real Property Ownership Documents); *Plaintiffs' Exh. 319* (Real Property Ownership Documents); *Plaintiffs' Exh. 321* (Judgment of Possession)]. The property was paid-for in full at the time of Katrina, and owned entirely by Mr. and Mrs. Richardson.  [*Testimony of Richardson, Plaintiffs' Exh. 318*; *Plaintiffs' Exh. 319*; *Plaintiffs' Exh. 321*]. They lived together at this residence at the time of Hurricane Katrina.  [*Testimony of Richardson*].  The house was, leading up to Katrina, a single story, brick-faced, raised structure.  [*Testimony of Richardson, Plaintiffs' Exh. 318*; *Plaintiffs' Exh. 319*; *Plaintiffs' Exh. 321*].

83.     On August 28, 2005, Ms. Richardson left 1321 Egania and went to her brother's home at 3800 Clermont Drive, New Orleans, Louisiana.  [*Testimony of Richardson*].  Mrs. Richardson left because a prior hip injury would have caused difficulty if it was necessary to get

Mrs. Richardson into the attic during the storm.  [*Testimony of Richardson*].  Mr. Richardson

remained at 1321 Egania to care for the property.  [*Testimony of Richardson*].  Mrs. Richardson

recalled her experiences in Hurricane Betsy, and expected that any flooding during Katrina

would be limited.  [*Testimony of Richardson*].  To Mrs. Richardson' knowledge, Mr. Richardson

was in good health.  [*Testimony of Richardson*].  Mrs. Richardson believed that Mr. Richardson

would be safe if flooding occurred.  [*Testimony of Richardson*].  At around 11:30 Sunday night,

August 28, 2005, she and Mr. Richardson spoke by telephone.  [*Testimony of Richardson*].

     84.    Mrs. Richardson remained at safely at her brother's home through Hurricane

Katrina, as flooding at that location went only half-way up the house.  [*Testimony of

Richardson*].  Three days after the storm, the National Guard took Mrs. Richardson from 3800

Clermont to the Superdome, whereafter, she was transported to a shelter in Dallas, Texas, and

then to Stone Mountain, Georgia, where Mr. and Mrs. Richardson's son, Jeffery Richardson,

resided.  [*Testimony of Richardson*].

     85.    The Richardson's 1321 Egania Street home was subjected to severe flooding

which submerged the entire structure at the time leading up to Mr. Richardson's death.

[*Testimony of Spinks*, *Plaintiffs' Exh. 421* (Spinks Report)].  Mr. Richardson's body was

subsequently found in the attic of the Richardson 1321 Egania Street home.  [*Testimony of

Lawrence Colon*; *Testimony of Lewis Colon*; *Testimony of Tyrone Colon*].  Mrs. Richardson

learned this fact while in Stone Mountain, Georgia.  [*Testimony of Richardson*].  Mr.

Richardson's Death Certificate, issued by the State of Louisiana and signed by Orleans Parish

Coroner Dr. Frank Minyard on April 18, 2006, lists as causes of death "Hurricane Katrina related

death," and "Asphyxia due to drowning."  [*Plaintiffs' Exh.341* (Death Certificate of Joseph

Richardson)].

86.     "The cause of death, and the manner or mode in which the death occurred, as incorporated in the death certificate as provided in the Vital Statistics Laws, R.S. 40:32 et seq., filed with the division of vital records of the Department of Health and Hospitals, shall be the legally accepted cause of death, unless the court of the parish in which the death occurred, after a hearing, directs otherwise."  La. Rev. Stat. 33:1563 E(3).  The Louisiana Supreme Court would agree with the Louisiana Third Circuit Court of Appeal in *Mckelvey v. DeQuincy*, 2007-604 (La.App. 3 Cir. 11/14/07); 970 So.2d 682, which reasoned, based upon the Louisiana Supreme Court's holdings in *State v. Winzer*, 354 So.2d 533 (La. 1978); *State v. Trahan*,543 So.2d 984 (La.App. 3 Cir.1989), *rev'd on other grounds*, 551 So.2d 1303 (La. 1989); *State v. Outley*, 629 So.2d 1243 (La.App. 2 Cir.1993), *writ denied*, 94-410 (La. 5/20/94), 637 So.2d 476, that *prima facie* proof of cause of death is not limited in a civil case to an autopsy report, especially when corroborated by additional competent evidence.  The cause of death identified by the Death Certificate, said Certificate bearing the State Registrar's certificate that it was recorded in the Vital Registry records pursuant to La. Rev. Stat. 40:32, et seq,  in the manner prescribed by La. Rev. Stat. 33:1563 E(3), is competent evidence of death, and its cause.  This evidence, coupled with the undisputed fact that Mr. Richardson was found in the attic of a structure completely immersed by flooding, establishes the cause of death.   The negligence of Lafarge North America, Inc. was the cause in fact and legal cause of all of Mr. and Mrs. Richardson's damages subject of this action.

87.     <u>Survival Action Damages</u>:  Louisiana Civil Code article 2315.1 vests Mrs. Richardson with a cause of action for all damages to Mr. Richardson's person and property. Under the "saving to suitors" clause codified at 28 USC § 1333 (1), state courts have concurrent jurisdiction with the admiralty jurisdiction of federal courts to entertain *in personam* claims

24

based on maritime causes of action. *Offshore Logistics, Inc. v. Tallentire*, 477 U. S. 207, 222 (106 SC 2485, 91 LE2d 174) (1986).

