# EXHIBIT 2

Deposition of Josephine Richardson

1

```
 1              UNITED STATES DISTRICT COURT

 2            EASTERN DISTRICT OF LOUISIANA

 3

 4   IN RE: KATRINA CANAL BREACHES  * CIVIL ACTION

 5                                  * NO. 05-4182

 6   PERTAINS TO: BARGES            * Consolidated

 7                                  * SECTION "K(2)"

 8   Boutte v. Lafarge       05-5531 *

 9   Mumford v. Ingram       05-5724 * JUDGE DUVAL

10   Lagarde v. Lafarge      06-5342 *

11   Perry v. Ingram         06-6299 * MAG. WILKINSON

12   Benoit v. Lafarge       06-7516 *

13   Parfait Family v. USA   07-3500 *

14   Lafarge v. USA          07-5178 *

15      *  *  *  *  *  *  *  *  *  *  *

16

17          Deposition of JOSEPHINE RICHARDSON,

18   given at Chaffe McCall, L.L.P., 2300 Energy

19   Centre, 1100 Poydras Street, New Orleans,

20   Louisiana 70163-2300, on August 11th, 2008.

21

22

23   REPORTER BY:

24          JOSEPH A. FAIRBANKS, JR., CCR, RPR

25          CERTIFIED COURT REPORTER #75005
```

**2**

1  APPEARANCES:
2  REPRESENTING THE BARGE PSLC:
3      BRIAN A. GILBERT, APLC
4      (BY:  BRIAN A. GILBERT, ESQUIRE)
5      821 Baronne Street
6      New Orleans, Louisiana 70113
7      504-885-7700
8  - and -
9      WIEDEMANN & WIEDEMANN
10     (BY:  EDWARD MORENO, ESQUIRE)
11     821 Baronne Street
12     New Orleans, Louisiana 70113
13     504-581-6180
14
15 REPRESENTING LAFARGE NORTH AMERICA:
16     GOODWIN PROCTOR, L.L.P.
17     (BY:  MARK S. RAFFMAN, ESQUIRE)
18     901 New York Avenue, NW
19     Washington, D.C. 20001
20     202-346-4000
21 - and -
22
23
24
25

**3**

1
2      CHAFFE, MCCALL, L.L.P.
3      (BY:  CHARLES BLANCHARD, ESQUIRE)
4      2300 Energy Centre
5      1100 Poydras Street
6      New Orleans, Louisiana 70163-2300
7      504-585-7000
8  REPRESENTING THE AMERICAN CLUB:
9      MONTGOMERY, BARNETT, BROWN, READ,
10     HAMMOND & MINTZ, L.L.P.
11     (BY:  RONALD J. KITTO, ESQUIRE)
12     1100 Poydras Street, Suite 3200
13     New Orleans, Louisiana 70163
14     504-585-3200
15
16 REPRESENTING ORLEANS LEVEE DISTRICT:
17     MCCRANIE, SISTRUNK, ANZELMO, HARDY,
18     MAXWELL & MCDANIEL
19     (BY:  DARCY DECKER, ESQUIRE)
20     3445 N. Causeway Boulevard, Suite 800
21     Metairie, Louisiana 70002
22     504-831-0946
23
24
25

**4**

1  REPRESENTING JEFFERSON PARISH:
2      BURGLASS & TANKERSLEY
3      (BY:  RICHARD PAVLICK, ESQUIRE)
4      5213 Airline Drive
5      Metairie, Louisiana 70001
6      504-836-2220
7
8  REPRESENTING LAKE BORGNE LEVEE DISTRICT:
9      DUPLASS, ZWAIN, BOURGEOIS, MORTON,
10     PFISTER & WEINSTOCK
11     (BY:  NICOLE BOYER-DUPLASS, ESQUIRE)
12     Three Lakeway Center, 29th Floor
13     3838 N. Causeway Boulevard
14     Metairie, Louisiana 70002
15     504-832-3700
16
17
18
19
20
21
22
23
24
25

**5**

1      E X A M I N A T I O N   I N D E X

2  EXAMINATION BY:                    PAGE
3  MR. RAFFMAN  ...............................7
4  MR. GILBERT  .............................192
5  MR. RAFFMAN  .............................194

6
7      E X H I B I T   I N D E X

8  EXHIBIT NO.                         PAGE
9  Richardson Exhibit 1 .........................11
10 Richardson Exhibit 2 .........................16
11 Richardson Exhibit 3 .........................24
12 Richardson Exhibit 4 .........................36
13 Richardson Exhibit 5 .........................71
14 Richardson Exhibit 6 .......................126
15 Richardson Exhibit 7 .......................139
16 Richardson Exhibit 8 .......................141
17 Richardson Exhibit 9 .......................149
18 Richardson Exhibit 10 .....................152
19 Richardson Exhibit 11 .....................154
20 Richardson Exhibit 12 .....................158
21 Richardson Exhibit 13 .....................160
22 Richardson Exhibit 14 .....................167
23 Richardson Exhibit 15 .....................179
24 Richardson Exhibit 16 .....................181

25

**6**

S T I P U L A T I O N

IT IS STIPULATED AND AGREED by and among counsel for the parties hereto that the deposition of the aforementioned witness may be taken for all purposes permitted within the Louisiana Code of Civil Procedure, in accordance with law, pursuant to notice;

That all formalities, save reading and signing of the original transcript by the deponent, are hereby specifically waived;

That all objections, save those as to the form of the question and the responsiveness of the answer, are reserved until such time as this deposition, or any part thereof, is used or sought to be used in evidence.

* * *

JOSEPH A. FAIRBANKS, JR., CCR, RPR, Certified Court Reporter in and for the State of Louisiana, officiated in administering the oath to the witness.

**7**

JOSEPHINE RICHARDSON 1321 Egania Street, New Orleans, Louisiana 70117, a witness named in the above stipulation, having been first duly sworn, was examined and testified on her oath as follows:

EXAMINATION BY MR. RAFFMAN:

Q.   Good afternoon, Mrs. Richardson.  My name is Mark Raffman, and I'm the lawyer for one of the defendants in this case Lafarge North America, Inc.

Have you ever given a deposition before?

A.   No.

Q.   Mrs. Richardson, I'm going to explain some of the rules of the road, and I'll ask whether you understand those rules.

A.   Okay.

Q.   The court reporter has administered an oath, and you'll be testifying today as if you were testifying under oath in a court of law. Do you understand that?

A.   Yes, I do.

Q.   In order for the court reporter to do his job he needs to take down our words as we speak them.  That means that each of us needs

**8**

to speak loudly enough for the court reporter to hear us.

A.   All right.

Q.   You understand that.

A.   Yes, I do.

Q.   I'll try to keep my voice up.  Will you try to keep your voice up, ma'am?

A.   Yes, I will.

Q.   Also, he can't -- the court reporter can't take down our words if we're both speaking at once.  I promise not to interrupt you when you're answering, or at least I'll try not to interrupt you when you're answering. Will you try to let me finish my questions before you answer?

A.   Sure will.

Q.   In order for the court reporter to take down your testimony you need to give a spoken answer to my questions.  Head nodding or head shaking will not be sufficient for him.

Do you understand that?

A.   Yes, I do.

Q.   If you don't understand one of my questions, will you ask me to clarify my question?

**9**

A.   Yes, I will.

Q.   If you remember something that I asked about earlier, you are welcome to add to whatever answer you previously gave.  Do you understand that?

A.   Yes.

Q.   Mrs. Richardson, have you taken any medication or alcohol or drugs or anything else that would interfere with your ability to give a truthful and accurate testimony here today?

A.   No.

Q.   Is there reason at all why you are not able to testify truthfully and accurately to the best of your recollection today?

A.   No.

Q.   If at any time during the afternoon you need to take a break, you want to get up and stretch your legs, take a comfort break, whatever, all you need to do is say I'd like to take a break.  And then I'll ask you to finish whatever answer you were giving and then we'll take a break.  Do you understand that?

A.   Yes, I do.

Q.   Mrs. Richardson, did you do anything to prepare for your deposition today?

10

1   A.   No.
2   Q.   Did you review any documents to
3   prepare for your deposition today?
4   A.   Yes.
5   Q.   Did any of the documents that you
6   reviewed refresh your recollection, refresh
7   your memory, about any of the events that you
8   may testify about today?
9   A.   Yes.
10   Q.   Which documents that you reviewed
11   refreshed your memory about those events?
12   A.   Pictures of my house, and that's about
13   it.
14   Q.   I'm sorry.  I didn't hear the last
15   part of your answer, ma'am.
16   A.   That's about it.  Pictures of my
17   house.
18   Q.   Did you meet with anyone to get ready
19   for the deposition today?
20   A.   With Brian Gilbert.  (Indicating.)
21   Q.   When did you met with Mr. Gilbert?
22   A.   Today.
23   Q.   For how long?
24   A.   From ten o'clock until 12:30.
25   Q.   Was anyone else present when you met

11

1   with Mr. Gilbert?
2   A.   This gentleman here.  Mr. Mark.
3   Q.   I believe you're pointing to
4   Mr. Edward Moreno.  Is that right?  If I ask
5   Mr. Moreno to raise his hand so that you can --
6   this gentleman here is Mr. Moreno.
7   A.   Oh.  Mr. Moreno.  I thought it was
8   Mr. Mark.  I'm sorry.
9   Q.   So apart from Mr. Gilbert and
10   Mr. Moreno, was anyone else present during your
11   meeting?
12   A.   No.
13   Q.   Ms. Richardson, do you remember
14   reading any legal type documents about your
15   claims in this case?
16   A.   Yes.
17   Q.   Do you know what discovery responses
18   are?
19   A.   No.
20   Q.   Okay.  I'm going to show you what has
21   been marked as Exhibit 1 to your deposition.
22   Exhibit 1 is a verification.
23       (Richardson Exhibit 1 was marked for
24   identification and is attached hereto.)
25   A.   Can I look at it?

12

EXAMINATION BY MR. RAFFMAN:
1   Q.   Would you please look at the document.
2   A.   Okay.  (Witness complies.)  All right.
3   Q.   Mrs. Richardson, do you recognize this
4   document Exhibit 1?
5   A.   Exhibit 1?
6   Q.   Right.  Exhibit 1 --
7   A.   Richardson?
8   Q.   Right.
9   A.   Yes.
10   Q.   I'll explain something to you just so
11   we can all be clear.  When I hand you a
12   document I'm going to put a little sticker on
13   it with your name and then a little number on
14   it and I'm going to put that sticker in the
15   bottom corner of the document.
16   A.   All right.
17   Q.   And that's going to identify that
18   document as an exhibit to your deposition.
19   A.   All right.
20   Q.   So when we talk about the document, we
21   can talk about it using the same language.
22   A.   All right.
23   Q.   So Exhibit 1 is the verification.  You
24   can see the sticker on the bottom, right?

13

1   A.   Yes.  I see it.
2   Q.   So my question is, have you ever seen
3   this document Exhibit 1 before today?
4   A.   Yes, I have.
5   Q.   What is it?
6   A.   What is it?
7   Q.   Yes, ma'am.  What is the document?
8   A.   Concerning the barge from Katrina?
9   That's what you want to know?
10   Q.   Yes.  What is it?  Do you know what it
11   is?
12   A.   Yeah.  It's concerning it, huh?  Yeah,
13   it's concerning the barge for me.
14   Q.   All right.  You've now had a chance
15   the look the document over; right?
16   A.   No.
17   Q.   No, you haven't looked it over.
18   A.   No.
19   Q.   All right.  Would you read the four
20   lines that start "before me," and then end at
21   the signature line, and tell me when you finish
22   reading that.
23   A.   I didn't bring my glasses.
24   Q.   I see.
25   A.   Which one do you want me to read now?

4  (Pages 10 to 13)

14

1 MR. GILBERT:
2     Counsel, you can read it to her.
3 EXAMINATION BY MR. RAFFMAN:
4     Q.  I'll read it out loud and we'll go
5 from there.
6     Before I do that, do you have trouble
7 reading without your glasses?
8     A.  Yes, I do.
9     Q.  So as we take testimony from you here
10 today, it's going to be hard for you to answer
11 any question about any written documents,
12 right?
13     A.  Yes.
14     Q.  All right.  What this verification
15 says, Mrs. Richardson, is that before me, the
16 undersigned Notary Public, came Josephine
17 Richardson, named barge plaintiff in the
18 Katrina Canal Breaches Consolidated Litigation,
19 and verifies that she has read all written
20 discovery responses made on her behalf in this
21 matter, and that all that is contained therein
22 is true and correct to the best of his or her
23 knowledge, information and belief.
24     A.  Yes.
25     Q.  Do you understand what I just said?

15

1     A.  Yes.  Yes, I do.
2     Q.  Underneath the text that has what I
3 just said, there's a signature line.  Do you
4 recognize the signature on that signature line?
5     A.  My name Josephine Richardson Plaintiff
6 Signature?
7     Q.  Yes.
8     A.  Josephine L. Richardson.
9     Q.  Did you sign that?
10     A.  Yes, I did.
11     Q.  Before signing that, did you in fact
12 read all the written discovery responses that
13 were made on your behalf in this case?
14     A.  Yes, I did.
15     Q.  Can you describe those responses to
16 me?  What do they look like?
17     A.  What looks like?
18     Q.  The written discovery responses that
19 you read before signing the paper.  What do you
20 remember about those?
21     A.  About Katrina, the canal barge, and
22 that I swore that everything that I put on
23 the -- that I signed, it was me, Josephine L.
24 Richardson, to the best of my knowledge.
25     Q.  You actually read some documents

16

before you signed this verification; right?
     A.  Yes, I did.
     Q.  Were they typewritten documents?
     A.  Yeah.  They were typed.
     Q.  Okay.  Okay.  I'm handing you what's
been marked as Exhibit 2 to your deposition.
     You can hand that one to me, please.
     (Richardson Exhibit 2 was marked for
identification and is attached hereto.)
     A.  (Tendering.)
EXAMINATION BY MR. RAFFMAN:
     Q.  Exhibit 2 is a document that's
entitled Answers To interrogatories Propounded
by the Barge Entities.  (Tendering.)  It is a
47-page document.
     Mrs. Richardson, based on just the
first page of the document, do you recognize
that as one of the typed documents that you
reviewed before signing the verification that I
just showed you?
     A.  Did I remember it?
MR. RAFFMAN:
     Why don't you read that back,
     please.
     (Whereupon the previous question was

17

read back.)
     A.  Did I recognize it?  Yes, I did.
EXAMINATION BY MR. RAFFMAN:
     Q.  I'll take it back.  I'm going to
direct your attention to an answer to one of
the interrogatories in this Exhibit 2.  It's on
Page 18.  It's the Answer to Interrogatory
Number 12, and I'll read it so that you don't
have to struggle without your glasses.
     A.  All right.
     Q.  It says, on August 28th, 2005,
plaintiff Josephine Richardson was located at
1321 Egania Street, New Orleans, Louisiana
70017.  On August 29th and 30th,
Mrs. Richardson was located at 3800 Clermont
drive, New Orleans, Louisiana.
     A.  Yes, that's true.
     Q.  Everything that I've just read is
true.
     A.  It's true.
     Q.  Okay.  The next one I'm going to show
you is on Pages 36 and 37, Interrogatory
Number 35.
     An interrogatory is a question.
     A.  All right.

**18**

1  Q.  This question asks, identify by court
2  and docket number each civil or criminal
3  proceeding in which any individual or proposed
4  class representative has been a party.
5  And you answered, plaintiff Josephine
6  Richardson has not been a party to a civil
7  proceeding or a criminal proceeding.
8  Do you see that?
9  A.  Yes, I see that.
10  Q.  Is that true?
11  A.  That's true.
12  Q.  Apart from this lawsuit, there are no
13  other lawsuits to which you have been a party.
14  A.  No.
15  Q.  You have never authorized any lawyer
16  to file a lawsuit on your behalf?
17  A.  Yes, I have.
18  Q.  You have.
19  A.  Uh-huh.
20  Q.  All right.  So this answer that I just
21  read --
22  A.  Uh-huh.
23  Q.  -- is incorrect.  Am I right?
24  A.  It's incorrect.  Yes, it is.
25  Q.  This answer is incorrect because in

**19**

1  fact you did authorize a lawsuit.
2  A.  I sure have.
3  Q.  All right.  Tell me what lawsuits
4  you've been a party to.
5  A.  Mr. Robert Caluna.  Calona or Caluna.
6  Q.  If I said the name Robert Caluda,
7  C-A-L-U-D-A, would that be the right name?
8  A.  That's him there.
9  You need the insurance, too?  I have a
10  insurance.
11  Q.  Is there another lawsuit besides the
12  one that Mr. Caluda filed?
13  A.  Right.  Right.
14  Q.  All right.  Tell me about that other
15  lawsuit.
16  A.  From Lafayette, for the roof damage.
17  They say they didn't pay us enough money for
18  the roof.  The one from Cedar Rapids, that he
19  knows.
20  Q.  You're pointing to your lawyer
21  Mr. Gilbert?
22  A.  No.  That's for the insurance for the
23  fire and wind damage I had.
24  Q.  All right.  Tell me about that
25  lawsuit.  Who is your lawyer in the lawsuit

**20**

1  against the insurance company for the fire and
2  wind damage?
3  THE WITNESS:
4  Do you have the papers?
5  MR. MORENO:
6  I can't answer.
7  A.  Lafayette.  I don't have his name,
8  because he never did contact me anymore.
9  EXAMINATION BY MR. RAFFMAN:
10  Q.  Did you give your lawyers Mr. Gilbert
11  or Mr. Moreno documents regarding your lawsuit
12  against an insurance company?
13  A.  No.
14  Q.  Do you have documents regarding your
15  lawsuit against an insurance company?
16  A.  No.  All I have is what they paid me
17  and the name of the company.
18  Q.  Okay.  Is there a lawsuit against an
19  insurance company?
20  A.  Yes.  There's supposed to be.
21  Q.  You're the plaintiff in the lawsuit?
22  Do you know what a plaintiff is?
23  A.  Yeah.  The --
24  Q.  I just want to make sure we understand
25  that you understand my questions.

**21**

1  A.  Yeah.  Uh-huh.
2  Q.  Did you sue an insurance company?
3  A.  I sued, but I haven't got anything
4  from them.
5  Q.  Okay.  So there's a lawsuit against an
6  insurance company.
7  A.  Yes.  There is a lawsuit against them.
8  Q.  And you're the person who brought the
9  suit.
10  A.  Yeah.  I saw it in the paper.
11  Q.  You can't tell me who the lawyer is.
12  A.  No, because they didn't tell me.  I
13  have the paper home, but I didn't know I needed
14  it.  I never talked to him anymore.
15  Q.  What paper do you have at home that
16  you were just talk about?
17  A.  The name of the people that's suing
18  them.
19  Q.  They're the lawyers that represent
20  you.
21  A.  Yes.
22  Q.  That lawsuit is still pending, as far
23  as you know?
24  A.  It's still pending, yes, sir.
25  Q.  The lawsuit that Mr. Caluda filed --

22

1  he's your lawyer?
2      A.  Supposed to be, yeah.
3      Q.  And who did you sue in that case?
4      A.  The Corps of Engineers.
5      Q.  Apart from the suit against the Corps
6  of Engineers and the suit against the insurance
7  company, are there any other lawsuits in which
8  you're a plaintiff -- in which you're bringing
9  the suit?
10     A.  No.  And Mr. Brian Gilbert.  That's
11 it.
12     Q.  So Mr. Gilbert 's lawsuit is the one
13 that we're involved in today?
14     A.  All right.  Just the other two.
15     Q.  Okay.  The suit against the Corps of
16 Engineers, tell me about that suit.
17     A.  That's for the wrongful death of my
18 husband Joseph Richardson, Sr.
19     Q.  And are you also seeking damage to
20 your property against the Corps?
21     A.  Yes.
22     Q.  In your suit against the Corps, are
23 you also claiming damages for emotional
24 distress that you suffered?
25     A.  Yes.

23

1      Q.  And are you seeking damages for loss
2  of income?
3      A.  Yes.
4      Q.  These are the same kinds of damages
5  that you're seeking in this case; right?
6      A.  Yes.
7      Q.  So you have a case against the Corps
8  and a separate case against the barge and the
9  defendants who are involved with the barge,
10 right?
11     A.  Yes.
12     Q.  And in each of those two lawsuits
13 you're seeking the same kinds of damages,
14 right?
15     A.  Yes.
16     Q.  Why did you sue the Corps?  Why did
17 you sue the Corps of Engineers?
18     A.  I just was depressed, stressed, and I
19 figured I need some help.
20     Q.  When you sued the Corps, did you
21 allege that the Corps caused or substantially
22 contributed to the flooding in the Lower Ninth
23 Ward that caused your damages?
24     A.  Yes, it was.
25     Q.  And do you believe that to be true?

24

1      A.  Yes, I do.
2      Q.  I'm going to hand you what's been
3  marked Exhibit 3 to your deposition.
4  (Tendering.) Exhibit 3 to your deposition is
5  entitled Barge Plaintiffs May 2008
6  Supplemental, Amended and Superseding
7  Supplemental Answers to Interrogatories
8  Propounded by Barge Entities.  All right?
9      Do you recognize this as another one
10 of the discovery responses that you reviewed at
11 or around the time that you signed your
12 verification?
13     (Richardson Exhibit 3 was marked for
14 identification and is attached hereto.)
15     A.  Yes, I do.
16 EXAMINATION BY MR. RAFFMAN:
17     Q.  Now, please turn to the Answer to
18 Interrogatory 24.  Your lawyer will help you
19 find it.  All right.  The answer to
20 interrogatory 24 -- the question is:  Do you
21 deny that the actions or inactions of the
22 United States Government, including the Army
23 Corps of Engineers, caused or substantially
24 contributed to the flooding at the Lower Ninth
25 Ward and St. Bernard Parish?  If so, provide

25

1  all reasons and identify every witness,
2  document, fact, opinion, inference and
3  conclusion upon which you rely, and
4  specifically including any experts who have so
5  concluded.
6      A.  Yes.
7      Q.  So do you understand that question,
8  Mrs. Richardson?
9      A.  Yes.  That the barge caused the
10 trouble that we had over there.
11     Q.  The question actually asks whether you
12 deny that the government had something to do
13 with the trouble.  Do you understand that?
14     A.  Oh, no.  No.  No.  I don't know who --
15     Q.  So you, as you sit here today, you
16 don't deny that, do you?
17     A.  No.
18     Q.  You think that the government had
19 something to do with the trouble over there,
20 don't you?
21     A.  I sure do.
22     Q.  But do you see the answer,
23 Mrs. Richardson, that was submitted on your
24 behalf here, it says, yes, plaintiffs deny the
25 matters subject of the interrogatory based upon

26

1 firsthand accounts that ING 4727 caused the
2 breach and subsequent flooding of the proposed
3 class geography, and then it goes on from
4 there.  But do you see that very first
5 sentence, does deny the interrogatory?  Do you
6 see that?
7     A.  Is this where it is here?
8     Q.  The very first two lines.
9     A.  That they were the cause of the
10 flooding?  That's what you were trying to tell
11 me?
12     Q.  I guess what I'm trying to get at,
13 Ms. Richardson, is that the answer to this
14 interrogatory denies that the government had
15 anything to do with the flooding.  Do you
16 understand that that's the answer to the
17 interrogatory?
18     A.  I don't think that's right.  Why
19 wouldn't he have nothing to do with that?
20     Q.  You think the government had something
21 to do with it; right?
22     A.  Yes.  Or the boat.  The barge.
23     Q.  I understand.
24     A.  Doesn't that come through the
25 government too?  The barge come through the

27

1 government?
2     Q.  I'm not saying the barge came through
3 the government, Mrs. Richardson, not at all?
4     A.  Okay.  Uh-huh.
5     Q.  As you sit here today, you, Josephine
6 Richardson, do not deny that the government had
7 something to do with the flooding; am I
8 correct?
9     A.  Right.
10     Q.  Do you remember reading that answer
11 before you signed your verification?
12     A.  No.
13     Q.  Do you remember that?
14     A.  No, I don't remember.
15     Q.  Let me shift gears a little bit.
16 Let's go back a bit and get some basic
17 information about you.
18     A.  Uh-huh.
19     Q.  When were you born?
20     A.  New Orleans.  When?
21     Q.  Yes, ma'am.
22     A.  March the 19th, 1928.
23     Q.  Where were you born?
24     A.  New Orleans.
25     Q.  Where did you grow up?

28

A.  New Orleans.
Q.  Have you lived in New Orleans your
entire life before Hurricane Katrina?
A.  Yes, I have.
Q.  Where do you live now?
A.  1321 Egania.
Q.  When -- let me go back.  Did you live
at 1321 Egania before Hurricane Katrina?
A.  Yes, I have.
Q.  When did you move back to 1321 Egania?
A.  May of this year.
Q.  Mrs. Richardson, before Hurricane
Katrina you were married, right?
A.  Oh, yes.
Q.  Just once.
A.  Once.
Q.  To whom?
A.  Joseph Richardson, Sr.
Q.  When did you and Mr. Richardson marry?
A.  October the 8th, 1947.
Q.  Do you have children?
A.  Seven.  Not all alive now, though.
But we had -- I have eight.  Seven boys and one
girl.  I was just counting the boys.  Seven
boys, one girl.

29

Q.  When were your children born?
A.  Right here.  What you want to know,
the years and the date or whatever?
Q.  Yes, ma'am.
A.  The first one, Joseph, Jr., born July
the 13th, '48; Clarence Richardson, Sr., July
the 31st, '50; Edward Gerald Richardson,
October the 25th, '53; Gregory Richardson, July
the 7th, '56; and Jeffrey Richardson, December
the 6th, '60; and I had twins in between that
lived a year but they been dead, two more boys;
now, I have -- the last one is a girl, June
Marie Greenwood, June the 29th, 1966.
Q.  You say the twins died before they
reached one year old?
A.  Yes, they did.
Q.  Of the six children whom you've named,
did all six of the children other than the
twins live through childhood?
A.  Yes.
Q.  And were all six of them alive at
the --
A.  No, Clarence Richardson -- oh, I'm
sorry.  He's deceased.
Q.  Okay.  When did Clarence Richardson

30

1  pass?
2      A.  Twelve years ago.
3      Q.  At the time of Hurricane Katrina, you
4  had five children still alive?
5      A.  Yes.
6      Q.  Where were your five children living
7  at the time of Hurricane Katrina?
8      A.  Four of them was in New Orleans, one
9  in Stone Mountain, Georgia.
10     Q.  Which of your children lived in Stone
11 Mountain, Georgia?
12     A.  Jeffrey Richardson, the baby boy.
13     Q.  Where in New Orleans did your son
14 Joseph, Jr. live at the time of Katrina?
15     A.  Um -- on Ray Avenue.
16     Q.  Could you spell the name of that
17 street, please?  I'm not sure I heard it
18 correctly.  The street where Joseph lived.
19     A.  Ray Avenue.  Fifty-seven I think
20 hundred Ray Avenue.
21     Q.  And in what neighborhood is that?
22     A.  Right off -- in Gentilly, right off of
23 Chef.
24     Q.  Okay.  So your son Joseph lived in
25 Gentilly at the time of the storm, right?

31

1      A.  Yes.
2      Q.  Where did your son Edward live at the
3  time of Katrina?
4      A.  On Nottingham.  I forget the address
5  on Nottingham.  In New Orleans, in the east.
6  They call it the east.
7      Q.  So your son Edward lived in New
8  Orleans East?
9      A.  Yes.  Uh-huh.
10     Q.  Where did your son Gregory live at the
11 time of the storm?
12     A.  In New Orleans East.
13     Q.  Where did your daughter June live at
14 the time of the storm?
15     A.  In New Orleans East.
16     Q.  Did you have any brothers or sisters
17 living in New Orleans at the time of Hurricane
18 Katrina?
19     A.  I had two brothers living.
20     Q.  What are the names of those two
21 brothers?
22     A.  The oldest brother, Albert Long,
23 L-O-N-G.  And Earl Long.
24     Q.  What was your brother Albert 's
25 address at the time of Hurricane Katrina?

32

1      A.  He's on Louisa.  1400, I think,
2  Louisa.  But he's deceased.  He died March
3  past.  March the 10th.
4      Q.  March 10th, 2008?
5      A.  Uh-huh.  This year.
6      Q.  In what neighborhood was your brother
7  Albert 's Louisa Street address?
8      A.  1400 on Louisa.
9      Q.  What part of town is that?
10     A.  In the Ninth Ward.
11     Q.  It's in the Upper or Lower Ninth?
12     A.  Upper.
13     Q.  So your brother Albert lived on the
14 west side of the Industrial Canal?
15     A.  Yeah.
16     Q.  Where did your brother Earl live at
17 the time of the storm?
18     A.  He still live at 3800 Clermont.
19     Q.  In what neighborhood is 3800 Clermont?
20     A.  Gentilly area.
21     Q.  What other family -- before the storm,
22 did you spend a lot of time with the members of
23 your family?
24     A.  Oh, yes.
25     Q.  Apart from the members of your family

33

1  that we've gone through here today, are there
2  other family members that you spent a lot of
3  time with before the storm?
4      A.  No.
5      Q.  Now you were at your brother Earl 's
6  house during the storm.
7      A.  Yes, I was.
8      Q.  Do you have any grandchildren?
9      A.  About thirty.
10     Q.  Thirty grandchildren.
11     A.  Uh-huh.
12     Q.  Before the storm, did any of them live
13 in the Lower Ninth Ward?
14     A.  No.
15     Q.  Did any of them live in other
16 neighborhoods of New Orleans?
17     A.  Yeah.  There's the ones that live in
18 Gentilly and all them.  But that's mostly --
19 they just scattered around.
20     Q.  Before the storm, they were scattered
21 around the New Orleans area?
22     A.  Uh-huh.  Slidell and Baton Rouge.
23     Q.  Which of your sons have married and
24 had children?
25     A.  All of them are married and had

9  (Pages 30 to 33)

34

1   children.
2       Q.   All of them.
3       A.   All of them.
4       Q.   All of them are still married?
5       A.   Who?
6       Q.   Are all of them still married today?
7       A.   Well, Joseph, his wife is deceased.
8       Q.   When did his wife die?
9       A.   Twelve years ago, the week after my
10  son.
11      Q.   A week after your son Clarence.
12      A.   Clarence, yeah.
13      Q.   So in the space of one week you lost a
14  son and you lost a daughter-in-law.
15      A.   The next week.  And a grandson.
16      Q.   Three family members in the space of a
17  week.
18      A.   In a week.  They got killed in a
19  house.  Nobody never found out who killed them.
20      Q.   Who got killed in the house?
21      A.   Joseph wife and his son.
22      Q.   They were murdered.
23      A.   Yeah.  And they never found out.
24      Q.   Where did they live?
25      A.   In the east.  Redwood Drive.

35

1       Q.   Mrs. Richardson, did you attend high
2   school?
3       A.   Two years.
4       Q.   And is the two years of high school
5   the highest level of education that you have
6   attained?
7       A.   Uh-huh.
8       Q.   Where does your son Joseph, Jr. live
9   now?
10      A.   Joseph, Jr.?  On Ray Avenue I told
11  you.
12      Q.   He still lives in New Orleans.
13      A.   Yeah.  Uh-huh.
14      Q.   Where does your son Edward live now?
15      A.   At Nottingham, in the east.  New
16  Orleans East.
17      Q.   Where does your son Gregory live now?
18      A.   Coronada Drive, in the east.  And
19  Nottingham for Edward.  And June, she's in the
20  east, too.
21      Q.   So all of your family members who
22  lived in New Orleans before the storm, except
23  for your husband Joseph, Sr --
24      A.   Right.
25      Q.   -- have either returned or are still

36

1   today living in New Orleans.
2       A.   Uh-huh.
3       Q.   Leaving aside your husband Joseph, Sr.
4   who is deceased, are you able to see your
5   family members?
6       A.   They come around.
7       Q.   Today?
8       A.   They come around all the time.
9   They're not that far from me.  They're all
10  buying their own property and stuff, that's why
11  they moved over there.
12      Q.   I want to ask you some questions about
13  your home.  I've handed you what has been
14  marked as Richardson Exhibit 4 which is a map
15  from Google.  Do you recognize the red bubble
16  in Exhibit 4 as representing the --
17          (Richardson Exhibit 4 was marked for
18  identification and is attached hereto.)
19      A.   Egania Street.  Yeah.  Andry and
20  Urquhart -- I can't even see this.  Does that
21  look like Urquhart there?  I'm on Egania
22  between Urquhart and Villere.  Those are the
23  two streets I'm in between.  All right.  It's
24  on there.
25  EXAMINATION BY MR. RAFFMAN:

37

1       Q.   So the red bubble is approximately the
2   location of your Egania Street house.
3       A.   Yes.  It is.  Yes, it is.
4       Q.   How long before Hurricane Katrina had
5   you and your husband lived at 1321 Egania
6   Street?
7       A.   Since 1954.
8       Q.   Who owned the property?
9       A.   Nobody.  We bought and paid for it.
10  It's ours.
11      Q.   You and Mr. Richardson owned it before
12  the storm.
13      A.   Oh, okay.  Yes.
14      Q.   And after the storm you still own it.
15      A.   Sure do.
16      Q.   Before the storm, did anyone besides
17  you and your husband live at the 1321 Egania?
18      A.   No.  They all had moved away.  Just
19  the two of us.
20      Q.   After the storm -- well, you moved
21  back in May of 2008, right?
22      A.   Right.
23      Q.   You live by yourself there now.
24      A.   Yes.
25      Q.   Where did you live before you moved

10  (Pages 34 to 37)

38

1   back to your Egania Street home this year?
2       A.   It's a long story.  Where did I live?
3       Q.   Yes.  And let's go backwards.
4       A.   From the day of the storm?
5       Q.   Okay.  We'll start with the day of the
6   storm and go forward, sure.
7       A.   Okay.  I left my house about 4:30,
8   quarter to 5:00 that evening.  My husband
9   didn't come.  He wanted to stay home and take
10  care of the house.  So I left and went to my
11  brother Earl.  That's on Clermont.  3800
12  Clermont.
13      Q.   At 3800?
14      A.   Clermont Drive.
15      Q.   3800 Clermont Drive.  And during --
16      A.   I stayed there for three days, in the
17  attic, till National Guard took us out of
18  there.  Three days later.
19           From there, the Army struck took us to
20  the Superdome, and another three days there.  I
21  was here for six days in the city waiting to
22  get out of here from the Superdome.
23      Q.   Where did you did from the Superdome?
24      A.   From the Superdome, the bus finally
25  came and brought us to Texas.  Houston, No,

39

1   Dallas.  I'm wrong.  Dallas, Texas.  We went to
2   Dallas.
3       Q.   Where did you stay?
4       A.   In a shelter in Dallas until my
5   son -- my grandson came and got us and my baby
6   boy Jeffrey Richardson took his credit cards
7   and flew my brother and I to Stone Mountain,
8   Georgia.
9       Q.   This is your brother Earl?
10      A.   That was my brother Earl.  We went to
11  Stone Mountain, Georgia by Jeffrey Richardson
12  and his family.  Twenty-eight of us staying
13  there.  Three bedrooms.  So after two months I
14  got lucky to get a senior citizen apartment in
15  Stone Mountain ten minutes from my son house.
16      Q.   How long were you in senior citizen's
17  apartment at Stone Mountain?
18      A.   Seven months before I left.  I left to
19  come home to bury my husband seven months
20  later.  I went to Harvey over the river by my
21  third son and his family.  I think I got his
22  address here.
23      Q.   Your third son is?
24      A.   Edward Gerald.
25      Q.   Edward.  So he was living in Harvey.

40

1       A.   And he came back, and they got a
2   girlfriend loaned us the house in Harvey, so we
3   stayed there.  I stayed there for seven months
4   with their family and their grandchildren.
5       Q.   All right.
6       A.   So -- and after seven months I moved
7   to my brother-in-law -- my son-in-law told me
8   about the house, the apartment in Pontchartrain
9   Oaks in New Orleans, 9696 Haynes Boulevard.  I
10  stayed there for a year and eight months.
11      Q.   That is in New Orleans East?
12      A.   Yes.  Pontchartrain ocean apartment, a
13  year and eight months there.
14      Q.   That, Pontchartrain Oaks address
15  was --
16      A.   Apartment.
17      Q.   I'm sorry.  We have to speak one at a
18  time.  Let me try to finish.  The Pontchartrain
19  Oaks was the address you lived at immediately
20  before you moved back to your Egania Street --
21      A.   Right.  Right.
22      Q.   Okay.  The Harvey address where your
23  son Earl was living, is that a different
24  address from where Earl lives now?
25      A.   Where Earl live?  He's back in his

41

1   home, 3800 Clermont.  He's back home.
2       Q.   When you were in Harvey, you were
3   living with your son Edward?
4       A.   Edward and his wife and his
5   grandchildren and his children.
6       Q.   Did Edward live in Harvey before the
7   storm?
8       A.   No.
9       Q.   Does Edward live in Harvey now?
10      A.   No.  He's in Nottingham in the east.
11  He back in his house.
12      Q.   When you were living in Harvey, you
13  were living in what was for your son Edward a
14  temporary location.
15      A.   Yeah.
16      Q.   How many of your children had to
17  relocate after Hurricane Katrina?
18      A.   All of us.  All of us had to relocate.
19      Q.   Jeffrey who lived in Stone Mountain
20  didn't have to relocate; right?
21      A.   No, the storm didn't come there.  They
22  were lucky.
23      Q.   Apart from Jeffrey who lived in Stone
24  Mountain, all of your children had to relocate?
25      A.   We all had to go there.

