# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| | * | |
| IN RE: KATRINA CANAL | * | |
| BREACHES | | |
| CONSOLIDATED LITIGATION | * | CIVIL ACTION |
| | * | |
| | * | NO. 05-4182 |
| | * | and consolidated cases |
| PERTAINS TO: ALL BARGE | * | |
| | * | SECTION "K" (2) |
| | * | |
| | * | |
| | * | JUDGE |
| | * | STANWOOD R. DUVAL, JR. |
| | * | |
| | * | MAGISTRATE |
| | * | JOSEPH C. WILKINSON, JR. |

## LAFARGE NORTH AMERICA INC.'S PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

# TABLE OF CONTENTS

**PROPOSED FINDINGS OF FACT** ........................................................................1
I.      Introduction .............................................................................................1
II.     Geography – The Inner Harbor Navigation Canal ..................................1
III.    The LNA Terminal ..................................................................................1
IV.     The Arrival and Unloading of the ING 4727 ..........................................2
V.      LNA Hurricane Preparation .....................................................................3
VI.     Evaluation of Mooring and Barge Handling Procedures ........................5
VII.    Relevant Rules and Regulations ..............................................................6
VIII.   Barge Breakaway - Causation ..................................................................7
IX.     Barge ING 4727 – Potential for Movement from Terminal .....................8
X.      Hurricane Katrina ....................................................................................9
        A.     Winds ............................................................................................ 9
        B.     Current ........................................................................................ 11
        C.     Waves .......................................................................................... 12
XI.     Floodwall Construction ..........................................................................14
XII.    The Floodwall Breaches on the IHNC ...................................................15
        A.     North Breach ............................................................................... 15
        B.     South Breach ............................................................................... 18
XIII.   Potential Barge Impact Forces/No Breach Causation.............................22
XIV.    Expertise of the Parties' Key Experts ....................................................26
XV.     Independent Studies of Levee and Floodwall Failures ..........................27
XVI.    Alleged Eyewitness Accounts.................................................................28
XVII.   Accounts of "Boom" Witnesses .............................................................31
XVIII.  Foreseeability / Proximate Cause ..........................................................31
XIX.    The MRGO Levee Breaches ..................................................................32
XX.     Damages - Flooding in the Lower Ninth Ward and St. Bernard Parish .................32
XXI.    Damages - Quantum ...............................................................................33

**PROPOSED CONCLUSIONS OF LAW** ..........................................................35
I.      Duty and Breach .....................................................................................35
II.     Causation.................................................................................................37
        A.     Causation in Fact......................................................................... 37
        B.     Proximate Cause ......................................................................... 39
III.    Damages...................................................................................................39

Pursuant to the Court's scheduling order (Doc. 19564), defendant Lafarge North America

Inc. ("LNA") supplies the following proposed findings of fact and conclusions of law:

## PROPOSED FINDINGS OF FACT

### I.      Introduction

1.  The plaintiffs in this case are three individuals (John and Jerry Alford and Josephine
    Long Richardson) and a corporation (Holiday Jewelers, Inc.) – whose properties were
    flooded during Hurricane Katrina on August 29, 2005.  The plaintiffs allege that their
    flood-related damages were caused, at least in part, by the breaches of the eastern
    floodwall on the Inner Harbor Navigation Canal ("IHNC") in New Orleans.  The
    plaintiffs allege, and LNA denies, that those floodwall breaches were caused by a
    breakaway barge, the ING 4727, which had been moored at a cement terminal on the
    western side of the Inner Harbor Navigation Canal operated by Lafarge North America
    Inc. ("LNA").  The plaintiffs allege, and LNA denies, that the barge broke away from its
    moorings due to the negligence of LNA.  LNA denies any wrongdoing, and denies that
    any action or inaction on its part was the cause-in-fact or proximate cause of any
    damages they may have sustained.

### II.     Geography – The Inner Harbor Navigation Canal

2.  The IHNC, sometimes referred to as the "Industrial Canal," provides a connection
    between the Mississippi River at its southern end and Lake Ponchartrain 5.8 miles to the
    north.  The southern half of the IHNC, approximately between the Florida Avenue Bridge
    and the Mississippi River, separates the city to the west from the Lower Ninth Ward to
    the east.  The IHNC is oriented in a roughly north-south direction.  Cushing Report at 13
    & Fig. 8; Doc. 18552 at 2.[1]

3.  The IHNC is bisected by Reach 1 of the Mississippi River – Gulf Outlet ("MRGO"),
    which enters the IHNC at a point just above the Florida Avenue Bridge.  The MRGO
    provides a direct hydrologic connection between the IHNC and the Gulf of Mexico.
    Cushing Report at 11.

4.  At the southern end of the IHNC, a lock system lifts vessels from the IHNC to the
    Mississippi River.  This lock system is one of the busiest in the Intra-Coastal Waterway
    System, with an estimated average wait of ten hours.  Because of the lock system, there is
    no direct hydrologic connection between the IHNC and the Mississippi River.  Cushing
    Report at 13, Mosher Dep. at 171.

### III.    The LNA Terminal

---

[1] Citations herein are to depositions, expert reports, and previous testimony in the "Barge Track" litigation.
Although most references are already in the record of the case, as reflected in the summary judgment and *Daubert*
motion papers, LNA will supply the Court with a copy of any references at the Court's request.

5. The Lafarge North America cement terminal ("LNA Terminal") is located on the west side of the IHNC, between the Florida Avenue Bridge and the Claiborne Avenue Bridge. The terminal is located in an protected "inset" away from the main channel of the IHNC. This protected inset is about 1200 feet long (north-south) and 850 feet wide (east-west). Cushing Report at 15, 21 & Fig. 8; Ryan Report at 4; Strouse Report at 2.

6. The LNA Terminal serves as a distribution point for the company's cement products. Cement products arrive at the terminal by barge and are unloaded into silos for distribution by truck to LNA customers in the region. LNA uses a vacuum hose system to unload cement from the barge and move it into the silo. The vacuum hose moves from one end of the barge to the other as the barge is unloaded. VanderMeulen Limitation Transcript ("Tr.") at 70-71; Busch Limitation Tr. at 23; Smith Dep. at 46-47.

7. Barges laden with cement arrive at the LNA Terminal riding low in the water under the weight of the cement. As cement is unloaded from a barge, the barge will rise at the end from which cement is being unloaded, causing the barge to sit unevenly in the water until it is fully unloaded. An unloaded barge will ride high in the water, with a shallow draft. Busch Tr. at 23-24.

8. To be delivered to the LNA Terminal for unloading, barges must pass through the IHNC lock from the Mississippi River. LNA does not have its own tugs at the terminal, and thus it relies on fleeting services to deliver full barges and to remove empty barges after they have been unloaded. Once the barges are unloaded, they must again pass through the IHNC lock to the Mississippi River upon retrieval by the fleeting service. Busch Tr. at 33-35, 45-46; VanderMeulen Tr. at 76; VanderMeulen Dep. at 91-92.

9. Upon unloading a barge, LNA terminal personnel call the relevant fleeting service to "release" the barge for pickup. Because of the necessary passage through the IHNC lock, it often takes days or even longer for fleeting services to retrieve barges once they have been released. During the 2005 time frame, it was not unusual for LNA to have several barges at its dock at any given time, and this occurred without complaint from the Harbor Police and Coast Guard who regularly patrolled the area. Busch Tr. at 18, 34-35.

10. During the period in question, LNA had a Transportation Agreement with Ingram Barge Company ("Ingram") to deliver LNA's cement products to the LNA terminal via barge from its production facility in Joppa, Illinois. Ingram employed Zito Fleeting Company to receive barges at its fleet in the Mississippi River, deliver them to the LNA Terminal, and then retrieve empty barges from the LNA Terminal and return them to the fleet, where they would be held before moving on to their next destination. Zito was the only designated fleeting service for delivering Ingram barges to the LNA Terminal and for retrieving them after unloading and fleeting them pending their next assignment by Ingram. Busch Tr. at 54; VanderMeulen Tr. at 79; VanderMeulen Dep. at 93, 97.

11. At least prior to Hurricane Katrina, it had long been known in the industry that LNA's terminal, located inside the IHNC, was a safe haven for the mooring of barges. Strouse Report ¶ 12.

## IV. The Arrival and Unloading of the ING 4727

12. The Barge ING 4727 arrived at the LNA Terminal, laden with cement, at approximately 12:20 p.m. CDT on August 26, 2005, together with another loaded barge, the ING 4745.

The two barges were delivered by Zito on behalf of Ingram, which owned both barges. Busch Tr. at 19; Strouse Report at 2; Pazos Report at 7.

13. At the time the two barges arrived at the LNA Terminal, there were five loaded barges moored in a tier at the dock immediately to the north of the unloading apparatus where the ING 4727 and ING 4745 were docked. Busch Tr. at 19; Strouse Report at 2.

14. Upon its delivery to LNA, the ING 4727 was tied up with two strands of 4.5-inch circumference (1.5-inch diameter) polypropylene line, both of which had previously been in use. Skaer Report at 1; Smith Dep. at 68.

15. LNA personnel began to unload the ING 4727 upon its arrival at the LNA Terminal. Unloading continued throughout the afternoon of August 26, and into the next morning. Busch Tr. at 19, 26, 31; VanderMeulen at Tr. 79; VanderMeulen Dep. at 104.

16. At the time that LNA terminal personnel began to unload the ING 4727, Hurricane Katrina was not projected to strike the New Orleans area, nor was New Orleans within the projected track of the hurricane. Thus there was no reason for LNA personnel to have refrained from unloading the barge. Busch Dep. at 22; Strouse Dep. at 132.

17. On August 26, at the time the Barge ING 4727 was delivered to the LNA Terminal, Hurricane Katrina was projected to make landfall on the Gulf Coast of Florida. Some time during the late afternoon or evening of August 26, the projected storm track shifted to the west and came to include the New Orleans area. By that time, however, the ING 4727 had already been partially unloaded. LNA 10251-262 (National Hurricane Center warnings); Strouse Report at 4; see also National Hurricane Center Katrina Graphics Archive (including National Hurricane Center Warnings and graphical analysis of approach o f hurricane) (available at http://www.nhc.noaa.gov/archive/ 2005/KATRINA_graphics.shtml).

18. The United States Coast Guard did not issue the first of its port condition alerts for the New Orleans area ("Port Condition WHISKEY") until after 10:00 p.m. on August 26, by which time the ING 4727 had already been partially unloaded. The Coast Guard did not issue its alert for "Port Condition XRAY," directing that port operations be shut down in anticipation of the storm's arrival, until August 28. Strouse Report at 7; LNA 001066-69 (Coast Guard documents showing timing of alerts).

19. The ING 4727 finished unloading on Saturday morning, August 27. At the time the barge finished unloading, LNA employee Ed Busch placed a call to release the barge to Zito, the designated fleeting service that had delivered it, but did not reach anyone at Zito other than a voice-mail system. Mr. Busch advised LNA employees that morning that he had called the fleeting service to release the barge. Busch Dep. at 33-34, 36; Busch Tr. at 33-34; Smith Dep. at 40, 108-09; Jennifer Arnold Dep. at 31-32.

## V.   LNA Hurricane Preparation

20. On Saturday morning, August 27, LNA terminal personnel learned that Hurricane Katrina had changed direction toward the west and that New Orleans was within the projected landfall area. At that point, LNA Assistant Terminal Manager Ed Busch directed terminal personnel to secure the facility for a hurricane. Mr. Busch had twenty-

3

three years of marine terminal experience at the time of the events in question.  Busch Dep. at 42-43, 90; Busch Tr. at 16, 32.

21. Although certain communications equipment were out of service at the LNA Terminal during late August 2005, LNA employees had Nextel phones and were able to receive outside communications, and had timely access to information about the approaching storm.  Busch Dep. at 14; Smith Dep. at 52.

22. Mr. Busch directed terminal personnel to remove equipment from the dock, secure buildings and silos, and secure barges and barge covers.  He directed terminal employees to use a new roll of 2-inch diameter (6-inch circumference) blue polypropylene rope to secure the rigging between the barges.  Busch Dep. at 44, 57, 63, 67; Smith Dep. at 22-23, 55, 64.

23. LNA's hurricane preparations included the five loaded barges in the tier immediately north of the unloading apparatus, as well as the two barges, ING 4727 (which had been emptied) and ING 4745 (which was still loaded), that were stationed next to the dock near the unloading apparatus.  Smith Dep. at 96; Strouse Report at 2, 4.

24. It was LNA's practice to replace worn-out mooring lines and to add additional mooring lines in preparation for a storm.  In the case of the ING 4727 and ING 4745, LNA employees replaced one of the old mooring lines with a length of new blue 6-inch circumference rope and added another connection with the new blue 6-inch circumference rope.  LNA employees also replaced or added lines in the five-barge tier to the north.  There were at least three connections between the ING 4727 and ING 4745 upon the completion of hurricane preparations – one at the bow, one at the stern, and at least one in the middle.  LNA employee Earl Smith, an employee with sixteen years of experience mooring barges, supervised the actual securing of the two barges.  Mr. Busch inspected the rigging to determine that it was satisfactory.  Busch Dep. at 66, 68, 77-78; Busch Tr. at 17, 44; Smith Dep. at 68, 70-71, 72, 78, 147; R. Johnson Dep. at 38-39, 41; Grabert Dep. at 47-48, 55.

25. By replacing one of the existing used lines with a strand of new 6-inch circumference (2-inch diameter) polypropylene line and by adding a third connection using the new 6-inch circumference line, LNA personnel more than doubled the strength of the mooring configuration between the two barges.  Skaer Report at 2.

26. Although LNA had in the past used cable to secure barges in advance of a hurricane, this older practice was based on an older dock design where the use of soft lines would result in chafing across the dock edge.  When the older dock was replaced by a new dock configuration in or around 2003, it became possible to improve the method of securing barges with the use of soft lines to moor barges in advance of a storm, employing a "long-lining" technique (described below) to permit barges to rise with anticipated storm surge.  From that time forward, LNA employees used polypropylene line instead of cable in preparing for storms prior to Katrina.  Busch Dep. at 72-73; Smith Dep. at 83-84, 87-88, 141-42; VanderMeulen Dep. at 22-25; Guthrie Dep. at 26-28; Strouse Report at 2.

27. The "long-lining" technique involved wrapping the soft line around a synthetic piling between the barge and the dock so that as the water level in the IHNC would rise, the line between the barge and the dock would pay out and allow the barge(s) to rise as the water

4

level from the storm surge would rise.  Busch Dep. at 72-73, 79; Smith Dep. at 65, 84; VanderMeulen Dep. at 25-26; R. Johnson Dep. at 37-38; Strouse Report at 2.

28. In addition to directing the securing of the barges at the terminal, Mr. Busch called Joseph Domino Towing ("Domino") to arrange for the ING 4727 and ING 4745 to be "switched" (or "shifted" or "topped around") so that the empty barge would be away from the dock.  Mr. Busch was concerned that having an empty barge against the dock would create the risk that the storm surge would cause the empty barge to ride up over the dock while the loaded barge (i.e., the ING 4745) would be unable to rise, causing both barges to break free, whereas having the empty barge on the outside and the loaded barge against the dock would enable both barges to rise with the storm surge through use of the "long-lining" technique described above.  Busch Dep. at 48-49, 58-60; Busch Tr. at 35-36, 62-64; Castaing Dep. at 22-23.

