UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| | * | |
| IN RE: KATRINA CANAL | * | |
| BREACHES | | |
| CONSOLIDATED LITIGATION | * | CIVIL ACTION |
| | * | |
| | * | NO. 05-4182 |
| | * | and consolidated cases |
| PERTAINS TO: ALL BARGE | * | |
| | * | SECTION "K" (2) |
| | * | |
| | * | |
| | * | JUDGE |
| | * | STANWOOD R. DUVAL, JR. |
| | * | |
| | * | MAGISTRATE |
| | * | JOSEPH C. WILKINSON, JR. |

LAFARGE NORTH AMERICA INC.'S PRE-TRIAL BRIEF

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION.............................................................................................................1

STATEMENT OF FACTS...................................................................................................3
    A.    The Tying Up of ING 4727 at LNA's Terminal..................................................3
    B.    Hurricane Katrina...............................................................................................5
    C.    The IHNC Floodwall Breaches............................................................................7
    D.    Alleged Eyewitness Accounts.............................................................................13
    E.    Plaintiffs' Expert Evidence...............................................................................15
    F.    Plaintiffs and Their Claims...............................................................................16

ARGUMENT ...................................................................................................................17

I.     RELEVANT LEGAL STANDARDS ........................................................................17
    A.    Duty of Care......................................................................................................17
    B.    Causation...........................................................................................................19
        1.    Causation in Fact.................................................................................. 19
        2.    Proximate Cause ................................................................................... 22

II.    LNA DID NOT BREACH ANY DUTY OF CARE OWED TO PLAINTIFFS.........23
    A.    LNA Exercised Reasonable Care.......................................................................23
        1.    LNA acted prudently in its handling of the barge..................................... 23
        2.    LNA did not violate any statutes, regulations, rules or customs. ............. 26
    B.    Plaintiffs Have Failed to Show that Any Additional Actions LNA Might Have Taken Would Have Prevented the Barge Breakaway. ................................27
    C.    Plaintiffs Were Not Foreseeable Victims of Any Breach of LNA's Duty. ..........28

III.   ING 4727 WAS NOT A CAUSE-IN-FACT OF EITHER FLOODWALL FAILURE................................................................................................................30
    A.    The Barge Had Nothing to Do With Either INHC Floodwall Breach..................30
    B.    The Barge Was Not a But-For Cause of Either INHC Floodwall Breach............33
    C.    The Barge Was Not a Concurrent Cause of Either INHC Floodwall Breach. ........................................................................................................36
    D.    Any Role That the Barge Played Was, at Most, *De Minimis*. ..............................38

IV.   THE BARGE WAS NOT THE PROXIMATE CAUSE OF THE FLOODWALL FAILURES...............................................................................39

V.    PLAINTIFFS' DAMAGES ARE LIMITED............................................................40
    A.    Ms. Richardson and the Alfords Have Already Been Adequately Compensated for Their Damages.......................................................................41
    B.    Holiday Jewelers Suffered No Loss During Hurricane Katrina. .........................43

CONCLUSION ...............................................................................................................44

# TABLE OF AUTHORITIES

<u>**CASES**</u>                                                                                                          <u>**Page:**</u>

*Am. Gulf VII v. Otto Candies, Inc.*, 1997 U.S. Dist. LEXIS 13414
   (E.D. La. Aug. 28, 1997) ........................................................................................33

*Am. River Transp. Co. v. Kavo Kaliakra SS,* 148 F.3d 446 (5th Cir. 1998)......................18, 22, 39

*Bach v. Trident S.S. Co.*, 920 F.2d 322 (5th Cir. 1991) ........................................................ passim

*Beahm v. Groike*, No. 98-1214, 1999 U.S. Dist. LEXIS 255 (E.D. La. Jan. 11, 1999)................37

*Boyett v. Keene*, 815 F. Supp. 204 (E.D. Tex. 1993), affirmed without opinion at
   1993 U.S. App. LEXIS 15852 (5th Cir. June 10, 1993) ........................................................41

*Brennan's Inc. v. Dickie Brennan & Co.*, 376 F.3d 356 (5th Cir. 2004)......................................44

*Calhoun v. Yamaha Motor Corp.*, 350 F.3d 316 (3d Cir. 2003)....................................................44

*Chavez v. Noble Drilling Corp.*, 567 F.2d 287 (5th Cir. 1978) ....................................19, 20, 21, 38

*Clement v. United States*, 980 F.2d 48 (1st Cir. 1992) ....................................................................21

*Consol. Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d 65 (5th Cir. 1987) ......................17, 23, 40

*Coumou v. United States*, Nos. 95-30219 & 95-30697, 1997 U.S. App. LEXIS 12674
   (5th Cir. Feb. 26, 1997)........................................................................................................18

*Daigle v. Point Landing, Inc.*, 616 F.2d 825 (5th Cir. 1977)........................................................18

*Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256 (1979) ..............................21, 39

*Fournier v. Petroleum Helicopters, Inc.*, 665 F. Supp. 483 (E.D. La. 1987) ..............19, 20, 22, 30

*Gavagan v. United States,* 955 F.2d 1016 (5th Cir. 1992)............................................................20

*Giles v. Gen. Elec. Co.*, 245 F.3d 474 (5th Cir. 2001)..................................................................42

*Gross v. So. Ry. Co.*, 446 F.2d 1057 (5th Cir. 1971) ....................................................................22

*In re Cooper/T. Smith*, 929 F.2d 1073 (5th Cir. 1991) ......................................................17, 22, 39

*In re Hanford Nuclear Reservation Litig.*, 534 F.3d 986 (9th Cir. 2008)....................................21

*In re Katrina Canal Breaches (Robinson)*, 647 F. Supp. 2d 644 (E.D. La. 2009) ............35, 41, 42

LIBW/1728983.8

*In Re Katrina Canal Breaches Consol. Litig.*, No. 07-5528, 2009 U.S. Dist. LEXIS 33068
    (E.D. La. Apr. 16, 2009) ..................................................................................................41, 42

*In re MNM Boats, Inc.*, Civ. No. 07-1938, 2009 U.S. Dist. LEXIS 119861
    (E.D. La. Dec. 4, 2009) ...........................................................................................................43

*In re Signal Int'l LLC*, 579 F.3d 478 (5th Cir. 2009)........................................................... passim

*In re SS Winged Arrow*, 425 F.2d 991 (5th Cir. 1970) ...........................................................18, 23

*In re Two-J Ranch, Inc.*, 534 F. Supp. 2d 671 (W.D. La. 2008)....................................................17

*In re Vulcan Materials Co.*, --- F. Supp. 2d ----, 2009 WL 4884017
    (E.D. Va. Dec. 17, 2009) .........................................................................................................42

*Inter-Cities Nav. Corp. v. United States,* 608 F.2d 1079 (5th Cir. 1979) ............................. passim

*Joshi v. Providence Health Sys. of Oregon Corp.*, 149 P.3d 1164 (Ore. 2006) ...........................21

*June v. Union Carbide Corp.*, 577 F.3d 1234 (10th Cir. 2009)......................................................21

*LeJeune v. Allstate Ins. Co.*, 365 So. 2d 471 (La. 1978)...............................................................21

*Little v. Brown & Williamson Tobacco Corp.*, 243 F. Supp. 2d 480 (D.S.C. 2000) ....................22

*Manns v. State Department of Highways*, 541 N.E.2d 929 (Ind. 1989) .......................................42

*McDermott, Inc. v. AmClyde*, 511 U.S. 202 (1994)......................................................................44

*McDorman v. Texas-Cola Leasing Co.*, 288 F. Supp. 2d 796 (N.D. Tex. 2003) ..........................40

*Med. Lab. Mgmt. Consultants v. Am. Broad. Cos.,* 306 F.3d 806 (9th Cir. 2002) .......................22

*Miciotto v. United States*, 270 Fed. Appx. 301 (5th Cir. 2008) ....................................................42

*Moser v. Texas Trailer Corp.*, 623 F.2d 1006 (5th Cir. 1980).....................................19, 20, 30, 34

*Mountbatten Surety Co. v. Town of Ware Shoals, S.C.*, 2008 WL 2704921 .................................42

*Pouliot v. Paul Arpin Van Lines, Inc.*, 235 F.R.D. 537 (D. Conn. 2006) .....................................42

*Ranger Ins. Co. v. Exxon Pipeline Co.*, 760 F. Supp. 97 (W.D. La. 1990) ..................................40

*Rector v. Hartford Accident & Indem. Co.*, 120 So.2d 511 (La. Ct. App. 1960) ..........................38

*Republic of France v. United States*, 290 F.2d 395 (5th Cir. 1961) ..............................................40

*Rosen v. Ciba-Geigy Corp.*, 892 F. Supp. 208 (N.D. Ill. 1995).......................................22

*Royal Beach Hotel, LLC v. Crowley Liner Services, Inc.*, No. 1:06-DV-129,
2007 U.S. Dist. LEXIS 28633 (S.D. Miss. Mar. 14, 2007) ...............................19, 29

*RSL Communications PLC v. Bildirici*, 649 F. Supp. 2d 184 (S.D.N.Y. 2009) ...........................21

*State of Louisiana ex rel. Guste v. M/V TESTBANK,* 564 F. Supp. 729
(E.D. La. 1983), *aff'd,* 767 F.2d 916 (5th Cir. 1985)..........................................27, 29

*Terre Aux Boeufs Land Co. v. Zurich Ins. Co.*, 803 So.2d 86
(La. Ct. App. 2001) ...........................................................................................36, 37

*Toga Soc'y, Inc. v. Lee*, No. 03-2981, 2005 U.S. Dist. LEXIS 13408
(E.D. La. June 29, 2005) (Duval, J.)....................................................................43

*Trahan v. Louisiana*, 536 So. 2d 1269 (La. Ct. App. 1988) ...............................................21

*Warrior & Gulf Nav. Co. v. United States,* 864 F.2d 1550 (11th Cir. 1989)................................36

*Westchester Fire Ins. Co. v. Haspel-Kansas Inv. P'ship*, 342 F.3d 416 (5th Cir. 2005).........22, 39

## **RULES AND REGULATIONS:**

33 C.F.R. § 6.19-1...............................................................................................................26

33 C.F.R. § 101.105............................................................................................................27

33 C.F.R. § 162.75(b)(3)(ii)................................................................................................26

33 C.F.R. § 165.100(c)........................................................................................................27

46 C.F.R. § 27.101..............................................................................................................26

## **STATUTES:**

1 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 5.3 at 189-90
(4th ed. 2004)...............................................................................................19, 20, 34

Restatement (Second) of Torts (1965) ................................................................. passim

iv

## INTRODUCTION

The plaintiffs in this "bellwether" bench trial allege that a barge, the ING 4727, caused the flooding of their properties during Hurricane Katrina.  The plaintiffs – John and Jerry Alford, Josephine Long Richardson, and Holiday Jewelers, Inc. (a Louisiana corporation owned by Jacob and Dianne Glaser) – accuse Lafarge North America Inc. ("LNA") of negligently allowing the barge to break from its moorings at LNA's terminal on the west side of the Inner Harbor Navigation Canal ("IHNC").  Plaintiffs claim the barge caused two major breaches of the eastern IHNC floodwall.  As the evidence at trial will show, however, LNA did not breach any duty owed to the plaintiffs and was not the cause-in-fact or proximate cause of any damages they sustained in the hurricane.

Regarding duty and breach, the evidence will show that LNA acted reasonably in its handling of the barge.  LNA personnel used high-strength and high-flexibility polypropylene rope to moor the ING 4727 and the other barges at its facility in advance of the storm, adding and replacing lines so that the strength of the mooring configuration was more than doubled. The mooring arrangement ultimately was unable to withstand the hurricane's extreme winds, just as happened with hundreds of other barges that broke away during Katrina, despite their having been moored with any number and type of mooring arrangements (including, for instance, wire cable).  Plaintiffs have not shown, and cannot show, that any reasonable alternate mooring arrangement would have had any greater chance of preventing the barge from breaking away.

