# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| | * | |
| IN RE: KATRINA CANAL | * | |
| BREACHES | | |
| CONSOLIDATED LITIGATION | * | CIVIL ACTION |
| | * | |
| | * | NO. 05-4182 |
| | * | and consolidated cases |
| PERTAINS TO: ALL BARGE | * | |
| | * | SECTION "K" (2) |
| | * | |
| | * | |
| | * | JUDGE |
| | * | STANWOOD R. DUVAL, JR. |
| | * | |
| | * | MAGISTRATE |
| | * | JOSEPH C. WILKINSON, JR. |

## LAFARGE NORTH AMERICA INC.'S RESPONSE
## TO PLAINTIFFS' PRETRIAL PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

Pursuant to the Court's Case Management Order (Docs. 19201, 19564), defendant

Lafarge North America Inc. ("LNA") responds to plaintiffs' pretrial proposed findings of fact

and conclusions of law (Doc. 19644) ("Pl. Mem.").  Plaintiffs' proposed factual findings provide

a superficial and incomplete rendering of the facts, and their proposed conclusions of law

provide an overreaching and inaccurate presentation of the law.  By contrast, LNA's own

proposed findings of fact and conclusions of law (Doc. 19652) and pretrial memorandum (Doc.

19653) show that plaintiffs' claims fail as a matter of fact and law because, among other reasons,

LNA did not breach any duty owed to plaintiffs in its handling of the barge ING 4727, and was

not the cause-in-fact or proximate cause of either of the two floodwall breaches that gave rise to

plaintiffs' damage claims.

I.      **Response to Plaintiffs' Summary of Their Negligence Claims**

Plaintiffs' summary of their negligence claims contains several inaccuracies, noted in the paragraphs below.[1]

**1.**  Initially, plaintiffs misstate the claims that they will be asserting at the June 2010 bench trial.  They claim that they are asserting a negligence claim under "both Louisiana State law and Maritime law."  In fact, the June 2010 trial will consider claims only under maritime law, not Louisiana law.[2]  Plaintiffs' election to proceed under maritime law means that their claims lie exclusively under maritime law, not Louisiana law.  *See East River S.S. Corp. v. Transamerica Delaval Inc.*, 476 U.S. 858, 864 (1986) ("With admiralty jurisdiction comes the application of substantive admiralty law."); *see also infra* at ¶¶ 87-93.

**2.**  Plaintiffs allege in this paragraph that the barge broke away and was permitted to "float adrift during the course of the Hurricane."  This characterization emphasizes that the "course of the Hurricane" as it passed to the east of New Orleans was critical to the movement of the barge.  However, as LNA will demonstrate at trial, the counterclockwise hurricane winds would not have allowed a drifting barge to be present at the eastern IHNC floodwall when the breaches occurred.

**3-4.**  These paragraphs contain further characterizations of plaintiffs' claims.  The geographic allegations in ¶ 3 are irrelevant to any issue in the June 2010 trial, given that the Court has denied plaintiffs' motion for class certification on the ground that the flooding and damage sustained at any particular location is an issue that differs for each plaintiff.  *See* Doc.

---

[1] The numbered paragraphs in this response correspond to the like-numbered paragraphs in plaintiffs' proposed findings of fact and conclusions of law (Doc. 19644).  Plaintiffs fail to provide specific page references to the portions of depositions that allegedly support their points.  In this document, LNA responds to that alleged evidence based on its reading of the transcripts, without knowledge of which particular sections plaintiffs claim support their arguments.

[2] *See* LNA Br. at 17 n.3 (quoting Doc. 18799 (Joint Stipulation Concerning Barge Track Scheduling Order), at 2 ("trial is pursuant to the Court's maritime jurisdiction, which these plaintiffs have invoked").

LIBW/1732237.5

18852, at 19.  Regardless, LNA disputes plaintiffs' assertion that ING 4727 caused the eastern

IHNC floodwall breaches or any of plaintiffs' alleged damages.

## II.     Response to Plaintiffs' Summary of The Elements of Their Claims

**5.**  Although LNA takes no issue with the elements of a negligence claim as identified in

this paragraph, LNA disagrees that plaintiffs can prove those elements based on the factual

record in this action.

### A.     Duty and Breach:  There is no presumption of negligence.

**6-7.**  LNA does not dispute that duty is a question of law and that whether a duty was

breached is a question of fact.  By conceding that the "foreseeability of the harm suffered by the

complaining party" is a critical issue (¶ 6), plaintiffs have set the stage for a ruling in LNA's

favor because massive flooding is not a foreseeable consequence of a barge breakaway.  *See*

LNA Finding of Fact ("LNA FF") No. 166.  LNA further notes that plaintiffs bear the burden of

establishing all parts of the duty analysis by a preponderance of the evidence.  LNA Conclusion

of Law ("LNA CL") No. 2 (citing *In re Cooper /T. Smith*, 929 F.2d 1073, 1077 (5th Cir. 1991)).

**8.**  Plaintiffs' reliance on the Louisiana Rule is misplaced for several reasons.  The

Louisiana Rule holds that when a vessel moving due to an external force, such as wind, allides

with a stationary object, the moving vessel is presumed to be at fault.  *The Louisiana*, 70 U.S.

164 (1865).  Courts do not actually apply the Louisiana Rule unless and until the plaintiff shows

that the vessel at issue allided with a stationary object.  *See Hatt 65, L.L.C. v. Kreitzberg*, No.

3:06cv332, 2009 U.S. Dist. LEXIS 95332, at *23 (N.D. Fla. 2009) (explaining that the Louisiana

Rule applies only when a vessel "has allided" with an object).  In *Hatt 65*, the Court made clear

that "[a]s a threshold question [to the application of the Louisiana Rule], then, the court must

decide whether there was an allision between the *Escape* and the *WEJ* while the *WEJ* was

moored.  It was the plaintiffs' burden to establish a prima facie case of an allision."[3]  In most maritime cases, there is no dispute that a vessel hit a wall or other structure.  *See, e.g., In re Signal Int'l LLC*, 579 F.3d 478 (5th Cir. 2009); *The Louisiana*, 70 U.S. at 173.  Here, plaintiffs cannot invoke the Louisiana Rule without first showing that the barge actually struck the eastern IHNC floodwall at or before the time that the North and South Breaches occurred.  *See, e.g., Crowley Am. Transp., Inc. v. Double Eagle Marine, Inc.*, 208 F. Supp. 2d 1250, 1259 (S.D. Ala. 2002) (Louisiana Rule did not apply because plaintiff "ha[d] not established its burden of showing that this damage occurred as a result of the collision with the barge"); *see also* LNA FF Nos. 117-120; *infra* at ¶¶ 66-69 (explaining that to the extent the barge did come into contact with the extreme southern end of the South Breach, it did so *after* the breach had occurred).

In any event, the Louisiana Rule does not apply when a defendant can show that it took reasonable care to prevent an accident.  *See Pioneer Natural Res. USA, Inc. v. Diamond Offshore Co.*, 638 F. Supp. 2d 665, 689 (E.D. La. 2009) (citing *Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790, 795 (5th Cir. 1977)); *Apache Corp. v. GlobalSantaFe Drilling Co.*, No. 06-1643, 2009 U.S. Dist. LEXIS 66872 (W.D. La. July 16, 2009) (same).  Thus, to the extent that LNA acted with reasonable care, the Louisiana Rule does not apply.  *See Fischer v. S/Y Neraida*, 508 F.3d 586 (11th Cir. 2007) (Louisiana Rule did not apply where owners of yacht took reasonable care in mooring yacht prior to hurricane even though yacht allided with dock during storm).  LNA

---

[3] Analogous to the Louisiana Rule is the Oregon Rule, which applies to vessels that have their own method of propulsion.  The Fifth Circuit has explained that the Oregon Rule does not excuse a plaintiff from proving that a collision caused his damages.  "[T]he Oregon rule . . . speaks explicitly only to a presumed breach on the part of the alliding vessel, and is not a presumption regarding either the question of causation (either cause in fact or legal cause) or the percentages of fault assigned parties adjudged negligent."  *In re Mid-South Towing Co.*, 418 F.3d 526, 532 (5th Cir. 2005) (footnotes omitted); *see also Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp.*, LLC, 571 F.3d 206, 212 (2d Cir. 2009) (declining to apply Oregon Rule to causation and holding that "[a]s in any negligence case, the plaintiff in a maritime allision case bears the burden of proving by a preponderance of the evidence that the defendant's negligence caused the alleged damages").

and its employees and agents acted with reasonable care in securing the ING 4727 prior to the arrival of Hurricane Katrina.  *See* LNA FF Nos. 12-42; *infra* at ¶¶ 25-42.[4]

### B.    Causation:  Plaintiffs' summary of the law is incomplete.

**9.**  LNA agrees with plaintiffs' statement that causation requires proof of cause-in-fact and proximate cause.

**10.**  LNA agrees that cause-in-fact "is generally a 'but-for' inquiry," as plaintiffs recognize in this paragraph.  LNA likewise agrees that when there are multiple concurrent causes of a harm, the question is whether the defendant's conduct was a "substantial factor" in causing the harm, and that this test involves "but-for" causation in cases where the harm "would not have occurred absent the specific defendant's conduct."[5]  However, in the case of concurrent causes, the "substantial factor" test requires that each cause be "sufficient" to cause the harm in the absence of the other concurrent cause(s).  LNA Br. at 20-21.  Plaintiffs provide no authority to contradict that conclusion, and their discussion of causation appears to accept it.  *See* Pl. Mem. ¶ 76 (arguing that barge impact was "sufficient" to cause breach).[6]

**11.**  Plaintiffs' argument correctly acknowledges that the proximate cause requirement is not met unless the damages at issue were a "reasonably foreseeable" result of the alleged negligence.  *See* LNA Br. at 22-23.  As LNA's opening brief noted, a harm is not reasonably foreseeable if it was "highly extraordinary" that the actor's conduct would have caused the harm (quoting Restatement (Second) of Torts § 435(2)).  And a "foreseeable consequence" of an

---

[4] Moreover, the Louisiana Rule does not apply when the accident results from an "Act of God."  *See infra* at ¶ 117.

[5] In support of this conclusion, plaintiffs erroneously cite (with the use of "*See id.*") to *Hennigan v. Cooper/T. Smith Stevedoring Co.*, 837 So. 2d 96, 102 (La. App. 2002).  In fact, their quotation is from this Court's merits decision in *Robinson*.

