<pre>
 1                     UNITED STATES DISTRICT COURT

 2                     EASTERN DISTRICT OF LOUISIANA

 3

 4

 5    IN RE:  KATRINA DREDGING      *    Civil Action
      LIMITATION ACTION            *
 6    CONSOLIDATED LITIGATION      *    No. 05-4182
                                   *
 7                                 *    Section K(2)
      PERTAINS TO:                 *
 8    BARGE                        *    New Orleans, Louisiana
                                   *
 9    MUMFORD, C.A. NO. 05-5724, AS *   June 22, 2010
      TO PLAINTIFFS JOSEPHINE      *
10    RICHARDSON AND HOLLIDAY      *    Afternoon Session
      JEWELERS, INC., ONLY         *
11    AND                          *
      BENOIT, C.A. NO. 06-7516, AS *
12    TO PLAINTIFFS JOHN ALFORD AND *
      JERRY ALFORD ONLY            *
13    * * * * * * * * * * * * * * * *

14                             DAY TWO
                        BENCH TRIAL BEFORE THE
15               HONORABLE STANWOOD R. DUVAL, JR.
                   UNITED STATES DISTRICT JUDGE
16

17

      APPEARANCES:
18
      For the Plaintiffs:          Best Koeppel
19                                 BY:  LAURENCE E. BEST, ESQ.
                                   BY:  PETER S. KOEPPEL, ESQ.
20                                 2030 St. Charles Avenue
                                   New Orleans, Louisiana 70130
21

22    For the Plaintiffs:          Law Offices of Brian A. Gilbert
                                   BY:  BRIAN A. GILBERT, ESQ.
23                                 2030 St. Charles Avenue
                                   New Orleans, Louisiana  70130
24

25
</pre>

```
 1    APPEARANCES:

 2
      For the Plaintiffs:          Wiedemann & Wiedemann
 3                                 BY:  KARL WIEDEMANN, ESQ.
                                   BY:  LAWRENCE WIEDEMANN, ESQ.
 4                                 821 Baronne Street
                                   New Orleans, Louisiana  70113
 5

 6
      For the Plaintiffs:          Patrick J. Sanders, LLC
 7                                 BY:  PATRICK J. SANDERS, ESQ.
                                   3316 Ridgelake Drive
 8                                 Suite 100
                                   Metairie, Louisiana  70002
 9

10
      For the Plaintiffs:          Law Office of Richard T. Seymour,
11                                   P.L.L.C.
                                   BY:  RICHARD T. SEYMOUR, ESQ.
12                                 1150 Connecticut Avenue N.W.
                                   Suite 900
13                                 Washington, D.C.  20036-4129

14

15    For the Plaintiffs:          Khorrami, Pollard & Abir, LLP
                                   BY:  SHAWN KHORRAMI, ESQ.
16                                 444 S. Flower Street
                                   33rd Floor
17                                 Los Angeles, California  90071

18

19    For the Plaintiffs:          Wilson, Grochow, Druker & Nolet
                                   BY:  LAWRENCE A. WILSON, ESQ.
20                                 233 Broadway
                                   5th Floor
21                                 New York, New York  10279

22

23    For the Defendant:           Chaffe, McCall, L.L.P.
                                   BY:  DEREK A. WALKER, ESQ.
24                                 BY:  CHARLES P. BLANCHARD, ESQ.
                                   1100 Poydras Street, Suite 2300
25                                 New Orleans, Louisiana 70163
```

1   <u>APPEARANCES</u>:

2

3   For the Defendant:          Goodwin Procter, L.L.P.
                                BY:   JOHN ALDOCK, ESQ.
                                BY:   MARK RAFFMAN, ESQ.
4                               BY:   ADAM CHUD, ESQ.
                                BY:   KIRSTEN ROBBINS, ESQ.
5                               BY:   ERIC I. GOLDBERG, ESQ.
                                901 New York Avenue, NW
6                               Washington, D.C. 20001

7

8   For the Defendant:          Sutterfield & Webb
                                BY:   DANIEL A. WEBB, ESQ.
9                               650 Poydras Street, Suite 2715
                                New Orleans, Louisiana 70130
10

11  For the Defendant:          Lafarge North America, Inc.
                                BY:   PETER KEELY, ESQ.
12                              12950 Worldgate Drive
                                Herndon, Virginia  20170
13

14  Official Court Reporter:    Jodi Simcox, RMR, FCRR
                                500 Poydras Street
15                              Room HB-406
                                New Orleans, Louisiana 70130
16                              (504) 589-7780

17

18  Proceedings recorded by mechanical stenography, transcript

19  produced by computer.

20

21

22

23

24

25

1                                **I N D E X**

2                                                              Page

3

ROBERT BARTLETT

4          Cross-Examination                                  355

5    GERTRUDE LEBLANC

           Direct Examination                                 366

6          Cross-Examination                                  379

           Redirect Examination                               385

7

FRAZIER TOMPKINS, III

8          Direct Examination                                 387

           Cross-Examination                                  404

9          Redirect Examination                               409

10   DONALD JOSEPH GREEN

           Direct Examination                                 417

11         Voir Dire                                          424

           Direct Examination                                 431

12         Voir Dire                                          437

           Direct Examination                                 441

13

14

15

16

17

18

19

20

21

22

23

24

25

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

|            |    |                                                         |
|------------|----|---------------------------------------------------------|
| 12:44:21   | 1  | **AFTERNOON SESSION**                                   |
| 12:44:21   | 2  | **(June 22, 2010)**                                     |
| 12:44:21   | 3  | * * * * *                                               |
| 12:44:46   | 4  | **THE DEPUTY CLERK:** All rise.                         |
| 13:08:34   | 5  | **THE COURT:** Be seated. Okay. Are you ready to        |
| 13:08:41   | 6  | proceed?                                                |
| 13:08:42   | 7  | **MR. ALDOCK:** I am. John Aldock for Lafarge.          |
| 13:08:47   | 8  | (WHEREUPON, **Robert Bartlett**, having been previously |
| 13:08:47   | 9  | duly sworn, testified as follows.)                      |
| 13:08:48   | 10 | **CROSS-EXAMINATION**                                   |
| 13:08:48   | 11 | **BY MR. ALDOCK:**                                      |
| 13:08:49   | 12 | **Q.** Dr. Bartlett, let me show you a slide from your report -- |
| 13:08:55   | 13 | well, actually, it's Defendant's 70, page 2, a familiar slide |
| 13:09:00   | 14 | to all of us.                                           |
| 13:09:02   | 15 | The area we're talking about throughout your direct     |
| 13:09:07   | 16 | testimony, Dr. Bartlett, is this little thing between the end |
| 13:09:13   | 17 | of the wall here and where it starts to curve; right? It's |
| 13:09:18   | 18 | this piece?                                             |
| 13:09:19   | 19 | **A.** That's correct. And if I could just -- I'm not   |
| 13:09:22   | 20 | Dr. Bartlett. It's Mr. Bartlett.                        |
| 13:09:25   | 21 | **Q.** Okay. Thank you. Promotion. You don't want it?   |
| 13:09:27   | 22 | **A.** That's fine. Thank you.                          |
| 13:09:29   | 23 | **Q.** Okay.                                            |
| 13:09:30   | 24 | So that means, does it not, that you didn't concern     |
| 13:09:36   | 25 | yourself with any of this?                              |

13:09:40  1    A.    The evaluation of that area was done by Mr. Marino and

13:09:44  2    Mr. Pazos.  That was not an area that I was asked to

13:09:48  3    investigate.

13:09:48  4    Q.    So you have no views about this huge bow that -- in the

13:09:55  5    floodwall that is in the photographs here, you have no views at

13:09:57  6    all?

13:09:58  7    A.    Correct.

13:09:59  8    Q.    Right.

13:10:00  9          The -- in fact, you really only concerned yourself

13:10:06  10   with what you said, I think at your deposition, was the

13:10:11  11   panel -- the two panels here and no more than 15, 20 feet on

13:10:17  12   either side of it.

13:10:18  13   A.    Well, that was the -- that general area, the southern end

13:10:22  14   of the south breach.

13:10:23  15   Q.    Right.

13:10:24  16   A.    That, as I pointed out --

13:10:26  17   Q.    Where there is no wall.  We can see it, right before the

13:10:31  18   curve; right?

13:10:32  19   A.    As I pointed out earlier, the adjacent panel that has the

13:10:37  20   cap still remained.

13:10:38  21   Q.    Right.  And the fractures that you refer to in your report

13:10:40  22   involve the bending of the rebar inside the concrete cap,

13:10:46  23   right, and the concrete cap around it?  That's the fractures

13:10:51  24   you're referring to?

13:10:52  25   A.    Well, just to make sure that -- not the bending of the

| | | |
|---|---|---|
| 13:11:00 | 1 | rebar while it was inside the cap.  In other words, the bending |
| 13:11:04 | 2 | of the rebar above the construction joint. |
| 13:11:13 | 3 | **Q.**   Right. |
| 13:11:14 | 4 | **MR. ALDOCK:**  Your Honor, I'm going to be -- just |
| 13:11:15 | 5 | notice to Counsel -- as Your Honor knows from our summary |
| 13:11:19 | 6 | judgment motion, that we agree with very much of what this |
| 13:11:23 | 7 | witness says. |
| 13:11:23 | 8 | **THE COURT:**  Yes. |
| 13:11:23 | 9 | **MR. ALDOCK:**  The barge came through at that point, it |
| 13:11:26 | 10 | bent that rebar, and this is not -- |
| 13:11:28 | 11 | **THE COURT:**  I realize that. |
| 13:11:30 | 12 | **MR. ALDOCK:**  It's not rocket science, it's not in |
| 13:11:32 | 13 | contest, but -- so I'll be brief, maybe 15 minutes. |
| 13:11:38 | 14 | **BY MR. ALDOCK:** |
| 13:11:38 | 15 | **Q.**   When the barge contacted the southern end of the southern |
| 13:11:41 | 16 | breach, the water was quite high, wasn't it? |
| 13:11:44 | 17 | **A.**   Yes. |
| 13:11:45 | 18 | **Q.**   Would you say about 12 feet? |
| 13:11:48 | 19 | **A.**   Well, the -- I understand the elevations marked on the |
| 13:11:54 | 20 | blueprint don't necessarily correspond to, for example, sea |
| 13:11:59 | 21 | level.  So if we would just say that the bottom of the barge |
| 13:12:02 | 22 | was at or above the elevation of the construction joint -- |
| 13:12:06 | 23 | **Q.**   Correct. |
| 13:12:06 | 24 | **A.**   -- on the floodwall. |
| 13:12:11 | 25 | **Q.**   Well, let's look at slide 6 from your report.  This is |

| | | |
|---|---|---|
| 13:12:18 | 1 | something you talked about on direct.  The -- this is the -- |
| 13:12:25 | 2 | what we're referring to as the concrete cap, what I've shaded? |
| 13:12:29 | 3 | A.   Yes. |
| 13:12:29 | 4 | Q.   It wasn't shaded in your report? |
| 13:12:33 | 5 | A.   That's correct. |
| 13:12:34 | 6 | Q.   And the construction joint here? |
| 13:12:34 | 7 | A.   That's correct. |
| 13:12:34 | 8 | Q.   And the rebar is sort of a foot or so below? |
| 13:12:38 | 9 | A.   Well, no.  I believe what you are pointing at is the top |
| 13:12:43 | 10 | of the sheet pile. |
| 13:12:44 | 11 | Q.   Yes, the sheet pile.  I'm sorry.  I misspoke.  I meant to |
| 13:12:48 | 12 | say the sheet pile.  About a foot and a half below? |
| 13:12:52 | 13 | A.   I believe it's 6 inches. |
| 13:12:57 | 14 | Q.   Okay.  I'll take that for now.  We may quarrel later, but |
| 13:13:01 | 15 | for now that's all right. |
| 13:13:02 | 16 | A.   I think I had said earlier less than a foot. |
| 13:13:05 | 17 | Q.   Okay.  So what you're telling us today is that the barge |
| 13:13:08 | 18 | contact that we discussed in your direct was about where the |
| 13:13:12 | 19 | line is, somewhere right around here; right? |
| 13:13:17 | 20 | A.   No.  I'm saying -- |
| 13:13:19 | 21 | Q.   Near or above the line? |
| 13:13:21 | 22 | A.   Well, you're saying the contact.  I'm saying the bottom -- |
| 13:13:27 | 23 | Q.   The bottom of the barge. |
| 13:13:29 | 24 | A.   Right.  So because the front of the barge has curvature to |
| 13:13:32 | 25 | it, the point of contact would have been above. |

JODI SIMCOX, RMR, FCRR – OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|--|--|--|
| 13:13:35 | 1 | **Q.** It would have been higher? |
| 13:13:37 | 2 | **A.** Correct. |
| 13:13:37 | 3 | **Q.** Right. So the contact is all up here above there? |
| 13:13:41 | 4 | **MR. BEST:** Objection to the form. You mean the |
| 13:13:42 | 5 | initial contact. |
| 13:13:46 | 6 | **MR. ALDOCK:** Let him answer the question. |
| 13:13:47 | 7 | **MR. BEST:** Well, I object to the question as vague |
| 13:13:50 | 8 | and ambiguous. |
| 13:13:52 | 9 | **THE COURT:** Just to let Mr. Aldock know, I'm assuming |
| 13:13:55 | 10 | you mean the initial contact. I'm assuming when the -- when |
| 13:13:58 | 11 | the barge first impacted that area. That's what I'm assuming. |
| 13:14:03 | 12 | So I have to -- I know we're talking about the entire continuum |
| 13:14:08 | 13 | of the barge movement through the wall, which would be a lot |
| 13:14:11 | 14 | more complex. |
| 13:14:13 | 15 | **MR. ALDOCK:** Well, I'm not sure. |
| 13:14:14 | 16 | **BY MR. ALDOCK:** |
| 13:14:15 | 17 | **Q.** Mr. Bartlett, the initial contact was up here; right? |
| 13:14:18 | 18 | **A.** Yes, just a few inches above the construction joint, or |
| 13:14:21 | 19 | above that. |
| 13:14:22 | 20 | **THE COURT:** Let him finish his answers. Okay? |
| 13:14:25 | 21 | He's finished. Go ahead. |
| 13:14:26 | 22 | **BY MR. ALDOCK:** |
| 13:14:26 | 23 | **Q.** And then the barge comes through? |
| 13:14:28 | 24 | **A.** Correct. |
| 13:14:29 | 25 | **Q.** And that's -- and it does localized damage to that cap? |

| | | |
|---|---|---|
| 13:14:35 | 1 | **A.**   Yes. |
| 13:14:46 | 2 | **Q.**   So the impact's at least 6 inches, if not a foot or more, |
| 13:14:53 | 3 | above the sheet pile? |
| 13:14:55 | 4 | **A.**   Yes. |
| 13:15:08 | 5 | **Q.**   Now, you say that once the cap is damaged, the water can |
| 13:15:12 | 6 | flow over the top of the cap where the concrete is sheared off? |
| 13:15:18 | 7 | I mean, if what you're saying, as I understand it -- |
| 13:15:20 | 8 | tell me if I've got it right.  If you displace some of this -- |
| 13:15:24 | 9 | this concrete cap makes a hole, and to the extent there's a |
| 13:15:31 | 10 | hole, water comes through? |
| 13:15:32 | 11 | **A.**   Correct.  But -- and you started that question -- were you |
| 13:15:36 | 12 | reading from my report when you -- when you made that |
| 13:15:38 | 13 | statement?  I just didn't know what you -- |
| 13:15:41 | 14 | **Q.**   I was reading from your declaration for summary judgment. |
| 13:15:45 | 15 | **A.**   All right. |
| 13:15:46 | 16 | **Q.**   Okay.  So you also said, I believe, in your declaration -- |
| 13:15:55 | 17 | and we could put it up.  It's slide 8. |
| 13:16:00 | 18 | **MR. BEST:**  Just note an objection to the form.  I |
| 13:16:02 | 19 | don't know that there's anything to impeach the witness over to |
| 13:16:06 | 20 | cross him on his declaration. |
| 13:16:08 | 21 | **MR. ALDOCK:**  If I put it up there, you're going to |
| 13:16:11 | 22 | tell me you want me to show it to you, and if I don't show it |
| 13:16:13 | 23 | to you -- |
| 13:16:14 | 24 | **MR. BEST:**  I just think the proper way -- |
| 13:16:16 | 25 | **MR. ALDOCK:**  -- I'm happy -- I'm not impeaching him. |

13:16:18    1   I am not impeaching the witness.

13:16:18    2           THE COURT:  If he's not impeaching him, this is just

13:16:20    3   to facilitate the question, I'm going to allow it.

13:16:24    4           MR. BEST:  Thank you.

13:16:24    5   BY MR. ALDOCK:

13:16:24    6   Q.   So what you're saying here is that -- that -- you prefaced

13:16:28    7   it by saying that you agreed with Dr. Cushing, as long as he's

13:16:40    8   not referring to secondary effects to water flowing through the

13:16:43    9   opening.  That's what you basically just said.

13:16:46   10           You agreed with Dr. Cushing on the -- on the impact.

13:16:49   11   But you wanted to make sure, as I understand that, that he's

13:16:53   12   not minimizing the fact that if you displace concrete, water

13:16:56   13   comes through?

13:16:57   14   A.   Yes.

13:17:06   15   Q.   But let's go back to the opening slide, Defendant's 70.

13:17:11   16           Mr. Bartlett, I take it that if the entire

13:17:14   17   neighborhood is flooded as a result of this failure -- take

13:17:19   18   this as a hypothetical.  The entire neighborhood is flooded as

13:17:23   19   a result of this failure.  Any -- no extra water really is

13:17:29   20   going to come through as a result of this localized contact,

13:17:32   21   because the water level would always be the same in the canal

13:17:38   22   and on the other side.

13:17:41   23   A.   Well, you're making a presumption --

13:17:44   24   Q.   I am.  I'm giving you a hypothetical.

13:17:47   25           MR. BEST:  To which I object, for the record.

```
13:17:50   1              THE COURT:  Well, the objection's overruled.  But I'd
13:17:52   2   like the questions to end and the answers to begin, and the
13:17:57   3   answers to --
13:17:58   4              MR. ALDOCK:  Sorry.
13:17:59   5              THE COURT:  -- from both of you.
13:18:01   6                   Go ahead and answer that.
13:18:05   7              THE WITNESS:  So could you -- could you clarify the
13:18:06   8   presumption that you'd like me to understand on your part?
13:18:10   9   BY MR. ALDOCK:
13:18:10  10   Q.  Yes.
13:18:12  11              I want you to presume that as a result of all of this
13:18:16  12   movement of the floodwall, that this area has already been
13:18:22  13   flooded.  And I think that becomes obvious that then the -- if
13:18:28  14   the area is all flooded and the barge comes through, then the
13:18:33  15   water level is the same on both sides, the incremental concrete
13:18:39  16   that was displaced that we just talked about isn't going to do
13:18:43  17   anything.
13:18:44  18              MR. BEST:  I just object, to protect the record, that
13:18:45  19   there's no foundation for that hypothetical.
13:18:49  20              THE COURT:  Overruled.  This is an expert.
13:18:50  21              MR. BEST:  I understand, Your Honor.
13:18:51  22              THE COURT:  Overruled.  Overruled, sir.
13:18:52  23              MR. BEST:  May I finish what I was saying?
13:18:54  24              THE COURT:  You can finish, but I think you're
13:18:56  25   wasting a lot of time.  This is an expert witness.
```

13:18:58  1          MR. BEST:  It's an irrational hypothetical, I submit.

13:19:02  2          THE COURT:  Sir, that's not an objection.  That's

13:19:04  3    your speaking and trying to make an objection under the Federal

13:19:08  4    Rules of Evidence.  Where precisely -- what federal rule are

13:19:11  5    you relying on?  What federal rule are you relying on, sir?

13:19:13  6          MR. BEST:  There's not going to be supporting

13:19:15  7    evidence for that hypothetical.

13:19:16  8          THE COURT:  Well, that -- that requires a Nostradamus

13:19:19  9    ruling, which you're not.  Overruled.

13:19:26  10          THE WITNESS:  The -- the evaluation of the hydrology,

13:19:30  11    water levels and that sort of thing, this is -- these are areas

13:19:33  12    that Mr. Pazos and Mr. Marino are handling.

13:19:41  13          But I will tell you that if you're asking me, I

13:19:42  14    doubt that the water level could be high enough for the barge

13:19:45  15    to float with its bottom over the construction joint if this

13:19:50  16    entire 793 feet of floodwall is displaced and out of position

13:19:55  17    as you see it in this photograph.

13:19:56  18    BY MR. ALDOCK:

13:19:56  19    Q.   And is that an opinion that you have as a metallurgist?

13:19:59  20    A.   It's an opinion that I have as a mechanical engineer who

13:20:02  21    is knowledgeable in the area of fluid mechanics.

13:20:06  22          But as I said, this is an area that is covered in

13:20:09  23    more detail by Mr. Pazos and Mr. Marino.  But if you're asking

13:20:14  24    me -- if you're requiring me to answer --

13:20:17  25          THE COURT:  Once you ask a question, sir, you then --

```
13:20:19   1   you then open the gate to this witness answering as best he
13:20:22   2   can, regardless of his tendered area of expertise.
13:20:26   3                You may continue your answer, sir.
13:20:28   4            THE WITNESS:  Oh, I believe that I'm finished,
13:20:32   5   Your Honor.  Thank you.
13:20:32   6            THE COURT:  All right.  Thank you.
13:20:33   7   BY MR. ALDOCK:
13:20:33   8   Q.   The force by which the barge struck the cap, it was not
13:20:35   9   enough to break the rebar.  It only bent it; right?
13:20:40  10   A.   It's unlikely that you would break rebar by any force,
13:20:45  11   because it's typically not dull enough to bend without
13:20:52  12   fracturing it.
13:20:54  13   Q.   And the force in the area that we're discussing was not
13:20:57  14   enough to cause the sheet pile to separate; correct?
13:21:03  15   A.   Well, you have to get the force down to the sheet pile.
13:21:06  16   And that was, of course, one of the things we talked about in
13:21:11  17   our report, that the force was enough to cause the -- a cap to
13:21:16  18   come loose.  But the force could not be transferred down to the
13:21:21  19   sheet pile to cause the sheet pile to be disturbed.
13:21:28  20                So that, again, is another thing that says that the
13:21:31  21   wall was -- that the foundation of the wall, the soil, was
13:21:33  22   intact.
13:21:45  23            MR. ALDOCK:  That's all I have, Your Honor.
13:21:47  24            THE COURT:  Thank you, sir.
13:21:47  25            MR. BEST:  Nothing, Your Honor.
```

13:21:48  1                 THE COURT:  Thank you, sir.

13:21:49  2                 And thank you, sir.

13:21:51  3                 THE WITNESS:  Thank you very much.

13:22:46  4                 THE COURT:  Okay.

13:22:52  5                 MR. BEST:  One moment, Your Honor.

13:22:54  6                 THE COURT:  Sure.

13:22:55  7                 MR. BEST:  I'm assembling my materials.

13:23:10  8                 Your Honor, we call Gertrude LeBlanc as our next

13:23:13  9     witness.

13:23:15  10                THE COURT:  Thank you, sir.

13:23:20  11                While Ms. LeBlanc is coming, just as a matter of

13:23:27  12    inquiry, is the -- has the Villavaso deposition been vetted?

13:23:31  13    Because we'll probably get to it today.

13:23:36  14                MR. SNYDER:  We're working on it, Your Honor.

13:23:38  15                THE COURT:  You're still working on it?

13:23:40  16                MR. SNYDER:  Yes, Your Honor.

13:23:55  17                THE COURT:  Okay.

13:23:55  18                Mr. Gilbert, I think you have a witness coming

13:23:57  19    in here.  There you go.  It's sort of hard to find your way up

13:24:01  20    here, ma'am.

13:24:02  21                (WHEREUPON, **Gertrude LeBlanc**, having been duly sworn,

13:24:02  22    testified as follows.)

13:25:04  23                THE DEPUTY CLERK:  Please state your full name and

13:25:04  24    correct spelling for the record.

13:25:08  25                THE WITNESS:  Gertrude LeBlanc, it's G-E-R-T-R-U-D-E,

13:25:16   1   L-E-B-L-A-N-C.

13:25:24   2                     **DIRECT EXAMINATION**

13:25:25   3   **BY MR. BEST:**

13:25:32   4   **Q.**   Good afternoon, ma'am.  How old are you?  And I hate to

13:25:40   5   start with that question, and I apologize.

13:25:42   6   **A.**   74.

13:25:43   7   **Q.**   74.  And where do you live today?

13:25:45   8   **A.**   1738 Tennessee Street, New Orleans.

13:25:47   9   **Q.**   And is that the same Tennessee Street that's in the Ninth

13:25:52   10   Ward?

13:25:53   11   **A.**   Yes.

13:25:53   12   **Q.**   The Lower Ninth Ward?

13:25:55   13   **A.**   Yes.

13:25:56   14   **Q.**   How long have you lived at that address?

13:25:58   15   **A.**   About 45 years.  It might be longer.

13:25:59   16   **Q.**   So you lived at that address before Hurricane Katrina?

13:26:01   17   **A.**   Yes.

13:26:01   18   **Q.**   And since the storm, you've come back and rebuilt and

13:26:04   19   moved in again?

13:26:05   20   **A.**   Yes.

13:26:06   21   **Q.**   All right.

13:26:08   22            And at the time of Hurricane Katrina, who lived with

13:26:11   23   you at that address?

13:26:13   24   **A.**   Jennifer, my oldest daughter, and my granddaughter,

13:26:18   25   Leaura.  And my grandsons go and come.

13:26:27  1   **Q.**   All right.  As Hurricane Katrina approached, what plans

13:26:29  2   did you make to deal with the storm?

13:26:30  3   **A.**   Well, I was -- like you see, you fill a container with

13:26:36  4   different things, items, but I didn't do that.  I really sat

13:26:42  5   down and watched what was going on in the Gulf.

13:26:51  6                **MR. WALKER:**  Your Honor, may I ask Mrs. LeBlanc to

13:26:57  7   come a little closer to the mic?

13:26:59  8                **THE COURT:**  Yes.  You were perfectly positioned a

13:27:00  9   little while ago.

13:27:00  10               **THE WITNESS:**  All right.

13:27:00  11               **THE COURT:**  That's good.  That's great.  Just stay

13:27:00  12  right there.

13:27:00  13                    Go ahead, Mr. Best.

13:27:00  14  **BY MR. BEST:**

13:27:01  15  **Q.**   Before I get too far down that road, let us pull up again

13:27:05  16  the map of the neighborhood that we've been using.  That was

13:27:10  17  Plaintiffs' Exhibit 274.

13:27:11  18                    And you have it on the screen in front of you as

13:27:14  19  well, Mrs. LeBlanc, so you can look at it.  I think you told us

13:27:18  20  you lived on Tennessee Street.

13:27:19  21  **A.**   Uh-huh.

13:27:20  22  **Q.**   Whereabouts on Tennessee?

13:27:22  23  **A.**   Between Derbigny and -- Roman does not go all the way

13:27:31  24  through, but Prieur would be the next street that goes through.

13:27:34  25  **Q.**   Okay.  So on Tennessee Street between the cross-street

| | | |
|---|---|---|
| 13:27:37 | 1 | North Derbigny and the cross-street North Prieur? |
| 13:27:41 | 2 | A.   Yes. |
| 13:27:41 | 3 | Q.   And which side of the street did you live on?  In other |
| 13:27:44 | 4 | words, did your house face the canal or did it face away from |
| 13:27:48 | 5 | the Industrial Canal? |
| 13:27:50 | 6 | A.   My backyard was to the canal, yeah. |
| 13:27:53 | 7 | Q.   Your backyard was to the canal? |
| 13:27:55 | 8 | A.   Yeah. |
| 13:27:55 | 9 | Q.   All right.  So about how many blocks were you from North |
| 13:27:57 | 10 | Claiborne Avenue? |
| 13:27:59 | 11 | A.   I'm about a block and a half from Claiborne. |
| 13:28:03 | 12 | Q.   All right.  Now, you told us you were -- you were |
| 13:28:06 | 13 | following the weather as the storm approached. |
| 13:28:09 | 14 | A.   Yes, I was watching the television. |
| 13:28:11 | 15 | Q.   And what did you finally decide to do about whether to |
| 13:28:15 | 16 | stay or to go? |
| 13:28:17 | 17 | A.   All right.  That -- when I saw that the hurricane covered |
| 13:28:21 | 18 | the whole Gulf -- I mean, the whole Gulf, I said, "We better |
| 13:28:26 | 19 | get out." |
| 13:28:28 | 20 | Q.   Okay. |
| 13:28:28 | 21 | A.   "Because something is going to happen." |
| 13:28:29 | 22 | Q.   And did you evacuate? |
| 13:28:31 | 23 | A.   Yeah.  We evacuated that Sunday morning. |
| 13:28:34 | 24 | Q.   And whom did you evacuate with? |
| 13:28:38 | 25 | A.   My oldest daughter, Jennifer, and my granddaughter. |

369

| | | |
|---|---|---|
| 13:28:41 | 1 | **Q.** And where did you-all evacuate to? |
| 13:28:44 | 2 | **A.** We was on our way to Pensacola, Florida. |
| 13:28:46 | 3 | **Q.** And when did you leave your home? |
| 13:28:47 | 4 | **A.** We left home about -- between 11:00 and 12:00, I would say |
| 13:28:52 | 5 | that time. |
| 13:28:52 | 6 | **Q.** On what day? |
| 13:28:54 | 7 | **A.** Sunday morning. |
| 13:28:56 | 8 | **Q.** Sunday, between 11:00 and 12:00.  And who did you leave |
| 13:28:59 | 9 | your home with? |
| 13:29:00 | 10 | **A.** Well, we left Chris there.  He came home for a while. |
| 13:29:05 | 11 | **Q.** I'm sorry, I -- |
| 13:29:05 | 12 | **A.** Chris, my grandson. |
| 13:29:05 | 13 | **Q.** Your grandson.  So whose car did you leave in? |
| 13:29:07 | 14 | **A.** My own. |
| 13:29:07 | 15 | **Q.** And who drove your car? |
| 13:29:09 | 16 | **A.** My daughter, Jennifer. |
| 13:29:10 | 17 | **Q.** And you were in the car? |
| 13:29:11 | 18 | **A.** Yes. |
| 13:29:11 | 19 | **Q.** With -- your daughter, Jennifer, was driving.  Was anybody |
| 13:29:15 | 20 | else in the car? |
| 13:29:16 | 21 | **A.** My granddaughter was in the backseat. |
| 13:29:18 | 22 | **Q.** Okay.  And when you-all left, where were you headed to? |
| 13:29:22 | 23 | **A.** I was headed to Pontchartrain Park. |
| 13:29:24 | 24 | **Q.** Why were you going there? |
| 13:29:26 | 25 | **A.** To my sister-in-law's house, because my other daughter was |

370

| | | |
|---|---|---|
| 13:29:30 | 1 | going to meet us there. |
| 13:29:32 | 2 | **Q.**   And then you were all going to head to Florida together? |
| 13:29:36 | 3 | **A.**   Yeah. |
| 13:29:36 | 4 | **Q.**   And I'm sorry, you said this was about what time that you |
| 13:29:39 | 5 | left your home? |
| 13:29:40 | 6 | **A.**   I would say between 11:00 and 12:00. |
| 13:29:43 | 7 | **Q.**   Between 11:00 and 12:00.  And what route did you take when |
| 13:29:46 | 8 | you left your house on Tennessee Street to go to the home of |
| 13:29:48 | 9 | your other family members? |
| 13:29:50 | 10 | **A.**   We went down Tennessee, made a right turn at Claiborne, to |
| 13:29:56 | 11 | go over the Claiborne bridge. |
| 13:29:58 | 12 | **Q.**   All right.  And where in the automobile were you seated? |
| 13:30:01 | 13 | **A.**   Passenger side. |
| 13:30:02 | 14 | **Q.**   Front seat or back seat? |
| 13:30:04 | 15 | **A.**   Front. |
| 13:30:05 | 16 | **Q.**   Front seat. |
| 13:30:11 | 17 |        And tell us what you remember about your ride over |
| 13:30:13 | 18 | the North Claiborne Avenue bridge over the Industrial Canal. |
| 13:30:20 | 19 | **A.**   Well, we was gong over the Industrial Canal, and I looked |
| 13:30:21 | 20 | to the right, and there was a barge in the canal. |
| 13:30:24 | 21 | **Q.**   All right.  Now before you go any further, you can see |
| 13:30:27 | 22 | here on the map, of course, that the Claiborne Avenue -- the |
| 13:30:29 | 23 | North Claiborne Avenue bridge is over the canal.  But the canal |
| 13:30:33 | 24 | extends quite a distance to the north; is that right? |
| 13:30:37 | 25 | **A.**   Uh-huh. |

13:30:37  1   **Q.**   You have to speak your answers.

13:30:39  2   **A.**   Yes.

13:30:40  3   **Q.**   And is there another bridge further up the canal from the

13:30:43  4   North Claiborne Avenue bridge?

13:30:45  5   **A.**   Yes, the Florida bridge.

13:30:45  6   **Q.**   The Florida bridge.  With respect to the North Claiborne

13:30:48  7   Avenue bridge and the Florida bridge, where was this barge that

13:30:51  8   you saw that you were talking about?

13:30:54  9   **A.**   I'd say it was more near the Claiborne Avenue bridge.

13:30:58  10  **Q.**   All right.

13:31:01  11  **A.**   About Derbigny Street.

13:31:03  12  **Q.**   North Derbigny Street here, down there where you told us

13:31:07  13  was --

13:31:08  14  **A.**   North Derbigny.

13:31:09  15  **Q.**   That's the same one that's the cross-street near your

13:31:12  16  house on Tennessee?

13:31:13  17  **A.**   Right.

13:31:13  18  **Q.**   So if we take North Derbigny Street and we draw a line

13:31:16  19  straight to the canal, the barge was in this vicinity; is that

13:31:19  20  correct?  In that area?

13:31:25  21          **THE COURT:**  You might want to look on the screen

13:31:26  22  right in front you.

13:31:27  23          **THE WITNESS:**  All right.

13:31:27  24  **BY MR. BEST:**

13:31:28  25  **Q.**   You can't see my red dot on your screen.

13:31:31  1   **A.**   No.

13:31:30  2   **Q.**   But if you draw an imaginary line from Derbigny Street

13:31:35  3   across the Industrial Canal.

13:31:37  4   **A.**   All right.  Yeah, it was near Derbigny.

13:31:40  5   **Q.**   Okay.

13:31:41  6   **A.**   Uh-huh.

13:31:46  7   **Q.**   Now can you tell us what you remember, if you do, about

13:31:48  8   how the barge was positioned in the waterway at that location?

13:31:54  9   **A.**   All right.  This is the levee, and the barge was like

13:31:58  10   this.

13:31:58  11   **Q.**   Parallel to the levee, running in the same direction as

13:32:01  12   the levee?

13:32:01  13   **A.**   Yeah.

13:32:03  14   **Q.**   North/south?  I'm sorry, in the same direction as the

13:32:06  15   levee?

13:32:06  16   **A.**   Yeah.

13:32:07  17   **Q.**   Okay.  And when you're talking about "the levee," you're

13:32:09  18   talking about the floodwall?

13:32:11  19   **A.**   The floodwall, yes.

13:32:14  20   **Q.**   All right.  Now, how long had you lived in the

13:32:17  21   neighborhood?

13:32:17  22   **A.**   About 45 years.

13:32:19  23   **Q.**   Had you been across that bridge before?

13:32:21  24   **A.**   Many times.

