1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF LOUISIANA

3

4

5   IN RE:  KATRINA DREDGING          *    Civil Action
    LIMITATION ACTION                 *
6   CONSOLIDATED LITIGATION           *    No. 05-4182
                                      *
7                                     *    Section K(2)
    PERTAINS TO:                      *
8   BARGE                             *    New Orleans, Louisiana
                                      *
9   MUMFORD, C.A. NO. 05-5724, AS *       June 29, 2010
    TO PLAINTIFFS JOSEPHINE           *
10  RICHARDSON AND HOLLIDAY           *    Afternoon Session
    JEWELERS, INC., ONLY              *
11  AND                               *
    BENOIT, C.A. NO. 06-7516, AS  *
12  TO PLAINTIFFS JOHN ALFORD AND *
    JERRY ALFORD ONLY                 *
13  * * * * * * * * * * * * * * * *

14               DAY SIX
            BENCH TRIAL BEFORE THE
15      HONORABLE STANWOOD R. DUVAL, JR.
           UNITED STATES DISTRICT JUDGE
16

17  APPEARANCES:

18  For the Plaintiffs:          Best Koeppel
                                 BY:  LAURENCE E. BEST, ESQ.
19                               BY:  PETER S. KOEPPEL, ESQ.
                                 2030 St. Charles Avenue
20                               New Orleans, Louisiana 70130

21

22  For the Plaintiffs:          Law Offices of Brian A. Gilbert
                                 BY:  BRIAN A. GILBERT, ESQ.
23                               2030 St. Charles Avenue
                                 New Orleans, Louisiana  70130
24

25

JODI SIMCOX, RMR, FCRR – OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1    APPEARANCES:

2

3    For the Plaintiffs:          Wiedemann & Wiedemann
                                   BY:  KARL WIEDEMANN, ESQ.
                                   BY:  LAWRENCE WIEDEMANN, ESQ.
4                                  821 Baronne Street
                                   New Orleans, Louisiana  70113

5

6

7    For the Plaintiffs:          Patrick J. Sanders, LLC
                                   BY:  PATRICK J. SANDERS, ESQ.
                                   3316 Ridgelake Drive
8                                  Suite 100
                                   Metairie, Louisiana  70002

9

10

11   For the Plaintiffs:          Law Office of Richard T. Seymour,
                                     P.L.L.C.
                                   BY:  RICHARD T. SEYMOUR, ESQ.
12                                 1150 Connecticut Avenue N.W.
                                   Suite 900
13                                 Washington, D.C.  20036-4129

14

15   For the Plaintiffs:          Khorrami, Pollard & Abir, LLP
                                   BY:  SHAWN KHORRAMI, ESQ.
16                                 444 S. Flower Street
                                   33rd Floor
17                                 Los Angeles, California  90071

18

19   For the Plaintiffs:          Wilson, Grochow, Druker & Nolet
                                   BY:  LAWRENCE A. WILSON, ESQ.
20                                 233 Broadway
                                   5th Floor
21                                 New York, New York  10279

22

23   For the Defendant:           Chaffe, McCall, L.L.P.
                                   BY:  DEREK A. WALKER, ESQ.
24                                 BY:  CHARLES P. BLANCHARD, ESQ.
                                   1100 Poydras Street, Suite 2300
25                                 New Orleans, Louisiana 70163

1  <u>APPEARANCES</u>:

2

3  For the Defendant:        Goodwin Procter, L.L.P.
                             BY:  JOHN ALDOCK, ESQ.
                             BY:  MARK RAFFMAN, ESQ.
4                            BY:  ADAM CHUD, ESQ.
                             BY:  KIRSTEN ROBBINS, ESQ.
5                            BY:  ERIC I. GOLDBERG, ESQ.
                             901 New York Avenue, NW
6                            Washington, D.C. 20001

7

8  For the Defendant:        Sutterfield & Webb
                             BY:  DANIEL A. WEBB, ESQ.
9                            650 Poydras Street, Suite 2715
                             New Orleans, Louisiana 70130
10

11 For the Defendant:        Lafarge North America, Inc.
                             BY:  PETER KEELEY, ESQ.
12                           12950 Worldgate Drive
                             Herndon, Virginia  20170
13

14

15 Official Court Reporter:  Jodi Simcox, RMR, FCRR
                             500 Poydras Street
                             Room HB-406
16                           New Orleans, Louisiana 70130
                             (504) 589-7780
17

18

19 Proceedings recorded by mechanical stenography, transcript

20 produced by computer.

21

22

23

24

25

JODI SIMCOX, RMR, FCRR – OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1          **I N D E X**

2                                                        Page

3
  GENNARO GERALD MARINO
4        Direct Examination                         1291
         Cross-Examination                          1301
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

|       |    |                                                          |
|-------|----|----------------------------------------------------------|
|       | 1  | **AFTERNOON SESSION** |
|       | 2  | **(June 29, 2010)** |
| 13:02:46 | 3 | * * * * * |
| 13:39:33 | 4 | **THE DEPUTY CLERK:**  All rise.  Court's in session. |
| 13:39:44 | 5 | Please be seated. |
| 13:39:49 | 6 | **MR. WILSON:**  Let's see if I can't wrap this up |
| 13:39:51 | 7 | quickly, Your Honor. |
| 13:39:56 | 8 | **THE COURT:**  Okay. |
| 13:39:57 | 9 | **MR. WILSON:**  Bob, could we have slide 235 of |
| 13:39:57 | 10 | Plaintiff's Exhibit 437? |
| 09:20:43 | 11 | (WHEREUPON, **Gennaro Gerald Marino**, having been |
| 09:20:43 | 12 | previously duly sworn, testified as follows.) |
| 13:39:59 | 13 | **DIRECT EXAMINATION** |
| 13:40:02 | 14 | BY MR. WILSON: |
| 13:40:15 | 15 | **Q.**   Okay.  Doctor, when we left on break, you were talking |
| 13:40:20 | 16 | about some damage deformation to the floodwall at the southern |
| 13:40:26 | 17 | part of the Industrial Canal's east floodwall. |
| 13:40:33 | 18 | I'm pointing to the bottom right-hand corner of |
| 13:40:37 | 19 | slide 235, where the cement I-wall is located, and it actually |
| 13:40:47 | 20 | looks like there's a white object and then another white object |
| 13:40:51 | 21 | kind of pointing to the I-wall.  Do you see that area on the |
| 13:40:54 | 22 | photograph? |
| 13:40:55 | 23 | **A.**   Yes. |
| 13:40:55 | 24 | **Q.**   Okay.  Is that the deformation on the top of the floodwall |
| 13:41:03 | 25 | that you were talking about? |

13:41:03   1    **A.**    Yes.  That's the scraping on the top of the floodwall.

13:41:07   2    **Q.**    Okay.

13:41:07   3    **A.**    And like I stated before our break, that I don't see how

13:41:11   4    you could get scraping on the top of a floodwall like that if

13:41:16   5    the floodwall isn't somewhat vertical and the barge is riding

13:41:20   6    over it.

13:41:21   7    **Q.**    Okay.

13:41:25   8              **THE COURT:**  How far would that be from the -- just to

13:41:28   9    orient us -- from where the -- there was a gap we had talked

13:41:39  10    about in earlier testimony, not yours, between one part of the

13:41:46  11    floodwall and another, I think, on the south breach.  I think

13:41:50  12    there was.

13:41:51  13              **THE WITNESS:**  I think I understand.

13:41:51  14              **THE COURT:**  If you could just orient us from the far

13:41:54  15    end of the south breach -- from the -- excuse me -- let me be

13:41:58  16    more specific -- from the southernmost end of the south breach,

13:42:01  17    how far is that?  Approximately.  I know you haven't measured

13:42:07  18    that.  I know you're a meticulous person.  So just an estimate.

13:42:12  19              **THE WITNESS:**  That would be the first panel that's

13:42:14  20    flat on the ground that hasn't been sheared off.

13:42:17  21              **THE COURT:**  Okay.  So that's immediately adjacent to

13:42:20  22    the area that was sheared off?

13:42:22  23              **THE WITNESS:**  Exactly.

13:42:23  24              **THE COURT:**  Okay.  I got it.

          25

| | | |
|---|---|---|
| 13:42:25 | 1 | BY MR. WILSON: |
| 13:42:25 | 2 | **Q.**   And just quickly, Doctor, I'd like to go to slide 237. |
| 13:42:31 | 3 | The Court has already seen this photograph. |
| 13:42:36 | 4 | **THE COURT:**   True. |
| 13:42:38 | 5 | BY MR. WILSON: |
| 13:42:39 | 6 | **Q.**   Why did you want to show that to the Court, Doctor? |
| 13:42:43 | 7 | **A.**   Well, it shows that, you know, the scraping is right up |
| 13:42:45 | 8 | the side of the barge. |
| 13:42:46 | 9 | **Q.**   Now, you say the side of the barge.  Do you mean the front |
| 13:42:49 | 10 | of the barge? |
| 13:42:50 | 11 | **A.**   Yes, whatever front -- it could be bow or stern. |
| 13:42:55 | 12 | **Q.**   All right.  The front side? |
| 13:42:57 | 13 | **A.**   This would be the side that contacted the sheared wall |
| 13:43:00 | 14 | first.  I mean, that would make sense if you had scrapings up |
| 13:43:04 | 15 | the side of the barge. |
| 13:43:07 | 16 | **Q.**   Meaning not on the bottom of the barge; correct? |
| 13:43:09 | 17 | **A.**   Right. |
| 13:43:10 | 18 | **Q.**   Okay.  And, Doctor, I don't know if the Court needs to see |
| 13:43:24 | 19 | the other photos like this, unless there's a reason you want to |
| 13:43:26 | 20 | show it to the judge? |
| 13:43:28 | 21 | **A.**   No, that's fine.  Unless the Court has a question. |
| 13:43:30 | 22 | **MR. WILSON:**   Okay.  Can we move to slide 241, please? |
| 13:43:37 | 23 | BY MR. WILSON: |
| 13:43:38 | 24 | **Q.**   Doctor, what is this?  It says "Barge Collision at South |
| 13:43:43 | 25 | End of South Breach." |

13:43:46   1   **A.**   What I'm trying to show here is here's the barge after the

13:43:51   2   broadside collision, where the wall has been displaced.

13:43:56   3   **Q.**   And you're referring to the top of this illustration where

13:43:59   4   the I-wall is bowed in; is that correct?

13:44:03   5   **A.**   That's correct.

13:44:03   6   **Q.**   Okay.  And the first -- the barge is here first, up

13:44:08   7   against -- the side of the barge is up against the side of the

13:44:11   8   I-wall, and it's kind of moved in until it hits the land side;

13:44:17   9   correct?

13:44:18   10   **A.**   That's correct.

13:44:18   11   **Q.**   Okay.

13:44:19   12   **A.**   And if you remember the photograph that we looked at

13:44:22   13   just -- just before this, on this end of the -- on this end of

13:44:27   14   the barge is where we saw those scrapes that went up -- up the

13:44:32   15   side or the wall of the barge.

13:44:35   16   **Q.**   Okay.

13:44:35   17   **A.**   And these are -- these lines are scrapings on the bottom

13:44:40   18   of the barge.  And so with the barge in this position, it was

13:44:46   19   driven up this direction and scraping along this corner.  This

13:44:52   20   corner would have first contact with the sheared area.  And as

13:44:58   21   its going up, it's rotating this way because of the wind and

13:45:02   22   just the resistance of the shearing.

13:45:04   23   **Q.**   The resistance of the wall, you mean?

13:45:06   24   **A.**   Yes.  Shearing up against the wall.

13:45:08   25   **Q.**   Okay.  And then is it -- go ahead, Doctor, please.

| | | |
|---|---|---|
| 13:45:14 | 1 | A.   And then this notch in the barge, this indentation in the |
| 13:45:19 | 2 | barge is consistent with, you know, the limits of these |
| 13:45:22 | 3 | scrapes.  And, basically, as this rotates, that indentation is |
| 13:45:29 | 4 | where that wall is vertically sheared to the top of the wall, |
| 13:45:35 | 5 | stopping the barge from going this direction. |
| 13:45:38 | 6 |         And then from that point, the wall fails, and the |
| 13:45:43 | 7 | flow of the water causes the wall -- causes the barge to come |
| 13:45:48 | 8 | back around and slide back in this direction. |
| 13:45:51 | 9 | Q.   Okay.  You are saying that that indentation was formed on |
| 13:45:55 | 10 | the side of the barge; right? |
| 13:45:57 | 11 | A.   Yes. |
| 13:45:58 | 12 | Q.   Okay.  And actually, you have a notch in the barge there. |
| 13:46:00 | 13 | I didn't see that, okay. |
| 13:46:02 | 14 |         And then what happened, Doctor? |
| 13:46:06 | 15 | A.   I thought I explained it, but... |
| 13:46:09 | 16 | Q.   Okay.  I thought we were moving to the bottom part.  Did |
| 13:46:11 | 17 | you explain it and I missed it? |
| 13:46:14 | 18 | A.   Yes. |
| 13:46:15 | 19 |         THE WITNESS:  Did the Court understand that? |
| 13:46:17 | 20 |         THE COURT:  Yes. |
| 13:46:18 | 21 | BY MR. WILSON: |
| 13:46:19 | 22 | Q.   Okay.  And what is this right here?  It's a little square |
| 13:46:22 | 23 | with a dot on it. |
| 13:46:24 | 24 | A.   I can't see your pointer. |
| 13:46:26 | 25 |         THE COURT:  Is that the school bus? |

13:46:27    1          **THE WITNESS:**  Yes, that's the school bus.  And then
13:46:28    2    that's the sign, "No Parking" sign.
13:46:31    3                If you look at some of the old photographs,
13:46:34    4    you'll see cars -- a bunch of cars parked in this direction
13:46:38    5    along the -- Jourdan Avenue.  I guess they didn't like that.
13:46:41    6    Somebody put up a "No Parking" sign.
13:46:44    7    BY MR. WILSON:
13:46:44    8    **Q.**   Okay.  All right.  Is there anything else that you wanted
13:46:46    9    to tell the Court about that illustration?
13:46:50   10    **A.**   No.
13:46:58   11    **Q.**   Next slide, please.
13:47:09   12    **A.**   Given the damage characteristics of the wall and the
13:47:13   13    barge, it puts the wall -- it puts the barge, essentially, next
13:47:20   14    to the wall, in the southern direction.
13:47:23   15    **Q.**   Okay.  Next slide, please.
13:47:27   16                Oh, okay.  Doctor, then there are a number of slides,
13:47:31   17    but we've already seen them -- the Court's already seen them
13:47:34   18    regarding the other damage at other levees throughout the city
13:47:38   19    area.
13:47:39   20    **A.**   Right.  Right.  I guess I should say a little bit more
13:47:42   21    about that last slide in that, if we had a full breach, that
13:47:48   22    barge going in the southern direction would have to -- it would
13:47:52   23    have to converse or traverse across the entire breach and not
13:47:59   24    get drawn into the breach, if those walls were already
13:48:04   25    collapsed and 195 feet away from where the floodwall was and

13:48:12   1   the levee already eroded.

13:48:15   2   Q.   So what you're saying, Doctor, is that if the breach was

13:48:19   3   already there, the barge would have got sucked into the open

13:48:22   4   area of the I-wall?

13:48:24   5   A.   Right.  It wouldn't have anything to retain it.  The wall

13:48:26   6   has to be up there to retain it at the southern area.

13:48:31   7   Q.   Okay.  Can we move to slide 249, please?

13:48:50   8   A.   You know, again, if we went through a comparison with the

13:48:52   9   other floodwalls, the things that we would see would be that

13:48:58  10   the concrete panel damage is less intense.

13:49:04  11           Again, you know, the floodwall -- those floodwalls

13:49:07  12   remained in the ground.  There's a regular displacement

13:49:11  13   pattern.  It doesn't have this unusual bowl -- bow shape and

13:49:16  14   then a straight shape.  There's no shearing of a top of the

13:49:21  15   wall or the localized coiling, there's no significant

13:49:27  16   back-scour, and there's no violent rush of water that causes

13:49:37  17   residential homes to be, essentially, wiped out adjacent to the

13:49:41  18   breaches.

13:49:45  19   Q.   Next slide, please.

13:49:50  20   A.   So in summary of my investigation of the south breach, I

13:49:55  21   broke it up -- I broke it up into two slides:  One more related

13:50:00  22   to the surge effects, and then the barge effects.

13:50:03  23   Q.   Next slide, please.

13:50:06  24   A.   So in terms of the -- you know, the surge effects, you

13:50:11  25   know, first off there were three basic areas of wall failure:

1298

13:50:17  1   Two involved excessive wall displacement; and another, the

13:50:23  2   shearing of the wall.  Two of the failure areas involved

13:50:28  3   yielding or loss of land side support.  These areas were

13:50:34  4   exhibited by the bowing and uniform displacement sections of

13:50:43  5   the wall.

13:50:44  6        Based on the study of the site conditions that we

13:50:47  7   talked about, the cross-sections that were developed -- two for

13:50:50  8   the south and one for the north -- in the failure areas, we

13:50:55  9   examined the effects of the surge.  We looked at the effects of

13:51:01  10  the surge from both a standpoint of seepage and water-loading

13:51:05  11  on the wall and analyzed those and found that it was unlikely

13:51:11  12  that these were the causes of the failure of the wall, and thus

13:51:16  13  the barge impacts were required to cause the wall failure.

13:51:21  14  **Q.**   Okay.  Next slide, please.

13:51:28  15  **A.**   These three areas of failure that we've talked about

13:51:33  16  represent three primary areas of collision of the barge.  The

13:51:39  17  floodwall failure characteristics of the other floodwall

13:51:44  18  failures are not consistent with what we see here in terms of a

13:51:53  19  wall exhumed from the ground or a collapsed wall, irregular

13:52:00  20  deformation pattern, and large wall displacements.

13:52:04  21        The shearing of the wall at the south breach, the

13:52:07  22  third collision, is the third collision by the barge which is

13:52:15  23  essentially undisputed.  The barge and the wall damage at the

13:52:19  24  south end indicate that the collision was initiated with a

13:52:26  25  southerly movement of the vessel.  With the southerly movement

| | | |
|---|---|---|
| 13:52:32 | 1 | of the vessel, this means that the barge was in the position |
| 13:52:36 | 2 | against the wall to the north where the second primary |
| 13:52:40 | 3 | collision occurred in a broadside position. |
| 13:52:45 | 4 | This position is consistent with the uniform |
| 13:52:48 | 5 | displaced floodwall to the east before the second collision. |
| 13:52:57 | 6 | Being in this broadside position next to the wall, the |
| 13:53:00 | 7 | floodwall, the barge would have clearly flowed into the Ninth |
| 13:53:05 | 8 | Ward if the wall had already collapsed and not had struck the |
| 13:53:10 | 9 | end of the breach -- it would have not have struck the end of |
| 13:53:14 | 10 | the breach. |
| 13:53:15 | 11 | Also, consistent with the fact that the wall had not |
| 13:53:18 | 12 | collapsed were the boom sounds uniformly heard prior to any |
| 13:53:25 | 13 | violent flooding.  One of these booms was clearly -- clearly |
| 13:53:32 | 14 | occurred at the south end of the breach where the concrete was |
| 13:53:35 | 15 | shattered and was undisputedly hammered by the barge. |
| 13:53:47 | 16 | Even if the wall was leaning prior to any barge |
| 13:53:51 | 17 | collision, it was -- it was not too great given that there was |
| 13:53:58 | 18 | not any significant flooding prior to the on-rush of water |
| 13:54:03 | 19 | reported. |
| 13:54:05 | 20 | THE COURT:  Just a couple of questions, Doctor.  The |
| 13:54:08 | 21 | boom sound -- and it's been a rather ubiquitous term in this |
| 13:54:09 | 22 | case, but there have been others.  But do you regard the boom |
| 13:54:20 | 23 | sound as, among other things, the sound of the wall collapsing |
| 13:54:28 | 24 | or -- you tell me what you regard it as. |
| 13:54:31 | 25 | THE WITNESS:  I regard it as the impact of the barge |

13:54:33  1    against -- against the wall.

13:54:39  2           THE COURT:  And I'll leave that to cross-examination.

13:54:44  3    I'm not going to cross-examine him, so -- not too much anyway.

13:54:51  4           MR. WILSON:  Just to follow up on your question, Your

13:54:52  5    Honor.

13:54:54  6    BY MR. WILSON:

13:54:54  7    Q.   Have you worked with breaking concrete?

13:54:56  8    A.   Yes.

13:54:57  9    Q.   Explain to the Court how you -- what you've done.

13:55:00  10   A.   I have done work with the University of Illinois where

13:55:04  11   we've tested large beams, concrete beams, and failed them.

13:55:10  12   Q.   What did they sound like when they failed?

13:55:12  13   A.   Not very loud.  In fact, I had an office in the civil

13:55:16  14   engineering building, and -- which has a large crane bay, and

13:55:23  15   this crane bay is where large-scale testing is done.  And I

13:55:28  16   don't remember ever hearing anything that consisted of the

13:55:32  17   sounds that these witnesses were describing.

13:55:58  18   Q.   Okay.  Doctor, the grinding or a screeching sound could be

13:56:03  19   attributable to a barge scraping against the wall?

13:56:07  20   A.   Right.  It could be that when the barge was in the second

13:56:09  21   collision location, being trapped because of the indentation,

13:56:13  22   it could have been banging up against the wall or rubbing back

13:56:18  23   and forth.

13:56:19  24   Q.   Okay.  And that's your opinion; correct, Doctor?

13:56:24  25   A.   Yes.

13:56:24   1    **Q.**   And, Doctor, is it your opinion that the barge was a

13:56:30   2    substantial cause of the failure of the north part of the

13:56:33   3    eastern floodwall in the Industrial Canal on August 29th, 2005?

13:56:38   4    **A.**   Yes.

13:56:39   5    **Q.**   And the same question, Doctor, with regard to the southern

13:56:44   6    breach of the eastern part of the Industrial Canal floodwall?

13:56:49   7    **A.**   Yes.

13:56:51   8    **Q.**   Have all your opinions been with a reasonable degree of

13:56:55   9    geotechnical engineering and civil engineering certainty?

13:56:58   10   **A.**   Yes.

13:57:00   11              **MR. WILSON:**  I tender the witness, Your Honor.

13:57:04   12              **THE COURT:**  Thank you.  Wait a minute.

13:57:06   13                   Counsel, you had something?

13:57:11   14                   Fine.  Thank you.

13:57:13   15              **MR. WILSON:**   Thank you.

13:57:15   16              **THE COURT:**  Cross-examination, sir.  I'll give you

13:57:17   17   time to get up here, of course.

13:57:37   18                   I assume, if you want to examine him, reference

13:57:40   19   any of the PowerPoint, the plaintiffs will be kind enough to

13:57:44   20   place that -- put them up on the screen for you.

13:57:50   21              **MR. RAFFMAN:**  Thank you, Judge.  I believe we're

13:57:51   22   going to be okay.

13:58:07   23                      **CROSS-EXAMINATION**

13:58:08   24   BY MR. RAFFMAN:

13:58:08   25   **Q.**   Good afternoon, Dr. Marino.

| | | |
|---|---|---|
| 13:58:10 | 1 | A.   Good to see you again, Mark. |
| 13:58:13 | 2 | Q.   Good to see you again too. |
| 13:58:15 | 3 | I'll start where the judge suggested maybe I should |
| 13:58:19 | 4 | start, with the boom sounds. |
| 13:58:23 | 5 | A.   The infamous boom sounds. |
| 13:58:25 | 6 | Q.   The infamous boom sounds. |
| 13:58:28 | 7 | So, Dr. Marino, you have created a table in your |
| 13:58:34 | 8 | report summarizing the sounds that people heard in the |
| 13:58:40 | 9 | neighborhood of the Industrial Canal on the morning of |
| 13:58:43 | 10 | August 29th; right? |
| 13:58:45 | 11 | A.   That's correct. |
| 13:58:45 | 12 | Q.   And that table is Table 3.1? |
| 13:58:52 | 13 | A.   That's correct. |
| 13:58:56 | 14 | Q.   Table 3.1 of your report; right? |
| 13:59:00 | 15 | A.   Yes. |
| 13:59:01 | 16 | MR. RAFFMAN:  This is Plaintiff's Exhibit 397, Table |
| 13:59:03 | 17 | 3.1.  May I have 21? |
| 13:59:15 | 18 | THE COURT:  There's four pages. |
| 13:59:16 | 19 | MR. RAFFMAN:  It's four pages long. |
| 13:59:18 | 20 | BY MR. RAFFMAN: |
| 13:59:18 | 21 | Q.   And you've got reports from, I guess, about 16 witnesses |
| 13:59:27 | 22 | who have got reports of the sounds that they heard; am I right, |
| 13:59:31 | 23 | Dr. Marino? |
| 13:59:32 | 24 | A.   That's true. |
| 13:59:33 | 25 | Q.   And will you accept my representation that ten of those |

JODI SIMCOX, RMR, FCRR – OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

13:59:36  1   witnesses used the word "boom" to describe the sound they heard

13:59:40  2   as it's rendered in your report?

13:59:42  3   **A.**   If you say it was ten.  I haven't counted them.

13:59:46  4   **Q.**   And --

13:59:47  5   **A.**   And they may have used other terms.  I noticed that some

13:59:51  6   witnesses used several different terms.

13:59:53  7   **Q.**   Well, I believe that 12 of the 16 used "boom," and then --

14:00:03  8   I'm sorry.  We have 16 entries, 12 separate witnesses, so the

14:00:08  9   record is clear.  Ten of the 12 used the word "boom"; and the

14:00:15  10  other two, Williams and Sartin, used the word "bang" and

14:00:21  11  "crash."  Will you accept my representation, or do we need to

14:00:25  12  go through it?

14:00:26  13  **A.**   I remember "crash."  I don't remember the exact witnesses,

14:00:28  14  but I remember "crash."

14:00:30  15  **Q.**   All right.  You're familiar, Dr. Marino, with reports in

14:00:36  16  IPET of witnesses at other breaches who also used the word

14:00:39  17  "boom" to describe sounds that they heard?

14:00:46  18           **MR. WILSON:**  I would object, Your Honor, in that, you

14:00:49  19  know, we don't know what happened at those other breaches.

14:00:52  20           **THE COURT:**  Overruled.

14:00:53  21           **THE WITNESS:**  Yeah, this one says "Crackling," "loud

14:00:57  22  crackling sound," "boom."

