## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

In Re:  KATRINA CANAL BREACHES    §   CIVIL ACTION
        CONSOLIDATED LITIGATION    §   NO. 05-4182 "K" (2)
                             §

_____    §

                             §   JUDGE DUVAL

PERTAINS TO:  MRGO           §
             *Armstrong,* No. 10-866    §
             *Entergy,* No.  10-77        §   MAG. WILKINSON

_____    §

## DEFENDANT UNITED STATES' MEMORANDUM OF LAW
## IN SUPPORT OF MOTION TO DISMISS OR, IN THE
## ALTERNATIVE, FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

**TABLE OF EXHIBITS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . viii

**UNDISPUTED FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.   The IHNC Lock . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.   New-Lock Site Selection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    B.   Bypass Channel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    C.   IHNC Flood Protection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    D.   Total Environmental Restoration Contract . . . . . . . . . . . . . . . . . . . . . . 12
    E.   Corps Actors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    F.   Community-Impact Mitigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

II.   Engineering Analyses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    A.   McDonough Marine Borrow Pit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
    B.   Saucer Marine Excavations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
    C.   Boland Marine Excavation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
    D.   Backfilling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

**ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

I.   The Flood Control Act bars these actions which seek to impose liability
    for flood damage. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

    A.   The plain language of § 702c bars these actions. . . . . . . . . . . . . . . . 30

    B.   Under this Court's own rulings, § 702c applies
        because the IHNC was part of a flood-control
        project. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

C.   The FCA applies because the new-Lock Project was directly
     related to two flood-control projects. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

II.   The Corps's management of the  new-lock project was a discretionary
      function not actionable under the FTCA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

      A.   The challenged conduct—supervision of WGI—
           involved considerable policy-based discretion.  . . . . . . . . . . . . . . . . 36

      B.   The Corps's review of WGI's work plans involved
            policy-based discretion.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

           1.   Deciding whether to seek further geo-
                technical review of WGI's work plan was
                not foreclosed by any regulation. . . . . . . . . . . . . . . . . . . . . . . . . 46

           2.   Guillory's decisions regarding how
                extensively to analyze  WGI's work plans
                were influenced by considerations of
                efficiency and risk, including the risk of an
                adverse community impact. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

III.   Plaintiffs did not exhaust their administrative remedies
       by filing suit, because the Army Corps of Engineers has
       no authority to compromise claims  in litigation. . . . . . . . . . . . . . . . . . . . . 52

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

# TABLE OF AUTHORITIES

## FEDERAL CASES

*ACORN v. U.S. Army Corps of Eng'rs.,*
No. 00-108, 2000 WL 43332
(E.D. La. Apr. 20, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Alinsky v. United States,*
415 F.3d 639 (7th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*ALX El Dorado, Inc. V. Southwest Sav. & Loan Ass'n,*
36 F.3d 409 (5th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Andrade v. Chojnacki,*
338 F.3d 448 (5th Cir. 2003),
*cert denied*, 541 U.S. 935 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Andrews v. United States,*
121 F.3d 1430 (11th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Attallah v. United States,*
955 F.2d 776 (1st Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Baldassaro v. United States,*
64 F.3d 206 (5th Cir. 1995),
*cert denied*, 517 U.S. 1207 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37

*Berkovitz v. United States,*
486 U.S. 531 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Boudreaux v. United States,*
53 F.3d 81 (5th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Brady v. United States,*
211 F.3d 499 (9th Cir.),
*cert denied*, 531 U.S. 1037 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Castro v. United States,*
    608 F.3d 266(5th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Central Green Co. v.  United States,*
    531 U.S. 425 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Dalehite v. United States,*
    346 U.S. 15 (1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Del Valle v. United States,*
    856 F.2d 406 (1ˢᵗ Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Domme v. United States,*
    61 F.3d 787(4th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Duff v. United States,*
    999 F.2d 1280 (8ᵗʰ Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Elder v. United States,*
    312 F.3d 1172 (10ᵗʰ Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Freeman v. United States,*
    556 F.3d 326 (5ᵗʰ Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Friends of the Earth, Inc v. Crown Central Petroleum Corp.,*
    95 F.3d 358 (5ᵗʰ Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Gaubert, United States v.*
    499 U.S. 315 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37, 51

*Guile v. United States,*
    422 F.3d 221 (5ᵗʰ Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 38, 41

*Hawes v. United States,*
    409 F.3d 213 (4ᵗʰ Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Houston v. U.S. Postal Service,*
    823 F.2d 896 (5th Cir. 1987) .................................... 55

*In re Katrina Canal Breaches Consol. Lit.,*
    471 F. Supp.2d  684 (E.D. La. 2007) ........................... 32

*In re Katrina Canal Breaches Consol. Lit.,*
    2008 WL 5234369 (E.D. La. Nov. 2, 2007) ............... *passim*

*In re Katrina Canal Breaches Consol. Lit.,*
    533 F. Supp. 2d 615 (E.D. La. 2008) ....................... 31, 32

*In re Katrina Canal Breaches Consol. Lit.,*
    577 F. Supp. 2d 802 (E.D. La. 2008) ..................... *passim*

*In re Katrina Canal Breaches Consol. Lit.,*
    647 F. Supp. 2d 644 (E.D. La. 2009) ....................... 31, 34

*In re Katrina Canal Breaches Consol. Lit.,*
    2010 WL 487431 (E.D. La. Feb. 2, 2010) ................. *passim*

*James*, United States v.
    478 U.S. 597 (1986) ........................................... 30

*Kelly v. United States,*
    241 F.3d 755 (9th Cir. 2001) .................................... 43

*Kennedy v. Texas Utils.,*
    179 F.3d 258 (5th Cir. 1999) .................................... 36

*Kirchmann v. United States,*
    8 F.3d 1273 (8th Cir. 1993) ................................. 41, 42

*Macharia v. United States,*
    334 F.3d 61 (D.C. Cir. 2003) .................................. 42

*McNeil v. United States,*
      508 U.S. 106 (1992) ............................................... 5

*Miller v. United States,*
      163 F.3d 591 (9ᵗʰ Cir. 1998) ..................................... 42

*Mohasco Corp v. Silver,*
      477 U.S. 807 (1980) ............................................. 53

*Osprey Ship Mgmt. Inc. v. Foster,*
      2010 WL 27275236 (5ᵗʰ Cir. 2010) ............................. 38

*Varig Airlines, United States v.*
      467 U.S. 797 (1984) .................................... 37, 42, 43

*Williams v. United States,*
      693 F.2d 555 (5ᵗʰ Cir. 1982) ........................... 53, 55, 56

*Wood v. United States,*
      290 F.3d 29 (1ˢᵗ Cir. 2002) ..................................... 42

## FEDERAL STATUES

28 U.S.C. § 2672 ............................................. 52, 55, 56

28 U.S.C. § 2675(a) ................................................. *passim*

28 U.S.C. § 2677 ................................................. *passim*

28 U.S.C. § 2680(a) .............................................. 36, 51

48 C.F.R. § 1.602-2 .............................................. 15, 38

Flood Control Act
      33 U.S.C. § 702c ..................................... 4, 30, 31, 32

Rivers and Harbors Act of 1956,
     Pub. L. No. 84-455, 70 Stat. 65 ................................... 4

Water Resources Development Act of 1986,
     Pub. L. No. 99-662, § 844(a), 100 Stat. 4082 ................... 7

Water Resources Development Act of 1996,
     Pub. L. No. 104-303, § 326 ( c ), 110 Stat. 3658 ............ 7, 51

# TABLE OF EXHIBITS

1 New Lock and Connecting Channels Evaluation Report (Mar. 1997) ........................................................ 1

2 New Lock and Connecting Channels Evaluation Report (Mar. 1997) ........................................................ 2

4 New Lock and Connecting Channels Evaluation Report (Mar. 1997) ........................................................ 3

5 New Lock and Connecting Channels Evaluation Report (Mar. 1997) ........................................................ 4

6 New Lock and Connecting Channels Evaluation Report (Mar. 1997) ........................................................ 5

MRGO New Lock and Connecting Channels Site Selection Report (March 1975) .................................................. 6

Letter From Maj. Gen. Ernst Graves to Col. James H. Phillips (June 10, 1977) ................................................ 7

Memorandum for Division Engineer, Lower Mississippi Valley Re: Violet Site Elimination (Jan. 23, 1991) ............ 8

Deposition of Gerald Dicharry (Oct. 2, 2008) ....................... 9

Statement of Undisputed Material Facts in Support of WGI, Inc.'s Motion For Summary Judgment (Doc. 15861-3) ................................................ 10

Deposition of Lee Guillory, Volume II (Aug. 22, 2008), ........... 11

Deposition of John Grieshaber, Volume II (Aug. 21, 2008) ....... 12

Sampling And Analysis Plan (Jan. 2001)  ............................ 13

Robinson Findings of Fact and Conclusions of Law
        Exhibits (Doc. 19415-2) ....................................... 14

IHNC Lock Replacement Project Design Documentation
        Report ["DDR"]No. 2: Levees, Floodwalls, and Channels
        (Jan. 2001) ...................................................... 15

USACE Fact Sheet: Community Impact Mitigation Plan,
        IHNC Lock Replacement Project (Aug. 3, 2001) .............. 16

Deposition of Stephen Clay Roe (Apr. 17, 2008) ............................ 17

Deposition of Lee Guillory, Volume I (June 30, 2008) ....................... 18

Project Work Plan: Project Site And Remedial Action of EBIA IHNC
        Lock Replacement Project (Oct. 2000) ............................... 19

IHNC Lock Replacement Project Design Documentation Report No. 1:
        Site Preparation and Demolition Vol. I (Feb. 1999) ................... 20

Technical Completion Report and Record Drawings
        EBIA IHNC (Aug. 2005) ............................................. 21

Final Recommendation Report for Demolition and Site Preparation
        Activities of the EBIA IHNC (Jan. 10, 2000) ........................... 22

Deposition of Phillip Lee Staggs (Apr. 26, 2008) ............................ 23

USACE Final Comments on WGI Submittals For EBIA IHNC Lock
        Replacement Project (Feb. 4, 2002) ................................... 24

Deposition of James Montegut (Aug. 8, 2008) .............................. 25

Deposition of Dennis O'Conner (Aug. 13, 2008) ............................ 26

Entergy Complaint (Doc. 1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Project Execution Plan and Signature Sheet (June 1999) . . . . . . . . . . . . . . . . . . . 28

Deposition of George Bacuta. (July 2, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Deposition of Alvin Clouatre (June 20, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Sur Reply Of The MRGO PSLC, as Amicus Curiae, to the Reply
    Memorandum of the United States of America's Motion
    to Dismiss Counts Two and Three of the Amended
    Complaint (Doc. 14784) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

MRGO PSLC Memorandum as Amicus Curiae in Support of the Robinson
    Plaintiffs' Opposition to the United States of America's Motion to
    Dismiss Counts Two and Three of the Amended Complaint
    (Doc. 14252) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

USACE Engineer Regulation 1110-2-1150 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

USACE Engineer Regulation 1110-1-8157 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Engineer Manual 200-1-2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Amended MR-GO Master Consolidated Class Action Complaint
    (Doc. 11471) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

United States of America's Reply in Support of its Motion to
Dismiss and Response to the Motions to Intervene and
Consolidate (Doc. 19390) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re:  KATRINA CANAL BREACHES § | CIVIL ACTION |
| CONSOLIDATED LITIGATION     § | NO. 05-4182 "K" (2) |
| § | |
| _____ § | |
| § | JUDGE DUVAL |
| PERTAINS TO:  MRGO     § | |
| *Armstrong,* No. 10-866     § | |
| *Entergy,* No.  10-77     § | MAG. WILKINSON |
| _____ § | |

## DEFENDANT UNITED STATES' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

The viability of the plaintiffs' claims at this preliminary stage turns on three

questions:

(1)  Can the United States be held liable for flood damage caused by the management of a flood-control project?

