UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE:  KATRINA CANAL BREACHES                    CIVIL ACTION
CONSOLIDATED LITIGATION

      NO. 05-4182
PERTAINS TO BARGE

      SECTION 'K'

*Mumford*    **C.A. NO. 05-5724**    *as to plaintiffs Josephine Richardson and Holiday Jewelers, Inc. – ONLY*

*Benoit*    **C.A. NO. 06-7516**    *as to claims of plaintiffs John Alford and Jerry Alford - ONLY*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# <u>PLAINTIFFS' POST TRIAL BRIEF</u>

## TABLE OF CONTENTS

I.      INTRODUCTION……………………………………………………1

II.    APPLICATION AND SIGNIFICANCE OF THE PENNSYLVANIA
       AND LOUISIANA RULES………………………………................1

     A. THE LOUISIANA RULE - PRESUMPTION OF NEGLIGENCE…3

         1.    The Louisiana Rule Is Applicable………………………..5

         2.    The Breakaway and Collision Were Not
             Inevitable………………………………….………..6

         3.    ING 4727 Was Not Moored To Withstand
             Katrina's    Predicted Winds.  The Breakaway
             Was NOT Inevitable………………………................7

4.    Vis Major - Lafarge Cannot Prove That It Was Not Negligent……………………………………………10

    a.    Lafarge failed to monitor the weather............10

    b.    Lafarge violated its own policies and Procedures………………………………………12

    c.    Lafarge failed to adequately moor the ING 4727 for hurricane conditions…………..................…13

    d.    Lafarge failed to remove the barge………….15

5.    Conclusions As To The Louisiana Rule……………..15

B. THE PENNSYLVANIA RULE – PRESUMPTION OF CAUSATION

    1.    Lafarge violated 33 CFR 162.75 by failing to ensure that the ING 4727 was adequately secured and moored….18

    2.    Based On The Applicable Rules of Construction, The First Sentence of 162.75(b)(3)(ii) imposed clear duties on Lafarge to adequately secure the ING 4727………19

    3.    The evidence establishes that Lafarge violated the first sentence of Subbpart (b)(3)(ii) based on either construction…………………………………………22

    4.    Lafarge violated the specific duties prescribed by 33 CFR 162.75 relating to the securing and mooring of ING 4727 as a constituent part of a tow………………26

    5.    Lafarge violated 33 CFR 6.19-1 by failing to adhere to the minimal directives set forth in the United States Coast Guard Sector New Orleans Hurricane Plan…….29

III.    THE BARGE WAS A SUBSTANTIAL FACTOR IN CAUSING THE EASTERN IHNC FLOODWALL BREACHES………………………33

A. Restatement of Torts 2d § 433, Considerations Important In Determining Whether Negligent Conduct Is Substantial Factor In Producing Harm…………………………………………..34

1.       Restatement § 433(a): The Number Of Other Factors Which
         Contribute In Producing The Harm And
         The Extent Of The Effect Which They Have In Producing
         It…………………………………………….38

         a.       Direct Proof that the Barge was a Substantial
                  Factor…………………………………………38

                  i. The eastern IHNC floodwall breaches occurred
                  only at locations where witnesses testified that they
                  saw a barge crash into the floodwall.  At each
                  instance, according the
                  witnesses,      the      floodwall      simultaneously
                  failed………………………………………….38

                  ii.       The eastern IHNC floodwall breaches
                  are the only Katrina floodwall breaches where a tip
                  of a barge was seen through one breach, and where
                  a barge was seen falling into a neighborhood where
                  it remained adjacent to the other breach.  This
                  phenomenon     is     unique     to     these
                  breaches…………………………………….38

                  iii.      The Northern IHNC floodwall shows
                  effects characteristic of localized failure caused by
                  impact……………………………………….38

                  iv.       The Southern IHNC floodwall shows
                  effects characteristic of localized failure caused by
                  impact……………………………………….39

                  v.       Concrete damage characteristic of barge
                  impact at both North and South Breaches.

                  vi.       Sounds uniquely associated with the
                  barge…………………………………………39

                  vii.      Sequence of sounds and flooding is
                  evidence of the intact floodwall before barge
                  impact………………………………………40

                  viii.     Photographic Evidence that the Barge
                  Preceded the Flood – Standing Houses……….40

B. Restatement 433(a) Comparison of the Barge's Effect with Potential Effect of Other Failure Modes – Lafarge's Impossibility Argument and Contribution……………………41

    1.Failure modes urged by Lafarge, in combination with Hurricane Katrina, may have contributed to the breaches, but not without the greater effect of the barge……………………………………………42

        a.    The defense experts rely purely upon hypotheses and evidence which is either flawed, or does not exist…………………………………………..42

        b.    If the eastern IHNC breaches occurred before any other canal breaches during Katrina…………..43

        c.    The eastern IHNC floodwall breaches occurred before the peak surge recorded at the IHNC lock gauge……………………………………………43

        d.    The eastern IHNC south of the North Breach endured widespread scour and trench formation at locations where it did not breach…………...44

        e.    The North Breach occurred absent overtopping and scour………………………………………44

        f.    IPET agrees, generally, in Vol. IV, FINAL, Technical Appendix 17, with Dr. Marino's conclusion that contact between the barge and the floodwall would cause or at least contribute substantially to its failure……………………..44

  2.  Restatement § 433(b): Whether The Actor's Conduct Has Created A Force Or Series Of Forces Which Are In Continuous And Active Operation Up To The Time Of The Harm...............45

C.  Contributing Legal Cause – Restatement Sections 439 and 450……45

IV.    GEOTECH EXPERT ANALYSIS……………………………………47

    A. North Breach Failure Modes………………………………..48

      1. The Primary Causes Advanced by Dr. Bakeer Are Unreliable

and Speculative……………………………………………49

    a. Top Soil Sink………………………………………..49

    b.  The "Faulty Weld" Theory…………………………52

    c.  Tension Cracks…………………………………………54

  3.  Dr. Bea's Fails to Provide Credible Evidence to Support His Seepage Theory……………………………………………55

    a.  ILIT Study…………………………………………………55

    b.  Permeability……………………………………………56

      i. The EBIA Excavations………………………57

      ii. The Marsh Layer……………………………61

    c.  Dr. Bea's Hydraulic Uplift Theory is Unsupported By Evidence………………………………………………62

B. South Breach Failure Modes…………………………………..63

  1.  Dr. Bakeer is Simply Wrong About the Causes of The Breaches……………………………………………63

  2.  Dr. Bakeer's Wall Height Theory Relies on Flawed Methodology…………………………………………………64

  3.  Dr. Bakeer's Theory Regarding the Particular Weakness of the Wall at the South Breach Does Not Exclude the Barge………………………………………………66

  4.  Overtopping and Scour Trenches………………………..70

  5.  Plain Strain Problem……………………………………..71

  6.  Drainage Canals on Both Sides of Floodwall…………..72

  7.  Dr. Bea's Early Position Regarding the Barge Concluded that the Barge was Involved in the North and South Breaches……………………………………………73

V.    OF THE EFFECT ON DAMAGES AND THE COURT'S DETERMINATION OF SUCH, SHOULD THE COURT SHOULD FIND

VI.     A FINDING THAT LAFARGE'S CONDUCT WAS A SUBSTANTIAL
        FACTOR IN BRINGING ABOUT AN INDIVISIBLE HARM
        PROVOKES APPLICATION OF MARITIME JOINT AND SEVERAL
        LIABILITY……………………………………………..78

VII.    WITNESS CREDIBILITY……………………………………………81

        A. Experts…………………………………………………………..81

        B. Defendant's "Laws of Nature" Argument…………………………83

        C.      Drs. Mitchell and Dooley, and Mr. Lemon……………………85

        D.      As To The Credibility Of Eye-Witnesses And Sound
                Witnesses On Sunday And Monday…………………………87

                1.      Eyewitnesses on Sunday………………………………90

                2.       Eyewitnesses on Monday, Sound Witness and
                        Scientific Corroboration………………………………90

VIII.   PUNITIVE DAMAGES…………………………………………94

IX.     CONCLUSION……………………………………………………95

**TABLE OF AUTHORITIES**

<u>**CASES**</u>

*Adams v. Traina*,
        830 So. 2d 526 (La. 2002)…………………………………………………………36

*Allstate Insurance Co. v. GE*,
        2002 U.S. Dist. LEXIS 28256 (W.D. La. Feb. 4, 2002)………………….................59

*American River Transportation Co., Inc. v. Paragon Marine Services, Inc.*,
        329 F.3d 946 (8th Cir. 2003)…………………………………………………………12

*Amstadt v. United States Brass Corp.*,
        919 S.W.2d 644 (Tex. 1996)……………………………………………...……75

*Belsome v. Belsome (In re Belsome)*,
  434 F.3d 774 (5th Cir. 2005)………………………………………………...…19

*Borel v. Fibreboard Paper Products Corp*.,
  493 F.2d 1076 (5th Cir. 1973)……………………………………………………75

*Bosnor, S.A. de C.V. v. Tug L.A. Barrios*,
  796 F.2d 776 (5th Cir. 1986)…………………………………………………...…82

*Boudoin v. J. Ray McDermott & Co.*,
  281 F.2d 81 (5th Cir. 1960)………………………………………………...……5, 10, 46

*Bunge vs. Freemont Marine Repair, Inc.*,
  240 F.3d 919 (11th Cir. 2001)……………………………………………………6, 7, 16

*Candies Towing Co. v. M/V B & C Eserman*,
  673 F.2d 91 (5th Cir. 1982)………………………………………………...…17

*Carey v. Hercules Ocean Corp.*,
  321 Fed. Appx. 402 (5th Cir. 2009)………………………………………...……81

*Carlisle v. M/S Sistina*,
  407 F.2d 824 (5th Cir.1969)………………………………………………………88

*Cenac Towing Company, Inc. v. Southport, L.L.C. (In re Cenac Towing Co.)*,
  232 Fed. Appx. 929 (11th Cir. 2007)………………………………………...……5

*Chaisson v. Avondale Indust., Inc.*,
  947 So. 2d 171 (La. App. 2006)……………………………………………………34

*Chan v. Coggins*,
  294 Fed.Appx. 934 (5th Cir. 2008)………………………………………………87

*Chandler v. Roudebush*,
  425 U.S. 840 (1976)……………………………………………………...……85

*Coats v. Penrod Drilling Corp.*,
  61 F.3d 1113 (5th Cir. 1995)……………………………………………………...…78

*Cranberry Creek Coal Co. v. Red Star Towing & Transp. Co.*,
  33 F.2d 272 (2d Cir. 1929)…………………………………………………...……1, 4

*Dalton v. Toyota Motor Sales, Inc.*,
  703 F.2d 137 (5th Cir. 1983)……………………………………………………82

*Daubert v. Merrell Dow Pharmaceutical*,

43 F.3d 1311 (9th Cir. 1995)……………………………………………………57, 59, 60

*Delta Transload, Inc. v. M/V Navios Commander,*
   818 F.2d 445 (5th Cir. 1987)…………………………………………………………5

*Dickens v. United States,*
   545 F.2d 886 (former 5th Cir. 1977)…………………………………………………..82

*Dotson v. Clark Equipment Co.,*
   783 F.2d 586 (5th Cir. 1986)…………………………………………………………..84

*Douglass v. Delta Air Lines, Inc.,*
   897 F.2d 1336 (5th Cir. 1990)…………………………………………………………87

*Doyle v. Graske,*
   565 F. Supp. 2d 1069 (D. Neb. 2008)…………………………………………………81

*Edmonds v. Compagnie Generale Transatlantic,*
   443 U.S. 256 (1979)………………………………………………………33, 78, 79, 80

*Evans v. BV Shipping Company Lombok Strait,*
   2009 U.S. Dist. LEXIS 92305 (D.N.J. Oct. 5, 2009)………………………….…..80

*Evergreen Int'l, S.A. v. Marinex Constr. Co.,*
   477 F. Supp. 2d 681 (D.S.C. 2007)……………………………………………………17

*Fischer v. S/Y Neraida,*
   508 F.3d 586 (11th Cir. 2007)…………………………………………………………..46

*Fortunato v. Ford Motor Co.,*
   464 F.2d 962 (2d Cir. 1972)……………………………………………….....…..84, 85

*Foulk v. Donjon Marine Co.,*
   963 F. Supp. 427 (D.N.J. 1997)……………………………………………..……35

*Gebr. Bellmer Kg. v. Terminal Services Houston, Inc.,*
   711 F.2d 622 (5th Cir. 1983)………………………………………………..……81

*Geigy Chemical Corp. v. Allen,*
   224 F.2d 110 (5th Cir. 1955)……………………………………………..……..84, 89

*Gifford v. National Gypsum Co.,*
   753 F.2d 1345 (5th Cir. 1985)…………………………………………………………83

*Gordon H. Mooney, Ltd. v. Farrell Lines, Inc.,*

616 F.2d 619 (2d Cir. 1980)…………………………………………………...……75

*Grant v. Cia Anonima Venezolana De Navegacion*,
228 F. Supp. 232 (E.D. La. 1964)……………………………………………….89

*Great Lakes Towing Co. v. American Shipbuilding Co*.,
243 F. 849 (6th Cir. 1917)……………………………………………………….6

*Great N. Insurance Co. v. Power Cooling, Inc.*,
2007 U.S. Dist. LEXIS 95912 (E.D.N.Y. Dec. 18, 2007)……………………………...60

*Henderson v. Norfolk Southern Corp.*,
55 F.3d 1066 (5th Cir. 1995)………………………………………..……………82

*Hennigan v. Cooper/T. Smith Stevedoring Co., Inc.*,
837 So. 2d 96 (La. App. 2002)……………………………………………………...34

*In re Mid-South Towing Co.*,
418 F.3d 526 (5th Cir. 2005)……………………………………………………2

*James v. River Parishes Co., Inc.*,
686 F.2d 1129 (5th Cir. 1982)……………………………………….…………3, 4, 5

*KCMC, Inc. v. FCC*,
600 F.2d 546 (5th Cir.
1979)...................................................................................................................19

*Kimble v. MacKintosh Hemphill Co.*,
59 A.2d 68 (1948) ...............................................................................................46

*Kirksey v. P&O Ports Tex., Inc.*,
488 F. Supp. 2d 579 (S.D. Tex. 2007) ..............................................................35

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)............................................................................................59

*Landers v. East Texas Salt Water Disposal Co*.,
151 Tex. 251 (Tex. 1952) ...................................................................................75

*Latulas v. Montco Offshore, Inc.*,
2006 U.S. Dist. LEXIS 20066 (E.D. La. Mar. 29, 2006)…………………………..…35

*Liberty Mutual Fire Insurance Co. v. Tidewater Oil Co*.,

292 F. Supp. 818 (W.D. La. 1967)……………………………………………………38

*Matheny v. Tennessee Valley Authority,*
523 F. Supp. 2d 697 (M.D. Tenn. 2007)…………………………………...……36

*McDermott, Inc. v. AmClyde,*
511 U.S. 202 (1994)……………………………………………………...….80, 81, 82

*McDermott, Inc. v. Clyde Iron,*
979 F.2d 1068 (5th Cir. 1992)……………………………………………………82

*Michaels v. Avitech, Inc.*
202 F.3d 746 (5th Cir. 2000)……………………………………………....75

*Miller v. Butcher Distributors,*
89 F.3d 265 (5th Cir. 1996)……………………………………………………84

*Moore v. Ashland Chemical Inc.,*
151 F.3d 269 (5th Cir. 1998)…………………………………………………...86

*Moore v. M/V ANGELA,*
353 F.3d 376 (5th Cir. 2003)…………………………………………....36

*Mosely v. City Of Chicago,*
252 F.R.D. 421 (N.D. Ill. 2008)………………………………………...……90

*N.D. Shipping, S.A. v. Zagora M/V,*
2009 U.S. Dist. LEXIS 47538 (E.D. La. June 5, 2009)…………………...…….2

*Neal v. United States,*
562 F.2d 338 (former 5th Cir. 1977)……………………………………………..83

*New York Marine Co. v. Cranberry Creek Coal Co.,*
280 U.S. 596 (1929)……………………………………………………………..4

*Norfolk Southern Railway Company v. Moran Towing Corp.,*
2010 U.S. Dist. LEXIS 56683 (E.D. Va. June 8, 2010)……………………..……47

*Ohio Valley Eng. v. Ove,*
214 F. Supp. 784 (E.D. La. 1963)……………………………………………...10

*Orange Beach Water, Sewer & Fire Protection Authority v. M/V Alva,*
680 F.2d 1374 (11th Cir. 1982)……………………………………………..17

*Pennzoil Producing Co. v. Offshore Express, Inc.,*
943 F.2d 1465 (5th Cir. 1991)…………………………………………….……17

*Perkins v. Entergy Corp.*,
    782 So. 2d 606 (La. 2001)…………………………………………….………..34

*Pioneer Natural Resources USA, Inc. v. Diamond Offshore Co.*,
    638 F. Supp. 2d 665 (E.D. La. 2009)……………………………………….....46

*Pongetti v. GMAC (In re Locklin)*,
    101 F.3d 435 (5th Cir. 1996)………………………………………….………19

*Project Hope v. M/V IBN SINA*,
    250 F.3d 67 (2nd Cir. 2001)………………………………………………..…75

*Ralston Purina Co. v. Hobson*,
    554 F.2d 725 (5th Cir. 1977)………………………………………………..84

*Ranger Ins. Co. v. Exxon Pipeline Co.*,
    760 F. Supp. 97 (W.D. La. 1990)……………………………………………17

*Rector v. Hartford Acc. & Indem. Co. of Hartford*,
    120 So.2d 511 (La. 1960)……………………………………………………81

*Remington Arms Co., Inc. (Peters Cartridge Division) v. Wilkins*,
    387 F.2d 48 (former 5th Cir. 1967)…………………………………………82

*Richard v. Firestone Tire & Rubber Co.*,
    853 F.2d 1258 (5th Cir. 1988)………………………………………………82

*Schipp v. GMC*,
    443 F. Supp. 2d 1023 (E.D. Ark. 2006)……………………………………..60

*Schober v. Maritz, Inc.*,
    2008 U.S. Dist. LEXIS 14060 ( E.D. Mich. Feb. 26, 2008)................................59

*Self Towing, Inc. v. Brown Marine Services, Inc.*,
    837 F.2d 1501 (11th Cir. 1988)………………………………………………27

*Signal Int'l LLC v. Miss. DOT*,
    579 F.3d 478 (5th Cir. 2009)………………………………………….3, 6 47, 83

*Simeon v. T. Smith & Son, Inc.*,
    852 F.2d 1421 (5th Cir. 1988)………………………………………………79

*Skandia Ins. Co., Ltd. v. Star Shipping*,
    173 F.Supp. 2d 1228 (S.D. Ala 2001)……………………………………..…6

*Skidmore v. Grueninger*,

      506 F.2d 716 (5th Cir. 1975)……………………………………..…………..17

*Sotto v. Wainwright*,
      601 F.2d 184 (5th Cir. 1979)………………………………………....19

*Spinks v. Chevron Oil Co.*,
      507 F.2d 216 (5th Cir. 1975)………………………………………………34

*St. Paul Fire & Marine Insurance Co. v. Nolen Group*,
      2007 U.S. Dist. LEXIS 64603 (E.D. Pa. Aug. 31, 2007)…………………………81

*Tassin v. Sears, Roebuck & Co.*,
      946 F. Supp. 1241 (M.D. La. 1996)......................................................................................60

*The Atlas*,
      93 U.S. 302 (1876)………………………………………………...79

*The Bern*,
      1929 A. M. C. 1145 (1929)…………………………………………………….6

*The Eagle*,
      52 F.Supp. 927 (E.D.N.Y. 1944)……………………………………..…10

*The Juniata*,
      93 U.S. 337 (1876)…………………………………………………..…79

*The Katie E*,
      46 F.2d 534 (E.D.N.Y. 1931)………………………………………………...10

*The Louisiana*,
      70 U.S. 164 (1866)……………………………………….………3, 4, 6, 9, 10, 16

*The Pennsylvania*,
      86 U.S. 125 (1874)………………………………………………………17

*The Surico*,
      42 F.2d 58 (1930)………………………………………………………..6

*Tolle v. Higgins Industries,*
      31 So.2d 730 (La. 1947)……………………….…………………...38, 42, 83, 88

*Travelers Ins. Co. v. Randall*,
      264 F.2d 1 (5th Cir. 1959)…………………………………………………….5

*Trinidad Corp. v. S.S. Keiyoh Maru*,
      845 F.2d 818 (9th Cir. 1988)………………………………………..……30

*United States v. Casel*,
　　　995 F.2d 1299 (5th Cir. 1993)……………………………………………………88

*United States v. Cota*,
　　　2009 U.S. Dist. LEXIS 18736 (N.D. Cal. 2009)…………………….…..37

*United States v. Cravero*,
　　　530 F.2d 666 (5th Cir. 1976)………………………………………….….…89

*United States v. De Los Santos*,
　　　625 F.2d 62 (5th Cir. 1980)………………………………………...….…..89

*United States v. Hutson*,
　　　980 F.2d 1443 (5th Cir. 1992)……………………………………….…84, 85

*United States v. Lamastus & Associates, Inc.*,
　　　785 F.2d 1349 (5th Cir. 1986)………………………………………………18

*United States v. Mathena*,
　　　23 F.3d 87 (5th Cir. 1994)………………………………………….….…..22

*Verrett v. McDonough Marine Service*,
　　　705 F.2d 1437 (5th Cir. 1983)………………………………………….…18

*United States v. Narciso*,
　　　446 F. Supp. 252 (E.D. Mich. 1977)…………………………………….89

*Vestal v. Glens*,
　　　146 F.Supp 494 (D.N.C. 1956)………………………………………..….42

*Warrior & Gulf Navigation Co. v. United States*,
　　　864 F.2d 1550 (11th Cir. 1989)……………………………….…..…46

*Westchester Fire Ins. v. Haspel-Kansas Inv.*,
　　　342 F.3d 416 (5th Cir. 2003)…………………………………………...37

## STATUTES

28 U.S.C. § 1333………………………………………………………….…33

## REGULATIONS

33 CFR 6.01-1……………………………………………………………….30

33 CFR § 6.14-1……………………………………………………………...30

33 CFR 6.19-1…………………………………………………………………...29, 30, 31, 32, 33

33 CFR 162.75……………………………………………………………...18, 21, 26, 27, 29

33 CFR 162.75(b)(3)(ii)……………………………………………………………….18

33 CFR 162.75(b)(5)(v)…………………………..……………………………………21, 26

## TREATISES

GRANT GILMORE & CHARLES L. BLACK, JR., THE LAW OF ADMIRALTY (1975)……………….10

JOHN A. EDGINTON ET AL., BENEDICT ON ADMIRALTY (2010)………………………………..46

JOHN W. GRIFFIN, THE AMERICAN LAW OF COLLISION (1988)………………………………..5

WILLIAM L. PROSSER & W. PAGE KEETON, PROSSER AND KEETON ON TORTS (5TH ED. 1984)…74

RESTATEMENT OF TORTS 2D § 431(A)…………………………………………………….37

RESTATEMENT OF TORTS 2D § 433(A)…………………………………………………….74

RESTATEMENT OF TORTS 2D § 433(B)…………………………………………………….77

RESTATEMENT OF TORTS 2D § 439……………………………………………………… 45

RESTATEMENT OF TORTS 2D § 450……………………………………………………….46

RESTATEMENT OF TORTS 2D § 879……………………………………………………….74

## OTHER AUTHORITIES

WILLIAM L. PROSSER, JOINT TORTS AND SEVERAL LIABILITY,
        25 Cal. L. Rev. 413 (1937)………………………………………………………….37

.

## I.      INTRODUCTION

The Court and parties recognize that, boiled down to its essence, this litigation turns primarily upon the question of what broke the eastern Industrial Canal Floodwall.  At the outset of this trial, Lafarge likened the requisite analysis to the considerations underlying Occam's Razor.  The irony of invoking this principle is that Lafarge's defense is the far more complex and assumption-based of the competing bodies of evidence at play.  All things being equal, a barge seen striking the previously intact floodwall during the storm, and found on the wrong side of a floodwall breach after the storm, offers the simplest explanation, and may in fact explain why so many who did not see the breaches occur "know" that ING 4727 caused them. Legal presumptions afforded the Plaintiffs render what is already a simple inquiry with an obvious conclusion that much more so.   On the other hand, Lafarge's tortuous defense is hardly simple, and relies on far too many un-premised assumptions and data-manipulations to be worthy of any association with Occam's Razor.

## II.     APPLICATION AND SIGNIFICANCE OF THE PENNSYLVANIA AND LOUISIANA RULES.

At their core, maritime presumptions which shift the burden of proof away from the victim of a maritime accident to the offending vessel rest upon rest upon principles of fairness. As explained by Judge Learned Hand nearly a century ago, "there are situations in which the law does not put the duty upon the sufferer to make proof at the outset; either because the facts are especially within the owner's knowledge, or, as in the case of collisions with an anchored vessel, because usually there must be some fault, it is thought just to require the owner to explain, and if he does not, to charge him."  *See Cranberry Creek Coal Co. v. Red Star Towing & Transp. Co.*, 33 F.2d 272, 274 (2d Cir., 1929).

This is precisely the justification underpinning the *Pennsylvania Rule*, which imposes a presumption of **causation** to a ship that violates a legal rule intended to prevent collisions [See *Plaintiffs' Pretrial Conclusions Of Law* (Dkt. No 19644) ,at 37-38], and the *Louisiana Rule*, which imposes a presumption of **fault** to a vessel that breaks free from its moorings and drifts into a stationary object.  *See id*., at 35-36.  Under these presumptions, the trier of fact is permitted to allocate the burden on issues of causation and liability to the party charged with care of the offending vessel in those circumstances, where due to absence of proof, causation and liability are a mystery:

> Despite the above findings, it is important to note that rebuttable presumptions such as the Oregon rule and the Pennsylvania rule serve only to permit the trier of fact, "in the absence of other evidence, … [to] have a solid, perhaps as a practical matter an unshakable, basis" to determine whether a party was negligent or whether the party's actions proximately caused an accident. *Rodi Yachts, Inc. v. National Marine, Inc.*, 984 F.2d 880, 887 (7th Cir. 1993). These presumptions, however, have limited applicability in the instant case because "there is other evidence." Id.(emphasis added). As the Fifth Circuit has explained, "[e]videntiary presumptions … are designed to fill a factual vacuum. Once evidence is presented … presumptions become superfluous because the parties have introduced evidence to dispel the mysteries that gave rise to the presumptions." *See In Re Mid-S. Towing Co.*, 418 F.3d at 531 (quoting Rodi Yachts, Inc., 984 F.2d at 887).

*See N.D. Shipping, S.A. v. Zagora M/V*, 2009 U.S. Dist. LEXIS 47538, 20-21 (E.D. La. June 5, 2009).

