**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE:  KATRINA CANAL BREACHES | * | |
| CONSOLIDATED LITIGATION | * | CIVIL ACTION |
| | * | |
| | * | NO. 05-4182 |
| | * | |
| PERTAINS TO BARGE | * | SECTION "K" |

| | | |
|---|---|---|
| *Mumford* | C.A. NO. 05-5724 | *as to plaintiffs Josephine Richardson and Holiday Jewelers, Inc. - ONLY* |
| *Benoit* | C.A. NO. 06-7516 | *as to claims of plaintiffs John Alford and Jerry Alford – ONLY* |

# PLAINTIFFS' CORRECTED POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Brian A. Gilbert (21297)
LAW OFFICE OF BRIAN A. GILBERT, P.L.C.
(Of Counsel to BEST KOEPPEL TRAYLOR)
2030 St. Charles A venue
New Orleans, Louisiana 70 l30
Telephone: (504) 598-1000
Facsimile: (504) 524-1024
E-mail: bgilbert@briangilbertlaw.com
bgilbert@bestkoeppel.com

Dated: August 30, 2010          (Additional Counsel Listed Inside)

i

Laurence E. Best (3012)
Peter S. Koeppel (1465)
BEST KOEPPEL TRAYLOR
2030 St. Charles Avenue
New Orleans, Louisiana 70130
Telephone: (504) 598-1000
Facsimile: (504) 524-1024
E-mail: lebest@bestkoeppel.com

Shawn Khorrami (CA SBN #14011)
KHORRAMI, POLLARD & ABIR, LLP
444 S. Flower Street, 33rd Floor
Los Angeles, California 90071
Telephone: (213) 596-6000
Facsimile: (213) 596-6010
e-mail: Skhorrami@kpalawyers.com

Lawrence A. Wilson (N.Y.S.B.A. #2487908)
WILSON, GROCHOW, DRUKER & NOLET
233 Broadway, 5th Floor
New York, NY 10279
Telephone: (212) 608-4400
Facsimile: (212) 608-0746
e-mail: lwilson@wgdnlawl.com

Lawrence D. Wiedemann (#13457)
Karl Wiedemann (18502)
WIEDEMANN AND WIEDEMANN
821 Baronne Street
New Orleans, Louisiana 70113
Telephone: 504-581-6180
Facsimile: 504-581-4336
e-mail: ldwiedeman@aol.com
karlwied@bellsouth.net

Patrick J. Sanders (18741)
PATRICK J. SANDERS, LLC
3316 Ridgelake Drive, Suite 100
Metairie, Louisiana 70002
Telephone: (504) 834-0646
e-mail: pistols42@aol.com

ii

Richard T. Seymour (D.C. Bar #28100)
LAW OFFICE OF RICHARD T. SEYMOUR, P.L.L.C.
1150 Connecticut Avenue N,W" Suite 900
Washington, D,C. 20036-4129
Telephone: 202-862-4320
Cell: 202-549-1454
Facsimile: 800-805-1065 and 202-828-4130
e-mail: rick@rickseyourlaw.net

*Attorneys for Plaintiffs*

**Table of Contents**

Findings of Fact ............................................................................................................................. 1

I.  The Evidence as to Duty and Breach of Duty ...................................................................... 1

   A.   Conditions At Lafarge Before Hurricane Katrina ............................................................ 1

   B.   The Days Before Hurricane Katrina .................................................................................. 2

   C.   Removal of the Barge ING 4727 from the Canal .............................................................. 5

   D.   Lafarge Violated its Own Policies and Procedures .......................................................... 6

   E.   Lafarge Management, At All Relevant Times, Lacked A Reasonable Expectation that the Barge ING 4727 Would be Picked Up by Zito Fleeting / Lafarge Personnel May Have Thought Differently ............................................................................................... 7

   F.   The Evidence Establishes the Barges ING 4727 and ING 4745 Were a Tow, and Lafarge Intended Them to Be Moved Collectively as a Tow ............................................ 9

   G.   Lafarge's Efforts to Secure ING 4727, and the State of the Mooring on the ING 4727 and ING 4745 When Lafarge Personnel Abandoned the Lafarge Facility ................... 12

   H.   The Stark Contrast Between Lafarge's Mooring of the Southern and Northern Tiers of Barges ............................................................................................................................. 14

   I.   The Various Issues With Lafarge's Mooring of the ING 4727 ....................................... 14

     1.   Lafarge's Failure to Use Fleeting Wires/Cables ....................................................... 15

     2.   The High-Low Mooring Configuration...................................................................... 17

     3.   Lafarge's Failure to Use Multiple Part Lines ............................................................ 19

     4.   Lafarge's Use of Long Lining .................................................................................... 24

   J.   Water Coming Into the IHNC ........................................................................................ 24

   K.   Witness Testimony About Water Splashing Over the East Floodwall ........................... 26

   L.   Observations Of Wind Direction and Wave Height Prior to Breaches .......................... 28

   M.   The North Breach ........................................................................................................... 28

   N.   The South Breach ........................................................................................................... 30

   O.   Physical Evidence of Barge Impact .............................................................................. 33

II.  The Breaches of the East Floodwall of the IHNC ............................................................. 34

   A.   Characteristics of the Breaches ..................................................................................... 34

   B.   Sounds uniquely associated with the barge .................................................................... 38

   C.   Undifferentiated sources of harm ................................................................................. 38

   D.   Witnesses ....................................................................................................................... 40

IV.  Causation .......................................................................................................................... 44

   A.   Introduction ................................................................................................................... 44

   B.   Dr. Marino's Opinions Are Scientifically Valid ........................................................... 46

     1.   Horizontal And Vertical Permeability....................................................................... 46

     2.   Assessment of Soil Strengths .................................................................................... 50

     3.   Lateral Stability Analysis .......................................................................................... 50

     4.   Uniqueness of the Sheet Pile Being Exhumed .......................................................... 52

   C.   North Breach Failure Modes .......................................................................................... 53

     1.   Top Soil Sink.............................................................................................................. 54

     2.   The "Faulty Weld" Theory ........................................................................................ 58

     3.   Tension Cracks .......................................................................................................... 60

iv

4. Underseepage and Marsh Layers ................................................................. 61
5. The EBIA Excavations Are a Necessary Element That Defendants Cannot Support ... 62
6. Hydraulic Uplift Pressures ....................................................................... 66
7. Seepage.................................................................................................. 67
8. The Marsh Layer is Not Composed of Peat ............................................... 68
D. South Breach Failure Modes ......................................................................... 68
1. Dr. Bakeer is Simply Wrong on What Caused the Breaches ........................ 68
2. Dr. Bakeer's Wall Height Theory Relies on Flawed Methodology ............... 69
3. Dr. Bakeer's Theory Regarding the Particular Weakness of the Wall at the South
   Breach Is Without Merit, and Does Not Exclude the Barge ......................... 72
   a. The Asserted "Plain Strain" Problem ................................................. 73
   b. The Asserted Drainage Canal Problem ............................................... 74
   c. The Asserted Unique-Soil Problem.................................................... 76
4. Overtopping and Scour Trenches.............................................................. 77
E. Dr. Bea Has a Motive and Goal, Adversely Affecting his Credibility.............. 79
F. Dr. Bea Did not Seriously Analyze the Barge as a Cause or Contributing Cause of Either
   Breach, Because He Assumed It Could Not be There ..................................... 81
G. Dr. Bea's Conclusions as to Barge Impacts Elsewhere Are Based on Speculation....... 91
H. Dr. Bea's Conclusions as to the Lack of Physical Evidence of the Impact of Barge ING
   4727 at the North and South Breaches, Except as to the Extreme Southern End of the
   South Breach, Are Unfounded ..................................................................... 91
I. The Pole in the Water ................................................................................. 96
V. Meteorological Evidence ................................................................................. 98
A. Comparison of the Experts .......................................................................... 98
B. Using Government Data .............................................................................. 101
C. The Operation of the Government's Doppler Radar.................................... 103
D. Mesoscale Phenomena ............................................................................... 108
E. Mesocyclones Affecting the IHNC ............................................................. 116
F. The Problem of Aliased Data and Dealiasing .............................................. 131
G. Mr. Lemon's Methodology ........................................................................ 135
H. Mr. Lemon's Practice of Always Keeping the Dealiasing Function "On" ................. 138
I. Mr. Lemon's Confusion About the Validity of NOAA Data ......................... 139
J. Mr. Lemon's Confusion About the Dealiasing of NOAA Data ..................... 142
K. Mr. Lemon's Confusion About the Concept of Aliased and Dealiased Data ............. 143
L. Mr. Lemon's Confusion about NOAA's Algorithms.................................... 149
M. Dr. Dooley's Conclusions and Their Limitations ......................................... 154
N. Dr. Dooley's Reluctance to Admit the Obvious When it Was Adverse to His Client. 158
O. Dr. Dooley's Reliance on Ocean Weather, Inc. ............................................ 159
P. Dr. Dooley's Reliance on Lakefront Airport Data........................................ 161
Q. Gaps in the Lakefront Airport Data............................................................. 165
VI. Injury and Remedies ....................................................................................... 168
A. Damages of Josephine Richardson............................................................... 168
B. Damages of Holiday Jewelers Inc................................................................ 171
C. Damages of John and Jerry Alford............................................................... 173
VI. Conclusion .................................................................................................... 175

v

Conclusions of Law .................................................................................................... 176
I. Summary of Plaintiffs' Negligence Claim .......................................................... 176
II. Maritime Jurisdiction .......................................................................................... 177
III. Elements of Plaintiffs' Claims ............................................................................ 178
   A.   Duty and Breach.......................................................................................... 178
   B.   Causation ..................................................................................................... 180
      1.  General Standards ................................................................................. 180
      2.  Dr. Bea's Approach is Legally Impermissible ..................................... 183
   C.   Joint and Several Liability........................................................................... 186
   D.   Defendant Owed Plaintiffs A Duty of Care to Adequately Moor ING 4727.............. 188
   E.   Defendant Bears the Burden to Disprove Negligence ................................ 190
   F.  Defendant's Conduct Was the Proximate ("Legal") Cause of Plaintiffs Injury ............. 191
   G.   Defendant Bears the Burden to Disprove Causation.................................... 192
   H.   Defendant Cannot Meet its Burden by Assertions of "Laws of Nature" .................... 198
   I.   Defendant Cannot Meet its Burden by Asserting Improbability ................................ 199
   J.   The Doctrine of Joint and Several Liability Applies in This Case ................................ 199
IV. Expert Credibility ................................................................................................ 202
V.   Damages................................................................................................................ 206
   A.   Compensatory Damages.............................................................................. 206
      1.  Damages for Loss of Property................................................................ 206
      2.  Other Compensatory Damages for Plaintiff Josephine Richardson............................ 206
   B.   Punitive Damages........................................................................................ 210

## **Table of Authorities**

### 1. **Cases**

*1900 Partnership v. Bubber, Inc.*,
   662 So.2d 808, 27,475 (La. App. 2 Cir. 11/1/95),
   *writ denied*, 668 So.2d 369, 96-0037 (La. 2/28/96)............................................................207

*Afran Transport Co. v. The Bergechief*,
   274 F.2d 469 (2d Cir. 1960).............................................................................................194

*Allstate Insurance Co. v. GE*,
   2002 U.S. Dist. LEXIS 28256 (W.D. La. Feb. 4, 2002).....................................................183

*America River Transport Co. v. Paragon Marine Services*,
   213 F. Supp. 2d 1035 (E.D. Mo. 2002).............................................................................189

*Anderson v. Bristol Myers Squibb Co.*,
   1998 WL 35178199 (S.D.Tex. April 20, 1998)
   (No. CIV.A. H-95-0003)...................................................................................................185

*Atlantic Sounding Co., Inc. v. Townsend*,
  __ U.S. __, 129 S. Ct. 2561, 174 L. Ed. 2d 382 (2009)..................................210, 211

*Barton v. Brown (The Corsair)*,
  145 U.S. 335, 12 S. Ct. 949, 36 L. Ed. 727 (1892)............................................208

*Board of Comm'rs of the Orleans Levee District v. M/V Belle of Orleans*,
  535 F.3d 1299 (11th Cir. 2008) ....................................................................177

*Blache v. Jones*,
  521 So. 2d 530 (La. App. 4 Cir. 1988) ..........................................................207

*Bonin v. Ferrellgas, Inc.*,
  877 So. 2d 89 (La. 2004) ..............................................................................180

*Bosnor, S.A. de C.V. v. Tug L.A. Barrios*,
  796 F.2d 776 (5th Cir. 1986) ........................................................................203

*Boudoin v. J. Ray McDermott & Co.*,
  281 F.2d 81 (5th Cir. 1960) ..........................................................................191

*Canal Barge Co. v. Torco Oil Co.*,
  220 F.3d 370 (5th Cir. 2000) ................................................................178, 189

*Candies Towing Co. v. M/V B & C Eserman*,
  673 F.2d 91 (5th Cir. 1982) ..................................................................183, 193

*Carey v. Hercules Ocean Corp.*,
  321 Fed.Appx. 402 (5th Cir. 2009)................................................................202

*Carlson v. A. & P. Corrugated Box Corp.*,
  72 A.2d 290 (Pa. 1950)................................................................................179

*Central Rivers Towing, Inc. v. City of Beardstown, Ill.*,
  750 F.2d 565 (7th Cir.1984) ........................................................................187

*Chaisson v. Avondale Indust., Inc.*,
  947 So. 2d 171 (La. App. 2006)....................................................................180

*Chan v. Coggins*,
  294 Fed.Appx. 934 (5th Cir. 2008)................................................................204

*Coats v. Penrod Drilling Corp.*,
  61 F.3d 1113 (5th Cir. 1995) ................................................................186, 200

vii

*In re Complaint of Ingram Barge Co.*,
   2008 U.S. Dist. LEXIS 33421 (E.D. La. Mar. 31, 2008)......................................189

*Consolidated Aluminum Corp. v. C.F. Bean Corp.*,
   833 F.2d 65 (5th Cir. 1987) .........................................................178, 181, 192

*Cook v. Ross Island Sand And Gravel Co.*,
   626 F.2d 746 (9th Cir. 1980) ........................................................208, 209

*Cooper Stevedoring Co. v. Fritz Kopke, Inc.*,
   417 U.S. 106, 94 S. Ct. 2174, 40 L. Ed. 2d 694 (1974)......................................187

*Dalton v. Toyota Motor Sales, Inc.*,
   703 F.2d 137 (5th Cir. 1983) ...............................................................203

*Daubert v. Merrell Dow Pharmaceutical*,
   43 F.3d 1311 (9th Cir. 1995), *cert. denied*, 516 U.S. 869 (1995)..................................184, 185

*Davis v. Parkhill-Goodloe Co.*,
   302 F.2d 489 (5th Cir. 1962) .........................................................208, 209

*Deal v. A.P. Bell Fish Co.*,
   728 F.2d 717 (5th Cir. 1984) ...............................................................209

*Delta Transload, Inc. v. Motor Vessel*,
   818 F.2d 445 (5th Cir. 1987) ...............................................................191

*Dickens v. United States*,
   545 F.2d 886 (Former 5th Cir. 1977).........................................................203

*Dotson v. Clark Equipment Co.*,
   783 F.2d 586 (5th Cir. 1986) .........................................................198, 199

*Douglass v. Delta Air Lines, Inc.*,
   897 F.2d 1336 (5th Cir. 1990) ...............................................................204

*Edmonds v. Compagnie Generale Transatlantique*,
   443 U.S. 256 (1979)................................................................186, 187, 199

*Evergreen International, S.A. v. Marinex Construction Co.*,
   477 F. Supp. 2d 681 (D.S.C. 2007)........................................................193, 194

*Exxon Shipping Co. v. Baker*,
   __ U.S. __, 128 S. Ct. 2605, 171 L. Ed. 2d 570 (2008).......................................211

*Florida E. Coast Railway v. Revilo Corp.*,
   637 F.2d 1060 (5th Cir. 1981*)* ...................................................................194

*Florida Fuels v. Citgo Petroleum Corp.*,
   6 F.3d 330 (5th Cir. 1993) .....................................................................179

*Folkstone Maritime Ltd.*,
   64 F.3d 1037 (7th Cir. 1995) ................................................................194

*Fortunato v. Ford Motor Co.*,
   464 F.2d 962 (2d Cir.), *cert. denied*, 409 U.S. 1038 (1972)...................198

*Foulk v. Donjon Marine Co.*,
   963 F. Supp. 427 (D.N.J. 1997) .............................................................188

*Freyou v. Iberia Parish Sch. Board*,
   657 So.2d 161, 94-1371 (La. App. 3 Cir. 5/3/95)..................................207

*Gardner v. National Bulk Carriers, Inc.*,
   221 F. Supp. 243 (E.D.Va. 1963),
   *aff'd,* 333 F.2d 676 (4th Cir. 1964) ......................................................208

*Gebr. Bellmer Kg. v. Terminal Services Houston, Inc.*,
   711 F.2d 622 (5th Cir. 1983) ................................................................202

*Geigy Chemical Corp. v. Allen*,
   224 F.2d 110 (5th Cir. 1955) .......................................................198, 205

*Gifford v. National Gypsum Co.*,
   753 F.2d 1345 (5th Cir. 1985) ..............................................................203

*Gillespie v. U.S. Steel Corp.*,
   379 U.S. 148 (1964)..............................................................................208

*Glasser v. United States*,
   315 U.S. 60 (1942)................................................................................205

*Grantham v. Quinn Menhaden Fisheries, Inc.*,
   344 F.2d 590 (4th Cir. 1965) ................................................................208

*Great N. Insurance Co. v. Power Cooling, Inc.*,
   2007 U.S. Dist. LEXIS 95912 (E.D.N.Y. Dec. 18, 2007) ....................184

*Henderson v. Norfolk Southern Corp.*,
   55 F.3d 1066 (5th Cir. 1995) ................................................................202

*Hennigan v. Cooper/T. Smith Stevedoring Co., Inc.,*
    837 So. 2d 96 (La.App. 2002) ................................................................ 180

*Hobart v. Hobart Estate Co.,*
    26 Cal. 2d 412, 159 P.2d 958 (1945) ...................................................... 205

*Hoffa v. United States,*
    385 U.S. 293 (1966) ................................................................................ 205

*In re Ingram Barge,*
    435 F. Supp. 2d 524 (E.D. La. 2006) ...................................................... 177

*Ira S. Bushey & Sons. Inc. v. United States,*
    *172* F.2d 447 (2d Cir. 1949) .................................................................. 193

*James v. River Parishes Co., Inc.,*
    686 F.2d 1129 ............................................................................ 179, 190, 191

*Jerome B. Grubart v. Great Lakes Dredge & Dock Co.,*
    513 U.S. 527 (1995) ................................................................................ 177

*Johnson v. First National Bank of Shreveport,*
    792 So.2d 33, 00-870 (La.App. 3rd Cir. 6/20/01),
    *writs denied*, 805 So.2d 212, 213, 01-2770, 01-2783 (La.1/4/02) ....................... 208

*In re Katrina Canal Breaches Consolidated Litigation,*
    647 F. Supp. 2d 644 (E.D. La. 2009) ............................................... 188, 189

*In re Katrina Canal Breaches Consolidated Litigation,*
    2009 U.S. Dist. LEXIS 72288 (E.D. La. Apr. 15, 2009) ......................... 180

*Kirksey v. P&O Ports Tex., Inc.,*
    488 F. Supp. 2d 579 (S.D. Tex. 2007),
    *rev'd on other grounds sub nom.Kirksey v. Tonghai Maritime,*
    535 F.3d 388 (5th Cir. 2008) ................................................................. 188

*Kumho Tire Co. v. Carmichael,*
    526 U.S. 137 (1999) ................................................................................ 183

*Lasyone v. Kansas City Southern Railroad,*
    786 So.2d 682 (La. 2001) ....................................................................... 182

*Latulas v. Montco Offshore, Inc.,*
    2006 U.S. Dist. LEXIS 20066 (E.D. La. Mar. 29, 2006) ......................... 187

*Liberty Mutual Fire Insurance Co. v. Tidewater Oil Co.*,
   292 F. Supp. 818 (W.D.La. 1967),
   *aff'd and opinion adopted*, 403 F.2d 1023 (5th Cir. 1968)...................................................204

*Lower River Ship Services, Inc. v. Casteel, Inc.*,
   1991 U.S. Dist. LEXIS 1097 (E.D. La. Jan. 29, 1991).........................................................189

*McDermott, Inc. v. AmClyde*,
   511 U.S. 202 (1994)............................................................................................................203

*McDermott, Inc. v. Clyde Iron*,
   979 F.2d 1068 (5th Cir. 1992),
   *aff'd in part and rev'd in part sub nom.*
   *McDermott, Inc. v. AmClyde*, 511 U.S. 202 (1994)............................................................202

*McKelvey v. DeQuincy*,
   970 So.2d 682, 2007-604 (La.App. 3 Cir. 11/14/07)...........................................................206

*In re Mid-South Towing Co.*,
   418 F.3d 526 (5th Cir. 2005) .............................................................................................180

*Miller v. Butcher Distributors*,
   89 F.3d 265 (5th Cir. 1996) ...............................................................................................198

*Moore v. Ashland Chemical Inc.*,
   151 F.3d 269 (5th Cir. 1998),
   *cert. denied*, 526 U.S. 1064 (1999)....................................................................................204

*Moser v. Texas Trailer Corp.*,
   623 F.2d 1006 (5th Cir. 1980) ...........................................................................................180

*Neal v. Barisich, Inc.*,
   (E.D.La. 1989) 707 F. Supp. 862.........................................................................................209

*Neal v. United States*,
   562 F.2d 338 (Former 5th Cir. 1977)..................................................................................203

*Offshore Logistics, Inc. v. Tallentire*,
   477 U.S. 207 (1986)............................................................................................................207

*Pennzoil Producing Co. v. Offshore Express, Inc.*,
   943 F.2d 1465 (5th Cir. 1991) .................................................................................182, 193

*Perkins v. Entergy Corp.*,
    782 So. 2d 606 (La. 2001) ....................................................................................181

*Peters v. Fitzpatrick*,
    310 F.2d 704 (7th Cir. 1962) ...............................................................................205

*Petition of the United States*,
    418 F.2d 264 (1st Cir. 1969)................................................................................209

*Petition of United States Steel Corp.*,
    436 F.2d 1256 (6th Cir. 1970) .............................................................................208

*Pitre v. Louisiana Tech University*,
    673 So. 2d 585 (La. 1996) ...................................................................................189

*Pledger v. Phil Guilbeau Offshore, Inc.*,
    2003 U.S. Dist. LEXIS 7416 (E.D. La. Apr. 30, 2003)................................178, 189

*In re Quality Marine Services*,
    2005 U.S. Dist. LEXIS 9201 (E.D. La. 2005) ..............................................182, 193

*Ralston Purina Co. v. Hobson*,
    554 F.2d 725 (5th Cir. 1977) ...............................................................................198

*Rant v. Cia Anonima Venezolana De Navegacion*,
    228 F. Supp. 232 (E.D.La. 1964)..........................................................................205

*Rector v. Hartford Acc. & Indemnity Co. Of Hartford*,
    120 So. 2d 511 (1960)..........................................................................................179

*Remington Arms Co., Inc. (Peters Cartridge Division) v. Wilkins*,
    387 F.2d 48 (Former 5th Cir. 1967)......................................................................203

*Richard v. Firestone Tire & Rubber Co.*,
    853 F.2d 1258 (5th Cir. 1988), *cert. denied*, 488 U.S. 1042 (1989)......................203

*Roberts v. Benoit*,
    605 So. 2d 1032 (La. 1991) .........................................................................181, 191

*Rogers v. Resolve Marine*,
    2009 WL 2984199 (E.D.La. Sept. 11, 2009) (No. CIV.A. 09-4141) ......................211

*Schipp v. GMC*,
    443 F. Supp. 2d 1023 (E.D. Ark. 2006)................................................................184

*Schober v. Maritz, Inc.*,
  2008 U.S. Dist. LEXIS 14060 ( E.D. Mich. Feb. 26, 2008) ................................................183

*Sea-Land Services v. Gaudet*,
  414 U.S. 573, 94 S. Ct. 806, 39 L. Ed. 2d 9.......................................................................209

*Seal Offshore, Inc. v. American Standard, Inc.*,
  777 F.2d 1042 (5th Cir.1985) ............................................................................................187

*Shamnoski v. PG Energy*,
  858 A.2d 589 (Pa. 2004) ....................................................................................................178

*In re Signal International, LLC*,
  579 F.3d 478 (5th Cir. 2009) ......................................................................179, 190, 192, 199

*Simeon v. T. Smith & Son, Inc.*,
  852 F.2d 1421 (5th Cir. 1988) ...........................................................................................200

*In re Sincere Navigation Corp.*,
  329 F. Supp. 652 (E.D.La. 1971).......................................................................................210

*Smith v. Wade*,
  461 U.S. 30 (1983).............................................................................................................211

*Spinks v. Chevron Oil Co.*,
  507 F.2d 216 (5th Cir. 1975) .............................................................................................180

*St. Paul Fire & Marine Insurance Co. v. Nolen Group, Inc.*,
  2007 U.S. Dist. LEXIS 64603 (E.D. Pa. Aug. 31, 2007).............................................179, 200

*State v. Outley*,
  629 So.2d 1243 (La.App. 2 Cir.1993),
  *writ denied*, 637 So.2d 476, 94-410 (La. 5/20/94)..............................................................206

*State v. Trahan*,
  543 So.2d 984 (La.App. 3 Cir.1989),
  *rev'd on other grounds*, 551 So.2d 1303 (La. 1989)...........................................................206

*State v. Winzer*,
  354 So. 2d 533 (La. 1978) .................................................................................................206

*Tassin v. Sears, Roebuck & Co.*,
  946 F. Supp. 1241 (M.D. La. 1996)...................................................................................183

*The Alabama*,
   92 U.S. 695 (1876)..................................................................................................187

*The "Atlas"*,
   93 U.S. 302 (1876)...........................................................................................186, 187

*The Complaint of Cambria Steamship Co.*,
   505 F.2d 517 (6th Cir. 1974), *cert. denied,* 420 U.S. 975, 95 S.Ct. 1399, 43 L.Ed.2d
   655 (1975)............................................................................................................210

*The George Washington*,
   76 U.S. 513, 19 L. Ed. 787 (1870).........................................................................187

*The "Juniata"*,
   93 U.S. 337 (1876)...........................................................................................186, 187

*The Louisiana*,
   70 U.S.164 (1865)..................................................................................179, 190, 191

*The Madison*,
   250 F. 850 (2d Cir. 1918) ......................................................................................193

*The Pennsylvania*,
   86 U.S. (19 Wall.) 125, 22 L. Ed. 148 (1874) ......................................182, 193, 194

*The Sterling*,
   106 U.S. 647, 1 S. Ct. 89, 27 L. Ed. 98 (1882)......................................................187

*Todd Shipyards Corp. v. Automobile Transportation, S.A.*,
   763 F.2d 745 (5th Cir.1985) ..................................................................................187

*Tolle v. Higgins Industries*,
   212 La. 173, 31 So.2d 730 (La. 1947) ...................................................................204

*In re Tug Helen B. Moran, Inc.*,
   *560* F.2d 527 (2d Cir. 1977)...................................................................................194

*United States v. Casel*,
   995 F.2d 1299 (5th Cir. 1993) ...............................................................................204

*United States v. Cota*,
   2009 WL 412976 (N.D.Calif. Feb. 17, 2009) (No. CR 08-00160 SI) ...................182

*United States v. Cravero*,
   530 F.2d 666 (5th Cir. 1976) .................................................................................205

*United States v. De Los Santos,*
  625 F.2d 62 (5th Cir. 1980) ........................................................................205

*United States v. Hill,*
  463 F.2d 235 (5th Cir. 1972),
  *cert. denied,* 409 U.S. 952 (1972) .............................................................205

*United States v. Hutson,*
  980 F.2d 1443, 1992 WL 366846 (5th Cir. 1992) (Table; text in WestLaw), *cert.*
  *denied*, 507 U.S. 1039 (1993) ...................................................................198

*United States v. Justice,*
  431 F.2d 30 (5th Cir. 1970) ........................................................................205

*United States v. Lindell,*
  881 F.2d 1313 (5th Cir. 1989) ....................................................................204

*United States v. Narciso,*
  446 F. Supp. 252 (E.D. Mich. 1977).............................................................205

*United States v. Parr,*
  516 F.2d 458 (5th Cir. 1975) ......................................................................205

*Vanderbrook v. Unitrin Preferred Insurance Co. ,*
  495 F.3d 191 (5th Cir. 2007) ......................................................................201

*Williams v. City of Baton Rouge,*
  731 So.2d 240, 98-1981 (La. 4/13/99)........................................................207

*Wm. G. Roe & Co. v. Armour & Co.,*
  414 F.2d 862 (5th Cir. 1969) ............................................................186, 200

## 2. Statutes

28 U.S.C. §1332.........................................................................................177

28 U.S.C. § 1333.........................................................................................177

28 U.S.C. § 1333(1) ....................................................................................207

42 U.S.C. § 1983.........................................................................................211

Louisiana Civil Code article 2315.1 ............................................................207

Louisiana Civil Code article 2315.2 .................................................................209

La. Rev. Stat. 33:1563................................................................................206

La. Rev. Stat. 40:32, et seq .........................................................................206

### 3.  <u>Rules</u>

Fifth Circuit Rule 47.5.3 ............................................................................198

### 4.  <u>Regulations</u>

33 C.F.R. § 6.01-1.....................................................................................196

33 C.F.R. § 6.14-1..............................................................................196, 197

33 C.F.R. § 6.14-2.....................................................................................197

33 C.F.R. § 6.19-1.....................................................................................196

33 C.F.R. § 162.75(b)(3)(ii)................................................................195, 196

### 5. <u>Treatises</u>

FRANK L. MARAIST & THOMAS C. GALLIGAN, JR., LOUISIANA TORT LAW (1996).....................208

W. PROSSER & P. KEETON, PROSSER & KEETON ON THE LAW OF TORTS (1984)...................187

RESTATEMENT (SECOND) OF TORTS, § 433B ...........................................181, 188, 200

# <u>Findings of Fact</u>

**I.  <u>The Evidence as to Duty and Breach of Duty</u>**

    **A.**    <u>**Conditions At Lafarge Before Hurricane Katrina**</u>

    1.    It is clear that New Orleans and the Gulf Coast is prone to hurricanes emanating from the Gulf of Mexico.  There is a defined hurricane season and defined categories of storms ranging from category 1 to category 5.  These storms can vary in size, strength, speed and direction.

    2.    Lafarge North America, Inc. (LNA) is a supplier of construction materials in the United States.  LNA operates a cement distribution facility on the Inner Harbor Navigational Canal (IHNC or Industrial Canal).  At its facility on the IHNC, Lafarge takes in cement from barges, loads it into silos and subsequently loads trucks for distribution to Southeast Louisiana. Lafarge takes in approximately 200-300 barges similar to the ING 4727 each year.  *Busch Testimony*, 50:8-9.

    3.    The Lafarge facility on the IHNC is in close proximity to the Florida Avenue Bridge, Claiborne Avenue Bridge, Corps. of Engineers lock system and floodwalls protecting New Orleans residents.  *Aerial Photogtaphs*, PX-163 and PX-164.

    4.    For approximately one month prior to Hurricane Katrina, the Lafarge facility was without weather service due to construction.  *Busch Testimony*, 63:13-16, 77:25 to 78:2.  Even though weather service was out for over a month during hurricane season, the facility made no attempt to obtain substitute weather service or by even buying a hand held weather radio.  *(Busch Testimony*, 64:12-13  ("Q. No $20 weather radio from Radio Shack, correct? A. No, sir.").

    5.    As for policies and procedures, Lafarge had no hurricane preparation plan. Lafarge did have a one-page "New Orleans Terminal Hurricane Preparation Checklist" that

consists mostly of blank space ("Name of Hurricane: _____") and contains a few very elementary precautions ("Cable all barges to shore," etc.). *(PX 37, New Orleans Hurricane Preparation Checklist)..*

6.      Lafarge's one-page "New Orleans Terminal Hurricane Preparation Checklist" fell far short of the requirements of a written hurricane preparation plan, and was explained to be no longer in effect by the time of Hurricane Katrina. *Busch Testimony*, 67:15-18.

7.      In addition, the Lafarge facility on the IHNC was required by its corporate office to have certain procedures in place.  In particular:

   (a)  "Written and diagramed tie-off (mooring) procedures";

   (b)  A "High Water Procedure Manual"; and

   (c)  A VHF radio in good working order.

PX-13, LNA00473-474, particularly 6(c), 6(k) and 9(b).

### B.      The Days Before Hurricane Katrina

8.      Lafarge had requested delivery of the 4727 and 4745 to the Lafarge facility when Hurricane Katrina was in the Gulf of Mexico due to the fact that Lafarge was in need of Type H Cement (oilfield cement). *Smith Testimony*, 129:10-11; *Busch Testimony*, 52:14-17.  Trucks were coming to pick up deliveries on Saturday, August 27. *Busch Testimony*, 52:21-23.

9.      After delivery of the ING 4727 and 4745, there were two tiers of barges at the Lafarge dock before the storm. *Busch Testimony*, 62:12.  The North Tier, which was comprised of five loaded barges and the South Tier, which was comprised of ING 4727 and 4745. *Busch Testimony*, 62:21 to 63:2.

2

10.     Lafarge personnel had not commenced unloading of the North Tier of five loaded barges due to the fact that they did not need that type of cement.  *(Smith Testimony*, 129:21-23.

11.     As a consequence, immediately after delivery on Friday, August 26, unloading operations of the 4727 began at 12:20 p.m. *Busch Testimony*, 53:4-6.  The unloading operation took approximately 20 hours.  *Id.*

12.     Lafarge manager, Ed Busch was aware that there was a hurricane "in the Gulf" and that hurricanes can be "devastating." *Busch Testimony*, 75:14-19.

13.     Although public information advising of the nature and approach of Hurricane Katrina was available for the week before the hurricane, as of Friday, August 26, 2005, the Governor for the State declared a state of emergency and hurricane advisories narrowed impact of the storm to New Orleans. *(PX-19, Proclamation by Governor Kathleen Blanco; PX-18, National Hurricane Center Advisories and Tracking Maps*).  Lafarge did not monitor the weather, nor did it receive any weather advisories, Marine Safety Bulletins or advisories from the U.S. Coast Guard.  *Busch Testimony*, 64:14 to 65:4.

14.     Commencing Friday, August 26, 2005, Lafarge proceeded to unload Barge ING 4727, continuing overnight despite the prior issuance of governmental and weather service warnings of the impending storm, and completed the unloading at 9:00 a.m. on Saturday, August 27, 2005.  PX-62 (Lafarge North America Barge Unloading Report); *Busch Testimony* 53:10-13; *PX-18, weather advisories/tracking maps.*

15.     The unloading process allowed the barge to float higher (exposing more freeboard to wind).

16.     Had Lafarge monitored the weather, it would have known of National Hurricane Center Advisories of that same day (Advisory 12, Friday, August 26, 2005, 11:00 EDT) (PX-18) confirmed that the three day projected track placed New Orleans within the potential strike zone of the hurricane, with the hurricane projected to make landfall east of New Orleans on the Mississippi/Alabama Gulf Cost.  (P18, *In Globo*)  Further, at 5:00 p.m. on that same day, the National Hurricane Center issued Advisory 14 which predicted Hurricane Katrina to strike within 100 miles of New Orleans.  By 8:00 p.m. Friday night, advisories placed New Orleans dead in the hurricane's path.

17.     Lafarge personnel at the facility did not receive notice of Hurricane Katrina's approach until around 9:00 A.M. on Saturday, August 27, 2005.  This notification came in the form of a cellular phone call from an employees' wife.  (*Busch Testimony*, 55:5-7).  (Q. And about this time, y'all got a phone call, or one of the employees got a phone call from his wife; isn't that correct?  A. Yes, sir.")

18.     At about 9:00, Lafarge manager, Busch, telephoned Zito Fleeting, Inc. to release the barge for pick up.  *Busch Testimony* 58:4-9.  In addition, Busch telephoned Joe Domino, Inc. to request a towboat to swap around the barges—to move the empty ING 4727 outboard of the loaded ING 4745.  *(Busch Testimony*, 58:15-17.  Mr. Busch requested no other services and made no other request regarding mooring or adding additional lines.  *Busch Testimony*, 59:9-11.

4

19.     Manager, Ed Busch left the Lafarge facility at 12:00 – 1:00 p.m.  *Busch Testimony*, 61:10-11.  However, prior to leaving, Mr. Busch did not walk the barges *(Busch Testimony*, 61:12-13) and was unsure as to the mooring of the North Tier and the South Tier as he viewed the barges from about 200 feet away and said they "appeared" to have rope on every cleat.  *Busch Testimony* 62:4-11.   In reality, there were only 3 single strands (parts) of rope connecting the ING 4727 and 4745.  *Thigpen Testimony*, 165:16-20.

20.     On Saturday, August 27, 2005 at approximately 2:25 p.m., The REGINA H towboat arrived at the Lafarge France Road facility to swap the barges around.  Unique Towing employee, Raymond Grabert, Captain of the REGINA H, testified that he would have taken the empty 4727 out of the Industrial Canal on the 27th if he had been requested to do so. *(DX-330, Deposition testimony of Captain Raymond Grabert*, 72:24 to 73:3*)* ("Q. But there would have been nothing to prevent you from taking the light Ingram barge through the docks if you had been requested?  A. If they'd have requested it I'd have done it").

**C.      Removal of the Barge ING 4727 from the Canal**

21.     Lafarge did not make a reasonable, timely effort to remove the unloaded Barge ING 4727 from the IHNC and get it out of harm's way.  Lafarge Assistant Manager, Edward Busch, claims to have left a voice mail message without speaking to a live person and without follow up. *Testimony of Busch,* 96:11-14.  However, Zito denies receiving any such call, denies voicemail capability exists such that Mr. Busch could have left a message, and has provided an automated telephone system log reflecting the absence of a call from Mr. Busch.  DX-328,

*Deposition Testimony of Barry Boudreaux*, pp. 38-40 and 45-46; PX-425 (Nextel invoice of calls by Ed Busch); PX-50 (Daily Calling Log of Zito)].

22.     Further, Manager, Ed Busch, agreed that he could have called "in advance to have a tug come in for a certain time" to remove the barge.  *Busch Testimony*, 121:3-5.  But, he did not.

23.     Zito Manager, Mr. Boudreaux testified in the trial of the limitation action that even though the fleet was closed, that he probably would have accepted the barge into the fleet. (DX-329, *Boudreaux Limitation Testimony*, 26:9-13.

24.     Had Lafarge ordered Joseph C. Domino, Inc., to remove the ING 4727 from the facility and tow it to the Zito fleet in the Mississippi River rather than top the two barges around, Lafarge would have prevented the breakaway. *Testimony of Donald Green* (Plaintiffs' Maritime Expert); *PX-386* (Green Report) ("It is my opinion that Lafarge's failure to order Joseph C. Domino, Inc….to remove the ING 4727 from the facility and tow it to a fleet in the Mississippi River…would have prevented this breakaway").

### D.     Lafarge Violated its Own Policies and Procedures

25.     Lafarge's Hurricane Preparation Checklist *(PX-37)* required that all barges be "cabled to shore."  All barges WERE NOT cabled to shore.  *Busch Testimony*, 67:11-14.

26.     Lafarge's Policies and Procedures required that each facility have written mooring procedures, a High Water Manual, and a working VHF radio.  Lafarge DID NOT have written mooring procedures, a High Water Manual, nor a working VHF radio.  *Busch Testimony*, 71:14-21 and 72:13-16.

**E.    Lafarge Management, At All Relevant Times, Lacked A Reasonable Expectation that the Barge ING 4727 Would be Picked Up by Zito Fleeting / Lafarge Personnel May Have Thought Differently**

27.     Prior to mooring the ING 4727 and ING 4745, Busch claims to have made two calls, one of which was to Zito Fleeting to release the ING 4727 for pick up. *See Busch Testimony*, at 58:4-9 ("Q.   Now, at some point in time, you made two phone calls; is that correct?  One was to Zito Fleeting; Am I correct?   A.   Yes, sir.   Q.   And that was to release the barge for pickup; Is that correct?   A.   Yes, sir.").

28.     With regard to the call to Zito, Busch does not claim that he ever spoke with any individual, but rather, testified that nobody answered and that he purportedly left a message. *See Busch Testimony*, 97:3-5 ("Q.   Okay.  And, in fact, you only made one call to Zito.  You didn't wait another 30 minutes and try again; is that correct?   A.   No, sir.  I made one call.   Q.   And are you aware that Zito put forth much evidence that there's no record of your phone call?   A.   I called Zito and I left a message on an answering machine.").

29.     Putting aside the fact Mr. Busch lacked any basis to represent to his subordinates that ING 4727 was scheduled to be picked up by Zito, Mr. Smith, an employee working under Mr. Busch who actively prepared the ING 4727, testified that in his experience it is impossible to predict how long it would take for a barge to be picked up subsequent to a request being made to the barge fleeter. *See Smith Testimony*, at 155:6-17 ("Q.   No, did he tell you that he had called?   A.   Yes.   Q.   And does that mean that the fleet company would come pick up the barge for the owner of the barge?   A.   That's my understanding, yes.   Q.   And in your experience, how long would it normally take for a company to come pick up that barge?  I forgot what your answer

7

was earlier.  A.  It all depends on whether the tugboat was in that area or whether it was out on other jobs it would take -- to determine how long it would take.  Q.  In some cases would it take as long as two days?  A.  If I don't recall, unless it was on weekends or something.  I'm not sure. Q.  In some cases would it take more than two days for them to come pick up the barges?  A.  I really don't know.").

30.      In fact, Mr. Robin, another employee working under Mr. Busch who actively prepared the ING 4727, testified that in the 10 years he worked at Lafarge he had **never** seen a fleeter arrive on time to pick up a barge.  *See Testimony of Robin*, 589:12-18 ("Q.  And when a phone call is made to have a vessel come pick up a barge, can you give us an idea of what happens after that?  A.  Well, they would give you a time that it would be there for, approximately.  They never on time or --  Q.  You said they are never on time?  A.  Never on time.  In the ten years I worked there, I never seen a boat on time.").

31.      Nonetheless, Lafarge personnel may have expected the barge to be picked up as Mr. Robin was told by Mr. Busch that the barge would be picked up "that evening."  *(Robin Testimony at p. 583)*.  In addition, Mr. Smith explained the simplistic mooring with only three single lines by admitting he thought the barge would be picked up.  *(Smith Testimony at p. 137)* ("Q. So you – all thought someone was coming to pick up the barge; is that right?  A. Yeah").

8

**F.**     **The Evidence Establishes the Barges ING 4727 and ING 4745 Were a Tow, and Lafarge Intended Them to Be Moved Collectively as a Tow**

32.     Busch testified that, at the time the call was purportedly made to Zito, Busch also made a call to Domino.  *See Busch Testimony*, at 58:10-17 (" Q.   So we got Zito.  And is it fair to say you called Joe Domino, Inc. to swap the barges around?  A.   Yes, sir.").

33.     Busch testified that, unlike the call to Zito, he affirmatively spoke to an individual at Domino, and scheduled a tug-boat to come to the Lafarge facility for the purposes of topping the ING 4727 and ING 4745 around.  *See Busch Testimony*, at 59:1-8 ("Q.   …. The Joe Domino call, that was for a tug to come in; Is that correct, to shift the barges around?  A.   Yes, sir.  Q. And your instructions to them, Joe Domino, was to top the barges around; Is that correct?  A. That was.").

34.     Busch testified that Domino was instructed to use the tug to switch the ING 4727 and ING 4745 around because Busch wanted the 4727, which was against the dock, switched to the outside position.  *See Busch Testimony*, at 59:11-18 ("A.   No, sir.  The lines for the—when the barges were to be topped around, the loaded barge was to be—the barge that was against the dock was the ING 4727, and it was empty.  I wanted it on the outside, and I wanted that loaded barge against the dock.  The ropes for mooring that against the dock were cut, tied on the bollards on the dock and the rope was coiled up near the dock so that the deckhand could grab the rope without having to get up on the dock itself.").

35.     Busch testified that the reason for swapping the ING 4745 to face the dock side was to facilitate long-lining to be used, as the long-lining mooring method used by Lafarge could

9

not work with the ING 4727 facing the dock.  *See Busch Testimony*, at 59:19-60:4 ("Q.   And

the reason why you wanted the empty barge on the outside, because you were concerned about

storm surge causing it to ride up on the dock; Is that correct?  A.   No, sir, I was concerned about

the fact that that barge, with long-lining the other barges, the rationale there was to let the barge

rise with the storm surge and pay line out from the poles.  With the unloaded barge, there's no

way to do a long-lining operation.  It would have just been a straight line to the dock, and it

would have caused that barge to break away from the dock and it would have turned a loaded

barge loose with it.")

36.     Busch testified that long-lining could not work with the ING 4727 facing the dock

because an empty barge, which sits 10 feet higher than a full barge, cannot be tied parallel to the

pole, but instead, the line must go straight up to the barge from the outset, risking the line

becoming tight and snapping.  *See Busch Testimony*, at 60:19-61:6 ("The Court:  Would you

describe one thing for me, just to make sure it's in the record and I understand it, why is it that

you can't long-line an empty barge? The Witness:  Well, if they put the picture back up, the way

-- the way that you long-line the barge is there's a post sticking up and we go from the bollard on

the dock, wrap it around and then down to the barge. This barge is sitting three or four feet from

the water level.  An empty barge is sitting ten feet above that water level, so there's no way to

wrap the line around the pole.  It will go from the dolphin straight up to the kevel on the barge

and it would be a tight line, so if that barge would rise ten, 25 feet, it would snap the ropes.").

37.     Consistent with Mr. Busch's testimony, Mr. Grabert, Captain of the Regina H.,

testified that the instruction relayed by the dispatcher at Domino was that there was an empty

10

barge facing the Lafarge dock with a loaded barge on the outside, and that he was to flip both barges around and tie the loaded barge to the dock. *See Deposition of Grabert*, 43:12-44:7.

38.     The Captain and crew of the Regina H. confirmed that this "topping procedure" was performed by the tug hooking up to the barges, pulling the barges out into the canal, flipping the barges around, and then using the tug to push the barges back in to the dock. *See Thigpen Testimony*, 168:1-9 ("Q.   Okay.   Describe the top-around procedure, please.   A.   All right.   I would have had to take the head line, which is, on a tugboat, like a two-point line.   It's tied to a bitt, which is in the center of the boat.   And I would have tooken that rope and put it onto the -- one of the kevels on the barge. Mr. Raymond would have pulled the barges out.   When he pulled them out, then he would have pulled the barges out into the canal, flipped them around.   And then when he would have pushed back in, I would have tied the load back to the dock."); *See also Deposition of Grabert*, 63:10-64:17 (same).

39.     Mr. Thigpen testified that nobody from the Regina H did anything to alter the lines between the ING 4745 and ING 4727 when they performed the topping procedure. *See Thigpen Testimony*, 168:10-12 ("Q.   Did anybody from the REGINA H change anything about the ropes between the two barges?   A.   No, sir.").

40.     Busch testified that Domino complied fully with his instructions. *See Busch Testimony*, 115:3-9 ("Q.   Did Domino, as far as you know, carry out your instructions?   A. Yes, sir, they did.   Q.   How do you know that?   A.   The barge was tied the way we had told them -- or the way I had told them to tie the barge.   And the ropes were still hanging the way the ropes on the other barges were hanging.").

11

G.     **Lafarge's Efforts to Secure ING 4727, and the State of the Mooring on the ING 4727 and ING 4745 When Lafarge Personnel Abandoned the Lafarge Facility**

41.     Busch testified that he was responsible for the ING 4727 until removed, and that he believed that it was his duty to ensure the barge was moored properly. *See Busch Testimony*, 80:12-13 ("I'm responsible for that barge until it leaves my dock."); *See id*., at 81:5-8 ("Q. Wouldn't you think, sir, that if you can't move it out, it has to be moored properly.  You would agree?  A.   Yes, Sir.").

42.     Busch testified that based on anticipated wind conditions, the Barge should have had a rope on every cleat.  *See Busch Testimony*, at 84:15-22 ("It is your position that, for a class 5 hurricane, that these barges should have had rope on every cleat?  A.   Should have, yes.").

43.     Busch confirmed in his testimony that the ING 4727 had seven (7) cleats and two (2) buttons.  *See Busch Testimony*, 83:13-17 ("Q.   So we've got one, two, three, four, five, six, seven cleats.  We also have a button right here (indicating); Is that correct?  A.   Yes, sir.   Q. And we have a button up here (indicating); Is that correct?   A.   Yes, sir.").

44.     Busch testified that although he believed every kevel or cleat of the ING 4727 "appeared" to have rope on it when he left the Lafarge facility, he admitted he could only view the barges from 200 feet away.  *See Busch Testimony*, at 62:4-11 ("Q.   So are you -- let me ask you this:  how was the tier of two barges tied together?  A.   The ropes from the loaded barge up to the empty barge were tight and it appeared that all the ropes or all the kevels that were on both barges had ropes leading back and forth.  Q.   So every kevel or cleat had a rope on it?  A.   From what I could see, like I say, from 200 feet away, it appeared to.").

12

45.     Importantly, Mr. Busch's testimony is controverted by both Mr. Thigpen and Captain Grabert, the crewman on the Regina H., who testified with certainty that when they arrived at the Lafarge facility the ING 4727 and the ING 4745 were tied together only by three single part ropes. *See Thigpen Testimony*, 165:16-22 ("Q.   Were these barges moored in any type of way?  A.   Yes.  The empty was tied to the dock with a few ropes, and then the loaded was tied to the empty, which was against the dock, with three ropes, single part ropes running from the empty to the loaded.  Q.   How was the empty tied to the dock?  A.   With ropes."); *See also Deposition of Grabert*, at 55:11-18.

46.     Significantly, the testimony of Mr. Thigpen and Captain Grabert is not disputed by Mr. Smith or Mr. Robin – the Lafarge employees who actually secured the ING 4745 and ING 4727 – as neither could testify as to the number of lines that were actually used between the ING 4745 and ING 4727.  *See Smith Testimony*, 140:21-141:3 ("Q.   If someone would later testify that there were three single part lines, you wouldn't have any reason to dispute that; am I correct?  A.   I still wouldn't know whether it was or not.  I know when we left -- I mean, when I left, but I don't know how many were on the barge.  Q.   You don't know how many?  A.   No."); *See also Testimony of Robin*, 583:3-7 ("Q.   And you don't remember how the other two were tied up?  A.   No, I don't recall.").

47.     As confirmed by Mr. Smith, the only thing that was done to the ING 4745 and ING 4727 after unloading the 4727, but before leaving the Lafarge facility, was to replace some of the lines between the barges to make up for the difference in height.  *See Smith Testimony*, 135:14-19 ("A.   We replaced -- let's see -- I think we put most of them on.  Because when the

13

barge come in, a lot of times they have just the rope's long enough to tie between the two barges when they the same height.  So we have to -- if the rope is too short, we have to put longer ropes on them in order to let the slack off as the barge go up.").

**H.**      **The Stark Contrast Between Lafarge's Mooring of the Southern and Northern Tiers of Barges**

48.      Importantly, the manner which the ING 4727 and ING 4745 were secured was in stark contrast with the northern tier of barges, where a rope was placed on every cleat. *See Testimony of Robin*, 583:3-7 ("Q.   And on the barges together y'all put a rope on every cleat;  Is that right?  A.   Every cleat.").

49.      According to Plaintiff's maritime expert, Donald Green, the comprehensive methodology used to secure the northern tier should also have been applied to secure ING 4745 and ING 4727.  *See Green Testimony*, 477:14-4787:8 ("Q.   Now, have you reviewed the deposition of Roland Johnson, who was another one of the crew members who was involved in the mooring?  A.   Yes, sir. …. Q.   And if he testified that they were tied together in every location on the barges, every little bitt, kevel, or cleat had a rope on it, from what you have seen, was that methodology which they applied to the northern tier applied to the 4727?  A.   No, sir. Q.   Should it have been?  A.   It should have been, yes.").

**I.**      **The Various Issues With Lafarge's Mooring of the ING 4727**

50.      It is a conclusive, undisputed fact that subsequent to Lafarge personnel leaving the Lafarge facility on Saturday, August 27 and prior to the arrival of Hurricane Katrina, the ING 4727 broke from its moorings.

14

### 1.      Lafarge's Failure to Use Fleeting Wires/Cables

51.      The ING 4727 also had permanently attached fleeting wires for binding the ING 4727 to other barges when constructing tows. *See Photos, PX-388* (picture 2).

52.      Mr. Busch admitted that the fleeting wires on the ING 4727 were not used to connect the ING 4727 and ING 4745 together when the barges were being prepared prior to Katrina. *See Busch Testimony*, 86:8-10 ("Q.   And we have fleet wires at the barge that wasn't used to moor the barge at the Lafarge facility; Is that correct?   A.   That's correct.").

53.      Mr. Busch testified that fleet wires are to be used when mooring a barge to a barge. *See Busch Testimony*, at 84:15-22 ("Q.   These wires that you talked about before, those are fleet wires; Is that correct?   A.   Yes, sir.   Q.   And those have winches on it to tighten them up; Is that correct?   A.   Yes, sir.   Q.   And those are used to moor barge to barge; Is that correct? A.   Yes, sir.").

54.      Plaintiff's expert, Donald Green, testified that the fleeting cables depicted on the ING 4727 in Plaintiff's Exhibit 388 are to be used for joining barges together when making tows. *See Green Testimony*, 457:14-24 ("Q.   This is also part of Plaintiffs' Exhibit 388, a photographic exhibit bearing No. 06-4132 below the 388.   Is this another photograph furnished to you at the time of your deposition?   A.   Yes.   Those are permanent ratchets as well as wire attached to them.   Q.   What are these used for on barges like this?   A.   They're used to make up tows, marry barges together.   They use wires and ratchets -- you can pull the wires from one barge to another, and they use the ratchet to take the slack out of it and draw the barges close to each together.").

15

55.     This is consistent with the testimony of Mr. Thigpen, who testified that when conducting a topping maneuver, securing barges with rope is not necessarily sufficient to ensure that barges remain connected during the maneuver. *See Thigpen Testimony*, 186:11-18 ("Q. When a top-around maneuver is done, is there care taken to see that the ropes between the two barges are not overstressed? A.  Yes, sir.  Sometimes you've had ropes pop before in the process, you know.  A rope that's sitting there that's been out in the weather is not as good as a brand-new rope that's just got made.  You don't know.  All it takes is a weak spot and a rope will pop, and that tugboat's out there, and you have to get them two barges back together.").

56.     Moreover, the ING 4727 also had cables attached on the two buttons. *See Photos, PX-388* (picture 1).

57.     Busch testified that "buttons" are an additional security mechanism used by towing companies to ensure stability of a tow if problems develop with a single barge. *See Busch Testimony*, 83:23-84:6 ("A button is a device, a steel device on the end of the barges that is used by the towing companies to run cables between the two barges.  When they move these barges up and down the river in large fleets, they will cable the ends of the barges together with their rigging, so as not to have something go wrong.  And if a barge starts taking on water, there is enough stability in those buttons and cables to hold that barge in place until they can get the pump on it to get the material pumped off.").

58.     Busch testified that the cables affixed to the "buttons" of the ING 4727 were not used when the ING was being prepared prior to Katrina. *See Busch Testimony*, 85:20-86:10 ("Q. Could I have the second picture.  There is a cable, am I correct, sir? A.  Yes, sir.  Q.  And there

16

is a cable on that button; Is that correct, sir?  A.   There appears to be, yes, sir. ….  Q.   so we have cable on the barge that wasn't used to moor it at the Lafarge facility; Is that correct?  A. correct.”).

## 2.       The High-Low Mooring Configuration

59.      Mr. Thigpen testified that when the Regina H arrived, the ING 4727 was facing the dock, and the ING 4727 was visibly higher than the outwardly facing ING 4745. *See Thigpen Testimony*, 164:14-17 (“Q.   Okay.  Can you describe these barges?  A.   The one against the dock was empty and it was way out of the water.  The one on the outside was loaded and it was way in the water.”).

60.      Mr. Thigpen testified that the ING 4727 was approximately 8 to 9 feet higher than the ING 4745. *See Thigpen Testimony*, 165:7-15 (“Q.   Okay.  How much higher was the empty than the full?  A.   At least probably eight feet, nine feet.  That's just -- I didn't know it matters the exact depth of the hull of the barge to how far it's going to be out of water. Because a 14-foot hull empty is only 14 foot -- well, it's a foot -- a foot three to a foot six is usually your draft on an empty barge.  So -- so if it was a 12-foot hull, it would have been like ten foot six out of water. The other barge, it was loaded pretty good.  I'd say maybe a 9-foot draft.”).

61.      While Mr. Smith testified that he was told to secure the ING 4745 and ING 4727 “tightly” due to the high-low configuration [*Smith Testimony*, 143:5-19], Mr. Smith testified that he could not determine the distance between the ING 4745 and ING 4727 once secured because the distance would fluctuate based on the water acting upon the high-low configuration.  *See Smith Testimony*, 149:3-15 (“Q.   Now, after those two barges were secured, can you tell me how

17

much distance there was between those two barges?  Side-to-side distance.  A.   The barge --

actually, when you unload a barge, it's about seven feet or better higher than the empty -- I mean,

higher than the full barge.  So what we do is tie them as tight as we can get them; and then the

barges against the dock, we would leave slack in them so they wouldn't pull against each other.

Q.   But the distance between the two barges was how far, from side to side?  A.   It -- I really

don't know.  Because, I mean, they're right together depending on whether the water was holding

them in or whatever.")

     62.     Mr. Thigpen testified that mooring a loaded barge to an unloaded barge was not

generally done, as it is difficult to secure barges in that configuration.  *See Thigpen Testimony*,

171:18-25 ("Q.   In your experience and in your training that you've had, is there a reason to

avoid mooring an empty barge to a full barge?  A.   You don't see it done in the fleets because it's

hard to get a proper secure.  If a barge is way up high and another barge is way low, it's -- it's just

-- you go in any fleet, they put the empties with the empties and the loads with the loads.")

     63.     According to Plaintiff's maritime expert, Donald Green, the height variation of

the ING 4727 and ING 4745 prevented the barges from being secured closely together.  See

Green Testimony, 480:3-16 ("Q.   Okay.  Now, assuming, hypothetically, that the vessels are not

on the same height, that the outboard of the 4727 is about eight feet higher, and assuming that

because of that, as Mr. Thigpen said, they can't bring them any closer than about two feet apart?

A.   That's correct, yes.  Q.   So what does that allow, in terms of movement between these

vessels while they are moored, after the people who have moored them have gone for the day?

A.   That allows -- that height difference and that fleet angle between the two barges and the lines

18

going down means that they cannot get barges butted up close to each other.  And that allows the

two barges to move, or the outboard barge, the 4727, some movement within its confines.")

64.     According to Plaintiff's maritime expert, Donald Green, the height variation

caused the ING 4727 and ING 4745 to separate 2-3 feet every time the ING 4745 was raised or

the ING 4727 was dipped by waves.  *See Green Testimony*, 483:2-10 ("Q.   Going to -- the

question was:  Could you bring those two vessels, with the height differential, as close as the

barges in the north tier appear to be?  A.   Yes and no.  Let me explain, Your Honor.  Is that if

they lay up against each other, then they're against each.  But if there's any movement, any tide,

any wind, whichever, that would play against the light barge, it would move out, at least two,

three feet away from the adjacent barge because of the angle of the line.")

### 3.     Lafarge's Failure to Use Multiple Part Lines

65.     Lafarge's use of single-part line was not suitable for mooring, as single-part is

suitable only when a vessel is preparing to get under way.  *See Plaintiff's Exhibit 395* (excerpt

from Knight's Modern Seamanship); *Green Testimony*, 490:3-17.

66.     According to Plaintiff's maritime expert, Donald Green, it is improper to moor a

vessel under any circumstances using single part lines. *Green Testimony*, 496:24-497:3 ("Q.   As

a temporary mooring, as described in the literature and as you've described it, is it proper to leave

a vessel at a marine waterfront facility unmanned with just temporary moorings under any

circumstances?  A.   No.")

67.     According to Mr. Green, the lines used to secure ING 4727 and ING 4745 should

have been parted at least double, if not more, as was done to the barges of the northern tier.  *See*

19

*Green Testimony*, 478:20-479:13 ("Q.   All right.  Let me show you, also, more of Mr. Roland's deposition testimony at page 16, and ask you to assume that the mooring of the northern tier, in addition to being at every bitt, kevel and mooring point, also that he did several circles, that the rope went around each cleat more than once. Do you see that?  A.   Yes.  Q.   If you assume that to be true, is that a description of doubling up or better?  A.   Yes.  I think Mr. Thigpen yesterday said it perfectly.  Is that using all of the line, and that is, if the line is 30 feet and the barges are snubbed up against each other and you wrap as many wraps as you can and use it all, because it just makes it safer, they're less likely to break away.  Q.   And did you see any indication that they used several circles of rope or doubling up or two part or three part lines on the mooring of the 4727?  A.   No.  All of the testimony is that there was only one part line going from the 4727 to the 4745.").

68.   The recommendations of the Coast Guard Sector New Orleans Hurricane plan (P28), particularly Appendix 2 requires that mooring lines be "doubled up" and that "special attention should be paid to barges moored in the proximity of bridges."  In addition, Annex C requires a facility to determine the special needs and intentions of vessels moored at the facility, to determine whether vessels desiring to remain moored at the facility during the hurricane would be allowed to do so and to notify the vessel master, vessel agent, and the COTP of the facilities decision.  Had such notification taken place, it is clear the vessel master, vessel, and the COTP would have been apprised that the ING 4727 was released for pick-up and moored with only 3 single part lines.  Such notification would have resulted in the vessel being moved and/or properly secured thus preventing the breakaway.  (PX-386, *Green Report* at p. 8).

20

69.     Mr. Thigpen testified that the practice of "parting" a single line is stronger than adding additional lines because of elasticity, and that adding an additional line was not equivalent to adding another line. *See Thigpen Testimony*, 169:12-170:11 ("THE COURT:  Mr. Thigpen, I'm going to ask you a question that might assist our colleagues in the Fifth Circuit who are maybe not nautically inclined.  Would you describe what a part is?  THE WITNESS:  A part is -- when you have a rope going from one end to another end, that's one part.  So, in other words, if you go to wherever you're tying it off and come back, that's two parts.  If you go back to it again, it's three parts.  The parts is just the number of lines that's in between your bitts or whatever you're tying.  THE COURT:  If you have a rope that's long enough, you could use that one rope to make several parts?  THE WITNESS:  Yes, sir.  THE COURT:  Or you could use additional -- a second rope to make a second part?  THE WITNESS:  No, I wouldn't say that.  Because then you would have two one-parts.  THE COURT:  I see.  THE WITNESS:  I wouldn't call that -- because when you put more parts, that rope's longer, it will stretch more.  It's stronger.  If you only have one part and another one part, it's not going to stretch as much as before.  THE COURT:  Two one-parts don't equal one rope that makes two parts?  THE WITNESS:  I wouldn't, no.").

70.     Mr. Thigpen testified that he in fact looked, unsuccessfully, to see if he could put additional parts in the rope between the between the ING 4745 and ING 4727, as three parts or more is the standard when mooring a barge. *See Thigpen Testimony*, 168:13-169:1 ("Q.  Did the ropes between the two barges, to the best of your knowledge, remain there during the top-around procedure?  A.  Yes, sir.  Yes, sir.  I looked at them.  I even looked to see if there was enough

21

rope, maybe, to put another part, and there was not.  Q.   You were looking for extra rope to put between the two barges?  A.   Yes.  To see if maybe I could put two parts, you know. There wasn't enough room.  Q.   Why would you want to do that?   A.   Because -- I don't -- the rule of thumb when you're working on a boat is three parts or more.  And one part's really -- if you go to any fleet or anything like that, you'll never see one-part ropes.").

71.     Mr. Thigpen's testimony is supported by Donald Green, who testified that the practice of "parting" a single line was stronger than adding additional lines because of elasticity, and that adding an additional line was not equivalent to adding another part.  *See Green Testimony*, 488:10-489:9 ("THE COURT:  Counsel, let me interrupt you for a minute to make sure I understand something.  The doubling up issue.  Do you regard doubling up -- is that two parts connecting the -- where the barge is tied to, let's say, either another barge or the dock, by having the rope come around twice?  THE WITNESS:  Yes, as a minimum.  But the -- the Coast Guard and everyone else in the industry considers three parts the minimum.  And that would be from the -- from the dock to the other barge back and back again.  THE COURT:  Using the same rope, if you have enough length? THE WITNESS:  Yes, sir.  THE COURT:  And if you have -- and I've asked this question previously -- if you have -- rather than doing that, if you tie two separate ropes to the same cleat on -- from the dock to the barge, would that also be doubling up or is that  not doubling up?  THE WITNESS:  No, I don't consider that doubling up, Your Honor.  Because by putting multiple parts in the same line, you're adding elasticity to the -- to the fastening.  And in the event that there is movement that those -- the multiple parts would be able to absorb that shock.  And also, it -- a single part line is not as strong as a double part.")

22

72.     Plaintiff's maritime expert, Donald Green, opines that the use of single-part mooring and high-low mooring of the ING 4745 and ING 4727 is consistent with, and a plausible explanation for, the ING 4727 having been witnessed broken from its moorings on Sunday. *See Green Testimony*, 593:7-16 ("A.   No, sir, I don't think I did.  You -- Tompkins and Leblanc saw the barge in the canal on Sunday.  I have no explanation how it could be there on Sunday -- Q.   Okay.  A.   -- other than the fact that the testimony is, is that the barge was left by the Lafarge people with three single-part lines  securing the barge, a light barge, to a loaded barge at the facility.  And I have opined numerous times, and I don't think my opinions have changed, with regard to the inadequacy of that mooring arrangement.")

73.     Lafarge's assertion that it "doubled up" lines by more than doubling the mooring strength of the mooring system is incorrect.  Lafarge's definition of doubling up does not comport with authoritative texts of United States Coast Guard, United States Navy, Greater New Orleans Fleeting Association and other authorities. (See Authoritative texts (P390-395, and P27)).

74.     Doubling up results in a mooring with multiple part lines. (P391, at p. 415 (see picture), also P393 "When the ship is secured, the mooring lines are normally "doubled up," which means that an extra bight of line is passed to the pier or other ship, giving three parts of line instead of only one part.")

75.     In addition, in order for dock personnel to effectively comply with Lafarge's definition of doubling up, personnel would have to be aware of the breaking strength of the numerous different ropes (type, age, strength, and size) in order to accomplish a doubling of

23

mooring strength.  Manager, Ed Busch was not aware of the breaking strength of the new rope or old rope. *(Busch Testimony at p. 104)*.  Further, Earl Smith and Louis Robin were unaware of the breaking strength of the various ropes used to moor the ING 4727, in evidence.  *(Smith Testimony at p. 137-138)*.

### 4.    Lafarge's Use of Long Lining

76.    According to Plaintiff's maritime expert, Donald Green, Lafarge's use of long-lining was not a suitable way to moor the two barge tiers, as it was incapable of preventing the northern tier from alliding with the 4727, which may have been a cause of the breakaway.  *See Green Testimony*, 487:5-16 ("Q.   What is your opinion of the suitability for long-lining at a commercial facility like this?  A.   Well, I don't agree that it should be done.  I think that it should have been moored properly, and the use of cables would have been better than having the long-line.  Q.   Okay.  A.   Their rationale for doing that was that they didn't want the barges to go up and go on top of the dock.  Q.   And what are the risks of long-lining?  A.   The risk of long-lining is that it gives movement to that tier of barges, and could very well have allided with the 4727, which was attached to the -- that barge right there below it.").

### J.    Water Coming Into the IHNC

77.    The IHNC Lock Staff Gage of the water level in the IHNC shows a rise of a couple of feet between 3:00 A.M. and 5:00 A.M. CDT on Monday, August 29.  DX-39.

78.    Mr. Villavasso testified in his deposition that, just before he saw what appeared to be the top of a barge in the floodwall he had seen a large volume of water coming into the IHNC:

Q.   Okay.  Can you, perhaps, tell me how much time transpired between the door

24

being blown off and your observation of the levee failing, the levee wall, I should say.

     A.   After it blew off, I stood out there and watched the waves coming over the wall and stuff, and I stood back to the side and looked over to the East, and that's when I heard another boom.  But it didn't sound like a transformer.  I looked over to that way, the wall started tumbling down, and I seen what appeared to be a barge tip, tip of it from the door, from the doorway.

     Q.   All right.  You, I thought—tell me if I'm wrong—described having seen a large volume of water traveling down the Industrial Canal from the lake toward the river.

     A.   That's correct.

     Q.   Okay.  So when did you observe that occurring?

     A.   Around the same time of—around the same time I heard the explosion, because I looked to my right, I looked to my left.

     Q.   Okay.

     A.   I looked to my right.  I seen a wave of water just gushing down the Industrial Canal, and it passed the bridge and I heard a boom.

*Villavasso Deposition,* PX-372, 644:24 to 645:18.

79.     Mr. Villavasso described the large volume of water as twenty feet high, but said that was just an estimate, and that he did not have a tape measure.  He was very definite that it occurred just before he saw the tip of the barge protruding through the wall and the wall collapse.

*Villavasso Deposition,* PX-372, 654:5 to 657:8.

80.     The Cushing Report contains a schematic showing the exact dimensions of the IHNC.  The schematic clearly shows that the entrance to the part of the IHNC at issue in this case, at the Florida Avenue Bridge, is extremely narrow where the water would have had to come in, and then opens up substantially.  *Cushing Report*, DX-196, p. 14, Figure 7.

81.     Dr. G. Paul Kemp, one of defendant's experts, testified that water is incompressible.  *Kemp Testimony*, 3002:16.

82.     It is common experience, as with using a hose or sprinkler, that if water is under pressure and its path is narrowed, it will speed up and rise up until it gets past the choke point. Without that, it would be impossible to fight fires or water a garden.

83.     As the wall of water entered the expanded area of the IHNC past the narrow point, it had a great deal of room in which to spread out—including the Lower Ninth Ward into which the barge had opened a path—and there would not be any high wall of water ultimately hitting the IHNC lock.

### K.     Witness Testimony About Water Splashing Over the East Floodwall

84.     Arthur Murph testified that on Sunday, most likely in the afternoon or evening, he saw water splashing over the East floodwall of the IHNC, blowing over the top.  *Murph Testimony*, 688:20 to 690:1.

85.     William Villavasso testified in his deposition, that he saw water erratically splashing, to a significantly greater level than before, over the East floodwall of the IHNC.  The splashes were from three to five feet higher than the top of floodwall.  This was about 3:00 A.M. to 4:00 A.M. CDT. *Villavasso Deposition*, PX-372, 615:6-8, 619:15 to 620:16, and 624:2-10.

86.     At 3:00 A.M. CDT, the water level in the IHNC was well below the top of the wall.  According to the IHNC Lockmaster Staff Gage, the water in the IHNC was just below 8 feet at 3:00 A.M. CDT, and just below 9 feet A.M. at 4:00 A.M. CDT.  *Spinks Report*, PX-421, p. 23, Figure 8, Surge Hydrographs chart.

87.     Splashes of the size mentioned by Mr. Villavasso at those times would have demonstrated very agitated water within the IHNC at those times.

88.     After about 5:00 A.M. and after the North Breach had occurred and he had gotten on his roof, Terry Adams testified that he saw water splashing over the top of the East floodwall of the IHNC, driven by wind and water.  *Adams Testimony*, 252:23 to 253:21 (time), 258:8 to 260:13, and 261:15-20.

89.     At 5:00 A.M. and 6:00 A.M. CDT, the water level in the IHNC was below the top of the wall.  According to the IHNC Lockmaster Staff Gage, the water in the IHNC was just below 10 feet at 5:00 A.M. CDT, and just below 11 feet A.M. at 5:00 A.M. CDT.  *Spinks Report*, PX-421, p. 23, Figure 8, Surge Hydrographs chart.

90.     At an unspecified time on Monday morning, August 29, 2005, before daybreak and shortly before his area started flooding, Michael Bickham testified that he saw water splashing over the East floodwall of the IHNC.  *Designated Parts of Bickham Deposition*, DX-316, 55:1-12 and 56:6-24.

91.     Mr. Lemon testified that his testimony about wind directions would not be changed by evidence about water splashing over the top of the East floodwall of the IHNC, because water splash could happen by waves running against the floodwall and foam and spray.  *Lemon Testimony*, 1883:3-11.  Mr. Lemon did not explain what, besides wind, could have driven the foam, the spray, and the waves against the East floodwall of the IHNC.

**L.**     **Observations Of Wind Direction and Wave Height Prior to Breaches**

92.     "Prevailing wind" was not the only force capable of motivating ING 4727; ING 4727 could move in directions other than "prevailing wind." *(Trial Testimony of Cmdr. (Ret.) Don Green*, p.____ll.___; *Trial Testimony of Hector Pazos, P.E.*, p.____ll.____).

93.     William Villavasso, a 23-year employee of the Water and Sewer Board and Chief Operator of Pump Station 5 at the time of Hurricane Katrina, testified to seeing four to five foot high waves splashing over the INHC at Pump Station 5 (located at Florida Avenue and the Industrial Canal) during the time leading up to the North Breach.  PX-372, *Deposition testimony of William Villavasso*, 615:6-8, 619:15 to 620:16, 624:2-10.

**M.**     **The North Breach**

94.     The North Breach occurred in floodwalls along the east bank of the south segment of the IHNC, between east-west streets Florida Ave. and Law Street, just south of the Florida Ave. Bridge, and was about 250 ft long. *(Trial Testimony of Gennaro Marino, P.E.,* p.____ll.____; *PX 397, Report of G. Marino, P.E.).*

95.     The IHNC North breach occurred at or before 4:30 A.M. CDT. *(Trial Testimony of Melvin Spinks*, p.____ll.____; *PX-421, Report of M. Spinks, p.37; PX-424, Spinks Declaration at ¶ 12).*

96.     That the IHNC North breach occurred at or before 4:30 A.M. CDT is corroborated by two eyewitnesses who reported seeing Barge ING 4727 in the IHNC on Sunday afternoon, August 28, 2005, the day before the breach. *(Trial testimony of Gertrude LeBlanc, p.377 ll.1-12.*

97.     The first witness, Gertrude LeBlanc, attested that she saw the barge in the IHNC on Sunday morning, August 28, 2005, while she was on the Claiborne Avenue Bridge crossing the IHNC.  *LeBlanc Testimony,* 370:12-15.  According to her account, the Barge was near the East side (the Lower Ninth Ward side), between the Claiborne Avenue and Florida Avenue.  *Id.*, 377:1-12.

98.     Frazier Tompkins, the second witness, stated that on Sunday, August 28, 2005, he saw an unattended barge by itself in the vicinity of Derbigny, Roman and Prieur streets on the east side of the canal. *(Trial Testimony of Frazier Tompkins, p.398 ll.5-13.*

99.     In addition to this eyewitness testimony, a total of 20 different people have been identified as having perceived boom sounds, on the Eastern side of the IHNC on the day in question between the time period of 3:00A.M. until 7:00 A.M.  See, for example, *Trial Testimony of Terry Adams, p.262 ll.6-24).*  However, testimony by witnesses in the Lower Ninth Ward also include description of sounds of grinding (Carolyn Berryhill, DX-317, pp. 33 – 41, 105, 108; screeching, knocking (Towanda Schexnayder, DX-319, p. 42, lines 6 – 10; hitting (Andrew Sartin, DX-285,  pp. 45 – 52;  Ronald McGill, DX-299, pp. 40 – 49,59 – 60); impact (Michael Bickham,  DX-316, pp. 63-65, 77 – 78; Arthur M. Anderson, III, DX-320, pp. 61 – 62; Kevin McFarland, DX-318, p. 91); dragging (Michael Bickham,  DX-316,  pp. 63-65, 77 – 78); knocking, scraping, grinding and rubbing (Arthur Murph, Tr.  693:1-16).  These sounds are unique to the eastern IHNC floodwall breaches, and cannot be explained by Lafarge or any of its experts.  Please see testimony of Jason Weiss, Tr. 2828 - 2851, and esp. 2832:11-20 and 2851:7-11.

100.    Most compelling is the testimony of William Villavasso, an individual who routinely observed barges on the INHC during his 23 years working for the Sewerage and Water Board,  who testified repeatedly at deposition that he personally witnessed the tip of a barge impact and cause the Northern floodwall breach.  *Deposition testimony of William Villavasso, PX 372, 24:9-25:13, 64:21-24, 71:5-9, 81:12-22, 85:2-8, 86:2-5, 86:9-16, 89:3-20, 97: 6-16, 98:14-17, 128:2-24, 186:23 to 187:18, 191:12-25, 202:6 to 203:7, and 203:8 to 204:18.*

101.    Defendant's contention that Mr. Villavasso's testimony is not plausible because "the object [he] allegedly saw was sticking up out of the water only one to four feet above the top of the floodwall," is incorrect.  Contrary to Defendant's assertion, Mr. Villavasso's testimony repeatedly refers to the fact he only saw what he perceived was the tip of the barge protruding from the floodwall, not to the height of the barge above the water.  *Deposition testimony of Villavasso*, PX-372, 24:9-25:13, 64:21-24, 71:5-9, 81:12-22, 85:2-8, 86:2-5, 86:9-16, 89:3-20, 97: 6-16, 98:14-17, 128:2-24, 186:23 to 187:18, 191:12-25, 202:6 to 203:7, and 203:8 to 204:18.

### N.    **The South Breach**

102.    The South Breach occurred in f1oodwalls along the east bank of the south segment of the IHNC, between east-west streets N. Galvez St. and N. Prieur St., and was about 850 ft long. *(Trial testimony of Gennaro Marino, p._____; PX 397, July 1, 2009 Report of Gennaro Marino, P.E.)*

103.    The IHNC South breach occurred sometime between 5:00 to 5:45A.M. CDT on Monday, August 29, 2005. *(Trial Testimony of Melvin Spinks, p. 1607 ll.4; PX 421, Report of M. Spinks, p.37; PX 424, Spinks' Declaration at  ¶ 12)..*

30

104.     This fact is first corroborated by two eyewitnesses who reported seeing Barge
ING 4727 in the IHNC on Sunday afternoon, August 28, 2005, the day before the breach.  *(Trial
Testimony of Gertrude LeBlanc*, 377:1-12; *Trial Testimony of Frazier Tompkins,* 398:5-13).

105.     The first witness, Gertrude LeBlanc attested that she saw the barge in the IHNC
on Sunday morning, August 28, 2005, between 11:00 A.M. and Noon while she was on the
Claiborne Avenue Bridge crossing the IHNC. *(Trial Testimony of Gertrude  LeBlanc*, 370:4-20
and 377:1-12).  According to her account, the Barge was near the East side (the Lower Ninth
Ward side), between the Claiborne Avenue and Florida Avenue Bridges. *(Trial Testimony of
Gertrude LeBlanc*, 377:1-12).

106.     Frazier Tompkins, the second witness, stated that on Sunday, August 28, 2005, on
two occasions, one at 9:00 A.M. and the other at 4:00 P.M., he saw an unattended barge by itself
in the vicinity of Derbigny, Roman and Prieur streets on the east side of the canal. *(Trial
testimony of Frazier Tompkins*, 395:5-25 and 397:1-13).

107.     Moreover, the direct eyewitness testimony of Lower Ninth Ward resident Terry
Adams who testified at deposition that he personally witnessed the Barge impact and cause the
Southern floodwall breach is persuading.  Adams, who had evacuated to the roof of his home at
2604 Deslonde Street between 5:30 A.M. and 6:00 A.M. on Monday, August 29, 2005,
witnessed the Barge impact and break through the floodwall from about five blocks away.  *(Trial
Testimony of Terry Adams, p.262, ll.6-24).*

108.     The floodwall was holding and intact before the barge came through. *(Trial
Testimony of Terry Adams, p.267 ll.14-18).*

31

109.    Additionally,  Arthur Murph both rendered  a statement and testified, that he witnessed the Barge impact and penetrate the floodwall at the location of the Southern breach. *(Trial Testimony of Arthur Murph,* 714:5-16; PX-264, *Arthur Murph's January 25, 2006 recorded statement to Attorney Richard Joseph Guidry).*

110.    Arthur Murph also told a long time friend on numerous occasions that he saw the barge break through the Eastside floodwall. (*Trial Testimony of Arthur Anderson III,* 776:17-18*).*

111.    Lafarge settled with Arthur Murph, an eyewitness homeowner on Jourdan Avenue, and placed upon his property a collateral mortgage in favor of a fictitious. "paper," non-funding mortgage corporation, New Jourdan, Inc., despite the all-cash sale by which his home was purchased.  This was done in an effort to keep him from testifying to his damaging recount of the havoc wreaked by the errant barge and to disguise the settlement from potential claimants. (*PX-269, Letter to Chaffe, McCall confirming collateral mortgage on Murph's property located at 105 Berkley Drive; PX-271, Act of collateral mortgage by Jeanne Church Murph and Arthur Murph, Jr.).*

112.    Defendant's "forensic engineer" expert, Dr. Robert Bea, admitted that the barge struck the east side floodwall twice, or more, before impacting and going through the East side floodwall at the south end. *(Trial testimony of Dr. Robert Bea, p.2761 ll.20-25).*

113.    The ING 4727 scraped along the east side floodwall, south of the north breach and struck the floodwall on several occasions weakening the stability of the floodwall and disrupting the alignment and interlocking of the sheet pile, ultimately crashing through the wall and bringing down the entire floodwall at the south breach, unleashing a tsunami on the Ninth

32

Ward, Arabi, and Western Chalmette. *(Trial testimony of Dr. Gennaro Marino, pp._____).*

## O.   Physical Evidence of Barge Impact

114.   While concrete monoliths on the London and 17th Street Canals fell intact,

concrete monoliths at the eastern Inner Harbor Navigation Canal breaches display significant

pulverization of concrete. *Photos contained in PX 402, Report of Hector Pazos).*  This distinction

is unique to the eastern IHNC floodwall breaches. *Photos contained in PX 402, Report of Hector*

*Pazos, P.E.).*

115.   Exposed rebar protruding from area where concrete floodwall cap was at southern

end of South Breach is a feature not present at any other breach. *(Trial Testimony of Hector*

*Pazos, p.___ll.____; PX 402, Report of Hector Pazos; Trial Testimony of Gennaro Marino, P.E.,*

*p.___ll.____; PX 397, Report of Marino; Trial Testimony of Robert Bartlett*, Tr. 319:17-320:1;

*Exh. P378, Figs. 5 - 8).*  The rebars replicated a corresponding pattern on the bottom of ING

4727. (*PX 419, Harbor Photo of ING 4727*); *Trial Testimony of Pazos, p.____ll.____; PX 402,*

*Report of Hector Pazos; Trial Testimony of Gennaro Marino, p.___ll.-___; PX 397, Report of G.*

*Marino; Trial testimony of Bartlett, Tr. 326:15-327:3).*  This feature is unique to the South

Breach of the Eastern IHNC floodwall.  *(Trial Testimony of Hector Pazos, P.E., p.____ll.___;*

*PX  402, Report of H. Pazos; Trial Testimony of Gennaro Marino, p.____ll.____; PX 397,*

*Report of G. Marino; Trial Testimony of Robert Bartlett,* p*. 337, ll. 9-16,  PX 378, Report of R.*

*Bartlett).*Barge ING 4727 contains scratches on its bottom which are spaced at intervals

consistent with the 9 inch design spacing of the vertical rebars in one face of the floodwall,

assuming the barge traveled in a somewhat straight path through the wall at a slight angle off

33

perpendicular to the live of the wall.  *Trial Testimony of Robert Bartlett, P.E.*, pp. 331-333; PX-378, *Report of Robert Bartlett, P.E.*).  Some of the scratches on the bottom of the barge extended approximately more than half the length of the barge.  *Trial Testimony of Robert Bartlett*, 334:11-14; PX.-378, *Report of R. Bartlett*).

116.    Dr. Reed Mosher of the Corps of Engineers, who was in charge of Volume V of the IPET Report, admitted in his deposition that it appeared the barge had struck part of the floodwall at the south breach, and that there was evidence on the barge that it had scraped against a floodwall.  *(PX  364, July 22, 2009 Deposition of Reed Mosher, at 90:23-91:6).*

117.    Moreover, scrape marks also appear along the inner expanse of the eastern IHNC floodwall from a point north of both the North Breach to the location of the South Breach. *(Trial testimony of Hector Pazos, P.E., pp.833 ll.10-21*; *PX 402, Report of Hector Pazos, P.E.;  PX 241, ABC News video interview of Joseph Edwards).*  This is consistent with witnesses who heard scraping, screeching and grinding noises. *(DX 316, Deposition testimony of Michael Bickham, p. 62 ll.3-18; DX 317, Deposition Testimony of Carolyn Berryhill, p.33 ll.12-22; DX 319, Deposition Testimony of Towanda Schexnayder, p.49 ll.19-25; p.50 ll.1-20).*

**II.  The Breaches of the East Floodwall of the IHNC**

    **A.**     **Characteristics of the Breaches**

118.    In the Ninth Ward, Barge ING 4727 played a role in the disaster of unfolding the levee under the excessive forces from the colliding barge." *Bea Video*, PX-350.  If the barge was present at the time and location of the breaches, it is a force that acted against the IHNC floodwall.  *Bea Testimony*, 2798:7-25.

119.    At the North Breach initiation point, a wedge-shaped flap of sheet piling torn on both sides from its adjoining continuum contrasts with the fact that older, rusty sheet pile at the southern end of the North Breach fully extruded and twisted 270 degrees without failing or tearing.  *Marino Testimony*, Tr. 1197:16 to 1199:6; 1204:10-20.  The difference results from application of localized impact force—e.g., the corner or "tip" of a barge—at the point where the North Breach initiated.

120.    Plaintiff's expert Robert Bartlett testified to "witness marks," *Bartlett Testimony*, 307:3-25, at the South Breach indicating barge impact—destruction of the concrete cap above the horizontal construction joint, *Id.*, 315:5-10; PX-378, Figure 4, folded rebar in alignment correlating with scrapes on the bottom hull of the barge *Bartlett Testimony*, 319:17 to 320:1; PX-378, Figures 5-8; vertical shearing of the concrete corresponding with the turn of the bilge, *Bartlett Testimony*, 326:15 to 327:3; impact while the wall was still standing up, *id.*, 329:18 to 330:21.

121.    Houses located to the east of Barge ING 4727's post-breach/pre-Rita resting spot (behind the barge in photos facing east) did not suffer the splintering and dislocation that other houses near the eastern IHNC breach sites experienced.  Dr. Bea had no answer when asked if this fact indicates a sequence of events such that the barge was already in the neighborhood when the floodwalls failed, and actually shielded the houses from the full force of flooding.  *Bea Testimony*, *Tr.* 2795:23 to 2796:4.

122.    According to defense expert Charles Cushing, the North Breach occurred between 4:30 and 6:30 A.M., *Cushing Testimony*, 2046:17-20, and the South Breach before 7:30 A.M. *id.,*

2110:1-6.  Breaches along the 17th Street Canal, if sound witnesses there are to be believed, and where there was no barge, occurred "sometime after 9:00," *Deposition of Paul Best*, DX-268, Tr. 15-17, after which it took the water about an hour to rise.  At the London Avenue Canal, the "boom" was not heard until after 10:00 or 10:30 in the morning, and flooding did not get high enough to get into the witness' house for four or five hours, *Deposition of Glenn Cross*, DX-271, Tr. 14-20).  The structures most prolific of breaches, and therefore suggestive of the worst-case, were earthen levees along Reach 1 and Reach 2 of MRGO, the funnel characteristics of which subjected these structures to hydrostatic forces much greater than in the IHNC.  Though breaches along Reach 2 formed without overtopping as early as 6:30 A.M., *Findings of Fact and Conclusions of Law* in Robinson, USDC 05-4182 c/w 06-2268, Record Doc. # 19415 at p. 66, these involved highly erodible earthen levees subject to extraordinarily forceful wave wash, not reinforced concrete floodwalls which would not experience peak surge for another two and a half hours.

   123. According to defense expert Charles Cushing, the North Breach occurred between 4:30 and 6:30 A.M., at a time when, in both Mr. Pazos' and Dr. Marino's opinions, the water level was too low to exert any unusual hydrostatic force upon the floodwall. 825:24 to 826:23; 839:20-24; 901:7-11; 1203:5-25.  According to Dr. Cushing, the South Breach occurred before 7:30 A.M., *Cushing Testimony*, 2046:17-20 and 2110:1-6.  Peak surge time at the IHNC lock was around 8:50 A.M., *Spinks Report*, PX-421, p. 23, Figure 8.  Dr. Bartlett testified that at the South Breach, the water level could not be high enough for the barge to float so as to only affect the concrete cap if 793' of preexisting flood wall breach had already occurred just north of the

area where it is agreed that the barge transited the floodwall. *Bartlett Testimony*, 362:11-17 and 363:13-17.

124.     Dr. Marino testified that water exerts uniform pressure in all directions.  Alone, it is insufficient to cause localized floodwall failure.  *Marino Testimony*, 1199:2-6.  Dr. Bartlett calculated the hydrostatic pressure at just over 200 p.s.i., and the force required at the South Breach to bend the rebar at 300 to 500 p.s.i.  Hydrostatic pressure could not have caused the failure of the cap.  *Bartlett Testimony*, 340:13-17.  By contrast, Barge ING 4727 weighed nearly one-thousand (1,000) tons, *Cushing Testimony*, 2047:23. At the North Breach, hydrostatic pressure played no role until barge impact, after which underseepage and gapping occur.  *Pazos Testimony*, 822:9 to 823:1.  At the South Breach, hydrostatic pressure may have contributed to gapping and seepage (though unlikely due to clay soils in which the sheet pile was embedded, *Marino Testimony*, 1139:1-7, but failure did not occur without the impact of the barge.  The IPET agrees, generally, in Vol. IV, FINAL, Technical Appendix 17, with Dr. Marino's conclusion that contact between the barge and the floodwall would cause or at least contribute substantially to floodwall failure.

125.     The North Breach occurred absent overtopping and scour. *Marino Testimony*, Tr. 1260:7-10; 1993:25-1994:25. The eastern IHNC south of the North Breach endured widespread scour and trench formation at locations where it did not breach.  *Pazos Report*, PX-402, Photo Group 1, pp. 1-3.  *See also Bakeer Report*, DX-205, Figure 59.

126.     The London Avenue and 17th Street Canal breaches consist of more-or-less intact monoliths leaning toward the protected side of the floodwall, showing characteristic signs of

hydrostatic failure. *Marino Testimony*, 1234:1-4, 1245:10 to 1246:22. By contrast, locations on the eastern IHNC floodwall where witnesses testify that they saw a barge collide show marked crumbling and pulverization of the concrete both above and below the horizontal construction joint.

### B.   Sounds uniquely associated with the barge

127.   Persons living near the 17th Street and London Avenue Canal reported hearing boom sounds followed by flooding. So did persons in the Lower Ninth Ward. However, testimony by witnesses in the Lower Ninth Ward also include description of sounds of grinding, *Deposition of Carolyn Berryhill*, DX-317, pp. 33-41, 105, 108; screeching, knocking Deposition of Towanda Schexnayder, DX-319, p. 42, lines 6-10; hitting (Deposition of Andrew Sartin, DX-285,  pp. 45-52; *Deposition of Ronald McGill*, DX-299, pp. 40-49, 59-60); impact (*Deposition of Michael Bickham*, DX-316, pp. 63-65, 77-78; *Deposition of Arthur M. Anderson, III*, DX-320, pp. 61-62; *Deposition of Kevin McFarland*, DX-318, p. 91; dragging (*Deposition of Michael Bickham*, DX-316, pp. 63-65, 77-78); knocking, scraping, grinding and rubbing (*Arthur Murph Testimony*, 693:1-16. These sounds are unique to the eastern IHNC floodwall breaches, and cannot be explained by Lafarge or any of its experts. Please see testimony of Jason Weiss, Tr. 2828-2851, and esp. 2832:11-20 and 2851:7-11.

### C.   Undifferentiated sources of harm

128.   Flooding from the North Breach contributed 20% of the IHNC floodwater, and flooding from the South Breach 805, before the water from the two breaches mixed. After 5:30 A.M. the water from the two IHNC breaches are mixed, and indistinguishable. *Spinks*

*Testimony*, 1606-1610.  Flooding from the IHNC accounted for over 90% of the floodwater in the Lower Ninth Ward and St. Bernard Parish before 9:00 A.M. *Spinks Testimony*, 1606 and 1609.  The combination of waters, which cannot be differentiated, resulted in the harm sustained by Plaintiffs.

129.    As for locations affected by water from one source before the other, despite any sequence or depth of water from either source, it is the combination of both sources which resulted in the harm.  In this instance, the question is not one of apportionment between sources, but whether the resulting harm can be apportioned.  *Melvin Spinks' Flood Simulation Timeline, and the United States Army Corps of Engineers New Orleans District Depth vs. Damage Curves, Appendices F and H*, *respectively, to Spinks' report*, PX-421.  By the time of the South Breach, around 5:30 A.M. according to Dr. Spinks' model, water from the North Breach had already deposited five feet of water in the Lower Ninth Ward all the way to N. Prieur Street.[1]  This is consistent with William Villavasso's observations, *Villavasso Deposition*, 646, that when the North Breach occurred, the water moved out in all directions.  In Arabi and St. Bernard, combined North and South breach floodwater flowed eastward from the IHNC, until it mixed with water from MRGO Reach 2 at around 9:15 A.M. near Delaronde and W. Genie, eventually leveling off at 14.7 feet.

130.    Other than eliciting direct examination testimony from Paul Kemp criticizing Dr. Spinks' alleged failure to distinguish the effects of the two breaches (though he explained their

---

[1] If Dr. Cushing is correct that the South Breach occurred at 7:30 A.M., a considerable increase in the depth and reach of the North Breach water is appropriate.

indivisibility as quoted above), Lafarge offered no proof of as to the apportionment of water from either breach, as it was incumbent upon Lafarge to do.  *Kemp Testimony*, 3020:8-17; *Suhayda Testimony*, 3046:19-24.

### D.   Witnesses

131.   At the times that Ms. Leblanc and Mr. Tompkins, each unknown to the other and each traveling separately, saw a barge loitering near the Claiborne Avenue Bridge, the IHNC lock had been closed for at least 7 hours.  *Leblanc Testimony*, 370-17 to 378:21; *Tompkins* Testimony, 391:21 to 399:22; *Lockmaster Log*, PX-24.

132.   Lockmaster O'Dowd denied having seen the barge on Sunday, but DX-145, Slide RB-063 from Dr. Bea's Power Point demonstrative, is a photo which reveals areas described by Ms. Leblanc and Mr. Tompkins that Lockmaster O'Dowd could not have seen from his station due to the interposition of the Claiborne Avenue Bridge structures.

133.   Mr. Villavasso testified ***eleven times*** in his deposition that he saw what appeared to be the tip of a barge protruding through the floodwall at the time that he heard and boom and saw it breach.  *Deposition of William Villavasso*, PX-372, at pp. 64, 66, 71, 74, 81, 85, 128, 145-146, 187, 202, and 205.

134.   The IHNC between the locks and Florida Avenue Bridge was sealed. *Lockmaster's Log*, PX-24; *Hall Testimony*, 1968:9-16.  Lafarge denies any breakaway other than Barge ING 4727.

40

135.    The large object depicted in certain post-Rita photos is a piece of a breakaway

drydock not present below the Florida Avenue Bridge during Katrina.  *Joel Dupre Deposition,*

13:20-23.

136.    Mr. Villavasso did not report the barge immediately.  Mr. Villavasso was clear in

his testimony that he could not swim, PX-372 at 75, that his life jacket did not work, *id*. at 164,

that he feared for his life, *id*. at 101, that he feared that he and his crew would be electrocuted, *id*.

at 68, that it was pitch black inside the station while Mr. Villavasso floated atop a wooden

cabinet, *id*. at 75-76, that he and his crew remained trapped in the flooded station without

communications for two days and nights awaiting rescue, *id*. at 76, and that he had been injured

when diesel fuel got into his eyes.  He testified that he "wasn't really doing too much talking

because [his] eyes were burnt red and [he]—[his] main focus was calling [his] superintendent to

get airlifted out of there to—[his] eyes were on fire."  *Id*., 178:11-17.  It is far-fetched to imagine

that the cause of this calamity should immediately concern Mr. Villavasso—*or any bystander*—

to the same degree as the deadly consequences.  He testified that he and his crew "were just

trying to survive."  *Id*., 74:11-20.  Yet, Mr. Villavasso did tell two people that he saw a barge

breach the floodwall.  He told his supervisor, John Huerkamp during the course of an official

investigation, *Huerkamp Testimony*, 3068-3069, and he told his co-worker, Richard Riess, *Riess

Testimony*, 2008:14-16.  During Mr. Villavasso's deposition, more than two years after the

storm, he was still visibly shaken when recalling the events.  PX-372, video.  Mr. Villavasso had

no financial stake in the outcome of this litigation.

41

137.    Arthur Murph testified to knocking, scraping, rubbing, and banging sounds coming from the floodwall before the flooding.  Dr. Bea echoes ILIT's statement that the barge scraped against the wall.  Where Dr. Bea diverges from Mr. Murph is that Dr. Bea claims these sounds to be associated with the barge's passage over the southern-most portion of the South Breach, after the ruptures had allegedly occurred.  Mr. Murph was standing in his driveway at the time.  *Murph Testimony*, 692:23-693:12.  Mr. Murph and the other Lower Ninth Ward sound witnesses are unanimous that flooding did not begin until after these sounds.

138.    Terry Adams describes, from a different vantage point, the same events experienced by Mr. Murph at his home.  Mr. Adams awoke around 5:00 A.M. to find water on the floor, getting only his feet wet, and water coming up through the bathroom drain.  254:2-11.  This is consistent with the undisputed fact that the North Breach had already occurred, and with Mr. Villavasso's testimony that he had the drainage pumps shut off.  When he first awoke, the power was out, but he could see the furniture in his bedroom, and could see the water coming up the drain.  298:14 to 299:16.  After gathering supplies, he went into the attic and onto his roof.  From his roof, Mr. Adams looked towards Claiborne Avenue, and saw about five blocks away, 262:5, "a big object, looked like it was going down—easing down the wall just bumping into the wall."  261:21-25.  The location of Mr. Adams' home is depicted in Exhibit PX-429.   He heard a sound "like an empty container squeezing up against something, like a squeaking sound." 266:17-25.  At the time, the lighting conditions were like "dusk."  It wasn't dark.  256:16-18.  He testified that the floodwall from his house to Claiborne Avenue "looked good," that it was "intact," despite water splashing over the floodwall.  260:14-261:20  The effect of this water in

42

the floodwall is borne out by photos of backside scour where the floodwall was left standing

after the storm.  That he could see this distance is borne out by the testimony of Richard Riess,

who stated at 2006:9 to 2007:1 that from a vantage point even with the front of the houses, one

could see the entire floodwall to Claiborne Avenue.  He testified that there were trees in his

neighborhood, but that he could move around on his roof, and that the trees did not block his

view.  265:7-13 and 267:8-13.  From his roof, Mr. Adams watched the object "about two to three

minutes" as it "went along the wall, looked like it would bump it a few times and then it just

crashed into it," after which "it looked like a tidal wave came in with it.  All the houses, cars

started floating away and houses started breaking apart."  262:1-24.  He saw it float into the

neighborhood, unleashing a tsunami, and causing his house to float off it its foundation.  285:9 to

286:6.

139.     Mr. Adams admits that he did not know what the large floating object was at the

time that he saw it.  He deduced that the large object he saw was not a house, because the levee

was still intact.  262:7-11.  He admits that the first time he understood it to be a barge was while

watching the news, when he saw it sitting in the neighborhood.  294:19-20.  There is no evidence

of any other large objects fitting the description Mr. Adams gave that were adrift in the IHNC

between the bridges.  As was the case with Mr. Villavasso, Mr. Adams was faced with a

multifaceted emergency.  His house had left its foundation and was floating.  All around him,

people were swimming for their lives, clinging to trees in the violent water.  265:2-4.  His friend,

Christopher Weaver, floated up, naked and injured.  He was bleeding badly.  Mr. Adams used

Christmas lights to pull him to relative safety on the roof, and then focused his attention on

treating his wounds and getting rescued.  294:2-15; 301:3-13.  The pair called 911, and reached

an emergency operator in Oklahoma.  299:17-19.  At these times, it is far-fetched to imagine that

Mr. Adams, or anyone, would be concerned with the cause of the flooding, rather than the

effects.  Lafarge's investigators at Centanni Investigative Agency did contact Mr. Adams and

attempt to speak with him.  Mr. Adams wisely evaded their questions and hung up the phone.

## IV.  Causation

### A.    Introduction

140.    In considering the testimony of the geotechnical engineering experts, two

common themes emerge:  (1) Dr. Marino conducted the most comprehensive review of the data;

and (2) Dr. Marino has minimized speculation while Dr. Bea and Dr. Bakeer simply speculate at

will.

141.    For example, it was Dr. Marino who first considered the group of borings that

include the famous boring 81A.  Until that date, neither Dr. Bea nor Dr. Bakeer had even

considered those borings in their analyses.

142.    It is quite telling that what Dr. Bakeer had not even considered has ultimately

become what he claims is one of the two primary causes of the North Breach.

143.    Similarly, while Dr. Bea has spent 5 years continuously claiming that the integrity

of the soil and seepage were the primary causes of both breaches, he somehow overlooked Dr.

Bakeer's seepage theory, and did not even consider boring 81A.

144.    As to the second theme—speculation—the Court should take note of the liberal

use of speculative terms such as "may have," "could have," leading to "must have"—a set of

ultimate conclusions far more definitive than their building blocks speaking of possibilities.

145.    *See e.g.*, DX-205, Bakeer Report at 41: "Based on this difference, much greater

settlements *must have* occurred within the breached segment . . ." (emphasis added).  "Pumping

of water at the drainage pump station near Florida Avenue has *probably* lowered the water table

within that area."  *Id.* (emphasis added).  "It is *possible* that some of the demolition and

construction activities such as deep excavations, construction vibration, and dewatering *may

have* also had some detrimental impact on stability of the floodwall."  *Id.* at 43 (emphasis added).

"In view of this, it is *possible* that the underseepage rate beneath the I-wall into the landside

*could have been* facilitated by the fill material placed on either side of the floodwall . . ."  *Id.*

(emphasis added).

146.    Further, it is noteworthy that the defense experts substantially differ vis-a-vis each

other.  There is virtually no overlap between Dr. Bakeer's failure theory and Dr. Bea's failure

theory as to the North Breach.  In fact, the two experts take largely inconsistent positions.  The

two are similarly at odds as to the South Breach.

147.    Drs. Bea and Bakeer have advanced a number of theories that are unique to them.

Among other things, no other investigator has found (1) a weak link between the 1968 and 1980

walls; (2) a faulty weld between the two; (3) a topsoil level that acted essentially as a sink that

extended from the 75 borings and drained into the area of boring 81A; (4) that the EBIA

excavations were sand filled; (5) that there was scour—localized or otherwise—at the North

Breach; or (6) that the EBIA excavations extended 25 feet below the ground surface.

148.    In fact, the only investigation that found underseepage to be a primary cause of

either breach is one which Dr. Bea now agrees was completely wrong—and as Dr. Bea was co-leader of that investigation, the Court should place much weight on this admission.  As such, Dr. Bea is alone in his underseepage theory.

      **B.**       **Dr. Marino's Opinions Are Scientifically Valid**

           **1.**       **Horizontal And Vertical Permeability**

149.    Dr. Bea mischaracterized Dr. Marino's opinions and analysis of the Marsh and alluded to the court that Dr. Marino used a single permeability value of 10-8 (ten to the -8th power, or $10^{-8}$) for the marsh.

> Q.  Now, which permeability values did you use and which did Dr. Marino use?
> A.  For the best estimate.
> Q. For the marsh layer. For the marsh layer.
> A.  The marsh layer is critical.  But for our analyses, the primary results were done for 10-to-the-minus-4, to  10-of-the-minus-5.  We were heavily criticized for the 10-to-the-minus-2.  Consequently, we re-examined that after we had some field experience.  But Dr. Marino used 10-to-the-minus-8.  That's equivalent to trying to get water through a brick.

*Bea Testimony*, 2733:2-8.

150.    However, Dr. Marino did not assign 10-8 as the only permeability value for the marsh. Instead, Dr. Marino assigned different permeability values **based on the soil characteristics of the marsh** and then analyzed the horizontal and vertical permeability of the marsh. PX 410a, Marino Declaration 12/18/09, Para 44 and 45; see also, Marino Testimony, 1185-1186; 1180-1185:2; See also, *Marino Report*, PX-397, Table 5-1.

151.    Dr. Marino explained while showing Table 5-1, from PX-397, that he assigned different permeability values to the different soils found in the marsh based on the boring

descriptions given for the marsh.  PX-401a, *Marino Declaration* 12/18/09, ¶¶ 44 and 45; *Marino Testimony*, 1185-1186; 1180-1185:2.

152.     As the *Marino Report*, PX- 397, Table 5-1, demonstrates, Dr. Marino did not just use 10-8 for the marsh stratum, he used the permeability values that range from 10-4 to 10-8 for the different soils that made up the marsh. Tr. 1185:5-8 ("So what this table does, it summarizes all the descriptions of the soils that we found from looking at the borings and then the signs, the permeability values, and also gives the values of strength that we talked about earlier.")

153.     It is important that the court compare DX-206, Bea's report, Table 8.1 (Input Values for Seepage Models) to PX-397, Marino's Report, table 5.1 (properties assumed for the north and south breach modeled sections). The court can clearly see the different permeability values used.  *Marino trial testimony*, Tr. 1132; 1135:12-1137; 1137:15-23;1177:18-25, 1179:11–1180:18; 1181: 1-25; 1183:1 - 1184:14.

154.     Dr. Marino also, correctly, did not assume the marsh to be made primarily of California peat as Dr. Bea assumed.  An examination of the boring logs will show that the marsh was not made up primarily of California Peat. (*Marino Demonstratives*, PX-437, Slides 36-48, 55-57, 61-88, 90-97, 99-100, and 102-105).  Marino marked the marsh (soils with organics) on the logs for the courts review.  *See also*, *Marino Report*, PX-397, Table 5.1; *Marino trial testimony*, 1177:18-25, 1180:2-18; 1181: 1-25, 1183:1 - 1184:14; 1184:21-25.

155.     Dr. Bea also displayed to the court a chart to explain the different soil permeability values that geotechnical engineers assign to the different soil classification while criticizing Dr. Marino's permeability analysis.  *Bea Testimony*, 2732:20-23 and 2733:2-8.

47

However, as a result of this chart, Dr. Bea admitted that clay is impervious and that it takes 200 years for water to pass through clay and it takes 200 days for water to pass through silt. *Bea Testimony*, 2732:20-23; Dr. Bea also admitted that organic clays are less permeable than peat. 2789:1-5; 2732:12 ("when you get to impervious, this would be things like fat clays….fat clays… are essentially impervious"); See also, *Marino Testimony*. 1132; 1135:12-1137; 1137:15-23; 1141:6-13; 1141:17-1143:22:1141:16-25;1145:7-12; 1145:16-20.

156.    The court should also closely look at the *Marino Report*, PX-397, Figure 5.25, Peat and Marsh Permeability Values; Exhibit 437, *Marino Demonstratives*, PX-437, Slide 106. It shows that Dr. Bea assigned permeability value of 10-4 to 10-5 for the marsh layer, which is akin to California peat, and that Dr. Bea did not properly consider the soils' properties. The permeability value for the marsh does not even fall within the range of permeability values IPET assigns for New Orleans Marsh. *Marino Testimony*, 1167:7-14.

157.    Most strikingly, Dr. Bea also assigned permeability in the horizontal and vertical directions in the order of magnitude of 10; Dr. Marino on the other hand, in accord with IPET, assigned permeability in horizontal and vertical direction in the order of 1 to 2.5.; IPET assigned the value 1. *Marino Testimony*, 1183:25-1186:19; *Bea Testimony*, 2737:15-2738:16.

158.    The reason Dr. Bea had permeability values in horizontal and vertical directions in the magnitude of 10 are because Dr. Bea assumed highly permeable sand in the excavations and canals and peat in the Marsh (DX-206, Table 8-1). Dr Bea used a horizontal and vertical permeability ten times that of IPET and at least 4 times that of Dr. Marino (PX-397, Table 5-1) (values for horizontal and vertical permeability ratios of 1 to 2.5). See PX-401-A, *Marino*

48

*Declaration, 12/18/09*, ¶¶ 20-24, 44-45 ("IPET used equal permeability for the marsh, factors of 1"). *Marino Testimony*, 1183:25-1186:19; *Bea Testimony*, 2737:15-2738:16.

159.    At trial, Dr. Bea testified that for the marsh layer the permeability values he considered 10-to-the-minus-4, to 10-to-the-minus-5 as his "best estimate". Tr.  2732:23-2733:6. However, according to his report, Dr. Bea in his report divided the marsh into two[2] separate strata. He assigned a permeability value of 10-2—the same number for which IPET—admittedly properly criticized him—for the upper marsh, and 10-6 for the lower marsh.  He then assigned 10-1 for the fill used at the EBIA excavations. DX-206, Table 8-1, Input Values for Seepage Models.  Tr. 1132; 1135:12-1137; 1137:15-23;1144:2-61147:19-1148:6;1150:5-13:1152:5-24: 1162:11-24.

160.    The Court should compare Dr. Bea's analysis of a permeable marsh and box and slot excavations to that of Dr. Marino who finds that there is no evidence of Dr. Bea's postulated box or slot excavations close enough to the levee or deep enough or permeable enough to enter the Marsh and that even if it these slots or box excavations entered the Marsh, the Marsh is not permeable enough to cause seepage. DX-401a, ¶ 22; the court can also note how many times Dr. Bea changed his theory.  Tr. 1121: 14-20; 1132; 1135:12-1137; 1137:15-23; 1141:6-13; 1141:17-1143:22:1141:16-25; 1143:16-22:1144:2-61147:19-1148:6:1150:5-13:1152:5-24: 1162:11-24.

---

[2]  Dr. Marino did not break the marsh into two separate strata. Dr. Bakeer was also incorrect when he claimed that Marino's strength numbers were higher than the other investigator's; Dr. Marino did not assume two strata in the marsh and the blank space below the 400 did not mean he assumed 400 for the lower marsh. **Bakeer,  Tr. 2486-2487**

Dr. Bakeer did not do any of his own permeability calculations on the marsh or anywhere else. *Bakeer Testimony*, 2481:1-4.

### 2.    <u>Assessment of Soil Strengths</u>

161.    Dr. Marino's collection of soil strength data was from IPET and ILIT which included both field and lab values.  Tr. 1130:24-1131:4; 1120:17-18**;** DX-397, Section 5.3.  His soil strengths were then based on relative location; the soil strengths were plotted versus their depts. His method was consistent with IPET.  Dr. Marino shear strengths are in line or lower than that of other investigators.  DX-401(a), Para 65-70, and Table D.1.  If the Court is to compare Dr. Bea's strength values with that of Dr. Marino, it will see that the numbers are in line with one another; particularly the strengths assigned to the marsh DX-401(a), Para 65-70, and Table D.1., the only exception is that of the strength of the levee which Dr. Bakeer admitted has little to do with lateral stability, and was based on the a stiff classification of the soils. Dx 401(a), Para 65-70; Tr. 2482:1-10 (the strength of the levee is not much involved in calculated mechanisms of instability and, therefore, has limited importance in the stability analysis." Is that true, sir? A. Absolutely correct.).

### 3.    <u>Lateral Stability Analysis</u>

162.    It must be pointed out that Dr. Marino's lateral stability analysis indicated that the wall would not have failed as a result of Katrina. 1230:19-1231:6;  PX 401(a), Marino, Dec. 18, 2009 report, Para. 22 & Section C.  Dr. Marino explained to the court that the failure occurs on the protected side.  Dr. Bea's also when considering the lateral stability of the flood wall only took into account the strengths on the protected side of the floodwall DX 361, Slide RB-124 (Dx

50

207, Bea Supp. Report, figure 16); not the flood side as Dr. Bakeer did with his south breach analysis utilizing boring 25a from the MMG borings. Tr. 2381:4-2392:18; 2395:12-.2396:14. Dr. Marino explained that the strength of the soils on the flood side did not come into play when assessing the stability of the floodwall and that a void as Dr. Bakeer opined was not probable. Tr. 1462: 11-19.

163.    Dr. Marino made his conclusions based on all the laboratory testing, field testing and review of all the borings.  He considered also the anecdotal evidence deduced from the WGI boring and reached his conclusions.  1130:24-1131:4; 1120:17-18; Dr. Marino layered all the strata and found that the marsh was not all peat as Dr. Bea claimed. Tr. 1121: 4-20.

164.    Dr. Bea on the other hand relied on unrealistic permeability values assigned to the marsh and slot excavations filled with sand to perform his lateral stability analysis; DX-361, Slide RB-055, & Slide RB 124.  The court can clearly see in DX-361, *Bea Demonstratives*, Slide RB-055, that Defendant combined the permeability of California peat into his lateral stability analysis in order to argue that there were problems with lateral stability of the IHNC flood walls. DX 361, *Bea Demonstratives*, Slide RB-055 (DX-207, *Bea Supplemental Report*, figure 16).  It must be noted that Dr. Marino's critical circular failure surface used in his lateral stability analysis is in accord with the generally accepted science and is what IPET used in their analysis. Dx 401a, Section D, Para 57; Dr. Bea however used a circular sliding surface based on slot excavations and his newly contrived theory.  Slide RB-055 (DX-207, *Bea Supplemental Report*, figure 16).

165.    Dr. Bea combined the pressure effects from his alleged seepage into his lateral

51

stability analysis to determine why the flood wall failed.  Tr.2609-2615:15.  He came up with his new theory in preparation for the Katrina litigations.  Tr. 2611:8-23.  This newly discovered methodology had never been used before by any geotechnical engineer and only invented by Dr. Bea and his graduate student for use in these Katrina litigations.  2611:8-23; 2609 to 2615:15.

### 4.      Uniqueness of the Sheet Pile Being Exhumed

166.      Dr. Marino opined that the barge caused the North and Southern breaches of the Eastern floodwall of the IHNC.   Dr. Marino explained that the sheet pile being exhumed from the ground was unique to the Eastern floodwall of the IHNC. Tr. 1254:1-1255:8.

167.      Additionally, regarding the North breach of the Eastern floodwall, Dr. Marino explained that a tear in the middle of the sheet pile that was not connected to the wall would indicate that there had to be a concentrated force consistent with the Barge hitting the floodwall. As shown to the court with photograph (Px 439), there is a faulty weld on the left side of the sheet pile and a failed interlock on the right side of the sheet pile, and then in the middle of the sheet pile (that wasn't connected on two sides), there is a tear in the middle of the unconnected sheet pile which could only be caused by a concentrated force, not hydraulic pressure.  Tr. 1254:1-1255:8; Tr. 1198:4-1200:3. See below,  Px 344, Fiq. 45.

168.      Simply stated, Dr. Marino's opinions, based in accepted methods of geotechnical engineering, are that the soils are of such a nature that the floodwalls would not have failed but for the barge impact; the permeability values assigned by the Defendant are unrealistic and Defendant has failed to come forward with sufficient evidence that there was a vertical or horizontal permeability problem that lead to seepage or hydraulic uplift or which would have caused lateral instability of the levee.  Moreover, defendant's methods are speculative, flawed,

52

were invented for the purposes of the Katrina litigations and are not generally accepted methods and therefore without scientific basis.

### C.   **North Breach Failure Modes**

169.   There is some common ground as to the North Breach: (1) all experts uniformly agree that there was **no overtopping** at the North Breach at the time of the breach, (2) all experts agree—with the limited exception of Dr. Bakeer—that scouring did **not** play a major role in the North Breach, and (3) all experts agree that the North Breach was a localized failure.

170.   However, the similarities stop there.  Except for tension cracks, **none** of Dr. Bakeer's primary causes for the North Breach match those of Dr. Bea's, or for that matter, any other investigator who has studied the North Breach.

171.   Where Drs. Marino and Bea differ is in seepage analysis – Dr. Marino has specifically ruled out the possibility of significant hydraulic effects under the sheetpile, whereas Dr. Bea claims significant hydraulic effects without identifying any scientifically reliable basis for doing so.   Dr. Marino's seepage analysis shows that there was insufficient time for the floodwaters to seep below the sheetpile wall and affect the stability of the resisting soil mass for either the North or South Breach.  Having rejected his own seepage analysis in the ILIT study, Dr. Bea has unsuccessfully attempted to put together another seepage theory through speculation only to have Dr.Marino reject it through an analysis of the evidence.  Specifically, Dr. Marino found no evidence to support Dr. Bea's characterization of the EBIA excavations and, even assuming Dr. Bea's characterization to be true, Dr. Marino ruled out the underseepage as a cause.  *Marino Report*, PX-397, p. 6-64; *Marino Declaration 10/30/09*, PX-401, p. 4 section 8.

### 1.   <u>Top Soil Sink</u>

172.    In doing his analysis, Dr. Marino considered <u>all</u> the available soil borings to establish the soil layers in the vicinity of the breaches, compared to only select borings considered by IPET and ILIT, which resulted in less precise soil layering.  Dr. Marino concluded from the soil boring seepage analyses that multiple layers of thick "fill" exist below the ground level of the breaches.  *Marino Testimony*, 1109:6-1110:1.  This forecloses Defendant's underseepage theory because in order for the underseepage theory to be plausible, the floodwaters must seep below the sheet pile and affect the stability of the remaining soil mass.  In fact, Defendant's underseepage theory is not only unsupported by the evidence, it is contradicted by it.

173.    To account for Dr. Marino's conclusions as to the composition of the soil layers below the breaches, Dr. Bakeer theorizes in his supplemental report *for the first time* that a deep, granular sand fill at the North Breach extends from the ground surface below the tip of the sheet piles of the floodwall, forming a conduit for water to flow through from the IHNC to the vicinity of the floodwall.  *Bakeer May 11, 2010 Supplemental Report*, DX-313, p. 6.  Dr. Bakeer further hypothesizes that during Hurricane Katrina, the higher water level in the IHNC forced water to flow landward through the sand fill "conduit" essentially forming a sink that drained into the area of boring 81A, beneath the sheet pile tips, causing seepage and undermining the stability of the floodwall.  *Bakeer Testimony*, 2477:15-17.

174.    Notably, even Dr. Bea, who has long attempted to advance underseepage as the primary cause of the subject breaches, has never taken the position that Dr. Bakeer's "sink" is a

primary cause of NB or even that it existed. *Bea Testimony*, 2772: 4-8. And Dr. Bakeer, himself, did not arrive at his topsoil sink until after Dr. Marino provided his analysis of the subject borings. Dr. Bakeer's topsoil sink was not mentioned at all in his primary report, at least implying that the theory was contrived in response to Dr. Marino's findings.

175.    Not only is Dr. Bakeer's theory based on pure speculation but it is also scientifically invalid as admitted by him in *his* own May 11, 2010 report where he criticizes the quality of the MMG boring logs and the methods used. Dr. Bakeer states in this report that the boreholes "**were not intended for use any in geotechnical engineering analysis**" yet he uses them for that very purpose. *Bakeer Supplemental Report*, DX-313, p. 3. Dr. Bakeer then states in that report that the soil samples recovered from Plate 12 (boring 81A) were highly disturbed and not fit for geotechnical engineering analysis yet he makes conclusions based on those very samples. *Id*. at p. 4. Dr. Bakeer then criticized the boring logs by stating that although the logs indicate where fill was used they don't distinguish between sand fill and clay fill and he attached the logs for Plates 7,8 and 9 (boring 77A and 79A) to his report to illustrate that point. *Bakeer May 11, 2010 Supplemental Report*, DX-313, p. 5. Interestingly, attached to his report are the logs for Plates 11, 12 and 13 (boring 81A) which also do not distinguish the type of fill used. Despite this, Dr. Bakeer uses the boring logs to make conclusive statements regarding the permeability of the materials used without doing any sort of permeability calculation. *Bakeer May 11, 2010 Supplemental Report*, DX-313, p. 5; *Bakeer Testimony*, 2477: 13; 2479:3-4 and 19-20, 2481: 1-4. Finally, Dr. Bakeer concludes in his report that "**no inference could be made from the MMG documents relative to strength, density, or lateral extent of the fill**" yet he

utilizes those very MMG boring logs as a basis for his geotechnical engineering analysis and opinion. *Bakeer May 11, 2010 Supplemental Report*, DX-313, p. 5; *Marino Testimony*, 2381:4-2392:18; 2395:12-.2396:14)

176.    Dr. Bakeer then criticized the boring logs by stating that although the logs indicate where fill was used they don't distinguish between sand fill and clay fill.  He attached the logs for Plates 7,8 and 9 (boring 77A) to his report to illustrate that point.  *Bakeer May 11, 2010 Supplemental Report*, DX-313, p. 5.  Interestingly, attached to his report are the logs for Plates 11, 12 and 13 (boring 81A) which also do not distinguish the type of fill used.  Despite this, Dr. Bakeer uses both boring logs to make conclusive statements regarding the permeability of the materials used.

177.    Finally, Dr. Bakeer concludes in his report that "**no inference could be made from the MMG documents relative to strength, density, or lateral extent of the fill,**" *Bakeer May 11, 2010 Supplemental Report*, DX-313, p. 5, yet he does just that.

178.    The inconsistencies alone in Dr. Bakeer's testimony regarding boring 81A make his testimony invalid and unreliable.  Dr. Bakeer criticizes the quality and methods of the MMG boring logs as an attempt to undermine Dr. Marino's testimony and then uses *those very same logs* to support his "sink" theory.  *Bakeer Supplemental Report*, DX-313, p. 6.  Nonetheless, by his own admission, Dr. Bakeer's geotechnical engineering analysis is not scientifically valid and without merit.

179.    Notably, even Dr. Bea, who has long attempted to advance underseepage as the primary cause of the subject breaches, has never taken the position that Dr. Bakeer's "sink" is a primary cause of the North Breach, or even that it existed.  *Testimony of Dr. Bea*, 2772: 4-8.

180.    Dr. Bakeer, himself, did not arrive at his topsoil sink until after Dr. Marino provided his analysis of the subject borings.  Dr. Bakeer's topsoil sink was not mentioned at all in his primary report, at least implying that the theory was developed in response to Dr. Marino's findings.

181.    Significantly, Defendant's evidence does not establish that the 81A soil boring was bored at its original proposed location.  Dr. Marino testified that his team located the GPS coordinates set forth in the original 81A boring log and it was his opinion that the originally proposed location for boring 81A and the GPS coordinates given on the original boring log for boring 81A fell in the middle of a "valley" or "ravine" where it is impracticable for a drill rig to bore.  Dr. Marino's opinion is based on his review of the relevant documents admitted into evidence in this matter, including the 1969 and 1980 levee construction plans and "as built" drawings showing the relevant ground elevations.  *Marino Testimony*, 1240:1-8; 1437:8 to 1438:15; 1440:13-25; 1441:8-11; 1482:5; 1485:8; 1085:3-5; and 1087:16-25.

182.    As Dr. Marino testified, the documentary evidence showed that after the 81A boring log was created, subsequent boring information concerning boring 81A indicated that the boring location had been adjusted.  *Marino Testimony*, 1175:8-20; 1437:8-1438:15; *Marino Demonstrative*, PX-437, Slide 25.

57

183.     The defense had no response to this other than to say it was "adjusted" vs. "moved."  *Bakeer Testimony*, 2338:18 to 2339:11.  Dr. Bakeer admitted that he did not have at trial any authorities or documents to support this claim.  *Id.*, 2455:2 to 2456:1.

184.     Similarly, to the extent Dr. Bea contended that boring 81A's location was not altered, he ignored the undisputed documentary evidence that the boring location was adjusted. *Bea Testimony*, 2634:22 to 2635:14.  Therefore, Dr. Bea's testimony in this regard is speculative and baseless.

185.     The Court noted that the issue remained as to whether the GPS coordinates shown on the original boring log for 81A was a proposed GPS coordinates or the actual GPS coordinates.  2634:18 to 2635:14.

186.     Regardless, Plaintiffs have established through undisputed documentary evidence that the location of boring 81A was adjusted.  Defendants came forward with no credible evidence regarding the location of boring 81A, rendering their position pure speculation.

### 2.     The "Faulty Weld" Theory

187.     Dr. Bakeer stated that the North Breach initiated when a rusted and shorter 1966-68 sheet pile connected to a new and longer 1980 sheet pile tore under the water pressure on the flood side.  *Bakeer Report*, DX-205, p. 50.  According to Dr. Bakeer, the developed tear allowed floodwater to enter with the higher flow and concentration into the landside, consequently causing localized erosion of the soils deeper on the land side of the I-wall.

188.     However, Dr. Bakeer's faulty weld theory is not only unsupported by evidence (or the conclusions of any other investigator who has studied the North Breach), it conflicts with the

evidence in the record.

189.    *First*, Dr. Bakeer admitted at trial that he was not qualified to render such an opinion—that he "could not make an assessment about welding" since he was not a structural engineer or a metallurgist.  *Bakeer Testimony*, 2461:2-7.  Moreover, Dr. Bakeer's weld theory is based on speculation, as he admitted that he "did not inspect the sheet piles personally and take samples and test them in a lab."  *Id.*, 2461:10-11.

190.    However, even if such an evaluation were conducted, Dr. Bakeer's theory of a faulty weld cannot account for the fact that other areas of the floodwall outside of the North Breach were also composed of the same purportedly rusted interlocks and the same 1966-1968 sheet piles but did not tear under the water pressure on the flood side during Katrina.

191.    The sheet pile found at the North Breach had two tears.  However, Dr. Bakeer's "faulty weld" theory only accounts for one of those tears.  Dr. Bakeer has not provided an explanation for the second tear.  The more probable explanation is that a powerful localized force, such as that of Barge ING 4727, was the only differentiating factor resulting in the North Breach.

192.    Moreover, Dr. Bakeer makes much of the fact that the 1966-1969 sheet piles had been flattened and lost their shape at the North Breach.  *Bakeer Testimony*, 2316:10-17.  However, Dr. Bakeer's assessment of the sheet piles fails to acknowledge the "fan out" that all experts agreed occurred, or the fact that such fanning can cause a flattening of the sheet piles.  *Bakeer Testimony*, 2316:10-17; *Bakeer Report*, DX-205, p. 44, ¶ 2.  Indeed, some portions of the sheet piles at the North Breach fanned and therefore flattened to some degree and others retained

59

their shape.  *See*, *e.g.*, Photo, DX-108; *Bea Demonstratives*, DX-361, Bea slide 60; *Bea Report*,

DX-206, Appendix C, p. 17, Fig. 10a.

3. **Tension Cracks**

193.   Dr. Bakeer further theorizes that under the storm surge water pressure, a tension

crack (separation or gap) developed between the I-wall face and the embedding soil along the

flood side causing the I-wall to tilt or lean back into the landside.  Dr. Bakeer has not, and indeed

cannot, provide any evidence to show that the tilting was in fact due to water pressure on the

wall or due to the displacement of the wall as a result of a localized pressure. (*See, e.g*., Bakeer

Report, Figure 51).  In fact, Dr. Marino concluded that the time necessary to allow the water to

rise and deflect the wall was <u>not</u> sufficient to have created a significant tension crack.

194.   Thus, a powerful localized pressure, such as that from a barge pushing against the

floodwall, could account for the fact that the North and South breaches were the only locations

along the IHNC where the floodwall was completely exhumed.  Indeed, Dr. Marino concluded

that "when examining the floodwall damage it is apparent that a concentrated force was present

on the upper part of the concrete I-wall.  This conclusion was reached as the north end of the

sheet pile wall tore-off the still intact adjacent section from top down and the floodwall was

completely removed from the ground.  Exhumed sheet pile was not observed at other I-wall

breaches except the IHNC South Breach."  (*Marino Report*, PX-397 at p. 5-70).  Dr. Marino

further concluded that he observed tension cracks that were larger than those found by Dr.

Bakeer in areas of the floodwall that were not exhumed.  Accordingly, it is impossible to

corroborate that the displacement of the wall resulting in a tension crack was caused by the storm

60

surge water pressures, rather than a powerful localized pressure.

### 4. Underseepage and Marsh Layers

195.    Defendant's evidence does not support its underseepage theory.  Defendant's

theory is contingent on evidence establishing the accuracy of (1) _all_ of Defendant's claims

regarding the EBIA excavations; _and_ (2) _all_ claims regarding the Marsh layer.  If defendant fails

in either respect, their arguments regarding permeability, seepage and hydraulic effects all fail.

196.    As to underseepage, Dr. Bakeer's testimony on this issue is predicated solely

upon  the ILIT Report, and as such, is of no value whatsoever.  As even ILIT's co-leader, Dr.

Bea, has acknowledged, the seepage analysis done by ILIT ultimately was incorrect and

criticized in IPET as deceptive and labeled "garbage in garbage out":

> Q.  Now, what I want to direct your attention to—and I'm sure you read this—is that the IPET team found that, particularly with respect to the Lower Ninth Ward, your conclusions of July 2006—as part of the ILIT team, as co-leader of that team.
> A.  Yes.
> Q.  —are based on unrealistic and unproven permeability; fair?
> A.  Yes.
> Q.  And those led to faulty and deceptive analysis; fair?
> A.  Fair.
> Q.  And they called it "garbage in, garbage out"?
> A.  That's always fair.
> Q.  Quite strong, huh?
> A.  How they put it?  This is a strong problem, and it requires strong people and sometimes strong speech.
> Q.  And you—I'm not going to say you agreed with exactly their criticism, but you felt that you were wrong in your permeability analysis, and you adjusted that analysis; fair?
> A.  That's correct.

_Bea Testimony_, 2756:6-25.

197.    Yet, while Dr. Bakeer acknowledges that the ILIT seepage analysis is not

61

appropriate, he at the same time attempts to advance the theory.  *See Bakeer Report*, DX-205, at

p. 51. (stating that "[t]he EBNB was possibly the result of one or more of the underseepage-

induced mechanisms, possibly two or more acting in concert."); *Id.* (stating that "to the extent

these [ILIT underseepage] mechanisms were at work, they would have weakened the levee/wall

structure and hastened its failure.").  These statements are untested, unsupported speculation.

198.    Because, as Dr. Bea has acknowledged, the seepage analysis done by ILIT

ultimately was incorrect, Dr. Bakeer cannot now credibly rely on it.

199.    That leaves the Court with Dr. Bea's purported underseepage opinions.  However,

Dr. Bea's underseepage theories, throughout their evolution, have never been well-received.  As

co-leader of ILIT, Dr. Bea was criticized by the IPET team for his underseepage analysis and

resulting conclusions.  *Bea Testimony*, 2756:6-25; PX-244 and DX-145, IPET Vol. V, Appendix

17.

200.    Particularly, Dr. Bea and ILIT were criticized for using permeability (water

conductivity) figures that were too high.  *Bea Testimony*, 2733:2-6.  IPET concluded that Dr.

Bea's underseepage deductions were based on unrealistic and unproven permeability numbers,

leading to faulty and deceptive analysis.  In fact, IPET's characterization of Dr. Bea's data

calculations as "garbage in, garbage out," *id.*, 2756:17-18, reflect criticisms that Dr. Bea could

not dispute, and in fact, agreed with.  *Id.,* 2756:6-25.

### 5.    The EBIA Excavations Are a Necessary Element That Defendants Cannot Support

201.    Dr. Bea's theory of the causation of the North Breach also depend on the accuracy

of his contentions on the EBIA excavations.  This theory, too, is flawed.

202.    Specifically, Dr. Bea expanded his new underseepage theory to include the interaction of the marsh layers with EBIA excavations on the East Bank of the IHNC.  He asserted that the EBIA excavations were backfilled with semi-compacted imported sand.

203.    According to Dr. Bea, this "sand backfill" is highly porous and permeable, acting as a conductive layer for water seepage between the backfilled excavations and the naturally occurring permeable marsh and swamp layers below.  *Bea Testimony*, Tr. 2647:3-19.

204.    Dr. Bea's "sand backfill" contention is a necessary first element for his theory that underseepage was a primary cause of either breach.

205.    No evidence supports Dr. Bea's "sand backfill" contention.

206.    Further, Dr. Bea asserts that these EBIA excavations penetrated 10 to 25 feet below the surface, thereby intersecting with the underlying marsh deposits.  (*Bea Report*, DX-206, Appendix C, p. 37).

207.    The depth of the EBIA excavations and their intersection with marsh layer deposits is a necessary second element of his underseepage argument.

208.    There is no evidence supporting Dr. Bea's assertions on the depth of the EBIA excavations and their intersection with marsh layer deposits.

209.    Simply put, Dr. Bea circled around and used the very permeability numbers which IPET so strongly—and admittedly appropriately—criticized by breaking the marsh layer into two layers, one of which he incorrectly called peat.

210.    Dr. Bea then hypothesized that the interaction of the naturally occurring

63

permeable marsh layers with the "highly permeable sand" at the excavation sites significantly contributed to the seepage of water underneath the floodwall, resulting in its overall instability.

211.    Without the purported EBIA sandboxes, Dr. Bea cannot support his underseepage theory.  Otherwise, he would be left with the same admittedly "garbage in, garbage out" theory that he had as part of ILIT.

212.    As an initial matter, Dr. Bea admitted that he initially arrived at the underseepage theory independently of the EBIA excavations—a theory which he admits was wrong.  He considering only the impact of the EBIA excavations during the MRGO trial.  *Bea Testimony*, 2779:14-16.

213.    Dr. Bea's conclusions regarding the EBIA excavations are based entirely on speculation.  Specifically, Dr. Bea made five (5) assumptions that he had no basis to make: **(1)** that the soil in his pictures is the only backfill material used in the excavations; **(2)** that the soil in his pictures is sand – and a particular type of it since he assumes the permeability; **(3)** that the ultimate backfill that was used was semi-compacted; **(4)** that the soil has the permeability that Dr. Bea assumes; and **(5)** that the excavations were 25 feet deep.  While all five assumptions are necessary to his theory, as discussed below, none of them are true.

214.    Dr. Bea's only support for his conclusions regarding the backfill is "photographic documentation."  (*Bea Report*, DX-206, Appendix C, p. 50).  In other words, Dr. Bea based his "sand box" theory entirely on photographs at excavation sites.  Based solely on pictures, he concluded that the backfill used was (1) solely what was depicted in the pictures; (2) that it was sand; (3) that it was semi-compacted; and (4) that it had very high permeability.  In fact, Dr. Bea

determined its exact permeability (solely with pictures) – 10-1.  *See Bea Report*, DX-206, Table 8-1.  Indeed no tests were conducted to determine the exact composition of the backfill and no records have been provided to support the contention that semi-compacted sand existed at those sites.  *Bea Testimony*, 2645:7-12.

215.    In addition, no evidence has been provided that what was depicted in the photographs was even the only material that was used as backfill.

216.    Determination of the composition of the backfill material is critical in evaluating its unique permeability characteristics in order to support Dr. Bea's "sand box" theory.

217.    Dr. Bea's reliance on photographs to make all of these determinations is fatally flawed.  As a matter of fact, in direct contradiction to Dr. Bea, Dr. Bakeer admitted in his report that visual analysis performed by a geotechnical engineer even where it is of actual soil borings—as opposed to photographs—*cannot* be used to render geotechnical engineering opinions, as, visual analysis of alone departs from ASTM and other recognized standards.  *See Bakeer May 11, 2010 Supplemental Report*, DX-313, p.3, ¶ 2  ("Visual classification of the retrieved soil samples from the MMG boreholes does not follow ASTM and other recognized standards…."); *id*, p. 5, ¶ 4 ("I have concluded that no inference could be made from the MMG documents relative to strength, density or lateral extent of the fill materials placed within the EBIA").  In fact, at trial, Dr. Bea, himself, claimed precisely the same thing.  *See*, *e.g.*, *Bea Testimony*, 2784:9-14.  Yet, while both Drs. Bakeer and Bea claim that visual inspection of the soil itself is not reliable, Dr. Bea relied on photographs of soil.

218.    Furthermore, Dr. Bea's conclusion that the excavation sites reach depths of up to

25 feet, thereby interacting with the marsh layers below, is similarly uncorroborated. *Bea Report*, DX-206, Appendix C, p. 37.  At no point did Dr. Bea conduct physical measurements of the excavation sites nor can he support the dubious contention that the borrow pits reached the depth of the marsh layers.  Without such data, Dr. Bea's underseepage theory, in conjunction with the scant evidence available from the excavation sites, cannot survive.

### 6.   Hydraulic Uplift Pressures

219.    Dr. Bea hypothesized that hydraulic uplift pressure, that is, pressures in the underlying marsh-swamp layers blanketed by the overlying, much less permeable soils, could lead to "uplift forces" resulting in the destabilization of the flood protection structures at the North Breach. *Bea Report*, DX-206, Appendix C, p. 93.

220.    Dr. Bea's hypothesis regarding hydraulic uplift pressure is equally without any foundational support.  Although Dr. Bea documented hydraulic uplift at various locations, including the Dutch levee and the Midwestern flooding in 2008, Dr. Bea provided **no** evidence of hydraulic uplift at the IHNC. *Bea Testimony*, 2647:24 to 2653:19, and 2790:1 to 2791:1. Significantly, Dr. Bea admitted that no photographic documentation—indeed, no evidence at all—of the phenomena observed at non-IHNC sites existed at the IHNC during Hurricane Katrina. *Bea Testimony*, 2650:3-4 ("Q.  The thrust of the Ivan photo is to show that it hadn't happened earlier?  A.   That's correct.").

221.    Additionally, Dr. Bea testified that if seepage flows as a result of these hydraulic pressures are great enough to reach the surface of the soil, it develops into what is called a "sand boil." *Bea Testimony*, 2647: 6-18.  Dr. Bea stated that sand boils are "well known along the

Mississippi River levees." *Id.*, 2647:6-180.  Again, while Dr. Bea documented these at other

locations, sand boils were <u>not</u> found at the North or South Breach following Katrina, nor was Dr.

Bea able to provide any documentation of their existence at these locations.  *Id.*, 2791:2-10.

222.    Furthermore, according to Dr. Bea, uplift pressures produce "blowouts" that are

equal or larger than the overburden stresses, resulting in soil removal.  (Bea Report, Appendix C,

p. 113).  At trial, Dr. Bea testified that blowouts are physical manifestations of underseepage.

(Tr. 2791:23-2792:1).  Importantly, however, although Dr. Bea documented blowouts at the

London Canal, he did not find any evidence of blowouts at the IHNC.  Indeed, despite the fact

that the soil at the London Canal is far more permeable than that found at the IHNC, the

floodwall at the London Canal did not fall or get exhumed from the ground.  (Tr. 2675: 1-3).

This calls into question Dr. Bea's conclusion that soil permeability, underseepage and

accompanying hydraulic lift have an impact on a floodwall's lateral stability.

### 7.    <u>Seepage</u>

223.    Dr. Bea's opinions regarding seepage are not supported by any evidence, and in

fact, are premised on conflicting or contradictory statements.

224.    Dr. Bea explained that the effect of choosing to use a high permeability value for

the Marsh deposit, such as $10^{-3}$ (or "10-3") centimeters per second,[3] is to show water being

conducted through the layer much faster, and that this quick passage "allows the potential for

**underseepage** and water exiting at the levee toe."  *Bea Report*, DX-206, pp. 61-65.

---

[3] The scale shows more permeability as the exponent becomes smaller, and less permeability as the
exponent becomes larger.  $10^{-1}$ is more permeable than $10^{-3}$, and both are much more permeable than $10^{-8}$.

225.     The higher the permeability value chosen, the faster the seepage.  *Id.*

226.     Notwithstanding, defendants have not established a vertical permeability from the EBIA excavations or drainage canals, that would saturate the Marsh layer.  Dr. Bea testified that he modeled the permeability of the marsh, his "best estimate, at 10-4, to 10-5".  Pursuant to Dr. Bea's own report at 10-5 he would not have hydraulic uplift, blow out, sand boils, and he would not have seepage.  *Bea Report*, DX-206, pp. 61-65.  Thus, the admissions in Dr. Bea's own report contradict his trial testimony regarding the existence of hydraulic uplift or seepage.

### 8.     The Marsh Layer is Not Composed of Peat

227.     Another necessary element of Dr. Bea's failure analysis, even if he could support all of the other necessary elements, which he cannot, is that the Marsh layer is in fact highly permeable, so that it can act as a conduit for water below the floodwall.

228.     Dr. Bea contends that the Marsh layer is really made of two materials, and that one of the materials is highly permeable peat.  It may or may not be accurate that there are two materials, but there is no evidence that highly permeable peat is in the Marsh layer.

### D.     South Breach Failure Modes

### 1.     Dr. Bakeer is Simply Wrong on What Caused the Breaches

229.     As already discussed, Dr. Bakeer stayed clear of commitment to any theory by using speculative terminology.  His entire testimony is based on the breaches occurring at weak points in the floodwalls.  However, such an explanation is completely consistent with the barge acting as a principal or contributing cause of the breach because the very same weak links exist in places where the barge did not hit and the walls did not fail.

68

230.    Dr. Bakeer's errors of approach and application, discussed above as to the North Breach, often applied to the South Breach as well.

## 2.    Dr. Bakeer's Wall Height Theory Relies on Flawed Methodology

231.    Dr. Bakeer relied upon faulty vertical data to hypothesize about floodwall heights. Specifically, Dr. Bakeer theorized that as a result of long-term settlement due to variations in subsoil conditions, the wall heights at the South Breach were significantly shorter than the segments of the floodwall at other locations.  Dr. Bakeer concluded that as a result of these shorter wall heights, as compared to the remaining segments of the floodwall, the areas with lower wall height elevation were subjected to earlier splashing by waves, overtopping by storm surge water and initiation of landside scour.  *Bakeer Report*, DX-205, p. 41.

232.    As a preliminary matter, Dr. Bakeer provided absolutely no evidence to corroborate that greater settlement occurred at the site of the South Breach than at other segments of the wall that did not fail.

233.    In addition, and significantly, Dr. Bakeer's wall height calculations are fundamentally flawed and raise serious doubts as to the validity of his theory.  Specifically, Dr. Bakeer's conversion figures improperly double count for the settlement originally anticipated in the wall design, resulting in wall heights at the South Breach that are not only inaccurate but virtually impossible.

234.    First, to account for *localized* settlement originally anticipated in the wall design, Dr. Bakeer subtracted 1 foot at Mean Sea Level ("MSL") from the original floodwall design of 15 feet MSL, resulting in 14 feet MSL.  *Bakeer Report*, DX-205, p. 33.  Then Dr. Bakeer

converted this figure from MSL to NAVD88, by using the formula MSL – 2.5 = NAVD88.  This

resulted in a wall height of 14 feet MSL – 2.5, or 11.5 feet NAVD88.  *Bakeer Report*, DX-205,

pp. 32, 34-35.

235.    Dr. Bakeer's initial assumption as to settlement and his conversion from MSL to

NAVD88 are patently incorrect.  To begin with, Dr. Bakeer's  conversion formula (NAVD88 =

MSL – 2.5) is unsupported.   IPET calculated the following differences as to the IHNC

floodwalls, where "LMSL" means "Local Mean Sea Level":

> LMSL elevation differences in the IHNC were computed by NOAA using historical
> USACE gauge records. The approximate LMSL (1983-2001) difference from NAVD88
> (2004.65) is 0.2 ft ± 0.1 ft. The difference is approximately 0.6 ft for the later LMSL
> modified NTDE (2001-2005) as described in a previous section of this Volume.

*IPET Volume II*, PX-244 and DX-145, p. II-108.

236.    Dr. Bakeer contends that the "2.5" conversion figure accounts, either in whole or

in part, for anticipated "global" settlement of the floodwall.  *Bakeer Testimony*, 2494:4-9.

237.    Defendant's own measurement of the floodwalls contradicts Dr. Bakeer.

Specifically, after Katrina, Dr. Daggett surveyed the floodwall from the N. Claiborne Bridge to

the Florida Avenue Bridge.  *See Bakeer Report*, DX-205, unpaginated Figure 63, p. 113 of the

Acrobat file.  Dr. Bakeer relies on this survey in his own report.  The measurements range from

12.8 NAVD88 (either North or South of the South Breach) to 14 NAVD88.  This is despite the

fact that the walls had tilted to some degree as a result of Katrina.

238.    If Dr. Bakeer's conversion formula was correct, those measurements would

translate to 15.3 to 16.5 MSL—meaning that the floodwalls *would actually have had to have*

*grown* between 1969 and 2005.  Simply put, Dr. Bakeer's formula is incorrect even if it only accounted for local settlement—as opposed to "global" settlement.  Furthermore, Dr. Bakeer's distinction between global and local settlement clearly cause him to double count as that would mean that at locations where the I-wall was surveyed at 14 NAVD88, MSL would equal NAVD88.

239.    Additionally, Dr. Bakeer claims that the settlement was even greater than 11.5 NAVD88 since LiDAR data, an imprecise test used to determine settlement at the levee toe, indicates additional settlement of up to 2 to 4 feet at the levee toe.  *Bakeer Testimony*, 2492:9-16; *Bakeer Report*, DX-205, p.40; *Bakeer Deposition*, PX-345, 163:14 to 164:8.

240.    Dr. Bakeer admitted that he used the same LiDAR data that ILIT employed in 2000, and he remains unaware of which LiDAR points were used to determine the location of the levee toe nor whether those points match the points used in the 1965 measurements.  *Bakeer Testimony*, 2492:17 to 2493:11.  As such, Dr. Bakeer has no basis for his measurement of settlement of the levee toe, *if it occurred at all*.

241.    Further, Dr. Bakeer does not explain how measurement of the settlement at the levee toe translates into measurement of settlement at the top wall.  *Bakeer Deposition*, PX-345, 164: 9-16.

242.    Regardless, accounting for the LiDAR, Dr. Bakeer claims that the height of the floodwall at the site of the breaches was "much lower" than the original predicted final figure, resulting in a wall height between 11.5 NAVD88 and as short as 8.5 NAVD88.  *Bakeer Report*, DX-205, p.40.

243.     Basically, Dr. Bakeer claims that at the breach sites, the walls were up to 4 feet lower than what the Defense's own survey shows for the portions of the wall that did not fail. No other investigator has made such a claim, and with good reason, as such a claim is not supportable.  In fact, Dr. Bakeer admitted that there is no correlation between settlement of the levee toe and the floodwall:

> THE COURT:  Simply because the toe is different, doesn't mean that the height of the floodwall itself, just for the record, is different.
> THE WITNESS:  There are two different measurements.  They will not be equal because the settlement of the ground is not necessarily equal to the settlement of the floodwall.  But  it would reflect a lower -- generally, lower trend in the top of the wall as much as the ground.  But not—if it's 12 inches here, it's going to be 2 inches there, the answer is no.
> THE COURT: It's not directionally proportional?
> THE WITNESS:  That's correct.

*Bakeer Testimony*, 2326:12-23.

244.     Perhaps even more significant is the fact that Dr. Daggett's survey disproves any correlation.  Indeed, if there were a correlation between settlement at the levee toe and the top of the I-wall, such a correlation would be apparent with the portions of the wall which did not fail, and there is absolutely none.

### 3.     Dr. Bakeer's Theory Regarding the Particular Weakness of the Wall at the South Breach Is Without Merit, and Does Not Exclude the Barge

245.     Dr. Bakeer testified that the Southern Breach of the eastern IHNC occurred for the following reasons: **1)** the floodwall deviated from a straight line alignment at the precise limits of the breach, **2)** the presence of drainage canals on both side of the floodwall allowed for seepage, and **3)** the unique soil conditions that allegedly existed at the area of the south breach allowed for

72

the floodwall failure.  *Bakeer Testimony*, 2368:19 to 2370:2.  Dr. Bakeer's opinions regarding

the South Breach failure are without evidentiary basis.

### a.  The Asserted "Plain Strain" Problem

246.    First, Dr. Bakeer testified that because the flood wall deviated from a straight line

that there was a "plane strain problem" on the wall and that caused a change of stresses on the

wall in different directions, that these changes in alignment matched the precise limits of the

southern breach, and caused a weak link in the IHNC's eastern floodwall.  *Bakeer Testimony*,

2371:5-21.

247.    The problem with Dr. Bakeer's first argument is three fold: First, this was not the

only area of the floodwall that deviated from a straight line.  There is a significant deviation of

the floodwall, South of the Southern Breach at the IHNC.  *Bakeer's Demonstratives*, DX-356,

Slide 78; *Photo*, DX-12, LNA 758.  These show that both the scour trench and the wall curve as

it proceeds South towards the Claiborne Avenue Bridge.

248.    *First*, Dr. Bakeer incorrectly testified, without exhibiting any measurements, that

*Bakeer Demonstratives*, DX-356, Slide 78, and DX-12, LNA 758, shows how the scour trenches

are wider as they get closer to the breaches.  This seems intended to support his unsupported

argument that the levee walls were lower in the area where the breaches occurred.  Clearly, this

is a mischaracterization of what is shown in the photograph.  *Bakeer Testimony*, 2402:5-22.

Simply stated, the scour trench is more narrow because the further an object (i.e. the scour

trench) is in a photograph the smaller it appears, and the scour trench obviously appears smaller

the further away from the person shooting the photograph.  More importantly, **the wall**

73

**obviously curves** as one looks South in the photograph.  *Bakeer's Demonstratives*, DX-356, Slide 78; DX-12, LNA 758.  *See also* Marino's analysis of the flood wall heights.  *Marino Report*, PX-397, section 5.

249.    *Second*, any contention that the wall failed because of the deviation at the Southern most portion of the Southern breach is fails to take into account that all experts agree that this point is certainly a point where the barge hit the floodwall.  *Bakeer's Demonstratives*, DX-356, Slide 59; PX-397, photo 4.36; PX-437, *Marino Demonstratives*, Slide 178.

250.    *Third*, and importantly, both Drs. Bea and Bakeer testified that the South Breach failure was initiated at the apex of the bow shown in *Bakeer's Demonstratives*, DX-356, Slide 72, not in the location of Dr. Bakeer's asserted "plain strain" problem.  *Bakeer Report*, DX-205, Fig. 50, *Bakeer Demonstratives*, DX-356, Slide 72; *Bakeer Testimony*, 2400:24-2401:3; Bea.

### b.    The Asserted Drainage Canal Problem

251.    The second reason Dr. Bakeer gave for the levee failure at the South Breach is that the presence of drainage canals on both side of the floodwall allowed for seepage.  This is equally without basis.

252.    Specifically, Dr. Bakeer testified as follows: "*The canals were filled.  The quality of the material that was used to backfill these canals **could cause problems** if they were not placed properly and they were not selected properly; this **could** be a seepage problem*" *Bakeer Testimony*, 2375:19-24.  Again, Dr. Bakeer used speculative words such as "could" and "if." Anything "could" cause problems, particularly "if" not placed properly or selected properly.

253.    Defendant presented no credible evidence as to the material used to fill these

excavations or canals.

254. Dr. Bakeer's excavation hypothesis is grounded purely in speculation. Indeed, Dr. Bakeer acknowledges that "no information is available relative to the type and placement conditions of the material used to backfill the Jourdan Canal on the landside of the floodwall." *Bakeer Report*, DX-205, p. 43. In fact, Dr. Bakeer admitted during his deposition that he has never seen the quality control construction records to confirm the exact composition and the permeability characteristics of the "backfill." *Bakeer Deposition*, PX-345, 170:13-24. Further, Dr. Bakeer testified during his deposition that he has not seen any reports documenting underseepage prior to Hurricane Katrina. *Id.*, 186:13-19.

255. Indeed, Dr. Marino concluded that based upon transient seepage analyses, "there is essentially no effect of underseepage felt by the protection side subsoils." *Marino Report*, PX-397, p. 5-66.

256. Defendant did not provide any corroborating evidence to support Dr. Bakeer's theory that the material found at these locations accelerated the rate of underseepage at the North and South breaches, resulting in lateral instability of the floodwall.

257. Further, Dr. Bea's opinion on the issue of what materials were used to fill the canals prior to Katrina is that it is unknown. In fact, Dr. Bea admits in his report that he is unaware of the type of material used to fill the landside canal. Specifically, his report states: "[t]he landside canal was filled sometime in the 1990s (ILIT, 2006) with unknown materials." (*Bea Report*, DX-206, p. 12).

75

c.        **The Asserted Unique-Soil Problem**

258.    The third and final reason Dr. Bakeer gave for the failure of the South Breach is

the assertedly unique soil conditions that existed in the area of the South Breach.  *Bakeer*

*Testimony*, 2369:22-24.

259.    The problem with Dr. Bakeer's argument is that he states in his report that the

results of the soil boring performed by MMG for WGI "were not intended for any use in

geotechnical engineering analyses or foundation design of the floodwall or any other structure."

*Bakeer May 11, 2010 Supplemental Report*, DX-313, p. 3, second paragraph, second sentence.

260.    Dr. Bakeer states that the bore holes are shallow and do not provide sufficient

borehole information regarding subsoil stratification along the centerline of the floodwall, that

the application of SPT tests are questionable, particularly in the predominant soils at the site

(very soft and soft clays), that the other type of tests performed—using hollow stem augers—are

limited in sampling soft clays, and that visual classification is not a recognized method of

classification of soil and does not meet ASTM requirements.  *Bakeer May 11, 2010*

*Supplemental Report*, DX-313, p. 3, ¶ 2 to p. 5, ¶ 4, 1st sentence.

261.    Dr. Bakeer further stated that "in many cases the logs indicated no recovery or

samples were highly disturbed, and that the sampling protocol was consistent with environmental

sampling which was the object of the MMG study, but that **the study did not yield results**

**suitable for use in formal geotechnical engineering design and analysis."**  Dr. Bakeer

specifically stated: "**In view of the above, I concluded that no inference could be made from**

**the MMG documents relative to strength, density, or lateral extent of the fill**".  *Bakeer May*

76

*11, 2010 Supplemental Report*, DX-313, p. 3, ¶ 2 to p. 5, ¶ 4, 1st sentence.

262.    Notwithstanding Dr. Bakeer's admissions regarding the boring samples and further criticisms of the MMG/WGI borings noted in his report, Dr. Bakeer at the trial of this matter then utilized the MMG boring logs—and specifically boring log 25a—to do exactly what he said could not be done: he utilized the MMG boring  logs to give a geotechnical engineering analysis of levee strength and characteristics. *Bakeer May 11, 2010 Supplemental Report*, DX-313, p. 3, ¶ 2 to p. 5, ¶ 4, 1st sentence; *Bakeer Testimony*, 2381:4 to 2392:18; 2395:12 to 2396:14.

263.    Dr. Bakeer's analysis of the soil characteristic regarding strength of the levee is by his own admission without scientific value or merit.

### 4.    Overtopping and Scour Trenches

264.    According to Dr. Bakeer, overtopping and the resulting scour trenches played a significant role in the floodwall failure at the South Breach. *Bakeer Report*, DX-205, pp. 3, 54. Specifically, Dr. Bakeer theorized that early splashing due to wind and waves and overtopping occurred over the wall top particularly over low areas of the floodwall.  This initiated erosion and scour of the surface soils immediately behind the floodwall on the landside.  Dr. Bakeer believed that early splashing due to wind and waves and overtopping occurred over the wall top particularly over low areas of the floodwall.  *Bakeer Report*, DX-205, p. 54.  According to Dr. Bakeer, as the water level continued to rise in the IHNC and continuous overtopping began, a contiguous scour trench developed along the landside of the floodwall starting at the low areas (North and South Breach). The scour trench widened as overtopping continued and the wall

leaned further allowing the falling water to reach farther back into the landside. *Bakeer Report*, DX-205, p. 54.

265.    Dr. Bakeer's scour trench theory relies heavily on faulty vertical data that the floodwall top at the North and South breaches was much lower than the design grade. *Bakeer Report*, DX-205, p. 54.  As discussed in the section above on wall height, Dr. Bakeer provides no evidence, photographic or otherwise, to corroborate that the heights of the floodwall at the North and South Breach locations were shorter than other segments of the wall that did not fail, resulting in scour trenches.

266.    Additionally, Dr. Bakeer, Dr. Bea and Dr. Cushing each admitted that it is not possible to measure the size of any of the scour trenches at the South Breach site.

267.    In fact, it is wholly speculative to claim that any scour trenches existed at the South Breach since the trenches found at the South Breach were caused by displacement and not scour.  Photograph 4.58 of Dr. Marino's report clearly shows the distinguishing features of a displacement trench versus a scour trench. *Marino Report*, PX-397, p. 4-75.

268.    Further, Dr. Bakeer stated that overtopping at the South Breach began at approximately 7 a.m. to 8 a.m. *Bakeer Testimony*, 2488:18-22.  However, he also stated that he believed the South Breach occurred just after 6 a.m. *Id.*, 2488:15-17.

269.    Dr. Bakeer's projected sequence of events is illogical as Dr. Bakeer essentially alleges that overtopping, one of his asserted causes of the South Breach, did not occur until *after* the South Breach was fully developed.  Indeed, ILIT, of which Dr. Bea was a co-leader, concluded that scouring of the landside of the floodwall was not a significant factor that

78

contributed to the instability and ultimate failure of the floodwall at the North and South breaches. *Bakeer Testimony*, 2489:3-12. In fact, hydrographic data supports the finding that even after the breaches occurred, the water levels in the IHNC continued to rise with no subsequent impact on other areas of the floodwall. *Bakeer Report*, DX-205, Figure 18.

### E.   Dr. Bea Has a Motive and Goal, Adversely Affecting his Credibility

270.   Dr. Bea admitted in his September 14, 2009 deposition, PX-349, in this case that he had a personal interest in the causation of the North and South breaches of the East wall of the IHNC, and that this interest would have been frustrated by a conclusion that the barge was a cause of either failure.

271.   Dr. Bea testified that he had spent in excess of 10,000 unpaid hours in the investigation of the levee failures. *Bea Testimony*, 2610:2-6; *Bea Deposition*, PX-349, 23:16-20. He has produced five thousand pages of technical reports. *Bea Deposition*, PX-349, 217:2-5. He had never produced anything like that volume of work on any other matter. "This case has absorbed far more time, far more intensity, than any of the previous cases I have worked on." *Id.*, Tr. 217, lines 10-12. "This is the biggest one in my entire 56 years of engineering." *Id.*, 218:8-9. He explained that his motive in making this unprecedented effort was that "I care." *Id.*, 218:10-14. When asked to elaborate, he responded:

> A   This is the largest, most destructive, catastrophic failure of a civil engineered structure in the history of the United States, if not the world.
> I'm at the close of my career. One of the things I would like to do, as I close my career, is contribute what I'm able to contribute in ways of insight and information to those who will follow me. And that's because I don't want them to repeat the horrible collection of mistakes that we made in the causation of this catastrophe.
> I care.

79

*Id.*, 218:14 to 219:3.

272.   Dr. Bea agreed that, "to fulfill this goal," it is "necessary that the Corps of Engineers build flood wall protection systems differently in the future than it has in the past." *Bea Deposition*, PX-349, 219:11-16.[4] He testified that others on his Independent Levee Investigation Team had discussed this goal with him and that most of them shared it. *Id.*, 220:3-7.   Certainly, Dr. Professor Raymond Seed and Dr. Professor David Rogers shared that goal. *Id.*, 220:6-9.   He testified that these colleagues remained with him on what he called "***this caring trail of tears***." *Id.*, 220, lines 9-11 (emphasis supplied).

273.   Dr. Bea testified that he had spoken about his goals with investigators on other teams, and thought that they generally shared those goals. *Bea Deposition*, PX-349, 220: 12-17. Dr. Bea added that he could do more than the others: "Their ability to act on those kinds of goals are different than my abilities." *Id.*, 220:17-19.

274.   Dr. Bea was a principal expert witness for the defendant in this action.   None of the other original investigators is a principal expert witness for the defendant in this action.   Dr. Bea was also a principal expert witness for the *Robinson* plaintiffs, as shown in the November 18, 2009 Findings of Fact and Conclusions of Law (Doc. # 19415).   Dr. Bea can advance his goals as an expert witness, but to the detriment of a just result for plaintiffs.

---

[4] *Id.*, Tr. 219, lines 11-16.

275.    Dr. Bea admitted in his deposition in this case that his goal would have been frustrated by any finding that the barge broke the floodwalls on the East bank of the IHNC, or was a contributing cause:

> Q   If the barge had been a cause of the failure of the North Breach and/or the South Breach, that would interfere with those goals, wouldn't it?
> A   Yes.

*Bea Deposition*, PX-349, 220:21-24.

276.    Dr. Bea claimed in response to a question from defense counsel that his goal did not affect his investigation or conclusions, but then added language underscoring the importance of his goal:

> BY MR. RAFFMAN:
> Q    Professor Bea, in answer to the last question you gave, did any part of your analysis—of the issue of whether the barge had been a cause of the failure, was any part of your analysis or your scientific conclusions motivated by your desire to see that the levee system  improve?
> A   No.  It's the knowledge and background understanding that comes from these investigations.  So if we can portray that convincingly and logically to our younger colleagues, then hopefully they will not repeat our mistakes."

*Bea Deposition*, PX-349, 221:6-19.

### F.      **Dr. Bea Did not Seriously Analyze the Barge as a Cause or Contributing Cause of Either Breach, Because He Assumed It Could Not be There**

277.    Dr. Bea testified at trial that he examined the role of the barge "very intently."

*Bea Testimony*, 2595:10-14.  This was not the case.

278.    Dr. Bea's Report quoted the ILIT report he co-authored, recognizing that the Barge ING 4727 might have struck the floodwall multiple times.  After discussing the evidence of the barge's impact on the floodwall at the South end of the Southern breach, it quoted with

81

approval the ILIT report's statement: "*That does not mean that the barge might not have struck the floodwall twice (or more times) before finally impacting the southern end of the breach). . . .*"). *Bea Report*, DX-206, p. 13, ¶ 23.

279.    In his September 14, 2009 deposition, Dr. Bea admitted that a floodwall could fail if a barge hit it with sufficient force:

> Q . . . Is it your testimony that no matter how weak a levee supporting a flood wall may be, a barge striking it with any amount of force will not cause failure?
>
> MR. RAFFMAN:  Objection.
>
> THE WITNESS:  I would never render an expert opinion on a combination of factors that clearly would indicate I wasn't telling you the truth.  If that wall is weak enough, and if the barge is strong enough and hits forcefully enough it can cause failure of such a wall.

*Bea Deposition*, PX-349, 195: 7-17.

280.    Dr. Bea admitted in his deposition that it was "theoretically possible" but "implausible" for the barge to have pushed against the IHNC East floodwall, causing it to lean, and causing or speeding up the underseepage that he thought was one of the factors leading to the failures of the North Breach and South Breach.

> Q  My question is a very simple and direct question.  Can the barge create the problem?  Not whether the problem can arise independently, but can the barge create the problem?
> A  What is the problem?
> Q   The problem is making the wall lean, creating a gap underneath through which water can go, further weakening the wall.  That's part one of the problem.
> A   Theoretically it's possible.  Is it plausible in this case?  I don't think so."

*Bea Deposition*, PX-349, 90:7-18.

281.    Dr. Bea stated that it was "implausible" because he calculated that the wall could have failed without the barge, and because the barge would not have been there in time, and

because the presence of a school bus on the canal side of the barge meant that the barge would have had to "high jump" the school bus, and that this somehow proved that the barge was not there in time.[5]  Dr. Bea was a slow and halting witness, intensely attempting to avoid answering the question, and thereby casting doubt on his own credibility:

> Q   That's fair.  That's fair.  I don't want you to guess.
> You referred to this section of wall as "flapping like a ribbon."  How much weight was there in that section of the wall?
> A   Well, I'd have to do the calculations to answer that, and could, since steel and concrete have known weight.  But it's not the weight in the section that solely determines how the section behaves.  Water, with the density of 600/800 times of air, is a tremendous forcing   function.  And so it can easily get under this heavy section, flip it and twist it.  And at least in my ocean engineering experience, now spanning 56 years, we have seen repeated instances of this kind of destructive action from water acting on very, very heavy structures.
> Q   Have you seen repeated instances of these adjacent sections pointing in different directions or is that unique there, too?
> A   This is unique to New Orleans North Breach, north end.
> Q   And if something causes part of the wall to lean, it's much easier for water to get underneath, isn't it?
> MR. RAFFMAN:  Objection.
> THE WITNESS:  To get underneath what?
> MR. SEYMOUR:  Underneath the flood wall.
> THE WITNESS:  Yes.  That's a crack, tension crack.
> BY MR. SEYMOUR:
> Q   And if a barge pushes the wall so that it leans, the barge then makes it much easier for the water to get underneath and for the wall to then fail the rest of the way, doesn't it?
> MR. RAFFMAN:  Objection, improper hypothetical.
> Go ahead.
> THE WITNESS:  If you are referring to this case, in this scenario, the answer is

---

[5] *Id.*, Tr. 88 line 4 to Tr. 93 line 23.  Dr. Bea's admission it was theoretically possible that the barge could cause or contribute to underseepage and thus wall failure was at Tr. 90 lines 7-18: "Q   My question is a very simple and direct question.  Can the barge create the problem?  Not whether the problem can arise independently, but can the barge create the problem?  A   What is the problem?  Q   The problem is making the wall lean, creating a gap underneath through which water can go, further weakening the wall.  That's part one of the problem.  A Theoretically it's possible.  Is it plausible in this case?  I don't think so."

the wall was leaning very, very early that morning due to the rising surge waters.  Once the water is able to get of the order of two feet above the earthen crown of the supporting soil levee, it begins to incline.  And because the sheet pile are rigid relative to the soil, that inclination propagates   directly to the bottom of the sheet piling.  It's like working a shovel; where you are trying to open a clod of dirt with a shovel and you push the handle over, a little bit of push of that handle propagates a crack, always at the bottom of the rigid shovel.

BY MR. SEYMOUR:

Q    And a barge pushing against a wall is going to speed that up a great deal, isn't it?

MR. RAFFMAN:  Objection.

THE WITNESS:  Well, if it's already present and it's at the bottom, the barge doesn't matter.

BY MR. SEYMOUR:

Q    I'm not positing a wall that's already fallen down.

A    I'm not either.  The wall is inclined.

Q    And the barge hitting against it is going to make it more inclined, isn't it?

A    No.  The initial inclination in the manner I described is sufficient to crack—to open a tension crack to the bottom of the sheet pile.  You do not need a barge.

Q    I'm sorry.  My questions don't relate to whether you need a barge—

A    Okay.

Q    —my questions do not relate to whether it is conceivable that the thing might have happened without the barge.

A    Right.

Q    My question is a very simple and direct question.  Can the barge create the problem?  Not whether the problem can arise independently, but can the barge create the problem?

A    What is the problem?

Q    The problem is making the wall lean, creating a gap underneath through which water can go, further weakening the wall.  That's part one of the problem.

A    Theoretically it's possible.

Is it plausible in this case?  I don't think so.

Q    And why do you say that?

A    Well, because we investigated the performance of both the North and the South Breaches and they breach without a barge, so the barge didn't ever need to leave the Lafarge terminal.

Q    That's what I just said.

 A    Okay.

Q    My question does not have to do with whether—

A    Then we're in agreement.

Q    —with whether it is conceivable that the breaches can occur without a barge.

84

That's not my question at all.

    A   Okay.  I misunderstood it.

    MR. RAFFMAN:  Well, I think you're now—

    BY MR. SEYMOUR:

    Q   Because—because perhaps other people might think it's conceivable that it would occur without the weight of the water and only the barge.

    My question to you is, sir:  If the barge is adrift in the canal, and if the barge is being pushed by any combination of wind and water up against the flood wall, is that not a force that will help to push the wall down and create a gap underneath?

    MR. RAFFMAN:  Objection, he's answered that question.

    Go ahead, answer it again.

    THE WITNESS:  Let's go to the South—

    MR. SEYMOUR:  Objection to coaching.  Please continue.

    THE WITNESS:  Let's go to the South Breach.

    BY MR. SEYMOUR:

    Q   I'm asking a hypothetical question about any barge hitting against a flood wall in the
Inner Harbor Navigational Canal.  It's not specific to place—

    A   Right.

    Q   —it's just a simple question of physics.

    A   It may be a simple question of physics to you, but it's a practical exercise in understanding the mechanics that can lead to failure and breaching.  And that's why I said, take for example the South Breach.  We know the barge impacted at the south end of the South Breach.  The rubbling, the rust streaks left as signature features on the flood wall, the features that, at least I could observe personally on the barge, says it was there.

    But that wall had failed before the barge ever got there.  And so the barge exerting additional prying forces, et cetera, played no substantial role in the evolution development of the breach.

    Q   How do you know that?

    A   Well, for one thing, a barge couldn't have gotten where it got unless it played high jump over that school bus.  The water had to be above the top of the school bus, which means I got water at the elevations that we think are inside the Lower 9th Ward at 8:00 to 9:00 a.m.

    But the breach was developed at 7:00 to 8:00, based on all of the mechanics that we can mobilize that allows water in, allows the barge to impact the south end of the breach, and force its way in, float over the top of that school bus, not performing a high jump, and as the water recedes, goes down and that's where we found it.

    Q   Are you talking about the barge being on top of the school bus?

    A   No.  It had to high jump the school bus because it was found on a protected east side of the school—

    Q   Finish your answer.

> **A**    —it was found on the east side of the school bus.  It didn't come to rest on the school bus until Hurricane Rita.

*Bea Deposition*, PX-349, 87:7 to 93:23.

282.   Dr. Bea's analysis was actually based on the sufficient-imagination model, rather than the scientific model.  As to his certainty that the floodwalls failed without the barge, Dr. Bea's analysis of causation was that factors other than the barge *might* have caused the failure of the floodwalls at the North and South Breaches independently of the barge, that the other factors therefore *did* cause the North and South Breaches independently of the barge, and the barge was therefore "*proven*" not to have been a cause of the failures.  His Report put it exactly that way:

> 65. <u>The forensic investigations indicate that if the ING 4727 cargo barge had remained moored at the Lafarge Terminal, the North Breach and South Breach at the Lower 9th Ward would still have developed during Hurricane Katrina</u>.  That is, conditions during Hurricane Katrina were clearly sufficient to cause the IHNC floodwall failures—and did cause those failures—without assistance from the ING 4727 cargo barge.

*Bea Report*, DX-206, p. 57, ¶ 65 (emphasis in original).

283.   Dr. Bea's investigation was limited to what he considered the *primary* causes of the North and South Breaches.  His Report stated: "Section III summarizes the *primary* reasons for causation of the North Breach and South Breach at the Lower 9th Ward that developed during Hurricane Katrina."  *Bea Report*, DX-206, p. 1, ¶ 2 (emphasis added).  It stated that the "cumulative adverse effects" of the MRGO "were a *primary* cause for the failure of the man-made flood protection structures along Reach 2 of the MRGO," including those "that defended the eastern perimeter of the Lower 9th Ward – St Bernard 'polder'."[6]  *Id.*, pp. 23-24, ¶ 31

---

[6] *Id.*, pp. 23-24, ¶ 31.  *See also* p. 24, ¶ 32.

(emphasis added).  *See also* p. 24, ¶ 32.  Dr. Bea discussed independent investigations of "the '*primary* mechanisms' participating in development of the North and South Breaches at the Lower 9th Ward."[7]  *Id.*, p. 51, ¶ 58.

284.    Dr. Bea's Report quoted the ILIT report he co-authored, concluding that the barge was not a cause of the South Breach because "*there are other modes of failure that would have been expected to fail this section without any need for help from the barge, so that the likelihood is that the barge slipped its moorings and was eventually drawn in through a breach that was already well developed.  Bea Report*, DX-206, p. 13, ¶ 23 (underline added for emphasis)."  He quoted another section of the ILIT Report, stating: "*this section would have been expected to fail without barge impact.*"  *Id.*, at p. 16, ¶ 28.  He quoted yet another section, stating: "*this section would have failed without barge impact.*"  *Id.*, at p. 16, ¶ 27.

285.    Notwithstanding Dr. Bea's emphasis on the "primary" causes of the breaches in question, and his admission that the other investigations focused on the primary causes of the breaches, his Report overstated their conclusion as being that "the cargo barge ING 4727 did not play any substantial role in development of these breaches and did not cause any flooding."  *Bea Report*, DX-206, p. 52, ¶ 59 (emphasis in original).  *See also* p. 57, ¶ 64.

286.    Dr. Bea's conclusion that the Barge ING 4727 could not have caused either the North breach or the South breach was based on the assumption that the barge could not have become loose before 9:00 A.M. on Monday, August 29, 2005, and that there was not enough

---

[7] *Id.*, pp. 51, ¶ 58.

wind or waves to move the barge to the East side of the IHNC before 9:00 A.M. on Monday, August 29, 2005. *Bea Report*, DX-206, pp. 13-14, ¶ 24: "It was during this phase that we learned that the ING 4727 barge had been moored at the Lafarge terminal on the west side of the IHNC opposite the location of the North Breach. Examination of the wind velocity and direction records in the USACE IPET report indicated that until about 9:00 – 10:00 am (CDT), the wind direction in this area was not such that the barge could be driven by the wind across the IHNC to either of the breach locations (IPET 2007). The forensic engineering analyses indicated this time was well after the two breaches had fully developed and thus the barge could not have participated in the development of the breaches." See also pp. 56-57, ¶ 64 ("Given that the cargo barge ING 4727 most probably was able to break from its moorings at the Lafarge Terminal on the west side of the IHNC as of 9:00 am (CDT) (Cushing 2009), and that the North Breach had fully developed on the east side of the IHNC as of 5:00 am (CDT) and the South Breach had fully developed as of 7:00 to 8:00 am (CDT), then the ING 4727 barge could not have played any substantial role in development of either of the breaches at the Lower 9th Ward. In any event, regardless of the time of the breakaway, the forensic engineering evidence and breach development analytical results indicate the barge was not a substantial contributor to either of the breaches.") (underlining in original). The source identified as "Cushing 2009" is identified in the list of references on p. 68 of Dr. Bea's Report as "Cushing (2009). 'Analysis of the Transit of the Barge ING 4727 During Hurricane Katrina and Reasons Why It Did Not Cause the Failure of the Inner Harbor Navigation Canal Floodwall,' Project No. 2581, C.R. Cushing & Co., Inc., NY." This is Dr. Cushing's Report in this litigation, DX-196.

88

287.    This assumption is contrary to eyewitness testimony. *Leblanc Testimony*, 369:1-7 (left home to evacuate between 11:00 and 12:00 Sunday morning), 370:16-20 (saw the barge in the IHNC), and 372:2 to 375:2 (describing the barge and its location); *Tompkins Testimony*, 391:14 to 394:25 (left home to go to church at 9:30 to 10:00 A.M. Sunday morning, left church about 10:20 A.M., and saw the barge on the way back), 395:5 to 399:16 (describing the barge).

288.    Dr. Bea admitted in his deposition that his "forensic" investigation of the causative role of the barge was first to assume that the barge played no role, and then to examine what factors other than the barge could have played a role, and then to decide that the other factors played an exclusive role:

> Q   Dr. Bea, you testified just a moment ago that it would not have been possible for a barge to have caused the North Breach or the South Breach under any conditions. Do I have it right, under any conditions?
> A   No.
> Q   Okay.  Could a barge have caused the damage that you observed on the North Breach?
> A   No.
> Q   No?
> A   No.
> Q   No.
> A   And I documented the reason why.
> Q   Tell me the reasons.
> A   The reasons concern our forensic engineering studies of the development of the North Breach.  Those studies converge on a primary causative element related to the discussed/ identified seepage, hydraulic effects and lateral instability effects.
>     Other information in the vicinity of North Breach lead to the conclusion that the barge wasn't there and couldn't have been there.
>     And so the barge does not enter my expert opinion as a causative/contributing/ participating element in the case of North Breach.
> Q   Would it be fair to say that your answers to Mr. Raffman's question mean that once you have already ruled the barge out of consideration it could not possibly have caused any damage?
> A   At the North Breach?

89

Q    Yes.
A    That is correct.
Q    Okay.  Is your answer the same with respect to the South Breach?
A    Yes, for very similar reasons.

*Bea Deposition*, PX-349, 225:10 to 226:22.

289.    Dr. Bea testified similarly at trial as to the school bus.  *Bea Testimony*, 2685:16-24.  He described the school bus as "a source of great joy."  *Id.*, 2683:22-24.  He stated on cross-examination that he did not think the school bus had been moved by the currents because its heels were deeply embedded in the mud, but did not explain whether he had any basis but assumption for his opinion that the bus's wheels were deeply embedded before the storm and it had just gotten stuck there on its own.  *Bea Testimony*, 2792:9-19.

290.    As to the school bus, Dr. Bea's Report did not address why he assumed that the school bus was an immovable object on the ground while the far more massive barge was floating, or why the school bus could not have floated into its post-Katrina location and sunk when waterlogged after the barge had passed that area, with its wheels becoming embedded after it sank.  Dr. Bea did not examine his own key assumption in his deposition or in his trial testimony, let alone perform a forensic examination; he just indulged in his speculation.

291.    Dr. Bea testified in his deposition that he was unable to answer whether winds in excess of 100 miles per hour could possibly have brought the barge into contact with the flood wall and caused a breach.  *Bea Deposition*, PX-349, 66:3-23.  "I would have to speculate to answer."  *Id.*, 66:22-23.  Nevertheless, he found no difficulty in ruling out the barge as a cause of either breach.

G.      **Dr. Bea's Conclusions as to Barge Impacts Elsewhere Are Based on Speculation**

292.    Dr. Bea's Report referred to other instances of barges hitting floodwalls that survived, and drew the general conclusion: "Based on these forensic engineering observations and analyses, the conclusion is if a barge strikes a floodwall that is not already failing for independent reasons, then the barge impact is not sufficient to cause a failure and breaching should not be expected to occur." *Bea Report*, DX-206, p. 57 ¶ 66.

293.    In Dr. Bea's deposition, however, he admitted that he had not studied the strength of the levees in those other barge-impact situations. *Bea Deposition*, PX-349, 94:14 to 96:18.  In the critical part of this testimony, he stated:

> Q   And did those flood walls, where the barge did not create a breach, exist where the levee was as weak as it was in the Inner Harbor Navigational Canal?
> MR. RAFFMAN:  Objection.
> THE WITNESS:  I cannot answer that question because I have not studied, quantitatively, the soil characteristics under all of the locations where we experienced barge impact with concrete I-walls.

*Id.*, 94:23 to 95:7.

H.      **Dr. Bea's Conclusions as to the Lack of Physical Evidence of the Impact of Barge ING 4727 at the North and South Breaches, Except as to the Extreme Southern End of the South Breach, Are Unfounded**

294.    Dr. Bea testified at trial that he examined the floodwall at the North Breach, and saw no physical evidence that the barge had come into contact with the floodwall:

> Q.  You examined this -- the floodwall, the sheet pile in the entire area of this north breach, right, Dr. Bea?
> A.  That's correct.
> Q.  Did you see any evidence that a barge had—
> A.  I saw no evidence—

> Q.  Let me finish my question.  Did you see any evidence that a barge had come into contact with that floodwall?
>
> A.  I did not see any evidence a barge had come in contact with this floodwall.

*Bea Testimony*, 2683:13-21.

295.    Dr. Bea's Report repeatedly referred to the lack of physical evidence of the impact of the barge on any of the floodwalls other than at the South end of the South breach — where the barge admittedly pulverized part of a floodwall and bent rebar — as evidence that the Barge ING 4727 had not struck any other part of the floodwall.  *Bea Report*, DX-206, p. 10, ¶ 21 (clear barge impact on floodwall at South end of South breach); *id.*, p. 12, ¶ 23 (quoting ILIT Report to same effect and stating this was "one single section of wall"); *id.*, p. 14, ¶ 24 (quoting NIST Report about barge impact on floodwall at South end of South breach); *id.*, p. 15, ¶ 25 (quoting Team Louisiana report on same impact); *id.*, p. 16, ¶ 27 (quoting ILIT Report as saying "*The south end of the breach (Figure 3) was the only location where the concrete floodwall, and its rebar, were crushed by compressive impact.*") (italics in original); *id.*, p. 16, ¶ 28 ("'*In addition, a large dent on the left side of the barge, near the bow, and a scrape on its base at that location, appeared to correlate well with the south end impact site shown in Fig. 10. . . . It was concluded by this investigation that the barge was most likely drawn in through a breach that was already open, and that it impacted at the extreme south end of the breach as it passed inland through the (already open) breach.*' (underline added for emphasis).");  *id.*, p. 54, ¶ 62 ("Whereas most of the concrete floodwall was failed in extension and flexure, there was one single section of wall which clearly evinced a major impact, and that was the extreme southern end of the breach.  The rebar is compressed and bent (Figure 22), and the concrete crushed at this location

(Figure 23).  It is important to note that forensic engineering examinations of the concrete panels at the North Breach did not disclose any evidence of local barge impact features such as were found at the south end of the South Breach."); *id.*, p. 55 ("Figure 22: View of crushed – impacted – concrete floodwall at the south end of the south breach at the east bank of the IHNC at the Lower 9th Ward. Scraping motion of barge over top of floodwall results in reinforcing bars pointing in direction of final location of ING 4727 cargo barge."); *id.*, p. 56, ¶ 63 ("As this was the extreme southern end of the very long breach, available evidence and analyses indicate that this impact was not the cause of the breach and failure (ILIT 2006; Team Louisiana 2007; USACE IPET 2007).  Instead, the barge was apparently traveling southwards along the IHNC (driven by the prevailing storm winds at that time) and was drawn into the breach by the inflowing waters. The barge did not enter cleanly into the breach, but struck at the south end before passing in.").

296.    Dr. Bea testified in his deposition to the same effect.[8]  *Bea Deposition*, PX-349, 72:10-17 ("We used photographic information to help us arrive at that conclusion, photographs that showed that the barge plausibly  could not have contacted the wall.  We used our forensic engineering experience, that is on site examining the flood wall detailed characteristics at the North Breach.   There were no signs of barge impact, general or local."); 141:4-17 (after

---

[8] Tr. 72 lines 10-17 ("We used photographic information to help us arrive at that conclusion, photographs that showed that the barge plausibly  could not have contacted the wall.  We used our forensic engineering experience, that is on site examining the flood wall detailed characteristics at the North Breach.  There were no signs of barge impact, general or local."); Tr. 141, lines 4-17 (after admitting that wind and water conditions and whether the barge was adrift earlier than he thought were important, stating at lines 13-17: "But if the flood wall itself shows no signature at that time, that primary play by the barge in the formation of the breach, then it doesn't figure prominently in drawing conclusions.").

admitting that wind and water conditions and whether the barge was adrift earlier than he thought were important, stating at lines 13-17: "But if the flood wall itself shows no signature at that time, that primary play by the barge in the formation of the breach, then it doesn't figure prominently in drawing conclusions.").

297.   After first denying that there was any rubble and claiming that the downed floodwalls at the North Breach were intact for examination, he admitted that there were a lot of concrete chunks lying about, that had been pulverized.  *Bea Deposition*, PX-349, 75: 2 to 76:4.

298.   Dr. Bea's first observation of conditions in the areas of floodwall failures was on September 29, 2005, a full month after Hurricane Katrina and after Hurricane Rita had occurred. *Bea Report*, DX-206, pp. 9-10; *Bea Deposition*, PX-349, 110: 21-24.

299.   Some remediation work had already been done, creating a defensive berm, *Bea Deposition*, PX-349, 111:3-5, and that "to facilitate the construction of the repair berm on the Industrial Canal side of the flood wall at the South Breach, they had constructed a rock earthen access ramp.  That ramp went over part of the breach site."  *Id.*, 111:12-17.

300.   These changes interfered with the ILIT team's ability to make observations, burying a flood wall panel, filling holes with fallen floodwalls, and obliterating evidence of what had happened during Hurricane Katrina.  *Bea Deposition*, PX-349, 111:18 to 112:8.

301.   While it was possible to obtain information about what type of fill had been used and what had previously been in some of the holes near the breach sites, there was no testimony suggesting that the buried floodwall elements had been made accessible to inspection.  *Bea Deposition*, PX-349, 112: 9 to 113:13.

302.    Similarly, much of the levee in the South Breach had been washed away when Dr. Bea conducted his examination.  *Bea Deposition*, PX-349, 102:1-20.

303.    Dr. Bea admitted that he did not arrange to turn over any of the remaining floodwalls that had been buried at the time of his inspection, that he did not arrange to turn over any rubble he did not personally move, that no one on the ILIT team had done so, that he thought Dr. Cushing's report might have included examinations of what he and his team could not see:

> Q   Prior to the removal, are you aware of anyone who examined all faces of the rubble to see whether there were signs of the barge impacting that wall?
> A   I'm aware of some experts that were able to examine faces of the concrete wall and panels that we could not access.  That documentation has been included primarily in Mr. Cushing's expert report.

*Bea Deposition*, PX-349, 78:19 to 79:2.

304.    While Dr. Cushing's Report was cited as one of Dr. Bea's sources, this was only as to the movement of the barge.  *Bea Report*, DX-206, p. 56, ¶ 64; p. 68 (list of references).

305.    Dr. Cushing's Report does not include any discussion of the inspection of floodwall segments or rubble greater than that described by Dr. Bea, other than to indicate the distribution of debris in the debris field.  *Cushing Report*, DX-196.

306.    Dr. Bea admitted in his deposition that otherwise he did not know of anyone on any team who made such arrangements, to inspect such fragments and see what evidence of barge impact might lie on their undersides.[9]  *Bea Deposition*, PX-349, 76:5 to 79:2.

---

[9] Plaintiffs' Exhibit 2, September 14, 2009 Deposition of Dr. Bea, Tr. 76 line 5 to Tr. 79 line 2.

307.    Dr. Bea's Report contains no reference, when he discusses the lack of physical evidence on the floodwalls of a barge impact, to the fact that he could not see numerous floodwall panels in the areas of the breaches that might have contained such evidence, or the fragments that might have contained such evidence.  *Bea Report*, DX-206.

## I.    <u>The Pole in the Water</u>

308.    A utility pole stands on the IHNC side of the North Breach.  DX-106 and DX-263.  *Marino Report*, PX-397, p. 4-7, Photo 4.6.

309.    Dr. Gennaro Marino testified that he had had one of his engineers plot the distance from the pole to the North Breach and concluded that there was ample room for the barge to have collided with the floodwall at the site of the breach without colliding with the pole.  1349:12-25.

310.    Arthur Guidry measured the distance from the telephone pole to the East floodwall of the IHNC, and found the perpendicular distance to be 88 feet and 10 inches and the distance at a 45-degree angle to be 125 feet.  PX-456.

311.    Defense counsel expressed great scorn at the idea of a 200-foot barge sneaking "around the pole" to cause the breach:

> Q.      You want to tell the Court that one of your engineers has done some calculation to say that a 200-foot barge can sneak around that pole to get into that breach under the forces of what plaintiffs' experts have called unpredictable wind and unpredictable waves?  Do you want to tell the Court that?

1366:10-14.  Such scorn is neither evidence nor remotely persuasive, in light of the fact that the barge is only 35 feet wide, according to defendant's own expert, Dr. Cushing.  *Cushing Report*,

DX-197, p. 23.

## V. __Meteorological Evidence__

### A. __Comparison of the Experts__

312.     Plaintiff's expert, David L. Mitchell, Ph.D., has a Bachelor of Science degree in both Mathematics and Physics in 1972 from Baylor University, a Master of Science degree in 1974 from Purdue University, and a Ph.D. in 1976 from Purdue University in Atmospheric Science and Meteorology.  His Ph.D. thesis was on mesoscale phenomena: their genesis and development, their enhancement with convection, and their interaction with other systems. *Mitchell Testimony*, 920:1-13.  He has provided expert testimony in hundreds of cases involving Hurricane Katrina in which it was necessary to use data from the National Weather Service to determine whether the damage at issue was caused by wind or by storm surge.  *Mitchell Testimony*, 921:9-16.  His litigation analysis and testimony includes all types of cases in which reconstruction of weather conditions is necessary.  *Id.*, 922:12-21.

313.     Dr. Mitchell has worked as a practicing meteorologist, not as a teacher.  He has not taken courses or obtained any certifications as a radar technician to operate a Doppler radar, but has read every journal of the American Meteorological Society on the updates of radar.  He understands Doppler radar and its processes completely.  He has had a practical focus, not the academic focus of writing papers and giving presentations.  *Mitchell Testimony*, 1017:6 to 1019:6.  Nothing in this case called for academic skills, as opposed to practical skills.At the time of his deposition, Dr. Mitchell was familiar with the fact that there are several algorithms and commercial products available for interpreting radar, but did not recognize the acronym "GR2ANALYST."  *Mitchell Testimony*, 1019:7-20.

98

314.    Dr. Mitchell never worked for the National Weather Service, did not develop Doppler radar and algorithms, has not used Doppler radar to issue warnings, is not a forecaster, and has not taught anyone how to issue warnings.  *Mitchell Testimony*, 1019:21 to 1020:7. Nothing in this case called for any such skills.

315.    Dr. Mitchell regards the people who developed the mesoscale and tornado vortex algorithms on which he relied as qualified to use Doppler radar for those purposes.  He talks to the people at the National Climatic Data Center that archive and ensure the quality of these products, and has relied upon them for his thirty years of forensic work.  *Mitchell Testimony*, 1020:8-16.

316.    Dr. Mitchell has a library of information on Doppler radar and its interpretation that is much more sophisticated than the information on the NOAA government web site, although the NOAA web site is a good resource for persons trying for the first time to learn something about the field.  *Mitchell Testimony*, 1020:18 to 1021:20.

317.    Leslie Lemon is a meteorologist employed by the University of Oklahoma in its Cooperative Institute in Mesoscale Meteorological Studies.  He is assigned to the Warning Decision Training Branch of the NOAA National Weather Service, where he teaches meteorologists how to make forecasts and give warnings.  *Lemon Testimony*, 1710:5-11 and 1794:7-16.  He is not a manager there.  *Id.*, 1794:17-19.  He is an associate meteorologist, not a meteorologist.  *Id.*, 1794:20-21.

99

318.    Mr. Lemon went to Kansas City Junior College, then spent one year at Kansas University and two years at the University of Oklahoma.  He received a Bachelor's Degree in Meteorology from the University of Oklahoma in 1970.  He worked in the radar room during college.  He left graduate school in his first semester to join the NOAA Commissioned Corps, as an alternative to the Vietnam-era draft.  *Lemon Testimony*, 1710:24 to 1711:23 and 1791:10-12.  He never returned to school.  *Id.*, 1791:13-14.

319.    Since Mr. Lemon left school, he has not taken any courses in meteorology, mathematics, or physics.  *Lemon Testimony*, 1791:15-21.

320.    Mr. Lemon has never taken any courses in the operation of Doppler radar, although he teaches Doppler radar to weather forecasters, has attended some seminars on the latest developments, and researches in the area.  *Lemon Testimony*, 1791:22 to 1792:17.  He worked on the design and development of the WSR-88D radar.  *Id.*, 1712:12 to 1715:2.

321.    Mr. Lemon's professional focus has been on the teaching of weather forecasters and the writing of papers, in addition to his work on the radar.

322.    Mr. Lemon did not rely on the work of Dr. Dooley, Dr. Cushing, or Dr. Mitchell.  *Lemon Testimony*, 1795:13-19.  He did not rely on the ground-level wind information presented by Dr. Dooley.  *Id.*, 1798:18-23.

323.    Only a very small amount of Mr. Lemon's activity has involved consulting in litigation involving weather, representing perhaps 1% of his income.  This case is the first case in which he has ever testified in court as an expert witness.  *Lemon Testimony*, 1715:2 to 1718:9.

100

324.    This case is also the first case in which Mr. Lemon has ever performed a hindcast of a thunderstorm or weather system.  *Lemon Testimony*, 1821:19 to 1822:4.

325.    Dr. Austin Dooley is an oceanographer and meteorologist.  He has a Bachelor of Science degree from the State University of New York, Marathon College, a Master of Science degree from New York University, and a Ph.D. from New York University.  He has taught at the maritime college, and has taught basic meteorology to NOAA Commissioned Corps officers. *Dooley Testimony*, 1830:4 to 1831:23.

### B.    Using Government Data

326.    Dr. Mitchell testified that it was common for most meteorologists doing his kind of work to rely on data obtained from the National Weather Service and the archived data in the National Climatic Data Center.  *Mitchell Testimony*, 921:1-8; 926:22-927:4.

327.    The National Weather Service's National Hurricane Center issues hurricane alerts that show the probable strike zone or probability cone at various times during the approach of a hurricane, including Hurricane Katrina.  *Mitchell Testimony*, 929:9-930:9.

328.    National Hurricane Center Advisory 19 showed that, as of 10:00 P.M. CDT on Saturday, August 27, 2005, the center of the cone of probability ran through Lake Pontchartrain. *Mitchell Report*, DX-312, p. 4; *Mitchell Demonstratives*, PX-436, p. 5; *Mitchell Testimony*, 929:9 to 930:9.

329.     There were 18 other advisories showing the probability cone approaching New Orleans.  There was plenty of warning by Saturday morning for business operations in New Orleans to prepare for the hurricane.  *Mitchell Testimony*, 930:14 to 931:5.

330.     The National Oceanic and Atmospheric Administration's ("NOAA's") updated "H-Wind Analysis" analyzes and integrates all available wind information, from dropsondes dropped by Hurricane Hunters, data from land-based stations, offshore buoy data, wind direction data, and radar velocity data where available, to create an official uniform wind field.  *Mitchell Testimony*, 931:814, 933:21 to 934:8.  This is a large-scale, or synoptic, wind field.  *Mitchell Testimony*, 932:24 to 935:2.

331.     The H-wind analysis shows that large-scale or synoptic wind levels in the left quadrant were 80 to 92 miles an hour after conversion from knots, and winds in the right quadrant were at a sustained speed of 115 miles an hour.  *Mitchell Testimony*, 933:3-7, 934:9-14.

332.     A wind field map prepared for FEMA and in common use shows that, in the area of the IHNC, the maximum three-second wind gusts were in the range of 100 to 110 or 120 miles per hour during Hurricane Katrina, without taking mesoscale phenomena or wind shear into account.  *Mitchell Report*, DX-312, p. 7; *Mitchell Demonstratives*, PX-436, p. 7; *Mitchell Testimony*, 935:16 to 936:15.

333.     Wind gusts have a much larger effect on open water, with a barge acting as a sail, than they would have on land, where there are other buildings and friction.  *Mitchell Testimony*, 1052:13 to 1054:6.

102

334.    Numerous of Dr. Mitchell's images are stamped "NOAA" because the information he used came straight from the NOAA database.  He had to log onto NOAA's computers in order to obtain them.  All of the data used by Dr. Mitchell was official NOAA data, which he did not alter.  It has NOAA's stamp of approval, and reflects the current state of the data.  *Mitchell Testimony*, 946:2-18 and 966:24 to 967:6; *Mitchell Demonstratives*, PX-436, pp. 9-44; *Mitchell Report*, DX-312, pp. 8-39.

335.    Mr. Lemon agreed that Dr. Mitchell did not alter the NOAA products he used. *Lemon Testimony*, 1804:13-22.

336.    Dr. Mitchell also testified that, at any point during the approach of Hurricane Katrina, to the extent New Orleans was in the probability strike cone, persons should expect and prepare for a direct hit.  *Mitchell Testimony*, 1000:4-10.

### C.    The Operation of the Government's Doppler Radar

337.    Dr. Mitchell examined the radar data made available to researchers by the government.  *Mitchell Testimony*, 926:8-14.

338.    The radar data was collected by high-resolution, standardized Doppler radar that is uniform across the country.  *Mitchell Testimony*, 928:1-10.

339.    The standard radar used in Hurricane Katrina and across the country is a WSR-88D Doppler radar.  *Mitchell Testimony*, 928:11-14.

103

340.     The radar functions by sending out an electromagnetic beam, and detecting the reflection of the beam back at the radar.  It works in the same manner as sonar or acoustics. *Mitchell Testimony*, 937:1-7.

341.     The phase shift of the beam as it goes out and comes back indicates the velocity of the object from which the beam has been reflected.  *Mitchell Testimony*, 937:8-14.

342.     It takes between five and six minutes for the radar to complete a set of scans and be in position to commence the next set.  It scans 360º—*i.e.*, in all horizontal directions—and for each direction it scans at six or seven tilt angles.  *Mitchell Testimony*, 937:25 to 938:16.

343.     Dr. Mitchell examined three products of the National Weather Service or NOAA and related entities.  He first looked at the reflectivity of the various components of the storm, then at the results of the government's algorithms showing where mesocyclones occurred, and then at the results of the government's algorithms for tornado vortex signatures.  *Mitchell Testimony*, 937:15-24.

344.     The reflectivity scan is a composite of all tilt angles, starting at base reflectivity. *Mitchell Testimony*, 938:7-9.

345.     The radar scans have limitations in measuring within 700 feet of the surface. *Mitchell Testimony*, 966:9-12.

346.     Mr. Lemon stated that the Doppler radar can measure wind velocity at ground level "close to the radar."  *Lemon Testimony*, 1792:18-22.  The radar beam is never pointed at ground level: "the antenna begins at a half-degree elevation to get above ground clutter . . . ." *Id.*, 1740:13-14.  The radar beam is farther and farther off the ground as distance becomes

104

greater, however: "But the radar horizon is one of the problems because, as the beam gets farther

away from the radar, it's farther and farther off the ground because the earth's curvature drops

out from under the beam.  So the beam is at higher elevation angles the farther out it goes."  *Id.*,

1790:21-25.

347.    In this case and in his other cases involving Hurricane Katrina, Dr. Mitchell

reviewed all of the available radar scans for Hurricane Katrina, from about 2:00 A.M. CDT on

August 29, 2005, to about 10:00 A.M. CDT that day.  *Mitchell Testimony*, 938:18 to 939:3.

348.    Dr. Mitchell looked at Level II data, but relied principally on Level III data,

issued by the National Weather Service or NOAA from scans made by the WSR-88D Doppler

radar in Slidell, Louisiana.[10]  *Mitchell Testimony*, 939:6-8; 986:24-25.  Level I data is the raw,

digital binary data that the radar is measuring.  Level II data is the first processed data by the

National Weather Service or NOAA that is in a form that can be displayed.  Level III data is

processed further, and the National Weather Service or NOAA analyzes Level III data to

determine the presence of mesocyclones, thunderstorm cell locations, tornado vortex signatures,

hail indices, and other products.  *Mitchell Testimony*, 952:2-16.

349.    The National Weather Service or NOAA algorithms identify mesocyclones only if

at least three conditions are met: (1) that there is a particular thunderstorm with intense rotation,

and (2) that the thunderstorm has a duration over all the time periods of the sweep, and (3) that

---

[10] Dr. Dooley estimated that the Slidell radar is 30 to 35 miles from the IHNC, but was not sure.  *Dooley Testimony*, 1896:13-16.

the thunderstorm occurs in all layers of the beam.  The thunderstorm must be significant if it is to be flagged as a mesocyclone cell.  *Mitchell Testimony*, 939:14 to 940:9.

350.    Dr. Mitchell testified that the mesocyclone algorithm output was good, although he looked at other information as well.  The algorithm was developed over many years of research by NASA and NOAA.  The algorithms are used in every hurricane for analysis. *Mitchell Testimony*, 1015:20-22 and 1016:4 to 1017:4.

351.    There can be rotation occurring anywhere within a patch of red, even if the National Weather Service or NOAA algorithms do not identify the rotation as a mesocyclone because it did not meet one or more of the criteria.  *Mitchell Testimony*, 948:13-22.

352.    The radar and the algorithms do not identify all mesocyclones; they can miss some.  *Mitchell Testimony*, 948:23-24.  Dr. Mitchell explained further on cross-examination:

> The thing about the algorithm is that it's flagging cells that have a certain intensity.  There are probably numerous cells the algorithm is missing that don't fit the criteria of being at multiple levels and duration of a certain time.
> So we're only seeing a fraction, possibly, of the probably hundreds of mesocyclones that are existing.

*Mitchell Testimony*, 1015:23 to 1016:3.

353.    On the reflectivity charts in Dr. Mitchell's reports, the radar measures intensity in the logarithmic or decibel scale.  Anything above red is considered intense convection, which means thunderstorm development, heavy rains, and heavy wind gusts.  *Mitchell Testimony*, 944:24 to 945:3.

106

354.     There is no aliased data problem or need to dealias reflectivity data, because the wave lengths used to detect reflectivity are unambiguous over very long ranges.  The problem arises only with velocity data.  *Lemon Testimony*, 1829:4-8.

355.     Each pixel on the reflectivity charts is two kilometers in length, and a kilometer is 3,280 feet.  *Mitchell Testimony*, 945:7-9.

356.     Mesocyclones can occur within any of the red patches on the composite reflectivity charts, but there is no guarantee that there is a mesocyclone there.  That is why one looks at additional National Weather Service or NOAA products, and looks at the results of the algorithms.  *Mitchell Testimony*, 951:15 to 952:1 and 968:7-16.

357.     Dr. Mitchell, like meteorologists generally, look at all of the images and data available when they perform forensic analyses.  The three products meteorologists use to determine if there was a severe weather event are the reflectivity, mesocyclone, and tornado vortex products.  *Mitchell Testimony*, 959:20 to 960:4.

358.     The elevation data shown on these three products is the elevation above sea level of the radar.  *Mitchell Testimony*, 979:25 to 980:4.

359.     Anomalous data can occur within a National Weather Service or NOAA product, and can be disregarded by experienced meteorologists.  An example is the blue patch to the left in the composite reflectivity chart for 3:42 A.M.  It had a very low signal range, did not fit the wind field, and probably represented a malfunction within the radar processing.[11]  Keeping the

---

[11] By contrast, the blue area within the eyewall in the composite reflectivity chart at 6:33 A.M. CDT were real.  There was no reflectivity because the area within the eyewall was clear.  All the convection was in the outer

anomalous data in allows experienced meteorologists to make a judgment that it is anomalous, and this is a reason why one does not want to filter everything out.  *Mitchell Report*, DX-312, p. 15; *Mitchell Demonstratives*, PX-436, p. 20; *Mitchell Testimony*, 962:2 to 963:6 and 976:2-19.

### D.    Mesoscale Phenomena

360.    Hurricane Katrina was a large storm, hundreds of miles across.  The patterns of wind on that scale are called the synoptic scale.  *Mitchell Testimony*, 934:18-24.

361.    The Hurricane Katrina storm surge was driven by the synoptic scale winds because it was so large.  Winds driven by mesocyclones and microbursts affect smaller areas like the IHNC, but not the storm surge.  *Mitchell Testimony*, 1073:6-23.

362.    Mr. Lemon testified that the only winds acting on the barge were synoptic winds, and that the barge was not affected by mesocyclone winds, wind gusts associated with mesocyclones, microburst winds.  He testified that the measured winds acting on the barge were uniform, that the measurements did not indicate any multidirectional components to the winds, and that Dr. Mitchell had made serious errors and unsubstantiated conclusions in his testimony.  *Lemon Testimony*, 1718:20 to 1720:15.

363.    Within a hurricane like Katrina, there are often embedded thunderstorms that may be from one to five or six miles across.  Within thunderstorms there are sometimes embedded tornados or tornadic winds.  *Mitchell Testimony*, 934:23 to 935:8; 941:18-25.

---

eyewall band and the extended feeder bands.  *Mitchell Report*, DX-312, p. 25; *Mitchell Demonstratives*, PX-436, p. 35; *Mitchell Testimony*, 981:1-7.  Similarly, the blue areas within The NOAA composite reflectivity chart for 8:54 A.M. CDT are correct data, showing no convection.  *Mitchell Report*, DX-312, p. 29; *Mitchell Demonstratives*, PX-436, p. 41; *Mitchell Testimony*, 983:22 to 984:14.

364.     Mr. Lemon agreed that the core circulation in a mesocyclone is typically one to five miles wide.  *Lemon Testimony*, 1727:14 to 1728:5.

365.     A mesocyclone has its own counterclockwise rotation within the synoptic wind field.  Its rotational winds are embedded within the synoptic wind field, conflict with it, and perturb the synoptic wind field.  *Mitchell Testimony*, 940:15 to 941:1 and 943:1-11.

366.     Mr. Lemon agreed that the winds in a mesocyclone rotate, stating: "A mesocyclone is a whirl within the storm.  It's a rotating wind field within the storm.  *Lemon Testimony*, 1727:15-16.

367.     Mr. Lemon stated that mesocyclones move essentially with the "steering winds in the flow they are embedded within," but admitted that there are departures, which he characterized as small, "because of what is called 'propagation of the updraft.'" *Lemon Testimony*, 1728:6-13.

368.     Mr. Lemon agreed that the rotation of mesocyclones can perturb the wind so that it is not uniform in a specific area:

> THE COURT:  Okay.  I guess is my question answerable: Can it happen that the wind is perturbed by a mesocyclone so that all—so the wind is not uniform in a specific area?
> THE WITNESS:  Oh, absolutely.

*Lemon Testimony*, 1784:8-11.

369.     Mr. Lemon agreed that there can be situations in which "on the ground, we'd have winds coming and something that's different from the synoptic winds that are there." *Lemon*

*Testimony*, 1790:1-7.  He said that he did not see any such instances in the vicinity of the IHNC.

*Id.*, 1790:9-13.

370.    The rotation of the mesocyclone gives the winds angular momentum, which can

lead to intense downdrafts and updrafts as the energy is transferred.  The transfer in turn can

create a microburst energy.  *Mitchell Testimony*, 941:1-3.

371.    Mr. Lemon agreed that there are updrafts and downdrafts in a mesocyclone,

stating: "It's composed of both an updraft and a rear flank downdraft."  *Lemon Testimony*,

1727:16-17.

372.    A microburst is an intense downdraft in a thunderstorm, which results from the

heat engine in a thunderstorm.  Dr. Mitchell described it as follows:

> Q.   Now, you mentioned microbursts.  You've done that several times.
> Specifically what does a microburst do?
> A.   The microburst occurs during a thunderstorm event, and all we have here is
> probably hundreds of thunderstorms occurring.  It's an intense downdraft.
> Think of the thunderstorm as a heat engine.  It's either heating from below from
> the ocean or it's cooling from above.  It's overturning of the convection, and so winds go
> up, they cool, and then they drop.  At a certain point, winds reach a certain height.  They
> are so cold that they drop all the way to the surface in one gust, straight down normally,
> and that's what we call a "microburst wind."
> Q.   When it drops straight down, what direction does the wind go?
> A.   When it drops straight down, it is totally unpredictable.  I mean, once it hits a
> surface, the wind can go in any direction, spreading out omnidirectional.
> Q.   And are microbursts common with mesocyclones?
> A.   They are common with mesocyclones.  In fact, the microburst wind that
> collapsed the Cowboy stadium was a single-microburst wind associated with a supercell
> storm that was rotating.

*Mitchell Testimony*, 955:1 to 956:2 and 1036:9-13.

373.     Mr. Lemon agreed that in a microburst, "the fluid is directed downward to the ground and hits the ground and spreads out in all directions.  It's like a starburst."  *Lemon Testimony*, 1736:23 to 1737:1.

374.     Microbursts may be isolated on a small object like a home, taking off only the back of the house or a chimney or other part of a house, but there may be hundreds of them in a hurricane.  *Mitchell Testimony*, 1035-9 to 1036:5.

375.     Microbursts would have an entirely different effect on a barge that acted as a sail on a body of water than they would have on a home.  *Mitchell Testimony*, 1043:15-20.

376.     Anemometers cannot measure a microburst, because anemometers only measure wind radial to the anemometer.  *Mitchell Testimony*, 1036:18-21.

377.     Dr. Mitchell testified that a microburst cannot be detected by radar, but only by an on-the-ground examination of damage, such as a home that has a piece of porch taken off and everything else is intact.  *Mitchell Testimony*, 1050:18 to 1051:18.

378.     Mr. Lemon disagreed, stating that the signatures of microbursts can be identified by radar, and that he had seen none near the canal or throughout the data set.  *Lemon Testimony*, 1737:2-14.

379.     Mr. Lemon did not testify as to the duration of a microburst signature, or as to the comparative ease or difficulty of a radar with a five- or six-minute sweep in detecting a microburst signature.

111

380.    Mr. Lemon testified that the way in which a radar identified microbursts was by looking at the base of the storm for inflow and looking at the top of the storm for convergence. *Lemon Testimony*, 1736:9-22.

381.    Dr. Mitchell testified that the radar was effective only from about the 700-foot level on up.  *Mitchell Testimony*, 966:9-10 and 1057:11-16.  Dr. Mitchell did not testify as to how far down the radar could reach, however ineffectively.

382.    Dr. Lemon's Report states: "At the range of the barge in the IHNC the beam is centered at 1128 feet above mean sea level.  Beam width at that range is about 1980 ft. Therefore the beam covers the altitude above the barge from about 138 ft up to 2118 ft."  *Lemon Report*, DX-311, at 5.  The Report also stated: "Even though these radar observations were centered at an altitude of 1128 ft MSL the beam did extend downward to height of only 138 ft." *Lemon Report* at 19.  At a range of 250 nautical miles, the radar scans up to 70,000 feet.  *Lemon Report* at 4-5.

383.    Dr. Lemon also testified that the maximum angle of elevation at which the WSR-88D radar in Slidell took images was 19.5 degrees, in order to avoid confusing horizontal wind motions with vertical wind motions.  *Lemon Testimony*, 1740:3-21.

384.    It is a necessary consequence of Dr. Lemon's Report and testimony that it was not possible for the radar in Slidell to show either convergence at the base of the storm in the area of the IHNC or divergence at the top of the storm in the area of the IHNC.

385.    It is a further necessary consequence of Dr. Lemon's Report and testimony that the radar in Slidell could not have detected any microburst signatures in the area of the IHNC

112

even if they had occurred with great frequency, and that his search for such signatures was doomed to failure before it started, regardless of the presence or absence of microbursts in the area of the IHNC.

386.    Mr. Lemon testified that microbursts are best detected by the types of anemometers placed by the Federal Aviation Administration "around every large airport designed specifically for detection of microbursts," and continued: "The second thing they have is a microburst detection radar, it's Terminal Doppler Weather Radar.  That's dedicated to detection of microbursts." *Lemon Testimony*, 1793:23 to 1794:3.

387.    There is no evidence that the Federal Aviation Administration had deployed these special anemometers at the New Orleans Lakefront Airport, or that the type of radar used to detect microbursts, the Terminal Doppler Weather Radar, was in use to take observations in the area of the IHNC.

388.    Mr. Lemon did not specifically testify that microbursts in the vicinity of the IHNC or affecting the IHNC could have been detected by the WSR-88D radar in Slidell.

389.    When a mesocyclone is detected by the National Weather Service or NOAA algorithms, there is no guarantee that a microburst is happening, but there is confirmation of the existence of the disturbance of the windfield that is necessary for a microburst.  *Mitchell Testimony*, 941:4-6.

113

390.    The NOAA composite reflectivity chart[12] for 3:04 A.M. CDT, *Mitchell Report*, DX-312, p. 11, *Mitchell Demonstratives*, PX-436, p. 14, *Mitchell Testimony*, 951:3-6, shows unorganized feeder bands three and a half hours before Hurricane Katrina made its first landfall, and the "blob of convective activity" was crossing some of the feeder bands and had an alignment different from that of the feeder bands. *Mitchell Testimony*, 952:25 to 953:7. The image was captured. *Mitchell Testimony*, 953:15 to 954:1; PX-434-C (screen capture).

391.    The 3:04 A.M. NOAA composite reflectivity chart shows that mesocyclones have a life of their own, do not have to follow the synoptic winds, and do not have to be within a feeder band. *Mitchell Report*, DX-312, p. 11; *Mitchell Demonstratives*, PX-436, p. 14; *Mitchell Testimony*, 953:8-14. *See also* the NOAA composite reflectivity chart for 3:15 A.M., showing a huge body of convection and omnidirectional winds. *Mitchell Report*, DX-312, p. 13; *Mitchell Demonstratives*, PX-436, p. 17; *Mitchell Testimony*, 957:21 to 959:6. The 3:42 A.M. NOAA composite reflectivity chart also showed storm systems that did not necessarily follow the synoptic flow, and had a life of their own. *Mitchell Report*, DX-312, p. 15; *Mitchell Demonstratives*, PX-436, p. 20; *Mitchell Testimony*, 961:11-23.

392.    Mesocyclones can operate against each other. If they are identified with different numbers, that means they have been identified in different, distinct cells. Each can rotate counterclockwise, and there can certainly be interference between the mesocyclones within the storm system. *Mitchell Testimony*, 956:9-16.

---

[12] There is no aliased data problem or need to dealias reflectivity data, because the wave lengths used to detect reflectivity are unambiguous over very long ranges. The problem arises only with velocity data. *Lemon Testimony*, 1829:4-8.

114

393.    Tornadic vortex signatures are thunderstorm cells previously identified as a mesocyclone, but with a much more intense, tighter rotation indicating a tornadic vortex or tornadic-type wind. *Mitchell Testimony*, 949:5-11.

394.    Tornadic vortex signatures are precursors to the formation of actual tornados. They are a necessary condition for the formation of tornados, but not a sufficient condition by themselves. They do mean that there is tornadic-type rotation that may or may not develop into a tornado. *Mitchell Testimony*, 949:12-16.

395.    To determine that there was a tornado, one must normally look at ground damage. The National Weather Service did not report any tornados in Mississippi or Louisiana during Hurricane Katrina, but that does not mean there was no tighter rotation or that there was no type of tornadic winds reaching the surface. *Mitchell Testimony*, 949:17-23.

396.    To detect a tornado reaching the ground, one would have to be on the ground or hovering above it and making a determination that the tornado touched the ground. No radar can make that determination. *Mitchell Testimony*, 1051:9-22.

397.    At 2:53 A.M. CDT, NOAA identified a particular cell in the Gulf designated U8 as containing both a mesocyclone and a tornadic vortex signature. This means that there was a tornadic vortex signature within a mesocyclone. *Mitchell Report*, DX-312, p. 10; *Mitchell Demonstratives*, PX-436, pp. 12-13; *Mitchell Testimony*, 949:24 to 950:9.

398.    While there was no report that a tornado reached the ground in the Lower Ninth Ward, there were tornadic winds affecting the IHNC. *Mitchell Testimony*, 1034:10 to 1035:3.

115

399.     The NOAA mesocyclone product does not show that a mesocyclone reached all the way down to the ground, but it is very likely that the mesocyclones identified by NOAA did in fact reach to the ground.  Dr. Mitchell testified:

> Q.   Now, just because we see a mesocyclone doesn't necessarily say that it reaches the ground; is that correct?
> A.   That's correct.
> Let me tell you, my thesis was on mesocyclone occurrence.  If you have upper air rotation, the atmosphere is a fluid.  And you have to conserve angular momentum.  And kinetic energy has to all be conserved.  So if you have rotation that's flagged at 10,000, 20,000 feet to the base, maybe 1,300 feet, it's hard to believe that that rotation suddenly cuts off at 1,300 feet and it's a uniform wind field.  It just can't happen.  There will be a rotation that extends to the surface.
> Now, it's always, what is the magnitude of that rotation, but it will extend to the surface.
> Q.   So, I mean, comparing it to something that we can all understand, is it like stirring a cup of water?
> A.   A cup of coffee or a cup of water with cream in it, you stir the top and eventually you'll see a transfer of momentum.  You will get down to the bottom of the cup.

*Mitchell Testimony*, 978:23 to 979:16.

400.     In addition, microbursts still happen, and they come from up high and go all the way down to the ground.  *Mitchell Testimony*, 979:17-19.

401.     Mr. Lemon also agreed that mesocyclones ordinarily have serious effects on the ground.  He testified that "90 percent of the time, mesocyclones are severe in some fashion."

*Lemon Testimony*, 1775:6-7.

**E.     Mesocyclones Affecting the IHNC**

402.     At 2:15 A.M. CDT, NOAA identified a mesocyclone, labeled G0, in the Lower Ninth Ward.  *Mitchell Testimony*, 939:6 to 941:12; *Mitchell Report*, DX-312, p. 8.

116

403.    Dr. Mitchell's Report stated, *Mitchell Report*, DX-312, p. 8:

There is an indication of a thunderstorm cell having wind shear and mesocyclone rotation at the time of the radar image at 2:15 AM CDT.  This cell (G0) is located near the Inner Harbor Navigation Canal at 2:15 AM CDT early in the approach of Hurricane Katrina on August 29, 2005.  The surface winds and wind gusts associated with this cell would be enhanced by the mesoscale rotation. This cyclonic rotation (mesocyclone) would produce winds and wind gusts over the *Canal* which had multi directional components (east, west, north and south winds).

404.    NOAA identified this mesocyclone cell as G0; the mark on the map is at the epicenter of the cell, and it was within the Lower Ninth Ward.  *Mitchell Testimony*, 941:16 to 942:9; *Mitchell Report*, DX-312, p. 8; *Mitchell Demonstratives*, PX-436, p. 9.

405.    Although this was more than four hours before Hurricane Katrina made its first landfall at 6:30 A.M. CDT, there were hotspots of intense convection.  *Mitchell Testimony*, 945:14 to 946:1.

406.    Within the same feeder band, there were numerous—perhaps dozens or more—mesocyclones, each with its own cyclonic rotation.  *Mitchell Testimony*, 947:8-16.

407.    The location of the IHNC was marked at trial on some of the charts.  *Mitchell Testimony*, 947:1-6; PX-434-A (screen capture); *Mitchell Testimony*, 948:1-9; PX-434-D (screen capture).

408.    At 3:04 A.M. CDT, the National Weather Service or NOAA algorithm flagged two mesocyclones near the IHNC but gave them the same I0 label, which mean that they were either one large mesocyclone or two separate ones.[13]  *Mitchell Testimony*, 942:14-25 and 943:7-

---

[13] On one chart, five different locations were labeled A8, as a result of the radar finding different possible latitude/longitude locations for the same cell while it was doing its six-minute sweep through different altitudes.

15; *Mitchell Report*, DX-312, p. 12; *Mitchell Demonstratives*, PX-436, pp. 15-16.  One was within half a mile of the IHNC, and the other would have been two or three miles away. *Mitchell Testimony*, 943:18 to 944:2.  Each could have affected the IHNC.  *Mitchell Testimony*, 944:6-7.

409.    There were no measuring instruments available at the time to measure microburst intensity, but there were a number of mesocyclones rotating and producing possibly intense updrafts and downdrafts, rotational winds, and possible microbursts.  The wind field was clearly perturbed, or there would not have been this number of mesocyclones as the hurricane approached.  *Mitchell Testimony*, 954:10-25.

410.    The earlier mesocyclone labeled G0 sitting within the Lower Ninth Ward on the 2:15 A.M. CDT NOAA chart,[14] and the mesocyclone labeled I0 on the 3:04 A.M. CDT NOAA chart, are close to the area of concern to this case with their rotation.  *Mitchell Testimony*, 956:24 to 957:6.

411.    As the mesocyclone labeled I0 moved West, it could have produced Southerly winds, moving from South to North, so that anything that is loose can be pushed to the North. *Mitchell Testimony*, 957:9-16.

---

*Mitchell Testimony*, 960:5 to 961:1.  Sometimes the algorithm labels different cells as the same when the locations are closely spaced.  *Id.*, 960:18 to 961:1.

[14] The trial transcript refers to the mesocyclone labeled G0 at 2:50 A.M., *Mitchell Testimony*, 957:3-4, but this seems incorrect because there were observations at 2:53 A.M., *e.g.*, *Mitchell Testimony*, 944:17-18, 947:17-18, and 951:10-14; *Mitchell Report*, DX-312, pp. 9-10; *Mitchell Demonstratives*, PX-436, pp. 11-13, less than the five- to six-minute interval between radar sweeps.  Dr. Mitchell was probably referring to the mesocyclone labeled G0 at 2:15 A.M.  *Mitchell Testimony*, 941:16 to 942:9; *Mitchell Report*, DX-312, p. 8; *Mitchell Demonstratives*, PX-436, p. 9.

412.     The mesocyclone labeled G0 also could have produced Southerly winds, moving from South to North, so that anything that is loose can be pushed to the North.  *Mitchell Testimony*, 957:17-19.

413.     At 3:15 A.M. CDT, the NOAA charts showed a huge area of convection containing numerous mesocyclones.  *Mitchell Testimony*, 957:12-25; *Mitchell Report*, DX-312, p. 13; *Mitchell Demonstratives*, PX-436, p. 17.

414.     With respect to all of the mesocyclones discussed in the area of the IHNC, to the extent that their feeder bands were within the IHNC, the winds within the canal would be affected by the mesocyclones.  *Mitchell Testimony*, 958:1-10.

415.     Dr. Mitchell testified:

> A.  . . .  And that's basically my report opinion.  I mean, we have a disturbed wind field with numerous mesocyclones.  We even have omnidirectional winds.  I mean, there is no way to say that the winds are uniformly in one direction, all for six or seven hours, and then uniformly in the opposite direction for another period of time.
> This particular cell right here is interesting because we're going to see a mesocyclone develop in the next display as a mesocyclone flagged that's right—it shows a circulation to the North.  Any circulation to the North is going to push an object in the canal, it's going to push it toward the East because it's going to be a westerly wind.
>
> The Court:  Forgive me for not perceiving this, but how can you tell the circulation is to the north on this image?
> The witness:  Well, you can't from this image.  Keep your eye on this pixel right there, your honor, that I've got my beam on.  Let's go to the next slide.  And let's zoom in.  And there it is.  It's right there.  Y6.
> The Court:  Y6 on that image.
> The witness:  Right there.
> So this having counterclockwise circulation around it, the barge is here and the canal is at this location.

*Mitchell Testimony*, 958:10 to 959:6.  The location of the IHNC on the image was captured.

119

*Mitchell Testimony*, 959:10-17; PX-434-D (screen capture).

416.    Defendant's expert Leslie Lemon identified a mesocyclone and supercell at 3:31 A.M. CDT, approximately five miles North of what he believed to be the barge location on the IHNC.  Mr. Lemon identified this not by using NOAA's or the National Weather Service's algorithms reflected in the NOAA Level III mesocyclone product, but by using Level II data which he processed himself and by using the algorithms installed on the private software package he was using.  Based on his own processing and these private algorithms, he contended that the mesocyclone was shallow and would not have affected the barge.  Mr. Lemon's processing involved subtracting out the entire storm system showing a rotation.  *Lemon Report*, DX-311, p. 16; *Mitchell Demonstratives*, PX-436, p. 45; *Mitchell Testimony*, 985:5-20.

417.    Mr. Lemon's image has four quadrants.  The upper left shows composite reflectivity,[15] the upper right is radial velocity, the lower left is relative velocity, and the lower right is spectrum width.  *Lemon Report*, DX-311, p. 16; *Mitchell Demonstratives*, PX-436, p. 45; *Mitchell Testimony*, 986:4-13.

418.    A relative velocity image of a storm, such as those in the lower left of some of Mr. Lemon's images, seeks to take out the forward motion of the hurricane, while retaining the movement of wind within the storm and within the feeder bands.  It looks at the velocity relative to the system, without the forward motion of the system.  The term "relative" refers to the

---

[15] There is no aliased data problem or need to dealias reflectivity data, because the wave lengths used to detect reflectivity are unambiguous over very long ranges.  The problem arises only with velocity data.  *Lemon Testimony*, 1829:4-8.

system, not to an observer on the ground. *Mitchell Testimony*, 1007:11 to 1008:5.  Mr. Lemon agreed. *Lemon Testimony*, 1747:21 to 1748:7.

419.   A radial velocity image of a storm, such as those in the upper right of some of Mr. Lemon's images, is a Level II product that shows any velocities moving toward or away from the radar, incorporating both the velocities of the mesocyclone and the forward or other motion of the hurricane. *Mitchell Testimony*, 1008:17 to 1009:12.

420.   Radial velocity only measures the velocity of the part of the wind that is parallel to the radar beam and moving towards the radar or away from the radar. *Lemon Testimony*, 1722:24 to 1723:16.

421.   When radial velocity is zero, this could either mean a rare event in which the area is calm with no wind, or the more frequent event that the wind is moving perpendicular to the radar beam.  Wind moving perpendicular to the radar beam is not measured by radial velocity, and appears to be zero velocity regardless of its actual velocity. *Lemon Report*, DX-311, p. 6 and Figure 1; *Lemon Demonstrative*, p. 7; *Lemon Testimony*, 1725:7-18.

422.   It necessarily follows from Mr. Lemon's Report, demonstratives, and testimony that the only true values for radial velocity are for the component of the wind moving directly parallel to the radar beam, and that Mr. Lemon's radial velocity measure understates the actual velocity of the wind to a greater and greater extent as its direction goes from directly parallel to the radar beam towards a direction perpendicular to the beam. *Lemon Report*, DX-311, p. 6 and Figure 1; *Lemon Demonstrative*, p. 7; *Lemon Testimony*, 1725:7-18.

121

423.     It necessarily follows from Mr. Lemon's Report, demonstratives, and testimony that the intensity of the reds and greens on his images are only partly affected by the velocity of the winds being measured, because the direction of the wind can make a high-speed wind component appearing as a dark red or green color look much slower than a bright red or green wind component that is in fact much slower, simply because the first wind component is in a direction farther from a direction parallel to the radar beam than the second wind component. *Lemon Report*, DX-311, p. 6 and Figure 1; *Lemon Demonstrative*, p. 7; *Lemon Testimony*, 1725:7-22 and 1726:23 to 1727:7.

424.     If all of the wind is moving in the same direction, spectrum width will be narrow. If the wind is multidirectional, with some moving toward the radar and some away from the radar, spectrum width will be very broad.  A high or very broad spectrum width is a sign of multidirectional winds.  *Lemon Testimony*, 1724:3-18.

425.     Mr. Lemon's application of his filter to his 3:31 A.M. CDT radial velocity image eliminated all of the wind moving toward the radar and made it all appear to be wind moving away from the radar.  Dr. Mitchell could not tell what Mr. Lemon had done with his algorithms and could not interpret Mr. Lemon's image as containing usable information about velocities. Dr. Mitchell explained that one cannot even see the mesocyclone that Mr. Lemon identified, and he had to insert an arrow pointing to it, whereas the mesocyclone was clearly shown in the unfiltered data.  *Mitchell Testimony*, 1009:13 to 1010:3.

426.     When wind moving towards the radar is filtered so as to make it appear to be wind moving away from the radar, Mr. Lemon's testimony at 1724:3-18 shows that it is a

122

necessary consequence that a very broad spectrum width would be changed to a narrow spectrum width.

427.    The scale shown on Mr. Lemon's 3:31 A.M. CDT images did not help show information as to velocity, because Mr. Lemon had highlighted the lower left quadrant, and the scale on the left of the image applied only to the storm relative velocity image in the lower left quadrant.  *Mitchell Testimony*, 1010:4 to 1011:10 and 1070:9 to 1072:12.

428.    The 3:31 A.M. CDT mesocyclone pointed out by Mr. Lemon was massive.  It was rotating and producing a perturbed wind field within the feeder bands.  It had to be producing West winds on everything to the South of it, going from West to East.  To the extent that the mesocyclone was East of the IHNC, it would produce a North wind, i.e., a wind blowing from the North to the South.  *Lemon Report*, DX-311, p. 16; *Mitchell Demonstratives*, PX-436, p. 45; *Mitchell Testimony*, 986:14 to 989:8.

429.    At 3:42 A.M. CDT, the NOAA composite reflectivity[16] chart started to show tight rotation around the eye, about three hours from the first landfall at Buras, Louisiana.  There was an elongated body of convection that was not following the feeder bands, was not necessarily following the flow of the hurricane, and did not need to follow the rotation of the hurricane.  *Mitchell Report*, DX-312, p. 15; *Mitchell Demonstratives*, PX-436, p. 20; *Mitchell Testimony*, 961:11-23 and 1072:13 to 1073:5.

---

[16] There is no aliased data problem or need to dealias reflectivity data, because the wave lengths used to detect reflectivity are unambiguous over very long ranges.  The problem arises only with velocity data.  *Lemon Testimony*, 1829:4-8.

430.     The 3:42 A.M. NOAA composite reflectivity[17] chart had a red convection area located directly above the IHNC but much larger than the IHNC.  *Mitchell Report*, DX-312, p. 15; *Mitchell Demonstratives*, PX-436, p. 20; PX-434-E (screen capture); *Mitchell Testimony*, 963:7-23.

431.     Turning to the mesocyclone occurrence product, NOAA designated three mesocyclone flags labeled A4 within the area of the large red convection pattern over the IHNC. The location of the canal was marked and captured.  *Mitchell Report*, DX-312, p. 16; *Mitchell Demonstratives*, PX-436, p. 21; PX-434-F (screen capture); *Mitchell Testimony*, 964:1-13.

432.     The A4 indicators on the NOAA 3:42 A.M. mesocyclone chart could show a single cell moving from East to West or could be showing three different mesocyclone rotations. Within the mesocyclone or within each of the three mesocyclones, to the extent they are North of the IHNC they are producing a West wind, i.e., one blowing from West to East.  *Mitchell Report*, DX-312, p. 16; *Mitchell Demonstratives*, PX-436, p. 21; PX-434-F (screen capture); *Mitchell Testimony*, 964:15 to 965:6.

433.     NOAA also identified one of the mesocyclones it labeled as A4 as having a tornadic vortex signature extending from 1,300 feet to 8,000 feet at that location.  This means that there was tornadic rotation from 1,300 feet to 8,000 feet.  *Mitchell Report*, DX-312, p. 16; *Mitchell Demonstratives*, PX-436, p. 22; *Mitchell Testimony*, 965:13 to 966:12.

---

[17] There is no aliased data problem or need to dealias reflectivity data, because the wave lengths used to detect reflectivity are unambiguous over very long ranges.  The problem arises only with velocity data. *Lemon Testimony*, 1829:4-8.

124

434.    The 3:42 A.M. CDT NOAA tornadic vortex chart showed the only tornado vortex in Louisiana during Hurricane Katrina.  It was right South of Lake Pontchartrain, North of the barge.  *Mitchell Testimony*, 970:11-14 and 977:1-7.

435.    Mr. Lemon agreed that there was at least one, and perhaps two, real mesocyclones in the 3:42 A.M. radar sweep.  He thought the other dots on an unidentified image were not real.  Unfortunately, he could not remember where the mesocyclones he thought real had been located.  He thought one might have been over the lake, "perhaps."  *Lemon Testimony*, 1739:7-22.

436.    The NOAA composite reflectivity[18] chart for 3:47 A.M. CDT showed a huge red convective zone, still sitting over the IHNC.  It was about the same size it had been at 3:42 A.M.  It does not appear to have been sitting in a feeder band at all.  The location of the canal was marked on the chart, and the image was captured.  *Mitchell Report*, DX-312, p. 17; *Mitchell Demonstratives*, PX-436, p. 23; PX-434-G (screen capture); *Mitchell Testimony*, 967:8 to 968:4 and 969:19-23.

437.    The NOAA composite reflectivity chart for 3:47 A.M. CDT showed that there are possible mesocyclones in this convective area, but Dr. Mitchell had to look at the other NOAA products to be certain whether there was cyclonic rotation.  *Mitchell Report*, DX-312, p. 17; *Mitchell Demonstratives*, PX-436, p. 23; *Mitchell Testimony*, 968:7-16 and 969:24 to 970:8.

438.    The NOAA mesocyclone product for 3:47 A.M. CDT showed two mesocyclones North of the Canal, whose winds would have pushed anything in the Canal from the West to the

---

[18] There is no aliased data problem or need to dealias reflectivity data, because the wave lengths used to detect reflectivity are unambiguous over very long ranges.  The problem arises only with velocity data.  *Lemon Testimony*, 1829:4-8.

East.  One of the mesocyclones was labeled A4; this was a continuation of the mesocyclone(s) labeled A4 in the previous radar sweep at 3:42 A.M. CDT.  A new mesocyclone cell has emerged, which NOAA labeled E4.  *Mitchell Report*, DX-312, p. 18; *Mitchell Demonstratives*, PX-436, p. 24; *Mitchell Testimony*, 968:24 to 969:10.

439.     Dr. Mitchell explained the phenomenon of the appearance and disappearance of mesocyclones:

> These are like popcorn in these convective—a system will rotate, you know, pick up rotation, and then it will lose its criteria and another cell will pop up that has the correct criteria to be flagged.  It's such a dynamic and chaotic system, you can't explain it by just a simple wind field.  It is very perturbed and very chaotic.

*Mitchell Testimony*, 969:13-18.

440.     The NOAA composite reflectivity[19] chart for 3:53 A.M. CDT showed both feeder bands and three distinct areas of hot spots or convective zones.  One was to the Southwest of the IHNC, having previously been over the Canal but gradually moving off as the whole system rotates.  One of the hot spots is very hot, over 50 decibels[20] on the NOAA scale, which means that there was severe weather there, with rainfall, updrafts and downdrafts.  *Mitchell Report*, DX-312, p. 19; *Mitchell Demonstratives*, PX-436, p. 26; *Mitchell Testimony*, 970:15 to 971:24.  One cannot tell from this chart whether there was rotation, making it even more intense, so one has to go to the next NOAA product.  *Mitchell Testimony*, 971:25 to 972:3.

---

[19] There is no aliased data problem or need to dealias reflectivity data, because the wave lengths used to detect reflectivity are unambiguous over very long ranges.  The problem arises only with velocity data.  *Lemon Testimony*, 1829:4-8.

[20] Decibels express the electromagnetic intensity of the convection, just as decibels express the intensity of sound.  *Mitchell Testimony*, 972:4-14.

441.    The NOAA mesocyclone chart for 3:53 A.M. CDT showed mesocyclones in the areas of each of the three hotspots.  They were to the Northwest of the IHNC, so their cyclonic rotation would have produced winds from the West.  NOAA labeled the two that were West of the IHNC and just South of Lake Pontchartrain as E4.  *Mitchell Report*, DX-312, p. 20; *Mitchell Demonstratives*, PX-436, p. 27; *Mitchell Testimony*, 972:19 to 973:12.

442.    The mesocyclones identified by NOAA as E4 at 3:53 A.M. CDT were close enough to the IHNC to affect wind direction at the IHNC, and were producing Westerly winds.  *Mitchell Testimony*, 973:12-23.

443.    The NOAA composite reflectivity[21] chart for 4:05 A.M. CDT, two and a half hours before Hurricane Katrina's first landfall, showed that the feeder bands were disorganized and that two small hot spots had popped up around the canal location.  The larger one was moving to the Southwest.  There were hot spots to the Northeast of the IHNC.  There were individual cells of about two kilometers to the North of the Canal and right over the Canal.  *Mitchell Report*, DX-312, p. 21; *Mitchell Demonstratives*, PX-436, p. 29; *Mitchell Testimony*, 974:20 to 975:20.

444.    The NOAA mesocyclone chart for 4:05 A.M. CDT showed scattered mesocyclones, and demonstrated that not every hot spot produces a mesocyclone.  *Mitchell*

---

[21] There is no aliased data problem or need to dealias reflectivity data, because the wave lengths used to detect reflectivity are unambiguous over very long ranges.  The problem arises only with velocity data.  *Lemon Testimony*, 1829:4-8.

*Report*, DX-312, p. 22; *Mitchell Demonstratives*, PX-436, p. 30; *Mitchell Testimony*, 975:22 to 976:9.

445.    The NOAA composite reflectivity[22] chart for 5:43 A.M. CDT, less than an hour before the first landfall, shows the eye of the hurricane.  The earlier charts showed the outer feeder bands.  They can also be seen in the 5:43 A.M. CDT chart, and are chaotic.  They are not uniform, they are weaker in some areas than in others, there is red showing convection in some areas, and thunderstorms come and go like popcorn within the larger synoptic system.  *Mitchell Report*, DX-312, p. 23; *Mitchell Demonstratives*, PX-436, p. 32; *Mitchell Testimony*, 977:8 to 978:2.

446.    The NOAA mesocyclone chart for 5:43 A.M. CDT shows a mesocyclone labeled U8, which, in light of the location of the barge or the IHNC could certainly be producing a North wind at that point in time.  *Mitchell Report*, DX-312, p. 24; *Mitchell Demonstratives*, PX-436, p. 33; *Mitchell Testimony*, 978:10-16.

447.    The various NOAA charts that Dr. Mitchell examined showed cells that, depending on their relative location to the IHNC, could have produced West winds, East winds, North winds, or South winds.  Winds produced by mesocyclones within the feeder bands are omnidirectional.  *Mitchell Report*, DX-312, p. 24; *Mitchell Testimony*, 978:17-22.  Dr. Mitchell further explained:

---

[22] There is no aliased data problem or need to dealias reflectivity data, because the wave lengths used to detect reflectivity are unambiguous over very long ranges.  The problem arises only with velocity data.  *Lemon Testimony*, 1829:4-8.

Q.   At the canal location.  No one can say for sure what the wind condition inside the canal is, correct?

A.   No one can say.  We have just gone through a couple of hours of seeing mesocyclones come and go south, north, east and west of the canal.  They all have the possibility of microbursts winds and they all have rotation.  So no meteorologist can sit here and tell that you the wind field was always in this direction or   these hours or always from the other direction.

The purpose of my analysis is to show a chaotic situation.  There are possibilities for omnidirectional winds during all those morning hours over the canal.

*Mitchell Testimony*, 990:20 to 991:5.

448.   The NOAA composite reflectivity[23] chart for 6:33 A.M. CDT showed strong feeder bands as the hurricane started to move ashore in its first landfall.  The NOAA mesocyclone chart for 6:33 A.M. CDT showed that the areas of mesocyclone activity were to the North and Northeast of Lake Pontchartrain.  There were some mesocyclones there, some near the eyewall, and some near or in Lake Borgne to the East of the IHNC.  While farther away from the IHNC, they still perturb the wind fields and one cannot say whether they affected the IHNC.

*Mitchell Report*, DX-312, pp. 25-26; *Mitchell Demonstratives*, PX-436, pp. 35-36; *Mitchell Testimony*, 980:6-16 and 981:8 to 981:2.

449.   The NOAA composite reflectivity[24] chart for 7:49 A.M. CDT shows strong feeder bands, but in the area near the IHNC the area of high reflectivity was not aligned with the feeder bands.  This is another illustration that these thunderstorms pop up on their own, and not in

---

[23] There is no aliased data problem or need to dealias reflectivity data, because the wave lengths used to detect reflectivity are unambiguous over very long ranges.  The problem arises only with velocity data.  *Lemon Testimony*, 1829:4-8.

[24] There is no aliased data problem or need to dealias reflectivity data, because the wave lengths used to detect reflectivity are unambiguous over very long ranges.  The problem arises only with velocity data.  *Lemon Testimony*, 1829:4-8.

accordance with the feeder bands.  *Mitchell Report*, DX-312, p. 27; *Mitchell Demonstratives*, PX-436, pp. 38; *Mitchell Testimony*, 982:12-25.

450.    The NOAA mesocyclone chart for 7:49 A.M. CDT shows a lot of rotation near the eyewall, with a much more intense environment, kinetic energy, and angular momentum, producing a cluster of mesocyclones.  Since each of them is rotating near the others, it produces a very chaotic wind field.  *Mitchell Report*, DX-312, p. 28; *Mitchell Demonstratives*, PX-436, p. 39; *Mitchell Testimony*, 983:1-15.

451.    The NOAA composite reflectivity[25] chart for 8:54 A.M. CDT shows more intense convection as one approaches the eyewall.  The areas of blue are real data, showing no convective activity.  *Mitchell Report*, DX-312, p. 29; *Mitchell Demonstratives*, PX-436, p. 41; *Mitchell Testimony*, 983:21 to 984:14.

452.    The NOAA mesocyclone chart for 8:54 A.M. CDT shows numerous mesocyclones confined within a small area.  Since each is rotating, their effect on the wind field is very chaotic, not uniform.  It "shows a perturbation with a storm within a storm."  Their effect on the barge or on the canal location depends on how far they extend out.  *Mitchell Report*, DX-312, p. 30; *Mitchell Demonstratives*, PX-436, p. 42; *Mitchell Testimony*, 984:16-24.

453.    Dr. Cushing's report shows on p. 80, Figure 52, a graphic display of the IHNC, with wind vectors drawn on it for various times.  Dr. Mitchell testified that this is a simplistic picture, based only on superimposing the synoptic wind flow at different times on the IHNC and

---

[25] There is no aliased data problem or need to dealias reflectivity data, because the wave lengths used to detect reflectivity are unambiguous over very long ranges.  The problem arises only with velocity data.  *Lemon Testimony*, 1829:4-8.

without consideration of radar data, mesocyclones, or tornado vortex signatures.  Contrary to the simplistic stick picture presented in this figure, the wind field was complicated, perturbed, and possibly multidirectional.  *Cushing Report*, DX-196, p. 80,[26] Figure 52; *Mitchell Testimony*, 996:12 to 997:21.

454.    Dr. Cushing's report shows on p. 86, Figure 57, a graphic display of the IHNC, showing what Dr. Cushing believed to be the path the barge took through the IHNC to the area of the Southern breach in the Eastern floodwall, with what he believed to be the direction of the current at that time.  Dr. Mitchell testified that there was no way an individual could predict trajectory within a hurricane, or predict the trajectory of a vessel through time, because the system was too complicated.  *Cushing Report*, DX-196, p. 86,[27] Figure 57; *Mitchell Testimony*, 997:22 to 998:8.

F.    **The Problem of Aliased Data and Dealiasing**

455.    Dr. Mitchell circled the area of the mesocyclone at 3:31 A.M. CDT that Dr. Lemon had identified, on Dr. Lemon's chart.  The image was captured.  *Mitchell Testimony*, 990:2 to 991:17; PX-434-I (screen capture).

456.    Dr. Mitchell showed the actual NOAA Level II radial velocity image for 3:31 A.M. CDT without any processing.  It showed a large green perturbation in the red wind field, showing that the wind was moving in different directions.  It was rotating.  *Mitchell Demonstratives*, PX-436, p. 44; *Mitchell Testimony*, 993:2-20; PX-434-J (screen capture).

---

[26] Page 80 of Dr. Cushing's Report is p. 84 of the Adobe Acrobat file for his report.
[27] Page 86 of Dr. Cushing's Report is p. 90 of the Adobe Acrobat file for his report.

457.    Mr. Lemon's alteration of the data made the entire wind field look red, *i.e.*, moving away from the radar.  It masked the rotation and made the mesocyclone difficult to spot even though Mr. Lemon agreed that it was there.  *Mitchell Testimony*, 991:6 to 992:10.  Mr. Lemon disagreed.  *Lemon Testimony*, 1765:8-17.

458.    Data from a weather radar can be aliased, meaning that data can hide itself or fold itself back.  Most of the time, the National Weather Service processes all of its data to anti-alias the false data or folded-back data.  *Mitchell Testimony*, 992: 10-17.

459.    There is no aliased data problem or need to dealias reflectivity data, because the wave lengths used to detect reflectivity are unambiguous over very long ranges.  The problem arises only with velocity data.  *Lemon Testimony*, 1829:4-8.

460.    Dr. Mitchell stated that the National Weather Service data always goes through an anti-alias algorithm, but the Level II data can be aliased if they are large and dispersed and do not have any character.  *Mitchell Testimony*, 1004:10-13.

461.    When an individual like Mr. Lemon clicks a button on his computer to dealias data, he can possibly eliminate data that is not aliased, depending on how he applies the algorithm.  *Mitchell Testimony*, 992:18-21.  An example is Mr. Lemon's removal of the mesocyclone he identified himself.  *Mitchell Testimony*, 992:22 to 994:5.  Dr. Mitchell testified that a professional meteorologist needs to make judgment calls:

> So if you look at the unfiltered data, you can identify the mesocyclone.  Other portions up here, maybe—other portions of this could be and most likely are alias data.  It may not make any sense.
> But if you do what Mr. Lemon had done and just click a button and filter the whole thing, you lost what was important.  And that's what I—the point I was trying to

make earlier.  A professional meteorologist can recognize things that are non-real, non-real data, and things that are meaningful as far as physical atmospheric phenomena.

*Mitchell Testimony*, 993:21 to 994:5.

462.    The arbitrary application of an anti-alias filter, as Mr. Lemon did, can lose the data one is trying to examine.  *Mitchell Testimony*, 1004:6-9 and 1004:14-15.

463.    The NOAA Level II data coming from the radar is dealiased if range folding is obvious because the radar itself has a filter.  If the data set is so noisy or so bad, stronger filters may be used.  Most of the time, NOAA does the minimum antialiasing and allows the interpreter to look at the data.  *Mitchell Testimony*, 1006:3-11.

464.    Some aliasing could remain in the Level II data.  *Mitchell Testimony*, 1005:18-20.

465.    Mr. Lemon accused Dr. Mitchell of making arbitrary judgments as to what data may or may not be aliased, but did not explain what aspect of Dr. Mitchell's approach he considered arbitrary.  *Lemon Testimony*, 1764:18-20.  Mr. Lemon's opinion was conclusory.

466.    Mr. Lemon himself admitted that he could not guarantee that all of the data on one of his own dealiased images, for 3:31 A.M. CDT, had been properly dealiased, and that it can happen with images generally.  *Lemon Testimony*, 1816:21-24.

467.    Dr. Mitchell did not further dealias the Level II data he examined.  *Mitchell Testimony*, 1005:21-23.

468.    Dr. Mitchell summarized his findings:

Q.   And let's go to your final slide here.
What are your findings actually?
A.   The findings, this is taken out of my report, your honor.  And basically what we have is one critical piece of information.  We have the terminal and the Inner Harbor

133

Navigation Canal were in direct path of the Katrina storm center landfall, according to the National Hurricane Advisory issued at 10:00 P.M. Central Daylight Time on August 27th, that Saturday, two days before the 29th.

Also, I have looked at NOAA H-Wind analysis, as the other met[eo]rologists have in this case, and determined that category 1 winds, one-minute sustained winds, category 1, 80 to 92 miles per hour were at the location of the barge with the addition of wind gusts, three-second gusts, ranging from 104 to 120.

The third and most important point that we just spent the time looking at all the radar data is then we have numerous mesocyclones occurring within the feeder bands. They are identified on the Doppler radar.  They occur over the canal during the early morning hours.  They are creating wind shear, rotational wind gusts, unpredictable wind gusts with respect to wind direction and produce surface winds and wind gusts with multidirectional components, in my opinion, East, West, North and South, acting on the barge during the time period that we looked at the radar, 3:00 to 5:00 A.M.

Q.   And you looked actually from 2 o'clock; is that correct?

A.   Looked at 2 o'clock.  And then, you know, like I said in all of my Katrina cases, actually in this case, we looked to 8, 9 o'clock almost.

Q.   You went and expressed opinions looking at all of the data from about 2 o'clock until past 9 o'clock in the morning; is that correct?

A.   That's correct.

Q.   And all of that information is within the your [sic] report; is that correct?

A.   That's correct.

*Mitchell Testimony*, 998:9 to 999:19.

469.   Mr. Lemon testified that a green portion of Dr. Mitchell's image of the base radial velocity of a large mesocyclone occurring North of the IHNC at 3:31 A.M. CDT, *Mitchell Demonstratives*, p. 44, correctly showed wind blowing towards the radar, *Lemon Testimony*, 1760:9-19.  When defense counsel started the next question with "Well," Mr. Lemon interrupted to say "guardedly," and went off on a different topic.  *Id.*, 1760:21-21.  Defense counsel then interrupted and suggested Mr. Lemon "may have misheard my question."  *Id.*, 1761:1.  Mr. Lemon then changed his testimony and said that the green area was not blowing towards the radar, but was folded.  *Id.*, 1761:3-6.

134

### G. **Mr. Lemon's Methodology**

470.    Mr. Lemon used the commercial software, GR2Analyst, in analyzing the Level II data on which he relied. *Lemon Testimony*, 1798:24 to 1799:3. Not everyone uses that program to interpret Level II data, and some use other software. *Id.*, 1799:4-14. Mr. Lemon did not use any software other than GR2Analyst and Microsoft word. *Id.*, 1799:15:17.

471.    When Mr. Lemon uses the GR2Analyst software, he always leaves the dealiasing feature on. *Lemon Testimony*, 1799:19 to 1800:3. Very rarely, he will turn it on and off when he thinks he has a data problem other than a dealiasing failure or a dealiasing failure. *Id.*, 1800:4-10.

472.    The GR2Analyst program was developed by a computer programmer, not a meteorologist. *Lemon Testimony*, 1801:8-13.

473.    Mr. Lemon denied that he was one of the developers of the GR2Analyst software, testifying that he only assisted the developer of the program, did some of the debugging, and recommended some enhancements. *Lemon Testimony*, 1800:11-15. He testified that he had never referred to himself as one of the developers of the software. *Id.*, 1800:16-18. However, Mr. Lemon admitted that he had testified in his deposition a few days before the trial that he was one of the developers of the software, and testified at trial that he had overstated his involvement in the deposition. *Id.*, 1800:19 to 1801:3.

474.    Mr. Lemon admitted that there was a GR3Analyst program, and that he had used it before but had not used it in this case. *Lemon Testimony*, 1801:14-18.

135

475.    PX-452 is a document labeled at the top "TheWxPage.Com GRLeve13 Radar Tutorial."  Mr. Lemon admitted that this new program "has a mesocyclone detection algorithm which is far superior to the 2005 ADAD algorithm.  It's based on National Severe Storms Laboratory algorithm."  *Lemon Testimony*, 1802:12-14.  However, he did not use it for this case. *Id.*, 1802:15-17.

476.    Mr. Lemon inconsistently testified that in performing the type of analysis he performed, it was necessary to look at all of the data available to him.  *Lemon Testimony*, 1819:19-23.

477.    Mr. Lemon relied solely on the radar data in this case, bringing his prior knowledge to bear because he could not avoid it.  He explained that he did not want to bias himself by looking at other available data.  *Lemon Testimony*, 1819:4 to 1820:2.

478.    Mr. Lemon gave an interview on January 25, 2010 to "WeatherBrains."  *Lemon Testimony*, 1820:3 to 1820:18.  The audio of the interview is in evidence at PX-453.  A portion of the text is set out in the transcript at 1820:10 to 1821:15.  In the interview, Mr. Lemon referred to meteorologists going directly to radar and relying only on radar, without first becoming thoroughly familiar with other data about the storm and its boundary layers, shears, and other phenomena as being the "greatest mistake" and a "major mistake" that "operational meteorologists" can make:

   "INTERVIEWER:  Let's, for people right now, operational meteorologists right now, using existing radar data, what is the greatest mistake that forecasters make when looking at current data and maybe issuing warnings that they don't need to issue or maybe missing a warning.
   "MR. LEMON:  That's a very good question, and one of the basic things that a lot

of people will forget is that you never sit down to use that radar until you know the environment in which you're in.

"That is, you have to— to brief yourself on what the structure of the atmosphere is around the radar in the region and synoptically, synoptic and mesoscale both; where the   boundaries are, what the motions of the boundaries are; know the soundings; do a detailed sounding interrogation; calculate shear, calculate the deep-layer shear, which is typically 0 to 6 kilometers, or 0 to 8 kilometers, calculate that shear, look at the boundary-layer shear; look at the—look at the cloud-base heights, the LCL height, those kinds of things.

"And know the—know the instability of the atmosphere.  And know where what I call the focus flow is, where you see their mesoscale convergence.

"But at any rate you have to sit—before you sit down at that radar, is know thoroughly that environment.  Then you begin to use that radar.  And then you can much more intelligently use and interrogate that radar, and you know where to look even before storms are formed because you know where the boundaries are, and you know what the mesoscale convergence is.

"That—that is, I think, a major mistake, is trying to use the radar as a single individual stand-alone tool without reference to—to other data."

*Lemon Testimony*, 1820:10 to 1821:15.

479.    On redirect examination, Mr. Lemon testified that his failure in this case to follow the advice he gave meteorologists in avoiding their "greatest mistake" or "major mistake" was not important because he was not issuing a warning in this case, and he did not need to know anything other than the radar images to understand everything there was to understand about all aspects of the weather during Hurricane Katrina.  *Lemon Testimony*, 1822:12-24.  Mr. Lemon did not explain why a forecaster would need to know so much more than a hindcaster in order to be accurate.

480.    This is the first instance in which Mr. Lemon has ever performed a hindcast of a thunderstorm or weather system.  *Lemon Testimony*, 1821:19 to 1822:4.

137

**H.**      **Mr. Lemon's Practice of Always Keeping the Dealiasing Function "On"**

481.      Mr. Lemon identified a mesocyclone and supercell at 3:31 A.M. CDT, approximately five miles North of what he believed to be the barge location on the IHNC.  Mr. Lemon identified this not by using NOAA's or the National Weather Service's algorithms reflected in the NOAA Level III mesocyclone product, but by using Level II data which he processed himself and by using the algorithms installed on the GRAnalyst private software package he was using.  *Lemon Report*, DX-311, p. 16; *Mitchell Demonstratives*, PX-436, p. 45; *Mitchell Testimony*, 985:5-20.

482.      Mr. Lemon admitted, in response to a question from the Court, that a mesocyclone can create wind that is flowing toward the radar, correctly appears green, and is not folded.  1761:25 to 1762:5.

483.      Mr. Lemon testified that if the wind is moving at right angles to the radar beam, there is no translational velocity to be subtracted and there is no problem.  *Lemon Testimony*, 1762:6-19.

484.      However, Mr. Lemon also testified that one must automatically apply a dealiasing algorithm to all of the data.  *Lemon Testimony*, 1762:8-13.

485.      Mr. Lemon testified that when one sees data one did not expect, one knows that the data is aliased and needs to be dealiased.  *Lemon Testimony*, 1763:11-14.

138

486.     The effect of Mr. Lemon's always keeping the dealiasing function "on" in his use of the GR2Analyst program he helped develop is to transform every image to make virtually all winds appear to be consistent with the synoptic wind field.  *Lemon Testimony*, 1815:7 to 1819:2. Mr. Lemon summed up this phenomenon:

> Q.   And all I have to do to fix up this data is press this button, and it all smooths out.  And, again, we have everything consistent with the synoptic winds; correct?
> A.   That applies the dealiasing algorithm, and it appears to be working correctly, yes.
> Q.   Yeah, because it shows everything to be in the same direction again; right?
> A.   That's not why no.
> Q.   That's the effect of it; right, sir?  That's been the effect of it every single scan I randomly put up; correct?
> A.   Every single scan that you put up, you've run the dealiasing algorithm.  It does appear to be correct.  It does appear to be consistent.

*Id.*, 1818:15 to 1819:2.

487.     Mr. Lemon did not testify that there would be no error introduced by successively dealiasing data that has already been dealiased.

## I.     Mr. Lemon's Confusion About the Validity of NOAA Data

488.     Mr. Lemon displayed confusion about whether he was saying that there was a problem with the Level II data he used, or with the Level II data Dr. Mitchell used, or both:

> Q.   So the level II data that was put out by NOAA, it's your contention there was something wrong with it; correct?
> A.   That's true, yes.
> Q.   That's the same level II data that you used; correct?
> A.   No, incorrect.  That is level II data that came from the RPG, so it's been processed in the RPG.  That's where the velocity dealiasing occurs.
> I didn't get—the level II data that I got is directly from the signal processor.  It's level II data.  It is not level III data.  Is it has not gone through the RPG, where the dealiasing algorithm runs.
> Q.   So the level II data that NOAA put out was defective, according to you?

139

      A.   No, the level II data was fine.  It was the level III dealiasing problem.  That's where the problem occurred.  In level II, dealiasing of level II data.

      Q.   So level—the level III data was now defective—the level III data that NOAA put out, correct, has been defective?

Correct?

      A.   Those products, yes.

      Q.   That's your contention; correct?

      A.   Yes.

*Lemon Testimony*, 1804:23 to 1805:19.

489.   Mr. Lemon then denied twice that NOAA had been putting out incorrect Level III data about Hurricane Katrina for five years.  *Lemon Testimony*, 1805:20-24.

490.   Mr. Lemon then stated that NOAA's Level III products for Hurricane Katrina were "problematic."  He added: "There is a problem there, though."  *Lemon Testimony*, 1807:8-12.

491.   Mr. Lemon then denied that NOAA's Level III data for Hurricane Katrina were defective, and stated that the data were currently good, as far as he knew.  *Lemon Testimony*, 1807:14-18.

492.   Mr. Lemon then compounded his confusion:

      Q.   This is, again, your deposition just a few days ago where you called the data that was available:  "I mean, *this is bad data*.  So I immediately"—that's when you immediately noticed it—"took a look at it and think what's wrong with this?  I looked further at the character of the displayed velocities.  It became very obvious to me it hasn't been dealiased."

      Isn't that the problem you contend exists with the NOAA data?

      A.   In this case, in those products, yes.

*Lemon Testimony*, 1808:10-18 (emphasis added).  Mr. Lemon then called the NOAA data "defective," and admitted it was still in use:

      Q.   This is the largest national disaster in U.S. history.  For five years, all the

140

scientists that have been studying it, all the experts that have been looking at it, everybody that's looked at anything having to do with it, hasn't noticed that it's bad data, data that you immediately noticed is bad; right?

That's your contention?

A.   No.  What I'm saying is these particular products of those that Dr. Mitchell used clearly had non-dealiased data, alias data, within them.  *They were defective.*

Now, you asked another question.  You asked do I mean that all the scientists who have looked at all this data have been looking at bad data?  It depends on what data they're looking at, what data they're using, whether they're relying on these specific products or not.  I don't know what data all these scientists have relied on.

THE COURT:  When you say "products," do you mean the software or the actual specific image that we're talking about?

MR. BEST:  Products usually refer to image—images.

THE COURT:  All right.  Just to get it clear.

BY MR. KHORRAMI:

Q.   *And if I contact NOAA today, I would get the very same data, the very same bad data; correct?*

A.   *I assume so.*

Q.   Okay.  They've taken no steps to correct it since you've contacted them; correct?

A.   I contacted Tim Crum of the ROC, that's not NCDC.  And I talked to Tim Crum and Dave Zittel in the applications branch.

I also sent them examples from Dr. Mitchell's report, and we have talked about it. We've talked about what the problem is.

I have made recommendations to Tim Crum on how this problem might be rectified and how we might prevent this from happening in the future.  *That's as far as this has gone, to my knowledge.*

*Lemon Testimony*, 1808:19 to 1810:1 (emphases supplied).

493.   Mr. Lemon stated that Mr. Crum agreed with him that the data on which Dr.

Mitchell relied was not properly dealiased, but this was not admitted for the truth of the matter.

It was admitted only to show Mr. Lemon's state of mind.  *Lemon Testimony*, 1825:23 to 1826:10.

494.   Mr. Lemon admitted that the error he accused NOAA of making was "very rare":

THE COURT:  It's my understanding on a base level that the general proposition is that level III products are dealiased.

THE WITNESS:  Yes.

THE COURT:  However, it is your opinion that this particular Level III product that we are talking about—I'm not sure exactly which one it is -- was, in fact, not dealiased.

THE WITNESS– That's correct.

BY MR. KHORRAMI:

Q.   And it is also true that it is very rare that data from the National Weather Service and NOAA would be released dealiased; correct?  This type of data?

A.   Very rare that it would be released dealiased?

Q.   Yes.  I'm sorry.  When it's not dealiased.  I apologize.

A.   Alias'

Q.   When it's alias; correct?

A.   Yes, I would say so.  In level III, yes.

Q.   Okay.  I'm just going to reask the question just to have a clear record.  I didn't ask a very good question.

It is very rare for the National Weather Service and NOAA to release this data aliased; correct?

A.   Level III base products, I would say yes.

*Lemon Testimony*, 1810:2-24.

### J.   **Mr. Lemon's Confusion About the Dealiasing of NOAA Data**

495.   Mr. Lemon stated that the WSR-88D radar automatically corrected the range-

overlay problem "in the RPG" that produces the "Level II data stream":

Q.   Now, when the National Weather Service and NOAA put out documents, particularly products, whether they're level III or level II, they dealias them already; correct?

A.   Incorrect.  The level II data stream is—comes directly out of the signal processor, and it is not dealiased because the dealiasing is done in the RPG.  The range—it is range overlay corrected.

*Lemon Testimony*, 1802:18-24.

496.   Mr. Lemon further explained that Level II data comes from the RPG, and has

been processed in the RPG.  He added: "That's where the velocity dealiasing occurs." *Lemon*

*Testimony*, 1805:2-4.  He later referred to "the dealiasing algorithms that are in the RPG." *Id.*, 1813:6-7.

### K.      Mr. Lemon's Confusion About the Concept of Aliased and Dealiased Data

497.    A fundamental aspect of Mr. Lemon's testimony commingled and confused different concepts.

498.    Mr. Lemon described the concept of aliased data and the need for dealiasing in terms of the problem of range overlay, which he called the "Doppler dilemma" and which he stated caused wind velocities above 64 knots away from the radar—which should appear as red on the images—to appear as wind velocities of 64 knots towards the radar—which appears as green on the images:

> Q.   All right.  We're going to move to another concept, which, for the patience of the Court as we move through it, we're going to talk about dealiasing and folded data.  So I'm going to ask for the next slide.
>
> Mr. Lemon, explain for the Court the scale that works from the bright green at minus 64 to the bright red at 64, and explain to the Court what happens when the radar detects a wind that blows at a speed larger than 64.  Let's talk to the Court about that.
>
> A.   Okay.  Remember, I mentioned we're talking about a phase change in velocity.
>
> By the way, in talking about this, we're talking about what's called "the Doppler dilemma."  It's very well known.  It was the major impediment that kept us from implementing Doppler Radar as a warning tool for so long.  We had to overcome the Doppler dilemma.  *The Doppler dilemma results in range-overlay data which you have to unfold; and velocity, alias data.*
>
> I talked about the fact that we use—we followed the phase change of the signal.  If the phase change of the signal, the phaser, moves at less than 180 degrees, then it's easily correctly assigned—velocity is correctly assigned.
>
> If it exceeds 180, it's not; it becomes ambiguous.
>
> So this is the velocity spectrum.  We see the positive values here, the negative values here.  We go up to 64 knots.  In the waveform 8, the maximum unambiguous velocity is about 64 knots, which means that if the velocity progresses up here to 30 or

40, they're still well within the Nyquist—what's call [sic] the Nyquist co-interval.

When they reach 64, they're still there.  But if that flow toward the radar reaches 65, it folds, it flips back in on this side of the spectrum and becomes a negative 64.  And then as the velocity continues, the inbound velocity continues to increase, it actually comes out a lower and lower negative value.

Q.  So let's hypothetically assume that you've got a wind of 65 miles an hour.  It's going to show up on the radar as what color?

A.  65.

Q.  65.  What color is 65—65 away from the radar, which it should be red, but what color is it going to be on the display?

A.  It will be green.  65 will be green.  Because it will fold in, so you'll go from— the real key here is that you flip.

So you go from a very high red value to a very high green value.  You don't pass—you don't pass zero.

Q.  Okay.

A.  There's no zero crossing in there.  It flips from one end of the scale to the opposite.

Q.  All right.  And so 65 is bright green.

Now, the speed of the wind goes up more.  Now we've got a 75-mile-an-hour wind.  What color is that going to be on the radar?

A.  Well, it's going to be about—in the 50-knot range.

Q.  It's going to be darker green?

A.  Yes.

Q.  Okay.

A.  Not the bright.

Q.  Okay.  And so if you have these winds blowing at 65 or 66 or 70 or whatever, and it's showing up on the radar, even though it's away from the radar, the wind—even though the real wind is away from the radar, your data is showing up with these bright green values that suggests high values toward the radar, what do you have to do to make that data usable?

A.  You have to dealias the date.  You have to put it in what we call the correct Nyquist co-interval.  That's the challenge, is that we have to develop an algorithm that does that.

And the algorithm has gotten to be more and more complex with time because we find individual places where, oh, you know, that gets us—we didn't properly unfold it there, and we have to add to that.  So we have to come up computer programs to process the data to make sure that the velocities are correctly unfolded.

*Lemon Testimony*, 1754:17 to 1757:13 (emphasis added).

499.    Similarly, Mr. Lemon equated the range-overlay problem with the aliased folded-data problem later in his testimony:

>    THE WITNESS:  You see a lot of purple.  That purple is affectionately called in the weather service "purple haze," and it—what it means is range overlay data.  That is there are two —well, we've been unable to unfold the data.  So we know the velocities at those areas indicated as purple are coming from more than one range interval, more than one—more than one range interval.
>    So we have data from one location folded back onto another—onto the same location from another.  So we don't know where the velocities came from, so we have to color-code it purple.  We can't use the velocities.

*Lemon Testimony*, 1772:22 to 1773:7.

500.    However, in order to maintain his position that Level II data are always aliased and to justify his always keeping the dealias button "on," Mr. Lemon stated that the WSR-88D radar automatically corrected the range-overlay problem in the Level II data—which *is* the aliasing problem as he described it above—but still left the Level II data in need of aliasing:

>    Q.   Now, when the National Weather Service and NOAA put out documents, particularly products, whether they're level III or level II, they dealias them already; correct?
>    A.   Incorrect.  The level II data stream is—comes directly out of the signal processor, and it is not dealiased because the dealiasing is done in the RPG.  The range—it is range overlay corrected.

*Lemon Testimony*, 1802:18-24.  See the discussion above as to the velocity dealiasing occurring in the RPG itself.

501.    Mr. Lemon described the nature of aliased data in the same terms he had used to describe storm-relative images independent of dealiasing.  He described aliased data in terms of the combination of the "translational velocity" of the movement of the hurricane winds being added to the velocity of mesocyclone winds:

145

Q.   Dr. Mitchell is telling the Court that this green area right here is blowing—in reality, this is blowing toward the radar.

A.   It's not.  It's folded.

Q.   Okay.  So now the record's clear.

THE COURT:  Why is it folded?

THE WITNESS:  It's folded because the velocities on that side of the circulation—that circulation is moving with the hurricane-force winds, and you're adding the rotational velocity to translational velocity, and it's exceeded the unambiguous velocity limit.  It's folded back in on the negative side.  So we've gone from here back into the negative.  It's been folded.

*Lemon Testimony*, 1761:3-15.

502.   Simultaneously, Mr. Lemon described ground-relative velocity images in the same terms, combining the translational velocity of the movement of the hurricane winds with the rotational velocity of mesocyclone winds:

THE COURT:  All right.  So is the green, then, moving away from the radar?

THE WITNESS:  In a storm-relative fashion.  But in a ground-relative fashion, because of the strength of the hurricane winds, the flow is still away from the radar.

I can illustrate that by saying that if the wind flow is 60 knots and that mesocyclone is moving at 60 knots, it has a rotational velocity of 40 knots, that means that, on the right-hand side of the circulation, the winds will be 100 knots because you're adding rotation and the translation.

On the left side—or in our view here on the right-hand side of the circulation, you're subtracting the rotational velocity from translational.  But rotational velocity is only 40 knots; whereas, the storm is moving at 60 knots.  So the people on the ground on that side of the circulation experience the same direction of wind except now it's 20 knots, not like it is on the other side of the circulation where it's 100 knots.

*Lemon Testimony*, 1751:13 to 1752:5.  And see *Lemon Testimony*, 1753:9 to 1754:1, which stated:

THE COURT:  Green is toward the radar.  Yes, I've been dyslexic.  I apologize.

So the green, if we just use general directions, appears to be moving generally from south to north.  But in actuality, then, are you telling me, is that wind actually not moving towards the radar?  Or whatever—whatever is being shown there.

THE WITNESS:  Exactly.  Because in the lower left, it's storm-relative, where we

146

are standing inside the storm, moving with the storm, and we see the circulation within the storm.

Now, in the upper right, that's ground-relative. Now we've added in the larger-scale wind field, and the storm is traveling with that wind field. Because it's traveling so fast, even though within the storm the flow is toward the radar, at the ground level, the flow is actually away from the radar because of the speed, the translational speed, of that storm.

503. There is no testimony, cited source, or treatise in evidence that legitimizes Mr. Lemon's equivalence of aliased data needing to be dealiased with ground-relative data.

504. Mr. Lemon also confused the concept of dealiasing with the concept of storm relative-velocity images. He testified that dealiasing simply removed the translational motion of the hurricane winds from the velocity of the mesocyclone winds:

THE COURT: And how does one determine that, when it's folded and not folded?

THE WITNESS: Because you can—well, first of all, you apply a dealiasing algorithm to the data automatically, all the data. That's applied to the data. Frequently, if you have a rapidly moving mesocyclone like this, if it's moving at right angles to the radar sampling, then that—you've automatically subtracted the translational motion.

For instance, if that circulation is moving from left to right, and the radar is sampling it from south to north, it sees none of the translational velocity. So it sees the actual rotational velocity. But when that is moving with the winds, then that complicates it. It contaminates the flow of the circulation.

*Lemon Testimony*, 1762:6-19.

505. Simultaneously, Mr. Lemon described storm-relative velocity images as removing the translational motion of the overall hurricane winds from the velocity of the mesocyclone winds:

Q. What's the difference between storm-relative velocity and ground-relative velocity?

A. We teach the use of storm-relative because, in a storm-relative framework, you can see the circulations far more clearly than you can, you know, in ground-relative.

147

Storm-relative is essentially subtracting out the translational velocity of the storm. It's subtracting out the winds that bear the storm; that is, the hurricane winds are removed.  You're only seeing the circulation relative to the storm.  It's as though you're standing in the middle of that convective storm and moving with it.  So you see the circulation in the storm itself, the convective storm.

Q.   So, in other words, the storm-relative velocity, basically, takes away the hurricane, and what's left is whatever circulations are happening?

A.   That's exactly right.  And that's the framework in which the mesocyclone shows that most clearly.

THE COURT:  Is that—and you haven't used this word, but, in essence, the synoptic event is eliminated or—

THE WITNESS:  The synoptic, it's—it's the motion of the storm.  The storm is typically moving with the cloud bearing layer winds and slightly sometimes one way or the other.  But usually with the cloud bearing layer winds, and that—those winds are the hurricane winds.  So it removes that, the influence of those winds, so we can see the circulation.

*Lemon Testimony*, 1747:16 to 1748:16.  Mr. Lemon also testified:

Q.   All right.  Now, the mesocyclone we just talked about, can you identify the mesocyclone in the ground-relative velocity image on the upper right?

A.   Certainly.  To identify in storm-relative, we don't—we don't remove any data or add any data.  We shift the data from the circulation.  In the upper right, the mesocyclone is still there, but it's in—it's certainly almost masked by the extremely strong hurricane winds.

But you see right here on this side of the mesocyclone, that's where you add the circulation, the rotating wind field, to the translational wind field.  So in this case, on our left side of the circulation, that's where we added transation [sic]—translation and rotation.

*Lemon Testimony*,1749:23 to 1750:10.

506.   There is no testimony, cited source, or treatise in evidence that legitimizes Mr. Lemon's equivalence of dealiased data with storm-relative data.

507.   Mr. Lemon's confusion of basic concepts may be traceable to his lack of advanced education in the field.

148

L.   **Mr. Lemon's Confusion about NOAA's Algorithms**

508.   Mr. Lemon did not rely on any Level III data but focused almost exclusively on Level II data, which he called "base level" and which he testified was the "most reliable data." *Lemon Testimony*, 1795:19 to 1796:3.

509.   Mr. Lemon similarly testified that the mesocyclone and tornado vortex signature algorithms in the Level III products are rarely if ever used by weather forecasters.  The passage began when the Court asked for Mr. Lemon's views about the detection of mesocyclones by using NOAA algorithms and Mr. Lemon made representations about what all weather forecasters used:

> THE COURT:  But you have to see them looking at the—apparently, you can't do it by looking at the algorithms.  You have to—somebody has to be looking at the base data; correct?
> THE WITNESS:  That's exactly right, yes.
> THE COURT:  So who's doing that?  When we get our warnings, where do we get them from?
> THE WITNESS:  The warning forecasters are dedicated to AWIPS work stations, and that's exactly what they do.  *They look all the time at base data.*
> THE COURT:  So they are not—then when are the algorithms used?
> THE WITNESS:  *Just about never.  They're very rarely used.*
> THE COURT:  But why would we get those images that we saw in Dr. Mitchell's presentation of all the little white dots that say "mesocyclone"?
> THE WITNESS:  That's a good question.  In the design of this machine when it was—before we had even released it to the field, we designed, at the government's request, what we called a product request list, and it's made for level III products.  On that level III product request list are the TVS and mesocyclone algorithms.  So they're automatically, all the time, generated even though they're not used by the warning forecaster.

*Lemon Testimony*, 1785:6 to 1786:5 (emphases added).

510.    On cross-examination, Mr. Lemon retreated from his broad statements on direct examination, made different broad statements not backed up by any empirical data, and disclaimed any suggestion that the NOAA algorithms should not be used by forensic meteorologists:

> Q.   And this type of data, level III data, in general, produces false positives in pointing out mesocyclones; correct?
> A.   It does, yes.
> Q.   It produces a great deal of false positives; correct?
> A.   I would say that now with the MDA—as you pointed out, the MDA algorithm has been added since then—I think with the improvements that have been made, they're probably fewer, but they remain sill unreliable.
> Q.   It's a highly unreliable product; correct?
> A.   Yes, it is.
> Q.   And it's never used; correct?
> A.   Almost.
> Q.   It's never used by forecasters; correct?
> A.   Almost never used.
> Q.   It's --
> A.   I won't—*I don't know what every forecaster does*.  I know that, best practices, it is not used.
> Q.   It's never used by individuals to provide warnings to the public; correct?
> A.   Yes.
> *Q.   That doesn't mean that it's not used by forensic meteorologists; correct?*
> *A.   Correct.*

*Lemon Testimony*, 1811:20 to 1812:17 (emphases added).

511.    Mr. Lemon agreed that it is necessary to look at other information to check on the results of the algorithms, to avoid errors.  *Lemon Testimony*, 1738:16 to 1739:38 and 1741:16-19.

512.    Mr. Lemon stated that the algorithms used in 2005 were "very immature" and had "high failure rates."  *Lemon Testimony*, 1741:2-4.  He stated that algorithms had improved a great deal since 2005.  *Id.*, 1742:15-17.

513.    The analyses done by Dr. Mitchell were done in 2010.  He had to log onto

NOAA's computers in order to obtain the images from NOAA's data base.  The data he obtained

reflected the current state of the data.  *Mitchell Testimony*, 946:2-18.

514.    There is no evidence that the current state of NOAA data is dependent on the

2005 state of NOAA algorithms.

515.    Mr. Lemon described the problem with the algorithms inconsistently.  He stated:

"The algorithms, especially the mesocyclone and TVSR rhythms, have a very high false-alarm

rate; that is, they detect a lot of false positives that are simply not there."  *Lemon Testimony*,

1738:20-22.  From two to four pages later in the transcript, he described the problem as one of

true but delayed positives, and false negatives, with the algorithms detecting signatures only

some time after they were recognizable to a meteorologist looking at base data, detecting only

"very obvious signatures" and missing ones that are more subtle:

>       THE COURT:  And what's the purpose of the algorithms?
>       THE WITNESS:  The algorithms were meant to relieve the burden, take the
> burden off of the forecasters, so—the warning forecasters.  So he may be dealing with
> one storm; whereas, while another one is developing.
>       But, unfortunately, the algorithms, certainly in 2005, were very immature.  They
> had high failure rates.  So they simply are not relied upon.
>       THE COURT:  And, therefore, it's your opinion that it's more precise to look at
> the base data, and you can make a better diagnosis as to the precise weather phenomenon
> that's occurring rather than to look at the data with the algorithms?
>       THE WITNESS:  Well, actually, there have been tests after this time of matching
> the man and the algorithm and trying to compare how each perform.  And <u>the man in
> base-data analysis way outperforms the algorithm in both identifying the signatures
> earlier and identifying the intensity of the signatures and identifying the longevity of the
> signatures</u>.  The base data is a far better use.
>       Now, at the weather service, we teach that, if, in fact, you use the algorithms and
> you get a positive indication with the algorithm, you've got to go back to the base data
> and verify it.

THE COURT:  Now, the base data, would you agree that, even if one looks at the base data meticulously, that it still requires an interpretation, and there is no—it's not like a broken bone where you see the bone broken on an x-ray; it still requires some subjective interpretation.  Is that—would that be correct?  Are you 100 percent certain when you do the base data?

THE WITNESS:  100 percent certain, no, I wouldn't say 100 percent certain.  I would say that the algorithm, when it does so correctly, it identifies very obvious signatures.  The much—the subtle signatures are far more likely to be identified by a man than by the algorithm.

THE COURT:  Okay.  But to answer my question, certainly, the algorithm is subjective, and you're saying the—and I don't want to be putting words in your mouth, but the skilled person looking at the base data would be—it would be a less subjective methodology than the algorithm, or more accurate?

THE WITNESS:  Well, the algorithm is an objective method.  The user is—he exercises subjectivity.  There's no question about that.  However, in the last probably five years or a little more, there, we've developed the algorithm so they give us far more quanti[ta]tive information than they did before.

*Lemon Testimony*, 1740:22 to 1742:17.

516.    Mr. Lemon testified that the false alarms generally, but not always, involve shear data that is transient.  They involve velocity differences and sometimes create a false mesocyclone indication.  However, one can recognize them as being transient.  *Lemon Testimony*, 1742:25 to 1743:11.

517.    Neither the National Weather Service nor any of these organizations ever did a hindcast to see whether any of the Hurricane Katrina mesocyclone indications shown by the algorithms were wrong.  *Lemon Testimony*, 1744:10-16.

518.    Mr. Lemon's wholesale rejection of Level III data and the Level III products was personal, and was not shared by Timothy Crum, who is the Deputy Director of the Radar Operations Center.  Mr. Lemon testified that he trusted, respected, and relied upon Mr. Crum.  Mr. Lemon testifies that he found Mr. Crum—the Deputy Director of the Radar Operations

152

Center—to be an authority only "[o]n some aspects" of Doppler Radar.  *Lemon Testimony*,

1796:4-16.

519.    PX-451 is an article in which the same Timothy Crum is the lead author, entitled

"Recording, Archiving, and Using WSR-88D Data," published in the April 1993 Bulletin of the

American Meteorological Society at pp. 645-53.  *Lemon Testimony*, 1796:17-25.  Mr. Lemon

testified to the highlighted text in the exhibit:

> Q.   Do you see the highlighted areas?
> A.   Yes.
> Q.   An advantage of using level III data versus level II is that no base-data
> processing is required; correct?
> A.   Yes.
> Q.   Do you agree with that statement?
> A.   Yes.
> Q.   And meteorological—one of the advantages is that meteorological research
> and legal inquiries concerning the atmospheric conditions present near the radar.  That's
> one of the advantages of using level III data; is that right?
> A.   Yes, that's true.
> Q.   And I think we have—and level III data, again, is appropriate for studies of
> important weather events; correct?
> A.   Yes.
> Q.   That includes forensically studying weather events; correct?
> A.   Yes, it does.
> Q.   Again, level III data is appropriate for use in legal matters and studies of
> important weather events; is that correct?
> A.   That's true.
> Q.   And you agree with Mr. Crum; correct?
> A.   I do.
> Q.   But you didn't review any level III data and you didn't rely on it; correct?
> A.   I did not.

*Lemon Testimony*, 1797:16 to 1798:17.

520.    Mr. Lemon claimed that the software program he helped a non-meteorologist

programmer develop was much more free of errors than the products developed by the U.S.

153

Government, and then inconsistently claimed that it was not more accurate than the products

developed by the U.S. Government:

> Q.  Now, your product, the GR2Analyst, you placed many slides in front of the Court from that.  Not one of them has been defective, has it?
> A.  Not that I know of.
> Q.  Our entire government puts out a product, and it's largely ineffective at pointing out mesocyclones; and a private software, of which you're a developer, never makes a mistake.  Right?
> A.  To err is human, and I certainly wouldn't say that Mike Gibson has never made an error.
> Q.  But it's more accurate than our government is; right?
> A.  No, I wouldn't say that.  We use—in the weather service we used what's called AWIPS, Automated [sic] Weather Information Processing System.  That uses the dealiasing algorithms that are in the RPG, and it also uses improved applications algorithms.  Those are two different things improved since Katrina.
>
> Mike Gibson also uses algorithms in his system for the mesocyclone and TVS and hail.  Those three algorithms he uses come from the National Severe Storms Laboratory, who are in the process of developing improved algorithms.  Mike doesn't have to wait for the weather service to go through all its testing.  He can take the algorithms, implement them, and test them himself.

*Lemon Testimony*, 1812:18 to 1813:16.

521.    Mr. Lemon did not present any mesocyclone flags or indicators identified by the

GR2Analyst software he used.

522.    Mr. Lemon inconsistently testified that in performing the type of analysis he

performed, it was necessary to look at all of the data available to him.  *Lemon Testimony*,

1819:19-23.

## M.    Dr. Dooley's Conclusions and Their Limitations

523.    Dr. Dooley testified that he did not rely on any radar data in reaching his

conclusions.  *Dooley Testimony*, 1918:12-20.

154

524.    Dr. Dooley did not rely on any information Mr. Lemon gave him, and did not even know Mr. Lemon at the time of his report. *Dooley Testimony*, 1918:21-23.

525.    Dr. Dooley testified that it was possible to estimate the wind conditions at a point where there is no reporting station of measure of wind conditions by interpolating data from other reporting stations. *Dooley Testimony*, 1836:16 to 1837:16.

526.    Dr. Dooley testified that it is possible to estimate the wind conditions in the IHNC during Hurricane Katrina by using this process. *Dooley Testimony*, 1838:3-9.

527.    Referring to Buys Ballot's Law, Dr. Dooley testified that the winds operating on the IHNC would have to have been the same as the synoptic wind flow, and would have been from the Northeast to the Southwest, or from the East to the West, before some time on Monday morning, August 29, 2005.  Between 7:00 A.M. and 9:45 A.M. CDT on August 29, the winds over the IHNC would be Northeasterly.  The winds would then "back," become more and more Northerly, and then become more and more Westerly. *Dooley Demonstratives*, DX-347, pp. 7-16; *Dooley Testimony*, 1838:22 to 1849:24.

528.    Dr. Dooley testified: "So these are well accepted applications of understanding the synoptic scale wind conditions around a hurricane.  There's no dispute over these facts." *Dooley Testimony*, 1849:22-24.

529.    Dr. Dooley admitted on cross-examination that Buys Ballot's Law was not as simple as he had described it on direct examination. *First*, it was designed to be used on water, not land, and it most accurate over water. *Second*, when used on land there has to be a correction for friction. *Third*, when used near structures like buildings there has to be a correction for the

155

friction of the structures. *Fourth*, it only applies to uninterrupted air flow, so it could not be applied if there was a wall around the observer. *Fifth*, it's not about where the low-pressure area is, it's about the direction of the wind. *Sixth*, it is not precise but only gives a sense of the synoptic scale. *Seventh*, local winds can interfere with it. *Dooley Testimony*, 1929:25 to 1932:7.

530.    Dr. Dooley did not use any method that would detect mesocyclones. *Dooley Testimony*, 1918:24 to 1919:1.

531.    Dr. Dooley did not use any method that would detect microbursts or downbursts, unless they were captured in the Lakefront Airport wind direction or wind speed and were significant there. *Dooley Testimony*, 1919:2-11.

532.    Dr. Dooley stated his opinion that anything that affected the IHNC would also affect the Lakefront Airport. *Dooley Testimony*, 1919:9-19.

533.    However, Dr. Dooley stated that, as to Dr. Mitchell's data showing two mesocyclones South of the IHNC, he would not expect to see any signature of such mesocyclones at the Lakefront Airport. *Dooley Testimony*, 1920:21 to 1921:1.

534.    Dr. Dooley did not use any method that would detect thunderstorms. *Dooley Testimony*, 1919:20-22.

535.    Dr. Dooley did not use any method that would detect tornado vortex signatures. *Dooley Testimony*, 1919:23-25.

536.    Dr. Dooley did not use any method that would detect wind shears, other than his belief that a wind shear would have shown up on the anemometer. *Dooley Testimony*, 1920:1-18.

156

537.   Dr. Dooley did not take any convective activity into account in his calculations. *Dooley Testimony*, 1918:4-5.

538.   Dr. Dooley agreed that mesocyclones could affect wind patterns at the surface. *Dooley Testimony*, 1921:2-4.

539.   Dr. Dooley agreed that microbursts would affect wind patterns at the surface, but stated they would have less effect than in still, warm air because n the way down they would hit more than a thousand feet of swiftly moving air, and "you would see some type of vectorial resolution from that downdraft," that there may be resulting peaks and lulls, but it would ultimately go in the direction of the prevailing wind.   *Dooley Testimony*, 1921:5 to 1922:1.

540.   Dr. Dooley denied that he was saying there would be no destructive effect to downbursts in a hurricane: "I think if you were subject to a strong downburst and that downburst added significantly to the speed of the prevailing wind, you could the get blown-downs, absolutely."   *Dooley Testimony*, 1922:12-14.

541.   Dr. Dooley did not rely on any eyewitness information, or on any information on water movement or wave direction, but relied only on what he called "first-level scientific data" of wind directions and speeds.   *Dooley Testimony*, 1910:12 to 1911:9.

542.   Dr. Dooley did not make any calculations of what the wind did to the barge. *Dooley Testimony*, 1911:10-17.

543.   Dr. Dooley's estimates of wind conditions at the IHNC started at midnight CDT on August 28/29, 2005 and continued through August 29.  He did not include any estimates of

wind conditions on Sunday, August 28, 2005.  *Dooley Report*, DX-198, Tables 6A, 6B, 6C, 7 and 8, pp. 23-34; *Dooley Demonstratives*, DX-347, pp. 19-42; *Dooley Testimony*, 1928:11-16.

544.    Dr. Dooley testified that he expected the visibility conditions at the Lakefront Airport would also be applicable to the IHNC.  From 3:00 A.M. to about 6:53 A.M., visibility was no less than 0.3 miles.  At 4:53 A.M., visibility was half a mile.  Throughout the morning, there was visibility of between 0.3 and 0.5 statute miles.  At 6:19 A.M., visibility was four miles. *Dooley Testimony*, 1912:12 to 1913:24.

545.    During the period of time covered by his analysis, Dr. Dooley did not record any wind speeds lower than 30 knots, or about 34 miles an hour.  Most wind speeds were in the 40s and touching into the 50s.  *Dooley Testimony*, 1928:20-23.

546.    Relying on Figure 91 from DX-196, Dr. Cushing's Report, Dr. Dooley testified that the barge had 19.5 feet of "windage," where the wind could blow on the barge, and that this was similar to the sail on a sailboat.  *Dooley Demonstratives*, DX-347, p. 3; *Dooley Testimony*, 1837:21 to 1838:2.

**N.    Dr. Dooley's Reluctance to Admit the Obvious When it Was Adverse to His Client**

547.    Although Dr. Dooley recognized that a mesocyclone rotates, and it necessarily follows that one side of the mesocyclone would rotate in the direction of the synoptic wind and the other side would rotate in a direction counter to the synoptic wind, he was very reluctant to admit that any part of the mesocyclone would rotate in a direction counter to the synoptic wind. *Dooley Testimony*, 1923:18 to 1924:21.

158

548.    Although Dr. Dooley recognized that a mesocyclone could affect wind patterns at the surface, *Dooley Testimony*, 1921:2-4, he was very reluctant to admit that any part of the mesocyclone near the surface could rotate in a direction counter to the synoptic wind.  *Id.* at 1924:22 to 1925:7.

549.    Although Dr. Dooley repeatedly referred to the "prevailing wind," he assumed that the synoptic wind was always the prevailing wind, and could not admit that a downdraft's wind could ever, even for a nanosecond, become the prevailing wind or move in a direction counter to the synoptic wind.  *Dooley Testimony*, 1925:8-22.

550.    Although Dr. Dooley admitted that during the period of time covered by his analysis, from 12:01 A.M. CDT on August 29, he did not record any wind speeds lower than 30 knots, or about 34 miles an hour, and that most wind speeds were in the 40s and touching into the 50s, *Dooley Testimony*, 1928:20-23, and although he was asked to accept that the moorings on Barge 4727 would have broken at about 30 miles an hour, he refused to admit that the moorings of the barge could have broken at any time after 12:01 A.M. CDT on August 29, and would only discuss the wind speeds as isolated matters.  *Id.*, 1928:24 to 1929:12.

**O.    Dr. Dooley's Reliance on Ocean Weather, Inc.**

551.    Dr. Dooley relied on a 2006 hindcast from Ocean Weather Inc. ("OWI") to provide raw data for average 30-minute wind speeds and directions from four locations at varying distances from the IHNC, as long as their anemometers lasted, and then Dr. Dooley personally interpolated the data to estimate the wind speed and direction at the IHNC at various

times.  The IHNC was not a grid point.  *Dooley Report*, DX-198, pp. 21-31; *Dooley*

*Demonstratives*, DX-347, pp. 17-29; *Dooley Testimony*, 1851:1 to 1857:4 and 1917:4-14.

552.    Dr. Dooley apparently did not perform calculations to do his interpolation; he

testified that he came up with his numbers by eyeballing the four grid points:

> Q.  Okay, that's it.
> And it took data used from four grid points, correct?
> A.  Yes, sir.
> Q.  And then from there, you came up with what you believe would occur at the
> industrial canal, correct?
> A.  If by looking at the four corners, you can visually interpolate it into that
> location, yes, sir.

*Dooley Testimony*, 1917:4-9.

553.    The OWI hindcast used reports of the prevailing winds in the synoptic scale,

averaged them over 30 minutes in running or rolling sets, and reported the running or rolling sets

every 15 minutes.  It did not use the actual wind measurements at each station, but modified

wind reports into models based on pressure patterns and reported those as the wind data.  *Dooley*

*Testimony*, 1913:25 to 1917:2.

554.    The wind speeds used by Dr. Dooley did not measure average wind speeds at

shorter intervals, but assumed they were a constant function of the average 30-minute wind

speeds.  Dr. Dooley's Report states that OWI recommended multiplying the 30-minute average

wind speed by 1.09 to obtain the 10-minute average wind speed, multiplying the 30-minute

average wind speed by 1.24 to obtain the 1-minute average wind speed, and multiplying the 30-

minute average wind speed by 1.53 to obtain the 3-second average speed of wind gusts.  *Dooley*

*Report*, DX-198, p. 22.

160

555.    Nevertheless, Dr. Dooley spoke of decreases in the average speeds of wind gusts as if they were measures of wind speed independent of average wind speeds for longer periods, instead of their being simple arithmetical constructs of each other. *Dooley Testimony*, 1860:1-5.

556.    Notwithstanding Dr. Dooley's and OWI's use of 30-minute average wind speeds and arithmetic constructs to estimate average wind speeds over shorter periods of time, Dr. Dooley's report makes clear that the National Weather Service standard is to use average one- or two-minute wind speeds to show the "sustained winds," and that the National Weather Service does not arithmetically change the two-minute value to estimate a one-minute value:

> Maximum Sustained Wind: The maximum sustained wind mentioned in the NHC advisories issued for tropical storms and hurricanes are the highest 1 minute surface winds occurring within the circulation of the system.  These "surface" winds are those observed (or, more often, estimated) to occur at the standard meteorological height of 10 m (33 ft) in an unobstructed exposure (i.e., not blocked by buildings or trees).  Since the inauguration of the Automatic Surface Observation System (ASOS) the National Weather Service has adopted a two minute average standard for its sustained wind definition.  This is because the ASOS stations average and report their wind data over a two-minute period.  There is no conversion factor to change a two-minute average wind into a one-minute average wind, and it is pointless to try to estimate the highest one-minute wind over a two-minute period, as they are essentially the same.

*Dooley Report*, DX-198, p. 4.

557.    Wind reports in Hurricane Katrina were limited because of instrument failures in many locations.  Such failures could have been caused by the weather, including downbursts, thunderstorms, wind, and other hurricane weather phenomena. *Dooley Testimony*, 1917:15 to 1918:3.

**P.     Dr. Dooley's Reliance on Lakefront Airport Data**

558.    Dr. Dooley also used automated wind data from the Lakefront Airport, until its anemometer failed at 6:53 A.M. CDT.  The Lakefront Airport was an ASOS station.  Dr. Dooley explained that the automated system records wind speeds every five seconds, creates two-minute averages of 24 of those five-second observations, and averages those two-minute averages in its automated regular or special reports.  *Dooley Report*, DX-198, p. 34; *Dooley Demonstratives*, DX-347, pp. 30-43; *Dooley Testimony*, 1857:5 to 1862:5.

559.    The Lakefront Airport wind direction measurements were approximate, in even tens of degrees; the charts did not show 31 degrees or 34 degrees or 38 degrees or 42 degrees, but showed either 30 or 40 degrees for such measurements.  Dr. Dooley explained that the automated system averaged wind directions to the nearest ten degrees.  *Dooley Testimony*, 1862:21 to 1863:2.

560.    Dr. Dooley volunteered, in addition to his response to a different question, that "Anybody who was serious about analyzing wind conditions near New Orleans at the time would have used that data," referring to Lakefront Airport data.  *Dooley Testimony*, 1861:11-13. However, he was less than certain whether IPET had used it, and testified only that he believed IPET had used it.  *Id.*, 1861:14-15.

561.    The Court observed that Dr. Dooley's reported wind direction from the Lakefront airport at 3:36 A.M. CDT was 90 degrees, from due East to due West, and Dr. Dooley's reported wind direction was 30 degrees at 3:43 A.M. CDT.  This is a North-Northeast wind.  The chart shows that Dr. Dooley's reported wind direction was also 30 degrees at 3:28 A.M. CDT.  Dr. Dooley stated that he thought the explanation was that this was near a time of convergent winds

fond by Dr. Lemon, and this affected wind direction at the Lakefront Airport. *Dooley Report*, DX-198, p. 34; *Dooley Demonstratives*, DX-347, p. 42; *Dooley Testimony*, 1858:8 to 1860:5.

562.    Mr. Lemon had identified a mesocyclone at 3:31 or 3:32 A.M. CDT, which his report stated was shallow at about 1,000 feet, and which in his analysis would have "essentially no effect at the barge location" except for heavy rain. *Lemon Report*, DX-311, at 16.

563.    Dr. Dooley's explanation necessarily requires that this mesocyclone have had an effect on wind conditions at anemometer height, close to ground level. *Dooley Report*, DX-198, p. 4 (standard height is 10 meters from the ground). Dr. Dooley testified that this was the height of the data from the anemometers he used, except that the Lakefront Airport anemometer was at 27 feet above ground level. *Dooley Testimony*, 1883:12 to 1884:1.

564.    Dr. Dooley admitted that local wind conditions can vary to some degree from Buys Ballot's Law, as he saw it. *Dooley Testimony*, 1860:8-16.

565.    Dr. Dooley testified that there may have been a wind from 285 degrees at 100 miles an hour in a gust for 3 to 5 seconds, but no long-term sustained wind. He did not explain why such a 285-degree wind would have been limited to 3 to 5 seconds. *Dooley Testimony*, 1887:1-18.

566.    Dr. Dooley testified that the Lakefront Airport showed basically Easterly wind directions, with perturbations at times, until the anemometer failed. *Dooley Testimony*, 1863:5 to 1866:13.

567.    Dr. Dooley testified that he did not see evidence of mesocyclones or short-period multidirectional winds from the anemometer data he saw. *Dooley Testimony*, 1866:14 to 1867:9

163

and 1885:16 to 1886:4.  He did, however, agree that there were thunderstorms in a hurricane, that they have effects on the ambient air flow, and that they can produce peaks, lulls, and gusts in wind speed.  He testified that such effects would always be in the direction of the easterly flow and the boundary layer because the synoptic flow will always predominate.  He testified that lulls are not important.  *Id.*, 1868:7 to 1871:19.

568.    Dr. Dooley was certain that no mesocyclonic activity affected the IHNC.  *Dooley Testimony*, 1871:20 to 1875:9.

569.    However, Dr. Dooley admitted that the 90-degree wind direction at 3:36 A.M. CDT at the Lakefront Airport, which he had characterized as the effect of a mesocyclone, had to be an average of wind directions that included a wind of greater than 90 degrees.  *Dooley Testimony*, 1925:25 to 1926:24.

570.    Dr. Dooley then compared wind speeds at the Lakefront Airport with the wind speeds at the IHNC, and found that they were similar.  He testified that if something happened at the IHNC, he would expect the same kind of thing would have happened at the Lakefront Airport.  He discussed the IHNC "values" and the Lakefront values in his tables as if they were completely independent, and did not mention during this part of his testimony that they would have to be similar because the IHNC "values" were estimated based in part on the Lakefront values.  *Dooley Testimony*, 1876:2 to 1879:1.  He similarly compared the Lakefront data to the OWI hindcast as it they were independent, without mentioning that the OWI hindcast involved the Lakefront airport data and the interpolation of data at the IHNC was the same interpolation he did when he compared IHNC "values" to the Lakefront values.  *Id.*, 1879:2 to 1881:15.

164

571.    Dr. Dooley's conclusion that two sets of data, each calculated to have an arithmetic relation to another set of data, are closely correlated with each other, does not add anything to his analysis.

Q.    **Gaps in the Lakefront Airport Data**

572.    The Lakefront Airport records data every five seconds, averages 24 of those observations into a two-minute average, and is supposed to make reports every one minute, reporting a set of running or rolling two-minute averages of data for everything except the 10-minute gust reports that cover the preceding ten minutes.  *Dooley Testimony*, 1897:23 to 1898:10, 1899:4-6, and 1901:4-8.

573.    When the Lakefront radar reported at 4:29 A.M. CDT, for example, it reported data from 4:27 to 4:29 A.M. CDT.  *Dooley Testimony*, 1899:7-9.  This answer did not mention the 10-minute gusts.

574.    The Court observed that most of the Lakefront Airport observations were five to seven minutes apart, and that there was a 29-minute gap from 4:00 A.M. to 4:29 A.M. CDT.  Dr. Dooley stated that he could not explain the gap.  *Dooley Report*, DX-198, p. 34; *Dooley Demonstratives*, DX-347, pp. 30-43; *Dooley Testimony*, 1862:6-15 and 1898:16-20.

575.    There was also a 26-minute gap in reports between 5:03 A.M. and 5:23 A.M. CDT.  *Dooley Testimony*, 1898:21-23.

576.    There was also a 14-minute gap between 6:05 A.M. and 6:19 A.M. CDT.  *Dooley Testimony*, 1898:24-25.

165

577.    Dr. Dooley testified that the regular reports are called "metars" and are made hourly, that the observations in his tables are "special reports," and that the absence of reports during a period of time means that there was nothing to report.  *Dooley Testimony*, 1899:12-16.

578.    Dr. Dooley explained the fact that the system reported at 4:00 A.M. despite the fact that there had been no change since 3:53 A.M. CDT on the ground that the 4:00 A.M. report was a metar and that drove the report despite the absence of anything to report.  *Dooley Testimony*, 1899:17-21.

579.    Dr. Dooley admitted in response to the Court's question that there was no change from 3:43 A.M. and 3:46 A.M.  *Dooley Testimony*, 1899:22-24.  The system reported anyway. *Id.*, 1900:2-12.

580.    Dr. Dooley admitted that there was nothing special that occurred between 4:29 and 4:37 A.M., but the system reported anyway.  *Dooley Testimony*, 13-20.  Dr. Dooley said that the 4:29 A.M. CDT report was a special report, but admitted he did not know why it was special. *Id.* at 1900:19 to 1901:3.

581.    Dr. Dooley testified that the Lakefront Airport did make "peak wind" reports during the period of the gaps, that he obtained the data from the NCDC (National Climatic Data Center), that he did not look at these data, and that he did not include it in his reports.  *Dooley Testimony*, 1901:6 to 1902:5.

582.    Dr. Dooley accepted that microbursts would last for 10 minutes or less.  *Dooley Testimony*, 1902:6-16.

583.    If a microburst occurred at 4:01 A.M. with wind spreading out in all directions when it hit the ground, Dr. Dooley said that the change in wind direction should have triggered a special report, although he could not say why special reports were made when there was no change in wind direction or speed.  He stated that squall events also triggered special reports, such as the one at 3:43 A.M. CDT with a code of "18" meaning a squall event   He defined a squall event as one involving a sharp increase in wind speed over the time frame in question. *Dooley Testimony*, 1903:3 to 1905:18.

584.    Dr. Dooley explained that, when he was asked previously about changes in data from one report to the next, he was focusing only on wind speed and direction.  *Dooley Testimony*, 1906:3-13.

585.    Dr. Dooley admitted that wind averages can be the same, even if one is averaging over a very wide variation and one is averaging over a narrow variation.  *Dooley Testimony*, 1908:25 to 1909:11.

586.    Dr. Dooley admitted that, if a 270-degree wind lasted for one minute or for thirty seconds and a 90-degree wind lasted for one minute or thirty seconds, the average would be a range in between.  He stated that such an event would show up in the metar data.  *Dooley Testimony*, 1909:12 to 1910:8.  Dr. Dooley did not advert to the fact that metar reports are issued only hourly.

### VI.  Injury and Remedies

**A.**        **Damages of Josephine Richardson**

587.        Plaintiff Josephine Richardson was born on March 19, 1928.  Joseph Richardson,

Sr. was born on March 28, 1928.  *(PX 341, Death Certificate of Joseph Richardson).*  Joseph

Richardson, Sr. and Josephine Richardson were married on October 8, 1947.  *(PX -320,*

*Marriage Certificate; Trial Testimony of Josephine Richardson, p.78:3-4).*  They purchased their

home at 1321 Egania Street in the Lower Ninth Ward in 1954.  *(Trial testimony of Josephine*

*Richardson, p.744:3-4; PX -318,  Real Property Ownership Documents*;  *PX -319 Real Property*

*Ownership Documents; PX- 321, Judgment of Possession*).  The property was paid-for in full at

the time of Katrina, and owned entirely by Mr. and Mrs. Richardson.  *(PX-458, Deposition*

*Testimony of Richardson, p.37:8-10; PX  318*; *PX  319*; *PX  321).*  They lived together at this

residence at the time of Hurricane Katrina. *(PX-458, Deposition testimony of Richardson,*

*p.37:16-19).*  The house was, leading up to Katrina, a single story, brick-faced, raised structure.

*(PX 458, Deposition testimony of Richardson, p.120:24-25; PX -318*;  *PX -319*;  *PX -321).*

588.        On August 28, 2005, Ms. Richardson left 1321 Egania and went to her brother's

home at 3800 Clermont Drive, New Orleans, Louisiana.  *(PX-458, Deposition Testimony of*

*Richardson, p.38:5-12).*  Mrs. Richardson left because a prior hip injury would have caused

difficulty if it was necessary to get Mrs. Richardson into the attic during the storm.  *(PX-458,*

*Deposition testimony of Richardson, p.64:19-p.65:5).*  Mr. Richardson remained at 1321 Egania

to care for the property.  *(PX-458, Deposition Testimony of Richardson, p.58:7-21).*  Mrs.

Richardson recalled her experiences in Hurricane Betsy, and expected that any flooding during

Katrina would be limited.  *(PX-458, Deposition testimony of Richardson, pp.51-55)*.  To Mrs. Richardson' knowledge, Mr. Richardson was in good health.  *(PX-458, Deposition Testimony of Richardson, p.51:4-12)*.  Mrs. Richardson believed that Mr. Richardson would be safe if flooding occurred.  *(PX-458, Deposition testimony of Richardson, p.68:8-15)*.  At around 11:30 Sunday night, August 28, 2005, she and Mr. Richardson spoke by telephone.  *(PX-458, Deposition testimony of  Richardson, p.76:1-21)*. Mrs. Richardson remained at safely at her brother's home through Hurricane Katrina, as flooding at that location went only half-way up the house.  *(PX-458, Deposition testimony of Richardson, p.72:4-17)*.  Three days after the storm, the National Guard took Mrs. Richardson from 3800 Clermont to the Superdome, whereafter, she was transported to a shelter in Dallas, Texas, and then to Stone Mountain, Georgia, where Mr. and Mrs. Richardson's son, Jeffery Richardson, resided.  *(PX-458, Deposition testimony of Richardson, pp. 81-91)*.

589.    The Richardsons' 1321 Egania Street home was subjected to severe flooding which submerged the entire structure at the time leading up to Mr. Richardson's death.  *(Trial Testimony of Melvin  Spinks, p.___ll.___);  PX-421 Report of M. Spinks)*.  Mr. Richardson's body was subsequently found in the living room of the Richardson 1321 Egania Street home. [*Testimony of Lawrence Colon*; *Testimony of Lewis Colon*; *Testimony of Tyronne Colon*].  Mrs. Richardson learned this fact while in Stone Mountain, Georgia.  (PX-458, Deposition Testimony of Richardson, p.91:13-17).  Mr. Richardson's Death Certificate, issued by the State of Louisiana and signed by Orleans Parish Coroner Dr. Frank Minyard on April 18, 2006, lists as causes of

death "Hurricane Katrina related death," and "Asphyxia due to drowning." *(PX-341, Death Certificate of Joseph Richardson).*

590.     Mrs. Richardson also incurred $8,978.69 in funeral expenses to bury her husband, Mr. Richardson.  *(PX -342, Funeral Expenses of Joseph Richardson).*

591.     <u>Property Loss Damage</u>: Mrs. Richardson is entitled to compensation for her own loses, including damage to, and loss and destruction of the property and contents at 1321 Egania Street.

592.     Mrs. Richardson incurred expenses in effecting repairs to 1321 Egania, as well as in replacing lost contents.  *(PX-458, Deposition Testimony of Richardson, p.150:8-10*; *PX  338, Home Inventory List*; *PX  337,  Invoices, Receipts, Reports reflecting repair/replacement of 1321 Egania structure and contents*; *PX  323-336* (*Interior/ Exterior Damage Photos*).  According to an appraisal by Peter Canizzaro of G&C Appraisers, properties comparable to Mrs. Richardsons' 1321 Egania Street property were valued in the range of $90,000.00 – $146,000.00 prior to August 28, 2005.  *(DX-334, Deposition Testimony of Peter Canizzaro* (G&C Appraisals) *p.___ll.____*; *PX  343 (G&C Appraisal Report).*  Mrs. Richardson's 1321 Egania Street property was valued at $110,000.00 on August 28, 2005, prior to Katrina, compared to a value of $9500.00 one year later.  *(DX 334, Deposition Testimony of Peter Canizzaro, p.___ll.___*; *PX 343, G&C Appraisals; Trial Testimony of Richardson, p.___ll.___).*.  Mrs. Richardson is entitled to an award for depreciation of the value of 1321 Egania caused by Defendant's conduct, and for repair and replacement costs of her immovable and movable property.

170

593.     Mrs. Richardson's grief and loss associated with the death of her husband is evidenced by the fact that she was hospitalized twice in Georgia for physical symptoms caused by learning of Mr. Richardson's death.  *(PX -339  (Certified Medical Records of DeKalb Medical Center, admission date of 9/27/05, 9/28/05, Richardson 000120 – 000170)*; *Trial Testimony of Richardson, p. 97:6-20).*

594.     Mr. Richardson owned his own business, and was gainfully self-employed as a snack salesman at the time of his death.  *(PX-458, Deposition Testimony of Richardson, pp.44-47).*

### B.     Damages of Holiday Jewelers Inc.

595.     Plaintiff Holiday Jewelers, LLC is a Louisiana corporation organized in 1984. Jacob Robert Glaser and his wife, Dianne Glaser, are the sole shareholders of the corporation. *(Trial testimony of Jacob Robert Glaser, Tr. 2040:21-22; 2545:25 - 2546:4).*  In the twenty plus years prior to Katrina, Holiday Jewelers, LLC operated as a retail jewelry business.  *(Trial Testimony of Glaser, Tr., 2546:8-10).*  The business was run entirely by Mr. And Mrs. Glaser, with the exception of Holiday season when a seasonal employee was brought on. *(Trial Testimony of Glaser, p.2245 ll.11-19).*

596.     Holiday Jewelers occupied a rented storefront, located in a strip shopping mall at 8400 West Judge Perez Drive. *(Trial Testimony of Glaser, Tr. 2241:4 - 2243:22; PX 291, Google map of 8400 W. Judge Perez).*  The store was approximately 1000 square feet.  *(Trial Testimony of Glaser, 2243:25 - 2244:2).*  Holiday Jewelers' entire inventory was contained in the store.  *(Trial testimony of Glaser, 2246:18 - 22)*  Mr. and Mrs. Glaser evacuated St. Bernard

171

Parish on August 27, 2005, in advance of Hurricane Katrina. *(Trial Testimony of Glaser, 2246:23 - 2247:1).* After securing the jewelry store, the Glaser's drove to Daphne, Alabama, and later to Panama City, Florida.

597. The 8400 West Judge Perez Drive store was subjected to severe flooding, which submerged the entire structure. *(Trial Testimony of Melvin Spinks, p.___ll.___; PX 421, Report of M. Spinks).* Upon returning subsequent to Katrina, the Glaser's discovered that floodwater had submerged the store and all fixtures and inventory. *(Trial Testimony of Glaser, 2249:15 - 2250:2; PX 296-315, Damage photos of Holiday Jewelers).*

598. Mr. Glaser has estimated that the loss of inventory, furniture, equipment and fixtures exceeded $250,000. *(Trial testimony of Glaser, 2250:8 - 2151:10;  PX 292, Contents inventory for Holiday Jewelers).* Other losses included customer contact information contained within the business' computer.

599. The Glasers relocated to St. Tammany Parish, and have not restored the Jewelry business. *(Trial Testimony of Glaser 2252:17 - 18; 2255:9 - 2256:5).* John W. Theriot, CPA, undertook a calculation of lost profits. After reviewing the business and tax records of the Glaser's and  Holiday Jewelers, Mr. Theriot concluded that Holiday Jewelers had lost an average of $44,264.71 for calendar years 2005 through 2011. The total lost profit after discounts through December 31, 2011 was $309,854*DX 223, Deposition Testimony of John Theriot; PX  293, Business Income Records for Holiday Jewelers).*

600.     Holiday Jewelers, LLC is entitled to recover from Defendants, as a consequence of their negligence, the following damages: $250,000 loss of inventory, tools, equipment, and fixtures; $150,000 loss of client contact information; $309,845 lost profit 2005 through 2011.

### C.     Damages of John and Jerry Alford

601.     Mrs. Jerry D. Alford, and Mr. John Alford, Jr. are a married couple with five grown children. *(Trial Testimony of Jerry Alford, p.192, ll.4-8).*  Leading up to Katrina, Mr. and Mrs. Alford resided at a single- family residence located at 2423 Deslonde Street, New Orleans, Louisiana where all of their five children were raised.  *(Trial Testimony of Jerry Alford, p.189, ll. 20-23; PX 274, Google map of Alford residence).*  Mr. and Mrs. Alford purchased the 2423 Deslonde Street home on August 27, 1981, as joint owners under their community estate, for the price and sum of $29,000.  *(PX 275, Real property ownership documents).*  The Alfords raised their children in the family home. *(Trial Testimony of Jerry Alford, p.192, ll.14-16).*

602.     At the time of Hurricane Katrina, Mrs. Alford was sixty years of age and was employed as a desk clerk at the St. Marie Hotel on Toulouse Street in the French Quarter.  *(Trial Testimony of Jerry Alford, p.191, ll. 20-22).*  Mrs. Alford has been employed at that hotel and the St. Marie Hotel as a desk clerk for an uninterrupted period of twenty-eight years.  *(Trial Testimony of Jerry Alford, 191:18-23.*

603.     451.     At the time of Hurricane Katrina, Mr. Alford was sixty-four.  *Trial testimony of John Alford, Jr.*, 227:21-22.  He retired in 1991 due to disability from a surgically repaired lumbar defect.  *Trial Testimony of John Alford, Jr.*, 228:2-17.

604.     Prior to Katrina, on Saturday August 27, 2005, Mrs. Alford and her husband,

packed food and clothing in anticipation of moving to the St. Marie Hotel, as the hotel had a

policy of providing rooms to their employees during hurricanes.  *Trial Testimony of Jerry D.*

*Alford*, 193:16-19.  Mrs. Alford went to work on Sunday, August 28, 2005, at approximately

7:00 A.M., and her husband went to the hotel at approximately 10:00 A.M. on the same day.

*Trial Testimony of Jerry D. Alford*, 194:11-15.  However, on Sunday afternoon the Alfords

decided to go to Mississippi because of deteriorating weather conditions, leaving the hotel at

about 6:00 P.M. *Trial Testimony of John Alford*, 194:11-15).   The Alfords resided in Mrs.

Alford's parents' home for approximately one month, contributing $300/month for room and

board.  *Trial testimony of Jerry D. Alford*, 198:14-17.  Thereafter, the Alfords moved in with

their granddaughter in Algiers so that Mrs. Alford could continue her employment with the hotel,

continuing their payment of $300 per month toward room and board.  *Trial Testimony of Jerry*

*D. Alford*, 200:1-9.

605.     The Alfords' 2423 Deslonde Street home was subjected to severe flooding, with

floodwaters reaching the roof-line of the structure.  *(Trial Testimony of Melvin Spinks,*

*p.___,ll.____; PX  421, Report of M. Spinks).*  As a result, the Alford home and all of its

contents, including a lifetime of mementos and two family dogs, were destroyed.  PX-276,

*Alford Contents inventory;* PX-277 through PX-289, *Alford damage photos*.  The remains of the

irreparable house and its unrecoverable contents were demolished and removed by the City of

New Orleans and only a vacant lot and memories remain.  (*Trial Testimony of Jerry D. Alford*,

214:4-12).  The replacement value of the family home was appraised at $105,851.11.  DX-334,

174

*Deposition Testimony of Peter Canizzaro ; PX 290, Report of Peter Cannizarro, G&C*

*Appraisals).*

606.    The Alfords are entitled to recover of Defendants, as a consequence of their

negligence, the following damages to wit: $145,851.11 property damage, and $11,100 substitute

residence.

## VI.  **Conclusion**

607.    To the extent that any of the foregoing Findings of Fact are more properly deemed

Conclusions of Law, they shall be considered Conclusions of Law.

175

# <u>Conclusions of Law</u>

**I.  <u>Summary of Plaintiffs' Negligence Claim</u>**

1.      Plaintiffs pursue a single claim of negligence, based on both Louisiana State law and Maritime law, arising out of Lafarge's inappropriate handling of Barge ING 4727. (*Mumford Complaint*).

2.      Plaintiffs allege that Lafarge's cumulative decisions and negligent conduct leading up to and through Hurricane Katrina resulted in Barge ING 4727 to become unmoored – permitting the ING 4727 to float adrift during the course of the Hurricane – causing two separate breaches to the eastern floodwall of the Inner Harbor Navigation Canal ("IHNC").

3.      Plaintiffs allege that Lafarge's negligent conduct led to the catastrophic flooding of New Orleans' Lower Ninth Ward and St. Bernard Parish, **(1)** on the <u>West</u> by the Industrial Canal, **(2)** on the <u>North</u> by the Public Belt or other Railway adjacent to and immediately north of Florida Avenue, and the east-west channel or canal extending from the aforesaid railway to Paris Road (Florida Walk Canal and Forty Arpent Canal), and **(3)** on the <u>South</u> by the Mississippi River.  In so doing, Lafarge's negligent conduct caused Plaintiffs to incur damage, as set forth herein.

4.      For the reasons discussed below, Plaintiffs have proven by a preponderance of evidence that Lafarge's negligence caused the southern and northern breaches of the IHNC, which resulted in catastrophic flooding of each Plaintiffs' property, and therefore is responsible for each Plaintiffs' loss.

## II.  **Maritime Jurisdiction**

5.      This Court has jurisdiction of the parties, and under 28 USC §1332, General

Maritime Law under 28 USC §1333; and the surrogate law of the State of Louisiana under the

saving to suitors clause of 28 USC §1333, has subject matter jurisdiction over this suit against

Lafarge.  (*Mumford Complaint*, at 1).

6.      Plaintiffs maintain that maritime jurisdiction governs the instant action.  In

addition to the fact Section 1 of Plaintiffs' operative Complaint specifically alleges maritime

jurisdiction under 28 USC §1333, maritime jurisdiction necessarily applies insofar as the facts of

this case implicate both the "locations" and "connections" tests set forth in *Jerome B. Grubart v.*

*Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995).  Significantly, the Court in *In re*

*Ingram Barge*, 435 F. Supp. 2d 524 (E.D. La. 2006) has already concluded that the facts of this

case implicates maritime law.  *See In re Ingram Barge Co.*, 435 F. Supp. 2d at 528 (reasoning

that "[t]he barge-related claims are similar to those of Grubart itself where jurisdiction was found

arising under the AEA[,]" but that "claimants have alleged the classic situation to which the

AEA was intended to apply: a vessel that collides with a land-based structure causing damage on

land.").  The Courts' determination is consistent with the conclusions of other cases involving

identical facts.  *See e.g. Bd. of Comm'rs of the Orleans Levee Dist. v. M/V Belle of Orleans*, 535

F.3d 1299, 1313 (11th Cir. 2008) (reasoning that "[t]he Belle of Orleans was a vessel; she was

operating in South Shore Harbor, a navigable waterway; she broke free from imperfect

moorings; she had the potential to and actually did disturb commercial activity; and she is

alleged to have caused damage when she struck property alongside a navigable waterway" and as

177

such "the district court improperly concluded that there was no admiralty jurisdiction over the Board's tort claim.").

### III.  Elements of Plaintiffs' Claims

7.      "The analysis of a maritime tort [of negligence] is guided by general principles of negligence law."  *See Consolidated Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d 65, 67 (5th Cir. 1987).  "To establish maritime negligence, a plaintiff must 'demonstrate that there was **[a]** a duty owed by the defendant to the plaintiff, **[b]** breach of that duty, **[c]** injury sustained by [the] plaintiff, and **[d]** a causal connection between the defendant's conduct and the plaintiff's injury.'" *See Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2000).

### A.      Duty and Breach

8.      "Whether a defendant owes a plaintiff a legal duty is a question of law."  *See Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2000). "[T]he determination of whether a party owes a duty to another depends on a variety of factors, 'most notably the foreseeability of the harm suffered by the complaining party.'" *See id*. at 377.   "A harm is a foreseeable consequence of an act or omission if harm of a general sort to persons of a general class might have been anticipated by a reasonably thoughtful person, as a probable result of the act or omission, considering the interplay of natural forces and likely human intervention."  *See Pledger v. Phil Guilbeau Offshore, Inc.*, 2003 U.S. Dist. LEXIS 7416 (E.D. La. Apr. 30, 2003).

9.      Tropical storms and hurricanes, though infrequent, are foreseeable events. *Shamnoski v. PG Energy*, 858 A.2d 589, 605 (Pa. 2004).  Where a defendant's negligent conduct concurs with a *vis major*, "[t]he rule of law is that, although an act of God entails no injury upon

178

anyone in contemplation of law, yet if man contributes towards it, it is man alone that is responsible." The fact that some other cause concurs with the negligence of the defendant in producing an injury does not relieve the defendant from liability unless he can show that such other cause would have produced the injury independently of his negligence. *Carlson v. A. & P. Corrugated Box Corp.*, 72 A.2d 290, 293 (Pa. 1950); *St. Paul Fire & Marine Insurance Co. v. Nolen Group*, 02-8601 (E.D.Pa. Aug. 31, 2007) (relied upon by the Louisiana Supreme Court in *Rector v. Hartford Acc. & Indem. Co. Of Hartford*, 120 So.2d 511 (1960)).

10.    "Whether a defendant has breached a duty owed is a question of fact." *See Florida Fuels v. Citgo Petroleum Corp.*, 6 F.3d 330, 333 (5th Cir. 1993).

11.    Notwithstanding the forgoing, however, "[u]nder maritime law, when a vessel breaks free from its moorings and drifts into an allision with a stationary object, the moving vessel is presumed at fault." *See In re Signal International, LLC*, 579 F.3d 478, 490 n.11 (5th Cir. 2009); *The Louisiana*, 70 U.S.164 (1865); *James v. River Parishes Co., Inc.*, 686 F.2d 1129. 1132 (5th Cir. 1982). "This inference or presumption of negligence is a rule of law based on the logical deduction that a vessel found floating loose was improperly moored." *See James*, 686 F.2d at 1133. "The drifting vessel is presumptively liable for damages unless it can 'show that her drifting was the result of an inevitable accident or a vis major, which human skill and precaution and a proper display of nautical skill could not have prevented.'" *See Signal*, 579 F.3d at 490 n.11.[28]

---

[28]  Plaintiffs' legal contentions regarding the applicability of the "Louisiana Rule" in this case are set forth in detail in Plaintiffs' *Contentions of Law* below.

179

B.      **Causation**

1.      **General Standards**

12.      Causation has the "sub-elements of: (a) cause in fact and (b) proximate or legal

cause." *In re Mid-South Towing Co.*, 418 F.3d 526, 532 (5th Cir. 2005).

13.      With regard to the first element, "[a] defendant's actions must be the cause in fact

of a plaintiff's injuries in order for the plaintiff to be able to recover." *See Moser v. Texas Trailer*

*Corp.*, 623 F.2d 1006, 1013 (5th Cir. 1980).  "Cause-in-fact is generally a 'but for' inquiry,

which tests whether the accident would or would not have occurred but for the defendant's

substandard conduct." *See In re Katrina Canal Breaches Consol. Litig.*, 2009 U.S. Dist. LEXIS

72288, 268 (E.D. La. Apr. 15, 2009) (citing *Bonin v. Ferrellgas, Inc.*, 877 So.2d 89 (La. 2004)).

It is well settled that "[t]here can be more than one cause in fact, making multiple wrongdoers

liable." *Hennigan v. Cooper/T. Smith Stevedoring Co., Inc.*, 837 So. 2d 96, 102 (La.App. 2002).

Barge ING 4727 need not be the only factor, rather; "*it need only increase the risk of harm.*"

*Hennigan, supra*, 837 So. 2d at 102 (citing *Spinks v. Chevron Oil Co.*, 507 F.2d 216 (5th Cir.

1975)) (emphasis added).  "However, where there are concurrent causes of an accident, the

proper inquiry is whether the conduct in question was a substantial factor in bringing about the

accident." *See id*.  "In considering the substantial factor test … cause-in-fact clearly exists when

the plaintiff's harm would not have occurred absent the specific defendant's conduct." *See id*.

(citing *Bonin v. Ferrellgas, Inc.*, 877 So.2d 89 (La. 2004)).  In cases involving concurrent causes

of damages, "'the proper inquiry is whether the conduct in question was a substantial factor in

bringing about'" plaintiff's damages. *Chaisson v. Avondale Indust., Inc.*, 947 So. 2d 171, 187-

88, (La. App. 2006) (quoting *Perkins v. Entergy Corp.*, 782 So. 2d 606, 611-12 (La. 2001)).

*Plaintiffs' Trial Brief, USDC EDLA C.A. 05-4182, Pertains to MRGO, Robinson (No. 06-2268).*

"If the Navy vessel ran into a papier maché levee, the vessel would still be a substantial factor in

the damage." *In Re Katrina Canal Breaches Consolidated Litigation*, Record Doc. 19415-1 at.

P. 78.

14.     The following considerations are in themselves or in combination with one

another important in determining whether the actor's conduct is a substantial factor in bringing

about harm to another: (a) the number of other factors which contribute in producing the harm

and the extent of the effect which they have in producing it; (b) whether the actor's conduct has

created a force or series of forces which are in continuous and active operation up to the time of

the harm, or has created a situation harmless unless acted upon by other forces for which the

actor is not responsible; (c) lapse of time.  *Restatement of Torts 2d § 433, Considerations*

*Important In Determining Whether Negligent Conduct Is Substantial Factor In Producing Harm.*

15.     The second element—proximate cause—"is ultimately a question of policy as to

whether the particular risk falls within the scope of the duty" and "asks 'whether the enunciated

rule or principle of law extends to or is intended to protect this plaintiff from this type of harm

arising in this manner.'"  *See Roberts v. Benoit*, 605 So.2d 1032, 1044-45 (La. 1991).  Under

maritime law, "[t]he task of defining the proper reach or thrust of a rule in its policy aspects is

one that must be undertaken by the court in each case as it arises" and, in making this

determination, "[f]oreseeability obviously marks the limits placed on a defendant's duty…." *See*

*Consolidated Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d at 67.

181

16.     "A party's conduct is a cause-in-fact of the harm if it was a substantial factor in bringing about the harm."  *Lasyone v. Kansas City Southern Railroad*, 786 So.2d 682, 691 (La. 2001).  Lafarge cannot disprove its own negligence simply by demonstrating that the negligence of other actors was another proximate cause of the allision.  *United States v. Cota*, 2009 WL 412976  (N.D.Calif. Feb. 17, 2009) (No. CR 08-00160 SI).

17.     Generally, the burden rests on the Plaintiff to establish causation.  "But when, as in this case, a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster."  *See The Pennsylvania*, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874).[29]  "The rule of The Pennsylvania concerns … the burden of proof for showing causation[.]"  *See Pennzoil Producing Co. v. Offshore Express, Inc.,* 943 F.2d 1465, 1472 (5th Cir. 1991).  When implicated, "[t]he rule allocates the burden of proof, transferring it to the party in violation of a statute or regulation."  *See Pennzoil*, 943 F.2d at 1472. In so doing, "[t]he Pennsylvania rule applies a higher standard of proof" [*In re Quality Marine Servs.*, 2005 U.S. Dist. LEXIS 9201, 7 (E.D. La. 2005)], which "imposes a heavy burden" on the defendant.  *See Pennzoil*, 943 F.2d at 1472. "In simplest terms, that rule states that where a vessel is guilty of a statutory violation, the defaulting ship must show 'not merely that her fault

---

[29]  "Though The Pennsylvania involved a collision, the Pennsylvania rule has been held to apply not only to fact scenarios involving collisions or allisions, but also to 'violations of statutes intended to prevent the injury that actually occurred.'"  *In re Quality Marine Servs.*, 2005 U.S. Dist. LEXIS 9201, 8 (E.D. La. 2005).

might not have been one of the causes, or that it probably was not, **but that it could not have been**.'"  *See Candies Towing Co. v. M/V B & C Eserman*, 673 F.2d 91, 94 (5th Cir. 1982).

### 2.      Dr. Bea's Approach is Legally Impermissible

18. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 157 (1999), upheld the exclusion of the testimony of an expert who used "visual/tactile inspection" to draw conclusions regarding tire failure as impermissibly "connected to existing data only by the *ipse dixit* of the expert."  So too, here.  As a matter of law, Dr. Bea cannot rely solely on photographs for his conclusions regarding the backfill of the EBIA excavations.

19. Consistent with *Kumho Tire*, it is well established that visual inspection based solely on examination of "photographs" cannot meet the rigors of *Daubert* for engineering related opinions.  *See*, *e.g.*, *Allstate Ins. Co. v. GE*, 2002 U.S. Dist. LEXIS 28256 (W.D. La. Feb. 4, 2002) at pp. 28-29 (concluding that "[t]he information relied upon by Allstate 's expert, i.e. claim photographs and "testimony of eyewitnesses," is insufficient to support his stated opinion" as "[n]o methodology was shown and no scientific method capable of confirmation was presented."); *Schober v. Maritz, Inc.*, 2008 U.S. Dist. LEXIS 14060 ( E.D. Mich. Feb. 26, 2008) at pp. 6-10 (concluding that opinion testimony derived from "reviewing nothing more than the complaint and several photographs of the subject trailer" required exclusion under *Daubert*, as it was "supported by little more than 'because I said so.'"); *Tassin v. Sears, Roebuck & Co.*, 946 F. Supp. 1241, 1250 (M.D. La. 1996) ("the Court grants the defendants' motion to exclude Mr. Killingsworth's opinion on the miter gauge hold-down clamp as an alternative design for the table saw" as "[h]e formed his opinion based on a picture of a miter gauge clamp without

183

knowing its dimensions or specifications and without performing any engineering calculations.").

20. More importantly, however, the above evidence establishing that relying solely on visual analysis departs from ASTM and other recognized standards.  This undermines the reliability of Dr. Bea's testimony completely.

21. Indeed, courts have consistently held that engineering testimony is incapable of meeting the minimal reliability standards under *Daubert* where the applicable engineering standard required visual inspection to be followed-up with actual testing, and the actual testing was never done.  *See*, *e.g.*, *Schipp v. GMC*, 443 F. Supp. 2d 1023, 1031 (E.D. Ark. 2006) ("To summarize, Rasty's opinions rest largely on visual examination.  General practice in failure analysis, as reflected in the ASM Handbook, requires further testing."); *Great N. Ins. Co. v. Power Cooling, Inc*., 2007 U.S. Dist. LEXIS 95912 (E.D.N.Y. Dec. 18, 2007) at pp. 46-47 (same).

22.   Dr. Bea has changed his opinion a minimum of three times as to what caused the floodwall failures.  He admitted he changed his report.  2753:15 to 2745:25.  In addition, it was disclosed at trial that Dr. Bea actually created a totally new methodology for determining the lateral stability of the flood wall.  *Daubert v. Merrell Dow Pharmaceutical*, 43 F.3d 1311, 1317 (9th Cir. 1995), *cert. denied*, 516 U.S. 869 (1995) (on remand) ( One important consideration in determining admissibility of expert scientific testimony is whether experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of litigation, or whether they have developed their opinions expressly for purposes

184

of testifying);  See, *Anderson v. Bristol Myers Squibb Co.*, 1998 WL 35178199 (S.D.Tex. April

20, 1998) (No. CIV.A. H-95-0003) at pp. *12-*13:

> In conclusion, the Court wishes to reiterate that this evidentiary ruling is not a
> comment on the scientific validity of Dr. Duvic's and Dr. Moore's, as yet, untested
> hypothesis.  It is just that an opinion that is "an insightful, or even an inspired,
> hunch" is not admissible if it lacks scientific rigor; "the courtroom is not the place
> for scientific guesswork, even of the inspired sort.  Law lags science; it does not
> lead it." . . . This is not to say that Drs. Duvic and Moore are insincere in their
> opinions or that their opinions may not some day be validated through scientific
> research and experiment; it is simply that the law cannot wait for such a
> confirmation. As the Supreme Court explained,
>
> > Law, [unlike science] must resolve disputes finally and quickly.
> > The scientific project is advanced by broad and wide-ranging
> > consideration of a multitude of hypotheses, for those that are incorrect will
> > eventually be shown so, and that in itself is an advance. Conjectures that
> > are probably wrong are of little use, however, in the project of reaching a
> > quick, final, and binding legal judgment-often of great consequence-about
> > a particular set of events in the past.... [I]n practice, a gatekeeping role for
> > the judge, no matter how flexible, inevitably on occasion will prevent the
> > jury from learning of authentic insights and innovations. That,
> > nevertheless, is the balance that is struck by Rules of Evidence designed
> > not for the exhaustive search for cosmic understanding but for the
> > particularized resolution of legal disputes.

(Citation omitted.)

23.     Dr. Bea combined the pressure effects from his alleged seepage into his lateral

stability analysis to determine why the flood wall failed.  Tr.2609-2615:15.  He came up with his

new theory in preparation for the Katrina litigations.  Tr. 2611:8-23.  This newly discovered

methodology had never been used before by any geotechnical engineer and only invented by Dr.

Bea and his graduate student for use in these Katrina litigations.  2611:8-23; 2609 to 2615:15.

The court must take note that Dr. Bea developed his latest theory solely for purposes of

testifying.  *Daubert v. Merrell Dow Pharmaceutical*, 43 F.3d 1311, 1317 (9th Cir. 1995), *cert.*

185

*denied*, 516 U.S. 869 (1995) (on remand).

### C.      Joint and Several Liability

24.      Under the applicable maritime rule of joint and several liability, "a person whose negligence is a substantial factor in the plaintiff's indivisible injury is entirely liable even if other factors concurred in causing the injury."  *See Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 260 n.8, 273 n.30 (1979).  The rule is applicable "in any situation where two or more causes concur to produce harm, even when one cause is an act of God."  *See Wm. G. Roe & Co. v. Armour & Co.*, 414 F.2d 862, 869 (5th Cir. 1969).  The rule relieves a plaintiff of any obligation to prove a defendant's degree of fault for an indivisible harm, as a "plaintiff can collect his entire judgment from a single defendant, leaving to the defendants allocation of fault among themselves."  *See Coats v. Penrod Drilling Corp.*, 61 F.3d 1113, 1116 (5th Cir. 1995).

25.      The law of maritime joint and several liability has its roots in the common law, finds its way into the American admiralty through such cases as *THE "ATLAS"*, 93 U.S. 302 (1876), and *THE "JUNIATA"*, 93 U.S. 337 (1876), and persists through modern jurisprudence such as *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256 (1979), and *Coats v. Penrod Drilling Corp.,* 61 F.3d 1113 (5th Cir. 1995) *(en banc)*.  Under maritime law, where one or more concurrent tortfeasors cause damage insusceptible of apportionment, the "substantial factor test" is intrinsic to application of the maritime law of joint and several liability as articulated in the seminal case, *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256 259-60 (1979).

26.     When one or more concurrent tortfeasors cause an indivisible injury, the plaintiff, who has not settled with any tortfeasor, is entitled to the full amount of his damages, less victim-fault, from either or both concurrent tortfeasors.  Foreseeable acts of nature whose effects can be mitigated through human prudence, or the immunity or non joinder of any tortfeasor, do not serve to reduce the sued tortfeasor's liability for the full measure of damages.  In other words, the possibility of harm occasioned by Katrina and/or the Army Corps does not affect the applicability or consequences of this doctrine.  Lafarge is liable for the whole of any harm of which it was at least a substantial contributing cause.  *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 99 S.Ct. 2753, 2756 n. 7, 61 L.Ed.2d 521 (1979); *Cooper Stevedoring Co. v. Fritz Kopke, Inc*., 417 U.S. 106, 94 S.Ct. 2174, 2178, 40 L.Ed.2d 694 (1974); *The Juniata*, 93 U.S. 337, 23 L.Ed. 930 (1876); *The Atlas*, 93 U.S. 302, 23 L.Ed. 863 (1876); *The Alabama*, 92 U.S. 695, 23 L.Ed. 763 (1876); *The George Washington*, 76 U.S. 513, 19 L.Ed. 787 (1870); *The Sterling*, 106 U.S. 647, 1 S.Ct. 89, 90, 27 L.Ed. 98 (1882); *Seal Offshore, Inc. v. American Standard, Inc.,* 777 F.2d 1042 (5th Cir.1985); *Todd Shipyards Corp. v. Auto Transportation, S.A.,* 763 F.2d 745, 756 (5th Cir.1985); *Central Rivers Towing, Inc. v. City of Beardstown, Ill.,* 750 F.2d 565, 575 (7th Cir.1984); W. Prosser & P. Keeton, Prosser & Keeton on the Law of Torts § 47 at 328 (1984).

27.     Thus, if Plaintiffs carry their burden of proving **any** negligence on the part of the Defendant, even if the Defendant is only 1% at fault, Defendant is liable for 100% of the damages sustained by the Plaintiffs.  *See e.g. Latulas v. Montco Offshore, Inc.*, 2006 U.S. Dist. LEXIS 20066, at 10 (E.D. La. Mar. 29, 2006) ("concluding that '[i]If an employer is found to be

99% at fault for an injury to a longshoreman, and a vessel owner 1% at fault, the vessel becomes liable for 100% of the damages sustained by the plaintiff.").[30]

28.     Other than eliciting direct examination testimony from Dr. Kemp criticizing Dr. Spinks' alleged failure to distinguish the effects of the two breaches (though he explained their indivisibility at Tr. 1606-1610), Lafarge offered no proof of as to the apportionment of water from either breach, as it was incumbent upon Lafarge to do.  *Kemp Testimony*, 3020:8-17; *Suhayda Testimony*, 3046:19-24.  If Lafarge's tortious conduct has combined with that of any other actor, such as the United States, to bring about harm to the plaintiff, and Lafarge seeks to limit its liability on the ground that the harm is capable of apportionment  among Lafarge and the United States, the burden of proof as to the apportionment, in this case in which Lafarge is the only first-party defendant, is upon Lafarge.  *Restatement (Second) of Torts,* § 433B, *Burden of Proof.*

### D.     Defendant Owed Plaintiffs A Duty of Care to Adequately Moor ING 4727

29.     "The existence of a duty presents a question of law which is determined by the facts of each case and the particular risk and harm and plaintiff involved."  *See In re Katrina Canal Breaches Consol. Litig.*, 647 F. Supp. 2d 644, 733 (E.D. La. 2009).  "It is the Court's

---

[30]  *See also Foulk v. Donjon Marine Co.*, 963 F. Supp. 427, 430 (D.N.J. 1997) ("To avoid any liability to Mr. Foulk, Donjon must thus convince a jury that Donjon was not at all at fault in causing Mr. Foulk's injuries. If the jury concludes otherwise, for example finding Donjon one percent at fault, joint and several liability will require that Donjon compensate Mr. Foulk for its role in the accident and for Breakwaters' role in the accident, however large that may be."); *Kirksey v. P&O Ports Tex., Inc.*, 488 F. Supp. 2d 579, 591 (S.D. Tex. 2007) ("Even if Tonghai was negligent partly as a vessel owner and Plaintiff's employer was partly negligent as well, Tonghai's negligence as vessel owner -- even if 1% - supports a judgment against it for all of Patrick Kirksey's damages"), *rev'd on other grounds*, *Kirksey v. Tonghai Mar.*, 535 F.3d 388 (5th Cir. 2008).

obligation to decide which risks are unreasonable, based on the facts and circumstances of each case." *See In re Katrina Canal Breaches Consol. Litig.*, 647 F. Supp. 2d 644, 733 (E.D. La. 2009). "[T]he determination of whether a party owes a duty to another depends on a variety of factors, 'most notably the foreseeability of the harm suffered by the complaining party.'" *See Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 377 (5th Cir. 2000). "A harm is a foreseeable consequence of an act or omission if harm of a general sort to persons of a general class might have been anticipated by a reasonably thoughtful person, as a probable result of the act or omission, considering the interplay of natural forces and likely human intervention." *See Pledger v. Phil Guilbeau Offshore, Inc.*, 2003 U.S. Dist. LEXIS 7416 (E.D. La. Apr. 30, 2003).

30.     Under general principles Louisiana law, "[a] landowner owes a plaintiff a duty to discover any unreasonably dangerous condition and to either correct the condition or warn of its existence." *See Pitre v. Louisiana Tech Univ.*, 673 So. 2d 585, 590 (La. 1996). More specific to the facts of this case, it is well established that there exists a "duty of reasonable skill and care in mooring … barges." *See Lower River Ship Services, Inc. v. Casteel, Inc.*, 1991 U.S. Dist. LEXIS 1097, 10 (E.D. La. Jan. 29, 1991); *Am. River Transp. Co. v. Paragon Marine Servs.*, 213 F. Supp. 2d 1035, 1057 (E.D. Mo. 2002) (holding that there is "a duty by the barge fleeter and shifting tugs to inspect tie-offs and insure they are fast and secure…."); *In re Complaint of Ingram Barge Co.*, 2008 U.S. Dist. LEXIS 33421, 35 (E.D. La. Mar. 31, 2008) (holding that there is "a duty 'to inspect tie-offs and insure that they are fast and secure ….'"). Indeed, the duty to secure a vessel is so strong that "'a vessel which drifts into collision is presumed to be at

189

fault until the contrary is made to appear[.]'" *See James v. River Parishes Co.*, 686 F.2d 1129, 1131 (5th Cir. 1982).

31.     Moreover, the Fifth Circuit has concluded that an allision is a foreseeable consequence of negligent mooring of a barge in the face of an approaching hurricane.  *See, e.g., In re Signal International, LLC*, 579 F.3d 478, 493, 496 (5th Cir. 2009) ("the approaching hurricane, the expected height and predicted movement of the storm surge, and the topology of the Pascagoula River basin gave rise to the need to moor the barges and made this allision a foreseeable consequence of negligence in that mooring.").

32.     Based on these authorities, and the facts set forth herein, Defendant must be held to have owed Plaintiffs a duty of care to adequately moor Barge ING 4727 in the face of Hurricane Katrina.

### E.     Defendant Bears the Burden to Disprove Negligence

33.     "Under maritime law, when a vessel breaks free from its moorings and drifts into an allision with a stationary object, the moving vessel is presumed at fault."  *See In re Signal International, LLC*, 579 F.3d 478, 490 n.11 (5th Cir. 2009); *The Louisiana*, 70 U.S. 164 (1865); *James v. River Parishes Co., Inc.*, 686 F.2d 1129. 1132 (5th Cir. 1982). "This inference or presumption of negligence is a rule of law based on the logical deduction that a vessel found floating loose was improperly moored."  *See James*, 686 F.2d at 1133. "The drifting vessel is presumptively liable for damages unless it can 'show that her drifting was the result of an inevitable accident or a vis major, which human skill and precaution and a proper display of nautical skill could not have prevented.'"  *See Signal*, 579 F.3d at 490 n.11.

190

34.     To rebut this presumption of fault "such vessels must exhaust every reasonable possibility which the circumstances admit and show that in each they did all that reasonable care required." *The Louisiana*, supra, at p. 164 and 173.  To state in another way, Defendant must show that the breakaway could not have been prevented by "human skill and precaution and a proper display of nautical skills." *See James*, supra, at p. 1132.  "The party against whom the presumption operates bears the burden of disproving it, not merely coming forward with countervailing evidence." *See Delta Transload, Inc. v. Motor Vessel*, 818 F.2d 445, 449 (5th Cir. 1987).  Moreover, the party "bears the burden of disproving fault by a preponderance of the evidence." *See James*, 686 F.2d at 1133.

35.     In discharging this burden, the Fifth Circuit Court of Appeal has held that a defendant asserting an Act of God or inevitable accident defense due to weather must show "(a) that the force of the wind was not to have been anticipated; (b) that the vessel had been moored or anchored in such a way as to be prepared to withstand any winds reasonably to have been expected; (c) that there was no negligence on the part of those in charge of her.  The defense [sic] has been disallowed when any of the elements of proof referred to above have been absent." *See Boudoin v. J. Ray McDermott & Co.*, 281 F.2d 81, 88(5th Cir. 1960).

### F.     Defendant's Conduct Was the Proximate ("Legal") Cause of Plaintiffs Injury

36.     Under general tort principles, proximate cause "is ultimately a question of policy as to whether the particular risk falls within the scope of the duty" and "asks 'whether the enunciated rule or principle of law extends to or is intended to protect this plaintiff from this type of harm arising in this manner.'" *See Roberts v. Benoit*, 605 So. 2d 1032, 1044-45 (La. 1991).

191

Under maritime law, "[t]he task of defining the proper reach or thrust of a rule in its policy aspects is one that must be undertaken by the court in each case as it arises" and, in making this determination, "[f]oreseeability obviously marks the limits placed on a defendant's duty…." *See Consolidated Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d at 67.  Importantly, "[t]he test of foreseeability is not measured against normal conditions, but those that were anticipated or reasonably should have been anticipated."  *See Signal*, 579 F.3d 478, 493 (5th Cir. 2009).

37.     Here, policy considerations support extending Defendant's duty to the risks at issue.  Indeed, the Fifth Circuit has concluded that "[a]llision with fixed structures is one of the principal risks of a vessel, moored inland, that breaks from its negligently executed moorings." *See In re Signal International, LLC*, 579 F.3d 478, 492 (5th Cir. 2009).  Based on the unique risks of harm and loss posed by an unmoored vessel in the INHC, which are exponentially multiplied in the face of hurricane conditions, the Court must find that Defendant's duty of care to adequately moor Barge ING 4727 in the face of Hurricane Katrina extended to Plaintiffs in this action.

### G.     Defendant Bears the Burden to Disprove Causation

38.     As Defendant's failure to moor Barge ING 4727 to withstand hurricane conditions constituted a regulatory violation, Defendant must be deemed to bear the burden of proof under the Pennsylvania Rule on the issue of whether Barge ING 4727's impact caused the north and south breaches.

39.     The Pennsylvania Rule states that:

The liability for damages is upon the ship or ships whose fault caused the injury. But when, as in this case, a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster.  In such a case, the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, **but that it could not have been**.  Such a rule is necessary to enforce obedience to the mandate of the statute.

*The Pennsylvania*, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874).

40.     "The rule of The Pennsylvania concerns … the burden of proof for showing causation[.]" *See Pennzoil Producing Co. v. Offshore Express, Inc.*, 943 F.2d 1465, 1472 (5th Cir. 1991). When implicated, "[t]he rule allocates the burden of proof, transferring it to the party in violation of a statute or regulation." *See Pennzoil*, 943 F.2d at 1472.  In so doing, "[t]he Pennsylvania rule applies a higher standard of proof" [*In re Quality Marine Servs.*, 2005 U.S. Dist. LEXIS 9201, 7 (E.D. La. 2005)], which "imposes a heavy burden" on the defendant. *See Pennzoil*, 943 F.2d at 1472. "In simplest terms, that rule states that where a vessel is guilty of a statutory violation, the defaulting ship must show 'not merely that her fault might not have been one of the causes, or that it probably was not, **but that it could not have been**.'" *See Candies Towing Co. v. M/V B & C Eserman*, 673 F.2d 91, 94 (5th Cir. 1982) (emphasis added).

41.     As explained by the court in *Evergreen Int'l, S.A. v. Marinex Constr. Co.*, 477 F. Supp. 2d 681 (D.S.C. 2007), courts have applied the *Pennsylvania* Rule applies to a whole host of rules and regulatory violations, *including vi*olations of customary law [*See Evergreen*, 477 F. Supp. 2d at 689 (citing *Ira S. Bushey & Sons. Inc. v. United States, 172 F*.2d 447 (2d Cir. 1949); The Madison, 250 F. 850 (2d Cir. 1918))], United States Coast Guard regulatio*ns* [*See id.,* (citing

193

*Afran Transport Co. v. The Bergechief*, 274 F.2d 469 (2d Cir. 1960)], and Corps of Engineers building permits and operational regulations. *See id*. (citing *Folkstone Maritime Ltd.*, 64 F.3d 1037; *Florida E. Coast Ry. v. Revilo Corp.*, 637 F.2d 1060, 1064 (5th Cir. 1981*); In re Tug Helen B. Moran, Inc., 560 F.2d* 527, 529 (2d Cir. 1977).  Based on such authority, the court in *Evergreen* "decline[d] to narrowly interpret the Rule as requiring a statutory violation before it may be applied" as "the *Pennsylvania* Rule applies more generally where a party has violated a known government-established safety requirement." *See Evergreen*, 477 F. Supp. 2d at 689.

42.    Here, as discussed above, the undisputed evidence reflects that Lafarge evacuated its facility **(a)** leaving the empty ING 4727 tied outboard and abreast of the fully loaded ING 4745, **(b)** that ING 4727 was *not* cabled to the shore, as required by Lafarge's own Hurricane Preparation Checklist, but rather, tied *only* to ING 4745, and **(c)** that ING 4727 was tied to ING 4745 using only three single strands (single parts) of rope, despite the availability of no fewer than eleven (11) mooring points.

43.    Moreover, when Lafarge abandoned its facility on Saturday, August 27, it made no arrangement for anyone to monitor the barges it had left in the IHNC.  Rather, Lafarge Manager Ed Busch, called Joe Domino, Inc./Unique Towing on the morning of Saturday, August 27, 2005 to have the empty Barge ING 4727 moved outboard of the Barge ING 4745, but did not **(a)** request any mooring of the Barge ING 4727 to the dock (per its own Hurricane Checklist "cable all barges to shore"), or **(b)** instruct Domino to modify, check, or strengthen the moorings between the two barges.

194

44.     Plaintiffs' maritime expert, Don Green, concluded that "it was [Lafarge's] duty and responsibility to ensure that the barges were secured in such a manner, i.e. doubled up mooring lines, to withstand the expected hurricane force winds and tides of Hurricane Katrina, which they did not do."  [*Testimony of Donald Green*; *Plaintiffs' Exh. 94* (*Report of Donald Green*, at ¶5.5)].

45.     Based on these facts, Lafarge violated numerous regulatory standards, and as such, must bear the heavy burden of establishing that the Barge "could not have been" the cause of the North and South Breaches under the Pennsylvania Rule.

46.     **First**, Lafarge's failure to ensure that the *ING 4727* was adequately moored to withstand the anticipated hurricane force winds of Hurricane Katrina violated 33 CFR 162.75 (b)(3)(ii).  That Section, entitled "Anchoring or mooring" states as follows:

> (i) V*essels or tows shall not anchor or moor in a*ny of the land cuts or other narrow parts of the waterway, except in an emergency, or with permission of the District Commander. Whenever it becomes necessary for a vessel or tow to stop in any such portions of the waterway, it shall be securely fastened to one bank and as close to the bank as possible. This shall be done only at such a place and under such conditions as will not obstruct or prevent the passage of other vessels or tows. Stoppages shall be only for such periods as may be necessary.

> (ii) When tied up individually, all vessels and tows shall be moored by bow and stern lines. Tows shall be secured at sufficiently frequent intervals to insure their not being drawn away form the bank by winds, currents, or the suction of passing vessels. Lines shall be shortened so that the various barges in a tow will be as close together as possible.
> ***
> (iv) Whenever any vessel or tow is moored to the bank (paragraph (b)(3)(i) of this section) at least one crew member shall always remain on board to see that proper signals are displayed and that the vessel or tow is properly moored at all times.

195

47.     Lafarge violated Section 162.75 (b)(3), and in particular subpart (ii), by failing to adequately moor ING 4727 to withstand the anticipated hurricane force winds of Hurricane Katrina.

48.     **Second**, Lafarge's failure to ensure that the *ING 4727* was adequately moored to withstand the anticipated hurricane force winds of Hurricane Katrina violated the provisions 33 CFR 6.19-1("Nothing contained in this part shall be construed as relieving the masters, owners, operators, and agents of vessels or other waterfront facilities from their primary responsibility for the protection and security of such vessels or waterfront facilities."), which proscribed that Lafarge's primary responsibility was to ensure the protection and security of vessels and waterfront facilities.

49.     **Third**, Lafarge failed to adhere to Appendix 2 of the United States Coast Guard Sector New Orleans Hurricane Plan, given the force of law pursuant to 33 CFR § 6.14-1 (entitled "Safety measures"),[31] which required that mooring lines be doubled up and that special attention be given to barges moored in the proximity of bridges.  [*Plaintiffs' Exh. 28* (*Coast Guard Sector New Orleans Hurricane Plan*); *Testimony of Donald Green*; *Plaintiffs' Exh. 94* (*Report of Donald Green*, at ¶5.8)].

---

[31]     Such rules were created pursuant to authority proscribed by 33 CFR § 6.14-1, entitled "Safety measures" which provides that: "The Commandant, in order to achieve the purposes of this part, may prescribe such conditions and restrictions relating to the safety of waterfront facilities and vessels in port as he finds to be necessary under existing circumstances. Such conditions and restrictions may extend, but shall not be limited to, the inspection, operation, maintenance, guarding, and manning of, and fire-prevention measures for, such vessels and waterfront facilities." See 33 CFR § 6.14-1. "Commandant as used in this part, means the Commandant of the United States Coast Guard." 33 CFR 6.01-1.

50.    **Fourth**, Lafarge failed to adhere to Annex C of the United States Coast Guard Sector New Orleans Hurricane Plan, given the force of law pursuant to 33 CFR § 6.14-1 (entitled "Safety measures"), by failing to determine the special needs and intentions of vessels moored at the facility, failing to determine whether vessels desiring to remain moored at the facility during the hurricane would be allowed to do so and failing to notify the Captain of the Port of the facility's decision.  *(PX 28, Coast Guard Sector New Orleans Hurricane Plan*; *(Trial Testimony of Donald Green, p.___,ll.____); PX  94, Report of Donald Green, at ¶5.8).*

51.    Had such notification taken place, it is clear that the COTP would have been apprised that the ING 4727 was released for pick up and moored with only 3 single part lines. Such notification would have permitted the Port to exercise its obligations under 33 CFR 6.14-2 to cause the vessel to be moved and/or properly secured thus preventing the breakaway. [Testimony of Donald Green; *Exh. 94* (*Report of Donald Green*, at ¶5.8)].  33 CFR 6.14-2, entitled "Condition of waterfront facility a danger to vessel", provides that:

> "Whenever the captain of the port finds that the mooring of any vessel to a wharf, dock, pier, or other waterfront structure would endanger such vessel, or any other vessel, or the harbor or any facility therein by reason of conditions existing on or about such wharf, dock, pier, or other waterfront structure, including, but not limited to, inadequate guard service, insufficient lighting, fire hazards, inadequate fire protection, unsafe machinery, internal disturbance, or unsatisfactory operation, the captain of the port may prevent the mooring of any vessel to such wharf, dock, pier, or other waterfront structure until the unsatisfactory condition or conditions so found are corrected, and he may, for the same reasons, after any vessel has been moored, compel the shifting of such vessel from any such wharf, dock, pier, or other waterfront structure."

*See* 33 CFR 6.14-2.

**H.**   **Defendant Cannot Meet its Burden by Assertions of "Laws of Nature"**

52.   Defendant relies on *Ralston Purina Co. v. Hobson*, 554 F.2d 725 (5th Cir. 1977), which rejected the speculations of the defendant that his chickens died because the late delivery of their feed turned them into cannibals, a behavior unknown to chickens.  In *Dotson v. Clark Equipment Co.*, 783 F.2d 586, 588 (5th Cir. 1986), however, the Court of Appeals held that *Ralston Purina*'s rejection of evidence because of the "laws of science" is limited to fairy-tale explanations and cannot be used to rule out improbable and far-fetched but competent evidence.[32]  Similarly, *Miller v. Butcher Distributors*, 89 F.3d 265, 267 (5th Cir. 1996), held that *Ralston Purina* is limited to "naturally impossible" situations.  *Geigy Chemical Corp. v. Allen*, 224 F.2d 110 (5th Cir. 1955) is a second rare example of the Fifth Circuit's acceptance of a "laws of nature" argument: "We cannot accept as true his estimate that he could stop his car making from forty to forty-five miles an hour within five feet, nor even within twenty-five feet."

53.   Reviewing the cases, the Second Circuit held that rejections of competent evidence because of a "laws of nature" argument should be very rare.  *Fortunato v. Ford Motor Co.*, 464 F.2d 962, 965-66 (2d Cir.), *cert. denied*, 409 U.S. 1038 (1972).  *United States v. Hutson*, 980 F.2d 1443, 1992 WL 366846 (5th Cir. 1992) (Table; text in WestLaw), *cert. denied*, 507 U.S. 1039 (1993),[33] cited *Fortunato* with approval and stated at p. *1: "the doctrine is used

---

[32] *Dotson* stated at 588: "Although it is admittedly difficult to imagine a heavy roll of roofing material falling forward, hitting the forklift's canopy, and cartwheeling backward underneath the canopy to strike Dotson, such a thing is nevertheless possible, especially since several rolls fell.  Collisions among the rolls as they were falling might have caused the improbable to occur.  In short, we conclude that the cartwheeling rolls and cannibalistic chickens are not birds of a feather."

[33] *Hutson* has precedential weight.  Fifth Circuit Rule 47.5.3.

sparingly and should apply only where the underlying physical facts are themselves undisputed; for example, where the issue involves an easily measured distance or height."

54.     That is not the case here.  There is great dispute over defendant's factual propositions, and there is no consensus of judicial acceptance of such positions.

### I.     Defendant Cannot Meet its Burden by Asserting Improbability

55.     *In re Signal Int'l, LLC*, 579 F.3d 478, 493 (5th Cir. 2009), rejected a defendant's argument that it could not have foreseen the improbable course taken by two barges that broke away during Hurricane Katrina and collided with the I-10 bridge 4.7 miles away, where the path the barges took was over typically non-navigable land; the court held that the defendant could reasonably foresee allision with some fixed structure in the vicinity if it negligently moored the barges, and that was sufficient.  High winds and storm surge were expected, so those were anticipated forces even if less than expected.  *Id.* at 493-94.  It did not matter that no one could prove the route taken by the barges.  *Id.* at 486.

56.     *Dotson v. Clark Equipment Co.*, 783 F.2d 586, 588 (5th Cir. 1986), pointed out that the improbable and far-fetched can in fact happen.

### J.     The Doctrine of Joint and Several Liability Applies in This Case

57.     Defendant may not avoid liability by claiming Plaintiffs damages were caused by multiple damage causing events.  The maritime rule for negligence liability "allows an injured party to sue a tortfeasor for the full amount of damages for an indivisible injury that the tortfeasor's negligence was a substantial factor in causing, even if the concurrent negligence of others contributed to the incident."  *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S.

256, 260 (U.S. 1979); *Coats v. Penrod Drilling Corp.,* 61 F.3d 1113, 1127 (5th Cir. 1995);

*Simeon v. T. Smith & Son, Inc.*, 852 F.2d 1421, 1452 (5th Cir. 1988).  The rule is applicable "in

any situation where two or more causes concur to produce harm, even when one cause is an act

of God."  *See Wm. G. Roe & Co. v. Armour & Co.*, 414 F.2d 862, 869 (5th Cir. 1969) ("There is

little doubt that the concurrence of a human act and an act of God may in appropriate

circumstances give rise to the principle of joint and several liability to the end that the wrongdoer

may be held entirely liable.").

58.      In evaluating whether a harm is divisible for purposes of joint and several

liability, "it is the indivisibility of the injury, rather than of culpability, that triggers joint

liability."  *See St. Paul Fire & Marine Ins. Co. v. Nolen Group, Inc.*, 2007 U.S. Dist. LEXIS

64603, 45-46 (E.D. Pa. Aug. 31, 2007).  It is well established that damage resulting from a flood

are inseparable.[34]  *See St. Paul Fire & Marine Ins. Co. v. Nolen Group, Inc.*, 2007 U.S. Dist.

LEXIS 64603, 46 (E.D. Pa. Aug. 31, 2007) ("The flood damage suffered in this case, much like

many personal injuries, is incapable of division.").  In fact, the Fifth Circuit has concluded that

damages caused by flooding relating to Hurricane Katrina are indivisible:

---

[34]  Restatement 2d of Torts, § 433A (comment i) provides the following as to the divisibility of harm:
"Certain kinds of harm, by their very nature, are normally incapable of any logical, reasonable, or practical division.
Death is that kind of harm, since it is impossible, except upon a purely arbitrary basis for the purpose of
accomplishing the result, to say that one man has caused half of it and another the rest. The same is true of a broken
leg, or any single wound, or the destruction of a house by fire, or the sinking of a barge. Such harms can be
apportioned, if it all, only upon the basis of a prior reduction in value of what has been destroyed. By far the greater
number of personal injuries, and of harms to tangible property, are thus normally single and indivisible. Where two
or more causes combine to produce such a single result, incapable of division on any logical or reasonable basis, and
each is a substantial factor in bringing about the harm, the courts have refused to make an arbitrary apportionment
for its own sake, and each of the causes is charged with responsibility for the entire harm."

> But here, on these pleadings, there are not two independent causes of the plaintiffs' damages at play; the only force that damaged the plaintiffs' properties was flood. To the extent that negligent design, construction, or maintenance of the levees contributed to the plaintiffs' losses, it was only one factor in bringing about the flood; the peril of negligence did not act, apart from flood, to bring about damage to the insureds' properties.

See Vanderbrook v. Unitrin Preferred Ins. Co. , 495 F.3d 191, 223 (5th Cir. 2007).

59.     The evidence before the Court uniformly reflects that initial flooding of the class area occurred as the result of breaches to the East wall of the Industrial Canal, thereafter merging with flood waters from the MRGO breaches outside of the class area. This is supported by Plaintiffs' hydrology expert, Melvin G. Spinks, P.E., who concludes that the flooding of the proposed class area resulting from the North and South breaches in the East wall of the Industrial Canal had already occurred prior to the time that flood waters from the MRGO levee breaches had reached the proposed class area.  [Plaintiffs' Exh. 421 (*Spinks Report*, at 22-23, 26, 29)].  Dr. Spinks' findings are consistent with the findings of the report conducted by the Interagency Performance Evaluation Task Force, U.S. Army Corps of Engineers ("IPET"), which also concluded that the proposed class area had already flooded due to the breaches in the East wall of the Industrial Canal before said water merged with the floodwaters resulting from the MRGO levee breaches:

> "In summary for the Lower Ninth Ward, it appears that flooding began early on Monday morning. Eyewitness accounts and stopped-clock data indicate that floodwaters began entering the Lower Ninth Ward prior to 1030 UTC (5:30 A.M. CDT) and possibly as early as 0930 UTC (4:30 A.M. CDT). These early times suggest that the water entered through one or both of the breaches in the IHNC Floodwall. The floodwall was overtopped later at about 1230 UTC (7:30 A.M. CDT). Time-stamped photographs confirm that flooding had occurred by about 1300 UTC (8:00 A.M. CDT) near the Jackson Barracks along the southern end of this area near the St. Bernard Parish line. The

201

floodwaters from the IHNC moved east, eventually merging with the waters from the Chalmette area near Paris Road in the midmorning timeframe."

Plaintiffs' Exh. 421 (*Spinks Report*, Appendix B, at 9).

60.     Thus, as Plaintiffs damages are not divisible, litigation of Defendants' liability does not require examination of the multiplicity of causal issues Defendant raises.  To the contrary, under principles of joint and several liability, Defendant may be held liable if ***any*** degree of flooding of the class area is attributable to ***any*** negligence on the part of Defendant in precipitating the breaches to the East wall of the Industrial Canal.

## IV.  Expert Credibility

61.     The credibility of experts is to be judged in the same manner as the credibility of any other witness.  *Carey v. Hercules Ocean Corp.*, 321 Fed.Appx. 402, 404 (5th Cir. 2009) ("The credibility and persuasiveness of experts are to be weighed by fact-finders as would be the testimony of any other witness."); *Gebr. Bellmer Kg. v. Terminal Services Houston, Inc.*, 711 F.2d 622, 626 (5th Cir. 1983) (after mentioning the conjecture of a defense witness, the court stated: "The credibility and persuasiveness of the witnesses is for the trial court to decide.").

62.     Experts whose opinions conform to the facts observed by competent eyewitnesses are often held to be more credible than experts whose opinions require the rejection of eyewitness testimony.  *Henderson v. Norfolk Southern Corp.*, 55 F.3d 1066, 1069 (5th Cir. 1995), held that the trial court did not clearly err in finding plaintiff's expert "more credible because it was the only expert testimony that was consistent with the testimony of the plaintiffs' eyewitnesses."  *Accord*, *McDermott, Inc. v. Clyde Iron*, 979 F.2d 1068, 1078-79 (5th Cir. 1992),

*aff'd in part on other grounds and rev'd in part on other grounds*, *sub nom. McDermott, Inc. v. AmClyde*, 511 U.S. 202 (1994) (upholding the sufficiency of expert testimony on causation where supported by eyewitnesses); *Richard v. Firestone Tire & Rubber Co.*, 853 F.2d 1258, 1261 (5th Cir. 1988), *cert. denied*, 488 U.S. 1042 (1989) (upholding jury verdict crediting expert supported by eyewitnesses); *Bosnor, S.A. de C.V. v. Tug L.A. Barrios*, 796 F.2d 776, 782 (5th Cir. 1986) (upholding district court's acceptance of expert testimony where no eyewitnesses contradicted it); *Dalton v. Toyota Motor Sales, Inc.*, 703 F.2d 137, 141-42 (5th Cir. 1983) (reversing grant of judgment as a matter of law and ordering reinstatement of the jury verdict where the trial judge disagreed with the jury's crediting of the expert whose opinion was aligned with eyewitness testimony, and crediting of experts whose opinions were contrary to eyewitnesses); *Dickens v. United States*, 545 F.2d 886, 891 (Former 5th Cir. 1977) (no error in crediting expert testimony aligned with eyewitness testimony); *Remington Arms Co., Inc. (Peters Cartridge Division) v. Wilkins*, 387 F.2d 48 (Former 5th Cir. 1967) (jury properly credited plaintiff's expert, whose testimony was corroborated by plaintiff eyewitness, instead of contrary experts).

63.     Competent eyewitness may properly be credited, and contrary expert testimony may properly be discredited.  *Gifford v. National Gypsum Co.*, 753 F.2d 1345, 1347-48 (5th Cir. 1985), held that the trial court did not commit clear error in crediting eyewitness testimony and refusing to credit contrary expert testimony.  *Neal v. United States*, 562 F.2d 338, 341 (Former 5th Cir. 1977), held that there was no clear error in crediting the testimony of eyewitnesses over the testimony of an expert.

64.     "Evidence by positive and direct eye witness testimony as to the facts must prevail over a theory propounded by experts which is not shown to be beyond dispute and is, therefore, only an opinion as to theoretical possibilities." *Liberty Mut. Fire Ins. Co. v. Tidewater Oil Co.*, 292 F.Supp. 818, 821 (W.D.La. 1967), *aff'd and opinion adopted*, 403 F.2d 1023 (5th Cir. 1968).  Louisiana law is the same.  *Tolle v. Higgins Industries*, 212 La. 173, 181, 31 So.2d 730 (La. 1947).

65.     An expert's testimony may properly be rejected as unreliable if there is too great an analytical gap between the opinion offered and its basis.  *Moore v. Ashland Chemical Inc.*, 151 F.3d 269, 279 (5th Cir. 1998), *cert. denied*, 526 U.S. 1064 (1999); *Chan v. Coggins*, 294 Fed.Appx. 934, 937-38 (5th Cir. 2008).

66.     In *Douglass v. Delta Air Lines, Inc.*, 897 F.2d 1336, 1343 (5th Cir. 1990), the Court of Appeals cautioned against replying on the testimony of experts who proclaim impartiality but are in fact partial, or who become advocates for their cause by offering "expert testimony based upon assumptions that are so outrageous as to transform the expert into an advocate . . . ."

67.     "The test for "incredibility" of a witness is an extremely stringent one, because an appellate court does not weigh the credibility of witnesses. To be found "incredible" as a matter of law, the witness' testimony must be factually impossible.  *United States v. Lindell,* 881 F.2d 1313, 1322 (5th Cir. 1989).  The mere fact that the witness' memory is later shown to be somewhat flawed will not suffice to demonstrate that the witness' entire testimony is "incredible." *United States v. Casel*, 995 F.2d 1299 (5th Cir. 1993).

204

68.     That a witness has consistently lied in the past, engaged in various criminal activities,   thought that his testimony would benefit him, and showed elements of mental instability does not make his testimony incredible.  This is not a case where a witness testifies to facts that he physically could not have possibly observed or events that could not have occurred under the laws of nature.  *See, e. g., United States v. Hill,* 463 F.2d 235 (5th Cir. 1972); *United States v. Justice,* 431 F.2d 30 (5th Cir. 1970)."  *United States v. Cravero,* 530 F.2d 666, 670 (5th Cir. 1976).  See also *Geigy Chemical Corp. v. Allen,* 224 F.2d 110, 114 (5th Cir. 1955); *Hoffa v. United States,* 385 U.S. 293, 311 (1966); *Glasser v. United States,* 315 U.S. 60, 77-80 (1942); *United States v. Parr,* 516 F.2d 458, 464 (5th Cir. 1975); *United States v. Hill,* 463 F.2d 235 (5th Cir.), *cert. denied,* 409 U.S. 952, 93 S.Ct. 297, 34 L.Ed.2d 223 (1972)."  *United States v. De Los Santos*, 625 F.2d 62 (5th Cir. 1980). *Rant v. Cia Anonima Venezolana De Navegacion*, 228 F. Supp. 232 (E.D.La. 1964).

69.     The power to disregard testimony because of its inherent lack of believability is one that has been used sparingly. *Peters v. Fitzpatrick*, 310 F.2d 704 (7th Cir. 1962). The courts have held that "Unless in the light of the circumstances the  testimony is so inherently improbable and impossible of belief as in effect to constitute no evidence at all, it may not be disregarded in determining the sufficiency of the evidence to support the judgment." *Hobart v. Hobart Estate Co.*, 26 Cal.2d 412, 159 P.2d 958, 966 (1945).  *United States v. Narciso*, 446 F. Supp. 252 (E.D. Mich. 1977).

## V. **Damages**

### A.   **Compensatory Damages**

#### 1.   **Damages for Loss of Property**

70.   There is no serious question that damages for loss of property are recoverable.

#### 2.   **Other Compensatory Damages for Plaintiff Josephine Richardson**

71.   "The cause of death, and the manner or mode in which the death occurred, as incorporated in the death certificate as provided in the Vital Statistics Laws, R.S. 40:32 et seq., filed with the division of vital records of the Department of Health and Hospitals, shall be the legally accepted cause of death, unless the court of the parish in which the death occurred, after a hearing, directs otherwise."  La. Rev. Stat. 33:1563 E(3).  The Louisiana Supreme Court would agree with the Louisiana Third Circuit Court of Appeal in *McKelvey v. DeQuincy*, 970 So.2d 682, 2007-604 (La.App. 3 Cir. 11/14/07), which reasoned, based upon the Louisiana Supreme Court's holdings in *State v. Winzer*, 354 So.2d 533 (La. 1978); *State v. Trahan*, 543 So.2d 984 (La.App. 3 Cir.1989), *rev'd on other grounds,* 551 So.2d 1303 (La. 1989); *State v. Outley*, 629 So.2d 1243 (La.App. 2 Cir.1993), *writ denied*, 637 So.2d 476, 94-410 (La. 5/20/94), that *prima facie* proof of cause of death is not limited in a civil case to an autopsy report, especially when corroborated by additional competent evidence.  The cause of death identified by the Death Certificate, said Certificate bearing the State Registrar's certificate that it was recorded in the Vital Registry records pursuant to La. Rev. Stat. 40:32, et seq, in the manner prescribed by La. Rev. Stat. 33:1563 E(3), is competent evidence of death, and its cause.  This evidence, coupled with the undisputed fact that Mr. Richardson was found in the living room of a structure

206

completely immersed by flooding, establishes the cause of death.   The negligence of Lafarge
North America, Inc. was the cause in fact and legal cause of all of Mr. and Mrs. Richardson's
damages subject of this action.

72.    Survival Action Damages:  Louisiana Civil Code article 2315.1 vests Mrs.
Richardson with a cause of action for all damages to Mr. Richardson's person and property.
Under the "saving to suitors" clause codified at 28 USC § 1333(1), state courts have concurrent
jurisdiction with the admiralty jurisdiction of federal courts to entertain *in personam* claims
based on maritime causes of action. *Offshore Logistics, Inc. v. Tallentire*, 477 U. S. 207, 222
(1986).

73.    Based on the facts above, Mr. Richardson was present to witness and experience
the destruction of his immovable and movable property.  Thus, Mrs. Richardson is entitled to
Mr. Richardson's damages for his mental anguish caused by his having witnessed the destruction
of his property.  Such damages are available to property owners under Louisiana law when the
owner is present or nearby and suffers psychic trauma as a result   *Williams* v. *City of Baton
Rouge*, 731 So.2d 240, 98-1981 (La. 4/13/99); *1900 Partnership v. Bubber, Inc.*, 662 So.2d 808,
27,475 (La. App. 2 Cir. 11/1/95), *writ denied*, 668 So.2d 369, 96-0037 (La. 2/28/96); *Freyou v.
Iberia Parish Sch. Bd.*, 657 So.2d 161, 94-1371 (La. App. 3 Cir. 5/3/95); *Blache v. Jones*, 521
So.2d 530 (La. App. 4 Cir. 1988).   "Although the plaintiff does not suffer contemporaneous
personal injury or property damage, he or she nevertheless may recover for negligently inflicted
emotional distress if the defendant's conduct placed the plaintiff in fear or concern for his or her
safety.... [In] Louisiana ... an award is proper when the conduct is directed at the mental anguish

207

victim and the circumstances show an "especial likelihood of genuine and serious mental distress." Cases in which a plaintiff fears for his personal safety or in which he watches his property destroyed probably are the most common." *Johnson v. First National Bank of Shreveport,* 792 So.2d 33, 51, 00-870 at p. 21(La.App. 3rd Cir. 6/20/01), *writs denied*, 805 So.2d 212, 213, 01-2770, 01-2783 (La.1/4/02) (quoting FRANK L. MARAIST & THOMAS C. GALLIGAN, JR., LOUISIANA TORT LAW § 5-8 at pp. 124-125 (1996)).

74.     Mrs. Richardson is entitled to damages for Mr. Richardson's pre-death physical and mental pain and suffering endured while in the attic of 1321 Egania. "Whether or not the estate can recover damages for pain and suffering should abide trial, there being no inflexible rule that where death occurs from drowning the period between accident and death is not sufficiently appreciable to afford a basis for the claim." *Gillespie v. U.S. Steel Corp.*, 379 U.S. 148 (1964).  In cases involving drowning, the courts generally have required evidence of a struggle or other post-accident consciousness on the part of the decedent before awarding damages for his pain and suffering prior to death.  *See, e.g., Barton v. Brown (The Corsair),* 145 U.S. 335, 348, 12 S.Ct. 949, 36 L.Ed. 727 (1892); *Petition of United States Steel Corp., supra* at 1275-76; *Grantham v. Quinn Menhaden Fisheries, Inc.,* 344 F.2d 590 (4th Cir. 1965); *Davis v. Parkhill-Goodloe Co.,* 302 F.2d 489, 495 (5th Cir. 1962); *Gardner v. National Bulk Carriers, Inc.,* 221 F. Supp. 243, 246 (E.D.Va. 1963), *aff'd,* 333 F.2d 676 (4th Cir. 1964).  Although eyewitness evidence is not necessary, there must be evidence supporting a finding that the decedent was conscious when drowned. *Cook v. Ross Island Sand and Gravel Co.,* 626 F.2d at 750; *Petition of United States Steel Corp.,* 436 F.2d 1256, 1276 (6th Cir. 1970). "There is dicta

208

in *Davis v. Parkhill-Goodloe Co.* suggesting that evidence supporting consciousness must be "substantial," 302 F.2d at 495, but a more accurate statement of the rule is that there must be evidence to support a reasonable inference of consciousness." *Deal v. A.P. Bell Fish Co.*, 728 F.2d 717 (5th Cir. 1984).  Cf. *Neal v. Barisich, Inc.*, (E.D.La. 1989) 707 F. Supp. 862.  The absence of evidence of a skull fracture in Mr. Richardson's autopsy report establishes that he was conscious for a period sufficient for awareness of his impending death, and sufficient to permit his physical suffering.  *Cook v. Ross Island Sand And Gravel Co.*, 626 F.2d 746 (9th Cir. 1980).

75.   <u>Wrongful Death Damages</u>: Louisiana Civil Code article 2315.2 vests Mrs. Richardson with a cause of action for the wrongful death of Mr. Richardson.

76.   Mrs. Richardson is not only entitled to damages for her mental and physical suffering due to Mr. Richardson's death, but also to damages for lost service, support and society, and damages for her related medical expenses.

77.   Mr. Richardson owned his own business, and was gainfully self-employed as a snack salesman at the time of his death.  *(Trial Testimony of Richardson, p.___ll.___).*   Mrs. Richardson is entitled to compensation for income lost as a result of his death. "A survivor may recover under DOHSA, the Jones Act and the general maritime law for the actual financial contributions the decedent would have made during his normal anticipated life span. *Sea-Land Services v. Gaudet,* 414 U.S. 573, at 584-85, 94 S.Ct. 806, 39 L.Ed.2d 9; *Davis v. Parkhill-Goodloe Co.,* 302 F.2d 489, 494 (5th Cir. 1962); *Petition of the United States,* 418 F.2d 264, 272 (1st Cir. 1969). The proper measure of damages for such loss of support is the reasonable pecuniary expectancy of each survivor over the remainder of the life expectancy of the decedent

209

or the survivor, whichever is shorter. *The Complaint of Cambria Steamship Co.,* 505 F.2d 517 (6th Cir. 1974), *cert. denied,* 420 U.S. 975, 95 S.Ct. 1399, 43 L.Ed.2d 655 (1975). In determining a reasonable expectancy, "a guide is set by determining first how much money the decedent would have had available, and how much of that sum he would have contributed to his beneficiaries." *In re Sincere Navigation Corp.,* 329 F. Supp. 652, 659 (E.D.La. 1971).

78.     Mrs. Richardson also incurred $8978.69 in funeral expenses to bury her husband, Mr. Richardson.  *(PX  342  Funeral Expenses of Joseph Richardson*; *Trial Testimony of Richardson, p.___ll.___).*

79.     <u>Property Loss Damage</u>: Mrs. Richardson is entitled to compensation for her own loses, including damage to, and loss and destruction of the property and contents at 1321 Egania Street.

80.     Mrs. Richardson is entitled to an award for depreciation of the value of 1321 Egania caused by Defendant's conduct, and for repair and replacement costs of her immovable and movable property.

### B.     **Punitive Damages**

81.     There can no longer be doubt that punitive damages are an available remedy under general maritime law.  *Atlantic Sounding Co., Inc. v. Townsend*, __ U.S. __, 129 S.Ct. 2561, 2569, 174 L.Ed.2d 382 (2009), a maritime claim involving bad faith failure to provide maintenance and cure, stated: "The settled legal principles discussed above establish three points central to resolving this case.  First, punitive damages have long been available at common law. Second, the common-law tradition of punitive damages extends to maritime claims."  (Footnote

omitted.)  *Exxon Shipping Co. v. Baker*, __ U.S. __, 128 S.Ct. 2605, 171 L.Ed.2d 570 (2008), a general maritime law negligence case, held that the ratio of punitive to compensatory damages should be no greater than 1:1 where the compensatory-damages award exceeded half a billion dollars.

82.      *Atlantic Sounding* did not describe the standard to be used for punitive-damage claims, but held that such damages should be available "for the willful and wanton disregard of the maintenance and cure obligation."  129 S.Ct. at 2574.  In *Exxon Shipping Co.*, the Court was evenly divided over whether the reckless acts of its managerial employees could expose the defendant to punitive damages, so this must be regarded as an open question.  128 S.Ct. at 2616.  Thus, the punitive-damages claim should remain so that retrial can be avoided.  *Rogers v. Resolve Marine*, 2009 WL 2984199 (E.D.La. Sept. 11, 2009) (No. CIV.A. 09-4141) (Barbier, J.).

83.      The general Federal rule is that punitive damages are available "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  *Smith v. Wade*, 461 U.S. 30, 56 (1983) (42 U.S.C. § 1983 case).

84.      The failure to secure the barge, as shown by eyewitness testimony that it was drifting free in the IHNC the day before Hurricane Katrina hit New Orleans, showed reckless conduct and callous indifference to the rights of plaintiffs under the general maritime laws.

Respectfully submitted,

Brian A. Gilbert (21297)
LAW OFFICE OF BRIAN A. GILBERT, P.L.C.
(Of Counsel to BEST KOEPPEL TRAYLOR)
2030 St. Charles A venue
New Orleans, Louisiana 70 l30
Telephone: (504) 598-1000
Facsimile: (504) 524-1024
E-mail: bgilbert@briangilbertlaw.com
bgilbert@bestkoeppel.com

Laurence E. Best (3012)
Peter S. Koeppel (1465)
BEST KOEPPEL TRAYLOR
2030 St. Charles Avenue
New Orleans, Louisiana 70130
Telephone: (504) 598-1000
Facsimile: (504) 524-1024
E-mail: lebest@bestkoeppel.com

Shawn Khorrami (CA SBN #14011)
KHORRAMI, POLLARD & ABIR, LLP
444 S. Flower Street, 33rd Floor
Los Angeles, California 90071
Telephone: (213) 596-6000
Facsimile: (213) 596-6010
e-mail: Skhorrami@kpalawyers.com

Lawrence A. Wilson (N.Y.S.B.A. #2487908)
WILSON, GROCHOW, DRUKER & NOLET
233 Broadway, 5th Floor
New York, NY 10279
Telephone: (212) 608-4400
Facsimile: (212) 608-0746
e-mail: lwilson@wgdnlawl.com

212

Lawrence D. Wiedemann (#13457)
Karl Wiedemann (18502)
WIEDEMANN AND WIEDEMANN
821 Baronne Street
New Orleans, Louisiana 70113
Telephone: 504-581-6180
Facsimile: 504-581-4336
e-mail: ldwiedeman@aol.com
karlwied@bellsouth.net

Patrick J. Sanders (18741)
PATRICK J. SANDERS, LLC
3316 Ridgelake Drive, Suite 100
Metairie, Louisiana 70002
Telephone: (504) 834-0646
e-mail: pistols42@aol.com

Richard T. Seymour (D.C. Bar #28100)
LAW OFFICE OF RICHARD T. SEYMOUR, P.L.L.C.
1150 Connecticut Avenue N,W" Suite 900
Washington, D,C. 20036-4129
Telephone: 202-862-4320
Cell: 202-549-1454
Facsimile: 800-805-1065 and 202-828-4130
e-mail: rick@rickseyourlaw.net

*Attorneys for Plaintiffs*

Dated: August 30, 2010

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the above and foregoing document have been served upon

counsel of record, by ECF upload, this 30th day of August, 2010.

<u>/s/ _____</u>
Richard T. Seymour (D.C. Bar #28100)
Law Office of Richard T. Seymour, P.L.L.C.
1150 Connecticut Avenue N.W., Suite 900
Washington, D.C.  20036-4129
          Voice: 202-862-4320
          Cell:   202-549-1454
          Facsimile:  800-805-1065 and 202-828-4130
          e-mail: rick@rickseymourlaw.net,