UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  KATRINA CANAL BREACHES CONSOLIDATED LITIGATION | CIVIL ACTION NUMBER:  05-4182 "K"(2) JUDGE DUVAL MAG. WILKINSON |
| PERTAINS TO:  *Entergy* (No. 10-0077) | |

**PLAINTIFFS' OPPOSITION TO UNITED STATES' MOTION TO DISMISS OR ALTERNATIVE MOTION FOR SUMMARY JUDGMENT AND PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON DISCRETIONARY FUNCTION EXCEPTION**

# Table of Contents

INTRODUCTION..................................................................................................................1

STATEMENT OF FACTS....................................................................................................2

ARGUMENT.........................................................................................................................2

I.    STANDARD FOR SUMMARY JUDGMENT..............................................................2

II.   §702(c) IMMUNITY DOES NOT APPLY ...................................................................3

    A. Defendant's Negligent Site Preparation for The IHNC Lock Expansion Project Does Not Enjoy Immunity as a Flood Control Project .............................................................3

        1. Despite the Corps' Arguments to the Contrary, This Court has Repeatedly Held That the Plain Language of §702(c) Does Not Bar This Action ...............................................4

        2. The IHNC is a Navigation Channel That Remained Wholly Independent of the Adjacent Flood Control Projects ....................................................................6

        3. This Court's Reluctant Grant of 702(c) Immunity for the Harm Suffered as a Result of the Failed Levees Surrounding the 17th Street and London Avenue Outfall Canals Does Not Extend to the IHNC Lock Expansion Project ......................8

III.  THE DISCRETIONARY FUNCTION EXCEPTION DOES NOT APPLY TO DEFENDANT'S CONDUCT ....................................................................................9

    A. NEPA's Mandates are Clear and Unambiguous..........................................................10

        1. In Clear Violation of NEPA, the Corps' 1997 EIS Failed to Address the Project's Impact on the Hurricane Protection System .......................................................12

        2. In Clear Violation of NEPA, The Corps Failed to Prepare a Separate EIS for Task Order 26 of the TERC or to Supplement Its 1997 EIS for the Lock Expansion Project ............................................................13

        3. Modifications to Task Order 26 That Expanded The Scope of Work Under The TERC Required the Corps either to Supplement Its 1997 EIS, Create a New EIS, or Submit a EA with a FONSI ......................................................14

        4. Immunity Does Not Apply ......................................................................16

    B.  The Corps' Negligent Excavations of Subsurface Structures in the Vicinity of the Levees Were Not the Result of Immune Policy Judgments .........................................18

        1. The Corps Acted in Contravention of Its Own Standards...........................................18

        2. The Corps' Actions Were Not Based on Policy Considerations .................................22

IV.  THIS COURT HAS ALREADY HELD THAT IT HAS SUBJECT MATTER JURISDICTION OVER THE ENTERGY COMPANIES' LAWSUIT ........................25

    CONCLUSION ......................................................................................................27

## <u>TABLE OF AUTHORITIES</u>

### Cases

*55 Motor Avenue Co. v. Liberty Industrial Finishing Corp,*
885 F. Supp. 410, 416 (E.D.N.Y. 1994) .................................................................................... 27

*Adams v. United States,*
2006 WL 3314571, (D.Idaho. 2006) ......................................................................................... 9

*Alabama Electric Cooperative, Inc. v. United States,*
769 F.2d 1523 (11th Cir. 1985). .............................................................................................. 21

*Association Concerned About Tomorrow, Inc. v. Dole,*
610 F. Supp. 1101, 1112 (N.D. Tex. 1985) ........................................................................ 15, 17

*Atchison, T. & S. F. Ry, Co. v. Callaway,*
382 F. Supp. 610, 619 (D. D.C. 1974) ..................................................................................... 17

*Bear Medicine v. United States ex rel. Sec'y of Dept. of Interior,*
241 F.3d 1208, 1213 (9th Cir. 2001) .................................................................................. 9, 23

*Berkovitz v. United States,*
486 U.S. 531, 537 (1988).......................................................................................... 9, 18, 22, 23

*Blue Mountains Biodiversity Project v. United States Forest Service,*
229 F. Supp. 2d 1140, 1147-48 (D. Or. 2002) ......................................................................... 15

*Camozzi v. Roland/Miller and Hope Consulting Group,*
866 F.2d 287, 291 (9th Cir. 1989) ............................................................................................. 9

*Camozzi v. Roland/Miller and Hope Consulting Group,*
866 F.2d 287, 291 (9th Cir. 1989) ........................................................................................... 24

*Celotex Corp. v. Catrett,*
477 U.S. 317, 323 (1986).......................................................................................................... 3

*Central Green v. U.S.,*
531 U.S. 425 (2001).................................................................................................................. 4

*Coliseum Square Ass'n, Inc. v. Jackson,*
465 F.3d 215, 224 (5th Cir. 2006) ............................................................................... 10, 11, 14

*Cope v. Scott,*
45 F.3d 445, 450 (D.C. Cir. 1995)...................................................................................... 22, 23

*Dept. of Transp. v. Public Citizen,*
541 U.S. 752, 757-58 (2004). ............................................................................. 11

*Duff v. United States,*
999 F.2d 1280, 1282 (8th Cir. 1993) ................................................................. 24

*Environmental Defense Fund, Inc. v. Corps of Engineers of U.S. Army,*
492 F.2d 1123, 1140 (5th Cir.1974) ................................................................. 10

*Friends of the Clearwater v. Dombeck,*
222 F.3d 552, 556-58 (9th Cir. 2000) ............................................................... 15

*Great Basin Mine Watch v. Hankins,*
456 F.3d 955, 69-70 (9th Cir. 2006) ................................................................ 13

*Hayes v. U.S.,*
539 F. Supp. 2d 393, 402-03 (D. D.C. 2008)................................................... 23

*Headwaters v. BLM,*
914 F.2d 1174, 1177 (9th Cir. 1990) ............................................................... 15

*Holy Cross et al. v. U.S. Army Corps of Engineers.,*
455 F. Supp. 532, 539-540 (E.D. La. 2006)............................................... 13, 17

*In re Glacier Bay,*
71 F.3d 1447, 1453 (9th Cir. 1995) ................................................................. 23

*In re Katrina Canal Breaches Consolidated Litigation,*
 07-cv-04608 (Doc 7) at 28 (E.D. La. 2010).................................... 25, 26, 27

*In re Katrina Canal Breaches Consolidated Litigation,*
471 F. Supp. 2d 684 (E.D. La. 2007)............................................................. 4, 16

*In re Katrina Canal Breaches Consolidated Litigation,*
647 F. Supp. 2d 644, 717 (E.D. La. 2009)....................................... *passim*

*In re Katrina Canal Breaches Consolidated Litigation,*
627 F. Supp. 2d 656 (E.D. La. 2009) ............................................................. 17

*In re Katrina Canal Breaches Consolidated Litigation,*
577 F. Supp. 2d 802, 805 (E.D. La. 2008).......................................... *passim*

*In re Katrina Canal Breaches Consolidated Litigation,*
533 F. Supp. 2d 615, 639 (E.D. La. 2008.) ...................................................... 8

*Kennedy v. Texas Util.*
179 F 3d. 258 (5th Cir. 1999). ............................................................................ 7, 8

*Kennewick Irr Dist. v. U.S.*,
880 F.2d 1018 (9th Cir. 1989) ............................................................................ 18

*Layton v. United States*,
984 F.2d 1496, 1502-03 (8th Cir. 1993) ............................................................ 24

*League of Wilderness Defenders/Blue Mountains Biodiversity Project  v. Forsgren*,
309 F.3d 1181, 1191 (9th Cir. 2002) .................................................................. 17

*Lively v. United States*,
870 F.2d 296, 299 (5th Cir.1989) ....................................................................... 22

*Marsh v. Oregon Natural Resources Council*,
490 U.S. 360, 374 (1989) .................................................................................... 15

*McCallister v. U.S.*,
925 F.2d  841, 843 (5th Cir. 1991) ..................................................................... 28

*McMichael v. United States*,
751 F.2d 303, 306 (8th Cir. 1985) ..................................................................... 24

*O'Reilly v. U.S. Army Corps of Engineers*,
477 F.3d 225, 228 (5th Cir. 2007) ................................................................ 10, 14

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332, 351 (1989) .................................................................................... 11

