UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: KATRINA CANAL BREACHES CONSOLIDATED LITIGATION | CIVIL ACTION NUMBER: 05-4182 "K"(2) JUDGE DUVAL MAG. WILKINSON |
| PERTAINS TO: *Entergy* (No. 10-0077) | |

**STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT
ON DISCRETIONARY FUNCTION EXCEPTION
AND
IN OPPOSITION TO DEFENDANT UNITED STATES' MOTION TO DISMISS
OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT**

**Plaintiffs, Entergy New Orleans, Inc. and Entergy Louisiana, L.L.C. (the "Entergy Companies") and Hartford Steam Boiler Inspection and Insurance Company ("Hartford") (collectively "Plaintiffs")** hereby contend that the following are undisputed facts:

1. The IHNC is a 5.5 mile long waterway that provides access from Lake Pontchartrain to the Mississippi River. The canal was constructed by the Port of New Orleans between 1918 and 1923. A lock for the IHNC was placed in service in 1923.[1]

2. The Mississippi River & Tributaries Project ("MRT") authorized the construction of levees along the Mississippi River, extending north along the east bank of the IHNC

---

[1] Louisiana Legislature Act No. 244 (1914), authorizing the Commission Council of New Orleans to determine the site and the Board of Port Commissioners of Louisiana or Dock Board to build the Industrial Canal.

1

terminating south of Florida Avenue under the Flood Control Act of 1928 (otherwise referred to as the Mississippi Riverine Levees "MRL").[2]

3. In 1956, thirty years after initial construction of the IHNC Lock, Congress approved replacement or expansion of the IHNC Navigation Lock under PL 84-455, the same act that authorized the Mississippi River Gulf Outlet (MRGO) construction.[3] The authorizing Act noted as follows:

> That when economically justified by obsolescence of the existing Industrial Canal Lock or by increased traffic, replacement of the existing lock or an additional lock with suitable connections is hereby approved to be constructed in the vicinity of Meraux Louisiana, with type, dimensions, and cost estimates to be approved by the Chief of Engineers.[4]

4. The Water Resources Development Act of 1986 (PL 99-662) emphasized that the MRGO New Lock and Connecting Channels Project, (IHNC Lock Expansion Project) was expressly a cargo and inland navigation project:

> The Water Resources Development Act of 1986 (PL 99-662) modified the [IHNC lock expansion] project and changed the *cost sharing arrangement*. The Act specifies that the cost of the Lock shall be allocated **between general cargo navigation and inland navigation**. The shallow draft cost would be funded 50 percent from the general funds of the US Treasury and 50 percent from the Inland Waterway Trust Fund. …The Act provides that the lock and connecting channels shall be in the area of the existing lock or at the Violet site.[5]

---

[2] *See*, "Exhibit 1" Independent Levee Investigation Team (ILIT) (2006), *Investigation of the Performance of the New Orleans Flood Protection Systems in Hurricane Katrina on August 29, 2005,* Final Report to the National Science Foundation, (Part II, Chapter 4, Section 4.3 pp 4-6 through 4-8).
[3] See, "Exhibit 2" MRGO New Lock and Connecting Channels Evaluation Report 1997 EIS sec 3.1.1 EIS 15,
[4] See, "Exhibit 2" MRGO New Lock and Connecting Channels Evaluation Report 1997 EIS sec 3.1.1 EIS 15.
[5] See, "Exhibit 2" MRGO New Lock and Connecting Channels Evaluation Report 1997 EIS sec 3.1.7 IS,16.

5. The authorizing Acts for the IHNC and the IHNC Lock are not Flood Control Act legislation.[6]

6. Nearly ten years later, under the Flood Control Act of 1965, the Lake Pontchartrain and Vicinity Hurricane Protection Plan (LPVHPP) commenced designs for the construction of levees on the IHNC from the lock traveling north past Florida Avenue and continuing through the outfall canal to the MR-GO levees and tying back into the east bank MRL system near Violet, La.[7]

7. In drafting the General Design Memoranda (GDM) for the LPVHPP levee work, the Corps highlighted eight principal design and construction "problems" in the area of the IHNC, including the design requirement that the "sources of fill material" [for the levees] be:

> obtained from a borrow area in the bottom of Lake Pontchartrain along the north shore. This material consisting of stiff Pleistocene clays will be transported to the project on barges.[8]

8. In March of 1997, over eighty years after the initial construction of the IHNC lock and forty years after the authorization to expand the lock, after considering other locations to accommodate increased navigation traffic, the Corps proposed that the Lock Expansion Project at the at IHNC be constructed between the Claiborne Avenue and Florida Avenue bridges.[9]

