UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re:  KATRINA CANAL BREACHES CONSOLIDATED LITIGATION | CIVIL ACTION NUMBER:  05-4182 "K"(2) JUDGE Duval MAG. Wilkinson |
| PERTAINS TO:   MRGO *Armstrong*, No. 10-866 | |

**MRGO PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

I.     **INTRODUCTION** ................................................................................................ 1

II.    **STATEMENT OF FACTS** ................................................................................ 1

III.   **ARGUMENT** ..................................................................................................... 2

   A.   **Section 702c Is Not Available Here Because The Army Corps's Alleged Negligence Is Not Related To A Flood Control Project Or Defective Design, Construction, Or Maintenance Of Levees** ...................................................................................... 2

   B.   **The Government Cannot Establish The First Prong of DFE Because It Failed To Comply With Specific Legal Mandates** .......................................................... 6

      1.   **Army Corp Regulations, Guidelines, and Engineering Standards Qualify As Specific Legal Mandates Under Prong One** ................................................. 7

      2.   **The Army Corps Violated Several Of Its Own Mandatory Engineering Requirements in the Planning and Execution of the EBIA Excavation and Backfilling Work At The Breach Sites** ........................................................... 9

   C.   **The Court Has Previously Ruled That Plaintiffs Properly Exhausted Their Administrative Remedies** .............................................................................. 16

IV.   **CONCLUSION** ................................................................................................ 19

## <u>TABLE OF AUTHORITIES</u>

### <u>CASES</u>

*Alabama Elec. Cooperative, Inc. v. United States,*
   769 F.2d 1523 (11th Cir. 1985) ........................................................................ 7, 15

*Andrulonis v.United States,*
   952 F.2d 652 (2d Cir. 1991) ...................................................................................... 7

*Bagner v. United States,*
   428 F.Supp.2d 101 (N.D. N.Y 2006) ........................................................................ 7

*Bean Horizon Corp. v. Tennessee Gas Pipeline Co.,*
   1998 WL 113935 (E.D. La. 1998) ..................................................................... 7, 8, 9

*Brady v. United States,*
   211 F.3d 499 (9th Cir. 2000) ................................................................................... 18

*Graci v. United States,*
   456 F.2d 20, 26 (5th Cir. 1971) ............................................................................ 5, 6

*Houston v. United States Post Office,*
   823 F.2d 896 (5th Cir. 1987) ................................................................................... 18

*In re Katrina Canal Breaches Consol. Litig.,*
   2008 WL 5234369 (E.D. La. Dec. 15, 2008) ......................................................... 4, 8

*In re Katrina Canal Breaches Consol. Litig.,*
   2010 WL 487431 (E.D. La. Feb. 2, 2010) ................................................... 16, 17, 18

*In re Katrina Canal Breaches Consol. Litig.,*
   471 F.Supp.2d 684 (E.D. La. 2007) ................................................................... 2, 4, 7

*In re Katrina Canal Breaches Consol. Litig.,*
   533 F.Supp.2d 615 (E.D. La. (2008) ...................................................................... 2, 5

*In re Katrina Canal Breaches Consol. Litig.,*
   577 F.Supp.2d 802 (E.D. La. 2008) .............................................................. 2, 3, 4, 6

*In re Katrina Canal Breaches Consol. Litig.,*
   627 F.Supp.2d 656 (E.D. La. 2009) ...................................................................... 6, 7

*In re Katrina Canal Breaches Consol. Litig.,*
   647 F.Supp.2d 644 (E.D. La. 2009) ................................................................. passim

*Lively v. United States,*
   870 F.2d 296 (5th Cir. 1989) ..................................................................................... 7

*McNeil v. United States*,
    508 U.S. 106 (1992) ............................................................................ 17

*Navarette v. United* States,
    500 F.3d 914 (9th Cir. 2007) ............................................................. 7

*Soldano v. United States,*
    453 F.2d 1140 (9th Cir. 2006) ........................................................... 8

*United States v. Gaubert*,
    449 U.S. 315 (1991) ....................................................................... 7, 9

*Williams v. United States,*
    693 F.2d 555 (5th Cir. 1982) ........................................................... 18

## I.      INTRODUCTION

Defendant's Motion to Dismiss, or in the Alternative, for Summary Judgment ("Motion")

is old wine in old bottles.  The three asserted grounds for dismissal—Flood Control Act of 1928,

the Discretionary Function Exception ("DFE"), and failure to exhaust administrative remedies—

are rehashes of legal arguments that this Court has already repudiated in numerous prior rulings.

Like its predecessors, this Motion should be denied.[1]

## II.     STATEMENT OF FACTS

Under this Court's consistent interpretation of the Flood Control Act of 1928 and the

state of the record as reflected in Entergy's Undisputed Facts, Defendant is not entitled to

summary judgment on § 702c immunity.  Likewise, Plaintiffs' Opposition to Defendant's

Statement of Undisputed Facts in Support of Motion to Dismiss, or, in the Alternative, for

Summary Judgment establishes the existence of genuine issues of material fact precluding

summary judgment for Defendant on DFE under the prevailing law previously applied by this

Court.  Finally, the exhaustion argument is a question of law already decided by this Court.  In

the interest of economy, the pertinent factual issues are discussed in the legal argument on each

topic.

