UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re:  KATRINA CANAL BREACHES CONSOLIDATED LITIGATION | CIVIL ACTION NUMBER:  05-4182 "K"(2) JUDGE Duval MAG. Wilkinson |
| PERTAINS TO:   MRGO *Armstrong*, No. 10-866 | |

## MRGO PLAINTIFFS' OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Plaintiffs Kenneth Paul Armstrong, Sr., Jeannine B. Armstrong, and Jerald N. Andry, Jr., in his administrative capacity as executor of the Estate of Ethel Coats hereby respond to Defendant United States Statement of Undisputed Facts submitted in support of its Motion to Dismiss or, in the Alternative, for Summary Judgment (Doc. No. 19988-4).

**The IHNC Lock**

1.      **The IHNC Lock was constructed in 1923 under the auspices of the Dock Board.[1]**

Undisputed.

2.      **The lock was 75-feet wide, 640-feet long, and 31.5-feet deep (below mean low gulf).[2]**

Undisputed.

---

[1] 1 New Lock and Connecting Channels Evaluation Report [hereinafter New Lock Eval.] (Mar. 1997) MVD-006-000000151 [Ex. 1].

[2] 1 New Lock Eval. MVD-006-000000151 [Ex. 1].

3.      When Congress authorized MRGO construction, it also authorized "the construction of a new lock and connecting channel when economically justified by obsolescence of the existing lock or by increased traffic."[3]

Undisputed.

4.      In 1960 anticipated obsolescence prompted new-lock studies.[4]

Undisputed.

5.      Ship-traffic delays averaged 10 hours and stretched up to 24-36 hours per lockage.[5]

Undisputed.

**New-Lock Site Selection**

6.      A 1961 site study eliminated Meraux from further consideration, and 1973 studies eliminated all but two sites:  the Industrial Canal and Lower Violet.[6]

Undisputed.

7.      Plans to site the new lock in St. Bernard Parish drew rabid opposition. About 1600 people attended meetings at the St. Bernard Parish courthouse in 1972.  To

---

[3]Rivers and Harbors Act of 1956, Pub. L. No. 84-455, 70 Stat. 65; *see also* 1 New Lock Eval. MVD-006-000000151 [Ex. 1].

[4]1 New Lock Eval. MVD-006-000000151 [Ex. 1]; *see also ACORN v. U.S. Army Corps of Eng'rs,* 2000 WL 433332, (E.D. La. Apr. 20, 2000) at *6.

[5]1 New Lock Eval. MVD-006-000000151 [Ex. 1].

[6]MR-GO New Lock and Connecting Channels Site Selection Report (Mar. 1975) AFW-161-000001908, AFW-161-000001939 [Ex. 6]; *see also ACORN,* 2000 WL 433332, at *7.

accommodate everyone who wished to be heard,  one meeting stretched from 10 o'clock on

a Saturday morning until 1:15 a.m. the next day.[7]

> Undisputed.

8.    **Despite this opposition, the 1975 site study recommended the Lower Violet**

**site.[8]**

> Undisputed.

9.    **Environmental concerns soon prompted a reconsideration.[9]**

> Undisputed.

10.    **On April 18, 1977 President Carter formally asked Congress to eliminate the**

**Violet site from further consideration:**

> **The project should be modified to eliminate consideration of the new channel**
> **location.  Further study should be carried out to determine whether repair or**
> **replacement is needed of the existing lock at the existing site.  If replacement**
> **and expansion are deemed necessary, special care should be taken to**
> **minimize dislocation and disruption of residents near the site.  Cost savings**
> **from the modification will depend on the outcome of the analysis.[10]**

> Undisputed.

11.    **President Carter reiterated his opposition to the Violet site in 1978 and urged**

**construction of the new lock at the IHNC.[11]**

---

[7]1975 Site Selection Report AFW-161-000001914, AFW-161-000001875 (listing opponents and proponents),  AFW-161-000002109 to -000002122 (tallying more than 31,000 opponents) [Ex. 6].

[8]Site Selection Rep. AFW-161-000001876 [Ex. 6]; *accord* 1 New Lock Eval. MVD-006-000000152 [Ex. 1].

[9]Site Selection Rep. AFW-161-000001876 [Ex. 6]; see also ACORN, 2000 WL 433332, at *7.

[10]Letter From Maj. Gen. Ernst Graves to Col. James H. Phillips (June 10, 1977) TED-102-000000754 [Ex. 7].

[11]*ACORN,* 2000 WL 433332, at *7.

Undisputed.

**12.  With construction at the IHNC becoming more likely, residents of the neighboring communities began to voice their opposition:**

> **[M]any people thought there [had been] a cloud hanging over the area since about 1960 when planning for a new lock began and the IHNC was targeted as a potential site.  Some even [likened] the lock replacement project to . . . a cancer in remission; it keeps flaring up every once in a while but never goes away.[12]**

Undisputed.

**13.     In 1986 Congress modified the Rivers and Harbors Act, directing the Secretary of the Army to consult with affected local communities before selecting the location for the new lock.[13]**

Undisputed.

**14.     In 1991 the Violet site was formally eliminated.[14]**

Undisputed.

**15.     In 1996 Congress again modified WRDA, directing that the location of the new lock be based on a community-impact mitigation plan that, 'to the maximum extent practicable, provides for mitigation or compensation, or both, for the direct and indirect social and cultural impacts" of the project.[15]**

Undisputed.

---

[12]2 New Lock Eval. NPM-006-000000337 [Ex. 2].

[13]Water Resources Development Act of 1986, Pub. L. No. 99-662, § 844(a), 100 Stat. 4082, 4177.

[14]*See generally* Memorandum for Division Engineer, Lower Mississippi Valley Re: Violet Site Elimination (Jan. 23, 1991) [Ex. 8].

[15] Water Resources Development Act of 1966, Pub. L. No. 104-303, § 326(c), 110 Stat. 3658, 3717.

16.     Eight alternatives were developed for construction at the IHNC.  The two selected for detailed analysis were the 200-Foot East plan and the North of Claiborne Avenue plan."[16]

Undisputed.

17.     Unlike the 200-Foot East Plan, the North of Claiborne Avenue Plan would not require the relocation of any residents in the Lower Ninth Ward.[17]

Undisputed.

18.     The North of Claiborne Avenue plan was selected because its community impacts were smaller than those of the 200-Foot East plan.[18]

Undisputed.

19.     In March 1997, the Corps published a nine-volume Final Evaluation Report, see generally Ex. 1, describing the proposed plan, alternatives, an Environmental Impact Statement ("EIS"), a Community Impact Plan, and technical data.[19]

Undisputed.

20.     Gerald J. Dicharry, Jr., was the Senior Project Manager for the Lock Replacement Project.[20]

Undisputed.

---

[16]1 New Lock Eval. MVD-006-000000152 [Ex. 1].

[17]Dicharry 23:14-19 [Ex. 9].

[18]1 New Lock Eval. MVD-006-000000153 [Ex. 1].

[19]*ACORN,* 2000 WL 433332, at *7; Dicharry 14:22-15:24 [Ex. 9].

[20]*See* 1 New Lock Eval. MVD-006-000000149 [Ex. 1]; Dicharry 17:11-24 [Ex. 9].

21.    The filing of the 1997 EIS was coordinated with the Environmental

Protection Agency, as well as "other federal and state agencies and the Governor of

Louisiana, each of which responded with comments."[21]

Undisputed.

**Bypass Channel**

22.    To avoid shutting down "a vital link" to the Gulf Intracoastal Waterway

("GIWW") during construction, the Corps planned to cut a temporary, two-way bypass

channel through the EBIA, which comprised 32 acres between Claiborne and Florida

Avenues, between the canal and the floodwall.[22]

Undisputed.

23.    The bypass channel was to be 220-feet wide, with a depth of 31 feet on the

canal side and 22 feet on the floodwall side.[23]

Undisputed.

24.    The bypass channel was sited so as not to affect the floodwalls' stability.[24]

Disputed.  The bypass channel was placed on the east bank of the EBIA because the local

sponsor, The Port of New Orleans, determined that: "The facilities along the east side of the

---

[21]*ACORN,* 2000 WL 433332, at *8.

[22]WGI's Statement Of Undisputed Material Facts [hereinafter WGI SOF] (Doc. 15861-3) ¶ 15 [Ex. 10]; 1 New Lock Eval. 54, 75, 112 , Plate 9 (General Plan:  New Lock and Channel (Mar. 1995)), Plate 11B (Cross Section (Oct. 1996)), Plate 23 (Proposed Relocations (Mar. 1995)), Plate 24 (Proposed Relocations (Mar. 1995)), Plate 25 (Potential Noise Impact Areas (Mar. 1995) [Ex. 1]; 2001 DDR No. 2 Plate I-2 (Gen. Plan – Ship Lock (Jan. 2001) [Ex. 15]; Guillory II, 118:11-20 [Ex. 18].

[23]WGI SOF 16 [Ex. 10].

[24]Dicharry 30:22-31 [Ex. 9]; WGI SOF ¶ 18 [Ex. 10]; *see also* 4 New Lock Eval. NPM-006-000001567-000001571 (Plates B-89 to B-93, showing "levee protection" for new lock and bypass channel) [Ex. 3]; Grieshaber II, 22:2-19 [Ex. 12]; Dicharry 31:23-32:1 (Ex. 9).

canal were more expendable than the ones on the west side."  USA Exh. 9 at 29:13-30:10

(DiCharry Depo.).  Thus, the Corps implemented no discretion in evaluating the location of the

bypass channel and employed no engineering analysis by selecting the EBIA as the site for the

bypass channel.

In preparation for the temporary bypass channel, the Corps identified six abandoned

industrial sites along Surekote road that comprise the EBIA: Boland Marine, McDonough

Marine, Indian Towing Company, Mayer Yacht/ Distributor Oil, Saucer Marine and the

Industrial Tank Terminal and the location for the channel.  *See* USA Exh. 13 at WGP005-

000047426-47430 and Table 1-1 on WGP005-000047445 (Sampling and Analysis Plan, Project

Site Development and Remedial Action of East Bank Industrial Area Inner Harbor Navigation

Canal Lock Replacement Project New Orleans Louisiana-WGI January 2001-Summary of

Previous Investigations, 1-1-1-5)

**25.    Lee Guillory, the Construction Manager for Task Order No. 26 at the EBIA,
had guidance on a minimum control line, which informed him as to what would impact the
stability of the floodwall.[25]**

Disputed to the extent that this statement implies that the Corps conducted proper

engineering analysis regarding the excavations and the location of the floodwalls.

To the contrary, the testimony emphasizes that the Corps established a "rule of thumb"

that defined the Soil Remediation Area as the area "15 feet from the flood side face of the wall to

the edge of Surekote Road."  USA Exh. 11 at 81:1-12 (Guillory Depo. Vol. II).  This footprint

was based not on a calculated engineering analysis or policy, (as the Corps's own witness

testified it was required to be [Plaintiffs' Exh. 16 at 53:4-12; 54:2-13; 60:24-62:6; 70:5-73:11;

---

[25]2 Grieshaber 12:23-13:13 [Ex. 12].

75:14-77:25; 88:7-21; 90:14-91:10; 94:21-96:15; 103:3-14; 123:5-124:7; 147:1-148:14; 159:20-160:25; 168:9-22; 173:8-174:19 (Grieshaber Depo. Vol. I)]), but "probably [on] a consensus of opinion" and the location of a concrete curb on Surekote Road in the EBIA.  USA Exh. 11 at 83:2-23 (Guillory Depo. Vol. II).

> **26.**    **Dr. John Grieshaber of the Geotechnical Branch, Engineering Division, described the general guidance available to the Construction Manager:**
>
>> **If the slope is a 1 on 3 slope, you just follow it underground as far down as— you know, you just continue that 1 on 3 slope.  And you would say any excavations that does not violate that line will not impact the stability of the wall.[26]**

Disputed to the extent that this statement implies that the Corps conducted proper engineering analysis.

In addition, disputed to the extent that it implies that the Corps could dispense with its own standard engineering practices and principles that required specialized architectural-engineering and geotechnical analysis for excavation in an area adjacent to the levees to ensure such work was "safe for the levee."  USA Exh. 18 at 164:19-166:12 (Guillory Depo. Vol. I); *see also* Plaintiffs' Exh. 12 at WGI38731-32, 5.1.2.1.5 (Recommendation Report for Demolition and Site Preparation Activities of the EBIA of the IHNC Lock Replacement Project).

Specifically, Mr. Grieshaber testified that the Corps would perform engineering analyses on the wall stability, seepage, and global stability to make certain that the excavations do no impact any adjacent flood control structures.  Plaintiffs' Exh. 16 at 53:4-12; 54:2-13; 60:24-62:6; 70:5-73:11; 75:14-77:25; 88:7-21; 90:14-91:10; 94:21-96:15; 103:3-14; 123:5-124:7; 147:1-148:14; 159:20-160:25; 168:9-22; 173:8-174:19 (Grieshaber Depo Vol. I).

---

[26]2 Grieshaber 13:21-14:1 [Ex. 12].

These engineering analyses, however, were never actually performed by the Corps's Engineering Division or its contractor, WGI.  USA Exh. 18 at 157:24-170:9; 171:18-172:11; 197:17-198:16; 203:21-205:12; 206:23-207:10 (Guillory Depo. Vol. I); USA Exh. 9 at 42:7-43:3 (DiCharry Depo.).

Rather, the only evaluations that the Engineering Division performed regarding the structural stability of the environmental remedial excavating work done on the EBIA in connection with Task Order 26 of the TERC was to evaluate an excavation footprint of 25 feet wide and 3 feet deep in areas not closer than 15 feet from the Jourdan Avenue floodwall/levee. *Id.*

**27.    Use of the general guidance on the stability of a flood control structure vis-à-vis extending the slope of the levee was an appropriate tool within the discretion of the Construction Manager and Contracting Officer Representative.[27]**

Disputed to the extent the statement implies that the Construction Manager and Contracting Officer Representative ever actually utilized or followed this "general guidance on the stability of a flood control structure vis‐à‐vis extending the slope of the levee."  To the contrary, when asked if this "appropriate tool" was ever used, Mr. Grieshaber speculated that "I *think* that would be what they would *probably* use."  USA Exh. 12 at 58:19-25 (Grieshaber Depo Vol. II) (emphasis added).

In addition, this statement is also disputed to the extent that it implies that using such "general guidance" was the *only* tool that the Corps was required to use with respect to analyzing the stability of a flood control structure.  To the contrary, Mr. Grieshaber testified that the Corps would perform engineering analyses on the wall stability, seepage, and global stability to make

---

[27]2 Grieshaber 57:21-25, 58:19-59:4 [Ex. 12].

certain that the excavations do no impact any adjacent flood control structures.  Plaintiffs' Exh. 16 at 53:4-12; 54:2-13; 60:24-62:6; 70:5-73:11; 75:14-77:25; 88:7-21; 90:14-91:10; 94:21-96:15; 103:3-14; 123:5-124:7; 147:1-148:14; 159:20-160:25; 168:9-22; 173:8-174:19 (Grieshaber Depo Vol. I).

These engineering analyses, however, were never actually performed by the Corps's Engineering Division or its contractor, WGI.  USA Exh. 18 at 157:24-170:9; 171:18-172:11; 197:17-198:16; 203:21-205:12; 206:23-207:10 (Guillory Depo. Vol. I); USA Exh. 9 at 42:7-43:3 (DiCharry Depo.).  Rather, the only evaluations that the Engineering Division performed regarding the structural stability of the environmental remedial excavating work done on the EBIA in connection with Task Order 26 of the TERC was to evaluate an excavation footprint of 25 feet wide and 3 feet deep in areas not closer than 15 feet from the Jourdan Avenue floodwall/levee.  *Id.*

**28.     Excavations allowed removal of structures, contaminants, and debris in preparation for the dredging of the bypass channel.[28]**

Disputed to the extent that this statement implies that the Corps conducted proper engineering analysis.

Specifically, Engineer Regulation ("ER") 1110-2-1150 defines the engineering responsibilities, requirements, and procedures during the planning, design, construction and operations phases of civil works projects.  USA Exh. 33.  This regulation is *mandatory*.  *Id.* at p. 23, §19.1.1; *see also* USA Exh. 12 at 64:2-11; 82:2-23 (Grieshaber Depo. Vol. II).  This regulation places responsibility for the technical content and engineering sufficiency of all engineering products with the Chief of the Engineering organization.

---

[28]Sampling And Analysis Plan (Jan. 2001) 14-18 [Ex. 13]; *see also* 5 New Lock Eval. C-71 to C-73 [Ex. 4].

This regulation further specifies that a Project Delivery Team be established for the project, which consists of a Project Manager and the technical personnel necessary to develop the project. *Id.* at p. 3, §7. The Corps specifies the utilization of five phases to present the engineering and design policy and process that applies to the project. *Id.* at p. 5, §11. These five phases are identified as reconnaissance; feasibility; preconstruction; engineering and design; and construction, operation and maintenance. *Id.*

The 1997 MRGO New Lock and Connecting Channels Evaluation Report was developed to provide guidance for the overall lock replacement project. In addition, the Corps developed a 1999 Design Documentation Report (DDR). USA Exh. 33 at p. 3, §8.2 (ER 1110-2-1150). The DDR is "a record of final design effort after the feasibility phase" and is "required for all engineering design products." *Id.* It "provides the technical basis for the plans and specifications and serves as a summary of the final design." *Id.* As a result of these two reports, the overall scope of the project was established before WGI became involved; however, it did not include geotechnical evaluations regarding excavations below five feet and the effects that underseepage could have on adjacent floodwalls.

WGI was engaged through Task Order 26 to evaluate the prior documentation relative to the EBIA and develop a Recommendation Report that the Army Corps could use to analyze the scope of work to be done at the Hazardous Toxic Radioactive Waste site, with a requirement that it identify any data gaps in the supplied information that needed further evaluation. But even as WGI identified these relevant data gaps, the Army Corps did not undertake further geotechnical evaluation. Until the end of 2000, this was immaterial as the deepest excavation contemplated and evaluated was to a depth of approximately eight feet. USA Exh. 18 at 80:5-81:8 (Guillory Depo. Vol. I). However immaterial it was at that time, the failure of the Army Corps to submit

the excavation plans developed by WGI to the Engineering Department violated mandatory

Corps's regulations.

Specifically, section 16.1 of ER 1110-2-1150 requires that "engineering support shall be

provided to those maintenance activities that require [plans and specifications]..." as support for

operations activities.  USA Exh. 33 at p. 21, §16.1.  This engineering support was required to be

provided to review "operational deviations, identify and address project deficiencies, and

evaluate replacement plans."  *Id.*  Any "deviations ... of any portion of a project" were required

to be "reviewed and approved by engineering."  *Id.* at §16.4.

Lee Guillory, the Project Manager and head of the Project Delivery team, failed to follow

this regulation.  He did not ask the geotechnical division of the engineering division to evaluate

the plan that was submitted by WGI for removal of the sewer lift station.  USA Exh. 18 at

153:25-154:7; 157:24-158:12; 198:6-16 (Guillory Depo. Vol. I).  Rather, Guillory testified that

George Bacuta, a geochemist, was tasked with reviewing the excavation plan.  *Id.* at 188:8-

189:1.  In fact, however, Bacuta never reviewed the excavation plan.  USA Exh. 29 at 142:21-25

(Bacuta Depo.).

Here we see that not only did the head of the team fail to follow mandatory regulation in

having this deviation from the original plan evaluated by the engineering department, but

evidently no geotechnical analysis whatsoever was done.  Ultimately, the southern breach of the

flood wall took place adjacent to this deep excavation.  Plaintiffs' Exh. 17 at pp. 22-31 (Bea

Tech. Report V, Jan. 2009).

The northern breach occurred adjacent to a deep excavation of the "wedding cake"

structure at the Boland Marine site.  This excavation plan also deviated from the DDR and,

similarly, Mr. Guillory failed to comply with ER 1110-2-1150 by presenting the excavation plan

to the Corps's Engineering Department.  USA Exh. 18 at 206:23-207:10 (Guillory Depo. Vol. I).

This reckless disregard for the Engineering Regulation led to *no* analysis being performed to

evaluate underseepage below the sheet pile curtains at the locations of the north breach site.

USA Exh. 29 at 176:20-179:12 (Bacuta Depo.).

According to the Plaintiffs' expert Robert Bea, this underseepage is exactly what caused

or contributed to the breach at the Boland Marine site.  Plaintiffs' Exh. 17 at pp. 1-21 (Bea Tech.

Report V, Jan. 2009).

The regulation that Mr. Guillory should have observed was Engineering Regulation

1110-1-8157.  USA Exh. 34.  This regulation "*prescribes* Geotechnical Data Quality

Management (GDQM) *responsibilities and requirements*, from initial investigation through

closeout at sites contaminated with hazardous, toxic, and radioactive waste."  *Id.* at p. 1, §1.

(emphasis added).  The utilization of this regulation is "to assure that a site is sufficiently

characterized, and the geotechnical data of acceptable quality are obtained and used properly

within the project."  *Id.*  To accomplish this goal, the regulation mandates a number of relevant

geotechnical requirements.

In particular, ER 1110-1-8157 required that "[all] geotechnical input, review or

confirmation of no geotechnical involvement will be certified in a project specific Project

Management Plan."  *Id.* at p. 2, §8(a).  This required a review of existing site data and technical

literature, and the usability of this data needed to be evaluated.  *Id.* at p. 3, §8(a)(2).  The

regulation further required that the products generated from project activities "*shall be reviewed

and approved by project geotechnical personnel for compliance....*"  *Id*. at p. 3, §8(a)(3)

(emphasis added).  "Geotechnical input *must also be obtained* for design services such as…plans

and specifications, where the project involves any earthwork or work related to the subsurface."
*Id*. at p. 3, §8(a)(4) (emphasis added).

As Lee Guillory and George Bacuta testified, these requirements were not met.  USA
Exh. 18 at 153:25-154:7; 157:24-158:12; 198:6-16; 206:23-207:10 (Guillory Depo. Vol. I); USA
Exh. 29 at 142:21-25; 176:20-179:12 (Bacuta Depo.).

ER 1110-1-8157 also detailed the oversight and quality assurance testing of geotechnical
work required for the Corps's construction projects.  USA Exh. 34 at pp. 5-6.  The Corps
appointed Alvin Clouatre as the quality assurance representative for the project.  USA Exh. 30 at
55:13-25 (Clouatre Depo.).  However, Mr. Clouatre was not qualified for this position due to the
technical nature of the project.  USA Exh. 30 at 90:10-92:8 (Clouatre Depo.).  Engineering
Regulation 1110-1-8157 mandates that if field oversight on an HTRW site done by someone
"other than project geotechnical personnel, the project delivery team will prepare *Engineering
Considerations and Instruction* (ECI)."  USA Exh. 34 at p. 6, §8(i)(3).  It has already been
established the Corps did not have a geotechnical person performing field oversight, and there
were no *Engineering Considerations and Instruction* developed or provided to Mr. Clouatre.

In addition, Corps Engineering Manuals highlight the need to perform specific
engineering evaluations of the mechanisms of levee failure and the effects of construction in the
vicinity of the levees on the "Factor of Safety" for the flood control structures.  *See* Plaintiffs'
Exh. 11 at pp. 5-1, 6-6, 8-7 to 8-8 (EM 1110-2-1913 Design and Construction of Levees (1978))
detailing minimum acceptable factor of safety and underseepage issues; Plaintiffs' Exh. 14 at pp.
6-11 through 6-17 (EM 1110-2-5027 Confined Disposal of Dredged Materials Engineering
Manual) (detailing the critical safety issues associated with seepage and levee and dike failure);
Plaintiffs' Exh. 20 at 7-3 "General Considerations," 7-25 (g) (Engineering and Design, Retaining

14

and Flood Walls, EM 1110-2-2502, September 29, 1989) (seepage and wall stability); Plaintiffs

Exh. 21 at 9-1 "General" (Engineering and Design, Seepage Analysis and Control for Dams, EM

1110-2-1901, April 30, 1993) (seepage control); and Plaintiffs Exh. 22 at 4-6 (Engineering and

Design, Design of Sheet Pile Walls, EM 1110-2-2504, March 31, 1994).  Collectively, these

specific, applicable engineering standards mandated that any foundation condition that may

impact the seepage potential under a levee must be evaluated.  Plaintiffs' Exh. 18 at pp. 3-8 (Bea

Tech. Report IV, July 2008).

**29.**     **"The soil from the east bank of the IHNC, below 5 feet in depth, is not**

**contaminated.  It would be used to develop wetlands as mitigation for impacts of the**

**graving site.  The material would be deposited into an area of shallow, brackish water."[29]**

In addition, this statement is also disputed as "in a majority of cases" the east bank "was

Disputed to the extent that this statement implies that the Corps conducted proper

engineering analysis for the purpose of removal of depths to five feet and there was an analysis

of that impact on the adjacent floodwalls.  The Corps acknowledged that these analyses were

required, yet only made superficial attempts to address these mandatory engineering obligations

with regard toxins to depths of three (out of the first five) feet of soil remediation in the EBIA.

USA Exh. 15 (Memo to: C/Engineering Division; ATTN: CEMVN-ED-F- James Miles Jr. Chief

Construction Division CEMVN-CD-QM 15-Apr-02 Re: IHNC Lock Replacement Project, Total

Environmental Restoration Contract (TERC) for Remedial Action of East Bank Industrial Area

(EBIA) Task Order 0026, New Orleans)

In addition, this statement is also disputed as "in a majority of cases" the east bank "was

excavated as required to a depth of four feet, [but] additional observations of contamination

---

[29]4 New Lock Eval. D-3-2 [Ex. 5].

15

prompted excavations to depths exceeding nine feet."  Plaintiffs' Exh. 17 at p. 7 (Bea Tech.

Report V, Jan. 2009).

**IHNC Flood Protection**

> 30.    **The IHNC lock reduces the risk of flooding during storm surges.**[31]

Disputed to the extent that this statement implies that the IHNC lock was intended as a

flood control device.  Rather the lock was a component of The Water Resources Development

Act of 1986 (PL 99-662) which emphasized that the IHNC Lock Expansion Project was

expressly a cargo and inland navigation project:

> The Water Resources Development Act of 1986 (PL 99-662)
> modified the [IHNC lock expansion] project and changed the **cost
> sharing arrangement.** The Act specifies that the cost of the Lock
> shall be allocated **between general cargo navigation and in land
> navigation**.  The shallow draft cost would be funded 50 percent
> from the general funds of the US Treasury and 50 percent from the
> Inland Waterway Trust Fund….  The Act provides that the lock
> and connecting channels shall be in the area of the existing lock or
> at the Violet site.

Plaintiffs' Exh. 2 at MVD-006-342, §3.1.7 (emphasis added).

The authorizing Acts for the IHNC and the IHNC Lock are not Flood Control Act

legislation.  *Id.* at§§ 3.1.1, 3.1.7.

Additionally, the construction of levee "tie ins" for a navigation project to connect it to a

preexisting flood construction project did not change the character of the navigation project to

flood protection.  Rather, the Corps repeatedly testified that the navigation never became a flood

control project.  Plaintiffs' Exh. 5 at 81:20:82:8 (Manguno Depo.); *see also* USA Exh. 9 at

93:10-95:25 (DiCharry Depo.).

---

[31]4 New Lock Eval. D-1-6 [Ex. 5].

**31.     The IHNC was bounded by Lake Pontchartrain and Vicinity Hurricane Protection Project ("LPV") levees and floodwalls when Hurricane Katrina struck New Orleans on August 29, 2005.[32]**

Undisputed but irrelevant.  The same is true of the MRGO—where the LPV levees were added after the waterway was constructed—but the evidence did not establish that "the MRGO had morphed into a hybrid flood control/navigational aid project."  *In re Katrina Canal Breaches Consol. Litig.*, 471 F. Supp. at 695.  In fact, the Court made findings based on uncontroverted evidence that "[e]ach project served a different purpose"—one to prevent flooding and the other to promote deep draft shipping; the construction of the LPV adjacent to the MRGO did not establish a nexus between the two projects; and the MRGO and LPV had different funding sources.  *See In re Katrina Canal Breaches Consol. Litig.*, 577 F.Supp.2d at 805, 811, 818, 825.

The same is true here with the IHNC.

