## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES
CONSOLIDATED LITIGATION

CIVIL ACTION

NO. 05-4182

PERTAINS TO: BARGE

SECTION "K"

*Mumford*          C.A. No. 05-5724    *as to claims of plaintiffs Josephine*
                                       *Richardson and Holiday Jewelers, Inc. -*
                                       *ONLY*

*Benoit*           C.A. No. 06-7516    *as to claims of plaintiffs John Alford and*
                                       *Jerry Alford - ONLY*


## LAFARGE NORTH AMERICA INC.'S PROPOSED POST-TRIAL
## FINDINGS OF FACT AND CONCLUSIONS OF LAW


September 17, 2010

## TABLE OF CONTENTS

**Page**

**PROPOSED FINDINGS OF FACT** ...................................................................1

I.      INTRODUCTION ...................................................................................1

II.     GEOGRAPHY – THE INNER HARBOR NAVIGATION CANAL ....................1

III.    EVENTS AT THE LNA TERMINAL – EXERCISE OF REASONABLE
        CARE ...................................................................................................2

        A.      LNA Terminal Operations ...........................................................2

        B.      The Arrival and Unloading of the ING 4727 ................................5

        C.      LNA's Hurricane Preparation .....................................................9

        D.      Exercise of Reasonable Care by LNA ......................................15

                i.      Compliance with Coast Guard recommendations.........15

                ii.     Reasonable care in mooring and barge handling ..........17

        E.      Compliance with Applicable Rules and Regulations.................19

        F.      Reasons Why Barge ING 4727 Broke Away ...........................20

IV.     BARGE TRANSIT – IMPOSSIBILITY FOR BARGE TO HAVE BEEN
        PRESENT AT SITE OF BREACHES WHEN BREACHES OCCURRED.........23

        A.      Introduction and Overview .......................................................23

        B.      Factors Affecting Barge Movement – Importance of Wind ......23

        C.      Hurricane Katrina – Wind Direction Away from Breaches.......25

                i.      Meteorological principles – counterclockwise flow .....26

                ii.     Application of meteorological principles – wind could not
                        have moved the barge to either of the breaches before they
                        occurred...........................................................................27

                iii.    Confirmation of prevailing wind from Oceanweather Inc.'s
                        hindcast ...........................................................................29

                iv.     Confirmation of prevailing wind from Lakefront Airport data .....29

                v.      Confirmation of prevailing wind from eyewitness testimony .......30

                vi.     Confirmation of prevailing wind from radar data.........................31

                        a.      Introduction to meteorological radar data and
                                concepts.................................................................31

                        b.      Radar data confirming consistent wind direction at
                                the IHNC ...............................................................32

                        c.      Consistency between radar data and Lakefront Airport

data...................................................................................................33

          d.    Dr. Mitchell's flawed interpretation of radar data ............35

            - Flawed reliance on "aliased' radial velocity data......35

            - Flawed reliance on "mesocyclone" algorithm data ...36

            - Flawed inferences drawn from supposed
              presence of mesocyclones.........................................38

D.    Hurricane Katrina – Current, Tide, and Waves ........................................40

    i.     Evidence that current and tides did not move the barge ...............40

    ii.    Evidence that waves did not move the barge..................................41

E.    Summary of Evidence Regarding Possible Barge Movements ................45

F.    Plaintiffs' Failure to Present Any Plausible Theory of Barge Movement .46

G.    Lay Witness Accounts – Failure to Establish Causation by Barge...........48

    i.     Alleged eyewitness accounts ........................................................49

        a.    William Villavasso..............................................................49

        b.    Terry Adams ......................................................................51

        c.    Sidney Williams.................................................................53

        d.    Arthur Murph ....................................................................55

    ii.    Accounts of "boom witnesses" ....................................................56

    iii.   Alleged presence of barge in IHNC on Sunday, August 28 ..........58

        a.    Testimony that no barge was present in the IHNC on
             Sunday...............................................................................59

        b.    Ambiguity as to identity of barge seen by Tompkins /
             LeBlanc .............................................................................61

        c.    Lack of relevance to location of barge on Monday
             morning .............................................................................62

    iv.   Summary .......................................................................................62

V.    HYPOTHETICAL BARGE IMPACT – IMPOSSIBILITY FOR BARGE TO
HAVE CAUSED SHEET PILE FAILURE, EVEN IF IT HAD BEEN
PRESENT ...........................................................................................................63

A.    Floodwall Construction – Introduction...................................................63

B.    Sources of Stability – Soil and Sheet Pile, Not Concrete Cap.................64

C.    Effect of Hypothetical Barge Impact – Local Damage to Concrete
Cap, But No Floodwall Failure ...............................................................65

    i.     Results of impact calculations – no sheet pile deflection or
        failure ...........................................................................................66

ii.    Failure of plaintiffs' experts to rebut impact calculations ............67

iii.   Confirmation that plaintiffs' hypothesized barge impact was with the concrete cap, not the sheet pile ........................................68

       a.    Alleged impact at North Breach – above construction joint .....................................................................................68

       b.    Alleged impact at South Breach – above construction joint .....................................................................................69

iv.   Physical evidence confirming barge impact with the concrete cap does not cause failure of sheet pile ...........................................70

**VI.  CAUSES OF IHNC EAST FLOODWALL FAILURES – GEOTECHNICAL CAUSES HAVING NOTHING TO DO WITH A BARGE .................................71**

  A.     Introduction...............................................................................................71

  B.     Katrina's Storm Surge..............................................................................72

  C.     The North Breach......................................................................................72

      i.    Reasons why the North Breach formed .........................................72

         a.    Summary.........................................................................72

         b.    Transition between 1969 sheetpile and 1980 sheetpile......73

         c.    Faulty field weld and rusted interlock ...............................73

         d.    Lower ground surface at levee toe – diminished soil support.............................................................................75

         e.    Sand-filled excavations; permeable sand and shell at breach location ...........................................................75

         f.    Formation of tension crack under hydrostatic pressure .....76

         g.    Role of hydraulic pressure on protected side from rising storm surge............................................................78

         h.    Seepage and stability analyses by defense experts ...........78

         i.    Sequence of formation of North Breach ...........................78

      ii.   Evidence that the barge did not cause the North Breach ...............79

         a.    Meteorological evidence showing barge could not have been present .......................................................................79

         b.    Physical evidence showing that barge could not have been present .......................................................................80

         c.    Physical evidence from breach site; absence of barge impact evidence ..............................................................80

         d.    Absence of support for plaintiffs' impact scenario............81

         e.    Summary.........................................................................82

D.      The South Breach.................................................................83

     i.      Reasons why the South Breach formed ...........................83

          a.      Summary ..................................................83

          b.      Wall curvature in the area of the South Breach ................83

          c.      Jourdan Avenue Canal and outflow canal ........................83

          d.      Poor soil conditions in the area of the South Breach.........84

          e.      Settlement and earlier overtopping due to weak subsoil conditions.................................................85

          f.      Role of overtopping at South Breach................................86

          g.      Formation of tension crack at South Breach.....................88

          h.      Role of hydraulic uplift at the South Breach ...................88

          i.      Seepage and stability analyses by defense experts ...........89

          j.      Sequence of formation of South Breach ...........................89

     ii.      Evidence that the barge did not cause the South Breach ..............90

          a.      Meteorological evidence – barge could not have been present .................................................90

          b.      Physical evidence from breach site and barge ..................90

          c.      Strong water flow; barge not drawn deep into neighborhood .................................................93

          d.      Evidence of high water level in neighborhood before barge arrived .................................................93

          e.      Absence of plausible impact scenario by plaintiffs ...........95

          f.      Comparison with floodwall breaches at other locations....95

          g.      Summary ..................................................96

E.      Reasons to Credit Drs. Bea and Bakeer, and Not Dr. Marino ..................97

     i.      Superior experience and expertise of Drs. Bea and Bakeer...........97

     ii.      Flaws in Dr. Marino's seepage and stability analysis...................99

          a.      Soil characterization – Dr. Marino's unusual lobe at North Beach .................................................99

          b.      Use of average soil values rather than normalized soil values .................................................101

          c.      Failure to consider cone penetrometer data in soil strength analysis.................................................102

          d.      Failure to consider hydraulic uplift................................102

          e.      Use of artificially low permeability values.....................103

f.    Lack of validation ..........................................................104

g.    Failure to assess whether floodwall could withstand full storm surge ....................................................................104

h.    Use of same flawed method to evaluate both breaches.................................................................................105

i.    Summary ...........................................................................106

F.    Confirmation by Independent Studies of Floodwall Failures .................106

i.    IPET .................................................................................107

ii.    ILIT .................................................................................107

iii.    Team Louisiana................................................................108

iv.    Summary ..........................................................................108

VII.    FORESEEABILITY AND PROXIMATE CAUSE: BREACHES AND FLOODING NOT FORESEEABLE CONSEQUENCES OF BREAKAWAY..................................................................................108

VIII.    FLOOD MODELING ANALYSIS AND RESULTS: PLAINTIFFS' FAILURE TO ESTABLISH FLOOD-RELATED DAMAGES CAUSED BY THE BARGE ...............................................................................109

A.    Introduction...............................................................................109

B.    Flaws in the Modeling and Sensitivity Analysis.......................................110

i.    Use of inappropriate breach times based on flawed assumptions..................................................................110

ii.    Use of flawed "sensitivity analysis" to shore up modeling results.................................................................113

iii.    Other errors undermining validity of modeling results................115

C.    Failure to Separate North and South Breaches in Model Analysis..........117

D.    Modeling Results Negating Individual Plaintiffs' Claims.......................117

i.    John and Jerry Alford...................................................117

ii.    Josephine Richardson....................................................118

iii.    Holiday Jewelers, Inc...................................................119

E.    MRGO Flooding Regardless of IHNC Breaches......................................119

IX.    PLAINTIFFS HAVE NOT PROVED DAMAGES IN EXCESS OF FUNDS RECEIVED AS COMPENSATION FROM AN ALLEGED JOINT TORTFEASOR..................................................................................120

A.    Mr. and Mrs. Alford – Road Home Funds ...............................................120

B.    Mrs. Richardson – Road Home Funds ....................................................122

C.    Holiday Jewelers – Failure to Prove Any Lost Income or Profits ...........122

**PROPOSED CONCLUSIONS OF LAW** ...................................................125

I.    PLAINTIFFS' FAILURE TO SHOW DUTY AND BREACH .........................125

    A.   Plaintiffs' Failure of Proof ..........................................................125

    B.   Inapplicability of The Louisiana Rule ...................................128

II.   PLAINTIFFS' FAILURE TO SHOW CAUSATION .........................................129

    A.   Plaintiffs' Failure to Show Causation in Fact ..........................................130

        i.   Legal standards for determining cause-in-fact.............................130

        ii.  Application of legal standards – multiple grounds for finding no causation ..................................................................................131

    B.   Plaintiffs' Failure to Show Proximate Causation.....................................137

    C.   Inapplicability of The Pennsylvania Rule................................138

III.  PLAINTIFFS' FAILURE TO ESTABLISH DAMAGES .................................143

Defendant Lafarge North America Inc. ("LNA") supplies the following proposed post-trial findings of fact and conclusions of law[1]:

## PROPOSED FINDINGS OF FACT

## I.    INTRODUCTION

1.    The central issue in this case is whether a barge, the ING 4727, caused the breaches of the eastern floodwall along the Inner Harbor Navigation Canal ("IHNC") in New Orleans during Hurricane Katrina. The plaintiffs, three individuals (John and Jerry Alford and Josephine Richardson) and a business (Holiday Jewelers, Inc.), contend that the barge caused the floodwall breaches after breaking away from its moorings at a cement terminal operated by the defendant, LNA. LNA denies any wrongdoing and denies that the barge caused the floodwall breaches or any of plaintiffs' flood-related damages.

2.    Upon consideration of all of the evidence, the Court finds that the barge did not cause the IHNC floodwall breaches. As discussed in greater detail below, overwhelming evidence supports this conclusion. That evidence demonstrates (a) that the barge could not possibly have been present at the site of the breaches when the breaches occurred (see below section IV); (b) that the barge, even had it been present, could not have caused the floodwall to fail in the manner that it did (see below section V); and (c) that the floodwall breaches occurred at the weakest points along the floodwall under the force of Katrina's massive storm surge, for reasons having nothing to do with a barge (see below section VI). Indeed, the evidence is so overwhelming that there is no competent evidence to support a contrary finding.

3.    The Court also finds that LNA did not act negligently in its handling of the barge (see below section III); that plaintiffs have not established that their flood-related damages were the foreseeable result of a barge breakaway (see below section VII); and that plaintiffs have not shown flood-related damages in excess of amounts already received from an alleged joint tortfeasor, the United States of America (see below sections VIII and IX).

## II.    GEOGRAPHY – THE INNER HARBOR NAVIGATION CANAL

4.    The IHNC, sometimes referred to as the "Industrial Canal," provides a connection between the Mississippi River at its southern end and Lake Pontchartrain 5.8 miles to the north. The southern half of the IHNC, approximately between the

---

[1] Citations in this document are to trial testimony (*i.e.*, "Cushing Tr. [page:line]"), trial exhibits (PX or DX), documents filed in the docket of this action ("Doc. xx"), the undisputed facts set forth in the Joint Pretrial Statement (Doc. 19842, at 37-42) (*i.e.*, "LNA Undisputed Fact xx" or "Plaintiffs' Undisputed Fact xx"), and plaintiffs' proposed post-trial findings of fact ("PFF ¶ xx") and conclusions of law ("PCL ¶ xx").

Florida Avenue Bridge and the Mississippi River, separates the city to the west from the Lower Ninth Ward to the east. The IHNC is oriented in a roughly north-south direction. LNA Undisputed Fact 2; Cushing Report at 13 & Fig. 8 (DX 196); Doc. 18552 at 2.

5. The IHNC is bisected by Reach 1 of the Mississippi River – Gulf Outlet ("MRGO"), which enters the IHNC from the east at a point just above the Florida Avenue Bridge. The MRGO provides a direct hydrologic connection between the IHNC and the Gulf of Mexico. LNA Undisputed Fact 3; Cushing Report at 11 (DX 196).

6. At the southern end of the IHNC, a lock system lifts vessels from the IHNC to the Mississippi River. This lock system is one of the busiest in the Intra-Coastal Waterway System, with an estimated average wait of ten hours. Because of the lock system, there is no direct hydrologic connection between the IHNC and the Mississippi River. Cushing Report at 13 (DX 196); Mosher Dep. 171:9-16 (DX 283).

## III. EVENTS AT THE LNA TERMINAL – EXERCISE OF REASONABLE CARE

### A. LNA Terminal Operations

7. The Lafarge North America New Orleans cement terminal ("LNA Terminal") is located on the west side of the IHNC, between the Florida Avenue Bridge and the Claiborne Avenue Bridge. LNA Undisputed Fact 4; Plaintiffs' Undisputed Fact 2. The LNA Terminal is located in a protected "inset," sometimes referred to as a "turning basin," away from the main channel of the IHNC. Strouse Tr. 2926:12-2927:6; Green Tr. 567:23 ("it's in a turn basin"); Cushing Tr. 2041:12-14; Hall Tr. 1979:1-8. This protected inset is about 1200 feet long (north-south) and 850 feet wide (east-west). Cushing Report at 15, 21 & Fig. 8 (DX 196); Ryan Report at 4 (DX 201); Strouse Report at 2 (DX 204). At least prior to Hurricane Katrina, it had long been known in the industry that the LNA Terminal, located inside the IHNC, was a safe haven for the mooring of barges. Strouse Tr. 2926:12–2927:6 (noting that the LNA Terminal is a safer area than one of the fleets on the River) Hall Tr. 1938:3-10; 1978:13-23 (describing LNA Terminal as a "safe harbor"); Strouse Report ¶ 12 (DX 204).

8. Barges laden with cement would regularly depart LNA's Joppa, Illinois manufacturing facility and travel via the inland river system to New Orleans and other distribution facilities. Jenks Dep. 7:6-9:11 (DX 365); Mays Dep. 27:19-30:5 (DX 280); Guthrie Dep. 22:5-14 (DX 275). LNA would ship cement to distribution facilities based on its employees' best estimates as to what product LNA's customers would need based on historical demand. Guthrie Dep. 23:2-22 (DX 275); Jenks Dep. 22:17-23:10 (DX 365). LNA distributed two types of cement in New Orleans: Type A and Type H (or oil-field) cement. Jenks Dep. 8:5-7 (DX 365).

9.     The LNA Terminal serves as a distribution point for the company's cement products.  Cement products arrive at the terminal by barge and are unloaded into silos for distribution by truck to LNA customers in the region.  LNA Undisputed Fact 5; Busch Tr. 49:25-50:5; Guthrie Dep. 24:8-15 (DX 275).  LNA uses a vacuum hose system to unload cement from barges and move it into the silo.  Using this method, it is not possible to unload the barge evenly.  Busch Tr. 69:23-70:17.  The vacuum hose moves from one end of the barge to the other end as the barge is unloaded.  Busch Tr. 50:19-22.  When the barge is mostly empty, employees place a Bobcat tractor inside the barge and the operator of the tractor pushes the remaining cement toward the vacuum.  Busch Tr. 66:4-13.  LNA cannot use the Bobcat to keep the cement evenly distributed inside the barge when it is mostly full because the semi-liquid cement could entrap the Bobcat and endanger the operator.  Busch Tr. 70:17-23 ("you would bury" the Bobcat operator by placing the Bobcat in anything but a mostly empty barge).  Mr. Busch said that this was the only unloading method he used and is what was used to unload the ING 4727.  Busch Tr. 70:5-16.

10.    Barges laden with cement arrive at the LNA Terminal riding low in the water under the weight of the cement.  As cement is unloaded from a barge, the barge will rise at the end from which cement is being unloaded, causing the barge to sit unevenly in the water until it is fully unloaded.  Busch Tr. 117:16-118:6 (a half empty barge is "dangerous" because it "will start bucking up and down with water surges").  An unloaded barge will ride high in the water, with a shallow draft.  Busch Tr. 60:13-61:6; Smith Tr. 165:7-20.

11.    To be delivered to the LNA Terminal for unloading, barges must pass through the IHNC lock from the Mississippi River.  LNA does not have its own tugs at the terminal, and thus it relies on fleeting services (usually hired by the barge owner, not LNA) to deliver full barges and to remove empty barges after they have been unloaded.  Busch Tr. 107:19-21, 119:13-21.  Once the barges are unloaded, they must again pass through the IHNC lock to the Mississippi River upon retrieval by the fleeting service.  LNA Undisputed Fact 6; VanderMeulen Dep. 41:9-15 (DX 287).  To get a barge through the lock requires a "lock turn."  A "lock turn" specifies when the lockmaster will allow a barge to go through the lock.  Sometimes, it would take several days to receive a lock turn.  Busch Tr. 78:13-79:7 ("I know when I have a one hundred lock turn, basically I've got four days of waiting before I can get a barge through there."); Grabert Dep. 71:4-72:2 (DX 274).

12.    LNA regularly moored barges at the LNA Terminal in tiers of multiple barges.  Busch Tr. 108:10-16; Photograph of LNA Terminal (DX 54 p. 1).  Because of the necessary passage through the IHNC lock discussed above (¶ 11), it would often take days or even longer for fleeting services to retrieve barges once they had been released.  During the 2005 time frame, it was not unusual for LNA to have several barges at its dock at any given time, and this occurred without complaint from the Harbor Police and Coast Guard who regularly patrolled the area.  Busch Tr. 108:17-21 (Harbor Police); Robin Tr. 589:12-23 ("in the ten years I worked

3

there, I never seen a boat on time" to pick up a barge); Jenks Dep. 20:9-15 (DX 365) ("There's always a delay" once LNA asks a barge owner to pick up its barge).

13.     Upon unloading a barge, LNA's terminal personnel would call the relevant fleeting service to "release" the barge for pickup.  LNA Undisputed Fact 7.  During the period in question, LNA had a Transportation Agreement with Ingram Barge Company ("Ingram") to deliver LNA's cement products to the LNA terminal via barge from its production facility in Joppa, Illinois.  Transportation Agreement (DX 1).  Ingram employed Zito Fleeting Company to receive barges at its fleet (sometimes known as the Algiers Fleet) in the Mississippi River, deliver the barges to the LNA Terminal, and then retrieve empty barges from the LNA Terminal and return them to the fleet, where they would be held before moving on to their next destination.  Boudreaux Limitation Tr. 6:14-18 (DX 329).  Zito was the only designated fleeting service for delivering Ingram barges to the LNA Terminal and for retrieving them after unloading and fleeting them pending their next assignment by Ingram.  LNA Undisputed Fact 8; Busch Tr. 96:15-23 (Ingram had informed LNA that Ingram itself would not pick up barges; LNA was to call Zito to pick up Ingram barges); VanderMeulen Dep. 92:23-93:7, 97:7-17 (DX 287); Boudreaux Limitation Tr. 11:21-25 (DX 329).

14.     Specific to barge operations, LNA had two types of safety documents:  a national document that covered all of LNA's operations and a checklist of procedures specific to New Orleans used to prepare the LNA Terminal for hurricanes.  See VanderMeulen Dep. 14:22-16:15 (DX 287) ("We have a two-tiered system at Lafarge.  We have standard operating procedures that … apply in general to all of our facilities [and] site-specific operating procedures that in order to be effective had to be generated locally"); Guthrie Dep. 92:9-93:8 (DX 275); LNA Terminal Hurricane Checklist (PX 37).  The hurricane checklist in effect at the time of Hurricane Katrina was augmented by the experience of LNA's employees.  See below ¶¶ 32, 44.  LNA had made advances in its safety procedures after an upgrade to the dock (see below ¶¶ 43-44) permitted the use of soft lines and a "long-lining" procedure that allowed moored barges to rise along with anticipated storm surge, which increased the safety of the mooring configuration.  VanderMeulen Dep. 23:24-26:1 (DX 287).  See below ¶ 45 (discussion of long-lining).  Although LNA did not revise its hurricane preparation checklist to reflect these advances, that meant only that the procedures that LNA used to prepare for hurricanes were improved from those stated in the checklist.  VanderMeulen Dep. 22:12-21, 23:12-23 (DX 287) ("The procedures had in fact been upgraded").

        a.     Plaintiffs contend (PFF ¶¶ 5-6) that LNA's checklist "fell far short of the requirements of a written hurricane protection plan," but that assertion is not supported by the record.  As noted above, LNA had standard procedures that apply in general to all facilities and site-specific operating procedures, that, in this case, had been augmented by experience of employees and prior practice.

4

15.   LNA's employees at the New Orleans Terminal were trained about the upgrade to the facility and the corresponding upgrade to the hurricane preparedness procedures to include long-lining and use of rope rather than wire cables. VanderMeulen Dep. 27:14-28:10 ("So these guys have practiced that procedure numerous times. Everyone was very well informed at the site."); Busch Tr. 110:2-19; Smith Tr. 146:17-147:15.

16.   Prior to the breakaway of the ING 4727, LNA had not experienced any breakaway barges from its New Orleans terminal. VanderMeulen Dep. 119:23-120:17 (DX 287) ("I don't know of any breakaways that have occurred from our dock under any circumstances.").

**B.      The Arrival and Unloading of the ING 4727**

17.   The ING 4727 was a hopper barge that measured 200 feet long, 35 feet wide, and was 12 feet tall without covers, and over 20-feet high from top to bottom including hatch covers. Cushing Report at 23 (DX 196); Cushing Tr. 2039:10-23; Marino Report Fig. 2.16 (PX 392); Pazos Dep. 102:9-12 ("23 feet" high) (DX 218).

18.   LNA tracked the ING 4727 from its manufacturing facility at Joppa down through the rivers to its terminal in New Orleans. Mays Dep. 30:16-20 (DX 280). The barge was transported by Ingram. Mays Dep. 78:16-23 (DX 280). After it departed Joppa, LNA determined that the barge should be delivered to New Orleans and not to Westlake, Louisiana, its original destination. Plaintiffs' Undisputed Fact 6; Mays Dep. 41:13-17, 43:6-8 (DX 280); Jenks Dep. 31:9-32:5 (it was not uncommon for LNA to reroute barges while in transit) (DX 365); August 17, 2005 e-mail from Rachel Burnett (Mays) to John Haverkamp, et al. (PX 7). Normally, it took nine to fourteen days for a barge to travel from Joppa to a fleet in New Orleans. Mays Dep. 36:14-37:11 (DX 280). In the case of the ING 4727, Ingram delivered the barge to the Zito fleet in the Mississippi River. Plaintiffs' Undisputed Fact 8; Boudreaux Limitation Tr. 8:3-5 (DX 329).

19.   LNA labeled the ING 4727 as a "hot" barge. This designation is used in the industry to prioritize a particular barge in terms of delivery. Jenks Dep. 11:19-12:2 (DX 365); Guthrie Dep. 41:9-20 (DX 275) ("hot" is "[n]ot rush, but it lists it as a priority shipment with the barge"). However, labeling as a "hot" barge did not mean that the barge could travel any more quickly than any other barge, and the designation did not suggest an extraordinary rush to get the barge to its destination. Jenks Dep. 49:11-51:4 ("[T]he barges physically can't move any faster … the water is the water") (DX 365); Guthrie Dep. 39:10-17 (DX 275). Moreover, although at least one internal LNA email labeled several barges (including the ING 4727) as "HOT HOT HOT barges" (PX 10), that label was not a special designation with any significance in the industry, or within LNA, but rather appears to have been an attempt at humor by LNA's barge scheduler.

5

Jenks Dep. 12:13-20, 51:18-52:13 (explaining that Ms. Burnett was "having fun" by referencing song lyrics "HOT HOT HOT" in her email) (DX 365).[2]  Similarly, although some of LNA's internal e-mails refer to a "stockout" (PX 6), that is a generic term that LNA uses when it runs low on product at a particular location. Jenks Dep. 14:14-15:2 (DX 365); Guthrie Dep. 43:6-45:1 (DX 275).  While a "stockout" may result in extra cost to transport cement by a more expensive means than had been planned (e.g., charter vessel or truck instead of barge), there is no basis for plaintiffs' suggestion that LNA incurred "penalties" as a result of a "stockout."  Jenks Dep. 15:14-18:8 (DX 365); E-mail from Carrie Jenks (PX 6). The priority designation of the ING 4727 was within the ordinary course of LNA's business and, contrary to plaintiffs' suggestion, did not diminish in any way the company's attention to safety respecting this barge.

20.     During the time period that LNA's internal e-mails referred to the ING 4727 as a "hot" barge, LNA had no knowledge that Hurricane Katrina was expected to make landfall near New Orleans, and LNA therefore made no effort to speed up that delivery in order to try to get the barge unloaded prior to the arrival of the storm.  Jenks Dep. 13:19-14:13 (DX 365).  Further, according to LNA Assistant Terminal Manager Ed Busch, there was no particular urgency that led LNA employees to unload the ING 4727 on Friday, August 26th.  Busch Tr. 108:22-109:2 (explaining that he had no knowledge of the "hot barge" designation for the ING 4727).

21.     The ING 4727 arrived at the LNA Terminal, laden with cement, at approximately 12:20 p.m. CDT on August 26, 2005, together with another loaded barge, the ING 4745.  Zito, on behalf of Ingram, delivered the two barges.  LNA Undisputed Fact 9; Busch Tr. 109:9-12; Strouse Report at 2 (DX 204); Pazos Report at 7 (PX 402).

22.     When the ING 4727 and ING 4745 arrived at the LNA Terminal, there were five loaded barges moored in a tier at the dock immediately to the north of the unloading apparatus where the ING 4727 and ING 4745 were docked.  LNA Undisputed Fact 10; Busch Tr. 51:25-52:1, 61:22-62:8; Strouse Report at 2 (DX 204).  It was not unusual for LNA to have seven barges at the Terminal at a time. Busch Tr. 108:13-16.  Had LNA personnel not begun unloading the ING 4727 that afternoon, they would have started unloading another of the six other loaded barges at the LNA Terminal that day.  Busch Tr. 108:22-24.  During the summer of 2005, LNA often unloaded barges around the clock, seven days a week.  Busch Tr. 109:13-17.

a.      Plaintiffs' contention that LNA did not need the cement on the five barge on the north tier is wrong.  PFF ¶ 10.  Mr. Busch's uncontroverted testimony was that if the ING 4727 and ING 4745 did not arrive on

---

[2]  After leaving LNA, Ms. Burnett married and changed her last name to Mays.  Thus, while LNA employees refer to her as Rachel Burnett, her name had changed to Rachel Mays by the time of her 2007 deposition.  Mays Dep. 5:17-6:8 (DX 280).

August 26, he would have directed employees to begin unloading one of the five barges in the north tier.  Busch Tr. 108:22-24.

23.   Upon its delivery to the LNA Terminal, the ING 4727 was tied up with at least two strands of 4.5-inch circumference (1.5-inch diameter) polypropylene line, both of which had previously been in use.  LNA Undisputed Fact 11; Skaer Report at 1 (DX 199); Smith Tr. 135:7-9 (3 lines).

24.   LNA personnel began to unload the ING 4727 upon its arrival at the LNA Terminal.  Unloading continued throughout the afternoon of August 26 and into the next morning.  LNA Undisputed Fact 12; Barge Unloading Report (DX 2); Busch Tr. 53:3-13; VanderMeulen Dep. 104:10-105:9 (DX 287).

25.   When LNA's terminal personnel began to unload the ING 4727, Hurricane Katrina was not projected to strike the New Orleans area, nor was New Orleans within the projected track of the hurricane.  Thus, there was no reason for LNA personnel to have refrained from unloading the barge at noon on Friday, August 26.  Busch Tr. 109:9-14; Strouse Tr. 2932:9-21; Strouse Report ¶ 7 (DX 204).

26.   Friday, August 26, was a normal workday for most in the New Orleans area.  *E.g.*, O'Dowd Tr. 2217:3-7 (IHNC lockmaster worked a normal shift that day and did no storm preparation); Jerry Alford Tr. 192:23-193:12; McFarland Dep. 34:16-23 (DX 318); Simmons Dep. 17:20-24 (DX 305); Busch Tr. 109:3-6; L. Arnold Tr. 2810:23-2811:8 (Lone Star received and unloaded barges that day).

27.   On August 26, at the time the ING 4727 was delivered to the LNA Terminal, Hurricane Katrina was projected to make landfall on the Gulf Coast of Florida, well to the east of Louisiana.  Busch Tr. 65:16-18, 109:9-12; National Weather Service, National Hurricane Center, Hurricane Katrina Forecast Advisory Bulletins (PX 18); Green Tr. 561:6-16 ("I agree that it was not … projected to be a direct hit on Friday.").  It was not until the late afternoon or evening of August 26 that the projected storm track shifted to the west and came to include the New Orleans area.  By that time, however, the ING 4727 had already been partially unloaded.  See Busch Tr. 109:9-12; Smith Tr. 129:15-17; National Hurricane Center Warnings and graphical analysis of approach of hurricane (DX 103); Strouse Tr. 2932:9-21; Strouse Report ¶ 7 (DX 204).

a.   Plaintiffs claim that LNA should have heeded the State of Emergency declared by Governor Blanco and refrained from starting to unload the barge.  PFF ¶ 13.  However, the exhibit plaintiffs cite – PX 19 – does not state the time of Governor Blanco's declaration.  (PX 19 is a copy of the official declaration, but it does not include any indications of the time it was issued.)  The only evidence in the record – a compilation of news articles (DX 367) – shows that Governor Blanco did not declare a state of emergency until at least 5:00 p.m.  (From the articles, it is difficult to discern how quickly the declaration was disseminated to news outlets assuming that the Governor issued it from her office at 5 p.m.)

b. Plaintiffs' citation to PX 18 – a compilation of National Weather Service advisories – is also misplaced. PFF ¶¶ 14, 16. They claim that at "11:00 EDT" the National Weather Service placed New Orleans within the "potential strike zone" of the hurricane. However, the first mention in PX 18 of Hurricane Katrina approaching the Louisiana Coast is not until Sunday August 28.

28. The United States Coast Guard did not issue the first of its port condition alerts for the New Orleans area ("Port Condition WHISKEY") until after 8:00 p.m. on August 26, by which time the ING 4727 had already been partially unloaded. Ryan Tr. 2875:4-6; U.S. Coast Guard documents (DX 19). Port Condition WHISKEY contained no recommendations or regulations specific to the LNA Terminal or the barges moored there (including the ING 4727). Ryan Tr. 2875:7-15. Thus, there were no Coast Guard recommendations or regulations restricting LNA's activities, including the unloading of the ING 4727, on Friday, August 26. Ryan Tr. 2881:4-7.

29. The Coast Guard did not issue its alert for "Port Condition XRAY," directing that port operations be shut down in anticipation of the storm's arrival, until 4:00 p.m. on Saturday, August 27. Ryan Tr. 2878:9-14; Strouse Report at 7 (DX 204); U.S. Coast Guard documents (DX 19). Port Condition XRAY contained no recommendations that applied to the LNA Terminal or to the ING 4727 or its mooring arrangements. Ryan Tr. 2878:15-20.

30. The Coast Guard did not set Port Condition ZULU until Sunday August 28. Ryan Tr. 2878:25-2879. The only recommendations in Port Condition ZULU applicable to LNA were that all operations at facilities handling oil or hazardous materials must cease and no vessels may be moving on the water. Ryan Tr. 2879:6-12. By this time, LNA had completed its hurricane preparations and ceased all activities at the LNA Terminal, and therefore it complied with all ZULU recommendations. Busch Tr. 61:10-62:11; Smith Tr. 115:10-15; Ryan Tr. 2879:10-12; 2905:21-24. (The Coast Guard never implemented Port Condition YANKEE prior to Hurricane Katrina. (DX 19)).

31. LNA's Terminal staff finished unloading the ING 4727 on Saturday morning, August 27, at around 9:00 a.m. LNA Undisputed Fact 13; Plaintiffs' Undisputed Fact 10. After the unloading was completed, Mr. Busch placed a call to release the barge to Zito, the designated fleeting service that had delivered it and the only fleeting service that could pick it up, but he did not reach anyone at Zito. Mr. Busch left a message on Zito's answering machine. Busch Tr. 97:8-9. However, it often took several days for Zito to come to the LNA Terminal to pick up an empty barge once LNA called to discharge it. Smith Tr. 155:15-156:2; Boudreaux Limitation Tr. 12:10-16 (DX 329) ("Reasonable dispatch is 24 to 48 hours"); 14:11-16 (same). In any event, at the time Mr. Busch called Zito, Zito was not accepting new pick-up orders. Boudreaux Limitation Tr. 13:5-19 (DX 329) ("We were completing the orders that were already assigned to us at that time"). Plaintiffs admit that Mr. Busch called Zito. PFF ¶ 18 ("At about 9:00,

Lafarge manager, Busch, telephoned Zito Fleeting, Inc. to release the barge for pick up.") (citing Busch Tr. 58:4-9).

    a.     Although phone records to substantiate the call to Zito were not introduced at trial, there was ample testimony that the call was placed, including by several LNA employees who said that Mr. Busch advised them that morning that he had called the fleeting service to release the barge.  Smith Tr. 130:22-24; Robin Tr. 586:18-21; J. Arnold Dep. 31:13–32:25 (DX 267).

## C.    LNA's Hurricane Preparation

32.    On Saturday morning, August 27, LNA terminal personnel learned that Hurricane Katrina had changed direction toward the west and that New Orleans was within the projected landfall area.  At that point, Mr. Busch directed terminal personnel to secure the facility for a hurricane.  Mr. Busch had twenty-three years of marine terminal experience at the time of the events in question, including mooring barges at cement terminals, gained during employment in Baltimore at Blue Circle Industries from 1982 to 1994, at Lone Star Cement in New Orleans from 1994 to 2001, and at LNA from 2001 to 2005.  Busch Tr. 107:18-109:9.  Also working that day were Earl Smith, who had 16 years of experience, and Louis Robin, who had 9 years of experience.  Busch Tr. 110:17-21; Smith Tr. 127:3-5; 142:5-10.  According to Mr. Busch, these employees were "extremely capable." Busch Tr. 110:22.  The fourth employee, Roland Johnson, was newer but "was learning" and "real good at taking orders and following through with what he was being told to do."  Busch Tr. 110:24-111:1.

33.    Although certain communications equipment was out of service at the LNA Terminal during late August 2005, LNA employees had Nextel phones and were able to receive outside communications, and had timely access to information about the approaching storm.  Busch Tr. 55:5-12 (Mr. Busch communicated with Ms. Arnold and received information from a co-worker's wife that the storm had changed course), 63:13-64:3 (explaining that certain communications equipment was temporarily disabled prior to the storm due to renovations to the office building).

34.    After unloading of the ING 4727 was completed, Mr. Busch directed terminal personnel to remove equipment from the dock, secure buildings and silos, and secure barges and barge covers.  He directed terminal employees to evaluate the condition of the existing rope and, where necessary, to use a new roll of 2-inch diameter (6-inch circumference) blue polypropylene rope to secure the rigging between the barges.  Busch Tr. 56:7-58:23; Smith Tr. 150:8-12; Robin Tr. 586:13-21; R. Johnson Dep. 25:2-12; 26:20-24 (DX 278).  The employees then worked together to cut new rope and tie off the barges.  Busch Tr. 57:24-58:3; R. Johnson Dep. 27:17-25 (DX 278).

35.   LNA learned at about 9:00 a.m. on August 27 that the Levee Board was going to close the floodgates, so Mr. Busch instructed the employees to move all of the movable equipment onto the protected side of the floodgates.  Busch Tr. 112:25-113:10; Smith Tr. 146:13-16 (Mr. Smith moved equipment to the non-flood side).

36.   The new rope that Mr. Busch purchased and that was used to secure the barges was high-quality, top-of-the-line synthetic rope (cordage) manufactured by industry leader Garware Wall Rope Company.  Skaer Tr. 2513:3-9, 2511:24-2512:1 ("I think the quality [of the Garware rope] was excellent.").  In the summer of 2005, Mr. Busch purchased three rolls of new 2-inch polypropylene rope from Shipyard Supply.  Shipyard Supply Invoice (DX 6); Busch Tr. 98:6-9, 102:1-6 ("The lines that we used [to] secure those barges for the hurricanes [sic] was the 2-inch polypro blue line.").

37.   LNA personnel did not remove all of the ropes that were tied to the barges at the dock at the start of the hurricane preparations.  Rather, lines that were in good condition and that had no chafing marks or cuts were left on the barges and "were deemed adequate for what [they] were doing."  Busch Tr. 103:4-15, 104:2-5 (agreeing that the ropes had "sufficient integrity to pass muster"); Smith Tr. 152:13-18 ("we checked the ropes and see if they got bad spots on them, like worn spots or stretched spots; or if the rope looked too old, we would change them out").

38.   All LNA personnel who testified at trial stated that during storm preparations, a rope was put on *every* kevel of *every* barge, including the ING 4727 and ING 4745, to the extent kevels were available.  Busch Tr. 62:4-18 ("it appeared that all the ropes or all the kevels that were on both barges had ropes leading back and forth"), 81:11-15 ("everything had a rope hanging off it connected to the other barge"); Smith Tr. 135:23-136:2 ("it depends on how many [bitts] – that's how many ropes we put"), 136:3-8 ("Yeah, it depends on how many cleats, that's how many ropes you can put on there."), 136:19-21 (company policy was to put a rope on every cleat); R. Johnson Dep. 33:8-34:15; 41:18-24 (noting that two-barge tier was tied up in the same way as the five-barge tier and that on the five-barge tier of barges "[e]very little bit, cavil or cleat had a rope on it") (DX 278); Robin Tr. 591:1-592:2 ("we went ahead and put extra lines on the [4727 and 4745] barges anyway" because "a lot of times the boat doesn't show up" to pick up an empty barge).

a.   Plaintiffs' claim that Mr. Busch was "unsure as to the mooring" of the barges is wrong.  PFF ¶ 19.  Mr. Busch never stated that he was unsure. As noted above, Mr. Busch unequivocally testified that he saw a rope on every cleat of every barge.  Busch Tr. 62:4-11; 81:11-5.  To distinguish this testimony, plaintiffs cite, in part, to deposition testimony of Captain Grabert.  PFF ¶ 45 (citing Grabert Dep. 55:11-18).  The cited testimony was not designated by either party (see DX 274) and thus is *not* part of the record.

39.  LNA's hurricane preparations included preparing the five loaded barges in the tier immediately north of the unloading apparatus, as well as the two barges, the ING 4727 (which had been emptied) and the ING 4745 (which was still loaded), that were at the dock near the unloading apparatus.  Busch Tr. 62:12-19; Smith Tr. 150:5-7; Strouse Report at 2, 4 (DX 204).  LNA did not have the ability to spread the barges out along the dock.  The dock was only 600' long so there was only room to put the 200' long barges two-abreast along the dock.  Busch Tr. 114:1-11.

40.  It was LNA's practice to replace worn-out mooring lines and to add additional mooring lines in preparation for a storm.  In the case of the ING 4727 and ING 4745, LNA employees replaced one of the old mooring lines with a length of new blue 6-inch circumference rope and added another connection with the new blue 6-inch circumference rope.  LNA employees also replaced or added lines in the five-barge tier to the north.  There were *at least* three connections between the ING 4727 and ING 4745 upon the completion of hurricane preparations – one at the bow, one at the stern, and at least one in the middle.  Thigpen Tr. 165:16-20 (there were "three ropes, single part ropes running from the empty to the loaded"), 176:15-17 ("brand-new ropes"); Green Tr. 462:17-21; Grabert Dep. 47:11:21 (DX 274).  LNA employee Earl Smith, who had sixteen years of experience mooring barges, supervised the actual securing of the two barges.  The LNA employees inspected the rigging to determine that it was satisfactory.  Busch Tr. 103:4-15; Smith Tr. 147:16-24; R. Johnson Dep. 38:16-39:16, 41:18-22 (DX 278).  Mr. Busch understood that LNA's work to add rope and replace rope resulted in a "doubling up" of the connections between the ING 4727 and ING 4745.  Busch Tr. 93:11-12 (doubling up means "[t]wo lines, or doubling the line back").

41.  The line in the middle between the ING 4745 and ING 4727 was not a "spring line," as plaintiffs' expert Mr. Green testified.  Green Tr. 462:17-463:11.  A spring line is a line that would run at an angle between the two barges, rather than between adjacent cleats or kevels.  However, the middle line remnants were only 44-46 feet long in total, which means that it was not long enough to be a spring line.  Skaer Tr. 2529:7-12.  Nor did any fact witness – including Messrs. Thigpen, Busch, Smith, Robin, R. Johnson, and Grabert – testify that he observed a mooring line at an angle.  Mr. Green thus relied only on the ambiguous deposition testimony of Mr. Thigpen – which is not part of the trial record – to conclude that a spring line connected the barges.  Green Tr. 464:8-14; 551:8-25 (acknowledging that he heard neither Mr. Busch nor Mr. Thigpen testify that either observed a spring line configuration); Strouse Tr. 2938:22-24 (noting that if the center rope was on an angle, it would have been discovered on the turn-around).

42.  By replacing one of the existing used lines with a strand of new 6-inch circumference (2-inch diameter) polypropylene line and by adding a third connection using the new 6-inch circumference line, LNA personnel more than doubled the strength of the mooring configuration between the two barges.  Skaer Tr: 2520:20-24 (the ropes were "three times as strong"); Skaer Report at 2 (DX 199); Ryan Tr. 2884:2-5; Strouse Tr. 2941:25-2942:11.  The use of at least three ropes, two of which were new, to moor the ING 4727 to the ING 4745 was

11

reasonable and adequate.  Strouse Tr. 2938:12-21; Strouse Report at 5 (DX 204) ("the quantity and arrangement of the high-quality stronger lines were adequate").

43.     Although LNA had in the past used cable to secure barges in advance of a hurricane, this old practice was based on an older dock design which required cable because soft lines would have chafed running across the dock edge.  When the older dock was replaced by a new dock configuration in or around 2003, it became possible to improve the method of securing barges in advance of a storm with the use of soft lines, using a "long-lining" technique to permit barges to rise with anticipated storm surge.  See Strouse Tr. 2946:22-2947:11 (explaining the technique).  From that time forward, LNA employees used lighter and more flexible polypropylene line instead of cable in preparing for storms prior to Katrina.  Busch Tr. 59:19-60:4 ("the rationale there was to let the barge rise with the storm surge and pay line out from the poles"); Smith Tr. 142:17-20 (LNA had used rope since time of dock renovations); Smith Tr. 146:20-147:4 (new pilings on dock stuck up higher to allow for long-lining); Robin Tr. 584:7-23 (explaining renovations to the dock); VanderMeulen Dep. 22:6-26:17 (DX 287); Guthrie Dep. 25:7-28:7 (DX 275); Strouse Tr. 2946:22-2947:11 (long-lining allowed the storm surge to raise the barges without straining the lines because the excess line would unwrap from the mooring bollards as the surge rose); Strouse Report at 2 (DX 204).  Generally, by 2005, rope had replaced cable in most mooring applications. Skaer Tr. 2532:1-18.

44.     All of LNA's employees knew that the LNA Terminal had been retrofitted for use with polypropylene rope rather than cables and they all knew how to long-line the barges and had performed long-lining at the LNA Terminal prior to Hurricane Katrina.  Busch Tr. 111:2-19 ("[T]hey felt the long-lining idea was an excellent idea. … They had used [long-lining] before."); Robin Tr. 587:15-588:5 ("We have done it before.  We have done it several times.").  Mr. Busch, based on his experience, believed that long-lining was far superior to cabling for barges during a hurricane and that is why he recommended that LNA switch to long-lining when they renovated their dock.  Busch Tr. 111:19-120:4 (explaining that it was not possible to make as many connections between the barges and from the barges to the dock with cables as compared to rope).  LNA also had mooring diagrams for barges on the wall of the Terminal's office.  Robin Tr. 579:12-14; see also id. 578:21-25.

45.     The "long-lining" technique involved wrapping the soft line around a synthetic piling between the barge and the dock so that as the water level in the IHNC would rise, the line between the barge and the dock would pay out and allow the barge(s) to rise as the water level from the storm surge would rise.  Busch Tr. 59:19-60:4 ("the rationale there was to let the barge rise with the storm surge and pay line out from the poles"; without long-lining "it would have caused [the unloaded] barge to break away from the dock and it would have turned a loaded barge loose with it"); Smith Tr. 147:5-7; VanderMeulen Dep. 24:7-26:17 (DX 287); R. Johnson Dep. 37:22-38:6 (DX 278); Strouse Report at 2 (DX 204). Long-lining would not result in the tiers of barges colliding with one another

because the slack in the lines would come out in the same way for both tiers. Busch Tr. 94:1-6.

46.   In addition to directing the securing of the barges at the terminal, Mr. Busch called Joseph Domino Towing ("Domino") to arrange for the ING 4727 and ING 4745 to be "switched" (or "shifted" or "topped around") so that the empty barge would be away from the dock.  Busch Tr. 114:12-21; Guthrie Dep. 43:19-44:10 (DX 275); Plaintiffs' Undisputed Fact 11.  Mr. Busch was concerned that having an empty barge riding high against the dock would make it impossible to utilize the "long-lining" technique described above, creating a risk that the rising storm surge waters would cause both the loaded and empty barges to break away. Busch Tr. 59:19-60:12, 60:19-61:7; Castaing Dep. 21:2-22:13 (LNA wanted Domino "to top around the two barges and retie them to the dock … to where the load was tied to the dock") (DX 270).

47.   A tugboat assigned by Domino from Unique Towing arrived to perform the switching maneuver during the afternoon of August 27.  Regina H Daily Log (PX 52); Thigpen Tr. 163:6-18 (explaining how Unique Towing's vessel, the Regina H, traveled to the LNA Terminal to switch the barges); Grabert Dep. 42:19-43:11; 46:1-7 (DX 274).  By that time, LNA personnel had completed their hurricane preparations and departed from the terminal in order to evacuate their families from New Orleans.  Plaintiffs' Undisputed Fact 14 (LNA evacuated its facility around noon on August 27).  The Unique Towing crew shifted the two barges and tied the loaded barge to the dock as instructed.  Thigpen Tr. 171:1-6; Grabert Dep. 57-60 (DX 274); see Edwards Dep. 69:5-12, 113:9-15, 118:4-119:7 & Exh. 10 (saw barge tied to dock at 1:30 a.m. on Monday) (DX 272).  The Unique Towing crew observed the "new ropes" between the ING 4727 and ING 4745.  Thigpen Tr. 176:15-17.  Moreover, the Unique Towing crew found the connections between the two barges sufficient so that they could safely perform the top around maneuver.  Thigpen Tr. 181:16-182:9.  Deckhand Thigpen, although testifying that mooring wires are often used to connect two barges together, did not use the wires on the ING 4727 or ING 4745 to connect the barges following the top around maneuver.  Thigpen Tr. 170:17-25.  Additionally, the LNA Terminal was not a fleet and did not use the same mooring procedures as a fleet.  Ryan Tr. 2881:24-2882:2; Strouse Tr. 2940:1-7 (explaining differences between a fleet and a dock); Busch Tr. 84:15-20.

48.   When the Unique Towing crew departed, the ING 4727 and ING 4745 were secured together with no fewer than three lengths of high-strength and high flexibility polypropylene rope with which the LNA personnel had secured them. Grabert Dep. 57:4-62:2 (DX 274); Busch Tr. 115:6-9 (Mr. Busch knew that Unique crew followed his instructions based on post-storm observations of the remaining barge, the ING 4745).

49.   LNA's cordage expert, Mr. Skaer, examined remnants of ropes collected by LNA's investigators and was able to match six of the remnants together into three separate ropes that had formed connections between the ING 4727 and ING 4745.

Skaer Tr. 2521:19-2522:3; see also Skaer Tr. 2522:4-12 (explaining that it is possible that the other remnants were also on the barges). Two of the ropes that Mr. Skaer matched were new, 6" polypropylene ropes that were the same type of rope that Mr. Busch purchased from Shipyard Supply. Skaer Tr. 2520:10-12, 2524:16-18; Rope remnants H-1 and H-1a and D-13 (DX 121). These two ropes were on the "quarter kevel" (kevel #4) and the bottom kevel (kevel #5).

50.   Mr. Skaer remarked that the condition of these ropes evidenced severe stress beyond that imposed on any rope he had ever seen in his forty-year career. Skaer Tr. 2524:19-25 ("Well, in 40 years of looking at ropes, I have never seen one this badly damaged, the severe damage that melted and completely fused [the rope] back to raw plastic again."). The kind of damage observed by Mr. Skaer would have to have been caused by "severe strain" on the rope. Skaer Tr. 2531:9-11. The third rope (which was not replaced) was at the top kevel (kevel #1). Skaer Tr. 2522:23-2523:8; Skaer Slide DPS-050 (DX 353) (matching the remnants to the kevels on the barges). This top rope was in good, near-new condition prior to the storm. Skaer Tr. 2516:1-24.

51.   The rope that was on kevel 4 was 44 to 46 feet long, which made it too short to be a spring line. Skaer Tr. 2565:11-13. The rope on kevel 5 (at the bottom) was 35 to 38 feet long. Skaer Tr. 2527:6-14.

52.   LNA personnel did not ask Domino or Unique to remove the barge from the terminal because there was no way of assuring that the barge would be accepted at the Zito fleet (*i.e.*, Ingram's only designated destination), and it would have been imprudent to send a barge away from the dock without a destination. Busch Tr. 114:24-115:2 (only Zito or Ingram could move Ingram's barge); VanderMeulen Dep. 100:7-20 (DX 287); Castaing Dep. 60:11-20; 63:21-24 (Domino did not work for Ingram in 2005) (DX 270). Moreover, the Unique deckhand, Mr. Thigpen, testified that they would never pick up a barge without having a destination for that barge. Thigpen Tr. 184:23-185:3 ("You're not going to pick up nothing unless you know where it's going."); Strouse Tr. 2947:22-25 (it would have been inappropriate to remove the barge unless there was a "dedicate[d] place to take it" – and in this case only Zito could provide that). Thus, plaintiffs' statement that Unique would have towed the barge if asked (PFF ¶ 20) is taken out of context. Both Mr. Grabert and Mr. Thigpen testified that they would only have taken the barge away from the Terminal *if* they had a destination for it.

53.   By the time Unique Towing arrived to perform the switching maneuver, Zito had already closed its fleet to new barges as it undertook its own hurricane preparations. Zito email of August 27, 2005 (DX 115); Boudreaux Limitation Tr. 23:25-25:20 (DX 329) ("Under the circumstances that day, the work load that we already had, I couldn't have been able to accommodate them"; "We were X'ing out any barges that were not announced because we were blocking the fleet off and tying it up in a fashion for safety reasons.").

54.  LNA completed its hurricane preparations around midday on August 27.  Busch Tr. 115:10-15.  Its employees were satisfied that the barges were tied up properly.  Smith Tr. 156:23-157:3.  LNA then allowed its employees to leave the facility and to prepare themselves and their families for the approaching hurricane.

55.  LNA employees did not consider ballasting or sinking the ING 4727 because they had no capability to do so.  Busch Tr. 115:25-116:8 ("I had no way of ballasting the barge down."); VanderMeulen Dep. 103:17-22 (DX 287).  LNA also had no vessels of its own to move or shift the barges.  Busch Tr. 116:9-13; Mays Dep. 80:18-19 (DX 280).

56.  While LNA personnel consider safety to be "the number one priority" (Jenks Dep. 47:19-20 (DX 365)), not all LNA employees had immediate safety responsibilities for the New Orleans Terminal.  In particular, LNA employees John Caldwell and John Erbes had no involvement in or responsibility for hurricane preparations at the New Orleans Terminal.  Mr. Caldwell was a marketing manager who had no direct safety responsibilities.  His e-mail to Mr. Erbes inquiring about LNA's emergency plan for the New Orleans terminal (PX 38) related solely to asking whether LNA would be able to continue to supply product to its customers after Katrina had passed.  VanderMeulen Dep. 110:20-111:18; 112:2-16 (DX 287); Jenks Dep. 18:9-19:10 (DX 365).

**D.    Exercise of Reasonable Care by LNA**

   **i.    Compliance with Coast Guard recommendations.**

57.  The United States Coast Guard Sector New Orleans Hurricane Plan ("Port Plan") is authored by the Coast Guard's Marine Safety Office.  Its purpose is to advise the maritime industry about the actions the Coast Guard will take in advance of an approaching hurricane and to provide recommendations to the industry on how to prepare for the hurricane.  Ryan Tr. 2873:24-2874:5.  The Port Plan is not a regulation and does not carry the force of law.  Ryan Tr. 2873:20-2874:19 (explaining that the Port Plan has two goals – to advise businesses of actions the Coast Guard will take and to provide recommendations on how to prepare for a storm); Green Tr. 519:3-5 (recommendations "not carved in stone").

58.  LNA complied with Coast Guard recommendations set forth in the Port Plan.  In particular, LNA's mooring arrangement complied with the recommendation (PX 28 Annex B ¶ 2) that "mooring lines [be] doubled up with due consideration given to the effects of storm surge.  Special attention should be paid to barges moored in the proximity of bridges."  Ryan Tr. 2884:1-6.  By adding connections sufficient to increase the strength of the mooring connections by more than double, LNA complied with the recommendation that mooring lines be "doubled up" in anticipation of a hurricane.  Strouse Tr. 2941:14-2942:11; Ryan Tr. 2885:8-15; Ryan Report at 8, 9-10 (DX 201); Skaer Tr. 2520:20-24; Skaer Report at 2 (DX 199); Strouse Report at 5 (DX 204).

59.     The new rope that LNA used to moor the barges prior to Hurricane Katrina was 6-inch high-tenacity polypropylene rope manufactured by Garware Wall Ropes. Skaer Tr. 2510:23-24; 2513:3-9; Grabert Dep. 48:3-5 (DX 274).  LNA had purchased Garware's Garfil Maxiflex rope – Garware's strongest polypropylene rope.  Skaer Slide DPS-4 (DX 357); Skaer Tr. 2514:1-20 (Shipyard Supply, which sold the rope to LNA, only purchased Maxiflex type rope from Garware).

60.     Mr. Skaer calculated the breaking strength of the mooring configuration of the barge before LNA prepared for the hurricane and after completing preparations. Prior to the storm, the barges were tied up with two 4.5-inch bow and stern lines. Skaer Tr. 2518:4-9.  The breaking strength of that mooring configuration, after accounting for the used condition of the ropes and the knots in the ropes, was 58,500 pounds.  Skaer Tr. 2519:10-12; Skaer Slide DPS-13 (DX 357).  After LNA completed its preparations, the barge was moored with *at least* three ropes – one at each end and another in the middle.  Skaer Tr. 2519:16-22.  The breaking strength of this configuration was 178,500 pounds.  Skaer Tr. 2520:16-19; Skaer Slide DPS-15 (DX 357).  Thus, the post-preparation configuration was more than three times stronger than the pre-preparation configuration.  Skaer Tr. 2520:20-24; Skaer Slide DPS-54 (DX 357).

    a.      Plaintiffs claim that "parting" a line makes it stronger.  PFF ¶ 69.  They cite no expert testimony for this proposition, relying instead solely on the testimony of Mr. Thigpen.  *Id.* (citing Thigpen Tr. 169:12-170:11).  Not only is Mr. Thigpen not an expert, but at the time of Hurricane Katrina he had been a deckhand for only five months.  Thigpen Tr. 176:24-17:1.  In contrast, LNA's mooring expert, who based his opinion on a lifetime of mooring, testified that strength is added to the mooring configuration either by doubling up the lines or by adding additional ropes.  Strouse Tr. 2884:8-15

61.     Beyond the mooring recommendations described above, the Port Plan recommendations generally concerned oceangoing manned vessels, not unmanned barges such as the ING 4727.  Strouse Report at 3 ¶ 5 (DX 204).  Furthermore, to the extent that the Port Plan applied to all vessels and facilities in the Port, the Coast Guard generally left the particular decisions up to each facility and vessel owner and did not tell anyone exactly how to prepare for a hurricane.  Ryan Tr. 2907:4:22, 2909:19-2910:3 ("As the Captain of the Port, I would leave [deciding when to unload a barge] up to the marine industry to make that decision."); Green Tr. 519:6-13 ("the Coast Guard is – strives to give as much leeway and discretion to facility operators").

62.     Portions of the Port Plan (Annex C) that recommended contacting the Coast Guard about vessels that remain in the Port applied only to manned self-powered vessels and did not apply to barges like the ING 4727.  Ryan Tr. 2910:17-2911:12 (Annex C applies only to "oceangoing vessels over 500 gross tons and oceangoing barges with their assist tugs.");  Ryan Tr. 2915:25-2916:13; U.S. Coast Guard documents showing timing of Port Condition Whiskey at 4 ¶ 3 (DX 19)

(the actual bulletin issued during Hurricane Katrina did not tell vessels to leave the Port). Thus, there was no recommendation calling upon LNA employees to call the Coast Guard's Captain of the Port on the Saturday or Sunday before Hurricane Katrina to ask for Coast Guard assistance with removal of the unloaded ING 4727. Furthermore, such a call would have been pointless. The Coast Guard owned no tugboats that could move the barge, nor did it have the ability to "commandeer" a third-party tugboat to remove the barge. Ryan Tr. 2880:4-2881:3. Moreover, the Captain of the Port would not have expected a call from LNA regarding the ING 4727 insofar as it was safely moored at the LNA Terminal. Ryan Tr. 2880:7-10.

**ii.    Reasonable care in mooring and barge handling.**

63.    Using polypropylene line instead of cable was a prudent decision by LNA. Skaer Tr. 2532:1-13 ("Poly ropes are absolutely the normal in mooring lines. Wire rope is seldom used anymore."); Green Tr. 552:5-9 (acknowledging that it was proper and appropriate for LNA to use new 2-inch polypropylene line). Synthetic ropes have superior stretch characteristics, while wire ropes tend to break. Moreover, the use of synthetic ropes allowed LNA personnel to use the "long-lining" technique to permit the barges to rise with the incoming storm surge, which would not have been possible with a cable configuration. Skaer Tr. 2532:1-13 ("Wire ropes are very difficult to tension. … They have no shock-loading ability and under a surge of anything that could have parted the lines. Poly ropes, on the other hand, do have a forgiving nature. They stretch, and then return to their original shape and length…."); Skaer Report at 2 (DX 199); Strouse Tr. 2934:24-2935:15 (poly pro lines are "lighter," "easier" and "have a lot more elasticity than cable"), 2938:2-7 (braided polypro lines are far superior for mooring barges than cable).

64.    The mooring configuration between the two barges was more than just a "temporary" or "single up" configuration, contrary to plaintiffs' suggestion. Strouse Tr. 2943:22-2944:16 (noting that "single up," as used in Knight's Modern Seamanship, refers to taking all of the lines off a vessel except one pending cast off). Indeed, there are multiple accepted definitions of "doubled up," including definitions that encompass the practice employed by LNA. Ryan Tr. 2884:7-2885:1.

a.    Plaintiffs rely heavily on Knight's Modern Seamanship (PX 395) to provide meanings for "double up" and "single up." PFF ¶¶ 65-66 (the cited testimony of Mr. Green makes clear that Knights provides the only basis for opinion on these topics) (citing Green Tr. 490:3-17; 496:24-497:3). However, the relevant page from Knight's states at the top "Orders for Men on the Lines." PX 395 at 247. Nothing in the portion of the document provided by plaintiffs establishes that these orders are the only accepted definitions of "single up" and "double up." Strouse Tr. 2916:14-21. Rather, it seems more likely that Knight's was simply providing a definition of these terms in the context of giving orders, not all

contexts.  Plaintiffs also misstate the authoritativeness of the other texts to which they cite.  PFF ¶¶ 73-74.  PX 390, PX 391, PX 392 and PX 393 are all texts published by the same private firm in Maryland; none are official Coast Guard or Navy publications.  In any event, PX 391 and PX 394 state that to "double up" one should "double mooring lines for extra strength" or "duplicate mooring ropes" respectively.  Plaintiffs do not explain how LNA's tripling of the strength of the moorings does not satisfy these definitions.  See also PX 392 (providing no definition of "double up" at all); PX 393 (discussing mooring of "Destroyers").

65. Because a partially unloaded barge is unstable and unsafe in a hurricane, it would not have been prudent for LNA personnel to cease unloading the barge and leave the barge in a partially-loaded state once unloading had started.  Busch Tr. 117:16-118:6 ("A barge that is half unloaded is probably more dangerous than either a fully-loaded barge or a completely empty barge. … .  [I]t will start bucking up and down with the water surges, because one end of the barge could move up and down faster than the other end.").  See also Busch Tr. 69:23-70:1 (explaining that unloading the barge "in order to make it level would cause a stress in the center of that barge by the weight and it would actually have a tendency to fold up in the middle").

66. There was no cause for LNA to call Zito to ask Zito to remove the ING 4727 prior to the completion of unloading, both because the timing to complete unloading was unpredictable and because there was the possibility that the "barge could have been taken out of there with equipment in it and cement in it…."  Busch Tr. 120:11-121:2.  As noted, a partially unloaded barge is unstable and is not easily moved due to its instability.  FF ¶ 65.  Therefore, even if LNA had called Zito before unloading completed, Zito would not have been able to remove the barge until 9 a.m.  Its fleet closed at 10 a.m., and, according to Mr. Busch, a lock turn was not available that morning in any event.  Busch Tr. 78:13-22.

67. Topping around the barges so that ING 4727 would be away from the dock was both reasonable and prudent.  Had the empty barge been next to the dock, the mooring configuration would have created the risk that the storm surge would carry the empty barge over the dock and sever the mooring connection with the outboard loaded barge, threatening the mooring of both barges.  Strouse Tr. 2933:5-16; Ryan Report at 12 (DX 201); Strouse Report at 4 (DX 204).

68. It would have been imprudent and impractical for LNA to have attempted to have the ING 4727 removed by Unique Towing, without knowing whether there was a safe destination in a fleet in the river that was willing to accept the barge.  Strouse Tr. 2947:22-25; Strouse Report at 5 (DX 204); Busch Tr. 80:6-14; Thigpen Tr. 185:2-5 ("You're not going to pick up nothing unless you know where it's going.").

69. The mooring arrangement between the ING 4727 and ING 4745 was expected to be sufficient to withstand the expected forces, and there was no reason for LNA to

have asked Unique to alter or add to the mooring arrangement, nor any reason to expect that anything Unique might have done would have prevented the eventual breakaway. Strouse Tr. 2933-2934:19 (noting that the top-around process put "significant strain" on the lines between the ING 4747 and the ING 4727 and that the fact that the lines held demonstrated that the mooring arrangement was adequate and proper); Strouse Report at 4 (DX 204).

70.     Adding and replacing lines was a superior mooring method to increasing the number of "parts" reaching from kevel to kevel, as single-part stronger lines would allow for more forgiveness when interacting with dynamic wind and tidal surge forces, while two-part lines would be more likely to bind or jam. Strouse Tr. 2942:12-21; Ryan Tr. 2884:7-20; Strouse Report at 5 (DX 204). See also Cushing Tr. 2063:1-9 (ships are tied with single-part mooring lines); Hall Tr. 1984:9-12 ("It [preparation] really don't depend on the parts of the lines, it depends on how many lines you have securing the barge").

71.     It would have been impossible and/or imprudent to attempt to scuttle or to ballast the ING 4727. The barge was not fitted with a ballasting system and it would not have been possible to get pumps to the dock and to ballast the barge within the time available. Also, ballasting could cause the vessel to be unstable. Strouse Tr. 2943:22-2944:9 ("inland hopper barges are basically built to transport cargo in a cargo box … they are not intended to be ballasted"). Moreover, it would have taken the type of pump (a two-inch jigger pump) on a tug such as the Regina H 16-24 hours to fill the ballast tanks on the ING 4727. Strouse Tr. 2944:16–2946:4; Strouse Report at 6 (DX 204) (scuttling is "a ridiculous thought" and would be "substantially imprudent, as well as unauthorized and potentially unlawful"). Nor did other companies with barges moored at their facilities, such as Lone Star Cement, ballast any unloaded barges. L. Arnold Tr. 2814:3-4.

72.     LNA personnel acted reasonably and prudently in evacuating the facility, as it would have been unsafe to remain, particularly in light of the mandatory evacuation order. Strouse Report at 6 (DX 204); see also Strouse Tr. 2946:16-21 (Coast Guard never recommended anyone stay behind at a marine facility during a hurricane); Busch Tr. 116:14-20 (it was "too dangerous" to leave someone behind).

73.     Even if LNA personnel had placed themselves in harm's way by remaining at the dock during the hurricane, there was nothing that they could have done during the hurricane either to prevent the barge from breaking free or to re-moor the barge after it broke free. Strouse Tr. 2946:16-21; Strouse Report at 6 ¶ 14 (DX 204).

**E.     Compliance With Applicable Rules and Regulations**

74.     There are only two Coast Guard regulations applicable to the LNA Terminal: 33 C.F.R. § 162.75, which "deals with mooring and anchoring" and 33 C.F.R. § 6.19, which says that "the ultimate responsibility for the safety and security of the facility rests with owners and operators." Ryan Tr. 2869:9-24.

75.    LNA complied with the provision in C.F.R. § 162.75(b)(3)(ii) – to the extent that regulation is even applied here (see CL ¶ 43(b)-(f)) – requiring that "all vessels and tows shall be moored by bow and stern lines." Ryan Tr. 2882:4-12. Plaintiffs' expert Mr. Green conceded that the barges were moored by bow and stern lines. Green Tr. 474:21-23. This is the only provision in that regulation that applied to the ING 4727. See CL ¶ 43(a).

76.    LNA did not violate 33 C.F.R. § 6.19 – to the extent that regulation is even capable of being violated (see CL ¶ 43(g)) – because LNA's personnel took "responsibility for the safety and security of the [LNA] facility" in their preparations for Hurricane Katrina.

77.    The Coast Guard has not promulgated regulations specific to hurricanes or preparations for hurricanes. Ryan Tr. 2868:23-2869:3. Nor are there regulations that applied to the unloading or loading of barges (Ryan Tr. 2868:13-18), that required a three-part mooring line (Ryan Tr. 2873:2-6); that defined (or even mentioned) the concept of a temporary mooring line (Ryan Tr. 2873:7-9); that required tiers of barges to be moored to one another (Ryan Tr. 2873:10-15); that required barges to be moored directly to the dock (as opposed to one another and then to the dock) (Ryan Tr. 2877:24–2878:3); that required ballast for barges in advance of a storm (Ryan Tr. 2879:22-25); that required lights on the ING 4727 while it was moored at the LNA Terminal (Ryan Tr. 2879:18-21); or that required LNA to remove the ING 4727 from the LNA Terminal prior to Hurricane Katrina (Ryan Tr. 2881:15-23).

## F.    Reasons Why Barge ING 4727 Broke Away

78.    At some point during Hurricane Katrina, the ING 4727 broke away from its moorings at the LNA Terminal under the force of heavy winds and storm surge. The physical evidence showed that the breakaway occurred under extreme conditions, most likely high winds, which were sufficient to cause the strands of the polypropylene rope to melt and fuse. Skaer Tr. 2529:24-2530:6 ("I've never seen any rope that bad"; the ropes all broke under "significantly severe strain"); Green Report at 7 ¶ 5.1 (PX 386) (barge broke away during "hurricane force winds and rising water levels"); Pazos Tr. 856:25-857:2 ("There are, at least, two possible causes [of the breakaway], and to me the most probable cause[s] were the action of the waves and the wind."); Pazos Dep. 104:16-105:19 (DX 218) (breakaway was due to wind force on side of barge).

79.    The evidence does not support plaintiffs' speculation that the barge could have broken away on Sunday, August 28, before the arrival of Katrina's winds and storm surge. Plaintiffs' expert Donald Green agreed that it "made sense" that the barge broke free during the hurricane. Green Tr. 537:14-17. Indeed, it was Mr. Green's opinion at trial that the barge broke away in hurricane conditions. Green Tr. 539:25-540:4 ("Yes, I think it broke away during hurricane conditions."). Mr. Green testified that he had "no explanation or opinion as to how the barge got there on a Sunday, if that is, in fact, the barge." Green Tr. 540:8-11; see also

20

Green Tr. 546:2-3 ("I have no idea when it failed or why it failed prior to the onset of the hurricane.").

80.   Nevertheless Mr. Green suggested, based solely on the testimony of Gertrude LeBlanc and Frazier Tompkins, that the ING 4727 might have broken away *the day before* the hurricane arrived in New Orleans, on a "calm, sunny day with no surge and no winds over about 18 miles per hour." Green Tr. 547:14-20, 540:1-541:2, 546:1-3. However, Mr. Green also testified that winds of at least 36 MPH winds were necessary to part the lines between the barges, and wind data at Lakefront Airport, taken from Mr. Green's own report, establish that winds *never* exceeded 24 MPH on Sunday August 28. DX 338; Green Tr. 540:17-21, 541:21-23, 543:2-544:6. As an alternative explanation, Mr. Green speculated that vessel traffic in the canal could have "suck[ed] the barge away" on August 28, but he admitted that there is no evidence to support this theory. Green Tr. 541:18-542:17 ("There is no evidence, there is no testimony" to support this theory); Pazos Tr. 864:25-865:10 (not aware of a wave wash incident in the IHNC on August 27 or 28). To the contrary, the evidence showed that vessels travel particularly slowly in the portion of the IHNC between Florida and Claiborne Avenues, as they would in a "no wake" zone, because of the need to stay clear of the bridges and to wait for the locks to open. Strouse Tr. 2927:21-2929:5 (the area is a "slow bell" area with a maximum speed of two knots); Hall Tr. 1936:31-1937:22 (vessel speed is "usually two, three knots"). And, even if there had been a vessel in the IHNC that could have caused wake sufficient to cause the barge to break away under calm conditions, the turning basin where LNA's terminal is located was wide enough that passing vessel traffic would not have caused a suction effect on the barge. Cushing Tr. 2016:14-22, 2062:14-25. Finally, plaintiffs' scenario implausibly posits that vessel traffic in the IHNC somehow caused the barge to break away, and yet the breakaway barge escaped the notice of every person aboard any of those vessels, not to mention the numerous security personnel who traversed the canal all the next day. See Pazos Tr. 865:11-18.

   a.   Curiously, despite the contested nature of the testimony of Ms. Leblanc and Mr. Tompkins, plaintiffs state *without any citation*, that "[i]t is a conclusive, undisputed fact that … *prior to the arrival* of Hurricane Katrina, the ING 4727 broke from its moorings." PFF ¶ 50 (emphasis added).

81.   The fact that the mooring connections between the two barges were strong enough to withstand the stress imposed by the Unique Towing switching maneuver, which involved pulling the two barges away from the dock before switching their positions, also evidences the implausibility of plaintiffs' theory that the mooring connections failed in calm weather under normal forces. Thigpen Tr. 181:8-182:9 (connections strong enough to withstand switching maneuver), 186:11-20 (switching maneuver causes weak rope to "pop"); Strouse Tr. 2934:8-19 (fact that lines were sufficient to withstand stress of topping around maneuver showed they were "of adequate strength and properly positioned"); Strouse Tr., 2949:19-21 (moorings were "adequate and proper for calm weather").

82.     There is no evidence that the two tiers of moored barges at the LNA Terminal collided with one another.  Green Tr. 558:1-559:4.

83.     Hundreds of barges broke away from their moorings under the force of wind during Hurricane Katrina.  Strouse Tr. 2939:2-5, 2948:12-22; Strouse Report at 6 (DX 204) (around 1500 barges in Mississippi River; 100 to 200 vessels in and around the IHNC from the Mississippi River to Lake Pontchartrain broke away during Hurricane Katrina); Hall Tr. 1964:11-1965:25 (describing breakaway barges); Green 2008 Dep. 115:20-116:2 (DX 216) ("numerous" barges broke away during Katrina).

84.     Barges broke away during Hurricane Katrina regardless of the materials used to moor them.  In particular, twenty-five barges broke from their moorings at the Lone Star facility during Hurricane Katrina, despite having been secured with cables and ropes combined.  L. Arnold Tr. 2814:15-2815:15 (all Lone Star barges, which were secured with cables and ropes, broke free during the storm except for three that sank but stayed moored together); Pictures of Lone Star barges that broke free (DX 13, DX 16).  The Lone Star barges that broke free were both loaded and unloaded and many had been released for pickup several days prior to Hurricane Katrina.  L. Arnold Tr. 2811:15-18, 2812:2-24 (explaining that it normally took one to five days to pick up a barge).

85.     The experience of Southern Scrap Material Company provides another example of the effect of Katrina's winds and storm surge on vessels in the vicinity of the IHNC.  At Southern Scrap's facility, which is located on the east side of the IHNC just north of the Florida Avenue bridge, two barges that were secured by soft lines became unmoored during Katrina.  Dupre Dep. 16:2-8, 17:8-24 (DX 364).  During Katrina, a dry dock secured at Southern Scrap secured by soft lines, steel cables, and anchor chains also broke away.  Dupre Dep. 14:18-15:17 (DX 364).  Two barges in Southern Scrap's fleet in the MRGO, secured by steel cable, broke loose during Hurricane Katrina.  Dupre Dep. 17:16-18:22 (also noting that over fifty barges in the fleet, secured by hard lines and anchor chains, broke free during Hurricane Gustav) (DX 364).

86.     Plaintiffs' expert Donald Green, a professional expert witness who derives all of his consulting income from litigation but who has never consulted with or advised a terminal on mooring practices or hurricane preparations (Green Tr. 428:3-5, 429:13-23), failed to demonstrate that the breakaway could have been prevented by any actions that LNA might reasonably have undertaken.  Similarly Mr. Pazos, another litigation expert, failed to undertake any calculations to show the forces required to part the lines on the two barges.  Pazos Tr. 867:24-6 (no calculations); Pazos Dep. 19:9-12 (he has handled "in the neighborhood of 1200 litigation cases") (DX 218).

87.     There is no record evidence of any measures that LNA might reasonably have undertaken that would have prevented the breakaway of the ING 4727 under the forces imposed by Hurricane Katrina.  Skaer Tr. 2565:11-16; Skaer Report at 3

(DX 199); Strouse Report at 6 (DX 204); Strouse Tr. 2938:19-21 ("I don't believe [more ropes would have prevented the breakaway], not with the tremendous surge and conditions with Hurricane Katrina").  The experience of other facilities, at which numerous barges broke away despite having been moored with various configurations of soft lines and cable, supports this conclusion.

## IV.  BARGE TRANSIT – IMPOSSIBILITY FOR BARGE TO HAVE BEEN PRESENT AT SITE OF BREACHES WHEN BREACHES OCCURRED

### A.  Introduction and Overview

88.  One of the central issues in the case is whether the Barge ING 4727 could have been present at the site of the IHNC east floodwall breaches when the breaches occurred.  The evidence showed that it was scientifically impossible for the barge to have been present at the site of the breaches at the time they occurred because: (a) lacking any means of self-propulsion, the ING 4727 could only have traveled under the influence of environmental forces such as wind, current or waves; (b) wind was the predominant force affecting the empty barge, due to its large "sail area" exposed above the water line; (c) multiple sources of meteorological data confirm that at all relevant times, the prevailing hurricane winds – including any embedded "local winds" – were blowing away from the east IHNC floodwall, and toward the LNA Terminal and would not have permitted the barge to be present when the breaches occurred; and (d) current and waves in the IHNC did not impose significant forces on the barge during Hurricane Katrina and in any event could have overcome the effect of the prevailing winds blowing away from the breach sites during all relevant times prior to the occurrence of the breaches.  The evidence concerning the forces acting on the barge, and preventing it from being present when the breaches occurred, is discussed in paragraphs 90 to 186 below.

89.  As discussed in paragraphs 187 to 192 below, plaintiffs' experts offered no plausible explanation of any kind as to the supposed movements of the barge on the morning of August 29, and indeed disclaimed any study or knowledge as to how the barge supposedly moved from one place to another.  Instead, plaintiffs relied on the testimony of lay witnesses who, according to their counsel, would "testify to the sights and sounds of a barge breaching the eastern industrial canal floodwall."  Opening Arg. Tr. 17:11-19.  To the contrary, as discussed at paragraphs 193 to 254 below, this lay witness testimony was equivocal at best and did *not* establish that the barge was present when the breaches occurred.

### B.  Factors Affecting Barge Movement – Importance of Wind

90.  The Barge ING 4727 was a hopper barge with no motor or other means of self-propulsion.  LNA Undisputed Fact 15.  Therefore, the barge required an external force to propel it from the west side to the east side of the IHNC.  LNA Undisputed Fact 16.  The only forces that could potentially have moved the barge away from the LNA Terminal and toward either of the breach sites during Hurricane Katrina were (a) wind, (b) waves and (c) current.  Cushing Tr. 2042:15-

2043:7 (winds, waves and currents were possible forces, winds predominant); Dooley Dep. 37:16-38:5 (forces that could potentially impact the movement of the barge were "the wind, the water movement, and the waves") (PX 354); Pazos Dep. 99:22-100:5 (barge "cannot move on its own" except for "wind conditions or currents"; barge requires "an external force" to move it) (DX 218); Marino 2009 Dep. 111:3-8 (admitting that in order for barge to move from one place to the other, something – wind or water – has to move it) (DX 229); Green 2009 Dep. 125:3-6, 127:6-8 (barge was "at the mercy of the winds and current"; barge was "dumb" and had no mode of power) (DX 216).

91.     The Barge ING 4727 was over twenty feet high from top to bottom (including hatch covers).  LNA Undisputed Fact 17, Pazos Tr. 832:4-7 (overall height of the barge was "a total of about 23 feet"); Cushing Report at 124 (21 feet high) (DX 196); Pazos Dep. 102:9-12 ("23 feet, approximately") (DX 218); Marino 2009 Dep. 65 (barge height is 23 feet) (DX 227).

92.     On the morning of August 29, 2005, the unloaded Barge ING 4727 had a draft of approximately one-and-a-half feet.  Cushing Tr. 2040:23-25 (draft 1 foot 4 1/2 inches); Cushing Report at 124 (draft of 1 foot, 4 inches) (DX 196); Pazos Dep. 100:22-25 (barge draft of 1 foot, 5 inches) (DX 218); Marino 2009 Dep. 65:21-66:21 and Marino Report at 2-34 (unloaded draft is 1.5 feet) (DX 221 and PX 397); Green 2008 Dep. 75:8-76:20 (barge's light draft is 1 foot, 4.5 inches – the remainder of the barge is above the water line) (DX 224); Pazos Report at 9 (barge light draft is 1 foot, 5 inches, but suggesting that draft may have been 2 feet, 5 inches due to water in the voids) (PX 402).

93.     Dr. Cushing's inspection confirmed that the barge was unloaded.  He removed the manhole covers, observed the tanks from the deck, observed the tanks were empty, and saw no evidence of residual product.  Cushing Tr. 2171:3-7, 2171:13-17, 2172:10.

94.     As a result of its unloaded condition, the barge was sticking out of the water over 20 feet above the waterline.  Pazos Tr. 852:24-853:3 (barge has sail area of "about 21 feet"); Cushing Report at 124 (barge stickup of approximately 20 feet) (DX 196); Pazos Dep. 103:4-104:10 (barge sticking up out of water "in excess of twenty feet") (DX 218); Marino 2009 Dep. 66:14-21 (barge was unloaded, and sticking up over 20 feet) (DX 221).

95.     This "sail area" made the barge particularly susceptible to being moved in the direction of the prevailing wind.  Accordingly, wind was the predominant force acting on the barge at all times material to this action.  Cushing Tr. 2042:15-2043:7 ("hurricane winds were strong," "barge has a lot of sail area," current was "insignificant," and "waves would have been moving in the direction of the wind, so they would have only added to the force of the wind"); Pazos Tr. 853:4-7 ("Primarily the wind" affects a barge with a high sail area); Pazos Dep. 102:18-22 (unloaded condition is relevant because it creates "exposed surface to the wind action") (DX 218); Pazos Dep. 104:2-12 ("wind is the predominant item" acting

on the barge) (DX 218); Green 2009 Dep. 45:10-15 (agreeing that barge has a "large sail area" and that "the greater the sail area, the more susceptible to wind") (DX 216); Green 2009 Dep. 127:2-5 (agreeing that "with a sail area of the type that the barge had, the wind affects the movement of that barge") (DX 216); Green 2009 Dep. 211:12-14 (due to sail area, the wind had a greater impact on the barge) (DX 216); Hall Tr. 1970:12-21 (unloaded barge is very susceptible to wind because of its large sail area).

### C.   Hurricane Katrina – Wind Direction Away from Breaches

96.   It is important to analyze weather data, particularly data regarding winds, in order to analyze wind loads on the barge and potential barge movement in the IHNC during the relevant time period.  Marino Tr. 1342:25-1343:3 ("if you wanted to actually know what really happened, what really moved this barge around, then meteorological data would be germane"); Marino Tr. 1343:4-11 (weather data helps assess what the barge impact loads could potentially be, and what the wind loads were on the barge at the time of the failure); Cushing Report at 77-81 (analyzing wind data and noting its importance for barge movement) (DX 196); Marino 2009 Dep. 71:20-23 (Q: "The weather data helps you to assess what in fact the wind loads were on the barge in the IHNC at the time of the failure; correct?"  A: "Yes.") (DX 221).

97.   Meteorologists can determine what the weather conditions were like in a specific place, even if there were no measuring instruments at that specific place.  Thus, even though there were no measuring instruments at the IHNC, wind conditions in the IHNC can be determined from available meteorological data and meteorological principles.  Dooley Tr. 1834:9-12 ("Q: Can a meteorologist determine what weather conditions were like in a specific place even if there were no measuring instruments at that specific place?  A: Yes, it – yes, we can.").

98.   In analyzing winds that could potentially affect the movement of the barge, the sustained or "prevailing" winds are critical.  As unrebutted testimony from LNA's experts showed, in order to overcome the inertia of a large object such as a barge, a "sustained force" in "a steady wind" is necessary "to cause it to get into motion," and, in that connection, a one-to-five-second wind gust of wind "will not cause the barge to move or . . . to develop speed."  Cushing Tr. 2047:12-2048:9; see also Dooley Tr. 1869:16-1870:22 (direction of wind gust is in the same direction as the prevailing wind flow); Mitchell Tr. 935:16-936:2 (wind gust "lasts three to five seconds").

99.   The presence of buildings and other structures near the IHNC would not have affected the direction of the prevailing wind in the IHNC.  To the contrary, as unrebutted testimony from LNA's experts showed, the effect of building-related turbulence is limited to the "shadow of the building."  Cushing Tr. 2048:10-19 (turbulence can create vortices or eddies around the building but did not cause the barge to move); Dooley Tr. 1884:20-1885:6 (effect of turbulence from structures around the IHNC is limited to the "the immediate area of the building").  Thus,

25

meteorological data and principles are valid to determine the winds potentially
acting on the barge in the IHNC during Hurricane Katrina.

### i.      Meteorological principles – counterclockwise flow

100.    According to a well-established law of nature known as Buys Ballot's law,
        hurricane winds in the northern hemisphere blow counterclockwise around the
        center (or "eye") of the hurricane.  Thus, the direction of the prevailing wind at a
        given time and location during a hurricane can be determined by comparing that
        location to the location of the eye of the storm at that same time.  Dooley Tr.
        1840:16-1842:14 & Dooley Slide AD-011 (DX 347) (describing counter-
        clockwise flow around the low pressure and the relationship of the low pressure
        center to wind direction); Dooley Tr. 1841:22-24 ("Q: Is there any dispute about
        the validity of Buys Ballot's Law?  A: No, not at all."); Dooley Tr. 1929:25-
        1932:5 ("if you know where the low is and you are in a particular location, you
        can get an idea of what the synoptic scale of wind direction will be"); Mitchell Tr.
        1031:4-10 (agreeing that "[h]urricanes circulate in a cyclonic counterclockwise
        motion" and "if you stand with your back to the wind in a hurricane in the
        northern hemisphere, you expect the low pressure area to be to your left");
        Cushing Tr. 2043:13-25 & Cushing Slide CC-009 (DX 349) ("where you face
        into the wind, and the eye of the hurricane is two points of abaft of the beam on
        your starboard side, or approximately so"); Cushing Report at 35-36
        ("counterclockwise circulation around the center") (DX 196); Pazos Dep. 107:23-
        108:14, 117:2-5 ("the hurricanes in the Gulf of Mexico have a counterclockwise
        rotation"; agreeing that "hurricane winds swirl counterclockwise along the storm
        eye") (DX 218); Pazos Report at 37 (noting the "counterclockwise rotation of the
        winds") (PX 402); Spinks 2008 Dep. 61:15-25 ("counterclockwise" rotation of
        wind) (DX 226); LNA Undisputed Fact 18 ("In the northern hemisphere, the
        counterclockwise cyclonic motion of a hurricane means that the area of low-
        pressure (the eye of the storm) is to the left of a person standing with his back to
        the wind.").

101.    As Dr. Dooley testified, Buys Ballot's Law applies to "[a]ny circulation around a
        low-pressure center in the Northern Hemisphere," including those at ground level,
        and can be applied to determine wind directions at the IHNC.  Dooley Tr.
        1842:15-20; 1929:25-1932:5 (testifying that in an urban environment such as New
        Orleans, Buys Ballot's Law can be used "to determine where the low is.  It's not
        going to give you an exact position, but it's going to give you a fair representation
        of what type of – what direction of winds you should expect with regards to your
        relative position to the low.").

102.    The Hurricane Research Division ("HRD") produced a reliable analysis, which
        depicts the counterclockwise flow of winds around Katrina's eye.  Dooley Tr.
        1840:24-1842:8 & Dooley Slide AD-011 (DX 347); Dooley Report at 7 (DX
        198); Mitchell Tr. 1029:16-17 (H*Wind is reliable data); Mitchell Tr. 1030:23-16
        and DX 341 at 7 (white arrows reflect the direction of the "large synoptic scale"
        winds); IPET Report Vol. IV App. 2 Figs. IV-2-11 to IV-2-43 (DX 145).  In fact,

plaintiffs' expert Dr. Mitchell acknowledged that his opinions regarding HRD's analysis are consistent with the defense experts in this case.  Mitchell Tr. 1075:18-22.

103.   The counterclockwise flow around Hurricane Katrina's eye was also documented by the Quikscat satellite.  Dooley Tr. 1842:21-1846:4 & Dooley Slides AD-012 to AD-013 (showing easterly winds at the IHNC on August 28, 2005) (DX 347).

**ii.    Application of meteorological principles – wind could not have moved the barge to either of the breaches before they occurred**

104.   Hurricane Katrina followed a path to the east of New Orleans and the IHNC, moving along a nearly vertical (due north) axis as it passed by the city.  The eye of the storm was located to the east of New Orleans and the IHNC throughout its passage.  Mitchell Tr. 1030:17-25; Cushing Report at 39 & Fig. 24, 42 (DX 196); Dooley Report at 16, Map 2 (close-up view of storm track near New Orleans) (DX 198); Dooley Report at 35 (storm center passed to the east of New Orleans) (DX 198); Spinks Report at 8, Fig. 1 (showing track of Hurricane Katrina) (PX 421).

105.   At all times prior to 7:30 a.m. CDT on the morning of August 29, 2005, the eye of Hurricane Katrina was at a latitude to the south of New Orleans and the IHNC. Dooley Report at 16, Map 2 (showing position of storm center was south-southeast of New Orleans at these times) (DX 198); Mitchell Tr. 1030:17-1031:3 (landfall at 6:30 a.m.); Green 2009 Dep. 119:21-120:14 (at 6:00 a.m., the storm was South-Southeast of New Orleans) (DX 216); Spinks 2008 Dep. 60:18-61:3 (storm made landfall at Buras, LA around 6:10 in the morning) (DX 226).

106.   The eye of Hurricane Katrina did not pass through the latitude of New Orleans and the IHNC until after 8:00 a.m. CDT on the morning of August 29, 2005. LNA Undisputed Fact 19; Mitchell Tr. 1031:1-3 ("Q: The storm center passed to the east of New Orleans around 9:00 in the morning on August 29th?  A: Correct."); Dooley Tr. 1848:16-19 (center of Katrina passed New Orleans between 8:45 and 9:00 a.m.); Dooley Report at 16-17 (eye of Hurricane Katrina did not pass latitude of New Orleans until 8:54 a.m.) (DX 198); Cushing Report at 43 (DX 196); Pazos Dep. 118:4-119:10 ("Hurricane Katrina's eye passed to the east of New Orleans about 8:30 a.m. central daytime on 29 August 2005.") (reading from report and adopting statement) (DX 218); Pazos Report at 37 (providing time of passage) (PX 402).

107.   As Hurricane Katrina approached New Orleans and the IHNC on its northward course to the east of the city, the prevailing counterclockwise winds in the IHNC blew first from the east, then from northeast-to-southwest, and then from north-to-south until the storm eye arrived at the latitude of New Orleans.  IPET Report at IV-17 ("winds first from the east, then from the northeast, then north, then northwest, and finally from the west") (DX 145); Marino 2009 Dep. 74:13-17 (Q: "Do you accept IPET's conclusion that, during the storm, winds came first from

27

the east, then the northeast, then the north, then the northwest, and finally from the west?"  A: "I guess in general, yes.") (DX 221); Dooley Tr. 1839:4-9 (when Katrina was to the south of New Orleans, the winds were northeasterly); Dooley Tr. 1848:6-15 (at 7:00 a.m., winds blew from the northeast); 1849:8-24 (from 7:00-8:45 a.m., the northeasterly winds gradually became more northerly until the system passed and they became slightly westerly); Dooley Tr. 1884:15-19; 1885:18-1886:4 (prevailing direction was mostly out of the northeast, and any type of downdrafts, swirls or eddies would have moved in the downwind direction from the northeast toward the southwest); Lemon Tr. 1719:11-14 (from 7:00 p.m. on August 28 through 9:00 a.m. on August 29, winds blew from the northeast toward the southwest until very late in the period when they turned to a more northerly direction); Dooley Report at 35 (prevailing winds turned from easterly to northerly to westerly as Katrina moved along its track) (DX 198); Cushing Tr. 2044:15-19 & Cushing Slide CC-029 (DX 349) (showing winds backed around from an easterly direction to a westerly direction over the course of the morning on August 29); Cushing Report at 77-81 & Fig. 52 (showing wind direction as a function of time) (DX 196); Kemp Tr. 2989:1-16 (Team Louisiana ruled out the barge as a potential cause of the IHNC breaches because at all relevant times the wind was out of the northeast); Green 2008 Dep. 56:12-20 (winds between 4:00 a.m. and 6:00 a.m. blew "from either the northeast or due from the north") (DX 224).

108.  It was not until after 7:30 a.m. CDT that Hurricane Katrina's prevailing winds at the IHNC came to include any component blowing across the IHNC from the LNA Terminal toward the east bank of the canal.  Before that time, the prevailing winds would have acted to keep the barge away from contact with the IHNC east floodwall, regardless of what time the barge broke free from its moorings. Dooley Tr. 1856:1-10 (the first time the wind has a component blowing from the west is between 7:30 and 7:45 a.m.); Dooley Tr. 1887:19-1888:9 (at 7:45 a.m., the winds still had a strong southerly component and it was not until after 9:00 that the wind takes a more westerly than northerly direction); Cushing Tr. 2128:10-20 ("By 7:30, the wind would have been blowing more parallel to the canal, and it isn't until after 8 o'clock that it starts to take a more westerly component."); Cushing Report at 45, 78 (winds prior to 8:00 a.m. had no cross-canal component) (DX 196); Marino Report at 3-11 (winds remained "essentially parallel" to IHNC before 9:00 a.m.) (DX 397); Dooley Report at 35 ("up until 7:42 a.m. CDT, the wind direction would push the barge toward the dock") (DX 198); IPET Report Vol. IV at IV-50 Fig. 26 (wind direction was from the northeast during the 6:00 a.m. to 7:00 a.m. time period) (DX 145).

109.  A southwesterly wind was necessary to propel the barge to the North Breach. However, Hurricane Katrina's winds never blew from south to north and therefore the wind could not have moved the barge to the North Breach site.  Cushing Tr. 2046:13-16; 2047:1-7; 2051:5-11; Cushing Report at Fig. 109 (DX 196).

110.  A northwesterly wind was necessary to drive the barge to the site of the South Breach.  At all times prior to the occurrence of the South Breach (7:30 a.m., at the

latest) the winds blew from the northeast and cannot have propelled the barge to the site of the South Breach.  Cushing Tr. 2051:12-2052:10; Cushing Report at Fig. 110 (DX 196).

### iii.    Confirmation of prevailing wind from Oceanweather Inc.'s hindcast

111.    A hindcast performed by Oceanweather Inc. ("OWI") is consistent with respect to the direction of the prevailing wind in the IHNC during Hurricane Katrina, and supports the conclusion that winds blew from the east and then northeast and north during the early morning hours of August 29.  Dooley Tr. 1852:3-1857:4 (findings and application of OWI hindcast).

112.    The OWI hindcast "involved a detailed study of Hurricane Katrina and an examination of all of the reporting stations and data in the Gulf of Mexico region over the days leading up to Katrina's formation and as Katrina moved up over land" and is a reliable method that may be used to interpolate wind directions at the IHNC during Katrina.  Dooley Tr. 1838:3-6; 1851:7-11; 1851:17-20 (hindcast "would give us an excellent understanding of the synoptic scale winds surrounding Katrina"); Dooley Tr. 1852:3-1853:1 (grid points A, B, C, and D, each located 3 miles or less from the Canal and used to interpolate wind directions and speed at the IHNC and plotted in Table 6-A of Dr. Dooley's Report (DX 198)); Dooley Tr. 1916:13-24 (the hindcast "shows the synoptic scale flow," "the prevailing winds"); Dooley Tr. 1853:5-1856:21 & Dooley Slides AD-020, AD-022, AD-024, and AD-026 to AD-029 (DX 347); Dooley Report at 21 (DX 198).  The OWI hindcast was used by IPET and in the ADCIRC modeling of Katrina's storm surge.  Dooley Tr. 1851:22-1852:2; IPET Report Vol. IV at IV-8, IV-4-3 (DX 145).

113.    The wind measurements in the OWI hindcast are wind speeds for a standard open exposure meteorological reference height of 10 meters or 32 feet above ground.  Wind speeds decrease closer to the surface due to terrain effects.  Winds acting on the barge were therefore lower than the speeds reported by the OWI hindcast.  Dooley Tr. 1883:12-1884:4; Dooley Tr. 1920:10-18; Dooley Report at 18 and 22 (DX 198); Mitchell Tr. 1052:22-1053:1 (acknowledging that land creates frictional effects and lower wind speeds than those measured at 10 meters); Cushing Tr. 2075:14-17 (adjusting wind speeds from hindcast to wind speed at barge level "since wind reports are all at 10 meters above the surface of sea level"); Pazos Report at Attachment 5 p. 4 (wind at barge level would be lower than that at 32 feet above the ground) (PX 402); Cushing Report at 158 (adjusting winds reported at standard reference height to altitude of barge) (DX 196).

### iv.    Confirmation of prevailing wind from Lakefront Airport data

114.    Local meteorological data from Lakefront Airport are consistent with the OWI data, and confirm that the direction of the prevailing wind in the IHNC during Hurricane Katrina was from the east and northeast, and would not have permitted the barge to be present at the east floodwall when the breaches occurred.  Dooley

Report at 17-18, 34 (DX 198); Dooley Tr. 1857:14-17 (distance from the anemometer at Lakefront Airport to the IHNC was approximately 4 miles) & Dooley Slide AD-031 (Google Map) (DX 347); Dooley Tr. 1862:17-20 (no west-to-east winds from 3:03 to 6:53 a.m.); Dooley Tr. 1908:1-16 (there is "consistency" between the lakefront data and the hindcast); Dooley Tr. 1876:13-1877:3 & Dooley Slides AD-049-59) (showing consistency between OWI hindcast and Lakefront Airport weather data) (DX 347); Marino Report at 3-11 (DX 397); Lakefront Airport data (DX 338); Green 2009 Dep. Exh. B (Lakefront Airport data) (PX 387).

115.   Dr. Dooley testified that Lakefront Airport data applies to the IHNC four miles away, and is "representative of the type of [wind] directions and speeds that one would see at the IHNC." Dooley Tr. 1875:2-9; 1881:7-12. The best way to measure wind data at ground level is with a gauge at ground level. Lemon Tr. 1793:20-22. Further as a scientist reporting background data on winds, plaintiffs' expert Dr. Marino considered the Lakefront data sufficiently reliable to include it in his report. Marino Tr. 1344:22-1345:4; Marino Report at 3-11 (DX 397).

116.   Lakefront Airport data includes measurements representing a shorter duration than the averages provided by the OWI hindcast and therefore includes the effects of local perturbations in the wind field. Dooley Tr. 1865:19-1866:13 (Lakefront Airport data show the "ambient wind conditions, the short period," which show "perturbations"). Yet, even with these local perturbations, no "reversals of wind direction from west to east" were recorded at Lakefront Airport during Hurricane Katrina. Dooley Tr. 1862:18-20, 1878:24-1879:1; Dooley Report at 34 (DX 198).

   **v.     Confirmation of prevailing wind from eyewitness testimony**

117.   Eyewitness evidence of weather conditions in or near the IHNC tends to support the meteorological data showing that the prevailing hurricane winds blew from the east, then northeast, then north, and did not blow from the northwest and west until after the eye of the storm had passed (*i.e.*, after approximately 8:00 a.m. CDT). IHNC lockmaster Michael O'Dowd testified that during the early morning hours of August 29, the wind "was coming out of the north, blowing towards the west." O'Dowd Tr. 2227:7-9. The physical evidence confirmed Mr. O'Dowd's lay assessment of wind direction, because when he was taking photographs that morning he "noticed a huge amount of driftwood that was blown up on the west floodwall." O'Dowd Tr. 2227:10-12. Captain James Hall testified that on Sunday August 28, when he tied his boat up near the New Orleans Public Bulk Terminal, the wind was "out of the east." Hall Tr. 1953:13-1954:13. The wind "slowly walk[ed] around the starboard side of [the] vessel in between daylight and 9 o'clock" the next morning, after the eye wall had passed. Hall Tr. 1954:15-1955:2. Captain Hall further testified that from Sunday night through 8:00 a.m. on Monday morning, the wind was always blowing from the east and never blew from the west or south. Hall Tr. 1955:4-11. See also McCrosky Dep. 42:13-43:3 (at 6:15 a.m., the wind was coming from the east to the west) (DX 243); McCrosky Dep. 45:22-46:19 (wind shifted from west to east "after ten o'clock")

(DX 243); Sartin Dep. 60:16-23 (wind did not turn until later in the day, after waters had risen) (DX 285).

**vi.   Confirmation of prevailing wind from radar data.**

118.   The parties devoted significant attention to the interpretation of radar weather data.  Radar data is merely one source of weather data, however – it is not the only source.  As described in this section, the radar data is consistent with the other meteorological data sources addressed above.  That is, radar data from the National Weather Service measuring station at Slidell, Louisiana confirms that the prevailing wind at the IHNC during Hurricane Katrina was blowing away from the IHNC east floodwall, and thus would not have permitted the barge to be present at the floodwall at the critical times.

> ### *a.    Introduction to meteorological radar data and concepts*

119.   The IHNC is about 23 nautical miles southeast of the Slidell radar station.  Lemon Tr. 1746:10-12.

120.   The radar processor produces three products which can be used to help understand weather conditions at the IHNC.  The first is reflectivity, which measures rain.  The second is radial velocity which can be used to infer wind direction as it measures movement of particles toward and away from the radar station and the magnitude of the velocity.  Finally, spectrum width measures turbulence within the beam, which shows wind shear and the possible existence of multidirectional winds.  Multidirectional winds would have a very high or broad spectrum width.  Lemon Tr. 1721:1-21, 1722:10-14, 1723:9-1724:2, 1724:15-18; Lemon Report at 4 (DX 311).

121.   Each side presented expert meteorological testimony regarding interpretation of the radar images generated at the Slidell station during Hurricane Katrina.

122.   LNA's expert, Leslie R. Lemon, is an award-winning researcher who has published and taught extensively in the field of radar meteorology, has served for many years as a consultant to the National Weather Service in the field of meteorological radar technology and training, and, indeed, is one of the developers of the technology used to measure weather conditions using radar.  Lemon Tr. 1709:18-1718:23.

123.   Plaintiffs' expert David Mitchell, by contrast, is a litigation expert who derives eighty percent of his income as an expert witness and who has never, at least since 1976, published or taught in the field of radar meteorology.  Mitchell Tr. 1018:17-1022:16.

### b.      *Radar data confirming consistent wind direction at the IHNC*

124.    The radar weather data from the Slidell station confirmed that the winds blew consistently from the northeast at the IHNC during the relevant hours on the morning of August 29, 2005.

125.    Radial velocity data is the most direct way to measure wind direction.  When looking at radial velocity radar images, green data represents a wind component moving toward the radar station in Slidell, while red data represents a wind component moving away from the radar station in Slidell.  Lemon Tr. 1723:9-16.  A bright color indicates a higher velocity to or away from the radar station and a darker color indicates a lesser velocity in that direction.  Lemon Tr. 1726:23-1727:9; Mitchell Tr. 1002:9-15, 1011:11-1012:5; Lemon Report at Fig. 1 (DX 311).  In the context of this case, thus, radar images that portray radial velocity in red at the IHNC represent winds blowing with a component from the northeast, away from the Slidell radar station and toward the IHNC.  Mitchell Tr. 1002:9-15.

126.    As shown by Mr. Lemon's testimony, the radial velocity data showed northeasterly winds at the Canal from Sunday night August 28, 2005 through the morning hours of August 29, 2005.  That is, the radar data images for each six-minute scan, throughout the relevant period, depicted the area of the IHNC with the color "red," showing the winds blowing with a component from the northeast, away from the radar station in Slidell and toward the IHNC.  Lemon Tr. 1719:11-14, 1720:4-15, 1775:13-16, 1777:14-19, 1778:13-1779:25 ("The data indicates a strong northeast wind, that is, northeast to southwest.") & Lemon Slide LL-021 (radar images exemplify northeasterly winds seen throughout the period) (DX 346); Lemon Tr. 1780:10-12, 1788:15-17 ("uniform northeasterly flow"); Lemon Tr. 1823:5-17 ("uniform wind field from the northeast"); Lemon Report at 2, 19, 35 ("winds were sustained northeasterly") (DX 311).

127.    In interpreting the radar data, Mr. Lemon took due account for the possibility that "local" winds such as mesocyclones or microburst winds might have affected the wind direction at the IHNC.  In particular, Mr. Lemon analyzed the radar images showing "ground-relative" velocity data which, as Mr. Lemon explained, takes into account the effects of ***both*** the prevailing hurricane winds ***and*** any mesocyclones or other localized wind phenomena that may happen to be present.  Lemon Tr. 1747:6-12, 1749:15-1751:1; see also Mitchell Tr. 1009:7-12 (agreeing that ground-relative velocity data includes hurricane and mesocyclone effects).  It was this data which showed consistent "red" images for the IHNC area, demonstrating that the winds were consistently away from the radar station, from the northeast.  Lemon Tr. 1779:12-25.

128.    In addition, Dr. Lemon analyzed "storm relative velocity" radar data and "spectrum width" data to ascertain whether any mesocyclones, microburst winds, or winds with multidirectional components were even present at the IHNC during the relevant time periods.  These data showed (a) that no mesocyclones passed over the IHNC at any time from 7:00 p.m. CDT on August 28 through 9:00 a.m.

CDT on August 29; (b) no microburst or wind gusts associated with mesocyclones affected the barge; and (c) there were no winds with multidirectional components affecting the Canal.  Lemon Tr. 1720:4-15, 1775:10-16, 1777:14-19, 1778:3-6, 1780:6-12 & Lemon Slide LL-021 (radar images are exemplary of northeasterly winds seen throughout the period) (DX 346); Lemon Tr. 1780:10-12; Lemon Report at 2, 19, 35 ("winds were sustained northeasterly") (DX 311).

129.   Radial velocity data would have detected microburst winds at the IHNC, if such winds had been present.  Lemon Tr. 1736:23-1737:9 (microburst signature can be seen "from any viewing angle"); Lemon Slide LL-008 (showing radar signature of a microburst) (DX 346).  The data revealed no microburst winds affecting the IHNC during Hurricane Katrina.  Lemon Tr. 1737:10-14 ("I saw no microburst signatures near the canal, nor did I see any microburst signatures throughout that data set."); Lemon Report at 2, 11 (DX 311).

130.   The spectrum width radar images, which would show multidirectional winds, showed "remarkably smooth" winds at the Canal, from 7:00 p.m. on August 28 through 9:00 a.m. on August 29.  No winds with multidirectional components affected the Canal the evening before or during Hurricane Katrina.  Lemon Tr. 1720:13-15, 1724:3-18, 1780:13-25, 1787:19-1788:4.

131.   No tornadoes touched down in New Orleans, including at the IHNC, during Hurricane Katrina.  Mitchell Tr. 1034:3-51.

132.   Eyewitness reports also support Mr. Lemon's conclusions regarding the absence of abnormal "local" wind conditions affecting the direction of the wind at the IHNC during Hurricane Katrina.  In particular, Captain Hall, whose vessel was stationed near the IHNC throughout the hurricane, did not see or experience any tornadoes, waterspouts, lightning, isolated storms, or any gusts of wind, downdrafts, downbursts, or other winds that came from a direction other than the prevailing wind.  He only experienced "the hurricane wind.  That's it."  Hall Tr. 1966:3-17.

### c.   Consistency between radar data and Lakefront Airport data

133.   Upon examining the local weather observations, Dr. Dooley determined that the alleged mesoscale activity identified by Dr. Mitchell did not change the prevailing wind directions at the IHNC during Katrina.  Dooley Tr. 1870:23-1871:3, 1872:20-25, 1885:16-1886:4 ("As I looked at the Lakefront data, these types of updrafts, which is a zone of convergence and downdrafts in these thunderstorms . . . they will either produce a lull or a gust, a peak.  And we see events like that in the ambient flow, instantaneous flow, measured by Lakefront.  But it doesn't reverse the directions, and it doesn't change my analysis of the synoptic scale, large-scale flow, across the IHNC.  You had northeasterlies blowing into the southwest.").

134.   In particular, Dr. Dooley examined the Lakefront Airport data at 2:15 a.m. CDT, a
time at which a mesocyclone signature was identified nearby by the radar
algorithm, according to Dr. Mitchell.  Nevertheless, at 2:15 a.m., there was no
change in wind speed, wind direction, or gust speed at Lakefront Airport.  Dooley
Tr. 1871:20-1871:19 ("we have 2:15 observation from Lakefront.  And you can
see that the wind direction is consistent, and you see that the wind speed is
consistent, and you see the gust speed is consistent.  So whatever that item was
that was identified as T-4, it had absolutely no impact on the surface winds at
Lakefront to 2:15"); Dooley Slides AD-045 and AD-046 (DX 347).  Similarly,
Mr. Lemon observed consistent northeasterly winds at the IHNC at 2:15 a.m. as
shown in the base radar data.  Lemon Tr. 1781:16-1782:17 ("At the canal itself,
… there's nothing there.  No mesocyclones."); Lemon Slides LL-026 to LL-027
(DX 346); Lemon Report at 25-26 and Fig. 13 (nearest supercell is "over 42 miles
away" and "pose[d] no threat to the IHNC or the barge").

135.   Dr. Dooley and Mr. Lemon examined data from around 3:42 a.m., another time at
which a mesocyclone signature was identified by the algorithm near Lakefront
Airport, according to Dr. Mitchell.  Mr. Lemon found that there was a
convergence zone near Lakefront Airport at 3:42 a.m.  Lemon Tr. 1786:22-1788:4
(finding wind velocity "slackened somewhat in response to the convergence,"
which is "about 4 miles north of the harbor"); Lemon Slide LL-032 (DX 346).
Dr. Dooley observed that there was a lull in wind speed at 3:36 a.m. and that the
wind direction became more easterly.  Dooley Tr. 1859:12-1860:16 ("That upper-
level region of convergence … over Lake Pontchartrain, which would be to the
north of Lakefront airport … , relaxed the wind to 90 [degrees].  And you'll also
see that the wind speeds slow down," and "there was some type of a convergence
which relaxed the wind and gave us these easterlies") & Dooley Slides AD-043
and AD-044 (DX 347); Dooley Tr. 1925:25-1926:12; Lemon Report at 17-18,
Fig. 11 ("surface winds, although remaining northeast or perhaps having shifted
to a more east northeast direction have, responded to the convergent flow into the
updraft ….  So there are no multidirectional winds or rapid changes in wind
direction and there is no mesocyclone over the barge location") (DX 311).

136.   "A supercell … is a large scale system.  It has updrafts and downdrafts.  When
those downdrafts reach the surface, those downdrafts will combine with the
preexisting wind conditions and produce gusts, and if those conditions persist
long enough and high enough, it will become – it will be reported as a squall."  A
squall event was reported at Lakefront Airport at 3:43 and 3:46 a.m., yet the
squall had no effect on the prevailing wind direction.  Dooley Tr. 1904:22-
1905:18, 1905:21-1906:2 & Dooley Slide AD-043 (DX 347).

137.   Any microbursts, downdrafts, or mesocyclones that would have changed wind
direction or wind speeds significantly would have been observed at Lakefront
Airport, triggering a special report.  Dooley Tr. 1903:3-16 ("if the downburst – or
the downdraft, as it hits the surface, changed the direction of the wind, I would
expect to see that in the special report.  If it changed the magnitude of the wind,
still maintaining the direction, I'd expect to see a reference to that in the wind

gusts, so we would see a much larger wind gust."); Dooley Tr. 1919:5-19 (surface observation of wind speed and direction at Lakefront airport would have shown presence of microburst or downdraft winds).

> ### d.  *Dr. Mitchell's flawed interpretation of radar data*
>
> *- Flawed reliance on "aliased" radial velocity data*

138. Dr. Mitchell testified that the radar data reflected a "complicated" wind field in which "multidirectional winds are possible." Mitchell Tr. 997:16-21. However, Dr. Mitchell admitted that this opinion was based, in part, on interpretation of radar images which had not been "dealiased." Mitchell Tr. 1006:12-17.

139. Dealiasing is a process to remedy the phenomenon of "folded velocities" which result when high velocity winds are recorded by the radar processor. One limitation of Doppler radar is that velocities can only be measured unambiguously up to a certain range, which is 64 knots for the radar in Slidell. A velocity above 64 knots is recorded on the other side of the spectrum – *i.e.*, data shown as "green" at 64 knots becomes "red" when the wind increases to 65 knots, even though the wind direction is the same. Such data is referred to as being "aliased" or "folded." Thus, for instance, Mr. Lemon explained that a wind of 65 knots away from the radar that is folded will show up as bright green on the radar, even though it should be red. Lemon Tr. 1754:21-1756:21; Lemon Report at 23-25 (DX 311).

140. Dealiasing is the process by which velocities are unfolded. Dealiasing is performed by a very reliable computer algorithm. Lemon Tr. 1759:10-20. The GRAnalyst program that Mr. Lemon used to dealias the data in this case is used by about two-thirds of the National Weather Service offices in the United States. Lemon Tr. 1813:25-1814:3, 1827:22-1828:1.

141. Dealiasing does not mask or obscure any meteorological phenomena such as mesocyclones. Rather, it represents the actual direction and velocity of the wind. Lemon Tr. 1765:8-20 ("There's no masking done at all because certainly, if it was masked, what would the weather service do? They couldn't use that data to issue warnings. [T]here's no masking here at all."). In the case of Hurricane Katrina, the dealiased data showed a "uniform northeasterly flow" at the IHNC. Lemon Tr. 1788:15-17.

142. "Base data from the signal processor" of the radar "is not dealiased." Lemon Tr. 1799:22-23, 1802:18-24, 1803:8-9. Dr. Mitchell used base data, but he did not dealias any of the data he used. Mitchell Tr. 1005:21-23 ("Q: . . . you performed no dealiasing of the level 2 data that you used, correct?  A: Correct.").

143. Dr. Mitchell admitted during his direct examination that some of the data he used had a dealiasing problem and he indicated that portions of the radar data were "not real." Mitchell Tr. 993:9-24 ("there are areas, large areas up here that possibly are aliased that are not real") (referring to Mitchell Demonstratives Slide

44 (PX 436); Mitchell Tr. 1004:6 ("More likely than not, Counselor, that is aliased"); Mitchell Tr. 1005:18-20 ("Q: So my question was that – what you answered is whether or not there is alias[ed] data in this graph, yes or no?  A: Could be"); Mitchell Tr. 1006:12-17 ("there is alias[ed] data, more likely than not, in this diagram, it wasn't completely – it wasn't severely dealiased, no, sir."); see Lemon Tr. 1768:12-1771:11 (aliased data relied upon by Dr. Mitchell could not be squared with time-lapse images, and were "incoherent when compared to the reflectivity field").

144. Dr. Mitchell incorrectly asserted that Mr. Lemon's depiction of dealiased radar "removes the mesocyclone" from the base radial velocity radar image for 3:31 a.m., regarding a mesocyclone over Lake Pontchartrain (not the IHNC).  Mitchell Tr. 992:22-993:1.  In fact, the dealiased radar data image as shown by Mr. Lemon clearly evidences a mesocyclone, with a bright red portion showing enhanced winds representing the combined effect of the hurricane wind and the mesocyclone, and a dark red portion showing a lull representing the offsetting effect of the hurricane wind and the mesocyclone's trailing edge.  Lemon Tr. 1815:22-1816:5; see Lemon Tr. 1749:23-1751:1; Lemon Report at 16, Fig. 9 (upper right quadrant) (DX 311).  The Court was easily able to discern the mesocyclone in this dealiased image, once Mr. Lemon had made clear the meaning of the different shades of red in the image.  Lemon Tr. 1816:1 (The Court: "Even I can identify it now."); see Lemon Report at 16, Fig. 9 (upper right quadrant) (DX 311).

145. Dr. Mitchell's reliance on radar data that had not been dealiased, and that contained representations of wind patterns that he admitted were not "real," renders his interpretation of the radial velocity radar data not credible, not reliable, and not acceptable.

*- Flawed reliance on "mesocyclone" algorithm data*

146. A mesocyclone is a smaller scale storm, approximately 1-5 miles across, which is embedded within the overall synoptic wind pattern of the hurricane.  As they move with the prevailing hurricane winds, they do not stay in one place very long. Mitchell Tr. 940:21-941:1 (mesocyclone and wind associated with it are "embedded in the overall wind field"); Mitchell Tr. 941:19-25 (size of mesocyclone is 1-5 miles); Mitchell Tr. 1031:11-13 (thunderstorms are embedded within the feeder bands of the hurricane); Mitchell Tr. 1031:20-1032:3 (the feeder bands with embedded mesocyclone obey the large scale rotation around the storm); Lemon Tr. 1728:4-13 ("diameter of the core of circulation . . . in a mesocyclone, it's typically 1 to 5 miles"; mesocyclones move essentially with the steering winds in the flow they are embedded within").

147. Mesocyclones typically form in the right front quadrant of a land-falling hurricane, which was over the Gulf and State of Mississippi for Hurricane Katrina.  The IHNC was not in the right front quadrant of Hurricane Katrina. Lemon Tr. 1728:14-21.

148.   Dr. Mitchell testified that the IHNC was affected by "numerous mesocyclones" which created "wind shear, rotational wind gusts, unpredictable wind gusts" and wind gusts with "multidirectional components" between 3:00 a.m. and 5:00 a.m. on the morning of August 29.  Mitchell Tr. 998:24-999:8.  Dr. Mitchell identified these mesocyclones based on the output of an algorithm which identifies thunderstorm cells having cyclonic rotation.  Mitchell Tr. 1015:11-17.

149.   However, Mr. Lemon – who helped develop the National Weather Service algorithms – testified that that these algorithms "have a very high false alarm rate" and are thus never relied upon by the National Weather Service without further analysis of the base radar data to determine if a mesocyclone is actually present.  Lemon Tr. 1738:2-25, 1741:5-1744:9, 1785:6-19, 1796:2, 1811:20-1812:14; Lemon Report at 23 (DX 311).

150.   Mr. Lemon analyzed the base radar data and found that there were no mesocyclones present at the IHNC during the relevant time periods.  Lemon Tr. 1720:1-10, 1736: 3-8.  In particular, examination of "storm relative velocity" images from 7:00 p.m. CDT on August 28 through 9:00 a.m. CDT on August 29 showed that **no mesocyclones** affected the IHNC.  Lemon Tr. 1747:16-1748:7, 1773:23-25; Lemon Report at 18-19 (DX 311).  Storm relative velocity is a radar product that removes the translational velocity of the storm and allows circulations within the feeder bands to be seen more clearly.  Lemon Tr. 1747:16-1748:7, 1753:9-1754:12 (explaining, in response to questioning from the Court, difference between storm relative and ground relative images).

151.   Dr. Mitchell admitted that in another case involving Hurricane Katrina (the *Bradley* case), he examined "storm relative velocity" radar images for the relevant six-minute time windows in opining about whether mesocyclonic winds were present during Hurricane Katrina at a property within a quarter mile of the IHNC, and found that these images did not show "any signature of mesocyclone rotation" at that location, even though the algorithm had identified a mesocyclone as present.  Mitchell Tr. 1063:14-24.  Dr. Mitchell's own reliance on storm relative velocity images in *Bradley* to negate the presence of mesocyclonic winds at the IHNC strongly supports Mr. Lemon's opinions that (a) it is important to consider base radar data to determine if the algorithm output is correct, and (b) the base radar data shows that no mesocyclones were present in the IHNC during the relevant time frames, regardless of the mesocyclone algorithm output.  Conversely, Dr. Mitchell's reliance on the base data in *Bradley* to reject the mesocyclone algorithm output thoroughly undermines his testimony in this case, in which he relied solely on algorithm output without any further analysis of the base data.

152.   Although Dr. Mitchell represented to the Court that he had conducted a thorough analysis of "all of the products" to "determine what [was] actually happening at the location of interest," Mitchell Tr. 976:17-19; see also Mitchell Tr. 962:25-963:4, his report in this case omitted any mention of the storm relative velocity radar images that he had relied upon in *Bradley* to test the output of the

mesocyclone algorithm and to conclude that there was in fact no evidence of mesocyclonic rotation at the IHNC during Katrina.  Mitchell Tr. 1063:4-8.  Although Dr. Mitchell's assignment in each case was the same – to "tell the Court what the wind conditions were at the property," Mitchell Tr. 1043:21-1044:1 – the reports in the two cases are glaringly inconsistent, reflecting the work of an advocate who will tailor his opinions to the needs of the lawyers who hire him, rather than that of a credible neutral expert.

153.   Dr. Mitchell's failure to check the output of the mesocyclone algorithm by looking at the underlying base radar data, as he did by looking at the "storm relative velocity" data for the very same outputs in the *Bradley* case, renders his opinions regarding the presence of mesocyclones in the region of the IHNC not credible, not reliable, and not acceptable.

- *Flawed inferences drawn from supposed presence of mesocyclones*

154.   Dr. Mitchell testified that the (supposed) presence of mesocyclones in the vicinity of the IHNC meant that the barge was necessarily subjected to multidirectional winds.  Mitchell Tr. 998:24-999:8.  However, Dr. Mitchell admitted that a microburst (the surface winds potentially produced by a mesocyclone) is "like a lightning strike," "very localized," and "does not necessarily reach the ground."  Mitchell Tr. 955:22-25; 978:23-25, 1036:3-21.  Dr. Mitchell repeatedly admitted that there was no certainty that microbursts or mesocyclones reached ground level.  Mitchell Tr. 1056:25-1057:1 (the radar data do not provide any means of measuring microburst winds); 1057:11-16 (there is no way of determining from radar whether a mesocyclone actually affects the ground); 1058:3-7 (we cannot measure the microburst component . . . we don't know if they are actually occurring); 1057:23-1058:2 (it is only "possible," not certain, that radar images produce evidence of mesocyclone microburst winds); 1068:14-22 (referring to Cell I0 on page 12 of DX 312, and testifying that it has only the "potential" to reach ground level, but there are no measurements showing that it did).

155.   Beyond that, the evidence established that even where mesocyclones were present during Hurricane Katrina, they were not sufficient to overcome the prevailing wind and cause the wind to blow in a different direction.  When a mesocyclone or microburst wind enters a hurricane, the wind speeds and directions are determined by vectorial resolution.  The part of the mesoscale wind that is in the same direction as the prevailing wind creates a *peak*, and the part of the mesoscale wind that is in another direction creates a *lull*.  Dooley Tr. 1885:16-1886:4 ("these types of updrafts … will either produce a lull or a gust, a peak"); Dooley Tr. 1921:5-1922:1 ("in a hurricane, as that [microburst] wind comes in and enters that hurricane wind, you're going to get a peak, and for that part of the wind that may be going in another direction, you're going to get a lull, but it's all going to go in the direction of the prevailing wind."); Dooley Tr. 1922:15-1923:7 ("There is a vectorial resolution.  So the vectors are adding up, and the net result is in the direction of the prevailing wind."); Dooley Tr. 1924:13-1925:15 (as winds come down from the mesocyclone aloft, "they fall into the prevailing winds and go with

38

and they add to that energy, or if there is some type of a downdraft in the opposite direction, they fight against the prevailing winds, and usually the prevailing winds dominate . . . it will not become a prevailing wind"); Lemon Tr. 1750:12-1752:5 (people on the ground in a hurricane experience winds from a mesocyclone as the same direction but on one side of the mesocyclone the velocity is greater than the prevailing wind and on the other side of the mesocyclone the velocity is lower); Lemon Tr. 1752:19-25 (when storm was moving at 60 knots and a mesocyclone occurred that was rotating at 40 knots, a 100 knot wind was experienced on the left hand of a circulation, while winds on the right side of the circulation were "essentially calm"); Lemon Tr. 1745:4-12 (all winds within mesocyclone were moving away from radar); Lemon Slide LL-010 (DX-346).

156.    On questioning by the Court, Dr. Mitchell admitted that "it's possible" that a mesocyclone embedded within a hurricane would create a lull in the hurricane wind, rather than changing the direction of the wind.  Mitchell Tr. 1014:1-5 (admitting that "it's possible" that a mesocyclone could result in wind that would be "in the same direction" but "the wind speed would simply be less").

157.    The base radar data showed that, when looking at radar images that measure base radial velocity in relationship to the ground, all winds were blowing in the direction of the prevailing wind.  Lemon Tr. 1750:12-1751:1 ("The circulation doesn't change the direction of the wind."); Lemon Tr. 1754:9-12 (When looking at both hurricane wind and mesoscale wind, wind at the ground at the IHNC is blowing from the northeast, away from the radar); Lemon Slide LL-010 (DX 346).

158.    By contrast, Dr. Mitchell could not provide any evidence that a microburst wind came out of a thunderstorm and acted on the barge and had no evidence of the direction of any microburst wind hitting the ground.  Mitchell Tr. 1036:9-21 (acknowledging that he had "no evidence" of a microburst wind acting on the barge and had "no way to calculate which way the winds would be blowing after a microburst event").

159.    Although he testified in several Katrina cases regarding the effects of wind on properties, Dr. Mitchell could not recall a Katrina case in which he had definitively testified that a mesocyclone or microburst had reached ground level. Mitchell Tr. 1041:11-15; 1044:4-7.

160.    In sum, the presence of a mesocyclone in a given area does not necessarily indicate or suggest the presence of "multidirectional" winds at ground level.  Dr. Mitchell's inference that multidirectional winds were present constitutes nothing more than speculation.

161.    Dr. Mitchell's inference that mesocyclones and microburst winds acted on the barge is not only speculative, but is totally undermined by his own testimony in previous Katrina cases involving properties in the New Orleans area.  In *Bradley,* Dr. Mitchell attested that no mesocyclones or microburst winds reached ground

level at a property less than a quarter mile away from the IHNC, based upon the very same radar data that he interpreted in this case.  Mitchell Tr. 1038:7-13 (resolution of radar); Mitchell Tr. 1041:16-25 (reliance upon same data); Mitchell Tr. 1047:4-23 (location of property was two blocks from North Breach and less than 1/4 mile from IHNC); Mitchell Tr. 1058:12-1063:8 (examining differences in language used regarding same radar images at 3:42 a.m.) (referring to Mitchell *Bradley* Report (DX 341) and Highlighted Mitchell *In re Katrina* Report (DX 343)); Mitchell Tr. 1063:9-24 (examining storm relative velocity images not included in Katrina report that "don't show any signature of mesocyclone rotation over the property as would be expected if such tornadic winds were present") (referring to Mitchell *Bradley* Report (DX 341)).  Dr. Mitchell's opinions in other Katrina cases are consistent with his opinion in *Bradley* and not this case, opining (for instance) that the presence of mesocyclone winds was merely "possible" or a "possibility" rather than a reality.  *E.g.*, Mitchell Tr. 1067:5-11 (agreeing that prior Katrina reports refer only to the "possibility" of a mesocyclone); Mitchell *Sherman* Report (DX 343).

162.   Dr. Mitchell did not examine the Lakefront Airport data to confirm his speculation regarding potential mesocyclones with microburst winds.  Mitchell Tr. 1036:22-1037:11 (acknowledging that opinions are based on interpretation of data listed in his report) and Mitchell Report at 40 (not identifying Lakefront Airport data as a reference) (DX 312).

163.   As described above, the base radar data demonstrate that the wind direction at the IHNC was "red" or away from the radar at all relevant times (*i.e.*, blowing from the northeast).  This radar data is consistent with the local data confirming that mesoscale activity, to the extent it was present in the area of the IHNC, did not alter the prevailing wind direction in any meaningful way.  These data sources confirm that Dr. Mitchell's speculation about the supposed existence of "multidirectional" winds at the IHNC is utterly without scientific merit or foundation, and that his opinions are not credible, not reliable, and not acceptable.

### D.   Hurricane Katrina – Current, Tide, and Waves

### i.   Evidence that current and tides did not move the barge

164.   The IHNC below the Florida Avenue Bridge was a "closed system" in the sense that the lock at its southern end prevented the flow of water to or from the Mississippi River.  LNA Undisputed Fact 20.  Therefore, when storm surge from Hurricane Katrina reached this part of the IHNC, it filled up "like a bathtub" without generating appreciable currents.  Cushing Tr. 2052:23-2053:13; Mosher Dep. 171:12-16 (end of IHNC was closed off; lock gates were closed) (DX 283); Pazos Dep. 104:8-11 ("Current is very insignificant because the current needs to flow in order to exist. And the locks were closed, so the flow – the flow was very limited or local …") (DX 218).

165.   Scientific modeling and analysis of the currents in the IHNC showed that currents could not have overcome the hurricane winds and moved the barge from the LNA Terminal to either breach site until after both breaches occurred.  Cushing Report at 48, 166-68 (currents did not flow toward north or south breach and "were very nearly zero" prior to breaching) (DX 196); Cushing Tr. 2042:24-2043:2 ("the current in the water was very, very small.  I would say insignificant."); Cushing Tr. 2053:14-23 ("The currents that we calculated and that existed in the canal were very, very weak, on the order of a hundredths of a knot.  And, therefore, they would have had very, very little effect compared to the wind, which would have been, say, 700 times more forceful on the barge."); Cushing Tr. 2170:3-8 ("at 9'o'clock, 9:15 and 9:30, . . ., the north and south breaches had already formed.  And in doing so, they were then . . . contributing . . . to the currents of the canal, which prior to the breaches were insignificant, but once the breaches had formed, they were then adding to the track of the [barge]"); Marino 2009 Dep. 281:23-282:25 (Q: "You didn't model the barge movement, did you?"  A: "No.") (DX 221); Pazos Dep. 104:8 (current "very insignificant") (DX 218); Spinks 2009 Dep. 31:18-32:11 ("We have not done any hydrodynamic studies of the waters within the Industrial Canal.") (also agreeing such studies could be done) (DX 222).

166.   Tides could not have moved the barge to the sites of the breaches.  Tidal movement in the New Orleans area is "on the order of a foot to a foot and a half" diurnally, which means there is "one high and one low tide per day."  Tides in the IHNC take 12 hours to rise one foot and to fall one foot, which means water rises and falls at a rate of approximately 1 inch per hour.  The hydrograph of Katrina's surge shows that water was rising steadily in the canal starting on Sunday August 28 and that the rise in water level from the surge "overwhelmed" the tidal flow, "and the net flow [was] into the canal, not out of the canal."  Cushing Tr. 2054:5-2055:20; IPET Report Vol. 5 Fig. 51 (hydrograph) (DX 145); Cushing Report at B-10 (IHNC Lockmaster's Record showing flow into the IHNC on the IHNC Lock Canal Gage) (DX 196).

167.   Plaintiffs failed to offer ***any*** evidence showing the tidal movements and the range of tide for the appropriate days, despite the Court's express inquiry.  Pazos Tr. 904:18-20.  Plaintiffs' expert Donald Green said only that "the water comes in, the water goes out, at least twice a day," and admitted that he had performed no calculations with respect to the effects on the barge of the tidal current or the wind and the forces exerted upon it.  Green Tr. 440:8-441:1.

### ii.   Evidence that waves did not move the barge

168.   It is possible, through scientific means, to determine wave heights during a storm event at a given location.  IPET Report Vol. IV at IV-4 (calculating wave height) (DX 145); Cushing Tr. 2065:7-16 (confirming IPET's analysis of wave heights with his own calculations of wave height using Navy Charts); Pazos Dep. 112:21-25 ("I'm a hydrodynamicist.  … Yes, you can develop height of [a] wave based on wind by not just a little formula, it's a sophisticated analysis.") (DX 218);

Spinks 2009 Dep. 32:18-25 (scientific processes exist to study wave heights in the IHNC) (DX 222).

169.   The Interagency Performance Evaluation Task Force ("IPET") conducted a scientific study and concluded that wave heights in the IHNC during Hurricane Katrina reached approximately 1 foot before 5:30 a.m. CDT on August 29, 2005, and two to three feet after that.  IPET Report Vol. IV at IV-4 (DX 145); Spinks Tr. 1613:17-1614:10, 1614:17-20 (IPET found that maximum wave heights during peak wind conditions were 1 foot before 5:30 a.m., and 2-3 feet after that; IPET went through a scientific process to come up with those figures); Cushing Tr. 2065:7-16 (confirming IPET's analysis of wave heights with his own calculations of wave height using Navy Charts); Pazos Report at 37 (reviewing IPET's study and noting that waves associated with the surge "decay rapidly, and within less than a mile have been reduced to about 1.2 feet") (PX 402); Pazos Report at 39-40 (quoting IPET's study at IV-227, which states that "[s]imilar to waves entering the MRGO/GIWW, these waves [entering the IHNC] decay rapidly and within less than a mile have been reduced to about 1.2 feet" and also noting that the maximum waves in the IHNC during Katrina occurred at 9:30 a.m.) (PX 402).

170.   Photographic evidence from August 29, and from similar conditions during Hurricane Rita, tends to confirm wave heights in the IHNC during the morning of August 29 of approximately one to three feet as set forth in the IPET Report. IHNC lockmaster Michael O'Dowd confirmed, through his testimony and his photos, that waves in the IHNC were 1-2 feet during the storm.  He also testified that the waves in the IHNC were moving south towards the Mississippi River. O'Dowd Tr. 2225:19-2226:2, 2226:18-20; DX 35 at LNA001345 and LNA001347 (photographs taken by O'Dowd the morning of August 29, showing small waves).  See also Cushing Tr. 2065:17-2066:7 (discussing DX 35 at LNA001345; "This is the time when conditions were the greatest.  The wind had backed around from the northeast and was coming from a more northerly direction.  So the wind would have had the greatest possible fetch and the greatest possible strength.  And here we see waves of about 3 feet high."); Cushing Report at 46, Fig. 28 (Katrina) (DX 196); Cushing Report at 133, Fig. 97 (Rita) (DX 196); Suhayda Report at 8-10 (waves one to two feet, maximum two to three feet) (DX 215).

171.   Although plaintiffs' experts opined that wave heights in the IHNC were as high as twenty feet, they did not perform any calculations or provide any scientific support for such a theory.  Cushing Report at 130-33 (addressing Pazos theory on waves) (DX 196); Pazos Dep. 124:3-7 ("[I]t's impossible to predict without making a very detailed analysis of the waves, the reflecting waves, the location of the wind, the direction of the wind – so it's pure guessing") (DX 218); Pazos Dep. 163:14-19 (Q:  "Have you done any calculations to support the conclusion that you've got eight to ten foot waves in the Inner Harbor Navigation Canal?"  A: "Not in this specific case, but I have done it in other occasions. … I didn't try to do it in this case.") (DX 218); Pazos Dep. 175:11-14 (Q: "Have you done any

modeling of waves or wave heights in the Inner Harbor Navigation Canal."  A: "No.") (DX 218); Pazos Dep. 175:15-19 (Q:  "When you say eight to ten foot waves in the canal, have you done any calculations to support those numbers in this case?"  A:  "Not in this case.  I have done it in other cases.") (DX 218).

172.   IHNC lockmaster Michael O'Dowd testified that at no time during Hurricane Katrina did he ever see a 20-foot wave, that no such wave hit the lock during Katrina, and that he had never seen a wave of that size in the IHNC during any prior hurricane.  O'Dowd Tr. 2226:21-2227:6.

173.   There is no evidence of a 20-foot wave in the IHNC during Katrina.  Such a wave "would be like a two-story high building, and it would have wiped out these buildings along the side, the sheds and shacks, and it would have eventually destroyed the facilities at the lockmaster's office."  Cushing Tr. 2067:2-12 (referring to Cushing Slide CC-32 (DX349)); Pazos Tr. 871:2-20 (acknowledging that it is not his opinion that a meteotsunami or 20-foot wave was involved in the breaches, that he "just was elaborating [o]n the information [he] read," and that "the 20 feet is an estimation from a person looking three-quarters of a mile away, so I don't believe that can be considered a set number"); Pazos Tr. 872:4-9 ("I don't have any solid information" regarding a 20-foot wave in the IHNC.  "I just was elaborating [o]n what an eyewitness said.").

174.   Dr. Suhayda, who has studied tsunamis and meteotsunamis, testified that tsunamis and meteotsunamis are gravity waves "produced by some impulsive force, like an earthquake."  There could not have been a meteotsunami in the IHNC during Katrina because the conditions for creating a meteotsunami did not exist. Suhayda Tr. 3042:17-3043:13.  Likewise, according to IPET's study, waves were 1-2 feet, with a maximum of 4 feet.  As a result, it would have been "statistically impossible" to have waves as high as 20 feet in the IHNC during Katrina. Suhayda Tr. 3042:6-16; Suhayda Report at ¶¶ 26-37 (DX 215).

175.   The available scientific data, including the IHNC lockmaster's hydrograph, do not support the allegation that a 20-foot wave struck the IHNC on the morning of August 29, 2005.  IPET Report Vol. 5 Fig. 51 (hydrograph) (DX 145); Cushing Tr. 2066:14-2067:1 ("from a scientific point of view, the canal is too shallow to support a 20-foot wave.  Such a wave would break, … so you can't get a 20-foot wave in [the] canal.  There's no source for that 20-foot wave."); Spinks Tr. 1614:21-24 (no 20-foot waves based on the science he read and studied).

176.   Wind-activated waves propagate in the direction of the prevailing wind.  Cushing Tr. 2063:10-20; Cushing Report at 47, 79 ("Another important property of wind-generated waves is that they travel in the same direction as the prevailing wind.") (DX 196); Spinks 2009 Dep. 23:17-22 (matter of "common sense") (DX 222); Pazos Dep. 151:5-9 (asked whether he had an opinion about the prevailing direction of waves at the time the barge supposedly contacted the wall at the north breach, Pazos response was "[a]bsolutely no") (DX 218).

177. Waves reflecting off a surface have less energy than "incoming" waves approaching that same surface and therefore could not have overcome the primary wind-driven waves and the hurricane winds. Cushing Tr. 2067:23-2068:6 ("a reflective wave is never as strong as a . . . primary wave . . . reflective waves wouldn't overcome the primary waves"); Cushing Report at 79 ("Reflected waves lose energy when reflection takes place.") (DX 196); Dooley Dep. 94:18-95:8 ("As waves hit, they lose energy. . . . Those waves may propagate, then, further into the upstream direction, but again, they've lost energy again. So they would very quickly dissipate. So I can't see reflected waves from the western side propelling a barge all the way to the eastern side.") (PX 354); Spinks 2009 Dep. 23:23-24:2 (reflected waves have less energy) (DX 222).

178. Because wind-activated waves could not have caused the barge to move in a direction counter to that of the prevailing winds, wind-activated waves could not have moved the barge from the LNA terminal to either breach site, or caused the barge to impact the floodwall at either breach site, at any time before the breaches occurred. Cushing Tr. 2042:18-2043:7 (waves "moving in the direction of the wind, so they would have only added to the force of the wind" and would not have moved the barge against the prevailing winds); Cushing Tr. 2063:10-20 (waves could not have moved the barge "[because] waves move with the wind . . . [s]o they would be moving in the same direction that the wind would be moving"); Cushing Tr. 2067:13-15 (not possible for waves to move barge against wind); Cushing Report at 79 (wind-generated waves, which were the only waves present in the IHNC during Hurricane Katrina, "could not possibly move any floating object in a direction counter to the wind"; reflected wave "can never have as much energy as the primary wave, and can never force a floating object in the direction from which the primary wave is coming") (DX 196); Cushing Report at 131-32 (waves had insufficient energy to propel barge) (DX 196); Cushing Report at 164 (calculations show pitching motion of barge in waves in IHNC would involve maximum vertical motion of slightly more than one foot) (DX 196); Dooley Report at 32 (waves moving with the prevailing wind "would also prevent the barge from moving northward" to the North Breach") (DX 198); Dooley Dep. 93:25-94:15 ("Any waves that may have been produced within the IHNC in this time period would have flowed with the direction of the dominant wind or the prevailing wind. … I do not see this barge moving from the southwest to the northeast into the direction of the wind") (PX 354).

179. In addition, even if the barge had been at the wall prior to the breaches, the waves in the canal were not significant enough to lift the barge onto the intact floodwall, as was speculated by plaintiffs' expert Mr. Pazos. Cushing Tr. 2123:16-20. The waves were also too small to cause the barge to have a significant pitch. Dr. Cushing testified that "in order . . . to have any significant pitching of a vessel, you need waves that are [at] least half the length of the barge, in other words, 100-foot long wave lengths, and these 1-to-3-foot high waves wouldn't cause pitching more than 2 or 3 inches at the most." Cushing Tr. 2125:17-2126:9; Cushing Report at 133-34 (calculating potential for pitching and heaving) (DX 196).

180.  Plaintiffs supplied no evidence to show any process by which waves could have moved the barge across the canal or caused it to come into contact with the floodwall.  Pazos Tr. 843:3-4 ("I cannot show you the trajectory because I don't know the trajectory."); Pazos Tr. 847:11-13 ("I know that the barge moved from the west side of the canal to the east side of the canal.  I don't know when and how."); Pazos Tr. 870:13-14 ("I don't know the trajectory of the barge"); Pazos Tr. 895:22-25 ("Well, I don't know for sure of the location of the barge in the canal, and I don't know what exactly propelled it."); Pazos Tr. 897:3-23 (regarding movement from North Breach to South Breach: "I don't know the trajectory.  I know the barge was there and after the point of contacts are going south"); Pazos Tr. 851:13-20 ("remote possibility" that barge could have traveled from near Claiborne Bridge to site of North Breach); Pazos Tr. 898:7-18 (testifying that reflecting waves were only "a possible way" to account for the barge's movement away from the North Breach); Cushing Report at 144, 155 (plaintiffs' experts supplied no transport analysis) (DX 196); Pazos Dep. 186-87 (Q: "Now, have you done any calculations to show what the pitch of the barge would be in a five or a ten or an eight foot wave?"  A:  "Not in this case.") (DX 218); Pazos Dep. 228:7-12 (Q:  "Have you done any calculation about how large a wave would be needed to pitch the end of the barge up high enough to get it above the floodwall at that time of morning?"  A:  "I didn't do any calculations, but I can do it if you want me to.") (DX 218); Marino 2009 Dep. 107:6-11 (Q: "And you've done no literature review or studies or scientific calculations to support a – a conclusion that waves in the Inner Harbor Navigation Canal operated with a predominant force or direction counter to the prevailing wind; is that correct?"  A:  "That is correct.") (DX 221).

**E.**     **Summary of Evidence Regarding Possible Barge Movements**

181.  Dr. Charles Cushing, a naval architect and marine engineer, was the principal defense expert regarding the potential movements of the barge ING 4727.  Dr. Cushing is an adviser to the United States Government on maritime matters, serving as a member of the Marine Board, a part of the National Academy of Sciences; the Naval Studies Board, established by the U.S. Navy; and the National Academy of Engineering.  Cushing Tr. 2031:9-22.  An expert in forensic marine casualty reconstruction, Dr. Cushing has participated in major marine investigations such as reconstructing the track of the EXXON VALDEZ in Alaska and analyzing the sinking of the PRESTIGE on behalf of the Spanish Government.  Cushing Tr. 2031:23-2033:13.  Dr. Cushing is not a "hired gun"; only fifteen to twenty percent of his work is as an expert in litigation.  Cushing Tr. 204:3-6.

182.  Dr. Cushing testified that the wind would not have permitted the barge to be present at the site of either breach before the time that it occurred.  Cushing 2045:22-2047:8 (North Breach); Cushing Tr. 2051:12-2052:10 (South Breach).  For the reasons described in paragraphs 90 to 167 above, overwhelming evidence supports Dr. Cushing's testimony and amply demonstrates that the direction of the prevailing wind – the predominant force acting on the barge – was, at all relevant

times, blowing away from the sites where the breaches formed on the eastern side of the Inner Harbor Navigation Canal.

183. Dr. Cushing also testified that there was no force (such as current, tide, or waves) which could have overcome Hurricane Katrina's prevailing wind to deliver the barge to the North Breach or to the South Breach before the breach occurred. Cushing Tr. 2047:8-10 (North Breach); Cushing Tr. 2052:2-5 (South Breach). Again, the overwhelming evidence described in paragraphs 168 to 180 above supports Dr. Cushing's testimony and makes clear that none of these other forces could have caused the barge to be present at the site of either of the breaches before the breaches occurred.

184. For these reasons, the evidence establishes that, as Dr. Cushing testified, it is simply not possible for the barge to have been present at the site of the breaches when the breaches occurred. Cushing Tr. 2038:21-2039:2.

185. Not only did Dr. Cushing establish that the barge could not have been present when the breaches occurred, but he also gave compelling testimony, consistent with the meteorological evidence and physical evidence alike, providing the most plausible explanation of how and when the barge ING 4727 crossed the IHNC, after the breaches had already formed. As shown by Dr. Cushing's testimony and in an animation presented by him, the evidence shows that the barge crossed the canal some time between 9:00 a.m. and 10:00 a.m. CDT on August 29, when (a) the wind was blowing in a direction that could have conveyed the barge from west to east; (b) the prevailing wind combined with the current flowing through the South Breach created conditions under which the barge could travel across the canal to the partially enter the neighborhood and contact the wall at the extreme southern end of the South Breach; and (c) the water level in the canal was at the appropriate level (approximately 12 feet NAVD-88) to permit the barge to come into contact with the concrete cap of the floodwall at this location, creating the shearing and bent rebar condition observed at that particular location after the storm. Cushing Tr. 2117:10-18, 2128:4-2130:4, 2131:22-2138:8 (narrating animation (DX 349)), 2170:2-8, 2212:4-2213:12.

186. Dr. Bea similarly concluded that the barge passed through the South Breach at around 10:00 a.m., after the breach had already fully formed, when the water level in the IHNC was around 12 feet NAVD-88, and the wind had shifted to a northwesterly direction, reinforcing Dr. Cushing's conclusion. Bea Tr. 2619:3-2620:8.

### F.     Plaintiffs' Failure to Present Any Plausible Theory of Barge Movement

187. Plaintiffs provided no meteorological data or analysis or scientific evidence to support any contrary theory regarding the direction of the prevailing wind or how the barge could have moved in a direction counter to the prevailing wind. Nor did plaintiffs present any data, analysis, or scientific evidence to support a theory that anything other than the prevailing wind was responsible for the movement of the

barge. To the contrary, plaintiffs' experts freely conceded that they had no idea how the barge could have moved as they contended it did.

188.    Mr. Pazos, plaintiffs' naval architecture expert, repeatedly testified that he could not say how the barge moved from one location to another, even though that was supposedly an area within his expertise. Pazos Tr. 843:3-4 ("I cannot show you the trajectory because I don't know the trajectory."); Pazos Tr. 847:11-13 ("I know that the barge moved from the west side of the canal to the east side of the canal. I don't know when and how."); Pazos Tr. 851:18-20 (regarding barge transport from the mooring buoy to the North Breach: "What I have is not very solid. It's a remote possibility that, with variable winds that always exist, it could have traveled. Although, it's not the most possible answer."); Pazos Tr. 855:7-20 (no explanation for barge transport from terminal to the mooring buoy and from mooring buoy to North breach, "except for the possible local winds" "I'm saying there is a possibility."); Pazos Tr. 870:13-14 ("I don't know the trajectory of the barge"); Pazos Tr. 897:3-23 (regarding movement from North Breach to South Breach: "I don't know the trajectory. I know the barge was there and after the point of contacts are going south"); Cushing Report at 129-30, 146 (review of Pazos and Marino reports) (DX 196).

189.    Mr. Pazos further conceded he did not consult meteorological data in forming his opinions regarding barge movement, despite the obvious importance of such data to the issue of the forces acting on the barge. Pazos Tr. 870:15-871:1 (inferring a northwest wind from the testimony of Mr. Villavasso that the door blew off its hinge but indicating he did not "do anything review any documentation of any type to corroborate [Mr. Villavasso's] observation or [Mr. Pazos'] interpretation of [the] observation that there were" northwest winds at the North Breach); Pazos Tr. 878:23-879:2 (agreeing that Mr. Villavasso's testimony "is the only solid statement I have for wind direction"); Pazos Tr. 895:22-25 ("Well, I don't know for sure of the location of the barge in the canal, and I don't know exactly what propelled it. All I said, there is a possibility that the barge was moved by winds."); Pazos Tr. 896:12-23 (inferring from Mr. Villavasso's testimony that the barge "[w]as there, but I don't know from what direction was coming" and "[t]he only information I have on local winds is the damage of the doors when he opened the doors"); Pazos Dep. 129:17-21 ("I review some meteorologic data, but I didn't either memorize the source or cover it recent to analyze it.") (DX 218); Pazos Dep. 130:19-22 (Q: "You haven't cited a single piece of data about turbulence at this location in your report, have you?" A: "Because I'm not interested.") (DX 218); Pazos Dep. 131:8-16 ("Don't need any meteorologic data") (DX 218); Pazos Dep. 132:19-25 (asked whether he had reviewed meteorologic data showing a south-to-north wind direction, Pazos responds, "I do not remember because I didn't concentrate in this activity") (DX 218); Pazos Dep. 150:25-151:4 (asked whether he had an opinion about the prevailing direction of the wind at the time the barge supposedly contacted the wall at the site of the north breach, Pazos responds, "[a]bsolutely no") (DX 218). To the extent that Mr. Pazos purported to identify supporting data for his opinions about barge

movement, it was done solely by working backward from lay testimony (*e.g.*, the "large wave" observed by Mr. Villavasso).  Pazos Tr. 833:22-834:3, 835:8-10.

190.    The testimony of Mr. Pazos concerning the supposed movement of the barge from one place to another, or its supposed presence at the site of either breach, consists of nothing more than speculation and unscientific parroting of lay testimony, coupled with unwarranted inferences drawn therefrom.  Mr. Pazos' testimony on this subject is not credible, not reliable, and not acceptable.

191.    Plaintiffs' expert Dr. Marino offered no competent testimony that could support any conclusions about the movement of the barge from one place to another, or that could support plaintiffs' claim that the barge was present at the site of either breach.  Dr. Marino admitted that he had no qualifications to opine about how the barge moved from one place to another.  Marino Tr. 1334:5-23 ("I would not be the one to be able to tell you how the barge would route from one location to the other").  Dr. Marino further admitted that he had no explanation for how the barge could have traveled in a direction opposite that of the prevailing wind, or moved from one place to another, despite giving opinions regarding the supposed effects of a barge impact with the wall caused by environmental forces such as wind. Marino 2009 Dep. 76:16-20 (admitting that at the time of the North Breach, the barge would have had to be going in a direction "other than the direction of the wind") (DX 221); Marino 2008 Dep. 147:25-148:4 (Q: "You didn't consider wind in connection with the north breach because the wind wasn't blowing in the direction of the wall at that time, right?"  A: "Right.") (DX 225); Marino 2009 Dep. 105:17-107:5 (admitting he does not know how the barge got to the North Breach and has done no studies or calculations or literature review to shed light on how it got there) (DX 221); Marino 2009 Dep. 142:10-13 (Q:  "So again, as with the north breach, you can't explain how or why the barge got from one place to the next?"  A:  "That's correct.") (DX 221).

192.    In short, there was a complete absence of plausible evidence from the plaintiffs to show how the barge could have moved from place to place to cause the breaches, as plaintiffs contend that it did.  The absence of such evidence, along with the overwhelming evidence showing that the barge ***could not have*** traveled to or been present at the sites of the breaches as described above, compels a finding that the barge was not present at the site of either breach and did not cause either of the floodwall breaches.

### G.    Lay Witness Accounts – Failure to Establish Causation by Barge

193.    Civil twilight was at 6:11 a.m. and sunrise was at 6:36 a.m. on the morning of August 29, 2005.  LNA Undisputed Fact 31; Cushing Report at I-3 (citing U.S. Naval Observatory data) (DX 196); Pazos Dep. 142:15-18 (accepting U.S. Naval Observatory as an authoritative source insofar as the time of civil twilight and sunrise) (DX 218).  Most of the witness accounts relied upon by the plaintiffs related to events that occurred before civil twilight and/or before sunrise.

194.   Witness reports regarding events that occurred in the midst of a hurricane, and in dark and/or rainy conditions, are subject to significant uncertainty.  Doc. 19693, at 4 (plaintiffs' statement that witness accounts as to the time of events are unreliable due to "the virtually universal confusion and varying perceptions of time among those in mortal danger during these events"); Bea Report at 62-63 & App. D at 24 (noting poor visibility, acoustic conditions, and stress) (DX 206); Marino Tr. 1315:4-7, 1316:22-24, 1317:3-6 (witness reports must be evaluated against known facts and cannot be accepted uncritically); Marino 2009 Dep. 24:2-22 (witness reports about time are "obviously off" and accounts should not be accepted "as gospel") (DX 221); Spinks 2009 Dep. 84:3-10 (Q: "Do you agree under the stress of the moment and in mortal danger almost all witnesses will recollect different times?"  A: "I think I mentioned previously that it's not uncommon to have differences in the eye witness accounts during a storm event.") (DX 222).

   **i.      Alleged eyewitness accounts**

195.   Plaintiffs presented testimony from four witnesses who plaintiffs claim witnessed the barge breach the IHNC floodwall:  William Villavasso, Terry Adams, Sidney Williams, and Arthur Murph.  Doc. 19644 at 13-16 (¶¶ 55-56, 63-64).  However, none of these witnesses testified unequivocally to having witnessed the ING 4727 strike or breach the IHNC floodwall.

   ***a.      William Villavasso***

196.   The account of William Villavasso does not establish that the ING 4727 was present at the site of the North Breach when the breach occurred.  Mr. Villavasso, who is deceased, testified by video deposition (DX 308), excerpted portions of which were reviewed by the Court at trial.  Villavasso Tr: 595:5-662:22.

197.   Mr. Villavasso was an employee stationed at Pump Station No. 5 in the Lower Ninth Ward near the Florida Avenue Bridge.  Villavasso Dep. 31:7-12 (DX 308).  He testified that from a porch at the Pump Station, he heard an explosion ("boom") and saw "[a] couple of sections" of the wall "tumble over," then saw "what appear[ed] to be [a] metal structure like a barge, only the tip of it."  Villavasso Dep. 64:4-24.

198.   Mr. Villavasso admitted that he was not wearing glasses when he made that observation and that he "see[s] long distance fuzzy."  Villavasso Dep. 211:2-19 (DX 308).  He acknowledged that he did not have "a clear focused picture."  Villavasso Dep. 66:9 (DX 308).

199.   Mr. Villavasso testified that it was "still dark" and that in order to try to make out what the object was, he was "squinting [his] eyes because it's raining too."  Villavasso Dep. 64:16-19; 140:9-19 ("It stayed dark through the entire time."); 181:4-25 (street lights ceased operating "[b]efore the wall broke," and there were no lights illuminating the area of the floodwall); 202:24-203:1 ("It was raining

and it was dark, the wind was blowing like hell.  That's all I could see.") (DX 308).  See also Rainey Dep. 54:24-55:8 (co-worker at Pump Station testified that there were no lights illuminating the IHNC floodwall area; it was "dark") (DX 284); Marino 2009 Dep. 121:6-11 (admitting Villavasso's vision was "obscured by rain and darkness") (DX 221).

200.   Mr. Villavasso said repeatedly that he saw only the "tip" of an object.  Villavasso Dep. 81:12-20 (saw "the tip," and "not much" of the object); 85:5-6 ("[a]ll I could see was the top part of the tip of it"); 86:4-5 ("I couldn't see that much of it."); 89:8-9 ("I could say maybe see a foot of this object"); 89:17-18 ("I could only see a tip of it at the top"); 97:8-9 ("I seen the tip of it.  That's all I seen."); 97:14-15 ("I seen the tip of it, and that was it."); 98:16 ("I only seen the tip of it.") (DX 308).

201.   When shown a picture of the ING 4727 and asked "[d]id it look anything like that?," Mr. Villavasso responded:  "*I really couldn't tell*."  Villavasso Dep. 65:1-2, 66:5-6 (emphasis added) & Dep. Exh. 4 (DX 308).  Mr. Villavasso further admitted that he "couldn't tell what it was" that he saw:  he could not tell the color of the object; could not see any writings on the object; could not see the name of a company on the object; could not tell whether it was a tank or hopper barge; could not tell whether it was an open barge; could not tell how big, long, or wide it was; and could not identify any other features on the object.  Villavasso Dep. 203:8-204:18 (DX 308).  In sum, Mr. Villavasso did *not* identify the object he saw as the ING 4727.

202.   Taken at face value, Mr. Villavasso's testimony establishes that the object he believes he saw could not possibly have been the ING 4727.  Mr. Villavasso testified that the object he saw was sticking up only one to two feet above the top of the floodwall.  Villavasso Dep. 202:11-17 ("I seen the top part where it appears to be a piece of steel, what appeared to be a barge to me, and it was like from maybe a foot, foot and a half, two feet at the most.  I don't know.  But that's all I seen.") (DX 308).  But the ING 4727, had it been present, would have been sticking up thirteen to fifteen feet above the top of the floodwall, with a much more massive and obvious presence and appearance.  Marino Tr. 1325:10-13 (admitting that barge was sticking up above the top of the floodwall by at least 15 feet); Pazos Dep. 164:10-16 ("the top of the barge was above the top of the seawall probably fifteen, sixteen, seventeen feet") (DX 218); Pazos Dep. 183:18-25 (stating that "[a] barge is huge compared … with the wall" and agreeing it would have been "sticking up 16 feet above the wall") (DX 218); Cushing Tr. 2100:11-14; Cushing Report at 124-25 & Fig. 93 (barge would have been more than 13 feet higher than the wall top) (DX 196).  In short, had the ING 4727 been present, it would have appeared dramatically different from the object that Mr. Villavasso described.

203.   Dr. Bea showed photographic evidence of floating debris poking over the floodwall during Hurricane Gustav, even at water levels below the top of the floodwall, which suggests that other debris (smaller in size than the ING 4727)

could have accounted for what Mr. Villavasso believed he saw.  Bea Tr. 2688:24-2689:20 & Bea Slide RB-069 (DX 361)

204.    That Mr. Villavasso did not witness the ING 4727 strike the floodwall at the site of the North Breach is not a matter of credibility, but rather a conclusion drawn from his testimony accepting everything he said as true and evaluating it in light of all of the evidence.  By the same token, the evidence established that Mr. Villavasso did not mention having seen an object strike the floodwall to any of his co-workers on duty with him during Hurricane Katrina.  Riess Tr. 2004:6-16; Rainey Dep. 7:24-8:3, 39:23-40:15, 44:20-45:2 (DX 284) (he was at the Pump Station during Katrina but Mr. Villavasso never told him that he had seen a barge or any other object hit the floodwall).  In fact, it was not until two years after the storm that Mr. Villavasso first gave this account.  Riess Tr. 2008:14-21; Heuerkamp Tr. 3068:12-15, 3069:2-3.  Indeed, IPET took a report from one or more pump station operators closer to the time of the hurricane, but no one said anything about a barge in that account.  DX 145 at IV-7-53; Marino Tr. 1320:18-1321:25.

### b.    Terry Adams

205.    The account of Terry Adams does not establish that the barge was present at the site of the South Breach when the breach occurred.

206.    Mr. Adams was alone on his roof (Adams Tr. 283:17-24) in hurricane rain and wind with no power in the neighborhood and claims to have seen an unidentified black object approach the floodwall over half a mile away, break the wall in the area of the South Breach, and travel into the neighborhood.

207.    Mr. Adams' home at 2604 Deslonde Street was over 2,950 feet from the site of the South Breach.  See LNA Undisputed Fact 30 ("The distance from 2604 Deslonde Street to the location of the South Breach is over 2950 feet."); Adams Tr. 280:6-14.

208.    Weather and visibility conditions were such that it would not have been possible for Mr. Adams to make observations of the South Breach site from his home.  At the time that Mr. Adams claims he saw all the way down to the South Breach area, visibility was poor:  power was out, it was still dark, it was raining hard, and there were hurricane-force winds.  Adams Tr. 253:3-5 (power out); 281:10-18 (dark); 256:19 ("it wasn't yet light"); 280:20-22 (raining hard); 282:9-15 (raining hard); 256:12-15 ("raining real hard"); 281:19-21 (hurricane wind conditions); 282:16-17 (windy); 256:12-15 ("wind blowing"); 259:22-23 ("The wind was pretty strong.").

209.    The photographs taken by IHNC lockmaster Michael O'Dowd confirm the very poor visibility in the area on the morning of August 29 during hurricane conditions.  Pictures taken by Mr. O'Dowd at 7:00 or 8:00 a.m. on August 29 show that the Claiborne Avenue bridge could barely be seen from the IHNC lock

at that time, even though the bridge was only 700-800 feet from the lock station. O'Dowd Tr. 2216:19-21, 2226:5-12, 2229:6-17; DX 35 at LNA001347 (photograph in the direction of the Claiborne Avenue bridge, with bridge barely visible).  In another photograph taken by Mr. O'Dowd, a building in the direction of the Claiborne Avenue bridge is quite blurry and obscured even though it was only 500 feet away.  O'Dowd Tr. 2223:12-2224:11; DX 35 at LNA001344.  Mr. O'Dowd stated that at the time he took the pictures, he could not see 2,950 feet ahead of him, or even half that distance.  O'Dowd Tr. 2226:13-17.  See also Cushing Report at 46, Fig. 28 (poor visibility even after sunrise) (DX 196).

210.    Several other individuals reported that during the morning of August 29, 2005, there was very limited visibility near the IHNC floodwall.  Berryhill Dep. 46:16-47:23 (when she got into a tree near her house at 6:00 a.m., for the next hour it was "just dark, period"; "you couldn't see nothing") (DX 317); Sutton Dep. 93:2-94:19, 112:7-113:18, 107:17-108:6 (went on roof near North Breach after 5:05 a.m., looked toward the levee across the street from his home, but could not see the levee because rain obstructed her view) (DX 307).

      a.    Plaintiffs claim (at PFF ¶ 138) that the testimony of Richard Riess shows that an observer could see the entire length of the floodwall.  But in the portion of the transcript that plaintiffs cite (Riess Tr. 2006:9-2007:1), Mr. Reiss was asked whether he could see the entire length of the floodwall on *Sunday*, which was a clear day.  Mr. Riess never testified he could see the entire floodwall down to Claiborne Avenue in the middle of the hurricane.

211.    Even assuming it were possible to perceive anything occurring over half a mile away in the midst of hurricane rain and wind in the predawn darkness, Mr. Adams' identification of the object he saw was equivocal at best.  Mr. Adams admitted that he could not identify the object as a barge.  Adams Tr. 284:6-7 (saw "four feet of an object [he] couldn't identify"), 288:8-10 ("I didn't know it was a barge").  Instead, he described it as a "big object."  Adams Tr. 261:24-25, 262:7. Even as the object supposedly crossed into the neighborhood, he was not able to get a better look at it and see what it was.  Adams Tr. 264:12-14.  Mr. Adams only inferred that the object was a barge when, several days after the incident, he saw the barge on television sitting in the neighborhood.  Adams Tr. 288:8-10, 294:1-20.

212.    Not only could Mr. Adams not identify the object he saw as a barge, but the object as described by Mr. Adams does not match the ING 4727.  To the contrary, the object that Mr. Adams described was sticking only four feet above the floodwall.  Adams Tr. 284:1-5, 284:13-17.  But the empty barge ING 4727 would have been sticking up fifteen or more feet above the floodwall.  Pazos Dep. 164 ("the top of the barge was above the top of the seawall probably fifteen, sixteen, seventeen feet") (DX 218).  See also above ¶ 202.  Moreover, Mr. Adams testified that the object he saw was black.  Adams Tr. 284:18-19, 264:9, 284:12.  But the ING 4727 was orange and red in color.  LNA 10210, 10211 (DX 100).

213. The physical evidence confirms that the ING 4727 cannot have been the object Mr. Adams described in his testimony. According to Mr. Adams, the object entered the Lower Ninth Ward along with a "rush of water" that he described as a "tsunami" which "took that object, houses, telephone poles, [and] everything in its way." Adams Tr. 285:9-22; see also Adams Tr. 262:21-24 ("tidal wave"), 264:20-265:4 ("ferocious" rush of water). The barge ING 4727, had it been present, would have been carried deep into the neighborhood by such a powerful rush of waters. The physical evidence, however, establishes that this did not occur. Cushing Tr. 2102:10-25 (barge did not enter neighborhood with initial rush of water).

214. The foregoing conclusions regarding Mr. Adams' testimony are not based on credibility, but rather are compelled by the equivocal nature of his testimony coupled with the overwhelming evidence that the barge was not and could not have been present. Nevertheless, there are significant credibility concerns with Mr. Adams' account. Mr. Adams is a convicted felon with a financial stake in the outcome of the barge litigation. Adams Tr. 292:16-19 (served five years in prison for felony conviction); 276:21-24, 277:19-21 (he is a plaintiff in the barge litigation, and prepared his trial testimony with plaintiffs' counsel). Moreover, and more important, Mr. Adams changed his testimony between his deposition and the trial. In particular, Mr. Adams testified at trial that the object was "easing down the wall, just bumping into the wall" (Adams Tr. 261:24-25, 264:15-19), in contrast to his deposition, where he testified that "[w]hen I looked towards the Claiborne bridge, I could see something coming toward the levee, toward the wall" (Adams Tr. 287:9-12), without ever saying that he saw an object scraping the wall or bumping up against the wall. Adams Tr. 290:18-22, 291:14-15. Dr. Marino acknowledged the inconsistency of Mr. Adams' deposition testimony of "one collision" versus his trial account of multiple impacts. Marino Tr. 1333:2-25.

### c. Sidney Williams

215. The account of Sidney Williams, introduced by deposition rather than live testimony despite the fact that Mr. Williams had previously traveled to New Orleans to testify at his deposition, does not establish that the barge was present at the site of the South Breach when the breach occurred.

216. At his deposition, Mr. Williams claimed to have seen the barge hit the IHNC floodwall immediately before flooding began. Williams Feb. 2008 Dep. 50:16-51:24 (DX 309). However, Mr. Williams admitted that at the time he went onto his roof and allegedly saw the barge, it was raining, windy, and the lights were out in the Lower Ninth Ward. Williams Feb. 2008 Dep. 72:14-21;75:7-17 (DX 309).

217. Mr. Williams testified that he could not tell whether the barge was full or empty, even though he knows they look different in the water. Williams Feb. 2008 Dep. 17:4-12, 51:25-52:2, 52:8-11 (DX 309). He also testified that he could see only the "top" of the barge and the covers, and that everything else was below the level

of the floodwall.  Williams Oct. 2008 Dep. 48:4-17 (DX 310).  But the ING 4727 would have been sticking up thirteen to fifteen feet above the top of the floodwall.  See above ¶ 202.

218.   If Mr. Williams' account of barge impact were true, the barge should have been pushed deep into neighborhood by inrushing waters, or grounded upon striking the land side of the unflooded neighborhood.  The physical evidence, however, establishes that this did not occur.  Cushing Tr. 2124:6-16.

219.   For the reasons stated in the foregoing paragraphs, even if Mr. Williams' account is taken at face value and without assessing his credibility, his account does not establish that the object he professes to have seen was the ING 4727.  Moreover, Mr. Williams' deposition testimony is totally lacking in credibility in light of prior inconsistent statements made by him regarding what he witnessed during Hurricane Katrina.  In particular, Mr. Williams gave an interview months after the storm in which he told an investigator that he did ***not*** see the barge and avowed that the barge did ***not*** cause the breach.  Williams Oct. 2008 Dep. 32:2-14, 37:4-38:2 (recognizes voice on audio recording by investigators) (DX 310); Williams Oct. 2008 Dep. Exh. 3 at 23 (first time he saw the barge "it was over the wall, you know.  We didn't know it had done broke the wall.  That's what they said, you know.  It didn't, to me (laughing), it sounded more like they blew the wall."), 24 ("[W]e was out there thinking that they had blew that damn thing.  That's what it sounded like more to me.  It really didn't sound like a barge to me."), 27 (saw barge for first time several hours after he made it to his roof), 28 (he did not see the barge until it was already on Jourdan Avenue; "We didn't even see a barge period during, knowing that they had the storm.  We didn't even see a barge."), 29 ("that barge did not break that wall"), 32 ("That barge didn't break that wall, man, they blowed that wall."), 40-41 (when he first saw the barge it was sitting on Jourdan Avenue) (DX 310).

   a.   As confirmation that even plaintiffs do not credit the account from Mr. Williams' deposition, they do not even mention Mr. Williams in their proposed findings of fact (Doc. 20019).

220.   At trial, plaintiffs' own causation expert, Dr. Marino, discounted the credibility of Mr. Williams' deposition testimony based on the unequivocal statements in the recorded interview that he did not see the barge strike or breach the floodwall.  Dr. Marino testified that he credited the transcript of Mr. Williams' statement more than his deposition testimony because "the transcript, it was, in my mind, more of an impromptu interview.  In his deposition, he was saying that the barge hit the wall, and it wasn't consistent with his transcript where he was specifically asked about that, had he seen the barge prior to the failure.  So I discounted the – that part of his deposition information."  Marino Tr. 1315:8-18.

221.   Mr. Williams has a financial stake in the outcome of the barge litigation and is represented by the same counsel who represented the plaintiffs at trial.  Williams Feb. 2008 Dep. 11:3-11 (Williams is represented by plaintiffs' counsel in this

case) (DX 309).  In light of this relationship, his failure to appear to testify live at trial is telling, and raises the inference that his appearance at trial would have further undermined his credibility.

### d.     Arthur Murph

222.   The account of Arthur Murph does not establish that the barge was present at the site of the South Breach when the breach occurred.

223.   Mr. Murph has **never** testified that he saw the barge make contact with the IHNC floodwall.  In fact, plaintiffs' counsel never even asked him at trial whether he saw the barge make contact with the floodwall.  See Murph Tr. 718:22-23 (the Court: "Well, I understand he did not see the barge burst or impair the levee").

   a.     Plaintiffs' assertion (at PFF ¶ 109) that "Arthur Murph both rendered a statement and testified, that he witnessed the Barge impact and penetrate the floodwall at the location of the Southern breach" is thus blatantly false.

224.   Mr. Murph did not observe the barge until long after the floodwall breach had already occurred.  Mr. Murph testified that at the time he first saw the barge, from the vantage point of his roof, the water was already "as high as the gutter" on his home.  Murph Tr. 700:7-9.

225.   It is clear from Mr. Murph's testimony that the breach in the floodwall occurred long before Mr. Murph first encountered the barge.  Mr. Murph described a lengthy series of events which, according to him, took place on Sunday evening, August 28.  Murph Tr. 719:20-23.  He testified that he went outside to hook up a generator after the lights went out, at which time he "heard some strange noises." Murph Tr. 692:8-693:2.  At that point or shortly after, Mr. Murph saw water coming "rushing down the street" moving "real fast," at which time he ran back inside his home in a "panic," without discovering the source of the sounds. Murph Tr. 693:24-696:21.  Once inside his home, Mr. Murph sat down on the sofa.  Murph Tr. 696:22-23.  Later, after the water had risen to the top of the windows and doors in his home, Mr. Murph went up into the attic and cut a hole in the roof with an axe.  Murph Tr. 697:23-698:1.  Following that, Mr. Murph went back downstairs and sat in the den drinking beers for a period of time, until the water had risen so high that it burst open his back door.  Murph Tr. 702:8-21. Only then did Mr. Murph return to the attic and then climb out onto his roof, and only after he was on his roof did he see the barge for the first time.  Murph Tr. 701:13-24.

226.   The lengthy sequence of events that occurred between when Mr. Murph heard sounds and when he first observed the barge is largely consistent with the account that Mr. Murph gave at his deposition.  Murph Dep. 190:3-5, 191:19-20 (heard "boom" sound); 47:3-9, 12-13, 48:20-49:1 (went outside and saw water coming down the street from the north); 51:4-9 (went to garage and got an ax); 51:25-52:3 (chopped hole in roof); 59:25-60:9; 61:11-13; 62:15-17 (saw barge) (PX 432).

That sequence of events is also generally consistent with the account that Mr. Murph gave to attorney Richard Guidry.  PX 264 at 12:23-14:6.

227.   Mr. Murph's testimony at trial was also consistent with his deposition testimony and recorded statement that he did not see the barge until *after* it had passed through the floodwall and was already in the neighborhood.  At his deposition, Mr. Murph testified that he first saw the barge when it was already on his house.  Murph Dep. 59:25-60:9, 61:11-13, 62:15-17 (PX 432).  And during the secretly-record interview of Mr. Murph by attorney Richard Guidry, Mr. Murph stated: "When I peeked up through the roof I saw this barge, and it had been through the levee then."  PX 264 at 39:6-8.  Although there were other aspects of his account where his trial testimony did not match his deposition and/or recorded statement (*e.g.*, whether the sound he heard was a "boom" (compare Murph Tr. 695:9-12 with Murph Tr. 713:20)), any such inconsistencies were inconsequential and certainly would not support a different version of the critical events.

228.   At trial, Mr. Murph explained that he had told attorney Guidry that he thought that it "sounded like" the barge had broken the floodwall (rather than based on anything he had seen).  Murph Tr. 718:15-16.  But, Mr. Murph did not offer any such speculation in his trial testimony.  In any event, Mr. Murph's prior speculation about the meaning of sounds he heard does *not* suggest or imply that the barge was present when the flooding began.  To the contrary, the fact that Mr. Murph did not encounter the barge until the water was already at the level of his gutter, despite the fact that his residence was immediately adjacent to the southern end of the South Breach, strongly implies that the sounds he heard were *not* caused by the barge.

229.   There is no basis for plaintiffs to contend that Mr. Murph's testimony at trial was the product of undue influence by LNA.  As noted above, the fundamentals of his testimony were consistent with the recorded statement that he gave to his own lawyer in terms of the sequence of events and the time he first observed the barge.  Thus, LNA's settlement with Mr. Murph – on whose house the barge landed – is irrelevant.  Moreover, LNA had no contact with Mr. Murph after he settled his claim, and Mr. Murph was represented by his own counsel at his deposition.  Murph Dep. 268:9-14 (PX 432); Murph Tr. 734:7-13.  Mr. Murph understood at all times that even though he settled his claim against LNA, he was free to tell the truth about his observations during Hurricane Katrina.  Murph Dep. 240:6-9, 240:12-17, 241:21-24 (PX 432); Murph Tr. 724:9-21 (LNA did not tell him what to say in this case; the confidentiality provisions in the settlement agreement do not affect his ability to testify); see also Murph Tr. 681:9-22 (Murph did not participate in pre-settlement communications, which were handled by his wife).

### ii.   Accounts of "boom witnesses"

230.   The plaintiffs have pointed to witness testimony regarding "boom" sounds heard by witnesses at or around the time of the IHNC floodwall breaches.  Although some witnesses described the sounds they heard in various ways, the

overwhelming preponderance of the descriptions clustered around the word
"boom" to describe the sound heard by these individuals.  Doc. 19352, Plaintiffs'
Compendium No. 3; Marino Report Table 3.1 (PX 392); Marino Tr. 1302:21 -
1303:14.

231.    However, the evidence also showed that numerous witnesses heard similar
"boom" sounds in vicinity of other breaches where no barge was present.  Marino
Tr. 1303:24-1305:8 (referring to IPET Report Vol. IV at IV-7-27, IV-7-3, IV-7-
21, IV-7-37 (DX 145)).

232.    For instance, similar sounds were reported by numerous witnesses near the
London Avenue canal.  Aguillard Dep. 7:14-19, 11:7:12:10, 13:25-14:3, 17:18-22
(heard a "muffled boom" sound and had water in his house 30-40 minutes later)
(DX 325); Blackwell Dep. 10:11-11:7, 13:14-15, 14:13-15, 16:21-24 (heard a
"big bam" and had water rising in her house twenty minutes later) (DX 326); G.
Campbell Dep. 9:2-12, 13:14:17, 17:17-20, 32:7-10 (heard "a bang or a boom," a
"heavy explosion tone" and saw water coming down the street 30 seconds later)
(DX 327); J. Campbell Dep. 10:1-4, 11:15-23, 24:18-25:8 (heard "this big old
sound like something just blowing up or something" and then "[y]ou could just
see the water just coming, nonstop, just flowing") (DX 269); G. Cross Dep. 10:4-
10, 16:14-18:6 (heard what "sounded like an explosion, boom" and then "saw
water coming down the street") (DX 271); Davis Dep. 25:1-12, 29:17-30:4 (heard
"boom" sound and had water in her house within a half hour) (DX 323); Foley
Dep. 11:5-11, 12:18-13:8, 13:13-16, 20:1-21:13 (heard "explosion" that "shook
the house" and had three feet of water at his house a half hour later ) (DX 273);
Hunter Dep. 12:22-23, 17:20-21, 20:16-21:5 (heard "four consecutive explosions"
that sounded "like something was getting blown up," and then "[o]nce we heard
the booms, the water just never stopped rising") (DX 276); Lee Dep. 17:17-18:5
(he got to the London Avenue canal "and all of sudden it was just this big old
blast, you know, 'boom'" and the water started to rise "within seconds") (DX
279); H. McNeal Dep. 16:6-9, 17:8-13 (heard "boom" and then water arrived at
her home about half hour later) (DX 281); R. McNeal Dep. 10:15-23, 12:14-13:5,
16:18-20 (heard a "sonic boom" "from towards the levee" and had water in his
house within an hour or so) (DX 282); McRoyal Dep. 9:17-20. 10:1-20, 15:2-3,
18:5-7, 20:5-9 (heard "boom" that sounded "like something blew up" and then
water arrived) (DX 322); Price Dep. 9:9-12, 17:21-18:5, 18:10-12 (heard a
"boom" and then water started to rise) (DX 321); Watson Dep. 11:13-18, 17:5-12,
25:10-17, 26:22-25 (heard "a big, loud explosion," a "boom" that "shook the
house" and then more water came to her house that "just started just tearing up
everything, moving stuff") (DX 288).

233.    Similarly, "boom"-like sounds were also reported by witnesses near the 17th
Street canal.  Lentz Dep. 8:13-20, 19:6-20:1, 20:7-21:4, 21:11-16, 24:4-6, 51:15-
25, 56:25-57:4 (heard "boom" just before water "rose pretty rapidly", inferred
sound was made by levee breaking) (DX 324); Best Dep. 9:14-15, 15:1-8, 16:9-
15, 17:11-17, 34:16-18, 38:6-10, 39:14-22, 43:10-19 (heard "loud double

explosion" from the direction of the levee and then water arrived at his home 15-30 minutes later) (DX 268).

234.   Expert testimony showed that floodwalls are made with concrete, and that when concrete breaks, as occurred in floodwall breaches, it makes a loud sound in the nature of a "boom."  Weiss Tr. 2832:17-20, 2832:25-2833:8, 2835:21-2836:5, 2837:1-9; Weiss Report at 4-5 (DX 213); Marino Tr. 1385:3-8 ("there's no doubt that the shattering of this concrete would create a 'boom'"); Bartlett Dep. 39-40 (DX 219).  No barge impact was necessary to create such a sound at the IHNC.  Weiss Tr. 2837:11-2838:7.

235.   There is no basis to infer that evidence of boom or other sounds represents the impact of a barge, as opposed to the breaking concrete associated with the breach(es) themselves.  Weiss Tr. 2837:24-2838:7, 2838:17-25, 2850:16-19; Weiss Report at 4-5 (DX 213).  Dr. Marino too acknowledged that boom sounds can be associated with breaches and have nothing to do with a barge.  Marino Tr. 1306:22-1307:1.  There is no evidence that any other sounds supposedly heard by witnesses in the area near the IHNC had anything to do with a barge.

**iii.    Alleged presence of barge in IHNC on Sunday, August 28**

236.   Plaintiffs offered two individuals – Gertrude LeBlanc and Frazier Tompkins – who claimed that on August 28, 2005, they crossed the Claiborne Avenue bridge and saw a barge in the Industrial Canal.  Ms. LeBlanc, a long-time glaucoma sufferer, claimed to have seen a barge in the canal when she crossed the Claiborne Avenue bridge between 11:00 a.m. and noon on August 28.  LeBlanc Tr. 369:3-5, 370:4-6, 379:13-17, 379:25-380:4, 380:19:22, 381:8-9.  Mr. Tompkins claimed to have seen a barge shortly after 10:20 that morning (Tompkins Tr. 394:3-11) and that the barge was still in the canal at 4:00 p.m. that day (Tompkins Tr. 408:3-13).  Both of these witnesses admitted that their view of the canal from the bridge lasted no more than a few seconds.  LeBlanc Tr. 381:8-9 ("a couple of seconds"); Tompkins Tr. 404:11-13 ("a few seconds").

237.   The fleeting glimpses attested to by Mr. Tompkins and Ms. LeBlanc are insufficient to establish that the Barge ING 4727 broke away from its moorings, against all of the evidence, on a calm Sunday when there was no wind or other force capable of causing the mooring ropes on the barge to melt, fuse and break in the manner that they did.  See above ¶¶ 78-87; Skaer Tr. 2524:22-25 (ropes melted and fused); Green Tr. 541:18-23 (barge required 36 mph wind to break free); LeBlanc Tr. 380:5-10 (weather on Sunday was "nice" and "pleasant" and "not windy"); Tompkins Tr. 404:5-7 ("nice" weather); Cushing Report at B-10 (lockmaster record – no wind of 36 mph on Sunday) (DX 196); Marino Report at 311 (Lakefront Airport data – same) (PX 397).

### a.      Testimony that no barge was present in the IHNC on Sunday

238.   Numerous other witnesses testified, based on observations from superior vantage points and with more time to observe conditions in the IHNC, that there was no barge free in the canal on Sunday, August 28, including at times *after* those reported by Ms. LeBlanc and Mr. Tompkins.

239.   On August 28, 2005, Captain James Hall was working for Stagg Marine as the captain of a tug.  Hall Tr. 1938:11-19.  On the tug there was a radar with a range of 48 miles that was capable of detecting the presence of barges.  Hall Tr. 1939:24-1940:2, 1940:10-14, 1940:24-1941:1.  At approximately 6:00 p.m. on August 28, Captain Hall's tug approached the Florida Avenue bridge.  Hall Tr. 1946:13-20, 1950:16-18.  At the time, it was "pretty clear" and visibility was "several miles."  Hall Tr. 1948:15-18.  He stayed in the area for approximately 45 minutes.  Hall Tr. 1948:9-10.  From his location just north of the Florida Avenue bridge, Captain Hall could see the mooring buoys in the Industrial Canal, and both the Claiborne Avenue bridge and the St. Claude Avenue bridge.  Hall Tr. 1948:11-14, 1949:9-10.  He used binoculars to "get a clear image of the whole area."  Hall Tr. at 1949:11-18.  While there, he never saw a loose barge in any direction or, in particular, near the Claiborne Avenue bridge at the mooring buoys.  Hall Tr. 1949:19-1950:2, 1982:22-24.  A loose barge never appeared on his radar screen.  Hall Tr. 1950:3-4, 1993:8-20.  Nor did he ever receive a radio report of a loose barge in the Industrial Canal.  Hall Tr. 1950:16-1951:6.

240.   IHNC Lockmaster Michael O'Dowd arrived at the lock at around noon on August 28 and remained there with his family until after Hurricane Katrina passed.  O'Dowd Tr. 2217:13-16, 2218:4-11.  The weather was good that day, and visibility was "clear."  O'Dowd Tr. 2217:17-21, 2221:14-15.  On August 28, Mr. O'Dowd was on the lock deck and could see the mooring buoys to the north of the Claiborne Avenue bridge on the east side of the IHNC.  O'Dowd Tr. 2221:16-18.  He saw no barges in the Canal any time that day, nor did he see any barges either loose near the eastern floodwall in the IHNC or tied to or near the mooring buoys.  O'Dowd Tr. 2222:1-13.  If there had been a loose barge, it would have been noted in the lock's records; but there no record of a loose barge on August 28.  O'Dowd Tr. 2222:21-23.  And even though the Coast Guard does not allow unattended barges in the Canal, Mr. O'Dowd did not receive a report from the Coast Guard of a loose barge in the Canal on August 28.  O'Dowd Tr. 2222:24-2223:4.

   a.      Plaintiffs assert (at PFF ¶ 132) that from his vantage point at the IHNC lock, Mr. O'Dowd could not see the area where Ms. LeBlanc and Mr. Tompkins claim to have seen the barge.  There is no evidence to support that argument.  In fact, the barge was 200 feet long and would clearly have been seen from the lock station on August 28 (a clear day) if it was in the canal.  See DX 35 at LNA 1358-59 (photos from IHNC lock looking toward Claiborne Ave. bridge).

59

241.    Ernest Edwards, aka "All Night Shorty," went to check the water levels in the IHNC six times between 8:00 p.m. on August 28 and 1:30 a.m. on August 29. Edwards Dep. 65:12-67:12 (DX 272).  At 1:30 a.m., he saw a barge *tied up* in the area where LNA's terminal is located.  *Id.* at 68:7-69:16, 111:13-112:14, 112:22-115:10 & Dep. Exhs. 9 and 10 (DX 272).  Mr. Edwards went to the Claiborne Avenue bridge at approximately 1:45 a.m. on August 29 and later observed water splashing over the levee, but he did not testify that there was a loose barge in the Canal that morning.  Edwards Dep. at 72:6-7, 77:9-79:19 (DX 272).

242.    Richard Riess was working at Pump Station No. 5 as a Pumping Plant Operator during Hurricane Katrina.  Riess Tr. 1996:20-1997:9, 1999:4-6.  When he arrived at the Pump Station at 6:30 a.m. on August 28, he did not see a loose barge in the IHNC.  Riess Tr. 1999:7-22.  Later, between midnight on Sunday, August 28 and 6:00 a.m. on Monday, August 29, he went onto a platform facing the IHNC every 20 minutes in order to check on the weather conditions.  Riess Tr. 1998:17-21, 2000:4-11.  At no time did he see a loose barge in the IHNC, near the Claiborne Avenue bridge at the mooring buoys or close to the Florida Avenue bridge.  Riess Tr. 2000:12-20, 2016:20-23.

243.    William Villavasso went on the porch at Pump Station No. 5 twenty times before he saw the wall collapse, but never saw a loose barge in the Canal.  Villavasso Dep. 183:1-5, 10-14, 185:13-18, 199:6-14 (DX 308).

244.    Plaintiff Jerry Alford testified that between 4:00 and 5:00 p.m. on August 28, she tried to cross the Claiborne Avenue bridge but could not do so because the police would not permit cars to cross the bridge.  Jerry Alford Tr. 196:7-21, 216:1-217:12.  Logically, had there been a loose barge in the Canal at the time, the police would have noted that fact in a police report and/or taken steps to have the barge removed or secured.  There is no evidence that the police ever saw a loose barge in the IHNC on August 28.

245.    Arthur Murph testified that he traveled across bridges over the Industrial Canal several times on August 28 to take his wife to a hotel and drop off his cars, but at no time did he see a barge in the Canal.  Murph Tr. 738:4-15.  He also walked to the eastern IHNC floodwall twice in order to check the height of the water, but did not see a barge in the Canal.  Murph Tr. 688:2-15, 738:16-22.

246.    Daniel Weber traveled from his home in the Lower Ninth Ward to the Superdome three times on August 28, and did not report having seen a barge in the Canal during any of those trips.  Weber Dep. 34:14-20, 74:1-7, 74:20-75:6 (DX 315). At approximately 2:00 a.m. on August 29, Mr. Weber drove to the levee near Florida Avenue to check the water levels in the Canal, but did not report seeing a barge at that time either.  Weber Dep. 84:17-24, 85:15-86:3 (DX 315).

247.    Andrew Sartin rode a bicycle to the Claiborne Avenue bridge on the evening of August 28.  There were a large number of people on the bridge at the time with their vehicles and belongings.  Sartin Dep. 36:15-38:14, 53:12-21 (DX 285).  He

testified that "[w]hen I looked off that bridge, all you see is water." He did not see the barge until "days later." Sartin Dep. 66:14-67:7 (DX 285).

> **b.** **Ambiguity as to identity of barge seen by Tompkins/LeBlanc**

248.    There is no evidence that the barge Ms. LeBlanc and Mr. Tompkins claim to have seen was the ING 4727. LeBlanc Tr. 378:9-10 ("there's plenty of barges that look like that"), 381:12-16 (she saw no numbers, markings, identification, or piping on the barge); Tompkins Tr. 405:2-4 (he "didn't pay any attention" to any numbers, markings, or identifications on the barge); 395:17-21, 396:5-7 (he doesn't remember "the shape or color" of the barge or whether it had covers). In fact, Mr. Tompkins testified that the barge that he saw was a grayish white color, which was not the color of the ING 4727. Tompkins Tr. 405:5-406:18. Mr. Tompkins agreed that the barge he saw "could have been anybody's barge." Tompkins Tr. 408:20-22.

249.    There is also no evidence that the barge Ms. LeBlanc and Mr. Tompkins claim to have seen in the Industrial Canal on August 28 was "loose." Both testified that they saw a barge near a mooring buoy at which each had previously seen other barges tied. LeBlanc Tr. 374:13-14 (barge "didn't appear to be moving"), 382:19-23, 383:10-14, 22-24 (barge was at mooring piling where barges go all the time); Tompkins Tr. 397:23-398:14 (barge was "near a buoy"), 406:19-23 (he has seen barges anchored at the mooring buoys before), 410:15-20 (he does not know whether the barge was tied to mooring column or just resting next to it). Neither witness was able to discount the possibility that the barge they professed to have seen at the location of this mooring buoy had been picked up later in the day. LeBlanc Tr. 384:21-23; Tompkins Tr. 407:25-408:2. Although there was testimony that the lock had been shut down as of Sunday morning, O'Dowd Tr. 2219:2-16, no records were introduced to rule out the possibility that a vessel might have retrieved a barge and passed into the MRGO through the Florida Avenue Bridge at some point on Sunday.

250.    The totality of the evidence does not support plaintiffs' contention that the ING 4727 was floating loose in the IHNC on Sunday morning, August 28. The weight of the eyewitness testimony, particularly from witnesses with vantage points and viewing opportunities superior to that of Mr. Tompkins and Ms. LeBlanc, was that there was no barge loose in the IHNC that day at all. Indeed Ms. LeBlanc also testified that "the water was halfway up [the] wall" on Sunday morning, LeBlanc Tr. 384:16, at a time when the hydrograph showed that the water had not risen more than a foot or two above its normal levels. IPET Report Vol. 5 Fig. 51 (hydrograph) (DX 145); Marino Tr. 1191:23-1192:7 & Marino Demonstratives Slide 116 (introducing hydrograph) (PX 437). But even if one accepts that Mr. Tompkins and Ms. LeBlanc saw a barge at the mooring buoy near the Claiborne Avenue Bridge on Sunday morning, August 28, the most plausible explanation, consistent with the testimony of other witnesses and the physical evidence about the circumstances under which the ING 4727 broke away, is that the barge that

they witnessed was not the ING 4727, and that it was removed at some point that day, presumably to the MRGO.

### c.    Lack of relevance to location of barge on Monday morning

251.    Finally, even if there were credible evidence that the ING 4727 had broken away and migrated to the area of the near the Claiborne Avenue bridge on Sunday, August 28, such evidence would not imply that the barge was present when either breach occurred. Certainly, neither Mr. Tompkins nor Ms. LeBlanc could testify as to the location of the barge at the time of the breaches. LeBlanc Tr. 384:17-23; Tompkins Tr. 407:25-408:2.

252.    Even if the barge had left the terminal area on Sunday, the winds acting on the barge would have been the same, and thus, if the barge became loose earlier, it would have been blown toward the west side of the canal. If it were already in the Canal, it would have been blown to the southwest corner of the IHNC, near the lock. Cushing Tr. 2045:2-15, 2051:5-11, 2068:13-2069:6; Dooley Tr. 1845:22-1846:4 (New Orleans experienced easterly-type winds on Sunday August 28th); O'Dowd Tr. 2227:11-12 (debris from storm accumulated in southwest corner of IHNC).

### iv.    Summary

253.    The accounts of the alleged eyewitnesses and other witnesses do not establish that the ING 4727 was present at the eastern IHNC floodwall before the breaches occurred. The accounts are equivocal and, taken on their own terms, do not show that the barge was present. To the extent the witnesses described seeing an object, that object was not the ING 4727, which (if present) would have been appeared dramatically different from the object the witnesses described. Conversely, it is possible that one or more witnesses observed floating debris in the water, other than a barge, which they incorrectly inferred was a barge when, after the storm, the barge was observed just inside the neighborhood on the protected side. Regardless, in light of the overwhelming scientific evidence that the barge could not have been present, not even the most favorable inference to be drawn from the eyewitness testimony would permit a finding that the barge was present when the breaches occurred.

254.    It also bears noting that there is no consistency between and among the accounts of the alleged eyewitnesses or between the witnesses' accounts and the scenarios proposed by plaintiffs' experts. For example, with respect to the North Breach, Mr. Villavasso testified that object "hit the wall" and then "instantaneously … the wall came down" (Villavasso Dep. 119:17-19 (DX 308)), whereas Mr. Adams testified that the floodwall at the North Breach "just kind of like laid down" without describing any impact at that location (Adams Tr. 282:18-283:10). The witness accounts of impact followed immediately by collapse are also inconsistent with the theory of plaintiffs' experts that repeated barge "contact" with the wall caused the formation of tension cracks or "gaps" that led to underseepage and

ultimately breaching some period of time after the contact took place. Pazos Tr. 837:19-23 (barge caused "underseepage and gradual failure" at the South Breach); Pazos Tr. 824:4-5 ("underseepage was an important explanation for the failure" at North Breach); Pazos Tr. 837:12-14 ("the seepage requires time for the hydrostatic pressure to put a range of soil away and create piping, that means the flow of water, under the protected side"); Marino 2009 Dep. 141:12-19 (DX 221); Pazos Dep. 202:15-203:7 (both describing multiple contacts) (DX 218). These inconsistencies undermine any attempt by the plaintiffs to create a coherent scenario or theory of the case.

## V.    HYPOTHETICAL BARGE IMPACT – IMPOSSIBILITY FOR BARGE TO HAVE CAUSED SHEET PILE FAILURE, EVEN IF IT HAD BEEN PRESENT

255.    Another independent basis for finding that the barge did not cause either of the breaches in the eastern IHNC floodwall is that even if the barge had been present (contrary to all of the evidence, as described above), the barge could not have caused the floodwall to fail in the manner that it did. The reason is that a barge impact, if it had occurred, would have caused only localized damage to the concrete cap of the floodwall, rather than dislodging or deflecting the steel sheet pile which anchored the floodwall in the soil. Localized damage to the cap would not cause the sheet pile and anchoring soil to fail, as occurred at both of the breaches in the eastern IHNC floodwall.

### A.    Floodwall Construction – Introduction

256.    The levee and floodwall structure protecting the Lower Ninth Ward extends along the eastern shore of the southern section of the IHNC and is part of the 320 miles of levees and floodwalls protecting the New Orleans and surrounding areas. The IHNC levee and floodwall extends from the Florida Avenue Bridge in the north to the N. Claiborne Avenue Bridge and the lock system to the south. It runs parallel to Jourdan Ave. in the Lower Ninth Ward. LNA Undisputed Fact 21; Cushing Report at 29 (DX 196).

257.    The levee system along the IHNC consisted of an earth embankment with a crest of approximately 7.5 feet according to the North American Vertical Datum of 1988 (NAVD-88) and side slopes of 2.4:1 and 2.8:1 on the land and water side, respectively. The elevation of the levee toe decreased toward Florida Avenue. LNA Undisputed Fact 22; Cushing Report at 29-30 (DX 196); Bakeer Tr. 2324:15-2325:15.

258.    The levees on the IHNC were topped by floodwalls ("I-Walls") comprised of a twenty-foot-long steel sheet pile driven into an earthen levee and subsoil to a depth of approximately seventeen feet and topped by a six-foot concrete panel sticking up out of the ground. The concrete was poured in two segments, the first encasing the top of the sheet pile (three feet), and the second extending three feet above. The upper "pour" consisted of three feet of concrete and reinforcing bar ("rebar") extending above the sheet pile. The floodwall had a horizontal

construction joint between the two "pours" of concrete.  Bartlett Tr. 312:13-314:1
(construction joint); Cushing Report at 29-30 & Fig. 21 (describing sheet pile I-
wall) (DX 196); Cushing Tr. 2071:13-2073:8 (referring to Cushing Slide CC-038
(DX 349)); Mosher Dep. 28:19-29:2 ("It was … what we called an I-wall, which
is essentially a sheet pile wall with a concrete header section sticking above the
ground") (DX 283); Marino 2009 Dep. 58:13-59:10 (floodwall had a six-foot
concrete monolith, with a construction joint three feet below the top of the
monolith) (DX 221); Pazos Report at 35-36 (floodwall "is a flexible cantilever (I
type) structure embedded in a soil of soft saturated clay"; sheetpile extends 5 feet
into the 8 foot wall) (PX 402); Marino Report Fig. 2.3 (dimensions of I-wall) (PX
397); Marino Report at 2-23 (describing two pours of concrete on monoliths) (PX
397); Bartlett Report App. A & B (schematic of floodwall and concrete cap) (PX
378).

259.    The concrete panels on the floodwall were approximately 30 feet long, with a
rubber water stop (or elastomer) placed in between the concrete panels to keep
water out.  Bartlett Tr. 314:2-17.  The water stops were placed vertically from the
top of the wall down to the top of the steel sheet pile curtain, a length of about
three and a half feet.  Marino Tr. 1357:5-20.

### B.    Sources of Stability – Soil and Sheet Pile, Not Concrete Cap

260.    The floodwall derived its strength from the steel sheet pile and the supporting
soils into which the sheet pile was embedded.  The floodwall is modeled
structurally as a cantilever in which one end (the top) is free to move and the other
(the buried sheet pile) is anchored against movement and rotation by the
surrounding soils in which it is embedded.  Thus, in order for the floodwall to fail,
it was necessary for the forces acting on the wall to overcome the support
provided by the soil to the embedded sheet pile.  Bakeer Report at 20-21 (DX
205); Mosher Dep. 17:12-17 ("The wall was founded in a levee, which is made up
of soil, and the principal resisting forces to any loads that are applied to the wall
were resisted by the soils that the wall was setting in, and so that it's a classical
soil-structure interaction problem") (DX 283); Pazos Dep. 201:15-18 (Q:  "And
so in order for the wall to do its job, it needs to have support in the soil on the
protected side, right?"  A:  "Yes.") (DX 218); Marino 2009 Dep. 55:14-17 (Q:
"[I]n a flood stage, you need to have the sheet pile provide resistance in the soil
and then below the levee; isn't that right?"  A: "Yes.") (DX 221); Marino 2009
Dep. 55:18-22 (Q: "And if you're going to fail the sheet pile, you've got to fail
the soil; isn't that right?"  A:  "I haven't thought of all instances of whether that's
true or not, but I would say in general, it's true.") (DX 221); Marino 2008 Dep.
40:13-15 (Q: "And in order to fail the floodwall, you have to have some failure of
the soil."  A: "Yes.") (DX 225); Marino 2008 Dep. 46:16-47:2 (agreeing that "the
fundamental principle is that in order for a wall to resist a load it needs to have
some sort of anchor somewhere so that when the load is exerted the wall can push
back" and that "embedment depth" is one way to do that) (DX 225); Cushing
Report at 51 (sheet piling requires "passive soil pressure to resist overturning
forces") (PX 378).

261.  The depth of the penetration of the sheet pile is the key to stability of the floodwall.  Bakeer Tr. 2288:22-24 ("the only means of achieving stability is to have an embedded element in the ground with sufficient tip penetration"); Bakeer Tr. 2312:4-14 ("the most important element in the stability of an I-wall is the depth of penetration in the soil"); Bea Tr. 2620:18-2621:10 (depth of sheet pile is critical to providing resistance against hydrostatic pressure and preventing underseepage).

262.  The sheet pile where the IHNC breaches occurred was only around 20 feet long, driven to a depth of only around -10 to -11 feet (NAVD-88).  Bakeer Tr. 2293:16-2294:3 & Bakeer Slide RMB-007 (DX 356).  This sheet piling is one of the shallowest of the major flood protection structures investigated by Dr. Bea.  Bea Tr. 2621:8-13.  As will be discussed below (¶¶ 307, 359-62), inadequate sheet pile tip penetration was a major factor in the IHNC breaches, as it rendered the sheet pile unable to withstand the forces imposed by Katrina's rising storm surge and failed to protect against underseepage and hydraulic uplift pressures.

263.  In contrast to the steel sheet pile and the underlying soils, the concrete cap of the floodwall does ***not*** add to the stability of the floodwall against rising floodwaters.  The main purpose of the cap is to provide a more aesthetically pleasing appearance.  Functionally, the cap also protects against rust, prevents injury for people in the area of the wall, and adds some height to the wall.  Bakeer Tr. 2294:9-2296:11; see also Team Louisiana Report at 151 (DX144).

## C.  Effect of Hypothetical Barge Impact – Local Damage to Concrete Cap, But No Floodwall Failure

264.  It is possible to calculate the effect of an impact by an object such as a barge on an I-Wall such as those at the IHNC under the conditions that existed in Hurricane Katrina.  Cushing Report at 158-63 & App. D, E, F (setting up and carrying out analysis) (DX 196); Cushing Tr. 2074:11-2076:25, 2077:25-2080:7 (describing calculations performed and results); Marino 2008 Dep. 37-38 (describing "hydrodynamic load analysis" to come up with "a potential force range that would impact the wall") (DX 225).

265.  Any impact calculation involving a barge like the ING 4727 would necessarily require a motivating force to propel the barge in the direction of, and into contact with, the floodwall.  In this case, wind was the motivating force acting on the barge, though, as discussed above, the actual winds were blowing away from the east floodwall.  In all of the hypothetical impact scenarios and calculations supplied by the experts in this case, it was assumed that the barge was forced into contact with the floodwall by winds blowing in a west-to-east direction.  However, as discussed above, there was no evidence of a west-to-east wind blowing at any time before both breaches had already occurred.  Thus, the impact calculations supplied by the experts in this case are hypothetical in nature, were done for theoretical purposes, and do not represent actual impacts that could potentially have been responsible for causing the floodwall breaches.  Cushing

Report at 173 (DX 196); Cushing Tr. 2074:11-15 (Dr. Cushing performed a "hypothetical calculation"); Cushing Tr. 2081:5-2082:18 (discussing hypothetical impact scenario submitted by Dr. Marino); Cushing Tr. 2082:19-2083:9 (discussing assumption underlying the hypothetical impact scenario submitted by Dr. Marino that there was a 100-mile-an-hour sustained wind blowing broadside to the barge "coming from almost due west," which did not exist) (referring to Cushing Slide CC-037 (DX 349)); Cushing Tr. 2083:24-2084:21 (wind speeds reported by Dr. Marino in his report show wind "blowing parallel to the floodwall," which could never cause the barge to impact the floodwall) (referring to Marino Report at 3-11 (PX 397)); Cushing Tr. 2084:25-2085:5 (plaintiffs' expert Mr. Pazos also assumed that a 100 mph blowing perpendicular to the floodwall, which did not exist); Dooley Tr. 1887:1-13 (at no time during Katrina was there a sustained 100 mph wind blowing perpendicular to the floodwall); Mitchell Tr. 932:24-933:7, 934:9-14 (sustained winds at the IHNC were 80-92 mph); Pazos Report Attachment 5 at 14 (PX 402); Marino October 2009 Decl. at Exh. E-F (PX 401).

266.  A barge impact with a floodwall would not be of consequence unless it affected the deeply-anchored sheet pile and supporting soil.  Bakeer Report at 63 (barge impact would have to affect soil but did not) (DX 205); Marino 2009 Dep. 254:22-255:4 (admitting barge impact on upper portion of wall has to be felt "all the way to the bottom of the [sheet pile] wall") (DX 221).

267.  The hypothetical impact calculations showed, however, that if an impact between the barge and the floodwall had occurred in the manner theorized by plaintiffs' causation expert, Dr. Marino, such an impact could not possibly have caused the floodwall to fail in the manner that it did.

   **i.     Results of impact calculations – no sheet pile deflection or failure**

268.  LNA's expert, Dr. Charles Cushing, performed calculations showing that a barge impact, if it occurred, would cause local damage to the concrete cap but would not affect the steel sheet pile or supporting soil.  Cushing Tr. 2078:15-2080:7 (discussing three possible types of local crushing damage from potential barge impact) (referring to Cushing Slides CC-040-47 (DX 349)); Cushing Tr. 2073:1-8 (the connection between the floodwall and cap is a "weak joint" and "weak connection"); Cushing Tr. 2076:21-25 ("We determined that the cap would either crush locally where the barge contacted it, or the cap itself would break off locally at the construction joint."); Cushing Tr. 2078:8-11 (identifying agreement with plaintiffs' expert Mr. Bartlett that barge would hit above the construction joint); Cushing Tr. 2081:20-24 (noting agreement with plaintiffs' expert Mr. Bartlett that because of the turn of the bilge of the barge, the barge would hit the floodwall above the construction joint and above the sheet pile); Cushing Report at 158-63 (analysis showing that "a barge striking the concrete cap of the floodwall could not cause the sheet pile to fail" but would only create localized damage ("cracking" or a "notch") in the concrete cap, with no effect in the sheet pile below) (DX 196); Cushing Report at 99 & Figs. 72, 73, 74 ("These photos show

66

that a barge impact with the concrete cap of a floodwall does not cause the floodwall to fail. Rather, the concrete cap gives way and the sheet pile remains intact.") (DX 196); Cushing Report at 149 ("As calculations show and evidence of other barge impacts prove, a barge or any other object impacting a concrete floodwall will cause the concrete that receives the impact load to crack before the load will cause the entire sheet piling to overturn or be uprooted (exhumed).") (DX 196); Bartlett Tr. 359:25-360:1 (barge causes "localized damage to th[e] cap").

269.   The Army Corps expert, Dr. Mosher, and plaintiffs' experts, Mr. Bartlett and Dr. Marino, expressed agreement with the concept that the concrete cap is a point of weakness, such that an impact with the cap would create a shear at the construction joint but not deflect the underlying sheet pile. Mosher Dep. 91:21-92:3, 267:4-9 (noting to "other places where we saw barges hit walls" and noting they "can cause damage to the walls, but it's usually very local damage to the walls"; "punching through" the concrete cap but not "causing collapse") (DX 283); Bartlett Tr. 337:17-25 (describing the concrete cap construction joint as a natural weak spot in the wall); Marino 2009 Dep. 59:5-60:3 (admitting that construction joint in concrete cap constitutes a point of weakness, and that he would expect the wall to shear at the construction joint if the impact was sufficient) (DX 221); Marino 2009 Dep. 104:14-24 (Q: "All right. So if a pressure on a wall is narrow in scope, you would not expect that pressure to be felt at deep depths?"  A: "Right."  Q: "So, for instance, the pressure of a corner of a barge hitting the top of a wall, you'd expect that pressure to be exerted on a narrow part of the wall rather than translating all the way down to the bottom of the sheet pile?"  A:  "Well, obviously.  I mean, it's where there is contact.  I mean, that's a simple answer.") (DX 221).

270.   The effect of a barge hitting the concrete cap of the floodwall is akin to a sideways force exerted on a book that is sitting on top of a table. The force will move the book, but the table will remain in place. So here, the concrete cap will give way and crack but the steel sheet pile will remain in place. Cushing Tr. 2078:23-2079:4 ("an easy way to think of it is if you wanted to move a table, and you placed a book on the table, and you glued the book to the table lightly, and then you tried to move the table by pushing on the book, the table wouldn't move, but the book would slide across the table"); Cushing Report at 149-51 & Figs. 104-05 (DX 196); Bakeer Report at 63, 66 (barge impact does not affect soil on other side of wall and "could not have caused [the] loss of soil resistance and stability") (DX 205).

**ii.    Failure of plaintiffs' experts to rebut impact calculations**

271.   None of the plaintiffs' experts performed any calculations showing the effect that a barge impact would have on the sheet pile or the supporting soil, as opposed to the concrete cap.  Plaintiffs' expert Dr. Marino admitted he had done no calculations to determine whether an impact with the concrete cap would cause the cap to shear off rather than pulling the sheet pile from the soil.  Marino Tr.

1386:13-20; Marino 2009 Dep. 127:6-10 (Q:  "You haven't done any calculations to determine whether an impact with the concrete cap would cause the cap to shear off rather than pulling the wall from the soil; correct?"  A:  "That's correct.") (DX 221); Marino 2009 Dep. 126:23-25 (Q:  "You haven't calculated the barge impact force at either of the breaches; correct?" A: "That's correct") (DX 221); Marino 2009 Dep. 31 22-32:4 (Q:  "Would you agree with me that there are no such engineering calculations [related to barge impact on floodwall] in the report that you issued in 2009?"  A: "Yes … That analysis never got finished.") (DX 221).

272.    Similarly, Mr. Bartlett and Mr. Pazos did not perform such calculations.  Mr. Bartlett only studied potential effects on the cap, not the entire floodwall; and he only studied the forty-foot portion of the floodwall where the barge passed through, not the area where the breach occurred, well to the north.  Bartlett Tr. 339:3-15, 356:4-20; Cushing Report at 143 (Pazos did not analyze wall deflection) (DX 196); Pazos Dep. 357:7-16 (describing calculations of wind forces, but not impact on cap versus sheet pile) (DX 218).

273.    Accordingly, plaintiffs failed to show that contact between the barge and the floodwall, had it occurred, would or even could have been sufficient to deflect the sheet pile, as opposed to creating local damage to the concrete cap.

**iii.    Confirmation that plaintiffs' hypothesized barge impact was with the concrete cap, not the sheet pile.**

274.    The testimony of Mr. Bartlett makes clear that any impact between the barge and the floodwall would occur at or above the level of the construction joint.  Any impact below that point would have been with the levee soil, not the floodwall itself.  As Mr. Bartlett testified, "the level of the soil would have been approximately at the bottom of the concrete cap."  Bartlett Tr. 316:19-21.

275.    The barge impact scenario posited by plaintiffs' expert, Dr. Marino, depicted the barge as impacting the wall at or above the level of the construction joint, and above the level of the embedded sheet pile.  The evidence thus establishes that the even if a barge impact had occurred at or around the time of the floodwall breaches as posited by Dr. Marino – contrary to the overwhelming evidence set forth above that such an impact could not have occurred – such an impact could ***not*** have caused the wall to fail in the manner that it did.

*a.      Alleged impact at North Breach – above construction joint*

276.    According to Dr. Marino, the water level in the IHNC at the time of the North Breach was 11.2 feet NAVD-88.   Marino Tr. 1193:22 -1194:10.  This is important because it establishes that the bottom of the barge, had it been present, would have been near the level of the construction joint.

277.    Dr. Marino testified that the level of the barge as it (allegedly) approached the floodwall at the North Breach would have been "just below the construction

joint." Marino Tr. 1326:11-1327:15. However, Dr. Cushing showed that, making proper adjustment for the true wall height and taking into account the radius of the bilge on the bottom of the barge, the barge impact would have been above the construction joint under Dr. Marino's scenario. Cushing Tr. at 2080:13-2082:13 (referring to Cushing Slides CC-048-49 (DX 349)); Cushing Report at 158-63 (DX 196); Marino 2009 Dep. 59:18-60:2, 112:22-113:1, 141:20-142:13 (DX 221).

278.    Moreover, and in any event, Dr. Marino testified that the top of the sheet pile is "no less than 6 inches *below* the level of the construction joint." Marino Tr. 1359:20-22 (emphasis added); see also Bartlett Tr. 328:7-13, 358:11-13 (sheet pile is six inches below construction joint). Thus, even without the adjustments shown by Dr. Cushing, the impact scenario posited by Dr. Marino would bring the barge into contact with the floodwall above the level of the sheet pile.

279.    Although plaintiffs' other causation expert, Mr. Pazos, posited an earlier barge impact at a lower water level, he admitted that incorporating the relevant water levels into his analysis, the barge would have run into the levee slope and "would get muddy" because the water level at that time was below the top of the earthen levee. Pazos Tr. 874:5-875:25 (also admitting he saw no evidence "whatsoever" of contact of the barge with the levee slope). Dr. Marino contradicted the testimony of Mr. Pazos in this regard, stating that "you couldn't have a barge collision if … the water level was below the levee." Marino Tr. 1328:2-6. Thus, Dr. Marino's alleged impact scenario is the only one proffered by the plaintiffs in which the barge would have contacted the floodwall at the site of the North Breach, and that contact (had it occurred) was above the construction joint.

### b.    Alleged impact at South Breach – above construction joint

280.    At the South Breach, Mr. Bartlett testified that "the bottom of the barge was at or above the level of the construction joint" when it passed over the rebar at the southern end of the south breach. Bartlett Tr. 357:15-24; Bartlett Tr. 359:17-19 ("initial contact" was "just a few inches above the construction joint"); Bartlett Tr. 360:2-4 (the barge impact was "at least six inches, if not a foot or more, above the sheet pile"); see also Bartlett Tr. 326:2-7 ("the fracture follows the construction joint"). Therefore, the barge did not come into contact with the sheet pile according to plaintiffs' own expert.

281.    Dr. Cushing testified that even at the earliest possible time that the barge could have struck the wall, the water levels in the IHNC were such that the barge "could only have struck the cap and not the slab or lower portion of the floodwall." Cushing Tr. 2076:13-20.

282.    Dr. Marino's testimony also demonstrates that the barge, had it been present, would have contacted the concrete cap, not the sheet pile. According to Dr. Marino, the water level at the time of the south breach was about 11.8 feet NAVD-88. Marino Tr. 1374:9-11; Marino Demonstratives Slide 217 (PX 437).

At that water level, the barge would have come into contact with the wall above the construction joint.

283. Dr. Cushing confirmed that under Dr. Marino's impact analysis, the barge would have impacted the concrete cap above the construction joint.  Cushing Tr. 2080:13-2082:16 and Cushing Slide CC-048-50 (DX 349); Cushing Report at 158-63 (DX 196); Marino 2009 Dep. 59:18-60:2, 112:22-113:1, 141:20-142:13 (DX 221).

284. Accordingly, plaintiffs' expert Mr. Bartlett concluded:  "The force could not be transferred down to the sheet pile to cause the sheet pile to be disturbed."  Bartlett Tr. 364:15-19.  Therefore, even if the barge had been present at the South Breach, it would only have contacted the cap, not the sheet pile.  Such an impact would not have caused – and indeed could not have caused – the floodwall to fail in the manner that it did.

### iv.    Physical evidence confirming barge impact with the concrete cap does not cause failure of sheet pile.

285. Photographic evidence of other barges that impacted levees and floodwalls during Hurricane Katrina showed multiple instances of barges causing localized damage at the point of impact, typically the concrete cap, but not undermining the entire floodwall structure.  Barges also struck floodwalls during Hurricane Gustav without causing any significant damage or failures to these structures.  Cushing Tr. 2086:8-2087:18 and Cushing Slides CC-054-56 (DX 349) (showing local cap damage at Bayou Bienvenue and Bayou Michoud in New Orleans East); Cushing Report Fig. 74 (DX 196); DX 33 (close-up picture); Cushing Report at 99, 149, 175 & Figs. 72, 73, 74, 122 (DX 196); Bakeer Tr. 2296:21-2297:10 ("cosmetic damage" from barge impact with I-wall); Bea Report at 57-60 (DX 206); Bakeer Report at 3, 14, 66 & Figs. 66, 72 (noting barge impacts during Hurricanes Katrina and Gustav) (DX 205); DX 13 at LNA 000762-69 (pictures of stranded barges, including evidence of contact or impact  with floodwalls); Bakeer Tr. 2296:21- 2297:10 (barge impact with I-wall caused only "cosmetic damage").

286. Dr. Mosher and IPET noted "other places where we saw barges hit walls" but observed that "it's usually very local damage to the wall" as a basis to rule out the barge as a potential cause of the IHNC floodwall failures.  Mosher Dep. 91:21-92:3, 267:4-9 (DX 283).

287. Photographic evidence also showed that a barge struck the Florida Avenue Bridge during Hurricane Katrina without knocking over the bridge.  Hall Tr. 1962:15-20; Rainey Dep Exh. 3 (DX 284); Marino 2009 Dep. 129:4-130:2 (DX 221).

288. The physical evidence found at the southern end of the South Breach, where the barge caused local damage to the concrete cap and rebar, tended to confirm that contact or impact between the barge and the wall at a different location, if any such contact or impact had occurred, would likewise have produced only local

damage to the concrete cap without dislodging the embedded steel sheet pile. Cushing Tr. 2079:7-25; Cushing Report at 88-92 (DX 196).

## VI.   CAUSES OF IHNC EAST FLOODWALL FAILURES – GEOTECHNICAL CAUSES HAVING NOTHING TO DO WITH A BARGE

### A.   Introduction

289.   On the morning of August 29, 2005, two breaches occurred in the floodwall on the east side of the IHNC.  LNA Undisputed Fact 23; Cushing Report at 80, Fig. 52 (DX 196); Marino Report at 4-5, Photo 4.4 (PX 397).

290.   The "North Breach" occurred just south of the Florida Avenue Bridge, at a location approximately 1400 feet to the north and east of the Lafarge Terminal and on the opposite side of the IHNC from the terminal.  Cushing Tr. 2042:5-8; Cushing Report at 80, Fig. 52 (DX 196); Marino Report at 4-5, Photo 4.4 (PX 397).  The North Breach occurred no later than 6:00 a.m. on August 29, 2005, and possibly as early as 4:00 a.m.  This breach was approximately 215 feet in length. LNA Undisputed Fact 28; Cushing Tr. 2046:17-20; Cushing Report at 51, 103-04 (DX 196); Pazos Report at 8, 37 (PX 402); Marino Report at 3-16 (PX 397); Bea Report at 56-57 & App. C at 9 (DX 206); Bea Tr. 2752:21-2753:1.

291.   The "South Breach" occurred closer to the Claiborne Avenue Bridge, at a location approximately 3000 feet to the south and east of the Lafarge Terminal and on the opposite side of the IHNC from the terminal.  Cushing Tr. 2046:4-16, 2149:8-11; Cushing Report at 80, Fig. 52 (DX 192); Marino Report at 4-5, Photo 4.4 (PX 397).  The South Breach occurred no later than 7:30 a.m. on August 29, 2005, but probably around that time.  The South Breach was more than 800 feet in length. LNA Undisputed Fact 29; Cushing Tr. 2051:18-19; Cushing Report at 114 (DX 196); Marino Report at 3-16 (PX 397); Bea Report at 56-57, App. C at 9 (DX 206); Pazos Report at 8, 37 (PX 402); see also Sartin Dep. 45:12-22 ("already daylight" when breach occurred) (DX 285); Bea Tr. 2753:2-11.

292.   As discussed in detail in paragraphs 297 to 320 and 335 to 364 below, the evidence showed that both the North Breach and the South Breach occurred at "weak links" along the floodwall under the forces imparted by rising water from Hurricane Katrina's storm surge, which undermined the stability of the floodwall at those two locations.  The evidence further showed that the barge did not cause either breach.

293.   As discussed in detail in paragraphs 321 to 334 and 365 to 392 below, the testimony of defense experts Reda Bakeer and Robert Bea clearly showed that the IHNC eastern floodwall breaches occurred for reasons having nothing to do with a barge.  By contrast, the geotechnical analysis of plaintiffs' causation expert, Gennaro Marino, was riddled with flaws and omissions that caused him to overestimate the strength of the floodwall and thus wrongly attribute causation to

71

the barge by a process of elimination, having found no other apparent causes of the breaches.  See below ¶¶ 393-429.

294.   Finally, as discussed in paragraphs 430 to 441 below, the conclusions of multiple independent studies regarding the causes of the floodwall breaches, each of which found the barge played no role in causing the breaches, confirm the findings of Dr. Bakeer and Dr. Bea and refute those of Dr. Marino.

**B.      Katrina's Storm Surge**

295.   Hurricane Katrina spawned a massive storm surge that propagated from Lake Borgne through the MRGO into the IHNC, overwhelming the flood protection structures there.  From the morning of August 28 through the peak surge in the IHNC at 9:00 a.m. CDT on August 29, the water level in the IHNC increased by over thirteen feet.  The peak water level measured by the lock staff in the IHNC was 14.2 feet NAVD-88, exceeding the floodwall top by around two feet.  The presence of the MRGO channel, the associated man-made flood protection structures, and the adverse effects of the MRGO on the surrounding natural environment exacerbated the surge elevation and duration in the IHNC at the Lower Ninth Ward.  Bea Report App. C at 3-7 (DX 206); Bea Tr. 2655:15-2626:8; Spinks Tr. 1140:10-19; Hall Tr. 1955:24-1957:25 (gradual surge lifted Capt. Hall's boat twenty feet, requiring that lines be cut); Mitchell Tr. 1032:11-14 (highest storm surge experienced in North America at Waveland, Mississippi).

296.   A hydrograph assembled from hourly gauge readings at the IHNC lock provides the most reliable source of information regarding the timing and levels of the surge.  Marino Tr. 1191:23-1192:7, 1193:22-1194:10; Cushing Tr. 2055:2-13; Bea Tr. 2653:22-2656:8.  However, the hydrograph is based on the still water level without accounting for waves which would have increased the height of water acting on the floodwalls at any given time, and provides an hourly average rather than the water level at a specific point in time.  Bea Tr. 2655:3-14.

**C.      The North Breach**

**i.      Reasons why the North Breach formed**

*a.      Summary*

297.   The North Breach occurred at a particularly weak portion of the IHNC floodwall.  The breach occurred at a transition point between the shallow IHNC sheet pile constructed in 1969 and a much deeper section of sheet pile constructed around 1980 near the Florida Avenue Bridge, where there was a strength differential between two sections.  In addition, there was a faulty field weld connecting the two sections, and the nearby interlock in the 1969 wall had weakened due to rust.  Moreover, there was inadequate soil foundation at the levee toe in this section.  Finally, there were sand-filled excavations in the vicinity of the floodwall and a deep layer of permeable shell and silty sand in the immediate location where the breach occurred.  These conditions, coupled with the formation of a gap or

72

"tension crack" between the floodwall and the canal side soils as the storm surge reached the level of the floodwall, and the existence of hydraulic pressure conveyed to the protected side through underlying saturated soils, led to the failure of the floodwall at the location of the North Breach as a result of hydrostatic pressure, seepage, and hydraulic uplift on the protected side.  Bakeer Tr. 2303:21- 2306:3; Bea Tr. 2617:3-10 (under levee seepage and hydraulic uplift resulting in blowout at levee toe, accompanied by lateral instability); Cushing Report at 54, 103-11 (graphics showing sequence of breach) (DX 196); Bakeer Report at 2-3 (DX 205); Bea Report at 21-22, 45-46 & App. C at 61 (DX 206).

### b.    Transition between 1969 sheetpile and 1980 sheetpile

298.   The North Breach occurred at a transition between two different portions of the floodwall:  an older segment with a depth of 23 feet and a newer segment with a depth of 35 feet.  DX 350 & Bakeer Tr. 2307:3-20; Marino Tr. 1110:13-18 (1980 floodwall was driven seventeen feet deeper than 1969 floodwall); Marino Tr. 1118:11-14 (north breach occurred in the last section of the 1969 sheet pile); Marino Tr. 1196:18-20 (court recognizes it is "unquestionable and everyone obviously has to agree that the break, whatever caused it, took place at this juncture").

299.   This transition constituted a point of weakness in the floodwall because of the potential for torsion and tension, and thus a concentration of pressure, between the stronger 35-foot sheet pile and the weaker 23-foot sheet pile.  LNA Undisputed Fact 25 ("The North Breach occurred at a location of structural discontinuity between deeper and longer I-wall sheet piles on the north side of the breach and shorter I-wall sheet piles within the displaced section of the breach."); Bakeer Tr. 2309:9-25, 2312:4-2313:15 (differential strength between two lengths of sheet pile); Bakeer Report at 42, 45 (DX 205); Cushing Report at 53 (DX 196); Marino Tr. 1361:12-14 (admitting that the wall to the north has more lateral resistance to movement from water than the wall to the south); Pazos Tr. 820:19-21 (the connection between the 1980s and 1960s wall is "a structural discontinuity that makes the location very weak").

a.    Mr. Pazos' testimony that this area was "very weak" due to "structural discontinuity" gives lie to plaintiffs' argument that "no other investigator has found … a weak link between the 196[9] and 1980 walls."  PFF ¶ 147.

### c.    Faulty field weld and rusted interlock

300.   The sheet pile at the North Breach ripped at the site of a faulty field weld between the 1980 sheet pile and the 1969 sheet pile, and a nearby interlock in the 1969 sheet pile that had deteriorated due to rust.  Examination of the failed sheet pile showed that the interlocks were significantly rusted and corroded, weakening the sheet piles in the area where the breach initiated.  Dr. Bakeer showed pictures of the rusted sheet pile with the faulty weld which made that section of sheet pile the weakest and most prone to failure, through tearing under pressure of the rising

water at the locations of both the weld and the deteriorated interlock.  Bakeer Tr. 2313:16-2323:22 & DX 351 (pictures of sheet pile); Bakeer Slides RMB-023-27 (DX 356); Bakeer Tr. 2314:20-23 (describing personal inspection of sheet piles); Bakeer Report at 45-46 & Figs. 40-45 (interlocks were "significantly rusted and corroded") (DX 205); Pazos Tr. 820:19-21 (the connection between the 1980s and 1960s wall is "a structural discontinuity that makes the location weak. . ."  The weld at the North Breach was "not proper.  And with no major force of impact, this welding was disturbed or it started cracking."); Pazos Dep. 151:17-152:23 (agreeing that a "field weld of poor quality" in the area of the north breach made this location "one of the weakest points" in the floodwall) (DX 218); Pazos Dep. 153:3-11 (agreeing that the poor quality weld made it possible for the wall to "develop a hinge between the monolith and the sheet piles") (DX 218).

301. The tear in the sheet pile at this transition point is a distinctive feature of the North Breach.  When the sheet pile gave way at this tear, the shorter portion became uprooted from the ground and was caused to twist by the inrushing water. Cushing Tr. 2095:17-21; Cushing Report at 105-11 (DX 196); Bakeer Report at 2-3 (discussing effect of flow through separation at weak joint) (DX 205).

302. Plaintiffs' experts undertook no calculations or other forensic engineering analyses to show that the rip in the sheet pile at location of the faulty weld and deteriorated interlock must have been caused by the barge, as opposed to hydrostatic pressure in the IHNC.  Pazos Tr. 876:21-877:2 ("Q: Did you make any calculations with respect to the hydrostatic pressure required to fail that weld? A: No.  Q: Did you make any calculations of the momentum, forces of the barge that would be required to fail that weld?  A: No."); Bakeer Report (Supp. Pazos Letter) at 7 (DX 205); Pazos Dep. 154:1-7 (Q:  "And have you done any calculations about whether a hinge can develop in this floodwall at any time, without a barge impact?"  A: "I didn't do any calculation regarding how a hinge can develop in this floodwall") (DX 218); Pazos Dep. 155:24-156:4 (Q: "Have you done any calculations that establish that the weld could not have come undone based on the hydrostatic pressure in the canal, without the barge?"  A: "No.  I haven't done any calculation, no.  I can do it.") (DX 218); Marino 2009 Dep. 116:12-15 (Q: "Have you done any calculations to rule out the possibility that a faulty weld failed under a hydrostatic load?"  A:  "I haven't done those calculations, no.") (DX 221); Marino Tr. 1355:22-1356:4 ("I still haven't done any calculations about it."); Marino 2009 Dep. 134:8-14 (admitting that hydrostatic pressure from rising water on the wall could "create torque at the connection between the deeper and shallower sheet pile" where the faulty weld occurred) (DX 221); LNA 103414 (showing other locations where sheet pile tore under hydrostatic pressure in Hurricane Katrina without impact by a barge) (DX 112).

303. Plaintiffs' experts also performed no calculations to rule out the failure of water stops due to hydrostatic pressure as the water rose along the wall at the location of the North Breach.  Marino Tr. 1360:9-14.

### d. Lower ground surface at levee toe – diminished soil support

304. The North Breach occurred at a location where there was substantially less soil on the protected side of the floodwall than at locations further to the south, and thus the floodwall had less stability at that location. The levee toe was lowest in the area of the North Breach, resulting in less soil available to resist the pressure of the rising water against the floodwall; the stability of the floodwall is compromised because there is less resisting pressure from the soil on the protected side. Bakeer Tr. 2324:15-2327:16, 2329:14-2330:2; Cushing Report at 105 ("inadequate soil resistance") (DX 196); Bakeer Report at 37, 48 ("worst conditions" at North Breach site with regard to "lower soil support on the landside") (DX 205); Bea Report App. C at 20-21 & Fig. 13 (DX 206); Mosher Dep. 64:24-65:18 (north breach had three feet less soil on the protected side, which was "sufficient to cause it to go from something that would be stable to something that would fail") (DX 283).

### e. Sand-filled excavations; permeable sand and shell at breach location.

305. The North Breach occurred in an area of the floodwall where there were sand-filled excavations from work carried out along the East Bank Industrial Area. The sand-filled excavations provided a route for underbase seepage and hydraulic uplift effects at the North Breach site. Bea Tr. 2627:3-2628:9; Bea Report at 21-22, 39 (summarizing research showing that EBIA excavations led to "'instant' pressures at the tip of the sheet piles," or "underbase seepage and hydraulic uplift effects") (DX 206); Bea Report App. C at 27, 35, 39, 61 & Fig. 29 (DX 206); Bakeer Report at 43 (DX 205); Marino 2009 Dep. 212 ("There could have been some silty sand" at the north breach) (DX 221); see Marino 2009 Dep. 161:12-23 (admitting that if seepage around the sheet pile tip occurred without a barge, then failure could occur without a barge) (DX 221).

306. The presence of silty sand and permeable material in the area of the North Breach is evidenced by boring records and photographic evidence alike. Boring 81A showed the presence of permeable material (silty sand, shell) down to a level of 18 feet, well below the depth of the sheet pile, at the location where the North Breach occurred. The soil boring data showed that this permeable granular material was deepest toward the north end of the North Breach, where the breach initiated. Bakeer Tr. 2332:9-2335:13, 2337:7-10 & DX 313, Plate 21 (Bakeer Slide RMB-038 (DX 356)). In addition, post-Katrina aerial photography shows that granular fill on the canal side was washed away during Katrina, evidencing the presence of such granular fill at the area of the North Breach. Bakeer Tr. 2348:8-2349:17 & Bakeer Slide RMB-041 (DX 356); Bea Tr. 2657:3-2659:17 & DX 106, 359 (shell visible in post-Katrina photos). Sandy areas are also visible in pre-Katrina photographs. Bea Tr. 2639:15-2640:12 & Bea Report Fig. 36-C (DX 206).

307.     The permeable granular materials extended from the floodwall to the canal, providing a "pipe" or "conduit" for water from the canal to reach the vicinity of the wall.  Bakeer Tr. 2349:19-2350:11 & Bakeer Slide RMB-042 (DX 356).  Once at the floodwall, this high-permeability granular material provided a conduit for seepage under the tip of the sheet pile, destabilizing the soils on the back side of the wall.  Bakeer Tr. 2337:7-10, 2350:12 -2351:3 & Bakeer Slide RMB-043 (DX 356); Bea Tr. 2631:11-19 (shell and sandy material "allows the water to directly communicate under the floodwall to the protected side"); Bea Tr. 2659:22-2660:9 (discussing presence of permeable shell in immediate vicinity of north breach); see Pazos Tr. 824:4-5 ("clearly … underseepage was an important explanation for the failure").  In addition, once the water level in the canal rose above the level of the ground surface, the granular material provided a direct connection from the canal under the sheet pile wall to the other side.  Bakeer Tr. 2477:11-2478:1.

                    *f.*        *Formation of tension crack under hydrostatic pressure.*

308.     One of the causes of the North Breach was the formation of a "tension crack" or "gap" between the canal-side soil and the steel sheet pile floodwall, which formed due to hydrostatic pressure on the wall.  This had the effect of cutting the levee embankment in two, increasing the hydrostatic pressure on the sheet pile by a multiple of nine or ten or even up to 37 times as large, and also providing opportunities for water to seep under the sheet pile to the protected side.  Bakeer Tr. 2351:4-2352:25, 2355:12-2356:18 & DX 353; Bea Tr. 2662:8-11, 2665:6-2667:5; Cushing Report at 52, 104 (DX 196); Bakeer Report at 47 (DX 205); see Mosher Dep. 57:22-61:8 (gap between sheet pile and canal side soil formed) (DX 283); Pazos Report at 43 (gap formation) (PX 402).

309.     Evidence from other breach sites showed that such gaps formed due to hydrostatic pressure during Katrina without impact from a barge.  Mosher Dep. 59:12-64:6 (gap between the sheet pile and canal side soil formed, splitting the levee in half and depriving it of canal-side soil resistance; gaps formed at multiple locations and no loading from a barge was needed for such a gap to form) (DX 283); Bakeer Report (Pazos Supp. Letter) at 5-6 (DX 205).

310.     Based on observational data from laboratory modeling tests, Dr. Bea calculated that a tension crack would form on the IHNC floodwall when the water reached a level of 7 feet NAVD.  Bea Tr. 2660:12-2663:2; see Bea Slides RB-042, 44-48 (DX 361).  This corresponds to the water level shown by the hydrograph for 1:00 a.m. on the morning of August 29, long before the barge is alleged to have been present.  Bea Slide RB-038 (DX 361).  The Army Corps' "E-99" full-scale field test similarly showed that hydrostatic pressure on I-walls creates gaps of the type observed after Hurricane Katrina.  Cushing Report at 137 (DX 196); Bakeer Report (Pazos Supp. Letter) at 6 (DX 205); Bea Report App. D at 11-12 (DX 206).

311.   Contrary to the suggestion of plaintiffs' expert Mr. Pazos that the barge was responsible for creating a tension crack, Dr. Bea showed that the tension crack would form when the water reached the base of the floodwall and before the water would have become deep enough for the barge to have come into contact with the wall.  Bea Tr. 2714:19-2715:2.

312.   Plaintiffs' experts acknowledged that the formation of tension cracks (or "gaps") played a role in the formation of the breaches.  Pazos Tr. 822:16-823:1, 830:2-9 (gapping and rising water create "underseepage and quicker failure and higher water conditions"); Cushing Report at 137 (DX 196); Pazos Report at 43-44 (PX 402); Pazos Dep. 90 (DX 218); Marino 2009 Dep. 164 (DX 221).  However, plaintiffs' experts erred in assigning the cause of the gaps to the barge, as opposed to hydrostatic pressure.  In particular, Dr. Marino was wrong to suggest that tension cracks did not have time to form during Hurricane Katrina (Marino Tr. 1221:19-23), and Mr. Pazos was wrong to suggest that tension cracks did not form on the portions of the wall that did not fail (Pazos Tr. 901:7-13).  To the contrary, photographic evidence showed that tension cracks did form, including on portions of the floodwall that did not fail.  Bakeer Tr. 2357:12-2359:12.  In addition, experimental test data showed that tension cracks form quickly on floodwalls of similar construction under similar water loads.  Bea Tr. 2726:14-2728:25; see also Mosher Dep. 242:9-17 (noting formation of crack due to hydrostatic pressure in full-scale experiment) (DX 283).

313.   Moreover, plaintiffs' experts performed no calculations to rule out the formation of tension cracks due to hydrostatic pressure, and admitted hydrostatic pressure on the wall during Katrina was sufficient to deflect the wall and induce gap forming, even on unfailed sections of the wall.  Cushing Report at 137 (DX 196); Marino 2009 Dep. 127:16-24, 246:2-13 (admitting he "wouldn't be surprised if there were some – you know, a tension crack" on unfailed sections of the wall) (DX 221); Marino 2008 Dep. 66:4-6 (Q: "And in fact, as the water rises in the canal the wall will deflect, won't it?"  A: "Yeah.  Yeah.") (DX 225); Pazos Dep. 95:21-96:8 (DX 218).

314.   The Interagency Performance Evaluation Team ("IPET") rejected the notion that a barge caused a tension crack at the location of the IHNC floodwall breaches, finding that tension cracks existed at other locations where there was no barge (such as at the London Avenue and 17th Street Canals), and that the forces were sufficient to create a tension crack without a barge.  Mosher Dep. 62:21-64:6, 102:8-12 ("a crack formed on the canal side of the wall" but "without any barge hitting it") (DX 283); IPET Report Vol. V at V-68 ("Formation of a gap on the canal side of the wall, allowing hydrostatic water pressure acting through the full depth of the gap, causes a very significant reduction in the value of the calculated factor of safety.") (DX 145).  Mr. Pazos also agreed that the 17th Street and London Avenue Canals failed due to hydrostatic pressure.  Pazos Tr. 900:20-24 (at the London Avenue and 17th Street Canals "hydrostatic pressure broke the wall stops and then pushed the panels and the levee inboard, inland, a few feet).

315.    The evidence showed, therefore, that the conditions presented in Hurricane Katrina were sufficient to create the tension cracks (or "gaps") that played a role in the breaches, without any impact from a barge.  Bea Tr. 2714:19-2715:2; Bakeer Tr. 2357:12-2358:6-13; Mosher Dep. 59:5-64:6 (DX 283).

> **g.**    ***Role of hydraulic pressure on protected side from rising storm surge***

316.    Dr. Bea explained that the saturated marsh layer provided a direct connection between the canal and the protected side soil which could immediately transmit hydraulic pressure from the rising water in the canal.  The pressure from the rising water in the canal acted in the same way as pressure in a hydraulic pump acts to lift an automobile on a hydraulic jack.  Bea Tr. 2647:24-2648:21.

317.    On the protected side, the hydraulic pressure coming from the canal through the saturated marsh layer acted in an upward direction against the overlying layers of soil.  This upward pressure had a destabilizing effect on the levee because the levee relied on the weight of the soil on the protected side to provide stability.  Bea Tr. 2648:22-2650:8 & Bea Report App. C, Fig. 72 (DX 206).

318.    Dr. Bea provided photographic evidence documenting the hydraulic uplift phenomenon in connection with other levee breaches in the United States and the Netherlands, and noted that uplift effects are now incorporated explicitly into new guidelines for the design of levees.  Bea Tr. 2650:9-2653:19; see also Marino Tr. 1144:22-1145:4 (court recognizes that one objective is to determine "what type of material" was present and then "determine its permeability" and "whether the undermining could have taken place" in "the period of time that is involved"); Marino Tr. 1188:2-17 & Marino Demonstrative Slide 109 (shows groundwater line that is above marsh layer) (PX 437); Marino Tr. 1467:21-24 (1969 sheet pile is cut off above the marsh layer all the way down the canal).

> **h.**    ***Seepage and stability analyses by defense experts***

319.    Seepage and stability analyses undertaken by LNA's experts, using reliable and validated methods and data, confirm that the floodwall failed at the North Breach without the need for any involvement by a barge.  Bea Report App. C at 47-64 (DX 206); Bakeer Report App. at 29-35 (DX 205).  Notably, the analyses showed that the floodwall was insufficient to withstand Katrina's storm surge even without regard to the sandy and silty soil evidenced by boring log 81A.  Bea Tr. 2730:3-21.

> **i.**    ***Sequence of formation of North Breach***

320.    During the early morning hours of August 29, within a window spanning from 4:00 a.m. to 6:00 a.m., water in the canal rose to the level of the backfilled excavations and initiated hydraulic uplift effects in the buried marsh layers.  As the water rose, the water opened a tension crack on the front of the floodwall causing added hydrostatic pressures against the wall.  Bea Tr. 2660:12-2651:23.

As the water rose, differences in local soil conditions resulted in differential movements along the wall, allowing waterstop joints to be opened between adjacent sections of the floodwall.  Bea Tr. 2667:19-2668:11.  As the water rose further along the wall, high pressures and flow resulted in blowout and instability at the location of the North Breach, together with a tear in the sheet pile connection between the 1980 sheet pile and the 1969 sheet pile, with a factor of safety against failure of less than 1.0.  Bea Tr. 2677:25-2678:18.  The separated sheet pile swung backward under the pressure of the water, flipping and twisting in the rushing water.  Bea Tr. 2679:10-2680:16.

**ii.     Evidence that the barge did not cause the North Breach**

321.    Multiple independent bodies of evidence confirm that the ING 4727 did not cause the North Breach.  These include: (a) meteorological evidence showing the barge could not have been present at the site of the breach; (b) physical evidence showing that the barge could not have been present (*i.e.*, a utility pole that would not have survived intact had the barge been present); (c) physical evidence at the site of the breached floodwall, which shows no signs of barge impact; (d) the absence of any evidence from plaintiffs' experts regarding a plausible impact scenario, and (e) physical evidence ruling out the hypothetical impact scenario that plaintiffs' experts presented.

> *a.      Meteorological evidence showing barge could not have been present*

322.    As shown in greater detail above at paragraphs 90 to 167, the ING 4727 could not have been present at the site of the North Breach when the breach occurred.  Wind was the primary force acting on the barge at all times, and the prevailing winds cannot have caused the barge to come into contact with the floodwall at the site of the North Breach at any time before its occurrence.  The North Breach had already occurred before the prevailing winds came to include any component blowing from the west toward the east and Katrina's wind never blew from south to north.  Thus, even if the barge had been loose in the IHNC at the time of the breach, the winds would not have permitted the barge to impact the wall at the site of the breach at the time it occurred.  Cushing Tr. 2046:13-16; 2047:1-7, 2051:5-11; Cushing Report at 104& Fig. 109 (at the time of the north breach, winds "prevented the barge from moving to the north breach site") (DX 196); Cushing Report at 129, 166 (impossible for wind to have pushed barge into wall at North Breach) (DX 196); Bakeer Report at 68-69 (for barge to travel against forces of wind and water is contrary to "[t]he laws of physics") (DX 205); Dooley Dep. 97:7-21 (wind could not have moved barge to North Breach) (PX 354); Marino Report at 3-11 (winds "essentially parallel" to canal before 9:00 a.m. [*i.e.*, blowing north to south along axis of the canal]) (PX 397).

323.    Neither water current nor waves could have brought the barge into contact with the floodwall.  Water currents were insignificant, and wave action (if any) was insufficient to move the barge against the prevailing winds.  Cushing Report at

168 (DX 196).  See also above ¶¶ 168-80 (discussing of wave and current evidence).

### b.   *Physical evidence showing the barge could not have been present*

324.   Photographs taken after Hurricane Katrina show a utility pole standing on the canal-side bank of the IHNC, close to the site of the North Breach and in a location that would have been in the path of the barge had the barge been present at or near the site of the North Breach.  Had the barge been floating free near the site of the North Breach, it would have toppled this utility pole.  Pazos Tr. 881:21-25 (conceding "[t]here's no way the barge would have missed that phone pole"); Cushing Tr. 2098:23-2099:20 (barge travels perpendicular to wind and therefore cannot arrive at breach without toppling pole).  The presence of this pole after the storm thus shows that the barge did not approach the North Breach site during the hurricane.  Cushing Tr. 2098:23-2099:20; Marino Report Photo 4.6 (PX 397); Bartlett Report Fig. 3 (PX 378).

325.   Plaintiffs' naval architecture expert expressly testified that the barge could not have missed the telephone pole, but speculated that the pole may have been placed after the storm, during levee repair efforts.  Pazos Tr. 881:21-882:12.  However, the pole appears in pre-Katrina photographs of the East Bank Industrial Area (Marino Tr. 1372:11-18 & DX 345) and in photographs taken immediately after the storm before any repair work had begun.  Marino Tr. 1368:16-1371:12 & DX 106, DX 263, DX 344 (newspaper article from August 31, 2005).

326.   Plaintiffs' geotechnical expert, meanwhile, testified that because he is "not a routing person," he could not explain how a 200-foot-long barge could have arrived at the site of the North Breach without knocking down the pole.  Marino Tr. 1366:10-18, 1367:23-1368:1.  Indeed, he agreed that the pole is right in the middle of the breach.  Marino Tr. 1365:23-1366:3.

### c.   *Physical evidence from breach site; absence of barge impact evidence*

327.   There was no damage at the site of the North Breach that could be uniquely associated with impact from a barge.  For instance, there was no cracking of the concrete at the transition points at the northern and southern ends of the North Breach as would be expected had a barge impacted the wall at either end, as plaintiffs allege.  Also if the barge had been present when the North Breach occurred, it would have entered the neighborhood with the water that rotated the sheet pile 270 degrees inland.  Yet, the evidence shows that the barge could not have entered North Breach.  Bea Tr. 2683:13-21 (Bea personally examined sheet pile and floodwall in area of North Breach and found no evidence a barge had come in contact with the floodwall); Cushing Report at 63, 88, 175 (DX 196); Cushing Tr. 2095:17-2096:2; Bea Report at 54 (DX 206); Bartlett Dep. 63:14-17 (DX 219); Mosher Dep. 130:15-131:4 (physical evidence at North Breach was different from what would have been seen had barge been present) (DX 283).

a.   Plaintiffs' assertion that Dr. Bea did not carry out a thorough investigation (PFF ¶¶ 294-307) is incorrect and, indeed, nonsensical. For instance, plaintiffs take Dr. Bea to task for not having "arrange[d] to turn over" the failed floodwall sections (PFF ¶ 303), ignoring that a barge impact, if any, would have been made evident on the canal-facing side of the wall lying face-up in the neighborhood.

328.   The North Breach formed in a "smooth curve" that "looked like a bow" except for the rip at the north end where the wall "wouldn't budge." Bakeer Tr. 2352:13-25. A smooth curve is characteristic of hydrostatic pressure and inconsistent with barge impact. Bakeer Tr. 2435:21-2436:7 (demonstration of difference between hydrostatic load resulting in smooth curve and pointed load resulting in sharp indentation).

329.   Plaintiffs' experts offered inconsistent testimony regarding the origin of floodwall damage at the North Breach, and attributed floodwall damage to the barge (horizontal scrapes on the floodwall) even though the photographic evidence showed the scrapes were present before the storm. Thus, for instance, Mr. Bartlett and Mr. Pazos suggested that certain horizontal scratches on the floodwall between the breaches were made by the barge. Bartlett Tr. 340:25-341:16; Pazos Tr. 887:15-889:12 (identifying photographs of scrapes in Attachment No. 4 to Pazos Report (PX 402) for the Court); Pazos Dep. 184 (alleging barge caused damage in photo) (DX 218). But Dr. Marino admitted these scratches were not made by the barge. Marino Tr. 1353:17-23 (scratches near north breach). Dr. Cushing testified similarly that the scratch marks pre-existed Katrina and were too low to have been caused by the barge given the water levels during Katrina. Cushing Tr. 2105:12-2106:22 and Cushing Slides CC-75.1-77 (DX 349); Cushing Report at 135 & Fig. 98 (scrape marks present before hurricane) (DX 196). And Dr. Bea clearly showed, using photographs from before Hurricane Katrina, that the scratches on the floodwall were created by lawn mowing equipment before Hurricane Katrina. Bea Tr. 2663:22-2665:5 & Bea Slide RB-43 (DX 361).

330.   There was also no damage on the barge consistent with an impact at the site of the North Breach. Cushing Tr. 2036:16-2037:8, 2125:3-6 (inspection of barge; only evidence of impact is at the southern section of the South Breach); Cushing Report at 175 (DX 196); Marino 2008 Dep. 146:1-8 (no distinctive damage on barge associated with North Breach) (DX 225).

### d.   Absence of support for plaintiffs' impact scenario

331.   Plaintiffs' experts provided no evidence to support the impact scenario they presented to the Court. Dr. Marino admitted he does not know how the barge got to the North Breach, or how it got from there to the South Breach. Marino Tr. 1334:5-23. He further admitted that he has done no studies or scientific calculations that could shed light on how an empty barge sticking out of the water 20 feet could move in a direction counter to that of the prevailing wind to arrive at either breach. Marino Tr. 1334:24-1335:4. He admitted, moreover, that in order

81

to understand the impact of a barge on the floodwall, it is necessary to know both "the momentum of the vessel and the impact of that vessel on the floodwall," Marino Tr. 1338:18-23, and that to know what really happened, information would be needed about the angle of the barge's approach, the speed of approach, the wind force acting on the barge, and the barge's momentum when it comes into contact with the wall. Marino Tr. 1377:14-1378:5. But, he admitted, he does not know any of those things. Marino Tr. 1378:6-7; see also Marino Tr. 1339:3-6 (admitting lack of expertise about inputs regarding vessel movement). Thus, Dr. Marino was forced to admit that his model did not represent actual barge impact under actual Katrina conditions, and that his model lacked the "mathematics or physics or whatever else is necessary to determine that it's real." Marino Tr. 1341:16-1342:24, 1422:15-22.

332. Mr. Villavasso's testimony is not consistent with the barge impacting the North Breach, although it is relied upon by plaintiffs' experts as evidence of impact. If Mr. Villavasso in fact saw 1-2 feet of the barge, the barge could not have been striking the floodwall. If the barge had been close to the floodwall, Mr. Villavasso would have seen 13-15 feet of the barge above the floodwall. The angle of the barge in relation to the floodwall did not affect the height of the barge visible to Mr. Villavasso above the floodwall. Thus Mr. Villavasso did not see the barge. Cushing Tr. 2099:21-2100:22; Cushing Report at 123-26 (DX 196). See also above ¶¶ 196-204 (full discussion of Villavasso testimony).

333. Dr. Marino's hypothetical impact scenario for the North Breach is inconsistent with the physical evidence showing that the events he portrayed could not have taken place. In Dr. Marino's scenario, the barge hits the wall about two feet from the area of the tear in the wall, with sufficient impact to tear the sheet pile. Marino Tr. 1235:22-1236:2 (showing "where this barge would have contacted the wall causing a concentrated force near this juncture with the … 1980 designed wall") (referring to Marino Demonstratives Slide 152 (PX 437)); Marino Tr. 1350:13-15 (barge impact was "in the first panel" next to the rip). According to Dr. Marino, the barge had enough energy to drive the wall back two to three feet. Marino Tr. 1238:13-17, 1351:17-20 (barge pushes wall back "two or three feet"). Then, however, the barge somehow fails to carry into the 1980 panel and leaves that panel without a dent. Marino Tr. 1351:21-25; Marino Report Photo 4.8 (un-damaged panel at north end of North Breach) (PX 397). (Then, the barge would have to back up, avoid the utility pole, and travel to the South Breach.) Dr. Marino could not explain how this could have happened, nor did he supply a basis for his assumption, arrived at without any data, that the wind or waves in the canal somehow caused the barge to reverse course. Marino Tr. 1353:6-16.

### e. Summary

334. In sum, the meteorological and physical evidence alike compel the conclusion that the barge was not present at the site of the North Breach and did not cause the floodwall to fail at that location. The failure occurred for reasons other than a barge impact. Bea Tr. 2617:11-15; Cushing Report at 79, 166-76 (DX 196).

D.     **The South Breach**

i.     **Reasons why the South Breach formed**

a.     *Summary*

335.   The South Breach occurred at another weak location on the floodwall, where the floodwall deviated from a straight line; where there were drainage and outfall canal features backfilled with semicompacted fill; and where poor soil conditions caused soil weakness and settlement reducing the height of the wall top, leading to earlier overtopping in the breached area.  Bakeer Tr. 2368:10-2370:2, 2409:19-2410:7.  The South Breach formed at this location as a result of loss of stability on the protected side due to added hydrostatic pressure from the formation of a tension crack on the canal side of the floodwall, and due to loss of stability on the protected side as a result of hydraulic uplift as well as overtopping and scour. Bakeer Tr. 2407:16-2410:8; Bea Tr. 2686:12-2687:21, 2692:24-2694:12.

b.     *Wall curvature in the area of the South Breach*

336.   As-built drawings of the floodwall in the area of the South Breach show curvatures in the floodwall near the southern and northern limits of what would become the South Breach.  Marino Report Figs. 2.12 and 2.13 (PX 397); Marino Tr. 1378:8-24; Bakeer Tr. 2372:25-2374:6.  Aerial photography shows that the South Breach occurred in the segment of the floodwall where the wall deviated from its normal straight-line alignment.  Bakeer Report, Figs. 46 and 74 (DX 205).  The limits of the deviated segment closely match those of the South Breach.  Bakeer Tr. 2371:16-21; Marino Tr. 1379:14-17.  The curvature of the floodwall at this location created weak links at the ends of the South Breach with the adjoining sheet piles.  Bakeer Tr. 2370:8-2371:21; Bakeer Report at 56 (DX 205).  Plaintiffs' expert did no calculations or studies of the effect of the curvature on the stability of the wall.  Marino Tr. 1380:3-6.

a.     Plaintiffs do not dispute the existence of these curvatures within the precise limits of the breach, but attempt to downplay their significance by asserting, incorrectly, that there were other curved areas in sections of the wall that did not breach.  Pl. Br. 63, 71.  Plaintiffs' argument, however, is based on a post-storm photograph showing a portion of the floodwall that sustained deformations *during the storm* as a result of rising floodwaters deflecting the wall.  Bakeer Slide RMB-078 (post-storm photograph) (DX 356); Bakeer Report, Fig. 76 (DX 205) (pre-storm photograph).

c.     *Jourdan Avenue Canal and outflow canal*

337.   The Jourdan Canal and outflow canal in the area of the South Breach created a zone of weakness both because the presence of these features was a reason for the curvature in the wall, and due to potential seepage problems resulting from inferior fill materials, as could be seen in deteriorated soil visible in aerial

photography.  Bakeer Tr. 2374:8-2376:17, 2409:19-2410:7 (semicompacted fill) & DX 354.

### d.    Poor soil conditions in the area of the South Breach

338.   The South Breach occurred at a location where excavations were carried out during remediation work on the East Bank Industrial Area, which were subsequently back-filled with sand or other permeable materials.  The excavations provided a route for seepage and for hydraulic uplift pressures on the protected side of the floodwall.  Photographic evidence also showed the presence of a poorly backfilled abandoned pipeline at the center of the breach.  The excavations also revealed the presence of buried swamp deposit including cypress stumps indicating permeable soil, with a high degree of correlation between the excavated areas and the breach locations.  Bea Tr. 2641:11-2643:14, 2644:8-2646:25; Bea Tr. 2692:17-2693:7; DX 206, Bea Report App. C, Figs. 27, 29, 30 (DX 206); Bakeer Report at 43, 56 (DX 205).  Significantly, plaintiffs' expert Dr. Marino did not include sand-filled excavations in his geotechnical analyses.  Marino Tr. 1472:5-15.

   a.    Contrary to plaintiffs' argument (Pl. Br. 57-59), Dr. Bea's reliance on photographs showing the existence of sand-filled excavations is entirely proper, as this Court's decision in *Robinson* makes clear.  Doc. 19415 at 88 ("These photographs depict all of the salient information adduced at trial.").  Here, Dr. Bea explained why the photographic evidence – including the "angle of repose" of the materials – clearly depicts sand fill rather than some other type of soil.  Bea Tr. 2645:7-12.  Beyond that, plaintiffs' assertion that Dr. Bea relied "solely on photographs" (Pl. Br. 59) is incorrect: Dr. Bea's report shows that he has reviewed extensive documentation concerning the work performed on the East Bank Industrial Area, including (for instance) the detailed "Technical Completion Report" documenting that work.  Bea Report App. C at 31 (DX 206).

339.   Photographs show that within the remains of the canal side levee embankment in the South Breach are the remains of an old wooden plank road and an old oyster shell road that had been buried when the levee was constructed.  Cushing Report at 65-66 & Fig. 43 (DX 196).

340.   Soil borings taken in the area of the South Breach reflect the presence of weak soils within that area.  For instance, Boring 25A, taken from the middle of the large bowed area of the South Breach, had considerable zones of "no recovery" just below the water table level, meaning that the sample had "slipped out of the sampler," most likely because it was too wet and mushy to retain its integrity or possibly because it was too granular (*e.g.,* sand).  Marino Tr. 1460:18-1462:4; Bakeer Tr. 2384:5-2387:12, 2389:14-22 & DX 355 (showing location of Boring 25A vis-à-vis South Breach).  A "no recovery" zone represents a weak zone in the soil, whether due to the presence "soupy" and "soft" soil that lacks the strength

even to stay in the boring tube, or the presence of granular material, or even a "void" in the soil.  Bakeer Tr. 2395:15-2396:16; Marino Tr. 1462:14-1463:17.

341.    The soil boring data in the area of the northern bow of the South Breach included several "no recovery" samples in addition to sample 25A.  Bakeer Tr. 2388:15-24.

342.    Similar "no recovery" zones, and areas of weak soil prone to settlement, were noted in the area of the 17th Street Canal that breached during Hurricane Katrina. Bakeer Tr. 2391:24-2393:17.

> ### e.    Settlement and earlier overtopping due to weak subsoil conditions

343.    As a result of weak subsoil conditions, settlement in the area of the South Breach was so severe over time that, when the floodwall was constructed, between five and six feet of fill had to be added to bring the levee up to grade.  Bakeer Tr. 2376:22-2380:12.  With the placement of five or six feet of added fill in that area during the construction of the 1969 floodwall, that area would be expected to settle more in the ensuing decades, resulting in further settlement there, more than in the surrounding areas.  This caused the top of the floodwall in the area of the South Breach to be lower than in surrounding areas, accounting for earlier overtopping in the area of the south breach.  Bakeer Tr. 2380:13-2381:3; Cushing Tr. 2110:18-25, 2111:12-2112:2 (floodwall had subsided substantially, as much as 3 feet since it was built, and had subsided most at the breach locations).

344.    Because the South Breach occurred at a location where substantial amounts of fill had been added to the levee during its construction, that location would have experienced considerable additional settlement over time, such that the top of the wall at the location of the South Breach would have been considerably lower than other portions of the wall, leading to earlier overtopping and concentrated scour at that location.  Bakeer Tr. 2397:5-25; Bakeer Report at 34-36, 41, 55 & Supp. (Marino) at 21 (DX 205); Cushing Report at 48 (DX 196); Cushing Tr. 2180:19-2181:3 (earlier overtopping at subsided points on wall).

345.    At the time of Hurricane Katrina, the top of the IHNC floodwall was considerably below the design elevation due, among other things, to the use of incorrect datums to define the top of the floodwall and due to subsidence of the levee and floodwall over time.  The American Society of Civil Engineers reported that at the time of Hurricane Katrina, the levees and floodwalls were up to 3 feet lower than their original design.  See Mosher Dep. 134:14-135:18 (noting "benchmarks were off due to subsidence") (DX 283).

346.    The height of the top of the floodwalls along the IHNC was not uniform.  At some locations, the top was lower due to greater subsidence and weaker soils.  Cushing Tr. 2110:18-25, 2111:12-2112:2 (floodwall had subsided substantially and non-uniformly, as much as 3 feet since it was built, and had subsided most at the breach locations); Cushing Report at 32 (DX 196); Bakeer Report at 31-32 &

Supp. (Marino letter) at 21 (discussing evidence of added fill placed in area of south breach, leading to differential settlement) (DX 205). IPET found that floodwall heights in the vicinity of the North Breach varied considerably and that the wall top was below 11 feet in some places. IPET Report Vol. IV at IV-9-8 (DX 145); see Mosher Dep. 238:17-22 (IPET used survey data for wall top height, not LIDAR) (DX 283); Marino Tr. 1402:8-14. Team Louisiana reported that "the floodwall crest at the point where overtopping initiated the south breach into the Lower Ninth Ward could have been a foot lower than the 12.5 feet [NAVD 88] found in surviving adjacent segments." Team Louisiana Report at 126 (DX 144); Bakeer Tr. 2401:19-2402:3; Marino Tr. 1406:12-19.

347.   Plaintiffs' expert failed to account for or to study the possibility of a lower wall top in the area of the South Breach. Marino Tr. 1190:24-25 ("obviously you don't know what is in the area of where the failure is because that is missing") (referring to wall top survey); Marino Tr. 1408:12-14 (has not studied whether the wall top in the area of the breach could be a foot lower, as Team Louisiana found).

### f.   Role of overtopping at South Breach

348.   Overtopping and scour of the land-side soils played a significant role at the South Breach. As noted above (¶ 295), the peak water levels in the IHNC exceeded the top of the floodwall by as much as 2 feet. These same water levels exceeded, by an even greater degree, those portions of the IHNC floodwall that had settled to a lower level. In the case of the IHNC South Breach, water cascading over the top of the floodwall created a scour trench on the protected side of the wall to depths in excess of six feet. The scour trench was deepest in the locations nearest to the initiation point of the South Breach. The scour trench grew wider and deeper toward the middle of the breach, indicating longer overtopping toward the middle of the breach. The effects of scour were exacerbated by the uneven floodwall, which gave rise to overtopping and scour at the lower portions of the wall. The location of the South Breach was one of the lowest points on the floodwall. The scour trench was also exacerbated by the cyclone fence, which was installed 18 inches from the floodwall, and channeled water along the floodwall. Bakeer Tr. 2402:5-21; Cushing Tr. 2108:25-2109:5, 2109:12-16, 2112:20-2114:17; Cushing Report at 54-57, 67 (DX 196); Bakeer Report at 41, 55 (DX 205); LNA 009744-45 (Hardberger photos) (scour trench) (DX 82).

a.   Dr. Cushing personally inspected the failed floodwall after Katrina and confirmed that the scour trench grew deeper and wider as one approached the breached area and then within the breached section itself, with the deepest section occurring within the large bow around North Johnson Street, reflecting the increased severity of the scour in that area due to the lower wall top height there. Cushing Tr. 2109:6-2111:17. Plaintiffs ignore this testimony and pretend (Pl. Br. 67) that the wider scour trench approaching the breached area, as shown in a photograph, is due to

perspective rather than the existence of what Dr. Cushing reported having seen with his own eyes.

349.   Overtopping of the floodwall in the area of the South Breach initiated by approximately 6:00 a.m., with eyewitness reports placing overtopping of the floodwalls even earlier than that.  The floodwall failure at the South Breach did not occur too early for overtopping to have played a substantial role.  Team Louisiana Report at 66 (DX 144) ("At approximately 0600, levees and floodwalls along both banks of the IHNC were overtopped, beginning on the south end where the surge was the highest"); Bea Report at 39, App. C at 3 (floodwalls began overtopping at 6:00 a.m. to 7:00 a.m. CDT) (DX 206.); Bea Tr. 2688:18-2690:18 (photo showing significant overtopping during Hurricane Gustav at water level of 11.5 feet, more than a foot below the top of the wall); Bakeer Report at 36-37 (entire wall overtopped by 7:00 a.m., with lower portions of wall overtopped earlier) (DX 205).

350.   Ernest Edwards (aka, "All Night Shorty") took several trips to the levee on Sunday night to watch waters rise and at approximately 1:30 a.m., the water was about a foot and a half from the top of the wall.  Edwards Dep. 63:10-16; 65:22-66:4; 67:5-9 (DX 272).  From the Claiborne Avenue bridge around 3:00 a.m., Mr. Edwards saw the water overtopping while the wall was still standing, with the water spilling over like a bucket, "cutting in the ground," and eroding a trench that was about 3 feet deep.  Edwards Dep. 78:2-12,78:24-79:24, 80:5-15 (DX 272).

351.   D'Antoinette Johnson described overtopping as well from Tonti to Prieur Streets before there was a break in the floodwall and then saw water flowing through the breach, but did not see the barge until after she was evacuated.  D'Antoinette Johnson Dep. 31:16-20, 32:1-33:2. 34:5-14, 35:6-18, 39:25-41:8, 139:22-140:20, 143:4-9, 143:15-144:3 (DX 277).

352.   Andrew Sartin also went to the IHNC and saw water lapping near the top of the floodwall on Sunday evening.  Sartin Dep. 53:3-54:1 (DX 285).

353.   Michael Bickham also walked to the levee on Sunday night and saw "water had already started to rise on the canal."  Bickham Dep. 52:18-53:9 (DX 316).  Mr. Bickham testified that on Sunday night the water was "popping on the wall" as it was blown by the wind.  Bickham Dep. 52:18-53:9; 53:24-55:5 (DX 316).  After midnight and before day break on Monday, Mr. Bickham saw waves splashing over the wall.  Bickham Dep, 56:1-24 (DX 316).

354.   In response to a question whether there was a "waterfall effect" along the entire length of the floodwall, at a time when "the levee was intact," Terry Adams testified that water was "hitting everywhere coming over" and "that's why it was coming in the neighborhood."  Adams Tr. 260:14-20.

355. Arthur Murph testified that when he went out to check on the level of water in the IHNC the water was "about to the top of the wall" and water was splashing and blowing over the top of the wall. Murph Tr. 688:9-690:12. This was well before Mr. Murph reported the flooding having begun. Murph Tr. 690:15-693:23 (after checking water level but before flooding, Murph went inside, watched television, and had "drank a few beers").

356. Plaintiffs' expert Dr. Marino admitted that if Team Louisiana's conclusion about the timing of overtopping is credited, then there would have been at least 30 minutes of surge overtopping at the floodwall before South Breach occurred, during which time the surge overtopping would have been eroding the soil on the protected side. Marino Tr. 1410:4-8; see also Bea Tr. 2690:20-25 (lower wall top in a particular area would mean earlier overtopping and scour). In that connection, Dr. Mosher testified that "it would have taken just a little bit in terms of time" for overtopping to cause the wall to start leaning and cause "more water [to] start rushing over it." Mosher Dep. 106:17-107:5 (DX 283).

357. Dr. Bea showed photographic evidence from Hurricane Gustav demonstrating that even before the surge level reaches the top of the floodwall, significant amounts of water can pour over the floodwall and cascade on the protected side, potentially leading to early development of erosion trenches in protected side soils. Bea Tr. 2689:21-2690:16.

### g.    Formation of tension crack at South Breach

358. The formation of a tension crack between the canal side floodwall and the steel sheet pile due to hydrostatic pressure played a role in causing the South Breach as well as the North Breach. Bakeer Tr. 2398:1-13; Bakeer Report at 3, 58-59 (DX 205); Mosher Dep. 59:12-64:6 (gap formation without barge involvement) (DX 283); Pazos Report at 51 (gap formation at South Breach) (PX 402).

### h.    Role of hydraulic uplift at the South Breach

359. The South Breach was subject to the same sorts of uplift pressures as the North Breach, but took longer to develop because the soils were somewhat less permeable. Bea Tr. 2686:12-2687:21. Although the hydraulic pressures did not give the same blowout as at the North Breach, the hydraulic pressures did reduce the effectiveness of the soil overburden on the protected side, rendering the wall less stable. Bea Tr. 2688:12-16. Dr. Bea's stability analysis showed that the factor of safety at the South Breach fell below 1.0 at approximately 7:00 a.m., reflecting a failure condition. Bea Tr. 2691:14-16.

360. Dr. Mosher noted that even at factors of safety above 1.0, the floodwall experiences "large deformations" as a result of wall movement. Mosher Dep. 86:13-87:6 (DX 283).

### i.      Seepage and stability analyses by defense experts

361.    Seepage and stability analyses performed by Dr. Bea and Dr. Bakeer, using reliable and validated methods and data, confirm that the floodwall failed at the South Breach without the need for any involvement by a barge.  Bakeer Tr. 2411:13-2414 (insufficient tip penetration; wall failed CWALSHT test); Bakeer Tr. 2415:5-2417:17 (floodwall failed global stability tests); Bakeer Tr. 2420:15-2425:9 (other failed tests and criteria); Bakeer Report App. at 29-35 (DX 205); Bea Tr. 2702:10-2715:2 (validation of results); Bea Report App. C at 64-90 (DX 206).

362.    The non-barge forces exerted on the floodwalls during Hurricane Katrina were sufficient to cause the floodwall to fail without impact from a barge.  Bakeer Report at 61 (walls failed "for reasons that had nothing to do with a barge") (DX 205); Mosher Dep. 14-15 ("The walls would have failed even if the barge hadn't hit the walls") (DX 283); Mosher Dep. 68 (Q:  "Did IPET conclude that the conditions in the Inner Harbor Navigation Canal were sufficient to cause the wall to fail without involvement by a barge?"  A: "Yes.") (DX 283); Mosher Dep. 117 ("[T]here were other causes to the failure of the wall other than the barge, and [we] didn't feel that was a potential cause for the failure of the walls.  They would have failed otherwise.") (DX 283).

### j.      Sequence of formation of South Breach

363.    The South Breach gave way first in the northern "bow shaped" section near North Johnson Street, as opposed to the southern portion where the sheet pile was displaced to a lesser degree.  Bakeer Tr. 2368:10-14; Bea Tr. 2692:1-16. Hydrostatic pressure and overtopping caused the sheet pile wall to form a bulge pushing back into the neighborhood which then gave way and translated approximately 180 feet inland, pulling the sheet pile out and unfolding the accordion-like folds in the sheet pile, forming a distinctive "bow" shape.  This northern "bow-shaped" section was also located in an area very close to one of the sand-filled EBIA excavations.  The smaller southern segment of the South Breach did not displace as deeply into the neighborhood.  It appears this segment was in a state of incipient failure and had become only partially dislodged when the northern segment failed first, pulling the southern segment out but displacing it only slightly by comparison.  These features developed without any involvement by the barge.  Bea Tr. 2619:3-2620:23; Bakeer Tr. 2399:16-2401:3; Cushing Report at 72-73, 112-14 (DX 196); Cushing Tr. 2100:23-2101:22; Bakeer Report at 57 (DX 205); Bea Report App. C at 8, Fig. 6 (DX 206).

364.    The wall top in the area of the South Breach was lower, and the ground was providing less resistance to the stability of the wall.  Formation of a tension crack increased the pressure of the water on the wall.  The breach formed in the northern bow together with an incipient failure in the small bow to the south, in a zone of weakness due to curvature of the wall and weak subsoil conditions including sand-filled excavations, which ultimately joined to become a contiguous

failure. Bakeer Tr. 2397:8-2401:3, 2407:16-2409:16 (demonstration with physical model); Bea Tr. 2617:20-2618:4 (lateral instability accompanied by hydraulic uplift, exacerbated by overtopping erosion; Cushing Report at 60 (DX 196); Bakeer Report at 3, 54-59 (DX 205); Bea Report at 21-22 (DX 206).

**ii.    Evidence that the barge did not cause the South Breach**

365.    Multiple independent bodies of evidence confirm that the ING 4727 did not cause the South Breach. These include: (a) meteorological evidence showing the barge could not have been present at the site of the breach; (b) physical evidence at the site of the breached floodwall and on the barge itself, which shows no signs of impact where the breach initiated in the "bow" section, and only reflects of impact at the far southern end of the breach, after the breach had already occurred; (c) evidence of the strong flow of water created by the breach, together with the failure of the barge to be drawn deeper into the neighborhood, as would have occurred had it been present; (d) evidence showing that the water level in the Lower Ninth Ward was already very high when the barge passed into the neighborhood, demonstrating that the breach had already occurred before the barge approached the wall; and (e) the absence of any evidence from plaintiffs' experts regarding a plausible impact scenario, and physical evidence ruling out the hypothetical impact scenario they presented.

### a.    Meteorological evidence – barge could not have been present

366.    The South Breach had already occurred before the prevailing winds came to include any component blowing from the direction of the LNA Terminal toward the east bank of the IHNC. The prevailing winds cannot have caused the barge to come into contact with the floodwall at the site of the South Breach at any time before its occurrence; neither could currents or waves have caused the barge to contact the wall at the time of the breach. Cushing Tr. 2051:12-2052:10; Cushing Report at 114 ("it is clear that the [south] breach had to have occurred before the winds had a west-to-east component") & Fig. 110 (DX 196); Marino Report at 3-11 (winds "essentially parallel" to canal before 9:00 a.m.) (PX 397); Cushing Report at 167-68 (DX 196). See also above ¶¶ 90-167 (full discussion of wind evidence).

### b.    Physical evidence from breach site and barge

367.    The barge did not impact the floodwall in the northern "bow shaped" section of the South Breach. The damage pattern there shows that the panels incline at increasing angles, but they do not show fracturing of the concrete. Cushing Tr. 2103:1-22 (there was no damage from the barge on the floodwall at the point of initiation; the only damage to the concrete on the floodwall was caused by the expansion of the sheet pile). Vertical cracking damage was not evidence of barge impact, as such cracks were due to torque and occurred on floodwalls that failed with no barge present. Cushing Tr. 2103:23-2105:11; Cushing Slides CC-072-73 (DX 349); Cushing Report at 88 (DX 196); see Pazos Dep. 202-03 (barge did not

90

"impact" the wall at northern section; claiming only lesser degree of "contact" at that location) (DX 402).

368.   Hydrostatically induced failure creates a bow-shaped deformation of the type observed at the South Breach, due to influence of a uniform load acting along the entire wall.  By contrast, a point-load impact, such as would be imposed by a barge, results in a pointed indentation.  The pointed indentation would *not* disappear even if the wall became bowed later due to hydrostatic pressure; instead it would constitute a "nonrecoverable plastic strain."  There was no evidence of a non-uniform or pronounced indentation at the apex of the South Breach.  Therefore, the absence of a point impact along the curving bow at the South Breach demonstrates that "the failure is due to hydrostatic pressure with no involvement from a barge."  Bakeer Tr. 2435:1-2437:15 (demonstration); Bakeer Report at 64-65, 67-68 (also noting no pointed indentation at North Breach) (DX 205).

369.   Apart from the localized damage observed at the extreme southern end of the South Breach, there is no evidence of damage on the floodwall consistent with a barge impact at the location of the South Breach, and specifically no evidence of barge impact damage to the floodwall in the area of the northern "bow" where the South Breach initiated.  Cushing Tr. 2125:3-6 (other than at the south end of the South Breach, there is no evidence of the barge impacting the floodwall); Cushing Report at 67, 173, 175 (DX 196); Mosher Dep. 271:9-13 (DX 283) (no physical evidence of barge impact with wall at any location other than south end of south breach); see also Mosher Dep. 144:12-145:12 (DX 283) (location of "primary damage" to floodwall does not "match up" to "where we saw potential damage from a barge hitting it"); Mosher Dep. 227:18-228:4 (same; opining that "we don't have any evidence" that barge was contributing cause of failures) (DX 283).

370.   By contrast with the evidence from the bow-shaped section in the northern portion of the breach, where no evidence of barge impact is present, the physical evidence at the southern end of the South Breach showed that the barge passed through the floodwall at the extreme southern end of the South Breach, breaking off some of the concrete cap and bending some of the rebar as it passed through.  LNA Undisputed Fact 27.  The concrete cap was cracked and the steel reinforcing bar bent toward the neighborhood, and the barge had scratches on the bottom consistent with the pattern of the steel rebar.  The damage to the floodwall showed that the panels at the southernmost end of the breach were in an inclined position before being struck by the barge.  Also, this impact with the concrete cap occurred well away from the apex of the northern bow, where the breach initiated.  Thus, this contact by the barge occurred after the floodwall had already failed in the northern bow segment of the South Breach; the floodwall was already down before the barge first made contact.  Cushing Tr. 2101:7-22; 2102:1-9 (the South Breach initiated at the apex of the main bow near North Johnson Street, where the most significant destruction was found); Cushing Tr. 2107:10-12 (South Breach did not initiate at the south end where barge traversed floodwall); Cushing Tr. 2114:23-2116:22 (the barge traversed the already-fallen floodwall, knocked the

cap off the leaning panel and bent the rebar in the cap horizontal, parallel to the water level in the IHNC); Cushing Tr. 2142:17-20 ("barge broke the cap off of the last panel of the already-fallen floodwall"); Cushing Slides CC-086-91 (DX 349); Cushing Report at 90-91 (scratches matched rebar; panels inclined before contact) (DX 196); Cushing Report at 115-20 (sequence of events at southern end of south breach) (DX 196); Cushing Report at 174 (floodwall damage demonstrating barge impact was after failure) (DX 196); Bakeer Report at 65-66 (barge impact area confined to extreme southern end, away from location where wall initially failed) (DX 205); Bartlett Tr. 336:4-9 (scratches on barge matched rebar); Team Louisiana Report at 67 (angle of rebar suggested this section of the wall "was already leaning having failed earlier") (DX 144); ILIT Report at 6-7 (barge was "drawn into the breach by the inflowing waters") (DX 141); Marino Tr. 1270:8-10 (agreeing that the shearing off of the concrete at the south end of the breach was the "last of the three events," referring to formation of northern bow and second smaller bow); Marino 2008 Dep. 91:14-18, 95:17-20 (Q: "Did this shearing off of the top three feet at this location occur before or after the failure at the center point of maximum displacement in Photo 10?" A: "It occurred after.") (DX 225); LNA 741-750, 755-757, 10171 (bent rebar photos) (DX 90); Bartlett Tr. 359:25-360:1 (shearing off created only "localized damage to the cap"); Pazos Tr. 836:25-837:2 ("So it's clear that the barge enters on top of the levee after knocking these concrete panels and gliding on top of the rebar").

371.    Damage on the barge itself is inconsistent with the barge having caused the breach.  There is no evidence of damage on the barge consistent with an impact with the floodwall at the point of the breach, or with entry into the neighborhood before the water level was already very high.  The scratch marks on the bottom of the barge line up with the rebar at the southern end of the breach, reflecting its passage through the existing breach at that location.  Cushing Tr. 2108:1-17, 2116:23-2117:9, 2117:24-2120:9, 2136:21-24; Cushing Slides CC-079, 92 (DX 349); Cushing Report at 87, 173 ("There was no damage on the barge that is consistent with the barge having caused the failure of the levee such as crushing damage, which could have been apparent if a major collision had occurred") (DX 196); Marino 2008 Dep. 131:25-132:2 (Q:  "So there was no significant barge damage [crushing damage] on this barge, right?"  A: "Yes.") (DX 225); Bakeer Dep. 118:18-119:3 (noting absence of damage on barge) (PX 345).

372.    Plaintiffs' experts offered contradictory opinions regarding photographic evidence of floodwall damage which failed to establish any such damage was caused by the barge.  Pazos Dep. 193:13-194:11 & Exh. 12 (alleging barge caused damage in photo) (DX 218); Marino 2009 Dep. 180:10-181:12 (denying barge caused damage in same photo) (DX 221); see Cushing Report at 136-37 (explaining why damage in photo was not caused by barge) (DX 196).  For instance, regarding concrete damage within the South Breach, Dr. Marino admitted that "the water has stretched the panels and caused the concrete to crack off" and that this damage was not a result of barge impact.  Marino Tr. 1387:25-1388:12 (citing Marino Report Photo 4.31 (PX 397)).  Mr. Pazos, however, attributed this same damage to the barge acting like a plane.  Pazos Tr. 835:20-836:5; Pazos Dep.

193:15-194:11 (DX 218).  Similarly, Dr. Marino admitted that the floodwall sheet pile did not become "disconnected" within the South Breach, disagreeing with testimony from Mr. Pazos that the sheet pile became separated "rubber band" at both breaches.  Marino Tr. 1388:14-1389:9; Pazos Tr. 827:24-828:8.  Dr. Cushing agreed with Dr. Marino and showed that the sheet pile interlock did not fail at the South Breach.  Cushing Tr. 2107:4-9 & Cushing Slide CC-078 (DX 349).

> ### c.    Strong water flow; barge not drawn deep into neighborhood

373.    The damage pattern inside the main part of the South Breach (*i.e.*, the bowed portion) shows that the water flow through the breach was very strong.  If the barge had caused the breach, it would have been immediately drawn into and propelled in an easterly direction with the inrushing waters, deep into the Lower Ninth Ward.  That did not occur, however.  The barge ended up just inside the floodwall, slightly inward from the extreme southern end of the breach, away from the main portion of the breach.  The position of the damaged houses and trees shows the barge cannot have traveled into the neighborhood and then drifted back toward the floodwall.  Thus, the barge was not present in the vicinity of the floodwall when the main initial flow into the neighborhood took place.  Cushing Tr. 2101:23-2102:9 (performed damage survey which showed that water flow fanned out around the main bow and was the area of the worst devastation); Cushing Tr. 2102:10-25 ("if the barge had caused this failure of the wall . . . it would have been blown right into the Lower Ninth Ward.  It would have moved directly inland and it would" not have been located farther north; barge could not have caused the breach and then moved south to its final location); Cushing Tr. 2121:12-14 (if the barge "had caused this failure, [it] would have [been] driven … deeper into the Lower Ninth Ward"); Cushing Tr. 2126:10-22 (the barge could only reach its final position from the canal at the south end of the South Breach "over the fallen wall and rebar"); Cushing Report at 68, 72, 169-71 (DX 196).

374.    Plaintiffs' expert could not explain how the barge, had it been present in the vicinity, managed to avoid being entrained in this violent inrush of water, other than to opine that it somehow did so.  Marino Tr. 1386:6-13.

> ### d.    Evidence of high water level in neighborhood before barge arrived

375.    The rebar at the southern end of the South Breach was bent horizontally, indicating the water level must have been high when the barge floated through.  The barge could not have floated into the neighborhood until the water was already high because if the case were otherwise, the barge would have toppled into the neighborhood and grounded on its end due to the height differential that would have existed in such a scenario.  Cushing Tr. 2123:25-2124:16 (rebar would not have been bent horizontally, the bottom of the barge would have suffered significant crushing damage from pivoting on the wall, and there would have been severe damage from the barge grounding in the unflooded Lower Ninth Ward); Cushing Slides CC-99-105 (DX 349); Cushing Report at 74, 141-43, 173

(DX 196); Pazos Dep. 224:8-12 (Q: "All right. And the angle of the bending of the rebar, does that reflect … the attitude of the barge as it went into the neighborhood?" A: "Absolutely. Some was horizontal.") (DX 218).

376.   The barge floated over the top of a small school bus to arrive at its post-Katrina location. Bea Tr 2619:24-2620:8, 2656:9-23, 2684:21-2685:10 & DX 360 (identifying school bus next to barge before floodwaters receded) Thus, the water in the Lower Ninth Ward must have been higher than the top of the school bus when the barge entered the neighborhood. Bea Tr. 2685:16-2686:7. The bus was at its post-Katrina location even before the floodwaters and the barge arrived, as confirmed by the fact that the bus's wheels were "fairly heavily embedded in the soil" and there was no evidence the bus had been moved by the water. Bea Tr. 2792:6-19.

377.   Dr. Bea testified that the water level in the canal at 10:00 a.m. was approximately 12.2 feet (NAVD-88). The interior water level at that time was approximately 10 to 12 feet inside the neighborhood. These water levels would have permitted the barge to travel across the rebar and float into the neighborhood in the manner that it did. Bea Tr. 2655:15-2656:8, 2695:9-2696:2. Dr. Cushing also showed that the most likely and most plausible time for the barge to have made its way across the canal was in the 9:30 to 10:00 a.m. time frame when the water level was in the area of 12 feet NAVD and the wind was blowing with a component from the west. Cushing Tr. 2092:16-2094:2, 2212:4-2213:12, 2117:10-18. Plaintiffs' expert Mr. Bartlett agreed that the water level in the canal was such that the barge would contact the cap – the upper portion of the floodwall. Bartlett Tr. 336:10-20.

378.   Physical and photographic evidence in the damaged neighborhood shows the barge must have floated into the neighborhood after the water was already high. For example, photographs show the barge landed on top of telephone wires rather than knocking the wires or telephone poles over. The barge could not possibly have landed on top of the telephone wires unless the water in the neighborhood was already quite high at the time the barge arrived. LNA 010209, 010210 (DX 100); Cushing Tr. 2127:1-11; Cushing Slide CC-108 (DX 349); Cushing Report at 120, 121 (telephone wire) (DX 196).

379.   In addition, the pattern of damage on the houses with which the barge came in contact, just inside the floodwall, shows it did not carry any further into the neighborhood and that the water was high when the barge came into contact with them. Cushing Tr. 2127:12-2128:3; Cushing Slide CC-109 (DX 349); Cushing Report at 68, 74, 172 (DX 196).

380.   No damage was found on the Namasco Gantry, which was located to the south of the LNA Terminal or to the covers of the barge. Therefore, even after the winds attained a westerly component, the winds would not have blown the barge clear of the undamaged structures until after 9:00 a.m. Cushing Tr. 2128:4-20, 2130:1-15; Cushing Report at 82-85 (DX 196).

### e. Absence of plausible impact scenario by plaintiffs

381. Plaintiffs' expert provided an implausible impact scenario at the South Breach. According to Dr. Marino, the barge must have exerted a "significant force" on the wall to cause the concrete cap to shear at the end of the southern breach. However, because the barge had purportedly been brought to a stop by one or more supposed impacts within the northern portion of the breach (according to Dr. Marino), this scenario requires the barge to have picked up a sufficient head of steam, within the small distance of 100 to 200 feet from the location of the prior impact, to cause that damage including shearing the cap and bending the rebar within the cap. Marino Tr. 1392:8-23, 1394:8-13.

382. Dr. Cushing, by contrast, provided a coherent and plausible account of the barge's transit across the IHNC after the breaches had already occurred, traveling at a low rate of speed and oriented perpendicular to the wind, until it came into contact with the already-fallen floodwall at an oblique angle at the far southern end of the South Breach and passed into the already-flooded neighborhood. Cushing Tr. 2083:15-23, 2135:21-2136:24.

### f. Comparison with floodwall breaches at other locations

383. The floodwalls protecting the New Orleans area failed in multiple other locations, in similar configurations to those found at the IHNC breach sites, without any barge impacts. Such failures exhibited similar bow-shaped configurations reflecting hydrostatic pressure rather than point impact. Cushing Report at 175 (DX 196); Bakeer Report at 3, 30, 53, 62, 68 & Figs. 15, 36 (DX 205).

384. At other floodwalls that failed without impact from a barge, there were unfailed portions adjacent to the portions that failed. These unfailed portions prove that, as at the IHNC, a floodwall will fail at its weakest link. Thus the existence of unfailed portions along the IHNC does *not* suggest that the barge must have impacted the wall where the failures took place. Bakeer Report at 59-60 (DX 205); Pazos Supplemental Report at 5 (DX 313); Cushing Report at 138-39 (DX 196).

385. Dr. Marino testified that the "exhumation of the sheet pile" is the "central focal difference" between the IHNC breaches and the other floodwall breaches. Marino Tr. 1399:7-16. Dr. Marino inferred from this difference that the barge must have been involved at the IHNC, even though he admitted he has done no stability or seepage analysis on any of those other floodwalls to determine why they failed. Marino Tr. 1399:19-1400:1.

386. There was, however, at least one other breach at which the sheet pile was exhumed in a manner similar to what was observed at the IHNC east floodwall. In particular, Dr. Bea identified the Bayou Bienvenue south breach as one at which the sheet pile became completely exhumed from the ground due to a blowout in an area where the sheet pile had not been driven deep enough. Bea Tr.

95

2793:12-23 (also noting that exhumed sheet pile remained under water). Similarly, at the IHNC breaches and at other breaches, shallow and inadequate penetration of the sheet piling was a prime cause of the failure and resulting damage pattern.  Bea Tr. 2692:6-9; Bakeer Tr. 2302:5-9.

387.   Dr. Bea identified other breaches with components similar to the IHNC breaches, although each had its own unique features.  Bea Tr. 2680:1-2681:6.  For all the breaches, not just the IHNC, the failures took place at the weakest link in the system.  Bakeer Tr. 2302:10-2303:14, 2425:22-2426:23.

388.   One feature that was present at the IHNC and at other breaches was the existence of tension cracks.  Dr. Bea showed that at other breaches, as at the IHNC breaches, tension cracks formed under hydrostatic pressure and played an important role in the failures.  Bea Tr. 2667:5-15.

389.   The bow-shaped feature apparent at the IHNC was also present at other breaches. An example of the bow-shaped feature is at the west bank of the IHNC, where an identical bow-shaped transition was observed caused by hydrostatic pressure. Bakeer Tr. 2430:7-2431:19 & Bakeer Slides RMB-095, 98 (DX 356).  This is a hydrostatic failure, not a point impact.  Bakeer Tr. 2429:10-13.

390.   Captain Hall saw a floodwall breach occur in the vicinity of the New Orleans Bulk Terminal where he rode out the storm.  He watched the floodwall collapse under water pressure around 9:00 a.m. on Monday morning without any involvement by a barge.  Captain Hall subsequently saw barges and other debris flow through the already-opened breach "like cattle, you know, running through a cattle gap."  Hall Tr. 1957:12-1959:25, 1976:24-1977:6 ("I know nothing struck it to cause the breach.  I watched the collapse of the wall and there was nothing other than water and wind present at the time.").

391.   Dr. Mosher testified that the IPET team found no important distinctions in the appearance of other floodwall breaches caused by similar factors such as overtopping and erosion.  Mosher Dep. 71:3-72:18 (DX 283).  In particular, Dr. Mosher testified that the erosion trench present at the Citrus Back Levee wall failure appeared similar to the failure at the IHNC South Breach, except that the IHNC breach had progressed further.  Mosher Dep. 73:24-75:16 ("similar" physical evidence at each breach) (DX 283).  The difference in appearance between those two breaches could be explained by the fact that the IHNC South Breach had a bigger drop-off from the level of the floodwall and canal to the level of the protected area below.  Mosher Dep. 75:17-77:17 (DX 283).  In a similar vein, Dr. Bea noted that the IHNC experienced a greater degree of storm surge than the floodwalls at the London Avenue and 17th Street Canals, which were not connected to the MRGO.  Bea Tr. 2764:15-2765:2.

g.   **Summary**

392.   In sum, the meteorological and physical evidence lead to the conclusion that the

barge was not present at the site of the South Breach when the breach occurred, and only passed through the extreme southern end of the breach after it had already occurred.  The barge did not cause the failure of the floodwall at the South Breach.  Bea Tr. 2618:5-6, 2696:5-7; Cushing Tr. 2038:24-2039:9; Cushing Report at 166-76 (DX 196).

**E.      Reasons to Credit Drs. Bea and Bakeer, and Not Dr. Marino**

      **i.        Superior experience and expertise of Drs. Bea and Bakeer**

393.   LNA's key geotechnical experts have years of experience studying the New Orleans region's floodwalls and levee structures.

394.   LNA's expert Robert Bea, Ph.D., P.E. is a Professor of Civil and Environmental Engineering at the University of California – Berkeley.  See Bea Report, App. A at 1 (DX 206).  Dr. Bea is an invited member of the American Society of Civil Engineers Committee on Forensic Engineering and has served as principal investigator on numerous high-profile investigations.  Bea Tr. 2581:20-2585:9.  Dr. Bea has spent approximately 10,000 unpaid hours studying and reporting on the failures of the hurricane flood protection system in New Orleans during Hurricane Katrina, including thirty-five visits to New Orleans to study the hurricane protection system.  Bea Tr. 2587:10-13, 2610:2-6; Bea Report at 4 ¶ 4 (DX 206).  He served as co-leader of the Independent Levee Investigation Team ("ILIT") sponsored by the National Science Foundation, and co-authored the ILIT team's preliminary and final reports.  Bea Tr. 2586:22-2587:25; Bea Report at 5 ¶ 4(c) (DX 206).  Dr. Bea has authored and co-authored more than twenty refereed conference and journal papers and over thirty technical papers documenting his forensic engineering work regarding the causes of the levee and floodwall breaches in and around New Orleans.  Bea Tr. 2588:1-23; Bea Report at 7 ¶ 12 (DX 206).  Dr. Bea reached his conclusion that the ING 4727 was not a cause of the IHNC floodwall breaches in multiple peer-reviewed publications that he wrote before he was ever retained as an expert by LNA (2009) or any other party in the Katrina litigation (2007).  Bea Tr. 2596:18-2598:12, 2616:9-14; Bea Report at 8-13 ¶¶ 17-23 (ILIT investigation and conclusions published in 2006) (DX 206); Bea Report at 15-22, ¶¶ 27-29 (peer-reviewed journal articles published in 2007 and 2008) (DX 206).

      a.      Plaintiffs' attack on Dr. Bea's motivations (PFF ¶¶ 270-76) is utterly without merit.  The Court accepted and relied upon Dr. Bea's testimony to support its findings of fact and conclusions of law in *Robinson*.  Doc. 19415 at 45-46 (Bea testimony "credible" and "accept[ed] as fact").  Dr. Bea has spent thousands of hours studying the causes of the floodwall breaches, and his testimony makes clear that he approached the topic with an open mind and continues to have an open mind.  *E.g.*, Bea Tr. 2594:21-2597:7 (Dr. Bea originally considered barge to be a potential cause, but ruled it out when evidence showed the barge was not involved).

395.   LNA's expert Reda Bakeer, Ph.D., P.E. is chief engineer of Ardaman and Associates and a Professor Emeritus of Civil and Environmental Engineering at Tulane University.  Bakeer Report App. C at 51-52 (DX 205); Bakeer Tr. 2275:15-16, 2277:11-2278:1.  Dr. Bakeer is an elected fellow in the American Society of Civil Engineers.  Bakeer Tr. 2276:17-22.  In addition to teaching soil mechanics and other courses relating to levee and floodwall design while at Tulane, Dr. Bakeer was selected to be a faculty member at the Levee School at Louisiana State University, a school created with funding from the Louisiana Department of Transportation and Development.  Bakeer Tr. 2278:2-2279:17.  In this role, Dr. Bakeer instructs local levee board members regarding engineering details of the levee systems.  *Id.*  Dr. Bakeer has published numerous peer-reviewed articles and has been involved with the study of floodwalls and levees for well over twenty years, including as a practicing engineer involved in levee and floodwall design for over a dozen years.  Bakeer Tr. 2284:23-2286:4.  As Ardaman's chief engineer for the State of Louisiana, Dr. Bakeer oversees all of his firm's engineering projects in the state, including numerous levee and floodwall projects throughout the state and in the New Orleans area, such as the recent project involving construction of the Bayou Bienvenue replacement gate and deflection monitoring within the massive primary floodwall in the GIWW that was shown to the Court.  Bakeer Tr. 2281:2-2284:22 Bakeer Slide RMB-04 (DX 356); Bakeer Report App. C at 54-72 (listing work done for Army Corps and other entities) (DX 205).

396.   Plaintiffs' expert Gennaro Marino lacks the experience that Dr. Bea and Dr. Bakeer have regarding the New Orleans levee systems.  Dr. Marino has never published any articles about the failure of a hurricane protection levee.  Marino Tr. 1308:7-9.  Dr. Marino has never taught any courses about the design of hurricane protection levees or floodwalls.  Marino Tr. 1308:10-12.  Also, Dr. Marino has never: (a) designed a levee or floodwall in Louisiana, Marino Tr. 1307:16-18; (b) evaluated the safety of a hurricane levee or floodwall in Louisiana, Marino Tr. 1307:24-1308:2; (c) been asked by the Corps to evaluate the safety of a hurricane protection levee or floodwall at any location, Marino Tr. 1307:20-23; or (d) conducted a seepage or stability analysis of a hurricane protection system that failed.  Marino Tr. 1308:13-24; Marino 2009 Dep. 89:17-91:6 (DX 221).

397.   Dr. Marino's work on the IHNC floodwall failures was carried out purely for litigation and does not grow out of his independent work.  All of the work Dr. Marino has done in connection with the IHNC breaches was performed for the plaintiffs' lawyers in this case.  Marino Tr. 1309:23-1310:1.  Dr. Marino did not take part in any of the independent investigations that were performed after Hurricane Katrina.  Marino Tr. 1311:22-1312:6.  Dr. Marino's work on this case has never been subject to independent oversight.  Nobody has ever commented on his report apart from plaintiffs' lawyers and his own staff.  Marino Tr. 1312:7-1313:1.  Dr. Marino has never published his research in a peer-reviewed or refereed journal.  Marino 2009 Dep. 49:4-7 (DX 221).  Finally, Dr. Marino's conclusions contradict the results of all of the independent published and peer-

reviewed studies conducted to date regarding the causes of the floodwall failures. Marino 2009 Dep. 261:20-62:2 (DX 221); Bakeer Report (Comments on Marino Report) at 3 (DX 205); Mosher Dep. 264:16-23 (DX 283) (no reports by any scientists, other than those working for plaintiffs, conclude that barge caused IHNC floodwall failures).

a.      In contrast to LNA's experts, Dr. Marino did not visit the failed floodwall for forensic purposes, and did not inspect the barge, the failed sheet pile, or any other failed floodwalls.  Marino 2009 Dep. at 126:3-14 (DX 221).

**ii.      Flaws in Dr. Marino's seepage and stability analysis**

*a.      Soil characterization – Dr. Marino's unusual lobe at North Breach*

398.   Dr. Marino admitted that soil layering is "critical to … the results" for both his stability and seepage analysis.  His soil layering included a lobe of levee embankment soil at the area of the North Breach, down to a depth of 18 feet, which had the effect of cutting off seepage and adding strength to the profile, but which had no data to support it.  Bakeer Tr. 2438:2-11 & Marino Report, Fig. 5.12 (PX 397); Bea Tr. 2731:4-7; see also Bea Tr. 2729:4-2730:2 (no evidence of documentation evidencing placement of levee embankment soils, despite extensive review).  By contrast, the teams of geologists on IPET and ILIT, working independently, arrived at soil characterization cross-sections that were similar to each other and that did not include this feature drawn by Dr. Marino.  Bea Tr. 2621:15-2624:19 & IPET Report Vol. V, Fig. 11-9 (DX 145); ILIT Report Fig. 6.24 (DX 141).

399.   The actual soil boring taken at the location where Dr. Marino placed this lobe of levee embankment soil is Boring 81A.  The actual boring data for this location showed the presence of shell and silty sand down to a level of around 18 feet, below the sheet pile tip.  See Bea Slide RB-117 (showing boring log) (DX 361).  Dr. Marino admitted that if this boring data reflected the actual soil conditions in the vicinity of the floodwall, that would present a dangerous condition due to the potential for seepage of water under the sheet pile tip.  Marino Tr. 1101:13-20 (boring 81A has "sand fill down to a depth of about almost 17 feet, and if it was … actually drilled where it shows on the plan, that would represent a concern"); Marino Tr. 1445:7-9 (sand next to the wall "is not a condition you want to have there"); Marino Tr. 1431:9-14 (shell and silty sand would create a dangerous condition if present near the floodwall because it could allow water to seep down the wall and undermine the wall underneath it); see Team Louisiana Report at 202 ("Once water can move down the floodside sheet pile face, it can increase pressure on the face of the wall, and in any pervious materials can potentially migrate around sheet pile thus enhancing the failure.") (DX 144); see also Marino Tr. 1158:7-11 ("if [water] is going to seep from the canal, you have to know what the conditions are on the ground in front of it as it's seeping") (explaining why boring 81A is important).

99

400.   The North Breach occurred in the area where the boring log indicates that sample 81A was taken.  Marino Tr. 1159:2-4 ("breach would have occurred around 81"); Marino Tr. 1440:13-17 (sample 81A, as represented in the documentation, would be right around the northern end of the North Breach); Marino Tr. 1441:14-23 (GPS coordinates on boring log match location at northern end of North Breach); Bea Tr. 2634:12-2635:4 (same).

401.   Dr. Marino speculated that boring 81A had been "moved" to a different location, based on his belief that the location reflected in the boring log was in a "ravine" and thus inaccessible to a drilling rig.  Marino Tr. 1102:22-1103:16, 1437:1-22. However, he could point to no document placing the boring in a different location.  Marino Tr. 1430:1-3.

402.   Dr. Bakeer, who has over twenty years of experience in soil drilling, testified that boring locations cannot be "moved" without documentation showing where the boring was actually drilled.  The word "adjusted" as used in the boring log means only a couple of feet in either direction, such that the GPS coordinates for the boring remain accurate as provided.  If a boring is "moved," the new coordinates must be provided.  Bakeer Tr. 2337:20-2340:17, 2344:2-2345:14; 2455:6-2456.

403.   Also, based on Dr. Bakeer's experience in the field of soil drilling, the drilling equipment is built in order to be able to drill on a slope – "you can fit it anywhere you want" – and thus Dr Marino is wrong to suggest drilling equipment could not have reached the location of boring 81A as shown in the data.  Bakeer Tr. 2340:14-2342; see also Bea Tr. 2635:15-21, 2636:17-25 ("certainly" possible to drill on an incline).

404.   Finally, photographic evidence from before Hurricane Katrina conclusively establishes that the location of boring 81A, immediately adjacent to the floodwall at the location where the North Breach would occur, was relatively flat and easily accessible for drill boring.  Bea Tr. 2637:1-2639:9 ("no ravine" present) & DX 358.

405.   Dr. Marino also assumed that the shell and silty sand in the vicinity of the floodwall at the North Breach had been replaced with impermeable levee material, despite the lack of any records showing what was placed or that the placement had even occurred.  Marino Tr. 1105:11-21, 1108:9-1109:6, 1442:24-1443:5.  However, Dr. Marino acknowledged that the government does not always do what it says it will do.  Marino Tr. 1444:21-1445:1.  And he admitted there are no records from a contractor, from the government, or from anyone else showing that the work was actually performed to replace the sand and shell with levee embankment fill, as he assumes was done.  Marino Tr. 1447:1-5.  He also admitted that the actual boring showed shell and silty sand, which would be more pervious.  Marino Tr. 1430:23-1431:8.  Finally, boring logs from other locations within the North Breach area, which Dr. Marino admits were taken from the locations referenced in the logs, also showed the presence of shell and silty sand. Marino Tr. 1434:6-10 (boring 79A, taken from the middle of the North Breach,

shows shell and silty sand down to six feet); Marino Tr. 1434:12-1435:4 (boring 77A, taken from southern end of North Breach, also showed shell and silty sand, down to five feet).

### b.  Use of average soil values rather than normalized soil values

406.  Dr. Marino's soil characterization was based on a technique by which he assembled soil data reflecting different types of soil tests, from different areas along the floodwall, and then simply averaged those values to derive a value that he then applied across the entire area for each soil layer.  Marino Tr. 1125:1-13 (took "all those samples" and plotted them to get the "average property" for that layer); Marino Tr. 1447:24-1447:9 (Marino used average values after excluding "abnormally high" or "abnormally low" values); Marino Tr. 1128:10-11, 1449:13-15, 1452:21-24 (used "same procedure" for all soil units and layers); Marino Tr. 1096:1-13, 1450:2-4, 1450:9-20 (mixed disparate samples taken at different times, and averaged the results of different kinds of tests).

407.  In so doing, Dr Marino derived average values that were significantly higher than the weakest soil values represented in the data.  The use of average values generates results that are (a) overpredictive, because the average values will always exceed the weakest soil areas; and (b) not representative, particularly because different types of soil tests need to be weighted differently but Dr. Marino weighted them the same.  Bakeer Tr. 2438:15-2441:8, 2442:13-20; see Marino Tr. 1454:16-20 (as a matter of arithmetic, the average value will necessarily be higher than the weakest sample).

408.  The weakest sample strength for levee embankment, as actually reported, was less than half of the derived average value employed by Dr. Marino.  Marino Tr. 1448:8-10.  The weakest sample strength in the marsh layer was less than one-third of the derived average value.  Marino Tr. 1452:14-20.  For this and other reasons, Dr. Marino's soil strength values for the marsh layer – the "most controlling stratum," according to Dr. Bakeer – were 33% higher than what the data suggests, as found by IPET and other independent studies.  Bakeer Tr. 2485:7, 2486:1-25.

   a.   For this reason, plaintiffs' assertion that Dr. Marino's soil strength values are consistent with other studies (PFF ¶ 161) is in error.

409.  Dr. Marino's use of averaging failed to recognize the principle that a failure occurs at the weak location, not the average location.  He admitted that as a general engineering principle, failure commences at the weakest part of the structure.  Marino Tr. 1456:24-1457:11.  Team Louisiana reported:  "As one of the senior Team Louisiana geotechnical engineers pointed out, it is the anomalous stratum, rather than the average soils condition, that generally causes foundation failure."  Team Louisiana Report at 1 (DX 144); see Bea Tr. 2782:15-22.

410. There are established methods to properly account for variations in soil data in a statistically valid way, but Dr. Marino did not use any of them. Bakeer Tr. 2442:22-2443:21. As Dr. Bea explained, the proper technique is to use "normalized soil properties" which use pressure in the soil as a primary element to determine strength, and which are validated by experimental test data. Bea Tr. 2718:19-2719:21, 2721:7-2722:23. Dr. Bea showed that according to experimental data, the averaging technique produced a 42 percent overprediction of the factor of safety, whereas the normalized process that Dr. Bea used, called SHANSEP, replicated observed data in the field. Bea Tr. 2724:2-2726:6 & Bea, Slide RB-129 (DX 361); Bea Report App. B at 158(DX 206). Dr. Mosher agreed that SHANSEP is the "standard practice" among experts in the field for representing the shear strength of soil. Mosher Dep. 161:12-163:6 (DX 283).

### c. Failure to consider cone penetrometer data in soil strength analysis

411. Also, Dr. Marino ignored cone penetrometer data in assigning strength values. Bakeer Tr. 2445:6-2446:20; Marino Tr. 1451:14-1452:4. ILIT, with Dr. Bea's participation, undertook soil testing including cone penetrometer tests. Cone penetrometer data is useful and important, and Dr. Bea found that Dr. Marino had committed a "dramatic mistake" by excluding such data from his analysis. Bea Tr. 2605:3-2606:16.

412. IPET, working independently and with a separate team of geotechnical experts, also relied heavily on cone penetrometer data in its soil characterization. Mosher Dep. 80:8-81:21 ("we felt that the CPT data was better" than boring data) (DX 283).

413. Dr. Marino's use of averaging and his neglect of CPT data led to artificially high strength values that drove the results of his analyses and caused his results to differ from all of the independent studies and from Drs. Bea and Bakeer, showing artificially high strengths and stability when, in fact, the strength and stability of the soil was much lower. Bakeer Tr. 2446:21-2447:19, 2483:5-2486:23; Bea Tr. 2745:2-2747:11.

### d. Failure to consider hydraulic uplift

414. Dr. Marino admitted that his seepage and stability analysis was a "process of elimination" in which he inferred causation by the barge by eliminating other potential causes. Marino Tr. 1424:11-14. However, he also admitted that in carrying out his seepage analysis, he only asked whether there was "enough time to develop the uplift pressures" as a result of the "rate of seepage." Marino Tr. 1209:19-1210:2. Thus, his seepage analysis was based on the concept that the rising water did not have sufficient time to get from the canal to the floodwall and go underneath. Marino Tr. 1465:25-1466:4. Thus, he admitted, he did not evaluate the possibility of immediate communication of hydraulic pressure

because he assumed that there was "nothing to evaluate" because canal water had not "reached that [protected] side yet."  Marino Tr. 1470:7-20.

415.    As shown above in connection with the testimony of Dr. Bea (¶¶ 316-18, 359), hydraulic pressure is immediately communicated from the canal side through saturated soil layers to the protected side of the floodwall, without the need for water to physically migrate from the canal side to the protected side.  Dr. Marino's failure to consider this phenomenon undermines his analysis and results.

### e.    Use of artificially low permeability values

416.    Dr. Marino's marsh layer permeability values were far too low.  First, the values that Dr. Marino used to characterize the key portions of the marsh layer amounted to "the permeability of a brick."  Bea Tr. 2731:17-2734:11.  Moreover, Dr. Marino used an arbitrary factor of 2.5 to adjust from vertical to horizontal permeability, while Dr. Bea used a factor of 10 based on test data.  Bea Tr. 2737:2-11 (factor of 10 based on test data); see Marino Tr. 1184:21-1186:19 (factor of 2.5, based on assumptions).

   a.    Plaintiffs argue (at PFF ¶¶ 150-52) that Dr. Marino used a range of permeability values in the marsh layer.  But the largest portions of the marsh layer, and the ones that governed his results, are assigned the least permeable value ($10^{-7}$ and $10^{-8}$).  Marino Report Table 5.1 & Figs. 5.42, 5.58, 5.59 (PX 397).  Thus Dr. Bea was correct in his characterization of Dr. Marino's permeability values.

417.    Dr. Bea's permeability values are also supported by field experience in the Lower Ninth Ward.  Extremely high horizontal permeability in the marsh layer, and instant connectivity and hydraulic pressure, were demonstrated when a cone penetrometer drilling immediately communicated with two open boreholes 100 feet away.  Bea Tr. 2738:24-2740:4.  In addition, Dr. Bea's permeability values are supported by actual sampling of the marsh layer soils, as reflected in the sample provided by Dr. Bea as a demonstrative.  Bea Tr. 2740:5-2741:8.  Finally, Dr. Bea's permeability values are supported by data collected in the same soil layer during tests of the 17th Street Canal, where rising water levels in the canal were immediately communicated to, and raised pressure values in, the marsh layer on the protected side.  Bea Tr. 2742:15-2745:1 and Bea Slide RB-123 (DX 361).

   a.    Plaintiffs wrongly assert (at PFF ¶ 156) that Dr. Bea used values for "California peat" and not "New Orleans marsh."  In fact, Dr. Bea's values are well within the range stated in IPET for New Orleans marsh ***and*** "California peat."  As Dr. Bea explained, moreover, those values are themselves consistent, when adjusted for the fact that one set of data come from the laboratory and the other from the field.  Bea Tr. 2735:1-2736:14 (discussing IPET Vol. V, App. 17, Fig. V-17-15 (DX 145)).  Moreover, Dr. Bea analyzed a range of permeability values and found that his

"transient water pressure" results were "insensitive to a plausible range in hydraulic conductivity."  Bea Report, App. C at 53 (DX 206).  Accordingly, it is false for plaintiffs to represent (PFF ¶ 164-65) that Dr. Bea's lateral instability results were governed by unrealistic permeability values.

### f.   Lack of validation

418.   Dr. Marino did not validate his results and methods by testing whether they would produce accurate results when applied to other breaches like the 17th Street Canal or London Avenue breaches.  Marino Tr. 1473:8-17.  By contrast, Dr. Bea validated his results and methods by showing that, when applied to other breaches for which photographic and video evidence exists of the timing of the breach (or that no breach occurred), Dr. Bea's models accurately predicted both the timing of the breaches on the breached walls and that the non-breached walls would remain intact at the 17th Street Canal.  Bea Tr. 2702:10-2709:22.  Dr. Bea undertook a similar validation, with similar results, for the London Avenue Canal breaches.  Bea Tr. 2709:23-2711:8.  Dr. Bea also validated his model by reference to field test data from various Army Corps of Engineers levee and floodwall field tests.  Bea Tr. 2711:9-2714:13  Dr. Bakeer based his analysis on validated models developed by the Army Corps of Engineers in its HSDRRS.  See below ¶¶ 419-20.

### g.   Failure to assess whether floodwall could withstand full storm surge

419.   The Army Corps has developed a set of guidelines for design and evaluation of floodwalls in the New Orleans area  (the "HSDRRS").  Dr. Bakeer used these guidelines to evaluate the IHNC eastern floodwall to determine whether it was sufficient to withstand the forces imposed by Hurricane Katrina.  Bakeer Tr. 2297:21-2300:6.

420.   The floodwall was not designed for Katrina conditions, which included formation of a tension crack.  The designs did not take soil variability into account, did not take possible overtopping into account, and did not adequately account for settlement.  Also the tip penetration was not sufficient to prevent seepage.  Bakeer Tr. 2413:9-2415:5, 2420:15-2421:14; see also Marino Tr. 1137:19-22 (admitting that "the sheet pile did not go all the way into the permeable marsh").

421.   Dr. Bakeer evaluated the floodwall by reference to HSDRRS criteria including local stability, global stability, piping and seepage, heave, and deflection.  He found the floodwall failed all but the "heave" analysis and even there received a low score.  These are established models that have been validated by the Corps for use post-Katrina in evaluating the safety and stability of floodwalls.  Bakeer Tr. 2410:8- 2423:19.

422.     In addition to failing these specific HSDRRS tests, the floodwall sheet pile was not sunk deep enough to cut off marsh layer (*i.e.*, it should have penetrated beneath the marsh layer), which both Dr. Bakeer and Dr. Bea testified should have been done as a matter of engineering judgment independent of the quantitative HSDRRS tests.  Bakeer Tr. 2423:17- 2425:9; Bea Tr. 2623:18-2624:3 (sheet pile left "window open for water transmission and hydraulic conduction effects under the bottom of the sheetpiling").

423.     The IHNC floodwalls were not built to withstand the hydrostatic pressure imposed by Katrina.  The wall failed under hydrostatic pressure with no involvement from a barge.  Bakeer Tr. 2303:15-20, 2360:18-22.

424.     IPET concluded that "conditions in the Inner Harbor Navigation Canal were sufficient to cause the wall to fail without involvement by a barge."  Mosher Dep. 68:7-11 (DX 283); see Mosher Dep. 14:13-15:2; 92:8-10 ("other things would have … caused the failure even if the barge hadn't been there") (DX 283).

425.     Dr. Marino did not show that the floodwall was strong enough to survive Katrina's peak storm surge.  He only evaluated the stability of the floodwall to a level of 12.5 feet NAVD-88.  Marino Tr. 1474:5-7.  Dr. Marino did not evaluate the stability of the floodwall to the height of the peak surge (14.2 feet).  Marino Tr. 1474:8-10.  Therefore, Dr. Marino admitted that plaintiffs have not proved that the wall was sufficiently stable to survive the storm, even if the Court were to fully accept his analysis.  Marino Tr. 1475:11-16 (agreeing with this proposition and noting he did not "evaluate[] it to the peak of the surge").

426.     Dr. Marino also skipped important steps in evaluating the strength and stability of the floodwall, and thus failed to show that the wall would have been expected to withstand the storm surge levels present earlier on the morning of August 29, when the breaches occurred.  For instance, Dr. Marino neglected to use a local stability analysis such as CWALSHT to check tip penetration.  Bakeer Tr. 2416:9-14.  Moreover, Dr. Marino used only the Spencer's method to evaluate global stability, even though the Corps uses both Spencer's and Method of Planes, and even though Spencer's is overpredictive of safety.  Bakeer Tr. 2416:15- 2417:13.

                    ***h.      Use of same flawed method to evaluate both breaches***

427.     Dr. Marino applied the same analytical methods and analysis at the South Breach that he did at the North Breach.  Marino Tr. 1262:9-24 ("same" seepage analysis, stability analysis, review of water tables, review of borings – "same analysis … for the south breach as [he] did for the north breach").  In fact, his opinions about the South Breach timing are informed by Mr. Villavasso's testimony about the North Breach, evidencing an inextricable connection in his analysis of the two breaches.  Marino Tr. 1377:3-5.  Thus, rejection of Dr. Marino's analysis as to the cause of the North Breach requires rejection of the same analysis as to the South Breach as well (and vice versa).

*i.*        ***Summary***

428.   In sum, Dr. Marino's analysis suffers from numerous flaws and defects, including:  (a) Dr. Marino's results have not been validated; (b) Dr. Marino's soil characterization does not reflect the underlying data; (c) Dr. Marino did not properly characterize horizontal permeability and did not evaluate pressure transmission; and (d) Dr. Marino applied an incorrect soil averaging methodology instead of using a proper method using normalized values.  Bea Tr. 2747:12-2748:14; Bea Slide RB-135 (DX 361).  These defects and flaws, among others, render Dr. Marino's analysis and conclusions not credible, not reliable, and not acceptable.

429.   By contrast, the approach to the failure mechanisms reflected in the work of Dr. Bea and Dr. Bakeer displayed all of the hallmarks of reliable and credible expert analysis and conclusions and none of the defects evident in Dr. Marino's work.  See above ¶¶ 297-395.

**F.        Confirmation by Independent Studies of Floodwall Failures**

430.   The Interagency Performance Evaluation Team ("IPET") was established by the U.S. Army Corps of Engineers to study the performance of the hurricane protection system.  Mosher Dep. 34:10-39:15 (IPET funded with $22-23 million, team of 350 plus people, overseen by two review panels from the American Society of Civil Engineers and the National Research Council) (DX 283); Mosher Dep. 24:25-25:6 ("The purpose was to do an unbiased assessment of what, from a scientific and engineering standpoint, took place in New Orleans during Hurricane Katrina ...") (DX 283).  The IPET investigators performed multiple site visits and inspections, took soil borings, and undertook intensive scientific analysis of the IHNC floodwall breaches and other breaches.  Mosher Dep. 44:13-52:4 (DX 283).  The IPET team was instructed to perform its investigation and analysis without regard to possible litigation, "regardless of who ends up being at fault."  Mosher Dep. 198:20-199:17 (DX 283).

431.   The Independent Levee Investigation Team ("ILIT") was established by an independent team of researchers led by scientists from the University of California at Berkeley and supported by the National Science Foundation.  The purpose of the investigation was to address the performance of the hurricane protection system to determine what happened, why it happened, and how a recurrence can be prevented.  ILIT Report at xix, xxvi to xxix (DX 141).

432.   The Team Louisiana Investigation was established by the State of Louisiana to study the performance of the New Orleans hurricane protection system and to identify causes of failure.  Team Louisiana Report at 3-4 (DX 144).

433.   The IPET, ILIT, and Team Louisiana investigations were performed to "provide credible and objective scientific and engineering answers to fundamental questions about the performance of the hurricane protection and flood damage

106

reduction system in the New Orleans metropolitan area during Hurricane Katrina."  Spinks Report at 11 (PX 421).

434.    The IPET, Team Louisiana and ILIT investigations all concluded that the failure of the IHNC floodwall was the result of failure in the supporting soils, due to foundation instability or underseepage or both, and all expressly or implicitly found that the barge did not cause either of the floodwall breaches.

     **i.     IPET**

435.    IPET concluded that the North Breach occurred prior to overtopping due to the formation of a tension crack on the floodwall and diminished soil support at the levee toe, and the South Breach resulted from overtopping and erosion.  Cushing Report at 51 (citing IPET V-11-17) (DX 196); see IPET Report Vol. V at V-68 (DX 145); Bea Report at 15 (DX 206); Mosher Dep. 55:6-21, 56:25-57:16 (DX 283) (North Breach was due to tension crack leading to instability, coupled with lower surface elevation on protected side); Mosher Dep. 68:12-17 (South Breach was caused by overtopping and erosion on the protected side) (DX 283).

436.    IPET rejected the barge as a cause.  Mosher Dep. 117:10-23 ("[T]here were other causes to the failure of the wall other than the barge, and [we] didn't feel that was a potential cause for the failure of the walls.  They would have failed otherwise.") (DX 283); Mosher Dep. 77:25-78:12 (IPET considered the barge as a potential cause of the South Breach and "rejected that conclusion") (DX 283); Mosher Dep. 212:8-10 ("I don't believe the barge had any impact on what took place at the north breach.") (DX 283).

437.    IPET's conclusions were reinforced by the external review process, including the independent review from the National Research Council.  Mosher Dep. 88:11-89:24 (DX 283).

     **ii.    ILIT**

438.    ILIT's initial report attributed the IHNC floodwall failures to underseepage and hydraulic uplift.  Bea Tr. 2607:18-2608:17; ILIT Report at 6-10, 6-11, 6-17 (DX 141).  Subsequent work performed by this team and summarized in American Society of Civil Engineers conference papers took account of comments on prior work and demonstrated the existence of multiple competing modes of failure including overtopping and underseepage-induced lateral stability failure.  Bea Tr. 2610:7-2615:19; Bea Report at 16-17 (DX 206).  ILIT concluded that barge impact "was not the cause of the breach and failure" and that the "likelihood is that the barge slipped its moorings and was eventually drawn in through a breach that was already well developed."  DX 141, ILIT Report at 6-7; see Bea Report, at 13 (DX 206); Bea Tr. 2597:10-2598:12.

     a.     Plaintiffs mischaracterize the ILIT Report as having made "findings that ING Barge 4727 played a role in the North and/or South Breaches."  Pl. Br. 73.  That is ***not*** what ILIT found, as the above-cited portions of the

ILIT Report make clear.  Nor did ILIT's initial report in November 2005 make such findings.  Instead, as Dr. Bea expressly testified, the November 2005 report concluded the barge was "not a cause."  Bea Tr. 2596:18-2597:2.

### iii.   Team Louisiana

439.   Team Louisiana consisted of engineers – including four geotechnical engineers – with centuries of experience among them.  Kemp Tr. 2979:7-8, 2985:13-21.  The members of Team Louisiana reached a consensus conclusion that "[t]he barge had clipped the end of the already formed breach as it was sucked through."  Team Louisiana Report at 67 (DX 144); Kemp Tr. 2982:11-13, 2986:1-4, 2987:25-2988:2.  Among other reasons for this conclusion, Team Louisiana saw "many, many barges that … had gone through levee alignments"; "found plenty of evidence of both overtopping and underseepage that [it] believed was the primary cause of the failures"; and, in studying weather conditions, found that there were no winds that would push the barge in the direction of the wall prior to the occurrence of the breaches.  Kemp Tr. 2986:14-15, 2988:23-2989:16.

### iv.   Summary

440.   Although the various independent investigative teams attributed different degrees of significance to the various causes of the floodwall failures, they were united in that "none of them concluded that the barge caused the breach[es]."  Marino Tr. 1477:19-1478:2; Bakeer Tr. 2447:4-14; Bea Tr. 2608:21-23, 2748:15-2749:24.

441.   Investigative reports issued by the American Society of Civil Engineers, National Academy of Engineering, National Research Council, and National Institute of Standards and Technology likewise found that the breaches occurred for reasons other than a barge.  Bea Tr. 2748:18-2749:3.

## VII.   FORESEEABILITY AND PROXIMATE CAUSE:  BREACHES AND FLOODING NOT FORESEEABLE CONSEQUENCES OF BREAKAWAY

442.   Regarding foreseeability, plaintiffs did not show that damage to homes in a neighborhood is a foreseeable consequence of a barge breakaway.  Plaintiffs' expert Mr. Green testified that loose barges can present a risk to "anything *on the waterway* in their path."  Green Tr. 475:11-15 (emphasis added); see also Green Tr. 513:14-17 (port safety plan refers to "bridge damage and vessel damage").  Neither Mr. Green nor any other witness testified that barges present a risk to dwellings such as those belonging to the three plaintiffs.  Further, neither Mr. Green nor any other witness testified that it was foreseeable that a barge impact with a floodwall would result in failure of the floodwall and flooding of the area behind it, as opposed to limited localized damage to the wall without any consequent flooding.

443.   Plaintiffs presented no evidence of *any* prior instance in which impact from a barge was responsible for causing a flood protection structure to be dislodged

from the ground or otherwise fail in the manner evident at the North and South Breaches of the IHNC floodwall, or for causing flooding in general.  Marino 2008 Dep. 105:18-22 (not aware of any instance in which a barge caused the failure of a floodwall before this incident) (DX 225); Plaintiffs' Response to Interrogatory No. 7 (answering "unknown" to interrogatory asking them to identify "any past instance in which a barge breakaway caused flooding as the result of an allision with a flood protection structure") (DX 244).

444.   The overwhelming evidence showed that when a barge impacts a levee or other flood protection structure, the expected result is limited to localized cracking or notching of the type observed at multiple other locations from barge impacts during Hurricane Katrina, not failure and flooding.  Cushing Report at 99, 149, 175 & Figs. 72, 73, 74, 122 (DX 196); Mosher Dep. 91:21-92:3, 267:4-9 (DX 283); Bea Report at 57-60 (DX 206); Bakeer Tr. 2296:21-2297:10; Bakeer Report at 3, 14, 66 & Figs. 66, 72 (noting barge impacts in Katrina and Gustav) (DX 205).  See also above ¶¶ 267-70, 285-88 (barges cause only localized damage to the concrete cap of floodwalls).

445.   In sum, there is no evidence that the failure of a flood protection structure is a foreseeable consequence of a barge breakaway.

## VIII.  FLOOD MODELING ANALYSIS AND RESULTS: PLAINTIFFS' FAILURE TO ESTABLISH FLOOD-RELATED DAMAGES CAUSED BY THE BARGE

### A.   Introduction

446.   Plaintiffs presented testimony from a hydrologist, Melvin Spinks, directed at showing, through application of a computer modeling program, that the plaintiffs' flood-related damages were caused by waters from the IHNC breaches as opposed to water emanating from the levee breaches along the MRGO.  Mr. Spinks contended that the results of his modeling correlated with the testimony of various witnesses with regard to the times at which flooding was observed, and concluded that this "sensitivity analysis" validated his opinions about the times at which the breaches occurred and the sources of the water that affected the plaintiffs' property.

447.   As discussed below at paragraphs 451 to 474, however, Mr. Spinks' modeling and sensitivity analysis produced results that contradict the conclusions of every other expert and the record evidence, based on errors that caused him to overestimate the amount of water arriving from the IHNC breaches as opposed to the MRGO breaches, rendering his conclusions unreliable.

448.   Furthermore, as discussed below at paragraphs 475 to 480 below, Mr. Spinks' modeling failed to separate the effects of the North Breach from the effects of the South Breach.  Accordingly, even if the results of Mr. Spinks' model were accepted, the model would generally provide no basis for assigning damages

unless the Court were to find that the barge caused **both** breaches – a finding the Court cannot make.

449.   As discussed at paragraphs 481 to 485 below, Mr. Spinks' hydrographs representing the flooding of the individual plaintiffs' properties negate certain elements of their damages claims.  For instance, the hydrograph for Mrs. Richardson's property shows that the floodwaters from the IHNC did not reach a level sufficient to cause Mr. Richardson to drown.

450.   Finally, as discussed at paragraphs 486 to 491 below, Mr. Spinks' modeling results demonstrate that plaintiffs' properties would have been flooded to the same level by waters from the MRGO levee breaches, even if the IHNC floodwall breaches had not occurred.  The only difference is that with the MRGO breaches only, the floodwaters would have taken a few hours longer to reach those same levels than actually occurred.

## B.   Flaws in the Modeling and Sensitivity Analysis

451.   Mr. Spinks carried out flood modeling for the plaintiffs' locations using the SOBEK computer program.  Spinks Tr. 1515:8-13.  This project was the first time that Mr. Spinks or his firm had worked with the SOBEK model.  Spinks Tr. 1515:8-13, 1614:25-1615:8.  For the reasons stated in this section, Mr. Spinks' modeling did not produce reliable information about the IHNC water levels at the plaintiffs' locations, and was not capable of accurately predicting the times that the IHNC breaches occurred.

452.   The SOBEK model omits certain basic information that is relevant in this action, including the contribution of water from wave overtopping and seepage below or through a floodwall.  Suhayda Tr. 3013:10-3014:8; Spinks Tr. 1616:17-20 (model does not incorporate water from wave overtopping); Spinks Tr. 1558:25-1559:3 (underseepage not taken into account in the modeling).  The model also omits information about the effect of waves on buildings, wind, and flowing water, all of which are recognized sources of damage to buildings during hurricanes. Suhayda Tr. 3014:9-3015:10.

### i.   Use of inappropriate breach times based on flawed assumptions

453.   Mr. Spinks' modeling used inappropriately early IHNC breach times as inputs. Mr. Spinks assumed for purposes of his analysis that the IHNC North Breach opened at 4:00 a.m. and was fully formed by 4:30 a.m., and that the South Breach opened at 5:30 a.m. and was fully formed by 6:00 a.m.  Spinks Report at 26, 37 (PX 421).  Though Mr. Spinks testified that his analysis showed that those breach times provided the best "fit" with the evidence, the record at trial proved otherwise.

454.   To begin, Mr. Spinks' assumption regarding the timing of the IHNC breaches is contrary to the conclusions of every expert on either side of the case, and all of the independent investigations, none of which found breach times as early as Mr.

Spinks posited, particularly with respect to the South Breach.  Suhayda Tr. 3018:19-3019:1; Marino Tr. 1234:1920 & Marino Report at 3-16 (PX 397) (6:00 North Breach time); Marino Tr. 1274:7 & Marino Report at 3-16 (6:30 South Breach time); Pazos Report at 37, 69 (PX 402) (4:30-5:00 North Breach start time; North Breach fully formed at 6:00 or 7:00); Pazos Report at 37 (6:00-6:30 South Breach time); ILIT Report at 6-6 (both breaches at 7:30-7:45) (DX 141); Team Louisiana Report at 54 (both breaches after 7:30) (DX 144); Spinks 2009 Dep. 130:21-25 (DX 222) (Delft team used 7-7:30 for both breaches); Spinks Tr. 1621:6-9 (IPET simulated South Breach at 7:00).

455.    Mr. Spinks' reliance on eyewitness accounts as determinative evidence of breach times is flawed because such accounts are inherently imprecise as to time.  In a pretrial filing in this case, plaintiffs admitted that there was "virtually universal confusion and varying perceptions of time among those in mortal danger during these events."  Doc. 19693 at 4.  Moreover, plaintiffs' expert Dr. Marino agreed that the event times reported by some witnesses were "obviously off" and there was "a lot of variation in time."  Marino Tr. 1315:19-1316:2, 1321:18-20.

    a.    Plaintiffs claim (at PFF ¶¶ 96 and 104) that Mr. Spinks' early breach times are "corroborated" by the testimony of Gertrude LeBlanc and Frazier Tompkins that there was a loose barge in the IHNC on August 28, 2005.  Putting aside that the ING 4727 did not in fact break free until the storm arrived, their testimony says nothing about whether the North Breach opened at 4:00 and the South Breach at 5:30, versus some other times later in the morning.

456.    In opining that the IHNC breaches occurred as early as he says they did, Mr. Spinks erroneously assumed that any water reported by a witness must have come from a breach, as opposed to water that may have overtopped the floodwall or seeped below or through the wall or the levee.  Suhayda Tr. 3013:18-3014:8, 3015:17-24, 3019:7-16.  That assumption is wrong as shown by the testimony of several witnesses.  For example, Mr. Spinks assumed that because Terry Adams had a wet carpet at 5:00 a.m., the North Breach must have begun to open at 4:00 a.m.  Spinks Tr. 1548:19-24, 1623:17-22.  But Mr. Adams testified that when he first got to his roof sometime after 5:00 a.m., he looked at the levee right near his home and saw that the floodwall was "still intact" with water "coming over" the levee and "coming from under, too, at the same time."  Adams Tr. 257:20-258:5, 258:7-22, 259:3-6; 286:7-21 (water coming over the levee was forming a trench).  Similarly, Mr. Spinks assumed that the South Breach must have happened by 5:30 a.m. because Carolyn Berryhill testified she saw water at her home at 5:30 a.m., when in fact, Mr. Spinks did not know whether the water that Ms. Berryhill saw came from water that had overtopped or seeped under or through the wall.  Spinks Tr. 1625:16-1626:13.

457.    Similarly, Mr. Spinks erroneously assumed that the North Breach must have occurred at or around 4:00 a.m. based on the amount of pumping activity taking place, which he said would not have been necessary for rainwater alone.  Spinks

111

Tr. 1561:22-1562:17.  But Richard Riess, a Pump Station employee, testified that the Pump Station was pumping accumulated rain water after midnight on Sunday, August 28, throughout Monday morning of August 29.  Riess Tr. 2000:22-2001:19; 2015:1-7.  Mr. Villavasso too testified that the Pump Station was already pumping before the floodwall fell.  Villavasso Dep. 48:20-23 (DX 308).  Mr. Riess and Mr. Villavasso also testified that before the IHNC floodwall failed, there was water coming down a driveway next to the Pump Station.  Riess Tr. 2002:10-14, 2002:22-2003:1, 2007:12-18; Villavasso Dep 48:7-14.  Pump Station employee Wallace Rainey also saw water coming "from the back of the station … down the driveway" before the IHNC floodwall failed.  Rainey Dep. 30:25-31:3, 31:8-13 (DX 284).  That water was accumulating in the neighborhood.  Riess Tr. 2003:7-11.  Mr. Riess testified that before 6:00 a.m., the only water he observed was coming from Southern Scrap; not until later did he see water coming from the IHNC.  Riess Tr. 2007:12-2008:10.

458.   Mr. Spinks erroneously suggested that his early breach times were supported by information from 911 calls.  Spinks Tr. 1573:20-25.  But the first 911 call to report any flooding came at 6:36 a.m. from Arcola Sutton, whose home was located at the site of the North Breach.  Spinks Tr. 1578:4-15; Spinks Report at App. E table 4 (PX 421).  That the first call related to flooding came at 6:36 a.m. from someone living at the North Breach does not support, and strongly undercuts, Mr. Spinks' conclusion that the North Breach must have initiated two and a half hours earlier (let alone any implication regarding the timing of the South Breach).  When the Court asked Mr. Spinks why the first 911 call was not until 6:30 a.m. if the North Breach began at 4:00 a.m., Mr. Spinks essentially had no response other than to say that a later North Breach time is "possible."  Spinks Tr. 1608:13-1609:10.

459.   Mr. Spinks' report includes a figure comparing his modeled results to various high water marks.  Spinks Report at 31, Fig. 13 (PX 241).  That figure shows several high water marks that are five or six feet below the modeled results.  Suhayda Tr. 3025:22-3027:2.  That figure indicates that the modeling overpredicts water heights.

460.   Even though the Delft group used breach times of 7:00-7:30 a.m. in their application of the SOBEK model, the Delft flood map showed flooding in relatively the same locations as does the flooding map from Mr. Spinks' modeling.  Spinks Tr. 1654:20-1655:19, 1657:6-15.  These results show that flood modeling cannot be used to suggest the time that the breaches occurred, as Mr. Spinks purported to do.

461.   Finally, Mr. Spinks' modeling results, which were based on his early breach times, were in conflict with time-stamped photographs from Jackson Barracks.  In particular, the IPET report includes a time-stamped photograph at Jackson Barracks showing that at 7:46 a.m. "the floodwaters had not yet reached this location."  IPET Report Vol. IV at IV-196 (DX 145); Spinks Tr. 1698:14-16.  Mr. Spinks' model, however, shows flooding at Jackson Barracks by 7:46 a.m.

112

Spinks Report at I-8, Fig. 7 (PX 421); Suhayda Tr. 3045:5-18.  The model thus
predicts water to arrive before the evidence shows that it did.  See also IPET IV-
196, IV-198 (DX 145); Suhayda Tr. 3044:14-3045:7 (flooding arrived at or after
8:00 a.m.).  The evidence led IPET to conclude that the IHNC South Breach
occurred at 7:00 a.m., not at 5:30 a.m. as Mr. Spinks opined.  Spinks Tr. 1581:15-
17.

### ii.     Use of flawed "sensitivity analysis" to shore up modeling results

462.    The sensitivity analysis that Mr. Spinks used to try to verify the breach time
        assumptions employed in his model is itself deeply flawed, and does not serve to
        confirm that the North Breach initiated at 4:00 a.m. or that the South Breach
        initiated at 5:30 a.m.

463.    Mr. Spinks carried out a "sensitivity analysis" that purported to use, as a starting
        point, witness observations of water levels reported down to a tenth of a foot,
        even though witnesses did not report their observations with that precision.
        Spinks Tr. 1663:22-24; Spinks Report at App. I Table 2 (PX 421); Suhayda Tr.
        3029:3-21.  He assigned that level of precision to the witness observations even
        though the observations were made during a hurricane, sometimes in the dark,
        without measuring instruments, and in some cases reported by the witnesses years
        after the fact, during depositions in this case.  Spinks Tr. 1664:19-1665:8.  Mr.
        Spinks also admitted he did not have all of the necessary information to determine
        water levels for particular data points.  Spinks Tr. 1667:7-22.

464.    Nowhere in his report or trial testimony did Mr. Spinks set forth the information
        that he used to come up with the observed water levels that he used in his
        sensitivity analysis.  Therefore it is impossible for any reviewer to verify the
        numbers that Mr. Spinks chose.  Suhayda Tr. 3030:2-13.

465.    Mr. Spinks failed to include any rate of error for the observed water levels in his
        sensitivity analysis, even though his report acknowledges in other areas that the
        data is subject to errors in both the time the observation was made and the depth
        of the water that an observer saw.  Spinks Report at I-3, Fig. 1 through I-6, Fig. 6
        (showing "error bars" emerging from data points) (PX 421); Spinks Tr. 1563:24-
        1564:9, 1668:9-17 (error bars reflected uncertainty in witness observations);
        Spinks Tr. 1669:25-1670:3 (error bars not carried forward to sensitivity analysis
        results); Spinks Report at App. I Table 2 (no error bars; observed data identified
        to a precise tenth of a foot); Suhayda Tr. 3030:14-24.

466.    Mr. Spinks' first method of assessing which breach times best matched the
        observed data is called "relative error," which consists of a "ratio" that measures
        "the error between observed and simulated" data.  Spinks Tr. 1662:6-11; Suhayda
        Tr. 3028:6-12.  As noted in the preceding paragraph, Mr. Spinks did not account
        for uncertainty in the underlying data.  When a reasonable rate of error is included
        for that data, the relative errors in Mr. Spinks' sensitivity analysis change by a
        factor that is far more significant than the ultimate differences between the overall

relative errors for the relevant scenarios in Mr. Spinks' chart.  Suhayda Tr.
3031:11-3032:22; Suhayda Report at 6, Table 1 (DX 215).  Moreover, the overall
"relative error" values reflected on Mr. Spinks' chart are themselves too high to
support his conclusion that the model produced valid results.  Suhayda Tr.
3033:2-18 (relative error of 65% "indicate[s] that the model is not producing
reliable or acceptable simulations").

467.    Mr. Spinks' second method for assessing which breach times best matched the
observed data was a "rating number" system that he devised.  However, as Dr.
Suhayda testified, this is not an accepted method for conducting a sensitivity
analysis:  neither the Corps of Engineers, the National Weather Service, nor
FEMA use a rating number system in their storm-surge modeling.  Suhayda Tr.
3035:13-23.  Moreover, Mr. Spinks has been inconsistent in his explanation of his
own rating number system: at his deposition, he testified that the scoring system
was an objective one under which the results could be determined based on
whether or not the observed data matched the model results as to whether or not
water was present to a level of one-half foot (Spinks Tr. 1676:4-15, Spinks 2009
Dep. 58:15-25 (DX 222); Spinks Tr. 1680:22-1681; Suhayda Tr. 3034:6-21), but
at trial, he said that the rating number scoring was subjectively determined by his
staff and constituted a "black box" in the sense that nothing in his report explains
what he considered in order to come up with rating numbers for each data point.
Spinks Tr. 1683:19-24.  As Dr. Suhayda noted, Mr. Spinks' "rating number"
system inappropriately failed to give credit for situations in which the modeled
data and the observed data both showed that there was no flooding at a location
(Suhayda Tr. 3036:4-10), and gave credit as a "match" for situations in which
observed and modeled results varied dramatically – by as much as eight feet –
indicating no true agreement between the model and observations.  See, *e.g.*,
Suhayda Tr. 3036:11-3037:10 (noting discrepancies and opining that they are
"way outside acceptable limits as far as error").

468.    An appropriate rating system would give credit as a "match" for situations where
the observed data and the modeled results either (a) both show more than one-half
foot of water at a location, or (b) both show less than a half foot of water (as Mr.
Spinks explained the system at his deposition).  By applying a system that failed
to distinguish between a correct "no flooding" prediction in a scenario based on a
later breach time input and an incorrect "flooding" prediction in a scenario based
on an earlier breach time input, in cases where no flooding was observed at the
given data point, Mr. Spinks biased the rating system in favor of the earlier breach
time inputs.  This is one reason why, if a rating system were appropriate, such a
system would have to give equal weight to correct predictions of "flooding" *or*
"no flooding."  See Suhayda Tr. 3019:17-25, 3036:4-10.

469.    If one applies a rating system that gives due credit for matches between observed
and predicted data, then Mr. Spinks' sensitivity analysis result chart includes a
large number of errors in the application of such a system.  See Spinks Report at
App. I Table 2 (PX 421) – Case 1 data points incorrectly scored as a "1" even
though model and observed data differed as to whether there was a half foot of

water (S7, S31, S36); Case 1 data points incorrectly scored as a "0" even though model and observed data agreed on whether there was a half foot of water (N8, S6, S24); Case 2 data points incorrectly scored as a "0" even though modeled and observed data agreed on whether there was a half foot of water (N8, S5, S6, S15, S16, S24, S34, S36); Suhayda Tr. 3038:14-3039:15 (identifying certain mistakes in Spinks' application of his rating number system).  After correcting these errors, the cumulative rating numbers for Case 1 (with a 4:00 North Breach time and a 5:30 South Breach time) and Case 2 (with a 4:00 North Breach time and a 7:00 South Breach time) are virtually identical (37 for Case 1 versus 36 for Case 2). Suhayda Tr. 3037:24-3038:13.  This means that the model cannot distinguish between whether the South Breach opened at 5:30 a.m. or 7:00 a.m.  Suhayda Tr. 3039:17-22.

470.   An alternative way to assess the reliability of modeling results is a "root mean square analysis," which is a standard statistical tool used to describe the difference between two sets of data.  Suhayda Tr. 3039:23-3040:3.  For the case representing the modeling times chosen by Mr. Spinks ("Case 1"), the root mean square error for all data points on Mr. Spinks' sensitivity analysis chart is 3.73. Suhayda Tr. 3040:4-16; Suhayda Report at ¶ 19 (DX 215).  That type of error is unacceptably high, and indicates that the model is not producing reliable results. Suhayda Tr. 3040:22-3041:1.

### iii.   Other errors undermining validity of modeling results

471.   Other errors in Mr. Spinks' modeling render it unreliable and undermine his reported results.  For instance, there is no support for the very short breach formation periods that Mr. Spinks used in his modeling.  His analysis contains no failure analysis showing that any work was done to determine how long it actually took for either IHNC breach to form.  Spinks Tr. 1630:7-12; Suhayda Tr. 3018:8-11.  The most Mr. Spinks could say on this issue is that "the 30-minute failure time for the north breach seemed plausible," and the 15-minute south breach time "was within the realm of possibility."  Spinks Tr. 1630:22-1631:4.  But Mr. Spinks was not asked to provide an opinion on the structural failure of the IHNC floodwall.  Spinks Tr. 1629:11-1630:4.  The relatively short breach formation periods that Mr. Spinks used in his modeling tended to allow flooding to occur earlier because the breach is fully opened relatively quickly.  Suhayda Tr. 3018:12-18.

472.   Mr. Spinks also used an inappropriately low roughness coefficient for residential areas.  A roughness coefficient is used in floodwater modeling to determine the rate at which water will tend to flow over a particular type of surface.  Spinks Tr. 1544:6-9, 1558:10-14, 1631:22-1632:1, 1639:15-19.  Mr. Spinks used a roughness coefficient of 0.05 for all residential areas.  Spinks Tr. 1632:6-8; Suhayda Tr. 3015:25-3016:3.  As shown by Mr. Spinks' map of St. Bernard Parish, a significant portion of the area over which water from the IHNC floodwall breaches traveled was residential area.  Spinks Report at C-2, Fig. 1 (PX 241); Spinks Tr. 1634:7-18.  Mr. Spinks' report states that he used two sources to obtain

his roughness coefficients:  the IPET report and a 1959 book called "Open Channel Hydraulics" by Ven Te Chow.  Spinks Report at C-1 and C-7 (PX 241); Spinks Tr. 1632:9-14.  IPET, however, used two different, and higher, roughness coefficients for residential areas:  0.07 for "low residential" and 0.14 for "high residential."  Suhayda Report at Table 5-4 (DX 222); Spinks Tr. 1632:15-24; Suhayda Tr. 3016:4-3017:4.  The Chow book, meanwhile, did not provide any roughness coefficients for residential areas like the Lower Ninth Ward, and only assigned roughness coefficient of 0.05 to unpopulated "brush" areas lacking any buildings, trees, or other large objects that would impede water flow.  Spinks Tr. 1695:14-21; Suhayda Tr. 3017:12-18; PX 446 (excerpts from Chow book).  Mr. Spinks' use of a lower roughness coefficient caused his modeled water flows from the IHNC to travel faster over land and result in earlier flooding than would be seen with a higher and more accurate roughness coefficient.  Spinks Tr. 1639:20-23; Suhayda Tr. 3017:5-11.

473.   These three errors – early breach times, short breach duration periods, and a low roughness coefficient – each caused Mr. Spinks' modeling results to overestimate the amount of water at a particular location at a point in time coming from the IHNC.  Suhayda Tr. 3019:17-25.

      a.   These same errors cause plaintiffs to greatly overstate the contribution of the IHNC breaches to the total flooding in the Lower Ninth Ward.  In fact, 88-90% of the flooding in the Lower Ninth Ward came from the MRGO breaches, not the IHNC breaches.  See *In re Katrina Canal Breaches Consolidated Litig. (Robinson)*, 647 F. Supp. 2d 644, 698 (E.D. La. 2009) ("As noted, there were two catastrophic breaches of the floodwalls at the IHNC which caused some flooding of the Lower Ninth Ward prior to the breaching of the 40 Arpent Levee.  There was clear testimony by both plaintiffs and defendant that the north and south breaches of the east side of the IHNC did not contribute greatly to the Lower Ninth Ward being flooded. ...  Dr. Bea testified that plaintiffs and defendants agreed that about 88 to 90 percent of the Lower Ninth Ward was caused by the Reach 2 breaches ... , and Mr. Fitzgerald testified that they do not disagree in a significant level."); Kemp Report (DX 202) at 34; Kemp Tr. 2998:22-3000:9.

474.   The errors in Mr. Spinks' modeling render his modeling results for the plaintiffs' locations unreliable.  As noted above (¶¶ 451-73), Mr. Spinks' modeling results show major discrepancies between observed data and modeled data that undermine the use of the model to determine water levels at any particular location.  See Suhayda Tr. 3037:11-16 (major differences for observed and modeled information for particular locations "indicate[] that the model is capable of producing, for a very specific location, some highly inaccurate representations of the flooding").  In particular, the modeling results for the three plaintiffs' locations wrongly predict earlier flooding from the IHNC floodwall breaches than would have occurred in reality, based on the errors in Mr. Spinks' modeling

stemming from unsupported early breach times, short breach duration periods, and low roughness coefficients.

### C.    Failure to Separate North and South Breaches in Model Analysis

475.    Mr. Spinks produced no modeling results showing the water levels at any particular location at any point in time from just the IHNC North Breach or just the IHNC South Breach (Suhayda Tr. 3020:1-17), even though the model was capable of doing so (Spinks Tr. 1661:1-5).

476.    Mr. Spinks produced no modeling results for the Alford property identifying the water levels at that property just from the IHNC North Breach or just from the IHNC South Breach.  Spinks Tr. 1649:10-18.

477.    Mr. Spinks produced no modeling results for the Richardson property identifying the water levels at that property just from the IHNC North Breach or just from the IHNC South Breach.  Spinks Tr. 1652:5-10.

478.    Mr. Spinks produced no modeling results for the Holiday Jewelers location identifying the water levels at that property just from the IHNC North Breach or just from the IHNC South Breach.  Spinks Tr. 1654:6-12.

479.    Although Mr. Spinks testified that once the North and South Breaches occurred, it was not possible to distinguish which "water molecules hit which property," he admitted in response to the Court's question that one could identify what portion of the total water level at a location was due to water from a particular breach. Spinks Tr. 1610:23-1611:6, 1615:9-16 (modeling permits one to decide how much water at a given location came from a particular source even if water that comes from various sources ends up mixing); see also Kemp Tr. 3001:14-20, 3002:12-3003:2.

480.    Accordingly, even if the results of Mr. Spinks' modeling were accepted, the modeling would generally provide no basis for assigning damages unless the Court were to find that the barge caused *both* breaches.

### D.    Modeling Results Negating Individual Plaintiffs' Claims

### i.    John and Jerry Alford

481.    John and Jerry Alford lived at 2423 Deslonde Street, close to the North Breach. Spinks Tr. 1553:21-24, 1648:11-15; Spinks Report App. J, Fig. 2 (PX 241).  The floodwaters at their home came primarily from the North Breach.  Spinks 2009 Dep. 189 (DX 222); Spinks Report App. J, Fig. 2; Suhayda Tr. 3021:10-14.  The MRGO waters were responsible for the increased water levels after 10:30 a.m. at the Alford property.  Suhayda Tr. 3021:15-21; Spinks Tr. 1648:20-1649:6 (IHNC water levels flatten out and drop a bit, and then total water levels increase after merging with MRGO floodwaters).  Although Mr. Spinks' modeling provides no basis for assigning damages, for the reasons stated in the previous subsection, the

117

proximity of the Alford home to the North Breach suggests, at a minimum, that their home was subject to considerable flooding from the North Breach before any water from the South Breach arrived. Accordingly, even if the Court were to have found the barge played a role at the South Breach (which it did not), the flooding at the Alford property was largely complete before that breach occurred.

### ii.    Josephine Richardson

482.    According to Mr. Spinks' model, the initial flooding at the Richardson home came from the IHNC, to a level of 5.9 feet above ground level. Spinks Tr. 1600:9-11; Spinks Report App. J, Fig. 3 (PX 241). The 5.9 feet means feet above the ground, not feet above the first floor of the Richardson home. Suhayda Tr. 3022:9-18. By 10:10 a.m., when the MRGO floodwaters arrived, the water levels from just the IHNC flooding had leveled out. Spinks Tr. 1651:6-16; Spinks Report App. J, Fig. 3; Suhayda Tr. 3022:5-8. The increased water levels at the Richardson property after 10:10 a.m. were due to the arrival of floodwaters from the MRGO. Spinks Tr. 1651:6-20; Suhayda Tr. 3022:19-21.

483.    The record suggests that Mr. Richardson drowned in the attic of his home. See Plaintiffs Summary of Material Facts in the Joint Pre-Trial Order at 21 (Doc. 19857) ("Mr. Richardson's body was subsequently found in the attic of the Richardson 1321 Egania Street home."); Plaintiffs' Pretrial Proposed Findings of Fact and Conclusions of Law at 23 (Doc. 19644) (same). He had told his wife that he would go to the attic if the house started to flood. Richardson Tr. 755:16-18.

   a.    Plaintiffs assert (at PFF ¶ 589) that Mr. Richardson's body was found in the living room of his home. In support, they rely on the "testimony" of Lawrence Colon and Tyronne Colon, neither of whom testified at trial, nor were they deposed. They also rely on the "testimony" of Lewis Colon, who did not testify at trial and whose deposition is not in the trial record. This assertion contradicts what plaintiffs told the Court in their pre-trial submission.

484.    The flooding from the IHNC breaches could not have caused Mr. Richardson's drowning, regardless of whether he was in his attic or on the first floor of his home when the floodwaters arrived. Mr. Richardson was five-foot-five to five-foot-seven inches tall. Richardson Tr. 755:19-22. The first floor of the Richardson home was four steps off the ground, which put it at an elevation of 3-4 feet above the ground. Richardson Tr. 755:23-756:9; Richardson Dep. at Exh. 1 (DX 366); PX 328 (photograph). The ceilings of the home were standard eight-foot ceilings. Richardson Tr. 756:10-17. Assuming Mr. Spinks' modeling is accurate, and the IHNC floodwaters leveled off at 5.9 feet above ground level before the MRGO waters arrived at the Richardson residence, the IHNC floodwaters would have reached only 1.9 to 2.9 feet above the first floor at that house (if Mr. Richardson was standing on the first floor), and well below the level of the attic (if Mr. Richardson had gone to the attic). Spinks Tr. 1651:21-1652:1.

118

### iii.    Holiday Jewelers, Inc.

485.   With respect to Holiday Jewelers, Mr. Spinks' hydrograph shows that the IHNC floodwaters generated 2.3 feet of water at that location at 9:15 a.m., and that by 9:30 a.m. the MRGO floodwaters arrived and the combined water levels went up to 3.7 feet and rose to their peak height.  Spinks Tr. 1601:8-10, 1652:21-1653:3; Spinks Report App. J, Fig. 4 (PX 421).  Even according to Mr. Spinks' modeling, the MRGO floodwaters arrived at this location about a half hour after the IHNC floodwaters.  Spinks Tr. 1653:4-8.  The hydrograph does not, however, incorporate any rate of error in the modeling.  Spinks Tr. 1653:14-19; Suhayda Tr. 3023:11-14.  Mr. Spinks admitted that if the South Breach had occurred at 7:00 a.m., and not the 5:30 a.m. time that he used as an input into his model in generating the hydrographs for the plaintiffs' properties, then the first water at the Holiday Jewelers location would have come from the MRGO, not the IHNC.  Spinks Tr. 1653:20-1654:1.

### E.    MRGO Flooding Regardless of IHNC Breaches

486.   Hurricane Katrina's storm surge caused massive breaches in the earthen levees along Reach 2 of the Mississippi River Gulf Outlet (the "MRGO Breaches").  Bea Report App. B (DX 206); Pazos Report at 37 (PX 402).

487.   The earthen levees along MRGO Reach 2 protect the same area ("polder") as the floodwalls on the east side of the IHNC.  LNA Undisputed Fact 32; Suhayda Report Fig. 1 (DX 215); Spinks Report at 10 (PX 421).

488.   The MRGO Breaches inundated St. Bernard Parish and the Lower Ninth Ward with massive flooding on the morning of August 29, 2005.  Suhayda Report at 2-3 (DX 215); Spinks Report at 17 (35,200 ft of breaches along MRGO) (PX 421); Spinks Report at 18 Fig. 4 (showing locations of "major levee breaches" along MRGO) (PX 421).

489.   It is possible, through scientific flood modeling, to determine the level of flooding that would have occurred in the Lower Ninth Ward and St. Bernard Parish even if the IHNC floodwall breaches (the North Breach and South Breach) had not happened.  Spinks Report at 34 Figs. 15 and 16 (PX 421); Suhayda Report at 2 (DX 215); Spinks 2008 Dep. 241-42 (DX 226); Spinks 2009 Dep. 142-44 (DX 222).

490.   Flood modeling by plaintiffs' expert shows that even if the IHNC North Breach and South Breach had not occurred, the MRGO levee breaches would have flooded the Lower Ninth Ward and St. Bernard Parish to the same maximum level on August 29, 2005.  Spinks Report at 33 ("The model simulations show that the levee breaches along MRGO could have inundated the Lower Ninth Ward and St. Bernard Parish approximately 3 to 4 hours later than what actually happened during Hurricane Katrina.") (PX 241); Spinks Report at 34, Figs. 15-16 (hydrographs for locations 1 and 2 showing water levels from MRGO breaches

alone reaching same maximum levels as combined MRGO/IHNC breaches); Spinks 2009 Dep. 149-50 (Q: "Without the IHNC breaches you get to the same water level, but just a couple of hours or a few hours later?" A: "At location 1 about five hours later. At location 2 closer to Paris Road where we know the two waters mixed, then about an hour to two hours difference.") (DX 222); Suhayda Report at 2 (DX 215); Suhayda Tr. 3043:18-3044:10.

491.    The value associated with five hours' use of property during hurricane conditions, and in the face of a mandatory evacuation order, is zero. Ragas Dep. 115:3-19 (damage caused by the IHNC breaches was only that of a loss of use of property for a few hours, which would be valued at "zero or an immeasurably small number") (DX 333).

## IX.    PLAINTIFFS HAVE NOT PROVED DAMAGES IN EXCESS OF FUNDS RECEIVED AS COMPENSATION FROM AN ALLEGED JOINT TORTFEASOR

### A.    Mr. and Mrs. Alford – Road Home Funds

492.    The value of the Alfords' property at 2423 Deslonde Street was approximately $47,000 prior to Hurricane Katrina. Ragas Report at 6, 8, and Addendum E (DX 214). At the time of the storm, the property had a mortgage of approximately $30,000, and the Alfords' net equity in their property amounted to approximately $17,000. Ragas Report at 8, 9 (DX 214); Jerry Alford Tr. 204:19-23, 205:3-9. After Katrina, the Alfords received homeowners' insurance for wind damage in the amount of $27,796, and funds from the Road Home program in the amount of $120,000 for flood damage. LNA Undisputed Facts 33 and 34; Ragas Report at 6 (DX 214); Jerry Alford Tr. 219:3-220:4. They chose to pay off the mortgage on their Deslonde property and to purchase a new home in Algiers for $107,000. Ragas Report at 6 (DX 214). They also continued to own the vacant lot at 2423 Deslonde, valued at approximately $11,500 as of the end of December of 2008. Ragas Report at 6 and Addendum E (DX 214). Accordingly, the Alfords' post-Katrina real estate equity is now approximately $118,500. Ragas Report at 6, 9 (DX 214). When all relevant payments are taken into account, the amounts already received by the Alfords for Katrina-related damage to their home exceeds the amount of damages they could claim in this case, had the barge been responsible for any such damages. Ragas Report at 6, 9 (DX 214).

493.    Plaintiffs' expert Peter Cannizzaro valued 2423 Deslonde immediately before Katrina at $58,500, and valued the property one year after Katrina at $8,000. But in determining his pre-Katrina appraised value, he failed to make appropriate adjustments to his calculations for differences in condition (among other things) between the Deslonde property and the comparable properties that he used in making his appraisal. Cannizzaro Dep. 56:11-59:22, 60:13-61:4, 63:20-66:20 (DX 334). Even applying Mr. Cannizzaro's numbers, however, the Alfords' Road Home proceeds alone exceed the amount they could claim as damages to their home at 2423 Deslonde in this case, had the barge been responsible for any such damages.

120

494. The Road Home program was funded by the federal government and administered by the State of Louisiana in order to fund the repair and reconstruction of damaged Louisianans' homes. *In Re Katrina Canal Breaches Consol. Litig. (Road Home)*, No. 07-5528, 2009 U.S. Dist. LEXIS 33068 at *14-15 (E.D. La. Apr. 16, 2009). In *Robinson*, the Court declined to reduce a plaintiff's damage award by the amount of Road Home payments she received because the plaintiff was "obligated to reimburse the Road Home from any insurance proceeds or other recovery she may receive." Doc. 19415 at 154. That repayment obligation comes from the "Road Home Limited Subrogation/Assignment Agreement" that each grant recipient was required to execute. See *In Re Katrina Canal Breaches Consol. Litig. (Road Home)*, 2009 U.S. Dist. LEXIS 33068, at *15 (describing Road Home program, and noting that "[a]s part of the grant process, recipients were required to execute the Road Home Limited Subrogation/Assignment Agreement ('Agreement'), in which the recipient agreed to repay duplicated payments that they received").

495. The State of Louisiana "required Road Home grant recipients to execute a "Limited Subrogation/Assignment Agreement." *In re Katrina Canal Breaches Litig.*, No. 09-30485 (5th Cir. July 28, 2010). The Road Home Limited Subrogation/Assignment Agreement required Road Home grant recipients to repay those monies only if they recover: "(a) under any policy of casualty or property damage insurance or flood insurance on the residence…; [or] (b) from FEMA, Small Business Administration, and any other federal agency, arising out of physical damage to the Residence caused by Hurricane Katrina and/or Hurricane Rita." See Sample Road Home Limited Subrogation/Assignment Agreement (Exh. 1 to LNA's Pre-Trial Brief (Doc. 19653)); Richardson Dep. at Exh. 3 (DX 366). In *Robinson*, the plaintiff was required to repay Road Home monies because her recoveries in that action were from the federal government. But there is no requirement in the Road Home Limited Subrogation/Assignment Agreement or elsewhere that Road Home grant recipients repay their grants if they recover in a tort suit against parties other than the federal government.

### B.  Mrs. Richardson – Road Home Funds

496.  The value of the Richardson property at 1321 Egania Street was $89,000 prior to Hurricane Katrina.  Ragas Report at 6, and Addendum D to his report (DX 214). After Katrina, Mrs. Richardson received wind damage insurance of $10,489.71, $21,000 from FEMA, and federal funds from the Road Home program in the amount of $119,010 for flood damage.  LNA Undisputed Fact 35 (wind insurance payment); LNA Undisputed Fact 36 (Road Home payment); Ragas Report at 6 (DX 214); Richardson Tr. 756:22-24, 757:15-17, 761:6-17.  Mrs. Richardson chose to renovate her home, and the renovated value of her residence after Katrina was approximately $140,000.  Ragas Report at 6, 7 (DX 214).  When all relevant payments are taken into account, the amount already received by Mrs. Richardson for Katrina-related damage to her property exceeds the amount of damages she could claim in this case, had the barge been responsible for any such damages. Ragas Report at 5-6 and Addendum D (DX 214).

497.  Plaintiffs' expert Peter Cannizzaro valued 1321 Egania Street immediately before Katrina at $110,000, and one year after Katrina at $9,500.  But again, in arriving at his pre-Katrina appraised value, he failed to make appropriate adjustments to his calculations for differences in condition (among other things) between the Egania property and the properties that he used as comparable properties in his appraisal.  See, e.g., Cannizzaro Dep. 89:19-93:7 (DX 334).  He also apparently valued 1321 Egania after Katrina as if it were a non-repairable building on a lot. But he admits that Mrs. Richardson has fully repaired 1321 Egania, and that it is a high quality renovation.  Cannizzaro Dep. 30:12-31:22 (DX 334).  Even applying Mr. Cannizzaro's numbers, Mrs. Richardson has received more in Road Home and wind insurance proceeds than she could claim as damages to her home in this case, had the barge been responsible for any such damages.

### C.  Holiday Jewelers – Failure to Prove Any Lost Income or Profits

498.  For the three years prior to the storm for which Holiday Jewelers, Inc. has financial records (i.e., 2001, 2002 and 2004 Federal Tax Returns), it operated at an average annual loss of $1,989.33 (excluding a one-time insurance payment in 2004).  Boudreaux Report at 3-4 (DX 203).  Accordingly, even if there had been no flooding at Holiday Jewelers, Inc.'s location from Katrina, Holiday Jewelers, Inc. would have had a projected *loss* totaling $13,925 for the period 2005-2011. Boudreaux Report at 4-5 (DX 203).  Holiday Jewelers cannot show that it suffered a monetary loss of profits, even if the barge had been responsible for any of the flooding encountered at its place of business.  Boudreaux Report at 2-4.

499.  Plaintiffs' expert John Theriot projected that Holiday Jewelers would have had profits for the period 2005-2011 if there had been no Katrina-related flooding. But he reached that conclusion only by adding back certain of Holiday Jewelers' business expenses, which is improper.  Specifically, Mr. Theriot added back the amounts of Holiday Jewelers' expenses for (i) officer salaries, (ii) automobile expenses, (iii) meals and entertainment expenses, and (iv) employee benefits,

purportedly because these were "discretionary."  But Holiday Jewelers historically reported these same types of expenses as necessary business expenses on its Federal Tax Returns.  Theriot Dep. 64:8-65:25, 70:2-71:15 (DX 335); Boudreaux 2009 Dep. 60:11-64:16, 78:3-17 (DX 332); Boudreaux Report at 2 (DX 203).  Moreover, in calculating lost profits for Holiday Jewelers, it cannot be assumed that the store could have operated without an individual working in the store.  Had Mr. Glaser become a realtor or engaged in another profession while Holiday Jewelers remained in operation, the corporation would have had to employ someone to physically operate the business.  Glaser Tr. 2269:9-12.  Thus, the profits of the business cannot be calculated as if there was no expense associated with the labor of the person or persons required to operate it.  Boudreaux Report at 2 (DX 203); Boudreaux 2009 Dep. 82:12-83:16 (DX 332).  Plaintiffs' expert John Theriot admitted that if he had not "added back" these business expenses in making his calculations, then he projects that Holiday Jewelers would have had a net *loss* over the period 2005-2011, even if there had been no flooding from Hurricane Katrina.  Theriot Dep. 62:5-63:2 (DX 335); Theriot June 21, 2009 Report at Exh. 4, Schedule V (DX 335).

500.  After Hurricane Katrina, Holiday Jewelers received $58,000 from its business owners policy insurance, almost all of which represented payment for lost movable property, furniture, and fixtures.  Glaser Tr. 2264:2-7, 15-18; GLASER 000070 at 4 (DX 176); see Glaser Tr. 2259:4-2261:4.  That policy did not cover losses due to flooding damages.  GLASER 000070 at 1 (DX 176).

501.  After Hurricane Katrina, Holiday Jewelers was able to salvage some of the merchandise from the store.  Glaser Tr.2251:15-16.  On its 2005 federal tax return (DX 174), Holiday Jewelers listed $30,012 of inventory at the beginning of the year and $14,049 at the end of the year, after Hurricane Katrina had struck.  Glaser Tr. 2267:4-12.  All of Holiday Jewelers' furniture and fixtures had been fully depreciated by early 2005.  GLASER 000004, line 10A (DX 174).

502.  Of the property damaged at Holiday Jewelers, some of the items were in showcases in the store.  The value of the items in those showcases was $26,400.  Glaser Tr. 2261:5-11; GLASER 000070 at 3 (DX 176).  Those items remained in the showcases after Hurricane Katrina, but were stolen after Hurricane Rita.  Glaser Tr. 2262:9-19.

503.  The size of Holiday Jewelers' post-Katrina customer base was affected by flooding in the New Orleans area other than flooding from the IHNC breaches.  Glaser Tr. 2254:14-17 (customers located in St. Bernard and Metarie), 2270:6-16, 19-25 (customers all over the New Orleans area).  Holiday Jewelers' business was also adversely affected by the Murphy Oil spill, and Mr. Glaser sued Murphy Oil for business losses resulting from that spill.  Glaser Tr. 2271:18-2272:15.

504.  Plaintiffs claim that Holiday Jewelers suffered $150,000 in damages due to the "loss of client contact information."  PFF ¶ 600.  But there is no evidence that the

"client" list of Holiday Jewelers, which operated at a loss, had any value, much less a figure of that magnitude.

## PROPOSED CONCLUSIONS OF LAW

1. The Court applies maritime law to this action. Doc. 18799 ¶ 2 (stipulation agreeing that the claims of these plaintiffs are governed by maritime law).

2. In order to establish their negligence claim under maritime law, plaintiffs must show by a preponderance of the evidence that LNA owed them a duty, LNA breached that duty, plaintiffs sustained injury, and LNA's conduct caused plaintiffs' injury. *In re Cooper/T. Smith*, 929 F.2d 1073, 1077 (5th Cir. 1991).

## I. PLAINTIFFS' FAILURE TO SHOW DUTY AND BREACH

### A. Plaintiffs' Failure of Proof

3. Plaintiffs must show that LNA owed them a duty of reasonable care and that LNA breached that duty. 1 Thomas J. Schoenbaum, Admiralty & Maritime Law § 5-2 at 184-85 (2004); *In re Two-J Ranch, Inc.*, 534 F. Supp. 2d 671, 684 (W.D. La. 2008) ("a general maritime negligence claim involves a traditional, broad formulation of the tort inquiry: 'under the negligence concept, there is only a duty to use due care, *i.e.*, reasonable prudence'") (quoting *Cox v. Esso Shipping Co.*, 247 F.2d 629, 637 (5th Cir. 1957)).

4. Plaintiffs have failed to show by a preponderance of the evidence that LNA owed them a duty because their injuries were not the type of harm that was reasonably foreseeable as a result of the allegedly negligent conduct in this case. See *In re Signal Int'l LLC*, 579 F.3d 478, 491 (5th Cir. 2009) (duty "is measured by the scope of the risk that negligent conduct foreseeably entails"); *Royal Beach Hotel, LLC v. Crowley Liner Servs., Inc.*, No. 1:06-DV-129, 2007 U.S. Dist. LEXIS 28633, at *3 (S.D. Miss. Mar. 14, 2007) ("Precaution is a duty only so far as there is reason for apprehension"). Here, the risk of catastrophic flooding from the breach of a floodwall was not a foreseeable risk of a breakaway barge. Plaintiffs have offered no evidence showing that any barge had ever before caused any floodwall to fail. See FF ¶¶ 285-88.

5. Plaintiffs have also failed to show by a preponderance of the evidence that LNA breached any duty to the plaintiffs, even if a duty was owed. When a defendant owes a duty to a plaintiff, the duty is to act with "ordinary care under the circumstances." *Daigle v. Point Landing, Inc.*, 616 F.2d 825, 827 (5th Cir. 1977) ("The plaintiff is owed a duty of ordinary care"); *Coumou v. United States*, Nos. 95-30219 & 95-30697, 1997 U.S. App. LEXIS 12674, at *16 (5th Cir. Feb. 26, 1997) ("The general maritime law of negligence recognizes a duty of reasonable care under existing circumstances when warranted by general tort law principles."). Maritime law regarding precautions in advance of an approaching storm asks generally "whether [the defendant] took reasonable precautions under the circumstances as known or reasonably to be anticipated," including whether the defendant's employees "were reasonable in their anticipation of the severity of the impending storm and undertook reasonable preparations in light of such

anticipation," based on the standard of "prudent men familiar with the ways and vagaries of the sea." *In re SS Winged Arrow*, 425 F.2d 991, 995 (5th Cir. 1970).

6.   Plaintiffs have not shown by a preponderance of the evidence that LNA failed to take "reasonable precautions" in preparing the ING 4727 for Hurricane Katrina. *In re SS Winged Arrow*, 425 F.2d 991, 995 (5th Cir. 1970).

a.   Plaintiffs have not shown that there was any reason for LNA personnel to refrain from unloading the barge upon its arrival at LNA's Terminal on Friday, August 26, 2005.

b.   Plaintiffs have not shown that LNA should have ceased unloading the barge or should have (or could have) added ballast on Friday night or the next morning.

c.   Plaintiffs have not shown that LNA could or should have removed ING 4727 from the IHNC before Hurricane Katrina arrived.

d.   Plaintiffs have not shown that LNA acted unreasonably in asking Domino and Unique Towing to shift the empty barge ING 4727 and the loaded barge ING 4745 so that the loaded barge was closer to the dock.

e.   Plaintiffs have not shown that LNA failed to "double up" the mooring lines between the ING 4727 and the ING 4745; to the contrary, the evidence established that the mooring configuration at the time of the storm was more than double the strength of the configuration before hurricane preparations were undertaken.  Plaintiffs have not shown that LNA should have used wire cable instead of polypropylene line to secure the ING 4727 to the ING 4745.

7.   Plaintiffs have failed to show by a preponderance of the evidence that LNA violated any statute, code, or regulation.

a.   LNA complied with C.F.R. § 162.75(b)(3)(ii), which states "(ii) When tied up individually, all vessels and tows shall be moored by bow and stern lines.  Tows shall be secured at sufficiently frequent intervals to insure their not being drawn away [from] the bank by winds, currents, or the suction of passing vessels. Lines shall be shortened so that the various barges in a tow will be as close together as possible."  There were at least three connections between the ING 4727 and ING 4745 – one at the bow, one at the stern, and one or two in the middle.  Accordingly, LNA complied with the provision requiring that "all vessels and tows shall be moored by bow and stern lines."  Ryan Tr. 2882:4-12.  Plaintiffs provided no evidence of non-compliance with this provision.

b.   The second sentence of C.F.R. § 162.75(b)(3)(ii) applies only to "tows," and not to individual "vessels."  A "towing vessel" is defined in the regulations as a "commercial vessel engaged in, or intending to engage in,

pulling, pushing, or hauling alongside, or any combination of pulling, pushing, or hauling alongside." 46 C.F.R. § 27.101. Accordingly, a barge that is part of a "tow" is one that is being pushed, pulled, or hauled alongside by a towing vessel. The ING 4727 was not engaged in any of these activities at the time of Hurricane Katrina. Rather, the barge had been unloaded at LNA's dock as an individual barge, and was awaiting pickup at LNA's dock as an individual barge with no towing vessel in attendance. See Ryan Tr. 2900:1-7 ("When the [ING] 4727 was moored as an individual barge, it was not a part of a tow."); Ryan Tr. 2902:1-17 (barge is not part of a tow unless it is "attached to [a] tug"); Ryan Tr. 2917:14-20 ("tow" does not include barge that has been released from tug); Ryan Report at 10 (DX 201) ("the ING 4727 … is not a tow); Green Tr. 560:15-16 ("No, it's not" part of a tow).

c.   LNA did not violate 33 C.F.R. § 6.19. This regulation does not place any specific duties on waterfront operators or owners. Moreover, and in any event, LNA's actions showed that its personnel took "responsibility for the safety and security of the [LNA] facility" in their preparations for Hurricane Katrina.

d.   No other regulations or statutory requirements are applicable to LNA's conduct, and LNA did not violate any such regulations or statutory requirements.

8.   Furthermore, even if plaintiffs could show that LNA breached a duty to them, they have not shown by a preponderance of the evidence that whatever LNA neglected or failed to do would, if done, have prevented the ING 4727 from breaking away. See *Inter-Cities Navigation Corp. v. United States*, 608 F.2d 1079, 1081 (5th Cir. 1979) ("A failure to act, even though unreasonable, cannot contribute to cause a collision where the action would not have affected its occurrence."); *State of La. ex rel. Guste v. M/V TESTBANK,* 564 F. Supp. 729, 740 (E.D. La. 1983) (use of different container to store hazardous chemicals aboard ship would not have prevented spill, "given the crushing and mangling of the containers due to the collision"), *aff'd,* 767 F.2d 916 (5th Cir. 1985). In other words, plaintiffs have failed to show by a preponderance of the evidence that if LNA had acted differently, it could have prevented the barge from breaking away. Specifically, as set forth in Findings of Fact paragraphs 78 to 87:

a.   Plaintiffs have not shown that the breakaway could have been prevented by placing additional mooring connections between the ING 4727 and the ING 4745.

b.   Plaintiffs have not shown that the breakaway could have been prevented by the use of wire cable as opposed to polypropylene rope.

  c. Plaintiffs have not shown that the barge would have remained fast if LNA had not asked Domino to switch the locations of the empty and loaded barges.

9. Plaintiffs have thus failed to show by a preponderance of the evidence that LNA owed a duty to the plaintiffs or that it breached any such duty.  Plaintiffs have also failed to show that the barge breakaway could have been prevented by undertaking any of the additional measures they contend were necessary to fulfill LNA's supposed duty.

## B. Inapplicability of The Louisiana Rule

10. Plaintiffs have attempted to invoke The Louisiana Rule to shift the burden of proof with respect to duty and breach.  The Court concludes that the Rule does not apply here.

11. The Louisiana Rule provides that when a moving vessel allides with a stationary object, the moving vessel is presumed to be at fault.  *The Louisiana*, 70 U.S. 164 (1865).  Courts do not apply The Louisiana Rule, however, unless the plaintiff proves that the vessel in fact allided with a stationary object at a time relevant to the damages they claim.  See *Hatt 65, L.L.C. v. Kreitzberg*, No. 3:06cv332, 2009 U.S. Dist. LEXIS 95332, at *23 (N.D. Fla. Sept. 30, 2009) (explaining that The Louisiana Rule applies only when a vessel "has allided" with an object; "[a]s a threshold question, then, the court must decide whether there was an allision between the *Escape* and the *WEJ* while the *WEJ* was moored.  It was the plaintiffs' burden to establish a prima facie case of an allision").

12. As shown above, plaintiffs have not proven that the ING 4727 made contact with the eastern IHNC floodwall before the breaches occurred.  To the contrary, the evidence showed that the only contact between the barge and the floodwall occurred at the extreme southern end of the South Breach, after both breaches had fully formed.  See FF ¶¶ 369-71.  That contact does not permit the invocation of The Louisiana Rule, however, because it had nothing to do with causing plaintiffs' damages.  See, *e.g., Crowley Am. Transp., Inc. v. Double Eagle Marine, Inc.*, 208 F. Supp. 2d 1250, 1259 (S.D. Ala. 2002) (The Louisiana Rule did not apply because plaintiff "ha[d] not established its burden of showing that this damage occurred as a result of the collision with the barge"); *Norfolk So. Ry. Co. v. Moran Towing Corp.*, 2010 WL 2326597, at *2 (E.D. Va. June 30, 2010) ("once the fact of contact … has been established, the Louisiana rule operates to shift the burden of proof to [defendant]").  Other Fifth Circuit district courts have found that a defendant's preparations for Hurricane Katrina were reasonable under the circumstances.  *Young v. Crowley Liner Servs., Inc.*, No. 1:06cv966, 2009 U.S. Dist. LEXIS 22746 (S.D. Miss. March 20, 2009) (plaintiff not negligent in failing to remove container from port because it was not foreseeable that containers would wash away due to the "unprecedented" and "enormously destructive force of Hurricane Katrina"); *Lee Brother, LLC v. Crowley Liner Servs.,* 2007 WL 188858744 (S.D. Miss. June 26, 2007) (same); *Defazio v.*

*Chiquita Fresh N. Am., LLC*, No. 1:06cv973, 2008 U.S. Dist. LEXIS 53407 (S.D. Miss. July 14, 2008) (same); *Royal Beach Hotel, LLC,* 2007 U.S. Dist. LEXIS 28633 (same).

13.    LNA can rebut the Louisiana Rule by showing that it took reasonable care to prevent an accident.  See *Fischer v. S/Y Neraida*, 508 F.3d 586 (11th Cir. 2007) (owners of yacht rebutted the presumption after showing that they took reasonable care in mooring yacht prior to hurricane even though yacht allided with dock during storm; noting that "[c]ollision cases decided subsequent to *The Louisiana* also understood the standard of care in admiralty to be reasonable care under the circumstances, and not a higher standard"); *Pioneer Natural Res. USA, Inc. v. Diamond Offshore Co.*, 638 F. Supp. 2d 665, 689 (E.D. La. 2009) (citing *Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790, 795 (5th Cir. 1977)).  Because LNA acted with reasonable care in securing the ING 4727 prior to Hurricane Katrina, it has rebutted the Louisiana Rule.

14.    LNA can also rebut the Louisiana Rule because an "Act of God" is responsible and not LNA's alleged negligence.  *Pioneer Natural Res. USA, Inc. v. Diamond Offshore Co.*, 638 F. Supp. 2d 665, 690 (E.D. La. 2009) ("Assuming that in this particular case an allision occurred, Hurricane Ivan was a *vis majeure* sufficient to discharge all liability.") (citing *In re Marine Leasing Services, Inc.*, 328 F. Supp. 589 (E.D. La.), *aff'd*, 471 F.2d 255 (5th Cir. 1973) (affirming district court's finding that Hurricane Betsy was the inevitable cause or a *vis majeure* considering winds over 90 miles an hour in the Baton Rouge area, hundreds of barges adrift on the Mississippi River and sinking and that no fleet of barges, no matter how well secured, was able to withstand the fury of the storm); *In re Int'l Marine Dev. Corp.*, 328 F. Supp. 1316 (S.D. Miss. 1971) (finding that Hurricane Camille was a 'freak of nature' of sufficient velocity and destructiveness to overcome all reasonable preparations and sustaining the defense of *force majeure* as to all three vessels involved) (other citation omitted).  Thus, because LNA has shown that it properly moored ING 4727, but that the force of the storm caused the barge to break free, plaintiffs cannot avail themselves of The Louisiana Rule.[3]

## II.    PLAINTIFFS' FAILURE TO SHOW CAUSATION

15.    Plaintiffs have the burden of proving that LNA's alleged negligence caused their damages – here, damages associated with the flooding of their properties and/or businesses during Hurricane Katrina.  See *Bach v. Trident S.S. Co.*, 920 F.2d 322,

---

[3] See also *Young v. Crowley Liner Servs., Inc.*, No. 1:06cv966, 2009 U.S. Dist. LEXIS 22746 (S.D. Miss. March 20, 2009*), Defazio v. Chiquita Fresh N. Am., LLC*, No. 1:06cv973, 2008 U.S. Dist. LEXIS 53407 (S.D. Miss. July 14, 2008), and *Royal Beach Hotel, LLC v. Crowley Liner Servs., Inc.*, No. 1:06DV129, 2007 U.S. Dist. LEXIS 28633 (S.D. Miss. March 14, 2007) (all holding that ship container owners had taken proper precautions to protect damage to the containers prior Hurricane Katrina and that the force of storm, and not negligence, caused the plaintiffs' damages).

327 (5th Cir. 1991); *Fournier v. Petroleum Helicopters, Inc.*, 665 F. Supp. 483, 486 (E.D. La. 1987).

16.     Causation is a two-part test, and plaintiffs must establish both parts by a preponderance of the evidence.  Plaintiffs must prove that the ING 4727 was both the actual and proximate cause of their flood-related damages.  *Chavez v. Noble Drilling Corp.*, 567 F.2d 287, 289 (5th Cir. 1978); *Moser v. Texas Trailer Corp.*, 623 F.2d 1006, 1013 (5th Cir. 1980); 1 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 5.3 at 189-90 (4th ed. 2004) (hereinafter "Schoenbaum"). Plaintiffs have not proved either aspect of causation.

### A.     Plaintiffs' Failure to Show Causation in Fact

### i.     Legal standards for determining cause-in-fact

17.     In order for plaintiffs to prevail on their negligence claims, LNA's "actions must be the cause in fact of [their] injuries." *Moser*, 623 F.2d at 1013.  Plaintiffs must "introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of [LNA] was a cause in fact of the result." *Bach*, 920 F.2d at 327 (quoting W. Page Keeton, Prosser and Keeton on Torts 263, 269 (5th ed. 1984)).  Plaintiffs cannot establish causation in fact by merely showing that it was ***possible*** that the ING 4727 caused the floodwall failures. *Fournier*, 665 F. Supp. at 486 (the "possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the Court to direct a verdict for the defendant").

18.     In applying maritime law, this Court utilizes the causation standards set forth in the Restatement (Second) of Torts (1965) (the "Restatement").  See, *e.g.*, *Bach,* 920 F.2d at 327; *Chavez,* 567 F.2d at 289; *Gavagan v. United States,* 955 F.2d 1016, 1020 (5th Cir. 1992).  The Restatement requires plaintiffs to show that LNA's conduct was a "substantial factor in bringing about the harm" (Restatement § 431).

19.     In most cases, the Restatement  "substantial factor" standard calls for a "but-for" test for causation – *i.e.*, an actor's negligent conduct is not a "substantial factor" in causing harm if the harm "would have been sustained even if the actor had not been negligent."  Restatement § 432(1); *Moser*, 623 F.2d at 1012-13 ("An act or omission is not regarded as a cause of an event if the particular event would have occurred without it."); Schoenbaum § 5.3 at 189-90 ([A] "defendant's act cannot be a 'substantial factor' if the plaintiff's harm would have occurred without it.").  Under this formulation, the barge cannot be considered the cause-in-fact of the IHNC floodwall failures if the evidence shows that the floodwall failed for reasons having nothing to do with a barge.  See, *e.g.*, *Moser*, 623 F.2d at 1013 ("A failure to fence a hole in the ice plays no part in causing the death of runaway horses which could not have been halted if the fence had been there.").

130

20.     The Restatement "substantial factor" standard employs a modified test for situations involving "concurrent causation" by two or more causes.  Under Restatement § 432(2), "if two forces are actively operating, one because of the actor's negligence, the other not because of any misconduct on his part, and each of itself is sufficient to bring about harm to another, the actor's negligence may be found to be a substantial factor in bringing it about."  An action is "sufficient" to cause a harm only if, when acting alone, the action would have caused the harm.[4] Thus, to the extent that plaintiffs contend that the barge is a "concurrent" cause of the floodwall breaches in combination with some other cause, the barge cannot be considered a cause-in-fact of the floodwall breaches unless the barge impact was "sufficient" to cause the breaches in the absence of the other cause or causes.

21.     An action also cannot be a "substantial factor" in causing harm if the action is only an insignificant cause, or, as the Fifth Circuit put it, merely "negligible negligence."  *Chavez*, 567 F.2d at 289 (citation omitted).  Thus, as the Supreme Court has recognized, "[i]n many cases, of course, the shipowner whose act or omission contributed only a very small percentage of the total negligence will avoid liability on the ground of lack of causation."  *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 265 n.15 (1979).[5]

### ii.     Application of legal standards – multiple grounds for finding no causation

22.     The Court concludes, as a matter of law, that the barge was not a cause-in-fact of plaintiffs' damages.  Multiple, independent grounds exist which compel this conclusion.

---

[4]  See *June v. Union Carbide Corp.*, 577 F.3d 1234, 1243-44 (10th Cir. 2009) (The term "sufficient" in the Restatement  requires the plaintiff to show "that the conduct … ***would*** in fact have caused the injury.") (emphasis added); *In re Hanford Nuclear Reservation Litig.*, 534 F.3d 986, 1010-11 (9th Cir. 2008) (dismissing personal injury claims for lack of proof that the radiation exposure "alone would have been sufficient to cause the injury"); *Clement v. United States*, 980 F.2d 48, 54 (1st Cir. 1992) (relying on Restatement's "sufficient" requirement in dismissing claims that hospital's negligence caused suicide); *RSL Communications PLC v. Bildirici*, 649 F. Supp. 2d 184, 219-20 (S.D.N.Y. 2009) (dismissing breach of fiduciary duty claims because there was no evidence that directors' failure to hold meetings caused alleged losses; instead, declining market conditions caused losses); *Lejeune v. Allstate Ins. Co.* 365 So.2d 471, 477 (La. 1978 (applying "sufficient" requirement to concurrent cause analysis).

[5] See also Restatement § 433 cmt. d ("There are frequently a number of events each of which is not only a necessary antecedent to the other's harm, but is also recognizable as having an appreciable effect in bringing it about.  Of these the actor's conduct is only one.  Some other event which is a contributing factor in producing the harm may have such a predominant effect in bringing it about as to make the effect of the actor's negligence insignificant and, therefore, to prevent it from being a substantial factor.  So too, although no one of the contributing factors may have such a predominant effect, their combined effect may, as it were, so dilute the effects of the actor's negligence as to prevent it from being a substantial factor."); Restatement § 435 cmt. a ("the manner in which the harm occurs may involve the cooperation of other assisting factors so numerous and so important that the actor's negligence cannot be regarded as a substantial factor in bringing about the harm").

23.     The Court concludes, in the first instance, that the barge did not cause plaintiffs' damages because the barge simply was not present at the breach sites before or at the time that the breaches occurred.  As discussed above in paragraphs 88 to 254 of the Findings of Fact, all of the evidence demonstrates that the barge was not and could not have been present when the breaches occurred.  Rather, the evidence shows that that the barge arrived after the breaches had already occurred and the Lower Ninth Ward was already flooded.  Therefore, under no theory of causation could the barge be deemed to have played any role in causing the floodwall breaches or any flood-related damage resulting from them.  *E.g.*, *Am. Gulf VII v. Otto Candies, Inc.*, No. 94-3905, 1997 U.S. Dist. LEXIS 13414, at *19 (E.D. La. Aug. 28, 1997) (no liability for negligence under maritime law where defendant's actions "did not play any role in causing the damage alleged").

24.     The Court concludes, as a second ground for finding no causation as a matter of law, that a barge impact could not possibly have caused the floodwall to fail in the manner that it did.  As discussed above in paragraphs 255 to 288 of the Findings of Fact, even if the barge had been present (which it was not), the evidence showed that it was impossible for the barge to have caused the deflection and displacement of the steel sheet pile that characterized and caused both the North Breach and South Breach of the IHNC floodwall.  Rather, the evidence showed that if had a barge impact had occurred, the result would have been only localized damage to the concrete cap, not deflection of the sheet pile.  In short, plaintiffs' theory that the barge caused the sheet pile to deflect, rather than merely cracking the concrete cap, was shown to be scientifically impossible.  For this simple reason as well, even assuming against all of the evidence that an impact had taken place before the breaches occurred (which it did not), the evidence demonstrates that such an impact cannot possibly have caused plaintiffs' damages.  See, *e.g.*, *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1077 (5th Cir. 1994) (en banc) (finding no causation where "evidence establishing a causal connection between the alleged defect … and the injury suffered is lacking"); *In re Ingram Towing Co.*, 1995 U.S. Dist. LEXIS 15034, at *2 (E.D. La. Oct. 4, 2005) (Duval, J.) (finding no causation because it was "impossible for any person to have become ill due to the oil spill from drinking tap water in the days following the accident"); *Molden v. Ga. Gulf Corp.*, 465 F. Supp. 2d 606, 613 (M.D. La. 2006) (finding no causation where "the level of exposure was not sufficiently high to give rise to the physical injuries complained of by Plaintiffs").

25.     The Court concludes, as a third ground for finding no causation as a matter of law, that the floodwall failed for reasons having nothing to do with a barge.  As discussed in paragraphs 289 to 392 of the Findings of Fact, the evidence overwhelmingly established that the IHNC eastern floodwall became unstable and failed under the forces imposed on it by Hurricane Katrina, without any participation by a barge.  Plaintiffs' contention to the contrary is based on Dr. Marino's flawed geotechnical "process of elimination," which must be rejected based on the multiple errors and flaws identified in paragraphs 393 to 429 of the Findings of Fact.  See, *e.g.*, *Michaels v. Avitech*, 202 F.2d 746, 753 (5th Cir. 2000) (affirming finding of no causation, holding that plaintiff's expert evidence

"lack[ed] any rational probative value" because it failed to "exclude[] … other potential causes"); *Westchester Fire Ins. Co. v. Haspel-Kansas Inv. P'ship*, 342 F.3d 416, 421 (5th Cir. 2003) (upholding finding of no causation where it was "very likely that the incident would have occurred" independent of alleged negligence); *Inter-Cities Navigation Corp.*, 608 F.2d at 1082-83 (upholding finding of no causation where incident occurred for reasons independent of alleged failure to maintain buoy at charted location); *Fournier*, 665 F. Supp. at 487 ("There are **several** plausible explanations for the current debilitated state of the plaintiff.  While the Court will not engage in speculation as to exactly which explanation it feels is the most plausible, the Court does not view the helicopter incident as having been such.") (emphasis added).

26.     The Court concludes, as a fourth ground for finding no causation as a matter of law, that the plaintiffs have failed to establish that the barge was a "concurrent cause" under the applicable test as set forth in Restatement § 432(2) because a barge impact was not "of itself . . . sufficient" to cause the wall to fail under any circumstance.  Plaintiffs and their experts presented no evidence that could support such a finding, while LNA and its experts showed that barge impacts do not cause floodwalls to fail.  See FF ¶¶ 285-88.  By contrast, as shown in Findings of Fact paragraphs 289 to 392, the non-barge forces acting on the wall were clearly sufficient to cause it to fail without any participation by a barge.  Even assuming the plaintiffs could point to some other cause with which the barge supposedly "concurred" to bring about the harm, the evidence showed that the barge was not "of itself … sufficient" to cause the floodwall breaches.  Therefore, the barge was not a concurrent cause of the breaches.  *Westchester Fire Ins. Co*, 342 F.3d at 421 (in case involving "multiple causes," finding no liability because "[w]hile a party's conduct does not have to be the sole cause of the harm, it is a necessary antecedent essential to an assessment of liability") (citation omitted); *June v. Union Carbide Corp.*, 577 F.3d 1234, 1243-44 (10th Cir. 2009) (plaintiff must show injury "would have" happened due to challenged conduct independent of concurring causes).

27.     The Court concludes, as a fifth ground for finding no causation as a matter of law, that any supposed contribution of the barge to the breaches and flooding, if such a contribution had been established, would be *de minimis* and therefore insufficient to impose liability or to assign any legal responsibility for causing the breaches.  See *Edmonds*, 443 U.S. at 265 n.15 ("In many cases, of course, the shipowner whose act or omission contributed only a very small percentage of the total negligence will avoid liability on the ground of lack of causation."); *Chavez*, 567 F.2d at 289 (no liability for "negligible negligence"); *Am. River Transp. Co. v. Kavo Kaliakra S.S.,* 148 F.3d 446, 450-51 (5th Cir. 1998) (barges moored abreast were not substantial causal factor because accident was dominated by other vessel's loss of power).

a.     Plaintiffs claim (at PCL ¶ 27) that if LNA is 1% at fault, then it is liable for all of plaintiffs' damages.  But 1% fault is *de minimis*, and therefore there is no liability for such a small degree of fault.  None of the cases

133

plaintiffs cite for this proposition in fact found a defendant liable for all of a plaintiffs' damages on the basis of 1% fault. See *Latulas v. Montco Offshore, Inc.*, No. 03-3544, 2006 U.S. Dist. LEXIS 20066, at *16 (E.D. La. Mar. 29, 2006) (finding defendant not liable and *dismissing* claim; 1% statement mere dicta); *Foulk v. Donjon Marine Co.*, 963 F. Supp. 427, 432 (D.N.J. 1997) (same); *Kirksey v. P&O Ports Texas, Inc.*, 488 F. Supp. 2d 579, 591 (S.D. Tex. 2007) (finding defendants liable where each caused 45% of the injuries; 1% statement mere dicta).

28. The Court concludes, as a sixth ground for finding no causation as a matter of law, that the barge did not cause the flooding of plaintiffs' properties because the undisputed evidence showed that the breaches in the IHNC floodwall would have occurred regardless of any participation by the barge. In particular, as shown in the Findings of Fact at paragraphs 297 to 320 and 355 to 364, the floodwall was not constructed to withstand the storm surge and prolonged overtopping imposed by Hurricane Katrina. Indeed, even assuming that plaintiffs could have shown that the barge had played some role in the formation of the breaches before Katrina's surge reached its maximum level (a showing plaintiffs did ***not*** make), the undisputed evidence established that the floodwall could not have withstood Katrina's maximum storm surge. This was the unanimous conclusion of all experts and independent studies other than Dr. Marino, who admitted he did not consider whether the wall could have withstood Katrina's maximum surge. See FF ¶¶ 419-26. In these circumstances, the barge cannot be considered a cause-in-fact of the floodwall failures because the floodwall would have failed even if the barge had remained moored at the LNA Terminal. See, *e.g.*, *Moser*, 623 F.2d at 1013 ("A failure to fence a hole in the ice plays no part in causing the death of runaway horses which could not have been halted if the fence had been there."); Restatement § 432(1), comment b, illustration 2 (negligent construction of dam is not a cause-in-fact of dam failure where "[t]he flood caused by the cloudburst is so great that it would have burst the dam even if it had been properly constructed"); *Inter-Cities Nav. Corp.*, 608 F.2d at 1081-83 (dislocation of buoy did not cause collision where pilot was not relying on buoy for navigation; accident would have occurred if buoy had been properly located).

29. The Court finds the testimony of Drs. Bea and Bakeer concerning the causes of the IHNC wall failures, Dr. Cushing concerning the transit of the ING 4727, and Dr. Dooley and Mr. Lemon concerning the weather-related issues during Hurricane Katrina, to be reliable, credible, and consistent with the physical and other evidence.

30. By contrast, although the Court has considered the opinions of plaintiffs' experts in full, the Court finds that the opinions of plaintiffs' key experts on causation – Dr. Marino, Mr. Pazos, and Dr. Mitchell – are not "based upon sufficient facts or data" and are not "the product of reliable principles and methods," and that these experts have not "applied the principles and methods reliably to the facts of the case," as required by Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

31.    Mr. Pazos, a naval architect, is plaintiffs' expert on the transit of the barge. At trial, he gave no opinion on the course that the barge supposedly traveled across the IHNC or how the barge could have transited to either breach site before the breaches occurred. The defects in his opinions are discussed further above at paragraphs 188 to 190 of the Findings of Fact.

32.    Dr. Marino is plaintiffs' expert concerning the stability of the wall and the surrounding soils. At trial, he mischaracterized the composition of the soil near the breach sites and ignored recognized processes such as hydraulic uplift causing displacement of the soils on the protected side of the levee. Further, his explanation of how the barge allegedly contacted the wall is contrary to the physical and meteorological evidence in numerous respects. The defects in his opinions are discussed further above at paragraphs 393 to 429 of the Findings of Fact.

33.    Dr. Mitchell is plaintiffs' weather expert. His testimony was largely irrelevant because he did not testify that any microburst wind could have moved the barge toward the eastern IHNC floodwall against the direction of the prevailing wind. Moreover, Dr. Mitchell's testimony regarding the supposed presence of mesocyclones and microburst winds in the area of the IHNC consisted of pure speculation, and was contradicted by the radar data on which he purported to rely. The defects in his opinions are discussed further above at paragraphs 138 to 183 of the Findings of Fact.

34.    In a bench trial, a court may admit expert testimony at trial and subsequently exclude it because the court does not find the testimony to meet the standard for reliability or relevance under *Daubert*. See *In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006) ("where the factfinder and the gatekeeper are the same, the court does not err in admitting the evidence subject to the ability later to exclude it or disregard it if it turns out not to meet the standard of reliability established by Rule 702"); *Jimenez v. United States*, 2008 WL 3849915 at *5 (N.D. Ill. Aug. 14, 2008) ("Under this sensible approach, the judge in a bench trial may choose to allow the presentation of borderline testimony, subject to the rigors of cross-examination, and decide later whether the testimony is entitled to some consideration or whether it should be excluded as irrelevant, unreliable, or both."); *Lyondell Chem. Co. v. Albemarle Corp.*, 2007 WL 5517247 at *2 (S.D. Tex. June 8, 2007) (due to the "greater flexibility" in a bench trial, "the trial court retains the power to exclude or disregard testimony that fails to conform to the standards of Rule 702, even where the expert's testimony was not initially excluded."); *In re Connolly N. Am., LLC*, 398 B.R. 564, 576-77 (Bankr. E.D. Mich. 2008) (excluding expert testimony after hearing the full testimony in a bench trial for failure to meet the standards of Rules 701 and 702). Although the has Court considered the testimony of Mr. Pazos, Dr. Marino, and Dr. Mitchell in full for purposes of making its findings of fact and reaching its conclusions, the Court finds that their opinions ultimately do not satisfy Fed. R. Evid. 702 and *Daubert*, for the reasons previously stated.

35.     The Court finds that the testimony of plaintiffs' principal lay witnesses, Messrs. Villavasso, Adams, and Williams, fails to establish that the barge was present at the eastern IHNC floodwall before the breaches occurred, for the reasons stated in the Court's findings of fact.  Even if the testimony of these witnesses had been less equivocal and speculative than it was, the Court would still, as a matter of law, find that this testimony cannot be credited to the extent it purports to place the barge at the North Breach and/or South Breach at the time of the respective breaches because the scientific evidence overwhelmingly showed that at all relevant times, the prevailing wind was pushing the barge toward the western side of the IHNC, and away from the eastern IHNC floodwall.  Thus, had any eyewitness professed to have identified the barge as present at the floodwall at the time that the breaches occurred, such testimony would have had to be rejected for the additional reason that such an account would be scientifically impossible. *Ralston Purina Co. v. Hobson*, 554 F.2d 725, 729 (5th Cir. 1977) ("Evidence manifestly at variance with the laws of nature and the physical facts is of no probative value and may not support a jury verdict."; plaintiff could not avoid a judgment notwithstanding the verdict where testimony regarding the cause of plaintiff's chickens' deaths was contradicted by poultry experts' testimony on chicken behavior and physical characteristics); *Molden*, 465 F. Supp. 2d 606 (court granted summary judgment despite plaintiffs' testimony that they suffered physical injuries within a short time of a toxic chemical release because the scientific evidence showed that their level of exposure was not sufficiently high to give rise to their physical injuries).[6]

36.     The court also now grants LNA's motion, made at the close of plaintiffs' case-in-chief, under Fed. R. Civ. P. 52(c).  At trial, the Court deferred a ruling on the Rule 52 motion.  Rule 52(c) provides that "[i]f a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue."  Now, having fully considered the evidence that plaintiffs presented,

---

[6] Furthermore, as the trier of fact, the Court has the authority to reject eyewitness accounts that are incredible, impossible, or do not comport with the other evidence.  See, *e.g.*, *Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 375 (5th Cir. 2000) (court of appeals "cannot second guess the district court's decision to believe one witness' testimony over another's or to discount a witness' testimony"); *So. Pac. Co. v. Matthews*, 335 F.2d 924, 927 (5th Cir. 1964) ("[t]estimony which is at variance with physical facts is no evidence"); *Holland v. Allied Structural Steel Co.*, 539 F.2d 476, 483 (5th Cir. 1976) (proper to reject witness testimony that is "incredible as a matter of law"); *Geigy Chem. Corp. v. Allen*, 224 F.2d 110 (5th Cir. 1955) (rejecting testimony regarding driver's speed that was contrary to the physical damage and other evidence; noting that "[c]ourts are not required to believe testimony which is inherently incredible or which is contrary to the laws of nature and of human experience, or which they judicially know to be unbelievable"); *Marchese v. Secretary, United States Dep't of the Interior*, 409 F. Supp. 2d 763, 766 (E.D. La. 2006) (rejecting testimony that was "completely unbelievable," "equivocal," "contradicted by the documentary evidence," and "not credible"); *Dollens v. Public Belt R.R. Comm'n*, 333 F. Supp. 72, 73-74 (E.D. La. 1971) (rejecting witness testimony that was "not corroborated by any other witness at the trial" and "implausible with respect to his location") *Grant v. Cia Anonima Venezolana de Navegacion*, 228 F. Supp 232, 235 (E.D. La. 1964) ("oral testimony of a witness may be disregarded when positively in contradiction to the physical facts").

the Court concludes, for the reasons stated, that plaintiffs' claims against LNA must fail because (a) the alleged eyewitness testimony does not show that it was more likely than not that the ING 4727 was the cause of either of the eastern IHNC floodwall failures, and (b) plaintiffs' experts – namely, Dr. Marino, Mr. Pazos, and Dr. Mitchell – did not provide credible testimony showing that it was more likely than not that the barge moved to the eastern IHNC floodwall before the breaches occurred or that the barge was responsible for the failure of the floodwall at either the North Breach or the South Breach locations.

37.     Although the trial was to the Court, the evidence showing that the ING 4727 did not cause either floodwall breach is so compelling and clear that no rational fact finder could conclude that the barge caused either breach.  The evidence is incontrovertible that (a) there was no force present in the IHNC during Hurricane Katrina (such as wind, waves, or current) that could have moved the barge toward the eastern IHNC floodwall before the wall had already breached in two places, (b) that the wall failed for reasons having nothing to do with a barge impact, and (c) that even if there had been a barge impact with the floodwall, that would have caused only localized damage to the concrete cap on top of the floodwall and not caused the displacement of the wall itself or the embedded sheet pile.

### B.     Plaintiffs' Failure to Show Proximate Causation

38.     Even if plaintiffs could show that the barge had been a cause-in-fact of their injuries, they would be unable to establish the requirement of foreseeability needed to satisfy the test for proximate causation.  "In admiralty the touchstone of proximate cause is foreseeability; the injury or damage must be a reasonably probable consequence of the defendant's act or omission."  Schoenbaum at 190. See *In re Cooper/T. Smith*, 929 F.2d at 1077 (in order to prove negligence claim under maritime law, "the resultant harm must be reasonably foreseeable").  A "foreseeable consequence" of an action is one that "might have been anticipated by a reasonably thoughtful person, as a probable result of the act or omission, considering the interplay of natural forces and likely human intervention." *Consol. Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d 65, 68 (5th Cir. 1987).

39.     The Court finds that the loss suffered by the plaintiffs "goes beyond the pale of general harm which reasonably might have been anticipated" as the result of a breakaway barge. *In re Signal,* 579 F.3d at 495 & n.19.  Rather, the catastrophic flooding occasioned by the floodwall failures represents precisely the sort of "highly extraordinary" occurrence that neither LNA nor any other actor could reasonably have foreseen.  Restatement § 435(2).  The undisputed evidence disclosed no prior occasion on which a barge had been the cause of flooding occasioned by the failure of a floodwall or any similar structure.  See above FF ¶¶ 285-88.  To the contrary, all of the trial evidence showed that if a barge comes into contact with a floodwall, the expected damage is limited to localized damage to the concrete cap on the floodwall, not failure of the entire structure.  See above FF ¶¶ 268-70.  For these reasons, the harms alleged by the plaintiffs in this case

were not the "foreseeable consequence" of a barge breakaway, and the barge cannot be deemed a proximate cause of plaintiffs' flood-related damages.

### C.    Inapplicability of The Pennsylvania Rule

40.    Plaintiffs have attempted to invoke The Pennsylvania Rule, but the Court concludes that the Rule does not apply to this case.

41.    The Pennsylvania Rule shifts the burden on causation following a collision or other maritime incident to a party that has committed a statutory violation. *The Pennsylvania*, 86 U.S. 125 (1874). *The Pennsylvania* involved two ships that collided in a dense fog. One boat did not comply with a statute requiring a foghorn, and instead rang a quieter bell. The Court explained that the burden of proving causation of the accident should be shifted to the party that violated the statute because in collisions at sea, it is difficult to prove causation. In *The Pennsylvania*, neither party denied that the two vessels had collided.

42.    In this case, The Pennsylvania Rule does not apply because plaintiffs have not proved that their damages stemmed from an allision between the ING 4727 and the eastern IHNC floodwall – that is, plaintiffs have not proved that the ING 4727 allided with the floodwall before the breaches occurred. See *Gosnell v. United States*, 262 F.2d 559, 563-64 (4th Cir. 1959) ("The Pennsylvania Rule does not apply where the physical cause of the damage is not known."); *In re Nautilus Motor Tanker Co.*, 85 F.3d 105, 115 (3d Cir. 1996) (Pennsylvania Rule is "not … intended to increase the likelihood of liability"); *Poulis-Minot v. Smith*, 388 F.3d 354 (1st Cir. 2008) ("[W]e do not know what happened [to a vessel that disappeared], and to rely on pure speculation to conjure a scenario in which the *Pennsylvania* burden-shifting rule should be applied would be a departure from the limited and cautious manner in which the courts, with good reason, have traditionally invoked this powerful rule."). See also *Willis v. Amerada Hess Corp.*, 379 F.3d 32, 42-43 (2d Cir. 2004) (declining to apply the Rule because the plaintiff made no showing that vessel's actions were related to his cancer).[7] The Rule "does not shift the burden of proof" on the question of what was "the physical cause of the damage"; rather, "[s]uch proof is always a part of libellant's case." *Gosnell*, 262 F.2d at 564. The Fifth Circuit has made clear that allegations of regulatory violations are irrelevant unless the plaintiff shows that the maritime incident to which the violations pertain is the incident that caused their damages. *Candies Towing Co. v. MV B & C Eserman*, 673 F.2d 91, 95 (5th Cir. 1982) (violation related to previous grounding of vessel was irrelevant to damages

---

[7] See also *Pennzoil Producing Co. v. Offshore Express, Inc.*, 943 F.2d 1465, 1471 (5th Cir. 1991) (the Rule applies "at the time of a collision"); *Tokio Marine & Fire Ins. Co. Ltd. v. Flora MV*, 235 F.3d 963, 966 (5th Cir. 2001) (the Rule applies "if [a] vessel [is] involved in a collision"); *Fla. Marine Transps., Inc. v. Sanford*, 225 Fed. Appx. 885, 888 (5th Cir. 2008) (same).

resulting from subsequent sinking).  In practically every reported case applying The Pennsylvania Rule, the parties did not dispute that the offending vessel was actually involved in the maritime incident that caused the plaintiff's damages.  But here, plaintiffs cannot avail themselves of Rule because they have not proved (and cannot prove) that the ING 4727 allided with the wall at the North Breach or the South Breach before the breaches occurred.

43.     The Pennsylvania Rule also does not apply here because plaintiffs have not shown that LNA violated any statute or regulation.

a.      There are only two Coast Guard regulations that plaintiffs allege are applicable to the LNA Terminal and LNA's mooring of the ING 4727:  33 C.F.R. § 162.75, which "deals with mooring and anchoring" and 33 C.F.R. § 6.19-1, which says that "the ultimate responsibility for the safety and security of the facility rests with owners and operators."  Ryan Tr. 2869:9-24.

b.      33 C.F.R. § 162.75(b)(3)(ii) did not apply to the mooring of the ING 4727 at the LNA Terminal because it applies only to mooring against the bank in the river channel.  It is clear from context that this provision applies only when a vessel or tow is moored against a bank in the river channel, and thus did not apply to the ING 4727, which was moored at a dock in a turning basin.  Section 162.75(b), of which this is a part, is captioned "Waterways" and starts with the basic principle in subsection 162.75(b)(1) that "[a] clear channel shall at all times be left open to permit free and unobstructed navigation by all types of vessels and tows ...."  This makes clear that the purpose of all of Section 162.75(b) is to address requirements for keeping the river channel clear.  Subsection 162.75(b)(3), which is captioned "Anchoring or mooring," then begins with Paragraph i, which provides:

> Vessels or tows shall not anchor or moor in any of the land cuts or other narrow parts of the waterway, except in an emergency, or with permission of the District Commander.  Whenever it becomes necessary for a vessel or tow to stop in any such portions of the waterway, it shall be securely fastened to one bank and as close to the bank as possible.  This shall be done only at such a place and under such conditions as will not obstruct or prevent the passage of other vessels or tows.  Stoppages shall be only for such periods as may be necessary.  (Emphasis added.)

This provision, thus, expressly only addresses mooring to the "bank" in "narrow parts" of the river channel.  Paragraph ii – the provision on which plaintiffs rely – then goes on to specify how the vessel or tow is supposed to be moored under those circumstances – that is, when the vessel or tow is being moored to the bank in a narrow part of the river channel.  This is

clear not only from the seamless flow from Paragraph i to Paragraph ii, but also because Paragraph ii expressly says that the tow shall be moored to avoid "being drawn away from the bank" (emphasis added), which is plainly a reference to the same river "bank" referenced in Paragraph i. This is also clear from the other paragraphs of Subsection 162.75(b)(3), which reconfirm that the entire subsection is limited to "moor[ing] to the bank" (Paragraph iv) and to stoppages in a "narrow portion of a waterway (Paragraph v).

c.      Even if Section 162.75(b)(3)(ii) applied, LNA complied with it.  The regulation states:

> "(ii) When tied up individually, all vessels and tows shall be moored by bow and stern lines.  Tows shall be secured at sufficiently frequent intervals to insure their not being drawn away [from] the bank by winds, currents, or the suction of passing vessels. Lines shall be shortened so that the various barges in a tow will be as close together as possible."

The ING 4727 was a "vessel," (Plaintiffs' Undisputed Fact 3) and thus it was it was subject to the requirements of the first sentence of this provision, called for "vessels and tows" to be moored by "bow and stern lines."  Because there were at least three connections between the ING 4727 and ING 4745 – one at the bow, one at the stern, and one or two in the middle – LNA complied with this. Ryan Tr. 2882:4-12.  Plaintiffs provided no evidence of non-compliance with this provision.

d.      The second sentence of C.F.R. § 162.75(b)(3)(ii) applies only to "tows," and not to individual "vessels."  A "towing vessel" is defined in the regulations as a "commercial vessel engaged in, or intending to engage in, pulling, pushing, or hauling alongside, or any combination of pulling, pushing, or hauling alongside."  46 C.F.R. § 27.101.  Accordingly, a barge that is part of a "tow" is one that is being pushed, pulled, or hauled alongside by a towing vessel.  The ING 4727 was not engaged in any of these activities at the time of Hurricane Katrina.  Rather, the barge had been unloaded at LNA's dock as an individual barge, and was awaiting pickup at LNA's dock as an individual barge with no towing vessel in attendance.  See Ryan Tr. 2900:1-7 ("When the [ING] 4727 was moored as an individual barge, it was not a part of a tow."); Ryan Report at 10 (DX 201) ("the ING 4727 … is not a tow"); Strouse Tr. 2940:19-21; Green Tr. 560:15-16 ("No, it's not" part of a tow).  Case law similarly uses the term "tow" to define the moving of a vessel from one place to another. *Sacramento Navigation Co. v. Salz*, 273 U.S. 326, 328 (1927) ("Towage service is the employment of one vessel to expedite the voyage of another."); *Stevens v. The White City*, 285 U.S. 195, 200 (1932) ("The supplying of power by a vessel, usually one propelled by steam, to tow or

140

draw another is towage.  Many vessels, such as barges . . . are built with a view to receiving their propelling force from other sources."); *Diamond Offshore Co. v. A&B Builders, Inc.*, 302 F.3d 531, 536 (5th Cir. 2002) (towing is the movement of a vessel from one place to another); *Agrico Chem. Co. v. M/V Ben W. Martin*, 664 F.2d 85, 90 (5th Cir. 1981) (barges depend on tugs for movement and that movement of a barge constitutes towage); *United States v. Massachusetts*, 493 F.3d 1, 14 (1st Cir. 2007) (defining a tow vessel as one that is "pushing, pulling, or hauling") (internal quotations omitted); *River Terminals Corp. v. Southwestern Sugar & Molasses Co.*, 274 F.2d 36, 37-38 (5th Cir. 1960) ("at the time she was ***taken in tow*** by R.T.C.'s tug Dottie D to proceed across open water to Texas City, Texas") (emphasis added); *United States v. St. Louis & M.V. Transp. Co.*, 184 U.S. 247, 253 (1902) ("There is a clear and well-defined custom at New Orleans respecting the course and practice of tows to land.  Descending tows come close to the shore on the city side of the river.  If they did not pursue this course descending tows would come down in the current so far out that the motive power could not back the tow to land.").

e.       Even if the second sentence had applied – which it did not, both because the whole Paragraph only applies to docking in the river channel and because the ING 4727 was not a "tow" – the ING 4727's mooring would not have violated its terms.  It is clear that the second sentence of Section 162.75(b)(3)(ii) is not meant to impose a greater mooring requirement than the 2-line requirement of the first sentence.  The first sentence states that a vessel or tow tied up individually must be secured by two lines, and the second sentence then provides lesser – and certainly no greater – requirement when multiple vessels are tied together in a tow.  Because the ING 4727 was secured by at least three lines, including bow and stern lines (FF ¶¶ 40-43, 58-60; PFF ¶¶ 45-47), its mooring would have satisfied the second sentence even if that sentence had applied.  Plaintiffs are incorrect when they contend that LNA violated this provision simply because the barge broke free.  Even where it applies, Section 162.75(b)(3)(ii) plainly only requires that the vessel or tow be moored in compliance with its terms; if that is done, then the fact that the vessel nevertheless breaks away (and thus is no longer moored) does not constitute a violation of the provision.  Put otherwise, this provision cannot be construed to create a harsh strict liability scheme not present elsewhere in maritime law.

f.       Finally, the Pennsylvania Rule cannot apply to the last two sentences of Section 162.75(b)(3)(ii) because those sentences are subjective and do not imply a "clear legal duty."  *Tokio Marine & Fire Ins. Co., Ltd. v. Flora MV*, 235 F.3d 963, 966 (5th Cir. 2001).  In *Tokio Marine*, the Fifth Circuit declined to apply the Pennsylvania Rule to a regulation that stated: "[e]very vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing

141

circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision." *Id.* (quoting 33 U.S.C. foll. § 1602). The court explained that the "*Pennsylvania* rule applies in cases in which a 'precise and clearly defined duty' is mandated by the relevant statute, not when the statute 'calls for the use of interpretation and judgment.'" *Id.* at 967 (quoting *Interstate Towing Co. v. Stissi*, 717 F.2d 752, 756 (2d Cir. 1983)). Like the rule in *Tokio Marine*, Section 162.75(b)(3)(ii) here allows for "judgment" in deciding how to moor a tow "to insure [tows from] not being drawn away [from] the bank." See also *Stolt Achievement, Ltd. v. Dredge B.E. Lindholm*, 447 F.3d 360, 365 n.9 (5th Cir. 2006) (whether regulation that barred "excessive speed" contained a "clear legal duty" was an open question); *Interstate Towing*, 717 F.2d at 756 (regulation that limited tow length depending whether "it is dangerous or inadvisable" to shorten them did not contain a "clear legal duty") (quoting 33 C.F.R. § 84.10 (1980)).

g. LNA did not violate 33 C.F.R. § 6.19. This regulation does not place any specific duties on waterfront operators or owners. Accordingly, the regulation cannot form the basis for application of the Pennsylvania Rule. *Tokio Marine*, 235 F.3d at 966 (the Rule "applies only to violations of statutes that delineate a clear legal duty, not regulations that require judgment and assessment of a particular circumstance") (citations omitted). Plaintiffs' attempt to use this regulation to apply the Rule to violations of the Port Plan is thus incorrect, as that plan proscribed only "RECOMMENDED PRECAUTIONARY MEASURES FOR BARGES." Green Report at 6 (quoting Port Plan); see also *City of Chicago v. M/V MORGAN*, 375 F. 3d 563, 572 n.11 (7th Cir. 2004) ("the Pennsylvania rule … does not apply as the City was under no statutory duty" to construct an item not mandated by the Coast Guard); *Afran Transport Company v. United States*, 309 F. Supp. 650, 657 (S.D.N.Y. 1969) ("And even if the cautionary language can be considered a regulation, it can scarcely be construed as prohibiting or mandating any particular conduct sufficient to invoke the drastic 'Pennsylvania' rule."). Nor does the case plaintiffs cite – *Trinidad Corp. v. S.S. Keiyoh Maru*, 845 F.2d 818, 820 (9th Cir. 1988) – hold that the Pennsylvania Rule applies to recommendations, such as the Hurricane Plan. *Trinidad Corp.* applied the Pennsylvania Rule to an express regulatory requirement that a vessel avoid certain restricted areas. *Id.* at 820 ("These restrictions were also in government publications of which both vessels were ***required*** to be aware.") (emphasis added). Moreover, and in any event, LNA's actions showed that its personnel took "responsibility for the safety and security of the [LNA] facility" in their preparations for Hurricane Katrina.

44. The Pennsylvania Rule does not apply to a party's alleged violation of a government "recommendation," such as the Coast Guard recommendations regarding "doubling up" on which plaintiffs attempt to rely here. *Tokio Marine*, 235 F.3d at 967 (rule does not apply to provisions that are "suggestive, rather than

mandatory"). Even if plaintiffs could show a violation of those recommendations (which they have not done), that would not permit the invocation of the Pennsylvania Rule.

45.    Plaintiffs also have not shown that any erstwhile regulatory violation caused the barge to make contact with and the IHNC floodwall. The Rule does not apply for this reason as well. *Willis*, 379 F.3d at 42-43 (declining to apply the Rule because plaintiff made no showing that vessel's regulatory violation was related to his cancer).

46.    Finally, the evidentiary presumption created by The Pennsylvania Rule cannot be applied here because it has been rendered superfluous by the presentation of evidence as to the cause of the IHNC wall failures. As the Fifth Circuit has held, "presumptions become superfluous [when] the parties have introduced evidence to dispel the mysteries that gave rise to the presumptions." *In re Mid-South Towing*, 418 F.3d 526, 531 (5th Cir. 2005). See also *N.D. Shipping, S.A. v. Zagora M/V*, No. 06-10734, 2009 U.S. Dist. LEXIS 47538, at *20 (E.D. La. June 5, 2009) ("[I]t is important to note that rebuttable presumptions such as the … *Pennsylvania* rule serve only to permit the trier of fact, 'in the absence of other evidence" to "have a solid, perhaps as a practical matter an unshakable, basis' to determine whether a party was negligent … . These presumptions, however, have limited applicability in the instant case because 'there *is* other evidence.'"). Unlike in *The Pennsylvania*, where the cause of the collision in a dense fog remained unknown, here, at the very least, LNA has introduced significant evidence that establishes that the ING 4727 did not cause either breach. The Court thus has no need to rely on presumptions to determine the cause of the breaches.

## III.    PLAINTIFFS' FAILURE TO ESTABLISH DAMAGES

47.    Even if plaintiffs had established the other elements of their negligence claim by a preponderance of the evidence, they have not established their entitlement to damages.

48.    Initially, even if the ING 4727 had contributed to the failure of the eastern IHNC floodwall (which it did not), LNA would not be jointly and severally liable for all of plaintiffs' flooding damages, as plaintiffs have contended. Indeed, as at most a *de minimis* contributor, LNA is not liable for *any* of the plaintiffs' damages, much less *all* of those damages. See above ¶ 39. Furthermore, joint and several liability would not serve to cause LNA to be liable for any flood-related damages attributable to flooding from the MRGO, which is separate from the IHNC flooding and could be apportioned accordingly. See *In re Katrina Canal Breaches (Robinson)*, 647 F. Supp. 2d 644, 735 (E.D. La. 2009); Restatement § 433A, cmts. d and e (damage from "flooding" is a "divisible harm" that "may be apportioned" among tortfeasors); Spinks Tr. 1610:23-1611:6 (flooding is divisible

between IHNC and MRGO by depth).[8]  In addition, with respect solely to flooding from the IHNC breaches, if LNA bore any liability (which it does not), that liability would need to be allocated among tortfeasors whose conduct combined to produce the injury.  *E.g., Edmonds*, 443 U.S. at 270-71 n.30.  Here, that would include the United States, a tortfeasor that plaintiffs elected not to sue.  See *McDermott, Inc. v. AmClyde*, 511 U.S. 202, 221 (1994); *Calhoun v. Yamaha Motor Corp.*, 350 F.3d 316, 325 (3d Cir. 2003).  Finally, in the event the Court were to have found that the barge was a cause of one breach but not the other (and, as noted, the barge did not cause either breach), plaintiffs' failure to model the two breaches as separate events constitutes a failure of proof that bars an assignment of any damages to LNA.  See FF ¶¶ 475-80.  Because the Court finds LNA not liable for any of plaintiffs' damages, the Court need not undertake an allocation of liability in this case.

49.     Furthermore, the Court concludes as a matter of law that plaintiffs have not established any damages for which compensation has not already been received from a joint tortfeasor (the United States) in the form of grants from the Road Home Program.  In this connection, the Court concludes as a matter of law that evidence of payments received from the Road Home Program is admissible and that such payments must be deducted from any award that the Court might otherwise make.  In *Robinson*, the Court held that the federal government is a tortfeasor with respect to the flooding in the St. Bernard polder.  See *In re Katrina Canal Breaches Consol. Litig. (Robinson)*, 647 F. Supp. 2d at 736.  Therefore, the collateral source rule, which bars admission of evidence of funds received from non-tortfeasors, does not apply to funds plaintiffs received from the government through the Road Home Program.  See *Giles v. Gen. Elec. Co.*, 245 F.3d 474, 495 (5th Cir. 2001) (where prior payments were not "additional, bargained-for compensation but were instead compensation for the injury out of which this case arises," the collateral source rule did not apply).[9]  As noted in paragraph 495 of

---

[8] Plaintiffs assert (at Proposed Conclusion of Law 58) that the Fifth Circuit has ruled that flooding damages are indivisible, citing *Vanderbrook v. Unitrin Preferred Insurance Co.*, 495 F.3d 191 (5th Cir. 2007).  That decision is irrelevant.  The issue related to insurance coverage.  The court concluded that all of those plaintiffs' damages (whether from rain, levee breaches, or other sources) was "flooding," and therefore there was no coverage under the policies regardless of the source of the water.  The court did not consider whether flooding from multiple breaches was indivisible for purposes of assessing tort damages.

[9] See also *Boyett v. Keene*, 815 F. Supp. 204, 208 (E.D. Tex. 1993), aff'd, 1993 U.S. App. LEXIS 15852 (5th Cir. June 10, 1993) (compensatory payments from a joint tortfeasor to the victim are not collateral to another tortfeasor); *Miciotto v. United States*, 270 Fed. Appx. 301, 303 (5th Cir. 2008) (holding under Louisiana law that collateral source rule does not apply when plaintiff gave no consideration in exchange for prior compensation); *In re Vulcan Materials Co.*, 2009 WL 4884017, at *13-14 (E.D. Va. Dec. 17, 2009) (United States was a joint tortfeasor and therefore payments made by it did not invoke collateral source rule); *Mountbatten Surety Co. v. Town of Ware Shoals, S.C.*, 2008 WL 2704921, at *3 (D.S.C. July 9, 2008) ("[I]t is well-settled that payment from a joint tortfeasor does not qualify as a collateral source.") (quoting *In re W.B. Easton Const. Co.*, 463 S.E.2d 317 (S.C. 1995)); *Pouliot v. Paul Arpin Van Lines, Inc.*, 235 F.R.D. 537, 551-52 (D. Conn. 2006) (payments to plaintiffs by co-defendants are not collateral source payments); *Manns v. State Department of Highways*, 541 N.E.2d 929, 934 (Ind. 1989) ("A joint tortfeasor however is not a collateral source.").

the Findings of Fact, plaintiffs are under no obligation to return their Road Home payments if they recover from LNA in this action.  Considering that they have already received full compensation for their property losses from a joint tortfeasor, they can recover no additional money from LNA for those very same losses.

50.    The Court finds, as a matter of law, that LNA is not liable to Mrs. Richardson for any wrongful death damages because the IHNC floodwaters did not cause her husband to drown.  If Mr. Spinks' modeling is credited, the IHNC floodwaters rose to a maximum of 2-3 feet above the first floor of the Richardson home, given that the waters rose 5.9 above the ground and the first floor of that home was 3-4 feet off the ground.  If Mr. Richardson drowned in his attic, then the IHNC floodwaters clearly did not reach that high.  Even if he drowned on the first floor of his home, the IHNC floodwaters still would not have reached high enough to cause him to drown.

51.    Any potential recovery for wrongful death damages would also be eliminated by Mr. Richardson's comparative fault.  See *United States v. Reliable Transfer Co.*, 421 U.S. 397, 403, 411 (1975) (adopting comparative fault as the rule under maritime law); *Lewis v. Timco, Inc.*, 716 F.2d 1425, 1428 (5th Cir. 1983) (*en banc*) ("comparative fault has long been the accepted risk-allocating principle under the maritime law").  Had Mr. Richardson complied with a mandatory evacuation order imposed in order to ensure his safety, he would not have been in his house when Hurricane Katrina struck.  For the same reason, there can be no recovery for Mr. Richardson's alleged mental distress in seeing his property being damaged.  Had he evacuated as required, he would not have suffered any such distress.

52.    Insofar as Holiday Jewelers neither made a profit before Hurricane Katrina nor can adduce evidence with "reasonable certainty" that it would have earned a profit after the storm, it is not entitled to recover damages for lost profits.  Recovery for "[l]ost profits will only be allowed when profits have actually been, or may reasonably suppose to have been lost, and the amount of such profits is proved with reasonable certainty."  *In re MNM Boats, Inc.*, No. 07-1938, 2009 U.S. Dist. LEXIS 119861, at *39 (E.D. La. Dec. 4 2009) (citing *The Conqueror*, 166 U.S. 110, 115 (1898)).  Businesses that can prove no profit prior to the event for which they seek compensation cannot seek compensation for lost profits.  See *Toga Soc'y, Inc. v. Lee*, No. 03-2981, 2005 U.S. Dist. LEXIS 13408 (E.D. La. June 29, 2005) (Duval, J.) (where limited evidence established that business was loss-making before injury, it could not recover lost profits).  See also *Brennan's Inc. v. Dickie Brennan & Co. Inc.*, 376 F.3d 356, 371 (5th Cir. 2004) ("[a] plaintiff is not entitled to be put in a better position" due to the allocation of damages).

53.    Furthermore, a plaintiff's damages are limited when subsequent events operate to cut off the claim.  See *Dixon v. Int'l Harvester Co.*, 754 F.2d 574 (5th Cir. 1985); *Lancaster v. Norfolk & Western Railway*, 773 F.2d 807, 822 (7th Cir. 1985); *Dillon v. Twin State Gas & Electric Co.*, 163 A. 111 (N.H. 1932).  For this reason,

the inevitable flooding from the MRGO, which would have inundated their homes to the same level just hours later regardless of any allegedly negligent conduct by LNA respecting the IHNC breaches, would serve to cut off plaintiffs' damages, at least to the extent the MRGO flooding was not tortiously induced.

54.  Finally, even if plaintiffs had shown liability and damages, plaintiffs' claim for punitive damages would be denied.

    a.  The rule in this Circuit is that punitive damages are not available under the general maritime law when the claim is asserted by an individual who is not a maritime worker.  See *Hunter v. Seabulk Offshore, Ltd.*, 993 F. Supp. 973, 975-76 (E.D. La. 1998) (punitive damages not recoverable by nonseaman under general maritime law); *Earhart v. Chevron U.S.A., Inc.*, 852 F. Supp. 515, 516 (E.D. La.) (same); *Ostrowiecki v. Aggressor Fleet, Ltd.*, 2008 U.S. Dist. LEXIS 104823 (E.D. La. Dec. 11, 2008) (same); *Hayden v. Acadian Gas Pipeline Sys.*, 1997 U.S. Dist. LEXIS 9843 (E.D. La. July 9, 1997) (same).  Plaintiffs are not maritime workers.

    b.  Plaintiffs contend (Pl. Br. 94) that "[t]here can no longer be doubt that punitive damages are an available remedy under general maritime law" (citing *Atlantic Sounding Co. v. Townsend*, 129 S. Ct. 2561 (2009)).  In fact, the judges of this Court have disagreed with that assertion.  For example, in *Kelly v. Porter, Inc.*, 2010 U.S. Dist. LEXIS 5600 (E.D. La. Jan. 22, 2010), Judge Knowles stated that it is an open question whether, under *Atlantic Sounding*, punitive damages are available under the general maritime law when the plaintiff is not a seaman seeking damages for the willful failure to pay maintenance and cure.  *Id.* at *35-38 (dismissing punitive damages claim on other grounds).  In *Rogers v. Resolve Marine*, 2009 U.S. Dist. LEXIS 91423 (E.D. La. Sept. 10, 2009), Judge Barbier agreed with a Magistrate Judge's refusal to "advance[] a broad reading of *Townsend* to support [the plaintiff's] argument that punitive damages are available under general maritime law and that the [Supreme] Court's decision extends beyond punitive damages in maintenance and cure cases."  *Id.* at *1-2.  And in *In re Maryland Marine, Inc.*, 641 F. Supp. 2d 579 (E.D. La. 2009), Judge Berrigan noted that "the plaintiff in *Atlantic Sounding* was a maritime worker, and the harm at issue was particular to maritime workers," and "[m]aritime employers' obligation of maintenance and cure has been part of maritime law for centuries."  *Id.* at 584.  She added that the plaintiffs in the case before her "did not draw similarities between maintenance and cure and the wrongful death of nonseafarers." *Id.*  *Atlantic Sounding* thus does not displace the rule that punitive damages are unavailable under the general maritime law in cases such as this, which does not involve maintenance and cure claims by seafarers.

    c.  Punitive damages are also unavailable because plaintiffs' assertion that the ING 4727 was loose in the IHNC on August 28, 2005, cannot support a claim for punitive damages.  In situations where punitive damages are

available, they are awarded only when a defendant has acted "willfully and wantonly," "in reckless or callous disregard of, or with indifference to, the rights of the plaintiff." Fifth Circuit Pattern Jury Instruction on Punitive Damages (Civil Instruction No. 4-10).  See, *e.g.*, *Johnson v. Livingston*, No. 09-20281, 2010 U.S. App. LEXIS 484, at *3-4 (5th Cir. Jan. 8, 2010) ("Because there is no support in the record for Johnson's conclusory assertions that the defendants' actions were motivated by evil intent, the district court did not err in dismissing his claim for punitive damages."); *Kelly*, 2010 U.S. Dist. LEXIS 5600, at *37-38 (dismissing punitive damages claim for lack of evidence of "willful and wanton conduct").

d.     Plaintiffs cannot meet that high standard here because (i) the ING 4727 broke free under the force of hurricane-force winds during Katrina, not during calm weather conditions on August 28, 2005; and (ii) plaintiffs have offered no evidence that the barge broke free because of any "willful" or "wanton" action by LNA that was "in reckless or callous disregard of, or with indifference" to plaintiffs' rights.  Plaintiffs may squabble with some of LNA's decisions concerning the mooring of the barge, but the evidence showed that as part of its preparations for Hurricane Katrina, LNA's terminal personnel tied up the ING 4727 with no fewer than three connections using strong polypropylene rope, two of which were new 6-inch-circumference line.  Thus, LNA made genuine efforts to moor the ING 4727 in preparation for the storm in a manner that would prevent it from breaking free.

Dated: September 17, 2010                    Respectfully submitted,


                                             Derek A. Walker (#13175)
                                             Robert B. Fisher, Jr., T.A. (#5587)
                                             CHAFFE MCCALL, L.L.P.
                                             2300 Energy Centre
                                             1100 Poydras Street
                                             New Orleans, LA  70163-2300
                                             Telephone:  (504) 585-7000
                                             Facsimile:  (504) 585-7075
                                             Fisher@chaffe.com
                                             Walker@chaffe.com

                                              /s/ John D. Aldock
                                             John D. Aldock
                                             Mark S. Raffman
                                             Adam M. Chud
                                             Eric I. Goldberg
                                             Kirsten V.K. Robbins
                                             GOODWIN PROCTER LLP
                                             901 New York Avenue, N.W.
                                             Washington, DC  20001
                                             Telephone:  (202) 346-4240
                                             jaldock@goodwinprocter.com
                                             rwyner@goodwinprocter.com
                                             mraffman@goodwinprocter.com


                                             Daniel A. Webb (#13294)
                                             SUTTERFIELD & WEBB, LLC
                                             Poydras Center
                                             650 Poydras Street, Suite 2715
                                             New Orleans, LA  70130
                                             Telephone:  (504) 598-2715

                                             *Attorneys for Lafarge North America Inc.*

148

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 17, 2010.

/s/ John D. Aldock