## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES
CONSOLIDATED LITIGATION

CIVIL ACTION

NO. 05-4182

PERTAINS TO: BARGE

SECTION "K"

*Mumford*          C.A. No. 05-5724    *as to claims of plaintiffs Josephine Richardson and Holiday Jewelers, Inc. - ONLY*

*Benoit*           C.A. No. 06-7516    *as to claims of plaintiffs John Alford and Jerry Alford - ONLY*

## LAFARGE NORTH AMERICA INC.'S
## POST-TRIAL BRIEF

September 17, 2010

# TABLE OF CONTENTS[1]

INTRODUCTION ........................................................................................................1

I.  **It Is Scientifically Impossible For The Barge To Have Been Present When
The Breaches Occurred** ...................................................................................2

   A. Legal Standards.................................................................................................3

   B. Wind Cannot Have Caused The Barge To Be Present At The Eastern IHNC Floodwall
When The Breaches Occurred ........................................................................4

      1. Meteorological data confirms winds from the northeast at the IHNC........................4

      2. Dr. Mitchell's speculative opinions were shown to be erroneous and
unreliable..........................................................................................................9

   C. Current, Tide And Waves Could Not Have Overcome The Hurricane Winds to
Transport the ING 4727 to the Breaches Before They Occurred ...................14

      1. Current and tide did not move the barge.......................................................14

      2. Waves did not move the barge.....................................................................15

   D. Physical Evidence Also Demonstrates that the Barge Could Not Have Been At
the Site of Either Breach When They Occurred ...........................................15

      1. Physical evidence shows the barge was not at the North Breach .............................15

      2. Physical evidence shows the barge was not at the South Breach .............................17

   E. Lay Witness Testimony Did Not Place the Barge at the Site of the Breaches ...............19

      1. Mr. Villavasso did not place the barge at the North Breach ....................................20

---

[1] LNA's post-trial brief addresses each of the questions identified in the Court's post-trial scheduling order.  Doc.
19936.  For purposes of reference, the Court's questions are addressed in the following sections:

     a. Applicability of Pennsylvania and Louisiana Rules: Sections V and VI.D, respectively
     b. "Substantial factor" analysis: Sections I, II, III and IV, extended discussion of legal standards in III.A
     c. Damages / one vs. two breaches:  Section VII.A
     d. Differentiation of Marino vs. Bea / Bakeer approaches:  Section III.D
     e. Credibility /plausibility of lay witness accounts:  Section I.E.
     f. Credibility / plausibility of theory re. barge transit and alleged presence at breaches:  Section I.
     g. "Uniqueness" of breaches:  Section III.B and III.C.
     h. Soil permeability, underseepage, trenching, overtopping and scouring.  Sections III.B, III.C, and III.D.

2. Mr. Adams did not place the barge at the South Breach ...........................22

3. Mr. Williams and Mr. Murph did not witness the barge break the wall...................24

4. "Earwitnesses" do not establish the barge was involved in either breach ................25

F. Only LNA Has Provided a Plausible Account of Barge Movement Consistent With the Evidence.............................................................................................26

1. LNA's account of barge movement is simple and consistent with the evidence.......26

2. Plaintiffs' account of barge movement is convoluted and without evidentiary support...........................................................................................27

**II. IT IS SCIENTIFICALLY IMPOSSIBLE FOR A BARGE IMPACT WITH THE CONCRETE CAP TO HAVE CAUSED THE FLOODWALL TO FAIL** ..........31

A. Legal Standards.................................................................................................32

B. Impact With the Concrete Cap Can at Most Cause Localized Damage to the Cap, Not Deflection of the Sheet Pile ......................................................................32

**III. THE BARGE WAS NOT A SUBSTANTIAL CAUSATIVE FACTOR BECAUSE THE BREACHES OCCURRED DUE TO LOSS OF STABILITY AND SEEPAGE/HYDRAULIC PRESSURE, WITHOUT ANY PARTICIPATION BY THE BARGE** ......................................................................................................35

A. Legal Standards.................................................................................................35

B. The North Breach Was Caused by Loss of Stability and Hydraulic/Seepage Pressures, Not the Barge .................................................................................38

1. Causes of the North Breach ......................................................................38

2. Evidence the barge played no role in causing the North Breach ...............41

C. The South Breach Was Caused by Loss of Stability and Hydraulic/Seepage Pressures, Not the Barge .................................................................................42

1. Causes of the South Breach .....................................................................42

2. Evidence the barge played no role in causing the South Breach ...............46

D. The Validated Geotechnical Analyses By Dr. Bea and Dr. Bakeer Must Be Credited Over the Flawed Approach of Dr. Marino .........................................49

1.  Credentials and experience of experts .................................................49

2.  Deficiencies in Marino approach and results ................................................51

    a.  Soil characterization.................................................................51
    b.  Use of averaged soil strength values.........................................53
    c.  Failure to consider cone penetrometer data .............................53
    d.  Failure to consider hydraulic uplift..........................................53
    e.  Incorrect permeability values....................................................54
    f.  Lack of validation ......................................................................55

3.  Confirmation of Bea/Bakeer approach and results by independent studies .............56

    a.  IPET ............................................................................................57
    b.  ILIT .............................................................................................57
    c.  Team Louisiana...........................................................................58

IV. **EVEN IF PLAINTIFFS' EXPERTS WERE CREDITED, THE BARGE WAS NOT A SUBSTANTIAL FACTOR BECAUSE THE BREACHES WOULD HAVE HAPPENED WITHOUT ITS PARTICIPATION** .............................................59

V.  **PLAINTIFFS' RELIANCE ON THE PENNSYLVANIA RULE TO SUPPORT THEIR POSITION ON FLOODWALL BREACH CAUSATION IS MISPLACED** ...62

A.  The Pennsylvania Rule Does Not Apply .........................................................62

    1.  The Pennsylvania Rule does not relieve plaintiffs of the burden of proving that the ING 4727 caused the floodwall breaches ....................................62

    2.  Plaintiffs also have not shown that LNA violated a statute or regulation ................65

        a.  33 C.F.R. § 162.75(b)(3)(ii).......................................................65
        b.  33 C.F.R. § 6.19-1.....................................................................69

    3.  Evidence eliminates any presumption ....................................................70

B.  Even if the Pennsylvania Rule Did Apply, LNA Has Amply Demonstrated that the Barge Did Not Cause the Floodwall Breaches............................................71

VI. **LNA DID NOT COMMIT ACTIONABLE NEGLIGENCE** ..........................................72

A.  LNA Acted with Reasonable Care in its Handling of the Barge ......................72

    1.  LNA could not halt unloading once the storm changed direction .............................72

    2.  LNA followed all applicable internal procedures....................................73

3.  LNA properly secured the ING 4727....................................................74

4.  LNA could not have removed or ballasted the barge .................................76

B.  In Any Event, the Breakaway Resulted from An Act of God, Not From LNA's
Alleged Negligence........................................................................................77

C.  LNA Owed No Legal Duty to Plaintiffs Because Flooding Was
Not a Foreseeable Consequence of a Barge Breakaway.............................79

D.  The Louisiana Rule Does Not Apply .............................................................81

1.  Plaintiffs have not proved an injury-causing allision ..............................81

2.  LNA rebutted any applicable presumption ..............................................82

**VII. PLAINTIFFS' DAMAGES ARE LIMITED**..................................................83

A.  Plaintiffs Cannot Recover Any Damages Unless the ING 4727 Caused Both
Breaches ........................................................................................................83

B.  Plaintiffs' Damages Were Not Caused by LNA ...........................................84

1.  The Alfords ..............................................................................................84

2.  Mrs. Richardson ......................................................................................84

a.  Property damage claim .......................................................................85
b.  Wrongful death claim .........................................................................85

3.  Holiday Jewelers .....................................................................................86

a.  Property damage claim .......................................................................86
b.  Lost profits claim ................................................................................87

C.  The Alfords and Mrs. Richardson Have Already Been Fully Compensated for
Property Losses by Road Home Benefits ......................................................87

D.  Joint-and-Several Liability Does Not Apply .................................................89

E.  Plaintiffs' Damages Are Limited by the Inevitable MRGO Flooding............90

**CONCLUSION** ..........................................................................................................91

## <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>:                                                                                        **Page**

*Afran Transport Company v. United States*, 309 F. Supp. 650 (S.D.N.Y. 1969)........................70

*Agrico Chem. Co. v. M/V Ben W. Martin*, 664 F.2d 85 (5th Cir. 1981) ........................................67

*Am. Gulf v. Otto Candies, Inc.*, No. 94-3905, 1997 U.S. Dist. LEXIS 13414
    (E.D. La. Aug. 28, 1997) ..........................................................................................................3, 31

*American River Transp. Co. v. Kavo Kaliakra SS*, 148 F.3d 446 (5th Cir. 1998).......................38

*American River Transp. Co. v. Paragon Marine Services, Inc.*, 213 F.Supp.2d 1035
    (E.D. Mo. 2002)........................................................................................................................80

*Bach v. Trident S.S. Co.*, 920 F.2d 322 (5th Cir. 1991) ....................................................... *passim*

*Board of Commissioners of the Port of New Orleans v. Tug O.H. Ingram*, 578 F.2d 289
    (5th Cir. 1978)..........................................................................................................................64

*Boudoin v. J. Ray McDermott & Co.*, 271 F.2d 81 (5th Cir. 1960)...............................................79

*Bright v. G B Bioscience Inc.*, 305 Fed. App'x 197 (5th Cir. 2008)..............................................21

*Brown v. Channel Fueling Service, Inc.*, 574 F. Supp. 666 (E.D.La. 1983)..................................81

*Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370 (5th Cir. 2000) ................................................19

*Candies Towing Co. v. M/V B&C Eserman*, 673 F.2d 91 (5th Cir. 1982)....................................64

*Cenac Towing Co. v. Southport, L.L.C.*, 232 Fed. App'x 929 (11th Cir. 2007)...........................79

*Chavez v. Noble Drilling Corp.*, 567 F.2d 287 (5th Cir. 1978) ..............................................36, 38

*City of Chicago v. M/V MORGAN*, 375 F.3d 563 (7th Cir. 2004)...........................................70, 71

*Clement v. United States*, 980 F.2d 48 (1st Cir. 1992) ..................................................................37

*Consol. Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d 65 (5th Cir. 1987) .................................80

*Crowley Am. Transp., Inc. v. Double Eagle Marine, Inc.*, 208 F. Supp. 2d 1250
    (S.D. Ala. 2002)........................................................................................................................82

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)...................................................51, 91

*Defazio v. Chiquita Fresh North America, LLC*, No. 1:06cv973,
2008 U.S. Dist. LEXIS 53407 (S.D. Miss. July 14, 2008) ............................................83

*Diamond Offshore Co. v. A&B Builders, Inc.*, 302 F.3d 531 (5th Cir. 2002) ..............................67

*Dixon v. Int'l Harvester*, 754 F.2d 574 (5th Cir. 1985) ....................................................90

*Dotson v. Clark Equip. Co.*, 783 F.2d 586 (5th Cir. 1986) ................................................20

*Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256 (1979) ..............................38, 89

*Fairley v. Clarke*, No. 02-2219, 2004 WL 877102 (E.D. La., April 22, 2004) ..........................50

*Fischer v. S/Y Neraida*, 508 F.3d 586 (11th Cir. 2007) ..............................................78, 83

*Florida Marine Transporters, Inc. v. Sanford*, 225 Fed. App'x 885 (5th Cir. 2007) ...................64

*Foulk v. Donjon Marine Co.*, 963 F. Supp. 427 (D.N.J. 1997) ..........................................38

*Fournier v. Petroleum Helicopters, Inc.*, 665 F. Supp. 483 (E.D. La. 1987) ...................3, 36, 59

*Gabler v. Regent Devel. Corp.*, 470 So.2d 149 (La. Ct. App. 5th Cir. 1985) ...........................61

*Gavagan v. United States,* 955 F.2d 1016 (5th Cir. 1992) ...............................................36

*Geigy Chemical Corp. v. Allen*, 224 F.2d 110 (5th Cir. 1955) .........................................31

*Giles v. Gen. Elec. Co.*, 245 F.3d 474 (5th Cir. 2001) .................................................88

*Gosnell v. United States*, 262 F.2d 559 (4th Cir. 1959) ................................................63

*Graves v. Page,* 703 So.2d 566 (La. 1997) .............................................................37

*Hatt 65, L.L.C. v. Kreitzberg*, No. 3:06cv332, 2009 U.S. Dist. LEXIS 95332
(N.D. Fla. Mar. 16, 2009) ...........................................................................81

*Holland v. Allied Structural Steel Co.*, 539 F.2d 476 (5th Cir. 1976) .................................20

*In re Cooper/T. Smith*, 929 F.2d 1073 (5th Cir. 1991) .................................................79

*In re Hanford Nuclear Reservation Litig.*, 534 F.3d 986 (9th Cir. 2008)................................37

*In re Ingram Towing Co.*, No. 93-3311, 1995 U.S. Dist. LEXIS 15034
(E.D. La. Oct. 4, 1995) (Duval, J.)..................................................................35

*In re Int'l Marine Dev. Corp.*, 328 F. Supp. 1316 (S.D. Miss. 1971) ..................................78

vi

*In Re Katrina Canal Breaches Consol. Litig. (Road Home)*, No. 07-5528,
    2009 U.S. Dist. LEXIS 33068 (E.D. La. Apr. 16, 2009)......................................88, 89

*In re Katrina Canal Breaches Consol. Litig. (Robinson)*, 647 F. Supp. 2d 644
    (E.D. La. 2009) ...........................................................................................88, 90

*In re Marine Leasing Services, Inc.*, 328 F. Supp. 589 (E.D. La.), *aff'd*, 471 F.2d 255
    (5th Cir. 1973)......................................................................................................78

*In re Mid-South Towing*, 418 F.3d 526 (5th Cir. 2005)..............................................71

*In re MNM Boats, Inc.*, Civ. No. 07-1938, 2009 U.S. Dist. LEXIS 119861
    (E.D. La. Dec. 4, 2009).........................................................................................87

*In re Nautilus Motor Tanker Co.*, 85 F.3d 105 (3d Cir. 1996) .............................63, 64

*In re Salem*, 465 F.3d 767 (7th Cir. 2006) ...............................................................51

*In re Signal*, 579 F.3d 478 (5th Cir. 2009)..................................................79, 80, 81

*In re Southern Scrap Material Co., L.L.C.*, 2010 U.S. Dist. LEXIS 47855
    (E.D. La. May 14, 2010) .......................................................................................78

*In re Taira Lynn Marine Ltd.*, 444 F.3d 371 (5th Cir. 2006)......................................81

*Inter-Cities Nav. Corp. v. United States*, 608 F.2d 1079 (5th Cir. 1979) .....................61

*Joshi v. Providence Health Sys.*, 149 P.3d 1164 (Ore. 2006) ....................................38

*June v. Union Carbide Corp.*, 577 F.3d 1234 (10th Cir. 2009)..............................37, 38

*Kesinger v. Herrington*, 381 F.3d 1243 (11th Cir. 2004) ..........................................20

*Kirksey v. P&O Ports Texas, Inc.*, 488 F. Supp. 2d 579 (S.D. Tex. 2007)...................38

*Latulas v. Montco Offshore, Inc.*, No. 03-3544, 2006 U.S. Dist. LEXIS 20066
    (E.D. La. Mar. 29, 2006).......................................................................................38

*LeJeune v. Allstate Ins. Co.*, 365 So.2d 471 (La. 1978).......................................37, 61

*Lewis v. Timco, Inc.*, 716 F.2d 1425 (5th Cir. 1983) .................................................86

*Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994) (en banc) ............................32

*Lloyd's Leasing Ltd. v. Conoco*, 868 F. 2d 1447 (5th Cir. 1999)................................80

*Lyondell Chem. Co. v. Albemarle Corp.*, Nos. 1:01-CV-890, 1:02-CV-003,
   2007 WL 5517247 (S.D. Tex. June 8, 2007) .......................................................51

*Marchese v. Secretary, United States Dep't of the Interior*, 409 F. Supp. 2d 763
   (E.D. La. 2006) .......................................................................................................19

*Michaels v. Avitech, Inc.*, 202 F.3d 746 (5th Cir. 2000) ................................................54

*Molden v. Ga. Gulf Corp.*, 465 F. Supp. 2d 606 (M.D. La. 2006) ................................35

*Moser v. Tex. Trailer Corp.*, 623 F.2d 1006 (5th Cir. 1980) ................................. *passim*

*N.D. Shipping, S.A. v. Zagora M/V*, No. 06-10734, 2009 U.S. Dist. LEXIS 47538
   (E.D. La. June 5, 2009) ..........................................................................................70

*Norfolk Southern Ry. Co. v. Moran Towing Corp.*, 2010 WL 2326597
   (E.D. Va. June 30, 2010)..........................................................................................82

*Paz v. Brush Eng'red Materials, Inc.*, 555 F.3d 383 (5th Cir. 2009) ...........................11

*Pennzoil Producing Co. v. Offshore Express, Inc.*, 943 F.2d 1465 (5th Cir. 1991) ......64

*Pioneer Natural Res. USA, Inc. v. Diamond Offshore Co.*, 638 F. Supp. 2d 665
   (E.D. La. 2009) .................................................................................................77, 79

*Poulis-Minot v. Smith*, 388 F.3d 354 (1st Cir. 2004) ....................................................64

*Ralston Purina Co. v. Hobson*, 554 F.2d 725 (5th Cir. 1977) ......................................20

*Rector v. Hartford Acc. & Indem. Ins. Co.*, 120 So.2d 511 (La. Ct. App. 1st Cir. 1960)..............61

*River Terminals Corp. v. Southwestern Sugar & Molasses Co.*, 274 F.2d 36
   (5th Cir. 1960)..........................................................................................................67

*Rodi Yachts, Inc. v. National Marine, Inc.*, 984 F. 2d 880 (7th Cir. 1993) ............70, 71

*Royal Beach Hotel, LLC v. Crowley Liner Services, Inc.*, No. 1:06DV129,
   2007 U.S. Dist. LEXIS 28633 (S.D. Miss. March 14, 2007) .................................83

*RSL Communications PLC v. Bildirici*, 649 F. Supp. 2d 184 (S.D.N.Y. 2009) ...........37

*S.C. Loveland, Inc. v. East West Towing, Inc.*, 608 F.2d 160 (5th Cir. 1979) ..............80

*Scott v. Hern*, 216 F.3d 897 (10th Cir. 2000) ..............................................................38

*So. Pac. Co. v. Matthews*, 335 F.2d 924 (5th Cir. 1964) ..............................................20

*Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254 (5th Cir. 2002)................................................19, 21

*Stevens v. The White City*, 285 U.S. 195 (1932) ...........................................................................67

*Stolt Achievement, Ltd. v. Dredge B.E. Lindholm*, 447 F.3d 360 (5th Cir. 2006) ........................69

*The Louisiana*, 70 U.S. 164 (1865)..................................................................................... *passim*

*The Pennsylvania*, 86 U.S. 125 (1874) ............................................................................... *passim*

*Toga Soc'y, Inc. v. Lee*, No. 03-2981, 2005 U.S. Dist. LEXIS 13408
  (E.D. La. June 29, 2005) ..........................................................................................................87

*Tokio Marine & Fire Ins. Co. v. Flora MV*, 235 F.3d 963 (5th Cir. 2001) ......................64, 68, 69

*Trinidad Corp. v. S.S. Keiyoh Maru*, 845 F.2d 818 (9th Cir. 1988) .............................................70

*United States v. Massachusetts*, 493 F.3d 1 (1st Cir. 2007) ........................................................67

*United States v. St. Louis & M.V. Transp. Co.*, 184 U.S. 247 (1902)...........................................67

*Washington v. Armstrong World Indus., Inc.*, 839 F.2d 1121 (5th Cir. 1988) .............................12

*Westchester Fire Ins. Co. v. Haspel-Kansas Inv. P'ship*, 342 F.3d 416 (5th Cir. 2003).........38, 61

*Willis v. Amerada Hess Corp.*, 379 F.3d 32 (2d Cir. 2004)..........................................................64

*Young v. Crowley Liner Services, Inc.*, No. 1:06cv966, 2009 U.S. Dist. LEXIS 22746
  (S.D. Miss. March 20, 2009)....................................................................................................83

*Lee Brother, LLC v. Crowley Liner Services,* WL 188858744 (S.D. Miss. June 26, 2007)..........83

## RULES AND REGULATIONS:

33 C.F.R. § 6.19-1..................................................................................................65, 69, 70
33 C.F.R. § 162.75(b) ........................................................................................... *passim*
33 C.F.R. § 162.75(b)(3)(ii)................................................................................66, 67, 68, 69
33 C.F.R. § 164.33 .............................................................................................................70
46 C.F.R. § 27.101 .............................................................................................................67

Fed. R. Civ. P. 52(a)(6)......................................................................................................19
Fed. R. Civ. P. 702............................................................................................................51

**OTHER AUTHORITIES:**

*Admiralty and Maritime Law* § 5.3...............................................................................................36

Restatement (Second) of Torts (1965) (the "Restatement")

    § 431..................................................................................................................................38
    § 432........................................................................................................... *passim*
    § 433.........................................................................................................37, 38, 84, 90

# INTRODUCTION

Causation is the dispositive issue in this case, and on that issue, all of the evidence at trial favored Lafarge.  The meteorological and physical evidence showed that it was scientifically impossible for the barge to have been present at the floodwall when the breaches occurred.  Plaintiffs' vaunted "eyewitness" evidence turned out to be nothing more than equivocal testimony from two individuals, as far as half a mile away, in the dark and rain.  LNA provided the only plausible account of the barge's movement across the canal, consistent with the meteorological, hydrological, and physical evidence alike, and showing it could only have arrived after the breaches had already occurred.  Plaintiffs, by contrast, offered a theory of barge movement so bizarre and complicated that not even their own experts would support it.

In addition, unrebutted engineering testimony showed that a barge impact was not capable of deflecting the steel sheet pile wall to cause the breaches that occurred.  Instead, the one-sided geotechnical evidence showed that the failures occurred at the two weakest locations along the floodwall under hydrostatic forces imposed by Katrina's storm surge, and with no involvement by the barge, as every independent study of the floodwall failures also concluded.

Any one of these points would suffice to defeat plaintiffs' claims, and together they provide a clear and coherent picture of what transpired at the eastern floodwall of the Inner Harbor Navigation Canal.  Against this overpowering evidence, plaintiffs' case has degenerated to the point where they must ask the Court to rule their way as a matter of faith, merely because the barge was found in the Lower Ninth Ward after the storm.  Proof, not faith, is the bottom line.  The proof established that the barge played no role in causing either of the floodwall breaches, and LNA is entitled to judgment on that basis.

Even beyond the dispositive issue of causation, plaintiffs' proof at trial fell far short of the mark on both negligence and compensable damages.  On negligence, the evidence showed that LNA took reasonable precautions in advance of the storm and could not have prevented the breakaway by any measures that might reasonably have been undertaken.  On damages, the evidence showed that plaintiffs sustained no damages for which full compensation has not already been received (*e.g.*, from Road Home grants not subject to the "collateral source" rule).

As a road map, this brief is organized as follows:

►    Plaintiffs have failed to show that the barge caused the floodwall breaches (and thus that it caused plaintiffs' alleged damages):

  -  Part I shows that the barge could not have been present when the breaches occurred;

  -  Part II shows that an impact by the barge could not have caused the breaches;

  -  Part III shows that the breaches occurred for reasons unrelated to the barge;

  -  Part IV shows that the floodwall was doomed to fail in any event; and

  -  Part V shows that plaintiffs' attempt to invoke the Pennsylvania Rule to impose a presumption of causation on LNA is both wrong and immaterial.

►    Plaintiffs have also failed to show that LNA was negligent in its handling of the barge, as shown in Part VI.

►    Plaintiffs have also failed to prove any compensable damages, for the reasons described in Part VII below.

## I.    IT IS SCIENTIFICALLY IMPOSSIBLE FOR THE BARGE TO HAVE BEEN PRESENT WHEN THE BREACHES OCCURRED.

The barge cannot have caused the breaches because it was not and could not have been present when the breaches occurred.  The barge required an external force to move it from one place to another.  Overwhelming meteorological and other scientific evidence demonstrates that

there was no force which could have driven the barge to the site of the breaches before the breaches had occurred – not the prevailing wind (which was the predominant force acting on the barge), nor current or tide or waves.  See Sections B and C below.  Physical evidence from the breach sites confirms the barge was not present when the breaches occurred and did not arrive until the neighborhood was already flooded.  See Section D below.  At trial, plaintiffs' "eyewitness" evidence amounted to nothing more than equivocal testimony from two individuals in extremely poor viewing conditions, whose accounts (if accepted) are inconsistent with the barge having been present.  See Section E below.  LNA and its experts provided a coherent account of the transit of the barge, consistent with the meteorological and physical evidence, while plaintiffs offered no plausible theory of barge movement.  See Section F below.

## A.      Legal Standards.

Plaintiffs must prove that the ING 4727 was the cause-in-fact of their flood-related damages.  *Moser v. Tex. Trailer Corp.*, 623 F.2d 1006, 1013 (5th Cir. 1980); *Bach v. Trident S.S. Co.*, 920 F.2d 322, 327 (5th Cir. 1991).  Plaintiffs cannot meet this burden with mere speculation about what "might have happened."  *Fournier v. Petroleum Helicopters, Inc.*, 665 F. Supp. 483, 486 (E.D. La. 1987).  Simply put, there can be no liability where the defendant's actions "did not play any role in causing the damage alleged."  *Am. Gulf v. Otto Candies, Inc.*, No. 94-3905, 1997 U.S. Dist. LEXIS 13414, at *19 (E.D. La. Aug. 28, 1997).[2]

---

[2] An extended discussion of legal standards is unnecessary for purposes of this section, as the evidence shows the barge simply was not present and cannot have played any role in causing the breaches.  The "substantial factor" test for causation-in-fact is discussed below in Section III, which addresses the reasons the floodwall failures occurred and the geotechnical evidence showing the barge was not a substantial factor in causing them.  The "Pennsylvania Rule" is addressed below in Section V, showing that it does not apply and would not affect the outcome if it did.

**B.     Wind Cannot Have Caused the Barge to be Present at the Eastern IHNC Floodwall When the Breaches Occurred.**

The ING 4727 was a hopper barge with no motor or other means of self-propulsion.  Doc. 19842 at 40, Undisputed Fact 15; FF ¶ 90.[3]  Thus, the barge required an external force – in this case, wind, waves, or current – to move it away from the LNA Terminal to any other location.  Cushing Tr. 2042:15-17.  Because the barge was unloaded and was sticking out of the water over twenty feet, it had a large "sail area" which made it particularly susceptible to movement by the prevailing wind.  Cushing Tr. 2042:18-2043:7 (wind is "only significant force[]"); Pazos Tr. 853:4-7 ("primarily the wind" acted on the barge); FF ¶¶ 90-95.  Dr. Cushing testified, without challenge or rebuttal, that the critical factor affecting barge movement is the prevailing wind (or "steady wind") because the barge, weighing nearly 1,000 tons, required a "sustained force to … overcome its inertia and get it moving."  Cushing Tr. 2047:12-2048:9.  Accordingly, as plaintiffs' own expert admitted, analysis of weather data, including wind speed and direction at the IHNC during Hurricane Katrina, is critical to ascertaining "what really happened, what really moved this barge around."  Marino Tr. 1342:25-1343:3; see also FF ¶ 96.

