## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: KATRINA CANAL BREACHES | § | CIVIL ACTION |
| CONSOLIDATED LITIGATION | § | NO. 05-4182 "K" (2) |
| | § | |
| _____ | § | |
| | § | JUDGE DUVAL |
| PERTAINS TO:  MRGO | § | |
| *Armstrong,* No. 10-866 | § | |
| *Entergy,* No.  10-77 | § | MAG. WILKINSON |
| _____ | § | |

## DEFENDANT UNITED STATES' OMNIBUS REPLY IN SUPPORT OF ITS MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT (Doc. 19993) AND OPPOSITION TO ENTERGY'S MOTION FOR PARTIAL SUMMARY JUDGMENT (Doc. 20033)

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I.    Plaintiffs fail to show that the challenged conduct was
      neither comprised by a flood-control project nor related
      to such a project . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

II.   The Corps did not deviate from regulations or manuals that
       prescribed particular conduct for this project . . . . . . . . . . . . . . . . . . . . . . . 11

III.  NEPA, a purely procedural statute, does not cabin discretion . . . . . . . . . 15

      A.  NEPA's procedures allowed room for choice . . . . . . . . . . . . . . . . . . . . . 15

      B.  Applying NEPA in this context distorts the statute . . . . . . . . . . . . . . . . 21

IV.   Plaintiffs cite no authority or reasoning to deem pending
      actions as having exhausted administrative remedies for
      the claims set forth therein . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Brady v. United States,* 211 F3d 499 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . 24-25

*City of Dallas v. Hall,* 562 F.3d 712 (5th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Coeur Alaska, Inc. v. Southeast Alaska Conserv. Council,*
     — U.S. — , 129 S. Ct. 2458 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Fla. Power & Light v. Lorion,* 470 U.S. 729 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Frame v. City of Arlington,* — F.3d — ,
     2010 WL 3294409 (5th Cir. Aug. 23, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Gaubert, United States v.,* 499 U.S. 315 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . 16-17

*Geyen v. Marsh,* 775 F.2d 1303 (5th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Houston v. United States Postal Service,* 823 F.2d 896 (5th Cir. 1987) . . . . 25-26

*James, United States v.,* 478 U.S. 597 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*In re Katrina Canal Breaches Consol. Lit.,*
     533 F. Supp. 2d 615, 635 (E.D. La. 2008) . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*In re Katrina Canal Breaches Consol. Lit.,*
     577 F. Supp. 2d 802 (E.D. La. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*In re Katrina Canal Breaches Consol. Lit.,*
     2008 WL 5234369 (Dec. 15, 2008 E.D. La.) . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Lujan v. Nat 'I Wildlife Fed'n,* 497 U.S. 871 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . 21

*McNeil v. United States,* 508 U.S. 106 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Medina County Envt'l Action Ass'n v. Surface Transp. Bd.,*
    602 F.3d 687 (5th Cir. 2010)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 19

*Sabine River Auth. v. U.S. Dep't of the Interior,*
    951 F.2d 669 (5th Cir. 1992)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16-17

*Sierra Club v. Peterson,* 185 F.3d 349 (5th Cir. 1999)  . . . . . . . . . . . . . . . . . . 16, 21

*Sierra Club v. Sigler,* 695 F.2d 957 (5th Cir. 1983)  . . . . . . . . . . . . . . . . . . . . . . . . 17

*Spiller v. White,* 352 F.3d 235 (5th Cir. 2003) . . . . . . . . . . . . . . . . . . . . 17, 19, 20, 21

*Transp., Dep't of v. Pub. Citizen,* 541 U.S. 752 (2004)  . . . . . . . . . . . . . . . . . . . . . 21

*United States v.*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . see opposing party

## FEDERAL STATUES

28 U.S.C. § 2401(a)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

28 U.S.C. § 2675(a)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

28 U.S.C. § 2680(a)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 13

33 U.S.C. § 702c  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

42 U.S.C. § 4332(2)(C)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Pub. L. No. 84-455, 70 Stat. 65 (1956)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Pub. L. No. 89-298, 79 Stat. 1073 (1965)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**MISCELLANEOUS**

USACE Engineer Manual 1110-2-1901 ..................................... 14

USACE Engineer Manual 1110-2-1913 ..................................... 14

USACE Engineer Manual 1110-2-2502 ..................................... 14

USACE Engineer Manual 1110-2-12504 ................................... 14

USACE Engineer Regulation 1110-1-8157 ................................ 13

USACE Engineer Regulation 1110-2-1150 ...................... 11-12

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In Re: KATRINA CANAL BREACHES | § | CIVIL ACTION |
| CONSOLIDATED LITIGATION | § | NO. 05-4182 "K" (2) |
| | § | |
| _____ | § | |
| | § | JUDGE DUVAL |
| PERTAINS TO:  MRGO | § | |
| *Armstrong*, No. 10-866 | § | |
| *Entergy*, No.  10-77 | § | MAG. WILKINSON |
| _____ | § | |

**DEFENDANT UNITED STATES' OMNIBUS REPLY IN SUPPORT OF ITS
MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY
JUDGMENT (Doc. 19993) AND OPPOSITION TO ENTERGY'S
MOTION FOR PARTIAL SUMMARY JUDGMENT (Doc. 20033)**

