**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| IN RE:  KATRINA CANAL BREACHES CONSOLIDATED LITIGATION | CIVIL ACTION |
| | NO. 05-418 |
| PERTAINS TO BARGE | |
| | SECTION "K" |

| | | |
|---|---|---|
| Mumford | C.A. NO. 05-5724 | as to plaintiffs Josephine Richardson and Holiday Jewelers, Inc. - ONLY |
| Benoit | C.A. NO. 06-7516 | as to claims of plaintiffs John Alford and Jerry Alford - ONLY |

**BARGE PLAINTIFFS' REPLY TO**
**LAFARGE NORTH AMERICA, INC.'S POST-TRIAL BRIEF**

**CONTENTS**

I.  PROOF OF LIABILITY                                                                3

A.  Maritime Negligence                                                              3

    1.      Lafarge Owed the Plaintiffs a Duty of Reasonable Care.              3

    2.      The Drifting Vessel Doctrine.                                       5

    3.      The Breakaway of ING 4727 Was Not an Inevitable Act of God.         5

    4.      The Louisiana Rule                                                  6

    5.      Lafarge Could Have Halted Unloading.                                7

    6.      Lafarge Could Have Moved or Ballasted ING 4727.                     7

B.  Meteorological Evidence                                                          8

    1.      Lakefront Airport Data                                              8

    2.      Evidence that Weather Observations Were Limited                     8

    3.      Double Dealiased Radar Data                                         10

    4.      Mr. Lemon's Confusion                                               11

5.     Dr. Mitchell and the Lakefront Airport Data                              12

•     Local Climatological Data/ Hourly Precipitation Data                13

•     Level II Data Examined by Dr. Mitchell                              13

•     Masking the Mesocyclone                                            13

•     Mesocyclone Effects on the Ground                                  14

C.  Physical Evidence                                                        14

1.     The North Breach                                                  15

2.     The South Breach                                                  16

D.  Witness Testimony Misconstrued                                           17

E.  Geotechnical Evidence                                                    18

1.      Alleged Tension Gap                                             18

2.     Alleged Floodwall Instability                                   19

•     Photo-visualization or calculation of soil composition          20

•     Boring 81a                                                       21

•     WGI Fill Material                                                22

•     The Marsh Strata                                                 23

•     Cone Penetrometer Testing                                        24

3.     Wall Height                                                     24

4.     Exhumed Sheet Pile                                             25

II.  LAW                                                                    26

A.  Causation                                                               26

1.     The Pennsylvania Rule                                          26

2.     Substantial Factor                                            29

III.  DAMAGES                                                      30

A.  Apportionment                                                 30

B.  "Would-Have-Happened-Anyway"                                  31

B.  Road Home Benefits                                            32

IV. CONCLUSION                                                    33

**MAY IT PLEASE THE COURT:**

Lafarge's revisionist description of the trial record, and their absolutist mantra - "impossible" - lays bare the defense's acknowledgment that the trial, if it was one-sided, did not incline to Lafarge's advantage. Lafarge simply ignores evidence it does not like.

## I.   PROOF OF LIABILITY

### A.  Maritime Negligence

1.    ***Lafarge Owed the Plaintiffs a Duty of Reasonable Care.***  LNA argues that flooding was not a foreseeable consequence of a breakaway, but does not properly frame the issue.  The question is whether the flooding was foreseeable as a result of the breakaway of a 500 ton barge which struck a floodwall (built to prevent floods) only several hundred feet from the mooring site.  In ***Signal Intl. LLC v. MISS DOT***, 579 F.3d 478 (5th Cir. 2009), the court provides an exhaustive explanation of legal duty and foreseeability.  "Duty…is measured by the scope of the risk that negligent conduct foreseeably entails." ***Consol. Aluminum***, 833 F.2d 65, 67 (5th Cir. 1987); *see also* ***id***. (the determination of duty "involves a number of factors, including most notably the foreseeability of the harm suffered by the complaining party." (citing, e.g. PROSSER AND KEETON ON TORTS § 53 (5th ed. 1984).  In ***Signal***, the Court addressed

the unpredictable movements of a breakaway barge over nearly 5 miles of land and bayous as a result of Hurricane Katrina before striking a bridge.

In *Signal*, the Fifth Circuit Court of Appeal extensively cited *In Re Kinsman*, 338 F.2d 708 (2d Cir. 1984). In *In Re Kinsman*, a vessel broke away as a result of predicted ice flow. The breakaway vessel caused another vessel to breakaway. The two vessels came to rest on a bridge causing a dam of the water. The dam resulted in flooding to upstream property. In *In re Kinsman*, Judge Friendly's learned discussion of the role of foreseeability in defining duty in admiralty cases led the Second Circuit to hold that "a ship insecurely moored in a fast flowing river is a known danger not only to herself but to the owners of all other ships and structures down-river, and to persons upon them." In *In re Kinsman*, the court found it foreseeable for an improperly secured vessel(s) to impact a bridge causing a dam and causing **flooding to property owners upstream**.

The court in *Signal* finding that the allision in that case was foreseeable noted "the approaching hurricane, the expected height and predicted movement of the storm surge, and the topology of the Pascagoula River basin gave rise to the need to moor the barges and made this allision a foreseeable consequence of negligence in that mooring." *Signal* at p. 493. The court further noted that "once unmoored and outside of the mooring area" it was "foreseeable to a reasonably thoughtful person" that the barges could reach the point of impact. (*Id*. at p. 494.)

Here, incidentally, is Plaintiffs' last word on the subject of trajectory: the barge got there how it got there. Trajectory matters much more to Lafarge's "impossibility" defense than does the plain reality that ING 4727 appears on Lafarge's records, at its terminal, at the North Breach, at the South Breach, and then on the wrong side of the floodwall. The Plaintiffs have established various means by which the barge would travel from the terminal to the breaches,

and in doing so, have refuted Lafarge's "impossibility" claims.  The LNA terminal was within several hundred feet of two bridges and a floodwall system protecting residents of the City of New Orleans.  It is foreseeable to a reasonably thoughtful person that with a predicted hurricane, an improperly moored vessel (weighing some 500 tons) would breakaway and impact a floodwall (built to prevent flooding and only a few hundred feet away) resulting in flooding.  It doesn't take a genius.

2. ***The Drifting Vessel Doctrine***.  As stated in Plaintiffs' original Post Trial Brief, a drifting vessel which breaks free from its moorings is presumed to have been mismanaged.  To rebut this presumption, Defendant must show that the breakaway could not have been prevented by "human skill and precaution and a proper display of nautical skill." ***Signal Intl, LLC vs. Miss. DOT***, 579 F.3d 478, 490 (5th Cir. 2009)  ***Jones vs. River Parishes Co., LLC,*** 686 F.2d 1129 (5th Cir. 1982)  Defendant cannot carry its heavy burden in this case as Defendant failed miserably in exercising human skill and precaution and a proper display of nautical skills.

3. ***The Breakaway of ING 4727 Was Not an Inevitable Act of God***.  Hurricane Katrina was foreseeable - not an Act of God "such that no reasonable preparations could have prevented" the breakaway.  While Defendant cites various cases where courts have found Act of God regarding the hurricanes in the past, Lafarge fails to address the fact that although Hurricane Katrina was ***predicted*** to be a Category 5 (meaning that it was foreseeable), when it made landfall in Buras, Louisiana it had ***diminished to a Category 3***.  It is undisputed by both Parties' experts that  winds did not exceed 92 mph in the IHNC.  This was the identical situation cited in ***Signal Intl, LLC vs. Miss. DOT***, 579 F.3d 478 (5th Cir. 2009)  where the court found that Katrina winds of 80-90 mph at a mooring site of a barge was ***not an Act of God*** "such that no reasonable

5

preparations could have prevented the allision and because the conditions experienced were foreseeable." *Id.* at p. 486  The Eleventh Circuit found likewise in ***Bunge vs. Freemont Marine Repair, Inc***., 240 F.3d 919 (11th Cir. 2001), regarding Hurricane Opal's 85-103 mph winds.

       4.    ***The Louisiana Rule***  Defendants claim incorrectly that Plaintiffs have not established sufficient evidence to trigger the Louisiana Rule.  As the floodwall was not a structure designed to come in contact with vessels, Plaintiffs need only produce circumstantial evidence that the ING 4727 contacted the floodwall to trigger the Louisiana Rule under applicable authority.  See e.g. ***Norfolk Southern Ry. v. Moran Towing Corp***., 2010 U.S. Dist. LEXIS 56683, 5-6 (E.D. Va. 2010) ("once the fact of contact between Bridge 5 and the COLUMBIA NORFOLK has been established, the Louisiana rule operates to shift the burden of proof to Moran to prove that the allision did not result from Moran's negligence.").[1]  Here, the record contains substantial evidence of ING 4727's contact with the floodwall at the North and South breach locations, including  eyewitness testimony (*Plaintiff's Finding of Fact*, 100 & 107), sound witnesses (*Plaintiffs' Finding of Fact,* 99), physical evidence of contact (*Plaintiffs' Finding of Fact,* 114-117), rebar scrapes on the bottom of the barge, and photographs of the barge on top of houses and/or a bus.  Significantly, far less evidence has been deemed sufficient to establish an allision.   See e.g. ***Pillsbury Co. v. Midland Enterprises, Inc.***, 715 F. Supp. 738, 757-58 (E.D. La. 1989) (concluding that circumstantial evidence that barges were adrift at the time damage to structures occurred was sufficient to support the finding that it was defendants'

---

[1] In *American Petrofina Pipeline Co. v. M/V Shoko Maru*, 837 F.2d 1324 (5th Cir., 1988), the court concluded that "when damage occurs to stationary objects designed to come into contact with vessels" such "contact must rise above a certain minimal level before it constitutes a collision at all, thus activating the presumption."  *See id.*, at 1326;  See also *Arkansas River Co. v. CSX Transp*., 780 F. Supp. 1138, 1142 (W.D. Ky. 1991) ("if the structure was designed to come in contact with ships, "the contact must rise above a certain minimal level before it constitutes a collision at all and activates the presumption.").  However, this standard is facially inapplicable where the stationary object was not designed to come in contact with vessels.  Indeed, this Court recognized this very fact in *Chalmette Terminal L.L.C. v. M/V Tzanetis*, 1998 U.S. Dist. LEXIS 13339, 13-14 (E.D. La. Aug. 20, 1998) ("the Court questions whether those cases are even applicable. The cases cited in Arkansas River and American Petrofina all deal with situations where the object damaged has been struck when it was being used for its intended purpose.").

barges that caused the damage to plaintiff's two structures even where no eyewitness saw a barge strike or touch the structures).

