# Exhibit 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: KATRINA CANAL BREACHES CONSOLIDATED LITIGATION | | CIVIL ACTION |
| | | NO. 05-4182 |
| PERTAINS TO: BARGE | | SECTION "K" |
| *Mumford* | C.A. No. 05-5724 | *as to claims of plaintiffs Josephine Richardson and Holiday Jewelers, Inc. – ONLY* |
| *Benoit* | C.A. No. 06-7516 | *as to claims of plaintiffs John Alford and Jerry Alford – ONLY* |

**LAFARGE NORTH AMERICA INC.'S
POST-TRIAL SURREPLY BRIEF**

With the Court's permission, LNA submits this post-trial surreply brief to address points and authorities presented for the first time in plaintiffs' post-trial reply brief.

**I.   CAUSATION**

   **A.   Meteorology**

   1. "Absence of Evidence". Regarding the meteorological evidence, plaintiffs' theme is that "the absence of evidence is not evidence of absence" (p. 9). To be sure, there is an "absence of evidence" that could support plaintiffs' claims, as there is no data showing west-to-east winds at the IHNC at any relevant time on August 29. There is, however, ample "evidence of absence" – *i.e.*, evidence that such winds were *not* present. In particular, four different and mutually-reinforcing bodies of meteorological evidence prove that there were no west-to-east winds at the IHNC during the critical early morning hours of August 29: (a) hurricane storm track and counterclockwise rotation showing winds from the northeast until the storm passed by New

1

Orleans around 8:45 a.m.; (b) OWI hindcast results showing winds from the northeast based on aggregated system-wide meteorological data; (c) local Lakefront Airport data showing winds consistently from the east and northeast; and (d) Slidell radar data showing "red" color (away from the radar, *i.e.*, from the northeast) at all relevant six-minute scans.  See LNA Br. 4-9.

      2. Lakefront Airport data.  Plaintiffs point to "gaps" in the data (p. 8), but Dr. Dooley explained that the Lakefront Airport reporting equipment did not make a "special report" unless conditions changed, and thus the absence of intermediate reports reflects conditions consistent with the reported measurements.  Dooley Tr. 1899:10-16.  Indeed, plaintiffs admit in their reply brief that the Lakefront data correlates with the other studies (p. 8), and that airport data such as this is "extremely comprehensive" (p. 13).  Contrary to plaintiffs' suggestion that the correlation between the Lakefront and OWI data represents some sort of double-counting (p. 8), the OWI study incorporates "all of the reporting stations and data in the Gulf of Mexico region," of which the Lakefront Airport was only one very small piece.  Dooley Tr. 1851:4-21.

      3. "Double-dealiased" radar data / "masked" mesocyclone.  Plaintiffs pretend that dealiasing is a "matter of degree," such that "important information can be lost by over-aliasing [sic] data" (p. 10).  To the contrary, as Mr. Lemon explained, "folded" data results at wind speeds above 64 knots, which exceed the reporting capacity of the radar and "flip" the color that signifies the true direction of the wind (i.e., "red" becomes "green" and vice versa).  Lemon Tr. 1756:2-1758:14.  A dealiasing algorithm corrects the error and depicts the true wind direction.  Lemon Tr. 1758:15-1760:6.  Thus, radar data has either been dealiased or it has not; and if it has not been dealiased, it will depict incorrect wind directions for winds exceeding 64 knots, as reflected in Dr. Mitchell's work.  Lemon Tr. 1761:3-15.  Plaintiffs' error is confirmed by their continued and wrongful insistence that the dealiasing algorithm "masked" a mesocyclone at a

different location, shown in the "upper-right Base Velocity quadrant" of Mr. Lemon's radar image (pp. 13-14), which is the same image in which both Mr. Lemon and the Court were able to identify the mesocyclone, with its bright-red "peak" showing where the mesocyclone and hurricane winds were acting together, and its dark red "lull" showing where the winds acted opposite each other, with all winds nonetheless blowing away from the radar.  Lemon Tr. 1816:1; LNA Br. 7 & n.8.[1]

  4.  <u>Level II data examined and ignored by Dr. Mitchell</u>.  Though plaintiffs aver that Dr. Mitchell "looked at all the data" (p. 13), they have no answer for the fact that in determining whether mesocyclones were present, he ***ignored*** the Level II base data and relied solely on the algorithm output.  Mitchell Tr. 1015:11-17.  In doing so, he arrived at opposite results to his opinions in the *Bradley* case, where he checked the Level II base data for storm relative velocity and found that an algorithm-identified mesocyclone did not, in fact, reflect "any signature of mesocyclonic rotation."  Mitchell Tr. 1063:14-18 & Bradley Report at 20 (DX 341).

