# EXHIBIT

# 2

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

IN RE KATRINA CANAL BREACHES                      CIVIL ACTION
CONSOLIDATED LITIGATION
                                                  NO. 05-4182

PERTAINS TO:                                      SECTION "K"(2)
    **05-4181, 05-4182, 05-4191, 05-4568, 05-5237, 05-6073**
    **05-6314, 05-6324, 05-6327, 05-6359, 06-0020, 06-1885,**
    **06-0225, 06- 0886, 06-11208, 06-2278, 06-2287, 06-2346,**
    **06-2545, 06-3529, 06-4065, 06-4389, 06-4634, 06-4931,**
    **06-5032, 06-5042, 06-5159, 06-5163, 06-5367, 06-5471,**
    **06-5771, 06-5786, 06-5937, 06-7682 07-0206, 07-0647,**
    **07-0993, 07-1284, 07-1286, 07-1288, 07-1289**

## ORDER AND REASONS

Before the Court is the United States' Motion to Dismiss Counts I-III and V-VII of the

Superseding Master Consolidated Class Action Complaint and to Strike the Remaining Counts.

(Doc. 6380). The Superseding Master Consolidated Class Action Complaint (Doc. 3420)

("Master Complaint")  incorporates all parties to these proceedings and attempts to state in one

document all the pending allegations against all of the defendants for the flooding and inundation

of approximately 80% of the City of New Orleans caused by the breaches in the 17th Street

Canal, the London Avenue Canal, the Orleans Avenue Canal[1] and MRGO.  The United States

maintains that the Master Complaint for levee failures is barred (a) by the Flood Control Act of

1928 ("FCA"), 33 U.S.C. §702c, and (b) by the discretionary function exception with respect to

allegations of the negligent granting of the dredging permit of the 17th St. Canal.  In addition, it

contends that the  MRGO allegations should be stricken as being in contravention of Case

---

[1]The Orleans Avenue Canal was accidently omitted from the Master Complaint and was subsequently added by Doc. No. 6941.  As the instant  motion was filed prior to the amendment, the motion does not directly address the Orleans Avenue Canal issues.

Management Order No.4.  The Government seeks dismissal pursuant to Fed. R. Civ. P. 12(b)(1) and 12(h)(3).

## I. Background

This motion puts at issue and spotlights the underlying actions and inaction which lead to the catastrophic failures of the levee system surrounding New Orleans and its vicinity.  The breaches and failures that occurred at the three "outfall canals" and the floodwalls constructed thereon are at the heart of this particular inquiry.  The 17th Street Canal, the Orleans Avenue Canal and the London Avenue Canal all serve as conduits for the drainage of rain water from the City of New Orleans and are controlled by the Sewerage and Water Board of the City of New Orleans ("SWB").   For instance, the Seventeenth Street Canal has served as such since at least 1913, when the SWB completed the construction of Pumping Station No. 6 which is located in that canal south of Interstate 10.  (Master Complaint, ¶24).   Each canal drains into Lake Pontchartrain.

In direct tension with this hydrological necessity to drain New Orleans during heavy rain occurrences is the countervailing reality that storm surge occurs during hurricanes pushing the waters of the Gulf of Mexico through The Rigolets, the Gulf Intracoastal Waterway and the Mississippi River Gulf Outlet into Lake Pontchartrain, and ultimately into these same outfall canals.  Thus, while these canals serve as conduits for the drainage of excess water from the streets of New Orleans during rain events, these same canals become channels for incoming storm surge creating increased risk of flooding caused by Lake Pontchartrain hurricane driven water.   These two forces–drainage versus storm surge and the decisions concerning how to

control them and who was to pay for those measures lie at the heart of the tragedy of what

Katrina wrought.  In order to fully comprehend the allegations of the Master Complaint, a review

of the Corps' approach to hurricane protection  and drainage issues of this area must be

examined.

**A. 1955-1965        Flood Control of Lake Pontchartrain Recognized as a Goal
                      Resulting in the Passage of the Flood Control Act of 1965 and
                      the Lake Pontchartrain and Vicinity Hurricane Protection
                      Plan**

On June 15, 1955, following a series of severe hurricanes, Congress authorized the Corps

to study projects to protect areas along the eastern and southern coasts from hurricane storm

surges.[2]  Included as a subject for study was the area surrounding New Orleans, which came to

be known as the Lake Pontchartrain and Vicinity Hurricane Protection Plan[3].  (HPDC, § 2.2 at 2-

3 and 2.3.1 at 2-18) (See Public Law 84-71).  As these studies were on-going, Congress

determined that the approach for paying for these projects would not follow the  traditional cost

sharing rules for federal civil works projects.  As explained in the HPDC:

> At that time, planning for civil works projects was to be a full federal cost
> responsibility, and this remained the case until the 1986 Water Resources
> Development Act required local sponsors to pay 50% of the cost of project
> feasibility studies.  Generally, the cost sharing requirement for implementing a

---

[2]While this motion is brought pursuant to Rule 12, the Government has relied on government documents to provide the required factual background; the Court will rely on these documents  as well as Exhibit D.8  attached to Plaintiffs' Opposition (Doc. 6804).  This report is entitled *Decision-Making Chronology for the Lake Pontchartrain & Vicinity Hurricane Protection Project* (Draft Final Report for the Headquarters, U.S. Army Corps of Engineers) drafted by Douglas Woolley and Leonard Shabman.  This Hurricane Protection Decision Chronology ("HPDC") study was chartered by the Institute for Water Resources  (IWR) of the Army Corps of Engineers ("the Corps") "to document and examine decision-making for the Lake Pontchartrain & Vicinity Hurricane Protection Project." *Id.* at ii. This exhaustive report provides detailed time lines and discussions concerning what proved to be a fifty-year exercise in ineptitude and gross economic and technological mismanagement.

[3]The Court will refer to the project as the "LPV" as the full acronym is unwieldy at best.

3

flood control project was that non-federal sponsors would provide all lands, easements, and rights of way (LERW) necessary for project construction, and these same entities were to assume long-term responsibility for the operation and maintenance of the completed project.

However, Congress in 1958 (PL85-500) said that hurricane project construction costs were to be a shared financial burden, with a local sponsor expected to sign an agreement assuring that it would pay for 30 % of project construction costs.  If the value of LERW did not reach 30% of total project costs, then the non-federal sponsors would need to agree to make cash payment until the total value of the non-federal contribution reached 30% of the cost of a hurricane protection project.

(HPDC, §2.3.1 at 2-19).  With this decision on the part of Congress, another factor, other than the cost to the federal government, was put into play in constructing the system; the ability of a local sponsor to underwrite such costs became another variable in the decision making process.

In  November of 1962, after **seven years** of study, an Interim Report produced the "Barrier Plan." HPDC § 2.3.5 at 2-28.   "Central to the protection were tidal gates at Chef Menteur Pass and The Rigolets, which would be closed during storms to hold back surges that otherwise would enter Lake Pontchartrain."  *Id*.   Other levees and floodwalls were included, none of which included the outfall canals of the 17th Street Canal, the Orleans Avenue Canal or the London Avenue Canal. [4](See Appendix 1, Map 2-2 of the HPDC at 2-29).  This study utilized a model to determine necessary levee height and engineering needs known as the "Standard Project Hurricane" ("SPH") which the Corps created in conjunction with the U.S. Weather Bureau to "select hurricane parameter of wind speed and central pressure for defining the SPH."  The LPV was to provide a degree of protection equivalent to the surge and wave

---

[4]"The Citrus area which is now known as New Orleans East would have a new low-level levee along the lakefront, floodwalls at the Inner Harbor Navigation Canal ("IHNC" [or the Industrial Canal]), and levees and floodwalls along the Gulf Intracoastal Waterway.  The metro New Orleans area would have levee enlargement and floodwalls at the IHNC and the Seabrook Lock at the mouth of the IHNC."

action predicted to result from the SPH parameters.  Also,  taken into account was the "Probable Maximum Hurricane" ("PMH") which was a stronger, although less likely event, than the SPH. The design of the project focused on SPH surge protection–the less forceful occurrence. (HPDC § 2.2 at 2-4; § 2.3.5. at 2-26-30).

On September 9, 1965, Hurricane Betsy made landfall over Grand Isle Louisiana, due south of New Orleans, at nearly Category 5 strength.  It moved up the Mississippi River which caused the river to rise ten feet at New Orleans.  As the United States Army Corps of Engineers ("the Corps") described the event on its own website, "A storm surged moved into Lake Pontchartrain and overtopped and breeched (sic) levees, flooding much of the city, including the 9th Ward.  More than 160 homes were flooded along the Mississippi."[5]

The Lake Pontchartrain and Vicinity Hurricane Protection Plan("LPV"), a program to construct a series of control structures, concrete floodwalls and levees intended to protect these areas from flooding, was passed by Congress on October 27, 1965 as the Flood Control Act of 1965, 29 Stat. 1073, 1077 (42 U.S.C.A. §1962d-5).[6]   It incorporated the Interim Report approach, and the Barrier Plan was put into place. It is pursuant to that authorization that the levees and eventually the  floodwalls involved in this litigation were created.

---

[5]http://www.hq.usace.army.mil/history/Hurricane_files/Hurricane.htm.  It is interesting to note that in the HPDC, the estimate of damages to houses is significantly higher–that is the HPDC posits that **six thousand homes** were seriously damaged by flooding by Hurricane Betsy.  HPDC, § 2.2 at 2-5.

[6]The authorization states:
The project for hurricane-flood protection on Lake Pontchartrain, Louisiana, is hereby authorized substantially in accordance with the recommendations of the Chief of Engineers in House Document Numbered 231, Eighty-ninth Congress, except that the recommendations of the Secretary of the Army in that document shall apply with respect to the Seabrook Lock feature of the project.  The estimated cost is $56,235,000.