88.     Based on the facts above, Mr. Richardson was present to witness and experience the destruction of his immovable and movable property.  Thus, Mrs. Richardson is entitled to Mr. Richardson's damages for his mental anguish caused by his having witnessed the destruction of his property.  Such damages are available to property owners under Louisiana law when the owner is present or nearby and suffers psychic trauma as a result   *Williams* v. *City of Baton Rouge*, 98-1981 (La. 4/13/99), 731 So.2d 240; *1900 Partnership v. Bubber, Inc.*, 27,475 (La. App. 2 Cir. 11/1/95), 662 So.2d 808, *writ denied*, 96-0037 (La. 2/28/96), 668 So.2d 369; *Freyou v. Iberia Parish Sch. Bd.*, 94-1371 (La. App. 3 Cir. 5/3/95), 657 So.2d 161; *Blache v. Jones*, 521 So.2d 530 (La. App. 4 Cir. 1988).   "Although the plaintiff does not suffer contemporaneous personal injury or property damage, he or she nevertheless may recover for negligently inflicted emotional distress if the defendant's conduct placed the plaintiff in fear or concern for his or her safety.... [In] Louisiana ... an award is proper when the conduct is directed at the mental anguish victim and the circumstances show an "especial likelihood of genuine and serious mental distress." Cases in which a plaintiff fears for his personal safety or in which he watches his property destroyed probably are the most common." *Johnson v. First National Bank of Shreveport,* 00-870,  at p. 21(La.App. 3rd Cir.6/20/01), 792 So.2d 33, 51,*writs denied*, 01-2770, 01-2783 (La.1/4/02), 805 So.2d 212, 213, 00-870 at p. 21,792 So.2d at 51 (quoting Frank L. Maraist & Thomas C. Galligan, Jr., Louisiana Tort Law § 5-8 at pp. 124-125 (1996)).

89.     Mrs. Richardson is entitled to damages for Mr. Richardson's pre-death physical and mental pain and suffering endured while in the attic of 1321 Egania. "Whether or not the estate can recover damages for pain and suffering should abide trial, there being no inflexible

rule that where death occurs from drowning the period between accident and death is not

sufficiently appreciable to afford a basis for the claim." *Gillespie v. U.S. Steel Corp.*, 379 U.S.

148 (1964).  In cases involving drowning, the courts generally have required evidence of a

struggle or other post-accident consciousness on the part of the decedent before awarding

damages for his pain and suffering prior to death.  *See, e.g., Barton v. Brown (The Corsair),* 145

U.S. 335, 348, 12 S.Ct. 949, 36 L.Ed. 727 (1892); *Petition of United States Steel Corp., supra* at

1275-76; *Grantham v. Quinn Menhaden Fisheries, Inc.,* 344 F.2d 590 (4th Cir. 1965); *Davis v.*

*Parkhill-Goodloe Co.,* 302 F.2d 489, 495 (5th Cir. 1962); *Gardner v. National Bulk Carriers,*

*Inc.,* 221 F. Supp. 243, 246 (E.D.Va. 1963), *aff'd,* 333 F.2d 676 (4th Cir. 1964).  Although

eyewitness evidence is not necessary, there must be evidence supporting a finding that the

decedent was conscious when drowned. *Cook v. Ross Island Sand and Gravel Co.,* 626 F.2d at

750; *Petition of United States Steel Corp.,* 436 F.2d 1256, 1276 (6th Cir. 1970). "There is dicta

in *Davis v. Parkhill-Goodloe Co.* suggesting that evidence supporting consciousness must be

"substantial," 302 F.2d at 495, but a more accurate statement of the rule is that there must be

evidence to support a reasonable inference of consciousness."  *Deal v. A.P. Bell Fish Co.*, 728

F.2d 717 (5th Cir. 1984).  Cf. *Neal v. Barisich, Inc*., (E.D.La. 1989) 707 F. Supp. 862.  The

absence of evidence of a skull fracture in Mr. Richardson's autopsy report establishes that he was

conscious for a period sufficient for awareness of his impending death, and sufficient to permit

his physical suffering.  *Cook v. Ross Island And Gravel Co*., 626 F.2d 746 (9th Cir. 1980).

90.     <u>Wrongful Death Damages</u>: Louisiana Civil Code article 2315.2 vests Mrs.

Richardson with a cause of action for the wrongful death of Mr. Richardson.

91.     Mrs. Richardson's grief and loss associated with the death of her husband is

evidenced by the fact that she was hospitalized twice in Georgia for physical symptoms caused

by learning of Mr. Richardson's death.  [*Plaintiffs' Exh. 339* (Certified Medical Records of DeKalb Medical Center, admission date of 9/27/05, 9/28/05, Richardson 000120 – 000170); *Testimony of Richardson*].  She is not only entitled to damages for her mental and physical suffering due to Mr. Richardson's death, but also to damages for lost service, support and society, and damages for her related medical expenses.

92.     Mr. Richardson owned his own business, and was gainfully self-employed as a snack salesman at the time of his death.  [*Testimony of Richardson*].  Mrs. Richardson is entitled to compensation for income lost as a result of his death. "A survivor may recover under DOHSA, the Jones Act and the general maritime law for the actual financial contributions the decedent would have made during his normal anticipated life span. *Sea-Land Services v. Gaudet,* 414 U.S. 573, at 584-85, 94 S.Ct. 806, 39 L.Ed.2d 9; *Davis v. Parkhill-Goodloe Co.,* 302 F.2d 489, 494 (5th Cir. 1962); *Petition of the United States,* 418 F.2d 264, 272 (1st Cir. 1969). The proper measure of damages for such loss of support is the reasonable pecuniary expectancy of each survivor over the remainder of the life expectancy of the decedent or the survivor, whichever is shorter. *The Complaint of Cambria Steamship Co.,* 505 F.2d 517 (6th Cir. 1974), *cert. denied,* 420 U.S. 975, 95 S.Ct. 1399, 43 L.Ed.2d 655 (1975). In determining a reasonable expectancy, "a guide is set by determining first how much money the decedent would have had available, and how much of that sum he would have contributed to his beneficiaries." *In re Sincere Navigation Corp.,* 329 F. Supp. 652, 659 (E.D.La. 1971).

93.     Mrs. Richardson also incurred $8978.69 in funeral expenses to bury her husband, Mr. Richardson.  [*Plaintiffs' Exh. 342* (Funeral Expenses of Joseph Richardson); *Testimony of Richardson*].