42

1    Q.   And you were all displaced for some
2  period of time?
3    A.   Uh-huh.
4    Q.   All of your children had flooding in
5  their houses; right?
6    A.   Oh, yes.
7    Q.   Do you know where the water came from
8  that flooded your children?
9    A.   Unh-unh.  I guess the same water that
10 came to my house visit their house, you know.
11   Q.   Do you know -- well, let me go back a
12 second.  You understand that in this case
13 you're alleging that a barge caused some
14 flooding in your neighborhood, right?
15   A.   Yes.
16   Q.   Do you understand that that same barge
17 caused flooding in the neighborhoods where your
18 children lived?  Do you understand that one way
19 or the other?
20   A.   No, I don't.
21   Q.   You don't -- do you --
22   A.   They all had water.
23   Q.   They all had water.
24   A.   Yes.
25   Q.   But the water that flooded them came

43

1  from different breaches, didn't it?
2    A.   Maybe.  I don't know.  I don't know.
3    Q.   Are you comfortable?  Do you want to
4  take a break?
5    A.   No, I'm all right.
6       (Brief recess.)
7  EXAMINATION BY MR. RAFFMAN:
8    Q.   Mrs. Richardson, do you work outside
9  the home now?
10   A.   Yes, I have.  I wasn't working then.
11 I done got too old.
12   Q.   All right.  Let's go back.  Today, in
13 2008, do you work outside the home?
14   A.   No, I haven't.
15   Q.   At the time of Hurricane Katrina, did
16 you work outside the home?
17   A.   No, I haven't.
18   Q.   You had retired from the workforce
19 before Hurricane Katrina.
20   A.   Yes, I had.
21   Q.   At the time of Hurricane Katrina, did
22 you have any plans to go back into the
23 workforce?
24   A.   Oh, no.  No.
25   Q.   I want to ask you some questions about

44

your husband.  Your husband's name was Joseph
Richardson, Sr.?
   A.   That's right.
   Q.   When was he born?
   A.   March the 28th, '28.
   Q.   He was born March 28th, 1928.
   A.   '28.  Uh-huh.
   Q.   And at the time of Hurricane Katrina,
was he working outside the home?
   A.   Yes, he was.
   Q.   What was his employment at the time of
Hurricane Katrina?
   A.   He worked for hisself.
Self-employment.
   Q.   What was his trade or occupation?
   A.   He had a truck, and he would park it
by the projects, mostly by the St. Bernard, the
biggest project we had here.  And he sold
vegetables and soft drinks and water and potato
chips and cookies, anything that was wrapped.
   Q.   How many days a week would he take the
truck and make sales before the storm?
   A.   Sometimes seven days.
   Q.   Sometimes fewer than seven days?
   A.   Sometimes five or six, but most of the

45

time it would be seven.  If he had to stay a
little while -- he was a nervous man.  He had
to be doing something, so he just kept hisself
busy busy busy.
   Q.   During the eight months before
Hurricane Katrina, can you tell me how much
money your husband brought home as a result of
the work he did with the truck?
   A.   No.
   Q.   What was your husband's income in
2004?
   A.   He got six hundred from the Social
Security, and he made his own money by working
with his truck.  He paid taxes to the city.  He
had his picture taken, everything he needed
from City Hall.
   Q.   Did your husband file federal tax
returns?
   A.   Yes, he did.
   Q.   Would the federal --
   A.   They would come to the house and
collect his taxes from City Hall, for Morial
on.  When Morial was in there, he had the girls
working the field, and they'd knock at the door
and we would write checks out to them.  That's

**46**

1   to make sure everything was paid, and it was.
2       Q.   And if I understand you right, the
3   people who would come to the door and collect
4   the money are from the City of New Orleans?
5       A.   City of New Orleans.
6       Q.   The money they were collecting was
7   some sort of a license fee that would allow
8   your husband to operate his truck?
9       A.   Uh-huh.  Take his picture every year,
10  too.  And he had license in the truck.
11      Q.   My question earlier was a little
12  different.  My question earlier was about
13  federal tax returns.  You understand what is a
14  federal tax return?
15      A.   No.
16      Q.   Did your husband pay income tax on the
17  money he made with the truck?
18      A.   I thought that went in with the city.
19  I'm not sure.
20      Q.   As we sit here today, you don't know
21  one way or the other whether your husband paid
22  federal income tax on the money he made with
23  the truck.
24      A.   No, I don't know for sure.
25      Q.   Part of your claim in this case is for

**47**

1   loss of income; right?
2       A.   Yeah.
3       Q.   Apart from the income your husband
4   made with the truck, is there any other income
5   that you've lost because of what happened in
6   Hurricane Katrina?
7       A.   No.
8       Q.   How could someone figure out the
9   amount of income that you lost because of your
10  husband's death and his inability to provide
11  for you the income from the truck?  If you
12  know.
13          MR. GILBERT:
14              Object.
15              You can answer.
16      A.   Object.
17  EXAMINATION BY MR. RAFFMAN:
18      Q.   I'm sorry.  I didn't hear your answer.
19      A.   Object.
20          MR. GILBERT:
21              No, no, no.  You can answer his
22          question.
23          THE WITNESS:
24              Oh, I can answer it?
25          MR. GILBERT:

**48**

1           You can answer his question.
2       A.   Oh.  Well, I thought city hall would
3   have all the papers, because they're the one
4   came and collect the money with checks that we
5   made out for them.  So City Hall must have, or
6   the state building from New Orleans, they got
7   the records.  They should have.
8   EXAMINATION BY MR. RAFFMAN:
9       Q.   So you think that the City of New
10  Orleans should have records reflecting how much
11  money your husband made with the truck?
12      A.   That's right.
13      Q.   As we sit here today, you don't --
14  well, I'll ask this differently.  Can you tell
15  me anything about your husband's income from
16  the truck during the eighteen months before
17  Hurricane Katrina?
18      A.   No.  He took care of that hisself.
19      Q.   At the time of Hurricane Katrina, your
20  husband was 77 years old.
21      A.   That's right.
22      Q.   Had your husband ever been in the
23  hospital?
24      A.   Well, once maybe before the way before
25  the storm, but --

**49**

1       Q.   How long before the storm?
2       A.   I think that was in '03.  '02 or '03.
3   That's been quite a while.  He didn't stay but
4   overnight.  Overnight.  They sent him home the
5   next day, he was okay.
6       Q.   What was the reason for his
7   hospitalization?
8       A.   His nerves and his chest.  They give
9   him medication and he came home.
10      Q.   Was your husband a smoker?
11      A.   Yeah.  He smoked.
12      Q.   He smoked cigarettes?
13      A.   Cigars.  King Edwards.
14      Q.   Did he smoke every day?
15      A.   I don't think so.  He didn't smoke in
16  my house, that's for sure.
17      Q.   Did your husband drink alcoholic
18  beverages?
19      A.   When the holidays come maybe he will
20  drink a little bit.
21      Q.   Was your husband diagnosed with heart
22  disease?
23          (Off the record.)
24          MR. GILBERT:
25              He didn't hear you.  What was

50

1   your last answer?
2   A.  You're saying he had heart disease?
3   EXAMINATION BY MR. RAFFMAN:
4   Q.  That's my question.
5   A.  I don't think so.  I'm not sure.
6   MR. GILBERT:
7       Okay.  You have to speak loud.
8   THE WITNESS:
9       Okay.  I'm sorry.
10  MR. GILBERT:
11      That's okay.
12  EXAMINATION BY MR. RAFFMAN:
13  Q.  Did your husband ever have cancer?
14  A.  No.
15  Q.  Did your husband ever have a stroke?
16  A.  No.  He never.
17  Q.  Did your husband have a family doctor?
18  A.  Well, we had the, um -- primary doctor
19  from the insurance Tenet Choice 65.
20  Q.  What was the name of the primary
21  doctor?
22  A.  Oh, boy.  I don't even know.  I never
23  went to his doctor.
24  Q.  What was the name of the health plan?
25  A.  I don't know.  I know it was a

51

1   medical, um -- clinic, but -- right off of
2   Esplanade.  But I don't know the name of it.  I
3   never been in there.
4   Q.  In the six months before Hurricane
5   Katrina, did your husband visit the doctor?
6   A.  Six months before that?  I'm not sure.
7   He wasn't never really sick with nothing
8   anyway.  I was always the one dragging and
9   dripping from one thing to another, myself.  I
10  got this hip replacement.  There was always
11  something wrong with me more than him.  He was
12  pretty good health.  That's why he stayed home.
13  Q.  Let me move in that direction.
14  A.  Okay.
15  Q.  You lived in the Lower Ninth Ward
16  during Hurricane Betsy; right?
17  A.  Yes.
18  Q.  Tell me about your experience in
19  Hurricane Betsy.
20  A.  Well, the water came halfway of our
21  home, but not like it did this time.  We were
22  able to replace everything with a small
23  business loan, and the Red Cross gave us
24  mattress.  And everybody got out safe, so we
25  were pretty much all right otherwise.

52

1   Q.  You and your husband were living at
2   Egania Street during Betsy?
3   A.  Oh, yeah.
4   Q.  Did you evacuate before that storm?
5   A.  No.  We left two o'clock in the
6   morning when the water was coming up.  My
7   neighbor called and knocked on the door and
8   told us to get out, that the water -- she heard
9   it, it cut on our side or whatever and it was
10  coming our way.  So we went right to Holy
11  Cross, about -- it's not even ten blocks from
12  the house.  And the water wasn't even there.
13  So we stayed there.
14  Q.  How many feet of flooding did your
15  house have during Hurricane Betsy?
16  A.  It was halfway our walls in our house.
17  We on three pillars, so it came up halfway of
18  the house.  Just enough to wet the beds and all
19  up.  All the mattress had to come out.
20  Q.  What was it like to -- I'm going to be
21  more clear because you lawyer --
22  MR. GILBERT:
23      I'm not about to object, I'm
24  trying to tell her old off.  She's
25  about to answer and you've only spoken

53

1   three words of the question.  Let him
2   ask the entire question.
3   EXAMINATION BY MR. RAFFMAN:
4   Q.  Tell me about your experience during
5   Betsy.  Were you scared during the storm?
6   A.  Everybody was a lill nervous.  But
7   after we all was safe, you know, like my
8   husband said, we can always get furniture and
9   replace everything but we couldn't replace a
10  life.
11  Q.  When did your husband say that?
12  A.  When he what?
13  Q.  When did he say that?
14  A.  For Betsy.
15  Q.  For Betsy.
16  A.  Yeah.
17  Q.  After the storm?
18  A.  Yeah.  After the storm.  We came, and
19  he said we can replace this, don't worry about
20  it.  It was all right.
21  Q.  He also said we can replace furniture
22  but he can't replace a life, you said.
23  A.  That's what he says.
24  Q.  What did you understand him to be
25  talking about when he said we can't replace --

14  (Pages 50 to 53)

54

MR. GILBERT:

    Just if you'd let him finish his question before you answer. That way you'll know the entire question.

THE WITNESS:

    Right. Okay.

A. Are you through?

EXAMINATION BY MR. RAFFMAN:

Q. When he said you can't replace a life, what do you understand him to be talking about then?

A. All the children were safe, I was safe, he was safe.

Q. During Hurricane Betsy, were you nervous for the safety of your children?

A. Sure.

Q. Your children were living with you in Egania Street at the time; right?

A. That's right.

Q. Why were you nervous for their safety during Betsy?

A. People drowned then, too, you know? But not like they did with this storm.

Q. You understood from your experience in Hurricane Betsy that whenever you're present in

55

a hurricane there's a risk that something bad could happen.

A. Yeah. Sure.

Q. One of the risks that occurred to your husband after Betsy was a risk that someone could drown.

A. Yes, it was.

Q. Before Betsy, did anybody suggest that you evacuate your home?

A. Just my neighbor-next door. They all deceased now, though.

Q. Did you and your husband take that suggestion?

A. Yes, we did.

Q. You did evacuate before Betsy?

A. No. When she called, knocked on the door to tell us.

Q. That was in the middle of Betsy --

A. Two o'clock in the morning.

Q. That was in the middle of Betsy, after the neighborhood was already flooding.

A. Right. Right.

Q. During the entire time that you lived at Egania Street before Hurricane Katrina, did you or your husband evacuate in advance of a

56

predicted hurricane?

A. No.

Q. You never evacuated before Katrina.

A. No. We always stayed home. We always stayed home. Because usually it passes over us. They say we so low, as people say here, that when storm pass they usually pass across us.

Q. Now let me take you to the days just before Hurricane Katrina.

A. All right.

Q. Do you remember the Friday before the storm hit?

A. The Friday? Yes, I do.

Q. What did you do that day?

A. Washed clothes, mopped the floors, cooked my food.

Q. Same as you usually do, right?

A. Yes.

Q. Friday was a normal day for you?

A. It was a like a normal day.

Q. Did your husband take the truck out and work that day?

A. Yes, he did.

Q. It was a normal day for him, too?

57

A. Uh-huh. Yes, he did.

Q. What about Saturday before the storm?

A. He had his truck and gone again, as usual.

Q. Saturday was another normal day?

A. Another normal day.

Q. Saturday was a normal day for you, too?

A. Yes, it was. It was.

Q. When was the first time you did anything to get ready for Hurricane Katrina?

A. I didn't get ready. We didn't get ready.

Q. When was the first time you heard that Hurricane Katrina was heading toward New Orleans?

A. On the TV, Margaret Orr, our weather lady, she started talking about a Category 5.

Q. Do you remember whether that was on Saturday --

A. On Saturday, yes.

Q. -- when you heard that a Category 5 storm was heading for New Orleans?

A. Yes, we did.

Q. Did you do anything --

58

1    A.  No.
2    Q.  -- to -- did you do anything to get
3  ready?
4    A.  No, I didn't.
5    Q.  Did your husband?
6    A.  No, he didn't either.
7    Q.  Tell me how you came to be present at
8  3800 Clermont Drive but not your husband.
9    A.  He stayed home because he wanted to
10  protect the house.  I left because my brother
11  kept calling us telling us, Sunday morning,
12  that it was going to hit in our area, for to
13  come on over there by him, the both of us.
14      So my daughter and my children were
15  all gone, and they kept calling us.  They were
16  all on the road, just dragging trying to get
17  out of town like everybody else was.  I said,
18  well, we're going to be all right.  We're going
19  to be all right.  So we stayed.  Until that
20  Sunday evening before I even left to go to
21  Clermont Drive.
22    Q.  All right.  When did your daughter and
23  her children levee town?
24    A.  They left that Saturday morning, I
25  think.  That Saturday morning.

59

1    Q.  Where did they go?
2    A.  Texas.
3    Q.  Did you talk to your daughter and her
4  children before they left town?
5    A.  Yes, I did.
6    Q.  What did you and -- tell me what you
7  and she said.
8    A.  Oh, she saying, mama, you sure y'all
9  going to be all right?
10      I say, yeah.  We're going to be all
11  right.  It usually pass over us.
12      I didn't think nothing going to happen
13  to none of us here.
14      She said, well, put my cellphone
15  number down in case something happen.
16      So next thing she's from Texas, next
17  thing she's in Chicago -- Joliet, Chicago,
18  wherever that's at.  That's where she wind up
19  at.
20    Q.  You and your daughter talked by phone
21  on the Saturday before the storm.
22    A.  Uh-huh.
23    Q.  Did your daughter urge you to leave
24  town also?
25    A.  No.  She say, y'all going to be all

60

right?
     I say, yeah, we going to be all right.
   Q.  And on that Saturday, you still
planned to stay in Egania Street with your
husband, right?
   A.  I sure did.
   Q.  Did you talk to anyone else on
Saturday about either staying or about leaving?
   A.  No.  My son, he called, and y'all
still at the house?
     I say, yeah.
     What, y'all going to stay out there?
     Yeah.  We'll see y'all when you get
back home.
   Q.  Which son called you on Saturday?  I'm
sorry.
   A.  Greg.  Gregory Richardson.
   Q.  When your son Gregory called you on
Saturday, did he tell you anything about his
plans to either levee or stay?
   A.  No.  They were leaving because they
had small children.  Other than that, he say
they wouldn't have left either.  But having
smaller children they decided to leave.  But we
didn't have small children, the two of us.

61

   Q.  Was your son Gregory concerned about
the safety of his children during the storm; is
that what he said?
   A.  Uh-huh.  Yes.
   Q.  He left --
   A.  That Saturday or sometime Saturday,
too.
   Q.  And he left out of concern about the
safety of his children.
   A.  Right.
   Q.  Apart from your daughter who was going
to Texas and your son Gregory, did you talk to
anyone else that Saturday about the storm?
   A.  No.
   Q.  Where did your son Gregory go?
   A.  Not that I remember.
   Q.  Where did your son Gregory go?
   A.  Where who?
   Q.  Where did Gregory evacuate to?
   A.  He didn't go to Texas, his bus -- he
was at the convention center.  So the bus took
him to Arkansas?  I think he say he went to
Arkansas.  Because he wasn't at the Superdome
where I was.
   Q.  Did your son Gregory stay in New

62

1 Orleans --
2 A. Yeah, he stayed.
3 Q. -- for the storm?
4 A. Yeah. His wife and the children left.
5 But he stayed at his house.
6 Q. Where did your son Gregory 's wife and
7 children go?
8 A. They went to Texas, and from Texas to
9 Stone Mountain by her sister.
10 Q. Where did your daughter and her child
11 go in Texas? With whom did they stay?
12 A. They had their own van, and they got a
13 hotel.
14 Q. Apart from your daughter and Gregory,
15 those two phone calls --
16 A. And Gerald Edward Richardson. They
17 had their son and three grandchildren. They
18 were in their van, though.
19 Q. When did your son Gerald evacuate?
20 A. Sometime Saturday, I guess, too. I'm
21 not sure.
22 Q. Did you talk to your son Gerald that
23 Saturday?
24 A. Yeah. My husband talked to him.
25 Q. Did your husband tell you anything

63

1 about the conversation he had had with your son
2 Gerald?
3 A. No. He say they were going on account
4 the kids and the grandchildren. They went
5 leaving for safety.
6 Q. Your husband reported that Gerald and
7 his family were leaving for safety because they
8 were concerned about the safety of the
9 children.
10 A. The children, uh-huh.
11 Q. Did your husband tell you where Gerald
12 was going?
13 A. Yes, he did.
14 Q. Where did Gerald go?
15 A. He was leaving. They had their van,
16 so they left in their car -- in their van.
17 Q. And then Gerald and his family went
18 where?
19 A. Stone Mountain by her sister, where we
20 were.
21 Q. Your son Jeffrey, the littlest one,
22 also lived in Stone Mountain?
23 A. Uh-huh. The youngest one, yes, sir.
24 Now, Jeffrey and Gerald, two brothers, married
25 two sisters.

64

1 Q. Gerald and Jeffrey married two women
2 who were sisters to each other.
3 A. To each other.
4 Q. Gerald and his family lived here in
5 New Orleans.
6 A. Yes, they do, on Nottingham.
7 Q. Jerry and his family lived in Stone
8 Mountain, Georgia.
9 A. Yes.
10 Q. Before the storm, Gerald and his
11 family drove to Stone Mountain, Georgia, to be
12 with their relatives.
13 A. Right.
14 Q. Did Gerald, to your knowledge --
15 A. He what?
16 Q. I'm trying to ask this question in a
17 way that will make it a fair question.
18 A. Okay.
19 Q. Did anybody ever tell you that Gerald
20 had suggested that you and your husband also go
21 to Stone Mountain, Georgia in advance of this
22 storm?
23 A. No. Because they thought we was going
24 to stay home like we said. I just changed my
25 mind at the last minute after 5:00 to go by my

65

1 brother, but he wouldn't come, he said he gone
2 be all right. And he might have trouble
3 getting me in the attic with this broken hip.
4 So he say go ahead on over there and call me
5 when you get there. I did.
6 Q. I'm still on Saturday, all right? I'm
7 still on Saturday. Apart from the call with
8 your daughter and with Gregory, and then apart
9 from your husband's call with Gerald --
10 A. Right.
11 Q. -- did you or your husband talk to
12 anyone else on Saturday about the storm?
13 A. I can't remember. I don't remember.
14 Q. As far as you knew, at the end of
15 Saturday --
16 A. Uh-huh.
17 Q. -- three of your children were
18 evacuating New Orleans.
19 A. Yes.
20 Q. On Sunday, did Joseph your husband go
21 out to work in the truck?
22 A. No. He didn't.
23 Q. What did he do on Sunday?
24 A. Played with his truck. He liked to be
25 picking and playing on that truck. He loved

**66**

1  his truck better than he loved me almost.  He
2  loved his truck.  He was always straightening
3  out something, doing something always on his
4  truck.
5      Q.   He was working on his truck doing
6  maintenance?
7      A.   Uh-huh.  Filling it up, doing this,
8  putting this there, putting that there.
9      Q.   He was getting ready to --
10     A.   For Monday.  For Monday, as we
11  thought --
12     Q.   You thought Monday would be another
13  day of work.
14     A.   Everything would be all right.
15     Q.   Did you or your husband watch the
16  television on Sunday to see what was happening
17  with the storm?
18     A.   I watched the TV.
19     Q.   You did.
20     A.   Uh-huh.
21     Q.   Did you tell your husband anything
22  about the news about the storm on Sunday?
23     A.   Yes.
24     Q.   What did you tell him?
25     A.   It just said the storm is coming.

**67**

1      I cooked all day Sunday.  So we
2  weren't really worrying about the storm.
3      Q.   On Sunday, did you take any plywood to
4  put on your windows or anything like that?
5      A.   No, we didn't.
6      Q.   Were you cooking on Sunday to get
7  ready for the storm?
8      A.   No, I was cooking because we had to
9  eat.
10     Q.   It was a normal Sunday for you.
11     A.   It was.  It was a beautiful day.
12     Q.   On Sunday, did you talk to anyone on
13  the phone about the storm?
14     A.   My niece called me.
15     Q.   When did your niece call you that day?
16     A.   Sunday, just before I left.  I told
17  her I was going by my brother.
18     Q.   All right.  Tell me -- what time did
19  you leave to go to your brother's?
20     A.   About 4:30, five o'clock.
21     Q.   In the afternoon.
22     A.   In the afternoon.
23     Q.   Tell me the story about how you came
24  to leave your home and go to your brother's.
25     A.   Like I said, my husband said he might

**68**

1  have trouble getting me in the attic.  So he
2  said -- I said, well, you want to go by Earl?
3  Because I think we need to get out of here,
4  because Margaret Orr keep talking about the
5  storm, a Category 5.  Well, we never heard of
6  Category 5 anyway.  And I said that sounds like
7  it getting serious.
8      But he said, no, I'm going to be all
9  right.  He say, you go and I'm gone be all
10  right.
11     I say, you sure?
12     He say, sure, I'm going be all right.
13     He was all right.  He could run like a
14  school boy.  Wasn't nothing wrong with him.  So
15  I left.
16     Q.   So as the day went on on Sunday and
17  you watched the reports of the storm, you
18  became concerned about the storm?
19     A.   Right.  I did.
20     Q.   You became concerned about the safety
21  of both yourself and your husband.
22     A.   Right.
23     Q.   When you talked to your husband, he
24  suggested that you should go but he wasn't
25  going to leave.

**69**

1      A.   That's what he said.
2      Q.   What time did your husband make that
3  suggestion?
4      A.   About one, two o'clock, somewhere
5  around that time.
6      Q.   Did your husband tell you why he was
7  thinking about being in the attic?
8      A.   No.  Because they were telling
9  everybody on the news if you got to get out if
10  the water came or whatever, to go in the attic,
11  you'll be safe.  That was what everybody
12  believed, you would be safe in the attic.
13     Q.   Did you hear anything on Sunday about
14  Mayor Nagin?
15     A.   No.
16     Q.   Did you hear anything on Sunday about
17  Mayor Nagin suggesting or telling or ordering
18  people to evacuate?
19     A.   No.  No, I didn't.
20     Q.   Your husband's concern, as he
21  expressed it to you, about being in the
22  attic --
23     A.   Uh-huh.
24     Q.   -- was that if there was a flood it
25  might be necessary to go up to the attic.

70

1    A.   That's what they telling us on TV.
2    Q.   After your husband suggested that you
3  leave and he stay --
4    A.   Uh-huh.  Yes.
5    Q.    -- what was the next event in the
6  chain that led to your going to your brother
7  Earl 's house?
8    A.   Well, I had just finished cooking.
9  That must have been after 2:00, 2:30, something
10  to 3:00, he sat down and ate.  And I went took
11  a shower.  So I say, you still not going?
12  Because I think I'm going to go over there.
13  Because he keep calling us, he called me about
14  ten times, my brother, to try to get me to come
15  over.  Tried to get both of us to come over.
16    Q.   What did your brother Earl tell you
17  when he called you that afternoon?  What did he
18  say?
19    A.   What he did what now?
20    Q.   What did your brother say to you on
21  the phone?
22    A.   Oh, he say it's going to hit hard in
23  our area here.  He had heard it on his TV or
24  his radio or something.  He had heard that it
25  was going to hit the Ninth Ward and our area

71

1  real bad.  I can't remember how he found out,
2  but he did.
3    Q.   Did your brother say anything about
4  why he thought his house would be a safer place
5  for you and your husband than your house in the
6  Lower Ninth Ward?
7    A.   No.  But he said somebody told him or
8  whatever, or he heard it, or he saw -- I don't
9  know -- that it was going to hit the Ninth
10  Ward.  And he lived in the Ninth Ward -- no, he
11  lived in the Eighth Ward.  He say, if it hit
12  hard in that area, he say, y'all going be all
13  messed up over there.
14    Q.   Let me show you what's been marked as
15  Exhibit 5 to your deposition.  I don't think
16  I've shown you that.
17       (Richardson Exhibit 5 was marked for
18  identification and is attached hereto.)
19    A.   What is this now?
20  EXAMINATION BY MR. RAFFMAN:
21    Q.   It's a map from Mapquest.
22       And do you recognize the star as
23  representing the approximate location of your
24  brother Earl 's house at 3800 Clermont Drive?
25    A.   Right.

72

1    Q.   Your brother Earl lives on the west
2  side of the Industrial Canal.
3    A.   Right.  On the corner.
4    Q.   Your brother Earl thought that his
5  home would be a safer place for you and your
6  husband than your home in the Lower Ninth Ward.
7    A.   That's what he thought.  That's what
8  he thought.  But he had water, too.  We wind up
9  in his attic at his house.  Because it went
10  halfway his house, but it didn't cover his
11  house like it did mine -- like it did ours,
12  anyway.  Yes.  But we were in his attic for
13  three days before the national guard came and
14  got us out of the attic.  And we weren't the
15  only one.  Everybody -- look like every other
16  house in his area were still home in the attic,
17  by Earl 's house.
18    Q.   I'm finished with that.
19    A.   Okay.
20    Q.   You did suggest to your husband that
21  it might be better if the both of you went over
22  to Earl 's house?
23    A.   Yes, I did.
24    Q.   Why did you suggest that to your
25  husband?

73

1    A.   Well, I thought maybe he would change
2  his mind.  But he didn't.
3    Q.   Did you think Earl's house was a safer
4  place for you?
5    A.   I wasn't sure.
6    Q.   What did your husband say to you,
7  um -- when you told him you were going to go to
8  Earl 's house?
9    A.   He said go.  He wanted me to go.
10    Q.   Why did he want you to go?
11    A.   Because I had an operation on my hip.
12  And I had the walker then.  I'm on a cane now,
13  but I was walking with a walker.
14    Q.   You and your husband were both
15  concerned that if a flood happened in the Lower
16  Ninth Ward during Hurricane Katrina you would
17  not be able to get into your attic because of
18  the condition of your hip.
19    A.   Right.  It was steps, like.  You know,
20  you go up -- trying to get up there, I don't
21  know if I would have made it anyway.
22    Q.   You both had a concern that the Lower
23  Ninth Ward might flood --
24    A.   Uh-huh.
25    Q.    -- which you didn't think would happen

19 (Pages 70 to 73)

1  at your brother Earl 's house.
2     A.  No.  No.  He probably didn't either.
3     Q.  Because the question wasn't very clear
4  let me break it up.  Okay?
5     A.  Uh-huh.
6     Q.  You were both concerned about the
7  Lower Ninth Ward flooding in Katrina; right?
8     A.  Yes.
9     Q.  You didn't think that Earl 's house
10 would flood; am I correct?
11    A.  I didn't think it would.  I thought he
12 knew what he was talking about, he was so sure.
13    Q.  How did you get from your house to
14 Earl 's house?
15    A.  In my car.
16    Q.  You drove your car.
17    A.  Yes.  I did.
18    Q.  What time did you arrive at Earl 's
19 house?
20    A.  Something to 6:00.  Before it got dark
21 and late.  About twenty minutes from my house
22 to his house.
23    Q.  Your husband decided not to go with
24 you?
25    A.  He decided not to go with me.

1     Q.  There was nothing preventing your
2  husband from leaving with you; right?
3     A.  No, it wasn't.
4     Q.  He could have gotten in the car and
5  gone with you.
6     A.  Yes, he could have.  And he had two
7  trucks that both were running.  He could have.
8     Q.  Why did your husband say he was
9  choosing to stay in your house?
10    A.  Because we always stay at home.
11    Q.  Did he give any reasons why he was
12 going to stay at home?
13    A.  No.  No.  He said he just want to be
14 home in case something happened over there.  He
15 just wanted to be home.
16    Q.  In case what happened?
17    A.  Looters or somebody.  You know, they
18 break in homes and stuff.  People act a fool
19 when you got a storm.
20    Q.  He told you he was going to stay
21 behind to protect your property?
22    A.  Yes.
23    Q.  What was it like at Earl 's house the
24 night of the -- Sunday night into Monday
25 morning?

1     A.  We watched TV, and the wind was
2  whipping hard, and my husband called me about
3  11:30 that night.  He said, Josephine, it
4  getting rough over here.
5        I say, well, Joe, what you going to
6  do?
7        He say, I'm going in the attic like I
8  told you.
9        I say, well, you be careful up there.
10 And you sure you all right?
11       He says, yeah, I'm all right.
12       I say, well, okay, I'll see you in the
13 morning.  I don't know what time, but I will be
14 home tomorrow.
15       Monday.  And I brought one outfit to
16 put on so when I go back home at least I had
17 another outfit to put on.  It never happened.
18    Q.  Had your husband gone to the attic
19 when he called you at 11:30?
20    A.  I don't know.  He might have.  He had
21 the cellphone, so it was hard to say.
22    Q.  Did he say anything -- provide any
23 more details about what he meant when he said
24 it was getting rough over here?
25    A.  No.  But over there in the morning, my

1  son Gregory called him, and he said he was the
2  last one to talk to him.  Greg called from his
3  house on the cellphone to his daddy on the
4  cellphone.  And they were the last two to talk.
5  After I talked to him about 11:30 I hadn't
6  talked to him anymore.
7     Q.  11:30 Sunday night was the last time
8  you talked to your husband on the cellphone.
9     A.  I talked to him about 11:30 on the
10 phone at my brother's house phone.
11    Q.  On your brother's house phone.  I'm
12 sorry.
13    A.  Yeah.  He had the cellphone.
14    Q.  Your husband had the cellphone.
15    A.  Uh-huh.  We had the house phone, too,
16 but I don't know why -- he likes using his
17 cellphone because he keeps it in his pocket
18 anyway.
19    Q.  Tell me what you know or what you
20 heard about the call your son Gregory made to
21 your husband.
22    A.  Greg say he told him, Daddy, if you go
23 in the attic, daddy, bring you something to cut
24 the roof out in case that you need to.  He say
25 because that's what they were saying on TV.

78

1    Q.   What time did your son Greg speak to
2  your husband, if you know?
3    A.   That I don't know.  But Greg told that
4  to me, that he had talked to him and that's
5  what he told him.  But what time I don't know.
6    Q.   When did you first hear about the call
7  that your son Greg had with your husband?
8    A.   When he came to Stone Mountain by his
9  family up there.  That's when he told us.
10   Q.   Where were you when your son Greg told
11  you about the call he had with your husband?
12   A.   I was at my brother 's house for three
13  days, so I must be in the attic.
14   Q.   So you heard from your son Greg about
15  the phone call Greg had with your husband while
16  you were still in the attic at your brother's
17  house.
18   A.   I didn't hear for about two weeks.
19  Because when they did tell me he was missing,
20  and they said he was trapped in the house, I
21  had to go to the hospital twice in Stone
22  Mountain.  So my son didn't want me to know
23  when he first heard it, the baby boy.  They
24  kept it from me.
25   Q.   Okay.

79

1    A.   So I don't know.  But that was about
2  two, maybe three weeks before he told me, mama,
3  I was the last one talked to daddy.
4    Q.   Okay.
5    A.   So I don't know.  Everything went
6  "zoop."  So I don't know.
7    Q.   Okay.  Let me just try to get this one
8  question clear on the record:  The first time
9  you heard about this phone call between Greg
10  and your husband was well after the storm?
11   A.   Right.  It was way after the storm.  I
12  don't know exactly when.
13   Q.   Greg told you that he had suggested --
14  if you want to take a break, we should take a
15  break.
16       (Brief recess.)
17  EXAMINATION BY MR. RAFFMAN:
18   Q.   When your son Greg told you about the
19  phone call he had had with your husband Joseph,
20  your son told you --
21   A.   Yeah.
22   Q.   -- that he had told your husband to
23  cut a hole in the roof.  Right?
24   A.   To bring something up there in case if
25  you have to cut a hole in the roof.

80

1    Q.   Your son Greg had told your husband to
2  bring something up there in case you have to
3  cut a hole in the roof.
4    A.   He say he told him that.
5    Q.   Do you know whether your husband did
6  bring something up to the attic to cut a hole
7  in the roof?
8    A.   No, I don't.
9    Q.   Did your husband cut a hole in the
10  roof?
11   A.   They had holes all over the roof, but
12  I know he didn't cut all them holes in the
13  roof.  The wind damage -- we had a lot of wind
14  damage, too, you know.  So I don't know.
15   Q.   You don't know one way or the other
16  whether your husband cut a hole in the roof.
17   A.   No, I don't.
18   Q.   When you went back to the property
19  after the storm, there was a lot of wind damage
20  to the roof.
21   A.   Both the wind damage, you know, and --
22  the house was a mess, upside-down.  So the wind
23  couldn't have did that much damage.  The
24  refrigerator upside-down, my stove in the
25  middle of the floor, the microwave -- the wind

81

1  couldn't have done that.
2    Q.   I'm going to come back to the damage
3  to your home.
4    A.   Uh-huh.
5    Q.   I'm asking about your roof now.  Do
6  you understand that I'm asking about your roof?
7    A.   The roof.
8    Q.   When you came back to your home there
9  was damage to your roof, right?
10   A.   It was damage to the roof.
11   Q.   Because of the damage to the roof, you
12  couldn't tell one way or the other whether your
13  husband had cut a hole in the roof to get out
14  from the attic, am I right?
15   A.   No, I couldn't tell.
16   Q.   Did your husband have an ax at home?
17   A.   No, he never owned an ax.
18   Q.   Did your husband have any -- did your
19  husband have a tool kit at home?
20   A.   Yeah.  He had a crowbar.  We had that
21  at the house.  I remember that.
22   Q.   Okay.  If your husband had wanted to
23  cut a hole in the roof, he had tools to do
24  that, right?
25   A.   Yes, he did.