29. A tugboat from Domino arrived to perform the switching maneuver during the afternoon of August 27.  By that time, LNA personnel had completed their hurricane preparations and departed from the terminal in order to evacuate.  The crew from Domino shifted the two barges and tied the loaded barge to the dock as instructed.  Busch Dep. at 61; Grabert Dep. at 57-60; see Edwards Dep. at 69, 113, 118-19 & Ex. 10 (saw barge tied to dock at 1:30 a.m. on Monday).

30. When the Domino crew departed, the ING 4727 and ING 4745 were secured together with no fewer than three lengths of high-strength and high flexibility polypropylene rope with which the LNA personnel had secured them.  Grabert Dep. at 57-61.

31. LNA personnel did not ask Domino to remove the barge from the terminal because there was no way of assuring that the barge would be accepted at the Zito fleet (i.e., Ingram's designated destination), and it would have been imprudent to send a barge away from the dock without a destination.  Domino did not work for Ingram at the time of Hurricane Katrina, and had not done so for more than a year prior to the storm; and Domino had never towed an Ingram barge at the request of anyone other than Ingram.  Strouse Dep. at 110; Busch Tr. at 43; Busch Dep. at 61-62; VanderMeulen Dep. at 100; Castaing Dep. at 61, 63 (Domino did not work for Ingram).

32. By the time that Domino Towing arrived to perform the switching maneuver, Zito Fleet had already closed its fleet to new barges as it undertook its own hurricane preparations. IBCO-0728 (Zito email of August 27, 2005).

## VI.   Evaluation of Mooring and Barge Handling Procedures

33. By adding connections sufficient to increase the strength of the mooring connections by more than double, LNA complied with the United States Coast Guard recommendation set forth in the "Sector New Orleans Maritime Hurricane Contingency Port Plan" that mooring lines be "doubled up" in anticipation of a hurricane.  Ryan Report at 8, 9-10; Skaer Report at 2; Strouse Report at 5.

34. Using polypropylene line instead of cable was a prudent choice by LNA.  Synthetic ropes have superior stretch characteristics, while wire ropes tend to break.  Moreover, the use of synthetic ropes allowed LNA personnel to use the "long-lining" technique to permit the barges to rise with the incoming storm surge, which would not have been possible with a cable configuration.  The polypropylene mooring arrangement satisfied the United

States Coast Guard recommendation set forth in the "Sector New Orleans Maritime Hurricane Contingency Port Plan" to give "due consideration to the effects of predicted storm surge."  Skaer Report at 2; Ryan Report at 8, 10; Strouse Report at 2.

35. Because a partially unloaded barge is unstable and unsafe in a hurricane, it would not have been prudent for LNA personnel to simply cease unloading the barge and leave the barge in a partially-loaded state once unloading had already started.  Strouse Dep. at 132.

36. Topping around the barges so that ING 4727 would be away from the dock was both reasonable and prudent.  Had the empty barge been next to the dock, the mooring configuration would have created the risk that the storm surge would carry the empty barge over the dock and sever the mooring connection with the outboard loaded barge, threatening the mooring of both barges.  Ryan Report at 12; Strouse Report at 4.

37. It would have been imprudent and impractical for LNA to have attempted to have the ING 4727 removed by Domino Towing, without knowing whether there was a safe destination in a fleet in the river that was willing to accept the barge.  Strouse Report at 5; Busch Dep. at 61-62; Gaskin Dep. at 48-49; Smith Dep. at 137-38.

38. The mooring arrangement between the ING 4727 and ING 4745 was expected to be sufficient to withstand the expected forces, and there was no reason for LNA to have asked Domino to alter or add to the mooring arrangement, nor any reason to expect that anything Domino might have done would have prevented the eventual breakaway.  Strouse Report at 4.

39. Adding and replacing lines was a superior mooring method to increasing the number of "parts" reaching from kevel to kevel, as single-part stronger lines would allow for more forgiveness when interacting with dynamic wind and tidal surge forces, while two-part lines would be more likely to bind or jam.  Strouse Report at 5.

40. It would have been impossible and/or imprudent to attempt to scuttle or to ballast the ING 4727.  The barge was not fitted with a ballasting system and it would not have been possible to get pumps to the dock and to ballast the barge within the time available.  Also, ballasting could cause the vessel to be unstable.  Strouse Report at 6.

41. LNA personnel acted reasonably and prudently in evacuating the facility, as it would have been unsafe to remain there, particularly in light of the mandatory evacuation order.  Strouse Report at 6.

42. Even had LNA personnel placed themselves in harm's way by remaining at the dock during the hurricane, there was nothing that they could have done during the hurricane either to prevent the barge from breaking free or to re-moor the barge after it broke free.  Strouse Report at 6 ¶ 14.

## VII.   Relevant Rules and Regulations

43. Prior to Hurricane Katrina, the Coast Guard issued the Coast Guard Sector New Orleans Hurricane Plan.  This plan contained recommendations – not regulations.  These recommendations generally applied to oceangoing manned vessels.  Strouse Report at 3 ¶ 5.  Regardless of what Coast Guard recommendations may have applied to LNA, the Coast Guard is clear that these recommendations do not advocate personnel placing

themselves in life threatening situations to secure property.  Ryan Dep. at 106; Strouse Report at 6 ¶ 14.

44. LNA placed a sufficient number of lines, consistent with 33 C.F.R. § 162.75(b)(3)(ii). That provision states "(ii) When tied up individually, all vessels and tows shall be moored by bow and stern lines. Tows shall be secured at sufficiently frequent intervals to insure their not being drawn away [from] the bank by winds, currents, or the suction of passing vessels. Lines shall be shortened so that the various barges in a tow will be as close together as possible."  There were at least three connections between the ING 4727 and ING 4745 – one at the bow, one at the stern, and one or two in the middle, which means that LNA did not violate the first portion of that provision – "all vessels and tows shall be moored by bow and stern lines."  The remainder of that provision applies to "tows" and the barge was not a tow.  Ryan Report at 10 ("the ING 4727 … is not a tow"); 46 C.F.R. § 27.101 (defining a tow as a "commercial vessel engaged in, or intending to engage in, pulling, pushing, or hauling alongside, or any combination of pulling, pushing, or hauling alongside.").

## VIII.  Barge Breakaway - Causation

45. At some point during Hurricane Katrina, the barge ING 4727 broke away from its moorings at the LNA Terminal under the force of heavy winds and storm surge.  The physical evidence showed that the breakaway occurred under extreme conditions, most likely high winds, which were sufficient to cause the strands of the polypropylene rope to melt and fuse.  Skaer Dep. at 107, 109; Green Report at 7 ¶ 5.1 ("hurricane force winds and rising water levels"); Pazos Dep. at 104 (breakaway was due to wind force on side of barge).

46. Hundreds of barges broke away from their moorings under the force of wind during Hurricane Katrina.  Strouse Report at 6 (around 1500 barges in Mississippi River; 100 to 200 vessels in and around the IHNC from the Mississippi River to Lake Pontchartrain); Larry Arnold Dep. at 44, 48-50 (twenty-five barges broke away from Lone Star facility; pictures of barges); Hardberger Dep. at 24 (LNA 009921 to 009935) (pictures of stranded barges in IHNC and elsewhere); Cunningham Dep. at 39-45 (LNA 000762 to 000769) (pictures of stranded barges); Green 2008 Dep. at 115 ("numerous" barges broke away during Hurricane Katrina).

47. Numerous barges broke away from their moorings during Hurricane Katrina even though they had been secured with both soft ropes and wire cable.  Hall Dep. at 80-85 (describing breakaway barges including several that had been secured with "plenty of rope and plenty of wire on them" before the storm); Larry Arnold Dep. at 44, 51-52 (Lone Star had 25 barges break away; cabled to shore); Sylve Dep. at 23-24 (Lone Star barges were secured with wire cable and rope); Hardberger Dep. at 29 (LNA 09923) (barge secured with cables at four connections broke away).

48. There is no evidence in the record of any measures that might reasonably have been undertaken by LNA terminal personnel that would have prevented the breakaway of the ING 4727 under the forces imposed by Hurricane Katrina.  Skaer Report at 3; Strouse Report at 6.

49. Prior to the breakaway of the ING 4727, LNA had not experienced any breakaway barges from its New Orleans terminal.  VanderMeulen Dep. at 119-20.

50. At the southern end of the protected slip where the LNA Terminal is located, there is a gantry shed that projects over the water.  This gantry shed would interfere with movement of a barge in high water at the southern end of the slip, if a barge were to come free in the slip.  Cushing Report at 20 & Fig. 13.  The gantry shed would have prevented the ING 4727 from entering the IHNC if it had broken away during the early morning hours of August 29.  Cushing Report at 78, 82-85.

51. There are no witnesses to the breakaway of the ING 4727, and it is therefore necessary to draw inferences about the timing of the breakaway and the passage of the ING 4727 across the IHNC.  Based on the fact that high winds were needed to cause the ropes to break in the manner they did, the likelihood is that the ING 4727 broke away during the hurricane.  Skaer Dep. at 107 109; Green Report 7 ¶ 5.1.  Based on the direction of the prevailing winds and the configuration of the LNA Terminal, the likelihood is that the ING 4727 exited the terminal basin during the morning of August 29 at some time after 9:00 a.m., after the South Breach had formed, and was drawn through the existing breach on the other side of the canal.  Cushing Report at 115, 169.

## IX.   Barge ING 4727 – Potential for Movement from Terminal

52. The Barge ING 4727 was a hopper barge with no motor or other means of self-propulsion.  Therefore, the barge required an external force to propel it from the west side to the east side of the IHNC.  The only forces that could potentially have moved the barge away from the LNA Terminal and toward either of the breach sites during Hurricane Katrina were (a) wind, (b) waves and (c) current.  Cushing Dep. at 238-40 (winds, waves and currents were possible forces, winds predominant); Dooley Dep. at 37-38 (forces that could potentially impact the movement of the barge were "the wind, the water movement, and the waves"); Pazos Dep. at 99-100 (barge "cannot move on its own" except for "wind conditions or currents"; barge requires "an external force" to move it); Marino 2009 Dep. at 111 (admitting that in order for barge to move from one place to the other, something – wind or water – has to move it); Green 2009 Dep. at 124, 127 (barge was "at the mercy of the winds and current"; barge was "dumb" and had no mode of power).

53. The Barge ING 4727 was over twenty feet high from top to bottom (including hatch covers).  Cushing Report at 124 (21 feet high); Pazos Dep. at 102 ("23 feet, approximately"); Marino 2009 Dep. at 65 (barge height is 23 feet).

54. On the morning of August 29, 2005, the unloaded Barge ING 4727 had a draft of approximately one-and-a-half feet.  Cushing Report at 124 (draft of 1 foot, 4 inches); Pazos Dep. at 100 (barge draft of 1 foot, 5 inches); Marino 2009 Dep. at 65-66 and Marino Report at 2-34 (unloaded draft is 1.5 feet); Green 2008 Dep. at 75-76 (barge's light draft is 1 foot, 4.5 inches – the remainder of the barge is above the water line); Pazos Report at 9 (barge light draft is 1 foot, 5 inches, but suggesting that draft may have been 2 feet, 5 inches due to water in the voids).

55. As a result of its unloaded condition, the barge was sticking out of the water over 20 feet above the waterline.  Cushing Report at 124 (barge stickup of approximately 20 feet);

Pazos Dep. at 103-04 (barge sticking up out of water "in excess of twenty feet"); Marino 2009 Dep. at 66 (barge was unloaded, and sticking up over 20 feet).

56. This "sail area" made the barge particularly susceptible to being moved in the direction of the prevailing wind. Accordingly, wind was the predominant force acting on the barge at all times material to this action. Cushing Dep. at 238 (wind was "dominant" force acting on the barge); Pazos Dep. at 102 (unloaded condition is relevant because it creates "exposed surface to the wind action"); Pazos at Dep. 104 ("wind is the predominant item" acting on the barge); Green 2009 Dep. at 45 (agreeing that barge has a "large sail area" and that "the greater the sail area, the more susceptible to wind"); Green 2009 Dep. at 127 (agreeing that "with a sail area of the type that the barge had, the wind affects the movement of that barge"); Green 2009 Dep. at 211 (due to sail area, the wind had a greater impact on the barge); Skaer Dep. at 113-14 ("sail effect" of vessel); Hall Dep. at 51 (wind effect on unloaded barge).

## X.     Hurricane Katrina

### A.     Winds

57. It is important to analyze weather data, particularly data regarding winds, in order to analyze wind loads on the barge and potential barge movement in the IHNC during the relevant time period. Cushing Report at 77-81 (analyzing wind data and noting its importance for barge movement); Marino 2009 Dep. at 71 (Q: "The weather data helps you to assess what in fact the wind loads were on the barge in the IHNC at the time of the failure; correct?" A: "Yes."); Spinks 2009 Dep. at 169 (Q: "Would you agree with me it's better in carrying out a scientific study of meteorology to rely on meteorologic data to the extent the data is available?" A: "Clearly you want to gather the data from where it's available at.").

58. According to a well-established scientific principle known as Buys Ballot's law, hurricane winds in the northern hemisphere blow counterclockwise around the center (or "eye") of the hurricane. Thus, the direction of the prevailing wind at a given time and location during a hurricane can be determined by comparing that location to the location of the eye of the storm at that same time. Cushing Report at 35-36 ("counterclockwise circulation around the center"); Pazos Dep. at 107-08, 117 ("the hurricanes in the Gulf of Mexico have a counterclockwise rotation"; agreeing that "hurricane winds swirl counterclockwise along the storm eye"); Pazos Report at 37 (noting the "counterclockwise rotation of the winds"); Spinks 2008 Dep. at 61 ("counterclockwise" rotation of wind).

59. Hurricane Katrina followed a path to the east of New Orleans and the IHNC, moving along a nearly vertical (due north) axis as it passed by the city. The eye of the storm was located to the east of New Orleans and the IHNC throughout its passage. Cushing Report at 39 & Fig. 24, 42; Dooley Report at 16, Map 2 (close-up view of storm track near New Orleans); Dooley Report at 35 (storm center passed to the east of New Orleans); Spinks Report at 8, Fig. 1 (showing track of Hurricane Katrina).

60. At all times prior to 7:30 a.m. CDT on the morning of August 29, 2005, the eye of Hurricane Katrina was at a latitude to the south of New Orleans and the IHNC. Dooley Report at 16, Map 2 (showing position of storm center was south-southeast of New

9

Orleans at these times); Plaintiffs' Response to Request for Admissions No. 6 (south of New Orleans at 5:30 a.m.); Green 2009 Dep. at 119-120 (at 6:00 a.m., the storm was South-Southeast of New Orleans); Spinks 2008 Dep. at 60 (storm made landfall at Buras, LA around 6:10 in the morning).

61. The eye of Hurricane Katrina did not pass through the latitude of New Orleans and the IHNC until after 8:00 a.m. CDT on the morning of August 29, 2005.  Dooley Report at 16-17 (eye of Hurricane Katrina did not pass latitude of New Orleans until 8:54 am); Cushing Report at 43; Pazos Dep. at 118-19 ("Hurricane Katrina's eye passed to the east of New Orleans about 8:30 a.m. central daytime on 29 August 2005.") (reading from report and adopting statement); Pazos Report at 37 (providing time of passage).