Regarding causation-in-fact, the evidence will show that the barge had nothing to do with causing either of the two floodwall breaches on the east side of the IHNC, as it could not have been present at the floodwall at the time of the breaches.  As an initial matter, the barge cannot move on its own and would have to have been moved by wind, current, or waves.  Indisputable scientific proof establishes that at all relevant times, Hurricane Katrina's powerful winds – the

predominant force acting on the barge, which has a sail area of approximately twenty feet above the waterline – were blowing away from the IHNC floodwall, thus preventing the barge from reaching or being present at the eastern IHNC floodwall at the time the breaches occurred.  Nor could current or waves have conveyed the barge to the site of either floodwall breach.  Instead, the barge was sucked through the southernmost end of the already-formed southern IHNC breach after both breaches had occurred.  Plaintiffs lack any theory – let alone any evidence – as to how the barge could have been present at the eastern IHNC floodwall when the breaches occurred.

Moreover, and in any event, the barge could not have caused the floodwall to fail in the catastrophic manner that it did.  The IHNC floodwall breaches resulted from the failure of the deeply-anchored steel sheet pile and its supporting soils.  Scientific calculations, physical evidence, and common sense demonstrate that any impact or contact between the barge and the floodwall would result only in negligible localized damage to the concrete cap of the floodwall, and not displacement or deflection of the deeply-anchored sheet pile.  The embedded steel sheet pile and supporting soils could not have failed and did not fail as a result of barge contact.

Next, regarding proximate causation, the evidence will show that the flooding was not a foreseeable result of LNA's alleged negligence.  Prior to Hurricane Katrina, it was not reasonably foreseeable that a loose barge could or would topple a floodwall and flood a major portion of New Orleans (and indeed the evidence continues to demonstrate that this is so, post-Katrina).  There has never been a documented instance of a barge breaching a floodwall, and experience before, during and after Hurricane Katrina shows that barge impacts with floodwalls have caused nothing more than negligible localized damage to the floodwalls themselves.  Even if the barge had been a cause-in-fact of the flooding (which it was not), such a freakish result transcends the boundaries of foreseeability and, thus, proximate cause.

Finally, regarding damages, plaintiffs' flood-related damages are reduced by payments they received from the federal government, an alleged tortfeasor, including Road Home Program payments.  In addition, Holiday Jewelers was unprofitable prior to Hurricane Katrina and had no expectation of earning a profit after the storm.  For all of these reasons, plaintiffs' damages claims are limited or extinguished.

## STATEMENT OF FACTS

### A.      The Tying Up of ING 4727 at LNA's Terminal

LNA's cement terminal is located on the west side of the IHNC in a protected "inset" away from the main IHNC channel.  FF 5.[1]  On Friday, August 26, 2005, the ING 4727 and another barge, the ING 4745, arrived at LNA's terminal loaded with cement.  FF 12.  The two barges were delivered by Zito Fleeting LLC ("Zito"), the towing company designated by their owner, Ingram Barge Company ("Ingram").  FF 12.  Upon its arrival at the terminal, LNA personnel began to unload the ING 4727.  FF 15.  At that time, the New Orleans area was not within the projected path of Hurricane Katrina, and the United States Coast Guard had not issued any port advisories for New Orleans.  FF 16.  It was not until 10:00 p.m. on Friday, August 26, that the United States Coast Guard issued the first of its port advisories ("Port Condition WHISKEY"), advising that New Orleans had come within the projected possible path of Hurricane Katrina.  FF 17-18.  It was not until Sunday, August 28, that the Coast Guard ordered port operations to cease in anticipation of the storm's arrival.  FF 18.

LNA personnel finished unloading the barge on Saturday morning, August 27.  FF 15, 19.  Also on Saturday morning, LNA personnel began to prepare the terminal for the arrival of Hurricane Katrina, which had shifted course, bringing the New Orleans area within the

---

[1] LNA's Proposed Findings of Fact and Conclusions of Law, Finding of Fact ("FF") 5.

hurricane's possible path.  FF 20.  At the time, five loaded barges were moored in a tier at the

LNA dock immediately north of the unloading apparatus where the ING 4727 (which was now

empty) and ING 4745 (which was still loaded) were docked.  FF 13, 23.  To prepare the barges

in advance of the hurricane, LNA personnel used a roll of brand new 2-inch diameter high-

strength blue polypropylene rope to secure the barges, replacing and adding lines in the five-

barge tier, replacing an old mooring line with a length of the new blue rope between the ING

4727 and the ING 4745, and making sure there were at least three connections between the two

barges.  FF 22, 24.  As a result, the strength of the mooring configuration between the two barges

was more than double what it had been.  FF 25.  The use of polypropylene rope made it possible

to secure the barges to the dock using a "long-lining" procedure that would allow line to pay out

and the barges to rise along with the anticipated storm surge.  FF 26, 27.

       During the morning of August 27, LNA assistant terminal manager Ed Busch called Zito

to "release" the ING 4727 (i.e., to advise that it was empty and ready to be picked up), but he did

not reach anyone at Zito.  FF 19.  Because he did not believe that the empty barge would be

picked up, Mr. Busch called Joseph Domino Towing ("Domino") to arrange for ING 4727 and

ING 4745 to be switched so that the empty barge ING 4727 would be away from the dock, and

the loaded barge ING 4745 would be next to the dock, in order to avoid the possibility of the

empty barge riding over the dock with the anticipated storm surge while the loaded barge would

be unable to rise, thereby causing both to break free.  FF 28.  Mr. Busch did not ask Domino to

remove the barge from the terminal because, in the absence of confirmation from Zito, there was

no destination available to accept it.  FF 31.  A crew dispatched by Domino arrived to perform

the switching maneuver that afternoon, after LNA personnel had departed the terminal to

evacuate in advance of the storm.  FF 29.  When the Domino crew departed, the ING 4727 and

ING 4745 remained secured together with no fewer than three lengths of high-strength and high-flexibility blue 2" diameter polypropylene rope.  FF 30.

### B.    Hurricane Katrina

At some point during Hurricane Katrina, the ING 4727 broke from its moorings at LNA's terminal under the force of surge and heavy winds so strong that the strands of the new polypropylene rope were caused to melt and fuse.  FF 45.  The storm caused hundreds of barges to break from their moorings.  FF 46-47.  ING 4727 was the first and only barge to ever break free from LNA's IHNC terminal.  FF 49.

Because the ING 4727 had no motor or other means of self-propulsion, its movement was entirely directed by environmental forces – specifically, wind, current, and waves.  FF 52.  Wind was the predominant force acting on the empty barge, which was sticking out about 20 feet above the water line and thus had a large "sail area" exposed to the prevailing wind.  FF 52.  Undisputed scientific evidence shows that wind could not have caused the barge to move from the terminal to the IHNC eastern floodwall at the time the breaches occurred, and in fact would have prevented it from moving in that direction.  As will be attested by LNA's expert meteorologist, Dr. Austin Dooley – the *only* meteorological expert to give testimony – scientific principles and scientific data conclusively establish that during the critical early morning hours of August 29, when the breaches occurred, the winds at the IHNC blew with an east-to-west component that would have prevented the barge from being present at the site of either breach.  In the first instance, this conclusion flows from a well-established scientific principle known as Buys Ballot's law, which provides that hurricane winds in the northern hemisphere blow counterclockwise around the center (or "eye") of the hurricane.  In the case of Hurricane Katrina, which passed on a north-south axis to the east of New Orleans with the center of the storm to the south of the city at the time that the breaches occurred, the counterclockwise hurricane winds

LIBW/1728983.8

blowing around the center of the storm necessarily had an east-to-west component at the IHNC at the time when the breaches occurred (i.e., in the opposite direction from the location of the breaches).  Only after the center of the storm passed by the city – well after the breaches had already occurred – did the hurricane winds shift to blow from west-to-east at the IHNC.  FF 57-62.  Before then, the prevailing winds would have kept the barge away from the eastern IHNC floodwall, regardless of when the barge broke from its moorings.  FF 63.  The meteorological data confirm that the direction of the wind in the IHNC during Hurricane Katrina did not include any west-to-east component until after the breaches had already occurred.  As reflected in Dr. Dooley's report as well as the report of plaintiffs' expert Dr. Marino, system-wide "hindcast" data relied upon by the Interagency Performance Evaluation Team ("IPET") as well as local meteorological data from Lakefront Airport show that the wind at the IHNC did not have a west-to-east component until after the breaches had already occurred.  FF 64.  Plaintiffs have not provided *any* meteorological data, analysis, or evidence to support any contrary theory regarding wind direction or barge movement.  FF 65.

Nor could current or waves have overcome the forces of the hurricane winds to deliver the barge to the breach sites.  Regarding current, the IHNC below the Florida Avenue Bridge was a "closed system" since the lock at its southern end prevented the flow of water to or from the Mississippi River, so that when storm surge from Hurricane Katrina reached this part of the IHNC, it filled up "like a bathtub" without generating appreciable currents.  FF 67, 68.  Regarding waves, the scientific data and photographic evidence show that waves in the IHNC were no higher than three feet (FF 70, 71), and plaintiffs have no evidence to support their allegation that a massive 20-foot wave caused the barge to be conveyed within the IHNC.  FF 72-73.  Indeed, because wind-activated waves tend to propagate in the direction of the prevailing

wind (FF 74), which at all relevant times was blowing away from the eastern IHNC floodwall, and because reflected waves have less strength than waves moving in the direction of the wind (FF 75), waves could not have delivered the barge to the site of either breach during Hurricane Katrina.

Although the precise time of the barge breakaway is not known, the best evidence suggests that the barge broke away and was carried to the site of the already-formed South Breach some time after 9:00 a.m. on the morning of August 29.  It was at that time that the hurricane winds came to blow from west-to-east, pushing the barge away from the dock and straining the mooring ropes in a way that could have caused the melting and fusing of the ropes observed after the storm.  Regardless of the timing of the breakaway, however, the evidence shows that the wind was blowing in the wrong direction for the barge to have been present at the eastern IHNC floodwall breaches at the time they occurred.

C.     The IHNC Floodwall Breaches

The floodwalls along the IHNC are part of a 320-mile system of levees and floodwalls put in place over several decades to protect New Orleans and the surrounding areas.  FF 2, 78. The IHNC floodwall is comprised of a twenty-foot-long steel sheet pile driven into the ground to a depth of approximately seventeen feet, topped by a concrete cap sticking six feet out of the ground.  FF 80.  The floodwall derives its strength from the supporting soils into which the sheet piles are embedded.  In order for a section of the wall to fail, the forces acting on the wall must overcome the support provided by the soil to the embedded sheet pile.  FF 82.

The IHNC eastern floodwall failed at two locations during Hurricane Katrina.  The first failure occurred no later than 6:00 a.m. on the morning of August 29, 2005 at the so-called "North Breach," just south of the Florida Avenue Bridge, north of the LNA terminal and on the opposite side of the IHNC from the terminal.  FF 85, 87.  The second failure occurred no later

7

than 7:30 a.m. at the site of the so-called "South Breach," toward the Claiborne Avenue Bridge near North Johnson Street, south and east of the Lafarge terminal.  FF 86, 104.

These floodwall failures, and the failures of other portions of the New Orleans hurricane protection system during Hurricane Katrina, have been the subject of exhaustive study and investigation by several independent research teams.  The IPET investigation was commissioned by the U.S. Army Corps of Engineers to study the performance of the hurricane system with a budget of over $20 million and a team of 350 researchers, overseen by independent panels from the American Society of Civil Engineers and the National Research Council.  FF 150.  The Independent Levee Investigation Team ("ILIT") was led by an independent scientific team from the University of California at Berkeley, including Dr. Robert Bea, and supported by the National Science Foundation.  FF 151.  The "Team Louisiana" investigation was established by the State of Louisiana and led by researchers from the Louisiana State University, including Dr. Paul Kemp.  FF 152.  Each of these independent investigative teams concluded that IHNC floodwall breaches occurred for reasons having nothing to do with a barge.  IPET found that the North Breach occurred due to foundation instability prior to overtopping, as a result of the formation of a tension crack on the floodwall and diminished soil support at the levee toe, and that the South Breach occurred as a result of overtopping and erosion.  FF 154(a).  The ILIT investigation found that underseepage and hydraulic pressure in the soils under the floodwall played a major role in both the IHNC breaches.  FF 154(b).  Team Louisiana concluded that the IHNC floodwall failures occurred due to a combination of foundation instability and underseepage.  FF 154(c).  All three investigations ruled out the ING 4727 as a cause of the breaches.  FF 154(d).  The work and conclusions of all three investigations are supported by

8

sworn testimony in this case from the primary authors of the studies.  See FF 150-54 (citing

testimony by Drs. Mosher, Bea, and Kemp).