[6] Louisiana state law similarly requires that each concurrent cause be "sufficient to cause the identical result."  *See* LNA Br. at 21 n. 7 (citing *LeJeune v. Allstate Ins. Co.*, 365 So. 2d 471, 477 (La. 1978); *Trahan v. Louisiana*, 536 So. 2d 1269, 1272 (La. Ct. App. 1988)).  Thus, the relevant "sufficient to cause" standard would apply even if Louisiana law rather than maritime law were to govern this action.

action is one that "might have been anticipated by a reasonably thoughtful person, as a probable result of the act or omission, considering the interplay of natural forces and likely human intervention."  *Consol. Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d 65, 68 (5th Cir. 1987); *Signal*, 579 F.3d at 492.  LNA does, however, object to plaintiffs' attempt to rely on Louisiana law to support the maritime proximate cause requirement, because their claims are governed by maritime law.  *See supra* at ¶ 1.

### C.   The Pennsylvania Rule does not apply.

**12.**  The Court should reject plaintiffs' attempted reliance on the Pennsylvania Rule for several reasons.  The Pennsylvania Rule shifts the burden on causation following a collision or other maritime incident to a party that has committed a statutory violation.  *See The Pennsylvania*, 86 U.S. 125 (1874).[7]  In this case, the Pennsylvania Rule cannot apply unless plaintiffs prove that the ING 4727 actually allided with the eastern IHNC floodwall at or before the time that the breaches occurred.  *See Gosnell v. United States*, 262 F.2d 559, 563-64 (4th Cir. 1959) ("The Pennsylvania Rule does not apply where the physical cause of the damage is not known."); *Willis v. Amerada Hess Corp.*, 379 F.3d 32, 42-43 (2d Cir. 2004) (declining to apply the Rule because plaintiff made no showing that vessel's actions were related to his cancer). While plaintiffs attempt to use the Pennsylvania Rule to avoid proving causation, the Rule "does not shift the burden of proof on the first issue:  the physical cause of the damage.  Such proof is always a part of libellant's case."  *Gosnell*, 262 F.2d at 564.  *See also In re Complaint of*

---

[7] *The Pennsylvania* involved two ships that collided in a dense fog.  The evidence established that the smaller, slower boat did not comply with a statute requiring a foghorn, and instead rang a quieter bell.  The Court explained that the burden of proving causation of the accident should be shifted to the party that violated the statute because, in collisions at sea, it is otherwise difficult to prove causation.  In *The Pennsylvania*, neither party denied that the two vessels had collided.

*Nautilus Motor Tanker Co.*, 85 F.3d 105, 115 (3d Cir. 1996) (Pennsylvania Rule is "not … intended to increase the likelihood of liability").[8]

Indeed, in every reported case applying the Pennsylvania Rule, the parties did not dispute that the offending vessel was actually involved in the underlying incident.  But the opposite is true here.  In this case, the entire dispute concerns whether the ING 4727 was involved in an allision that led to floodwall breaching on the IHNC.  Plaintiffs cannot avail themselves of the Pennsylvania Rule unless and until they show that the ING 4727 allided with the wall at the North Breach and at the South Breach at or before the times those breaches occurred.  *See, e.g., Pennzoil Producing Co. v. Offshore Express, Inc.*, 943 F.2d 1465, 1471 (5th Cir. 1991) (the Rule applies "at the time of a collision"); *Tokio Marine & Fire Ins. Co. Ltd. v. Flora MV*, 235 F.3d 963, 966 (5th Cir. 2001) (the Rule applies "if [a] vessel [is] involved in a collision"); *Florida Marine Transporters, Inc. v. Sanford*, 225 Fed. Appx. 885, 888 (5th Cir. 2008) (same).  Plaintiffs cite to no case that applies the Pennsylvania Rule absent proof that the violating vessel was actually involved in the incident that caused the damages.

Moreover, plaintiffs cannot satisfy the other prerequisites for the application of the Pennsylvania Rule.  They have not shown that LNA violated a statute or regulation.  *See infra* at ¶¶ 15-17, 120-133; LNA FF Nos. 43-44; LNA Br. at 26-27.  They have not identified any case in which a court applied the rule to a party's violation of a government "recommendation," such as

---

[8] Notably, neither of the cases that plaintiffs rely upon actually applied the Pennsylvania Rule.  *See, e.g., Pennzoil Producing Co. v. Offshore Express, Inc.*, 943 F.2d 1465, 1472 (5th Cir. 1991) (affirming trial court's decision not to apply Rule); *Candies Towing Co. v. M/V B&C Eserman*, 673 F.2d 91, 94 (5th Cir. 1982) (same).  A survey of recent cases citing the Rule shows that courts find reasons *not* to apply the Rule rather to apply it reflexively, as plaintiffs ask the Court to do here.  *See. e.g., Cardinal Servs. v. Omega Protein Inc.*, 304 Fed. Appx. 247, 250 (5th Cir. 2008) (declining to apply Pennsylvania Rule); *Stolt Achievement v. Dredge B.E. Lindholm*, 447 F.3d 360, 364 (5th Cir. 2006) (same); *In re Mid-South Towing Co.*, 418 F.3d 526, 534 (5th Cir. 2005) (same); *Kevin Gros Marine, Inc. v. Weeks Marine, Inc.*, No. 07-1433, 2008 U.S. Dist. LEXIS 87705 (E.D. La. Oct. 3, 2008); *Blake Drilling & Workover Co. v. Sabine Vessels Inc.*, No. 07-41034, 2008 U.S. App. LEXIS 12185 (5th Cir. June 6, 2008) (affirming district court's refusal to apply Pennsylvania Rule).

the Coast Guard recommendations on which plaintiffs attempt to rely here.  They have not shown that any erstwhile regulatory violation caused the accident in question.  *See Willis*, 379 F.3d at 42-43 (declining to apply the Rule because plaintiff made no showing that vessel's regulatory violation was related to his cancer).  And they cannot prove that LNA failed to take reasonable steps to secure the barge for the storm, or could have done anything different that would have prevented the barge from breaking away.  *See* LNA FF 33-42; *infra* at ¶¶ 25-42.

Finally, and in any event, the Pennsylvania Rule would not affect the outcome here.  As the Fifth Circuit has held, "presumptions become superfluous [when] the parties have introduced evidence to dispel the mysteries that gave rise to the presumptions."  *In re Mid-South Towing*, 418 F.3d at 531.  Here, at the very least, LNA has introduced significant evidence that establishes that the ING 4727 did not cause either breach, and therefore there is no need to rely on presumptions to determine the cause of the breaches.

### D.      Joint and several liability does not apply.

**13-14.**  Plaintiffs argue that under maritime law, any actor whose negligence was a "substantial factor in the plaintiff's indivisible injury" is jointly and severally liable for the plaintiff's entire injury.  For several reasons, there is no joint and several liability on these facts.  First, plaintiffs' argument assumes that the conduct of the actor in question was a "substantial factor" in causing the harm.  As noted (*supra* at ¶ 10; LNA Br. at 20-22), in concurrent cause cases, the "substantial factor" test asks whether the alleged cause was sufficient to produce the harm in the absence of the other causes.  Moreover, in the very case on which the plaintiffs rely, the Supreme Court observed that the law does not hold *de minimis* causes liable for *any* portion of the harm.  *See Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 265 n.15 (1979) ("In many cases, of course, the shipowner whose act or omission contributed only a very

small percentage of the total negligence will avoid liability on the ground of lack of causation."); *see also Chavez v. Noble Drilling Corp.*, 567 F.2d 287, 289 (5th Cir. 1978) (no liability for "negligible negligence").  Thus, causes that make only a *de minimis* contribution to a plaintiff's injuries will not be liable for ***any*** of the plaintiff's damages, much less ***all*** of those damages.  *See also* LNA Br. at 21-22 (citing Restatement and additional cases).[9]

Second, plaintiffs claim that joint and several liability applies when there is an "indivisible harm."  But the flip side is that joint and several liability is "inapplicable where the injury is divisible and the causation of each part can be separately assigned to each tortfeasor." *Edmonds*, 443 U.S. at 260-61 n.8.  This Court has already found that flooding from the IHNC floodwall failures and the MRGO breaches is divisible, such that the Court can apportion liability and damages based on the flooding caused by the various breaches.  *See In re Katrina Canal Breaches (Robinson)*, 647 F. Supp. 2d 644, 735 (E.D. La. 2009) (finding United States liable only for the level of flooding caused by the MRGO levee breaches, and not for the total amount of the flooding from the combined MRGO and the IHNC breaches).[10]

Third, even if flooding damages were "inseparable" (which they are not), damages would still need to be allocated based on the degree of fault among any entities that caused a plaintiff's

---

[9] Plaintiffs' cited cases do not support their position.  As noted, *Edmonds* expressly rejects plaintiffs' position. Plaintiffs cite *Wm. G. Roe & Co. v. Armour & Co.*, 414 F.2d 862 (5th Cir. 1969), but that case holds that joint and several liability applies "only where the resulting harm is of an indivisible nature and is not subject to rational apportionment."  *Id.* at 869-72.  Plaintiffs also cite three cases for the proposition that if an actor is 1% at fault, he is liable for all of the plaintiff's damages.  But in *none* of those cases did a court find a party liable for all of a plaintiff's damages even though the actor was only 1% responsible.  *See Latulas v. Montco Offshore, Inc.*, No. 03-3544, 2006 U.S. Dist. LEXIS 20066, at *16 (E.D. La. Mar. 29, 2006) (finding defendant not liable and *dismissing* claim; 1% statement mere dicta); *Foulk v. Donjon Marine Co.*, 963 F. Supp. 427, 432 (D.N.J. 1997) (same); *Kirksey v. P&O Ports Texas, Inc.*, 488 F. Supp. 2d 579, 591 (S.D. Tex. 2007) (finding defendants liable where each caused 45% of the injuries; 1% statement mere dicta).