13:32:21  25   **Q.**   Have you seen barges before?

| | | |
|---|---|---|
| 13:32:23 | 1 | **A.**   Yes, sir. |
| 13:32:25 | 2 | **Q.**   Was there anything unusual or different about this barge |
| 13:32:29 | 3 | in particular? |
| 13:32:32 | 4 | **A.**   No. |
| 13:32:32 | 5 | **Q.**   Okay.  Do you remember anything about the color or any -- |
| 13:32:37 | 6 | **A.**   Yeah.  It was a rust-orangey -- rust-colored barge. |
| 13:32:43 | 7 | **Q.**   Was it -- |
| 13:32:46 | 8 | **A.**   Oval top. |
| 13:32:48 | 9 | **Q.**   I'm sorry?  What kind -- |
| 13:32:49 | 10 | **A.**   Oval top. |
| 13:32:50 | 11 | **Q.**   Oval top, meaning -- you're using your hand to indicate it |
| 13:32:51 | 12 | was a curved top? |
| 13:32:53 | 13 | **A.**   Yeah. |
| 13:32:53 | 14 | **Q.**   Okay.  So am I understanding you correctly that it was a |
| 13:32:56 | 15 | barge that had covers on top? |
| 13:32:59 | 16 | **A.**   Nah, it had to be -- it wasn't an open barge. |
| 13:33:04 | 17 | **Q.**   It was not an open barge? |
| 13:33:06 | 18 | **A.**   No. |
| 13:33:06 | 19 | **Q.**   And it had a curved top? |
| 13:33:09 | 20 | **A.**   Yeah. |
| 13:33:09 | 21 | **Q.**   Okay.  All right.  Now, when you saw the barge there, |
| 13:33:12 | 22 | was -- did you see any other vessels anywhere in the canal in |
| 13:33:17 | 23 | that vicinity? |
| 13:33:18 | 24 | **A.**   All right.  No, because -- what do you call this |
| 13:33:22 | 25 | peripheral vision, when you look at something -- |

```
13:33:26   1    Q.    Your peripheral vision?
13:33:29   2    A.    Yeah.  You can see something, you know, out of the side of
13:33:30   3    your eyes.  No, nothing was in the water but that barge.
13:33:34   4    Q.    Had you -- at other times in the past, when you had seen
13:33:35   5    barges in the canal, had you seen barges being pushed or towed
13:33:40   6    through the canal with towboats?
13:33:43   7    A.    Yes.
13:33:43   8    Q.    Was there any towboat at either end of this barge?
13:33:49   9    A.    No, sir.
13:33:50   10   Q.    Could you tell whether the barge was moving or not?
13:33:54   11   A.    Looking down at it I'd say no, I couldn't tell if it was
13:33:59   12   moving.
13:33:59   13   Q.    So is it fair to say that it didn't appear to be moving?
13:34:03   14   A.    No, it didn't appear to be moving.
13:34:05   15   Q.    Okay.  Now, was it -- as it's sitting in the canal and
13:34:08   16   it's running in the same direction as the floodwall, is it
13:34:10   17   closer to one side of the canal than the other, it's the
13:34:13   18   middle?  Whereabouts is this barge that you saw situated?
13:34:17   19   A.    It was not close to the floodwall.  It was a little
13:34:21   20   distance, but it wasn't in the center of the canal.  There was
13:34:26   21   a little distance.
13:34:27   22   Q.    Okay.  So it was off center?
13:34:29   23   A.    Yes.
13:34:29   24   Q.    To which side?  To the --
13:34:31   25   A.    The Ninth Ward side.
```

13:34:34  1   **Q.**   To the Lower Ninth Ward side?

13:34:36  2   **A.**   Yes, sir.

13:34:37  3   **Q.**   Did you take any particular notice of the water level in

13:34:39  4   the canal that Sunday morning?

13:34:41  5   **A.**   I'd say it was about halfway to the floodwall.

13:34:45  6   **Q.**   Okay.  Was it -- how did it compare that Sunday morning

13:34:49  7   with the way it usually was?  The water level, did you notice

13:34:54  8   if it was higher or lower than usual?

13:35:00  9   **A.**   It was higher than usual, yes.

13:35:01  10  **Q.**   All right.  And you said it was -- I'm sorry, with respect

13:35:04  11  to the floodwall, you said the water level was what?

13:35:08  12  **A.**   I'd say it was about halfway up the floodwall.

13:35:11  13  **Q.**   Halfway up the floodwall?

13:35:13  14  **A.**   Yeah.

13:35:13  15  **Q.**   Okay.  Just to be clear, when you say it was not in the

13:35:29  16  center, it was more one side or the other, it was towards the

13:35:34  17  Ninth Ward side, that means it's about where I'm pointing now

13:35:38  18  with the red pointer; is that fair?

13:35:45  19  **A.**   It -- it was -- let's see.  It wasn't close to the wall.

13:35:47  20  It was a distance from the wall.

13:35:49  21  **Q.**   Okay.  But we're talking about the wall on the north -- on

13:35:50  22  the Lower Ninth Ward side?

13:35:52  23  **A.**   Yeah.

13:35:53  24  **Q.**   On the Jourdan Avenue side?

13:35:55  25  **A.**   Yes.

13:35:55   1    **Q.**    Okay.  And that's the wall it was closer to?

13:35:58   2    **A.**    Yes.

13:36:07   3    **Q.**    Okay.  I just wanted to make sure I got that right.

13:36:07   4            And just to be clear, this barge that you saw was one

13:36:10   5    barge as opposed to multiple barges?

13:36:12   6    **A.**    One barge.

13:36:21   7            **THE COURT:**  It would be helpful for the record, and I

13:36:23   8    don't want to tax the witness -- and I won't do this often --

13:36:25   9    but, ma'am, if you touch that screen in front of you, it makes

13:36:30   10   a little mark.

13:36:31   11           Could you, as best you can -- and if it doesn't

13:36:34   12   work, I'll eliminate it -- could you touch the screen where you

13:36:37   13   think -- where you saw the barge as you were going over the

13:36:39   14   Claiborne Avenue bridge?  As best you can.

13:36:44   15           And if it's not right, we can try it again, and

13:36:47   16   I won't belabor it too much.  I just want to give the Court of

13:36:50   17   Appeals some record here.

13:36:51   18           **THE WITNESS:**  All right.  About right there.

13:36:53   19           **THE COURT:**  Okay.  It should be showing up on there.

13:36:57   20   **BY MR. BEST:**

13:36:57   21   **Q.**    You might have to press a little harder.

13:37:00   22   **A.**    It was right about here.

13:37:19   23           **THE COURT:**  Okay.  Is that about right, looking at

13:37:21   24   it?

13:37:21   25           **THE WITNESS:**  Yes, sir.

13:37:22   1          THE COURT:  Okay.  Now -- and about how far was it
13:37:26   2   into the -- from the floodwall?  Can you judge feet very --
13:37:33   3   well, you might show that.  Just a little.
13:37:37   4          THE WITNESS:  That's -- all right.  The floodwall
13:37:39   5   would be where that mark I just made is.
13:37:42   6          THE COURT:  Yes.
13:37:42   7          THE WITNESS:  All right.  I'd say it was about -- I'd
13:37:50   8   say, distance, it was about -- because I could see the water
13:37:52   9   before the floodwall.  So I'd say it was a little distance
13:37:56  10   away.  Not even a car distance away.  Not even that.
13:38:00  11          THE COURT:  So it was fairly close to the floodwall?
13:38:02  12          THE WITNESS:  It was near it, yeah.
13:38:04  13   BY MR. BEST:
13:38:04  14   Q.   And you could see water of the canal between the side of
13:38:06  15   the barge?
13:38:08  16   A.   And the floodwall, yeah.
13:38:09  17          THE COURT:  Okay.  I'm going to ask -- at least that
13:38:11  18   gives me -- the Court of Appeals a location of where the barge
13:38:16  19   was in the canal.  You just have to move it over.
13:38:21  20          MR. BEST:  Even though the mark that's -- are you
13:38:24  21   preserving this?
13:38:25  22          THE COURT:  Yes.
13:38:26  23          MR. BEST:  For the record, it appears, at least, that
13:38:28  24   it's outside of the water on the drawing.
13:38:30  25          THE COURT:  Yes, it is.  That's not where --

13:38:33  1  obviously, you saw it in the water --

13:38:35  2          **THE WITNESS:**  Yes.

13:38:35  3          **THE COURT:**  -- and it was close to the wall?

13:38:37  4              I think that's about as best as we can do, and

13:38:39  5  I'm going to capture this, so I'll have something.

13:38:43  6  **BY MR. BEST:**

13:38:43  7  **Q.**  Just one more question, ma'am:  Did you ever see that

13:38:46  8  barge again?

13:38:46  9  **A.**  No.  That particular barge -- well, there's plenty of

13:38:50  10  barges that look like that.

13:38:52  11  **Q.**  Did you see one that looked like that?

13:38:54  12  **A.**  I've seen others on the Industrial Canal.

13:38:56  13  **Q.**  I'm talking about after you left and after the evacuation,

13:39:00  14  did you see that barge again?

13:39:01  15  **A.**  Yes, I did.

13:39:02  16  **Q.**  Where?

13:39:02  17  **A.**  Not too far from my backyard, when we went and saw the

13:39:06  18  destruction.

13:39:07  19  **Q.**  Sitting in the neighborhood?

13:39:08  20  **A.**  In the neighborhood.

13:39:10  21          **MR. BEST:**  Thank you, ma'am.

13:39:13  22          **THE COURT:**  Cross-examination?

13:39:36  23              Go ahead, sir.

13:39:38  24          **MR. WALKER:**  Thank you, Your Honor.

           25

| | | |
|---|---|---|
| 13:39:15 | 1 | **CROSS-EXAMINATION** |
| 13:39:40 | 2 | BY MR. WALKER: |
| 13:39:40 | 3 | Q.   Hello, Ms. LeBlanc.  How are you? |
| 13:39:43 | 4 | A.   How are you? |
| 13:39:44 | 5 | Q.   Can we see each other? |
| 13:39:46 | 6 | A.   Yeah. |
| 13:39:46 | 7 | Q.   So at the time of Katrina, you were about 69 years old; is |
| 13:39:49 | 8 | that right? |
| 13:39:50 | 9 | A.   At the time of Katrina, I was 69.  No -- well, I guess |
| 13:39:54 | 10 | about that. |
| 13:39:55 | 11 | Q.   About that? |
| 13:39:56 | 12 | A.   Yeah. |
| 13:39:56 | 13 | Q.   Okay.  And how long have you suffered glaucoma in the |
| 13:40:02 | 14 | eyes? |
| 13:40:04 | 15 | A.   Oh, it's been a while. |
| 13:40:08 | 16 | Q.   Did you have that at the time of Katrina? |
| 13:40:10 | 17 | A.   Yes.  Uh-huh. |
| 13:40:14 | 18 | Q.   All right.  And the night before, Saturday night, you |
| 13:40:17 | 19 | stayed up most of the night concerned about the hurricane |
| 13:40:19 | 20 | watching TV; is that right? |
| 13:40:21 | 21 | A.   That's right, sir. |
| 13:40:26 | 22 | Q.   And you packed your car Sunday morning with Jennifer, your |
| 13:40:29 | 23 | daughter, and Leaura, your granddaughter; is that right? |
| 13:40:33 | 24 | A.   Yeah. |
| 13:40:33 | 25 | Q.   And the three of you then crossed the Claiborne Avenue |

| | | |
|---|---|---|
| 13:40:38 | 1 | bridge; is that right? |
| 13:40:38 | 2 | A.    Yes, sir. |
| 13:40:39 | 3 | Q.    And that was about 11:00 a.m.? |
| 13:40:41 | 4 | A.    Between 11:00 and 12:00. |
| 13:40:43 | 5 | Q.    And the weather that day, do you remember? |
| 13:40:45 | 6 | A.    Pleasant. |
| 13:40:46 | 7 | Q.    Pleasant, wasn't it? |
| 13:40:47 | 8 | A.    A nice summer day. |
| 13:40:48 | 9 | Q.    Not windy? |
| 13:40:49 | 10 | A.    Not windy. |
| 13:40:56 | 11 | Q.    And the bridge was pretty empty when you crossed it; |
| 13:40:58 | 12 | right? |
| 13:40:59 | 13 | A.    It -- we had a clear crossing. |
| 13:41:01 | 14 | Q.    You just went right on by; right? |
| 13:41:04 | 15 | A.    Yes, uh-huh. |
| 13:41:04 | 16 | Q.    And just off to your right, as you went by, you saw this |
| 13:41:08 | 17 | barge? |
| 13:41:08 | 18 | A.    Sitting there. |
| 13:41:08 | 19 | Q.    Right.  You didn't stop, did you? |
| 13:41:11 | 20 | A.    No. |
| 13:41:11 | 21 | Q.    You went right on by? |
| 13:41:12 | 22 | A.    That's right. |
| 13:41:13 | 23 | Q.    Did Jennifer see it? |
| 13:41:15 | 24 | A.    Jennifer saw it too. |
| 13:41:17 | 25 | Q.    Did you come back to take a look or did you drive on off |

| | | |
|---|---|---|
| 13:41:20 | 1 | to Pensacola? |
| 13:41:22 | 2 | **A.**   Kept going to Pensacola, yeah.  We got out of the city. |
| 13:41:25 | 3 | **Q.**   So it's fair to say, isn't it, with the bridge empty and |
| 13:41:29 | 4 | you wanting to evacuate, what you did was cross the North |
| 13:41:32 | 5 | Claiborne Avenue bridge, looked off to your right and saw this |
| 13:41:36 | 6 | barge, and kept on going? |
| 13:41:37 | 7 | **A.**   Yes, sir. |
| 13:41:38 | 8 | **Q.**   So you saw it for a couple of seconds; right? |
| 13:41:41 | 9 | **A.**   Yeah. |
| 13:41:42 | 10 | **Q.**   All right. |
| 13:41:42 | 11 | **A.**   You couldn't miss it. |
| 13:41:43 | 12 | **Q.**   All right.  You didn't see any numbers, any markings, any |
| 13:41:54 | 13 | identification on this barge, did you? |
| 13:41:56 | 14 | **A.**   I'm looking down at it.  No, sir. |
| 13:41:58 | 15 | **Q.**   Did you see any piping? |
| 13:41:59 | 16 | **A.**   No. |
| 13:41:59 | 17 | **Q.**   Any red flags on it? |
| 13:42:01 | 18 | **A.**   No, sir. |
| 13:42:03 | 19 | **Q.**   Now, the barge was not in the middle of the canal, was it? |
| 13:42:06 | 20 | **A.**   No, sir. |
| 13:42:07 | 21 | **Q.**   In fact, it was located right next to the wall when you |
| 13:42:10 | 22 | saw it about a car length away that you measured -- |
| 13:42:15 | 23 | **A.**   Yeah. |
| 13:42:15 | 24 | **Q.**   -- by your Grand Am; right? |
| 13:42:18 | 25 | **A.**   Not as far as -- I have a small Grand Am.  Not that far. |

382

| | | |
|---|---|---|
| 13:42:23 | 1 | **Q.** Okay. But isn't that right? To the best of your |
| 13:42:25 | 2 | calculation, what you remember seeing was that barge within one |
| 13:42:28 | 3 | car length of the wall? |
| 13:42:31 | 4 | **A.** I wouldn't say that, because you could see the water, then |
| 13:42:35 | 5 | you seen the wall, and the barge was there. I wouldn't say a |
| 13:42:40 | 6 | whole car length. |
| 13:42:41 | 7 | **Q.** So less than a car length? |
| 13:42:43 | 8 | **A.** Yeah. |
| 13:42:44 | 9 | **Q.** It was closer than that? |
| 13:42:45 | 10 | **A.** Yeah. |
| 13:42:45 | 11 | **Q.** Okay. So nearly touching the wall. You could still see |
| 13:42:50 | 12 | the water, but it was right up to the wall? |
| 13:42:52 | 13 | **A.** No, it was not. |
| 13:42:53 | 14 | **Q.** It was one car length or less from the wall? |
| 13:42:55 | 15 | **A.** A car length -- less than a car length. |
| 13:42:58 | 16 | **Q.** Okay. |
| 13:42:59 | 17 | **A.** All right. |
| 13:42:59 | 18 | **Q.** I just wanted to make sure. |
| 13:43:03 | 19 | And do you know what those mooring pilings are, |
| 13:43:09 | 20 | mooring buoys are, in the middle of the river? |
| 13:43:13 | 21 | **A.** Yes. I've seen barges attached there. |
| 13:43:13 | 22 | **Q.** And barges go there all the time, don't they? |
| 13:43:15 | 23 | **A.** Yes, sir. |
| 13:43:15 | 24 | **Q.** It's pretty common. You've seen it, having been a Ninth |
| 13:43:18 | 25 | Ward resident, quite a bit. That's where the tugs come and tie |

| | | |
|---|---|---|
| 13:43:23 | 1 | up to wait for the locks? |
| 13:43:24 | 2 | **A.**  Uh-huh. |
| 13:43:24 | 3 | **Q.**  Okay. |
| 13:43:25 | 4 | THE COURT:  You have to say yes or no, ma'am. |
| 13:43:29 | 5 | Was that a yes to Mr. Walker's question? |
| 13:43:33 | 6 | THE WITNESS:  Yes. |
| 13:43:33 | 7 | THE COURT:  Okay.  Thank you. |
| 13:43:33 | 8 | MR. WALKER:  Thank you, Your Honor. |
| 13:43:34 | 9 | BY MR. WALKER: |
| 13:43:34 | 10 | **Q.**  And the barge as you saw it angled, looked to you like it |
| 13:43:37 | 11 | might be tied to one of those mooring buoys; right? |
| 13:43:43 | 12 | **A.**  Well, I saw it sitting there.  And normally you would see |
| 13:43:46 | 13 | the barges connect to these things, but I'm going across, I |
| 13:43:49 | 14 | just saw the barge, that's it. |
| 13:43:50 | 15 | **Q.**  Right.  You're going so fast, you didn't see the ropes |
| 13:43:53 | 16 | that usually -- |
| 13:43:53 | 17 | **A.**  I wasn't going fast. |
| 13:43:55 | 18 | **Q.**  I didn't mean you were speeding.  Of course not.  You were |
| 13:44:00 | 19 | just crossing and you didn't pay any attention to the ropes or |
| 13:44:02 | 20 | anything like that? |
| 13:44:03 | 21 | **A.**  No, sir.  Just had my eye on the barge. |
| 13:44:04 | 22 | **Q.**  Right.  And you just saw it at that mooring buoy where you |
| 13:44:07 | 23 | would normally see it? |
| 13:44:09 | 24 | **A.**  Yes, sir. |
| 13:44:09 | 25 | **Q.**  Okay. |

384

13:44:38    1              THE COURT:  Just one second.  I'm sorry to interrupt

13:44:38    2    you.

13:44:38    3                         (OFF THE RECORD)

13:44:39    4              THE WITNESS:  Go ahead.

13:44:42    5              MR. WALKER:  Thank you, Judge.

13:44:44    6              THE COURT:  This is a systems issue --

13:44:47    7              MR. WALKER:  We've had some of those.

13:44:50    8              THE COURT:  -- that my Alabama friend and I've

13:44:53    9    discussed.

13:44:56   10              MR. WALKER:  I'm happy to take a break, Your Honor.

13:44:59   11              THE COURT:  No, no.  That's okay.

13:45:02   12    BY MR. WALKER:

13:45:03   13    Q.   And Ms. LeBlanc, when you were telling the judge how close

13:45:06   14    the barge was, this car length, the water that you described

13:45:11   15    earlier, it was sort of halfway up the wall; is what you said?

13:45:14   16    A.   I'd say about halfway up that wall.

13:45:18   17    Q.   Okay.  Now, you don't know what happened to that barge

13:45:29   18    after you drove off to Pensacola, do you?  You never saw it

13:45:33   19    that day?

13:45:34   20    A.   Not that day.

13:45:34   21    Q.   Okay.  You don't know if the tug that left it there came

13:45:38   22    and picked it up that afternoon, do you?

13:45:40   23    A.   No.  I was gone.

13:45:57   24              MR. WALKER:  Your Honor, I think that's all I have

13:45:59   25    for Ms. LeBlanc.  Thank you very much.

| | | |
|---|---|---|
| 13:46:02 | 1 | **THE COURT:**  All right.  Thank you, sir. |
| 13:46:03 | 2 | Any redirect? |
| 13:46:04 | 3 | **MR. BEST:**  Just very briefly. |
| 13:46:05 | 4 | **REDIRECT EXAMINATION** |
| 13:46:05 | 5 | BY MR. BEST: |
| 13:46:06 | 6 | Q.   Counsel asked you about your eyes.  Just for completeness, |
| 13:46:09 | 7 | that Sunday when you were going over the bridge with your |
| 13:46:12 | 8 | family, what was the weather like that Sunday morning as you |
| 13:46:15 | 9 | crossed the bridge? |
| 13:46:16 | 10 | A.   It was pleasant. |
| 13:46:17 | 11 | Q.   And what about sunshine, clouds, rain? |
| 13:46:20 | 12 | A.   No, there was no clouds, no rain.  It was a summer's day. |
| 13:46:24 | 13 | Q.   Sunny day?  Was it a sunny day as well? |
| 13:46:27 | 14 | A.   Yes, sunny day, uh-huh. |
| 13:46:28 | 15 | Q.   Did you have any trouble seeing this barge? |
| 13:46:30 | 16 | A.   No, sir. |
| 13:46:32 | 17 | Q.   Did -- did you see the entirety of this barge, that is |
| 13:46:35 | 18 | from one end to the other and side to side? |
| 13:46:38 | 19 | A.   I saw the whole barge sitting there. |
| 13:46:40 | 20 | Q.   And when you saw the whole barge sitting there, did you |
| 13:46:44 | 21 | see any other vessels moving around in the waterway at all? |
| 13:46:48 | 22 | A.   No, sir. |
| 13:46:51 | 23 | Q.   And I take it you don't know what time the waterway was |
| 13:46:54 | 24 | closed or the locks were closed to traffic? |
| 13:46:56 | 25 | A.   The locks? |

```
13:46:57   1    Q.    Yeah.
13:46:57   2          You don't know what time they closed the locks?
13:47:00   3    A.    No, sir, I don't.
13:47:01   4               MR. BEST:  Thank you, ma'am.
13:47:02   5               THE COURT:  Thank you, ma'am.  You may step down.
13:47:04   6    You're released and thank you very much.
13:47:06   7               THE WITNESS:  You're welcome, sir.
13:47:11   8                       (OFF THE RECORD)
13:48:28   9               MR. BEST:  Your Honor, our next witness is
13:48:30  10    approaching, Frazier Tompkins, III.
13:48:38  11               THE COURT:  Yes.
13:48:38  12               (WHEREUPON, Frazier Tompkins, III, having been duly
13:48:38  13    sworn, testified as follows.)
13:49:44  14               THE DEPUTY CLERK:  Please state your full name and
13:49:44  15    correct spelling for the record.
13:50:00  16               THE WITNESS:  Frazier Tompkins.
13:50:04  17               THE DEPUTY CLERK:  I need you to speak into the
13:50:06  18    microphone.  Could you move it a little bit?
13:50:08  19               THE WITNESS:  Frazier Tompkins.
13:50:10  20               THE COURT:  Perfect.  Do you want to spell it, sir,
13:50:12  21    just to make sure that we get your name right for posterity.
13:50:15  22               THE WITNESS:  Frazier, F-R-A-Z-I-E-R, Tompkins,
13:50:19  23    T-O-M-P-K-I-N-S.
13:50:21  24               THE COURT:  Thank you.
13:50:25  25               Mr. Walker, is the microphone there because he's
```

```
13:50:28   1   speaking --
13:50:28   2          THE DEPUTY CLERK:  It sounds like it's --
13:50:29   3          MR. WALKER:  I think he just has a very deep and
13:50:31   4   quiet voice, Your Honor.
13:50:33   5          THE COURT:  I don't know.  Check that mic there,
13:50:36   6   Sheena.
13:50:48   7          MR. WALKER:  It doesn't sound like the system is on,
13:50:52   8   Your Honor.
13:50:53   9          THE COURT:  Oh, that's because the judge turned it
13:50:55  10   off.  The judge is, unfortunately, all too fallible himself.
13:50:58  11          Go ahead.
13:50:59  12                       DIRECT EXAMINATION
13:50:59  13   BY MR. BEST:
13:51:00  14   Q.  Mr. Tompkins, as I understand it, it is Frazier Tompkins,
13:51:05  15   III?
13:51:05  16   A.  Correct.
13:51:05  17   Q.  And your address, sir?
13:51:06  18   A.  1310 Tricou, T-R-I-C-O-U, Street.
13:51:10  19   Q.  Where is that located?
13:51:11  20   A.  The Lower Ninth Ward.
13:51:12  21   Q.  How long have you lived there?
13:51:13  22   A.  Thirty-one years.
13:51:15  23   Q.  And did you -- obviously you lived there before Hurricane
13:51:18  24   Katrina?
13:51:19  25   A.  Correct.
```

| | | |
|---|---|---|
| 13:51:20 | 1 | **Q.**  All right.  Are you employed? |
| 13:51:22 | 2 | **A.**  Yes, I am. |
| 13:51:23 | 3 | **Q.**  What do you do? |
| 13:51:24 | 4 | **A.**  Truck driver. |
| 13:51:26 | 5 | **Q.**  And were you employed back in -- like August of 2005? |
| 13:51:31 | 6 | **A.**  Yes, sir. |
| 13:51:32 | 7 | **Q.**  What did you do then? |
| 13:51:34 | 8 | **A.**  Truck driver. |
| 13:51:34 | 9 | **Q.**  And what does it mean being a truck driver?  What did -- |
| 13:51:38 | 10 | **A.**  I'm an owner/operator. |
| 13:51:40 | 11 | **Q.**  Owner/operator.  Of what? |
| 13:51:41 | 12 | **A.**  A dump truck. |
| 13:51:43 | 13 | **Q.**  And at that time, before the storm, did you have just a |
| 13:51:45 | 14 | single dump truck? |
| 13:51:47 | 15 | **A.**  No, I had several. |
| 13:51:48 | 16 | **Q.**  And so in addition to driving your own truck, did you have |
| 13:51:51 | 17 | other people that you would hire -- |
| 13:51:53 | 18 | **A.**  Yes, I had other employees. |
| 13:51:54 | 19 | **Q.**  Okay.  Just to let you know, we can't talk at the same |
| 13:51:57 | 20 | time because it would be difficult for our court reporter.  And |
| 13:52:00 | 21 | if and when you wish to answer a question with a yes or no, |
| 13:52:03 | 22 | please say the word and don't just nod your head because we |
| 13:52:06 | 23 | want to get it down. |
| 13:52:08 | 24 | **THE COURT:**  Thank you, Mr. Best. |
| 13:52:15 | 25 | **MR. BEST:**  If the defendants would be so kind as to |

13:52:17  1  have their tech operator call up DX-337, Exhibit 1, which is

13:52:24  2  the map that this witness used at the time of his deposition,

13:52:26  3  I'd be most appreciative.

13:52:29  4          **THE COURT:**  Thank you, defendants -- or defendant.

13:52:42  5  **BY MR. BEST:**

13:52:42  6  **Q.**   And you, sir, before you you'll see you have a screen

13:52:44  7  there with this same map that's close up that you can look at.

13:52:47  8  And up in the corner, there's a box you'll see that says,

13:52:54  9  "2143 Tricou Street."

13:52:58  10          That's your address?

13:53:00  11 **A.**   No, it isn't.

13:53:01  12 **Q.**   What was your number on Tricou Street?

13:53:07  13 **A.**   1310.

13:53:07  14          **MR. BEST:**  Okay.  Now, I remember.  I'm slow,

13:53:08  15 Your Honor.  We used this at the deposition, but it was not

13:53:11  16 originally his.

13:53:12  17 **BY MR. BEST:**

13:53:13  18 **Q.**   So 1310 -- Tricou Street runs which direction?

13:53:15  19 **A.**   It runs from the river to the lake.

13:53:18  20 **Q.**   Okay.  So we don't see the name on the map anywhere, but

13:53:22  21 if we go to the bottom of where that point is, that's Tricou

13:53:25  22 Street and we can follow it down to the river.

13:53:36  23          Well, let me ask it this way:  Do you also see

13:53:38  24 there's an X marked at 1310 Tricou Street?  Do you see we've

13:53:41  25 got the address written down at the paper with a line and the X

| | | |
|---|---|---|
| 13:53:45 | 1 | marked? |
| 13:53:45 | 2 | **A.**   Yes, I see it. |
| 13:53:47 | 3 | **Q.**   That's your home? |
| 13:53:47 | 4 | **A.**   Yes. |
| 13:53:48 | 5 | **Q.**   Okay.  And you lived at that address for many years prior |
| 13:53:55 | 6 | to the storm? |
| 13:53:56 | 7 | **A.**   Yes, sir. |
| 13:53:56 | 8 | **Q.**   Who lived there with you? |
| 13:53:59 | 9 | **A.**   Well, no one lived with me at the time. |
| 13:54:01 | 10 | **Q.**   At the time.  All right. |
| 13:54:05 | 11 | When did you last work before the storm?  Do you |
| 13:54:08 | 12 | remember your last workday? |
| 13:54:11 | 13 | **A.**   It must have been Friday before the storm. |
| 13:54:14 | 14 | **Q.**   All right.  And did you monitor the approach of the storm |
| 13:54:17 | 15 | Friday, Saturday and Sunday? |
| 13:54:19 | 16 | **A.**   Yes, I did. |
| 13:54:19 | 17 | **Q.**   And what decisions -- what did you decide to do about the |
| 13:54:23 | 18 | storm? |
| 13:54:24 | 19 | **A.**   Well, normally, what we do -- I would move my vehicles -- |
| 13:54:28 | 20 | some of my vehicles out of harm's way. |
| 13:54:33 | 21 | **Q.**   Move them -- where did you normally keep your vehicles? |
| 13:54:37 | 22 | **A.**   At my house. |
| 13:54:38 | 23 | **Q.**   Okay.  And so you made a plan to move your vehicles |
| 13:54:41 | 24 | somewhere else? |
| 13:54:42 | 25 | **A.**   Yes, sir. |

13:54:43  1    Q.   And for what purpose?

13:54:45  2    A.   In case water come.

13:54:47  3    Q.   Okay.  Is that something that you've done before for

13:54:52  4    storms?

13:54:53  5    A.   Yes, sir.

13:54:53  6    Q.   And how many vehicles did you have to move?

13:55:00  7    A.   I moved three vehicles.

13:55:02  8    Q.   And when did you do that?

13:55:07  9    A.   It must have been Saturday morning.

13:55:11  10   Q.   And did you do that alone or did you have help to do that?

13:55:15  11   A.   No, me and a friend of mine, we moved them together.

13:55:18  12   Q.   All right.  And then where did you stay Saturday night?

13:55:21  13   A.   At my home.

13:55:21  14   Q.   And what did you do on Sunday?

13:55:24  15   A.   Sunday morning I got up to go to church.

13:55:29  16   Q.   Okay.  I gather you had made a decision not to evacuate.

13:55:37  17   A.   Yes.

13:55:38  18   Q.   Okay.  Had you stayed through hurricanes before in the

13:55:40  19   Ninth Ward?

13:55:41  20   A.   Yes, sir.

13:55:41  21   Q.   Okay.  And Sunday morning, you say you got up to go to

13:55:44  22   church?

13:55:45  23   A.   Yes, sir.

13:55:45  24   Q.   All right.  What time did you leave your home?

13:55:50  25   A.   It must have been about 9:30, around 10:00.

13:55:54  1   **Q.**   And what time did your church usually start?

13:55:58  2   **A.**   I think about 10:00.

13:55:59  3   **Q.**   And you were dressed for church?

13:56:01  4   **A.**   Yes, I was.

13:56:02  5   **Q.**   All right.  Now, we also have a red dot on this map with

13:56:05  6   "church" written in.  And I believe you gave us that as an

13:56:09  7   indication, at the time of your deposition, as to where the

13:56:12  8   church you were going to was located.  Do you remember that?

13:56:15  9   **A.**   Yes, sir.

13:56:15  10  **Q.**   Is that an accurate representation of where the church you

13:56:18  11  were going to was located?

13:56:20  12  **A.**   Yes, sir.

13:56:20  13  **Q.**   What was the name of your church?

13:56:24  14  **A.**   Third Church of God and Christ.

13:56:27  15  **Q.**   I'm sorry.  Third Church of?

13:56:28  16  **A.**   God and Christ.

13:56:29  17  **Q.**   God and Christ.

13:56:30  18          How long had you been a member of that church?

13:56:31  19  **A.**   All my life.

13:56:32  20  **Q.**   And what did you do with respect to that church?  Were you

13:56:37  21  just somebody that went to church on Sunday, or did you have

13:56:39  22  other duties?

13:56:40  23  **A.**   I had other duties.

13:56:41  24  **Q.**   What were your other duties?

13:56:43  25  **A.**   One was I was assistant chairman of the finance board.

| | | |
|---|---|---|
| 13:56:47 | 1 | Another was I was a choir director.  I was a district choir |
| 13:56:51 | 2 | president at the church.  I was the maintenance man.  Whatever |
| 13:56:59 | 3 | you call -- I wore many hats. |
| 13:57:02 | 4 | **Q.**   You did it all? |
| 13:57:02 | 5 | **A.**   Yes, sir. |
| 13:57:02 | 6 | **Q.**   So when you went to go to church that Sunday morning, it |
| 13:57:05 | 7 | was to do more than just go to church for Sunday worship? |
| 13:57:07 | 8 | **A.**   Yes, sir. |
| 13:57:08 | 9 | **Q.**   It was to do all of those things that you ordinarily do? |
| 13:57:11 | 10 | **A.**   Yes, sir. |
| 13:57:11 | 11 | **Q.**   Had you had any communications from anybody before that |
| 13:57:13 | 12 | Sunday morning about whether or not services would be held? |
| 13:57:16 | 13 | **A.**   No, I didn't. |
| 13:57:17 | 14 | **Q.**   Okay.  So you got up and you left your house.  And about |
| 13:57:20 | 15 | how long did it take you to get from your house to the church? |
| 13:57:23 | 16 | **A.**   About three minutes. |
| 13:57:24 | 17 | **Q.**   Did you drive or did you walk? |
| 13:57:26 | 18 | **A.**   I drove. |
| 13:57:26 | 19 | **Q.**   And what did you drive? |
| 13:57:28 | 20 | **A.**   A van. |
| 13:57:29 | 21 | **Q.**   All right.  And what did you find when you got to the |
| 13:57:33 | 22 | church? |
| 13:57:33 | 23 | **A.**   I found the doors were locked. |
| 13:57:35 | 24 | **Q.**   And did you -- what did you do then? |
| 13:57:37 | 25 | **A.**   I sat and waited. |

13:57:39   1   **Q.**   For how long?

13:57:42   2   **A.**   I sat about 15, 20 minutes.

13:57:45   3   **Q.**   All right.  So by the time you left the church -- and the

13:57:47   4   services normally would have started at 10:00?

13:57:50   5   **A.**   Yes, sir.

13:57:50   6   **Q.**   So it's about 10:15 or 10:20 when you gave up?

13:57:54   7   **A.**   Yes, sir.

13:57:55   8   **Q.**   Because no one else arrived?

13:57:57   9   **A.**   No one else arrived.

13:57:58   10   **Q.**   And you left.  And where did you go after that?

13:58:00   11   **A.**   I went toward Claiborne.

13:58:02   12   **Q.**   And where were you headed?

13:58:03   13   **A.**   I was going to go check the -- I had a problem with

13:58:06   14   checking the water level at the bridge.

13:58:10   15   **Q.**   Meaning the water level in the Industrial Canal?

13:58:12   16   **A.**   Correct.

13:58:13   17   **Q.**   You just wanted to go take a look-see?

13:58:17   18   **A.**   That's what I did.

13:58:17   19   **Q.**   Okay.  And was anybody with you?

13:58:19   20   **A.**   No, sir.

13:58:19   21   **Q.**   And so you left the church and you turned right on

13:58:22   22   Claiborne Avenue and went across the bridge over the Industrial

13:58:24   23   Canal?

13:58:25   24   **A.**   I turned left.

13:58:26   25           **THE COURT:**  Left.

13:58:26   1   BY MR. BEST:

13:58:27   2   Q.   I'm sorry, left.  And I'm looking right at the map.

13:58:33   3        MR. BEST:  Thank you both for correcting me.

13:58:34   4   BY MR. BEST:

13:58:35   5   Q.   And what do you remember about your trip over that bridge?

13:58:37   6   A.   Well, as I approached the bridge, I just went up normally

13:58:40   7   and I looked over to see the water level.  And I seen there

13:58:44   8   wasn't that much water in there at that time, but I seen the

13:58:48   9   barge sitting there.

13:58:49   10  Q.   Describe the barge to us.

13:58:52   11  A.   Pardon?

13:58:53   12  Q.   Describe the barge to us.

13:58:54   13  A.   It was just a large barge sitting there.

13:58:57   14  Q.   And somebody -- have you seen barges in the Industrial

13:59:01   15  Canal before during the years you've lived in the neighborhood?

13:59:05   16  A.   Yes.

13:59:05   17  Q.   Okay.  I guess what we'd kind of like to know is if you

13:59:08   18  remember anything about the shape or the color or the way this

13:59:11   19  thing looked.

13:59:12   20  A.   I don't remember the shape or color.  It was a big barge,

13:59:17   21  that's all.  I just noticed a barge.

13:59:19   22  Q.   Was there anything that stands out in your mind about it

13:59:22   23  being markedly different from other barges you saw routinely in

13:59:27   24  that canal?

13:59:27   25  A.   Not -- not really.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

13:59:28  1   Q.   Okay.  Could you see inside the hull of the barge or not?

13:59:31  2   A.   I don't think I could see inside the hull.