14:00:59  23  **BY MR. RAFFMAN:**

14:00:59  24  **Q.**   And that one, I'll represent for the Court, is from

14:01:02  25  Defendant's Exhibit 145, IPET, Volume IV, Appendix Page

| | | |
|---|---|---|
| 14:01:07 | 1 | IV-7-27, and it relates to the London Avenue Canal. |
| 14:01:14 | 2 | MR. RAFFMAN:  23, please. |
| 14:01:15 | 3 | BY MR. RAFFMAN: |
| 14:01:17 | 4 | Q.   Because you've reviewed IPET, you know that witnesses near |
| 14:01:20 | 5 | the 17 Street Canal also used the word "boom" to refer to |
| 14:01:25 | 6 | sounds that they heard in connection with the breaches that |
| 14:01:28 | 7 | occurred at that location; right? |
| 14:01:30 | 8 | A.   That's correct. |
| 14:01:31 | 9 | Q.   And I'm referring now to Defendant's Exhibit 145, IPET |
| 14:01:36 | 10 | volume IV, Appendix Page IV-7-3 where the witness said he |
| 14:01:45 | 11 | heard -- reported hearing a loud "boom" and "rumbling like |
| 14:01:49 | 12 | thunder." |
| 14:01:51 | 13 | I have maybe one or two more of these. |
| 14:01:53 | 14 | MR. RAFFMAN:  24, please. |
| 14:01:53 | 15 | BY MR. RAFFMAN: |
| 14:01:53 | 16 | Q.   And because you read the IPET report, you know that, in |
| 14:01:57 | 17 | the vicinity of the London Avenue Canal, an eyewitness, an |
| 14:02:01 | 18 | elderly lady, said that the rain stopped, when she had heard a |
| 14:02:06 | 19 | loud "boom," and then saw water rising.  At IPET, Defendant's |
| 14:02:10 | 20 | Exhibit 145, Volume IV, Appendix Page IV-7-21.  You've seen |
| 14:02:18 | 21 | that? |
| 14:02:18 | 22 | A.   Yes. |
| 14:02:18 | 23 | MR. RAFFMAN:  And we have one more, 25. |
| 14:02:20 | 24 | BY MR. RAFFMAN: |
| 14:02:21 | 25 | Q.   In the location of the Inner Harbor Navigation Canal west |

| | | |
|---|---|---|
| 14:02:26 | 1 | breaches report, IPET reports that a witness heard a loud |
| 14:02:29 | 2 | "boom," and then the water started quickly rising.  This is |
| 14:02:32 | 3 | from Defendant's Exhibit 145, Volume IV, Page IV-7-37.  You've |
| 14:02:38 | 4 | seen that report as well; right? |
| 14:02:40 | 5 | A.   That's correct. |
| 14:02:40 | 6 | Q.   And you're not suggesting to the Court that any of those |
| 14:02:44 | 7 | "boom" sounds that were heard at any of those other breaches |
| 14:02:50 | 8 | were created by a barge impact; am I right, Dr. Marino? |
| 14:02:55 | 9 | A.   That's correct.  In fact, at those other breaches, if you |
| 14:02:58 | 10 | remember my testimony this morning, Mark, where I talked about |
| 14:03:02 | 11 | the structural failure, you could see at the joint -- the joint |
| 14:03:06 | 12 | between the concrete and the steel.  The sheet pile; remember |
| 14:03:12 | 13 | that?  You could see that structural failure. |
| 14:03:17 | 14 | And in our case, we don't have that condition.  We |
| 14:03:19 | 15 | don't have that break.  There's no structural failure, unless |
| 14:03:24 | 16 | you're talking about the south end, that, in my mind, would |
| 14:03:28 | 17 | cause that kind of sound. |
| 14:03:32 | 18 | Q.   I guess -- |
| 14:03:33 | 19 | A.   Also, some of these witnesses may be hearing what's going |
| 14:03:35 | 20 | on over on the east side. |
| 14:03:37 | 21 | Q.   Well, to be clear, Dr. Marino, none of the witnesses at |
| 14:03:41 | 22 | the 17 Street Canal and none of the witnesses at the London |
| 14:03:45 | 23 | Avenue Canal are hearing booms associated with the east side of |
| 14:03:50 | 24 | the Inner Harbor Navigation Canal; right, Dr. Marino? |
| 14:03:55 | 25 | A.   I'm saying that some are clearly saying that it is related |

| | | |
|---|---|---|
| 14:03:59 | 1 | to these canals, the 17th Street and London. |
| 14:04:03 | 2 | **Q.**   Okay. |
| 14:04:03 | 3 | **A.**   There's others that are farther away that may be and not |
| 14:04:05 | 4 | be -- and may not be hearing the "booms" from here. |
| 14:04:10 | 5 | **Q.**   All right.  Well -- okay. |
| 14:04:11 | 6 | **A.**   There's, for example, a newspaper article I read about a |
| 14:04:17 | 7 | Ramirez, who was in New Orleans Parish, who talks about hearing |
| 14:04:24 | 8 | "bang" sounds from the barge hitting the wall. |
| 14:04:30 | 9 | **Q.**   Are you telling the Court, Dr. Marino, that the Court |
| 14:04:33 | 10 | should rely on a newspaper account from -- I'm sorry. |
| 14:04:35 | 11 | **THE COURT:**  The Court won't, so we can -- |
| 14:04:38 | 12 | **MR. RAFFMAN:**  Judge, I apologize. |
| 14:04:42 | 13 | **THE COURT:**  I am, shall we say, by the very nature of |
| 14:04:44 | 14 | my profession, intensely skeptical of newspaper articles. |
| 14:04:49 | 15 | **MR. RAFFMAN:**  Thank you, Your Honor. |
| 14:04:50 | 16 | **THE COURT:**  Especially if they've even mentioned |
| 14:04:53 | 17 | something about any decision I may have made.  But go ahead. |
| 14:04:56 | 18 | I'm joking.  I'm joking. |
| 14:04:57 | 19 | **MR. RAFFMAN:**  Well, I promise not to quote you to the |
| 14:05:00 | 20 | press. |
| 14:05:01 | 21 | **BY MR. RAFFMAN:** |
| 14:05:02 | 22 | **Q.**   But just to put a cap on this line of inquiry, Dr. Marino, |
| 14:05:06 | 23 | will you agree with me that, based on these eyewitness |
| 14:05:09 | 24 | accounts, you could have a "boom" sound associated with a |
| 14:05:12 | 25 | breach of a floodwall that doesn't require a barge impact? |

14:05:16    1   A.   Yes.

14:05:26    2   Q.   Dr. Marino, because we didn't do this earlier, let me ask

14:05:29    3   you a few questions about your professional background and what

14:05:32    4   you do.

14:05:34    5              Am I correct, Dr. Marino, that you've never designed

14:05:37    6   a hurricane levee or protection floodwall for the United States

14:05:41    7   Army Corps of Engineers?

14:05:43    8   A.   No.

14:05:46    9              THE COURT:  It is -- the answer is yes, he's correct,

14:05:49   10   but I know what you mean.  We have the same problem.

14:05:51   11              MR. RAFFMAN:  Thank you, Your Honor.

14:05:52   12              THE WITNESS:  We've had this problem in depositions

14:05:54   13   as well.

14:05:56   14              MR. RAFFMAN:  Dr. Marino and I will, we will

14:05:57   15   communicate.  We will.

14:05:59   16   BY MR. RAFFMAN:

14:05:59   17   Q.   Dr. Marino, am I correct that you've never designed a

14:06:02   18   levee or a floodwall in Louisiana?

14:06:04   19   A.   Yes.

14:06:05   20   Q.   Am I correct that you've never been asked by the United

14:06:08   21   States Army Corps of Engineers to evaluate the safety of a

14:06:12   22   hurricane protection levee or floodwall at any location?

14:06:17   23   A.   Yes.

14:06:20   24   Q.   Am I correct that, before this case, you had never

14:06:24   25   evaluated the safety of a hurricane levee or floodwall in the

14:06:28   1   state of Louisiana?

14:06:35   2   **A.**   Yes.

14:06:39   3   **Q.**   Am I correct that, before this case, you had never

14:06:43   4   evaluated the failure of a hurricane protection structure in

14:06:47   5   hurricane conditions?

14:06:50   6   **A.**   Yes.

14:06:53   7   **Q.**   Am I correct that you have never published any articles on

14:06:55   8   the failure of a hurricane protection floodwall or levee?

14:07:00   9   **A.**   Yes.

14:07:02   10   **Q.**   And am I correct that you've never taught courses about

14:07:05   11   the design of hurricane protection levees or floodwalls?

14:07:13   12   **A.**   Yes.

14:07:14   13   **Q.**   Am I correct that before this case, you had never

14:07:16   14   conducted a seepage study of a hurricane protection system that

14:07:20   15   failed?

14:07:27   16   **A.**   Yes.

14:07:30   17   **Q.**   Am I correct that, before this case, you had never

14:07:32   18   conducted a stability analysis or a limit equilibrium analysis

14:07:39   19   of a hurricane protection system that failed?

14:07:49   20   **A.**   Can you repeat that question?

14:07:53   21   **Q.**   Sure.  Am I correct that, before this case, you had never

14:07:56   22   conducted a stability analysis or a limit equilibrium analysis

14:08:00   23   of a hurricane protection system that failed?

14:08:10   24   **A.**   I -- I guess the answer is yes.

14:08:18   25   **Q.**   Now, you have described yourself as a forensic engineer;

14:08:22  1  am I right?

14:08:24  2  A.   I may have used that term.

14:08:26  3  Q.   And you don't have any certifications in the field of

14:08:30  4  forensic engineering, do you?

14:08:33  5  A.   No.  I've written a textbook that covers areas of

14:08:37  6  forensics.

14:08:43  7  Q.   You're not a member of the American Society of Civil

14:08:45  8  Engineers Committee on Forensic Engineering; right?

14:08:49  9  A.   That's correct.

14:08:49  10  Q.   And you don't teach forensic engineering courses; right?

14:08:53  11  A.   That's correct.

14:08:54  12  Q.   This case is the first time that you've ever evaluated in

14:08:58  13  any respect the impact of a marine vessel on a fixed structure;

14:09:03  14  right?

14:09:04  15  A.   That's correct.

14:09:05  16  Q.   And you don't hold yourself out as an expert in the

14:09:09  17  reconstruction of marine vessel casualties; right?

14:09:18  18  A.   That's correct.

14:09:23  19  Q.   All right.  You mentioned a textbook.  Am I right that

14:09:28  20  your textbook is called *Earthquake Damage:  Inspection,*

14:09:31  21  *Evaluation, and Repair*?

14:09:33  22  A.   That's correct.

14:09:39  23  Q.   Am I right that all of the work you've done in connection

14:09:42  24  with the breaches at the Inner Harbor Navigation Canal has been

14:09:48  25  performed for the plaintiffs' lawyers in this case?

14:09:51   1    A.    Yes.

14:09:52   2    Q.    And your work has been performed purely for the purpose of

14:09:56   3    providing expert evidence or testimony in litigation?

14:10:06   4    A.    I was asked to perform an investigation of what I thought

14:10:08   5    the likely causes were, and I went about an independent

14:10:11   6    investigation to do that.

14:10:27   7    Q.    And as you understand it, the purpose of the investigation

14:10:29   8    you undertook was to assist the plaintiffs' lawyers in either

14:10:35   9    presenting evidence or, at least, evaluating or developing a

14:10:41   10   litigation case; correct?

14:10:45   11            MR. WILSON:   Objection, Judge, compound.

14:10:50   12            THE COURT:   Okay.   The question is:   "As you

14:10:55   13   understand, the purpose of the investigation you undertook was

14:10:58   14   to assist the plaintiffs' lawyers in, at least, evaluating or

14:11:04   15   developing a litigation case; correct?"   I'm going to allow the

14:11:07   16   question.

14:11:09   17            MR. WILSON:   Well, I also object to "developing" --

14:11:12   18            THE COURT:   Whenever you object, you stand.

14:11:14   19            MR. WILSON:   I'm sorry, Your Honor.

14:11:16   20            THE COURT:   And the mic picks you up better, and I

14:11:16   21   know you are objecting --

14:11:16   22            MR. WILSON:   I apologize.

14:11:16   23            THE COURT:   -- and who it comes -- that's all right.

14:11:19   24            MR. WILSON:   I would also object to the term

14:11:21   25   "developing a litigation case."

14:11:25  1          **THE COURT:**  That is certainly, I guess, *what's good*

14:11:29  2  *for the goose is good for the gander.*  I will assume, then,

14:11:33  3  that all your experts developed a litigation case as well.  I

14:11:36  4  don't think we discern one expert from another even though they

14:11:39  5  may have different experiences.  So maybe the word "develop" is

14:11:44  6  infused with something else.  I'm not sure.

14:11:48  7          **MR. RAFFMAN:**  I actually don't --

14:11:49  8          **THE COURT:**  "Developed a litigation case."

14:11:51  9          **MR. RAFFMAN:**  I don't mean to impart any sinister

14:11:54  10  meaning, Judge.

14:11:56  11          **THE COURT:**  Then I'm going to allow it.

14:11:56  12          **MR. RAFFMAN:**  All I'm trying to do is to distinguish

14:11:58  13  what this expert has done from other experts who may testify

14:12:00  14  who've reached their opinions before they were ever retained to

14:12:06  15  do any litigation.

14:12:07  16          **THE COURT:**  That's fair enough.

14:12:07  17          Go ahead.  You can answer the question.

14:12:07  18  **BY MR. RAFFMAN:**

14:12:08  19  **Q.**  You reached your opinions in this case after you were

14:12:12  20  retained by lawyers in litigation; right?

14:12:14  21  **A.**  That's correct.

14:12:14  22  **Q.**  And you haven't taken part in any of the independent

14:12:16  23  investigations that were established after Katrina to study the

14:12:19  24  New Orleans levee or floodwall failures; right?

14:12:22  25  **A.**  That's correct.

| | | |
|---|---|---|
| 14:12:22 | 1 | **Q.**   You didn't participate on the IPET team; right? |
| 14:12:28 | 2 | **A.**   That's correct. |
| 14:12:28 | 3 | **Q.**   You didn't participant in ILIT; right? |
| 14:12:30 | 4 | **A.**   That's correct. |
| 14:12:30 | 5 | **Q.**   You didn't participant in Team Louisiana; right? |
| 14:12:33 | 6 | **A.**   That's correct. |
| 14:12:34 | 7 | **Q.**   All right.  And your work on this case has not been |
| 14:12:37 | 8 | subject to any sort of independent oversight, has it? |
| 14:12:45 | 9 | **A.**   Other than my own staff. |
| 14:12:52 | 10 | **Q.**   The only persons who have provided comments on your report |
| 14:12:56 | 11 | before it was completed were the lawyers for the plaintiffs and |
| 14:12:59 | 12 | people either working for the plaintiffs' lawyers or for you? |
| 14:13:03 | 13 | **A.**   You know, I know I said that in my deposition, but I |
| 14:13:07 | 14 | actually don't think the lawyers really had any comments on my |
| 14:13:10 | 15 | report. |
| 14:13:13 | 16 | **Q.**   Okay. |
| 14:13:16 | 17 | **A.**   I mean, I think maybe there was a word here and there, but |
| 14:13:19 | 18 | it wasn't -- you know, it wasn't anything substantial. |
| 14:13:22 | 19 | **Q.**   No, I'm not going to impeach you with your deposition on |
| 14:13:25 | 20 | that, Dr. Marino, because my question was not whether the |
| 14:13:29 | 21 | plaintiffs' lawyers provided comments or not.  My question is |
| 14:13:32 | 22 | that nobody other than they or your staff has ever commented on |
| 14:13:38 | 23 | your report. |
| 14:13:38 | 24 | **A.**   Oh, I understand.  Okay. |
| 14:13:40 | 25 | **Q.**   Is that right? |

1313

14:13:41   1   A.   That's correct.

14:13:49   2   Q.   Now, I heard you -- this is photo 4.14 in your report,

14:14:10   3   Dr. Marino?

14:14:11   4   A.   That's correct.

14:14:11   5   Q.   Plaintiff's Exhibit 397?

14:14:13   6   A.   That's correct.

14:14:13   7   Q.   And I heard you this morning correct an error in your

14:14:16   8   report, where you had said in your report this photo was taken

14:14:20   9   during Katrina and, in fact, it was taken during Rita.  Did I

14:14:23   10  hear that right?

14:14:24   11  A.   Yes.

14:14:29   12  Q.   So the record is clear, I'm putting up Figure 2.15 from

14:14:32   13  the report that you issued in this case.  This is, in fact,

14:14:36   14  Figure 2.15 in your report, isn't it?

14:14:40   15  A.   Prior to being corrected, yes.

14:14:44   16  Q.   I'm sorry.  I didn't hear what you said.

14:14:45   17  A.   Prior to being corrected, yes.

14:14:47   18  Q.   Prior to being corrected.

14:14:50   19       Well, I have a copy of your report dated July 1,

14:15:02   20  2009, with revisions to photograph designations dated May 14th,

14:15:06   21  2010.  At least as of May 14th, 2010, that photo had not been

14:15:14   22  corrected; am I right?

14:15:16   23  A.   Well, my understanding was that I could not correct the

14:15:19   24  photos; all I could do was change figure and photo

14:15:25   25  designations.  But if you look at my slide presentation, it is

14:15:29  1  in my slide presentation.

14:15:30  2  Q.   You've corrected it in your slide presentation?

14:15:32  3  A.   That's correct.

14:15:34  4  Q.   All right.  And so you would agree with me, Dr. Marino,

14:15:37  5  this slide that was in your report, which depicts the barge

14:15:43  6  moored outside of the five-barge tier, is incorrect?

14:15:47  7  A.   Yes.  But it doesn't have any -- it doesn't really -- it's

14:15:51  8  for information purposes.  It has nothing to do with my

14:15:55  9  analysis.

14:16:02  10  Q.   Your conclusions in this case are informed by your

14:16:08  11  examination of eyewitness accounts; right, Dr. Marino?

14:16:12  12  A.   Can you say that again?

14:16:16  13  Q.   Sure.  Maybe I'll --

14:16:29  14        Dr. Marino, do you believe that examination of

14:16:32  15  eyewitness observations and relevant damage conditions are

14:16:38  16  determinative analyses of the barge's contribution to the

14:16:42  17  failures?

14:16:43  18  A.   Yes.

14:16:44  19  Q.   You recognize that language from your December 2009

14:16:46  20  declaration?

14:16:48  21  A.   Yes.

14:16:52  22  Q.   So with eyewitness observations being determinative, I

14:16:56  23  want to ask you some questions about the eyewitness

14:17:00  24  observations.

14:17:01  25        At the north breach, you have identified William

14:17:05    1    Villavaso as an important witness, and you've discussed his
14:17:09    2    testimony this morning; right?
14:17:10    3    A.    That's correct.
14:17:12    4    Q.    And regarding witnesses, when you looked at witness
14:17:17    5    accounts, you had to decide which accounts were credible given
14:17:21    6    the facts that you know to exist; right?
14:17:27    7    A.    That's correct.
14:17:29    8    Q.    And, for instance, as one example, informing the opinions
14:17:35    9    that led to the preparation of your report, you credited the
14:17:41   10    transcript of the interview with Sidney Williams more than you
14:17:48   11    credited the deposition testimony of Sidney Williams?
14:17:54   12    A.    That's correct.  And the reason I did that was because the
14:17:57   13    transcript, it was, in my mind, more of an impromptu interview.
14:18:05   14    In his deposition, he was saying that the barge hit the wall,
14:18:09   15    and it wasn't consistent with his transcript where he was
14:18:15   16    specifically asked about that, had he seen the barge prior to
14:18:18   17    the failure.  So I discounted the -- that part of his
14:18:24   18    deposition information.
14:18:26   19    Q.    Well, with respect to some witnesses, would you agree with
14:18:36   20    me that the event times reported by some witnesses are
14:18:44   21    obviously off, and you have to take that into consideration?
14:18:47   22    A.    Yeah.  I think I talked about that in my direct, that
14:18:51   23    there's a lot of variation in time.  And what I found most
14:18:56   24    consistent was the "daylight" or the, you know, "dark" or
14:19:01   25    "turning" -- "turning to daylight."  And that's why I more

14:19:07  1    relied on other -- the 911 call, for example, for the south

14:19:11  2    breach, for the time.

14:19:25  3    Q.   I guess I want to go through a couple of examples of

14:19:28  4    witness accounts that you've rejected on the basis of your

14:19:32  5    expert opinion, and I want to start with Table 3.1, the first

14:19:37  6    page, GM-005.

14:19:41  7              You have included in your table some accounts from

14:19:49  8    Arthur Murph Jr.; right?

14:19:53  9    A.   Yes.

14:19:53  10   Q.   And next to the accounts where it says "Date and Timing,"

14:19:59  11   you wrote "TNV"; right?

14:20:02  12   A.   Yes.

14:20:03  13   Q.   And when you wrote "TNV," that meant "time not valid";

14:20:12  14   right?

14:20:15  15   A.   I can deduce that.  I don't remember what that symbol

14:20:17  16   meant, but now I remember -- yeah.

14:20:19  17   Q.   Yes?

14:20:20  18   A.   Yes.

14:20:21  19   Q.   Okay.

14:20:21  20   A.   And because he, Mr. Murph, was saying it was on a Sunday

14:20:24  21   night, and it obviously was not a Sunday night.

14:20:29  22   Q.   Okay.  So you rejected that account from Arthur Murph

14:20:32  23   because it can't possibly be true?

14:20:35  24   A.   That's correct.

14:20:36  25   Q.   And as an expert, it's proper to reject accounts that, as

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

14:20:42  1   an expert, you conclude can't possibly be true?

14:20:48  2   A.   That's correct.

14:20:50  3   Q.   And, in fact, an expert who uncritically accepts whatever

14:21:01  4   a witness has to say without approaching it in some sort of

14:21:05  5   scientific manner isn't really doing science; right?

14:21:16  6   A.   Yes.

14:21:16  7   Q.   Now, in your expert report -- in your expert report, you

14:21:37  8   included a section of factual narrative, and among the factual

14:21:43  9   narrative, you included -- it was a statement that wave heights

14:21:47  10  during this time were at least 4 feet and up to about 20 feet;

14:21:51  11  right?

14:21:51  12  A.   That's correct.

14:21:52  13  Q.   Plaintiff's Exhibit 397 at page 3-17.

14:21:57  14         You're talking there about wave heights in the

14:22:01  15  Industrial Canal; right?

14:22:04  16  A.   Yes.   There's two witnesses I can think of offhand.

14:22:13  17  Q.   If I understood you right, you've relied on witness

14:22:17  18  observations as the basis to conclude that a 20-foot wave in

14:22:24  19  the Inner Harbor Navigation Canal was plausible or credible?

14:22:28  20  A.   Well, that's why I think I prefaced it with "about."  I'm

14:22:37  21  not a hydrologist.  I can't tell you what -- I think this is a

14:22:43  22  pretty complicated science to figure out what spurious waves

14:22:48  23  are in terms of size or height.  I mean, this is not -- it's a

14:22:53  24  very complicated situation in terms of weather conditions.

14:22:58  25         But I reported what the witness said was present --

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1318

| | | |
|---|---|---|
| 14:23:00 | 1 | there was two witnesses:  One was Villavaso; and there was |
| 14:23:04 | 2 | another one, I want to say D'Antoinette Johnson, who said she |
| 14:23:11 | 3 | was not exaggerating.  This wave was, at least, 15 or 20 feet. |
| 14:23:19 | 4 | **Q.**   Now, when Ms. Johnson testified that the wave was 15 or |
| 14:23:23 | 5 | 20 feet, do you remember, Dr. Marino, that Ms. Johnson was in a |
| 14:23:27 | 6 | home on the protected side of the floodwall; right? |
| 14:23:33 | 7 | **A.**   Yes. |
| 14:23:33 | 8 | **Q.**   And the wave that she described was not a wave that was |
| 14:23:39 | 9 | propagating inside the Inner Harbor Navigation Canal but, |
| 14:23:43 | 10 | rather, a wave of water that was coming toward her from the |
| 14:23:46 | 11 | canal as the floodwall broke.  Do you remember that to be true? |
| 14:23:51 | 12 | **A.**   I believe it was after the floodwall broke.  It was |
| 14:23:53 | 13 | actually during the time period when the flooding occurred. |
| 14:23:57 | 14 | But it was -- you know, it -- it was, basically, just reporting |
| 14:24:02 | 15 | what these witnesses said. |
| 14:24:04 | 16 | **Q.**   All right. |
| 14:24:05 | 17 | **A.**   I mean, this really -- really has nothing to do with the |
| 14:24:09 | 18 | work I did. |
| 14:24:10 | 19 | **Q.**   Sure.  And don't have any science to support your |
| 14:24:15 | 20 | statement and the 20-foot wave about heights being -- |
| 14:24:18 | 21 | **A.**   I didn't do any analysis, and I wouldn't pretend to be one |
| 14:24:22 | 22 | who can do such a sophisticated analysis to figure out if these |
| 14:24:29 | 23 | occasional, very occasional, waves could be that high. |
| 14:24:37 | 24 | **Q.**   So as you sit here today, you're not going to tell the |
| 14:24:40 | 25 | Court words to the effect of "I don't think you need to have |

| | | |
|---|---|---|
| 14:24:48 | 1 | science if someone sees it"? |
| 14:24:52 | 2 | A.   That's -- that's -- that's correct.  I mean, if -- if you |
| 14:25:01 | 3 | have -- there's certain things that -- certain things that are |
| 14:25:08 | 4 | not possible and certain things that are.  This is one of the |
| 14:25:12 | 5 | things that I wouldn't find myself being able to determine |
| 14:25:16 | 6 | whether a 20-foot wave was possible or not.  This was provided |
| 14:25:22 | 7 | just for information only. |
| 14:25:25 | 8 | MR. RAFFMAN:  Let me have deposition 83, lines 2 -- |
| 14:25:29 | 9 | BY MR. RAFFMAN: |
| 14:25:29 | 10 | Q.   You gave a deposition in the summer of 2009; right?  Do |
| 14:25:34 | 11 | you remember? |
| 14:25:35 | 12 | A.   Yes. |
| 14:25:35 | 13 | Q.   I took your deposition, and I want to show the Court what |
| 14:25:38 | 14 | you said on that subject at your deposition because I think |
| 14:25:42 | 15 | it's not quite the same as what you just said.  The Court will |
| 14:25:45 | 16 | evaluate it, of course: |
| 14:25:46 | 17 | "QUESTION:  Anything -- any science other than the |
| 14:25:49 | 18 | observation? |
| 14:25:50 | 19 | "ANSWER:  I don't think you need to have science if |
| 14:25:52 | 20 | someone sees it." |
| 14:25:56 | 21 | MR. WILSON:  What are we talking about? |
| 14:25:58 | 22 | MR. RAFFMAN:  The 20-foot wave.  I can go back and |
| 14:25:59 | 23 | play the rest of the clip -- I'm sorry.  Would Your Honor like |
| 14:26:02 | 24 | to see the rest of the clip so we can get the context, or will |
| 14:26:05 | 25 | Your Honor accept my representation that we're talking about |

14:26:07  1   the 20-foot wave?

14:26:08  2           THE COURT:  I'll certainly accept your representation

14:26:10  3   as an officer of the court.

14:26:12  4           MR. RAFFMAN:  Thank you, Your Honor.

          5   BY MR. RAFFMAN:

14:26:19  6   Q.   You have accepted Mr. Villavaso's testimony that the

14:26:21  7   object that he saw was the barge -- well, you -- I'm sorry.

14:26:25  8   Let me go back.

14:26:27  9           You've relied on Mr. Villavaso's testimony about

14:26:30  10  seeing an object on the morning of August 29th, 2005; right?

14:26:35  11  A.   That's correct.

14:26:35  12  Q.   And you have inferred or opined that the object that

14:26:40  13  Mr. Villavaso saw was the barge ING 4727?

14:26:46  14  A.   Well, I don't believe that he has said what barge it was,

14:26:49  15  but he said several times in his deposition that he saw what

14:26:56  16  appeared to be a barge and that he knows what a barge is

14:27:00  17  because he's worked in this area for a long time.

14:27:04  18  Q.   You've studied IPET as part of your work on this case;

14:27:08  19  right?

14:27:09  20  A.   That's correct.

14:27:14  21  Q.   And IPET -- whoops.  So IPET took a report from an

14:27:26  22  individual who was an operator at Pump Station 5 during the

14:27:29  23  storm.  You've read that account; right?

14:27:35  24          MR. RAFFMAN:  For the record this is Defendant's

14:27:36  25  Exhibit 147, IPET Volume IV, Appendix Page IV-7-53.

14:27:43  1    A.    If I remember this account correctly, that -- from what

14:27:45  2    Villavaso stated was that he was the only one that would have

14:27:49  3    seen it.  The other people were not -- it wasn't their job to

14:27:53  4    keep an eye on the floodwalls and observe what was going on.

14:27:56  5    He was the only one that was doing that.

14:27:58  6    BY MR. RAFFMAN:

14:28:07  7    Q.    So if Mr. Villavaso was the only one who was keeping an

14:28:09  8    eye on what was happening outside, and if the narrator of this

14:28:16  9    report is saying that, by 4:30, the water was halfway up the

14:28:21  10   chain-link fence of the station, and by 5:30 a.m., the fence

14:28:25  11   was completely under water, do you infer from putting two and

14:28:28  12   two together that this is an account that Mr. Villavaso also

14:28:32  13   gave?