(2)  Did the Corps's decisions concerning excavations at the East Bank Industrial Area involve discretion related to the lock-replacement project 's commercial and national-defense purposes and the project's community impacts?

(3) Did the plaintiffs exhaust their administrative remedies by filing suits that the Corps of Engineers lacked authority to compromise?

The Inner Harbor Navigation Canal is part of a flood-control project.  It gained that status when Lake Pontchartrain and Vicinity levees and floodwalls were built along the canal.  Some of those levees were slated for improvement as part of the IHNC Lock Replacement Project.  The new-lock project also entailed extending Mississippi River levees to the site of the replacement.  The new lock, like the old lock, would be an essential part of the defense against riverine flooding.

The new-lock project's commercial and military purposes gave impetus to the EBIA  remediation, which finally occurred after decades of political controversy. From the outset, local governments, concerned citizens, and interested organizations jockeyed with one another, each striving to keep the lock from being built in its own community.  St. Bernard Parish vehemently opposed locating the new lock anywhere within the Parish boundaries.  When replacement at or near the existing site became more likely, the neighborhoods next to the IHNC raised a chorus of unified opposition.  In response, Congress mandated that the project include a community-impact mitigation plan.  As the plan explained, "many people thought there [had been] a cloud hanging over the area since about 1960 when planning for a new lock began and the IHNC was targeted as a potential site.  Some even

[likened] the lock replacement project to . . . a cancer in remission; it keeps flaring up every once in a while but never goes away."[1] Formally recognizing the project's unavoidable impacts on neighboring communities ensured that the Corps's management of the project would never be based solely on engineering considerations.

Although Plaintiffs filed these duplicative suits to evade the FTCA's administrative-exhaustion requirements, the pendency of their earlier actions prevented exhaustion. The Attorney General exercises authority over claims in litigation.[2] Consequently, when Entergy filed suit less than six months after presenting its claims administratively, the Army Corps of Engineers lost its ability to "make final disposition of [the] claims."[3] Similarly, the MRGO litigation, which began before the *Armstrong* plaintiffs had administratively presented their EBIA claims, prevented the Corps from ever having authority to "make final disposition of" the MRGO plaintiffs' EBIA claims.[4]

_____

[1]MRGO New Lock and Existing Channels Eval. Rpt. Vol. 2, App. A: Community Impact Mitigation Plan 6.

[2]28 U.S.C. § 2677.

[3]28 U.S.C. § 2675(a).

[4]In addition, the claims of Entergy Services, Inc., and Entergy Corp. must be dismissed because those entities failed to submit administrative claims, as required by 28 U.S.C. § 2675(a). *See In re Katrina Canal Breaches Consol. Lit.,* 2010 WL 487431 (Feb. 2, 2010 E.D. La.) at *17-*18.

## UNDISPUTED FACTS

**The IHNC Lock**

1.    The IHNC Lock was constructed in 1923 under the auspices of the Dock

Board.[5]

2.    The lock was 75-feet wide, 640-feet long, and 31.5-feet deep (below

mean low gulf).[6]

3.    When Congress authorized MRGO construction, it also authorized "the

construction of a new lock and connecting channel when economically

justified by obsolescence of the existing lock or by increased traffic."[7]

4.    In 1960 anticipated obsolescence prompted new-lock studies.[8]

---

Plaintiffs' MRGO claims reprise the claims litigated in *Norman Robinson, et al. v. United States,* No. 06-2268, and their LPVHPP claims are patently foreclosed by the Flood Control Act, 41 U.S.C. § 702c. Accordingly, as directed by the Court, this brief only addresses the jurisdictional flaws that foreclose the EBIA claims. The Court is respectfully referred to the United States' motions to dismiss in *Robinson*, which discuss the lack of jurisdiction over the MRGO claims and are incorporated here by reference.

[5]1 New Lock and Connecting Channels Evaluation Report [hereinafter New Lock Eval.] (Mar. 1997) MVD-006-000000151 [Ex. 1].

[6]1 New Lock Eval. MVD-006-000000151 [Ex. 1].

[7]Rivers and Harbors Act of 1956, Pub. L. No. 84-455, 70 Stat. 65; *see also* 1 New Lock Eval. MVD-006-000000151 [Ex. 1].

[8]1 New Lock Eval. MVD-006-000000151 [Ex. 1]; *see also ACORN v. U.S. Army Corps of Eng'rs,* 2000 WL 433332, (E.D. La. Apr. 20, 2000) at *6.

5.    Ship-traffic delays averaged 10 hours and stretched up to 24-36 hours per lockage.[9]

**New-Lock Site Selection**

6.    A 1961 site study eliminated Meraux from further consideration, and 1973 studies eliminated all but two sites:  the Industrial Canal and Lower Violet.[10]

7.    Plans to site the new lock in St. Bernard Parish drew rabid opposition. About 1600 people attended meetings at the St. Bernard Parish courthouse in 1972.  To accommodate everyone who wished to be heard,  one meeting stretched from 10 o'clock on a Saturday morning until 1:15 a.m. the next day.[11]

8.    Despite this opposition, the 1975 site study recommended the Lower Violet site.[12]

---

[9] 1 New Lock Eval. MVD-006-000000151 [Ex. 1].

[10] MR-GO New Lock and Connecting Channels Site Selection Report (Mar. 1975) AFW-161-000001908, AFW-161-000001939 [Ex. 6]; *see also ACORN,* 2000 WL 433332, at *7.

[11] 1975 Site Selection Report AFW-161-000001914, AFW-161-000001875 (listing opponents and proponents),  AFW-161-000002109 to -000002122 (tallying more than 31,000 opponents) [Ex. 6].

[12] Site Selection Rep. AFW-161-000001876 [Ex. 6]; *accord* 1 New Lock Eval. MVD-006-000000152 [Ex. 1].

9.   Environmental concerns soon prompted a reconsideration.[13]

10.  On April 18, 1977 President Carter formally asked Congress to

eliminate the Violet site from further consideration:

> The project should be modified to eliminate consideration of the new
> channel location.  Further study should be carried out to determine
> whether repair or replacement is needed of the existing lock at the
> existing site.  If replacement and expansion are deemed necessary,
> special care should be taken to minimize dislocation and disruption of
> residents near the site.  Cost savings from the modification will depend
> on the outcome of the analysis.[14]

11.  President Carter reiterated his opposition to the Violet site in 1978 and

urged construction of the new lock at the IHNC.[15]

12.  With construction at the IHNC becoming more likely, residents of  the

neighboring communities began to voice their opposition:

> [M]any people thought there [had been] a cloud hanging over the area
> since about 1960 when planning for a new lock began and the IHNC was
> targeted as a potential site.  Some even [likened] the lock replacement
> project to . . . a cancer in remission; it keeps flaring up every once in a
> while but never goes away.[16]

---

[13]Site Selection Rep. AFW-161-000001876 [Ex. 6]; see also ACORN, 2000 WL 433332, at
*7.

[14]Letter From Maj. Gen. Ernst Graves to Col. James H. Phillips (June 10, 1977)
TED-102-000000754 [Ex. 7].

[15]ACORN, 2000 WL 433332, at *7.

[16]2 New Lock Eval. NPM-006-000000337 [Ex. 2].

-6-

13.  In 1986 Congress modified the Rivers and Harbors Act, directing the Secretary of the Army to consult with affected local communities before selecting the location for the new lock.[17]

14.  In 1991 the Violet site was formally eliminated.[18]

15.  In 1996 Congress again modified WRDA, directing that the location of the new lock be based on a community-impact mitigation plan that, 'to the maximum extent practicable, provides for mitigation or compensation, or both, for the direct and indirect social and cultural impacts" of the project.[19]

16.  Eight alternatives were developed for construction at the IHNC.  The two selected for detailed analysis were the 200-Foot East plan and the North of Claiborne Avenue plan."[20]

17.  Unlike the 200-Foot East Plan, the North of Claiborne Avenue Plan would not require the relocation of any residents in the Lower Ninth Ward.[21]

---

[17]Water Resources Development Act of 1986, Pub. L. No. 99-662, § 844(a), 100 Stat. 4082, 4177.

[18]*See generally* Memorandum for Division Engineer, Lower Mississippi Valley Re: Violet Site Elimination (Jan. 23, 1991) [Ex. 8].

[19] Water Resources Development Act of 1966, Pub. L. No. 104-303, § 326(c), 110 Stat. 3658, 3717.

[20]1 New Lock Eval. MVD-006-000000152 [Ex. 1].

[21]Dicharry 23:14-19 [Ex. 9].

18.  The North of Claiborne Avenue plan was selected because its community impacts were smaller than those of the 200-Foot East plan.[22]

19.  In March 1997, the Corps published a nine-volume Final Evaluation Report, see generally Ex. 1, describing the proposed plan, alternatives, an Environmental Impact Statement ("EIS"), a Community Impact Plan, and technical data.[23]

20.  Gerald J. Dicharry, Jr., was the Senior Project Manager for the Lock Replacement Project.[24]

21.  The filing of the 1997 EIS was coordinated with the Environmental Protection Agency, as well as "other federal and state agencies and the Governor of Louisiana, each of which responded with comments."[25]

**Bypass Channel**

22.  To avoid shutting down "a vital link" to the Gulf Intracoastal Waterway ("GIWW") during construction, the Corps planned to cut a temporary, two-way bypass channel through the EBIA, which comprised 32 acres

---

[22]1 New Lock Eval. MVD-006-000000153 [Ex. 1].

[23]*ACORN,* 2000 WL 433332, at *7; Dicharry 14:22-15:24 [Ex. 9].

[24]*See* 1 New Lock Eval. MVD-006-000000149 [Ex. 1]; Dicharry 17:11-24 [Ex. 9].