However, even where some evidence exists, the Fifth Circuit has concluded that it is entirely proper for a court to simultaneously apply the presumption and demonstrate the same result would occur based on the evidence.  *See In re Mid-South Towing Co.*, 418 F.3d 526, 532 (5th Cir. La. 2005) ("So even though the court may have framed its breach analysis through the lens of the Oregon rule, the court nevertheless made findings of duty, breach, and causation regarding M/V DIANE OAK and each of the other three vessels independent of that presumption that account for the result it reached.").

As set forth below, both the *Pennsylvania* and *Louisiana* presumptions are applicable in this case. Based thereon, Defendant not only bears the heavy burden of disproving fault and causation, but also must bear the brunt of any gaps in proof that may exist on either issue.

## A.      THE LOUISIANA RULE - PRESUMPTION OF NEGLIGENCE

It is plain that New Orleans and the Gulf Coast are prone to hurricanes emanating from the Gulf of Mexico. There is a defined hurricane season and various categories of storms ranging from category 1 to category 5. These storms can vary in size, strength, speed and direction. However, gone are the days where hurricanes appear without warning. Modern day meteorology affords a high level of predictability. Therefore, it is well accepted that those in the maritime community must be vigilant in monitoring hurricane data in order to properly plan for the impact of hurricanes as well as the movement and safety of vessels in their care. Those in charge of vessels in proximity to structures such as bridges, locks and floodwalls have a heightened duty of care as it is equally common knowledge that a breakaway vessel can cause catastrophic damage. Lafarge breached its duties, and therefore must bear the consequences of allowing ING 4727 to break away.

"Under maritime law, when a vessel breaks free from its moorings and drifts into an allision with a stationary object, the moving vessel is presumed at fault." *See Signal Intl LLC v. Miss. DOT,* 579 F.3d 478, 490 n.11 (5th Cir., 2009); *The Louisiana, 70 U.S.* 164 (1865); *James v. River Parishes Co., Inc.,* 686 F.2d 1129. 1132 (5th Cir. 1982). "This inference or presumption of negligence is a rule of law based on the logical deduction that a vessel found floating loose was improperly moored." See *James,* 686 F.2d at 1133. "The drifting vessel is presumptively liable for damages unless it can `show that her drifting was the result of an inevitable accident or

a vis major, which human skill and precaution and a proper display of nautical skill could not have prevented." See *Signal,* 579 F.3d at 490 n. 11.

Judge Learned Hand discussed the rationale for the presumption of fault in *Cranberry Creek Coal Co. v. Red Star Towing & Transportation Co.*, 33 F.2d 272, 274 (2nd Cir.), cert. denied, *New York Marine Co. v. Cranberry Creek Coal Co.*, 280 U.S. 596, 50 S.Ct. 67, 74 L.Ed. 643 (1929), and stated:

> …[T]here are situations in which the law does not put the duty upon the sufferer to make proof at the outset; either because the facts are especially within the owner's knowledge or, as in the case of collisions with an anchored vessel, because usually there must be some fault, it is thought just to require the owner to explain, and if he does not, to charge him. …[T]he owner's duty is often spoken of as the defense of 'inevitable accident.' Strictly, it is no defense at all, but a true presumption; that is to say, a duty laid upon him to supply proof which costs him if he fails.
>
> "This duty extends not only to disclosing what happened, but …what would have been necessary to prevent it."

To rebut this presumption of fault "such vessels must exhaust every reasonable possibility which the circumstances admit and show that in each they did all that reasonable care required." *The Louisiana,* supra, at p. 164 and 173. To state in another way, Defendant must show that the breakaway could not have been prevented by "human skill and precaution and a proper display of nautical skills." See *James,* supra, at p. 1132. A person may meet this heavy burden by proving by preponderance of evidence that the allision was an "unavoidable," or "inevitable," accident such as a vis major (greater force, or Act of God); to establish this defense, the person against whom the burden-shifting is applied "must exhaust every reasonable possibility which the circumstances admit and show that in each [he] did all that reasonable care required.' " *The Louisiana*, supra, at p. 164, 173   "The party against whom the presumption operates bears the burden of disproving it, not merely coming forward with counter*r*vailing

evidence." See *Delta Transload, Inc. v. M/V Navios Commander,* 818 F.2d 445, 449 (5th Cir. La. 1987). Moreover, the party "bears the burden of disproving fault by a preponderance of the evidence." *See James,* 686 F.2d at 1133.

Defendants raise the defense of Hurricane Katrina as an inevitable accident and/or Act of God. Under the general maritime law, Courts have defined an Act of God as "any accident, due directly and exclusively to natural causes without human intervention, which by no amount of foresight, pain or care, reasonably to have been expected, could have been prevented." *Re Cenac Towing Company, Inc. v. Southport, L.L.C., et al.,* 232 Fed. Appx. 929, 932; Civ. No. 06-15363, 2007 U.S. App. LEXIS 11705, *8 (11th Cir. May 2007) (finding that defendant failed to prove Act of God) quoting *Travelers Ins. Co. v. Randall*, 264 F.2d 1, 2 (5th Cir. 1959) (same) (other citations omitted).

In discharging a burden of disproving fault, the Fifth Circuit Court of Appeal cited *Griffin, The American Law of Collision,* section 241 at p. 544-545 for the proposition that a defendant asserting an Act of God or inevitable accident defense due to weather must show "(a) that the force of the wind was not to have been anticipated; (b) that the vessel had been moored or anchored in such a way as to be prepared to withstand any winds reasonably to have been expected; (c) that there was no negligence on the part of those in charge of her. The defense [sic] has been disallowed when any of the elements of proof referred to above have been absent." *See Boudoin v. J. Ray McDermott & Co.,* 281 F.2d 81, 88(5th Cir. 1960).

### 1.   The Louisiana Rule Is Applicable.

It is undisputed that the ING 4727 broke free of its moorings and drifted, eventually striking a stationary object. Eyewitnesses William Villivasso, Sidney Williams and Terry Adams saw the barge strike the floodwall at the North and South Breaches, respectively. In

addition, and at a minimum, experts from both sides agree that the ING 4727 struck the floodwall at the south end of the South Breach. (*Bartlett Testimony* at p. 336-337, *Bea Testimony* at p. 2620, 2796)

### 2. The Breakaway and Collision Were Not Inevitable.

A collision is not inevitable if the wind conditions were not extraordinary. *Great Lakes Towing Co. v. Am. Ship. Co.*, C. C. A. 6, 243 Fed. 849 (1917); *The Surico*, C. C. A. 1, 42 F.2d 58, 1930 A. M. C. 1454; *The Bern*, 1929 A. M. C. 1145. *The Louisiana*, supra, at p. 173 (Drifting of vessel not caused by any sudden hurricane which could not be anticipated) *Skandia Ins. Co., Ltd. v. Star Shipping,* 173 F.Supp 1228, 1239 (S.D. Ala 2001) (Act of God applies only to extraordinary events in nature which afford no warning).

Defendants cannot show that the weather was of an unpredictable nature; in fact, the weather was predicted. It is clear that Hurricane Katrina was predicted to be a Category 5 hurricane yet, upon landfall had diminished in strength to only a Category 3. Further, experts from both sides agree that the winds at the mooring site (the INHC) were much weaker with defense expert, Dr. Dooley opining that maximum winds were only 75-79 knots (86-92 mph). (DX198) Plaintiff's expert, Dr. Mitchell opined that winds were only 80 to 92. (*Mitchell Testimony* at p. 998, 1039)

Jurisprudence of particular interest is *In re: In the Matter of Signal International LLC vs. Mississippi Department of Transportation,* supra, and *Bunge vs. Freemont Marine Repair, Inc.* 240 F.3d 919 (11th Cir. 2001). In *Signal International* (a Katrina case), the United States Fifth Circuit Court of Appeal cited findings of the trial court:

> At its maximum intensity, Hurricane Katrina had sustained winds of 170 mph, rendering it a Category 5 hurricane. Weakening as it approached the Gulf Coast, it made landfall on August 29, 2005, in Southeast Louisiana, as a Category 3 hurricane with sustained winds of 127 mph.

> **Approximately 60 miles to the east, at the mooring site, the barges were subjected to Category 1 winds, ranging from 80-90 mph, with gusts of 100-110 mph.**  (Emphasis added)

The trial court found that the allision by the breakaway barge in the *Signal* case was not an inevitable accident or *vis major* because Hurricane Katrina, at the mooring site, was not an Act of God "such that no reasonable preparations could have prevented the allision and because the conditions experienced were foreseeable." (*Id.* at p. 486)

 The Eleventh Circuit Court of Appeal in *Bunge***,** likewise affirmed findings of a trial court that Defendants could not be exonerated from liability because sustained winds of 85-103.5 mph "were not of such force that no reasonable precautions would have prevented her from breaking free from her moorings."  *Bunge*, supra, at p. 926

In the present case, the weather was predicted and foreseen.  Further, the weather, at the mooring site, was not an extraordinary Act of God in that sustained winds did not exceed 92 mph.

### 3.  ING 4727 Was Not Moored To Withstand Katrina's Predicted Winds.   The Breakaway Was *NOT* Inevitable.

Clearly the vessel was not moored to withstand winds reasonably expected.  Despite the danger of mooring the empty (high) ING 4727 to the full (low) ING 4745 - with a height differential of about 6-8 feet - despite notice of an impending Category 5 Hurricane, Lafarge placed **only three single strands of rope** (single part lines) between the two barges.  (*Thigpen Testimony* at p. 166).  These mooring forsook all United States Coast Guard recommendations and notions of good seamanship, all of which dictate that moorings should, at least, be doubled-up with special attention to vessels in close proximity to bridges and other structures.

The US Coast Guard Sector New Orleans Hurricane Plan states:

## APPENDIX 2 - RECOMMENDED PRECAUTIONARY MEASURES FOR BARGES

Applies to barges:

| Moored | Anchored | | |
|--------|----------|-----|--------------------------------------------------------------------------------|
| | X | 1. | All available anchors are deployed. |
| X | | 2. | Mooring lines doubled up with due consideration given to the effects of predicted storm surge.  Special attention should be paid to barges moored in the proximity of bridges. |
| X | | 3. | Sufficient personnel are available ashore to respond to emergencies. |
| X | X | 4. | All hatches, portholes and other openings are closed and secured. |
| X | | 5. | Fire fighting equipment is available and ready for immediate use. |
| | X | 6. | At least one (1) fire warp is rigged on the bow and another on the stern.  In order to expedite the establishment of an emergency tow, a portion of each fire warp should be draped overboard and allowed to hang no more than six (6) feet above the waterline. |
| X | X | 7. | Spare mooring lines and/or wires should be readily available. |

Mooring lines were **not** "doubled up."[1]   Though Lafarge moored the barges in the South Tier (ING 4727 and 4745) using only three (3) single part lines between three (3) cleats, they moored the barges in the North Tier much differently - using mulit-part lines at every available cleat.  Lafarge employee, Roland Johnson, testified via deposition how differently the North Tier of five (5) barges was tied:

> Q. Every little bit, cavil, or cleat –
> A. Yes.
> Q. –had a rope on it?
> A. Yes, sir.
> Q. So approximately how many ropes, on the group that was tied together, mind you, how many connecting points did you have on each barge?
> A. I am not sure, to be honest, but I do know that every one of them was tied.  If you want me to guess, I can.  I'm guessing that the barge had five different cleats that were tied to each other…

---

[1] "Doubled up" lines has specific meaning in seamanship when, if done correctly, results in 3 part lines at each mooring point.  *See* P390-395 (Authoritative texts of United States Coast Guard and others defining doubling up mooring lines).  However, Lafarge argues that while they did not double the lines, by placing new lines they succeeded in more than doubling the mooring strength.  However, this theory/definition of doubling up has no support in any authoritative texts on seamanship.  In fact, defendant's rope expert agreed that before one can double the strength of a line, one would have to know the original breaking strength.  (*Skaer Testimony* at p. 2558-2559)  However, none of Lafarge's employees, including its manager, were unaware of the breaking strength of the ropes as new, or of the various used ropes (different sizes, types, age) utilized in mooring the barges. (*Smith Testimony* at p.137-138, and *Busch Testimony* at p. 104).  Further, defense expert, Ryan, admitted that he would expect a deckhand to follow the traditional method of doubling up lines by adding lines or using the same line twice. (*Ryan Testimony* at P2885-2886) .

8

> Q. Let me – See, if we have a barge (writing) tied to another barge,    you know, and this is a cleat and this is a cleat (indicating), if    you remember, was there a single rope connecting these two?    Or was there several circles of rope?
> A. Several circles.
> Q. Okay. So they were not single strands connecting each cleat?
> A. I can say the rope went around each cleat more than once.

(DX278, Johnson depos. at P34 and 36)

The five (5) barges in the North Tier did not breakaway.

The case of *The Louisiana, supra*, is similar to the case at bar.  *The Louisiana*, supra, involved the breakaway of a vessel which drifted into another vessel.  The court, in describing the circumstances of the breakaway, noted that with a change of tide and rise in wind, new ropes were put out on the vessel by the crew.  *Id* at p. 166   All cleats were employed.

The court further found that The Louisiana had entirely failed to establish her defense of Act of God.  In so holding, the court noted that the drifting of the vessel <u>was not caused by any sudden hurricane which nautical experience could not anticipate</u> and <u>that no other vessels, in the harbor, were driven from their moorings.</u>  *Id* at p. 173   The court further noted that when winds and tide conditions changed that the necessity to move the vessel "ought to have suggested itself to a person of nautical skill, as a proper precaution against a danger which might justly have been anticipated."  Further, in directly emphasizing that no other vessels in the harbor broke free, the Court noted:

> The fact that the captain and made "did not anticipate the breaking away of the vessel, and thought the lines sufficient to hold her," may prove their want of judgment, **but not that "the accident was unavoidable;"** and this more especially, as other persons of nautical skill – disinterested witnesses in this case – **found no difficulty in securing their vessels at the same place, and under similar circumstances.** (Emphasis added)

 In the present case, other Lafarge personnel in securing the North Tier "*found no difficulty in securing their vessels at the same place and under similar circumstances." The*

*Louisiana, supra,* at 174 (emphasis added).   Again, the barges moored in the Northern Tier of five *did not leave their berth*.

### 4.   Vis Major - Lafarge Cannot Prove That It Was *Not* Negligent.

It is Lafarge's burden to prove that it was ***not*** negligent.   Human negligence as a contributing cause defeats any claim to the "Act of God" immunity[,] because an "Act of God" is not only one which causes damage, but one as to which reasonable precautions and/or the exercise of reasonable care by the defendant, could not have prevented the damage from the natural event.   See *Gilmore and Black, The Law of Admiralty,* at 163-164.   Indeed, an "Act of God" will insulate a defendant from liability *only* if there is *no* contributing human negligence and the defendant has the burden of establishing that weather conditions encountered constituted an uncontrollable and unforeseeable cause by "Act of God."   *Id.* At 1240-41

In the present case, the record is replete with evidence of negligence of defendant, Lafarge, including without limitation:

> A.  Failure to properly monitor the weather, the effects of which were foreseeable;
> B.  Violation of its own policies & procedures;
> C.  Failure to adequately moor the barge for hurricane conditions;
> D.  Failure to *remove the barge*.

### a.   Lafarge failed to monitor the weather.

A competent shipmaster must evaluate data continuously.   *Boudoin*, supra, at p. 85. Further, a mariner has an obligation to utilize available weather reports in order to operate in a manner   consistent with foreseeable risks, and a mariner is chargeable with knowledge of weather predictions, whether he knows of them or not. *The Katie E*, 46 F.2d 534 (E.D.N.Y. 1931); *The Eagle*, 52 F.Supp. 927 (E.D.N.Y. 1944); *Ohio Valley Eng. V. Ove*, 214 F.Supp. 784 (E.D. La. 1963).   Lastly, both defendant maritime experts agree that members of the maritime community should monitor the weather when there is a storm in the Gulf.   (*Ryan Testimony* at p.

2914, *Strouse Testimony* at p. 2965)

Prior to arrival of Hurricane Katrina, governmental authorities issued various advisories.

On Friday, August 26, 2005, Governor Blanco declared a State of Emergency, stating:

> Hurricane Katrina poses an imminent threat, carrying severe storms, high winds
> and torrential rain that may cause flooding and damage to private property…and
> threaten the safety and security of the citizens of the State of Louisiana. (P19)

Further, National Hurricane Center Advisories of that same day (Advisory 12, Friday,
August 26, 2005, 11:00 EDT) (P18) confirmed that the three day projected track placed New
Orleans within the potential strike zone of the hurricane, with the hurricane projected to make
landfall east of New Orleans on the Mississippi/Alabama Gulf Coast.  (P18, In Globo)  Further,
at 5:00 p.m. on that same day, the National Hurricane Center issued Advisory 14 which predicted
Hurricane Katrina to strike within 100 miles of New Orleans.  By 8:00, advisories placed New
Orleans dead in the hurricane's path.

Lafarge did not monitor the weather.  In fact, Lafarge's acts and omissions are more
egregious in light of the fact that Lafarge's weather service was out for approximately one month
due to construction activities.   (*Busch Testimony* at p. 63)   During this time, Lafarge made no
effort to obtain substitute weather monitoring; not even attempting to purchase a hand held
weather monitor from a local electronic store. (*Busch Testimony* at p. 64)   In addition, Lafarge
violated its own policies and procedures by failing to have a working VHF radio, which would
have allowed for weather monitoring. (P13, 9(B))

The management of unmanned, barges with no source of propulsion requires planning.
Had Lafarge monitored the weather, it could have taken appropriate steps to cease unloading

operations[2] thus naturally ballasting the barge down or taken appropriate steps to move the barge out of the canal[3].

### b. Lafarge violated its own policies and procedures.

In *American River Transportation Co., Inc. v. Paragon Marine Services, Inc.,* 329 F.3d 946 (8th Circ. 2003) the court was faced with similar situation to the one at bar. In *American River,* an Ingram barge weighing approximately 17,000 tons drifted from its moorings for unknown reasons. The District Court found that defendant's fleet management "was lax due to their failure to maintain a formal safety program or written procedures for mooring and inspecting barges." *Id* at p. 948 In the present case, Lafarge violated its owned published policies and procedures and failed to publish procedures (including that of procedures for mooring) which would have resulted in proper guidance and consistency in mooring by its employees.

Lafarge admits that it did not abide by its published New Orleans Terminal Hurricane Checklist (P37) which required personnel to "cable all barges to shore." In addition, Lafarge's own corporate policies and procedures required that each facility have:

6 (a) …

(c) Each dock operation should establish **written and diagramed tie off (mooring) procedures and arrangements** with specifications for proper standards. All personnel must understand and maintain these procedures.

(k) …each terminal **must have a High Water procedures manual**. (Emphasis Added) (P13, LNA 000473-474)

---

[2] While Lafarge argues that ceasing unloading operations would have left the barge in an unstable situation, this strains credibility as Lafarge Manager, Ed Busch, admitted that barges could be unloaded in a way so that they remain level. (*Busch Testimony* at p. 71) In addition, Lafarge's own corporate polices requires that "cement barges should be unloaded as level as possible…" (P13 at 6(f)).

[3] Lafarge was aware that leaving an empty barge moored in the canal was dangerous. Employee Louis Robin says that Lafarge moored barges out of the canal to the fleet in the past to avoid storms. (*Robin Testimony* p. 593) In fact, he was told to come in that Saturday to finish unloading the barge as Manager, Ed Busch, wanted to get that barge "out of there." (*Robin Testimony* at p592-593)

Lafarge had no "written and diagramed tie-off (mooring) procedures" (other than the Hurricane Preparation Checklist, which does not qualify as such) nor did Lafarge have a High Water Manual.  (*Busch Testimony* at p. 72, 105-106)    Defense maritime expert, Ryan and Strouse, both admit that members of the maritime community should have proper training for their employees and managers to make sure that its dock crew perform dock operations in a consistent manner. (*Ryan Testimony* at p. 2915, *Strouse Testimony* at p. 2966-67)    Further, reasonable and prudent members of the maritime industry should follow their own established policies.  (*Ryan Testimony* at p. 2915)

Evidence of the adverse affect of Lafarge's failure to have proper policies and procedures in place is the actual mooring of the North and South tier.  There was inconsistency in the mooring of the North Tier (5 barges) and the South Tier (2 barges).  The South tier was moored with three single part lines while the North Tier (which did not break away) was moored at every available cavil and cleat and even utilized cables.  (*Robin Testimony* at p. 582-583)[4]

**c.   Lafarge failed to adequately moor the ING 4727 for hurricane conditions.**

Possibly, Lafarge personnel moored the ING 4727 differently in the south tier from the barges in the north tier due to the fact that personnel expected the barge to be picked up.  Or perhaps they did *not* expect it to be picked up.  Lafarge's proof and arguments are inconsistent on this point, but in either event, Lafarge dropped the ball.

Lafarge has argued and its employees have nonchalantly testified previously that they never really expected the barge to be picked up.   Plaintiff's expert, Cmdr. Don Green, testified

---

[4] It cannot be accepted that both tiers were moored for hurricane conditions given the difference in mooring.  Thus the failure to have written tie-off (mooring) procedures is relevant to show that had there been written procedures there would be no inconsistency in how the barges were tied.  However, more likely than not, the south tier was left with only 3 single part lines as based upon the testimony Mr. Smith that someone was coming to pick up the barge. In addition, Mr. Robin testified that he was told by Mr. Busch that the barge would be picked up "that evening."

that when mooring a vessel for hurricane conditions, every available resource should be utilized. (*Green Testimony* at p. 493)   While Lafarge used only three single part lines at three mooring points, Commander Green testified that Lafarge had available mooring cables/fleet wires, ratchets and extra rope, that were not used (*Green Testimony* at p. 456-458, see also photographs of unused fleet wires laying on deck of ING 4727 and 4745, P388).  In addition, there were five cleats on the side of each barge, two on each end with two buttons.  Of these nine available mooring points, only three were used.  In addition to the testimony of Commander Don Green, plaintiffs have submitted into evidence authoritative texts of the United States Coast Guard, United States Navy, Greater New Orleans Barge Fleeting Association and several other maritime authorities which define doubling up of lines as to require additional bights of line or extra lines. (P27, 390-395).  This doubling up process results in a mooring with multiple part lines. (P391, at p. 415 (see picture), also P393   "When the ship is secured, the mooring lines are normally "doubled up," which means that an extra bight of line is passed to the pier or other ship, giving three parts of line instead of only one part.")

On the other hand, Louis Robin was told to come into work on Saturday because Manager, Ed Busch, wanted to finish unloading and get that barge "out of there."  (*Robin Testimony* at p. 592-593)  Further, after unloading, Ed Busch called to have the barge picked up and told Mr. Robin that it would be picked up "that evening."  (*Robin Testimony* at p. 583)  In addition, Lafarge supervisor, Earl Smith, explained the difference in mooring was based upon the fact that the ING 4727 was to be picked up.  Mr. Smith stated:

> Q. So if these two barges -- these two Ingram barges were identical and had cleats right next to cleats five times, you're saying you-all should have had five lines on this barge; is that correct?
> A. Well, if the tug was coming to pick it up, we wouldn't -- probably wouldn't put that many on it, unless we had the rope to put it on.

> Q. So you-all thought someone was coming to pick up the barge; is that right?
> A. Yeah.

(*Smith Testimony* at p. 137)

In addition, Lafarge personnel did not place lights on the barge as required by Lafarge policies. (P13 at Section 9(R), *Busch Testimony at* p. 92)   Plaintiff's maritime expert, Commander Don Green, opined that single part lines are clearly a "temporary mooring."   (P386, Report)   In addition, Commander Green's testimony is corroborated by Lafarge's own policies which require only three lines when unloading. (P13 at p. LNA 000479)   No lights and temporary moorings are yet another indication that Lafarge's personnel did not expect the barge to stay overnight.   **However**, a nonexistent call to Zito's nonexistent voicemail system is not sufficient if Lafarge really wanted the barge picked up.

### d.   Lafarge failed to remove the barge.

After the alleged phone call which Mr. Busch swore under oath that he made to Zito, the same phone call that defies both Lafarge's and Zito's telephone records, and after the call to Domino by which Lafarge asked for nothing but what would spare Lafarge's dock from damage, Lafarge abandoned the facility.   In doing so, Lafarge deprived itself and the Plaintiffs of the last reasonable chance to moor the barge in the safest way possible – at another location.   Evidence and testimony prove that Lafarge could have removed the barge from the residential area in which it was left during the storm.   Whether Lafarge intended removal or not, the result was the same.

### 5.   Conclusions As To The Louisiana Rule.

As discussed, under *The Louisiana Rule*, the burden to disprove negligence is upon defendant.   Defendant may rebut the presumption of fault by proving that the breakaway was

unavoidable or inevitable, such as a vis major (greater force, or Act of God) for which no amount of foresight, pain or care, could prevent the accident.

Defendant cannot prevail on rebutting the presumption of fault as Hurricane Katrina, at the mooring site, was not an inevitable accident or Act of God such that reasonable preparations could not have prevented the breakaway and because the conditions were foreseeable.   See *Signal* and *Bunge, supra*.    It is agreed by both sides that the sustained winds did not exceed 92 mph.

Second, defendant cannot rebut the presumption of fault as the vessel was not moored to withstand winds reasonably to have been expected.   Defendant's own employees indicated that the barges should have been moored differently with at least five lines unless "the tug was coming to pick it up." (Testimony of Earl Smith, *supra*).   This is further supported by the fact that the North Tier of barges was moored at every available cleat.   Further, it is clear that personnel who moored the North Tier "found no difficulty in securing their vessels at the same place, and under similar circumstances."   See, *The Louisiana,* infra

Thirdly, defendant cannot rebut the presumption of fault as there can be no Act of God defense where a defendant is negligent.   In the present case, defendant was clearly negligent for many reasons, including without limitation:

1.  Failing to monitor the weather;
2. As defendant is charged with notice of the weather, failing to cease unloading operations to ballast the vessel;
3. As defendant is charged with notice of the weather, failing to plan for vessel movement out of the canal;
4. If the vessel was not going to be moved, failing to properly moor the vessel for hurricane conditions (also including improper high-to-low mooring using inadequate line);
5. Failure of Lafarge management to properly inspect the mooring prior to evacuation; (Busch incorrectly thought every cleat had a line when in fact there were only three lines, *Busch Testimony* at p. 81-82)

6.  Failing to abide by its own "Hurricane Preparation Checklist" which required that all barges be "cabled to shore";

7.  Failing to abide by its corporate policies and procedures which required written and diagramed mooring procedures for employees, High Water procedures and a VHF radio.

A finding of one or more of the above acts of negligence will preclude a finding of Act of God/inevitable accident as set forth by The Louisiana Rule.

## B.   THE PENNSYLVANIA RULE – PRESUMPTION OF CAUSATION

**The Pennsylvania Rule Applies, As The Evidence Establishes That Lafarge Violated Established Safety Requirements Relating To Mooring Of The ING 4727.**

As explained by the Supreme Court well over a century ago, a presumption as to causation arises "when … a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions....." *See The Pennsylvania*, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874).   "The rule allocates the burden of proof, transferring it to the party in violation of a statute or regulation." *See Pennzoil*, 943 F.2d at 1472.   To meet its burden, "the defaulting ship must show 'not merely that her fault might not have been one of the causes, or that it probably was not, **but that it <u>could not</u> have been**.'" *See Candies Towing Co. v. M/V B & C Eserman*, 673 F.2d 91, 94 (5th Cir., 1982) (emphasis added).