*Sabine River Authority v. U.S. Dept of Interior*,
745 F. Supp. 388, 392 (E.D. Tex. 1990) ............................................................ 13

*Sierra Club v. Espy*,
38 F.3d 792, 802 (5th Cir. 1994) .......................................................................... 9

*Sierra Club v. Hassell*,
636 F.2d 1095, 1099 (5th Cir. 1981) .................................................................. 13

*Socialist Workers Party v. Atty Gen.*,
 642 F. Supp. 1357, 1414 (S.D.N.Y. 1986).......................................................... 27

*State of Louisiana v. Lee*,
758 F.2d 1081, 1089,1086  (5th Cir. 1985) ......................................................... 13

*U.S. v. James*,
478 U.S. 597, 604 (1986) ................................................................................ 4

*U.S. v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*,
467 U.S. 797, 81 (1984) ............................................................................ 22, 23

*Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense
Council, Inc.,*435 U.S. 519, 558 (1989) ........................................................ 9

*West Branch Valley Flood Protection Association v. Stone*,
820 F. Supp. 1, 5-6 (D.C. 1993) .............................................................. 15, 16

*Whisnant v. United States*,
400 F.3d 1177, 1183 (9th Cir. 2005) ............................................................ 23

*Wisconsin v. Weinberger*,
745 F.2d 412, 418 (7th Cir. 1984) ........................................................... 15, 16

**Statutes**

28 U.S.C. § 2680(a). ...................................................................................... 1

33 C.F.R. § 230.6 ......................................................................................... 16

40 C.F.R. § 1500.13 ...................................................................................... 16

40 C.F.R. § 1502.1 .......................................................................................... 9

40 C.F.R. § 1502.9(c)(1) .......................................................................... 15, 16

40 C.F.R. § 1502.9(c)(1)(ii) ......................................................................... 15

40 C.F.R. § 1505.1(e) .................................................................................. 17

40 C.F.R. § 1508.17 ...................................................................................... 10

40 C.F.R. § 1508.18 ...................................................................................... 10

40 C.F.R. § 1506.8 ........................................................................................ 10

40 C.F.R.§ 1501.4(e) ..................................................................................... 11

40 C.F.R.§ 1508.9(a) ..................................................................................... 11

40 C.F.R.§1508.13 ......................................................................................... 11

40 C.F.Rr 1508.25 ................................................................................................................ 13

42 U.S.C. § 432, *et seq*. ........................................................................................................... 2

42 U.S.C. § 4332(2) .......................................................................................................... 10, 14

42 U.S.C. § 4332(C) .......................................................................................................... 10, 15

Fed. R. Civ. P 56(e). ............................................................................................................... 3

Fed. R. Civ. P. 56(c). ............................................................................................................... 2

## INTRODUCTION

**Plaintiffs, Entergy New Orleans, Inc. and Entergy Louisiana, L.L.C. (the "Entergy Companies") and Hartford Steam Boiler Inspection and Insurance Company ("Hartford") (collectively "Plaintiffs")** jointly submit this brief in Opposition to the United States' ("Defendant") Motion to Dismiss or in the Alternative for Summary Judgment and in Support of their Motion for Partial Summary Judgment on the Discretionary Function Exception ("DFE") to the Federal Tort Claims Act ("FTCA").[1]

Plaintiffs complain of damages that are the result of the United States Army Corps of Engineers' ("Corps") negligence in proceeding with a poorly planned and executed navigational lock project – "not the negligence that occurred in the construction or maintenance of a flood control project."[2]

This Court has previously disposed of the argument presented here once again by the United States: that Flood Control Act immunity granted under 33 U.S.C. §702(c) extends to a navigation project. Despite the United States' characterization, the conduct complained of by Plaintiffs in this case is unconnected to government actions associated with the adjacent levee projects in the vicinity. Thus, §702(c) immunity simply does not attach.

Moreover, Plaintiffs are entitled to summary judgment because it is clear that the DFE does not apply in this case. Despite its attempts to evade liability, Defendant remains liable for the damages sustained by Plaintiffs as a result of its negligent excavations and backfilling performed in the site preparation for the Inner Harbor Navigational Canal ("IHNC") New Lock and Connecting Channels Project ("IHNC Lock Expansion Project").

Under "prong one" of the DFE, immunity cannot attach because the Corps negligently omitted the foreseeable harm suffered by Plaintiffs from any mandatory Environmental Impact Statement ("EIS"). In addition, when changes in the scope of the project became evident, neither

---

[1]    28 U.S.C. § 2680(a).

[2]    *In re Katrina Canal Breaches,* 577 F. Supp 2d 802, 805 (E.D. La. 2008).

a Supplemental EIS ("SEIS") nor an Environmental Assessment ("EA") was filed by the Corps, as required by the National Environmental Policy Act ("NEPA").[3]

Under "prong two" of the DFE, immunity cannot attach because the challenged conduct is not the Corps' negligent supervision of a contractor, but rather its owns acts of professional negligence in the planning and completing the IHNC Lock Expansion Project. Moreover, no policy governed the Corps' faulty engineering decisions associated with the methods of construction, excavation, and site preparation work for the project, which resulted in Plaintiffs' harm.

Finally, Plaintiffs' claims against the United States for the Corps' negligence are ripe and all administrative procedures have been exhausted.

## STATEMENT OF FACTS

Plaintiffs incorporate by reference their annexed Statement of Undisputed Facts ("PSUF"). Plaintiffs contest Defendant's Statement of Uncontested facts that rely on the Statement of Facts submitted by Washington Group International (WGI) in Support of its Motion for Summary Judgment,[4] and refer the Court to Plaintiffs' Opposition to the United States' Statement of Uncontested Facts and incorporate by reference the Opposition to the United States Uncontested Facts as filed by the MRGO Plaintiff's Liaison Group.[5]

## ARGUMENT

## I.  STANDARD FOR SUMMARY JUDGMENT

Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[6] The moving party "bears the initial responsibility of informing the district court

---

[3]     42 U.S.C. § 432, *et seq.*
[4]     (Doc 15861-3).
[5]     Plaintiffs adopt and incorporate (1) the MRGO Plaintiffs Opposition to Defendant's Motion to Dismiss or in the Alternative for Summary Judgment; and (2) the MRGO Plaintiffs' Opposition to Defendant's Statements of Undisputed Facts in Support of Motion to Dismiss or in the Alternative for Summary Judgment.
[6]     Fed. R. Civ. P. 56(c).

of the basis for its motion, and identifying those portions of [the record]…which it believes demonstrate the absence of a genuine issue of material fact."[7]

On June 3, 2010 this Court ordered Defendant to furnish all responsive documents associated with its NEPA compliance for the Lock Expansion Project and Task Order 26 of the Total Environmental Restoration Contract (TERC) on July 2, 2010. Thus, by representation of the Department of Justice that its production is the complete record for the Lock Expansion Project and Task Order 26 of the TERC question of the Corps' NEPA compliance is ripe for consideration.  Plaintiffs' Motion is made upon reliance of those representations to this Court

Once the movant meets this burden, the burden shifts to the non-movant "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[8]  Mere allegations or denials will not defeat a well-supported motion for summary judgment.[9]  Rather, the non-movant must come forward with "specific facts" that establish an issue for trial.[10]

## II.  § 702(c) IMMUNITY DOES NOT APPLY.

The United States' attempt to claim §702(c) immunity for the harm inflicted on the Lower Ninth Ward by the Corps' negligent site preparation for the IHNC Lock Expansion Project and Connecting Channels Project must fail.

### A.  Defendant's Negligent Site Preparation For the IHNC Lock Expansion Project Does Not Enjoy Immunity as a Flood Control Project.

Like in *Robinson, et al v. United States*,[11] Plaintiffs do not complain of damages sustained by the negligent construction or maintenance of the LPV levees themselves.  Rather, Plaintiffs complain of damages sustained by virtue of the Corps' negligence in excavating and backfilling large subsurface structures without implementing engineering designs to preserve the

---

[7]      *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Condrey*, 429 F.3d at 562.
[8]      *Celotex*, 477 U.S. at 323.
[9]      Fed. R. Civ. P 56(e).
[10]     *Id*.
[11]     *In re Katrina* , 577 F. Supp 2d 802.

integrity of the adjacent levees, which created the dangerous hazard that undermined the LPV levees during Hurricane Katrina.