---

[6] *See,* "Exhibit 2,"1997 EIS sec 3.1.1 EIS 15 and 3.1.7 EIS 16.
[7] *See*, "Exhibit 3,"Lake Pontchartrain and Vicinity, La and Vicinity Chalmette Area Plan, Design Memoranda Number 3 General Design (GDM3) (November 1966) Appendix A,,and p.6 paragraph 11; See, "Exhibit 4"Lake Pontchartrain and Vicinity, La and Vicinity Chalmette Area Plan, Design Memoranda Number 2 General Design (GDM2) General Advanced Supplement IHNC West Levee Florida Ave to IHNC Lock March 1967 (Appendix 1) at NPM-023-000002282-at 2283 (Correspondence Letter 7-Oct-1965).
[8] *See* "Exhibit 3," GDM3 at p17 at paragraph 33 through p19. (November 1966).
[9] *See* "Exhibit 2," MRGO New Lock and Connecting Channels Evaluation Report. (March 1997).

9. Complaint does not challenge the Corps' decision to place the lock between the Claiborne and Florida Avenue Bridges.[10]

10. The IHNC Lock Expansion Project planning objectives were:

    1)     to develop plans that reduce or eliminate delays to **navigation** between the Mississippi River and tidewater facilities and waterways to the east of the river;

    2)     to develop plans that avoid and minimize relocations and other impacts to local residents and businesses to the maximum extent practicable;

    3)     to develop plans that avoid and minimize environmental impacts to the maximum extent practicable; and

    4)     to design and recommend appropriate mitigation features for unavoidable impacts to local residents, cultural resources, and environmental resources.[11]

11. Although the Lock Expansion Project proposed a phased construction sequence for its major elements, the Corps only obtained funding from the relevant general cargo and inland navigation interests to pursue only two phases prior to Katrina. Those phases were:

    1)     assessment of the existing conditions of the IHNC; and

    2)     site preparation including tree removal, demolition and relocation of the US Coast Guard station, removal of the Galvez Street Wharf, and the relocation of the business along the east side of the IHNC.[12]

12. Proposed, yet unfunded and uninitiated phases of construction for the project included:

    1)     construction of new bridges at Florida Avenue;

---

[10]     *See*, U.S. Exhibits 27 and 36
[11]     *See* "Exhibit 2," MRGO New Lock and Connecting Channels Evaluation Report sec 3.3, Planning Objectives. EIS -17-EIS-18. (March 1997).
[12]     *See* "Exhibit 2"MRGO New Lock and Connecting Channels Evaluation Report, p. 119; MVD-006-000000281. (March 1997).

4

    2)    the construction of the new levees and floodwalls tying the MRL to the new expanded lock location and ensuring continued hurricane protection on the tidewater side in light of the modified lock location;

    3)    construction of the navigation bypass channel;

    4)    site preparation, including excavation for the lock and construction of the pile foundation and preparation for the precast lock modules.[13]

13. As part of the unfunded and uninitiated sequence of construction for the design of the Expanded Lock, The Corps anticipated demolition of the MRL to connect the levees to the new profile of the lock when financing became available. If funded, this would have necessitated expanding the MRL approximately 2500 feet on both the east and west banks of the IHNC. The project plan required that when the alterations were to be completed the reconstructed levees were to be constructed to elevation 22.4 feet ("NGVD").[14] As noted, this levee feature of the Lock Project was never funded or accomplished.[15]

> The construction of levee "tie ins" for a navigation project to connect it to a preexisting flood construction project does not change the character of the navigation project to flood protection. Rather, the Corps repeatedly testified that in those situations where the navigation project requires levee construction the levees work remains part of the navigation project.[16]

14. During construction of the expanded lock, the navigation interests required continued operation through the IHNC. The Corps' plan for construction included a temporary

---

[13] *See* "Exhibit 2," MRGO New Lock and Connecting Channels Evaluation Report, p119 , MVD-006-000000281.

[14] *See* "Exhibit 2," MRGO New Lock and Connecting Channels Evaluation Report, p. 112, MVD-006-000000274 and see NPM-001-000003056.

[15] *See*, U.S. Exhibit 9, Deposition Transcript of Gerald DiCharry, p. 33 lines 8-14. (Oct 2008).

[16] *See*, "Exhibit 5," Deposition Transcript of John Manguno**,** COE, Chief of the Economic Branch, NOD, 7/24/08 (Robinson), p81,  lns 20-25, through p82 lns 1-8; and see, US Exhibit 9, *See also* U.S. Exhibit 9, Deposition Transcript of Gerald DiCharry,Jr. - 10/2/08, (MRGO), at p 93, ln 10 through p95 ln 25.