---

[1] Plaintiffs adopt and incorporate by reference Plaintiffs' Opposition To United States' Motion To Dismiss Or Alternative Motion For Summary Judgment And Plaintiffs' Memorandum In Support Of Motion For Partial Summary Judgment On Discretionary Function Exception filed by Entergy Corporation, Entergy New Orleans, Inc., and Hartford Steam Boiler and Inspection Company ("Entergy Opp.") (Doc. No. 20033-1); and Plaintiffs' Statement of The Undisputed Facts In Opposition To United States' Motion to Dismiss, or In the Alternative, for Summary Judgment by Entergy Corporation, Entergy New Orleans, Inc., and Hartford Steam Boiler and Inspection Company ("Entergy's Undisputed Facts") (Doc. No. 20033-2).

### III.   ARGUMENT

#### A.   Section 702c Is Not Available Here Because The Army Corps's Alleged Negligence Is Not Related To A Flood Control Project Or Defective Design, Construction, Or Maintenance Of Levees

Defendant apparently believes that the Court is a *tabula rasa* when it comes to the Flood Control Act of 1928.  In reading the Government's argument, one would never know that this Court has ruled no fewer than four times on this very issue.  Each time the Court has rejected Defendant's expansive statutory interpretation, holding that § 702c is inapplicable where Plaintiffs allege that the Army Corps is liable for damages caused by its negligence that is extrinsic and unconnected to the Lake Pontchartrain and Vicinity Hurricane Protection Project ("LPV").  *See In re Katrina Canal Breaches Consol. Litig.*, 471 F.Supp.2d 684, 690-96 (E.D. La. 2007) (denying Government's Motion to Dismiss); *In re Katrina Canal Breaches Consol. Litig.*, 533 F.Supp.2d 615, 633-40 (E.D. La. 2008) (granting Government's Motion to Dismiss); *In re Katrina Canal Breaches Consol. Litig.*, 577 F.Supp.2d 802 (E.D. La. 2008) (denying Government's Motion To Dismiss/Summary Judgment); *In re Katrina Canal Breaches Consol. Litig.*, 647 F.Supp.2d 644, 648-49 (E.D. La. 2009) (rejecting again Government's § 702c arguments in the post-trial Findings of Fact and Conclusions of Law).

Defendant reprises here its twin arguments that (1) § 702c's plain language—"no liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place"—covers the flooding of the Lower Ninth Ward because the LPV levees could not control Karina's floodwaters, and (2) the IHNC and IHNC Lock Replacement Project are either a flood control project or have a nexus to a flood control project.  *See* Motion at 30-36.

2

1.      The first argument has been rejected every time that the Court has ruled on the

reach of flood immunity as summarized in the Court's most recent holding:

> In *In re Katrina Canal Breaches Consol. Litig. (Robinson)*, 471 F.Supp.2d 684
> (E.D. La. 2007) . . . , denied the motion [to dismiss based on the Flood Control
> Act of 1928] . . . and in particular refused to apply the United States' overly broad
> interpretation of that statute and the seminal case of *Central Green Co. v. United
> States*, 531 U.S. 425 . . . (200l).  Relying on *Graci v. United States,* 456 F.2d 20
> (5th Cir. 1971), this Court found that the Corps could be held liable for damages
> arising out of activities surrounding a navigational channel notwithstanding the
> fact that those actions caused the failure of certain levees.

The Court continued:

> …[T]he Government's position ignores the fact that even the Supreme Court in
> *Central Green* opened the possibility of a segregation of damages-those for which
> the Government would be immune under § 702c and those for which immunity
> would not attach. Indeed, the Government even concurred with this reading at oral
> argument.  (See Transcript of Hearing, October 27, 2006, at 33).  For example,
> would the United States be immune for all damages if a Navy vessel lost control
> and broke through a levee where the sole cause of the failure of that levee was the
> Navy vessel's negligence?  Thus contrary to the Government's contention that
> *Central Green* broadens the immunity provided by § 702c, in realty *Central
> Green* requires the Court to identify *the cause of the damage* rather than base a
> decision on the mere fact that a flood control project was involved. *Central Green*
> does not answer the question of what nexus to a flood control project is required
> for floodwaters to trigger immunity.  *Id.* at 695.

*In re Katrina Canal Breaches Consol. Litig.*, 647 F.Supp.2d at 648 (emphasis in original).

2.      The second argument—the IHNC and New Lock are, or are related to, a flood

control project—is untenable on the facts and the law.  The Government cites no evidence that

the waterway or the expanded locks project are part of the LPV or any other flood control

project.  *See* Entergy Undisputed Facts No. 5 (The authorizing acts for the IHNC and IHNC

Lock are not flood control legislation.).  Indeed, the record demonstrates the IHNC (like the MR-

GO) is a navigable waterway connecting Lake Pontchartrain and the Mississippi River and was

never incorporated into the LPV or had a flood control purpose. *Id.*, Nos. 1, 14.  The EBIA

excavation was necessitated by the need for a temporary bypass channel on the IHNC's east

bank so that shipping could continue to operate along the route during lock expansion activities. *Id.*, No. 15. The remediation and removal costs were not funded by the LPV. *Id.*, Nos. 27, 28.