**32.     The LPV levees and floodwalls between the replacement lock and the river were to be raised to the design standards and elevations of the Mississippi River and Tributaries (MR&T) Project to prevent riverine flooding. [33]**

Disputed to the extent that this statement implies that the IHNC lock was intended as a flood control device.  Rather the lock was a component of The Water Resources Development Act of 1986 (PL 99-662) which emphasized that the IHNC Lock Expansion Project was expressly a cargo and inland navigation project:

---

[32]*See, e.g., Katrina,* 577 F. Supp. 2d 802, 812-814 (describing LPV plan of protection to include floodwalls at the IHNC);  Robinson Findings of Fact and Conclusions of Law Exhibits (Doc. 19415-2) 1 [Ex. 14].

[33]IHNC Lock Replacement Project Design Documentation Report No. 2: Levees, Floodwalls, and Channels (Jan. 2001) 1-1  to 1-2 (NED-142-000003336 to -000003337)[(Ex. 15]; *see also* 1 New Lock Eval. MVD-006-000000153, 75, 112, Plate 12 (Riverside Flood Protection:  Ship and Barge Lock), Plate 13 (River Side Flood Protection (Mar. 1995) [Ex. 1].

> The Water Resources Development Act of 1986 (PL 99-662)
> modified the [IHNC lock expansion] project and changed the **cost
> sharing arrangement**. The Act specifies that the cost of the Lock
> shall be allocated **between general cargo navigation and in land
> navigation**.  The shallow draft cost would be funded 50 percent
> from the general funds of the US Treasury and 50 percent from the
> Inland Waterway Trust Fund….  The Act provides that the lock
> and connecting channels shall be in the area of the existing lock or
> at the Violet site.

Plaintiffs' Exh. 2 at MVD-006-342, §3.1.7 (emphasis added).

The authorizing Acts for the IHNC and the IHNC Lock are not Flood Control Act

legislation.  *Id.* at §§3.1.1, 3.1.7.

Additionally, the construction of levee "tie ins" for a navigation project to connect it to a

preexisting flood construction project did not change the character of the navigation project to

flood protection.  Rather, the Corps repeatedly testified that the navigation never became a flood

control project.  Plaintiffs' Exh. 5 at 81:20-82:8 (Manguno Depo.); *see also* USA Exh. 9 at

93:10-95:25 (DiCharry Depo.).

**33.     This improvement was necessary because the new lock was slated to be built**

**north of Claiborne Avenue, farther from the river than the old lock.[34]**

Disputed to the extent that this statement implies that the IHNC lock was intended as a

flood control device.  Rather the lock was a component of The Water Resources Development

Act of 1986 (PL 99-662) which emphasized that the IHNC Lock Expansion Project was

expressly a cargo and inland navigation project:

> The Water Resources Development Act of 1986 (PL 99-662)
> modified the [IHNC lock expansion] project and changed the **cost
> sharing arrangement**. The Act specifies that the cost of the Lock
> shall be allocated **between general cargo navigation and in land
> navigation**.  The shallow draft cost would be funded 50 percent
> from the general funds of the US Treasury and 50 percent from the

---

[34]*See* 1 New Lock Eval. MVD-006-000000153 [Ex. 1].

> Inland Waterway Trust Fund…. The Act provides that the lock
> and connecting channels shall be in the area of the existing lock or
> at the Violet site.

Plaintiffs' Exh. 2 at MVD-006-342, §3.1.7 (emphasis added).

The authorizing Acts for the IHNC and the IHNC Lock are not Flood Control Act

legislation. *Id.* at §§3.1.1, 3.1.7.

Additionally, the construction of levee "tie ins" for a navigation project to connect it to a

preexisting flood construction project did not change the character of the navigation project to

flood protection. Rather, the Corps repeatedly testified that the navigation never became a flood

control project. Plaintiffs' Exh. 5 at 81:20-82:8 (Manguno Depo.); *see also* USA Exh. 9 at

93:10-95:25 (DiCharry Depo.).

**34. The Secretary of the Army approved the project in 1998 and appropriations for construction followed.[35]**

Disputed to the extent that this implies all appropriations necessary for this project were

funded upon internal approval of the Record of Decision (ROD). Although the Lock Expansion

Project proposed a phased construction sequence for its major elements, the Corps only obtained

funding from the relevant general cargo and inland navigation interests to pursue only two

phases prior to Katrina. Those phases were:

1)      assessment of the existing conditions of the IHNC; and

2)      site preparation including tree removal, demolition and
        relocation of the US Coast Guard station, removal of the
        Galvez Street Wharf, and the relocation of the business along
        the east side of the IHNC,

Plaintiffs' Exh. 2 at p. 119, MVD-006-000000281 (MRGO New Lock and Connecting
Channels Evaluation Report).

---

[35]*ACORN,* 2000 WL 433332, at *8; *see also* USACE Fact Sheet: Community Impact Mitigation
Plan, IHNC Lock Replacement Project (Aug. 3, 2001) [Ex. 16].

Proposed, yet unfunded and uninitiated phases of construction for the project included:

    1)      construction of new bridges at Florida Avenue;

    2)      the construction of the new levees and floodwalls tying the MRL to the new expanded lock location and ensuring continued hurricane protection on the tidewater side in light of the modified lock location;

    3)      construction of the navigation bypass channel;

    4)      site preparation, including excavation for the lock and construction of the pile foundation and preparation for the precast lock modules.

*Id.*.

As part of the unfunded and uninitiated sequence of construction for the design of the Expanded Lock, The Corps anticipated demolition of the MRL to connect the levees to the new profile of the lock when financing became available. If funded, this would have necessitated expanding the MRL approximately 2500 feet on both the east and west banks of the IHNC. The project plan required that when the alterations were to be completed the reconstructed levees were to be constructed to elevation 22.4 feet NGVD. Plaintiffs' Exh. 2 at p. 112 MVD-006-000000274 (MRGO New Lock and Connecting Channels Evaluation Report). As noted, this levee feature of the Lock Project was never funded or accomplished. USA Exh. 9 at 33:8-14 (DiCharry Depo.).

**35.    It was anticipated that "[t]he lock project will involve reconstruction of a portion of the [LPV] protection and/or tying the hurricane protection back to the new lock in order to maintain the integrity of the hurricane protection system."[36]**

---

[36] 1 New Lock Eval. 10 [Ex. 1]; Dicharry 32:1 – 33:7 [Ex. 9].

Disputed to the extent that this statement implies that the IHNC lock was intended as a flood control device.  Rather the lock was a component of The Water Resources Development Act of 1986 (PL 99-662) which emphasized that the IHNC Lock Expansion Project was expressly a cargo and inland navigation project:

> The Water Resources Development Act of 1986 (PL 99-662) modified the [IHNC lock expansion] project and changed the **cost sharing arrangement**. The Act specifies that the cost of the Lock shall be allocated **between general cargo navigation and in land navigation**.  The shallow draft cost would be funded 50 percent from the general funds of the US Treasury and 50 percent from the Inland Waterway Trust Fund….  The Act provides that the lock and connecting channels shall be in the area of the existing lock or at the Violet site

Plaintiffs' Exh. 2 at MVD-006-342, §3.1.7 (emphasis added).

The authorizing Acts for the IHNC and the IHNC Lock are not Flood Control Act legislation.  *Id.* at §§3.1.1, 3.1.7.

Additionally, the construction of levee "tie ins" for a navigation project to connect it to a preexisting flood construction project did not change the character of the navigation project to flood protection.  Rather, the Corps repeatedly testified that the navigation never became a flood control project.  Plaintiffs' Exh. 5 at 81:20-82:8 (Manguno Depo.); *see also* USA Exh. 9 at 93:10-95:25 (DiCharry Depo.).

**Total Environmental Restoration Contract**

**36.     Remediation of the debris and contaminated soils at the EBIA was required to continue construction on the new lock and bypass channel.  This remediation task became known as Task Order 26.[37]**

Undisputed.

---

[37]WGI SOF ¶¶ 28-29 [Ex. 10].

**37.    "[F]or the sake of time, expediency, [and] expertise," the Corps chose to utilize Washington Group International, Inc.'s ("WGI") Total Environmental Restoration Contract ("TERC") that was based in the Corps' Tulsa District to complete the EBIA clean-up.  The cost reimbursable nature of the TERC was "highly desirable" because it provided "[f]lexibility for the Corps to accomplish the work within the time and money [allotted], and . . . to handle unknowns, unknown contamination, unknown debris, unknown foundations," that might be discovered in the course of performing the contract.[38]**

Disputed to the extent that this statement implies that cost analysis supplants the priority and requirement for basic engineering and safety analysis.

**38.    The cost-reimbursable nature of the TERC required the Corps to "monitor, work with the contractor in a team type approach, to track all costs, labor, equipment, [and] personnel."[39]**

Disputed to the extent that this statement implies that cost analysis supplants the priority and requirement for basic engineering and safety analysis.

**39.    Because the TERC was a cost-reimbursable contract, the Corps' on-site Task Order representative always had to "know what was being spent and why it was being spent," to decide if the contractor's proposed activities were "justifiable or not."[40]**

Disputed to the extent that this statement implies that cost analysis supplants the priority and requirement for basic engineering and safety analysis.

---

[38]WGI SOF ¶ 25 [Ex. 10].

[39] WGI SOF ¶ 26 [Ex. 10].

[40] WGI SOF ¶ 27 [Ex. 10].

**40.   The cost-reimbursable contract allowed the Corps to balance the cost of the project against the  available funds.[41]**

Disputed to the extent that this statement implies that cost analysis supplants the priority and requirement for basic engineering and safety analysis.

**<u>Corps Actors</u>**

**41.   Two primary individuals were responsible for the Corps' actions on Task Order 26 – Lee Guillory and James Montegut.[42]**

Undisputed.

**42.   Lee Guillory, a professional engineer in the Construction Division of the Corps in New Orleans and a Functional Team Leader for the Lock Replacement project, was the Contracting Officer Representative ("COR") for Task Order 26.[43]**

Undisputed.

**43.  Prior to Task Order 26, Guillory had "extensive experience of six years of being a project engineer on the ground in different area offices, supervising, monitoring and administrating construction contracts for earthen levees, hurricane protection levees . . . and major navigational structures."  From this experience, he understood "how levees and floodwalls are built in New Orleans."[44]**

Disputed to the extent that this statement implies that the Corps performed the mandated engineering analyses along the EBIA.

---

[41]*See* Roe 126:15 – 129:2 [Ex. 17]; 1 Guillory 146:3-14 [Ex. 18].

[42]*Katrina,* 2008 WL 5234369, at *3.

[43]*Id.*

[44]WGI SOF ¶ 37 (Ex. 10).

Mr. Grieshaber testified that the Corps would perform engineering analyses on the wall stability, seepage, and global stability to make certain that the excavations do no impact any adjacent flood control structures.  Plaintiffs' Exh. 16 at 53:4-12; 54:2-13; 60:24-62:6; 70:5-73:11; 75:14-77:25; 88:7-21; 90:14-91:10; 94:21-96:15; 103:3-14; 123:5-124:7; 147:1-148:14; 159:20-160:25; 168:9-22; 173:8-174:19 (Grieshaber Depo Vol. I).  Mr. Guillory, however, testified that neither the Corps nor its contractor, WGI, performed any analysis of the engineering requirements of construction in the proximity to floodwalls and levees where the excavations at the Boland and Saucer Marine locations occurred.  USA Exh. 18 at 157:24-170:9; 171:18-172:11; 197:17-198:16; 203:21-205:12; 206:23-207:10 (Guillory Depo. Vol. I); USA Exh. 9 at 42:7-43:3 (DiCharry Depo.).  Rather, his testimony was that the Corps only studied the potential impacts that the proposed excavations and borrow sites could have on the adjacent Jourdan Avenue floodwall and levee to make certain that such work was "safe for the levee." USA Exh. 18 at 164:19-166:12 (Guillory Depo. Vol. I).

The requirement for a proper analysis on levee and floodwall stability at the EBIA site is further buttressed by the Corps's own engineering regulations.  Specifically, Engineer Regulation ("ER") 1110-2-1150 defines the engineering responsibilities, requirements, and procedures during the planning, design, construction and operations phases of civil works projects.  USA Exh. 33.  This regulation is *mandatory*.  *Id.* at p. 23, §19.1.1; *see also* USA Exh. 12 at 64:2-11; 82:2-23 (Grieshaber Depo. Vol. II).  This regulation places responsibility for the technical content and engineering sufficiency of all engineering products with the Chief of the Engineering organization.

This regulation further specifies that a Project Delivery Team be established for the project, which consists of a Project Manager and the technical personnel necessary to develop

the project.  *Id.* at p. 3, §7.  The Corps specifies the utilization of five phases to present the engineering and design policy and process that applies to the project.  *Id.* at p. 5, §11.  These five phases are identified as reconnaissance; feasibility; preconstruction; engineering and design; and construction, operation and maintenance.  *Id.*

The 1997 MRGO New Lock and Connecting Channels Evaluation Report was developed to provide guidance for the overall lock replacement project.  In addition, the Corps developed a 1999 Design Documentation Report (DDR).  USA Exh. 33 at p. 3, §8.2 (ER 1110-2-1150).  The DDR is "a record of final design effort after the feasibility phase" and is "required for all engineering design products."  *Id.*  It "provides the technical basis for the plans and specifications and serves as a summary of the final design."  *Id.*  As a result of these two reports, the overall scope of the project was established before WGI became involved; however, it did not include geotechnical evaluations regarding excavations below five feet and the effects that underseepage could have on adjacent floodwalls.

WGI was engaged through Task Order 26 to evaluate the prior documentation relative to the EBIA and develop a Recommendation Report that the Army Corps could use to analyze the scope of work to be done at the Hazardous Toxic Radioactive Waste site, with a requirement that it identify any data gaps in the supplied information that needed further evaluation.  But even as WGI identified these relevant data gaps, the Army Corps did not undertake further geotechnical evaluation.  Until the end of 2000, this was immaterial as the deepest excavation contemplated and evaluated was to a depth of approximately eight feet.  USA Exh. 18 at 80:5-81:8 (Guillory Depo. Vol. I).  However immaterial it was at that time, the failure of the Army Corps to submit the excavation plans developed by WGI to the Engineering Department violated mandatory Corps's regulations.

Specifically, section 16.1 of ER 1110-2-1150 requires that "engineering support shall be provided to those maintenance activities that require [plans and specifications]..." as support for operations activities.  USA Exh. 33 at p. 21, §16.1.  This engineering support was required to be provided to review "operational deviations, identify and address project deficiencies, and evaluate replacement plans."  *Id.*  Any "deviations ... of any portion of a project" were required to be "reviewed and approved by engineering."  *Id.* at §16.4.

Lee Guillory, the Project Manager and head of the Project Delivery team, failed to follow this regulation.  He did not ask the geotechnical division of the engineering division to evaluate the plan that was submitted by WGI for removal of the sewer lift station.  USA Exh. 18 at 153:25-154:7; 157:24-158:12; 198:6-16 (Guillory Depo. Vol. I).  Rather, Guillory testified that George Bacuta, a geochemist, was tasked with reviewing the excavation plan.  *Id.* at 188:8-189:1.  In fact, however, Bacuta never reviewed the excavation plan.  USA Exh. 29 at 142:21-25 (Bacuta Depo.).

Here we see that not only did the head of the team fail to follow mandatory regulation in having this deviation from the original plan evaluated by the engineering department, but evidently no geotechnical analysis whatsoever was done.  Ultimately, the southern breach of the flood wall took place adjacent to this deep excavation.  Plaintiffs' Exh. 17 at pp. 22-31 (Bea Tech. Report V, Jan. 2009).

The northern breach occurred adjacent to a deep excavation of the "wedding cake" structure at the Boland Marine site.  This excavation plan also deviated from the DDR and, similarly, Mr. Guillory failed to comply with ER 1110-2-1150 by presenting the excavation plan to the Corps's Engineering Department.  USA Exh. 18 at 206:23-207:10 (Guillory Depo. Vol. I). This reckless disregard for the Engineering Regulation led to *no* analysis being performed to

evaluate underseepage below the sheet pile curtains at the locations of the north breach site. USA Exh. 29 at 176:20-179:12 (Bacuta Depo.).

According to the Plaintiffs' expert Robert Bea, this underseepage is exactly what caused or contributed to the breach at the Boland Marine site. Plaintiffs' Exh. 17 at pp. 1-21 (Bea Tech. Report V, Jan. 2009).

The regulation that Mr. Guillory should have observed was Engineering Regulation 1110-1-8157. USA Exh. 34. This regulation "*prescribes* Geotechnical Data Quality Management (GDQM) *responsibilities and requirements*, from initial investigation through closeout at sites contaminated with hazardous, toxic, and radioactive waste." *Id.* at p. 1, §1. (emphasis added). The utilization of this regulation is "to assure that a site is sufficiently characterized, and the geotechnical data of acceptable quality are obtained and used properly within the project." *Id.* To accomplish this goal, the regulation mandates a number of relevant geotechnical requirements.

In particular, ER 1110-1-8157 required that "[all] geotechnical input, review or confirmation of no geotechnical involvement will be certified in a project specific Project Management Plan." *Id.* at p. 2, §8(a). This required a review of existing site data and technical literature, and the usability of this data needed to be evaluated. *Id.* at p. 3, §8(a)(2). The regulation further required that the products generated from project activities "*shall be reviewed and approved by project geotechnical personnel for compliance....*" *Id*. at p. 3, §8(a)(3) (emphasis added). "Geotechnical input *must also be obtained* for design services such as…plans and specifications, where the project involves any earthwork or work related to the subsurface." *Id*. at p. 3, §8(a)(4) (emphasis added).

As Lee Guillory and George Bacuta testified, these requirements were not met.  USA

Exh. 18 at 153:25-154:7; 157:24-158:12; 198:6-16; 206:23-207:10 (Guillory Depo. Vol. I); USA

Exh. 29 at 142:21-25; 176:20-179:12 (Bacuta Depo.).

ER 1110-1-8157 also detailed the oversight and quality assurance testing of geotechnical

work required for the Corps's construction projects.  USA Exh. 34 at pp. 5-6.  The Corps

appointed Alvin Clouatre as the quality assurance representative for the project.  USA Exh. 30 at

55:13-25 (Clouatre Depo.).  However, Mr. Clouatre was not qualified for this position due to the

technical nature of the project.  USA Exh. 30 at 90:10-92:8 (Clouatre Depo.).  ER 1110-1-8157

mandates that if field oversight on an HTRW site done by someone "other than project

geotechnical personnel, the project delivery team will prepare *Engineering Considerations and

Instruction* (ECI)."  USA Exh. 34 at p. 6, §8(i)(3).  It has already been established the Corps did

not have a geotechnical person performing field oversight, and there were no *Engineering

Considerations and Instruction* developed or provided to Mr. Clouatre.

Additional engineering mandates that the Corps failed to follow can also be found in

engineering manual (EM 1110-2-5027), which outlines the field investigations and design

studies that the Corps was expected to undergo when proposing work in the vicinity of levees

and floodwalls.  Plaintiffs' Exh. 14 (EM 1110-2-5027 Confined Disposal of Dredged Materials

Engineering Manual).  In particular, the manual states that field investigations and design studies

should be "more extensive where *the consequences of the failure involve life, property, or

damage to the environment are great.*"  *Id.* at p. 6-4 (emphasis added).

EM 1110-2-5027 further states that the "design of a foundation of a levee require

specialized knowledge in soil mechanics" adding that "all designs and specifications should be

prepared under the direct supervision and guidance of a geotechnical engineer and should bear

his approval." *Id.* at p. 6-10, §6-4.  The manual also specifically addresses the critical safety issues associated with seepage and levee and dike failure.  *Id.* at 6-11 through 6-17.

These basic engineering principles, however, were disregarded as Guillory, the project manager, failed to ask the geotechnical division of the engineering department to evaluate the relevant excavation plans that were submitted by the contractor.  USA Exh. 18 at 157:24-170:9; 171:18-172:11; 197:17-198:16; 203:21-205:12; 206:23-207:10 (Guillory Depo. Vol. I); USA Exh. 9 at 42:7-43:3 (DiCharry Depo.).  Thus, no geotechnical analysis relative to underseepage was performed at either excavation adjacent to the flood wall failure sites.

Rather, the only evaluation that the Corps's Engineering Division performed regarding the structural stability of the environmental remedial excavating work done on the EBIA in connection with Task Order 26 of the TERC was to evaluate an excavation footprint of 25 feet wide and 3 feet deep in areas not closer than 15 feet from the Jourdan Avenue floodwall/levee. *Id.*

While the Corps's Engineering Division assessed "soil backfill and compaction requirements" for the three foot deep contaminant excavations, it failed to perform a similar evaluation for the completion backfill at the much deeper structural removal excavations at Saucer and Boland.  USA Exh. 18 at 170:10-24; 203:21-207:10 (Guillory Depo. Vol. I).

In addition, other Corps Engineering Manuals highlight the need to perform specific engineering evaluations of the mechanisms of levee failure and the effects of construction in the vicinity of the levees on the "Factor of Safety" for the flood control structures.  *See* Plaintiffs' Exh. 11 at pp. 5-1, 6-6, 8-7 to 8-8 (EM 1110-2-1913 Design and Construction of Levees (1978)) (detailing minimum acceptable factor of safety and underseepage issues); Plaintiffs' Exh. 20 at 7-3 "General Considerations," 7-25 (g) (Engineering and Design, Retaining and Flood Walls,

EM 1110-2-2502, September 29, 1989) (seepage and wall stability); Plaintiffs Exh. 21 at 9-1

"General" (Engineering and Design, Seepage Analysis and Control for Dams, EM 1110-2-1901,

April 30, 1993) (seepage control); and Plaintiffs Exh. 22 at 4-6 (Engineering and Design, Design

of Sheet Pile Walls, EM 1110-2-2504, March 31, 1994).  Collectively, these specific, applicable

engineering standards mandated that any foundation condition that may impact the seepage

potential under a levee must be evaluated.  Plaintiffs' Exh. 18 at pp. 3-8 (Bea Tech. Report IV,

July 2008).

**44.     Guillory served as both COR and Construction Manager, and was**
**"instrumental in the planning, direction, coordination, execution and construction**
**management" of Task Order 26.[45]**

Disputed to the extent that this statement implies that the Corps performed the mandated

engineering analyses along the EBIA.

Mr. Grieshaber testified that the Corps would perform engineering analyses on the wall

stability, seepage, and global stability to make certain that the excavations do no impact any

adjacent flood control structures.  Plaintiffs' Exh. 16 at 53:4-12; 54:2-13; 60:24-62:6; 70:5-

73:11; 75:14-77:25; 88:7-21; 90:14-91:10; 94:21-96:15; 103:3-14; 123:5-124:7; 147:1-148:14;

159:20-160:25; 168:9-22; 173:8-174:19 (Grieshaber Depo Vol. I).  Mr. Guillory, however,

testified that neither the Corps nor its contractor, WGI, performed any analysis of the

engineering requirements of construction in the proximity to floodwalls and levees where the

excavations at the Boland and Saucer Marine locations occurred.  USA Exh. 18 at 157:24-170:9;

171:18-172:11; 197:17-198:16; 203:21-205:12; 206:23-207:10 (Guillory Depo. Vol. I); USA

Exh. 9 at 42:7-43:3 (DiCharry Depo.).  Rather, his testimony was that the Corps only studied the

---

[45]2008 WL 5234369, at *8.

potential impacts that the proposed excavations and borrow sites could have on the adjacent

Jourdan Avenue floodwall and levee to make certain that such work was "safe for the levee."

USA Exh. 18 at 164:19-166:12 (Guillory Depo. Vol. I).

The requirement for a proper analysis on levee and floodwall stability at the EBIA site is

further buttressed by the Corps's own engineering regulations.  Specifically, Engineer

Regulation ("ER") 1110-2-1150 defines the engineering responsibilities, requirements, and

procedures during the planning, design, construction and operations phases of civil works

projects.  USA Exh. 33.  This regulation is *mandatory*.  *Id.* at p. 23, §19.1.1; *see also* USA Exh.

12 at 64:2-11; 82:2-23 (Grieshaber Depo. Vol. II).  This regulation places responsibility for the

technical content and engineering sufficiency of all engineering products with the Chief of the

Engineering organization.

This regulation further specifies that a Project Delivery Team be established for the

project, which consists of a Project Manager and the technical personnel necessary to develop

the project.  *Id.* at p. 3, §7.  The Corps specifies the utilization of five phases to present the

engineering and design policy and process that applies to the project.  *Id.* at p. 5, §11.  These five

phases are identified as reconnaissance; feasibility; preconstruction; engineering and design; and

construction, operation and maintenance.  *Id.*

The 1997 MRGO New Lock and Connecting Channels Evaluation Report was developed

to provide guidance for the overall lock replacement project.  In addition, the Corps developed a

1999 Design Documentation Report (DDR).  USA Exh. 33 at p. 3, §8.2 (ER 1110-2-1150).  The

DDR is "a record of final design effort after the feasibility phase" and is "required for all

engineering design products."  *Id.*  It "provides the technical basis for the plans and

specifications and serves as a summary of the final design."  *Id.*  As a result of these two reports,

the overall scope of the project was established before WGI became involved; however, it did not include geotechnical evaluations regarding excavations below five feet and the effects that underseepage could have on adjacent floodwalls.

WGI was engaged through Task Order 26 to evaluate the prior documentation relative to the EBIA and develop a Recommendation Report that the Army Corps could use to analyze the scope of work to be done at the Hazardous Toxic Radioactive Waste site, with a requirement that it identify any data gaps in the supplied information that needed further evaluation. But even as WGI identified these relevant data gaps, the Army Corps did not undertake further geotechnical evaluation. Until the end of 2000, this was immaterial as the deepest excavation contemplated and evaluated was to a depth of approximately eight feet. USA Exh. 18 at 80:5-81:8 (Guillory Depo. Vol. I). However immaterial it was at that time, the failure of the Army Corps to submit the excavation plans developed by WGI to the Engineering Department violated mandatory Corps's regulations.

Specifically, section 16.1 of ER 1110-2-1150 requires that "engineering support shall be provided to those maintenance activities that require [plans and specifications]..." as support for operations activities. USA Exh. 33 at p. 21, §16.1. This engineering support was required to be provided to review "operational deviations, identify and address project deficiencies, and evaluate replacement plans." *Id.* Any "deviations ... of any portion of a project" were required to be "reviewed and approved by engineering." *Id.* at §16.4.

Lee Guillory, the Project Manager and head of the Project Delivery team, failed to follow this regulation. He did not ask the geotechnical division of the engineering division to evaluate the plan that was submitted by WGI for removal of the sewer lift station. USA Exh. 18 at 153:25-154:7; 157:24-158:12; 198:6-16 (Guillory Depo. Vol. I). Rather, Guillory testified that

George Bacuta, a geochemist, was tasked with reviewing the excavation plan. *Id.* at 188:8-189:1. In fact, however, Bacuta never reviewed the excavation plan. USA Exh. 29 at 142:21-25 (Bacuta Depo.).

Here we see that not only did the head of the team fail to follow mandatory regulation in having this deviation from the original plan evaluated by the engineering department, but evidently no geotechnical analysis whatsoever was done. Ultimately, the southern breach of the flood wall took place adjacent to this deep excavation. Plaintiffs' Exh. 17 at pp. 22-31 (Bea Tech. Report V, Jan. 2009).

The northern breach occurred adjacent to a deep excavation of the "wedding cake" structure at the Boland Marine site. This excavation plan also deviated from the DDR and, similarly, Mr. Guillory failed to comply with ER 1110-2-1150 by presenting the excavation plan to the Corps's Engineering Department. USA Exh. 18 at 206:23-207:10 (Guillory Depo. Vol. I). This reckless disregard for the Engineering Regulation led to *no* analysis being performed to evaluate underseepage below the sheet pile curtains at the locations of the north breach site. USA Exh. 29 at 176:20-179:12 (Bacuta Depo.).

According to the Plaintiffs' expert Robert Bea, this underseepage is exactly what caused or contributed to the breach at the Boland Marine site. Plaintiffs' Exh. 17 at pp. 1-21 (Bea Tech. Report V, Jan. 2009).

The regulation that Mr. Guillory should have observed was Engineering Regulation 1110-1-8157. USA Exh. 34. This regulation "*prescribes* Geotechnical Data Quality Management (GDQM) *responsibilities and requirements*, from initial investigation through closeout at sites contaminated with hazardous, toxic, and radioactive waste." *Id.* at p. 1, §1. (emphasis added). The utilization of this regulation is "to assure that a site is sufficiently

characterized, and the geotechnical data of acceptable quality are obtained and used properly within the project." *Id.* To accomplish this goal, the regulation mandates a number of relevant geotechnical requirements.