1.  Meteorological data confirms winds from the northeast at the IHNC.

Multiple sources of meteorological data uniformly establish that the winds at the IHNC blew from the east and then the northeast, away from the breach sites, at all times prior to the occurrence of the breaches at or before 7:30 a.m. on August 29.  First, undisputed meteorological evidence as to Katrina's track establishes that the center of the storm was south and east of New Orleans at all times before the breaches occurred, and that the center of the storm passed on a due north course to the east of New Orleans around 8:45 a.m. on August 29.  Dooley Report at 16, Map 2 (DX 198); Mitchell Tr. 1031:1-3; FF ¶ 106.  This evidence of the storm's track is of

_____
[3] Citations to LNA's proposed findings of fact and conclusions of law are identified as "FF ¶ xx" and "CL ¶ xx."

critical importance because, as experts for both sides agreed, hurricane winds blow in a
counterclockwise direction around the eye of a hurricane in the Northern Hemisphere, and thus
knowing the location of the center of the storm provides information on wind directions within
its counterclockwise circulation.  Dooley Tr. 1840:16-23, 1842:15-20; Mitchell Tr. 1031:4-10
(agreeing that "[h]urricanes circulate in a cyclonic counterclockwise motion" and "if you stand
with your back to the wind in a hurricane in the northern hemisphere, you expect the low
pressure area to be to your left"); see FF ¶¶ 100-01.  Application of this principle, known as
Buys Ballot's Law, establishes that Katrina's counterclockwise winds were blowing *from the
northeast* at the IHNC during the critical early morning hours of August 29, when Katrina's
center was to the south and east of the city.  Dooley Tr. 1839:4-9, 1847:20-1848:15; FF ¶¶ 105-
08.[4]  QuikSCAT satellite imagery confirmed the counterclockwise wind directions predicted by
Buys Ballot's Law for Hurricane Katrina.  Dooley Tr. 1842:21-1845:21; Dooley Slides AD-012,
13 (DX 347); see Dooley Report at 35 ("up until 7:42 a.m. CDT, the wind direction would push
the barge toward the dock") (DX 198).

       The second source of meteorological data showing winds from the northeast at the IHNC
is a system-wide hindcast prepared by Oceanweather, Inc. ("OWI"), a leading authority on
hurricane and tropical storm hindcasting.  Dooley Tr. 1851:4-21.  IPET relied on this same OWI
hindcast in reporting on Katrina's wind field.  IPET Report Vol. IV at IV-8, IV-2-4 (DX 145).
Using the data from the four OWI gridpoints nearest to the IHNC (each less than three miles
away), Dr. Dooley undertook a simple interpolation to calculate wind speed and direction in the
IHNC.  Dooley Tr. 1852:3-1854:10 (explaining the interpolation and that the result of the

---

[4] Dr. Dooley further testified that Buys Ballot's Law applies without question to winds that could have affected the
barge at the IHNC.  Buys Ballot's Law applies to "[a]ny circulation around a low-pressure center in the Northern
Hemisphere," which includes not only winds aloft but also winds at ground level as well as winds in an urban
environment.  Dooley Tr. 1929:25-1932:5.

calculation must be within the range of the four points surrounding the IHNC).  The OWI

hindcast confirmed that winds in the IHNC blew from the northeast at all times prior to 7:30 a.m.

Dooley Tr. 1855:17-1856:20 ("between 4:00 and 7:45 what we have are wind blowing from the

eastern side to the western side"); Dooley Tr. 1853-13-15 ("northeasterly wind"); FF ¶¶ 111-13.[5]

The third source of meteorological data showing winds from the northeast at the IHNC is

local data from Lakefront Airport.  Dr. Dooley noted that Lakefront Airport, only four miles

from the IHNC, provides data that are "representative of the type of [wind] directions and speeds

that one would see at the IHNC."  Dooley Tr. 1875:2-9; FF ¶¶ 114-17.  Importantly, the

Lakefront Airport data reflect not only the synoptic scale prevailing winds generated by

Katrina's counter-clockwise rotation, but also any local perturbations.  Dooley Tr. 1877:1-

1878:4.  Here, the Lakefront data showed "the same counterclockwise circulation" and the same

northeasterly winds.  Dooley Tr. 1878:24-1879:1.[6]  Winds at the Lakefront Airport, and thus in

the IHNC, consistently blew away from the eastern floodwall prior to 7:00 a.m. on the morning

of August 29.  Dooley Tr. 1865:19-1866:13; FF ¶¶ 114, 117.  There were no "reversals of wind

direction from west to east" recorded at Lakefront Airport during Katrina.  Dooley Tr. 1878:24-

1879:1.

The fourth source of meteorological data which confirms northeasterly winds at the

IHNC is radar data from the National Weather Service radar station at Slidell, located 23 miles

---

[5] As Dr. Dooley testified, the OWI hindcast derived its power from incorporating "all of the reporting stations and data in the Gulf of Mexico region" throughout Katrina's formation and passage over land.  Dooley Tr. 1851:4-21. The hindcast presents thirty-minute average winds reported in fifteen-minute intervals, and thus supplies strong evidence of the sustained winds in the IHNC which, as noted, represent the determining conditions with respect to potential barge movement.  Dooley Tr. 1852:3-16, 1865:8-18; Cushing Tr. 2047:12-2048:9.

[6] Dr. Dooley explained that because the Lakefront Airport data represent shorter reporting intervals, there are "variations in the instantaneous wind value which do not show up in the [OWI] data because the [OWI] data is a long-term average."  Dooley Tr. 1884:10-14.  He added, however, that when the two data sources are compared, the overall wind pattern is consistent, reflecting wind that "was always generally northeasterly, with some turn either slightly to the right or slightly to the left of that northeast direction."  Dooley Tr. 1884:15-19.

northeast of the IHNC. LNA's expert, Mr. Lemon, examined the radar data from Sunday night August 28 through the morning of August 29 and found that winds at the IHNC always blew with a component from the northeast, away from the Slidell radar station. Lemon Tr. 1779:12-25; FF ¶¶ 125-27. In particular, the "base radial velocity" data at all relevant times showed the IHNC in a red color, reflecting a "uniform wind field from the northeast." Lemon Tr. 1788:15-17; Lemon Slide LL-021 (images "exemplary" for data from August 28 and 29) (DX 346); see FF ¶ 157. In interpreting the radar data, Mr. Lemon carefully looked for any evidence that "local" winds such as mesocyclones or microburst winds might have affected the IHNC, but found that the data reflected no such phenomena at the location of the IHNC.[7] Mr. Lemon further showed that even where mesocyclones were present (*i.e.*, at other locations such as over Lake Pontchartrain), they did *not* cause the wind to blow from a different direction, but rather created a "lull" in the portion of the mesocyclone where the rotation was opposite the prevailing hurricane winds (shown in dark red on the radar image), and a "peak" in the portion of the mesocyclone where the two vectors operated in the same direction (shown in bright red on the radar image). Lemon Tr. 1749:23-1751:1; Lemon Report at 16, Fig. 9 (upper right) (DX 311).[8]

---

[7] In particular, Mr. Lemon examined: (a) "ground-relative" velocity data which accounts for effects of both prevailing hurricane winds and any mesocyclones or other localized phenomena, and which revealed only winds blowing from the northeast at the IHNC (Lemon Tr. 1747:6-12, 1749:15-1751:1, 1779:12-25); and (b) "storm relative" velocity data and "spectrum width" data which were capable of detecting the presence of mesocyclonic winds, mircobursts, or winds with multidirectional components within the overall hurricane wind field, and which showed no evidence of such winds at the IHNC during the relevant periods. See Lemon Tr. 1718:18-25, 1720:4-15, 1724:3-18, 1736:23-1737:14, 1775:10-16, 1777:14-19, 1780:6-25, 1787:19-1788:17 & Lemon Slide LL-021 (radar images showing northeast winds) (DX 346); FF ¶¶ 127-32.

[8] Plaintiffs' attempted cross-examination of Mr. Lemon backfired badly on this point. Attempting to validate Dr. Mitchell's accusation that Mr. Lemon had "masked the mesocyclone" in the radar image (Mitchell Tr. 992:7-993:2), plaintiffs' counsel showed the image to Mr. Lemon and suggested that "no mesocyclones are apparent in it." Lemon Tr. 1815:19-22. Mr. Lemon disagreed and, referring to the bright red and dark red features in the image, responded: "No. There is a mesocyclone apparent." Lemon Tr. 1815:23. The Court, having heard Mr. Lemon's earlier testimony showing the mesocyclone embedded within the hurricane winds, with its dark red and bright red portions representing winds of varying speeds but having the same overall direction, added: "Even I can identify it now." Lemon Tr. 1816:1; see FF ¶ 144 (mesocyclone over Lake Pontchartrain, not near IHNC).

Importantly, these four sources of meteorological data were mutually reinforcing.  For instance, Dr. Dooley demonstrated that the Lakefront Airport data detected perturbations in the wind field that were also reflected in the radar data analyzed by Mr. Lemon.  In particular, Dr. Dooley observed that the Lakefront Airport data reported a lull in the wind field at around 3:36 a.m., with wind blowing more from the east, at a time when the radar data identified a zone of convergence near the airport.  Dooley Tr. 1858:8-1860:16; Dooley Slides AD-043, 44 (DX 347); Lemon Tr. 1786:22-1788:4.  The ability to correlate the Lakefront Airport data and the radar data confirms that the Lakefront Airport weather station was able to detect any significant localized wind phenomena, to the extent present, and thus provides assurance that no such phenomena existed and escaped detection.  Because the Lakefront Airport station remained operational until at least 6:53 a.m., it provides hard data to rule out the phantom mesocyclonic winds that plaintiffs' expert Dr. Mitchell speculated might have been present.  Further, the correlation between observed data at the Lakefront Airport and the radar data analyzed by Mr. Lemon serves to confirm Mr. Lemon's opinions about the radar data and its significance.

In sum, there is absolute agreement between the radar data, the Lakefront Airport data, the OWI hindcast, and the wind direction based on Buy's Ballot's Law and the Katrina storm track.  Winds were from the northeast at all relevant times.  Thus, as Dr. Cushing testified, winds simply cannot have conveyed the barge to the site of either the North Breach or the South Breach before the breaches occurred.  Cushing Tr. 2046:2-3, 2051:12-16; FF ¶¶ 109-10.[9]

---

[9] Eyewitness testimony from witnesses in a position to make observations provides further confirmation that wind directions were from the northeast at all relevant times.  The IHNC lockmaster, Michael O'Dowd, testified that the wind at the lock "was coming out of the north, blowing towards the west" during the early morning hours on August 29, which was confirmed by a build up of debris in the southwest corner of the IHNC.  O'Dowd Tr. 2227:7-12. Captain James Hall, who had tied up his boat at the New Orleans Public Bulk Terminal a short distance away, similarly testified that on Sunday August 28 and during the whole night prior to 8:00 a.m. on Monday August 29, the wind always blew from the east and never from the west or south.  Hall Tr. 1955:4-11; see also FF ¶ 116.

2. <u>Dr. Mitchell's speculative opinions were shown to be erroneous and unreliable</u>.

Against the overwhelming weight of scientific evidence showing the direction of the prevailing winds in the IHNC during Hurricane Katrina's approach, plaintiffs offer not one single scrap of data showing that winds in the IHNC blew in any other direction. Instead, plaintiffs contend that wind conditions in a hurricane are essentially unknowable – "chaotic and unpredictable, rather like head-banger heavy metal music." Pl. Br. 83; see Mitchell Tr. 990:22 ("no one can say" what wind conditions were). Plaintiffs' assumption that the laws of atmospheric science cease to operate in bad weather, and that it is proper to ignore important data in favor of crude speculation, is simply untenable.

The testimony of Dr. Mitchell, plaintiffs' eleventh-hour expert, failed to prove anything that might help their case. Dr. Mitchell is a quintessential "hired gun" who derives most of his income from testifying in litigation but who has not, at least since 1976, published or taught in the field of radar meteorology. Mitchell Tr. 1018:17-1022:16. By contrast, Mr. Lemon – who exposed the flaws in Dr. Mitchell's analysis – has served as a consultant to the National Weather Service for many years, has taught the use of Doppler radar to National Weather Service personnel and others around the world, and has won awards for his role in developing the Doppler radar technology. Lemon Tr. 1709:18-1718:23.[10] As shown by Mr. Lemon's testimony and by cross-examination of Dr. Mitchell, the testimony of Dr. Mitchell is rife with errors and unfounded speculation, rendering his opinions unreliable and not credible.

---

[10] In a bizarre and wholly unsupported attack on Mr. Lemon (Pl. Br. 85-86), plaintiffs assert that his "lack of training beyond the college level" caused him to be "confus[ed] about the basic concepts he was testifying about" and to "not understand" the data he was analyzing. The Court's own questions of Mr. Lemon, and his responses to those questions, revealed the breadth and depth of his knowledge on this subject. See, *e.g.*, Lemon Tr. 1748:8-17, 1759:10-1760:5, 1828:3-1829:10. Plaintiffs' attempt to paint Mr. Lemon as a dilettante in the field of radar meteorology is belied by Mr. Lemon's award-winning work in designing and improving the technology, his authorship of seminal scientific journal articles about it, and his decades of experience teaching others how to use it. Lemon Tr. 1709:18-1718:23; see Lemon Report at 38-50 (DX 311).

The first critical error in Dr. Mitchell's testimony was his reliance on data that had not

been "dealiased."  The need to dealias data stems from a well-known limitation of Doppler radar:

as wind speeds rise above a certain level (here, 64 knots), the "maximum unambiguous velocity"

is exceeded and the data are "folded" to the other side of the spectrum, so that a wind of 64 knots

away from the radar shows up as bright red (signifying the true direction), but the same wind

blowing 65 knots away from the radar shows up as bright green (signifying wind blowing

opposite the true direction).  Lemon Tr. 1754:17-1756:21.  Because winds within Hurricane

Katrina blew at speeds higher than 64 knots, the base data from the Slidell radar included

"folded" data that needed to be dealiased, and thus Mr. Lemon made sure that the radar data

employed in his analysis had been properly dealiased.  Lemon Tr. 1757:24-1758:14, 1799:19-

24.[11]  Dr. Mitchell, by contrast, performed no dealiasing of the radar data that he used,

apparently assuming, mistakenly, that the data had already been dealiased.  Mitchell Tr. 1005:21-

23.  At trial, however, Dr. Mitchell admitted that the radar data he used had ***not*** been dealiased,

and thus contained "large areas" that were "not real."  Mitchell Tr. 993:9-24 ("there are areas,

large areas up here that possibly are aliased that are not real") (referring to Mitchell Slide 4 (PX

436)); Mitchell Tr. 1006:12-17 (admitting that in some of his data "there is alias[ed] data, more

likely than not" and that "it wasn't severely dealiased, no, sir").[12]

The problem with using "aliased" data is that the actual direction and velocity of the

winds are inaccurately depicted; indeed, the aliased data suggest speeds and directions that are

the opposite of what is actually occurring.  Lemon Tr. 1765:8-20; FF ¶ 141.  Time-lapsed images

---

[11] Dealiasing is very reliably performed by a computer algorithm.  Lemon Tr. 1759:10-20.  The GR2Analyst program that Mr. Lemon used to dealias the data in this case is so reliable that it is used by about two thirds of the National Weather Service offices in the United States.  Lemon Tr. 1813:25-1814:3, 1827:22-1828:1.

[12] Although Dr. Mitchell initially volunteered that "the data from the National Weather Service always goes through an anti-alias algorithm," Mitchell Tr. 1004:10-11, he was quickly forced concede that "they don't uniformly do it" and that "there is alias data" in the Katrina data that he relied upon.  Mitchell Tr. 1006:7, 14-15.

of the hurricane system as a whole made plain that Dr. Mitchell had relied on aliased data which did not accurately depict the hurricane wind conditions:  the images representing Dr. Mitchell's aliased data were "incoherent," depicting wind patterns that contradicted the observed cyclonic motion of the storm; by contrast, the time-lapsed images representing Mr. Lemon's dealiased data accurately reflected the storm's cyclonic motion.  Lemon Tr. 1768:12-1771:1.  Dr. Mitchell's reliance upon radar data that were not properly dealiased, and that included "large areas" that he admits were "not real," renders his opinions unreliable.  See, *e.g.*, *Paz v. Brush Eng'red Materials, Inc.*, 555 F.3d 383, 389 (5th Cir. 2009) (expert opinion unreliable where "based on erroneous information"); FF ¶¶ 138-45.

A second critical error in Dr. Mitchell's work was his reliance on mesocyclone algorithm output as definitively establishing the presence of mesocyclones, without checking the base radar data to confirm mesocyclones were actually present.  As Mr. Lemon explained, the mesocyclone algorithm has a "very high false alarm rate," and thus is not used by the National Weather Service without further analysis of the base radar data to confirm that a mesocyclone is actually present.  Lemon Tr. 1738:2-25; FF ¶ 149.  Dr. Mitchell testified that in forming his opinions in this case, he took the presence of a mesocyclone as "an established fact" any time it was "flagged by the algorithm."  Mitchell Tr. 1015:11-17.  Dr. Mitchell's failure to check the algorithm output by looking at the base radar data was improper, as shown not only by Mr. Lemon's testimony, but also by Dr. Mitchell's own practice in other litigation involving Hurricane Katrina.  In particular, in his report in the *Bradley* case, Dr. Mitchell evaluated the ***same Katrina radar data*** and concluded that an algorithm-identified mesocyclone ***was not present*** in actuality, based on his further review of "storm relative velocity" radar data which did not reflect "any signature of mesocyclonic rotation."  Mitchell Tr. 1063:14-18 & *Bradley* Report at 20 (DX 341); FF ¶¶ 151-

53.  In other words, by checking the base radar data to test the algorithm output, Dr. Mitchell

actually did in *Bradley* what Mr. Lemon said Dr. Mitchell should have done in this case, and

arrived at the same conclusion as Mr. Lemon – no mesocyclone was present.[13]  As a result of Dr.

Mitchell's reliance on an algorithm that generates "false alarms," without checking the algorithm

results, Dr. Mitchell's identification of mesocyclones and microbursts that supposedly affected

the IHNC is pure speculation.  See *Washington v. Armstrong World Indus., Inc.*, 839 F.2d 1121,

1123-24 (5th Cir. 1988) (expert conclusions "lacked probative value" as "pure speculation").

A third major error in Dr. Mitchell's testimony was his insistence that the (supposed)

presence of mesocyclones in the vicinity of the IHNC meant that the barge was necessarily

subjected to "multidirectional winds."  Mitchell Tr. 998:24-999:8.  On cross-examination, Dr.

Mitchell was forced to concede that he had "no evidence" that a microburst wind reached ground

level and acted on the barge.  Mitchell Tr. 1036:9-21, 1056:25-1057:1; see FF ¶ 154.  Indeed,

although he has testified in numerous Katrina cases regarding the effects of wind on properties,

Dr. Mitchell could not recall a Katrina case in which he had definitively testified that a

mesocyclone or microburst had reached ground level.  Mitchell Tr. 1041:11-15, 1044:4-7.

Moreover, and in any event, the evidence showed that even where mesocyclones were present

---

[13] Comparison of Dr. Mitchell's opinions in other Katrina cases with his opinions in this case reveal him to be a results-driven advocate rather than an impartial expert.  In *Bradley*, Dr. Mitchell was asked to give opinions about wind conditions during Katrina at a property two blocks from the North Breach.  Mitchell Tr. 1043:21-1044:1, 1047:4-11.  In *Bradley*, however, Dr. Mitchell's insurance-company client had an interest in showing that winds were unimportant to the plaintiff's damages (Mitchell Tr. 1042:15-24), while in this case his "purpose … is to show a chaotic situation."  Mitchell Tr. 991:3-4.  Thus, in this case, Dr. Mitchell relied on the algorithm output to affirmatively testify that rotational mesocyclonic winds were present at the IHNC, while in *Bradley*, he went beyond the algorithm output to find no mesocyclones were present at the IHNC during the exact same six-minute time frame.  Compare Mitchell Tr. 965:1 ("there is a cyclonic rotation") with *Bradley* Report at 20 (data do not show "any signature of mesocyclone rotation") (DX 341) (describing same data for 3:42 a.m.).  Dr. Mitchell's report in *Bradley* is replete with statements, based on the exact same radar data he used in this case, that there was only a "possibility" of mesocyclonic winds, not that such winds were actually present.  Mitchell Tr. 1067:5-11; *Bradley* Report (DX 341); FF ¶ 161.  Despite Dr. Mitchell's protestation that he does not produce "canned" reports (Mitchell Tr. 1061:25), the nearly word-for-word identity in language from one report to the next – with only the words "possible" or "possibility" edited out of relevant sections of his report in this case – cannot be a coincidence.  Compare *Bradley* Report (DX 341) with highlighted *In re Katrina* Report (DX 343).

during Hurricane Katrina, they were not sufficient to overcome the prevailing wind and cause the wind to blow in a different direction.  See Lemon Tr. 1745:4-12 (all winds within mesocyclone were moving away from radar); Lemon Slide LL-010 (DX-346); Dooley Tr. 1885:16-1886:4, 1921:5-1922:23 (vectorial resolution results in "lull" or "peak"); FF ¶ 155.  On questioning by the Court, Dr. Mitchell admitted that a mesocyclone embedded within a hurricane could produce winds with the "same direction" but with wind speeds that would "simply be less."  Mitchell Tr. 1014:1-5.  In sum, Dr. Mitchell's attempt to equate the presence of (supposed) mesocyclones with ground-level multidirectional winds is, by his own admission, pure speculation.  FF ¶¶ 158-59, 161.  That speculation, in turn, is rebutted by the actual radar data showing that wind direction at the IHNC was not affected by mesoscale phenomena and remained consistent from the northeast at all relevant times.[14]

Finally, even if Dr. Mitchell's unreliable testimony about supposed multidirectional winds were credited in full (despite all of the evidence to the contrary), that would ***not*** establish the presence of "multidirectional" winds capable of affecting the movement of the barge. Instead, the evidence showed that microburst winds are "very localized" and last only a few seconds (Mitchell Tr. 955:22-25; 1036:3-21), and that mesocyclones are ephemeral storms whose effects are felt for only one or two minutes at a particular location (Lemon Tr. 1728:4-13). Neither of these short-lived phenomena would have been capable of imposing the sustained force needed to overcome the barge's inertia (and the prevailing winds) to deliver the barge across the IHNC to the site of either breach.  Cushing Tr. 2047:12-2048:9.

---

[14] Lemon Tr. 1750:12-1751:1 ("The circulation doesn't change the direction of the wind."); Lemon Tr. 1754:9-12 (when looking at both hurricane wind and mesoscale wind, wind at the ground at the IHNC is blowing from the northeast, away from the radar); Lemon Slide LL-010 (DX 346).

For all these reasons, Dr. Mitchell's analysis cannot begin to overcome the mountain of reliable evidence showing that wind could not have caused the barge to be present at the eastern floodwall when either of the breaches occurred.

### C.   Current, Tide and Waves Could Not Have Overcome the Hurricane Winds to Transport the ING 4727 to the Breaches Before They Occurred.

The evidence also conclusively showed that current, tide, and waves could not have moved the barge against the prevailing winds to the site of either breach.

1. Current and tide did not move the barge.

With the lock gates closed, the IHNC was a closed system, in which water could enter only through the Florida Avenue Bridge.  Consequently, as Katrina's storm surge rose, the IHNC filled "like a bathtub."  Cushing Tr. 2052:23-2053:13; FF ¶ 164.  And just as in a bathtub, Mr. Pazos acknowledged, the current was "insignificant."  Pazos Dep. 104:6-11 (DX 218).  In fact, Dr. Cushing calculated that the current was 700 times less than the strength of the wind on the barge, and therefore could not have pulled the barge away from the Terminal or caused it to cross the IHNC against the prevailing wind.  Cushing Tr. 2053:14-23; FF ¶ 165.

Plaintiffs speculated that tides could have moved the barge to the site of the North Breach (assuming it was loose on Sunday August 28) because "the water comes in, the water goes out, at least twice per day."  Green Tr. 440:8-441:1.  This speculation finds no basis in fact.  To the contrary, the lockmaster's hydrograph shows that Katrina's storm surge caused a steady rise in water level beginning on Sunday in the IHNC that "overwhelmed" the tidal flow and resulted in a "net flow into the canal, not out of the canal."  Cushing Tr. 2054:5-2055:20; IPET Report Vol. V, Fig. 51 (DX 145); FF ¶ 166.  Also, despite the Court's express request that plaintiffs provide evidence of tidal movements or the range of the tide in the IHNC (Pazos Tr. 904:18-20),

plaintiffs supplied no such evidence.  In short, neither current nor tides could have moved the barge to the breach sites.

    2.  <u>Waves did not move the barge</u>.

    Plaintiffs' suggestion that waves could have moved the ING 4727 to the North Breach and/or South Breach is also nothing more than speculation disproved by the evidence.  The evidence – including IPET's calculations, Dr. Cushing's calculations, and the testimony and photographs from Mr. O'Dowd at the IHNC lock – made clear that waves in the IHNC were on the order of one to three feet high.  IPET Report Vol. IV at IV-4 (DX 145); Cushing Tr. 2065:7-16; DX 35 at LNA 001345, LNA 001347 (photographs); O'Dowd Tr. 2225:19-2226:20; FF ¶ 170.[15]  These waves were driven by the wind, which was blowing away from the breaches prior to their initiation.  Cushing Tr. 2063:16-18.  Rather than moving the barge toward the site of either of the breaches, the waves played no role in the movement of the barge, and certainly did not push it in a direction contrary to the prevailing winds from the northeast.  Cushing Tr. 2063:10-20.

    **D.**    **Physical Evidence Also Demonstrates that the Barge Could Not Have Been At the Site of Either Breach When They Occurred.**

    1.  <u>Physical evidence shows the barge was not at the North Breach</u>.

    The utility pole on the canal side of the North Breach (DX 106, 263, 344, 345) is one of several pieces of evidence that conclusively confirm that the barge could not have been present at the North Breach.  Mr. Pazos, plaintiffs' expert regarding barge movement, conceded that if the barge had been floating freely near the site of the North Breach "[t]here's no way the barge

---

[15] Mr. Pazos speculated in a pretrial declaration about the supposed existence of a twenty-foot "meteotsunami" (Pazos Decl. at 17) (PX 404), but abandoned that position at trial, admitting he did not have "any solid information" and that he was "just elaborating [o]n what an eyewitness said."  Pazos Tr. 872:4-9.  Plaintiffs' "giant wave" theory is but another flight of fancy unsupported by any scientific or other evidence, as plaintiffs' own expert hydrologist was quick to admit.  Spinks Tr. 1614:21-24 (no evidence of 20-foot waves); see also Cushing Tr. 2066:14-2067:1 (20-foot wave impossible in IHNC); O'Dowd Tr. 2226:21-2227:6 (no twenty-foot wave); FF ¶¶ 171-75.

would have missed that [utility] pole." Pazos Tr. 881:21-25.  Dr. Cushing reached the same

conclusion, explaining that because the barge would have been traveling perpendicular to the

wind, the barge could not have arrived at the site of the North Breach without destroying the

pole.  Cushing Tr. 2098:23-2099:20.  Thus the two experts designated and qualified to discuss

the movement of the barge both agreed the barge could not have arrived at the North Breach

without destroying the pole.[16]  The pole proves that the barge was not present.

 Other physical evidence also proves the barge was absent from the North Breach.

Separate in-depth examinations of the floodwall and breach site by Dr. Bea, Dr. Cushing, and Dr.

Mosher revealed no evidence of impact damage to the floodwall at the North Breach.  Bea Tr.

2683:13-21; Cushing Report at 63, 88, 175 (DX 196); Mosher Dep. 130:15-131:4 (DX 283); see

FF ¶ 327.  After examining the barge from every conceivable angle, Dr. Cushing found no

impact damage on the barge either.  Cushing Tr. 2152:3-6; FF ¶ 330.  The barge did not travel

into the neighborhood with the inrushing waters, nor did it even make contact with the unfailed

portion of the floodwall, as should have occurred if it had been present when the breach

occurred.  Cushing Tr. 2095:22-2096:2; FF ¶¶ 327, 333.  Finally, the "smooth curve" of the bow

shape at the southern end of the North Breach is the hallmark of a failure due to hydrostatic

pressure, demonstrating that there was no point-load impact from a barge.  Bakeer Tr. 2352:13-

25, 2435:21-2436:7.  Thus, the physical evidence reinforces and confirms what the

---

[16]  Although Dr. Marino suggested that there would have been room for a 35-foot-wide barge to fit between the pole and the wall (Marino Tr. 1349:12-25, 1495:4-10), he admitted that "I am not a routing person, so I can't tell you how the barge got there" (Marino Tr. 1366:10-18).  Given the unanimous testimony of the routing experts showing the barge could *not* have avoided the pole, and given the unchallenged testimony of Dr. Cushing that the barge would have been traveling perpendicular to the wind along its entire 200-foot length, Dr. Marino's speculation about where a 35-foot-wide barge might fit is of absolutely no consequence.

meteorological data shows – the barge was not and could not have been present at the North Breach.[17]

2. <u>Physical evidence shows the barge was not at the South Breach</u>.