This brief responds to Entergy's motion for partial summary judgment and

to the plaintiffs' Oppositions to the United States' motion to dismiss.[1]  In our

opening brief we advanced three independent grounds for dismissal:

- **33 U.S.C. § 702c**

    Section 702c applies because these suits seek to impose liability
    for damage from floodwaters that a flood-control project failed
    to control.  The East Bank Industrial Area remediation project
    occurred within one flood-control project (the lock-
    replacement project) and was directly related to two other
    flood-control projects (the Lake Pontchartrain and Vicinity

---

[1]The term "plaintiffs" in this brief refers to the Entergy corporations and the three
named *Armstrong* plaintiffs.  See Case 2:10-cv-00866-SRD-JCW, Doc. 1 (filed Mar. 12, 2010).

Hurricane Protection Project and the Mississippi River & Tributaries Project).  Further, the floodwaters that escaped from the Inner Harbor Navigation Canal were floodwaters "emanating from a flood control project"[2]—the LPV, which encompassed the IHNC.

- **28 U.S.C. § 2680(a)**

   The Federal Tort Claims Act's discretionary-function exception applies because (1) no statute or regulation required the Corps to evaluate whether WGI's deep excavations would increase the risk of flooding, and (2) deciding whether to undertake such an evaluation was based on social, economic, and political considerations, including specifically the impact of the excavations on the neighboring communities.

- **28 U.S.C. § 2675(a)**

   The FTCA cannot be invoked because the plaintiffs did not exhaust their administrative remedies before filing suit.  Their initial suits cannot serve as administrative claims because those suits are still pending in this Court.

In opposition, the plaintiffs argue:

- Section 702c does not apply because neither the lock project nor the IHNC was described as having a flood-control purpose in the authorizing legislation.  The lock project had no nexus with the LPV.

- The DFE does not apply because regulations and manuals required that the Corps perform an engineering analysis to determine whether WGI's excavations would reduce the effectiveness of the LPV levee.  Further, NEPA required an

---

[2]*In re Katrina,* 533 F. Supp. 2d 615, 635 (E.D. La. 2008).

assessment of the environmental impact of WGI's excavations. Entergy also argues that, the challenged conduct was driven entirely by economics, not policies.

● The initial suits satisfied § 2675(a) because they gave notice more than six months before the duplicative suits were filed. Entergy's initial suit was timely because it was filed on the same calendar date six months after Entergy presented its claims administratively.

The plaintiffs' arguments are unavailing.  First, as to § 702c, the plaintiffs concede that they are suing for damage caused by floodwaters that a flood-control project failed to control.  In our view, this concession establishes the applicability of § 702c.  But even if, as this Court has concluded, something more is required to make § 702c apply, those elements are present here. Indeed, the plaintiffs' arguments fail under this Court's construction of the statute.  The Court applied § 702c to the outfall canals, not because they were the product of flood-control legislation, but because they were "wrapped into" the LPV when the Corps built floodwalls along them.[3]  The surge that breached those walls became "flood waters emanating from a flood-control project."[4]

Second, as to the discretionary-function exception, the plaintiffs' arguments fail because the applicable regulations and manuals do not remove discretion.  The plaintiffs cite regulations and manuals that are either

[3]*In re Katrina,* 533 F. Supp. 2d at 639.

[4]*Id.* at 637.

inapplicable or not mandatory and specific.  The lock project was in the construction phase, so the cited provisions pertaining to operation or maintenance simply do not apply.  The cited manuals provide guidance for designing or building dams, floodwalls, or levees.  They do not apply to the challenged conduct, which did not involve those activities.  Further, the manuals and regulations are not mandatory in the relevant sense:  they do not remove discretion.  Instead, they provide guidance while allowing room for deviation in their application.  Indeed, their breadth and generality require that Corps employees exercise judgment and choice in deciding whether these regulations and manuals applied and, if so, then how to apply them to the task at hand.

The plaintiffs' NEPA argument is fundamentally flawed.  NEPA is a purely procedural statute.  NEPA does not mandate particular results.  It prescribes a process for assessing environmental impacts but does not prescribe a course of action for the agency to follow after making those assessments.  Thus, even if the Corps had undertaken the NEPA-related activities that the plaintiffs say were required, the Corps would have had the same freedom to prosecute the EBIA remediation as it had absent those activities.

Finally, the argument that the initial complaints satisfied § 2675(a) does not address, much less attempt to explain, how those documents, which

commenced the litigation, provided an opportunity for the Corps to investigate and compromise the plaintiffs' claims.  They cite no case, and we are aware of none, in which a pending federal action was deemed to exhaust administrative remedies vis-a-vis an identical, subsequently filed duplicative suit.  Moreover, the plaintiffs do not even attempt to provide a reason for allowing the maintenance of such duplicate suits, filed merely to circumvent an obstacle that could not be surmounted by amending the original action.  Lacking any reasoned basis for the ruling that they seek, they cling to the Court's previous decision and ask that it be reaffirmed.