     **5.**    ***Lafarge Could Have Halted Unloading***.    Lafarge's manager, Ed Busch, asserts that Lafarge could not cease unloading operations as this would have left the vessel unstable with one end higher than the other.  This creative argument is contrary to LNA's own corporate policy to unload vessels as evenly as possible (PX13, Bates No. LNA 000471 at 6f), Mr. Busch's admissions on cross-examination (*Busch Testimony*, 71:4-6) , and common sense. Lafarge was aware that it takes approximately 20 hours to unload a barge.  Had LNA monitored the weather, LNA would have been aware that on Friday, August 26 ***as early as 11:00 EDT***, the National Hurricane Center placed New Orleans in the potential three day track of Hurricane Katrina (PX18, Advisory 12).  This was about 20 minutes prior to the time that Lafarge commenced unloading operations[2].

     **6.**    ***Lafarge Could Have Moved or Ballasted ING 4727***.    LNA was not monitoring the storm.  Had LNA monitored the storm, it would have had time for planning and removal of the barge.  LNA's argument that they could not remove the barge lacks factual support.[3]  Clearly, Defendant's argument that it could not have removed the barge from the canal is self-serving and unsupported by fact.  As for ballasting, simply ceasing unloading operations would have ballasted the barge as the weight of the cement inside the barge would have ballasted

---

[2] Unloading commenced at 12:20.  (PX62, Barge unloading report) (See *Busch Testimony*, p. 53:4-6.)

[3] First, Captain Grabert of the Regina H (the vessel which did not top around) testified that he would have removed the barge had he been asked to do so.  (DX330, Grabert depos., at p. 72-73)  Secondly, LNA was fully aware of the time it takes to unload a barge as they have handled 200-300 barges a year for the past many years.  (*Busch Testimony*, 50:8-0) As a consequence, LNA could have planned to have a vessel standing by to remove the barge to the Zito Fleet by calling in advance.  (*Busch Testimony* at p. 121:3-6)  Thirdly, while Zito Fleeting did close on Saturday morning, Zito manager, Mr. Boudreaux testified Zito allowed vessels into the fleet after the fleet closed because those incoming barges had advised Zito in advance.  (DX329, *Boudreaux Testimony, Limitation Action Trans.* at p. 25)  Further, even if LNA did not schedule the arrival in advance, Mr. Boudreaux admitted that the "chances are good we would have taken them in." (*Id.*at p. 26:9-15)  The owner of the barge, Ingram Barge Company, had a contract with Zito Fleeting which dedicated some 40 spaces in various fleets solely to Ingram barges.  (*Id.* at p. 18:2-5)  Fourth, other than an alleged phone call to Zito, Manager Ed Busch did nothing in follow up to have the barge moved.

it down.  Lafarge cites no compelling reason it could not have properly planned for the timely removal or ballasting of the barge.

**B.  Meteorological Evidence**

      1.    ***Lakefront Airport Data***:    Lafarge's discussion of the meteorological evidence does not fairly reflect the evidence received at trial.  For example, its many references to the high probative value of the observations from the Lakefront Airport (Lafarge Brief at 6, 8; Lafarge Proposed Findings 114, 115, 126, 133, 134, 135, 136, 137, 162, and 237) fail to mention or explain the erratic reporting from the Lakefront Airport prior to the complete failure of its anemometer, with resulting gaps in its data that could have concealed the presence of sustained changes in wind speeds or direction.  See Plaintiffs' Proposed Findings 558-569 and 572-586.  Similarly, defendant's reliance on the partial Lakefront Airport data ignores Dr. Dooley's concession the Lakefront Airport data would not be expected to show any signature of mesocyclones South of the IHNC.  *See* Plaintiffs' Proposed Finding 533.  Yet another example is that defendant attempted to validate the Lakefront Airport data by showing that other studies of wind speed and direction correlated with it (Lafarge's Proposed Finding 114), but completely failed to respond to plaintiffs' marshaling of the evidence that the other studies incorporated the Lakefront Airport data and as a matter of course would be correlated with the Lakefront Airport data.  *See* Plaintiffs' Proposed Findings 570-571.

      2.    ***Evidence that Weather Observations Were Limited***:    Plaintiffs fairly described the evidence indicating that the wind observations that could be made with the equipment and software programs available were severely limited, and that many anemometers failed during Hurricane Katrina, possibly because of downbursts, thunderstorms, wind, and other hurricane weather phenomena.  See Plaintiffs' Proposed Findings 345-346 (ability of radar beam

to observe conditions at ground level affected by distance curvature of the Earth), 376 (limits of anemometers), 377 (limits of radar), 379 (gaps caused by radar sweeps separated by 5 or 6 minutes), 381 (radar can effectively observe only above 700 feet from the ground, at the distance of the IHNC from the radar at Slidell), 380-385 (radar would not detect microbursts), 386-388 (special type of radar can detect microbursts, no evidence of its use at lakefront Airport, and no evidence that radar at Slidell could detect microbursts), 395-396 (radar cannot detect whether tornadic winds reached the ground), 399-401 (radar at Slidell cannot detect whether mesocyclones reach the ground, and expert agreement that they commonly reach the ground and have severe effects), 409 (no measuring instruments can detect microburst intensity), 420-423 (radar measurements of radial velocity only measure the part of the wind moving parallel to the radar beam and underestimate velocities in all other directions in proportion to their deviation from a parallel direction), 474-475 (Mr. Lemon's failure to use superior mesocyclone detection of GR3Analyst software), and 557 (instrument failures during Hurricane Katrina could have been caused by downbursts, thunderstorms, wind, and other hurricane weather phenomena).  On top of all this, of course, is Mr. Lemon's failure of memory as to what he saw and analyzed.  See Plaintiff's Proposed Finding 435.

Lafarge has forgotten Carl Sagan's famous caution that "the absence of evidence is not evidence of absence."  It has treated the limited observations that were possible as if they are complete and exhaustive of all possible weather phenomena, and affirmatively prove that mesocyclones, tornadic vortex signatures, microbursts, and downbursts over the IHNC did not occur.  It is equivalent to the testimony of a blind person that something in the plain sight of others is not actually there because he cannot see it.

     **3.**     ***Double Dealiased Radar Data***:     Lafarge repeatedly argues that Mr. Lemon should be credited, and Dr. Mitchell discredited, because only Mr. Lemon understood that the Level II Slidell radar data had to be dealiased.  (Lafarge Brief at 10-11; Lafarge proposed findings 142-145).   Lafarge has not tried to explain, but has simply ignored, Mr. Lemon's confusion.  Mr. Lemon explained the entire problem of aliased data and the need to dealias data in terms of range overlay: "The Doppler dilemma results in range-overlay data which you have to unfold; and velocity, alias data."  Tr. 1755:8-9 and 1772:22 to 1773:7.  He also testified: "The level II data stream is -- comes directly   out of the signal processor, and it is not dealiased because the dealiasing is done in the RPG.  The range -- it is range overlay corrected."  Tr. 1802:21-24.  Dr. Mitchell testified consistently that the Level II Slidell radar data was already at least partially dealiased.  *See* Plaintiffs' Proposed Findings 460 and 463 (Dr. Mitchell).

     Lafarge's papers treat dealiasing as if it were a simple, all-one-way or all-the-other phenomenon.  However, both experts agreed that dealiasing is a matter of degree, and any dealiasing algorithms can leave some data dealiased and some data dealiased.  *See* Plaintiffs' Proposed Findings 460 and 464 (Dr. Mitchell) and 466 (Mr. Lemon).  Thus, the presence of an aliased area in an image is no proof that it has not been dealiased.  Lafarge argues to the contrary (Lafarge Brief at 10; Lafarge proposed finding 143), without coming to grips with the actual evidence on this point.   Lafarge has ignored the evidence, uncontradicted on this record, that important information can be lost by over-aliasing data.  *See* Plaintiffs' Proposed Findings 461-462 (Dr. Mitchell).  Mr. Lemon did not contradict this point, *see* Plaintiffs' Proposed Finding 487, and Lafarge has ignored it.  Nevertheless, Mr. Lemon reflexively assumed that anything he saw in an image that did not fit his assumptions was the result of aliased data, and further

dealiased the already at least partially dealiased Level II data even where there was no aliasing problem.  *See* Plaintiffs' Proposed Findings 482-486.