  5.  <u>Mesocyclone ground effects</u>.  Plaintiffs cannot plausibly deny that mesocyclones are ephemeral storms that do not stay in one place for very long (p. 14), given that Dr. Mitchell's own report depicts purported mesocyclones that traveled many miles during a single six minute radar scan.  Mitchell Report, DX-312, at 16, 18 (algorithm output for 3:42 a.m. and 3:47 a.m. showing movement of purported mesocyclone A4[2]); Lemon Tr. 1728:4-13 (mesocyclones "move[] with the hurricane wind field" and thus do not remain in any one place for a long time).

---

[1] Though plaintiffs recapitulate their rant about Mr. Lemon's supposed "confusion" (pp. 11-12), no point-by-point refutation is needed as the Court can readily determine that the confusion rests with plaintiffs' counsel and not with Mr. Lemon, who developed the radar technology under review and has spent his career improving it.

[2] In fact, Mr. Lemon showed that A4 does not represent a mesocyclone and at "about 4 miles north of the harbor, … it's not affecting winds at the harbor at all."  Lemon Tr. 1786:13-1787:14.

**B.     Physical Evidence / Witnesses**

1. <u>Scrape marks</u>.  Having failed to cross-examine or otherwise challenge Dr. Bea's testimony that scrape marks on the floodwall were created by lawn-mowing equipment (see Bea Tr. 2663:22-2665:5; Slide RB-043, DX 361), plaintiffs argue that Dr. Bea's photograph does not depict the eastern IHNC floodwall because the wall "did not have a fence on top of it" and the photos "appear to have been taken on the protected side of the levee" (pp.14-15).  The undisputed evidence shows, however, that there was a cyclone fence on the protected side of the IHNC eastern floodwall (*e,g.*, Cushing Report Fig. 98 (DX 196); Bea Report App. C, Fig. 21 (DX 206)), as reflected in the lawn-mowing photograph, and the WGI bates stamp confirms that photograph was taken in the East Bank Industrial Area, where WGI was performing remediation work.  Moreover, the presence of tall trees on the other side of the wall from where the mowing activities were taking place proves that the mowing was occurring on the canal side of the floodwall, not the protected side.  Bea Slide RB-043, DX 361.

2. <u>North Breach – utility pole</u>.  Plaintiffs argue that a 35-foot-wide barge could have fit between the utility pole and the wall (pp. 15-16).  But the undisputed testimony showed that the barge would have been traveling broadside to the wind if it had been present, and thus the proper dimension for evaluating whether the barge could have avoided the pole is not the barge's 35-foot width, but rather its 200-foot length.  Cushing Tr. 2098:23-2099:20.  This explains why plaintiffs' expert on barge movement, Mr. Pazos, did not hesitate to agree that "there's no way the barge would have missed that … pole." Pazos Tr. 881:21-25.

3. <u>South Breach – school bus and telephone lines</u>.  Plaintiffs argue that because the barge passed over the floodwall in a lengthwise direction (i.e., bow or stern first), it would have "passed the school bus" rather than floating over it (pp. 16-17).  But as Dr. Cushing's report and

4

animation both showed, once clear of the floodwall the barge would have rotated to face perpendicular to the wind, and thus must have passed directly over the school bus. Cushing Report at 94-98 (Figs. 62-71) (DX 196); Cushing Animation (DX 349). The water in the neighborhood must already have been at a very high level to allow the barge to pass over the school bus, and also to settle on top of power lines rather than knocking over their supporting poles. Bea Tr. 2684:21-2685:24; Cushing Tr. 2127:1-11.