The tortured tale of its construction is among the most convoluted stories told.  To outline every twist and turn and decision made in the building of  the specific levees and floodwalls involved which are the subject of  this Master Complaint would require more space and time than is appropriate for this opinion. Nonetheless,  an overview is necessary to provide factual support for the Court's decision concerning the subject motion. Tangentially, it demonstrates how this catastrophic failure of the Corps to fulfill its mission occurred.

**B.  1966-1975          Continued Planning, Failure to Incorporate New Data in Plans, Funding Issues, and NEPA Lawsuit**

In August of 1966 the Corps reviewed its elevations of the levees involved as a result of the lessons learned with Hurricane Betsy, and by September of 1968, it determined that the design elevations of all project structures were to be raised by 1 to 2 feet.  This elevation remained the status quo, despite new models, new information concerning subsidence and the like thereafter.  The Corps maintained that it would be adequate and protect against the SPH up to the time of Hurricane Katrina.

In 1969, after Hurricane Camille, the Corps had the opportunity to revisit its calculations concerning PMH and SPH.  It was clear that "these two occurrences were no longer as close in size as when they were first defined in 1962, and it was no longer the case that the plan as originally conceived would contain the PMH surge in addition to the SPH surge." This reality meant that there was an increased likelihood of a large storm surge occurring that would exceed the structure heights designed to contain the SPH as first established in 1965 and then adjusted in 1968.  The Corps did not fold this information into another project redesign.  (HPDC § 2.3.6 at 2-37).

6

From 1970 through 1975, the Corps continued to design barrier structures for The Rigolets, Chef Menteur Pass and the Seabrook lock despite increasing opposition to these portions of the Barrier Plan.  In addition, new environmental analyses were required for compliance with the 1969 National Environmental Policy Act ('NEPA").  (HPDC, § 2.2 at 2-6).  With respect to the outfall canals, the HPDC states:

> In the original 1962 Barrier Plan, the existing local levees along the outfall canals were predicted to be of sufficient height to contain barrier dampened SPH surges coming up the canals from the lake.  However, District analyses after Hurricane Betsy concluded that those existing levees and walls could be overtopped even with the planned barriers in place.  What follow[ed was] a 20-plus year period during which the District, the Orleans Levee District (OLD) and the . . . SWB debate[ed] different project alternatives for the outfall canals to accommodate the twin local objectives of hurricane protection and effective interior drainage of rainfall from New Orleans.  During these years, the District recommend[ed] "frontage protection" involving butterfly gates at the canal mouths that would close automatically during hurricane driven high lake water events.  A requirement to recommend the least cost solution as the federally preferred alternative for surge protection, combined with the federal policy defining interior drainage as a non-federal responsibility [was] the basis for the district position.  The OLD and SWB prefer[ed] higher canal walls "parallel protection" to contain surge that might enter the canals since the higher walls would not interfere with (and would even enhance) interior drainage capacity during hurricanes and heavy rainfall events. [7]

Id. at 2-7.  This battle continued from 1970 through 1992.  So, even while recognizing that the 1962 plan was insufficient, the Corps, the SWB and OLD battled over the proper design.  Initially, the discussion was based on the belief that there would be some protection against the surge–that being the Barrier Plan, but that was fated to change.

---

[7]The obvious irony of this ordering of priorities is that with the passage of the National Flood Insurance Act of 1968, one federal agency–the Corps–was taking action that would impact and require payment from the federal government for flood damage.  The failure of our national government–whether Congress or the Executive Branch to recognize such a short-sighted approach to risk management boggles the mind.

As noted, with the passage of NEPA, an Environmental Impact Study ("EIS") was filed with the Council on Environmental Quality.  Apparently at the subsequent public hearing, held on February 22, 1975,  opposition to the Barrier Plan was voiced on environmental grounds as well as others.  The Corps maintained that the barriers would have no significant adverse environmental impact.  (HPDC § 2.2 at 2-8).

On December 8, 1975, Save Our Wetlands, Inc. filed suit in the United State District Court for the Eastern District of Louisiana against the District Engineer, the Secretary of the Army, the Administrator of the EPA and the President of OLD.  The suit "alleged that a regional cumulative EIS should be accomplished prior to proceeding with the project; that the Corps had not complied with conditions of final approval by the EPA; and that the Corps had not completely eliminated the St. Charles lakefront levee as required by the EPA."  (HPDC, § 2.2 at 2-8).  This action triggered the odyssey that resulted in the abandoning of the Barrier Plan by the Corps.  Meanwhile, as the project had yet to be started with respect to the barriers, the cost estimations were escalating causing concerns as to whether the local  sponsor would be able to afford the local cost shares.  (HPDC § 2.2 at 2-8).

**C.  1976-1990**       **The Demise of the Barrier Plan, the Plan to Increase the Drainage Capacity of the Seventeenth Street Canal, the High Level Plan, Issues of Re-Authorization and the  E-99 Sheet Pile Wall Field Load Test Report.**

On December 7, 1977, nearly two years after the initial suit was filed and eleven years after the establishment of the LPV, the court enjoined the project implementation "citing inadequacies in the District EIS [Environmental Impact Study] analysis of the surge barrier effects on lake salinity regimes and habitat." (*Id.* at 2-9). Four months later, the court lifted the injunction as to project levees and floodwalls apart from the barrier complexes because they would have no adverse affect on the lake environment. Nonetheless, the injunction on the construction of the barrier structures at Chef Menteur Pass, the Rigolets, and the Seabrook Lock was maintained which effectively stopped work on the lakefront levees as the design and construction of those levees would be affected by the barrier resolution. *Id.*

In April of 1978, the Corps approved the project restudy plan and scheduled to address the deficiencies in the EIS that were the basis for the court's injunction which were that "1) the EIS [did] not describe what the Corps proposed to build; 2) the alternatives to the barrier plan [were] not adequately described and evaluated; and 3) the impact on the surrounding wetlands on movement of aquatic organisms through the passes [was] not adequately addressed." A 36-month time line was created with a February 1980 deadline for alternative analysis being established. Apparently "all subsequent economic and environmental analysis for the project restudy and revised EIS in response to the court injunction was limited to redesign of the barriers and the higher lakefront levees that could replace the barriers because there was concern within

the Corps that without such a narrow scope new congressional authorization might be required."[8]

(HPDC, §2.2 at 2-10).

At approximately the same time, that is from 1974 through 1977, the SWB began to try to obtain a permit from the Corps pursuant to the River & Harbors Act to dredge the 17th Street Canal to increase its outflow capacity.  The Operations Division of the Corps is responsible for these kinds of permits, not the Engineering Division, which is responsible for flood control. (Master Complaint, ¶ 27).  However on May 23, 1977, the application was returned with no action because of SWB's failure to furnish certain information concerning soil data substantiating the stability or integrity of the 17th Street Levee.[9]  Another  long and protracted process began concerning this dredging project to improve the drainage capacity of the canal.

In February of 1980, the Corps completed the Alternative Plans Study with respect to the engineering alternative for the LPV.  The Barrier Plan and a High Level  Plan "providing SPH protection and another High Level Plan providing 100 -year protection were given priority study."  HPDC, §2.2 at 2-10.   In June of the same year, the Corps completed a Draft Preliminary Analysis which incorporated the February engineering alternatives and subjected each to economic and environmental assessment.    The assessment concluded that the High Level Plan providing SPH protection, was less costly, less damaging to the environment, and more

---

[8]With respect to the reason for the Corps' limited response to the Court's directive, the Court has used the HPDC  as the best resource at its disposal at this time.  To the extent that some of the Corps' analysis has been used, the Court has attempted to cite verbatim  the report.  It does not intend to adopt or sanction the Corps' conclusions as fact in the allocation of responsibility for this debacle.  *See, e.g.,* HPDC § 2.3.7. at 2-42, Letter from OLD President to Corps, dated November 20, 1980.  In this missive, the President of OLD notes the cost escalation for the EIS and the time delays concomitant with that.  He concludes, "It is my feeling that if there is a possibility that the answer in three years would be the same as one that could be issued today, it makes no sense to proliferate the cost of the project and the EIS under those conditions."

[9]Apparently, the east bank of the Seventeenth Street Canal was built by the Orleans Levee District and whereas the west bank was built by the Army Corps of Engineers.

10

acceptable than the Barrier Plan.  And so, in the beginning of 1980, it appears that  the shift to

the High Level Plan was instigated.[10]

On September 24, 1980,  the Corps briefed local sponsors on the June Preliminary

Alternatives Analysis which demonstrated "that the High Level Plan for providing SPH

protection compared favorably with the original Barrier Plan.  On November 20, 1980, the

President of OLD wrote to the Corps New Orleans District Engineer in which he encapsulated

his ire at the delays concerning completion or the project, which was 15 years post-Hurricane

Betsy.  It must be emphasized that at this point in time, not a single barrier had been

constructed–no significant construction to protect New Orleans from catastrophic flooding had

begun–after 15 years from the passage of the 1965 Flood Control Act which put in place the

LPV.   Rather, the Corps now estimated that the Barrier Plan cost would be between

$445,089,000 to $552, 465,000 whereas the High Level Plan cost was  $416,000,000.  HPDC, §

2.3.7 at 2-42.  Furthermore, it appears in the November 20th letter also referenced at footnote 8

that OLD's frustration with the delays caused by the environmental studies were edging the local

authority  to prefer the High Level Plan.

At some point then the decision to switch to the High Level Plan was made and presented

to ASA(CW)[11] on November 10, 1982.  As succinctly stated in the HPDC:

> However, a question that remained was whether the decision to approve the
> change fit within the discretionary authority of the Chief of Engineers.  If it did

---

[10]Notwithstanding all of the foregoing, the New Orleans District of the Corps "in the BJS [Budget Justification Sheet] for years 1978-1984 continued to report that the barrier complexes were going to be modified to accommodate the concerns of the court.  Apparently, it was not until July 1984 that the New Orleans District reported to Corps Headquarters that the Barrier Plan was no longer the district-preferred plan.  *See*  HPDC § 2.3.7. at 2-39.