94.     <u>Property Loss Damage</u>: Mrs. Richardson is entitled to compensation for her own

27

loses, including damage to, and loss and destruction of the property and contents at 1321 Egania Street.

95.     Mrs. Richardson incurred expenses in effecting repairs to 1321 Egania, as well as in replacing lost contents.  [*Testimony of Richardson*; *Plaintiffs' Exh. 338* (Home Inventory List); *Plaintiffs' Exh. 337* (Invoices, Receipts, Reports reflecting repair/replacement of 1321 Egania structure and contents); *Plaintiffs' Exhs. 323-336* (Interior/ Exterior Damage Photos)]. According to an appraisal by Peter Canizzaro of G&C Appraisers, properties comparable to Mrs. Richardsons' 1321 Egania Street property were valued in the range of $90,000.00 – $146,000.00 prior to August 28, 2005.  [*Testimony of Peter Canizzaro* (C&C Appraisals); *Plaintiffs' Exh. 343* (G&C Appraisal Report)].  Mrs. Richardsons' 1321 Egania Street property was valued at $110,000.00 on August 28, 2005, prior to Katrina, compared to a value of $9500.00 one year later.  [*Testimony of Peter Canizzaro*; *Plaintiffs' Exh. 343* ; *Testimony of Richardson*].  Mrs. Richardson is entitled to an award for depreciation of the value of 1321 Egania caused by Defendant's conduct, and for repair and replacement costs of her immovable and movable property.

### Damages Plaintiff Holiday Jewelers Inc.

96.     Plaintiff Holiday Jewelers, LLC is a Louisiana corporation organized in 1984. Jacob Robert Glaser and his wife, Dianne Glaser, are the sole shareholders of the corporation. [*Testimony of Jacob Robert Glaser*].  In the twenty plus years prior to Katrina, Holiday Jewelers, LLC operated as a retail jewelry business.  [*Testimony of Glaser*].  The business was run entirely by Mr. And Mrs. Glaser, with the exception of Holiday season when a seasonal employee was brought on.  [*Testimony of Glaser*].

97.     Holiday Jewelers occupied a rented storefront, located in a strip shopping mall at 8400 West Judge Perez Drive.  [*Testimony of Glaser*; Plaintiffs' Exh. 291].  The storefront was approximately 1000 square feet.  [*Testimony of Glaser*; Plaintiffs' Exh. 291].  Holiday Jewelers' entire inventory was contained in the store.  [*Testimony of Glaser*].

98.     Mr. and Mrs. Glaser evacuated St. Bernard Parish on August 27, 2005, in advance of Hurricane Katrina.  [*Testimony of Glaser*].  After securing the jewelry store, the Glaser's drove to Daphne, Alabama, and later to Panama City, Florida.  While in Florida, the Glaser's learned of the inundation of St. Bernard Parish, and the flooding of their business.  [*Testimony of Glaser*].

99.     The 8400 West Judge Perez Drive store was subjected to severe flooding, which submerged the entire structure.  [*Testimony of Spinks*, *Plaintiffs' Exh. 421* (Spinks Report)].  Upon returning subsequent to Katrina, the Glaser's discovered that floodwater had submerged the store and all fixtures and inventory.  [*Testimony of Glaser*; *Plaintiffs' Exhs. 296-315* (Damage photos for Holiday Jewelers)].  Recovery of anything was impossible.  [*Testimony of Glaser*; *Plaintiffs' Exhs. 296-315*].

100.    Mr. Glaser has estimated that the loss of inventory, furniture, equipment and fixtures exceeded $250,000.  [*Testimony of Glaser*; *Plaintiffs' Exh.292* (Contents Inventory for Holiday Jewelers)].  Other losses included the loss of over 8000 customer contact information contained within the business' computer.  [*Testimony of Glaser*].

101.    The Glaser's relocated to St. Tammany Parish, and have not reopened the Jewelry business.  [*Testimony of Glaser*].   John W. Theriot, CPA, undertook a calculation of lost profits.  After reviewing the business and tax records of the Glaser's and  Holiday Jewelers, Mr. Theriot concluded that Holiday Jewelers had lost an average of $44,264.71 for calendar years 2005

through 2011. The total lost profit after discounts through December 31, 2011 was $309,854.

[*Testimony of Glaser; Testimony of Theriot; Plaintiffs' Exh. 293* (Business Income Records for

Holiday Jewelers)].

102.    Holiday Jewelers, LLC is entitled to recover from Defendants, as a consequence

of their negligence, the following damages: $250,000 loss of inventory, tools, equipment, and

fixtures; $150,000 loss of client contact information; $309,845 lost profit 2005 through 2011.


**Damages of Plaintiffs John and Jerry Alford**

103.    Mrs. Jerry D. Alford, and Mr. John Alford, Jr. are a married couple with five

grown children. [*Testimony of Jerry Alford*; *Testimony of John Alford, Jr.*].  Leading up to

Katrina, Mr. and Mrs. Alford resided at a single family residence located at 2423 Deslonde

Street, New Orleans, Louisiana.  [*Testimony of Jerry Alford*; *Testimony of John Alford, Jr.*;

*Plaintiffs' Exh. 274*].  Mr. and Mrs. Alford purchased the 2423 Deslonde Street home on August

27, 1981, as joint owners under their community estate, for the price and sum of $29,000.

[*Testimony of Jerry Alford*; *Testimony of John Alford, Jr.*; *Plaintiffs' Exh. 275* (Real Property

Ownership Documents)].  The Alfords raised their children in the family home. [*Testimony of

Jerry Alford*; *Testimony of John Alford, Jr.*].

104.    At the time of Hurricane Katrina, Mrs. Alford was sixty years of age and was

employed as a desk clerk at the St. Marie Hotel on Toulouse Street in the French Quarter.

[*Testimony of Jerry* Alford].  Mrs. Alford has been employed at that hotel and the Embassy

Suites Hotel as a desk clerk for an uninterrupted period of twenty-eight years.  [*Testimony of

Jerry* Alford].