21 (Pages 78 to 81)

82

1   Q.   Tell me what happened to you in the
2   storm at your brother Earl 's house.
3   A.   Tell you what happened?
4   Q.   Yes.
5   A.   We was in his attic for three days and
6   three nights.  We went there, and that Sunday
7   night my lill cellphone they had gave me for
8   Mother's Day say battery low, battery low.
9   Well, we knew we had water halfway his house,
10  so you couldn't plug it.  So I told my brother
11  Earl that we better call somebody because this
12  thing saying battery low and we not going to be
13  able to call nobody.  So I called 911, and they
14  took the message.  She said soon as she get
15  somebody she going send somebody.  It took
16  three days before they got somebody.  The
17  National Guard came knocking at the door and we
18  was all in the attic.
19      My brother say, you hear something?
20  You hear something?  We listened and we did
21  hear it.  So he got out and come down in a
22  whirlpool of water and went to the door, and he
23  told them that we was in the attic.  And that's
24  when they took us out and brought us to the
25  overpass in Gentilly, Elysian Fields overpass,

83

1   the National Guard.  Put us in a boat from his
2   house.  Got in a boat.  And we stayed on that
3   overpass until almost dark before the big army
4   trucks came and took us from there to the
5   Superdome.  And from the Superdome, we stayed
6   another three days before they got a bus to
7   take us out of town.  So I was here for six
8   days in the city of New Orleans, six days
9   before we left.  That was that Saturday before
10  they got us.
11     Q.   At what time did you go to your
12  brother Earl 's attic from the house?
13     A.   That Sunday evening.
14     Q.   Sunday evening.
15     A.   Uh-huh.
16     Q.   Do you remember what time it was?
17     A.   I'd say between 4:30 and five o'clock.
18  Somewhere around that time.  I'm not sure about
19  the time but I know it was in the afternoon.
20     Q.   So you went -- well, now, you went
21  from your home to Earl 's home in the
22  afternoon, right?
23     A.   Yeah.
24     Q.   And upon getting to your brother
25  Earl 's home, what did you and your brother do?

84

1   A.   Well, he was cooking.
2   Q.   He was cooking?
3   A.   Uh-huh.
4   Q.   Who else was at the home?
5   A.   His girlfriend.
6   Q.   Anybody else?
7   A.   No, that's all.
8   Q.   Just the three of you?
9   A.   Just the three of us.
10  Q.   Did y'all have a meal?
11  A.   Yeah.  We had ate.
12  Q.   And what time did you finish eating?
13  A.   Um -- about seven, eight a clock that
14  night.
15  Q.   Okay.  And after you finished eating
16  at seven or eight o'clock that night, what did
17  you do then?
18  A.   He start putting his food up.  We
19  washed the dishes and all and put the food in
20  the refrigerator.
21  Q.   And after you washed the dishes and
22  put the food away, what did you do next?
23  A.   Watching the TV.  Watching TV, the
24  news.
25  Q.   And you watched television until what

85

1   time?
2   A.   About 11:30 when my husband called.
3   And that's when he say it was getting rough
4   over there in the Ninth Ward.
5   Q.   When your husband called at 11:30,
6   were you down there in Earl 's living room?
7   A.   Uh-huh.  In the living room watching
8   TV.
9   Q.   Could you hear the storm outside?
10  A.   Oh, yeah.  We could see the wind
11  blowing, trees moving back and forth.  It was
12  rough.  Because I told him, I say, it's rough
13  over here, too, which it was.  And he kept
14  insisting that he was going in the attic.  He
15  say, I told you --
16     I say, well, Joe, what you going to
17  do?
18     He say, well, I told you I'm going in
19  the attic if anything happen.
20     I say, okay, see you tomorrow.
21  Tomorrow never came.
22     Q.   After -- let's say after your phone
23  call with your husband at 11:30, did you go to
24  bed?
25  A.   No.

86

1    Q.   You stayed up?
2    A.   We was still up.  About 1:00, 1:30 in
3  the morning, the water came around the house
4  like a big snake.  He had two big floor
5  furnace, and it came under that floor furnace
6  and through the door.  Just round and round and
7  getting higher and higher.  So we start taking
8  his dining room chairs and putting them
9  upside-down on the table.  That's all he saved
10 was that.
11   Q.   So you had water coming into your
12 brother Earl's house at 1:30 in the morning?
13   A.   Yes.  Yes, it was.  And that's when he
14 say, we might have to go in the attic.  So we
15 did.
16   Q.   How high did the water get at your
17 brother's house before you went to the attic?
18   A.   It went about halfway of me almost.
19 It kept coming, getting higher and higher and
20 higher and higher.  It was coming on up.
21   Q.   So you're gesturing, and so that the
22 record reflects your gesture, the water got
23 above your waist before you went into the
24 attic.
25   A.   It sure was.  Up to my waist.  That's

87

1  why he say, we better go in the attic.
2    Q.   Did you happen to look at a clock or a
3  watch at the time you went up to the attic?
4    A.   No, I sure didn't.
5    Q.   So you don't know what time you went
6  up to the attic.
7    A.   No.  No.  I know it was 'fore day in
8  the morning.  And we never came down.  I never
9  came down because I couldn't get back and
10 forth.  So I had to stay.
11   Q.   When you -- maybe I missed the words
12 you said.  It was full day in the morning,
13 or --
14   A.   Yeah, after 2:00.  1:00, 2:00, three
15 o'clock in the morning.  It was 'fore day in
16 the morning.  I know that much.
17   Q.   Had the sun come up when you went into
18 the attic?
19   A.   No.  It was wind.  Wind was blowing
20 so.  And the rain, with all the rain -- it was
21 raining.
22   Q.   Was it dark when you went to the
23 attic?
24   A.   It was dark.  We brought search lights
25 up there.

88

1    Q.   It was before sunrise.
2    A.   Huh?
3    Q.   Before sunrise you were in the attic?
4    A.   Oh, yeah, we had been up there.  Oh,
5  yeah.
6    Q.   So you were in the attic for three
7  days, and then --
8    A.   To the Superdome for another three
9  days.
10   Q.   And then the bus took you to Texas?
11   A.   That Saturday.  I had been on my
12 brother house that Sunday, and the bus didn't
13 come until the Saturday, the next week.  That's
14 the time they brought us to Texas.  About 11:30
15 in the day.  And we went to the shelter in
16 Dallas.
17   Q.   And it was from Dallas that your son
18 Jeffrey --
19   A.   And Tyrone, they called him T.  Two of
20 my grandchildren.  T lives up there.  So he had
21 a one-bedroom apartment.  So he came and got us
22 with my other grandson Seabrum.  That my first
23 grandbaby.
24        So I stayed there for two, three days.
25 The third day my brother -- my son had got

89

1  credit cards -- he tried to get FEMA and all to
2  help us, everybody he knew, but everything was
3  at a standstill, so they took their credit
4  cards and they flew us, my brother and I.
5  Because his girlfriend stayed up there.  Her
6  brother lived up there so she went by her
7  brother.
8    Q.   They flew you to Stone Mountain,
9  Georgia.
10   A.   And my brother Earl, just the two of
11 us.
12   Q.   All right.  When did you first learn
13 that the Lower Ninth Ward had been flooded in
14 the storm?
15   A.   On the TV.  When I first learned?  I
16 think, um -- no, I was in Texas.  I saw it on
17 my grandson's TV.  Them three days I stayed
18 there they were showing it.
19   Q.   During the time you were in Earl 's
20 attic, you didn't know what happened over in
21 the Lower Ninth Ward.
22   A.   No.  No.  I had no idea.
23   Q.   Your phone had lost its battery
24 charge?
25   A.   What now?

90

1    Q.   Did your phone have a charge on the
2  batteries?
3    A.   The batteries that we had up there?
4    Q.   On your phone, the telephone, the
5  cellphone.
6    A.   No.  No.  We used the batteries so
7  they ran out.
8    Q.   Right.  And you had no way of trying
9  to call your husband?
10   A.   No.  He didn't call, and that wasn't
11 like him because that baby boy, he called him
12 every week, always.  They always called each
13 other, the baby boy and Jeffrey.
14   Q.   By the time you got to the Superdome
15 you didn't know what had become of your
16 husband?
17   A.   I kept asking different people.  I saw
18 about twenty-five, thirty people that knew us,
19 and they kept telling me they saw him on TV,
20 they saw him on Canal Street, they saw him at
21 the convention center.  I'm just hoping and
22 praying -- oh, we know Mr. Joe.  We know him,
23 we know him.  I just -- and after a week or
24 two, when I was in Stone Mountain, I say, Jeff,
25 something wrong.  That's not like your daddy

91

1  not to call to check on me and you and the rest
2  of us, something ain't right.  I could begin to
3  feel it.
4        So but he had found out but he didn't
5  want me to know.  They tried to hold it from
6  me.  They did held it from me.  My
7  daughter-in-law Gerald's wife told them, if you
8  don't tell your mama, she say, I'm going tell
9  her, my daughter-in-law, she say, because she
10 going have to know.  So that's how I found out.
11 Then I had to go to the hospital twice in
12 Georgia.
13   Q.   Okay.  I need to get the events
14 straight, so bear with me while I ask these
15 questions:  You learned of your husband's death
16 when you were in Georgia.
17   A.   In Georgia.
18   Q.   You said you went to the hospital
19 twice.  Did you go to the hospital twice --
20   A.   After I heard.
21   Q.   Both trips to the hospital were after
22 you heard of your husband's death.
23   A.   Yes.
24   Q.   What was the name of the hospital you
25 went to?

92

THE WITNESS:
    You had it on that last paper.
My son came in for 4th of July and he
wrote it on the last paper I mailed to
you -- to Mark.  It was on the last
paper that y'all mailed me.  Because
he came down for the 4th of July.
MR. GILBERT:
    Answer the best you can from
memory.  Go ahead and answer his
question the best you can from your
memory.
   A.   What else you want to know now?
EXAMINATION BY MR. RAFFMAN:
   Q.   The name of the hospital.
   A.   That -- it's on the paper.  I don't
remember.  I never lived in Georgia or nothing.
I just was there on account of the storm.  I
visit a lot of times, but I ain't never been in
their hospital until then.
   Q.   Why -- was the reason for your trip to
the hospital the same each of the two times you
went?
   A.   The nurse told me, she say, you keep
on you're going kill yourself, she say, because

93

your heart just jumping out your clothes.  And
I had so much stress, they give me eleven pills
at one time, I don't know, all different colors
and different shapes.  But, that I don't know.
My mind just went blank.
   Q.   How long were you in the hospital the
first time you went?
   A.   Two days.  And they send me back.
   Q.   Do you remember what month it was when
you were in the hospital for two days that
first time?
   A.   What month it was?
   Q.   Yes, ma'am.
   A.   Sometime in September.
   Q.   September of '05.
   A.   '05, yeah.  But what day of the month,
I don't know.
   Q.   You knew by September of 2005 that
your husband had died in the storm?
   A.   Yeah.  After my son told me.  Jeffrey
told me.
   Q.   How long were you in the hospital the
second time you went?
   A.   Three days, I think.  I'm not sure.
I'm not sure.

94

1    Q.   What month were you in the hospital
2  the second time?
3    A.   I had just come home a day or two and
4  I had to go right back.
5    Q.   Go right back.  So it was right around
6  the same time.
7    A.   Around the same time.  I remember that
8  much.
9    Q.   Your son Jeffrey told you about your
10 husband's passing.
11   A.   Yes, he did.
12   Q.   What can you tell us about how it was
13 learned that your husband had perished in the
14 storm?
15   A.   My kids were born and raised in that
16 house.  His best friend, he had been in the
17 service, too.  I had three of my kids been in
18 the service.  He had been in the service, but
19 his good friend live across the street, he was
20 still in the police department.  His brother
21 was in the National Guard, his other best
22 friend was a harbor police.  So he called them
23 all up and asked them to go to make sure that
24 he wasn't in the house, that he was okay.  That
25 at least he wasn't in the house.  They found

95

1  him in the house, the three.  And they called
2  long distance and told my son that he was in
3  the house.  He was still in the house.
4    Q.   So I get the record clear, which son
5  had friends who were in the harbor police, the
6  guard and all the rest of those?
7    A.   Jeffrey.  The one that live in Stone
8  Mountain.
9    Q.   Jeffrey called his friends and asked
10 them to go to the house.
11   A.   Make an appointment with each other
12 and give a date and a time and go in.  And
13 that's what they did.
14   Q.   Do you know when they went to the
15 house?
16   A.   No.  No, I don't.
17   Q.   Do you know the name of the person who
18 found your husband's body in the house?
19   A.   Those three?
20   Q.   Did they all three go together?
21   A.   Yeah.  They went together.
22   Q.   What are the names of the three
23 people?
24   A.   Lawrence Colon.  He works for the
25 Fifth Precinct.  No, wait, Louis.  They're

96

twins.  Louis Colon.  They're identical.
Warner is his first name.  He works for the
harbor police.  And Tyrone Colon, that's Louis
brother, he's a National Guard.
   Q.   They all three went to the house
together to look for your husband.
   A.   They did.  And they found him.
   Q.   In what room did they find him?
   A.   In the den they said, I think.  In the
den.  He wasn't even in the attic by then.
   Q.   When you talked to him at 11:30 on
Sunday night, did he tell you he was in the
attic?
   A.   He said he was going in the attic.
   Q.   Based on what you've learned from your
son Gregory --
   A.   Uh-huh.
   Q.   -- did your husband tell your son
Gregory that he was in the attic when the two
of them spoke?
   A.   I don't know that part.  I don't know.
   Q.   Do you know for a fact one way or the
other whether your husband went to the attic
that morning?
   A.   No, I don't know that either.  No.

97

   Q.   Do you have medical records regarding
the two trips to the hospital in Georgia
September of 2005?
   A.   No.  I had them, but moving so many
places, you know --
   Q.   Are your medical expenses for those
two trips to the hospital part of your claim
for damages in this case?
   A.   Not really, no, because Tenet Choice
65 took care of it.  I never got a bill.  I
don't have to take care of it.
   Q.   Did the doctor at the hospital give
you a diagnosis on either of the times you went
in Georgia?
   A.   Uh-huh.  I went to the clinic after.
They had me going for seven months while I
stayed up there.  He had me go to the clinic,
his clinic.  Dr. -- I know it was Dr. R-O-U.
He was a foreign doctor.  I think I was R-O-U,
Rou, whatever.
   Q.   You had outpatient care after the two
hospitalizations.
   A.   After.  Yes, I did, yeah.  For seven
months up there.
   Q.   For what condition were you being

98

1   treated by Dr. Rou?
2       A.   For stress and my heart and my
3   pressure, my pain in my stomach.  The pain in
4   my stomach, pain in my hip.  I had about eight
5   or nine bottles of medicine.  They give me
6   about eleven when I went in there.  So I don't
7   know what all I was taking.  Had me walking
8   around like a zombie.  I couldn't remember
9   nothing.
10      Q.   For which of those conditions, if any,
11  are you seeking compensation in this lawsuit or
12  in your lawsuit against the government?
13          MR. GILBERT:
14              Let me just -- for the record,
15          she reserves all of her rights.  She's
16          not waiving any claims.  So she can
17          answer.
18      A.   I wouldn't even know.
19          MR. GILBERT:
20              You can answer his question.
21          THE WITNESS:
22              Answer?
23          MR. GILBERT:
24              Uh-huh.
25      A.   Um -- for the barge, huh?

99

1   EXAMINATION BY MR. RAFFMAN:
2       Q.   Well, you've described medical
3   conditions that you suffered after the storm.
4       A.   Right.
5       Q.   They include stress, heart, pain,
6   stomach and hip.  Those are the ones you
7   mentioned, right?
8       A.   And high blood pressure.
9       Q.   Blood pressure.  Were there others?
10      A.   Were there what?
11      Q.   Were there others, other medical
12  complaints?
13      A.   No, I can't think of it.
14      Q.   Which of those six medical conditions
15  do you attribute to your reaction to your
16  husband's death?
17      A.   Well, that stress for one thing, I
18  know that did.  It made my pressure go way up
19  high and my heart keep bouncing around in my
20  chest.  I still having pains in my hip.  And my
21  stomach, I got a nervous stomach.
22      Q.   Were the pain in your stomach and hip
23  are also reaction to your husband's death in
24  your view?
25      A.   Uh-huh.  Yes.

100

1       Q.   All of those conditions are, in your
2   mind at least, traceable to your husband's
3   death in the storm.
4       A.   Just about.
5       Q.   Do those conditions persist to this
6   day?
7       A.   To his death?
8       Q.   To this day, now.
9       A.   Oh, yeah.  My stomach been worrying me
10  all day today.  I didn't want to take too much
11  medication to come over here, for the stomach,
12  you know.
13      Q.   Huh?
14      A.   I say I didn't want to take medication
15  to come here.
16      Q.   Were you nervous before this
17  deposition?
18      A.   Did I did what now?
19      Q.   Were you nervous before this
20  deposition?
21      A.   Yeah.  Yeah.
22      Q.   This deposition is a stressful event
23  for you?
24      A.   Yeah.  Stress, and it's nerve racking
25  and stress.  Trying to let it go, trying to let

101

it go, trying to live kind of normal, but it
keeps coming back.  When I got to tell the
story, it just rolls fast back in your mind.
So it's hard.
    Q.   The stress you felt today, did you
feel the same stress yesterday or the day
before?
    A.   No.  Yesterday I did, but not day
before.
    Q.   And the day before that you didn't
feel it either.
    A.   No.  It just come and go.  The closer
your time come here, it start making me nervous
like.  Yesterday and today.
    Q.   The stress you felt yesterday and
today was because you knew you had to come here
and give a deposition; right?
    A.   Yes.  Uh-huh.  It just makes me
nervous thinking about all the things that
happened, and it just -- and when my husband
was in the house, he was in there for two
months before they even come back after they
reported it.  And then they kept him at the
women's prison over there in them trucks and
trailers for another seven months.  He was up

102

1   here for nine months before we buried
2   something, I don't even know what.  Nine months
3   waiting to be buried.  And we couldn't see
4   nothing, we never know nothing -- even until
5   today.  It's just a mystery.  We didn't get a
6   chance to put clothes or see him for the last
7   time, none of us.  You know?  And it hurts.
8   Nothing.  We had them put him in my family
9   plot.  We had to go back and put a stone there
10  or something to say maybe he was there.  It's
11  something you can't even describe how a person
12  could live, and a good person.  That man was my
13  best friend, he was my husband and my
14  children's father.  And we lost all that.  I'm
15  not worrying about the house as much, but just
16  losing him, and with all these -- the children
17  and myself, we needed him.  We still do.  But
18  what we going do?  What are we going to do?  Go
19  on without him.  That's all about all we can
20  do.  And that hurts.  It really hurts.
21      Q.   After you learned of your husband's
22  death in September -- I think you said
23  September.
24      A.   Yeah.
25      Q.   -- you were describing difficulty

103

1   that you had recovering your husband's body.
2   How did your husband's body get from where it
3   was in the house to wherever it went next?  If
4   you know.
5       A.   My son Greg, his wife Gail and my
6   brother Earl, two months after the storm they
7   let's us go back in over the bridge.  The
8   National Guard would let us in.  They went back
9   to check on their houses, so I asked them to
10  check ours and look for a strong box I had with
11  my children birth certificate and important
12  papers that I had, insurance policies and all.
13  They were there looking for that for me when my
14  brother say he looked over and he saw something
15  big.  And he say, oh, my sister don't have no
16  statue in her house that big.  So he looked
17  again and he looked again, and he told my son
18  Greg, let's get out of here.
19          So my son Greg say, oh, man, I'm
20  looking for that box mama want, she asked me to
21  get for her.
22          And he say, man, you got a dead bed by
23  your feet.
24          My boy liked to jump and hit the
25  ceiling when he looked.  He said, oh, God, man,

104

that's my daddy.
        He was still in the house two months
later.
    Q.   By the time that your son discovered
your husband's body in your house, you knew
already that he had died?
    A.   I know he was dead, but I didn't know
he was still in the house.  They never told me
that.  I didn't learn that until I got to the
apartment when my daughter-in-law finally told
me.  Because my son, don't tell mama, don't
tell mama, don't tell mama.  He tried to hold
everything to keep from making me sicker.
    Q.   By the time that your son discovered
your husband's body in your house --
    A.   Right, that was Greg.
    Q.   It was Greg, okay.  By the time that
Greg discovered your husband's body in your
house, you had already learned of your
husband's death.
    A.   That he died, but I didn't know he was
still in the house.
    Q.   And you had already been to the
hospital twice.
    A.   I had.  That's why they didn't want me

105

to know, and that's why they didn't tell me.
But they called the police.  My daughter
called, with her cellphone, Gail did, and she
told them that her father-in-law was still in
the house.  So that's when they sent the police
and they send the coroner.  And they told them
to go to Urquhart across the street and stand
way over there, almost a block from the house
until they pull him out.  So they did.  And
they took him out, and that's when they brought
him to the women's prison, as they say, up
there in St. Gabriel.  And that's where he
stayed for seven months.
    Q.   The account of the discovery of your
husband's body still in the home two months
later was an account you heard from your son
Gregory.
    A.   Yeah.  He called my son Jeff.  But
they didn't tell me even then.  They didn't
tell me.
    Q.   All right.  Go ahead.
    A.   They was afraid I was going to go back
to the hospital again, so they -- I didn't know
it until over a year almost, until I moved in
Pontchartrain Oaks apartment.  My

106

1    daughter-in-law finally told me.
2        Q.   Your daughter-in-law told you a year
3    later what had happened at your home --
4        A.   Or maybe two years.  It would be two
5    years, in '07.  Did I say '06 or '07?  I'm
6    mixed up with the time.
7        Q.   Your daughter-in-law told you long
8    after the fact what had happened in your home.
9        A.   Right.  Because she was there.  She
10   saw him, too.  And that's what I have to --
11   every Wednesday I had to call St. Gabriel to
12   ask had they turned him loose.  My two boys had
13   to go give DNA tests to verify their daddy.
14   Greg and Jeffrey had to give DNA tests.
15       Q.   And this difficulty that you had
16   getting your husband's body from St. Gabriel --
17       A.   Seven months.  Seven -- I had to call
18   there every Wednesday between 12 -- between
19   10:00 and 12:00 every Wednesday.  If I didn't
20   call then, I had to wait till the next week.
21   That was the time they gave me, and that's the
22   only time I could call to ask had they turned
23   him loose, if they going to let him go.  Seven
24   months I called before they did.
25       It was March the 19th on my birthday

107

1    that they finally let him go, that we can bury
2    something.  Like we say, we didn't see nothing,
3    though.  Just a sealed casket.
4        Q.   You finally had a funeral for your
5    husband --
6        A.   Yeah, at the parlor.
7        Q.   Where?
8        A.   Thornton and Thornton.  Thornton and
9    Sontheimer or Thornton and Thornton.
10       Q.   And when was the funeral for your
11   husband?
12       A.   Yeah.  That was the parlor.  And we
13   buried him at Providence Memorial Park on
14   Airline Highway where all of my people at.
15       Q.   Okay.  During which month did you bury
16   your husband?
17       A.   March the 25th.
18       Q.   Did your experience during those many
19   months trying to get your husband's body
20   released add to the distress you were feeling
21   about your husband's death?
22       A.   Yes, I was.  Yes, it was a lot of
23   stress.  It was nine months of waiting.  Nine
24   months -- that's a long time to have to bury
25   somebody like --

108

1        Q.   Since the two trips to the hospital in
2    Georgia, have you required the care of a doctor
3    or mental health professional to cope with your
4    husband's death and all that came after it?
5        A.   No.  I need a -- not a psychiatry.
6    Counseling you're talking about?  I never saw a
7    counselor.  But I went to the meeting last
8    Saturday gone and they gave me a card.  And she
9    said that they have counseling there.  So I
10   told her I'm going to call her and I'm going to
11   go.  This Saturday past, down in the
12   neighborhood, meetings that they have once a
13   month on Charbonet down there by us.  But no.
14       Q.   Until last Saturday --
15       A.   I have a regular primary doctor that I
16   goes to.
17       Q.   Okay.  Primary doctor that you go to.
18   Now what is that doctor's name?
19       A.   Dwight McKenna.
20       Q.   Where does Dr. McKenna practice?
21       A.   1800 I think Gentilly.  I got a card
22   in here with his name on it.  There we go.
23   Dr. Dwight McKenna.
24       Q.   The witness is handing me a card.
25       A.   Right.  That's him there.

109

1        Q.   Dr. McKenna practices medicine at 1827
2    Gentilly Boulevard?
3        A.   That's him.
4        Q.   Have you sought treatment from
5    Dr. McKenna for symptoms or conditions of your
6    emotional distress resulting from your
7    husband's death?
8        A.   Yeah.  He just give me the
9    prescription that I have from Dr. Rou.  And
10   when I had it over the river, Dr. Bacaru, when
11   I was in Harvey, they gave me the same
12   prescriptions over and over.
13       Q.   Can you tell me what medications the
14   doctors prescribed for your distress?
15       A.   I should have wrote it down.  For my
16   heart and my pressure, for stress, for pain and
17   for my stomach.
18       Q.   Had you ever been treated for heart
19   problems before Hurricane Katrina?
20       A.   Yes, I had.
21       Q.   Tell me about those.
22       A.   I was in the hospital at, um -- Lindy
23   Boggs -- it's not Lindy Boggs.  It never opened
24   again, though.
25       Q.   You were hospitalized for heart

110

1  problems before Katrina.
2      A.  Yeah.
3      Q.  Did you have blood pressure problems
4  before Hurricane Katrina?
5      A.  Yes, I did.
6      Q.  Did you require medical treatment for
7  your blood pressure problems before Katrina?
8      A.  Yeah.  That's what I take pills every
9  day for, for both of those.
10     Q.  Do the pills you take after Katrina
11 for your heart problems and blood pressure
12 differ from the ones you took before Katrina
13 for those same problems?
14     A.  Yeah.  They differ.  They're not the
15 same color, anyway.  And they're a little
16 stronger than the ones I used to take from
17 Tulane.
18     Q.  Can you name the medications you take
19 now?  I think I may have asked you this before,
20 excuse me if I have:  Which piles do you take
21 now for your heart problems or blood pressure?
22     A.  I should have wrote it down, too.
23 It's a long name.
24     Q.  You don't know what it is today.
25     A.  No.

111

1      Q.  Do you take other pills for mental
2  stress or nerves?
3      A.  I try not to take the stress if I
4  don't have to because it make you feel funny
5  when you take too much medication.  I don't
6  like that.
7      Q.  So you take stress medicine only when
8  you need it.
9      A.  Yeah.
10     Q.  Within the last month, how many times
11 have you taken medicine for stress?
12     A.  About twenty times.
13     Q.  So you take the stress medicine fairly
14 frequently now, right?
15     A.  Yeah.
16     Q.  Had you taken this medicine before
17 Hurricane Katrina?
18     A.  No.
19     Q.  What is the name of this medicine, if
20 you can tell me?
21     A.  (Shakes head negatively.)
22     Q.  You can't --
23     A.  I need to bring all the medications I
24 got.
25     Q.  Did you have stomach problems before

112

1  Hurricane Katrina?
2      A.  Yeah.  Not as bad, though.
3      Q.  Tell me about the stomach problems you
4  had before Hurricane Katrina.
5      A.  I had gallstones they removed, and I
6  still have problems.
7      Q.  Tell me about your stomach problems
8  after Katrina.
9      A.  It's got worse.
10     Q.  More painful?
11     A.  Much more painful.
12     Q.  What medicine if any did you take for
13 stomach problems before Katrina?
14     A.  The same one I'm taking now.  It says
15 it's for stomach but it's a little stronger
16 than the ones I had used to take.
17     Q.  You take the same medication as before
18 but a little stronger?
19     A.  Uh-huh.  He said he was going to
20 increase it, the strength.
21     Q.  What symptoms do you suffer with your
22 stomach problems?
23     A.  Nervous stomach.  Nervous and aches.
24 I got pain in my stomach, and then it's
25 nervous.  My nerves all --

113

1      Q.  Are there certain foods that you can't
2  eat?
3      A.  Oh, yes.  Grease.  Anything greasy.
4      Q.  Did this restriction on your diet
5  predate Katrina?
6      A.  No.  I had it partly, but not as bad
7  then as it is now.
8      Q.  Let me make sure --
9      A.  Everything just increase everything
10 more than what it was before.
11     Q.  Did anybody tell you before Katrina
12 that you shouldn't eat greasy foods?
13     A.  Oh, yeah.  My doctor.  Yes.  Yes.  He
14 have told me.
15     Q.  And since Katrina, are there any foods
16 that your doctor tells you shouldn't eat
17 that you were allowed to eat before Katrina?
18     A.  Yes.
19     Q.  And what are those?
20     A.  Hamburgers and French fries and fish.
21     Q.  Your doctor had told you before
22 Katrina not to eat greasy foods; right?
23     A.  Yeah.  He had.  He had.  Sometimes you
24 get an urge and see everybody else eating it,
25 you know, you want a lill piece of it.

114

1    Q.   Burgers and fries and fried fish are
2  the kinds of greasy foods that your doctor had
3  told you not to eat before the storm.
4    A.   Not to eat.  Uh-huh.
5    MR. GILBERT:
6         I think that's a misstatement of
7       her testimony.  The statement was
8       after the storm.
9    MR. RAFFMAN:
10        That's what I'm trying to find
11      out.
12 EXAMINATION BY MR. RAFFMAN:
13   Q.   Is it your testimony that the burgers
14 and the fries and the fried fish are
15 restrictions on your diet that only happened
16 after Katrina?
17   A.   No.  That happened before the Katrina.
18 And after it got worse, that's when he
19 increased my medication.  When you got your
20 grandchildren around and your children and
21 everybody chewing and enjoying it, you know,
22 it's kind of hard to say no.
23   Q.   Do you -- notwithstanding your
24 doctor's instructions, do you every now and
25 then indulge yourself in a hamburger or fries

115

1  or fried fish now?
2    A.   (Nods affirmatively.)  What about it?
3    Q.   Even though your doctor tells you not
4  to eat those foods --
5    A.   Right.
6    Q.   -- every now and then you'll eat them,
7  right?
8    A.   I sure will.  I do.  When you're
9  around people what you going to do, starve
10 yourself to death?
11   Q.   So you --
12   A.   I have a little piece from here and a
13 little piece from there and I got to pay for it
14 with my life.
15   Q.   Every now and then you might eat --
16   A.   I do.  I do.
17   Q.   Let me finish the question and then
18 you can answer.  I'm sorry.
19        Every now and then you might eat one
20 of those kinds of foods.
21   A.   I sure do.
22   Q.   All right.  I need to go back to
23 Katrina for a little while longer.
24   A.   Okay.
25   Q.   I just need to rule some things out.

116

1    A.   All right.
2    Q.   Did you see the breach in the levee on
3  the Industrial Canal?
4    A.   When, before the storm or after the
5  storm?
6    Q.   During or immediately after the storm.
7    A.   No.
8    Q.   Did anyone tell you they saw what
9  happened when the levee breached and the water
10 came in on the Industrial Canal?
11   A.   I didn't see that.
12   Q.   Did anyone tell you that they saw it?
13   A.   Oh, yeah.  A lot of people saw it, but
14 they ain't coming forward or nothing, you know.
15 A lot of people knew about it, or heard about
16 it or whatever, however, but I didn't.
17   Q.   All right.  What are the names of the
18 people who told you they saw what happened?
19   A.   Some of the people I don't even know.
20 Just in the supermarket you hear people
21 talking, you know.  Nobody really I know.
22   Q.   What have you heard in the
23 supermarket?
24   A.   Oh, about the levee broke.
25   Q.   Yeah.  What have you heard about the

117

1  levee breaking in the supermarket?
2    A.   I remember people saying the barge --
3  and they had it on TV, and it was in the paper,
4  the barge sitting on where it's broke at, on
5  our side of the canal.  It was in the paper.
6  And it was on the news.
7    Q.   What you saw in the paper was the
8  aftermath?
9    A.   Right.  Right.
10   Q.   When I say the aftermath I mean the
11 picture of a barge sitting on --
12   A.   On the levee.  It wasn't even in the
13 water anymore.  It was sitting on the levee
14 where it broke, and you could see the broken
15 spot.
16   Q.   What I'm trying to ask you now is
17 whether anyone has told you they saw how that
18 barge got to where it ended up.
19   A.   Nobody really see it, no.
20   Q.   Did anybody tell you they saw the
21 levee break and the water come in?
22   A.   No.
23   Q.   Did anybody tell you they saw the
24 barge hit the wall?
25   A.   Unh-unh.

118

1    Q.   Did anyone tell you they saw the barge
2  pass through the wall?
3    A.   No.  Because when I left I never came
4  back.
5    Q.   Since you've been back living in the
6  Lower Ninth Ward, has anyone told you that they
7  stayed during the storm?
8    A.   Nobody hardly talks about it.
9    Q.   Do you have any knowledge about what
10 caused the flooding?
11   A.   No, I don't.
12   Q.   You don't know what caused the
13 flooding in the Lower Ninth Ward?
14   A.   I wasn't there.  I had just left.
15 There wasn't no water when I left.
16   Q.   You don't know what caused the
17 flooding at Clermont Street where you rode out
18 the storm.
19   A.   No.  All I know it came in the house.
20   Q.   Apart from your house at 1321 Egania
21 Street, did you own or have an interest in any
22 immovable property in the Lower Ninth Ward?
23   A.   No.  Did I have any other property
24 besides that one?
25   Q.   That's right.

119

1    A.   No.  We had been sold that one from my
2  mother-in-law and them, but they're all dead.
3    Q.   Do you have any pre-storm pictures of
4  your home at 1321 Egania Street?
5    A.   Before the storm or after?
6    Q.   Yes, ma'am.  Before.
7    A.   I may have a few pictures.  I'm not
8  sure.  Oh, no, I don't have them because the
9  water took them.  They were all under the TV in
10 the albums.  No.
11   Q.   So you don't have any pictures.
12   A.   All I got is the one they send me, and
13 that was after the storm.  No.
14   Q.   When was the home built?
15   A.   Five years before we bought it.  We
16 bought it in '54.  It was built five years
17 before that.
18   Q.   So it was built around 1949?
19   A.   Somewhere around there.
20   Q.   How many stories?
21   A.   It was five rooms.  And we added on
22 twice.
23   Q.   Okay.
24   A.   We had nine rooms.
25   Q.   All on the same level?

120

   A.   All on the same level.
   Q.   Was the house raised up off the
ground?
   A.   Three pillars.
   Q.   How high were the pillars?
   A.   You know, three?  Them stones.  Three
of those.  So it was pretty high.  It wasn't
flat on the ground.  I got a front porch, come
up the steps.
   Q.   How many steps to get up to the front
porch?
   A.   Four.
   Q.   The front porch was at the same level
as the floors in the house?
   A.   Uh-huh.  To the house, yeah.  From the
porch, when you come up the steps, you got the
big porch, and then into the house.
   Q.   So it was four steps up.
   A.   I got three steps or four steps in the
last room, Number 8 room.  That's where one of
the attics, one of the -- yeah, the attic was
in one of the rooms.  It used to be my daddy's
room.
   Q.   What's your house made of?
   A.   Bricks.

121

   Q.   How many square feet?
   A.   You know?  (Shakes negatively.)
   Q.   You don't know.
   A.   No, I don't know.
   Q.   Apart from the flooding during Betsy,
had there been any previous -- had there been
any flooding in the house apart from Betsy?
   A.   No.
   Q.   When was the last time you had put a
new roof on the home?
   A.   We had just put a new roof before this
storm, about a year, when we had that white
stuff got on all the houses.
   Q.   What had happened to the houses?
   A.   All in New Orleans something happened,
they had white stuff all on -- the insurance
paid us to put new roofs on the house.  We had
a whole roof put on it.
   Q.   Did you ever have termites in your
house?
   A.   Oh, yes, we did.  But we have the
termite man that comes every month.
   Q.   Did you have termite damage in the
home at the time of the storm?
   A.   After the storm we had some, he told

122

1  me after, by sitting there so long with all
2  that dampness.  I don't remember having them
3  before, but we had them after.
4      Q.  It's your testimony that you had
5  termites that infested the home --
6      A.  Every month.
7      Q.  Before Hurricane Katrina there was
8  termite damage in your home, right?
9      A.  If there was -- I can't remember
10  having termites.  Because we always had it
11  sprayed all the time.  So I don't remember
12  seeing any.  But after the storm, sitting up
13  there over two years or more, the man say we
14  had termites to the back of the house, not the
15  front.
16      Q.  So the termite damage -- your
17  understanding is that the termite damage to
18  your home was damage that happened in the last
19  two years after Katrina?
20      A.  Yes.
21      Q.  Did the termite man find an active
22  infestation of termites when he inspected it
23  after the storm?
24      A.  Yeah.  That's when they found it,
25  after the storm, yes.