62. As Hurricane Katrina approached New Orleans and the IHNC on its northward course to the east of the city, the prevailing counterclockwise winds in the IHNC blew first from the east, then from northeast-to-southwest, and then north-to-south until the storm eye arrived at the latitude of New Orleans.  IPET Report at IV-17 ("winds first from the east, then from the northeast, then north, then northwest, and finally from the west"); Marino 2009 Dep. at 74 (Q: "Do you accept IPET's conclusion that, during the storm, winds came first from the east, then the northeast, then the north, then the northwest, and finally from the west?"  A: "I guess in general, yes."); Dooley Dep. at 67-74 (prevailing direction was mostly out of the northeast, and any type of downdrafts, swirls or eddies would have moved in the downwind direction from the northeast toward the southwest); Cushing Dep. at 80 (winds blew "from an easterly direction to a westerly direction" during early morning hours on August 29); Green 2008 Dep. at 56 (winds between 4:00 a.m. and 6:00 a.m. blew "from either the northeast or due from the north"); Cushing Report at 77-81 & Fig. 52 (showing wind direction as a function of time); Dooley Report at 35 (prevailing winds turned from easterly to northerly to westerly as Katrina moved along its track).

63. It was not until after 7:30 a.m. CDT that Hurricane Katrina's prevailing winds at the IHNC came to include any component blowing across the IHNC from the LNA Terminal toward the east bank of the canal.  Before that time, the prevailing winds would have acted to keep the barge away from contact with the IHNC east floodwall, regardless of what time the barge broke free from its moorings.  Dooley Dep. at 59 (wind had no westerly component (from the west) until 7:42 a.m. CDT); Dooley Dep. at 93, 97 (wind did not move the barge from west to east during the 4:00 to 5:00 a.m. time frame ascribed to northern breach); Dooley Dep. at 36 ("the wind would not have allowed that barge to move from the western side to the eastern side that early in the morning") (referring to time of south breach occurrence); Cushing Report at 45, 78 (winds prior to 8:00 a.m. had no cross-canal component); Marino Report at 3-11 (winds remained "essentially parallel" to IHNC before 9:00 a.m.); Dooley Report at 35 ("up until 7:42 a.m. CDT, the wind direction would push the barge toward the dock"); IPET Report at IV-50 Fig. 26 (wind direction was from the northeast during the 6:00 a.m. to 7:00 a.m. time period).

64. Meteorological data including a hindcast by Oceanweather Inc. and local data from Lakefront Airport are consistent with respect to the direction of the prevailing wind in the IHNC during Hurricane Katrina, and support the conclusion that winds blew from the east and then northeast and north during the early morning hours of August 29.  Dooley

Report at 17-18, 21; Dooley Dep. at 59; Marino Report at 3-11; Green 2009 Dep. Exh. B
(Lakefront Airport data).

65. Plaintiffs provided no meteorological data or analysis or scientific evidence to support
any contrary theory regarding wind direction or barge movement.  Cushing Report at
129-30, 146 (review of Pazos and Marino reports); Pazos Dep. at 129 ("I review some
meteorologic data, but I didn't either memorize the source or cover it recent to analyze
it."); Pazos Dep. at 130 (Q: "You haven't cited a single piece of data about turbulence at
this location in your report, have you?"  A:  "Because I'm not interested."); Pazos Dep. at
131 ("Don't need any meteorologic data"); Pazos Dep. at 132 (asked whether he had
reviewed meteorologic data showing a south-to-north wind direction, Pazos responds, "I
do not remember because I didn't concentrate in this activity"); Pazos Dep. at 150-51
(asked whether he had an opinion about the prevailing direction of the wind at the time
the barge supposedly contacted the wall at the site of the north breach, Pazos responds,
"[a]bsolutely no"); Marino 2009 Dep. at 76 (admitting that at the time of the north
breach, the barge would have had to be going in a direction "other than the direction of
the wind"); Marino 2008 Dep. at 147-48 (Q: "You didn't consider wind in connection
with the north breach because the wind wasn't blowing in the direction of the wall at that
time, right?"  A: "Right."); Marino 2009 Dep. at 105-06 (admitting he does not know
how the barge got to the north breach and has done no studies or calculations or literature
review to shed light on how it got there); Marino 2009 Dep. at 142 (Q: "So again, as
with the north breach, you can't explain how or why the barge got from one place to the
next?"  A:  "That's correct.").

66. Eyewitness evidence of weather conditions in or near the IHNC tended to support the
meteorological data showing that the prevailing hurricane winds blew from the east, then
northeast, then north, and did not blow from the northwest and west until after the eye of
the storm had passed (*i.e.*, after 8:00 a.m. CDT).  Hall Dep. at 69-70; McCrosky Dep. at
42-43, 45-46; Sartin Dep. at 60 (wind did not turn until later in the day, after waters had
risen).

### B.    Current

67. The IHNC below the Florida Avenue Bridge was a "closed system" in the sense that the
lock at its southern end prevented the flow of water to or from the Mississippi River.
Therefore, when storm surge from Hurricane Katrina reached this part of the IHNC, it
filled up "like a bathtub" without generating appreciable currents.  Cushing Dep. at 68
(IHNC was "closed at the southern end where the locks were"); Mosher Dep. at 171 (end
of IHNC was closed off; lock gates were closed); Pazos Dep. at 104 ("Current is very
insignificant because the current needs to flow in order to exist. And the locks were
closed, so the flow – the flow was very limited or local …").

68. Scientific modeling and analysis of the currents in the IHNC showed that currents could
not have moved the barge from the LNA Terminal to either breach site until after both
breaches occurred.  Cushing Report at 48, 166-68 (currents did not flow toward north or
south breach and "were very nearly zero" prior to breaching); Cushing Dep. at 124 ("[I]n
this particular case, what we found was that the winds were strong and the currents were
negligible."); Cushing Dep. at 238 (barge "would not have been significantly influenced
by any slight currents that existed in the canal"); Cushing Dep. at 261 ("[T]he currents

would have had a negligible effect."); Marino 2009 Dep. at 281-82 (Q: "You didn't model the barge movement, did you?"  A: "No."); Spinks 2009 Dep. at 31-32 ("We have not done any hydrodynamic studies of the waters within the Industrial Canal.") (also agreeing such studies could be done); Pazos Dep. at 104 (current "very insignificant").

### C.    Waves

69. It is possible, through scientific means, to determine wave heights during a storm event at a given location.  IPET Report at IV-4 (calculating wave height); Pazos Dep. at 112 ("I'm a hydrodynamicist.  … Yes, you can develop height of a wave based on wind by not just a little formula, it's a sophisticated analysis."); Spinks 2009 Dep. at 32 (scientific processes exist to study wave heights in the Inner Harbor Navigation Canal).

70. The Interagency Performance Evaluation Task Force ("IPET") conducted a scientific study and concluded that wave heights in the IHNC during Hurricane Katrina reached approximately 1 foot before 5:30 a.m. CDT on August 29, 2005, and two to three feet after that.  IPET Report at IV-4 (waves in IHNC were in the 2-3 foot range); Spinks 2009 Dep. at 22 (IPET conducted a scientific analysis of wave heights in the IHNC on August 29); Spinks 2009 Dep. at 17-21 (accepting and crediting IPET analysis that waves in the IHNC were less than one foot before 5:30 in the morning and two to three feet after 5:30 in the morning); Cushing Dep. at 134 (waves in IHNC were "small surface waves … on the order of a couple of feet, two feet"); Pazos Report at 37 (reviewing IPET's study and noting that waves associated with the surge "decay rapidly, and within less than a mile have been reduced to about 1.2 feet."); Pazos Report at 39-40 (quoting IPET's study at IV-227, which states that "[s]imilar to waves entering the MRGO/GIWW, these waves [entering the IHNC] decay rapidly and within less than a mile have been reduced to about 1.2 feet" and also noting that the maximum waves in the IHNC during Katrina occurred at 9:30 a.m.).

71. Photographic evidence from August 29, and from similar conditions during Hurricane Rita, tends to confirm wave heights in the IHNC during the morning of August 29 of approximately one to three feet as set forth in the IPET Report.  Cushing Report at 46 Fig. 28 (Katrina); Cushing Report at 133 Fig. 97 (Rita); Cushing Dep. 242 ("waves on the order of two feet high"); Suhayda Report at 8-10 (waves one to two feet, maximum two to three feet).

72. Although plaintiffs' experts opined that wave heights in the IHNC were as high as twenty feet, they did not perform any calculations or provide any other sort of scientific support for such a theory.  Cushing Report at 130-33 (addressing Pazos theory on waves); Pazos Dep. at 123-24 ("[I]t's impossible to predict without making a very detailed analysis of the waves, the reflecting waves, the location of the wind, the direction of the wind – so it's pure guessing"); Pazos Dep. at 163 (Q:  "Have you done any calculations to support the conclusion that you've got eight to ten foot waves in the Inner Harbor Navigation Canal?"  A:  "Not in this specific case, but I have done it in other occasions. … I didn't try to do it in this case."); Pazos Dep. at 175 (Q: "Have you done any modeling of waves or wave heights in the Inner Harbor Navigation Canal."  A:  "No."); Pazos Dep. at 175 (Q:  "When you say eight to ten foot waves in the canal, have you done any calculations to support those numbers in this case?"  A:  "Not in this case.  I have done it in other cases.").

73. The available scientific data, including the IHNC lockmaster's hydrograph, do not support the allegation that a 20-foot wave struck the IHNC on the morning of August 29, 2005. Cushing Report at 47 Fig. 29 (hydrograph); Spinks 2009 Dep. at 21-22 (rejecting the idea of 20-foot waves based on "the science that I've read and studied" in the IPET report).

74. Wind-activated waves tend to propagate in the direction of the prevailing wind. Dooley Dep. at 94 ("Any waves that may have been produced within the IHNC in this time period would have flowed with the direction of the dominant wind or the prevailing wind. So wave action would have been from the north towards the south that morning."); Cushing Report at 47, 79 ("Another important property of wind-generated waves is that they travel in the same direction as the prevailing wind"); Spinks 2009 Dep. at 23 (matter of "common sense"); Pazos Dep. at 151 (asked whether he had an opinion about the prevailing direction of waves at the time the barge supposedly contacted the wall at the north breach, Pazos response was "[a]bsolutely no").

75. Waves reflecting off a surface have less energy than "incoming" waves approaching that same surface. Dooley Dep. at 94-95 ("As the waves hit, they lose energy. … [T]hey would very quickly dissipate. So I can't see reflected waves from the western side propelling a barge all the way to the eastern side."); Cushing Dep. at 240-42 ("We considered reflective waves ... When the wave then reflects, it has lost its driving force, and it diminishes. It quickly dissipates."); Cushing Report at 79 ("Reflected waves lose energy when reflection takes place."); Spinks 2009 Dep. at 23-24 (reflected waves have less energy).

76. Because wind-activated waves could not have caused the barge to move in a direction counter to that of the prevailing winds, wind-activated waves could not have moved the barge from the LNA terminal to either breach site, or caused the barge to impact the floodwall at either breach site, at any time before the breaches occurred. Cushing Report at 79 (wind-generated waves, which were the only waves present in the IHNC during Hurricane Katrina, "could not possibly move any floating object in a direction counter to the wind"; reflected wave "can never have as much energy as the primary wave, and can never force a floating object in the direction from which the primary wave is coming"); Cushing Report at 131-32 (waves had insufficient energy to propel barge); Cushing Report at 164 (calculations show pitching motion of barge in waves in IHNC would involve maximum vertical motion of slightly more than one foot).

77. Plaintiffs supplied no evidence to show any process by which waves could have moved the barge across the canal or caused it to come into contact with the floodwall. Cushing Report at 144, 155 (plaintiffs' experts supplied no transport analysis); Pazos Dep. at 186-87 (Q: "Now, have you done any calculations to show what the pitch of the barge would be in a five or a ten or an eight foot wave?" A: "Not in this case."); Pazos Dep. at 228 (Q: "Have you done any calculation about how large a wave would be needed to pitch the end of the barge up high enough to get it above the floodwall at that time of morning?" A: "I didn't do any calculations, but I can do it if you want me to."); Marino 2009 Dep. at 107 (Q: "And you've done no literature review or studies or scientific calculations to support a – a conclusion that waves in the Inner Harbor Navigation Canal operated with a predominant force or direction counter to the prevailing wind; is that correct?" A: "That is correct.").

13

## XI.     Floodwall Construction

78. The levee and floodwall structure protecting the Lower Ninth Ward extends along the
eastern shore of the southern section of the IHNC and is part of the 320 miles of levees
and floodwalls protecting the New Orleans and surrounding areas.  The IHNC levee and
floodwall extends from the Florida Avenue Bridge in the north to the N. Claiborne
Avenue Bridge and the lock system to the south.  It runs parallel to Jourdan Ave. in the
Lower Ninth Ward.  Cushing Report at 29.

79. The levee system along the IHNC consisted of an earth embankment with a crest of
approximately 7.5 feet according to the North American Vertical Datum of 1988
(NAVD-88) and side slopes of 2.4:1 and 2.8:1 on the land and water side, respectively.
The elevation of the levee toe decreased toward Florida Avenue.  Cushing Report at 29-
30.

80. The levees on the IHNC were topped by floodwalls ("I-Walls") comprised of a twenty-
foot-long steel sheet pile driven into an earthen levee and subsoil to a depth of
approximately seventeen feet and capped by a six-foot concrete monolith (cap) sticking
up out of the ground.  The concrete cap was poured in two segments, the first encasing
the top of the sheet pile (three feet), and the second extending three feet above.  The
upper "pour" consisted of three feet of concrete and reinforcing bar ("rebar") extending
above the sheet pile.  The floodwall had a horizontal construction joint between the two
"pours" of concrete.  Cushing Report at 29-30 & Fig. 21 (describing sheet pile I-wall);
Mosher Dep. at 28-29 ("It was … what we called an I-wall, which is essentially a sheet
pile wall with a concrete header section sticking above the ground"); Marino 2009 Dep.
at 58-59 (floodwall had a six-foot concrete monolith, with a construction joint three feet
below the top of the monolith); Pazos Report at 35-36 (floodwall "is a flexible cantilever
(I type) structure) embedded in a soil of soft saturated clay"; sheetpile extends 5 feet into
the 8 foot wall); Marino Report Figure 2.3 (dimensions of I-wall); Marino Report at 2-23
(describing two pours of concrete on monoliths); Bartlett Report App. A & B (schematic
of floodwall and concrete cap).

81. At the time of Hurricane Katrina, the top of the IHNC floodwall was considerably below
the design elevation due, among other things, to the use of incorrect datums to define the
top of the floodwall and due to subsidence of the levee and floodwall over time.  The
American Society of Civil Engineers reported that at the time of Hurricane Katrina, the
levees and floodwalls were up to 3 feet lower than their original design.  The height of
the top of the floodwalls along the IHNC was not uniform, moreover; some were lower
than others, due to greater subsidence and for other reasons.  Cushing Report at 32;
Bakeer Report at 31-32 & Supp. (Marino letter) at 21 (discussing evidence of added fill
placed in area of south breach, leading to differential settlement).