Causes of the North Breach:



*Fig. 1:  Photo of North Breach, looking east to west*

The scientific evidence, including evidence developed by the independent investigations

and by expert evidence developed in this case, shows that the North Breach was the result of

several factors, none of which involved a barge impact.  FF 95, 96, 103.  First, the North Breach

occurred at a location where there was substantially less soil on the protected side of the

floodwall than at locations further south along the IHNC floodwall, which meant that the soil

provided less support to the floodwall in the North Breach area.  FF 92.  Second, the formation

of a "tension crack" or "gap" between the canal-side soil and the steel sheet pile floodwall led to

increased hydrostatic pressure on the wall and underseepage below the sheet pile.  FF 93.  Third, the North Breach occurred in an area of the floodwall where there were sand-filled excavations from work carried out along the East Bank Industrial Area ("EBIA"), which made the area more susceptible to the effects of underseepage and hydraulic lift.  FF 94.  Finally, the sheet pile failed at a point of transition between an older, shallower segment of floodwall and a newer, deeper segment of floodwall.  FF 88.  That transition point was a point of weakness, exacerbated by a faulty field weld that rusted and corroded over time.  FF 88-89.  These factors emerge from the IPET, ILIT, and Team Louisiana Reports, as well as the forensic investigations undertaken in this case by Dr. Robert Bea, who augmented his exhaustive previous studies of the levee and floodwall failures, and by Dr. Reda Bakeer, a Louisiana geotechnical scientist with decades of experience in levee design and performance, including teaching the "Levee School" for Louisiana State University.  FF 148(b).

Expert analysis and physical evidence demonstrate that the barge had no role in causing the North Breach.  As described above, there was simply no environmental force that could have caused the barge to be present at the North Breach, and indeed the east-to-west wind blowing at the time of the breach would have prevented the barge from being present.  FF 97-98.  Moreover, photographs taken after the hurricane show that there is a telephone pole standing on the canal side of the floodwall very close to the North Breach, in a location which the barge would have had to traverse – and knock the pole down – if it had been present at the site of the breach.  The presence of the telephone pole shows the barge was not there.  FF 99.  Moreover, there was no damage on the barge consistent with an impact with the floodwall at the North Breach, nor was there any evidence of damage to the floodwall at the North Breach that could be traced to impact from a barge.  FF 100-101.

LIBW/1728983.8

Causes of the South Breach:



*Fig. 2:  Overhead view of South Breach, after Hurricane Katrina but before Hurricane Rita*

The scientific evidence, including evidence developed by the independent investigations and by experts in this case, shows that the South Breach was similarly the result of several factors, none involving a barge.  FF 114.  First, as at the North Breach, the formation of a tension crack between the canal side floodwall and the steel sheet pile played a role in causing the South Breach, increasing the pressure on the wall and allowing for seepage.  FF 105.  Second, overtopping and severe scouring of the protected/land side soils led to the loss of necessary soil support; indeed, variations in subsoil conditions along the floodwall caused the specific area in the vicinity of the South Breach to have a lower wall top elevation, leading to earlier overtopping and concentrated scouring at that location.  FF 106.  Third, the floodwall failed at a point where its course deviated from its normal straight-line alignment, which created weak links at the ends of the South Breach with the adjoining sheet piles.  FF 109.  Finally, sand-fill excavations from remediation work on the EBIA provided a route for seepage and hydraulic uplift pressures on the

LIBW/1728983.8

protected side of the floodwall.  FF 111.  Again, these factors emerge from the studies done by IPET, ILIT, and Team Louisiana, and the work done in this case by Dr. Bea and Dr. Bakeer.

As was also the case with the North Breach, the scientific and physical evidence shows the barge did not play any role in causing the South Breach.  First, because the South Breach occurred before the prevailing wind had any west-to-east component, the barge could not have been present when the breach occurred.  Beyond that, ample physical evidence confirms that the barge did not cause the South Breach, including the following:

- The barge did not impact the floodwall in the northern "bow shaped" section of the South Breach where the breach originated.  The damage pattern there shows that the panels incline at increasing angles, but they do not show fracturing of the concrete cap, which would be expected had a barge struck the wall.  Apart from the negligible and localized damage observed at the extreme southern end of the South Breach where the barge passed through after the breach had occurred, there is *no* evidence of damage on the floodwall consistent with a barge impact at the South Breach.  FF 116.

- The damage pattern inside the main part of the South Breach shows that the water flow through the breach was very strong.  If the barge had caused the breach, it would have been immediately drawn into and propelled in an easterly direction with the inrushing waters, deep into the Lower Ninth Ward.  Instead, the barge ended up just inside the floodwall, slightly inward from the extreme southern end of the breach, away from the main portion of the breach.  FF 117.

- The physical evidence at the extreme southern end of the South Breach shows that the barge broke off some of the concrete cap and bent some of the rebar as it passed through.  The concrete cap was cracked and the steel reinforcing bar bent toward the neighborhood, and the barge had scratches on the bottom consistent with the pattern of the steel rebar.  The damage to the floodwall showed that the panels at the southernmost end of the breach were in an inclined position before being struck by the barge.  Thus, this contact with the concrete cap by the barge occurred *after* the floodwall had already failed in the main bow segment of the breach; the floodwall was already down at the South Breach before the barge first made contact.  FF 118.

- The rebar at the southern end of the South Breach was bent horizontally, indicating the water level must have been high when the barge floated through.  FF 119.

LIBW/1728983.8

- The position of the damaged houses and trees near the South Breach shows that the barge could not have traveled into the neighborhood and then drifted back toward the floodwall.  Thus, the barge was not present in the vicinity of the floodwall when the main initial flow into the neighborhood took place.  FF 120.

- Physical and photographic evidence in the damaged neighborhood shows that the barge must have floated into the neighborhood after the water was already high.  For example, photographs show that the barge landed on top of telephone wires rather than knocking the wires or telephone poles over.  FF 124.

- The barge floated over the top of a small school bus to arrive at its post-Katrina location.  Thus, the water in the Lower Ninth Ward must have been higher than the top of the school bus when the barge entered the neighborhood.  FF 121.

- The barge could not have floated into the neighborhood until the water was already high because otherwise, the barge would have entered when there was no water on the land side and toppled into the neighborhood and grounded on its end. FF 126.

Thus the physical and scientific evidence is consistent with only one conclusion:  the barge passed through the South Breach at its extreme southern end after the wall had already failed and the water in the Lower Ninth Ward was already high.

### D.    Alleged Eyewitness Accounts

Plaintiffs have identified as trial witnesses several individuals who claim to have seen or heard things during Hurricane Katrina that plaintiffs claim show that the barge impacted the eastern IHNC floodwall before it breached.  At trial, LNA will show that no witness can provide reliable testimony that ING 4727 caused either breach.  Because plaintiffs have consistently relied on the testimony of three purported eyewitnesses and a number of persons who heard "boom" noises at or around the time of the breaches, we briefly put their accounts into context.

William Villavasso, now deceased, is the only individual who purportedly connects the barge to the North Breach.  He was working at Pump Station No. 5 in the Lower Ninth Ward on August 29, 2005.  He testified at deposition that he heard a "boom" and saw "[a] couple of sections" of the wall "tumble [] over," then saw "what appear[ed] to be [a] metal structure like a

13

barge, only the tip of it," but "couldn't tell what it was" that he saw.  FF 157.  Mr. Villavasso made this observation while it was dark and rainy, and was not wearing his glasses (which he needed for distance vision) at the time.  *Id.*  Mr. Villavasso did not contemporaneously share his observation with his coworkers at the Pump Station, either during or after the storm.  Moreover, the object that Mr. Villavasso saw could not possibly have been ING 4727, because the object that Mr. Villavasso observed was sticking up only one or two feet above the floodwall, whereas the ING 4727, had it been present, would have been sticking up 13-15 feet above the floodwall.  Though the object Mr. Villavasso saw cannot possibly have been the ING 4727, there is a rational explanation for what Mr. Villavasso testified to have seen – a portion of the steel sheet pile emerging from the concrete shell as the wall failed under hydrostatic pressure.  *Id*.

Terry Adams, plaintiffs' purported eyewitness to the South Breach, was ***over half a mile away*** from the events he says that he witnessed.  FF 158.  From a rooftop near Deslonde and Law Streets in the Lower Ninth Ward, near the Florida Avenue Bridge, he claims to have seen "something coming towards the levee" between 5:30 a.m. and 6:00 a.m., when it was "still dark" and "raining hard."  Mr. Adams "couldn't exactly see what it was" and "couldn't make out what it was," but inferred that he saw a barge because "this canal don't have nothing on it like that." The object that Mr. Adams said he saw was sticking out only four feet above the floodwall, and thus could not have been the barge.  Mr. Adams has a financial interest in the outcome of this case, having retained plaintiffs' counsel to represent him to pursue claims against the barge.  *Id.*.

Sidney Williams, another purported witness to the South Breach, testified that he saw the "top" of a barge "hit the wall, bounce[] off, [and] hit the wall again" immediately before flooding.  But during an earlier interview, he told investigators that he did not see the barge and that the barge did not cause the breach.  FF 159.  Mr. Williams, who changed his story only after

retaining plaintiffs' counsel as his own attorney to pursue claims against the barge, has a financial interest in the outcome of this litigation.  FF 159(e).

Plaintiffs also rely on witnesses who heard "boom" or similar sounds around the time that the breaches occurred.  Plaintiffs and their experts infer that these sounds must represent the barge hitting the floodwall, and place great reliance on the testimony of these "boom witnesses." However, the evidence will show that numerous witnesses heard similar "boom" sounds in the vicinity of the London Avenue and 17th Street Canal breaches, where no barge was present. Further, expert testimony will show that when concrete breaks, it makes a loud sound in the nature of a "boom" and, thus, no barge was necessary to produce the "boom" sounds that people heard.  Thus, the fact that witnesses heard "boom" or other noises provides absolutely no basis to infer that a barge impact produced such sounds.  FF 162-65.

### E.  Plaintiffs' Expert Evidence

When the supposed eyewitnesses and the "boom witnesses" are properly accounted for, plaintiffs have nothing to support their claims.  Plaintiffs' causation experts, Hector Pazos and Gennaro Marino, place inordinate reliance on the testimony of these witnesses in their recitation of the relevant facts.  However, in forming their expert conclusions about the formation of the breaches, these experts entirely disregard the witnesses' accounts.  In particular, each of the witnesses' accounts involves a supposed barge strike followed immediately by the collapse of the wall and inundation of the neighborhood.  FF 157-59.  Plaintiffs' experts, however, have opined that the barge created smaller tension cracks which eventually undermined the stability of the floodwall after a period of underseepage.  FF 135.  Thus plaintiffs' expert evidence provides an incoherent view of the case which cannot possibly support a verdict in plaintiffs' favor.  By contrast, LNA's causation experts have placed the witness accounts and scientific and physical evidence in their proper context, and have performed sound scientific analyses that lead

15

inexorably to the conclusion that the barge did not, and could not have, caused the floodwall breaches.

Moreover, neither Mr. Pazos nor Dr. Marino carried out any analysis of whether a barge impact with the concrete cap of the floodwall is even capable of causing the failure of the wall. Though both of them opined that contact between the barge and the wall caused the steel sheet pile to deflect, creating a gap or "tension crack" between the sheet pile and the canal side soil, neither analyzed whether this sort of effect was even possible given the configuration and construction of the floodwall. By contrast, LNA's expert, Dr. Charles Cushing, analyzed the potential effect of a barge on a floodwall and found that the barge would cause the concrete cap to fracture in a localized and insignificant manner rather than cause the entire sheet pile to deflect. And LNA's experts (and also the independent investigations) showed that a tension crack forms due to hydrostatic pressure without the need for a barge. Thus, plaintiffs' experts did not undertake the analysis needed to support their conclusions, while LNA's experts showed that plaintiffs have no basis to conclude the barge caused the failure of the buried sheet pile and its supporting soil.