[10] *See also* Restatement (Second) of Torts § 433A, cmt. d (damage from "flooding" is a "divisible harm" that "may be apportioned" among tortfeasors); *id.*, cmt. e ("apportionment may be made where a part of the harm can fairly be assigned to an innocent cause, as where the defendant's dam or embankment combines with an unprecedented and unforeseeable rainfall to flood the plaintiff's land, and it is clear that a part of the flood would have resulted in any event from the rainfall alone").

damages.  Plaintiffs omit the relevant passage from *Edmonds* on this point:  that under maritime law, "damages are … allocated accordingly" between joint tortfeasors whose conduct has combined to produce an injury, regardless of joint and several liability.  443 U.S. at 270-71 n.30 (citing *United States v. Reliable Transfer*, 421 U.S. 397 (1975)); *Coats v. Penrod Drilling Corp.*, 61 F.3d 1113, 1128 (5th Cir. 1995) (en banc) ("assessment of damages on the basis of proportionate fault" is required).  In *McDermott, Inc. v. AmClyde*, 511 U.S. 202 (1994), the Supreme Court held that joint and several liability does not apply to the proportionate share of any settling defendant because the plaintiff's inability to recover from such defendant has been "limited not by outside forces, but by its own agreement to settle."  *Id.* at 221.  The same principles apply when a plaintiff's recourse against a particular entity has been limited by the plaintiff's "own decision" to voluntarily refrain from suit.  *Calhoun v. Yamaha Motor Corp.*, 350 F.3d 316, 325 (3d Cir. 2003).  Indeed, this Court has recognized that "[i]f Lafarge is found partially negligent, it will be held liable ***only for its proportional damage***."  Doc. 16574, at 18 (emphasis added).  Therefore, the relative contributions of ***all*** causes of plaintiffs' injuries, including those of entities that plaintiffs chose not to sue, must be assessed and determined under maritime law.

## III.   Response to Plaintiffs' "Discussion of the Key Evidence"

### A.    LNA properly prepared its terminal for Hurricane Katrina.

**15-17.**  Plaintiffs argue that at the time of Hurricane Katrina, LNA lacked a written hurricane preparation plan.  That is wrong.  Edward VanderMuelen testified that LNA had two types of safety documents:  a national document that covered all of LNA's operations and a checklist of procedures to be followed to prepare the New Orleans terminal for hurricanes.  *See* VanderMeulen Dep. at 16-18; LNA Exh. 113.  Although plaintiffs assert (at ¶ 15) that LNA had no hurricane preparation plan, they in fact recognize that LNA did have a plan (at ¶ 16), since

10

they erroneously suggest that the plan violated "standard practices and Coast Guard requirements," even though they do not identify any particular practices or requirements with which LNA's plan did not comply.  Not only did LNA have a written hurricane preparation plan specific to the operations at its terminal on the IHNC, but those written procedures were augmented by the experience and knowledge of LNA's terminal staff, which was highly experienced in preparing for hurricanes.  Assistant Terminal Manager Ed Busch had 23 years of marine terminal experience (LNA FF No. 20) and Earl Smith had 16 years of experience (*see* Smith Dep. at 13).

Plaintiffs also argue that the written plan was no longer in effect at the time of Hurricane Katrina.  That misconstrues Mr. VanderMeulen's testimony.  He testified that at the time of the storm, LNA had made advances in its safety procedures after an upgrade to the dock permitted the use of soft lines and a "long-lining" procedure that allowed moored barges to rise along with the anticipated storm surge, increasing the safety of the configuration.  *See* VanderMeulen Dep. at 22-25.  Although those advances were not incorporated into the written checklist, that does not mean that LNA's hurricane plan was "no longer in effect," but only that certain features of the plan had been improved upon while the remaining features remained in effect.  *Id.* at 22.

**18-19.**  Plaintiffs next attempt to criticize the communications equipment at LNA's terminal.  Notably, they do not claim that terminal personnel were ***ever*** out of communication during the period leading up to Hurricane Katrina, or that any equipment failures caused terminal personnel to miss storm-related updates.  In fact, at the time of the storm, LNA's employees had Nextel phones and a radio that received outside communications about the approaching storm.  *See* LNA FF No. 21; Busch Dep. at 112-113.[11]

---

[11] Although a satellite dish that received reports on local weather conditions had been removed to permit the installation of a new roof, Busch Dep. at 105, there is no evidence that any information received from the satellite

**20-21.**  Plaintiffs attempt to criticize LNA because its terminal personnel learned that New Orleans was within the projected landfall area of the hurricane at 9:00 a.m. on August 27. However, LNA had ample time thereafter to prepare the terminal for the storm.  The Coast Guard did not issue its "Port Condition WHISKEY" alert (meaning that hurricane force winds were expected within 72 hours) until after 10:00 p.m. on August 26, and did not issue a "Port Condition XRAY" alert, directing operations at the port to shut down, until August 28, well after LNA had already shut down its terminal operations and secured the terminal for the storm.  *See* LNA FF No. 18.  Therefore, LNA personnel began their preparations for Hurricane Katrina a full day before the Port Condition XRAY alert and almost two full days before the storm arrived.[12]

**22-24.**  Finally, plaintiffs mention a phone conversation between Mr. Busch and Lafarge Safety Manager Jennifer Arnold, although it is unclear from plaintiffs' brief what they are criticizing about that conversation.  Ms. Arnold's job was to ensure the safety of LNA's employees.  *See* Arnold Dep. at 12.  It was appropriate for her to call Mr. Busch to make sure that LNA's personnel were safe, which is what she did.  She had no reason to ask about the tying up of barges because that was "not [her] area of expertise."  *Id.* at 32.[13]  It was reasonable for LNA to delegate to its highly experienced dock manager, Mr. Busch, the task of preparing the terminal for Hurricane Katrina.  Mr. Busch also had no need to tell Ms. Arnold that the weather

---

would have extended to Hurricane Katrina, far off the Louisiana coast, let alone been more timely than the reports that the terminal personnel actually received through the operable communications equipment at the terminal.

[12] In ¶ 20, plaintiffs claim that certain information was available Friday, August 26, 2005.  They cite to a Proclamation by Governor Blanco (Pl. Exh. 19), but that document does not show the time that she issued the Proclamation.  Nor have they shown that LNA should have known about that Proclamation when it was issued or that the Proclamation imposed any requirements on LNA that LNA did not follow.  They cite certain National Hurricane Center Advisories (Pl. Exh. 18), but that document does not include any information about warnings given on August 26, 2005.  And they cite to Impact Weather Advisories (Pl. Exh. 15), to which LNA has objected because there is no evidence that LNA received or had access to that notice.

[13] Although Mr. Busch was not obligated to tell Ms. Arnold anything about the status of the barges, he recalls that he mentioned to her that he had "released the barge."  *See* Arnold Dep. at 32-33.  That is strong support for the conclusion Mr. Busch called Zito Fleeting Company to attempt to have the barge removed from the IHNC.

reporting service at the terminal had been disabled, because the terminal staff was well aware of the approaching hurricane at the time; they had radio weather reports; and that was simply not an issue germane to Ms. Arnold or relevant to whether the terminal personnel timely and properly prepared the terminal for Hurricane Katrina.

### B. LNA did not negligently fail to remove or secure the barge.

**25.** Plaintiffs incorrectly suggest that because LNA began to unload the barge on Friday, August 26, 2005 (*see* LNA FF Nos. 12, 15), LNA ignored "warnings of the impending storm." To the contrary, when LNA began unloading the barge, there was no formal or informal order, warning, or recommendation from any city, municipality, state, or federal agency suggesting that commercial operations on the Mississippi River, IHNC, or elsewhere should cease. Throughout New Orleans, including at the Lone Star facility just north of the LNA terminal, unloading operations continued. Furthermore, the United States Coast Guard did not issue the first of its port condition alerts for the New Orleans area until after 10:00 pm on August 26 (LNA FF Nos. 17-18). Before then – and, notably, prior to the start of the unloading of the ING 4727 – there were no such warnings in place for the New Orleans area. *Id.* By the time the Coast Guard issued its "Port Condition WHISKEY" alert in the late evening on August 26th, it was too late for LNA to halt the unloading of the barge. *See* LNA FF No. 35 (explaining that a partially unloaded barge is unstable and unsafe in a hurricane).

**26.** Plaintiffs' assertion that the unloaded barge was "much more susceptible to winds" does nothing to advance their negligence claim, given that the unloading of the barge commenced well before the hurricane shifted course for New Orleans. By the same token, plaintiffs' admission that wind was the predominating force acting on the barge only serves to bolster LNA's showing that the barge was particularly susceptible to being moved in the direction of the prevailing wind (*see* LNA FF Nos. 52, 56), which was blowing from east-to-west

13

during the critical early morning hours of August 29, 2005 (LNA FF No. 62; *see also* LNA FF Nos. 63-66).

**27-29.**  Plaintiffs incorrectly assert that LNA could have removed the barge from the IHNC but did not attempt to do so.  Although plaintiffs apparently dispute the testimony of Mr. Busch that he called Zito to release the barge (¶ 27), his testimony that he placed such a call is backed up by numerous witnesses who confirm that he reported having made such a call that very morning.  LNA FF No. 19; *supra* at ¶¶ 22-24.  Moreover, and in any event, the record is clear that Zito had stopped accepting new traffic into its fleet on the morning of August 27, 2005, and thus was not in a position to retrieve the barge even if a Zito employee had answered the call.  LNA FF No. 19.

Plaintiffs next misstate (¶ 28) the testimony of Mr. Boudreaux, who did not testify that it would "have been possible" for Zito to "move the barge out of the IHNC."  Instead, Mr. Boudreaux was asked if he could have removed the barge on Saturday August 27 and he answered (after repeatedly avoiding the question) that "I didn't have the resource.  We were working and busy in other things."  Boudreaux Dep. at 118.[14]

Finally, plaintiffs erroneously assert (¶ 29) that LNA could and should have ordered Joseph C. Domino, Inc. to remove the barge to some unspecified location in the Mississippi River rather than topping it around at the dock.  First, absent a known destination that was available to accept the barge and moor it safely, it would have been highly imprudent for LNA (or Domino) to even consider sending the barge to the Mississippi River.  Busch Dep. at 61.  Indeed, there is no evidence that any fleet on the Mississippi River (or anywhere else) was

---

[14] Mr. Boudreaux further testified that Ingram was busy getting its own equipment in order prior to the storm and that Ingram would not have been able to remove the barge.  *Id.* at 116-17 ("We were bringing in the barges with our own boats, bringing in barges that we had out there that was in front of our boats prior to  this closing, they were already in front of the boats."); *see also* LNA FF Nos. 19, 31.

available to accept the barge.  To the contrary, at the time that plaintiffs say LNA should have asked Domino to tow the barge to the Mississippi River, every fleet in the area was itself making hurricane preparations.  *See, e.g.,* Boudreaux Dep. at 116-18.  Plaintiffs' claim that one of those fleets would have interrupted their preparations to accept the ING 4727 is just speculation.