13:59:33  3   Q.   Meaning it might have been a covered barge?

13:59:36  4   A.   It may have been.

13:59:37  5   Q.   And you don't remember anything as we sit here today about

13:59:40  6   the colors of whatever you saw?

13:59:42  7   A.   No, sir.

13:59:44  8   Q.   All right.  Now, as you're crossing the bridge, you're

13:59:50  9   looking and you're seeing this.  This is on your first crossing

13:59:53  10   over the bridge?

13:59:54  11   A.   Yes, sir.

13:59:54  12   Q.   So the barge is to your right?

13:59:58  13   A.   Yes, sir.

13:59:58  14   Q.   And you can see it over the bridge through the passenger

14:00:00  15   window?

14:00:01  16   A.   Yes, sir.

14:00:01  17   Q.   All right.  Could you see the whole barge or was part of

14:00:03  18   it under the bridge?

14:00:05  19   A.   I seen the whole barge.

14:00:06  20   Q.   The whole barge.

14:00:06  21        From one end to the other?

14:00:09  22   A.   Yes, sir.

14:00:09  23   Q.   Was it a single barge or more than one barge?

14:00:11  24   A.   One barge.

14:00:12  25   Q.   One barge.

| | | |
|---|---|---|
| 14:00:13 | 1 | And how was it situated or positioned in the waterway |
| 14:00:16 | 2 | as you saw it from your vehicle window? |
| 14:00:20 | 3 | A.   It was on a slight angle toward the levee. |
| 14:00:23 | 4 | Q.   Meaning one end of it was closer to the levee than the |
| 14:00:26 | 5 | other? |
| 14:00:26 | 6 | A.   Yes, it was. |
| 14:00:27 | 7 | Q.   Which levee are we talking about? |
| 14:00:30 | 8 | A.   The Chalmette side of the canal. |
| 14:00:32 | 9 | Q.   The Chalmette -- the east side and the Lower Ninth Ward |
| 14:00:34 | 10 | side? |
| 14:00:34 | 11 | A.   Yes, sir. |
| 14:00:35 | 12 | Q.   So one end of it was closer to that floodwall? |
| 14:00:37 | 13 | A.   Yes, sir. |
| 14:00:38 | 14 | Q.   And was it the end closest to you or the end furthest away |
| 14:00:44 | 15 | from you that was closest to the floodwall? |
| 14:00:46 | 16 | A.   The end closest -- say it again. |
| 14:00:49 | 17 | Q.   I'll ask it again. |
| 14:00:50 | 18 | You said one end was closer to the floodwall than the |
| 14:00:53 | 19 | other.  So I want to know if the end that was closest to the |
| 14:00:55 | 20 | floodwall was the end of it away from you or the end closest to |
| 14:00:58 | 21 | you. |
| 14:00:59 | 22 | A.   The end that was away from me. |
| 14:01:01 | 23 | Q.   All right.  And the end that was closer to the floodwall, |
| 14:01:07 | 24 | can you give us an estimate of its distance from the floodwall? |
| 14:01:12 | 25 | A.   It had -- the water hadn't really risen in there.  It was |

398

14:01:17  1   just sitting in there, in the water, near a buoy or whatever it
14:01:21  2   was.  That -- it was just sitting there --
14:01:22  3   Q.   The canal in that area has -- you said "near a buoy."
14:01:27  4   Tell the judge about that.  What kind of buoy are you talking
14:01:31  5   about?
14:01:31  6   A.   Well, it's -- I think it was just something that they put
14:01:33  7   there for the boats to tie down before they went in the locks.
14:01:37  8   Because we had an accident before down there.  And what they
14:01:39  9   would do is they would park there before they move through the
14:01:43  10  locks and moor up against there.
14:01:45  11  Q.   So you called it a buoy, but --
14:01:46  12  A.   Yes.
14:01:46  13  Q.   -- it's something that boats moored to?
14:01:48  14  A.   Correct.  That's what I'm talking about.
14:01:50  15  Q.   What was it made of?
14:01:52  16  A.   It looked like a big cement pillar.
14:01:57  17  Q.   Big cement pillar sticking up out of the water?
14:02:00  18  A.   Yes, sir.
14:02:00  19  Q.   And you've seen barges tied to it in the past before?
14:02:02  20  A.   I've seen them there before, yes.
14:02:05  21  Q.   Okay.  Could you tell if this one was tied to the cement
14:02:07  22  column or not?
14:02:09  23  A.   No, I couldn't tell you.
14:02:10  24  Q.   Okay.  But was there any other vessel in attendance of the
14:02:15  25  barge or with the barge?

14:02:15  1   A.   Not any other.

14:02:15  2   Q.   Did you --

14:02:16  3        THE COURT:  One question.

14:02:17  4             When you've seen barges there in the past, were

14:02:19  5   the barges alone or did they have a tug with them?

14:02:25  6        THE WITNESS:  Most of the time they have a tug with

14:02:26  7   them.

14:02:27  8        THE COURT:  But you had seen them alone as well?

14:02:29  9        THE WITNESS:  Very seldom do you see them alone.

14:02:31  10       THE COURT:  Okay.

14:02:31  11  BY MR. BEST:

14:02:32  12  Q.   Did you see any tug or towboat anywhere in the canal?

14:02:36  13  A.   None at all.

14:02:36  14  Q.   Did you see any other marine traffic between the bridge

14:02:44  15  you were on and the Florida Avenue bridge?

14:02:47  16  A.   None at all.

14:02:48  17  Q.   And then what did you do after you saw this?

14:02:51  18  A.   I got disgusted.

14:02:56  19  Q.   Why was that?

14:02:56  20  A.   I was wondering why would a barge be in there when we have

14:03:01  21  a storm coming.  And that really got on my nerves.  That's why

14:03:04  22  I noticed.

14:03:05  23  Q.   All right.  And then what did you do?

14:03:06  24  A.   I drove up Claiborne to, maybe, Elysian Fields and turned

14:03:09  25  around and came back home.

14:03:10  1   **Q.**   Okay.  Now, when you came back, did you come back -- and
14:03:15  2   what direction did you take to get home again?
14:03:17  3   **A.**   I went to Elysian Fields and made a U-turn and just came
14:03:20  4   back home.
14:03:20  5   **Q.**   Over the same bridge?
14:03:21  6   **A.**   Over the same bridge.
14:03:22  7   **Q.**   Okay.  Did you look out when you came back?
14:03:25  8   **A.**   No, I didn't look out.
14:03:26  9   **Q.**   So you made no observation one way or the other about this
14:03:28  10  barge on the return trip?
14:03:29  11  **A.**   I didn't.
14:03:30  12  **Q.**   But if you're coming back on the other side of the bridge,
14:03:32  13  between you and the area where the barge was would be the
14:03:36  14  structure of the bridge, the other lanes of traffic going the
14:03:38  15  other direction; is that fair?
14:03:40  16  **A.**   Yes.
14:03:41  17  **Q.**   Would it have been more difficult to see from that side?
14:03:44  18  **A.**   It would have to me.
14:03:46  19  **Q.**   I think I neglected to ask you:  When you were crossing
14:03:50  20  the first time and you saw the barge and you were able to see
14:03:53  21  the whole barge, about how far from the bridge up the waterway
14:03:57  22  was the closest end of the barge to you?
14:04:00  23  **A.**   I think it was like between Derbigny and Roman Street,
14:04:04  24  somewhere in that area.
14:04:09  25  **Q.**   And I may or may not have asked you, how far from the

14:04:12  1    floodwall was that nearest point that was angled towards the
14:04:15  2    floodwall?
14:04:20  3    A.    Approximately about 50 feet, I think.  Something like
14:04:22  4    that.
14:04:23  5    Q.    50 feet.  Okay.
14:04:24  6          Now, after you returned home, what did you do?
14:04:27  7    A.    I really didn't do too much of nothing.  Just sit and
14:04:31  8    wait.
14:04:31  9    Q.    You stayed there for the storm?
14:04:32  10   A.    Yes, sir.
14:04:33  11   Q.    And tell us about the storm.  Were you able to stay in
14:04:39  12   your home during the entirety of the storm or not?
14:04:41  13   A.    No, I wasn't.
14:04:43  14   Q.    What happened?
14:04:43  15   A.    Well, basically, I always bring one of my trucks home when
14:04:48  16   a storm comes.  Because, basically, that's how we got out
14:04:53  17   during the storms.  My father had trucks.  So I brought my
14:04:56  18   truck home, and I was putting some -- a tarpaulin in my attic
14:05:01  19   because the water was leaking through my attic.  Then my
14:05:04  20   friend, which is my wife now, she said, "The water's on the
14:05:07  21   street now."
14:05:07  22         I said, "Well, it wasn't out there when I went up
14:05:11  23   there."  So I went out -- I said, "Let me start my truck up in
14:05:14  24   case it's time to move out."
14:05:15  25         And by the time I started the truck up and built the

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

14:05:18  1   air pressure up, the water was coming in my front door.  So I

14:05:22  2   didn't have time to do nothing else but grab her, throw her in

14:05:25  3   the truck and we drove on out.

14:05:27  4   **Q.**   And where did you go?

14:05:28  5   **A.**   We went to her apartment, which was the 500 block of

14:05:33  6   Andry.

14:05:33  7   **Q.**   The 500 block of Andry?

14:05:33  8   **A.**   Yes, sir.

14:05:34  9   **Q.**   Where is that in proximity to, say, to your house in

14:05:37  10  general?

14:05:37  11  **A.**   It's one block before Flood, one block -- two, three

14:05:40  12  blocks on the other side of Caffin.

14:05:43  13  **Q.**   I don't need to go through the whole long story of where

14:05:45  14  you went that day.  Where did you wind up waiting out the rest

14:05:49  15  of the storm?

14:05:50  16  **A.**   Well, after she went in her home to put on dry clothes,

14:05:53  17  because she got wet, I told her, "You need to come on out here

14:05:57  18  because the water's coming down the street."

14:05:59  19            And so we got back in the truck.  And I wanted to

14:06:03  20  turn on Chartres Street, but they had lines -- power lines down

14:06:04  21  and trees down.  So I backed the truck up, which I had the

14:06:05  22  trailer on the back of it.

14:06:06  23  **Q.**   Now, this truck is what kind of truck?

14:06:08  24  **A.**   It's an 18-wheeler dump truck.

14:06:11  25  **Q.**   So you're higher off the ground than a regular --

| 14:06:13 | 1 | **A.** Yes, sir, higher up. |
| 14:06:14 | 2 | **Q.** Thank you. |
| 14:06:15 | 3 | And where did you wind up? |
| 14:06:16 | 4 | **A.** On Alabo Street Wharf.  I stayed on the levee after that. |
| 14:06:19 | 5 | **Q.** Okay.  The levee on the Mississippi River? |
| 14:06:21 | 6 | **A.** Yes, sir. |
| 14:06:22 | 7 | **Q.** All right.  Now, about what time was it when this water |
| 14:06:24 | 8 | started coming into your house and you-all had to get out? |
| 14:06:29 | 9 | **A.** Between 7:30, 8:00, something like that. |
| 14:06:31 | 10 | **Q.** In the morning? |
| 14:06:32 | 11 | **A.** It was in the morning. |
| 14:06:34 | 12 | **Q.** On Monday? |
| 14:06:34 | 13 | **A.** Yes, sir. |
| 14:06:35 | 14 | **Q.** And how fast was the water coming up as you and your -- |
| 14:06:37 | 15 | **A.** Real fast.  Because when I looked outside -- when I went |
| 14:06:40 | 16 | to start my truck up, I had on some short boots.  And the water |
| 14:06:44 | 17 | was not covering my boots; but by the time I built my air |
| 14:06:49 | 18 | pressure up, it was running over my legs and running up into my |
| 14:06:52 | 19 | house. |
| 14:06:52 | 20 | **MR. BEST:** One moment, Your Honor. |
| 14:06:53 | 21 | **THE COURT:** Yes, sir. |
| 14:06:54 | 22 | **MR. BEST:** Tender the witness. |
| 14:07:01 | 23 | Thank you, sir. |
| 14:07:25 | 24 | **THE COURT:** Go ahead, Mr. Walker. |
| 14:07:27 | 25 | **MR. WALKER:** Thank you. |

|          |    |                                                                    |
|----------|----|--------------------------------------------------------------------|
| 14:07:27 | 1  | CROSS-EXAMINATION                                                   |
| 14:07:27 | 2  | BY MR. WALKER:                                                      |
| 14:07:28 | 3  | Q.   Good afternoon, Mr. Tompkins.                                  |
| 14:07:30 | 4  | A.   Good afternoon.                                                |
| 14:07:30 | 5  | Q.   Just to recap a little bit, the weather was very nice, not     |
| 14:07:31 | 6  | windy, a calm, good, sunny day when you crossed the bridge?         |
| 14:07:37 | 7  | A.   Yes, it was nice.                                              |
| 14:07:38 | 8  | Q.   And as you drove, you just glanced over your right             |
| 14:07:41 | 9  | shoulder and kept on driving; right?  You didn't stop?              |
| 14:07:44 | 10 | A.   No, I didn't stop.                                             |
| 14:07:45 | 11 | Q.   Okay.  So it's fair to say that your view of the barge was     |
| 14:07:48 | 12 | a few seconds?                                                      |
| 14:07:49 | 13 | A.   It was a few seconds.                                          |
| 14:07:51 | 14 | Q.   Okay.  And you were actually concentrating on the water        |
| 14:07:54 | 15 | level because that's what interested you; that was your worry,      |
| 14:07:58 | 16 | wasn't it?                                                          |
| 14:07:58 | 17 | A.   Well, my worry was -- yes, correct.                            |
| 14:08:01 | 18 | Q.   And when you drove back, you didn't even look at the           |
| 14:08:04 | 19 | barge?                                                              |
| 14:08:04 | 20 | A.   No, I didn't.                                                  |
| 14:08:11 | 21 | Q.   And in those seconds when you did look at the water level      |
| 14:08:14 | 22 | and the barge as you drove over, you could see that the water       |
| 14:08:18 | 23 | was not up to the wall; right?                                      |
| 14:08:20 | 24 | A.   It wasn't up to the wall at that time.                         |
| 14:08:21 | 25 | Q.   In fact, you could still see dirt and grass?                   |

14:08:28   1   **A.**   Correct.

14:08:28   2   **Q.**   And you couldn't see any -- you didn't see any numbers or

14:08:29   3   markings or identifications on the barge?

14:08:32   4   **A.**   I didn't pay any attention to it.

14:08:34   5   **Q.**   Now, isn't it right that the barge that you saw had a

14:08:37   6   grayish white cover?

14:08:41   7   **A.**   I can't remember.

14:08:43   8   **Q.**   I'd like to show you your deposition, page 81, line 17 to

14:08:48   9   20.

14:08:55  10          I asked you:  "How about any color?"

14:08:59  11          "I can't" -- "I can remember like -- looked like a

14:09:01  12   grayish white looking color, something like that."

14:09:03  13          Does that refresh your memory?

14:09:05  14   **A.**   Yeah, I did see that.  That's what I thought, you know.

14:09:07  15   Like I said, I'm 61 years old and I'm getting older, and I

14:09:11  16   can't remember everything I see.

14:09:12  17   **Q.**   Well, but I also did more than that.  I showed you some

14:09:16  18   photographs, Exhibit 3 to your deposition.  And I asked you, at

14:09:24  19   page 82, lines 12 through 20, and page 83, 22 through 24, if

14:09:30  20   the barge that you looked at, that you identified with that

14:09:34  21   cover, looked like one of these with the white cover.  And you

14:09:37  22   said it did.

14:09:39  23          Do you recall that?

14:09:42  24   **A.**   I guess so.

14:09:44  25   **Q.**   Okay.  Does that refresh your memory more about what the

14:09:48   1   barge looked like and what the colors of the covers were?
14:09:53   2   A.   All I can say is I know it was a colored barge.  The
14:09:56   3   colors -- I can't really remember.  I was trying to remember.
14:10:01   4   Q.   Well, I didn't leave it there either.  I showed you
14:10:04   5   Exhibit 4 to your deposition because I wanted to make sure that
14:10:07   6   we knew what you remembered.  And I'll show you that
14:10:10   7   photograph.
14:10:11   8          And I asked you, at page 82, lines 22 through 25, and
14:10:16   9   page 38, line 1 through 4, if it didn't look like that barge.
14:10:21   10          And you said, yes, it looked like that barge.
14:10:24   11          Do you recall that?
14:10:25   12          MR. BEST:  Objection to the form.  That's actually a
14:10:28   13   misstatement of the testimony.  He said, "It looked somewhat
14:10:32   14   like one of those over there with the cover on it, right, but I
14:10:35   15   don't think it was that long."
14:10:36   16   BY MR. WALKER:
14:10:38   17   Q.   Do you recall that?
14:10:38   18   A.   Yes, I recall that.
14:10:41   19   Q.   Okay.  Now, let's talk about the mooring points, mooring
14:10:54   20   buoys.  You've seen barges tied up there before; right?
14:10:59   21   A.   I've seen them -- I've seen them anchored there before,
14:11:02   22   but they're always -- mostly -- 90 percent of the time, they
14:11:07   23   have a tug with them.
14:11:08   24   Q.   So some 10 percent of the time, they don't have a tug and
14:11:10   25   the barge is there alone; right?

407

| | | |
|---|---|---|
| 14:11:13 | 1 | A.   I've very seldom seen them without a tug. |
| 14:11:16 | 2 | Q.   I understand. |
| 14:11:17 | 3 | And this particular barge, you don't remember seeing |
| 14:11:19 | 4 | any ropes or tie-downs? |
| 14:11:22 | 5 | A.   No, I don't remember. |
| 14:11:23 | 6 | Q.   And you described for Mr. Best the angle that you saw. |
| 14:11:27 | 7 | And I'll show you Deposition Exhibit 6.  And do you recall |
| 14:11:36 | 8 | drawing that at your deposition?  And does that accurately |
| 14:11:40 | 9 | depict what you described here for the judge today? |
| 14:11:43 | 10 | A.   That looked like the angle. |
| 14:11:45 | 11 | Q.   Okay.  And you see it right at that mooring buoy, the tail |
| 14:11:49 | 12 | end? |
| 14:11:50 | 13 | A.   I see that, yes. |
| 14:11:51 | 14 | Q.   Okay.  And, in fact, you corrected the little bigger box I |
| 14:11:55 | 15 | had drawn in the red outline, and you made the black outline to |
| 14:12:01 | 16 | say it ended right there at the buoy.  Do you remember that? |
| 14:12:07 | 17 | A.   I can't say it was at the end of the buoy because I drove |
| 14:12:10 | 18 | straight across the bridge and all I could see was the barge. |
| 14:12:14 | 19 | Q.   To the best of your recollection, as shown in this |
| 14:12:17 | 20 | photograph is the angle and the location of the barge? |
| 14:12:19 | 21 | A.   Correct. |
| 14:12:23 | 22 | Q.   And from the front end to the wall, there were some |
| 14:12:26 | 23 | 50 feet, more or less? |
| 14:12:30 | 24 | A.   More or less. |
| 14:12:39 | 25 | Q.   After you returned, you got busy, you don't know what |

| | | |
|---|---|---|
| 14:12:43 | 1 | happened to that barge, do you? |
| 14:12:44 | 2 | **A.**   No, I don't. |
| 14:12:45 | 3 | **Q.**   You don't know if somebody came to pick it up and took it? |
| 14:12:51 | 4 | **A.**   No.  But I did go across there later that evening and it |
| 14:12:53 | 5 | was still there. |
| 14:12:54 | 6 | **Q.**   And what time was that? |
| 14:12:56 | 7 | **A.**   When I picked my wife -- she was my fiancée.  I picked my |
| 14:12:59 | 8 | wife up to bring her home and we rode across and it was still |
| 14:13:02 | 9 | sitting there. |
| 14:13:02 | 10 | **Q.**   And what time was that? |
| 14:13:04 | 11 | **A.**   Later that evening. |
| 14:13:05 | 12 | **Q.**   After or before 4:00? |
| 14:13:06 | 13 | **A.**   After 4:00, I guess. |
| 14:13:24 | 14 | **Q.**   Well, Mr. Tompkins, wasn't the bridge shut down by the |
| 14:13:27 | 15 | police before 4:00 on Sunday? |
| 14:13:29 | 16 | **A.**   Not that I know of. |
| 14:13:31 | 17 | **Q.**   Do you know of any police that were there that saw this |
| 14:13:35 | 18 | barge? |
| 14:13:36 | 19 | **A.**   Nope.  I don't recall the bridge being shut down at all. |
| 14:13:43 | 20 | **Q.**   Now, that barge that you saw could have been anybody's |
| 14:13:46 | 21 | barge; right? |
| 14:13:47 | 22 | **A.**   Correct. |
| 14:13:48 | 23 | **Q.**   In fact, it could have been a Boh Brothers barge, is what |
| 14:13:51 | 24 | you said previously; right? |
| 14:13:52 | 25 | **A.**   That's what people said, and I went with that. |

14:13:57  1   **Q.**   And after you saw this barge that -- I think you said here

14:14:01  2   you got kind of aggravated about it, you didn't call 911 to

14:14:05  3   report it, did you?

14:14:06  4   **A.**   Nope.

14:14:06  5   **Q.**   You didn't call the Coast Guard?

14:14:08  6   **A.**   Nope.

14:14:08  7   **Q.**   You didn't call the Orleans Police or Jefferson Parish

14:14:15  8   Police Department or anybody, did you?

14:14:16  9   **A.**   No.

14:14:20  10                  **MR. WALKER:**  Thank you, Your Honor.

14:14:21  11                      Thank you, Mr. Tompkins.

14:14:22  12                  **THE COURT:**  Anything, Mr. Best?

14:14:24  13                  **MR. BEST:**  Briefly, Your Honor.  If we could leave

14:14:26  14   that exhibit up for just one moment.

14:14:28  15                  **REDIRECT EXAMINATION**

14:14:28  16   **BY MR. BEST:**

14:14:29  17   **Q.**   Mr. Tompkins, you and counsel --

14:14:31  18                  **THE COURT:**  What exhibit number is that?  Defendant

14:14:33  19   337-12; is that correct?

14:14:37  20                  **MR. BEST:**  That's what I see on the screen.

14:14:38  21                  **THE COURT:**  All right.  Thank you.

14:14:39  22   **BY MR. BEST:**

14:14:40  23   **Q.**   Counsel asked you -- you kept referring to buoys,

14:14:44  24   particularly a buoy at the rear corner of this barge where you

14:14:47  25   drew in the box.

| | | |
|---|---|---|
| 14:14:48 | 1 | **A.** Uh-huh. |
| 14:14:48 | 2 | **Q.** We see a little white circle there.  That's what you're |
| 14:14:52 | 3 | referring to; right? |
| 14:14:53 | 4 | **A.** Yes, sir. |
| 14:14:53 | 5 | **Q.** And that's what you told me was a cement column? |
| 14:14:56 | 6 | **A.** Yes, sir. |
| 14:14:56 | 7 | **Q.** And we see two more in the waterway, one to the north of |
| 14:14:59 | 8 | it and one to the south.  Were those additional mooring |
| 14:15:02 | 9 | columns? |
| 14:15:02 | 10 | **A.** Yes, sir. |
| 14:15:03 | 11 | **Q.** So a buoy to me is something that floats? |
| 14:15:06 | 12 | **A.** Right, I'm sorry. |
| 14:15:06 | 13 | **Q.** But these were fixed as you -- |
| 14:15:08 | 14 | **A.** They're fixed, yeah. |
| 14:15:09 | 15 | **Q.** And you saw it next to -- the back end of it, one corner, |
| 14:15:12 | 16 | next to that column.  Could you tell if it was tied to that |
| 14:15:18 | 17 | column or if it was just resting against that column? |
| 14:15:21 | 18 | **A.** I couldn't tell. |
| 14:15:22 | 19 | **Q.** You didn't know one way or the other. |
| 14:15:24 | 20 | **A.** I didn't know. |
| 14:15:24 | 21 | **Q.** And as it was against that column, how was it riding in |
| 14:15:28 | 22 | the water? |
| 14:15:29 | 23 | **A.** It was just sitting there. |
| 14:15:30 | 24 | **Q.** But what about the elevation of the barge in the water? |
| 14:15:33 | 25 | Did you notice anything about that? |

14:15:35  1   A.   I didn't notice -- to me it was sitting up pretty high, so

14:15:39  2   I don't think it was loaded.

14:15:41  3   Q.   Thank you.

14:15:45  4        And counsel asked you about when you went -- you --

14:15:50  5   I'm sorry, you went across the bridge again at 4:00?

14:15:56  6   A.   Yes, sir.

14:15:57  7   Q.   Going with your lady friend out over the bridge?

14:15:59  8   A.   Yes, sir.

14:16:00  9   Q.   And that's when you saw it was still there?

14:16:02  10  A.   It was still there.

14:16:02  11  Q.   Where did you go after that?

14:16:04  12  A.   To my home.

14:16:04  13  Q.   So it's coming -- coming back across the bridge.

14:16:08  14  A.   No, we went that way.  We looked at the water level again.

14:16:12  15  Q.   Then where did you go after that?

14:16:13  16  A.   Turned around and came back home.

14:16:16  17  Q.   All right.  Do you have any knowledge one way or the other

14:16:21  18  whether the bridge at some point was closed that afternoon?

14:16:23  19  A.   No, I don't have no knowledge of the bridge being closed.

14:16:26  20  Q.   Okay.  And I saw you -- you brought some reading material

14:16:31  21  while you were waiting in the hall.  What was that I saw on

14:16:33  22  your lap?

14:16:34  23  A.   My Bible and a hymnal.

14:16:39  24        MR. BEST:  Thank you, sir.

14:16:39  25        THE COURT:  You can step down, sir.  Thank you very

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| 14:16:42 | 1 | much. |
| 14:16:42 | 2 | THE WITNESS:  Thank you. |
| 14:16:53 | 3 | THE COURT:  Before you call your next witness, just a |
| 14:16:55 | 4 | couple of things that I wanted to talk to the attorneys about. |
| 14:17:07 | 5 | Just to let you know, I've been trying to note |
| 14:17:11 | 6 | it for the record, but I don't always do it, each time you |
| 14:17:14 | 7 | refer to an exhibit, you might state the number so that not |
| 14:17:23 | 8 | only us, because we're following it pretty well, but the poor |
| 14:17:27 | 9 | clerks at the Fifth Circuit would have an opportunity to find |
| 14:17:30 | 10 | it, if necessary. |
| 14:17:32 | 11 | I'm curious, do we have evidence coming as to |
| 14:17:36 | 12 | when the locks were closed to all traffic?  Is it -- |
| 14:17:40 | 13 | MR. BEST:  I think there is a lock log in the bench |
| 14:17:44 | 14 | book of exhibits that shows when the last traffic left and what |
| 14:17:47 | 15 | time -- Mr. Gilbert would know better than me which exhibit it |
| 14:17:51 | 16 | is, but -- |
| 14:17:52 | 17 | THE COURT:  But there is something in the record? |
| 14:17:53 | 18 | MR. BEST:  -- I'm pretty confident that there is a |
| 14:17:55 | 19 | lock log in our bench book. |
| 14:17:57 | 20 | THE COURT:  And is there any evidence in the record, |
| 14:17:59 | 21 | other than testimony, that would show when and if the Claiborne |
| 14:18:02 | 22 | Street bridge was closed? |
| 14:18:04 | 23 | MR. BEST:  There's nothing -- nobody has commented on |
| 14:18:06 | 24 | that other than these two witnesses, who just gave their |
| 14:18:08 | 25 | depositions in April of this year. |

413

| | | |
|---|---|---|
| 14:18:10 | 1 | **THE COURT:**  So we don't have any official record? |
| 14:18:12 | 2 | **MR. BEST:**  No. |
| 14:18:16 | 3 | **MR. SEYMOUR:**  Your Honor, this is Richard Seymour. |
| 14:18:19 | 4 | The exhibit numbers, 24 through 26, I think is the range for |
| 14:18:22 | 5 | the lock transfer logs. |
| 14:18:26 | 6 | **MR. BEST:**  And that's referring to plaintiff |
| 14:18:29 | 7 | exhibits. |
| 14:18:32 | 8 | **THE COURT:**  Okay.  I will certainly look at all of |
| 14:18:35 | 9 | that. |
| 14:18:40 | 10 | All right.  Do we have a witness? |
| 14:18:44 | 11 | **MR. BEST:**  I think we're -- the video deposition is |
| 14:18:46 | 12 | not yet ready.  Is that correct? |
| 14:18:48 | 13 | **MR. SNYDER:**  No, it's not -- |
| 14:18:49 | 14 | **MR. BEST:**  It's not entirely ready.  So our next |
| 14:18:52 | 15 | witness would be Mr. Donald Green, who is one of our experts. |
| 14:18:58 | 16 | **THE COURT:**  Do you want to take a little break before |
| 14:19:00 | 17 | you take him or do you want to take a little break before |
| 14:19:03 | 18 | Villavaso? |
| 14:19:04 | 19 | **MR. BEST:**  I guess we could take a break and check on |
| 14:19:06 | 20 | the status of -- |
| 14:19:06 | 21 | **THE COURT:**  It's only 2:15, but let's take just a |
| 14:19:10 | 22 | ten-minute recess and then we'll come back and see where we |
| 14:19:13 | 23 | are. |
| 14:19:13 | 24 | **MR. BEST:**  Thank you, Your Honor. |
| 14:19:14 | 25 | **THE COURT:**  We'll need 15 minutes because I'm going |

414

14:19:15  1    to install a printer here.

14:19:18  2            THE DEPUTY CLERK:  All rise.

14:19:28  3            (WHEREUPON, the Court took a recess.)

14:29:58  4            THE DEPUTY CLERK:  All rise.

14:46:15  5            Court's in session.  Please be seated.

14:46:23  6            THE COURT:  Yes, sir.

14:46:41  7            MR. BEST:  Just to update you, you asked a question

14:46:44  8    before we retired about our exhibit books and the lock logs.

14:46:47  9            THE COURT:  Yes.

14:46:49  10           MR. GILBERT:  Your Honor, it's Exhibit 24.  It's

14:46:51  11   already in evidence.  This is a log of the lock master showing

14:46:55  12   that the locks closed at 4:00 a.m. on Sunday, about seven hours

14:46:59  13   before the events described by Ms. LeBlanc and Mr. Tompkins.

14:47:09  14           THE COURT:  I mean, this case -- I keep seeing

14:47:14  15   interesting conundrums.  All right.  Thank you.  Meaning that

14:47:19  16   nothing could go out of the canal.

14:47:22  17           MR. BEST:  The locks were closed.

14:47:24  18           THE COURT:  I understand.

14:47:26  19           MR. GILBERT:  As of 4:00 a.m. Sunday morning.

14:47:28  20           THE COURT:  Right.  4:00 a.m. Sunday morning.  And

14:47:30  21   these events they were testifying to occurred subsequent to

14:47:34  22   that.

14:47:35  23           MR. GILBERT:  Correct.

14:47:35  24           THE COURT:  Of course.  I understand.

14:47:41  25           MR. BEST:  The status of the Villavaso video is it

14:47:44  1   can be shown to Your Honor this afternoon, but it would still
14:47:47  2   at this moment require our operator to edit on the fly.
14:47:52  3   Whereas, he has a final copy edited, which can be played
14:47:57  4   straight through, which he expects to have in his hands --
14:48:02  5              Tomorrow?  By what time?
14:48:03  6         MR. SNYDER:  Actually on my system by tomorrow, but
14:48:05  7   I'll hard copy --
14:48:06  8         MR. BEST:  You'll have it on your system to play
14:48:09  9   tomorrow morning when we start court?
14:48:10  10        THE COURT:  Okay.  That's fine.
14:48:12  11        MR. BEST:  So, of course -- or whatever time we get
14:48:15  12   to it.  So we thought Your Honor would prefer to do that rather
14:48:18  13   than have it edited on the fly.
14:48:20  14        THE COURT:  I think so.  That makes sense.
14:48:22  15        MR. BEST:  Okay.  Just wanted to let you know where
14:48:24  16   we are.
14:48:25  17        THE COURT:  Yeah.  And I think counsel for defense
14:48:27  18   would prefer that as well.
14:48:30  19        MR. ALDOCK:  Yes.
14:48:31  20        MR. BEST:  So what we're going to do now is call
14:48:33  21   Dr. Donald Green.
14:48:34  22        (WHEREUPON, **Donald Joseph Green**, having been duly
14:48:34  23   sworn, testified as follows.)
14:48:53  24        THE DEPUTY CLERK:  Please state your full name and
14:48:53  25   correct spelling for the record.

| | | |
|---|---|---|
| 14:49:05 | 1 | **THE WITNESS:**  My name is Donald Joseph Green. |
| 14:49:09 | 2 | D-O-N-A-L-D, J-O-S-E-P-H, Green, G-R-E-E-N. |
| 14:49:22 | 3 | **MR. BEST:**  Your Honor, Mr. Green's report is in |
| 14:49:24 | 4 | evidence as Plaintiffs' Exhibit 386.  The other exhibits in the |
| 14:49:30 | 5 | plaintiffs' bench book pertinent to Mr. Green's testimony |
| 14:49:35 | 6 | run -- correction -- |
| 14:49:37 | 7 | **MR. GILBERT:**  Your Honor, within 386, there is a |
| 14:49:43 | 8 | prior edit of Mr. Green's report that's inadvertently included. |
| 14:49:51 | 9 | It's June 2008.  The correct version is March 11th, 2009. |
| 14:49:56 | 10 | That's attached to his deposition as an exhibit.  We'll use |
| 14:49:59 | 11 | that exhibit to refer to his report today. |
| 14:50:02 | 12 | **THE COURT:**  Mr. Walker, are you straight on that? |
| 14:50:05 | 13 | **MR. WALKER:**  I'm looking at -- I missed the |
| 14:50:06 | 14 | beginning.  So you substituted -- |
| 14:50:07 | 15 | **MR. GILBERT:**  The -- |
| 14:50:08 | 16 | **MR. WALKER:**  You have one report in twice? |
| 14:50:10 | 17 | **MR. GILBERT:**  No.  The June 2008 report is mistakenly |
| 14:50:14 | 18 | in there.  The March 11th, 2009 report is what should be in |
| 14:50:20 | 19 | what I gave you. |
| 14:50:22 | 20 | **MR. WALKER:**  Okay. |
| 14:50:23 | 21 | **MR. GILBERT:**  But it is attached to his deposition, |
| 14:50:24 | 22 | which is also in that exhibit number. |
| 14:50:27 | 23 | **MR. BEST:**  Actually, 387 are the exhibits to the |
| 14:50:32 | 24 | deposition of Mr. Green dated June 25th, 2009, which I |
| 14:50:37 | 25 | understand includes the proper report, March 11th, 2009. |

417

| | | |
|---|---|---|
| 14:50:40 | 1 | MR. GILBERT:  Yes. |
| 14:50:41 | 2 | MR. BEST:  And that's the report we're going to be |
| 14:50:43 | 3 | referring to. |
| 14:50:44 | 4 | THE COURT:  All right. |
| 14:50:46 | 5 | MR. BEST:  But with that exception, the exhibits |
| 14:50:48 | 6 | pertaining to Donald Green run from 386 to 395. |
| 14:50:56 | 7 | THE COURT:  Thank you. |
| 14:50:56 | 8 | MR. WALKER:  Your Honor, before we begin, if I may, I |
| 14:50:59 | 9 | noted that there was a demonstrative exhibit, their exhibit. |
| 14:51:02 | 10 | And we inspected it.  And the first three sections of that |
| 14:51:07 | 11 | exhibit refer to matters that Your Honor struck in Your Honor's |
| 14:51:10 | 12 | order. |
| 14:51:11 | 13 | THE COURT:  I did?  I recall.  I can't see it from |
| 14:51:16 | 14 | here, but I can see USCG and regulation. |
| 14:51:19 | 15 | MR. BEST:  I actually did not plan to use that, Your |
| 14:51:21 | 16 | Honor. |
| 14:51:21 | 17 | THE COURT:  All right.  Thank you, Mr. Best.  That |
| 14:51:23 | 18 | makes it much easier. |
| 14:51:29 | 19 | DIRECT EXAMINATION |
| 14:51:29 | 20 | BY MR. BEST: |
| 14:51:30 | 21 | Q.   What's your business, Mr. Green? |
| 14:51:31 | 22 | A.   I'm the president of Houston Exam-Prep Training Center in |
| 14:51:35 | 23 | Houston, Texas. |
| 14:51:36 | 24 | Q.   And what is the business of that training center? |
| 14:51:39 | 25 | A.   It's a Coast Guard-approved training facility for mariners |

14:51:43   1    seeking Coast Guard credentials.

14:51:46   2    Q.   And what sort of sea -- what sort of credentials do you

14:51:50   3    train them for?