14:28:35  14   A.    I didn't get the impression that this was from Villavaso.

14:28:46  15         But this individual, maybe he wasn't looking at -- I

14:28:46  16   mean, his job wasn't to look at these walls.  I don't know.

14:28:50  17   Q.    Okay.

14:28:51  18   A.    You know, these times, you know, as I've said before, I've

14:28:54  19   found from reviewing a number of different witnesses, there's

14:28:58  20   different times that are given.

14:29:00  21   Q.    In any event, regardless of which pump station employee

14:29:04  22   this account is, whether it's Mr. Villavaso or one of the other

14:29:07  23   employees, there's nothing about a barge in the pump station

14:29:13  24   report in the IPET; right?

14:29:14  25   A.    That's correct.

| | | |
|---|---|---|
| 14:29:15 | 1 | **Q.** And there's no mention of -- whoever this individual is |
| 14:29:18 | 2 | that's reporting this, there's no mention that this individual |
| 14:29:23 | 3 | ever heard anyone else say that anyone saw a barge; right? |
| 14:29:26 | 4 | **A.** That's correct. And Villavaso's deposition -- |
| 14:29:29 | 5 | THE COURT: Keep in mind the credibility of |
| 14:29:30 | 6 | Mr. Villavaso is going to be determined by one person. |
| 14:29:33 | 7 | MR. RAFFMAN: Your Honor, I understand. |
| 14:29:35 | 8 | THE COURT: Sitting right up here. |
| 14:29:36 | 9 | But we're going to see how much he relied on |
| 14:29:40 | 10 | Mr. Villavaso, which is fair cross-examination. I'm just |
| 14:29:43 | 11 | giving you the overarching. Thank you. |
| 14:29:46 | 12 | MR. RAFFMAN: Thank you, Your Honor, and this is -- |
| 14:29:47 | 13 | THE COURT: I know you knew that, but -- go ahead. |
| 14:29:51 | 14 | THE WITNESS: If I can make a comment, Your Honor? |
| 14:29:54 | 15 | THE COURT: As long as it's responsive to the |
| 14:29:56 | 16 | question, yes, sir; or explanation. |
| 14:29:58 | 17 | THE WITNESS: Yes, in Villavaso's testimony, he says |
| 14:30:01 | 18 | that he didn't talk to anybody about -- about that occurring, |
| 14:30:07 | 19 | having seen the barge. |
| 14:30:08 | 20 | THE COURT: The Court has read the depositions |
| 14:30:09 | 21 | designated by the defense in this as well. |
| 14:30:13 | 22 | MR. RAFFMAN: And that was my last question. |
| 14:30:15 | 23 | THE COURT: And its familiar that Mr. Villavaso is |
| 14:30:16 | 24 | the only person at the pumping station who ostensibly saw some |
| 14:30:21 | 25 | object in the vicinity of the floodwall. |

14:30:23  1         **MR. RAFFMAN:**  I understand.  And in evaluating

14:30:26  2   Mr. Villavaso's credibility, I know Your Honor will evaluate

14:30:29  3   all aspects.

14:30:30  4         **THE COURT:**  True.  And I realize you have a right to

14:30:33  5   probe this witness as to the degree on which he relied on that

14:30:38  6   testimony to make his conclusions, which you, of course, can

14:30:39  7   do.

14:30:40  8         **MR. RAFFMAN:**  And that's my last -- well, I guess I

14:30:43  9   have a couple of other questions if Your Honor will bear with

14:30:46  10  me.

14:30:46  11        **THE COURT:**  Go ahead.  Certainly.

          12  **BY MR. RAFFMAN:**

14:30:48  13  **Q.**   You're aware that Mr. Villavaso testified he only saw the

14:30:50  14  tip of whatever it was he saw?

14:30:51  15  **A.**   That's correct.

14:30:52  16  **Q.**   And you're aware that Mr. Villavaso's vision was obscured

14:30:58  17  by rain and darkness to some degree?

14:31:00  18  **A.**   Yes.

14:31:00  19  **Q.**   And you're aware that Mr. Villavaso testified he didn't

14:31:03  20  have "a clear focused picture," words he used?

14:31:08  21  **A.**   I don't remember those exact words, but I -- I -- that

14:31:11  22  sounds reasonable, what you're saying.

14:31:14  23  **Q.**   And that he wasn't wearing the glasses that he would wear

14:31:19  24  for distance vision; right?

14:31:21  25  **A.**   Yeah.  But I don't wear my glasses all the time and I can

14:31:25   1   see distances and things.

14:31:26   2   Q.    I want to ask some more questions about what Mr. Villavaso

14:31:32   3   said he saw on top of the floodwall.

14:31:35   4            He said that what he saw was only a foot or two above

14:31:37   5   the top of the floodwall.  You recall that testimony; right?

14:31:41   6   A.    Yeah.  And we went -- I reread that part of his

14:31:46   7   deposition, and what I remember him saying, "I'm not really

14:31:50   8   good with numbers, I'm not good with dimensions," and he was

14:31:54   9   pushed to give a number.  And some people are not really good

14:31:58   10   at seeing what a distance is, something -- you know, a height

14:32:01   11   or something that is 400 or 500 feet away.

14:32:05   12            Also, in my direct, we talked about, well, maybe he's

14:32:09   13   talking about that tip of the barge that we showed him by

14:32:13   14   PowerPoint.

14:32:13   15   Q.    We're going to go into that in some detail.

14:32:16   16   A.    Great.

14:32:16   17   Q.    But just to get a sense of when Mr. Villavaso says "a foot

14:32:19   18   or two," you also recall from Mr. Villavaso's deposition that

14:32:22   19   he said that the water was splashing three or four or five feet

14:32:25   20   above the top of the floodwall before the breach happened.

14:32:28   21   You're familiar with that testimony?

14:32:30   22   A.    I remembered him saying that there was splashing.  There

14:32:34   23   was no overtopping.  There was splashing.

14:32:36   24   Q.    Sure.  But when we compare the foot or two above the top

14:32:38   25   of the wall for this object, we can, at least, get a frame of

14:32:42  1  reference from it was smaller than the amount that went

14:32:45  2  splashing over the top of the wall?  We can take that --

14:32:49  3  A.   I mean, I don't know if, you know -- have you looked at

14:32:51  4  his pictures to his exhibit?  I mean, they're like kindergarten

14:32:56  5  drawings.  I mean, I don't know if he has -- he qualified that

14:32:59  6  "I'm not really good with numbers and dimensions," so...

14:33:07  7  Q.   Well, let's move away from Mr. Villavaso's metrics,

14:33:21  8  1 foot, 3 feet, and let's move to something that we can measure

14:33:24  9  maybe better.

14:33:24  10         You would agree with me that the barge ING 4727, if

14:33:29  11  it were present at the wall, would be sticking up above the top

14:33:31  12  of the floodwall by at least 15 feet and probably more; right?

14:33:35  13  A.   Yes.

14:33:41  14         MR. RAFFMAN:  This is going to be -- now, we've

14:33:51  15  written here "Marino North Breach Presentation, Page 50," and

14:33:56  16  I'm not sure that that is the correct number, Your Honor.  This

14:34:01  17  was a number that we used last night with the set of slides we

14:34:08  18  received, so --

14:34:14  19         THE COURT:  That would have been part of his slide

14:34:16  20  presentation yesterday, of course.

14:34:18  21         MR. RAFFMAN:  Part of the presentation that was given

14:34:20  22  yesterday, and it's in the book for this morning.

14:34:29  23         I guess I'm going to have to ask Dr. Marino.

          24  BY MR. RAFFMAN:

14:34:31  25  Q.   This is a slide that you created, and it's part of your

| | | |
|---|---|---|
| 14:34:33 | 1 | PowerPoint from this morning; right? |
| 14:34:36 | 2 | **A.**   That's correct. |
| 14:34:37 | 3 | **MR. RAFFMAN:**  And the Court can locate this slide |
| 14:34:39 | 4 | within the demonstrative slide exhibit; right?  If Your Honor |
| 14:34:43 | 5 | likes, I will pause and locate it. |
| 14:34:47 | 6 | **THE COURT:**  Only if this becomes -- |
| 14:34:49 | 7 | **MR. RAFFMAN:**  I don't believe -- |
| 14:34:50 | 8 | **THE COURT:**  -- something other than I think it will. |
| 14:34:53 | 9 | **MR. RAFFMAN:**  Sure. |
| | 10 | **BY MR. RAFFMAN:** |
| 14:34:55 | 11 | **Q.**   So, Dr. Marino, this is your rendering of the barge as it |
| 14:34:58 | 12 | arrives at the location of the north breach; am I right? |
| 14:35:02 | 13 | **A.**   That's correct. |
| 14:35:03 | 14 | **Q.**   And for clarity, the water level is represented by this |
| 14:35:13 | 15 | upward horizontal line at the top of the notation that says |
| 14:35:17 | 16 | "2 feet"; right? |
| 14:35:19 | 17 | **A.**   That's correct. |
| 14:35:19 | 18 | **Q.**   And the barge has a 2-foot draft.  So the bottom |
| 14:35:22 | 19 | horizontal line on this graph is your rendition of the bottom |
| 14:35:27 | 20 | of the barge; right? |
| 14:35:29 | 21 | **A.**   That's correct. |
| 14:35:29 | 22 | **Q.**   So the water level as the barge approaches the wall, as |
| 14:35:32 | 23 | you have it, prior to breaching is about a foot and a half |
| 14:35:36 | 24 | below the top of the wall; right? |
| 14:35:41 | 25 | **A.**   Say that again. |

1327

14:35:42  1   **Q.**   The water level, as you rendered in this drawing, the

14:35:47  2   water level is up here and about a foot and a half below the

14:35:51  3   wall top; right?

14:35:52  4   **A.**   If we assume the 13-foot elevation and at 12-2, it would

14:36:01  5   be 1.8 feet.

14:36:03  6   **Q.**   1.8 feet.  We'll be precise as an engineer.  1.8 feet.

14:36:08  7         And I guess my point is this, Dr. Marino:  We heard

14:36:12  8   testimony the other day about a barge approaching the wall at a

14:36:17  9   time when the water was low and the barge grounding in the mud

14:36:19 10   or some such thing.  As you portray it, this barge is not

14:36:24 11   grounding or hitting the mud; it's hitting the wall -- this

14:36:28 12   upper part of the wall.  Right?

14:36:30 13   **A.**   Yeah, just below the construction joint.

14:36:32 14   **Q.**   Just below the construction joint?

14:36:35 15   **A.**   That's correct.

14:36:37 16   **Q.**   At the north breach, we're talking?

14:36:43 17   **A.**   Right.

14:36:43 18   **Q.**   Okay.

14:36:43 19   **A.**   Right.  And that assumes the 6:00 time, based on, you

14:36:46 20   know, Villavaso saying that --

14:36:54 21   **Q.**   Sure.  I'm sorry to interrupt you.  I didn't mean to do

14:36:57 22   that.

14:36:57 23   **A.**   That water level is based upon the 6:00 time, based on the

14:37:00 24   control -- power control log that shows a call at 6:10.  Now,

14:37:11 25   if he called a little earlier than that, then it would be a

14:37:15   1    little lower than that.

14:37:16   2    Q.   But just to be clear for the record here, the water level

14:37:19   3    you have is substantially up the wall; it's not down here below

14:37:22   4    the wall or grounding in the mud.  Right?

14:37:26   5    A.   That's correct.  I mean, you couldn't have a barge

14:37:28   6    collision if it was -- the water level was below the levee.

14:37:34   7    Q.   Thank you.

14:37:36   8         Now, I've created a graphic.

14:37:43   9         MR. RAFFMAN:  GM-098, please.

14:37:45   10   BY MR. RAFFMAN:

14:37:48   11   Q.   What we've done, Dr. Marino, is we've taken your -- I'm

14:37:53   12   sorry.  We've taken your previous graphic and assumed that the

14:37:58   13   barge has got 12-foot height, plus the coaming and the covers?

14:38:10   14   A.   I like your depiction.  There's nice colors and it looks

14:38:14   15   well.  But you have the barge going sideways, and that's not

14:38:18   16   the orientation that I was trying to portray.

14:38:24   17   Q.   Okay.

14:38:24   18   A.   It's not a broadside collision, in other words.

14:38:27   19   Q.   So if we were to portray it the way you were to portray

14:38:31   20   it, the barge would be at somewhat of an angle or it would be

14:38:35   21   approaching headfirst somehow?

14:38:36   22   A.   Right.

14:38:37   23   Q.   And regardless of the angle, Dr. Marino, would you agree

14:38:40   24   with me that the stick-up of the barge over the top of the wall

14:38:45   25   is going to be substantially higher than a foot or two?

14:38:48  1   **A.**   As I said before, you know, I know you're trying to say

14:38:51  2   about this -- about that Villavaso said a foot, but he, in my

14:38:57  3   mind, gave enough inference or -- because he said it three or

14:39:05  4   four times, it appeared to be a barge to him.  He's been there.

14:39:08  5   He knows what a barge looks like.  He was pressed for a number,

14:39:11  6   and he said, "I'm not good with dimensions."

14:39:14  7        And if you look at his -- if you look at any of his

14:39:17  8   sketches, I mean, they're terrible sketches.  He's not very

14:39:20  9   good at drawing either.  So I -- you know, I understand your

14:39:24  10  point.

14:39:24  11  **Q.**   I understand -- thank you, Dr. Marino.  I understand it

14:39:28  12  too.  But I would like the record to be clear about how this

14:39:32  13  barge, if it's present, is going to appear.  Maybe the judge is

14:39:35  14  going to tell me to move on.

14:39:37  15       **THE COURT:**  Well, I mean, it does -- assuming it's

14:39:39  16  coming at the angle Dr. Marino says, it's obvious that, because

14:39:43  17  of the level of the water, a substantial amount of footage

14:39:48  18  would be seen more than the 1 or 2-foot; assuming

14:39:52  19  Mr. Villavaso's vision, which we've impugned, is clear enough

14:39:57  20  to see that in the rain and the dark.

14:40:00  21       **MR. RAFFMAN:**  Thank you, Your Honor.

14:40:00  22       **THE COURT:**  I just don't want to get anybody, but I

14:40:03  23  understand how high the barge was, and I understand that the

14:40:07  24  1-foot or 2-foot estimate is certainly in question.  And the

14:40:16  25  whole credibility issue and how much can be relied on him, it's

| | | |
|---|---|---|
| 14:40:20 | 1 | fairly elementary.  It's a question of perception and how the |
| 14:40:27 | 2 | Court looks at it all eventually. |
| 14:40:30 | 3 | By I understand the point. |
| 14:40:32 | 4 | MR. RAFFMAN:  Thank you, Your Honor.  I'm going to |
| 14:40:33 | 5 | move on. |
| 14:40:34 | 6 | May I please see slide 216 from this morning's |
| 14:40:43 | 7 | presentation. |
| 14:40:44 | 8 | BY MR. RAFFMAN: |
| 14:40:44 | 9 | Q.   I want to move away from the north breach now, and I want |
| 14:40:47 | 10 | to ask you about the witness summary to the south breach. |
| 14:40:49 | 11 | Am I right, Dr. Marino, that this slide, 216, from |
| 14:40:53 | 12 | your demonstratives this morning, represents your summary of |
| 14:40:56 | 13 | the salient witness information regarding the south breach? |
| 14:41:00 | 14 | A.   Yes. |
| 14:41:00 | 15 | Q.   And as we look at this summary of the salient witness |
| 14:41:06 | 16 | impact -- information, one thing that struck me, Dr. Marino, is |
| 14:41:11 | 17 | there's nothing here about any eyewitnesses to the south |
| 14:41:13 | 18 | breach.  Would you agree with me that none of these entries |
| 14:41:18 | 19 | refers to an eyewitness who saw the barge at the south breach? |
| 14:41:24 | 20 | A.   I'm not sure I understand -- I'm saying barge in the |
| 14:41:26 | 21 | vicinity or impacting the wall. |
| 14:41:29 | 22 | Q.   But it doesn't say -- |
| 14:41:31 | 23 | THE COURT:  Is that a hearing witness or a seeing |
| 14:41:33 | 24 | witness or both? |
| 14:41:35 | 25 | THE WITNESS:  A seeing witness. |

| | | |
|---|---|---|
| 14:41:37 | 1 | **THE COURT:**  Okay. |
| 14:41:38 | 2 | **MR. RAFFMAN:**  I'm sorry. |
| 14:41:41 | 3 | **THE WITNESS:**  I mean, Terry Mark Adams, for example, |
| 14:41:45 | 4 | and Arthur Murph are examples of that. |
| | 5 | **BY MR. RAFFMAN:** |
| 14:41:49 | 6 | **Q.**   Well, I want to ask you some questions about Terry Mark |
| 14:41:57 | 7 | Adams.  The Court has heard Arthur Murph, and you've told the |
| 14:42:01 | 8 | Court a little about Arthur Murph yourself this morning, so let |
| 14:42:01 | 9 | me ask about -- |
| 14:42:01 | 10 | **THE COURT:**  And Mr. Adams as well.  I've heard both |
| 14:42:05 | 11 | of them. |
| 14:42:06 | 12 | **MR. RAFFMAN:**  That's right.  Your Honor has heard |
| 14:42:07 | 13 | both of them. |
| 14:42:08 | 14 | **THE COURT:**  And I've read Mr. Williams' statements as |
| 14:42:12 | 15 | well. |
| | 16 | **BY MR. RAFFMAN:** |
| 14:42:14 | 17 | **Q.**   Your opinion about the south breach was that there were |
| 14:42:18 | 18 | three separate impacts; right?  A primary collision at the |
| 14:42:25 | 19 | north. |
| 14:42:25 | 20 | **A.**   Yes. |
| 14:42:26 | 21 | **Q.**   A second primary in the middle, and then a third -- |
| 14:42:29 | 22 | **A.**   The key is that you said "primary." |
| 14:42:34 | 23 | **Q.**   Did you mean to imply by that that there are more impacts |
| 14:42:37 | 24 | than those three? |
| 14:42:38 | 25 | **A.**   Well, I've always said in my report, in my deposition, |

1332

14:42:43  1  "primary" in that there can be -- you know, this grinding and

14:42:48  2  bumping, especially in the second collision, when it's in the

14:42:52  3  broadside position.

14:42:53  4  Q.   Well, for the moment, at least, we'll take it that your

14:42:57  5  account of the floodwall failure at the south breach is

14:43:00  6  something other than a barge coming toward the levee and then

14:43:08  7  creating a bang and then floating through; right?

14:43:14  8  A.   If that's a witness' account, it could be that the first

14:43:25  9  two bangs, they weren't all heard.  They all didn't hear each

14:43:29  10  three bangs.  Some heard three and some heard different ones,

14:43:33  11  you know, depending upon -- I don't know the -- if you consider

14:43:39  12  the conditions during the hurricane, you know, what people

14:43:44  13  remember.

14:43:46  14         You know, I don't think that each collision would

14:43:50  15  have the same sound or the same decibel.  Obviously, the last

14:43:58  16  collision, there's, in my mind, no doubt that that's going to

14:44:03  17  cause a large explosion-like boom.  And right after that

14:44:08  18  occurred, invariably, you see in witness accounts the violent

14:44:12  19  rushing of flooding occurred.

14:44:14  20  Q.   And let me -- because I don't think you quite answered my

14:44:17  21  question.  Your account of how this happened is something other

14:44:21  22  than this simple report of something comes toward the levee,

14:44:28  23  toward the levee, and then there's a bang, and then it floats

14:44:34  24  through; right?

14:44:37  25  A.   If -- if it's just one collision with the levee?

1333

| | | |
|---|---|---|
| 14:44:40 | 1 | Obviously, that's not what I believe. |
| 14:44:44 | 2 | Q.   So let's look at what Mr. Adams said in his deposition. |
| 14:44:49 | 3 | Adams -- page 25 of his deposition.  Mr. Adams was asked -- let |
| 14:44:58 | 4 | me just wait until it comes up: |
| 14:45:13 | 5 | "QUESTION:  Okay.  Did you see anything else after |
| 14:45:20 | 6 | you were on your roof at 5:30 or thereabouts?" |
| 14:45:24 | 7 | That's the question; right, Dr. Marino?  You've read |
| 14:45:27 | 8 | that question, and you've read this account. |
| 14:45:28 | 9 | A.   Yes, I've read his deposition. |
| 14:45:29 | 10 | Q.   So the question is a very general question, and Mr. Adams |
| 14:45:33 | 11 | answered with his account, and what Mr. Adams says in his |
| 14:45:36 | 12 | deposition is: |
| 14:45:36 | 13 | "QUESTION:  When I looked toward the Claiborne |
| 14:45:39 | 14 | bridge, I could see something coming toward the levee, toward |
| 14:45:41 | 15 | the wall.  I couldn't see exactly what it was, and I kept |
| 14:45:47 | 16 | watching it.  Then I heard something that sounded like a |
| 14:45:51 | 17 | 'bang,' and when I heard the 'bang,' I seen the barge come |
| 14:45:56 | 18 | floating through." |
| 14:45:58 | 19 | That's Mr. Adams' account that you've read and you've |
| 14:46:03 | 20 | relied on in your report; right? |
| 14:46:05 | 21 | A.   That's correct. |
| 14:46:05 | 22 | Q.   And would you agree with me, Dr. Marino, that this account |
| 14:46:09 | 23 | from Terry Adams is not the same as watching a barge make |
| 14:46:17 | 24 | multiple impacts against the wall? |
| 14:46:24 | 25 | A.   That indicates that there was -- he saw one collision. |

14:46:28   1    **Q.**    Okay.   Thank you.

14:46:44   2          Now, I want to ask you some questions about the

14:46:50   3    movement of the barge and your conclusions about where it went,

14:46:59   4    how it got there, to the extent you have those.

14:47:03   5          Am I right, Dr. Marino, that you don't know how the

14:47:07   6    barge got to the north breach?

14:47:11   7    **A.**    That's correct.

14:47:13   8    **Q.**    And in order for the barge to move from one place to the

14:47:19   9    other, something has to move it; right?

14:47:22  10    **A.**    That's correct.

14:47:24  11    **Q.**    And that something in this case has got to be wind or

14:47:29  12    water; right?

14:47:32  13    **A.**    As I've said before, I'm not claiming to be a person that

14:47:37  14    is able to determine the routing of a vessel given the complex

14:47:43  15    nature of the climatic conditions that existed at the time.

14:47:47  16    **Q.**    Well, so your report does not include any explanation of

14:47:54  17    how the barge got from one place to another; right?

14:47:59  18    **A.**    That's correct.

14:48:01  19    **Q.**    And for the south breach as well as the north, you don't

14:48:04  20    know how the barge got from one place to the next?

14:48:09  21    **A.**    I did not -- I did not do any -- or I wouldn't be the one

14:48:18  22    to be able to tell you how the barge would route from one

14:48:21  23    location to the other.

14:48:23  24    **Q.**    You've done no studies or scientific calculations or

14:48:25  25    literature review that could shed light on how an empty barge

1335

| | | |
|---|---|---|
| 14:48:28 | 1 | sticking out of the water 20 feet could move in a direction |
| 14:48:32 | 2 | counter to that of the prevailing wind in order to arrive at |
| 14:48:37 | 3 | either breach? |
| 14:48:38 | 4 | A.   I wouldn't be able to do that. |
| 14:48:40 | 5 | Q.   Now, I wanted to ask you some questions about this impact |
| 14:48:43 | 6 | analysis that you showed on the PowerPoint this morning. |
| 14:48:49 | 7 | You prepared a preliminary report in 2008; right? |
| 14:48:54 | 8 | A.   That's correct. |
| 14:48:55 | 9 | Q.   And that was in connection with the class certification |
| 14:48:59 | 10 | proceedings that the Court was then considering? |
| 14:49:02 | 11 | A.   That's correct. |
| 14:49:05 | 12 | Q.   And your preliminary report said that you were performing |
| 14:49:08 | 13 | engineering calculations related to a barge impact on a |
| 14:49:12 | 14 | floodwall; right? |
| 14:49:13 | 15 | A.   I personally wasn't doing that.  It was Dr. Gamal with my |
| 14:49:20 | 16 | company. |
| 14:49:21 | 17 | Q.   Dr. Gamal, all right.  Whoever was doing the work, |
| 14:49:28 | 18 | Dr. Marino, the impact analysis and the engineering |
| 14:49:33 | 19 | calculations were not included in the reports you did in 2009 |
| 14:49:40 | 20 | because that analysis never got finished, at least, of last |
| 14:49:45 | 21 | summer; right? |
| 14:49:46 | 22 | A.   That's correct, and I didn't feel like I needed to have it |
| 14:49:50 | 23 | done in order to conclude what I concluded. |
| 14:49:56 | 24 | Q.   You reported as of -- |
| 14:49:58 | 25 | A.   I mean, I could have -- you know, we could have put |

1336

| | | |
|---|---|---|
| 14:50:01 | 1 | together, or I could have had somebody put together some |
| 14:50:04 | 2 | analysis, but I didn't feel that -- my judgment was that this |
| 14:50:09 | 3 | is such a difficult structure -- soil-structure interaction |
| 14:50:15 | 4 | that it required -- |
| 14:50:17 | 5 | THE COURT:  Doctor, could you get a little closer to |
| 14:50:18 | 6 | the microphone.  It's a little hard for me to hear you.  I'm |
| 14:50:23 | 7 | sure counsel, as well, would appreciate it. |
| 14:50:23 | 8 | THE WITNESS:  -- and it required much more work in |
| 14:50:26 | 9 | order to do a responsible job. |
| | 10 | BY MR. RAFFMAN: |
| 14:50:36 | 11 | Q.   I'm sorry.  I was just trying to make sure I understood |
| 14:50:39 | 12 | your testimony.  Dr. Marino, you thought that this was a |
| 14:50:44 | 13 | sufficiently complicated analysis, that you didn't want to rush |
| 14:50:46 | 14 | through anything; right? |
| 14:50:49 | 15 | A.   That's correct. |
| 14:50:52 | 16 | Q.   In November of 2009, you reported in your summary judgment |
| 14:50:57 | 17 | declaration that a barge impact load analysis is underway by |
| 14:51:06 | 18 | Dr. Issam Harik.  Do you remember reporting that? |
| 14:51:13 | 19 | A.   Yes. |
| 14:51:13 | 20 | Q.   And when you gave your declaration in December of 2009, |
| 14:51:20 | 21 | which I hope is Plaintiff's Exhibit 428, you didn't report any |
| 14:51:26 | 22 | new results in December 2009; right? |
| 14:51:29 | 23 | A.   I know one of the declarations had an attachment from |
| 14:51:33 | 24 | Professor Harik on potential barge loads that could occur on a |
| 14:51:42 | 25 | rigid wall. |