[25]*ACORN,* 2000 WL 433332, at *8.

between Claiborne and Florida Avenues, between the canal and the

floodwall.[26]

23.  The bypass channel was to be 220-feet wide, with a depth of 31 feet on

the canal side and 22 feet on the floodwall side.[27]

24.  The bypass channel was sited so as not to affect the floodwalls'

stability.[28]

25.  Lee Guillory, the Construction Manager for Task Order No. 26 at the

EBIA, had guidance on a minimum control line, which informed him as to what

would impact the stability of the floodwall.[29]

26.  Dr. John Grieshaber of the Geotechnical Branch, Engineering Division,

described the general guidance available to the Construction Manager:

If the slope is a 1 on 3 slope, you just follow it underground as far down
as—you know, you just continue that 1 on 3 slope.  And you would say

---

[26]WGI's Statement Of Undisputed Material Facts [hereinafter WGI SOF] (Doc. 15861-3)
¶ 15 [Ex. 10]; 1 New Lock Eval. 54, 75, 112 , Plate 9 (General Plan:  New Lock and Channel
(Mar. 1995)), Plate 11B (Cross Section (Oct. 1996)), Plate 23 (Proposed Relocations (Mar.
1995)), Plate 24 (Proposed Relocations (Mar. 1995)), Plate 25 (Potential Noise Impact
Areas (Mar. 1995) [Ex. 1]; 2001 DDR No. 2 Plate I-2 (Gen. Plan – Ship Lock (Jan. 2001) [Ex.
15]; Guillory II, 118:11-20 [Ex. 18].

[27]WGI SOF 16 [Ex. 10].

[28]Dicharry 30:22-31 [Ex. 9]; WGI SOF ¶ 18 [Ex. 10]; *see also* 4 New Lock Eval.
NPM-006-000001567-000001571 (Plates B-89 to B-93, showing "levee protection" for
new lock and bypass channel) [Ex. 3]; Grieshaber II, 22:2-19 [Ex. 12]; Dicharry 31:23-32:1
(Ex. 9).

[29]2 Grieshaber 12:23-13:13 [Ex. 12].

any excavations that does not violate that line will not impact the stability of the wall.[30]

27.  Use of the general guidance on the stability of a flood control structure vis-à-vis extending the slope of the levee was an appropriate tool within the discretion of the Construction Manager and Contracting Officer Representative.[31]

28.  Excavations allowed removal of structures, contaminants, and debris in prepration for the dredging of the bypass channel.[32]

29.  "The soil from the east bank of the IHNC, below 5 feet in depth, is not contaminated.  It would be used to develop wetlands as mitigation for impacts of the graving site.  The material would be deposited into an area of shallow, brackish water."[33]

---

[30]2 Grieshaber 13:21-14:1 [Ex. 12].

[31]2 Grieshaber 57:21-25, 58:19-59:4 [Ex. 12].

[32]Sampling And Analysis Plan (Jan. 2001) 14-18 [Ex. 13]; *see also* 5 New Lock Eval. C-71 to C-73 [Ex. 4].

[33]4 New Lock Eval. D-3-2 [Ex. 5].

**IHNC Flood Protection**

30.   The IHNC lock reduces the risk of flooding during storm surges.[31]

31.   The IHNC was bounded by Lake Pontchartrain and Vicinity Hurricane Protection Project ("LPV") levees and floodwalls when Hurricane Katrina struck New Orleans on August 29, 2005.[32]

32.   The LPV levees and floodwalls between the replacement lock and the river were to be raised to the design standards and elevations of the Mississippi River and Tributaries (MR&T) Project to prevent riverine flooding. [33]

33.   This improvement was necessary because the new lock was slated to be built north of Claiborne Avenue, farther from the river than the old lock.[34]

---

[31]4 New Lock Eval. D-1-6 [Ex. 5].

[32]*See, e.g., Katrina,* 577 F. Supp. 2d 802, 812-814 (describing LPV plan of protection to include floodwalls at the IHNC);  Robinson Findings of Fact and Conclusions of Law Exhibits (Doc. 19415-2) 1 [Ex. 14].

[33]IHNC Lock Replacement Project Design Documentation Report No. 2: Levees, Floodwalls, and Channels (Jan. 2001) 1-1  to 1-2 (NED-142-000003336 to -000003337)[[Ex. 15]; *see also* 1 New Lock Eval. MVD-006-000000153, 75, 112, Plate 12 (Riverside Flood Protection:  Ship and Barge Lock), Plate 13 (River Side Flood Protection (Mar. 1995) [Ex. 1].

[34]*See* 1 New Lock Eval. MVD-006-000000153 [Ex. 1].

34.  The Secretary of the Army approved the project in 1998 and appropriations for construction followed.[35]

35.  It was anticipated that "[t]he lock project will involve reconstruction of a portion of the [LPV] protection and/or tying the hurricane protection back to the new lock in order to maintain the integrity of the hurricane protection system."[36]

**Total Environmental Restoration Contract**

36.  Remediation of the debris and contaminated soils at the EBIA was required to continue construction on the new lock and bypass channel.  This remediation task became known as Task Order 26.[37]

37.  "[F]or the sake of time, expediency, [and] expertise," the Corps chose to utilize Washington Group International, Inc.'s ("WGI") Total Environmental Restoration Contract ("TERC") that was based in the Corps' Tulsa District to complete the EBIA clean-up.  The cost reimbursable nature of the TERC was "highly desirable" because it provided "[f]lexibility for the Corps to accomplish

---

[35]*ACORN,* 2000 WL 433332, at *8; *see also* USACE Fact Sheet: Community Impact Mitigation Plan, IHNC Lock Replacement Project (Aug. 3, 2001) [Ex. 16].

[36]1 New Lock Eval. 10 [Ex. 1]; Dicharry 32:1 – 33:7 [Ex. 9].

[37]WGI SOF ¶¶ 28-29 [Ex. 10].

the work within the time and money [allotted], and . . . to handle unknowns, unknown contamination, unknown debris, unknown foundations," that might be discovered in the course of performing the contract.[38]

38.  The cost-reimbursable nature of the TERC required the Corps to "monitor, work with the contractor in a team type approach, to track all costs, labor, equipment, [and] personnel."[39]

39.  Because the TERC was a cost-reimbursable contract, the Corps' on-site Task Order representative always had to "know what was being spent and why it was being spent," to decide if the contractor's proposed activities were "justifiable or not."[40]

40.  The cost-reimbursable contract allowed the Corps to balance the cost of the project against the  available funds.[41]

**Corps Actors**

41.  Two primary individuals were responsible for the Corps' actions on Task Order 26 – Lee Guillory and James Montegut.[42]

---

[38]WGI SOF ¶ 25 [Ex. 10].

[39] WGI SOF ¶ 26 [Ex. 10].

[40] WGI SOF ¶ 27 [Ex. 10].

[41]*See* Roe 126:15 – 129:2 [Ex. 17]; 1 Guillory 146:3-14 [Ex. 18].

[42]*Katrina,* 2008 WL 5234369, at *3.

42.  Lee Guillory, a professional engineer in the Construction Division of the Corps in New Orleans and a Functional Team Leader for the Lock Replacement project, was the Contracting Officer Representative ("COR") for Task Order 26.[43]

43.  Prior to Task Order 26, Guillory had "extensive experience of six years of being a project engineer on the ground in different area offices, supervising, monitoring and administrating construction contracts for earthen levees, hurricane protection levees . . . and major navigational structures."  From this experience, he understood "how levees and floodwalls are built in New Orleans."[44]

44.  Guillory served as both COR and Construction Manager, and was "instrumental in the planning, direction, coordination, execution and construction management" of Task Order 26.[45]

45.  As COR, the Corp designated Guillory to perform the following function on Task Order 26:

(1)  verify that WGI performed the technical requirements of the project in accordance with the contract terms and specifications;

---

[43]*Id.*

[44]WGI SOF ¶ 37 (Ex. 10).

[45]2008 WL 5234369, at *8.

(2)  conduct inspections of the work site through the project to assess WGI's performance;

(3)  maintain liaison and direct communications with WGI; and

(4)  where work deficiencies or other problems were observed, record and report the incidents to the Contracting Officer, notify WGI of the deficiencies, and direct appropriate action to effect correction. [46]

46.  Guillory had to exercise judgment and choice in overseeing WGI's performance.[47]

47.  To fulfill these discretionary functions, Guillory decided to meet with WGI employees to review and comment on WGI's work plans.[48]

48.  Guillory "sought to ascertain what the Government needed to do to help WGI resolve any issue that arose, take their recommendations into consideration, and work them out to the best of the Government's ability."[49]

---

[46]*Id.* at *3-4.

[47]*See* 48 C.F.R. § 1.602-2 (mandating that contracting officers "be allowed wide latitude to exercise business judgment," so that they can "ensure compliance with the terms of the contract, and safeguard[] the interests of the United States.").

[48]2008 WL 5234369, at *4.

[49]*Id.* (citation omitted).

49.  The Corps evaluated WGI's proposals, gave WGI feedback, and solicited revisions until the Corps was satisfied.  At that point the Corps approved the work plans, giving WGI a green light to proceed with the work.[50]

50. Guillory had the discretion as to when to consult the Corps's geotechnical engineers as well as whether to accept a licensed engineer's analysis.[51]

51.  Guillory visited the job site approximately one to three times per week, met with his on-site Quality Assurance staff, met with WGI, had team meetings to discuss the progress and performance on the project, and discussed any particular problems or issues that arose during that week.  He sought to ascertain what the Government needed to do to help WGI resolve any issue that arose, take their recommendations into consideration, and work them out to the best of the Government's ability.[52]

52.  James Montegut, a Project Engineer in the Construction Division of the New Orleans District, was the on-site Contracting Officer Representative for Task Order 26.  On-site quality assurance inspectors reported to Montegut.

---

[50] See *id.* at *5-8.

[51] 2 Grieshaber 17:11-12:9, 17:9-19:15 [Ex. 12].

[52] *Katrina,* 2008 WL 5234369, at *4.

Montegut was responsible for overseeing WGI's performance and ensuring

WGI worked in an efficient and cost-effective manner.[53]

53.  In addition to reviewing and approving WGI's proposed expenses on

Task Order 26, Montegut managed the Corps' on-site Quality Assurance

Representatives, met daily with WGI's on-site personnel, approved plans for

various features of work, and monitored the physical progress of work on a

day-to-day basis.[54]

54.  Montegut had "thirty-three years of experience on the job" relating to

"issues of underseepage with floodwalls."[55]

55.  At all times, the Corps had one or more Quality Assurance ("QA")

Inspectors on-site monitoring the work of WGI and its subcontractors.  These

QA Inspectors were Alvin Clouatre and Alex Brogna, but also included at some

times Robert Ariatti, P.E. and Steven Keen.[56]

---

[53]*Id.*

[54]*Id.*

[55]WGI SOF ¶ 43 [Ex. 10].

[56]*Id.* ¶ 44 [Ex. 10].