"[I]n order for a plaintiff to be within The Pennsylvania rule, he must demonstrate by a preponderance of the evidence that a statutory violation has occurred." *See Skidmore v. Grueninger*, 506 F.2d 716, 722 (5th Cir., 1975).[5]   As demonstrated blow, the evidence

---

[5] As discussed in Plaintiff's *Plaintiffs' Pretrial Proposed Conclusions Of Law*, at 38 (par. 123), application of the *Pennsylvania* Rule is not limited to instance of statutory violations, but rather "applies more generally where a party has violated a known government-established safety requirement." *See Evergreen*, 477 F. Supp. 2d at 689.   Indeed, it is widely recognized that the Rule applies to violations of Coast Guard Safety Regulations.   *See Benedict on Admiralty*, 8-XIV § 14.10 ("The Pennsylvania Rule applies to Coast Guard regulations, as well as statutes…").   Moreover, "[t]he failure to comply with a permit issued by the Corps triggers the application of the rule of The Pennsylvania."   *See Orange Beach Water, Sewer & Fire Protection Authority v. M/V Alva*, 680 F.2d 1374, 1383 (11th Cir., 1982); *Ranger Ins. Co. v. Exxon Pipeline Co.*, 760 F. Supp. 97, 99 (W.D. La. 1990) (same).   Additionally,

establishes that Lafarge violated several established safety requirements relating to mooring of the ING 4727. Based thereon, Lafarge must bear the heavy burden of disproving that the ING 4727 was not and could not have been the cause of the breaches to the North and South Floodwalls on the INHC.

> **1.   Lafarge violated 33 CFR 162.75 by failing to ensure that the *ING 4727* was adequately secured and moored.**

The evidence admitted at trial establishes that Lafarge violated 33 CFR 162.75 through its failure to adequately moor the ING 4727.

Section 33 CFR 162.75(b)(3)(ii) – a Coast Guard safety regulation governing "mooring" – prescribes, in relevant part, the following mooring requirements on vessels and tows:

> When tied up individually, all vessels and tows shall be moored by bow and stern lines. Tows shall be secured at sufficiently frequent intervals to insure their not being drawn away form [sic] the bank by winds, currents, or the suction of passing vessels. Lines shall be shortened so that the various barges in a tow will be as close together as possible.

*See 33 CFR 162.75(b)(3)(ii).*

Lafarge asserts that it cannot be held to violate this subpart, claiming that **(1)** only "tows" need be secured to withstand forces by "winds, currents, or the suction of passing vessels" under (b)(3)(ii), and **(2)** in its view, the ING 4727 does not fall within the meaning of "tow." Importantly, Lafarge's cannot cite to any judicial authority to justify this construction,[6] and in fact, when the entire regulation is viewed objectively, such a construction would thwart the

_____

the Rule has been applied to port safety restrictions.  *See e.g. Trinidad Corp. v. S.S. Keiyoh Maru*, 845 F.2d 818, 827 n. 7 (9th Cir. Cal. 1988) ("failure to observe the restrictions concerning Anchorage 'G' and the Los Angeles Pilotage Area constituted a 'statutory' violation for the purposes of The Pennsylvania rule.").

[6] To date, no opinion exists interpreting all three sentences which comprise 33 CFR 162.75(b)(3)(ii).  In fact, while two opinions have cited the first sentence of subpart(b)(3)(ii), neither opinion engages in discussion of that sentence's construction.  In *Verrett v. McDonough Marine Service*, 705 F.2d 1437, 1442 (5th Cir., 1983), the Fifth Circuit merely upheld a district court finding that a barge owner violated subpart (b)(3)(ii) based on evidence that an unmoored end of a barge swung out into a channel.  In *United States v. Lamastus & Associates, Inc.*, 785 F.2d 1349, 1351 (5th Cir. La. 1986), which involved a similar violation, the Court's discussion on review was limited to whether Coast Guard regulations were applicable to privately owned navigable waterways.

purpose of the regulation in violation of established cannons of construction.

As held by the Fifth Circuit, "in construing a regulation, [the court] must employ the rules of construction generally applicable to statutes." *See KCMC, Inc. v. FCC*, 600 F.2d 546, 549 (5th Cir. 1979). "'The starting point in every case involving a construction of a statute is the language itself." *See Pongetti v. GMAC (In re Locklin)*, 101 F.3d 435, 439 (5th Cir., 1996). "However, statutory language must always be read in its proper context" [*Pongetti*, 101 F.3d at 439], and "[i]n determining the plain meaning of a statute, the court must 'look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy.'" *See id*. A court "should not give a statute an interpretation that makes any part superfluous or meaningless, if that result can be avoided." *See Belsome v. Belsome (In re Belsome)*, 434 F.3d 774, 778 (5th Cir.. 2005). "If strict construction of a statute's language would produce 'an absurd, unjust, or unintended result,' or 'merely an unreasonable one' 'at odds with the statute's purpose, the provision' 'must be construed so as to avoid that result.'" *See Sotto v. Wainwright*, 601 F.2d 184, 189 (5th Cir., 1979).

Applying these rules to the construction, Section 162.75, subpart (b)(3)(ii) must be read to impose a mandatory legal duty on Lafarge to adequately secure the ING 4727, regardless of whether the ING 4727 is considered a "vessel" or a constituent part of "tow." Based on the evidence in the record, Lafarge violated this duty, no matter how framed.

### 2. Based On The Applicable Rules of Construction, The First Sentence of 162.75(b)(3)(ii) imposed clear duties on Lafarge to adequately secure the ING 4727.

Lafarge's contention that only "tows" need be secured to withstand forces by "winds, currents, or the suction of passing vessels" violates numerous tenants of statutory construction. Lafarge arrives at this conclusion by asserting that the first sentence of subpart (b)(3)(ii) must be

read to literally require only bow and stern lines for vessels, and nothing more.  This construction fails for several reasons.

First, Lafarge's construction, if accepted, would sanction a lopsided set of obligations which places greater duties on "securing" the vessels that comprise a tow than when "mooring" a tow itself.  Indeed, Lafarge's above construction disregards the fact that first sentence of subpart (b)(3)(ii) is not limited to vessels, but rather, expressly imposes the minimum standard for "mooring" for **both** vessels and tows.  Based on this fact, the second and third sentences of subpart (b)(3)(ii), which are both limited to tows, cannot relate to mooring lines (i.e. lines securing the tow to the bank or the dock), but rather, necessarily must be read as referring to the lines used to "secure" the various vessels which comprise the tow together when the tow is moored (i.e. lines linking vessel to vessel).  Such a construction is required, as construing sentence one and sentence two as both imposing direct mooring requirements would generate two competing and contradictory standards regarding the minimum number of lines to be used when mooring a tow.  Such a construction must be avoided under the well settled rules of statutory construction stated above.

Accordingly, when viewed under the proper lens, Lafarge's construction leads to the proposition that only the lines used to "secure" the vessels which comprise the tow (i.e. lines linking vessel to vessel) would need to be sufficient to withstand forces by "winds, currents, or the suction of passing vessels", whereas the lines used to moor the entire tow itself (i.e. lines to the bank or the dock) would not.  Such construction is absurd, especially when it is considered that an entire tow can do more damage if broken from its moorings than any individual vessel component of that tow.

Second, such lopsidedness in obligation would be far from trivial. As subpart (b)(5)(v)

20

imposes specific standards for "securing" the components of a tow when the tow is assembled in the first instance [*33 CFR 162.75(b)(5)(v)* ("The various parts of a tow **shall be securely assembled** with the individual units connected by lines as short as practicable"], the provisions set forth in the second and third sentences of subpart (b)(3)(ii) necessarily must impose additional requirements that are above and beyond the requirements imposed by subpart (b)(5)(v).[7]  Thus, under Lafarge's construction, one also must be prepared to accept the proposition that the Coast Guard engaged in an extraordinary amount of effort to regulate the adequacy of the lines used to secure the vessels that comprise a tow (i.e. vessel to vessel), with absolutely no concern whatsoever being paid the adequacy of the lines used to moor the tow in its entirety (i.e. lines to the bank or the dock).  Such a proposition is patently unreasonable.

Finally, and most importantly, Lafarge's claim that the first sentence of subpart (b)(3)(ii) must be read as literally requiring only bow and stern lines would completely eviscerate the objective of the regulation, in violation of the "golden rule" of statutory construction.  Indeed, Lafarge's literal construction would sanction the mooring of all vessels and tows, regardless of size, using any lines, **including thread**.  Such a construction is absurd, as it would fail completely to achieve the overarching objective of affirmatively compelling the "mooring" of any vessel or tow.  Moreover, Lafarge's construction sidesteps the most plausible literal construction of this sentence – namely, that a vessel which at any time breaks completely free from its moorings is literally **not** "moored by bow and stern lines", in violation of the black letter of the regulation.

It is well settled that "[i]f strict construction of a statute's language would produce 'an absurd, unjust, or unintended result,' or 'merely an unreasonable one' 'at odds with the statute's

---

[7] Such a construction is required, as the reading the standards for "assembling" a tow and securing a tow for "mooring" as identical would render subpart (b)(3)(ii) completely meaningless.

purpose, the provision' 'must be construed so as to avoid that result.'" *See Sotto*, 601 F.2d 184, 189 (5th Cir., 1979).   Indeed, "[i]t has been called a golden rule of statutory interpretation that unreasonableness of the result produced by one among alternative possible interpretations of a statute is reason for rejecting that interpretation in favor of another which would produce a reasonable result." *See United States v. Mathena*, 23 F.3d 87, 93 (5th Cir., 1994).   The U.S. Supreme Court has long held that "courts, in interpreting a statute, have some 'scope for adopting a restricted rather than a literal or usual meaning of its words where acceptance of that meaning would lead to absurd results . . . or would thwart the obvious purpose of the statute.'"

Thus, to achieve the objective of (b)(3) and avoid absurdity detailed above, this Court must interpret the first sentence of subpart (b)(3)(ii) as either **(1)** literally requiring that "all vessels and tows shall be moored by bow and stern lines" at all times without exception, or **(2)** interpret the scope of the term "line" narrowly to include only lines which are "adequate" to achieve the objective of mooring.

### 3.   The evidence establishes that Lafarge violated the first sentence of Subpart (b)(3)(ii) based on either construction.

No matter which of the two constructions are given to the first sentence of subpart (b)(3)(ii), the evidence establishes that Lafarge violated its duty to adequately moor the ING 4727.   Obviously, to the extent that the Court adopts a literal construction requiring that "all vessels and tows shall be moored by bow and stern lines" at all times without exception, Lafarge must be deemed to have violated that duty, as there is no dispute that the ING 4727 broke free from its all of moorings.   However, even the court is not inclined to adopt this construction, the evidence nonetheless confirms that the bow and stern lines actually used by Lafarge were not adequate to meet the most minimal standards of mooring.

As an initial point, it is important to note the record contains admissions by Lafarge

employees that they never intended to secure the ING 4727 for purposes of "mooring" and as such, undertook **no effort** to secure the ING 4727 for purposes of "mooring" as required by subpart (b)(3)(ii).  Indeed, as testified by Edward Busch – the Assistant Terminal Manager at the Lafarge facility – a call was made to Zito Fleeting prior to evacuating the Lafarge facility on Saturday to release the ING 4727 for pick up.  *See Busch Testimony*, at 58:4-9.  Mr. Busch communicated this to Earl Smith – one of the two Lafarge employees who secured the 4727 [*Smith Testimony*, at 155:6-17] – who testified that additional lines were intentionally **not** added between the ING 4745 and ING 4727 based on his belief that someone was coming to pick up the ING 4727.  *See Smith Testimony*, 137:4-13.[8]  This stands in stark contrast to manner which barges were secured in the northern tier, with ropes placed on every cleat.  *See Testimony of Robin*, 583:3-7.

Similarly, Lafarge may not claim that its employees in fact believed the three single part lines used to secure the ING 4727 and the ING 4745 was sufficient for purposes of "mooring." Indeed, Mr Busch testified that he believed that it was his duty to ensure the barge was moored properly if the ING 4727 could not be moved out [*Busch Testimony*, at 81:5-8], and that based on anticipated wind conditions, he believed proper mooring would require a rope on every cleat. *See Busch Testimony*, at 84:15-22.  As the evidence establishes that any belief the ING 4727 would be removed was itself facially untenable,[9] and as the evidence establishes that the ING

---

[8] In fact, Smith testified that the only thing that was done after unloading the 4727 was to replace some of the lines between the barges to make up for the difference in height between the loaded and unloaded barges.  See *Smith Testimony*, 135:14-19.

[9] No matter how examined, Lafarge personnel had no basis to expect the ING 4727 to be removed by Zito Fleeting prior to Katrina.  First, as Mr. Busch readily admits that he never spoke with any individual at Zito [*Busch Testimony*, 97:3-5], Busch had no reasonable basis to believe, let alone communicate to his subordinates, that the ING 4727 was to be removed prior to Katrina. In fact, the only reasonable inference to be drawn by Mr. Busch's second call to Domino to top the barges was that Mr. Busch himself did not believe that Zito was going to dispatch a tug to the Lafarge facility to remove the ING 4727.  Even then, both Lafarge personnel who prepared the ING 4727 testified that they lacked any basis to believe that Zito would arrive at **any** designated time.  *See Smith Testimony*, at 155:6-17.  In fact, Mr. Robin testified that in the 10 years he worked at Lafarge he had <u>never</u> seen a fleeter arrive on

4727 was not moored with a rope on every cleat, [10] it necessarily follows that the ING 4727 was moored in a fashion Mr. Busch himself believed to be inadequate.

However, even putting these admissions aside, the evidence reflects the lines actually used to join the ING 4727 and ING4745 – which was comprise solely of three single part ropes [*Thigpen Testimony*, 165:16-22; *See also Deposition of Grabert*, at 55:11-18] [11] – were inadequate under established maritime standards.

**First**, Lafarge's use of single part lines was itself insufficient to secure the ING 4727 for purposes of mooring under subpart (b)(3)(ii), as the evidence establishes that it is improper to moor a vessel under any circumstances using only single part lines. *See Green Testimony*, 496:24-497:3.[12]   Indeed, numerous independent sources confirmed that placing multiple parts in a line is a generally accepted maritime standard of care in the context of mooring. *See Plaintiff's Exhibit 395* (excerpt from Knight's Modern Seamanship, explaining that single part is only suitable for temporary mooring when a vessel is preparing to get under way); *Green Testimony*, 490:3-17; *See Thigpen Testimony*, 169:12-170:11.   Moreover, multiple independent evidentiary sources also confirm that parting an individual line is not equivalent, but in fact, is superior to adding additional lines.   *See Thigpen Testimony*, 169:12-170:11; *See also Green Testimony*,

---

time to pick up a barge.  *See Testimony of Robin*, 589:12-18.

[10] Busch confirmed that the ING 4727 had seven (7) cleats and two (2) buttons.  *See Busch Testimony*, 83:13-17. However, the evidence establishes that the ING 4727 was only secured to the ING 4745 by three single part lines.

[11] Significantly, the testimony of Mr. Thigpen and Captain Grabert is not disputed by Mr. Smith or Mr. Robin – the Lafarge employees who actually secured the ING 4745 and ING 4727 – as neither could testify as to the number of lines that were actually used between the ING 4745 and ING 4727.  *See Smith Testimony*, 140:21-141:3; *See also Testimony of Robin*, 583:3-7.

[12] That such mooring was not adequate in this case is further supported by testing, which revealed that the three single part lines used by Lafarge would not withstand winds in excess of 36 miles-per-hour.  *See Green Testimony*, 540:17-24.

488:10-489:9.[13]   Thus, Lafarge's failure to moor the ING 4727 with parted bow and stern lines necessarily fell below the minimal standard required by subpart (b)(3)(ii).

**Second**, even if the single part mooring was not below the standard of care in and of itself – which it was – the evidence establishes that single part lines were necessarily inadequate to moor the empty ING 4727 the fully loaded 4745.   Significantly, the unloaded ING 4727 was approximately 8 to 9 feet higher than the fully loaded ING 4745. *See Thigpen Testimony*, 165:7-15.   According to Plaintiff's maritime expert, Donald Green, the height variation of the ING 4727 and ING 4745 necessarily prevented the barges from being secured together.   *See Green Testimony*, 480:3-16.   Even when pulled together, the high-low variation in height necessarily would permit the distance between the ING 4727 and ING 4745 to continuously fluctuate, separating 2-3 feet every time the ING 4745 was raised or the ING 4727 was dipped by waves. *See Green Testimony*, 483:2-10.[14]   As testified by Mr. Thigpen, deckhand of the Regina H, loaded barges are generally not secured to unloaded barges for the very reason that it is difficult to secure barges in that configuration.   *See Thigpen Testimony*, 171:18-25.   Thus, the evidence establishes that Defendant's mooring of the unloaded ING 4727 to the fully loaded 4745 was improper in the first instance.

Thus, based on either construction which this court may give to the first sentence of subpart (b)(3)(ii), the evidence establishes that Lafarge violated the regulation by failing to use adequate mooring lines.

---

[13] This fact renders Lafarge's use of a third line as insufficient to secure the ING 4727 for purposes of mooring. Moreover, unlike the process of strengthening of a line through parting, adding a third line is not consistent with subpart (b)(3)(ii), which only requires a bow and stern lines.

[14] This is supported by the testimony of Lafarge employee Earl Smith, who testified that he was in fact told to secure the ING 4745 and ING 4727 "tightly" due to the high-low configuration [*Smith Testimony*, 143:5-19], but admitted that he could not determine the distance between the ING 4745 and ING 4727 once secured because the distance would fluctuate based on the water acting upon the high-low configuration.  *See Smith Testimony*, 149:3-15.

**4. Lafarge violated the specific duties prescribed by 33 CFR 162.75 relating to the securing and mooring of ING 4727 as a constituent part of a tow.**

However, even if this Court is not inclined to find that the first sentence of subpart (b)(3)(ii) encompasses an adequacy component – which as explained above, it must – this Court nonetheless must hold that the 4727 was not properly secured as a constituent part of a "tow."

While Lafarge claims that existence of a "tow" is contingent on a vessel being connected to a tug, Lafarge does not, and cannot, identify a basis for extracting such a definition from within the language of 33 CFR 162.75 itself.   Although the term "tow" is not specifically defined, the meaning of "tow" can be gleaned from 33 CFR 162.75, subpart (b)(5) – entitled "Size, assembly, and handling of tows." As set forth in subpart (b)(5)(v), the plain language not only repeatedly draws a distinction between the concept of a "tow" and a "towing vessel" in the first instance, the concept of "tow" used therein is very broad, with specific duties attaching at the assembly stage when vessels are being secured for subsequent connection to a tug:

> **All vessels pulling tows** not equipped with rudders in restricted channels and land cuts shall use two towlines, or a bridle on one towline, shortened as much as safety of the **towing vessel** permits, so as to have maximum control at all times. **The various parts of a tow shall be securely assembled with the individual units connected by lines as short as practicable**. In open water, the towlines and fastenings between barges may be lengthened so as to accommodate the wave surge. In the case of lengthy or cumbersome tows, or tows in restricted channels, the District Commander may require that tows be broken up, and may require the installation of a rudder or other approved steering device on the tow in order to avoid obstructing navigation or damaging the property of others. Pushing barges with **towing vessel** astern, towing barges with **towing vessel** alongside, or pushing and pulling barges with units of the tow made up both ahead and astern of the **towing vessel** are permissible provided that adequate power is employed to keep the tows under full control at all times. No **tow shall be drawn by a vessel** that has insufficient power or crew to permit ready maneuverability and safe handling.

*See 33 CFR 162.75(b)(5)(v).*

In fact, the distinction made by Lafarge make little sense in the confines on subpart

(b)(3)(ii), which is limited solely to "mooring" and not "anchoring."[15]  Even then, Lafarge's construction divorces the regulation from the overarching objective of ensuring that lines between a set of married barges are sufficient to secure for mooring (see above) – an objective that does not in any way hinge on whether a tug is present or not.

Based on the forgoing construction, Lafarge may not credibly contend that the ING 4727 was not intended to be constituent part of a "tow."   The evidence conclusively establishes that when Lafarge personnel left the Lafarge facility, Lafarge personnel **(1)** secured the ING 4727 and 4745 together for the purposes of being towed collectively by a towing vessel,[16] **(2)** and consistent with that expectation, the ING 4727 and 4745 were in fact towed collectively by a towing vessel.[17] As such, the ING 4727 fell within the literal meaning of a "tow" as explained in 33 CFR 162.75.   Moreover, the evidence establishes multiple violations by Lafarge, not only in constructing the ING 4727 and 4745 as a tow in the first instance, but in failing to adequately secure the ING 4727 and 4745 together as is required pursuant to subpart (b)(3)(ii) when a tow is moored.

---

[15] As held by the 11th Circuit, the concepts of a "'vessel at anchor' and 'moored vessel' are not synonymous terms of art" for the purpose of interpreting Coast Guard regulations, as "[a] mooring is a permanent location to which a vessel ties" whereas "[i]n contrast, an anchorage is a temporary location…."  *See Self Towing, Inc. v. Brown Marine Services, Inc.*, 837 F.2d 1501, 1504-1505, n.8 (11th Cir., 1988) (reasoning that because "Section 2030 by its express terms applies to a 'vessel at anchor'… we hold that Section 2030 does not apply to moored vessels").  Importantly, one does not typically permanently moor a "tow" with a "towing vessel."

[16] In fact, Edward Busch, the Assistant Terminal Manager at the Lafarge facility, testified that prior to evacuating the Lafarge facility on Saturday, he placed a second call to Joseph Domino, scheduled a tug-boat to come to the Lafarge facility, and give specific instruction to top the ING 4727 and ING 4745 around.  *See Busch Testimony*, 58:10-59:1-8.  Busch testified that Domino was instructed to use the tug to switch the ING 4727 and ING 4745 around because Busch wanted the empty 4727, which was against the dock, switched to the outside position.  *See Busch Testimony*, at 59:11-60:4.  Consistent with Mr. Busch's testimony, Mr. Grabert, Captain of the Regina H., testified that the instruction relayed by the dispatcher at Domino was that he was to flip both barges around and tie the loaded barge to the dock.  *See Deposition of Grabert*, 43:12-44:7.

[17] Both the Captain and crew of the Regina H. confirmed that this "topping procedure" was in fact performed by the tug hooking up to the barges, pulling the barges out into the canal, flipping the barges around, and then using the tug to push the barges back in to the dock.  *See Thigpen Testimony*, 168:1-9; *See also Deposition of Grabert*, 63:10-64:17 (same).  Busch testified that Domino complied fully with his instructions, and knew this to be the case based on the way the ropes were hanging on the vessel.  *See Busch Testimony*, 115:3-9.

**First**, Lafarge's failure to ratchet the ING 4727 and 4745 together with fleeting wires precluded the barges from being "securely assembled" for purposes of subpart (b)(5)(v), and undermines Lafarge's argument that the barges were secured "at sufficiently frequent intervals" or sufficiently "close together" for purposes of mooring as is required under subpart (b)(3)(ii).

Here, the evidence establishes that the ING 4727 had permanently attached fleeting wires with ratchets [*Plaintiff Trial Exhibit 388* (picture 2)], which Lafarge admits were not used. *See Busch Testimony*, 86:8-10. As testified by Plaintiff's maritime expert, fleeting wires are in place for the specific purpose of binding barges together when constructing tows. *See Green Testimony*, 457:14-24. Importantly, Lafarge terminal manager, Edward Busch, conceded the importance of fleet wires, testifying that fleet wires are also used for mooring purposes. *See Busch Testimony*, at 84:15-22. The importance of such cables are underscored by the testimony of, Mr. Thigpen, the deckhand of the Regina H, who testified that even when conducting a topping maneuver, securing barges with rope is not necessarily sufficient to ensure that barges remain connected during the maneuver. *See Thigpen Testimony*, 186:11-18. Based on the forgoing, it is undisputed that fleeting wires are a minimum standard for both constructing and mooring barges assembled as a tow. As such, Defendant's failure to utilize fleeting wires violated its obligations under both subpart (b)(5)(v) and subpart (b)(3)(ii).

**Second**, the extreme height variance between the empty ING 4727 and loaded 4745 precluded the barges from being "securely assembled" for purposes of subpart (b)(5)(v), and precludes any conclusion that the barges were secured sufficiently "close together" for purposes of mooring as is required under the third sentence of subpart (b)(3)(ii). Indeed, as discussed above, the evidence establishes that the height variation of unloaded ING 4727 and fully loaded 4745 necessarily prevented the barges from being secured together.

28

**Finally**, even if it were assumed that ING 4727 and ING 4745 were "securely assembled" for purposes of "towing" by the use of three single part lines for purposes of constructing a tow under subpart (b)(5)(v) – which based on the evidence above, it was not – no effort was made by Lafarge to secure the ING 4745 and 4727 for purposes of "mooring" as required by subpart (b)(3)(ii). As discussed previously, the second and third sentences of subpart (b)(3)(ii) necessarily must be read as requiring something above and beyond the "securely assembled" requirements of subpart (b)(5)(v), otherwise subpart (b)(3)(ii) would be superfluous. Here, the evidence discussed above not only conclusively demonstrates that Lafarge employees intentionally did **<u>not</u>** secure the lines between the ING 4727 for "mooring" purposes, but that the single part lines that were inadequate, per se, for purposes of mooring.

In sum, the evidence conclusively establishes that the three single part lines used by Lafarge to secure the ING 4547 and 4727 was not even sufficient to construct a tow, let alone satisfy Lafarge's additional duties to secure a tow under the second and third sentences of subpart (b)(3)(ii).

Based on the forgoing, the evidence establishes that Lafarge violated 33 CFR 162.75 through its failure to adequately moor the ING 4727. Accordingly, the Pennsylvania Rule must be applied in this case.

### 5. Lafarge violated 33 CFR 6.19-1 by failing to adhere to the minimal directives set forth in the United States Coast Guard Sector New Orleans Hurricane Plan.

Notwithstanding the forgoing, the above evidence also establishes that Lafarge violated 33 CFR 6.19-1[18] through its failure to adhere to the minimal directives set forth in the United

---

[18] 33 CFR 6.19-1 provides as follows: "Nothing contained in this part shall be construed as relieving the masters, owners, operators, and agents of vessels or other waterfront facilities from their primary responsibility for the protection and security of such vessels or waterfront facilities."

States Coast Guard Sector New Orleans Hurricane Plan (hereinafter "Hurricane Plan" or "Plan"). While Lafarge claims that the Hurricane Plan cannot serve as a predicate for application of the Pennsylvania Rule, this argument fails for several reasons.