By way of analogy, this Court has explained that the United States would not receive §702(c) immunity for a Navy vessel that lost control and broke through a levee where the sole cause of the failure of that levee was the Navy vessel's negligence.[12] In this case, "there is no innate difference between that Navy Ship that hits the levee" and the Corps' negligent actions regarding the excavations in question.[13]

### 1. Despite the Corps' Arguments to the Contrary, this Court has Repeatedly Held That The Plain Language of §702(c) Does Not Bar This Action.

The United States has consistently argued that §702(c) immunizes it for any damages caused by any floodwaters based on the "plain language" of the statute.[14] In *Robinson*, however, this Court held that it has previously rejected this "contention and will continue to do so until otherwise guided by a higher court."[15]

Despite this clear ruling, Defendant again advances the same argument: that 702(c) immunizes it from all damages that are the result of any "flood" or "floodwaters," not just those that occur as a result of a "flood control project." However, the cases relied on by Defendant for this argument, *Central Green* and *James*, still do not support such a proposition.[16] This Court has held that "a fair reading of *Central Green* and its narrow holding in conjunction with *James* leaves this Court with the belief that §702(c) immunity arises where damage is caused by flood waters emanating from a ***flood control project***."[17]

This Court explained that "*Central Green* requires the Court to identify the cause of the

---

[12]     *Id*. at 824
[13]     *Id*. at 825.
[14]     *Id* at 821.
[15]     *In re Katrina Canal Breaches Consolidated Litigation*, 471 F. Supp. 2d 684 (E.D. La. 2007).
[16]     *U.S. v. James*, 478 U.S. 597, 604 (1986); *Central Green v. U.S.*, 531 U.S.425 (2001).
[17]     *In re Katrina* , 577 F. Supp 2d at 824. (emphasis added).

damage rather than [b]ase a decision on the mere fact that a flood control project was involved." In fact, the United States has already conceded that there is not a single reported case where it received immunity pursuant to § 702(c) that occurred *outside* of a flood control project.[18]

In this case, the negligence complained of by Plaintiffs was *outside* the contours of a flood control project. The IHNC is a navigation project, not a flood protection project. The planning objective of the Lock  Expansion Project focused exclusively on enhanced navigation objectives and had no flood protection components whatsoever.[19]   In addition, this navigation project had completely separate funding from any flood control project.   Notwithstanding these facts and the prior rulings of this Court, however, the United States once again urges the rejected interpretation of *Central Green* that broadens its immunity to any venture undertaken by the Corps in proximity to a flood protection project.

In this case, Plaintiffs only complain of negligence for which immunity under § 702(c) does not attach.    To be clear, a flood control project did not cause Plaintiffs damages, a navigation project did.   To use this Court's analogy, the site preparation performed pursuant to The IHNC Lock Expansion Project without consideration of the impacts of excavations on the nearby levees is no different than if an uncontrolled Navy vessel had hit the Lake Pontchartrain and Vicinity Hurricane levees ("LPV Levees") in the vicinity of the IHNC.  **Here, first the levees were constructed. Then subsequently, work performed adjacent to those levees to enhance navigation interests compromised their integrity.**  Under this Court's clear holdings, no immunity can exist.

---

[18]      *Id*. at 825, FN 16.
[19]      PSUF at ¶ 9.

**2. The IHNC is a Navigation Channel That Remained Wholly Independent of the Adjacent Flood Control Projects.**

Despite Defendant's attempts to rewrite history, the IHNC is a navigation project, not a flood protection project. "Simply because the waters involved in the harm suffered by Plaintiffs crossed a flood control project does not eliminate the remedies that Congress has fashioned for a navigational aid project that went wrong."[20] This Court has stated that "it would be absurd to hold that flooding damage to property owners outside the confines of a flood control project would have a viable claim and those within it do not when the negligent act was extrinsic from and not connected to the expenditure of funds to construct the flood control project."[21]

The United States attempts to conflate four separate projects with multiple objectives and funding sources, and asks this Court to conclude that all are one for the purpose of granting 702(c) immunity:

- The IHNC and its original lock (a navigation project), which was authorized by the State of Louisiana to furnish the Dock Board and the Port Board with an industrial canal;[22]

- The IHNC Lock Expansion Project (a navigation project ), which was  authorized by PL 84-455 to increased traffic needs and funded by general cargo and inland navigation interests;[23]

- The LPVHPP (or "LPV")(a flood control project),[24] which was given no consideration in the subject project planning and funded by the federal government and cost shared with local sponsoring authority Orleans Levee; and,

- The Mississippi River Levees ("MRL")(a flood control project), which was authorized as a component of the Mississippi River and Tributary Project ("MRT") under the Flood Control Act of 1928 and called for the construction of levees along the Mississippi River, extending north along the east bank of the IHNC and

---

[20]   *In re Katrina* , 577 F. Supp 2d  at 826.
[21]   *Id*.
[22]   PSUF at ¶ 1, 5.
[23]   PSUF at ¶ 3-5.
[24]   PSUF at ¶ 6.

terminating south of Florida Avenue.[25]

The undermined LPV levees were not components of the IHNC Lock Expansion Project.  Rather, the levees surrounding the IHNC were a component of the LPV and MRT, which were funded and maintained under the separate Congressional authorizations that did not relate to navigation.[26]   On the other hand, the IHNC was undoubtedly a navigation project and had nothing to do with flood control.  The IHNC and its lock were initially authorized in 1914 by the Louisiana legislature for the express purpose of enhancing navigation interests.[27]  The lock expansion project was authorized by the United States Congress in 1956 by the same navigation act that authorized the Mississippi River Gulf Outlet "MRGO"), which is a navigation project.[28]  In other words, both the creation of the IHNC and its expansion were authorized for navigation purposes, not for flood control purposes.

The Lock Expansion Project contemplated the "tying-in" of the Mississippi River Levees to the newly created shape of the IHNC expanded Lock.  But even the Corps has acknowledged through its 30(b)(6) witness, the Chief of the Economic Branch of the New Orleans District of the Corps, that when a navigation project requires levee construction because of the navigation project's impact on an adjacent flood control project, the navigation project does not become a flood control project, but remains a navigation project.[29]   Further, the tying-in had not commenced or even received funding at the time of Katrina and this proposed activity cannot even arguably create a §702(c) nexus to immunization.  And as the Corps has admitted, this activity could not convert a pure navigation project into a flood control project even if it had

---

[25]      PSUF at ¶ 2.
[26]      PSUF at ¶ 2.
[27]      PSUF at ¶ 1.
[28]      PSUF at ¶ 3.
[29]      John Manguno, 7/24/08; (*Robinson*) at 81 and 82.

been finished.[30]

In this case, because §702(c) cannot attach to a non-flood control project—and the IHNC and its expansion are not flood control projects, but navigation projects—immunity cannot attach.

### 3. This Court's Reluctant Grant of 702(c) Immunity for the Harm Suffered as a Result of the Failed Levees Surrounding the 17th Street and London Avenue Outfall Canals Does Not Extend to the IHNC Lock Expansion Project.

Rather than a broad extension and expansion of §702 (c) immunity as a blanket enhancement of immunity,[31] as Defendant contends, this Court's decision in *Katrina Levee 702(c)* was unique factual confines presented in that case.[32]

In *Katrina Levee 702(c)*, the damages suffered were due to failed levees surrounding poorly maintained canals that had been *legally re-defined* to render them part of the adjacent "flood protection system."  In contrast to the United States' position, the Court noted:

> Had these outfall canals not been wrapped into the LPV and had the levees failed solely, or in part, as a result of the Corps permitting the scouring of the east bank of the 17th Street Canal Levee, section 702(c), in all likelihood, would not have provided the United States refuge.[33]

---

[30]      The United States misconstrues case law extending Flood Control Act immunity to **flood control projects** with multiple purposes.  Notably, although cited in by Defendant, the Fifth Circuit **refused to extend immunity** in *Kennedy v. Texas Utils.* 179 F 3d. 258 (5th Cir 1999).  There, after swimming in the reservoir the plaintiff was injured by an electrical line installed and used by the Texas Utilities.  The line was not installed by the United States and was not used in connection with a flood control project.  The United States argued to extend Flood Control Act immunity to plaintiff's injuries because one of the multiple functions of the project included recreation and flood control project management.  The district court granted summary judgment relying on *James* and *Boudreau*; however, the Fifth Circuit reversed, holding that nothing in the language of *James* and *Boudreau* compels the holding "that the injury here which occurred on dry land and was due to a condition unrelated to flood control, is nevertheless an injury 'from or by floods or flood water.'" *Id*. at 262.