5

bypass channel on the East Bank, running parallel to the LPVHPP levees between Claiborne and Florida Avenues along Surekote Road.[17]

15. The bypass channel was placed on the east bank of the EBIA because the local sponsor, the Port of New Orleans, determined that "the facilities along the east side of the canal were more expendable than the ones on the west side."[18]

16. Thus, the Corps implemented no discretion in evaluating the location of the bypass channel and employed no engineering analysis in the selecting the EBIA as the site for the bypass channel.

17. In preparation for the temporary bypass channel The Corps identified six abandoned industrial sites along Surekote road that comprise what is called the East Bank Industrial Area ("EBIA"): Boland Marine, McDonough Marine, Indian Towing Company, Mayer Yacht/ Distributor Oil, Saucer Marine and the Industrial Tank Terminal as the location for the channel.[19]

18. The entire EBIA area runs parallel to the LPV levees along the IHNC and adjacent to the Lower Ninth Ward.

19. Soil boring and chemical sampling studies conducted by the Corps in 1990, 1993, 1998 and continuing into 1999 revealed that material dredged from the IHNC in the area of the

---

[17] *See* "Exhibit 2," MRGO New Lock and Connecting Channels Evaluation Report,, p. 112 MVD-006-000000274 and see, US Exhibit 20, IHNC Lock Replacement Project Design Document Report No.1 Site Preparation and Demolition, February 1999 .

[18] *See*, U.S. Exhibit 9, Deposition Transcript of Gerald DiCharry,Jr. - 10/2/08, (MRGO), p 29 ln 13 through p30 ln 10.

[19] *See*, U.S. Exhibit 13, Sampling and Analysis Plan, Project Site Development and Remedial Action of East Bank Industrial Area Inner Harbor Navigation Canal Lock Replacement Project New Orleans Louisiana-WGI January 2001-Summary of Previous Investigations, 1-1-1-5 WGP005-000047426-47430, and Table 1-1 on WGP005-000047445.

EBIA to depths of about -5 feet below the surface were contaminated with hazardous, toxic, and radioactive wastes.[20]

20. In February 1998, the Corps filed their 1997 Nine Volume EIS with the Environmental Protection Agency outlining the plan for the Mississippi River Gulf Outlet, New Lock and Connecting Channels (Evaluation Report and EIS).

21. Although NEPA mandates that in an EIS, a Government Agent take a hard look at the potential impacts of federal action on the health and safety of the human environment, The Corps 1997 EIS does not identify the potential impacts on the health and safety of the human environment resulting from excavation of five feet of hazardous soils in the EBIA adjacent to the LPVHPP levees and the lower Ninth Ward.[21]

22. NEPA also mandates that in an EIS government actors take a hard look at the interrelationship of federal action on other federal projects in the vicinity. The Corps 1997 EIS did not examine the impact of the construction of the bypass channel and proposed remedial excavations in the area of the LPVHPP levees on their structural integrity.[22]

23. On December 18, 1998, Major General Russell Furman signed a Record of Decision (ROD) approving the IHNC New Lock and Connecting Channels Project for construction to:

> replace the obsolete Inner Harbor Navigation Canal Lock in order to improve navigation between Mississippi River in the

---

[20] See "Exhibit 2," MRGO New Lock and Connecting Channels Evaluation Report 1997 EIS 92-93, and plate 27, see also, US Exhibit 13, Sampling and Analysis Plan, Project Site Development and Remedial Action of East Bank Industrial Area Inner Harbor Navigation Canal Lock Replacement Project New Orleans Louisiana-WGI January 2001-Summary of Previous Investigations, 1-5 WGP005-000047430, and Table 1-1 on WGP005-000047445.
[21] *See* "Exhibit 2," MRGO New Lock and Connecting Channels Evaluation Report, 1997 EIS.
[22] *See* "Exhibit 2," MRGO New Lock and Connecting Channels Evaluation Report 1997 EIS,

vicinity if New Orleans, Louisiana, the Gulf Intercoastal Waterway, and the Mississippi River Gulf Outlet.[23]

24. The ROD expressly authorized "demolition of the existing lock and construction of two temporary navigation bypass channels."[24] The ROD also noted that the construction would require "the extension of the Mississippi River flood protection levees and floodwalls approximately 2,500 feet along the canal to the new lock."[25]

25. The ROD characterized the project as a navigation project and contains no authorization for a "flood control project," nor did it acknowledge an interrelationship between the new lock project and the LPVHPP levees and floodwalls North of Claiborne Avenue.[26]