The IHNC Lock Expansion was authorized in the same legislation in 1956 establishing the MR-GO, and the Water Resources Development Act of 1986 mandated that the costs be borne by the shipping industry. *Id.*, Nos. 3, 4, 11. The purpose of the new lock was "to replace the obsolete Inner Harbor Navigation Canal Lock in order to improve navigation between the Mississippi River in the vicinity of New Orleans, Louisiana, the Gulf Intercoastal Waterway, and the Mississippi River Gulf Outlet." *Id.*, Nos. 23, 10. The Army Corps's Record of Decision characterized the new lock construction as a navigation project and contained no authorization for a "flood control project" or acknowledgment of any interrelationship between this lock expansion and the LPV levees along the IHNC or the floodwalls north of Claiborne Avenue. *Id.*, No. 25. Indeed, this Court has found that "WGI was performing a remediation contract *which did not involve any flood control structure*." *In re Katrina Canal Breaches Consol. Litig.*, 2008 WL 5234369, *19 (E.D. La. 2008) (emphasis added).

The fact that the IHNC "is bounded by flood-control structures" is of no moment here. Motion at 32. The same is true of the MR-GO—where the LPV levees were added after the waterway was constructed—but the evidence did not establish that "the MRGO had morphed into a hybrid flood control/navigational aid project." *In re Katrina Canal Breaches Consol. Litig.*, 471 F. Supp. at 695. In fact, the Court made findings based on uncontroverted evidence that "[e]ach project served a different purpose"—one to prevent flooding and the other to promote deep draft shipping; the construction of the LPV adjacent to the MR-GO did not establish a nexus between the two projects; and the MR-GO and LPV had different funding sources. *See In re Katrina Canal Breaches Consol. Litig.*, 577 F.Supp.2d at 805, 811, 818, 825.

The dismissal of the LEVEE lawsuit involving the two outfall canal levees was not predicated on the fact that the 17th Street and London Avenue Canals had floodwalls on either side.  The distinguishing facts there were that the failed floodwalls were constructed as part of the LPV system as mandated by Congress and the Corps's liability was largely predicated on negligent design (and the failure of) levees built as part of the LPV's High Level Plan.  *Id.* at 824; *see also In re Katrina Canal Breaches Consol. Litig.*, 533 F.Supp.2d at 637-39.  Indeed, the Court stressed this critical distinction in noting:  "Had these outfall canals not been wrapped into the LPV and had the levees failed solely, or in part, as a result of the Corps' permitting the scouring of the east bank of the 17th Street Canal levee, § 702c, in all likelihood, would not have provided the United States refuge."  *Id.* at 638-39 (citing *Graci v. United States*, 456 F.2d 20 (5th Cir. 1971)).

3.      Finally, like the MR-GO case, the EBIA claims are not predicated on the defective design, maintenance, or operation of the floodwalls along the IHNC.  Instead, Plaintiffs are complaining about negligence extrinsic to the LPV, *viz.,* the Army Corps's independent acts of negligence with regard to the EBIA excavation and soil replacement activities that undermined the stability of the nearby LPV structures and contributed to the North and South Breaches along the eastern perimeter.  *See* Class Action Complaint, *Armstrong et. al. v. United States*, CV 00866—SRD—JCW (filed March 12, 2010), ¶¶ 31-43; Plaintiffs' Exh. 17 (Dr. Robert Bea and Chad Morris, Technical Report V, *IHNC Lock Expansion EBIA Site Clearing Excavations: Lower 9th Ward Breaches*, (Jan. 2009); Entergy Undisputed Facts Nos. 30-66.

For flood immunity purposes, the pertinent focus is the alleged cause of the flooding, not the fact that flood control structures failed to prevent the flooding.  "The damages sought are for negligence that occurred extrinsic to the LPV….  The United States should not be immunized for

a tort which occurred from an activity unrelated to a flood control project." *In re Katrina Canal Breaches Consol. Litig.*, 577 F.Supp.2d at 825; *see also Graci v. United States,* 456 F.2d 20, 26 (5th Cir. 1971) (§ 702c does not apply to negligence "unconnected with flood control projects"). "The course of conduct of the Corps"—its failure to conduct the EBIA work in a competent manner and consistent with its own engineering standards—"does not concern the LPV directly." *In re Katrina Canal Breaches Consol. Litig.*, 647 F.Supp.2d at 699.

In *Robinson*, there was "no innate difference between the Navy ship that hits the levee and the MR-GO. The levee was built and an independent actor—the ship—causes damages when it crashes through the levee at flood stage in New Orleans." *Id.* at 825. Similarly, the negligent acts at the EBIA created an independent actor—unfilled holes that served as efficient pathways for floodwaters and undermined the floodwalls at the North and South Breaches—that ripped gaping holes in the flood control structures. Here the Navy ship was a submarine that undermined the levees.