In particular, ER 1110-1-8157 required that "[all] geotechnical input, review or confirmation of no geotechnical involvement will be certified in a project specific Project Management Plan." *Id.* at p. 2, §8(a). This required a review of existing site data and technical literature, and the usability of this data needed to be evaluated. *Id.* at p. 3, §8(a)(2). The regulation further required that the products generated from project activities "*shall be reviewed and approved by project geotechnical personnel for compliance....*" *Id.* at p. 3, §8(a)(3) (emphasis added). "Geotechnical input *must also be obtained* for design services such as…plans and specifications, where the project involves any earthwork or work related to the subsurface." *Id.* at p. 3, §8(a)(4) (emphasis added).

As Lee Guillory and George Bacuta testified, these requirements were not met. USA Exh. 18 at 153:25-154:7; 157:24-158:12; 198:6-16; 206:23-207:10 (Guillory Depo. Vol. I); USA Exh. 29 at 142:21-25; 176:20-179:12 (Bacuta Depo.).

ER 1110-1-8157 also detailed the oversight and quality assurance testing of geotechnical work required for the Corps's construction projects. USA Exh. 34 at pp. 5-6. The Corps appointed Alvin Clouatre as the quality assurance representative for the project. USA Exh. 30 at 55:13-25 (Clouatre Depo.). However, Mr. Clouatre was not qualified for this position due to the technical nature of the project. USA Exh. 30 at 90:10-92:8 (Clouatre Depo.). ER 1110-1-8157 mandates that if field oversight on an HTRW site done by someone "other than project geotechnical personnel, the project delivery team will prepare *Engineering Considerations and Instruction* (ECI)." USA Exh. 34 at p. 6, §8(i)(3). It has already been established the Corps did

not have a geotechnical person performing field oversight, and there were no *Engineering Considerations and Instruction* developed or provided to Mr. Clouatre.

Additional engineering mandates that the Corps failed to follow can also be found in engineering manual (EM 1110-2-5027), which outlines the field investigations and design studies that the Corps was expected to undergo when proposing work in the vicinity of levees and floodwalls.  Plaintiffs' Exh. 14 (EM 1110-2-5027 Confined Disposal of Dredged Materials Engineering Manual).  In particular, the manual states that field investigations and design studies should be "more extensive where *the consequences of the failure involve life, property, or damage to the environment are great.*"  *Id.* at p. 6-4 (emphasis added).

EM 1110-2-5027 further states that the "design of a foundation of a levee require specialized knowledge in soil mechanics" adding that "all designs and specifications should be prepared under the direct supervision and guidance of a geotechnical engineer and should bear his approval."  *Id.* at p. 6-10, §6-4.  The manual also specifically addresses the critical safety issues associated with seepage and levee and dike failure.  *Id.* at 6-11 through 6-17.

These basic engineering principles, however, were disregarded as Guillory, the project manager, failed to ask the geotechnical division of the engineering department to evaluate the relevant excavation plans that were submitted by the contractor.  USA Exh. 18 at 157:24-170:9; 171:18-172:11; 197:17-198:16; 203:21-205:12; 206:23-207:10 (Guillory Depo. Vol. I); USA Exh. 9 at 42:7-43:3 (DiCharry Depo.).  Thus, no geotechnical analysis relative to underseepage was performed at either excavation adjacent to the flood wall failure sites.

Rather, the only evaluation that the Corps's Engineering Division performed regarding the structural stability of the environmental remedial excavating work done on the EBIA in connection with Task Order 26 of the TERC was to evaluate an excavation footprint of 25 feet

wide and 3 feet deep in areas not closer than 15 feet from the Jourdan Avenue floodwall/levee. *Id.*

While the Corps's Engineering Division assessed "soil backfill and compaction requirements" for the three foot deep contaminant excavations, it failed to perform a similar evaluation for the completion backfill at the much deeper structural removal excavations at Saucer and Boland.  USA Exh. 18 at 170:10-24; 203:21-207:10 (Guillory Depo. Vol. I).

In addition, other Corps Engineering Manuals highlight the need to perform specific engineering evaluations of the mechanisms of levee failure and the effects of construction in the vicinity of the levees on the "Factor of Safety" for the flood control structures.  *See* Plaintiffs' Exh. 11 at pp. 5-1, 6-6, 8-7 to 8-8 (EM 1110-2-1913 Design and Construction of Levees (1978)) (detailing minimum acceptable factor of safety and underseepage issues); Plaintiffs' Exh. 20 at 7-3 "General Considerations," 7-25 (g) (Engineering and Design, Retaining and Flood Walls, EM 1110-2-2502, September 29, 1989) (seepage and wall stability); Plaintiffs Exh. 21 at 9-1 "General" (Engineering and Design, Seepage Analysis and Control for Dams, EM 1110-2-1901, April 30, 1993) (seepage control); and Plaintiffs Exh. 22 at 4-6 (Engineering and Design, Design of Sheet Pile Walls, EM 1110-2-2504, March 31, 1994).  Collectively, these specific, applicable engineering standards mandated that any foundation condition that may impact the seepage potential under a levee must be evaluated.  Plaintiffs' Exh. 18 at pp. 3-8 (Bea Tech. Report IV, July 2008).

**45.  As COR, the Corp designated Guillory to perform the following function on Task Order 26:**

**(1)     verify that WGI performed the technical requirements of the project in accordance with the contract terms and specifications;**

36

**(2)      conduct inspections of the work site through the project to assess WGI's performance;**

**(3)      maintain liaison and direct communications with WGI; and**

**(4)      where work deficiencies or other problems were observed, record and report the incidents to the Contracting Officer, notify WGI of the deficiencies, and direct appropriate action to effect correction. [46]**

Disputed to the extent that this statement implies that the Corps performed the mandated engineering analyses along the EBIA.

Mr. Grieshaber testified that the Corps would perform engineering analyses on the wall stability, seepage, and global stability to make certain that the excavations do no impact any adjacent flood control structures.  Plaintiffs' Exh. 16 at 53:4-12; 54:2-13; 60:24-62:6; 70:5-73:11; 75:14-77:25; 88:7-21; 90:14-91:10; 94:21-96:15; 103:3-14; 123:5-124:7; 147:1-148:14; 159:20-160:25; 168:9-22; 173:8-174:19 (Grieshaber Depo Vol. I).  Mr. Guillory, however, testified that neither the Corps nor its contractor, WGI, performed any analysis of the engineering requirements of construction in the proximity to floodwalls and levees where the excavations at the Boland and Saucer Marine locations occurred.  USA Exh. 18 at 157:24-170:9; 171:18-172:11; 197:17-198:16; 203:21-205:12; 206:23-207:10 (Guillory Depo. Vol. I); USA Exh. 9 at 42:7-43:3 (DiCharry Depo.).  Rather, his testimony was that the Corps only studied the potential impacts that the proposed excavations and borrow sites could have on the adjacent Jourdan Avenue floodwall and levee to make certain that such work was "safe for the levee." USA Exh. 18 at 164:19-166:12 (Guillory Depo. Vol. I).

---

[46]*Id.* at *3-4.

The requirement for a proper analysis on levee and floodwall stability at the EBIA site is further buttressed by the Corps's own engineering regulations. Specifically, Engineer Regulation ("ER") 1110-2-1150 defines the engineering responsibilities, requirements, and procedures during the planning, design, construction and operations phases of civil works projects. USA Exh. 33. This regulation is *mandatory*. *Id.* at p. 23, §19.1.1; *see also* USA Exh. 12 at 64:2-11; 82:2-23 (Grieshaber Depo. Vol. II). This regulation places responsibility for the technical content and engineering sufficiency of all engineering products with the Chief of the Engineering organization.

This regulation further specifies that a Project Delivery Team be established for the project, which consists of a Project Manager and the technical personnel necessary to develop the project. *Id.* at p. 3, §7. The Corps specifies the utilization of five phases to present the engineering and design policy and process that applies to the project. *Id.* at p. 5, §11. These five phases are identified as reconnaissance; feasibility; preconstruction; engineering and design; and construction, operation and maintenance. *Id.*

The 1997 MRGO New Lock and Connecting Channels Evaluation Report was developed to provide guidance for the overall lock replacement project. In addition, the Corps developed a 1999 Design Documentation Report (DDR). USA Exh. 33 at p. 3, §8.2 (ER 1110-2-1150). The DDR is "a record of final design effort after the feasibility phase" and is "required for all engineering design products." *Id.* It "provides the technical basis for the plans and specifications and serves as a summary of the final design." *Id.* As a result of these two reports, the overall scope of the project was established before WGI became involved; however, it did not include geotechnical evaluations regarding excavations below five feet and the effects that underseepage could have on adjacent floodwalls.

WGI was engaged through Task Order 26 to evaluate the prior documentation relative to the EBIA and develop a Recommendation Report that the Army Corps could use to analyze the scope of work to be done at the Hazardous Toxic Radioactive Waste site, with a requirement that it identify any data gaps in the supplied information that needed further evaluation. But even as WGI identified these relevant data gaps, the Army Corps did not undertake further geotechnical evaluation. Until the end of 2000, this was immaterial as the deepest excavation contemplated and evaluated was to a depth of approximately eight feet. USA Exh. 18 at 80:5-81:8 (Guillory Depo. Vol. I). However immaterial it was at that time, the failure of the Army Corps to submit the excavation plans developed by WGI to the Engineering Department violated mandatory Corps's regulations.

Specifically, section 16.1 of ER 1110-2-1150 requires that "engineering support shall be provided to those maintenance activities that require [plans and specifications]..." as support for operations activities. USA Exh. 33 at p. 21, §16.1. This engineering support was required to be provided to review "operational deviations, identify and address project deficiencies, and evaluate replacement plans." *Id.* Any "deviations ... of any portion of a project" were required to be "reviewed and approved by engineering." *Id.* at §16.4.

Lee Guillory, the Project Manager and head of the Project Delivery team, failed to follow this regulation. He did not ask the geotechnical division of the engineering division to evaluate the plan that was submitted by WGI for removal of the sewer lift station. USA Exh. 18 at 153:25-154:7; 157:24-158:12; 198:6-16 (Guillory Depo. Vol. I). Rather, Guillory testified that George Bacuta, a geochemist, was tasked with reviewing the excavation plan. *Id.* at 188:8-189:1. In fact, however, Bacuta never reviewed the excavation plan. USA Exh. 29 at 142:21-25 (Bacuta Depo.).

Here we see that not only did the head of the team fail to follow mandatory regulation in having this deviation from the original plan evaluated by the engineering department, but evidently no geotechnical analysis whatsoever was done. Ultimately, the southern breach of the flood wall took place adjacent to this deep excavation. Plaintiffs' Exh. 17 at pp. 22-31 (Bea Tech. Report V, Jan. 2009).

The northern breach occurred adjacent to a deep excavation of the "wedding cake" structure at the Boland Marine site. This excavation plan also deviated from the DDR and, similarly, Mr. Guillory failed to comply with ER 1110-2-1150 by presenting the excavation plan to the Corps's Engineering Department. USA Exh. 18 at 206:23-207:10 (Guillory Depo. Vol. I). This reckless disregard for the Engineering Regulation led to *no* analysis being performed to evaluate underseepage below the sheet pile curtains at the locations of the north breach site. USA Exh. 29 at 176:20-179:12 (Bacuta Depo.).

According to the Plaintiffs' expert Robert Bea, this underseepage is exactly what caused or contributed to the breach at the Boland Marine site. Plaintiffs' Exh. 17 at pp. 1-21 (Bea Tech. Report V, Jan. 2009).

The regulation that Mr. Guillory should have observed was Engineering Regulation 1110-1-8157. USA Exh. 34. This regulation "*prescribes* Geotechnical Data Quality Management (GDQM) *responsibilities and requirements*, from initial investigation through closeout at sites contaminated with hazardous, toxic, and radioactive waste." *Id.* at p. 1, §1. (emphasis added). The utilization of this regulation is "to assure that a site is sufficiently characterized, and the geotechnical data of acceptable quality are obtained and used properly within the project." *Id.* To accomplish this goal, the regulation mandates a number of relevant geotechnical requirements.

In particular, ER 1110-1-8157 required that "[all] geotechnical input, review or confirmation of no geotechnical involvement will be certified in a project specific Project Management Plan." *Id.* at p. 2, §8(a).  This required a review of existing site data and technical literature, and the usability of this data needed to be evaluated.  *Id.* at p. 3, §8(a)(2).  The regulation further required that the products generated from project activities "*shall be reviewed and approved by project geotechnical personnel for compliance....*"  *Id*. at p. 3, §8(a)(3) (emphasis added).  "Geotechnical input *must also be obtained* for design services such as…plans and specifications, where the project involves any earthwork or work related to the subsurface." *Id*. at p. 3, §8(a)(4) (emphasis added).

As Lee Guillory and George Bacuta testified, these requirements were not met.  USA Exh. 18 at 153:25-154:7; 157:24-158:12; 198:6-16; 206:23-207:10 (Guillory Depo. Vol. I); USA Exh. 29 at 142:21-25; 176:20-179:12 (Bacuta Depo.).

ER 1110-1-8157 also detailed the oversight and quality assurance testing of geotechnical work required for the Corps's construction projects.  USA Exh. 34 at pp. 5-6.  The Corps appointed Alvin Clouatre as the quality assurance representative for the project.  USA Exh. 30 at 55:13-25 (Clouatre Depo.).  However, Mr. Clouatre was not qualified for this position due to the technical nature of the project.  USA Exh. 30 at 90:10-92:8 (Clouatre Depo.).  ER 1110-1-8157 mandates that if field oversight on an HTRW site done by someone "other than project geotechnical personnel, the project delivery team will prepare *Engineering Considerations and Instruction* (ECI)."  USA Exh. 34 at p. 6, §8(i)(3).  It has already been established the Corps did not have a geotechnical person performing field oversight, and there were no *Engineering Considerations and Instruction* developed or provided to Mr. Clouatre.

Additional engineering mandates that the Corps failed to follow can also be found in engineering manual (EM 1110-2-5027), which outlines the field investigations and design studies that the Corps was expected to undergo when proposing work in the vicinity of levees and floodwalls.  Plaintiffs' Exh. 14 (EM 1110-2-5027 Confined Disposal of Dredged Materials Engineering Manual).  In particular, the manual states that field investigations and design studies should be "more extensive where *the consequences of the failure involve life, property, or damage to the environment are great.*"  *Id.* at p. 6-4 (emphasis added).

EM 1110-2-5027 further states that the "design of a foundation of a levee require specialized knowledge in soil mechanics" adding that "all designs and specifications should be prepared under the direct supervision and guidance of a geotechnical engineer and should bear his approval."  *Id.* at p. 6-10, §6-4.  The manual also specifically addresses the critical safety issues associated with seepage and levee and dike failure.  *Id.* at 6-11 through 6-17.

These basic engineering principles, however, were disregarded as Guillory, the project manager, failed to ask the geotechnical division of the engineering department to evaluate the relevant excavation plans that were submitted by the contractor.  USA Exh. 18 at 157:24-170:9; 171:18-172:11; 197:17-198:16; 203:21-205:12; 206:23-207:10 (Guillory Depo. Vol. I); USA Exh. 9 at 42:7-43:3 (DiCharry Depo.).  Thus, no geotechnical analysis relative to underseepage was performed at either excavation adjacent to the flood wall failure sites.

Rather, the only evaluation that the Corps's Engineering Division performed regarding the structural stability of the environmental remedial excavating work done on the EBIA in connection with Task Order 26 of the TERC was to evaluate an excavation footprint of 25 feet wide and 3 feet deep in areas not closer than 15 feet from the Jourdan Avenue floodwall/levee. *Id.*

While the Corps's Engineering Division assessed "soil backfill and compaction requirements" for the three foot deep contaminant excavations, it failed to perform a similar evaluation for the completion backfill at the much deeper structural removal excavations at Saucer and Boland.  USA Exh. 18 at 170:10-24; 203:21-207:10 (Guillory Depo. Vol. I).

In addition, other Corps Engineering Manuals highlight the need to perform specific engineering evaluations of the mechanisms of levee failure and the effects of construction in the vicinity of the levees on the "Factor of Safety" for the flood control structures.  *See* Plaintiffs' Exh. 11 at pp. 5-1, 6-6, 8-7 to 8-8 (EM 1110-2-1913 Design and Construction of Levees (1978)) (detailing minimum acceptable factor of safety and underseepage issues); Plaintiffs' Exh. 20 at 7-3 "General Considerations," 7-25 (g) (Engineering and Design, Retaining and Flood Walls, EM 1110-2-2502, September 29, 1989) (seepage and wall stability); Plaintiffs Exh. 21 at 9-1 "General" (Engineering and Design, Seepage Analysis and Control for Dams, EM 1110-2-1901, April 30, 1993) (seepage control); and Plaintiffs Exh. 22 at 4-6 (Engineering and Design, Design of Sheet Pile Walls, EM 1110-2-2504, March 31, 1994).  Collectively, these specific, applicable engineering standards mandated that any foundation condition that may impact the seepage potential under a levee must be evaluated.  Plaintiffs' Exh. 18 at pp. 3-8 (Bea Tech. Report IV, July 2008).

**46.    Guillory had to exercise judgment and choice in overseeing WGI's performance.[47]**

Disputed to the extent that this statement implies that the Corps performed the mandated engineering analyses along the EBIA.

---

[47]*See* 48 C.F.R. § 1.602-2 (mandating that contracting officers "be allowed wide latitude to exercise business judgment," so that they can "ensure compliance with the terms of the contract, and safeguard[] the interests of the United States.").

Mr. Grieshaber testified that the Corps would perform engineering analyses on the wall stability, seepage, and global stability to make certain that the excavations do no impact any adjacent flood control structures.  Plaintiffs' Exh. 16 at 53:4-12; 54:2-13; 60:24-62:6; 70:5-73:11; 75:14-77:25; 88:7-21; 90:14-91:10; 94:21-96:15; 103:3-14; 123:5-124:7; 147:1-148:14; 159:20-160:25; 168:9-22; 173:8-174:19 (Grieshaber Depo Vol. I).  Mr. Guillory, however, testified that neither the Corps nor its contractor, WGI, performed any analysis of the engineering requirements of construction in the proximity to floodwalls and levees where the excavations at the Boland and Saucer Marine locations occurred.  USA Exh. 18 at 157:24-170:9; 171:18-172:11; 197:17-198:16; 203:21-205:12; 206:23-207:10 (Guillory Depo. Vol. I); USA Exh. 9 at 42:7-43:3 (DiCharry Depo.).  Rather, his testimony was that the Corps only studied the potential impacts that the proposed excavations and borrow sites could have on the adjacent Jourdan Avenue floodwall and levee to make certain that such work was "safe for the levee." USA Exh. 18 at 164:19-166:12 (Guillory Depo. Vol. I).

The requirement for a proper analysis on levee and floodwall stability at the EBIA site is further buttressed by the Corps's own engineering regulations.  Specifically, Engineer Regulation ("ER") 1110-2-1150 defines the engineering responsibilities, requirements, and procedures during the planning, design, construction and operations phases of civil works projects.  USA Exh. 33.  This regulation is *mandatory*.  *Id.* at p. 23, §19.1.1; *see also* USA Exh. 12 at 64:2-11; 82:2-23 (Grieshaber Depo. Vol. II).  This regulation places responsibility for the technical content and engineering sufficiency of all engineering products with the Chief of the Engineering organization.

This regulation further specifies that a Project Delivery Team be established for the project, which consists of a Project Manager and the technical personnel necessary to develop

the project.  *Id.* at p. 3, §7.  The Corps specifies the utilization of five phases to present the engineering and design policy and process that applies to the project.  *Id.* at p. 5, §11.  These five phases are identified as reconnaissance; feasibility; preconstruction; engineering and design; and construction, operation and maintenance.  *Id.*

The 1997 MRGO New Lock and Connecting Channels Evaluation Report was developed to provide guidance for the overall lock replacement project.  In addition, the Corps developed a 1999 Design Documentation Report (DDR).  USA Exh. 33 at p. 3, §8.2 (ER 1110-2-1150).  The DDR is "a record of final design effort after the feasibility phase" and is "required for all engineering design products."  *Id.*  It "provides the technical basis for the plans and specifications and serves as a summary of the final design."  *Id.*  As a result of these two reports, the overall scope of the project was established before WGI became involved; however, it did not include geotechnical evaluations regarding excavations below five feet and the effects that underseepage could have on adjacent floodwalls.

WGI was engaged through Task Order 26 to evaluate the prior documentation relative to the EBIA and develop a Recommendation Report that the Army Corps could use to analyze the scope of work to be done at the Hazardous Toxic Radioactive Waste site, with a requirement that it identify any data gaps in the supplied information that needed further evaluation.  But even as WGI identified these relevant data gaps, the Army Corps did not undertake further geotechnical evaluation.  Until the end of 2000, this was immaterial as the deepest excavation contemplated and evaluated was to a depth of approximately eight feet.  USA Exh. 18 at 80:5-81:8 (Guillory Depo. Vol. I).  However immaterial it was at that time, the failure of the Army Corps to submit the excavation plans developed by WGI to the Engineering Department violated mandatory Corps's regulations.

Specifically, section 16.1 of ER 1110-2-1150 requires that "engineering support shall be provided to those maintenance activities that require [plans and specifications]..." as support for operations activities.  USA Exh. 33 at p. 21, §16.1.  This engineering support was required to be provided to review "operational deviations, identify and address project deficiencies, and evaluate replacement plans."  *Id.*  Any "deviations ... of any portion of a project" were required to be "reviewed and approved by engineering."  *Id.* at §16.4.

Lee Guillory, the Project Manager and head of the Project Delivery team, failed to follow this regulation.  He did not ask the geotechnical division of the engineering division to evaluate the plan that was submitted by WGI for removal of the sewer lift station.  USA Exh. 18 at 153:25-154:7; 157:24-158:12; 198:6-16 (Guillory Depo. Vol. I).  Rather, Guillory testified that George Bacuta, a geochemist, was tasked with reviewing the excavation plan.  *Id.* at 188:8-189:1.  In fact, however, Bacuta never reviewed the excavation plan.  USA Exh. 29 at 142:21-25 (Bacuta Depo.).

Here we see that not only did the head of the team fail to follow mandatory regulation in having this deviation from the original plan evaluated by the engineering department, but evidently no geotechnical analysis whatsoever was done.  Ultimately, the southern breach of the flood wall took place adjacent to this deep excavation.  Plaintiffs' Exh. 17 at pp. 22-31 (Bea Tech. Report V, Jan. 2009).

The northern breach occurred adjacent to a deep excavation of the "wedding cake" structure at the Boland Marine site.  This excavation plan also deviated from the DDR and, similarly, Mr. Guillory failed to comply with ER 1110-2-1150 by presenting the excavation plan to the Corps's Engineering Department.  USA Exh. 18 at 206:23-207:10 (Guillory Depo. Vol. I).  This reckless disregard for the Engineering Regulation led to *no* analysis being performed to

evaluate underseepage below the sheet pile curtains at the locations of the north breach site. USA Exh. 29 at 176:20-179:12 (Bacuta Depo.).

According to the Plaintiffs' expert Robert Bea, this underseepage is exactly what caused or contributed to the breach at the Boland Marine site.  Plaintiffs' Exh. 17 at pp. 1-21 (Bea Tech. Report V, Jan. 2009).

The regulation that Mr. Guillory should have observed was Engineering Regulation 1110-1-8157.  USA Exh. 34.  This regulation "*prescribes* Geotechnical Data Quality Management (GDQM) *responsibilities and requirements*, from initial investigation through closeout at sites contaminated with hazardous, toxic, and radioactive waste." *Id.* at p. 1, §1. (emphasis added).  The utilization of this regulation is "to assure that a site is sufficiently characterized, and the geotechnical data of acceptable quality are obtained and used properly within the project." *Id.*  To accomplish this goal, the regulation mandates a number of relevant geotechnical requirements.

In particular, ER 1110-1-8157 required that "[all] geotechnical input, review or confirmation of no geotechnical involvement will be certified in a project specific Project Management Plan." *Id.* at p. 2, §8(a).  This required a review of existing site data and technical literature, and the usability of this data needed to be evaluated. *Id.* at p. 3, §8(a)(2).  The regulation further required that the products generated from project activities "*shall be reviewed and approved by project geotechnical personnel for compliance....*" *Id.* at p. 3, §8(a)(3) (emphasis added).  "Geotechnical input *must also be obtained* for design services such as…plans and specifications, where the project involves any earthwork or work related to the subsurface." *Id.* at p. 3, §8(a)(4) (emphasis added).

As Lee Guillory and George Bacuta testified, these requirements were not met.  USA Exh. 18 at 153:25-154:7; 157:24-158:12; 198:6-16; 206:23-207:10 (Guillory Depo. Vol. I); USA Exh. 29 at 142:21-25; 176:20-179:12 (Bacuta Depo.).

ER 1110-1-8157 also detailed the oversight and quality assurance testing of geotechnical work required for the Corps's construction projects.  USA Exh. 34 at pp. 5-6.  The Corps appointed Alvin Clouatre as the quality assurance representative for the project.  USA Exh. 30 at 55:13-25 (Clouatre Depo.).  However, Mr. Clouatre was not qualified for this position due to the technical nature of the project.  USA Exh. 30 at 90:10-92:8 (Clouatre Depo.).  ER 1110-1-8157 mandates that if field oversight on an HTRW site done by someone "other than project geotechnical personnel, the project delivery team will prepare *Engineering Considerations and Instruction* (ECI)."  USA Exh. 34 at p. 6, §8(i)(3).  It has already been established the Corps did not have a geotechnical person performing field oversight, and there were no *Engineering Considerations and Instruction* developed or provided to Mr. Clouatre.

Additional engineering mandates that the Corps failed to follow can also be found in engineering manual (EM 1110-2-5027), which outlines the field investigations and design studies that the Corps was expected to undergo when proposing work in the vicinity of levees and floodwalls.  Plaintiffs' Exh. 14 (EM 1110-2-5027 Confined Disposal of Dredged Materials Engineering Manual).  In particular, the manual states that field investigations and design studies should be "more extensive where *the consequences of the failure involve life, property, or damage to the environment are great.*"  *Id.* at p. 6-4 (emphasis added).

EM 1110-2-5027 further states that the "design of a foundation of a levee require specialized knowledge in soil mechanics" adding that "all designs and specifications should be prepared under the direct supervision and guidance of a geotechnical engineer and should bear

his approval." *Id.* at p. 6-10, §6-4. The manual also specifically addresses the critical safety issues associated with seepage and levee and dike failure. *Id.* at 6-11 through 6-17.

These basic engineering principles, however, were disregarded as Guillory, the project manager, failed to ask the geotechnical division of the engineering department to evaluate the relevant excavation plans that were submitted by the contractor. USA Exh. 18 at 157:24-170:9; 171:18-172:11; 197:17-198:16; 203:21-205:12; 206:23-207:10 (Guillory Depo. Vol. I); USA Exh. 9 at 42:7-43:3 (DiCharry Depo.). Thus, no geotechnical analysis relative to underseepage was performed at either excavation adjacent to the flood wall failure sites.

Rather, the only evaluation that the Corps's Engineering Division performed regarding the structural stability of the environmental remedial excavating work done on the EBIA in connection with Task Order 26 of the TERC was to evaluate an excavation footprint of 25 feet wide and 3 feet deep in areas not closer than 15 feet from the Jourdan Avenue floodwall/levee. *Id.*

While the Corps's Engineering Division assessed "soil backfill and compaction requirements" for the three foot deep contaminant excavations, it failed to perform a similar evaluation for the completion backfill at the much deeper structural removal excavations at Saucer and Boland. USA Exh. 18 at 170:10-24; 203:21-207:10 (Guillory Depo. Vol. I).