Physical evidence from the South Breach site similarly confirms that the barge could not have reached the eastern floodwall and traversed the South Breach until after the breach had fully formed and the floodwaters had risen to high levels within the neighborhood.  First, the barge could not have floated over top of the school bus, which was "fairly heavily embedded in the soil," unless the floodwaters where higher than the top of the school bus when the barge arrived.  Bea Tr. 2792:6-19; FF ¶ 376.  Similarly, the barge could not have settled atop the phone lines when the floodwaters receded if the barge had not floated over the lines when it entered the neighborhood; otherwise the poles would have been toppled.  Cushing Tr. 2127:1-11; FF ¶ 378.  The barge also could not have settled up against a still-standing house just inside the breach if the barge had not been moving at a very slow velocity, which in turn required the barge to have entered the neighborhood well after the breach unleashed its initial torrent of water deep into the neighborhood.  Cushing Tr. 2127:12-2128:3; FF ¶ 381.[18]

In addition, the northern part of the South Breach, the main bow, displays the hallmarks of a rounded failure due to uniform hydrostatic pressure and not the pointed shape associated with a point-load impact.  Bakeer Tr. 2435:1-2437:15; FF ¶ 369.  The only portion of the South Breach that sustained any impact damage is the extreme southern end (approximately 30-40 feet wide), and this is the only portion of the entire eastern floodwall that shows any evidence that the

---

[17] Additional physical evidence concerning the North Breach site is addressed below at 38-42.

[18] Plaintiffs implausibly contend that the barge "shielded" houses on the east side of the floodwall from the inrushing waters (Pl. Br. 40-41).  To the contrary, had the barge been present when the floodwall broke, it would have been driven in along with that same rush of water, and could not have "shielded" anything.

barge was present.  Cushing Tr. 2125:3-6; FF ¶¶ 369-70.[19]  The evidence further shows that the South Breach initiated well to the north of this area of impact, near the apex of the main bow near North Johnson Street, and it was there that the most significant destruction was found as the floodwaters fanned out from the apex.  Cushing Tr. 2101:2-22, 2102:1-9.  Had the barge been present when the South Breach initiated, it would have been swept into the neighborhood by the inrushing water.  Cushing Tr. 2102:10-25, 2121:12-14; FF ¶¶ 373-74.  Yet, the presence of trees and structures shows that the barge never entered this area.  Cushing Tr. 2126:10-22; FF ¶ 373.

Evidence at the southern end of the South Breach also establishes that the barge could only have entered the Lower Ninth Ward after the breach had fully formed.[20]  Dr. Cushing showed that the horizontal direction of the bent rebar signified a high level of water in the neighborhood, and that if the barge had passed over the wall before the neighborhood was flooded, it would have grounded and sustained considerable damage that was not evident on the barge after the storm.  Cushing Tr. 2123:25-2124:16; FF ¶ 375.  Additionally, damage to the concrete panels showed that the panels must have been inclined, and that the breach was thus fully formed, before the barge made its first contact with the floodwall.  Cushing Tr. 2114:23-2116:22; FF ¶ 370.  The position of the scrapes on the back third of the barge shows that the front of the barge entered the Lower Ninth Ward without contacting the floodwall, which can only have occurred if that portion of the barge passed over the already-fallen floodwall as shown on Dr. Cushing's animation.  Cushing Tr. 2118:4-2119:3; Cushing Report at 94, Figs. 62-63 (DX

[19] The only other damage to the concrete on the floodwall was caused by the expansion of the sheet pile.  Cushing Tr. 2103:1-22.

[20] The parties agree that the south end of the South Breach was the point of entry of the barge and that the rebar exposed in this area left its fingerprint upon the bottom of the barge.  Cushing Tr. 2108:1-17; Bartlett Tr. 326:15-327:3; Pazos Report at 53 (PX 402); FF ¶ 372.

196).  For these reasons, the physical evidence at the South Breach site confirms what the meteorological data shows – that the barge was not present when the breach occurred.[21]

###### E.     Lay Witness Testimony Did Not Place the Barge at the Site of the Breaches.

In their opening statement, plaintiffs promised to provide "eyewitness testimony … to the sight and sounds of a barge breaching the eastern Industrial Canal floodwall" that would be so compelling as to render any contrary expert testimony "superfluous, misleading and irrelevant." Tr. 17:10, 17-19, 18:5.  Plaintiffs utterly failed to deliver on that promise.  By the end of the trial, they were left with just a single alleged eyewitness at each breach, Mr. Villavasso for the North Breach and Mr. Adams for the South Breach.  See Pl. Br. 90-94.  The accounts of these two witnesses were so equivocal that neither of them could even positively identify what he supposedly saw as a barge; and, if their accounts were credited in full, then their descriptions would compel a conclusion that the object they thought they saw could not have been the ING 4727.  Moreover, plaintiffs' inferences from that testimony would render it contrary to the laws of nature, which, as noted, provide that at all relevant times the prevailing wind would have been pushing the barge *away from* the breaches, not toward them.  Likewise, plaintiffs' "boom" evidence was so discredited that, in their post-trial brief (Pl. Br. 39-40), plaintiffs do not even argue that the "boom" sounds heard by Lower Ninth Ward witnesses were made by the barge.

As the trier of fact, the Court can disregard equivocal evidence such as the testimony of these witnesses.  See*, e.g., Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 271-72 (5th Cir. 2002); *Marchese v. Secretary, United States Dep't of the Interior*, 409 F. Supp. 2d 763, (E.D. La. 2006); Fed. R. Civ. P. 52(a)(6).[22]  And even if the witnesses' testimony had been less equivocal, the

---

[21] Physical evidence at the South Breach site is discussed further at pages 42 to 49 below.

[22] See also *Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 375 (5th Cir. 2000) (after bench trial, court of appeals "cannot second guess the district court's decision to believe one witness' testimony over another's or to discount a witness' testimony").

case law makes clear that "[e]vidence manifestly at variance with the laws of nature and the physical facts is of no probative value."  See *Ralston Purina Co. v. Hobson*, 554 F.2d 725, 729 (5th Cir. 1977).[23]

    1.  Mr. Villavasso did not place the barge at the North Breach.

    The account of William Villavasso does not establish that the barge was present at the North Breach.  Mr. Villavasso testified that from a porch at Pump Station No. 5, near the Florida Avenue Bridge, he heard a "boom" and saw "[a] couple of sections" of the wall "tumble over," at which point he saw "what appear[ed] to be [a] metal structure like a barge, only the tip of it." Villavasso Dep. 64:4-24 (DX 308).  However, when directly shown a picture of the ING 4727, under the most suggestive questioning imaginable ("Did it look anything like that?"), Mr. Villavasso could not identify the barge as what he saw: his response was, "***I really couldn't tell.***" Villavasso Dep. 65:1-2, 66:5-6 (emphasis added) and Dep. Exh. 4 (DX 308); FF ¶ 201.[24]  Mr. Villavasso's inability to identify the object he saw in any meaningful way is no surprise, given that: (a) Mr. Villavasso was not wearing glasses, without which he "s[aw] long distance fuzzy" (Villavasso Dep. 211:2-19, 66:9) (DX 308); and (b) it "was raining and it was dark, [and] the wind was blowing like hell," interfering with his vision and forcing him to "squint [his] eyes." Villavasso Dep. 64:16-19, 140:9-19, 181:4-25, 202:24-203:1 (DX 308); FF ¶ 199.

---

[23]  See also *S. Pac. Co. v. Matthews*, 335 F.2d 924, 927 (5th Cir. 1964) ("[t]estimony which is at variance with physical facts is no evidence"; rejecting testimony that driver could not see approaching train when photographs showed train could be seen from driver's location); *Holland v. Allied Structural Steel Co.*, 539 F.2d 476, 483 (5th Cir. 1976) (proper to reject witness testimony that is "incredible as a matter of law"); *Kesinger v. Herrington*, 381 F.3d 1243, 1248-50 (11th Cir. 2004) (witness account inconsistent with "undisputed, clearly demonstrated, photographed physical evidence" was "not substantial evidence and must be disregarded").  Plaintiffs' citation to *Dotson v. Clark Equip. Co.*, 783 F.2d 586, 588 (5th Cir. 1986) for the proposition that a court should not "rule out improbable and far-fetched but competent evidence" (Pl. Br. 84) shows only that the best plaintiffs can say about their own witnesses' accounts is that they are "improbable and far-fetched."

[24]  Mr. Villavasso similarly could not tell the color of the object; could not see any writings on the object; could not see the name of a company on the object; could not tell whether it was a tank or hopper barge; could not tell whether it was an open barge; could not tell how big, long, or wide it was; and could not identify any other features on the object.  Villavasso Dep. 203:8-204:18 (DX 308).

In any event, taking Mr. Villavasso's testimony at face value, the object he saw cannot have been the ING 4727.  Mr. Villavasso testified at least seven times that all he saw was the "tip" of an object.[25]  According to Mr. Villavasso, this object was sticking up only one to two feet above the top of the floodwall.  Villavasso Dep. 202:11-17 ("maybe a foot, foot and a half, two feet at the most") (DX 308).  Experts from both sides agreed that if the ING 4727 had in fact been at the floodwall when Mr. Villavasso made his observations, then the top of the barge would have been sticking up at least fourteen feet above the floodwall, a towering hulk that no witness would describe as "only the tip" of an object.  Cushing Tr. 2100:11-14; Marino Tr. 1325:10-13; FF ¶ 202.[26]  Conversely, Dr. Cushing established that if Mr. Villavasso had seen the tip of the ING 4727 sticking up a foot or two over the top of the wall, the barge would have been at least 30 feet away from the floodwall and could not have been causing sections of the wall to "tumble over."  Cushing Tr. 2099:24-2100:22; Villavasso Dep. 64:14 (DX 308).

In sum, Mr. Villavasso's testimony does not support plaintiffs' assertion that he saw the barge strike the wall at the North Breach.  See *Bright v. G B Bioscience Inc.*, 305 Fed. App'x 197, 203-04 (5th Cir. 2008) (refusing to rely on equivocal testimony that did not establish plaintiff's contention); *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 271-72 (5th Cir. 2002) (same).[27]  Assuming Mr. Villavasso saw an object at or near the floodwall, the more reasonable inference is that Mr. Villavasso saw debris near the floodwall, of a size more similar to the object that he described having seen.  Bea Tr. 2688:23-2689:20 (referring to Bea Slide RB-069 (DX

[25]  Villavasso Dep. 81:12-20 (saw "the tip," and "not much" of the object); 85:5-6 ("[a]ll I could see was the top part of the tip of it"); 86:4-5 ("I couldn't see that much of it."); 89:8-9 ("I could say maybe see a foot of this object"); 89:17-18 ("I could only see the tip of it at the top"); 97:8-9 (" I seen the tip of it.  That's all I seen."); 97:14-15 ("I seen the tip of it, and that was it"); 98:16 ("I only seen the tip of it") (DX 308).

[26]  The difference between one to two feet and fourteen feet is equivalent to the difference in height between a banker's box on the floor of the courtroom versus the height of the entire courtroom from floor to cornice.

[27]  It bears noting that Mr. Villavasso's account is not contemporaneous with his experiences during Katrina; instead, he did not relate his account to anyone until two years after the storm, and then only when asked as part of an internal investigation.  Heuerkamp Tr. 3068:12-15, 3069:2-3; Riess Tr. 2004:6-16, 2008:14-21; FF ¶ 204.

361)) (floating debris poking over the floodwall, similar to that seen during Hurricane Gustav, could account for Mr. Villavasso's observations); see also Bakeer Dep. 113:20-114:6 (PX 345) (red metal sheet pile made visible by tear accounts for object Mr. Villavasso saw).

    2. <u>Mr. Adams did not place the barge at the South Breach</u>.

    The account of Terry Adams does not establish that the barge was present at the site of the South Breach when the breach occurred.  Mr. Adams, from his roof near the Florida Avenue Bridge, claims to have seen a large object "crash[] into" the wall and then go "through the levee" along with a "tidal wave" of water at the location of the South Breach.  Adams Tr. 262:7-264:9.

    As an initial matter, it is extremely unlikely that Mr. Adams could have seen any of the events he purported to describe.  Mr. Adams' vantage point was ***over 2,950 feet*** from the site of the South Breach.  Doc. 19842 at 42, LNA Undisputed Fact 30.  Mr. Adams admitted, moreover, that he was contending with extreme hurricane conditions at the time:  he was "up on [his] rooftop in the middle of hurricane wind conditions" (Adams Tr. 281:19-20), it was "raining real hard" (Adams Tr. 256:12-15), the power had gone out (Adams Tr. 253:3-5), and it was "still dark" (Adams Tr. 281:10-12) or at least "wasn't yet light" (Adams Tr. 256:19).  See FF ¶ 208.  As shown by photographs taken during Hurricane Katrina at the IHNC lock under the same rainy and windy hurricane conditions that Mr. Adams described, the field of vision was limited to a few hundred feet, even after day had broken.  O'Dowd Tr. 2216:19-21, 2223:12-2224:1, 2226:5-12, 2229:6-17; DX 35 at LNA 001344, 47.[28]  Testimony confirmed that visibility was extremely limited during Katrina's rain and wind.  O'Dowd Tr. 2226:13-15; Berryhill Dep. 46:16-47:23 ("you couldn't see nothing") (DX 317); FF ¶¶ 209-10.  Given this evidence, it is inconceivable

---

[28]  Mr. O'Dowd's photographs, taken after sunrise, demonstrate that it was difficult or impossible to make out the Claiborne Avenue Bridge, seven or eight hundred feet away from the IHNC lock.  O'Dowd Tr. 2226:10-12; DX 35.

that Mr. Adams could have seen events occurring over half a mile away before dawn during the height of the storm.

In any event, Mr. Adams did not identify the object he saw as a barge. Instead, he described it as a "big object" that "looked like a big black house." Adams Tr. 261:24-25, 262:7, 264:9. Mr. Adams admitted he saw "four feet of an object that [he] couldn't identify." Adams Tr. 284:1-3. Mr. Adams further admitted that he "didn't know it was a barge" until after the storm, when he saw pictures of the barge in the neighborhood and inferred that this was the object he had seen. Adams Tr. 288:8-289:12.

Furthermore, if Mr. Adams' testimony were credited in full, then the "big object" involved in the events that Mr. Adams described cannot possibly have been the ING 4727. Whereas Mr. Adams described a black object sticking only four feet above the floodwall, the ING 4727 was orange and red and would have been towering fourteen feet or more over the top of the floodwall. Adams Tr. 284:1-5, 13-17; FF ¶ 212. Moreover, the object that Mr. Adams described was swept into the neighborhood by a powerful "tidal wave" of water that "took that object, houses, telephone poles, [and] everything in its way" (Adams Tr. 285:18-20), while the ING 4727 clearly did ***not*** enter the neighborhood with the initial inrush of water, but rather floated from the canal to its final location near Jourdan Avenue, less than a block from the floodwall just inside the south end of the South Breach, without entering deep into the Lower Ninth Ward. Cushing Tr. 2102:10-25; FF ¶ 213.

Finally, Mr. Adams' testimony revealed severe credibility defects. Most importantly, Mr. Adams changed his testimony between his deposition and the trial, first testifying at deposition that the object approached the floodwall and struck it a single time (Adams Tr. 289:9-12), and at trial saying instead that the object was "easing down the wall" bumping into it multiple times

(Adams Tr. 261:21-25, 264:15-19); see FF ¶ 214.  Further, Mr. Adams is a convicted felon with

a financial stake in the outcome of this litigation.  Adams Tr. 292:16-19, 276:21-24, 277:19-21.

Mr. Adams' testimony provides no basis to find that the ING 4727 caused the South Breach.

     3.  <u>Mr. Williams and Mr. Murph did not witness the barge break the wall</u>.

     While plaintiffs had previously identified Sidney Williams and Arthur Murph as

eyewitnesses to the South Breach, plaintiffs' post-trial brief does not include them in its

treatment of supposed eyewitnesses.  See Pl. Br. 90-94.  This omission confirms what the record

makes clear:  neither one of these individuals saw the barge cause the South Breach.

     With respect to Mr. Williams, plaintiffs unsuccessfully fought to exclude a statement that

Mr. Williams gave shortly after the storm, in which he emphatically stated that the barge was not

present when the floodwall failed at the South Breach and did not cause the breach.  Williams

Oct. 2008 Dep. Exh. 3 at 7-10, 12 (DX 310).  Indeed, plaintiffs' own expert, Dr. Marino, credited

Mr. Williams' statement and "discounted" his contradictory deposition testimony, upon which

plaintiffs had sought to rely.  Marino Tr. 1315:8-18; see also Williams Feb. 2008 Dep. 11:3-11

(financial interest) (DX 309); FF ¶¶ 215-21.  Thus, plaintiffs cannot seriously put forward Mr.

Williams as a supposed eyewitness.[29]

     With respect to Mr. Murph, his testimony established that he never saw the barge make

contact with the floodwall.  To the contrary, Mr. Murph did not see the ING 4727 until long after

the breaches had occurred and the floodwaters had risen "as high as the gutter" on his home.

Murph Tr. 700:7-9; FF ¶¶ 223-27.  Mr. Murph's testimony does not demonstrate that the barge

---

[29]  Plaintiffs' proposed findings of fact omit any mention of Mr. Williams.

caused the South Breach, but rather shows that the barge entered the Lower Ninth Ward after the breaches had formed and the floodwaters had risen in the neighborhood.[30]

    4. <u>"Earwitnesses" do not establish the barge was involved in either breach</u>.

Plaintiffs' reliance on the testimony of the "earwitnesses" has diminished drastically as this case has progressed. As shown in Dr. Marino's report, plaintiffs originally attributed all boom sounds to the barge. See, *e.g.,* Marino Report at Table 3.1 (PX 397). However, plaintiffs' position shifted after numerous witnesses at the 17th Street and London Avenue Canals testified that they heard booms shortly before floodwaters arrived,[31] and experts from both sides established that floodwalls make boom sounds as they fail without any involvement by a barge. Weiss Tr. 2832:17-20; Marino Tr. 1385:3-8, 1306:22-1307:1; FF ¶ 234. Unwilling to concede the point entirely, plaintiffs retreat to citing isolated scraps of deposition testimony where witnesses occasionally used words other than or in addition to "boom" to describe sounds they heard. Pl. Br. 39-40. Regardless, sounds described by a handful of witnesses at various locations at various times, in the midst of a hurricane, certainly do not equate to a barge having caused the floodwall failures. To the contrary, there is no physical evidence of the barge "scraping" or "knocking" or otherwise contacting the floodwall at any location other than the extreme southern end of the South Breach, after the floodwall was already down and the neighborhood already flooded.

---

[30] Plaintiffs suggest that Mr. Murph heard noises while "standing in his driveway" that must have represented the barge "knocking, scraping, rubbing, or banging." Pl. Br. 40. However, had the barge been present at the time, it would have been looming above the top of the floodwall (see above at 21); yet, Mr. Murph never identified the source of the sounds. Murph Tr. 693:24-25. It was only much later, after Mr. Murph had spent time in his attic, in his den drinking beer, and then again in his attic, that Mr. Murph chopped a hole and emerged onto his roof and saw the barge for the first time, already in the neighborhood, with the floodwater at the level of the gutters on his house. Murph Tr. 696:20-23 (went inside to living room), 697:23-698:1 (went to attic), 702:8-21 (in living room drinking beers), 701:12-24 (back to attic, then to roof, emerged and saw barge for first time); 700:7-9 (water up to gutters).

[31] *E.g.,* Marino Tr. 1303:24-1305:8 (IPET reports of booms at other breaches); Aguillard Dep. 7:14-19, 11:7-12:10, 13:25-14:3, 17:18-22 (London Avenue Canal) (DX 325); Lentz Dep. 8:13-20, 19:6-20:1, 20:7-21:4, 21:11-16, 24:4-6, 51:15-25, 56:25-57:4 (17th Street Canal) (DX 324); FF ¶¶ 231-33 (citing numerous witnesses).

**F.     Only LNA Has Provided a Plausible Account of Barge Movement Consistent With the Evidence.**

1. <u>LNA's account of barge movement is simple and consistent with the evidence.</u>

In Dr. Cushing's animation (DX 349), LNA offered the Court a straightforward account, grounded in the evidence, depicting the movement of the ING 4727 on August 29. Cushing Tr. 2131:22-2137:25. At all times prior to 7:30 a.m., by which time both the North Breach and South Breach had already formed, the wind at the IHNC blew from the northeast, ***away from the floodwall***, and therefore, the winds prior to 7:30 could not have blown the barge out of the protected slip and into the canal. Cushing Tr. 2051:19-22. As Hurricane Katrina moved on her northwardy course, east of New Orleans, the winds backed around and started to blow with more northerly and then slightly westerly components. Dooley Tr. 1849:8-24; FF ¶ 107. It was not until after 9:00 a.m., after Hurricane Katrina's eye had moved north of the IHNC, and the winds were blowing from the northwest, that the winds placed strain on the mooring lines between the outboard ING 4727, riding high in the water, and the inboard ING 4745 riding lower in the water. Cushing Tr. 2135:16-20. The wind caused "severe damage [to the lines] that melted and completely fused [the rope] back to raw plastic again." Skaer Tr. 2524:19-25.[32]

Once the barge had broken free, the northwesterly wind after 9:00 a.m. blew the barge clear of the Namasco Gantry, permitting it to enter the Canal. Cushing Tr. 2135:21-23. The barge drifted slowly south and east, oriented perpendicular to the wind, under the forces of the wind, the currents now passing through the South Breach, and the barge's own inertia. Cushing Tr. 2120:2-20, 2135:24-2136:20.

---

[32] Even if the barge had broken free earlier, moreover, the wind would have kept it away from the east side of the IHNC. Cushing Tr. 2045:2-15, 2051:5-11; FF ¶ 252.

The leading edge of the barge passed over the already-fallen floodwall, without contact, before the midsection of the barge came into contact with the southern end of the South Breach. Cushing Tr. 2136:20-24.  The back third of the barge contacted a portion of the already-fallen floodwall, shearing the concrete cap at the construction joint and bending the rebar horizontally as it passed into the already-flooded neighborhood.  Cushing Tr. 2123:25-2124:16.  The ING 4727 pivoted gently with the fanning floodwater, passing over the school bus and telephone lines, until the houses on Jourdan Avenue brought it to a stop, where it grounded after the storm. Cushing Tr. 2120:16-20; 2137:7-25.

This account is simple and direct, involving nothing more than:  (a) a breakaway under the forces of hurricane winds, consistent with the physical evidence of the ropes; (b) passage from northwest to southeast across the canal, consistent with the direction of the prevailing wind and current through the South Breach; (c) a single impact at the southern end of the South Breach, consistent with the physical evidence on the barge and the wall; and (d) passage into the already-flooded neighborhood, consistent with the horizontal rebar and the physical evidence in the neighborhood itself.  Both wind and water data converge to place the timing of the barge passage around 10:00 a.m., when the wind was blowing from the northwest and the water level (as shown by the hydrograph) would place the bottom of the barge at the level of the construction joint.  Cushing Tr. 2123:25-2124:16; FF ¶ 377.

2.  Plaintiffs' account of barge movement is convoluted and without evidentiary support.

Plaintiffs claim that the barge's "[t]rajectory is probably not relevant …"  Pl. Br. 42 n.23. Plaintiffs have little choice but to take this position because their own naval architect, Mr. Pazos, did not study meteorological data and repeatedly testified that he could not say how the ING 4727 moved from one location to another, even though this should have been an area within his

expertise.  *E.g.*, Pazos Tr. 843:3-4 ("I cannot show you the trajectory because I don't know the trajectory."); 895:22-25 ("Well, I don't know for sure the location of the barge in the canal, and I don't know exactly what propelled it.  All I said, there is a possibility that the barge was moved by winds."); FF ¶¶ 188-89.[33]

That plaintiffs' experts were unable to explain the barge's supposed movements comes as no surprise, given the utter implausibility of plaintiffs' theory.  If plaintiffs' theories are believed, the barge left the dock in calm weather on Sunday morning; moved south to a point near the Claiborne Avenue Bridge; moved north about 3/4 mile; maneuvered around a utility pole on the IHNC batture to create the North Breach on Monday morning; then moved due south bumping against the flood wall until the South Breach was created.  There is no physical evidence or credible testimony to support this unlikely scenario, and ample evidence to contradict it.

Initially, plaintiffs rely on the testimony of Ms. Leblanc and Mr. Tompkins, contending that the barge "was drifting free in the IHNC the day before Hurricane Katrina hit New Orleans." Pl. Br. 95.  However, these two witnesses each had no more than "a few seconds" to make their observations while driving across the Claiborne Avenue Bridge.  Leblanc Tr. 369:3-5, 370:4-6, 379:13-15, 379:25-380:4, 380:19-22, 389:8-9; Tompkins Tr. 404:11-13.  Moreover, neither of them definitively identified what they saw as the ING 4727 (assuming a barge was even present). Leblanc Tr. 378:9-10 ("there's plenty of barges that look like that"); Tompkins Tr. 405:5-406:18 ("could have been anybody's barge"); FF ¶ 248.

By contrast, multiple (and disinterested) witnesses had the opportunity to view the IHNC for a longer period of time, from a variety of superior vantage points, and at later points in time,

---

[33]  Dr. Marino, plaintiffs' other main causation expert, admitted that he was not only unqualified to present opinions regarding movements of the barge (Marino Tr. 1334:5-23), but also acknowledged that he had no explanation for the barge's movements on August 29 (Marino 2009 Dep. 76:16-20 (DX 221); FF ¶ 191).

and **none** report having seen a loose barge.  For instance, Captain James Hall had a clear view of the entire IHNC for no less than forty-five minutes while he was looking through binoculars at that very area, and saw no loose barges.  Hall Tr. 1946:13-1951:6; see also O'Dowd Tr. 2217:13-2223:4 (no loose barges seen from IHNC lock; no reports of loose barges); Riess Tr. 1996:20-2000:20 (no loose barge seen from Pump Station platform); see FF ¶¶ 238-47 (documenting the testimony of Captain Hall, Lockmaster O'Dowd, Mr. Edwards, Mr. Riess, Mr. Villavasso, Mr. Alford, Mr. Murph, Mr. Weber, and Mr. Sartin).  To accept what plaintiffs glean from the drive-by accounts of Mr. Tompkins and Ms. Leblanc, the Court must reject the testimony of all of these other witnesses and imagine that a loose barge escaped the detection of every other person present along the Canal that day, including but not limited to the emergency evacuation personnel stationed on the Claiborne Avenue Bridge (Alford Tr. 196:7-21, 216:1-217:12).

Not only the testimony, but also the physical evidence negates plaintiffs' theory of a breakaway on Sunday in calm weather.  In particular, the unrebutted testimony of Mr. Skaer showed that the mooring ropes on the ING 4727 broke under conditions so severe that the rope fibers actually melted and fused together – conditions that most certainly did **not** exist on a calm Sunday morning.  Skaer Tr. 2524:19-25, 2531:9-11; FF ¶ 80.  In light of this and other evidence, even plaintiffs' own experts refused to sponsor the Sunday-breakaway theory.  Green Tr. 539:25-540:11 ("I think [the barge] broke away during hurricane conditions. … I have no explanation or opinion as to how the barge got there on a Sunday, if that is, in fact, the barge."); Pazos Tr. 850:6-12 ("I don't know if they can pinpoint, when they're driving, crossing a bridge, the exact location of a barge in a canal that they see in the distance."); see FF ¶¶ 78-80.

Next, even assuming that the barge had been present on Sunday near the Claiborne Avenue Bridge, as plaintiffs suggest, plaintiffs' account then implausibly requires the barge to

have traveled more than 3,000 feet back to the north before impacting the North Breach.  Even

Mr. Pazos deemed this a "remote possibility."  Pazos Tr. 851:11-20.  Indeed, all of the evidence

showed that, if the barge had been loose in the IHNC on Sunday, it would have been pushed by

the wind to the southwestern portion of the Canal, near the lock station, where Mr. O'Dowd

testified that driftwood and other debris migrated during the storm.  O'Dowd Tr. 2227:10-12; FF

¶ 254.  Plaintiffs' attempted "tidal movement" theory had no evidence to support it at all.  See

above at 14-15.

Plaintiffs' theory not only requires the barge to have migrated from south to north against

the forces of nature, but then requires it to somehow avoid the utility pole barring its way to the

North Breach site and, once there, to impact the wall with enough velocity to drive the sheet pile

back two or three feet, but without carrying into the undamaged, newer, 1980 panel just a few

feet away, or into the neighborhood along with the in-rushing waters.  See above at 16.  Plaintiffs

have no data to support such acrobatics.  Marino Tr. 1353:6-16.