## ARGUMENT

### I.  PLAINTIFFS FAIL TO SHOW THAT THE CHALLENGED CONDUCT WAS NEITHER COMPRISED BY A FLOOD-CONTROL PROJECT NOR RELATED TO SUCH A PROJECT.

Recognizing that the Court has applied the Flood Control Act to "flood waters emanating from a flood control project,"[5] the plaintiffs argue that neither the IHNC nor the lock-replacement project "are part of the LPV or any other flood control project."[6]  Their argument rests on a formalism:  the laws that authorized the IHNC and the lock project were not flood control legislation.  They point out that "[t]he purpose of the new lock was . . . 'to

---

[5]*In re Katrina,* 533 F. Supp. 2d at 637.

[6]MRGO Plt. Opp. [Doc. 20035] 3; *see also* Entergy Opp. [Doc. 20033-1] 5-8.

improve navigation . . . .'"[7] And they assert that the presence of levees and floodwalls along the IHNC "is of no moment" because "[t]he same is true of the MR-GO . . . ."[8]

These arguments miss the mark because they ignore the undisputed fact that is dispositive of these cases: the alleged damage is from floodwaters that a flood-control project failed to control.[9] These arguments are also foreclosed by this Court's own prior rulings, which hold that § 702c immunity applies not only to flood-control projects but also to extrinsic conduct that has a nexus to a flood-control project.[10] As noted in our opening brief, the lock-replacement project itself included flood-protection elements—the construction and enlargement of levees between the new lock and the river, creating a significant nexus between the lock project and two flood-control projects whose levees were being improved.[11] The *Armstrong* plaintiffs do not even address the fact that the lock project involved the construction and improvement of flood-control levees. Entergy attempts to evade this

---

[7]*Id.* at 4.

[8]*Id.*

[9]*See United States v. James,* 478 U.S. 597, 605 (1986).

[10]*See* Doc. 6194, at 5; *In re Katrina,* 577 F. Supp. 2d 802, 818, 824-25 (E.D. La. 2008).

[11]*Cf.* USA Opening Brief 11 (fact no. 30) (IHNC lock itself reduces risk of flooding).

inconvenient fact by arguing that § 702c applies only to flood-control projects that are identified as such in the authorizing legislation.

Attempting to bring their claims into the *Robinson* realm rather than the realm of the Levee ruling, the plaintiffs assert that the MRGO, like the IHNC and the outfall canals was "'bounded by flood-control structures.'"[12]  If the Court had so found, however, then it would have applied § 702 in *Robinson,* under the construction the Court had previously adopted.

What is undisputed here, however, and what disposes of the plaintiffs' claims, is that the IHNC and the outfall canals were all guarded by LPV levees and floodwalls on both sides, from end to end.  These floodworks were built to prevent "damage caused by flood waters emanating from" them.[13]  In the same way that the outfall canals were folded into the LPV when floodwalls were erected along their banks, so too was the IHNC folded into the LPV when levees and floodwalls were built along that canal.[14]  Indeed, the Court has already taken note of the IHNC's incorporation into the LPV.[15]

---

[12]MRGO Plt. Opp. 4.

[13]533 F. Supp. 2d at 637.

[14]*See In re Katrina,* 533 F. Supp. 2d at 638.

[15]*See In re Katrina,* 533 F. Supp. 2d at 638-39; *cf. id.* at 620 n.4 (noting that the Barrier Plan included new and enlarged levees and floodwalls at the IHNC).

The plaintiffs attempt to distinguish the IHNC from the outfall canals on the basis of the legislation that directed the Corps to build levees along the outfall canals.[16]  But this distinction fails because the levees and floodwalls along the IHNC were also built because of legislation that directed the Corps to put them there.[17]  Just as § 702c provided immunity for damage caused by floodwaters escaping from the Madera Canal, in California's Central Valley, so too is immunity provided for damage caused by the floodwaters that escaped from the IHNC during Hurricane Katrina.[18]

Inexplicably the plaintiffs assert that the challenged "'course of conduct . . . does not concern the LPV directly.'"[19]  They do not even acknowledge the many direct connections between the lock-replacement project and the LPV.

---

[16]*See* MRGO Plt. Opp. 5; Entergy Opp. 8.

[17]*Compare* Pub. L. No. 89-298, 79 Stat. 1073, 1077 (1965) (authorizing "hurricane-flood protection . . . substantially in accordance with the recommendations of the Chief of Engineers in House Document Numbered 231, Eighty-ninth Congress") *with* H.R. Doc. No. 89-231, at 9 (1965) (recommending "construction of a concrete-capped sheet-pile wall along the levee west of the Inner Harbor Canal in New Orleans; . . . construction of a concrete-capped sheet-pile wall along the east levee of the Inner Harbor Canal between the Gulf Intracoastal Waterway and the New Orleans Airport; construction of a concrete-capped sheet-pile wall along the east levee of the Inner Harbor Canal extending from the existing lock to the Gulf Intracoastal Waterway") *and id.* at 18 ("The plan of protection recommended . . . provides for the improvement of the existing levee along the Inner Harbor Navigation Canal . . . ."); *id.* Plate 3 (depicting planned "improvements" along the IHNC).