   **4.**  ***Mr. Lemon's Confusion:*** Lafarge makes no attempt to explain Mr. Lemon's repeated self-contradictions and ignoring of uncontradicted testimony on the key issues in this case and key issues as to his own actions, *see* Plaintiffs' Proposed Findings 91 (some unidentified force other than wind must have caused the water, foam, waves, and spray to splash over the East floodwall of the IHNC at a time when his analysis showed winds had to be blowing from East to West), 378-385 and 388 (radar can detect microbursts by looking at top and bottom of storm and the absence of such images showed there were no microbursts at the IHNC, but at the distance the IHNC was from Slidell the radar could not see either the top or the bottom of the storm), 419-426 (Mr. Lemon's estimates of radial velocity and spectrum width are necessarily underestimates, to a greater and greater degree as the direction of the wind deviates from the direction parallel to the radar beam), 435 (Mr. Lemon could not remember which mesocyclones were real and which were not); 469 (stating that green area on radar chart showed that wind was moving towards the radar and then, sensing discomfort by defense counsel, changing course 180 degrees and saying the wind was moving away from the radar), 472-473 (he was not one of the developers of the GR2Analyst software—meaning that no one trained in meteorology was among the developers—and had overstated his involvement in his deposition a few days before the trial); 476-480 (critical to look at all available data, which he had not done; critical to avoid major mistake of not looking at all available data in the type of analysis he did in this case, but had not done so because he was not issuing a warning, even though this was the first time he had ever done a hindcast), 488-492 (NOAA's Level III data were defective, but they were not, but there was a problem, but they were now good data, but he had reported a problem, but nothing

had been done), 495-496 (Level II data is not dealiased in the RPG, but it is dealiased in the RPG), 497-507 (confusion about dealiasing concepts), and 508-522 (NOAA algorithms not very good for forecasters but good for forensic analysis in 2005, good in 2010 [when Dr. Mitchell applied them], the errors in the NOAA algorithms were that they resulted in false positives, the errors in the NOAA algorithms were that they resulted in accurate but delayed positives and false negatives, the GR2Analyst software used much better algorithms than NOAA used and was error-free as far as he knew, the NOAA algorithms were just as good as those in the GR2Analyst software, NOAA disagreed with him on the utility of the Level III data, he did not present any of the mesocyclone flags or tornado vortex signature flags in the GR2Analyst software he used, but it was important to look at all of the data).   Instead, Lafarge attempts to brush this aside by urging it is "bizarre and wholly unsupported" to point out that Lafarge's Emperor has no clothes. Lafarge Brief at 9 n.10.   Lafarge argues in support of Mr. Lemon's enthusiastic estimate of the market penetration of the GR2Analyst software program, Lafarge Brief at 10 n. 11, but does not explain how Mr. Lemon could possibly know this if he was not a developer, or why it is any more reliable than his memory as to whether he was a developer.

> 5.      *Dr. Mitchell and the Lakefront Airport Data:*  Ignoring the contrary evidence is not enough to establish a defense, of course.   Lafarge's discussion of the meteorological evidence also misdescribes the record.   Lafarge's proposed finding 162 represents that Dr. Mitchell did not examine the Lakefront Airport data.   Because defense counsel never asked such a question and never received a denial of such an examination, Lafarge relies only on Dr. Mitchell's statement that he relied on the data sources described in his report (DX-312), and represents that the Lakefront Airport data were not mentioned in those data sources, citing p. 40

of the Report.  That page states that Dr. Mitchell relied on data from the National Climatic Data Center, and described the following as part of that data:

- *Local Climatological Data/ Hourly Precipitation Data:*  Meteorological data from both NWS Cooperative Stations in the region and the Local Climatological Data recorded at regional airports in the area have been examined.  Most airports take observations on a continuous basis, with a minimum of one report per hour.  The airport observations are extremely comprehensive and usually contain data on temperature, cloudiness, visibility, wind direction and speed as well as the amount of precipitation.  Copies of official weather records were obtained from the National Climatic Data Center.

- *Level II Data Examined by Dr. Mitchell:*  Lafarge argues that Dr. Mitchell did not look at the base data to confirm the presence of mesocyclones, but reflexively relied solely on erroneous NOAA algorithms with a high false-positive rate.  Not one part of this is supported by the record.  Dr. Mitchell testified repeatedly that he looked at all the data, including Level II base data, *see* Plaintiff's Proposed Findings 348, 350, 357, 456, 460, 463-464, and 467, and Mr. Lemon's virtually incoherent testimony on errors left him at the end of the day stating that the NOAA algorithms had resulted in delayed but true positives and false negatives, *id.*, Plaintiff's Proposed Finding 515, were greatly improved by 2010 when Dr. Mitchell used them, *id.*, Plaintiff's Proposed Finding 512, and were as good as those in the GR2Analyst software he used. *See* Plaintiffs' Proposed Finding 520.

- *Masking the Mesocyclone:*  Lafarge argues that the cross-examination of Mr. Lemon "backfired badly" because Mr. Lemon could identify the mesocyclone at 3:31 A.M. CDT that Dr. Mitchell had testified was masked.  Lafarge Brief at 7 n.8.  Dr. Mitchell actually testified that the mesocyclone was masked only in the upper-right Base Velocity quadrant, on p. 16 of

Mr. Lemon's Report, DX-311, Figure 9, and was apparent in the lower-left Storm Relative Velocity quadrant.  Tr. 991:6 to 992:6.

- *Mesocyclone Effects on the Ground:*  Lafarge argues in its brief at 13 that "mesocyclones are ephemeral storms whose effects are felt for only one or two minutes at a particular location (Lemon Tr. 1728:4-13)," the cited portion of the transcript provides no support for that extreme statement, and the record is to the contrary.  Even Mr. Lemon agreed that mesocyclones can be big, with a "core circulation" as much as five miles across, *see* Plaintiff's Proposed Finding 364, do not always move with the synoptic wind field, *see* Plaintiff's Proposed Finding 367, commonly have severe effects on the ground, and that "90 percent of the time, mesocyclones are severe in some fashion."  *See* Plaintiff's Proposed Finding 401.  *Duration of Wind Required to Move the Barge*:  Lafarge cites Dr. Cushing's testimony at Tr. 2047:12 to 2048:9 and argues that not even a mesocyclone could move the barge, because it takes a sustained wind, not a one- or two-minute "ephemeral storm" to move a barge.  Lafarge Brief at 4, 13.  Putting aside the complete lack of record evidence that the duration of mesocyclones at a location is so short, and putting aside the evidence to the contrary as to the duration of mesocyclone effects at a location, and putting aside the obvious fact that overcoming inertia is the result of a combination of velocity as well as duration, Dr. Cushing did not testify to this proposition or anything remotely similar.  His testimony was limited to "a one-to-five-second gust of wind."  Tr. 2047:25.

## C.  Physical Evidence

Defendant's made-for-trial proof appears in the form of Dr. Bea's sworn testimony that *a lawn mower* created the scrape marks along the flood side of the levee wall.[4]  See Bea

---

[4] Another bogus argument made by defendant can be discerned in footnote 47 of defendant's brief; defendant cites DX 205, Bakeer's report, Fig. 76 for the claim that pre-storm photos show no deflection in the wall south of the south breach.  However, Fig. 76 is an aerial photograph that was taken from so far away and above the floodwall that it doesn't show any curvature in the wall, even where it is agreed there was a curvature in the wall.  It must also

Demonstrative, DX 361, RB- 43.  *First*, Dr. Bea already testified at his deposition,  *"[t]he*

*rubbing, the rust streaks left as signature features on the flood wall, the features that I could*

*observe personally on the barge, says it was there.* PX 349, 91-93**.**  *Second*, there is a fence on

top of the levee shown in the photographs with the lawn mower, and as such, it is clearly not the

levee at issue in this case:  *the eastern floodwall of the IHNC did not have a fence on top of it*.

*Third,* the photos appear to have been taken on the protected side of the levee, not the flood side.

There has been absolutely no evidence or testimony that grass was even cut on the flood side of

the levee at the IHNC. DX 206, Bea's Slide 176, taken from PX 397, and Marino's report photo

4.7, reveal that there are in fact no scrape marks from an alleged lawnmower on the protected

side of the flood.   PX 349, 91-93.

   **1.**  ***The North Breach:***  Lafarge misrepresents the trial record as to physical

evidence of barge impact. Lafarge argues at pp. 15 - 17 of its Post-Trial Brief that the telephone

pole depicted in photos DX 106, 263, 344, and 345 "conclusively confirm" that ING 4727 did

not cause or contribute to the North Breach.  This typically revisionist mischaracterization of the

record relies upon Mr. Pazos' previous unawareness of the pole, and the fact that the distance

from the pole to the floodwall was unknown until well after Mr. Pazos testified.   In fact,

Plaintiffs' Exhibit 456, the Affidavit and Report of Stanley Guidry, admitted without opposition,

objection or rebuttal, establishes the perpendicular distance from the pole to the wall.  Given this

distance from pole to wall, and given the undisputed lateral dimensions of ING 4727 (200' x

35'), a simple application of Pythagoras' Theorem reveals that ample space between the pole and

---

be pointed out that in order for Defendant's argument to be valid that there wasn't existing curvature in the floodwall south of the south breach, the wall had to deflect (curve) before the scour trenches formed because the scour trench themselves exactly follow the curves in the flood wall.  See *Bakeer's Demonstratives*, DX-356, Slide 78; *Photo*, DX-12, LNA 758.

wall would allow *several* ING 4727s to travel side-by-side between the pole and wall without touching the pole.[5]   If the 35' wide barge approached the wall at a zero degree angle, two ING 4727s could have fit side by side without touching the pole.  If it approached at a 45 degree angle, three ING 4727s could have fit side by side.  Other angles of approach are possible, and Lafarge's keyhole snapshot of the then-incomplete record "conclusively confirms" nothing.