    4. Witnesses. Unable to defend the equivocal testimony of their supposed eyewitnesses, which would not describe the ING 4727 even if credited (LNA Br. 19-25), plaintiffs are reduced to arguing that "only if a witness' account is *physically impossible* … is that witness' testimony to be disregarded" (pp. 17-18) (emphasis in original). That assertion is plainly wrong: as the trier of fact, the Court has plenary authority to credit or discredit witness testimony as equivocal, implausible, or simply outweighed by other evidence, and its determinations will not be disturbed on appeal. *E.g.*, *Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 375 (5th Cir. 2000). That said, the handful of equivocal eyewitness accounts on which plaintiffs rely are, as construed by plaintiffs, physically impossible and otherwise so weak and implausible that no reasonable fact finder could possibly rule in plaintiffs' favor, a finding this Court can and should make here. *E.g., S. Pac. Co. v. Matthews*, 335 F.2d 924, 927 (5th Cir. 1964) ("[t]estimony which is at variance with physical facts is no evidence"); LNA Br. 19-20 & n.23.[3]

    **C.    Geotechnical Evidence**

    1. Tension gap. Plaintiffs accuse LNA of "misinform[ing] the court … that Dr. Marino testified that there was insufficient time for a tension gap to form" (p. 18). In fact, Dr. Marino

---

[3] Plaintiffs' assertion that the accounts of Messrs. Adams, Williams, and Murph are "mutually corroborating" (p.18) is incorrect. Mr. Murph said he did not see the barge until the floodwaters had risen "high as the gutter" on his home (Murph Tr. 700:7-9); by contrast, Mr. Adams said that the object he saw was carried into the neighborhood

did so testify, as plaintiffs' own post-trial brief makes clear: "Dr. Marino concluded that the time necessary to allow the water to rise and deflect the wall was not sufficient enough to create a tension crack." Doc. 20018 at 54 (emphasis in original). Plaintiffs' reply brief makes no attempt to defend this erroneous assertion by Dr. Marino, which was refuted by test data and by indisputable photographic and other evidence showing that tension cracks *did* form on floodwalls, including the IHNC floodwall, during Katrina. LNA Br. 40 n.42.[4]

    2. Soil composition. Plaintiffs deny (at 20-21) what photographic evidence shows – that sandy soils were used to fill excavations in the EBIA. Having failed to cross-examine Dr. Bea on deposition or at trial about his identification of sandy soils in photographs of the backfill materials used on the EBIA, or to offer expert testimony challenging such identification, plaintiffs now argue that Dr. Bea's opinions "lack specifics" about angles of repose, lighting, and other matters (p.20 & n.14). Dr. Bea had ample basis to conclude that sandy materials were used to fill the EBIA excavations, both from photographic evidence and from other documentation of the EBIA remediation work. Bea Slides RB-026, 64, 65 (DX 361); Bea Report App. C at 24-44, 115-18 (listing references) (DX 206). Furthermore, plaintiffs cannot plausibly contend that interpreting photographs is a "diabolical art" (p.21), given that Dr. Marino never visited any of the breach sites for forensic purposes (Marino 2009 Dep. 126:3-14, DX 221), and thus relied *only* on photographs as his basis for interpreting the visual evidence.

    3. Boring 81A. Dr. Bea showed that there was no "ravine" at the location where Boring 81A was taken, based on a pre-storm photograph showing relatively flat ground at this location.

---

with the initial flooding (Adams Tr. 285:15-20). In a statement given shortly after the storm, Mr. Williams said that the barge was not present when the floodwall failed. Williams Oct. 2008 Dep. Exh. 3 at 7-10, 12 (DX 310).

[4] Plaintiffs argue that Dr. Marino "assumed" the existence of a tension crack in his stability analysis (pp. 18-19), but that assumption is irrelevant because Dr. Marino biased the results of his stability analysis by using imaginary strong soil layers and improper averaging techniques – errors plaintiffs make no attempt to defend in their reply brief – and other errors that caused his stability results to differ from every other investigation. See LNA Br. 51-59.