[11]This acronym stands for the Assistant Secretary of the Army for Civil Works.

not then a new congressional authorization would be required.  At the time, the standing view of the district and others, including the ASA(CW), had been that any replacement of the Barrier Plan with some other plan would require new authorization.  To seek new authorization would mean further delay, especially given that there had been no Water Resources Development Act authorization bill since 1976 and there was no prospect for a bill on the horizon (the next WRDA would not come until 1986).  The Corps Chief Counsel in March 1983, after consultation with the Division, offered an opinion that became the basis for approving the switch to the High Level Plan as a PAC [Post Authorization Change][12] under the discretionary authority of the Chief of Engineers in February 1985.  The opinion rested on three determinations that followed from the limited scope of the proposed project changes.  Specifically, the Chief Counsel found that the change would not involve: "a) a material alteration of the function of the project; b) a material change in the scope of the authorized plan of improvement; and c) a change in legal relationships" with non-federal sponsors.

HPDC, § 2.3.7 at 2-41.  So on March 31, 1983, the Chief of the Corps recommended that the

High Level Plan be undertaken.  HPDC, § 2.2 at 2-12.

In July of 1984, the Corps produced the Lake Pontchartrain, Louisiana and Vicinity

Hurricane Protection Project Reevaluation Study which contained the Main Report and the Final

Supplement I to the Environmental Impact Statement.   The District Engineer officially

recommended the High Level Plan for the lakefront and formally recommended against the

barrier structures.  The HPDC describes the report as follows:

The engineering and economic analyses in the reevaluation report focuses only on the replacement of the barrier elements with higher lakefront levees designed to secure protection from the surge and wave effects corresponding to the originally authorized SPH parameters.  **The report also notes that surge protection for the outfall canals remains unresolved, but the canals are identified as a matter that will be addressed, consistent with the original authorization that defines interior drainage as a local responsibility.**  The new plan for the lakefront is less costly than modifying the barriers to address environmental objections.

_____

[12]A PAC is a "modification to an authorized project at the discretion of the Chief of Engineers for engineering or construction reasons to produce the improvement envisioned by Congress.  Such changes must not materially alter the function and scope of the project nor change legal relationships such as requirements of local cooperation." HPDC, Appendix B at B-4.

HPDC, § 2.2 at 2-12 (emphasis added) . In 1985, the Chief of the Corps approved a post

authorization change, and the reevaluation report was submitted to Congress. *Id.*

Thus, while the Corps determined to proceed at a reduced cost to itself by virtue of

abandoning the Barrier Plan, with that decision it created an exponentially greater risk

concerning flooding that could occur at the outfall canals. This new revision, as it pertained to

the issue of flooding caused by the outfall canals, **only** included "the project lakefront area and

[] how high levees there would need to be to protect against the stillwater surges in the lake that

would be realized without the barriers." HPDC § 2.3.7 at 2-44. Thus, the areas that were to be

flooded by Katrina in 2005 were at greater risk in 1985 with the High Level Protection Plan than

with the initial Barrier Plan adopted in 1965. The Corps' solution was that it recognized the need

for future study for the outfall canals. Furthermore, in the same report, while acknowledging

that the SPH parameters had been revised upwards, those revisions were not used. Thus, with

the passage of twenty years from the Congressional mandate to protect New Orleans from

flooding, the Corps had engineered a partial solution that (1) was not inclusive of the most

vulnerable waterways–the outfall canals, (2) used outmoded data in the process, and arguably (3)

shifted a significant amount of the cost onto the local sponsors.

Eventually, the "Corps developed a butterfly valve gate concept as a means of providing

frontage protection that also would allow the SWB to continue pumping rainfall into the canals

during storms until the lake rose to the point where lake waters began flowing back into the

canals (at which time the gates would close automatically)." HPDC § 2.3.8. at 2-46. Thus, the

SWB was faced with the possibility that under the Corps' plans, it would have to stop draining

the City regardless of the intensity of rainfall occurrence during a hurricane as soon as the storm

surge occurred, thus practically guaranteeing flooding of at least some neighborhoods. As a

result, the SWB and OLD pressured for what came to be know as the "Parallel Protection Plan"

which would require the Corps to place floodwalls on the all canal levees. The Corps did not

agree.

> Two policy interpretations influenced the District's recommendation to pursue the
> frontage plan and its resulting position on cost distribution. First, by Corps'
> policy set by Headquarters in the 1980s, the District was required to select the
> most cost-effective alternative to address the surge protection project purpose.
> Analysis contained in the 1984 Reevaluation Report indicated that frontage
> protection was a significantly less costly means of preventing overtopping of the
> canal levees during a storm event than raising and strengthening the canal levees
> under the parallel protection plan. Second, internal drainage was understood to be
> a local responsibility in accordance with project authorization language. Since
> the frontage protection plan was less expensive, parallel protection was described
> by the District as a "betterment," meaning that the incremental cost of its
> implementation (over the cost of the least-cost butterfly gates plan) would be a
> local financial responsibility. For reasons unique to the 17th Street Canal, the
> district found that parallel protection would cost approximately the same as
> frontage protection; accordingly, the District recommended parallel protection for
> that canal as preferred by the local sponsor. But the district continued to
> recommend frontage protection for the London Avenue Canal and the Orleans
> Avenue Canal.

HPDC, § 2.3.8 § 2-47.

In May of 1985, the Corps' Lower Mississippi Valley Division began to test to determine

whether "new design criteria for I-wall sheet pile penetration depths were warranted for cases

where loading is short-term" such as in the instance of a hurricane surge. This test was:

> motivated by the anticipated extensive use of I-walls for hurricane protection
> projects throughout the region, as well as general sense that existing design
> criteria may be overly conservative. The interpretation of the results of the test
> resulted to new Division guidance that called for reduced sheet pile penetration of
> hurricane protection I-walls, as a cost-saving measure that could not compromise
> I-wall reliability.

14

 This test is referred to as the E-99 Sheet Pile Wall Field Load Test Report. This test became the basis for the criteria used in 1989  for the building of floodwalls. HPDC § 2.2 at 2-13.  From the court's perspective, this decision was yet another in the monumental miscalculations of the Corps for there is strong evidence that the reduced penetration requirements was another cause for the failures experienced along the outfall canals.

Meanwhile, the drainage/dredging project continued on its separate track.  While the Corps was focused on hurricane protection, the SWB was focused on improving drainage in the City of New Orleans.  It continued its efforts to increase the capacity of the 17th Street Canal and pursued its aforementioned application to the Corps for approval to dredge the canal. The SWB had increased the amount of volume of soil it sought to remove.  The testing of the levee at the 17th Street Canal  continued and the results were less than stellar.

On January 28, 1981, SWB's engineers provided a memo which indicated that at three of the six test locations, the factors of safety fell below the required values set by the Corps.  It further reported that the sheet pile wall along the east side of the canal, north of Hammond Highway was unstable.  In doing so, questions were raised in the permitting process as to the stability of the east or New Orleans side of the 17th Street Canal, which had not been built by the federal government.    (Master Complaint, ¶¶32-33).  The Corps apparently acknowledged that there were problems requiring the project to be redesigned in an internal memo (Master Complaint, ¶ 34).  The areas to which reference is made in that memo allegedly breached on August 29, 2005. (Master Complaint, ¶35).

The permitting process continued and throughout that time, plaintiffs contend that the instability and danger of dredging the canal as requested was known to the Corps.  Nonetheless,

by May of 1983, SWB sought to remove 470,000 cubic yards of canal bottom.  In essence, the SWB sought and was successful in scouring out the soil which would have allegedly prevented the cataclysmic failure at the 17th Street Canal.  (See Appendix B, Schema of Dredged 17th Street Canal).  In spite of the numerous warning signs for a potential "blow-out at the land side toe of the levee,"  the Corps issued a permit to commence dredging on June 13, 1984 (Master Complaint, ¶¶ 44-48)–precisely at the same time that the decision to forego the Barrier Plan that would have controlled storm surge into the canal was abandoned by the Corps.   "The SWB completed some work on some project phases by 1989, but it was not until 1990 that it entered into an agreement with OLD for combined dredging and flood protection works for the east bank of the canal. . . . With the time frame for the SWB permit about to expire, SWB requested that the District grant a permit time extension to complete the work.  The district granted the permit time extension to June 1997. "   (HPDC, § 4.3.2 at 4-11, Box 4-3).  To that end installation of sheet piles was permitted on July 4, 1990 and that portion of  the job was completed on January 10, 1992 (Master Complaint, ¶ 54).   Thus, initially, it appears that the floodwalls built at this time were under the auspices of OLD; the Corps did not control this construction.  However, this control was to change.

### D.  1990-2005        Congressional Mandate of Parallel Protection and Its Consequences

As previously noted, the battle continued concerning the Parallel Protection Plan that the OLD was promoting for all three canals.  Apparently because of the dredging and activity going on the 17th Street Canal, the Corps had found that the cost issues that made the butterfly gates the

preferable and cost effective solution for the London Avenue[13] and Orleans Avenue Canals, did

not apply equally to the 17th Street Canal. "On March 1990, the District recommend[ed] a

parallel protection plan for the 17th St. Canal since, with the new sheet pile guidance,[14] the cost

difference between parallel protection and butterfly gates [was] minimal for this canal and the

local sponsor (OLD) prefer[ed] parallel protection."  (HPDC § 2.2 at 2-14).