105.    At the time of Hurricane Katrina, Mr. Alford was sixty-four.  [*Testimony of John

*Alford, Jr.*].  He retired in 1991 due to disability from a surgically repaired lumbar defect.
[*Testimony of John Alford, Jr.*].

      106.    Prior to Katrina, on Saturday August 27, 2005, Mrs. Alford and her husband,
packed food and clothing in anticipation of moving to the St. Marie Hotel, as the hotel had a
policy of providing rooms to their employees during hurricanes. [*Testimony of Jerry D. Alford;
Testimony of John Alford*].  Mrs Alford went to work on Sunday, August 28, 2005, at
approximately 7:00 a.m., and her husband went to the hotel at approximately 10:00 a.m. on the
same day.  [*Testimony of Jerry D. Alford*; *Testimony of John Alford*].  However, on Sunday
afternoon the Alfords decided to go to Mississippi because of deteriorating weather conditions,
leaving the hotel at about 6:00 p.m. [*Testimony of Jerry D. Alford*; *Testimony of John Alford.*].
The Alfords resided in Mrs. Alfords' parent's home  for approximately one month, contributing
$300 for room and board.   [*Testimony of Jerry D. Alford*; *Testimony of John Alford.*].
Thereafter, the Alfords moved in with their granddaughter in Algiers so that Mrs. Alford could
continue her employment with the hotel, continuing their payment of $300 per month toward
room and board. [*Testimony of Jerry D. Alford*; *Testimony of John Alford*].

      107.    The Alford's 2423 Deslonde Street home was subjected to severe flooding, with
floodwaters reaching the roof line of the structure.  [*Testimony of Spinks*, *Plaintiffs' Exh. 421*
(Spinks Report)].  As a result, the Alford home and all of its contents, including a lifetime of
mementos and two family dogs, were destroyed. [*Testimony of Jerry D. Alford*; *Testimony of
John Alford; Plaintiffs' Exh.276* (Contents Inventory); *Plaintiffs' Exh. 277-289* (Damage
Photos)].  The remains of the irreparable  house and its unrecoverable contents were demolished
and removed by the City of New Orleans and only a vacant lot and memories remain.
[*Testimony of Jerry D. Alford; Testimony of John Alford*].   The replacement value of the family

home was appraised at $105,851.11.  [*Testimony of Peter Canizzaro* (C&C Appraisals);
*Plaintiffs' Exh. 290* (appraisals and reports and attachments of G&C Appraisals)].  The
replacement value of the contents of the family home, including the lost mementoes and the two
family pets, are estimated at $40,000.  [*Testimony of Jerry D. Alford; Testimony of John Alford;
Plaintiffs' Exh..276*].  Moreover, Mrs. Alford suffered a post traumatic stress disorder secondary
to the loss of the family home, pets, and mementoes, and her displacement for over three years
necessitating medical intervention and pharmacological management for which she and her
husband are entitled to recover damages.  [*Testimony of Jerry D. Alford; Testimony of John
Alford.*].

108.    The Alfords are entitled to recover of Defendants, as a consequence of their
negligence, the following damages to wit: $145,851.11 property damage; $11,100 substitute
residence; Mrs. Alford $7,500.00 for mental anguish and Mr. Alford $3,000 for mental anguish
secondary to his wife's emotional trauma and the affects thereof.

## PLAINTIFFS' CONTENTIONS OF LAW

### Maritime Jurisdiction

109.    This Court has jurisdiction of the parties, and under 28 USC §1332, General
Maritime Law under 28 USC §1333; and the surrogate law of the State of Louisiana under the
saving to suitor's clause of 28 USC §1333, has subject matter jurisdiction over this suit against
Lafarge.  (*Mumford Complaint*, at 1).

110.    Plaintiffs maintain that maritime jurisdiction governs the instant action.   In
addition to the fact Section 1 of Plaintiffs' operative Complaint specifically alleges maritime
jurisdiction under 28 USC §1333, maritime jurisdiction necessarily applies insofar as the facts of

this case implicate both the "locations" and "connections" tests set forth in *Jerome B. Grubart v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995). Significantly, the Court in *In re Ingram Barge*, 435 F. Supp. 2d 524 (E.D. La. 2006) has already concluded that the facts of this case implicates maritime law. *See In re Ingram Barge Co.*, 435 F. Supp. 2d at 528 (reasoning that "[t]he barge-related claims are similar to those of Grubart itself where jurisdiction was found arising under the AEA[,]" but that "claimants have alleged the classic situation to which the AEA was intended to apply: a vessel that collides with a land-based structure causing damage on land."). The Courts' determination is consistent with the conclusions of other cases involving identical facts. *See e.g. Bd. of Comm'rs of the Orleans Levee Dist. v. M/V Belle of Orleans*, 535 F.3d 1299, 1313 (11th Cir.,2008) (reasoning that "[t]he Belle of Orleans was a vessel; she was operating in South Shore Harbor, a navigable waterway; she broke free from imperfect moorings; she had the potential to and actually did disturb commercial activity; and she is alleged to have caused damage when she struck property alongside a navigable waterway" and as such "the district court improperly concluded that there was no admiralty jurisdiction over the Board's tort claim.").

**Defendant Owed Plaintiffs A Duty of Care to Adequately Moore ING 4727**

111.   "The existence of a duty presents a question of law which is determined by the facts of each case and the particular risk and harm and plaintiff involved." *See In re Katrina Canal Breaches Consol. Litig.*, 647 F. Supp. 2d 644, 733 (E.D. La. 2009). "It is the Court's obligation to decide which risks are unreasonable, based on the facts and circumstances of each case." *See In re Katrina Canal Breaches Consol. Litig.*, 647 F. Supp. 2d 644, 733 (E.D. La. 2009). "[T]he determination of whether a party owes a duty to another depends on a variety of

factors, 'most notably the foreseeability of the harm suffered by the complaining party.'" *See Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 377 (5th Cir. La. 2000). "A harm is a foreseeable consequence of an act or omission if harm of a general sort to persons of a general class might have been anticipated by a reasonably thoughtful person, as a probable result of the act or omission, considering the interplay of natural forces and likely human intervention." *See Pledger v. Phil Guilbeau Offshore, Inc.*, 2003 U.S. Dist. LEXIS 7416 (E.D. La. Apr. 30, 2003).