123

1      Q.  They actually found the termites
2  crawling in the house?
3      A.  In the wood, yeah.  They had to redo
4  everything.  We had to take the walls and
5  everything out.  Everything.
6      Q.  They had to take the walls and
7  everything out to repair the storm damage?
8      A.  From the water and all, yes.  Every
9  room.  We had to strip them, nothing but the --
10  those planks that holds your house up.  That's
11  the only thing we had left.
12      Q.  When they took all that stuff out to
13  repair the storm damage they found active
14  termite infestation?
15      A.  To the back of the house, they did.
16      Q.  What's the name of the man that
17  inspected your home and found active termite --
18      A.  Bug Smasher.  And I had Orkin, too,
19  one time.  Before that I had Orkin.
20      Q.  I want to know specifically after the
21  storm --
22      A.  After the storm, Bug Smasher.  Before
23  the storm, too.  The same man.
24      Q.  And the name of the company is called
25  Bug Smasher.

124

A.  That's what it is.
Q.  Was there a mortgage on your house?
A.  No.
Q.  Do you know what the tax assessed
value of your home was before Katrina?
A.  No.
Q.  Had the house been appraised before
Katrina?
A.  No.
Q.  Do you know of any sales -- home sales
in your neighborhood before Katrina?
A.  No.
Q.  When is the first time you returned to
the home after Katrina?
A.  When I returned?
Q.  Yeah.
A.  We came over the river -- after we
came to bury my husband, and my son brought me,
we were living in Harvey, over the river, and
he brought me to see it.  Him and his wife.
Q.  This was --
A.  Gerald.  Edward Gerald.
Q.  This was nine or more months after --
A.  Seven months.
Q.  Seven months after the storm.

125

A.  Uh-huh.
Q.  Describe the damage that you found
when you visited your home.
A.  For the storm?  Or before we left the
house?
Q.  I'm sorry.
A.  What did you say, describe my home --
Q.  The damage when you returned after the
storm.
A.  I was still -- they had took all the
walls out.  They had gutted it out, as they
say.
Q.  Who had gutted the house?
A.  They did that when I was in Stone
Mountain.  My son Gerald -- Edward Gerald and
his wife Lucille.
Q.  So your sons had begun the process of
demolition and repairs?
A.  Not demolition, just gut it out.
Q.  Your sons had gutted your home before
you visit?
A.  Before I came, yeah.  But they took
pictures of it before they did.  They had
pictures.
Q.  All right.  I'm showing you Richardson

126

1  Exhibit 6.
2       (Richardson Exhibit 6 was marked for
3  identification and is attached hereto.)
4     A.  Yeah.  This is me.  This is the
5  chandelier the kids gave me for Christmas.
6  Look at it.  In the den.
7  EXAMINATION BY MR. RAFFMAN:
8     Q.  I need to ask a question before you
9  start talking.  I'm going to represent for the
10  record that the pictures that I've handed you
11  as Richardson Exhibit 6 bear the Bates numbers
12  Richardson 000011 through 000019.  The Bates
13  stamped pictures are in black and white.  I've
14  handed her the color pictures.
15       Mrs. Richardson, can you identify the
16  pictures that are now attached as Exhibit 6 to
17  your deposition?
18     A.  Oh, yeah.  They're mine.
19     Q.  Who took them?
20     A.  My daughter-in-law.  I will say
21  Gerald.  We call him Gerald.  Edward and
22  Lucille Richardson.
23     Q.  When did Edward and Lucille Richardson
24  take those pictures?
25     A.  Before I came home, before they gutted

127

1  it out, or while they were gutting it out.
2  These were taken before they were gutted out.
3  And the others were taken -- this is my home.
4     Q.  Now, let me just -- so that the court
5  reporter can take down your testimony, the
6  second page has a picture of a house.  Do you
7  see that, at the bottom of it?  The lower
8  picture?
9     A.  Yeah.
10     Q.  Is that a picture of the outside of
11  your home?
12     A.  No.  Yes, it is.  It's next door to
13  me, though.  Yeah.  This is my awnings.  I'm on
14  the other side of this fence.
15     Q.  The house that's pictured in this
16  lower picture on the second page is your home?
17     A.  That's mine.  That's my home.
18     Q.  Okay.  The upper picture, do you see
19  the upper picture on that same page?
20     A.  Yes, I do.
21     Q.  Is that a ladder that comes down from
22  your attic?
23     A.  Uh-huh.  That's the one my husband was
24  supposed to go up to be in the attic there.
25     Q.  And in this picture, in this picture

128

the ladder that goes up to the attic is hanging
but does not reach all the way down to the
ground.  Correct?
   A.  Yeah.  One or two slacks [sic] were
missing.  They were supposed to put them and
they never did.
   Q.  Now, let me -- stay with the picture
that I'm looking at, the second page, upper
picture.
   A.  All right.
   Q.  If that ladder were fully extended --
   A.  Yeah.  But it wasn't -- go ahead.
   Q.  Let me ask the question first.  Okay?
   A.  All right.
   Q.  When you take the ladder all the way
down from the attic --
   A.  Uh-huh.
   Q.  -- how far down does the bottom come?
   A.  About that high.  One of the slacks
wasn't on it at the bottom.  You see at the
very bottom?
   Q.  Right.
   A.  One of them is not on there.
   Q.  So the bottom of the ladder would
reach almost to the floor of it was brought all

129

the way down, correct?
   A.  Yeah.  That's why I'd have to step up
to get up there.
   Q.  The ladder in this picture is not all
the way down, right?
   A.  No.  No.
   Q.  Do you have any knowledge as we sit
here today why the ladder is only halfway down
instead of all the way down?
   A.  No, because one of the -- the little
slacks on it had come off, and I think somebody
was supposed to put it back on, but they never
did.  Didn't think we'd need it anyway.
   Q.  Do you know when these pictures in
Exhibit 6 were taken?
   A.  When they were taken?
   Q.  Yes, what month?
   A.  No.  My daughter-in-law and my son
Gerald -- Edward and Lucille had taken them.
   Q.  They took them -- did they take these
pictures in the same trip that they discovered
your husband's body in the home?
   A.  No, I don't think so.  No.
   Q.  Did they take those later?
   A.  I think so.  I'm not sure.  I was in

130

1   Stone Mountain.  They mailed these to me.
2       Q.   Do you know whether the pictures were
3   taken after your husband's body was found?
4       A.   No, I don't.
5       Q.   All right.  Do you know whether
6   Hurricane Rita had happened by the time these
7   pictures were taken?
8       A.   No, I don't know that either.
9       Q.   If I wanted to ask anybody about these
10  pictures I'd have to ask your son Edward, or
11  Gerald, or your daughter-in-law?
12      A.   Okay.
13      Q.   Is that right?
14      A.   Sure.  She would tell you.
15      Q.   Looking at the next-to-last page --
16  all right?
17      A.   The next-to-the-last page.  Okay.  The
18  outside?
19      Q.   Go one more.
20      A.   The next to the last.
21      Q.   Second from the back, right.
22      A.   That's my husband's trucks.
23      Q.   All right.  The page we're looking at
24  now is the next-to-last page, and there's a
25  picture of a ceiling fan.  Do you see that in

131

1   the top?
2       A.   Yeah.
3       Q.   And next to the ceiling fan there's a
4   ladder.
5       A.   That's the same ladder.
6       Q.   Do you see that?
7           And this is the ladder that goes up to
8   the attic.
9       A.   That's it.
10      Q.   And in this picture, the ladder is not
11  extended all way down, is it?
12      A.   No, it's not, huh?  I don't know.
13          THE WITNESS:
14              Do you see it?
15          MR. MORENO:
16              You have to answer the question.
17  EXAMINATION BY MR. RAFFMAN:
18      Q.   In fact, the ladder is only extended
19  part of the way down in this picture, right?
20      A.   It sure does look like it.
21      Q.   And if someone was going to go into
22  the attic, the ladder would have to be brought
23  much further down to climb up it, wouldn't it?
24      A.   Maybe.  I don't know.  But look at my
25  fan.  Look.  The water was all the way up

132

1   there.
2       Q.   Do you know whether the water got up
3   into the attic?
4       A.   He told my son it was almost up into
5   the attic.  And that's why he told him to bring
6   something to chop, I guess, I don't know.  You
7   can talk to Gerald and talk to Greg.  They
8   could tell you better than I can.
9           Now, these were the two trucks my
10  husband had.  My car was by my brother Earl
11  house.
12      Q.   All right.  The picture -- all right.
13  I want to -- turn one more page over, in that
14  direction.  There's a picture of a van.
15      A.   Of a who?  A van?  I had it.
16      Q.   Yeah, you got it.  There's a picture
17  of a van there.  It's the third page from the
18  back.  Do you see this picture of a van?
19      A.   Of the van?
20      Q.   Yes.  Do you see that?
21      A.   Yes.  Those are my husband's two vans.
22      Q.   These are your husband's?
23      A.   Uh-huh.
24      Q.   These two trucks were left in the
25  Lower Ninth Ward during the storm; correct?

133

1       A.   Right.  And this one moved all the way
2   across the door.  Because this was over here.
3   And this one was in the driveway here.
4       Q.   In this picture, in the lower --
5   lower picture of this page, there are two
6   vehicles, right?
7       A.   That's right.
8       Q.   One of them is a truck that has no
9   windows in the side panel.  Do you see that
10  truck?
11      A.   Yes.
12      Q.   And one of them is a van that has a
13  couple of windows on the side.  Do you see
14  that?
15      A.   Yes, I do.
16      Q.   Does the van have a ring around it in
17  this picture?
18      A.   A ring around it?
19      Q.   Yes, a ring.  Like a water ring, like
20  a bathtub ring.
21      A.   No.
22          THE WITNESS:
23              Can you see it?  Because my
24  eyes --
25          MR. GILBERT:

134

I can't answer.  If you can
answer -- if can see it, answer.
A.  No, I can't see it.
EXAMINATION BY MR. RAFFMAN:
Q.  All right.  You said your husband told
your son the water had gotten high.  Is that
what you said?
A.  That's what he told him.
Q.  Your husband had told your son that
the home was flooding; is that what you heard?
A.  That's what I heard.
Q.  This is Gregory, your son?
A.  That's Gregory, my son.
Q.  According to Gregory, your husband
told him that the water had gotten how high in
the home?
A.  Yeah.  He said it was up to the beds.
Q.  Did your husband tell your son Gregory
that he was in the attic?
A.  I don't remember that.  I don't know.
Q.  I'm finished with the pictures.
     When you went back to the
neighborhood, did you see any homes that had
damaged roofs?
A.  Oh, yes.  All of my neighbors.

135

Q.  All the neighbors had roof damage?
A.  All of us had roof damage.
Q.  Shingles had blown off?
A.  Sure.
Q.  Roofs had holes in them?
A.  I don't know about -- next door I saw
a big hole in that one, but the other ones,
they was all -- they had to put new roofs on
all of the houses.  Everybody around there had
to put a few roof.
Q.  Roofs had blown off in the wind?
A.  Uh-huh.  All of us.
Q.  Did you see any homes that had trees
blown on top of them?
A.  No.
Q.  Did you see any homes that looked like
they had burned?
A.  No.
Q.  Did you ever hear about any vandalism
or looting in your neighborhood after the
storm?
A.  Oh, yeah.  We always had that.
Q.  Any of your neighbors tell you that
things had been taken from their homes?
A.  Yeah.

136

Q.  What did you hear from your neighbors
about that?
A.  Took the TV out the house, a
microwave.
Q.  Your neighbors came home and their TV
and their microwave were missing?
A.  That's what she said.
Q.  What was the name of your neighbor?
A.  Rita.  She live across the street.
Q.  Her last name?
A.  Neison.
Q.  Spell it for the court reporter,
please.
A.  Rita Neison.  I don't know how to
spell her name.  N-E-I-S-O-N or N-E-S-O-N, I
don't know for sure.  They had a lot of looting
in the Ninth Ward, though.  A lot of people
lost stuff after, taking stuff.  I don't know
what they're going do with it.  But they had to
steal it.  They took my air condition out my
yard, the whole unit out of my yard.
Q.  Vandals or looters took your air
conditioner.
A.  For the copper.  And then when they
were working on my house they broke in my house

137

while they were working taking the copper out
of all the attic.  Before I got in my house I
had to pay extra money to get that done.  All
the copper.
Q.  When you were repairing your house --
A.  Right.
Q.  -- you had to pay extra money --
A.  I sure did.
Q.  All right.  When you were repairing
your house you had to pay extra money to
replace the copper that looters took after the
storm.
A.  That's right.  The electric man had
put the copper in for me.  They took all that
out of my house.  It was reported to the
police.  The people who worked on it reported
it.
Q.  Do your claims in this case include
compensation for the copper that was taken by
looters after the storm?
A.  Uh-huh.  Okay.
Q.  That's my question to you.
A.  So if it claimed for that, too?
     MR. GILBERT:
          She just accepted your offer it

138

1   sounded like.
2       A.  I know they stole mine out of my
3   house.  The man who built the house over could
4   tell you.  It's on the police report.
5       MR. GILBERT:
6           Listen to his question.
7   EXAMINATION BY MR. RAFFMAN:
8       Q.  My question is, in his lawsuit -- in
9   this lawsuit you want the defendants in this
10  lawsuit to pay you for repairs to your home,
11  right?
12      A.  Yes.
13      Q.  Do the amounts that you want the
14  defendants to pay you include compensation for
15  the lost copper that was stolen from your home?
16      A.  Please.
17      Q.  Is that a yes?
18      A.  Yes.
19          (Off the record.)
20  EXAMINATION BY MR. RAFFMAN:
21      Q.  Let me mark Exhibit 7 is form SF 95
22  that bears the date June 28th, 2006.
23  Mrs. Richardson, the writing on this document
24  will be impossibly small for you.  I have a
25  question about it, though.

139

1           Ms. Richardson, do you see in the
2   lower right-hand corner there's a signature
3   block?  Do you see that?
4           (Richardson Exhibit 7 was marked for
5   identification and is attached hereto.)
6       MR. GILBERT:
7           The left.
8   EXAMINATION BY MR. RAFFMAN:
9       Q.  Your counsel is right.  It's in the
10  lower left-hand corner.  I apologize.
11          You see the signature block?  Is that
12  your signature?
13      A.  Uh-huh.  That's my signature.
14      Q.  Do you recognize this as a claim form
15  for a claim to the United States Army Corps of
16  Engineers?
17      A.  Yes, I do.
18      Q.  Did you fill out the handwritten parts
19  of this form?
20      A.  No.  My daughter filled this in for
21  me.
22      Q.  Were you present while your daughter
23  filled in this form?
24      A.  Yes, I did.
25      Q.  Was your daughter asking you for the

140

information to put in the boxes?
    A.  Yeah.  She did.
    Q.  You supplied the information that's in
the boxes, right?
    A.  Yeah.
    Q.  And then you signed the form.
    A.  I signed the form.
    Q.  Did you read the form before signing
it?
    A.  I read most of it.
    Q.  Did a lawyer help you fill this out?
    A.  No.
    Q.  Do you see in the part about wrongful
death, the Box Number 12C in the middle of the
first page -- do you see that?  There's a box
for wrongful death that has the number five
million in it.  Do you see that?
    A.  Yeah.
    Q.  Did you tell your daughter to put in
the $5 million figure in that box?
    A.  I sure did.
    Q.  What if anything was the basis for
choosing that number?
    A.  I figured he was worth that much.  He
could have been worth more.

141

    Q.  Is there anything else?
    A.  No.
    Q.  I'll take that one back.
    A.  You want this one?
    Q.  Yes, ma'am.
    A.  Okay.
    MR. GILBERT:
        Counsel, I'd like to ask for the
    record who produced these?  Because I
    see that there's a cautionary
    confidentiality statement referencing
    the Master Protective Order.  I'm not
    questioning the authenticity of them,
    I'm just questioning the origin.
    MR. RAFFMAN:
        I believe it was produced by the
    United States, but I honestly am not
    sure.
    MR. GILBERT:
        Okay.
EXAMINATION BY MR. RAFFMAN:
    Q.  Mrs. Richardson, do you see the
document that's been marked as Exhibit 8 to
your deposition?
        (Richardson Exhibit 8 was marked for

142

1   identification and is attached hereto.)
2       A.   Exhibit 8?  Oh, yeah.
3   EXAMINATION BY MR. RAFFMAN:
4       Q.   Is this another Form SF 95 that was
5   submitted to the government on your behalf?
6       A.   Uh-huh.
7       Q.   You need to answer for the court
8   reporter.
9       A.   So what about it?
10      Q.   Is this another Form SF 95 that was
11  submitted to the government by you or on your
12  behalf?
13      A.   You have my handwriting.  So this was
14  for the Corps of Engineers, too?  No.
15      Q.   Why don't I ask another question.
16          Ms. Richardson, in the box on the
17  lower left corner of this document where it
18  says signature, is that your signature in the
19  bottom left?
20      A.   Yes, that's my signature.
21      Q.   Did you fill this out?
22      A.   No, I didn't.  It's not my
23  handwriting.
24      Q.   Do you know who filled this out?
25      A.   Either my daughter or my

143

1   daughter-in-law.  It been so long I done forgot
2   half of the stuff I filled out.
3       Q.   Were you present with whoever was
4   filling this form out for you?
5       A.   Yeah.  I had to be, I spelled my name
6   out.  That's my handwriting.
7       Q.   Now on this form, under amount of
8   claim, do you see the numbers there under the
9   amount of claim?
10      A.   Yeah.
11      Q.   Now, here, under wrongful death, the
12  amount is $1 million.  You see that?
13      A.   Yeah.  Right here.  Yeah.
14      Q.   Did I read that document correctly, is
15  it $1 million there?
16      A.   I see the $1 million here.
17      Q.   Was it $1 million and zero cents?  Is
18  that what that says, Ms. Richardson?
19      A.   That's what it says.
20      Q.   Do you remember deciding one way or
21  the other how much money to seek for a wrongful
22  death claim involving your husband?
23      A.   No.
24      Q.   Do you see under property damage, the
25  far left -- there's box in 12A, it says a

144

1   $150,000.  Do you see that number?
2       A.   Yeah.  I see that.
3       Q.   Do you remember figuring out what the
4   amount of your property damage claim was to
5   prepare this form?
6       A.   Not really.
7       Q.   When you wrote $150,000 -- or you
8   signed the form that had $150,000 written on
9   it --
10      A.   Yeah.  I did.
11      Q.   -- did you think that was the right
12  amount for your property damage claim?
13      A.   No.  But this was for the damage for
14  the home, huh?  How I understood this was
15  supposed to be for the furniture and all,
16  replacement of everything in the home?
17      Q.   And is that why --
18      A.   That's why I think we put this down.
19  Mostly for the damage for the house, for the
20  property and all our clothes and everything
21  else in the house, the furniture.
22      Q.   As you're looking at the form now, do
23  you remember who helped you fill this out?
24      A.   One of my children.  I can't remember
25  which one did it.  But one of my kids tried to

145

1   help me out to fill this out.
2       Q.   And you have a number here for
3   personal injury, do you see that,
4   Mrs. Richardson, in the middle, fifty thousand
5   dollars?  Do you see that?
6       A.   Yeah.  I see the fifty thousand.
7       Q.   For what personal injury were you
8   seeking compensation in this form?
9       A.   For my husband, huh?  That's supposed
10  to be for me or for my husband?
11      Q.   That's what I'm asking you,
12  Mrs. Richardson.
13      A.   Oh, for my husband.
14      Q.   Is that --
15      A.   Or for the both of us.  Could it be
16  like that, for the two of us?
17      Q.   I know you're looking at me and asking
18  me a question, and --
19      A.   Right.
20      Q.   -- if I may, I'm the last person who
21  can answer that.
22      A.   Okay.  Well, from the two of us, for
23  the money it cost to bury him and all, too.  It
24  wasn't free.
25      Q.   That reminds me.  How much were your

146

1  husband's funeral expenses?
2      A.  $10,000.  And $300 to put his name on
3  it.  That's total, now, from the undertaker to
4  the grave.  There's two different bills there.
5  They're five thousand dollars each.
6      Q.  Did you pay cash for all of those?
7      A.  Sure did.
8      Q.  All right.  Mrs. Richardson, does the
9  personal injury here, $50,000, relate to Box 10
10 where it says mental distress, high blood
11 pressure and depression over loss?
12     A.  Uh-huh.
13     Q.  Is there a connection between those
14 two entries in your form?
15     A.  Is it connection between what now?
16     Q.  Those two entries in your form.
17     A.  I don't think it's a connection.  Is
18 it?  It should be a -- yeah.  Between the high
19 blood pressure and all.  All that.  It's a
20 connection from all this happening.
21     Q.  And is it fair to say,
22 Mrs. Richardson, that by submitting this form
23 you were asking the government to pay you
24 $50,000 for the mental distress, high blood
25 pressure and depression you suffered as a

147

1  result of your husband's drowning and the
2  aftermath of Katrina?
3      A.  Yes.
4      Q.  Did you -- can you tell us how you
5  derived the $50,000 figure, if you know or if
6  you remember?
7      A.  Oh, that just I guess from me, for the
8  house, for all the furniture, things that we
9  need and all the things I lost that can't be
10 replaced.
11     Q.  All right.  What you just described,
12 damage to your house and all of your things, is
13 that part of the $150,000 property damage
14 claim, Mrs. Richardson?
15     A.  Yeah.  Property damage.
16     Q.  Next number over is $50,000 for
17 personal injury.  My question is, how did you
18 arrive at that number?
19     A.  We figured it cost about that much.
20 We were trying to get a figure for it.  We
21 don't have enough proof for everything.  If we
22 did, it would be even easier to get this
23 together.  But everything being destroyed, you
24 got to estimate as much as you can.
25     Q.  You received $10,000 from your

148

1  homeowner's insurance?
2      A.  Yes, sir.
3      Q.  Did your homeowner's insurer deny any
4  part of your claim for insurance?
5      A.  They didn't deny, but they said after
6  they didn't pay us enough money.  Or they
7  didn't pay me enough money.
8      Q.  How much money did you think you were
9  entitled to from your homeowner's carrier?
10     A.  They never told me.  All they told me,
11 it wasn't enough that they paid me for.  So I
12 don't know for sure.  They didn't tell me.
13     Q.  You have a lawsuit against your
14 homeowner's insurance company right now?
15     A.  Yes, I do.
16     Q.  Did you have flood insurance?
17     A.  No.  I had wind and fire.
18     Q.  Did you receive money from First
19 American Title Insurance Company?
20     A.  First American Title?  That's mine?
21 That's ours?  In fact --
22         MR. GILBERT:
23             I'm going to object to the
24         question.  I mean, that -- you're
25         asking her if she received proceeds

149

1              from a title insurance policy?  You
2              can follow that if you want --
3  EXAMINATION BY MR. RAFFMAN:
4      Q.  That was my question.
5          MR. GILBERT:
6              You can follow that if you want,
7          but it's getting late.
8  EXAMINATION BY MR. RAFFMAN:
9      Q.  I'll take Richardson 8 back.
10 Richardson 9 is Bates marked --
11     A.  Oh.  This is the money, yeah, from the
12 Road Home, huh?  Yeah.  This is what I got from
13 Road Home.  Yeah.
14     Q.  All right.  Richardson 9 reflects
15 money you got from Louisiana Road Home.
16         (Richardson Exhibit 9 was marked for
17     identification and is attached hereto.)
18     A.  This is what I got from --
19 EXAMINATION BY MR. RAFFMAN:
20     Q.  And you're able to see the amount of
21 money you got from Road Home?
22     A.  This is it here.
23     Q.  And it's -- you received $120,000 from
24 Road Home.
25     A.  119.

150

1    Q.  I'm sorry.  You have better eyesight
2  than I do.  You received $119,000 from
3  Louisiana Road Home.
4    A.  Yeah.  It's on there.
5    Q.  Have you used that money to repair
6  your house?
7    A.  Yes, I did.
8    Q.  How much have you spent repairing your
9  house?
10   A.  $100,000.
11   Q.  All right, sir.  The money that you
12 spent to repair your house is among the damages
13 you're seeking in this case, right?
14   A.  Yes.
15   Q.  Have you saved the receipts of the
16 expenses that you've --
17   A.  Yes, I did.
18   Q.  One of the reasons you have saved the
19 receipts for the expenses is so that you can
20 document repairs to your home?
21   A.  Yes.
22   Q.  All right.  And you supplied your
23 lawyers with a stack of receipts?
24   A.  Yes, I did.
25   Q.  The receipts you supplied to your

151

1  lawyers are the receipts for which you want
2  compensation in this case?
3    A.  Yes.
4    Q.  I'm going to show you what's Bates
5  marked Richardson 53 through Richardson 114.
6  I'm not going to mark them all as an exhibit,
7  and I'm going to ask you to take a quick look
8  through here and verify for me that these are
9  the receipts that you supplied to your lawyers.
10   A.  All right.  This is the house.
11        (Whereupon the previous question was
12 read back.)
13   A.  These are mine.
14 EXAMINATION BY MR. RAFFMAN:
15   Q.  They're your receipts, right?
16   A.  All of them are mine.
17   Q.  And you supplied them to your lawyers.
18   A.  Yes.  I did.
19   Q.  When you supplied them to your
20 lawyers, you intended that they be used to
21 support your claims for damages in this case,
22 right?
23   A.  Yes, sir.  Yes, sir.
24   Q.  Now that you've looked through them,
25 is there any receipts in there that you don't

152

think should be used to support your damages
claims in this case?
    A.  No.
    Q.  So all of them support your claims.
    A.  All of them, yes.  All of them.
    Q.  All right.  Bates mark 53, I'm going
to mark that as Richardson Exhibit 10.
        (Richardson Exhibit 10 was marked for
identification and is attached hereto.)
EXAMINATION BY MR. RAFFMAN:
    Q.  What is this document,
Mrs. Richardson?
    A.  This one I'm looking at now?
    Q.  Yes.
    A.  This is the windows that they had to
put in the house, huh?  And for the plumbing?
        (Off the record.)
    A.  This came from the carpenters when
they were working on the house.  This is some
of the things that Mason had to put in there.
EXAMINATION BY MR. RAFFMAN:
    Q.  All right.  At the bottom you see
there's a number $91,271.  Do you see that in
the -- about two lines up from bottom?
    A.  They got -- oh, yeah.  Okay.

153

    Q.  Does that represent the amount you had
spent on repairs?
    A.  For the roof repair?  They got her for
the roof repair here?  Is that the same one?
    Q.  I guess what I'm trying to ask you,
Mrs. Richardson, does this document have
anything to do with the amount that you've
spent repairing your house?
    A.  Yes, it had to do with it.  All this
is from the same contractor.
    Q.  What's the name of that contractor?
    A.  I just passed it up, mason something,
in the ones you just showed me.  They had the
address and the phone number on it.
    Q.  The name is Manson -- M-A-N-S-O-N,
Manson?
    A.  They got the phone number, address and
all on one of them.  At the very top.  The last
one you gave me.  They're the one did all the
work.  And they called in the different people
that had to be paid.
    Q.  All right.  I've marked another page,
this is Bates marked Richardson 000064.  This
is from Manson Services, Inc.
    A.  That it is it.

154

1    Q.   Richardson 11.  Is the name and
2  address of your contractor as reflected on
3  Richardson Exhibit 11?
4         (Richardson Exhibit 11 was marked for
5  identification and is attached hereto.)
6    A.   Yeah.  Okay.
7  EXAMINATION BY MR. RAFFMAN:
8    Q.   Richardson Exhibit 11 reflects in
9  Item 7, repair termite damage, $3,900.  Do you
10  see that?
11   A.   Yeah.  So they did some more for the
12  wood, because it was all bad back there in the
13  back of the house.
14   Q.   The termite damage that was being
15  repaired, is it your testimony that all of that
16  termite damage was created by termites after
17  Hurricane Katrina?
18   A.   Had to be after.
19   Q.   How do you know it was after?
20   A.   That I don't know for sure, but I know
21  when they came to do the work, the first day he
22  came he started pulling the back, and it was
23  all crumbling.  We didn't even know it was
24  there.  Just before he started working he told
25  me we had termites back there.  In the last two

155

1  rooms.
2    Q.   Did he tell you that all of that
3  damage had occurred after the storm?
4    A.   No, he didn't.  He didn't.
5    Q.   Do you know one way or the other
6  whether that termite damage existed before the
7  storm?
8    A.   No, I shouldn't have had termite
9  damage.
10   Q.   Why do you say that?
11   A.   Because I paid every month.  I paid
12  them eight hundred and something just to start,
13  to drill the holes all around the house with
14  that machine, and they put something in and
15  they put a caulk in it and then they sprayed
16  every month.
17   Q.   When did you start treating your home
18  for termites?
19   A.   I been treating my home for about ten
20  years, maybe more.
21   Q.   Do you know whether there was termite
22  damage in your home before that ten years?
23   A.   No, I didn't know it.  If it was
24  there, I didn't know.  Because the man came
25  every month, so I shouldn't have had any.

156

1    Q.   Do you know whether termites damaged
2  your home in the period before you started
3  treating for termites?
4    A.   Yeah.  He told me.  Manson told me
5  that it was in there.  That's how I knew.  But
6  other than that, I wouldn't have never known.
7  I just had it sprayed in August when the storm
8  came.
9    Q.   The damages that you're claiming in
10  this case includes the $3,900 that you paid
11  Manson the repair the termite damage, is that
12  correct?
13   A.   Yeah.  I had to pay him off, yes.
14   Q.   Mrs. Richardson, before the storm what
15  kind of countertops did you have in your
16  kitchen?
17   A.   Marble-like.  Before the storm.
18   Q.   Yes, ma'am.
19   A.   Yes.  White marble.  I still got
20  marble again in my house.
21   Q.   All right.  You had countertops
22  replaced after the storm, right?
23   A.   Oh, yes.  They tore all the cabinets
24  out.  I had to replace everything.
25   Q.   Right.  And one of the things you had

157

1  to do was replace the countertops.
2    A.   Replaced all that.  My stove --
3    Q.   Did you replace the countertops with
4  the same material that you had before the
5  storm?
6    A.   No.  This was different, from
7  different people, different companies.
8         Is that what you're talking about?
9  But it's marble, but it's a different color and
10  different place that I bought it from.  It
11  wasn't the same place we bought it from before.
12   Q.   Did you upgrade your countertops after
13  the storm?
14   A.   Yes.
15   Q.   The countertops --
16   A.   It's all upgraded.  The cabinets and
17  the countertop is all upgraded.
18   Q.   The cabinets and countertops you
19  bought after the storm are nicer than the ones
20  you had before the storm?
21   A.   Oh, yeah.  They're nicer.  Much nicer.
22  Oh, yes.
23   Q.   And in order to buy nicer cabinets and
24  countertops you had to spend a little more than
25  you would have had to spend simply to replace

158

1  what you had before, right?
2      A.  Oh, yes, sir.
3      Q.  And your claims in this case are the
4  claims for the entire cost of putting in the
5  new countertops and cabinets, right?
6      A.  Yes, sir.  Yes, sir.
7      Q.  Did you pay an engineering company
8  named Robert B. Anderson to do a structural
9  observation of your home?
10     A.  Yes, I did.  They were saying you
11 needed all that before they start working.
12 They claimed you had to have all that.  So I
13 did pay him to come over and --
14     Q.  I've marked as Exhibit 12 a document
15 bearing Bates numbers Richardson 000070 through
16 072.  Is this the report from the consulting
17 engineers?
18         (Richardson Exhibit 12 was marked for
19 identification and is attached hereto.)
20     A.  Yes, it is.
21 EXAMINATION BY MR. RAFFMAN:
22     Q.  Did the consulting engineers tell you
23 that it might not be cost effective to repair
24 your home?
25     A.  Yes, he did tell me that.  Because I

159

1  had wanted it torn down anyways.  But then this
2  Manson come along and he say it could be saved,
3  and if you'd tear it down it would take twice
4  as long to try and get back in.  And some of
5  the places still torn down, nothing but a lot.
6  They're not fixing them.  So I just decided to
7  go ahead on and try to fix mine all over again.
8      Q.  You went ahead and fixed yours anyway,
9  despite what the consulting engineer told you?
10     A.  I sure did.  It came out nice.  Yeah,
11 he told me that.
12     Q.  He didn't tell you it couldn't be
13 done, did he?
14     A.  No.  He didn't say it couldn't be
15 done.
16     Q.  He just told you it might not be cost
17 effective.
18     A.  Well, he said that it wouldn't make
19 sense to do it, to fix it.  But then that other
20 one came by, Mason, he say that's not true.
21     Q.  So you went ahead and used Manson to
22 repair despite --
23     A.  And he did.  He did.
24     Q.  And you went ahead and used Manson to
25 repair despite what Robert Anderson told you.

160

1      A.  I sure did.  And that's who did all
2  the work.
3      Q.  Richardson 13 bears the Bates mark
4  Richardson 000087.  Is Exhibit 13 one of the
5  receipts that you included in the stack you
6  gave your lawyer?
7          (Richardson Exhibit 13 was marked for
8  identification and is attached hereto.)
9      A.  What about it now?
10 EXAMINATION BY MR. RAFFMAN:
11     Q.  Is this one of the receipts that was
12 in the stack you gave your lawyer?
13     A.  Yeah.  I gave you a bunch of them from
14 Wal-Marts and everywhere.  Buying this, you saw
15 that Home Depot and Lowe's and -- this is mine.
16     Q.  This is one of the receipts you gave
17 your lawyer --
18     A.  Yes, sir.
19     Q.  -- to document your damages claims in
20 this case.
21     A.  Right.
22     Q.  Do you see the receipt over on the
23 left side there from Wal-Mart?  Do you see
24 that?
25     A.  Yes.  I see that.

161

1      Q.  Can you read what items are on that
2  receipt?
3      A.  Unh-unh.
4  MR. GILBERT:
5          Are you going to attach it as an
6          exhibit?
7  MR. RAFFMAN:
8          Yes.
9  MR. GILBERT:
10         The exhibit speaks for itself.
11 MR. RAFFMAN:
12         I just need to ask her a question
13         about those items, Mr. Gilbert.
14     A.  I can make out some of it like
15 macaronis and ham -- smoked ham.
16 EXAMINATION BY MR. RAFFMAN:
17     Q.  Right.  Are you claiming that --
18     A.  No.
19     Q.  -- the defendants ought to pay for
20 food as part of the damages?
21     A.  Well, I lost a lot of food, now.  But
22 we were buying food at the time.
23     Q.  You're not claiming that the
24 defendants should pay for that food in that
25 receipt, are you?

162

1    A.   Well, they should.  That goes with the
2  stuff I lost.  We lost everything.  I had a
3  freezer full of stuff and a refrigerator.  And
4  all that stuff went.  Couldn't save nothing.
5    Q.   All right.  Let me ask you, then,
6  before I come back, tell me what movable
7  property you lost in the storm that you want
8  the defendants to pay you for in this case.
9    A.   For the house?
10    MR. GILBERT:
11          Please define movable for the --
12  EXAMINATION BY MR. RAFFMAN:
13    Q.   Apart from your house.  Apart from the
14  house -- leave the house out.  Tell me what
15  other property you lost in the storm that you
16  want the defendants to pay for.
17    A.   My car and my husband's two trucks.
18    Q.   Where was your car during the storm?
19    A.   By my brother Earl, 3800 Clermont
20  Drive.  Water went over the top of it in his
21  yard.  In his driveway.  And my husband trucks,
22  both of them went under.
23    Q.   Where were they?
24    A.   At 1321, the two trucks was.
25    Q.   What else?  Before I go back, each of

163

1  those two trucks, how old were they?
2    A.   I don't know exactly how old.  I know
3  mine was a 2000 Chevy Malibu.
4    Q.   The chevy Malibu was at your brother's
5  house over in Gentilly?
6    A.   That's where I drove.  I drove it
7  there.
8    Q.   That's where it got wet, right?
9    A.   It didn't get wet.  It went under.
10  Under.  The hood popped up from the trunk, and
11  the whole car was loaded with water.
12    Q.   That car was destroyed in a flood by
13  Gentilly.
14    A.   It was destroyed.  I had to get a tow
15  truck to get it out of his yard.
16    Q.   What about your brother -- the trucks
17  that were at your 1321 Egania, do you know how
18  old either of them was?
19    A.   No, not really.  I'm not familiar with
20  the trucks.
21    Q.   Can you give me any idea how much
22  either of them was worth on the day of the
23  storm?
24    A.   No, I don't even know.  No, I don't
25  know how old they were.  So I don't have no

164

1  blue book on it.  But they both were running
2  and he used them every day, both of them.
3    Q.   What other property are you claiming?
4    A.   Your clothes that we bought from
5  Wal-Marts.  We got a lot of clothes.  Curtains
6  and Venetian blinds and -- well, that went with
7  the house, huh?  Trying to decorate the house
8  back that I had.
9    Q.   What else?
10    A.   I can't think.  Everything that need
11  to be put in the house we put it back in the
12  house.
13    Q.   What about the air conditioner that
14  was vandalized, is that part of your claim?
15    A.   Oh, yes.  We had to put a new one.
16  Central air and central heat.
17    Q.   The copper pipes that were vandalized,
18  that's part of your claim, too.
19    A.   Yes.  They went through my bathroom
20  and got in the house.  They left the opening in
21  the bathtub for the bathtub, and they got in
22  there and stole the copper.
23    Q.   Apart from the trucks, the clothes,
24  the Venetian blinds, air conditioner and pipes,
25  any items of property that you lost in the

165

1  storm that was worth more than a thousand
2  dollars that you can think of as we sit here
3  today?
4    A.   I can't think.  I can't think.  I'm
5  sure it worth more than a thousand dollars, but
6  I can't think of everything.  There was so
7  much.  For furniture and all?  You got that,
8  too?  All the bath towels, the hooks to put the
9  bath towel on, the hooks for the curtains
10  and -- what else?  I can't think.
11    Q.   All right.  Referring you back to
12  Richardson 13, and the grocery items here from
13  Wal-Mart you saw --
14    A.   Yes.
15    Q.   -- if I understood you correctly, the
16  reason for putting these in your claim is that
17  this is going to replace the food that was in
18  your house?
19    A.   Well, some of it, huh?
20    Q.   Okay.
21    A.   But that ain't enough of it -- that
22  ain't all of it.  We made many trips to
23  Wal-Mart.  We had to go all the way over the
24  river.  All the time and gas going back and
25  forward over there.  There is nothing over here

---

**166**

1  still.  You can't buy clothes, you can't buy
2  shoes -- we don't have a shoe store, we don't
3  have a clothes store.  We have to spend gas and
4  time.
5      Q.   Just to be clear, this Wal-Mart
6  receipt is from Lithonia, Georgia, right?  Do
7  you see what?
8          Okay.  One other question about the
9  receipts:  Anything that the defendants did in
10 this case, the defendants in this case, did
11 anything that the defendants in this case
12 affect your teeth?
13     A.   The receipt for what now?
14     Q.   Your teeth.  Your teeth.  Do you have
15 any dental problems that --
16     A.   Oh, yeah.  Yeah.  Is it there, too?
17     Q.   That's my question.  Do you have
18 dental problems that you attribute to the
19 defendants in this case?
20     A.   Yeah.  I did get the top fixed, but it
21 wasn't fixed right.  It's still in the drawer.
22 I'm getting it fixed again over here.  Yeah.  I
23 had that in Stone Mountain.
24     Q.   That's what I want you to explain to
25 me.