82. The floodwall derived its strength from the supporting soils into which the sheet pile was
embedded.  The floodwall is modeled structurally as a cantilever in which one end (the
top) is free to move and the other (the buried sheet pile) is anchored against movement
and rotation by the surrounding soils in which it is embedded.  In order for the floodwall
to fail, it was necessary for the forces acting on the wall to overcome the support
provided by the soil to the embedded sheet pile.  Bakeer Report at 20-21; Mosher Dep. at
17 ("The wall was founded in a levee, which is made up of soil, and the principal

14

resisting forces to any loads that are applied to the wall were resisted by the soils that the wall was setting in, and so that it's a classical soil-structure interaction problem"); Pazos Dep. at 201 (Q: … And so in order for the wall to do its job, it needs to have support in the soil on the protected side, right?" A: "Yes."); Marino 2009 Dep. at 55 (Q: "[I]n a flood stage, you need to have the sheet pile provide resistance in the soil and then below the levee; isn't that right?" A: "Yes."); Marino 2009 Dep. at 55 (Q: "And if you're going to fail the sheet pile, you've got to fail the soil; isn't that right?" A: "I haven't thought of all instances of whether that's true or not, but I would say in general, it's true."); Marino 2008 Dep. at 40 (Q: "And in order to fail the floodwall, you have to have some failure of the soil." A: "Yes."); Marino 2008 Dep. at 46-47 (agreeing that "the fundamental principle is that in order for a wall to resist a load it needs to have some sort of anchor somewhere so that when the load is exerted the wall can push back" and that "embedment depth" is one way to do that); Cushing Report at 51 (sheetpiling requires "passive soil pressure to resist overturning forces").

83. Hurricane Katrina spawned a massive storm surge that propagated from Lake Borgne through the MRGO into the IHNC. From the morning of August 28 through the peak surge in the IHNC at 9:00 a.m. CDT on August 29, the water level in the IHNC increased by over thirteen feet. The presence of the MRGO channel, the associated man-made flood protection structures, and the adverse effects of the MRGO on the surrounding natural environment exacerbated the surge elevation and duration in the IHNC at the Lower Ninth Ward. Bea Report App. C at 3-7.

## XII.   The Floodwall Breaches on the IHNC

84. On the morning of August 29, 2005, two breaches occurred in the floodwall on the east side of the IHNC. Cushing Report at 80 (Fig. 52); Marino Report at 4-5 (Photo 4.4); Spinks 2009 Dep. at 38.

85. The "North Breach" occurred just south of the Florida Avenue Bridge, at a location to the north and east of the Lafarge Terminal and on the opposite side of the IHNC from the terminal. Cushing Report at 80 (Fig. 52); Marino Report at 4-5 (Photo 4.4).

86. The "South Breach" occurred closer to the Claiborne Avenue Bridge, at a location to the south and east of the Lafarge Terminal and on the opposite side of the IHNC from the terminal. Cushing Report at 80 (Fig. 52); Marino Report at 4-5 (Photo 4.4).

### A.     North Breach

#### a.       formation and configuration

87. The North Breach occurred no later than 6:00 a.m. on August 29, 2005, and possibly as early as 4:30 a.m. The North Breach was approximately 215 feet in length. Cushing Report at 51, 103-04; Pazos Report at 8, 37; Marino Report at 3-16; Spinks Report Appendix I; Bea Report at 56-57. App. C at 9; Bakeer Dep. at 102.

88. The North Breach occurred at a transition between two different portions of the floodwall, an older segment with a depth of 23 feet and a newer segment with a depth of 35 feet. This transition constituted a point of weakness in the floodwall because of the

potential for torsion and tension between the 35-foot sheet pile, which was stronger, and the 23-foot sheet pile, which was weaker.  Bakeer Report at 42, 45; Cushing Report at 53.

89. The sheet pile at the North Breach ripped at the site of a faulty field weld between two sections of sheet pile.  Examination of the failed sheet pile showed that the interlocks between the two sections were significantly rusted and corroded, weakening the sheet piles in the area where the breach initiated.  Bakeer Report at 45-46 & figs. 40-45 (interlocks were "significantly rusted and corroded"); Pazos Dep. at 151-52 (agreeing that a "field weld of poor quality" in the area of the north breach made this location "one of the weakest points" in the floodwall); Pazos Dep. at 153 (agreeing that the poor quality weld made it possible for the wall to "develop a hinge between the monolith and the sheet piles"); LNA 009761, 9765 (Hardberger/Fernandes photo) (shows rip with floodwall standing on north side).

90. The tear in the sheet pile at this transition point is a distinctive feature of the North Breach.  When the sheet pile gave way at this tear, the shorter portion became uprooted from the ground and was caused to twist by the inrushing water.  Cushing Report at 105-11; Bakeer Report at 2-3 (discussing effect of flow through separation at weak joint).

91. Plaintiffs' experts undertook no calculations or other forensic engineering analyses to show that the rip in the sheet pile in the faulty weld at the North Breach must have been caused by the barge, as opposed to hydrostatic pressure in the IHNC.  Bakeer Report (Supp. Pazos Letter) at 7; Pazos Dep. at 154 (Q:  "And have you done any calculations about whether a hinge can develop in this floodwall at any time, without a barge impact?"  A: "I didn't do any calculation regarding how a hinge can develop in this floodwall …"); Pazos Dep. at 155-56 (Q: "Have you done any calculations that establish that the weld could not have come undone based on the hydrostatic pressure in the canal, without the barge?"  A:  "No.  I haven't done any calculation, no.  I can do it."); Marino 2009 Dep. at 116 (Q: "Have you done any calculations to rule out the possibility that a faulty weld failed under a hydrostatic load?"  A:  "I haven't done those calculations, no."); Marino 2009 Dep. at 134 (admitting that hydrostatic pressure from rising water on the wall could "create torque at the connection between the deeper and shallower sheet pile" where the faulty weld occurred); LNA 103414 (showing other locations where sheet pile tore under hydrostatic pressure in Hurricane Katrina without impact by a barge).

92. The North Breach occurred at a location where there was substantially less soil on the protected side of the floodwall than at locations further to the south, and thus the floodwall had less stability at that location.  Cushing Report at 105 ("inadequate soil resistance"); Bakeer Report at 37, 48 ("worst conditions" at North Breach site with regard to "lower soil support on the landside"); Bea Report App. C at 20-21 & Fig. 13; Mosher Dep. at 64-65 (north breach had three feet less soil on the protected side, which was "sufficient to cause it to go from something that would be stable to something that would fail").

93. One of the causes of the North Breach was the formation of a "tension crack" or "gap" between the canal-side soil and the steel sheet pile floodwall, which formed due to hydrostatic pressure on the wall.  This had the effect of cutting the levee embankment in two, increasing the hydrostatic pressure on the sheet pile and providing opportunities for water to seep under the sheet pile to the protected side.  Cushing Report at 52, 104;

16

Bakeer Report at 47; see Mosher Dep. at 59-64 (gap between sheet pile and canal side soil formed; no loading from a barge was needed for such a gap to form); Pazos Report at 43 (gap formation).

94. The North Breach occurred in an area of the floodwall where there were sand-filled excavations from work carried out along the East Bank Industrial Area. The sand-filled excavations provided a route for underbase seepage and hydraulic uplift effects at the North Breach site. Bea Report at 21-22, 39 (summarizing research showing that EBIA excavations led to "'instant' pressures at the tip of the sheet piles," or "underbase seepage and hydraulic uplift effects"); Bea Report App. C at 27, 35, 39, 61 & Fig. 29; Bakeer Report at 43; Marino 2009 Dep. at 212 ("There could have been some silty sand" at the north breach); see Marino 2009 Dep. at 161 (admitting that if seepage around the sheet pile tip occurred without a barge, then failure could occur without a barge).

95. Seepage and stability analyses confirm that the floodwall failed at the North Breach without the need for any involvement by a barge. Bea Report App. C at 47-64; Bakeer Report Appendix at 29-35.

96. In summary, the causes of the North Breach were: (1) formation of a gap between the canal side levee and the sheet pile leading to added hydraulic pressure and seepage; (2) inadequate soil foundation at the levee toe; (3) failure of the sheet pile at a transition point near the Florida Avenue Bridge, where there was a strength differential between two sections and a faulty field weld connecting them; and (4) underseepage and hydraulic uplift effects caused in part by sand-filled excavations in the vicinity of the floodwall at the North Breach site. Cushing Report at 54, 103-11 (graphics showing sequence of breach); Bakeer Report at 2-3; Bea Report at 21-22, 45-46 & Appendix C at 61.

**b.    non-involvement by ING 4727**

97. The Barge ING 4727 could not have been present at the site of the North Breach when the breach occurred. Wind was the primary force acting on the barge at all times, and the prevailing winds cannot have caused the barge to come into contact with the floodwall at the site of the North Breach at any time before its occurrence. The North Breach had already occurred before the prevailing winds came to include any component blowing from the west toward the east. Thus, even if the barge had been loose in the IHNC at the time of the breach, the winds would not have permitted the barge to impact the wall at the site of the breach at the time it occurred. Cushing Report at 104 (at the time of the north breach, winds "prevented the barge from moving to the north breach site"); *id.* at 129, 166 (impossible for wind to have pushed barge into wall at North Breach); Bakeer Report at 68-69 (for barge to travel against forces of wind and water is contrary to "[t]he laws of physics"); Dooley Dep. at 97 (wind could not have moved barge to North Breach); Marino Report at 3-11 (winds "essentially parallel" to canal before 9:00 a.m. [*i.e.*, blowing north to south along the axis of the canal]).

98. Neither water current nor waves could have brought the barge into contact with the floodwall. Water currents were insignificant in the canal, and wave action (if any) was insufficient to move the barge against the prevailing winds. Cushing Report at 168.

99. Photographs taken after Hurricane Katrina show a telephone pole standing on the canal-side bank of the IHNC, very close to the site of the North Breach and in a location that

would have been in the path of the barge, had it been present at or near the site of the North Breach.  Had the barge been floating free near the site of the North Breach, it would have toppled this telephone pole.  The presence of this telephone pole after the storm shows that the barge did not approach the North Breach site during the hurricane. Marino Report Photo 4.6; Bartlett Report Fig. 3.

100. There was no damage on the barge consistent with an impact at the site of the north breach.  Cushing Report at 175; Marino 2008 Dep. at 146 (no distinctive damage on barge associated with north breach).

101. There was no damage at the site of the North Breach that could be uniquely associated with impact from a barge.  For instance, there was no cracking of the concrete at the transition points at the northern and southern ends of the North Breach as would be expected had a barge impacted the wall at either end, as plaintiffs allege.  Cushing Report at 63, 88, 175; Cushing Dep. at 224-26; Bea Report at 54; Bartlett Dep. at 63.

102. Plaintiffs' experts offered inconsistent testimony regarding the origin of floodwall damage at the north breach, and attributed floodwall damage to the barge (horizontal scrapes on the floodwall) even though the photographic evidence showed the scrapes were present before the storm.  Cushing Report at 135 & Fig. 98 (scrape marks present before hurricane); Marino 2009 Dep. at 138-40, 179, 181 (denying barge caused damage in photo); Pazos Dep. at 184 (alleging barge caused damage in photo);.

103. In sum, the meteorological and physical evidence lead to the conclusion that the barge was not present at the site of the North Breach and did not cause the floodwall to fail at that location.  Cushing Report at 79, 166-76.

    B.        **South Breach**

        a.        **formation and configuration**

104. The South Breach occurred no later than 7:30 a.m. on August 29, 2005, but probably around that time.  The South Breach was more than 800 feet in length.  Cushing Report at 114; Marino Report at  3-16; Bea Report at 56-57, App. C at 9; Bakeer Dep. at 102; Pazos Report at 8, 37; see also Sartin Dep. 45 ("already daylight" when breach occurred).

105.  The formation of a tension crack between the canal side floodwall and the steel sheet pile due to hydrostatic pressure played a role in causing the South Breach as well as the North Breach.  Bakeer Report at 3, 58-59; Mosher Dep. at 59-64 (gap formation without barge involvement); Pazos Report at 51 (gap formation at South Breach).

106.  Overtopping and scour of the land-side soils played a significant role at the South Breach.  According to the IPET report, the peak water levels in the IHNC exceeded the top of the floodwall by as much as 2 feet.  These same water levels would have exceeded, by an even greater degree, those portions of the IHNC floodwall that had settled to an even lower level than IPET reported.  According to Team Louisiana, the point at which overtopping initiated the south breach into the Lower Ninth Ward could have been a foot lower than the wall top level (12.5 ft NAVD 88) found in surviving adjacent sections. Because the South Breach occurred at a location where substantial amounts of fill had been added to the levee during its construction, that location would have experienced considerable additional settlement over time, such that the top of the wall at the location of

the South Breach would have been considerably lower than other portions of the wall, leading to earlier overtopping and concentrated scour at that location. Bakeer Report at 34-36, 41, 55 & Supp. (Marino) at 21; Cushing Report at 48.

107.   Water falling from the top of the floodwall exerts an impact on the soil, which in turn experiences erosion, i.e. scours away. The scouring of soil causes the floodwall to lose support from the soil on the protected side. In the case of the IHNC South Breach, water cascading over the top of the floodwall created a scour trench on the protected side of the wall to depths in excess of six feet. The scour trench was deepest in the locations nearest to the initiation point of the South Breach. The effects of scour were exacerbated by the uneven floodwall, which gave rise to overtopping and scour at the lower portions of the wall. The location of the South Breach was one of the lowest points on the floodwall. Cushing Report at 54-57, 67; Bakeer Report at 41, 55; LNA 009744-45 (Hardberger photos) (scour trench).

108.   Overtopping of the floodwall in the area of the South Breach initiated by approximately 6:00 a.m., with eyewitness reports placing overtopping of the floodwalls even earlier than that. The floodwall failure at the South Breach did not occur too early for overtopping to have played a substantial role. Bea Report at 39, App. C at 3 (floodwalls began overtopping at 6:00 a.m. to 7:00 a.m. CDT); Edwards Dep. at 65-68, 75-79 (water got up to one foot below top of wall by 1:30 a.m., and overtopped wall and created scour trench in 3:00 a.m. time frame); Sartin Dep. at 53 (water was lapping top of floodwall on Sunday evening August 28); Bakeer Report at 36-37 (entire wall overtopped by 7:00 a.m., with lower portions of wall overtopped earlier).

109.   Aerial photography shows that the South Breach occurred in a segment of the floodwall where the wall deviated from its normal straight line alignment. The limits of the deviated segment precisely match those of the South Breach. The curvature of the floodwall at this location created weak links at the ends of the South Breach with the adjoining sheet piles. Bakeer Report at 56.

110.   Photographs show that within the remains of the canal side levee embankment in the South Breach are the remains of an old wooden plank road and an old oyster shell road that had been buried when the levee was constructed. Cushing Report at 65-66 & Fig. 43.

111.   The South Breach occurred at a location where excavations were carried out during remediation work on the East Bank Industrial Area, which were subsequently back-filled with sand or other permeable materials. The excavations provided a route for seepage and for hydraulic uplift pressures on the protected side of the floodwall. The evidence suggests a high degree of correlation between the excavations and the breach locations. Bea Report at 21, 48, 50 & App. C at 28, 34, 37-40; Bakeer Report at 43, 56.

112.   The South Breach gave way first in the northern "bow shaped" section near North Johnson Street, as opposed to the southern portion where the sheet pile was displaced to a lesser degree. Hydrostatic pressure and overtopping caused the sheet pile wall to form a bulge pushing back into the neighborhood which then gave way and translated approximately 180 feet inland, pulling the sheet pile out and unfolding the accordion-like folds in the sheet pile, forming a distinctive "bow" shape. This northern "bow-shaped" section was also located in an area very close to one of the sand-filled EBIA excavations. The smaller southern segment of the South Breach did not displace as deeply into the

19

neighborhood. It appears this segment was in a state of incipient failure and had become only partially dislodged when the northern segment failed first, pulling the southern segment out but displacing it only slightly by comparison. Cushing Report at 72-73, 112-14; Cushing Dep. at 245-46; Bakeer Report at 57; Bea Report App. C at 8 Fig. 6.