### F.  Plaintiffs and Their Claims

The trial will resolve the claims of four plaintiffs – John and Jerry Alford, Josephine Long Richardson, and Holiday Jewelers (Jacob and Dianne Glaser's business).[2] Each has brought a negligence claim against LNA, and Ms. Richardson is also asserting a wrongful death claim arising out of the death of her husband Joseph Richardson. The Richardson home was located at 1321 Egania Street in New Orleans, about six blocks east of the South Breach. FF 177. The Alfords lived at 2423 Deslonde Street in New Orleans, in the vicinity of the North

---

[2] Pursuant to a joint stipulation, Holiday Jewelers, Inc. was substituted as a plaintiff for Dianne and Jacob Glaser. *See* Joint Stipulation Of Substitution And Dismissal With Prejudice (R.D. 19292 at 1-2) (Sept. 30, 2009).

16

Breach.  FF 176.  Holiday Jewelers was further east, at 8400 W. Judge Perez Drive in Chalmette,

Louisiana.  FF 179.  The evidence will show that each of these plaintiffs has received funds –

from insurance payments for unrelated wind damage during the storm and from Road Home

payments by the United States, a co-tortfeasor – that exceed their claimed property damages in

this case.  And the evidence will show that Holiday Jewelers was an unprofitable enterprise that

sustained no damages in the form of lost profits.  FF 182.

## ARGUMENT

### I.  RELEVANT LEGAL STANDARDS

"The analysis of a maritime tort is guided by general principles of negligence law."

*Consol. Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d 65, 67 (5th Cir. 1987).[3]  To prevail on

their negligence claims, plaintiffs must prove that (a) LNA owed them a duty, (b) LNA breached

that duty, (c) they sustained injury, and (d) LNA's conduct caused plaintiffs' injury.  *In re

Cooper/T. Smith*, 929 F.2d 1073, 1077 (5th Cir. 1991).

### A.  Duty of Care

Plaintiffs cannot prevail on their negligence claims unless they show that LNA owed

them a duty of reasonable care, and that LNA breached that duty.  1 Thomas J. Schoenbaum,

Admiralty & Maritime Law § 5-2 p. 184-85 (2004); *In re Two-J Ranch, Inc.*, 534 F. Supp. 2d

671, 684 (W.D. La. 2008) ("a general maritime negligence claim involves a traditional, broad

formulation of the tort inquiry: 'under the negligence concept, there is only a duty to use due

care, i.e., reasonable prudence'") (quoting *Cox v. Esso Shipping Co.*, 247 F.2d 629, 637 (5th Cir.

1957)).  Where a duty exists, it involves exercising reasonable care under the circumstances, and

does not require the defendant to take every possible precaution.  See *Daigle v. Point Landing,*

---

[3] Plaintiffs have invoked maritime jurisdiction, and thus the trial is governed by maritime law.  See Doc. 18799, at 2
(trial is "pursuant to the Court's maritime jurisdiction, which these plaintiffs have invoked").

*Inc.*, 616 F.2d 825, 827 (5th Cir. 1977) ("The plaintiff is owed a duty of ordinary care"); *Coumou v. United States*, Nos. 95-30219 & 95-30697, 1997 U.S. App. LEXIS 12674, at *16 (5th Cir. Feb. 26, 1997) ("The general maritime law of negligence recognizes a duty of reasonable care under existing circumstances when warranted by general tort law principles.").  Maritime law regarding precautions in advance of an approaching storm asks generally "whether [the defendant] took reasonable precautions under the circumstances as known or reasonably to be anticipated," including whether the defendant's employees "were reasonable in their anticipation of the severity of the impending storm and undertook reasonable preparations in light of such anticipation," based on the standard of "prudent men familiar with the ways and vagaries of the sea."  *In re SS Winged Arrow*, 425 F.2d 991, 995 (5th Cir. 1970).

The existence of a duty, and the alleged breach thereof, are only relevant insofar as compliance with the duty would have changed the outcome.  For instance, the failure to have a lookout is irrelevant where a lookout would not have prevented a collision.  *See Inter-Cities Nav. Corp. v. United States,* 608 F.2d 1079, 1081 (5th Cir. 1979); *Am. River Transp. Co. v. Kavo Kaliakra SS,* 148 F.3d 446, 450-51 (5th Cir. 1998) ("fault in the abstract" is not actionable; negligence must affect the outcome).  In the context of the breakaway of the ING 4727, therefore, an alleged breach of duty by LNA cannot result in liability unless it is shown that the barge would have remained at its moorings, or would not have broken away, if LNA acted differently.[4]

That a duty is owed to some does not mean that this duty is owed to all.  Rather, the duty extends only to those who may foreseeably be harmed by a breach of that duty.  *See In re Signal Int'l LLC*, 579 F.3d 478, 491 (5th Cir. 2009) (duty "is measured by the scope of the risk that

---

[4] In addition, plaintiffs must also show that floodwall breaches would not have occurred if the barge had remained at its moorings.  We address that point below, in connection with causation.

negligent conduct foreseeably entails").  In *Royal Beach Hotel, LLC v. Crowley Liner Services, Inc.*, No. 1:06-DV-129, 2007 U.S. Dist. LEXIS 28633, at *3 (S.D. Miss. Mar. 14, 2007), the court concluded that a defendant did not have a duty to remove shipping containers and trailers from its cargo port prior to Hurricane Katrina because "both the extraordinary force of this storm and its ability to transport containers … away from the port and onto and into neighboring property was unforeseeable, as these were 'unusual and improbable or extraordinary occurrence[s].'"  *Id.* at *14 (quotation omitted).  Thus, unless damage to people like the plaintiffs can be expected to occur "periodically or with some degree of frequency" as a result of the allegedly negligent conduct, an actor owes no duty of care to those individuals.  *In re Signal*, 579 F.3d at 492.

### B.      Causation

Plaintiffs must prove that LNA's alleged negligence caused their alleged damages.  See *Bach v. Trident S.S. Co.*, 920 F.2d 322, 327 (5th Cir. 1991); *Fournier v. Petroleum Helicopters, Inc.*, 665 F. Supp. 483, 486 (E.D. La. 1987).  Causation is typically thought of as a two-part inquiry involving (a) the establishment of "causation in fact" and (b) a "policy judgment on the limits of liability when causation in fact has been established."  *Chavez v. Noble Drilling Corp.*, 567 F.2d 287, 289 (5th Cir. 1978) (citation omitted).  This second inquiry is often denominated "proximate causation" to distinguish it from "causation in fact."  *Moser v. Texas Trailer Corp.*, 623 F.2d 1006, 1013 (5th Cir. 1980); Schoenbaum, *supra*, § 5.3 at 189-90.

### 1.      Causation in Fact

"A defendant's actions must be the cause in fact of a plaintiff's injuries in order for the plaintiff to be able to recover."  *Moser*, 623 F.2d at 1013.  To prevail on this issue, plaintiffs must "introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of [LNA] was a cause in fact of the result."  *Bach*, 920 F.2d at

327 (5th Cir. 1991) (quoting W. Page Keeton, Prosser and Keeton on Torts 263, 269 (5th ed. 1984)).  But the "possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the Court to direct a verdict for the defendant." *Fournier*, 665 F. Supp. at 486.

Courts applying maritime law have followed the causation standards set forth in the Restatement (Second) of Torts (1965) (the "Restatement").[5]  The Restatement standard for causation-in-fact begins with the formulation that the conduct must be a "substantial factor in bringing about the harm" (Restatement § 431).  In most cases, the Restatement provides a "but-for" test for causation – *i.e.*, an actor's negligent conduct is not a "substantial factor" in causing harm if the harm "would have been sustained even if the actor had not been negligent." Restatement § 432(1); *Moser*, 623 F.2d at 1012-13 ("An act or an omission is not regarded as a cause of an event if the particular event would have occurred without it."); 1 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 5.3 at 189-90 (4th ed. 2004) ([A] "defendant's act cannot be a 'substantial factor' if the plaintiff's harm would have occurred without it.").  Under this formulation, the barge cannot be considered a cause of the IHNC floodwall failures if the floodwall would have failed even had the barge remained at its moorings.  See, *e.g.*, *Moser*, 623 F.2d at 1013 ("A failure to fence a hole in the ice plays no part in causing the death of runaway horses which could not have been halted if the fence had been there.").

The Restatement test includes a separate provision to address cases involving "concurrent causation" by two or more causes.  Under Restatement § 432(2), "if two forces are actively operating, one because of the actor's negligence, the other not because of any misconduct on his part, and each of itself is sufficient to bring about harm to another, the actor's negligence may be

---

[5] See, *e.g.*, *Bach,* 920 F.2d at 327; *Chavez v. Noble Drilling Corp.*, 567 F.2d 287, 289 (5th Cir. 1978); *Gavagan v. United States,* 955 F.2d 1016, 1020 (5th Cir. 1992).

found to be a substantial factor in bringing it about."  An action is "sufficient" to cause a harm if, when acting alone, the action would have caused the harm.[6]  Thus, even if the barge is alleged to have been a "concurrent" cause of the floodwall breaches in combination with some other cause(s), the barge cannot be considered a cause-in-fact of the floodwall breaches unless the barge impact was *"sufficient"* to cause the breaches in the absence of the other cause or causes.[7]

Finally, an action cannot be a "substantial factor" in causing harm if the action is only an insignificant cause, or, as the Fifth Circuit put it, merely "negligible negligence." *Chavez*, 567 F.2d at 289 (citation omitted).  As the Supreme Court has expressly recognized, "[i]n many cases, of course, the shipowner whose act or omission contributed only a very small percentage of the total negligence will avoid liability on the ground of lack of causation." *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 265 n.15 (1979).  If other contributing factors have "such a predominant effect in bringing it about as to make the effect of the actor's negligence insignificant," then the actor's negligence is not a substantial factor and the actor is not liable for causing the harm.  Restatement § 433(a) and cmt. d; see also *id.* § 435 cmt. a ("the manner in which the harm occurs may involve the cooperation of other assisting factors so

---

[6] *See June v. Union Carbide Corp.*, 577 F.3d 1234, 1243-44 (10th Cir. 2009) ("sufficient" as used in Restatement requires that conduct "*would* in fact have caused the injury"); *see also Bach*, 920 F.2d at 327 (citing Restatement § 431 and finding no liability for crew's failure to administer CPR on ship because the victim "had no more than a fifteen percent chance of surviving even if the crew had rendered CPR"); *Joshi v. Providence Health Sys. of Oregon Corp.*, 149 P.3d 1164 (Ore. 2006) (recognizing substantial factor test and finding that hospital did not cause patient's death because he had only a 30% chance of survival even without the alleged negligence); *In re Hanford Nuclear Reservation Litig.*, 534 F.3d 986, 1010-11 (9th Cir. 2008) (dismissing personal injury claims for lack of proof that the radiation exposure at issue "alone would have been sufficient to cause the injury"); *Clement v. United States*, 980 F.2d 48, 54 (1st Cir. 1992) (relying on Restatement's "sufficient" requirement in dismissing claims that hospital's negligence caused suicide); *RSL Communications PLC v. Bildirici*, 649 F. Supp. 2d 184, 219-20 (S.D.N.Y. 2009) (dismissing breach of fiduciary duty claims because there was no evidence that directors' failure to hold meetings caused alleged losses; instead, declining market conditions caused losses).