**30-32.**  Plaintiffs mischaracterize the quality of the connections between the ING 4727 and the ING 4745.  The ING 4727 was connected to the ING 4745 with no fewer than three strands of high quality hi-flex blue polypropylene rope.  LNA FF Nos. 22, 24-26.  Mr. Busch, who directed the rigging of the barges, instructed terminal employees to use a new roll of 2-inch diameter (6-inch circumference) blue polypropylene rope to secure the rigging between the barges.  LNA FF No. 22.

In using this high quality line to moor the ING 4727 to the ING 4745 and then to the dock, LNA did not violate any standard of care or practice.  First, by adding connections sufficient to increase the strength of the mooring connections by more than double, LNA complied with the Coast Guard's recommendation that mooring lines be "doubled up" prior to a hurricane.  LNA FF No. 33.  Second, LNA's use of soft line to moor the barges pursuant to its "long-lining" practice complied with its internal operating practice and was the only practical way to allow the barges to rise with the storm surge.  LNA FF No. 26.

**33.**  Plaintiffs wrongly imply that the only reason LNA switched the position of the full and empty barges was to "avoid damage to its dock."  To the contrary, having an unloaded barge ride up over the dock would also potentially cause it to become separated from the outboard loaded barge, allowing both to break free.  LNA FF No. 28.  The configuration used by LNA – with the unloaded barge switched to the outside – would allow both barges to rise up with the

storm surge without putting too much stress on the connection.  *Id.*; *see also* LNA FF Nos. 26-27 (explaining the long-lining technique regularly used to secure barges).

**34.**  Plaintiffs wrongly suggest that LNA should have asked Domino to re-moor the two barges.  LNA did not ask Domino to inspect or adjust the moorings of the two barges because it was satisfied that it had adequately moored the barge before Domino arrived at the dock to switch the position of the ING 4727 and the ING 4745.  LNA FF Nos. 28-30.

**35.**  LNA did not "abandon" its terminal as plaintiffs imply.  Rather, LNA made extensive preparations in anticipation of the arrival of Hurricane Katrina, and only then instructed its personnel to comply with the mandatory evacuation order.  LNA FF No. 41.  In any event, had LNA personnel jeopardized their own safety by remaining at the Terminal during the storm, there is no evidence that they would have been able to do anything to prevent the breakaway of the ING 4727.  LNA FF No. 42.

**36.**  Because there was no known destination available to accept the ING 4727 on the afternoon of August 27, it would have been foolish for LNA to ask the towboat captain to remove the barge, regardless of any post hoc speculation on his part about his willingness to remove the barge if a destination had been identified.  *See supra* at ¶¶ 27-29.

**37.**  Although LNA did not instruct Unique Towing to secure the ING 4727 "directly to the dock," this was not a violation of LNA's internal procedures, which had been upgraded to include a "long-lining" procedure that would allow the barges to rise along with the storm surge. *See supra* at ¶¶ 31-32 (explaining that insofar as the ING 4727 was connected to the shore by way of the ING 4745, LNA did not violate its own Hurricane Checklist).

**38.**  As explained above (*supra* at ¶ 35), LNA did not "abandon" its facility.  Regardless, there is no evidence that anyone, in the face of hurricane force winds and rain, would have been

able to prevent the ING 4727 from breaking away. Other than plaintiffs' unsupported speculation, there is no evidence that it would have been possible for LNA to arrange for anyone to "monitor" the barges in the IHNC during Hurricane Katrina.

**39.** The observation by the Unique Towing deckhand that the barges were moored with three strands of two-inch line confirms that the barges were, indeed, moored together in advance of the storm after LNA's employees had departed the facility. The assertion about one of the lines being at an "angle" is vague and does not support any speculation about the degree of the supposed "angle." The fact that the barges were observed to have been moored together with three lengths of extra-strength polypropylene lines supports the inference that a significant wind force was required to cause the lines to part, contrary to plaintiffs' suggestion (¶ 52) that the breakaway inexplicably occurred on Sunday, August 28, a calm day.

**40-42.** Plaintiffs erroneously assert that LNA should have left more line for the Unique crew to use, or should have asked the Unique crew to add more lines. There was no basis to make such a request, because LNA was satisfied with the mooring configuration prepared by its own employees, who had considerable experience in hurricane preparation. *See supra* at ¶¶ 15-17; LNA FF No. 20. Nor did LNA's decision not to ask Domino to provide additional rigging violate any Coast Guard recommendations because LNA had already reinforced the mooring lines on the barges (i.e., they were already "doubled up"). *See supra* at ¶¶ 30-32; LNA FF Nos. 24-26, 33-42.

### C.   Plaintiffs mischaracterize the evidence regarding wind and waves.

**43.** LNA will show at trial that the laws of nature (Buys Ballot's Law), meteorological data including hindcast data assembled for the federal government by Oceanweather Inc., and local data from Lakefront Airport prove that at all relevant times during Hurricane Katrina, the prevailing winds would have kept the barge away from the eastern IHNC floodwall because they

17

were blowing from east to west.  *See* LNA FF Nos. 57-65.  In an attempt to undercut that evidence, plaintiffs claim that water splashed over the eastern IHNC floodwall.  But that is a *non sequitur* because it says nothing about the direction of the prevailing wind at the time.  If water exceeds the height of a floodwall, then water will splash over the wall regardless of the direction of the prevailing wind.  *See* Cushing Report at 103.  By the same token, if water was observed splashing over the eastern IHNC floodwall, that confirms that the water was sufficiently high that it would have created significant hydrostatic pressure on the wall without the presence of a barge.  *See id.*

**44-46.**  Plaintiffs next claim that eyewitnesses observed wind blowing in directions other than what the scientific evidence shows.  In fact, the lay witness testimony tends to confirm the meteorological data.  *See* LNA FF No. 66.  Although plaintiffs cite to the testimony of Andrew Sartin and Dennis Martinez, Mr. Sartin testified that the wind was blowing in an east-to-west direction (*see* Sartin Dep. at 40-43), and Mr. Martinez testified that the winds "were coming from the east" during the early morning hours of August 29.  *See* Martinez Dep. at 34.  Plaintiffs also claim that Captain James Hall saw unpowered vessels in the Intracoastal Waterway blowing west to east when LNA claims it was not blowing in that direction.  In fact, on the morning of August 29, the wind at his location blew "out of the east" until "after the eye wall had passed." Hall Dep. at 19-22, 69-70.

**47.**  Although plaintiffs appear to accept that the barge could not move unless some force moved it (*see* LNA FF No. 52), they contend that forces other than the prevailing wind could have moved the barge.  However, plaintiffs' experts Don Green and Hector Pazos both agreed with LNA's experts that given the large sail area of the barge that stuck out of the water (over 20 feet), the prevailing wind was the predominant force acting on the barge at all material times.

18

*See* LNA FF No. 56.  Therefore plaintiffs' statement that the prevailing wind "was not the only force capable of motivating ING 4727," and that the barge "could move in directions other than 'prevailing wind,'" relying on the Green and Pazos testimony, is hopelessly vague, unsupported by any scientific facts, and simply untrue, especially as it pertains to the critical early morning hours of August 29.

48.  Finally, plaintiffs claim that Mr. William Villavasso saw 4-5 foot high waves "splashing over the INHC [sic] at Pump Station 5."  His lay estimate is contradicted by his co-workers at the pump station, the science, and the conclusions of plaintiffs' experts.  IPET studied the issue and found that waves in the IHNC reached 1 foot before 5:30 a.m. CDT on August 29, 2005, and 2-3 feet thereafter.  LNA FF No. 70.  Mr. Pazos agreed with those conclusions.  *See id.* Even if Mr. Villavaso's estimate were true, none of plaintiffs' experts claim that waves of that height moved the barge toward the eastern IHNC floodwall before the breaches occurred.  *See* LNA FF No. 77.  Moreover, wind-generated waves propagate in the direction of the prevailing wind, and therefore waves in the IHNC, regardless of their height, would only have caused the barge to move ***away from*** the eastern IHNC floodwall before the breaches occurred.  *See* LNA FF Nos. 74, 76.

### D.    Plaintiffs' summary of facts regarding the North Breach is inaccurate.

49.  Plaintiffs contend that the North Breach was 250 feet long.  However, the breach was only 215 feet long.  *See* LNA FF Nos. 85, 87.

50.  While plaintiffs assert that the North Breach occurred "at or before 4:30 a.m.," the only evidence they cite is a statistically-invalid analysis by their expert hydrologist, Melvin Spinks.  *See* Doc. 19444 (*Daubert* motion).  In fact, plaintiffs' wall-failure causation expert, Gennaro Marino, testified that the North Breach occurred around 6:00 a.m.  Marino 2009 Dep. at 98.  LNA's position is that the North Breach occurred no later than 6:00 a.m., and possibly as

early as 4:30 a.m.  LNA FF No. 87; *see also* LNA FF Nos. 88-96 (explaining the processes which led to the failure of the wall in the area of the North Breach).

**51-53.**  Plaintiffs contend the North Breach must have occurred before 4:30 a.m. on August 29 based on the testimony of two ***rebuttal*** witnesses, Gertrude LeBlanc and Frazier Tompkins, who supposedly saw the barge in the IHNC on Sunday afternoon, August 28.[15]  As an initial matter, even if these witnesses' dubious accounts were correct as to the location of the barge on Sunday afternoon, they would imply nothing about the location of the barge during the early morning hours of August 29, when the hurricane winds were indisputably blowing from east to west, away from the eastern IHNC floodwall.  *See* LNA FF Nos. 57-83.  Even if the barge had inexplicably broken away and crossed the canal the day before the storm arrived (and there is no evidence that this is what occurred), the prevailing winds would have blown it toward the west side of the canal before the breaches occurred.  In any event, the reports of these two witnesses are not corroborated by any sightings by law enforcement officers, port workers, or any of the hundreds or thousands of other people who were present in and around the IHNC on Sunday, August 28; nor is there any photographic evidence to support such a contention.  Rather, the evidence shows that the ropes connecting the ING 4727 to the ING 4745 parted under such intense pressure that they melted, which can only be explained by the effect of hurricane force winds acting on the ropes, not the calm conditions present on Sunday, August 28.

**54.**  Plaintiffs cite the testimony of witnesses who heard "boom" sounds and similar noises, but this testimony does not advance their claims.  None of these witnesses saw the barge and none has conclusively testified that the sound(s) they heard were the sounds of the barge colliding with the floodwall.  To the contrary, the evidence shows that witnesses heard similar

---

[15] *See* Doc. 19646 (motion in limine to exclude rebuttal evidence on plaintiffs' case in chief); Doc. 19419 (listing witnesses as rebuttal witnesses).  Plaintiffs' reliance on rebuttal witnesses' accounts to support their case-in-chief reflects the absence of merit in their case-in-chief.

sounds at other breaches where no barge was present, and that when concrete breaks, as it did at these other breaches as well as at the IHNC, it makes a loud sound in the nature of a "boom." LNA FF Nos. 163-65.