14:51:51   4    A.   Master unlimited, all the way down to including able

14:51:55   5    seamen, as well as mobile offshore drilling unit engineers,

14:52:01   6    unlimited engineers and the like.

14:52:04   7    Q.   And able-bodied seamen are some of the personnel most

14:52:08   8    commonly involved in mooring?

14:52:10   9    A.   Yes, that's correct.

14:52:11   10   Q.   And you're training those people to get what they need to

14:52:14   11   know to get their credentials?

14:52:16   12   A.   Yes.

14:52:17   13   Q.   And do you also train them in mooring?

14:52:19   14   A.   Yes, we do.

14:52:21   15   Q.   What's your educational background?

14:52:22   16   A.   I have an undergraduate degree from Urbana University in

14:52:27   17   business and a master's degree from Pepperdine University in

14:52:30   18   human resource management.

14:52:33   19   Q.   All right.  And the Court has your CV as an attachment to

14:52:38   20   your report, which is attached to your deposition, Exhibit 387.

14:52:42   21   Without going through your CV and recounting every item to the

14:52:48   22   Court, would you tell the Court what in particular of your

14:52:50   23   background qualifies you to address mooring practices and

14:52:53   24   issues in this case and application of the United States Coast

14:52:57   25   Guard regulations from a marine operations standpoint?

419

| | | |
|---|---|---|
| 14:53:00 | 1 | A.   I'm a retired Coast Guard commander.  I served |
| 14:53:04 | 2 | 23 1/2 years with the Coast Guard.  Eight years were at sea.  I |
| 14:53:12 | 3 | served on five different vessels, from deckhand all the way up |
| 14:53:18 | 4 | to including relief master executive officer of Coast Guard |
| 14:53:23 | 5 | cutters. |
| 14:53:24 | 6 | And then after my tour at sea, I was assigned to |
| 14:53:29 | 7 | marine safety.  And I served the remainder of my career in |
| 14:53:33 | 8 | marine safety, including five years here in New Orleans as a |
| 14:53:37 | 9 | Coast Guard inspector, shipyard inspector, as well as an |
| 14:53:41 | 10 | investigator investigating casualties in reference to this |
| 14:53:49 | 11 | case, barge breakaways on the Mississippi River, the |
| 14:53:53 | 12 | Atchafalaya and other areas. |
| 14:53:56 | 13 | Q.   And what was your position at the time of your retirement |
| 14:53:59 | 14 | from the Coast Guard? |
| 14:54:00 | 15 | A.   I was assistant chief of merchant vessel safety here in |
| 14:54:04 | 16 | the district office, which is next door to this court. |
| 14:54:08 | 17 | Q.   What is your experience in actually operating vessels at |
| 14:54:11 | 18 | sea and on navigable waters? |
| 14:54:13 | 19 | A.   I just testified that I spent eight years at sea in |
| 14:54:17 | 20 | various Coast Guard cutters.  Then subsequent -- during my |
| 14:54:21 | 21 | career, I served six months with the American Waterways |
| 14:54:25 | 22 | Operators, riding tugs and tows throughout the young waters of |
| 14:54:29 | 23 | United States. |
| 14:54:29 | 24 | And I served, not as an employee, but as a |
| 14:54:34 | 25 | participant in various marine operations, including making up |

| | |
|---|---|
| 14:54:41 | 1 |
| 14:54:51 | 2 |
| 14:54:53 | 3 |
| 14:54:54 | 4 |
| 14:54:58 | 5 |
| 14:54:59 | 6 |
| 14:55:00 | 7 |
| 14:55:04 | 8 |
| 14:55:08 | 9 |
| 14:55:10 | 10 |
| 14:55:15 | 11 |
| 14:55:16 | 12 |
| 14:55:20 | 13 |
| 14:55:24 | 14 |
| 14:55:31 | 15 |
| 14:55:35 | 16 |
| 14:55:40 | 17 |
| 14:55:43 | 18 |
| 14:55:44 | 19 |
| 14:55:47 | 20 |
| 14:55:55 | 21 |
| 14:55:58 | 22 |
| 14:56:00 | 23 |
| 14:56:01 | 24 |
| 14:56:05 | 25 |

tows, steering, deckhand duties, mate duties.  And it was my job to become intimately familiar with the operations of the young towing vessels.

Q.   And what's your total years of experience in maritime operations?

A.   Over 50 years.  I began as a young boy, 14 years old, as a deckhand on a family shrimp boat out of Pass Christian, Mississippi.  I did that during the summers, and then I joined the Coast Guard in 1958.

Q.   And what's your hurricane experience from a vessel operation standpoint?

A.   I was assigned to Coast Guard cutters.  In the event of a hurricane that got into the Gulf, we had to make plans whether to go to sea to avoid the hurricane and/or seek a safe shelter.

        And in one instance in Mobile, I participated in mooring our ship up the Mobile River using a combination of lines and cables to -- in the event that the hurricane hit our area.

        In addition to that, I rode through a hurricane in 1961 off of Galveston on that very ship, the same ship that I just talked about just a few minutes ago.

Q.   In the course and scope of your duties?

A.   Yes.

Q.   And did you have vessel mooring experience even before your United States Coast Guard service?

14:56:07  1   **A.**   Yes.  And as a deckhand on the shrimp boat, it was my job

14:56:11  2   to tie the boat up, handle lines and shrimp, and all the duties

14:56:17  3   that the captain didn't want to do.

14:56:20  4   **Q.**   And over the years, in terms of your marine operations,

14:56:23  5   from a marine operations standpoint, have you had involvement

14:56:27  6   in understanding and complying with United States Coast Guard

14:56:32  7   regulations?

14:56:33  8   **A.**   Yes, I have.  I was a Coast Guard inspector, as well as an

14:56:37  9   investigator.  It was my job to enforce the marine statutes of

14:56:42  10  the United States and also investigate violations or supposed

14:56:49  11  violations of those regulations.

14:56:52  12  **Q.**   And have you been involved in the past in litigation

14:56:56  13  involving mooring?

14:56:57  14  **A.**   Yes, I have.  I testified in this very case in front of

14:57:02  15  Judge Berrigan.  I've also testified in other cases involving

14:57:07  16  moorings of barges and as well as breakaways.

14:57:12  17  **Q.**   And have you had occasion during your -- that part of your

14:57:16  18  work that involves consulting for purposes of litigation, have

14:57:20  19  you done -- qualified -- have you served as an expert in marine

14:57:24  20  operations, including for law firms like Chaffe McCall and

14:57:29  21  Liskow & Lewis, among other s?

14:57:32  22  **A.**   Yes, that's correct.

14:57:33  23  **Q.**   And have you previously qualified as an expert in marine

14:57:35  24  operations and the United States Coast Guard regulations as

14:57:39  25  they have -- with respect to marine operations?

| | | |
|---|---|---|
| 14:57:42 | 1 | **A.**   Yes, I have. |
| 14:57:43 | 2 | **Q.**   Has your testimony as an expert in that field ever been |
| 14:57:47 | 3 | limited, to your knowledge? |
| 14:57:48 | 4 | **A.**   Not to my knowledge. |
| 14:57:49 | 5 | **Q.**   All right. |
| 14:57:50 | 6 |          **MR. BEST:**  Your Honor, we tender Mr. Green as an |
| 14:57:53 | 7 | expert in marine operations and United States Coast Guard |
| 14:57:56 | 8 | regulations with respect to marine operations. |
| 14:57:58 | 9 |          **THE COURT:**  Any objections? |
| 14:58:00 | 10 |          **MR. WALKER:**  May I voir dire, Your Honor? |
| 14:58:02 | 11 |          **THE COURT:**  You may.  Even though we've ruled on |
| 14:58:08 | 12 | Daubert issues, I'll allow voir dire, regardless, to some |
| 14:58:14 | 13 | degree. |
| 14:58:29 | 14 |          **MR. WALKER:**  Your Honor, in the interest of the flow |
| 14:58:31 | 15 | that we're giving to the case, since we're going to likely |
| 14:58:34 | 16 | defer examination to tomorrow, I'll defer my voir dire until |
| 14:58:38 | 17 | tomorrow, Your Honor. |
| 14:58:39 | 18 |          **THE COURT:**  If you save it for tomorrow, he might be |
| 14:58:42 | 19 | through his direct by then. |
| 14:58:45 | 20 |               Let me make sure I understand.  I may have |
| 14:58:49 | 21 | missed something.  I may have forgotten something. |
| 14:58:53 | 22 |          **MR. WALKER:**  Based on the agreement that the parties |
| 14:58:57 | 23 | had because of the deposition situation with Mr. Villavaso, it |
| 14:59:00 | 24 | was our understanding that plaintiffs were going to put on |
| 14:59:03 | 25 | Mr. Green for direct only today, Your Honor. |

14:59:11  1          **MR. ALDOCK:**  We had an agreement, Your Honor, because
14:59:12  2  Mr. Green was moved up in the order, if he was going to go
14:59:16  3  today at all.
14:59:20  4          **MR. GILBERT:**  Your Honor this is an aspiration --
14:59:21  5          **THE COURT:**  Hold on.
14:59:21  6          **MR. GILBERT:**  I'm sorry.
14:59:21  7          **THE COURT:**  Let Mr. Aldock finish.
14:59:22  8          **MR. ALDOCK:**  We had an agreement with counsel that
14:59:25  9  there would be no cross today.
14:59:27  10         **MR. GILBERT:**  If we ran out of time.  We may get
14:59:31  11  through Mr. Green today, both parties.  It's possible.
14:59:34  12         **MR. ALDOCK:**  Mr. Gilbert, we had a stipulation with
14:59:38  13  Mr. Khorrami.
14:59:39  14         **MR. BEST:**  Irrespective of the agreement or the
14:59:43  15  understanding that the cross-examination of the witness would
14:59:44  16  be deferred until tomorrow potentially, the cross-examination
14:59:47  17  of his credentials would ordinarily occur at the outset of my
14:59:50  18  presentation of his testimony.  And I think I'm entitled to a
14:59:53  19  ruling as to whether or not at the beginning --
14:59:56  20         **THE COURT:**  I've already ruled.  *Daubert's* gone.
14:59:58  21  This is simply for the record.  I mean, *Daubert's* gone.  I'm
15:00:02  22  going to accept him as qualified because there's been no
15:00:05  23  granted *Daubert* challenge.  So my allowing this is purely
15:00:11  24  cosmetic, but I will allow it.
15:00:16  25         **MR. WALKER:**  Your Honor, this is for the weight only.

| | | |
|---|---|---|
| 15:00:18 | 1 | **THE COURT:**  And that's why I allow it. |
| 15:00:20 | 2 | **MR. WALKER:**  And I'll be brief. |
| 15:00:21 | 3 | **VOIR DIRE** |
| 15:00:21 | 4 | BY MR. WALKER: |
| 15:00:22 | 5 | **Q.**   Mr. Green, presently you reside in Houston, Texas? |
| 15:00:25 | 6 | **A.**   No, sir, I reside in Alpine, Texas. |
| 15:00:28 | 7 | **Q.**   I'm sorry. |
| 15:00:29 | 8 | **A.**   My business is in Houston. |
| 15:00:30 | 9 | **Q.**   Have you been to the Ninth Ward recently? |
| 15:00:38 | 10 | **A.**   No, sir. |
| 15:00:39 | 11 | **Q.**   Have you visited the Ninth Ward in connection with this |
| 15:00:41 | 12 | case? |
| 15:00:41 | 13 | **A.**   Yes, sir. |
| 15:00:41 | 14 | **Q.**   Have you visited the Lafarge terminal? |
| 15:00:44 | 15 | **A.**   Yes, sir, I have. |
| 15:00:44 | 16 | **Q.**   And are you going to offer any opinions regarding mooring |
| 15:00:47 | 17 | in this case? |
| 15:00:48 | 18 | **A.**   Yes, I am. |
| 15:00:49 | 19 | **Q.**   And in your opinion, that has to do with marine practices |
| 15:00:51 | 20 | or operations? |
| 15:00:52 | 21 | **A.**   Yes. |
| 15:00:53 | 22 | **Q.**   Could you tell me what marine practices and operations |
| 15:00:55 | 23 | means? |
| 15:00:56 | 24 | **A.**   Marine practice and operations, in my opinion, covers the |
| 15:01:00 | 25 | operation of vessels, barges, all types of craft that -- used |

15:01:05  1   for transportation or float.  That includes the management of

15:01:09  2   those vessels, as well as the securing, mooring, operation,

15:01:15  3   navigation.  It's an all-encompassing term, in my opinion.

15:01:21  4   **Q.**   Okay.  And those operations in this case have to do with

15:01:23  5   the Lafarge terminal; is that right?

15:01:25  6   **A.**   Yes.

15:01:26  7   **Q.**   So your testimony is limited to the occurrences at the

15:01:29  8   Lafarge terminal on the West Bank of the Industrial Canal?

15:01:37  9   **A.**   In this case, yes.

15:01:37  10  **Q.**   You're not offering any opinions, are you, regarding the

15:01:40  11  movement of that barge after it broke away from its moorings?

15:01:45  12  **A.**   Only from the standpoint that -- I said in my report that,

15:01:49  13  at the end, it ended up in the Ninth Ward, in the neighborhood.

15:01:57  14  **Q.**   Right.  You're not offering any opinions of how it got

15:01:59  15  there or where it traveled?

15:02:01  16  **A.**   Not unless the question comes up.  It depends on what the

15:02:05  17  direct is.  If -- on your cross, if you ask me questions of

15:02:10  18  what my opinion is of how it got there, I'll certainly offer

15:02:13  19  some opinions.

15:02:14  20  **Q.**   I understand.

15:02:15  21          But the reports that you prepared in this case, based

15:02:17  22  on your marine operations experience, do not opine on the

15:02:22  23  movement of the barge?

15:02:24  24  **A.**   That's right.  My -- my report stands as it reads.

15:02:29  25  **Q.**   Okay.  You're not a rope expert, are you?

| | | |
|---|---|---|
| 15:02:38 | 1 | **A.**  No, sir. |
| 15:02:39 | 2 | **Q.**  Did you attend any Coast Guard academy? |
| 15:02:42 | 3 | **A.**  No, I didn't. |
| 15:02:43 | 4 | **Q.**  You're not a marine engineer or a naval architect? |
| 15:02:45 | 5 | **A.**  No, sir, I'm not. |
| 15:02:45 | 6 | **Q.**  You're not a hydrologist? |
| 15:02:49 | 7 | **A.**  No, sir. |
| 15:02:49 | 8 | **Q.**  I'm a little confused by your education at Urbana.  It was |
| 15:02:54 | 9 | since 1978? |
| 15:02:55 | 10 | **A.**  Yes. |
| 15:02:55 | 11 | **Q.**  So you've been working 20 years?  Did I -- |
| 15:02:58 | 12 | **A.**  No, I came into the Coast Guard as an enlisted man in |
| 15:03:02 | 13 | 1958.  As I told the Court, I came up through the ranks as a |
| 15:03:06 | 14 | seaman and went all the way through and went to officer |
| 15:03:12 | 15 | candidate school, then I rose to the rank of commander before I |
| 15:03:16 | 16 | retired. |
| 15:03:17 | 17 | And during that long period, I served in all |
| 15:03:20 | 18 | positions aboard a ship, except I was not an engineer.  I did |
| 15:03:24 | 19 | not serve in the engineering department.  I served in all deck |
| 15:03:27 | 20 | departments. |
| 15:03:27 | 21 | **Q.**  I'm sorry.  My question was:  You went to the university |
| 15:03:30 | 22 | in 1978? |
| 15:03:31 | 23 | **A.**  Yes.  At that time I was a lieutenant commander in the |
| 15:03:34 | 24 | Coast Guard and I went to night school. |
| 15:03:36 | 25 | **Q.**  I got you.  Okay. |

15:03:37  1           Have you ever been a district hearing officer?
15:03:39  2  A.   Yes, I was.
15:03:41  3  Q.   What year?
15:03:43  4  A.   I was in that position before the district hearing officer
15:03:45  5  was established.  In other words, violations were sent to me,
15:03:48  6  and I had to determine whether a violation did, in fact, occur.
15:03:54  7  And I would issue civil fines against the party if it was
15:04:01  8  appropriate.
15:04:02  9           Subsequent to my assignment, a district hearing
15:04:05  10  officer was established.
15:04:06  11  Q.   So what was the name of the position at the time that you
15:04:09  12  had it?
15:04:10  13  A.   There was no such thing as a hearing officer at that time.
15:04:13  14  It was sent to me as the assistant marine safety officer for
15:04:20  15  the district.  And violations were sent to my desk for my
15:04:26  16  determination whether a violation existed.
15:04:29  17  Q.   Okay.  In other words, there's somebody above you who
15:04:32  18  determined whether your assessment of that was correct or not?
15:04:34  19  A.   Yes.
15:04:35  20  Q.   And who was that?
15:04:36  21  A.   That was the chief of merchant marine vessel safety.
15:04:41  22  Q.   And that would be the person who actually determined
15:04:43  23  whether or not a regulation had been violated?
15:04:45  24  A.   I don't think so.  I think at that time it stopped with
15:04:48  25  me.  If there was an appeal, it would go to the captain.

| | | |
|---|---|---|
| 15:04:52 | 1 | **Q.**   In 1989, you formed KDON Marine Consulting? |
| 15:04:57 | 2 | **A.**   That's correct, yes. |
| 15:04:57 | 3 | **Q.**   And is it fair to say about 50 percent of your consulting |
| 15:05:01 | 4 | is litigation-based? |
| 15:05:02 | 5 | **A.**   I would say all of it. |
| 15:05:04 | 6 | **Q.**   All of it? |
| 15:05:05 | 7 | **A.**   Yes. |
| 15:05:05 | 8 | **Q.**   Okay.  Approximately how many times have you testified in |
| 15:05:10 | 9 | court? |
| 15:05:11 | 10 | **A.**   Oh, I'd say 75, 100 times. |
| 15:05:16 | 11 | **Q.**   And were you ever a commanding officer of any of the Coast |
| 15:05:19 | 12 | Guard vessels you served on? |
| 15:05:21 | 13 | **A.**   I -- only from the standpoint of relief master.  When the |
| 15:05:25 | 14 | master went on leave or took vacation or was called away on |
| 15:05:30 | 15 | TAD, I became the acting commanding officer.  But I was never |
| 15:05:34 | 16 | assigned as the commanding officer of a ship. |
| 15:05:36 | 17 | **Q.**   Do you hold any professional licenses other than your |
| 15:05:41 | 18 | Coast Guard license? |
| 15:05:43 | 19 | **A.**   Yes -- you mentioned my Coast Guard license.  That's my |
| 15:05:46 | 20 | credentials. |
| 15:05:46 | 21 | **Q.**   You don't hold any other professional-type licenses? |
| 15:05:51 | 22 | **A.**   No, sir. |
| 15:05:51 | 23 | **Q.**   So you've never been a licensed officer on a river towboat |
| 15:05:57 | 24 | or on a fleet boat? |
| 15:05:58 | 25 | **A.**   No, sir. |

| | | |
|---|---|---|
| 15:05:59 | 1 | **Q.**   Have you ever run a barge fleet? |
| 15:06:01 | 2 | **A.**   No, sir. |
| 15:06:01 | 3 | **Q.**   Have you ever been an auditor or examiner in the towing |
| 15:06:05 | 4 | industry? |
| 15:06:06 | 5 | **A.**   No, sir.  Those are all duties that have popped up in the |
| 15:06:09 | 6 | last, oh, 20 years since I retired. |
| 15:06:13 | 7 | **Q.**   And you never managed an inland marine company? |
| 15:06:16 | 8 | **A.**   No, I have not. |
| 15:06:17 | 9 | **Q.**   And isn't it correct that you have actually not moored or |
| 15:06:22 | 10 | physically tied up a barge since 1975? |
| 15:06:24 | 11 | **A.**   That's true, but the procedures used in 1975 are the same |
| 15:06:30 | 12 | that they are today. |
| 15:06:32 | 13 | **Q.**   Have you ever prepared a terminal for a hurricane? |
| 15:06:35 | 14 | **A.**   No, I have not. |
| 15:06:36 | 15 | **Q.**   Have you ever consulted with a terminal regarding their |
| 15:06:39 | 16 | hurricane preparedness? |
| 15:06:40 | 17 | **A.**   No, sir. |
| 15:06:41 | 18 | **Q.**   Have you ever consulted with a terminal regarding their |
| 15:06:43 | 19 | hurricane preparedness policies or manuals? |
| 15:06:49 | 20 | **A.**   No, sir, I have not. |
| 15:06:54 | 21 | **Q.**   Have you ever advised a marine terminal how to moor or tie |
| 15:06:57 | 22 | up barges? |
| 15:06:58 | 23 | **A.**   No, I have not. |
| 15:07:01 | 24 | **Q.**   Have you ever testified as an expert in hurricane |
| 15:07:04 | 25 | preparation? |

| | | |
|---|---|---|
| 15:07:05 | 1 | **A.**   No, I have not.  Other than the two trials that I |
| 15:07:09 | 2 | talked -- one trial I talked about during my early testimony |
| 15:07:14 | 3 | today, and that was a trial here in Houston.  And I testified |
| 15:07:19 | 4 | about the mooring preparation of a facility on the Mississippi |
| 15:07:22 | 5 | River during Hurricane Katrina. |
| 15:07:26 | 6 | **Q.**   And you said Houston. |
| 15:07:28 | 7 | **A.**   Excuse me, I'm sorry.  In court here in New Orleans. |
| 15:07:32 | 8 | **Q.**   Okay.  Was that the Judge Berrigan case you're talking |
| 15:07:34 | 9 | about? |
| 15:07:35 | 10 | **A.**   Yes. |
| 15:07:35 | 11 | **Q.**   Okay. |
| 15:07:36 | 12 | **A.**   Not this case, but another case in front of Judge |
| 15:07:38 | 13 | Berrigan. |
| 15:07:41 | 14 | **Q.**   Have you actually testified as a mooring expert? |
| 15:07:44 | 15 | **A.**   No, sir. |
| 15:07:48 | 16 | **Q.**   Has any court rejected your credentials when you've been |
| 15:07:52 | 17 | offered as an expert in any capacity? |
| 15:07:54 | 18 | **A.**   Not that I'm aware of. |
| 15:07:56 | 19 | **Q.**   Has any court not found your testimony credible? |
| 15:08:02 | 20 | **A.**   I think Judge -- what is his name -- I testified in a |
| 15:08:11 | 21 | crane case.  And the judge's decision, he said -- one sentence, |
| 15:08:18 | 22 | he said, "Green's testimony was not credible." |
| 15:08:20 | 23 | **Q.**   Was that a case here in the Eastern District of Louisiana |
| 15:08:23 | 24 | called *Dexter Latulas versus Montco Offshore*? |
| 15:08:27 | 25 | **A.**   That's it, yes. |

15:08:28  1   **Q.**   And the judge stated that he didn't find credible the

15:08:31  2   testimony of Commander Don Green, plaintiffs' liability expert?

15:08:36  3   **A.**   That's true.

15:08:38  4   **Q.**   Is that the only case you recall where you were not found

15:08:41  5   credible?

15:08:41  6   **A.**   Yes, sir.

15:08:44  7            **MR. WALKER:**  Thank you, Your Honor.

15:08:45  8            **THE COURT:**  Thank you, sir.

15:08:52  9            **MR. BEST:**  Just a couple of those same issues before

15:08:55  10  we get down to his testimony.

15:08:56  11                    **DIRECT EXAMINATION**

15:08:56  12  BY MR. BEST:

15:08:57  13  **Q.**   Counsel asked you about testimony you were going to give.

15:09:00  14  Your testimony in this case is your opinions within your field

15:09:03  15  of expertise about the acts and omissions of Lafarge at this

15:09:07  16  facility in this time frame that we're talking about; is that

15:09:12  17  right?

15:09:12  18  **A.**   Yes.

15:09:12  19  **Q.**   Okay.  Now, although that's what you're testifying about,

15:09:14  20  it's based on your experience through the course of your career

15:09:18  21  in all the different capacities and doing all the different

15:09:20  22  activities you've described?

15:09:22  23  **A.**   That's true.

15:09:23  24  **Q.**   And one of the things I didn't ask you, but it's in your

15:09:26  25  CV, what is the title captain of the port?  What does that mean

15:09:30  1   to somebody in the Coast Guard?

15:09:32  2   A.   It's the person designated by the Coast Guard as the chief

15:09:36  3   law enforcement regarding Coast Guard rules and regulations and

15:09:40  4   safety of the port.

15:09:41  5   Q.   Is that sort of the top Coast Guard man with respect to a

15:09:45  6   particular geographical area encompassed by given ports around

15:09:49  7   the country?

15:09:50  8   A.   Yes.

15:09:50  9   Q.   And did you serve as a captain of the port during your

15:09:53  10  career?

15:09:53  11  A.   Yes, for six months in Cincinnati.

15:09:59  12  Q.   Did you get involved in operating the port in New Orleans

15:10:02  13  during your work here?

15:10:03  14  A.   Yes.  As I mentioned before, I was a Coast Guard inspector

15:10:06  15  here in New Orleans.  And my second assignment was as the

15:10:10  16  assistant chief of merchant vessel safety here in the district

15:10:14  17  office.

15:10:15  18  Q.   And counsel asked you a question about the opinions you

15:10:18  19  gave in your report.  And he was talking about not -- not

15:10:22  20  involving vessel movements.  Do you recall giving a declaration

15:10:28  21  in addition to your report which was used for us in connection

15:10:30  22  with responding to a motion for summary judgment?

15:10:33  23  A.   Yes.

15:10:33  24  Q.   And do you recall that, in that declaration, you gave

15:10:35  25  opinions about movements of a loose vessel due to tides, wind

| | | |
|---|---|---|
| 15:10:39 | 1 | and waves based on your experience as a mariner? |
| 15:10:42 | 2 | A.   Yes. |
| 15:10:42 | 3 | Q.   And you've been asked to and intend to give opinions of |
| 15:10:45 | 4 | that nature in this case? |
| 15:10:46 | 5 | A.   Yes.  If -- during your direct, if you ask me the |
| 15:10:49 | 6 | question, I'll respond. |
| 15:10:49 | 7 | Q.   Right.  And you also are knowledgeable by virtue of your |
| 15:10:53 | 8 | experience as a mariner of the effect of winds, tides, seas and |
| 15:10:57 | 9 | other vessel traffic on vessel mooring connections? |
| 15:11:01 | 10 | A.   Yes. |
| 15:11:03 | 11 | MR. BEST:  Thank you. |
| 15:11:05 | 12 | MR. WALKER:  Your Honor, may I?  This is an entirely |
| 15:11:07 | 13 | new aspect, then, if we're going to talk about the tidal and |
| 15:11:13 | 14 | the movement of the barge.  That's not -- |
| 15:11:14 | 15 | THE COURT:  If it's not in his report, it's not |
| 15:11:16 | 16 | coming in. |
| 15:11:18 | 17 | MR. BEST:  Your Honor, it's in his declaration -- |
| 15:11:18 | 18 | THE COURT:  I don't care if he's the world's greatest |
| 15:11:20 | 19 | expert in the world. |
| 15:11:21 | 20 | MR. BEST:  Your Honor, it's in his declaration, which |
| 15:11:24 | 21 | is in evidence as part of our exhibits and was used in the |
| 15:11:28 | 22 | motion for summary judgment.  And I might add -- |
| 15:11:30 | 23 | THE COURT:  Hold on a minute because I want to check |
| 15:11:32 | 24 | something here. |
| 15:11:36 | 25 | MR. BEST:  His declaration is Exhibit -- |

```
15:11:38   1              THE COURT:  Just a second.
15:12:34   2                       (OFF THE RECORD)
15:12:39   3              THE COURT:  Did I had a motion in limine to this
15:12:43   4   issue?
15:12:44   5              MR. BEST:  We're looking for that right now, Your
15:12:45   6   Honor.
15:12:49   7              THE COURT:  I generally have them all here.  I have a
15:12:55   8   lot of stuff, but not necessarily in the right --
15:12:56   9              MR. BEST:  If I may point out, the declaration -- the
15:12:58  10   reason the declaration contains things that are not in the
15:13:02  11   report is because we just obtained the testimony of these two
15:13:05  12   fact witnesses that just testified in April of 2010.
15:13:08  13              So this was new information to all parties.  And
15:13:11  14   the declaration of Mr. Green addresses those, and it serves as
15:13:15  15   a supplement to his report.  It served as part of our
15:13:19  16   opposition to the motion for summary judgment.
15:13:21  17              MR. WALKER:  May I, Your Honor?
15:13:23  18              THE COURT:  Wait until they finish.
15:13:25  19              MR. GILBERT:  I want to remind Your Honor, this
15:13:27  20   declaration that Mr. Green did was in response to arguments
15:13:31  21   that Lafarge was raising in their motion for summary judgment.
15:13:34  22              THE COURT:  I understand that.  And I had motions --
15:13:36  23   I had some motions on some of those declarations.  I just don't
15:13:41  24   recall my ruling on each motion.
15:13:43  25              MR. GILBERT:  I believe that it's 19733.
```

15:13:47   1           MR. WALKER:  That's correct, Your Honor.

15:13:48   2           MR. GILBERT:  And let me get to the bottom line:

15:13:50   3   "Moreover, some of the testimony" --

15:13:57   4           MR. WALKER:  Your Honor, I can cut this short.  We

15:13:59   5   lost that motion.  My point is not the declaration as a

15:14:02   6   document.  It's the extent of the man's testimony based on the

15:14:05   7   expertise that he's testified here to today.

15:14:09   8           And it wasn't brought up in the original voir

15:14:12   9   dire.  There was nothing mentioned about tides.  I asked the

15:14:17  10   specific questions:  "Are you going to testify regarding the

15:14:19  11   movements of the barge across the canal?

15:14:22  12           He said he would not unless somebody asked him a

15:14:25  13   question.  And I think either I can ask him a couple more

15:14:28  14   questions on that topic or he's really not qualified to testify

15:14:32  15   regarding movements of the barge based on the tide.

15:14:35  16           MR. BEST:  Let me say, first, Your Honor, that the

15:14:37  17   declaration is in evidence without objection.  That's the first

15:14:41  18   point.

15:14:41  19           The second point is that I think it is pretty

15:14:43  20   common sense -- pretty much common sense that a mariner with

15:14:47  21   this man's experience has to know, and does, indeed, have --

15:14:52  22   he's not a hydrologist, he's not a meteorologist, but you can't

15:14:57  23   do what he has done and not have knowledge of movements of

15:15:01  24   vessels on the seas.  That's what mariners do.

15:15:03  25           THE COURT:  I don't know what he's opining about.

15:15:04   1   And I don't recall his declaration.  So I would like to look at

15:15:08   2   the declaration myself.  Do you have it there?  I have so much

15:15:13   3   stuff up here, I cannot put my hands on it.

15:15:17   4                 MR. BEST:  Plaintiffs' Exhibit 389.

15:15:19   5                 THE COURT:  Thank you.

15:15:20   6                 MR. WALKER:  Your Honor, to --

15:15:20   7                 THE COURT:  Just let me read it.

15:15:34   8                 I don't think I've seen this.  If I have, it's

15:15:37   9   been a while.

15:16:07  10                 Okay.  I don't want to take anybody's copy here

15:16:09  11   because I know you need this.  So we have a declaration and we

15:16:13  12   have an expert report and a declaration that expands the expert

15:16:21  13   report.  We had -- I see it.  And I may need to pull it out in

15:16:28  14   a minute -- did we have a motion in limine directed to this?

15:16:32  15                 Because I usually remember every motion in

15:16:35  16   limine.  Again, I'm not omniscient.  Did we have a motion in

15:16:39  17   limine directed to this affidavit?

15:16:40  18                 MR. WALKER:  Yes, Your Honor, that 19733 document.

15:16:43  19                 THE COURT:  Okay.  May I see that ruling, please?

15:16:46  20   I'm going to get it.  Okay.  The Opinions 5.6 and 5.7 and -- at

15:18:11  21   page 8 of the report do not relate to the declaration.  And the

15:18:19  22   motion is --

15:18:20  23                 MR. WALKER:  Your Honor, I'm sorry.  You were given

15:18:22  24   the wrong one.  That's why it wasn't making sense to you.

15:18:25  25                 THE COURT:  It's easily understood, Counsel.

15:19:50  1            I think the motion was couched as to being

15:19:54  2   untimely.  So if you're going into whether -- whether I'm right

15:19:58  3   or wrong on it being untimely, you're saying this opinion is

15:20:02  4   not within his expertise and you want to question him on it?

15:20:07  5            MR. WALKER:  Precisely, Your Honor.

15:20:08  6            THE COURT:  And because of the late nature of the

15:20:11  7   opinion, I'm going to allow you to do that.

15:20:13  8            MR. WALKER:  Thank you, Your Honor.

15:20:42  9            THE COURT:  Okay.  Sir.

15:20:44  10           MR. WALKER:  Thank you, Your Honor.

15:20:44  11                        VOIR DIRE

15:20:44  12   BY MR. WALKER:

15:20:45  13   Q.   Mr. Green, I don't want to go into the areas that we're

15:20:48  14   going to examine later, so I would ask you to listen to my

15:20:51  15   question carefully.

15:20:53  16            Prior to this declaration, you hadn't looked at any

15:20:57  17   tide information, had you?

15:20:59  18   A.   That's correct.  If --

15:21:01  19   Q.   And the reason that you looked at this tidal information

15:21:04  20   is because you received Tompkins and LeBlanc's statements -- or

15:21:07  21   depositions; correct?

15:21:08  22   A.   I'm sure that's true, right.

15:21:10  23   Q.   And you weren't aware that -- contrary to what was just

15:21:14  24   stated, that in the spring of '08, not as late as the fall of

15:21:18  25   '09 in your declaration, plaintiffs had in their possession

15:21:22  1    interviews or statements of Tompkins and LeBlanc, so you could

15:21:27  2    have been given this information previously?

15:21:29  3    A.   I was unaware of those statements.

15:21:31  4    Q.   Right.  Hence, your October 2009 declaration date.  That's

15:21:36  5    when you received that information?

15:21:38  6    A.   Some time period before that, yes.

15:21:40  7    Q.   And you said previously you're not a hydrologist?

15:21:43  8    A.   That's correct.

15:21:44  9    Q.   You're not a meteorologist?

15:21:45  10   A.   That's correct.

15:21:46  11   Q.   In your tender and on the basis on which you wrote your

15:21:50  12   original reports, you wrote them as an expert on marine

15:21:54  13   operations and mooring practices, which is what you were

15:21:57  14   tendered as here today; correct?

15:21:58  15   A.   That's correct.

15:21:59  16   Q.   And that does not include, does it, tidal information and

15:22:06  17   information on how a barge moves from one side of the canal to

15:22:08  18   the other, does it?

15:22:10  19              You can answer yes or no.

15:22:14  20              **THE COURT:**  You can explain it afterwards.

15:22:17  21              **THE WITNESS:**  Yes.

15:22:17  22   BY MR. WALKER:

15:22:19  23   Q.   Yes, it does or yes, it doesn't?