14:51:46   1   **Q.**   Plaintiff's Exhibit 401, Marino Declaration Exhibit F, is
14:52:03   2   that the document you're talking about?
14:52:05   3   **A.**   It looks familiar.
14:52:11   4   **Q.**   But even as of the time that document was provided, you
14:52:13   5   had not created the impact demonstration that you provided the
14:52:21   6   Court this morning, had you?
14:52:24   7   **A.**   Can you say that again?  I'm sorry.
14:52:27   8   **Q.**   You gave an animation this morning of an impact with the
14:52:30   9   wall at the north breach and at the south breach, and what I
14:52:34   10   want to know was, in December 2009, did you have that impact
14:52:40   11   analysis.  Had that been done?
14:52:44   12   **A.**   I don't know if I can say this, but since you asked the
14:52:47   13   question, those -- those animations that I provided were actual
14:52:54   14   models, that it was ongoing of the barge impact.
14:53:06   15   **Q.**   So --
14:53:07   16   **A.**   You asked me if there was anything going on in December
14:53:11   17   that was new, and I -- and some of those models that we showed,
14:53:16   18   we're using them as demonstratives, but they were actually
14:53:21   19   models that were used during -- as part of our impact analysis.
14:53:27   20   **Q.**   And you don't know whether those models that you've showed
14:53:30   21   this morning for the first time were ready to be shown in
14:53:38   22   December of 2009?
14:53:41   23   **A.**   No, they weren't ready to be shown.
14:53:46   24   **Q.**   Are those models created by Dr. Harik?
14:53:55   25   **A.**   Those -- that -- there's two parts of this analysis:  One

| 14:54:00 | 1 | is how much the soil will give under the load; and then the |
| 14:54:04 | 2 | effect of the barge and its momentum to that -- to that wall |
| 14:54:10 | 3 | soil response.  The wall soil response is the end that we're |
| 14:54:15 | 4 | performing, and the other portion of the work is being done by |
| 14:54:21 | 5 | Dr. Harik. |
| 14:54:23 | 6 | Q.   And you need both portions -- |
| 14:54:25 | 7 | A.   Yes.  It's half the story.  One is half the story.  You |
| 14:54:28 | 8 | have to have both. |
| 14:54:33 | 9 | MR. RAFFMAN:  Your Honor, I don't want to admonish |
| 14:54:35 | 10 | the witness, but I do want to say that the dialogue would be |
| 14:54:39 | 11 | better if we don't interrupt each other's questions and |
| 14:54:41 | 12 | answers. |
| 14:54:42 | 13 | THE COURT:  Absolutely.  Thank you.  And I will ask |
| 14:54:44 | 14 | the witness to wait until the question is completed prior to |
| 14:54:47 | 15 | answering it. |
| 14:54:48 | 16 | THE WITNESS:  I'm sorry, Mark. |
|  | 17 | BY MR. RAFFMAN: |
| 14:54:50 | 18 | Q.   So there's two halves of the analysis:  One requires you |
| 14:54:55 | 19 | to know what's happening to the barge as it approaches the |
| 14:54:59 | 20 | wall; the other requires you to know what's happening to the |
| 14:55:03 | 21 | wall as it is impacted by the barge, in your opinion.  Right? |
| 14:55:11 | 22 | A.   And the vessel itself, the momentum of the vessel and the |
| 14:55:15 | 23 | impact of that vessel on the floodwall. |
| 14:55:17 | 24 | Q.   And what you're -- I think you suggested is that your area |
| 14:55:21 | 25 | of expertise is about the wall, and Dr. Harik's area of |

| | | |
|---|---|---|
| 14:55:25 | 1 | expertise is about the vessel and its movement and momentum. |
| 14:55:31 | 2 | A.   Exactly. |
| 14:55:32 | 3 | Q.   So if I want to ask questions about the inputs and the |
| 14:55:37 | 4 | assumptions that are made regarding that vessel movement, I've |
| 14:55:42 | 5 | got to ask Dr. Harik? |
| 14:55:44 | 6 | A.   That's correct. |
| 14:55:46 | 7 | Q.   Well, I'm going to ask you, Dr. Marino, since you're here. |
| 14:55:51 | 8 | If you can't answer me, I will throw up my hands. |
| 14:55:56 | 9 | MR. RAFFMAN:  I guess, Judge, and I don't mean to |
| 14:55:58 | 10 | make speeches.  I'm sorry. |
| 14:56:00 | 11 | BY MR. RAFFMAN: |
| 14:56:02 | 12 | Q.   In order to evaluate the impact of a barge on a wall, you |
| 14:56:07 | 13 | need to know something about how fast the barge is moving; |
| 14:56:11 | 14 | right? |
| 14:56:12 | 15 | A.   That's correct. |
| 14:56:14 | 16 | Q.   And -- |
| 14:56:17 | 17 | A.   Sorry. |
| 14:56:20 | 18 | Q.   -- the impact force requires you also to know the |
| 14:56:25 | 19 | direction in which the barge is moving vis-à-vis the wall; |
| 14:56:28 | 20 | right? |
| 14:56:32 | 21 | A.   I'm sorry, Mark.  I have something on my mind that I -- if |
| 14:56:35 | 22 | I may, if you don't mind me saying that first. |
| 14:56:39 | 23 | Q.   I -- |
| 14:56:40 | 24 | A.   It's a clarification on this that I just realized. |
| 14:56:44 | 25 | Q.   Please clarify your testimony, Dr. Marino. |

14:56:46   1   **A.**    Okay.  When this was done by Dr. Harik, he performed the

14:56:52   2   analysis with the wall being rigid.  So this is -- this is not

14:56:56   3   with any soil-giving conditions.  So it doesn't account for the

14:57:03   4   input that we would give from our modeling.  This was more he's

14:57:09   5   working on his collision processes in determining what kind of

14:57:15   6   loads we would get once I give him the input for the give of

14:57:20   7   the wall.  If you understand what I'm saying.

14:57:22   8   **Q.**    I think I do, and maybe for the benefit of the Court -- I

14:57:24   9   was going to ask you about this later -- when we're talking

14:57:27   10  about an infinitely rigid wall, that's in distinction to a wall

14:57:34   11  that will allow for some give in the soil; right?

14:57:37   12  **A.**    Oh, exactly.  We're talking about much lower -- lower

14:57:41   13  loads, much lower loads.

14:57:43   14  **Q.**    And so when you got involved, you allowed for some give in

14:57:46   15  the soil when you performed your impact analysis; right?

14:57:50   16  **A.**    When I got involved?

14:57:54   17  **Q.**    Well, I --

14:57:55   18  **A.**    You mean the part of the work that I was doing?

14:57:57   19  **Q.**    I don't mean to be unclear.  When you took the analysis

14:58:07   20  from Dr. Harik and provided your own input to it, you added

14:58:12   21  some soil give to the infinitely rigid wall that Dr. Harik had

14:58:19   22  assumed initially; right?

14:58:21   23  **A.**    I'm sorry.  Can you repeat that again?

14:58:25   24  **Q.**    I actually am going to come back to it, Dr. Marino.  This

14:58:30   25  was somewhat of a detour here.  I need to ask a couple other

14:58:34   1    questions first.

14:58:35   2           THE COURT:   All right.

14:58:36   3    BY MR. RAFFMAN:

14:58:38   4    Q.   Am I right, Dr. Marino, that your impact model requires an

14:58:44   5    impact force in order to drive it?

14:58:49   6    A.   That's correct.

14:58:51   7           MR. RAFFMAN:   And what I'm showing the Court, for the

14:58:55   8    record, is a slide that was provided to us by Dr. Marino before

14:59:01   9    the animation this morning.

14:59:05   10   BY MR. RAFFMAN:

14:59:05   11   Q.   The slide has at the top, when you click it:  "Job Title:

14:59:09   12   Model 1 Impact Force 1,000,000 E equals 1,000 $S_u$."  I'm not

14:59:15   13   asking about units, but the point is there is an impact force

14:59:18   14   that drives the model; right?

14:59:21   15   A.   Yes.

14:59:23   16   Q.   Now, Dr. Marino, what assumption did you make in your

14:59:33   17   impact analysis this morning about how fast the barge was

14:59:36   18   traveling when it hit the wall?

14:59:45   19   A.   This was an illustrative example.  I mean, it's not -- as

14:59:49   20   I said, it's not a finished product.  What you're asking is

14:59:53   21   something that, actually, Dr. Harik will be able to answer once

14:59:58   22   he's done with his work.

15:00:00   23   Q.   So you have provided the Court with a model of an impact

15:00:06   24   and yet, as you sit here today, you can't tell the Court that

15:00:10   25   the model represents an actual barge impact under actual

| | | |
|---|---|---|
| 15:00:16 | 1 | Katrina conditions? |
| 15:00:17 | 2 | A.   Well, this was meant to be an illustration of what I |
| 15:00:21 | 3 | believe as the effect of the wall.  It's not meant to be any |
| 15:00:30 | 4 | calculations or final calculations.  In fact, I thought that |
| 15:00:36 | 5 | this title had been removed.  I'm surprised it's on there, |
| 15:00:41 | 6 | actually. |
| 15:00:42 | 7 | THE COURT:  It's my understanding that the animations |
| 15:00:45 | 8 | that I saw was really illustrative of Dr. Marino's opinion as |
| 15:00:50 | 9 | to the mechanism of failure of, wherever it was, of the |
| 15:00:56 | 10 | floodwall; but not taken into account was the actual dynamics |
| 15:01:03 | 11 | of the barge, including speed, weight, and any other factor |
| 15:01:09 | 12 | that's necessary.  That was not calculated in that animation. |
| 15:01:19 | 13 | It's simply an illustration of his opinion, and that's all it |
| 15:01:22 | 14 | is.  That's what I'm getting. |
| 15:01:25 | 15 | Without the mathematics, physics, or whatever |
| 15:01:30 | 16 | else is necessary to determine, at least, in their opinion, |
| 15:01:35 | 17 | precisely what the barge was doing at that time vis-à-vis |
| 15:01:38 | 18 | speed, et cetera. |
| 15:01:41 | 19 | MR. RAFFMAN:  I understand, Judge. |
| | 20 | BY MR. RAFFMAN: |
| 15:01:48 | 21 | Q.   But I guess my question for you is:  It's without the |
| 15:01:49 | 22 | mathematics or physics or whatever else is necessary to |
| 15:01:53 | 23 | determine that it's real? |
| 15:01:55 | 24 | A.   Mark, as I said, it's an illustration. |
| 15:01:59 | 25 | Q.   Now, if you -- if you wanted to actually know what really |

1343

15:02:05  1   happened, what really moved this barge around, then

15:02:16  2   meteorological data would be germane; right?

15:02:24  3   A.   Yes.

15:02:25  4   Q.   And meteorological data is germane to wind conditions in

15:02:31  5   the IHNC because it helps assess what the barge impact loads

15:02:37  6   could potentially be; right?

15:02:42  7   A.   Yes.

15:02:43  8   Q.   And the weather data helps you assess what, in fact, the

15:02:48  9   wind loads were on the barge in the IHNC at the time of the

15:02:54  10  failure?

15:02:57  11  A.   Yes.

15:02:59  12  Q.   Well, in your report, you included some data about the

15:03:04  13  wind speed and direction, and I'm referring now to Section 3.2.

15:03:09  14         MR. RAFFMAN:  May I have GM-027, please.

15:03:15  15  BY MR. RAFFMAN:

15:03:15  16  Q.   You included a graphic from the IPET report in your own

15:03:19  17  report; right?

15:03:21  18  A.   Yes.  And as I said in my deposition, you know, this was

15:03:26  19  for information only.  I didn't use it in any of my work.  I'm

15:03:31  20  not -- I don't consider myself to understand exactly the

15:03:36  21  localized conditions that might occur during a hurricane.  I

15:03:45  22  hope you're not going to ask me that.

15:03:49  23         MR. RAFFMAN:  I promise, Your Honor, I will not go

15:03:50  24  through this in excruciating detail, but I will ask a few

15:03:55  25  questions.

| | | |
|---|---|---|
| 15:03:57 | 1 | GM-100, please. |
| 15:03:59 | 2 | **BY MR. RAFFMAN:** |
| 15:03:59 | 3 | **Q.**   As depicted in your report, Dr. Marino, for 5:00 in the |
| 15:04:03 | 4 | morning, the IPET meteorological investigation shows wind |
| 15:04:08 | 5 | directions in a northeast-to-southwest direction; right? |
| 15:04:15 | 6 | **THE COURT:**  I think this witness has said he has no |
| 15:04:17 | 7 | idea how the barge got there.  You know, I'm not sure what this |
| 15:04:21 | 8 | means.  I know we're going to have witnesses testify about the |
| 15:04:23 | 9 | wind, et cetera, and we have eyewitnesses.  And it's going to |
| 15:04:27 | 10 | be a giant mystery that the Court will resolve in its own |
| 15:04:33 | 11 | extraordinarily, shall we say un-omniscient self. |
| 15:04:45 | 12 | **THE WITNESS:**  Thank you, Your Honor. |
| 15:04:45 | 13 | **THE COURT:**  He doesn't know how it got there. |
| 15:04:47 | 14 | **MR. RAFFMAN:**  I understand.  I guess with Your |
| 15:04:50 | 15 | Honor's indulgence that -- |
| 15:04:58 | 16 | **THE COURT:**  If you have another point, that's fine. |
| 15:05:00 | 17 | I've got this one.  But if there's another one that I'm not |
| 15:05:04 | 18 | talking about, go ahead. |
| 15:05:04 | 19 | **MR. RAFFMAN:**  There might be.  It won't take me long. |
| 15:05:06 | 20 | **THE COURT:**  Okay. |
| | 21 | **BY MR. RAFFMAN:** |
| 15:05:07 | 22 | **Q.**   As a scientist investigating the failures of the |
| 15:05:10 | 23 | floodwall, you thought that the meteorological data that you |
| 15:05:15 | 24 | included in your report from IPET and from the lakefront |
| 15:05:17 | 25 | airport, which the Court will peruse at its leisure, you |

15:05:23  1    thought that data was sufficiently reliable and germane and

15:05:27  2    helpful to be included in a report about what happened in

15:05:32  3    Hurricane Katrina; is that fair?

15:05:33  4    A.   Yeah.  I mean, for background information, yes.

15:05:39  5            MR. RAFFMAN:  With that, I'll move on, Judge.

15:05:42  6            THE COURT:  Okay.  We'll take a 10- to 15-minute

15:05:44  7    recess.  I'll try to give you a little warning before I come

15:05:49  8    in, a little two-minute prewarning before I come in.

15:05:50  9            MR. RAFFMAN:  Thank you, Judge.

15:05:51  10           THE DEPUTY CLERK:  All rise.

15:05:52  11           (WHEREUPON, the Court took a recess.)

15:30:10  12           THE DEPUTY CLERK:  All rise.  Court's in session.

15:30:30  13   Please be seated.

15:30:31  14           THE COURT:  Yes, sir.  You may proceed.

15:30:34  15           MR. RAFFMAN:  Thank you, Your Honor.

15:30:34  16   BY MR. RAFFMAN:

15:30:37  17   Q.   Dr. Marino, I'm going to ask you some questions about the

15:30:40  18   rip and the tear in the north breach.  But before I do that, I

15:30:43  19   just want to make clear:  You are not opining about what gave

15:30:48  20   the barge whatever momentum it had when it approached the wall;

15:30:52  21   right?

15:30:52  22   A.   You mean in terms of a number, a quantity?

15:30:56  23   Q.   Well, the force, Dr. Marino.  What caused -- what impelled

15:31:00  24   it to the wall?  You're not opining about that, are you?

15:31:04  25   A.   The only thing I could say is there's wind and wave that

15:31:08  1   would cause the barge adjacent to the wall to be contact -- for

15:31:14  2   the barge being adjacent to the wall to be contacting or

15:31:19  3   knocking into the wall.

15:31:21  4   Q.   And are you going to tell the Court what direction the

15:31:24  5   wind was blowing when the barge contacted the wall at the north

15:31:28  6   end of the north breach?  Are you going to testify about that?

15:31:32  7   A.   No.

15:31:32  8   Q.   Are you going to testify about what direction the waves

15:31:35  9   were moving when the barge contacted the wall, as you say, at

15:31:39  10  the north breach?

15:31:40  11  A.   Obviously, there's one or two or a combination of both

15:31:43  12  that propelled the barge into the wall.

15:31:46  13  Q.   Well --

15:31:47  14  A.   In terms of a quantity, a direction, I cannot opine upon

15:31:52  15  that.

15:31:52  16  Q.   It's an inference you made that, because the barge is

15:31:55  17  there, there must be a wind or there must be a wave; otherwise,

15:31:59  18  it can't get there.  Is that fair?

15:32:04  19  A.   That's -- well, I mean, that's fair in terms of the

15:32:10  20  components of wind and wave.

15:32:13  21       But I have other things that I have opined upon that

15:32:16  22  I believe are the reasons why I believe the barge caused the

15:32:19  23  wall to tear, which I can go over again.

15:32:36  24  Q.   Well, I'm going to ask questions, and if your other

15:32:39  25  reasons are responsive to my questions --

| | | |
|---|---|---|
| 15:32:43 | 1 | MR. RAFFMAN:  I'm sorry, Judge. |
| 15:32:44 | 2 | THE COURT:  No.  He's answered it as well as he can |
| 15:32:48 | 3 | at this point. |
| 15:32:48 | 4 | BY MR. RAFFMAN: |
| 15:32:55 | 5 | Q.   So this is your photo 4.8 from Plaintiff's Exhibit 397, |
| 15:33:02 | 6 | and this shows the torn sheet pile that you say resulted from |
| 15:33:09 | 7 | impact by a barge; right, Dr. Marino? |
| 15:33:11 | 8 | A.   That's correct. |
| 15:33:12 | 9 | Q.   And according to your depiction, the barge is going to be |
| 15:33:15 | 10 | coming into contact with the wall a short distance from where |
| 15:33:19 | 11 | the wall is ripped; right? |
| 15:33:21 | 12 | THE COURT:  So we know what we're talking about for |
| 15:33:23 | 13 | the record on your cross, and I think you stated it, would that |
| 15:33:25 | 14 | be slide 48 in the first -- |
| 15:33:30 | 15 | MR. RAFFMAN:  Your Honor, I don't know what slide it |
| 15:33:31 | 16 | is in the dec.  It is photo -- |
| 15:33:35 | 17 | THE COURT:  It's just going to be hard for anybody |
| 15:33:37 | 18 | that's looking at this to compare the two. |
| 15:33:39 | 19 | MR. RAFFMAN:  I can find it, your Honor.  I was given |
| 15:33:41 | 20 | the dec this morning and -- |
| 15:33:43 | 21 | THE COURT:  I know, and I'll give you a little extra |
| 15:33:46 | 22 | time.  Just so we can compare it up for the record, sir.  I |
| 15:33:52 | 23 | don't mean to make your examination more tedious. |
| 15:33:58 | 24 | MR. RAFFMAN:  Believe me, Judge, I don't want my |
| 15:34:00 | 25 | examination to be the least bit tedious to you. |

| | | |
|---|---|---|
| 15:34:03 | 1 | **THE COURT:**  I know.  And I hate to make it worse, but |
| 15:34:06 | 2 | I am.  It's just that the record needs to reflect what you're |
| 15:34:10 | 3 | talking about, and it is -- to make it simple, it's figure 4.8 |
| 15:34:15 | 4 | in the report in the -- |
| 15:34:19 | 5 | **MR. RAFFMAN:**  Yes, Your Honor.  And what Your Honor's |
| 15:34:20 | 6 | going to observe is that, in each of our slides, at the bottom |
| 15:34:27 | 7 | right-hand corner, Your Honor will see a reference to the |
| 15:34:30 | 8 | exhibit and to the photo. |
| 15:34:31 | 9 | **THE COURT:**  Great.  And we'll say it for the record |
| 15:34:34 | 10 | so the Court of Appeal will know . |
| 15:34:35 | 11 | What I was concerned about is, if we |
| 15:34:38 | 12 | cross-examine him on some of the slide presentation, it might |
| 15:34:41 | 13 | not be in the report.  So we'll try to identify that if we get |
| 15:34:45 | 14 | there.  But this one here, so we don't -- I made a -- we don't |
| 15:34:48 | 15 | need to worry about at this point -- a mountain out of a |
| 15:34:49 | 16 | molehill here. |
| 15:34:50 | 17 | **MR. RAFFMAN:**  I'll do my very best to keep the record |
| 15:34:53 | 18 | clear, Your Honor. |
| 15:34:54 | 19 | **THE COURT:**  Okay.  Good. |
| 15:34:54 | 20 | **MR. RAFFMAN:**  Thank you, Your Honor. |
| 15:34:56 | 21 | So it's photo slide 118.  So now the record is |
| 15:34:59 | 22 | doubly clear. |
| 15:35:01 | 23 | **THE COURT:**  Thank you. |
| 15:35:01 | 24 | BY MR. RAFFMAN: |
| 15:35:05 | 25 | Q.   I'm not sure what the answer to my question was. |

15:35:08  1   A.   Yeah, there was a lot of conversation, so I was waiting.

15:35:11  2   Q.   As the barge hits the wall, as you have it, close to this

15:35:14  3   rip; right?

15:35:18  4   A.   Again, you know, the routing and the amount of distance

15:35:23  5   between the barge, where it is, and to where it hits the wall,

15:35:29  6   I wouldn't know what that is.

15:35:32  7   Q.   Let me go to your illustrative slide for a second and see

15:35:41  8   if this illustration has anything to do with it.  This would be

15:35:46  9   GM-038 and 39.  Part of your --

15:35:55  10          MR. RAFFMAN:  038 first, please.

15:35:55  11  BY MR. RAFFMAN:

15:35:55  12  Q.   These are two slides from your illustration, which are not

15:35:58  13  numbered.

15:35:59  14  A.   Yeah.  And if you remember, I qualified this, Mark, and I

15:36:02  15  said that this direction was just an illustration.  It could be

15:36:06  16  moving laterally into the wall.  I didn't have -- I don't have

15:36:10  17  a direction that is -- it has to be.  Other than that

15:36:18  18  there's -- which I realized probably a year and a half ago that

15:36:22  19  there was a pole that exists in this area somewhere.  So, you

15:36:26  20  know, it would have to be within that distance between the pole

15:36:29  21  and the wall.

15:36:31  22          And when I realized that I actually -- I remember

15:36:35  23  having one of my engineers plot it, and he looked at it and,

15:36:38  24  yeah, surely the barge can fit between the pole and the wall

15:36:42  25  and create a collision.

1350

| | | |
|---|---|---|
| 15:36:48 | 1 | **Q.**   I haven't asked you about the pole yet.  I promise you I |
| 15:36:53 | 2 | will. |
| 15:36:53 | 3 | **A.**   I just thought we were going to talk about that. |
| 15:36:56 | 4 | **Q.**   I promise you, Dr. Marino.  But before I do that, let me |
| 15:36:58 | 5 | just -- since you volunteered in nonresponse to a question that |
| 15:37:01 | 6 | I didn't ask, I guess I should move to strike the answer. |
| 15:37:05 | 7 | Until I ask the question, I don't... |
| 15:37:07 | 8 | **THE COURT:**  We'll strike -- we weren't talking about |
| 15:37:10 | 9 | the pole.  We were going to get there, so that's fine.  Why |
| 15:37:14 | 10 | don't you ask your question again, and listen to it carefully, |
| 15:37:17 | 11 | Dr. Marino, and attempt to answer it as best you can. |
| 15:37:20 | 12 | BY MR. RAFFMAN: |
| 15:37:20 | 13 | **Q.**   I want to know how close to that rip the barge struck the |
| 15:37:25 | 14 | wall. |
| 15:37:27 | 15 | **A.**   I believe it was in the first panel. |
| 15:37:29 | 16 | **Q.**   The first panel, thank you. |
| 15:37:31 | 17 | **A.**   Yes. |
| 15:37:33 | 18 | **Q.**   Now, let's have that photo 4.8 back. |
| 15:37:43 | 19 | This barge -- before I say anything more, this barge |
| 15:37:45 | 20 | is 35 feet wide; right? |
| 15:37:47 | 21 | **A.**   That's correct. |
| 15:37:47 | 22 | **Q.**   And the barge is 200 feet long; right? |
| 15:37:51 | 23 | **A.**   That's correct. |
| 15:37:51 | 24 | **Q.**   And a barge that's being propelled by the winds is most |
| 15:37:55 | 25 | likely going to be broadside to the wind; right? |

1351

| | | |
|---|---|---|
| 15:38:02 | 1 | A.   I'm not sure what the wind direction's going to be at the |
| 15:38:05 | 2 | time that this happened. |
| 15:38:08 | 3 | Q.   I'm not asking what the direction of the wind is.  What |
| 15:38:10 | 4 | I'm asking is that if the wind is going to act on the sail area |
| 15:38:13 | 5 | of the barge, the biggest sail area of the barge is along its |
| 15:38:17 | 6 | 200-foot length; isn't that right? |
| 15:38:19 | 7 | A.   If you want to assume that that's the direction that the |
| 15:38:21 | 8 | wind was relative to the barge, I mean, you can assume that. |
| 15:38:26 | 9 | Q.   Well, the barge will align itself in the wind so that the |
| 15:38:29 | 10 | wind is acting on the sail, won't it?  Isn't that that how a |
| 15:38:35 | 11 | sailboat works? |
| 15:38:37 | 12 | A.   I don't know.  Maybe it was catty-corner; maybe it was |
| 15:38:39 | 13 | spinning.  I don't know. |
| 15:38:41 | 14 | Q.   Regardless, the smallest surface is 35 feet because that's |
| 15:38:45 | 15 | the width; right? |
| 15:38:47 | 16 | A.   That's correct. |
| 15:38:47 | 17 | Q.   And so we have here a force that's sufficient to push the |
| 15:38:52 | 18 | wall back 2 to 3 feet, as you've said; right?  In response to |
| 15:38:57 | 19 | the judge's question? |
| 15:38:58 | 20 | A.   That's correct. |
| 15:38:59 | 21 | Q.   And yet, Dr. Marino, you can see that this panel here, |
| 15:39:02 | 22 | just a few feet away, is undisturbed by this barge hit that's |
| 15:39:08 | 23 | got sufficient momentum to drive the wall back 2 to 3 feet; |
| 15:39:14 | 24 | isn't that right? |
| 15:39:14 | 25 | A.   That's correct. |

15:39:14  1   Q.    And are you suggesting, Dr. Marino, that the barge somehow

15:39:18  2   stopped on a dime and changed direction after driving the wall

15:39:20  3   back 2 to 3 feet?

15:39:23  4   A.    The testimony has been that the barge was -- protruded the

15:39:27  5   wall, or was just through the wall, and then wasn't seen again.

15:39:31  6   So it -- my -- my understanding and what I believe is that the

15:39:36  7   barge was there, and then the wind or wave blew it away.

15:39:41  8   Q.    Well, the barge is going to have considerable momentum,

15:39:45  9   won't it, because it's blowing --

15:39:46  10  A.    Well, the momentum's going to be -- the momentum is going

15:39:48  11  to be gone by the time -- it's like -- it's like -- Mark, it's

15:39:54  12  like a shock absorber.  It's not a rigid wall.  It's like

15:39:59  13  something stretching and consuming that momentum to a point

15:40:03  14  where there's no momentum.

15:40:05  15  Q.    The wall doesn't absorb all the barge's momentum,

15:40:08  16  Dr. Marino.  Instead of absorbing the momentum, the wall gives

15:40:14  17  way and rips and moves back 2 to 3 feet; isn't that right?

15:40:19  18  A.    Well, you're assuming that the barge has enough momentum

15:40:21  19  that it will carry itself further into the protection area,

15:40:29  20  based on my opinion that it doesn't take a large barge load to

15:40:41  21  cause that rip.

15:40:46  22            THE COURT:  And by "that rip," precisely what do you

15:40:48  23  mean?

15:40:50  24            THE WITNESS:  What we talked about this morning, Your

15:40:53  25  Honor, this -- these areas here that caused that tearing.

| | | |
|---|---|---|
| 15:40:59 | 1 | **THE COURT:**  You're talking about the two areas on |
| 15:41:01 | 2 | what we've been calling the isolated sheet pile in the direct |
| 15:41:05 | 3 | examination? |
| 15:41:06 | 4 | **THE WITNESS:**  That's correct. |
| 15:41:06 | 5 | **BY MR. RAFFMAN:** |
| 15:41:08 | 6 | **Q.**   Just -- just so we're clear, in your opinion of what |
| 15:41:13 | 7 | happens, the barge moves into the wall with sufficient |
| 15:41:18 | 8 | momentum, whatever it is, to drive this metal sheet pile back 2 |
| 15:41:24 | 9 | to 3 feet, and then before it can come into contact with this |
| 15:41:30 | 10 | unfailed panel, the barge ceases to move in that direction and |
| 15:41:37 | 11 | comes to a stop and just does something else; right? |
| 15:41:42 | 12 | **A.**   Yes.  Or the wind or wave causes it to go away from the |
| 15:41:46 | 13 | wall. |
| 15:41:47 | 14 | **Q.**   And you don't know anything about the wind or the waves, |
| 15:41:54 | 15 | you just assume that must have happened; right? |
| 15:41:56 | 16 | **A.**   That's my opinion. |
| 15:41:57 | 17 | **Q.**   These scratches here, do you see these scratches in your |
| 15:42:00 | 18 | photo? |
| 15:42:01 | 19 | **A.**   Yes. |
| 15:42:01 | 20 | **Q.**   Barge cannot possibly have caused those scratches; am I |
| 15:42:06 | 21 | right? |
| 15:42:06 | 22 | **A.**   I don't believe that those scratches are caused by the |
| 15:42:09 | 23 | barge. |
| 15:42:13 | 24 | **Q.**   I want to ask you a couple of questions about the faulty |
| 15:42:22 | 25 | weld.  You didn't know anything about the faulty weld when I |

15:42:26   1    asked you about it at your deposition; right?