**Community-Impact Mitigation**

56.  The Corps's Community Impact Mitigation Plan for the project was

developed in coordination with local interests.  It included:

> [D]irect and indirect mitigation measures that address impacts related
> to noise, transportation, cultural resources, aesthetics, employment,
> community and regional growth, and community cohesion.  Potential
> features of the mitigation plan include, but are not limited to, enhanced
> police protection, job training, reimbursement of businesses' lost
> revenue, street improvements, housing revitalization program,
> education enhancements, parks and playgrounds, historical/cultural
> markers and displays, and emergency medical services.[57]

57.  The project was carefully tailored to avoid adverse community-impacts

insofar as was practicable.[58]

58.  Accordingly, WGI conducted vibration tests along Jourdan Avenue to

ensure that vibration levels of excavation equipment would not disturb the

Lower Ninth Ward.[59]

---

[57]USACE Fact Sheet: Community Impact Mitigation Plan, IHNC Lock Replacement
Project (Aug. 3, 2001) NPM-003-000000779 [Ex. 16].

[58]2 Guillory 217:24-218:22 (Ex. 18); *see also* Project Work Plan: Project Site And
Remedial Action of EBIA IHNC Lock Replacement Project (Oct. 2000) 8 ("The use of a
wrecking ball to demolish foundations could cause excessive and unnecessary noise, dust
and vibrations in the adjacent neighborhood, and is not an approved method of demolition
for this project") [Ex. 19]; 1 IHNC Lock Replacement Project Design Documentation Report
33 ("The contractor will be required to provide for noise monitoring and air quality
monitoring during the demolition operations.") [Ex. 20].

[59]Technical Completion Report and Record Drawings EBIA IHNC (Aug. 2005) [WGI MSJ
Ex. 24] 31. (PDF 31) [Ex. 21].

59.  The final Recommendation Report for Demolition and Site Preparation Activities stated that "[e]very effort will be made to utilize local subcontractors to perform the construction work since using local resources not only supports the community economically, but also results in a more cost-effective approach."[60]

60.  Per the Corps' instruction, the Project Work Plan ("PWP") set the work site's boundaries: all soil remediation and associated excavations were confined to "the area 15-feet west of the floodwall."[61]

61.  This exclusion zone within 15 feet of the floodwall was intended to prevent damage to the wall.[62]

62.  Guillory developed the 15-foot guideline based on a "consensus of opinion between [himself] and the rest of the small [EBIA remediation] team" at the Corps.[63]

---

[60]Final Recommendation Report for Demolition and Site Preparation Activities of the EBIA IHNC (Jan. 10, 2000) PDF 50 [Ex. 22].

[61]*Katrina,* 2008 WL 5234369, at *6; WGI SOF ¶ 72 [Ex. 10].

[62]*Katrina,* 2008 WL 5234369, at *6; WGI SOF ¶ 73 [Ex. 10].

[63]WGI SOF ¶ 74 [Exh. 10]..

**Engineering Analyses**

  **McDonough Marine Borrow Pit**

63.  During the planning process for Task Order 26, the Corps determined that, when feasible, excavations should be backfilled with soils from a borrow pit on-site, rather than with imported material.[64]

64.  The Corps's concerns were that using off-site commercial material would increase remediation costs, and any new material added to the site would increase future dredging costs because they would have to be removed anyway to construct the bypass channel.[65]

65.  A borrow pit at the McDonough Marine site was to serve as the primary source of backfill.  If more material was needed, WGI could import backfill material subject to Corps approval.[66]

66.  WGI submitted a plan for an on-site borrow pit at McDonough Marine to the Corps and the Louisiana Department of Environmental Quality ("LDEQ") for review and approval in August 2001.[67]

---

[64]1 Guillory 194:6-14; Staggs 151:4-17.

[65]WGI SOF ¶ 179 [Ex. 10]..

[66]WGI SOF ¶ 180.

[67]WGI SOF ¶ 181 [Ex. 10].

67.   As the scope of the remediation work increased, so did the need for additional backfill material.  By late 2001, WGI and the Corps sought permission from the LDEQ to expand the borrow pit from 0.84 acres to 1.55 acres.[68]

68.   However, the Corps was concerned that the extension proposal, as prepared by WGI, could have a detrimental effect on the adjacent flood control structure.[69]

69.   The Corps undertook a review of the proposed expansion on the adjacent flood control structures.  As Guillory stated:

> We had two ways we could have gone with it; we could have asked [WGI] to evaluate the structural stability of it and submit that to the Corps for final review and approval, or we could just do [the analysis] in-house.  And for expediency, and being that Corps had the final say-so in the structural stability analysis, . . . and the [Hazardous, Toxic, and Radioactive Waste] team tasked [WGI] to provide us with accurate cross-sections and surveys of the area, and from that I specifically requested, by memo, to our geotechnical engineering branch in engineering division to perform that analysis. [70]

---

[68]WGI SOF ¶ 182 [Ex. 10].

[69]WGI SOF ¶ 183 [Ex. 10].

[70]WGI SOF ¶ 185 [Ex. 10]; *Katrina,* 2008 WL 5234369, at *2.

70.  The in-house review from the Corps was incorporated into a design template for WGI to use in its excavation of the expanded borrow pit.  WGI SOF ¶ 187.

71.  The Corps was also concerned with the potential safety hazards of the borrow pit to the neighboring community.  Guillory commented that:

> The [borrow pit] excavation would leave a big hole that can appear as a nuisance to the neighborhood in regard to "aesthetic" and "potential health and safety" implications.  The hole can be filled with rainwater that can stagnate (if left enclosed) and turn into a potential breeding ground for mosquitoes as well as an inviting swimming pool. There should be some engineering and Institutional controls in-place to address I mitigate these issues such that this feature won't pose a hazard Issue after Project close-out.[71]

72.  Following the conclusion of work for Task Order 26, the Corps instructed WGI to breach the dikes between the borrow pit and the IHNC, allowing water to fill up there.[72]

73.  Despite the proximity of the borrow pit to the floodwall, the wall did not breach at that location during Hurricane Katrina.

---

[71]USACE Final Comments on WGI Submittals for EBIA IHNC Lock Replacement Project (Feb. 4, 2002) 4 [Ex. 24].

[72]WGI SOF ¶ 189 [Ex. 10].

**Saucer Marine Excavations**

74.   Since June 1999, the Corps was aware of the subsurface structure at the corner of the Saucer Marine and Mayer Yacht sites.[73]

75.   By August 2000, the Corps was aware of the depth of the necessary excavation to remove the sewer lift station.[74]

76.   The sewer lift station was generally described as a "large diameter pipe with pumps in it, valves and ladders to get down into it, all encased in . . . metal pipe[,]" which had deteriorated due to prolonged exposure to brackish water in the IHNC.[75]

77.   The sewer lift station was approximately 80-100 feet from the floodwall.[76]

78.   The removal of the sewer lift station was to be performed by a subcontractor working for WGI.  The approved plan required a braced

---

[73]*Katrina,* 2008 WL 5234369, at *7; 2 Guillory 34:20-35:21 [Ex. 11].

[74]1 Guillory 132:10-20[Ex. 18].

[75]2008 WL 5234369, at *7; Montegut 75:3-10 [Ex. 25].

[76]1 Guillory 83:2-6 [Ex. 18]; 2 Guillory 132:12-23 [Ex. 11].

excavation, also referred to as a cofferdam.  A braced excavation prevents

sloughing or movement of the surrounding soils while in place.[77]

79.  The braced excavation was to be designed by a licensed professional

engineer in Louisiana.[78]

80.  The Corps reviewed, critiqued and commented on the proposed braced

excavation design several times before finally expressing approval on October

19, 2001.[79]

81.  The Corps concluded that the braced excavation would not affect the

floodwall because of its distance from the floodwall and because the bracing

had been designed by a licensed professional engineer and was being installed

by experienced contractors under the supervision of the Corps's quality

assurance inspectors.[80]

---

[77]1 Guillory 142:15-143:10 [Ex. 18]; 2 Grieshaber 17:25-18:7 [Ex. 12]; O'Conner
38:5-50:2 [Ex. 26].

[78]*Katrina,* 2008 WL 5234369, at *7.

[79]*Katrina,* 2008 WL 5234369, at *8.

[80]2 Guillory 141:5-21 [Ex. 11].

82.  Alvin Clouatre observed completion of the excavation, removal of the

sewer lift station, and backfill of the excavation on November 7, 2001, and

submitted a Quality Assurance Report to that effect on November 13, 2001.[81]

83.  The Corps accepted the work of WGI and its subcontractor with

respect to the excavation of the sewer lift station.[82]

**Boland Marine Excavation**

84.  "After demolition work began, WGI identified eight previously

unknown subsurface concrete and steel foundations at the Boland Marine site,

including a large concrete block commonly referred to as . . . the 'wedding cake

structure.'"[83]

85.  The concrete block was approximately 150-175 feet from the

floodwall.[84]

---

[81]*Katrina,* 2008 WL 5234369, at *10-11.

[82]*Katrina,* 2008 WL 5234369, at *11.

[83]*Katrina,* 2008 WL 5234369, at *11.

[84]*Katrina,* 2008 WL 5234369, at *11; *see also id.* at *11 n. 7.

86.  WGI submitted a proposal that included a braced excavation installation, removal of the concrete structure, and backfill methods on December 11, 2001. The Corps approved the plan on December 13, 2001. [85]

87.  With respect to backfill excavations, the Court has found as follows:

Immediately following pile extraction operations, the excavations will be backfilled with either import sand or onsite borrow back to original grade."  The Sequence of Operations for Concrete Foundation South Pad Cofferdam Installation and Concrete Removal with respect to Cofferdam Backfilling:

* Backfill excavation with previously excavated soil in 2' lifts.

* Initial backfill operations will be to the bottom of the whalers (sic) inside the cofferdam.

* Complete backfilling to top of sheet piles with material to be provided by WGI after whalers are re-moved.

Backfilling was to be completed to grade after sheet-pile removal occurred.[86]

88.  Again, the Corps was not concerned that the braced excavation would affect the floodwall, because the work was being designed and carried out by qualified and experienced engineers and contractors.  For these reasons,

---

[85]*Katrina,* 2008 WL 5234369, at *12.

[86]*Katrina,* 2008 WL 5234369, at *12-13.

Guillory did not request that the Engineering Division of the Corps's New

Orleans District perform an evaluation of the proposed excavation.[87]

89.  Further, the proposed excavation at Boland Marine was farther away

from the floodwall than at the sewer lift station and within the footprint of the

planned bypass channel, which the Corps had previously evaluated for its

effect on the floodwalls and determined that there was no negative impact.[88]

90.  Quality Assurance inspections noted that the cofferdam was being

backfilled with spoil from the wedding cake excavation and the borrow-pit.

The backfill material was being compacted every two to three feet. [89]

91.  When backfilling the wedding cake structure excavation at the Boland

Marine location, the Corps only used on-site material obtained from: (1)

---

[87] *Katrina,* 2008 WL 5234369, at *12-13.