**First**, the Pennsylvania Rule has been applied to port safety restrictions. *See e.g. Trinidad Corp. v. S.S. Keiyoh Maru*, 845 F.2d 818, 827 n. 7 (9th Cir., 1988) ("failure to observe the restrictions concerning Anchorage 'G' and the Los Angeles Pilotage Area constituted a 'statutory' violation for the purposes of The Pennsylvania rule.").

**Second**, the Hurricane Plan was enacted under the authority of the Coast Guard regulations. Indeed, the Hurricane Plan itself states that it was enacted pursuant to "[t]he provisions of Title 33, Code of Federal Regulations (CFR), Parts 160 and 165" which "describe[s] the authority that Coast Guard Captains of the Port (COTPs) can use to ensure the safety of their ports", and in particular to "[e]stablish safety zones" and to "[o]rder vessels to operate or anchor, in whatever manner is necessary to protect life, property, and the environment." *See Plaintiff's Trial Exh. 28*, at 0073.[19]

**Finally**, Lafarge's legal obligation is not derived from the Hurricane Plan itself, but by 33 CFR 6.19-1. Indeed, although the Hurricane Plan was framed in terms of "recommended precautionary measures", the Plan itself explains that this was done in recognition of the fact some vessels and facilities would require **additional** measures be taken to meet minimal standards for safety. *See Plaintiff's Trial Exh. 28*, at 0079 ("The safety precautions contained in this part are not the only precautions that may be necessary to fully prepare a vessel or facility.").

---

[19] Additional authority justifying the Plan may be found in 33 CFR § 6.14-1, entitled "Safety measures" which provides that: "The Commandant, in order to achieve the purposes of this part, may prescribe such conditions and restrictions relating to the safety of waterfront facilities and vessels in port as he finds to be necessary under existing circumstances. Such conditions and restrictions may extend, but shall not be limited to, the inspection, operation, maintenance, guarding, and manning of, and fire-prevention measures for, such vessels and waterfront facilities." See 33 CFR § 6.14-1. "Commandant as used in this part, means the Commandant of the United States Coast Guard." 33 CFR 6.01-1.

As explained within the plan itself, this was not intended to relieve persons/entities subject to the Hurricane Plan of their obligation to adhere to the requirements set forth in the Plan, as such persons are at all times bound by 33 CFR 6.19-1. *See Plaintiff's Trial Exh. 28*, at 0079 ("Nothing in these recommendations shall be construed as relieving the masters, owners, operators, and agents of vessels or the owners, operators, and persons in-charge of waterfront facilities from their primary responsibility for the safety of such vessels or waterfront facilities during a hurricane.").

It is anticipated the Lafarge will nonetheless claim that it cannot be held to have violated 33 CFR 6.19-1 on the grounds that neither Section 6.19-1 nor the Hurricane Plan sufficiently identified Lafarge's legal obligations. Such an argument must fail. Based on the testimony of Lafarge's own employees, as explained above, it is established that **(1)** Lafarge **<u>never</u>** intended to secure the ING 4727 for purposes of "mooring", **(2)** that **<u>no effort</u>** was made to secure the ING 4727 for purposes of "mooring" and **(3)** the three single part lines actually used to secure the ING 4727 and the ING 4745 fell below that Lafarge employees believed to be sufficient for purposes of "mooring." Thus, the testimony establishes **<u>complete inaction</u>** on the part of Lafarge, a fact which establishes a violation of 33 CFR 6.19-1 on its face.

Even putting this aside, however, the Hurricane Plan set forth very detailed requirements, all of which the evidence establishes were abrogated by Lafarge.

**First**, Lafarge violated the requirements of Annex B, Appendix 2, relating to the mooring of barges. Specifically, Annex B proscribed series of "Task Requirements", the first of which was to "[e]nsure the vessel is securely moored or anchored and prepared for hurricane conditions." *See Plaintiff's Trial Exh. 28*, at 0084. To accomplish this "task requirement", Appendix 2, which related to "barges", provided various precautionary measures, including that

"[m]ooring lines doubled up with due consideration given to the effects of predicted storm surge." *See Plaintiff's Trial Exh. 28*, at 0085.  Of course, such considerations would include whether the barge was empty, as the Plan itself advised that "[v]essels in a fully loaded condition normally fare better than light vessels in hurricanes."  *See Plaintiff's Trial Exh. 28*, at  0079.

Here, as established by the evidence detailed above, Lafarge did not double up lines on the ING 4727, in stark contrast to manner which barges were secured in the northern tier with ropes placed on every cleat, and in fact did not give **any** consideration to the impact of the unloaded condition of the ING 4727 in regard to the storm surge.  Based on such evidence, Lafarge failed to meet the most minimal aspects of Annex B  Appendix 2, and thereon, violated 33 CFR 6.19-1.

**Second**, Lafarge violated the requirements of Annex C relating to "Waterfront Facilities."  Specifically, Annex C proscribed a series of "Task Requirements", including (a) to "[d]etermine the special needs and intentions of vessels moored at the facility" and (b) to "[d]etermine whether vessels desiring to remain moored to the facility during the hurricane will be allowed to do so." *See Plaintiff's Trial Exh. 28*, at 0086.  As explained in the Hurricane Plan, the underlying purpose of this part is to ensure that a vessel is not left without some individual/entity taking responsibility for a vessel:

> Facilities that do not intend to allow vessels to remain moored at their facility during the storm must provide sufficient notice to the vessel to allow time for the vessel to move to a safe mooring, hurricane anchorage or depart to sea. It must be understood that the initial decision to allow a vessel to remain moored to a facility for the duration of a hurricane rests primarily with the facility owner, operator, and/or person-in-charge. The facility must then request permission and receive approval from the COTP for all self-propelled oceangoing vessels over 500 OT and all oceangoing barges to remain at the facility. The owner, operator and/or person-in-charge of a facility and the masters, owners, operators, and/or agents of a vessel are primarily responsible for the safety and security of their facilities and vessels.

*See Plaintiff's Trial Exh. 28*, at 0080.

Here, Annex C was violated on its face, as the evidence establishes that Lafarge simply assumed the ING 4727 was to be picked up without determining the intentions of the owner. Specifically, Edward Busch testified that while a call was made to Zito Fleeting prior to evacuating the Lafarge facility on Saturday to release the ING 4727 for pick up [*Busch Testimony*, at 58:4-9], Mr. Busch readily admits that he never spoke with **any** individual at Zito. *See Busch Testimony*, 97:3-5. Yet, despite this fact, the evidence reflects that Mr. Busch communicated to his subordinates, as a fact, that the ING 4727 was scheduled to be picked up. *See Smith Testimony*, at 155:6-17. Based thereon, the ING 4727 was secured as though it was going to be removed prior to Katrina. *See Smith Testimony*, 137:4-13.

Based on the forgoing, the evidence establishes that Lafarge violated 33 CFR 6.19-1 through its repeated failure to adhere to the minimal directives set forth in the United States Coast Guard Sector New Orleans Hurricane Plan. Accordingly, the Pennsylvania Rule must be applied in this case.

## III. THE BARGE WAS A SUBSTANTIAL FACTOR IN CAUSING THE EASTERN IHNC FLOODWALL BREACHES.

Under maritime law, where one or more concurrent tortfeasors cause damage insusceptible of apportionment, the "substantial factor test" is intrinsic to application of the maritime law of joint and several liability as articulated in the seminal case, *Edmonds v. Compagnie Generale Transatlantic*, 443 U.S. 256 259-60 (1979), discussed *infra*. The substantial factor test has its roots in common law, and is thus innate to maritime litigation, but occasionally finds its way into Louisiana jurisprudence, the application of which to Plaintiffs state law claims is equally justified here by the Saving to Suitors Clause of 28 U.S.C. 1333 and

the reverse-Erie Doctrine, pursuant to this Court's supplemental jurisdiction over state tort claims.

It is well settled that "[t]here can be more than one cause in fact, making multiple wrongdoers liable." *Hennigan v. Cooper/T. Smith Stevedoring Co., Inc.*, 837 So. 2d 96, 102 (La. App. 2002). ING 4727 need not be the only factor, rather; "*it need only increase the risk of harm.*" *Hennigan, supra*, 837 So. 2d at 102 (citing *Spinks v. Chevron Oil Co.*, 507 F.2d 216 (5th Cir. 1975)) (emphasis added). In cases involving concurrent causes of damages, "'the proper inquiry is whether the conduct in question was a substantial factor in bringing about'" plaintiff's damages. *Chaisson v. Avondale Indust., Inc.*, 947 So. 2d 171, 187-88, (La. App. 2006) (quoting *Perkins v. Entergy Corp.*, 782 So. 2d 606, 611-12 (La. 2001)).[20] "If the Navy vessel ran into a papier mache levee, the vessel would still be a substantial factor in the damage."[21]

Jurisprudence demonstrates that inquiry focuses upon case-by-case evaluation of the body of evidence to determine whether a factor is substantial, guided by these common law principles.

## A. Restatement of Torts 2d § 433, Considerations Important In Determining Whether Negligent Conduct Is Substantial Factor In Producing Harm

The Restatement provides:

The following considerations are in themselves or in combination with one another important in determining whether the actor's conduct is a substantial factor in bringing about harm to another:

> (a) the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it;

> (b) whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible;

---

[20] Adapted from Plaintiffs' Trial Brief, USDC EDLA C.A. 05-4182, Pertains to MRGO, Robinson (No. 06-2268).
[21] *In Re Katrina Canal Breaches Consolidated Litigation*, Record Doc. 19415-1 at. P. 78.

(c) lapse of time.

Jurisprudence demonstrates no bright-line which quantitatively or qualitatively triggers a finding that a causal factor is substantial.  In fact, where a plaintiff carries his burden of proving **any** negligence on the part of the defendant, even if the defendant is only 1% at fault, the defendant is liable for 100% of the damages sustained by the plaintiff. *See e.g. Latulas v. Montco Offshore, Inc.*, 2006 U.S. Dist. LEXIS 20066, at 10 (E.D. La. Mar. 29, 2006) ("If the plaintiff in an action brought pursuant to § 905(b) carries his burden of proving any negligence on the part of the vessel owner, the vessel owner cannot reduce the plaintiff's recovery by the contributory negligence of the plaintiff's employer. If an employer is found to be 99% at fault for an injury to a longshoreman, and a vessel owner 1% at fault, the vessel becomes liable for 100% of the damages sustained by the plaintiff."); *Foulk v. Donjon Marine Co.*, 963 F. Supp. 427, 430 (D.N.J. 1997) (Remanded and modified at 182 F.R.D. 465 on other grounds.) ("To avoid any liability to Mr. Foulk, Donjon must thus convince a jury that Donjon was not at all at fault in causing Mr. Foulk's injuries. If the jury concludes otherwise, for example finding Donjon one percent at fault, joint and several liability will require that Donjon compensate Mr. Foulk for its role in the accident and for Breakwaters' role in the accident, however large that may be."); *See also Kirksey v. P&O Ports Tex., Inc.*, 488 F. Supp. 2d 579, 591 (S.D. Tex. 2007) ("Even if Tonghai was negligent partly as a vessel owner and Plaintiff's employer was partly negligent as well, Tonghai's negligence as vessel owner -- even if 1% - supports a judgment against it for all of Patrick Kirksey's damages"), rev'd on other grounds in *Kirksey v. Tonghai Mar.*, 535 F.3d 388 (5th Cir. Tex. 2008).

Analysis generally proceeds upon logical and practical consideration of the proof,

circumstances, and inferences drawn by the fact finder.[22]   The Fifth Circuit's opinion in

*Westchester Fire Ins. v. Haspel-Kansas Inv* is instructive, in which the Court wrote:

> In Lasyone v. Kansas City Southern Railroad, the Louisiana Supreme Court
> undertook the duty-risk analysis and explained that "[a] party's conduct is a cause-
> in-fact of the harm if it was a substantial factor in bringing about the harm." 786
> So.2d 682, 691 (La. 2001). In Lasyone, the Louisiana Supreme Court explained
> the following:
>
> > [T]he pertinent question is to what extent did [the   defendant's]
> > placement of this longitudinal guardrail have something to do with
> > the injuries [the   plaintiff] suffered. See Roberts v. Benoit,   605
> > So.2d 1032 (La. 1991); Hill v. Lundin & Associates,   Inc., 260 La.
> > 542, 256 So.2d 620, 622 (La. 1972).   The evidence is quite clear
> > that the presence of the   guardrail indeed "was a substantial factor
> > in  bringing about the harm" that [the plaintiff] suffered.
>
> Id. (emphasis added). Accordingly, the Louisiana Supreme Court found no
> manifest error in the trial court's finding that the defendant's action was a cause-
> in-fact of the plaintiff's injuries. Id.
>
> In light of Lasyone, it appears that the Louisiana Supreme Court has transformed
> the earlier threshold test — that the conduct have "something to do" with the
> plaintiff's injuries — into an inquiry of "to what extent" did the defendant's
> conduct have something to do with the plaintiff's injuries. For example, in cases
> involving multiple causes, a substantial factor test is used. See, e.g., Adams, 830
> So.2d at 533 ("Where there are concurrent causes of an accident, the proper
> inquiry is whether the conduct in question was a substantial factor in bringing
> about the harm or injuries.").

---

[22] See, for example, **Error! Main Document Only.***Error! Main Document Only.**Moore v. M/V ANGELA*, 353 F.3d
376 (5th Cir. 2003); In Re Katrina Canal Breaches, USDC EDLA C.A. No. 05-4182 c/w 06-2268, Record Doc.
19415-1 at pp. 16, 78 (P. 16:  "The fact remains that the failure to provide foreshore protection worked as the Navy
vessel hitting the levee.  It was a substantial factor in the failure of the Reach 2 Levee which all parties maintain
were built to grade.")  ***Error! Main Document Only.****Doyle v. Graske*, **Error! Main Document Only.**8:05CV21
(**Error! Main Document Only.**USDC, D. Nebraska. June 10, 2008); *Matheny v. Tennessee Valley Authority*,
**Error! Main Document Only.**No. 3:06-0565 (USDC, M.D. Tenn., Nashville Div. December 6, 2007).

This brief will not exhaustively address evidence with which the Court is already or is soon to be well familiar
through its own trial preparation review of the trial record.  However, some of the broader points will be addressed
as examples of how the substantial factor analysis might proceed.

See also *In Re Katrina Canal Breaches* at Record Doc. 19415-1: ("In order to unravel the
issue of causation, that is whether the MRGO was a substantial cause of the flooding of the individuals that have
brought this suit,  one must begin by defining the geographic areas where the plaintiffs reside and were damaged as
a result of the United States' alleged negligence.").

*Westchester Fire Ins. v. Haspel-Kansas Inv.*, 342 F.3d 416 (5th Cir. 2003).

"If the effects of the actor's negligent conduct actively and continuously operate to bring about harm to another, the fact that the active and substantially simultaneous operation of the effects of a third person's . . . tortious . . . act is also a substantial factor . . . does not protect the actor from liability."). The proper inquiry is whether Fleet's negligence was a "substantial factor" in bringing about the allision. *See* Restatement, Second, Torts § 431(a). Fleet therefore cannot disprove its own negligence simply by demonstrating that the negligence of other actors was another proximate cause of the allision." *U.S. v. Cota*, CR 08-00160 SI (N.D.Cal. 2-17-2009).

A tortfeasor's individual full responsibility for an injury is most obvious when its tortious behavior was either necessary or independently sufficient for the occurrence of the injury. W. Prosser, *Joint Torts and Several Liability*, 25 Cal. L. Rev. 413, 413 at 432-34 (1937). Indeed, Dr. Bea, given his own experiences and knowledge, absent even the corroborating evidence adduced by the Plaintiffs, and without the dissuasion of others' "experience and knowledge" (Tr. 2595:15 - 2596:9) recognized that "in fact, in the Ninth Ward, [ING 4727] played a role in the disaster of unfolding the levee under the excessive forces from the colliding barge." (Bea Video, *Exhibit P350*.) This statement, alone, embodies all that is necessary to satisfy the substantial factor test. Dr. Bea also agrees that if the barge was present at the time and location of the breaches, it is a force that acted against the IHNC floodwall. (Tr. P. 2798, LL 7-25). However, against the backdrop of Dr. Bea's self-contradiction, and Lafarge's claims that the barge could not and would not harm the floodwall, the inquiry properly draws within its scope the proof in the trial record that the barge was in fact present, and its effects substantial compared with other potential floodwall failure modes.

1.      **Restatement § 433(a): The Number Of Other Factors Which Contribute In Producing The Harm And The Extent Of The Effect Which They Have In Producing It**

The first prong of Restatement § 433 suggests comparison of the effect of the barge on the floodwall with other factors potentially effective toward breach causation.  This brings into play proof that the barge caused, or at least substantially contributed to, the floodwall breaches, despite Lafarge's contentions that the barge was not and could not have been present at the time.

a.      **Direct Proof that the Barge was a Substantial Factor.**

i.      **The eastern IHNC floodwall breaches occurred only at locations where witnesses testified that they saw a barge crash into the floodwall.  At each instance, according the witnesses, the floodwall simultaneously failed.**

The Court would be inimically committed to entirely reject eyewitness testimony in order to find that the barge was not a substantial causative factor.  "Evidence by positive and direct eye witness testimony as to the facts must prevail over a theory propounded by experts which is not shown to be beyond dispute and is, therefore, only an opinion as to theoretical possibilities. Hopkins v. Louisiana Ry. & Nav. Co., 152 La. 13, 92 So. 717 (1922); Tolle v. Higgins Industries, 212 La. 173, 31 So.2d 730 (1947)."  *Liberty Mutual Fire Insurance Co. v. Tidewater Oil Co.*, 292 F. Supp. 818 (WDLA - Lafayette Div. 1967) (aff'd at 403 F.2d 1023 (5th Cir. 1968)).

ii.      **The eastern IHNC floodwall breaches are the only Katrina floodwall breaches where a tip of a barge was seen through one breach, and where a barge was seen falling into a neighborhood where it remained adjacent to the other breach.  This phenomenon is unique to these breaches.**

iii.      **The Northern IHNC floodwall shows effects characteristic of localized failure caused by impact.**

As described by Dr. Marino, at the North Breach initiation point, a wedge- shaped flap of sheet piling torn on both sides from its adjoining continuum contrasts with the fact that older,

rusty sheet pile at the southern end of the North Breach fully extruded and twisted 270 degrees without failing or tearing. (Tr. 1197:16-1199:6; 1204:10-20).   The difference results from application of localized impact force - e.g., the corner or "tip" of a barge - at the point where the North Breach initiated.

### iv.   The Southern IHNC floodwall shows effects characteristic of localized failure caused by impact.

Plaintiff's expert Robert Bartlett testified to "witness marks" (Tr. 307:3-25) at the South Breach indicating barge impact - destruction of the concrete cap above the horizontal construction joint (Tr. 315:5-10; Exh. P378, Fig 4); folded rebar in alignment correlating with scrapes on the bottom hull of the barge (Tr. 319:17-320:1; Exh. P378, Figs. 5 - 8); vertical shearing of the concrete corresponding with the turn of the bilge (Tr. 326:15-327:3); impact while the wall was still standing up (Tr. 329:18-330: 21).

### v.   Concrete damage characteristic of barge impact at both North and South Breaches.

As photos attest, failures at the London Avenue and 17th Street Canal breaches consist of more-or-less intact monoliths leaning toward the protected side of the floodwall, showing characteristic signs of hydrostatic failure.   (Tr. 1234:1-4, 1245:10-1246:22.)   By contrast, locations on the eastern IHNC floodwall where witnesses testify that they saw a barge collide show marked crumbling and pulverization of the concrete both above and below the horizontal construction joint.

### vi.   Sounds uniquely associated with the barge.

Persons living near the 17th Street and London Avenue Canal reported hearing boom sounds followed by flooding.  So did persons in the Lower Ninth Ward.  However, testimony by witnesses in the Lower Ninth Ward also include description of sounds of grinding (Carolyn

Berryhill, Dx 317, pp. 33 – 41, 105, 108; screeching, knocking (Towanda Schexnayder, Dx 319, p. 42, lines 6 – 10; hitting (Andrew Sartin, Dx 285,  pp. 45 – 52;  Ronald McGill, Dx 299, pp. 40 – 49,59 – 60); impact (Michael Bickham,  Dx 316, pp. 63-65, 77 – 78; Arthur M. Anderson, III, Dx 320, pp. 61 – 62;  Kevin McFarland, Dx 318, p. 91); dragging (Michael Bickham,  Dx 316, pp. 63-65, 77 – 78); knocking, scraping, grinding and rubbing (Arthur Murph, Tr.  693:1-16). These sounds are unique to the eastern IHNC floodwall breaches, and cannot be explained by Lafarge or any of its experts.  Please see testimony of Jason Weiss, Tr. 2828 - 2851, and esp. 2832:11-20 and 2851:7-11.

### vii. Sequence of sounds and flooding is evidence of the intact floodwall before barge impact.

Arthur Murph testified to knocking, scraping, rubbing, and banging sounds coming from the floodwall before the flooding.  Dr. Bea echoes ILIT's statement that the barge scraped against the wall.  Where Dr. Bea diverges from Mr. Murph is that Dr. Bea claims these sounds to be associated with the barge's passage over the southern-most portion of the South Breach, after the ruptures had allegedly occurred.   Mr. Murph was standing in his driveway at the time. 692:23-693:12. Mr. Murph and the other Lower Ninth Ward sound witnesses are unanimous that flooding did not begin until after these sounds.   Otherwise, and according to Dr. Bea's impression, Mr. Murph would probably not have survived to tell anyone what he heard.   The inevitable conclusion is that the floodwall was still standing before it breached, and that the barge was present, moving against it, in order to produce these unique sounds.  This conclusion dovetails with Dr. Bea's concession, *supra*, that the presence of the barge at the time and location of the breaches renders it a force which acted upon the floodwalls.

### viii. Photographic Evidence that the Barge Preceded the Flood – Standing Houses.

Photographic evidence reflects that houses located to the east of ING 4727's post-breach/pre-Rita resting spot (behind the barge in photos facing east) did not suffer the splintering and dislocation that other houses near the eastern IHNC breach sites experienced.  Dr. Bea had no answer when asked if this fact indicates a sequence of events such that the barge was already in the neighborhood when the floodwalls failed, and actually shielded the houses from the full force of flooding.

**B.  Restatement 433(a) Comparison of the Barge's Effect with Potential Effect of Other Failure Modes –  Lafarge's Impossibility Argument and Contribution.**

Lafarge contends that the North Breach occurred solely because of(a) the formation of a gap between the canal side levee and the sheet pile leading to added hydraulic pressure and seepage;  (b) inadequate soil foundation at the levee toe;  (c) failure of the sheet pile at a transition point near the Florida Avenue Bridge, where there was a strength differential between two sections and a faulty field weld connecting them; and (d) underseepage and hydraulic uplift effects caused in part by sand-filled excavations in the vicinity of the floodwall at the North Breach site. Lafarge contends that the South breach occurred solely because of:  (a) the formation of a gap leading to increased hydrostatic pressure on the floodwall;  (b) overtopping and severe scouring of the landside soils leading to loss of soil support; (c) variations from straight-line wall alignment creating weak points coinciding with the limits of the breach;  (d) variations in subsoil conditions causing the area of the South Breach to have a lower wall top elevation; and (e) sand- filled excavations that exacerbated seepage and hydraulic uplift.  If   the Court finds that these failure modes, acting alone, caused the breaches, then the barge was not a substantial factor, the inquiry ends here, and Lafarge wins.  However, the proof demonstrates that these failure modes, if pertinent at all, were of limited or no effect until localized barge impact.

1.  **Failure modes urged by Lafarge, in combination with Hurricane Katrina, may have contributed to the breaches, but not without the greater effect of the barge.**

If the Court finds that such failure modes acted at all to contribute to the eastern IHNC breaches, the guiding principles are found in Restatement §§ 439 and 450, discussed *infra*. Failure modes urged by Lafarge will be treated in more detail in other sections of this brief. Broadly, however, for purposes of comparison - if necessary - several points lend themselves to the comparative analysis.

a.  **The defense experts rely purely upon hypotheses and evidence which is either flawed, or does not exist.**

Dr. Bakeer relies upon faulty vertical data to hypothesize about floodwall heights which allegedly, contrary to photographic proof, allowed overtopping and scour to fail the floodwalls.  Dr. Cushing rejects eyewitness testimony, and relies upon flawed meteorological conclusions based upon manipulated radar data and incomplete wind data to hypothesize about barge trajectory.[23]  Dr. Bea relies upon "sand boils" of which no evidence was found at the IHNC.  "Evidence by positive and direct eye witness testimony as to the facts must prevail over a theory propounded by experts which is not shown to be beyond dispute and is, therefore, only an opinion as to theoretical possibilities. Hopkins v. Louisiana Ry. & Nav. Co., 152 La. 13, 92 So. 717 (1922); Tolle v. Higgins Industries, 212 La. 173, 31 So.2d 730 (1947)."  *Liberty Mutual Fire Insurance Co. v. Tidewater Oil Co.*, 292 F. Supp. 818 (WDLA - Lafayette Div. 1967) (aff'd at 403 F.2d 1023 (5th Cir. 1968)).

---

[23] Trajectory is probably not relevant anyway; foreseeability is.   "When the defendant unleashes large physical forces such as those associated with . . . large ships broken loose from their moorings . . ., he creates risks that injury could be caused in diverse ways, too numerous and particular to foresee in detail. . . . The[se] cases call[] for the rule that if I foresee the risk in general, I need not foresee the details." *Signal Int'l LLC v. Miss. DOT*, 579 F.3d 478 (5th Cir., August 12, 2009)  In Signal International, there was no explanation for the trajectory of the breakaway to the location where it caused damage.  It did not matter.  What mattered was that the harm was foreseeable. Furthermore, in crediting eyewitness accounts of the damges to the property at issue, the Court in Vestal v. Glens, 146 F.Supp 494 (USDC EDNC, Wilson Div. 1956) wrote:  "...we must bear in mind the wholly unbelievable and bizarre results accomplished by winds of the hurricane and tornado varieties"  *Vestal* at 495 (aff'd at 244 F.2d 78).

       **b.**    **If the eastern IHNC breaches occurred before any other canal breaches during Katrina…**

Without the impact of a barge, this would suggest that the eastern IHNC floodwall was the worst-constructed, most prone to failure among all floodwalls in the area.  The entire body of evidence in *In Re Katrina Canal Breaches Consolidated Litigation* contradicts any such supposition.  According to defense expert Charles Cushing, the North Breach occurred between 4:30 and 6:30 a.m. (Tr., 2046:17-20, and the South Breach before 7:30 a.m. (Tr., 2110:1-6) Breaches along the 17th Street Canal, if sound witnesses there are to be believed, and where there was no barge, occurred "sometime after 9:00" (Dx 268, 15-17) after which it took the water about an hour to rise.  At the London Avenue Canal, the "boom" was not heard until after 10:00 or 10:30 in the morning, and flooding did not get high enough to get into the witness' house for four or five hours (Dx 271, 14-20).  The structures most prolific of breaches, and therefore suggestive of the worst-case, were earthen levees along Reach 1 and Reach 2 of MRGO, the funnel characteristics of which subjected these structures to hydrostatic forces much greater than in the IHNC.  Though breaches along Reach 2 formed without overtopping as early as 6:30 a.m., USDC 05-4182 c/w 06-2268, Record Doc. 19415 at p. 66, these involved highly erodible earthen levees subject to extraordinarily forceful wave wash, not reinforced concrete floodwalls which would not experience peak surge for another two and a half hours.