Here, the United States' argument is even further attenuated; the immune levees have never incorporated among their "functions" the need to accommodate navigation interests.  The immunity of the flood control project does not extend to this purely navigational project.

[31]      Defendant United States' Memorandum of Law in Support of Motion to Dismiss, or, in the Alternative, for Summary Judgment ("U.S. Motion to Dismiss"), at page 32-33.

[32]      *In re Katrina Canal Breaches Litigation,* 533 F. Supp 2d 615, 639 (E.D. La. 2008)("*Katrina Levee 702 (c)*").

[33]      *Id.*

Here, the United States' plea for immunity is unsupported by jurisprudential authority. The United States cannot support its contention that the mere fact that a "canal is bounded by flood control structures" renders negligently maintained canals part of a flood control project. [34]

## III.  THE DISCRETIONARY FUNCTION EXCEPTION DOES NOT APPLY TO DEFENDANT'S CONDUCT.

The DFE provides the United States a potential exception to liability only where its behavior is the result of uniquely governmental acts of discretion.  Courts have consistently held that the FTCA is not intended to create inconsistent liabilities between private and government entities performing identical acts. [35]   In attempting to invoke this exception to liability, "[t]he burden of proving the applicability of the [DFE] is on the United States." [36]

In order for the DFE to apply, the United States must prove that the challenged conduct is **both** "a matter of choice for the acting employee," *i.e.*, discretionary rather than mandatory, and a decision exercised "based on considerations of public policy." [37]  In the instant case, Defendant cannot meet its burden.

This Court has recently held that the Corps' failure to follow NEPA's procedural dictates defeats the United States' attempt to invoke the DFE. [38]  NEPA is a procedural, not a substantive environmental statute, and procedural mandates imposed on the Corps must be strictly scrutinized by courts. [39]   Stated plainly, the Corps failed to satisfy NEPA's mandatory prerequisites by not including in any NEPA filing the impacts of the East Bank Industrial Area ("EBIA") excavations on the adjacent levees.   Accordingly, the Corps' omissions preclude the application of the DFE in this case.

---

[34]     U.S. Motion to Dismiss at 32.

[35]     *Bear Medicine v. United States ex rel. Sec'y of Dept. of Interior*, 241 F.3d 1208, 1213 (9th Cir. 2001).

[36]     *Id.*

[37]     *Berkovitz v. United States*, 486 U.S. 531, 537 (1988).

[38]     *In re Katrina Canal Breaches Consolidated Litigation*, 647 F. Supp. 2d 644, 717 (E.D. La. 2009)(citing *Adams v. United States,* 2006 WL 3314571 (D. Idaho Nov.14, 2006)).

[39]     *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 351 (1989);  *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 558 (1978); *Sierra Club v. Espy,* 38 F.3d 792, 802 (5th Cir.1994);  *Calvert Cliffs' Coordinating Committee, Inc. v. Atomic Energy Comm.,* 449 F.2d 1109 (D.C.Cir. 1971);  *See also* 40 C.F.R. § 1502.1.

A. **NEPA's Mandates Are Clear and Unambiguous**

As this Court previously recognized, NEPA was intended to insure that the appropriate responsible officials consider the environmental effects of a project, and that Congress and others receiving such recommendation or proposal be provided a sound basis for evaluating the environmental aspects of the particular project or program.[40]

NEPA requires all agencies of the federal government to:

> (C)   Include in every recommendation or report on proposals for legislation and **other major Federal actions significantly affecting the quality of the human environment,** a detailed statement by the responsible official on-
> (i)   the environmental impact of the proposed action,
> (ii)   any adverse environmental effects which cannot be avoided should the proposal be implemented,
> (iii)   alternatives to the proposed action[41]

A "major Federal action" is one with effects that may be major and may include new and continuing activities, either entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies.[42]   "Significantly" requires that the context of the activity be analyzed in terms of the long and short term effect of the activity on the locale and the "*intensity*" of the impact must be evaluated in terms of its severity.[43]

In order to comply with NEPA's requirements, the Corps was mandated to prepare an Environmental Impact Statement or "EIS," which serves a dual purpose:

> It ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role

---

[40]   *In re Katrina* , 647 F. Supp. 2d at 719 (E.D. La. 2009); (citing *Save Our Ten Acres v. Kreger,* 472 F.2d at 466); *Environmental Defense Fund, Inc. v. Corps of Engineers of U.S. Army,* 492 F.2d 1123, 1140 (5th Cir.1974)).

[41]   42 U.S.C. § 4332(C); see also *Coliseum Square Ass'n, Inc. v. Jackson,* 465 F.3d 215, 224 (5th Cir. 2006).

[42]   *In re Katrina Canal Breaches Consolidated Litigation*, 647 F.Supp.2d 644, 720 (E.D.La., 2009); 40 C.F.R. §§ 1506.8, 1508.17, 1508.18.

[43]   *Id.*

in both the decision making process and the implementation of that decision.[44]

In the event that the Corps had determined that the project did not warrant an EIS, it was nevertheless required produce an Environmental Assessment ("EA").  An EA is:

> a "concise public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS]." If, pursuant to the EA, an agency determines that an EIS is not required under applicable CEQ regulations, it must issue a "finding of no significant impact" ("FONSI'), which briefly presents the reasons why the proposed agency action will not have a significant impact on the human environment.)[45]

Additionally, when there are new circumstances surrounding a project that could potentially impact the human environment, NEPA instructs/required the Corps to submit a Supplemental Environmental Impact Statement ("SEIS").  This mandate requires that the Corps:

> (1)   Shall prepare supplements to either draft or final environmental impact statements if:
> (i)   the agency makes substantial changes in the proposed action that are relevant to environmental concerns; or
> (ii)   there are **significant new circumstances or informationrelevant to environmental concerns and bearing on the proposed action or its impacts.**[46]

NEPA requires that, on balance, the significance of an impact must be evaluated against the "degree to which the proposed action affects public health or safety" and the "degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks."[47]

In this case, there is no dispute that the EBIA project was a "major federal action" that "significantly" affected the human environment.   Nevertheless, the Corps (1) did not include the

---

[44]      *In re Katrina,* 647 F. Supp. 2d at 719 (citing *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349 (1989)).

[45]      40 C.F.R. § 1508.9(a); 40 C.F.R. § 1501.4(e); 40 C.F.R.§1508.13; *Dept. of Transp. v. Public Citizen,* 541 U.S. 752, 757-58 (2004).

[46]      *In re Katrina,* 647 F. Supp. 2d at 723; 40 C.F.R. § 1502.9(c)(1) (emphasis added).

[47]      *In re Katrina,* 647 F.Supp.2d at 720.

site work's potential hazards to the nearby floodwalls in its 1997 EIS; (2) did not submit an EA and FONSI regarding the potential hazards to the nearby floodwall; (3) did not submit an EIS, EA, or  SEIS regarding the impact of the work done under the Task Order 26 of the TERC on the floodwalls; and (4) did not submit an EIS, EA, or SEIS when the work done pursuant to the TERC underwent drastic changes that posed a potential threat to the nearby floodwalls.  In fact, at no time did the Corps warn Congress of the potential threat to the floodwalls in the EBIA. Accordingly, the Corps violated NEPA, and thus; the DFE cannot immunize its actions in this case.

### 1.   In Clear Violation of NEPA, the Corps' 1997 EIS Failed to Address the Project's Impact on the Hurricane Protection System.

The Corps proposed a lock expansion project in the EBIA purely for the purpose of enhanced navigation.[48]  The EBIA encompassed six industrial sites along Surekote Road: Boland Marine, McDonough Marine, Indian Towing Company, Mayer Yacht/ Distributor Oil, Saucer Marine and the Industrial Tank Terminal. [49]  In preparing its designs for this navigation project, the Corps accommodated navigation interests so that the project did not hamper shipping traffic.[50]  Towards this end, the project proposed a bypass channel along the east bank of the IHNC running parallel to the LPV levees adjacent to the Lower Ninth Ward.[51]   The soil sampling conducted prior to 1997 for site preparation of the bypass channel revealed that the EBIA contained extensive hazardous waste to depths of -5 feet that required environmental remediation.[52]

In 1997, the Corps prepared a NEPA mandated EIS for the lock expansion project. [53]  In

---

[48]   PSUF at ¶ 10, 24. Accordingly, there can be no question that the actions in the vicinity of the levee system had a high potential to severely impact the health and safety of the population protected by those levees, and the impacts were thus required to be included in an EIS.
[49]   PSUF at ¶ 18.
[50]   PSUF at ¶ 11,12,15.
[51]   PSUF at ¶ 18, 19.
[52]   PSUF at ¶ 20.
[53]   PSUF at ¶ 21.