26. In 1999, through Task Order 26 of the Total Environmental Restoration Contract ("TERC"), a separate Corps project, the Corps obtained separate funding for remediation and removal of the surface soils and contaminants identified at depths of up to -5 feet below ground surface at the EBIA.[27]

27. Although the lock expansion project benefitted from Task Order 26 of the TERC, funding for the Task Order 26 came entirely from the Corps' Tulsa division.[28]

28. The Corps prepared no independent NEPA mandated EIS for Task Order 26 of the TERC, nor did the Corps supplement its NEPA submissions for the IHNC New Lock and Connecting Channels Project to reflect the potential impact that the remediation

---

[23] See, "Exhibit 6," Record of Decision, Mississippi River-Gulf Outlet New Lock and Connecting Channels, Louisiana, NED-149-000000437.
[24] *See*, "Exhibit 6," Record of Decision, Mississippi River-Gulf Outlet New Lock and Connecting Channels, Louisiana, NED-149-000000437.
[25] *See*, "Exhibit 6," Record of Decision, Mississippi River-Gulf Outlet New Lock and Connecting Channels, Louisiana, , NED-149-000000437 .
[26] *See*, "Exhibit 6," Record of Decision, Mississippi River-Gulf Outlet New Lock and Connecting Channels, Louisiana, , NED-149-000000437 .
[27] *See* , U.S. Exhibit 22,Task Order 26 to the TERC NCS-010-000000420- 533
[28] *See*, U.S. Exhibit 9, Deposition Transcript of Gerald DiCharry, (10-2-08), , p40 lns 8-16.

8

excavations for Task Order 26 of the TERC might have on the adjacent LPVHPP flood control levees.[29]

29. The Corps knew that the site hydrogeology for the IHNC bypass channel revealed that movement of groundwater under the EBIA was influenced by the "physical conditions" at each of the six respective industrial sites:[30]

> Physical conditions include the topography of the ground surface, the nature of the contact between the coarse material and the fine grain clays and silts within the fill material, buried building foundations and utilities, surface drainage systems and the activities of the nearby pumping stations.[31]

30. Recognizing the influence of the "physical conditions" of the subsurface structures on groundwater flow in the vicinity of the levees, in August 2001, the Corps modified the scope of work planned for the bypass channel and adopted a plan that significantly altered the physical conditions of the foundation of the EBIA by excavating large buried concrete foundation blocks at the Boland Marine Site.[32]

31. The Corps engaged in no policy based analysis or evaluation of the impacts of these changes in the scope of work and conducted no independent engineering evaluation of the impacts of this work on the adjacent levees.

---

[29] The Corps NEPA production furnished on July 3, 2010, contained no EA Supplemental EIS or other submission regarding the work to be done relating to the Task Order 26 of TERC.

[30] *See*, U.S. Exhibit 20, IHNC Lock Replacement Project Design Document Report No.1 Site Preparation and Demolition February 1999

[31] *See*, U.S. Exhibit 20, IHNC Lock Replacement Project Design Document Report No.1 Site Preparation and Demolition February 1999,

[32] *See* "Exhibit 8," Draft Work Plan Excavation of Concrete, Anchor Foundation Blocks and Steel Forms IHNC EBIA Area,,WGI037607, and *see*, "Exhibit 9," Cofferdam Installation and Concrete Foundations Removal Final Work Plan at WGI039041.

32. The Corps regulations mandating preparation of a NEPA EIS require that when a Corps project undergoes proposed changes that increase its size substantially or, add additional purposes an EIS must be prepared.[33]

33. To the extent that the Task Order broadened the purpose of the IHNC lock expansion project to include remediation, it was not reflected in a mandatory environmental document.

34. Moreover, to the extent that the excavations increased in depth from negative five feet to depths required to excavate these larger structures, the Corps performed no policy evaluations and performed no mandatory NEPA related documents.

35. Finally, to the extent that these excavations significantly changed physical conditions of the project environment for the IHNC Lock Expansion Project the Corps failed to acknowledge same in any Corps NEPA submissions.