### B. The Government Cannot Establish The First Prong Of DFE Because It Failed To Comply With Specific Legal Mandates

This Court has ruled that "the Fifth Circuit in *Ashford [v. United States*, 511 F.3d 501, 505 (5th Cir. 2007)] placed the burden of proof on the United States on the first prong of the discretionary function exception to demonstrate that the decisions which it claims are shielded by the discretionary function exception are indeed subject to the exercise of judgment…." *In re Katrina Canal Breaches Consol. Litig.*, 627 F.Supp.2d 656, 666 (E.D. La. 2009). The Government fails to meet its burden if it cannot establish there was no "'room for choice' in making the allegedly negligent decision" since a federal statute, regulation, or policy mandated specific action. *Id.* at 669 (citing *Ashford*, 511 F.3d at 505). If a "federal statute, regulation, or policy" specifically prescribes a course of action for the federal employee to employee has no

6

choice but to adhere to the directive.  *United States v. Gaubert*, 449 U.S. 315, 322 (1991); *see also In re Katrina Canal Breaches Consol. Litig.*, 647 F.Supp.2d at 717.

In the Fifth Circuit, prong one cannot be invoked if

> "the Government employee violated a mandatory *regulation* that restricts his discretion or judgment.  Under this interpretation two types of activity fall within the exception: violations of specific, mandatory *regulations* or statutes and ordinary common law torts where the exercise of discretion is not based on policy considerations."

*In re Katrina Canal Breaches Consol. Litig.*, 627 F.Supp.2d at 669 (quoting *Lively v. United States*, 870 F.2d 296, 299 (5th Cir. 1989)) (emphasis added).

### 1.  Army Corp Regulations, Guidelines, and Engineering Standards Qualify as Specific Legal Mandates Under Prong One

Government policy mandates may be "expressed or implied by statute, regulation or agency guidelines," both internal and published.  *Gaubert*, 499 U.S. at 324; *see also Andrulonis v.United States,* 952 F.2d 652, 654 (2d Cir. 1991).  Legal mandates may be articulated in many forms, and the label placed on the Corps's engineering directives is not talismanic.  Whether denominated as regulations, standards, guidelines, manuals, technical reports, pamphlets, or policies, they are nonetheless binding on Corps employees where the language dictates a specific course of action making it a "mandatory regulatory command."  *Griffin v. United States,* 500 F.2d 1059, 1068-69 (3d Cir. 1074) (regulation); *see also, Navarette v. United* States, 500 F.3d 914, 917 (9th Cir. 2007) (Army Corps Safety Plan); *Alabama Elec. Cooperative, Inc. v. United States*, 769 F.2d 1523 (11th Cir. 1985) (Army Corps technical report); *In re Katrina Canal Breaches Consol. Litig.*, 471 F.Supp.2d at 699 (Army Corps engineering "regulations and policies" and "standard engineering dictates"); *Bagner v. United States,* 428 F.Supp.2d 101, 104 (N.D. N.Y 2006) (Army Corps Standards Manual); *Bean Horizon Corp. v. Tennessee Gas Pipeline Co.*, 1998 WL 113935, *5 (E.D. La. 1998) (Army Corps Engineer Regulations,

Pamphlets, and Guidelines and Standards); *cf. Soldano v. United States,* 453 F.2d 1140, 1150-51 (9th Cir. 2006) (National Park Service Standards incorporating "basic, scientific safety specifications").

The Corps's own exquisitely detailed engineering standards are therefore specific legal mandates—indeed, the quintessence of micromanagement of engineering practices—and not general, precatory guidelines. *See In re Katrina Canal Breaches Consol. Litig.*, 647 F.Supp.2d at 718. In this case, the Government has conceded that certain engineering responsibilities, requirements, and procedures during the planning, design, construction and operations phases of civil works projects—like the EBIA excavation and soil replacement—were *mandatory*. *See* USA Exh. 33 at §19.1.1 (ER 1110-2-1150); *see also* USA Exh. 12 at 64:2-11; 82:2-23 (Grieshaber Depo. Vol. II). And this Court has already determined that "[t]he Corps had the responsibility and duty to insure the integrity of the levee system [during the EBIA remediation]." *In re Katrina Canal Breaches Consol. Litig.*, 2008 WL 5234369, *19 (E.D. La. 2008).

That the Army Corps' own engineering regulations and guidelines qualify as specific legal mandates and a prescribed course of action under prong one is illustrated in *Bean Horizon Corp. v. Tennessee Gas Pipeline Co.*, 1998 WL 113935, *5 (E.D. La. March 10, 1998). That decision involved a suit concerning several parties, including the Army Corps, for damages allegedly caused when a contractor's dredge dropped a spud on a pipeline that had been improperly marked by the Corps in the contract under which the dredge was operating, and where a Corps Quality Insurance inspector was assigned to monitor the dredge's activity.