In addition, other Corps Engineering Manuals highlight the need to perform specific engineering evaluations of the mechanisms of levee failure and the effects of construction in the vicinity of the levees on the "Factor of Safety" for the flood control structures. *See* Plaintiffs' Exh. 11 at pp. 5-1, 6-6, 8-7 to 8-8 (EM 1110-2-1913 Design and Construction of Levees (1978)) (detailing minimum acceptable factor of safety and underseepage issues); Plaintiffs' Exh. 20 at 7-3 "General Considerations," 7-25 (g) (Engineering and Design, Retaining and Flood Walls,

49

EM 1110-2-2502, September 29, 1989) (seepage and wall stability); Plaintiffs Exh. 21 at 9-1

"General" (Engineering and Design, Seepage Analysis and Control for Dams, EM 1110-2-1901,

April 30, 1993) (seepage control); and Plaintiffs Exh. 22 at 4-6 (Engineering and Design, Design

of Sheet Pile Walls, EM 1110-2-2504, March 31, 1994).  Collectively, these specific, applicable

engineering standards mandated that any foundation condition that may impact the seepage

potential under a levee must be evaluated.  Plaintiffs' Exh. 18 at pp. 3-8 (Bea Tech. Report IV,

July 2008).

**47.    To fulfill these discretionary functions, Guillory decided to meet with WGI
employees to review and comment on WGI's work plans.[48]**

Disputed to the extent that this statement implies that the Corps performed the mandated

engineering analyses along the EBIA.

Mr. Grieshaber testified that the Corps would perform engineering analyses on the wall

stability, seepage, and global stability to make certain that the excavations do no impact any

adjacent flood control structures.  Plaintiffs' Exh. 16 at 53:4-12; 54:2-13; 60:24-62:6; 70:5-

73:11; 75:14-77:25; 88:7-21; 90:14-91:10; 94:21-96:15; 103:3-14; 123:5-124:7; 147:1-148:14;

159:20-160:25; 168:9-22; 173:8-174:19 (Grieshaber Depo Vol. I).  Mr. Guillory, however,

testified that neither the Corps nor its contractor, WGI, performed any analysis of the

engineering requirements of construction in the proximity to floodwalls and levees where the

excavations at the Boland and Saucer Marine locations occurred.  USA Exh. 18 at 157:24-170:9;

171:18-172:11; 197:17-198:16; 203:21-205:12; 206:23-207:10 (Guillory Depo. Vol. I); USA

Exh. 9 at 42:7-43:3 (DiCharry Depo.).  Rather, his testimony was that the Corps only studied the

potential impacts that the proposed excavations and borrow sites could have on the adjacent

---

[48]2008 WL 5234369, at *4.

Jourdan Avenue floodwall and levee to make certain that such work was "safe for the levee." USA Exh. 18 at 164:19-166:12 (Guillory Depo. Vol. I).

The requirement for a proper analysis on levee and floodwall stability at the EBIA site is further buttressed by the Corps's own engineering regulations. Specifically, Engineer Regulation ("ER") 1110-2-1150 defines the engineering responsibilities, requirements, and procedures during the planning, design, construction and operations phases of civil works projects. USA Exh. 33. This regulation is *mandatory*. *Id.* at p. 23, §19.1.1; *see also* USA Exh. 12 at 64:2-11; 82:2-23 (Grieshaber Depo. Vol. II). This regulation places responsibility for the technical content and engineering sufficiency of all engineering products with the Chief of the Engineering organization.

This regulation further specifies that a Project Delivery Team be established for the project, which consists of a Project Manager and the technical personnel necessary to develop the project. *Id.* at p. 3, §7. The Corps specifies the utilization of five phases to present the engineering and design policy and process that applies to the project. *Id.* at p. 5, §11. These five phases are identified as reconnaissance; feasibility; preconstruction; engineering and design; and construction, operation and maintenance. *Id.*

The 1997 MRGO New Lock and Connecting Channels Evaluation Report was developed to provide guidance for the overall lock replacement project. In addition, the Corps developed a 1999 Design Documentation Report (DDR). USA Exh. 33 at p. 3, §8.2 (ER 1110-2-1150). The DDR is "a record of final design effort after the feasibility phase" and is "required for all engineering design products." *Id.* It "provides the technical basis for the plans and specifications and serves as a summary of the final design." *Id.* As a result of these two reports, the overall scope of the project was established before WGI became involved; however, it did

not include geotechnical evaluations regarding excavations below five feet and the effects that underseepage could have on adjacent floodwalls.

WGI was engaged through Task Order 26 to evaluate the prior documentation relative to the EBIA and develop a Recommendation Report that the Army Corps could use to analyze the scope of work to be done at the Hazardous Toxic Radioactive Waste site, with a requirement that it identify any data gaps in the supplied information that needed further evaluation. But even as WGI identified these relevant data gaps, the Army Corps did not undertake further geotechnical evaluation. Until the end of 2000, this was immaterial as the deepest excavation contemplated and evaluated was to a depth of approximately eight feet. USA Exh. 18 at 80:5-81:8 (Guillory Depo. Vol. I). However immaterial it was at that time, the failure of the Army Corps to submit the excavation plans developed by WGI to the Engineering Department violated mandatory Corps's regulations.

Specifically, section 16.1 of ER 1110-2-1150 requires that "engineering support shall be provided to those maintenance activities that require [plans and specifications]..." as support for operations activities. USA Exh. 33 at p. 21, §16.1. This engineering support was required to be provided to review "operational deviations, identify and address project deficiencies, and evaluate replacement plans." *Id.* Any "deviations ... of any portion of a project" were required to be "reviewed and approved by engineering." *Id.* at §16.4.

Lee Guillory, the Project Manager and head of the Project Delivery team, failed to follow this regulation. He did not ask the geotechnical division of the engineering division to evaluate the plan that was submitted by WGI for removal of the sewer lift station. USA Exh. 18 at 153:25-154:7; 157:24-158:12; 198:6-16 (Guillory Depo. Vol. I). Rather, Guillory testified that George Bacuta, a geochemist, was tasked with reviewing the excavation plan. *Id.* at 188:8-

189:1.  In fact, however, Bacuta never reviewed the excavation plan.  USA Exh. 29 at 142:21-25 (Bacuta Depo.).

Here we see that not only did the head of the team fail to follow mandatory regulation in having this deviation from the original plan evaluated by the engineering department, but evidently no geotechnical analysis whatsoever was done.  Ultimately, the southern breach of the flood wall took place adjacent to this deep excavation.  Plaintiffs' Exh. 17 at pp. 22-31 (Bea Tech. Report V, Jan. 2009).

The northern breach occurred adjacent to a deep excavation of the "wedding cake" structure at the Boland Marine site.  This excavation plan also deviated from the DDR and, similarly, Mr. Guillory failed to comply with ER 1110-2-1150 by presenting the excavation plan to the Corps's Engineering Department.  USA Exh. 18 at 206:23-207:10 (Guillory Depo. Vol. I).  This reckless disregard for the Engineering Regulation led to *no* analysis being performed to evaluate underseepage below the sheet pile curtains at the locations of the north breach site.  USA Exh. 29 at 176:20-179:12 (Bacuta Depo.).

According to the Plaintiffs' expert Robert Bea, this underseepage is exactly what caused or contributed to the breach at the Boland Marine site.  Plaintiffs' Exh. 17 at pp. 1-21 (Bea Tech. Report V, Jan. 2009).

The regulation that Mr. Guillory should have observed was Engineering Regulation 1110-1-8157.  USA Exh. 34.  This regulation "*prescribes* Geotechnical Data Quality Management (GDQM) *responsibilities and requirements*, from initial investigation through closeout at sites contaminated with hazardous, toxic, and radioactive waste."  *Id.* at p. 1, §1. (emphasis added).  The utilization of this regulation is "to assure that a site is sufficiently characterized, and the geotechnical data of acceptable quality are obtained and used properly

53

within the project." *Id.* To accomplish this goal, the regulation mandates a number of relevant geotechnical requirements.

In particular, ER 1110-1-8157 required that "[all] geotechnical input, review or confirmation of no geotechnical involvement will be certified in a project specific Project Management Plan." *Id.* at p. 2, §8(a). This required a review of existing site data and technical literature, and the usability of this data needed to be evaluated. *Id.* at p. 3, §8(a)(2). The regulation further required that the products generated from project activities "*shall be reviewed and approved by project geotechnical personnel for compliance....*" *Id*. at p. 3, §8(a)(3) (emphasis added). "Geotechnical input *must also be obtained* for design services such as…plans and specifications, where the project involves any earthwork or work related to the subsurface." *Id*. at p. 3, §8(a)(4) (emphasis added).

As Lee Guillory and George Bacuta testified, these requirements were not met. USA Exh. 18 at 153:25-154:7; 157:24-158:12; 198:6-16; 206:23-207:10 (Guillory Depo. Vol. I); USA Exh. 29 at 142:21-25; 176:20-179:12 (Bacuta Depo.).

ER 1110-1-8157 also detailed the oversight and quality assurance testing of geotechnical work required for the Corps's construction projects. USA Exh. 34 at pp. 5-6. The Corps appointed Alvin Clouatre as the quality assurance representative for the project. USA Exh. 30 at 55:13-25 (Clouatre Depo.). However, Mr. Clouatre was not qualified for this position due to the technical nature of the project. USA Exh. 30 at 90:10-92:8 (Clouatre Depo.). ER 1110-1-8157 mandates that if field oversight on an HTRW site done by someone "other than project geotechnical personnel, the project delivery team will prepare *Engineering Considerations and Instruction* (ECI)." USA Exh. 34 at p. 6, §8(i)(3). It has already been established the Corps did

not have a geotechnical person performing field oversight, and there were no *Engineering Considerations and Instruction* developed or provided to Mr. Clouatre.

Additional engineering mandates that the Corps failed to follow can also be found in engineering manual (EM 1110-2-5027), which outlines the field investigations and design studies that the Corps was expected to undergo when proposing work in the vicinity of levees and floodwalls.  Plaintiffs' Exh. 14 (EM 1110-2-5027 Confined Disposal of Dredged Materials Engineering Manual).  In particular, the manual states that field investigations and design studies should be "more extensive where *the consequences of the failure involve life, property, or damage to the environment are great.*"  *Id.* at p. 6-4 (emphasis added).

EM 1110-2-5027 further states that the "design of a foundation of a levee require specialized knowledge in soil mechanics" adding that "all designs and specifications should be prepared under the direct supervision and guidance of a geotechnical engineer and should bear his approval."  *Id.* at p. 6-10, §6-4.  The manual also specifically addresses the critical safety issues associated with seepage and levee and dike failure.  *Id.* at 6-11 through 6-17.

These basic engineering principles, however, were disregarded as Guillory, the project manager, failed to ask the geotechnical division of the engineering department to evaluate the relevant excavation plans that were submitted by the contractor.  USA Exh. 18 at 157:24-170:9; 171:18-172:11; 197:17-198:16; 203:21-205:12; 206:23-207:10 (Guillory Depo. Vol. I); USA Exh. 9 at 42:7-43:3 (DiCharry Depo.).  Thus, no geotechnical analysis relative to underseepage was performed at either excavation adjacent to the flood wall failure sites.

Rather, the only evaluation that the Corps's Engineering Division performed regarding the structural stability of the environmental remedial excavating work done on the EBIA in connection with Task Order 26 of the TERC was to evaluate an excavation footprint of 25 feet

55

wide and 3 feet deep in areas not closer than 15 feet from the Jourdan Avenue floodwall/levee. *Id.*

While the Corps's Engineering Division assessed "soil backfill and compaction requirements" for the three foot deep contaminant excavations, it failed to perform a similar evaluation for the completion backfill at the much deeper structural removal excavations at Saucer and Boland.  USA Exh. 18 at 170:10-24; 203:21-207:10 (Guillory Depo. Vol. I).

In addition, other Corps Engineering Manuals highlight the need to perform specific engineering evaluations of the mechanisms of levee failure and the effects of construction in the vicinity of the levees on the "Factor of Safety" for the flood control structures.  *See* Plaintiffs' Exh. 11 at pp. 5-1, 6-6, 8-7 to 8-8 (EM 1110-2-1913 Design and Construction of Levees (1978)) (detailing minimum acceptable factor of safety and underseepage issues); Plaintiffs' Exh. 20 at 7-3 "General Considerations," 7-25 (g) (Engineering and Design, Retaining and Flood Walls, EM 1110-2-2502, September 29, 1989) (seepage and wall stability); Plaintiffs Exh. 21 at 9-1 "General" (Engineering and Design, Seepage Analysis and Control for Dams, EM 1110-2-1901, April 30, 1993) (seepage control); and Plaintiffs Exh. 22 at 4-6 (Engineering and Design, Design of Sheet Pile Walls, EM 1110-2-2504, March 31, 1994).  Collectively, these specific, applicable engineering standards mandated that any foundation condition that may impact the seepage potential under a levee must be evaluated.  Plaintiffs' Exh. 18 at pp. 3-8 (Bea Tech. Report IV, July 2008).

**48.     Guillory "sought to ascertain what the Government needed to do to help WGI resolve any issue that arose, take their recommendations into consideration, and work them out to the best of the Government's ability."[49]**

---

[49]*Id.* (citation omitted).

Disputed to the extent that this statement implies that the Corps performed the mandated engineering analyses along the EBIA.

Mr. Grieshaber testified that the Corps would perform engineering analyses on the wall stability, seepage, and global stability to make certain that the excavations do no impact any adjacent flood control structures.  Plaintiffs' Exh. 16 at 53:4-12; 54:2-13; 60:24-62:6; 70:5-73:11; 75:14-77:25; 88:7-21; 90:14-91:10; 94:21-96:15; 103:3-14; 123:5-124:7; 147:1-148:14; 159:20-160:25; 168:9-22; 173:8-174:19 (Grieshaber Depo Vol. I).  Mr. Guillory, however, testified that neither the Corps nor its contractor, WGI, performed any analysis of the engineering requirements of construction in the proximity to floodwalls and levees where the excavations at the Boland and Saucer Marine locations occurred.  USA Exh. 18 at 157:24-170:9; 171:18-172:11; 197:17-198:16; 203:21-205:12; 206:23-207:10 (Guillory Depo. Vol. I); USA Exh. 9 at 42:7-43:3 (DiCharry Depo.).  Rather, his testimony was that the Corps only studied the potential impacts that the proposed excavations and borrow sites could have on the adjacent Jourdan Avenue floodwall and levee to make certain that such work was "safe for the levee." USA Exh. 18 at 164:19-166:12 (Guillory Depo. Vol. I).

The requirement for a proper analysis on levee and floodwall stability at the EBIA site is further buttressed by the Corps's own engineering regulations.  Specifically, Engineer Regulation ("ER") 1110-2-1150 defines the engineering responsibilities, requirements, and procedures during the planning, design, construction and operations phases of civil works projects.  USA Exh. 33.  This regulation is *mandatory*.  *Id.* at p. 23, §19.1.1; *see also* USA Exh. 12 at 64:2-11; 82:2-23 (Grieshaber Depo. Vol. II).  This regulation places responsibility for the technical content and engineering sufficiency of all engineering products with the Chief of the Engineering organization.

This regulation further specifies that a Project Delivery Team be established for the project, which consists of a Project Manager and the technical personnel necessary to develop the project. *Id.* at p. 3, §7. The Corps specifies the utilization of five phases to present the engineering and design policy and process that applies to the project. *Id.* at p. 5, §11. These five phases are identified as reconnaissance; feasibility; preconstruction; engineering and design; and construction, operation and maintenance. *Id.*

The 1997 MRGO New Lock and Connecting Channels Evaluation Report was developed to provide guidance for the overall lock replacement project. In addition, the Corps developed a 1999 Design Documentation Report (DDR). USA Exh. 33 at p. 3, §8.2 (ER 1110-2-1150). The DDR is "a record of final design effort after the feasibility phase" and is "required for all engineering design products." *Id.* It "provides the technical basis for the plans and specifications and serves as a summary of the final design." *Id.* As a result of these two reports, the overall scope of the project was established before WGI became involved; however, it did not include geotechnical evaluations regarding excavations below five feet and the effects that underseepage could have on adjacent floodwalls.

WGI was engaged through Task Order 26 to evaluate the prior documentation relative to the EBIA and develop a Recommendation Report that the Army Corps could use to analyze the scope of work to be done at the Hazardous Toxic Radioactive Waste site, with a requirement that it identify any data gaps in the supplied information that needed further evaluation. But even as WGI identified these relevant data gaps, the Army Corps did not undertake further geotechnical evaluation. Until the end of 2000, this was immaterial as the deepest excavation contemplated and evaluated was to a depth of approximately eight feet. USA Exh. 18 at 80:5-81:8 (Guillory Depo. Vol. I). However immaterial it was at that time, the failure of the Army Corps to submit

58

the excavation plans developed by WGI to the Engineering Department violated mandatory

Corps's regulations.

Specifically, section 16.1 of ER 1110-2-1150 requires that "engineering support shall be

provided to those maintenance activities that require [plans and specifications]..." as support for

operations activities.  USA Exh. 33 at p. 21, §16.1.  This engineering support was required to be

provided to review "operational deviations, identify and address project deficiencies, and

evaluate replacement plans."  *Id.*  Any "deviations ... of any portion of a project" were required

to be "reviewed and approved by engineering."  *Id.* at §16.4.

Lee Guillory, the Project Manager and head of the Project Delivery team, failed to follow

this regulation.  He did not ask the geotechnical division of the engineering division to evaluate

the plan that was submitted by WGI for removal of the sewer lift station.  USA Exh. 18 at

153:25-154:7; 157:24-158:12; 198:6-16 (Guillory Depo. Vol. I).  Rather, Guillory testified that

George Bacuta, a geochemist, was tasked with reviewing the excavation plan.  *Id.* at 188:8-

189:1.  In fact, however, Bacuta never reviewed the excavation plan.  USA Exh. 29 at 142:21-25

(Bacuta Depo.).

Here we see that not only did the head of the team fail to follow mandatory regulation in

having this deviation from the original plan evaluated by the engineering department, but

evidently no geotechnical analysis whatsoever was done.  Ultimately, the southern breach of the

flood wall took place adjacent to this deep excavation.  Plaintiffs' Exh. 17 at pp. 22-31 (Bea

Tech. Report V, Jan. 2009).

The northern breach occurred adjacent to a deep excavation of the "wedding cake"

structure at the Boland Marine site.  This excavation plan also deviated from the DDR and,

similarly, Mr. Guillory failed to comply with ER 1110-2-1150 by presenting the excavation plan

to the Corps's Engineering Department.  USA Exh. 18 at 206:23-207:10 (Guillory Depo. Vol. I).

This reckless disregard for the Engineering Regulation led to *no* analysis being performed to

evaluate underseepage below the sheet pile curtains at the locations of the north breach site.

USA Exh. 29 at 176:20-179:12 (Bacuta Depo.).

      According to the Plaintiffs' expert Robert Bea, this underseepage is exactly what caused

or contributed to the breach at the Boland Marine site.  Plaintiffs' Exh. 17 at pp. 1-21 (Bea Tech.

Report V, Jan. 2009).

      The regulation that Mr. Guillory should have observed was Engineering Regulation

1110-1-8157.  USA Exh. 34.  This regulation "*prescribes* Geotechnical Data Quality

Management (GDQM) *responsibilities and requirements*, from initial investigation through

closeout at sites contaminated with hazardous, toxic, and radioactive waste."  *Id.* at p. 1, §1.

(emphasis added).  The utilization of this regulation is "to assure that a site is sufficiently

characterized, and the geotechnical data of acceptable quality are obtained and used properly

within the project."  *Id.*  To accomplish this goal, the regulation mandates a number of relevant

geotechnical requirements.

      In particular, ER 1110-1-8157 required that "[all] geotechnical input, review or

confirmation of no geotechnical involvement will be certified in a project specific Project

Management Plan."  *Id.* at p. 2, §8(a).  This required a review of existing site data and technical

literature, and the usability of this data needed to be evaluated.  *Id.* at p. 3, §8(a)(2).  The

regulation further required that the products generated from project activities "*shall be reviewed

and approved by project geotechnical personnel for compliance....*"  *Id*. at p. 3, §8(a)(3)

(emphasis added).  "Geotechnical input *must also be obtained* for design services such as…plans

60

and specifications, where the project involves any earthwork or work related to the subsurface."
*Id.* at p. 3, §8(a)(4) (emphasis added).

As Lee Guillory and George Bacuta testified, these requirements were not met.  USA
Exh. 18 at 153:25-154:7; 157:24-158:12; 198:6-16; 206:23-207:10 (Guillory Depo. Vol. I); USA
Exh. 29 at 142:21-25; 176:20-179:12 (Bacuta Depo.).

ER 1110-1-8157 also detailed the oversight and quality assurance testing of geotechnical
work required for the Corps's construction projects.  USA Exh. 34 at pp. 5-6.  The Corps
appointed Alvin Clouatre as the quality assurance representative for the project.  USA Exh. 30 at
55:13-25 (Clouatre Depo.).  However, Mr. Clouatre was not qualified for this position due to the
technical nature of the project.  USA Exh. 30 at 90:10-92:8 (Clouatre Depo.).  ER 1110-1-8157
mandates that if field oversight on an HTRW site done by someone "other than project
geotechnical personnel, the project delivery team will prepare *Engineering Considerations and
Instruction* (ECI)."  USA Exh. 34 at p. 6, §8(i)(3).  It has already been established the Corps did
not have a geotechnical person performing field oversight, and there were no *Engineering
Considerations and Instruction* developed or provided to Mr. Clouatre.

Additional engineering mandates that the Corps failed to follow can also be found in
engineering manual (EM 1110-2-5027), which outlines the field investigations and design
studies that the Corps was expected to undergo when proposing work in the vicinity of levees
and floodwalls.  Plaintiffs' Exh. 14 (EM 1110-2-5027 Confined Disposal of Dredged Materials
Engineering Manual).  In particular, the manual states that field investigations and design studies
should be "more extensive where *the consequences of the failure involve life, property, or
damage to the environment are great.*"  *Id.* at p. 6-4 (emphasis added).

61

EM 1110-2-5027 further states that the "design of a foundation of a levee require specialized knowledge in soil mechanics" adding that "all designs and specifications should be prepared under the direct supervision and guidance of a geotechnical engineer and should bear his approval." *Id.* at p. 6-10, §6-4. The manual also specifically addresses the critical safety issues associated with seepage and levee and dike failure. *Id.* at 6-11 through 6-17.

These basic engineering principles, however, were disregarded as Guillory, the project manager, failed to ask the geotechnical division of the engineering department to evaluate the relevant excavation plans that were submitted by the contractor. USA Exh. 18 at 157:24-170:9; 171:18-172:11; 197:17-198:16; 203:21-205:12; 206:23-207:10 (Guillory Depo. Vol. I); USA Exh. 9 at 42:7-43:3 (DiCharry Depo.). Thus, no geotechnical analysis relative to underseepage was performed at either excavation adjacent to the flood wall failure sites.

Rather, the only evaluation that the Corps's Engineering Division performed regarding the structural stability of the environmental remedial excavating work done on the EBIA in connection with Task Order 26 of the TERC was to evaluate an excavation footprint of 25 feet wide and 3 feet deep in areas not closer than 15 feet from the Jourdan Avenue floodwall/levee. *Id.*

While the Corps's Engineering Division assessed "soil backfill and compaction requirements" for the three foot deep contaminant excavations, it failed to perform a similar evaluation for the completion backfill at the much deeper structural removal excavations at Saucer and Boland. USA Exh. 18 at 170:10-24; 203:21-207:10 (Guillory Depo. Vol. I).

In addition, other Corps Engineering Manuals highlight the need to perform specific engineering evaluations of the mechanisms of levee failure and the effects of construction in the vicinity of the levees on the "Factor of Safety" for the flood control structures. *See* Plaintiffs'

Exh. 11 at pp. 5-1, 6-6, 8-7 to 8-8 (EM 1110-2-1913 Design and Construction of Levees (1978)) (detailing minimum acceptable factor of safety and underseepage issues); Plaintiffs' Exh. 20 at 7-3 "General Considerations," 7-25 (g) (Engineering and Design, Retaining and Flood Walls, EM 1110-2-2502, September 29, 1989) (seepage and wall stability); Plaintiffs Exh. 21 at 9-1 "General" (Engineering and Design, Seepage Analysis and Control for Dams, EM 1110-2-1901, April 30, 1993) (seepage control); and Plaintiffs Exh. 22 at 4-6 (Engineering and Design, Design of Sheet Pile Walls, EM 1110-2-2504, March 31, 1994).  Collectively, these specific, applicable engineering standards mandated that any foundation condition that may impact the seepage potential under a levee must be evaluated.  Plaintiffs' Exh. 18 at pp. 3-8 (Bea Tech. Report IV, July 2008).

**49.     The Corps evaluated WGI's proposals, gave WGI feedback, and solicited revisions until the Corps was satisfied.  At that point the Corps approved the work plans, giving WGI a green light to proceed with the work.[50]**

Disputed to the extent that this statement implies that the Corps performed the mandated engineering analyses along the EBIA.

Mr. Grieshaber testified that the Corps would perform engineering analyses on the wall stability, seepage, and global stability to make certain that the excavations do no impact any adjacent flood control structures.  Plaintiffs' Exh. 16 at 53:4-12; 54:2-13; 60:24-62:6; 70:5-73:11; 75:14-77:25; 88:7-21; 90:14-91:10; 94:21-96:15; 103:3-14; 123:5-124:7; 147:1-148:14; 159:20-160:25; 168:9-22; 173:8-174:19 (Grieshaber Depo Vol. I).  Mr. Guillory, however, testified that neither the Corps nor its contractor, WGI, performed any analysis of the engineering requirements of construction in the proximity to floodwalls and levees where the

---

[50] See *id.* at *5-8.

excavations at the Boland and Saucer Marine locations occurred.  USA Exh. 18 at 157:24-170:9;

171:18-172:11; 197:17-198:16; 203:21-205:12; 206:23-207:10 (Guillory Depo. Vol. I); USA

Exh. 9 at 42:7-43:3 (DiCharry Depo.).  Rather, his testimony was that the Corps only studied the

potential impacts that the proposed excavations and borrow sites could have on the adjacent

Jourdan Avenue floodwall and levee to make certain that such work was "safe for the levee."

USA Exh. 18 at 164:19-166:12 (Guillory Depo. Vol. I).

The requirement for a proper analysis on levee and floodwall stability at the EBIA site is

further buttressed by the Corps's own engineering regulations.  Specifically, Engineer

Regulation ("ER") 1110-2-1150 defines the engineering responsibilities, requirements, and

procedures during the planning, design, construction and operations phases of civil works

projects.  USA Exh. 33.  This regulation is *mandatory*.  *Id.* at p. 23, §19.1.1; *see also* USA Exh.

12 at 64:2-11; 82:2-23 (Grieshaber Depo. Vol. II).  This regulation places responsibility for the

technical content and engineering sufficiency of all engineering products with the Chief of the

Engineering organization.

This regulation further specifies that a Project Delivery Team be established for the

project, which consists of a Project Manager and the technical personnel necessary to develop

the project.  *Id.* at p. 3, §7.  The Corps specifies the utilization of five phases to present the

engineering and design policy and process that applies to the project.  *Id.* at p. 5, §11.  These five

phases are identified as reconnaissance; feasibility; preconstruction; engineering and design; and

construction, operation and maintenance.  *Id.*

The 1997 MRGO New Lock and Connecting Channels Evaluation Report was developed

to provide guidance for the overall lock replacement project.  In addition, the Corps developed a

1999 Design Documentation Report (DDR).  USA Exh. 33 at p. 3, §8.2 (ER 1110-2-1150).  The

DDR is "a record of final design effort after the feasibility phase" and is "required for all engineering design products." *Id.* It "provides the technical basis for the plans and specifications and serves as a summary of the final design." *Id.* As a result of these two reports, the overall scope of the project was established before WGI became involved; however, it did not include geotechnical evaluations regarding excavations below five feet and the effects that underseepage could have on adjacent floodwalls.

WGI was engaged through Task Order 26 to evaluate the prior documentation relative to the EBIA and develop a Recommendation Report that the Army Corps could use to analyze the scope of work to be done at the Hazardous Toxic Radioactive Waste site, with a requirement that it identify any data gaps in the supplied information that needed further evaluation. But even as WGI identified these relevant data gaps, the Army Corps did not undertake further geotechnical evaluation. Until the end of 2000, this was immaterial as the deepest excavation contemplated and evaluated was to a depth of approximately eight feet. USA Exh. 18 at 80:5-81:8 (Guillory Depo. Vol. I). However immaterial it was at that time, the failure of the Army Corps to submit the excavation plans developed by WGI to the Engineering Department violated mandatory Corps's regulations.