Plaintiffs' theory next requires the barge to back up and leave the North Breach area, and

then travel southward, moving away from the wall and then ultimately back toward the wall,

presumably under the influence of a freak 20-foot wave and/or winds of undetermined speed and

direction.  Pazos Tr. 894:17-895:2 ("I don't know the exact trajectory of the barge.  The only

thing I know, from all the documentation available, it's clear to me that a barge arrived there.");

Pazos Tr. 910:14-20 (on redirect, speculating as to what might have moved barge to south

breach).  Once at the South Breach, plaintiffs posit a totally implausible impact scenario under

which the barge is supposed to have struck the floodwall, come to a stop, and then picked up a

sufficient head of steam within the space of 100 to 200 feet to exert a "significant force" on the

concrete cap at the southern end of the breach.  Marino Tr. 1392:8-23, 1394:8-13; FF ¶¶ 381-

82.[34]  Plaintiffs' theory cannot accommodate or explain how the barge sustained no crushing damage from its impact, avoided getting ensnared in the torrent of water that entered the Lower Ninth Ward when the floodwall failed at the South Breach, "high jumped" over the school bus, and slowly came to rest atop the phone lines and settled up against the houses on Jourdan Avenue.  Cushing Tr. 2012:10-25; Bea Tr. 2619:24-2620:8; FF ¶¶ 371, 375-76, 378-79.

In contrast to LNA's evidence-based explanation of the barge's movements, plaintiffs' theory is a fantasy without any support at all.  No meteorological or hydrological data support plaintiffs' theory of how the barge supposedly moved in the IHNC.  Ultimately plaintiffs concede they have no rational explanation for "how the barge got from its berth to the wall," and thus they are forced to say that the barge's movements "hardly matter[]" because "the barge was there."  Pl. Br. 95.  But this assertion, based on nothing more than equivocal accounts from a pair of witnesses in the dark and rain, merely establishes that they have no plausible theory.

In sum, not only is there no basis to find in favor of the plaintiffs, but no rational factfinder could do so on this record.  The ING 4727 "did not play any role in causing the damage alleged."  *Otto Candies,* 1997 U.S. Dist. LEXIS, at *19.  Consequently, the barge is not a cause-in-fact of plaintiffs' flood-related damages and plaintiffs' theory of liability fails.  *Moser*, 623 F.2d at 1013; *Bach*, 920 F.2d at 322.

## II.   IT IS SCIENTIFICALLY IMPOSSIBLE FOR A BARGE IMPACT WITH THE CONCRETE CAP TO HAVE CAUSED THE FLOODWALL TO FAIL.

Even if the barge had been present at the floodwall when the failures occurred (which it was not), the barge could not have caused the floodwall to fail in the manner that the floodwall did.  To the contrary, any barge impact would have resulted in only localized damage to the

---

[34]  Dr. Marino's sudden acceleration theory has no more currency than the sudden deceleration theory rejected in *Geigy Chemical Corp. v. Allen*, 224 F.2d 110 (5th Cir. 1955), cited by plaintiffs (Pl. Br. 84), wherein the court said: "We cannot accept as true his estimate that he could stop his car making from forty to forty-five miles an hour within five feet, nor even within twenty-five feet."  *Id.* at 114.

concrete cap on the IHNC floodwall, without deflecting or dislodging the buried sheet pile as occurred at the site of both breaches.

### A.      Legal Standards.

Plaintiffs must show that it is "more likely than not that the conduct of [LNA] was a cause in fact of the result."  *Bach*, 920 F.2d at 327 (quoting W. Page Keeton, Prosser and Keeton on Torts, 263, 269 (5th ed. 1984)).  One question that arises, therefore, is whether a barge impact *could have* caused the wall to fail in the manner that it did.  Absent such a showing, plaintiffs' claims must fail.  *E.g., Little v. Liquid Air Corp.*, 37 F.3d 1069, 1077 (5th Cir. 1994) (en banc) (no causation where "evidence establishing a causal connection between the alleged defect … and the injury suffered is lacking").

### B.      Impact With the Concrete Cap Can At Most Cause Localized Damage to the Cap, Not Deflection of the Sheet Pile.

The IHNC floodwall was comprised of a twenty-foot-long steel sheet pile driven into the earth to a depth of approximately seventeen feet (equating to a level of minus-10 to minus-11 feet NAVD88), and capped by a six-foot concrete monolith.  See Cushing Report at 29-30 & Fig. 21 (DX 196); FF ¶¶ 258, 262.  The concrete monolith was comprised of two "pours," separated by a horizontal construction joint located about six inches above the top of the steel sheet pile.  Cushing Report at 29-30 & Fig. 21 (DX 196); FF ¶¶ 258, 278.  At trial, the witnesses referred to the upper section of concrete, rising three feet above the construction joint, as the "cap."  Bartlett Tr. 317:10-14; Cushing Tr. 2071:12-2072:12.

To hold back rising waters in the IHNC, the floodwall depended upon the embedded steel sheet pile and its anchoring soils for stability.  Bakeer Report at 20-21 (DX 205); FF ¶¶ 260, 261.  The concrete cap did not provide stability for the floodwall, but rather was intended to provide aesthetic appeal, to protect against rust, and to add some height to the wall.  Bakeer Tr. 2294:2-

2296:11; FF ¶ 263.  The construction joint between the two pours of concrete was a point of weakness on the wall.  Bartlett Tr. 337:17-25; Cushing Tr. 2073:1-8; FF ¶ 268.

Dr. Cushing performed calculations that showed that a barge impact with the concrete cap, if it occurred, would cause localized damage to the concrete cap but would ***not*** deflect or disturb the sheet pile or the soil in which it was buried.  Cushing Report at 158-63 (DX 196); Cushing Tr. 2076:21-25; FF ¶ 268.  As Dr. Cushing explained, impacting the concrete cap is like pushing a book on top of a table – the book moves, but the table does not.  Cushing Tr. 2078:23-2079:4; FF ¶ 270.  Dr. Mosher affirmed this explanation, opining that a barge might "punch[] through" but would not "caus[e] collapse" of a floodwall.  Mosher Dep. 267:4-9 (DX 283).  Plaintiffs' expert Mr. Bartlett also agreed that the effect of a barge impact would be limited to localized damage to the concrete cap, but not to the sheet pile underneath.  Bartlett Tr. 359:17-361:14; see FF ¶ 269.

Physical and photographic evidence from other barge impacts with floodwalls, both during Hurricane Katrina and other hurricanes as well, confirms that a barge impact with the concrete cap of a floodwall causes localized damage to the concrete cap but does not disturb the underlying sheet pile.  *E.g.*, Cushing Tr. 2086:8-2087:18 (discussing pictures of barge impacts); Mosher Dep. 91:21-92:3 (barge impacts caused only local damage) (DX 283); Bakeer Tr. 2296:21-2297:10 (same); see FF ¶¶ 285-87.  Indeed the localized shearing damage that was evident at the southern end of the South Breach, where the barge made contact with the wall as it passed through, demonstrates that a barge impact does ***not*** affect the underlying sheet pile, which is where the failure occurred.  Cushing Report at 88-92 (DX 196); FF ¶ 288.

Though plaintiffs' experts attributed the failure of the wall to deflection of the steel sheet pile, allegedly by the barge (*e.g.*, Pazos Tr. 822:16-823:1; see FF ¶ 312), they ignored the issue

of whether a barge impact was even capable of deflecting the sheet pile in the manner they claim it did, rather than merely causing local damage to the concrete cap.  Instead, plaintiffs' experts uniformly admitted that they had done no calculations to support their opinions.  Marino Tr. 1386:13-20; FF ¶¶ 271, 272.  Indeed, when Dr. Marino attempted to present an impact scenario, he was forced to admit that his model lacked the "mathematics or physics or whatever else is necessary to determine that it's real."  Marino Tr. 1341:16-1342:24, 1422:15-22; see FF ¶ 331.

Plaintiffs' expert analysis confirmed, however, that if the barge had been present when the breaches occurred, then the impact with the floodwall would have been at or above the level of the construction joint, or at least the top of the steel sheet pile.  At the North Breach, Dr. Marino opined that the water level was approximately 11.2 feet NAVD-88 when the breach occurred, placing the bottom of the barge "just below the construction joint" but above top of the steel sheet pile (which is over six inches below the construction joint).  Marino Tr. 1326:11-1327:15, 1329:20-22; see FF ¶¶ 277, 278.[35]  At the South Breach, Dr. Marino opined that the water level was approximately 11.8 feet NAVD-88 when the breach occurred, placing the barge above the level of the construction joint, and Mr. Bartlett expressly affirmed that "the bottom of the barge was at or above the level of the construction joint" when it passed over the rebar at the southern end of the breach.  Marino Tr.1374:9-11; Bartlett Tr. 357:15-24; see FF ¶¶ 280-83.

In sum, even if plaintiffs' impact scenario were accepted as true, the barge still could not have caused the floodwall breaches because the supposed impact would have created only limited, localized damage to the concrete cap, not deflection or failure of the sheet pile.  As plaintiffs' expert Mr. Bartlett conceded:  ***The force could not be transferred down to the sheet pile to cause the sheet pile to be disturbed***."  Bartlett Tr. 364:15-19 (emphasis added); see FF

---

[35]  Dr. Cushing showed that, when proper adjustments are made for the wall height and the curvature of the barge bottom, the level of the supposed impact would be above the construction joint.  Cushing Tr. 2080:13-2082:13.

¶ 284.  The situation here is directly analogous to a toxic exposure case in which proof of causation fails because the claimed exposure cannot have caused the physical symptoms alleged by the plaintiff.  *E.g., In re Ingram Towing Co.*, No. 93-3311, 1995 U.S. Dist. LEXIS 15034, at *2 (E.D. La. Oct. 4, 1995) (Duval, J.) (finding no causation because it was "impossible for any person to have become ill due to the oil spill from drinking tap water in the days following the accident"); *Molden v. Ga. Gulf Corp.*, 465 F. Supp. 2d 606, 613 (M.D. La. 2006) (finding no causation where "the level of exposure was not sufficiently high to give rise to the physical injuries complained of by Plaintiffs").  The supposed barge impact here was simply not capable of causing the floodwall failures at issue in this case.

## III.   THE BARGE WAS NOT A SUBSTANTIAL CAUSATIVE FACTOR BECAUSE THE BREACHES OCCURRED DUE TO LOSS OF STABILITY AND SEEPAGE / HYDRAULIC PRESSURE, WITHOUT ANY PARTICIPATION BY THE BARGE.

The previous two sections showed why the barge could not possibly have caused the breaches, without reference to what actually caused the breaches to occur.  This section shows that the actual causes of the breaches involved geotechnical factors – principally loss of stability and hydraulic seepage and pressure – and not the barge.  This section also shows that the expert evidence regarding these geotechnical issues was uniformly in favor of LNA, as the analysis of Dr. Marino for the plaintiffs was shown to be flawed and unreliable, while the analysis of Drs. Bea and Bakeer for LNA was validated by multiple independent sources.  For these reasons, in addition to those set forth above, the barge was not a "substantial factor" in causing the breaches.

### A.   Legal Standards.

For plaintiffs to prevail on their negligence claims, LNA's "actions must be the cause in fact of [their] injuries."  *Moser*, 623 F.2d at 1013; *Bach,* 920 F.2d at 327 (plaintiffs must show it is "more likely than not that the conduct of [defendant] was a cause in fact of the result")

(quoting W. Page Keeton, Prosser and Keeton on Torts 263, 269 (5th ed. 1984)).  Plaintiffs cannot prevail merely by showing that it was *possible* that the ING 4727 caused the floodwall failures.  *Fournier*, 665 F. Supp. at 486 (the "possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the Court to direct a verdict for the defendant").

In applying maritime law, this Court utilizes the causation standards set forth in the Restatement (Second) of Torts (1965) (the "Restatement").  See, *e.g.*, *Bach,* 920 F.2d at 327; *Chavez v. Noble Drilling Corp.*, 567 F.2d 287, 289 (5th Cir. 1978); *Gavagan v. United States,* 955 F.2d 1016, 1020 (5th Cir. 1992).  The Restatement requires plaintiffs to show that LNA's conduct was a "substantial factor in bringing about the harm."  Restatement § 431.

In most cases, the Restatement  "substantial factor" standard calls for a "but-for" test for causation – *i.e.*, an actor's negligent conduct is not a "substantial factor" in causing harm if the harm "would have been sustained even if the actor had not been negligent."  Restatement § 432(1); *Moser*, 623 F.2d at 1012-13 ("An act or an omission is not regarded as a cause of an event if the particular event would have occurred without it."); 1 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 5.3 at 189-90 (4th ed. 2004) ([A] "defendant's act cannot be a 'substantial factor' if the plaintiff's harm would have occurred without it.").  Under this formulation, the barge cannot be considered the cause-in-fact of the IHNC floodwall failures if the evidence shows that the floodwall failed for reasons having nothing to do with a barge.  See, *e.g.*, *Moser*, 623 F.2d at 1013 ("A failure to fence a hole in the ice plays no part in causing the death of runaway horses which could not have been halted if the fence had been there.").

The Restatement "substantial factor" standard employs a modified test for a narrow class of situations involving "concurrent causation" by two or more independently-sufficient causes.

36

Under Restatement § 432(2), "if two forces are actively operating, one because of the actor's negligence, the other not because of any misconduct on his part, and ***each of itself is sufficient to bring about harm to another***, the actor's negligence may be found to be a substantial factor in bringing it about."  Restatement § 432(2) (emphasis added).  An action is "sufficient" to cause a harm only if, when acting alone, the action would have caused the harm.[36]  Thus, to the extent that plaintiffs contend that the barge is a "concurrent" cause of the breaches in combination with some other cause(s), the applicable "substantial factor" test requires them to show that the barge impact was "of itself … sufficient" to cause the breaches in the absence of the other cause(s).[37]

Plaintiffs' brief utterly misstates the governing legal standards.  First, plaintiffs wrongly contend that the barge "need only increase the risk of harm" (Pl. Br. 34), even though the Fifth Circuit ruled out such a holding in *Bach*, finding that an increased risk of harm was ***not*** sufficient because the plaintiff had "no more than a fifteen percent chance of surviving" even if the defendant had not been negligent.  *Bach*, 920 F.2d at 327; see below n.38.  Second, plaintiffs ignore the requirements of Restatement § 432, and instead pretend that the Court may simply invoke the "considerations" in Restatement § 433 to determine causation.  Pl. Br. 34-35.  As the Restatement comments and governing case law make clear, the "considerations" in section 433 establish ***limitations*** on liability that come into play only ***after*** the plaintiff has shown either but-for causation (§ 432(1)) or concurrent causation through the "of itself … sufficient" standard

---

[36]  See *June v. Union Carbide Corp.*, 577 F.3d 1234, 1243-44 (10th Cir. 2009) (The term "sufficient" in the Restatement requires the plaintiff to "show that the conduct … ***would*** in fact have caused the injury."); *In re Hanford Nuclear Reservation Litig.*, 534 F.3d 986, 1010-11 (9th Cir. 2008) (dismissing personal injury claims lacking proof that radiation exposure "alone would have been sufficient to cause the injury"); *Clement v. United States*, 980 F.2d 48, 54 (1st Cir. 1992) (relying on Restatement's "sufficient" requirement to dismiss claim that hospital caused suicide); *RSL Communications PLC v. Bildirici*, 649 F. Supp. 2d 184, 219-20 (S.D.N.Y. 2009) (finding alleged losses caused by declining market conditions, not directors' failure to hold meetings).

[37]  To the extent plaintiffs may argue that Louisiana law is relevant to the "substantial factor' analysis (Pl. Br. 34), the result is the same, as Louisiana also requires each actor's conduct to be independently "sufficient" to cause the harm.  *LeJeune v. Allstate Ins. Co.*, 365 So.2d 471, 477 (La. 1978) ("If two causes concur to bring about an event, and either one of them, operating alone, would have been sufficient to cause the identical result, some other test is needed [than but-for causation]."); *Graves v. Page,* 703 So.2d 566, 570 (La. 1997) (same).

(§ 432(2)).  See Restatement § 431 cmt. a (section 432 requirements are "necessary" but not

"sufficient" to establish liability); *Westchester Fire Ins. Co. v. Haspel-Kansas Inv. P'ship*, 342

F.3d 416, 421 (5th Cir. 2003) ("While a party's conduct does not have to be the sole cause of the

harm, it is a necessary antecedent essential to an assessment of liability."); *June*, 577 F.3d 1234,

1241 (10th Cir. 2009) ("Once conduct satisfies one of the alternative requirements in § 432(1)

and (2), … it must still qualify under § 433 if it is to be considered a substantial factor.").

Finally, although plaintiffs argue that a party is liable if its actions contributed only 1% to

causing harm, there is *no* liability for "negligible negligence," because such minimal causes do

not rise to the level of causes-in-fact.  *Chavez*, 567 F.2d at 289.[38]

As shown below, the breaches occurred for reasons wholly unrelated to the barge, and

thus the barge was not a substantial factor under any applicable Restatement standard.

**B.     The North Breach Was Caused by Loss of Stability and Hydraulic/Seepage
Pressures, Not the Barge.**

1.   Causes of the North Breach.

The North Breach, approximately 215 feet in length, occurred just south of the Florida

Avenue Bridge between 4:00 a.m. and 6:00 a.m. CDT on the morning of August 29.  Cushing

Report at 51, 103-04 (DX 196); FF ¶ 290.  The breach occurred at a transition point between a

section of floodwall built in 1980 with very deep sheet pile (over 30 feet) and a section built in

---

[38]  See Restatement § 433 cmts. a and d; *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 265 n.15 (1979) (defendant that committed a "small percentage of the total negligence" can "avoid liability on the ground of lack of causation"); *American River Transp. Co. v. Kavo Kaliakra SS*, 148 F.3d 446, 450 (5th Cir. 1998) (though a but-for cause, presence of barges was "not a substantial and material factor" in causing the damages); *Scott v. Hern*, 216 F.3d 897, 911 (10th Cir. 2000) (even if defendant's report was "sufficient" to support allegedly-wrongful commitment of plaintiff, "it was not a substantial factor in relation to the other facts set forth in the affidavit"); *Joshi v. Providence Health Sys.*, 149 P.3d 1164, 1169 (Ore. 2006) ("insignificant contribution" not actionable).  None of the cases plaintiffs cite for this proposition in fact found a defendant liable for all of a plaintiffs' damages based on 1% fault.  See *Latulas v. Montco Offshore, Inc.*, No. 03-3544, 2006 U.S. Dist. LEXIS 20066, at *16 (E.D. La. Mar. 29, 2006) (finding defendant not liable and *dismissing* claim; 1% statement mere dicta); *Foulk v. Donjon Marine Co.*, 963 F. Supp. 427, 432 (D.N.J. 1997) (same); *Kirksey v. P&O Ports Texas, Inc.*, 488 F. Supp. 2d 579, 591 (S.D. Tex. 2007) (finding defendants liable where each caused 45% of the injuries; 1% statement mere dicta).

1969 with much shallower sheet pile (around 20 feet).  Bakeer Slide RMB-021 (DX 356).  The shallow 1969 sheet pile segment ripped away from the deep segment at the site of a poor field weld and a rusted interlock, and the rising storm surge in the canal caused the section of 1969 sheet pile to be uprooted and twisted like a ribbon, giving the breached segment its distinctive "twisted" shape, while the 1980 sheet pile remained intact.  Bakeer Report Fig. 28 (DX 205).

The conditions at the site of the North Breach made it a particularly weak location.  As experts for **both sides** testified, the transition between two different lengths of sheet pile created the potential for torsion and tension, and thus a concentration of pressure, due to the greater capacity of the deeper sheet pile to resist the forces of water rising along the floodwall and the lesser capacity of the shallower sheet pile to resist those same forces.  Bakeer Tr. 2303:21-2309:9-25; Pazos Tr. 821:19-21 ("weak" due to "structural discontinuity"); FF ¶¶ 298-99.  This condition of weakness was exacerbated by the faulty weld and rusted interlock at the transition point, as shown by photographic evidence of the very poor condition of the floodwall section that failed.  Bakeer Slides RMB-023-27 (DX 356); Pazos Tr. 820:19-20 (weld "not proper"); FF ¶¶ 300-01.[39]  Moreover, because the ground surface at the levee toe was lower at the North Breach location than at other points along the floodwall, there was less soil support for the wall and hence less stability to resist the forces imposed by rising water in the canal.  Bakeer Slide RMB-029 (DX 356); FF ¶ 304.  Finally, the North Breach occurred in an area where there were sand-filled excavations, including a deep zone of very permeable sand and shell material in the immediate vicinity of the floodwall providing a ready conduit for underseepage and destabilizing

---

[39]  Mr. Pazos' testimony that there was a faulty weld at this location, on direct examination, negates plaintiffs' attempt to deny there was a faulty weld, or to challenge Dr. Bakeer's qualifications to identify it.  Pl. Br. 53. Likewise Mr. Pazos' identification of the sheet pile transition as a "weak" location, again on direct examination, Pazos Tr. 821:19-21, negates plaintiffs' attack on Dr. Bakeer (at 53) for identifying the transition as a weak location.

hydraulic pressure.  Bakeer Tr. 2349:19-2351:3; Bea Tr. 2659:22-2660:9; FF ¶ 305.[40]  Dr.

Marino admitted that permeable materials in the area of the floodwall represented a "concern"

and "not a condition you would want to have" because it would allow water to seep down and

undermine the wall.  Marino Tr. 1101:13-20, 1445:7-9, 1431:9-14; see FF ¶ 399.[41]

      As water rose in the canal, a "gap" or "tension crack" formed between the canal side soil

and the floodwall, dramatically increasing the hydrostatic pressure on the wall and allowing

water to penetrate more rapidly to the bottom of the sheet pile.  *E.g.,* Bakeer Tr. 2351:4-2352:25;

see FF ¶ 308 (citing Bakeer, Bea, Cushing, and Mosher testimony).  Based on full-scale field test

results, Dr. Bea showed that the tension crack would have formed when the water reached a level

of around 7 feet NAVD-88, or around 1:00 a.m. on August 29 according to the lockmaster's

hydrograph.  Bea Slides RB-042, 44-48 (tension crack formation), 38 (hydrograph) (DX 361);

FF ¶ 310.  The IPET Report and Mr. Pazos both emphasized the importance of the tension crack

to the formation of the breach.  IPET Report Vol. V at V-68 (gap caused "very significant

reduction" in factor of safety) (DX 145); Pazos Tr. 822:16-823:1, 830:2-9 (gapping creates

"underseepage and quicker failure").[42]  As the rising water pressed all the way to the bottom of

---

[40]  The evidence of permeable sandy materials in the vicinity of the floodwall included photographic evidence showing the sandy materials placed in the excavations (*e.g.,* DX 206, Fig. 36-C (Bea photos)), and Boring 81A data showing permeable materials at the floodwall (*e.g.,* DX 356, slide RB-038) (soil boring results)).

[41]  Incomprehensibly, plaintiffs attack Dr. Bakeer for analyzing the WGI boring data, while simultaneously congratulating Dr. Marino for having considered "all the data."  Pl. Br. 49-51.  Of course, Dr. Marino did not consider *all* the data, because he chose to disregard the results of Boring 81A, the boring located immediately adjacent to the North Breach.  See below at 51-52.  Equally astounding is plaintiffs' assertion that Dr. Bea "did not even consider Boring 81A."  Pl. Br. 47, 50.  To the contrary, as Dr. Bea testified and the Court specifically noted, Dr. Bea issued a supplemental report analyzing that boring and its significance.  Bea Tr. 2770:8-10, 2772:9-14; Bea Supplemental Report (DX 207).

[42]  Though plaintiffs concede the importance of "underseepage and gapping," Pl. Br. 43, they argue that there was insufficient time for a hydrostatic tension crack to form during Hurricane Katrina.  Pl. Br. 44; see Marino Tr. 1221:19-23.  However, experimental test data showed that tension cracks form quickly on floodwalls of similar construction under similar water loads.  *E.g.,* Bea Tr. 2726:14-2728:25; Bea Slides RB-044 to 048 (DX 361); see FF ¶¶ 309-13; Mosher Dep. 62:21-64:6, 102:8-12 ("a crack formed on the canal side of the wall" but "without any barge hitting it") (DX 283).  Moreover, the evidence showed that hydrostatic tension cracks formed throughout the New Orleans hurricane protection system during Katrina, including on unfailed sections of the floodwall at the

the sheet pile, hydraulic uplift pressures acted to destabilize the already-weak soil on the protected side of the floodwall.  Bea Tr. 2647:24-2650:8; Bea Report App. C, Fig. 72 (DX 206); FF ¶¶ 317-18.  Heightened hydraulic pressure and flow resulted in blowout and instability, together with a tear in the sheet pile connection between the 1980 sheet pile and the 1969 sheet pile, resulting in a factor of safety against failure of less than 1.0.  Bea Tr. 2677:25-2678:18; FF ¶ 319.  The separated sheet pile swung backward under the pressure of the water, flipping and twisting in the rushing water, as the rip gave way.  Bea Tr. 2679:10-2680:16; FF ¶ 320.[43]  Thus the North Breach formed for reasons that had nothing to do with a barge.

### 2. Evidence the barge played no role in causing the North Breach.

As shown in section I.B. above, it was impossible for the barge to have been present at the site of the North Breach because the prevailing wind was blowing in the wrong direction.  As also noted, the physical evidence – including the utility pole blocking the way to the breach – also rules out the presence of the barge at the breach site.[44]  In addition, the pristine condition of the unfailed 1980 wall panel immediately adjacent to the breach, just feet from where the sheet pile rip occurred, demonstrates that the barge did not strike the wall in that vicinity; otherwise, the momentum of the barge would have carried it into the unfailed panel, causing damage to the concrete on that panel.  Bakeer Slide RMB-023 (DX 356) (picture of unfailed panel immediately

---

IHNC.  *E..g.*, Bakeer Tr. 2357:12-2359:12 & Bakeer Slides RMB-047, 048 (DX 356).  Thus there was clearly sufficient time for tension cracks to form during Katrina, and Dr. Marino's testimony to the contrary is discredited.

[43] Though plaintiffs' experts opined that the barge caused the rip, none of them performed any calculations or other forensic engineering analyses to determine whether this sheet pile tear, which occurred at the precise location of a faulty weld and rusted interlock, must have been caused by the barge as opposed to hydrostatic pressure in the IHNC.  FF ¶¶ 302-03; Pazos Tr. 876:21-877:2; Marino Tr. 1355:22-1356:4.

[44] Cushing Tr. 2098:23-2099:20 (barge travels perpendicular to wind and therefore cannot arrive at breach without toppling pole; "it would have been coming sideways, and the barge is 200 feet long"); Pazos Tr. 881:21-25 (conceding "[t]here's no way the barge would have missed that phone pole"); see Marino Tr. 1366:10-1368:1 (unable to explain how barge could have missed pole).  Though Mr. Pazos speculated that the pole was not present during Katrina, and had been placed during post-storm repairs (Pazos Tr. 881:21-882:12), the pole appears in photographs taken before the storm (DX 345) and in photos taken immediately after the storm before any repair works had begun (DX 106, 263, 344).  See FF ¶¶ 324-26.

adjacent to rip in sheet pile); Marino Tr. 1238:13-17, 1351:17-20 (barge supposedly hit wall with sufficient momentum to drive it back "two or three feet"); FF ¶¶ 327, 333.  Moreover, the curved configuration of the sheet pile in the North Breach, including the "flipped" segment that broke away from the adjacent panel and twisted in the inrushing waters, is characteristic of hydrostatic forces, not impact forces.  Bakeer Tr. 2352:13-25, 2435:21-2436:7; FF ¶ 328.[45]  Finally, close inspection of the failed floodwall and the barge revealed *no* damage that could be tied to a barge impact with the wall at that location.  Bea Tr. 2683:13-21 (inspection of floodwall); Cushing Tr. 2036:16-2037:8, 2125:6 (inspection of barge); Mosher Dep. 130:15-131-4 (no sign of barge presence) (DX 283); FF ¶¶ 327, 330.[46]

**C.    The South Breach Was Caused by Loss of Stability and Hydraulic/Seepage Pressures, Not the Barge.**

1.   Causes of the South Breach.

The South Breach, approximately 800 feet in length, occurred closer to the Claiborne Avenue Bridge, approximately 3000 feet to the south of the LNA Terminal, at some point in the time frame of 6:30 a.m. to 7:30 a.m. on the morning of August 29.  Cushing Tr. 2051:18-19; Bea Tr. 2753:2-11; FF ¶ 291.  The breach occurred within the limits of a pre-existing curvature in the floodwall and in a section where there had been considerable settlement, indicating weak underlying soils.  Bakeer Slides RMB-059, 63 (DX 356).  The breach consisted of a large "bow" in its northern segment, where the breach initiated, and a second less-pronounced bow to the south.  Bakeer Slide RMB-081 (DX 356).  The breach formed at this location as a result of loss

---

[45]  A similar but smaller sheet pile rip was observed at another location where a transition-point breach occurred during Hurricane Katrina, demonstrating that such rips do result from hydrostatic pressure.  See Bea Slides RB-172, 173 (DX 361).  Thus, hydrostatic forces fully explain the appearance of the North Breach, including both the twisting of the sheet pile in the inrushing water and the sheet pile rip that allowed the twisting to occur.