[18]*See In re Katrina,* 533 F. Supp. 2d at 635 (immunity attached to floodwaters emanating from Madera Canal even though canal served no flood-control purpose).

[19]MRGO Plt. Opp. 6.

The new lock project so directly "concerned" the LPV and the MR&T projects that it required the construction of additional levees and the improvement of existing ones.[20]  The EBIA remediation so directly "concerned" the adjacent LPV levees that the Corps's Contracting Officer Representative established a zone of exclusion to prevent damage to them.  Only by ignoring the direct and substantial links between these projects can the plaintiffs claim that they are challenging conduct that is "wholly independent" of the flood-control projects.[21]

The plaintiffs' final attempt to distinguish these claims from those that were dismissed in the Court's Levee ruling is to label them "extrinsic" and point out that "the EBIA claims are not predicated on the defective design, maintenance, or operation of the floodwalls along the IHNC."[22]  They then invoke the familiar metaphor of "'the Navy ship that hits the levee,'" describing the vessel here as "a submarine that undermined the levees."[23]  The distinction fails, however, and the metaphor is inapposite because, as we have

---

[20]*See* USA Opening Brief 12 (fact no. 35).

[21]Entergy Opp. 6; *accord* MRGO Plt. Opp. 6.

[22]MRGO Plt. Opp. 5.

[23]*Id.* at 6.

already demonstrated, the IHNC was part of the LPV.  The label "extrinsic" is therefore inapposite.

The fact that the plaintiffs are not suing for defects in the levee or the floodwall does not prevent the application of § 702c.  The Court's reasoning in its Levee opinion makes it clear that when floodwaters emanate from a flood-control project, § 702c applies even to conduct that is only tangentially related to flood control:

> Once the 17th Street Canal was incorporated into LPV, which is undoubtedly a flood control project, and the Corps erected the floodwalls that did eventually fail creating floodwaters damaging plaintiffs herein, the fact that those levees and/or floodwalls were part of the LPV created immunity for the Corps under § 702c for whatever defalcations it might have made in permitting the dredging of the 17th Street Canal.[24]

In short, the challenged conduct here is not extrinsic to a flood-control project and cannot be likened to an external force impacting a flood-control project because the IHNC was "wrapped into" the LPV and the lock project itself was directly and substantially related to the LPV and the MR&T projects. Indeed, the lock project required the construction and enlargement of levees. For these reasons, § 702c requires that the plaintiffs' claims be dismissed.

---

[24]*In re Katrina,* 533 F. Supp. 2d at 638-39.

## II. THE CORPS DID NOT DEVIATE FROM REGULATIONS OR MANUALS THAT PRESCRIBED PARTICULAR CONDUCT FOR THIS PROJECT.

The plaintiffs cite two regulations and four manuals as documents that removed discretion from the Corps's Contracting Officer Representative Lee Guillory. By their terms, these documents were not mandatory in the relevant sense–*i.e.,* they did not remove discretion. The first cited regulation, ER 1110-2-1150, "provides *guidance* for developing and documenting quality engineering analyses and designs for projects and products on time and in accordance with project management policy for civil works activities."[25] The regulation variously pertains to the five phases of a civil works project: reconnaissance, feasibility, preconstruction engineering and design, construction, and operation and maintenance.[26]

A project enters the operation phase, also referred to as "[o]peration, maintenance, repair, replacement, and rehabilitation (OMRR&R)," following completion of a project.[27] The EBIA remediation occurred during the construction phase. The new lock was far from being completed, and Task Order 26 itself did not close until the Corps approved WGI's Technical

---

[25]USA Ex. 33, at § 1 (emphasis added).

[26]*Id.*§ 6.1.

[27]*Id.* § 16.

Completion Report on August 23, 2005.[28]  These facts doom the plaintiffs'

argument.  They say Guillory failed to comply with § 16 of ER-1110-2-1150,

particularly § 16.1, which is captioned, "Support of Operations Activities," and

§ 16.4, captioned "Operational Deviations from the Plan."  Because the

challenged conduct occurred while the project was still in the construction

phase, the regulatory provisions cited by the plaintiffs do not apply.

Therefore, Guillory did enjoy the discretion to decide what resources to tap in

reviewing WGI's work plans.  In some instances, he did seek an in-house

geotechnical analysis and in others he did not.[29]

As noted in our opening brief, Guillory considered a variety of factors in

deciding not to request an in-house analysis of WGI's plan for excavating the

wedding cake.[30]  Whether Guillory's decisions were right or wrong is hotly

disputed.  The plaintiffs say more in-house reviews would have kept water

from destabilizing the levee during Hurricane Katrina.  Independent

---

[28]*See* Doc. No. 15861-2, at 42 (WGI MSJ).

[29]*Compare* 2 Guillory Dep. 153:7-20 (explaining why he asked the District's
Geotechnical Branch to review WGI's borrow-pit plan) *with* 1 Guillory Dep. 210:17 – 212:2
(explaining why he chose not to have such a review of WGI's wedding-cake excavation
plan).  *Cf.* 2 Grieshaber Dep. 11:16 – 12:9 (Guillory had discretion to determine when to
consult Corps's geotechnical engineers), 17:9 – 19:15 (Guillory had discretion to accept
licensed engineer's analysis).