> **2.**       ***The South Breach:***      Lafarge similarly misrepresents the facts and record as to the South Breach.  The defense argues at pp. 17-19 of their Post-Trial Brief that the barge's position relative to the school bus and phone lines which Dr. Bea observed indicate that the barge floated over the wall.  Lafarge urges this, despite several omissions and inaccuracies. First, the barge floated and moved before Dr. Bea first saw it in the Lower Ninth Ward.  Dr. Bea was not on-site in the Lower Ninth Ward until *after* Rita.  Bea, Tr. 2789:18-21.  Dr Bea agrees that the barge was farther inland before Rita.  Bea, Tr. 2795:13-15.  Second, Figure 57 of Charles Cushing's Report, DX 196, p. 86, reflects Dr. Cushing's opinion that the barge traversed the floodwall in a lengthwise direction (i.e. bow or stern first).  This is at-odds with Lafarge's misconstruction in their brief of Dr. Cushing's testimony, wherein Lafarge attempts to demonstrate that the barge would have had to float over the school bus.  By Dr. Cushing's own conclusion, the barge would have passed the school bus, assuming it was even located there at the time.  Third, as for houses left standing, Dr. Bea had no answer when asked if their presence behind the barge indicates a sequence of events such that the barge was already in the neighborhood when the floodwalls failed, and actually shielded the houses from the full force of flooding.  *Bea Testimony*, *Tr.* 2795:23 to 2796:4; Plaintiffs' FOF No. 121.  Neither Lafarge nor

---

[5] The telephone pole is 85' from the wall, measured along an axis perpendicular to the wall itself.  An imaginary 85' line along the length of the wall creates a second line, at a 90 degree angle from the first.  These two lines are two sides of a right triangle.  The length of the third side - the longest side - is the square root of the sum of the squares of the two short sides.  Thus 85 squared (7225) + 85 squared (7225) = 14450, the square root of which is 120.2.

Dr. Cushing offer any explanation as to why the still-standing houses in the direct path of the South Breach floodwaters were not ripped to shreds as were houses not located behind the barge. Fourth, Lafarge claims that the barge bent the rebar at the South Breach, but argues at the same time that the barge made no contact at the South Breach.

## D.  Witness Testimony Misconstrued

The Defense is left post-trial with **no eyewitnesses** corroborating its desperate attempt to revise history.  The Plaintiffs need not have discussed boom witnesses in their brief because the Court did not ask for guidance as to this clear body of proof, and because Lafarge's comparison of booms at other breaches is so attenuated, so unsupported, that even a superfluous would-be expert, William Jason Weiss, could not prevent Lafarge's defense from unraveling. Lafarge's unseemly post-trial attack on the Plaintiffs' eyewitnesses - whose testimony was clear and convincing - is based upon Dr. Cushing's testimony as to what Mr. Villavasso would have seen had the barge been a certain distance from the wall.  The Plaintiffs wonder rhetorically which of Dr. Cushing's areas of expertise support his conclusions as to human visual perception, perspective, point of view, or mind-reading.  The Plaintiffs also note that Lafarge's own witness, Dr. Reed Mosher, does not join Lafarge in the suggestion that Mr. Villavasso saw something other than ING 4727.  DX 283, Deposition of Reed Mosher, 261:23 - 262:19.  Again,   the  only hope for Lafarge is complete and utter absolution from fault, and therefore, witness testimony must be completely and utterly disregarded for Lafarge to prevail.   However, the testimony and governing legal standards for credibility are amply addressed in the Plaintiffs' Post Trial Brief, and in the trial record.  Only if a witness' account is *physically impossible* (Lafarge's theme) is that witness' testimony to be disregarded.  *Plaintiffs' Post-Trial Brief* and *Plaintiffs' Memorandum In Response To "Lafarge North America's Legal Memorandum Concerning Fed.*

*R. Evidence 613 (Arthur Murph),"  And Concerning  Credibility To Be Accorded Mr. Murph,* and

citations contained in each.   What Lafarge does not and cannot address, is the fact that Messrs.

Adams, Williams, and Murph - all incorrect and unbelievable according to Lafarge - nonetheless

render accounts which, despite their differing vantage points and despite being strangers to one-

another, are mutually corroborating as among themselves, and as to the "boom" witnesses.[6]   It is

also worthy of note that Lafarge ignores the glaring reality that the eastern IHNC floodwall

breached only at locations where witnesses say that they saw (and/or heard) a barge hitting it.[7]

**E.  Geotechnical Evidence**

The Defense combines an ill-conceived cocktail of factually unsupported theories

involving imagined hydraulic uplift, permeability and under seepage, a tension gap (and

overtopping at the southern breach) in support of a conclusion that there was lateral instability of

the floodwall and consequent failure.  Bea Tr. 2609-2615:15; 2617:3-2618:7; 2644-2647;

2649:7-7-2650:2;  Tr.1121:  14-20;  1132;  1135:12-1137;  1137:15-23;  1141:6-13;1141:17-

1143:22;  1141:16-25;1143:16-22:1144:2-61147:19-1148:6:1150:5-13:1152:5-24;  1162:11-24;

DX 361, Slide RB-055, & Slide RB 124.  This complex alchemy does not overcome Plaintiffs'

simple, observable evidence and eyewitness testimony.

**1.  *Alleged Tension Gap***        Defendant misinforms the court at P.40 of its

brief that Dr. Marino testified that there was insufficient time for a tension gap to form. This is

just one of defendant's many fabrications.  In truth, Dr. Marino specifically testified that he

---

[6] The defense absurdly implies that Plaintiffs' failure to address the "boom witnesses" in the opening Post-Trial Brief amounts to a concession of the point.  To the contrary, IHNC boom witness testimony and Dr. Weiss' failed comparisons and need no elaboration, as the Court must have recognized by omitting the topic from those upon which briefing was requested.

[7] As an aside, it is interesting to note that despite all of the proof Lafarge introduced concerning Hurricane Gustav, there is no explanation for why the IHNC floodwall did not breach when the water rose during that storm, yet did when a barge was undeniably loose in the canal.

assumed that there *was* a tension gap, that it was 6 inches wide, and extended all the way down to the tip of the sheet pile. Marino Tr. 1210:20-24; 1231:2-1232:12; See Marino Report, PX 397, fig. 5.32, E-99, Army Corps, Test Sheet Pile Deflection Plots at Different Flood Levels. Dr. Marino testified that - based on field tests - even with a gap extending all the way down to the sheet pile the levee wall would remain stable.[8] Tr. 1231:2-1232:12; Marino Report, PX 397, fig. 5.32.

       **2.**    **Alleged *Floodwall Instability***    To support his illusory seepage and hydraulic uplift arguments Dr. Bea assigned horizontal and vertical permeability values in the order of magnitude of 10.[9],[10] Plaintiffs' Findings of Fact, 157-158. Dr. Marino, on the other hand - and in accord with IPET - assigned permeability in horizontal and vertical directions on the order of 1 to 2.5.[11] IPET assigned the value "1." Marino Testimony, 1183:25-1186:19; Bea

---

[8] Marino explained that the North Breach is considered a localized failure and that one would need to do a three dimensional analysis of the soil to analyze a localized failure; that based on his analysis, the soils at the North Breach had 300 percent more capacity than what was needed to withstand the hydrostatic pressure from the surge. Tr. 1227:23-1232:13. Dr. Marino found it un-necessary to calculate under seepage into the stability analysis because there was no seepage. He even considered the scenario of a massive slide at the north breach, notwithstanding that same was not evident, and found that there was still 30 percent more capacity than what would be required to withstand the surge pressures, even if the gap was all the way down to the bottom of the sheet pile. Tr. 1227:23-1232:13; Tr.1121: 14-20; 1132; 1135:12-1137; 1137:15-23; 1141:6-13; 1141:17-1143:22:1141:16-25; 1143:16-22:1144:2-61147:19-1148:6:1150:5-13:1152:5-24: 1162:11-24. Tr. 2609-2615:15. Tr. **2649:7:7-2650:2** DX 361, Slide RB-055, & Slide RB 124.

[9] Dr. Marino also testified that hydraulic uplift calculation is not indicated without a change in the water table indicating hydraulic pressure, and that his seepage analysis corroborated the IPET's findings - *that there was no seepage*. (Marino Tr. 1263:9-164:20; 1466-1472.)

[10] The reason Dr. Bea had permeability values in horizontal and vertical directions in the magnitude of 10 are because Dr. Bea assumed highly permeable sand in the excavations and canals and peat in the Marsh (see Dx 206, Table 8-1, **Excavations 10-1**). Dr Bea used a horizontal and vertical permeability ten times that of IPET and at least 4 times that of Dr. Marino (Px 397, Table 5-1)(values for horizontal and vertical permeability ratios of 1 to 2.5). See Exhibit 401a, Marino Declaration, 12/18/09, Para. 20-24, 44-45, "IPET used equal permeability for the marsh, factors of 1". Marino Testimony, 1183:25-1186:19; Bea Testimony, 2737:15-2738:16.

[11] The court should compare Bea's analysis of a permeable marsh and box and slot excavations to that of Dr. Marino. PFF, para 160.

Testimony, 2617:3-2618:7; 2737:15-2738:16. See Plaintiffs' Findings of Fact, para.157-158. [12]

Defendant also makes the spurious claim that it introduced evidence of sand and shell found at the breach sites, allegedly supported by photographs of the WGI excavations, by the angle of repose of the soils shown in the photographs, by Boring Log 81a, and through Dr. Bea's review of the technical appendix for the WGI work.[13]   Def.Br., P.39, and footnote 41.