6

DX 358; Bea Slide RB-185 (DX 361).[5] Though plaintiffs now contend that the photograph shows only the area in front of the 1980 floodwall (p. 21 & n.16), in fact the junction between the 1980 floodwall and the 1969 floodwall is clearly visible at the side of the photo, in the exact location where Dr. Bea placed Boring 81A based on the GPS coordinates in the boring log. DX 358; Bea Slides RB-175, 176, and 185 (DX 361); Bea Tr. 2634:22-2635:4, 2637:1-2639:9.[6]

    4. <u>Marsh stratum permeability</u>. Plaintiffs assert that Dr. Marino did not "use[] a single permeability value of 10-8 for the marsh" (p. 23), but his own report shows that he assigned this value, or a slightly lower value (10-7), to the largest portions of the marsh layer. Marino Report Table 5.1 & Figs. 5.42, 5.58, and 5.59 (areas M1, M4, M3, M6, and M8) (PX 397). Also, while plaintiffs incorrectly contend that Dr. Bea used values for "California peat" and not "New Orleans marsh" (p. 23 & n.20), Dr. Bea explained that the values he used are well within the IPET range for New Orleans marsh *and* California peat, and that those values are themselves consistent when adjusted for the fact that one set of data comes from laboratory tests and the other from field tests. Bea Tr. 2735:1-2736:14 (discussing IPET Fig. V-17-15 (DX 145)).

    5. <u>Cone penetrometer data</u>. Though plaintiffs cite deposition testimony from Dr. Bea as suggesting that CPT data is not "superior" to boring data (p. 24), that provides no excuse for Dr. Marino to have totally disregarded the CPT data in assigning strength values, alone among all the investigators. Bea Tr. 2605:3-2616:16 (ILIT); Mosher Dep. 80:8-81:21 (IPET) (DX 283). Plaintiffs quote IPET as finding that CPT data were "inconsistent and used mainly to define contact between the interdistributary clay and silty sand" (p. 24 n.21), but omit that the quoted

---

[5] This photograph proves that Dr. Marino's demonstrative, which hypothesizes a "ravine" along the entire floodwall, is erroneous. Compare Bea Slide RB-185 (photograph) with Bea Slide RB-186 (Marino demonstrative) (DX 361).

[6] Though plaintiffs rely on an "as-built" drawing of the 1969 floodwall, arguing that it shows "how the levee was actually built" (p. 20, n.13), this document supports LNA because it makes clear that the sand and shell materials had not been removed and replaced as of the completion of construction. Marino Report Fig. 2.2 (PX 397).

7

passage specifically pertains to "the Michoud site," not the IHNC.  IPET Report Vol V, App. 23 at V-23-3 ("The CPT data *at the Michoud site* were inconsistent, and were used mainly to define the contact between the interdistributary clay and the silty sand.") (emphasis added) (DX 145).

      6. <u>Wall height</u>.  Plaintiffs argue that the addition of five feet of fill during construction did not cause settlement in the weak underlying soils present within the limits of the South Breach, based on their post-hoc interpretation of one of Dr. Bakeer's demonstratives (unaided by cross-examination or testimony from their own experts) concerning areas outside the limits of the breach (pp. 24-25).  However, the South Breach occurred in the middle of the area where the fill was added, which also represented the area where the soil borings reflected the weakest underlying soils and where the scour trench was deepest, reflecting differential settlement and a lower wall top.  Bakeer Tr. 2388:16-2390:17 (weakest soils in breached area); Cushing Tr. 2109:6-2111:17 (scour trench deepest in breached area); see Bakeer Tr. 2380:20-2381:3.

      7. <u>Exhumed sheet pile</u>.  Plaintiffs cavil with Dr. Bea's testimony about exhumation of the sheet pile at Bayou Bienvenue (p. 25), one of the many breaches Dr. Bea personally visited over the course of thirty-five trips to New Orleans.  Bea Tr. 2587:10-13.  Though plaintiffs claim to have been "sand-bagged" by this testimony (p. 25), they adduced it on ***cross-examination***, and thus it was a self-inflicted wound.  Dr. Bea's testimony that the exhumed sheet pile was under water rather than visible above the surface (Bea Tr. 2793:16-23) provides no basis for doubt, as a trained forensic engineer can draw appropriate inferences based on available evidence at the site of a breach.  In any case, plaintiffs have no answer to LNA's showing that a barge impact could ***not*** have caused the floodwall to become exhumed in the manner that it did.  LNA Br. 31-35.