Congress finally stepped into the fray to resolve the choice of protection approach and

plan cost-sharing distribution for the outfall canals in favor of OLD's wishes.  (HPDC § 4.3.6 at

4-13.)  The HPDC explains the process as follows:

> Congress first weighed in on the protection approach in a conference report
> accompanying the Water Resource Development Act of 1990.  Under the section
> entitled "Joint Explanatory Statement of the Committee of Conference," the
> Conferees:
>> "[directed] the Corps to treat the outfall canals as part of the
>> overall hurricane protection project , and to favorably consider a
>> plan that raises the levees along the entire lengths of the London
>> Avenue and Orleans Avenue Canals to grades sufficient to confine
>> a standard project hurricane with costs to be borne by both the
>> Federal and local assuring authorities." (citation omitted)
> But this conference report language seemed to carry little authority by itself and
> did not specify how the costs of implementing parallel protection should be split
> between the federal government and the local sponsor.  The Congress finally
> resolved the protection approach and cost distribution for the outfall canals in the
> Energy and Water Development Act of 1992.  The legislation stated:
>> "The Secretary of the Army is authorized and directed to provide
>> parallel hurricane protection along the entire lengths of the outfall
>> canals and other pertinent work necessary to complete an entire
>> parallel protection system to be cost shared as an authorized
>> project feature, the Federal cost participation in which shall be 70
>> percent of the total cost of the entire parallel protection system,

---

[13] A Design Memorandum was prepared by the corps which recommended frontage protection–butterfly gates–for the canal as the least cost alternative.  However, in a second volume, an alternative parallel protection plan was in included using the I-Wall designed based on  the E-99 reduced penetration model.(HPDC § 2.2 at 2-14).

[14] Presumably, this reference is again to the reduced penetration model created after the E-99 test.  (HPDC § 2.2 at 2-14).

and the local cost participation in which shall be 30 percent of the
total cost of such entire parallel protection system."

(HPDC, § 4.2.6 at 4-13-14).

This action apparently did not put to rest the feud between the Corps and OLD.  There is
correspondence from late 1990 through 1993 regarding who would control plan contracting and
design work demonstrating that the federal-local partnership was strained.  Indeed, the Corps did
not even budget for the parallel protection work after 1992 contending that it was against
administration policy with respect to budgeting. " Nevertheless, federal funding for parallel
protection was provided annually by congressional adds to the administration's requested
appropriations.  The District then used these monies to implement the work."  (HDPC § 4.3.7. at
4-14).

And so, the project to provide the hurricane protection to New Orleans mandated in the
Flood Protection Act of 1965 settled on a design to raise the level of protection for the outfall
canals 27 years after Congress first mandated the safeguards.  The project would entail the
construction of I-walls, for the most part, along all 3 canals with specifications  in line with the
E-99 Sheet Pile Test approved methods–that is to depths that were to prove to be woefully
inadequate–in an effort to save money.  The engineering calculations upon which this
"protection" was premised were outdated and  lacking which was known to the Corps but
ignored because of funding concerns.

Thus, the stage was set for Hurricane Katrina to damage or destroy 80% of the housing
stock of  New Orleans, not merely by its own winds and rain, but by virtue of its effects on the
outfall canals.   As concerns this motion, plaintiffs allege that the floodwalls surrounding all
three outfall canals failed to some degree or another.  It is for this failure that plaintiffs have filed

suit against the United States.  And it is in this motion that the United States maintains that it is

immune.  Thus, with this background, the Court will now take up the United States' Motion to

Dismiss.


**II.      The Master Complaint**

Plaintiffs brought this case pursuant to, *inter alia*,  the Federal Tort Claims Act, 28

U.S.C. § 2680(a) ("FTCA") basing jurisdiction on 28 U.S.C. 1346(b)(1).  In the 73 page

complaint, plaintiffs substantially allege the defalcations presented in the background portion of

this opinion.   Based thereon, in Count 1 of the Complaint, they alleged that various plaintiffs

including the Corps "had the legal responsibility and duty to these plaintiffs to cause, allow,

and/or conduct the aforesaid dredging activity in a manner that would not compromise the safety

of the canal's levee/flood wall system".  (Master Complaint, ¶197).  In particular, against the

Corps, they allege that the Corps:

(1)      negligently failed to follow federal regulations and its own engineering standards

and procedures , in regard to the issuance of a permit to dredge the 17th Street

Canal (Master Complaint,¶ 198);

(2)      violated federal law to the extent theat the River & Harbors Act prohibits the

granting of a dredging permit that is contrary to the public interest; (Master

Complaint, ¶ 199);

(3)      violated of federal regulations (including 33 C.F.R. § 320.4) for failing to

properly balance the benefits of the requested dredging against the reasonably

foreseeable harm, including possible harm related to detrimental effects on flood

control (Master Complaint, ¶ 200);

(4)     negligently issued a dredging permit which cased and allowed changes to occur in

the 17th Street Canal Bottom, leading to subsurface and soil destabilization of the

canal levee (Master Complaint ¶ 201);

Plaintiffs further allege that since the dredging activities are not under the ambit of a federal

flood control project the provision os § 702c of the Flood Control Act of 1928 are inapplicable

for Corps immunity.  (Master Complaint,¶ 204).  They also contend that the Corps did not have

the discretion to permit the dredging activity in question, since the activity constituted damage to

the public interest in violation of the defendant's clear statutory duties and obligations, and

constituted activity which undermined already existing flood protection for the benefit of

citizens.  (Master Complaint, ¶ 205).

In Count II of the Master Complaint, plaintiffs contend that the Corps failed in the design

and construction of the levees and floodwalls of the 17th Street Canal.  They contend that the 17th

Street Canal was not an authorized federal flood control project (Master Complaint, ¶ 218) and

as such should not have immunity under § 702c.  They maintain that the I-wall design was never

authorized by Congress equally denying the Corps § 702c immunity. (Master Complaint ¶219)

They contend that the Corps knew or should have known that the design and construction of the

levees and floodwalls were impracticable, unsafe and subject to overflow and damage. (Master

Complaint ¶220).

Count III concerns the alleged design and construction defalcations with respect to the

London Avenue Canals.   (Master Complaint ¶236).  Count IV  concerns the legal fault regarding

20

the MRGO and Count V concern the Inner-Harbor Navigation Canal breaches.  Count VI contains allegations solely against the Orleans Levee District.  In Count VII, plaintiffs contend that a legal responsibility was owed to plaintiffs by the Corps to devise, implement and maintain the LPV n a manner that afforded plaintiffs protection against the catastrophic failure and deficiencies giving rise to this litigation.  They maintain that the Corps is liable for its negligence and willful and wanton recklessness in causing or allowing the serious failure and deficiencies of the LPV considering its deliberate departures from authorized, current and safe criteria.  Count VIII also pertains to the MRGO.

As previously noted , the United States has moved  pursuant to Fed. R. Civ. P. 12(b)(1) and 12(h)(3) to dismiss this Master Complaint based on § 702c immunity granted under the Flood Control Act of 1928 and the discretionary function exception with respect to allegations of the negligent granting of the dredging permit of the 17th St. Canal.  In addition, it contends that the  MRGO allegations should be stricken as being in contravention of Case Management Order No.4.  The Court will now examine the proper legal approach to make such a determination.


## III.   Legal Standard to Apply to the United States' Motion to Dismiss

Generally, Rule 12(b)(1) of the Federal Rules of Civil Procedure allows a party to challenge the subject matter jurisdiction of the district court to hear a case.  The burden of proof for a Rule 12(b)(1) motion is on the party asserting jurisdiction.  *Ramming v. United States*, 281 F.3d 158 (5th Cir. 2001).  As the Fifth Circuit has stated:

> When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits. *Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir. 1977) (per curium).  This requirement prevents a court without

jurisdiction from prematurely dismissing a case with prejudice.  *Id.*  The court's
dismissal of a plaintiff's case because the plaintiff lacks subject matter
jurisdiction is not a determination of the merits and does not prevent the plaintiff
from pursing a claim in a court that does have jurisdiction.  *Id.*

*Ramming*, 281 F.3d at 161.

The United States Court of Appeals for the Fifth Circuit instructed in *Montez v.*

*Department of the Navy*, 392 F.3d 147 (5th Cir. 2004) that generally "the district court can

resolve factual disputes in determining jurisdiction pursuant to a Rule 12(b)(1) motion for

dismissal."  *Id.* at 148.  However, where the dispute is determinative of both the federal

jurisdiction question and the underlying federal cause of action, and thus are interdependent, a

district court might err where it resolves the disputed factual issue in favor of the Government.

*Montez*  arose in the context of a FTCA case which as noted is one of the jurisdictional bases

alleged herein.   The Court of Appeals for the Fifth Circuit stated:

> In general, where subject matter jurisdiction is being challenged, the trial
> court is free to weigh the evidence and resolve factual disputes in order to satisfy
> itself that it has the power to hear the case. See *Land v. Dollar,* 330 U.S. 731, 735
> & n. 4, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947). "A court may base its disposition of
> a motion to dismiss for lack of subject matter jurisdiction on (1) the complaint
> alone; (2) the complaint supplemented by undisputed facts; or (3) the complaint
> supplemented by undisputed facts plus the court's resolution of disputed facts."
> *Robinson,* 117 F.3d at 904. In short, no presumptive truthfulness attaches to the
> plaintiff's allegations, and the court can decide disputed issues of material fact in
> order to determine whether or not it has jurisdiction to hear the case.
> However, where issues of fact are central both to subject matter
> jurisdiction and the claim on the merits, we have held that the trial court must
> assume jurisdiction and proceed to the merits. In circumstances where "the
> defendant's challenge to the court's jurisdiction is also a challenge to the existence
> of a federal cause of action, the proper course of action for the district court  is to
> find that jurisdiction exists and deal with the objection as a direct attack on the
> merits of the plaintiff's case" under either Rule 12(b)(6) or Rule 56. *Williamson v.*
> *Tucker,* 645 F.2d 404, 415 (5th Cir.1981); see also *Daigle v. Opelousas Health*
> *Care, Inc.,* 774 F.2d 1344, 1347 (5th Cir.1985).
> As we stated in *Williamson,*
> [N]o purpose is served by indirectly arguing the merits in the

22

> context of federal jurisdiction. Judicial economy is best promoted
> when the existence of a federal right is directly reached and, where
> no claim is found to exist, the case is dismissed on the merits. This
> refusal to treat indirect attacks on the merits as Rule 12(b)(1)
> motions provides, moreover, a greater level of protection to the
> plaintiff who in truth is facing a challenge to the validity of his
> claim: the defendant is forced to proceed under Rule 12(b)(6) . . .
> or Rule 56 . . .  both of which place greater restrictions on the
> district court's discretion.