112.   Under general principles Louisiana law, "[a] landowner owes a plaintiff a duty to discover any unreasonably dangerous condition and to either correct the condition or warn of its existence." *See Pitre v. Louisiana Tech Univ.*, 673 So. 2d 585, 590 (La. May 10, 1996). More specific to the facts of this case, it is well established that there exists a "duty of reasonable skill and care in mooring … barges." *See Lower River Ship Services, Inc. v. Casteel, Inc.*, 1991 U.S. Dist. LEXIS 1097, 10 (E.D. La. Jan. 29, 1991); *Am. River Transp. Co. v. Paragon Marine Servs.*, 213 F. Supp. 2d 1035, 1057 (E.D. Mo. 2002) (holding that there is "a duty by the barge fleeter and shifting tugs to inspect tie-offs and insure they are fast and secure…."); *In re Complaint of Ingram Barge Co.*, 2008 U.S. Dist. LEXIS 33421, 35 (E.D. La. Mar. 31, 2008) (holding that there is "a duty 'to inspect tie-offs and insure that they are fast and secure ….'"). Indeed, the duty to secure a vessel is so strong that "'a vessel which drifts into collision is presumed to be at fault until the contrary is made to appear[.]'" *See James v. River Parishes Co.*, 686 F.2d 1129, 1131 (5th Cir. La. 1982).

113.   Moreover, the Fifth Circuit has concluded that an allision is a foreseeable consequence of negligent mooring of a barge in the face of an approaching hurricane. *See e.g. Signal Int'l LLC v. Miss. DOT*, 579 F.3d 478, 493, 496 (5th Cir. Miss. 2009) ("the approaching hurricane, the expected height and predicted movement of the storm surge, and the topology of

34

the Pascagoula River basin gave rise to the need to moor the barges and made this allision a foreseeable consequence of negligence in that mooring.").

114.   Based on these authorities, and the facts set forth herein, Defendant must be held to have owed Plaintiffs a duty of care to adequately moore Barge ING 4727 in the face of Hurricane Katrina.

## Defendant Bears the Burden to Disprove Negligence

115.   "Under maritime law, when a vessel breaks free from its moorings and drifts into an allision with a stationary object, the moving vessel is presumed at fault."  *See Signal Int'l LLC v. Miss. DOT*, 579 F.3d 478, 490 n.11 (5th Cir., 2009); *The Louisiana*, 70 U.S. 164 (1865); *James v. River Parishes Co., Inc.*, 686 F.2d 1129. 1132 (5th Cir. 1982). "This inference or presumption of negligence is a rule of law based on the logical deduction that a vessel found floating loose was improperly moored."  *See James*, 686 F.2d at 1133. "The drifting vessel is presumptively liable for damages unless it can 'show that her drifting was the result of an inevitable accident or a vis major, which human skill and precaution and a proper display of nautical skill could not have prevented.'"  *See Signal*, 579 F.3d at 490 n.11.

116.   To rebut this presumption of fault "such vessels must exhaust every reasonable possibility which the circumstances admit and show that in each they did all that reasonable care required."  *The Louisiana*, supra, at p. 164 and 173.  To state in another way, Defendant must show that the breakaway could not have been prevented by "human skill and precaution and a proper display of nautical skills."  *See James*, supra, at p. 1132.  "The party against whom the presumption operates bears the burden of disproving it, not merely coming forward with countervailing evidence."  *See Delta Transload, Inc. v. Motor Vessel*, 818 F.2d 445, 449 (5th Cir.

La. 1987).  Moreover, the party "bears the burden of disproving fault by a preponderance of the evidence." *See James*, 686 F.2d at 1133.

117.    In discharging this burden, the Fifth Circuit Court of Appeal has held that a defendant asserting an Act of God or inevitable accident defense due to weather must show "(a) that the force of the wind was not to have been anticipated; (b) that the vessel had been moored or anchored in such a way as to be prepared to withstand any winds reasonably to have been expected; (c) that there was no negligence on the part of those in charge of her.  The defense [sic] has been disallowed when any of the elements of proof referred to above have been absent."  *See Boudoin v. J. Ray McDermott & Co.*, 281 F.2d 81, 88(5th Cir. 1960).

### Defendant's Conduct Was the Proximate ("Legal") Cause of Plaintiffs Injury

118.    Under general tort principles, proximate cause "is ultimately a question of policy as to whether the particular risk falls within the scope of the duty" and "asks 'whether the enunciated rule or principle of law extends to or is intended to protect this plaintiff from this type of harm arising in this manner.'"  *See Roberts v. Benoit*, 605 So. 2d 1032, 1044-45 (La. 1991).  Under maritime law, "[t]he task of defining the proper reach or thrust of a rule in its policy aspects is one that must be undertaken by the court in each case as it arises" and, in making this determination, "[f]oreseeability obviously marks the limits placed on a defendant's duty…." *See Consolidated Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d at 67.  Importantly, "[t]he test of foreseeability is not measured against normal conditions, but those that were anticipated or reasonably should have been anticipated."  *See Signal*, 579 F.3d 478, 493 (5th Cir. Miss. 2009).

119.    Here, policy considerations support extending Defendant's duty to the risks at issue.  Indeed, the Fifth Circuit has concluded that "[a]llision with fixed structures is one of the

principal risks of a vessel, moored inland, that breaks from its negligently executed moorings."
*See Signal Int'l LLC v. Miss. DOT*, 579 F.3d 478, 492 (5th Cir. Miss. 2009).   Based on the
unique risks of harm and loss posed by an unmoored vessel in the INHC, which are
exponentially multiplied in the face of hurricane conditions, the Court must find that Defendant's
duty of care to adequately moore Barge ING 4727 in the face of Hurricane Katrina extended to
Plaintiffs in this action.