---

**167**

1      A.   That was just one of the receipts,
2  because I had two.
3      Q.   Richardson 14 is a dental bill --
4          (Richardson Exhibit 14 was marked for
5  identification and is attached hereto.)
6      A.   Right.  Eight something.  I had two
7  for eight something.
8      Q.   $880?
9      A.   $1,600.
10     Q.   $1,600 of dental work.
11     A.   Right.
12     Q.   And explain to me what the defendants
13 did to cause you to incur $1,600 of dental
14 work.
15     A.   Not really.  It was getting old and I
16 just needed some more.  And when they fixed
17 them they don't stay in my mouth.  And I can't
18 go back to Stone Mountain, so I got to -- the
19 man say they couldn't do too much with it.  So
20 I got to get it done all over again.
21     Q.   Richardson 14 is a dental bill.  Do
22 you see that?
23     A.   Yes.  My dental bill.
24     Q.   It's a dental bill you got in Stone
25 Mountain Georgia, right?

---

**168**

1      A.   Right.  Right.
2      Q.   You gave this to your lawyer so that
3  it could be part of your claim in this case,
4  right?
5      A.   Yeah.  It was in the bills -- with all
6  the bills, and I give it to him.
7      Q.   As we sit here today, do you want the
8  defendants in this case to pay that dental
9  bill?
10     A.   Right.  Right.
11     Q.   And what did the defendants do to make
12 you incur the dental expenses?  That's what I'm
13 trying to figure out.
14     A.   Well, nothing.  I just had to take
15 care of that myself.
16     Q.   Did you lose your dentures in the
17 flood?
18     A.   In the drawer.
19     Q.   So your dentures were in the flood?
20     A.   In the drawer, yes.  I did.
21     Q.   Is this a bill to replace your
22 dentures?
23     A.   That's part of it, yes.  They had to
24 replace top and bottom.  That's one part of it.
25 Yeah.

---

**169**

1      Q.   You left your dentures behind when you
2  went to your brother Earl 's house.
3      A.   In the drawer.
4      Q.   Now, without you here to tell me about
5  your loss of your dentures --
6      A.   Oh.  Okay.
7      Q.   -- there's no way that anybody could
8  know about why it is --
9      A.   That's true.
10     Q.   -- you lost your dentures.  Right?
11     A.   Right, right, right.
12         MR. GILBERT:
13             Well, I'm going -- I'm going to
14         object again and make note that the
15         exhibit speaks for itself as to
16         whether anybody could tell what it's
17         for.  I can tell what it's for --
18     A.   Yeah.  That's right.
19         MR. GILBERT:
20             -- without being told.
21 EXAMINATION BY MR. RAFFMAN:
22     Q.   Well, your counsel's point is well
23 taken.  So let me rephrase.
24         Without an individual document from
25 you or individual testimony from you about your

---

170

1   dentures, there's no way to explain to a jury
2   why the defendants should pay your dental bill.
3   Right?
4        A.   Okay.  Yes.  Yes.
5        Q.   Did you receive compensation from
6   FEMA?
7        A.   Yeah.  The check that they gave us
8   from FEMA.
9        Q.   How much did you get from FEMA?
10        A.   What was it, twenty-one thousand.  I
11   think they got a copy of it.  They should have.
12   In my files.
13        MR. RAFFMAN:
14             All right.  I'll represent for
15        the record I don't believe we got a
16        copy of that check.
17        A.   Yes.  I do.
18        MR. RAFFMAN:
19             So we'll look for it.
20        A.   Okay.  I had a copy of it.  In Stone
21   Mountain.  They gave me that from Stone
22   Mountain, Georgia.
23   EXAMINATION BY MR. RAFFMAN:
24        Q.   You said twenty-one thousand.  Did you
25   men to say something other than twenty-one

171

1   thousand?
2        A.   Twenty-one thousand.  Might be some
3   cents, I'm not sure.
4        Q.   Well, in any event, I don't have a
5   copy of the document.  I'll go back and look
6   for it and we'll follow up in writing.
7        A.   That's when I lived them seven months
8   in Georgia.
9        Q.   Did you receive any money from -- did
10   you receive any money from the SBA, Small
11   Business Administration?
12        A.   No.  They told me to just wait for the
13   grant.
14        Q.   Is your grant application with SBA
15   pending?
16        A.   No.
17        Q.   Did you submit a grant application to
18   SBA?
19        A.   No.  They told me over the phone just
20   wait.  That's all they told me.  No, it's not
21   pending.
22        Q.   Did you submit a claim to the SBA?
23        A.   No.
24        Q.   Directing your attention to Richardson
25   Exhibit 2 which is your interrogatory

172

answers --
     A.   What is this for?
     Q.   It's interrogatory answers for
Josephine Richardson.  Do you see where it says
Josephine Richardson submitted a claim to the
SBA?
     A.   But they didn't pay me anything or
nothing.  I called to ask them about it and
gave them the information over the phone, but
as far as I know I didn't write no papers or
nothing to them.
     Q.   Okay.  So you submitted a claim to the
SBA over the phone --
     A.   Over the phone.
     Q.   -- right?  And since you did that
nothing has happened.
     A.   No.  No.  I never got anything or
nothing.  We had SBA before with Betsy, but I
never got nothing from this time.  He say with
my age and all just to wait.
        MR. GILBERT:
             Wait.  He if he doesn't ask a
        question, you don't have to say
        anything.
EXAMINATION BY MR. RAFFMAN:

173

     Q.   You were about to say something about
this answer, and I guess, is there -- you can
see there are certain entries under your name
Josephine Richardson.  Do you see that?  In
Exhibit 2?
     A.   Right here?  Yeah.
     Q.   Yeah.  Is there anything that's listed
under your name that's incorrect?
     A.   No.  For the household and the
insurance?  Is that what you're talking about?
     Q.   The first line says plaintiff
Josephine Richardson submitted a claim for
homeowner's insurance on or about
December 13th, 2005, she received $10,489.91.
Do you see that?
     A.   That's what I got from --
     Q.   So that's accurate.
     A.   Yeah, that's accurate.
     Q.   All right.  It says Plaintiff
Josephine Richardson submitted a claim to the
Road Home.  Do you see that?
     A.   Yes, I did.
     Q.   And you did submit a claim to the Road
Home.
     A.   Yes, I did.

174

Q.   You received $119,000.
A.   I sure did.
Q.   Plaintiff Josephine Richardson submitted a claim to the SBA.  Do you see that?
A.   Yes.  I do.
Q.   That's the claim you submitted over the phone.
A.   Right.
Q.   Plaintiff Josephine Richardson submitted a claim to FEMA.  Do you see that?
A.   Yes, I did.
Q.   That's the claim for which you received $21,000, as you just testified?
A.   I sure did.
Q.   Is that right?
A.   Yes.  Red Cross you got here, too.
Q.   The last one is Red Cross.  And it says you can't recall the amount from Red Cross.  Do you remember now?
A.   I got three hundred dollars.
Q.   Three hundred dollars for Red Cross.
A.   Three hundred.  That was it.
Q.   Okay.  Thank you.
MR. GILBERT:
Mark, let me just make mention of

175

Richardson however many zeros 52 which is the FEMA check.  Josephine.
MR. RAFFMAN:
All right.  I apologize.  It's not in my stack.  We'll go back and look for it.
MR. GILBERT:
It is 21 something thousand.
MR. RAFFMAN:
All right.
EXAMINATION BY MR. RAFFMAN:
Q.   Ms. Richardson, you have -- when is the first time spoke with a lawyer about filing a lawsuit against the barge?
A.   When I saw it in the paper.
Q.   What did you see in the paper?
A.   Oh, I don't know.  I just was reading the morning paper and I happened to see it, about the -- you can file from the Ninth Ward or whatever, different wards, you can file the claim for the barge.
Q.   About the barge.
A.   Yeah.
Q.   And when you saw that, what did you do?

176

A.   I called them.
Q.   Who did you call?
A.   Mr. Brain Gilbert.
Q.   Mr. Gilbert.  Do you remember when that call was made?
A.   No.  '06?  '07?  I don't --
Q.   When is the first time -- well, do you understand you were proposed to be a class representative in this case?
A.   All right.  Yeah.  I understand.
Q.   What is a class representative?
A.   Represent the rest of the people in the Ninth Ward, too, and myself.
Q.   If the Court appoints you as a class representative, what do you understand to be your obligations as a class representative?
A.   I guess everybody felt the same way I feel about it.  I hope.  We all suffered all the damages.  Same damage I suffered just about everybody down there suffered, too.
Q.   What is your responsibility as a class representative, if you understand?  If you know?
MR. GILBERT:
Well, I'm going to object to the

177

extent that she can't possibly know
what Rule 23 says.  But subject to the
objection.
EXAMINATION BY MR. RAFFMAN:
Q.   Are you supposed to do anything as a class representative?
A.   No.  Not that I know of.
Q.   If the Court decides not to certify this case as a class action, would you go ahead with your individual claim for wrongful death of your husband?
A.   Yes.  Yes.
Q.   And you would also go ahead with an individual claim for property damage?
A.   Yes.
Q.   Whether or not the court certifies this case as a class action, would you also pursue the complaint and lawsuit you filed against the Army Corps of Engineers?
MR. GILBERT:
I'm going to object to the
question.  She cannot possibly
understand the legal ramifications of
doing that or possibly render a
competent answer.  But subject to

178

1    that, she can answer.
2  EXAMINATION BY MR. RAFFMAN:
3      Q.  Do you intend to pursue your claim
4  against the Corps of Engineers?
5          MR. GILBERT:
6              With advice of counsel.
7      A.  Yeah.  With advice of somebody.
8  Counsel know more but them.  I'm not familiar
9  enough.
10  EXAMINATION BY MR. RAFFMAN:
11      Q.  Mr. Caluda is your lawyer in the claim
12  against the Corps, right?
13      A.  I guess he is.  I don't hear from him.
14          MR. RAFFMAN:
15              Richardson 15.
16          MR. GILBERT:
17              Just for the record, it's not a
18  lawsuit against the Corps.
19          MR. RAFFMAN:
20              All right.  I thought she
21  testified that Caluda had filed a
22  lawsuit against the Corps, but --
23          MR. GILBERT:
24              Well, she actually did.
25          MR. RAFFMAN:

179

1          Well, I don't know if he did or
2      not.
3  EXAMINATION BY MR. RAFFMAN:
4      Q.  Let's ask about 15, because your
5  counsel has correctly observed that the Corps
6  is not one of the defendants that's named in
7  15.  Let me ask the question first.
8          Is Richardson 15 a lawsuit that was
9  filed on your behalf by attorney Robert Caluda
10  against Boh Bros. Construction Company and some
11  other defendants?
12          (Richardson Exhibit 15 was marked for
13  identification and is attached hereto.)
14      A.  Oh.  What about it now?
15          (Whereupon the previous question was
16  read back.)
17      A.  Yeah.
18  EXAMINATION BY MR. RAFFMAN:
19      Q.  Do you intend to pursue your claims
20  against those defendants as you sit here today?
21          MR. GILBERT:
22              Asked and answered.
23      A.  Can you sue both companies?  If
24  that --
25  EXAMINATION BY MR. RAFFMAN:

180

1      Q.  Do you intend to pursue those claims?
2          MR. GILBERT:
3              Asked and answered.
4  EXAMINATION BY MR. RAFFMAN:
5      Q.  With advice of counsel; is that your
6  answer?
7      A.  Yeah.
8      Q.  You haven't dismissed those claims as
9  far as you know, have you?
10      A.  No, I haven't.
11      Q.  The claims in Exhibit 15 are related
12  to the death of your husband Joseph Richardson?
13      A.  Yeah.
14      Q.  In the lawsuit that you filed against
15  Boh Bros. and the other defendants, are you
16  seeking compensation for mental distress?
17      A.  Yes.
18      Q.  Are you seeking compensation for
19  property damage?
20      A.  I'm not sure.
21      Q.  And you are seeking damages for the
22  wrongful death of your husband.
23      A.  That's what I'm supposed to be.
24      Q.  Have you ever attended any of the
25  court hearings in this case?

181

1      A.  No, I haven't.
2      Q.  Have did you ever attend any of the
3  depositions in this case other than your own?
4      A.  No, I haven't.
5      Q.  Apart from the interrogatory answers
6  that you reviewed before signing your
7  verification, have you ever reviewed any court
8  documents in this case before they were filed?
9      A.  No.
10          (Off the record.)
11  EXAMINATION BY MR. RAFFMAN:
12      Q.  Richardson 16.  Exhibit 16 is another
13  set of interrogatory answers titled
14  Supplemental Answers to Interrogatories
15  Propounded by the Barge Entities.  I'm going to
16  ask you questions about your answer to
17  Number 26.  (Tendering.)
18          Does your answer to this interrogatory
19  set out the damages you're seeking compensation
20  for in this case?
21          (Richardson Exhibit 16 was marked for
22  identification and is attached hereto.)
23      A.  Yeah.  Yes.  Complications?
24  EXAMINATION BY MR. RAFFMAN:
25      Q.  You're seeking damages for past and

182

1  future mental suffering, pain and anguish,
2  right?
3    A.  Yes.
4    Q.  That relates to the death of your
5  husband?
6    A.  Yes, it does.
7    Q.  Does it relate to anything other than
8  the -- well, it also relates to the loss of
9  property?
10   A.  Yes.
11   Q.  Apart from the loss of property and
12  the loss of your husband --
13   A.  Yes.
14   Q.  -- is there anything else, other than
15  those two causes of mental suffering, pain and
16  anguish?
17   A.  I can't think of --
18   Q.  The next item is past and future
19  mental health care expense.  Do you see that on
20  this list, Mrs. Richardson?
21   A.  Yes.
22   Q.  How much money are you seeking for
23  that element of damage?
24   A.  It's not on here.
25   Q.  Past and future mental health care

183

1  expense is not on there under your name?
2    A.  Unh-unh.  I don't see it.
3    Q.  I think it is.  The second item down.
4  Do you see it?  Your lawyer will help you.
5       MR. GILBERT:
6          (Gesturing.)
7          For purposes of the question she
8       accepts that it's there.  You can ask
9       the question.
10  EXAMINATION BY MR. RAFFMAN:
11   Q.  Well, my question is, how much money
12  are you seeking for mental health care expense?
13       MR. GILBERT:
14          And I'm going to object to the
15       question because I think it requires
16       an expert opinion to answer.
17          But you can go ahead and answer
18       subject to that.  If you know the cost
19       of mental health care, you can answer
20       his question.
21   A.  No, I don't know the cost of it, no.
22  EXAMINATION BY MR. RAFFMAN:
23   Q.  Well, I don't mean to have you -- are
24  you seeking compensation for past mental health
25  care expense, Mrs. Richardson?

184

1    A.  From myself or my husband.
2    Q.  For yourself.  Mental health care
3  expense for yourself that you had in the past.
4    A.  Yes.  But how much you want to know?
5    Q.  Yes.  How much?  If you know.
6       MR. GILBERT:
7          Look, I'm going object to the
8       line of questioning.  I mean, this is
9       just an effort to trap her.  She's
10      testified as to what past mental
11      health, um -- treatment she's had.
12      The bills are either available or
13      they're not available.  That's what
14      she's seeking past mental health
15      treatment expense for.
16          You know, you're going to -- she
17      doesn't understand this.
18   A.  No, I don't.
19      MR. RAFFMAN:
20          Mrs. Richardson understands more
21      than you give her credit for,
22      Mr. Gilbert, and the objections to the
23      last two questions were speaking
24      objections that were coaching the
25      witness in her answer.  I understand

185

1  the impatience of counsel to terminate
2  the deposition, but I will ask that
3  the coaching objections stop.  If the
4  witness does not understand a
5  question --
6  EXAMINATION BY MR. RAFFMAN:
7    Q.  Mrs. Richardson, if you don't
8  understand my question, tell me you don't
9  understand my question and I'll rephrase it.
10  Do you understand that?
11   A.  Yes, I do.
12   Q.  If you don't know the answer to my
13  question, you don't need to agonize over your
14  answer, just say you don't know the answer and
15  we'll go on.  Do you understand that?
16   A.  Yes, I do.
17   Q.  The third item on your list is
18  wrongful death.  Do you see that?
19   A.  Yes, I do.
20   Q.  Well, actually, before I go back to --
21  I'm sorry.  I didn't finish my line of
22  questions on the past mental health care
23  expense.
24       In order for me to understand how much
25  you want for past mental health care expense I

186

1  would have to look at the receipts of the --
2  the medical bills.  Isn't that right?
3      A.  Yes, you have to.
4      Q.  For wrongful death.  This is for the
5  wrongful death of your husband Joseph
6  Richardson, right?
7      A.  Yes, it is.
8      Q.  As we sit here today, do you have a
9  number that you associate with the damages
10  claimed for your husband Joseph Richardson 's
11  death?
12          MR. GILBERT:
13              Object.
14              You can answer.
15      A.  No.
16  EXAMINATION BY MR. RAFFMAN:
17      Q.  Mrs. Richardson, the next item on your
18  list says past and future loss of love,
19  affection, service, support, society and
20  consortium.  Do you see that?
21      A.  Yes, I do.
22      Q.  Is there anything in that item that's
23  not related to the death of your husband Joseph
24  Richardson?
25      A.  No.

187

1      Q.  That item is, in fact, related to the
2  death of your husband, right?
3      A.  Yes, it is.
4      Q.  Okay.  The next item is for past and
5  future loss and destruction of and damage to
6  immovable and movable property.  Do you see
7  that?
8      A.  Yes, I do.
9      Q.  Apart from what you've testified about
10  earlier today regarding the destruction of your
11  house and the property inside your house and
12  the two vehicles --
13      A.  Okay.
14      Q.  -- is there anything else included in
15  that element of damages that you can think of,
16  that we haven't talked about yet?
17      A.  No.
18      Q.  The next item is past and future loss
19  of use of immovables and movables.  Do you see
20  that?
21      A.  Yes, I do.
22      Q.  Is there anything that you can think
23  of sitting here today involving the loss of use
24  of your property that does not relate to your
25  house or the contents of your house or the two

188

1  vehicles?
2      A.  No, I can't think of anything.
3      Q.  So have we covered everything you can
4  think of in that item?
5      A.  Yes, sir.
6      Q.  The next item is past and future
7  expenses for demolition and salvage of
8  immovable and movable property.  Do you see
9  that?
10      A.  Yes, I do.
11      Q.  And have we also covered that subject
12  in this deposition today?
13      A.  Yes, we have.
14      Q.  The next item is diminution of
15  property value.  Do you see that?
16      A.  Yes, I do.
17      Q.  Does that relate to your -- the value
18  of your home at 1321 Egania Street?
19      A.  Yes, it should.  Yes.
20      Q.  Does it relate to anything other than
21  121 Egania Street?
22      A.  No.
23      Q.  The next item is past and future loss
24  and destruction of businesses and business
25  assets.  Do you see that?

189

1      A.  Yes, I do.
2      Q.  Does that relate to your husband's
3  truck?  Or what does that relate to?
4      A.  For the damage to his truck?  And his
5  business?  Because he used it for his business.
6      Q.  And past and future lost profits.  Do
7  you see the next item there?
8      A.  Yes.
9      Q.  Does that relate to the lost profit
10  for your husband's business?
11      A.  Yes, it is.
12      Q.  Now, just so -- to make sure I
13  understand, part of your claim for -- the
14  wrongful death claim for your husband is that
15  you no longer have the income that your husband
16  generated from his business, right?
17      A.  That's right.  That's right.
18      Q.  So your husband's lost income is a
19  part of your wrongful death claim, if I
20  understand it properly.  Is that right?
21      A.  Yes, it is.
22      Q.  And the claim for lost profits here is
23  that same income, right?
24      A.  Yes, it is.
25      Q.  And is your answer the same for the

190

1  lost, the next item of damage on next page,
2  lost income, lost earning capacity and lost
3  business opportunity?  Do you see those?
4      A.  Yes, sir.
5      Q.  Those all relate to your husband's
6  lost ability to provide you with income?
7      A.  Yes, it is.
8      Q.  The next item, your past and future
9  loss of enjoyment of lifestyle, do you see
10  that?
11      A.  Yes, sir.
12      Q.  Does that relate to anything other
13  than the loss of your husband's companionship?
14      A.  Everything to do with it, yes, sir.
15      Q.  Apart from your husband's
16  companionship, what does that element relate
17  to?
18      A.  We miss him.  We need him.
19      Q.  Sorry.
20      A.  Yes.  But he's not around anymore.
21      Q.  So when you're talking about the loss
22  of enjoyment of lifestyle, what you're saying
23  is that you've lost your husband.
24      A.  And my children lost their father.  I
25  lost my best friend.

191

1      (Off the record.)
2  EXAMINATION BY MR. RAFFMAN:
3      Q.  Mrs. Richardson, can you identify for
4  me any of the physicians who treated you before
5  Hurricane Katrina?
6      A.  Who treated me?  You said can I
7  identify -- between my husband and I?
8      Q.  I'm thinking of you in particular now.
9      A.  How did we treat each other?
10      MR. GILBERT:
11          No.  Can you tell him any of the
12          doctors that used to treat you before
13          Katrina?
14      A.  Oh, yeah.  Just McKenna.
15  EXAMINATION BY MR. RAFFMAN:
16      Q.  Dr. McKenna was your doctor before the
17  storm.
18      A.  Yes, he was.
19      Q.  Okay.  And was he also your husband's
20  doctor?
21      A.  No.
22      Q.  Do you know what the name of your
23  husband's doctors were?
24      A.  I had the papers, but all that's gone.
25      Q.  All right.

192

1      A.  No.  I don't know.
2      Q.  Did you see a doctor at Tulane before
3  the storm?
4      A.  My husband?
5      Q.  You.
6      A.  I did, yes.  I had a hip re --
7      Q.  What was the name of the doctor at
8  Tulane?
9      A.  Dr. Butler.
10      Q.  Dr. Butler.  And he replaced your hip?
11      A.  Yes, he did.
12      Q.  Can you think of any other doctors who
13  treated you before the storm?
14      A.  No.  And Dr. McKenna.  Those two.
15  Those are the only once I had.
16      Q.  All right.  I have no further
17  questions at this time.
18      MR. GILBERT:
19          All right.  I have just a couple
20          follow-up questions.
21  EXAMINATION BY MR. GILBERT:
22      Q.  Ms. Richardson, if the damage to the
23  lower Ninth Ward was caused by the barge --
24      A.  Was it damaged by the barge?
25      Q.  No.  Listen to my question.  If the

193

1  floodwall was broken by the barge --
2      A.  It was.
3      Q.  -- and if the floodwall let the water
4  into the Lower Ninth Ward --
5      A.  All right.
6      Q.  -- do you want the people responsible
7  to compensate you?
8      A.  Well, sure.
9      Q.  If it's the government 's fault that
10  the floodwall opened and the floodwaters came
11  through, do you want the government to pay?
12      A.  I sure do.
13      Q.  If your attorneys or the Court require
14  you to do anything particular in connection
15  with your duties as a class representative,
16  will you do what we ask?
17      MR. RAFFMAN:
18          Objection.
19      A.  I sure will.
20      MR. GILBERT:
21          That's all I have.
22      MR. RAFFMAN:
23          I have recross.
24      MR. GILBERT:
25          Enjoy.

194

EXAMINATION BY MR. RAFFMAN:
1  Q.   I have one question.
2       Mrs. Richardson, you don't know what
3  caused the damage in the Lower Ninth Ward, do
4  you?
5  A.   I don't know the damage?
6  Q.   You don't know what caused it.
7  A.   Oh, no.  No, I don't know if anyone --
8  you know.  No, I don't know.  No.
9  MR. GILBERT:
10      You've done an excellent job.
11 MR. RAFFMAN:
12      Ma'am, thank you very much for
13 bearing with us today.
14 THE WITNESS:
15      Okay.  That's it?
16
17
18
19
20
21
22
23
24
25

195

1       WITNESS' CERTIFICATE
2
3       I, JOSEPHINE RICHARDSON, do hereby
4  certify that the foregoing testimony was given
5  by me, and that the transcription of said
6  testimony, with corrections and/or changes, if
7  any, is true and correct as given by me on the
8  aforementioned date.
9
10 _____    _____
11 DATE SIGNED       JOSEPHINE RICHARDSON
12
13 _____ Signed with corrections as noted.
14
15 _____ Signed with no corrections noted.
16
17
18
19
20
21
22
23
24
25 DATE TAKEN: August 11th, 2008

196

REPORTER'S CERTIFICATE
I, JOSEPH A. FAIRBANKS, JR., CCR, RPR,
Certified Court Reporter in and for the State
of Louisiana, do hereby certify that the
aforementioned witness, after having been first
duly sworn by me to testify to the truth, did
testify as hereinabove set forth;
        That said deposition was taken by me
in computer shorthand and thereafter
transcribed under my supervision, and is a true
and correct transcription to the best of my
ability and understanding.
        I further certify that I am not of
counsel, nor related to counsel or the parties
hereto, and am in no way interested in the
result of said cause.


_____
JOSEPH A. FAIRBANKS, JR., CCR, RPR
CERTIFIED COURT REPORTER #75005

RICHARDSON, JOSEPHINE

## A

**ability** 9:9 190:6 196:12
**able** 9:13 36:4 51:22
　73:17 82:13 149:20
**accepted** 137:25
**accepts** 183:8
**account** 63:3 92:18
　105:14,16
**accounts** 26:1
**accurate** 9:10 173:17,18
**accurately** 9:13
**aches** 112:23
**act** 75:18
**action** 1:4 177:9,17
**actions** 24:21
**active** 122:21 123:13,17
**add** 9:3 107:20
**added** 119:21
**address** 31:4,25 32:7
　39:22 40:14,19,22,24
　153:14,17 154:2
**administered** 7:18
**administering** 6:24
**Administration** 171:11
**advance** 55:25 64:21
**advice** 178:6,7 180:5
**affect** 166:12
**affection** 186:19
**affirmatively** 115:2
**aforementioned** 6:4
　195:8 196:5
**afraid** 105:22
**aftermath** 117:8,10
　147:2
**afternoon** 7:7 9:16 67:21
　67:22 70:17 83:19,22
**age** 172:20
**ago** 30:2 34:9
**agonize** 185:13
**AGREED** 6:2
**ahead** 65:4 92:10 105:21
　128:12 159:7,8,21,24
　177:9,13 183:17
**ain't** 91:2 92:19 116:14
　165:21,22

**air** 136:20,22 164:13,16
　164:24
**Airline** 4:4 107:14
**Albert** 31:22,24 32:7,13
**albums** 119:10
**alcohol** 9:8
**alcoholic** 49:17
**alive** 28:22 29:21 30:4
**allege** 23:21
**alleging** 42:13
**allow** 46:7
**allowed** 113:17
**Amended** 24:6
**America** 2:15 7:10
**American** 3:8 148:19,20
**amount** 47:9 143:7,9,12
　144:4,12 149:20 153:1
　153:7 174:18
**amounts** 138:13
**Anderson** 158:8 159:25
**Andry** 36:19
**and/or** 195:6
**anguish** 182:1,16
**answer** 6:13 8:15,19 9:4
　9:21 10:15 14:10 17:5
　17:7 18:20,25 20:6
　24:17,19 25:22 26:13
　26:16 27:10 47:15,18
　47:21,24 48:1 50:1
　52:25 54:3 92:9,10
　98:17,20,22 115:18
　131:16 134:1,2,2 142:7
　145:21 173:2 177:25
　178:1 180:6 181:16,18
　183:16,17,19 184:25
　185:12,14,14 186:14
　189:25
**answered** 18:5 179:22
　180:3
**answering** 8:12,13
**answers** 16:13 24:7
　172:1,3 181:5,13,14
**anybody** 55:8 64:19 84:6
　113:11 117:20,23 130:9
　169:7,16
**anymore** 20:8 21:14 77:6

**air** 117:13 190:20
**anyway** 51:8 68:6 72:12
　73:21 77:18 110:15
　129:13 159:8
**anyways** 159:1
**ANZELMO** 3:17
**apart** 11:9 18:12 22:5
　32:25 41:23 47:3 61:11
　62:14 65:7,8 118:20
　121:5,7 162:13,13
　164:23 181:5 182:11
　187:9 190:15
**apartment** 39:14,17 40:8
　40:12,16 88:21 104:10
　105:25
**APLC** 2:3
**apologize** 139:10 175:4
**APPEARANCES** 2:1
**application** 171:14,17
**appointment** 95:11
**appoints** 176:14
**appraised** 124:7
**approximate** 71:23
**approximately** 37:1
**area** 32:20 33:21 58:12
　70:23,25 71:12 72:16
**Arkansas** 61:22,23
**army** 24:22 38:19 83:3
　139:15 177:19
**arrive** 74:18 147:18
**aside** 36:3
**asked** 9:2 94:23 95:9
　103:9,20 110:19 179:22
　180:3
**asking** 81:5,6 90:17
　139:25 145:11,17
　146:23 148:25
**asks** 18:1 25:11
**assessed** 124:4
**assets** 188:25
**associate** 186:9
**ate** 70:10 84:11
**attach** 161:5
**attached** 11:24 16:9
　24:14 36:18 71:18
　126:3,16 139:5 142:1

**air** 149:17 152:9 154:5
　158:19 160:8 167:5
　179:13 181:22
**attained** 35:6
**attend** 35:1 181:2
**attended** 180:24
**attention** 17:5 171:24
**attic** 38:17 65:3 68:1
　69:7,10,12,22,25 72:9
　72:12,14,16 73:17 76:7
　76:18 77:23 78:13,16
　80:6 81:14 82:5,18,23
　83:12 85:14,19 86:14
　86:17,24 87:1,3,6,18,23
　88:3,6 89:20 96:10,13
　96:14,19,23 120:21
　127:22,24 128:1,16
　131:8,22 132:3,5
　134:19 137:2
**attics** 120:21
**attorney** 179:9
**attorneys** 193:13
**attribute** 99:15 166:18
**August** 1:20 17:11,14
　156:7 195:25
**authenticity** 141:13
**authorize** 19:1
**authorized** 18:15
**available** 184:12,13
**Avenue** 2:18 30:15,19,20
　35:10
**awnings** 127:13
**ax** 81:16,17

## B

**B** 5:7 158:8
**baby** 30:12 39:5 78:23
　90:11,13
**Bacaru** 109:10
**back** 16:23 17:1,4 27:16
　28:7,10 37:21 38:1
　40:1,20,25 41:1,11
　42:11 43:12,22 60:14
　76:16 80:18 81:2,8
　85:11 87:9 93:8 94:4,5
　101:2,3,22 102:9 103:7

RICHARDSON, JOSEPHINE

103:8 105:22 115:22
118:4,5 122:14 123:15
129:12 130:21 132:18
134:22 141:3 149:9
151:12 154:12,13,22,25
159:4 162:6,25 164:8
164:11 165:11,24
167:18 171:5 175:5
179:16 185:20
**backwards** 38:3
**bad** 55:1 71:1 112:2
113:6 154:12
**barge** 2:2 13:8,13 14:17
15:21 16:14 23:8,9
24:5,8 25:9 26:22,25
27:2 42:13,16 98:25
117:2,4,11,18,24 118:1
175:14,21,22 181:15
192:23,24 193:1
**BARGES** 1:6
**BARNETT** 3:9
**Baronne** 2:5,11
**based** 16:16 25:25 96:15
**basic** 27:16
**basis** 140:22
**Bates** 126:11,12 149:10
151:4 152:6 153:23
158:15 160:3
**bath** 165:8,9
**bathroom** 164:19
**bathtub** 133:20 164:21
164:21
**Baton** 33:22
**batteries** 90:2,3,6
**battery** 82:8,8,12 89:23
**bear** 91:14 126:11
**bearing** 158:15 194:14
**bears** 138:22 160:3
**beautiful** 67:11
**bed** 85:24 103:22
**bedrooms** 39:13
**beds** 52:18 134:17
**begun** 125:17
**behalf** 14:20 15:13 18:16
25:24 142:5,12 179:9
**belief** 14:23

**believe** 11:3 23:25
141:16 170:15
**believed** 69:12
**Benoit** 1:12
**Bernard** 24:25 44:17
**best** 9:14 14:22 15:24
92:9,11 94:16,21
102:13 190:25 196:11
**Betsy** 51:16,19 52:2,15
53:5,14,15 54:14,21,25
55:5,8,15,18,20 121:5,7
172:18
**better** 66:1 72:21 82:11
87:1 132:8 150:1
**beverages** 49:18
**big** 83:3 86:4,4 103:15
103:16 120:17 135:7
**biggest** 44:18
**bill** 97:10 167:3,21,23,24
168:9,21 170:2
**bills** 146:4 168:5,6
184:12 186:2
**birth** 103:11
**birthday** 106:25
**bit** 27:15,16 49:20
**black** 126:13
**BLANCHARD** 3:2
**blank** 93:5
**blinds** 164:6,24
**block** 105:8 139:3,11
**blocks** 52:11
**blood** 99:8,9 110:3,7,11
110:21 146:10,19,24
**blowing** 85:11 87:19
**blown** 135:3,11,14
**blue** 164:1
**boat** 26:22 83:1,2
**body** 95:18 103:1,2
104:5,15,18 105:15
106:16 107:19 129:22
130:3
**Boggs** 109:23,23
**Boh** 179:10 180:15
**book** 164:1
**BORGNE** 4:8
**born** 27:19,23 29:1,5

44:4,6 94:15
**bottles** 98:5
**bottom** 12:16,25 127:7
128:18,20,21,24 142:19
152:22,24 168:24
**bought** 37:9 119:15,16
157:10,11,19 164:4
**Boulevard** 3:20 4:13
40:9 109:2
**bouncing** 99:19
**BOURGEOIS** 4:9
**Boutte** 1:8
**box** 103:10,20 140:14,15
140:20 142:16 143:25
146:9
**boxes** 140:1,4
**boy** 30:12 39:6 50:22
68:14 78:23 90:11,13
103:24
**BOYER-DUPLASS**
4:11
**boys** 28:23,24,25 29:11
106:12
**Brain** 176:3
**breach** 26:2 116:2
**breached** 116:9
**breaches** 1:4 14:18 43:1
**break** 9:17,18,20,22 43:4
74:4 75:18 79:14,15
117:21
**breaking** 117:1
**Brian** 2:3,4 10:20 22:10
**Bricks** 120:25
**bridge** 103:7
**Brief** 43:6 79:16
**bring** 13:23 77:23 79:24
80:2,6 111:23 132:5
**bringing** 22:8
**broke** 116:24 117:4,14
136:25
**broken** 65:3 117:14
193:1
**Bros** 179:10 180:15
**brother** 31:22,24 32:6,13
32:16 33:5 38:11 39:7
39:9,10 58:10 65:1