113.   Seepage and stability analyses confirm that the floodwall failed at the South Breach without the need for any involvement by a barge. Bea Report App. C at 64-90; Bakeer Report Appendix at 29-35.

114.   In summary, the causes of the South Breach were: (1) formation of a gap leading to increased hydrostatic pressure on the floodwall; (2) overtopping and severe scouring of the landside soils leading to loss of soil support; (3) variations from straight-line wall alignment creating weak points coinciding with the limits of the breach; (4) variations in subsoil conditions causing the area of the South Breach to have a lower wall top elevation; and (5) sand-filled excavations that exacerbated seepage and hydraulic uplift. Cushing Report at 60; Bakeer Report at 3, 54-59; Bea Report at 21-22.

**b.      non-involvement by ING 4727**

115.   The South Breach had already occurred before the prevailing winds came to include any component blowing from the direction of the LNA Terminal toward the east bank of the IHNC. The prevailing winds cannot have caused the barge to come into contact with the floodwall at the site of the South Breach at any time before its occurrence; neither could currents or waves have caused the barge to contact the wall at the time of the breach. Cushing Report at 114 ("it is clear that the [south] breach had to have occurred before the winds had a west-to-east component"); Marino Report at 3-11 (winds "essentially parallel" to canal before 9:00 a.m.); Cushing Report at 167-68.

116.   The barge did not impact the floodwall in the northern "bow shaped" section of the South Breach. The damage pattern there shows that the panels incline at increasing angles, but they do not show fracturing of the concrete. Cushing Report at 88; see Pazos Dep. at 202-03 (barge did not "impact" the wall at northern section; claiming only lesser degree of "contact" at that location).

117.   The damage pattern inside the main part of the South Breach (i.e., the bowed portion) shows that the water flow through the breach was very strong. If the barge had caused the breach, it would have been immediately drawn into and propelled in an easterly direction with the inrushing waters, deep into the Lower Ninth Ward. That did not occur, however. The barge ended up just inside the floodwall, slightly inward from the extreme southern end of the breach, away from the main portion of the breach. The position of the damaged houses and trees shows the barge cannot have traveled into the neighborhood and then drifted back toward the floodwall. Thus, the barge was not present in the vicinity of the floodwall when the main initial flow into the neighborhood took place. Cushing Report at 68, 72, 169-71; Cushing Dep. at 244-45, 263 (if barge had been present, it "would surely have been drawn in with the flooding water [and] blown well inland if it had ridden in on that deluge"; "would have moved inland"); see Edwards Dep. 90 (believes barge floated in after neighborhood was flooded).

118.   The physical evidence at the southern end of the South Breach showed that the barge passed through the floodwall at the extreme southern end of the South Breach, breaking

off some of the concrete cap and bending some of the rebar as it passed through. The concrete cap was cracked and the steel reinforcing bar bent toward the neighborhood, and the barge had scratches on the bottom consistent with the pattern of the steel rebar. The damage to the floodwall showed that the panels at the southernmost end of the breach were in an inclined position before being struck by the barge. Also, this impact with the concrete cap occurred well away from the apex of the northern bow, where the breach initiated. Thus, this contact by the barge occurred *after* the floodwall had already failed in the northern bow segment of the South Breach; the floodwall was already down before the barge first made contact. Cushing Report at 90-91 (scratches matched rebar; panels inclined before contact); *id.* at 115-20 (sequence of events at southern end of south breach); *id.* at 174 (floodwall damage demonstrating barge impact was after failure); Bakeer Report at 65-66 (barge impact area confined to extreme southern end, away from location where wall initially failed); Bartlett Report at 8 (scratches on barge matched rebar); Team Louisiana Report at 67 (angle of rebar suggested location of the wall "was already leaning having failed earlier"); ILIT Report at 6-7 (barge was "drawn into the breach by the inflowing waters"); Marino 2008 Dep. at 91, 95 (Q: "Did this shearing off of the top three feet at this location occur before or after the failure at the center point of maximum displacement in Photo 10?" A: "It occurred after."); LNA 009742-75 (bent rebar photos included in group of documents taken by J. Fernandes/M. Hardberger).

119.   The rebar at the southern end of the South Breach was bent horizontally, indicating the water level must have been high when the barge floated through. Cushing Report at 173; Pazos Dep. at 224 (Q: "All right. And the angle of the bending of the rebar, does that reflect … the attitude of the barge as it went into the neighborhood?" A: "Absolutely. Some was horizontal.")

120.   Damage on the barge itself is inconsistent with the barge having caused the breach. There is no evidence of damage on the barge consistent with an impact with the floodwall at the point of the breach, or with entry into the neighborhood before the water level was already very high. The scratch marks on the bottom of the barge line up with the rebar at the southern end of the breach, reflecting its passage through the existing breach at that location. Cushing Dep. at 265 ("[T]he barge, with its shallow draft, would have … hit the ground very, very hard and there would have been evidence on the barge that the barge had grounded at the edge that it entered he Lower Ninth Ward. There was no such evidence when I inspected the barge."); Cushing Report at 87 ("There was no damage on the barge that is consistent with the barge having caused the failure of the levee such as crushing damage, which could have been apparent if a major collision had occurred"), *id.* at 173; Marino 2008 Dep. at 130-31 (Q: "So there was no significant barge damage [crushing damage] on this barge, right?" A: "Yes."); Bakeer Dep. at 118-19 (noting absence of damage on barge).

121.   The barge floated over the top of a small school bus to arrive at its post-Katrina location. Thus, the water in the Lower Ninth Ward must have been higher than the top of the school bus when the barge entered the neighborhood. Bea Dep. 93-94.

122.   Apart from the localized damage observed at the extreme southern end of the South Breach, there is no evidence of damage on the floodwall consistent with a barge impact at the location of the South Breach, and specifically no evidence of barge impact damage to

the floodwall in the area of the northern "bow" where the South Breach initiated.  Cushing Report at 67, 173, 175.

123.   Plaintiffs' experts offered contradictory opinions regarding photographic evidence of floodwall damage which failed to establish any such damage was caused by the barge. Pazos Dep. at 193-94 & Exh. 12 (alleging barge caused damage in photo); Marino 2009 Dep. at 181 (denying barge caused damage in same photo); see Cushing Report at 136-37 (explaining why damage in photo was not caused by barge).

124.   Physical and photographic evidence in the damaged neighborhood shows the barge must have floated into the neighborhood after the water was already high.  For example, photographs show the barge landed on top of telephone wires rather than knocking the wires or telephone poles over.  LNA 010209, 010210; (Cunningham Dep. at 15)) (telephone wire); Cushing Report at 120, 121 (telephone wire).

125.   In addition, the pattern of damage on the houses with which the barge came in contact, just inside the floodwall, shows it did not carry any further into the neighborhood and that the water was high when the barge came into contact with them.  Cushing Report at 68, 74, 172.

126.   The barge could not have floated into the neighborhood until the water was already high because if the case were otherwise, the barge would have toppled into the neighborhood and grounded on its end due to the height differential that would have existed in such a scenario.  Cushing Report at 74, 141-43; Cushing Dep. 264-66 (barge would have "hit the ground very, very hard" but there was "no such evidence" on inspection of the barge).

127.   In sum, the meteorological and physical evidence lead to the conclusion that the barge was not present at the site of the South Breach when the breach occurred, and only passed through the extreme southern end of the breach after it had already occurred.  The barge did not cause the failure of the floodwall at the South Breach.  Cushing Report at 166-76.

## XIII.   Potential Barge Impact Forces/No Breach Causation

128.   It is possible to calculate the effect of an impact by an object such as a barge on an I-Wall such as those at the IHNC under the conditions that existed in Hurricane Katrina. Cushing Report at 158-63 and App. D, E, F (setting up and carrying out analysis); Marino 2008 Dep. at 37-38 (describing "hydrodynamic load analysis" to come up with "a potential force range that would impact the wall").

129.   An impact calculation involving a barge like the ING 4727 necessarily requires a motivating force to propel the barge in the direction of, and into contact with, the floodwall.  In this case, wind was the motivating force acting on the barge.  In all of the impact calculations supplied by the experts in this case, it was assumed that the barge was forced into contact with the floodwall by winds blowing in a west-to-east direction. However, there was no evidence of a west-to-east wind blowing at any time before both breaches had already occurred.  Thus, the impact calculations supplied by the experts in this case were done for theoretical purposes and do not represent impacts that could have been responsible for causing the North and South breaches, as the prevailing winds were not blowing in the direction of the floodwall prior to either the North or South Breaches. Cushing Report at 173; Pazos Report Attachment 5 at 14.

130.   A barge impact with a floodwall would not be of consequence unless it affected the deeply-anchored sheet pile and supporting soil.  Bakeer Report at 63 (barge impact would have to affect soil but did not); Marino Dep. at 254-55 (admitting barge impact on upper portion of wall has to be felt "all the way to the bottom of the [sheet pile] wall").

131.   LNA's expert, Dr. Charles Cushing, performed calculations showing that a barge impact, if it occurred, would cause local damage to the concrete cap but would not affect the steel sheet pile or supporting soil.  The Army Corps expert (Mosher) and even plaintiffs' expert (Marino) expressed agreement with this concept.  *E.g.*, Cushing Report at 158-63 (analysis showing that "a barge striking the concrete cap of the floodwall could not cause the sheetpile to fail" but would only create localized damage ("cracking" or a "notch") in the concrete cap, with no effect in the sheetpile below); Cushing Report at 99 & Figs. 72, 73, 74 ("These photos show that a barge impact with the concrete cap of a floodwall does not cause the floodwall to fail.  Rather, the concrete cap gives way and the sheetpile remains intact."); Cushing Report at 149 ("As calculations show and evidence of other barge impacts prove, a barge or any other object impacting a concrete floodwall will cause the concrete that receives the impact load to crack before the load will cause the entire sheetpiling to overturn or be uprooted (exhumed).");  Mosher Dep. at 91-92, 267 (noting to "other places where we saw barges hit walls" and noting they "can cause damage to the walls, but it's usually very local damage to the walls"; "punching through" the concrete cap but not "causing collapse"); Marino 2009 Dep. at 59-60 (admitting that construction joint in concrete cap constitutes a point of weakness, and that he would expect the wall to shear at the construction joint if the impact was sufficient); Marino 2009 Dep. at 104 (Q: "All right. So if a pressure on a wall is narrow in scope, you would not expect that pressure to be felt at deep depths?"  A: "Right."  Q: "So, for instance, the pressure of a corner of a barge hitting the top of a wall, you'd expect that pressure to be exerted on a narrow part of the wall rather than translating all the way down to the bottom of the sheet pile?"  A:  Well, obviously.  I mean, it's where there is contact.  I mean, that's a simple answer.").

132.   The effect of a barge hitting the concrete cap of the floodwall is akin to a sideways force exerted on a book that is sitting on top of a table.  The force will move the book, but the table will remain in place.  So here, the concrete cap will give way and crack but the steel sheet pile will remain in place.  Cushing Report at 149-51 & Fig. 104-05; Bakeer Report at 63, 66 (barge impact does not affect soil on other side of wall and "could not have caused [the] loss of soil resistance and stability").

133.   Plaintiffs' expert opined that "a corner of the barge hit the wall" at a level corresponding to 11.8 feet – a level just below the top of the concrete cap.  At that level, the barge impact would have caused localized damage to the cap but not the embedded sheet pile.  Cushing Report at 158-63; Marino 2009 Dep. at 59-60, 112, 166.

134.   None of the plaintiffs' experts performed any calculations showing the effect that a barge impact would have on the sheet pile or the supporting soil, as opposed to the concrete cap.  Accordingly, plaintiffs failed to show that contact between the barge and the floodwall, had it occurred, would have been sufficient to deflect the sheet pile, as opposed to creating local damage to the concrete cap.  *E.g.,* Cushing Report at 143 (Pazos did not analyze wall deflection); Marino 2009 Dep. at 127 (Q:  "You haven't done any calculations to determine whether an impact with the concrete cap would cause the cap to

23

shear off rather than pulling the wall from the soil; correct?" A: "That's correct.");
Marino 2009 Dep. at 126 (Q: "You haven't calculated the barge impact force at either of
the breaches; correct?" A: "That's correct"); Marino 2009 Dep. at 31-32 ("Would you
agree with me that there are no such engineering calculations [related to barge impact on
floodwall] in the report that you issued in 2009?" A: "Yes … That analysis never got
finished."); Pazos Dep. at 357 (describing calculations of wind forces, but not impact on
cap versus sheet pile).

135.   Plaintiffs' experts opined that the formation of tension cracks (or "gaps") played a role
in the formation of the breaches.  Cushing Report at 137; Pazos Report at 43-44; Pazos
Dep. at 90; Marino 2009 Dep. at 164.

136.   However, plaintiffs' experts did not perform calculations to rule out the formation of
tension cracks or gaps due to hydrostatic pressure, and admitted hydrostatic pressure on
the wall during Katrina was sufficient to deflect the wall and induce gap forming, even on
unfailed sections of the wall.  Cushing Report at 137; Marino 2009 Dep. at 127, 246
(admitting he "wouldn't be surprised if there were some – you know, a tension crack" on
unfailed sections of the wall); Marino 2008 Dep. at 66 (Q: "And in fact, as the water rises
in the canal the wall will deflect, won't it?" A: "Yeah.  Yeah."); Pazos Dep. at 95-96.

137. Evidence from other breach sites showed that such gaps formed due to hydrostatic
pressure without impact from a barge.  Mosher Dep. at 59-64 (gap between the sheet pile
and canal side soil formed, splitting the levee in half and depriving it of canal-side soil
resistance; gaps formed at multiple locations (including at the 17th Street Canal) and no
loading from a barge was needed for such a gap to form); Bakeer Report (Pazos Supp.
Letter) at 5-6.

138. The Army Corps' "E-99" full-scale field test similarly showed that hydrostatic pressure
on I-walls creates gaps of the type observed after Hurricane Katrina.  Cushing Report at
137; Bakeer Report (Pazos Supp. Letter) at 6; Bea Report App. D at 11-12.

139. The evidence showed, therefore, that the conditions presented in Hurricane Katrina were
sufficient to create the tension cracks (or "gaps") alleged by plaintiffs to have played a role
in the breaches without any impact from a barge.  Bea Dep. at 89; Bakeer Dep. at 122;
Mosher Dep. at 59-64.

140.   The physical evidence found at the southern end of the South Breach, where the barge
caused local damage to the concrete cap and rebar, tended to confirm that contact or
impact between the barge and the wall at a different location, if any such contact or impact
had occurred, would likewise have produced only local damage to the concrete cap
without dislodging the embedded steel sheet pile.  Cushing Report at 88-92.