[7] The same would be true under Louisiana law, if it were relevant to the outcome of this case.  In applying the "substantial factor" test for causation, the Louisiana Supreme Court and lower appellate courts have held that where there are multiple causes of a harm, a cause can be liable if "either one of them, operating alone, would have been sufficient to cause the identical result." *LeJeune v. Allstate Ins. Co.*, 365 So. 2d 471, 477 (La. 1978); *Trahan v. Louisiana*, 536 So. 2d 1269, 1272 (La. Ct. App. 1988).

numerous and so important that the actor's negligence cannot be regarded as a substantial factor in bringing about the harm").  Thus, if LNA's role was very minor compared to the other forces at work during Hurricane Katrina, then that would generally not suffice to render LNA liable.[8] And this is so even if there is some debate about which of the other causative factors was predominant.  See *Fourner*, 665 F. Supp. at 487 ("While the Court will not engage in speculation as to exactly which explanation it feels is the most plausible [for plaintiff's injury], the Court does not view the helicopter incident as having been such.").

2.      Proximate Cause

Not only must plaintiffs show that the barge was the cause-in-fact of their injuries, but they must also show it was the proximate cause.  "In admiralty the touchstone of proximate cause is foreseeability; the injury or damage must be a reasonably probable consequence of the defendant's act or omission."  Schoenbaum, *supra*, at 190.  Thus, plaintiffs cannot prevail on their negligence claims unless their damages were a reasonably foreseeable consequence of the alleged negligent conduct.  See *In re Cooper/T. Smith*, 929 F.2d at 1077 (in order to prove negligence claim under maritime law, "the resultant harm must be reasonably foreseeable").  Restatement § 435(2) ("The actor's conduct may be held not to be a legal cause of harm to another where after the event and looking back from the harm to the actor's negligent conduct, it

---

[8] See, *e.g.*, *Westchester Fire Ins. Co. v. Haspel-Kansas Inv. P'ship*, 342 F.3d 416, 421 (5th Cir. 2005) (lack of security in parking lot not a substantial factor causing shooting because "it is *very likely* that the incident would have occurred despite any additional security") (emphasis in original); *Am. River Trans Co. v. Kavo Kaliakra SS*, 148 F.3d 446, 450 (5th Cir. 1998) (even though presence of barges moored without permit "was a but-for cause of the allision," that "was not a substantial and material factor in causing" bulk carrier to allide with the barges because accident was dominated by other vessel's loss of power); *Gross v. So. Ry. Co.*, 446 F.2d 1057, 1065 (5th Cir. 1971) (railroad crossing lacked crossing sign; held that lack of sign did not cause grade crossing accident because the car driver should have seen the train itself); *Med. Lab. Mgmt. Consultants v. Am. Broad. Cos.*, 306 F.3d 806, 821 (9th Cir. 2002) (undercover video at medical lab was not a legal cause of lab's lost business because the lab's poor performance was to blame); *Little v. Brown & Williamson Tobacco Corp.*, 243 F. Supp. 2d 480, 499-500 (D.S.C. 2000) (smoking from particular cigarette brand not the cause of lung disease because it "was not an efficient cause without which his injury would not have resulted to as great an extent"); *Rosen v. Ciba-Geigy Corp.*, 892 F. Supp. 208, 211 (N.D. Ill. 1995) (plaintiff claimed that nicotine patch caused heart attack; held, citing Restatement § 433 cmt. d, that the man's "preexisting coronary artery disease had such a predominant effect in bringing about his heart attack as to make the effect of the patch insignificant and to prevent it from being a substantial factor").

22

appears to the court highly extraordinary that it should have brought about the harm.").  The

Fifth Circuit defined a "foreseeable consequence" of an action as harm that "might have been

anticipated by a reasonably thoughtful person, as a probable result of the act or omission,

considering the interplay of natural forces and likely human intervention."  *Consol. Aluminum*,

833 F.2d at 68; *In re Signal*, 579 F.3d at 492.

## II.      LNA DID NOT BREACH ANY DUTY OF CARE OWED TO PLAINTIFFS

### A.      LNA Exercised Reasonable Care.

As noted above, to the extent a duty was owed by LNA in preparing its cement terminal

in advance of Hurricane Katrina, it was to take "reasonable precautions" in "anticipation of the

severity of the impending storm."  *In re SS Winged Arrow*, 425 F.2d at 995.  LNA's actions were

reasonable and prudent when measured by this standard, and did not violate any statutes,

regulations, rules or customs.

### 1.      LNA acted prudently in its handling of the barge.

Plaintiffs have alleged that LNA's preparations for Hurricane Katrina were unreasonable,

and in particular that LNA failed to moor the barge in a way that would minimize the risk that

the barge would break free during the storm.  LNA will show at trial that it undertook significant

preparations for Hurricane Katrina, and that its preparations were reasonable under the

circumstances.  In particular, LNA added and replaced connections to the barge sufficient to

increase the strength of the mooring connections by more than double.  FF 25, 33.  It used

polypropylene line instead of cable, both because synthetic ropes have superior stretch

characteristics, while wire ropes tend to break (FF 34), and because the use of synthetic ropes

allowed LNA personnel to use the "long-lining" technique to permit the barges to rise with the

incoming storm surge, which would not have been possible with a cable configuration (FF 26,

34).  Also, LNA had Domino shift the barges so that the empty barge would be away from the

dock, reducing the risk that the storm surge would carry it over the dock and sever the mooring connection with the outboard loaded barge, threatening the mooring of both barges. FF 36.

Plaintiffs have made scattershot challenges to various aspects of LNA's handling of the barge in advance of the storm, but none of these survives scrutiny. First, plaintiffs have claimed that LNA should not have begun unloading the barge when it arrived at noontime on Friday, August 26. But as of the early afternoon on August 26, Hurricane Katrina was not projected to strike New Orleans at all. FF 15, 16. Indeed, the Coast Guard did not issue its first port condition alert for the New Orleans area until 10:00 p.m. on Friday night, August 26, and did not order port operations to cease until Sunday night, August 28. FF 17, 18.

Second, plaintiffs have argued that LNA should have stopped unloading the barge or should have added ballast after the hurricane shifted course to head for New Orleans. However, it would have been imprudent for LNA to stop unloading the barge because, as noted, a partially unloaded barge would have been unstable. Adding ballast was not an option because (a) the barge was not fitted with a ballasting system and it would not have been possible to get pumps to the dock and to ballast the barge within the limited amount of time available before the arrival of the storm; and (b) ballasting could have caused the barge to become unstable in any event. FF 40.

Third, plaintiffs have claimed that LNA should have removed ING 4727 from the IHNC on Saturday August 27, before Hurricane Katrina arrived. But LNA did not own any powered vessels and did not have any means to deliver it elsewhere. Zito Fleeting was the sole designated fleeting service allowed to retrieve Ingram barges from the LNA terminal. FF 10. After LNA had finished unloading the barge on Saturday, August 27, LNA employee Ed Busch attempted to contact Zito to request that the barge be removed. FF 19. By that time, however, Zito had

24

already closed its fleet.  FF 32.  Nor could LNA have asked Domino to remove the barge from the terminal in the absence of a known destination available to accept the barge.  FF 31.[9]

Fourth, plaintiffs have argued that LNA should not have shifted the barges so that the empty barge was on the outside of the full barge.  To the contrary, LNA acted reasonably, and indeed, prudently, in shifting the barges.  Had LNA left the empty barge next to the dock, the storm surge would likely have carried the empty barge up over the dock, severing its connection with the loaded barge and causing both barges to be cast adrift.  FF 36.  By shifting the two barges, LNA protected the dock and made it possible to tie the full barge to the dock using the "long-lining" technique that allowed both barges to rise with the storm surge while not riding up over the dock – a technique that resulted in the loaded barge, at least, remaining fast to the dock.  Thus, shifting the two barges was a prudent step.

Fifth, plaintiffs have claimed that LNA failed to "double up" the mooring lines between the ING 4727 and the ING 4745 in accordance with recommendations from the United States Coast Guard.  In fact, LNA did double up the mooring lines by adding and replacing mooring line connections with the result that the mooring configuration was more than doubled in strength from the pre-storm configuration.  FF 25.

Sixth, plaintiffs have claimed that LNA should have used wire cable instead of polypropylene line to secure the barges to the dock and to each other.  To the contrary, polypropylene line has superior stretch characteristics and also enabled LNA to undertake the "long-lining" procedure that resulted in six barges remaining fast to the dock.  FF 27, 34.  In this regard, the performance of polypropylene line at LNA's terminal was far superior to the

---

[9] LNA's expert Captain Larry Strouse has opined that, at least prior to Hurricane Katrina, it had long been known in the industry that LNA's terminal and the mooring arrangements in the IHNC at Florida Avenue are in a protected area and a safe haven for mooring barges.  FF 11.  Although Mr. Busch took what measures he could to have the barge removed from the dock by Zito, the only service that could provide a destination for it, it remains the case that the barge was moored in what was considered a relatively safe and protected location.

performance of wire cable at the Lone Star facility, where twenty-five barges that had been moored with wire cable were cast adrift in the storm.  FF 46.

Finally, plaintiffs have argued that LNA should have had personnel remain at its terminal during Hurricane Katrina in order ensure that ING 4727 did not break free.  But during the storm, there was a mandatory evacuation order in place for New Orleans, which covered the area of LNA's terminal.  FF 41.  LNA was under no duty to endanger the safety of its employees by asking them to remain at the terminal during a hurricane.[10]  Moreover, even had LNA personnel placed themselves in harm's way by remaining at the facility, they could hardly have remained on the canal side of the floodwall where the barges were moored, so there was nothing that they could have done either to prevent the barge from breaking free or to re-moor it after it broke free.

2.      LNA did not violate any statutes, regulations, rules or customs.

Plaintiffs have incorrectly claimed that LNA violated certain Coast Guard rules and regulations concerning the mooring of barges.  See Pl. Opp. to Mot. for Summ J. (Doc. 19352) at 44-45.  However, LNA did not violate either of the two Coast Guard regulations that plaintiffs have previously cited.  One of those regulations, 33 C.F.R. § 162.75(b)(3)(ii), states that "all vessels and tows shall be moored by bow and stern lines."  But there were at least three connections between the ING 4727 and ING 4745 – one at the bow, one at the stern, and one or two in the middle.  FF 24, 25, 44.[11]  The other regulation, 33 C.F.R. § 6.19-1, did not require LNA to do anything at all.  It provides that "[n]othing contained in this part shall be construed as relieving the masters, owners, operators, and agents of vessels or other waterfront facilities from

---

[10] See, *e.g.,* Coast Guard recommendations ("[I]n no way should any of these recommendations be understood as the COTP advocating personnel being placed in life threatening situations to secure property.") (FF 43).

[11] The remainder of § 162.75(b)(3)(ii) applies only to "tows," but the barge was not a tow.  FF 44 (citing Ryan Report at 10 ("the ING 4727 ... is not a tow")); 46 C.F.R. § 27.101 (defining a tow as "a commercial vessel engaged in, or intending to engage in, pulling, pushing, or hauling alongside, or any combination of pulling, pushing, or hauling alongside"); see also 33 C.F.R. § 101.105 (explaining that a "towing vessel" has "operational control of an unmanned vessel"); 33 C.F.R. § 165.100(c) (same).

26

their primary responsibility for the protection and security of such vessels or waterfront facilities." That provision means only that the regulations do not absolve those in control of vessels of their basic responsibility to protect and secure the vessels.[12]

**B.**     **Plaintiffs Have Failed to Show that Any Additional Actions LNA Might Have Taken Would Have Prevented the Barge Breakaway.**

Even if plaintiffs could establish that LNA should have acted differently in some respect, that would still not suffice to establish liability in the absence of a showing that by acting differently, LNA would have prevented the barge from breaking away. "A failure to act, even though unreasonable, cannot contribute to cause a collision where the action would not have affected its occurrence." *Inter-Cities Navigation Corp. v. United States*, 608 F.2d 1079, 1081 (5th Cir. 1979). Here, plaintiffs have not shown that a different course of action on the part of LNA could or would have prevented the barge from breaking away.

In particular, plaintiffs have not shown that the breakaway could have been prevented by placing additional mooring connections between the two barges. As noted above, the ropes between the two barges broke under the pressure of winds so extreme they caused the high-strength polypropylene lines to melt and fuse. FF 45. Plaintiffs have not shown that additional connections would not have melted and fused in the same way. *See State of Louisiana ex rel. Guste v. M/V TESTBANK,* 564 F. Supp. 729, 740 (E.D. La. 1983) (use of different container to store hazardous chemicals aboard ship would not have prevented spill, "given the crushing and mangling of the containers due to the collision"), *aff'd,* 767 F.2d 916 (5th Cir. 1985).