**55-56.**  The account of William Villavasso does not establish that the barge was present at the site of the North Breach.  To the contrary: (1) Mr. Villavasso was not wearing his glasses and had "fuzzy" vision without them, in conditions that were dark, stormy, and raining at the time of his observation, (2) Mr. Villavasso was not even certain the object he saw was a barge, (3) Mr. Villavasso did not mention seeing a barge to his co-workers, who did not see a barge themselves, but who did see water entering from a different direction, and (4) what Mr. Villavasso claims he saw could not have been the barge because the barge would have been sticking up over thirteen feet above the top of the wall, in contrast to the object that Mr. Villavasso said he saw sticking up only one to two feet above the wall.  LNA FF No. 157.

      **E.**      **Plaintiffs' summary of facts regarding the South Breach is inaccurate.**

**57.**  LNA agrees with plaintiffs' general description of the location and length of the South Breach.  *See* LNA FF Nos. 86, 104.

**58.**  While plaintiffs contend that the South Breach occurred at or before 6:00 a.m., the only evidence they cite is a statistically-invalid analysis by their expert hydrologist, Melvin Spinks.  *See* Doc. 19444 (*Daubert* motion).  Plaintiffs' causation expert, Dr. Marino, testified that the South Breach occurred around 6:30 a.m.  Marino 2009 Dep. at 100-01.  The weight of expert opinion from the independent studies, and from the experts in *Robinson*, places the timing of the South Breach closer to 7:00 a.m.  *See* Suhayda Report at 4-5.  LNA agrees, however, that the South Breach occurred no later than 7:30 a.m.  LNA FF No. 104; *see also* LNA FF Nos. 105-14 (explaining the processes which led to the failure of the wall in the area of the South Breach).

**59-61.**  Plaintiffs again rely on the irrelevant and uncorroborated accounts of two rebuttal witnesses, Gertrude LeBlanc and Frazier Tompkins, to support their allegations regarding the timing of the South Breach.  These accounts have no bearing on the timing of the South Breach for the same reasons that they are irrelevant to the North Breach, as shown above with regard to ¶¶ 51-53.

**62.**  Plaintiffs' reliance on "boom" witnesses with regard to their claims regarding the South Breach has no merit for the same reasons discussed above with regard to ¶ 54.

**63.**  The account of Terry Adams does not establish that the barge caused the South Breach, as plaintiffs contend.  To the contrary:  (1) Mr. Adams was over half a mile away from the events he purports to have witnessed, and he made his observation during the storm when it was dark, rainy, and windy, (2) Mr. Adams' testimony is equivocal:  he said that he "couldn't make out exactly what it was" that he saw, (3) the object that Mr. Adams says he saw was sticking up only four feet above the floodwall, whereas the barge would have stuck up over thirteen feet above the top of the wall, (4) if Mr. Adams' account were true, the barge would have been pushed deep into the neighborhood by the inrushing water upon passing through the wall, and (5) Mr. Adams' credibility is open to serious challenge due to his financial stake in the outcome of this litigation and for other reasons.  LNA FF No. 158.

**64.**  The accounts of Mr. Murph and Mr. Williams similarly fail to establish that the barge caused the South Breach.  *See* LNA FF No. 159 (explaining that Mr. Williams gave conflicting accounts to investigators, first having told them he never saw the barge; that like Mr. Adams, what Mr. Williams saw was too low in the water to be a barge; and that Mr. Williams also has a financial stake in the outcome of this litigation); Murph Dep. at 196, 199 (Murph

testified he did not see barge strike floodwall); Doc. 19649 (motion to exclude partial interview transcript).

**F.     There is no physical evidence of barge impact at the locations where the breaches formed.**

**65.**   In an attempt to distinguish the IHNC breaches from the conditions at other breaches, plaintiffs cite testimony from Hector Pazos referring to "pulverization of concrete" as "unique to the eastern IHNC floodwall breaches."  However, Mr. Pazos testified in his deposition that the only location where the barge made an "impact" with the floodwall was at the far southern end of the South Breach.  Pazos Dep. at 244 (distinguishing "impact" from "contact").  Thus, by Mr. Pazos' own account, the barge could not have caused the massive "pulverization" in the main section of both breaches.  Rather, as Reed Mosher, Ph.D., of the Corps of Engineers explained, the "more dramatic" concrete damage at the site of the IHNC breaches, as compared with other breaches, can be traced to the "bigger drop-off to the protective side" at the IHNC, which caused the wall to be pushed further into the neighborhood resulting in the unfolding of the sheet pile and the cracking off of the concrete.  Mosher Dep. at 76.

**66-68.**   In these paragraphs, plaintiffs implicitly acknowledge that the only area where there is specific physical evidence of contact between the barge and the floodwall is at the extreme southern end of the South Breach.  Indeed, the physical evidence makes clear that the barge passed through the floodwall at this location, breaking off some of the concrete at the top and bending some of the rebar, creating scratch marks on the bottom of the barge that match the bent rebar sections.  LNA FF Nos. 118-20.  This contact between the barge and the concrete cap took place far from the apex of the northern "bow" section of the breach, where the breach had previously initiated.  LNA FF No. 112.  Indeed, although plaintiffs cite the testimony of Dr. Mosher (¶ 68), he testified that the barge contact with the floodwall at the southern end of the

South Breach did not "match up to where the primary damage is," and that the barge was ***not*** the cause of the floodwall breach.  Mosher Dep. at 144-45; *see id.* at 68.

Furthermore, the physical evidence of damage on the barge is inconsistent with the barge having caused the breach.  LNA FF No. 120.  While plaintiffs vaguely contend that scratches on the barge match the pattern of the rebar, the only place where the rebar "matches" is at the southern end of the south breach.  LNA's expert was clear that if the barge had caused both breaches, there would have been physical evidence that the barge had hit the walls prior to their being breached.  *Id.* (citing Cushing Dep. at 265 ("[T]he barge, with its shallow draft, would have … hit the ground very, very hard and there would have been evidence on the barge that the barge had grounded at the edge that it entered the Lower Ninth Ward.  There was no such evidence when I inspected the barge.") (other citations omitted).

**69.**  Plaintiffs' contention that "scrape marks also appear along the inner expanse of the eastern floodwall," and their implication that the barge caused the scrape marks, is belied by photographic evidence showing that the scrape marks were present before Hurricane Katrina. *See* Cushing Report Fig. 98.

> **G.**     **The "accident reconstruction analysis" performed by Dr. Marino does not show that a barge impact caused either floodwall breach.**

**70.**  Although plaintiffs claim that their expert, Dr. Marino, has "ruled in" the barge as a cause of the two floodwall breaches, his analysis is fundamentally flawed and internally inconsistent in numerous respects.  *See* Doc. 19441 (*Daubert* motion).  While Dr. Marino purported to use a "process of elimination" to find that the barge caused the breaches, he failed to consider or eliminate potential non-barge causes of the floodwall failures that other experts concluded were responsible for the breaches, and he omitted any direct analysis of whether the barge could have been the cause.  Thus, for instance, Dr. Marino's analysis of the North Breach

concludes that the barge caused "tearing of the I-wall" without even considering the existence of a faulty weld in the sheet pile at that exact location.  *See, e.g.,* LNA FF Nos. 89-90 (explaining in detail how the sheet pile was weak at this key point); Pazos Dep. at 152-54 (faulty weld made this "one of the weakest points on the wall").[16]  Similarly, Dr. Marino's analysis of the South Breach by reference to "failure manifestations" such as "wall displacement" fails to take into account similarities in the failure patterns at other breaches.  *See, e.g.,* Bakeer Report at 44 ("In fact, the 'bow' shape characteristics found at the IHNC closely resemble other breaches in interlocking sheet pile walls … where no barge impact occurred."); LNA FF Nos. 104-27.

**71.**  LNA does not take issue with plaintiffs' characterization of the I-wall structure as containing an embedded sheetpile element with an upper floodwall of reinforced concrete, which is accurate as far as it goes (*see* LNA FF Nos. 78-83).  However, plaintiffs' assertion that "the I-wall was not designed … for barge impacts" is misleading to the extent it implies that a barge impact would be expected to cause the failure of an I-wall.  In fact, the opposite is true, as shown by:  (1) unrebutted expert calculations showing that a barge impact is not sufficient to cause a floodwall to fail (LNA FF No. 143), (2) photographic evidence of impacts by similar barges on similar floodwalls during Hurricane Katrina showing that barge impacts result in only minimal localized damage to the concrete cap (LNA FF Nos. 141-42), and (3) the absence of evidence of even a single prior instance of a barge causing a floodwall to fail (LNA FF No. 166).

**72.**  Although plaintiffs assert that Dr. Marino's account of the North Breach is "consistent with witness observations," his conclusion that the damage to the wall "would require significant upper force on the wall" (i.e. a major impact by the barge) contradicts the conclusion of plaintiffs' maritime reconstruction expert, Mr. Pazos, who denied that there was

---

[16] Photographic evidence in Dr. Marino's own report includes a photo showing a large, intact telephone pole on the canal side of the North Breach, in the middle of the path the barge would have had to travel in order to arrive at the site of the breach.  *See* Marino Report Photo. 4.6.

any "impact" or "crushing" by the barge at that location.  Pazos Dep. at 146-47.  Moreover, none of plaintiffs' experts can explain what might have caused the barge to exert a "significant upper force" on the wall given that the wind was blowing in the opposite direction.[17]

**73.**  In this paragraph, plaintiffs contend that the South Breach occurred "in two main stages," and that there "would have been several areas of impact" despite the fact that the only physical evidence of impact was found at the "south end of the breach."[18]  In this regard, Dr. Marino's conclusions are inconsistent with the eyewitness on which he and the plaintiffs chiefly rely (Terry Adams), who testified that he "heard something like a bang" and then "seen the barge come floating through."  LNA FF No. 158 (quoting Adams Dep. at 24-25).  Dr. Marino's hypothesis of multiple barge impacts is also inconsistent with the physical evidence showing that the only area of contact between the barge and the floodwall was at the extreme southern end of the already-formed breach.  *See* LNA FF No. 118.