15:22:20  24   A.   Yes, my -- whether the judge finds that I'm qualified to

15:22:25  25   testify in this regard, I teach tides and currents, I teach

```
15:22:32   1    weather patterns, I teach hurricane avoidance.  And if the
15:22:37   2    question is asked, "If a barge is free, unmoored, does it move
15:22:42   3    with the current," and the answer's going to be, "Yes."
15:22:45   4            And I think I'm totally qualified, as any seaman, any
15:22:51   5    shrimp boat captain on the way up through master of an
15:22:55   6    unlimited ship, that vessels move with the current if they're
15:22:59   7    unmoored and they're not steaming against the current.
15:23:03   8            It's a natural thing.  You don't have to be a
15:23:06   9    hydrologist to be able to figure that out.
15:23:09  10    Q.   Okay.  Well, if it's a natural thing and it's logical,
15:23:12  11    then the judge does not need an expert opinion to determine
15:23:15  12    that a barge may be moved in a direction of a current, does he?
15:23:19  13    A.   I would say so, that's correct, yes.
15:23:21  14    Q.   You don't think he needs that.  That's --
15:23:23  15    A.   That's logical.
15:23:29  16            MR. WALKER:  In that case, Your Honor, I don't think
15:23:31  17    Your Honor requires the assistance of an expert to determine
15:23:35  18    whether a barge or other vessel would move in the direction of
15:23:39  19    a current.
15:23:39  20            THE COURT:  Well, it would be interesting -- if a
15:23:41  21    wind's blowing one way and the current is going another way and
15:23:44  22    if there's something that's a certain size and how many knots
15:23:47  23    does the wind have to be to counter-prevail the current, those
15:23:52  24    could be fairly involved.  And I'm not sure if that's where
15:23:55  25    he's going or not.
```

| | | |
|---|---|---|
| 15:23:57 | 1 | **MR. WALKER:** Well, you predicted the areas, and |
| 15:23:59 | 2 | precisely why I worded it, that you don't need assistance to |
| 15:24:01 | 3 | know that a vessel is going to go in the direction of a |
| 15:24:05 | 4 | current. |
| 15:24:05 | 5 | **THE COURT:** Like I say, I -- |
| 15:24:05 | 6 | **MR. WALKER:** May I ask another question, then? |
| 15:24:07 | 7 | BY MR. WALKER: |
| 15:24:07 | 8 | Q.   You actually didn't do any calculations of the type that |
| 15:24:10 | 9 | the judge just suggested with research to any forces, either |
| 15:24:14 | 10 | wind or current, acting on the barge, did you? |
| 15:24:17 | 11 | A.   Yes.  In preparing the -- that declaration, I looked at |
| 15:24:21 | 12 | the tide tables.  I looked at -- I know that in the Industrial |
| 15:24:26 | 13 | Canal, there are typically two tides a day, a flood and an ebb. |
| 15:24:32 | 14 | And that means the water comes in, the water goes out, the |
| 15:24:35 | 15 | water comes in, the water goes out, at least twice a day. |
| 15:24:38 | 16 | And if a barge is unmoored, free to float, the barge |
| 15:24:43 | 17 | will be affected and move with the tide.  If it goes out, it |
| 15:24:47 | 18 | will move in an outwardly direction with the tide.  If the tide |
| 15:24:53 | 19 | reverses and comes back in with the flood, it will move with |
| 15:25:18 | 20 | the flood and come back in. |
| 15:25:19 | 21 | Q.   Right.  You said everything that the judge said he |
| 15:25:19 | 22 | understood, but you didn't address my question. |
| 15:25:19 | 23 | Did you make any calculations of any type with |
| 15:25:20 | 24 | respect to the effects on the barge of the current or the wind |
| 15:25:21 | 25 | and the forces exerted upon it; yes or no? |

15:25:22   1    A.   No.

15:25:23   2              MR. WALKER:   Your Honor, I don't think this man is

15:25:23   3    qualified to give Your Honor and the Court any assistance,

15:25:24   4    which is precisely what an expert is required to do based on a

15:25:26   5    certain area of expertise, not what the Court can assume on his

15:25:27   6    own.

15:25:28   7              THE COURT:   All right.

15:25:28   8              MR. BEST:   May I ask a couple more questions of the

15:25:29   9    witness?

15:25:29   10             THE COURT:   You may.

15:25:29   11             Let me just take one more second to glance over

15:25:32   12   this declaration again.

15:26:20   13             All right.

15:26:20   14                        DIRECT EXAMINATION

15:26:20   15   BY MR. BEST:

15:26:23   16   Q.   Mr. Green, mariners of vessels have to know something

15:26:27   17   about the tides to operate those vessels in ports, don't they?

15:26:30   18   A.   Yes, that's correct.

15:26:31   19   Q.   They have to know something about tides to moor vessels

15:26:34   20   properly in ports, don't they?

15:26:37   21   A.   Yes, they take into consideration tides when making their

15:26:37   22   decision as to whether they tie it port side, starboard side or

15:26:42   23   whether or not they're going to have any problems getting it

15:26:44   24   against the dock.  But, yes, tides and currents are calculated

15:26:48   25   by a seaman operating a ship.

| 15:26:50 | 1 | **Q.**   All right.  And in connection with the declaration you |
| 15:26:53 | 2 | gave, you reviewed local tidal records for certain locations |
| 15:26:57 | 3 | that I gather you concluded, based on your experience, were |
| 15:27:01 | 4 | pertinent to this location. |
| 15:27:02 | 5 | **A.**   Yes.  If I recall correctly, I looked at the tide tables |
| 15:27:07 | 6 | for the New Orleans Airport, of the Industrial Canal, and that |
| 15:27:14 | 7 | area for this. |
| 15:27:16 | 8 | **Q.**   And you've had to know about tides since you worked as |
| 15:27:19 | 9 | [sic] a shrimp boat when you were a kid? |
| 15:27:21 | 10 | **A.**   Yes. |
| 15:27:21 | 11 | **Q.**   So you know a lot more about tides than the average |
| 15:27:24 | 12 | landlubber who hasn't been to sea on a boat? |
| 15:27:27 | 13 | **A.**   And I've taught approximately 12,000 people how to use the |
| 15:27:31 | 14 | tide tables and the current tables. |
| 15:27:33 | 15 | **Q.**   So what is elementary to you may not be elementary to |
| 15:27:36 | 16 | someone who does not have your level of experience? |
| 15:27:40 | 17 | **A.**   I would agree with that. |
| 15:27:42 | 18 | **Q.**   And the opinions you've given in this declaration, as I |
| 15:27:47 | 19 | understand it, are based on your knowledge and experience for |
| 15:27:50 | 20 | all these years as a mariner who has to know tides and know how |
| 15:27:53 | 21 | they affect the vessels you operate and are responsible for in |
| 15:27:59 | 22 | port and out of port? |
| 15:28:00 | 23 | **A.**   Yes.  That's correct, yes. |
| 15:28:01 | 24 | **MR. BEST:**  Your Honor, I just don't know how you can |
| 15:28:04 | 25 | be -- |

| | | |
|---|---|---|
| 15:28:05 | 1 | **THE COURT:** Well, I can certainly -- let me say, one, |
| 15:28:10 | 2 | I read the reports in general.  I have not focused on this |
| 15:28:15 | 3 | declaration.  But there's certainly -- the defendants have |
| 15:28:20 | 4 | reports about the prevailing wind and, of course, that assumes |
| 15:28:23 | 5 | a certain wind -- it does not assume the vessel was loose in |
| 15:28:28 | 6 | the Industrial Canal, unmoored, at 12:00 on Sunday.  I |
| 15:28:37 | 7 | understand that. |
| 15:28:39 | 8 | But I guess if we get to what happens when |
| 15:28:41 | 9 | there's a 100-mile-an-hour wind or a 90-mile-an-hour wind or an |
| 15:28:47 | 10 | 80-mile-an-hour wind from a given direction -- |
| 15:28:50 | 11 | Let me finish, Counsel. |
| 15:28:51 | 12 | -- from a given direction at a certain time at a |
| 15:28:54 | 13 | certain place and the movement of a barge there, then we're |
| 15:28:57 | 14 | getting into more than common sense.  We're getting into the |
| 15:29:01 | 15 | size, the sail, the amount of freeboard on the barge.  We're |
| 15:29:07 | 16 | getting into what current, where was it flowing, what |
| 15:29:10 | 17 | direction, what was the hydrology.  We're getting beyond the |
| 15:29:16 | 18 | mundane at that point. |
| 15:29:18 | 19 | I'm talking about at the time of 5:00 in the |
| 15:29:20 | 20 | morning and 4:00 in the morning.  And also one of the problems |
| 15:29:23 | 21 | is, we're talking about a barge, which I'm sure the defendants |
| 15:29:27 | 22 | do not -- a barge that was loose as opposed to a barge that was |
| 15:29:33 | 23 | moored on Saturday, as several people have testified, at the |
| 15:29:39 | 24 | Lafarge terminal. |
| 15:29:43 | 25 | So all of this is fairly perplexing to the Court |

| | | |
|---|---|---|
| 15:29:46 | 1 | because the Court finds it extraordinarily hard to understand |
| 15:29:49 | 2 | how a barge that was moored, as the witnesses have testified, |
| 15:29:52 | 3 | at the Lafarge dock on Saturday would somehow be loose on |
| 15:29:57 | 4 | Sunday when the wind wasn't -- as we've all pointed out, when |
| 15:30:01 | 5 | we didn't have hurricane conditions.  I find it perplexing. |
| 15:30:06 | 6 | MR. BEST:  I think you will hear from Mr. Pazos on |
| 15:30:11 | 7 | that, who is a naval architect and a marine engineer, who has |
| 15:30:15 | 8 | in his report addressed things called -- I can't remember his |
| 15:30:18 | 9 | exact term, I have to pull his report out -- but the effect |
| 15:30:19 | 10 | that you have waves in a closed space -- sort of like in a |
| 15:30:22 | 11 | swimming pool, that when they -- |
| 15:30:24 | 12 | THE COURT:  That didn't happen Sunday morning.  I'm |
| 15:30:26 | 13 | not interrupting you, Mr. Best, but is he saying it happened |
| 15:30:28 | 14 | Sunday morning?  Then I'm going to find that really |
| 15:30:30 | 15 | interesting.  Sunday morning? |
| 15:30:33 | 16 | MR. BEST:  No. |
| 15:30:34 | 17 | THE COURT:  So how did it come loose from the dock |
| 15:30:36 | 18 | Saturday, sir? |
| 15:30:37 | 19 | MR. BEST:  I'm about to tell you, Your Honor. |
| 15:30:40 | 20 | THE COURT:  All right.  Good, then tell me. |
| 15:30:42 | 21 | MR. BEST:  I don't know because I wasn't there.  I |
| 15:30:42 | 22 | think it's fair to say that nobody -- |
| 15:30:44 | 23 | THE COURT:  Any expert -- look, when I'm interrupting |
| 15:30:47 | 24 | you, sir, take it with grace -- |
| 15:30:49 | 25 | MR. BEST:  I apologize. |

15:30:49  1        **THE COURT:**  -- or you're going to continue to be

15:30:51  2   interrupted, and you may not even be able to speak.  Do you

15:30:53  3   understand that?  No wincing.  You got it?

15:30:56  4        **MR. BEST:**  Yes, Your Honor.  I understand.

15:30:56  5        **THE COURT:**  Please get it.  Because the wincing does

15:30:58  6   not help you.  It's not persuasive; it's not good lawyering; in

15:31:00  7   fact, it's counterproductive.  You need to let me finish my

15:31:04  8   thought, sir.  Then you can intelligently respond to it.  You

15:31:08  9   cannot intelligently respond to it until I have finished my

15:31:13  10  point.  Otherwise, it is simple infused rhetoric that is

15:31:19  11  nothing, that is not persuasive.

15:31:21  12        So let's just get that straight.

15:31:22  13       **MR. BEST:**  Yes, Your Honor.

15:31:23  14       **THE COURT:**  My point is:  Do you have any expert who

15:31:26  15  has opined how a vessel that was moored on Sunday, the way --

15:31:33  16  let's just take the average person who's testified here,

15:31:36  17  whether it was three lines, four lines, five lines -- it was

15:31:39  18  moored the way it was on Saturday, is loose in the canal at

15:31:44  19  11:00 to 12:00 on Sunday?

15:31:46  20        Now I will be quiet and listen to you.

15:31:52  21       **MR. BEST:**  Okay.  Mr. Pazos has given testimony and

15:31:56  22  opinions in his report about wave reflection and magnification,

15:32:00  23  particularly in closed areas.  Although, we're now talking

15:32:04  24  about a situation that is pre-storm, there are still waves in

15:32:08  25  there.  The lock logs show there was significant vessel traffic

446

| | | |
|---|---|---|
| 15:32:12 | 1 | in the waterway after the Lafarge people moored the barge and |
| 15:32:17 | 2 | left. |
| 15:32:18 | 3 | There's pretty much a steady stream of barges -- |
| 15:32:22 | 4 | of towboats moving things and themselves out of that canal |
| 15:32:25 | 5 | until the lock closure, which we've just shown by the exhibits |
| 15:32:29 | 6 | is about 4:00 p.m. on Saturday. |
| 15:32:32 | 7 | These barges, as you heard, were -- only got |
| 15:32:34 | 8 | about -- they weren't touching -- |
| 15:32:36 | 9 | THE COURT:  I don't mean to interrupt you, but I |
| 15:32:38 | 10 | think it's 4:00 a.m. on Sunday morning.  Is that an |
| 15:32:41 | 11 | appropriate -- |
| 15:32:42 | 12 | MR. BEST:  Yes.  The lock closure. |
| 15:32:43 | 13 | THE COURT:  You said 4:00 p.m. and I knew you didn't |
| 15:32:46 | 14 | mean it. |
| 15:32:47 | 15 | MR. BEST:  Right.  4:00 a.m. on Sunday. |
| 15:32:50 | 16 | And these vessels, as you heard from |
| 15:32:53 | 17 | Mr. Thigpen, they weren't touching, butted up against each |
| 15:32:56 | 18 | other in the manner that vessel barges typically are in a fleet |
| 15:32:58 | 19 | at the same elevation.  They were unable to bring them any |
| 15:33:02 | 20 | closer than about 2 feet.  This witness is going to testify |
| 15:33:06 | 21 | about the effect that has and the movement that it allows on |
| 15:33:09 | 22 | moored vessels. |
| 15:33:11 | 23 | And Mr. Pazos is prepared to testify about the |
| 15:33:14 | 24 | effect of this wave magnification and -- I've forgotten the |
| 15:33:20 | 25 | terms he used, quite frankly.  But when they're in an enclosed |

15:33:23  1   space and across from one another it intensifies the waves and

15:33:26  2   the pressure.  So while that is true in a hurricane, it's also

15:33:30  3   true at any time in an enclosed space, as I understand it.

15:33:34  4              So it is certainly possible -- I think when Your

15:33:36  5   Honor hears the evidence, it's conceivable that you could

15:33:40  6   conclude that the barge was loose Sunday morning; because it

15:33:42  7   was so poorly moored with vessels of differential height that

15:33:46  8   weren't touching one another and weren't properly moored and

15:33:47  9   secured, that these lines could have come loose even before

15:33:50  10  that.

15:33:51  11             This witness can only -- Mr. Pazos is the one

15:33:56  12  who talks about the waves from a scientific, naval

15:33:59  13  architecture, marine engineering standpoint.  This witness can

15:34:01  14  only talk about waves from his experience as a mariner and

15:34:06  15  working for the Coast Guard.

15:34:08  16             I have just submitted that I think his

15:34:09  17  declaration is from that perspective, from that experience, and

15:34:14  18  I think is limited to that.  And, of course, Your Honor can

15:34:16  19  give it whatever weight Your Honor thinks it deserves based

15:34:20  20  upon his qualifications and experience.  But I think it's a

15:34:22  21  legitimate opinion based upon his experience about the movement

15:34:26  22  of vessels under varying circumstances.

15:34:30  23             And he's not being specific.  He's not here

15:34:33  24  plotting a vessel trajectory over a particular time in a

15:34:37  25  particular direction and place.  He's more or less just saying,

15:34:40  1   you can't be for sure that it wouldn't do what it did here.

15:34:44  2   And I think he has the qualifications to do that.

15:34:46  3            But more particularly, this was submitted as an

15:34:49  4   exhibit.  It's in evidence without objection.  And I think any

15:34:54  5   objection the defendant has to its contents and to the opinion

15:34:56  6   of this witness and to his credentials in this regard has been

15:34:59  7   waived and comes too late.

15:35:00  8            THE COURT:  Thank you, sir.

15:35:01  9            MR. WALKER:  May I, Your Honor?

15:35:03  10           THE COURT:  Yes.  Let's get to the "too late" part

15:35:05  11  first, rather than the technical part.

15:35:07  12           MR. WALKER:  The "too late" part --

15:35:08  13           THE COURT:  Why wasn't there an objection lodged as

15:35:11  14  to this declaration?

15:35:16  15           MR. RAFFMAN:  Your Honor, my name is Mark Raffman and

15:35:19  16  I prepared the motion to exclude the document as untimely.

15:35:23  17           THE COURT:  Right.

15:35:23  18           MR. RAFFMAN:  The motion to exclude the document as

15:35:25  19  untimely was filed because Your Honor ordered that the

15:35:29  20  plaintiffs' expert reports be served in the summer of 2009.

15:35:35  21           THE COURT:  I recall.  I recall that motion.

15:35:38  22           MR. RAFFMAN:  At the time, Mr. Green did not provide

15:35:40  23  any declaration regarding tidal movement of barges.

15:35:45  24           Our position is that the plaintiffs had had the

15:35:47  25  Tompkins and LeBlanc statements since the spring of 2008.  And

15:35:52  1    if the plaintiffs wanted to rely on Tompkins and LeBlanc, they

15:35:56  2    had every opportunity to provide those statements to their

15:35:59  3    experts in time for the experts to provide their opinions in a

15:36:03  4    timely way.

15:36:04  5             The plaintiffs chose not to provide Tompkins and

15:36:07  6    LeBlanc to their experts.  They chose to keep that evidence

15:36:10  7    from their experts until after their reports were served, until

15:36:15  8    after our summary judgment was filed.

15:36:17  9             At that point, they changed their position,

15:36:19  10   provided the declarations to their experts, and their experts

15:36:22  11   came in with late declarations.

15:36:25  12            We move to strike those declarations in

15:36:28  13   connection with our summary judgment motion.  Your Honor

15:36:32  14   decided that that motion to strike -- which I argued to Your

15:36:36  15   Honor, and Your Honor was very interested in that motion, but

15:36:39  16   Your Honor decided it was moot when Your Honor decided that you

15:36:42  17   would not grant our summary judgment motion for reasons apart

15:36:46  18   from the expert opinions.

15:36:48  19            The plaintiffs then submitted the late

15:36:53  20   declarations of Mr. Green and some other experts as exhibits --

15:36:58  21   trial exhibits.  We moved -- we renewed our motion and Your

15:37:03  22   Honor denied our motion and allowed them to come in.

15:37:11  23            So that's the state --

15:37:13  24        THE COURT:  You never focused on the expertise.

15:37:15  25            What I'm going to do is this -- I'm going to

15:37:17   1   make this simple.  This is a judge trial, and although I would
15:37:21   2   love a jury to be deciding this, in some instances, it's a
15:37:25   3   little easier because ultimately I'm going to get to the bottom
15:37:29   4   of it and I'm going to let a record be made here.  And I'm
15:37:32   5   going to give it --
15:37:32   6            Frankly, this opinion, this declaration, unless
15:37:37   7   I get overwhelmed, I'm going to just tell you right now --
15:37:40   8   later on I'm -- unless I get really overwhelmed, is going to
15:37:44   9   have little or no weight, but I'm going to let it get in the
15:37:48  10   record because of where we are now.
15:37:51  11            So I'm tired of haggling about it now.
15:37:55  12   Mr. Pazos, as I recall his expert report -- and I could be
15:38:01  13   wrong -- it certainly didn't regard the benign condition -- it
15:38:06  14   wasn't involving benign conditions Sunday morning.
15:38:10  15            But nevertheless, with all that in mind and
15:38:12  16   because of where we are now, and because of the ruling that I
15:38:14  17   made, and because we didn't focus on his expertise, I'm going
15:38:18  18   to let it go in and it will go -- I hate to sound like a state
15:38:22  19   judge, but it will go to the weight.  That's pretty much what
15:38:25  20   I'm going to do and I will let him testify.
15:38:31  21            You got your objections on the record.
15:38:33  22            MR. RAFFMAN:  Thank you, Your Honor.
15:38:34  23            I just -- if I might react to what Mr. Best
15:38:38  24   has --
15:38:38  25            THE COURT:  You may.

| | | |
|---|---|---|
| 15:38:38 | 1 | **MR. RAFFMAN:**  -- represented to the Court about |
| 15:38:40 | 2 | Mr. Pazos' opinion. |
| 15:38:41 | 3 | **THE COURT:**  I'll hear that.  And if you want to |
| 15:38:42 | 4 | counter -- |
| 15:38:42 | 5 | **MR. RAFFMAN:**  I just want to preview for Your Honor |
| 15:38:45 | 6 | that the opinion that the barge broke away on Sunday morning as |
| 15:38:49 | 7 | a result of wave reflection is nowhere. |
| 15:38:53 | 8 | **THE COURT:**  Well, I've read the report.  And that's |
| 15:38:56 | 9 | why I asked Mr. Best, if he wondered why I was interrupting |
| 15:39:00 | 10 | him, that would be news to me, let me just say.  And again, |
| 15:39:04 | 11 | we've already discovered I'm not omniscient. |
| 15:39:09 | 12 | But I could be wrong.  It's got to be really |
| 15:39:12 | 13 | hard to believe that at 11:00 -- it's kind of a mystery, but |
| 15:39:17 | 14 | there are mysteries in the world.  If the two people I believe |
| 15:39:20 | 15 | who saw a barge and there's no record of the barge leaving, |
| 15:39:23 | 16 | well, that's another mystery that I'll have to resolve.  That's |
| 15:39:26 | 17 | why I'm here.  We'll see what happens. |
| 15:39:29 | 18 | By I appreciate your remarks.  Forgive the |
| 15:39:33 | 19 | Court's impatience, but I just want to be able to get my point |
| 15:39:38 | 20 | across.  I'm the trier of facts.  It's best to listen to me |
| 15:39:43 | 21 | because -- I do listen.  I talk, but I also listen.  So make |
| 15:39:46 | 22 | your points, but understand that I've read these reports and |
| 15:39:51 | 23 | understand, something's got to make sense to me or it's not |
| 15:39:54 | 24 | going to have much persuasive power.  Okay. |
| 15:39:59 | 25 | **MR. RAFFMAN:**  Thank you, Your Honor. |

| | | |
|---|---|---|
| 15:40:00 | 1 | THE COURT:  All right.  Thank you very much. |
| 15:40:00 | 2 | Mr. Best? |
| 15:40:01 | 3 | MR. BEST:  In order not to belabor the declaration, |
| 15:40:03 | 4 | since it's been discussed and Your Honor has read it -- |
| 15:40:06 | 5 | THE COURT:  Is this yours?  Did I take your |
| 15:40:07 | 6 | declaration?  Do you have one? |
| 15:40:10 | 7 | MR. BEST:  No, I have one. |
| 15:40:11 | 8 | THE COURT:  Okay.  I've read it. |
| 15:40:12 | 9 | MR. BEST:  Since Your Honor's read it and it's in |
| 15:40:14 | 10 | evidence, I'm not going to belabor it by having the witness |
| 15:40:17 | 11 | repeat and parrot simply what's in the declaration.  I think |
| 15:40:20 | 12 | it's been exhausted. |
| 15:40:23 | 13 | THE COURT:  Thank you. |
| 15:40:24 | 14 | You've never had a chance to start your |
| 15:40:26 | 15 | questioning, I don't think. |
| 15:40:28 | 16 | MR. BEST:  No, I haven't. |
| 15:40:30 | 17 | THE COURT:  Then you really will be genuinely |
| 15:40:33 | 18 | uninterrupted.  Go ahead, sir. |
| 15:40:35 | 19 | MR. BEST:  I don't know.  It's lengthy, Judge. |
| 15:40:37 | 20 | Things don't go that simply. |
| 15:40:43 | 21 | THE COURT:  Okay. |
| 15:40:45 | 22 | BY MR. BEST: |
| 15:40:46 | 23 | Q.   In your report, which is part of Exhibit 387, you've |
| 15:40:50 | 24 | listed materials you had reviewed at the time that you prepared |
| 15:40:54 | 25 | that report, which was dated March 11th, 2009.  For |

15:41:01  1   completeness of the record, have you reviewed additional

15:41:04  2   materials since that time?

15:41:05  3   A.   Yes, sir.

15:41:06  4   Q.   What are the other materials you've reviewed since that

15:41:09  5   time?

15:41:10  6   A.   I've reviewed expert reports from the defense side,

15:41:15  7   Mr. Strouse and Captain Ryan and one other gentleman, and also

15:41:26  8   affidavits of the two people that testified today.

15:41:30  9   Q.   All right.  And you were here for their testimony?

15:41:34  10  A.   Yes, I was here for most of the testimony of the lady and

15:41:40  11  all the testimony of the gentleman.

15:41:42  12  Q.   Do the additional materials you reviewed include -- and I

15:41:46  13  don't know when you reviewed these, but we have listed in our

15:41:50  14  exhibits, 390 is the Coast Guardsman's Manual; 391, the Blue

15:41:56  15  Jacket Manual; 392, The Seamanship Fundamentals for Deck

15:42:00  16  Officers; 393, Naval Ship Handling; and 394, Dictionary of Old

15:42:05  17  Sea Terms; and finally, 395, Knight's Modern Seamanship.

15:42:12  18          Those are also materials you've reviewed?

15:42:14  19  A.   Yes.

15:42:14  20  Q.   And they pertain -- in most respects, do those materials

15:42:17  21  pertain to the mooring issues in this case?

15:42:19  22  A.   I'm sorry?

15:42:20  23  Q.   Those materials, those reference materials I just listed

15:42:23  24  from our exhibit list, pertain to the mooring issues in this

15:42:26  25  case?

15:42:26  1   A.   Yes.
15:42:26  2   Q.   And has anything that you have reviewed since you've
15:42:30  3   prepared your report changed the opinions you gave in that
15:42:34  4   report?
15:42:35  5   A.   No.
15:42:35  6   Q.   And what has been the effect of the materials you reviewed
15:42:38  7   on the opinions you gave in the report?
15:42:40  8   A.   The fact that -- it's my opinion they supported the
15:42:44  9   opinions I offered.
15:42:50  10  Q.   And the exhibits I just listed, 390 through 395, are those
15:42:58  11  authorities typically relied upon by mariners and seamen and
15:43:02  12  those who teach mariners and seamen on subjects including
15:43:06  13  mooring?
15:43:07  14  A.   Yes, they come directly from textbooks that I use in my
15:43:11  15  lectures.
15:43:12  16  Q.   And they're considered authoritative text by you as a
15:43:15  17  teacher of seaman of these sorts of things?
15:43:17  18  A.   Yes.  They're publicly available and they're well known by
15:43:20  19  mariners.
15:43:20  20  Q.   And they've confirmed your opinions that you gave in your
15:43:23  21  report on mooring issues in this case?
15:43:25  22  A.   Yes.
15:43:27  23  Q.   Now, you were also at your deposition furnished with some
15:43:31  24  photographs by defense counsel of the barges -- of the barge
15:43:37  25  that you did not have at the time that you prepared that

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| 15:43:40 | 1 | report; am I correct? |
| 15:43:42 | 2 | **A.**   That's correct. |
| 15:43:42 | 3 | **Q.**   And those photographs showed what that was of interest to |
| 15:43:46 | 4 | you? |
| 15:43:47 | 5 | **A.**   They showed wires, ratchets and other hardware that was on |
| 15:43:55 | 6 | the 4727 as it was when it was in the neighborhood, in the |
| 15:44:01 | 7 | Ninth Ward. |
| 15:44:02 | 8 | **Q.**   Okay.  These, likewise, just simply confirmed your |
| 15:44:08 | 9 | previous opinions and did not change them? |
| 15:44:09 | 10 | **A.**   That's correct. |
| 15:44:10 | 11 | **MR. BEST:**  I would ask if defense counsel would be so |
| 15:44:12 | 12 | kind as to demonstrate, through your technician, Defense |
| 15:44:16 | 13 | Exhibit 252, particularly photographs 35 through 41.  And those |
| 15:44:21 | 14 | are -- and we'll do one at a time. |
| 15:44:26 | 15 | What I'm going to ask him to do is to say what's |
| 15:44:28 | 16 | in the photograph and then later we'll get to his opinion. |
| 15:44:30 | 17 | **THE COURT:**  Thank you. |
| 15:44:31 | 18 | **MR. BEST:**  This is a predicate since this is |
| 15:44:32 | 19 | additional material he reviewed that did not have the final -- |
| 15:44:34 | 20 | **THE COURT:**  Thank you, sir. |
| 15:44:44 | 21 | **MR. BEST:**  I'm sorry.  That's the wrong number.  I |
| 15:44:46 | 22 | think -- I'm sorry.  Those are the photographs recently |
| 15:44:50 | 23 | furnished, which is my next question.  I think these |
| 15:44:53 | 24 | photographs are attached in Plaintiffs' Exhibit 387, which is |
| 15:45:01 | 25 | the exhibits to the deposition of Donald Green, the |

15:45:06  1  photographic exhibits.  I'll give you a moment to see if you

15:45:09  2  can find those.

15:45:11  3            While you're locating those, sir, we can go

15:45:15  4  ahead -- I don't want to get ahead of myself.

15:45:31  5  **BY MR. BEST:**

15:45:33  6  **Q.**   Okay.  Let's take them one at a time.  We have Plaintiffs'

15:45:36  7  Exhibit 388.  Is that one of the photographs furnished to you

15:45:39  8  by defense counsel at the time of your deposition?

15:45:41  9  **A.**   Yes, it is.

15:45:42  10 **Q.**   And what does that show that was of interest to you in

15:45:45  11 terms of the mooring issues in this case?

15:45:47  12 **A.**   It shows that there was standing wire attached to the

15:45:53  13 kevel on Barge 727, and the bitter end is over the side of the

15:46:02  14 barge -- it continues over the side of the barge.

15:46:04  15 **Q.**   And these you understood to be photographs taken of the

15:46:06  16 barge while it's sitting on the ground in the Ninth Ward after

15:46:09  17 the storm?

15:46:09  18 **A.**   That's what I understand, yes.

15:46:11  19 **Q.**   And the mooring wires coming down, we see the white thing

15:46:15  20 with the horns is the kevel?

15:46:18  21 **A.**   Yes.

15:46:18  22 **Q.**   And next to it we have what looks like a round thing.  Is

15:46:21  23 that what somebody -- I think Mr. Thigpen described previously

15:46:24  24 as a button?

15:46:25  25 **A.**   That's correct, yes.

15:46:26  1   **Q.**   So here we have what appears to be a steel cable attached
15:46:29  2   to the kevel, and doing what?
15:46:32  3   **A.**   It's just draped over the side.
15:46:35  4   **Q.**   Okay.  And your understanding from the testimony you've
15:46:41  5   heard here in court and from the depositions that you reviewed
15:46:43  6   in preparing your report was that those wires were not used in
15:46:48  7   mooring the vessel?
15:46:49  8   **A.**   That's correct.
15:46:49  9   **Q.**   But they were, by virtue of this photo, available?
15:46:54  10  **A.**   Yes, they were on the vessel.
15:46:55  11          **MR. BEST:**  Next photo, please.
15:46:57  12  **BY MR. BEST:**
15:46:57  13  **Q.**   This is also part of Plaintiffs' Exhibit 388, a
15:47:08  14  photographic exhibit bearing No. 06-4132 below the 388.  Is
15:47:14  15  this another photograph furnished to you at the time of your
15:47:16  16  deposition?
15:47:17  17  **A.**   Yes.  Those are permanent ratchets as well as wire
15:47:20  18  attached to them.
15:47:21  19  **Q.**   What are these used for on barges like this?
15:47:23  20  **A.**   They're used to make up tows, marry barges together.  They
15:47:31  21  use wires and ratchets -- you can pull the wires from one barge
15:47:37  22  to another, and they use the ratchet to take the slack out of
15:47:39  23  it and draw the barges close to each together.
15:47:43  24  **Q.**   So if a barge like this is being moored to another barge,
15:47:46  25  in a fleet, for example, these are the wires that can be used

15:47:49  1    to moor them together?

15:47:50  2    A.   Yes.  They are used for that.

15:47:52  3    Q.   And the ratchets tighten them and bring the vessels

15:47:56  4    together?

15:47:56  5    A.   Yes.  The ratchets take the slack out of the cable,

15:47:59  6    exactly.

15:48:00  7    Q.   And you, likewise, understand that these were not in use

15:48:05  8    in the mooring of this vessel at the time it was moored at

15:48:08  9    Lafarge prior to the storm?

15:48:09  10   A.   Yes.  All the testimony is that they only used soft line.

15:48:13  11   Q.   Okay.

15:48:17  12        MR. BEST:  Next photograph.  That's it.

15:48:17  13   BY MR. BEST:

15:48:18  14   Q.   Now, in addition to those photographs that you got at the

15:48:22  15   deposition from defense counsel, you were more recently

15:48:24  16   furnished with additional photographs of mooring lines on the

15:48:31  17   barge that remained at the dock and of the mooring lines on

15:48:34  18   this vessel; is that correct?

15:48:36  19   A.   Yes.  The -- those photographs also show hardware and

15:48:41  20   wires and --

15:48:43  21   Q.   We're going to get them.  I'm going to call them up.

15:48:46  22        MR. BEST:  And now I would ask the defendants for the

15:48:48  23   exhibit I asked for prematurely a moment ago, DX-252, photos 35

15:48:57  24   through 41.

15:49:03  25        I believe we're loading them, Your Honor.

459

15:49:10   1        **MR. BEST:**  This photograph is labeled as Exhibit 5 on

15:49:15   2   the photo.

15:49:30   3        **THE COURT:**  Do you-all need a brief break?

15:49:31   4        **MR. BEST:**  Yes, I'm trying to figure out how to

15:49:33   5   identify it.  We were given the materials.  Okay.  There it is

15:49:36   6   at the bottom.  D -- on the lower right-hand corner, D252-035.

15:49:42   7   So it's identified by that for these purposes --

15:49:48   8        **THE COURT:**  Thank you very much, Counsel.

15:49:49   9        **MR. BEST:**  -- and then Exhibit 5.

15:49:49  10   BY MR. BEST:

15:49:50  11   Q.   And these photographs were more recently furnished to you,

15:49:53  12   and these were the ones that were photographs -- it was

15:50:00  13   represented to you, as I understand it, that these were taken

15:50:03  14   shortly after the hurricane during Lafarge's own investigation

15:50:07  15   by its staff and representatives?

15:50:09  16   A.   That's my understanding, yes.

15:50:11  17   Q.   Okay.  And what is the photograph at the top significant

15:50:15  18   of to you?

15:50:16  19   A.   That's a -- an eye of a piece of mooring line, the

15:50:20  20   remnants of a mooring line.

15:50:29  21        **MR. BEST:**  So it's kind of hard to tell in this

15:50:30  22   photograph where it is and what we're looking at, so let's go

15:50:31  23   to the next photograph in the sequence, which is D252-036.

15:50:35  24   BY MR. BEST:

15:50:35  25   Q.   Let me represent to you that these are photographs of the

460

15:50:38  1  barge to which 2747 [sic] was moored, which remained at the

15:50:42  2  dock at the Lafarge facility.  And these are photographs taken

15:50:47  3  by Lafarge as part of their investigation shortly after the

15:50:50  4  storm.  And these are the mooring lines found on that adjacent

15:50:56  5  barge.

15:50:57  6          You reviewed these photograph?

15:50:59  7  A.   Yes, I did.

15:51:01  8          MR. BEST:  Let's go to the next one in the sequence.

15:51:04  9  BY MR. BEST:

15:51:07  10  Q.   What's significant -- and this is D252-037.  What's

15:51:13  11  significant about these photos?

15:51:14  12  A.   Well, the top photo shows the piece of mooring line, a

15:51:20  13  remnant of a mooring line.  The eye was passed through the

15:51:24  14  kevel and draped over one horn of the kevel.

15:51:31  15          And the bitter end that looks like it's parted, I

15:51:36  16  understand was leading up to the 4727.

15:51:38  17  Q.   So just to put this photograph in context, if we assume

15:51:41  18  this is the barge that remained at the dock and these were the

15:51:44  19  blue mooring lines that moored it to the 4727, they would have

15:51:50  20  been going up from this kevel to the higher level of the 4727?

15:51:56  21  A.   That's correct, yes.

15:51:56  22  Q.   To kevels on the 4727.

15:51:58  23  A.   Yes.

15:52:01  24          MR. BEST:  And to the next photograph in this

15:52:04  25  sequence.  This is D252-038.

15:52:13    1  **BY MR. BEST:**

15:52:13    2  **Q.**   These are more photographs of parted lines.

15:52:16    3  **A.**   Yes, sir.

15:52:22    4  **Q.**   And the bottom photograph shows the actual dock itself,

15:52:26    5  including the cement bollards to which the inboard barge was

15:52:32    6  moored?

15:52:32    7  **A.**   That's correct, yes.

15:52:33    8          **MR. BEST:**  The next photograph in the sequence.

15:52:35    9  **BY MR. BEST:**

15:52:37   10  **Q.**   D252-039, the bottom photograph, again I'll represent to

15:52:43   11  you was on the barge that remained at the dock.  As you could

15:52:47   12  see, the barge is in the water, as opposed to the other barge

15:52:51   13  which was on the land in the neighborhood.

15:52:56   14          Now, this barge -- this photo at the bottom, again we

15:52:59   15  have a broken blue mooring line?

15:53:01   16  **A.**   Yes.  It looked like it parted right there at the eye.

15:53:05   17  **Q.**   Close -- at the knot, close to the kevel?

15:53:07   18  **A.**   Yes.

15:53:07   19  **Q.**   Okay.  We'll talk about the knot and the moorings later.

15:53:12   20          Now, in that same photo, beyond the kevel, we have

15:53:14   21  another button.  And what's on the button?

15:53:17   22  **A.**   It's a permanent wire.

15:53:18   23  **Q.**   And, of course, based upon the testimony, you have no

15:53:20   24  indication that that wire cable was used in the mooring of the

15:53:25   25  vessel prior to the storm to the 4727?