15:42:29   2    A.   This is true.  I've since learned much about it.

15:42:32   3    Q.   You have.  And, in fact, Mr. Pazos --

15:42:37   4         MR. RAFFMAN:  Let me have GM-123.

15:42:37   5    BY MR. RAFFMAN:

15:42:37   6    Q.   This is Defendant's Exhibit 404.  This is Mr. Pazos'

15:42:41   7    summary judgment declaration.  Mr. Pazos has testified that

15:42:44   8    there was a rupture of a defective weld at this location on the

15:42:50   9    wall; right?

15:42:51   10   A.   That's what that says.  I haven't read his declaration,

15:42:55   11   so...

15:42:57   12   Q.   This is -- in your slide 118, you refer to a double rip;

15:43:02   13   right?

15:43:02   14   A.   That's correct.

15:43:03   15   Q.   And one of those rips is the faulty weld; right?

15:43:06   16   A.   That's correct.

15:43:07   17   Q.   And you have done no calculations to rule out the

15:43:13   18   possibility that a faulty weld failed under a hydrostatic load;

15:43:20   19   am I right?

15:43:20   20   A.   Well, I wouldn't say that I haven't done anything related

15:43:24   21   to that.  As I discussed in my -- in my direct, that the

15:43:33   22   deflection of the sheet pile from the water load alone would

15:43:37   23   not be sufficient --

15:43:38   24        THE COURT:  Can you get a little closer?

15:43:40   25        THE WITNESS:  I'm sorry.

15:43:40  1          **THE COURT:**  My hearing may wane as the day goes on.
15:43:43  2  Just a little closer.  Thank you.
15:43:47  3          **THE WITNESS:**  You're welcome.
15:43:48  4          **THE COURT:**  Go ahead, sir.  You were saying?
15:43:50  5          **THE WITNESS:**  That the deflection of the sheet pile
15:43:52  6  from the water load alone wouldn't be sufficient to make or
15:43:55  7  cause the tear that we observed at the north end.
15:43:58  8          We're talking about -- if you remember, we
15:44:01  9  talked about a quarter-of-an-inch or a part-of-an-inch gap at
15:44:06  10  the top.  And if you recall, we talked about the flexibility of
15:44:11  11  that sheet piling.  And this defective weld doesn't mean that
15:44:18  12  it doesn't have any strength, rupture of a defective weld.
15:44:21  13  Maybe -- maybe it didn't have the full capacity that the sheet
15:44:30  14  pile had, but that doesn't mean it doesn't have any.
15:44:31  15          And I haven't seen anybody come up with, okay,
15:44:34  16  this is what the defective weld's strength was.  IPET doesn't
15:44:39  17  talk about it.  ILIT doesn't talk about it.  You know, I don't
15:44:46  18  know -- to me, it really doesn't have a lot of relevance.
15:44:50  19          **MR. RAFFMAN:**  All right.  Let me have page 116, line
15:44:50  20  12 to 15, in the deposition to make the record complete.
15:44:54  21  **BY MR. RAFFMAN:**
15:44:54  22  **Q.**   I asked you the same question at your deposition.
15:44:57  23          "QUESTION:  Have you done any calculations to rule
15:45:01  24  out the possibility that a faulty weld failed under a
15:45:04  25  hydrostatic load?

15:45:07  1         "ANSWER:  I haven't done those calculations, no."
15:45:14  2         You haven't supplemented your report with any
15:45:17  3    calculations since your deposition, have you?
15:45:19  4    A.   I still haven't done any calculations about it.  What I've
15:45:22  5    done is I've looked at that problem, and I said that the
15:45:26  6    deflection of wall from water hydrostatic pressure alone is not
15:45:31  7    going to give you the tears that we're looking at.
15:45:36  8    Q.   Now, you have not ruled out the possibility that
15:45:44  9    hydrostatic pressure caused the rubber water stops in the
15:45:49  10   concrete monolith to dislodge as the water rose up the
15:45:54  11   floodwall on the morning of August 29th, have you?
15:46:00  12   A.   Can you repeat that question, Mark?
15:46:05  13   Q.   You have not ruled out the possibility that hydrostatic
15:46:10  14   pressure caused water stops in the concrete monoliths to
15:46:19  15   dislodge as the water rose up the wall on the morning of
15:46:22  16   August 29th at the north breach?
15:46:27  17   A.   I haven't ruled out whether the hydrostatic pressure --
15:46:31  18         THE COURT:  You are repeating the question, not
15:46:33  19   answering it.
15:46:34  20         THE WITNESS:  Yeah.  I'm trying to understand the
15:46:36  21   question.  Exactly.
15:46:37  22         THE COURT:  He's asking you -- I don't want to ask
15:46:39  23   it.  Do you want to ask it again, sir?
15:46:41  24         THE WITNESS:  I think I know the answer, but I'm not
15:46:43  25   sure I'd be answering the right question.

1357

15:46:46  1          **THE COURT:**  If you don't mind, counsel, I'll impose

15:46:49  2   upon you to ask it again.

15:46:50  3          **MR. RAFFMAN:**  Thank you, Your Honor.

15:46:50  4   **BY MR. RAFFMAN:**

15:46:51  5   **Q.**   The wall has panels; right?

15:46:54  6   **A.**   Yes.

15:46:54  7   **Q.**   And in between those panels, there are rubber water stops.

15:46:58  8   You testified about them this morning; right?

15:47:00  9   **A.**   That's correct.

15:47:00  10  **Q.**   And those rubber water stops in this wall go to the level

15:47:03  11  of the construction joint, but not all the way down to the

15:47:07  12  levee.  That's what you testified about this morning.

15:47:10  13  **A.**   I said they went down to the -- at least, to the sheet

15:47:16  14  pile, which would be below the construction joint.

15:47:19  15  **Q.**   Below the construction joint?

15:47:22  16  **A.**   Yes.

15:47:23  17  **Q.**   At the Inner Harbor Navigation Canal, you have water stops

15:47:24  18  that are going all the way down to the top of the sheet pile,

15:47:27  19  below the construction joint?

15:47:29  20  **A.**   Yes.

15:47:30  21  **Q.**   And as the water rises along the wall, it can exert

15:47:34  22  pressure on the wall, and maybe those panels will want to move

15:47:37  23  out a little bit, and maybe the water can dislodge the water

15:47:43  24  stop and start squirting through.

15:47:46  25          Have you done any calculations to rule out the

1358

15:47:47  1   possibility that the water pressure on the wall could cause the
15:47:51  2   water stops to dislodge and allow water through?
15:47:55  3   A.    Again, I mean, if we're talking about the north, it's
15:48:01  4   common sense that tells you, if you've got a deflection of only
15:48:04  5   a fraction of an inch, the differential that you're going to
15:48:10  6   have at a joint to cause that stop to rupture, I mean, even if
15:48:17  7   it does rupture, we're talking about an eighth-of-an-inch gap
15:48:25  8   at the construction joint.  So how much water are you going to
15:48:28  9   get through there?
15:48:30  10          Plus, the water is above that -- whatever's happening
15:48:33  11  there, the water would be above the levee.  It's not -- as we
15:48:36  12  talked about earlier, the sheet pile -- I'm sorry -- the sheet
15:48:42  13  pile is above the levee surface.  So if we have a leak up here,
15:48:49  14  a little squirt of water out here, I don't know what the
15:48:51  15  relevance of that is.
15:48:53  16  Q.    Well, at the time of the north breach, the water level is
15:49:01  17  1.8 feet below the top of what you tell me is a 13-foot wall;
15:49:08  18  right?
15:49:08  19  A.    Yes.
15:49:09  20  Q.    And I'll grant you, for purposes of the argument, the
15:49:12  21  13 feet.  We're going to talk about that a little later.  But
15:49:16  22  the construction joint is 3 feet below the top of the wall;
15:49:23  23  isn't that right?
15:49:26  24  A.    Are you talking about the horizontal construction joint?
15:49:30  25  What joint are you talking about?  Or the vertical joint?

1359

15:49:32  1   **Q.**   Well, the first question is the construction joint.  Then

15:49:35  2   we're going to get to the sheet pile, which is underneath the

15:49:39  3   construction joint.

15:49:41  4   **A.**   Okay.

15:49:41  5   **Q.**   The construction joint is 3 feet below the top of the

15:49:44  6   wall.

15:49:45  7   **A.**   So you're talking not about the vertical construction --

15:49:47  8          **THE COURT:**   There are two construction joints, as the

15:49:49  9   Court understands it:  A horizontal, where the various segments

15:49:53  10  of the floodwall are joined; and a vertical, as we saw in

15:49:57  11  pictures earlier.  Or photographs, as he said.

15:49:59  12  **BY MR. RAFFMAN:**

15:49:59  13  **Q.**   And the vertical, to be clear, is where the water stops

15:50:02  14  are; right?

15:50:04  15  **A.**   Yes.

15:50:04  16  **Q.**   And horizontal is just for purposes of orienting the Court

15:50:09  17  to where the water is vis-à-vis the wall.  The construction

15:50:13  18  joint is 3 feet below the top.

15:50:17  19  **A.**   Okay.

15:50:17  20  **Q.**   The top of the sheet pile is no less than 6 inches below

15:50:20  21  the construction joint?

15:50:22  22  **A.**   That's correct.

15:50:22  23  **Q.**   So if you have water that has risen to about a foot and a

15:50:27  24  half or 1.8 feet below the top of the wall, that water is going

15:50:30  25  to be about 2 feet on top of the level of the sheet pile?

15:50:36  1  **A.**   Okay.

15:50:38  2  **Q.**   And so if you have water 2 feet high up there, and that

15:50:45  3  water is pushing on the wall, and that water dislodges the

15:50:50  4  water stop, you could have 2 feet of water that are now being

15:50:57  5  forced in like a jet onto the protected side of the floodwall,

15:51:05  6  if that happens; isn't that right?

15:51:07  7  **A.**   I don't think it would be a jet.  I mean, I don't know

15:51:11  8  that -- that doesn't sound like good science to me.  To me.

15:51:24  9  **Q.**   Have you done any calculations to rule out the

15:51:27  10  possibility, whether it's a jet or not --

15:51:31  11  **A.**   Okay.

15:51:32  12  **Q.**   -- to rule out the possibility that the water stop fails

15:51:40  13  under the pressure of the water as it rises up the wall?

15:51:45  14  **A.**   I haven't done any calculations.

15:51:47  15  **Q.**   Now, let me ask you about the transition between the deep

15:51:50  16  sheet pile in 1980 and the shallow 1969 sheet pile so that the

15:51:59  17  Court understands -- and the Court probably does understand,

15:52:01  18  but let me ask anyway.

15:52:04  19          **THE COURT:**  Never assume, you're right.  Ask, please.

15:52:07  20  Go ahead.

15:52:07  21  **BY MR. RAFFMAN:**

15:52:08  22  **Q.**   The 1980 sheet pile is buried to what depth?

15:52:14  23  **A.**   A negative 27.5.

15:52:18  24  **Q.**   The 1969 sheet pile is buried to what depth?

15:52:22  25  **A.**   Negative 10.5.

1361

| | | |
|---|---|---|
| 15:52:23 | 1 | **Q.**   So you've got a 17-foot sheet pile next to a 10.5 sheet |
| 15:52:28 | 2 | pile, and they're connected together; right? |
| 15:52:31 | 3 | **A.**   That's correct. |
| 15:52:31 | 4 | **Q.**   And when the water rises on the wall, that deeper sheet |
| 15:52:37 | 5 | pile has got more structural integrity than that shallower |
| 15:52:41 | 6 | sheet pile; isn't that right? |
| 15:52:45 | 7 | **A.**   In what way? |
| 15:52:46 | 8 | **Q.**   Well, let me ask it this way:  Am I correct, Dr. Marino, |
| 15:52:58 | 9 | that the junction between the failed sheet pile and the deeper |
| 15:53:01 | 10 | sheet pile is a weaker point on the wall because the panel to |
| 15:53:04 | 11 | the north has more structural integrity? |
| 15:53:11 | 12 | **A.**   Well, what I could say is that the wall to the north has |
| 15:53:19 | 13 | more resistance than -- for lateral movement from -- for the |
| 15:53:27 | 14 | water than the wall to the south. |
| 15:53:29 | 15 | **Q.**   So as the water rises on the wall, that deeper sheet pile |
| 15:53:34 | 16 | wants to stick and that shallower sheet pile wants to give; is |
| 15:53:41 | 17 | that a colloquial expression of the science you're using? |
| 15:53:48 | 18 | **A.**   I think the terms you are using are fairly dramatic, but I |
| 15:53:51 | 19 | don't know about give.  But as I said before, we're talking |
| 15:53:55 | 20 | about a fraction-of-an-inch deflection with the smaller sheet |
| 15:54:02 | 21 | pile.  So when you're talking "give" and "weak link," it sounds |
| 15:54:07 | 22 | more severe than it is. |
| 15:54:09 | 23 | **Q.**   Well, I haven't asked you to quantify it yet. |
| 15:54:14 | 24 | **A.**   But I want to make sure we're using the right terminology. |
| 15:54:17 | 25 | **THE COURT:**  Counsel, can you give me one second to |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| 15:54:19 | 1 | fix something on my realtime? |
| 15:55:47 | 2 | **(OFF THE RECORD)** |
| 15:55:47 | 3 | THE COURT:  I apologize, counsel.  I'm sorry. |
| 15:55:48 | 4 | BY MR. RAFFMAN: |
| 15:55:49 | 5 | Q.   If you put pressure on the wall to the south where you |
| 15:55:52 | 6 | have the weaker sheet pile, you will induce tension, torsion, |
| 15:56:00 | 7 | between the deeper and the shallower pile; right? |
| 15:56:05 | 8 | A.   Yeah, but it wouldn't be very significant. |
| 15:56:10 | 9 | Q.   Have you quantified the torsion? |
| 15:56:14 | 10 | A.   I don't need to.  I mean, if it's only the deflection -- |
| 15:56:17 | 11 | if you look at the twisted sheet pile on the north end, I mean, |
| 15:56:20 | 12 | this -- sheet pile is flexible.  Okay.  An eighth-of-an-inch |
| 15:56:24 | 13 | difference is not going to make a difference. |
| 15:56:25 | 14 | THE COURT:  When you're saying "an eighth-of-an-inch |
| 15:56:28 | 15 | difference," explain that eighth of an inch to me. |
| 15:56:29 | 16 | THE WITNESS:  If one sheet pile is moving, say -- the |
| 15:56:32 | 17 | stiffer one is moving, say, an eighth of an inch, and the other |
| 15:56:37 | 18 | is moving, say, a half an inch, so you have an |
| 15:56:40 | 19 | eighth-of-an-inch difference between the two, it's not a |
| 15:56:41 | 20 | significant deflection. |
| 15:56:43 | 21 | THE COURT:  Where do we get the difference of an |
| 15:56:45 | 22 | eighth of an inch?  Where do you get it? |
| 15:56:48 | 23 | THE WITNESS:  Basically, by looking at the gaps, the |
| 15:56:50 | 24 | gap formation, in terms of the deflection of the wall. |
| 15:56:54 | 25 | If you remember, Your Honor, we looked at those |

1363

15:56:59  1   E-99 tests, the E-99 field tests, that showed deflections at

15:57:07  2   the top of the crown.  Remember it was a fraction of an inch?

15:57:11  3           **THE COURT:**  I recall.  I do recall where that comes

15:57:13  4   from.  Okay.  Thank you.

15:57:14  5   **BY MR. RAFFMAN:**

15:57:14  6   **Q.**   Well, if you have --

15:57:18  7   **A.**   And, remember, if I could qualify, that that's over a much

15:57:22  8   longer period of time.

15:57:23  9           **THE COURT:**  I do.  I recall.  Yes, sir.

15:57:26  10  **BY MR. RAFFMAN:**

15:57:27  11  **Q.**   Dr. Marino, are you telling the Court that because the

15:57:33  12  E-99 test was over a much longer period of time, that during

15:57:42  13  Hurricane Katrina, the floodwalls throughout the New Orleans

15:57:44  14  area didn't have time for tension cracks to form?  Is that what

15:57:49  15  you're telling the Court?

15:57:50  16  **A.**   Absolutely not.  I'm saying the tension cracks are not

15:57:54  17  going to be large prior to overtopping.  Or some back -- or

15:58:00  18  some erosion on the back side or the protection side of the

15:58:06  19  levee.

15:58:06  20  **Q.**   The tension crack forms on the --

15:58:10  21  **A.**   Flood side.

15:58:10  22  **Q.**   -- flood side.

15:58:20  23          And tension cracks formed at the London Avenue Canal;

15:58:25  24  right?

15:58:26  25  **A.**   Yes.

| | | |
|---|---|---|
| 15:58:26 | 1 | **Q.**   And tension cracks formed at the 17 Street Canal; right? |
| 15:58:32 | 2 | **A.**   Yes. |
| 15:58:32 | 3 | **Q.**   And those walls were not overtopped? |
| 15:58:36 | 4 | **A.**   Yes.  But there was erosion of the protection levee. |
| 15:58:47 | 5 | **Q.**   And, in fact, at the London Avenue Canal and at the |
| 15:59:03 | 6 | 17 Street Canal, you could see tension cracks that formed at |
| 15:59:11 | 7 | places where the walls were not overtopped? |
| 15:59:17 | 8 | **A.**   Okay. |
| 15:59:18 | 9 | **Q.**   Okay? |
| 15:59:20 | 10 | THE COURT:  And you're saying that's a "yes"? |
| 15:59:22 | 11 | THE WITNESS:  Yes. |
| 15:59:25 | 12 | MR. RAFFMAN:  Thank you, Judge. |
| 15:59:27 | 13 | THE WITNESS:  I'm saying "okay" because that's what |
| 15:59:28 | 14 | he's telling me. |
| 15:59:30 | 15 | THE COURT:  That's what concerned me.  But do you |
| 15:59:32 | 16 | agree with that proposition? |
| 15:59:34 | 17 | THE WITNESS:  Yes.  As I said, Your Honor, there |
| 15:59:35 | 18 | would be a gap that would form.  It would be limited in size |
| 15:59:39 | 19 | and it would be limited in depth.  Until there's some support |
| 15:59:46 | 20 | that's lost on the protection side in terms of erosion or |
| 15:59:52 | 21 | overtopping from erosion. |
| 15:59:54 | 22 | **BY MR. RAFFMAN:** |
| 15:59:55 | 23 | **Q.**   Did you go to the London Avenue Canal? |
| 15:59:58 | 24 | **A.**   No, sir. |
| 15:59:58 | 25 | **Q.**   Did you go to the 17 Street Canal? |

1365

| | | |
|---|---|---|
| 16:00:00 | 1 | **A.**   No, sir. |
| 16:00:02 | 2 | **Q.**   You've read IPET; you've read ILIT.  They all say that |
| 16:00:07 | 3 | tension cracks formed on the canal side.  Significant tension |
| 16:00:10 | 4 | cracks; right? |
| 16:00:16 | 5 | **A.**   Yes. |
| 16:00:16 | 6 | **Q.**   And they formed in Katrina over the 24 hours, or whatever |
| 16:00:19 | 7 | the amount of storm surge time was that they had to form.  It |
| 16:00:23 | 8 | didn't take 52 days; right? |
| 16:00:26 | 9 | **A.**   That's correct.  As I've said, I'm not saying that there |
| 16:00:28 | 10 | isn't tension cracks that formed.  I'm saying that the tension |
| 16:00:32 | 11 | cracks are limited in size and depth. |
| 16:00:35 | 12 | **Q.**   Did you measure the tension cracks at the London Avenue |
| 16:00:37 | 13 | Canal? |
| 16:00:38 | 14 | **A.**   No. |
| 16:00:38 | 15 | **Q.**   Did you measure the tension cracks at the 17 Street Canal? |
| 16:00:42 | 16 | **A.**   No.  I don't know if anybody could measure it anyway. |
| 16:00:49 | 17 | **Q.**   There will be testimony about it, tension cracks forming |
| 16:00:53 | 18 | at all canals. |
| 16:01:08 | 19 | Let's look at the power pole, or the pole. |
| 16:01:11 | 20 | **MR. RAFFMAN:**  Let me have photo 4.6.  I'm sorry, |
| 16:01:19 | 21 | GM-033.  I'm sorry. |
| 16:01:27 | 22 | **BY MR. RAFFMAN:** |
| 16:01:27 | 23 | **Q.**   This is photo 4.6 from your report, Plaintiff's Exhibit |
| 16:01:31 | 24 | 397.  It's also slide 149 in Dr. Marino's dec from this |
| 16:01:36 | 25 | morning. |

16:01:40   1          Dr. Marino, the pole is readily observable right in
16:01:46   2   the middle of the area where the north breach occurred; right?
16:01:49   3   A.   That's correct.
16:01:51   4   Q.   That's a photo that's included in your report; right?
16:01:54   5   A.   It looks like it.
16:01:58   6   Q.   How long is the breach from end to end?
16:02:04   7   A.   Over 200 feet.
16:02:06   8   Q.   The barge from end to end?
16:02:08   9   A.   200 feet.
16:02:11  10   Q.   You want to tell the Court that one of your engineers has
16:02:14  11   done some calculation to say that a 200-foot barge can sneak
16:02:20  12   around that pole to get into that breach under the forces of
16:02:25  13   what plaintiffs' experts have called unpredictable wind and
16:02:29  14   unpredictable waves?  Do you want to tell the Court that?
16:02:33  15   A.   I am not a routing person, so I can't tell you how the
16:02:35  16   barge got there.  All I can say is that the damage patterns
16:02:39  17   that I've observed are not indicative of what I would expect to
16:02:45  18   occur if it failed from soil yielding or seepage conditions.
16:02:50  19          THE COURT:  Counsel, I'm sorry.  Forgive me.  I
16:02:53  20   was -- I was typing a note here, and I want to make sure I'm
16:03:00  21   looking at the right pole.  Would you point that one out to me,
16:03:05  22   sir?
16:03:06  23          MR. RAFFMAN:  Of course, Judge.  It's slide 149 in
16:03:09  24   Dr. Marino's dec from this morning.  It is also -- I'm so
16:03:16  25   sorry.  It's right here.

16:03:18   1              **THE COURT:**  You want to -- you can mark it, sir.

16:03:21   2    Okay.

16:03:23   3              **MR. RAFFMAN:**  I just pointed it right there, Judge.

16:03:26   4              **THE COURT:**  Okay.  All right.  I'm looking in the

16:03:28   5    wrong place.  I'm glad you did.

16:03:31   6              **MR. RAFFMAN:**  I'm so sorry.

16:03:32   7              **THE COURT:**  No, I've got it.  It was my own glitch.

16:03:35   8              **MR. RAFFMAN:**  We've all gotten used to looking at it

16:03:38   9    over the weekend.  But here's this power pole -- pole right

16:03:41   10   here.

16:03:41   11             **THE COURT:**  Yes.

16:03:41   12             **MR. RAFFMAN:**  In the middle of the breach.

16:03:42   13             **THE COURT:**  I see it.

16:03:43   14             **MR. RAFFMAN:**  This is the pole that Mr. Pazos

16:03:45   15   testified would be reduced to splinters if the barge was

16:03:47   16   anywhere near it.

16:03:49   17             **MR. WILSON:**  Objection, Judge.  That's a

16:03:50   18   mischaracterization of his testimony.

16:03:53   19             **THE COURT:**  I'll look at the testimony eventually.

16:03:56   20             **MR. RAFFMAN:**  I'll withdraw the characterization.

16:03:57   21   The Court will look at the testimony.

16:04:00   22   **BY MR. RAFFMAN:**

16:04:01   23   **Q.**   200-foot barge, 200-foot breach.  Dr. Marino, you're not

16:04:06   24   here to testify that that barge is going to sneak into that

16:04:11   25   breach without touching that pole, are you?

| | | |
|---|---|---|
| 16:04:13 | 1 | **A.**   As I said, I'm not a routing person, so... |
| 16:04:17 | 2 | **Q.**   So let's now look at some other photos -- |
| 16:04:19 | 3 | **MR. RAFFMAN:**  I'm sorry. |
| 16:04:19 | 4 | **THE COURT:**  I'm just going to ask Dr. Marino to -- |
| 16:04:26 | 5 | you could do it by pointer -- show where you think the breach |
| 16:04:30 | 6 | is vis-à-vis the pole. |
| 16:04:32 | 7 | **THE WITNESS:**  I believe that the breach occurred -- |
| 16:04:35 | 8 | began here at the corner of the barge.  Would have to be in |
| 16:04:40 | 9 | this direction. |
| 16:04:41 | 10 | **THE COURT:**  All right. |
| 16:05:07 | 11 | **MR. RAFFMAN:**  Slide 04 in Dr. Marino's dec -- Your |
| 16:05:11 | 12 | Honor, may we clear the screen? |
| 16:05:12 | 13 | **THE COURT:**  Yes, you certainly may. |
| 16:05:14 | 14 | BY MR. RAFFMAN: |
| 16:05:16 | 15 | **Q.**   Dr. Marino, this is slide 4 in your dec. |
| 16:05:21 | 16 | **MR. RAFFMAN:**  Plaintiffs' Exhibit 397, Marino report |
| 16:05:24 | 17 | photo 4.3, Your Honor. |
| 16:05:24 | 18 | BY MR. RAFFMAN: |
| 16:05:26 | 19 | **Q.**   Dr. Marino, can you see the same pole in the location |
| 16:05:30 | 20 | where I've placed my mark? |
| 16:05:32 | 21 | **A.**   Yes. |
| 16:05:37 | 22 | **Q.**   Now, in this photo, this is a photo taken shortly after |
| 16:05:41 | 23 | Katrina; right? |
| 16:05:43 | 24 | **A.**   Yes. |
| 16:05:43 | 25 | **Q.**   You don't see any repair works in this photo? |

| | | |
|---|---|---|
| 16:05:52 | 1 | **A.**   I don't believe so, no. |
| 16:05:53 | 2 | **Q.**   All right. |
| 16:05:54 | 3 | **MR. RAFFMAN:**  Your Honor, would you please clear the |
| 16:05:56 | 4 | screen? |
| 16:05:56 | 5 | **THE COURT:**  Okay. |
| 16:05:56 | 6 | BY MR. RAFFMAN: |
| 16:06:13 | 7 | **Q.**   Here we have a couple of other photos.  I don't -- there |
| 16:06:17 | 8 | should be exhibit numbers here.  DX-263 is the one on the |
| 16:06:41 | 9 | right, and the one on the right is DX-106.  Is that not -- |
| 16:06:50 | 10 | left.  I'm sorry, the one on the left is DX-106. |
| 16:06:55 | 11 | Dr. Marino, again, you can see the pole readily |
| 16:06:57 | 12 | visible in both of these photos; correct? |
| 16:07:01 | 13 | **A.**   That's correct. |
| 16:07:01 | 14 | **Q.**   And the one on the right, the water's still rushing out of |
| 16:07:07 | 15 | the neighborhood after Katrina; right? |
| 16:07:13 | 16 | **A.**   If you say that's Katrina.  I don't know that that's |
| 16:07:16 | 17 | Katrina. |
| 16:07:16 | 18 | **Q.**   Well, did the northern breach re-breach in Rita? |
| 16:07:22 | 19 | **A.**   I'm not sure. |
| 16:07:23 | 20 | **Q.**   All right.  I'm going to ask you to assume that the |
| 16:07:26 | 21 | northern breach did not rebreak in Rita, and I'll ask you |
| 16:07:30 | 22 | again:  The water's rushing out of the neighborhood immediately |
| 16:07:34 | 23 | following Katrina; right? |
| 16:07:36 | 24 | **A.**   Yes. |
| 16:07:37 | 25 | **Q.**   And so would you agree with me that that pole was present |

| | | |
|---|---|---|
| 16:07:41 | 1 | before any repair work started in the neighborhood? |
| 16:07:46 | 2 | A.   Mark, I've already stated that I thought that the pole was |
| 16:07:49 | 3 | there. |
| 16:07:49 | 4 | Q.   All right.  Let me just show a couple of other pieces for |
| 16:07:52 | 5 | the record in case it's ever disputed by anybody else. |
| 16:07:58 | 6 | THE COURT:  Yes.  Just one second, sir. |
| 16:08:00 | 7 | (OFF THE RECORD) |
| 16:08:31 | 8 | THE COURT:  Go ahead, counsel. |
| 16:08:33 | 9 | MR. RAFFMAN:  I'm sorry, Your Honor.  Next slide |
| 16:08:34 | 10 | please.  I have just a couple more. |
| 16:08:37 | 11 | BY MR. RAFFMAN: |
| 16:08:40 | 12 | Q.   Dr. Marino, I'm showing you a New Orleans *Times-Picayune* |
| 16:08:44 | 13 | article from Wednesday, August 31st, 2005, in which -- |
| 16:08:50 | 14 | MR. WILSON:  Objection, Your Honor.  Is this in |
| 16:08:51 | 15 | evidence? |
| 16:08:54 | 16 | MR. RAFFMAN:  Well, it's going to be as soon as I |
| 16:08:56 | 17 | offer it. |
| 16:08:59 | 18 | THE COURT:  Which one -- it looks like the same |
| 16:09:03 | 19 | photograph as the other one, but okay. |
| 16:09:06 | 20 | BY MR. RAFFMAN: |
| 16:09:07 | 21 | Q.   Do you recognize this as the same photograph that I just |
| 16:09:09 | 22 | showed you, DX-106? |
| 16:09:21 | 23 | MR. RAFFMAN:  No?  263, I'm sorry.  My colleagues |
| 16:09:23 | 24 | have all reminded me that it's 263. |
| 16:09:28 | 25 | MR. WILSON:  Judge, I can't see the date on the |

16:09:29  1    *Times-Picayune* newspaper that he's producing.  And I haven't

16:09:39  2    even been provided with what he's putting up here.