[88] *Katrina,* 2008 WL 5234369, at *12-13; *see also* 4 New Lock Eval. Plate B-89 (Final Levee Protection – East Side: Soils Stability, Sta. 13+05 Lock Baseline to New Lock), Plate B-90 (Final Levee Protection – East Side: Soils Stability, Sta. 13+05 Lock Baseline to New Lock) (showing bypass channel), B-91 (Temporary Flood Protection – East Side: Soils Stability, Sta. 67+00 Relocation Corridor) (showing bypass channel), B-92 (Temporary Flood Protection: Soils Stability, Sta. 619+00 Relocation Corridor) (showing bypass channel and minimum control line), Plate B-93 (Final Levee Protection: Soils Stability, Sta. 619+00 Relocation Corridor) (showing bypass channel) [Ex. 4]; 2 Grieshaber 22:2-19 [Ex. 12].

[89] *Katrina,* 2008 WL 5234369, at *13-14.

material removed from the cofferdam excavation; and (2) the McDonough

Marine borrow pit.[90]

**Backfilling**

92.  Both excavations required WGI or its subcontractor to backfill the

excavation.[91]

93.  When backfilling the excavations, WGI was first required to backfill

with the excavated material and then use material obtained from the

McDonough Marine borrow pit.  WGI could only import additional, off-site

material if there was not enough on-site material to backfill the excavations.[92]

94.  When compared to using on-site material, there was an additional cost

to purchase and deliver off-site material to backfill the excavations.[93]

---

[90]*Id.* at *12, n.10, *14; 2 Guillory 120:10-17 [Ex. 11].

[91]*See Katrina,* 2008 WL 5234369, at *9 ("The excavation created to remove the lift station, wet well, and associated support structures will be back filled with previously excavated material . . . [a]dditional fill material necessary to complete backfill operations will be provided by WGI."); *cf. id.* at *13 ("Complete backfilling to top of sheet piles with material to be provided by WGI after whalers [sic] are removed.").

[92]1 Guillory  206:7-206:22 [Ex. 18]; 2 Guillory 116:21-119:3 [Ex. 11]; O'Connor 153:10-158:6 [Ex. 26]; *Katrina,* 2008 WL 5234369, at *10, n.6.

[93]2 Guillory 116:21-119:3 [Ex. 11].

95.   The Corps was going to later dredge two-thirds of the EBIA site as a bypass channel for the lock replacement project.  Resultantly, the Corps was cost-conscious in regards to purchasing off-site material.[94]

96.   Any sand that was used on site was river sand, "a colloquial term that we use here for the silty sand and material that is hydraulically dredged out of the base of the Mississippi River, and commercial suppliers sell it as a traditional backfill for sub-base and foundation material throughout New Orleans."[95]

97.  River sand is far less permeable than beach sand.[96]

---

[94]2 Guillory 116:21-119:3 [Ex. 11]; O'Conner 153:10-158:6 [Ex. 26].

Guillory testified:

The cost increased by having to purchase off-site commercial material, whether it be sand, clay, gravel, crushed stone, or whatever, and paying for the actual cost, the transportation and delivery cost, and um – using that material on the site.

   Likewise, the scope of the overall project, if that backfilled material is placed in an area that would be subsequently dredged when the two bypass channels are done for the overall project, it would increase the cost of that dredging because we would be not only purchasing the material but hydraulically dredging and disposing of it again at additional cost.

2 Guillory II 117:12-118:4 [Ex. 11]; *accord* WGI SOF ¶¶ 178-80 [Ex. 10].

[95]*Katrina,*2008 WL 5234369, at *10, n.6.

[96]2 Grieshaber 84:1-5 [Ex. 12].

98.  River sand is commonly used for fill in the New Orleans area.[97]

99.  The Corps would make sure that the river sand had proper density and compaction.[98]

## ARGUMENT

I. **THE FLOOD CONTROL ACT BARS THESE ACTIONS WHICH SEEK TO IMPOSE LIABILITY FOR FLOOD DAMAGE.**

A. **THE PLAIN LANGUAGE OF § 702C BARS THESE ACTIONS.**

The Flood Control Act provides that "no liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place."  33 U.S.C. § 702c.  "It is difficult to imagine broader language."[99]  On its face, this language covers the damage alleged here. Entergy's damage occurred as a result of hurricane-driven surge that reached elevations far exceeding any flood previously recorded in New Orleans history.  "Nor do the terms 'flood' and 'flood waters' create any uncertainty in the context of" this natural disaster:  It is "clear from § 702c's plain language that the terms 'flood' and 'flood waters' apply . . . to waters that [a federal

---

[97]2 Grieshaber 84:6-9 [Ex. 12].

[98]2 Grieshaber 84:19-85:15 [Ex. 12].

[99]*United States v. James,* 478 U.S. 597, 604 (1986).

flood-control project] cannot control."[100]  "[T]he sweeping language of § 702c

reveals that "Congress clearly sought to ensure beyond doubt that sovereign

immunity would protect the Government from 'any' liability associated with

flood control."[101]  The Supreme Court therefore concluded that "the

unambiguous words of the statute" should be given "their ordinary

meaning."[102]

In *Central Green Co.  v.  United States,* the Court reiterated that the

application of 702c immunity turns not "on whether the damage relates in

some, often tenuous, way to a flood control project," but on "whether it relates

to 'floods or flood waters.'"[103]  The Court found it instructive that "[t]he text of

the statute does not include the words 'flood control project.'  Rather it states

that immunity attaches to 'any damage from or by floods or flood water . . . .'

Accordingly the text of the statute directs us to determine the scope of the

immunity conferred, not by the character of the federal project or the

purposes it serves, but by the character of the waters that cause the relevant

---

[100]*Id.*  at 605.

[101]*Id.* at 608.

[102]*Id.*

[103]531 U.S. 425, 430 (2001) (footnote omitted),

damage and the purposes behind their release."[104]  Here "the character of the
waters that cause[d] the relevant damage" is plain.  Indisputably,
"catastrophic flooding" caused Entergy's alleged damage.  Complaint at 1.  For
this reason, and this reason alone, § 702c confers immunity, and this case
must be dismissed for lack of subject-matter jurisdiction.

**B.   UNDER THIS COURT'S OWN RULINGS, § 702C APPLIES BECAUSE THE IHNC WAS
PART OF A FLOOD-CONTROL PROJECT.**

This Court has held that "immunity is provided for damage caused by flood
waters emanating from a flood control project."[105]  If the challenged conduct
"concerns" a flood-control project "directly," then § 702c applies.[106]

A canal that is  bounded by flood-control structures is part of a flood-
control project.  Accordingly, this Court reasoned that the presence of
floodwalls along the 17th Street and London Avenue canals was sufficient to

---

[104]*Id.* at 434; *accord id.*  at 437.

[105]*In re Katrina Canal Breaches Consol. Lit.,* 533 F.  Supp.  615, 635 (2008); *accord id.*  at
637; *In re Katrina Canal Breaches Consol. Lit.,* 577 F.  Supp. 2d 802, 824 (2008); *see also In
re Katrina Canal Breaches Consol.  Lit.,* 471 F.  Supp.  684, 692 (E.D. La.  2007) (FCA bars
actions for floodwater damage caused by negligence connected with flood-control project);
*In re Katrina Canal Breaches Consol. Lit.,* 2007 WL 3270768, at *5-*6 (E.D. La. Nov.  2, 2007)
(§ 702c applies if damage results from floodwaters that escape from a canal that is "part of
a flood control project").

[106]*In re Katrina Canal Breaches Consol. Lit.,* 647 F. Supp. 2d 644, 699 (2009).

demonstrate that those canals were part of the LPV.[107]  Because the waters
that escaped from these canals during Hurricane Katrina were floodwaters,
the incorporation of the outfall canals into the LPV "compel[led] the Court to
apply [FCA] immunity."[108]

The "nub of the issue," then, under this Court's prior rulings, "is whether
the [IHNC] is a flood control project,"[109] or has a "nexus to a flood-control
project."[110]  And as the Court is well aware through prior proceedings in this
litigation, the IHNC was bounded by LPV levees and floodwalls when Katrina
struck.[111]  The flooding of the Lower Ninth Ward and St. Bernard Parish
resulted from two breaches in the floodwall adjacent to the IHNC.[112]  As the
Complaint notes, this floodwall separated the Lower Ninth neighborhoods
from "the East Bank Industrial Area of the IHNC—a 32 acre site located
between Florida Avenue and Claiborne Avenue and extending from the canal

---

[107]*See Katrina.,* 533 F. Supp. 2d at 637.

[108]*Id.* at 638.

[109]*Katrina,* 471 F. Supp. 2d at 689.

[110]577 F. Supp. 2d at 824.

[111]*See, e.g.,* Doc. 19415-2, at 1 ("Greater New Orleans Flood Protection
System").

[112]*See* Complaint ¶ 59.

to the floodwall."[113]  Entergy specifically complains that the Army Corps of Engineers allegedly did not "compensate . . . with respect to the floodwalls along the IHNC" when the Barrier Plan was abandoned in favor of the High Level Plan.[114]  The breaching of the IHNC floodwalls by floodwaters compels application of FCA immunity.

## C. THE FCA APPLIES BECAUSE THE NEW-LOCK PROJECT WAS DIRECTLY RELATED TO TWO FLOOD-CONTROL PROJECTS.

The IHNC Lock Replacement Project, which entailed the "demoli[tion of] the East Bank Industrial Area,"[115] was directly related to the LPV project and the Mississippi River and Tributaries project.  The LPV levees and floodwalls between the replacement lock and the river were to be raised to the design standards and elevations of the Mississippi River and Tributaries (MR&T) Project to prevent riverine flooding.[116]  This improvement was necessary because the new lock was slated to be built north of Claiborne Avenue, farther

---

[113]Complaint ¶ 41.

[114]*Id.* ¶ 54.

[115]Complaint ¶ 41.

[116]Ex. 2 (IHNC Lock Replacement Project Design Documentation Report No. 2:  Levees, Floodwalls and Channels) at 1-1  to 1-2 (NED-142-000003336 to -000003337), ; *see also* Ex. 1 (1997 Eval. Rpt.) Vol. 1 unpaginated syllabus  (MVD-006-000000153), 75 (MVD-006-000000237), 112 (MVD-006-000000274), Plate 12 (Riverside Flood Protection: Ship and Barge Lock), Plate 13 (River Side Flood Protection (Mar. 1995).

from the river than the old lock.[117]  In addition, it was anticipated that "[t]he

lock project will involve reconstruction of a portion of the [LPV] protection

and/or tying the hurricane protection back to the new lock in order to

maintain the integrity of the hurricane protection system."[118]

Under this Court's own rulings, this direct connection between the IHNC

lock replacement project and two flood-control projects renders the United

States immune to Entergy's IHNC claims.[119]  Although flood control was not

---

[117]*See* Ex. 1 (1997 MRGO New Lock and Connecting Channels Evaluation Report) Vol. 1 (Main Report and Environmental Impact Statement) unpaginated syllabus (MVD-006-000000153).  The Secretary of the Army approved the project in 1998 and appropriations for construction followed.  *ACORN v. U.S. Army Corps of Eng'rs,* No. 00-108 , 2000 WL 433332, at *8; *see also* Ex. 3 (IHNC Project Fact Sheet).