       **c.**    **The eastern IHNC floodwall breaches occurred before the peak surge recorded at the IHNC lock gauge.**

According to defense expert Charles Cushing, the North Breach occurred between 4:30 and 6:30 a.m., at a time when, in both Mr. Pazos' and Dr. Marino's opinions, the water level was too low to exert any unusual hydrostatic force upon the floodwall. (Tr. 825:24-826:23; 839:20-24; 901:7-11; 1203:5-25).  According to Dr. Cushing, the South Breach occurred before 7:30

a.m. (Tr., 2046:17-20 and 2110:1-6).  Peak surge time at the IHNC lock was around 8:50 a.m.,

Exhibit P421, Spinks Report, p. 23, Figure 8.  Dr. Bartlett testified that at the South Breach, the

water level could not be high enough for the barge to float so as to only affect the concrete cap if

793' of preexisting flood wall breach had already occurred just north of the area where it is

agreed that the barge transited the floodwall. (Tr.362:11-17; 363:13-17).  Indeed, even under

Lafarge's post-surge peak time and suction theory, it is difficult to imagine the 200' by 35' barge

floating cleanly past 793' of downed floodwall, cracked enough to cause a "boom" as Dr. Weiss

advocates, only to transit at an area where the wall was more upright, and the concrete cap still

intact until hit by the barge.

> **d.     The eastern IHNC south of the North Breach endured widespread scour and trench formation at locations where it did not breach.**

Exhibit P402, Report of Hector Pazos, Photo Group 1, pp. 1 – 3.  See also Dx 205, Bakeer
Report, Figure 59.

> **e.     The North Breach occurred absent overtopping and scour.**

Tr. 1260:7-10; 1993:25-1994:25.

> **f.     IPET agrees, generally, in Vol. IV, FINAL, Technical Appendix 17, with Dr. Marino's conclusion that contact between the barge and the floodwall would cause or at least contribute substantially to its failure.**

Dr. Marino testified that water exerts uniform pressure in all directions.  Alone, it is

insufficient to cause localized floodwall failure. (Marino, Tr. 1199:2-6). Dr. Bartlett calculated

the hydrostatic pressure at just over 200 p.s.i., and the force required at the South Breach to bend

the rebar at 300 to 500 p.s.i.  Hydrostatic pressure could not have caused the failure of the cap.

(Tr. 340:13-17). By contrast, ING 4727 is nearly one-thousand (1000) tons (Cushing, Tr.

2047:23). At the North Breach, hydrostatic pressure played no role until barge impact, after

which underseepage and gapping occur.  (Pazos, Tr. 822:9-823:1).  At the South Breach,

hydrostatic pressure may have contributed to gapping and seepage (though unlikely due to clay soils in which the sheetpile was embedded, Tr., 1139:1-7, but failure did not occur without the impact of the barge.

### 2. Restatement § 433(b): Whether The Actor's Conduct Has Created A Force Or Series Of Forces Which Are In Continuous And Active Operation Up To The Time Of The Harm...

Lafarge's conduct, and the unbroken chain of events by which this conduct culminated in breaching of the eastern IHNC floodwall, with which this Court is well-familiar, will be treated with brevity in other pertinent sections of this brief. Concisely, however, the chain of salient events is:

1. Lafarge re-routed from safe harbor ING 4727, a HOT, HOT, HOT barge, in order to avoid freight concessions due to an H-grade cement shortage. In order to fill customer orders for H-grade and avoid freight concessions, Lafarge unloaded the barge despite an emergency proclamation by the governor, despite the Sector New Orleans Hurricane Plan, and despite its own Terminal Preparation Checklist;

2. Lafarge had no communications due to an ongoing construction project;

3. Lafarge moored the empty ING 4727 to nothing other than a full barge, using three single parts of line;

4. Lafarge abandoned the facility without adding line or removing ING 4727 from the IHNC;

5. At some point after ING 4727 was "topped around," it broke away. Whether its trajectory began at the LNA Terminal or from a point nearer the S. Claiborne Bridge, it allided into the eastern IHNC floodwall.

### C. Contributing Legal Cause – Restatement Sections 439 and 450.

Any attribute of the flood protection structures or of Hurricane Katrina which contributed to or accelerated the harm is addressed by the Restatement (Second) of Torts, §§ 439 and 450:

- Restatement of Torts 2d § 439. Effect Of Contributing Acts Of Third Persons When Actor's Negligence Is Actively Operating:

If the effects of the actor's negligent conduct actively and continuously operate to bring about harm to another, the fact that the active and substantially simultaneous operation of the effects of a third person's innocent, tortious, or criminal act is also a substantial factor in bringing about the harm does not protect the actor from liability.

- Restatement of Torts 2d § 450. Harm Increased Or Accelerated By Extraordinary Force Of Nature

The extraordinary operation of a force of nature, which merely increases or accelerates harm to another which would otherwise have resulted from the actor's negligent conduct, does not prevent the actor from being liable for such harm.

Even in the event of affirmative findings of contribution by those responsible for the LPVHPS, Lafarge is not relieved of liability for the full measure of harm.  Neither does *vis major* relieve Lafarge of liability.  "One who fails in his duty to remedy a defective or dangerous condition is liable for injuries resulting there from although the immediate cause of the injury is the wind: Schwarz v. Adsit, 91 Ill. App. 576; Moore v. Townsend, 76 Minn. 64; Sutphen v. Hedden & Sons, 67 N.J.L. 324; Meyer v. Haven, 37 N.Y. App. 194; Stehle v. Jaeger, etc., Co., 225 Pa. 348, 352."  *Kimble v. MacKintosh Hemphill Co.*, 59 A.2d 68  (1948).

"Included within the scope of the act of God defense are "losses resulting from lightning, earthquakes, tidal waves . . ., or such extraordinary storms as hurricanes or typhoons." 2A John A. Edginton et al., Benedict on Admiralty § 152 (2010). The defense has been stated to apply "only to events in nature so extraordinary that the history of climactic variations and other conditions in the particular locality affords no reasonable warning of them." Warrior & Gulf Navigation Co. v. United States, 864 F.2d 1550, 1553 (11th Cir. 1989) (quoting Bradford v. Stanley, 355 So. 2d 328, 330 (Ala. 1978)). "The burden of proving an inevitable accident or an Act of God rests heavily upon the vessel asserting such defense." Pioneer Natural Resources USA, Inc. v. Diamond Offshore Co., 638 F. Supp. 2d 665, 689 (E.D. La. 2009) (citing Boudoin v. J. Ray McDermott & Co., 281 F.2d 81, 88 (5th Cir. 1960)).

"The mere fact that an act of God occurred is insufficient to avoid liability if the damage would not have occurred but for the defendant's negligence; thus, the party asserting the defense must also show that it "took reasonable precautions under the circumstances as known or reasonably to be anticipated." Fischer, 508 F.3d at 594. Therefore, where barges were improperly moored prior to Hurricane Katrina, their owner was still held liable for the damage caused when they broke free and allided with a bridge, because "[t]he allision was a harm of the general sort . . . that might have been anticipated by a

reasonably thoughtful person as a probable consequence of the negligent mooring of the barges . . . in light of the interplay of the expected storm surge and the surrounding topology." Signal Intern., 579 F.3d at 496."

*Norfolk Southern Railway Company v. Moran Towing Corp*., 2:09CV545 (E.D.Va. 6-9-2010).

## IV.  GEOTECH EXPERT ANALYSIS

In considering the testimony of the geotech experts, two common themes emerge:  (1) Dr. Marino conducted the most comprehensive review of the data; and (2) Dr. Marino has minimized speculation while other experts simply speculate at will.  For example, it was Dr. Marino who first considered the group of borings which include the infamous boring 81A.  Until that date, neither Dr. Bea nor Dr. Bakeer had even considered those borings in their analyses.  It is quite telling that what Dr. Bakeer had not even considered what he ultimately claims is one of the two primary causes of the North Breach.  Similarly, while Dr. Bea has spent five years continuously claiming that the integrity of the soil and seepage were the primary causes of both breaches, he somehow overlooked Dr. Bakeer's seepage theory, and did not even consider boring 81A.  As to the second theme – speculation – the Court should take note of the liberal use of speculative terms such as "may have," "could have," and "must have," in the defense experts' opinions – particularly those of Dr. Bakeer.[24]

Further, it is noteworthy that the defense experts substantially differ vis a vis each other. Specifically, there is virtually no overlap between Dr. Bakeer's failure theory and Dr. Bea's theory as to NB.  In fact, the two experts take largely inconsistent positions.  The two are

---

[24] *See e.g., Bakeer Report*, DX-205, p.41: "Based on this difference, much greater settlements *must have* occurred within the breached segment . . ." (emphasis added).  "Pumping of water at the drainage pump station near Florida Avenue has *probably* lowered the water table within that area."  *Id.* (emphasis added).  "It is *possible* that some of the demolition and construction activities such as deep excavations, construction vibration, and dewatering *may have* also had some detrimental impact on stability of the floodwall."  *Id. at 43* (emphasis added).  "In view of this, it is *possible* that the underseepage rate beneath the I-wall into the landside *could have been* facilitated by the fill material placed on either side of the floodwall . . ."  *Id.* (emphasis added).

similarly at odds as to failure mechanisms of SB.  Not only are they at odds with one another, but they are completely alone in their theories in general.  Among other things, no investigator has found (1) a weak link between the 1968 and 1980 walls; (2) a faulty weld between the two walls; (3) a topsoil level that acted as a sink that extended from the 75 borings and drained into the area of boring 81A; (4) the EBIA excavations were sand filled; (5) there was scour – localized or otherwise – at NB; or (6) the EBIA excavations extended 25 feet below the ground surface.  In fact, the only investigation that found underseepage to be a primary cause of either breach (ILIT) is one which Dr. Bea now agrees was completely wrong.  And, as Dr. Bea was co-leader of the ILIT investigation, the Court should place much weight on this admission.  As such, Dr. Bea is alone in his underseepage theory.

### A.    NORTH BREACH FAILURE MODES:

At the outset, it is important to highlight that (1) all experts uniformly agree that there was **<u>no overtopping</u>** at NB at the time of the breach, (2) all experts agree – with the limited exception of Dr. Bakeer – that scouring did **<u>not</u>** play a major role in NB, and (3) that all experts agree that NB was a localized failure.  However, the similarities stop there.  Except for tension cracks, **<u>none</u>** of Dr. Bakeer's primary causes for NB match those of Dr. Bea's, or for that matter, any other investigator who has studied the NB.

Where Drs. Marino and Bea differ is in seepage analysis – Dr. Marino has specifically ruled out the possibility of significant hydraulic effects under the sheetpile, whereas Dr. Bea claims significant hydraulic effects without identifying any scientifically reliable basis for doing so.   Dr. Marino's seepage analysis shows that there was insufficient time for the floodwaters to seep below the sheetpile wall and affect the stability of the resisting soil mass for either the North or South Breach.  Having rejected his own seepage analysis in the ILIT study, Dr. Bea has

unsuccessfully attempted to put together another seepage theory through speculation only to have Dr.Marino reject it through an analysis of the evidence.  Specifically, Dr. Marino found no evidence to support Dr. Bea's characterization of the EBIA excavations and, even assuming Dr. Bea's characterization to be true, Dr. Marino ruled out the underseepage as a cause.  *Marino Report*, p. 6-64; *Marino Declaration 10/30/09*, p. 4 section 8.

### 1.     The Primary Causes Advanced by Dr. Bakeer are Unreliable and Speculative

#### a.     Top Soil Sink

 In doing his analysis, Dr. Marino considered <u>all</u> the available soil borings to establish the soil layers in the vicinity of the breaches, compared to only select borings considered by IPET and ILIT, which resulted in less precise soil layering.   Dr. Marino concluded from the soil boring seepage analyses that multiple layers of thick "fill" exist below the ground level of the breaches.  *Marino Testimony*, 1109:6-1110:1.  This forecloses Defendant's underseepage theory because in order for the underseepage theory to be plausible, the floodwaters must seep below the sheetpile and affect the stability of the remaining soil mass.  In fact, Defendant's underseepage theory is not only unsupported by the evidence, it is contradicted by it.

To account for Dr. Marino's conclusions as to the composition of the soil layers below the breaches, Dr. Bakeer theorizes in his supplemental report *for the first time* that a deep, granular sand fill at the North Breach extends from the ground surface below the tip of the sheet piles of the floodwall, forming a conduit for water to flow through from the IHNC to the vicinity of the floodwall.  *Bakeer May 11, 2010 Supplemental Report*, DX-313, p. 6.  Dr. Bakeer further hypothesizes that during Hurricane Katrina, the higher water level in the IHNC forced water to flow landward through the sand fill "conduit" essentially forming a sink that drained into the

area of boring 81A, beneath the sheet pile tips, causing seepage and undermining the stability of the floodwall.  *Bakeer Testimony*, 2477:15-17.

Notably, even Dr. Bea, who has long attempted to advance underseepage as the primary cause of the subject breaches, has never taken the position that Dr. Bakeer's "sink" is a primary cause of NB or even that it existed.  *Bea Testimony*, 2772: 4-8.  And Dr. Bakeer, himself, did not arrive at his topsoil sink until after Dr. Marino provided his analysis of the subject borings.   Dr. Bakeer's topsoil sink was not mentioned at all in his primary report, at least implying that the theory was contrived in response to Dr. Marino's findings.

Not only is Dr. Bakeer's theory based on pure speculation but it is also scientifically invalid as admitted by him in *his* own May 11, 2010 report where he criticizes the quality of the MMG boring logs and the methods used.  Dr. Bakeer states in this report that the boreholes "**were not intended for use any in geotechnical engineering analysis**" yet he uses them for that very purpose.  *Bakeer Supplemental Report*, DX-313, p. 3.  Dr. Bakeer then states in that report that the soil samples recovered from Plate 12 (boring 81A) were highly disturbed and not fit for geotechnical engineering analysis yet he makes conclusions based on those very samples.  *Id*. at p. 4.  Dr. Bakeer then criticized the boring logs by stating that although the logs indicate where fill was used they don't distinguish between sand fill and clay fill and he attached the logs for Plates 7,8 and 9 (boring 77A and 79A) to his report to illustrate that point.  *Bakeer May 11, 2010 Supplemental Report*, DX-313, p. 5.   Interestingly, attached to his report are the logs for Plates 11, 12 and 13 (boring 81A) which also do not distinguish the type of fill used.  Despite this, Dr. Bakeer uses the boring logs to make conclusive statements regarding the permeability of the materials used without doing any sort of permeability calculation. *Bakeer May 11, 2010 Supplemental Report*, DX-313, p. 5; *Bakeer Testimony*, 2477: 13; 2479:3-4 and 19-20, 2481: 1-4.

Finally, Dr. Bakeer concludes in his report that "**no inference could be made from the MMG documents relative to strength, density, or lateral extent of the fill**" yet he utilizes those very MMG boring logs as a basis for his geotechnical engineering analysis and opinion. *Bakeer May 11, 2010 Supplemental Report*, DX-313, p. 5; *Marino Testimony*, 2381:4-2392:18; 2395:12-.2396:14)

The inconsistencies alone in Dr. Bakeer's testimony regarding boring 81A make his testimony invalid and unreliable. Dr. Bakeer criticizes the quality and methods of the MMG boring logs as an attempt to undermine Dr. Marino's testimony and then uses *those very same logs* to support his "sink" theory. *Bakeer Supplemental Report*, DX-313, p.6. Nonetheless, by his own admission, Dr. Bakeer's geotechnical engineering analysis is not scientifically valid and without merit.

Significantly, Defendant's evidence does not establish that the 81A soil boring was bored at its original proposed location. Dr. Marino testified that his team located the GPS coordinates set forth in the original 81A boring log and it was his opinion that the originally proposed location for boring 81A and the GPS coordinates given on the original boring log for boring 81A fell in the middle of a "valley" or "ravine" where it is impracticable for a drill rig to bore. Dr. Marino's opinion is based on his review of the relevant documents admitted into evidence in this matter, including the 1969 and 1980 levee construction plans and "as built" drawings showing the relevant ground elevations. *Marino Testimony*, 1240:1-8; 1437:8-1438:15; 1440:13-25; 1441:8-11; 1482:5; 1485:8; 1085:3-5; 1087:16-25.

Specifically, Dr. Marino provided a demonstrative which showed the contours of the levee between Surkote Road and the 1969 levee as well as the top of the level surface contours along the North Breach in front of the 1969 levee. *Marino Demonstratives*, PX-437, Slides 157,

12 and 7; *Marino Report*, PX-397, Figs. 2.9, 2.10, 2.11, 2.12;  *Marino Testimony*, 1240:1-18;

1437:8-1438:15; 1440:13-25; 1441:8-11; 1482:5; 1485:8; 1085:3-5; 1087:16-25.  Additionally,

as testified to by Dr. Marino[25] and illustrated by Dr. Bakeer, Surkote Road's elevation is raised

as it enters by Boland Marine creating a valley between Surkote Road and the 1969 earthen

levee. *Marino Demonstrative*, PX-437, Slide 157; *Marino Testimony*, 1240:1-18 and 1441:8-10.

As Dr. Marino testified, the irrefutable documentary evidence showed that after the 81A

boring log was created, subsequent boring information concerning boring 81A indicated that the

boring location was adjusted.  *Marino Testimony*, 1175:8-20; 1437:8-1438:15; *Marino

Demonstrative*, PX-437, Slide 25.  The defense simply had no response to this point other than to

create the fiction of "adjusted" vs. "moved."  *Bakeer Testimony*, 2338:18 to 2339:11.  Dr. Bakeer

admitted that he did not have any authorities or documents to support this claim.  *Id.* at 2455:2 to

2456:1.

Similarly, to the extent Dr. Bea contended that 81A's location was not altered, he ignored

the undisputed documentary evidence that the boring location was adjusted.  *Bea Testimony*,

2634:22 to 2635:14.  Therefore, Dr. Bea's testimony in this regard is speculative and baseless.

The Court aptly noted that the issue remained as to whether the GPS coordinates shown on the

original boring log for 81A were the proposed GPS coordinates or the actual GPS coordinates.

*Bea Testimony*, 2634:18 to 2635:14.

Regardless, Plaintiffs have established through undisputed documentary evidence that the

location of boring 81A was adjusted.  Defendants came forward with no credible evidence

regarding the location of boring 81A rendering their position pure speculation.

### b. .    The "Faulty Weld" Theory

---

[25] Dr. Bakeer also testified that the ground elevation dropped as one proceeded north along the eastern flood wall of
the IHNC which explains why the road elevation is higher in front of Boland Marine and a valley is created between
the road and the 1969 levee. *Bakeer Testimony*¸ 2380: 16-19; *Bakeer Demonstrative, DX 356, Slide 44.*

Dr. Bakeer alleges that the North Breach initiated when a rusted and shorter 1966-68 sheet pile connected to a new and longer 1980 sheetpile tore under the water pressure on the flood side.  *Bakeer Report*, DX-205, p. 50.  According to Dr. Bakeer, the developed tear allowed floodwater to enter with the higher flow and concentration into the landside, consequently causing localized erosion of the soils deeper on the landside of the I-wall.  However, Dr. Bakeer's faulty weld theory is not only unsupported by evidence (or the conclusions of any other investigator who has studied NB), it is conflicts with the evidence in the record.

First, Dr. Bakeer admitted at trial that he was not qualified to render such an opinion – that he "could not make an assessment about welding" since he was not a structural engineer or a metallurgist.  *Bakeer Testimony*, 2461:2-7.  Moreover, Dr. Bakeer's weld theory is based on speculative data as he admitted that he "did not inspect the sheetpiles personally and take samples and test them in a lab." *Id.* at 2461:10-11.

However, even if such an evaluation were conducted, Dr. Bakeer's faulty weld theory cannot account for the fact that other areas of the floodwall outside of the North Breach were also composed of the same purportedly rusted interlocks and the same 1966-1968 sheetpiles and yet did not tear under the water pressure on the flood side during Katrina.  Dr. Bakeer's only possible response is the bald assertion that because the particular joint in question connected the 1966-68 wall to the 1980 walls, it was a weak connection.  However, Dr. Bakeer has done no analysis nor does he advance any to support his theory.  The link was weak merely because he says so.

This notwithstanding, the sheetpile found at the North Breach had two tears.  However, Dr. Bakeer's "faulty weld" theory only accounts for one of those tears.  Dr. Bakeer has not, and indeed cannot, provide an explanation for the second tear.  The more probable explanation is that

a powerful localized force, such as that of ING 4727, was the only differentiating factor resulting in the North Breach, which was shown by Dr. Marino. (*Marino Testimony*, Tr. 1254:1-1255:8; Tr. 1198:4-1200:3)

Moreover, Dr. Bakeer makes much of the fact that the 1966-1969 sheetpiles had been flattened and lost their shape at the North Breach. *Bakeer Testimony*, 2316:10-17. However, Dr. Bakeer's assessment of the sheetpiles fails to acknowledge the "fan out" that all experts agreed occurred or the fact that such fanning can cause a flattening of the sheetpiles. *Bakeer Testimony*, 2316: 10-17; *Bakeer Report*, DX-205, p. 44, ¶2. Indeed, some portions of the sheetpiles at NB fanned and therefore flattened to some degree and others retained their shape. *See, e.g.*, Photo, DX-108; *Bea Demonstratives*, DX-361, Slide 60; *Bea Report*, DX-206, Appendix C, p. 17, Fig. 10a.

### c.     Tension Cracks

Dr. Bakeer further theorizes that under the storm surge water pressure, a tension crack (separation or gap) developed between the I-wall face and the embedding soil along the flood side causing the I-wall to tilt or lean back into the landside. Dr. Bakeer has not, and indeed cannot, provide any evidence to show that the tilting was in fact due to water pressure on the wall or due to the displacement of the wall as a result of a localized pressure. *See, e.g.*, *Bakeer Report*, DX-205, Figure 51. In fact, Dr. Marino concluded that the time necessary to allow the water to rise and deflect the wall was not sufficient enough to create a tension crack that would allow exhumation. *Marino Testimony*, 1221:19-1222:5, 1225:2-12.

Thus, a powerful localized pressure, such as that from a barge pushing against the floodwall, could account for the fact that the North and South breaches were the only locations along the IHNC where the floodwall was completely exhumed. Indeed, Dr. Marino concluded

that "when examining the floodwall damage it is apparent that a concentrated force was present on the upper part of the concrete I-wall.  This conclusion was reached as the north end of the sheetpile wall tore-off the still intact adjacent section from top down and the floodwall was completely removed from the ground. Exhumed sheetpile was not observed at other I-wall breaches except the IHNC South Breach."  *Marino Report*, PX-397 at p. 5-70.  Dr. Marino further concluded that he observed tension cracks that were *deeper* than those found by Dr. Bakeer.  *Marino Testimony,* 1221:19-1222:5, 1225:2-12; *Bakeer Trial Testimony,* 2358: 6-16.  Accordingly, it is impossible to corroborate that the displacement of the wall resulting in a tension crack was caused by the storm surge water pressures, rather than a powerful localized pressure.

## 2.   Dr. Bea's Fails to Provide Credible Evidence to Support His Seepage Theory

Defendant's evidence does not support their underseepage theory.  Defendant's theory is contingent on evidence establishing (1) _all_ of Defendant's conclusions regarding the EBIA excavations; _and_ (2) _all_ conclusions regarding the Marsh layer.  If Defendants fail in either respect, their arguments regarding permeability, seepage and hydraulic effects all fail.

### a.   ILIT Study

As to underseepage, Dr. Bakeer's testimony on this issue is predicated solely upon ILIT, and as such, is of no value whatsoever.  Even as ILIT's co-leader, Dr. Bea has acknowledged [*Bea Testimony*, 2614:9-2615:13; 2754:24-2755:6] that the seepage analysis done by ILIT ultimately was incorrect and criticized in IPET as deceptive and labeled "garbage in garbage out."  *Bea Testimony*, 2756:17-18).  Yet, while Dr. Bakeer acknowledges that the ILIT seepage analysis is not appropriate [*Bakeer Report*, DX-205, p. 56, ¶1], he at the same time attempts to advance the theory.  *See Bakeer Report*, DX-205, at p. 51. (stating that "[t]he EBNB was

possibly the result of one or more of the underseepage-induced mechanisms, possibly two or more acting in concert."); *Id.* (stating that "to the extent these [ILIT underseepage] mechanisms were at work, they would have weakened the levee/wall structure and hastened its failure."). These statements are not admissible opinion testimony, but rather, are nothing more than untested, unsupported speculation.  Even then, as Dr. Bea has acknowledged the seepage analysis done by ILIT ultimately was incorrect [*Bea Testimony*, 2614:9-2615:13; 2756:17-18], Dr. Bakeer cannot now credibly rely on it.  Thus, the Court should lend no weight to Dr. Bakeer's opinion in this regard.

That leaves the Court with Dr. Bea's purported underseepage opinions.  However, Dr. Bea's underseepage theories, throughout their evolution, have never been well-received.  As co-leader of ILIT, Dr. Bea was criticized by the IPET team for his underseepage analysis and resulting conclusions.  *Bea Testimony*, 2756:6-25; PX-244 and DX-145, IPET Vol. V, Appendix 17.  Particularly, Dr. Bea was criticized for using permeability (water conductivity) figures that were too high.  *Bea Testimony*, 2733:2-6.  IPET concluded that Dr. Bea's underseepage deductions were based on unrealistic and unproven permeability numbers, leading to faulty and deceptive analysis.  In fact, IPET's characterization of Dr. Bea's data calculations as "garbage in, garbage out" [*id.* at 2756:17-18] reflect criticisms which Dr. Bea could not dispute, and in fact, agreed with.  *Id.* at 2756:6-25.

### b.    Permeability

Dr .Marino's analysis shows the nature of soils are such that the floodwalls would not have failed but for the barge impact.  Defendant has failed to come forward with sufficient evidence showing that vertical or horizontal permeability were such that they would lead to seepage or hydraulic uplift resulting in lateral instability of the levee.  Moreover, Defendant's

methods are speculative, fatally flawed , were done for the first time in the Katrina litigation.  As such, they are not generally accepted methods within the scientific community.

**The EBIA Excavations**

Having now agreed that his underseepage conclusions in ILIT were unreliable and not credible, Dr. Bea needed another mechanism by which to show underseepage without using the permeabilities that he advocated as part of ILIT.  Dr. Bea abandoned his original theory that underseepage of the marsh layers alone created the North Breach and turned to the EBIA excavations and developed a theory equally as flawed.