February 1998, the Corps filed its EIS with the Environmental Protection Agency ("EPA").[54] And on December 18, 1998, the Corps issued its Record of Decision ("ROD") endorsing its proposed work. [55]

Pursuant to NEPA, the Corps was under a mandatory duty to take a "hard look" at the effects of its conduct that should have included an analysis of the full spectrum of the environmental remediation of the EBIA on the levees in the vicinity.[56] The Corps concedes that it had knowledge that this environmental remediation could have impacted the nearby floodwalls;[57] but the 1997 EIS makes no mention whatsoever of the potential adverse impacts that these proposed site preparation excavations could have on the integrity of the adjacent levees or how the Corps intended to mitigate those potential adverse impacts.[58]

The failure to include in an EIS, a supplemental EIS, or an EA the potential hazards posed by the excavations necessary to complete the initial environmental restoration renders the Corps in clear violation of NEPA. The Corps' actions in the vicinity of the levee system had a high potential to severely impact the health and safety of the population protected by those levees. Accordingly, because the Corps violated NEPA, DFE does not apply.

Indeed, upon evaluation of the Corps' 1997 EIS after Katrina, a division of this Court ruled that the Corps handling of the storm-related impacts of the project was inadequate:

> The EIS does not adequately address risks of flooding and hurricanes in general….Of the thousands of pages in the administrative record, only a few paragraphs mention hurricane protection or flood control. See Vol. Main Report and Environmental Impact Statement, at US000226-US000227 (describing need to upgrade floodwalls along the canal due to higher river stages in the new lock); Vol. 3 evaluation Report Engineering Investigations, at US 0005-US000649 (discussing historical flooding trends). These brief discussions are limited to

---

[54]     PSUF at ¶ 21.
[55]     PSUF at ¶ 24.
[56]     *Great Basin Mine Watch v. Hankins,* 456 F.3d 955, 69-70 (9th Cir. 2006); 40 CFR 1508.25 1508.7; *State of Louisiana v. Lee,* 758 F.2d 1081, 1089,1086  (5th Cir 1985);  *Sabine River Authority v. U.S. Dept of Interior,* 745 F. Supp. 388, 392 (E.D. Tex. 1990); *Sierra Club v. Hassell,* 636 F.2d 1095, 1099 (5th Cir. 1981).
[57]     U.S. Motion to Dismiss at 21-22, 24-27.
[58]     PSUF at ¶ 22, 23.

13

changes in the walls of the canal.[59]

**2.   In Clear Violation of NEPA, the Corps Failed to Prepare a Separate EIS For Task Order 26 of the TERC or to Supplement Its 1997 EIS for the Lock Expansion Project.**

To address the remediation needs uncovered during its site evaluation of the EBIA, the Corps utilized funding available for a separate federal program, the Total Environmental Restoration Contract ("TERC"), which is an independent program developed to address environmental remediation needs throughout the country.  Through Task Order 26 to the TERC, the Corps developed a Scope Of Work that intended to excavate the removal of the first 3 feet of contaminated soils at the EBIA.[60]  Although Task Order 26 of the TERC overlapped with the objectives of one feature of the Lock Expansion Project, the construction of the bypass channel, it too separately qualified as a Major Federal Project that significantly impacted the environment.[61]   **In violation of NEPA, the Corps prepared no NEPA related document regarding impacts of the hazardous soil remediation excavation work proposed in the vicinity of the levees pursuant to Task Order 26 of the TERC.**[62]

Had the Corps found that the excavation work proposed pursuant to Task Order 26 of the TERC would have no significant impact on the environment to warrant completion of its own EIS, then the Corps was nevertheless mandated under NEPA to prepare an EA  and FONSI, presenting the analysis that resulted  in that conclusion to Congress.  The Corps, however, prepared neither an EIS nor an EA and FONSI addressing the potential impacts of this environmental remediation work under Task Order 26 of the TERC.[63]

**3.   Modifications to Task Order 26 that Expanded the Scope of Work Under the TERC Required the Corps to Either Supplement Its 1997 EIS, Create a New EIS, or Submit a EA with a FONSI.**

---

[59]     *Holy Cross et al. v. U.S. Army Corps of Engineers.,* 455 F. Supp. 532, 539-540 (E.D. La. 2006).

[60]     *See*, PSUF at ¶ 27.

[61]     *O'Reilly,* 477 F.3d at 228 ; 42 U.S.C. § 4332(2); *Coliseum Square,* 465 F.3d at 228.

[62]     PSUF at ¶ 29.

[63]     PSUF at ¶ 29.

Beginning in 2001, the Corps introduced the first of several modifications to its site preparation plans for the bypass channel and added work plans that expanded the scope of the soil remediation to include removal of multiple large subsurface structures from the foundation of the EBIA in the vicinity of the hurricane protection levees.[64]   Each of these proposed excavations significantly altered the size of the initial remedial top soil removal.[65]   These modifications changed the purpose of the excavation work pursuant to Task Order 26 of the TERC from its original objective and explicit design of soil remediation to a depth of three feet deep,[66] to include the removal of several, large, deep foundational structures in the vicinity of the levees, to accommodate the space requirements for the bypass channel.[67]

NEPA itself requires that when an agency has created an EIS, and circumstances surrounding the environment or the project have changed, the agency bears a continuing obligation to update its environmental evaluation in response to those changes or circumstances.[68]   Ultimately, where an agency has prepared an EIS, it cannot simply rest on the original document.  The agency must be alert to new information that may alter the results of its original environmental analysis, and continue to take a "hard look at the environmental effects of [its] planned action, even after a proposal has received initial approval."[69]   NEPA mandates that:

---

[64]   PSUF at ¶ 31-45.
[65]   PSUF at ¶ 55, 37, 43.
[66]   PSUF at ¶ 55.
[67]   PSUF at ¶ 37, 43.
[68]   40 C.F.R. § 1502.9(c)(1) (1992). *West Branch Valley Flood Protection Association v. Stone,* 820 F. Supp. 1, 5-6 (D.C. 1993); *Association Concerned About Tomorrow, Inc. v. Dole,* 610 F. Supp. 1101, 1112 (N.D. Tex. 1985). *West Branch Valley,* 820 F. Supp. at 6 (citing *Wisconsin v. Weinberger,* 745 F.2d 412, 418 (7th Cir. 1984)).
[69]   *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 374 (1989); 40 C.F.R. § 1502.9(c)(1)(ii); *Friends of the Clearwater v. Dombeck,* 222 F.3d 552, 556-58 (9th Cir. 2000); *Blue Mountains Biodiversity Project v. United States Forest Service,* 229 F.Supp.2d 1140, 1147-48 (D. Or. 2002); *Headwaters v. BLM,* 914 F.2d 1174, 1177 (9th Cir. 1990).

"Agencies have continuing obligations to reassess ongoing projects to avoid or minimize adverse environmental effects."[70] As this Court has noted:[71]

> [An] agency bears a continuing obligation to update its environmental evaluation in response to substantial changes to the proposed action or significant new circumstances.[72] The results of this later evaluation are published in a supplemental environmental impact statement ("SEIS"). Based on the findings of the SEIS, the agency must consider anew whether to proceed with the proposed project."[73] That process is triggered when new information presents a 'seriously different picture of the environmental landscape' such that another in-depth look at the environment is necessary."[74]

Tellingly, the Corps' own internal regulations for compliance with NEPA require that when a Corps project undergoes changes that substantially increase its size or add additional purposes, an EIS must be prepared.[75] **The Corps' excavation plan grew from a simple 3 foot skimming of the top soil to the removal of a minimum of 8 solid structures at the Boland site to depths of -25 feet,[76] plus an additional solid structure at Saucer measuring nearly 70 feet wide, 80 feet long and approximately 20 feet deep.[77]** All of this enhanced work was adjacent to the Lower Ninth Ward and clearly had the potential to impact the floodwalls designed to protect the human environment.[78] Either the supplementation of the 1997 EIS or the creation of a separate EIS for the expanded Scope Of Work under the TERC was therefore required under NEPA. Because the Corps did not comply with NEPA's mandates, immunity cannot attach.