36. Specifically, in addition to the five feet surface contaminant excavation, the newly proposed excavations included one block measuring: 10'x 12' x 8', another measuring 10' x 14' x 6.5' and a third that measured 25'x 22' x 24'.[34] Additionally, five concrete and steel anchor pads were to be excavated from the Boland Marine area of the EBIA; two of the pads measured 7'x 13' x 5', one measured 6' x 245' with two arms measuring 2'x 4', another measured 3' x 8' x 6' and the last measured 6' with a 18' length that was 2' wide with two arms 2' x 8.'[35] The Corps' Boland Marine excavation ultimately

---

[33] USACE, 33C.F.R. 230.6
[34] See "Exhibit 8," Draft Work Plan Excavation of Concrete, Anchor Foundation Blocks and Steel Forms IHNC EBIA Area, WGI037607, *and see*, "Exhibit 9" Cofferdam Installation and Concrete Foundations Removal Final Work Plan at WGI039041.
[35] See "Exhibit 8," Draft Work Plan Excavation of Concrete, Anchor Foundation Blocks and Steel Forms IHNC EBIA Area, WGI037607, *and see*, "Exhibit 9" Cofferdam Installation and Concrete Foundations Removal Final Work Plan at WGI039041

proposed removal of foundation depths ranging -20 to -25 feet and proposed back fill with "imported sand and sandy clay material."[36]

37. This alteration in the project plan was not accompanied by any mandatory NEPA submission.

38. Further, without engaging in any policy analysis of the decision making, the anchor foundation excavation plans noted without explanation that:

> [c]ompaction testing of the back fill will **not be required**.
> However, backfilled soil must be compacted to a degree
> that subsidence does not subsequently occur and equipment
> is capable of traversing the backfilled excavations.[37]

39. In October 2001, the Corps developed a separate plan for removal of a Sewage Lift Station in the Saucer Marine site.[38]

40. Once again the Corps' proposed additional excavation significantly altered the physical condition of the foundation of the EBIA.

41. Once again the Corps neglected to prepare NEPA mandated documents for these proposed excavations.

42. Specifically, the Saucer Marine excavation removed a footprint of EBIA foundation that was 69' wide by 81' long to depths -19.75.[39]

43. The Corps engaged in no policy analysis to reach its decision about the backfill material to use or the level of compaction necessary to maintain the integrity of the levees, rather,

---

[36] *See* "Exhibit 8," Draft Work Plan Excavation of Concrete, Anchor Foundation Blocks and Steel Forms IHNC EBIA Area, WGI037607.
[37] *See* "Exhibit 8," Draft Work Plan Excavation of Concrete, Anchor Foundation Blocks and Steel Forms IHNC EBIA Area, WGI037607. "Exhibit 9" Cofferdam Installation and Concrete Foundations Removal Final Work Plan at WGI039041,.
[38] *See*, "Exhibit 10," Lift Station Removal Plan for Saucer, WGI048621-630.
[39] *See*, "Exhibit 10," Lift Station Removal Plan for Saucer, WGI048621-630.

11

the proposed plan for backfilling the excavation is silent as to backfill material or the level of compaction necessary to ensure the structural integrity of the adjacent levees.[40]

44. Once again, regulations mandating preparation of a NEPA EIS for the significantly changed physical conditions of the project environment were wholly ignored the Corps.[41]

45. The plans for removal of the Lift Station acknowledged that the soils in the vicinity of the Saucer Marine were too weak to maintain their integrity without constructing an excavation cofferdam.[42]

46. While the excavation plan considered the safety of the workers doing the excavation, it overlooked the potential adverse impact on the adjacent LPVHPP levees by the removal of the excavation cofferdam in this weak sub grade soil conditions.[43]

47. The Corps Engineering Manuals highlight the need to perform specific engineering evaluations of the mechanisms of levee failure and the effects of construction in the vicinity of the levees on the "Factor of Safety" for the flood control structures.[44]

48. Without evaluation of the stability of the floodwalls and unconnected to any "minimum control line"[45] associated with the factors of safety for the flood control levees, the Corps established a "rule of thumb" that defined the Soil Remediation Area "as the area 15-feet west of the floodwall".[46]  This footprint was based not on a calculated engineering analysis or policy, but on a "general consensus" and the location of a concrete curb on Surekote Road in the EBIA.[47]

---

[40] See, "Exhibit 10," Lift Station Removal Plan for Saucer, WGI048621-630 at 622,
[41] USACE 33CFR 230.6
[42] *See*, "Exhibit 10," Lift Station Removal Plan for Saucer, WGI048621-630, at 622, .
[43] *See*, "Exhibit 10," Lift Station Removal Plan for Saucer, WGI048621-630, .
[44] *See*, "Exhibit 11," EM 1110-2-1913 (1978) Design and Construction of Levees , at page 6-6 minimum acceptable factor of safety.
[45] *See*, U.S. Exhibit 11, Deposition Transcript of Lee Guillory,Vol II at p83 lns 17-19.
[46] *See*, U.S. Exhibit 1,  Deposition Transcript of Lee Guillory,Vol II, p 81, lns 7-12.
[47] *Id* at p. 83 lns 8-13.