The Government moved for summary judgment claiming that, among other things, the DFE barred plaintiff's claims. *Id.* at *2. In opposition, plaintiff argued that the Army Corps

failed to follow specific engineering guidelines and regulations governing the Corps's conduct. *Id.* at *5 (citing EP 1130-2-520, EP 1130-2-520, ER 1130-2-520, ER 1180-1-6, in addition to a Corps's guideline entitled "Action of Inspectors in Cases of Immediate Hazard."). In response, the Government argued that the guidelines and regulations cited by plaintiff were "'purely internal directives' that created no duties to the general public." *Id.* at *6 (citation omitted).

The District Court held that the DFE did *not* apply to the challenged conduct because the provisions cited by plaintiff in fact "imposed mandatory safety responsibilities on the Corps' inspection personnel…." *Id.* at *5. In applying a *Gaubert* analysis, the Court concluded that "[a]cts involving mandatory compliance with a federal statute, regulation, or policy do not satisfy the discretionary function exception's requirement of judgment or choice." *Ibid.* (citing *Gaubert*, 499 U.S. at 322). The Court found further support for its holding in the Corps's own acknowledgment that the guidelines and provisions at issue were, in fact, "'responsibilities [that were] delegated to Government inspection personnel…." *Id.* at *6.

### 2. The Army Corps Violated Several of its Own Mandatory Engineering Requirements in the Planning and Execution of the EBIA Excavation and Backfilling Work at the Breach Sites

The record reflects that the Army Corps failed to comply with several of its own mandatory engineering requirements in the planning and execution of the EBIA project. *See* Plaintiffs' Exh. 17 (Dr. Robert Bea, Technical Report IV, *Review of USACE Excavation and Backfill Guidelines and Practices Near Flood Control Structures*, (July 2008)). A brief summary of these mandatory legal mandates is set forth below. In the face of this evidence, Defendant simply cannot satisfy its burden of proof as to prong one. At the very least, there are triable issues of material fact on this issue precluding DFE immunity. *See* MRGO Plaintiffs' Opposition to USA's Undisputed Facts.

**Engineer Regulation ("ER") 1110-2-1150** defines the engineering responsibilities, requirements, and procedures during the planning, design, construction and operations phases of civil works projects. USA Exh. 33. This regulation is *mandatory*. *Id.* at §19.1.1; *see also* USA Exh. 12 at 64:2-11; 82:2-23 (Grieshaber Depo. Vol. II). This regulation places responsibility for the technical content and engineering sufficiency of all engineering products with the Chief of the Engineering organization.

This regulation specifies that a Project Delivery Team be established for the project, which consists of a Project Manager and the technical personnel necessary to develop the project. *Id.* at p. 3, §7. The Corps specifies the utilization of five phases to present the engineering and design policy and process that applies to the project. *Id.* at p. 5, §11. These five phases are identified as reconnaissance; feasibility; preconstruction; engineering and design; and construction, operation and maintenance. *Ibid.*

The 1997 MRGO New Lock and Connecting Channels Evaluation Report was developed to provide guidance for the overall lock replacement project. USA Exh. 1. In addition, the Army Corps developed a 1999 Design Documentation Report (DDR). USA Exh. 33 at p. 3, §8.2 (ER 1110-2-1150). The DDR is "a record of final design effort after the feasibility phase" and is "required for all engineering design products." *Ibid.* It "provides the technical basis for the plans and specifications and serves as a summary of the final design." *Ibid.* As a result of these two reports, the overall scope of the project was established before WGI became involved; *however, it did not include geotechnical evaluations regarding excavations below five feet and the effects that underseepage could have on adjacent floodwalls.*

WGI was engaged through Task Order 26 to evaluate the prior documentation relative to the EBIA and develop a Recommendation Report that the Army Corps could use to analyze the

scope of work to be done at the Hazardous Toxic Radioactive Waste site, with a requirement that it identify any data gaps in the supplied information that needed further evaluation.  But even though WGI identified these relevant data gaps, the Army Corps did not undertake further geotechnical evaluation.  After 2000, the Corps realized that it would have to excavate far deeper than five feet—indeed, as deep as 25 feet.  USA Exh. 18 at 80:9-81:14 (Guillory Depo. Vol. I). As discussed below, the excavation plans had to be submitted to the Engineering Department and the Corps project members' failure to submit the excavation plans developed by WGI to the Engineering Department violated mandatory Corps's regulations.

In particular, section 16 of ER 1110-2-1150 requires that "engineering support shall be provided to those maintenance activities that require [plans and specifications]" as support for operations activities.  USA Exh. 33 at p. 21, §16.1.  This engineering support was required to be provided to review "operational deviations, identify and address project deficiencies, and evaluate replacement plans."  *Id.* at §16.1.  These "deviations . . . of any portion of a project" were required to be "reviewed and approved by engineering."  *Id.* at §16.4.

Lee Guillory, the Project Manager and head of the Project Delivery team, admittedly failed to follow this regulation.  He did not ask the geotechnical division of the engineering division to evaluate the plan that was submitted by WGI for removal of the sewer lift station. USA Exh. 18 at 153:25-154:7; 157:24-158:12; 198:6-16 (Guillory Depo. Vol. I).  Rather, Guillory testified that George Bacuta, a geochemist and not an engineer, was tasked with reviewing the excavation plan.  *Id.* at 188:8-189:1.  In fact, however, Bacuta never reviewed the excavation plan.  USA Exh. 29 at 142:21-25 (Bacuta Depo.).