Specifically, section 16.1 of ER 1110-2-1150 requires that "engineering support shall be provided to those maintenance activities that require [plans and specifications]..." as support for operations activities. USA Exh. 33 at p. 21, §16.1. This engineering support was required to be provided to review "operational deviations, identify and address project deficiencies, and evaluate replacement plans." *Id.* Any "deviations ... of any portion of a project" were required to be "reviewed and approved by engineering." *Id.* at §16.4.

Lee Guillory, the Project Manager and head of the Project Delivery team, failed to follow this regulation.  He did not ask the geotechnical division of the engineering division to evaluate the plan that was submitted by WGI for removal of the sewer lift station.  USA Exh. 18 at 153:25-154:7; 157:24-158:12; 198:6-16 (Guillory Depo. Vol. I).  Rather, Guillory testified that George Bacuta, a geochemist, was tasked with reviewing the excavation plan.  *Id.* at 188:8-189:1.  In fact, however, Bacuta never reviewed the excavation plan.  USA Exh. 29 at 142:21-25 (Bacuta Depo.).

Here we see that not only did the head of the team fail to follow mandatory regulation in having this deviation from the original plan evaluated by the engineering department, but evidently no geotechnical analysis whatsoever was done.  Ultimately, the southern breach of the flood wall took place adjacent to this deep excavation.  Plaintiffs' Exh. 17 at pp. 22-31 (Bea Tech. Report V, Jan. 2009).

The northern breach occurred adjacent to a deep excavation of the "wedding cake" structure at the Boland Marine site.  This excavation plan also deviated from the DDR and, similarly, Mr. Guillory failed to comply with ER 1110-2-1150 by presenting the excavation plan to the Corps's Engineering Department.  USA Exh. 18 at 206:23-207:10 (Guillory Depo. Vol. I).  This reckless disregard for the Engineering Regulation led to *no* analysis being performed to evaluate underseepage below the sheet pile curtains at the locations of the north breach site.  USA Exh. 29 at 176:20-179:12 (Bacuta Depo.).

According to the Plaintiffs' expert Robert Bea, this underseepage is exactly what caused or contributed to the breach at the Boland Marine site.  Plaintiffs' Exh. 17 at pp. 1-21 (Bea Tech. Report V, Jan. 2009).

The regulation that Mr. Guillory should have observed was Engineering Regulation 1110-1-8157.  USA Exh. 34.  This regulation "*prescribes* Geotechnical Data Quality Management (GDQM) *responsibilities and requirements*, from initial investigation through closeout at sites contaminated with hazardous, toxic, and radioactive waste."  *Id.* at p. 1, §1. (emphasis added).  The utilization of this regulation is "to assure that a site is sufficiently characterized, and the geotechnical data of acceptable quality are obtained and used properly within the project."  *Id.*  To accomplish this goal, the regulation mandates a number of relevant geotechnical requirements.

In particular, ER 1110-1-8157 required that "[all] geotechnical input, review or confirmation of no geotechnical involvement will be certified in a project specific Project Management Plan."  *Id.* at p. 2, §8(a).  This required a review of existing site data and technical literature, and the usability of this data needed to be evaluated.  *Id.* at p. 3, §8(a)(2).  The regulation further required that the products generated from project activities "*shall be reviewed and approved by project geotechnical personnel for compliance....*"  *Id*. at p. 3, §8(a)(3) (emphasis added).  "Geotechnical input *must also be obtained* for design services such as…plans and specifications, where the project involves any earthwork or work related to the subsurface." *Id*. at p. 3, §8(a)(4) (emphasis added).

As Lee Guillory and George Bacuta testified, these requirements were not met.  USA Exh. 18 at 153:25-154:7; 157:24-158:12; 198:6-16; 206:23-207:10 (Guillory Depo. Vol. I); USA Exh. 29 at 142:21-25; 176:20-179:12 (Bacuta Depo.).

ER 1110-1-8157 also detailed the oversight and quality assurance testing of geotechnical work required for the Corps's construction projects.  USA Exh. 34 at pp. 5-6.  The Corps appointed Alvin Clouatre as the quality assurance representative for the project.  USA Exh. 30 at

55:13-25 (Clouatre Depo.).  However, Mr. Clouatre was not qualified for this position due to the

technical nature of the project.  USA Exh. 30 at 90:10-92:8 (Clouatre Depo.).  ER 1110-1-8157

mandates that if field oversight on an HTRW site done by someone "other than project

geotechnical personnel, the project delivery team will prepare *Engineering Considerations and*

*Instruction* (ECI)."  USA Exh. 34 at p. 6, §8(i)(3).  It has already been established the Corps did

not have a geotechnical person performing field oversight, and there were no *Engineering*

*Considerations and Instruction* developed or provided to Mr. Clouatre.

     Additional engineering mandates that the Corps failed to follow can also be found in

engineering manual (EM 1110-2-5027), which outlines the field investigations and design

studies that the Corps was expected to undergo when proposing work in the vicinity of levees

and floodwalls.  Plaintiffs' Exh. 14 (EM 1110-2-5027 Confined Disposal of Dredged Materials

Engineering Manual).  In particular, the manual states that field investigations and design studies

should be "more extensive where *the consequences of the failure involve life, property, or*

*damage to the environment are great.*"  *Id.* at p. 6-4 (emphasis added).

     EM 1110-2-5027 further states that the "design of a foundation of a levee require

specialized knowledge in soil mechanics" adding that "all designs and specifications should be

prepared under the direct supervision and guidance of a geotechnical engineer and should bear

his approval."  *Id.* at p. 6-10, §6-4.  The manual also specifically addresses the critical safety

issues associated with seepage and levee and dike failure.  *Id.* at 6-11 through 6-17.

     These basic engineering principles, however, were disregarded as Guillory, the project

manager, failed to ask the geotechnical division of the engineering department to evaluate the

relevant excavation plans that were submitted by the contractor.  USA Exh. 18 at 157:24-170:9;

171:18-172:11; 197:17-198:16; 203:21-205:12; 206:23-207:10 (Guillory Depo. Vol. I); USA

Exh. 9 at 42:7-43:3 (DiCharry Depo.).  Thus, no geotechnical analysis relative to underseepage was performed at either excavation adjacent to the flood wall failure sites.

Rather, the only evaluation that the Corps's Engineering Division performed regarding the structural stability of the environmental remedial excavating work done on the EBIA in connection with Task Order 26 of the TERC was to evaluate an excavation footprint of 25 feet wide and 3 feet deep in areas not closer than 15 feet from the Jourdan Avenue floodwall/levee. *Id.*

While the Corps's Engineering Division assessed "soil backfill and compaction requirements" for the three foot deep contaminant excavations, it failed to perform a similar evaluation for the completion backfill at the much deeper structural removal excavations at Saucer and Boland.  USA Exh. 18 at 170:10-24; 203:21-207:10 (Guillory Depo. Vol. I).

In addition, other Corps Engineering Manuals highlight the need to perform specific engineering evaluations of the mechanisms of levee failure and the effects of construction in the vicinity of the levees on the "Factor of Safety" for the flood control structures.  *See* Plaintiffs' Exh. 11 at pp. 5-1, 6-6, 8-7 to 8-8 (EM 1110-2-1913 Design and Construction of Levees (1978)) (detailing minimum acceptable factor of safety and underseepage issues); Plaintiffs' Exh. 20 at 7-3 "General Considerations," 7-25 (g) (Engineering and Design, Retaining and Flood Walls, EM 1110-2-2502, September 29, 1989) (seepage and wall stability); Plaintiffs Exh. 21 at 9-1 "General" (Engineering and Design, Seepage Analysis and Control for Dams, EM 1110-2-1901, April 30, 1993) (seepage control); and Plaintiffs Exh. 22 at 4-6 (Engineering and Design, Design of Sheet Pile Walls, EM 1110-2-2504, March 31, 1994).  Collectively, these specific, applicable engineering standards mandated that any foundation condition that may impact the seepage

potential under a levee must be evaluated.  Plaintiffs' Exh. 18 at pp. 3-8 (Bea Tech. Report IV, July 2008).

**50.     Guillory had the discretion as to when to consult the Corps's geotechnical engineers as well as whether to accept a licensed engineer's analysis.[51]**

Disputed to the extent that this statement implies that the Corps performed the mandated engineering analyses along the EBIA.

Mr. Grieshaber testified that the Corps would perform engineering analyses on the wall stability, seepage, and global stability to make certain that the excavations do no impact any adjacent flood control structures.  Plaintiffs' Exh. 16 at 53:4-12; 54:2-13; 60:24-62:6; 70:5-73:11; 75:14-77:25; 88:7-21; 90:14-91:10; 94:21-96:15; 103:3-14; 123:5-124:7; 147:1-148:14; 159:20-160:25; 168:9-22; 173:8-174:19 (Grieshaber Depo Vol. I).  Mr. Guillory, however, testified that neither the Corps nor its contractor, WGI, performed any analysis of the engineering requirements of construction in the proximity to floodwalls and levees where the excavations at the Boland and Saucer Marine locations occurred.  USA Exh. 18 at 157:24-170:9; 171:18-172:11; 197:17-198:16; 203:21-205:12; 206:23-207:10 (Guillory Depo. Vol. I); USA Exh. 9 at 42:7-43:3 (DiCharry Depo.).  Rather, his testimony was that the Corps only studied the potential impacts that the proposed excavations and borrow sites could have on the adjacent Jourdan Avenue floodwall and levee to make certain that such work was "safe for the levee." USA Exh. 18 at 164:19-166:12 (Guillory Depo. Vol. I).

The requirement for a proper analysis on levee and floodwall stability at the EBIA site is further buttressed by the Corps's own engineering regulations.  Specifically, Engineer Regulation ("ER") 1110-2-1150 defines the engineering responsibilities, requirements, and

---

[51]2 Grieshaber 17:11-12:9, 17:9-19:15 [Ex. 12].

procedures during the planning, design, construction and operations phases of civil works projects.  USA Exh. 33.  This regulation is *mandatory*.  *Id.* at p. 23, §19.1.1; *see also* USA Exh. 12 at 64:2-11; 82:2-23 (Grieshaber Depo. Vol. II).  This regulation places responsibility for the technical content and engineering sufficiency of all engineering products with the Chief of the Engineering organization.

This regulation further specifies that a Project Delivery Team be established for the project, which consists of a Project Manager and the technical personnel necessary to develop the project.  *Id.* at p. 3, §7.  The Corps specifies the utilization of five phases to present the engineering and design policy and process that applies to the project.  *Id.* at p. 5, §11.  These five phases are identified as reconnaissance; feasibility; preconstruction; engineering and design; and construction, operation and maintenance.  *Id.*

The 1997 MRGO New Lock and Connecting Channels Evaluation Report was developed to provide guidance for the overall lock replacement project.  In addition, the Corps developed a 1999 Design Documentation Report (DDR).  USA Exh. 33 at p. 3, §8.2 (ER 1110-2-1150).  The DDR is "a record of final design effort after the feasibility phase" and is "required for all engineering design products."  *Id.*  It "provides the technical basis for the plans and specifications and serves as a summary of the final design."  *Id.*  As a result of these two reports, the overall scope of the project was established before WGI became involved; however, it did not include geotechnical evaluations regarding excavations below five feet and the effects that underseepage could have on adjacent floodwalls.

WGI was engaged through Task Order 26 to evaluate the prior documentation relative to the EBIA and develop a Recommendation Report that the Army Corps could use to analyze the scope of work to be done at the Hazardous Toxic Radioactive Waste site, with a requirement that

it identify any data gaps in the supplied information that needed further evaluation.  But even as WGI identified these relevant data gaps, the Army Corps did not undertake further geotechnical evaluation.  Until the end of 2000, this was immaterial as the deepest excavation contemplated and evaluated was to a depth of approximately eight feet.  USA Exh. 18 at 80:5-81:8 (Guillory Depo. Vol. I).  However immaterial it was at that time, the failure of the Army Corps to submit the excavation plans developed by WGI to the Engineering Department violated mandatory Corps's regulations.

Specifically, section 16.1 of ER 1110-2-1150 requires that "engineering support shall be provided to those maintenance activities that require [plans and specifications]..." as support for operations activities.  USA Exh. 33 at p. 21, §16.1.  This engineering support was required to be provided to review "operational deviations, identify and address project deficiencies, and evaluate replacement plans."  *Id.*  Any "deviations ... of any portion of a project" were required to be "reviewed and approved by engineering."  *Id.* at §16.4.

Lee Guillory, the Project Manager and head of the Project Delivery team, failed to follow this regulation.  He did not ask the geotechnical division of the engineering division to evaluate the plan that was submitted by WGI for removal of the sewer lift station.  USA Exh. 18 at 153:25-154:7; 157:24-158:12; 198:6-16 (Guillory Depo. Vol. I).  Rather, Guillory testified that George Bacuta, a geochemist, was tasked with reviewing the excavation plan.  *Id.* at 188:8-189:1.  In fact, however, Bacuta never reviewed the excavation plan.  USA Exh. 29 at 142:21-25 (Bacuta Depo.).

Here we see that not only did the head of the team fail to follow mandatory regulation in having this deviation from the original plan evaluated by the engineering department, but evidently no geotechnical analysis whatsoever was done.  Ultimately, the southern breach of the

flood wall took place adjacent to this deep excavation.  Plaintiffs' Exh. 17 at pp. 22-31 (Bea
Tech. Report V, Jan. 2009).

 The northern breach occurred adjacent to a deep excavation of the "wedding cake"
structure at the Boland Marine site.  This excavation plan also deviated from the DDR and,
similarly, Mr. Guillory failed to comply with ER 1110-2-1150 by presenting the excavation plan
to the Corps's Engineering Department.  USA Exh. 18 at 206:23-207:10 (Guillory Depo. Vol. I).
This reckless disregard for the Engineering Regulation led to *no* analysis being performed to
evaluate underseepage below the sheet pile curtains at the locations of the north breach site.
USA Exh. 29 at 176:20-179:12 (Bacuta Depo.).

 According to the Plaintiffs' expert Robert Bea, this underseepage is exactly what caused
or contributed to the breach at the Boland Marine site.  Plaintiffs' Exh. 17 at pp. 1-21 (Bea Tech.
Report V, Jan. 2009).

 The regulation that Mr. Guillory should have observed was Engineering Regulation
1110-1-8157.  USA Exh. 34.  This regulation "*prescribes* Geotechnical Data Quality
Management (GDQM) *responsibilities and requirements*, from initial investigation through
closeout at sites contaminated with hazardous, toxic, and radioactive waste."  *Id.* at p. 1, §1.
(emphasis added).  The utilization of this regulation is "to assure that a site is sufficiently
characterized, and the geotechnical data of acceptable quality are obtained and used properly
within the project."  *Id.*  To accomplish this goal, the regulation mandates a number of relevant
geotechnical requirements.

 In particular, ER 1110-1-8157 required that "[all] geotechnical input, review or
confirmation of no geotechnical involvement will be certified in a project specific Project
Management Plan."  *Id.* at p. 2, §8(a).  This required a review of existing site data and technical

literature, and the usability of this data needed to be evaluated.  *Id.* at p. 3, §8(a)(2).  The

regulation further required that the products generated from project activities "*shall be reviewed

and approved by project geotechnical personnel for compliance....*"  *Id.* at p. 3, §8(a)(3)

(emphasis added).  "Geotechnical input *must also be obtained* for design services such as…plans

and specifications, where the project involves any earthwork or work related to the subsurface."

*Id.* at p. 3, §8(a)(4) (emphasis added).

    As Lee Guillory and George Bacuta testified, these requirements were not met.  USA

Exh. 18 at 153:25-154:7; 157:24-158:12; 198:6-16; 206:23-207:10 (Guillory Depo. Vol. I); USA

Exh. 29 at 142:21-25; 176:20-179:12 (Bacuta Depo.).

    ER 1110-1-8157 also detailed the oversight and quality assurance testing of geotechnical

work required for the Corps's construction projects.  USA Exh. 34 at pp. 5-6.  The Corps

appointed Alvin Clouatre as the quality assurance representative for the project.  USA Exh. 30 at

55:13-25 (Clouatre Depo.).  However, Mr. Clouatre was not qualified for this position due to the

technical nature of the project.  USA Exh. 30 at 90:10-92:8 (Clouatre Depo.).  ER 1110-1-8157

mandates that if field oversight on an HTRW site done by someone "other than project

geotechnical personnel, the project delivery team will prepare *Engineering Considerations and

Instruction* (ECI)."  USA Exh. 34 at p. 6, §8(i)(3).  It has already been established the Corps did

not have a geotechnical person performing field oversight, and there were no *Engineering

Considerations and Instruction* developed or provided to Mr. Clouatre.

    Additional engineering mandates that the Corps failed to follow can also be found in

engineering manual (EM 1110-2-5027), which outlines the field investigations and design

studies that the Corps was expected to undergo when proposing work in the vicinity of levees

and floodwalls.  Plaintiffs' Exh. 14 (EM 1110-2-5027 Confined Disposal of Dredged Materials

Engineering Manual). In particular, the manual states that field investigations and design studies should be "more extensive where *the consequences of the failure involve life, property, or damage to the environment are great.*" *Id.* at p. 6-4 (emphasis added).

EM 1110-2-5027 further states that the "design of a foundation of a levee require specialized knowledge in soil mechanics" adding that "all designs and specifications should be prepared under the direct supervision and guidance of a geotechnical engineer and should bear his approval." *Id.* at p. 6-10, §6-4. The manual also specifically addresses the critical safety issues associated with seepage and levee and dike failure. *Id.* at 6-11 through 6-17.

These basic engineering principles, however, were disregarded as Guillory, the project manager, failed to ask the geotechnical division of the engineering department to evaluate the relevant excavation plans that were submitted by the contractor. USA Exh. 18 at 157:24-170:9; 171:18-172:11; 197:17-198:16; 203:21-205:12; 206:23-207:10 (Guillory Depo. Vol. I); USA Exh. 9 at 42:7-43:3 (DiCharry Depo.). Thus, no geotechnical analysis relative to underseepage was performed at either excavation adjacent to the flood wall failure sites.

Rather, the only evaluation that the Corps's Engineering Division performed regarding the structural stability of the environmental remedial excavating work done on the EBIA in connection with Task Order 26 of the TERC was to evaluate an excavation footprint of 25 feet wide and 3 feet deep in areas not closer than 15 feet from the Jourdan Avenue floodwall/levee. *Id.*

While the Corps's Engineering Division assessed "soil backfill and compaction requirements" for the three foot deep contaminant excavations, it failed to perform a similar evaluation for the completion backfill at the much deeper structural removal excavations at Saucer and Boland. USA Exh. 18 at 170:10-24; 203:21-207:10 (Guillory Depo. Vol. I).

In addition, other Corps Engineering Manuals highlight the need to perform specific engineering evaluations of the mechanisms of levee failure and the effects of construction in the vicinity of the levees on the "Factor of Safety" for the flood control structures. *See* Plaintiffs' Exh. 11 at pp. 5-1, 6-6, 8-7 to 8-8 (EM 1110-2-1913 Design and Construction of Levees (1978)) (detailing minimum acceptable factor of safety and underseepage issues); Plaintiffs' Exh. 20 at 7-3 "General Considerations," 7-25 (g) (Engineering and Design, Retaining and Flood Walls, EM 1110-2-2502, September 29, 1989) (seepage and wall stability); Plaintiffs Exh. 21 at 9-1 "General" (Engineering and Design, Seepage Analysis and Control for Dams, EM 1110-2-1901, April 30, 1993) (seepage control); and Plaintiffs Exh. 22 at 4-6 (Engineering and Design, Design of Sheet Pile Walls, EM 1110-2-2504, March 31, 1994). Collectively, these specific, applicable engineering standards mandated that any foundation condition that may impact the seepage potential under a levee must be evaluated. Plaintiffs' Exh. 18 at pp. 3-8 (Bea Tech. Report IV, July 2008).

**51.    Guillory visited the job site approximately one to three times per week, met with his on-site Quality Assurance staff, met with WGI, had team meetings to discuss the progress and performance on the project, and discussed any particular problems or issues that arose during that week. He sought to ascertain what the Government needed to do to help WGI resolve any issue that arose, take their recommendations into consideration, and work them out to the best of the Government's ability.[52]**

Disputed to the extent that Mr. Guillory testified that he did not perform analysis of the engineering requirments of construction in the proximity to floodwalls and levees. Rather, his testimony was that the potential impacts that the proposed excavations and borrow sites could

---

[52]*Katrina,* 2008 WL 5234369, at *4.

have on adjacent levees and floodwalls and "had to be addressed" to make certain that such work was "safe for the levee."  USA Exh. 18 at 164:19-166:12 (Guillory Depo. Vol. I).

Disputed to the extent that this statement implies that the Corps performed the mandated engineering analyses along the EBIA.

Mr. Grieshaber testified that the Corps would perform engineering analyses on the wall stability, seepage, and global stability to make certain that the excavations do no impact any adjacent flood control structures.  Plaintiffs' Exh. 16 at 53:4-12; 54:2-13; 60:24-62:6; 70:5-73:11; 75:14-77:25; 88:7-21; 90:14-91:10; 94:21-96:15; 103:3-14; 123:5-124:7; 147:1-148:14; 159:20-160:25; 168:9-22; 173:8-174:19 (Grieshaber Depo Vol. I).  Mr. Guillory, however, testified that neither the Corps nor its contractor, WGI, performed any analysis of the engineering requirements of construction in the proximity to floodwalls and levees where the excavations at the Boland and Saucer Marine locations occurred.  USA Exh. 18 at 157:24-170:9; 171:18-172:11; 197:17-198:16; 203:21-205:12; 206:23-207:10 (Guillory Depo. Vol. I); USA Exh. 9 at 42:7-43:3 (DiCharry Depo.).  Rather, his testimony was that the Corps only studied the potential impacts that the proposed excavations and borrow sites could have on the adjacent Jourdan Avenue floodwall and levee to make certain that such work was "safe for the levee." USA Exh. 18 at 164:19-166:12 (Guillory Depo. Vol. I).

The requirement for a proper analysis on levee and floodwall stability at the EBIA site is further buttressed by the Corps's own engineering regulations.  Specifically, Engineer Regulation ("ER") 1110-2-1150 defines the engineering responsibilities, requirements, and procedures during the planning, design, construction and operations phases of civil works projects.  USA Exh. 33.  This regulation is *mandatory*.  *Id.* at p. 23, §19.1.1; *see also* USA Exh. 12 at 64:2-11; 82:2-23 (Grieshaber Depo. Vol. II).  This regulation places responsibility for the

technical content and engineering sufficiency of all engineering products with the Chief of the Engineering organization.

This regulation further specifies that a Project Delivery Team be established for the project, which consists of a Project Manager and the technical personnel necessary to develop the project. *Id.* at p. 3, §7. The Corps specifies the utilization of five phases to present the engineering and design policy and process that applies to the project. *Id.* at p. 5, §11. These five phases are identified as reconnaissance; feasibility; preconstruction; engineering and design; and construction, operation and maintenance. *Id.*

The 1997 MRGO New Lock and Connecting Channels Evaluation Report was developed to provide guidance for the overall lock replacement project. In addition, the Corps developed a 1999 Design Documentation Report (DDR). USA Exh. 33 at p. 3, §8.2 (ER 1110-2-1150). The DDR is "a record of final design effort after the feasibility phase" and is "required for all engineering design products." *Id.* It "provides the technical basis for the plans and specifications and serves as a summary of the final design." *Id.* As a result of these two reports, the overall scope of the project was established before WGI became involved; however, it did not include geotechnical evaluations regarding excavations below five feet and the effects that underseepage could have on adjacent floodwalls.

WGI was engaged through Task Order 26 to evaluate the prior documentation relative to the EBIA and develop a Recommendation Report that the Army Corps could use to analyze the scope of work to be done at the Hazardous Toxic Radioactive Waste site, with a requirement that it identify any data gaps in the supplied information that needed further evaluation. But even as WGI identified these relevant data gaps, the Army Corps did not undertake further geotechnical evaluation. Until the end of 2000, this was immaterial as the deepest excavation contemplated

and evaluated was to a depth of approximately eight feet.  USA Exh. 18 at 80:5-81:8 (Guillory Depo. Vol. I).  However immaterial it was at that time, the failure of the Army Corps to submit the excavation plans developed by WGI to the Engineering Department violated mandatory Corps's regulations.

Specifically, section 16.1 of ER 1110-2-1150 requires that "engineering support shall be provided to those maintenance activities that require [plans and specifications]..." as support for operations activities.  USA Exh. 33 at p. 21, §16.1.  This engineering support was required to be provided to review "operational deviations, identify and address project deficiencies, and evaluate replacement plans."  *Id.*  Any "deviations ... of any portion of a project" were required to be "reviewed and approved by engineering."  *Id.* at §16.4.

Lee Guillory, the Project Manager and head of the Project Delivery team, failed to follow this regulation.  He did not ask the geotechnical division of the engineering division to evaluate the plan that was submitted by WGI for removal of the sewer lift station.  USA Exh. 18 at 153:25-154:7; 157:24-158:12; 198:6-16 (Guillory Depo. Vol. I).  Rather, Guillory testified that George Bacuta, a geochemist, was tasked with reviewing the excavation plan.  *Id.* at 188:8-189:1.  In fact, however, Bacuta never reviewed the excavation plan.  USA Exh. 29 at 142:21-25 (Bacuta Depo.).

Here we see that not only did the head of the team fail to follow mandatory regulation in having this deviation from the original plan evaluated by the engineering department, but evidently no geotechnical analysis whatsoever was done.  Ultimately, the southern breach of the flood wall took place adjacent to this deep excavation.  Plaintiffs' Exh. 17 at pp. 22-31 (Bea Tech. Report V, Jan. 2009).

The northern breach occurred adjacent to a deep excavation of the "wedding cake" structure at the Boland Marine site.  This excavation plan also deviated from the DDR and, similarly, Mr. Guillory failed to comply with ER 1110-2-1150 by presenting the excavation plan to the Corps's Engineering Department.  USA Exh. 18 at 206:23-207:10 (Guillory Depo. Vol. I). This reckless disregard for the Engineering Regulation led to *no* analysis being performed to evaluate underseepage below the sheet pile curtains at the locations of the north breach site. USA Exh. 29 at 176:20-179:12 (Bacuta Depo.).

According to the Plaintiffs' expert Robert Bea, this underseepage is exactly what caused or contributed to the breach at the Boland Marine site.  Plaintiffs' Exh. 17 at pp. 1-21 (Bea Tech. Report V, Jan. 2009).

The regulation that Mr. Guillory should have observed was Engineering Regulation 1110-1-8157.  USA Exh. 34.  This regulation "*prescribes* Geotechnical Data Quality Management (GDQM) *responsibilities and requirements*, from initial investigation through closeout at sites contaminated with hazardous, toxic, and radioactive waste."  *Id.* at p. 1, §1. (emphasis added).  The utilization of this regulation is "to assure that a site is sufficiently characterized, and the geotechnical data of acceptable quality are obtained and used properly within the project."  *Id.*  To accomplish this goal, the regulation mandates a number of relevant geotechnical requirements.

In particular, ER 1110-1-8157 required that "[all] geotechnical input, review or confirmation of no geotechnical involvement will be certified in a project specific Project Management Plan."  *Id.* at p. 2, §8(a).  This required a review of existing site data and technical literature, and the usability of this data needed to be evaluated.  *Id.* at p. 3, §8(a)(2).  The regulation further required that the products generated from project activities "*shall be reviewed*

*and approved by project geotechnical personnel for compliance....*"  *Id*. at p. 3, §8(a)(3)

(emphasis added).  "Geotechnical input *must also be obtained* for design services such as…plans

and specifications, where the project involves any earthwork or work related to the subsurface."

*Id*. at p. 3, §8(a)(4) (emphasis added).

As Lee Guillory and George Bacuta testified, these requirements were not met.  USA

Exh. 18 at 153:25-154:7; 157:24-158:12; 198:6-16; 206:23-207:10 (Guillory Depo. Vol. I); USA

Exh. 29 at 142:21-25; 176:20-179:12 (Bacuta Depo.).