[46]  Though plaintiffs' experts speculated that the barge might have caused scratches on the floodwall, pre-storm photographs showed the scratches were caused by mowing equipment.  Bea Tr. 2663:22-2665:5 & Bea Slide RB-043 (DX 361); see FF ¶ 329.

of stability on the protected side due to hydrostatic pressure, hydraulic uplift, and overtopping and scour.  Bakeer Tr. 2407:16-2410:8; Bea Tr. 2686:12-2687:21, 2692:24-2694:12.

The South Breach occurred at another weak location on the floodwall.  Deviations in the alignment of the floodwall at the precise limits of the breach, as reflected in both as-built drawings and pre-storm photographs, created points of discontinuity and stress under rising water.  Bakeer Tr. 2370:8-2371:21; Marino Tr. 1379:14-17; see Bakeer Report at 56 (DX 205); Marino Report Figs. 2.12, 2.13 (PX 397); FF ¶ 336.[47]  In addition, the Jourdan Canal on the protected side and an outflow canal on the IHNC side created weakened conditions in this area due to inferior fill materials, as shown in post-storm aerial photography.  Bakeer Tr. 2374:8-2376:17 & DX 354 (aerial photo marked by Dr. Bakeer, showing inferior fill materials).

Another important weakness in the area of the South Breach was poor soil conditions, as shown by the following evidence:

> \*   Excavations in the area of the South Breach were back-filled with sand and other permeable materials, and revealed the presence of pre-existing buried cypress swamp deposits, both of which created opportunities for seepage.  Bea Tr. 2644:8-2646:25; Bea Slides RB-026, 64, 65 (DX 361); see FF ¶ 338.[48]

---

[47]  Plaintiffs accept that curvatures existed within the precise limits of the breach, but attempt to downplay their significance by asserting, incorrectly, that there were other curvatures in unbreached sections of the wall.  Pl. Br. 63, 71.  Plaintiffs' argument, however, is based on a post-storm photograph showing a portion of the wall that sustained deformations **during the storm** as a result of rising storm surge.  Bakeer Slide RMB-078 (post-storm photograph) (DX 356); Bakeer Report, Fig. 76 (DX 205) (pre-storm photograph showing no deflections in that same area).

[48]  Plaintiffs contend that Dr. Bea did not have "any evidence" to support the existence of sand-filled excavations (Pl. Br. 57), but then admit that Dr. Bea's opinions are supported by "photographic documentation," which they then deem inadequate.  Pl. Br. 58-59.  But there is nothing wrong with relying on photographs depicting salient information, as this Court's opinion in *Robinson* makes clear.  Doc. 19415 at 88 ("These photographs depict all of the salient information adduced at trial.").  Here, Dr. Bea explained why the photographic evidence – including the "angle of repose" of the materials – clearly depicts sand fill rather than some other soil type.  Bea Tr. 2645:7-12.  Also, plaintiffs' assertion that Dr. Bea relied "solely on photographs" (Pl. Br. 59) is incorrect, given that Dr. Bea also reviewed extensive documentation concerning work performed on the East Bank Industrial Area, including (for instance) the detailed "Technical Completion Report" documenting that work.  Bea Report App. C at 31 (DX 206).

      \* Soil borings taken in the immediate vicinity of the floodwall near the initiation

point of the South Breach included "no recovery" samples, evidencing soil that was too

wet and mushy or too granular (and hence too weak) to remain in the sampler. Bakeer

Tr. 2384:5-2389:22 & DX 355 (location of Boring 25A); see FF ¶ 340-41.[49]

      \* Subsoil conditions in the area of the South Breach were so poor that, when the

floodwall was constructed in 1969, between five and six feet of extra fill had to be added

to bring the levee up to grade in that area to remedy the effects of settlement, reflecting

weak underlying soils. Bakeer Tr. 2376:22-2380:12; FF ¶ 343.

Subsidence within the area of the South Breach, resulting from the addition of fill and the weak

underlying soils, caused the top of the floodwall there to be lower than in the surrounding areas,

leading to earlier overtopping as the water rose along the wall. Bakeer Tr. 2380:13-2381:3;

Cushing Tr. 2109:12-2111:17; Team Louisiana Report at 126 (floodwall crest "could have been

a foot lower … in surviving adjacent sections") (DX 144); FF ¶¶ 343-47.[50] These weaknesses in

the South Breach area rendered the floodwall vulnerable to rising storm surge.

      The South Breach gave way first in the northern "bow shaped" section near North

Johnson Street. Bakeer Tr. 2368:10-14; Bea Tr. 2692:1-16. As noted, the wall top in the area of

---

[49] Similar "no recovery" zones were noted near the 17th Street Canal breach, indicating a correlation between weak soil areas and areas prone to breaching. Bakeer Tr. 2391:24-2393:17; FF ¶ 342. As noted above (n. 41), plaintiffs cannot legitimately complain about Dr. Bakeer's analysis of Boring 25A and other similar borings (see Pl. Br. 69), given Dr. Marino's reliance on those very same borings.

[50] At trial, the Court noted the confusion about the various datums and conversion factors and asked for clarity regarding the "empirical data" regarding wall height. Bakeer Tr. 2495:15-21. The simplest way for the Court to consider the issue is to use the NAVD-88 datum, and to start from the accepted data showing that the top of the floodwall at the time of Katrina – *in areas that were not subject to local settlement* – was somewhere between 12.5 feet and 12.9 feet NAVD-88. *E.g.*, Marino Tr. 1401:11-17; Bakeer Tr. 2203:8-22. The top of the wall was significantly lower in the area of the South Breach because, as Dr. Bakeer explained, local settlement was particularly severe within that area due to documented poor soils and the placement of six feet of additional fill when the 1969 wall was built. Bakeer Tr. 2380:13-2381:3; see Cushing Tr. 2111:12-17 (aerial surveys showed uneven wall top heights, reflecting uneven subsidence); Team Louisiana Report at 126 (wall top lower in breached area) (DX 144). Plaintiffs' brief ignores the evidence of local settlement and obfuscates the issue by applying unintelligible conversions to conclude that Dr. Bakeer's analysis suggests "that the floodwalls actually grew between 1969 and 2005" (Pl. Br. 65), when Dr. Bakeer testified to the opposite effect.

the South Breach was lower than surrounding segments, allowing for earlier overtopping and scour at that location.  Bakeer Tr. 2397:9-25; Cushing Tr. 2110:18-24; FF ¶¶ 344-48.[51]  By approximately 6:00 a.m., or even earlier according to eyewitness accounts, water was pouring over the floodwall and creating a deep scour trench on the protected side of the wall.  Team Louisiana Report at 66 (overtopping at 6:00 a.m.) (DX 144); Bea Tr. 2688:18-2690:18 & Bea Slides RB-069, 71 (overtopping between 6:00 a.m. and 7:00 a.m.) (DX 361); FF ¶¶ 346-57.[52]

A tension crack formed, increasing the hydrostatic pressure on the floodwall, and at the same time hydraulic pressures communicated to the protected side through the saturated marsh layer beneath the sheet pile, thereby reducing the effectiveness of the protected side soil resistance.  Bakeer Tr. 2397:8-2401:3, 2407:16-2409:16 (demonstration with physical model); Bea Tr. 2617:20-2618:4, 3688:12-16 (lateral instability accompanied by hydraulic uplift, exacerbated by overtopping erosion); Cushing Report at 60 (DX 196); Bakeer Report at 3, 54-59 (DX 205); Bea Report at 21-22 (DX 206); FF ¶¶ 358-60.[53]  In this connection, the shallow penetration of the sheet pile in the 1969 floodwall was a primary culprit, as it did not penetrate

---

[51]  Dr. Marino failed to come to grips with the lower wall top height in the area of the breach.  He testified that the top of the floodwall in the breached area was at 12.9 feet NAVD-88, based on a survey of unbreached portions of the floodwall by LNA's experts.  Marino Tr. 1401:11-22.  But Dr. Marino conceded that the survey did not (and could not have) measured the floodwall height in the area that failed (Marino Tr. 1407:9-14), and admitted that he had not studied or analyzed the likelihood, as found by Team Louisiana, that the floodwall top was considerably lower in the breached area as a result of settlement over time.  Marino Tr. 1408:1-14.

[52]  No fewer than six eyewitnesses testified to overtopping and/or very high water levels on the wall at early times on Sunday or Monday morning, well before the flooding began.  For instance, Terry Adams testified that water was "hitting everywhere coming over" and "that's why it was coming in the neighborhood" at a time when "the levee was intact."  Adams Tr. 260:14-20; see also Murph Tr. 688:9-693:23 (water "about to the top of the wall" well before flooding began); see also FF ¶¶ 350-53 (summarizing deposition testimony from Ernest Edwards, Andrew Sartin, D'Antionette Johnson, and Michael Bickham).  Contrary to plaintiffs' argument (Pl. Br. 70), Dr. Bakeer never said that the breach developed before overtopping; rather, he said that the "first bubble in the first bolt" [mistranscribed from bow] developed "later than 7:00" and that "overtopping was a contributing factor."  Bakeer Tr. 2488:15-2489:1.  Plaintiffs' argument misconstrues Dr. Bakeer's testimony, including that plaintiffs' counsel interrupted Dr. Bakeer's answer about when the breach developed by asking a question about overtopping.  *Id.*

[53]  Plaintiffs incorrectly assert that hydraulic pressures were absent at the IHNC because such pressures, if present, should have resulted in "sand boils."  Pl. Br. 62-63 (citing Bea testimony).  This argument rests on a blatant mischaracterization of Dr. Bea's testimony.  In fact, Dr. Bea testified that "sand boils" result from "piping," not hydraulic pressure.  Indeed, Dr. Bea characterized hydraulic pressure as "the second important effect" and specifically said these are "two different effects."  Bea Tr. 2647:3-23 (emphasis added).

adequately to cut off the marsh layer.  See Bakeer Tr. 2423:17-2424:12 ("you should have cut off th[e] marsh strata"); Bea Tr. 2620:18-2624:3 (shallow penetration left "window open for water transmission and hydraulic conduction effects" in the marsh layer); FF ¶¶ 261-62.

Under the forces of hydrostatic pressure and overtopping, the sheet pile wall formed a bulge pushing back into the neighborhood, which then gave way and translated approximately 180 feet inland, pulling the sheet pile out and forming a distinctive "bow" shape in the northern segment of the breach, located in an area very close to one of the sand-filled EBIA excavations. Bakeer Tr. 2399:16-2401:3; Cushing Tr. 2100:23-2101:22; Cushing Report at 72-73, 112-14 (DX 196); Bea Report App. C at 8, Fig. 6 (DX 206); FF ¶ 363.  The failure of the northern "bow" was accompanied by a tremendous rush of water that knocked homes off of their foundations for several blocks behind the breach.  Cushing Tr. 2102:23-2102:9.  The smaller southern segment of the South Breach appears to have been in a state of incipient failure and had become only partially dislodged when the northern segment failed first, pulling the southern segment out but displacing it only slightly by comparison.  Bakeer Tr. 2399:16-2401:3; Bakeer Report at 57 (DX 205).  After the hurricane, there was a deep scour trench centered in the breached area reflecting severe overtopping erosion in that particular area.  Bakeer Tr. 2402:5-21; Cushing Tr. 2108:25-2109:16; FF ¶ 348.[54]  Thus the South Breach formed for reasons that had nothing to do with a barge impact.

### 2. Evidence the barge played no role in causing the South Breach.

As explained in section I.B. above, the meteorological evidence proves that the barge cannot have arrived at the site of the South Breach until after the breach had already occurred.

---

[54]  Dr. Cushing personally inspected the failed floodwall after Katrina and confirmed that the scour trench grew deeper and wider as one approached the breached area and then within the breached section itself, reflecting the increased severity of the scour in that area due to the lower wall top height there.  Cushing Tr. 2109:6-2111:17. Plaintiffs ignore this testimony and pretend (Pl. Br. 67) that the wider scour trench approaching the breached area, as shown in a photograph, is due to perspective rather than what Dr. Cushing reported having seen with his own eyes.

Physical evidence at the floodwall, on the barge, and in the Lower Ninth Ward confirms that the barge cannot have been present when the South Breach occurred, and only arrived after the South Breach had fully formed and the neighborhood was already flooded.

First, there is no evidence of impact damage on the floodwall within the large northern "bow"-shaped segment where the breach initiated.  Instead, the floodwall damage in the large bow displayed similar characteristics to damage patterns in breaches along the west side of the IHNC where no barge was present, including unfolding of the sheet pile under hydrostatic pressure and vertical cracking due to torsion.  Cushing Tr. 2103:1-2105:11; Cushing Slides CC-072, 73 (DX 349); see FF ¶ 367.  The curved shape of the bowed segment reflects uniform hydrostatic pressure rather than a pointed impact, as Dr. Bakeer demonstrated using a physical model of the corrugated sheet pile.  Bakeer Tr. 2435:1-2437:15; FF ¶ 368.  In contrast to the damage at the far southern end of the South Breach, where the bent rebar and shearing of the concrete cap indicated the barge had come into contact with the floodwall, there was absolutely no evidence of a barge impact within the limits of the northern bow-shaped section or even the more gentle bow to the south.  Cushing Tr. 2125:3-6; Mosher Dep. 271:9-13 (IPET found no physical evidence of barge impact except at extreme southern end) (DX 283); FF ¶¶ 369-70.[55]

Moreover, there was no damage on the barge consistent with an impact at the location of the bow-shaped segments of the South Breach.  Dr. Cushing's inspection of the barge revealed no crushing or other damage of the type that would have been observed if the barge had

---

[55] Plaintiffs' experts contradicted each other in speculating as to the cause of certain floodwall damage.  For instance, while Mr. Pazos suggested the barge had scraped away two inches from the inside of the floodwall in the breached area (Pazos Tr. 835:20-836:5), Dr. Marino denied this was so, saying instead that the water had "stretched the panels and caused the concrete to crack off" (Marino Tr. 1387:25, 1388:12).  See FF ¶ 372.  Citing Mr. Bartlett, plaintiffs argue (Pl. Br. 39) that the southern end shows "localized failure caused by impact" made "while the wall was still standing up."  But Mr. Bartlett only considered the two panels where the barge passed through, not the area where the breach initiated, well to the north.  Bartlett Tr. 339:3-15, 356:4-20.  Those two panels had failed and were leaning below the water but not flat when the barge arrived.  Cushing Tr. 2114:23-2116:22; see FF ¶¶ 272, 370.

impacted the wall at that location.  Cushing Tr. 2108:1-17; Cushing Report at 87, 173 (DX 196).

To the contrary, the only damage observed on the barge was a series of scratch marks on the

bottom, which clearly evidenced contact with the bent rebar at the southern end of the breach,

but nowhere else.  Cushing Tr. 2116:23-2117:9; FF ¶ 371.

Further, ample physical evidence also showed that the barge did not arrive on the scene

until after the neighborhood was already flooded.  Had the barge been present at the inception of

the breach, it would have carried deep into the neighborhood with the inrushing floodwaters, but

that did not occur.  Cushing Tr. 2102:10-25; FF ¶¶ 373-74.  The horizontal angle of the bent

rebar and the absence of grounding damage on the barge also reflect that the water level was

high when the barge passed into the neighborhood.  Cushing Tr. 2123:25-2124:16; FF ¶ 375.

Photographic evidence showed that the barge floated over the top of a small school bus to arrive

at its resting place, establishing that the water must have been higher than the top of the school

bus when the barge entered the neighborhood.  Bea Tr. 2684:21-2686:7 & DX 360 (identifying

school bus next to barge before floodwaters receded); FF ¶ 376.  That the barge landed on top of

telephone wires similarly reflects high water levels in the neighborhood at the time of entry.

Cushing Tr. 2127:12-2128:3; FF ¶ 379.  Based on this and other evidence, Dr. Bea and Dr.

Cushing established that the most likely time for the barge's entry into the neighborhood was

between 9:30 a.m. and 10:00 a.m., when the wind and current would have permitted it to be

present and the water level would be high enough to account for the physical evidence observed

after the storm.  Bea Tr. 2695:9-2696:2; Cushing Tr. 2092:16-2094:2; FF ¶¶ 377, 380.

Finally, physical evidence from other breach sites establishes that similar mechanisms

produced similar breach features without participation by a barge.  At the Bayou Bienvenue

south breach, sheet pile was exhumed in a manner similar to what was observed at the IHNC, but

the exhumed sheet pile remained under water.  Bea Tr. 2793:12-23.  Hydrostatically-induced

failures produced similar "bow"- or "fan"-shaped features at other failures on the west bank of

the IHNC and elsewhere.  Bakeer Tr. 2430:7-2431:19 & Bakeer Slides RMB-095, 98 (DX 356);

FF ¶ 389.  Shallow and inadequate tip penetration, tension cracks between the floodwall and the

canal-side soil, and failures at the weakest locations along the floodwall were other common

features observed at the IHNC and at other breaches that occurred without participation by a

barge.  Bea Tr. 2667:5-15, 2680:1-2681:6, 2692:6-9, Bakeer Tr. 2302:5-2303:14, 2425:22-

2426:23; see Mosher Dep. 74:25-75:16 (physical evidence at Citrus Back levee breach is "pretty

similar to" evidence at IHNC) (DX 283); FF ¶ 386-88, 390-91.

      In short, the physical evidence from the IHNC and other breach locations both rules out

participation by the barge and establishes breach causation by hydrostatic forces.

      **D.**    **The Validated Geotechnical Analyses By Dr. Bea and Dr. Bakeer Must Be Credited Over the Flawed Approach of Dr. Marino.**

      At trial, the parties offered geotechnical testimony from their respective experts – Dr.

Marino for the plaintiffs, and Drs. Bea and Bakeer for LNA.  As shown in this section, Dr.

Marino's analysis was replete with flaws that rendered his approach entirely unreliable, while the

conclusions of Drs. Bea and Bakeer were validated by numerous sources and proven reliable.

      1.  Credentials and experience of experts.

      As an initial matter, Drs. Bea and Bakeer possess far superior qualifications and

experience compared to Dr. Marino, and their analyses bear indicia of reliability absent from Dr.

Marino's work.  For instance, both Dr. Bea and Dr. Bakeer have years of experience studying the

New Orleans region's floodwalls and levee structures, unrelated to any work performed in

connection with this litigation.  Both Dr. Bea and Dr. Bakeer have taught and published

extensively in peer-reviewed journals concerning levee and floodwall safety.[56]

Dr. Bea was a co-leader of the Independent Levee Investigation Team ("ILIT")

sponsored by the National Science Foundation, and he co-authored the preliminary and final

ILIT reports.  Bea Tr. 2586:22-2587:25; Bea Report at 5 ¶ 4(c) (DX 206).  He has spent over

10,000 unpaid hours studying and reporting on the failures of the hurricane protection system in

New Orleans during Hurricane Katrina, including thirty-five visits to New Orleans to study the

hurricane protection system.  Bea Tr. 2587:10-13, 2610:2-6; Bea Report at 4 ¶ 4 (DX 206).  The

Court accepted and relied on Dr. Bea's testimony to support its findings of fact and conclusions

of law in *Robinson*.  Doc. 19415 at 45-46 (Bea testimony "credible" and "accept[ed] as fact").

Dr. Bakeer is an emeritus professor of civil engineering at Tulane University and serves

as chief engineer of Ardaman and Associates, where he oversees his firm's numerous levee and

floodwall projects in Louisiana, such as the recent project involving construction of the Bayou

Bienvenue replacement gate and deflection monitoring within the massive primary floodwall in

the GIWW.  Bakeer Tr. 2281:2-2284:22 & Bakeer Slide RMB-04 (DX 356)); Bakeer Report

App. C at 54-72 (listing work done for Army Corps and others) (DX 205).

By contrast, Dr. Marino has never published any articles or taught any courses about the

design or the failure of hurricane protection levees or floodwalls (Marino Tr. 1308:7-12), and has

never designed or evaluated the safety of a levee or floodwall in Louisiana, or anywhere for the

Corps of Engineers (Marino Tr. 1307:16-1308:2).[57]  Moreover, Dr. Marino's work on the IHNC

---

[56]  Bea Tr. 2588:1-23 (many refereed conference papers, journal papers and technical reports on Katrina breaches);
Bakeer Tr. 2278:2-2279:17, 2284:23-2286:4 (service on Tulane faculty and LSU Levee School; publications).

[57]  In contrast to LNA's experts, Dr. Marino did not visit the failed floodwall for forensic purposes, and did not
inspect the barge, the failed sheet pile, or any other failed floodwalls.  Marino 2009 Dep. 126:3-14 (DX 221); see
*Fairley v. Clarke*, No. 02-2219, 2004 WL 877102 at *5 (E.D. La., April 22, 2004) (Duval, J.) (excluding expert
analysis, noting that expert did not examine the vehicle or the skid marks).

floodwall failures was carried out purely for litigation and does not grow out of any independent

work he has done regarding the New Orleans hurricane protection system.   Marino Tr. 1309:23-

1310:1.[58]  And Dr. Marino's work on this case has never been subject to any sort of independent

oversight or review.  Marino Tr. 1312:7-1313:1.

These factors all favor LNA's experts and severely undercut the force of Dr. Marino's

testimony.  See *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593-94 (1993) (asking

whether opinion "has been subjected to peer review and publication"); Comments to Rule 702

(expert testimony growing out of work conducted "independent of the litigation" more reliable

than work developed specifically for litigation).

2.  Deficiencies in Marino approach and results.

Turning to the merits of the experts' opinions, the evidence at trial revealed pervasive

deficiencies in Dr. Marino's opinions so severe that his work cannot be considered reliable

within the meaning of Rule 702, notwithstanding the Court's previous determination to permit

him to testify at trial.[59]  Those deficiencies include the following:

*a.  Soil characterization*:  Dr. Marino mischaracterized the soil profile at the North

Breach by substituting a deep lobe of high-strength and low-permeability soil instead of the

sandy and permeable soils shown to be present by the actual soil boring results, without any data

---

[58]  Dr. Bea, by contrast, arrived at his conclusions independent of the litigation, having determined that the barge did not cause the IHNC floodwall breaches as a co-leader of ILIT before he was ever retained as an expert by LNA (2009) or the MRGO plaintiffs (2007).  Bea Tr. 2596:18-2598:12, 2616:9-14; Bea Report at 8-13 ¶¶ 17-23 (ILIT published in 2006) (DX 206); *id.* at 15-22 ¶¶ 27-29 (peer-reviewed journal articles published in 2007 and 2008); see Bea Tr. 2594:21-2597:7 (Dr. Bea originally considered barge to be a potential cause, but concluded otherwise when evidence showed barge was not involved).

[59]  In a bench trial, a court may admit expert testimony and subsequently exclude it because the court does not find the testimony to meet the standard for reliability or relevance under *Daubert*.  *In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006) ("where the factfinder and the gatekeeper are the same, the court does not err in admitting the evidence subject to the ability later to exclude it or disregard it if it turns out not to meet the standard of reliability established by Rule 702"); *Lyondell Chem. Co. v. Albemarle Corp.*, Nos. 1:01-CV-890, 1:02-CV-003, 1:03-CV-225, 2007 WL 5517247 at *2 (S.D. Tex. June 8, 2007) (due to the "greater flexibility" in a bench trial, "the trial court retains the power to exclude or disregard testimony that fails to conform to the standards of Rule 702, even where the expert's testimony was not initially excluded").

to support the substitution.  Bakeer Tr. 2438:2-11 & Marino Report Fig. 5.12 (PX 397); FF

¶ 398.  In particular, Boring 81A revealed the presence of permeable sand and shell, well below

the sheet pile tip, at the precise location where the North Breach initiated.  Marino Tr. 1101:13-

20, 1440:13-1441:23; Bea Slide RB-117 (DX 361); FF ¶¶ 399-400.[60]  Dr. Marino chose to ignore

this data and substitute a different soil profile by speculating, first, that Boring 81A must have

been "moved" to a different (undisclosed) location because the original location listed in the

boring log was supposedly in a "ravine" and thus inaccessible to a drilling rig.  Marino Tr.

1102:22-1103:16, 1437:1-22; Pl. Br. 51.  Photographic evidence from before Katrina showed,

however, that the location of Boring 81A, immediately adjacent to the floodwall, was relatively

flat and easily accessible to a drilling rig.  DX 358 (photograph); Bea Tr. 2637:1-2639:9 ("no

ravine").[61]  Dr. Marino then compounded this error by assuming that a deep layer of

impermeable fill had been placed at the floodwall at some unknown point in the past, based

solely on a 1969 document saying such work was contemplated in the future, and without *any*

documentation that the work was actually performed, or boring data showing that such soils were

actually placed at the location he assumed they existed.  Marino Tr. 1442:24-1443:5, 1447:1-5;

FF ¶ 405.[62]  In short, Dr. Marino's conclusions are based on an imaginary soil profile.

---

[60]  *E.g.,* Marino Tr. 1431:9-14 (shell and silty sand creates a dangerous condition); Team Louisiana Report at 202 (pervious materials enhance failure) (DX 144); FF ¶ 399.

[61]  Moreover, Dr. Bakeer testified, based on many years of experience in the field, that soil boring equipment is designed to drill on a slope and thus would have been able to access the site even if a "ravine" had been present. Bakeer Tr. 2340:14-2342:3; FF ¶ 403.  Dr. Bakeer also made clear that Dr. Marino had no basis to ignore the Boring 81A data based on a document using the phrase "location adjusted," because that phrase, when used in a boring log, means moving a couple of feet in either direction, and never to an entirely different, undocumented location as Dr. Marino suggested.  Bakeer Tr. 2337:20-2340:17; FF ¶ 402.  According to plaintiffs' theory (Pl. Br. 51), the boring log does not reflect the location where the boring was taken, rendering the boring data useless to characterize the soils at any location, constituting a "serious violation" of proper soil surveying practice.  Bakeer Tr. 2339:17-23.

[62]  Dr. Bea, who has extensively reviewed documentation concerning work performed in the East Bank Industrial Area, testified that he has seen no evidence or documentation that levee soils were placed in the area where Dr. Marino speculated they had been placed.  Bea Tr. 2729:4-2730:2.

b. *Use of averaged soil strength values.*  Dr. Marino's soil strength analysis employed an averaging technique whereby results of disparate types of soil tests, from different locations, were simply averaged together to produce values that he then used to characterize the entire soil layer.  Marino Tr. 1125:1-13, 1450:2-20; FF ¶ 406.  In so doing, Dr. Marino obscured the importance of "weak links" in the system, particularly given that the weakest samples were less than half as strong as the derived average values employed in his analysis.  Marino Tr. 1448:8-10, 1452:14-20; see Bea Tr. 2782:15-22 (subsoils "highly variable"); FF ¶¶ 408-09.  Dr. Marino's averaging technique contravened proper geotechnical practice, which calls for a "normalized soil properties" methodology called SHANSEP that has been validated by experimental data, including test data that shows Dr. Marino's averaging technique overpredicts soil strengths by over forty percent.  Bea Tr. 2718:19-2722:23 & Bea Slide RB-129 (DX 361); Bakeer Tr. 2442:22-2443:21; Mosher Dep. 161:12-163:6 (SHANSEP is "standard practice" among experts in the field) (DX 283); FF ¶ 410.  For these and other reasons, Dr. Marino's soil strength values for the marsh layer – the "most controlling stratum" according to Dr. Bakeer – were 33% higher than what the data suggests, as found by IPET and other independent studies.  Bakeer Tr. 2485:7, 2486:1-25.  In short, Dr. Marino's averaging technique overestimated soil strength values and obscured the importance of weak soil areas that drove the failures.

c. *Failure to consider cone penetrometer data.*  Dr. Marino testified that in assigning strength values, he disregarded the results of cone penetrometer testing by the Army Corps of Engineers and by ILIT because he is "not really a proponent of using this testing method for strength assessment."  Marino Tr. 1451:14-1452:4.  As Dr. Bakeer testified, a cone penetrometer test (or "CPT") uses a cone-shaped measuring device to push down into the soils and measure resistance, providing "a good measure of the actual strength" in the soil profile.  Bakeer Tr.