[30]*See* Opening Brief 40-41; *cf. id.* at 14-16 (describing Guillory's responsibilities and
performance).

engineering analyses performed after the event concluded that WGI's excavations played no role in the disaster.  Regardless, this dispute is irrelevant here, for even if the plaintiffs' contention is correct, it merely shows that Guillory abused his discretion.  The discretionary-function exception protects decisions such as these from forming a basis of liability in tort, even if the decisions are wrong.[31]

The plaintiffs also cite ER 1110-1-8157 as a regulation that was violated. This regulation did not apply, because it was not promulgated until after the challenged conduct had occurred.  It was promulgated on October 1, 2002.[32] The Corps approved WGI's sewer-lift-station-excavation plan on October 19, 2001.[33]  WGI's plan for removing the wedding cake was approved on December 13, 2001.[34]  In any event, the Corps followed this regulation's "principles and guidelines" during its review of WGI's site characterization and related geotechnical data.[35]

---

[31]*See* 28 U.S.C. § 2680(a) (excepting discretionary functions "whether or not discretion involved be abused").

[32]*See* ER 1110-1-8157, at 1.

[33]Opening Brief 24 (citing *In re Katrina,* 2008 WL 5234369 (Dec. 15, 2008 E.D. La.) at *8).

[34]*Id.* at 26 (citing *In re Katrina,* 2008 WL 5234369, at *12).

[35]ER 1110-1-8157 § 1; see also USA Opening Brief 47-48.

The plaintiffs also argue that the Corps's discretion was cabined by four manuals.  But the manuals they cite do not apply to the challenged conduct.

- **EM 1110-2-2502**, "Engineering and Design: Retaining and Flood Walls," provides "guidance for the safe design and economical construction of retaining and flood walls."[36]

- **EM 1110-2-1901**, "Engineering Design: Seepage Analysis and Control for Dams," presents "the fundamental design principles and guidance concerning seepage considerations for design of new dams and the evaluation of existing projects."[37]

- **EM 1110-2-2504**, "Engineering and Design: Design of Sheet Pile Walls," provides "information on foundation exploration and testing procedures, analysis techniques, allowable criteria, design procedures, and construction consideration for the selection, design, and installation of sheet pile walls."[38]

- **EM 1110-2-1913**, "Engineering and Design: Design and Construction of Levees," presents "basic principles used in the design and construction of earth levees."[39]

By their terms, these manuals do not apply to the events in question.  The plaintiffs attempt to finesse this by adducing the contrary opinion of Robert Bea.  Dr. Bea's opinion carries no weight, however.  The application of these

---

[36]Entergy Ex. 20, at 3.

[37]Entergy Ex. 21, at 4.

[38]Entergy Ex. 22, at 3; *cf. id.* (this "manual is intended to provide examples and procedures of what has been proven successful" and is not the "last nor final word on the state of the art for this technology").

[39]Entergy Ex. 11, at 4; *cf. id.* (this "manual is . . . not intended to replace the judgment of the design engineer on a particular project").

manuals can be determined on the basis of the documents themselves.  If they were ambiguous, then the Court could seek clarification in the agency's construction.[40]  But since the manuals are unambiguous, then not even the agency's construction could effect a change in their import.[41]  The manuals in question expressly state their purpose and describe their scope, and neither their purpose nor their scope encompasses the conduct that is at issue here.

## III.  NEPA, A PURELY PROCEDURAL STATUTE, DOES NOT CABIN DISCRETION.

### A.  NEPA'S PROCEDURES ALLOWED ROOM FOR CHOICE.

The Corps's substantive authority to undertake the lock-replacement project resides not in NEPA but in the same law that authorized the construction of the MRGO.[42]  Indeed, NEPA is not the source of any authority for the Corps, or any other federal agency, to take substantive action.  "NEPA is a procedural statute that requires a federal agency contemplating a 'major Federal action[ ] significantly affecting the quality of the human environment' to take environmental considerations into account in its decisionmaking

---

[40]*See Coeur Alaska, Inc. v. Southeast Alaska Conserv. Council,* — U.S. — , 129 S. Ct. 2458, 2469 (2009); *Frame v. City of Arlington,* — F.3d — , 2010 WL 3294409 (5th Cir. Aug. 23, 2010) at 5.

[41]*See Frame,* — F.3d — , 2010 WL 3294409, at 5.

[42]*See* Pub. L. No. 84-455, 70 Stat. 65 (1956).

process."[43] Once Congress authorizes the Corps to undertake a project, only then does the Corps apply the procedural requirements of NEPA.  Those procedures do not remove discretion.  On the contrary, they contemplate that the agency will exercise judgment and choice regarding environmental impacts.  NEPA initially requires the agency to decide whether a contemplated action is "major" and, if so, whether it will "have a 'significant impact on the environment."[44]  If an agency decides that its contemplated action is "major," then NEPA requires that the agency perform an environmental assessment ("EA") and report its conclusions in an EIS or a FONSI.[45]  Thus, while NEPA imposes a process that the Corps must follow before it acts, the process itself is one that involves "an element of judgment and choice."[46]

Further, at the conclusion of this process, NEPA does not limit the agency's discretion in proceeding with the contemplated action.  Because NEPA "*is a procedural statue, mandating only . . . a particular process,*"[47] it "provides no

---

[43]*Medina County Envt'l Action Ass'n v. Surface Transp. Bd.,* 602 F.3d 687, 695 (5th Cir. 2010) (quoting 42 U.S.C. § 4332(2)(C)).