- *Photo-visualization or calculation of soil composition.*   Defendant's claim that photographs are competent evidence of high permeability sand and shell near the levee, leading to under seepage, is undermined by the photos themselves.[14]   Dr. Bea has not established what was used to fill the excavations, and Dr. Bakeer admits that a geotechnical engineer can not base an opinion as to what the lateral extent of the fill was by visual classification of a soil. *See Bakeer May 11, 2010 Supplemental Report*, DX-313, p.3, ¶ 2 ("Visual classification of the retrieved soil samples from the MMG boreholes does not follow ASTM and other recognized standards….") *Id.* at p. 5, ¶ 4 ("I have concluded that no inference could be made from the MMG documents

---

[12] In Bea's report, Page 62-63, he posited (1) that seepage occurs at permeability 10-3 (or higher, e.g., 10-1), and (2), that hydraulic uplift at permeability 10-5 or lower (e.g.,10-8) does not occur because of the clay layer underlying the marsh. Dx 206, pages 62-63; See PFF, para. 219-226.

[13] "As-built" drawings are the final set of drawings produced at the <u>completion</u> of a construction project. The "as-built" drawings admitted into evidence in this case called for shell material to be removed from against the Sheet pile of the 1969 I-wall.   Defendants again conjecture that the "as built" drawings do not depict how the levee was actually built, and that the shell located against the flood was not removed from along the levee wall as noted in the as-builts. PX 437, Marino Demonstrative, Slide 16, DX 397, Marino report, Fig. 2.2.

[14] Whether what is depicted in the photographs is sand, silty sand, clay with sand, clay with silt, clay or other is mere speculation.   Bea's opinions are speculative; his testimony about the angle of repose lacks specifics; no angle was ever given, nor did he reference what angle on which pile of soil he was talking about.   Further, the color in a photograph is subject to lighting, is at the mercy of the photographer and developer, and defendants have presented absolutely no testimony to the accuracy of the photographs.   Moreover, it is unclear if it rained or had been a heat wave at the time; and if one look behind the tractor in RB-027 it is clear that this material is not sand. DX 206, Bea report, App. C, Fig.28.   It should also be noted that Dr. Bea testified incorrectly before congress and had to change his theory of why the levee failed at the IHNC eastern floodwall after he testified before congress.  Plaintiffs' Findings of Fact, para. 270-276.

relative to strength, density or lateral extent of the fill materials placed within the EBIA").[15]   See Plaintiffs' Findings of Fact, para. 175-178, 259-263.    As for alleged angle of repose - that is, divination of soil classification (i.e., sand), because friction affects how it falls when it is piled up upon itself - Dr. Bea's claim to have performed this calculation based on a photograph is self-promotion at best.   Bea Demonstrative, DX 361, RB-027, depicting photos from DX 206, Bea report, App. C, Fig.28 and RB-041; DX 208, App. C, Fig 27. DX 208, App. C, Fiq. 29;  DX 208, App. C, Fig 30.  The Court should not countenance this otherworldly, diabolical art in place of science.

- *Boring 81a.*  As for Defendant's claim that 81a is proof of sand and shell near the levee wall, see Plaintiffs' Post Trial Brief, Plaintiffs' Findings of Fact, 175-178 and 181-186; PX 437, Slide 7; PX 397, Fiq. 2.4; DX 356, Bakeer Demonstrative, RMB 044 (DX 205 Bakeer Report Figure 28 (showing slope relevant to relocation of 81a). [16]

---

[15] Dr. Bakeer also attempted to show the court what he claimed to be shell in Slide 68 of his demonstrative, DX 356, RMB-68, DX 58, LNA 7811, DX58 LNA 7812.[15] However, a close examination of Bakeer's Slide 68 shows the court what appears to be a clay-like material with a little bit of shell and maybe sand.  In fact, Dr. Bakeer's photographs are arguably consistent with the MMG boring which show levee *fill* (clay) with some shell and sand. PX 437, Slides 26-28.  Also, a close examination of the photographs Dr. Bea used to claim that there was sand fill in the excavation also disprove Defendant's claim.  See Bea Demonstrative, DX 361, RB-027, depicting photos from DX 206, Bea report, App. C, Fig.28 - note carefully the material behind the bull dozer - and RB-041, DX 208, App. C, Fig 27. DX 208, App. C, Fiq. 29, and DX 208, App. C, Fig 30.

[16]   The defendant admits that if 81a had been drilled where originally plotted that boring 81a would have been at the northern end of the northern breach. (DX 361, RB-176). It then goes without argument, that if boring 81a was moved in any direction north of its original designation, it would have been drilled in front of the 1980 flood wall; not at the northern end of the north breach of the 1969 levee.

Dr. Bea attempted to use a photograph from his demonstrative to show where the defendants believed the 81a boring was drilled. (DX 358 captured photo from DX 361, RB-185). However, Dr. Bea's photograph does not show the area between Surekote Road and the northern part of the flood side 1969 levee and 20 feet west of the 1969 levee wall, where boring 81a was originally plotted to be drilled (DX 361, RB-176); clearly, because he would have had to show to the court a valley/ravine which a CME 75 rig could not get access.  Marino, Trial, P. 1440 l. 13-25.Marino Tr. 1441:8-11; Marino Tr.. 1494:10-24; (PX 437, Slide 44, 45, 46, 81a boring log noting CME-75 rig). The photograph used by Dr. Bea actually showed the area where Dr. Marino testified boring 81a was re-located to, more north of the 1969 levee, and in front of the 1980 levee wall, where the area was flatter, and a truck with a drill rig could easily access. Marino Tr.. 1440 l. 13-25;1441 l. 8-11. See, Plaintiff's captured Exhibit 442 (DX 293/263)(Marino marked where 81a was drilled and compare with DX 358, Dr. Bea's captured slide (RB-185, DX 361).  In fact, Dr. Bea marked slide 185 as close to the edge of the photo as possible to show the court where he claimed the1969 levee wall would have stood. Bea Tr. 2637:22-2638:9. Notwithstanding, Dr. Bea put a mark at the

- *WGI Fill Material.* Bea also assigned 10-1 for the fill used at the EBIA excavations and the drainage canals. DX 206, Table 8-1, Input Values for Seepage Models. Tr. 1132; 1135:12-137; 1137:15-23;1144:2-61147:19-1148:6:1150:5-13:1152:5-24: 1162:11-24. [17]    There is no evidence whatsoever that the WGI technical appendix for the called high permeability

---

edge of Slide 185; it is without argument that the borings along the "a" line were taken twenty feet from the levee wall. DX 361, RB-176; Bea Tr., 2634:22-2635:14. Dr. Bea opined, while displaying DX 358, Demonstrative Slide 185, DX361, that the grassy area was next to Surekote Road and in front of the 1969 levee; this argument, again, was made with a photograph depicting the area in front of the 1980 flood wall and Surekote Road, not the area where 81a was originally plotted to be drilled, in front of the 1969 levee wall (between the 1969 levee and Surekot road). See DX 358.

Dr. Bea, then testified that even if the location for boring 81a was on a levee slope, that it is not impossible to drill a bore hole on a levee. Bea Tr. 236. Dr. Bea then showed the court a photograph with a drill rig on top of a levee. Slide RB- 177, DX 361. However, Dr. Bea's photograph was not the actual ground contours at issue, nor the location at issue referenced in 81a, nor is it the actual rig used by WGI to do the boring. Dr. Bea, nor did anyone else even testify what type of rig was depicted in Dr. Bea's Slide RB- 177, DX 361 or exactly where this photo was taken. Bea Tr. 236.Further, as previously stated boring 81a was not taken at the top of the levee; it was originally plotted to be taken twenty feet from the levee. DX 361, RB-176    Further, what Dr. Bea failed to mention to the court was that when ILIT performed its few boring at the IHNC, they too had a problems drilling at certain locations along the levee and noted this in ILIT's report. See, Exhibit ,ILIT, Appendix B, paragraph 2. Specifically, ILIT had to use two different types of drilling rigs to obtain borings at the levee; ILIT used a F-350 truck with a 15 foot tower mounted CME-75[16] rig (the same CME-75 drill type used by WGI to take boring 81a) and a ADRACO drill rig, was also used for "sites where access was difficult." Exhibit ,ILIT, Appendix B, paragraph 2; Exhibit , Marino Demonstrative, Slide 26, boring 81a, lists, Manuf. Desg. Drill, CME 75)).

Further, ILIT reported that they even used a small geoprobe in locations where both drill rigs (CME-75 & the ADRACO) were inaccessible. There has been no evidence submitted by defendants that a small geo probe or an ADRACO rig was used by WGI for difficult to access areas.  In fact, the 81a log evidences that WGI's contractor was not using a geoprobe or an ADRACO rig to drill in difficult to access areas like a revine. (boring log 81a lists the boring drill as a CME 75); Exhibit , ILIT, Appendix B, paragraph 2.