8

D.  **Legal Standards for Causation**

1. <u>Pennsylvania Rule – predicate to apply</u>.  Plaintiffs again admit that presumptions are superfluous when evidence is introduced (p. 26 n.24).  As a result, the debate over evidentiary presumptions is itself superfluous because the Court has ample evidence here and need not rely on any presumptions.  Regardless, plaintiffs cannot invoke the Pennsylvania Rule without first showing that their injuries resulted from an allision.[7]  Plaintiffs ignore that requirement and instead focus on the separate requirement that the plaintiff show a causal connection between the statutory violation and the allision.  But the Court never even gets to that question if plaintiffs do not prove there was an injury-causing allision.  In most cases, including those cited by plaintiffs, there is no dispute that an injury-causing allision occurred.  See, *e.g., Osprey Ship Mgmt v. Foster*, No. 08-61125, 2010 U.S. App. LEXIS 13540, at *2 (5th Cir. July 1, 2010) ("case arises from an allision between a commercial vessel and a submerged submarine launchway").[8]  But here, plaintiffs have not established a barge allision other than the one at the southern end of the South Breach, which occurred *after* both breaches had formed, and thus have not met their burden of showing an injury-causing allision.[9]

2. <u>Pennsylvania Rule – statutory violation.</u>  Plaintiffs fail to show either that 33 C.F.R. § 162.75(b)(3)(ii) applied to LNA or that LNA violated that provision.  LNA explained that the provision applies only to mooring against the bank in the river channel and not against a dock.

---

[7] See LNA Br. 62-65 (citing *Gosnell v. United States*, 262 F.2d 559, 563-64 (4th Cir. 1959) (Pennsylvania Rule does not relieve plaintiff of the burden of "establish[ing] either the 'physical cause' or the identity of one of two colliding objects"); *Candies Towing Co. v. M/V B&C Eserman*, 673 F.2d 91, 95 (5th Cir. 1982) (refusing to apply Rule because "whatever [defendant]'s statutory violations, whatever its negligence insofar as the grounding is concerned, neither had anything to do with the sinking").

[8] Though plaintiffs cite *In re Nautilus Motor Tanker Co.*, 85 F.3d 105, 115 (3d Cir. 1996) (p. 27), the court in that case refused to apply the Pennsylvania Rule because the plaintiffs "had presented no evidence that any impact had occurred in or near [defendant]'s ship berth — the location of the dredging violations."  Similarly here, plaintiffs have not shown that any impact occurred at or near the breach locations at any time before they occurred.

LNA Br. 65-67.  In response (p. 27), plaintiffs cite to § 162.75(a), which states that § 162.75 applies to waterways; bridges, wharves, and other structures; and vessels.  But that does not mean that *every* subparagraph applies to all waterways, bridges, wharves, and vessels.  Rather, in captioning Section 162.75(b) "Waterways," the drafters plainly intended to limit the scope of that section to waterways.[10]  Disregarding case law, other authorities, and testimony establishing that the ING 4727 was not a tow (LNA Br. 67-68), plaintiffs invoke § 162.75(b)(5) for the first time (p. 28), but that provision does not define "tow" and appears to adopt the industry-wide understanding of "tow" (cited at LNA CL ¶ 7(b)) because it discusses the towing of many barges by a single tug and nowhere discusses or envisions two barges moored to a dock.

     3. <u>Substantial factor</u>.  Plaintiffs now profess for the first time (at 29) to "advocate" the standards in Restatement § 432, but those standards are fatal to plaintiffs' causation case.  Plaintiffs cannot show the barge was a "but for" cause of the breaches, as required by § 432(1), because the floodwall would have breached as a result of Katrina's maximum surge even if the barge stayed moored at the dock.  LNA Br. 59-61.  And the barge was not "sufficient" to cause the breaches because a barge impact cannot have caused the wall to fail, with or without a storm surge.  LNA Br. 31-35.  Plaintiffs' invocation (at 30) of the Court's hypothetical in *Robinson* regarding a "Navy vessel [running] into a *papier mache* levee" is unavailing, as the Navy vessel in the hypothetical was undisputedly both a "but-for" cause and "sufficient" cause of the breach, unlike the alleged barge impact here.  See *In re Canal Breaches Consol. Litig.*, 471 F. Supp. 2d 684, 695 (E.D. La. 2007) (vessel was "sole cause" of hypothetical breach).