645 F.2d at 415. Therefore, we follow our general rule in holding that a
jurisdictional attack intertwined with the merits of an FTCA claim should be
treated like any other intertwined attack, thereby making resolution of the
jurisdictional issue on a 12(b)(1) motion improper.

*Montez,* 392 F.3d at 149 -150.  Thus, as plaintiffs' claims are brought pursuant to the FTCA, the

Court will treat this motion as one brought pursuant to Rule 12(b)(6).

 In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6),

the complaint must be liberally construed in favor of plaintiff,  and all facts pleaded in the

original complaint must be taken as true.  *Campbell v. Wells Fargo Bank*, *N.A.,* 781 F.2d 440,

442 (5th Cir. 1980). In *Bell Atlantic Corporation v. Twombly*, ____ U.S. ____, ____, 127 S.Ct.

1955, 1969 (2007) the Supreme Court "retired" the  *Conley v. Gibson*, 355 U.S. 41, 45-46, 78

S.Ct. 99, 101-102, 2 L.Ed.2d 80 (1957), standard for analyzing a  motion to dismiss under Rule

12(b)(6) which held that a district court may not dismiss a complaint for failure to state a claim

"unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim

which would entitle him to relief." Noting that the *Conley* pleading standard "is best forgotten as

an incomplete, negative gloss on an accepted pleading standard," the Supreme Court announced

that "once a claim has been stated adequately, it may be supported by showing any set of facts

consistent with the allegations of the complaint."  *Id.* at ___, _____, 127 S.Ct. at 1969.   "The

question therefore is whether in the light most favorable to the plaintiff and with every doubt

resolved in his favor, the complaint states any valid claim for relief." *Lowery v. Texas A&M*

*University System*, 117 F.3d 242, 247  (5th Cir. 1997) quoting 5 Charles A. Wright & Arthur R.

Miller, *Federal Practice and Procedure*, §1357, at 601 (1969).

Rule 12 also provides:

 "If on a motion asserting the defense numbered (b) to dismiss for failure of the
pleading to state a claim upon which relief can be granted, matters outside the
pleading are presented to and not excluded by the court, the motion shall be
treated as one for summary judgment and disposed of as provided in Rule 56, and
all parties shall be given reasonable opportunity to present all material made
pertinent to such a motion by Rule 56.

Furthermore, Rule 56(f) provides that an opposing party may seek a continuance to permit

discovery to be had for the adjudication of such a motion for summary judgment.  In this

instance, the plaintiffs' have made a Rule 56(f) request.  However, the Court finds that this

matter may be decided as a Rule 12(b)(6) motion without the need to convert it to a Rule 56

motion and denies such a request.

As stated by the United States Court of Appeals for the Fifth Circuit:

Normally, in deciding a motion to dismiss for failure to state a claim,
courts must limit their inquiry to the facts stated in the complaint and the
documents either attached to or incorporated in the complaint.  However, courts
may also consider matters of which they may take judicial notice.  *See* Fed. R.
Evid. 201(f) ("Judicial notice may be taken at any stage of the proceeding.")

*Lovelace v. Software Specturm, Inc.* , 78 F.3d 1015 (5th Cir. 1996).   Likewise, the

commentators in *Federal Practice and Procedure* have noted:

 Memoranda of points and authorities as well as briefs and oral arguments in
connection with the motion, however, are not considered matters outside the
pleadings for purposes of conversion.  The same is true for various types of
exhibits that are attached to the pleading,  matters of which the district court can
take judicial notice, and items of unquestioned authenticity that are referred to in
the challenged pleading and are "central" or "integral" to the pleader's claim for
relief.

24

5C Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure*, §1366.

Rule 201 of the Federal Rules of Evidence provides that a court may take judicial notice of an "adjudicative fact" if the fact is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and read determination by resort to resources whose accuracy cannot be questioned." Fed. R. Evid. 201(a) and (b);  *Hyder v. Quarterman*, 2007 WL 4300446 (S.D. Tex. Oct. 10, 2007) *citing Taylor v. Charter Med. Corp.,* 162 F.3d 827, 829 (5th Cir. 1998). In addressing the question of what constitutes an adjudicative fact, in the Advisory Committee Notes to that rule, citing to Professor Davis, A System of Judicial Notice Based on Fairness and Convenience, in Perspectives of Law 69, 73 (1964), "' When a court or an agency finds facts concerning the immediate parties--who did what, where, when, how, and with what motive or intent--the court or agency is performing an adjudicative function, and the facts are conveniently called adjudicative facts. '"

The Court believes that the legal conclusions reached herein are not based upon reliance on any matters outside the pleadings that would require conversion to a Rule 56 motion.  The background section of this opinion is a restatement of the Amended Master Complaint fleshed out in some instances with the use of a government publication which provided a time line and facts surrounding certain legislation.  As stated in *Hyder:*

> The Fifth Circuit has determined that courts may take judicial notice of governmental websites. *See Hawk Aircargo, Inc. v. Chao.,* 418 F.3d 453, 457 (5th Cir.2005) (taking judicial notice of approval by the National Mediation Board published on the agency's website); *Coleman v. Dretke,* 409 F.3d 665, 667 (5th Cir.2005) (per curiam) (Fifth Circuit taking judicial notice of Texas agency's website); *see also O'Toole v. Northrop Grumman Corp.,* 499 F.3d 1218, 2007 WL 2421754, at *6 (10th Cir. Aug.28, 2007) ("It is not uncommon for courts to take judicial notice of factual information found on the world wide web.") (citations

> omitted); *Denius v. Dunlap,* 330 F.3d 919, 926 (7th Cir.2003) (taking judicial
> notice of information on official government website pursuant to Rule 201).
> Federal courts have taken judicial notice of other courts' websites. *See, e.g.,
> Graham v. Smith,* 292 F.Supp. 153, 155 n. 2 (D.Me.2003) (taking judicial notice
> of pleadings located on the internet); *Anderson v. Cal. Bd. of Prison Terms,* No.
> CIV-04-1172, 2007 WL 404900, at *1 (E.D.Cal. Feb. 2, 2007) (unpublished)
> (taking judicial notice of records from official website for California Appellate
> Courts); *Collier v. Dretke,* No. Civ.A 4:05CV379Y, 2005 WL 1429738, at *1 n. 5
> (N.D.Tex. June 17, 2005) (unpublished) ("The Court ... takes judicial notice of
> the disposition of Collier's seven writ applications in the Texas Court of Criminal
> Appeals through a search on its website."); *Booker v. Taft,* No. 7:03-CV-263-R,
> 2004 WL 1253410, at *1 (N.D.Tex. June 8, 2004) (unpublished) (taking judicial
> notice that petitioner's state habeas petition remained pending based on the Texas
> Second Court of Appeals' website).

*Hyder*, 2007 WL 4300446 at *3.  Furthermore, this decision is based on Acts of Congress of

which it certainly may take judicial notice.   As such, the Court finds that this motion will not be

converted and will now turn to the salient legal issues presented.


IV.    ISSUES PRESENTED

   A.  Section 702c of the Flood Control Act of 1928

      1.  Parties Contentions

    As previously noted, the United States in the instant motion has moved to dismiss the

Master Complaint pursuant to Fed. R. Civ. P. 12(b)(1) and 12(h)(3) maintaining that the Court

lacks jurisdiction over the subject matter based on the Flood Control Act of 1928 ("FCA")

Section 3 of the FCA , 33 U.S.C. § 702c, (hereinafter "§ 702c") provides in relevant part:

> No liability of any kind shall attach to or rest upon the United States for any
> damage from or by floods or flood waters at any place: Provided, however, That
> if in carrying out the purposes of sections 702a, 702b to 702d, 702e to 702g,
> 702h, 702i, 702j, 702k, 702l, 702m, and 704 of this title it shall be found that
> upon any stretch of the banks of the Mississippi River it is impracticable to
> construct levees, either because such construction is not economically justified or
> because such construction would unreasonably restrict the flood channel, and

> lands in such stretch of the river are subjected to overflow and damage which are
> not now overflowed or damaged by reason of the construction of levees on the
> opposite banks of the river it shall be the duty of the Secretary of the Army and
> the Chief of Engineers to institute proceedings on behalf of the United States
> Government to acquire either the absolute ownership of the lands so subjected to
> overflow and damage or floodage rights over such lands.

33 U.S.C. § 702c.  As such, the United States maintains it is immune solely  because the waters

which damaged plaintiffs were "flood waters", under the ambit of § 702c.  As an alternative

position, the Government contends that it is immune because it is indisputable that the damages

alleged were caused by flood waters that federal works failed to control.

Plaintiffs respond with a myriad of arguments.  To begin, they argue that  under *Central

Green v. United States,*  531 U.S.  425 (2001),  the scope of § 702c immunity covers "only those

damages caused by 'floods' or 'flood waters' that flow through Congressionally authorized

projects that have flood control as their unique purpose." (Opposition at 4-5).   As such, they

contend that the scope of this motion is beyond that of a motion to dismiss–that the United States

bears the burden of production to make a prima facie factual showing that "flood water" related

to a "flood control project" caused plaintiffs' damages.  As such, plaintiffs maintain that the

inquiry goes beyond the pleadings and is not subject to a motion to dismiss.