### Defendant Bears the Burden to Disprove Causation

120.   As Defendant's failure to moore Barge ING 4727 to withstand hurricane
conditions constituted a regulatory violation, Defendant must be deemed to bear the burden of
proof under the Pennsylvania Rule on the issue of whether Barge ING 4727's impact caused the
north and south breaches.

121.   The Pennsylvania Rule states that:

> The liability for damages is upon the ship or ships whose fault caused the injury.
> But when, as in this case, a ship at the time of a collision is in actual violation of a
> statutory rule intended to prevent collisions, it is no more than a reasonable
> presumption that the fault, if not the sole cause, was at least a contributory cause
> of the disaster.   In such a case, the burden rests upon the ship of showing not
> merely that her fault might not have been one of the causes, or that it probably
> was not, **but that it could not have been**.   Such a rule is necessary to enforce
> obedience to the mandate of the statute.

*The Pennsylvania*, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874).

122.   "The rule of The Pennsylvania concerns … the burden of proof for showing
causation[.]" *See Pennzoil Producing Co. v. Offshore Express, Inc.*, 943 F.2d 1465, 1472 (5th
Cir., 1991). When implicated, "[t]he rule allocates the burden of proof, transferring it to the party
in violation of a statute or regulation."   *See Pennzoil*, 943 F.2d at 1472.   In so doing, "[t]he
Pennsylvania rule applies a higher standard of proof" [*In re Quality Marine Servs.*, 2005 U.S.

Dist. LEXIS 9201, 7 (E.D. La. 2005)], which "imposes a heavy burden" on the defendant. *See Pennzoil*, 943 F.2d at 1472. "In simplest terms, that rule states that where a vessel is guilty of a statutory violation, the defaulting ship must show 'not merely that her fault might not have been one of the causes, or that it probably was not, **but that it could not have been**.'" *See Candies Towing Co. v. M/V B & C Eserman*, 673 F.2d 91, 94 (5th Cir., 1982) (emphasis added).

123.    As explained by the court in *Evergreen Int'l, S.A. v. Marinex Constr. Co.*, 477 F. Supp. 2d 681 (D.S.C. 2007), courts have applied the *Pennsylvania* Rule applies to a whole host of rules and regulatory violations, *including vi*olations of customary law [*See Evergreen*, 477 F. Supp. 2d at 689 (citing *Ira S. Bushey & Sons. Inc. v. United States, 172 F.*2d 447 (2d Cir. 1949); The Madison, 250 F. 850 (2d Cir. 1918))], United States Coast Guard regulatio*ns* [*See id.,* (citing *Afran Transport Co. v. The Bergechief*, 274 F.2d 469 (2d Cir. 1960)], and Corps of Engineers building permits and operational regulations. *See id*. (citing *Folkstone Maritime Ltd.*, 64 F.3d 1037; *Florida E. Coast Ry. v. Revilo Corp.***,** 637 F.2d 1060, 1064 (5th Cir. 1981*); In re Tug Helen B. Moran, Inc., 560 F.2d* 527, 529 (2d Cir. 1977). Based on such authority, the court in *Evergreen* "decline[d] to narrowly interpret the Rule as requiring a statutory violation before it may be applied" as "the *Pennsylvania* Rule applies more generally where a party has violated a known government-established safety requirement." *See Evergreen*, 477 F. Supp. 2d at 689.

124.    Here, as discussed above, the undisputed evidence reflects that Lafarge evacuated its facility **(a)** leaving the empty ING 4727 tied outboard and abreast of the fully loaded ING 4745, **(b)** that ING 4727 was *not* cabled to the shore, as required by Lafarge's own Hurricane Preparation Checklist, but rather, tied *only* to ING 4745, and **(c)** that ING 4727 was tied to ING 4745 using only three single strands (single parts) of rope, despite the availability of no fewer than eleven (11) mooring points.

125.   Moreover, when Lafarge abandoned its facility on Saturday, August 27, it made no arrangement for anyone to monitor the barges it had left in the IHNC.  Rather, Lafarge Manager Ed Busch, called Joe Domino, Inc./Unique Towing on the morning of Saturday, August 27, 2005 to have the empty Barge ING 4727 moved outboard of the Barge ING 4745, but did not **(a)** request any mooring of the Barge ING 4727 to the dock (per its own Hurricane Checklist "cable all barges to shore"), or **(b)** instruct Domino to modify, check, or strengthen the moorings between the two barges.

126.   Plaintiffs' maritime expert, Don Green, concluded that "it was [Lafarge's] duty and responsibility to ensure that the barges were secured in such a manner, i.e. doubled up mooring lines, to withstand the expected hurricane force winds and tides of Hurricane Katrina, which they did not do."  [*Testimony of Donald Green*; *Plaintiffs' Exh. 94* (*Report of Donald Green*, at ¶5.5)].

127.   Based on these facts, Lafarge violated numerous regulatory standards, and as such, must bear the heavy burden of establishing that the Barge "could not have been" the cause of the North and South Breaches under the Pennsylvania Rule.

128.   **First**, Lafarge's failure to ensure that the *ING 4727* was adequately moored to withstand the anticipated hurricane force winds of Hurricane Katrina violated 33 CFR 162.75 (b)(3)(ii).  That Section, entitled "Anchoring or mooring"  states as follows:

> (i) V*essels or tows shall not anchor or moor in a*ny of the land cuts or other narrow parts of the waterway, except in an emergency, or with permission of the District Commander. Whenever it becomes necessary for a vessel or tow to stop in any such portions of the waterway, it shall be securely fastened to one bank and as close to the bank as possible. This shall be done only at such a place and under such conditions as will not obstruct or prevent the passage of other vessels or tows. Stoppages shall be only for such periods as may be necessary.