67:17 70:6,14,16,20
71:3,24 72:1,4 74:1
78:12 82:2,10,19 83:12
83:24,25 86:12 88:12
88:25 89:4,6,7,10 94:20
96:4 103:6,14 132:10
162:19 163:16 169:2
**brothers** 31:16,19,21
63:24
**brother's** 67:19,24 77:10
77:11 78:16 86:17
163:4
**brother-in-law** 40:7
**brought** 21:8 38:25 45:7
76:15 82:24 87:24
88:14 105:10 124:18,20
128:25 131:22
**BROWN** 3:9
**bubble** 36:15 37:1
**Bug** 123:18,22,25
**building** 48:6
**built** 119:14,16,18 138:3
**bunch** 160:13
**burgers** 114:1,13
**BURGLASS** 4:2
**buried** 102:1,3 107:13
**burned** 135:17
**bury** 39:19 107:1,15,24
124:18 145:23
**bus** 38:24 61:20,21 83:6
88:10,12
**business** 51:23 171:11
188:24 189:5,5,10,16
190:3
**businesses** 188:24
**busy** 45:4,4,4
**Butler** 192:9,10
**buy** 157:23 166:1,1
**buying** 36:10 160:14
161:22

---
**C**
---
**cabinets** 156:23 157:16
157:18,23 158:5
**call** 31:6 65:4,7,9 67:15
77:20 78:6,11,15 79:9

RICHARDSON, JOSEPHINE

8/11/2008

Page 3

79:19 82:11,13 85:23
90:9,10 91:1 106:11,17
106:20,22 108:10 176:2
176:5
**called** 52:7 55:16 60:9,15
60:18 67:14 70:13,17
76:2,19 77:1,2 82:13
85:2,5 88:19 90:11,12
94:22 95:1,9 105:2,3,18
106:24 123:24 153:20
172:8 176:1
**calling** 58:11,15 70:13
**calls** 62:15 126:21
**Calona** 19:5
**Caluda** 19:6,12 21:25
178:11,21 179:9
**Caluna** 19:5,5
**canal** 1:4 14:18 15:21
32:14 72:2 90:20 116:3
116:10 117:5
**cancer** 50:13
**cane** 73:12
**capacity** 190:2
**car** 63:16 74:15,16 75:4
132:10 162:17,18
163:11,12
**card** 108:8,21,24
**cards** 39:6 89:1,4
**care** 38:10 48:18 97:10
97:11,21 108:2 168:15
182:19,25 183:12,19,25
184:2 185:22,25
**careful** 76:9
**carpenters** 152:18
**carrier** 148:9
**case** 7:9 11:15 15:13 22:3
23:5,7,8 42:12 46:25
59:15 75:14,16 77:24
79:24 80:2 97:8 137:18
150:13 151:2,21 152:2
156:10 158:3 160:20
162:8 166:10,10,11,19
168:3,8 176:9 177:9,17
180:25 181:3,8,20
**cash** 146:6
**casket** 107:3

**Category** 57:18,22 68:5
68:6
**caulk** 155:15
**cause** 26:9 167:13
196:16
**caused** 23:21,23 24:23
25:9 26:1 42:13,17
118:10,12,16 192:23
194:4,7
**causes** 182:15
**Causeway** 3:20 4:13
**cautionary** 141:10
**CCR** 1:24 6:22 196:2,24
**Cedar** 19:18
**ceiling** 103:25 130:25
131:3
**cellphone** 59:14 76:21
77:3,4,8,13,14,17 82:7
90:5 105:3
**center** 4:12 61:21 90:21
**central** 164:16,16
**Centre** 1:19 3:3
**cents** 143:17 171:3
**certain** 113:1 173:3
**certificate** 103:11 195:1
196:1
**Certified** 1:25 6:23
196:3,25
**certifies** 177:16
**certify** 177:8 195:4 196:4
196:13
**Chaffe** 1:18 3:1
**chain** 70:6
**chairs** 86:8
**chance** 13:14 102:6
**chandelier** 126:5
**change** 73:1
**changed** 64:24
**changes** 195:6
**Charbonet** 108:13
**charge** 89:24 90:1
**CHARLES** 3:2
**check** 91:1 103:9,10
170:7,16 175:2
**checks** 45:25 48:4
**Chef** 30:23

**chest** 49:8 99:20
**chevy** 163:3,4
**chewing** 114:21
**Chicago** 59:17,17
**child** 62:10
**childhood** 29:19
**children** 28:21 29:1,17
29:18 30:4,6,10 33:24
34:1 41:5,16,24 42:4,8
42:18 54:12,15,17
58:14,23 59:4 60:22,24
60:25 61:2,9 62:4,7
63:9,10 65:17 102:16
103:11 114:20 144:24
190:24
**children's** 102:14
**chips** 44:20
**Choice** 50:19 97:9
**choosing** 57:9 140:23
**chop** 132:6
**Christmas** 126:5
**cigarettes** 49:12
**Cigars** 49:13
**citizen** 39:14
**citizen's** 39:16
**city** 38:21 45:14,16,22
46:4,5,18 48:2,5,9 83:8
**civil** 1:4 6:6 18:2,6
**claim** 46:25 97:7 139:14
139:15 143:8,9,22
144:4,12 147:14 148:4
164:14,18 165:16 168:3
171:22 172:5,12 173:12
173:20,23 174:4,6,10
174:12 175:21 177:10
177:14 178:3,11 189:13
189:14,19,22
**claimed** 137:23 158:12
186:10
**claiming** 22:23 156:9
161:17,23 164:3
**claims** 11:15 98:16
137:18 151:21 152:2,4
158:3,4 160:19 179:19
180:1,8,11
**Clarence** 29:6,23,25

34:11,12
**clarify** 8:24
**class** 18:4 26:3 176:8,11
176:14,16,21 177:6,9
177:17 193:15
**clear** 12:12 52:21 74:3
79:8 95:4 166:5
**Clermont** 17:15 32:18,19
38:11,12,14,15 41:1
58:8,21 71:24 118:17
162:19
**climb** 131:23
**clinic** 51:1 97:15,17,18
**clock** 84:13 87:2
**closer** 101:12
**clothes** 56:16 93:1 102:6
144:20 164:4,5,23
166:1,3
**CLUB** 3:8
**coaching** 184:24 185:3
**Code** 6:6
**collect** 45:22 46:3 48:4
**collecting** 46:6
**Colon** 95:24 96:1,3
**color** 110:15 126:14
157:9
**colors** 93:3
**come** 26:24,25 36:6,8
38:9 39:19 41:21 45:21
46:3 49:19 52:19 58:13
65:1 70:14,15 81:2
82:21 87:17 88:13 94:3
100:11,15 101:12,13,16
101:22 117:21 120:8,16
128:18 129:11 158:13
159:2 162:6
**comes** 121:22 127:21
**comfort** 9:18
**comfortable** 43:3
**coming** 52:6,10 66:25
86:11,19,20 101:2
116:14
**companies** 157:7 179:23
**companionship** 190:13
190:16
**company** 20:1,12,15,17

RICHARDSON, JOSEPHINE

8/11/2008

Page  4

20:19 21:2,6 22:7
123:24 148:14,19 158:7
179:10
**compensate** 193:7
**compensation** 98:11
137:19 138:14 145:8
151:2 170:5 180:16,18
181:19 183:24
**competent** 177:25
**complaint** 177:18
**complaints** 99:12
**Complications** 181:23
**complies** 12:3
**computer** 196:9
**concern** 61:8 69:20
73:22
**concerned** 61:1 63:8
68:18,20 73:15 74:6
**concerning** 13:8,12,13
**concluded** 25:5
**conclusion** 25:3
**condition** 73:18 97:25
136:20
**conditioner** 136:23
164:13,24
**conditions** 98:10 99:3,14
100:1,5 109:5
**confidentiality** 141:11
**connection** 146:13,15,17
146:20 193:14
**Consolidated** 1:6 14:18
**consortium** 186:20
**Construction** 179:10
**consulting** 158:16,22
159:9
**contact** 20:8
**contained** 14:21
**contents** 187:25
**contractor** 153:10,11
154:2
**contributed** 23:22 24:24
**convention** 61:21 90:21
**conversation** 63:1
**cooked** 56:17 67:1
**cookies** 44:20
**cooking** 67:6,8 70:8 84:1

84:2
**cope** 108:3
**copper** 136:24 137:1,4
137:11,14,19 138:15
164:17,22
**copy** 170:11,16,20 171:5
**corner** 12:16 72:3 139:2
139:10 142:17
**Coronada** 35:18
**coroner** 105:6
**Corps** 22:4,5,15,20,22
23:7,16,17,20,21 24:23
139:15 142:14 177:19
178:4,12,18,22 179:5
**correct** 14:22 27:8 74:10
128:3 129:1 132:25
156:12 195:7 196:11
**corrections** 195:6,13,15
**correctly** 30:18 143:14
165:15 179:5
**cost** 145:23 147:19 158:4
158:23 159:16 183:18
183:21
**counsel** 6:3 14:2 139:9
141:8 178:6,8 179:5
180:5 185:1 196:14,14
**counseling** 108:6,9
**counselor** 108:7
**counsel's** 169:22
**countertop** 157:17
**countertops** 156:15,21
157:1,3,12,15,18,24
158:5
**counting** 28:24
**couple** 133:13 192:19
**court** 1:1,25 6:23 7:18,20
7:23 8:1,9,17 18:1
127:4 136:12 142:7
176:14 177:8,16 180:25
181:7 193:13 196:3,25
**cover** 72:10
**covered** 188:3,11
**crawling** 123:2
**created** 154:16
**credit** 39:6 89:1,3 184:21
**criminal** 18:2,7

**Cross** 51:23 52:11
174:16,17,19,21
**crowbar** 81:20
**crumbling** 154:23
**curtains** 164:5 165:9
**cut** 52:9 77:23 79:23,25
80:3,6,9,12,16 81:13,23
**C-A-L-U-D-A** 19:7

---

**D**

**D** 5:1,7
**daddy** 77:3,22,23 79:3
90:25 104:1 106:13
**daddy's** 120:22
**Dallas** 39:1,1,2,4 88:16
88:17
**damage** 19:16,23 20:2
22:19 80:13,14,19,21
80:23 81:2,9,10,11
121:23 122:8,16,17,18
123:7,13 125:2,8 135:1
135:2 143:24 144:4,12
144:13,19 147:12,13,15
154:9,14,16 155:3,6,9
155:22 156:11 176:19
177:14 180:19 182:23
187:5 189:4 190:1
192:22 194:4,6
**damaged** 134:24 156:1
192:24
**damages** 22:23 23:1,4,13
23:23 97:8 150:12
151:21 152:1 156:9
160:19 161:20 176:19
180:21 181:19,25 186:9
187:15
**dampness** 122:2
**DARCY** 3:19
**dark** 74:20 83:3 87:22,24
**date** 29:3 95:12 138:22
195:8,11,25
**daughter** 31:13 58:14,22
59:3,20,23 61:11 62:10
62:14 65:8 105:2
139:20,22,25 140:19
142:25

**daughter-in-law** 34:14
91:7,9 104:10 106:1,2,7
126:20 129:18 130:11
143:1
**day** 38:4,5 49:5,14 56:15
56:20,21,23,25 57:5,6,7
66:13 67:1,11,16 68:16
82:8 87:7,12,15 88:15
88:25 93:16 94:3 100:6
100:8,10 101:6,8,10
110:9 154:21 163:22
164:2
**days** 38:16,18,20,21
44:21,23,24 56:9 72:13
78:13 82:5,16 83:6,8,8
88:7,9,24 89:17 93:8,10
93:24
**dead** 29:11 103:22 104:7
119:2
**death** 22:17 47:10 91:15
91:22 99:16,23 100:3,7
102:22 104:20 107:21
108:4 109:7 115:10
140:14,16 143:11,22
177:10 180:12,22 182:4
185:18 186:4,5,11,23
187:2 189:14,19
**deceased** 29:24 32:2 34:7
36:4 55:11
**December** 29:9 173:14
**decided** 60:24 74:23,25
159:6
**decides** 177:8
**deciding** 143:20
**DECKER** 3:19
**decorate** 164:7
**defendants** 7:9 23:9
138:9,14 161:19,24
162:8,16 166:9,10,11
166:19 167:12 168:8,11
170:2 179:6,11,20
180:15
**define** 162:11
**demolition** 125:18,19
188:7
**den** 96:9,10 126:6

RICHARDSON, JOSEPHINE

**denies** 26:14
**dental** 166:15,18 167:3
  167:10,13,21,23,24
  168:8,12 170:2
**dentures** 168:16,19,22
  169:1,5,10 170:1
**deny** 24:21 25:12,16,24
  26:5 27:6 148:3,5
**department** 94:20
**deponent** 6:10
**deposition** 1:17 6:4,14
  7:11 9:25 10:3,19
  11:21 12:19 16:6 24:3
  24:4 71:15 100:17,20
  100:22 101:17 126:17
  141:24 185:2 188:12
  196:8
**depositions** 181:3
**Depot** 160:15
**depressed** 23:18
**depression** 146:11,25
**derived** 147:5
**describe** 15:15 102:11
  125:2,7
**described** 99:2 147:11
**describing** 102:25
**despite** 159:9,22,25
**destroyed** 147:23 163:12
  163:14
**destruction** 187:5,10
  188:24
**details** 76:23
**diagnosed** 49:21
**diagnosis** 97:13
**die** 34:8
**died** 29:14 32:2 93:19
  104:6,21
**diet** 113:4 114:15
**differ** 110:12,14
**different** 40:23 43:1
  46:12 90:17 93:3,4
  146:4 153:20 157:6,7,7
  157:9,10 175:20
**differently** 48:14
**difficulty** 102:25 106:15
**diminution** 188:14

**dining** 86:8
**direct** 17:5
**Directing** 171:24
**direction** 51:13 132:14
**discovered** 104:4,14,18
  129:21
**discovery** 11:17 14:20
  15:12,18 24:10 105:14
**disease** 49:22 50:2
**dishes** 84:19,21
**dismissed** 180:8
**displaced** 42:1
**distance** 95:2
**distress** 22:24 107:20
  109:6,14 146:10,24
  180:16
**DISTRICT** 1:1,2 3:16
  4:8
**DNA** 106:13,14
**docket** 18:2
**doctor** 50:17,18,21,23
  51:5 97:12,19 108:2,15
  108:17 113:13,16,21
  114:2 115:3 191:16,20
  192:2,7
**doctors** 109:14 191:12
  191:23 192:12
**doctor's** 108:18 114:24
**document** 12:2,5,13,16
  12:19,21 13:3,7,15
  16:12,15,17 25:2
  138:23 141:23 142:17
  143:14 150:20 152:11
  153:6 158:14 160:19
  169:24 171:5
**documents** 10:2,5,10
  11:14 14:11 15:25 16:3
  16:18 20:11,14 181:8
**doing** 45:3 66:3,5,7
  177:24
**dollars** 145:5 146:5
  165:2,5 174:20,21
**door** 45:24 46:3 52:7
  55:10,17 82:17,22 86:6
  127:12 133:2 135:6
**Dr** 97:18,18 98:1 108:20

108:23 109:1,5,9,10
  191:16 192:9,10,14
**dragging** 51:8 58:16
**drawer** 166:21 168:18
  168:20 169:3
**drill** 155:13
**drink** 49:17,20
**drinks** 44:19
**dripping** 51:9
**drive** 4:4 17:16 34:25
  35:18 38:14,15 58:8,21
  71:24 162:20
**driveway** 133:3 162:21
**drove** 64:11 74:16 163:6
  163:6
**drown** 55:6
**drowned** 54:22
**drowning** 147:1
**drugs** 9:8
**duly** 7:4 196:6
**DUPLASS** 4:9
**duties** 193:15
**DUVAL** 1:9
**Dwight** 108:19,23
**D.C** 2:19

---

**E**

**E** 5:1,1,7,7
**Earl** 31:23 32:16 33:5
  38:11 39:9,10 40:23,24
  40:25 68:2 70:7,16
  71:24 72:1,4,17,22 73:8
  74:1,9,14,18 75:23 82:2
  82:11 83:12,21,25 85:6
  89:10,19 103:6 132:10
  162:19 169:2
**earlier** 9:3 46:11,12
  187:10
**Earl's** 73:3 86:12
**earning** 190:2
**easier** 147:22
**east** 31:5,6,8,12,15 34:25
  35:15,16,18,20 40:11
  41:10
**EASTERN** 1:2
**eat** 67:9 113:2,12,16,17

113:22 114:3,4 115:4,6
  115:15,19
**eating** 84:12,15 113:24
**education** 35:5
**Edward** 2:10 11:4 29:7
  31:2,7 35:14,19 39:24
  39:25 41:3,4,6,9,13
  62:16 124:22 125:15
  126:21,23 129:19
  130:10
**Edwards** 49:13
**effective** 158:23 159:17
**effort** 184:9
**Egania** 7:2 17:13 28:6,8
  28:10 36:19,21 37:2,5
  37:17 38:1 40:20 52:2
  54:18 55:24 60:4
  118:20 119:4 163:17
  188:18,21
**eight** 28:23 40:10,13
  45:5 84:13,16 98:4
  155:12 167:6,7
**eighteen** 48:16
**Eighth** 71:11
**either** 35:25 58:6 60:8,20
  60:23 74:2 96:25 97:13
  101:11 130:8 142:25
  163:18,22 184:12
**electric** 137:13
**element** 182:23 187:15
  190:16
**eleven** 93:2 98:6
**Elysian** 82:25
**emotional** 22:23 109:6
**employment** 44:11
**ended** 117:18
**Energy** 1:18 3:3
**engineer** 159:9
**engineering** 158:7
**engineers** 22:4,6,16
  23:17 24:23 139:16
  142:14 158:17,22
  177:19 178:4
**Enjoy** 193:25
**enjoying** 114:21
**enjoyment** 190:9,22

RICHARDSON, JOSEPHINE

**entire** 28:3 53:2 54:4
  55:23 158:4
**Entities** 16:14 24:8
  181:15
**entitled** 16:13 24:5 148:9
**entries** 146:14,16 173:3
**Esplanade** 51:2
**ESQUIRE** 2:4,10,17 3:2
  3:11,19 4:3,11
**estimate** 147:24
**evacuate** 52:4 55:9,15,25
  61:19 62:19 69:18
**evacuated** 56:3
**evacuating** 65:18
**evening** 38:8 58:20 83:13
  83:14
**event** 70:5 100:22 171:4
**events** 10:7,11 91:13
**everybody** 51:24 53:6
  58:17 69:9,11 72:15
  89:2 113:24 114:21
  135:9 176:17,20
**evidence** 6:15
**exactly** 79:12 163:2
**EXAMINATION** 5:2
  7:6 12:1 14:3 16:11
  17:3 20:9 24:16 36:25
  43:7 47:17 48:8 50:3
  50:12 53:3 54:8 71:20
  79:17 92:14 99:1
  114:12 126:7 131:17
  134:4 138:7,20 139:8
  141:21 142:3 149:3,8
  149:19 151:14 152:10
  152:21 154:7 158:21
  160:10 161:16 162:12
  169:21 170:23 172:25
  175:11 177:4 178:2,10
  179:3,18,25 180:4
  181:11,24 183:10,22
  185:6 186:16 191:2,15
  192:21 194:1
**examined** 7:5
**excellent** 194:11
**excuse** 110:20
**exhibit** 5:8,9,10,11,12,13

  5:14,15,16,17,18,19,20
  5:21,22,23,24 11:21,22
  11:23 12:5,6,7,19,24
  13:3 16:6,8,12 17:6
  24:3,4,13 36:14,16,17
  71:15,17 126:1,2,11,16
  129:15 138:21 139:4
  141:23,25 142:2 149:16
  151:6 152:7,8 154:3,4,8
  158:14,18 160:4,7
  161:6,10 167:4 169:15
  171:25 173:5 179:12
  180:11 181:12,21
**existed** 155:6
**expense** 182:19 183:1,12
  183:25 184:3,15 185:23
  185:25
**expenses** 97:6 146:1
  150:16,19 168:12 188:7
**experience** 51:18 53:4
  54:24 107:18
**expert** 183:16
**experts** 25:4
**explain** 7:14 12:11
  166:24 167:12 170:1
**expressed** 69:21
**extended** 128:11 131:11
  131:18
**extent** 177:1
**extra** 137:3,7,10
**eyes** 133:24
**eyesight** 150:1

---

**F**

**fact** 15:11 19:1 25:2
  96:22 106:8 131:18
  148:21 187:1
**fair** 64:17 146:21
**FAIRBANKS** 1:24 6:22
  196:2,24
**fairly** 111:13
**familiar** 163:19 178:8
**family** 1:13 32:21,23,25
  33:2 34:16 35:21 36:5
  39:12,21 40:4 50:17
  63:7,17 64:4,7,11 78:9

  102:8
**fan** 130:25 131:3,25
**far** 21:22 36:9 65:14
  128:18 143:25 172:10
  180:9
**fast** 101:3
**father** 102:14 190:24
**father-in-law** 105:4
**fault** 193:9
**federal** 45:17,20 46:13
  46:14,22
**fee** 46:7
**feel** 91:3 101:6,11 111:4
  176:18
**feeling** 107:20
**feet** 52:14 103:23 121:1
**felt** 101:5,15 176:17
**FEMA** 89:1 170:6,8,9
  174:10 175:2
**fence** 127:14
**fewer** 44:24
**field** 45:24
**Fields** 82:25
**Fifth** 95:25
**fifty** 145:4,6
**Fifty-seven** 30:19
**figure** 47:8 140:20 147:5
  147:20 168:13
**figured** 23:19 140:24
  147:19
**figuring** 144:3
**file** 18:16 45:17 175:19
  175:20
**filed** 19:12 21:25 177:18
  178:21 179:9 180:14
  181:8
**files** 170:12
**filing** 175:13
**fill** 139:18 140:11 142:21
  144:23 145:1
**filled** 139:20,23 142:24
  143:2
**filling** 66:7 143:4
**finally** 38:24 104:10
  106:1 107:1,4
**find** 24:19 96:8 114:10

  122:21
**finish** 8:14 9:20 13:21
  40:18 54:2 84:12
  115:17 185:21
**finished** 70:8 72:18
  84:15 134:21
**fire** 19:23 20:1 148:17
**first** 7:4 16:17 26:4,8
  29:5 57:10,14 78:6,23
  79:8 88:22 89:12,15
  93:7,11 96:2 124:13
  128:13 140:15 148:18
  148:20 154:21 173:11
  175:13 176:7 179:7
  196:5
**firsthand** 26:1
**fish** 113:20 114:1,14
  115:1
**five** 30:4,6 44:25 67:20
  83:17 119:15,16,21
  140:16 146:5
**fix** 159:7,19
**fixed** 159:8 166:20,21,22
  167:16
**fixing** 159:6
**flat** 120:8
**flew** 39:7 89:4,8
**flood** 69:24 73:15,23
  74:10 148:16 163:12
  168:17,19
**flooded** 42:8,25 89:13
**flooding** 23:22 24:24
  26:2,10,15 27:7 42:4,14
  42:17 52:14 55:21 74:7
  118:10,13,17 121:5,7
  134:10
**floodwall** 193:1,3,10
**floodwaters** 193:10
**floor** 4:12 80:25 86:4,5
  128:25
**floors** 56:16 120:14
**follow** 149:2,6 171:6
**follows** 7:5
**follow-up** 192:20
**food** 56:17 84:18,19,22
  161:20,21,22,24 165:17

RICHARDSON, JOSEPHINE

**foods** 113:1,12,15,22
114:2 115:4,20
**fool** 75:18
**fore** 87:7,15
**foregoing** 195:4
**foreign** 97:19
**forget** 31:4
**forgot** 143:1
**form** 6:12 138:21 139:14
139:19,23 140:6,7,8
142:4,10,21 143:4,7
144:5,8,22 145:8
146:14,16,22
**formalities** 6:8
**forth** 85:11 87:10 196:7
**forward** 38:6 116:14
165:25
**found** 34:19,23 71:1 91:4
91:10 94:25 95:18 96:7
122:24 123:1,13,17
125:2 130:3
**four** 13:19 30:8 120:12
120:18,19
**free** 145:24
**freezer** 162:3
**French** 113:20
**frequently** 111:14
**Friday** 56:12,14,20
**fried** 114:1,14 115:1
**friend** 94:16,19,22
102:13 190:25
**friends** 95:5,9
**fries** 113:20 114:1,14,25
**front** 120:8,10,13 122:15
**full** 87:12 162:3
**fully** 128:11
**funeral** 107:4,10 146:1
**funny** 111:4
**furnace** 86:5,5
**furniture** 53:8,21 144:15
144:21 147:8 165:7
**further** 131:23 192:16
196:13
**future** 182:1,18,25
186:18 187:5,18 188:6
188:23 189:6 190:8

**G**

**Gabriel** 105:12 106:11
106:16
**Gail** 103:5 105:3
**gallstones** 112:5
**gas** 165:24 166:3
**gears** 27:15
**generated** 189:16
**Gentilly** 30:22,25 32:20
33:18 82:25 108:21
109:2 163:5,13
**gentleman** 11:2,6
**geography** 26:3
**Georgia** 30:9,11 39:8,11
64:8,11,21 89:9 91:12
91:16,17 92:17 97:2,14
108:2 166:6 167:25
170:22 171:8
**Gerald** 29:7 39:24 62:16
62:19,22 63:2,6,11,14
63:17,24 64:1,4,10,14
64:19 65:9 124:22,22
125:15,15 126:21,21
129:19 130:11 132:7
**Gerald's** 91:7
**gesture** 86:22
**gesturing** 86:21 183:6
**getting** 65:3 66:9 68:1,7
76:4,24 83:24 85:3
86:7,19 106:16 149:7
166:22 167:15
**Gilbert** 2:3,4 5:4 10:20
10:21 11:1,9 14:1
19:21 20:10 22:10,12
47:13,20,25 49:24 50:6
50:10 52:22 54:1 92:8
98:13,19,23 114:5
133:25 137:24 138:5
139:6 141:7,19 148:22
149:5 161:4,9,13
162:10 169:12,19
172:21 174:24 175:7
176:3,4,24 177:20
178:5,16,23 179:21
180:2 183:5,13 184:6

184:22 186:12 191:10
192:18,21 193:20,24
194:10
**girl** 28:24,25 29:12
**girlfriend** 40:2 84:5 89:5
**girls** 45:23
**give** 8:18 9:9 20:10 49:8
75:11 93:2 95:12 97:12
98:5 101:17 106:13,14
109:8 163:21 168:6
184:21
**given** 1:18 7:11 195:4,7
**giving** 9:21
**glasses** 13:23 14:7 17:9
**go** 14:4 27:16 28:7 38:3,6
41:25 42:11 43:12,22
58:20 59:1 61:15,17,20
62:7,11 63:14 64:20,25
65:4,20 67:19,24 68:2,9
68:24 69:10,25 70:12
73:7,9,9,10,20 74:23,25
76:16 77:22 78:21
83:11 85:23 86:14 87:1
91:11,19 92:10 94:4,5
94:23 95:10,12,20
97:17 99:18 100:25
101:1,12 102:9,18
103:7 105:7,21,22
106:13,23 107:1 108:11
108:17,22 115:22
127:24 128:12 130:19
131:21 159:7 162:25
165:23 167:18 171:5
175:5 177:9,13 183:17
185:15,20
**God** 103:25
**goes** 26:3 108:16 128:1
131:7 162:1
**going** 7:14 11:20 12:13
12:15,18 14:10 17:4,21
24:2 52:20 58:12,18,18
59:9,10,12,25 60:2,12
61:11 63:3,12 64:23
67:17 68:8,12,25 70:6
70:11,12,22,25 71:9,12
73:7 75:12,20 76:5,7

81:2 82:12,15 85:14,16
85:18 91:8,10 92:25
96:14 97:16 102:18,18
105:22 106:23 108:10
108:10 112:19 115:9
126:9 131:21 136:19
148:23 151:4,6,7 152:6
161:5 165:17,24 169:13
169:13 176:25 177:21
181:15 183:14 184:7,16
**good** 7:7 51:12 94:19
102:12
**GOODWIN** 2:16
**Google** 36:15
**gotten** 75:4 134:6,15
**government** 24:22 25:12
25:18 26:14,20,25 27:1
27:3,6 98:12 142:5,11
146:23 193:9,11
**grandbaby** 88:23
**grandchildren** 33:8,10
40:4 41:5 62:17 63:4
88:20 114:20
**grandson** 34:15 39:5
88:22
**grandson's** 89:17
**grant** 171:13,14,17
**grave** 146:4
**Grease** 113:3
**greasy** 113:3,12,22 114:2
**Greenwood** 29:13
**Greg** 60:17 77:2,22 78:1
78:3,7,10,14,15 79:9,13
79:18 80:1 103:5,18,19
104:16,17,18 106:14
132:7
**Gregory** 29:8 31:10
35:17 60:17,18 61:1,12
61:15,17,19,25 62:6,14
65:8 77:1,20 96:16,19
105:17 134:12,13,14,18
**grocery** 165:12
**ground** 120:3,8 128:3
**grow** 27:25
**guard** 38:17 72:13 82:17
83:1 94:21 95:6 96:4

RICHARDSON, JOSEPHINE

103:8
**guess** 26:12 42:9 62:20
  132:6 147:7 153:5
  173:2 176:17 178:13
**gut** 125:19
**gutted** 125:11,13,20
  126:25 127:2
**gutting** 127:1

**H**

**H** 5:7
**half** 143:2
**halfway** 51:20 52:16,17
  72:10 82:9 86:18 129:8
**hall** 45:16,22 48:2,5
**ham** 161:15,15
**hamburger** 114:25
**Hamburgers** 113:20
**HAMMOND** 3:10
**hand** 11:5 12:12 16:7
  24:2
**handed** 36:13 126:10,14
**handing** 16:5 108:24
**handwriting** 142:13,23
  143:6
**handwritten** 139:18
**hanging** 128:1
**happen** 55:2 59:12,15
  73:25 85:19 87:2
**happened** 47:5 73:15
  75:14,16 76:17 82:1,3
  89:20 101:20 106:3,8
  114:15,17 116:9,18
  121:14,15 122:18 130:6
  172:16 175:18
**happening** 66:16 146:20
**harbor** 94:22 95:5 96:3
**hard** 14:10 70:22 71:12
  76:2,21 101:4 114:22
**HARDY** 3:17
**Harvey** 39:20,25 40:2,22
  41:2,6,9,12 109:11
  124:19
**Haynes** 40:9
**head** 8:19,20 111:21
**heading** 57:15,23

**health** 50:24 51:12 108:3
  182:19,25 183:12,19,24
  184:2,11,14 185:22,25
**hear** 8:2 10:14 47:18
  49:25 69:13,16 78:6,18
  82:19,20,21 85:9
  116:20 135:19 136:1
  178:13
**heard** 30:17 52:8 57:14
  57:22 68:5 70:23,24
  71:8 77:20 78:14,23
  79:9 91:20,22 105:16
  116:15,22,25 134:10,11
**hearings** 180:25
**heart** 49:21 50:2 93:1
  98:2 99:5,19 109:16,18
  109:25 110:11,21
**heat** 164:16
**held** 91:6
**help** 23:19 24:18 89:2
  140:11 145:1 183:4
**helped** 144:23
**hereinabove** 196:7
**hereto** 6:3 11:24 16:9
  24:14 36:18 71:18
  126:3 139:5 142:1
  149:17 152:9 154:5
  158:19 160:8 167:5
  179:13 181:22 196:15
**high** 35:1,4 86:16 99:8
  99:19 120:5,7 128:19
  134:6,15 146:10,18,24
**higher** 86:7,7,19,19,20
  86:20
**highest** 35:5
**Highway** 107:14
**hip** 51:10 65:3 73:11,18
  98:4 99:6,20,22 192:6
  192:10
**hisself** 44:13 45:3 48:18
**hit** 56:13 58:12 70:22,25
  71:9,11 103:24 117:24
**hold** 91:5 104:12
**holds** 123:10
**hole** 79:23,25 80:3,6,9,16
  81:13,23 135:7

**holes** 80:11,12 135:5
  155:13
**holidays** 49:19
**Holy** 52:10
**home** 21:13,15 36:13
  38:1,9 39:19 41:1,1
  43:9,13,16 44:9 45:7
  49:4,9 51:12,21 55:9
  56:4,5 58:9 60:14
  64:24 67:24 72:5,6,16
  75:10,12,14,15 76:14
  76:16 81:3,8,16,19
  83:21,21,25 84:4 94:3
  105:15 106:3,8 119:4
  119:14 121:10,24 122:5
  122:8,18 123:17 124:5
  124:10,14 125:3,7,20
  126:25 127:3,11,16,17
  129:22 134:10,16 136:5
  138:10,15 144:14,16
  149:12,13,15,21,24
  150:3,20 155:17,19,22
  156:2 158:9,24 160:15
  173:21,24 188:18
**homeowner's** 148:1,3,9
  148:14 173:13
**homes** 75:18 134:23
  135:13,16,24
**honestly** 141:17
**hood** 163:10
**hooks** 165:8,9
**hope** 176:18
**hoping** 90:21
**hospital** 48:23 78:21
  91:11,18,19,21,24
  92:15,20,22 93:6,10,22
  94:1 97:2,7,12 104:24
  105:23 108:1 109:22
**hospitalization** 49:7
**hospitalizations** 97:22
**hospitalized** 109:25
**hotel** 62:13
**house** 10:12,17 33:6
  34:19,20 37:2 38:7,10
  39:15 40:2,8 41:11
  42:10,10 45:21 49:16

52:12,15,16,18 58:10
  60:10 62:5 70:7 71:4,5
  71:24 72:9,10,11,16,17
  72:22 73:3,8 74:1,9,13
  74:14,19,21,22 75:9,23
  77:3,10,11,15 78:12,17
  78:20 80:22 81:21 82:2
  82:9 83:2,12 86:3,12,17
  88:12 94:16,24,25 95:1
  95:3,3,10,15,18 96:5
  101:21 102:15 103:3,16
  104:2,5,8,15,19,22
  105:5,8 118:19,20
  120:2,14,15,17,24
  121:7,17,20 122:14
  123:2,10,15 124:2,7
  125:5,13 127:6,15
  132:11 136:3,25,25
  137:2,5,10,15 138:3,3
  144:19,21 147:8,12
  150:6,9,12 151:10
  152:16,19 153:8 154:13
  155:13 156:20 162:9,13
  162:14,14 163:5 164:7
  164:7,11,12,20 165:18
  169:2 187:11,11,25,25
**household** 173:9
**houses** 42:5 103:9
  121:13,14 135:9
**Houston** 38:25
**huh** 13:12 88:2 98:25
  100:13 131:12 144:14
  145:9 149:12 152:16
  164:7 165:19
**hundred** 30:20 45:12
  155:12 174:20,21,22
**hurricane** 28:3,8,12 30:3
  30:7 31:17,25 37:4
  41:17 43:15,19,21 44:8
  44:12 45:6 47:6 48:17
  48:19 51:4,16,19 52:15
  54:14,25 55:1,24 56:1
  56:10 57:11,15 73:16
  109:19 110:4 111:17
  112:1,4 122:7 130:6
  154:17 191:5

RICHARDSON, JOSEPHINE

8/11/2008

Page 9

**hurts** 102:7,20,20
**husband** 22:18 35:23
  36:3 37:5,17 38:8
  39:19 44:1 45:7,17
  46:8,16,21 47:3 48:11
  48:20,22 49:10,17,21
  50:13,15,17 51:5 52:1
  53:8,11 55:5,12,25
  56:22 58:5,8 60:5
  62:24,25 63:6,11 64:20
  65:11,20 66:15,21
  67:25 68:21,23 69:2,6
  70:2 71:5 72:6,20,25
  73:6,14 74:23 75:2,8
  76:2,18 77:8,14,21 78:2
  78:7,11,15 79:10,19,22
  80:1,5,9,16 81:13,16,18
  81:19,22 85:2,5,23 90:9
  90:16 93:19 94:13 96:6
  96:18,23 101:20 102:13
  107:5,11,16 124:18
  127:23 132:10 134:5,9
  134:14,18 143:22 145:9
  145:10,13 162:21
  177:11 180:12,22 182:5
  182:12 184:1 186:5,10
  186:23 187:2 189:14,15
  190:23 191:7 192:4
**husband's** 44:1 45:10
  47:10 48:15 65:9 69:20
  91:15,22 94:10 95:18
  99:16,23 100:2 102:21
  103:1,2 104:5,15,18,20
  105:15 106:16 107:19
  107:21 108:4 109:7
  129:22 130:3,22 132:21
  132:22 146:1 147:1
  162:17 189:2,10,18
  190:5,13,15 191:19,23