141. Photographic evidence of other barges that impacted levees and floodwalls during
Hurricane Katrina showed multiple instances of barges causing localized damage at the
point of impact, typically the concrete cap, but not undermining the entire floodwall
structure.  Barges also struck floodwalls during Hurricane Gustav without causing any
significant damage or failures to these structures.  Cushing Report at 99, 149, 175 & Figs.
72, 73, 74, 122; Mosher Dep. at 91-92, 267; Bea Report at 57-60; Bea Dep. at 94; Bakeer
Report at 3, 14, 64 & Figs. 66, 72 (noting barge impacts in Katrina and Gustav);

Cunningham Dep. at 39-45 (LNA 000762 to 000769) (pictures of stranded barges including evidence of contact or impact with floodwalls).

142.   Photographic evidence also showed that a barge struck the Florida Avenue Bridge during Hurricane Katrina without knocking over the bridge. Hall Dep. at 43; Marino 2009 Dep. at 129.

143.   Impact from a barge is not sufficient to cause a floodwall to fail in the manner observed at the IHNC North Breach and South Breach. Cushing Report at 173 ("The barge could not strike the sheetpiling with sufficient energy to cause overturning. In any event, the concrete cap on top of the wall would have cracked before the barge could have affected the anchoring of the sheetpile."); Cushing Dep. at 252-54 (force not sufficient to fail floodwall); Bartlett Report at 6 ("The fact that the wall fractured at this location demonstrates that when the impact occurred, the wall foundation had sufficient strength to resist the force required to cause the fracture, rather than fall over"); Marino 2009 Dep. at 35-36 (Q: "This report doesn't contain any other quantitative forensic engineering analysis to demonstrate that the ING 4727 was capable of causing either breach, does it?" A: "No."); Marino 2009 Dep. at 127 (Q: "you haven't calculated the force that would be needed to exhume the sheet pile at either location; is that correct? A: "That's correct."); Marino 2009 Dep. at 157 (Q: "And you haven't calculated whether the momentum of the barge was sufficient to cause the wall to deflect and create this gap in the manner you've described?" A: "Right.").

144. The bow-shaped configuration of the South Breach reflects the influence of a uniform load due to hydrostatic pressure rather than a point-load impact from a barge. The sheet piles within the limits of the "bow" spread and tilted in both directions from the apex of the bow, with a rounded center at the apex. By contrast, a point-load impact would have caused a localized or pronounced indentation at the point of impact. There was no evidence of a non-uniform or pronounced indentation at the apex of the South Breach, nor was there any such evidence at the North Breach. Bakeer Report at 64-65, 67-68.

145. The floodwalls protecting the New Orleans area failed in multiple other locations, in similar configurations to those found at the IHNC breach sites, without any barge impacts. Such failures exhibited similar bow-shaped configurations reflecting hydrostatic pressure rather than point impact. Cushing Report at 175; Bakeer Report at 3, 30, 53, 62, 68 & Figs. 15, 36.

146. The non-barge forces exerted on the floodwalls during Hurricane Katrina were sufficient to cause the floodwall to fail at the North Breach and South Breach without impact from a barge. Bakeer Report at 61 (walls failed "for reasons that had nothing to do with a barge"); Mosher Dep. at 14-15 ("The walls would have failed even if the barge hadn't hit the walls"); Mosher Dep. at 68 (Q: "Did IPET conclude that the conditions in the Inner Harbor Navigation Canal were sufficient to cause the wall to fail without involvement by a barge?" A: "Yes."); Mosher Dep. at 117 ("[T]here were other causes to the failure of the wall other than the barge, and [we] didn't feel that was a potential cause for the failure of the walls. They would have failed otherwise.").

147. It is irrelevant that some portions of the floodwall did not fail. A floodwall will fail at its weakest link. Thus, at other floodwalls that failed without impact from a barge, there

25

were similarly unfailed portions adjacent to the portions that failed.  Bakeer Report at 59-60 & Pazos Supp. Letter at 5; Cushing Report at 138-39.

## XIV.  Expertise of the Parties' Key Experts

148.  LNA's key experts have years of experience studying the New Orleans region's floodwalls and levee structures.

a.  LNA's expert Robert Bea, Ph.D., P.E. is a Professor of Civil and Environmental Engineering at the University of California – Berkeley.  *See* Bea Report Appendix A at 1.  Dr. Bea has spent approximately 10,000 unpaid hours studying and reporting on the failures of the hurricane flood protection system in New Orleans during Hurricane Katrina.  *Id.* at 4 ¶ 4; Bea Dep. at 23, 27, 40.  He served as co-leader of the Independent Levee Investigation Team ("ILIT") sponsored by the National Science Foundation, and co-authored the ILIT team's preliminary and final reports.  *Id.* at 5 ¶ 4(c).  Dr. Bea has authored and co-authored twenty-one refereed conference and journal papers documenting his forensic engineering work regarding the causes of the levee and floodwall breaches in and around New Orleans.  *Id.* at 7 ¶ 12.  Dr. Bea reached his conclusion that the ING 4727 was not a cause of the IHNC floodwall breaches in multiple peer-reviewed publications that he wrote before he was ever retained as an expert by LNA (in 2009) or any other party in the Katrina litigation (2007).  *See id.* at 8-13 ¶¶ 17-23 (ILIT investigation and conclusions published in 2006); *id.* at 15-22 ¶¶ 27-29 (peer-reviewed journal articles published in 2007 and 2008).

b.  LNA's expert Reda Bakeer, Ph.D., P.E. is chief engineer of Ardaman and Associates and a Professor Emeritus of Civil and Environmental Engineering at Tulane University.  Bakeer Dep. at 32; Bakeer Report Appendix C at 51-52.  Dr. Bakeer was selected to be a faculty member at the Levee School at Louisiana State University, a school created with funding from the Louisiana Department of Transportation.  Bakeer Dep. at 79.  In this role, Dr. Bakeer instructs local levee board members regarding engineering details of the levee systems.  *Id.*  Prior to his work with the Levee School, Dr. Bakeer worked on several projects for the U.S. Army Corps of Engineers for which he designed I-walls and other flood protection structures in New Orleans.  Bakeer Dep. at 43-49.  Dr. Bakeer was hired by the Corps on several occasions to write technical reports on various levee issues.  Bakeer Dep. 50-53; Bakeer Report Appendix C at 54-72 (listing work done for Army Corps and other entities).

149.  Plaintiffs' expert Gennaro Marino lacks the experience that Dr. Bea and Dr. Bakeer have regarding the New Orleans levee systems.  Dr. Marino's work on the IHNC floodwall failures was carried out purely for litigation and does not grow out of his independent work.  Indeed, he has never before designed or evaluated the safety of a hurricane protection levee or floodwall for the Corps, and has never before conducted a seepage or stability analysis of a hurricane protection system that failed.  Marino 2009 Dep. at 89-91.  Moreover, Dr. Marino's work on this case has never been subject to independent oversight, and he has never published his research in a peer-reviewed or refereed journal.

Marino 2009 Dep. at 48-49. Finally, Dr. Marino's conclusions contradict the results of all of the independent published and peer-reviewed studies conducted to date regarding the causes of the floodwall failures. Marino 2009 Dep. at 261-62; LNA SJ Reply Exh. 1, Bakeer Comments on Marino Report at 3.

## XV.   Independent Studies of Levee and Floodwall Failures

150.   IPET was established by the U.S. Army Corps of Engineers to study the performance of the hurricane protection system. Mosher Dep. at 34-39 (IPET funded with $22-23 million, team of 350 plus people, overseen by two review panels from the American Society of Civil Engineers and the National Research Council); Mosher Dep. at 25 ("The purpose was to do an unbiased assessment of what, from a scientific and engineering standpoint, took place in New Orleans during Hurricane Katrina ...").

151.   The Independent Levee Investigation Team ("ILIT") was established by an independent team of researchers led by scientists from the University of California at Berkeley and supported by the National Science Foundation. The purpose of the investigation was to address the performance of the hurricane protection system in New Orleans to determine what happened, why it happened, and how a recurrence can be prevented. ILIT Report at xix, xxvi to xxix.

152.   The "Team Louisiana" Investigation was established by the State of Louisiana to study the performance of the New Orleans hurricane protection system and to identify causes of failure. Team Louisiana Report at 3-4.

153.   The IPET, Team Louisiana and ILIT investigations were performed to "provide credible and objective scientific and engineering answers to fundamental questions about the performance of the hurricane protection and flood damage reduction system in the New Orleans metropolitan area during Hurricane Katrina." Spinks Report at 11.

154.   The IPET, Team Louisiana and ILIT investigations all concluded that the failure of the IHNC floodwalls was the result of failure in the supporting soils, due to foundation instability or underseepage or both, and all expressly or implicitly found that the barge did not cause the failures.

   a.   IPET concluded that the North Breach occurred prior to overtopping as a result of the formation of a tension crack on the floodwall and diminished soil support at the levee toe, and the South Breach resulted from overtopping and erosion. Cushing Report at 51 (citing IPET V-11-17); see IPET Report at V-68; Bea Report at 15; Mosher Dep. at 117 ("[T]here were other causes to the failure of the wall other than the barge, and [we] didn't feel that was a potential cause for the failure of the walls. They would have failed otherwise."); Mosher Dep. 78 (IPET considered the barge as a potential cause of the south breach and "rejected that conclusion."); Mosher Dep. 68 (IPET concluded that the south breach was caused by overtopping and erosion on the protected side).

   b.   ILIT's initial report attributed the IHNC floodwall failures to underseepage. ILIT Report at 6-10, 6-11, 6-17 (failures due to underseepage). Subsequent work performed by this team and summarized in American Society of Civil Engineers conference papers showed multiple competing modes of failure including

overtopping and underseepage-induced lateral stability failure.  Bea Report at 16-17.  Barge impact "was not the cause of the breach and failure" … the "likelihood is that the barge slipped its moorings and was eventually drawn in through a breach that was already well developed."  ILIT Report at 6-7; see Bea Report at 13; Bea Dep. 47-49.

    c.   Team Louisiana concluded that the failures were due to a combination of foundation instability and underseepage.  It found that "[t]he barge had clipped the end of the already formed breach as it was sucked through."  Team Louisiana Report at 67; Kemp Dep. 44-46.

    d.   Although the various teams attributed different degrees of significance to the various causes of the floodwall failures, they were united in concluding that the barge was not a causative factor.

## XVI.   Alleged Eyewitness Accounts

155.   Civil twilight was at 6:11 am and sunrise was at 6:36 am on the morning of August 29.  Cushing Report at I-3 (citing U.S. Naval Observatory data); Pazos Dep. at 142 (accepting U.S. Naval Observatory as an authoritative source insofar as the time of civil twilight and sunrise).

156.   Witness reports regarding events that occurred in the midst of a hurricane, and in dark and/or rainy conditions, are subject to significant uncertainty.  Bea Report at 62-63 & Appendix D at 24 (noting poor visibility, acoustic conditions, and stress); Marino 2009 Dep. at 24 (witness reports about time are "obviously off" and accounts should not be accepted "as gospel"); Spinks 2009 Dep. at 84 (Q: "Do you agree under the stress of the moment and in mortal danger almost all witnesses will recollect different times?"  A: "I think I mentioned previously that it's not uncommon to have differences in the eye witness accounts during a storm event.").

157.   The account of William Villavasso does not establish that the barge was present at the site of the North Breach when the breach occurred.

    a.   Mr. Villavasso, an employee stationed at Pump Station No. 5 in the Lower Ninth Ward near the Florida Avenue Bridge, testified that he heard an explosion ("boom") and saw "[a] couple of sections " of the wall "tumble [] over," then saw "what appear[ed] to be [a] metal structure like a barge, only the tip of it."  Villavasso Dep. at 31, 53, 64.

    b.   Mr. Villavasso admitted he was not wearing glasses and had "fuzzy" long-distance vision.  Villavasso Dep. at 211; see Cushing Dep. at 207-08.  He also admitted in his deposition that he "couldn't tell what it was" he saw.  Villavasso Dep. at 203-04.  He testified that it was "still dark" and "raining" at the time.  Villavasso Dep. at 64; Marino 2009 Dep. at 121 (admitting Villavasso's vision was "obscured by rain and darkness" and that "he said he did not have a clear, focused picture").  These conditions would have made it difficult for Mr. Villavasso to have conclusively identified what he saw as a barge.  Cushing Dep. at 206 ("I rejected Mr. Villavasso's testimony that he saw what he thought was a barge.  He was 400 feet away.  He had a … sight problem, as I understand it.  It was dark.  It was

raining heavily, and I don't believe he could have seen clearly what he was seeing. Certainly not to be able to define it as – as a barge.").

    c.   Mr. Villavasso did not mention having seen a barge to his co-workers who were on duty with him during Katrina; and he did not mention having seen the wall fall down. Riess Dep. at 52-53, 77-78; Rainey Dep. at 36, 39-40, 44-45. The same co-workers testified they observed water entering the vicinity from a different direction than that identified by Mr. Villavasso. Rainey Dep. at 30-32, 36-38 (reported water coming from Southern Scrap area to the north, not IHNC to the west).

    d.   Mr. Villavasso's testimony, taken at face value, establishes that the object he believes he saw could not have been the ING 4727. Mr. Villavasso testified that the object he saw was sticking up only one to two feet above the top of the floodwall, whereas the ING 4727, had it been present, would have been sticking up thirteen to fifteen feet above the top of the floodwall. Villavasso Dep. at 202 (object sticking up one to two feet above wall); Pazos Dep. at 164 ("the top of the barge was above the top of the seawall probably fifteen, sixteen, seventeen feet"); Pazos Dep. 183-84 (stating that "[a] barge is huge compared … with the wall" and agreeing it would have been "sticking up 16 feet above the wall"); Marino 2009 Dep. 120-21 (admitting that barge was sticking up at least 15 feet above the wall, but Villavasso said he saw a stickup of no more than "a few feet"); Cushing Dep. at 205 ("The barge would have been sitting 13 feet up in the air" had it been present; not just one or two feet as Villavasso testified); Cushing Report at 124-25 & Fig. 93 (barge would have been higher than 13 feet above the wall top); Cushing Dep. at 193) (the one-to-two-foot object he described could just as easily have been the sheet pile behind the peeling concrete, revealed in the breach).

158.   The account of Terry Adams does not establish that the barge was present at the site of the South Breach when the breach occurred.

    a.   Mr. Adams testified that between 5:30 a.m. and 6:00 a.m., from a vantage point on a rooftop near Deslonde and Law Street, he "could see something coming toward the levee" and then "heard something like a bang" and then "seen the barge come floating through." Adams Dep. at 24-25.

    b.   Mr. Adams' testimony was equivocal about what he saw; he said he "couldn't exactly see what it was"; "couldn't make out what it was"; and inferred it was a barge because "this canal don't be having nothing on it like that." Adams Dep. at 23-26.

    c.   Mr. Adams was over half a mile away from the location of the event he purported to have witnessed. Adams Dep. at 88 ("five blocks" away); Stone Dep. at 15 (distance from house to barge was 2975 feet); Cushing Report at 123 (half mile away); Cushing Dep. at 168 (rejecting Adams account of what he saw based on expert's personal inspection of site where Adams says he was, obstructions to vision, darkness and rain that obscured vision).

    d.   It was dark and rainy at the time that Mr. Adams purports to have made his observation. Adams Dep. at 48 ("raining"), 77 ("still dark"); 88 ("still dark" and

"still raining hard"); Cushing Dep. at 172 (photograph shows that visibility conditions even at 7:47 a.m. would not have permitted Adams to see as far as he claims to have seen); Cushing Report at 46 Fig. 28 (poor visibility even after sunrise).

    e.   The object that Mr. Adams described was sticking four feet above the floodwall, not thirteen to fifteen feet as the ING 4727 would have been.  Adams Dep. at 82 ("only about four feet of that barge sticking out … over the floodwall"); Pazos Dep. at 164 ("the top of the barge was above the top of the seawall probably fifteen, sixteen, seventeen feet").

    f.   If Mr. Adams' account were true, the barge should have pushed deep into neighborhood by inrushing waters, or grounded after tumbling over the wall into the unflooded neighborhood; the physical evidence, however, establishes that this did not occur.  Cushing Dep. at 141-43.

    g.   Mr. Adams is a convicted felon with a financial stake in the outcome of the barge litigation.  Plaintiffs' Response to Request to Admit No. 17 (felony conviction); Adams Dep. 40-41 (Adams has retained plaintiffs' counsel to pursue claims).