Similarly, plaintiffs have not shown that the breakaway could have been prevented by the use of wire cable as opposed to polypropylene rope. To the contrary, the experience at the Lone

---

[12] Plaintiffs have also alleged that LNA failed to comply with a United States Coast Guard **recommendation** that mooring lines be "doubled up" in advance of an approaching hurricane. As noted above, however, LNA complied with the recommendation by increasing the strength of the mooring connections by more than double. FF 25.

Star facility, where twenty-five barges broke away from their wire-cable moorings, suggests that the barges at the LNA terminal would have fared worse with cable than with the polypropylene rope that was used.

The same is true with respect to plaintiffs' other allegations of improper mooring. Plaintiffs cannot show that an unstable barge (either due to ballast, or partial unloading) would have fared better in the storm.  And they cannot show that the barge would have remained fast if LNA had not asked Domino to switch the locations of the empty and loaded barges.  Instead, the evidence suggests there would have been two breakaway barges (the loaded ING 4745 as well as the ING 4727) if LNA had not asked Domino to perform that maneuver.

In short, lacking proof that the barge breakaway could have been prevented by the exercise of what plaintiffs call due care, they cannot establish their liability claims in this case.

### C.    Plaintiffs Were Not Foreseeable Victims of Any Breach of LNA's Duty.

Finally, plaintiffs cannot show that they were among the group of persons who would foreseeably be injured if the breakaway were not prevented.  *See In re Signal*, 579 F.3d at 491 (holding that "a tortfeasor is accountable only to those to whom a duty is owed" based on "whether the harm that does occur is within the scope of danger created by the defendant's negligent conduct").  Here, if the barge caused two catastrophic floodwall breaches and flooding as plaintiffs have alleged, that was an extraordinary, freakish result that could not have reasonably been foreseen in advance of Hurricane Katrina.  This is so because: (a) physical evidence and past history shows that when a barge impacts a levee or floodwall structure, the expected result is limited to negligible localized cracking or notching, as observed at many other locations during Hurricane Katrina and during other hurricanes as well (FF 46-47); and (b) plaintiffs have identified no instance prior to, during, or since Hurricane Katrina where a loose

28

barge was responsible for causing a levee or flood protection structure to fail.[13]  Therefore the risk of catastrophic flooding was not a foreseeable risk of a barge breakaway, and residents of the areas behind the floodwall were not foreseeable victims to whom a duty was owed.  See *Royal Beach Hotel, LLC v. Crowley Liner Services, Inc.*, 2007 U.S. Dist. LEXIS 28633, at *14 (S.D. Miss. Mar. 17, 2007) (extraordinary force of storm and resulting movement of transport containers was "unforeseeable"; noting that "prior to Hurricane Katrina, there was no recorded incident in the United States of a hurricane striking a marine terminal facility and separating a block stow beyond the perimeters of an affected facility"); *State of Louisiana ex rel. Guste v. M/V TESTBANK,* 564 F. Supp. 729, 740 (E.D. La. 1983) (no duty to move cargo below deck to avoid spill; "while collisions, of course, do occur, collisions which result in spills must be considered relatively infrequent occurrences"), *aff'd,* 767 F.2d 916 (5th Cir. 1985).

*In re Signal International LLC*, 579 F.3d 478 (5th Cir. 2009), is a useful counterpoint to the facts of this case.  There, the Fifth Circuit affirmed a finding that the owner of two barges that broke from their moorings during Hurricane Katrina was not exonerated from liability to the State of Mississippi for allision damage to a bridge of Interstate 10, almost five miles away, because that type of allision was a foreseeable risk if the barges broke from their moorings.  See *id.* at 492-94.  Here, by contrast, the question is not whether impact with the IHNC floodwall was a foreseeable consequence of a barge breakaway, but rather whether catastrophic flooding, resulting from the total failure of the sheetpile and supporting soil, was a reasonably foreseeable consequence of a barge breakaway.  Given that there is no documented instance of such an event ever having happened in the past, and that all experience teaches that the expected consequence

---

[13] FF 166 (citing Marino 2008 Dep. at 105 (not aware of any instance in which a barge caused the failure of a floodwall); Plaintiffs' Response to Interrogatory No. 7 (answering "unknown" to interrogatory asking them to identify "any past instance in which a barge breakaway caused flooding as the result of an allision with a flood protection structure").

of a barge impact is limited to negligible localized damage to the floodwall structure itself, it cannot be said that plaintiffs' alleged damages were the foreseeable result of a barge breakaway (and indeed, no different conclusion could reasonably be reached today, post Katrina).

## III.   ING 4727 WAS NOT A CAUSE-IN-FACT OF EITHER FLOODWALL FAILURE.

LNA cannot be held liable for damages resulting from either IHNC floodwall breach because the ING 4727 was not a "cause in fact of … plaintiff's injuries." *Moser,* 623 F.2d at 1013-14; see also *Fournier*, 665 F. Supp. at 483 (plaintiff must show that "it is more likely than not that the conduct of [LNA] was a cause in fact of the result").

Simply stated, the barge had nothing to do with causing either of the breaches.  To the contrary, the barge could not have been present at the eastern IHNC floodwall when the breaches occurred, and even if it had been, it could not have caused the failure of the embedded sheet pile. With specific reference to the legal tests that have been applied to assess "causation-in-fact," the barge was not a "substantial factor" in causing the breaches because: (a) it was not a "but-for cause" of either breach, given that the floodwall would have failed even if the barge had remained moored at LNA's terminal; (b) it was not a "concurrent cause" of either breach because the barge was not sufficient under any circumstances to cause the floodwall to fail; and (c) it cannot be considered to have played more than a *de minimis* role that is irrelevant for purposes of determining legal responsibility for the floodwall failures.

### A.   The Barge Had Nothing to Do With Either INHC Floodwall Breach.

Under any legal test, the barge was not a cause-in-fact of the IHNC floodwall breaches because it was not present at the eastern IHNC floodwall when either breach occurred.  The scientific, physical, and testimonial evidence strongly supports this conclusion.  Because of the large sail area of the barge, there is consensus among the experts that the dominant force acting on the barge during Hurricane Katrina was the prevailing wind.  But the application of Buys

Ballot's law, the system-wide meteorological data from the hindcast by Oceanweather Inc., and the local meteorological data from Lakefront Airport all confirm that the prevailing wind was blowing away from the eastern IHNC floodwall, and toward the LNA terminal, during the critical early morning hours on August 29, 2005. There was, moreover, no appreciable current or waves capable of moving the barge against the prevailing wind to the site of the breaches.

Physical evidence from both breach sites confirms that the barge was not present at either site before the breaches occurred. As discussed above (at 9-10), the photographic evidence at the North Breach shows that even after the breach occurred, a telephone pole remained standing on the canal side of the breaches. To arrive at the North Breach site, however, the barge would have had to first knock over the telephone pole. There were also no markings on the barge itself, nor was there any physical evidence from the North Breach site, consistent with a barge impact there. The barge thus never came into contact with the floodwall at the North Breach site, and under no theory of causation could it be deemed to be a cause of that breach.

There is also ample physical evidence ruling out the barge as a cause of the South Breach. As discussed above (at 11-13), there is no physical evidence of a barge impact at the large bow-shaped section of the South Breach, where the breach initiated. This is in stark contrast to the extreme southern end of the South Breach, where physical evidence of a cracked or notched concrete cap and bent rebar on panels that had tilted prior to the barge's arrival, together with scratches on the bottom of the barge, shows that the barge passed through the floodwall after the breach had already formed. Further, the position of the damaged houses and trees near the South Breach shows that the barge was not present when the main initial rush of water poured into the neighborhood took place. This and other physical evidence confirms that the barge was not present when the South Breach occurred.

31

The scientific and physical evidence also confirms that the barge, even had it been present, could not have caused the floodwall to fail in the manner that it did. As discussed above (at 7-8), it is undisputed that the floodwall breaches resulted from the failure of the deeply-anchored sheet pile and its supporting soils. Calculations by LNA's expert, Dr. Cushing, showed that a barge impact with the concrete cap of the floodwall could not have caused the deflection or failure of the sheet pile, but rather would cause only negligible localized damage to the concrete cap itself. The Army Corps expert (Dr. Reed Mosher) and even plaintiffs' expert Dr. Marino testified to similar effect. FF 131. Physical evidence from other locations where barges impacted floodwalls during Hurricane Katrina confirms Dr. Cushing's calculations; indeed, the fact that other barges struck other floodwalls and caused no more than negligible localized damage is strong evidence that the ING 4727 had nothing to do with the floodwall breaches in this case.[14] Plaintiffs' experts have provided *no* proof to the contrary. Thus, physical and scientific evidence shows not only that the barge could not have been present at the site of the breaches, but that it could not have caused the breaches even if it had been present.

Against this overwhelming evidence, plaintiffs proffer nothing more than unwarranted inferences from equivocal eyewitness testimony. William Villavasso, plaintiffs' only alleged witness to the supposed barge impact at the North Breach, professed to have seen only the "tip" of a metal structure (though he "couldn't tell what it was"), under dark and rainy conditions and without eyeglasses to correct "fuzzy" distance vision.[15] Terry Adams, plaintiffs' principal witness regarding the South Breach, was *over a half mile away* from the events he claims to

---

[14] *See Inter-Cities Navigation Corp. v. United States*, 608 F.2d 1079, 1083 (5th Cir. 1979) (fact that 5000 vessels successfully completed navigation even though buoy was off its charted position showed that buoy position did not cause collision).

[15] In any event, the object Mr. Villavasso identified could not have been the barge, because the object was sticking up only one or two feet above the floodwall, whereas the barge would have risen 13-15 feet above the floodwall. In all likelihood, what Mr. Villavasso saw was in fact a portion of the steel sheet pile emerging from the concrete shell as the wall failed under hydrostatic pressure. FF 91, 157.

32

have seen, admits it was dark and "raining hard" at the time; and as a claimant, has a financial stake in the outcome of the case.  Sidney Williams, plaintiffs' other supposed South Breach witness, told investigators that the barge was ***not*** present when the breach occurred, and only changed his story after he, too, had a financial interest in claims against the barge.  Not only are these witnesses' accounts dubious at best, but they are not even consistent with the theory espoused by plaintiffs' own experts for how the breaches occurred.  See above at 13-15.  There is no reason for the Court to accept a version of events that plaintiffs' experts do not accept.

Plaintiffs also infer that the barge must have caused the breaches because several individuals heard "boom" sounds or other loud noises around the time that the breaches occurred.  But barge impacts are not necessary to create those types of sounds, as both fact and expert testimony confirms.  See above at 15.  Therefore, testimony from "boom" witnesses says nothing about whether the barge caused the "boom" noises, let alone the floodwall breaches.

For all of these reasons, the barge was not a cause-in-fact of the IHNC floodwall failures. Although we address each potentially-applicable legal test for causation below, the overwhelming evidence is that the barge simply had nothing to do with causing the failures. Plaintiffs' negligence claims therefore fall short because they cannot prove "that it is more likely than not that the conduct of [LNA] was a cause in fact of" the breaches.  *Bach*, 920 F.2d at 327 (quotation omitted).  See also *Am. Gulf VII v. Otto Candies, Inc.*, 1997 U.S. Dist. LEXIS 13414, at *19 (E.D. La. Aug. 28, 1997) (no liability for negligence under maritime law where defendant's actions "did not play any role in causing the damage alleged").