**74.**  Plaintiffs' contention in this paragraph that differences between the appearance of different breaches means that they must have been caused by different factors is based upon a false premise.  The various breaches actually share many characteristics.  For instance, principal IPET author Dr. Reed Mosher testified that the INHC east floodwall breaches were similar to other breaches based on the formation of tension cracks between the canal side soils and the sheetpile, depriving the sheetpile of supporting strength.  Mosher Dep. at 62-64, 101-02, 241-42; *see also* Bakeer Report at 29-32 (noting "some common failure mechanisms" among breaches).

---

[17] Although plaintiffs also observe that the North Breach occurred prior to overtopping, as if that made the barge a likely culprit, every other investigation also concluded that the North Breach occurred prior to overtopping, but for reasons having nothing to do with a barge.  *See* LNA Nos. FF 87-96 (explaining why North Breach occurred prior to overtopping); 150-154 (summarizing the conclusions of the independent studies).

[18] This paragraph appears to relate to Dr. Marino's conclusions regarding the South Breach, notwithstanding an apparent typographical error in the first sentence.

75.  Plaintiffs' conclusion in this paragraph – that seepage-induced instability could not have caused the floodwall failures – is based on faulty seepage and stability analyses performed by Dr. Marino.  Among other things, Dr. Marino's analyses used flawed and faulty input data that mischaracterized the underlying soil profile, combined disparate sample values in a scientifically invalid manner, and substituted artificially high strength parameters for the underlying soils.  *See* Doc. 19441 (*Daubert* motion); Bea Supp. Report at 2-3 & Fig. 2.  In purporting to rule out instability and underseepage as causes of the IHNC floodwall failures, Dr. Marino is alone among the many scientists who have studied this issue, including well-funded independent scientists whose conclusions have been published in peer-reviewed and refereed journals, unlike Dr. Marino's own work.

76.  In accordance with the prevailing law on the issue of causation, plaintiffs appear to recognize that at a minimum, the barge cannot be considered a cause-in-fact of either floodwall breach unless the barge was a "sufficient" cause of the breach.  *See supra* at ¶¶ 9-12; LNA CL Nos. 10-19.  However, plaintiffs cite no relevant evidence to support their conclusion that "it is well-established that impact by or contact with ING 4727 was sufficient" to cause the floodwall failures.  First, plaintiffs' citation to IPET Vol. IV Technical Appendix 17 does not support the conclusion that contact between the barge and the eastern IHNC floodwall would cause a breach.  Appendix 17 makes clear that its discussion is purely hypothetical and that the Technical Appendix fails to account for actual conditions.[19]  The same is true with regard to plaintiffs' first citation to the National Institute of Standards and Technology Technical Note 1746, which pertains to casino barges on the Mississippi River, not cargo barges coming into contact with

---

[19] IPET vol. IV Technical App'x 17 at 14-15 ("It is emphasized that, although the methodology presented here provides a basis for calculating the actual motions and force characteristics associated with a freely floating barge acting under the action of wind, the examples presented are for illustration only and have purposely avoided attempting to utilize actual wind characteristics."); *see also id*. at 1 ("uncertainty remains due to lack of requisite necessary information").

floodwalls.  Indeed, the NIST document cited by plaintiffs concludes that the ING 4727 **did not cause** the South Breach in the IHNC floodwall (and thus plaintiffs' second citation to this document is wrong, too).[20]

### H. Plaintiffs' account of the flooding omits important facts.

**77.**  The allegations in this paragraph as to the timing of the eastern IHNC floodwall breaches repeat ¶¶ 50 and 58 of plaintiffs' brief.  We address those allegations at ¶¶ 50 and 58, *supra*.

**78.**  Plaintiffs claim that witnesses saw flooding that was "forceful and sudden, similar to [a] tidal wave or tsunami."  The evidence in the Lower Ninth Ward clearly shows that the initial rush of water into the neighborhood was very powerful.  *See* Cushing Report at 70, 72.  This evidence tends to confirm that the barge was not present when the breaches occurred, as it would have been driven deep into the neighborhood by the powerful rush of water.  *See id.* at 170.

**79-80.**  Plaintiffs rely on hydrologic modeling by Melvin Spinks to conclude that "prior to 9:00 a.m.," the IHNC breaches and not the MRGO breaches accounted for most of the water entering the Lower Ninth Ward and western St. Bernard Parish.  Plaintiffs' reference to the entire geographic area is irrelevant, as this case concerns three specific properties, for which Mr. Spinks has created an individualized assessment of the time that flooding occurred.  *See* Spinks Report at Appendix J.  Moreover, this individualized assessment permits specific inferences regarding the time that floodwaters from the IHNC versus the MRGO arrived at plaintiffs' properties.  Spinks 2009 Dep. at 189-200.  However, Mr. Spinks' model is subject to considerable inaccuracies based on flawed inputs that he employed.  *See* Suhayda Report.

---

[20]  NIST Technical Note 1476 at 96 ("rotational failure caused by full outboard pressure and increased cantilever action from the loss of the supporting soil along the inboard toe due to overtopping scour as the likely mode of failure" at the South Breach) (citations omitted).

**81.** Contrary to plaintiffs' assertion that the MRGO floodwall breaches were only "theoretically capable" of causing massive flooding in the Lower Ninth Ward and St. Bernard Parish, the report of plaintiffs' own expert, Mr. Spinks, shows that the MRGO breaches actually contributed "an additional four feet of flood depth" in the Lower Ninth Ward and St. Bernard Parish. *See* Spinks Report at 33: Spinks 2009 Dep. at 149-50. And even Mr. Spinks acknowledged that if the IHNC floodwall had not breached, the floodwaters would have reached the same level because of the massive MRGO Reach 2 levee breaches. *See* LNA FF No. 173.

     **I.**     **Damages alleged by Josephine Richardson are overstated.**

**82-84.** These paragraphs provide background information regarding Mr. and Mrs. Richardson, much of which is irrelevant to any question concerning LNA's alleged liability or the damages that Mrs. Richardson could recover even if LNA had been negligent. *See* LNA FF Nos. 177-178. Although plaintiffs contend that Mrs. Richardson expected flooding from Hurricane Katrina to be limited based on her experience in Hurricane Betsy, she acknowledged that there was significant flooding and loss of life as a result of Hurricane Betsy, and she admitted that she and her family urged Mr. Richardson to leave 1321 Egania Street prior to Hurricane Katrina out of concern for his safety. Richardson Dep. at 52-55, 58, 67-72. Had Mr. Richardson complied with these requests and the mandatory evacuation order then in place, he would have avoided the serious risk of personal harm posed by the approaching hurricane.

**85.** LNA does not dispute that 1321 Egania Street experienced severe flooding as a result of Hurricane Katrina, although the report of plaintiffs' expert Mr. Spinks makes clear that the flooding came from multiple sources, not just the IHNC. *See* LNA FF No. 178; Spinks Report Appendix J, Fig. 2; Spinks 2009 Dep. at 195-200. LNA has no basis to dispute plaintiffs' assertion that Mr. Richardson's body was found in the attic of the home, but notes that this

assertion is based on the testimony of three individuals who were not included on plaintiffs' witness list and whom LNA has not had the opportunity to depose.

**86.**   Plaintiffs argue that under Louisiana law, a death certificate is conclusive as to the cause of death, and that Mr. Richardson therefore died by drowning because his death certificate says so.   Initially, they do not explain why Louisiana law is relevant as to the cause of Mr. Richardson's death, given that this action is governed by maritime law.   *See infra* at ¶¶ 87-93. Plaintiffs do not cite, and research has not disclosed, a single federal decision applying La. Rev. Stat. 33:1563(E)(3) in the manner that plaintiffs claim this Court should.   Even so, plaintiffs' statement of Louisiana law is ***backwards***.   According to plaintiffs, the decision in *McKelvey v. City of DeQuincy*, 970 So. 2d 682 (La. Ct. App. 2007) supports their position that a death certificate "is competent evidence of death, and its cause."   In fact, *McKelvey* held, citing a string of other cases, that "[i]t is settled law that 'a death certificate is proof only of the death itself, not proof of the cause of death, and it is inadmissible for the purpose of showing cause of death.'" *Id.* at 688.   Mr. Richardson's death certificate therefore does not prove, and cannot be used to prove, that he died by drowning.

**87-93.**   Plaintiffs improperly attempt to rely on Louisiana state law in support of Mrs. Richardson's alleged right to recover "survival action" and "wrongful death" damages.   Instead, when considering a claim under maritime law, a court must apply substantive admiralty law. *See, e.g.*, *East River S.S. Corp. v. Transamerica Delaval Inc.*, 476 U.S. 858, 864 (1986) ("With admiralty jurisdiction comes the application of substantive admiralty law."); *Carlisle Packing Co. v. Sandanger*, 259 U.S. 255, 259 (1922) ("The general rules of maritime law apply whether the proceeding be instituted in an admiralty or common-law court."); *Powell v. Offshore Navigation Inc.*, 644 F.2d 1063, 1068 (5th Cir. 1981) ("[A]s a general rule the same substantive

law governs the case whether it is brought under admiralty jurisdiction of the federal courts or instead by the saving-to-suitors clause under either the common law jurisdiction of the states or the diversity jurisdiction of the federal courts.").

Under maritime law, "[g]eneral principles of negligence guide the analysis of a maritime tort case." *Casaceli v. Martech*, 774 F.2d 1322, 1328-29 (5th Cir. 1985).  Here, under general principles of negligence law, Mrs. Richardson cannot recover survival action or wrongful death action damages, for several reasons.

First, as LNA detailed in its opening brief, plaintiffs cannot establish that LNA owed the Richardsons a duty of care or that its actions were the cause-in-fact or proximate cause of any damages that the Richardsons incurred.

Second, any recovery would be reduced, and effectively eliminated, based on Mr. Richardson's comparative fault.  *See United States v. Reliable Transfer Co.*, 421 U.S. 397, 403, 411 (1975) (adopting comparative fault as the rule under maritime law); *Lewis v. Timco, Inc.*, 716 F.2d 1425, 1428 (5th Cir. 1983) (*en banc*) ("comparative fault has long been the accepted risk-allocating principle under the maritime law").  Mr. Richardson did not comply with a mandatory evacuation order imposed in order to ensure his safety.  Had he done so, he would not have been in his house when Hurricane Katrina struck, and would not have incurred any injuries. For the same reason, there can be no recovery for Mr. Richardson's alleged mental distress in seeing his property being damaged.  Had he evacuated as required, he would not have incurred any such distress.