15:53:28   1   A.   No, all the information I have is that no wires were used.

15:53:32   2   Q.   All right.

15:53:32   3           MR. BEST:   And the next photograph in the sequence.

15:53:36   4   This is D252-040.

15:53:42   5   BY MR. BEST:

15:53:42   6   Q.   What are the significance, particularly -- what's the

15:53:48   7   significance of these photos?

15:53:51   8   A.   Well, again, it's pieces of mooring line that was, I

15:53:54   9   understand, used to moor the 4727 to the 4745.

15:53:58   10   Q.   Now, in the photograph on the right here, this kevel that

15:54:02   11   has the blue line around it is -- it appears to be somewhere in

15:54:07   12   midship.  That is, it's not at either end of the barge; is that

15:54:13   13   correct?

15:54:13   14   A.   That's correct.

15:54:14   15   Q.   So fair to say that would be generally consistent with the

15:54:15   16   testimony that you read that there were three single part lines

15:54:17   17   on the barge?

15:54:18   18   A.   Yes.  It was my understanding there were two breast lines,

15:54:21   19   one at each end, and a spring line between the two barges.

15:54:25   20   Q.   And just for the completeness of the record and the

15:54:27   21   benefit of the Court, should the Court need the information,

15:54:30   22   what is a spring line and how does it differ from the mooring

15:54:33   23   lines at each end of the barge?

15:54:35   24   A.   The mooring lines at the end of the barge would be

15:54:38   25   described as breast lines, which means they go perpendicular

15:54:44  1  from the barge, from barge to barge, straight to the barge and

15:54:50  2  not at an angle.

15:54:53  3          A spring line is at an angle, meaning it's made fast

15:54:58  4  to one kevel and then it's led forward, or led aft, to a kevel

15:55:02  5  on the other barge, which means that it's at an oblique angle

15:55:08  6  or parallel to the two barges.

15:55:14  7  Q.   So it's not a direct perpendicular mooring?

15:55:22  8  A.   That's correct.  It's used to prevent a vessel from moving

15:55:26  9  laterally against each other.

15:55:28  10  Q.   And I think you also read way back in the deposition

15:55:29  11  testimony of Mr. Thigpen, who observed the condition of all

15:55:34  12  this mooring when he came to assist in the topping around of

15:55:36  13  the vessels?

15:55:37  14  A.   Yes.

15:55:37  15  Q.   And did you see there where he said that, in addition to

15:55:39  16  the mooring at each end of the barge, there was also mooring

15:55:44  17  more or less at midships at an angle?

15:55:48  18  A.   Yes.

15:55:48  19  Q.   Is that consistent with a spring line, as you understand

15:55:50  20  it?

15:55:51  21  A.   Yes.

15:55:51  22  Q.   Is the location of this --

15:55:51  23          MR. WALKER:  Your Honor, that was not what

15:55:53  24  Mr. Thigpen testified to in this courtroom.

15:55:56  25          THE COURT:  Well, an objection like that is

| | | |
|---|---|---|
| 15:55:59 | 1 | extraordinarily difficult for me to rule on.  I'll note your |
| 15:56:02 | 2 | objection and we will -- it's in the record.  When I read the |
| 15:56:06 | 3 | whole transcript, I will make that determination. |
| 15:56:10 | 4 | MR. WALKER:  Thank you, Your Honor. |
| 15:56:10 | 5 | BY MR. BEST: |
| 15:56:11 | 6 | Q.   In any case, is this photo on the right of this |
| 15:56:14 | 7 | Exhibit 252-040 generally consistent with a spring line and |
| 15:56:19 | 8 | your understanding of that witness' deposition? |
| 15:56:21 | 9 | A.   Well, I can't tell -- I'm only going on the testimony that |
| 15:56:25 | 10 | was given that the line in the middle was going at an angle and |
| 15:56:31 | 11 | not straight across to the barge.  And that would -- that would |
| 15:56:35 | 12 | lead me to believe that it was deployed as a spring line. |
| 15:56:39 | 13 | Q.   In any case, this certainly is a kevel that is not at |
| 15:56:43 | 14 | either end of the barge? |
| 15:56:44 | 15 | A.   That's right.  What remains on it is the remains of a |
| 15:56:48 | 16 | mooring line. |
| 15:56:50 | 17 | THE COURT:  Do you want to point to it and make a |
| 15:56:51 | 18 | mark on it just for the record?  You said this is not a kevel. |
| 15:56:57 | 19 | This is a kevel that is not being utilized.  Is that -- |
| 15:57:01 | 20 | MR. BEST:  No, I didn't say it was not being |
| 15:57:03 | 21 | utilized.  I said this is a kevel that is at neither end of the |
| 15:57:08 | 22 | barge.  This is more or less at midships and is consistent with |
| 15:57:13 | 23 | what you have said was a spring line and what you understood |
| 15:57:17 | 24 | Mr. Thigpen said. |
| 15:57:17 | 25 | THE COURT:  I got you.  Thanks. |

15:57:17   1   BY MR. BEST:

15:57:18   2   Q.   Is that the point, where I put that purple mark?

15:57:20   3   A.   Yes.

15:57:20   4   Q.   Now, this line is bright blue?

15:57:22   5   A.   Yes.

15:57:23   6   Q.   That's consistent with perhaps being a new line, as you've

15:57:26   7   heard some of the testimony?

15:57:27   8   A.   Yes.

15:57:29   9   Q.   Had some new rope that they might have used?

15:57:33   10  A.   Yes, sir.

15:57:33   11  Q.   This barge is 200 feet long; am I right?

15:57:37   12  A.   Correct.  Yes, sir.

15:57:40   13  Q.   And the barge that was moored to it that's no longer at

15:57:42   14  the dock next to it was also 200 feet long?

15:57:45   15  A.   Yes.

15:57:46   16  Q.   Just so I got this photograph right, what we had, based on

15:57:49   17  everything you've reviewed, is three of these blue lines, like

15:57:59   18  we see in this picture, one at each end that went perpendicular

15:58:02   19  and one in the middle that may have been a spring line at an

15:58:06   20  angle?

15:58:06   21  A.   That's correct, yes.

15:58:07   22  Q.   And that's all?

15:58:07   23  A.   That's the testimony.

15:58:08   24  Q.   For two 200-foot-long barges, I guess, if you had gone up

15:58:12   25  five or six stories above the barges, would look like three

15:58:16  1  blue threads; is that fair?

15:58:18  2  **A.**   Yes.

15:58:18  3  **Q.**   And that's all the mooring that was between these two

15:58:18  4  barges?

15:58:19  5           **THE COURT:**  Do you have an objection?

15:58:20  6           **MR. WALKER:**  Your Honor, I realize Mr. Green is an

15:58:23  7  expert, but I would like to hear him, so my objection is

15:58:28  8  leading more than necessary.

15:58:29  9           **THE COURT:**  I'm going to overrule the objection.

15:58:32  10          Although, you're not by right entitled to lead

15:58:33  11  experts in federal court under the rule, the Court has ultimate

15:58:36  12  discretion over that and I'm going to allow you to lead.

15:58:39  13  **BY MR. BEST:**

15:58:41  14  **Q.**   Now --

15:58:41  15          **THE COURT:**  Not testify for him, but to lead.  Go

15:58:43  16  ahead, sir.

15:58:44  17          **MR. BEST:**  Thank you, Your Honor.

15:58:45  18          I think we may be almost finished.  There's one

15:58:48  19  more exhibit in this sequence that I think is the final one.

15:58:51  20  This is D252-041.

15:59:00  21  **BY MR. BEST:**

15:59:00  22  **Q.**   At the top, we have actually the 427 -- 4727, which is in

15:59:05  23  the Ninth Ward apparently at a time when the ground still looks

15:59:09  24  wet.  Do you see that?

15:59:10  25  **A.**   Yes, sir.

| | | |
|---|---|---|
| 15:59:10 | 1 | **Q.**   And what do you see that is of significance on the deck of |
| 15:59:15 | 2 | the 4727? |
| 15:59:17 | 3 | **A.**   Well, the top photograph, if I can see correctly, it looks |
| 15:59:21 | 4 | like the remnants of a mooring line. |
| 15:59:26 | 5 | **Q.**   You're talking about -- |
| 15:59:28 | 6 | **THE COURT:**  Is it the top photograph? |
| 15:59:31 | 7 | **MR. BEST:**  Yes. |
| 15:59:31 | 8 | BY MR. BEST: |
| 15:59:31 | 9 | **Q.**   The top photograph, what looks like a white kevel -- |
| 15:59:34 | 10 | **A.**   Yes. |
| 15:59:36 | 11 | **Q.**   -- appears to have a little, thin blue thread of mooring |
| 15:59:39 | 12 | line going through the kevel and then laying up on the deck. |
| 15:59:42 | 13 | **THE COURT:**  Would you be kind enough to point that |
| 15:59:44 | 14 | out to the, obviously, vision-impaired Court. |
| 15:59:50 | 15 | **MR. BEST:**  I'm going to try to touch it just below |
| 15:59:53 | 16 | the kevel.  Well, I went over the line, but -- |
| 15:59:55 | 17 | **THE COURT:**  Okay.  But that's where -- |
| 15:59:55 | 18 | **MR. BEST:**  That's what I'm talking about. |
| 15:59:55 | 19 | **THE COURT:**  I'll clear that.  I simply had trouble |
| 15:59:58 | 20 | seeing it. |
| 15:59:58 | 21 | BY MR. BEST: |
| 15:59:59 | 22 | **Q.**   And then it appears that blue line goes back behind the |
| 16:00:01 | 23 | kevel and the remnants of the line, or some length of it, |
| 16:00:06 | 24 | appear to be stacked up against where the bulwark is? |
| 16:00:09 | 25 | **A.**   Yes. |

| | | |
|---|---|---|
| 16:00:11 | 1 | **Q.**   So I know we don't have a measurement of that line from |
| 16:00:13 | 2 | the photo, but does the fact that we're not just looking at a |
| 16:00:19 | 3 | stub like we are at the piece at the dock where you saw it |
| 16:00:22 | 4 | broken past the knot -- but it certainly makes sense that there |
| 16:00:28 | 5 | could have been a longer piece of line on this barge and a |
| 16:00:30 | 6 | shorter piece of line that was left on the barge that stayed |
| 16:00:33 | 7 | moored at the dock? |
| 16:00:34 | 8 | **A.**   Yes.  And it would be my opinion that when it parted, that |
| 16:00:37 | 9 | line recoiled back and went up on top of the deck. |
| 16:00:41 | 10 | **Q.**   And finally, at the bottom of this last photographic |
| 16:00:47 | 11 | exhibit, 041, we have another kevel that again appears to be a |
| 16:00:50 | 12 | midships kevel; that is, it's at neither end of the barge? |
| 16:00:53 | 13 | **A.**   Yes, sir. |
| 16:00:53 | 14 | **Q.**   And it has a section of blue line made up to it, a single |
| 16:00:58 | 15 | part line draped down some distance, almost to the bottom of |
| 16:00:58 | 16 | the hull; is that correct? |
| 16:01:00 | 17 | **A.**   Yes, that's correct. |
| 16:01:01 | 18 | **Q.**   Would that be the counterpart of what you've described in |
| 16:01:04 | 19 | the previous photographs as being what you appreciated to be a |
| 16:01:07 | 20 | spring wire? |
| 16:01:08 | 21 | **A.**   Yes, that would the other end of it. |
| 16:01:10 | 22 | **Q.**   And the fact that we had a long length of blue line on the |
| 16:01:14 | 23 | vessel that remained at the dock at the midships kevel and we |
| 16:01:18 | 24 | have a long length of blue line on this midships kevel also is |
| 16:01:23 | 25 | consistent, if you put the two lengths together, with it being |

16:01:26  1  a spring line, which would have more length than a

16:01:29  2  perpendicular line?

16:01:30  3  **A.**   That's correct.

16:01:33  4           **MR. BEST:**  All right.  Thank you, Your Honor.

16:01:38  5  **BY MR. BEST:**

16:01:38  6  **Q.**   Again, just summarily, these new photographs that you got

16:01:43  7  recently don't change your previous opinions about the quality

16:01:46  8  of the mooring job that was done here?

16:01:48  9  **A.**   No.

16:01:48  10 **Q.**   They merely reinforce those opinions?

16:01:52  11 **A.**   That's correct.

16:01:52  12 **Q.**   All right.  In addition, I think you, since your report,

16:01:57  13 have gotten copies of the official documentation of the

16:02:00  14 Barge 4727?

16:02:01  15 **A.**   Yes.

16:02:02  16 **Q.**   At the time of your report, did you have that?

16:02:04  17 **A.**   No, I had -- during my deposition with Mr. Walker, I told

16:02:10  18 him I would try to look for copies of the document online, but

16:02:16  19 I was unsuccessful.  So I put in my report the documentation

16:02:20  20 was unknown.

16:02:21  21 **Q.**   Now, before we get further into your particular opinions

16:02:24  22 about the mooring and what wasn't done that should have been

16:02:27  23 done and whatnot, let me ask you another line of questioning

16:02:31  24 that is included in your report.

16:02:35  25           Are there federal regulations that apply to the

16:02:37   1    mooring of vessels?

16:02:38   2    **A.**   Yes.

16:02:39   3    **Q.**   And have you referenced those in your report?

16:02:42   4    **A.**   Yes, I did.

16:02:43   5    **Q.**   Okay.  Now, there are just, I think, three or four of

16:02:47   6    them.

16:02:48   7              **MR. BEST:**  And, Your Honor, what I'd like to do for

16:02:51   8    continuity and context is -- they are not listed as exhibits.

16:02:56   9    They are not in evidence because they are law.  But what I was

16:03:00   10   going to do, since the witness referred to them in his report,

16:03:03   11   is just put them on the ELMO and have him put them in context

16:03:07   12   from a marine operations standpoint.

16:03:10   13             **THE COURT:**  All right.

16:03:13   14             **MR. BEST:**  All right.

           15   **BY MR. BEST:**

16:03:13   16   **Q.**   The first one -- and that's one that you cited in your

16:03:16   17   report, is it not, sir, 6.14-1 of Title 33, subpart 6.14?

16:03:24   18   **A.**   Yes.

16:03:25   19   **Q.**   And you could see -- this is my highlight on these, in

16:03:29   20   order save time and expedite matters.

16:03:32   21             What's the subject matter of this section of the Code

16:03:34   22   of Federal Regulations, in general?

16:03:36   23   **A.**   It gives the kind of authority to inspect and determine

16:03:46   24   whether a barge is in danger or presents a danger to the port,

16:03:53   25   including its operation and its mooring, et cetera.

16:03:56  1   Q.   All right.  And the title of subpart 6.14, would you read
16:04:00  2   that, please?
16:04:01  3   A.   Yes.  It says "Safety Measures."
16:04:03  4   Q.   Actually, that's the title of 6.14.1.  That's the title of
16:04:10  5   subpart 6.14 above.
16:04:12  6   A.   Oh, its Title 33, Navigation -- Navigation and Navigable
16:04:21  7   Waters, Chapter 1 -- or Chapter I, whichever -- Coast Guard,
16:04:24  8   Department of Homeland Security, subchapter A.
16:04:28  9          Part 6, protection and security of vessels, harbors,
16:04:31  10  waterfront facilities.
16:04:33  11          Subpart 6.14, security of waterfront facilities and
16:04:36  12  vessels in port.
16:04:38  13  Q.   All right.  And based upon your experience and your
16:04:41  14  service in the Coast Guard, and your knowledge of these facts
16:04:45  15  and circumstances, are these provisions that, from a marine
16:04:48  16  operations standpoint, you, as somebody involved in marine
16:04:53  17  operations, would consult in order to determine what needed to
16:04:56  18  be done?
16:04:57  19  A.   Yes.  It gives the Coast Guard the authority to intervene,
16:05:00  20  in the event that it determined that a vessel is -- poses a
16:05:08  21  threat to the port.
16:05:09  22  Q.   All right.  Now, the first section here, entitled "Safety
16:05:12  23  Measures," refers to the commandant.  Is that the same as the
16:05:17  24  captain of the port that you've been referring to or is that
16:05:19  25  somebody different?

472

| | | |
|---|---|---|
| 16:05:20 | 1 | A.   No, that's the ultimate person in the Coast Guard. |
| 16:05:22 | 2 | Q.   Okay.  He's even above the captains of various ports? |
| 16:05:25 | 3 | A.   Right.  But that authority is delegated down to the |
| 16:05:28 | 4 | captain of the port. |
| 16:05:29 | 5 | Q.   All right.  But this chapter says that the objective here |
| 16:05:35 | 6 | is the safety of waterfront facilities and vessels in port; am |
| 16:05:38 | 7 | I correct? |
| 16:05:39 | 8 | A.   That's correct.  Yes, sir. |
| 16:05:39 | 9 | Q.   And that's what we're concerned with in this section of |
| 16:05:42 | 10 | federal regulations? |
| 16:05:43 | 11 | A.   Yes. |
| 16:05:44 | 12 | Q.   Okay.  Moving next to 6.19-1, what's this about? |
| 16:05:50 | 13 | A.   This is the same part of the CFR, Navigation and Navigable |
| 16:05:59 | 14 | Waters, subpart 6.19, Responsibility for Security of Vessels in |
| 16:06:05 | 15 | Waterfront Facilities.  And it's -- 6.19-1, outlines the |
| 16:06:12 | 16 | primary responsibility for safety. |
| 16:06:15 | 17 | Q.   As being with whom? |
| 16:06:16 | 18 | A.   As being:  "Nothing in this part would be" -- "shall be |
| 16:06:21 | 19 | construed as relieving the masters, owners, operators and the |
| 16:06:27 | 20 | agents of vessels or other waterfront facilities from their |
| 16:06:30 | 21 | primary responsibility for the protection and security of such |
| 16:06:32 | 22 | vessels or waterfront facilities." |
| 16:06:35 | 23 | Q.   Is the Lafarge cement facility that is the subject of this |
| 16:06:38 | 24 | case, a waterfront facility such as is being referred to here? |
| 16:06:44 | 25 | A.   Yes, it is. |

| | | |
|---|---|---|
| 16:06:46 | 1 | Q.   And -- |
| 16:06:47 | 2 | **MR. WALKER:**  Your Honor, I'm not sure of the purpose |
| 16:06:49 | 3 | of the display, but these are regulations that were struck by |
| 16:06:56 | 4 | *Daubert*. |
| 16:06:59 | 5 | **MR. SANDERS:**  Your Honor, I think that the *Daubert* |
| 16:07:02 | 6 | ruling was that he could not testify as to a violation. |
| 16:07:05 | 7 | **MR. BEST:**  That's correct. |
| 16:07:05 | 8 | **MR. SANDERS:**  Not as to other -- |
| 16:07:06 | 9 | **MR. BEST:**  And I haven't asked him that. |
| 16:07:07 | 10 | **MR. SANDERS:**  -- matters. |
| 16:07:08 | 11 | **MR. BEST:**  I'm trying to get the marine operations |
| 16:07:09 | 12 | context of the applicable regulations.  I was not asking him |
| 16:07:13 | 13 | the question that Your Honor has prohibited. |
| 16:07:15 | 14 | **THE COURT:**  Let me look at my ruling, just to make |
| 16:07:17 | 15 | sure.  I think it's document 19554. |
| 16:07:34 | 16 | **MR. BEST:**  Yes. |
| 16:07:34 | 17 | **THE COURT:**  Yes.  No opinions of law.  That's me.  I |
| 16:07:40 | 18 | have to do that. |
| 16:07:41 | 19 | **MR. BEST:**  I understand that, Your Honor.  Thank you. |
| 16:07:46 | 20 | Moving to -- |
| 16:07:47 | 21 | **THE COURT:**  You can cite me the law in your brief and |
| 16:07:49 | 22 | I can read it. |
| 16:07:51 | 23 | **MR. BEST:**  The last, 162.75. |
| | 24 | BY MR. BEST: |
| 16:07:59 | 25 | Q.   Now, we read down through the highlighted regulations. |

474

| | | |
|---|---|---|
| 16:08:04 | 1 | Are there specific instructions down here -- let me move it up |
| 16:08:09 | 2 | a little -- at the bottom of the page about the mooring of |
| 16:08:13 | 3 | vessels that the people involved in marine operations and |
| 16:08:16 | 4 | vessel mooring operations need to know about? |
| 16:08:18 | 5 | A.   Yes. |
| 16:08:18 | 6 | Q.   And particularly moving down to the section that says |
| 16:08:22 | 7 | "Anchoring or mooring," and below that, "Vessels or Tows," |
| 16:08:27 | 8 | subsection II, would you read that, please? |
| 16:08:31 | 9 | A.   Yes.  It says:  "When tied up individually, all vessels |
| 16:08:33 | 10 | and tows shall be moored by bow and stern lines.  Tows shall be |
| 16:08:38 | 11 | secured at sufficiently frequent intervals to ensure they're |
| 16:08:44 | 12 | not being drawn away from the bank by winds, currents, and the |
| 16:08:51 | 13 | suction of passing vessels." |
| 16:08:53 | 14 | Q.   In your experience in marine operations, are waterfront |
| 16:08:56 | 15 | facilities such as Lafarge, is this one of the places the |
| 16:09:05 | 16 | operators of waterfront facilities such as Lafarge, would look |
| 16:09:09 | 17 | to see what they were to do in the mooring of vessels? |
| 16:09:12 | 18 | A.   Yes. |
| 16:09:16 | 19 | Q.   And, of course, here, you do understand from the materials |
| 16:09:19 | 20 | you've read that the 4727 was moored by bow and stern lines? |
| 16:09:30 | 21 | A.   Yes. |
| 16:09:30 | 22 | Q.   This particular CFR doesn't get into doubling or single |
| 16:09:32 | 23 | part, double part, or anything like that, does it? |
| 16:09:35 | 24 | A.   No, sir.  The -- in my opinion, the operative words are |
| 16:09:38 | 25 | "shall be sufficient".  "Tows shall be secured at sufficiently |

475

16:09:43   1   frequent intervals to ensure they're not being drawn away from
16:09:48   2   the bank by winds, currents, or the suction of passing
16:09:53   3   vessels."
16:09:54   4   Q.   And again, the purpose of this is for the safety of marine
16:09:55   5   operations and waterfront facilities and vessels?
16:09:59   6   A.   Yes.  It's to prevent breakaways, to prevent collisions,
16:10:04   7   or allisions of those vessels that might break away, and also
16:10:09   8   to protect the environment.
16:10:11   9   Q.   And in your experience, are vessels that are improperly
16:10:14  10   moored that break away a danger to waterfront facilities and
16:10:17  11   other vessels?
16:10:18  12   A.   Yes.  They endanger -- they endanger anything on the
16:10:22  13   waterway in their path.
16:10:24  14   Q.   In the circumstances of this case, on the Inner Harbor
16:10:29  15   Navigational Canal, which we are referring to as the Industrial
16:10:30  16   Canal, would the waterfront facilities that you would be
16:10:33  17   concerned about, in your opinion, extend to the floodwalls?
16:10:37  18   A.   Yes, it would extend to floodwalls, it would extend to the
16:10:42  19   bridges in proximity to that location, and it would extend to
16:10:44  20   other vessels moored nearby.
16:10:57  21   Q.   Thank you, sir.
16:11:21  22        And in terms of risk to bridges, what are the risks
16:11:23  23   to the bridges in this area in a hurricane context, involving
16:11:27  24   the need for evacuation?
16:11:30  25   A.   The barge was -- the location that the barge was tied up

| | | |
|---|---|---|
| 16:11:36 | 1 | is between two bridges, main bridges, that are used for |
| 16:11:43 | 2 | evacuation of the Lower Ninth Ward and Chalmette.  That's the |
| 16:11:48 | 3 | Claiborne Avenue bridge and the Florida Avenue bridge. |
| 16:11:53 | 4 | **Q.**   And based upon all the materials you have reviewed, was |
| 16:11:58 | 5 | the 4727 moored to the adjacent barge and/or to the dock in an |
| 16:12:06 | 6 | adequate and proper manner, based upon your experience and |
| 16:12:09 | 7 | expertise? |
| 16:12:10 | 8 | **A.**   No.  It's my opinion that it was not moored adequately for |
| 16:12:14 | 9 | the conditions that they expected to arrive with the hurricane. |
| 16:12:31 | 10 | **Q.**   And is the fact that this barge was later found in the |
| 16:12:35 | 11 | Ninth Ward consistent with that opinion? |
| 16:12:37 | 12 | **A.**   Yes, it is. |
| 16:12:38 | 13 | **Q.**   Is it indicative of a breakaway? |
| 16:12:40 | 14 | **A.**   Yes.  It's my opinion the barge broke away and ended up in |
| 16:12:44 | 15 | the Ninth Ward. |
| 16:12:45 | 16 | **Q.**   And the photos of the ropes that we just referred to in |
| 16:12:50 | 17 | the last photographic series of exhibits that were furnished to |
| 16:12:54 | 18 | you as being taken by Lafarge's representatives, as part of |
| 16:12:57 | 19 | their investigation immediately following the storm, is the |
| 16:13:00 | 20 | state of those ropes, as we went through those photos, also |
| 16:13:04 | 21 | consistent with mooring failure and breakaway of the barge? |
| 16:13:07 | 22 | **A.**   Yes. |
| 16:13:13 | 23 | **Q.**   Given the -- and you've reviewed some weather records, |
| 16:13:16 | 24 | have you not, as well? |
| 16:13:18 | 25 | **A.**   Yes, sir, I did. |

16:13:18  1    **Q.**   What weather records did you review?

16:13:22  2    **A.**   They were the weather conditions at the Lakefront Airport.

16:13:28  3    **Q.**   In your opinion, based upon your experience, could a

16:13:31  4    reasonable and proper display of nautical skills have prevented

16:13:36  5    the vessel, in terms of mooring, from breaking away and

16:13:40  6    floating free, notwithstanding those conditions as evidenced by

16:13:40  7    the weather records you reviewed?

16:13:43  8    **A.**   Yes.  I think it could have been secured.

16:13:46  9    **Q.**   And that's, in fact, confirmed by the fact that the other

16:13:49  10   six barges at the location didn't breakaway?

16:13:51  11   **A.**   That's correct.

16:14:05  12   **Q.**   Now, have you reviewed the deposition of Roland Johnson,

16:14:14  13   who was another one of the crew members who was involved in the

16:14:17  14   mooring?

16:14:18  15   **A.**   Yes, sir.

16:14:19  16   **Q.**   Okay.

16:14:22  17          **MR. BEST:**  This is -- has been designated and put

16:14:24  18   into evidence by the parties, Your Honor.  But I'm just going

16:14:27  19   if ask him to assume that, as is shown with the ELMO on page 15

16:14:38  20   of the witness' deposition, when asked about -- talking about

16:14:42  21   the mooring of the northern tier of barges that did not break

16:14:46  22   away.

16:14:46  23   **BY MR. BEST:**

16:14:46  24   **Q.**   And if he testified that they were tied together in every

16:14:49  25   location on the barges, every little bitt, kevel, or cleat had

| | | |
|---|---|---|
| 16:14:54 | 1 | a rope on it, from what you have seen, was that methodology |
| 16:14:58 | 2 | which they applied to the northern tier applied to the 4727? |
| 16:15:03 | 3 | **A.**  No, sir. |
| 16:15:04 | 4 | **Q.**  Should it have been? |
| 16:15:05 | 5 | **A.**  It should have been, yes. |
| 16:15:06 | 6 | **Q.**  Do you see any explanation, from a marine operation |
| 16:15:11 | 7 | standpoint in the testimony of the fact witnesses you have |
| 16:15:14 | 8 | reviewed, for them having done every little bitt, kevel, or |
| 16:15:19 | 9 | cleat with a rope on it, on the northern tier and not doing |
| 16:15:22 | 10 | that on the southern tier? |
| 16:15:25 | 11 | **A.**  Yes.  The testimony of Mr. Smith and Mr. Busch indicated |
| 16:15:37 | 12 | that Mr. Busch wasn't really sure how many lines were on the |
| 16:15:42 | 13 | barge. |
| 16:15:42 | 14 |      Mr. Smith did, and said there were three lines.  And |
| 16:15:47 | 15 | that the -- both gentlemen expected that the barge was going to |
| 16:15:51 | 16 | be picked up. |
| 16:15:53 | 17 | **Q.**  All right.  Let me show you, also, more of Mr. Roland's |
| 16:15:58 | 18 | deposition testimony at page 16, and ask you to assume that the |
| 16:16:02 | 19 | mooring of the northern tier, in addition to being at every |
| 16:16:05 | 20 | bitt, kevel and mooring point, also that he did several |
| 16:16:10 | 21 | circles, that the rope went around each cleat more than once. |
| 16:16:13 | 22 |      Do you see that? |
| 16:16:13 | 23 | **A.**  Yes. |
| 16:16:14 | 24 | **Q.**  If you assume that to be true, is that a description of |
| 16:16:18 | 25 | doubling up or better? |

479

16:16:20   1   **A.**    Yes.  I think Mr. Thigpen yesterday said it perfectly.  Is

16:16:25   2   that using all of the line, and that is, if the line is 30 feet

16:16:34   3   and the barges are snubbed up against each other and you wrap

16:16:40   4   as many wraps as you can and use it all, because it just makes

16:16:47   5   it safer, they're less likely to break away.

16:16:52   6   **Q.**    And did you see any indication that they used several

16:16:54   7   circles of rope or doubling up or two part or three part lines

16:16:58   8   on the mooring of the 4727?

16:17:00   9   **A.**    No.  All of the testimony is that there was only one part

16:17:05  10   line going from the 4727 to the 4745.  I think that's...

16:17:12  11   **Q.**    Now, in addition to the failure to moor at every cleat,

16:17:15  12   kevel, button, or whatever it was, and in addition to not

16:17:20  13   doubling up, when we're talking about the 4727, we also had a

16:17:24  14   situation of what were the relative -- pertaining to the

16:17:29  15   heights of the vessels; is that correct?

16:17:31  16   **A.**    Yes.  The testimony is that there was six to eight feet of

16:17:37  17   difference in height between the deck of the 4727 and the 4745.

16:17:41  18   **Q.**    Okay.

16:17:42  19   **A.**    And so when they put the lines out, that meant that the

16:17:47  20   line had to go at an angle down to the loaded barge.  And

16:17:55  21   Mr. Thigpen testified that there was -- maybe yesterday, or I

16:17:58  22   know in his deposition -- that when he looked at the lines,

16:18:02  23   there was not enough line to -- to -- not enough line left over

16:18:07  24   to make a two part or double up the lines.

16:18:19  25   **Q.**    Okay.  Now, assuming, hypothetically, that the vessels are

16:18:23  1  not on the same height, that the outboard of the 4727 is about
16:18:27  2  eight feet higher, and assuming that because of that, as
16:18:30  3  Mr. Thigpen said, they can't bring them any closer than about
16:18:33  4  two feet apart?
16:18:35  5  A.   That's correct, yes.
16:18:36  6  Q.   So what does that allow, in terms of movement between
16:18:40  7  these vessels while they are moored, after the people who have
16:18:43  8  moored them have gone for the day?
16:18:48  9  A.   That allows -- that height difference and that fleet angle
16:18:52  10  between the two barges and the lines going down means that they
16:18:57  11  cannot get barges butted up close to each other.  And that
16:19:04  12  allows the two barges to move, or the outboard barge, the 4727,
16:19:10  13  some movement within its confines.
16:19:18  14       MR. BEST:  And just one moment, Your Honor.  I'm
16:19:23  15  flipping through another photographic exhibit.  162.
16:19:45  16  BY MR. BEST:
16:19:45  17  Q.   You've seen is this photo before, Mr. Green?
16:19:48  18  A.   Yes, sir.
16:19:48  19       THE COURT:  And that's Plaintiffs' Exhibit --
16:19:50  20       MR. BEST:  162.
16:19:51  21       THE COURT:  -- 162?
16:19:51  22            Thank you.
         23  BY MR. BEST:
16:19:54  24  Q.   Just, again, to put this in context for the record, would
16:19:58  25  you explain where you understand the 4727 to have been with

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

16:20:01  1    respect to these other barges which remained at the Lafarge

16:20:06  2    dock?

16:20:07  3    **A.**   It was abreast to the red barge, or the single barge,

16:20:10  4    against the dock.

16:20:15  5    **Q.**   Now, the barges in -- the five barges in the north tier

16:20:19  6    appear to be pretty close together?

16:20:20  7    **A.**   Yes.

16:20:22  8    **Q.**   Is it fair to say that, based on the height differential

16:20:25  9    of the 4727 and the red barge that remained against the dock,

16:20:28  10   that it could not have been brought as close to the red barge

16:20:31  11   as those white barges are to one another?

16:20:35  12              **MR. WALKER:**  Your Honor, these areas are beyond the

16:20:39  13   reports.

16:20:40  14              **THE COURT:**  Okay.  There's been an objection.

16:20:46  15              **MR. BEST:**  It is true that the aerial is not an

16:20:49  16   attachment to --

16:20:50  17              **THE COURT:**  He's not talking about the aerial.  He's

16:20:52  18   talking about the opinion he's rendering.

16:20:55  19              **MR. WALKER:**  That's correct.

16:20:56  20              **MR. BEST:**  Well, I just asked him where the barge

16:20:57  21   was, is the first one.  And second one -- I guess, Your Honor,

16:21:00  22   I have to say it's probably not in his report exactly as to

16:21:03  23   what the -- I don't know how you have an expert --

        24   **BY MR. BEST:**

16:21:07  25   **Q.**   Your report was how many pages, sir?

| | | |
|---|---|---|
| 16:21:11 | 1 | **THE COURT:**  Well, I've done it with -- I've done it |
| 16:21:12 | 2 | for 15 years, sir.  If we don't have rules as to expert |
| 16:21:16 | 3 | reports, we have anarchy.  So it has to be within the scope of |
| 16:21:20 | 4 | his report.  Logic and reason will prevail, I promise. |
| 16:21:24 | 5 | So if you can give me logic and reason, I'll -- |
| 16:21:27 | 6 | that it's within the scope of his report, I'll listen. |
| 16:21:31 | 7 | What opinion are you seeking to elicit, before |
| 16:21:33 | 8 | we elicit it, just so I understand it? |
| 16:21:35 | 9 | **MR. BEST:**  First, the question I think I asked is: |
| 16:21:36 | 10 | "Based upon the testimony of Mr. Thigpen, which was also in his |
| 16:21:41 | 11 | deposition, that they couldn't get it any closer than two feet |
| 16:21:43 | 12 | apart between the missing barge and the red barge?" |
| 16:21:46 | 13 | The question I think last asked was:  "So you |
| 16:21:49 | 14 | couldn't get them as close as the barges in the northern tier?" |
| 16:21:51 | 15 | Now he has testified very clearly in his report |
| 16:21:56 | 16 | and in deposition that the height differential, they shouldn't |
| 16:21:58 | 17 | have been moored that way.  And this is really the consequences |
| 16:22:01 | 18 | of that that I'm talking about. |
| 16:22:04 | 19 | **THE COURT:**  I'm going to allow it, based on the |
| 16:22:05 | 20 | height differential, because it's certainly in his report. |
| 16:22:08 | 21 | **MR. BEST:**  Okay. |
| | 22 | BY MR. BEST: |
| 16:22:09 | 23 | Q.   Going to -- the question was:  Could you bring those two |
| 16:22:13 | 24 | vessels, with the height differential, as close as the barges |
| 16:22:16 | 25 | in the north tier appear to be? |

| | | |
|---|---|---|
| 16:22:18 | 1 | **A.**   Yes and no.  Let me explain, Your Honor. |
| 16:22:21 | 2 | Is that if they lay up against each other, then |
| 16:22:25 | 3 | they're against each.  But if there's any movement, any tide, |
| 16:22:29 | 4 | any wind, whichever, that would play against the light barge, |
| 16:22:32 | 5 | it would move out, at least two, three feet away from the |
| 16:22:37 | 6 | adjacent barge because of the angle of the line. |
| 16:22:40 | 7 | **THE COURT:**  I understand. |
| | 8 | **BY MR. BEST:** |
| 16:22:43 | 9 | **Q.**   Okay.  Now, did you see any indication, in anything you |
| 16:22:47 | 10 | reviewed, that the northern tier of five and the southern tier |
| 16:22:49 | 11 | of two were moored together in any way? |
| 16:22:53 | 12 | **A.**   No.  The testimony is that they were not moored together. |
| 16:22:57 | 13 | **Q.**   Okay.  In addition to mooring, as Mr. Roland Johnson said, |
| 16:23:04 | 14 | the northern tier at every point, every kevel, would it be |
| 16:23:08 | 15 | possible -- assuming we didn't have the height differential -- |
| 16:23:10 | 16 | I understand that's a problem -- but setting it aside, if you |
| 16:23:13 | 17 | had barges all of the same height, could you moor all of them |
| 16:23:17 | 18 | together here, the north tier to the south tier? |
| 16:23:19 | 19 | **A.**   Yes.  In fact, that would have been advisable that they |
| 16:23:22 | 20 | would, rather than have two separate tiers, that they could |
| 16:23:26 | 21 | have married the lower tier to the upper tier.  In the event |
| 16:23:31 | 22 | this -- anything came loose, they would go away as a complete |
| 16:23:36 | 23 | package. |
| 16:23:36 | 24 | **Q.**   And that's commonly done in barge fleeting? |
| 16:23:39 | 25 | **A.**   Yes. |

| | | |
|---|---|---|
| 16:23:40 | 1 | **Q.**   And it's commonly done with wires? |
| 16:23:42 | 2 | **A.**   Yes. |
| 16:23:43 | 3 | **Q.**   Such as the 4727 was equipped with, as we have seen? |
| 16:23:48 | 4 | **A.**   Yes. |
| 16:23:49 | 5 | **Q.**   Now, this -- and really, I had my questions all laid out, |
| 16:24:08 | 6 | and now I'm just kind of running by the seat of my pants.  So |
| 16:24:12 | 7 | forgive me if these are not -- if they do not appear to you to |
| 16:24:13 | 8 | be in any particular order. |
| 16:24:16 | 9 |           You have heard the testimony, and you have seen it in |
| 16:24:18 | 10 | depositions before today, of Lafarge's description of |
| 16:24:22 | 11 | long-lining? |
| 16:24:23 | 12 | **A.**   Yes. |
| 16:24:23 | 13 | **Q.**   What did you understand, from materials you reviewed, |
| 16:24:25 | 14 | long-lining to be? |
| 16:24:28 | 15 | **A.**   The testimony that -- I think it was -- that the purpose |
| 16:24:32 | 16 | of it was to allow the fleet, or the tiers of barges, to, as |
| 16:24:38 | 17 | the surge came in, that they would obviously go up and float up |
| 16:24:44 | 18 | with the surge.  And that the long-lining on the pilings |
| 16:24:49 | 19 | against the dock would allow line to unwind from around the -- |
| 16:24:59 | 20 | the post on the dock and wouldn't -- it would allow the vessel |
| 16:25:06 | 21 | to continue to float up, as opposed to putting it in a bind. |
| 16:25:11 | 22 | **Q.**   Okay.  And you understood that the long-lining was |
| 16:25:21 | 23 | utilized only at the two barges that were right against the |
| 16:25:25 | 24 | wharf? |
| 16:25:25 | 25 | **A.**   Yes. |

16:25:26    1    **Q.**    And long-lining, as I understand it, was something that

16:25:29    2    they did in lieu of the old hurricane checklist policy that

16:25:32    3    said, "cable all barges"?