16:09:41  3         **THE COURT:**  So this is an exhibit you haven't seen?

16:09:42  4    You are objecting to it because it wasn't on the exhibit list.

16:09:48  5    Is that the nature of your objection, sir?

16:09:50  6         **MR. WILSON:**  I'm going to allow it, judge.

16:09:52  7         **THE COURT:**  All right.  Thank you.

16:09:53  8         **MR. RAFFMAN:**  So we'll offer this one as Exhibit 344.

16:10:03  9    BY MR. RAFFMAN:

16:10:04  10   Q.   Dr. Marino, the pole appears in a newspaper article dated

16:10:06  11   August 31st, 2005?

16:10:09  12   A.   Yes.

16:10:11  13   Q.   All right.  I have one more.  Dr. Marino, you have

16:10:15  14   reviewed documents created by -- or for Washington Group

16:10:19  15   International regarding the works that were done on the East

16:10:23  16   Bank industrial area; am I right?

16:10:26  17   A.   Yes.

16:10:27  18   Q.   And among those documents were soil borings that were

16:10:30  19   taken as those works were being demobilized as part of the work

16:10:36  20   that was being done by Washington Group; right?

16:10:42  21   A.   Can you repeat that question?

16:10:45  22   Q.   The documents you reviewed included soil borings that were

16:10:51  23   taken as the East Bank industrial works at Boland Marine and

16:10:56  24   other sites were being decommissioned or demobilized or

16:11:02  25   removed?

| | | |
|---|---|---|
| 16:11:03 | 1 | **A.**   The borings were removed? |
| 16:11:05 | 2 | **Q.**   No.  The Boland Marine businesses and buildings and other |
| 16:11:10 | 3 | things were being removed? |
| 16:11:12 | 4 | **A.**   That's correct. |
| 16:11:13 | 5 | **Q.**   And you've reviewed documents involving the removal of |
| 16:11:17 | 6 | those buildings and things; right? |
| 16:11:19 | 7 | **A.**   That's correct. |
| 16:11:20 | 8 | **Q.**   So I'm going to show you a document -- |
| 16:11:22 | 9 | **MR. RAFFMAN:**  May I have the ELMO, please? |
| 16:11:24 | 10 | **BY MR. RAFFMAN:** |
| 16:11:32 | 11 | **Q.**   This document bears the Bates number WGI-013699A. |
| 16:11:47 | 12 | Dr. Marino, do you recognize this as a photo of the East Bank |
| 16:11:51 | 13 | industrial area, looking from north to south, taken prior to |
| 16:11:55 | 14 | Hurricane Katrina? |
| 16:12:04 | 15 | **A.**   Yes. |
| 16:12:06 | 16 | **Q.**   And you can see at least one -- and actually, several more |
| 16:12:12 | 17 | poles -- in that area at that time; right? |
| 16:12:15 | 18 | **A.**   Yes. |
| 16:12:15 | 19 | **MR. RAFFMAN:**  And I'm going to offer this one as |
| 16:12:17 | 20 | Defendant's Exhibit 345. |
| 16:12:22 | 21 | **THE COURT:**  Any objection? |
| 16:12:25 | 22 | **MR. WILSON:**  No objection, Your Honor. |
| 16:12:26 | 23 | **THE COURT:**  Let it be admitted. |
| 16:12:27 | 24 | **BY MR. RAFFMAN:** |
| 16:12:36 | 25 | **Q.**   Let's keep going here. |

16:12:47   1              **MR. RAFFMAN:**  I'm going to need one for the Court.

16:12:50   2    We'll bring one for the Court of that one and the New York --

16:12:50   3    the *Times-Picayune*.  I know what the newspaper is.

16:12:56   4              **THE COURT:**  Yes.  Thank you.

16:13:02   5              **MR. RAFFMAN:**  May I have GM-016, please?

16:13:05   6    BY MR. RAFFMAN:

16:13:07   7    Q.   Dr. Marino, this is slide 217 in the Marino dec for the

16:13:13   8    record.  And you recognize this as your depiction of three

16:13:17   9    impacts at the south breach; right, Dr. Marino?

16:13:20   10   A.   Yes.

16:13:20   11   Q.   And for each of these impacts, you've got a side view at

16:13:24   12   the bottom; right?

16:13:25   13   A.   Yes.

16:13:26   14   Q.   And in your opinion, the water level at the time these

16:13:30   15   impacts takes place is the same; right?

16:13:32   16   A.   Well, that's -- that would be more consistent with the

16:13:37   17   exit point.

16:13:38   18   Q.   How much higher was the water at the exit point,

16:13:42   19   Dr. Marino?

16:13:42   20   A.   No, no.  I'm saying that would be more consistent with the

16:13:45   21   exit point.

16:13:46   22   Q.   That side view is?

16:13:48   23   A.   Yes.

16:13:48   24   Q.   My question is:  All three of these impacts are taking

16:13:52   25   place within a window of no less than half an hour; right?

1374

| | | |
|---|---|---|
| 16:13:56 | 1 | **A.**   I would say approximately. |
| 16:13:57 | 2 | **Q.**   Well, you've got the north breach happening at 6:00; |
| 16:14:00 | 3 | right? |
| 16:14:00 | 4 | **A.**   I said -- I said to you that that's an approximate time. |
| 16:14:03 | 5 | **Q.**   Okay.  But what I want to do -- right.  And the water |
| 16:14:07 | 6 | level at the time of the north breach, as I remember, was |
| 16:14:09 | 7 | 11.2 feet NAVD88; right? |
| 16:14:13 | 8 | **A.**   Yes. |
| 16:14:13 | 9 | **Q.**   And the water level at the time of the south breach is |
| 16:14:17 | 10 | 11.8 feet NAVD88; right? |
| 16:14:20 | 11 | **A.**   That's correct.  That assumes that it is at 6:00 on the |
| 16:14:23 | 12 | north breach. |
| 16:14:25 | 13 | **Q.**   6:00 on the north breach. |
| 16:14:27 | 14 | **A.**   And the next -- |
| 16:14:27 | 15 | **Q.**   6:30 at the south breach? |
| 16:14:29 | 16 | **A.**   6:30 is when the flooding, the violent flooding, occurred. |
| 16:14:32 | 17 | **Q.**   Obviously, then, Dr. Marino, whatever impact the barges |
| 16:14:36 | 18 | had in any of these places has to have been completed by 6:30; |
| 16:14:43 | 19 | right? |
| 16:14:43 | 20 | **A.**   Approximately. |
| 16:14:45 | 21 | **Q.**   So between 6:00 and 6:30 is when all of this is happening; |
| 16:14:51 | 22 | right? |
| 16:14:51 | 23 | **A.**   Approximately. |
| 16:14:52 | 24 | **Q.**   And the water level within 6 inches as you've put it; |
| 16:14:57 | 25 | right? |

16:14:57    1    A.    Approximately.

16:14:59    2    Q.    So the water level at the time the barge exits in the

16:15:05    3    neighborhood is 6 inches higher than the water level at the

16:15:09    4    time of north breach; right?

16:15:14    5    A.    Approximately.

16:15:15    6    Q.    And all times in between are in that 6-inch water level

16:15:21    7    window; right?   Approximately?

16:15:25    8    A.    Approximately.

16:15:31    9    Q.    Dr. Marino, you haven't calculated the amount of seepage

16:15:37   10    that occurs between the time that the barge first comes into

16:15:42   11    contact with the wall at this primary impact, as you put it,

16:15:45   12    and the time of the massive flood that takes place at 6:30,

16:15:50   13    have you?

16:15:54   14    A.    Calculated the amount of seepage?

16:15:56   15    Q.    Yes, sir.

16:15:57   16    A.    I'm not understanding the question.

16:16:01   17    Q.    Deposition 151, line 11 to 14, please:

16:16:07   18            "QUESTION:  You have not calculated the amount of

16:16:09   19    seepage that occurs during that less than a half an hour;

16:16:17   20    right?

16:16:20   21            "ANSWER:  That's correct."

16:16:26   22    A.    I think the context -- I would need the context, but I

16:16:29   23    think what you're talking about is -- what we're talking about

16:16:33   24    at that point is how much water would be going underneath the

16:16:39   25    sheet pile during that period of time.

16:16:43  1  **Q.**   And you haven't calculated --

16:16:45  2  **A.**   I don't know how you would calculate that.

16:16:47  3  **Q.**   Sure.

16:16:48  4  **A.**   But, as I said earlier in my deposition, that when you

16:16:54  5  have that impact and you create that channel, and the rush of

16:16:58  6  water coming down from the barge impact down to the tip of the

16:17:05  7  sheet pile, that's a very dramatic effect that's being caused.

16:17:10  8  We're talking about a drop of 16 or 17 feet.  Rush of water

16:17:18  9  that's -- with a channel, that's over 2 feet or so.  And that

16:17:24  10  would cause a great impact on the soils, particularly on the

16:17:29  11  protection side.

16:17:33  12  **Q.**   What you haven't done is a calculation of how much water

16:17:37  13  goes under the sheet pile and undermines the soil on the

16:17:40  14  backside.  That's a calculation you have not done; right?

16:17:44  15  **A.**   No.  I mean, if you look at Villavaso's testimony how

16:17:48  16  quickly it occurred, I did a -- I was involved in the

16:17:56  17  investigation of a dam in South Carolina where the water didn't

16:17:59  18  even reach the top of -- they were pounding the water behind

16:18:05  19  the dam, and it completely eroded out before they could get it

16:18:10  20  to the top.

16:18:19  21  **Q.**   You mentioned, Doctor, Mr. Villavaso's testimony.  So that

16:18:22  22  the record is clear, he's at the north breach; right?

16:18:24  23  **A.**   That's correct.

16:18:24  24  **Q.**   Nothing he's offering has anything to do with the south

16:18:27  25  breach, does it?

16:18:28   1   A.   It's just a demonstration that it can occur fairly

16:18:31   2   rapidly.

16:18:32   3   Q.   So your conclusion about the south breach is informed by

16:18:34   4   your conclusion about the north breach and Mr. Villavaso's

16:18:38   5   testimony; is that fair?

16:18:40   6   A.   In part.

16:18:55   7   Q.   Am I right, Dr. Marino, that with respect to the

16:18:57   8   PowerPoint demonstration you did, the animation you did about

16:19:01   9   the south breach, that that's just an illustration; that

16:19:05   10  doesn't purport to be a real representation of what actually

16:19:09   11  happened when the barge approached the wall?

16:19:13   12  A.   Yes.  We've -- we've put that in as a demonstrative

16:19:17   13  exhibit.

16:19:22   14  Q.   And, in fact, if you wanted to know what really happened,

16:19:26   15  you'd want to know something about the angle as the barge

16:19:29   16  approached the wall; right?

16:19:34   17  A.   It's not only the angle.  I mean, there's a lot of

16:19:37   18  variables that relate to the momentum that's going to be

16:19:40   19  imparted in a wall.

16:19:42   20  Q.   So let's talk about all those variables you'd want to know

16:19:44   21  about.  You'd want to know about the angle; right?

16:19:47   22  A.   Yes.

16:19:48   23  Q.   You'd want to know about the speed; right?

16:19:50   24  A.   Yes.

16:19:50   25  Q.   You'd want to know about the wind force acting on the

16:19:54  1  barge; right?

16:19:55  2  **A.**   That's correct.

16:19:58  3  **Q.**   You'd want to know the barge's momentum when it comes into

16:20:01  4  contact with the wall; right?

16:20:03  5  **A.**   That's correct.

16:20:03  6  **Q.**   We don't know any of those things?

16:20:05  7  **A.**   That's correct.

16:20:17  8  **Q.**   Dr. Marino, this is a slide taken from slide 177 in your

16:20:20  9  PowerPoint and magnified.  It's also Plaintiff's Exhibit 397,

16:20:25  10  Marino report, figure 2.12.

16:20:27  11      You referred earlier to a construction detail in the

16:20:30  12  wall, and I've highlighted that.  Do you see, Dr. Marino, that

16:20:34  13  in the as-built drawings, in the area of the south breach,

16:20:37  14  there a curvature in the wall toward the south -- part of the

16:20:40  15  south breach?

16:20:41  16  **A.**   That's correct.

16:20:42  17      **MR. RAFFMAN:**  Let me have the next slide.  Slide 178

16:20:51  18  in Dr. Marino's dec.  Plaintiffs' Exhibit 397, Marino report

16:20:53  19  figure 2.13.

16:20:57  20  **BY MR. RAFFMAN:**

16:20:57  21  **Q.**   You can see, Dr. Marino, that in the area around the

16:21:00  22  northern boundary of the south breach, there's another

16:21:05  23  curvature in the wall in the design of the wall; right?

16:21:07  24  **A.**   That's correct.

16:21:08  25  **Q.**   Have you ever seen an overhead photo of the wall before

| | |
|---|---|
| 16:21:11 | 1 | the storm? |
| 16:21:12 | 2 | A.   Yes. |
| 16:21:13 | 3 | Q.   Have you ever compared that overhead photo to the limits |
| 16:21:16 | 4 | of the breach? |
| 16:21:17 | 5 | A.   I have eyeballed it.  I haven't superimposed it exactly. |
| 16:21:23 | 6 | Q.   Let me see GM-92.  Does that overhead photo look like an |
| 16:21:30 | 7 | overhead photo you've seen with the curvature in the wall? |
| 16:21:34 | 8 | A.   That's correct. |
| 16:21:34 | 9 |         MR. RAFFMAN:  93. |
| 16:21:35 | 10 | BY MR. RAFFMAN: |
| 16:21:39 | 11 | Q   Does that overhead photo on the top look like a photo of |
| 16:21:44 | 12 | the limits of the breach? |
| 16:21:47 | 13 | A.   Yes. |
| 16:21:47 | 14 | Q.   And would you agree with me, Dr. Marino, that the limits |
| 16:21:49 | 15 | of the breach correspond fairly closely to these two points of |
| 16:21:58 | 16 | curvature in the floodwall? |
| 16:21:59 | 17 | A.   Yes. |
| 16:22:01 | 18 | Q.   Dr. Marino, you haven't studied whether the curvature in |
| 16:22:08 | 19 | the wall creates a point of weakness that could affect the |
| 16:22:16 | 20 | location of the south breach, have you? |
| 16:22:19 | 21 | A.   A curvature of the wall -- the structural curvature of the |
| 16:22:23 | 22 | wall? |
| 16:22:23 | 23 | Q.   You haven't evaluated that feature at all in your |
| 16:22:25 | 24 | analysis, have you? |
| 16:22:26 | 25 | A.   In my -- in my feeling, that's just ridiculous to think |

| | | |
|---|---|---|
| 16:22:31 | 1 | that that curvature is going to cause an effect on the wall, |
| 16:22:35 | 2 | given the flexibility of the sheet piling. |
| 16:22:39 | 3 | **Q.**   You haven't done -- |
| 16:22:39 | 4 | **A**   No. |
| 16:22:40 | 5 | **Q**   -- any calculations or studies? |
| 16:22:42 | 6 | **A.**   No, sir. |
| 16:22:51 | 7 | **MR. WILSON:**  What exhibit number is this? |
| 16:22:53 | 8 | **MR. RAFFMAN:**  This is DX-205, Dr. Bakeer's report, |
| 16:22:59 | 9 | figure 74, at the bottom.  And at the top, it's Dr. Bakeer's |
| 16:23:04 | 10 | figure 46.  I'm sorry.  I probably should have noted that for |
| 16:23:07 | 11 | the record.  Thank you, counsel. |
| 16:23:21 | 12 | **MR. RAFFMAN:**  GM-049, please. |
| 16:23:23 | 13 | **BY MR. RAFFMAN:** |
| 16:23:28 | 14 | **Q**   Dr. Marino, I did have one question about this |
| 16:23:32 | 15 | illustration you drew.  This is your demonstrative of what |
| 16:23:39 | 16 | happens when the barge hits the wall at the south breach; |
| 16:23:42 | 17 | right? |
| 16:23:42 | 18 | **A.**   Yes. |
| 16:23:43 | 19 | **Q.**   And the way you've bottled it, you've got -- |
| 16:23:46 | 20 | **THE COURT:**  Wait.  Have you finished your answer, |
| 16:23:48 | 21 | sir? |
| 16:23:49 | 22 | **THE WITNESS:**  I haven't finished. |
| | 23 | **BY MR. RAFFMAN:** |
| 16:23:50 | 24 | **Q.**   I'm sorry.  I'm sorry.  I didn't mean to interrupt. |
| 16:23:52 | 25 | **A.**   That's fine.  It's no big deal.  I just wanted to qualify |

1381

16:23:59  1    that that -- this is the northern part.  That's all.

16:24:01  2    **Q.**   Northern -- the primary impact, the one that -- the

16:24:03  3    northern above?

16:24:04  4    **A.**   That's correct.

16:24:04  5            **THE COURT:**  This would have been the first impact?

16:24:06  6            **THE WITNESS:**  The first impact.

16:24:07  7    BY MR. RAFFMAN:

16:24:08  8    **Q.**   The way you've drawn it, the barge creates an angled shape

16:24:13  9    in the wall; isn't that right, Dr. Marino?

16:24:17  10   **A.**   Yes.

16:24:18  11   **Q.**   And that angled shape, if it were apparent in the sheet

16:24:24  12   pile, you would expect to see some evidence of an angular form

16:24:36  13   or an angled impact or a point-load impact when you look at the

16:24:39  14   apex of the bow after the storm, wouldn't you?

16:24:42  15   **A.**   Absolutely not.  I mean, this is -- this is the start of

16:24:46  16   the condition.  And afterwards this -- this floodwall is

16:24:49  17   stretching, and there's concrete that's being displaced to the

16:24:57  18   south with the floodwall.  And so if you look at that bow, you

16:25:01  19   can see that the sheet pile itself is stretched out.

16:25:09  20           So, you know, you don't see a corner like that

16:25:11  21   because this is the initiation of the failure.

16:25:14  22   **Q.**   So -- just so I understand your testimony, you've got a

16:25:17  23   barge that strikes a wall with sufficient force to knock that

16:25:23  24   wall and all the soil behind it back and to create a massive

16:25:30  25   in-rush of water, and yet you don't expect to see a scratch or

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1382

16:25:37    1   a dent --

16:25:37    2   A    No.

16:25:37    3   Q    -- or any other impact on the wall --

16:25:39    4   A    No.  No, that's not --

16:25:39    5   Q    -- that you can identify as a barge impact?

16:25:41    6   A.   No, that's not what I'm saying.  You asked me if I would

16:25:44    7   see this -- this dent, this corner, in the displaced shape that

16:25:54    8   existed on Jourdan Avenue, and I'm saying to you that, by the

16:25:57    9   time you get that -- by the time this failure completes, that

16:26:02   10   wall is completely stretched out.

16:26:05   11        In fact, there's a lot -- much of the concrete is

16:26:09   12   missing.  So you wouldn't see evidence of this dent in the

16:26:12   13   final shape of the floodwall as it existed at Jourdan Avenue.

16:26:18   14   Q.   No peak, no point, nothing?

16:26:21   15   A.   I wouldn't think so.

16:26:26   16   Q.   Now, this barge is --

16:26:32   17        MR. RAFFMAN:  Slide 214, please.

16:26:38   18   BY MR. RAFFMAN:

16:26:38   19   Q    All right.  This is slide 214 from the Marino dec.  That

16:26:45   20   hole that's right there, that deep scour hole, you've

16:26:48   21   identified in your testimony this morning?

16:26:50   22   A.   Here?

16:26:52   23   Q.   Yes.  With your laser pointer, that's it.

16:26:55   24        So the barge is hitting this wall.  As you described

16:27:01   25   it this morning, Dr. Marino, there's a very violent in-rush of

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

16:27:06  1    water, a violent event.  And the water moves into the

16:27:11  2    neighborhood with enough force to do some real damage there;

16:27:16  3    right?

16:27:17  4    A.   Yes.  What it does is you have a violent rush of water

16:27:21  5    that comes around the sheet pile, and then the sheet pile

16:27:24  6    starts becoming a bow shape.  And this bow continues out as

16:27:32  7    there's more wash-out that occurs.

16:27:36  8    Q    And the barge, during the time that this is all

16:27:37  9    happening -- this is going to happen at 6:30; right -- before

16:27:44  10   6:30?

16:27:45  11   A.   That's correct.

16:27:45  12   Q.   And the barge is in this area, somewhere in here, as the

16:27:49  13   water is rushing into the neighborhood; right?

16:27:50  14   A.   That's your supposition.  What I'm saying is that it could

16:27:53  15   very well be that it hits here, and it comes to this location

16:27:56  16   fairly rapidly.

16:27:59  17   Q.   And your testimony is that when this massive rush of water

16:28:05  18   sweeps into the neighborhood, wiping out houses, that the

16:28:10  19   barge --

16:28:11  20   A.   I'm sorry.  I'm sorry.  I think you're mischaracterizing

16:28:13  21   what I'm saying.  What I'm saying is -- okay.  You're just

16:28:20  22   using the wrong words, so go ahead.  I'm sorry.

16:28:23  23   Q.   I'll finish my question, and then if you --

16:28:29  24          MR. RAFFMAN:  I'm sorry, Your Honor.  The witness and

16:28:30  25   I just need to allow each other to finish.

16:28:33   1          THE COURT:  Oh, I understand.  Are you using --

16:28:39   2          MR. RAFFMAN:  I'm using words that I'm using, and he

16:28:42   3  doesn't want to agree with them, so I'll try to use different

16:28:45   4  words.

16:28:46   5          THE COURT:  Or you could use them and he can explain

16:28:48   6  why he disagrees.

16:28:49   7          MR. RAFFMAN:  Sure.

16:28:49   8  BY MR. RAFFMAN:

16:28:50   9  Q.  I mean, and my point is simple, Dr. Marino:  The barge is

16:28:52  10  around here.  You've got a very violent in-rush of water, and

16:28:55  11  yet your testimony is that somehow the barge manages to avoid

16:28:58  12  being swept into that neighborhood by that water.  That's your

16:29:02  13  testimony?

16:29:02  14  A.  The "violent rush of water" is the word that I disagree

16:29:06  15  with in terms of I don't want it to be equated to the violent

16:29:10  16  flooding that occurred once this wall collapsed.  When I talk

16:29:14  17  about severe or violent water, I'm talking -- flow of water,

16:29:19  18  I'm talking about associated with -- in perspective to the

16:29:24  19  dramatic effect that channel would have, and the flow around

16:29:28  20  that channel.

16:29:30  21          THE COURT:  At what point, looking at that diagram,

16:29:36  22  we have multicolors.  That's the incremental movement of the

16:29:40  23  sheet pile; correct?

16:29:41  24          THE WITNESS:  Exactly.  Exactly so.

16:29:42  25          THE COURT:  At what point would you say that the

16:29:45  1   failure was sufficient so that the water would rush in in a

16:29:53  2   rather rapid fashion?

16:29:54  3          THE WITNESS:  Your Honor, all the testimony has been

16:29:56  4   that we have this "boom"; right?  And we know the boom, this

16:30:02  5   would create a "boom."  I mean, there's no doubt the shattering

16:30:06  6   of this concrete would create a "boom."

16:30:09  7               And it's universal that, after the last "boom,"

16:30:11  8   this violent rush of water occurred.

16:30:13  9          THE COURT:  So sometime -- sometime in between -- I

16:30:17  10  guess I'm wondering at what level of the -- if you know.  If

16:30:21  11  you don't know, please tell me -- at what level of the lines

16:30:25  12  you've drawn there would approximately the failure be such that

16:30:28  13  the water's really rushing in as the sheet pile incrementally

16:30:31  14  moves back over a period of whatever minutes we're talking

16:30:35  15  about.

16:30:35  16         THE WITNESS:  From my understanding of the testimony

16:30:37  17  that's been given is that there's no real discussion of a lot

16:30:42  18  of water, of rushing of water, until afterwards.

16:30:47  19         THE COURT:  Okay.

16:30:48  20         THE WITNESS:  So, you know, during this time of

16:30:51  21  bowing, there is water obviously being disbursed into the Lower

16:30:57  22  Ninth Ward, but it's not what's caused all this displacement

16:31:01  23  and violent rushing of water of these homes.

16:31:05  24         THE COURT:  Go ahead.  Proceed.

          25

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| 16:31:06 | 1 | BY MR. RAFFMAN: |

16:31:06   1   BY MR. RAFFMAN:

16:31:14   2   Q.   The rush of water through that channel is a violent rush

16:31:17   3   of water.  It's digging out a channel; right?

16:31:22   4   A.   If we're using the same term, yes.  Same adjective for the

16:31:28   5   same reason.

16:31:29   6   Q.   And somehow the barge, wherever it is in this area of

16:31:32   7   several hundred feet, manages to avoid being entrained in

16:31:36   8   whatever current is created by that violent rush of water;

16:31:39   9   right?

16:31:40   10   A.   Obviously.

16:31:42   11   Q.   In your opinion?

16:31:43   12   A.   Yes.

16:31:43   13   Q.   Before I leave this subject, Dr. Marino, you haven't done

16:31:56   14   any calculations to determine whether an impact with the

16:31:59   15   concrete cap would cause the cap to shear off rather than

16:32:06   16   pulling the sheet pile wall from the soil; right?