[118]Ex. 1 (1997 Eval. Rpt.) Vol. 1, at 10 (MVD-006-000000172); Dicharry 32:1 – 33:7.  To keep the IHNC accessible from the river during construction, the project entailed construction of a bypass channel through the East Bank Industrial Area.  *See* Ex. 1 (1997 Eval. Rpt.) Vol. 1, at 54 (MVD-006-000000216), 75 (MVD-006-000000237), 112 (MVD-006-000000274), Plate 9 (General Plan:  New Lock and Channel (Mar. 1995)), Plate 11B (Cross Section (Oct. 1996)), Plate 23 (Proposed Relocations (Mar. 1995)), Plate 24 (Proposed Relocations (Mar. 1995), Plate 25 (Potential Noise Impact Areas (Mar. 1995); Ex. 2 (2001 Design Doc. Rpt.) at , Plate I-2 (Gen. Plan – Ship Lock (Jan. 2001)); Deposition of Lee Guillory Vol. II, Aug. 22, 2008 (Ex. XX) at 118:11-20.   The excavation and subsurface activity that allegedly contributed to the flooding of the Lower Ninth Ward, Complaint ¶ 42, aimed to remove structures, contaminants, and debris preparatory to dredging the bypass channel.  Sampling and Analysis Plan (Jan. 2001) 14-18; *see also* Ex. 1 (1997 Eval. Rpt.) Vol. 5, at C-71 to C-73.

[119]*See In re Katrina Canal Breaches Consol. Lit.,* 647 F. Supp. 2d 644, 699 (2009); 577 F. Supp. 2d at 824.

the project's sole purpose, that does not matter, because FCA immunity

applies to multi-purpose projects.[120]

## II.  THE CORPS'S MANAGEMENT OF THE  NEW-LOCK PROJECT WAS A DISCRETIONARY FUNCTION NOT ACTIONABLE UNDER THE FTCA.

### A.  THE CHALLENGED CONDUCT—SUPERVISION OF WGI—INVOLVED CONSIDERABLE POLICY-BASED DISCRETION.

The Federal Tort Claims Act does not apply to Entergy's IHNC claims

because they challenge conduct that is (1) discretionary and (2) "susceptible

to policy analysis."[121]  Conduct is discretionary if it "involve[s] an element of

---

[120]*See Kennedy v. Texas Utils.,* 179 F.3d 258, 262 (5th Cir. 1999); *see also Boudreaux v. United States,* 53 F.3d 81, 84-86 (5th Cir. 1995) (broadly applying FCA immunity to flood-control-project management).

[121]*United States v. Gaubert,* 499 U.S. 315, 325 (1991) (construing 28 U.S.C. § 2680(a)); *Andrade v. Chojnacki,* 338 F.3d 448, 457 (5th Cir. 2003), *cert. denied,* 541 U.S. 935 (2004); *Baldassaro v. United States,* 64 F.3d 206, 208, 211 (5th Cir. 1995), *cert. denied,* 517 U.S. 1207 (1996).

 Section 2680 provides as follows:

   The provisions of this chapter and section 1346(b) of this title shall not apply to—

   **(a)** Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

(continued...)

-36-

judgment and choice."[122]  Unless a statute, regulation, or policy provides a

"specific direction" for the employee to take, conduct is "discretionary" for

FTCA purposes.[123]  Discretion is removed only by "a 'federal statute,

regulation, or policy [that] specifically prescribes a course of action for an

employee to follow.'"[124]

Discretionary conduct that is "susceptible to policy analysis" cannot be

challenged via the FTCA.[125]  If it is "the kind of conduct that can be said to be

grounded in the policy of the regulatory regime," then no action will lie.[126]

And when governmental policy gives room for employees to exercise

judgment and choice, a strong presumption arises:  established policy "is

presumed to have been furthered when" Government employees have

---

[121](...continued)
The Supreme Court's construction of this exception is principally set forth in four cases: *United States v. Gaubert,* 499 U.S. 315 (1991); *Berkovitz v. United States,* 486 U.S. 531 (1988); *United States v. Varig Airlines*, 467 U.S. 797 (1984); and *Dalehite v. United States,* 346 U.S. 15 (1953).

[122]*Gaubert,* 499 U.S. at 322 (original alteration omitted) (quoting *Berkovitz v. United States,* 486 U.S. 531, 536 (1988), and citing *Dalehite v. United States,* 346 U.S. 15, 34 (1953)); *accord Baldassaro,* 64 F.3d at 208.

[123]*Guile v. United States,* 422 F.3d 221, 231 (5th Cir. 2005).

[124]*Gaubert,* 499 U.S. at 322; *accord ALX El Dorado, Inc., v. Southwest Sav. & Loan Ass'n,* 36 F.3d 409, 411-12 (5th Cir. 1994).

[125]*Gaubert,* 499 U.S. at 325; *accord Baldassaro,* 64 F.3d at 211.

[126]*Gaubert*, 499 U.S. at 325.

"exercised their discretion to choose from various courses of action."[127]  The

plaintiffs bear the burden of overcoming this presumption and of proving that

their claims are within this Court's jurisdiction.[128]

The supervision of Washington Group International, Inc., involved

considerable discretion, particularly with regard to the degree of confidence

that the Corps could place in the plans and specifications developed by WGI

and WGI's subcontractors.  No statute, regulation, or policy dictated a specific

course of action.  Consequently, the Corps's Contracting Officer

Representative, Lee Guillory, was required to exercise judgment and choice in

overseeing WGI's performance.[129]  As the Court has previously found,

Guillory's task was couched in general terms that did not prescribe "a specific

direction."[130]  He was directed to perform four functions:

> (1) verify that WGI performed the technical requirements of the project
> in accordance with the contract terms and specifications;
> (2) conduct inspections of the work site through the project to assess
> WGI's performance;

---

[127]*See id.* at 332; *accord Baldassaro*, 64 F.3d at 211.

[128]*See Castro v. United States,* 608 F.3d 266, — (5th Cir. 2010) (en banc); *Osprey Ship Mgmt. Inc. v. Foster,* 2010 WL 2725236, at *3 (5th Cir. 2010).

[129]*See* 48 C.F.R. § 1.602-2 (mandating that contracting officers "be allowed wide latitude to exercise business judgment, so that they can "ensure compliance with the terms of the contract, and safeguard[] the interests of the United States").

[130]*Guile,* 422 F.3d at 231.

(3) maintain liaison and direct communications with WGI; and

(4) where work deficiencies or other problems were observed, record and report the incidents to the Contracting Officer, notify WGI of the deficiencies, and direct appropriate action to effect correction.[131]

To fulfill these discretionary functions, Guillory decided to meet with WGI employees to review and comment on WGI's work plans.[132]  These meetings involved discussion of the WGI's progress and performance, problems or issues, and recommendations.  Guillory "sought to ascertain what the Government needed to do to help WGI resolve any issue that arose, take their recommendations into consideration, and work them out to the best of the Government's ability."[133]  Guillory followed the plan specified in the contract, in which WGI developed work plans, presented them to the Corps for approval, and then revised the plans in response to the Corps's comments and suggestions.  The Corps evaluated WGI's proposals, gave WGI feedback, and solicited revisions until the Corps was satisfied.  At that point the Corps

---

[131]*In re Katrina Canal Breaches Consol. Lit.,* 2008 WL 5234369, at *3-*4 (citation omitted).

[132]*See id.* at *4.

[133]*Id.* (citation omitted).

approved the work plans, giving WGI a green light to proceed with the work.[134]

To be sure, the Corps brought its own engineering expertise to bear in reviewing and approving WGI's work plans.  But reliance on WGI's engineering expertise and its subcontractors' expertise cannot be discounted. The EBIA remediation and demolition was premised on the requirement that WGI would "furnish all services, materials, supplies, labor, and travel, as required,"  including specifically "all engineering services."[135]  The interplay between Guillory's own engineering judgment and his reliance on a WGI subcontractor's  judgment is apparent in his description of how he decided that WGI's plan for excavating a large concrete block (the "wedding cake") was acceptable:

> The location and proximity of those concrete foundations with respect to the floodwall and the levee were quite a bit far away as opposed to McDonough Marine borrowing area.  Also, where those concrete block foundations were located were within the footprint of where the future bypass channels were to be dredged . . . in a stairstep fashion to -22 NGVD and -31 NGVD, and those concrete foundations and their cofferdams fit within those footprints.  So that—those braced structural excavations were designed by a professional engineer . . . hired by WGI and their subcontractors—professionally reviewed by all parties, and

---

[134]*See id.* at *5-*8.

[135]*Id.* at *3.

constructed, and intense quality control and quality assurance inspection followed on how those were installed and removed.[136]

Here we see that Guillory's approval of a specific plan involved three separate judgments:  his own, that of the engineers who designed the bypass channels, and that of the professional engineer hired by WGI to design the cofferdam that was intended to keep the hole from caving in.  First, he considered the distance between the hole and the floodwall.  Second, he considered that the excavation would not extend below the depth of the bypass channels which would be dug after WGI's task was complete.  And third, he relied on the expertise of the licensed professional engineer hired to draw up the plans that WGI would use to excavate and remove the wedding cake.

Guillory's explanation, together with the details of the general methods by which the Corps supervised WGI, provides sound support for the Fifth Circuit's conclusion that "[s]upervision of a contractor's work, including the degree of oversight to exercise, is inherently a discretionary function."[137]

---

[136]Guillory I 210:17 – 212:2; *cf* Grieshaber Dep II 17:11:16 – 12:9 (Guillory had discretion to determine when to consult Corps's geotechnical engineers), 17:9 – 19:15 (Guillory had discretion to accept licensed engineer's analysis).

[137]*Guile v. United States,* 422 F.3d 221, 231 (5th Cir. 2005) (citing *Kirchmann v. United States,* 8 F.3d 1273, 1276-77 (8th Cir.1993)).

Indeed, when the government decides to accomplish a governmental function

by hiring a contractor, it signals an intent to place some degree of confidence

in the contractor's expertise and competence to perform the contracted

functions.[138]  By choosing to rely on the expertise of contractors, the

government takes "'certain calculated risks.'"[139]  Choosing to employ a

contractor and to supervise the contractor's work rather than perform the

work "in house," involves discretion of the very sort that Congress protected

from judicial scrutiny under the FTCA.[140]

Accordingly, courts have repeatedly held that contractor supervision

involves policy-based discretion.[141]  A principal policy that drives contractor

supervision is "to obtain the best value for the American taxpayer."[142]  As the

---

[138]*See Kirchmann v. United States,* 8 F.3d 1273, 1278 (8th Cir. 1993) (quoting *United States v. Varig Airlines,* 467 U.S. 797, 820 (1984)); *Duff v. United States,* 999 F.2d 1280, 1281 (8th Cir. 1993).