Specifically, Dr. Bea expanded his new underseepage theory to include the interaction of the marsh layers with EBIA excavations on the East Bank of the IHNC which he asserted were backfilled with semi-compacted imported sand – a proposition not supported by **any** evidence.[26] The methodology used was one which was newly developed by Dr. Bea and his graduate student for use in the Katrina litigations and never been used before by any geotechnical engineer which alone gives rise to a Daubert argument.  (*Bea* Testimony, Tr. 2611:8-23; 2609-2615:15).

Dr. Bea then hypothesizes that the interaction of the naturally occurring permeable marsh layers with the "highly permeable sand" at the excavation sites, significantly contributed to the seepage of water underneath the floodwall, resulting in its overall instability.  However, without the purported EBIA sandboxes, Dr. Bea cannot support his underseepage theory as he will be left with the same faulty theory that he had as part of ILIT.

Dr. Bea's conclusions regarding the EBIA excavations are based entirely on speculation.

---

[26] This is a necessary element for Dr. Bea's theory that underseepage was a primary cause of either breach – and it is an element which Dr. Bea cannot support with evidence.  According to Dr. Bea, this "sand backfill" is highly porous and permeable, acting as a conductive layer for water seepage between the backfilled excavations and the naturally occurring permeable marsh and swamp layers below. *Bea Testimony*, 2647:3-19).

Dr. Bea makes five (5) assumptions that he has no basis to make: **(1)** that the soil in his pictures is the only backfill material used in the excavations; **(2)** that the soil in his pictures is sand – and a particular type of it since he assumes the permeability; **(3)** that the ultimate backfill that was used was semi-compacted; **(4)** that the soil has the permeability that Dr. Bea assumes; and **(5)** that the excavations were 25 feet deep.  While all five assumptions are necessary to his theory, as discussed below, none of them are true – not factually, and not legally.

Dr. Bea's only support for his conclusions regarding the backfill is "photographic documentation."  *Bea Report*, DX-206, Appendix C, p. 50.  In other words, Dr. Bea bases his "sand box" theory entirely on photographs at excavation sites.  Based solely on pictures, Dr. Bea concluded that the backfill used was (1) solely what was depicted in the pictures; (2) that it was sand; (3) that it was semi-compacted; and (4) that it had very high permeability.  In fact, Dr. Bea determined its exact permeability (solely with pictures) – 10-1.  *See* Exhibit DX 206, Bea Report, Table 8-1.  Indeed, no tests were conducted to determine the exact composition of the backfill and no records have been provided to support the contention that semi-compacted sand existed at those sites.  *Bea Testimony*, 2645:7-12. This notwithstanding, no evidence has been provided that what is depicted in the photographs is even the only material that was used as backfill.  As a material premise of his opinion, determination of the composition of the backfill material is critical in evaluating its unique permeability characteristics in order to support Dr. Bea's "sand box" theory.

Dr. Bea's reliance on photographs to make all of these determinations is fatally flawed both as a matter of fact and as a matter of law.  As a matter of fact, in direct contradiction to Dr. Bea, Dr. Bakeer admitted in his report that visual analysis performed by a geotechnical engineer even where it is of actual soil borings – as opposed to photographs – *cannot* be used to render

58

geotechnical engineering opinions, as, visual analysis of alone departs from ASTM and other recognized standards.  *See Bakeer May 11, 2010 Supplemental Report*, DX-313, p.3, ¶ 2 ("Visual classification of the retrieved soil samples from the MMG boreholes does not follow ASTM and other recognized standards….") *id*. at p. 5, ¶ 4 ("I have concluded that no inference could be made from the MMG documents relative to strength, density or lateral extent of the fill materials placed within the EBIA").   In fact, at trial, Dr. Bea claimed *precisely* the same thing.  *See*, *e.g.*, *Bea Testimony*, 2784:9-14. Yet, while both Drs. Bakeer and Bea claim that visual inspection of the soil itself is not reliable, Dr. Bea nonetheless utilizes this methodology by relying on photographs to draw his opinions with regard to soil.

As a matter of law, Dr. Bea cannot rely solely on photographs for his conclusions regarding the backfill of the EBIA excavations.  Indeed, "visual inspection" itself was deemed an unreliable basis on which to form an expert opinion in the context of engineering by the U.S. Supreme Court in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 157 (1999), which upheld exclusion of an expert who used "visual/tactile inspection" to draw conclusions regarding tire failure as impermissibly "connected to existing data only by the *ipse dixit* of the expert."

Consistent with *Kumho Tire*, it is well established that visual inspection based solely on examination of "photographs" cannot meet the rigors of *Daubert* for engineering related opinions.  *See e.g. Allstate Ins. Co. v. GE*, 2002 U.S. Dist. LEXIS 28256, 28-29 (W.D. La. Feb. 4, 2002) (concluding that "[t]he information relied upon by Allstate 's expert, i.e. claim photographs and "testimony of eyewitnesses," is insufficient to support his stated opinion" as "[n]o methodology was shown and no scientific method capable of confirmation was presented."); *Schober v. Maritz, Inc.*, 2008 U.S. Dist. LEXIS 14060, 6-10 ( E.D. Mich. Feb. 26, 2008) (concluding that opinion testimony derived from "reviewing nothing more than the

complaint and several photographs of the subject trailer" required exclusion under *Daubert*, as it was "supported by little more than 'because I said so.'""); *Tassin v. Sears, Roebuck & Co.*, 946 F. Supp. 1241, 1250 (M.D. La. 1996) ("the Court grants the defendants' motion to exclude Mr. Killingsworth's opinion on the miter gauge hold-down clamp as an alternative design for the table saw" as "[h]e formed his opinion based on a picture of a miter gauge clamp without knowing its dimensions or specifications and without performing any engineering calculations.").

More importantly, however, the above evidence establishing that visual analysis alone departs from ASTM and other recognized standards undermines the reliability Dr. Bea's testimony completely. Indeed, courts have consistently held that engineering testimony is incapable of meeting the minimal reliability standards under *Daubert* where the applicable engineering standard required visual inspection to be follow-up with actual testing. *See e.g. Schipp v. GMC*, 443 F. Supp. 2d 1023, 1031 (E.D. Ark. 2006) ("To summarize, Rasty's opinions rest largely on visual examination. General practice in failure analysis, as reflected in the ASM Handbook, requires further testing."); *Great N. Ins. Co. v. Power Cooling, Inc*., 2007 U.S. Dist. LEXIS 95912, 46-47 (E.D.N.Y. Dec. 18, 2007) (same).

Furthermore, Dr. Bea's conclusion that the excavation sites reach depths of up to 25 feet, thereby interacting with the marsh layers below, is similarly uncorroborated. *Bea Report*, DX-206, Appendix C, p. 37. At no point did Dr. Bea conduct physical measurements of the excavation sites nor can he support the dubious contention that the borrow pits reached the depth of the marsh layers. Without such data, Dr. Bea's underseepage theory, in conjunction with the scant evidence available from the excavation sites, cannot survive.

**The Marsh Layer**

Even if Dr. Bea could justify his theories as to the EBIA excavations, those would not, in and of themselves, cause underseepage – even if they reach the Marsh layer, which Dr. Marino has shown they do not. *Marino Declaration* 12/18/09, p.12, no.2 and Figure B.4.   Specifically, he then needs the Marsh layer to be highly permeable so it can act as a conduit for water below the floodwall.  In order to accomplish this, he claims that the Marsh layer is really made of two materials – something that is not necessarily disputed – and that one of the layers is made of Peat – something that is hotly disputed and for which there is no evidence offered by Bea to support his position.

Dr. Bea mischaracterized Dr. Marino's opinions and analysis of the Marsh, claiming that Dr. Marino used a single permeability value of $10^{-8}$. (Bea Tr. 2733:2-8.   To the contrary, Dr. Marino took the results of the boring logs, and assigned different permeability values **based on the observed soil characteristics of the Marsh.**  He then analyzed the horizontal and vertical permeability of the Marsh. (PX 410a, Marino Declaration 12/18/09, Para 44 and 45; see also, Marino Testimony, 1185-1186; 1180-1185:2; See also, Exh. 397, Table 5-1. ) These values ranged from $10^{-4}$ to $10^{-8}$.  (Marino Tr. 1185:5-8). Dr. Bea's high permeability values include the fact that he divided the Marsh level into two separate strata and assigned a permeability value of $10^{-2}$ for the upper Marsh layer.  (*Bea Report, p.* 52, Table 2).  This is the very same value that IPET criticized him for using in the ILIT study.  This indicates how Dr. Bea did not really abandon the highly criticized permeability values used in the ILIT study.

Furthermore, an examination of the boring logs shows that the Marsh was not primarily of Peat (Marino Demonstrative, Slides 36-48, 55-57, 61-88, 90-97, 99-100, 102-105); see also, Exhibit 397, Marino Report, Table 5.1;  Marino trial testimony, 1177:18-25, 1180:2-18; 1181: 1-

25, 1183:1 - 1184:14; 1184:21-25).  Dr. Marino explained that what is identified as a "Peat layer" by Dr. Bea, "is not Peat, and the Peat which is present is localized and typically described to contain **a significant amount of silt and clay**." Similarly, Dr. Marino further determined that based upon soil boring analyses, although there were certain "Peat-rich" zones in the layers of the soil, much of this peat is actually filled with clay, therefore a homogenous peat layer, as Dr. Bea describes, does not exist.  *Marino Testimony*, Tr. 1116:21-25; 1144:9-15.  Dr. Marino concluded that these "pockets of peat" are insufficient to transfer water pressure.  *Marino Testimony,* Tr. 1144: 9-15.

Therefore, for the purpose of horizontal permeability, by assuming the Marsh was Peat, Dr. Bea significantly overstated its permeability.

### c.    Dr. Bea's Hydraulic Uplift Theory Is Unsupported By Evidence

As an extension of Dr. Bea's unreliable underseepage theory, Dr. Bea introduces a phenomenon called hydraulic uplift[27]  that is similarly lacking in foundational support. Although Dr. Bea documented hydraulic uplift at various locations, including the Dutch levee and the Midwestern flooding in 2008, Dr. Bea provided **no** evidence of hydraulic uplift at the IHNC.  Significantly, Dr. Bea admitted that no photographic documentation – indeed, no evidence at all – of the phenomena observed at non-IHNC sites exists at the IHNC.  *Bea Testimony*, 2647:24 to 2653:19, and 2790:1 to 2791:1; *Bea Report*, DX-206, Appendix C, p. 113.

Additionally, Dr. Bea testified that if seepage flows as a result of these hydraulic pressures are great enough to reach the surface of the soil, it develops into what is called a "sand boil."  *Bea Testimony*, 2647: 6-18.  Dr. Bea stated that sand boils are "well known along the

---

[27] Dr. Bea hypothesized that hydraulic uplift pressure, that is, pressures in the underlying marsh-swamp layers blanketed by the overlying, much less permeable soils, could lead to "uplift forces" resulting in the destabilization of the flood protection structures at the North Breach.  *Bea Report*, DX-206, Appendix C, p. 93.

Mississippi River levees." *Id.* at 2647:6-180.  Again, while Dr. Bea documented this phenomenon at other locations, sand boils were <u>not</u> found at the North or South Breach following Katrina nor was Dr. Bea able to provide any documentation of their existence at these locations.  *Id.* at 2791:2-10.

Furthermore, according to Dr. Bea, uplift pressures produce "blowouts" that are equal or larger than the overburden stresses, resulting in soil removal.  *Bea Report*, DX-206, Appendix C, p. 113.  At trial, Dr. Bea testified that blowouts are physical manifestations of underseepage. *Bea Testimony*, 2791:23-2792:1.  Importantly, however, although Dr. Bea documented blowouts at the London Canal, he did not find any evidence of blowouts at the IHNC.  Indeed, despite the fact that the soil at the London Canal is far more permeable than that found at the IHNC, the floodwall at the London Canal did not fall or become exhumed from the ground.  *Bea Testimony*, 2675: 1-3.  This calls into question Dr. Bea's conclusion that soil permeability, underseepage and accompanying hydraulic lift have an impact on a floodwall's lateral stability.

Thus, while Dr. Bea showed photos of sand boils and blowouts related to hydraulic uplift, he failed to show **any evidence** of hydraulic uplift at the IHNC.  *Bea Demonstratives*, Slide RB-051; DX 258; *Bea Testimony*, 2791:2-10.

## B.    SOUTH BREACH FAILURE MODES

### 1.    Dr. Bakeer is Simply Wrong About The Causes of the Breaches

As previously discussed, Dr. Bakeer's opinions avoid commitment to any theory, as each of his opinions are couched by using speculative terminology.   Moreover, Dr. Bakeer's entire testimony is based on the breaches occurring at weak points in the floodwalls – a proposition which if assumed true, does not exclude the Barge as a cause of failure.  Indeed, the very same weak links exist in places where the walls did not fail.  Thus, as his opinions cannot rule out the

Barge as to the North Breach on such grounds, his opinions fare no better on the South Breach.

### 2.    Dr. Bakeer's Wall Height Theory Relies on Flawed Methodology

Dr. Bakeer relies upon faulty vertical data to hypothesize about floodwall heights. Specifically, Dr. Bakeer theorizes that as a result of long-term settlement due to variations in subsoil conditions, the wall heights at the South Breach were significantly shorter than the segments of the floodwall at other locations.  Dr. Bakeer concludes that as a result of these shorter wall heights, as compared to the remaining segments of the floodwall, the areas with lower wall height elevation were subjected to earlier splashing by waves, overtopping by storm surge water and initiation of landside scour.  *Bakeer Report*, DX-205, p. 41.

As a preliminary matter, Dr. Bakeer provides absolutely **no evidence** to corroborate that greater settlement occurred at the site of the South Breach than other segments of the wall that did not fail.  More significantly, however, Dr. Bakeer's wall height calculations are fundamentally flawed, undermining the validity of his theory.  Specifically, Dr. Bakeer's conversion figures improperly <u>double count</u> for the settlement originally anticipated in the wall design, resulting in wall heights at the South Breach that are not only inaccurate but virtually impossible.

To account for *localized* settlement originally anticipated in the wall design, Dr. Bakeer subtracts 1 foot at Mean Seal Level (MSL) from the original floodwall design of 15 feet MSL, resulting in 14 feet MSL. (Bakeer Report, p. 33).  Then, Dr. Bakeer converts this figure from MSL to NAVD88, by using the formula MSL – 2.5 = NAVD88.  This results in a wall height of 14 MSL – 2.5, or 11.5 NAVD88.  *Bakeer Report*, DX-205, pp. 32, 34-35.

Yet, Dr. Bakeer's initial assumption as to settlement and his conversion from MSL to NAVD88 is incorrect.  To begin with, Dr. Bakeer's  conversion formula (NAVD88 = MSL –

2.5) is wholly arbitrary and uncorroborated.  The USACE utilizes a much smaller conversion

figure of "1.05" to account for the global settlement of the floodwall.  *Bakeer Testimony*,

2494:12; 2495:5-13).  Dr. Bakeer admits that the "2.5" conversion figure accounts, either in

whole or in part, for anticipated "global" settlement of the floodwall.  *Bakeer Testimony*, 2494:4-

9.  This claim is incorrect and readily disproved by Dr. Daggett's survey of the floodwall from

the N. Claiborne Bridge to the Florida Avenue Bridge which Dr. Bakeer relies on in his own

report.  *See Bakeer Report*, DX-205, unpaginated Figure 63, p. 113 of the Acrobat file.  There,

the measurements range is from 12.8 NAVD88 (on either side of SB) to 14 NAVD88.  This is

despite the fact that the walls had tilted to some degree as a result of Katrina.  If Dr. Bakeer's

conversion formula was correct, those measurements would translate to 15.3 to 16.5 MSL –

meaning that the floodwalls actually grew between 1969 and 2005.  Simply put, Dr. Bakeer's

formula is incorrect even if it only accounted for local settlement – as opposed to "global"

settlement.  Furthermore, Dr. Bakeer's distinction between global and local settlement clearly

cause him to double count as that would mean that at locations where the I-wall was surveyed at

14 NAVD88, MSL would equal NAVD88.

 Additionally, Dr. Bakeer claims that the settlement was even greater than 11.5 NAVD88

since LiDAR data, an imprecise test used to determine settlement at the levee toe, indicates

additional settlement of up to 2 to 4 feet at the levee toe.  *Bakeer Testimony*, 2492:9-16; *Bakeer

Report*, DX-205, p.40; *Bakeer Deposition*, PX-345, 163:14 to 164:8.  Dr. Bakeer admitted that

he used the same LiDAR data that ILIT employed in 2000, and he remains unaware of which

LiDAR points were used to determine the location of the levee toe nor whether those points

match the points used in the 1965 measurements.  (Tr. 2492:17-2493:11).  As such, Dr. Bakeer

has no basis for his measurement of settlement of the levee toe, let alone a basis to conclude it

occurred at all.

Further, Dr. Bakeer does not explain how measurement of the settlement at the levee toe translates into measurement of settlement at the top wall. *Bakeer Deposition*, PX-345, 164: 9-16. Regardless, accounting for the LiDAR, Dr. Bakeer claims that the height of the floodwall at the site of the breaches was "much lower" than the original predicted final figure, resulting in a wall height between 11.5 NAVD88 and as short as 8.5 NAVD88. *Bakeer Report*, DX-205, p.40. Basically, Dr. Bakeer claims that at the breach sites, the walls were up to 4 feet lower than what the Defense's own survey shows for the portions of the wall that did not fail. No other investigator has made such a claim, and with good reason, as such a claim is not supportable. In fact, Dr. Bakeer admitted that he was unaware of the correlation between settlement of the levee toe and the floodwall. *Bakeer Testimony*, 2326:12-23.

Perhaps even more significant is the fact that Dr. Bakeer's theory that there is any correlation is affirmatively disproved by Dr. Daggett's survey. Indeed, if Dr. Bakeer were correct that there was a correlation between settlement at the levee toe and the top of the I-wall, such a correlation would be apparent with the portions of the wall which did not fail – there is absolutely none.

> **3.     Dr. Bakeer's Theory Regarding the Particular Weakness of the Wall at the South Breach Does Not Exclude the Barge**

Dr. Bakeer testified that the South Breach occurred for the following reasons: **(1)** the floodwall deviated from a straight line alignment at the precise limits of the breach, **(2)** the presence of drainage canals on both side of the floodwall allowed for seepage, and **(3)** the unique soil conditions that allegedly existed at the area of the south breach allowed for the floodwall failure. *Bakeer Testimony*, 2368:19-2370:2. Dr. Bakeer's opinions on these points are based on

mere speculation, conjecture and conclusions without evidentiary basis.

With regard to the first point, Dr. Bakeer testified that because the flood wall deviated from a straight line that there was a "plane strain problem" on the wall and that caused a change of stresses on the wall in different directions, that these changes in alignment matched the precise limits of the southern breach, and caused a weak link in the IHNC's eastern floodwall. *Bakeer Testimony*, 2371:5-21. Dr. Bakeer's first argument is three fold:

First, this was not the only area of the floodwall that deviated from a straight line. There was also significant deviation of the floodwall south of the southern breach at the IHNC. *Bakeer's Demonstratives*, DX-356, Slide 78; *Photo*, DX-12, LNA 758. Dr. Bakeer ignored other areas of the subject floodwall also deviated from a straight line, as is depicted in Slide 78, Dx 12 LNA 758 (demonstating both the scour trench and the wall curve as it proceeds south towards the Clairborne Avenue Bridge).

Moreover, Dr. Bakeer incorrectly testified without exhibiting any measurements that Bakeer Demonstrative, Slide 78 (DX-12 LNA 758), shows how the scour trenches are wider as they get closer to the breaches which was supposed to support his unsupported argument that the levee walls were lower in the area where the breaches occurred. Clearly, this is a mischaracterization of what is shown in the photograph. *Bakeer Testimony*, 2402:5-22. Simply stated, the scour trench is more narrow because the further an object (i.e. the scour trench) is in a photograph the smaller it appears, and the scour trench obviously appears smaller the further away from the person shooting the photograph and more importantly **the wall obviously curves** as one looks south in the photograph. *Bakeer's Demonstratives*, DX-356, Slide 78; DX-12, LNA 758; *Marino Report*, PX-397, section 5 (Marino's analysis of the flood wall heights).

Second, the claim that the wall failed because of the deviation at the southern most

portion of the southern breach is absurd. That the southern-most portion of the south breach is where the barge hit the floodwall cannot be reasonability contested.  All testifying experts admit that the barge impacted the wall, at the southern most portion of the south breach, after it road up on a leaning monolith just to the north.  *E.g., Bakeer's Demonstratives*, DX-356, Slide 59; PX-397, photo 4.36; PX-437, *Marino Demonstratives*, Slide 178.

Third, and importantly, both of defendants' experts, Bea and Bakeer, testified that the south breach failure was initiated at the apex of the bow shown in Slide 72 of Bakeer's demonstrative, not in the location of Dr. Bakeer's alleged "plain strain" problem. *Bakeer Report*, DX-205, Fig. 50, *Bakeer Demonstratives*, DX-356, Slide 72; *Bakeer Testimony*, 2400:24-2401:3.

With regard to the second point, Bakeer's opinion that the levee failed at the south breach is equally without basis. Dr. Bakeer testified that the presence of drainage canals on both sides of the floodwall allowed for seepage.

Specifically, Dr. Bakeer testified as follows: "*The canals were filled.  The quality of the material that was used to backfill these canals **could cause problems** if they were not placed properly and they were not selected properly; this **could** be a seepage problem*." *Bakeer Testimony*, 2375:19-24.  Again, Dr. Bakeer uses inappropriate and speculative words such as "could" and "if" – anything "could" cause problems, particularly "if" not placed properly or selected properly. The bottom line is that Dr. Bakeer had to use those words because Defendants presented not a stitch of credible evidence as to the material used to fill these excavations or canals.

With regard to the third point –  that the failure of the south breach was due to the unique soil conditions that existed in the area of the south breach [*Bakeer Testimony,* 2369:22-24] Dr. Bakeer himself admits in his report that the results of the soil boring performed by MMG for

WGI "were not intended for any use in geotechnical engineering analyses or foundation design of the floodwall or any other structure" *Bakeer May 11, 2010 Supplemental Report*, DX-313, p. 3.

Dr. Bakeer states that the bore holes are shallow and do not provide sufficient borehole information regarding subsoil stratification along the centerline of the floodwall;  that the application of SPT tests are questionable, particularly in the predominate soils at the site (very soft and soft clays) and the other types of tests performed, hollow stem augers, are limited in sampling soft clays; that visual classification is not a recognized method of classification of soil, and does not meet ASTM requirements.  *Bakeer May 11, 2010 Supplemental Report*, DX-313, p. 3.

Dr. Bakeer further stated that "in many cases the logs indicated no recovery or samples were highly disturbed, and that the sampling protocol was consistent with environmental sampling which was the object of the MMG study, but that **the study did not yield results suitable for use in formal geotechnical engineering design and analysis."** Dr. Bakeer specifically stated: "**In view of the above, I concluded that no inference could be made from the MMG documents relative to strength, density, or lateral extent of the fill.**" *Bakeer May 11, 2010 Supplemental Report*, DX-313, p. 3.

Notwithstanding Dr. Bakeer's admissions regarding the boring samples and further criticisms of the MMG/WGI borings noted in his report, Dr. Bakeer at the trial of this matter then utilized the MMG boring logs—and specifically boring log 25a—to do exactly what he said could not be done: he utilized the MMG boring  logs to give a geotechnical engineering analysis of levee strength and characteristics.  *Bakeer May 11, 2010 Supplemental Report*, DX-313, p. 3, ¶ 2 to p. 5, ¶ 4, 1st sentence; *Bakeer Testimony*, 2381:4 to 2392:18; 2395:12 to 2396:14.

### 4.  Overtopping and Scour Trenches

Dr. Bakeer's scour trench theory[28] relies heavily on faulty vertical data that the floodwall top at the North and South breaches was much lower than the design grade.  *Bakeer Report*, DX-205, p. 54.  As was the case with his opinion regarding wall height, Dr. Bakeer provides no evidence, photographic or otherwise, to corroborate that the floodwall at the North and South Breach locations were shorter than other segments of the wall that did not fail, resulting in scour trenches.

Additionally, Dr. Bakeer, Dr. Bea and Dr. Cushing each admitted that it is not possible to measure the size of any of the scour trenches at the South Breach site.  In fact, it is wholly speculative to claim that any scour trenches existed at the South Breach since the trenches found at the South Breach were caused by displacement and not scour.  Photograph 4.58 of Dr. Marino's report clearly shows the distinguishing features of a displacement trench versus a scour trench.  *Marino Report*, PX-397, p 4-75.

Further, Dr. Bakeer testified that overtopping at the South Breach began at approximately 7 a.m. to 8 a.m. [*Bakeer Testimony*, 2488:18-22], but also testified that he believed the South Breach occurred just after 6 a.m.  *Id.* at 2488:15-17.  Dr. Bakeer's projected sequence of events is illogical.  Dr. Bakeer essentially alleges that overtopping, one of the major causes of the South Breach, did not occur until *after* the South Breach was fully developed.  Indeed, ILIT, of which Dr. Bea was a co-leader, concluded that scouring of the landside of the floodwall was not a

---

[28] According to Dr. Bakeer, overtopping and the resulting scour trenches played a significant role in the floodwall failure at the South Breach. *Bakeer Report*, DX-205, pp. 3, 54.  Specifically, Dr. Bakeer theorizes that early splashing due to wind and waves and overtopping occurred over the wall top particularly over low areas of the floodwall. This initiated erosion and scour of the surface soils immediately behind the floodwall on the landside. Dr. Bakeer believed that early splashing due to wind and waves and overtopping occurred over the wall top particularly over low areas of the floodwall.  *Bakeer Report*, DX-205, p. 54.  According to Dr. Bakeer, as the water level continued to rise in the IHNC and continuous overtopping began, a contiguous scour trench developed along the landside of the floodwall starting at the low areas (North and South Breach). The scour trench widened as overtopping continued and the wall leaned further allowing the falling water to reach farther back into the landside. *Bakeer Report*, DX-205, p. 54.

significant factor that contributed to the instability and ultimate failure of the floodwall at the North and South breaches. *Bakeer Testimony*, 2489:3-12. In fact, hydrographic data supports the finding that even after the breaches occurred, the water levels in the IHNC continued to rise with no subsequent impact on other areas of the floodwall. *Bakeer Report*, DX-205, Figure 18.

### 5.   Plain Strain Problem

Dr. Bakeer testified that as a result of the floodwall's deviation from a straight line, a "plane strain problem" existed that caused stresses on the wall in different directions. Dr. Bakeer conjectured that these changed in alignment matched the precise limits of the South Breach and caused a weak link in the IHNC's eastern floodwall. *Bakeer Testimony*, 2371:5-21.