---

[70]   40 C.F.R. § 1500.13; *O'Reilly,* 477 F.3.d at 238.
[71]   647 F.Supp.2d 644, 723 (E.D. La.  2009).
[72]   40 C.F.R. § 1502.9(c)(1)
[73]   *Stone,* 820 F. Supp. 1, 5-6 (D.C. 1993) (emphasis added); *Association Concerned About Tomorrow, Inc. v. Dole,* 610 F. Supp. 1101, 1112 (N.D.Tex.1985).
[74]   *Stone,* 820 F. Supp. at 6 (citing *Wisconsin v. Weinberger,* 745 F.2d 412, 418 (7th Cir. 1984)
[75]   PSUF at ¶ 33; 33 CFR 230.6
[76]   PSUF at ¶ 37.
[77]   PSUF at ¶ 43.
[78]   PSUF at ¶ 18, 19.

The Corps failed to supplement its only NEPA filing for the Lock Expansion Project, the 1997 EIS, to address the modified work proposed under Task Order 26 of the TERC.[79]

### 4.  Immunity Does Not Apply

This Court has ruled that the 1997 EIS did "not adequately address the risks of flooding and hurricanes in general."[80]  The Corps cannot now meet its burden of proving that it complied with mandatory statutory requirements of NEPA.[81]

The 1997 EIS submitted by the Corps failed to include a comprehensive appreciation of the project's impacts.  The EIS (1) omitted the details regarding the possible effects of the conduct taken, and (2) examined only isolated aspects of a project.  The Corps failed to update the EIS despite substantial changes in the character of the project. These failings render the project "not authorized" because legislators voting on appropriations have the right to assume that the agency had been following, and was following the law.[82]  Therefore, as a matter of law, the conduct that was not presented, studied, or approved in an EIS, and could not have been legally authorized action.

 Not only did the Corps' actions/inactions violate its obligations under NEPA, they were also the cause of Plaintiffs damages in this case.  There can be no doubt that the Corps' failure to address the potential impacts of its remedial excavation in its 1997 EIS on the adjacent flood control structures, and its continued failure to supplement its EIS with a "hard look" at the impacts on the levees of expanding those excavations, was clearly a substantial cause of the failures of the levees.

Had the Corps adequately reported the potential adverse impacts of its proposed conduct under NEPA, the Corps would have been obligated to also present alternative measures available

---

[79]     PSUF at ¶ 29.

[80]     *Holy Cross et al. v. U.S. Army Corps of Engineers*., 455 F. Supp. 532, 539-540 (E.D. La. 2006); 647 F. Supp. 2d 644.

[81]     *In re Katrina*, 627 F. Supp. 2d 656, 697, 699, 705 (E.D. La. 2009) .

[82]     *Atchison, T. & S. F. Ry, Co. v. Callaway*, 382 F. Supp. 610, 619 (D. D.C. 1974)*; League of Wilderness Defenders/Blue Mountains Biodiversity Project  v. Forsgren*, 309 F.3d 1181, 1191 (9th Cir. 2002) (approving only the project evaluated and considered in an EIS and a final decision to proceed with a project, *as analyzed in the EIS*)*;* 40 C.F.R. § 1505.1(e).

to prevent potential adverse consequences to the levees, the relevant decision makers could have considered the potential impact of this proposed plan had on the levees and could have demanded the inclusion of alternative measures to protect and prevent harmful impact to the human environment.  The United States cannot now claim exemption from liability for the damage created by its failure to consider the impacts of its conduct on the adjacent levees.

**B.  The Corps' Negligent Excavations of Subsurface Structures in the Vicinity of the Levees Were Not The Result of Immune Policy Judgments.**

The second inquiry in the application of DFE is whether the alleged improper actions or failures to act were based on considerations of public policy.  In *Berkovitz*, the United States Supreme Court specifically rejected the argument that "the exception precludes liability for any and all acts arising out of the regulatory programs of federal agencies."[83]  "[T]he salient issues to consider as to the second prong of the discretionary function exception is whether the government actor was (1) acting in contravention of its own regulations or standards or (2) exercising a policy choice."[84]

In essence, the Corps' negligence in failing to follow professional engineering standards to the structural integrity of the levees before, during, or at completion of the site excavations for the bypass channel in the EBIA is not protected under prong two of the DFE.

**1.  The Corps Acted in Contravention of Its Own Standards.**

Technical considerations of actual construction are not protected from liability under the DFE.[85]  This Court has already ruled that where the Corps' "decisions concern safety and engineering judgments, [DFE] is not an absolute shield."[86]

---

[83]     *Berkovitz,* 486 at 543.
[84]     *In re Katrina* , 647 F. Supp. 2d at 706.
[85]     *Id.* (citing *Kennewick Irr Dist. v. U.S*., 880 F.2d 1018 (9th Cir. 1989)).
[86]     *Id*.

In the instant case, the Corps neglected to perform the standard and internally mandated analysis of the following: wall stability, underseepage propensity, and global stability of the levees in relation to the excavations at the Boland and Saucer Marine sites [87]

The United States suggests that the Corps indeed engaged in an engineering analysis and references as support the "15 foot exclusion zone" in the vicinity of the levees for work along the "borrow pit."[88]   This "15 foot zone" associated with work along the borrow pit, however, **was not the result of any engineering analysis or evaluations of the IHNC floodwalls' stability or factors of safety for the LPV levees**.   Rather, this zone was created through "general consensus" to establish a "rule of thumb" based on the location of the curb of Surekote Road.[89]

Additionally, the engineering evaluations performed on the EBIA remediation for Task Order 26 of the TERC were limited to a footprint of 25 feet wide by 3 feet deep, which was to be the initial hazardous waste soil remediation.[90]   As aforementioned, however, the size and scope of the excavations quickly grew much larger to depths as low as -25 feet.  The Corps simply failed to perform basic engineering analysis when it expanded the excavations beyond their initial three feet depth.

In fact, testimony by the Corps' witnesses acknowledged that standard engineering practices and principles required specialized architectural-engineering and geotechnical analysis for excavation in an area adjacent to levees to ensure such work was "safe for the levees."[91]   The Corps' witnesses testified that this project was "fairly simplistic" and that "the only way to endanger the flood system [was] by some form of inappropriate excavation or inappropriate

---

[87]        *See*, PSUF at ¶ 50.
[88]        U.S. Motion to Dismiss at 49. The United States merely relies on the Statement of Facts filed by Washington Group International, (WGI) which evidently went unopposed.  Plaintiffs do not accept these facts as stated.
[89]        PSUF at ¶ 50.
[90]        PSUF at ¶ 58, 59.
[91]        PSUF at ¶ 50.

backfill," the Engineer in charge of the project "should have wanted some type of information on backfilling criteria."[92]

The Corps Engineering Manuals and Corps testimony acknowledge the need for "more extensive" field investigations and design studies "where consequences of [a] failure involve life, property, or damage to the environment."[93]   The Corps' witness testimony demonstrates that the Corps was aware that the foundation of the IHNC levees was weak.   The General Design Memoranda for the LPV levees in the IHNC reveals that the Corps had been aware of this weakness since 1966 when it expressly specified the use of Pleistocene clay fill from Lake Pontchartrain for the LPV levees in the IHNC.[94]   Despite their own requirements, the Corps admittedly elected to forego as "unnecessary" a more thorough geotechnical engineering analysis of the threat to the levees posed by the excavations.[95]

The Corps' Engineering Manuals offered specific guidance in conducting analysis of proper backfill and compression to prevent known levee failure problems of piping and underseepage caused by excavations near levees[96] in areas with low shear strength.[97]   Indeed, so commonplace are these required stability analyses that the Corps' Engineering Manuals direct the engineer to relevant technical reports and available computer programs on mainframes and microcomputers at the Corps that perform the calculations for them.[98]

Despite the Corps' witnesses acknowledgment of the weakness of the levees and the need to preserve the levees though bracing mechanisms during excavations within 229 feet of a levee