49. The Corps, witnesses acknowledged that "standard engineering practices and principles" required specialized architectural-engineering and geotechnical analysis for excavation in an area adjacent to the levees to ensure such work was "safe for the levees"[48] However, the plans for the large subsurface excavations at the Saucer and Boland sites, omitted any engineering analysis of the soil wall stability, underseepage propensity, global stability[49] or the proper compression for back fill material used at these sites.

50. This Corps' Engineering Manual referenced in the 1997 EIS Design Vols 1 and 3 EM1110-2-5027 1987 also outline the field investigations and design studies that the Corps was expected to undergo when proposing work in the vicinity of dikes and levees. Particularly, the manual states that field investigations and design studies should be "more extensive where *the consequences of the failure involve life, property, or damage to the environment are great.*"[50]

51. This Corps Engineering manual outlines and provides analysis for evaluating the known potential engineering problems created by failing to properly analyze the geotechnical impacts of foundation work in the vicinity of levees.  Specifically, the Corps engineering manual notes "design of a foundation of a levee requires specialized knowledge in soil mechanics" adding that "all designs and specifications should be prepared under the direct supervision and guidance of a geotechnical engineer and should bear his

---

[48] *See*, U.S. Exhibit 11,  Deposition Transcript of Lee Guillory, Vol II  p165,  ln.12 through p166,  *See also,* U.S. Exhibit 12, Deposition Transcript of John Grieshaber,  , p53, ln 7-12 and p54 ln 7-13.
See "Exhibit 12" Recommendation Report for Demolition and Site Preparation Activities of the EBIA of the IHNC Lock Replacement Project, , WGI038704 at WGI38731-2, 5.1.2.1.5;  WGI041893, Sec 1.5; *See also*, "Exhibit 13" Project Work Plan, WGI041879at WGI041928, Sec 3.7.
[49] *See* "Exhibit 16," Deposition Transcript of John Grieshaber,p95, lns 2-10.
[50] *See*, "Exhibit 14," Confined Disposal of Dredged Materials Engineering Manual, EM 1110-2-5027, at NPM 156-000011410.

13

approval."[51] To assist the Corps in its execution of the foundational stability analysis this engineering manual states:

> c. Embankment and Foundation Stability Proposed cross-section designs should be analyzed for stability as it is affected by foundation and/or embankment, and external erosion. The analytic methods described and referenced here contain procedures that have been proven satisfactory from past use, and most are currently employed by the CE [Corps of Engineers]. Specific details concerning methods of analyzing dike stability are reported in TR D-77-9 (item 16) and EM 1110-2-1902 [Slope Stability Engineering Manual]. Several computer programs are available to CE districts to assist in stability analyses, either on mainframe or on microcomputers.[52]

52. This Engineering Manual also specifically acknowledges the following known levee failure mechanisms-

> d. Causes of Dike Instability….
> (2) Seepage. Potentially detrimental seepage can occur through earth dikes and foundations consisting of pervious or semi-pervious materials unless prevented by positive means such as impervious linings…**Seepage effects can create instability through internal erosion (piping) of the foundation materials,** or they may lead to shear failure by causing a reduction in the shear strength of the dike and/or foundation materials through increased pore water pressure or by the introduction of seepage forces. The following conditions may lead to seepage problems in containment dikes:
> **(b) Dikes built on pervious foundation materials or where previous materials are near the surface or exposed** *as a result of nearby excavation.* As shown in Figure 6-9[sic, image is Figure 6-8]…This condition may lead to the development of large uplift pressures beneath and at the outer toe of the dike, causing overall instability from inadequate shear strength or may result in piping near the

---

[51] *See*, "Exhibit 14," Confined Disposal of Dredged Materials Engineering Manual, EM 1110-2-5027, at NPM 156 000011416.

[52] *See*, "Exhibit 14," Confined Disposal of Dredged Materials Engineering Manual, EM 1110-2-5027, at NPM 156-000011319-11562.

14

embankment base. Methods for analyzing this condition are reported in WES TM 3-424 (item 34).