Here we see that not only did the head of the team fail to follow mandatory regulations requiring that this deviation from the original plan be evaluated by the engineering department,

*but evidently no geotechnical analysis whatsoever was done*.  Ultimately, the South Breach of the flood wall—900 feet long—took place adjacent to this deep excavation at the Saucer Marine site.  Plaintiffs' Exh. 17 at pp. 22-31 (Bea Tech. Report V, Jan. 2009); *see also* Entergy Undisputed Facts, Nos. 65-66.

The North Breach—250 feet long—occurred adjacent to a deep excavation of the "wedding cake" structure at the Boland Marine site.  *Ibid.*  This excavation plan also deviated from the DDR and, similarly, Mr. Guillory failed to comply with ER 1110-2-1150 by presenting the excavation plan to the Corps's Engineering Department.  USA Exh. 18 at 206:23-207:10 (Guillory Depo. Vol. I).  This reckless disregard for the Engineering Regulation led to *no analysis being performed to evaluate underseepage below the sheet pile curtains at the locations of the North Breach site*.  USA Exh. 29 at 176:20-179:12 (Bacuta Depo.).

The evidence clearly establishes a causal link between the Army Corps' negligent failure to comply with its own engineering standards (designed to prevent underseepage of levees) and the resulting catastrophic failure of those levees due in part to underseepage.  According to the Plaintiffs' expert Dr. Robert Bea, this underseepage is exactly what contributed substantially to the floodwall failure on the eastern IHNC at the Boland Marine and Saucer Marine sites where improper excavations and backfilling (without the required analyses) had occurred.  Plaintiffs' Exh. 17 (Bea Tech. Report V, Jan. 2009).  Indeed, the Army Corps has conceded that the North Breach was caused by foundational failure before overtopping.  *See* Plaintiff's Exh. 19 at pp. 68-69 (IPET, vol. V).

The regulation that Mr. Guillory should have observed was **Engineering Regulation 1110-1-8157**.  USA Exh. 34 (Engineering and Design - Geotechnical Data Quality Management for Hazardous Waste Remedial Activities).  The stated purpose of this regulation is to

12

"*prescribe[]* Geotechnical Data Quality Management (GDQM) *responsibilities and requirements*, from initial investigation through closeout at sites contaminated with hazardous, toxic, and radioactive waste." *Id.* at p. 1, §1. (emphasis added). This mandatory regulation is designed "to assure that a site is sufficiently characterized, and the geotechnical data of acceptable quality are obtained and used properly within the project." *Ibid.* To accomplish this goal, the regulation mandates a number of relevant geotechnical requirements.

In particular, ER 1110-1-8157 required that "[all] geotechnical input, review or confirmation of no geotechnical involvement will be certified in a project specific Project Management Plan." *Id.* at p. 2, §8(a). This required a review of existing site data and technical literature, and the usability of this data needed to be evaluated. *Id.* at p. 3, §8(a)(2). The regulation further required that the products generated from project activities "*shall be reviewed and approved by project geotechnical personnel for compliance....*" *Id*. at p. 3, §8(a)(3) (emphasis added). "Geotechnical input *must also be obtained* for design services such as…plans and specifications, where the project involves any earthwork or work related to the subsurface." *Id*. at p. 3, §8(a)(4) (emphasis added).

As Lee Guillory and George Bacuta admitted, these requirements were not met. USA Exh. 18 at 153:25-154:7; 157:24-158:12; 198:6-16; 206:23-207:10 (Guillory Depo. Vol. I); USA Exh. 29 at 142:21-25; 176:20-179:12 (Bacuta Depo.).

In addition, ER 1110-1-8157 detailed the oversight and quality assurance testing of geotechnical work required for the Corps's construction projects. USA Exh. 34 at pp. 5-6. The Corps appointed Alvin Clouatre as the quality assurance representative for the project. USA Exh. 30 at 55:13-25 (Clouatre Depo.). However, Mr. Clouatre was not qualified for this position due to the technical nature of the project. USA Exh. 30 at 90:10-92:8 (Clouatre Depo.). ER

1110-1-8157 mandates that if field oversight on an HTRW site is undertaken by someone "other than project geotechnical personnel, the project delivery team will prepare *Engineering Considerations and Instruction* (ECI)."  USA Exh. 34 at p. 6, §8(i)(3).  As already noted, the Corps did not have a geotechnical person performing field oversight, and there were no *Engineering Considerations and Instruction* developed or provided to Mr. Clouatre.