ER 1110-1-8157 also detailed the oversight and quality assurance testing of geotechnical

work required for the Corps's construction projects.  USA Exh. 34 at pp. 5-6.  The Corps

appointed Alvin Clouatre as the quality assurance representative for the project.  USA Exh. 30 at

55:13-25 (Clouatre Depo.).  However, Mr. Clouatre was not qualified for this position due to the

technical nature of the project.  USA Exh. 30 at 90:10-92:8 (Clouatre Depo.).  ER 1110-1-8157

mandates that if field oversight on an HTRW site done by someone "other than project

geotechnical personnel, the project delivery team will prepare *Engineering Considerations and

Instruction* (ECI)."  USA Exh. 34 at p. 6, §8(i)(3).  It has already been established the Corps did

not have a geotechnical person performing field oversight, and there were no *Engineering

Considerations and Instruction* developed or provided to Mr. Clouatre.

Additional engineering mandates that the Corps failed to follow can also be found in

engineering manual (EM 1110-2-5027), which outlines the field investigations and design

studies that the Corps was expected to undergo when proposing work in the vicinity of levees

and floodwalls.  Plaintiffs' Exh. 14 (EM 1110-2-5027 Confined Disposal of Dredged Materials

Engineering Manual).  In particular, the manual states that field investigations and design studies

should be "more extensive where *the consequences of the failure involve life, property, or damage to the environment are great.*"  *Id.* at p. 6-4 (emphasis added).

EM 1110-2-5027 further states that the "design of a foundation of a levee require specialized knowledge in soil mechanics" adding that "all designs and specifications should be prepared under the direct supervision and guidance of a geotechnical engineer and should bear his approval."  *Id.* at p. 6-10, §6-4.  The manual also specifically addresses the critical safety issues associated with seepage and levee and dike failure.  *Id.* at 6-11 through 6-17.

These basic engineering principles, however, were disregarded as Guillory, the project manager, failed to ask the geotechnical division of the engineering department to evaluate the relevant excavation plans that were submitted by the contractor.  USA Exh. 18 at 157:24-170:9; 171:18-172:11; 197:17-198:16; 203:21-205:12; 206:23-207:10 (Guillory Depo. Vol. I); USA Exh. 9 at 42:7-43:3 (DiCharry Depo.).  Thus, no geotechnical analysis relative to underseepage was performed at either excavation adjacent to the flood wall failure sites.

Rather, the only evaluation that the Corps's Engineering Division performed regarding the structural stability of the environmental remedial excavating work done on the EBIA in connection with Task Order 26 of the TERC was to evaluate an excavation footprint of 25 feet wide and 3 feet deep in areas not closer than 15 feet from the Jourdan Avenue floodwall/levee.  *Id.*

While the Corps's Engineering Division assessed "soil backfill and compaction requirements" for the three foot deep contaminant excavations, it failed to perform a similar evaluation for the completion backfill at the much deeper structural removal excavations at Saucer and Boland.  USA Exh. 18 at 170:10-24; 203:21-207:10 (Guillory Depo. Vol. I).

In addition, other Corps Engineering Manuals highlight the need to perform specific engineering evaluations of the mechanisms of levee failure and the effects of construction in the vicinity of the levees on the "Factor of Safety" for the flood control structures. *See* Plaintiffs' Exh. 11 at pp. 5-1, 6-6, 8-7 to 8-8 (EM 1110-2-1913 Design and Construction of Levees (1978)) (detailing minimum acceptable factor of safety and underseepage issues); Plaintiffs' Exh. 20 at 7-3 "General Considerations," 7-25 (g) (Engineering and Design, Retaining and Flood Walls, EM 1110-2-2502, September 29, 1989) (seepage and wall stability); Plaintiffs Exh. 21 at 9-1 "General" (Engineering and Design, Seepage Analysis and Control for Dams, EM 1110-2-1901, April 30, 1993) (seepage control); and Plaintiffs Exh. 22 at 4-6 (Engineering and Design, Design of Sheet Pile Walls, EM 1110-2-2504, March 31, 1994). Collectively, these specific, applicable engineering standards mandated that any foundation condition that may impact the seepage potential under a levee must be evaluated. Plaintiffs' Exh. 18 at pp. 3-8 (Bea Tech. Report IV, July 2008).

**52.    James Montegut, a Project Engineer in the Construction Division of the New Orleans District, was the on-site Contracting Officer Representative for Task Order 26. On-site quality assurance inspectors reported to Montegut.  Montegut was responsible for overseeing WGI's performance and ensuring WGI worked in an efficient and cost-effective manner.[53]**

Disputed.  Mr. Montegut specifically testified that he was not a supervisor of the Quality Assurance representatives.  USA Exh. 25 at 43:11-20 (Montegut Depo.).  He also specifically denied any involvement in the development or review of any documentation. *Id.* at 40:8-19.

---

[53]*Id.*

Mr. Montegut's actual responsibility was ensuring that WGI spent money correctly, in an efficient and effective manner. *Id.* at 28:12-31:3. For example, if Mr. Montegut felt that too many people were being used to dig a small hole, he would take issue with that. *Id.* at 44:18-46:18.

**53.    In addition to reviewing and approving WGI's proposed expenses on Task Order 26, Montegut managed the Corps' on-site Quality Assurance Representatives, met daily with WGI's on-site personnel, approved plans for various features of work, and monitored the physical progress of work on a day-to-day basis.[54]**

Disputed. Mr. Montegut specifically testified that he was not a supervisor of the Quality Assurance representatives. USA Exh. 25 at 43:11-20 (Montegut Depo.). He also specifically denied any involvement in the development or review of any documentation. *Id.* at 40:8-19.

Mr. Montegut's actual responsibility was ensuring that WGI spent money correctly, in an efficient and effective manner. *Id.* at 28:12-31:3. For example, if Mr. Montegut felt that too many people were being used to dig a small hole, he would take issue with that. *Id.* at 44:18-46:18.

**54.    Montegut had "thirty-three years of experience on the job" relating to "issues of underseepage with floodwalls."[55]**

Disputed. Mr. Montegut testified that he had thirty-three years of experience on the job, and that his expertise, if any, would have been developed during that time period. USA Exh. 25 at 47:4-23 USA Exh. 25 at 43:11-20 (Montegut Depo.). He specifically denied that he was an expert in the field of geotechnical engineering. *Id.* at 52:2-16.

---

[54]*Id.*

[55]WGI SOF ¶ 43 [Ex. 10].

55.     At all times, the Corps had one or more Quality Assurance ("QA")
Inspectors on-site monitoring the work of WGI and its subcontractors.  These QA
Inspectors were Alvin Clouatre and Alex Brogna, but also included at some times Robert
Ariatti, P.E. and Steven Keen.[56]

Undisputed.

**Community-Impact Mitigation**

56.     The Corps' Community Impact Mitigation Plan for the project was
developed in coordination with local interests.  It included:

> [D]irect and indirect mitigation measures that address impacts related to
> noise, transportation, cultural resources, aesthetics, employment, community
> and regional growth, and community cohesion.  Potential features of the
> mitigation plan include, but are not limited to, enhanced police protection,
> job training, reimbursement of businesses' lost revenue, street
> improvements, housing revitalization program, education enhancements,
> parks and playgrounds, historical/cultural markers and displays, and
> emergency medical services.[57]

Disputed to the extent that this statement implies that the mitigation plans contained in its
EIS contemplated all relevant impacts of the proposed action.

57.     The project was carefully tailored to avoid adverse community-impacts
insofar as was practicable.[58]

---

[56]*Id.* ¶ 44 [Ex. 10].

[57]USACE Fact Sheet: Community Impact Mitigation Plan, IHNC Lock Replacement Project
(Aug. 3, 2001) NPM-003-000000779 [Ex. 16].

[58]2 Guillory 217:24-218:22 (Ex. 18); *see also* Project Work Plan: Project Site And Remedial
Action of EBIA IHNC Lock Replacement Project (Oct. 2000) 8 ("The use of a wrecking ball to
demolish foundations could cause excessive and unnecessary noise, dust and vibrations in the
adjacent neighborhood, and is not an approved method of demolition for this project") [Ex. 19];
1 IHNC Lock Replacement Project Design Documentation Report 33 ("The contractor will be
required to provide for noise monitoring and air quality monitoring during the demolition
operations.") [Ex. 20].

Disputed that the Corps's Community Impact Mitigation Plan was "carefully tailored to avoid adverse community-impacts" where the Corps failed to comply with its own safety and engineering guidelines and to the extent that this statement implies that the mitigation plans contained in its EIS contemplated all relevant impacts of the proposed action.

Mr. Grieshaber testified that the Corps would perform engineering analyses on the wall stability, seepage, and global stability to make certain that the excavations do no impact any adjacent flood control structures.  Plaintiffs' Exh. 16 at 53:4-12; 54:2-13; 60:24-62:6; 70:5-73:11; 75:14-77:25; 88:7-21; 90:14-91:10; 94:21-96:15; 103:3-14; 123:5-124:7; 147:1-148:14; 159:20-160:25; 168:9-22; 173:8-174:19 (Grieshaber Depo Vol. I).

Mr. Guillory, however, testified that he did not perform any analysis of the engineering requirements of construction in the proximity to floodwalls and levees where the excavations at the Boland and Saucer Marine locations occurred.  USA Exh. 18 at 157:24-170:9; 171:18-172:11; 197:17-198:16; 203:21-205:12; 206:23-207:10 (Guillory Depo. Vol. I); USA Exh. 9 at 42:7-43:3 (DiCharry Depo.).  Rather, his testimony was that the Corps only studied the potential impacts that the proposed excavations and borrow sites could have on the adjacent Jourdan Avenue floodwall and levee to make certain that such work was "safe for the levee."  USA Exh. 18 at 164:19-166:12 (Guillory Depo. Vol. I).

The requirement for a proper analysis on levee and floodwall stability at the EBIA site is further buttressed by the Corps's own engineering manual.  Specifically, Engineer Regulation ("ER") 1110-2-1150 defines the engineering responsibilities, requirements, and procedures during the planning, design, construction and operations phases of civil works projects.  USA Exh. 33.  This regulation is *mandatory*.  *Id.* at p. 23, §19.1.1; *see also* USA Exh. 12 at 64:2-11; 82:2-23 (Grieshaber Depo. Vol. II).  This regulation places responsibility for the technical

content and engineering sufficiency of all engineering products with the Chief of the Engineering organization.

This regulation further specifies that a Project Delivery Team be established for the project, which consists of a Project Manager and the technical personnel necessary to develop the project. *Id.* at p. 3, §7. The Corps specifies the utilization of five phases to present the engineering and design policy and process that applies to the project. *Id.* at p. 5, §11. These five phases are identified as reconnaissance; feasibility; preconstruction; engineering and design; and construction, operation and maintenance. *Id.*

The 1997 MRGO New Lock and Connecting Channels Evaluation Report was developed to provide guidance for the overall lock replacement project. In addition, the Corps developed a 1999 Design Documentation Report (DDR). USA Exh. 33 at p. 3, §8.2 (ER 1110-2-1150). The DDR is "a record of final design effort after the feasibility phase" and is "required for all engineering design products." *Id.* It "provides the technical basis for the plans and specifications and serves as a summary of the final design." *Id.* As a result of these two reports, the overall scope of the project was established before WGI became involved; however, it did not include geotechnical evaluations regarding excavations below five feet and the effects that underseepage could have on adjacent floodwalls.

WGI was engaged through Task Order 26 to evaluate the prior documentation relative to the EBIA and develop a Recommendation Report that the Army Corps could use to analyze the scope of work to be done at the Hazardous Toxic Radioactive Waste site, with a requirement that it identify any data gaps in the supplied information that needed further evaluation. But even as WGI identified these relevant data gaps, the Army Corps did not undertake further geotechnical evaluation. Until the end of 2000, this was immaterial as the deepest excavation contemplated

and evaluated was to a depth of approximately eight feet.  USA Exh. 18 at 80:5-81:8 (Guillory

Depo. Vol. I).  However immaterial it was at that time, the failure of the Army Corps to submit

the excavation plans developed by WGI to the Engineering Department violated mandatory

Corps's regulations.

Specifically, section 16.1 of ER 1110-2-1150 requires that "engineering support shall be

provided to those maintenance activities that require [plans and specifications]..." as support for

operations activities.  USA Exh. 33 at p. 21, §16.1.  This engineering support was required to be

provided to review "operational deviations, identify and address project deficiencies, and

evaluate replacement plans."  *Id.*  Any "deviations ... of any portion of a project" were required

to be "reviewed and approved by engineering."  *Id.* at §16.4.

Lee Guillory, the Project Manager and head of the Project Delivery team, failed to follow

this regulation.  He did not ask the geotechnical division of the engineering division to evaluate

the plan that was submitted by WGI for removal of the sewer lift station.  USA Exh. 18 at

153:25-154:7; 157:24-158:12; 198:6-16 (Guillory Depo. Vol. I).  Rather, Guillory testified that

George Bacuta, a geochemist, was tasked with reviewing the excavation plan.  *Id.* at 188:8-

189:1.  In fact, however, Bacuta never reviewed the excavation plan.  USA Exh. 29 at 142:21-25

(Bacuta Depo.).

Here we see that not only did the head of the team fail to follow mandatory regulation in

having this deviation from the original plan evaluated by the engineering department, but

evidently no geotechnical analysis whatsoever was done.  Ultimately, the southern breach of the

flood wall took place adjacent to this deep excavation.  Plaintiffs' Exh. 17 at pp. 22-31 (Bea

Tech. Report V, Jan. 2009).

The northern breach occurred adjacent to a deep excavation of the "wedding cake" structure at the Boland Marine site. This excavation plan also deviated from the DDR and, similarly, Mr. Guillory failed to comply with ER 1110-2-1150 by presenting the excavation plan to the Corps's Engineering Department. USA Exh. 18 at 206:23-207:10 (Guillory Depo. Vol. I). This reckless disregard for the Engineering Regulation led to *no* analysis being performed to evaluate underseepage below the sheet pile curtains at the locations of the north breach site. USA Exh. 29 at 176:20-179:12 (Bacuta Depo.).

According to the Plaintiffs' expert Robert Bea, this underseepage is exactly what caused or contributed to the breach at the Boland Marine site. Plaintiffs' Exh. 17 at pp. 1-21 (Bea Tech. Report V, Jan. 2009).

The regulation that Mr. Guillory should have observed was Engineering Regulation 1110-1-8157. USA Exh. 34. This regulation "*prescribes* Geotechnical Data Quality Management (GDQM) *responsibilities and requirements*, from initial investigation through closeout at sites contaminated with hazardous, toxic, and radioactive waste." *Id.* at p. 1, §1. (emphasis added). The utilization of this regulation is "to assure that a site is sufficiently characterized, and the geotechnical data of acceptable quality are obtained and used properly within the project." *Id.* To accomplish this goal, the regulation mandates a number of relevant geotechnical requirements.

In particular, ER 1110-1-8157 required that "[all] geotechnical input, review or confirmation of no geotechnical involvement will be certified in a project specific Project Management Plan." *Id.* at p. 2, §8(a). This required a review of existing site data and technical literature, and the usability of this data needed to be evaluated. *Id.* at p. 3, §8(a)(2). The regulation further required that the products generated from project activities "*shall be reviewed*

*and approved by project geotechnical personnel for compliance.......*" *Id.* at p. 3, §8(a)(3)

(emphasis added). "Geotechnical input *must also be obtained* for design services such as…plans

and specifications, where the project involves any earthwork or work related to the subsurface."

*Id.* at p. 3, §8(a)(4) (emphasis added).

As Lee Guillory and George Bacuta testified, these requirements were not met. USA

Exh. 18 at 153:25-154:7; 157:24-158:12; 198:6-16; 206:23-207:10 (Guillory Depo. Vol. I); USA

Exh. 29 at 142:21-25; 176:20-179:12 (Bacuta Depo.).

ER 1110-1-8157 also detailed the oversight and quality assurance testing of geotechnical

work required for the Corps's construction projects. USA Exh. 34 at pp. 5-6. The Corps

appointed Alvin Clouatre as the quality assurance representative for the project. USA Exh. 30 at

55:13-25 (Clouatre Depo.). However, Mr. Clouatre was not qualified for this position due to the

technical nature of the project. USA Exh. 30 at 90:10-92:8 (Clouatre Depo.). Engineering

Regulation 1110-1-8157 mandates that if field oversight on an HTRW site done by someone

"other than project geotechnical personnel, the project delivery team will prepare *Engineering*

*Considerations and Instruction* (ECI)." USA Exh. 34 at p. 6, §8(i)(3). It has already been

established the Corps did not have a geotechnical person performing field oversight, and there

were no *Engineering Considerations and Instruction* developed or provided to Mr. Clouatre.

Additional engineering mandates that the Corps failed to follow can also be found in

engineering manual (EM 1110-2-5027), which outlines the field investigations and design

studies that the Corps was expected to undergo when proposing work in the vicinity of levees

and floodwalls. Plaintiffs' Exh. 14 (EM 1110-2-5027 Confined Disposal of Dredged Materials

Engineering Manual). In particular, the manual states that field investigations and design studies

should be "more extensive where *the consequences of the failure involve life, property, or damage to the environment are great.*"  *Id.* at p. 6-4 (emphasis added).

EM 1110-2-5027 further states that the "design of a foundation of a levee require specialized knowledge in soil mechanics" adding that "all designs and specifications should be prepared under the direct supervision and guidance of a geotechnical engineer and should bear his approval." *Id.* at p. 6-10, §6-4.  The manual also specifically addresses the critical safety issues associated with seepage and levee and dike failure.  *Id.* at 6-11 through 6-17.

These basic engineering principles, however, were disregarded as Guillory, the project manager, failed to ask the geotechnical division of the engineering department to evaluate the relevant excavation plans that were submitted by the contractor.  USA Exh. 18 at 157:24-170:9; 171:18-172:11; 197:17-198:16; 203:21-205:12; 206:23-207:10 (Guillory Depo. Vol. I); USA Exh. 9 at 42:7-43:3 (DiCharry Depo.).  Thus, no geotechnical analysis relative to underseepage was performed at either excavation adjacent to the flood wall failure sites.

Rather, the only evaluations that the Corps's Engineering Division performed regarding the structural stability of the environmental remedial excavating work done on the EBIA in connection with Task Order 26 of the TERC was to evaluate an excavation footprint of 25 feet wide and 3 feet deep in areas not closer than 15 feet from the Jourdan Avenue floodwall/levee. *Id.*

While the Corps's Engineering Division assessed "soil backfill and compaction requirements" for the three foot deep contaminant excavations, it failed to perform a similar evaluation for the completion backfill at the much deeper structural removal excavations at Saucer and Boland.  USA Exh. 18 at 170:10-24; 203:21-207:10 (Guillory Depo. Vol. I).

**58.    Accordingly, WGI conducted vibration tests along Jourdan Avenue to ensure that vibration levels of excavation equipment would not disturb the Lower Ninth Ward.[59]**

Undisputed.

**59.    The final Recommendation Report for Demolition and Site Preparation Activities stated that "[e]very effort will be made to utilize local subcontractors to perform the construction work since using local resources not only supports the community economically, but also results in a more cost-effective approach."[60]**

Disputed to the extent that this statement implies that cost analysis supplants the priority and requirement for basic engineering and safety analysis.

**60.    Per the Corps' instruction, the Project Work Plan ("PWP") set the work site's boundaries: all soil remediation and associated excavations were confined to "the area 15-feet west of the floodwall."[61]**

Undisputed.

**61.    This exclusion zone within 15 feet of the floodwall was intended to prevent damage to the wall.[62]**

Disputed to the extent that this statement implies that the Corps conducted proper engineering analysis regarding the excavations and the location of the floodwalls.

---

[59]Technical Completion Report and Record Drawings EBIA IHNC (Aug. 2005) [WGI MSJ Ex. 24] 31. (PDF 31) [Ex. 21].

[60]Final Recommendation Report for Demolition and Site Preparation Activities of the EBIA IHNC (Jan. 10, 2000) PDF 50 [Ex. 22].

[61]*Katrina,* 2008 WL 5234369, at *6; WGI SOF ¶ 72 [Ex. 10].

[62]*Katrina,* 2008 WL 5234369, at *6; WGI SOF ¶ 73 [Ex. 10].

To the contrary, the testimony emphasizes that the Corps established a "rule of thumb" that defined the Soil Remediation Area as the area "15 feet from the flood side face of the wall to the edge of Surekote Road."  USA Exh. 11 at 81:1-12 (Guillory Depo. Vol. II).  This footprint was based not on a calculated engineering analysis or policy, (as the Corps's own witness testified it was required to be [Plaintiffs' Exh. 16 at 53:4-12; 54:2-13; 60:24-62:6; 70:5-73:11; 75:14-77:25; 88:7-21; 90:14-91:10; 94:21-96:15; 103:3-14; 123:5-124:7; 147:1-148:14; 159:20-160:25; 168:9-22; 173:8-174:19 (Grieshaber Depo. Vol. I)]), but "probably [on] a consensus of opinion" and the location of a concrete curb on Surekote Road in the EBIA.  USA Exh. 11 at 83:2-23 (Guillory Depo. Vol. II).

**62.    Guillory developed the 15-foot guideline based on a "consensus of opinion between [himself] and the rest of the small [EBIA remediation] team" at the Corps.[63]**

Disputed to the extent that this statement implies that the Corps conducted proper engineering analysis regarding the excavations and the location of the floodwalls.

To the contrary, the testimony emphasizes that the Corps established a "rule of thumb" that defined the Soil Remediation Area as the area "15 feet from the flood side face of the wall to the edge of Surekote Road."  USA Exh. 11 at 81:1-12 (Guillory Depo. Vol. II).  This footprint was based not on a calculated engineering analysis or policy, (as the Corps's own witness testified it was required to be [Plaintiffs' Exh. 16 at 53:4-12; 54:2-13; 60:24-62:6; 70:5-73:11; 75:14-77:25; 88:7-21; 90:14-91:10; 94:21-96:15; 103:3-14; 123:5-124:7; 147:1-148:14; 159:20-160:25; 168:9-22; 173:8-174:19 (Grieshaber Depo. Vol. I)]), but "probably [on] a consensus of opinion" and the location of a concrete curb on Surekote Road in the EBIA.  USA Exh. 11 at 83:2-23 (Guillory Depo. Vol. II).

---

[63]WGI SOF ¶ 74 [Exh. 10]..

**Engineering Analyses**

**McDonough Marine Borrow Pit**

**63.     During the planning process for Task Order 26, the Corps determined that, when feasible, excavations should be backfilled with soils from a borrow pit on-site, rather than with imported material.[64]**

Undisputed.

**64.     The Corps's concerns were that using off-site commercial material would increase remediation costs, and any new material added to the site would increase future dredging costs because they would have to be removed anyway to construct the bypass channel.[65]**

Disputed to the extent that this statement implies that cost analysis supplants the priority and requirement for basic engineering and safety analysis.

**65.     A borrow pit at the McDonough Marine site was to serve as the primary source of backfill.  If more material was needed, WGI could import backfill material subject to Corps approval.[66]**

Disputed to the extent that this statement implies that an analysis of the proper backfill material for the vicinity of the IHNC levees was to be found in the materials located in the McDonough Marine site.  Rather, no analysis of the suitability of this material was made and no attempt to conform the material with that of the required materials specified in the IHNC design documents was made.  In drafting the General Design Memoranda (GDM) for the LPV levee

---

[64]1 Guillory 194:6-14; Staggs 151:4-17.

[65]WGI SOF ¶ 179 [Ex. 10]..

[66]WGI SOF ¶ 180.

work, the Corps highlighted eight principal design and construction "problems" in the area of the IHNC and included the design requirement that the "6) Sources of fill material" [for the levees] be:

> the earth fill for completing the existing levee portion of the protection between the IHNC lock and Florida Avenue will be obtained from a borrow area in the bottom of Lake Pontchartrain along the north shore. This material consisting of stiff Pleistocene clays will be transported to the project on barges.

Plaintiffs' Exh. 3 at p. 17, ¶33; p. 19 (Pontchartrain and Vicinity Hurricane Protection Plan (LPV) Design Memoranda Number 3 General Design, November 1966).

**66.    WGI submitted a plan for an on-site borrow pit at McDonough Marine to the Corps and the Louisiana Department of Environmental Quality ("LDEQ") for review and approval in August 2001.[67]**

Disputed to the extent that this statement implies that the material was reviewed for engineering suitability for use in the proximity of the levees rather than toxicity.

**67.    As the scope of the remediation work increased, so did the need for additional backfill material. By late 2001, WGI and the Corps sought permission from the LDEQ to expand the borrow pit from 0.84 acres to 1.55 acres.[68]**

Undisputed.

**68.    However, the Corps was concerned that the extension proposal, as prepared by WGI, could have a detrimental effect on the adjacent flood control structure.[69]**

---

[67]WGI SOF ¶ 181 [Ex. 10].

[68]WGI SOF ¶ 182 [Ex. 10].

[69]WGI SOF ¶ 183 [Ex. 10].

Undisputed as to perceived significance of the impact expanding the size of the borrow pit could have on the adjacent flood control structure.  Disputed as to the implication that this perceived significance was evaluated and presented to decision makers for consideration.

**69.    The Corps undertook a review of the proposed expansion on the adjacent flood control structures.  As Guillory stated:**

> **We had two ways we could have gone with it; we could have asked [WGI] to evaluate the structural stability of it and submit that to the Corps for final review and approval, or we could just do [the analysis] in-house.  And for expediency, and being that Corps had the final say-so in the structural stability analysis, . . . and the [Hazardous, Toxic, and Radioactive Waste] team tasked [WGI] to provide us with accurate cross-sections and surveys of the area, and from that I specifically requested, by memo, to our geotechnical engineering branch in engineering division to perform that analysis. [70]**

Disputed to the extent that this statement implies that the Corps performed a thorough and sound engineering analysis of the excavations.  Further this statement is disputed to the extent that it implies that an engineering analysis was performed at the Boland and Saucer Marine excavations.  Nonetheless, this statement implies that the Corps understood the significance of the impact of these excavations on the stability of the adjacent floodwalls and omitted this significant impact from any EIS presented for consideration.

**70.    The in-house review from the Corps was incorporated into a design template for WGI to use in its excavation of the expanded borrow pit.  WGI SOF ¶ 187.**

Undisputed.

**71.    The Corps was also concerned with the potential safety hazards of the borrow pit to the neighboring community.  Guillory commented that:**

> **The [borrow pit] excavation would leave a big hole that can appear as a nuisance to the neighborhood in regard to "aesthetic" and "potential health and safety" implications.  The hole can be filled with rainwater that can**

---

[70]WGI SOF ¶ 185 [Ex. 10]; *Katrina,* 2008 WL 5234369, at *2.

96

stagnate (if left enclosed) and turn into a potential breeding ground for mosquitoes as well as an inviting swimming pool. There should be some engineering and Institutional controls in-place to address I mitigate these issues such that this feature won't pose a hazard Issue after Project close-out.[71]

Undisputed.

**72.     Following the conclusion of work for Task Order 26, the Corps instructed WGI to breach the dikes between the borrow pit and the IHNC, allowing water to fill up there.[72]**

Undisputed.

**73.     Despite the proximity of the borrow pit to the floodwall, the wall did not breach at that location during Hurricane Katrina.**

Undisputed.

**Saucer Marine Excavations**

**74.     Since June 1999, the Corps was aware of the subsurface structure at the corner of the Saucer Marine and Mayer Yacht sites.[73]**

Undisputed.

**75.     By August 2000, the Corps was aware of the depth of the necessary excavation to remove the sewer lift station.[74]**

Undisputed.

---

[71]USACE Final Comments on WGI Submittals for EBIA IHNC Lock Replacement Project (Feb. 4, 2002) 4 [Ex. 24].

[72]WGI SOF ¶ 189 [Ex. 10].

[73]*Katrina,* 2008 WL 5234369, at *7; 2 Guillory 34:20-35:21 [Ex. 11].

[74]1 Guillory 132:10-20[Ex. 18].

**76.     The sewer lift station was generally described as a "large diameter pipe with pumps in it, valves and ladders to get down into it, all encased in . . . metal pipe[,]" which had deteriorated due to prolonged exposure to brackish water in the IHNC.[75]**

Undisputed.

**77.     The sewer lift station was approximately 80-100 feet from the floodwall.[76]**

Undisputed.

**78.  The removal of the sewer lift station was to be performed by a subcontractor working for WGI.  The approved plan required a braced excavation, also referred to as a cofferdam.  A braced excavation prevents sloughing or movement of the surrounding soils while in place.[77]**

Undisputed that the removal of the sewer lift station was to be performed by WGI. Disputed that the "approval plan" was proper and complied with Corps' engineering practices and principles.