2445:6-2446:20; see Bea Tr. 2606:9-12 (CPT used worldwide for forty years, provides "extremely important information"). The IPET and ILIT geotechnical teams, working independently, each relied heavily on cone penetrometer testing data to characterize the soils at the IHNC. Bea Tr. 2605:3-2616:16 (ILIT undertook soil testing including CPT) ; Mosher Dep. 80:8-81:21 (IPET: "we felt that CPT data was better" than boring data) (DX 283). Dr. Marino's decision to ignore the CPT data, alone among all researchers, contributed to his artificially high soil strength values and caused his results to differ from the independent studies and from Drs. Bea and Bakeer. Bakeer Tr. 2446:21-2447:19 ("ignoring the CPT contributed to very higher strengths"); Bea Tr. 2605:3-2606:6 ("dramatic mistake" to disregard this data); FF ¶¶ 411-13.

d. *Failure to consider hydraulic uplift.* In carrying out his "process of elimination" to infer causation by the barge (Marino Tr. 1424:11-14), Dr. Marino did not consider potential hydraulic uplift pressures communicated directly through the saturated marsh layer. Instead, he admitted that his seepage analysis considered only whether there was "enough time to develop the uplift pressures" as a result of the "rate of seepage." Marino Tr. 1209:19-1210:2, 1465:25-1466:4. Thus, he conceded, he did not evaluate possible immediate communication of hydraulic pressures because he assumed there was "nothing to evaluate" as canal water had not "reached that [protected] side yet." Marino Tr. 1470:7-20. Dr. Bea showed, however, that hydraulic pressure was immediately communicated from the canal side through already-saturated soils to the protected side of the wall, without the need for water to physically migrate from the canal side to the protected side. Bea Tr. 2647:24-2653:19 (also showing validation of his analysis); FF ¶¶ 316-18. Dr. Marino's failure to even consider this important mechanism fatally undermines his analysis. See *Michaels v. Avitech, Inc.*, 202 F.3d 746, 753-54 (5th Cir. 2000) (expert analysis "lack[ed] probative value" due to failure to consider potential causes of air crash).

*e. Incorrect permeability values.*  Without proper support, Dr. Marino assigned permeability values that were far too low.  Within the most important sections of the marsh layer, for instance, Dr. Marino used a permeability value that amounted to "the permeability of a brick."  Bea Tr. 2731:17-2734:11.[63]  Dr. Bea, by contrast, used a range of permeability values to test his results, and found that significant hydraulic pressures developed "for this entire range of hydraulic conductivity."[64]  Moreover, regarding horizontal permeability, Dr. Marino used an arbitrary factor of 2.5 to adjust from vertical to horizontal permeability, while Dr. Bea used a factor of 10 based on test data.  Bea Tr. 2737:2-11 (factor of 10 based on test data); Marino Tr. 1184:21-1186:19 (factor of 2.5, based on assumptions).  In contrast to Dr. Marino's arbitrary assumptions, Dr. Bea's permeability values were supported by field experience in the Lower Ninth Ward, by actual sampling of marsh layer soils, and by field test pressure data taken within the marsh layer over an extended period of time.  Bea Tr. 2738:24-2740:4 (instant communication of pressure during cone penetrometer drilling); Bea Tr. 2740:5-2741:8 (actual marsh layer soil); Bea Tr. 2742:15-2745:1 & Bea Slide RB-123 (data evidencing immediate communication of pressure at 17th Street Canal in same soil layer) (DX 361); FF ¶¶ 416-17.[65]

*f. Lack of validation.*  Dr. Marino did not validate his results and methods by testing whether they would produce accurate results when applied to other breaches like the 17th Street

---

[63]  Though plaintiffs argue that Dr. Marino used a range of permeability values in the marsh layer (Pl. Br. 61), he used the lowest permeability values ($10^{-7}$ and $10^{-8}$) to characterize the largest and most important portions of the marsh layer.  Marino Report Table 5.1 and Figs. 5.42, 5.58, and 5.59 (PX 397).  Not only Dr. Bea, but also IPET, used higher permeability values than Dr. Marino employed.  Thus Dr. Bea's characterization of Dr. Marino's "impermeable marsh" layer is apt – he in fact assigned the critical portions the permeability of a brick.  See Marino Tr. 1135:2-3 (The Court: "Never heard of an impermeable marsh, but go ahead").

[64]  Bea Report, App. C at 52-53 (DX 206).  Plaintiffs mischaracterize Dr. Bea's report to suggest that he continued to rely on the same high permeability values ($10^{-2}$) set forth in the original ILIT Report.  Pl. Br. 61.  To the contrary, Dr. Bea testified without challenge or objection that "for our analysis, the primary results were done for 10-to-the-minus-4 to 10-to-the-minus-5."  Bea Tr. 2732:23-2733:6.

[65]  In sharp contrast to Dr. Bea,  Dr. Marino had no field experience in the Lower Ninth Ward and made no direct observations concerning the soils and their permeability.  Marino 2009 Dep. 126:3-14 (DX 221).

Canal or London Avenue breaches.  Marino Tr. 1473:8-17.  By contrast, Dr. Bea validated his results and methods by showing that, when applied to other breaches for which photographic and video evidence exists of the timing of the breach (or that no breach occurred), Dr. Bea's models accurately predicted both the timing of the breaches on the breached walls and that the non-breached walls would remain intact.  Bea Tr. 2702:10-2709:22 (17th Street Canal); Bea Tr. 2709:23-2711:8 (London Avenue Canal); see Bea Tr. 2711:9-2714:13 (validation of Bea model by field test data from various Corps of Engineers levee and floodwall field tests); FF ¶ 418.[66]

The errors and flaws in Dr. Marino's analysis are so pervasive that they render his entire approach unreliable.[67]  Moreover, because Dr. Marino expressly testified that he used the same analytical methods to arrive at his conclusions about the North Breach and the South Breach (Marino Tr. 1262:9-24, 1377:3-5), rejection of his analysis as to one breach requires rejection of his analysis as to the other:  There can be no "splitting the difference" based on the trial record.

3.  Confirmation of Bea/Bakeer approach and results by independent studies.

In demonstrating the flaws in Dr. Marino's analysis, the previous section also showed that the work of Dr. Bea and Dr. Bakeer exhibited none of the flaws identified in Dr. Marino's analysis.  That is, Drs. Bea and Bakeer (a) did not invent soil layers out of nothing; (b) relied on proper soil strength analysis rather than an inappropriate averaging methodology; (c) incorporated cone penetrometer data into their analysis rather than ignoring it; (d) considered hydraulic uplift phenomena; (e) used appropriate permeability values consistent with the observed data; and (f) provided evidence of validation lacking in Dr. Marino's work.

---

[66] Dr. Bakeer based his analysis on validated models developed by the Army Corps of Engineers in its Hurricane and Storm Damage Risk Reduction System ("HSDRRS").  Bakeer Tr. 2297:21-2300:6, 2423:17-2424:3.

[67] Dr. Marino's analysis and conclusions contained many other important errors, including, by way of example: (a) his assumption that a tension crack would not have time to form during Katrina (see above at 40 n.42); (b) his failure to consider varying wall top height and early overtopping within breached segments (see above at 45 n.51); and (c) his implausible impact scenarios which were contrary to the physical evidence (see above at 30-31).

The various independent studies firmly support the opinions of Dr. Bea and Dr. Bakeer. In the words of plaintiffs' expert Mr. Spinks, these studies were performed to "provide credible and objective scientific and engineering answers to fundamental questions about the performance of the hurricane protection and flood damage reduction system." Spinks Report at 11 (PX 421). As such, these studies constitute a particularly important body of evidence for the Court to evaluate the approaches of the experts in this case.

a. *IPET*. The Interagency Performance Evaluation Team ("IPET") was established by the U.S. Army Corps of Engineers with a team of over 350 scientists to perform "an unbiased assessment of what, from a scientific and engineering standpoint, took place in New Orleans during Hurricane Katrina." Mosher Dep. 24:25-25:6, 34:10-39:15 (DX 283); see FF ¶ 430. IPET concluded that the North Breach occurred prior to overtopping due to the formation of a tension crack on the floodwall and diminished soil support at the levee toe, and the South Breach resulted from overtopping and erosion. IPET Report Vol. V at V-68 (DX 145).[68]  IPET examined the barge as a potential cause, but "rejected that conclusion." Mosher Dep. 77:25-78:12 (DX 283); see FF ¶ 436. IPET's conclusions were reinforced by the external review process, including independent review from the National Research Council and an external review panel from the American Society of Civil Engineers (ASCE). Mosher Dep. 88:11-89:24 (DX 283).

b. *ILIT*. The Independent Levee Investigation Team ("ILIT") was established by an independent team of researchers led by scientists from the University of California at Berkeley, supported by the National Science Foundation, to study the causes of the failures and make recommendations on how to prevent a recurrence. ILIT Report at xix, xxvi to xxix (DX 141); FF

---

[68]  See also Mosher Dep. 55:6-21, 56:25-57:16 (North Breach caused by tension crack leading to instability, aided by lower surface elevation on protected side), 68:12-17 (South Breach caused by overtopping and erosion on the protected side) (DX 283); see FF ¶ 435.

¶ 431.  ILIT's initial report attributed the IHNC floodwall failures to underseepage and hydraulic uplift.  ILIT Report at 6-10, 6-11, 6-17 (DX 141); see Bea Tr. 2607:18-2608:17.  Later work by this team, published in ASCE conference papers, showed multiple competing modes of failure including overtopping and underseepage-induced instability.  Bea Tr. 2610:7-2615:19; Bea Report at 16-17 (DX 206).[69]  ILIT concluded that the barge "was not the cause of the breach and failure," but rather was "drawn in through a breach that was already well developed."  ILIT Report at 6-7 (DX 141); see Bea Report at 13 (DX 206); Bea Tr. 2597:10-2598:12; FF ¶ 438.[70]

c. *Team Louisiana*.  The Team Louisiana Investigation was established by the State of Louisiana to study the performance of the hurricane protection system and why it failed.  Team Louisiana Report at 3-4 (DX 144).  Team Louisiana consisted of engineers, including four geotechnical experts, with centuries of experience among them.  Kemp Tr. 2979:7-8, 2985:13-21.  Team Louisiana concluded that the primary causes of the breaches were overtopping and underseepage, and that the barge merely "clipped the end of the already formed breach as it was sucked through."  Team Louisiana Report at 67 (DX 144); Kemp Tr. 2982:11-13, 2986:1-15, 2987:25-2989:16 (reasons for conclusion that barge did not cause breaches); see FF ¶ 439.

Investigative reports issued by the American Society of Civil Engineers, National Academy of Engineering, National Research Council, and National Institute of Standards and Technology likewise found that the breaches occurred for reasons other than a barge.  Bea Tr. 2748:18-2749:3.  Although the various independent investigative teams attributed different

---

[69]  Plaintiffs pretend that the ILIT research ended with the publication of the "ILIT Report" in 2006.  See Pl. Br. 48, 55-56 (attacking seepage analysis in 2006 report).  As Dr. Bea testified, however, members of the ILIT team continued their research after publication of the 2006 report, taking into account various critiques that had been made, refining their analyses, and ultimately publishing their results in several peer-reviewed journal articles.  Bea Tr. 2610:7-2615:19 & Bea Slide RB-013 (DX 361).

[70]  Plaintiffs mischaracterize the ILIT Report as having made "findings that ING Barge 4727 played a role in the North and/or South Breaches."  Pl. Br. 73.  That is *not* what ILIT found, as the above-cited portions of the ILIT Report make clear.  Nor did ILIT's initial report in November 2005 make such findings.  Instead, as Dr. Bea expressly testified, the November 2005 report concluded the barge was "not a cause."  Bea Tr. 2596:18-2597:2.

degrees of significance to the various causes of the floodwall failures, they were united in that "none of them concluded that the barge caused the breach[es]."  Marino Tr. 1477:19-1478:2; Bakeer Tr. 2447:4-14; Bea Tr. 2608:21-23, 2748:15-2749:24.[71]

## IV. EVEN IF PLAINTIFFS' EXPERTS WERE CREDITED, THE BARGE WAS NOT A SUBSTANTIAL FACTOR BECAUSE THE BREACHES WOULD HAVE HAPPENED WITHOUT ITS PARTICIPATION.

For the reasons presented in the preceding sections, there is absolutely no basis for the Court to find that the barge participated in the creation of the North Breach or the South Breach of the IHNC floodwall.  This section demonstrates that plaintiffs cannot establish causation-in-fact as a matter of law, even in the unlikely event that the Court were to conclude the barge was present (even though it could not have been, see section I), that it impacted the wall in a way that could have caused the sheet pile to deflect (even though it could not have done so, see section II), and that such impact played a role in the failure (even though the failures occurred for other reasons, see section III).  To the contrary, even accepting plaintiffs' expert evidence across the board, notwithstanding its many defects, the barge was not a cause-in-fact of the breaches.

To begin, the barge was not a "but for" cause of the breaches.  Indeed, the evidence established that the floodwalls would have failed even if the barge had remained tied up at the dock because the floodwalls were not strong enough to withstand Katrina's storm surge and overtopping.  In particular, IPET, ILIT, Team Louisiana and LNA's experts showed that the floodwalls were not designed for overtopping, were not strong enough to survive Katrina's maximum storm surge, and would have failed under Katrina's conditions regardless of any

---

[71]  Plaintiffs' reference to points of disagreement between IPET and an intermediate version of the ILIT team's work (Pl. Br. 56) is unavailing.  It is irrelevant that the teams did not see eye to eye in assigning levels of importance to the various factors that undermined the stability of the floodwall.  What matters is that they all found that the barge was not one of those factors.  See *Fournier*, 665 F. Supp. at 487 ("A review of the facts herein indicate that there are *several* plausible explanations for the current debilitated state of the plaintiff.  While the court will not engage in speculation as to exactly which explanation it feels is the most plausible, the Court does not view the helicopter incident as having been such.").

involvement by the barge.  *E.g.,* Bakeer Tr. 2410:8- 2423:19, 2413:9-2415:5, 2420:15-2421:14;

Mosher Dep. 68:7-11 (IPET concluded "conditions in the Inner Harbor Navigation Canal were

sufficient to cause the wall to fail without involvement by a barge") (DX 283); FF ¶¶ 419-24.[72]

Dr. Marino, by contrast, did not study whether the walls were strong enough to withstand

Katrina's maximum surge.  Instead, Dr. Marino evaluated the stability of the floodwall only to a

level of 12.5 feet NAVD-88, and did not assess whether the floodwall was stable to resist the

peak surge of 14.2 feet or the overtopping that such a surge would have caused.  Marino Tr.

1474:8-10.  Therefore, Dr. Marino admitted that plaintiffs have not proved that the wall was

sufficiently stable to survive the storm, even if the Court were to fully accept his analysis.

Marino Tr. 1475:11-16 (agreeing with this proposition and noting he did not "evaluate[] it to the

peak of the surge").[73]

Because the undisputed evidence shows that the floodwall would have failed regardless

of the barge, the barge was not a "but-for" cause of the breaches.  *Moser*, 623 F.2d at 1012-13

("An act or an omission is not regarded as a cause of an event if the particular event would have

occurred without it.").  An on-point comment in the Restatement provides that a party's

negligent construction of a dam is not a cause-in-fact of the failure of the dam where "[t]he flood

caused by the cloudburst is so great that it would have burst the dam even if it had been properly

constructed."  Restatement § 432(1), comment b, illustration 2.  In short, if the structure would

have failed under the environmental forces imposed on it (there, a cloudburst; here, Katrina),

---

[72]  In fact, the evidence established that the floodwall was insufficient to withstand a storm surge of less than the maximum level during Katrina.  See Section III above.

[73]  Dr. Marino also skipped important steps in evaluating the strength and stability of the floodwall, and thus failed to show that the wall would have been expected to withstand the storm surge levels present earlier on the morning of August 29, when the breaches occurred.  For instance, Dr. Marino neglected to use a local stability analysis such as CWALSHT to check tip penetration.  Bakeer Tr. 2416:9-14.  Moreover, Dr. Marino used only the Spencer's method to evaluate global stability, even though the Corps uses both Spencer's and Method of Planes, and even though Spencer's is overpredictive of safety.  Bakeer Tr. 2416:15- 2417:13.

then there is no causation-in-fact, even if there was negligence at the inception (there, faulty construction; here, alleged improper mooring).  The Fifth Circuit has endorsed this approach on multiple occasions.  See, *e.g.*, *Westchester Fire Ins. Co.*, 342 F.3d at 421 (failure to provide security did not cause shooting where it was "very likely that the incident would have occurred despite any additional security"); *Inter-Cities Nav. Corp. v. United States*, 608 F.2d 1079, 1081-83 (5th Cir. 1979) (dislocation of buoy did not cause collision where pilot was not relying on buoy for navigation; accident would have occurred if buoy had been properly located).[74]

Nor can the barge be deemed a "substantial factor" under the modified test that applies in "concurrent causation" cases.  That test requires that each concurrent cause be shown to be "of itself … sufficient" to cause the damage, in the absence of the other concurring causes.  Restatement § 432(2); *LeJeune v. Allstate Ins. Co.*, 365 So.2d 471, 477 (La. 1978); see above at 36-37.   Here, plaintiffs have produced ***no evidence*** that a barge impact with the floodwall would have been "sufficient" to produce a floodwall failure in the absence of Katrina's storm surge, assuming such an impact were even possible.  Thus, the barge cannot be considered a "concurrent cause" of the floodwall failures.  In short, even if the Court accepted their expert evidence in full (despite the myriad reasons why it should be rejected), plaintiffs would still fail both prongs of the "substantial factor" test.  Under no circumstances can the barge be deemed to have caused either of the breaches.

---

[74]  Louisiana courts have applied this analysis to hold that causation-in-fact is lacking where a natural event would have produced the same damage even if the defendant had not acted negligently.  *Rector v. Hartford Acc. & Indem. Ins. Co.*, 120 So.2d 511, 514 (La. Ct. App. 1st Cir. 1960) ("If the Act of God is of such overwhelming and destructive character as by its own force, and independently of the particular negligence alleged or shown, to produce the injury, there is no liability."); *Gabler v. Regent Devel. Corp.*, 470 So.2d 149, 152-53, 162 (La. Ct. App. 5th Cir. 1985) (applying this rule and finding no liability because flooding from "100-year storm" would have occurred even if street and homes had been built to recommended minimum height).

**V.      PLAINTIFFS' RELIANCE ON THE PENNSYLVANIA RULE TO SUPPORT
          THEIR POSITION ON FLOODWALL BREACH CAUSATION IS MISPLACED.**

Plaintiffs mistakenly argue that, under the Pennsylvania Rule, LNA has the burden of
proving that the ING 4727 did not cause the floodwall breaches.  As we now show, the
Pennsylvania Rule does not relieve plaintiffs of their burden of proving that the ING 4727
caused the floodwall breaches.  We also show that, even if the rule did apply and LNA did have
such a burden, LNA has more than amply satisfied that burden.

**A.      The Pennsylvania Rule Does Not Apply.**

The Pennsylvania Rule provides that when an injury results from a maritime collision (or
other maritime incident), and one of the parties to the collision had violated a statutory provision
designed to avoid collisions, then that party bears the burden of proving that the statutory
violation did not cause the collision.  *The Pennsylvania*, 86 U.S. 125 (1874).  The Rule does not
apply here for three reasons.  First, the Pennsylvania Rule does not apply unless and until the
plaintiffs first establish that their injuries resulted from a maritime collision, *i.e.,* here, that the
flooding resulted from an allision between the ING 4727 and the floodwall.[75]  The Pennsylvania
Rule cannot be invoked for that threshold issue, as plaintiffs improperly seek to do.  Second,
plaintiffs have not established that LNA violated any statute or regulation.  Third, LNA has come
forth with other evidence of causation more than sufficient to pierce any presumption.

1.      <u>The Pennsylvania Rule does not relieve plaintiffs of the burden of proving that the
        ING 4727 caused the floodwall breaches.</u>

Plaintiffs fundamentally misapprehend the limited nature of the Pennsylvania Rule.  As
we now show, the Rule only operates *after* the plaintiffs have established that their injuries

---

[75] *The Pennsylvania* involved two ships that collided in a dense fog.  The evidence established that the smaller,
slower boat did not comply with a statute requiring a foghorn, and instead rang a quieter bell.  *Id.*  The Court
explained that the burden of proving causation of the accident should be shifted to the party that violated the statute
because, in collisions at sea, it is otherwise difficult to prove causation.  In *The Pennsylvania*, neither party denied
that the two vessels had collided.

resulted from a maritime collision (as well as that the defendant violated the law).  It does not create a presumption that an injury-causing collision occurred.  As such, plaintiffs cannot invoke the Rule to evade their burden of proving that their injuries resulted from a maritime collision, *i.e.*, that the floodwall breaches resulted from an allision with the ING 4727.

In *Gosnell v. United States*, 262 F.2d 559, 563-64 (4th Cir. 1959), a statutory violation led to the breakup of the defendant's vessel eight days before the sinking of the plaintiff's vessel, but it was disputed whether the defendant's vessel had caused the sinking of plaintiff's vessel, that is, whether the sinking was the result of a collision or something else.  The Fourth Circuit held that the Pennsylvania Rule did not apply to that issue.  The court observed that, in *The Pennsylvania*, the "damage resulted from a ***known*** collision between a ***known*** steamer and a ***known*** schooner."  262 F.2d at 563 (emphasis added).  "The rule, thus stated [in *The Pennsylvania*], was not there invoked to establish either the 'physical cause' or the identity of one of two colliding objects, as here sought, but simply placed the burden upon the schooner to show that its statutory violation could not have been the cause, or one of the causes, of the collision between the known ships."  *Id.*  As such, the Pennsylvania Rule cannot "begin to operate [until] after" the plaintiff proves "(1) the physical cause of his injuries and (2) fault on the part of the person sought to be held responsible."  *Id.* at 563-64.

Citing *Gosnell*, the Third Circuit reached the same conclusion in *In re Nautilus Motor Tanker Co.*, 85 F.3d 105, 114-15 (3d Cir. 1996).  In that case, the plaintiff claimed that its boat had been damaged by colliding with improperly dredged material for which the defendant was responsible, but the defendant denied that such a collision had caused the plaintiff's damages.  The Third Circuit held that the Pennsylvania Rule did not apply, because the plaintiff must first establish that "the physical cause of the [plaintiff's] harm" was a collision involving the

defendant.  *Id*.  The court emphasized that, unless the plaintiff first proved that its injury resulted

from a collision with the defendant's vessel or other property, application of the Pennsylvania

Rule would be highly unfair:  "a contrary rule ... would result in a presumption of liability

following any statutory violation no matter how remote or inconsequential such a violation may

have been to the subsequent accident."  *Id*. at 115.

Other cases have applied the same principle.  See, *e.g., Candies Towing Co. v. M/V B&C
Eserman*, 673 F.3d 91, 95 (5th Cir. 1982) (adopting district court finding that "Plaintiffs failed to

show that any of the [statutory violations] above, either individually or collectively, were *in any

way* connected to the sinking of the barge."); *Board of Commissioners v. Tug O.H. Ingram*, 578

F.2d 289, 297 (5th Cir. 1978) (Pennsylvania Rule did not apply due to lack of connection

between fault and casualty).[76]

By contrast, in cases where the Pennsylvania Rule has been applied, it was undisputed

that the plaintiff's injury resulted from a collision or other maritime incident involving the

defendant's vessel or other property.  See, *e.g.*, *Tokio Marine & Fire Ins. Co. v. Flora MV*, 235

F.3d 963, 966 (5th Cir. 2001); *Pennzoil Producing Co. v. Offshore Express, Inc.*, 943 F.2d 1465,

1471 (5th Cir. 1991) (because Rule applies "at the time of a collision," court refused to apply

Rule where violation occurred two days earlier for a brief time and was otherwise unrelated to

incident); *Florida Marine Transporters, Inc. v. Sanford*, 225 Fed. App'x 885, 888 (5th Cir. 2007)

(same).

---

[76]  See also *Poulis-Minot v. Smith*, 388 F.3d 354 (1st Cir. 2004).  In *Poulis-Minot*, the plaintiff could not apply the
Rule to a vessel's violation of a regulation mandating certain safety equipment because "no one knows precisely
what happened to the Vessel," including whether it sank at all.  *Id*. at 356.  "[W]e do not know what happened, and
to rely on pure speculation to conjure a scenario in which the *Pennsylvania* burden-shifting rule should be applied
would be a departure from the limited and cautious manner in which the courts, with good reason, have traditionally
invoked this powerful rule."  *Id*. at 365; see also *Willis v. Amerada Hess Corp*., 379 F.3d 32, 42-43 (2d Cir. 2004)
(declining to apply the Rule because plaintiff made no showing that vessel's actions were related to his cancer).

In sum, the Pennsylvania Rule does not relieve plaintiffs of their burden of establishing that their injuries resulted from a maritime allision, *i.e.,* of showing that the ING 4727 allided with, and caused the breaches in, the IHNC floodwalls.  To the contrary, the Rule could come into effect, if at all, only *after* plaintiffs had satisfied their burden of establishing that point (as well as that LNA violated a statutory rule meant to avoid such allisions).  For this reason, plaintiffs' reliance on the Pennsylvania Rule is fundamentally misplaced as a threshold matter.[77]

       2.    <u>Plaintiffs also have not shown that LNA violated a statute or regulation</u>.

The Pennsylvania Rule also does not apply because plaintiffs have not met their burden of establishing that LNA violated a statute or regulation meant to avoid a collision.  Plaintiffs claim that LNA violated two different Coast Guard regulations:  33 C.F.R. §§ 162.75(b)(3)(ii) and 6.19-1.  The former, however, only applies to mooring against the bank in the river channel, not against a dock; and even if that were not the case, the ING 4727 did not violate the mooring requirements of that provision.  The latter provision, likewise, imposed no requirements on LNA. See FF ¶¶ 57-62; 74-77; CL ¶ 7.

       *a.  33 C.F.R. § 162.75(b)(3)(ii).*  Section 162.75(b)(3)(ii) reads as follows:

> When tied up individually, all vessels and tows shall be moored by bow and stern lines.  Tows shall be secured at sufficiently frequent intervals to insure their not being drawn away from the bank by winds, currents, or the suction of passing vessels. Lines shall be shortened so that the various barges in a tow will be as close together as possible.

Plaintiffs' reliance on this provision fails for multiple separate reasons.

---

[77] For example, and by way of contrast, because it is acknowledged that the ING 4727 did allide with the south end of the South Breach *after* the South Breach and North Breach had already occurred, the owner of the concrete cap might be in a position to invoke the Pennsylvania Rule in a suit for localized damage to the cap, if it proved that LNA violated a safety statute or regulation and that the violation proximately caused the allision with the cap.  That is the only way in which the Pennsylvania Rule could even potentially apply in the circumstances present here. Because plaintiffs concede that the contact between the barge and the concrete cap at the south end of the South Breach occurred *after* the breaches had already formed (*e.g.*, Marino Tr. 1270:8-10), however, the plaintiffs are not in a position to invoke the Pennsylvania Rule on that basis.

*First*, as a threshold matter, it is clear from context that this provision applies only when a vessel or tow is moored against a bank in a river channel, and thus did not apply to the ING 4727, which was moored at a dock in a turning basin.  Section 162.75(b), of which this is a part, is captioned "Waterways" and starts with the basic principle in subsection 162.75(b)(1) that "[a] clear channel shall at all times be left open to permit free and unobstructed navigation by all types of vessels and tows ...."  This makes clear that the purpose of all of Section 162.75(b) is to address requirements for keeping the river channel clear.  Subsection 162.75(b)(3), which is captioned "Anchoring or mooring," then begins with Paragraph 3(i), which provides:

> Vessels or tows shall not anchor or moor *in any of the land cuts or other narrow parts of the waterway*, except in an emergency, or with permission of the District Commander.  Whenever it becomes necessary for a vessel or tow to stop in any such portions of the waterway, it shall be securely fastened to *one bank* and as close to *the bank* as possible.  This shall be done only at such a place and under such conditions as  will not obstruct or prevent the passage of other vessels or tows.  Stoppages shall be only for such periods as may be necessary.