[44]*City of Dallas v. Hall,* 562 F.3d 712, 717 (5th Cir. 2009) (quoting *Sabine River Auth. v. U.S. Dep't of the Interior,* 951 F.2d 669, 677 (5th Cir. 1992)).

[45]*Id.* at 717-18.

[46]*United States v. Gaubert,* 499 U.S. 315, 322 (1991).

[47]*Sierra Club v. Peterson,* 185 F.3d 349, 373 n.34 (5th Cir. 1999) (contrasting NEPA with the National Forest Management Act) (emphasis in original).

substantive guarantees."[48]  It "does not command the agency to favor an

environmentally preferable course of action . . . ."[49]  It does not even "prohibit

the undertaking of federal projects patently destructive of the environment; it

simply mandates that the agency gather, study, and disseminate information

concerning the projects' environmental consequences."[50]  By its very nature,

NEPA cannot prevent application of the discretionary function to a major

federal action, because NEPA leaves "room for choice" in the undertaking.[51]

As a matter of law, then, NEPA cannot dictate a particular outcome, because

the agency has the prerogative to elect the same course of action once it has

completed the required analysis.[52]  And whether a different NEPA analysis

would have resulted in the same substantive decision is one that, as a matter

of law, courts will not prejudge.[53]

These cases are particularly relevant here because they demonstrate that

NEPA is not a discretion-removing statute.  Whether the agency—here, the

---

[48]*Spiller v. White,* 352 F.3d 235, 238 (5th Cir. 2003).

[49]*Id.*

[50]*Sabine River Auth. ,* 951 F.2d AT 676.

[51]*Gaubert,* 499 U.S. at 322-23.

[52]*See Sabine River Auth.,* 951 F.2d at 676.

[53]*See Sierra Club v. Sigler,* 695 F.2d 957, 983 (5th Cir. 1983) ("We, of course, may not and do not express an opinion on the merits of the permits" that the Corps might re-issue after preparing a revised EIS on remand).

Corps—would have carried out the project differently if a NEPA analysis (or, as would have been the case here, an additional NEPA analysis) had been undertaken is beside the point.  The point relevant to the DFE is that whether to change the project or carry it out as originally planned would have been a matter entirely within the agency's discretion.  For this reason, the supposed NEPA violation alleged by the plaintiffs does not prevent application of the DFE.  The Corps's discretion in deciding how to remediate the EBIA was not diminished in any way by NEPA.

Disregarding the fundamental nature of the statute, Entergy invites the Court to examine the process and scrutinize the Corps's decisions.  Entergy argues that "[t]he failure to include in an EIS, a supplemental EIS, or an EA the potential hazards posed by the excavations necessary to complete the initial environmental restoration renders the Corps in clear violation of NEPA."[54] Even if this assertion were correct, it would merely show that the Corps erred in deciding what to include in the EIS.  NEPA provides a general description of what an EIS must contain, but it certainly did not eliminate the Corps's

---

[54]Entergy Opp. 13.

discretion in deciding whether the document should include that particular elements that Entergy is focusing on.[55]

The same flaw afflicts Entergy's argument that the discovery of subterranean structures presented "'a "seriously different picture of the environmental landscape" such that another in-depth look at the environment is necessary.'"[56]   Whether the removal of a handful of structures extending to a depth of 25 feet "seriously" altered the environmental landscape is dubious, to say the least.   The site was slated for excavation to a far greater extent to create a deep-draft shipping channel.   Be that as it may, Entergy's argument again highlights the room that NEPA afforded for the Corps to decide whether an additional environmental assessment was required.[57]

Allowing NEPA to defeat the discretionary function exception cannot be squared with *Noe v. Metro. Atlanta Rapid Transit Auth.,* 644 F.2d 434,435 (5th Cir. 1981), which rejected the availability of an action for tort damages under

---

[55]*See Medina County Envt'l Action Ass'n,* 602 F.3d 695 n.13; *Sabine River Auth.,* 951 F.2d at 676.

[56]Entergy Opp. 16.

[57]*See Spiller,* 352 F.3d at 242 ("in taking a 'hard look' at whether a proposed activity's impact will be significant, the relevant regulations instruct the Lead Agencies to consider both the 'context' and the 'intensity' of the impacts.  40 C.F.R. § 1508.27").

NEPA.[58]  There, the court reviewed the statute and its history and concluded

"that there was no desire to have NEPA used as a vehicle for judicial redress of

private injuries."[59]  The purpose of NEPA, the court said, is to provide agency

decision-makers with the best projections of environmental impacts.[60] But

such projections are necessarily just "scientific approximations," the court

reasoned, which are unlikely to be "absolutely accurate in all cases."[61]  The

court explained:

> If private citizens are allowed to sue for money damages each time one
> of these projections turns out to be inaccurate, the result is likely to be
> that those making the predictions will "hedge" their estimates of the
> impact of a given project.  Rather than being consistent with the
> statutory purpose of providing decision-makers with the best available
> information, the result is likely to be that they would receive distorted
> information.[62]

The logic of Noe suggests that the Fifth Circuit would not permit NEPA to

serve as the basis for defeating the discretionary function exception.