Plaintiff's has established through admissible documentary evidence and testimony that location for boring 81a was adjusted.  Defendants came forward with no credible evidence of where 81a was relocated to except to have Dr. Bea say it was bored in the originally plotted boring location and to display a picture showing the area in front of the1980 flood wall; again this photograph doesn't show the twenty feet west of the 1969 levee and the location comported with Dr. Marino's opinion that boring 81a was moved north of its original boring location and taken from a more northern location in front of the 1980 floodwall where the land was flat. *Marino, trial,* P. 1436 l.5-12; . Marino, *1437 l.7-1438 l.15.*

Dr. Marino also explained that when the Army Corps built the 1980 wall they drove the sheet pile further down, if there was any concern of sand and shell shown in boring 81a which was in front of the 1980 floodwall *Marino Testimony, 1446: 18-25;* See also,. *Marino trial testimony P. 1442, l.24- 1443, l. 5; P. 1443, l.12-13; 1446, L. 18-2.*

[17] Lafarge's brief at 60 claims that Marino never evaluated the stability of the floodwall at the level of the NAVD88 14.2-foot peak surge.  However, Dr. Marino did in fact testify that based on the safety factor he calculated for the surge to the top of the wall height, the wall would not fail even at a surge of 14.2 feet.  Tr. 1474:11-20.

playground-type sand that Dr. Bea assumed was used to fill the excavations (Dx 206, Table 8-1, Excavations 10-1).[18]

- *The Marsh Strata*      Defendant again mischaracterizes Dr. Marino's analysis and opinions of the marsh, alluding that Dr. Marino used a single permeability value of 10-8 for the marsh. Plaintiff's Findings of Fact, 149-159. **("**Dr. Marino used 10-to-the-minus-8.  That's equivalent to trying to get water through a brick."). Bea Tr. 2733:2-8.[19] The truth is that Dr. Marino did not assign 10-8 as the ***only*** permeability value for the marsh.[20]   PX 410-A, 12/18/09 Marino Declaration, Para 44 and 45; Marino Tr., 1185-1186; 1180-1185:2. See also, Exh. 397, Table 5-1 and compare with DX 206, Table 8-1, Dr. Bea's Input Values for Seepage Models.  Marino Tr. 1132;  1135:12-1137;  1137:15-23;1144:2-6;1147:19-1148:6;1150:5-13:1152:5-24:  1162:11-24. Dr. Marino - correctly - ***did not assume*** the marsh to be made primarily of California peat as did Dr. Bea.    In fact, the boring logs demonstrate the contrary. Marino Demonstrative, PX 437, Slides 36-48, 55-57, 61-88, 90-97, 99-100, 102-105)  Marino marked the marsh (soils with organics) on the logs for the Court's review. See also Exhibit 397, Marino Report, Table 5.1; Marino Tr. 1177:18-25, 1180:2-18; 1181: 1-25, 1183:1 - 1184:14; 1184:21-25.

---

[18] Defendant also did not come forward with any compaction density testing to show the compaction was inadequate.

[19] Dr. Bea admitted that clay is impervious and that it takes 200 years for water to pass through clay and it takes 200 days for water to pass through silt. Bea Testimony, 2732:20-23; Dr. Bea also admitted that organic clays are less permeable than peat. Bea Tr. 2789:1-5; 2732:12  (when you get to impervious, this would be things like fat clays….fat clays… are essentially impervious); See also, Bea Tr. 2788:21-25-2789:3 Marino Tr. 1132; 1135:12-1137; 1137:15-23; 1141:6-13; 1141:17-1143:22:1141:16-25;1145:7-12; 1145:16-20.

[20] Dr. Marino explained while showing Table 5-1, from Px 397 that he assigned different permeability values for the different soils found in the marsh based on the boring descriptions given for the marsh.  PX 401a, Marino Declaration 12/18/09, Para 44 and 45; Exhibit 397, Table 5-1; Marino Tr. 1185-1186; 1180-1185:2.  The Court should also closely look at Exhibit 397, Figure 5.25, Peat and Marsh Permeability Values; Exhibit 437, Marino Demonstrative, Slide 106.  Dr. Bea assigned permeability value of 10-4 to 10-5 for the marsh layer, which is akin to California peat and Dr. Bea did not properly consider the soils properties. Bea Tr.  2732:23-2733:6.  The permeability value for the marsh does not fall within the range of permeability values IPET assigns for New Orleans Marsh. Marino Testimony, 1167:7-14.

- *Cone Penetrometer Testing*  Defendant also claims at P. 53 of its brief that Dr. Marino's failure to consider the Cone Penetrometer Tests was a flaw in his analysis.[21]  However, Dr. Marino testified that he ***did*** consider the Cone Penetrometer Tests, but was not a proponent of utilizing the results when calculating strengths of the soils.[22]  (Marino Trial Testimony, 1451:14-1452:4) What defendant forgot to mention when making this argument is that Dr. Bea testified at his deposition as follows:   "*Q    The specific purpose for which he was testifying about the superiority, as he saw it, of the Cone Penetrometer Test, was for purposes of determining shear strength in calculating factors of safety. A.    Okay. Q.    Would you agree with him, that it's superior for that purpose?  A.   **No, I would not***."  PX 349, P. 128:5-13.

     **3.**    ***Wall Height***   Defendant also speculates at page 44 and footnote 50 of its brief that approximately five feet of fill added to the levee in certain areas when it was constructed in 1969 - particularly in the area of the south breach - is conclusive evidence that the wall heights were lower in the areas of the south breach and of allegedly weak underlying soils[23]  However, if the Court would examine Dr. Bakeer's Demonstrative, DX 356, Slide 063, and compare it to PX 397, Marino's report, Fig. 2.14, specifically station 31+00 (immediately north of the southern

---

[21] Additionally, IPET found the Cone Penetrometer Test data to be unreliable and stated in its report that they found "the CPT data to be inconsistent and used mainly to define contact between the interdistributary clay and silty sand" and "the data was used to a lesser extent in determination of undrained shear strength of the cohesive soil layers." See PX 254 Vol. 5 Tech. app. 16.

[22] Dr. Marino's collection of soil strength data was from IPET and ILIT which included both field and lab values. Tr. 1130:24-1131:4; 1120:17-18**;** Dx 397, Section 5.3.  His soil strengths were then based on relative location; the soil strengths were plotted versus their depths. His method was consistent with IPET.  Dr. Marino's shear strengths are in line or lower than that of other investigators.  Dx 401(a), Para 65-70, and Table D.1.  If the court is to compare Dr. Bea's strength values with that of Dr. Bea, it will see that the numbers are in line with one another; particularly the strengths assigned to the marsh Dx 401(a), Para 65-70, and Table D.1., the only exception is that of the strength of the levee which Dr. Bakeer admitted (Tr. 2482:1-10) has little to do with lateral stability, and Dr. Marino testified was based on the stiff classification of the soils. Dx 401(a), Para 65-70; Also Dr. Marino explained that he did not even calculate into his strength analysis the settlement of the soils or vegetation which would make the soils stronger.  IPET utilized the original design requirements. (Marino Trial Testimony 1507:4-15). See also PX 401a, 65-71.

[23] See also, PX 401a para. 63-64 ("no significant overtopping occurred at time of failure").

breach), it becomes apparent that five feet of fill was added right next to wall ***where the wall didn't fail.***  Defendant's argument that the wall height was lower as evidenced by the fact that levee fill had to be added is, again, mere conjecture and speculation.  In fact the wall height measured by Dr. Cushing, north of the north breach, where station 31+00 was located, measured 13 feet in height. DX 351 Cushing Report, 2009, P. 32, Fig. 22, Table of Wall Height.

      **4.**    ***Exhumed Sheet Pile***  Dr. Marino explained that the sheet pile being exhumed from the ground was a signature of the barge and unique to the Eastern IHNC floodwall. Tr. 1254:1-1255:8.  At the trial of this matter, notwithstanding that (1) no other investigative study found that there was exhumed sheet pile at Bayou Bienvenue (or at any levee failures throughout the New Orleans area other than at the Eastern floodwall of the IHNC) and that (2) Dr. Bea did not claim in his first, second or third ILIT report that the sheet pile was exhumed at Bayou Bieneville, nor (3) did he ever make such a claim in his initial report exchanged in this case, or (4) any of his amended reports exchanged or declarations submitted to the court, Dr. Bea nonetheless sand- bagged Plaintiffs with his made-for-trial testimony that there was an exhumation of the sheet pile at Bayou Bienvenue. (Bea Tr., 2793:16-23)   When Dr. Bea surprised plaintiffs with this testimony, Dr. Bea also added that the exhumation of the sheet pile at Bayou Bienvenue was under water (Bea Tr., 2793:16-23), *and thus no one could see it.*  There was clearly no photographic or documentary evidence introduced of exhumed sheet pile at Bayou Bienvenue.  Dr. Bea did not explain whether he had X-ray vision or wore SCUBA gear to see this exhumation of the sheet pile at Bayou Bienvenue.  Dr. Bea's claim of exhumed sheet pile at Bayou Bienvenue is similar to Defendant's other claims: it is made from whole cloth, a fiction, without support, and utterly meritless.

## II. <u>LAW</u>

### A. <u>Causation</u>

1. ***The Pennsylvania Rule***: Defendant's argument that Pennsylvania rule does not apply is predicated upon an erroneous legal standard and a construction of the coast guard regulations completely divorced from the regulation's plain language and underlying objectives.