---

[9] The same is true for Louisiana Rule (pp. 6-7) – a damage-causing allision must be shown first for that presumption to apply, as well.  See LNA Br. at 81-82.

[10] See also 33 C.F.R. § 162.75(b)(1) (explaining that the purpose of Section 162.75(b) is to address requirements for keeping the river channel clear).

**II.   NEGLIGENCE**

1. <u>Duty</u>.  Plaintiffs cite two cases (pp. 3-5) to support their claim that LNA owed them a duty of care, but both cases stand for the unremarkable concept that a vessel operator owes a duty of care to other vessels and structures *in or on the waterway*.  For example, plaintiffs quote *In re Kinsman*, 338 F.2d 708 (2d Cir. 1964), as stating that a vessel poses a "known danger … to the owners of all other ships and structures ***down-river***."  *Id.* at 722 (emphasis added).  But they ignore the footnote that follows, which states that the court was ***not*** deciding whether a vessel poses danger to "non-riparian property other than the real and personal property which was sufficiently close to the bridge to have been damaged by the fall of the towers."  338 F.2d at 722 n.6.  Similarly, in *In re Signal Int'l LLC*, 579 F.3d 478 (5th Cir. 2009), the question was whether two vessels' impacts with a bridge abutment were foreseeable.  The abutment was in the Pascagoula River and the vessels travelled on an "an unobstructed waterway right to the bridge," and thus it was plainly in "the general class of persons for which the harm of allision was foreseeable."  579 F.3d at 492, 494.  Neither decision held a vessel operator liable for damage to properties away from the waterway.

2. <u>Unavoidable breakaway</u>.  In contending that the breakaway was avoidable, plaintiffs cite again to *Signal* (pp. 5-6), but they reference the Fifth Circuit's summary of the lower court's discussion of Act of God, which the appellant did not appeal.  See 579 F.3d at 490 n.11.  The Fifth Circuit made no finding that Katrina was not an Act of God.  Plaintiffs' citation to *Bunge Corp. v. Freemont Marine Repair, Inc.*, 240 F.3d 919 (11th Cir. 2001), is also inapposite, because that case involved a different storm (Opal) in a different location (Florida) and a

11

different incident (breakaway of partially-constructed casino vessel).[11] Plaintiffs make no effort to distinguish any of LNA's cases on this issue, which demonstrate unavoidable breakaway. See LNA Br. 77-78; CL ¶ 18).

3. Unloading / ballasting / removal. Plaintiffs say that LNA should not have unloaded the barge (p. 7), but their own expert, Don Green, stated "I agree that [Katrina] was not – it was not projected to be a direct hit on Friday." Green Tr. 561:6-16. The evidence at trial established that only much later on Friday, after unloading had started, did the storm make its turn towards New Orleans. See Busch Tr. 109:9-12; Ryan Tr. 2875:4-6; FF ¶¶ 21-28 (first Coast Guard alert was at 8:00 p.m. on August 26).[12] In any event, as LNA established in its opening brief (at 72-73), it was not possible to halt unloading once it began. Nor have plaintiffs shown that "simply ceasing unloading operations would have ballasted the barge" (pp. 7-8); instead, as Mr. Busch, Mr. Strouse, and Mr. Ryan testified, a partially unloaded barge sits unevenly in the water because the cement is not evenly distributed, presenting a heightened risk, not a reduced risk. LNA Br. 73; FF ¶ 65. Plaintiffs again claim that LNA could have had the barge removed, but they ignore that there was nowhere for the barge to be taken, that the barge could not have gotten a lock turn, and that it was not feasible to request pickup of the barge before unloading ended. See LNA Br. 76-77; LNA FF ¶¶ 11, 31, 52-53, 65-66.