They next argue that the proviso language following the grant of immunity in §702c

limits the immunity for flooding to that which occurs solely along the Mississippi River.  They

argue that the legislative history of demonstrates this interpretation.  Further, they maintain that

there exists a genuine issue of material fact as to whether the levee breaches were caused by

flooding related to a flood control project.  To this end, they maintain that the timing of the

innundation at issue is crucial.  "If the levee breach along the canals that caused the innundation

occurred before the storm surge, it was related to the dredging and other activities attendant to the canal, and there is no immunity under § 702c."  (Opposition at 15).

Plaintiffs also argue that the Corps can only claim immunity for congressionally-authorized flood control projects and contend that there was no congressional authorization for the protection to be erected along the outfall canals.  Another argument is that the Corps did not have authorization for the actions it took relating to the flood control project at issue herein–that is the Corps' decision to switch from the Barrier Plan to the High Level Plan eviscerates its immunity.  Furthermore, plaintiffs contend that the Corps did not build what it was told to build to the degree they constructed I-Walls instead of  raising the levees. (Opposition at 29).  In addition,  the Corps did not spend the amount of money appropriated to it for the protection of the outfall canals.  (Opposition at 31).

### 2.      Analysis of  Immunity Granted by Section 702c the Flood Control Act of 1928

The United States may not be sued without its consent under the doctrine of sovereign immunity.  *United States v. Mitchell*, 463 U.S. 206, 212 (1983); however, the FTCA provides, *inter alia*, that "the United States shall be liable, respecting the provision of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances . . . ."  28 U.S.C. § 2674.  Based on this waiver of sovereign immunity, plaintiffs have sued the federal government.  However, as interpreted by the Supreme Court  in *United States v. James*, 478 U.S. 597 (1986) and clarified in *Central Green Co. v. United States*, 531 U.S.  425 (2001), § 702c provides immunity where, as here, a flood control project fails to control flood waters because of the failure of the flood control project itself.

28

The United States maintains that §702c provides blanket immunity for damages from flood or floodwaters regardless of any relationship to a flood control project.  This interpretation ignores the fact that the immunity is grounded in the Flood Control Act of 1928.  The legislative history and case law interpreting § 702c  supports the proposition that such a safeguard arises from the fact that the United States has undertaken the expense of flood control projects and should not be sought to bear the cost of their failures.  "Those [flood control] costs should not have added to them the floodwater damages that might occur in spite of federal flood control efforts."  *Graci v. United States*, 456 F.2d 20, 25 (5th Cir. 1971) and cases cited therein.  This Court has previously rejected the United States' contention that  it is immune from damages for any floodwater regardless of its source in its ruling on a motion to dismiss before as seen in *Robinson* and will continue to do so until otherwise guided by a higher court.  *In re Katrina Canal Breaches Consolidated Litigation*, 471 F. Fupp. 2d 684 (E.D.La. 2007).

However, the immunity granted by § 702c is indeed broad.  In *Central Green Co. v. United States*, 531 U.S. 425 (2001), the Supreme Court examined the breadth of immunity granted under § 702c.  In that case, owners of real property sued, *inter alia*, the United States under the FTCA for damage to their pistachio farm allegedly caused by subsurface and surface water flooding from the Madera Canal, a federal facility leased to the Madera Irrigation District (MID).  Plaintiffs sought damages from the United States and MID "alleging that their negligence in the design, construction, and maintenance of the canal had caused subsurface flooding resulting in damage to the orchards and increased operating costs for petitioner. Petitioner did not allege that any physical failure of the dam caused damage to its property."  *Id.* at 427.

29

This canal was part or a "branch" of a vast federal project known as the Central Valley Project ("CVP"), which included flood control projects for the Sacramento and San Joaquin Rivers in California.  The various portions of the CVP captures and stores waters of both rivers and many of their tributaries, in some cases generating electric energy in the diversion, and then redirects the later to semiarid land below.  As described in *Central Green*:

> "The Central Valley basin development envisions, in one sense, an integrated undertaking, but also an aggregate of many subsidiary projects, each of which is of first magnitude.  It consists of thirty-eight major dams and reservoirs bordering the valley floor and scores of smaller ones in headwaters.  It contemplates twenty-eight hydropower generating stations.  It includes hundreds of miles of main canals, thousands of miles of laterals and drains, electric transmission and feeder lines and substations a vast network of structure for the control and use of water on two million acres of land already irrigated, three million acres of land to be newly irrigated, 380, 000 acres in the delta needing protection from intrusions of salt water, and for municipal and miscellaneous purposes including cities, towns, duck clubs and game refuges.  These projects are not only widely separated geographically, many of them physically independent in operation, but they are authorized in separate acts from year to year and are to be constructed at different times over a considerable span of years."

*Id.* at 433 *citing United States v. Gerlach Live Stock Co.*, 339 U.S. 725, 733 (1950).

The United States filed a Rule 12(b)(1) motion to dismiss in *Central Green*.  The district court granted the motion because the parties agreed that the Madera Canal was part of the Friant Division of the Central Valley Project, and that flood control was one of that project's purposes. As such, it found that § 702c immunity attached.  The Ninth Circuit  affirmed. "It agreed with petitioner that the Madera Canal 'serves no flood control purpose,' but nevertheless held that immunity attached solely because it is a branch of the Central Valley Project" and as such was not wholly unrelated to flood control.  *Central Green*, 531 U.S. at 428 *citing* 177 F.3d 834, 839 (1999).  The Supreme Court of the United States stated that the narrow question  presented in *Central Green*  was whether § 702c's provision that "no liability of any kind shall attach to or

30

rest upon the United States for any damage from or by floods or flood waters at any place"
encompasses all the water that flows through a federal facility that was designed and is operated,
at least in part, for flood control purposes." *Id.* at 427. The Supreme Court reversed the Ninth
Circuit in essence holding that simply because water that caused damage might have been in
contact with a flood control project does not automatically provide immunity; rather, §702c
immunity is provided for damage caused by flood waters emanating from a flood control project.
This ineluctable conclusion is reached by reading *Central Green* and its examination of *United
States v. James*, 478 U.S. 597 (1986).

In *Central Green,* the Supreme Court squarely confronted *dicta* it had rendered in the
first occasion it had to interpret § 702c, that being *James* which had "generated conflicting
opinions among the Courts of Appeal." *Id.* at 430. In *James*, two suits were consolidated to
determine whether §702c barred recovery for personal injuries to individuals allegedly caused by
the negligence of the United States in its failure to warn of dangers from the release of flood
waters from federal flood control projects. The injuries at issue there were caused by "turbulent
current generated by unwarned releases of waters from a reservoir after the Army Corps of
Engineers had determined that the waters were at "flood stage." *Central Green* 531 U.S. at 430
Thus, the fact that the injuries were caused by "flood waters" was undisputed.

In *James*, the Supreme Court stated in *dicta*:

> Nor do the terms 'flood' and 'flood waters' create any uncertainty in the context of
> accidents such as the ones at issue in these cases. The Act concerns flood control
> projects designed to carry floodwaters. *It is thus clear from § 702c's plain
> language that the terms 'flood ' and 'flood waters' apply to all waters contained in
> or carried through a federal flood control project for purposes of or related to
> flood control*, as well as to waters that such projects cannot control. *Id.* at 605,
> 106 S. Ct. 3116 (emphasis added).

31

*Central Green*, 531 U.S. at 430 (emphasis provided).  From that statement, many courts focused on whether the damage related  in some manner to a flood control project  rather than whether it related to floods or flood waters.  The Supreme Court in *Central Green*, refined this dicta, and stated:

> In *James,* we held that the phrase "floods or flood waters" is not narrowly confined to those waters that a federal project is unable to control, and that it encompasses waters that are released for flood control purposes when reservoired waters are at flood stage.  That holding, however, is vastly different from the Ninth Circuit's reading of § 702c, under which immunity attaches simply because the Madera Canal is part of the Friant Division of the Central Valley Project, and flood control is one of the purposes served by that project.  The holding in *James* also differs from the less attenuated and more fact-specific proposition advanced by the Government, which would require us to take judicial notice of evidence that the Friant Division of the Central Valley Project and, indeed, the Madera Canal itself can and do serve flood control purposes.  We ultimately conclude that the judgment cannot be upheld under either rationale.

*Id.* at 431.

In overturning the Ninth Circuit, the Supreme Court focused on the fact that the lower court had characterized "every drop of water that flows through that immense project as 'flood water' simply because flood control is among the purposes served by the project unnecessarily dilutes the language of the statute." *Id.* at 434.  It noted that the text of § 702c does not include the words "'flood control project" and thus "the text of the statue directs us to determine the scope of the immunity conferred not by the character of the federal project or the purposes it serves, but by the character of the waters that cause the relevant damage **and the purposes behind their release**." *Id.*  In the factual context of *Central Green*, this phrase is key.  Implicit in this case in light of the discussion of *James* is that the Court  rejected a facile approach to immunity, that is if the water, regardless of whether it is flood water or not, comes from a flood protection project, there is immunity.  Rather, the damaging water for which the Government is

immune in *Central Green* is for flood waters, not other kinds of water, that actually were being

diverted in a flood control portion of the entire project.