> (ii) When tied up individually, all vessels and tows shall be moored by bow and stern lines. Tows shall be secured at sufficiently frequent intervals to insure their not being

drawn away form the bank by winds, currents, or the suction of passing vessels. Lines shall be shortened so that the various barges in a tow will be as close together as possible.

\*\*\*

(iv) Whenever any vessel or tow is moored to the bank (paragraph (b)(3)(i) of this section) at least one crew member shall always remain on board to see that proper signals are displayed and that the vessel or tow is properly moored at all times.

129.    Lafarge violated Section 162.75 (b)(3), and in particular subpart (ii), by failing to adequately moore ING 4727 to withstand the anticipated hurricane force winds of Hurricane Katrina.

130.    **Second**, Lafarge's failure to ensure that the *ING 4727* was adequately moored to withstand the anticipated hurricane force winds of Hurricane Katrina violated the provisions 33 CFR 6.19-1("Nothing contained in this part shall be construed as relieving the masters, owners, operators, and agents of vessels or other waterfront facilities from their primary responsibility for the protection and security of such vessels or waterfront facilities."), which proscribed that Lafarge's primary responsibility was to ensure the protection and security of vessels and waterfront facilities.

131.    **Third**, Lafarge failed to adhere to Appendix 2 of the United States Coast Guard Sector New Orleans Hurricane Plan, given the force of law pursuant to 33 CFR § 6.14-1 (entitled "Safety measures"),[5] which required that mooring lines be doubled up and that special attention be given to barges moored in the proximity of bridges.  [*Plaintiffs' Exh. 28* (*Coast Guard Sector New Orleans Hurricane Plan*); *Testimony of Donald Green*; *Plaintiffs' Exh. 94* (*Report of Donald Green*, at ¶5.8)].

---

[5] Such rules were created pursuant to authority proscribed by 33 CFR § 6.14-1, entitled "Safety measures" which provides that: "The Commandant, in order to achieve the purposes of this part, may prescribe such conditions and restrictions relating to the safety of waterfront facilities and vessels in port as he finds to be necessary under existing circumstances. Such conditions and restrictions may extend, but shall not be limited to, the inspection, operation, maintenance, guarding, and manning of, and fire-prevention measures for, such vessels and waterfront facilities." See 33 CFR § 6.14-1. "Commandant as used in this part, means the Commandant of the United States Coast Guard." 33 CFR 6.01-1.

132.   **Fourth**, Lafarge failed to adhere to Annex C of the United States Coast Guard Sector New Orleans Hurricane Plan, given the force of law pursuant to 33 CFR § 6.14-1 (entitled "Safety measures"), by failing to determine the special needs and intentions of vessels moored at the facility, failing to determine whether vessels desiring to remain moored at the facility during the hurricane would be allowed to do so and failing to notify the Captain of the Port of the facility's decision.  [Plaintiffs' Exh. 28 (*Coast Guard Sector New Orleans Hurricane Plan*); *Testimony of Donald Green*; *Plaintiffs' Exh. 94* (*Report of Donald Green*, at ¶5.8)].

133.   Had such notification taken place, it is clear that the COTP would have been apprised that the ING 4727 was released for pick up and moored with only 3 single part lines. Such notification would have permitted the Port to exercise its obligations under 33 CFR 6.14-2 to cause the vessel to be moved and/or properly secured thus preventing the breakaway. [Testimony of Donald Green; *Exh. 94* (*Report of Donald Green*, at ¶5.8)].   33 CFR 6.14-2, entitled "Condition of waterfront facility a danger to vessel", provides that:

> "Whenever the captain of the port finds that the mooring of any vessel to a wharf, dock, pier, or other waterfront structure would endanger such vessel, or any other vessel, or the harbor or any facility therein by reason of conditions existing on or about such wharf, dock, pier, or other waterfront structure, including, but not limited to, inadequate guard service, insufficient lighting, fire hazards, inadequate fire protection, unsafe machinery, internal disturbance, or unsatisfactory operation, the captain of the port may prevent the mooring of any vessel to such wharf, dock, pier, or other waterfront structure until the unsatisfactory condition or conditions so found are corrected, and he may, for the same reasons, after any vessel has been moored, compel the shifting of such vessel from any such wharf, dock, pier, or other waterfront structure."

*See* 33 CFR 6.14-2.

### The Doctrine of Joint and Several Liability Applies in This Case

134.   Defendant may not avoid liability by claiming Plaintiffs damages were caused by multiple damage causing events.  The maritime rule for negligence liability "allows an injured

party to sue a tortfeasor for the full amount of damages for an indivisible injury that the

tortfeasor's negligence was a substantial factor in causing, even if the concurrent negligence of

others contributed to the incident." *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S.

256, 260 (U.S. 1979); *Coats v. Penrod Drilling Corp.,* 61 F.3d 1113, 1127 (5th Cir. 1995);

*Simeon v. T. Smith & Son, Inc.*, 852 F.2d 1421, 1452 (5th Cir. 1988).  The rule is applicable "in

any situation where two or more causes concur to produce harm, even when one cause is an act

of God."  *See Wm. G. Roe & Co. v. Armour & Co.*, 414 F.2d 862, 869 (5th Cir. 1969) ("There is

little doubt that the concurrence of a human act and an act of God may in appropriate

circumstances give rise to the principle of joint and several liability to the end that the wrongdoer

may be held entirely liable.").

135.    In evaluating whether a harm is divisible for purposes of joint and several

liability, "it is the indivisibility of the injury, rather than of culpability, that triggers joint

liability."  *See St. Paul Fire & Marine Ins. Co. v. Nolen Group, Inc.*, 2007 U.S. Dist. LEXIS

64603, 45-46 (E.D. Pa. Aug. 31, 2007).  It is well established that damage resulting from a flood

are inseparable.[6]  *See St. Paul Fire & Marine Ins. Co. v. Nolen Group, Inc.*, 2007 U.S. Dist.