**I**

**idea** 89:22 163:21
**identical** 96:1
**identification** 11:24 16:9
  24:14 36:18 71:18
  126:3 139:5 142:1

**I**

  149:17 152:9 154:5
  158:19 160:8 167:5
  179:13 181:22
**identify** 12:18 18:1 25:1
  126:15 191:3,7
**immediately** 40:19 116:6
**immovable** 118:22 187:6
  188:8
**immovables** 187:19
**impatience** 185:1
**important** 103:11
**impossibly** 138:24
**inability** 47:10
**inactions** 24:21
**include** 99:5 137:18
  138:14
**included** 160:5 187:14
**includes** 156:10
**including** 24:22 25:4
**income** 23:2 45:10 46:16
  46:22 47:1,3,4,9,11
  48:15 189:15,18,23
  190:2,6
**incorrect** 18:23,24,25
  173:8
**increase** 112:20 113:9
**increased** 114:19
**incur** 167:13 168:12
**Indicating** 10:20
**individual** 18:3 169:24
  169:25 177:10,14
**indulge** 114:25
**Industrial** 32:14 72:2
  116:3,10
**inference** 25:2
**infestation** 122:22
  123:14
**infested** 122:5
**information** 14:23 27:17
  140:1,3 172:9
**ING** 26:1
**Ingram** 1:9,11
**injury** 145:3,7 146:9
  147:17
**inside** 187:11
**insisting** 85:14

**inspected** 122:22 123:17
**instructions** 114:24
**insurance** 19:9,10,22
  20:1,12,15,19 21:2,6
  22:6 50:19 103:12
  121:16 148:1,4,14,16
  148:19 149:1 173:10,13
**insurer** 148:3
**intend** 178:3 179:19
  180:1
**intended** 151:20
**interest** 118:21
**interested** 196:15
**interfere** 9:9
**interrogatories** 16:13
  17:6 24:7 181:14
**interrogatory** 17:7,22,24
  24:18,20 25:25 26:5,14
  26:17 171:25 172:3
  181:5,13,18
**interrupt** 8:11,13
**involved** 22:13 23:9
**involving** 143:22 187:23
**item** 154:9 182:18 183:3
  185:17 186:17,22 187:1
  187:4,18 188:4,6,14,23
  189:7 190:1,8
**items** 161:1,13 164:25
  165:12

**J**

**J** 3:11
**Jeff** 90:24 105:18
**JEFFERSON** 4:1
**Jeffrey** 29:9 30:12 39:6
  39:11 41:19,23 63:21
  63:24 64:1 88:18 90:13
  93:20 94:9 95:7,9
  106:14
**Jerry** 64:7
**job** 7:24 194:11
**Joe** 76:5 85:16 90:22
**Joliet** 59:17
**Joseph** 1:24 6:22 22:18
  28:18 29:5 30:14,18,24
  34:7,21 35:8,10,23 36:3

  44:1 65:20 79:19
  180:12 186:5,10,23
  196:2,24
**Josephine** 1:17 7:1 14:16
  15:5,8,23 17:12 18:5
  27:5 76:3 172:4,5
  173:4,12,20 174:3,9
  175:2 195:3,11
**Jr** 1:24 6:22 29:5 30:14
  35:8,10 196:2,24
**JUDGE** 1:9
**July** 29:5,6,8 92:3,7
**jump** 103:24
**jumping** 93:1
**June** 29:12,13 31:13
  35:19 138:22
**jury** 170:1

**K**

**Katrina** 1:4 13:8 14:18
  15:21 28:3,8,13 30:3,7
  30:14 31:3,18,25 37:4
  41:17 43:15,19,21 44:8
  44:12 45:6 47:6 48:17
  48:19 51:5 55:24 56:3
  56:10 57:11,15 73:16
  74:7 109:19 110:1,4,7
  110:10,12 111:17 112:1
  112:4,8,13 113:5,11,15
  113:17,22 114:16,17
  115:23 122:7,19 124:5
  124:8,11,14 147:2
  154:17 191:5,13
**keep** 8:6,7 68:4 70:13
  92:24 99:19 104:13
**keeps** 77:17 101:2
**kept** 45:3 58:11,15 78:24
  85:13 86:19 90:17,19
  101:23
**kids** 63:4 94:15,17 126:5
  144:25
**kill** 92:25
**killed** 34:18,19,20
**kind** 101:1 114:22
  156:15
**kinds** 23:4,13 114:2

RICHARDSON, JOSEPHINE

115:20
**King** 49:13
**kit** 81:19
**kitchen** 156:16
**KITTO** 3:11
**knew** 65:14 74:12 82:9
   89:2 90:18 93:18
   101:16 104:5 116:15
   156:5
**knock** 45:24
**knocked** 52:7 55:16
**knocking** 82:17
**know** 11:17 13:9,10
   20:22 21:13,23 25:14
   29:2 42:7,10,11 43:2,2
   46:20,24 47:12 50:22
   50:25,25 51:2 53:7
   54:4,22 71:9 73:19,21
   75:17 76:13,20 77:16
   77:19 78:2,3,5,22 79:1
   79:5,6,12 80:5,12,14,14
   80:15,21 83:19 87:5,7
   87:16 89:20 90:15,22
   90:22,23 91:5,10 92:13
   93:3,4,17 95:14,17
   96:21,21,22,25 97:5,18
   98:7,18 99:18 100:12
   102:2,4,7 103:4 104:7,7
   104:21 105:1,23 110:24
   113:25 114:21 116:14
   116:19,21,21 118:12,16
   118:19 120:6 121:2,3,4
   123:20 124:4,10 129:14
   130:2,5,8 131:12,24
   132:2,6 134:20 135:6
   136:14,16,18 138:2
   142:24 145:17 147:5
   148:12 154:19,20,20,23
   155:5,21,23,24 156:1
   163:2,2,17,24,25 169:8
   172:10 175:17 176:23
   177:1,7 178:8 179:1
   180:9 183:18,21 184:4
   184:5,16 185:12,14
   191:22 192:1 194:3,6,7
   194:8,9,9

**knowledge** 14:23 15:24
   64:14 118:9 129:7
**known** 156:6
**knows** 19:19
**K(2)** 1:7

---
## L

**L** 6:1 15:8,23
**ladder** 127:21 128:1,11
   128:15,24 129:4,8
   131:4,5,7,10,18,22
**lady** 57:18
**Lafarge** 1:8,10,12,14
   2:15 7:9
**Lafayette** 19:16 20:7
**Lagarde** 1:10
**LAKE** 4:8
**Lakeway** 4:12
**language** 12:22
**late** 74:21 149:7
**law** 6:7 7:20
**Lawrence** 95:24
**lawsuit** 18:12,16 19:1,11
   19:15,25,25 20:11,15
   20:18,21 21:5,7,22,25
   22:12 98:11,12 138:8,9
   138:10 148:13 175:14
   177:18 178:18,22 179:8
   180:14
**lawsuits** 18:13 19:3 22:7
   23:12
**lawyer** 7:8 18:15 19:20
   19:25 21:11 22:1 24:18
   52:21 140:11 160:6,12
   160:17 168:2 175:13
   178:11 183:4
**lawyers** 20:10 21:19
   150:23 151:1,9,17,20
**learn** 89:12 104:9
**learned** 89:15 91:15
   94:13 96:15 102:21
   104:19
**leave** 59:23 60:24 67:19
   67:24 68:25 70:3
   162:14
**leaving** 36:3 60:8,21 63:5

63:7,15 75:2
**led** 70:6
**left** 38:7,10 39:18,18
   52:5 58:10,20,24 59:4
   60:23 61:5,8 62:4
   63:16 67:16 68:15 83:9
   118:3,14,15 123:11
   125:4 132:24 139:7
   142:17,19 143:25
   160:23 164:20 169:1
**left-hand** 139:10
**legal** 11:14 177:23
**legs** 9:18
**let's** 27:16 38:3 43:12
   85:22 103:7,18 179:4
**levee** 3:16 4:8 58:23
   60:20 116:2,9,24 117:1
   117:12,13,21
**level** 35:5 119:25 120:1
   120:13
**license** 46:7,10
**life** 28:3 53:10,22 54:9
   115:14
**lifestyle** 190:9,22
**lights** 87:24
**liked** 65:24 103:24
**likes** 77:16
**lill** 53:6 82:7 113:25
**Lindy** 109:22,23
**line** 13:21 15:3,4 173:11
   184:8 185:21
**lines** 13:20 26:8 152:24
**list** 182:20 185:17 186:18
**listed** 173:7
**Listen** 138:6 192:25
**listened** 82:20
**Lithonia** 166:6
**Litigation** 14:18
**little** 12:13,14 27:15 45:2
   46:11 49:20 110:15
   112:15,18 115:12,13,23
   129:10 157:24
**littlest** 63:21
**live** 28:5,7 29:19 30:14
   31:2,10,13 32:16,18
   33:12,15,17 34:24 35:8

35:14,17 37:17,23,25
   38:2 40:25 41:6,9
   94:19 95:7 101:1
   102:12 136:9
**lived** 28:2 29:11 30:10,18
   30:24 31:7 32:13 35:22
   37:5 40:19 41:19,23
   42:18 51:15 55:23
   63:22 64:4,7 71:10,11
   89:6 92:17 171:7
**lives** 35:12 40:24 72:1
   88:20
**living** 30:6 31:17,19 36:1
   39:25 40:23 41:3,12,13
   52:1 54:17 85:6,7
   118:5 124:19
**loaded** 163:11
**loan** 51:23
**loaned** 40:2
**located** 17:12,15
**location** 37:2 41:14
   71:23
**long** 10:23 31:22,23 37:4
   38:2 39:16 49:1 93:6
   93:22 95:2 106:7
   107:24 110:23 122:1
   143:1 159:4
**longer** 115:23 189:15
**look** 11:25 12:2 13:15
   15:16 36:21 72:15 87:2
   96:6 103:10 126:6
   131:20,24,25 151:7
   170:19 171:5 175:6
   184:7 186:1
**looked** 13:17 103:14,16
   103:17,25 135:16
   151:24
**looking** 103:13,20 128:8
   130:15,23 144:22
   145:17 152:13
**looks** 15:17
**loose** 106:12,23
**looters** 75:17 136:22
   137:11,20
**looting** 135:20 136:16
**lose** 168:16

RICHARDSON, JOSEPHINE

**losing** 102:16
**loss** 23:1 47:1 146:11
169:5 182:8,11,12
186:18 187:5,18,23
188:23 190:9,13,21
**lost** 34:13,14 47:5,9
89:23 102:14 136:18
138:15 147:9 161:21
162:2,2,7,15 164:25
169:10 189:6,9,18,22
190:1,2,2,2,6,23,24,25
**lot** 32:22 33:2 80:13,19
92:19 107:22 116:13,15
136:16,17 159:5 161:21
164:5
**loud** 14:4 50:7
**loudly** 8:1
**Louis** 95:25 96:1,3
**Louisa** 32:1,2,7,8
**Louisiana** 1:2,20 2:6,12
3:5,13,21 4:5,14 6:6,24
7:2 17:13,16 149:15
150:3 196:4
**love** 186:18
**loved** 65:25 66:1,2
**low** 56:6 82:8,8,12
**lower** 23:22 24:24 32:11
33:13 51:15 71:6 72:6
73:15,22 74:7 89:13,21
118:6,13,22 127:7,16
132:25 133:4,5 139:2
139:10 142:17 192:23
193:4 194:4
**Lowe's** 160:15
**Lucille** 125:16 126:22,23
129:19
**lucky** 39:14 41:22
**L-O-N-G** 31:23
**L.L.P** 1:18 2:16 3:1,10

**M**

**M** 5:1
**macaronis** 161:15
**machine** 155:14
**MAG** 1:11
**mailed** 92:4,6 130:1

**maintenance** 66:6
**making** 101:13 104:13
**Malibu** 163:3,4
**mama** 59:8 79:2 91:8
103:20 104:11,12,12
**man** 45:2 102:12 103:19
103:22,25 121:22
122:13,21 123:16,23
137:13 138:3 155:24
167:19
**Manson** 153:15,16,24
156:4,11 159:2,21,24
**map** 36:14 71:21
**Mapquest** 71:21
**marble** 156:19,20 157:9
**Marble-like** 156:17
**March** 27:22 32:2,3,4
44:5,6 106:25 107:17
**Margaret** 57:17 68:4
**Marie** 29:13
**mark** 2:17 7:8 11:2,8
92:5 138:21 151:6
152:6,7 160:3 174:25
**marked** 11:21,23 16:6,8
24:3,13 36:14,17 71:14
71:17 126:2 139:4
141:23,25 149:10,16
151:5 152:8 153:22,23
154:4 158:14,18 160:7
167:4 179:12 181:21
**married** 28:13 33:23,25
34:4,6 63:24 64:1
**marry** 28:19
**mason** 152:20 153:12
159:20
**Master** 141:12
**material** 157:4
**matter** 14:21
**matters** 25:25
**mattress** 51:24 52:19
**MAXWELL** 3:18
**Mayor** 69:14,17
**ma'am** 8:7 10:15 13:7
27:21 29:4 93:13 119:6
141:5 156:18 194:13
**McCall** 1:18 3:1

**MCCRANIE** 3:17
**MCDANIEL** 3:18
**McKenna** 108:19,20,23
109:1,5 191:14,16
192:14
**meal** 84:10
**mean** 117:10 148:24
183:23 184:8
**means** 7:25
**meant** 76:23
**medical** 51:1 97:1,6 99:2
99:11,14 110:6 186:2
**medication** 9:8 49:9
100:11,14 111:5 112:17
114:19
**medications** 109:13
110:18 111:23
**medicine** 98:5 109:1
111:7,11,13,16,19
112:12
**meet** 10:18
**meeting** 11:11 108:7
**meetings** 108:12
**members** 32:22,25 33:2
34:16 35:21 36:5
**Memorial** 107:13
**memory** 10:7,11 92:10
92:12
**men** 170:25
**mental** 108:3 111:1
146:10,24 180:16 182:1
182:15,19,25 183:12,19
183:24 184:2,10,14
185:22,25
**mention** 174:25
**mentioned** 99:7
**mess** 80:22
**message** 82:14
**messed** 71:13
**met** 10:21,25
**Metairie** 3:21 4:5,14
**microwave** 80:25 136:4
136:6
**middle** 55:18,20 80:25
140:14 145:4
**million** 140:17,20 143:12

143:15,16,17
**mind** 64:25 73:2 93:5
100:2 101:3
**mine** 72:11 126:18
127:17 138:2 148:20
151:13,16 159:7 160:15
163:3
**MINTZ** 3:10
**minute** 64:25
**minutes** 39:15 74:21
**missed** 87:11
**missing** 78:19 128:5
136:6
**misstatement** 114:6
**mixed** 106:6
**Monday** 66:10,10,12
75:24 76:15
**money** 19:17 45:7,13
46:4,6,17,22 48:4,11
137:3,7,10 143:21
145:23 148:6,7,8,18
149:11,15,21 150:5,11
171:9,10 182:22 183:11
**MONTGOMERY** 3:9
**month** 93:9,12,16 94:1
107:15 108:13 111:10
121:22 122:6 129:17
155:11,16,25
**months** 39:13,18,19 40:3
40:6,10,13 45:5 48:16
51:4,6 97:16,24 101:22
101:25 102:1,2 103:6
104:2 105:13,15 106:7
106:24 107:19,23,24
124:23,24,25 171:7
**mopped** 56:16
**Moreno** 2:10 11:4,5,6,7
11:10 20:5,11 131:15
**Morial** 45:22,23
**morning** 52:6 55:19
58:11,24,25 75:25
76:13,25 86:3,12 87:8
87:12,15,16 96:24
175:18
**mortgage** 124:2
**MORTON** 4:9

**Mother's** 82:8
**mother-in-law** 119:2
**Mountain** 30:9,11 39:7
39:11,15,17 41:19,24
62:9 63:19,22 64:8,11
64:21 78:8,22 89:8
90:24 95:8 125:15
130:1 166:23 167:18,25
170:21,22
**mouth** 167:17
**movable** 162:6,11 187:6
188:8
**movables** 187:19
**move** 28:10 51:13
**moved** 36:11 37:18,20,25
40:6,20 105:24 133:1
**moving** 85:11 97:4
**Mumford** 1:9
**murdered** 34:22
**mystery** 102:5
**M-A-N-S-O-N** 153:15

**N**

**N** 3:20 4:13 5:1,1,1,7 6:1
**Nagin** 69:14,17
**name** 7:8 12:14 15:5
19:6,7 20:7,17 21:17
30:16 44:1 50:20,24
51:2 91:24 92:15 95:17
96:2 108:18,22 110:18
110:23 111:19 123:16
123:24 136:8,10,15
143:5 146:2 153:11,15
154:1 173:3,8 183:1
191:22 192:7
**named** 7:3 14:17 29:17
158:8 179:6
**names** 31:20 95:22
116:17
**national** 38:17 72:13
82:17 83:1 94:21 96:4
103:8
**necessary** 69:25
**need** 8:18 9:17,19 19:9
23:19 68:3 77:24 91:13
108:5 111:8,23 115:22

115:25 126:8 129:13
142:7 147:9 161:12
164:10 185:13 190:18
**needed** 21:13 45:15
102:17 158:11 167:16
**needs** 7:24,25
**negatively** 111:21 121:2
**neighbor** 52:7 136:8
**neighborhood** 30:21
32:6,19 42:14 55:21
108:12 124:11 134:23
135:20
**neighborhoods** 33:16
42:17
**neighbors** 134:25 135:1
135:23 136:1,5
**neighbor-next** 55:10
**Neison** 136:11,14
**nerve** 100:24
**nerves** 49:8 111:2 112:25
**nervous** 45:2 53:6 54:15
54:20 99:21 100:16,19
101:13,19 112:23,23,25
**never** 18:15 20:8 21:14
34:19,23 50:16,22 51:3
51:7 56:3 68:5 76:17
81:17 85:21 87:8,8
92:17,19 97:10 102:4
104:8 108:6 109:23
118:3 128:6 129:12
148:10 156:6 172:17,19
**new** 1:19 2:6,12,18 3:5
3:13 7:2 17:13,16
27:20,24 28:1,2 30:8,13
31:5,7,12,15,17 33:16
33:21 35:12,15,22 36:1
40:9,11 46:4,5 48:6,9
57:15,23 61:25 64:5
65:18 83:8 121:10,11
121:15,17 135:8 158:5
164:15
**news** 66:22 69:9 84:24
117:6
**next-to-last** 130:15,24
**next-to-the-last** 130:17
**nice** 159:10

**nicer** 157:19,21,21,23
**NICOLE** 4:11
**niece** 67:14,15
**night** 75:24,24 76:3 77:7
82:7 84:14,16 96:12
**nights** 82:6
**nine** 98:5 102:1,2 107:23
107:23 119:24 124:23
**Ninth** 23:22 24:24 32:10
32:11 33:13 51:15
70:25 71:6,9,10 72:6
73:16,23 74:7 85:4
89:13,21 118:6,13,22
132:25 136:17 175:19
176:13 192:23 193:4
194:4
**nodding** 8:19
**Nods** 115:2
**normal** 56:20,21,25 57:5
57:6,7 67:10 101:1
**North** 2:15 7:10
**Notary** 14:16
**note** 169:14
**noted** 195:13,15
**notice** 6:7
**Nottingham** 31:4,5 35:15
35:19 41:10 64:6
**notwithstanding** 114:23
**number** 12:14 17:8,23
18:2 59:15 120:20
140:14,16,23 144:1
145:2 147:16,18 152:23
153:14,17 181:17 186:9
**numbers** 126:11 143:8
158:15
**nurse** 92:24
**NW** 2:18
**N-E-I-S-O-N** 136:15
**N-E-S-O-N** 136:15

**O**

**O** 5:1 6:1
**Oaks** 40:9,14,19 105:25
**oath** 6:25 7:5,19,20
**object** 47:14,16,19 52:23
148:23 169:14 176:25

177:21 183:14 184:7
186:13
**objection** 177:3 193:18
**objections** 6:11 184:22
184:24 185:3
**obligations** 176:16
**observation** 158:9
**observed** 179:5
**occupation** 44:15
**occurred** 55:4 155:3
**ocean** 40:12
**October** 28:20 29:8
**offer** 137:25
**officiated** 6:24
**oh** 11:7 25:14 28:14
29:23 32:24 37:13 42:6
43:24 47:24 48:2 50:22
52:3 59:8 70:22 85:10
88:4,4 90:22 100:9
103:15,19,25 113:3,13
116:13,24 119:8 121:21
126:18 134:25 135:22
142:2 145:13 147:7
149:11 152:25 156:23
157:21,22 158:2 164:15
166:16 169:6 175:17
179:14 191:14 194:8
**okay** 7:17 11:20 12:3
16:5,5 17:21 20:18
21:5 22:15 27:4 29:25
30:24 37:13 38:5,7
40:22 49:5 50:7,9,11
51:14 54:6 64:18 72:19
74:4 76:12 78:25 79:4
79:7 81:22 84:15 85:20
91:13 94:24 104:17
107:15 108:17 115:24
119:23 127:18 128:13
130:12,17 137:21 141:6
141:20 145:22 152:25
154:6 165:20 166:8
169:6 170:4,20 172:12
174:23 187:4,13 191:19
194:16
**old** 29:15 43:11 48:20
52:24 163:1,2,18,25

RICHARDSON, JOSEPHINE

167:15
**oldest** 31:22
**once** 8:11 28:15,16 48:24
    108:12 192:15
**ones** 33:17 99:6 110:12
    110:16 112:16 135:7
    153:13 157:19
**one-bedroom** 88:21
**opened** 109:23 193:10
**opening** 164:20
**operate** 46:8
**operation** 73:11
**opinion** 25:2 183:16
**opportunity** 190:3
**order** 7:23 8:17 141:12
    157:23 185:24
**ordering** 69:17
**origin** 141:14
**original** 6:9
**Orkin** 123:18,19
**Orleans** 1:19 2:6,12 3:5
    3:13,16 7:2 17:13,16
    27:20,24 28:1,2 30:8,13
    31:5,8,12,15,17 33:16
    33:21 35:12,16,22 36:1
    40:9,11 46:4,5 48:6,10
    57:16,23 62:1 64:5
    65:18 83:8 121:15
**Orr** 57:17 68:4
**ought** 161:19
**outfit** 76:15,17
**outpatient** 97:21
**outside** 43:8,13,16 44:9
    85:9 127:10 130:18
**overnight** 49:4,4
**overpass** 82:25,25 83:3
**owned** 37:8,11 81:17
**o'clock** 10:24 52:5 55:19
    67:20 69:4 83:17 84:16
    87:15

**P**

**P** 6:1
**page** 5:2,8 16:17 17:7
    127:6,16,19 128:8
    130:15,17,23,24 132:13

132:17 133:5 140:15
    153:22 190:1
**Pages** 17:22
**paid** 20:16 37:9 45:14
    46:1,21 121:17 148:11
    153:21 155:11,11
    156:10
**pain** 98:3,3,4 99:5,22
    109:16 112:24 182:1,15
**painful** 112:10,11
**pains** 99:20
**panel** 133:9
**paper** 15:19 21:10,13,15
    92:2,4,6,16 117:3,5,7
    175:15,16,18
**papers** 20:4 48:3 103:12
    172:10 191:24
**Parfait** 1:13
**Parish** 4:1 24:25
**park** 44:16 107:13
**parlor** 107:6,12
**part** 6:14 10:15 32:9
    46:25 96:21 97:7
    131:19 140:13 147:13
    148:4 161:20 164:14,18
    168:3,23,24 189:13,19
**particular** 191:8 193:14
**parties** 6:3 196:14
**partly** 113:6
**parts** 139:18
**party** 18:4,6,13 19:4
**pass** 30:1 56:7,7 59:11
    118:2
**passed** 153:12
**passes** 56:5
**passing** 94:10
**PAVLICK** 4:3
**pay** 19:17 46:16 115:13
    137:3,7,10 138:10,14
    146:6,23 148:6,7
    156:13 158:7,13 161:19
    161:24 162:8,16 168:8
    170:2 172:7 193:11
**pending** 21:22,24 171:15
    171:21
**people** 21:17 46:3 54:22

56:6 69:18 75:18 90:17
    90:18 95:23 107:14
    115:9 116:13,15,18,19
    116:20 117:2 136:17
    137:16 153:20 157:7
    176:12 193:6
**period** 42:2 156:2
**perished** 94:13
**permitted** 6:5
**Perry** 1:11
**persist** 100:5
**person** 21:8 95:17
    102:11,12 145:20
**personal** 145:3,7 146:9
    147:17
**PERTAINS** 1:6
**PFISTER** 4:10
**phone** 59:20 62:15 67:13
    70:21 77:10,10,11,15
    78:15 79:9,19 85:22
    89:23 90:1,4 153:14,17
    171:19 172:9,13,14
    174:7
**physicians** 191:4
**picking** 65:25
**picture** 45:15 46:9
    117:11 127:6,8,10,16
    127:18,19,25,25 128:7
    128:9 129:4 130:25
    131:10,19 132:12,14,16
    132:18 133:4,5,17
**pictured** 127:15
**pictures** 10:12,16 119:3
    119:7,11 125:23,24
    126:10,13,14,16,24
    129:14,21 130:2,7,10
    134:21
**piece** 113:25 115:12,13
**piles** 110:20
**pillars** 52:17 120:4,5
**pills** 93:2 110:8,10 111:1
**pipes** 164:17,24
**place** 71:4 72:5 73:4
    157:10,11
**places** 97:5 159:5
**plaintiff** 14:17 15:5

17:12 18:5 20:21,22
    22:8 173:11,19 174:3,9
**plaintiffs** 24:5 25:24
**plan** 50:24
**planks** 123:10
**planned** 60:4
**plans** 43:22 60:20
**Played** 65:24
**playing** 65:25
**please** 12:2 16:7,24
    24:17 30:17 136:13
    138:16 162:11
**plot** 102:9
**plug** 82:10
**plumbing** 152:16
**plywood** 67:3
**pocket** 77:17
**point** 169:22
**pointing** 11:3 19:20
**police** 94:20,22 95:5 96:3
    105:2,5 137:16 138:4
**policies** 103:12
**policy** 149:1
**Pontchartrain** 40:8,12
    40:14,18 105:25
**popped** 163:10
**porch** 120:8,11,13,16,17
    130:24
**possibly** 177:1,22,24
**potato** 44:19
**Poydras** 1:19 3:4,12
**practice** 108:20
**practices** 109:1
**praying** 90:22
**Precinct** 95:25
**predate** 113:5
**predicted** 56:1
**prepare** 9:25 10:3 144:5
**prescribed** 109:14
**prescription** 109:9
**prescriptions** 109:12
**present** 10:25 11:10
    54:25 58:7 139:22
    143:3
**pressure** 98:3 99:8,9,18
    109:16 110:3,7,11,21
    146:11,19,25

RICHARDSON, JOSEPHINE

**pretty** 51:12,25 120:7
**preventing** 75:1
**previous** 16:25 121:6
   151:11 179:15
**previously** 9:4
**pre-storm** 119:3
**primary** 50:18,20 108:15
   108:17
**prison** 101:24 105:11
**probably** 74:2
**problems** 109:19 110:1,3
   110:7,11,13,21 111:25
   112:3,6,7,13,22 166:15
   166:18
**Procedure** 6:6
**proceeding** 18:3,7,7
**proceeds** 148:25
**process** 125:17
**PROCTOR** 2:16
**produced** 141:9,16
**professional** 108:3
**profit** 189:9
**profits** 189:6,22
**project** 44:18
**projects** 44:17
**promise** 8:11
**proof** 147:21
**properly** 189:20
**property** 22:20 36:10
   37:8 75:21 80:18
   118:22,23 143:24 144:4
   144:12,20 147:13,15
   162:7,15 164:3,25
   177:14 180:19 182:9,11
   187:6,11,24 188:8,15
**proposed** 18:3 26:2
   176:8
**Propounded** 16:13 24:8
   181:15
**protect** 58:10 75:21
**Protective** 141:12
**provide** 24:25 47:10
   76:22 190:6
**Providence** 107:13
**PSLC** 2:2
**psychiatry** 108:5

**Public** 14:16
**pull** 105:9
**pulling** 154:22
**purposes** 6:5 183:7
**pursuant** 6:7
**pursue** 177:18 178:3
   179:19 180:1
**put** 12:13,15 15:22 59:14
   67:4 76:16,17 83:1
   84:19,22 102:6,8,9
   121:9,11,17,18 128:5
   129:12 135:8,10 137:14
   140:1,19 144:18 146:2
   152:16,20 155:14,15
   164:11,11,15 165:8
**putting** 66:8,8 84:18
   86:8 158:4 165:16

---
**Q**
---

**quarter** 38:8
**question** 6:12 8:25 13:2
   14:11 16:25 17:24 18:1
   24:20 25:7,11 46:11,12
   47:22 48:1 50:4 53:1,2
   54:3,4 64:16,17 74:3
   79:8 92:11 98:20
   115:17 126:8 128:13
   131:16 137:22 138:6,8
   138:25 142:15 145:18
   147:17 148:24 149:4
   151:11 161:12 166:8,17
   172:23 177:22 179:7,15
   183:7,9,11,15,20 185:5
   185:8,9,13 192:25
   194:2
**questioning** 141:13,14
   184:8
**questions** 8:14,19,24
   20:25 36:12 43:25
   91:15 181:16 184:23
   185:22 192:17,20
**quick** 151:7
**quite** 49:3

---
**R**
---

**racking** 100:24

**radio** 70:24
**Raffman** 2:17 5:3,5 7:6,8
   12:1 14:3 16:11,22
   17:3 20:9 24:16 36:25
   43:7 47:17 48:8 50:3
   50:12 53:3 54:8 71:20
   79:17 92:14 99:1 114:9
   114:12 126:7 131:17
   134:4 138:7,20 139:8
   141:15,21 142:3 149:3
   149:8,19 151:14 152:10
   152:21 154:7 158:21
   160:10 161:7,11,16
   162:12 169:21 170:13
   170:18,23 172:25 175:3
   175:9,11 177:4 178:2
   178:10,14,19,25 179:3
   179:18,25 180:4 181:11
   181:24 183:10,22
   184:19 185:6 186:16
   191:2,15 193:17,22
   194:1,12
**rain** 87:20,20
**raining** 87:21
**raise** 11:5
**raised** 94:15 120:2
**ramifications** 177:23
**ran** 90:7
**Rapids** 19:18
**Ray** 30:15,19,20 35:10
**reach** 128:2,25
**reached** 29:15
**reaction** 99:15,23
**read** 3:9 13:19,25 14:2,4
   14:19 15:12,19,25
   16:23 17:1,8,18 18:21
   140:8,10 143:14 151:12
   161:1 179:16
**reading** 6:8 11:14 13:22
   14:7 27:10 175:17
**ready** 10:18 57:11,12,13
   58:3 66:9 67:7
**real** 71:1
**really** 51:7 67:2 97:9
   102:20 116:21 117:19
   144:6 163:19 167:15

**reason** 9:12 49:6 92:21
   165:16
**reasons** 25:1 75:11
   150:18
**recall** 174:18
**receipt** 160:22 161:2,25
   166:6,13
**receipts** 150:15,19,23,25
   151:1,9,15,25 160:5,11
   160:16 166:9 167:1
   186:1
**receive** 148:18 170:5
   171:9,10
**received** 147:25 148:25
   149:23 150:2 173:14
   174:1,13
**recess** 43:6 79:16
**recognize** 12:4 15:4
   16:17 17:2 24:9 36:15
   71:22 139:14
**recollection** 9:14 10:6
**record** 49:23 79:8 86:22
   95:4 98:14 126:10
   138:19 141:9 152:17
   170:15 178:17 181:10
   191:1
**records** 48:7,10 97:1
**recovering** 103:1
**recross** 193:23
**red** 36:15 37:1 51:23
   174:16,17,18,21
**redo** 123:3
**Redwood** 34:25
**referencing** 141:11
**Referring** 165:11
**reflected** 154:2
**reflecting** 48:10
**reflects** 86:22 149:14
   154:8
**refresh** 10:6,6
**refreshed** 10:11
**refrigerator** 80:24 84:20
   162:3
**regarding** 20:11,14 97:1
   187:10
**regular** 108:15

RICHARDSON, JOSEPHINE

**relate** 146:9 182:7
187:24 188:17,20 189:2
189:3,9 190:5,12,16
**related** 180:11 186:23
187:1 196:14
**relates** 182:4,8
**relatives** 64:12
**released** 107:20
**relocate** 41:17,18,20,24
**rely** 25:3
**remember** 9:2 11:13
15:20 16:21 27:10,13
27:14 56:12 57:19
61:16 65:13,13 71:1
81:21 83:16 92:17 93:9
94:7 98:8 117:2 122:2
122:9,11 134:20 143:20
144:3,23,24 147:6
174:19 176:4
**reminds** 145:25
**removed** 112:5
**render** 177:24
**repair** 123:7,13 150:5,12
153:3,4 154:9 156:11
158:23 159:22,25
**repaired** 154:15
**repairing** 137:5,9 150:8
153:8
**repairs** 125:18 138:10
150:20 153:2
**rephrase** 169:23 185:9
**replace** 51:22 53:9,9,19
53:21,22,25 54:9
137:11 156:24 157:1,3
157:25 165:17 168:21
168:24
**replaced** 147:10 156:22
157:2 192:10
**replacement** 51:10
144:16
**report** 138:4 158:16
**reported** 63:6 101:23
137:15,16
**reporter** 1:23,25 6:23
7:18,23 8:1,9,17 127:5
136:12 142:8 196:3,25

**REPORTER'S** 196:1
**reports** 68:17
**represent** 21:19 126:9
153:1 170:14 176:12
**representative** 18:4
176:9,11,15,16,22
177:6 193:15
**representing** 2:2,15 3:8
3:16 4:1,8 36:16 71:23
**require** 110:6 193:13
**required** 108:2
**requires** 183:15
**reserved** 6:13
**reserves** 98:15
**responses** 11:17 14:20
15:12,15,18 24:10
**responsibility** 176:21
**responsible** 193:6
**responsiveness** 6:12
**rest** 91:1 95:6 176:12
**restriction** 113:4
**restrictions** 114:15
**result** 45:7 147:1 196:16
**resulting** 109:6
**retired** 43:18
**return** 46:14
**returned** 35:25 124:13
124:15 125:8
**returns** 45:18 46:13
**review** 10:2
**reviewed** 10:6,10 16:19
24:10 181:6,7
**RICHARD** 4:3
**Richardson** 1:17 5:9,10
5:11,12,13,14,15,16,17
5:18,19,20,21,22,23,24
7:1,7,14 9:7,24 11:13
11:23 12:4,8 14:15,17
15:5,8,24 16:8,16 17:12
17:15 18:6 22:18 24:13
25:8,23 26:13 27:3,6
28:12,18,19 29:6,7,8,9
29:23,25 30:12 35:1
36:14,17 37:11 39:6,11
43:8 44:2 60:17 62:16
71:17 125:25 126:2,11

126:12,15,22,23 138:23
139:1,4 141:22,25
142:16 143:18 145:4,12
146:8,22 147:14 149:9
149:10,14,16 151:5,5
152:7,8,12 153:6,23
154:1,3,4,8 156:14
158:15,18 160:3,4,7
165:12 167:3,4,21
171:24 172:4,5 173:4
173:12,20 174:3,9
175:1,12 178:15 179:8
179:12 180:12 181:12
181:21 182:20 183:25
184:20 185:7 186:6,10
186:17,24 191:3 192:22
194:3 195:3,11
**right** 8:3 11:4 12:3,7,9
12:17,20,23,25 13:14
13:15,19 14:12,14 16:1
17:10,25 18:20,23 19:3
19:7,13,13,14,24 22:14
23:5,10,14 24:8,19
26:18,21 27:9 28:13
29:2 30:22,22,25 35:24
36:23 37:21,22 40:5,21
40:21 41:20 42:5,14
43:5,12 44:3 46:2 47:1
48:12,21 51:1,16,25
52:10 53:20 54:6,18,19
55:22,22 56:11,18
58:18,19,22 59:9,11
60:1,2,5 61:10 64:13
65:2,6,10 66:14 67:18
68:9,10,12,13,19,22
71:25 72:3 73:19 74:7
75:2 76:10,11 79:11,23
81:9,14,24 83:22 89:12
90:8 91:2 94:4,5,5 99:4
99:7 101:17 104:16
105:21 106:9 108:25
111:14 113:22 115:5,7
115:22 116:1,17 117:9
117:9 118:25 122:8
125:25 128:10,14,22
129:5 130:5,13,16,21