159.   The account of Sidney Williams does not establish that the barge was present at the site of the South Breach when the breach occurred.

    a.   Mr. Williams purports to have seen the barge "hit the wall, bounce[] off, [and] hit the wall again" immediately before flooding.  Williams Feb. 2008 Dep. at 41, 50-51.

    b.   However, Mr. Williams gave an interview in which he told investigators that he did not see the barge and avowed that the barge did not cause the breach.  Williams Oct. 2008 Dep. Exh. 3 at 23, 24, 26, 27, 29, 32.

    c.   Mr. Williams also testified that he could only see the "top" of the barge, or the "covers" of the barge.  Williams Oct. 2008 Dep. at 47-48.

    d.   If Mr. Williams' account of barge impact were true, the barge should have been pushed deep into neighborhood by inrushing waters, or grounded upon striking the land side of the unflooded neighborhood; the physical evidence, however, establishes that this did not occur.  Cushing Dep. at 141-43.

    e.   Mr. Williams has a financial stake in the outcome of the barge litigation.  Williams Feb. 2008 Dep. at 11 (Williams represented by plaintiffs' counsel in this case).

160.   The accounts of the alleged eyewitnesses, even if credited, are inconsistent with the theory of plaintiffs' experts that repeated barge "contact" with the wall caused the formation of tension cracks or "gaps" that led to the formation of breaches after the contact took place.  Marino 2009 Dep. at 141; Pazos Dep. at 202-03 (both describing multiple contacts).

161.   There are countervailing witness accounts by people who say they saw the flooded area but no barge was present.  Marenthia Lagarde Dep. at 89-90, 94 (video showed water streaming into neighborhood before barge went through); D'Antionette Johnson Dep. at 34-36, 39-41, 50 (saw water coming over the floodwall in waves, saw flooded neighborhood early morning, but no barge).

**XVII.  Accounts of "Boom" Witnesses**

162.   The plaintiffs have pointed to substantial witness testimony regarding "boom" sounds heard by witnesses at or around the time of the IHNC floodwall breaches.  Although some witnesses described the sounds they heard in various ways, the overwhelming preponderance of the descriptions clustered around the word "boom" to describe the sound heard by these individuals.  Doc. 19352, Plaintiffs' Compendium No. 3.

163.   However, the evidence also showed that witnesses heard similar "boom" sounds in vicinity of other breaches where no barge was present.  IPET Report at IV-7-3, IV-7-27; Marenthia Lagarde Dep. at 71-72 ("boom" during Hurricane Betsy); Lentz Dep. at 8, 19-20, 24, 51, 56-57 (from residence half a block from 17th Street Canal floodwall, heard "boom" just before water "rose rapidly", inferred sound was made by levee breaking); Doc. 19293-4, Exhibit 25 (LNA compendium of deposition testimony of witnesses who heard boom sounds at other breaches).

164.   Expert testimony showed that concrete breaking, as occurred in floodwall breaches, makes a loud sound in the nature of a "boom."  Weiss Report at 4-5; Bakeer Dep. at 133; Bartlett Dep. at 39-40.

165.   Evidence of "boom" or other sounds in the vicinity of the IHNC floodwall breaches provides no basis to infer that the sounds represent impact from a barge, as opposed to other sounds such as breaking concrete associated with the breach(es) themselves.  Weiss Report at 4-5.

**XVIII. Foreseeability / Proximate Cause**

166.   Plaintiffs presented no evidence of any prior instance in which impact from a barge was responsible for causing a flood protection structure to be dislodged from the ground or otherwise fail in the manner evident at the North and South Breaches of the IHNC floodwall, or causing flooding in general.  Marino 2008 Dep. at 105 (not aware of any instance in which a barge caused the failure of a floodwall before this incident); Plaintiffs' Response to Interrogatory No. 7 (answering "unknown" to interrogatory asking them to identify "any past instance in which a barge breakaway caused flooding as the result of an allision with a flood protection structure").

167.   The overwhelming evidence showed that when a barge impacts a levee or other flood protection structure, the expected result is limited to localized cracking or notching of the type observed at multiple other locations from barge impacts during Hurricane Katrina, not failure and flooding.  Cushing Report at 99, 149, 175 & Figs. 72, 73, 74, 122; Mosher Dep. at 91-92, 267; Bea Report at 57-60; Bea Dep. at 94; Bakeer Report at 3, 14, 64 & Figs. 66, 72 (noting barge impacts in Katrina and Gustav); Cunningham Dep. at 39-45 (LNA 000762 to 000769) (pictures of stranded barges including evidence of contact or impact with floodwalls).

168.   There is no evidence that the failure of a flood protection structure is a foreseeable consequence of a barge breakaway.

31

## XIX.    The MRGO Levee Breaches

169.   Hurricane Katrina's storm surge caused massive breaches in the earthen levees along Reach 2 of the Mississippi River Gulf Outlet (the "MRGO Breaches").  Bea Report Appendix B; Pazos Report at 37.

170.   The earthen levees along MRGO Reach 2 protect the same area ("polder") as the floodwalls on the east side of the IHNC.  Suhayda Report Fig. 1; Spinks Report at 10.

171.   The MRGO Breaches inundated St. Bernard Parish and the Lower Ninth Ward with massive flooding on the morning of August 29, 2005.  Suhayda Report at 2-3; Spinks Report at 17 (35,200 ft of breaches along MRGO); Spinks Report at 18 Fig. 4 (showing locations of "major levee breaches" along MRGO).

## XX.    Damages - Flooding in the Lower Ninth Ward and St. Bernard Parish

172.   It is possible, through scientific flood modeling, to determine the level of flooding that would have occurred in the Lower Ninth Ward and St. Bernard Parish even if the IHNC floodwall breaches (the North Breach and South Breach) had not happened.  Suhayda Report at 2; Spinks 2008 Dep. at 241-42; Spinks 2009 Dep. at 142-44.

173.   Flood modeling by plaintiffs' expert shows that even if the IHNC North Breach and South Breach had not occurred, the MRGO levee breaches would have flooded the Lower Ninth Ward and St. Bernard Parish to the same maximum level on August 29, 2005. Suhayda Report at 2; Spinks 2008 Dep. at 202-03 (MRGO breaches "would have flooded this [Lower Ninth Ward] location to a depth of over 14 feet regardless of the Inner Harbor Navigation Canal breaches"); Spinks 2009 Dep. 147-48 ("[If] you only considered MRGO breaches and overtopping, … at some point in the future this area would have been affected by only MRGO's waters" in both Lower Ninth Ward and St. Bernard Parish); Spinks 2009 Dep. at 206 (water at Richardson home reaches the same maximum level "with or without the IHNC breaches").

174.   Flood modeling by plaintiffs' expert shows that the only difference in flooding resulting from the IHNC breaches is that the water arrived up to five hours earlier on August 29 than it would have arrived if the IHNC breaches had not occurred.  Suhayda Report at 11; Spinks 2009 Dep. at 149-50 (Q:  "Without the IHNC breaches you get to the same water level, but just a couple of hours or a few hours later?"  A: "At location 1 about five hours later.  At location 2 closer to Paris Road where we know the two waters mixed, then about an hour to two hours difference."); Spinks Report at 34 Figs. 15-16.

175.   The value associated with five hours' use of property during hurricane conditions, and in the face of a mandatory evacuation order, is zero.  Ragas Dep. at 115 (damage caused by the IHNC breaches was only that of a loss of use of property for a few hours, which would be valued at "zero or an immeasurably small number").

176.   The flooding at John and Jerry Alford's home at 2423 Deslonde Street came primarily from the North Breach.  See Spinks Report Appendix J, Fig. 1; Spinks 2009 Dep. at 189.

177.   Josephine Richardson's home – located at 1321 Egania Street – was built on three pillars in an area slightly above sea level and it had four steps up from the porch to the

main house.  The attic (accessible by ladder) was located in one of the bedrooms. Richardson Dep. at 69, 120, 127.

178.  The initial flooding at the Richardson home came from the IHNC, to a level of 5.9 feet. However, water from the MRGO caused depths to reach or exceed 10 feet.  Spinks Report Appendix J, Fig. 2 and Spinks 2009 Dep. at 190, 195-200, 203; Richardson Dep. at 69.

179.  The flooding at the location of Holiday Jewelers in Chalmette (located at 8400 W. Judge Perez Drive) was initially from the IHNC, but after only thirty minutes, most of the water to arrive there was from the MRGO.  Spinks Report Appendix J, Fig. 3; Spinks 2009 Dep. at 191.

## XXI.  Damages - Quantum

180.  The value of the Alford property at 2423 Deslonde Street was approximately $47,000 prior to Hurricane Katrina.  At the time of the storm, the property had a mortgage of approximately $30,000, and the Alfords' equity amounted to approximately $17,000. After Katrina, the Alfords received wind damage insurance in the amount of $27,796, and federal funds from the Road Home program in the amount of $120,000 for flood damage. They chose to pay off the mortgage on their Deslonde property and to purchase a new home in Algiers for $107,000.  When all relevant payments are taken into account, the amount already received by the Alfords for Katrina-related damage to their property exceeds the amount of damages they could claim in this case, had the barge been responsible for any such damages.  Ragas Report at 6; Jerry Alford Dep. at 6, 61, 70.

181.  The value of the Richardson property at 1321 Egania Street prior to the storm was approximately $89,000 prior to Hurricane Katrina.  After Katrina, Mrs. Richardson received wind damage insurance of $10,489.71 and federal funds from the Road Home program in the amount of $119,010 for flood damage.  Mrs. Richardson chose to renovate her property, and as of 2007 it had a market value in excess of $140,000.  When all relevant payments are taken into account, the amount already received by Mrs. Richardson for Katrina-related damage to her property exceeds the amount of damages she could claim in this case, had the barge been responsible for any such damages.  Ragas Report at 5-6; Richardson Dep. at 37, 150, 173.

182.  Jacob R. Glaser owned a business, Holiday Jewelers, Inc. in Chalmette, Louisiana. There was no proof of damages to his business related to the flooding from the IHNC, as opposed to the MRGO flooding which accounted for most of the water at his location; or as opposed to the Murphy Oil spill, which also allegedly damaged his business. Furthermore, on an average basis for the three years prior to the storm for which records are available, the business operated at a loss of $1,989.33 (excluding a one-time insurance payment).  Boudreaux Report at 4.  Based on financial figures for the business, there was no net profit for the period 2005-11 attributable to Hurricane Katrina, taken as a whole (a total loss of $13,925 is projected).  Boudreaux Report at 4-5.  By any measure, therefore, Holiday Jewelers cannot show that it suffered a monetary loss, even if the barge had been responsible for any of the flooding encountered at his place of business. Bourdreaux Report at 2-4.

183.   Following Hurricane Katrina, Mr. Glaser became a realtor in the New Orleans Area. Glaser Dep. at 125; Boudreaux Report at 5-6.  Based on projections derived from the average salaries of jewelers and realtors in Louisiana as well as Mr. Glaser's actual earnings in 2006 and 2007, Mr. Glaser's projected wages for the 2005-2011 period exceed his projected wages had Katrina not occurred.  Boudreaux Report at 5-6.

184.   In calculating lost profits for Holiday Jewelers, it cannot be assumed that the store would have been able to operate without a proprietor.  Had Mr. Glaser become a realtor while Holiday Jewelers remained in operation, the store would have had to employ someone to physically operate the business.  Thus, the profits of the business cannot be calculated as if there was no expense associated with the labor of the person or persons required to operate it.  Boudreaux Report at 6.

## PROPOSED CONCLUSIONS OF LAW

1. The Court will apply maritime law to this action.  (See R.D. 18799 ¶ 2 (joint stipulation of the parties agreeing that this action is governed by maritime law.)

2. In order to succeed on their claim under maritime law, plaintiffs must show by a preponderance of the evidence that (a) LNA owed them a duty, (b) LNA breached that duty, (c) plaintiffs sustained injury, and (d) LNA's conduct caused plaintiffs' their injury. *In re Cooper/T. Smith*, 929 F.2d 1073, 1077 (5th Cir. 1991).

## I.    Duty and Breach

3. LNA's duty, to the extent it existed, was a duty to act with "ordinary care under the circumstances."  *Daigle v. Point Landing, Inc.*, 616 F.2d 825, 827 (5th Cir. 1977) ("The plaintiff is owed a duty of ordinary care"); *Coumou v. United States*, Nos. 95-30219 & 95-30697, 1997 U.S. App. LEXIS 12674, at *16 (5th Cir. Feb. 26, 1997) ("The general maritime law of negligence recognizes a duty of reasonable care under existing circumstances when warranted by general tort law principles.").

4. Plaintiffs have failed to show by a preponderance of the evidence that LNA did not take "reasonable precautions" in "anticipation of the severity of the impending storm" in its preparations for Hurricane Katrina.  *See In re SS Winged Arrow*, 425 F.2d 991, 995 (5th Cir. 1970).

5. Plaintiffs have failed to show by a preponderance of the evidence that LNA did not act reasonably in preparing the ING 4727 for Hurricane Katrina.  Specifically:

    a. Plaintiffs have failed to show that there was any reason for LNA personnel to refrain from unloading the barge upon its arrival at noontime on Friday, August 26.

    b. Plaintiffs have failed to show that LNA should have ceased unloading the barge or should have added ballast on Friday night or Saturday morning.

    c. Plaintiffs have failed to show that LNA could or should have removed ING 4727 from the IHNC on Saturday August 27, before Hurricane Katrina arrived.

    d. Plaintiffs have failed to show that LNA should have refrained from asking Domino to shift the empty and loaded barges.

    e. Plaintiffs' claim that LNA failed to "double up" the mooring lines between the ING 4727 and the ING 4745 is belied by the evidence, which establishes that the mooring configuration was more than doubled in strength from the pre-storm configuration.

    f. Plaintiffs have failed to show that LNA should have used wire cable instead of polypropylene line to secure the barges to the dock and to each other.

6. Plaintiffs have failed to show by a preponderance of the evidence that LNA violated any statutes, codes, or regulations.  Specifically:

    a. LNA did not violate 33 C.F.R. § 162.75(b)(3)(ii).  Specifically, the ING 4727 was properly "moored by bow and stern lines" because there were at least three

35

connections between the ING 4727 and ING 4745 – one at the bow, one at the stern, and one or two in the middle.  The remainder of § 162.75(b)(3)(ii) does not apply to ING 4727 because that portion of the regulation applies only to "tows" and the ING 4727 is not a tow. See Ryan Report at 10 ("the ING 4727 ... is not a tow"); 46 C.F.R. § 27.101 (defining a tow as "a commercial vessel engaged in, or intending to engage in, pulling, pushing, or hauling alongside, or any combination of pulling, pushing, or hauling alongside"); see also 33 C.F.R. § 101.105 (explaining that a "towing vessel" has "operational control of an unmanned vessel"); 33 C.F.R. § 165.100(c) (same).

    b.  LNA did not violate 33 C.F.R. § 6.19-1.  That regulation did not require LNA to do anything at all.  The provision provides that "[n]othing contained in this part shall be construed as relieving the masters, owners, operators, and agents of vessels or other waterfront facilities from their primary responsibility for the protection and security of such vessels or waterfront facilities." *Id.*  That provision means only that the regulations do not absolve those in control of vessels of their basic responsibility to protect and secure the vessels.