### B.     The Barge Was Not a But-For Cause of Either INHC Floodwall Breach.

In order for conduct to be legally responsible for causing a harm, it must be a "substantial factor in bringing about the harm."  Restatement § 431.  This typically requires "but-for"

causation, meaning that conduct is not a "substantial factor" in causing harm if the harm "would have been sustained even if the actor had not been negligent."  Restatement § 432(1).[16]

Here, the IHNC floodwall breaches would have occurred even if the barge had remained at its moorings.  With respect to the North Breach, LNA will show that the various causes of the breach identified by IPET, ILIT, Team Louisiana, and Drs. Bea and Bakeer – which include, among other causes, the lack of soil support on the protected side of the floodwall and the formation of a tension crack between the canal-side soil and the sheet pile, leading to increased hydrostatic pressure on the wall and underseepage below the sheet pile – would have caused the North Beach regardless of whether a barge was present.  Likewise, the factors acting upon the floodwall at South Breach site, including formation of a tension crack between the canal side floodwall and the steel sheet pile, which increased the pressure on the wall and allowed for seepage; and overtopping and severe scouring of the protected side soils, leading to the loss of necessary soil support – would have caused that breach without any barge impact.  Therefore, the barge was not a but-for cause of those breaches.  See, *e.g.*, *Moser*, 623 F.2d at 1013 ("A failure to fence a hole in the ice plays no part in causing the death of runaway horses which could not have been halted if the fence had been there."); *Inter-Cities Navigation,* 608 F.2d at 1081-83 (misplaced buoy did not cause collision that occurred for other reasons, regardless of placement).

Moreover, even under plaintiffs' theory, the barge was not a but-for cause of the breaches.  Plaintiffs' theory is that the barge somehow made it across the IHNC and contacted the floodwall, which contact caused the sheet pile to deflect and form tension cracks that increased hydrostatic pressure on the wall, which then undermined the soil support for the wall,

---

[16] See *Moser*, 623 F.2d at 1012-13 ("An act or an omission is not regarded as a cause of an event if the particular event would have occurred without it."); 1 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 5.3 at 189-90 (4th ed. 2004) (a "defendant's act cannot be a 'substantial factor' if the plaintiff's harm would have occurred without it").

leading to the breaches.  FF 135.  Evidence from other breaches confirms, however, that tension cracks formed due to hydrostatic pressure even where no barge was present.  FF 137.  Further, plaintiffs' experts have admitted that the hydrostatic pressure on the IHNC floodwall during Hurricane Katrina was sufficient to deflect the wall and induce gap formation.  FF 143.  And the Army Corps' "E-99" field test similarly showed that hydrostatic pressure on floodwalls creates gaps of the type observed after Hurricane Katrina.  FF 138.  The tension cracks that plaintiffs attribute (wrongly) to the barge would have formed anyway, regardless of the barge.  Hence the barge was not a but-for cause of the tension cracks that plaintiffs say caused the breaches to form, and thus was not a but-for cause of the breaches themselves.

The conclusion that the barge was not a but-for cause of the IHNC floodwall failures, and therefore not a "substantial factor" in causing them, follows from this Court's decision in *Robinson*.  There, the Court used a but-for analysis to conclude that the MRGO was not a "substantial factor" in causing the IHNC floodwall breaches because the IHNC breaches would have happened even without the MRGO.  See *In re Katrina Canal Breaches (Robinson)*, 647 F. Supp. 2d 644, 735 (E.D. La. 2009) (finding MRGO was not a "substantial factor in the breaching of the IHNC floodwalls" based on expert testimony that "the east walls of the IHNC would have failed regardless of the MRGO").  Other cases addressing damage stemming from hurricanes and other natural disasters make clear that this is the proper analysis to apply in assigning causation. *See, e.g.*, *Warrior & Gulf Nav. Co. v. United States*,  864 F.2d 1550, 1553-54 (11th Cir. 1989) (government relieved of liability where "unprecedented rain" was "the inevitable cause of the chain of events," which would have occurred "irrespective of the [government's] negligence"); *Terre Aux Boeufs Land Co. v. Zurich Ins. Co.*, 803 So.2d 86, 92-93 (La. Ct. App. 2001) (defendant relieved of liability where hurricane "would have produced the same damage,

regardless of [defendant's] negligence").  Likewise here, the IHNC floodwalls would have failed regardless of the barge, and thus the barge was not a but-for cause of the breaches.

### C.        The Barge Was Not a Concurrent Cause of Either INHC Floodwall Breach.

Plaintiffs may attempt to argue that the barge was one of several "concurrent causes" of the breaches, along with the massive storm surge which raised the water level in the IHNC during the storm or the many other forces that acted on the wall and undermined its stability. Such an argument would fail, however, because plaintiffs cannot satisfy the test applicable to concurrent causes, which provides that an actor's conduct is not a "substantial factor" in causing a harm unless it was "sufficient" to cause the harm "of itself," even absent the other alleged cause(s).  See Restatement § 432(2) (actor's conduct is substantial factor only if conduct "of itself is sufficient to bring about [the] harm"); *see also* cases cited at n.6 *supra*.

Clearly, the barge was not "sufficient" to cause the floodwall to fail.  To the contrary, as discussed above (at 32), a barge impact with the IHNC floodwall would have caused only insignificant localized damage to the concrete cap, and the deeply-embedded steel sheet pile would have remained in place.  Plaintiffs have no evidence to the contrary, as none of their experts calculated the effect of a barge impact on the sheet pile or supporting soil as opposed to the concrete cap.  Moreover, the physical evidence at the southern end of the South Breach shows that the barge in fact caused only local damage to the concrete cap and rebar, negligible from a causation standpoint and nothing like the type of damage that would have been necessary to dislodge the embedded steel sheet pile, if that were even possible for a barge to do. Photographs of other barges that impacted levees and floodwalls during Hurricane Katrina and Hurricane Gustav show that the barges caused minimal and localized damage at the point of impact with floodwalls (typically with the concrete cap), but did not undermine the entire

36

floodwall structure.  Because the barge was not and cannot have been "of itself … sufficient" to cause the floodwall to fail, it was not a cause-in-fact of the floodwall breaches.

Moreover, without the storm surge from Hurricane Katrina, the water level in the canal would not have permitted the barge even to approach the eastern IHNC floodwall.  For this reason as well, the barge itself was not sufficient to cause the breaches without the operation of other forces.  The conditions created by Hurricane Katrina, conversely, were more than sufficient to cause the failure of the floodwall without any involvement by the barge.  See above at 7-11.

In addition, in cases where allegedly negligent conduct is claimed to have been a concurring cause along with naturally-occurring forces such as a devastating hurricane, as in this case, courts have refused to assign liability for harms that would have been sustained due to the natural causes acting alone.  See, *e.g.*, *Beahm v. Groike*, No. 98-1214, 1999 U.S. Dist. LEXIS 255, at *11 (E.D. La. Jan. 11, 1999) ("When a 'force majeure' or 'act of God' combines or concurs with the conduct of a defendant to produce an injury, the defendant may be held liable for any damages that would not have occurred but for its own conduct or omission."); *Terre Aux Boeufs Land Co.*, 803 So. 2d at 92 (under "federal admiralty law," the defendant is absolved from liability if "the exercise of reasonable care by the defendant could not have prevented the damage from the natural event") (quoting *Skandia Ins. Co. v. Star Shipping AS*, 173 F. Supp. 2d 1228 (S.D. Ala. 2001)).[17]  Here, the hurricane and its effect on the IHNC floodwall was "sufficient … of itself" to cause plaintiffs' damages for reasons unrelated to a barge, while the barge was not "sufficient" to do anything of the sort.  Accordingly, an allegation that the barge is

---

[17] See also *Rector v. Hartford Accident & Indem. Co.*, 120 So.2d 511, 513-14 (La. Ct. App. 1960) ("In other words, if the Act of God is of such an overwhelming and destructive character as by its own force, and independently of the particular negligence alleged or shown, to produce the injury, there is no liability, even though there is some negligence").

a "concurrent cause" along with the hurricane-induced storm surge cannot render LNA liable for causing harms that the hurricane-induced storm surge would have caused anyway.

### D.   Any Role That the Barge Played Was, at Most, *De Minimis*.

Finally, even if the barge did contact the eastern IHNC floodwall before the breaches occurred (which it did not), that contact would have made only a minor contribution to any damage to the wall (and such damage, as LNA will show at trial, was not of the type capable of making the wall fail).  As a matter of law, such *de minimis* causes are not actual causes assigned any responsibility for the resulting harm.[18]

As noted, there were many forces acting on the IHNC floodwall that contributed to the breaches, including, among other causes, inadequate soil support at the North Breach site, overtopping and scour of the protected side soils at the South Breach site, and the development of tension cracks leading to increased hydrostatic pressure on the wall and underseepage at both breach sites.  Those factors, in combination with the storm surge caused by Hurricane Katrina, were substantial and would have caused the floodwall to fail without the presence of a barge.  Indeed, that is what happened with other floodwalls that failed during Hurricane Katrina – they failed even though there was admittedly no contact by a barge.

Therefore, any contribution the barge might be said to have made (and, we stress, there was no such contribution) would have been *de minimis* at best, not of the type or degree necessary in order for the wall to have failed, and insufficient to assign the barge any legal responsibility for causing the breaches.  See *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 265 n.15 (1979) ("[i]n many cases, of course, the shipowner whose act or omission

---

[18] See *Chavez*, 567 F.2d at 289 (no liability for "negligible negligence"); Restatement § 433(a) (in assessing causation, court must consider the "other factors which contribute in producing the harm and the extent of the effect which they have in producing it"); *Id.* § 433 cmt. d. (if the other contributing factor(s) have "such a predominant effect in bringing it about as to make the effect of the actor's negligence insignificant," then the actor's negligence is not a substantial factor).  See, *e.g.*, cases cited at n.8 supra.

contributed only a very small percentage of the total negligence will avoid liability on the ground of lack of causation").[19]

## IV.   THE BARGE WAS NOT THE PROXIMATE CAUSE OF THE FLOODWALL FAILURES.

Even if the barge had played some role in the breaching of the IHNC floodwall (which it did not), the barge cannot be regarded as a proximate cause of plaintiffs' damages.  The issue of proximate cause is connected to the question of foreseeability and duty, addressed at pages 28-30 above.  *See In re. Signal*, 579 F.3d at 490 n.12.  In particular, proximate cause focuses on whether the harm sustained by the plaintiff was a "reasonably foreseeable" consequence of the defendant's allegedly negligent conduct.  *In re Cooper/T. Smith*, 929 F.2d at 1077.  Where it was "highly extraordinary" that the conduct in question would cause the damage that occurred, the conduct is not the proximate cause of the harm.  Restatement § 435(2) ("The actor's conduct may be held not to be a legal cause of harm to another where after the event and looking back from the harm to the actor's negligent conduct, it appears to the court highly extraordinary that it should have brought about the harm.").

As discussed above (at 28-29), the evidence before, during, and after Hurricane Katrina shows that loose barges do not cause the catastrophic failure of floodwalls buried seventeen feet in the soil, as alleged in this case.  Instead, the foreseeable consequence of a barge contacting a wall was limited to localized and negligible damage to the concrete cap of the floodwall itself.  According to plaintiffs, however, the barge in this instance caused the bottom of the sheet pile to

---

[19] See, *e.g.*, *Inter-Cities Navigation Corp.*, 608 F.2d at 1081-82 (unreasonable failure to have lookout irrelevant for purposes of causation if the loss "could not have been guarded against by a lookout"); *Bach*, 920 F.2d at 327 (where pilot had no more than 15% chance of survival even if CPR had been administered, "[n]o rational factfinder could conclude that the crew's failure to administer CPR more likely than not caused [his] death"); *Westchester Fire Ins. Co.*, 342 F.3d at 421 (lack of security in parking lot not a substantial factor causing shooting because "it is *very likely*" that the incident would have occurred despite any additional security"); *Am. River Trans Co.,*148 F.3d at 450 (even though presence of unpermitted barges "was a but-for cause of the allision," it "was not a substantial and material factor in causing" allision because accident was dominated by other vessel's loss of power).

deflect, allowing water to penetrate down to the bottom of the sheet pile and seep underneath, thereby causing the collapse of the wall.  This is *not* a foreseeable consequence of a barge breakaway.  Plaintiffs have cited no previous instance in which such an event occurred, nor anything subsequent.