Third, plaintiffs surmise that because Mr. Richardson's skull was not fractured, he must have been conscious before he died from drowning, and therefore he must have incurred mental distress damages before he died.  But the absence of a skull fracture by itself does not prove that

Mr. Richardson was conscious at the time of his death, because the flooding occurred early in the morning when Mr. Richardson could have been asleep or rendered unconscious by any number of other circumstances present in the midst of a hurricane.  Plaintiffs have not provided evidence, let alone proved, that Mr. Richardson was conscious.

Finally, water from the IHNC floodwall breaches did not cause flooding to the level of the Richardsons' attic, and therefore any damages caused by flooding to that level cannot be attributed to those breaches under any theory of liability.  *See* LNA FF No. 178; Spinks Report Appendix J, Fig. 2; Spinks 2009 Dep. 195-200.[21]

**94-95.**  Although plaintiffs claim that Mrs. Richardson incurred property loss damages, she has already been fully compensated for those damages.  Reconstruction of her home cost $107,114.  *See* Ragas Report at 5-6 ¶ 28.  That is less than the $119,010 that Mrs. Richardson received from the Road Home Program.  *See* LNA FF No. 181.  Mrs. Richardson also received $10,489.71 in insurance proceeds for wind damage.  *See* Ragas Report ¶ 5-6; LNA FF 181.  Mrs. Richardson therefore should not be permitted to recover any additional property loss damages.

> **J.**      **Damages alleged by Holiday Jewelers are overstated.**

**96-98.**  LNA agrees that Holiday Jewelers was and is a Louisiana corporation owned by Mr. and Mrs. Glaser.  *See* LNA FF Nos. 1, 182.  LNA notes that in ¶ 96, plaintiffs acknowledge that Holiday Jewelers employed the Glasers and therefore the business must have paid them a salary or compensated them in some way for their labor.  This is important because plaintiffs' theory of damages implicitly assumes that Holiday Jewelers could have operated without incurring expenses to compensate its employees.  Furthermore, while plaintiffs state that the

---

[21] Plaintiffs claim that, as an element of damages, Mrs. Richardson may recover the income that Mr. Richardson lost as a result of his death and her loss of society.  But plaintiffs' proposed findings of fact do not quantify any such damages or explain how they would be calculated.  If they do so at trial, LNA will respond at that time to her alleged entitlement to recover those damages and the alleged amount thereof.  *See Miles v. Apex Marine Corp.*, 498 U.S. 27, 36 (1990) (no recovery of lost income or loss of society under general maritime law).

Glasers "secur[ed]" the store in advance of the storm, they ultimately misplaced the keys to the display cases that contained much of their inventory of jewelry.  Glaser Dep. at 84.

**99-100.**  Plaintiffs contend that upon Mr. and Mrs. Glaser's return to Holiday Jewelers after the storm, recovery of "anything" (including the store's inventory of jewelry) was "impossible."  However, Mr. Glaser explained that when he first returned to the store after the storm, "most of the cases [with the jewelry] were still locked, although they were askew.  We couldn't find keys to [unlock] them."  Glaser Dep. at 84.  Rather than being "impossible" for Mr. Glaser to recover the jewelry, recovery would have been possible had Mr. Glaser located the keys.  Nowhere did he testify that he tried to or wanted to remove the jewelry but was unable.  It appears that following his visit to the store he determined that the inventory was safely locked, so he did not need to remove the jewelry.  Indeed, recovery was not "impossible" because upon his return to the store a second time, all of the jewelry had been stolen by vandals, who did not find it "impossible" to remove the jewelry from the store.  The inventory was lost to vandals, not the flood.

**100-102.**  While Mr. Glaser claims to have lost contact information for his 8,000 customers, his backup tapes of that computer data were stored not at the Holiday Jewelers store but at his home.  Glaser Dep. at 108-09.  Damage and losses that occurred at Mr. Glaser's home are not part of this lawsuit, and the Glasers themselves are no longer plaintiffs in this action.  Separately, Mr. Glaser admitted that his determination that Holiday Jewelers lost $250,000 in "movable property" was a "guesstimate."  Glaser Dep. at 102-03.  Mr. Glaser admitted that he had made no effort to be more precise in his determination of this amount.

Furthermore, as LNA explained in its proposed findings of fact, the estimated lost profits of Hurricane Jewelers is inaccurate.  LNA FF Nos. 182-184.  Excluding a one-time insurance

payment, Holiday Jewelers operated at a loss during the three years preceding Hurricane Katrina. LNA FF No. 182.  Similarly, LNA's expert Kenneth Boudreaux determined that Holiday Jewelers also could not have expected to earn a profit in the years following Hurricane Katrina. Therefore, even if the barge had been responsible for any of the flooding of Holiday Jewelers, its owners would not be entitled to recover any of lost profits.

### K.    Damages alleged by John and Jerry Alford are overstated.

**103-106.**  While LNA does not object to the background information regarding the Alfords, LNA does not concede that all of this information is relevant to the Alfords' alleged property damages.  *See* LNA FF No. 103.

**107-108.**  The Alfords, who had only $17,000 in equity in their property prior to the storm, chose not to rebuild their property following Hurricane Katrina.  *See* Ragas Report ¶ 37. Reconstruction of their home would have cost $105,727.  LNA FF 180.  This is less than the $120,000 that the Alfords received from the Road Home Program.  *Id.* ¶ 36; LNA FF 180.  The Alfords also received $28,000 in insurance proceeds for wind damage.  *Id.*

## IV.   Response to Plaintiffs' Contentions of Law

### A.    Maritime law applies to this case, not Louisiana law.

**109-110.**  Plaintiffs argue that this Court has jurisdiction over the parties under maritime law, which LNA does not dispute.  They also claim, however, that the Court has jurisdiction under "the surrogate law of the State of Louisiana under the saving to suitor's clause of 28 U.S.C. § 1333."  As noted, however, *supra* at ¶¶ 87-93, because plaintiffs have invoked this Court's maritime jurisdiction, their claims lie exclusively under the general maritime law, not under Louisiana law.

### B.    Plaintiffs cannot establish that LNA owed a duty of care to them.

34

**111.** LNA does not dispute plaintiffs' statement of the legal standards regarding duty under maritime law. LNA notes, however, that plaintiffs have the burden of establishing a duty, showing that LNA violated it, and showing that the harm suffered as a result of that breach was foreseeable. LNA CL Nos. 2, 11.

**112.** Plaintiffs' reference to "general principles of Louisiana law" is misplaced, as Louisiana law does not apply to this case. Although LNA does not deny that a duty of reasonable care in securing the barge may have been owed to persons who would foreseeably be injured by a breakaway, LNA denies that the plaintiffs are among such persons. *See* LNA Br. at 18-19, 28-30.[22] Moreover, any duty owed by LNA extended only to what was reasonable "under the circumstances." LNA CL No. 3 (quoting *Daigle v. Point Landing, Inc.*, 616 F.2d 825, 827 (5th Cir. 1977)).

**113-14.** Plaintiffs cite to *In re Signal Int'l LLC*, 579 F.3d 478 (5th Cir. 2009), for the proposition that an allision is a foreseeable consequence of negligent mooring of a barge, and therefore a duty of care must have existed. The holding in *Signal* holding does not mean, however, that the massive flooding of an entire neighborhood was the foreseeable consequence of an allision by the barge with the eastern IHNC floodwall. In *Signal*, the court was concerned only with whether the damage to a bridge support in a river was foreseeable. *Id.* This case is much more akin to *Consol. Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d 65 (5th Cir. 1987), in which a dredging impact with an underground pipeline was found not to have proximately caused damage to a customer whose supply of gas was interrupted by the loss of the pipeline, based on lack of foreseeability. *Id.* at 66; *see also Royal Beach Hotel, LLC v. Crowley Liner*

---

[22] The cases cited by plaintiffs in this paragraph do not address the foreseeability of harm to the persons bringing suit in this case.

LIBW/1732237.5

*Services, Inc.*, No. 1:06-DV-129, 2007 U.S. Dist LEXIS 28633, at *3 (S.D. Miss. Mar 14, 2007)

(extraordinary harm from Hurricane Katrina not foreseeable).

### C.   The Louisiana Rule does not apply.

**115-116.**   The Louisiana Rule does not apply for the reasons stated at ¶¶ 6-8 above.

Moreover, even if the rule were applicable, the case law makes clear that LNA need not make an

extraordinary showing of reasonable care to rebut the application of the Louisiana Rule.  As the

Eleventh Circuit recently explained in rejecting application of the Louisiana Rule, "[a]lthough

what 'reasonable care' requires changes with the circumstances, that standard recognizes the

existence in every case of something more that could be done – and perhaps would be legally

required under a 'highest degree of caution' standard – but that reasonable care does not

demand."  *Fischer v. S/Y/ Neraida*, 508 F.3d 586, 594 (11th Cir. 2007) (noting that multiple

circuits agree with this analysis and that "[c]ollision cases decided subsequent to *The Louisiana*

also understood the standard of care in admiralty to be reasonable care under the circumstances,

and not a higher standard") (citing *The Virginia Ehrman*, 97 U.S. 309 (1877)) (other citations

and quotations omitted).

**117.**   Plaintiffs, in citing to a decades-old Fifth Circuit decision regarding the

applicability of the "Act of God" defense, ignore the multitude of more recent decisions that

have allowed and applied the defense following hurricane damages.  Indeed, in many of these

cases the assertion of the "Act of God" defense led the court to decline to apply the Louisiana

Rule.  *See Pioneer Natural Res. USA*, *Inc. v. Diamond Offshore Co.*, 638 F. Supp. 2d 665, 690

(E.D. La. 2009) ("Assuming that in this particular case an allision occurred, Hurricane Ivan was

a *vis majeure* sufficient to discharge all liability.") (citing *In re Marine Leasing Services, Inc.*,

328 F. Supp. 589 (E.D. La.), *aff'd*, 471 F.2d 255 (5th Cir. 1973) (affirming district court's

finding that Hurricane Betsy was the inevitable cause or a *vis majeure* considering winds over 90

miles an hour in the Baton Rouge area, hundreds of barges adrift on the Mississippi River and sinking and that no fleet of barges, no matter how well secured, was able to withstand the fury of the storm); *In re Int'l Marine Dev. Corp.*, 328 F. Supp. 1316 (S.D. Miss. 1971) (finding that Hurricane Camille was a 'freak of nature' of sufficient velocity and destructiveness to overcome all reasonable preparations and sustaining the defense of *force majeure* as to all three vessels involved) (other citation omitted)).  Thus, if LNA can show that it properly moored ING 4727 but that the force of the storm caused it to break free, plaintiffs cannot avail themselves of the Louisiana Rule.[23]