16:25:34    4    **A.**    That's correct.  Their written policy was -- their written

16:25:38    5    policy was that they should use cables.  But they changed that

16:25:42    6    some time ago.

16:25:43    7    **Q.**    Well, there's no documentation of it having been changed.

16:25:46    8    **A.**    Well, there was testimony --

16:25:49    9    **Q.**    I understand.  Did you see any documentation of it having

16:25:52   10    been changed, such as a publication and distribution to the

16:25:55   11    employees of Lafarge of a new hurricane checklist that said

16:25:59   12    this?

16:25:59   13    **A.**    No, sir.

16:26:00   14    **Q.**    And the only hurricane checklist said "Cable all barges to

16:26:04   15    shore"?

16:26:04   16    **A.**    That's correct.

16:26:05   17    **Q.**    Now, that doesn't -- "Cable all barges to shore," to you,

16:26:08   18    as marine operations, do you understand that to be limited to

16:26:11   19    the barge adjacent to the wharf?

16:26:14   20    **A.**    No.  I would mean it -- I would interpret that to mean

16:26:19   21    that it would be -- each barge would be cabled to each other

16:26:22   22    and then to the dock.

16:26:23   23    **Q.**    Okay.  So there would be multiple cables running to the

16:26:29   24    dock?

16:26:30   25    **A.**    Yes.  As the barges that we -- the pictures that you

16:26:34   1   showed me with the hardware on the deck of the 4727, I would

16:26:38   2   expect to see hardware and permanent cables on all those

16:26:43   3   barges.

16:26:44   4   Q.   So the checklist that said "Cable all barges to the dock,"

16:26:47   5   if we -- if we understand now we have the practice of

16:26:52   6   long-lining substituted for cabling here, were all these barges

16:26:56   7   long-lined to the dock?

16:26:58   8   A.   No.  Only the barge that was against the dock.

16:27:02   9   Q.   Right.  So in this particular exhibit that we're looking

16:27:07  10   at, Plaintiffs' Exhibit -- I'm sorry -- 162, we can see that

16:27:16  11   the northern tier of barges in this post-storm photograph is

16:27:21  12   canted?

16:27:22  13   A.   Yes.

16:27:22  14   Q.   And if we look close, it looks like there's still a line

16:27:26  15   running to the northern tier barge, where it has moved away

16:27:32  16   from the dock?

16:27:33  17   A.   That's correct.

16:27:33  18   Q.   Is that sort of consistent with the testimony about

16:27:36  19   long-lining that barge to the dock?

16:27:38  20   A.   Yes.

16:27:39  21   Q.   So it would appear that what happened is the vessels rose

16:27:42  22   on the tides with the storm, and the loops, at least at that

16:27:45  23   end of the barge, came over the bollard, and the result was

16:27:50  24   that that northern tier canted out?

16:27:53  25   A.   That's correct.

| | | |
|---|---|---|
| 16:27:55 | 1 | Q.   What is your opinion of the suitability for long-lining at |
| 16:28:00 | 2 | a commericial facility like this? |
| 16:28:01 | 3 | A.   Well, I don't agree that it should be done.  I think that |
| 16:28:05 | 4 | it should have been moored properly, and the use of cables |
| 16:28:09 | 5 | would have been better than having the long-line. |
| 16:28:12 | 6 | Q.   Okay. |
| 16:28:13 | 7 | A.   Their rationale for doing that was that they didn't want |
| 16:28:17 | 8 | the barges to go up and go on top of the dock. |
| 16:28:19 | 9 | Q.   And what are the risks of long-lining? |
| 16:28:22 | 10 | A.   The risk of long-lining is that it gives movement to that |
| 16:28:27 | 11 | tier of barges, and could very well have allided with the 4727, |
| 16:28:34 | 12 | which was attached to the -- that barge right there below it. |
| 16:28:40 | 13 | Q.   Of course -- |
| 16:28:41 | 14 | A.   Anyway, if they had all been married together, it would |
| 16:28:44 | 15 | have been my opinion that maybe it would not have broken away. |
| 16:28:49 | 16 | But the fact that the -- the upper tier of long-line |
| 16:28:53 | 17 | gave rise to the opportunity for that tier to bear down on the |
| 16:29:00 | 18 | 4727. |
| 16:29:01 | 19 | Q.   And so we might have forces from that northern tier going |
| 16:29:05 | 20 | on the 4727, which is already eight feet higher, with lines |
| 16:29:10 | 21 | going down at a diagonal, with two feet between the vessels |
| 16:29:14 | 22 | when the crew left? |
| 16:29:16 | 23 | A.   That's correct, yes. |
| 16:29:17 | 24 | Q.   And the potential for more movement there? |
| 16:29:19 | 25 | A.   That's correct, yes. |

16:29:22   1   **Q.**   So is it fair to say that the long-lining of the northern

16:29:25   2   tier created -- or had the point for creating even more stress

16:29:30   3   on the 4727, in addition to the stresses on the lines created

16:29:33   4   by the height differential?

16:29:35   5   **A.**   That's also correct.

16:29:41   6           **THE COURT:**  Counsel, let me interrupt you for a

16:29:43   7   minute to make sure I understand something.

16:29:46   8                The doubling up issue.  Do you regard doubling

16:29:52   9   up -- is that two parts connecting the -- where the barge is

16:30:01  10   tied to, let's say, either another barge or the dock, by having

16:30:07  11   the rope come around twice?

16:30:09  12           **THE WITNESS:**  Yes, as a minimum.  But the -- the

16:30:12  13   Coast Guard and everyone else in the industry considers three

16:30:16  14   parts the minimum.  And that would be from the -- from the dock

16:30:23  15   to the other barge back and back again.

16:30:27  16           **THE COURT:**  Using the same rope, if you have enough

16:30:29  17   length?

16:30:30  18           **THE WITNESS:**  Yes, sir.

16:30:31  19           **THE COURT:**  And if you have -- and I've asked this

16:30:33  20   question previously -- if you have -- rather than doing that,

16:30:37  21   if you tie two separate ropes to the same cleat on -- from the

16:30:46  22   dock to the barge, would that also be doubling up or is that

16:30:50  23   not doubling up?

16:30:51  24           **THE WITNESS:**  No, I don't consider that doubling up,

16:30:53  25   Your Honor.  Because by putting multiple parts in the same

| | | |
|---|---|---|
| 16:30:57 | 1 | line, you're adding elasticity to the -- to the fastening. |
| 16:31:03 | 2 | And in the event that there is movement that |
| 16:31:06 | 3 | those -- the multiple parts would be able to absorb that shock. |
| 16:31:11 | 4 | And also, it -- a single part line is not as strong as a double |
| 16:31:20 | 5 | part. |
| 16:31:21 | 6 | THE COURT:  All right. |
| 16:31:22 | 7 | THE WITNESS:  But it gives it -- it gives it an |
| 16:31:23 | 8 | opportunity to move and stretch together and not apart. |
| 16:31:29 | 9 | THE COURT:  Thank you, sir. |
| 16:31:30 | 10 | All right, Mr. Best. |
| | 11 | BY MR. BEST: |
| 16:31:32 | 12 | Q.  On that subject, since I have that in my examination, too, |
| 16:31:36 | 13 | I might as well jump to that for a moment. |
| 16:31:39 | 14 | Does the Modern Seamanship, that's one of the things |
| 16:31:43 | 15 | that you have reviewed, have a specific definition on page 247 |
| 16:31:47 | 16 | of double up secure and single up? |
| 16:31:51 | 17 | A.  Which part are you looking at? |
| 16:31:53 | 18 | Q.  This -- |
| 16:31:53 | 19 | A.  The definition is doubling up the same line on multiple |
| 16:32:00 | 20 | parts. |
| 16:32:00 | 21 | Q.  One moment.  First, I need my exhibit number. |
| 16:32:30 | 22 | MR. BEST:  It's Exhibit 395.  It's Exhibit 395.  I |
| 16:32:31 | 23 | apologize for the delay, Your Honor. |
| 16:32:32 | 24 | It's Knight's Modern Seamanship.  And on page |
| 16:32:39 | 25 | 247, if we may ELMO this. |

490

|          | 1  | BY MR. BEST: |
|----------|----|-------------|
| 16:32:50 | 2  | **Q.**   Is this -- it gives us a definition of double up and |
| 16:32:52 | 3  | secure and single up? |
| 16:32:53 | 4  | **A.**   Yes. |
| 16:32:54 | 5  | **Q.**   Would you read "Double up and Secure"? |
| 16:32:56 | 6  | **A.**   Double up and Secure means run additional lines or bites |
| 16:32:59 | 7  | of lines as needed to make the mooring secure. |
| 16:33:02 | 8  | **Q.**   And "Single up"? |
| 16:33:03 | 9  | **A.**   Single up is to take all lines, but a single standing |
| 16:33:06 | 10 | part, to each station preparatory to getting underway. |
| 16:33:11 | 11 | **Q.**   So what we had in this situation is described as a single |
| 16:33:14 | 12 | up? |
| 16:33:15 | 13 | **A.**   Yes. |
| 16:33:15 | 14 | **Q.**   "Preparatory to getting underway," what does that mean? |
| 16:33:18 | 15 | **A.**   It means that -- this is -- it comes from commands for a |
| 16:33:25 | 16 | master of a ship, and preparatory to getting underway.  When |
| 16:33:31 | 17 | you come into the dock, you put a line out and the command is |
| 16:33:36 | 18 | given, double up and secure, which means they take the same |
| 16:33:38 | 19 | line and pass it back to the dock and double up. |
| 16:33:42 | 20 | When a vessel prepares to get underway, the command |
| 16:33:45 | 21 | is single up preparatory to getting underway. |
| 16:33:50 | 22 | **Q.**   Okay.  So is it fair to describe a singling up as a |
| 16:33:54 | 23 | temporary mooring in preparation for getting underway? |
| 16:33:56 | 24 | **A.**   That's correct, yes. |
| 16:33:57 | 25 | **Q.**   And your understanding of the mooring that existed on the |

491

| | | |
|---|---|---|
| 16:34:00 | 1 | 4727 was single part lines? |
| 16:34:03 | 2 | **A.**  Right. |
| 16:34:03 | 3 | **Q.**  Which, according to this definition, would be a temporary |
| 16:34:07 | 4 | mooring? |
| 16:34:08 | 5 | **A.**  Yes.  I would consider that to be a temporary mooring. |
| 16:34:10 | 6 | **Q.**  And that would be consistent with, I think, Mr. Smith's |
| 16:34:14 | 7 | testimony that he understood he'd been told somebody was going |
| 16:34:17 | 8 | to come pick up the barge? |
| 16:34:19 | 9 | **A.**  That's correct. |
| 16:34:21 | 10 | **Q.**  So is it fair to say that even without a hurricane coming, |
| 16:34:25 | 11 | these barges -- this barge, 4727, should have been doubled up |
| 16:34:29 | 12 | for a permanent mooring on a regular day? |
| 16:34:32 | 13 | **A.**  Yes. |
| 16:34:32 | 14 | **Q.**  Or, as Mr. -- the deckhand this morning -- |
| 16:34:38 | 15 | **THE COURT:**  Thigpen. |
| | 16 | **BY MR. BEST:** |
| 16:34:40 | 17 | **Q.**  -- Thigpen -- as Mr. Thigpen said, three parts is |
| 16:34:46 | 18 | standard? |
| 16:34:46 | 19 | **A.**  Right.  That's what we consider to be the minimum. |
| 16:34:53 | 20 | **Q.**  And I have, also, an illustration from when -- the judge |
| 16:34:59 | 21 | asked what a multiple part mooring looked like. |
| 16:35:04 | 22 | This is Exhibit 391, page 415. |
| 16:35:07 | 23 | Can you explain to the judge what we're looking at in |
| 16:35:11 | 24 | the illustration? |
| 16:35:13 | 25 | **A.**  Your Honor, that's one single line moor, and it's deployed |

16:35:20   1    multiple times, the same line, back between two...

16:35:23   2    Q.   And that's from the U.S. Navy Manual?

16:35:26   3    A.   I think so, yes.

16:35:27   4    Q.   This is the section on seamanship?

16:35:31   5    A.   Yes.

16:35:32   6    Q.   And so what we have -- it says, "Correct method for

16:35:36   7    doubling up."  We've run -- but we have three parts.  So is

16:35:42   8    this --

16:35:43   9    A.   Yes.

16:35:44   10   Q.   So it's not -- doubling up does not just mean necessarily

16:35:47   11   a two part line?

16:35:49   12   A.   Well, it could be a two part line, but that would be the

16:35:53   13   bare minimum.  But the accepted practice is three parts.

16:35:56   14   Q.   Okay.  And if you have enough rope, you just keep running

16:36:00   15   it until you run out of rope.

16:36:03   16   A.   Right.  As Mr. Thigpen described, you use all the line

16:36:06   17   that you can, or that you have available to you.  The objective

16:36:11   18   is to make it as strong as you possibly can.

16:36:16   19   Q.   Now, we talked about, on the testimony of Mr. Johnson, I

16:36:24   20   think, about using every kevel, every thing.  And I think in

16:36:28   21   your report, you said, particularly with the storm, you should

16:36:31   22   use every connection possible; do you recall that?

16:36:33   23   A.   Yes.

16:36:34   24   Q.   Now, what does that mean in terms of mooring?  Let's

16:36:38   25   assume that we have barges that are close to the same height,

16:36:40  1    which is not what we have here.  But if you have barges at a
16:36:43  2    dock like this that are close to the same height, and you want
16:36:45  3    to moor them for a storm, can you moor the outboard barge not
16:36:49  4    only to the inboard barge, but also directly to the wharf?
16:36:54  5    A.    Yes.
16:36:54  6    Q.    And is that advisable under storm condition preparations?
16:36:57  7    A.    Yes.  I would use all available resources.
16:37:00  8    Q.    Okay.  So then if the two barges had five kevels between
16:37:04  9    them, those kevels would all be used to moor them together?
16:37:08  10   A.    Yes.
16:37:08  11   Q.    And doubled up, as a minimum?
16:37:10  12   A.    Yes.
16:37:10  13   Q.    And then the outboard barge would also be tied directly to
16:37:14  14   the dock by ropes or cables?
16:37:19  15   A.    Yes, that would be ideal.
16:37:25  16   Q.    And the inboard barge with the five kevels inboard
16:37:29  17   adjacent to the wharf, could you also use all five kevels to
16:37:34  18   secure the bollards on the wharf?
16:37:36  19   A.    Yes, but the bollards might not fit directly across from
16:37:39  20   each other.  And -- but they should employ as many mooring
16:37:43  21   spots as they can.
16:38:20  22   Q.    Given the complexities presented by this situation, and
16:38:23  23   the risk where we have one barge that's eight feet higher than
16:38:27  24   the other -- scratch that.  Let me ask it this way.
16:38:33  25             What is your experience, in your opinion, of the

16:38:35   1   proprietary of mooring vessels of different heights together

16:38:39   2   for a permanent mooring?

16:38:40   3   A.   Well, first off, you -- you prefer not to have light

16:38:46   4   barges against loaded barges.  It happens, but the preferred

16:38:56   5   situation is loads to loads and lights to lights.  Mainly,

16:39:00   6   because the mooring between the two can be accomplished in a

16:39:03   7   more efficient manner and a stronger manner by going directly

16:39:08   8   at the same level straight across from barge to barge.

16:39:10   9   Q.   Okay.  So you're in agreement with what Mr. Thigpen

16:39:13  10   testified to today?

16:39:14  11   A.   Yes, sir.  Yes.

16:39:16  12   Q.   And in your experience in general, when we're talking

16:39:19  13   about permanent mooring, not temporary mooring --

16:39:22  14   A.   Right.

16:39:22  15   Q.   -- is that industry practice?

16:39:24  16   A.   Yes.  That's not to say that it doesn't happen.  I think

16:39:29  17   the testimony you'll find is, occasionally, they're presented

16:39:34  18   that they have to do that.  But the preferred method is

16:39:40  19   supposed to have loads to loads and empties to empties.

16:39:47  20   Q.   And commercially with barges, there are times when,

16:39:52  21   because of the nature of the particular commercial operation,

16:39:55  22   they're loading a tier of barges, one's loaded and one's not

16:39:59  23   yet, as an example?

16:40:02  24   A.   That's correct.

16:40:02  25   Q.   But here we're talking about the work's done, we're at the

16:40:04  1    end of an operation and we have a hurricane that's coming.

16:40:08  2    What is your recommendation that one -- that a competent marine

16:40:15  3    operator should do faced with this situation of a

16:40:17  4    significant -- a barge that's significantly elevated above the

16:40:21  5    other barges that are still loaded?

16:40:22  6    A.   I think the first thing I would do is recommend that they

16:40:25  7    get the barge out of there.

16:40:26  8    Q.   Okay.

16:40:27  9    A.   Secondly, if they brought it in, then in light of all the

16:40:33  10   announcements and the plethora of news events concerning the

16:40:38  11   approaching storm, that they should have not discharged the

16:40:43  12   barge.

16:40:45  13   Q.   Stepping back just a moment, given the height differential

16:40:49  14   of the barges here and the fact that they couldn't be brought

16:40:52  15   close together, was this barge -- forget the storm -- at risk

16:40:56  16   for breakaway just by virtue of marine traffic in the

16:40:59  17   intercoastal water?

16:41:01  18   A.   Yes, yes.

16:41:04  19             MR. WALKER:  Your Honor --

16:41:04  20   BY MR. BEST:

16:41:04  21   Q.   And I've been referring to --

16:41:05  22             THE COURT:  Just a minute.  We have an objection.

16:41:07  23             MR. WALKER:  This is beyond the scope of his report,

16:41:08  24   Your Honor.

16:41:11  25             THE COURT:  Okay.

16:41:13   1          MR. BEST:  Well, the report is faulty mooring and
16:41:15   2   refers to the height of the barges, the problems and risks.
16:41:18   3   And he's just said that they should have got it out of the
16:41:21   4   canal.
           5   BY MR. BEST:
16:41:23   6   Q.   Is that one of the reasons they should have got it out of
16:41:26   7   the canal?
16:41:27   8   A.   Yes.
16:41:27   9          THE COURT:  Well, let me rule on the objection,
16:41:29  10   beyond the scope of the report.
16:41:30  11              In other words, you're saying that there is the
16:41:34  12   risk of a breakaway even in a non-hurricane situation, simply
16:41:37  13   from other river traffic?
16:41:39  14          MR. BEST:  Yes, because it's a temporary mooring.
16:41:41  15          THE COURT:  And he's saying -- I'm going to regard
16:41:44  16   it, for the purpose of this trial, as from the periphery of the
16:41:49  17   report, and I'll allow it.  The objection's noted.
16:41:53  18          MR. WALKER:  Thank you, Your Honor.
          19   BY MR. BEST:
16:41:55  20   Q.   As a temporary mooring, as described in the literature and
16:42:00  21   as you've described it, is it proper to leave a vessel at a
16:42:04  22   marine waterfront facility unmanned with just temporary
16:42:08  23   moorings under any circumstances?
16:42:11  24   A.   No.
16:42:14  25   Q.   And because it is a risk to a waterfront facility?

16:42:18    1    A.    It's a risk to the entire -- that entire area.  It's a

16:42:20    2    risk to the bridge.  It's a risk for it to break away and the

16:42:25    3    result and damage and chaos that it could cause.

16:42:34    4    Q.    Now, you prepared a time line exhibit, which is one of the

16:42:37    5    attachments to your deposition, which is Plaintiffs'

16:42:39    6    Exhibits 387 and 388.  387 is his report, 388 is his

16:43:03    7    deposition, and I believe it was a deposition exhibit, as well.

16:43:24    8           But I'm going to demonstrate it on the ELMO -- well,

16:43:24    9    I'm sorry.  We can't get it all on at once, but I'm going to

16:43:27   10    start here with it.

16:43:30   11           One moment, your Honor.

           12    BY MR. BEST:

16:43:42   13    Q.    Okay.  It is 387, page 12, and I'm going to take it off

16:43:45   14    the ELMO and ask you to bring it up, to bring it up in small

16:43:47   15    portions.

16:43:51   16           Okay.  This is something you prepared, Mr. Green?

16:43:53   17    A.    No.  I had a graphics person who prepared that under my

16:43:58   18    direction.

16:43:58   19    Q.    But you provided the content?

16:44:00   20    A.    Yes.

16:44:00   21    Q.    And it was done at your --

16:44:02   22           THE COURT:  By the way, just to let you know, in the

16:44:03   23    event the Court's going to utilize this and -- or look at it

16:44:09   24    after this trial in rendering its opinion, the copy we have is

16:44:14   25    fairly indecipherable, just to let you know.

16:44:18    1          **MR. BEST:**  Meaning the one we're looking at on the
16:44:21    2  screen?
16:44:22    3          **THE COURT:**  Yes.  That's what we'll have.
16:44:25    4          **MR. BEST:**  Okay.  So you won't have it in color?
16:44:28    5          **THE COURT:**  So far we don't.
16:44:30    6              You may not want to part with it right now, but
16:44:32    7  eventually if you want us to look at it and you're going to put
16:44:36    8  it in your brief, we're going to have a hard time using the one
16:44:40    9  we have.
16:44:53   10          **MR. BEST:**  We're going to go back to the ELMO,
16:44:56   11  Your Honor.  We're going to make an effort to get a copy of
16:44:56   12  this.
16:44:57   13          **THE COURT:**  You can provide it tomorrow if necessary,
16:44:58   14  or whenever.
16:44:59   15          **MR. BEST:**  We'll do so.
           16  **BY MR. BEST:**
16:45:01   17  Q.    Now, you've just given the Court an opinion.  I think you
16:45:04   18  said that under the circumstances, given all the problems with
16:45:06   19  the height differential, what did you say should be done with
16:45:10   20  the barge?
16:45:10   21  A.    It should have been taken out.
16:45:12   22  Q.    Taken out of the canal.  Okay.  Let's look at this --
16:45:15   23  let's go back and look at the context a little bit.
16:45:18   24              As we're sitting in -- at the Lafarge facility on
16:45:23   25  August 27th and 28th -- or 26th, 27th, and 28th, and there's a

16:45:29  1  hurricane in the Gulf, that's not the first hurricane we had

16:45:32  2  had that year, is it?

16:45:34  3  A.   No, sir, they had several.

16:45:36  4  Q.   And, in fact, you have down on the left-hand side a

16:45:41  5  graphic of pre-Katrina 2005 hurricanes that shows the other

16:45:46  6  storms we had had that season?

16:45:47  7  A.   Yes.

16:45:48  8  Q.   And that even includes Hurricane Cindy, which went right

16:45:51  9  over the city --

16:45:52  10  A.   Yes.

16:45:52  11  Q.   Or Tropical Storm Cindy, I'm not sure what its status was.

16:45:56  12       THE COURT:  I think it became ambiguous after a

16:46:00  13  while.

16:46:01  14       MR. BEST:  Right.

         15  BY MR. BEST:

16:46:02  16  Q.   But it's fair to say, by the time Katrina came, which is a

16:46:06  17  "K" storm, we had had a lot of storms that hurricane season?

16:46:09  18  A.   Yes.

16:46:10  19  Q.   Is that something that marine facility operators have to

16:46:13  20  be concerned about as they operate their facilities in the port

16:46:15  21  of New Orleans in the summer and towards the end of August and

16:46:18  22  early September?

16:46:19  23  A.   Yes.  That applies all along the coast.

16:46:21  24  Q.   Is that a particularly bad time to be mooring a light

16:46:25  25  barge to a loaded barge?

500

| | | |
|---|---|---|
| 16:46:27 | 1 | A.    In my opinion, yes. |
| 16:46:32 | 2 | Q.    Now, the -- just for completeness, on the August 26th, |
| 16:46:44 | 3 | Friday entry, there is a map up at the top.  Do you see the |
| 16:46:48 | 4 | map? |
| 16:46:49 | 5 | A.    Yes. |
| 16:46:49 | 6 | Q.    And the purpose of that map is to illustrate what? |
| 16:46:51 | 7 | A.    Just the location of the various entities, the Zito fleet, |
| 16:46:59 | 8 | locks, the Claiborne bridge, and the Florida bridge, and as |
| 16:47:05 | 9 | well as Lafarge. |
| 16:47:06 | 10 | Q.    And what we see here is Lafarge between the two bridges |
| 16:47:09 | 11 | that you've talked about -- |
| 16:47:11 | 12 | A.    Yes, sir. |
| 16:47:11 | 13 | Q.    -- north of the locks? |
| 16:47:13 | 14 |        But then the Zito fleet in Algiers -- and Zito's |
| 16:47:18 | 15 | relevant for what, based on your review of the -- |
| 16:47:22 | 16 | A.    That's where the barge was destined to go, if it was going |
| 16:47:28 | 17 | to be picked up. |
| 16:47:29 | 18 | Q.    If and when it was picked up, that's where it would have |
| 16:47:32 | 19 | gone? |
| 16:47:32 | 20 | A.    Yes. |
| 16:47:32 | 21 | Q.    And we see that that's pretty proximate.  That's not a far |
| 16:47:36 | 22 | distance from the Industrial Canal? |
| 16:47:37 | 23 | A.    No, it's not. |
| 16:47:40 | 24 | Q.    Now, going down to the hurricane cones.  And we have on |
| 16:47:49 | 25 | these, let me see -- let me see if I can zoom in on this any. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

501

16:47:59  1   This first one, August 26th, which is Friday, at 11:00 a.m.

16:48:04  2            And these cones, by the way, are something that are

16:48:06  3   followed by operators of marine facilities, and waterfront

16:48:11  4   facilities in New Orleans, in particular?

16:48:12  5   A.   It should be followed by anyone with marine vessels,

16:48:16  6   facilities that have vessels at their facilities.

16:48:19  7   Q.   And these hurricane tracks are pretty much the same thing

16:48:23  8   that average citizens follow to make their decisions about what

16:48:27  9   they're going to do about the storm?

16:48:29  10  A.   Yes.

16:48:29  11  Q.   And so this one shows that Friday morning, 11:00 a.m., the

16:48:33  12  storm is -- the center of the track is the Florida Panhandle,

16:48:37  13  but the Port of New Orleans is already in the cone?

16:48:40  14  A.   Yes.  We call it the "cone of uncertainty."

16:48:43  15  Q.   Now, that's at 11:00 a.m.  What time is that with respect

16:48:47  16  to when the barge unloading began?

16:48:49  17  A.   I understand the barge came -- I have it here someplace.

16:48:54  18  Q.   In fact, it's the entry on August 26th, at 12:20?

16:48:57  19  A.   Yes.

16:48:58  20  Q.   So as you understand it, the unloading of the 4727 began

16:49:03  21  after we were in the cone?

16:49:05  22  A.   That's correct.

16:49:07  23  Q.   All right.  And then the next advisory below that is 14.

16:49:22  24  On that same day, August 26th, at 5:00 p.m.  And now it's

16:49:27  25  shifted significantly west?

| | | |
|---|---|---|
| 16:49:28 | 1 | A.   Yes, sir. |
| 16:49:29 | 2 | Q.   And that didn't happen on Saturday, that happened before |
| 16:49:32 | 3 | 5:00 p.m. on Friday? |
| 16:49:33 | 4 | A.   That's correct. |
| 16:49:34 | 5 | Q.   All right.  That's something -- again, something that |
| 16:49:38 | 6 | marine operators -- operators of marine facilities, in your |
| 16:49:41 | 7 | opinion, should be attending to and knowledgeable of? |
| 16:49:46 | 8 | A.   That's correct. |
| 16:49:46 | 9 | Q.   And is that, in your opinion, significant to the unloading |
| 16:49:49 | 10 | operation of the 4727 that is ongoing? |
| 16:49:52 | 11 | A.   Yes.  In my opinion, they should have stopped offloading, |
| 16:49:56 | 12 | if they were offloading. |
| 16:49:57 | 13 | Q.   That is if they started it despite the earlier cone? |
| 16:50:01 | 14 | A.   That's correct. |
| 16:50:01 | 15 | Q.   Okay.  Now, you also have here in your time line -- |
| 16:50:04 | 16 | there's an entry of the unloading begins.  And that same day |
| 16:50:08 | 17 | Governor Blanko declared a state of emergency? |
| 16:50:13 | 18 | A.   That's correct. |
| 16:50:13 | 19 | Q.   And where did you get the information for this -- you got |
| 16:50:16 | 20 | this from -- |
| 16:50:16 | 21 | A.   The 1300? |
| 16:50:19 | 22 | Q.   Yes. |
| 16:50:20 | 23 | A.   That was a report that was submitted to the Congressional |
| 16:50:24 | 24 | committee investigating Hurricane Katrina. |
| 16:50:26 | 25 | Q.   And that's a public document --- |

| | | |
|---|---|---|
| 16:50:26 | 1 | **THE COURT:** I'm sorry. Mr. Walker, you're standing. |
| 16:50:30 | 2 | Are you wanting to lodge an objection? |
| 16:50:32 | 3 | **MR. WALKER:** Your Honor, the time of that -- and |
| 16:50:34 | 4 | maybe Mr. Best was about to correct it. It wasn't -- it's |
| 16:50:39 | 5 | 11:00 p.m., not 1:00 p.m. And that's a publicly-known -- |
| 16:50:48 | 6 | **THE COURT:** So it's not 1300? |
| 16:50:49 | 7 | **MR. WALKER:** That's right, Your Honor. |
| 16:50:50 | 8 | **THE COURT:** But 2300? |
| 16:50:52 | 9 | **MR. WALKER:** Correct, Your Honor. |
| 16:50:53 | 10 | **MR. BEST:** I'm not in a position to stipulate that, |
| 16:50:55 | 11 | Your Honor, because that's why I'm asking him where he got it |
| 16:50:57 | 12 | from. |
| 16:50:59 | 13 | **THE COURT:** We'll get that -- we need to get that |
| 16:51:03 | 14 | straight. |
| 16:51:04 | 15 | **MR. WALKER:** It's their own Exhibit 20, I believe, |
| 16:51:06 | 16 | Your Honor. |
| 16:51:07 | 17 | **MR. BEST:** I just want him to say where he got this |
| 16:51:09 | 18 | information from. |
| 16:51:10 | 19 | **THE COURT:** The Court will -- it's duly noted, and we |
| 16:51:16 | 20 | will certainly check and look at the other exhibit you |
| 16:51:20 | 21 | mentioned and ascertain the 2300. |
| 16:51:24 | 22 | **MR. BEST:** Okay. I just -- |
| 16:51:25 | 23 | **THE COURT:** 2300 actually makes a little more |
| 16:51:29 | 24 | temporal sense to the Court. |
| | 25 | |

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | BY MR. BEST:                                                  |
| 16:51:32 | 2  | Q.   I just want to know where you got this.               |
| 16:51:34 | 3  | A.   Well, where I got this, it's the governor's time line to |
| 16:51:37 | 4  | Congress on October 7th, 2005.                              |
| 16:51:39 | 5  | Q.   But in your file you have particulars, and you showed it |
| 16:51:41 | 6  | to me.                                                      |
| 16:51:42 | 7  | A.   Yes.                                                   |
| 16:51:42 | 8  | Q.   There were Congressional hearings after Katrina that  |
| 16:51:46 | 9  | evaluated the whole series of events.  And this is the time |
| 16:51:49 | 10 | line that was published in that document?                  |
| 16:51:52 | 11 | A.   That's correct.                                       |
| 16:51:52 | 12 | Q.   And right or wrong, that was your source for it?      |
| 16:51:55 | 13 | A.   Yes, sir.                                             |
| 16:51:55 | 14 | Q.   In any event, the unloading began even after the city was |
| 16:51:59 | 15 | in the cone, and continued after the next advisory that we |
| 16:52:04 | 16 | already talked about of Friday, at 5:00 p.m.  They continued |
| 16:52:11 | 17 | unloading it overnight; is that correct?                   |
| 16:52:14 | 18 | A.   Yes, sir.                                             |
| 16:52:15 | 19 | Q.   And then the next advisory below this comes out at    |
| 16:52:27 | 20 | 11:00 p.m. Friday night?                                   |
| 16:52:29 | 21 | A.   Yes.  That would be Eastern Daylight time.  It was 10:00. |
| 16:52:34 | 22 | Q.   And, of course, by this time it's moved even further west? |
| 16:52:40 | 23 | A.   Yes, it was coming right for us.                      |
| 16:52:41 | 24 | Q.   And, of course, as you heard Mr. Busch's testimony, he was |
| 16:52:43 | 25 | completely unaware of all three of these cones?            |

505

16:52:47   1   A.   Yes.

16:52:47   2   Q.   Should an operator of a marine facility like this have

16:52:51   3   been aware of all of these cones?

16:52:53   4   A.   Yes.  It's my opinion that they should have been -- made

16:52:57   5   an opinion to that fact, that they should have been monitoring

16:53:01   6   the progress of the storm.

16:53:02   7   Q.   Now, you said your opinion was it should have -- the barge

16:53:05   8   should have been moved out of the canal, preferably.

16:53:11   9        If a facility like this is accepting a loaded barge

16:53:15   10   for processing in hurricane season with a hurricane in the

16:53:19   11   Gulf, is it -- can arrangements be made for -- if they want to

16:53:24   12   unload it -- for somebody to pick it up?  Can those

16:53:27   13   arrangements be made in advance?

16:53:29   14   A.   Yes.

16:53:30   15   Q.   And here, they didn't have that far to take that barge out

16:53:33   16   of the Industrial Canal through the lock into the Zito fleet?

16:53:37   17   A.   That's correct.

16:53:38   18   Q.   But to do that, you have to call before Zito Fleeting

16:53:40   19   closes?

16:53:41   20   A.   Well, yes.