16:32:13   17   A.   I don't think it's as simple as that.

16:32:17   18       THE COURT:  But you first might answer the question.

16:32:19   19   Have you done any calculations in that estimate?

16:32:23   20       THE WITNESS:  No.

16:32:24   21       THE COURT:  If you want to explain your answer, you

16:32:26   22   may.

16:32:26   23       THE WITNESS:  I don't think it's as simple as that.

16:32:30   24   Even if you -- I believe that the barge hit the lower portion

16:32:36   25   of the wall, either near the construction joint or below it,

1387

16:32:39  1   and so you would have a different set of forces that would be

16:32:43  2   imposed on the wall.  What would happen would be that you would

16:32:50  3   end up with more -- if we could show -- Mark, can you bring

16:32:56  4   back that first impact on the south?

16:32:59  5            MR. RAFFMAN:  I'll do whatever the judge tells me to

16:33:01  6   do.

16:33:01  7            THE COURT:  I'm not sure -- he just asked you if you

16:33:05  8   had done any calculations.  So I'll let your attorney ask you

16:33:09  9   something on redirect.

16:33:11  10           Go ahead, counsel.  I opened the door, but I'm

16:33:13  11  going to close it.

16:33:15  12           MR. RAFFMAN:  Thank you, Your Honor.  I do have a

16:33:16  13  clock.

16:33:16  14           THE COURT:  Right.

16:33:17  15  BY MR. RAFFMAN:

16:33:30  16  Q.   Dr. Marino, I'm showing you a photograph.  It's

16:33:34  17  Plaintiff's Exhibit 397, Marino report photograph 4.31.

16:33:39  18           Dr. Marino, the concrete damage you've observed in

16:33:41  19  this panel is not the consequence of a barge hitting the wall

16:33:45  20  and knocking the concrete off it; right?

16:33:50  21  A.   Well, it depends on what you mean by "consequences."

16:33:53  22  Like, if I believe that the wall -- that the impact was caused

16:33:58  23  by -- I'm sorry, if the -- if the failure was caused by the

16:34:04  24  barge, then this would be a consequence of that.

16:34:09  25  Q.   The water has stretched the panels and caused the concrete

1388

| | | |
|---|---|---|
| 16:34:18 | 1 | to crack off; correct? |
| 16:34:20 | 2 | A.   That's correct. |
| 16:34:20 | 3 | Q.   The barge has not scraped the concrete off by acting like |
| 16:34:23 | 4 | some sort of a plane as it's going down the wall; right? |
| 16:34:28 | 5 | A.   I don't believe so. |
| 16:34:37 | 6 | Q.   If, hypothetically, Mr. Pazos were to have opined at |
| 16:34:41 | 7 | page 43 of his report that the barge acted like a plane and |
| 16:34:46 | 8 | scraped the concrete off, that's not something you would agree |
| 16:34:49 | 9 | with; right? |
| 16:34:50 | 10 | A.   I don't know what the basis of -- you know, I haven't read |
| 16:34:53 | 11 | his report.  I don't know what the basis of him saying that is. |
| 16:34:57 | 12 | MR. RAFFMAN:  Okay.  Next slide, 063, please. |
| 16:35:00 | 13 | BY MR. RAFFMAN: |
| 16:35:04 | 14 | Q.   This photo is Plaintiff's Exhibit 397, Marino report photo |
| 16:35:08 | 15 | 4.35.  Dr. Marino, based on this photo and every other photo |
| 16:35:14 | 16 | you've seen in this case, am I correct that the sheet pile at |
| 16:35:21 | 17 | the south breach is and remains a continuous length of sheet |
| 16:35:28 | 18 | pile? |
| 16:35:29 | 19 | A.   Yes. |
| 16:35:29 | 20 | Q.   The sheet pile did not snap like a rubber band at any |
| 16:35:35 | 21 | location at the south breach, did it? |
| 16:35:37 | 22 | A.   That's correct. |
| 16:35:38 | 23 | Q.   And so if another witness were to have opined that "If I |
| 16:35:43 | 24 | take a rubber band and stretch it a little bit and then cut it |
| 16:35:46 | 25 | with a scissors" as an analogy to the south breach, that |

1389

16:35:51   1   analogy would not, in your opinion, be an appropriate analogy;

16:35:56   2   right?

16:35:56   3   A.   I wouldn't -- I mean, I haven't seen the evidence of the

16:36:00   4   sheet pile being disconnected.

16:36:03   5          MR. RAFFMAN:   And for the Court's -- for the record,

16:36:05   6   I'm referring to page 828 of the transcript in which Mr. Pazos

16:36:11   7   opined that:  "This is obvious that this happened in the case

16:36:14   8   of both breaches."

16:36:15   9          Slide 217, please.

16:36:28  10   BY MR. RAFFMAN:

16:36:29  11   Q.   All right.  Now, this is your sequence of events at the

16:36:35  12   south breach; right?  Marino slide 217.

16:36:38  13   A.   That's correct.

16:36:40  14   Q.   And here you have the barge lined up square with the

16:36:45  15   floodwall in the second impact, and that wall is now upright;

16:36:54  16   correct?

16:36:54  17   A.   That's at the time -- as you can see, for both the first

16:36:57  18   and second, that would be the condition just at the time of

16:37:01  19   impact.

16:37:02  20   Q.   And now what's happened at the third is that the wall has

16:37:08  21   now translated into the neighborhood; right?

16:37:12  22   A.   It's been displaced eastward.

16:37:15  23   Q.   It's been displaced.  And it's been displaced because it's

16:37:19  24   been knocked over and now it's lying down; right?

16:37:23  25   A.   No.

| | | |
|---|---|---|
| 16:37:24 | 1 | **Q.**   How does this wall become that -- how does this wall in |
| 16:37:29 | 2 | the second image become that wall in the third image without |
| 16:37:32 | 3 | being displaced and falling over? |
| 16:37:36 | 4 | **A.**   As I showed in my animation, the broadside collision |
| 16:37:42 | 5 | causes a gap to form, and it's just like the northern breach |
| 16:37:48 | 6 | where the wall did not collapse because of the erosion that |
| 16:37:54 | 7 | occurred under the tip.  It displaced southward without |
| 16:38:06 | 8 | collapsing. |
| 16:38:06 | 9 | **Q.**   This wall here has displaced to the east -- |
| 16:38:17 | 10 | **A.**   That's correct. |
| 16:38:17 | 11 | **Q.**   -- by whatever amount is the bottom of the triangle, whose |
| 16:38:23 | 12 | hypotenuse is that angle of that wall and whose long angle is |
| 16:38:27 | 13 | this dotted line; isn't that right? |
| 16:38:29 | 14 | **A.**   That's correct. |
| 16:38:31 | 15 | **Q.**   And in so displacing, necessarily, the top of that wall is |
| 16:38:36 | 16 | going to have to be a reduced elevation, probably below the |
| 16:38:41 | 17 | level of the barge; wouldn't you imagine, Dr. Marino? |
| 16:38:43 | 18 | **A.**   I would say that by the time that the barge got to the |
| 16:38:46 | 19 | south end, that's -- that's exactly what happened. |
| 16:38:50 | 20 | In fact, you can see that in one of the slides that |
| 16:38:53 | 21 | we talked about this morning, where the barge was riding on top |
| 16:38:57 | 22 | of the wall, that scrape that we were -- that photograph that |
| 16:39:01 | 23 | showed the scrape on the top of the wall.  Of course, when the |
| 16:39:05 | 24 | barge gets -- when the wall gets displaced that much, the barge |
| 16:39:11 | 25 | is going to be riding on top of that wall as it's going in this |

| 16:39:15 | 1 | direction. |
| 16:39:16 | 2 | **Q.**   I guess what I'm suggesting, Dr. Marino, is that you've |
| 16:39:18 | 3 | got the barge traveling -- you've got the wall translating |
| 16:39:22 | 4 | inward to the east, and you've got the barge moving to the |
| 16:39:24 | 5 | south as if it's being pushed by a tug.  Isn't that what your |
| 16:39:30 | 6 | diagram depicts? |
| 16:39:31 | 7 | **A.**   Say that again? |
| 16:39:32 | 8 | **Q.**   Well, you've got your wall moving from west to east, |
| 16:39:35 | 9 | presumably under the force of whatever momentum is being |
| 16:39:38 | 10 | imparted; and yet your barge, rather than moving into the east |
| 16:39:42 | 11 | over this wall, your barge continues to the south on its |
| 16:39:50 | 12 | long-wise axis, as if something is pushing it in a tow, so that |
| 16:39:57 | 13 | it could come into contact with the rebar at that location. |
| 16:40:00 | 14 |         Isn't that what your -- |
| 16:40:05 | 15 | **A.**   There is a driving force of wind or wave that caused the |
| 16:40:08 | 16 | barge to go southward.  It wasn't a tug boat. |
| 16:40:15 | 17 | **Q.**   Well, whatever that driving force is, wind and waves, the |
| 16:40:18 | 18 | barge is being pushed by that as if it's a tugboat, because |
| 16:40:23 | 19 | it's not traveling broadside of the wind in your example; it's |
| 16:40:29 | 20 | traveling as if the wind and the waves are pushing on its back. |
| 16:40:32 | 21 | Or its "stern" I guess is what we call it in the maritime |
| 16:40:35 | 22 | field. |
| 16:40:36 | 23 | **A.**   At the initial impact, that's correct.  And if you look at |
| 16:40:39 | 24 | my illustration, I show it to be sweeping as it's going up the |
| 16:40:43 | 25 | construction joint. |

16:40:44   1   Q.   All right.  Dr. Marino, one last question about the entry

16:40:51   2   of the barge into the neighborhood -- maybe two.  You

16:41:03   3   testified --

16:41:04   4            MR. RAFFMAN:  Let me have the picture of the photo

16:41:07   5   4.38.  May I have that, please?

16:41:31   6                 Sorry for the delay.

16:41:31   7   BY MR. RAFFMAN:

16:41:32   8   Q.   All right.  This is photo 4.38, slide 236, in your dec.

16:41:36   9   You recognize that one; right, Dr. Marino?

16:41:39   10   A.   Yes, I do.

16:41:40   11   Q.   So what you testified to earlier this morning is that that

16:41:42   12   barge, as it's riding on top of this bent rebar panel, it's

16:41:47   13   going to have to be having a lot of force -- a lot of force --

16:41:51   14   to do that; right?

16:41:52   15   A.   Sufficient force to cause those panels to shear off.

16:41:56   16   Q.   And that's a significant force, as you testified this

16:41:59   17   morning; right?

16:42:00   18   A.   Significant enough to cause that, that's correct.

16:42:02   19   Q.   Okay.  And in your scenario, what's happening is that the

16:42:08   20   barge, having impacted the wall once and stopped, and swung

16:42:16   21   around and stopped, now it's going to have, you know, 100 to

16:42:22   22   200 feet to pick up a head of steam; isn't that right?

16:42:26   23   A.   That's correct.

16:42:28   24   Q.   And you haven't done any calculations to figure out

16:42:30   25   whether the barge could pick up enough head of steam in 100 to

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1393

| | | |
|---|---|---|
| 16:42:35 | 1 | 200 feet to do the kind of significant damage to the rebar that |
| 16:42:38 | 2 | your opinion says it did, have you? |
| 16:42:40 | 3 | **A.**   If you're trying to say that barge didn't cause that, |
| 16:42:45 | 4 | that's just -- to me, that doesn't need a calculation. |
| 16:42:48 | 5 |             **THE COURT:**  I hope -- I'm sure a briefing would |
| 16:42:52 | 6 | explain -- will explain -- I think we're talking about position |
| 16:42:57 | 7 | No. 2 rather than the actual damage caused by No. 3. |
| 16:43:00 | 8 |             **MR. RAFFMAN:**  What I'm trying to do, Your Honor, is, |
| 16:43:02 | 9 | because the witness has asked me what I'm trying to do, I'm |
| 16:43:05 | 10 | trying to explain this damage, and I'm trying to test whose |
| 16:43:10 | 11 | scenario is better.  All right?  The scenario of Dr. Marino, as |
| 16:43:14 | 12 | he's testified -- I want to make sure that I understand it -- |
| 16:43:17 | 13 | is that the barge picks up enough of a head of steam in a very |
| 16:43:21 | 14 | short distance to create this significant damage. |
| 16:43:23 | 15 |             **THE COURT:**  Did you understand my point that you are |
| 16:43:28 | 16 | concerned about position Nos. 1 and 2 than No. 3? |
| 16:43:32 | 17 |             **MR. RAFFMAN:**  Well -- |
| 16:43:34 | 18 |             **THE COURT:**  Maybe I'm being opaque.  Are you saying |
| 16:43:36 | 19 | the barge didn't cause those rebars to go down -- |
| 16:43:38 | 20 |             **MR. RAFFMAN:**  Your Honor, I'm not saying that at all. |
| 16:43:40 | 21 |             **THE COURT:**  Well, that's what I'm trying to point out |
| 16:43:42 | 22 | to you.  That was out -- I was trying to point out to you to |
| 16:43:42 | 23 | get you to agree with me about.  That's all I was saying. |
| 16:43:46 | 24 |             **THE WITNESS:**  I'm not listening to Your Honor enough. |
| 16:43:48 | 25 | Yes, yes, our experts all opined about what's happened at the |

16:43:53   1   southern end of the south breach.

16:43:56   2            THE COURT:  I didn't mean -- right.  That's all -- so

16:43:56   3   we're talking about what happened before those rebars -- and

16:43:58   4   the scenario makes more sense.

16:44:01   5            MR. RAFFMAN:  What came first, what makes more sense.

16:44:03   6            THE COURT:  I got you.

           7   BY MR. RAFFMAN:

16:44:06   8   Q.   Dr. Marino, your scenario is that the barge, from more or

16:44:09   9   less a resting position, in 100 to 200 feet, picks up enough of

16:44:14  10   a head of steam to cause that damage with whatever force it

16:44:18  11   required.  That's your scenario; right?

16:44:21  12   A.   Yes.  Because of the damage and the scrapes that indicate

16:44:23  13   that the barge is going in a southerly direction.

16:44:27  14   Q.   Now, another scenario might be that the wall is already

16:44:33  15   down; that these panels are leaning; and that the barge --

16:44:38  16   after the break -- after the breach has happened, the barge

16:44:43  17   breaks from its moorings and is blown by a wind from the

16:44:48  18   northwest to the southeast, after the eye of the storm has

16:44:52  19   passed by New Orleans and after the hurricane winds have come

16:44:54  20   around to the point where they're blowing from the northwest to

16:45:00  21   the southeast and imparting their force broadside to this

16:45:04  22   barge, and it's traveling across the canal, and it picks up

16:45:07  23   enough of a head of steam so that it comes into contact with a

16:45:11  24   single panel at the far southern end of the south breach with

16:45:15  25   enough force to do that damage.

16:45:19  1          That's another scenario that could cause those rebars

16:45:23  2   to bend if that happened, isn't it, Dr. Marino?

16:45:27  3   A.   I don't think that scenario is possible.  Because you have

16:45:30  4   floodwall sitting here with scrapes on the top of the wall.

16:45:35  5   You can't tell me that wall is flat like that and the barge is

16:45:39  6   floating over.  How does that scratch get on the top of the

16:45:42  7   wall?

16:45:43  8   Q.   Let's suppose, Dr. Marino, that before the barge flattens

16:45:46  9   the rebar, that the barge scrapes the very top of that wall,

16:45:50  10  because that wall is already tilted so that the top of that

16:45:54  11  wall is lower -- lower -- than the panel next to it, so that

16:46:03  12  the barge scrapes the top of that panel, and it continues to

16:46:07  13  the south, and then it comes into contact with the rebar.

16:46:10  14         Would the barge then be able to have enough force to

16:46:14  15  bend the rebar?

16:46:15  16  A.   So what you're saying is that the wall is tilted already

16:46:19  17  in somewhat of a, you know, slanted position?

16:46:23  18  Q.   Hypothetically, Dr. Marino, I'm asking you to assume

16:46:25  19  that's true, and I'm asking you whether, in that scenario, the

16:46:30  20  barge could impart enough force to bend the rebar.

16:46:34  21  A.   Okay.  So if I understand you, you're talking about a wall

16:46:37  22  that's slanted like this, and the barge comes in and scrapes on

16:46:41  23  top of this wall, this wall collapses and then shears off the

16:46:45  24  end; is that correct?

16:46:47  25  Q.   That first panel; right -- this is my hypothetical.  I'm

1396

16:46:49  1   just asking you a question.

16:46:51  2           THE COURT:  He's just trying to understand it.

16:46:53  3           MR. RAFFMAN:  Yes, that's fine.

         4   BY MR. RAFFMAN:

16:46:55  5   Q.   In the hypothetical, the wall is tilted.  It's a little --

16:46:57  6   at the top is lower than this one.

16:47:01  7           THE COURT:  It's tilted towards the protected side?

16:47:02  8   BY MR. RAFFMAN:

16:47:03  9   Q.   It's tilted toward the protected side, and it's angled

16:47:06  10  down.

16:47:06  11          THE COURT:  Angled down.

16:47:06  12  BY MR. RAFFMAN:

16:47:06  13  Q    So that the top is lower than this panel here.  And so

16:47:10  14  when the barge comes into contact with that panel, it just

16:47:14  15  shaves off a little bit, leaving a couple of rebars poking out.

16:47:22  16  But because this panel is higher, the barge comes into contact

16:47:26  17  with that panel, and because part of the barge is already in

16:47:29  18  the neighborhood, that part of the barge doesn't get scrapes,

16:47:35  19  and the part of the barge that gets scrapes is the part of the

16:47:40  20  barge that actually comes into contact with the rebar.

16:47:42  21          So that's my hypothesis.  What I'm asking you,

16:47:47  22  Dr. Marino, is, if that happened, wouldn't that be another way

16:47:50  23  that the barge could take the rebar and bend it?

16:47:54  24  A.   If you want to say that.  I don't agree with that.  I

16:47:57  25  mean, there's clear evidence that that impact at the end was

1397

| | |
|---|---|
| 16:48:05 | 1 | heard and then there was violent water. |
| 16:48:08 | 2 | If you want to say that the -- you know, if you want |
| 16:48:11 | 3 | to say that the wall is leaning like some of these other walls |
| 16:48:14 | 4 | that we saw, these floodwalls, there's still protection, and |
| 16:48:19 | 5 | maybe you don't have complete protection; the wall is now |
| 16:48:21 | 6 | displaced and its lower. |
| 16:48:24 | 7 | But once you collapse that wall from that barge |
| 16:48:27 | 8 | impact, you have no protection, and you have eroded a part of |
| 16:48:32 | 9 | that levee and caused -- and caused this violent rush of water |
| 16:48:39 | 10 | into the neighborhood. |
| 16:48:43 | 11 | THE COURT: Let me make sure I understand.  Let me |
| 16:48:46 | 12 | make sure I understand this. |
| 16:48:50 | 13 | Are you saying without -- and I may be -- I just |
| 16:48:54 | 14 | want to make sure.  Are you saying, without the third hit, you |
| 16:48:58 | 15 | would not have a violent rush of water into the neighborhood? |
| 16:49:02 | 16 | MR. RAFFMAN: No. |
| 16:49:03 | 17 | THE COURT: No, I'm asking the witness. |
| 16:49:04 | 18 | THE WITNESS: I think that, eventually, those two |
| 16:49:06 | 19 | hits would have caused the floodwall to extend out, and I'm not |
| 16:49:15 | 20 | sure whether or not it would have collapsed or not. |
| 16:49:20 | 21 | But what I'm saying is that, for sure, given the |
| 16:49:24 | 22 | scenario I was just given, that if that wall is leaning, and -- |
| 16:49:32 | 23 | if it's leaning, that it would not have come out of the ground. |
| 16:49:36 | 24 | Because none of the other floodwalls came out of the ground. |
| 16:49:41 | 25 | And I believe that that wouldn't have occurred in this location |

1398

16:49:47  1   unless the barge hit the wall.

00:59:57  2   BY MR. RAFFMAN:

16:49:53  3   Q.   All right.  I'm going to move on.

16:49:56  4          THE COURT:  Before you move on, counsel, I'm going to

16:49:58  5   ask just a couple of questions.  It may relate to what you're

16:50:01  6   talking about; it may not.  I won't be long.

16:50:03  7          MR. RAFFMAN:  Your Honor, always.

16:50:05  8          THE COURT:  As concisely as you can, and just to

16:50:08  9   summarize it so I can benchmark this before counsel

16:50:12  10  cross-examines you on it, if he does, describe to me as

16:50:17  11  concisely as you can the different mechanisms of failure, why

16:50:25  12  you think the mechanisms of failure at the London Avenue and

16:50:29  13  17th Avenue floodwalls are different than the mechanism of

16:50:36  14  failure that occurred here.

16:50:38  15          And you don't have to give every explanation.

16:50:42  16  Just highlight to me the primary differences.  Based on the

16:50:49  17  photographic evidence you've observed since we know you didn't

16:50:52  18  actually go to the 17 Street Canal location or the London

16:50:54  19  Avenue Canal.  Is that fair?

16:50:58  20          THE WITNESS:  Yes.

16:50:58  21          THE COURT:  What would that be, sir?

16:51:01  22          THE WITNESS:  I think I have summarized it in one of

16:51:03  23  my PowerPoint slides, but number one, none of those -- those

16:51:10  24  failures or any of the other failures has the wall coming out

16:51:14  25  of the ground, okay, and been exhumed from the ground.

1399

16:51:22   1              I believe that what caused it to come out of the

16:51:25   2    ground was that there was severe eroding of the back side

16:51:30   3    caused by this channel that's created from the impact of the

16:51:37   4    barge into the wall.  That would be the main -- the main

16:51:49   5    differences that I see.

16:51:50   6              THE COURT:  Because, in your examination of the

16:51:53   7    photographs of the 17th Street and London Avenue failures,

16:51:58   8    there was no exhumation of the sheet pile?

16:52:02   9              THE WITNESS:  Not even close.

16:52:04   10             THE COURT:  Okay.

16:52:04   11             THE WITNESS:  Not even close.

16:52:05   12             THE COURT:  That is -- I know there are others, but

16:52:06   13   that's the central focal difference.

16:52:10   14             THE WITNESS:  That's the central focal --

16:52:10   15             THE COURT:  Is that correct?

16:52:12   16             THE WITNESS:  Yes.

16:52:12   17             THE COURT:  Okay.  Counsel.

16:52:12   18   BY MR. RAFFMAN:

16:52:13   19   Q.   Let me just ask a couple of other questions about the

16:52:17   20   other floodwall failures to follow on Your Honor's questions.

16:52:21   21             Dr. Marino, you've done no stability analysis about

16:52:23   22   why those other floodwalls failed; correct?

16:52:25   23   A    That's correct.

16:52:25   24   Q.   You've never done any seepage analysis to determine why

16:52:28   25   those other floodwalls failed; right?

1400

| | | |
|---|---|---|
| 16:52:30 | 1 | **A.**   That's correct. |
| 16:52:30 | 2 | **Q.**   Any conclusion you've done about those floodwall failures |
| 16:52:33 | 3 | is purely the result of inspecting photos? |
| 16:52:37 | 4 | **A.**   Well, it's clearly, and I don't have to do a stability |
| 16:52:40 | 5 | analysis to see that the sheet pile didn't come out of the |
| 16:52:42 | 6 | ground. |
| 16:52:43 | 7 | **Q.**   So you haven't studied whether similar mechanisms at those |
| 16:52:47 | 8 | other failures can produce results that look different because |
| 16:52:52 | 9 | they operate in a different physical environment, have you? |
| 16:53:00 | 10 | **A.**   That's kind of a complex question. |
| 16:53:03 | 11 | **Q.**   Have you read the deposition of Dr. Mosher? |
| 16:53:09 | 12 | **A.**   I may have read a few pages of it. |
| 16:53:15 | 13 | **Q.**   Did you read what Dr. Mosher had to say about comparison |
| 16:53:21 | 14 | between the Inner Harbor Navigation Canal failures and the |
| 16:53:29 | 15 | failure at the Citrus back levee? |
| 16:53:32 | 16 | **A.**   No. |
| 16:53:33 | 17 | **Q.**   Did you read that? |
| 16:53:35 | 18 | **A.**   No. |
| 16:53:35 | 19 |     **MR. RAFFMAN:**  Well, then I'm going to -- it's page 76 |
| 16:53:37 | 20 | of Dr. Mosher's deposition.  I won't question the witness about |
| 16:53:42 | 21 | it. |
| 16:53:42 | 22 |     **THE COURT:**  And that's in evidence, so -- I mean, it |
| 16:53:44 | 23 | will be in evidence, at least. |
| 16:53:45 | 24 |     **MR. RAFFMAN:**  Yes, yes. |
| 16:53:46 | 25 |     **THE COURT:**  I don't know if you made your |

| | | |
|---|---|---|
| 16:53:47 | 1 | introduction of that, but it will be in evidence. |
| 16:53:49 | 2 |     MR. RAFFMAN:  Your Honor, it's one of our exhibits. |
| 16:53:51 | 3 |     THE COURT:  Right.  I've read it, summarized it, so |
| 16:53:53 | 4 | it's fair.  You want to ask him about it?  You wanted to ask |
| 16:53:57 | 5 | him about something in Dr. Mosher's deposition? |
| 16:54:00 | 6 |     MR. RAFFMAN:  No, no, no.  He hasn't read it.  I'm |
| 16:54:03 | 7 | content to let Your Honor read it and infer what Your Honor |
| 16:54:06 | 8 | wants. |
| 16:54:08 | 9 |     THE COURT:  All right. |
| | 10 | BY MR. RAFFMAN: |
| 16:54:09 | 11 | Q.   I do want to ask some questions about overtopping.  Your |
| 16:54:13 | 12 | opinion today is that the wall top along the east side of the |
| 16:54:20 | 13 | navigational canal is 12.9 feet NAVD88; right? |
| 16:54:25 | 14 | A.   That's based on the survey data that we have. |
| 16:54:28 | 15 | Q.   Yes.  And when I took your deposition, it was 12.5 because |
| 16:54:31 | 16 | you didn't have the survey data; right? |
| 16:54:34 | 17 | A    That's correct. |
| 16:54:35 | 18 | Q.   So now we'll give you another few inches because you've |
| 16:54:39 | 19 | taken a survey that the defendant's experts have looked at and |
| 16:54:43 | 20 | said, "Well, I like that.  It's reliable.  I'm going to take |
| 16:54:47 | 21 | it." |
| 16:54:49 | 22 | A    That's correct. |
| 16:54:49 | 23 | Q.   But you're also aware -- |
| 16:54:51 | 24 |     MR. RAFFMAN:  GM-66, please. |
| 16:54:52 | 25 | BY MR. RAFFMAN: |

1402

16:54:53   1   Q     You're also aware, Dr. Marino, that IPET did a survey, and
16:54:59   2   they reported that floodwall-top heights along the canal had
16:55:06   3   some significant differences; right?
16:55:10   4   A.    I remember seeing this.  When you brought it up in my
16:55:16   5   deposition, I did not recognize it.  But afterwards when I
16:55:23   6   looked it, I realize I didn't use it because it didn't extend
16:55:27   7   far enough down towards the south breach.
16:55:30   8   Q.    For the record, we're looking at Defendant's Exhibit 145,
16:55:32   9   IPET report Volume IV, Appendix Page IV-9-8.
16:55:38  10           What we see here, Dr. Marino, is wall top heights in
16:55:41  11   the northern portion of the east part of the Industrial Canal
16:55:47  12   that are reported to be including 11.29, 10.1, 10.9.
16:55:54  13           You see that; right, Dr. Marino?
16:55:56  14   A.    I can see those numbers.
16:55:58  15   Q.    Yes.  And if the IPET wall top heights are correct, then
16:56:06  16   you could have the opportunity for earlier overtopping of the
16:56:09  17   floodwall there; right?
16:56:11  18           MR. WILSON:  Objection, Your Honor.  I don't see that
16:56:13  19   this is the north breach or Florida bridge.  I can't tell what
16:56:16  20   this is.
23:59:57  21   BY MR. RAFFMAN:
16:56:17  22   Q.    Dr. Marino, do you recognize --
16:56:19  23           THE COURT:  All right.  If you can clarify it,
16:56:20  24   counsel, please.
          25

| | | |
|---|---|---|
| 23:59:57 | 1 | **BY MR. RAFFMAN:** |
| 16:56:21 | 2 | **Q.** Well, it's Figure 9-5, Floodwall Elevations at the IHNC. |
| 16:56:28 | 3 | Do you see that at the bottom of the page, Dr. Marino? |
| 16:56:31 | 4 | **A.** Yes. |
| 16:56:31 | 5 | **Q.** Is there any other place in the IHNC where there's a |
| 16:56:35 | 6 | bridge and then there's a slip with what appears to be a cement |
| 16:56:40 | 7 | terminal over at the side there?  That's the area of the |
| 16:56:42 | 8 | Florida Avenue bridge, isn't it? |
| 16:56:45 | 9 | **A.** Can you point to that again? |
| 16:56:47 | 10 | **Q.** Florida Avenue bridge.  The area of the north breach.  The |
| 16:56:52 | 11 | Lafarge terminal slip over here.  Do you recognize that? |
| 16:57:00 | 12 | **A.** That's correct. |
| 16:57:01 | 13 | **Q** Thank you.  So I'll ask again:  If the wall top heights in |
| 16:57:05 | 14 | IPET are correct, then you have some lower wall top heights; |
| 16:57:09 | 15 | correct? |
| 16:57:11 | 16 | **A.** That's correct.  But when I looked at the other -- I |
| 16:57:13 | 17 | looked at what IPET assumed for their stability analysis, and |
| 16:57:16 | 18 | that's what I used at the time. |
| 16:57:18 | 19 | **Q.** All right. |
| 16:57:18 | 20 | **A.** I thought that was representative of those areas. |
| 16:57:21 | 21 | And then when I looked at the additional information |
| 16:57:28 | 22 | prepared by the defendant consultant, I -- I saw that the |
| 16:57:38 | 23 | survey -- well, one survey is wrong.  Either this one's wrong |
| 16:57:42 | 24 | or the other one's wrong, because they're not matching. |
| 16:57:45 | 25 | **Q.** And you don't know which one's wrong because you haven't |

| | | |
|---|---|---|
| 16:57:47 | 1 | done it independently, have you? |
| 16:57:49 | 2 | **A.**   Well, I wouldn't think your own consultant would put in |
| 16:57:53 | 3 | wrong survey data. |
| 16:57:57 | 4 | **Q.**   So you are prepared to rely on my consultants and my |
| 16:58:00 | 5 | experts when they give you opinions that support your |
| 16:58:02 | 6 | conclusions, but when my consultant does something that you |
| 16:58:06 | 7 | don't -- doesn't agree with -- |
| 16:58:09 | 8 | **MR. WILSON:**  Objection, Your Honor. |
| 16:58:11 | 9 | **THE COURT:**  I understand.  Counsel, it's |
| 16:58:13 | 10 | argumentative. |
| 16:58:14 | 11 | **MR. RAFFMAN:**  Well, I'll move along. |
| 16:58:15 | 12 | **THE COURT:**  He doesn't have to disagree with |
| 16:58:16 | 13 | everything. |
| 16:58:20 | 14 | **MR. RAFFMAN:**  I'll move along. |
| 16:58:22 | 15 | **THE COURT:**  Okay.  Thank you. |
| 16:58:22 | 16 | **MR. RAFFMAN:**  Let me have GM-067, please. |
| 16:58:26 | 17 | **BY MR. RAFFMAN:** |
| 16:58:28 | 18 | **Q**   Team Louisiana wrote -- DX-144, Team Louisiana report, |
| 16:58:32 | 19 | page 126:  "Given the variation in crown elevations that IPET |
| 16:58:38 | 20 | documented farther north" -- |
| 16:58:40 | 21 | **MR. WILSON:**  Your Honor, the slide he just had up, |
| 16:58:43 | 22 | I'm sorry, the one I was objecting, it says "Entrance to Lake |
| 16:58:47 | 23 | Pontchartrain" underneath it.  If we went back with the heights |
| 16:58:51 | 24 | of the wall, the varying heights of the wall, it says "Entrance |
| 16:58:54 | 25 | to Lake Pontchartrain" underneath it.  DX-145, IPET Volume IV. |

16:59:01  1          THE COURT:  Well, I'm not sure what we're objecting
16:59:05  2   to right now.
16:59:06  3          MR. WILSON:  Just previously he had up DX-145, IPET
16:59:11  4   Volume IV.  It had varying heights of the wall, and it had it
16:59:15  5   less than 12 feet.  It has -- underneath it, it's entitled
16:59:17  6   "Entrance to Lake Pontchartrain."
16:59:19  7          THE COURT:  I understand, but I think he pointed out
16:59:21  8   the topographical features that seems to be in the area of the
16:59:25  9   relevant area.  If I'm wrong about that, you know, we can look
16:59:31  10  at it again.  There it is.  Okay.
16:59:48  11          MR. RAFFMAN:  I see "Floodwall Elevations in the
16:59:50  12  IHNC."  We both looked at this, all three of us, and --
16:59:54  13          MR. WILSON:  Your Honor, my version says right after
16:59:56  14  that "To Lake Pontchartrain."  Those words are missing from
16:59:59  15  that photograph.
17:00:00  16          THE COURT:  Okay.  Wherever it's to, if it's to
17:00:05  17  Hoboken, I'm just interested if that shows elevations in the
17:00:10  18  relevant area, and if the witness can recognize that as the
17:00:17  19  area of the north breach and/or the south breach.  That's all
17:00:20  20  I'm interested in.
17:00:22  21          And I'm interested in it does come from the IPET
17:00:27  22  study.
17:00:28  23          THE WITNESS:  If I may point out, Your Honor.  Some
17:00:30  24  of these elevations may be from the deflected sheet pile to the
17:00:37  25  east.  If you look, you can see that they increased from the

| | | |
|---|---|---|
| 17:00:42 | 1 | south end of the -- of the north breach, 10.1, 11.29. |
| 17:00:50 | 2 | There's -- then there's a 10.35, and they're up to 12.06 and 12 |
| 17:00:58 | 3 | point -- |
| 17:01:01 | 4 | **THE COURT:**  Can you show me where you are, sir, |
| 17:01:03 | 5 | because if you point it out to me -- |
| 17:01:05 | 6 | **MR. WILSON:**  You know what, Judge?  I withdraw it.  I |
| 17:01:07 | 7 | withdraw it. |
| 17:01:07 | 8 | **THE COURT:**  Okay.  Thank you, sir. |
| 17:01:09 | 9 | **THE WITNESS:**  In this area. |
| 17:01:11 | 10 | **THE COURT:**  Yes, I see that. |
| | 11 | BY MR. RAFFMAN: |
| 17:01:16 | 12 | **Q.**  So Team Louisiana wrote:  "Given the variation in |
| 17:01:21 | 13 | floodwall crown elevations that IPET documented farther north, |
| 17:01:24 | 14 | it's possible that the floodwall crest elevation at the point |
| 17:01:27 | 15 | where overtopping initiated the south breach into the Lower |
| 17:01:32 | 16 | Ninth Ward could have been a foot lower than the 12.5 feet |
| 17:01:37 | 17 | found in surviving adjacent segments." |
| 17:01:42 | 18 | Isn't that right, that's what Team Louisiana wrote? |
| 17:01:45 | 19 | **A.**  That's correct. |
| 17:01:46 | 20 | **Q.**  And in our consultant's report -- let me see if I can find |
| 17:01:54 | 21 | that.  I want to show it now.  So I want to put up our |
| 17:02:10 | 22 | consultant's report.  I need a couple of seconds to get it. |
| 17:02:22 | 23 | **THE COURT:**  All right.  Go ahead. |
| 17:02:23 | 24 | **MR. RAFFMAN:**  I'm sorry to interrupt the flow here. |
| 17:02:23 | 25 | I can't find it.  So let me just ask the question when the |

1407

| | | |
|---|---|---|
| 17:02:26 | 1 | judge is ready. |
| 17:02:30 | 2 | **(OFF THE RECORD)** |
| 17:03:02 | 3 | **THE WITNESS:**  Are you ready, Judge? |
| 17:03:03 | 4 | **THE COURT:**  Yes. |
| 17:03:04 | 5 | **MR. RAFFMAN:**  You know what they say:  If you can't |
| 17:03:06 | 6 | get it in 15 seconds, you're out of luck."  So we're going |
| 17:03:09 | 7 | to -- your Honor will understand my question. |
| 17:03:10 | 8 | **BY MR. RAFFMAN:** |
| 17:03:12 | 9 | **Q.**   In our consultant's wall top surveys that you relied on, |
| 17:03:17 | 10 | Dr. Marino, he hasn't got a wall top height anywhere in the |
| 17:03:20 | 11 | 800-foot south breach, does he? |
| 17:03:22 | 12 | **A.**   No one does. |
| 17:03:23 | 13 | **Q.**   Nobody does? |
| 17:03:24 | 14 | **A.**   That's correct. |
| 17:03:25 | 15 | **Q.**   And so according to Team Louisiana, your wall top in the |
| 17:03:30 | 16 | middle of the breach would be a foot lower; right? |
| 17:03:36 | 17 | **A.**   I don't know how you can measure -- consider crown |
| 17:03:42 | 18 | elevations to be equivalent to the settlement of the floodwall |
| 17:03:48 | 19 | itself.  They're not necessarily connected. |
| 17:03:50 | 20 | **Q.**   Well, that's what Team Louisiana concluded; right? |
| 17:03:53 | 21 | **A.**   That's -- that's what they're saying, yes. |
| 17:03:56 | 22 | **Q.**   You haven't studied it? |
| 17:03:58 | 23 | **A.**   Yeah.  And they're saying that the floodwall on the |
| 17:04:00 | 24 | adjacent side is 12.5, where it's almost closer to 13 based on |
| 17:04:06 | 25 | your own defendants. |

1408

17:04:07  1    Q.   And whatever you choose for your elevation, in the breach

17:04:10  2    segment, IPET's telling the public that the top would be a foot

17:04:18  3    lower; right?

17:04:19  4    A    Okay.  Well, let's assume --

17:04:19  5         THE COURT:  Okay.  Team Louisiana.

17:04:21  6    BY MR. RAFFMAN:

17:04:22  7    Q    Team Louisiana.  I'm sorry if I missed that.

17:04:30  8    A    Let's assume that it's a foot below the 12.9 that's

17:04:32  9    surveyed.  So we're talking about 11.9.  That still doesn't --

17:04:35  10   that gets you almost to the top of the wall.  It still doesn't

17:04:35  11   give you significant overtopping.

17:04:38  12   Q.   Well, I'm going to come to that.  My question was:  You

17:04:42  13   haven't studied whether it could have been a foot lower; right?

17:04:46  14   A.   I don't have anything to base that on.

17:04:49  15        MR. RAFFMAN:  Okay.  Just to complete the circle on

17:04:51  16   this.  Let me have GM-068, please.

17:04:55  17   BY MR. RAFFMAN:

17:04:56  18   Q    What Team Louisiana wrote, DX-144, Team Louisiana, page

17:05:00  19   219:  "It's more likely that the I-wall crest elevation was

17:05:04  20   lower within the breach reached, perhaps as a result of local

17:05:09  21   settlement."

17:05:09  22        You saw that; right?  You read Team Louisiana?

17:05:12  23   A.   Yes.

17:05:13  24   Q.   So you saw that that was what Team Louisiana wrote?

17:05:16  25   A.   Yes.

1409

17:05:18   1   **Q.**   Okay.   Now, you also saw that IPET, DX-145, Volume IV,

17:05:46   2   Page IV-185, IPET wrote that:   "It is possible that waves could

17:05:53   3   have been putting significant amounts of water over the

17:05:56   4   floodwalls and levees."

17:05:58   5            You saw that; right?

17:06:00   6   **A.**   Yes.

17:06:00   7   **Q.**   And you saw the testimony from Mr. Villavaso that, as

17:06:04   8   early as whatever time he observed this -- earlier than

17:06:09   9   whatever time he observed this object, he was talking about

17:06:12   10  waves 3 to 4 to 5 feet over the top of the wall.   You remember

17:06:16   11  that testimony; right?

17:06:17   12  **A.**   I remember him talking about splashing over the walls.

17:06:21   13  **Q**   So it could have been significant amounts of water before

17:06:24   14  the surge level got all the way to the top; right?

17:06:27   15  **A**   Say that again.

17:06:28   16  **Q.**   Could have had significant amounts of water coming over

17:06:30   17  the walls before the surge level got all the way to the top?

17:06:35   18  **A.**   I don't know if it's significant.

17:06:36   19  **Q.**   Okay.

17:06:42   20  **A.**   If someone is saying "splashing" to me, I don't think of

17:06:47   21  it as significant.

17:06:48   22  **Q.**   Team Louisiana -- well, okay.   Team Louisiana wrote:

17:06:52   23  DX-144 -- Team Louisiana, page 66, they wrote:   "At

17:06:57   24  approximately 0600, levees and floodwalls along both banks of

17:07:02   25  the IHNC were overtopped, beginning on the south end where the

1410

17:07:06    1    surge was highest."

17:07:07    2            You read that in Team Louisiana's report; right?

17:07:10    3    A.   I don't remember reading that, no.

17:07:11    4    Q.   All right.  If Team Louisiana were correct, that would

17:07:17    5    mean that there was 30 minutes of overtopping along the

17:07:20    6    southern portion of the Inner Harbor Navigation Canal before

17:07:25    7    the flooding started as you have it; right?

17:07:28    8    A.   That's correct.

17:07:29    9    Q.   And your time of flooding at 6:30 is geared to, what you

17:07:32   10    say, 911 calls and other evidence you reviewed?

17:07:36   11    A.   Yes.

17:07:37   12    Q.   Now, I want to ask you about another witness that we

17:07:41   13    haven't talked about yet, and his name Ernest Edwards, locally

17:07:44   14    known as "All-Night Shorty."  And you know from, at least,

17:07:50   15    looking at his deposition that he -- well, maybe you don't.

17:07:54   16            Do you know that he rescued people in the Lower Ninth

17:07:57   17    Ward during Hurricane Katrina?

17:07:58   18    A.   I remember reading his deposition, but I don't remember

17:08:01   19    that specific point.

17:08:03   20    Q.   All right.  You're aware that Mr. Edwards went up to the

17:08:08   21    Claiborne Avenue bridge around 3:00 in the morning on the

17:08:13   22    morning of August 29th?  You remember that deposition

17:08:15   23    testimony?

17:08:16   24    A.   Yes.

17:08:22   25    Q.   And in his deposition he was asked:

| | | |
|---|---|---|
| 17:08:24 | 1 | "QUESTION:  At what time did you get to the bridge?" |
| 17:08:25 | 2 | "ANSWER:  About a quarter to 2:00." |
| 17:08:30 | 3 | And he was asked -- I'm at page 77 and 78 for my |
| 17:08:36 | 4 | colleagues. |
| 17:08:37 | 5 | "QUESTION:  Okay.  So around quarter to 2:00 you got |
| 17:08:42 | 6 | there, and what did you see when you got out of the truck and |
| 17:08:46 | 7 | started looking at the Ninth Ward? |
| 17:08:49 | 8 | "ANSWER:  The water rising." |
| 17:08:55 | 9 | **MR. RAFFMAN:**  Let me have the next slide, please. |
| 17:08:57 | 10 | **BY MR. RAFFMAN:** |
| 17:08:57 | 11 | **Q**    This is DX-211, Edwards' deposition, page 78. |
| 17:09:03 | 12 | He says:  "So maybe around a quarter to 3:00?" |
| 17:09:06 | 13 | "Yeah. |
| 17:09:07 | 14 | "QUESTION:  It started overtopping? |
| 17:09:08 | 15 | "Answer:  It started topping." |
| 17:09:11 | 16 | Next slide.  DX-221, Edwards' deposition, page 79: |
| 17:09:17 | 17 | "QUESTION:  Describe to me the trench that it was |
| 17:09:20 | 18 | created from falling over. |
| 17:09:21 | 19 | "ANSWER:  I don't know how much trenches, but it was |
| 17:09:24 | 20 | coming over the wall pretty fast.  Pretty heavy too. |
| 17:09:28 | 21 | "QUESTION:  Sort of like spilling over a bucket; |
| 17:09:31 | 22 | right? |
| 17:09:31 | 23 | "ANSWER:  Right. |
| 17:09:32 | 24 | "QUESTION:  And those are your words; right? |
| 17:09:36 | 25 | "ANSWER:  Yes. |

| | | |
|---|---|---|
| 17:09:37 | 1 | "QUESTION:  Would you have used the word trench? |
| 17:09:41 | 2 | "ANSWER:  Right. |
| 17:09:43 | 3 | "QUESTION:  And I was using your words. |
| 17:09:44 | 4 | "ANSWER:  It cut a trench in there." |
| 17:09:49 | 5 | My question for you, Dr. Marino, is:  At the time of |
| 17:09:51 | 6 | your deposition in this case, you had never seen the testimony |
| 17:09:53 | 7 | of that witness before; correct? |
| 17:09:55 | 8 | A.   That's correct. |
| 17:09:57 | 9 | Q.   I showed it to you for the first time at your deposition? |
| 17:10:00 | 10 | A.   That's correct. |
| 17:10:01 | 11 | Q.   And since your deposition, you haven't changed your |
| 17:10:03 | 12 | conclusion about the time that the surge waters overtopped the |
| 17:10:08 | 13 | IHNC floodwall; that is to say, you haven't revised your |
| 17:10:12 | 14 | conclusion to state that the water was coming over the wall |
| 17:10:14 | 15 | pretty fast and pretty heavy and cutting a trench at 3:00 in |
| 17:10:17 | 16 | the morning, have you? |
| 17:10:19 | 17 | A.   Yeah.  As I said before, you know, I -- I didn't rely on |
| 17:10:22 | 18 | the times that much because there were varying times from |
| 17:10:26 | 19 | different witnesses.  So I didn't place that much emphasis on |
| 17:10:30 | 20 | times. |
| 17:10:32 | 21 | Q.   And to be clear, you've testified in your summary judgment |
| 17:10:35 | 22 | declaration and throughout that both breaches occurred before |
| 17:10:38 | 23 | any significant overtopping could have caused erosion and scour |
| 17:10:42 | 24 | trenches; right? |
| 17:10:44 | 25 | A.   That's correct. |

| | | |
|---|---|---|
| 17:10:44 | 1 | **Q.**   And if Mr. Edwards were correct that overtopping happened |
| 17:10:49 | 2 | at 3:00 in the morning, or 4:00 in the morning, or even 5:00 in |
| 17:10:56 | 3 | the morning, your conclusion that the breaches happened before |
| 17:10:59 | 4 | overtopping would be incorrect; isn't that right? |
| 17:11:02 | 5 | **A.**   Yes.  But it would be contrary to the elevations of the |
| 17:11:04 | 6 | floodwall that that we know of and also of the canal water |
| 17:11:08 | 7 | levels that we know of. |
| 17:11:10 | 8 | **Q.**   And the canal water levels are levels taken by the lock |
| 17:11:14 | 9 | master; right? |
| 17:11:15 | 10 | **A.**   That's correct. |
| 17:11:16 | 11 | **Q.**   And taken by visual observations from considerable |
| 17:11:19 | 12 | distance; right? |
| 17:11:20 | 13 | **A.**   And digital camera pictures. |
| 17:11:23 | 14 | **Q.**   All right. |
| 17:11:30 | 15 |        **MR. RAFFMAN:**  Your Honor, I have reached a point |
| 17:11:33 | 16 | where I'm going to move to another line.  My next line could be |
| 17:11:38 | 17 | an hour -- it's no more than an hour, but it could be an hour. |
| 17:11:42 | 18 | We've reached 5:00, and I don't want to -- I want -- I'm at |
| 17:11:48 | 19 | your Honor's disposal.  I'll do whatever Your Honor desires. |
| 17:11:52 | 20 |        **THE COURT:**  Well, tell me, what is your estimate, |
| 17:11:56 | 21 | without holding you to it, about how much longer you think -- |
| 17:12:00 | 22 | you said the next line would be an hour.  How much longer do |
| 17:12:01 | 23 | you think? |
| 17:12:02 | 24 |        **MR. RAFFMAN:**  It's the last line. |
| 17:12:03 | 25 |        **THE COURT:**  Okay.  And just while we're talking, who |

| | | |
|---|---|---|
| 17:12:08 | 1 | does the plaintiff have for tomorrow? |
| 17:12:12 | 2 | MR. GILBERT:  Your Honor, actually, there's some |
| 17:12:15 | 3 | procedural housekeeping matters that are going to determine how |
| 17:12:19 | 4 | tomorrow goes.  There are a couple -- we're going to be putting |
| 17:12:23 | 5 | on Dr. Spinks, our hydrologist.  Then there's some lay |
| 17:12:31 | 6 | witnesses, a couple of rebuttal witnesses.  One's going to |
| 17:12:34 | 7 | rebut some evidence that's already come in. |
| 17:12:39 | 8 | One of them -- |
| 17:12:40 | 9 | THE COURT:  Wait.  Wait a second.  Rebuttal witnesses |
| 17:12:42 | 10 | in your case in chief? |
| 17:12:45 | 11 | MR. GILBERT:  Well, that's the thing.  It's up to the |
| 17:12:47 | 12 | Court how we organize this.  I mean, I don't have any |
| 17:12:51 | 13 | preference.  They can come in after. |
| 17:12:53 | 14 | THE COURT:  If I get consent from the other side, you |
| 17:12:57 | 15 | know, I'll -- maybe you need to talk with them first.  That |
| 17:13:02 | 16 | makes it easy.  If I don't -- I don't know who they are or what |
| 17:13:06 | 17 | they're about. |
| 17:13:07 | 18 | MR. GILBERT:  I'm content for them to come in after |
| 17:13:09 | 19 | the defendant's case or before.  It doesn't matter to us.  And |
| 17:13:13 | 20 | actually, one of them is going to rebut witnesses that haven't |
| 17:13:18 | 21 | testified yet, but I have an idea what they're going to testify |
| 17:13:22 | 22 | to. |
| 17:13:23 | 23 | THE COURT:  Well, it might be best to have them come |
| 17:13:26 | 24 | in at the appropriate time. |
| 17:13:29 | 25 | You have Spinks tomorrow? |

| | | |
|---|---|---|
| 17:13:32 | 1 | **MR. GILBERT:**  Spinks tomorrow.  I've also got the two |
| 17:13:40 | 2 | Centanni witnesses.  Mr. Webb is waiting for my signal as to |
| 17:13:40 | 3 | when to send them out. |
| 17:13:41 | 4 | But I'm waiting for a ruling from Your Honor on |
| 17:13:44 | 5 | our motion to strike -- I'm waiting for a decision from Your |
| 17:13:50 | 6 | Honor on our motion to strike the Sidney Williams statement as |
| 17:13:56 | 7 | an attachment to his deposition designations, because that's |
| 17:14:00 | 8 | going to determine the scope of my examination of these two |
| 17:14:05 | 9 | Centanni witnesses. |
| 17:14:07 | 10 | If that motion is granted, my examination |
| 17:14:10 | 11 | shrinks considerably. |
| 17:14:13 | 12 | **THE COURT:**  You mean you move to strike the |
| 17:14:15 | 13 | transcript, you're talking about? |
| 17:14:17 | 14 | **MR. GILBERT:**  Move to strike that interview, the |
| 17:14:19 | 15 | transcript of that interview. |
| 17:14:21 | 16 | **THE COURT:**  We will get that done tonight. |
| 17:14:23 | 17 | **MR. GILBERT:**  Okay.  So we've got Dr. Spinks; |
| 17:14:30 | 18 | presumably the two Centanni witnesses, which are either going |
| 17:14:38 | 19 | to be short or very short. |
| 17:14:44 | 20 | **THE COURT:**  And I'll have to rule on that. |
| 17:14:46 | 21 | **MR. GILBERT:**  I guess we're going to have to wait to |
| 17:14:49 | 22 | rest until after we've put on Mr. Glaser out of turn because he |
| 17:14:55 | 23 | couldn't get off until July 6th to come and testify. |
| 17:15:01 | 24 | **THE COURT:**  And do you have consent? |
| 17:15:03 | 25 | **MR. ALDOCK:**  Consent to Mr. Glaser.  I think they |

1416

| | | |
|---|---|---|
| 17:15:05 | 1 | could rest subject to Mr. Glaser -- |
| 17:15:07 | 2 | THE COURT:  Certainly they could. |
| 17:15:07 | 3 | MR. GILBERT:  -- so we could make the appropriate |
| 17:15:09 | 4 | motions at the appropriate -- |
| 17:15:11 | 5 | THE COURT:  On factual findings, yes.  I don't think |
| 17:15:13 | 6 | Mr. Glaser is going to be testifying to any of the factual |
| 17:15:16 | 7 | findings that you would be making your Rule 52 motions |
| 17:15:19 | 8 | concerning. |
| 17:15:20 | 9 | MR. ALDOCK:  Right.  He would only be speaking to |
| 17:15:22 | 10 | that. |
| 17:15:23 | 11 | MR. GILBERT:  So that's what tomorrow looks like.  So |
| 17:15:25 | 12 | it's a little bit nebulous, but generally -- |
| 17:15:28 | 13 | THE COURT:  In all likelihood, it's possible you |
| 17:15:32 | 14 | finish tomorrow. |
| 17:15:33 | 15 | MR. GILBERT:  It's possible we finish tomorrow, Your |
| 17:15:35 | 16 | Honor. |
| 17:15:36 | 17 | MR. ALDOCK:  Could we ask them if there will redirect |
| 17:15:39 | 18 | of this witness? |
| 17:15:39 | 19 | THE COURT:  I'm sure there will be some redirect. |
| 17:15:41 | 20 | MR. GILBERT:  Some redirect. |
| 17:15:42 | 21 | MR. WILSON:  Absolutely, Your Honor. |
| 17:15:43 | 22 | THE COURT:  Hopefully, incisive. |
| 17:15:46 | 23 | All right.  With that, sir, your day is done, |
| 17:15:48 | 24 | and we will see you at 9:00 in the morning.  We'll try to have |
| 17:15:52 | 25 | the rulings out that are necessary for us to proceed with |

17:15:58    1    alacrity.

17:15:59    2                **MR. GILBERT:**  Thank you, Your Honor.

17:15:59    3                **MR. RAFFMAN:**  Your Honor, in connection with the

17:16:01    4    rulings on the objections, Your Honor may wish to look at the

17:16:04    5    transcript of this witness' testimony insofar as he's relied on

17:16:07    6    the one document that they're now seeking to strike.

17:16:12    7                **MR. GILBERT:**  No, sir.  No, sir.  That's -- I can't

17:16:17    8    believe that, Mark, you're under a misimpression.

17:16:20    9                **THE COURT:**  I'm looking at it all.

17:16:21   10                **MR. GILBERT:**  I'm not trying to strike.

17:16:23   11                **THE COURT:**  We are adjourned -- recessed for the day.

17:16:29   12    Off the record.

17:16:38   13                (WHEREUPON, the proceedings were concluded.)

           14                                    *****

           15                             **CERTIFICATE**

           16          I, Jodi Simcox, RMR, FCRR, Official Court Reporter

           17    for the United States District Court, Eastern District of

           18    Louisiana, do hereby certify that the foregoing is a true and

           19    correct transcript, to the best of my ability and

           20    understanding, from the record of the proceedings in the

           21    above-entitled and numbered matter.

           22

           23

           24                   S/ Jodi Simcox, RMR, FCRR
                               Jodi Simcox, RMR, FCRR
           25                  Official Court Reporter


                    JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                            UNITED STATES DISTRICT COURT
                            EASTERN DISTRICT OF LOUISIANA