[139]*Kirchmann,* 8 F.3d at 1278 (quoting *Varig Airlines,* 467 U.S. at 820).

[140]*See id.*

[141]*See, e.g., Alinsky v. United States,* 415 F.3d 639, 647 (7th Cir. 2005); *Wood v. United States,* 290 F.3d 29, 39-42 ((1st Cir. 2002); *Andrews v. United States,* 121 F.3d 1430, 1441 (11th Cir. 1997); *Domme v. United States,* 61 F.3d 787, 792-93 (4th Cir. 1995); *Kirchmann,* 8 F.3d 1273, 1277 (8th Cir. 1993); *Attallah v. United States,* 955 F.2d 776, 784 (1st Cir. 1992); *Del Valle v. United States,* 856 F.2d 406, 409 (1st Cir. 1988).

[142]*Wood,* 290 F.3d at 39; *see also Alinsky,* 415 F.3d at 648; *cf. Hawes v. United States,* 409 F.3d 213, 219 (4th Cir. 2005) (judgment concerning cost effectiveness is grounded in policy); *Macharia v. United States,* 334 F.3d 61, 66-67 (D.C. Cir. 2003) (cost-benefit analysis
(continued...)

Supreme Court explained in *Varig Airlines,* contractor supervision "require[s]

the agency to establish priorities for the accomplishment of its policy

objectives by balancing the objective sought to be obtained against such

practical considerations as staffing and funding."[143]

Guillory testified that the Corps chose to accomplish the EBIA remediation

and demolition by employing WGI because a pre-existing contractual

relationship provided "[f]lexibility for the Corps to accomplish the work

within the time and money" allotted.[144]  The cost-reimbursable contract

allowed the Corps to balance the cost of the project against the Corps's

---

[142](...continued)
implicates policy); *Elder v. United States,* 312 F.3d 1172, 1181 (10th Cir. 2002) (same); *Kelly v. United States,* 241 F.3d 755, 762-63 (9th Cir. 2001) (agency resources are policy consideration); *Miller v. United States,* 163 F.3d 591, 596 (9th Cir. 1998) (cost and efficiency considerations).

[143]467 U.S. at 820.

[144]Guillory II, 39:11-24; *see also* George Bacuta 23:19 – 24:13, 52:6 – 53:16, 55:4-17; *cf.* Project Execution Plan Memo. ¶ 6 (expeditious project prosecution identified as special consideration "[d]ue to the importance of this lock replacement project to the nation and the constant delays and associated costs experienced by the inland waterway industry resulting from the use of the current obsolete lock"), ¶ 8 (cost-plus contract "[n]ot selected due to excessive acquisition time and cost, and fixed-price delivery option "[n]ot selected due to . . . lack of flexibility").

available funds.[145]  The Corps "work[ed] with the contractor in a team type

approach, to track all costs, labor, equipment, materials, [and] personnel."[146]

James Montagut, the Corps's on-site Contracting Officer Representative,

testified that his primary objective in monitoring WGI's work was to "ensur[e]

that they were spending money correctly.  And by correctly, I mean that the

work they were doing was being accomplished in an efficient and an effective

manner."[147]  He therefore would question WGI personnel if he thought the

contractor "had too many people or too much equipment or the wrong type of

equipment to accomplish the job."[148]  Montagut always wanted to "know what

was being spent and why it was being spent," so that he could decide if each of

the contractor's proposed activities was "justifiable or not."[149]  Montagut

supervised the Corps's Quality Assurance Representatives.  The QA inspectors

---

[145]*See* Roe 126:15 – 129:2; Guillory I 146:3-14.

[146]Guillory I, 40:21 – 41:10.

[147]Montegut 30:12 – 31-3; *see also id.* at 46:3-18.

[148]*Id.* at 43:21 – 46:2.

[149]*Id.* at 24:4-10.

monitored WGI's operations to ensure compliance with safety regulations, the

contract, and the work-plan specifications and drawings.[150]

Recognizing that contractor supervision is most assuredly a discretionary

function, the MRGO PSLC have tried to characterize their claims as something

other than an attack on the Corps's supervision of WGI.  Counsel have

therefore assured the Court that they are not "tak[ing] issue with the Corps's

procedure to assure that the 'public fisc is not milked.'"[151]  Rather, the crux of

their complaint is that the Corps did not more thoroughly evaluate "the

excavation plans developed by WGI."[152]  "[A]s WGI identified . . . data gaps[,]

the Corps did not undertake further geotechnical evaluation."  *Id.*  Intending,

perhaps, to keep the Court from seeing that this is not a distinction at all, the

PSLC emphasize that they are challenging the Corps's "own negligent acts."[153]

But of course:  supervision of government contractors *is* performed by

government employees.  Here, the decision not to request further geotechnical

review was made by Lee Guillory, who was the Corps's Construction Manager

---

[150]Clouatre 29:3-10; Staggs 126:7-11, 223:23 – 224:4.

[151]MRGO PSLC Amicus Surreply [Doc. 14784] at 3.

[152]MRGO PSLC Amicus Brief [Doc. 14252] at 15.

[153]Amicus Surreply at 1 (emphasis in original).

for Task Order No. 26 at the EBIA.  He made that decision in the course of

supervising WGI, and the PSLC's challenge goes to contractor supervision and

to no other conduct.

**B.  THE CORPS'S REVIEW OF WGI'S WORK PLANS INVOLVED POLICY-BASED DISCRETION.**

**1.  DECIDING WHETHER TO SEEK FURTHER GEOTECHNICAL REVIEW OF WGI'S WORK PLAN WAS NOT FORECLOSED BY ANY REGULATION.**

The PSLC argues that Guillory lacked discretion because Corps regulations

required that WGI's excavation plans be reviewed by the District's

Engineering Department.[154]  Plaintiffs identify Engineer Regulation 1110-2-

1150 and argue that the Corps failed to comply with its requirement that

"maintenance activities" receive engineering support.[155]  Plaintiffs err.

Paragraph 16, which they quote, applies to "Engineering During Operations

Phase," as the caption indicates.[156]  This project was still in the construction

phase.  More fundamentally, Plaintiffs quest to overcome the discretionary-

function exception fails because the regulation allows "[d]eviations from the

[engineering]  process described in paragraph[s] 12 through 16 and in

---

[154]*See* PSLC Amicus Brief at 15-18.

[155]PSLC Amicus Brief at 15.

[156]*See* ER 1110-2-1150, ¶ 16.

paragraph 18."  Accordingly, the construction-phase processes set forth in

paragraph 15 are not mandatory and therefore cannot prevent application of

the discretionary-function exception.  The provisions of paragraph 17 that the

plaintiffs cite are too general to prevent application of the exception.  As the

paragraph itself observes, the provisions are aspirational "goals," not

mandatory and specific requirements.  Failure to attain these goals would not

vitiate the discretionary-function exception.[157]

Plaintiffs also identify ER 1110-1-8157 as a regulation that was violated.

They charge that the Corps did not obtain required geotechnical input and

design services.[158]  They assert that the Corps's quality assurance

representative was unqualified and insufficiently guided.[159]  Here again

Plaintiffs err.  In compliance with this regulation, the Corps obtained all

required geotechnical input and services.  By singling out Quality Assurance

Representative Alvin Clouatre, Plaintiffs imply that he alone provided field

oversight.  But Clouatre was just one member of the team that provided field

---

[157]*See Freeman v. United States,* 556 F.3d 326, 338 (5th Cir. 2009) (discretion is not removed by "generalized, precatory, or aspirational language that is too general to prescribe a specific course of action").

[158]PSLC Amicus Brief at 17-18.

[159]*Id.* at 18-19.

oversight.  The Corps's field team consisted of a Senior Project Engineer, a Project Engineer, and five Quality Assurance Representatives.  This team performed daily inspections and provided oversight of the Contractor at various times while WGI was employed under Task Order 26.  Additional oversight was provided periodically by other members of the Corps's HTRW team and by the SWT Contracting Officer.  The Project Delivery Team included engineers in the District's Engineering Department.  Guillory I, 53:7-22.  This team defined the scope of work, the projected start and stop dates, and the approximate cost of the remediation.  *Id.* 51:10-19.

Geotechnical, geological, geochemical, and chemical-testing data were reviewed by HTRW team members and an LADEQ Senior Scientist. Engineering Division team members consisted of Dr. George Bacuta (Professional Geologist); Gary Brouse (Civil Engineer) and Reuben Mabry (Civil Engineer with a Master of Science in Environmental Engineering). WGI's Denver office staff had numerous geologists, geochemists, and environmental engineers on staff that augmented the USACE team as required.

**2. GUILLORY'S DECISIONS REGARDING HOW EXTENSIVELY TO ANALYZE WGI'S WORK PLANS WERE INFLUENCED BY CONSIDERATIONS OF EFFICIENCY AND RISK, INCLUDING THE RISK OF AN ADVERSE COMMUNITY IMPACT.**

Plaintiffs allege that WGI's work damaged the LPV levee and floodwall,[160] and they imply that further geotechnical analysis of WGI's work plan would have identified and avoided this consequence.[161] But the Corps was not oblivious to the risk that WGI's work might affect the LPV levee. Indeed, to avoid damage to the levee, Guillory prescribed a 15-foot exclusion zone along the levee.[162] In particular, Guillory recognized that WGI's excavations could affect the levee.[163] And he considered possible adverse community-impacts that might result from these excavations.[164]

To avoid an adverse community impact, Guillory directed that "upon completion of all borrow operations the dikes between the IHNC and the borrow area shall be slowly breached to allow IHNC water to fill borrow area

---

[160]*See* MRGO Amended Complaint ¶ 47; PSLC Amicus Brief 17.

[161]*See* PSLC Amicus Brief 16.

[162]*See* WGI SOF ¶ 74.

[163]*See* WGI SOF ¶ 185; 2008 WL 5234369, at *2.

[164]*See* WGI MSJ Ex. 109 (commenting that the borrow-pit "excavation would leave a big hole that can appear as a nuisance to the neighborhood in regard to 'aesthetic' and 'potential health and safety' implications. The hole can be filled with rainwater that can stagnate (if left enclosed) and turn into a potential breeding ground for mosquitoes as well as an inviting swimming pool.").

and allow intertidal flow between the two water bodies."[165]  He did so because

he thought tidal flow into and out of the pit would prevent stagnation.[166]  He

allowed water to accumulate in the borrow pit and other excavations because

he knew the hydrostatic pressure would reduce the risk that WGI's

excavations would affect the levee.[167]

At the same time, Guillory had to consider whether additional analysis

would reduce the risk of harm or merely delay the project unnecessarily.

Speeding the half-century-old project to completion was a special

consideration in view of the project's national importance and the adverse

commercial impacts caused by further delay.[168]  Guillory recognized that

expediency would promote a timely completion of the site remediation, in

furtherance of the social and economic policies undergirding the lock

project.[169]

Guillory's appreciation of the need to consider possible community impacts

shows that the challenged conduct is susceptible to policy analysis.  Would

---

[165]  Guillory II, 154:11-15.

[166]*Id.* 154:19-24.

[167]*Id.* 154:25 – 155:10.

[168]Project Execution Plan Mem. ¶ 6.

[169]*See* Guillory I, 47:8-10; Guillory II, 153:3-20.

more evaluation of WGI's work plans have prevented the community impact

that gave rise to this litigation?  The plaintiffs contend that it would have.  But

that judgment was Guillory's (and more broadly the Corps's)  to make.

Neither this Court nor any other is empowered by the FTCA to review that

judgment..  Congress excluded discretionary functions from the purview of the

FTCA to prevent courts from criticizing judgments like those that Guillory

made in administering Task Order 26.[170]  Whether Guillory was right or wrong

is of no moment here, for his exercise of discretion is not subject to judicial

review "whether or not the discretion [was] abused."[171]

   The overarching policy that guided Guillory was a policy that provided

room for him to exercise discretion.   He was to mitigate adverse community

impacts "to the maximum extent practicable."[172]  Whether his determination

of what was capable of being done within the various constraints imposed by

the welter of social, economic, and political implications that had propelled

this project into the twenty-first century, his conduct is not subject to judicial

review in this tort action.

---

[170]*See Gaubert,* 499 U.S. at 323.

[171]28 U.S.C. § 2680(a).

[172]1996 WRDA, Pub. L. No. 104-303, § 326(c), 110 Stat. 3658, 3717.

**III.  PLAINTIFFS DID NOT EXHAUST THEIR ADMINISTRATIVE REMEDIES BY FILING SUIT, BECAUSE THE ARMY CORPS OF ENGINEERS HAS NO AUTHORITY TO COMPROMISE CLAIMS IN LITIGATION.**

As the Court has already found, the MRGO plaintiffs first informed the United States of their EBIA claims on March 15, 2007, when they filed the MR-GO Master Consolidated Class Action Complaint.[173]  Entergy first informed United States of its claims on February 28, 2007, when they presented their claims administratively to the Corps of Engineers.[174]  They deemed those claims denied less than six months later when they filed suit on August 28.[175] Neither the MRGO plaintiffs nor the Entergy plaintiffs complied with 28 U.S.C. § 2675(a), which requires that"the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been denied" before an action is instituted on the claim.  This defect afflicts the re-filed MRGO complaint no less than the initial complaint.

Although the Court has expressed its belief that the initial MRGO master complaint functioned as an administrative claim, that view cannot be squared with the statutory scheme in §§ 2672, 2675, and 2677  It is untenable in view

---

[173]2010 WL 487431, at *5 (E.D. La. Feb. 2, 2010).

[174]*Id.* at *16.

[175]*Id.*

of *McNeil v. United States*, which insisted on "'strict adherence to the procedural requirements specified by the legislature.'"[176]  The FTCA's procedures "require complete exhaustion of Executive remedies before invocation of the judicial system."[177]  Adhering to this and to other FTCA procedures fosters "'evenhanded administration of the law'" and promotes the efficiencies that Congress desired to obtain.[178]  *McNeil* recognized that "[e]very premature filing imposes some burden on the judicial system and on the Department of Justice which must assume the defense of such actions."[179]  The proceedings in the present litigation bear testimony to the truth of the Supreme Court's teaching.  Both the Department of Justice and this Court have expended more than *de minimis* resources simply because the plaintiffs did not hew to the FTCA's procedural requirements.

The FTCA's procedures do not mandate a single form or particular method for presenting tort claims administratively.[180]  But filing suit in federal court cannot be deemed an acceptable method of complying with § 2675(a).  The

---

[176]508 U.S. 106, 113 (1992) (quoting *Mohasco Corp. v. Silver,* 447 U.S. 807, 826 (1980)).

[177]508 U.S. at 112.

[178]*See id.* at 112-13.

[179]508 U.S. at 112-13.

[180]*Williams v. United States,* 693 F.2d 555, 557 (5th Cir. 1982).

FTCA's administrative scheme rules that method out.  The scheme is premised

on adherence to § 2675(a)'s command that administrative exhaustion occur

*before* an action is instituted upon a claim.  Under the procedural rules, the

process is as follows: (1) claim is presented to agency; (2) agency considers

claim (3) agency acts on the claim or, if the agency does not finally deny the

claim within six month, the claimant deems it denied and files suit; (4) absent

compromise or settlement of the claim, litigation ensues at the claimant's

option.

The service of a complaint commencing action in federal court cannot

satisfy the first step in the process because the action itself would preclude

the second and third steps.  The agency could not consider the claim or act on

it because § 2677 vests the authority to "arbitrate, compromise, or settle" the

claim in the Attorney General.  Even though "the appropriate Federal agency"

might be notified of the claims in litigation, the agency would be without

power to "make final disposition of" those claims, *id.* § 2675(a), thwarting the

very purpose of the rule that claims be exhausted administratively before an

action is commenced.  Indeed, the statute allows claimants to deem agency

inaction "a final denial of the claim for purposes of [§ 2675(a)]" based on the

assumption that the agency will have had an adequate opportunity  to exercise

the authority conferred by § 2672.  Section 2672authorizes "[t]he head of each

Federal agency or his designee . . . [to] consider, ascertain, adjust, determine,

compromise, and settle any claim . . . ."  Reading this provision together with §

2677 makes it clear that the authority to "make final disposition" of a claim

passes from the agency to the Attorney General when an action on the claim

commences.  Consequently, allowing the filing of suit in federal court to satisfy

the administrative presentment requirement deprives the agency of any

opportunity to "make final disposition of" the claims, and destroys the entire

basis for allowing claimants to deem their claims finally denied.[181]

   An appreciation of the FTCA's procedural scheme reveals that *Williams*

stands only for the undisputed  proposition that "[n]o particular method of

giving [administrative] notice is required" by § 2675(a).[182]  The holding of the

case does not encompass the facts of the present case.  There, § 2675(a)'s

administrative-notice requirement was deemed to have been satisfied

because the agency received notice of claims that had been asserted in state

---

[181]*Cf. Brady v. United States,* 211 F.3d 499, 502-03 (9th Cir.), *cert. denied,* 531 U.S. 1037 (2000) (rejecting argument that first judicial complaint could fulfill administrative-presentment requirement for second action); *Houston v. U.S. Postal Service,* 823 F.2d 896, 903-04 (5th Cir. 1987 (state-court action did not toll limitations period because plaintiff had not exhausted administrative remedies).

[182]2010 WL 487431 at *8.

court.  Commencing the state-court action did not divest the agency of its authority to "consider, ascertain, adjust, determine, compromise, and settle" the claims.[183]  Here, the commencement of actions in this Court did divest the agency of that authority.

In its February 2, 2010, ruling the Court allowed the MRGO plaintiffs to file a new suit, on the view that "plaintiffs' claims can be deemed exhausted because more that six months has passed since the 2007 complaint was filed placing the Corps on notice that the EBIA claim was being made by these three plaintiffs, just as in *Williams*."[184]  But as the administrative scheme reveals, "placing the Corps on notice" of claims that the agency lacked the authority "to make final disposition of" does not provide any basis for allowing the plaintiffs to deem the agency's inaction a denial.  Three years have passed since the 2007 complaint was filed, but the passage of time is irrelevant under the circumstances present in this litigation.  The agency lacked the authority that is presupposed by § 2675(a).  If thirty years had passed without any final action by the agency, that would be no basis for viewing the agency's inactivity

---

[183]28 U.S.C. § 2672.

[184]2010 WL 487431 at *12.

as a denial of the claims, given the agency's inability to take any action on them while they remain in litigation.

The same flaw afflicts Entergy's actions.  The agency has not taken any action on them and has not been afforded the statutorily prescribed six months in which to do so.  As explained in prior briefing on this issue, Entergy filed suit on the last day of the six-month period set aside for agency action.[185] Attempting to remedy this defect in their suits, Entergy filed duplicate suits.[186] But Entergy did not dismiss its prior actions.  According, the six-month period of administrative consideration prescribed by § 2675(a) has not been satisfied.  The statutory basis for allowing Entergy to deem its claims to have been finally denied does not exist.  Inasmuch as Entergy did not exhaust its administrative remedies before filing these suits, they must be dismissed for lack of subject-matter jurisdiction.

---

[185]*See* Doc. 19390, at 15-18.

[186]Entergy's filing of this duplicate action warrants dismissal in and of itself, because the aim was to gain a procedural advantage that could not be obtained by amending its initial suit.  *See Friends of the Earth, Inc. v. Crown Central Petroleum Corp.,* 95 F.3d 358, 362 (5th Cir. 1996).

## CONCLUSION

The three questions posed at the outset can now be answered.  Those

answers confirm that the plaintiffs' EBIA claims must be dismissed.

(1) The United States cannot be held liable for flood damage caused by its

management of the IHNC lock-replacement project.  That project entailed

remediation of the EBIA.  It also entailed the construction and enlargement of

hurricane-protection and river levees intended to reduce the risk of flooding.

The Flood Control Act provides immunity from the liability that these actions

seek to impose.

(2) No statute or regulation told Lee Guillory how extensively to evaluate

WGI's work plans.  In making those judgment calls, Guillory took into account

the usefulness of additional analysis and the possible impact that WGI's work

might exert on the adjacent communities.  His decisions are susceptible to

analysis in terms of their furtherance of the commercial and national-defense

purposes underlying the new-lock project and the project's community

impacts.  Whether more analyses would have provided more useful

information in service of the project's missions or would  merely have wasted

resources and delayed the project is an inquiry beyond this Court's

jurisdiction.

(3) The plaintiffs failed to exhaust their administrative remedies before filing suit, even though the FTCA requires it.  The prematurity of their actions not only precluded agency action but also prevented the passage of time from serving as a basis for deeming their claims to have been denied.  Because the plaintiffs failed to heed the clear statutory command requiring administrative exhaustion before filing suit, their EBIA claims must be dismissed.

Respectfully Submitted,

TONY WEST
Assistant Attorney General

PHYLLIS J. PYLES
Director, Torts Branch

JAMES G. TOUHEY, JR.
Assistant Director, Torts Branch

 s/ Robin Doyle Smith
ROBIN D. SMITH
Senior Trial Counsel, Torts Branch
DAN BAEZA
Trial Attorney, Torts Branch
Civil Division
U.S. Department of Justice
Benjamin Franklin Station,
P.O. Box 888
Washington, D.C.  20044
(202) 616-4400/616-5200 (fax)
robin.doyle.smith@usdoj.gov
Attorneys for the United States

## **CERTIFICATE OF SERVICE**

I certify that a true copy of the foregoing was served upon all counsel of

record by ECF on August 3, 2010.

/s  Robin D. Smith
ROBIN D. SMITH