The problem with Dr. Bakeer's argument is three fold: First, the area where the floodwall deviated was not the only area where such a deviation occurred. Dr. Bakeer failed to mention to the Court that other areas of the floodwall also deviated from the straight line. For example, there was a significant deviation of the floodwall south of the South Breach at the IHNC. *Bakeer's Demonstratives*, DX-356, Slide 78; *Photo*, DX-12, LNA 758. Slide 78 evidences the curvature of the floodwall and the scour trench as the wall proceeds south towards the Clairborne Avenue Bridge. Second, Defendants' assertion that the wall failed because of the deviation at the southern tip of the South Breach is nonsensical. It is undisputed by both parties' experts that the southern tip of the South Breach is the precise location of where the barge impacted the floodwall. *Bakeer Report*, DX-205, p. 65; *Bea Report*, DX-206, p. 53-54; *Marino Report*, PX-397, p. 4-27, 4-52). Third, both Dr. Bakeer and Dr. Bea testified that the South Breach was initiated at the apex of the bow shown in Slide 72 of Dr. Bakeer's demonstrative, not at the location of Dr. Bakeer's alleged "plain strain." *Bakeer Report*, DX-205, Fig. 50, *Bakeer Demonstratives*, DX-356, Slide 72; *Bakeer Testimony*, 2400:24-2401:3. Thus, Dr. Bakeer's

"plain strain" problem is plain wrong.

### 6.    Drainage Canals on Both Sides of Floodwall

Dr. Bakeer's underseepage theory attempts to explain, without providing any corroborating evidence, the mechanism behind the movement of floodwater within levee soils, resulting in the overall instability of the floodwall.  Specifically, Dr. Bakeer testified that the presence of drainage canals on both sides of the floodwall allowed for seepage at the South Breach.  *Bakeer Testimony*, 2375:19-24.  Thus, the underseepage rate could have been facilitated by the fill material allegedly placed on either side of the floodwall.

Dr. Bakeer's excavation hypothesis is grounded purely in speculation.  Indeed, Dr. Bakeer acknowledges that "no information is available relative to the type and placement conditions of the material used to backfill the Jourdan Canal on the landside of the floodwall." *Bakeer Report*, DX-205, p. 43.  In fact, Dr. Bakeer admitted during his deposition that he has never seen the quality control construction records to confirm the exact composition and the permeability characteristics of the "backfill".  *Bakeer Deposition*, PX-345, 170:13-24.  Further, Dr. Bakeer testified during his deposition that he has not seen any reports documenting underseepage prior to Hurricane Katrina.  *Id.* at 186:13-19.  Indeed, Dr. Marino concluded that based upon transient seepage analyses, "there is essentially no effect of underseepage felt by the protection side subsoils."  *Marino Report*, PX-397, p. 5-66.  Dr. Bakeer cannot provide any corroborating evidence to support his theory that the material found at these borrow pits accelerated the rate of underseepage at the North and South breaches, resulting in lateral instability of the floodwall.

Further, Dr. Bea's opinion on the issue of what materials were used to fill the canals prior to Katrina is equally meritless.  In fact, Dr. Bea admits in his report that he is unaware of the type

of material used to fill the landside canal.  Specifically, his report states: "[t]he landside canal was filled sometime in the 1990s (ILIT, 2006) with unknown materials."  *Bea Report*, DX-206, p. 12.

**7.      Dr. Bea's Early Position Regarding the Barge Concluded that the Barge Was Involved in the North and South Breaches**

Much like Dr. Bakeer, Dr. Bea opinion testimony is pure hypotheses, constructed using foundational premises that are either completely unsupported, or supported by flawed evidence. Even this aside, his conclusions as to the causation of the breaches have been inconsistent.  For example, at the outset of Hurricane Katrina, at the time ILIT published its final report in November 2005, Dr. Bea agreed with the report's findings that ING Barge 4727 played a role in the North and/or South breaches. *Bea Testimony*, 2757:4-16; *see also Bea Deposition*, PX-349, 43:18-44:25).  However, ILIT, on which Bea relied for the conclusion that the barge not involved, did not actually analyze the barge's involvement, but merely concluded that it was not involved.

In fact, on December 12, 2005, Dr. Bea provided a statement to the Times-Picayune newspaper regarding the strength of the barge's impact on the floodwall, stating: "But from the cracking of concrete to the deafening sounds of a huge barge slamming against the Industrial Canal floodwall, residents had plenty of reason to believe their community was under siege." *Bea Testimony*, 2759:15-18.  While Bea testified that he relied upon "opinions" of others to support his own change of opinion that the barge breached the floodwall and that as his work continues, this does not dispose of the fact that his conclusions are "constantly changing."  *Bea Testimony*, 2801:3-16.  In essence, the history of Dr. Bea's expert opinion as to the cause of the breaches is a series of inconsistencies and shifting conclusions.

**V.     OF THE EFFECT ON DAMAGES AND THE COURT'S DETERMINATION OF SUCH, SHOULD THE COURT SHOULD FIND THAT THE BARGE WAS A SUBSTANTIAL FACTOR WITH RESPECT TO ONE BREACH – INDIVISIBLE HARM AND APPORTIONMENT**

When one or more tortfeasors cause or contribute to damages which are indivisible such that no rational means of apportionment is available, either tortfeasor, or both, can be held liable for the whole measure of damages.  If the barge caused one eastern IHNC breach, but not the other, the damages are - according to the facts adduced at trial - nonetheless indivisible, and Lafarge is liable for the entirety.

Restatement (Second) of Torts § 433A Apportionment of Harm to Causes, states that:

(1) Damages for harm are to be apportioned among two or more causes where

> (a) there are distinct harms, or

> (b) there is a reasonable basis for determining the contribution of each cause to a single harm.

(2) Damages for any other harm cannot be apportioned among two or more causes.[29]

"Where a fair allocation of liability cannot be made among multiple tortfeasors, the federal common law permits imposition of joint and several liability.  See, e.g., Restatement (Second) of Torts § 879 (1979) ("If the tortious conduct of each of two or more persons is a legal cause of harm that cannot be apportioned, each is subject to liability for the entire harm, irrespective of whether their conduct is concurring or consecutive."); W. Page Keeton, Prosser and Keeton on Torts § 52, at 347-48 (5th ed. 1984) ("Single Indivisible Result: Certain results, by their very nature, are obviously incapable of any reasonable or practical division and . . . [n]o ingenuity can suggest anything more than a purely arbitrary apportionment of such harm.  Where

---

[29] See Comment on Subsection (2) of Restatement (Second) of Torts § 433A, ¶ i:  "Certain kinds of harm, by their very nature, are normally incapable of any logical, reasonable, or practical division. … Whether there is liability in such a case may depend upon the effect of the intervening agency as a superseding cause (see Title C of this Chapter); but if the defendant is liable at all, he is liable for the entire indivisible harm which he has caused.

two or more causes combine to produce [a single loss], each may be a substantial factor in bringing about the loss, and if so, each is charged with all of it."); cf. Gordon H. Mooney, Ltd. v. Farrell Lines, Inc., 616 F.2d 619, 625-26 (2d Cir. 1980) (holding that, under the Carmack Amendment, comparative fault is the appropriate method for assigning liability among joint tortfeasors where fault is assignable)." *Project Hope v. M/V IBN SINA*, 250 F.3d 67 (2nd Cir. 2001).[30]

Plaintiffs' hydrological engineering expert, Melvin Spinks, testified in trial:

1606
4  What we can determine through our analysis is that
5  the north and the south breaches along the IHNC floodwall
6  accounted for over 90 percent of the flow in the Lower Ninth
7  Ward in St. Bernard Parish before 9:00 a.m.

1609
13  the north breach probably,
14  in terms of its contribution, is probably 20 percent, versus
15  80 percent from the south breach, because of the size of the
16  opening.

As Dr. Spinks' testified, This is to be understood, as valid only if water from either source remained isolated there, which is unlikely and unproven, and only during the short interval until the South Breach occurred and the waters mixed.

1606
20  Q.   What about the water for the north breach and the water
21  from the south breach?
22  A.   You can determine that water up until the point it ties
23  together, I mean, it becomes together, but you can also

---

[30] See also *Landers v. East Texas Salt Water Disposal Co.*, 151 Tex. 251 (Texas, 1952)    in which both the East Texas Salt Water Disposal Company and the Sun Oil Company allowed their pipelines to break, each contributing unknown and indivisible quantities of salt water and oil to a lake; *Michaels v. Avitech, Inc.*202 F.3d 746 ("If both Avitech and the subsequent facility were sources of contamination, however, that does not necessarily relieve Avitech of liability, so long as the sources of contamination combined to create a contaminated environment which, through a string of events, caused the plane to crash. In such an instance, the contamination could be seen as an indivisible harm which creates joint and several liability for the parties whose negligence created it. See, e.g., *Borel v. Fibreboard Paper Products Corp.*, 493 F.2d 1076, 1095 (5th Cir. 1973); *Amstadt v. United States Brass Corp.*, 919 S.W.2d 644 (Tex. 1996).

24   determine it based upon some science relative to width of
25   opening.

1607

1   So there are some processes that you can use to
2   determine that, but for all practical purposes, once water --
3   the north breach occurs at 4:30, or 4:00 or 4:30; the south
4   breach from 5:00 to 5:45.  So once they -- after 5:30, it's a
5   quick rush of water from the south breach toward the north
6   breach, and it's hard to distinguish the water at that time.

1610

14   Q.   As a practical matter, when you got the north and the
15   south breach so close together, after the waters mingle, is it
16   possible to distinguish which water molecules hit which
17   property?
18   A.   No.
19   Q.   And that is what you described as being indivisible?
20   A.   Yes.

As for locations affected by water from one source before the other, despite any sequence

or depth of water from either source, it is the combination of both sources which resulted in the

harm.  In this instance, the question is not one of apportionment between sources, but whether

the resulting harm can be apportioned.   Please see Melvin Spinks' Flood Simulation Timeline,

and the United States Army Corps of Engineers New Orleans District Depth vs. Damage Curves,

Appendices F and H, respectively, to his report, Exhibit P421.  According to this formula, the

Alford's home at 2423 Deslonde Street near the North Breach would have been saturated in up to

five (5) feet of floodwater from the time of the North Breach until the South Breach occurred,

causing the water to rise further.  According to Charles Cushing, the North Breach occurred

between 4:30 a.m. and 6:00 a.m.  Dr. Spinks' model essentially agrees, stating that the North

Breach occurred around 4:00.  By the time of the South Breach, around 5:30 a.m. according to

Dr. Spinks' model, water from the North Breach had already deposited five feet of water in the

76

Lower Nine Ward all the way to N. Prieur Street.[31]    This is consistent with William

Villavasso's observations at Trial Transcript, p. 646:

> 12 A. Yeah. When the -- when the break occurred, it moved out in
> 13 all directions.
> 14 Q. Okay. You could see actually --
> 15 A. Not just towards me, but towards the opposite way also.
> 16 Q. But could you see that?
> 17 A. Yeah. I could see the water coming.
> 18 Q. And it went in all different directions?
> 19 A. Yeah.

According to the NOD Depth vs. Damage Curve Chart, a one story structure without a

basement exposed to five (5) feet of flooding is about 53.2% damaged.   After 5:30, when the

South Breach occurred, water in the Lower Ninth Ward increased to 9.8 feet, eventually reaching

its maximum of 16.5 feet.  After 5:30, the two breaches emitted water in all directions (other than

westward), which waters are indistinguishable, and acted in combination to cause indivisible

harm.  In Arabi and St. Bernard, combined North and South breach floodwater flowed eastward

from the IHNC, until it mixed with water from MRGO Reach 2 at around 9:15 a.m. near

Delaronde and W. Genie, eventually leveling off at 14.7 feet.

It is important to note the following:

Restatement (Second) of Torts, § 433B Burden of Proof, states in pertinent part:

> (2)     Where the tortious conduct of two or more actors has combined to
>         bring about harm to the plaintiff, and one or more of the actors seeks
>         to limit his liability on the ground that the harm is capable of
>         apportionment  among them, the burden of proof as to the
>         apportionment is upon each such actor.

Other than eliciting direct examination testimony from Paul Kemp criticizing Dr. Spinks'

alleged failure to distinguish the effects of the two breaches (though he explained their

---

[31] If Dr. Cushing is correct that the South Breach occurred at 7:30 a.m., a considerable increase in the depth and reach of the North Breach water is appropriate.

indivisibility as quoted above), Lafarge offered no proof of as to the apportionment of water from either breach, as it was incumbent upon Lafarge to do.  Kemp, Tr. 3020:8-17; Suhayda, Tr., 3046:19-24. It is difficult to imagine that this was an oversight, given the volume of expert opinion Lafarge did present, but that such absence of proof is borne out of the indivisibility of the waters.

## VI. A FINDING THAT LAFARGE'S CONDUCT WAS A SUBSTANTIAL FACTOR IN BRINGING ABOUT AN INDIVISIBLE HARM PROVOKES APPLICATION OF MARITIME JOINT AND SEVERAL LIABILITY.

The law of maritime joint and several liability has its roots in the common law, finds its way into the American admiralty through such cases as *THE "ATLAS"*, 93 U.S. 302 (1876), and *THE "JUNIATA"*, 93 U.S. 337 (1876), and persists through modern jurisprudence such as *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256 (1979), and *Coats v. Penrod Drilling Corp.*, 61 F.3d 1113 (5th Cir. 1995) *(en banc)*.  The Court did not specifically request that this area of law be briefed, but its application is the consequence of finding that Lafarge's conduct was a substantial factor in causing an indivisible injury. The doctrine is old, well accepted and defined, and constitutional to the maritime law.  Opinions discussing and implementing the doctrine are legion.  Put concisely, when one or more concurrent tortfeasors cause an indivisible injury, the plaintiff, who has not settled with any tortfeasor, is entitled to the full amount of his damages, less victim-fault, from either or both concurrent tortfeasors. Foreseeable acts of nature whose effects can be mitigated through human prudence, or the immunity or non joinder of any tortfeasor, do not serve to reduce the sued tortfeasor's liability for the full measure of damages.  In other words, the possibility of harm occasioned by Katrina and/or the Army Corps does not affect the applicability or consequences of this doctrine.

Lafarge is liable for the whole of any harm of which it was at least a substantial contributing cause.

Briefing of this topic will be limited, absent a request by the Court for more exhaustive treatment, and will consist only of the following notable excerpts from jurisprudence germane to the record in this case.

"Like the common law, W. Prosser & P. Keeton, Prosser & Keeton on the Law of Torts § 47 at 328 (1984), the general maritime law has long recognized the concept of joint liability. For example, in The Atlas, 93 U.S. 302, 23 L.Ed. 863 (1876), the Supreme Court held that the insurer of cargo lost in a collision between two vessels caused by the fault of both could recover all of its damages from one vessel. The Court borrowed this rule from the common law, which recognized a plaintiff's right "to sue        all the wrong-doers, or any one of them, at his election; and it is equally clear, that, if he did not contribute to the disaster, he is entitled to judgment in either case for the full amount of his loss." Id., at 315, 23 L.Ed. at 866; see also The Alabama, 92 U.S. 695, 23 L.Ed. 763 (1876); The George Washington, 76 U.S. 513, 19 L.Ed. 787 (1870); The Juniata, 93 U.S. 337, 23 L.Ed. 930 (1876); The Sterling, 106 U.S. 647, 1 S.Ct. 89, 90, 27 L.Ed. 98 (1882) (describing the joint liability rule in admiralty as "well-established"). Neither the Supreme Court nor the lower courts have ever retreated from the rule of joint liability under maritime law. See, e.g., Edmonds v. Compagnie Generale Transatlantique, 443 U.S. 256, 99 S.Ct. 2753, 2756 n. 7, 61 L.Ed.2d 521 (1979); Cooper Stevedoring Co. v. Fritz Kopke, Inc., 417 U.S. 106, 94 S.Ct. 2174, 2178, 40 L.Ed.2d 694 (1974); Seal Offshore, Inc. v. American Standard, Inc., 777 F.2d 1042 (5th Cir.1985); Todd Shipyards Corp. v. Auto Transportation, S.A., 763 F.2d 745, 756 (5th Cir.1985); Central Rivers Towing, Inc. v. City of Beardstown, Ill., 750 F.2d 565, 575 (7th Cir.1984).

"Collision cases provided the context in which joint liability was applied most frequently,FN9 but the rule of joint liability also has been applied in cases, like Simeon's, involving other maritime fault-based claims. See, e.g., Cooper Stevedoring, 94 S.Ct. at 2178 (commenting that plaintiff longshoreman who slipped while loading vessel "could have proceeded against either The Vessel or [the nonemployer stevedore company, which had created the dangerous condition in loading at a prior port] or both of them to recover full damages for his *1429 injury"); Joia v. Jo-Ja Service Corp., 817 F.2d 908 (1st Cir.1987).FN10"

*Simeon v. T. Smith & Son, Inc.*, 852 F.2d 1421 (5th Cir. 1988) (rehearing, rehearing *en banc* denied at 860 F.2d 1255 (5th Cir. 1988).

Unlike the rule in *Edmonds*, the proportionate share rule announced in this opinion applies when there has been a settlement. In such cases, the plaintiff's

recovery against the settling defendant has been limited not by outside forces, but by its own agreement to settle.

*McDermott, Inc. v. AmClyde,* 511 U.S. 202, 114 S.Ct. 1461 (1994).

"In Edmonds v. Compagnie Generale Transatlantique, the Supreme Court held that where a ship's negligence causes injury to a longshoreman, the ship is liable for the full amount of the longshoreman's damages, reduced only by the percentage of damages caused by the longshoreman's own negligence. 443 U.S. 256, 266 (1979). Even when a non-party joint tortfeasor, such as a stevedoring company, bears some fault for the plaintiff's injury, a negligent ship-defendant is liable for the full damages award (minus the plaintiff's potion of fault). Id.

"The Edmonds rule presents a peculiar problem in cases where a ship-defendant elicits testimony about the stevedoring company's negligence in order to establish that its own negligence did not proximately cause the plaintiff's injury. Because Edmonds holds that the ship-defendant is liable for the full damages amount (minus the percentage caused by the plaintiff-longshoreman's own negligence), including whatever percentage might otherwise have been attributed to the stevedoring company, the ship-defendant runs a risk in amplifying the stevedoring company's role in causing the accident — namely, if the jury finds that the ship's negligence was a proximate cause of the plaintiff's injury, the ship effectively becomes liable for the stevedoring company's share of the damages, which it sought to inflate. In other words, avoiding liability altogether may be strategically at odds with minimizing the damages award."

*Evans v. BV Shipping Company Lombok Strait*, 07-3139 (USDC, D. N.J., Camden Vicinage. October 5, 2009).

"Admiralty law imposes joint and several liability on tortfeasors. Edmonds v. Compagnie Generale Transatlantique, 443 U.S. 256, 273 n. 30 (1979) (stating that "the general rule is that a person whose negligence is a substantial factor in the plaintiff's indivisible injury is entirely liable even if other factors concurred in causing the injury"). Where joint and several liability is imposed, "[n]ormally, the chosen tortfeasor may seek contribution from another concurrent tortfeasor." Id.; see also McDermott, Inc. v. AmClyde, 511 U.S. at 210 n. 10 (noting that comparative negligence and joint and several liability are not incompatible). Joint and several liability allows a plaintiff to recover from one of multiple defendants, when plaintiff's recovery from other tortfeasors is limited by outside facts, such as a defendant's insolvency, making other defendants, rather than the innocent plaintiff, responsible for the shortfall. McDermott, 511 U.S. at 210 n. 10. Although the damages assignable to the plaintiff's own culpability must be subtracted from whatever damages the plaintiff has proven at trial, the defendant would still be liable "in full for the remainder," even where a third-party's negligence contributed to the injuries. See Edmonds v. Compagnie Generale Transatlantique, 443 U.S. at 260.

"Joint and several liability applies "where there has been a judgment against multiple defendants," whereas, in admiralty law, a defendant may be liable for the proportion of fault assignable to another culpable party who was not named as a defendant. See Id. (quoting McDermott, Inc. v. AmClyde, 511 U.S. at 221)."

*Doyle V. Graske* (Neb. 6-10-2008)

The courts in Pennsylvania have previously found that tropical storms and hurricanes, though infrequent, are foreseeable events. In Shamnoski v. PG Energy, 858 A.2d 589, 605 (Pa. 2004), the Supreme Court of Pennsylvania held that a dam owner must design, maintain and operate its dams in a fashion that ensured structural integrity would be safely maintained "even in a storm of the predictable (if rare) intensity of Hurricane Gloria." Where a defendant's negligent conduct concurs with a *vis major*, "[t]he rule of law is that, although an act of God entails no injury upon anyone in contemplation of law, yet if man contributes towards it, it is man alone that is responsible." Carlson v. A. & P. Corrugated Box Corp., 72 A.2d 290, 293 (Pa. 1950) (finding that the rule "is only an application of the general principle that the fact that some other cause concurs with the negligence of the defendant in producing an injury does not relieve the defendant from liability unless he can show that such other cause would have produced the injury independently of his negligence.") (citations omitted)."[32]

*St. Paul Fire & Marine Insurance Co. v. Nolen Group*, 02-8601 (E.D.Pa. 8-31-2007)(Relied Upon By Louisiana Supreme Court In *Rector V. Hartford Acc. & Indem. Co. Of Hartford*, 120 So.2d 511 (1960)).

## VII.   WITNESS CREDIBILITY

### i.   Experts

The credibility of experts is to be judged in the same manner as the credibility of any other witness. *Carey v. Hercules Ocean Corp.*, 321 Fed.Appx. 402, 404 (5th Cir. 2009) ("The credibility and persuasiveness of experts are to be weighed by fact-finders as would be the testimony of any other witness." ); *Gebr. Bellmer Kg. v. Terminal Services Houston, Inc.*, 711

---

[32] The IHNC floodwall breaches and flooding of the Plaintiffs' properties did not occur due to any Act of God, that is, any unforeseeable, irresistible force. Weather forecasts afforded clear warning of Katrina's strength, and clear opportunity for preparation. This Court found in favor of the Plaintiffs in MRGO/Robinson, who alleged concurrent causation by the effects of Katrina, and the United States' negligence addressed in *In Re Katrina Canal Breaches*, Record Doc. 19415-1. The IHNC breaches and flooding in the Barge Litigation occurred due to acts of men, including employees of Lafarge, and/or the United States of America.

F.2d 622, 626 (5th Cir. 1983) (after mentioning the conjecture of a defense witness, the court stated: "The credibility and persuasiveness of the witnesses is for the trial court to decide.").

Experts whose opinions confirm to the facts observed by competent eyewitnesses are often held to be more credible than experts whose opinions require the rejection of eyewitness testimony.  *Henderson v. Norfolk Southern Corp.*, 55 F.3d 1066, 1069 (5th Cir. 1995), held that the trial court did not clearly err in finding plaintiff's expert "more credible because it was the only expert testimony that was consistent with the testimony of the plaintiffs' eyewitnesses." *Accord*, *McDermott, Inc. v. Clyde Iron*, 979 F.2d 1068, 1078-79 (5th Cir. 1992), *aff'd in part on other grounds and rev'd in part on other grounds*, *sub nom. McDermott, Inc. v. AmClyde*, 511 U.S. 202 (1994) (upholding the sufficiency of expert testimony on causation where supported by eyewitnesses); *Richard v. Firestone Tire & Rubber Co.*, 853 F.2d 1258, 1261 (5th Cir. 1988), *cert. denied*, 488 U.S. 1042 (1989) (upholding jury verdict crediting expert supported by eyewitnesses); *Bosnor, S.A. de C.V. v. Tug L.A. Barrios*, 796 F.2d 776, 782 (5th Cir. 1986) (upholding district court's acceptance of expert testimony where no eyewitnesses contradicted it); *Dalton v. Toyota Motor Sales, Inc.*, 703 F.2d 137, 141-42 (5th Cir. 1983) (reversing grant of judgment as a matter of law and ordering reinstatement of the jury verdict where the trial judge disagreed with the jury's crediting of the expert whose opinion was aligned with eyewitness testimony, and crediting of experts whose opinions were contrary to eyewitnesses); *Dickens v. United States*, 545 F.2d 886, 891 (Former 5th Cir. 1977) (no error in crediting expert testimony aligned with eyewitness testimony); *Remington Arms Co., Inc. (Peters Cartridge Division) v. Wilkins*, 387 F.2d 48 (Former 5th Cir. 1967) (jury properly credited plaintiff's expert, whose testimony was corroborated by plaintiff eyewitness, instead of contrary experts).

Competent eyewitness may properly be credited, and contrary expert testimony may

properly be discredited.  *Gifford v. National Gypsum Co.*, 753 F.2d 1345, 1347-48 (5th Cir. 1985), held that the trial court did not commit clear error in crediting eyewitness testimony and refusing to credit contrary expert testimony.  *Neal v. United States*, 562 F.2d 338, 341 (Former 5th Cir. 1977), held that there was no clear error in crediting the testimony of eyewitnesses over the testimony of an expert.

"Evidence by positive and direct eye witness testimony as to the facts must prevail over a theory propounded by experts which is not shown to be beyond dispute and is, therefore, only an opinion as to theoretical possibilities."  *Liberty Mut. Fire Ins. Co. v. Tidewater Oil Co.*, 292 F.Supp. 818, 821 (W.D.La. 1967), *aff'd and opinion adopted*, 403 F.2d 1023 (5th Cir. 1968). Louisiana law is the same.  *Tolle v. Higgins Industries*, 212 La. 173, 181, 31 So.2d 730 (La. 1947).

### ii.  Defendant's "Laws of Nature" Argument

Stripped to its essentials, the defendant's entire case rests on the proposition that "the laws of physics" rescue it from the evidence of witnesses who saw and heard the barge at the site of and causing the North Breach, scraping and pushing against the East floodwall of the IHNC between the North and South Breaches, and at the site of and causing the North Breach. Defendant's experts Lemon, Dooley, and Cushing argue that because of Buys Ballot's "Law" the motion of hurricanes is exact, predictable, and uniform from the tops of the clouds right down to the ground.  Their description of the operation and effects of hurricanes at ground level is similar to the stately rhythms of an Eighteenth Century minuet.  In reality, the operation and effects of hurricanes at ground level is far more chaotic and unpredictable, rather like head-banger heavy metal music.

*In re Signal Int'l, LLC*, 579 F.3d 478, 493 (5th Cir. 2009), rejected a defendant's argument that it could not have foreseen the improbable course taken by two barges that broke

away during Hurricane Katrina and collided with the I-10 bridge 4.7 miles away, where the path the barges took was over typically non-navigable land; the court held that the defendant could reasonably foresee allision with some fixed structure in the vicinity if it negligently moored the barges, and that was sufficient.  High winds and storm surge were expected, so those were anticipated forces even if less than expected.  *Id.* at 493-94.  It did not matter that no one could prove the route taken by the barges.  *Id.* at 486.

Defendant relies on *Ralston Purina Co. v. Hobson*, 554 F.2d 725 (5th Cir. 1977), which rejected the speculations of the defendant that his chickens died because the late delivery of their feed turned them into cannibals, a behavior unknown to chickens.  In *Dotson v. Clark Equipment Co.*, 783 F.2d 586, 588 (5th Cir. 1986), however, the Court of Appeals held that *Ralston Purina*'s rejection of evidence because of the "laws of science" is limited to fairy-tale explanations and cannot be used to rule out improbable and far-fetched but competent evidence.[33]  Similarly, *Miller v. Butcher Distributors*, 89 F.3d 265, 267 (5th Cir. 1996), held that *Ralston Purina* is limited to "naturally impossible" situations.  *Geigy Chemical Corp. v. Allen*, 224 F.2d 110 (5th Cir. 1955) is a second rare example of the Fifth Circuit's acceptance of a "laws of nature" argument: "We cannot accept as true his estimate that he could stop his car making from forty to forty-five miles an hour within five feet, nor even within twenty-five feet."

Reviewing the cases, the Second Circuit held that rejections of competent evidence because of a "laws of nature" argument should be very rare.  *Fortunato v. Ford Motor Co.*, 464 F.2d 962, 965-66 (2d Cir.), *cert. denied*, 409 U.S. 1038 (1972).  *United States v. Hutson*, 980 F.2d 1443, 1992 WL 366846 (5th Cir. 1992), *cert. denied*, 507 U.S. 1039 (1993)

---

[33] *Dotson* stated at 588: "Although it is admittedly difficult to imagine a heavy roll of roofing material falling forward, hitting the forklift's canopy, and cartwheeling backward underneath the canopy to strike Dotson, such a thing is nevertheless possible, especially since several rolls fell.  Collisions among the rolls as they were falling might have caused the improbable to occur.  In short, we conclude that the cartwheeling rolls and cannibalistic chickens are not birds of a feather."

(unpublished),[34] cited *Fortunato* with approval and stated at p. *1: "the doctrine is used sparingly and should apply only where the underlying physical facts are themselves undisputed; for example, where the issue involves an easily measured distance or height."

That is not the case here. There is great dispute over defendant's propositions that either Buys Ballot's "Law"—developed for the practical assistance of mariners at sea at a time when they had no weather-monitoring or communications ability—or the synoptic flow of hurricane winds controls the movement of winds at ground level on land. Plaintiff has been unable to find any Federal or State court decision accepting either proposition. Defendant has offered no evidence that anyone except its experts and their coterie so believes. Defendant's self-styled "laws of nature" is thus revealed for what it is: an argument in a "curious, narrow, hidden sense that nothing but the exigency of a hard case and the ingenuity and study of an acute and powerful intellect would discover." *Chandler v. Roudebush*, 425 U.S. 840, 848 (1976) (statutory interpretation).

## C.      Drs. Mitchell and Dooley, and Mr. Lemon

Throughout Dr. Mitchell's testimony, he was candid about what he knew did occur, what he thought probably occurred, and what he only thought might have occurred. He is the only meteorological expert who did not alter data for his analysis, whose testimony is in accord with the testimony of eyewitnesses, and who has provided explanations for the winds blowing from West to East and blowing water over the East floodwall in the IHNC. His many years of experience in the practical tasks of applied meteorology taught him a level of care that was revealed in his work in this case.

Mr. Lemon, in common with many largely self-taught "experts," saw certainty everywhere. On direct, he knew what all other forecasters did (*compare* proposed findings 198

---

[34] *Hutson* has precedential weight. Fifth Circuit Rule 47.5.3.

and 199).  Mr. Lemon's decision not to pursue training beyond the college major level (proposed findings 8-9) revealed itself in his confusion about the basic concepts he was testifying about: the validity of the NOAA data (proposed findings 177-183), what NOAA data was dealiased and what was not (proposed findings 184-185), the very nature of aliased and dealiased data (proposed findings 186-189), and the NOAA algorithms (proposed finding 197-211).  He did not understand the difference between aliased data and storm ground-relative data (proposed findings 190-192), and he did not understand the difference between dealiased data and reflectivity data (proposed findings 193-195).  He was content not to examine data a forecaster would make a "major mistake" by not examining (proposed finding 167).   He made an unexamined and inexperienced assumption that forensic meteorology is so much simpler than forecasting that it was not necessary to avoid this mistake (proposed findings 166-168).  He was familiar with a more primitive version of GR Analyst software that he had helped develop and decided it was acceptable to rely on the admittedly inferior algorithms in that more primitive version (proposed findings 159-164).  He unthinkingly kept his dealiasing function "on" and automatically made the wind fields like he wanted them (proposed findings 160, 170, 173, and 175-176); indeed, he admitted that seeing unexpected wind fields was itself a sign that he needed to dealias data (proposed finding 174).  The National Weather Service was plainly not impressed by Mr. Lemon's post-lawsuit-retention belief that its Level III data were wrong (proposed findings 180-183).  Mr. Lemon's testimony clearly exceeded his learning, and is unreliable.

The Fifth Circuit has made clear that an expert's testimony may properly be rejected as unreliable if there is too great an analytical gap between the opinion offered and its basis.  *Moore v. Ashland Chemical Inc.*, 151 F.3d 269, 279 (5th Cir. 1998), *cert. denied*, 526 U.S. 1064 (1999); *Chan v. Coggins*, 294 Fed.Appx. 934, 937-38 (5th Cir. 2008).

Dr. Dooley had both training and experience, but did not rely on any radar data (proposed findings 212-213), overstated his conclusions (proposed findings 216-226, 243-244, 249, and 254-260), relied on a pastiche of constructed "data" he just eyeballed to support his conclusions (proposed findings 213, 214, and 240-245).  He gave broad opinions that no mesocyclones or microbursts or downbursts occurred in the vicinity of the IHNC without even bothering to mention that the data he used were too infrequent and remote from the IHNC to pick up all such phenomena (proposed findings 214, 247-275), or that the duration of the unexplained holes in his data could have masked the occurrence of the phenomena for which he said he was looking (proposed findings 245 and 261-275).  Moreover, he was not impartial.  He was so wedded to the cause of his client that he refused to make even obvious admissions where they would appear to undermine defendant in any way (proposed findings 236-239).  Dr. Dooley's testimony is not reliable.

In *Douglass v. Delta Air Lines, Inc.*, 897 F.2d 1336, 1343 (5th Cir. 1990), the Court of Appeals cautioned against replying on the testimony of experts who proclaim impartiality but are in fact partial, or who become advocates for their cause by offering "expert testimony based upon assumptions that are so outrageous as to transform the expert into an advocate . . . ."  Assuming that hurricane winds are as uniform, stately and predictable as a minuet meets this description.

### D.     As To The Credibility Of Eye-Witnesses And Sound Witnesses On Sunday And Monday

Pursuant to a manifest error standard, the District Court has almost plenary discretion to assess witness credibility.

"This Court is bound by the findings of the District Court and may not disturb them unless they are clearly erroneous. Fed.R.Civ.P. 52(a); McAllister v. United

States, 348 U.S. 19, 20, 75 S.Ct. 6, 8, 99 L.Ed. 20 (1954); Mladinich v. United States, 5 Cir., 1968, 394 F.2d 147, 148; American Commercial Lines, Inc. v. Eusay, 5 Cir., 1968, 395 F.2d 717, 718; Chaney v. City of Galveston, 5 Cir., 1966, 368 F.2d 774, 776. The District Judge's findings are amply supported by substantial evidence. He was persuaded by this evidence to resolve the conflict in favor of appellee, and we find no error in his decision." *Carlisle v. M/S Sistina*, 407 F.2d 824 (5th Cir. 1969).

Lafarge claims - through hindsight expert opinion only - that all of Plaintiffs' witnesses are incredible because their testimony defies the laws of physics, and thus, it is impossible that that ING 4727 contributed at all to the eastern IHNC floodwall breaches. "Evidence by positive and direct eye witness testimony as to the facts must prevail over a theory propounded by experts which is not shown to be beyond dispute and is, therefore, only an opinion as to theoretical possibilities. Hopkins v. Louisiana Ry. & Nav. Co., 152 La. 13, 92 So. 717 (1922); Tolle v. Higgins Industries, 212 La. 173, 31 So.2d 730 (1947)." *Liberty Mutual Fire Insurance Co. v. Tidewater Oil Co.*, 292 F. Supp. 818 (WDLA - Lafayette Div. 1967) (aff'd at 403 F.2d 1023 (5th Cir. 1968)).

"The test for "incredibility" of a witness is an extremely stringent one, because an appellate court does not weigh the credibility of witnesses. To be found "incredible" as a matter of law, the witness' testimony must be factually impossible. *See United States v. Lindell*, 881 F.2d 1313, 1322 (5th Cir. 1989) (Because the jury is "the ultimate arbiter of the credibility of a witness.... Only when testimony is so unbelievable on its face that it defies physical laws should the court intervene and declare it incredible as a matter of law"), *cert. denied,* 496 U.S. 926, 110 S.Ct. 2621, 110 L.Ed.2d 642 (1990); *United States v. Silva*, 748 F.2d 262, 266 (5th Cir. 1984) ("[A] conviction may be based solely upon the uncorroborated testimony of an accomplice if the testimony is not incredible or otherwise insubstantial on its face") (citation omitted). The mere fact that the witness' memory is later shown to be somewhat flawed will not suffice to demonstrate that the witness' entire testimony is "incredible."" *U.S. v. Casel*, 995 F.2d 1299 (5th Cir. 1993).

"We believe that for the testimony to be incredible it must be unbelievable on its face. The fact that Lipsky has consistently lied in the past, engaged in various criminal activities,   thought that his testimony would benefit him, and showed elements of mental instability does not make his testimony incredible. Lipsky's testimony on direct is quite plausible. This is not a case where a witness testifies

to facts that he physically could not have possibly observed or events that could not have occurred under the laws of nature. To be sure Lipsky was thoroughly impeached on cross-examination, but one cannot say that his testimony could not have been believed by a reasonable jury. *See, e. g., United States v. Hill,* 463 F.2d 235 (5th Cir. 1972); *United States v. Justice,* 431 F.2d 30 (5th Cir. 1970)." *United States v. Cravero,* 530 F.2d 666, 670 (5th Cir. 1976)

"The notion that Closner's testimony was "incredible as a matter of law" finds neither logical nor legal support. The trial judge did comment on the quality of the testimony but he ultimately found it sufficient as evidenced by his denial of the motion for judgment of acquittal. It did not defy physical evidence or the laws of nature, *United States v. Cravero,* 530 F.2d 666, 670 (5th Cir. 1976); *Geigy Chemical Corp. v. Allen,* 224 F.2d 110, 114 (5th Cir. 1955). Whether there were inconsistencies and, if so, how this affected Closner's credibility, were questions for the jury. *See, e. g., Hoffa v. United States,* 385 U.S. 293, 311, 87 S.Ct. 408, 418, 17 L.Ed.2d 374 (1966); *Glasser v. United States,* 315 U.S. 60, 77-80, 62 S.Ct. 457, 468-69, 6 L.Ed. 680 (1942); *United States v. Parr,* 516 F.2d 458, 464 (5th Cir. 1975); *United States v. Hill,* 463 F.2d 235 (5th Cir.), *cert. denied,* 409 U.S. 952, 93 S.Ct. 297, 34 L.Ed.2d 223 (1972)." *United States v. De Los Santos,* 625 F.2d 62 (5th Cir. 1980).

"Libellant's witnesses are wholly disinterested and, ordinarily, their testimony should not be disregarded, Chesapeake & Ohio Railroad Company v. Martin, 283 U.S. 209, 51 S.Ct. 453, 75 L.Ed. 983; Quock Ting v. United States, 140 U.S. 417, 11 S.Ct. 733, 35 L.Ed. 501; Pennsylvania Railroad Co. v. Chamberlain, 288 U.S. 333, 53 S.Ct. 391, 77 L.Ed. 819; unless it has to give way in the face of overpowering physical facts, or other evidence which simply makes it incredible or inherently improbable, Cf. Geigy Chemical Corporation v. Allen, 5 Cir. 224 F.2d 110." *Rant v. Cia Anonima Venezolana De Navegacion,* 228 F. Supp. 232 (USDC, E.D.La, New Orleans Div., April 13, 1964).

"The power to disregard testimony because of its inherent lack of believability is one that has been used sparingly. *Peters v. Fitzpatrick,* 310 F.2d 704 (7th Cir. 1962). The courts have held that:

> "Unless in the light of the circumstances the testimony is so inherently improbable and impossible of belief as in effect to constitute no evidence at all, it may not be disregarded in determining the sufficiency of the evidence to support the judgment." *Hobart v. Hobart Estate Co.,* 26 Cal.2d 412, 159 P.2d 958, 966 (1945).""

*United States v. Narciso,* 446 F. Supp. 252 (United States District Court, E.D. Michigan, 1977).

"Of course, the trier of fact will be able to observe the demeanor of Mr. Mosely. But that does not in the slightest reduce the need for and relevance of the information that is being sought, for credibility involves more than demeanor. *Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 575 (1985); *Indiana Metal Products v. N.L.R.B.,* 442 F.2d 46 (7th Cir. 1971). "Evidence to be worthy of credit" must not only be "'credible' in itself,'" but must proceed "from a credible source. . . ." *Geighy Chemical Corp. v. Allen,* 224 F.2d 110, 114 n. 5 (5th Cir. 1955). Admission and prior inconsistent statements of a witness undermine credibility. *See United States v. Hale,* 422 U.S. 171, 176 (1975); *Harris v. New York,* 401 U.S. 222, 226 (1971); *Jones v. Wallace,* 525 F.3d 500, 504 (7th Cir. 2008)." *Mosely v. City Of Chicago,* 06 C 6314 (N.D.Ill. 2008).

Though the Court's findings as to witness credibility ultimately rests upon the Court's analysis of the proof, guided by the above principles, Plaintiffs illustrate the following examples as indicators of Plaintiffs' witnesses' credibility.[35]

### 1.    Eyewitnesses on Sunday.

At the times that Ms. Leblanc and Mr. Tompkins, each unknown to the other and each traveling separately, saw a barge loitering near the Claiborne Avenue Bridge, the IHNC lock had been closed for at least 7 hours. Tr., 370-17-378:21; 391:21-399:22.  Exh. P. 24.  Neither saw a tug or any other vessel between the bridges.  Lafarge denies any operations involving ING 4727 after the top-around.  Lafarge denies any other barges at its facility aside from ING 4745 and the five barge tier, and any other breakaways.  Dx 145, Slide RB-063 from Dr. Bea's Power Point demonstrative is a photo which reveals areas described by Ms. Leblanc and Mr. Tompkins that Lockmaster O'Dowd could not have seen from his station due to the interposition of the Claiborne Avenue Bridge structures.

### 2.    Eyewitnesses on Monday, Sound Witness and Scientific Corroboration:

Plaintiff's proposed findings 288-294 show that there is no reason to doubt the credibility

---

[35] Please note that the credibility of Arthur Murph is addressed in *Plaintiffs' Memorandum In Response To "Lafarge North America's Legal Memorandum Concerning Fed. R. Evidence 613(Arthur Murph)," And Concerning Credibility To Be Accorded Mr. Murph.*

of Mr. Villavasso's description of a large wave of water coming into the IHNC just before he saw the tip of a barge penetrate the floodwall and the floodwall collapse.   The narrow choke point at the entrance to the part of the IHNC bordering the Lower Ninth Ward would have caused water under pressure to rise up and speed up in order to get past the choke point, and it would have spread out immediately afterward.   The water could at that point spread into the Lower Ninth Ward at the North Breach, and it also had a much wider IHNC into which to spread.   Defendant argues that, if Mr. Villavasso were to be credited, there would have to have been a twenty-foot wall of water slamming into the IHNC Lock and it would have had to be noticed by the staff there, is the element of this case that truly violates the law of physics.   It is not in the nature of water to stand up above its surroundings when no physical constraint forces it to do so.   That is not what water does, and *Ralston Purina Co. v. Hobson* bars consideration of this argument.

*Did William Villavasso see a barge?*   Mr. Villavasso testified **eleven times** in his deposition that he saw what appeared to be the tip of a barge protruding through the floodwall at the time that he heard and boom and saw it breach.   (Exhibit P372, Deposition of William Villavasso, at pp. 64, 66, 71, 74, 81, 85, 128, 145-146, 187, 202, and 205.)

                                                                  74
   5   And the reason I say that is because
   6   I have worked and seen these barges go up and
   7   down the Industrial Canal for a long time.

The IHNC between the locks and Florida Avenue Bridge was sealed.   Exhibit P24, Lockmaster's Log; Hall testimony, Tr. 1968:9-16.   Lafarge denies any breakaway other than ING 4727.   The large object depicted in certain post-Rita photos is a piece of a breakaway drydock not present below the Florida Avenue Bridge during Katrina.   Joel Dupre deposition, 13:20-23.

*Why didn't Mr. Villavasso not report the barge immediately?*  The preceding question is one of Lafarge's preferred means of attempting to discredit Mr. Villavasso.  The implication is that if he did not immediately tell anyone, then he must have fabricated the story.[36]   Mr. Villavasso was clear in his testimony that he could not swim, (Exh. P372 at 75), that his life jacket did not work (*Id*. at 164), that he feared for his life (Id. at 101), that he feared that he and his crew would be electrocuted (*Id*. at 68), that it was pitch black inside the station while Mr. Villavasso floated atop a wooden cabinet (*Id*. at 75-76), that he and his crew remained trapped in the flooded station without communications for two days and nights awaiting rescue  (*Id*. at 76), and that he had been injured when diesel fuel got into his eyes.  He testified that he "wasn't really doing too much talking because [his] eyes were burnt red and [he] -- [his] main focus was calling [his] superintendent to get airlifted out of there to -- [his] eyes were on fire."  (*Id*., 178:11-17).  It is far fetched to imagine that the cause of this calamity should immediately concern Mr. Villavasso -  *or any bystander* -  to the same degree as the deadly consequences.  He testified that he and his crew "were just trying to survive."  (*Id*., 74:11-20).   Yet, Mr. Villavasso did tell two people that he saw a barge breach the floodwall.  He told his supervisor, John Huerkamp during the course of an official investigation, (Tr. 3068-3069), and he told his co-worker, Richard Reiss (Tr. 2008:14-16).  During Mr. Villavasso's deposition, more than two years after the storm, he was still visibly shaken when recalling the events. (Exh. P372, video).  Mr. Villavasso had no financial stake in the outcome of this litigation.

*Did Terry Adams see the barge cause the south breach?* Terry Adams describes, from a different vantage point, the same events experienced by Mr. Murph at his home.  Mr. Adams awoke around 5:00 a.m. to find water on the floor, getting only his feet wet, and water coming up through the bathroom drain.  Tr.  254:2-11. This is consistent with the undisputed fact that the

---

[36] Contrast Lafarge's desire that Mr. Murph *not* tell anyone.

North Breach had already occurred, and with Mr. Villavasso's testimony that he had the drainage pumps shut off.  When he first awoke, the power was out, but he could see the furniture in his bedroom, and could see the water coming up the drain.  Tr. 298:14 - 299:16.   After gathering supplies, he went into the attic and onto his roof.   From his roof, Mr. Adams looked towards Claiborne Avenue, and saw about five blocks away (Tr. 262:5) "a big object, looked like it was going down --easing down the wall just bumping into the wall." Tr. 261:21-25.   The location of Mr. Adams' home is depicted in Exhibit P429.   He heard "like an empty container squeezing up against something, like a squeaking sound."  Tr. 266:17-25.  At the time, the lighting conditions were like "dusk."  It wasn't dark.  Tr. 256:16-18.  He testified at Tr. 260:14-261:20 that the floodwall from his house to Claiborne Avenue "looked good,"  that it was "intact," despite water splashing over the floodwall.  The effect of this water in the floodwall is borne out by photos of backside scour where the floodwall was left standing after the storm.  That he could see this distance is borne out by the testimony of Richard Reiss, who stated at Tr. 2006:9 - 2007:1 that from a vantage point even with the front of the houses, one could see the entire floodwall to Claiborne Avenue.  He testified that there were trees in his neighborhood, but that he could move around on his roof, and that the trees did not block his view.  Tr. 265:7-13 and 267:8-13.  From his roof, Mr. Adams watched the object "about two to three minutes" as it "went along the wall, looked like it would bump it a few times and then it just crashed into it," after which "it looked like a tidal wave came in with it.  All the houses, cars started floating away and houses started breaking apart."  Tr. 262:1-24.  He saw it float into the neighborhood, unleashing a tsunami, and causing his house to float off it its foundation.  Tr. 285:9-286:6.

*Why did Terry Adams not tell anyone immediately about the barge?*   Lafarge again raises this question in efforts to impeach Mr. Adams' testimony, notwithstanding that had he told

anyone, Lafarge might have reacted in a fashion more similar to that respecting Arthur Murph. *First*, Mr. Adams admits that he did not know what the large floating object was at the time that he saw it.  He deduced that the large object he saw was not a house, because the levee was still intact.  Tr. 262:7-11.   He admits that the first time he understood it to be a barge was while watching the news, when he saw it sitting in the neighborhood.  Tr. 294:19-20.  There is no evidence of any other large objects fitting the description Mr. Adams gave that were adrift in the IHNC between the bridges.   It doesn't take a sleuth or mathematician to grasp the simple deductive logic associating the object Mr. Adams saw in the canal with the barge in the neighborhood.  Tr. 289:3-12.   *Second*, as was the case with Mr. Villavasso, Mr. Adams was faced with a multifaceted emergency.  His house had left its foundation and was floating.  All around him, people were swimming for their lives, clinging to trees in the violent water (Tr. 265:2-4).  His friend, Christopher Weaver, floated up, naked and injured.  He was bleeding badly.  Mr. Adams used Christmas lights to pull him to relative safety on the roof, and then focused his attention on treating his wounds and getting rescued.  Tr. 294:2-15; 301:3-13.  The pair called 911, and reached an emergency operator in Oklahoma.  Tr. 299:17-19.  At these times, it is far fetched to imagine that Mr. Adams, or anyone, would be concerned with the cause of the flooding, rather than the effects.  Lafarge's investigators at Centanni Investigative Agency did contact Mr. Adams and attempt to speak with him.  Mr. Adams wisely evaded their questions and hung up the phone.

## VIII.   PUNITIVE DAMAGES

Finally, the Plaintiffs briefly address the availability of punitive damages in this case. There can no longer be doubt that punitive damages are an available remedy under general maritime law.  *Atlantic Sounding Co., Inc. v. Townsend*, __ U.S. __, 129 S.Ct. 2561, 2569, 174

L.Ed.2d 382 (2009); *Exxon Shipping Co. v. Baker*, __ U.S. __, 128 S.Ct. 2605, 171 L.Ed.2d 570 (2008).  *Atlantic Sounding* did not describe the standard to be used for punitive-damage claims, but held that such damages should be available "for the willful and wanton disregard of the maintenance and cure obligation."  129 S.Ct. at 2574.   The general Federal rule is that punitive damages are available "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  *Smith v. Wade*, 461 U.S. 30, 56 (1983) (§ 1983 case).   The failure to secure the barge, as shown by eyewitness testimony that it was drifting free in the IHNC the day before Hurricane Katrina hit New Orleans, as well as a large and compelling body of additional evidence, demonstrates reckless conduct and callous indifference to the rights of plaintiffs under the general maritime laws.

IX.     **CONCLUSION**

Undersigned view this case very simply.   ING 4727 is the proverbial 'elephant in the room.'  How the barge got from its berth to the wall hardly matters to the outcome.  The barge was there, where it should not have been, and the only living souls charged with the obligation to moor it eschewed every maritime convention and regulation meant to protect the souls on the other side of the wall.  It doesn't take a fortune teller to foresee that a breakaway barge, adrift near a residential community during a hurricane, will meander about, and eventually unleash a catastrophe.  It doesn't take a sleuth to examine and observe, through rational eyes, and reach an unassailable conclusion that the barge broke the eastern IHNC floodwall.  There is no mystery; it was the only object in the IHNC capable of doing so, and was in fact observed doing so at the only two locations where the eastern IHNC floodwall then breached.  It doesn't take a genius, or mathematician conjuring up an implausible denial, protesting that the barge could not possibly be

the culprit, and so must be "the victim."  No amount alchemy, of specious protest - or tortuous opinion from Lafarge's hired guns - can overcome the direct factual proof, or the legal presumptions against which Lafarge must wage a steep uphill battle.  The case is simple.  Even if Lafarge manages to prove that the barge acted in combination with defects in the wall, weak soil, or the storm, Lafarge is liable to the plaintiffs for their full measure of damages.  Lafarge is also liable to serve as an example, a deterrent, to let the maritime community, the insurance industry, and business interests worldwide know that the American public is due debt of care and responsibility,  and expects not to fall victim to any measure of wantonness, recklessness or callous indifference for the sake of corporate profit.  The Plaintiffs in this case, and the tens of thousands waiting in the wings, pray that justice be served.

August 27, 2010

Respectfully Submitted,

*/s/Brian A. Gilbert*
Brian A. Gilbert (21297)
**LAW OFFICE OF BRIAN A. GILBERT, P.L.C.**
(Of Counsel to **BEST KOEPPEL TRAYLOR**)
2030 St. Charles Avenue
New Orleans, Louisiana 70130
Telephone: (504) 598-1000
Facsimile: (504) 524-1024
E-mail: bgilbert@briangilbertlaw.com,
bgilbert@bestkoeppel.com

*/s/Shawn Khorrami*
Shawn Khorrami (CA SBN #14011)
**KHORRAMI, POLLARD & ABIR, LLP**
444 S. Flower Street, 33rd Floor
Los Angeles, California 90071
Telephone: (213) 596-6000
Facsimile: (213) 596-6010
e-mail: Skhorrami@kpalawyers.com

Laurence E. Best (3012)
Peter S. Koeppel (1465)
**BEST KOEPPEL TRAYLOR**
2030 St. Charles Avenue
New Orleans, Louisiana 70130
Telephone: (504) 598-1000
Facsimile: (504) 524-1024
E-mail: lebest@bestkoeppel.com
peterklaw@aol.com


Lawrence A. Wilson (N.Y.S.B.A. #2487908)
**WILSON, GROCHOW, DRUKER & NOLET**
233 Broadway, 5th Floor
New York, NY  10279
Telephone:  (212) 608-4400
Facsimile:  (212) 608-0746
e-mail:  lwilson@wgdnlaw1.com

Lawrence D. Wiedemann (#13457)
Karl Wiedemann (18502)
**WIEDEMANN AND WIEDEMANN**
821 Baronne Street
New Orleans, Louisiana 70113
Telephone: 504-581-6180
Facsimile: 504-581-4336
e-mail: ldwiedeman@aol.com
karlwied@bellsouth.net

Patrick J. Sanders (18741)
**PATRICK J. SANDERS, LLC**
3316 Ridgelake Drive, Suite 100
Metairie, Louisiana 70002
Telephone: (504) 834-0646
e-mail: pistols42@aol.com

Richard T. Seymour (D.C. Bar #28100)
**LAW OFFICE OF RICHARD T. SEYMOUR, P.L.L.C.**
1150 Connecticut Avenue N.W., Suite 900
Washington, D.C. 20036-4129
Telephone: 202-862-4320
Facsimile: 800-805-1065 and 202-828-4130
e-mail: rick@rickseyourlaw.net


*Attorneys for the Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above and foregoing document has been served upon counsel of record, by United States Mail, postage prepaid and properly addressed, facsimile and/or ECF upload, this <u>27</u> day of <u>August</u>, 2010.


<u>/s/ Brian A. Gilbert</u>