---

[92]     PSUF at ¶ 57, 61, 62.
[93]     PSUF at ¶ 51, 52, 53.
[94]     PSUF at ¶ 7.
[95]     U.S. Motion to Dismiss at 49; *See*, PSUF at ¶ 55, 61.
[96]     PSUF at ¶ 53.
[97]     PSUF at ¶ 51,52,53.
[98]     PSUF at ¶ 52.

that would exceed depths of 12 feet,[99] **the Corps performed no analysis of the foundational stability needs for excavations that reached depths of -20 to -25 feet.**[100]   Indeed, after the removal of the cofferdams at the large Boland and Saucer excavations in the vicinity of the IHNC levees, the Corps failed to conduct the analysis to determine the proper materials for use in the IHNC[101] and backfilled the excavations with "sandy silt" from the area rather than with the Pleistocene clay fill carted in from the bottom of the north shore of Lake Pontchartrain as required in the IHNC General Design Memorandum ("GDM"). [102]

Simply put, in contravention of the engineering principles and internal the Corps' Engineering Manuals, the Corps failed to undertake the requisite and easily accessible architectural-engineering, hydro-geological, and geotechnical evaluations.   Those evaluations would have taken into account the known mechanisms of levee failure and the effects of construction in the vicinity of flood control structures and could have prevented the damages of which Plaintiffs now complain.[103]

As noted in *Alabama Electric Cooperative, Inc. v. United States,*[104] where the Corps' failed to consult an internal manual which was "a recognized authority on dike design," the Court found that the techniques used fell woefully short of the technical elements indicated as necessary by the Corps.[105]   The Eleventh Circuit found that the DFE did not shield the Corps from liability caused by such engineering errors.[106]   Here, because the Corps failed to follow basic engineering standards, as well as its own engineering manuals, the DFE cannot apply.

---

[99]        PSUF at ¶ 60.
[100]       PSUF at ¶ 59, 37, 43.
[101]       PSUF at ¶ 62.
[102]       PSUF at ¶ 7, 63.
[103]        PSUF at ¶ 48, 50.
[104]       *Alabama Electric Cooperative, Inc. v. United States,* 769 F.2d 1523 (11th Cir. 1985).
[105]       *Id.*
[106]       *Id.*

Moreover, in a misguided attempt to cast its engineering oversights as policy, the United States admits that the "timely completion" of a "half century old project" was the guiding consideration for the Corps' onsite project engineer's refusal to undergo more thorough engineering analysis.[107]

This Court observed that:

> No matter the level at which the decision was made, the nature of the decision, or the impact it had on others, … the discretionary function exception applies "only where 'the question is not negligence, but social wisdom, not due care but political practicability, not reasonableness but economic expediency.[108]

Here, the Corps did exactly what this Court has cautioned against:  it unreasonably failed to perform basic engineering evaluations that were required by its own engineering manuals and professional engineering standards in order to further economic expediency.  Further, if the Government could trigger the DFE immunity by invoking the "budget restraints" mantra, it could always escape liability of even gross malfeasance after the fact.  The Government would always win. Accordingly, for this conduct, the DFE cannot apply.

### 2.   The Corps' Actions Were Not Based On Policy Considerations.

Under the second step of the *Gaubert* analysis, the question is not whether the challenged decision *involved* policy considerations but whether the nature of the decision is grounded in such considerations.  The Supreme Court has observed:  "[T]he discretionary function exception insulates the government from liability if the action challenged in the case involves the permissible exercise of policy judgment."[109]

---

[107]     U.S. Motion to Dismiss at 49.
[108]     *In re Katrina,* 647 F. Supp. 2d at 709 *(*citing *Cope v. Scott,* 45 F.3d 445, 450 (D.C. Cir. 1995)).
[109]     *U.S. v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 81 (1984); *Berkovitz* 486 U.S. at 537; *Lively v. United States,* 870 F.2d 296, 299 (5th Cir.1989).

The Fifth Circuit has specifically rejected an overly broad application of the exception and found that "in determining whether the discretionary function exception applies, we examine the nature and quality of the activity to determine if it is the type that Congress sought to protect."[110]   This Court has noted that failing to properly exercise "engineering judgment" or adhere to professional standards does not constitute a "matter of policy" or an "exercise of policy judgment."[111]   Decisions involving the application of objective scientific standards are not insulated by the DFE because they do not involve the weighing of economic, political and social policy."[112]

This Court has also followed the long tradition of rejecting the government's invocation of general "economic considerations," reasoning that "[b]udgetary constraints underlie virtually all government activity."[113]

Additionally, it is clear that where the government has undertaken responsibility for the safety of a project, the execution of that responsibility is not subject to the DFE.   The decision to adopt safety measures and the negligent implementation of those measures are not protected policy decisions.[114]   "[W]here safety is at the nucleus of the decision, simple engineering mistakes cannot be shielded,"[115] engineering judgment is no more a matter of policy than objective scientific principles.[116]

---

[110]     *Varig Airlines*, 870 F.2d at 299 (5th  Cir.1989).
[111]     *Cope,* 45 F.3d at 452 (citing *Berkovitz v. United States,* 486 U.S. at 545;  647 F. Supp. 2d at 710-14 (quoting *Bear Medicine*, 241 F.3d at 1217); *In re Glacier Bay*, 71 F.3d 1447, 1453 (9th Cir. 1995).
[112]     *In re Katrina* 647 F. Supp. 2d at 712-14; *Cope*, 45 F.3d at 452 (quoting *Kennewick Irrigation Dist. v. United States,* 880 F.2d 1018, 1030 (9th Cir.1989)); *Whisnant v. United States*, 400 F.3d 1177, 1183 (9th  Cir. 2005).
[113]     *In re Katrina* 647 F. Supp. 2d at 710; *Cope*, 45 F.3d at 449 (quoting *ARA Leisure Servs. v. United States,* 831 F.2d at 196); *Hayes v. U.S.,* 539 F. Supp. 2d 393, 402-03 (D. D.C.  2008).
[114]     *Id*. at 705; *Kennewick* , 880 F.2d at 1018
[115]     *Cope*, 45 F.3d at 452.
[116]     *In re Katrina,* 647 F. Supp. 2d at 710.

The United States mischaracterizes the Plaintiffs' position as a challenge to the Corps' otherwise immune policy discretion to delegate its work and to supervise its contractor, WGI. To the contrary, Plaintiffs challenge the Corps' negligent engineering conduct that led to the levees' failure.  Plaintiffs further contest the proposition that the negligent engineering decisions made by the Corps were guided by principles of immune policy.

Here, the Corps' witnesses have admitted that the responsibility to undertake geotechnical stability analysis of levees or floodwalls at the EBIA was not among those acts delegated to its contractors.[117]  Rather, the Corps acknowledges that its engineering designes predated the retention of its contractors and that they were not "expected to provide input regarding geotechnical stability of levees or floodwalls at the East Bank."[118]

The United States concedes that the only policy considerations influencing its supervision of its contractors were the economics of expediency.[119]  The United States asserts that the Corps appropriately supervised its contractors and appreciated the threat to the levees posed by their work.  Without explanation, however, the United States characterizes as policy judgment the Corps' decision forego as "unnecessary" the required stability and thorough geotechnical engineering analysis of that threat.[120]  In an attempt to cast these engineering oversights as policy, the United States asserts that the "timely completion" of a "half century old project" was the guiding policy consideration of the Corps onsite project engineer.[121]  When offered the choice between reducing the risk of harm and delaying the project, the Corps chose expediency over safety requirements.[122]

---

[117]     PSUF at ¶ 54, 56, 57; U.S. Motion to Dismiss at 47 and 48.
[118]     PSUF at ¶ 54.
[119]     U.S. Motion to Dismiss at 42-44.
[120]     U.S. Motion to Dismiss at 49; see also PSUF 55, 61
[121]     U.S. Motion to Dismiss at 49.
[122]     U.S. Motion to Dismiss at 50.

Here, the United States has admitted the Corps failed to undergo a thorough engineering analysis of the foundational impacts of it excavations, in direct contravention of general engineering principles and internal guidelines. Pure negligence cannot be grounded in polic. Thus, the DFE does not apply.

## IV.    THIS COURT HAS ALREADY HELD THAT IT HAS SUBJECT MATTER JURISDICTION OVER THE ENTERGY COMPANIES' LAWSUIT.

On February 28, 2007, the Entergy Companies filed their Standard Form 95s putting the Corps on notice of their claim for damages, including those related to the actions/inactions in the EBIA.[123]   Defendant has not challenged the validity of these filings.   Instead, for the second time, Defendant challenges the Entergy Companies' lawsuit as premature and argues that this Court accordingly lacks subject matter jurisdiction. This Court has already rejected such an argument.[124]

The Entergy Companies have always maintained that their initial lawsuit was timely.[125] As explained more fully in the Entergy Companies' Reply Memorandum in Support of Motion to Consolidate, many courts have interpreted the "within" six months language in the FTCA to mean that the six month period ends on the "day before the same calendar date six months later."[126]   This Court has acknowledged that "using this calculation method in the instant case, the filing on the 28th of August would be appropriate."[127]

However, on January 12, 2010, to end all doubt regarding the prematurity issue, the Entergy Companies filed a new suit.[128]   In response to this filing, this Court held that:

---

[123]     *In re Katrina Canal Breaches Consolidated Litigation*, 07-cv-04608 (Doc 7) at 28 (E.D. La. 2010).
[124]     *Id*. at 31-32.
[125]     Entergy Companies' Complaint, 2:07-cv-04608 (Doc. 1).
[126]     *Id*. at 30-31; Entergy Companies' Reply Memorandum in Support of Motion to Consolidate, 2:05-cv-4180 (Doc. 19458) at 3-5.
[127]     *In re Katrina Canal Breaches Consolidated Litigation*, 2;07-cv-04608 (Doc. 7) at 31.
[128]     *Id*. at 31; Entergy Companies Complaint, 2:10-cv-00077 (Doc. 1).

> **As no claim has been denied, and certainly at this point, far more than six months has run since Entergy's claims were filed, any alleged infirmity under § 2675 with respect to the 2007 suit is absent as to this newly filed suit.  As such, the Court finds that the issue of prematurity is rendered moot….**[129]
>
> **Thus, as the Court finds that any alleged infirmities with the first filed suit have been dispensed with by the filing of the second suit.**[130]

Despite this clear ruling, Defendant attempts to place old wine in new bottles by again asserting that the Entergy Companies' 2007 suit is premature.  Defendant argues that because the Entergy Companies' initial lawsuit was never voluntarily dismissed before filing the second suit, the instant suit does not comply with the FTCA's six month exhaustion mandate.[131]

Defendant, however, does not, and cannot, offer any support for its argument.  Further, during the Motion to Consolidate, the Entergy Companies put Defendant on notice that they could simply refile in order to cure any alleged defects.  This Court likewise warned Defendant that the Entergy Companies could simply refile their lawsuit to cure any defects since there has not been a final rejection of the Companies' administrative claims.

Instead of voicing its opinion on the record that the Entergy Companies must first dismiss their initial suit in order to comply with §2675(a), the Government remained silent only to now assert that the Companies should dismiss both lawsuits, wait one day, then refile yet again.  Simply put, the Government is wasting this Court's time and resources.  This Court should reject Defendant's exhaustion argument and reiterate its finding that **that any alleged infirmities with the first filed suit have been mooted by the filing of the second suit.**[132]

---

[129] *In re Katrina Canal Breaches Consolidated Litigation*, 2;07-cv-04608 (Doc. 7 ) at 31.  (Emphasis Added).
[130] *Id*. at 32.
[131] *See* U.S. Motion to Dismiss at 57.  (Doc 19988-4).
[132] *In re Katrina Canal Breaches Consolidated Litigation*, 2;07-cv-04608 (Doc. 7) at 32.

Defendant also argues that because the authority to "make final disposition" of a claim passes from the agency to the Attorney General when an action on the claim commences, a claimant cannot deem their claims denied once a suit is filed and therefore the Corps was not allowed six months to consider the Companies' claim despite the filing of the second suit.[133] This line of reasoning has also been considered and rejected by this Court.

In arguing in its November 12, 2009 Reply In Support of Motion to Dismiss that the filing of a class action usurps the Corps' authority to settle a claim, Defendant stated as follows:

> Once an action on the claim has been filed, however, the agency is deprived of its authority to settle the claim (at least during the pendency of the suit), and that authority instead is vested exclusively with the Attorney General. Thus, by foreclosing the possibility of any settlement by the agency, the filing of a premature suit frustrates the purpose of the administrative exhaustion requirement.

This Court stated that this line of argument is "without basis in any case law and is ethereal at best."[134]   Defendant—yet again without citing any authority—attempts to stretch the same reasoning to apply to the Entergy Companies' suit.   This theory, however, stands in direct contrast to established case law that allows Plaintiffs to refile or amend a complaint to cure potential prematurity defects.[135]   The United States has long conceded "that there is no time limit from filing an FTCA action when an administrative claim is deemed to be denied under 28

---

[133]    U.S. Motion to Dismiss at 55.

[134]    *See In re Katrina Canal Breaches Consolidated Litigation*, 2;07-cv-04608 (Doc. 7) at 32.

[135]    *Socialist Workers Party v. Atty Gen.*, 642 F. Supp. 1357, 1414 (S.D.N.Y. 1986) (holding that where plaintiffs  amended their complaint  after the Government failed to issue a formal denial of their administrative claim within six months instead of refiling, they were in "clear compliance with § 2675(a)"); see also *55 Motor Avenue Co. v. Liberty Industrial Finishing Corp*, 885 F. Supp. 410, 416 (E.D.N.Y. 1994) (holding that it would be "the ultimate exercise of form over substance to require plaintiffs to refile their tort claims" because the six month waiting period has long since past); *In re Katrina Canal Breaches Consolidated Litigation*, 2;07-cv-04608 (Doc. 7) at 32.

U.S.C. § 2675(a) by virtue of an agency's failure to finally dispose of a claim within six months."[136]

The fact is that this Court instructed the Government to file an application for interlocutory appeal within ten days, and the Government simply failed to do so. Now, without appealing, and without filing a motion to reconsider, the Government simply urges the same arguments that this Court has already rejected. Thus, for reasons contained in (1) this Court's February 2, 2010 Order and Reasons and (2) the Entergy Companies' Reply Memorandum in Support of Motion to Consolidate, this Court should again reject Defendant's prematurity argument and maintain subject matter jurisdiction over the instant lawsuit.

## CONCLUSION

Where the Corps engineering manuals and guidelines require that it undergo more extensive analysis of the impacts of its actions when the consequences of the failure of that action will affect life, property, or damage to the environment; where the Corps presents no policy basis for disregarding its professional engineering standards; where the Corps was mandated under NEPA to present these impacts in an environmental disclosure, and where the Corps failed to comply with all of the aforementioned, the Corps' conduct in creating the hazard and risk of harm to the people and property in the vicinity of the IHNC cannot be immune under the DFE. Accordingly, this Court should deny Defendant United States' Motion to Dismiss or in the Alternative Summary Judgment and Plaintiffs' Motion for Partial Summary Judgment should be granted.

---

[136]   *McCallister v. U.S.*, 925 F.2d 841, 843 (5th Cir. 1991)(citing *Taumby v. U.S.*, 919 F.2d 69 (8th Cir. 1990)).

Respectfully submitted on September __03__, 2010,

Ewell E. Eagan Jr. (La. Bar No. 5239), T.A.
Nina Wessel English (La. Bar No. 29176).
Brian L. Guillot (La. Bar No. 31759)
Gordon, Arata, McCollam,
 Duplantis & Eagan, L.L.P.
201 St. Charles Avenue, 40th Floor
New Orleans, Louisiana  70170-4000
Telephone: (504) 582-1111
Fax: (504) 582-1121

By:_____/s/Brian L. Guillot_____

and

Marcus V. Brown (La. Bar No. 18817)
Wendy Hickok Robinson (La. Bar No. 25225)
Entergy Services, Inc.
639 Loyola Avenue, Suite 2600
New Orleans, LA  70113
Tel:  504-576-2765

Attorneys for Plaintiffs, **Entergy New Orleans, Inc.,
Entergy Louisiana, L.L.C.,**

and

Elisa T. Gilbert (ETG 5713), T.A.
Brendan R. O'Brien (BO 9033)
Kea Sherman, Esq (La. Bar No. 30299)
The Gilbert Firm, LLC
325 East 57th Street
New York, NY 10022

Attorneys for Hartford Steam Boiler Inspection and
Insurance Company

29

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true copy of the foregoing was served by ECF on September _____, 2010.

By:_____/s/Brian L. Guillot_____
          BRIAN L. GUILLOT