53. The Corps disregarded these engineering "technical consideration" and appreciated that their contractor was "not expected to provide input regarding geotechnical stability if levees or floodwalls at the east bank."[53]

54. The Corps acknowledged that these analyses were required, yet only made superficial attempts to address these mandatory engineering obligations with regard to Task Order 26 of the TERC which was initially limited only to the excavation of toxins to depths of three (out of the first five) feet of soil remediation in the EBIA.[54]

55. The Corps's 30 (b)(6) witness, Grieshaber (Assistant Chief of Engineering Division, Geotechnical Branch) testified that the Construction Manager, Lee Guillory had the responsibility to make judgments based on engineering considerations as to whether the work would jeopardize the integrity of the adjacent flood control structures.[55]

56. The Corps' 30 (b) (6) witness, Grieshaber, further testified that Guillory should have "wanted some type of information on backfilling criteria" and admitted that "since the job was fairly simplistic the only way [he] could endanger the flood system [was] by some form of inappropriate excavation or inappropriate backfill."[56]

57. The Corps' 30(b)(6) witness, Construction Manager, Lee Guillory however testified that the only evaluations that the Corps' Engineering Division performed regarding the structural stability of the environmental remedial excavating work done on the EBIA in

---

[53] *See*, U.S. Exhibit 9, Deposition Transcript of Gerald DiCharry, (10-2-08) p42, ln 24 through p43, ln 3.
[54] *See*, "Exhibit 15," Memo to: C/Engineering Division; ATTN: CEMVN-ED-F- James Miles Jr. Chief Construction Division CEMVN-CD-QM 15-Apr-02 Re: IHNC Lock Replacement Project, Total Environmental Restoration Contract (TERC) for Remedial Action of East Bank Industrial Area (EBIA) Task Order 0026, New Orleans,
[55] *See* U.S. Exhibit 12, Deposition Transcript of John Grieshaber, p.47 lns 2- 10.
[56] *See* U.S. Exhibit 12, Deposition Transcript of John Grieshaber ,p.14 lns 23 through p15 lns 1-11.

connection with Task Order 26 of the TERC was to evaluate an excavation footprint of 25 feet wide and 3 feet deep in areas not closer than 15 feet from the Jourdan Avenue floodwall/levee.[57]

58. The Corps' Engineering Division assessed "soil backfill and compaction requirements" for the three feet deep contaminant excavations[58] The Corps' Engineering Division however failed to perform a similar evaluation for the completion back fill at the much deeper structural removal excavations at Saucer and Boland.[59]

59. Admittedly, Corps' engineering calculations and standard practices required that preservation of the structural integrity of the levees required pit bracing through cofferdams where excavations would exceed depths of 12 feet within 229 feet of the levee center line.[60] However, the Corps engineering analysis of the Saucer and Boland excavations was limited to the evaluation of the cofferdam constructions which were only deemed necessary to preserve the "structural integrity of the hole [itself] and [prevent] soil displacement outside the hole, worker safety, equipment safety, etc."[61]

60. The Corps entertained no concern that the excavations and ultimate removal of the cofferdams at the Saucer and Boland Marine sites might affect the IHNC flood control structures.[62]

---

[57] *See*, U.S. Exhibit 18, Deposition Transcript of Lee Guillory, Vol I pp 159-166 and See, "Exhibit 15" at 2 (b) Memo to: C/Engineering Division; ATTN: CEMVN-ED-F- James Miles Jr. Chief Construction Division CEMVN-CD-QM 15-Apr-02 Re: IHNC Lock Replacement Project, Total Environmental Restoration Contract (TERC) for Remedial Action of East Bank Industrial Area (EBIA) Task Order 0026, New Orleans
[58] *See*, "Exhibit 15," Memo to: C/Engineering Division; ATTN: CEMVN-ED-F- James Miles Jr. Chief Construction Division CEMVN-CD-QM 15-Apr-02 Re: IHNC Lock Replacement Project, Total Environmental Restoration Contract (TERC) for Remedial Action of East Bank Industrial Area (EBIA) Task Order 0026, New Orleans.
[59] *See*, U.S. Exhibit 18, Deposition Transcript of Lee Guillory,Vol I pp 159-172
[60] *See*, U.S. Exhibit 18. Deposition Transcript of Lee Guillory,Vol I pp 159-166, p178 lns 11-21.
[61] *See*, U.S. Exhibit 18, Deposition Transcript of Lee Guillory,Vol I pp 159-166,p168 lns 14-17.
[62] *See*, U.S. Exhibit 18, Deposition Transcript of Lee Guillory,Vol I, p168 lns 3-7, and see p169 lns 1-14.

61. The Corps' admitted through the 30 (b)(6) testimony of Grieshaber, that it was among the Corps' responsibility to make sure that the fill was appropriate for the use to which it was put and that it was put in under the appropriate conditions.[63]

62. Nonetheless, The Corps overlooked the technical design requirements for foundational materials originally set forth in the IHNC flood control levee design (specifically stiff Pleistocene clays from the bottom of Lake Pontchartrain along the north shore)[64] and performed no levee structural analysis of the back fill material or compaction methods to be employed upon removal of the cofferdams.[65]

63. Giving the plan for the removal of the cofferdams no geotechnical engineering or policy considerations, the Corps permitted the removed cofferdams to be filled with "any material in the vicinity."[66]

64. On August 29, 2005, Hurricane Katrina's storm surge from the Gulf of Mexico and Lake Borne hydraulically connected to the IHNC via the Gulf Intercoastal Waterway ("GIWW")/MRGO channel. The flood control structures along the EBIA failed in two distinct areas along the EBIA.[67]

65. The larger of the two breaches, "the South Breach," was approximately 900 feet in length, was located North of Claiborne Avenue adjacent to the excavation at the Saucer Marine site.[68] The shorter "North Breach" was approximately 250 feet long and occurred

---

[63] *See,* U.S. Exhibit 12, Deposition Transcript of John Grieshaber, p85 lns 2-7.
[64] *See,* "Exhibit 3" GDM3 at page 17 at paragraph 33 page 19.
[65] *See*, US Exhibit 18" Deposition Transcript of Lee Guillory, Vol I, p179 lns 3-16; and p170 lns10 through p171 lns 1-16.
[66] *See*, U.S. Exhibit 1, Deposition Transcript of Lee Guillory, Vol I, p188 lns 8-11.
[67] *See*, "Exhibit 1," Independent Levee Investigation Team (ILIT) (2006), *Investigation of the Performance of the New Orleans Flood Protection Systems in Hurricane Katrina on August 29, 2005,* Final Report to the National Science Foundation, Chapter 6 p. 6-6,7
[68] *See*, "Exhibit 1," Independent Levee Investigation Team (ILIT) (2006), *Investigation of the Performance of the New Orleans Flood Protection Systems in Hurricane Katrina on August 29, 2005,* Final Report to the National Science Foundation, Chapter 6 p. 6-6,7

17

close to Florida Avenue at the area adjacent to the excavation at the Boland Marine Site.[69]

66. These failures caused catastrophic damage on the "protected" side of the levees in the Lower Ninth Ward. The Entergy Companies sustained damages to their utility infrastructure as a result of the Corps' negligence in undermining the nearby flood control structures.

67. On February 28, 2007 the Entergy Companies filed their SF Form 95 alleging among other damage sustained in the New Orleans area.  Entergy's SF 95 specifically articulated its damages were sustained as a consequence of the failure of the I-walls, spoil banks and flood walls along the MR-GO and the Industrial Canal.  Entergy's SF 95 also states that its damages were a result of the Corps negligence in planning, design, construction, and maintenance of the levees, I-walls, spoil banks, flood walls and navigable waterways.

68. The Corps never denied the Entergy Company's claim upon receipt of the SF95.

69. On August 28, 2007, the Entergy Companies filed and served a Complaint alleging damages under the Federal Tort Claims Act, Civil Action No. 07-4608.

70. On January 12, 2010, in response to the Corps assertion that the August, 2007 Complaint was one day premature, The Entergy Companies initiated a new action, Civil Action No. 10-0077.

---

[69] *See*, "Exhibit 1," Independent Levee Investigation Team (ILIT) (2006), *Investigation of the Performance of the New Orleans Flood Protection Systems in Hurricane Katrina on August 29, 2005,* Final Report to the National Science Foundation, Chapter 6 p. 6-6,7

Respectfully submitted on September __3__, 2010,

Ewell E. Eagan Jr. (La. Bar No. 5239), T.A.
Nina Wessel English (La. Bar No. 29176).
Brian L. Guillot (La. Bar No. 31759).
Gordon, Arata, McCollam,
 Duplantis & Eagan, L.L.P.
201 St. Charles Avenue, 40th Floor
New Orleans, Louisiana  70170-4000
Telephone: (504) 582-1111
Fax: (504) 582-1121

By:            /s/Brian L. Guillot

and

Marcus V. Brown (La. Bar No. 18817)
Wendy Hickok Robinson (La. Bar No. 25225)
Entergy Services, Inc.
639 Loyola Avenue, Suite 2600
New Orleans, LA  70113
Tel:  504-576-2765

Attorneys for Plaintiffs, **Entergy New Orleans, Inc., Entergy Louisiana, L.L.C.,**

and

Elisa T. Gilbert (ETG 5713), T.A.
Brendan R. O'Brien (BO 9033)
Kea Sherman, Esq (La. Bar No. 30299)
The Gilbert Firm, LLC
325 East 57th Street
New York, NY 10022

Attorneys for Hartford Steam Boiler Inspection and Insurance Company

19

## **CERTIFICATE OF SERVICE**

I certify that a true copy of the foregoing was served by ECF on September __3__, 2010.

By: __/s/Brian L. Guillot__
BRIAN L. GUILLOT