In addition to failing to comply with various provisions of Engineering Regulations 1110-2-1150 and 1110-1-8157, the Army Corps ignored at least four engineering manuals that mandated specific activity and conduct for the planning and execution of  the Lock Expansion Project.  *See* Entergy Undisputed Facts, Nos. 54-64.  These include (1) Engineering and Design, Retaining and Flood Walls, EM 1110-2-2502, September 29, 1989 at 7-3 "General Considerations," 7-25 (g) (seepage and wall stability) (Plaintiffs Exh. 20); (2) Engineering and Design, Seepage Analysis and Control for Dams, EM 1110-2-1901, April 30, 1993, at 9-1 "General" (seepage control) (Plaintiffs Exh. 21); (3) Engineering and Design, Design of Sheet Pile Walls, EM 1110-2-2504, March 31, 1994 at 4-6 (Plaintiffs Exh. 22); and (4) Engineering and Design, Design and Construction of Levees, EM 1110-2-1913, April 30, 2000 at 5-1 (underseepage), 8-7 to 8-8 at "General" and ¶ b (Plaintiffs Exh. 11); *see also* Plaintiffs' Exh. 18 (Bea Tech. Report IV, July 2008).

Collectively, these specific, applicable engineering standards mandated that any foundation condition that may impact the seepage potential under a levee must be evaluated. Plaintiffs' Exh. 18 at 3 (Bea Tech. Report IV, July 2008) (stating that all relevant and applicable Army Corps "guidelines pertaining to flood control protection systems require seepage analyses be performed as part of the design."); *see also* Entergy Undisputed Facts, Nos. 48-53.

It is therefore not surprising that underseepage and piping contributed to instability and breaches of the IHNC floodwalls along the EBIA since no mandatory seepage analysis was ever performed. *See* Plaintiffs' Exh. 18 at p. 21 (Bea Tech. Report IV, July 2008) ("USACE design guidelines clearly establish the requirement to evaluate seepage impacts on flood control structures as a result of subsurface activity in the proximity of existing flood control elements…. [N]o analyses [demonstrating] these evaluations were completed as part of the IHNC Lock Replacement Project."); Plaintiffs' Exh. 17 (Bea Tech. Report V, Jan. 2009).

As Plaintiffs experts' succinctly conclude:

[The Army Corps' own documentation] provides sufficient evidence that there were many poorly backfilled excavations developed during the USACE IHNC Navigation Lock Expansion Project EBIA site clearing operations. These poorly backfilled excavations provided many conduits for hurricane surge waters in the IHNC to communicate directly with the buried marsh layers that undermine the entire area (Figures 35-39). These buried marsh and swamp layers are able to transmit high water pressures developed in the IHNC directly under the flood protection structures adjacent to the Lower 9th Ward. These high water pressures can contribute significantly to destabilization of flood control structures (Figure 40).

Plaintiffs' Exh. 17 at p. 31 (Bea Tech. Report V, Jan. 2009).

In sum, the situation with respect to the Army Corps' EBIA excavation and soil replacement activities is identical to its failure to follow its own specific technical standards for channel stabilization projects in major alluvial waters in *Alabama Electric Cooperative, Inc. v.United States*, 769 F.2d 1523, 1525-26 (11th Cir. 1985). There the Eleventh Circuit held that the DFE did not apply because Army Corps officials testified that they did not design the defective dike consistent with its own guidelines set forth in a Corps technical report but instead admitted that the "design was basically 'eyeballed' using 'rules of thumb.'" *Id.* at 1525-26. The Court rejected the Government's argument that "its engineers were not required by regulation to consider this technical report" and that plaintiff "had not alleged a specific violation of any

specific regulations." *Id.* at 1525 (quoted in *In re Katrina Canal Breaches Consol. Litig.,* 647 F. Supp.2d at 716).  The technical report imposed mandatory engineering elements for the dike design.  *Ibid.*

The first prong of DFE is simply not available here.

### C.  The Court Has Previously Ruled That Plaintiffs Properly Exhausted Their Administrative Remedies

Defendant reprises a jurisdictional challenge that this Court previously rejected, *viz.,* Plaintiffs' purported failure to exhaust their administrative remedies before filing suit as required by the FTCA.  Once again, Defendant argues that this putative prematurity not only precluded Army Corps administrative action but also prevented the passage of time from serving as a basis for deeming their claims to have been denied.  Once again, this Court should reject this argument.

After extensive briefing and argument, this Court, in allowing Plaintiffs to refile their suit as to the EBIA claims, ruled that "in the case of Ms. Coats and the Armstrongs, there were documents which taken together give the United States sufficient notice of the claim to meet the requirements of § 2675."  *See In re Katrina Canal Breaches Consol. Litig.,* 2010 WL 487431, *12 (E.D. La. Feb. 2, 2010).  These documents included (1) the form 95s filed by these three representative plaintiffs in June 2006, (2) the Armstrongs' Amended Form 95 filed on February 27, 2007, and (3) "a MRGO Master Consolidated Class Action Complaint [filed on March 15, 2007} containing exact detail concerning the EBIA contentions."  *Ibid.*  In addition, the six-month waiting period imposed by Section (a) was also satisfied "because more than six months has passed since the 2007 complaint was filed placing the Corps on notice that the EBIA claim was being made by these three plaintiffs…."  *Ibid.* (citation omitted).

The Court reached the same conclusion as to Entergy New Orleans, Inc. and Entergy Louisiana, LLC.  The Court rejected Defendant's contention that as to these two Entergy entities, a timely Form 95 had not been filed with the Army Corps and the lawsuit was instituted prematurely.  The Entergy Plaintiffs had filed a complaint on January 12, 2010 (detailing their EBIA claims) before their EBIA claim had been denied by the Corps and more than six months after the filing of an earlier Entergy suit raising the EBIA issues.  "As such, the Court finds that the issue of prematurity is rendered moot by this [January 10, 2010] filing…and will recognize the later filed suit as timely…."  *Id.* at *17.

Once again, the Government invokes *McNeil v. United States*, 508 U.S. 106 (1992).  As this Court earlier ruled, *McNeil* does not support dismissal of Plaintiff's EBIA claims.  *Id.* at *10-11.  In *McNeil*, the Supreme Court struggled with the harsh result of total preclusion of the claim of a prisoner who had been the subject of human research and experimentation by the U.S. Public Health Service.  Procedurally, the petitioner had first lodged a complaint in District Court four months before filing an administrative claim for damages to the Department of Health and Human Services.  Unlike the present case, however, the agency there actually **denied** the administrative claim, thus invoking a different limitations period than presented before this court.

McNeil did not file a new suit; he simply sent a letter to the District Court enclosing a copy of the denial and asked the court to accept the letter as a request to commence the legal action.  The Supreme Court agreed that the complaint was properly dismissed as premature.  This dismissal precluded the petitioner's claim because preserving the previously filed petition was his only avenue for recourse as the six month limitation period from the date of the denial of the administrative claim had expired.  Thus, the reasoning in *McNeil* is inapposite to the logic

relied upon by the Court as found in the long standing jurisprudence set forth by the Fifth Circuit in *Williams v. United States,* 693 F.2d 555 (5th Cir. 1982).

Curiously, two other cases cited by the Defendant bolster the Court' prior ruling on this issue.  In *Brady v. United States*, 211 F.3d 499 (9th Cir. 2000), the plaintiff did not present an administrative claim until after the first and second complaints were dismissed.  Looking to the statute's spirit and purpose, the Ninth Circuit even commented that the plaintiff had never asked the agency to treat the complaint as an administrative claim, thus advising the agency or her intent to pursue the claim.  *Id.* at 503.

Similarly, the Fifth Circuit recognized that an informal presentation of an administrative claim could fulfill the statute's spirit and purpose.  *See Houston v. United States Post Office*, 823 F.2d 896 (5th Cir. 1987).  In *Houston*, the plaintiff filed a petition in state court against various federal entities within one year of an automobile accident caused by a postal worker, but withheld service.  *Id.* at 897-88.  An administrative claim was filed two years later, which was promptly denied by the agency within two months.  *Ibid.*  Plaintiff's counsel failed to file suit in federal court within the requisite six month period, and only finally requested service of the dormant state court suit two years after the denial.  *Ibid.*  Unexplained delays notwithstanding, the Fifth Circuit still opined that "if the United States had been served in the six months after the administrative denial, and had removed the case to federal court within that time, the action would have timely commenced."  *Id.* at 904.

The Government presents no new reasons why this Court should disturb its prior ruling.  Indeed, Defendant is in the wrong forum.  This Court issued an order granting interlocutory review of this issue pursuant to 28 U.S.C. § 1292(b).  *In re Katrina Canal Breaches Consol. Litig.,* 2010 WL 487431, *15.  The Government declined this open invitation to secure appellate

review—a telling indication of its faith in these arguments.  The motion to dismiss on this ground should be again denied.

## IV.    CONCLUSION

Litigating over and over again the same issues for nearly five years brings to mind the memorable words of King Henry V:  "Once more unto the breach, dear friends, once more." Hopefully, once and for all, the Court's emphatic denial of the Motion "will close the wall up." At least we can hope, perchance to dream.

Dated:  September 3, 2010

**Respectfully Submitted,**
**PLAINTIFFS LIAISON COUNSEL**

     /s/ Joseph M. Bruno
JOSEPH M. BRUNO (La. Bar # 3604)
Bruno & Bruno, LLP
855 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 525-1335
Facsimile: (504) 561-6775
Email: jbruno@brunobrunolaw.com

**MR-GO PLAINTIFFS SUB-GROUP LITIGATION**
**COMMITTEE**

     /s/ James Parkerson Roy
JAMES PARKERSON ROY
MR-GO PSLC Liaison Counsel
LA. Bar Roll Number: 11511
Domengeaux Wright Roy & Edwards LLC
P.O.Box 3668
Lafayette, LA. 70502
Telephone: (337) 593-4190 or (337) 233-3033
Facsimile: 337-233-2796
Email: jimr@wrightroy.com

**MR-GO PLAINTIFFS SUB GROUP LITIGATION**
**COMMITTEE**

Jonathan Andry (The Andry Law Firm, New Orleans, LA)

19

Clay Mitchell (Levin, Papantonio, et al., Pensacola, FL)
Pierce O'Donnell (O'Donnell & Associates, Los Angeles, CA)
James Parkerson Roy (Domengeaux, Wright, et al., Lafayette, LA)

**<u>CERTIFICATE OF SERVICE</u>**

I certify that a true and correct copy of the foregoing was served upon all counsel of

record by ECF on September 3, 2010.

<u>/s/ Joseph M. Bruno</u>