Corps witnesses acknowledged that "standard engineering practices and principles" required specialized architectural-engineering and geotechnical analysis for excavation in an area adjacent to the levees to ensure such work was "safe for the levee."  USA Exh. 18 at 164:19-166:12 (Guillory Depo. Vol. I); Plaintiffs' Exh. 16 at 53:4-12; 54:2-13; 60:24-62:6; 70:5-73:11; 75:14-77:25; 88:7-21; 90:14-91:10; 94:21-96:15; 103:3-14; 123:5-124:7; 147:1-148:14; 159:20-160:25; 168:9-22; 173:8-174:19 (Grieshaber Depo Vol. I); *see also* Plaintiffs' Exh. 12 at

---

[75]2008 WL 5234369, at *7; Montegut 75:3-10 [Ex. 25].

[76]1 Guillory 83:2-6 [Ex. 18]; 2 Guillory 132:12-23 [Ex. 11].

[77]1 Guillory 142:15-143:10 [Ex. 18]; 2 Grieshaber 17:25-18:7 [Ex. 12]; O'Conner 38:5-50:2 [Ex. 26].

WGI38731-32, 5.1.2.1.5 (Recommendation Report for Demolition and Site Preparation Activities of the EBIA of the IHNC Lock Replacement Project).

The Corps's own engineering regulation also mandated that "engineering support shall be provided to those maintenance activities that require [plans and specifications]..." as support for operations activities.  USA Exh. 33 at p. 21, §16.1 (ER 1110-2-1150).  This engineering support was required to be provided to review "operational deviations, identify and address project deficiencies, and evaluate replacement plans."  *Id.*  Any "deviations ... of any portion of a project" were required to be "reviewed and approved by engineering."  *Id.* at §16.4.

However, the plans for the large subsurface excavations at the Saucer and Boland sites, omitted any engineering analysis of the soil wall stability, underseepage propensity, global stability, the potential impact on the adjacent LPV levees, or the proper compression for backfill material used at these sites.  USA Exh. 18 at 157:24-170:9; 171:18-172:11; 197:17-198:16; 203:21-205:12; 206:23-207:10 (Guillory Depo. Vol. I); Plaintiffs' Exh. 10 at WGI048621-630 (Lift Station Removal Plan for Saucer); USA Exh. 9 at 42:7-43:3 (DiCharry Depo.).

The only evaluations that the Engineering Division performed regarding the structural stability of the environmental remedial excavating work done on the EBIA in connection with Task Order 26 of the TERC was to evaluate an excavation footprint of 25 feet wide and 3 feet deep in areas not closer than 15 feet from the Jourdan Avenue floodwall/levee.  *Id.*

In addition, the Corps's Engineering Manual referenced in the 1997 EIS Design Volumes 1 and 3 (EM 1110-2-5027 (1987)) outlined the field investigations and design studies that the Corps was expected to undergo when proposing work in the vicinity of dikes and levees. Particularly, the manual states that field investigations and design studies should be "more extensive where *the consequences of the failure involve life, property, or damage to the*

*environment are great.*"  Plaintiffs' Exh. 14 at p. 6-4 (EM 1110-2-5027 Confined Disposal of Dredged Materials Engineering Manual) (emphasis added).  In addition, the Corps's engineering manual notes "design of a foundation of a levee requires specialized knowledge in soil mechanics" adding that "all designs and specifications should be prepared under the direct supervision and guidance of a geotechnical engineer and should bear his approval."  *Id.* at p. 6-10, §6-4.  The Corps disregarded these engineering "technical consideration" and appreciated that their contractor was "not expected to provide input regarding geotechnical stability of levees or floodwalls at the east bank."  USA Exh. 9 at 42:7-43:3 (DiCharry Depo.)

Finally, no one in the geotechnical section of the Corps's engineering department reviewed the removal plan.  USA Exh. 18 at 188:8-11 (Guillory Depo. Vol. I).

**79.    The braced excavation was to be designed by a licensed professional engineer in Louisiana.[78]**

Disputed to the extent that this statement implies that the design of the cofferdams themselves was relevant to the impact that their removal and backfilling had on the adjacent levees.

**80.    The Corps reviewed, critiqued and commented on the proposed braced excavation design several times before finally expressing approval on October 19, 2001.[79]**

Disputed to the extent that this statement implies that the design of the cofferdams themselves was relevant to the impact that their removal and backfilling had on the adjacent levees.

---

[78]*Katrina,* 2008 WL 5234369, at *7.

[79]*Katrina,* 2008 WL 5234369, at *8.

Corps witnesses acknowledged that "standard engineering practices and principles" required specialized architectural-engineering and geotechnical analysis for excavation in an area adjacent to the levees to ensure such work was "safe for the levee."  USA Exh. 18 at 164:19-166:12 (Guillory Depo. Vol. I); Plaintiffs' Exh. 16 at 53:4-12; 54:2-13; 60:24-62:6; 70:5-73:11; 75:14-77:25; 88:7-21; 90:14-91:10; 94:21-96:15; 103:3-14; 123:5-124:7; 147:1-148:14; 159:20-160:25; 168:9-22; 173:8-174:19 (Grieshaber Depo Vol. I); *see also* Plaintiffs' Exh. 12 at WGI38731-32, 5.1.2.1.5 (Recommendation Report for Demolition and Site Preparation Activities of the EBIA of the IHNC Lock Replacement Project).

The Corps's own engineering regulation also mandated that "engineering support shall be provided to those maintenance activities that require [plans and specifications]..." as support for operations activities.  USA Exh. 33 at p. 21, §16.1 (ER 1110-2-1150).  This engineering support was required to be provided to review "operational deviations, identify and address project deficiencies, and evaluate replacement plans."  *Id.*  Any "deviations ... of any portion of a project" were required to be "reviewed and approved by engineering."  *Id.* at §16.4.

However, the plans for the large subsurface excavations at the Saucer and Boland sites, omitted any engineering analysis of the soil wall stability, underseepage propensity, global stability, the potential impact on the adjacent LPV levees, or the proper compression for backfill material used at these sites.  USA Exh. 18 at 157:24-170:9; 171:18-172:11; 197:17-198:16; 203:21-205:12; 206:23-207:10 (Guillory Depo. Vol. I); USA Exh. 9 at 42:7-43:3 (DiCharry Depo.); *see also* Plaintiffs' Exh. 10 at WGI048621-630 (Lift Station Removal Plan for Saucer).

The only evaluations that the Engineering Division performed regarding the structural stability of the environmental remedial excavating work done on the EBIA in connection with

Task Order 26 of the TERC was to evaluate an excavation footprint of 25 feet wide and 3 feet deep in areas not closer than 15 feet from the Jourdan Avenue floodwall/levee.  *Id.*

In addition, the Corps's Engineering Manual referenced in the 1997 EIS Design Volumes 1 and 3 (EM 1110-2-5027 (1987)) outlined the field investigations and design studies that the Corps was expected to undergo when proposing work in the vicinity of dikes and levees. Particularly, the manual states that field investigations and design studies should be "more extensive where *the consequences of the failure involve life, property, or damage to the environment are great.*"  Plaintiffs' Exh. 14 at p. 6-4 (EM 1110-2-5027 Confined Disposal of Dredged Materials Engineering Manual) (emphasis added).  In addition, the Corps's engineering manual notes "design of a foundation of a levee requires specialized knowledge in soil mechanics" adding that "all designs and specifications should be prepared under the direct supervision and guidance of a geotechnical engineer and should bear his approval."  *Id.* at p. 6-10, §6-4.  The Corps disregarded these engineering "technical consideration" and appreciated that their contractor was "not expected to provide input regarding geotechnical stability of levees or floodwalls at the east bank."  USA Exh. 9 at 42:7-43:3 (DiCharry Depo.)

Finally, no one in the geotechnical section of the Corps's engineering department reviewed the removal plan.  USA Exh. 18 at 188:8-11 (Guillory Depo. Vol. I).

**81.     The Corps concluded that the braced excavation would not affect the floodwall because of its distance from the floodwall and because the bracing had been designed by a licensed professional engineer and was being installed by experienced contractors under the supervision of the Corps's quality assurance inspectors.[80]**

---

[80]2 Guillory 141:5-21 [Ex. 11].

Disputed to the extent that the Corps' appointed quality assurance representative for the project; Mr. Clouatre was not qualified for this position due to the technical nature of the project. USA Exh. 30 at 55:13-56:3; 90:10-92:8 (Clouatre Depo.).

In the event that field oversight is performed by someone "other than project geotechnical personnel"—as was done here—the Corps's ER 1110-1-8157 mandates that the "project delivery team will prepare *Engineering Considerations and Instructions* (ECI)." USA Exh. 34 at p. 6, §8(i)(3). However, in this case, there were no *Engineering Considerations and Instructions* developed or provided to Mr. Clouatre.

This statement is also disputed to the extent that it implies that the design of the cofferdams themselves was relevant to the impact that their removal and backfilling had on the adjacent levees.

Corps witnesses acknowledged that "standard engineering practices and principles" required specialized architectural-engineering and geotechnical analysis for excavation in an area adjacent to the levees to ensure such work was "safe for the levee." USA Exh. 18 at 164:19-166:12 (Guillory Depo. Vol. I); Plaintiffs' Exh. 16 at 53:4-12; 54:2-13; 60:24-62:6; 70:5-73:11; 75:14-77:25; 88:7-21; 90:14-91:10; 94:21-96:15; 103:3-14; 123:5-124:7; 147:1-148:14; 159:20-160:25; 168:9-22; 173:8-174:19 (Grieshaber Depo Vol. I); *see also* Plaintiffs' Exh. 12 at WGI38731-32, 5.1.2.1.5 (Recommendation Report for Demolition and Site Preparation Activities of the EBIA of the IHNC Lock Replacement Project).

The Corps's own engineering regulation also mandated that "engineering support shall be provided to those maintenance activities that require [plans and specifications]..." as support for operations activities. USA Exh. 33 at p. 21, §16.1 (ER 1110-2-1150). This engineering support was required to be provided to review "operational deviations, identify and address project

deficiencies, and evaluate replacement plans."  *Id.*  Any "deviations ... of any portion of a project" were required to be "reviewed and approved by engineering."  *Id.* at §16.4.

However, the plans for the large subsurface excavations at the Saucer and Boland sites, omitted any engineering analysis of the soil wall stability, underseepage propensity, global stability, the potential impact on the adjacent LPV levees, or the proper compression for backfill material used at these sites.  USA Exh. 18 at 157:24-170:9; 171:18-172:11; 197:17-198:16; 203:21-205:12; 206:23-207:10 (Guillory Depo. Vol. I); Plaintiffs' Exh. 10 at WGI048621-630 (Lift Station Removal Plan for Saucer); USA Exh. 9 at 42:7-43:3 (DiCharry Depo.).

The only evaluations that the Engineering Division performed regarding the structural stability of the environmental remedial excavating work done on the EBIA in connection with Task Order 26 of the TERC was to evaluate an excavation footprint of 25 feet wide and 3 feet deep in areas not closer than 15 feet from the Jourdan Avenue floodwall/levee.  *Id.*

In addition, the Corps's Engineering Manual referenced in the 1997 EIS Design Volumes 1 and 3 (EM 1110-2-5027 (1987)) outlined the field investigations and design studies that the Corps was expected to undergo when proposing work in the vicinity of dikes and levees. Particularly, the manual states that field investigations and design studies should be "more extensive where *the consequences of the failure involve life, property, or damage to the environment are great.*"  Plaintiffs' Exh. 14 at p. 6-4 (EM 1110-2-5027 Confined Disposal of Dredged Materials Engineering Manual) (emphasis added).  In addition, the Corps's engineering manual notes "design of a foundation of a levee requires specialized knowledge in soil mechanics" adding that "all designs and specifications should be prepared under the direct supervision and guidance of a geotechnical engineer and should bear his approval."  *Id.* at p. 6-10, §6-4.  The Corps disregarded these engineering "technical consideration" and appreciated

that their contractor was "not expected to provide input regarding geotechnical stability of levees or floodwalls at the east bank."  USA Exh. 9 at 42:7-43:3 (DiCharry Depo.)

Finally, no one in the geotechnical section of the Corps's engineering department reviewed the removal plan.  USA Exh. 18 at 188:8-11 (Guillory Depo. Vol. I).

**82.     Alvin Clouatre observed completion of the excavation, removal of the sewer lift station, and backfill of the excavation on November 7, 2001, and submitted a Quality Assurance Report to that effect on November 13, 2001.[81]**

Disputed.  Pursuant to the Corps's own Engineering Regulations, Mr. Clouatre was not qualified to perform these functions.  USA Exh. 30 at 55:13-56:3; 90:10-92:8 (Clouatre Depo.); USA Exh. 34 at p. 5, §8(I)(3) (ER 1110-1-8157).

Disputed also to the extent that this statement implies that the design of the cofferdams themselves was relevant to the impact that their removal and backfilling had on the adjacent levees.

Corps witnesses acknowledged that "standard engineering practices and principles" required specialized architectural-engineering and geotechnical analysis for excavation in an area adjacent to the levees to ensure such work was "safe for the levee."  USA Exh. 18 at 164:19-166:12 (Guillory Depo. Vol. I); Plaintiffs' Exh. 16 at 53:4-12; 54:2-13; 60:24-62:6; 70:5-73:11; 75:14-77:25; 88:7-21; 90:14-91:10; 94:21-96:15; 103:3-14; 123:5-124:7; 147:1-148:14; 159:20-160:25; 168:9-22; 173:8-174:19 (Grieshaber Depo Vol. I); *see also* Plaintiffs' Exh. 12 at WGI38731-32, 5.1.2.1.5 (Recommendation Report for Demolition and Site Preparation Activities of the EBIA of the IHNC Lock Replacement Project).

---

[81] *Katrina,* 2008 WL 5234369, at *10-11.

The Corps's own engineering regulation also mandated that "engineering support shall be provided to those maintenance activities that require [plans and specifications]..." as support for operations activities.  USA Exh. 33 at p. 21, §16.1 (ER 1110-2-1150).  This engineering support was required to be provided to review "operational deviations, identify and address project deficiencies, and evaluate replacement plans."  *Id.*  Any "deviations ... of any portion of a project" were required to be "reviewed and approved by engineering."  *Id.* at §16.4.

However, the plans for the large subsurface excavations at the Saucer and Boland sites, omitted any engineering analysis of the soil wall stability, underseepage propensity, global stability, the potential impact on the adjacent LPV levees, or the proper compression for backfill material used at these sites.  USA Exh. 18 at 157:24-170:9; 171:18-172:11; 197:17-198:16; 203:21-205:12; 206:23-207:10 (Guillory Depo. Vol. I); Plaintiffs' Exh. 10 at WGI048621-630 (Lift Station Removal Plan for Saucer); USA Exh. 9 at 42:7-43:3 (DiCharry Depo.).

The only evaluations that the Engineering Division performed regarding the structural stability of the environmental remedial excavating work done on the EBIA in connection with Task Order 26 of the TERC was to evaluate an excavation footprint of 25 feet wide and 3 feet deep in areas not closer than 15 feet from the Jourdan Avenue floodwall/levee.  *Id.*

In addition, the Corps's Engineering Manual referenced in the 1997 EIS Design Volumes 1 and 3 (EM 1110-2-5027 (1987)) outlined the field investigations and design studies that the Corps was expected to undergo when proposing work in the vicinity of dikes and levees.  Particularly, the manual states that field investigations and design studies should be "more extensive where *the consequences of the failure involve life, property, or damage to the environment are great.*"  Plaintiffs' Exh. 14 at p. 6-4 (EM 1110-2-5027 Confined Disposal of Dredged Materials Engineering Manual) (emphasis added).  In addition, the Corps's engineering

manual notes "design of a foundation of a levee requires specialized knowledge in soil mechanics" adding that "all designs and specifications should be prepared under the direct supervision and guidance of a geotechnical engineer and should bear his approval." *Id.* at p. 6-10, §6-4. The Corps disregarded these engineering "technical consideration" and appreciated that their contractor was "not expected to provide input regarding geotechnical stability of levees or floodwalls at the east bank." USA Exh. 9 at 42:7-43:3 (DiCharry Depo.)

Finally, no one in the geotechnical section of the Corps's engineering department reviewed the removal plan. USA Exh. 18 at 188:8-11 (Guillory Depo. Vol. I).

**83.    The Corps accepted the work of WGI and its subcontractor with respect to the excavation of the sewer lift station.[82]**

Disputed also to the extent that this statement implies that the design of the cofferdams themselves was relevant to the impact that their removal and backfilling had on the adjacent levees.

Corps witnesses acknowledged that "standard engineering practices and principles" required specialized architectural-engineering and geotechnical analysis for excavation in an area adjacent to the levees to ensure such work was "safe for the levee." USA Exh. 18 at 164:19-166:12 (Guillory Depo. Vol. I); Plaintiffs' Exh. 16 at 53:4-12; 54:2-13; 60:24-62:6; 70:5-73:11; 75:14-77:25; 88:7-21; 90:14-91:10; 94:21-96:15; 103:3-14; 123:5-124:7; 147:1-148:14; 159:20-160:25; 168:9-22; 173:8-174:19 (Grieshaber Depo Vol. I); *see also* Plaintiffs' Exh. 12 at WGI38731-32, 5.1.2.1.5 (Recommendation Report for Demolition and Site Preparation Activities of the EBIA of the IHNC Lock Replacement Project).

---

[82]*Katrina,* 2008 WL 5234369, at *11.

The Corps's own engineering regulation also mandated that "engineering support shall be provided to those maintenance activities that require [plans and specifications]..." as support for operations activities.  USA Exh. 33 at p. 21, §16.1 (ER 1110-2-1150).  This engineering support was required to be provided to review "operational deviations, identify and address project deficiencies, and evaluate replacement plans."  *Id.*  Any "deviations ... of any portion of a project" were required to be "reviewed and approved by engineering."  *Id.* at §16.4.

However, the plans for the large subsurface excavations at the Saucer and Boland sites, omitted any engineering analysis of the soil wall stability, underseepage propensity, global stability, the potential impact on the adjacent LPV levees, or the proper compression for backfill material used at these sites.  USA Exh. 18 at 157:24-170:9; 171:18-172:11; 197:17-198:16; 203:21-205:12; 206:23-207:10 (Guillory Depo. Vol. I); Plaintiffs' Exh. 10 at WGI048621-630 (Lift Station Removal Plan for Saucer); USA Exh. 9 at 42:7-43:3 (DiCharry Depo.).

The only evaluations that the Engineering Division performed regarding the structural stability of the environmental remedial excavating work done on the EBIA in connection with Task Order 26 of the TERC was to evaluate an excavation footprint of 25 feet wide and 3 feet deep in areas not closer than 15 feet from the Jourdan Avenue floodwall/levee.  *Id.*

In addition, the Corps's Engineering Manual referenced in the 1997 EIS Design Volumes 1 and 3 (EM 1110-2-5027 (1987)) outlined the field investigations and design studies that the Corps was expected to undergo when proposing work in the vicinity of dikes and levees. Particularly, the manual states that field investigations and design studies should be "more extensive where *the consequences of the failure involve life, property, or damage to the environment are great.*"  Plaintiffs' Exh. 14 at p. 6-4 (EM 1110-2-5027 Confined Disposal of Dredged Materials Engineering Manual) (emphasis added).  In addition, the Corps's engineering

manual notes "design of a foundation of a levee requires specialized knowledge in soil mechanics" adding that "all designs and specifications should be prepared under the direct supervision and guidance of a geotechnical engineer and should bear his approval." *Id.* at p. 6-10, §6-4. The Corps disregarded these engineering "technical consideration" and appreciated that their contractor was "not expected to provide input regarding geotechnical stability of levees or floodwalls at the east bank." USA Exh. 9 at 42:7-43:3 (DiCharry Depo.)

Finally, no one in the geotechnical section of the Corps's engineering department reviewed the removal plan. USA Exh. 18 at 188:8-11 (Guillory Depo. Vol. I).

**Boland Marine Excavation**

**84.    "After demolition work began, WGI identified eight previously unknown subsurface concrete and steel foundations at the Boland Marine site, including a large concrete block commonly referred to as . . . the 'wedding cake structure.'"[83]**

Undisputed.

**85.    The concrete block was approximately 150-175 feet from the floodwall.[84]**

Undisputed.

**86.    WGI submitted a proposal that included a braced excavation installation, removal of the concrete structure, and backfill methods on December 11, 2001. The Corps approved the plan on December 13, 2001. [85]**

Undisputed.

**87.    With respect to backfill excavations, the Court has found as follows:**

---

[83]*Katrina,* 2008 WL 5234369, at *11.

[84]*Katrina,* 2008 WL 5234369, at *11; *see also id.* at *11 n. 7.

[85]*Katrina,* 2008 WL 5234369, at *12.

**Immediately following pile extraction operations, the excavations will be backfilled with either import sand or onsite borrow back to original grade."  The Sequence of Operations for Concrete Foundation South Pad Cofferdam Installation and Concrete Removal with respect to Cofferdam Backfilling:**

**\* Backfill excavation with previously excavated soil in 2' lifts.**

**\* Initial backfill operations will be to the bottom of the whalers (sic) inside the cofferdam.**

**\* Complete backfilling to top of sheet piles with material to be provided by WGI after whalers are re-moved.**

**Backfilling was to be completed to grade after sheet-pile removal occurred.[86]**

Disputed to the extent that this statement implies that the Court evaluated the appropriateness of these actions in terms of their impact on the adjacent levees.

**88.     Again, the Corps was not concerned that the braced excavation would affect the floodwall, because the work was being designed and carried out by qualified and experienced engineers and contractors.  For these reasons, Guillory did not request that the Engineering Division of the Corps's New Orleans District perform an evaluation of the proposed excavation.[87]**

Disputed.  The Corps' 30(b)(6) witness Mr. Grieshaber testified that Mr. Guillory should have "wanted some type of information on backfilling criteria" and admitted that "since the job was fairly simplistic the only way [he] could endanger the flood system [was] by some form of

---

[86]*Katrina,* 2008 WL 5234369, at \*12-13.

[87]*Katrina,* 2008 WL 5234369, at \*12-13.

inappropriate excavation or inappropriate backfill."  USA's Exh. 12 at 14:23-15:11 (Grieshaber Vol. II).

Mr. Guillory, however, testified that the only evaluations that the Corps's Engineering Division performed regarding the structural stability of the environmental remedial excavating work done on the EBIA in connection with Task Order 26 of the TERC was to evaluate an excavation footprint of 25 feet wide and 3 feet deep in areas not closer than 15 feet from the Jourdan Avenue floodwall/levee.  USA Exh. 18 at 157:24-170:9; 171:18-172:11; 197:17-198:16; 203:21-205:12; 206:23-207:10 (Guillory Depo. Vol. I).

The Corps's Engineering Division assessed "soil backfill and compaction requirements" for the three foot deep contaminant excavations.  *Id.* at 171:18-172:11.  The Corps's Engineering Division, however, failed to perform a similar evaluation for the completion backfill at the much deeper structural removal excavations at Saucer and Boland.  *Id*. at 170:10-24; 203:21-207:10.

Admittedly, Corps engineering calculations and standard practices observed that preservation of the structural integrity of the levees required pit bracing through cofferdams where excavations would exceed depths of 12 feet within 229 feet of the levee center line.  *Id.* at 178:11-21.  However, the Corps's engineering analysis of the Saucer and Boland excavations was limited to the evaluation of the cofferdam constructions which were only deemed necessary to preserve the "structural integrity of the hole [itself] and preventing soil displacement outside the hole, worker safety, equipment safety, etc."  *Id.* at 168:8-17.

The Corps entertained no concern that the excavations and ultimate removal of the cofferdams at the Saucer and Boland Marine sites might affect the IHNC flood control structures.  *Id.* at 167:23-170:2.  The Corps 30(b)(6) witness, Mr. Grieshaber, admitted that it

111

was among the Corps's responsibilities to make certain that it used appropriate fill and that the fill was put in under the appropriate conditions.  USA Exh. 12 at 84:19-86:9 (Grieshaber Vol. II).

In fact, Mr. Guillory testified that the potential impacts that the proposed excavations and borrow sites could have on adjacent levees and floodwalls "had to be addressed" to make certain that such work was "safe for the levee."  USA Exh. 18 at 164:19-166:12 (Guillory Depo. Vol. I). Mr. Grieshaber testified that the Corps would perform engineering analyses on the wall stability, seepage, and global stability to make certain that the excavations do no impact any adjacent flood control structures.  Plaintiffs' Exh. 16 at 53:4-12; 54:2-13; 60:24-62:6; 70:5-73:11; 75:14-77:25; 88:7-21; 90:14-91:10; 94:21-96:15; 103:3-14; 123:5-124:7; 147:1-148:14; 159:20-160:25; 168:9-22; 173:8-174:19 (Grieshaber Depo Vol. I).

These engineering analyses, however, were never actually performed by the Corps's Engineering Division or its contractor, WGI.  USA Exh. 18 at 157:24-170:9; 171:18-172:11; 197:17-198:16; 203:21-205:12; 206:23-207:10 (Guillory Depo. Vol. I); USA Exh. 9 at 42:7-43:3 (DiCharry Depo.).

EM 1110-2-5027 outlines the field investigations and design studies that the Corps was expected to undergo when proposing work in the vicinity of levees and floodwalls.  Plaintiffs' Exh. 14 (EM 1110-2-5027 Confined Disposal of Dredged Materials Engineering Manual).  In particular, the manual states that field investigations and design studies should be "more extensive where *the consequences of the failure involve life, property, or damage to the environment are great.*"  *Id.* at p. 6-4 (emphasis added).

EM 1110-2-5027 further states that the "design of a foundation of a levee require specialized knowledge in soil mechanics" adding that "all designs and specifications should be prepared under the direct supervision and guidance of a geotechnical engineer and should bear

his approval." *Id.* at p. 6-10, §6-4.  The manual also specifically addresses the critical safety issues associated with seepage and levee and dike failure.  *Id.* at 6-11 through 6-17.

These basic engineering principles, however, were disregarded as Guillory, the project manager, failed to ask the geotechnical division of the engineering department to evaluate the relevant excavation plans that were submitted by the contractor.  USA Exh. 18 at 157:24-170:9; 171:18-172:11; 197:17-198:16; 203:21-205:12; 206:23-207:10 (Guillory Depo. Vol. I); USA Exh. 9 at 42:7-43:3 (DiCharry Depo.).  Thus, no geotechnical analysis relative to underseepage was performed at either excavation adjacent to the floodwall failure sites.

**89.    Further, the proposed excavation at Boland Marine was farther away from the floodwall than at the sewer lift station and within the footprint of the planned bypass channel, which the Corps had previously evaluated for its effect on the floodwalls and determined that there was no negative impact.[88]**

Disputed to the extent that this statement implies that the Corps's failure to perform any seepage analysis was proper and did not violate its own engineering mandates.

Specifically, Engineer Regulation ("ER") 1110-2-1150 defines the engineering responsibilities, requirements, and procedures during the planning, design, construction and operations phases of civil works projects.  USA Exh. 33.  This regulation is *mandatory*.  *Id.* at p. 23, §19.1.1; *see also* USA Exh. 12 at 64:2-11; 82:2-23 (Grieshaber Depo. Vol. II).  This

---

[88]*Katrina,* 2008 WL 5234369, at *12-13; *see also* 4 New Lock Eval. Plate B-89 (Final Levee Protection – East Side: Soils Stability, Sta. 13+05 Lock Baseline to New Lock), Plate B-90 (Final Levee Protection – East Side: Soils Stability, Sta. 13+05 Lock Baseline to New Lock) (showing bypass channel), B-91 (Temporary Flood Protection – East Side: Soils Stability, Sta. 67+00 Relocation Corridor) (showing bypass channel), B-92 (Temporary Flood Protection: Soils Stability, Sta. 619+00 Relocation Corridor) (showing bypass channel and minimum control line), Plate B-93 (Final Levee Protection: Soils Stability, Sta. 619+00 Relocation Corridor) (showing bypass channel) [Ex. 4]; 2 Grieshaber 22:2-19 [Ex. 12].

regulation places responsibility for the technical content and engineering sufficiency of all engineering products with the Chief of the Engineering organization.

This regulation further specifies that a Project Delivery Team be established for the project, which consists of a Project Manager and the technical personnel necessary to develop the project. *Id.* at p. 3, §7.  The Corps specifies the utilization of five phases to present the engineering and design policy and process that applies to the project. *Id.* at p. 5, §11.  These five phases are identified as reconnaissance; feasibility; preconstruction; engineering and design; and construction, operation and maintenance. *Id.*

The 1997 MRGO New Lock and Connecting Channels Evaluation Report was developed to provide guidance for the overall lock replacement project.  In addition, the Corps developed a 1999 Design Documentation Report (DDR).  USA Exh. 33 at p. 3, §8.2 (ER 1110-2-1150).  The DDR is "a record of final design effort after the feasibility phase" and is "required for all engineering design products." *Id.*  It "provides the technical basis for the plans and specifications and serves as a summary of the final design." *Id.*  As a result of these two reports, the overall scope of the project was established before WGI became involved; however, it did not include geotechnical evaluations regarding excavations below five feet and the effects that underseepage could have on adjacent floodwalls.

WGI was engaged through Task Order 26 to evaluate the prior documentation relative to the EBIA and develop a Recommendation Report that the Army Corps could use to analyze the scope of work to be done at the Hazardous Toxic Radioactive Waste site, with a requirement that it identify any data gaps in the supplied information that needed further evaluation.  But even as WGI identified these relevant data gaps, the Army Corps did not undertake further geotechnical evaluation.  Until the end of 2000, this was immaterial as the deepest excavation contemplated

and evaluated was to a depth of approximately eight feet.  USA Exh. 18 at 80:5-81:8 (Guillory

Depo. Vol. I).  However immaterial it was at that time, the failure of the Army Corps to submit

the excavation plans developed by WGI to the Engineering Department violated mandatory

Corps's regulations.

Specifically, section 16.1 of ER 1110-2-1150 requires that "engineering support shall be

provided to those maintenance activities that require [plans and specifications]..." as support for

operations activities.  USA Exh. 33 at p. 21, §16.1.  This engineering support was required to be

provided to review "operational deviations, identify and address project deficiencies, and

evaluate replacement plans."  *Id.*  Any "deviations ... of any portion of a project" were required

to be "reviewed and approved by engineering."  *Id.* at §16.4.

Lee Guillory, the Project Manager and head of the Project Delivery team, failed to follow

this regulation.  He did not ask the geotechnical division of the engineering division to evaluate

the plan that was submitted by WGI for removal of the sewer lift station.  USA Exh. 18 at

153:25-154:7; 157:24-158:12; 198:6-16 (Guillory Depo. Vol. I).  Rather, Guillory testified that

George Bacuta, a geochemist, was tasked with reviewing the excavation plan.  *Id.* at 188:8-

189:1.  In fact, however, Bacuta never reviewed the excavation plan.  USA Exh. 29 at 142:21-25

(Bacuta Depo.).

Here we see that not only did the head of the team fail to follow mandatory regulation in

having this deviation from the original plan evaluated by the engineering department, but

evidently no geotechnical analysis whatsoever was done.  Ultimately, the southern breach of the

flood wall took place adjacent to this deep excavation.  Plaintiffs' Exh. 17 at pp. 22-31 (Bea

Tech. Report V, Jan. 2009).

The northern breach occurred adjacent to a deep excavation of the "wedding cake" structure at the Boland Marine site.  This excavation plan also deviated from the DDR and, similarly, Mr. Guillory failed to comply with ER 1110-2-1150 by presenting the excavation plan to the Corps's Engineering Department.  USA Exh. 18 at 206:23-207:10 (Guillory Depo. Vol. I).  This reckless disregard for the Engineering Regulation led to *no* analysis being performed to evaluate underseepage below the sheet pile curtains at the locations of the north breach site.  USA Exh. 29 at 176:20-179:12 (Bacuta Depo.).

According to the Plaintiffs' expert Robert Bea, this underseepage is exactly what caused or contributed to the breach at the Boland Marine site.  Plaintiffs' Exh. 17 at pp. 1-21 (Bea Tech. Report V, Jan. 2009).

The regulation that Mr. Guillory should have observed was Engineering Regulation 1110-1-8157.  USA Exh. 34.  This regulation "*prescribes* Geotechnical Data Quality Management (GDQM) *responsibilities and requirements*, from initial investigation through closeout at sites contaminated with hazardous, toxic, and radioactive waste."  *Id.* at p. 1, §1. (emphasis added).  The utilization of this regulation is "to assure that a site is sufficiently characterized, and the geotechnical data of acceptable quality are obtained and used properly within the project."  *Id.*  To accomplish this goal, the regulation mandates a number of relevant geotechnical requirements.

In particular, ER 1110-1-8157 required that "[all] geotechnical input, review or confirmation of no geotechnical involvement will be certified in a project specific Project Management Plan."  *Id.* at p. 2, §8(a).  This required a review of existing site data and technical literature, and the usability of this data needed to be evaluated.  *Id.* at p. 3, §8(a)(2).  The regulation further required that the products generated from project activities "*shall be reviewed*

*and approved by project geotechnical personnel for compliance.......*"  *Id*. at p. 3, §8(a)(3)

(emphasis added).  "Geotechnical input *must also be obtained* for design services such as…plans

and specifications, where the project involves any earthwork or work related to the subsurface."

*Id*. at p. 3, §8(a)(4) (emphasis added).

As Lee Guillory and George Bacuta testified, these requirements were not met.  USA

Exh. 18 at 153:25-154:7; 157:24-158:12; 198:6-16; 206:23-207:10 (Guillory Depo. Vol. I); USA

Exh. 29 at 142:21-25; 176:20-179:12 (Bacuta Depo.).

ER 1110-1-8157 also detailed the oversight and quality assurance testing of geotechnical

work required for the Corps's construction projects.  USA Exh. 34 at pp. 5-6.  The Corps

appointed Alvin Clouatre as the quality assurance representative for the project.  USA Exh. 30 at

55:13-25 (Clouatre Depo.).  However, Mr. Clouatre was not qualified for this position due to the

technical nature of the project.  USA Exh. 30 at 90:10-92:8 (Clouatre Depo.).  Engineering

Regulation 1110-1-8157 mandates that if field oversight on an HTRW site done by someone

"other than project geotechnical personnel, the project delivery team will prepare *Engineering*

*Considerations and Instruction* (ECI)."  USA Exh. 34 at p. 6, §8(i)(3).  It has already been

established the Corps did not have a geotechnical person performing field oversight, and there

were no *Engineering Considerations and Instruction* developed or provided to Mr. Clouatre.

In addition, Corps Engineering Manuals highlight the need to perform specific

engineering evaluations of the mechanisms of levee failure and the effects of construction in the

vicinity of the levees on the "Factor of Safety" for the flood control structures.  *See* Plaintiffs'

Exh. 11 at pp. 5-1, 6-6, 8-7 to 8-8 (EM 1110-2-1913 Design and Construction of Levees (1978))

detailing minimum acceptable factor of safety and underseepage issues; Plaintiffs' Exh. 14 at pp.

6-11 through 6-17 (EM 1110-2-5027 Confined Disposal of Dredged Materials Engineering

Manual) (detailing the critical safety issues associated with seepage and levee and dike failure);

Plaintiffs' Exh. 20 at 7-3 "General Considerations," 7-25 (g) (Engineering and Design, Retaining

and Flood Walls, EM 1110-2-2502, September 29, 1989) (seepage and wall stability); Plaintiffs

Exh. 21 at 9-1 "General" (Engineering and Design, Seepage Analysis and Control for Dams, EM

1110-2-1901, April 30, 1993) (seepage control); and Plaintiffs Exh. 22 at 4-6 (Engineering and

Design, Design of Sheet Pile Walls, EM 1110-2-2504, March 31, 1994).  Collectively, these

specific, applicable engineering standards mandated that any foundation condition that may

impact the seepage potential under a levee must be evaluated.  Plaintiffs' Exh. 18 at pp. 3-8 (Bea

Tech. Report IV, July 2008).

**90.     Quality Assurance inspections noted that the cofferdam was being backfilled**
**with spoil from the wedding cake excavation and the borrow-pit.  The backfill material was**
**being compacted every two to three feet. [89]**

Disputed to the extent that this statement implies that the Corps's failure to perform any

seepage analysis was proper and did not violate its own engineering mandates.

The Corps' 30(b)(6) witness Grieshaber testified that Guillory should have "wanted some

type of information on backfilling criteria" and admitted that "since the job was fairly simplistic

the only way [he] could endanger the flood system [was] by some form of inappropriate

excavation or inappropriate backfill."  USA's Exh. 12 at 14:23-15:11 (Grieshaber Vol. II).

Mr. Guillory, however, testified that the only evaluations that the Corps's Engineering

Division performed regarding the structural stability of the environmental remedial excavating

work done on the EBIA in connection with Task Order 26 of the TERC was to evaluate an

excavation footprint of 25 feet wide and 3 feet deep in areas not closer than 15 feet from the

---

[89]*Katrina,* 2008 WL 5234369, at *13-14.

Jourdan Avenue floodwall/levee.  USA Exh. 18 at 157:24-170:9; 171:18-172:11; 197:17-198:16; 203:21-205:12; 206:23-207:10 (Guillory Depo. Vol. I).

The Corps's Engineering Division assessed "soil backfill and compaction requirements" for the three foot deep contaminant excavations.  *Id.* at 171:18-172:11.  The Corps's Engineering Division, however, failed to perform a similar evaluation for the completion backfill at the much deeper structural removal excavations at Saucer and Boland.  *Id*. at 170:10-24; 203:21-207:10.

Admittedly, Corps engineering calculations and standard practices observed that preservation of the structural integrity of the levees required pit bracing through cofferdams where excavations would exceed depths of 12 feet within 229 feet of the levee center line.  *Id.* at 178:11-21.  However, the Corps's engineering analysis of the Saucer and Boland excavations was limited to the evaluation of the cofferdam constructions which were only deemed necessary to preserve the "structural integrity of the hole [itself] and preventing soil displacement outside the hole, worker safety, equipment safety, etc."  *Id.* at 168:8-17.

The Corps entertained no concern that the excavations and ultimate removal of the cofferdams at the Saucer and Boland Marine sites might affect the IHNC flood control structures.  *Id.* at 167:23-170:2.  The Corps 30(b)(6) witness, Mr. Grieshaber, admitted that it was among the Corps's responsibilities to make certain that it used appropriate fill and that the fill was put in under the appropriate conditions.  USA Exh. 12 at 84:19-86:9 (Grieshaber Vol. II).

In fact, Mr. Guillory testified that the potential impacts that the proposed excavations and borrow sites could have on adjacent levees and floodwalls "had to be addressed" to make certain that such work was "safe for the levee."  USA Exh. 18 at 164:19-166:12 (Guillory Depo. Vol. I). Mr. Grieshaber testified that the Corps would perform engineering analyses on the wall stability, seepage, and global stability to make certain that the excavations do no impact any adjacent

flood control structures.  Plaintiffs' Exh. 16 at 53:4-12; 54:2-13; 60:24-62:6; 70:5-73:11; 75:14-77:25; 88:7-21; 90:14-91:10; 94:21-96:15; 103:3-14; 123:5-124:7; 147:1-148:14; 159:20-160:25; 168:9-22; 173:8-174:19 (Grieshaber Depo Vol. I).

These engineering analyses, however, were never actually performed by the Corps's Engineering Division or its contractor, WGI.  USA Exh. 18 at 157:24-170:9; 171:18-172:11; 197:17-198:16; 203:21-205:12; 206:23-207:10 (Guillory Depo. Vol. I); USA Exh. 9 at 42:7-43:3 (DiCharry Depo.).

EM 1110-2-5027 outlines the field investigations and design studies that the Corps was expected to undergo when proposing work in the vicinity of levees and floodwalls.  Plaintiffs' Exh. 14 (EM 1110-2-5027 Confined Disposal of Dredged Materials Engineering Manual).  In particular, the manual states that field investigations and design studies should be "more extensive where *the consequences of the failure involve life, property, or damage to the environment are great.*"  *Id.* at p. 6-4 (emphasis added).

EM 1110-2-5027 further states that the "design of a foundation of a levee require specialized knowledge in soil mechanics" adding that "all designs and specifications should be prepared under the direct supervision and guidance of a geotechnical engineer and should bear his approval."  *Id.* at p. 6-10, §6-4.  The manual also specifically addresses the critical safety issues associated with seepage and levee and dike failure.  *Id.* at 6-11 through 6-17.

These basic engineering principles, however, were disregarded as Guillory, the project manager, failed to ask the geotechnical division of the engineering department to evaluate the relevant excavation plans that were submitted by the contractor.  USA Exh. 18 at 157:24-170:9; 171:18-172:11; 197:17-198:16; 203:21-205:12; 206:23-207:10 (Guillory Depo. Vol. I); USA

Exh. 9 at 42:7-43:3 (DiCharry Depo.).  Thus, no geotechnical analysis relative to underseepage

was performed at either excavation adjacent to the floodwall failure sites.

In addition, the Corps failed to adopt the required source of fill material for the IHNC

levees:

> the earth fill for completing the existing levee portion of the
> protection between the IHNC lock and Florida Avenue will be
> obtained from a borrow area in the bottom of Lake Pontchartrain
> along the north shore.  This material consisting of stiff Pleistocene
> clays will be transported to the project on barges.

Plaintiffs' Exh. 3 at p. 17, ¶ 33; p. 19 (Lake Pontchartrain and Vicinity Hurricane Protection Plan

(LPV) Design Memoranda Number 3 General Design, November 1966).

**91.   When backfilling the wedding cake structure excavation at the Boland**

**Marine location, the Corps only used on-site material obtained from: (1) material removed**

**from the cofferdam excavation; and (2) the McDonough Marine borrow pit.[90]**

Undisputed that the Corps used sand and other pervious materials at the Boland and

Saucer Marine locations in direct contravention of the required source of fill material for the

IHNC levees:

> the earth fill for completing the existing levee portion of the
> protection between the IHNC lock and Florida Avenue will be
> obtained from a borrow area in the bottom of Lake Pontchartrain
> along the north shore.  This material consisting of stiff Pleistocene
> clays will be transported to the project on barges.

Plaintiffs' Exh. 3 at p. 17, ¶ 33; p. 19 (Lake Pontchartrain and Vicinity Hurricane Protection Plan

(LPV) Design Memoranda Number 3 General Design, November 1966).

This statement is also undisputed in that the excavations, with poor backfill, served as

direct access ways for Katrina's storm surge to communicate with the buried saturated marsh and

---

[90] *Id.* at *12, n.10, *14; 2 Guillory 120:10-17 [Ex. 11].

swamp layers.  Plaintiffs' Exh. 17 at pp. 13-31 (Bea Tech. Report V, Jan. 2009).  As a result, these holes served as pathways utilized by the Katrina's storm surge to undermine the flood protection structure at the Boland and Saucer breach sites.  *Id.*

**Backfilling**

**92.    Both excavations required WGI or its subcontractor to backfill the excavation.[91]**

Undisputed.

**93.    When backfilling the excavations, WGI was first required to backfill with the excavated material and then use material obtained from the McDonough Marine borrow pit.  WGI could only import additional, off-site material if there was not enough on-site material to backfill the excavations.[92]**

Disputed to the extent that this statement implies that an analysis of the proper backfill material for the vicinity of the IHNC levees was to be found in the materials located in the McDonough Marine site.  Rather, no analysis of the suitability of this material was made and no attempt to conform the material with that of the required materials specified in the IHNC design documents was made.  In drafting The General Design Memoranda (GDM) for the LPV levee work, The Corps highlighted eight principal design and construction "problems" in the area of the IHNC and included the design requirement that the "6) Sources of fill  material" [for the levees] be:

---

[91]*See Katrina,* 2008 WL 5234369, at *9 ("The excavation created to remove the lift station, wet well, and associated support structures will be back filled with previously excavated material . . . [a]dditional fill material necessary to complete backfill operations will be provided by WGI."); *cf. id.* at *13 ("Complete backfilling to top of sheet piles with material to be provided by WGI after whalers [sic] are removed.").

[92]1 Guillory  206:7-206:22 [Ex. 18]; 2 Guillory 116:21-119:3 [Ex. 11]; O'Connor 153:10-158:6 [Ex. 26]; *Katrina,* 2008 WL 5234369, at *10, n.6.

> the earth fill for completing the existing levee portion of the
> protection between the IHNC lock and Florida Avenue will be
> obtained from a borrow area in the bottom of Lake Pontchartrain
> along the north shore.  This material consisting of stiff Pleistocene
> clays will be transported to the project on barges.

Plaintiffs' Exh. 3 at p. 17, ¶33; p. 19 (Lake Pontchartrain and Vicinity Hurricane Protection Plan (LPV) Design Memoranda Number 3 General Design, November 1966).

Additionally, the Corps' own 30(b)(6) witness testified that Mr. Guillory "probably would have wanted some type of information on backfilling criteria" because the "only way you could endanger the flood system is by some form of inappropriate excavation or inappropriate backfill."  USA Exh. 12 at 14:18-15:11 (Grieshaber Depo. Vol. II); *see also* Plaintiffs' Exh. 17 at pp. 13-31 (Bea Tech. Report V, Jan. 2009).

As a result, in many areas at the Boland and Saucer Marine Breach sites, WGI, under direction of the Corps, made excavations and replaced existing materials with non-compacted backfill and sand backfill.  Plaintiffs' Exh. 17 at pp. 13-31 (Bea Tech. Report V, Jan. 2009).  The extensive excavations were associated with removal of existing foundations, removal of contaminated soil and grid trenching.  *Id.*  These excavations, with poor backfill, served as direct access ways for water to communicate with the buried saturated marsh and swamp layers.  *Id.*  During Katrina's storm surge these holes served as pathways utilized by the water to undermine the flood protection structure at the Boland and Saucer Marine Breach sites.  *Id.*

**94.     When compared to using on-site material, there was an additional cost to purchase and deliver off-site material to backfill the excavations.[93]**

Disputed to the extent that this statement implies that cost analysis supplants the priority and requirement for basic engineering and safety analysis.

---

[93]2 Guillory 116:21-119:3 [Ex. 11].

**95.     The Corps was going to later dredge two-thirds of the EBIA site as a bypass channel for the lock replacement project.  Resultantly, the Corps was cost-conscious in regards to purchasing off-site material.[94]**

Disputed to the extent that this statement implies that cost analysis supplants the priority and requirement for basic engineering and safety analysis.

**96.     Any sand that was used on site was river sand, "a colloquial term that we use here for the silty sand and material that is hydraulically dredged out of the base of the Mississippi River, and commercial suppliers sell it as a traditional backfill for sub-base and foundation material throughout New Orleans."[95]**

Disputed this statement to the extent that the Corps performed any analysis of the backfill material used for these excavations.  Mr. Guillory testified that the Corps permitted the excavations to be filled with any material in the vicinity, including nearby sand material.  USA Exh. 18 at 191:24-196:4; 203:21-205:12 (Guillory Depo. Vol. I); *see also* Plaintiffs' Exh. 17 at pp. 13-31 (Bea Tech. Report V, Jan. 2009).  Moreover, Mr. Guillory testified that the Corps

---

[94]2 Guillory 116:21-119:3 [Ex. 11]; O'Conner 153:10-158:6 [Ex. 26].

Guillory testified:

The cost increased by having to purchase off-site commercial material, whether it be sand, clay, gravel, crushed stone, or whatever, and paying for the actual cost, the transportation and delivery cost, and um – using that material on the site.

   Likewise, the scope of the overall project, if that backfilled material is placed in an area that would be subsequently dredged when the two bypass channels are done for the overall project, it would increase the cost of that dredging because we would be not only purchasing the material but hydraulically dredging and disposing of it again at additional cost.

2 Guillory II 117:12-118:4 [Ex. 11]; *accord* WGI SOF ¶¶ 178-80 [Ex. 10].

[95]*Katrina,*2008 WL 5234369, at *10, n.6.

actually does not know with any certainty what material was used to actually fill the excavations.

USA Exh. 18 at 190:6-22 (Guillory Depo. Vol. I).

Significantly, this statement is also disputed to the extent that it implies that river sand would have been acceptable for the fill material in the vicinity of the IHNC where, in the General Design Memoranda (GDM) for the LPV levee work, the Corps highlighted eight principal design and construction "problems" in the area of the IHNC and included the design requirement that the "6) Sources of fill material" [for the levees] be:

> the earth fill for completing the existing levee portion of the protection between the IHNC lock and Florida Avenue will be obtained from a borrow area in the bottom of Lake Pontchartrain along the north shore.  This material consisting of stiff Pleistocene clays will be transported to the project on barges.

Plaintiffs' Exh. 3 at p. 17, ¶33; p. 19 (Lake Pontchartrain and Vicinity Hurricane Protection Plan (LPV) Design Memoranda Number 3 General Design, November 1966).

Additionally, as the Corps' own 30(b)(6) witness testified, Mr. Guillory "probably would have wanted some type of information on backfilling criteria" because the "only way you could endanger the flood system is by some form of inappropriate excavation or inappropriate backfill."  USA Exh. 12 at 14:18-15:11 (Grieshaber Depo. Vol. II); *see also* Plaintiffs' Exh. 17 at pp. 13-31 (Bea Tech. Report V, Jan. 2009).

As a result, in many areas at the Boland and Saucer Marine Breach sites, WGI under direction of the Corps made excavations and replaced existing materials with non-compacted backfill and sand backfill.  Plaintiffs' Exh. 17 at pp. 13-31 (Bea Tech. Report V, Jan. 2009).  The extensive excavations were associated with removal of existing foundations, removal of contaminated soil and grid trenching.  *Id.*  These excavations, with poor backfill, served as direct access ways for water to communicate with the buried saturated marsh and swamp layers.  *Id.*

During Katrina's storm surge these holes served as pathways utilized by the water to undermine the flood protection structure at the Boland and Saucer Marine Breach sites. *Id.*

**97.    River sand is far less permeable than beach sand.[96]**

Undisputed that river sand is less permeable than beach sand, however, this statement is irrelevant because the Corps used improper, permeable materials as backfill at the Boland and Saucer marine sites.

In addition, this statement is also disputed to the extent that it implies that river sand would have been acceptable for the fill material in the vicinity of the IHNC where, in the General Design Memoranda (GDM) for the LPV levee work, the Corps highlighted eight principal design and construction "problems" in the area of the IHNC and included the design requirement that the "6) Sources of fill material" [for the levees] be:

> the earth fill for completing the existing levee portion of the protection between the IHNC lock and Florida Avenue will be obtained from a borrow area in the bottom of Lake Pontchartrain along the north shore. This material consisting of stiff Pleistocene clays will be transported to the project on barges.

Plaintiffs' Exh. 3 at p. 17, ¶33; p. 19 (Lake Pontchartrain and Vicinity Hurricane Protection Plan (LPV) Design Memoranda Number 3 General Design, November 1966).

Mr. Guillory testified that river sand was used by the Corps because it was preferable for "very shallow excavation[s]." USA Exh. 11 at 233:20-234:25 (Guillory Depo. Vol. II). The Boland and Saucer Marine sites were not "very shallow excavation[s]." Rather, the Boland Marine excavation ultimately proposed removal of foundation depths ranging -20 to -25 feet and the Saucer Marine excavation removed a footprint of EBIA foundation that was 69' wide by 81' long to depths -19.75. Plaintiffs' Exh. 8 (Draft Work Plan Excavation of Concrete, Anchor

---

[96]2 Grieshaber 84:1-5 [Ex. 12].

Foundation Blocks and Steel Forms IHNC EBIA Area WGI037607); Plaintiffs' Exh. 10 at

WGI048621-630 (Lift Station Removal Plan for Saucer).  Also, piles removed at the Boland and

Saucer Marine sites "protruded into and through layers of buried marshy material…located

between elevations of -10 feet and -30 feet."  Plaintiffs' Exh. 17 at pp. 13, 26 (Bea Tech. Report

V, Jan. 2009).

> 98.     **River sand is commonly used for fill in the New Orleans area.**[97]

Undisputed that river sand is "commonly used" for fill in New Orleans.  Disputed that

just because using river sand as fill is "common" that it is acceptable under the Corps's own

engineering mandates for use as fill in the vicinity of the IHNC levees.  As Mr. Guillory testified,

the Corps used river sand for "very shallow excavation[s]."  USA Exh. 11 at 233:20-234:25

(Guillory Depo. Vol. II).  The Boland and Saucer Marine sites were not "very shallow

excavation[s]."  Rather, the piles removed at the Boland and Saucer Marine sites "protruded into

and through layers of buried marshy material…located between elevations of -10 feet and -30

feet."  Plaintiffs' Exh. 17 at pp. 13, 26 (Bea Tech. Report V, Jan. 2009).

In addition, this statement is also disputed as irrelevant because the Corps used improper,

permeable materials as backfill at the Boland and Saucer marine sites, which caused the

floodwall breaches as these two sites.  In particular, in the General Design Memoranda (GDM)

for the LPV levee work, the Corps highlighted eight principal design and construction

"problems" in the area of the IHNC and included the design requirement that the "6) Sources of

fill material" [for the levees] be:

> the earth fill for completing the existing levee portion of the
> protection between the IHNC lock and Florida Avenue will be
> obtained from a borrow area in the bottom of Lake Pontchartrain

---

[97] 2 Grieshaber 84:6-9 [Ex. 12].

> along the north shore.  This material consisting of stiff Pleistocene
> clays will be transported to the project on barges.

Plaintiffs' Exh. 3 at p. 17, ¶33; p. 19 (Lake Pontchartrain and Vicinity Hurricane Protection Plan

(LPV) Design Memoranda Number 3 General Design, November 1966).

**99.  The Corps would make sure that the river sand had proper density and compaction.[98]**

Disputed.  The Corps's Engineering Division assessed "soil backfill and compaction

requirements" for the three foot deep contaminant excavations.  USA Exh. 18 at 172:1-11

(Guillory Depo. Vol. I).  However, the Corps's engineering and geotechnical departments failed

to perform a similar evaluation for the completion backfill at the much deeper structural removal

excavations at the Saucer and Boland sites.  USA Exh. 18 at 170:10-24; 203:21-207:10 (Guillory

Depo. Vol. I).

In addition, this statement is disputed to the extent that it implies that the Corps's process

was proper.  In fact, however, the Corps 30(b)(6) witness, Mr. Grieshaber, admitted that it was

among the Corps's responsibilities to make certain that it used appropriate fill and that the fill

was put in under the appropriate conditions.  USA Exh. 12 at 84:19-86:9 (Grieshaber Vol. II).

Nonetheless, the Corps overlooked the technical design requirements for foundational materials

originally set forth in the IHNC flood control levee design (specifically stiff Pleistocene clays

from the bottom of Lake Pontchartrain along the north shore), and performed no levee structural

analysis of the backfill material or compaction methods to be employed upon removal of the

cofferdams.  Plaintiffs' Exh. 3 at p. 17, ¶33, and p. 19 (LPV Design Memoranda Number 3

General Design, November 1966); USA Exh. 18 at 170:10-24; 203:21-207:10 (Guillory Depo.

Vol. I).

---

[98]2 Grieshaber 84:19-85:15 [Ex. 12].

Dated:  September 3, 2010

**Respectfully Submitted,**
**PLAINTIFFS LIAISON COUNSEL**

_____/s/ Joseph M. Bruno
JOSEPH M. BRUNO (La. Bar # 3604)
Bruno & Bruno, LLP
855 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 525-1335
Facsimile: (504) 561-6775
Email: jbruno@brunobrunolaw.com

**MR-GO PLAINTIFFS SUB-GROUP LITIGATION**
**COMMITTEE**

_____/s/ James Parkerson Roy
JAMES PARKERSON ROY
MR-GO PSLC Liaison Counsel
LA. Bar Roll Number: 11511
Domengeaux Wright Roy & Edwards LLC
P.O.Box 3668
Lafayette, LA. 70502
Telephone: (337) 593-4190 or (337) 233-3033
Facsimile: 337-233-2796
Email: jimr@wrightroy.com

**MR-GO PLAINTIFFS SUB GROUP LITIGATION**
**COMMITTEE**

Jonathan Andry (The Andry Law Firm, New Orleans, LA)
Clay Mitchell (Levin, Papantonio, et al., Pensacola, FL)
Pierce O'Donnell (O'Donnell & Associates, Los Angeles, CA)
James Parkerson Roy (Domengeaux, Wright, et al., Lafayette, LA)

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing was served upon all counsel of

record by ECF on September 3, 2010.

/s/ Joseph M. Bruno