(Emphasis added.)  This provision thus addresses only mooring to the "bank" in "narrow parts" of the river channel.  Paragraph 3(ii) – the provision on which plaintiffs rely – then goes on to specify how the vessel or tow is supposed to be moored *under those circumstances* – that is, when the vessel or tow is being moored *to the bank in a narrow part of the waterway*.  This is clear not only from the seamless flow from Paragraph 3(i) to Paragraph 3(ii), but also because Paragraph 3(ii) expressly says that the tow shall be moored to avoid "being drawn away from *the bank*" (emphasis added), which is plainly a reference to the same river "bank" referenced in Paragraph 3(i).  This is also clear from the other paragraphs of Subsection 162.75(b)(3), which reconfirm that the entire subsection is limited to "moor[ing] to the bank" (Paragraph 3(iv)) and to stoppages in a "narrow portion of a waterway" (Paragraph 3(v)).

66

In sum, by its plain terms and context, the provision on which plaintiffs rely applies only to mooring to the river bank in a land cut or other narrow part of the river channel. As such, it simply did not apply to the ING 4727, which was moored at a dock in a protected turning basin. Plaintiffs' reliance on Section 162.75(b)(3)(ii) fails for this threshold reason.

*Second*, even if Section 162.75(b)(3)(ii) had applied, the ING 4727 was moored in compliance with its terms. The first sentence of Section 162.75(b)(3)(ii) says that when tied up individually, vessels or tows shall be moored by bow and stern lines. Here, the ING 4727 indisputably was moored by bow and stern lines, as well as a third line. FF ¶¶ 38, 40-42; Green Report (PX 386) at 11. Plaintiffs assert (at 25) that LNA did not moor the barge "with *parted* bow and stern lines." On its face, however, the regulation did not require "parted" lines.

Plaintiffs also argue that the barge did not comply with the second sentence of Section 162.75(b)(3)(ii), which provides that "[t]ows shall be secured at sufficiently frequent intervals to insure their not being drawn away from the bank by winds, currents, or the suction of passing vessels." To begin with, however, the ING 4727 was not a "tow," either by itself or as tied up to the ING 4745 at the LNA dock. Extensive caselaw makes clear that a "tow" is a combination of a towing vessel and a series of barges secured together in a configuration to transit from one point to another.[78] Coast Guard regulations also make plain that a barge that is part of a "tow" is one that is being pushed, pulled, or hauled alongside by a towing vessel. 46 C.F.R. § 27.101.

---

[78] See, *e.g., Stevens v. The White City*, 285 U.S. 195, 200 (1932) ("The supplying of power by a vessel, usually one propelled by steam, to tow or draw another is towage. Many vessels, such as barges . . . are built with a view to receiving their propelling force from other sources."); *Diamond Offshore Co. v. A&B Builders, Inc.*, 302 F.3d 531, 536 (5th Cir. 2002) (towing is the movement of a vessel from one place to another); *Agrico Chem. Co. v. M/V Ben W. Martin*, 664 F.2d 85, 90 (5th Cir. 1981) (movement of a barge constitutes towage); *United States v. Massachusetts*, 493 F.3d 1, 14 (1st Cir. 2007) (defining a tow vessel as one that is "pushing, pulling, or hauling") (internal quotations omitted); *River Terminals Corp. v. Southwestern Sugar & Molasses Co.*, 274 F.2d 36, 37-38 (5th Cir. 1960) ("at the time she was *taken in tow* by R.T.C.'s tug Dottie D to proceed across open water to Texas City, Texas") (emphasis added); *United States v. St. Louis & M.V. Transp. Co.*, 184 U.S. 247, 253 (1902) ("There is a clear and well-defined custom at New Orleans respecting the course and practice of tows to land. Descending tows come close to the shore on the city side of the river. If they did not pursue this course descending tows would come down in the current so far out that the motive power could not back the tow to land.").

Every witness asked at trial agreed that the barge was not a tow.  Ryan Tr. 2901:1-17; Green Tr. 560:15-16; CL ¶ 7(b).  Instead, the ING 4727 was tied up individually to the ING 4745.

Moreover, even if the second sentence had applied – which it did not, both because the whole Paragraph only applies to docking in the river channel and because the ING 4727 was not a "tow" – the ING 4727's mooring would not have violated its terms.  It is clear that the second sentence of Section 162.75(b)(3)(ii) is not meant to impose a greater mooring requirement than the bow and stern line requirement of the first sentence.  The first sentence states that a vessel or tow tied up individually must be secured by two lines, and the second sentence then provides *lesser* – and certainly no greater – requirement when multiple vessels are tied together in a tow.  Because the ING 4727 was secured by at least three lines, including bow and stern lines (Thigpen Tr. 165:16-20; FF ¶¶ 40-43, 58-60; PFF ¶¶ 45-47), its mooring would have satisfied the second sentence even if that sentence had applied.

In this regard, plaintiffs' argument (at 22) that the ING 4727 violated § 162.75(b)(3)(ii) simply because it broke free of its mooring is mistaken.  Even where the provision applies (which is not here, as shown above), Section 162.75(b)(3)(ii) plainly only requires that the vessel or tow be moored in compliance with its terms:  if that is done, then the fact that the vessel nevertheless breaks away (and thus is no longer moored) does not constitute a violation of the provision.  Put otherwise, this provision cannot be construed to create a harsh strict liability scheme not present elsewhere in maritime law.

Finally, the Pennsylvania Rule cannot apply to the last two sentences of Section 162.75(b)(3)(ii) for the additional reason that those sentences are subjective and do not imply a "clear legal duty."  *Tokio Marine*, 235 F.3d at 966.  In *Tokio Marine*, the Fifth Circuit declined to apply the Pennsylvania Rule to a regulation that stated:  "[e]very vessel shall at all times

68

maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision."  *Id.* (quoting 33 U.S.C. foll. § 1602).  The court explained that the "*Pennsylvania* rule applies in cases in which a 'precise and clearly defined duty' is mandated by the relevant statute, not when the statute 'calls for the use of interpretation and judgment.'"  *Id.* at 967 (citation omitted).  Like the rule in *Tokio Marine*, which instructed a lookout be supplied "appropriate in the prevailing circumstances," section 162.75(b)(3)(ii) here allows "judgment" in deciding how to moor a tow "to insure [tows from] not being drawn away [from] the bank."

b.  <u>33 C.F.R. § 6.19-1</u>.  The second provision on which plaintiffs rely, 33 C.F.R. § 6.19-1, merely provides that:  "Nothing contained in this part shall be construed as relieving the masters, owners, operators, and agents of vessels or other waterfront facilities from their primary responsibility for the protection and security of such vessels or waterfront facilities."  On its face, however, this provision imposes no requirements on LNA and cannot, by itself, be violated. *Stolt Achievement, Ltd. v. Dredge B.E. Lindholm*, 447 F.3d 360, 365 n.9 (5th Cir. 2006) (Rule "applies only to violations of statutes that delineate a clear legal duty, not regulations that require judgment and assessment of a particular circumstance.") (citation omitted).

Plaintiffs are plainly wrong to assert that this regulation somehow transforms the *recommendations* in the Captain of the Port's Hurricane Plan (Appendix 2 of the U.S. Coast Guard Sector New Orleans Maritime Hurricane Contingency Port Plan) into a regulation for purposes of the Pennsylvania Rule.  On its face, Appendix 2 is entitled "**RECOMMENDED PRECAUTIONARY MEASURES FOR BARGES.**"  Green Report at 6 (quoting Hurricane Sector Plan) (emphasis added) (PX 386).  The same is true as to the second cited provision, derived from Annex C.  Green Report at 8 (admitting Annex C sets forth a "recommendation")

(PX 386).  Plaintiffs' expert Don Green agreed at trial that the Hurricane Plan contained recommendations, not regulations.  Green Tr. 519:3-5.  Nothing in § 6.19-1 changes that fact.

It is clear that the Pennsylvania Rule does not apply to recommendations such as these.  See *City of Chicago v. M/V MORGAN*, 375 F.3d 563, 572 n.11 (7th Cir. 2004) (Pennsylvania rule "does not apply as the City was under no statutory duty" to construct an item not mandated by a Coast Guard permit); *Afran Transport Company v. United States*, 309 F. Supp. 650, 657 (S.D.N.Y. 1969) ("And even if the cautionary language can be considered a regulation, it can scarcely be construed as prohibiting or mandating any particular conduct sufficient to invoke the drastic 'Pennsylvania' rule.").  The sole case that plaintiffs cite – *Trinidad Corp. v. S.S. Keiyoh Maru*, 845 F.2d 818, 820 (9th Cir. 1988) – is inapposite.  *Trinidad Corp.* applied the Pennsylvania Rule to an express regulatory requirement that a vessel avoid certain restricted areas.  *Id.* at 820 ("These restrictions were also in government publications of which both vessels were *required* to be aware.") (emphasis added).[79]  Plaintiffs cite to no authority applying the Pennsylvania Rule when a defendant violated a "recommended" precautionary measure.[80]

3.    <u>Evidence eliminates any presumption</u>.

In any event, as plaintiffs acknowledge, the evidentiary presumptions created by the Pennsylvania Rule can only be applied when there is an "absence of other evidence."  Pl. Br. 2 (quoting *N.D. Shipping, S.A. v. Zagora M/V*, No. 06-10734, 2009 U.S. Dist. LEXIS 47538, at *20-21 (E.D. La. June 5, 2009)).  The Fifth Circuit has held that evidentiary presumptions are "superfluous [when] the parties have introduced evidence to dispel the mysteries that gave rise to

---

[79]  Unlike the vague language of § 6.19-1 at issue here, the relevant regulation in *Trinidad Corp.*, 33 C.F.R. § 164.33, stated that "(a) Each vessel must have" documents containing the restrictions on board.

[80]  In any event, LNA complied with the recommendations of the Captain of the Port's Hurricane Plan.  See Strouse Report (DX 204); FF ¶¶ 57-62.  LNA met the recommendation that "mooring lines [be] doubled up" when it tripled the strength of the mooring.  Ryan Tr. 2884:1-6; FF ¶¶ 57-62.  Plaintiffs cite several old maritime texts that they claim provide a narrower definition of "doubled up" but they did not show that these definitions applied to the mooring of barges or that the Coast Guard meant to employ a narrow definition of "doubled up."

the presumptions." *In re Mid-South Towing*, 418 F.3d 526, 531 (5th Cir. 2005) (citing *Rodi Yachts, Inc. v. National Marine, Inc.*, 984 F. 2d 880, 887 (7th Cir. 1993)); *N.D. Shipping*, 2009 U.S. Dist. LEXIS 47538, at \*20 (the Pennsylvania Rule should be applied only "in the absence of other evidence" and the Rule has "limited applicability where there *is* other evidence.").  As *Rodi Yachts* explained, "[e]videntiary presumptions, or, as we prefer to call them, inferences from experience, are designed to fill a factual vacuum.  Once evidence is presented … presumptions become superfluous because the parties have introduced evidence to dispel the mysteries that gave rise to the presumptions."  984 F.2d at 887.

Here, it is important to remember the origin of the Pennsylvania Rule – a collision at sea between two vessels in a dense fog.  *The Pennsylvania*, 86 U.S. at 126.  In that case, no evidence remained for the court to assess liability.  As is discussed in detail above, much evidence exists of the cause of the IHNC breaches.  See Part III above.  The Court need not rely on the crutch provided by the Pennsylvania Rule and it should decline to apply it here.[81]

### B. Even if the Pennsylvania Rule Did Apply, LNA Has Amply Demonstrated that the Barge Did Not Cause the Floodwall Breaches.

Even if the Pennsylvania Rule applied and shifted onto LNA the burden of proving that the ING 4727 did not cause the floodwall breaches, LNA has more than satisfied that burden.  In particular, as set forth in the Parts above, LNA has proven (I) that the ING 4727 could not have been and was not present at the floodwall locations before breaches occurred, (II) that an impact by the ING 4727 could not have caused the floodwall to fail, (III) that the breaches occurred for reasons wholly unrelated to the barge, and (IV) that, in addition and in any event, the floodwalls would have failed regardless of any impact from the barge.  Based on these points, LNA in fact

---

[81]  In *City of Chicago v. M/V Morgan*, the Seventh Circuit noted:  "In light of modern day technology and practices, the value of such presumptions has diminished."  375 F.3d 563, 575 n.15 (7th Cir. 2004) (quoting Paige Hess, *Applying the Pennsylvania Rule — Circumstances to Consider in Allisions:  American River Transportation Co. v. M/V Kavo Kaliakra*, 24 Tul. Mar. L.J. 343, 352 (1999)).

has amply established that the barge could not have caused the floodwall breaches and in fact did

not cause them.  Thus even if the Pennsylvania Rule were applicable here, LNA has satisfied any

burden that it might have had under the Rule.

## VI.   LNA DID NOT COMMIT ACTIONABLE NEGLIGENCE.

We show in this Part: (A) that LNA acted with reasonable care in its handling of the

barge, (B) that even if LNA had taken extra steps, the barge would have broken away anyway,

(C) that LNA owed no legal duty to plaintiffs, and (D) that plaintiffs' erroneous reliance on the

Louisiana Rule does not change any of these conclusions.

### A.   LNA Acted with Reasonable Care in its Handling of the Barge.

The evidence refutes plaintiffs' various arguments that LNA did not act with reasonable

care in preparing its Terminal and the ING 4727 for the onslaught of Hurricane Katrina.

1.   LNA could not halt unloading once the storm changed direction.

Plaintiffs contend (at 11-12) that "LNA did not monitor the weather" and thus failed to

"cease unloading" the ING 4727 when it supposedly should have done so.[82]  Notably, plaintiffs

*do not* contend that LNA's decision to **start** unloading the ING 4727 when it arrived at the

Terminal around noon on August 26 was improper.  Rather, plaintiffs argue only LNA was

negligent for "failing to cease unloading operations" once "advisories placed New Orleans dead

in the hurricane's [sic] path."  Pl. Br. 11.[83]  Indeed, the evidence shows that the storm did not

---

[82]  The claim that LNA did not monitor the weather cannot be relevant to any other claim of negligence, because LNA completed its hurricane preparations well before the storm arrived.  Busch Tr. 115:10-15; FF ¶¶ 26-28, 32, 54.

[83]  In the section of their brief discussing causation and multiple tortfeasors, plaintiffs do state (without any citations) that "Lafarge unloaded the barge … to avoid freight concessions."  Pl. Br. 45.  Despite indicating that this topic "will be treated with brevity in other pertinent sections of this brief," plaintiffs do not mention LNA's decision to start unloading the barge at all in their discussion of why LNA was supposedly negligent.  See generally Pl. Br. 1-33.  Apparently aware that LNA unloaded the ING 4727 in the ordinary course, several hours before Governor Blanco's 5 p.m. emergency declaration, and almost twelve hours before the National Hurricane Center Advisory at 11 p.m., plaintiffs do not allege that this decision was negligent.  *See* Busch Tr. 65:18-18, 108:22-109:12; Jenks Dep. 15:14-18:8 (DX 365); FF ¶¶ 18-28 (explaining that (1) LNA was not subject to freight concessions and that the term "hot barge" is an ordinary designation of which barge to move first, (2) LNA unloaded the barge in the

turn toward New Orleans until after LNA started unloading the ING 4727.  See Busch Tr. 109:9-
12; Ryan Tr. 2875:4-6; FF ¶¶ 21-28 (first Coast Guard alert was at 8:00 p.m. on August 26).

The evidence at trial overwhelmingly established, however, that by the time the storm
changed course, it would have been both unsafe and impractical for LNA to cease the unloading
process.  A partially unloaded barge is unstable and dangerous because, as Assistant Terminal
Manager Ed Busch testified, "[a] barge that is half unloaded is probably more dangerous than
either a fully-loaded barge or a completely empty barge. … [I]t will start bucking up and down
with the water surges, because one end of the barge could move up and down faster than the
other end."  Busch Tr. 117:16-118:6; FF ¶ 65.  Plaintiffs suggest (at 11-12 n.2) that LNA should
have unloaded the barge so that the cement remained even inside the barge throughout the
process.  Not only do plaintiffs lack evidentiary support for this suggestion, Mr. Busch explained
that this was impossible.  Busch Tr. 69:23-70:17; FF ¶ 9.  In his 23-year career of unloading
river-type cement barges for three different companies, Mr. Busch had unloaded them all the
same way as the ING 4727.  Busch Tr. 70:5-23, 107:18-109:9.  At the LNA Terminal, LNA used
a Bobcat tractor to push around the cement only when the barge was almost empty.  To use the
Bobcat earlier in the process – in order to keep the cement even while still in the barge – could
entrap the Bobcat and endanger the operator.  Busch Tr. 70:17-23; FF ¶ 9.[84]

2.    LNA followed all applicable internal procedures.

Plaintiffs assert that LNA "violated its own published policies and procedures" because it
did not "cable all barges to shore."  Pl. Br. 12 (citing PX 37).  But the requirement to "cable all

ordinary course and would have unloaded another barge if the ING 4727 had not arrived, and (3) when LNA started
unloading the barge, Katrina was not projected to strike the New Orleans area).

[84] Plaintiffs cite (at 12 n.2) to LNA's policy that barges be unloaded "as level as possible," but they offer no
explanation of what this means or evidence that the New Orleans Terminal's practices did not comply with this
directive.  See Busch Tr. 69:23-70:1 (Unloading the barge "in order to make it level would cause a stress in the
center of that barge by the weight and it would actually have a tendency to fold up in the middle.").

barges to shore" had been eliminated at the time LNA upgraded its dock to allow for long-lining with polypropylene rope.  Busch Tr. 59:19-60:4; Smith Tr. 142:17-20; FF ¶¶ 14-15, 43-45.  In addition to LNA employees who testified that long-lining with rope was preferable to using cable, LNA's expert Captain Strouse testified that long-lining allowed the storm surge to raise the barges without straining the lines because the excess line would unwrap from the mooring bollards as the surge rose.  Strouse Tr. 2946:22-2947:11.[85]  All of the employees working on Saturday knew about the renovations and the Terminal's use of long-lining and all had done it before in other hurricanes.  Busch Tr. 111:2-19 ("We have done it before.  We have done it several times"); FF ¶¶ 15, 43-45 (LNA employees understood and had used the new procedures).  Because long-lining with polypropylene rope was better than using cable, plaintiffs have not shown that LNA's failure to "cable all barges to shore" was negligent or led to the breakaway.[86]

Plaintiffs also argue inconsistently (at 12) that LNA had no mooring procedures.  To the contrary, former LNA employee Louis Robin testified that there were mooring diagrams.  Robin Tr. 579:12-14 ("Q:  And you never saw any written diagrams on how to moor barges, is that correct?  A:  Yes [sic], we had some written diagrams posted up in the office."); id. at 578:21-25.

3.    LNA properly secured the ING 4727.

Plaintiffs contend (at 13-14) that LNA did not moor the ING 4727 as well as it moored the other barges at the dock because its employees expected Zito to pick up the barge before the storm.  But the undisputed evidence established that LNA employees took steps to significantly upgrade the mooring of the barge in anticipation of the storm, which they would not have done if they intended the mooring arrangement to be "temporary."  Robin Tr. 591:1-592:2; Smith Tr.

---

[85]  Cordage expert Phillip Skaer further testified that rope had replaced cable in most mooring applications.  Skaer Tr. 2532:1-18.

[86]  Moreover, many barges that had been moored with cable also broke away during the storm.  L. Arnold Tr. 2814:15-2815:15; Dupre Dep. 17:16-18:22 (DX 364); FF ¶ 84-85.

152:6-12, 156:23-157:3.  First, LNA employees inspected all of the ropes and replaced worn out

or damaged rope with new 2-inch diameter (6-inch circumference) rope that had been purchased

at the start of hurricane season.  Busch Tr. 56:7-58:23; FF ¶¶ 34, 59.  As a result, the strength of

the mooring arrangement went from 58,500 pounds to 178,000 pounds after LNA employees

replaced one rope and added a third.  Skaer Tr. 2519:10-2520:19; FF ¶ 60.  The testimony of

LNA's cordage expert Phil Skaer is uncontroverted – the hurricane preparation efforts had more

than tripled the strength of the mooring configuration between the ING 4727 and the ING 4745.

Plaintiffs do not and cannot explain why LNA would have taken the time and effort to triple the

strength of the mooring arrangement between the barges, including adding new ropes, if LNA

had not been trying to moor the barge to withstand the hurricane.  Indeed, Mr. Busch testified

that he purchased the rope that LNA used to moor the two barges especially for use during the

storm season.  Busch Tr. 112:10-20.

     In addition, the evidence at trial established that LNA's mooring of the ING 4727 with

three ropes, two of which were brand new, was an adequate and reasonable mooring for the

approaching storm.  Strouse Report at 4-5 ("the quantity and arrangement of the high-quality

stronger lines were adequate") (DX 204); see FF ¶ 69.  The barge was moored with a bow and

stern line and a line at the kevel above the stern; the "stern" rope and the "middle" rope were

both brand new.  Skaer Tr. 2520:20-24; FF ¶¶ 40-42, 49.  Captain Strouse testified that having at

least three ropes between the ING 4727 and ING 4745 was a reasonable mooring arrangement.

Strouse Tr. 2938 12-21; Strouse Report at 5 (DX 204) see also FF ¶ 63.[87]

---

[87]  Plaintiffs also argue that LNA was negligent in not using fleeting wires.  Pl. Br. 13, 28.  Lacking expert testimony
on this point, they cite only to Mr. Thigpen's testimony that fleeting wires are preferred in mooring barges together.
*Id*.  Mr. Thigpen's testimony on this point strongly suggests that fleeting wires could not be used on these two
barges, however; otherwise Mr. Thigpen, having looked for additional rope and not found any, would presumably
have used the fleeting wires, had they been available.  See Thigpen Tr. 170:17-25.  In any event, the LNA Terminal
was not a fleet and did not moor barges the same way as fleets did.  See Ryan Tr. 2881:24-2882:3; Strouse Tr.
2940:1-7 (explaining the difference between a fleet and a dock); Busch Tr. 84:15-20.

Although the undisputed evidence that the ING 4727 was secured by three new ropes is sufficient to establish that LNA was not negligent in how it moored the barge, there was considerable evidence to show that the barge was moored at ***more*** than just three points. Specifically, four LNA employees testified that a rope was put on ***every*** kevel of every barge that was at the LNA Terminal before the storm, including the ING 4727 (which had five kevels). Busch Tr. 62:4-18 ("all the kevels…had ropes leading back and forth"); Smith Tr. 135:23-136:2 ("everything had a rope hanging off it connected to the other barge"); R. Johnson Dep. 33:8-34:15, 41:18-24 (tiers made up same way with rope on every kevel) (DX 278); Robin Tr. 591:1-592:2 ("extra lines"); see FF ¶ 38.

4.    <u>LNA could not have removed or ballasted the barge</u>.

Plaintiffs also contend that LNA should have had the barge removed from its Terminal before Hurricane Katrina. Even if plaintiffs had shown that Mr. Busch did not call Zito,[88] the evidence is uncontroverted that (1) Zito was no longer accepting new barges at the time (DX 115; FF ¶ 53), and (2) even under normal circumstances, it could take several days for Zito to come to pick up an empty barge. Smith Tr. 115:15-156:2; FF ¶ 31. Plaintiffs' assertion that LNA should have asked Zito to tow away the barge prior to completing the unloading is contradicted by evidence showing that it was not feasible to call Zito before the barge was empty because it is hard to predict when unloading would finish and it is not possible to remove the barge when partially unloaded because an unloaded barge is unstable and cannot be towed. Busch Tr. 117:16-118:6; FF ¶¶ 65-66. But even if Zito had arrived to collect the empty barge, there is no evidence that it would have received a lock turn on Saturday to remove the barge, given the heavy traffic and long waits to which Mr. Busch testified. Busch Tr. 78:13-22 (lock

---

[88] Ample evidence was introduced at trial that the call had indeed been placed. See Busch Tr. 97:8-9; Smith Tr. 30:22-24; FF ¶ 31 n.3.

turns were unavailable on Saturday morning); FF ¶ 11.  Similarly, there is no evidence that LNA

could have asked Domino to remove the barge to "another location."  Pl. Br. 13.  Domino would

not pick up a barge, particularly before a hurricane, without being certain of a destination.

Thigpen Tr. 184:23-185:3 ("You're not going to pick up nothing unless you know where it's

going."); FF ¶¶ 52, 53.  And Zito's fleet had closed that morning to incoming barge traffic.  Zito

e-mail of August 27, 2005 (DX 115); FF ¶ 53.

Plaintiffs also assert (without evidence) that LNA could have added ballast to the barge.

This suggestion ignores evidence that (1) LNA had no ability to add ballast, (2) the barge had no

fixed ballast system or piping, and was not designed to be ballasted; (3) it would have taken a tug

at least 24-48 hours to fill the barge, and (4) adding ballast to the barge would have made the

barge unstable and more dangerous.  Busch Tr. 115:25-116:8; FF ¶¶ 55, 71.  Indeed, plaintiffs

adduced no evidence that anyone ballasted a single barge during Katrina.  *E.g.*, L. Arnold Tr.

2814:3-4 (Lone Star did not ballast any of its empty barges).

### B.     In Any Event, the Breakaway Resulted from An Act of God, Not From LNA's Alleged Negligence.

Not only did LNA act reasonably in the way it moored the barge, but plaintiffs also failed

to establish that the ING 4727 would have remained in place even if LNA had employed the

actions that plaintiffs now suggest.  "The act of God defense denies that the defendant's acts or

omissions, even assuming they did not meet the standard of reasonable care under the

circumstances, caused the accident."  *Fischer*, 508 F.3d at 596.  Courts in this Circuit routinely

decline to address a party's negligence following a hurricane, finding instead that plaintiffs'

damages were the result of an Act of God.  *E.g., Pioneer Natural Res. USA, Inc. v. Diamond

Offshore Co.*, 638 F. Supp. 2d 665, 690 (E.D. La. 2009) ("Hurricane Ivan was a *vis majeure*

sufficient to discharge all liability"); CL ¶ 14.  Indeed, several courts have already held that

Hurricane Katrina was an Act of God and have not addressed the alleged negligence of other defendants accused of inadequate mooring.[89]

In this case, the evidence established that the barge would have broken away in the face of the massive hurricane regardless of plaintiffs' hindsight suggestions. First, several experts testified that more ropes would not have prevented a breakaway. LNA's cordage expert Phillip Skaer testified that the ropes mooring the ING 4727 to the ING 4745 broke under such extreme stress that they melted and fused. Skaer Tr. 2565:11-16; FF ¶ 87. This establishes, he explained, that they were under immense force and that even if LNA had added additional ropes, those ropes would have failed as well. *Id.* Similarly, Captain Strouse testified that additional ropes would not have prevented a breakaway. Strouse Tr. 2938:19-21 ("I don't believe [more ropes would have prevented the breakaway], not with the tremendous surge and conditions with Hurricane Katrina"). No expert testified to the contrary. Second, although plaintiffs claim LNA should have "cabled" the barges to the shore, cabled barges were among those that broke away at Lone Star. L. Arnold Tr. 2814:15-2815:15; FF ¶¶ 84-85. Finally, although plaintiffs assert that a full barge would not have broken away, the evidence establishes that hundreds of vessels broke free, including full barges. Strouse Report at 6 (DX 204); FF ¶¶ 83-84. Many of these barges were full and many were secured with both cable and rope. *Id.*[90]

---

[89] Several courts have held breakaways in hurricanes – including Hurricane Katrina – were due to an Act of God regardless of the defendant's negligence. *In re Southern Scrap Material Co., L.L.C.*, 2010 U.S. Dist. LEXIS 47855 (E.D. La. May 14, 2010) ("Hurricane Katrina may well be considered to have been an Act of God.") (citing *John W. Stone Oil Distributor, L.L.C. v. Bollinger Shipyards, Inc.*, 2007 U.S. Dist. LEXIS 67426, at *6 (E.D. La. Sept. 12, 2007)); *In re Marine Leasing Services, Inc.*, 328 F. Supp. 589 (E.D. La.), *aff'd*, 471 F.2d 255 (5th Cir. 1973)). In *Marine Services*, the Fifth Circuit affirmed a district court's finding that Hurricane Betsy was the inevitable cause or a *vis majeure* of the sinking of a barge – and not defendant's negligence – after considering winds over 90 miles an hour in the Baton Rouge area, hundreds of other barges that were adrift on the Mississippi River and that no barge fleet, no matter how well secured, was able to withstand the fury of the storm. See also *In re Int'l Marine Dev. Corp.*, 328 F. Supp. 1316, 1322 (S.D. Miss. 1971) (Hurricane Camille was a 'freak of nature' sufficient to overcome all reasonable preparations and sustaining the defense of *force majeure*) (other citation omitted).

[90] Likewise, to the extent plaintiffs rely on the lack of lights on the barge, there is no evidence that any barges had lights on them during Hurricane Katrina.

Plaintiffs rely on an unpublished decision from the Eleventh Circuit to support their claim that their damages are not the result of an Act of God.  Pl. Br. 5 (quoting *Cenac Towing Co. v. Southport, L.L.C.*, 232 Fed. App'x 929, 932 (11th Cir. May. 18, 2007)).[91]  While *Cenac Towing* held that Hurricane Ivan was not an Act of God, many courts in the Fifth Circuit, as shown above, have held the opposite.  See, *e.g., Pioneer*, 638 F. Supp. 2d. at 690.  In this case, in light of plaintiffs' failure to establish that the breakaway could have been prevented by any of the measures they say LNA should have undertaken, the Court should determine that the breakaway was caused by an Act of God, not any alleged negligence on the part of LNA.

### C.  LNA Owed No Legal Duty to Plaintiffs Because Flooding Was Not a Foreseeable Consequence of a Barge Breakaway.

Plaintiffs' negligence claim also fails because it was not foreseeable that a breakaway of the ING 4727 would injure plaintiffs, and therefore LNA had no legal duty to plaintiffs.  See *In re Cooper/T. Smith*, 929 F.2d 1074, 1077 (5th Cir. 1991) (in order to establish a duty under maritime law, "the resultant harm must be reasonably foreseeable").  Plaintiffs adduced *no* evidence at trial to establish that they were "within the class of those for which damage would be expected if barge broke free [on the IHNC] during a hurricane."  *In re Signal LLC*, 579 F.3d 478, 490 (5th Cir. 2009).  A harm is not reasonably foreseeable if it was "highly extraordinary" that the actor's conduct would have caused the harm.  Restatement § 435(2).  The Fifth Circuit defined a "foreseeable consequence" of an action as harm that "might have been anticipated by a reasonably thoughtful person, as a probable result of the act or omission, considering the

---

[91]  The other case plaintiffs cite – *Boudoin v. J. Ray McDermott & Co.*, 271 F.2d 81, 88 (5th Cir. 1960) – is not as broad as they contend.  There, a barge broke from a tug and damaged a dock during a hurricane.  The court rejected an inevitable accident affirmative defense (not an Act of God defense) because the captain of the tug totally ignored warnings of the approaching hurricane.  *Id.* at 87.  Here, there is no dispute that LNA was aware of the approaching hurricane and that its employees took steps to prepare the barges moored at the Terminal to withstand it.

interplay of natural forces and likely human intervention." *Consol. Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d 65, 68 (5th Cir. 1987); *In re Signal*, 579 F.3d at 492.

Plaintiffs err in citing to *In re Signal* as showing that their damages were foreseeable. That case involved an allision between a barge and a bridge abutment in Mississippi, causing damage to the bridge abutment. 579 F.3d at 486. The Fifth Circuit explained that the bridge was "within the general class of fixed structures in the low-lying areas near the Pascagoula River against which the [barges] could foreseeably allide when propelled by the anticipated storm surge, and the general class of persons for which the harm of allision was foreseeable." *Id.* at 492-93. By contrast, the plaintiffs here, located outside the channel, were not with the "general class of persons for which the harm of allision was foreseeable."[92] Nor do plaintiffs cite any case where damage to residents on the protected side of a canal was held to be a foreseeable consequence of allegedly improper mooring of a barge.[93] Rather, the damages here are more attenuated, like in *Consolidated Aluminum*, where the Fifth Circuit held that it was not foreseeable that negligent dredging that damaged a pipeline would cause damage to the plaintiff's on-shore factory and its product that depended on the pipeline. 833 F.2d at 68; see also *In re Signal*, 579 F.3d at 495 n.20 (noting that injuries are not foreseeable when they represent "improbable interplay of natural and human forces"); *Lloyd's Leasing Ltd. v. Conoco*, 868 F.2d 1447, 1448 (5th Cir. 1999) (injury not foreseeable where vessel owner "had no reason

---

[92] Importantly, the question of foreseeability looks at the injury to the plaintiff, not to the act that caused their damages. *In re Signal*, 579 F.3d at 491 ("The defendant is liable for harms he negligently caused so long as a reasonable person in his position should have recognized or foreseen ***the general kind of harm the plaintiff suffered***.") (emphasis added). Here, the "harm the plaintiffs suffered" was not damage to the floodwall but rather to their personal property.

[93] By contrast, the Fifth Circuit's holding in *In re Signal* was by no means unique. Courts, including the Fifth Circuit, have long held that it is foreseeable that barges will allide with bridges. See, *e.g., S. C. Loveland, Inc. v. East West Towing, Inc.*¸608 F.2d 160 (5th Cir. 1979); *American River Transp. Co. v. Paragon Marine Services, Inc.*, 213 F.Supp.2d 1035 (E.D. Mo. 2002). By contrast, no court has held that it is foreseeable that a barge allision with a floodwall will cause the flooding of a large part of a city.


to have anticipated that the oil would probably wash ashore in a heavily populated area and then be tracked into businesses and homes").[94]

Indeed, while hundreds of barges broke free of their moorings during Hurricane Katrina, none caused damages like what the ING 4727 is alleged to have caused. Specifically, many of these vessels collided with floodwalls and levees and none of those structures failed like the IHNC floodwalls did. Strouse Report at 6 (DX 204); see also FF ¶¶ 84-85. Nor have plaintiffs identified any past instance of flooding occasioned by a breakaway barge. See Marino 2008 Dep. 105:18-22 (not aware of any instance in which a barge caused the failure of a floodwall before this incident) (DX 225); Plaintiffs' Response to Interrogatory No. 7 (answering "unknown" to interrogatory asking them to identify "any past instance in which a barge breakaway caused flooding as the result of an allision with a flood protection structure") (DX 244); FF ¶ 443. Simply put, there is no evidence in the record that widespread flooding is a foreseeable consequence of a barge breakaway.

### D.     The Louisiana Rule Does Not Apply.

The Louisiana Rule provides that when a drifting vessel allides with a stationary object, the drifting vessel is presumed to be at fault. *The Louisiana*, 70 U.S. 164 (1865). Plaintiffs' reliance on it is misplaced, as we now show.

### 1.     Plaintiffs have not proved an injury-causing allision.

Just as with the Pennsylvania Rule, before the Louisiana Rule can apply, plaintiffs must establish that an allision occurred. See, *e.g.*, *Hatt 65, L.L.C. v. Kreitzberg*, No. 3:06cv332, 2009

---

[94] See also *In re Signal*, 579 F.3d at 68 n.2 (noting that the Louisiana Supreme Court held that dredging damage to a PPG Plant's pipeline that was "adjacent to the channel" was not a foreseeable result of the negligence) (citing *PPG Indus., Inc. v. Bean Dredging*, 447 So. 2d 1058 (La. 1984)); *In re Taira Lynn Marine Ltd.*, 444 F.3d 371, 380 (5th Cir. 2006) (damages not foreseeable when they occurred due to electric power shutdown following barge's allision with bridge); *Brown v. Channel Fueling Service, Inc.*, 574 F. Supp. 666, 668 (E.D. La. 1983) ("it simply was not foreseeable that oil which spilled into the Mississippi as a result of a collision would splash aboard a barge miles away and cause someone to slip some two days after the collision").

U.S. Dist. LEXIS 95332, at *23 (N.D. Fla. Mar. 16, 2009) ("[a]s a threshold question, then the court must decide whether there was an allision"); *Crowley Am. Transp., Inc. v. Double Eagle Marine, Inc.*, 208 F. Supp. 2d 1250, 1259 (S.D. Ala. 2002) (declining to apply Rule because plaintiff "ha[d] not established its burden of showing that this damage occurred as a result of the collision with the barge"); *Norfolk Southern Ry. Co. v. Moran Towing Corp.*, 2010 WL 2326597, at *2 (E.D. Va. June 30, 2010) ("once the fact of contact … has been established, the Louisiana rule operates to shift the burden of proof to [defendant]").

Plaintiffs cannot satisfy this threshold requirement.  The only "evidence" plaintiffs offer of an allision is (1) supposed "eyewitness" testimony (shown above, at 19-24, to be equivocal and not credible) and (2) the fact that the barge did impact the southern end of the South Breach. As to the impact with the concrete cap and rebar at the southern end of the South Breach, the evidence shows that this impact occurred ***after*** both breaches had occurred.  See above at 46-48. The mere fact that the ING 4727 clipped the wall long after the relevant failures occurred cannot result in the application of the Louisiana Rule.  In *The Louisiana*, the role of the defendant in the collision was obvious.  70 U.S. at 173 ("The collision being caused by the Louisiana drifting from her moorings, she must be liable for the damages consequent thereon…").  But what was obvious and not in dispute in *The Louisiana* is the crux of the dispute in this case.  The Court should not shift the burden to LNA unless and until plaintiffs establish that there was even a collision between the barge and the floodwall before the floodwall had failed.

2.    LNA rebutted any applicable presumption.

Plaintiffs acknowledge that LNA can rebut the Louisiana Rule by showing that it took reasonable care under the circumstances to prevent an accident.  Pl. Br. 4 (quoting *The Louisiana*, 70 U.S. at 173); see also *Fischer v. S/Y Neraida*, 508 F.3d 586 (11th Cir. 2007) (owners of yacht rebutted Louisiana rule where they had taken reasonable care in mooring yacht

during storm); CL ¶ 13 (collecting cases).  As we have shown, LNA came forward with ample evidence to show that it acted with reasonable care under the circumstances in preparing the ING 4727 for Katrina.  See above at 72-77*;* FF ¶¶ 32-56 (explaining in detail the steps taken to prepare the barge for the hurricane).  Courts in this Circuit have held that an operator's conduct was reasonable based on the history of prior storms and experience.[95]

Moreover, the Louisiana Rule also can be rebutted by showing that the incident resulted from an Act of God, rather than the alleged negligence.  See *Fischer*, 508 F.3d 586 at 596 (11th Cir. 2007).  As shown just above, the evidence establishes that the ING 4727 would have broken away even if more ropes had been added or other measures taken.  Indeed, thousands of vessels broke free throughout the Gulf Coast during Hurricane Katrina, clearly overwhelming what other experienced maritime operators thought were reasonable preparations.  For this additional reason, the Louisiana Rule would not affect the result even if it were applicable here.

## VII.   PLAINTIFFS' DAMAGES ARE LIMITED.

### A.   Plaintiffs Cannot Recover Any Damages Unless the ING 4727 Caused Both Breaches.

As explained above, the ING 4727 did not cause either IHNC floodwall breach.  Even if Plaintiffs had shown that the barge caused one breach, but not both, however, their claims would still fail because they have failed to prove the damages they incurred from just the North Breach or just the South Breach.  In fact, Melvin Spinks did no modeling to determine the amount of flooding at plaintiffs' locations from either breach in isolation.  Suhayda Tr. 3020:1-17; Spinks Tr. 1649:10-18, 1652:5-10, 1654:6-12; FF ¶¶ 475-80.

---

[95]  See *Young v. Crowley Liner Services, Inc.*, No. 1:06cv966, 2009 U.S. Dist. LEXIS 22746 (S.D. Miss. March 20, 2009) (plaintiff not negligent in failing to remove container from port; unforeseeable that containers would wash away due to the "unprecedented" and "enormously destructive force of Hurricane Katrina"); *Lee Brother, LLC v. Crowley Liner Services,* WL 188858744 (S.D. Miss. June 26, 2007); *Defazio v. Chiquita Fresh North America, LLC*, No. 1:06cv973, 2008 U.S. Dist. LEXIS 53407 (S.D. Miss. July 14, 2008) (same); *Royal Beach Hotel, LLC v. Crowley Liner Services, Inc.*, No. 1:06DV129, 2007 U.S. Dist. LEXIS 28633 (S.D. Miss. March 14, 2007) (same).

In an attempt to skirt this further defect, plaintiffs argue (at 77-78) that LNA has the burden to prove the amount of water that came from each breach. They rely on Restatement of Torts § 433B(2), which states that the burden of proof on causation is shifted to the defendant(s) when "the tortious conduct of two or more actors has combined to bring about harm to the plaintiff." But plaintiffs have offered no proof that the IHNC floodwall breaches were caused by "the tortious conduct of two or more actors." See Restatement § 433B at cmts. c, d, and e (rule applies only when multiple tortfeasors are responsible for causing damages). Section 433B(2) therefore does not apply, and the burden remains on plaintiffs to prove their damages.

### B.      Plaintiffs' Damages Were Not Caused by LNA.

1. <u>The Alfords</u>.

Because the barge did not cause the North Breach, the Alfords cannot recover any damages from LNA. The Alfords lived at 2423 Deslonde Street (which was just inside the North Breach site), and the floodwaters at their home came primarily from the North Breach. Spinks Tr. 1553:21-24; FF ¶ 481. Even crediting Mr. Spinks' modeling, the North Breach opened an hour and a half before the South Breach (4:00 a.m. versus 5:30 a.m.). If the South Breach did not occur until 7:00 a.m. or later, as others have opined (Suhayda Tr. 3018:19-25; FF ¶ 454), then the North Breach was open for an even longer period of time before the South Breach occurred. See Pl. Br. 77 n.31 (if South Breach occurred later, "a considerable increase in the depth and reach of the North Breach water is appropriate"). Either way, the Alford home was destroyed from the North Breach floodwaters before any water from the South Breach arrived.

2. <u>Mrs. Richardson</u>.

Plaintiff Josephine Richardson seeks to recover for property loss and damages arising out of the death of her husband during Hurricane Katrina. The Court should reject both requests.

*a. Property damage claim.*  Plaintiffs have failed to prove that Mrs. Richardson is entitled to the property loss damages that she seeks.  As noted above, if the Court concludes that the ING 4727 did not cause both breaches, then there is no evidence as to the amount of flooding or damage at her home from a single breach.  Spinks Tr. 1652:5-10; FF ¶ 477.  Moreover, Mr. Spinks concluded that water level at the Richardson home from the combined IHNC North and South Breaches was only 5.9 feet.  Spinks Tr. 1600:9-11; FF ¶ 482; CL ¶ 50.  Given that the first floor of Mrs. Richardson's home was 3-4 feet off the ground (Richardson Tr. 755:23-756:9; FF ¶ 484), the IHNC floodwaters did not cause the complete destruction of the home, but could at most be responsible for only 2-3 feet of water in the home.[96]  Any damage award to Mrs. Richardson would have to reflect the relatively small amount of flooding from the IHNC floodwaters, which award would be even smaller if the barge did not cause **both** breaches.

*b. Wrongful death claim.*  The Court should also reject Mrs. Richardson's wrongful death claim.  First, the record suggests that Mr. Richardson drowned in the attic of his home.  Doc. 19857 at 21; FF ¶ 483.  If the IHNC floodwaters reached only 2-3 feet above the floor on the first level, then that water did not get close to the attic and could not have caused Mr. Richardson to drown.  Even if Mr. Richardson was on the first floor of his home when the water arrived, the 2-3 feet of IHNC water in the home would not have caused him to drown.  Spinks Tr. 1651:21-1652:1; FF ¶ 484; CL ¶ 50.  In either case, the MRGO flooding was responsible for Mr. Richardson's death.  Second, Mr. Richardson's comparative fault in ignoring a mandatory evacuation order imposed in order to ensure his safety bars Mrs. Richardson from

---

[96] The actual amount of IHNC water at the Richardson home was likely less than Mr. Spinks predicted, as the numerous flaws in Mr. Spinks' flood modeling tend to overstate the amount of IHNC flooding at a location and accelerate the timing of the IHNC flooding.  Suhayda Tr. 3019:17-25; FF ¶¶ 446-74, 482-84.

recovering on a wrongful death claim now.  *Lewis v. Timco, Inc.*, 716 F.2d 1425, 1428 (5th Cir. 1983) (comparative fault); CL ¶ 51.

    3.  Holiday Jewelers.

    Holiday Jewelers has asserted claims for property damage and for alleged lost profits. Neither claim is supported by the evidence.

    *a.  Property damage claim.*  There was limited property damage at Holiday Jewelers from the IHNC breaches.  Initially, plaintiffs have not proved that the IHNC floodwaters reached Holiday Jewelers before the MRGO waters flooded that location.  Mr. Spinks' modeling shows that the IHNC water arrived at this location approximately one half hour before the MRGO water.  Spinks Tr. 1653:4-8; FF ¶ 485.  But even Mr. Spinks acknowledged that if the South Breach had occurred at 7:00 a.m. (and not 5:30 a.m. as he had assumed in his modeling), then the MRGO water would have arrived first at this location.  Spinks Tr. 1653:20:1654:1; FF ¶ 485. The evidence in fact shows that Mr. Spinks' 5:30 a.m. South Breach time is far too early, and that a time of 7:00 a.m. is more likely.  Suhayda Tr. 3044:15-3045:7; FF ¶¶ 453-61.  Mr. Spinks' modeling is flawed in other respects that also tend to show the IHNC water arriving too early, including his use of very short breach formation periods and a low surface roughness coefficient. Suhayda Tr. 3017:5-11, 3019:17-25; FF ¶¶ 471-73.  These errors in combination demonstrate that the MRGO floodwater was the source of the early flooding at this location.  That initial flooding caused most of the property damage at Holiday Jewelers, including the damage to the showroom and the damage to the contents of the jewelry stored in cases located at ground level.

    The IHNC floodwaters added only a small amount of water on top of the MRGO flooding.  Mr. Spinks' hydrograph shows that the IHNC breaches caused 2.3 feet of flooding at the Holiday Jewelers location at 9:15 a.m., and that by 9:30 the MRGO floodwaters arrived and

the combined water levels rose to their ultimate peak height.  Spinks Tr. 1601:8-19; FF ¶ 485.

Therefore, even if the Court credits Mr. Spinks' flawed modeling, only approximately 2.3 feet of

water at Holiday Jewelers came from the IHNC breaches.

     *b. Lost profits claim.*  Holiday Jewelers cannot recover any lost profits for one simple

reason:  the business was not profitable.  During the four years prior to the storm, Holiday

Jewelers had an average annual loss of $1,989.33, which, projected forward, meant that for the

years 2005-2011, had Hurricane Katrina not occurred, Holiday Jewelers would have had a total

loss of $13,925.  Boudreaux Report at 4-5 (DX 203); FF ¶ 498.[97]

     Recovery for "[l]ost profits will only be allowed when profits have actually been, or may

reasonably suppose to have been lost, and the amount of such profits is proved with reasonable

certainty."  *In re MNM Boats, Inc.*, Civ. No. 07-1938, 2009 U.S. Dist. LEXIS 119861, at *39

(E.D. La. Dec. 4, 2009) (citation omitted).  Businesses that can prove no profit prior to the event

for which they seek compensation cannot seek compensation for lost profits.  See *Toga Soc'y,*

*Inc. v. Lee*, No. 03-2981, 2005 U.S. Dist. LEXIS 13408 (E.D. La. June 29, 2005) (Duval, J.)

(where limited evidence established that business was loss-making before injury, it could not

recover lost profits).  Insofar as Holiday Jewelers neither made a profit before Hurricane Katrina

nor can adduce evidence with "reasonable certainty" that it would have earned a profit after the

storm, it is not entitled to recover damages for lost profits.  *Id.*; CL ¶ 52.

### C.    The Alfords and Mrs. Richardson Have Already Been Fully Compensated for Property Losses by Road Home Benefits.

     The Road Home program was funded by the federal government and administered by the

State of Louisiana in order to fund the repair and reconstruction of damaged Louisianans' homes.

---

[97]  Plaintiffs' contention that Holiday Jewelers would have been profitable relies on flawed accounting principles that improperly add certain business expenses to Holiday Jewelers' bottom line.  See FF ¶ 499.

See *In Re Katrina Canal Breaches Consol. Litig. (Road Home)*, No. 07-5528, 2009 U.S. Dist. LEXIS 33068 at *14-15 (E.D. La. Apr. 16, 2009). The Alfords and Mrs. Richardson each received a substantial cash payment from the Road Home program, as follows:

- The Alfords received $120,000 from the Road Home program. At the time of Hurricane Katrina, the Alfords had a $30,000 mortgage on their home and $17,000 in equity (the house was valued at $47,000). After the storm, using Road Home proceeds, the Alfords paid off their mortgage and bought a new home in Algiers. Ragas Report at 6 (DX 214); FF ¶ 492.

- Mrs. Richardson received $119,010 from the Road Home program. Before Katrina, Ms. Richardson's home was worth $89,000 and she reconstructed it after the storm at a cost of $107,114. Ragas Report at 6-7 (DX 214); FF ¶ 496.

The Road Home payments therefore fully compensated plaintiffs for any injury that might otherwise be attributed to Hurricane Katrina-related flooding.

The payments that plaintiffs received from Road Home for their property losses must be deducted from any award that the Court might make concerning plaintiffs' property damage claims. In *Robinson*, the Court held that the federal government is a tortfeasor with respect to the flooding in the St. Bernard polder. See *In re Katrina Canal Breaches Consol. Litig. (Robinson)*, 647 F. Supp. 2d 644, 736 (E.D. La. 2009). Therefore, the collateral source rule, which bars admission of evidence of funds received from non-tortfeasors, does not apply to funds plaintiffs received from the government through the Road Home Program. See *Giles v. Gen. Elec. Co.*, 245 F.3d 474, 495 (5th Cir. 2001) (where prior payments were not "additional, bargained-for compensation but were instead compensation for the injury out of which this case arises," the collateral source rule did not apply); see also CL ¶ 49.

In *Robinson*, the Court refused to reduce a plaintiff's damage award by the Road Home payments she received because the plaintiff was "obligated to reimburse the Road Home from any insurance proceeds or other recovery she may receive." Doc. 19415 at 154. That repayment

obligation comes from the "Road Home Limited Subrogation/Assignment Agreement" ("Road Home Agreement") that each grant recipient was required to execute.  See *In Re Katrina Canal Breaches Consol. Litig. (Road Home)*, No. 07-5528, 2009 U.S. Dist. LEXIS 33068, at *15 (E.D. La. Apr. 16, 2009).  The Road Home Agreement requires grant recipients to repay those monies *only* if they recover:  "(a) under any policy of casualty or property damage insurance or flood insurance on the residence…; [or] (b) from FEMA, Small Business Administration, and any other federal agency, arising out of physical damage to the Residence caused by Hurricane Katrina and/or Hurricane Rita."  Richardson Dep. Exh. 3 (DX 366); FF ¶ 495.

There is no requirement in the Road Home Agreement or elsewhere that Road Home grant recipients must repay their grants if they recover in a tort suit against parties other than the federal government.  Therefore, any amount that the Court awards plaintiffs against LNA should be reduced by the amount of their Road Home grants, because they have already been fully compensated for damage to their properties.[98]

### D.      Joint-and-Several Liability Does Not Apply.

Plaintiffs contend that if the ING 4727 made any contribution, however small, to the failure of either IHNC floodwall breach, then LNA is responsible for all flooding from the breaches.  That is wrong as a matter of law.  Initially, even if the ING 4727 had contributed to the failure of the eastern IHNC floodwall (which it did not), LNA would not be jointly and severally liable for all of plaintiffs' flooding damages.  Instead, as at most a *de minimis* contributor, LNA is not liable for *any* of plaintiffs' damages.  See *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 265 n.15 (1979); CL ¶¶ 21, 48.

---

[98]  If the Court considers the actual property losses that plaintiffs claim they sustained, any damage award should be reduced as plaintiffs' experts overstated real estate values.  See Ragas Report (DX 214); FF ¶¶ 492-93, 496-97.

Joint and several liability also would not serve to cause LNA to be liable for any flood-related damages attributable to flooding from the MRGO, which is separate from the IHNC flooding and could be apportioned accordingly, as this Court found in *Robinson*. *In re Katrina Canal Breaches*, 647 F. Supp. 2d 644, 735 (E.D. La. 2009); CL ¶ 48.  Plaintiffs claim (at 74), citing the Restatement of Torts, that joint and several liability applies where liability cannot be allocated among several tortfeasors.  But the Restatement in fact concludes that flooding is a type of damage where apportionment is possible.  Restatement (Second) of Torts § 433A; CL ¶ 48.

Plaintiffs also claim that Mr. Spinks opined that when the waters from the North and South breaches mixed, the waters became indivisible.  But both Mr. Spinks and Dr. Kemp testified that flood modeling can determine the amount of water at a location from a particular breach (Spinks Tr. 1610:23-1611:6; FF ¶ 479), and, as noted, the Court held in *Robinson* that damages can be apportioned based on the amount of water contributed by particular breaches.

Finally, if the Court finds that the barge caused one breach but not the other (even though, as noted, the barge did not cause either breach), plaintiffs' failure to model the two breaches as separate events constitutes a failure of proof that bars an assignment of any damages to LNA.  See Suhayda Tr. 3020:1-17; FF ¶¶ 475-80; CL ¶ 48.  Because LNA is not liable for any of plaintiffs' damages, the Court need not undertake an allocation of liability in this case.

### E.    Plaintiffs' Damages Are Limited by the Inevitable MRGO Flooding.

Plaintiffs also cannot recover damages due to the IHNC floodwall breaches because their properties would have been flooded to the same level mere hours later by the floodwaters from the MRGO breaches.  Spinks Report at 33 (PX 241); FF ¶¶ 486-91.  The Fifth Circuit has held that a plaintiff's damages are limited when subsequent events operate to cut off the plaintiff's claim.  *Dixon v. Int'l Harvester*, 754 F.2d 574 (5th Cir. 1985); CL ¶ 53.  For this reason, the

inevitable flooding from the MRGO serves to cut off plaintiffs' damages.  At most, plaintiffs could recover damages only for the loss of the use of their property for a few hours before the MRGO floodwaters arrived.  But several hours use of property during a hurricane and under a mandatory evacuation order has no value.  Ragas Dep. 115:15-19 (DX 333); FF ¶ 491.

## **CONCLUSION**

For the numerous reasons thoroughly catalogued above, LNA respectfully submits that the Court should enter judgment in favor of LNA – and, in doing so, should make clear both (1) that no reasonable factfinder could find otherwise on the five-year record before the Court, and (2) that the flaws inherent in the speculative and unscientific opinions offered by plaintiffs' experts Marino, Mitchell, and Pazos render those opinions inadmissible under the standards of F.R.E. 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

Dated: September 17, 2010                    Respectfully submitted,

                                             Derek A. Walker (#13175)
                                             Robert B. Fisher, Jr., T.A. (#5587)
                                             **CHAFFE MCCALL, L.L.P.**
                                             2300 Energy Centre
                                             1100 Poydras Street
                                             New Orleans, LA  70163-2300
                                             Telephone:  (504) 585-7000
                                             Facsimile:  (504) 585-7075
                                             Fisher@chaffe.com
                                             Walker@chaffe.com


                                             /s/ John D. Aldock
                                             John D. Aldock
                                             Richard M. Wyner
                                             Mark S. Raffman
                                             Adam M. Chud
                                             **GOODWIN PROCTER LLP**
                                             901 New York Avenue, N.W.
                                             Washington, DC  20001
                                             Telephone:  (202) 346-4240
                                             jaldock@goodwinprocter.com
                                             rwyner@goodwinprocter.com
                                             mraffman@goodwinprocter.com



                                             Daniel A. Webb (#13294)
                                             **SUTTERFIELD & WEBB, LLC**
                                             Poydras Center
                                             650 Poydras Street, Suite 2715
                                             New Orleans, LA  70130
                                             Telephone:  (504) 598-2715

                                             *Attorneys for Lafarge North America Inc.*


## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 17, 2010.

                                             /s/ John D. Aldock

LIBW/1757846.9