Otherwise, tort claimants could circumvent the holding in Noe by pleading an

FTCA claim—a result that would elevate form over substance.

---

[58]*Id.* at 435.

[59]*Id.* at 438.

[60] *Id.* at 439.

[61]*Id.*

[62]*Id.*

**B. Applying NEPA in this context distorts the statute.**

To obtain judicial review of a NEP A document, a party ordinarily must bring suit under the Administrative Procedure Act ("APA").[63]  Prior to raising an issue in litigation, the party must present its concern to the administrative agency through the public comment process.[64]  And when it brings suit, it must do so within the six-year statute of limitations applicable to APA claims.[65]  Also, judicial review is conducted based upon the administrative record for the challenged decision, and litigants typically are not able to rely upon extra-record evidence.[66]  Further, courts apply a deferential standard of review, especially with regard to an agency's scientific findings.[67]

Entergy invites the Court to undertake a review without observing any of the strictures that ordinarily compass a review of agency action under the APA.  The EIS in question was published in 1997, so any review would be far

---

[63]*See Lujan v. Nat 'I Wildlife Fed'n,* 497 U.S. 871, 882 (1990).

[64] *See Dep't of Transp. v. Pub. Citizen,* 541 U.S. 752, 764-65 (2004).

[65]28 U.S.C. § 2401(a); *see Geyen v. Marsh,* 775 F.2d 1303, 1306-07 (5th Cir. 1985).

[66]*See Fla. Power & Light v. Lorion,* 470 U.S. 729, 743-44 (1985).  *But see Sierra Club v. Peterson,* 185 F.3d 349,371 (5th Cir. 1999), *rev'd on other grounds,* 228 F.3d 559 (5th Cir. 2000) (en banc) (allowing trial evidence where "the administrative record was entirely inadequate").

[67]*See Spiller v. White,* 352 F.3d 235, 240 (5th Cir. 2003) ("NEPA-related decisions are accorded a considerable degree of deference.").

beyond the six-year limitations period.  Energy has not made any reference to the administrative record but instead invites the Court to conduct its review based upon the record in this case without any deference to the agency's decisions.[68]  Under these circumstances, the Court should refuse to distort NEPA by applying it in a way that is plainly at odds with the statute's purpose and procedures.

## IV. PLAINTIFFS CITE NO AUTHORITY OR REASONING TO DEEM PENDING ACTIONS AS HAVING EXHAUSTED ADMINISTRATIVE REMEDIES FOR THE CLAIMS SET FORTH THEREIN.

In their opposition papers, the plaintiffs present no arguments to support viewing their prior pending lawsuits as having exhausted their administrative remedies.  Instead, they point to distinctions in the cases relied upon by the United States without showing that those distinctions matter, and they excerpt statements from this Court's prior ruling in an attempt to demonstrate that the Court has already fully considered the issue presented.

The *Armstrong* plaintiffs, for example, argue that "the reasoning in *McNeil* is inapposite to the logic relied upon by the Court" because "McNeil did not file a new suit."[69]  The plaintiffs also point out that "the agency there actually

---

[68]*See* Entergy Opp. 8-12.

[69]MRGO Plt. Opp. 17-18.

denied the administrative claim, thus invoking a different limitations period

than presented before this court."  The plaintiffs do not attempt to explain

why these distinctions make a difference but simply assert that "*McNeil* does

not support dismissal of Plaintiff's [sic] EBIA claims."[70]  *McNeil,* of course,

stands for the proposition that prematurely filed suits must be dismissed,

even if no substantial progress has occurred in the litigation.[71]  The Court

insisted on "strict adherence" to § 2675(a), the "clear statutory command"

that "bars claimants from bringing suit in federal court until they have

exhausted their administrative remedies."[72]  If the plaintiffs' suits are

premature, as indeed they are, then *McNeil* does not merely support dismissal,

it mandates dismissal.  Moreover, theses suits are duplicative of previously

filed suits that remain pending.  The dubious propriety of maintaining these

duplicative suits shines a light on the similarity of the present circumstances

to those at issue in *McNeil.*  The Supreme Court refused to allow the claims to

proceed in litigation, not because the plaintiff had failed to present them to the

agency—indeed, he had—but because he filed suit before doing so.  The same

---

[70]*Id.* at 17.

[71]*See McNeil v. United States,* 508 U.S. 106, 113 (1993).

[72]*Id.*

is true here:  the *Armstrong* plaintiffs filed suit before presenting their EBIA claims to the Corps.

The plaintiffs contend that two cases cited by the United States "bolster the Court's prior ruling on this issue."[73]  But their discussion of these cases fails to back up their claim.  First, they note that the plaintiff in *Brady v. United States,* 211 F3d 499 (9th Cir. 2000), "did not present an administrative claim until after the first and second complaints were dismissed."[74]  Here again the plaintiffs fail to explain why this distinction matters.  It does not.  Then they assert that "the Ninth Circuit even commented that the plaintiff had never asked the agency to treat the complaint as an administrative claim, thus advising the agency or her intent to pursue the claim."[75]  This is not even a distinction.  The present plaintiffs did not ask the Corps to treat their complaints as administrative claims.

As in their discussion of *McNeil,* the plaintiffs ignore the holding of the case and seize on irrelevant details.  In *Brady* the Ninth Circuit held that service of the first complaint on the agency did not satisfy the FTCA's administrative-

---

[73]MRGO Plt. Opp. 18.

[74]*Id.*

[75]*Id.*

claim requirement with respect to the second claim.[76]  Like the present

plaintiffs, she argued that she satisfied the requirements of 28 U.S.C. § 2675(a)

"because her first complaint put the agency on notice of all the essential

elements of her claim. In Plaintiff's view, the service of that first judicial

complaint on the agency, in 1996, amounted to the presentation of an

administrative claim to the agency, thus satisfying the jurisdictional

prerequisite for her second complaint."[77]  The Ninth Circuit rejected her

argument for the same reason that this Court should reject it:  the first suit did

not allow the agency "to investigate and, if possible, settle the claim *before it*

*went to court.*"[78]

   The plaintiffs argue that *Houston v. United States Postal Service,* 823 F.2d

896 (5th Cir. 1987), bolsters their case because the court "opined that 'if the

United States had been served in the six months after the administrative

denial, and had removed the case to federal court within that time, the action

would have timely commenced.'"[79]  The quotation is misleading for two

reasons.  First, the quote comes from a footnote in which the court notes that

---

   [76]211 F.3d 503.

   [77]211 F.3d 502.

   [78]*Id.* at 503.

   [79]MRGO Plt. Opp. 18 (quoting *Houston,* 823 F.2d at 904 n.4).

it is raising questions that it not only does not reach but "do[es] *not* suggest answers to."[80]  The full sentence in the footnote makes this clear:  "In this case, it also *might* be arguable that if the United States had been served in the six months after the administrative denial, and had removed the case to federal court within that time, an action would have timely commenced under section 2401(b) even though the original state suit was premature."[81]

Second, in the body of its opinion the court points out that the state-court action could not have been maintained even if it had been removed to federal court within the limitations period:  "Had the United States been served with process in Houston's state suit, it no doubt would have removed the case to federal court, where *the judge would have had to dismiss the case* for lack of jurisdiction."[82]  The court's reasoning applies here with equal force:  the suit could not be maintained because "Houston had not exhausted his administrative remedies, as required by section 2675(a), at the time he

---

[80]823 F.2d 904 n.5 (emphasis in original).

[81]*Id.* (emphasis in original).

[82]*Id.* at 903 (emphasis added).  In contrast, the present plaintiffs' premature suits have *not* been dismissed.  Their continuous pendency has precluded administrative settlement, thereby frustrating the purpose of the exhaustion requirement.  See USA Opening Brief 54-57.

commenced his state suit."[83]  His problem is the present plaintiffs' problem: "relying on a suit brought *before* he had exhausted his administrative remedies."[84]  *Houston,* like *Brady* and *McNeil,* supports dismissal of these actions, which were filed before the plaintiffs exhausted their administrative remedies.

## CONCLUSION

Three independent grounds support dismissal.  Immunity is provided by 33 U.S.C. § 702c because these suits seek to impose liability for damage from floodwaters that a flood-control project could not control.  The challenged conduct—supervision of WGI, a government contractor—occurred within a flood-control project and was substantially connected to two other flood-control projects.

The FTCA's discretionary-function exception protects this conduct because the government employees in question were exercising judgment and choice within a statutory and regulatory framework that gave them options and allowed them to take policy considerations into account.  No statute or regulation was violated.

---

[83]*Id.*

[84]*Id.* (emphasis in original).

Third, and finally, these suits cannot be maintained because they were filed before the plaintiffs exhausted their administrative remedies.  The Corps could not settle the claims in these cases administratively because the claims were asserted in litigation before the administrative review period concluded. Suits filed before administrative remedies are exhausted must be dismissed.

For these reasons, the United States' motion to dismiss should be granted and Entergy's motion for partial summary judgment should be denied.

Respectfully Submitted,

TONY WEST
Assistant Attorney General

PHYLLIS J. PYLES
Director, Torts Branch

JAMES G. TOUHEY, JR.
Assistant Director, Torts Branch

 s/ Robin Doyle Smith
ROBIN DOYLE SMITH
Senior Trial Counsel, Torts Branch
DAN BAEZA
Trial Attorney, Torts Branch
Civil Division
U.S. Department of Justice
Benjamin Franklin Station,
P.O. Box 888
Washington, D.C.  20044
(202) 616-4400/616-5200 (fax)
robin.doyle.smith@usdoj.gov
Attorneys for the United States

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true copy of the foregoing was served upon all counsel of

record by ECF on September 23, 2010.

/s  Robin Doyle Smith
ROBIN DOYLE SMITH