*First*, Defendant contends – and wrongly so – that "the Pennsylvania Rule does not apply unless and until the plaintiffs first establish … that the flooding resulted from an allision between the ING 4727 and the floodwall."  Significantly, none of the authorities cited by Defendant support such a sweeping proposition, nor could they, as the standard articulated by Defendant would swallow the Pennsylvania Rule in its entirety.  Indeed, under Defendant's interpretation, Plaintiffs would have to establish that the ING 4727 caused the North and South Breaches to shift the burden to Defendant to disprove the ING 4727 caused the North and South Breaches. Such a proposition is not only nonsensical, it negates completely the very purpose of the rule.[24]

Importantly, a court may decline to apply the Pennsylvania Rule on the grounds advanced by Defendant ***only if*** the record reveals that the statutory violation could not have been the cause ***as a matter of law***.  *See Osprey Ship Mgmt. v. Foster*, 2010 U.S. App. LEXIS 13540, at 25 (5th Cir., July 1, 2010) ("[I]f the causal connection between the statutory violation and the damage is ***implausible*** the rule does not apply.").  This rule derives from the Court's decision in *The Pennsylvania* [86 U.S. 125, 136 (1874) ("if it clearly appears the fault ***could have had nothing to do*** with the disaster, it may be dismissed from consideration.")], and is applied only where

---

[24] Indeed, the presumptions of the Pennsylvania and Louisiana Rules are "designed to fill a factual vacuum", and as such "[o]nce evidence is presented … [the] presumptions become superfluous because the parties have introduced evidence to dispel the mysteries that gave rise to the presumptions." *See N.D. Shipping, S.A. v. Zagora M/V*, 2009 U.S. Dist. LEXIS 47538, 20-21 (E.D. La. June 5, 2009) (quoting *In Re Mid-S. Towing Co.*, 418 F.3d at 531).

causation is logically precluded.[25]   Consistent with this principle, "in cases where there is no clear link between the statutory violation and the casualty, the party seeking to take advantage of the Rule has been required to make some showing that the statutory violation *may have had* some relation to the accident."   *In re Nautilus Motor Tanker Co.*, 85 F.3d 105, 115 (3d Cir., 1996).

Thus, in light of the forgoing, application of the Pennsylvania Rule is not (and cannot be) contingent on Plaintiffs establishing the ING 4727 caused the North and South breaches as Defendant claims.  Indeed, under the above authority, evidence that ING 4727 merely *contacted* the floodwall at the North and South breach locations would itself be a sufficient basis to "show[] that the statutory violation *may have had* some relation to the accident" and foreclose any argument that the statutory violations at issue "could not have been" the cause as a matter of law.  As discussed above, the record contains substantial evidence of ING 4727's contact with the floodwall at the North and South breach locations.   As such, application of the rule Defendant advocates is foreclosed by the record in the instant case.[26]

*Second*, Defendant's contention that 162.75(b)(3)(ii) applies only when a vessel or tow is moored against a bank in a river channel not only conflicts with the language of *subpart (a)*, which expressly states that "[t]he regulations in this section shall apply to … [a]ll navigable

---

[25] *See e.g. Union Oil Co. v. M/V Point Dover*, 756 F.2d 1223, 1230 (5th Cir., 1985) ("Whatever statutory violation occurred, *it did not have anything to do* with the pipeline snag."); *Candies Towing Co. v. M/V B & C Eserman*, 673 F.2d 91, 95 (5th Cir. La. 1982) ("The District Court concluded, and we cannot disagree, that whatever B&C ESERMAN's statutory violations, whatever its negligence insofar as the grounding is concerned, *neither had anything to do* with the sinking."); *Associated Dredging Co. v. Continental Marine Towing Co.*, 617 F. Supp. 961, 968 (E.D. La. 1985) ("While the defendants are guilty of a statutory violation, *the violation did not have anything to do* with the capsizing of the dredge CAPTAIN ROY BENOIT."); *Mathes v. The Clipper Fleet*, 774 F.2d 980, 983 (9th Cir., 1985) ("We agree with the district court that this violation does not bring into play the Pennsylvania Rule because *there is no conceivable causal connection* between the violation and the injury.").

[26] Moreover, Defendant's argument also disregards the fact that "[a]pplication of the Pennsylvania Rule… does not negate the presumption that a moving vessel that hits a fixed object is at fault." *See In re TT Boat Corp.*, 1999 U.S. Dist. LEXIS 5627, 29 (E.D. La. 1999).  "The presumptions are not mutually exclusive; rather, they act in conjunction with one another and will each be relevant when the court allocates fault…." *See id.*

waters …" and "[a]ll bridges, wharves, and other structures *in or over* these waterways" [*33 CFR §162.75(a)(1)-(2)*], but the plain language of the first sentence of *subpart (b)(3)(ii)* itself, which contains no such limiting language. *See 33 CFR §162.75(b)(3)(ii)* ("When tied up individually, all vessels and tows shall be moored by bow and stern lines.").

*Third*, Defendant's *self-serving* assertion that giving a literal construction to the first sentence of subpart 162.75(b)(3)(ii) would "create a harsh strict liability scheme" lacks merit.  In making this argument, Defendant not only disregards the fact that its own construction would impose a strict liability standard, but also that its proposed construction is wholly incapable of fulfilling the safety objectives which underpin the Regulation.[27]  Unlike Defendant's construction, reading this subpart as literally requiring a vessel be moored by bow and stern lines at all times actually effectuates the objectives of the regulation.

*Fourth*, Defendant's claim that the Barge cannot be considered a constituent part of a "tow" is flawed, not only because it disregards the testimony of its own employees that they secured the ING 4727 and 4745 together to be topped (and then removed) via a tug, but because Defendant attempts to give meaning to that term using case-law and a regulation unrelated to subpart 162.75.[28]  Such argument must be rejected, as the language of Section 162.75(b)(5) ascribes a very specific meaning to the term "tow" that exists at the assembly stage when vessels are being secured for subsequent connection to a tug.

---

[27] Indeed, 33 CFR §162.75 is a "regulation[] implementing the Ports and Waterways Safety Act" [33 CFR § 160.1], which itself was passed to "(1) reduce the possibility of … damage to life, property, or the marine environment; (2) prevent damage to structures in, on, or immediately adjacent to the navigable waters of the United States …; [and] (3) insure that vessels operating in the navigable waters of the United States shall comply with all applicable standards and … operational procedures[.]"  *See 33 USCS § 1221(c)*.  As demonstrated in *Plaintiff's Post Trial Brief*, at page 21, Lafarge's construction is incapable of furthering these policies, as it would sanction the mooring of all vessels and tows, regardless of size, using any lines, **including thread**.

[28] In fact, the Regulation Defendant cites – 46 C.F.R. § 27.101 – is contained in a completely separate title.

*Finally*, even if the second and third sentences of subpart 162.75(b)(3)(ii) did require a sufficient degree of judgment to bring such provisions within the scope of the court's decision in *Tokio Marine* – which they do not – Defendant readily concedes that this does not in any way impact the first sentence of that provision.

2.   ***Substantial Factor:***   Lafarge does not detract from Plaintiffs' analysis of the standards applicable to determination of whether conduct is a substantial causative factor. Instead, Lafarge lashes out at the law itself, complaining caustically at P. 37 of the defense brief that the Plaintiffs "utterly misstate[s] the governing legal standards."  In fact, the language with which Lafarge takes issue (at Pl. Br. 34) is quoted directly from seminal jurisprudence issued by the Louisiana Supreme Court and United States Fifth Circuit concerning the very topic of concurrent causation.  Lafarge's lone argument on this point is merely that the barge could not have been a substantial factor, and is predicated entirely upon the defense's steady beating of the drum of "physical impossibility."  Furthermore, Plaintiffs do not "ignore" the tenets of Restatement (Second) of Torts § 432.  Rather, Plaintiffs advocate them (without concession to the defense's notion that Lafarge was not the moving force behind the entirety of damages west of Paris Road):

> "(1) Except as stated in Subsection (2), the actor's negligent conduct is not a substantial factor in bringing about harm to another if the harm would have been sustained even if the actor had not been negligent.
>
> "(2) If two forces are actively operating, one because of the actor's negligence, the other not because of any misconduct on his part, and each of itself is sufficient to bring about the harm to another, the actor's negligence may be found to be a substantial factor in bringing it about."
>
> Restatement (Second) of Torts § 432.

At this point, it probably bears repeating that "[i]f the Navy vessel ran into a *papier mache* levee, the vessel would still be a substantial factor in the damage." ***In Re Katrina Canal Breaches Consolidated Litigation***, Record Doc. 19415-1 at. P. 78.[29]

## III.  DAMAGES

**A.  Apportionment:**

Lafarge relies on ***Bach v. Trident Steamship Co., Inc.,*** 920 F.2d 322 (5th Cir. 1991), a 905(b) action in which a river pilot died of an unforeseeable heart attack the moment he set foot aboard the defendant's vessel.   Nobody performed C.P.R.   The Court declined to extend the "lost chance of survival" theory to the case at hand, based upon undisputed medical testimony that the decedent would very likely have died, even with the resuscitative care not-rendered and subject of the plaintiff's complaint.   Lafarge seeks to analogize ***Bach***, but must first rewrite Melvin Spinks' testimony.  Again, Lafarge relates testimony vastly different from that actually in the record, claiming that Dr. Spinks described apportionment of flood waters in accord with Lafarge's wishes.  To reiterate Plaintiffs' Post-Trial Brief, Melvin Spinks ***did not*** testify that the harm resulting from flooding was distinguishable between North and South breaches and MRGO.  He testified, rather – and quite plainly - that the IHNC waters met the MRGO waters around Paris Road at about 9:00 a.m., that the IHNC water preceded the MRGO water west of Paris Road, and that North and South Breach waters were distinguishable and capable of modeling ***only for the short period of time before they mixed***.  This would be ***at most*** the amount of time between the North and South Breaches, as the North Breach floodwaters had spread southward along Jourdan Avenue to N. Prieur Street, resulting in a depth of about five

---

[29] ...and that the Eastern IHNC breaches occurred only where a barge was seen and heard hitting the floodwall.

feet at that location by the time of the South Breach's occurrence. *Plaintiffs' Brief, pp. 74-77*. Hence, anything analogous to undisputed medical expert testimony that the victim had little chance of survival even with first aid is strikingly absent. Finally, Lafarge's statement that failure to treat the breaches as separate events bars damages is ridiculous at best, and unsupported by any authority whatsoever.

**B. "<u>Would-Have-Happened-Anyway</u>":**   Lafarge again resurrects the would-have-happened anyway argument, relying still on *Dixon v. International Harvester Co*., 754 F.2d 573 (5th Cir. 1985) (mistakenly cited in Lafarge's brief as 754 F.2d 574).   Lafarge, despite this Court's admonitions during hearing of Lafarge's Motion for Summary Judgment, appears to greatly overemphasize and misconstrue the applicability of *Dixon* to any set of factual or legal circumstances at issue here. *Dixon* is a Mississippi products liability diversity action tried to a jury. The surviving spouse's general damages award in her survival action was reduced from 2.8 Million Dollars because her husband – the victim – died two and a half years post-accident. *Dixon* is not a wrongful death case. It does not stand for the proposition that Lafarge urges. Though *Dixon* has been cited plenty relative to *remittitur*, *de novo* review, jury assessment of expert testimony, comments from the bench, admissibility of subsequent remedial measures by non-litigants, measure of damages in diversity cases, and discretionary grant of new trial, the Fifth Circuit has not placed nearly the importance on *Dixon* as Lafarge does, and does not rely upon it as precedential for any proposition that Lafarge seeks to advance.   *Dixon* does not address causation, but merely the cutting-off of damages due to death of the plaintiff in a non-wrongful death case. *Dixon* does not aid Lafarge beyond the truism that after a plaintiff dies, he's no longer experiencing pain and suffering.

**C.  Road Home Benefits:**

Lafarge argues beginning at p. 87 of its Post-Trial Brief that receipt of Road Home benefits should operate as a credit against amounts for which Lafarge is liable due to property damage.  The defense appears not to understand the LRA's Road Home Program or the Louisiana Collateral Source Doctrine.  As this Court is well aware, e.g., ***In Re: KATRINA CANAL BREACHES CONSOLIDATED LITIGATION, Pertains To: Road Home Louisiana State, 07-5528***, 601 F.Supp. 809 (EDLA March 5, 2009):

> "Consistent with federal law, the Road Home program prohibits providing any relief funds that would duplicate payments from other sources, and therefore the Road Home program deducts any insurance payments from the federal grants that it receives. Individual recipients of grant money must likewise reimburse the State insofar as they subsequently receive insurance payments or other payments for losses covered by their Road Home grants. To the extent that the State recovers funds pursuant to these Agreements, the State recycles such funds within the Road Home Program. As part of the closing process, the Road Home program requires that individual recipients execute the Road Home Limited Subrogation/Assignment Agreement ("Agreement") in which the recipient promises to pay back any Road Home funds that are duplicated through other sources, such as through insurance payments for building coverage. The recipient further assigns the right to such duplicate funds to the State, and further agrees to provide notice to the State if he/she chooses to "abandon, dismiss, or release the claims against [his/her] insurance company . . . to allow the State to individually pursue recovery of the rights which have been assigned to the State herein." Agreement at 1, Rec. Doc. 1, Ex. A (Civ. A. No. 07-5528)." *Id*. at 811.[30]

Lafarge cites no legal authority which stands for reduction of a property damage award due to Road Home payments.  First, a Road Home disbursement is not compensation.  It is a ***grant***. ***Greater New Orleans Fair Housing Action Center v. HUD***, 08-01938 (HHK) (D.C. 9-7-2010). It does not arise out of any liability or tort obligation, but out of a voluntary relief fund.  Second, as is plain from ***In Re Katrina Canal Breaches Consolidated Litigation***, *supra*, reimbursements go not to the Federal Government - the alleged solidary tortfeasor in Lafarge's scenario - but to

---

[30] *Cf. **Bringol v. ANPAC***, C. A. 06-9987 "K" (2) (EDLA March 17, 2009).

the State of Louisiana, which is not party to this litigation.  Third, though the program is funded

with Federal Dollars, the United States Government does not determine who gets a grant, in what

amount, or why.  The Road Home Program is administered and grants paid solely by the State of

Louisiana.   The Louisiana Recovery Authority and Office of Community Development are

"agencies of the State of Louisiana."   *Robinson v. Road Home Corporation*, C.A. 09-4782

"K"(2) (EDLA January 12, 2010).   Again, the State of Louisiana is not a solidary obligor here

(and in accord with *Robinson, supra*, could not be).   Lafarge does not itself ascribe to the view

that the State of Louisiana is a joint tortfeasor.  Fourth and finally, the State of Louisiana is a

source collateral to Lafarge.   Relevant jurisprudence exists, soundly refuting Lafarge's assertions

to the contrary.   "The Trial Judge could have factually concluded that plaintiff was on welfare

only during the period she had to stay with Andrew. If so, under the "collateral source" rule, no

credit should be allowed for welfare payments. *Hall v. State Dept. of Hwys,* 213 So.2d 169

(La.App. 3rd Cir.) writ refused, 252 La. 959, 215 So.2d 128 (1968)."   *Bonnet, Etc. v. Slaughter*,

422 So.2d 499 (La.App. 4 Cir. 1982) (followed by *Metoyer v. Auto Club Family Ins. Co.*, 536 F.

Supp.2d 664 (E.D.La. 2008)).[31]

## IV.   CONCLUSION

Lafarge's Post Trial Brief does not accurately or honestly represent the trial record, or

the law.   Where Lafarge portrays its proof as unrebutted, or Plaintiffs' case as unsupported in

---

[31] Cf. *Bozeman v. State*, 2003-1016 (La. 7/2/04); 879 So.2d 692. ("The collateral source rule has been held to apply not only where plaintiff directly purchased insurance   against which the plaintiff recovered, but also where   there have been Medicare payments — *Womack v.  Travelers Insurance Co.*, 258 So.2d 562 (La.App. 1st  Cir., 1972); sick leave and annual leave payments —  *Dunlap v. Armendariz*, 265 So.2d 352 (La.App. 4th  Cir., 1972); retirement pension payments — *Adam v. Schultz*, 250 So.2d 811 (La.App. 4th Cir., 1971); free medical services rendered as a professional courtesy — *Spizer v. Dixie Brewing Co.*, 210 So.2d 528 (La.App. 4th Cir., 1968); Federal Social Security Benefits — *Doerle v. State*, 147 So.2d 776 (La.App. 3rd Cir., 1962); free medical care rendered by the Veteran's Administration — *Fullilove v. U.S. Casualty Co. of N.Y.*, 129 So.2d 816 (La.App. 2nd Cir., 1961); insurance paid for by the employer for the employee as a result of a collective bargaining agreement in a F.E.L.A. case — *Hall v. Minnesota Transfer Ry. Co.*, 322 F.Supp. 92 (D.Minn., 1971); and suits brought under the Jones Act and   Longshoremen's and Harbor Worker's Compensation Act — *Tipton v. Socony Mobil Oil Co.*, 375 U.S. 34, 84 S.Ct. 1, 11 .Ed.2d 4 (1963).").

fact or law, the actual record, and the law itself, are the more reliable sources of valid information.

        October 1, 2010.

                                      Respectfully Submitted,

                                        ***/s/Brian A. Gilbert***
Brian A. Gilbert (21297)
**LAW OFFICE OF BRIAN A. GILBERT, P.L.C.**
(Of Counsel to **BEST KOEPPEL TRAYLOR**)
2030 St. Charles Avenue
New Orleans, Louisiana 70130
Telephone: (504) 598-1000
Facsimile: (504) 524-1024
E-mail: bgilbert@briangilbertlaw.com,

Shawn Khorrami (CA SBN #14011)
**KHORRAMI, POLLARD & ABIR, LLP**
444 S. Flower Street, 33rd Floor
Los Angeles, California 90071
Telephone: (213) 596-6000
Facsimile: (213) 596-6010
e-mail: Skhorrami@kpalawyers.com

Laurence E. Best (3012)
Peter S. Koeppel (1465)
**BEST KOEPPEL TRAYLOR**
2030 St. Charles Avenue
New Orleans, Louisiana 70130
Telephone: (504) 598-1000
Facsimile: (504) 524-1024
E-mail: lebest@bestkoeppel.com
peterklaw@aol.com

Lawrence A. Wilson (N.Y.S.B.A. #2487908)
**WILSON, GROCHOW, DRUKER & NOLET**
233 Broadway, 5th Floor
New York, NY  10279
Telephone:  (212) 608-4400
Facsimile:  (212) 608-0746
e-mail:  lwilson@wgdnlaw1.com

Lawrence D. Wiedemann (#13457)
Karl Wiedemann (18502)

**WIEDEMANN AND WIEDEMANN**
821 Baronne Street
New Orleans, Louisiana 70113
Telephone: 504-581-6180
Facsimile: 504-581-4336
e-mail: ldwiedeman@aol.com
karlwied@bellsouth.net

Patrick J. Sanders (18741)
**PATRICK J. SANDERS, LLC**
3316 Ridgelake Drive, Suite 100
Metairie, Louisiana 70002
Telephone: (504) 834-0646
e-mail: pistols42@aol.com

Richard T. Seymour (D.C. Bar #28100)
**LAW OFFICE OF RICHARD T. SEYMOUR, P.L.L.C.**
1150 Connecticut Avenue N.W., Suite 900
Washington, D.C. 20036-4129
Telephone: 202-862-4320
Facsimile: 800-805-1065 and 202-828-4130
e-mail: rick@rickseyourlaw.net

*Attorneys for the Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing document has been served upon counsel of record, by United States Mail, postage prepaid and properly addressed, facsimile and/or ECF upload, this 27th day of August, 2010.

***/s/ Brian A. Gilbert***