### III.  DAMAGES

---

[11] If the Court considers this type of authority, a more analogous decision is the recent opinion in *Bay Point High & Dry v. New Palace Casino, L.L.C.*, ___ So.3d ___, 2010 WL 3860443 (Miss. Ct. App. Oct. 5, 2010), where the court affirmed a trial court decision that even though the defendant's barge broke free during Hurricane Katrina, the defendant was not negligent because the storm was an Act of God. *Id.* at *3-4.

[12] While plaintiffs cite an exhibit from earlier on August 26 showing that the very edge of the "potential three day track" was grazing New Orleans (PX 18), that image plainly shows that the storm was forecasted to strike Florida, hundreds of miles away as of Friday afternoon. Plaintiffs cite no evidence that LNA should have refrained from unloading the barge because of a storm headed east of Pensacola.

1. <u>Apportionment</u>.  Plaintiffs deny that flooding from several breaches can be apportioned (pp. 30-31).  But Mr. Spinks admitted that modeling can determine the volume of water at a location from different sources (LNA FF ¶ 479); the Restatement identifies flooding as capable of being apportioned (LNA CL ¶ 48); and the Court did exactly that in *Robinson* (*id.*).  Plaintiffs supplied no evidence on this issue, and their proof fails for that reason.  LNA Br. 90.  Indeed, because the barge did not cause the North Breach, the Alfords' claim must fail because their home was flooded from that breach.  Similar considerations apply to the other two plaintiffs' claims, based on division of flooding between the IHNC and the MRGO.[13]

2. <u>Road Home</u>.  Plaintiffs do not dispute that the Road Home Limited Subrogation/ Assignment Agreement requires grant recipients to repay Road Home monies ***only*** if they are compensated by their insurers or the federal government, not if they recover in a third-party tort suit such as this.  Plaintiffs instead argue that Road Home monies are not "compensation" (pp. 32-33).  But courts and the Road Home Program itself recognize these funds compensate homeowners for property losses.[14]  Though plaintiffs argue that Road Home funds are distributed by the State of Louisiana, they admit (at p.33) that the funds come from the federal government.  This means that a tortfeasor (the federal government) has already compensated the plaintiffs for their property losses.  The collateral source rule thus does not bar the Court from deducting from plaintiffs' recovery (if any) the amount of their Road Home payments.   LNA Br. 87-89.

Dated: October 7, 2010                                    Respectfully submitted,

---

[13] Plaintiffs' reply does not rebut LNA's showing that MRGO flooding caused Mr. Richardson's death, most of Mrs. Richardson's property damage, and the initial, most significant, flooding at Holiday Jewelers.  LNA Br. 84-87.

[14] See *Groby v. Davis*, 575 F. Supp. 2d 762, 763 (E.D. La. 2008) (grants given "to provide ***compensation*** to those who sustained un-reimbursed damage to their homes"); *The Road Home* Program, http://www.road2la.org/about-us/ (program "is designed to provide ***compensation*** to Louisiana homeowners affected by Hurricanes Katrina or Rita for the damage to their homes. … Eligible homeowners … may receive up to $150,000 in ***compensation*** for your losses to get you back into your homes.") (all emphasis added).

        Derek A. Walker (#13175)
        Robert B. Fisher, Jr., T.A. (#5587)
        **CHAFFE MCCALL, L.L.P.**
        2300 Energy Centre
        1100 Poydras Street
        New Orleans, LA  70163-2300
        Telephone:  (504) 585-7000
        Facsimile:  (504) 585-7075
        Fisher@chaffe.com
        Walker@chaffe.com

        /s/ John D. Aldock
        John D. Aldock
        Richard M. Wyner
        Mark S. Raffman
        Adam M. Chud
        **GOODWIN PROCTER LLP**
        901 New York Avenue, N.W.
        Washington, DC  20001
        Telephone:  (202) 346-4240
        jaldock@goodwinprocter.com
        rwyner@goodwinprocter.com
        mraffman@goodwinprocter.com

        Daniel A. Webb (#13294)
        **SUTTERFIELD & WEBB, LLC**
        Poydras Center
        650 Poydras Street, Suite 2715
        New Orleans, LA  70130
        Telephone:  (504) 598-2715

        *Attorneys for Lafarge North America Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on October 7, 2010.

        /s/ John D. Aldock

LIBW/1759586.4