The Supreme Court concluded:

> This case does raise a difficult issue because the property damage at issue
> was allegedly caused by continuous or repeated flows occurring over a period of
> years, rather than by a single, discrete incident. It is relatively easy to determine
> that a particular release of water that has reached flood stage is "flood water" as
> in *James*, or that a release directed by a power company for the commercial
> purpose of generating electricity is not, as in *Henderson v. United States*, 965
> F.2d 1488 (C.A.8 1992). It is, however, not such a simple matter when damage
> may have been caused over a period of time in part by flood waters and in part by
> the routine use of the canal when it contained little more than a trickle. The fact
> that a serious flood did occur in the San Joaquin in 1977 creates the distinct
> possibility that flood waters may have surged down the Madera Canal and harmed
> petitioner's property.
>
> For present purposes, we merely hold that it was error to grant the
> Government's motion for judgment on the pleadings and that it is the text of §
> 702c, as informed by our holding in *James*, rather than the broad dictum in that
> opinion, that governs the scope of immunity from liability for damage caused "by
> floods or flood water." Accordingly in determining whether § 702c immunity
> attaches, courts should consider the character of the waters that cause the relevant
> damage rather than the relation between that damage and a flood control project.

*Id.* at 436-47. While the Government seeks to read any connexity to a flood control project out

of § 702c immunity, a fair reading of *Central Green* and its narrow holding in conjunction with

*James* leaves this Court with the belief that §702c immunity arises where damage is caused by

flood waters emanating from a flood control project.

This suit for damages caused by the failures of the levees and/or floodwalls at 17th Street

Canal and the London Avenue Canal is barred by § 702c. While the facts surrounding the LPV

in relation to the outfall canals is checkered and replete with what appears to be errors in

judgment as described above, the fact remains that this Court must take judicial notice of the fact

that Congress enacted the LPV in 1965 as a "project for hurricane-flood protection on Lake

Pontchartrain, Louisiana." Pub. L. No. 890298, 79 Stat. 1073, 1077 (1965). Indeed, one House committee report directed the Corps to "treat the outfall canals as part of the overall hurricane protection project." H.R. Rep. No. 101-966 at 67 (1990).   Congress in 1991, when faced with the knowledge that parallel protection had been approved by the Corps for the 17th Street Canal, but not the Orleans Avenue and London Avenue outfall canals, specifically directed the Secretary of the Army "to provide parallel hurricane protection works along the entire lengths of the Orleans Avenue and London Avenue Outfall Canals by raising levees and improving flood protection works along and parallel to the entire lengths of the outfall canals and other pertinent work necessary to complete an entire parallel protection system." Pub. L. No. 102-104, 105 Stat. 510, 514 (1991).  And when funding was not being provided through the Corps' budget process, Congress again appropriated funds and "directed the Secretary of the Army, acting through the Chief of Engineers, to incorporate parallel protection along the Orleans and London Avenue Outfall Canals into the authorized Lake Pontchartrain and Vicinity, Louisiana, Hurricane Protection project." Pub. L. No. 102-377, 106 Stat. 1315 1320 (1992).   Such actions demonstrate beyond peradventure Congress's tacit acceptance of the Corps' decision to abandon the Barrier Plan initially considered in 1965 and allow the Corps to proceed with the High Level Plan as manifested with the parallel protection construction.

The Court notes that it has not directly addressed whether specific Congressional authorization of funds is necessary in order for the Government to have the benefit of the FCA immunity.  Here there was specific authorization of the parallel protection plan on all three canals.

These facts make it irrelevant for purposes of this motion to determine whether storm surge had affected the outfall canals or not.  With the incorporation of the parallel protection approach for the outfall canals, Congress had manifested its desire to prevent all flooding–including that caused by the flow of drainage water.  Furthermore, the argument that immunity for flooding is limited to the Mississippi River has been categorically rejected as demonstrated in *James*, *Central Green*, and *Graci v. United States*, 456 F.2d 20 (5th Cir. 1971).  Finally, while the decision to abandon the Barrier Plan for the High Level Plan may have been a death-knell for the City of New Orleans, when Congress forced the Corps to provide parallel protection to the outfall canals, any argument that such a change was not authorized falls.  It is as if Congress approved the change *nunc pro tunc* with its actions.

When Congress grants immunity to the "sovereign" and that immunity is interpreted as it has been by the Supreme Court in *James* and *Central Green*, in essence, the King can do no wrong if the facts of the case compel the Court to apply that immunity.  Here, the Court must apply this broad immunity based upon the facts of this case.  Often, when the King can do no wrong, his subjects suffer the consequences.  Such is the case here.

**B.     Negligent Granting of Dredging Permit in Count I**
**       Section 702c and the Discretionary Function Exception to the FTCA**

**1.     Parties Contentions**

The United States also maintains that it is immune from suit for the alleged negligent permitting of dredging of the 17th Street Canal as alleged in Count I.  It first  contends  that §702c provides immunity in this regard as well as for the other defalcations alleged.  In addition, it  maintains that theses claims are barred by the discretionary function exception to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2680(a).

Plaintiffs contend that the exception does not apply.  They maintain that the Master Complaint alleges facts which would support a finding that the challenged actions are not the kind of conduct that could be said to have been grounded in considerations of public policy. Rather, they maintain that the Corps' violation of  its non-discretionary duty in issuing the dredging permit substantially contributed to the failure of the 17th Street Canal and thus is not subject to a motion to dismiss citing  *Baldassaro v. United States,* 64 F.3d 206, 209 (5th Cir. 1995), *cert. denied*, 517 U.S. 1290 (1996) and  *Gaubert*, 499 U.S. 315,  324-25).  Furthermore, they argue that the Corps' lack of professional engineering competence is not protected by this exception because only governmental policy decisions based on economic, political or social factors fall within the discretionary function exception.  Rather, they contend that matters of scientific and professional judgment–particularly safety are rarely considered to be susceptible to social, economic, or political policy." *Whisnant v. United States*, 400 F3d 1177, 1181 (9th Cir. 2005).

**2.     Analysis Permitting Decision in Light of § 702c and the Discretionary Function Exception**

**a. §702c Immunity**

Once the 17th Street Canal was incorporated into LPV, which is undoubtedly a flood control project,  and the Corps erected the floodwalls that did eventually fail creating floodwaters damaging plaintiffs herein,  the fact that those levees and/or floodwalls were part of the LPV created immunity for the Corps under § 702c for whatever defalcations it might have made in permitting the dredging of the 17th Street Canal.  The irony that the dredging decision was made at approximately the same time as the shift from the Barrier Plan to the Parallel Protection Plan was made is not lost on the Court.  Had these outfall canals not been wrapped into the LPV and had the levees failed solely, or in part, as a result of the Corps' permitting the scouring of the east bank of the 17th Street Canal levee, § 702c,  in all likelihood, would not have provided the United States refuge.  *See Graci v. United States*, 456 F.2d 20 (5th Cir. 1971) (§ 702c does not bar action against the United States under the FTCA where  flooding is unconnected to a flood control project).  However, even if § 702 would not provide immunity for the United States, it would not end the inquiry.[15]

---

[15]As noted, allegations concerning damages arising from the failures of the Orleans Avenue Levee/Floodwalls  were inadvertently omitted from the Master Complaint.  On August 10, 2007 a First Supplemental and Amending Master Consolidated Complaint (Doc. 6941) was filed which included allegations concerning liability against the United States for the Orleans Avenue Levee/Floodwall failures.  For the reasons assigned herein, the Court dismisses those allegations as well as it finds that it has no jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1).

### b.  Discretionary Function Exception

The United States is also protected from liability with respect to damages caused by the allegedly negligent granting of the permit to dredge the 17th Street Canal by the discretionary function exception to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2680(a).    That statute provides:

> Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved by abused.

As this Court has noted before, the discretionary function exception defies precise definition of its contours.  This difficulty was underscored in the Supreme Court's decision in *Berkovitz v. United States*, 486 U.S. 531 (1988).  In that case, a child contracted polio after taking an oral polio vaccine that had been approved for production and distribution by two governmental agencies.  The district court denied a motion to dismiss for lack subject-matter jurisdiction based on the discretionary function exception finding that "neither the licensing of [the vaccine] nor the release of a specific lot of that vaccine to the public was a 'discretionary function' with the meaning of the FTCA." *Id.* at 534.  A divided panel of the Third Circuit Court of Appeals reversed relying on *United States v. Varig Airline,* 467 U.S. 797 (1984)  holding that the licensing and release of polio vaccines were wholly discretionary actions and, as such, could not form the basis for suit against the United States. The Supreme Court reversed.

In *Berkovitz*, the Supreme Court reiterated certain guiding principles.  Citing *Varig*, it noted that "'it is the nature of the conduct, rather than the status of the actor that governs whether the discretionary function exception applies in a given case.'" *Berkovitz*, 486 U.S. at 536.  The

determination requires a two-step process.  First, a court must determine whether the action is "a matter of choice for the acting employee.  This inquiry is mandated by the language of the exception; conduct cannot be discretionary unless it involves an element of judgment or choice." *Id. citing Dalehite v. United States,* 346 U.S. 15, 34 (1953).  The Supreme Court continued:

> Thus, the discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow.  In this event, the employee has no rightful option but to adhere to the directive.  And if the employee's conduct cannot appropriately be the product of judgment or choice, then there is no discretion in the conduct for the discretionary function exception to protect.

*Berkovitz*, 486 U.S. at 536. Thus, "if an employee violates a mandatory regulation 'there will be no shelter from liability because there is no room for choice.'"  *Bean Horizon Corp. v. Tennessee Gas Pipeline Co.*, 1998 WL 113935 (E.D.La. March 10, 1998) *citing United States v. Gaubert*, 499 U.S. 315, 324 (1991).

The second inquiry,  is whether that judgment or choice is based on considerations of public policy.  As state in *Berkovitz*, "The basis for the discretionary function exception was Congress' desire to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. Varig Airlines* [467 U.S.] at 814."  *Berkovitz* 486 U.S. at 537.  "The discretionary function exception insulates the Government from liability if the action challenged in the case involves the permissible exercise of policy judgment."  *Id*.

This position, however, does **not** mean that "if Government activity involves conduct that is rooted in policy, the discretionary function exception bars a cause of action based on that conduct unless the Government employee violated **a mandatory regulation** that restricts his discretion or judgment" as noted by the Fifth Circuit in *Lively*, 870 F.2d at 299.  The exception is

39

not so circumscribed.   Furthermore, the discretionary function exception does not preclude liability for any and all acts arising out of the regulatory programs of federal agencies.

Indeed, in *Berkovitz,* the Supreme Court precisely rejected that premise and examined the regulatory scheme under which the polio vaccine was placed into commerce.  First, since the government agency had no discretion to issue a license without first receiving the required test data, and plaintiffs in that case alleged that it had not done so, the Supreme Court found that the discretionary function provided no bar.  *Berkovitz*, 486 U.S. at 543.  Furthermore, to the extent that plaintiffs averred that the agency licensed the vaccine without determining whether the vaccine complied with regulatory standards or after determining that the vaccine failed to comply, there was no basis for the imposition of the exception as the agency had no discretion to deviate from the  mandated procedure.  *Id* at 544.  Finally,  the Supreme Court noted that if plaintiffs' claim was that the Government had made a determination in compliance with regulatory standards, but that determination was incorrect, the "question of the applicability of the discretionary function exception requires a somewhat different analysis."  The Supreme Court continued:

> In that event, the question turns on whether the manner and method of determining compliance with the safety standards at issue involve agency judgment of the kind protected by the discretionary function exception. **Petitioners contend that the determination involves the application of objective scientific standards, . . whereas the Government asserts that the determination incorporates considerable "policy judgment."**  In making these assertions, the parties have framed the issue appropriately; **application of the discretionary function  exception to the claim that the determination of compliance was incorrect hinges on whether the agency official making that determination permissibly exercised policy choice.**  The parties, however, have not addressed this question in detail, and they have given us no indiction of the way in which the DBS interprets and applies the regulations setting forth the criteria for compliance.  Given that these regulations are particularly abstruse, we hesitate to decide the question on the scanty record before us.

40

*Berkovitz 486 U.S.* at 546-47.  Likewise, with respect to whether the release of the vaccine survived a motion to dismiss, the Supreme Court noted that the discretionary function act did prevent suit for the formulation of policy as to the appropriate way in which to regulate the release of vaccine lots; however, "if the [Government's] policy leaves no room for an official to exercise policy judgment in performing a given act, or if the act simply does not involve the exercise of such judgment, the discretionary function exception does not bar a claim that the act was negligent or wrongful."  *Id.*

In the context of the issue before the Court posed by this motion–permitting dredging of the 17th Street Canal, the issuance of the permit was informed by the regulation for the Rivers and Harbors Act, 33 U.S.C. § 403, which is found at 33 C.F.R. § 320.4.  It provides:

> (a) Public Interest Review
>> (1) The decision whether to issue a permit will be based on an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest. Evaluation of the probable impact which the proposed activity may have on the public interest requires a careful weighing of all those factors which become relevant in each particular case. The benefits which reasonably may be expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments. The decision whether to authorize a proposal, and if so, the conditions under which it will be allowed to occur, are therefore determined by the outcome of this general balancing process. That decision should reflect the national concern for both protection and utilization of important resources. **All factors which may be relevant to the proposal must be considered including the cumulative effects thereof: among those are conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production, mineral needs, considerations of property ownership and, in general, the needs and welfare of the people.** For activities involving 404 discharges, a permit will be denied if the discharge

> that would be authorized by such permit would not comply with
> the Environmental Protection Agency's 404(b)(1) guidelines.
> Subject to the preceding sentence and any other applicable
> guidelines and criteria (see §§ 320.2 and 320.3), a permit will be
> granted unless the district engineer determines that it would be
> contrary to the public interest.

33 C.F.R. § 320.4 (emphasis added).  This language demonstrates that as to the issuance of the

subject permit, by virtue of the language of the regulation, this decision  was a policy judgment

left to the Corps to balance a myriad of factors, including flood hazards as opposed to the needs

and welfare of the people.  The context of the dredging application cannot be forgotten.  The

SWB was indeed seeking an increase in the volume of water that it could drain through this

canal to prevent flooding during a rain event.  A countervailing factor would have been the

prevention of flooding from storm surge; the Corps had determined to build I-Walls along this

area in order to accomplish its goals.  Thus, the Corps' decision was grounded in a policy-based

judgment and is protected by the discretionary function exception.  As stated in *United States v*

*Gaubert*, 499 U.S. 315 (1991):

> Under the applicable precedents, therefore, if a regulation mandates
> particular conduct and the employee obeys the direction, the Government will be
> protected because the action will be deemed in furtherance of the policies which
> led to the promulgation of the regulation. . . . If the employee violates the
> mandatory regulation, there will be no shelter from liability because there is no
> room for choice and the action will be contrary to policy.  On the other hand, if a
> regulation allows the employee discretion, the very existence of the regulation
> creates a strong presumption that a discretionary act authorized by the regulation
> involves consideration of the same policies which led to the promulgation of the
> regulations. . . .
>       For a complaint to survive a motion to dismiss, it must allege facts which would
> support a finding that the challenged actions are not the kind of conduct that can be said
> to be grounded in the policy of the regulatory regime.  The focus of the inquiry is not on
> the agent's subjective intent in exercising the discretion conferred by statute or
> regulation, but on the nature of the actions taken and on whether they are susceptible to
> policy analysis.

*Id.* at 324-35.  *See Reed v. United States Dept. Of the Interior*, 231 F.3d 501 (9th Cir. 2000) (permit issuance required balancing of competing public policy concerns, including issues of public access, safety, resource allocation, and the environment).  Thus, the motion to dismiss Count I is supported by the discretionary function exception as well.


### C.       Counts IV, V and VIII–MRGO and the IHNC

The United State has moved to strike Counts IV and VIII based on their relationship to MRGO and this Court's Case Management Order No. 4 which placed claims into three categories: Levee, MRGO and Insurance.  (Doc. 3299,  CMO 4 at 3).  The United States contends that with the Levee Master Complaint filing, plaintiffs erroneously included issues that should be contained in the MRGO Master Complaint.  Furthermore, the Court in reviewing Count No. V finds that it concerns the Inner Harbor Navigational Canal which also for the Court's purposes geographically is to be considered in the MRGO Master Complaint.

With the agreement of the parties and based on the Court's attempt to manage the subject litigation in an organized manner, the Court will order  plaintiffs to amend their MRGO Master Complaint (Doc. 3415) to include any and all allegations that are stated against the Corps in Counts IV and VIII with respect to the appropriate geographic locations.   Furthermore, with respect to Count V, as it pertains to allegations of legal fault regarding the Inner Harbor Navigational Canal and names the Corps in ¶ 254 it should be contained in the MRGO Master Complaint as well.  However, there are no specific allegations of fault alleged with respect to the Corps in the remainder of that count.  Therefore, the Motion to Dismiss will be granted as to the Corps with respect to Count V as it appears it was erroneously added in the subject defendants.

If this assumption is incorrect, then whatever claims plaintiffs have with respect to the Corps that are not already alleged in the MRGO Master Complaint as it pertains to the INHC, those claims are to be amended into the MRGO Master Complaint as well.

**Conclusion**

While the United States government is immune for legal liability for the defalcations alleged herein, it is not free, nor should it be,  from posterity's judgment concerning its failure to accomplish what was its task.  The citizens of each and every city in this great nation have come to depend on their government and its agencies to perform certain tasks which have been assigned to federal agencies by laws passed by Congress and overseen by the Executive Branch. It should not be unreasonable for those citizens to rely on their agents, whom they pay through their taxes, to perform the tasks assigned in a timely and competent way.  However, because of § 702c, there is neither incentive, nor punishment to insure that our own government performs these tasks correctly. There is no provision in the law which allows this Court to avoid the immunity provided by § 702c; gross incompetence receives the same treatment as simple mistake.

This story–fifty years in the making–is heart-wrenching.  Millions of dollars were squandered in building a levee system with respect to these outfall canals  which was known to be inadequate by the Corps' own calculations.  The byzantine funding and appropriation methods for this undertaking were in large part a cause of this failure.  In addition, the failure of Congress to oversee the building of the LPV and the failure to recognize that it was flawed from practically the outset–using the wrong calculations for storm surge, failing to take into account

44

subsidence, failing to take into account issues of the strength of canal walls at the 17th Street Canal while allowing the scouring out of the canal–rest with those who are charged with oversight.

The cruel irony here is that the Corps cast a blind eye, either as a result of executive directives or bureaucratic parsimony, to flooding caused by drainage needs and until otherwise directed by Congress, solely focused on flooding caused by storm surge. Nonetheless, damage caused by either type of flooding is ultimately borne by the same public fisc. Such egregious myopia is a caricature of bureaucratic inefficiency.

It is not within this Court's power to address the wrongs committed. It is hopefully within the citizens of the United States' power to address the failures of our laws and agencies. If not, it is certain that another tragedy such as this will occur again. Accordingly,

**IT IS ORDERED** that the United States' Motion to Dismiss with respect to Counts I-III and VI-VII of the Superseding Master Consolidated Class Action Complaint and to Strike the Remaining Counts (Doc. 6380) **IS GRANTED**.

**IT IS FURTHER ORDERED** that plaintiffs shall amend the MRGO Master Complaint **no later than February 28, 2008,** to contain any and all allegations contained in the Superseding Master Consolidated Class Action Complaint (Doc. 3420) which it wishes to pursue that are not already contained therein.

**IT IS FURTHER ORDERED** that on March 1, 2008, Counts IV, V, and VIII shall be

**STRICKEN**.

New Orleans, Louisiana, this  30th  day of January, 2008.

_____
                    **STANWOOD R. DUVAL, JR.**
                **UNITED STATES DISTRICT COURT JUDGE**

46

Appendix 1, Map 2-2 of HPDC



**Map 2-2: The LP&VHPP Barrier Plan Authorized in 1965**

# As Built

Appendix 2



SOURCE: IPET