LEXIS 64603, 46 (E.D. Pa. Aug. 31, 2007) ("The flood damage suffered in this case, much like

many personal injuries, is incapable of division.").  In fact, the Fifth Circuit has concluded that

damages caused by flooding relating to Hurricane Katrina are indivisible:

But here, on these pleadings, there are not two independent causes of the plaintiffs'

---

[6] Restat 2d of Torts, § 433A (comment i) provides the following as to the divisibility of harm: "Certain kinds of harm, by their very nature, are normally incapable of any logical, reasonable, or practical division. Death is that kind of harm, since it is impossible, except upon a purely arbitrary basis for the purpose of accomplishing the result, to say that one man has caused half of it and another the rest. The same is true of a broken leg, or any single wound, or the destruction of a house by fire, or the sinking of a barge. Such harms can be apportioned, if it all, only upon the basis of a prior reduction in value of what has been destroyed. By far the greater number of personal injuries, and of harms to tangible property, are thus normally single and indivisible. Where two or more causes combine to produce such a single result, incapable of division on any logical or reasonable basis, and each is a substantial factor in bringing about the harm, the courts have refused to make an arbitrary apportionment for its own sake, and each of the causes is charged with responsibility for the entire harm."

damages at play; the only force that damaged the plaintiffs' properties was flood. To the extent that negligent design, construction, or maintenance of the levees contributed to the plaintiffs' losses, it was only one factor in bringing about the flood; the peril of negligence did not act, apart from flood, to bring about damage to the insureds' properties.

*See Vanderbrook v. Unitrin Preferred Ins. Co.* , 495 F.3d 191, 223 (5th Cir., 2007).

136.    The evidence before the Court uniformly reflects that initial flooding of the class area occurred as the result of breaches to the East wall of the Industrial Canal, thereafter merging with flood waters from the MRGO breaches outside of the class area. This is supported by Plaintiffs' hydrology expert, Melvin G. Spinks, P.E., who concludes that the flooding of the proposed class area resulting from the North and South breaches in the East wall of the Industrial Canal had already occurred prior to the time that flood waters from the MRGO levee breaches had reached the proposed class area.  [Plaintiffs' Exh. 421 (*Spinks Report*, at 22-23, 26, 29)].  Dr. Spinks' findings are consistent with the findings of the report conducted by the Interagency Performance Evaluation Task Force, U.S. Army Corps of Engineers ("IPET"), which also concluded that the proposed class area had already flooded due to the breaches in the East wall of the Industrial Canal before said water merged with the floodwaters resulting from the MRGO levee breaches:

> "In summary for the Lower Ninth Ward, it appears that flooding began early on Monday morning. Eyewitness accounts and stopped-clock data indicate that floodwaters began entering the Lower Ninth Ward prior to 1030 UTC (5:30 a.m. CDT) and possibly as early as 0930 UTC (4:30 a.m. CDT). These early times suggest that the water entered through one or both of the breaches in the IHNC Floodwall. The floodwall was overtopped later at about 1230 UTC (7:30 a.m. CDT). Time-stamped photographs confirm that flooding had occurred by about 1300 UTC (8:00 a.m. CDT) near the Jackson Barracks along the southern end of this area near the St. Bernard Parish line. The floodwaters from the IHNC moved east, eventually merging with the waters from the Chalmette area near Paris Road in the midmorning timeframe."

[Plaintiffs' Exh. 421 (*Spinks Report*, Appendix B, at 9)]

137.    Thus, as Plaintiffs damages are not divisible, litigation of Defendants' liability

does not require examination of the multiplicity of causal issues Defendant raises.  To the contrary, under principles of joint and several liability, Defendant may be held liable if ***any*** degree of flooding of the class area is attributable to ***any*** negligence on the part of Defendant in precipitating the breaches to the East wall of the Industrial Canal.

Respectfully submitted,


**\s\Brian A. Gilbert**
Brian A. Gilbert (21297)
Law Office Of Brian A. Gilbert, P.L.C.
Best Koeppel Traylor
2030 St. Charles Avenue
New Orleans, Louisiana 70130
Telephone: (504) 598-1000
Facsimile: (504) 524-1024
E-mail: bgilbert@briangilbertlaw.com
 bgilbert@bestkoeppel.com

**\s\Matt C. Bailey**
Shawn Khorrami (CA SBN #14011)
Dylan Pollard (CA SBN #180306)
Matt C. Bailey (CA SBN #218685)
Khorrami, Pollard & Abir, LLP
444 S. Flower Street, 33rd Floor
Los Angeles, California 90071
Telephone: (213) 596-6000
Facsimile: (213) 596-6010
e-mail: Skhorrami@kpalawyers.com,
 Dpollard@kpalawyers.com
Mbailey@kpalawyers.com


Lawrence D. Wiedemann (#13457)
Karl Wiedemann (18502)
Wiedemann and Wiedemann
821 Baronne Street
New Orleans, Louisiana 70113
Telephone: 504-581-6180
Facsimile: 504-581-4336
e-mail: ldwiedemann@gmail.com
karlwied@bellsouth.net

Patrick J. Sanders (18741)
3123 Ridgelake Drive, Suite B
Metairie, Louisiana 70002
Telephone: (504) 834-0646
e-mail: pistols42@aol.com

Richard T. Seymour (D.C. Bar #28100)
Law Office of Richard T. Seymour, P.L.L.C.
1150 Connecticut Avenue N.W., Suite 900
Washington, D.C. 20036-4129
Telephone: 202-862-4320
Cell: 202-549-1454
Facsimile: 800-805-1065 and 202-828-4130
e-mail: rick@rickseymourlaw.net

Laurence E. Best, #3012
Peter S. Koeppel, #1465
Best Koeppel Traylor
2030 St. Charles Avenue
New Orleans, LA 70130
Telephone: (504) 598-1000
Facsimile: (504) 524-1024
Email: lebest@bestkoeppel.com
Email: peterklaw@aol.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing document has been served upon counsel of record, by United States Mail, postage prepaid and properly addressed, facsimile and/or ECF upload, this 4th day of March, 2010.

/s/ Brian A. Gilbert