130:23 131:19 132:12
132:12 133:1,6,7 134:5
137:6,9,13 138:11
139:9 140:4 143:13
144:11 145:19 146:8
147:11 148:14 149:14
150:11,13,22 151:10,15
151:22 152:6,22 153:22
156:21,22,25 158:1,5
160:21 161:17 162:5
163:8 165:11 166:6,21
167:6,11,25 168:1,1,4
168:10,10 169:10,11,11
169:11,18 170:3,14
172:15 173:6,19 174:8
174:15 175:4,10 176:10
178:12,20 182:2 186:2
186:6 187:2 189:16,17
189:17,20,23 191:25
192:16,19 193:5
**rights** 98:15
**right-hand** 139:2
**ring** 133:16,18,19,19,20
**risk** 55:1,5
**risks** 55:4
**Rita** 130:6 136:9,14
**river** 39:20 109:10
124:17,19 165:24
**road** 7:15 58:16 149:12
149:13,15,21,24 150:3
173:21,23
**Robert** 19:5,6 158:8
159:25 179:9
**rode** 118:17
**rolls** 101:3
**RONALD** 3:11
**roof** 19:16,18 77:24
79:23,25 80:3,7,10,11
80:13,16,20 81:5,6,7,9
81:10,11,13,23 121:10
121:11,18 135:1,2,10
153:3,4
**roofs** 121:17 134:24
135:5,8,11
**room** 85:6,7 86:8 96:8
120:20,20,23 123:9

RICHARDSON, JOSEPHINE

**rooms** 119:21,24 120:22
  155:1
**Rou** 97:20 98:1 109:9
**Rouge** 33:22
**rough** 76:4,24 85:3,12,12
**round** 86:6,6
**RPR** 1:24 6:22 196:2,24
**rule** 115:25 177:2
**rules** 7:15,16
**run** 68:13
**running** 75:7 164:1
**R-O-U** 97:18,19

---

**S**

**s** 2:17 6:1 22:12 31:24
  32:7 33:5 62:6 70:7
  71:24 72:17,22 73:8
  74:1,9,14,18 75:23
  78:12 82:2 83:12,21,25
  85:6 89:19 169:2
  186:10 193:9
**safe** 51:24 53:7 54:12,13
  54:13 69:11,12
**safer** 71:4 72:5 73:3
**safety** 54:15,20 61:2,9
  63:5,7,8 68:20
**sales** 44:22 124:10,10
**salvage** 188:7
**sat** 70:10
**Saturday** 57:2,5,7,20,21
  58:24,25 59:21 60:3,8
  60:15,19 61:6,6,13
  62:20,23 65:6,7,12,15
  83:9 88:11,13 108:8,11
  108:14
**save** 6:8,11 162:4
**saved** 86:9 150:15,18
  159:2
**saw** 21:10 71:8 89:16
  90:17,19,20,20 103:14
  106:10 108:6 116:8,12
  116:13,18 117:7,17,20
  117:23 118:1 135:6
  160:14 165:13 175:15
  175:24
**saying** 27:2 50:2 59:8

**77:25** 82:12 117:2
  158:10 190:22
**says** 14:15 17:11 25:24
  53:23 76:11 112:14
  142:18 143:18,19,25
  146:10 172:4 173:11,19
  174:18 177:2 186:18
**SBA** 171:10,14,18,22
  172:6,13,18 174:4
**scared** 53:5
**scattered** 33:19,20
**school** 35:2,4 68:14
**Seabrum** 88:22
**sealed** 107:3
**search** 87:24
**second** 42:12 93:23 94:2
  127:6,16 128:8 130:21
  183:3
**SECTION** 1:7
**Security** 45:13
**see** 12:25 13:1,24 18:8,9
  25:22 26:4,6 36:4,20
  60:13 66:16 76:12
  85:10,20 102:3,6 107:2
  113:24 116:2,11 117:14
  117:19 124:20 127:7,18
  128:20 130:25 131:6,14
  132:18,20 133:9,13,23
  134:2,3,23 135:13,16
  139:1,3,11 140:13,15
  140:17 141:10,22 143:8
  143:12,16,24 144:1,2
  145:3,5,6 149:20
  152:22,23 154:10
  160:22,23,25 166:7
  167:22 172:4 173:3,4
  173:15,21 174:4,10
  175:16,18 182:19 183:2
  183:4 185:18 186:20
  187:6,19 188:8,15,25
  189:7 190:3,9 192:2
**seeing** 122:12
**seek** 143:21
**seeking** 22:19 23:1,5,13
  98:11 145:8 150:13
  180:16,18,21 181:19,25

**182:22** 183:12,24
  184:14
**seen** 13:2
**Self-employment** 44:14
**send** 82:15 93:8 105:6
  119:12
**senior** 39:14,16
**sense** 159:19
**sent** 49:4 105:5
**sentence** 26:5
**separate** 23:8
**September** 93:14,15,18
  97:3 102:22,23
**serious** 68:7
**service** 94:17,18,18
  186:19
**Services** 153:24
**set** 181:13,19 196:7
**seven** 28:22,23,24 39:18
  39:19 40:3,6 44:23,24
  45:1 84:13,16 97:16,23
  101:25 105:13 106:17
  106:17,23 124:24,25
  171:7
**SF** 138:21 142:4,10
**Shakes** 111:21 121:2
**shaking** 8:20
**shapes** 93:4
**shelter** 39:4 88:15
**shift** 27:15
**Shingles** 135:3
**shoe** 166:2
**shoes** 166:2
**shorthand** 196:9
**show** 11:20 17:21 71:14
  151:4
**showed** 16:20 153:13
**shower** 70:11
**showing** 89:18 125:25
**shown** 71:16
**sic** 128:4
**sick** 51:7
**sicker** 104:13
**side** 32:14 52:9 72:2
  117:5 127:14 133:9,13
  160:23

**sign** 15:9
**signature** 13:21 15:3,4,4
  15:6 139:2,11,12,13
  142:18,18,20
**signed** 15:23 16:1 24:11
  27:11 140:6,7 144:8
  195:11,13,15
**signing** 6:9 15:11,19
  16:19 140:8 181:6
**simply** 157:25
**sir** 21:24 63:23 148:2
  150:11 151:23,23 158:2
  158:6,6 160:18 188:5
  190:4,11,14
**sister** 62:9 63:19 103:15
**sisters** 31:16 63:25 64:2
**SISTRUNK** 3:17
**sit** 25:15 27:5 46:20
  48:13 129:7 165:2
  168:7 179:20 186:8
**sitting** 117:4,11,13 122:1
  122:12 187:23
**six** 29:17,18,21 38:21
  44:25 45:12 51:4,6
  83:7,8 99:14
**slacks** 128:4,19 129:11
**Slidell** 33:22
**small** 51:22 60:22,25
  138:24 171:10
**smaller** 60:24
**Smasher** 123:18,22,25
**smoke** 49:14,15
**smoked** 49:11,12 161:15
**smoker** 49:10
**snake** 86:4
**Social** 45:12
**society** 186:19
**soft** 44:19
**sold** 44:18 119:1
**somebody** 71:7 75:17
  82:11,15,15,16 107:25
  129:11 178:7
**son** 30:13,24 31:2,7,10
  34:10,11,14,21 35:8,14
  35:17 39:5,15,21,23
  40:23 41:3,13 60:9,15

RICHARDSON, JOSEPHINE

60:18 61:1,12,15,17,25
62:6,17,19,22 63:1,21
77:1,20 78:1,7,10,14,22
79:18,20 80:1 88:17,25
92:3 93:20 94:9 95:2,4
96:16,18 103:5,17,19
104:4,11,14 105:16,18
124:18 125:15 129:18
130:10 132:4 134:6,9
134:12,13,18
**sons** 33:23 125:17,20
**Sontheimer** 107:9
**son-in-law** 40:7
**soon** 82:14
**sorry** 10:14 11:8 29:24
40:17 47:18 50:9 60:16
77:12 115:18 125:6
150:1 185:21 190:19
**sort** 46:7
**sought** 6:15 109:4
**sounded** 138:1
**sounds** 68:6
**space** 34:13,16
**speak** 7:25 8:1 40:17
50:7 78:1
**speaking** 8:11 184:23
**speaks** 161:10 169:15
**specifically** 6:10 25:4
123:20
**spell** 30:16 136:12,15
**spelled** 143:5
**spend** 32:22 157:24,25
166:3
**spent** 33:2 150:8,12
153:2,8
**spoke** 96:20 175:13
**spoken** 8:19 52:25
**spot** 117:15
**sprayed** 122:11 155:15
156:7
**square** 121:1
**Sr** 22:18 28:18 29:6
35:23 36:3 44:2
**St** 24:25 44:17 105:12
106:11,16
**stack** 150:23 160:5,12

175:5
**stamped** 126:13
**stand** 105:7
**standstill** 89:3
**star** 71:22
**start** 13:20 38:5 84:18
86:7 101:13 126:9
155:12,17 158:11
**started** 57:18 154:22,24
156:2
**starve** 115:9
**state** 6:23 48:6 196:3
**statement** 114:7 141:11
**States** 1:1 24:22 139:15
141:17
**statue** 103:16
**stay** 38:9 39:3 45:1 49:3
60:4,12,20 61:25 62:11
64:24 70:3 75:9,10,12
75:20 87:10 128:7
167:17
**stayed** 38:16 40:3,3,10
51:12 52:13 56:4,5
58:9,19 62:2,5 83:2,5
86:1 88:24 89:5,17
97:17 105:13 118:7
**staying** 39:12 60:8
**steal** 136:20
**step** 129:2
**steps** 73:19 120:9,10,16
120:18,19,19
**sticker** 12:13,15,25
**STIPULATED** 6:2
**stipulation** 7:4
**stole** 138:2 164:22
**stolen** 138:15
**stomach** 98:3,4 99:6,21
99:21,22 100:9,11
109:17 111:25 112:3,7
112:13,15,22,23,24
**stone** 30:9,10 39:7,11,15
39:17 41:19,23 62:9
63:19,22 64:7,11,21
78:8,21 89:8 90:24
95:7 102:9 125:14
130:1 166:23 167:18,24

170:20,21
**stones** 120:6
**stop** 185:3
**store** 166:2,3
**stories** 119:20
**storm** 30:25 31:11,14
32:17,21 33:3,6,12,20
35:22 37:12,14,16,20
38:4,6 41:7,21 44:22
48:25 49:1 52:4 53:5
53:17,18 54:23 56:7,13
57:2,23 59:21 61:2,13
62:3 64:10,22 65:12
66:17,22,25 67:2,7,13
68:5,17,18 75:19 79:10
79:11 80:19 82:2 85:9
89:14 92:18 93:19
94:14 99:3 100:3 103:6
114:3,8 116:4,5,6 118:7
118:18 119:5,13 121:12
121:24,25 122:12,23,25
123:7,13,21,22,23
124:25 125:4,9 132:25
135:21 137:12,20 155:3
155:7 156:7,14,17,22
157:5,13,19,20 162:7
162:15,18 163:23 165:1
191:17 192:3,13
**story** 38:2 67:23 101:3
**stove** 80:24 157:2
**straight** 91:14
**straightening** 66:2
**street** 1:19 2:5,11 3:4,12
7:2 17:13 30:17,18
32:7 36:19 37:2,6 38:1
40:20 52:2 54:18 55:24
60:4 90:20 94:19 105:7
118:17,21 119:4 136:9
188:18,21
**streets** 36:23
**strength** 112:20
**stress** 93:2 98:2 99:5,17
100:24,25 101:5,6,15
107:23 109:16 111:2,3
111:7,11,13
**stressed** 23:18

**stressful** 100:22
**stretch** 9:18
**strip** 123:9
**stroke** 50:15
**strong** 103:10
**stronger** 110:16 112:15
112:18
**struck** 38:19
**structural** 158:8
**struggle** 17:9
**stuff** 36:10 75:18 121:13
121:16 123:12 136:18
136:18 143:2 162:2,3,4
**subject** 25:25 177:2,25
183:18 188:11
**submit** 171:17,22 173:23
**submitted** 25:23 142:5
142:11 172:5,12 173:12
173:20 174:4,6,10
**submitting** 146:22
**subsequent** 26:2
**substantially** 23:21
24:23
**sue** 21:2 22:3 23:16,17
179:23
**sued** 21:3 23:20
**suffer** 112:21
**suffered** 22:24 99:3
146:25 176:18,19,20
**suffering** 182:1,15
**sufficient** 8:20
**suggest** 55:8 72:20,24
**suggested** 64:20 68:24
70:2 79:13
**suggesting** 69:17
**suggestion** 55:13 69:3
**suing** 21:17
**suit** 21:9 22:5,6,9,15,16
22:22
**Suite** 3:12,20
**sun** 87:17
**Sunday** 58:11,20 65:20
65:23 66:16,22 67:1,3,6
67:10,12,16 68:16
69:13,16 75:24 77:7
82:6 83:13,14 88:12

96:12
**sunrise** 88:1,3
**Superdome** 38:20,22,23
38:24 61:23 83:5,5
88:8 90:14
**supermarket** 116:20,23
117:1
**Superseding** 24:6
**supervision** 196:10
**Supplemental** 24:6,7
181:14
**supplied** 140:3 150:22
150:25 151:9,17,19
**support** 151:21 152:1,4
186:19
**supposed** 20:20 22:2
127:24 128:5 129:12
144:15 145:9 177:5
180:23
**sure** 8:16 19:2 20:24
25:21 30:17 37:15 38:6
46:1,19,24 49:16 50:5
51:6 54:16 55:3 59:8
60:6 62:21 68:11,12
73:5 74:12 76:10 83:18
86:25 87:4 93:24,25
94:23 113:8 115:8,21
119:8 129:25 130:14
131:20 135:4 136:16
137:8 140:21 141:18
146:7 148:12 154:20
159:10 160:1 165:5
171:3 174:2,14 180:20
189:12 193:8,12,19
**swore** 15:22
**sworn** 7:4 196:6
**symptoms** 109:5 112:21

---

**T**

**T** 5:1,7 6:1,1 88:19,20
**table** 86:9
**take** 7:24 8:10,18 9:17
9:18,20,22 14:9 17:4
38:9 43:4 44:21 46:9
55:12 56:9,22 67:3
79:14,14 83:7 97:11

100:10,14 110:8,10,16
110:18,20 111:1,3,5,7
111:13 112:12,16,17
123:4,6 126:24 127:5
128:15 129:20,24 141:3
149:9 151:7 159:3
168:14
**taken** 6:5 9:7 45:15
111:11,16 127:2,3
129:15,16,19 130:3,7
135:24 137:19 169:23
195:25 196:8
**talk** 12:21,22 21:16 59:3
60:7 61:12 62:22 65:11
67:12 77:2,4 132:7,8
**talked** 21:14 59:20 62:24
68:23 77:5,6,8,9 78:4
79:3 96:11 187:16
**talking** 53:25 54:10
57:18 68:4 74:12 108:6
116:21 126:9 157:8
173:10 190:21
**talks** 118:8
**TANKERSLEY** 4:2
**tax** 45:17 46:13,14,16,22
124:4
**taxes** 45:14,22
**tear** 159:3
**teeth** 166:12,14,14
**telephone** 90:4
**television** 66:16 84:25
**tell** 13:21 19:3,14,24
21:11,12 22:16 26:10
45:6 48:14 51:18 52:24
53:4 55:17 58:7 59:6
60:19 62:25 63:11
64:19 66:21,24 67:18
67:23 69:6 70:16 77:19
78:19 81:12,15 82:1,3
91:8,8 94:12 96:12,18
101:2 104:11,12,12
105:1,19,20 109:13,21
111:20 112:3,7 113:11
116:8,12 117:20,23
118:1 130:14 132:8
134:18 135:23 138:4

140:19 147:4 148:12
155:2 158:22,25 159:12
162:6,14 169:4,16,17
185:8 191:11
**telling** 58:11 69:8,17
70:1 90:19
**tells** 113:16 115:3
**temporary** 41:14
**ten** 10:24 39:15 52:11
70:14 155:19,22
**Tendering** 16:10,14 24:4
181:17
**Tenet** 50:19 97:9
**terminate** 185:1
**termite** 121:22,23 122:8
122:16,17,21 123:14,17
154:9,14,16 155:6,8,21
156:11
**termites** 121:19 122:5,10
122:14,22 123:1 154:16
154:25 155:18 156:1,3
**testified** 7:5 174:13
178:21 184:10 187:9
**testify** 9:13 10:8 196:6,7
**testifying** 7:19,20
**testimony** 8:18 9:10 14:9
114:7,13 122:4 127:5
154:15 169:25 195:4,6
**tests** 106:13,14
**Texas** 38:25 39:1 59:2,16
61:12,20 62:8,8,11
88:10,14 89:16
**text** 15:2
**thank** 174:23 194:13
**thereof** 6:14
**they'd** 45:24
**thing** 51:9 59:16,17
82:12 99:17 123:11
**things** 101:19 115:25
135:24 147:8,9,12
152:20 156:25
**think** 25:18 26:18,20
30:19 32:1 39:21 48:9
49:2,15 50:5 58:25
59:12 61:22 68:3 70:12
71:15 73:3,25 74:9,11

89:16 93:24 96:9 97:19
99:13 102:22 108:21
110:19 114:6 129:11,13
129:23,25 144:11,18
146:17 148:8 152:1
164:10 165:2,4,4,6,10
170:11 182:17 183:3,15
187:15,22 188:2,4
192:12
**thinking** 69:7 101:19
191:8
**third** 39:21,23 88:25
132:17 185:17
**thirty** 33:9,10 90:18
**Thornton** 107:8,8,8,9,9
**thought** 11:7 46:18 48:2
64:23 66:11,12 71:4
72:4,7,8 73:1 74:11
178:20
**thousand** 145:4,6 146:5
165:1,5 170:10,24
171:1,2 175:8
**three** 4:12 34:16 38:16
38:18,20 39:13 52:17
53:1 62:17 65:17 72:13
78:12 79:2 82:5,6,16
83:6 84:8,9 87:14 88:6
88:8,24 89:17 93:24
94:17 95:1,19,20,22
96:5 120:4,6,6,19
174:20,21,22
**till** 38:17 106:20
**time** 6:13 9:16 24:11
30:3,7,14,25 31:3,11,14
31:17,25 32:17,22 33:3
36:8 40:18 42:2 43:15
43:21 44:8,11 45:1
48:19 51:21 54:18
55:23 57:10,14 67:18
69:2,5 74:18 76:13
77:7 78:1,5 79:8 83:11
83:16,18,19 84:12 85:1
87:3,5 88:14 89:19
90:14 93:3,7,11,23 94:2
94:6,7 95:12 101:13
102:7 104:4,14,17

RICHARDSON, JOSEPHINE

8/11/2008

Page 19

106:6,21,22 107:24
121:9,24 122:11 123:19
124:13 130:6 161:22
165:24 166:4 172:19
175:13 176:7 192:17
**times** 70:14 92:19,22
97:13 111:10,12
**title** 148:19,20 149:1
**titled** 181:13
**today** 7:19 9:10,14,25
10:3,8,19,22 13:3 14:10
22:13 25:15 27:5 33:1
34:6 36:1,7 43:12
46:20 48:13 100:10
101:5,14,16 102:5
110:24 129:8 165:3
168:7 179:20 186:8
187:10,23 188:12
194:14
**told** 35:10 40:7 52:8
67:16 71:7 73:7 75:20
76:8 77:22 78:3,5,9,10
79:2,13,18,20,22 80:1,4
82:10,23 85:12,15,18
91:7 92:24 93:20,21
94:9 95:2 103:17 104:8
104:10 105:4,6 106:1,2
106:7 108:10 113:14,21
114:3 116:18 117:17
118:6 121:25 132:4,5
134:5,8,9,15 148:10,10
154:24 156:4,4 159:9
159:11,16,25 169:20
171:12,19,20
**tomorrow** 76:14 85:20
85:21
**tool** 81:19
**tools** 81:23
**top** 131:1 135:14 153:18
162:20 166:20 168:24
**tore** 156:23
**torn** 159:1,5
**total** 146:3
**tow** 163:14
**towel** 165:9
**towels** 165:8

**town** 32:9 58:17,23 59:4
59:24 83:7
**traceable** 100:2
**trade** 44:15
**trailers** 101:25
**transcribed** 196:10
**transcript** 6:9
**transcription** 195:5
196:11
**trap** 184:9
**trapped** 78:20
**treat** 191:9,12
**treated** 98:1 109:18
191:4,6 192:13
**treating** 155:17,19 156:3
**treatment** 109:4 110:6
184:11,15
**trees** 85:11 135:13
**tried** 70:15 89:1 91:5
104:12 144:25
**trip** 92:21 129:21
**trips** 91:21 97:2,7 108:1
165:22
**trouble** 14:6 25:10,13,19
65:2 68:1
**truck** 44:16,22 45:8,14
46:8,10,17,23 47:4,11
48:11,16 56:22 57:3
65:21,24,25 66:1,2,4,5
133:8,10 163:15 189:3
189:4
**trucks** 75:7 83:4 101:24
130:22 132:9,24 162:17
162:21,24 163:1,16,20
164:23
**true** 14:22 17:17,19,20
18:10,11 23:25 159:20
169:9 195:7 196:10
**trunk** 163:10
**truth** 196:6
**truthful** 9:10
**truthfully** 9:13
**try** 8:6,7,12,14 40:18
70:14 79:7 111:3 159:4
159:7
**trying** 26:10,12 52:24

58:16 64:16 73:20 90:8
100:25,25 101:1 107:19
114:10 117:16 147:20
153:5 164:7 168:13
**Tulane** 110:17 192:2,8
**turn** 24:17 132:13
**turned** 106:12,22
**TV** 57:17 66:18 70:1,23
76:1 77:25 84:23,23
85:8 89:15,17 90:19
117:3 119:9 136:3,5
**Twelve** 30:2 34:9
**twenty** 74:21 111:12
**Twenty-eight** 39:12
**twenty-five** 90:18
**twenty-one** 170:10,24,25
171:2
**twice** 78:21 91:11,19,19
104:24 119:22 159:3
**twins** 29:10,14,19 96:1
**two** 22:14 23:12 26:8
29:11 31:19,20 35:3,4
36:23 37:19 39:13 52:5
55:19 60:25 62:15
63:24,25 64:1 69:4
75:6 77:4 78:18 79:2
86:4 88:19,24 89:10
90:24 92:22 93:8,10
94:3 96:19 97:2,7,21
101:21 103:6 104:2
105:15 106:4,4,12
108:1 122:13,19 128:4
132:9,21,24 133:5
145:16,22 146:4,14,16
152:24 154:25 162:17
162:24 163:1 167:2,6
182:15 184:23 187:12
187:25 192:14
**type** 11:14
**typed** 16:4,18
**typewritten** 16:3
**Tyrone** 88:19 96:3

---

**U**

**U** 6:1
**uh-huh** 18:19,22 21:1

27:4,18 31:9 32:5
33:11,22 35:7,13 36:2
42:3 44:7 46:9 57:1
59:22 61:4 63:10,23
65:16 66:7,20 69:23
70:4 73:24 74:5 77:15
81:4 83:15 84:3 85:7
96:17 97:15 98:24
99:25 101:18 112:19
114:4 120:15 125:1
127:23 128:17 132:23
135:12 137:21 139:13
142:6 146:12
**um** 30:15 50:18 51:1
73:7 84:13 89:16 98:25
109:22 184:11
**Underneath** 15:2
**undersigned** 14:16
**understand** 7:16,21 8:4
8:21,23 9:5,22 14:25
20:24,25 25:7,13 26:16
26:23 42:12,16,18 46:2
46:13 53:24 54:10 81:6
176:8,10,15,22 177:23
184:17,25 185:4,8,9,10
185:15,24 189:13,20
**understanding** 122:17
196:12
**understands** 184:20
**understood** 54:24 144:14
165:15
**undertaker** 146:3
**Unh-unh** 42:9 117:25
161:3 183:2
**unit** 136:21
**United** 1:1 24:22 139:15
141:17
**upgrade** 157:12
**upgraded** 157:16,17
**upper** 32:11,12 127:18
127:19 128:8
**upside-down** 80:22,24
86:9
**urge** 59:23 113:24
**Urquhart** 36:20,21,22
105:7

RICHARDSON, JOSEPHINE

**USA** 1:13,14
**use** 187:19,23
**usual** 57:4
**usually** 56:5,7,18 59:11

---

**V**

**v** 1:8,9,10,11,12,13,14
**value** 124:5 188:15,17
**van** 62:12,18 63:15,16
 132:14,15,17,18,19
 133:12,16
**vandalism** 135:19
**vandalized** 164:14,17
**Vandals** 136:22
**vans** 132:21
**vegetables** 44:19
**vehicles** 133:6 187:12
 188:1
**Venetian** 164:6,24
**verification** 11:22 12:24
 14:14 16:1,19 24:12
 27:11 181:7
**verifies** 14:19
**verify** 106:13 151:8
**view** 99:24
**Villere** 36:22
**visit** 42:10 51:5 92:19
 125:21
**visited** 125:3
**voice** 8:6,7

---

**W**

**waist** 86:23,25
**wait** 95:25 106:20
 171:12,20 172:20,22
**waiting** 38:21 102:3
 107:23
**waived** 6:10
**waiving** 98:16
**walker** 73:12,13
**walking** 73:13 98:7
**wall** 117:24 118:2
**walls** 52:16 123:4,6
 125:11
**Wal-Mart** 160:23 165:13
 165:23 166:5

**Wal-Marts** 160:14 164:5
**want** 9:17 13:9,25 20:24
 29:2 36:12 43:3,25
 68:2 73:10 75:13 78:22
 79:14 91:5 92:13
 100:10,14 103:20
 104:25 113:25 123:20
 132:13 138:9,13 141:4
 149:2,6 151:1 162:7,16
 166:24 168:7 184:4
 185:25 193:6,11
**wanted** 38:9 58:9 73:9
 75:15 81:22 130:9
 159:1
**Ward** 23:23 24:25 32:10
 33:13 51:15 70:25 71:6
 71:10,10,11 72:6 73:16
 73:23 74:7 85:4 89:13
 89:21 118:6,13,22
 132:25 136:17 175:20
 176:13 192:23 193:4
 194:4
**wards** 175:20
**Warner** 96:2
**washed** 56:16 84:19,21
**Washington** 2:19
**wasn't** 43:10 51:7 52:12
 61:23 68:14,24 73:5
 74:3 75:3 90:10 94:24
 94:25 96:10 117:12
 118:14,15 120:7 128:12
 128:20 145:24 148:11
 157:11 166:21
**watch** 66:15 87:3
**watched** 66:18 68:17
 76:1 84:25
**watching** 84:23,23 85:7
**water** 42:7,9,22,23,25
 44:19 51:20 52:6,8,12
 69:10 72:8 82:9,22
 86:3,11,16,22 116:9
 117:13,21 118:15 119:9
 123:8 131:25 132:2
 133:19 134:6,15 162:20
 163:11 193:3
**way** 42:18 46:21 48:24

52:10 54:3 64:17 79:11
 80:15 81:12 90:8 96:22
 99:18 105:8 128:2,15
 129:1,5,9 131:11,19,25
 133:1 143:20 155:5
 165:23 169:7 170:1
 176:17 196:15
**weather** 57:17
**Wednesday** 106:11,18
 106:19
**week** 34:9,11,13,15,17
 34:18 44:21 88:13
 90:12,23 106:20
**weeks** 78:18 79:2
**WEINSTOCK** 4:10
**welcome** 9:3
**went** 38:10 39:1,10,20
 46:18 50:23 52:10
 61:22 62:8 63:4,17
 68:16 70:10 72:9,21
 79:5 80:18 82:6,22
 83:20,20 86:17,18,23
 87:3,5,17,22 88:15 89:6
 91:18,25 92:23 93:5,7
 93:23 95:14,21 96:5,23
 97:13,15 98:6 103:3,8
 108:7 134:22 159:8,21
 159:24 162:4,20,22
 163:9 164:6,19 169:2
**weren't** 67:2 72:14
**west** 32:14 72:1
**wet** 52:18 163:8,9
**we'll** 9:21 14:4 38:5
 60:13 170:19 171:6
 175:5 185:15
**we're** 8:10 22:13 58:18
 58:18 59:10 130:23
**we've** 33:1
**whipping** 76:2
**whirlpool** 82:22
**white** 121:12,16 126:13
 156:19
**WIEDEMANN** 2:9,9
**wife** 34:7,8,21 41:4 62:4
 62:6 91:7 103:5 124:20
 125:16

**WILKINSON** 1:11
**wind** 19:23 20:2 59:18
 72:8 76:1 80:13,13,19
 80:21,22,25 85:10
 87:19,19 135:11 148:17
**windows** 67:4 133:9,13
 152:15
**witness** 6:4,25 7:3 12:3
 20:3 25:1 47:23 50:8
 54:5 92:1 98:21 108:24
 131:13 133:22 184:25
 185:4 194:15 195:1
 196:5
**women** 64:1
**women's** 101:24 105:11
**wood** 123:3 154:12
**words** 7:24 8:10 53:1
 87:11
**work** 43:8,13,16 45:8
 56:23 65:21 66:13
 153:20 154:21 160:2
 167:10,14
**worked** 44:13 137:16
**workforce** 43:18,23
**working** 43:10 44:9
 45:13,24 66:5 136:25
 137:1 152:19 154:24
 158:11
**works** 95:24 96:2
**worry** 53:19
**worrying** 67:2 100:9
 102:15
**worse** 112:9 114:18
**worth** 140:24,25 163:22
 165:1,5
**wouldn't** 26:19 60:23
 65:1 98:18 131:23
 156:6 159:18
**wrapped** 44:20
**write** 45:25 172:10
**writing** 138:23 171:6
**written** 14:11,19 15:12
 15:18 144:8
**wrong** 39:1 51:11 68:14
 90:25
**wrongful** 22:17 140:13

RICHARDSON, JOSEPHINE

140:16 143:11,21
177:10 180:22 185:18
186:4,5 189:14,19
**wrote** 92:4 109:15
110:22 144:7

---

### X

**X** 5:1,1,7,7

---

### Y

**yard** 136:21,21 162:21
163:15
**yeah** 13:12,12 16:4 20:23
21:1,10 22:2 32:15
33:17 34:12,23 35:13
36:19 41:15 47:2 49:11
52:3 53:16,18 55:3
59:10 60:2,11,13 62:2,4
62:24 76:11 77:13
79:21 81:20 83:23
84:11 85:10 87:14 88:4
88:5 93:16,20 95:21
97:23 100:9,21,21,24
102:24 105:18 107:6,12
109:8 110:2,8,14 111:9
111:15 112:2 113:13,23
116:13,25 120:15,21
122:24 123:3 124:16
125:22 126:4,18 127:9
127:13 128:4,12 129:2
131:2 132:16 134:17
135:22,25 140:2,5,18
142:14 143:5,10,13,13
144:2,10 145:6 146:18
147:15 149:11,12,13
150:4 152:25 154:6,11
156:4,13 157:21 159:10
160:13 166:16,16,20,22
168:5,25 169:18 170:7
173:6,7,18 175:23
176:10 178:7 179:17
180:7,13 181:23 191:14
**year** 28:11 29:11,15 32:5
38:1 40:10,13 46:9
105:24 106:2 121:12
**years** 29:3 30:2 34:9 35:3

---

35:4 48:20 106:4,5
119:15,16 122:13,19
155:20,22
**yesterday** 101:6,8,14,15
**York** 2:18
**youngest** 63:23
**y'all** 59:8,25 60:9,12,13
71:12 84:10 92:6

---

### Z

**zero** 143:17
**zeros** 175:1
**zombie** 98:8
**zoop** 79:6
**ZWAIN** 4:9

---

### $

**$1** 143:12,15,16,17
**$1,600** 167:9,10,13
**$10,000** 146:2 147:25
**$10,489.91** 173:14
**$100,000** 150:10
**$119,000** 150:2 174:1
**$120,000** 149:23
**$150,000** 144:1,7,8
147:13
**$21,000** 174:13
**$3,900** 154:9 156:10
**$300** 146:2
**$5** 140:20
**$50,000** 146:9,24 147:5
147:16
**$880** 167:8
**$91,271** 152:23

---

### #

**#75005** 1:25 196:25

---

### 0

**000011** 126:12
**000019** 126:12
**000064** 153:23
**000070** 158:15
**000087** 160:4
**02** 49:2
**03** 49:2,2

---

**05** 93:15,16
**05-4182** 1:5
**05-5531** 1:8
**05-5724** 1:9
**06** 106:5 176:6
**06-5342** 1:10
**06-6299** 1:11
**06-7516** 1:12
**07** 106:5,5 176:6
**07-3500** 1:13
**07-5178** 1:14
**072** 158:16

---

### 1

**1** 5:9 11:21,22,23 12:5,6
12:7,24 13:3
**1:00** 86:2 87:14
**1:30** 86:2,12
**10** 5:18 146:9 152:7,8
**10th** 32:3,4
**10:00** 106:19
**11** 5:9,19 154:1,3,4,8
**11th** 1:20 195:25
**11:30** 76:3,19 77:5,7,9
85:2,5,23 88:14 96:11
**1100** 1:19 3:4,12
**114** 151:5
**119** 149:25
**12** 5:20 17:8 106:18
158:14,18
**12A** 143:25
**12C** 140:14
**12:00** 106:19
**12:30** 10:24
**121** 188:21
**126** 5:14
**13** 5:21 160:3,4,7 165:12
**13th** 29:6 173:14
**1321** 7:2 17:13 28:6,8,10
37:5,17 118:20 119:4
162:24 163:17 188:18
**139** 5:15
**14** 5:22 167:3,4,21
**1400** 32:1,8
**141** 5:16
**149** 5:17

---

**15** 5:23 178:15 179:4,7,8
179:12 180:11
**152** 5:18
**154** 5:19
**158** 5:20
**16** 5:10,24 181:12,12,21
**160** 5:21
**167** 5:22
**179** 5:23
**18** 17:7
**1800** 108:21
**181** 5:24
**1827** 109:1
**19th** 27:22 106:25
**192** 5:4
**1928** 27:22 44:6
**194** 5:5
**1947** 28:20
**1949** 119:18
**1954** 37:7
**1966** 29:13

---

### 2

**2** 5:10 16:6,8,12 17:6
171:25 173:5
**2:00** 70:9 87:14,14
**2:30** 70:9
**2000** 163:3
**20001** 2:19
**2004** 45:11
**2005** 17:11 93:18 97:3
173:14
**2006** 138:22
**2008** 1:20 24:5 32:4
37:21 43:13 195:25
**202-346-4000** 2:20
**21** 175:8
**23** 177:2
**2300** 1:18 3:3
**24** 5:11 24:18,20
**25th** 29:8 107:17
**26** 181:17
**28** 44:5,7
**28th** 17:11 44:5,6 138:22
**29th** 4:12 17:14 29:13

---

RICHARDSON, JOSEPHINE

8/11/2008

Page 22

**3**

**3** 5:11 24:3,4,13
**3:00** 70:10
**30th** 17:14
**31st** 29:7
**3200** 3:12
**3445** 3:20
**35** 17:23
**36** 5:12 17:22
**37** 17:22
**3800** 17:15 32:18,19
  38:11,13,15 41:1 58:8
  71:24 162:19
**3838** 4:13

**4**

**4** 5:12 36:14,16,17
**4th** 92:3,7
**4:30** 38:7 67:20 83:17
**47-page** 16:15
**4727** 26:1
**48** 29:6

**5**

**5** 5:13 57:18,22 68:5,6
  71:15,17
**5:00** 38:8 64:25
**50** 29:7
**504-581-6180** 2:13
**504-585-3200** 3:14
**504-585-7000** 3:6
**504-831-0946** 3:22
**504-832-3700** 4:15
**504-836-2220** 4:6
**504-885-7700** 2:7
**52** 175:1
**5213** 4:4
**53** 29:8 151:5 152:6
**54** 119:16
**56** 29:9

**6**

**6** 5:14 126:1,2,11,16
  129:15
**6th** 29:10
**6:00** 74:20

**60** 29:10
**65** 50:19 97:10

**7**

**7** 5:3,15 138:21 139:4
  154:9
**7th** 29:9
**70001** 4:5
**70002** 3:21 4:14
**70017** 17:14
**70113** 2:6,12
**70117** 7:3
**70163** 3:13
**70163-2300** 1:20 3:5
**71** 5:13
**77** 48:20

**8**

**8** 5:16 120:20 141:23,25
  142:2 149:9
**8th** 28:20
**800** 3:20
**821** 2:5,11

**9**

**9** 5:17 149:10,14,16
**901** 2:18
**911** 82:13
**95** 138:21 142:4,10
**9696** 40:9