7.  Even if plaintiffs had shown that LNA breached a duty to plaintiffs, they must also show that whatever LNA neglected or failed to do would have, if done, prevented the ING 4727 from breaking away.  *Inter-Cities Navigation Corp. v. United States*, 608 F.2d 1079, 1081 (5th Cir. 1979) ("A failure to act, even though unreasonable, cannot contribute to cause a collision where the action would not have affected its occurrence."); *State of Louisiana ex rel. Guste v. M/V TESTBANK,* 564 F. Supp. 729, 740 (E.D. La. 1983) (use of different container to store hazardous chemicals aboard ship would not have prevented spill, "given the crushing and mangling of the containers due to the collision"), *aff'd,* 767 F.2d 916 (5th Cir. 1985).  Plaintiffs have failed to show by a preponderance of the evidence that LNA could have prevented the barge from breaking away.  Specifically:

    a.  Plaintiffs have not shown that the breakaway could have been prevented by placing additional mooring connections between the two barges.

    b.  Plaintiffs have not shown that that the breakaway could have been prevented by the use of wire cable as opposed to polypropylene rope.

    c.  Plaintiffs have not shown that an unstable barge (due to either ballast, or partial unloading) would have fared better than the ING 4727.

    d.  Plaintiffs have not shown that the barge would have remained fast if LNA had not asked Domino to switch the locations of the empty and loaded barges.

8.  Plaintiffs have failed to show by a preponderance of the evidence that LNA breached any duty that it owed to plaintiffs.

9.  Plaintiffs have failed to show by a preponderance of the evidence that LNA owed a duty to plaintiffs because their injuries were not within the scope of the risk of harm that was reasonably foreseeable as a result of the alleged negligent conduct in this case.  *See In re Signal Int'l LLC*, 579 F.3d 478, 491 (5th Cir. 2009) (duty "is measured by the scope of the risk that negligent conduct foreseeably entails"); *Royal Beach Hotel, LLC v. Crowley Liner Services, Inc.*, No. 1:06-DV-129, 2007 U.S. Dist. LEXIS 28633, at *3 (S.D. Miss.

Mar. 14, 2007) ("Precaution is a duty only so far as there is reason for apprehension"). Here, the risk of catastrophic flooding was not a foreseeable risk of a breakaway barge.

## II.     Causation

10.  Plaintiffs have the burden of proving that LNA's alleged negligence caused their damages.  See *Bach v. Trident S.S. Co.*, 920 F.2d 322, 327 (5th Cir. 1991); *Fournier v. Petroleum Helicopters, Inc.*, 665 F. Supp. 483, 486 (E.D. La. 1987).

11.  Causation is a two-part test; both parts must be established by a preponderance of the evidence.  Plaintiffs must establish (a) "causation in fact" and (b) a "policy judgment on the limits of liability when causation in fact has been established."  *Chavez v. Noble Drilling Corp.*, 567 F.2d 287, 289 (5th Cir. 1978) (quoting *Spinks v. Chevron Oil Co.*, 507 F.2d 216, 222-23 (5th Cir. 1975)).  This second inquiry is often denominated "proximate causation" to distinguish it from "causation in fact."  *Moser v. Texas Trailer Corp.*, 623 F.2d 1006, 1013 (5th Cir. 1980); 1 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 5.3 at 189-90 (4th ed. 2004).

### A.     Causation in Fact

12.  To establish causation in fact, LNA's "actions must be the cause in fact of a plaintiff's injuries."  *Moser v. Texas Trailer Corp.*, 623 F.2d 1006, 1013 (5th Cir. 1980).  To prevail on this issue, plaintiffs must "introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of [LNA] was a cause in fact of the result."  *Bach S.S.*, 920 F2d at 327 (quoting W. Page Keeton, Prosser and Keeton on Torts 263, 269 (5th ed. 1984)).

13.  Plaintiffs cannot succeed in establishing causation in fact by merely showing that it was possible that the ING 4727 caused the floodwall failures.  *Fournier*, 665 F. Supp. at 486.  The "possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the Court to direct a verdict for the defendant."  *Id.*

14.  This Court, in applying maritime law, adopts the causation standards set forth in the Restatement (Second) of Torts (1965) (the "Restatement").  See, *e.g.*, *Bach,* 920 F.2d at 327; *Chavez,* 567 F.2d at 289; *Gavagan v. United States,* 955 F.2d 1016, 1020 (5th Cir. 1992).  The Restatement requires plaintiffs to show that the conduct was a "substantial factor in bringing about the harm" (Restatement § 431).  The Restatement includes specific provisions setting forth the showing that is required to establish that conduct rises to the level of a "substantial factor' in bringing about a result.

a.  In most cases, the Restatement provides a "but-for" test for causation – *i.e.*, an actor's negligent conduct is not a "substantial factor" in causing harm if the harm "would have been sustained even if the actor had not been negligent." Restatement § 432(1); *Moser*, 623 F.2d at 1012-13 ("An act or omission is not regarded as a cause of an event if the particular event would have occurred without it."); 1 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 5.3 at 189-90 (4th ed. 2004) ([A] "defendant's act cannot be a 'substantial factor' if the plaintiff's harm would have occurred without it.").  Under this formulation, the barge cannot be considered a cause of the IHNC floodwall failures if the

floodwalls would have failed even had the barge remained at its moorings.  See, *e.g.*, *Moser*, 623 F.2d at 1013 ("A failure to fence a hole in the ice plays no part in causing the death of runaway horses which could not have been halted if the fence had been there.").

This Court also adopts the Restatement test for situations involving "concurrent causation" by two or more causes.  Under Restatement § 432(2), "if two forces are actively operating, one because of the actor's negligence, the other not because of any misconduct on his part, and each of itself is sufficient to bring about harm to another, the actor's negligence may be found to be a substantial factor in bringing it about." An action is "sufficient" to cause a harm if, when acting alone, the action would have caused the harm.[2]  Thus, to the extent that plaintiffs have tried to prove that the barge is a "concurrent" cause of the floodwall breaches in combination with some other cause, the barge cannot be considered a cause-in-fact of the floodwall breaches unless the barge impact was "sufficient" to cause the breaches in the absence of the other cause or causes.

15. An action cannot be a "substantial factor" in causing harm if the action is only an insignificant cause, or, as the Fifth Circuit put it, merely "negligible negligence." *Chavez*, 567 F.2d at 289 (citation omitted).  As the Supreme Court has expressly recognized, "[i]n many cases, of course, the shipowner whose act or omission contributed only a very small percentage of the total negligence will avoid liability on the ground of lack of causation."  *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 265 n.15 (1979).

16. Plaintiffs have failed to show by a preponderance of the evidence that LNA was the cause in fact of their injuries.  *Moser,* 623 F.2d at 1013-14; see also *Fournier*, 665 F. Supp. at 483 (plaintiff must show that "it is more likely than not that the conduct of [LNA] was a cause in fact of the result"); *Bach*, 920 F.2d at 327 (quotation omitted).  See also *Am. Gulf VII v. Otto Candies, Inc.*, No. 94-3905, 1997 U.S. Dist. LEXIS 13414, at *19 (E.D. La. Aug. 28, 1997) (no liability for negligence under maritime law where defendant's actions "did not play any role in causing the damage alleged").

---

[2] *See June v. Union Carbide Corp.*, 577 F.3d 1234, 1243-44 (10th Cir. 2009) (The term "sufficient" in Restatement "does not mean that either of them would impose liability for conduct that is not a but-for cause if only the conduct *could* have caused the injury.  Rather, it is necessary for the plaintiff to show that the conduct (or the causal set of which it is a necessary part) *would* in fact have caused the injury."); *see also, e.g.*, *Bach v Trident S.S. Co.*, 920 F.2d 322, 327 (5th Cir. 1991) (citing Restatement § 431 and finding no liability for crew's failure to administer CPR on ship because the victim "had no more than a fifteen percent chance of surviving even if the crew had rendered CPR"); *Joshi v. Providence Health Sys. of Oregon Corp.*, 149 P.3d 1164 (Ore. 2006) (recognizing substantial factor test and finding that hospital did not cause patient's death because he had only a 30% chance of survival even without the alleged negligence); *In re Hanford Nuclear Reservation Litig.*, 534 F.3d 986, 1010-11 (9th Cir. 2008) (dismissing personal injury claims for lack of proof that the radiation exposure at issue "alone would have been sufficient to cause the injury"); *Clement v. United States*, 980 F.2d 48, 54 (1st Cir. 1992) (relying on Restatement's "sufficient" requirement in dismissing claims that hospital's negligence caused suicide); *RSL Communications PLC v. Bildirici*, 649 F. Supp. 2d 184, 219-20 (S.D.N.Y. 2009) (dismissing breach of fiduciary duty claims because there was no evidence that directors' failure to hold meetings caused alleged losses; instead, declining market conditions caused losses).

17. Plaintiffs cannot prove by a preponderance of the evidence that the barge was a but-for cause of the IHNC floodwall failures because the breaches would have occurred even if the barge had remained at its moorings.  See, *e.g.*, *Moser*, 623 F.2d at 1013 ("A failure to fence a hole in the ice plays no part in causing the death of runaway horses which could not have been halted if the fence had been there.").

18. Plaintiffs cannot, by a preponderance of the evidence, satisfy the test applicable to concurrent causes, which states that the actor's conduct is not a "substantial factor" in causing a harm unless it was "sufficient" to cause the harm "of itself," even absent the other alleged cause(s).  See Restatement § 432(2) (actor's conduct is substantial factor only if conduct "of itself is sufficient to bring about [the] harm").  Here, the barge was not a "sufficient" cause of the floodwall breaches.

19. Even if the Court had concluded that there had been a contribution by the barge to the failure of the IHNC floodwall, such contribution would have been *de minimis*, not necessary in order for the wall to have failed, and insufficient to assign the barge any legal responsibility for causing the breaches.  See *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 265 n.15 (1979) ("[i]n many cases, of course, the shipowner whose act or omission contributed only a very small percentage of the total negligence will avoid liability on the ground of lack of causation").

   **B.      Proximate Cause**

20. Even if the plaintiffs could show that the barge was the cause-in-fact of their injuries, they cannot establish proximate cause.  "In admiralty the touchstone of proximate cause is foreseeability; the injury or damage must be a reasonably probable consequence of the defendant's act or omission."  Schoenbaum, *supra*, at 190.

21. The Court finds that the loss suffered by the plaintiffs "goes beyond the pale of general harm which reasonably might have been anticipated."  *In re Signal*, 579 F.3d at 495 & n.19.  Rather, the catastrophic flooding occasioned by the floodwall failures represents precisely the sort of "highly extraordinary" occurrence that neither LNA nor any other actor could reasonably have foreseen.  Restatement § 435(2).  The barge was therefore not the proximate cause of plaintiffs' flood-related damages.

**III.   Damages**

22. Even if plaintiffs had established the other elements of negligence by a preponderance of the evidence, they have nonetheless not put forth evidence establishing their entitlement to damages.

23. A plaintiff's damages are limited when subsequent events operate to cut off the claim, as provided in this Circuit by *Dixon v. Int'l Harvester Co.*, 754 F.2d 574 (5th Cir. 1985).  Here, plaintiffs' damages are effectively zero because the inevitable flooding from the MRGO would have inundated their homes to the same level just hours later, regardless of any supposedly tortious conduct by LNA.

24. Evidence of payments that plaintiffs received from the Road Home Program is admissible and the Court will deduct the amounts of those payments from any award that the Court might otherwise make.  See *In re Katrina Canal Breaches Consol. Litig. (Robinson)*, 647 F. Supp. 2d 644, 736 (E.D. La. 2009) (holding that the federal government is a

tortfeasor).  Therefore, the collateral source rule, which bars admission of evidence of funds received from non-tortfeasors, does not apply to funds plaintiffs received from the government through the Road Home Program.  *See Giles v. Gen. Elec. Co.*, 245 F.3d 474, 495 (5th Cir. 2001) (where prior payments were not "additional, bargained-for compensation but were instead compensation for the injury out of which this case arises," the collateral source rule did not apply).  Considering those Road Home payments, the Alfords and Ms. Richardson suffered no monetary loss as a result of their property damage.

25.  Insofar as Holiday Jewelers neither made a profit before Hurricane Katrina nor can adduce evidence with "reasonably certainty" that it would have earned a profit after the storm, it is not entitled to recover damages for lost profits.  Recovery for "[l]ost profits will only be allowed when profits have actually been, or may reasonably suppose to have been lost, and the amount of such profits is proved with reasonable certainty."  *In re MNM Boats, Inc.*, No. 07-1938, 2009 U.S. Dist. LEXIS 119861, at *39 (E.D. La. Dec. 4 2009) (citing *The Conqueror*, 166 U.S. 110, 115 (1898)).  Businesses that can prove no profit prior to the event for which they seek compensation cannot seek compensation for lost profits.  *See Toga Soc'y, Inc. v. Lee*, No. 03-2981, 2005 U.S. Dist. LEXIS 13408 (E.D. La. June 29, 2005) (Duval, J.) (where limited evidence established that business was loss-making before injury, it could not recover lost profits).

26.  Neither Mr. Glaser nor Holiday Jewelers are entitled to damages because any award would put them in a better position than what they could have expected had there been no Hurricane Katrina.  "A plaintiff is not entitled to be put in a better position…" due to the allocation of damages.  *Brennan's Inc. v. Dickie Brennan & Co. Inc.*, 376 F.3d 356, 371 (5th Cir. 2004) (citations omitted).

Dated: March 4, 2010                    Respectfully submitted,


                                        Robert B. Fisher, Jr., T.A. (#5587)
                                        Derek A. Walker (#13175)
                                        CHAFFE MCCALL, L.L.P.
                                        2300 Energy Centre
                                        1100 Poydras Street
                                        New Orleans, LA  70163-2300
                                        Telephone:  (504) 585-7000
                                        Facsimile:  (504) 585-7075
                                        Fisher@chaffe.com
                                        Walker@chaffe.com

                                         /s/ John D. Aldock
                                        John D. Aldock
                                        Mark S. Raffman
                                        GOODWIN PROCTER LLP
                                        901 New York Avenue, N.W.
                                        Washington, DC  20001
                                        Telephone:  (202) 346-4240
                                        jaldock@goodwinprocter.com
                                        rwyner@goodwinprocter.com
                                        mraffman@goodwinprocter.com

                                        Daniel A. Webb (#13294)
                                        SUTTERFIELD & WEBB, LLC
                                        Poydras Center
                                        650 Poydras Street, Suite 2715
                                        New Orleans, LA  70130
                                        Telephone:  (504) 598-2715

                                        *Attorneys for Lafarge North America Inc.*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on March 4, 2010.

                        <u>/s/ John D. Aldock             </u>