The case law confirms that the barge cannot be considered a proximate cause of the plaintiffs' damages.  While proximate cause may be found where the plaintiff's damages are of the "same general sort that was expectable," there is no proximate causation where the plaintiff's loss "goes beyond the pale of general harm which reasonably might have been anticipated."  *In re. Signal,* 579 F.3d at 495 & n.19.  Thus, while a barge impact with a bridge was found to have proximately caused damage to the bridge itself in *In re. Signal*, 579 F.3d at 492, a dredging impact with an underground pipeline was found not to have proximately caused damage to a customer whose supply of gas was interrupted by the loss of the pipeline.  *Consol. Aluminum*, 833 F.2d at 66.[20]  Here, the plaintiffs' theory that a barge impact caused the catastrophic flooding of an entire neighborhood, as opposed to localized and insignificant damage to the concrete cap of a floodwall structure, represents precisely the sort of "highly extraordinary" event that neither LNA nor any other actor could reasonably have foreseen.

The barge was therefore not the proximate cause of the IHNC floodwall breaches.

## V.     PLAINTIFFS' DAMAGES ARE LIMITED.

---

[20] *See also, e.g., Republic of France v. United States*, 290 F.2d 395, 401 (5th Cir. 1961) (vessel owners not liable for fire in ship's cargo because it was unknown that the nitrate was explosive when exposed to fire, and therefore explosion was not foreseeable; to be liable, defendant must have "knowledge of a danger, not merely possible but probable") (quotation omitted); *Ranger Ins. Co. v. Exxon Pipeline Co.*, 760 F. Supp. 97, 101 (W.D. La. 1990) (barge and its tug not the proximate cause of damage to oil pipeline because "[t]he most damage the tug captain or barge operator might have reasonably foreseen was to drag bottom or hit a natural obstruction such as a stump or sandbar," and "[t]here was no reason to expect an explosion from a pipeline under the barge, and it was a reasonable assumption that no pipeline would be suspended in the water above the mud line"); *McDorman v. Texas-Cola Leasing Co.*, 288 F. Supp. 2d 796, 804 (N.D. Tex. 2003) ("Whether an injury is foreseeable in a particular instance requires more than someone, viewing the facts in retrospect, theorizing an extraordinary sequence of events whereby the defendant's conduct brings about the injury.") (citation omitted).

**A.      Ms. Richardson and the Alfords Have Already Been Adequately
Compensated for Their Damages.**

The Road Home program was funded by the federal government and administered by the

State of Louisiana in order to fund the repair and reconstruction of damaged Louisianans' homes.

See *In Re Katrina Canal Breaches Consol. Litig. (Road Home)*, No. 07-5528, 2009 U.S. Dist.

LEXIS 33068 at *14-15 (E.D. La. Apr. 16, 2009).  Ms. Richardson and the Alfords each

received a substantial cash payment from the Road Home program, as follows:

- Ms. Richardson received $119,010 from the Road Home program.  Prior to
  Hurricane Katrina, Ms. Richardson's home was worth $89,000 and she
  reconstructed it after the storm at a cost of $107,114.  FF 181.

- The Alfords received $120,000 from the Road Home program.  At the time of
  Hurricane Katrina, the Alfords had a $30,000 mortgage on their home and
  $17,000 in equity (the house was valued at $47,000).  After the storm, using Road
  Home proceeds, the Alfords paid off their mortgage on their home and bought a
  new home in Algiers.  FF 180.

The Road Home payments therefore fully compensated plaintiffs for any injury that might

otherwise be attributed to Hurricane Katrina-related flooding.

The payments that plaintiffs received from the Road Home Program for their property

losses must be deducted from any award that the Court might make concerning plaintiffs'

property damage claims.  This Court has already held that the federal government is a tortfeasor.

See *In re Katrina Canal Breaches Consol. Litig. (Robinson)*, 647 F. Supp. 2d 644, 736 (E.D. La.

2009).  Therefore, the collateral source rule, which bars admission of evidence of funds received

from non-tortfeasors, does not apply to funds plaintiffs received from the government through

the Road Home Program.  See *Giles v. Gen. Elec. Co.*, 245 F.3d 474, 495 (5th Cir. 2001) (where

prior payments were not "additional, bargained-for compensation but were instead compensation

for the injury out of which this case arises," the collateral source rule did not apply); *Boyett v.

Keene*, 815 F. Supp. 204, 208 (E.D. Tex. 1993), affirmed without opinion at 1993 U.S. App.

LEXIS 15852 (5th Cir. June 10, 1993) (compensatory payments from a joint tortfeasor to the victim are not collateral to another tortfeasor).[21]

In *Robinson*, the Court refused to reduce a plaintiff's damage award by the amount of Road Home payments she received because the plaintiff was "obligated to reimburse the Road Home from any insurance proceeds or other recovery she may receive."  Doc. 19415 at 154. That repayment obligation comes from the "Road Home Limited Subrogation/ Assignment Agreement" that each grant recipient was required to execute.  See *In Re Katrina Canal Breaches Consol. Litig. (Road Home)*, No. 07-5528, 2009 U.S. Dist. LEXIS 33068, at *15 (E.D. La. Apr. 16, 2009) (describing Road Home program, and noting that "[a]s part of the grant process, recipients were required to execute the Road Home Limited Subrogation/Assignment Agreement ('Agreement'), in which the recipient agreed to repay duplicated payments that they received").  The Road Home Limited Subrogation/Assignment Agreement requires Road Home grant recipients to repay those monies ***only*** if they recover:  "(a) under any policy of casualty or property damage insurance or flood insurance on the residence…; [or] (b) from FEMA, Small Business Administration, and any other federal agency, arising out of physical damage to the Residence caused by Hurricane Katrina and/or Hurricane Rita."[22]

But there is no requirement in the Road Home Limited Subrogation/Assignment Agreement or elsewhere that Road Home grant recipients repay their grants if they recover in a

---

[21] *See also Miciotto v. United States*, 270 Fed. Appx. 301, 303 (5th Cir. 2008) (holding under Louisiana law that collateral source rule does not apply when plaintiff gave no consideration in exchange for prior compensation); *In re Vulcan Materials Co.*, --- F. Supp. 2d ----, 2009 WL 4884017, at *13-14 (E.D. Va. Dec. 17, 2009) (United States was a joint tortfeasor and therefore payments made by it did not invoke collateral source rule); *Mountbatten Surety Co. v. Town of Ware Shoals, S.C.*, 2008 WL 2704921, at *3 (D.S.C. July 9, 2008 ("[I]t is well-settled that payment from a joint tortfeasor does not qualify as a collateral source.").(quoting *In re W.B. Easton Const. Co.*, 463 S.E.2d 317 (S.C. 1995)); *Pouliot v. Paul Arpin Van Lines, Inc.*, 235 F.R.D. 537, 551-52 (D. Conn. 2006) (payments to plaintiffs by co-defendants are not collateral source payments); *Manns v. State Department of Highways*, 541 N.E.2d 929, 934 (Ind. 1989) ("A joint tortfeasor however is not a collateral source.").

[22] See sample Road Home Limited Subrogation/ Assignment Agreement at Exh. 1 hereto.

tort suit against parties other than the federal government.  Therefore, any amount that the Court awards plaintiffs against LNA should be reduced by the amount of their Road Home grants, because they have already been fully compensated for damage to their properties.[23]

### B.    Holiday Jewelers Suffered No Loss During Hurricane Katrina.

Holiday Jewelers has no claim for lost profits for the years after Hurricane Katrina because the business earned no profit prior to Hurricane Katrina.  During the four years prior to the storm, Holiday Jewelers was, on average, a loss-making business with an average annual loss of $1,989.33.  FF 182.[24]  Projecting that loss forward for the years 2005-2011, had Hurricane Katrina not occurred, Holiday Jewelers would not be profitable but instead would have had a total loss of $13,925.  FF 182.  Recovery for "[l]ost profits will only be allowed when profits have actually been, or may reasonably suppose to have been lost, and the amount of such profits is proved with reasonable certainty."  *In re MNM Boats, Inc.*, Civ. No. 07-1938, 2009 U.S. Dist. LEXIS 119861, at *39 (E.D. La. Dec. 4, 2009) (citing *The Conqueror*, 166 U.S. 110, 115 (1898)).  Businesses that can prove no profit prior to the event for which they seek compensation cannot seek compensation for lost profits.  *See Toga Soc'y, Inc. v. Lee*, No. 03-2981, 2005 U.S. Dist. LEXIS 13408 (E.D. La. June 29, 2005) (Duval, J.) (where limited evidence established that business was loss-making before injury, it could not recover lost profits).  Insofar as Holiday Jewelers neither made a profit before Hurricane Katrina nor can adduce evidence with "reasonable certainty" that it would have earned a profit after the storm, it is not entitled to recover damages for lost profits.

---

[23] Plaintiffs' recovery, if any, must also be reduced by the amount of insurance payments received by them for wind damage to their property.  Such amounts are not subject to the collateral source rule because the wind damage was separate from the alleged flood damage at issue in this case.

[24] Holiday Jewelers received a one-time insurance payment in 2004.  Including that payment Holiday Jewelers had an average annual profit of $1344 during the four years preceding Hurricane Katrina.  However, it is improper to consider that one-time payment in determining future lost profits.  FF 182.

Nor can Mr. Glaser recover for his lost income.  He has sued LNA only in his capacity as owner of Holiday Jewelers.  Mr. Glaser's earnings (or lack thereof) are irrelevant to calculating whether Holiday Jewelers (on behalf of whom Mr. Glaser has brought, suit) has a claim for lost profits.  FF 183.  Had Mr. Glaser become a realtor while operating Holiday Jewelers, the store would still have had to employ someone to operate the business, so that the money that the business spent paying Mr. Glaser would necessarily be spent on another employee.  FF 183.  Regardless, based on the projections derived from the average salaries of a jeweler and realtor in Louisiana as well as Mr. Glaser's actual earnings in 2006 and 2007, Mr. Glaser's projected wages for the 2005-2011 period exceed his projected wages had Katrina not occurred.  FF 184.[25]  But "[a] plaintiff is not entitled to be put in a better position" due to the allocation of damages. *Brennan's Inc. v. Dickie Brennan & Co.*, 376 F.3d 356, 371 (5th Cir. 2004) (citations omitted).[26]  Mr. Glaser is therefore not entitled to any recovery for lost income.

## CONCLUSION

**The Court should reject plaintiffs' claims and enter judgment for LNA.**


Dated: March 4, 2010                    Respectfully submitted,


                                        Robert B. Fisher, Jr., T.A. (#5587)
                                        Derek A. Walker (#13175)
                                        **CHAFFE MCCALL, L.L.P.**
                                        2300 Energy Centre
                                        1100 Poydras Street

---

[25] There are other faulty assumptions implicit in Holiday Jeweler's claims for lost profits.  First, plaintiffs assume that all of the store's pre-storm customers would have returned after the storm.  Second, plaintiffs assume that *all* damage to the business was caused by LNA.  FF 181.  However, the store's loss of customers and damages are attributable to various other forces – floodwaters from the MRGO, wind and rain from the storm, the federal government, and the effects of the Murphy Oil spill.  FF 182.

[26] Because LNA is not liable for *any* damages in the case of these four plaintiffs, there is no need to allocate liability between LNA and any other entity.  If there were any damages, then an allocation would be necessary between LNA and tortfeasors (such as the United States) that plaintiffs chose not to sue.  *McDermott, Inc. v. AmClyde*, 511 U.S. 202, 221 (1994); *Calhoun v. Yamaha Motor Corp.*, 350 F.3d 316, 325 (3d Cir. 2003).

New Orleans, LA  70163-2300
Telephone:  (504) 585-7000
Facsimile:  (504) 585-7075
Fisher@chaffe.com
Walker@chaffe.com

 /s/ John D. Aldock
John D. Aldock
Mark S. Raffman
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC  20001
Telephone:  (202) 346-4240
jaldock@goodwinprocter.com
rwyner@goodwinprocter.com
mraffman@goodwinprocter.com

Daniel A. Webb (#13294)
**SUTTERFIELD & WEBB, LLC**
Poydras Center
650 Poydras Street, Suite 2715
New Orleans, LA  70130
Telephone:  (504) 598-2715

***Attorneys for Lafarge North America Inc.***

45

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on March 4, 2010.

<u>/s/ John D. Aldock            </u>

46