### D. ING 4727 did not proximately cause plaintiffs' damages.

**118-119.**  Plaintiffs argue that ING 4727 proximately caused their damages based on the alleged "unique risks of harm and loss posed by an unmoored vessel in the IHNC" during hurricane conditions.  But that rhetoric is not supported by the law or the facts.  As LNA noted in its opening brief (at 38-39), the proximate cause requirement eliminates liability for harms that were not "reasonably foreseeable," but instead were "highly extraordinary."  *In re Cooper/T. Smith*, 929 F.2d 1073 (5th Cir. 1991); Restatement (Second) of Torts § 435(2).  The evidence shows that barge allisions cause only localized damage to the concrete cap on the top of a floodwall and do not cause the embedded sheetpile to fail.  Therefore, even if plaintiffs' theory of the case were correct – i.e., that the barge contacted the top of the wall and somehow caused the buried sheetpile to fail – that would be the type of highly extraordinary event that LNA could

---

[23] *See also Young v. Crowley Liner Services, Inc.*, No. 1:06cv966, 2009 U.S. Dist. LEXIS 22746 (S.D. Miss. March 20, 2009)*, Defazio v. Chiquita Fresh North America, LLC*, No. 1:06cv973, 2008 U.S. Dist. LEXIS 53407 (S.D. Miss. July 14, 2008), and *Royal Beach Hotel, LLC v. Crowley Liner Services, Inc.*, No. 1:06DV129, 2007 U.S. Dist. LEXIS 28633 (S.D. Miss. March 14, 2007) (all holding that ship container owners had taken proper precautions to protect damage to the containers prior Hurricane Katrina and that the force of storm, and not negligence, caused the plaintiffs' damages).

LIBW/1732237.5

not have reasonably foreseen.  Plaintiffs' citation to *Signal* does not advance their argument, since the only issue in that case was whether an allision was foreseeable.

### E.      The Pennsylvania Rule does not apply.

**120-23.**  Plaintiffs cannot invoke the Pennsylvania Rule in this case because, among other reasons, they cannot show a statutory or regulatory violation on the part of LNA.  No court has ever applied the Pennsylvania Rule to an alleged failure to follow a Coast Guard "recommendation" such as the ones in the Coast Guard Sector New Orleans Port Hurricane Plan, which plaintiffs allege were not followed in this case.  *See supra* at ¶ 12 (discussing reasons why Pennsylvania Rule does not apply).

**124.**  Plaintiffs' allegations in this paragraph have nothing to do with any supposed statutory or regulatory violation.  Moreover, as discussed above at ¶¶ 30-33, LNA properly moored the ING 4727 outboard of the ING 4745 to prevent a more likely breakaway that could have occurred if LNA had left the ING 4727 closer to the dock.  LNA also added and replaced existing lines with new 2-inch blue polypropylene rope to permit the barges to rise with the anticipated storm surge in compliance with the non-binding Coast Guard recommendations and with its own upgraded hurricane preparation procedure.

**125.**  Plaintiffs' allegations in this paragraph have nothing to do with any supposed statutory or regulatory violation.  Moreover, as discussed above (supra at ¶¶ 15-42), (i) LNA did not "abandon" its facility; rather, it safely secured all of the barges and other equipment at its facility before instructing its employees to comply with the mandatory evacuation order in place for the New Orleans area, (ii) LNA had no need to instruct Domino or Unique Towing to re-moor the barges, to adjust their moorings, or to inspect the moorings because LNA was already satisfied that the barges were adequately moored before its staff left the Terminal, and (iii) LNA complied with its upgraded mooring procedure.

**126-127.**  Although plaintiffs' expert concluded that LNA failed to "double[] up"

mooring lines, that testimony does not establish a statutory or regulatory violation nor otherwise

support application of the Pennsylvania Rule.  Moreover, LNA complied with the Coast Guard

recommendation by doubling the strength of the lines.  *See* LNA FF No. 25; LNA Br. at 4.

**128-129.**  Plaintiffs have failed to show that LNA violated 33 C.F.R. § 162.75(b)(3)(ii)

because the ING 4727 was properly "moored by bow and stern lines" as there were at least three

connections between the ING 4727 and the ING 4745 – one at the bow, one at the stern, and one

or two in the middle.  LNA CL No. 6(a).  The remainder of § 162.75(b)(3)(ii) does not apply to

the ING 4727 because that portion of the regulation applies only to tows, and the ING 4727 was

not a tow.  *Id.  See also* LNA Br. at 26 n.11.

**130.**  Plaintiffs vaguely cite to 33 C.F.R. § 6.19-1 but do not explain how this provision

required LNA (or anyone else) to do anything at all.  LNA CL No. 6(b).  This provision means

only that the promulgated regulations do not absolve those in control of vessels of their basic

responsibility to protect and secure vessels.  *See* LNA Br. at 26-27.

**131-133.**  Plaintiffs cannot establish that Appendix 2 of the U.S. Coast Guard Sector New

Orleans Maritime Hurricane Contingency Port Plan actually carries the "force of law."  The cited

portions of the Commandant's Hurricane Plan plainly contains ***recommendations*** only.

Plaintiffs cite to Appendix 2, which is entitled "**RECOMMENDED** PRECAUTIONARY

MEASURES FOR BARGES."  Green Report at 6 (quoting Hurricane Sector Plan) (emphasis

added).  The same is true as to the second cited provision, derived from Annex C.  *See* Green

Report at 8 (explaining that Annex C sets forth a "recommendation").  Plaintiffs cite to no

authority that allows this Court to invoke the Pennsylvania Rule when a defendant violates a

"recommended" precautionary measure.  In any event, plaintiffs are simply wrong when they

state that the mooring lines were not doubled up on the ING 4727.  As has been stated

repeatedly, the ING 4727 was moored at three locations, and the strength of the configuration

was more than doubled from the previous configuration.  *See supra* at ¶¶ 130-131; LNA FF 24-

26; LNA CL No. 6-7.  As to 33 C.F.R. § 6.14(2), plaintiffs' supposition – that if LNA had

notified the Captain of the Port ("COTP") that the barge was "released for pickup and moored

with only 3 single part lines," then the COTP would have taken additional measures to secure the

barge – is based entirely on unsupported conjecture.  First, as noted, the barge was adequately

moored.  Second, there is no evidence that the COTP would have found that the "mooring of [the

barge] to a … dock … would [have] endanger[ed] such vessel."  Regardless, the speculation that

the Coast Guard would have had the opportunity or inclination to inspect one of the thousands of

boats to be secured in the hours prior to the arrival of Hurricane Katrina is simply baseless.

### F.       Joint and several liability does not apply.

**134-137.**  As noted above, *supra* at ¶¶ 13-14, even if the barge had contacted the eastern

IHNC floodwall before the breaches occurred, LNA could not be held liable for any of plaintiffs'

damages, let alone all of them, because (a) acting alone, the barge could not have caused the

floodwall breaches, and therefore it was not a "substantial factor" in causing the breaches and is

not a cause-in-fact of the breaches or the resulting flooding, (b) Hurricane Katrina-related

flooding is divisible between the IHNC floodwaters and the MRGO floodwaters, and therefore

LNA could never be liable for damages from floodwaters that did not come from the IHNC

floodwall breaches, and (c) any damages would have to be allocated based on the proportionate

fault between all of the causes of plaintiff's damages, even fault caused by entities (such as the

federal government) they elected not to sue in this action.  In ¶ 134, plaintiffs rehash the

erroneous legal standards from prior portions of their memorandum (¶¶ 13-14), which LNA

addressed above.

Plaintiffs erroneously argue that the waters that flooded their homes were "indivisible," such that joint and several liability applies. As noted above (at ¶¶ 13-14), this Court already found in *Robinson* that the flooding from the MRGO breaches and the flooding from the IHNC floodwall breaches is divisible. Plaintiffs ignore that conclusion. Instead, plaintiffs rely on several cases that do not support their argument. They cite *St. Paul Fire & Marine Insurance Co. v. Nolen Group, Inc.*, No. 02-8601, 2007 U.S. Dist. LEXIS 64603 (E.D. Pa. Aug. 31, 2007), for what they call the "well established" rule that "damage[s] resulting from a flood are inseparable." But *St. Paul Fire* established no such rule, nor did it recognize that any such rule has been established. Instead, it merely concluded that on its facts the flood damage was indivisible (*id.* at *46) because although there were several negligent parties, the flooding itself came from a single creek (*id.* at *9). That does not mean that where flooding comes from two or more separate breaches, the floodwaters are inherently indivisible. Likewise, in *In re Katrina Canal Breaches Litigation (Vanderbrook)*, 495 F.3d 191 (5th Cir. 2007), the Fifth Circuit decided only that flooding caused those plaintiffs' property damages, not that flooding from multiple sources was indivisible. *Id.* at 223. The Restatement (Second) of Torts, also cited by plaintiffs, proves that their argument is wrong because it specifically identifies flooding as a type of damage that *is* "capable of division upon a reasonable and rational basis." Restatement at § 433A, cmt. d.

Finally, plaintiffs allege that the IHNC floodwall breaches occurred before the MRGO breaches. But that has nothing to do with whether the floodwaters from the IHNC floodwall breaches and the MRGO breaches are divisible for purposes of determining whether joint and several liability applies. The IHNC breaches caused flooding only up to a certain level, and any

additional flooding was caused by the MRGO breaches.  LNA cannot be held liable for damages caused by the floodwaters from the MRGO breaches.

## CONCLUSION

The Court should reject plaintiffs' claims and enter judgment for LNA.

Dated: April 1, 2010                    Respectfully submitted,


Robert B. Fisher, Jr., T.A. (#5587)
Derek A. Walker (#13175)
**CHAFFE MCCALL, L.L.P.**
2300 Energy Centre
1100 Poydras Street
New Orleans, LA  70163-2300
Telephone:  (504) 585-7000
Facsimile:  (504) 585-7075
Fisher@chaffe.com
Walker@chaffe.com


 /s/ John D. Aldock
John D. Aldock
Richard M. Wyner
Mark S. Raffman
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC  20001
Telephone:  (202) 346-4240
jaldock@goodwinprocter.com
rwyner@goodwinprocter.com
mraffman@goodwinprocter.com


Daniel A. Webb (#13294)
**SUTTERFIELD & WEBB, LLC**
Poydras Center
650 Poydras Street, Suite 2715
New Orleans, LA  70130
Telephone:  (504) 598-2715


***Attorneys for Lafarge North America Inc.***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on April 1, 2010.

<u>  /s/ John D. Aldock                 </u>

LIBW/1732237.5