16:53:42   21   Q.   So if you've got a barge that you're unloading that you

16:53:46   22   know is going to take 20 hours or so -- 12 to 20 hours to

16:53:50   23   unload, as Mr. Busch testified, you need to make advance

16:53:53   24   planning if you want to accomplish that before, potentially,

16:53:56   25   you were exposed to hurricane conditions?

| | | |
|---|---|---|
| 16:53:58 | 1 | A.    That's correct. |
| 16:54:01 | 2 | Q.    And if you -- you either choose not to take it out of the |
| 16:54:06 | 3 | canal, or you fail to take it out of the canal, what else could |
| 16:54:10 | 4 | you do to ameliorate or mitigate in any way the height |
| 16:54:15 | 5 | differential between these barges for storm mooring? |
| 16:54:18 | 6 | A.    Well, it's my opinion that they could have ballasted the |
| 16:54:23 | 7 | vessel by loading -- pumping water into the void tanks. |
| 16:54:30 | 8 | Q.    Okay.  Let me back up a little bit, because I think I |
| 16:54:32 | 9 | missed a question.  I'll bring you back to that one. |
| 16:54:36 | 10 |       One thing you can do is stop before the barge is |
| 16:54:38 | 11 | completely unloaded; is that right? |
| 16:54:41 | 12 | A.    That's correct.  They should have stopped, if my time line |
| 16:54:43 | 13 | is correct, when Governor Blanko declared an emergency.  If |
| 16:54:50 | 14 | they had been aware of that, they should have taken that into |
| 16:54:53 | 15 | consideration and stopped unloading. |
| 16:54:54 | 16 | Q.    Well, even if they had stopped at the 5:00 advisory, when |
| 16:54:57 | 17 | the significant shift came towards New Orleans, they would have |
| 16:55:00 | 18 | only, by that time, been unloading some, what four and a half |
| 16:55:03 | 19 | hours -- |
| 16:55:04 | 20 | A.    That's correct. |
| 16:55:04 | 21 | Q.    -- of what was going to ultimately take until the next |
| 16:55:07 | 22 | morning to do? |
| 16:55:07 | 23 | A.    That's correct, yes. |
| 16:55:08 | 24 | Q.    So by that time, I mean, we don't know exactly what the |
| 16:55:11 | 25 | height differential would have been.  But is it fair to say |

16:55:14  1  that it would have been significantly less than the eight feet
16:55:16  2  we wound up with an empty barge?
16:55:18  3  A.   That's correct.
16:55:19  4  Q.   If they stopped at 5:00?
16:55:20  5  A.   Yes.
16:55:20  6  Q.   And you heard the testimony that they have these little
16:55:23  7  front-end loaders that they lower into the barge to move the
16:55:26  8  cement around towards the end of the process?
16:55:30  9  A.   Yes.
16:55:30  10 Q.   And you heard that the unloading device that they used to
16:55:35  11 suction up the cement moves along the side of the barge?
16:55:39  12 A.   Yes.
16:55:45  13 Q.   It's not possible to say exactly what state that barge
16:55:48  14 would have been in at 5:00; is that fair?
16:55:49  15 A.   Yes.  I have no way to say.
16:55:49  16 Q.   Well, let me ask you this:  Suppose at 5:00 they decide to
16:55:52  17 stop, because they're aware of this hurricane advisory; and
16:55:56  18 let's say the barge is lower in the water at one end than the
16:55:59  19 other --
16:55:59  20 A.   Yes.
16:55:59  21 Q.   -- and they don't know what to do.  What can they do?
16:56:03  22 What exists?  What authority exists that they can consult or
16:56:08  23 seek help from about this?
16:56:09  24 A.   Well, they can notify the Coast Guard that they have a
16:56:13  25 barge partially unloaded that might pose a problem.

16:56:21    1            They can ballast that end of the barge if it's -- if

16:56:23    2    it was down by the bow or down by the stern, they can ballast

16:56:27    3    the -- one end of it.

16:56:29    4            They can do that using two-inch pumps to load water

16:56:35    5    in the water tanks.  Or they can -- if they could use that

16:56:39    6    Bobcat, but Mr. Busch testified that that wasn't an option.

16:56:44    7    Q.   All right.  Well, if they're really in a bind and they

16:56:47    8    called the captain of the port, does he have the authority to

16:56:50    9    take matters into his own hands and to find a towboat or order

16:56:54    10    some vessel in there to pick it up and get it out before it's

16:56:57    11    too late?

16:56:58    12    A.   Yes.

16:56:59    13    Q.   He can even, if it's too late and the locks are closed, he

16:57:02    14    can reverse the lock closure and get it out of there, if he

16:57:04    15    thinks it's a hazard, can't he?

16:57:05    16    A.   Yes, he can.

16:57:05    17    Q.   But he is only going to act if somebody notifies him of

16:57:08    18    the problem?

16:57:08    19    A.   That's correct.

16:57:09    20    Q.   And you don't see any indication here that anybody

16:57:10    21    notified him of the problem or took advantage of that resource?

16:57:15    22    A.   That's correct.

16:57:15    23    Q.   And, in fact, there -- well, we'll get to that in a little

16:57:20    24    bit.

16:57:27    25            And then moving on your time line to the next day,

16:57:30   1   Saturday, the 27th.  We have there, 9:00 a.m. on Saturday
16:57:39   2   morning Lafarge completes unloading the 4727?
16:57:44   3   A.   Yes, sir.
16:57:45   4   Q.   And you see in the lock log, that the locks in the
16:57:49   5   Industrial Canal didn't close until 4:00 a.m. the next morning?
16:57:53   6   A.   No, I heard that testimony -- I mean, I heard that today.
16:57:57   7   Q.   You heard that today.  Okay.
16:58:00   8        So it would appear that if you're going to -- if all
16:58:03   9   else fails and you don't get a telephone call back from your
16:58:05  10   fleeting service, there's certainly time to call the captain of
16:58:08  11   the port and make arrangements to deal with this problem when
16:58:11  12   they finish -- even when they finish the unloading at 9:00 a.m?
16:58:14  13   A.   Well, that was an option to him, and he could have called
16:58:16  14   other contractors or other boat companies.  Or he could have
16:58:20  15   asked Domino to take it out.
16:58:22  16   Q.   Is it reasonable and proper, in your opinion, for the
16:58:25  17   operator of this marine facility to have completed the
16:58:28  18   unloading, leave this barge in this waterway, with two bridges
16:58:32  19   and floodwalls, with temporary single part moorings?
16:58:35  20   A.   No.  I think that's unreasonable.
16:58:37  21   Q.   Particularly in the face of what is now known by Saturday
16:58:41  22   to be potentially a class 5 hurricane?
16:58:44  23   A.   That's correct, yes.
16:58:51  24   Q.   Is that exactly what the Coast Guard and the captain of
16:58:53  25   the port are there for, to help you in emergencies?

16:58:56   1   **A.**   The Coast Guard attempts to apprize itself of all
16:59:05   2   conditions in a port.  The Coast Guard is patrolling the port.
16:59:09   3   They made forays into the Industrial Canal and other parts of
16:59:13   4   the port.  And, certainly, they were available.  If a facility
16:59:16   5   is in trouble or they perceive themselves to be in trouble,
16:59:20   6   they can certainly ask for -- ask for help from the Coast
16:59:21   7   Guard, advice.
16:59:24   8           And/or the Coast Guard could have said, "Well, we
16:59:28   9   can't send anyone in there, but we can help you contact a
16:59:32  10   towing company to come get it."
16:59:37  11           **MR. BEST:**  With that, Your Honor, I'm through with
16:59:39  12   this particular exhibit.  And I would like to offer -- it's my
16:59:42  13   personal copy, but I will offer it to the Court at this time,
16:59:46  14   if I may, as a supplement to the record.
16:59:48  15           **THE COURT:**  Yes.  Thank you, sir.  That will be filed
16:59:50  16   into the record.  That's simply the colored copy of the --
16:59:53  17           **MR. BEST:**  Of the time line we've been referring to.
16:59:55  18           **THE COURT:**  And, of course, your objection is noted
16:59:57  19   as to the 1300.  And Court will check that, because it was
17:00:01  20   11:00 p.m. when the forecast came out that put New Orleans more
17:00:08  21   in the center.
17:00:09  22           **MR. WALKER:**  Thank you, Your Honor.
          23   **BY MR. BEST:**
17:00:11  24   **Q.**   If it turns out that the time of the declaration of
17:00:14  25   emergency is different than what you said, does that change any

| | | |
|---|---|---|
| 17:00:18 | 1 | of the opinions that you've just given us? |
| 17:00:21 | 2 | A. No. |
| 17:00:21 | 3 | Q. All the information about the hurricane cones and the |
| 17:00:24 | 4 | weather forecasts available to operators of marine facilities, |
| 17:00:27 | 5 | irrespective of when the governor of the state or the mayor of |
| 17:00:30 | 6 | the city declares an emergency? |
| 17:00:32 | 7 | A. No, it does not. |
| 17:00:34 | 8 | Q. Certainly, in any case though, by the time they finished |
| 17:00:38 | 9 | unloading this barge, if we accept that it was at 11:00 that |
| 17:00:42 | 10 | night, there's still time on Saturday morning to call the |
| 17:00:45 | 11 | captain of the port? |
| 17:00:47 | 12 | A. Or -- yes. And also get ahold of a contractor, another |
| 17:00:50 | 13 | boat company to come get it. In fact, they called a towing |
| 17:00:55 | 14 | company to come in and turn it around. |
| 17:00:57 | 15 | Q. And a declaration of emergency by the governor prior to |
| 17:01:00 | 16 | the time they completed the unloading of the barge, certainly |
| 17:01:05 | 17 | is an indication to an operator of this marine facility that if |
| 17:01:10 | 18 | he's got this unloaded barge with nothing else of that height |
| 17:01:12 | 19 | to tie it to, he's got an emergency? |
| 17:01:15 | 20 | A. Yes. |
| 17:01:16 | 21 | Q. That was not dealt with? |
| 17:01:17 | 22 | A. Say that again? |
| 17:01:19 | 23 | Q. That was not dealt with? |
| 17:01:20 | 24 | A. It was not dealt with. You're correct, yes. |
| 17:01:22 | 25 | Q. They left? |

17:01:23  1  A.   They left.

17:01:29  2  Q.   Okay.  Now, among the other documents you reviewed was the

17:01:33  3  United States Coast Guard Sector, New Orleans, Louisiana,

17:01:36  4  hurricane plan?

17:01:37  5  A.   Yes, I did.

17:01:39  6  Q.   And do you have an opinion about the applicability of the

17:01:45  7  New Orleans sector hurricane plan to the Inner Harbor

17:01:49  8  Navigational Canal and the Lafarge facility?

17:01:51  9  A.   Yes.  It's applicable to the Lafarge facility.

17:01:57  10          MR. BEST:  Let me get an exhibit number for this,

17:01:59  11  Your Honor, if I may.  I apologize for having lost my exhibit

17:02:04  12  list.

17:02:15  13          This, Your Honor, is Plaintiffs' Exhibit 28.

          14  BY MR. BEST:

17:02:21  15  Q.   And I'm going to use the ELMO to go through a few

17:02:24  16  pertinent pages of this, if I may.

17:02:55  17          This document, which on the ELMO here bears number

17:03:00  18  IBCO-0070, this is the hurricane contingency port plan; is that

17:03:08  19  correct?

17:03:08  20  A.   Yes.  This was in effect at the time of the hurricane.

17:03:11  21  Q.   All right.  And going to page 73 of this document, this is

17:03:26  22  titled "Maritime Hurricane Contingency Port Plan."  The

17:03:31  23  background, in general, says what?

17:03:33  24          I know it speaks for itself, but I'm trying to

17:03:36  25  cite -- I'm asking you if these are part of the provisions that

17:03:39  1  make this document, in your opinion, applicable to this place
17:03:43  2  and time.
17:03:43  3  A.   Yes.  And background is:  "From June 1st to
17:03:47  4  November 3rd of each year, communities and ports of the Gulf
17:03:50  5  Coast face the threat of hurricanes.  In fact, Gulf Coast
17:03:54  6  hurricanes routinely make landfall and adversely impact
17:03:59  7  shoreline communities.  On average, hurricanes kill over 50
17:04:02  8  people and cause more than $100 million in property damage each
17:04:07  9  year.  New Orleans is particularly vulnerable to the hazards
17:04:11 10  associated with hurricanes."
17:04:13 11  Q.   I don't need you to read the whole thing, sir.  It's in
17:04:15 12  the record, and the judge will have the exhibit.  But it does
17:04:16 13  refer to the potential for bridge damage and vessel damage?
17:04:19 14  A.   Yes, it does.
17:04:20 15  Q.   That's part of the purpose of this plan, to protect and
17:04:22 16  avoid that?
17:04:23 17  A.   That's correct.
17:04:23 18  Q.   And down below it says:  "Threatened as we are by these
17:04:28 19  hazards, it is important that the entire port community share a
17:04:30 20  common understanding."
17:04:30 21          Is it your opinion that the Lafarge facility is
17:04:31 22  located in something that is part of the entire port community?
17:04:36 23  A.   That's correct, it is.
17:04:37 24  Q.   And down below it says:  "Authority applicability."  It
17:04:42 25  says it's applicable to all waterfront facilities and vessels

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| 17:04:47 | 1 | within the captain of the port.  Is that what COTP means? |
| 17:04:52 | 2 | **A.**   Yes. |
| 17:04:53 | 3 | **Q.**   Do you see any reason to think that that doesn't apply to |
| 17:04:55 | 4 | this facility? |
| 17:04:56 | 5 | **A.**   No.  It applies, in my opinion. |
| 17:05:06 | 6 | **Q.**   And going to page D-7, IBCO-0079 of this same exhibit, |
| 17:05:15 | 7 | under "Vessels" it says it applies to all seaworthy vessels, |
| 17:05:21 | 8 | doesn't it? |
| 17:05:21 | 9 | **A.**   Yes. |
| 17:05:22 | 10 | **Q.**   And it talks about barges; right? |
| 17:05:25 | 11 | **A.**   Yes, it does. |
| 17:05:26 | 12 | **Q.**   And, again, in the second-to-the-last full sentence it |
| 17:05:29 | 13 | says:  "All vessels"? |
| 17:05:31 | 14 | **A.**   Yes. |
| 17:05:31 | 15 | **Q.**   And actually, the last sentence says:  "Vessels in a |
| 17:05:34 | 16 | fully-loaded condition normally fare better than light vessels |
| 17:05:37 | 17 | in hurricanes," doesn't it? |
| 17:05:40 | 18 | **A.**   Yes, that's common knowledge. |
| 17:05:41 | 19 | **Q.**   Is there anything on this page that suggests to you that |
| 17:05:44 | 20 | this does not have applicability to this vessel in this |
| 17:05:49 | 21 | location? |
| 17:05:50 | 22 | **A.**   No. |
| 17:05:52 | 23 | **MR. BEST:**  Your Honor, I beg the Court's indulgence, |
| 17:05:55 | 24 | and I apologize if this -- if it seems tedious.  But the |
| 17:06:01 | 25 | defense experts have offered opinions that this does not apply. |

| | | |
|---|---|---|
| 17:06:05 | 1 | **THE COURT:**  Oh, I understand. |
| 17:06:05 | 2 | **MR. BEST:**  And I just felt this predicate might be |
| 17:06:08 | 3 | necessary in the -- it might be overlooked by the Court with |
| 17:06:12 | 4 | all the documentation.  I apologize. |
| 17:06:14 | 5 | **THE COURT:**  That's certainly possible. |
| 17:06:15 | 6 | I'm sure, in your briefing, you'll point it out, |
| 17:06:17 | 7 | and I won't overlook anything in your briefing. |
| | 8 | **BY MR. BEST:** |
| 17:06:24 | 9 | **Q.**   Now, on -- I'm going now to D-8, which bears the |
| 17:06:26 | 10 | identification number at the bottom IBCO-0080.  All right? |
| 17:06:31 | 11 | **A.**   Yes, sir. |
| 17:06:32 | 12 | **Q.**   And this talks about waterfront facilities? |
| 17:06:36 | 13 | **A.**   Yes. |
| 17:06:36 | 14 | **Q.**   Again, is the -- the Lafarge facility, does it fall within |
| 17:06:39 | 15 | that, in your opinion? |
| 17:06:41 | 16 | **A.**   Yes, it does. |
| 17:06:41 | 17 | **Q.**   And what does it say to do about cargo operations in the |
| 17:06:46 | 18 | first sentence? |
| 17:06:46 | 19 | **A.**   "Waterfront facilities shall secure hazards and halt their |
| 17:06:49 | 20 | cargo operations in advance of the storm's arrival to prevent |
| 17:06:55 | 21 | unnecessary damage to life, property, or the environment." |
| 17:06:59 | 22 | **Q.**   Now, they don't establish here a precise time by which |
| 17:07:02 | 23 | that has to be done in this section, do they? |
| 17:07:06 | 24 | **A.**   That's correct. |
| 17:07:06 | 25 | **Q.**   But certainly, one of the things that a facility's |

| | | |
|---|---|---|
| 17:07:10 | 1 | operator should take into consideration when deciding when to |
| 17:07:13 | 2 | halt cargo operations? |
| 17:07:14 | 3 | A.   Yes, that's correct. |
| 17:07:15 | 4 | Q.   One of the things would be being stuck with a light load |
| 17:07:19 | 5 | and nothing else to moor it to? |
| 17:07:21 | 6 | A.   That's correct, yes. |
| 17:07:22 | 7 | Q.   Actually, even based on the prior entry, just having a |
| 17:07:27 | 8 | light load, even if you didn't have -- you should have problems |
| 17:07:28 | 9 | even mooring it to the dock? |
| 17:07:30 | 10 | A.   That's correct. |
| 17:07:42 | 11 | Q.   Now, particularly, I want to jump ahead to Appendix B -- |
| 17:07:51 | 12 | I'm sorry, annex B, appendix 1 and appendix 2, down at the |
| 17:07:57 | 13 | bottom of the page, IBCO-0085.  And the section at the bottom, |
| 17:08:03 | 14 | "Recommended precautionary measures for barges." |
| 17:08:06 | 15 | Do you have an opinion as to the applicability of |
| 17:08:08 | 16 | this section of the port hurricane plan to the Lafarge facility |
| 17:08:12 | 17 | and to the barge 4727? |
| 17:08:14 | 18 | A.   Yes, I do.  It applies, in my opinion, and particularly |
| 17:08:19 | 19 | item No. 2. |
| 17:08:20 | 20 | Q.   Okay.  Now, it has two columns "moored" and "anchored"? |
| 17:08:24 | 21 | A.   Yes. |
| 17:08:25 | 22 | Q.   We're not dealing with the anchored column, because the |
| 17:08:28 | 23 | 4727 didn't have anchors? |
| 17:08:29 | 24 | A.   That's correct. |
| 17:08:30 | 25 | Q.   But we're dealing with the moored column, because it was |

17:08:33   1    moored?

17:08:33   2    A.   Yes.

17:08:33   3    Q.   And what does it say the mooring of a barge should be?

17:08:37   4    A.   "Mooring lines doubled up and due consideration given to

17:08:39   5    the effects of the predicted storm surge.  And special

17:08:43   6    attention should be paid to barges moored in the proximity of

17:08:47   7    barges."

17:08:48   8    Q.   Of bridges.

17:08:49   9    A.   Oh, excuse me.  Bridges.

17:08:51  10    Q.   Okay.  And in your opinion, does this have applicability

17:08:54  11    to this barge in this facility?

17:08:56  12    A.   Yes, it does.

17:08:57  13    Q.   And I think you've already told us, it was not doubled up?

17:09:01  14    A.   It was not doubled up.

17:09:03  15    Q.   In your opinion, did the mooring give due consideration to

17:09:05  16    the effects of the predicted storm surge?

17:09:12  17    A.   No, it didn't, except the tiering of the five barges with

17:09:14  18    the long lines.

17:09:14  19    Q.   Okay.  I'm referring to this -- this barge, 4727.

17:09:18  20    A.   No, it did not.

17:09:20  21    Q.   Was there any indication that special attention had been

17:09:22  22    given to the 2747, given that it was moored in proximity to the

17:09:28  23    two bridges?

17:09:29  24    A.   No, it was not.

17:09:31  25    Q.   And particularly, these bridges connect the Greater New

17:09:33  1   Orleans area with St. Bernard Parish?

17:09:40  2   A.   That's correct, yes, the Lower Ninth Ward.

17:09:42  3   Q.   And is it fair to say that in terms of the port, those are

17:09:45  4   major evacuation routes?

17:09:47  5   A.   Yes.

17:09:48  6   Q.   So they're not just any bridges, they're evacuation route

17:09:52  7   bridges?

17:09:52  8   A.   Yes, that's my understanding.

17:09:53  9   Q.   And then going to "Recommended precautionary practice for

17:09:57  10   barge," No. 7.  What does it say?

17:10:00  11   A.   Where are you?

17:10:02  12   Q.   At the bottom of appendix 2, item No. 7?

17:10:06  13   A.   Yes, I see.  "Spare mooring lines and/or wires should be

17:10:10  14   readily available."

17:10:11  15   Q.   And based upon the testimony of Mr. Thigpen, who arrived

17:10:16  16   to assist in the topping around, you saw that he was unable to

17:10:20  17   find any extra mooring lines?

17:10:22  18   A.   He said he found a piece of line on the dock.

17:10:25  19   Q.   But he was unable to find the amount that he would have

17:10:28  20   liked to -- the amount of rope he would have liked to apply?

17:10:32  21   A.   That's correct, yes.

17:10:33  22   Q.   So at least as to him, if there was some there, it was not

17:10:36  23   readily available to him?

17:10:37  24   A.   That's correct.

17:10:44  25   Q.   Now, these are just -- it's recommended.  I mean, this is

17:10:47  1   not carved in stone that somebody has to do this; right?

17:10:51  2   A.   No, that's correct.  It's recommendations.

17:10:55  3   Q.   And why do they just make recommendations instead of a

17:11:03  4   long, long list of ironclad, dozens and dozens of specifics?

17:11:05  5   A.   Well, each facility is an entity unto itself and

17:11:07  6   circumstances are different at different facilities.  And the

17:11:10  7   Coast Guard is -- strives to give as much leeway and discretion

17:11:16  8   to facility operators, as well as vessel operators, to take

17:11:21  9   these things into consideration and consider their own

17:11:27  10  situation in applying it.

17:11:28  11  Q.   Do you see any indication that the Lafarge facility did

17:11:30  12  anything remotely approaching these recommendations?

17:11:34  13  A.   No, they did not.

17:11:35  14  Q.   Is temporary single part lining remotely in compliance

17:11:40  15  with this recommendation?

17:11:41  16  A.   No, it's not.

17:11:49  17  Q.   Going to appendix C, bearing number -- designation

17:11:55  18  IBC-0086, the bottom section on C talks about setting a

17:12:04  19  voluntarily time for suspension of cargo handling operations.

17:12:07  20  Do you see that?

17:12:10  21  A.   Yes.

17:12:10  22  Q.   Okay.  You've reviewed Lafarge's hurricane checklist;

17:12:14  23  right?

17:12:15  24  A.   Yes.

17:12:15  25  Q.   Does it deal at all with suspension of cargo handling

17:12:19  1    operations?

17:12:19  2    **A.**   No.

17:12:20  3    **Q.**   So do you see any indication anywhere from any witness or

17:12:24  4    any document that Lafarge had any plan to follow in the event

17:12:27  5    of a hurricane, in terms of cargo handling operations, let

17:12:30  6    alone their suspension?

17:12:32  7    **A.**   No.  They only had a little checkoff list.

17:12:47  8    **Q.**   Did they have any plan that would have helped them decide

17:12:51  9    what to do to avoid having light vessels or to deal with

17:12:55  10   mooring of light and loaded vessels?

17:12:57  11   **A.**   No, they did not.

17:13:01  12           **THE COURT:**  Speaking of the waterfront, Mr. Best,

17:13:05  13   have you almost covered it?

17:13:07  14           **MR. BEST:**  I've probably more than covered it, ad

17:13:09  15   nauseam, Your Honor.  I apologize.  I think all the lawyers are

17:13:14  16   about to kill me, and it's 10 after 5:00.  I think I'm just

17:13:17  17   about through.  Let me just glance through this very quickly.

17:13:18  18               I tell you what.  I'm happy to quit for the day.

17:13:18  19           **THE COURT:**  No, we are going to finish this witness

17:13:20  20   on direct.

17:13:21  21               Oh, no, no.  Let me say that.  We will cover the

17:13:24  22   waterfront on direct.

          23   **BY MR. BEST:**

17:13:26  24   **Q.**   In that entire plan, in all the sections that we've just

17:13:29  25   referred to, did you see anything that suggests this doesn't

17:13:32  1    apply to this barge?

17:13:33  2    **A.**    No, sir.

17:13:34  3    **Q.**    Did you see anything that carves out some exception for

17:13:37  4    the Industrial Canal and says it doesn't apply to the

17:13:39  5    Industrial Canal as part of the Port of New Orleans?

17:13:41  6    **A.**    No.

17:13:42  7    **Q.**    Did you see anything that says it only applies to

17:13:44  8    ocean-going barges?

17:13:46  9    **A.**    No.

17:13:48  10            **THE COURT:**  You can save a lot of this for

17:13:50  11   cross-examination of the opposing expert.

          12   **BY MR. BEST:**

17:14:12  13   **Q.**    You've talked about removing the vessel from the canal.

17:14:14  14   We've seen -- and you had on your time line an entry, and I

17:14:18  15   won't put it back on, about when Zito's fleet closed.

17:14:22  16            Did you see testimony from Mr. Boudreaux that if the

17:14:25  17   vessel had been brought into Zito even after closure they would

17:14:29  18   have accepted it?

17:14:30  19   **A.**    Yes.

17:14:55  20   **Q.**    Also, you reached an opinion which I haven't covered yet,

17:14:57  21   and that is included in your report, that this single part

17:15:00  22   mooring arrangement, which was deployed on the 4727, would have

17:15:04  23   failed at approximately 36-mile per hour winds?

17:15:08  24   **A.**    That's correct, yes.

17:15:08  25   **Q.**    And that's based on some calculations done by someone else

17:15:12  1   for you to use?

17:15:13  2   A.   Yes.

17:15:14  3   Q.   And your report attaches a chart that was prepared by

17:15:19  4   Mr. Flory?

17:15:21  5   A.   That's also correct.

17:15:23  6   Q.   I just want to bring that up real quick.

17:15:33  7          And at the top line of that chart is the line that

17:15:35  8   actually, by his calculation, shows what wind it would take to

17:15:39  9   cause that -- that line to part?

17:15:42  10  A.   Yes.  He provided seven different scenarios -- I think

17:15:47  11  it's seven -- of how to -- that the barge could be attached and

17:15:54  12  the various amounts of wind that it would be able to withstand.

17:16:04  13  Q.   And it includes some different assumptions from light and

17:16:06  14  loaded barges.  And it includes a calculation for the failure

17:16:10  15  point of steel cable, too, doesn't it?

17:16:12  16  A.   Yes, it does.

17:16:13  17  Q.   And it shows the steel cable to be substantially stronger

17:16:16  18  than the rope?

17:16:17  19  A.   Yes, in all cases.

17:16:19  20  Q.   Of course, in fairness, even if we're using steel cable on

17:16:23  21  this light load, we still have greater problems with it

17:16:27  22  handling the forces associated with being a higher vessel

17:16:31  23  moored to a lower vessel?

17:16:33  24  A.   Yes.  But I think Mr. Flory took all of that into

17:16:37  25  consideration when he made these calculations.

523

17:16:41  1    **Q.**    Forgive me.  I have mislaid mine for the moment in my

17:16:44  2    stack of papers.  May I have yours to put it on the ELMO --

17:16:48  3    **A.**    Sure.

17:16:48  4    **Q.**    -- since you're referring to it?

17:17:08  5                **THE COURT:**  That's also part of Mr. Green's report?

17:17:11  6                **MR. BEST:**  That's correct, Your Honor.

17:17:12  7                **THE COURT:**  And we have --

17:17:13  8                **MR. BEST:**  ING 2747 mooring arrangement.

          9    BY MR. BEST:

17:17:17  10   **Q.**    And the 36-mile-per-hour failure of a single part mooring

17:17:21  11   arrangement, which you've described in your report, is based on

17:17:24  12   line 1?

17:17:25  13   **A.**    Yes.

17:17:25  14   **Q.**    Which is the light barge.  And that mooring arrangement,

17:17:28  15   as I understand it, is supposed to represent the three moorings

17:17:33  16   that had been described by the witnesses?

17:17:35  17   **A.**    That's correct, yes.

17:17:36  18   **Q.**    Okay.  And under the column for 100-strength, that means a

17:17:43  19   brand-new rope?

17:17:44  20   **A.**    Yes.

17:17:44  21   **Q.**    And 75 is lower, based upon the fact that the longer we

17:17:47  22   use rope it may not be -- have 100 percent of its strength?

17:17:52  23   **A.**    Used rope.

17:17:53  24   **Q.**    Used rope.

17:17:55  25                And these other alternatives show the strength if you

| | | |
|---|---|---|
| 17:17:59 | 1 | had doubled arrangements; right? |
| 17:18:02 | 2 | A.  Yes. |
| 17:18:02 | 3 | Q.  But, of course, with the light barge, we still are |
| 17:18:05 | 4 | potentially going to have failure on line 4 at 70-mile an hour |
| 17:18:12 | 5 | winds? |
| 17:18:12 | 6 | A.  Yes. |
| 17:18:13 | 7 | Q.  That's one of the reasons you said the best thing to do |
| 17:18:15 | 8 | with this barge was to get it out of the canal? |
| 17:18:17 | 9 | A.  Yes. |
| 17:18:18 | 10 | Q.  Of course, then mooring the light barge with the wire, we |
| 17:18:21 | 11 | get up to 147-mile-an-hour winds; right? |
| 17:18:25 | 12 | A.  That's correct, yes. |
| 17:18:25 | 13 | Q.  But if you're facing a class 5 hurricane with unknown -- |
| 17:18:25 | 14 | and we have gusts to deal with, in addition to sustained winds, |
| 17:18:30 | 15 | right -- |
| 17:18:30 | 16 | A.  Yes. |
| 17:18:30 | 17 | Q.  -- in hurricane planning? |
| 17:18:31 | 18 | A.  Yes. |
| 17:18:32 | 19 | Q.  So this all supports your recommendation that this barge |
| 17:18:34 | 20 | be removed? |
| 17:18:35 | 21 | A.  Yes, it does. |
| 17:18:42 | 22 | Q.  Is it fair to say, based upon this information, that it |
| 17:18:45 | 23 | was impossible to moor this light barge in such a way as to |
| 17:18:50 | 24 | ensure that it wouldn't break away from that location, given |
| 17:18:53 | 25 | you didn't know what was coming? |

17:18:55   1   A.    In a Cat 5 hurricane, it would fail.

17:19:07   2   Q.    But it's possible, within these parameters set out on this

17:19:11   3   chart, to moor it so that it would stay and survive?

17:19:14   4   A.    Yes.

17:19:14   5   Q.    Even in light condition?

17:19:15   6   A.    Yes.

17:19:15   7   Q.    But it wasn't moored, other than in -- consistent with

17:19:21   8   line mooring?

17:19:22   9   A.    Yeah.  The first scenario, No. 1, is with -- is how the

17:19:27   10  barge was tied up.

17:19:36   11         THE COURT:  We do not appear to have that in the

17:19:42   12  report that was provided to the Court.

17:19:43   13         MR. BEST:  I think, because Mr. Gilbert told you the

17:19:45   14  report that, thus far, we had was for the wrong date, and we

17:19:47   15  substituted in the report with the later date, which has the

17:19:50   16  attachment.  Alternatively, it is also included, I believe, as

17:19:54   17  one of his deposition exhibits, which is the next -- 388, I

17:19:57   18  believe.

17:20:03   19         Pardon me, no.  It's 387.

17:20:04   20         MR. GILBERT:  Your Honor, this is Exhibit 387 to

17:20:07   21  Mr. Green's deposition.

17:20:09   22         MR. BEST:  Which is Exhibit 387.

17:20:12   23         Actually, Your Honor, I stand corrected.  It was

17:20:14   24  not part of the report that was produced at the time of the

17:20:18   25  deposition.  So it is part of Plaintiffs' Exhibit 387.

| | | |
|---|---|---|
| 17:20:22 | 1 | With that, Your Honor, just bear with me one |
| 17:20:25 | 2 | minute. |
| 17:20:26 | 3 | THE COURT:  All right. |
| | 4 | BY MR. BEST: |
| 17:20:59 | 5 | Q.   And although there was a prediction a CAT 5 storm, it |
| 17:21:03 | 6 | didn't turn out that way, did it? |
| 17:21:05 | 7 | A.   No, it did not. |
| 17:21:06 | 8 | Q.   And, in fact, the weather records you reviewed, the |
| 17:21:10 | 9 | highest thing at the Lakefront Airport before the gauge broke |
| 17:21:13 | 10 | there was what? |
| 17:21:14 | 11 | A.   I think it was 68 miles an hour, 80 miles an hour. |
| 17:21:15 | 12 | Q.   I think it was 86. |
| 17:21:16 | 13 | A.   86 miles an hour. |
| 17:21:18 | 14 | Q.   Okay.  So given the weather circumstances, and given the |
| 17:21:20 | 15 | fact that the other barges there at the facility did not break |
| 17:21:23 | 16 | away, in your opinion, was it possible, even with this as a |
| 17:21:27 | 17 | light barge, to moor it in such a fashion that it would not |
| 17:21:31 | 18 | have broken away? |
| 17:21:32 | 19 | A.   Yes, it could have. |
| 17:21:35 | 20 | MR. BEST:  I tender the witness, Your Honor. |
| 17:21:37 | 21 | THE COURT:  Thank you. |
| 17:21:37 | 22 | And Mr. Aldock, certainly, your wish to cross |
| 17:21:41 | 23 | tomorrow was going to be granted anyhow.  But it's definitely |
| 17:21:44 | 24 | going to be granted now. |
| 17:21:46 | 25 | MR. ALDOCK:  I saw that coming. |

| 17:21:47 | 1 | **THE COURT:**  After our little back-and-forth, at |
| 17:21:49 | 2 | least, took some time and, of course, the direct of this |
| 17:21:52 | 3 | witness. |
| 17:21:52 | 4 | You may stand down, sir.  You, of course, will |
| 17:21:55 | 5 | be here in the morning.  We will see you. |
| 17:21:57 | 6 | I have a couple of questions to ask you.  Let |
| 17:21:59 | 7 | me -- New Orleans is the epicenter of news in disasters, |
| 17:22:16 | 8 | apparently. |
| 17:22:43 | 9 | **(OFF THE RECORD)** |
| 17:23:14 | 10 | **THE COURT:**  The time -- we don't have an exhibit that |
| 17:23:16 | 11 | shows the time the governor declared an emergency.  I'm looking |
| 17:23:19 | 12 | at 19 and 20 -- Defendant's 20.  We don't see -- |
| 17:23:24 | 13 | **MR. RAFFMAN:**  Plaintiffs' 20. |
| 17:23:26 | 14 | **THE COURT:**  It has Defendant's -- Plaintiffs' 19 and |
| 17:23:30 | 15 | Defendant's 20.  I don't see the time.  So if we could find |
| 17:23:34 | 16 | something with it in the record, it would be helpful. |
| 17:23:36 | 17 | **MR. ALDOCK:**  It's Plaintiffs' 20, Your Honor. |
| 17:23:38 | 18 | **THE COURT:**  Plaintiffs' -- |
| 17:23:41 | 19 | **MS. DALEY:**  Plaintiffs' 20 has nothing to do with -- |
| 17:23:45 | 20 | **MR. WALKER:**  We'll find it right now. |
| 17:23:46 | 21 | **THE COURT:**  Okay.  And you don't have to do it now. |
| 17:24:11 | 22 | **(OFF THE RECORD)** |
| 17:24:12 | 23 | **MR. GILBERT:**  Not a problem, Judge.  Thank you. |
| 17:24:15 | 24 | **MR. ALDOCK:**  Thank you, Your Honor. |
| 17:24:22 | 25 | **THE COURT:**  Tomorrow we're going to go to 12:30, and |

17:24:27  1    then we'll miss a day, and then we'll be back Friday.  That
17:24:32  2    will give you a little break from me and from each other.
17:24:40  3                              *****
17:24:40  4                           **CERTIFICATE**
17:24:40  5            I, Jodi Simcox, RMR, FCRR, Official Court Reporter
17:24:40  6    for the United States District Court, Eastern District of
17:24:40  7    Louisiana, do hereby certify that the foregoing is a true and
17:24:40  8    correct transcript, to the best of my ability and
17:24:40  9    understanding, from the record of the proceedings in the
17:24:40  10   above-entitled and numbered matter.
17:24:40
17:24:40  11
17:24:40
17:24:40  12
17:24:40
17:24:40  13                      ___S/ Jodi Simcox, RMR, FCRR___
17:24:40                             Jodi Simcox, RMR, FCRR
17:24:40  14                         Official Court Reporter
17:24:40
          15
16:03:10  16
          17
          18
          19
          20
          21
          22
          23
          24
          25

JODI SIMCOX, RMR, FCRR – OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA