```
 1                     UNITED STATES DISTRICT COURT

 2                    EASTERN DISTRICT OF LOUISIANA

 3
        ****************************************************************
 4
        IN RE:  KATRINA CANAL
 5      BREACHES CONSOLIDATED
        LITIGATION
 6                                  CIVIL ACTION 05-4182
                                    SECTION "K"(2)
 7                                  NEW ORLEANS, LOUISIANA
                                    WEDNESDAY, OCTOBER 13, 2010, 1:30 P.M.
 8      PERTAINS TO:  MRGO

 9          ARMSTRONG, NO. 10-866
            ENTERGY, NO. 10-77
10
        ****************************************************************
11

12                     TRANSCRIPT OF MOTIONS PROCEEDINGS
               HEARD BEFORE THE HONORABLE STANWOOD R. DUVAL, JR.
13                      UNITED STATES DISTRICT JUDGE

14

15      APPEARANCES:

16
        FOR THE PLAINTIFFS:        O'DONNELL & ASSOCIATES
17                                 BY:  PIERCE O'DONNELL, ESQUIRE
                                   550 SOUTH HOPE STREET
18                                 SUITE 1000
                                   LOS ANGELES, CA  90071
19

20                                 BRUNO & BRUNO
                                   BY:  JOSEPH M. BRUNO, ESQUIRE
21                                      L. SCOTT JOANEN, ESQUIRE
                                   855 BARONNE STREET
22                                 NEW ORLEANS, LA  70113

23
                                   DOMENGEAUX WRIGHT ROY & EDWARDS
24                                 BY:  JAMES P. ROY, ESQUIRE
                                   556 JEFFERSON STREET
25                                 LAFAYETTE, LA  70502
```

```
 1  APPEARANCES CONTINUED:

 2

 3                              GORDON ARATA MCCOLLAM
                                DUPLANTIS & EAGAN
 4                              BY:  EWELL E. EGAN, JR., ESQUIRE
                                     NINA W. ENGLISH, ESQUIRE
 5                                   BRIAN L. GUILLOT, ESQUIRE
                                     WENDY H. ROBINSON, ESQUIRE
 6                              201 ST. CHARLES AVENUE, SUITE 4000
                                NEW ORLEANS, LA  70170
 7

 8                              THE GILBERT FIRM
                                BY:  ELISA T. GILBERT, ESQUIRE
 9                                   BRENDAN R. O'BRIEN, ESQUIRE
                                325 EAST 57TH STREET
10                              NEW YORK, NY  10022

11

12                              SHERMAN LAW FIRM
                                BY:  KEA SHERMAN, ESQUIRE
                                5221 CAMP STREET
13                              NEW ORLEANS, LA  70115

14

15  FOR THE UNITED STATES
    OF AMERICA:                 DEPARTMENT OF JUSTICE
16                              BY:  ROBIN D. SMITH, ESQUIRE
                                     DANIEL M. BAEZA, JR., ESQUIRE
17                              TORTS BRANCH, CIVIL DIVISION
                                BENJAMIN FRANKLIN STATION
18                              P.O. BOX 888
                                WASHINGTON, D.C. 20044
19

20

21
    OFFICIAL COURT REPORTER:    CATHY PEPPER, CCR, RMR, CRR
22                              500 POYDRAS STREET, ROOM B406
                                NEW ORLEANS, LOUISIANA 70130
23                              (504) 589-7779

24

25  PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
    PRODUCED BY COMPUTER.
```

1                                **I N D E X**

2

3       SPEAKERS                                                PAGE

4

5       MR. SMITH...............................................     4

6       MR. O'DONNELL...........................................    46

7       MS. GILBERT.............................................    73

8       MR. EGAN...............................................    86

9       MR. SMITH...............................................    87

10      THE COURT..............................................    90

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              P-R-O-C-E-E-D-I-N-G-S

2              WEDNESDAY, OCTOBER 13, 2010

3            A F T E R N O O N   S E S S I O N

4              (COURT CALLED TO ORDER)

5

6

7          THE DEPUTY CLERK:  All rise, please.  Court is in

8    session.  Please be seated.

9          THE COURT:  Good afternoon.

10         THE DEPUTY CLERK:  This is Civil Action #05-4182

11   consolidated with #10-77 and #10-866, and we're here on

12   Document Number 19993, 20033, 20035.

13         THE COURT:  Okay, who is going to commence?

14         MR. SMITH:  Good afternoon, Your Honor.

15         THE COURT:  Good afternoon, Mr. Smith.  Nice to see you.

16         MR. SMITH:  Robin Smith for the United States.  I

17   believe it's our motion, and we'll go first, if Your Honor

18   please.

19         THE COURT:  Yes, sir, please.

20         MR. SMITH:  May it please the Court.

21         THE COURT:  Yes, sir.

22         MR. SMITH:  The United States has moved to dismiss the

23   plaintiffs' EBIA claims on three independent grounds.  First of

24   all, the Flood Control Act provides that no liability of any kind

25   shall rest upon or attach to the United States for any damage

1   from or by floods or floodwaters at any place.

2       In this case, it's undisputed that the damage was from

3   floodwaters, and it's also undisputed that the damage was from

4   floodwaters that a flood control project failed to control.

5       Those two undisputed facts are dispositive of these claims.

6   As Your Honor has previously ruled, Section 702(c) is based upon

7   the notion that the United States' liability should be capped

8   when it enters into flood control projects, and that when there

9   is a nexus between the damage that result from floodwaters and a

10  flood control project, then that immunity applies.

11      In this case, the nexus between a flood control project and

12  the floodwaters is plain.  It's undisputed that the levees and

13  floodwalls along the IHNC were part of the Lake Pontchartrain and

14  vicinity hurricane protection project, and they were built to

15  prevent flooding from entering the lower Ninth Ward and

16  St. Bernard Parish from the Inner Harbor Navigation Canal.

17      Your Honor has also said that Section 702(c) applies to

18  floodwaters that, quote, emanate from a flood control project,

19  close quote.  And in Your Honor's ruling in the *Levee* portion of

20  this litigation, he determined that Section 702(c) applied to the

21  flooding that resulted from the breaching of the floodwalls along

22  the outfall canals because those canals had been incorporated

23  into the Lake Pontchartrain project when Congress told the Corps

24  to build levees and floodwalls along those outfall canals, and

25  then, following that instruction, those flood control structures

 1  were erected.  And, as here, they failed as a result of being

 2  overtopped and breached by floodwaters resulting in flooding of

 3  the surrounding neighborhood.

 4      These facts are not in dispute here.  It's not disputed that

 5  Congress authorized the building of these levees and floodwalls

 6  along the IHNC as part of the Lake Pontchartrain plan.  The

 7  plaintiffs have sought to distinguish Your Honor's ruling in

 8  *Levee* from these set of facts by arguing that there was a

 9  specific authorization to incorporate the outfall canals into the

10  Lake Pontchartrain project when Congress directed the Corps to

11  build parallel protection along the outfall canals; but, in

12  reality, there was similar authorization for these floodwalls and

13  these levees along the IHNC, not specifically contained in the

14  law that Congress passed, but by reference in the law that

15  Congress passed in which Congress directed the Corps, authorized

16  the Corps to construct the Lake Pontchartrain project in

17  accordance with the chief of engineers' report.  And that report

18  carefully laid out the fact that there were going to be levees

19  and floodwalls along the length of the IHNC.

20      So, just as in *Levee*, here, too, we have a canal that's

21  going to be bounded by and, in fact, eventually was bounded by

22  flood control structures intended to prevent flooding from that

23  body of water.

24          THE COURT:  Now, you say eventually.  Those flood

25  control structures, as I understand it, that were in place at the

1    time of Katrina were the very same flood control structures that

2    had been there, at least to a large part, since 1969 or '70.  I

3    know part of it was since 1980.  I understand that other --

4             MR. SMITH:  They enlarged preceding structures that were

5    there prior to the federal involvement, yes, Your Honor.

6             THE COURT:  And nothing had taken place to the existing

7    floodwalls -- I realize there were plans, but at the time of

8    Katrina those -- the floodwalls along the IHNC were pretty much

9    the same floodwalls that had been there for quite a considerable

10   period of time.

11            MR. SMITH:  That's correct, Your Honor.  Although the

12   lock replacement project called for a modification of some of

13   those levees --

14            THE COURT:  Right.

15            MR. SMITH:  -- that project hadn't reached that stage

16   yet.

17            THE COURT:  I do understand that part of the -- that as

18   an adjunct, or whatever word we want to use, to the lock widening

19   and this project that's taken quite a long time to -- it may

20   never come to fruition, but the bottom line is as part of that,

21   it was contemplated that as a result of the project -- and you

22   can correct me if I'm wrong, and I know you will -- as a result

23   of that project or in tandem with that project, there was going

24   to be additional levees, larger levees.

25            MR. SMITH:  Yes, Your Honor.  Because they were building

1    the new lock north of the location of the existing lock, that

2    would mean that the water that was going to be south of the new

3    lock would be flowing into that area of the canal from the river.

4            THE COURT:  Right.

5            MR. SMITH:  So that part of the canal, then, would be

6    controlled by river elevation stages.  And, therefore, they

7    needed to bring the hurricane protection levee up to the level of

8    the Mississippi River and tributaries.

9            THE COURT:  It seems that those facts are undisputed,

10   and it becomes -- the analysis that the Court has to make, and I

11   understand your argument, is was this levee project simply

12   ancillary and a result of this navigation project; and does that,

13   then, inextricably link them, or does that create the nexus that

14   you talked about, that I have talked about, as well.

15       I know we disagree on the general holding of *Central Green*,

16   which will -- ultimately, some court will clear us up on that.

17   But getting to your point with this Court, that seems to be the

18   intersection that I have to determine, is there -- is there a

19   nexus, and you've certainly laid out that argument.

20           MR. SMITH:  It's hard to imagine what could be a more

21   direct nexus than we have here.  We have a navigation project,

22   construction of a new lock, which actually requires a

23   modification of the existing flood control structures.

24       They are not going to tear them down and leave the area

25   susceptible to flooding.  In fact, they are going to take what's

1   there and improve it and raise it to a higher level.

2        And I think the problem with finding that immunity wouldn't

3   attach to these new flood control structures because they were

4   part of the lock replacement project can be seen if you would

5   envision what would have been the case if the project had been

6   completed at the time of Hurricane Katrina, and we had a failure

7   of those levees and floodwalls adjacent to the lower Ninth Ward.

8        Unless that Flood Control Act immunity was understood to

9   attach to even the newly constructed levees that were part of the

10  navigation replacement project, you would have a situation in

11  which there would be immunity for the breaches that occurred just

12  to the north of the new lock, but you wouldn't have immunity for

13  the breaches that occurred of that same levee just south of the

14  new lock.

15       And so the Court would be -- in fact, some of those levees

16  weren't going to be replaced, they were going to be improved.  So

17  then you'd face the quandary of, well, does immunity attach to a

18  levee that was originally constructed as part of the flood

19  control project, but was improved as part of a navigation project

20  later?

21       And it seems that if you look at *Central Green*, what you see

22  in *Central Green* is you see a similar situation.  You have a

23  canal in *Central Green*, the Madeira canal, which had no flood

24  control purpose or function.  It was an irrigation canal, but it

25  was part of a larger -- the Central Valley project, which was a

1    multi-purpose project.  It encompassed flood control, as well as

2    irrigation projects as well.

3        And the Supreme Court, in looking at the flooding there,

4    noted that there wasn't any, you know, physical damage to the

5    levees along the canal, but there was a seepage of water,

6    subterranean seepage of water that escaped from the canal into

7    the adjacent property where the pistachio orchard was.  And the

8    Court said, we need to look at those waters to determine whether

9    or not immunity applies.

10       It didn't look at the nature of the canal.  It didn't look

11   at the funding of the levees along the canal.  It said, if this

12   damage was caused by floodwaters which escaped from this

13   multi-purpose project, then immunity will attach.

14       And we have the same situation here.  We have separate

15   projects.  We have a Lake Pontchartrain project, which was

16   undeniably a flood control project, and we have the MRGO, the

17   IHNC lock replacement project, which was a navigation project, in

18   aid of navigation, not flood control.

19       And, yet, because those two projects were physically -- not

20   just physically adjacent, but, in the context of this lock

21   replacement project, they were literally going to be physically

22   overlapping, in other words, the same physical geometry that was

23   part of the Lake Pontchartrain project was going to be impinged

24   upon by this lock replacement project, it required that there

25   would be modification of those structures that were built as part

1   of the flood control project.

2          THE COURT:  How was the staging of this, Mr. Smith?

3   That is, of course, we're talking about futuristic and maybe a

4   little speculative, but, as planned, when were the levees going

5   to be constructed vis-a-vis the construction of the lock?

6       When I say the levees, we have this bypass channel, then the

7   lock.  When were the levees going to be constructed that we're

8   talking about, if everything -- I understand in this world

9   certainly everything doesn't go according to plan, but as

10  envisioned as part of the master plan.

11         MR. SMITH:  The levees -- that was going to be the final

12  part of this project.  After the lock was in place, then they

13  were going to replace the existing levee with the new levees in

14  the parts that needed to be modified as a result of the new lock.

15      Until the new lock was in place, and as long as you had the

16  original lock in place, as you know, they were going to dredge a

17  bypass channel around --

18         THE COURT:  Yes.

19         MR. SMITH:  -- the location of the new lock so they

20  could continue to use the existing lock while the construction

21  was underway.  So they would have a defense against riverine

22  flooding at the existing lock until that lock was taken out of

23  place.

24         THE COURT:  I do understand that.  I guess my point is,

25  in the event -- and this is, again, hypothetical, and I realize

 1   sometimes hypotheticals can be just that, hypotheticals -- but in

 2   the event the Corps were to have, in the construction of the --

 3   in the remediation work, let's say, during the remediation work

 4   the Corps, leaving WGI out of it, but the Corps would have done

 5   something to destroy the floodwall or impair the floodwall,

 6   you're saying the Corps gets immunity for some project that may

 7   take place many years from that point?

 8          MR. SMITH:  You mean something apart from the lock

 9   replacement project?

10          THE COURT:  No.  I mean, in the remediation project

11   itself.  If it were during the remediation project, the Corps

12   damages a floodwall somehow, or causes -- allows damage to occur.

13   And we're not going to get into the -- we're going to get into

14   all those arguments later.  I guess you would still be arguing

15   immunity because it's part of a flood control -- you would say it

16   would be part of a flood control project or had nexus to a flood

17   control project contemplated in the future?

18          MR. SMITH:  Well, I don't think so, Your Honor.  I mean,

19   I don't think that's fair to say a project contemplated in the

20   future because the EBIA remediation was part of the lock

21   replacement project.  It was --

22          THE COURT:  Right.  I agree with that.  I agree.

23          MR. SMITH:  It was the first part of that project.  The

24   replacement of the levees was going to come later.  But this is

25   all part of the project, and, as Your Honor knows, as you already

1    alluded to, it may be decades from the commencement --

2         THE COURT:  Well, it was 1955 when the idea was first

3    hatched, so we do move glacially, no question.

4         MR. SMITH:  But the point, I think, the salient point

5    here is that they wouldn't have been remediating that.  They

6    bought that land and took over that land because they needed to

7    replace -- to have a bypass channel through that area while they

8    were rebuilding the new lock.  Apart from the new lock, the

9    federal government had no interest in remediating that land.

10        THE COURT:  Your argument is it's all part and parcel of

11   the same plan which involves a flood control project.

12        MR. SMITH:  And it unavoidably did so because, as

13   Your Honor knows, other locations were ruled out for a variety of

14   reasons.  They were politically, you know, unacceptable,

15   environmentally unacceptable, and this was deemed to be the most

16   politically and socially and environmentally acceptable place to

17   put this lock.

18        THE COURT:  When I dealt with this many years ago, I had

19   no idea I would be --

20        MR. SMITH:  In the *ACORN* case.

21        THE COURT:  Yes, exactly.

22        MR. SMITH:  Right.

23        THE COURT:  Wow, a lot has happened to ACORN and me

24   since then, but, anyway.

25        MR. SMITH:  I think you've faired better than ACORN.

1          THE COURT:  I hope so.  Anyway, I digress.  I'm sorry,

2     Mr. Smith.  Go ahead.

3          MR. SMITH:  But I do think, Your Honor, that looking at

4     these various aspects just tends to heighten attention at the

5     fact that these two projects were here inextricably

6     interconnected.  They just couldn't put in this lock in this

7     location without modifying those levees and floodwalls, and so we

8     have that direct connection in these two projects.

9          THE COURT:  I understand your argument.

10         MR. SMITH:  I think, Your Honor -- I know you know your

11    opinions better than I do or anyone else in this courtroom, but I

12    think in the *Levee* judgment, I think there is a key passage.  And

13    if you'll bear with me, I just think it's clear enough and I

14    think it's -- the implications reach to the situation we're in

15    here.

16        It's at page 638 of the published version in 533 F.Supp.2d

17    where Your Honor says, "Once the 17th Street Canal was

18    incorporated into the LPV, which is undoubtedly a flood control

19    project, and the Corps erected the floodwalls that did eventually

20    fail creating floodwaters damaging plaintiffs herein, the fact

21    that those levees and/or floodwalls were part of the LPV created

22    immunity for the Corps under Section 702(c) for whatever

23    defalcations it might have made in permitting the dredging of the

24    17th Street Canal."

25        There, we had conduct, the dredging of the 17th Street

 1    Canal, which wasn't part of the Lake Pontchartrain project.  And

 2    Your Honor found that because you had this incorporation of a

 3    canal into this flood control project, the LPV, which purpose was

 4    to prevent this flooding, that was broad enough to encompass

 5    these defalcations that occurred outside the project per se.

 6             THE COURT:  I do understand your argument, and I do

 7    recall that passage.  I guess, there we were dealing with

 8    reality.

 9         Here, we're dealing with sort of the ethereal yonder in the

10    sense that although it was on paper, it may or may not ever be

11    constructed, that I'm not sure what something planned in the

12    future has to do with the immunity at that point.  It had not yet

13    been part -- the levees hadn't been built, much less incorporated

14    into a project.

15         And, two, it could be argued that they -- that this is not a

16    flood control project but something ancillary to a navigation

17    project that was, in essence, dictated by the location of it.

18         But, yet, I mean -- I'm sure I'm going to hear those

19    arguments, but I don't think it's quite as straightforward as

20    you're saying, but it is an interesting argument.

21             MR. SMITH:  I don't know if I misunderstood Your Honor,

22    but, you know, our position would be that 702(c) applies not

23    prospectively -- because of the prospective construction of

24    levees as part of the lock replacement project, but because, in

25    fact, this isn't ethereal, but we think that, in fact, the levees

1   and floodwalls that were along the IHNC when Katrina struck were

2   just as much a part of the LPV as the levees and floodwalls that

3   were outside the outfall canals.  So it was --

4        THE COURT:  That's true, that's true.  If you would have

5   broken the outfall canal by not the levees failing but you doing

6   something to break the levee, it would be a different situation.

7   And the allegation here is that you, the government, did

8   something to impair the levee.

9        No, I understand.  Yes, I certainly agree that the existing

10  levees are part of the LPV, absolutely.  And there is no cause of

11  action for any failure of those levees because of the intrinsic

12  quality of those levees.  That, I do understand that.

13       But I think the argument -- I'm just extending -- it's

14  almost like you're getting immunity for a levee -- a flood

15  control project you haven't built.  That's the bottom line.  You

16  haven't built the flood control project.

17       Because, certainly, the remediation was not a flood control

18  project.  It was to get a navigation project going.  And I guess

19  those are the things that I have to struggle with.  You're a lot

20  more sure about them than I am.  But I've listened to your

21  argument, and I have to now deal with it.

22       MR. SMITH:  I would just -- you know, I also think the

23  conduct is analogous in the sense that it was alleged, you know,

24  in the levee part of this case that the dredging --

25       THE COURT:  Right.

1          MR. SMITH:  -- affected the stability of the floodwalls.

2    And here, it's alleged that -- not dredging, but they were

3    digging holes in dry ground, you know, so a very similar kind of

4    process being carried out by a third party, but, again, with the

5    permission, if you will.  There, you had a permitting process.

6    Here, you have a contracting process.  But you've got a Corps,

7    you know, involvement in this process.

8          THE COURT:  702(c) applies either way, is what you're

9    saying?

10         MR. SMITH:  I'm struggling to see a distinction, a

11   meaningful distinction here, because in both situations you have

12   very similar conduct.  You have a very similar situation in terms

13   of a flood control project that's in place along a canal, and you

14   have floodwaters that damage that.

15         THE COURT:  I guess the point being the floodwall failed

16   when it was a floodwall, when it was part of the LPV.  But you're

17   saying negligence that occurred before it was a floodwall may

18   have caused part of it to fall?

19         MR. SMITH:  I'm sorry.  I'm having a hard time

20   understanding Your Honor's point about before it was a floodwall.

21   I don't know what you're referring to.

22         THE COURT:  Well, I was actually trying to understand

23   your analogy.  I'm saying here -- if we're talking about the

24   existing flood -- you're saying -- let's assume there is no -- to

25   make it clear, you've already made your argument about being part

1  of a flood control project.  If there wasn't another flood

2  control project, you're saying this levee failing because of this

3  activity is analogous to --

4          MR. SMITH:  That's what I'm saying.

5          THE COURT:  -- the holding in *Levee*.  I understand that.

6          MR. SMITH:  That's my argument, Your Honor.

7          THE COURT:  Good point.

8          MR. SMITH:  Whether or not the EBIA project --

9          THE COURT:  Right.

10         MR. SMITH:  -- had required any modification of those

11 levees.

12         THE COURT:  I understand.  I'll be interested to see

13 what the plaintiffs have to say about that.

14         MR. SMITH:  Your Honor, I'll move on to the second

15 point, then --

16         THE COURT:  Yes, please do.

17         MR. SMITH:  -- if you don't have any more questions

18 about that.

19     We've also raised the Federal Tort Claims Act discretionary

20 function exception as an independent grounds for dismissal of

21 these claims here.

22     And as Your Honor knows, there is a two-prong test for

23 application of the discretionary function exception, which we

24 sometimes call the DFE so we don't have to trip over all those

25 long words.

1          THE COURT:  Just a minute, Mr. Smith.  I'm going to

2    interrupt you, and I'm not going to penalize you for this time.

3          (WHEREUPON, at this point in the proceedings, there was

4    a bench conference held outside the presence of the court

5    reporter.)

6          THE COURT:  Yes, sir.  I'm sorry to interrupt you.  Go

7    ahead.

8          (WHEREUPON, at this point in the proceedings, there was

9    a bench conference held outside the presence of the court

10   reporter.)

11         THE COURT:  Yes, sir.  You were on the DFE.

12         MR. SMITH:  Right, Your Honor.  There is two prongs to

13   the discretionary function exception test.  The first prong

14   requires that the challenged conduct be a matter of choice for

15   the government employee.  If there is a statute or a regulation

16   that prescribes particular conduct, a course of conduct that is

17   not followed, then the exception does not apply.

18       In this case, however, there is no statute or regulation

19   that eliminated the choices and the judgment that the contracting

20   officer's representative was required to exercise in managing the

21   remediation of the EBIA, the East Bank Industrial Area.

22       Generally, as Your Honor has laid out in his prior opinion

23   in granting Washington Group International's motion for summary

24   judgment, Mr. Guillory, the contracting officer representative,

25   was required to see that the contract terms were fulfilled, and

1  to do that he was to conduct inspections to assess how WGI was

2  performing the contract, he was to liaison with WGI, and if there

3  were problems, he was to report those problems to the contracting

4  officer himself.

5        And as Your Honor also well knows and he has laid out in his

6  prior opinions, Mr. Guillory and the team that he was a member of

7  implemented an intricate approval process whereby --

8              THE COURT:  Fifth Circuit didn't think it was intricate

9  enough, apparently.  Go ahead.  Go ahead.  They never cease to

10 surprise me.  Go ahead.

11             MR. SMITH:  Well, it's not over yet, Your Honor.  We'll

12 see what they decide.

13             THE COURT:  You were saying --

14             MR. SMITH:  Your Honor has already laid this out, I

15 think, pretty well in his prior opinion.  There was a fairly

16 elaborate, intricate, whatever word you want to use, approval

17 process, a back and forth, if you will, that went on between WGI

18 and the Corps.  And typically, it required WGI to come up with

19 the work plans and the specifications and to submit them to the

20 Corps for approval.  And if the Corps approved, then WGI went

21 ahead and did the work.

22       This was the task that the Corps was tasked with, and the

23 Corps in this task required judgment choice.  And there wasn't a

24 regulation that told them how to do this that they didn't follow.

25             THE COURT:  Let me ask you a question, sir.

1    Mr. DiCharry -- I may be pronouncing his name -- DiCharry -- and,

2    again, I know you'll correct me if I'm not correct --

3            MR. SMITH:  I had to ask somebody myself, Your Honor.  I

4    think it's DiCharry, like the drink.

5            THE COURT:  DiCharry, okay.

6        -- testified that WGI was not expected to provide input

7    regarding geotechnical stability of levees or floodwalls at the

8    east bank.  And I guess I'm wondering, if WGI didn't have that

9    responsibility, didn't the Corps have that responsibility?

10           MR. SMITH:  And they did do that, Your Honor.  They did

11   that as part of the lock replacement project.

12       Part of the -- there was a nine-volume new lock and

13   connecting channels report that was several hundred, if not

14   thousand pages long, in which they, among other things, examined

15   whether this project was going to affect the stability of the

16   floodwalls.

17       So that was analyzed as part of the lock project, and it was

18   not --

19           THE COURT:  Was that the existing floodwall or the --

20           MR. SMITH:  The existing floodwall, Your Honor.

21           THE COURT:  So the stability analysis affected the

22   existing floodwall as well as the -- did it affect the floodwall

23   to be built, the ones we're talking about in the future?  It

24   wasn't clear to me, frankly.

25           MR. SMITH:  Yes, Your Honor.  I think they did an

1   analysis that examined what they had to do to preserve the

2   stability of the existing floodwall and the floodwall to be

3   built.

4          THE COURT:  We may ask you, but if we could -- we had

5   trouble finding something that was precise enough where we could

6   find that, yes, there was something done -- a stability line for

7   the existing floodwall as well as the to-be-constructed

8   floodwall.  So if you don't have that right on your fingertip

9   right now, we might ask for it.

10         MR. SMITH:  We can submit a supplemental submission to

11  the Court, Your Honor.

12         THE COURT:  Go ahead, sir.

13     How much geotechnical engineering goes into establishing a

14  stability line?

15         MR. SMITH:  They look at the load of the structure and

16  the soils that are surrounding the structures to determine how

17  much the new structure will displace the existing soils.  If the

18  new structure is too heavy and doesn't have a broad enough

19  foundation, then it can become unstable.

20         So one of the things that they did in this, they modified

21  the floodwall along the east side of the Industrial Canal because

22  the residents were concerned about the esthetics of having a high

23  floodwall that was right adjacent to their neighborhood.  And so

24  they lowered the ultimate height of the floodwall, and they

25  broadened the base of the floodwall so that they could prevent so

1    much of a visual impact from the --

2           THE COURT:  Do we know the distance that that stability

3    line was from the now existing and then existing floodwall?

4           MR. SMITH:  I'm sorry, Your Honor?

5           THE COURT:  The distance of the stability line from

6    the -- I haven't seen a superimposition of the stability analysis

7    onto the actual topography as it exists now.

8           MR. SMITH:  It basically runs at a diagonal.  In other

9    words, it comes out and then slants downward from the --

10          THE COURT:  Getting the slope.

11          MR. SMITH:  Right.  There's a slope, basically.  So the

12   farther -- the farther you are away from the structure, the less

13   impact that soil will have on the stability of the structure

14   itself.

15       If you're going to come very close to the wall, then that

16   soil there is more, you know, significant in terms of maintaining

17   stability of the wall.

18          THE COURT:  Go ahead, sir.

19          MR. SMITH:  Your Honor, you may recall this was part of

20   the testimony in the Robinson trial about the factors of safety.

21   It's the same principle here is you analyze the downward forces

22   from the structure against the lateral forces.  And there -- I

23   think -- which used to be like a 1 to 1.3 was what they used to

24   use as their factor of safety in building those structures.

25          THE COURT:  Is there any proof in the record that the

1    Corps or any of its personnel considered the geotechnical

2    consequences of the remediation considering the proximity to the

3    floodwall, other than the 25-by-3-foot Surekote remediation in

4    the borrow pit?

5          MR. SMITH:  I'm sorry, are you asking as part of the

6    EBIA project?

7          THE COURT:  Yes.

8          MR. SMITH:  The borrow pit was the only stability

9    analysis that was done by the engineering department.  They did

10   not analyze the wedding cake structure excavation or the sewer

11   lift station.

12      And Mr. Guillory explained that he didn't ask for an

13   analysis of those because he felt that the use of a licensed

14   professional engineer to devise a cofferdam structure to surround

15   those two excavations was sufficient to prevent any of the

16   adjacent soils from being affected by those holes.

17      I think it's -- it's Mr. Guillory's testimony, and, frankly,

18   the absence of any regulation that would have required it, that

19   shows that he was exercising his discretion in asking the

20   engineering department to look at one excavation, which was going

21   to come very close to the floodwall, and he thought it needed to

22   be analyzed, as opposed to other excavations which he did not.

23         THE COURT:  That's a really interesting question, and

24   you could be right, that could be discretion.  And I'm not sure

25   when -- and we know that an abuse of discretion, no matter how

 1   negligent, is generally regarded as discretion.

 2        And I'm sure we're going to get an argument about

 3   engineering judgment and other things, and we'll get an argument,

 4   I'm sure, on also whether there is some mandates or not, but I'll

 5   save that for the plaintiffs.

 6             MR. SMITH:  Well, he may have been wrong, Your Honor.  I

 7   mean, obviously people can differ about whether more analysis

 8   should have been done, whether those holes, you know -- what went

 9   into those holes, as you know from the WGI argument, whether they

10   needed to require more compaction of the filling of those holes,

11   whether they needed to require less permeability in what went

12   into those holes.

13        Those are certainly engineering judgments, but I think we

14   can see that even in looking at these small aspects of the case,

15   that not only was there no -- I hate to confuse the two prongs,

16   because I think that's part of where we're going when you mention

17   engineering judgment.

18             THE COURT:  Right.

19             MR. SMITH:  But, certainly, the fact that if these

20   things weren't done right, it could have a considerable -- and

21   it's not really funny under the circumstances, but a considerable

22   community impact.

23        I mean, essentially the plaintiffs' claims here are that the

24   flood was a result of not taking enough care.  And one of the

25   things that Mr. Guillory did, it's clear, was in every phase of

 1    what he did, he thought about how what he was doing was going to

 2    impact the community.  Even went so far as to when they were

 3    talking about what they would do with the borrow pit, decided

 4    that they would, when they finished excavating the borrow pit,

 5    they would connect it to the canal so that the water in there

 6    wouldn't become stagnant and become a breeding ground for

 7    mosquitoes.

 8          And that was essentially because they were thinking about

 9    this becoming a nuisance to the community.  And they thought

10    about whether it would be an attractive nuisance, whether people

11    in the community, children, would view this as a swimming hole

12    and might enter it to try to swim in it.

13          THE COURT:  One of the things in the WGI -- I remember

14    from the WGI argument, I have learned since, as a result of the

15    case I tried with the barge, the barge and now this case, there

16    were a lot more holes than the borrow pits -- than the wedding

17    cake -- we kept talking about the wedding cake structure in the

18    other one.  Well, there were holes all over the place.  I didn't

19    realize the extent of the remediation, but I understand it a lot

20    better now.

21          MR. SMITH:  There were scores, there were scores of

22    excavations, yes, Your Honor.  And there's just, you know, three,

23    I think, that have really become -- and two, if you take out the

24    borrow pit, have become a focus now of the litigation.  But

25    that's correct, Your Honor.

1       And I think, you know, it's perhaps telling, although I

2   think it's irrelevant to the discretionary function exception,

3   but if we're going to look at causation, the largest excavation

4   and the one that was closest to the floodwalls was the borrow

5   pit; and, yet, we didn't have a breach adjacent to the borrow

6   pit.

7       So that's neither here nor there, Your Honor, with respect

8   to this.  But I think some of Your Honor's questions have gone to

9   the prudence of Mr. Guillory --

10              THE COURT:  Yes.

11              MR. SMITH:  -- in whether he was -- you know, his

12  judgment was sound in terms of not involving more of the

13  engineering department --

14              THE COURT:  Yes.

15              MR. SMITH:  -- in reviewing the plans that were

16  developed by WGI.

17      The plaintiffs have cited two regulations that they claim

18  cabined Mr. Guillory's judgment and that he violated, that were

19  violated by the Corps in connection with this project.  And I

20  think one of the them, in fact, wasn't even -- hadn't even been

21  promulgated yet at the time of the challenged conduct, so I

22  think, for that reason by itself, that regulation is --

23              THE COURT:  Which one is that?  I know you put it in

24  your brief.

25              MR. SMITH:  That's ER 1110-1-8157.  That wasn't

 1   promulgated until October of 2002.

 2            THE COURT:  I have a question for the plaintiffs about

 3   that.  So you're saying it wouldn't be applicable because it

 4   wasn't in existence?

 5            MR. SMITH:  It couldn't have governed the conduct since

 6   it didn't exist.  And there was no predecessor to that regulation

 7   either, Your Honor.

 8            THE COURT:  All right.

 9            MR. SMITH:  So I'd like to focus on the other regulation

10   which they cite, which is ER 1110-2-1150, which took effect at

11   the end of August in 1999.  That's Exhibit 33, Your Honor.

12            THE COURT:  I have it.

13            MR. SMITH:  The plaintiffs argue that certain aspects of

14   this regulation were violated, but their argument depends upon

15   importing from one provision certain requirements and applying

16   them in another part of the regulation.

17        And the reason why that's not proper to do is that this

18   regulation is based upon the five phases of a project, and these

19   phases are generally temporal phases.  A project moves through

20   time -- over time through five separate phases.

21        And so as section -- or paragraph 6.1 says, "This regulation

22   uses the five phases, which are reconnaissance, feasibility,

23   preconstruction engineering and design, construction, and the

24   last one is operation and maintenance, to present the engineering

25   and design policy and process that applies to all projects and

1    products."

2         And I think it's important, and I'm going to put these up

3    here because I really think that it makes a difference when we're

4    looking at this regulation to keep in mind whether, when we're

5    looking at the provision, does it apply to this phase of this

6    project at this time.

7              THE COURT:  It is something I wanted argument about

8    because it's helpful.

9              MR. SMITH:  So I'm just going to use the -- there are

10   five phases, but I'm going to use the paragraph numbers because

11   it's the paragraph numbers that correspond to each phase.

12        So paragraph 12 is the reconnaissance phase.  And the

13   reconnaissance phase is the very first part of a project, and the

14   purpose -- and I'm reading from the regulation itself, "the

15   purpose of the reconnaissance is to identify a problem and a

16   potential solution."  So that occurs very early on.

17        And in the case, the reconnaissance phase goes back to the

18   '60s.  And, as Your Honor knows, they began looking at the

19   feasibility -- actually, this even precedes feasibility, but they

20   began looking at the problem and trying to identify potential

21   solutions.

22        The next phase of a project is the feasibility phase.  So

23   when we're looking at paragraph 13, we're looking at feasibility.

24   Feasibility is also a preliminary phase.  And I'm, again, reading

25   from the regulation, paragraph 13.  It says, "The purpose of the

1  feasibility phase is to formulate a solution to address a

2  specific public need."

3      So feasibility studies look at the costs and benefits, they

4  prepare initial designs, and then they recommended a plan to

5  solve the problem.  Feasibility studies become the basis for

6  Congressional authorization.  That's paragraph 13.

7      The third phase of a project is set forth in paragraph 14,

8  and it's called preconstruction engineering and design.  This is

9  the phase in which the design is finalized, plans and

10  specifications are prepared, and the construction contract is

11  prepared for advertising.

12      The next phase, which will be the fourth phase, is the

13  construction phase, and that's set forth in paragraph 15.

14  Engineering during construction includes the completion of design

15  documentation reports, a modification of plans and

16  specifications, where appropriate, and the preparation of

17  engineering considerations and instructions to field personnel.

18  It also includes the review of selected contractor submittals and

19  site visits are the reports that are prepared during the

20  construction phase.

21      And then the last phase, again, I think Your Honor is

22  familiar with some of this because we talked about a lot of this

23  in the case prior and the MRGO project, is the operations phase.

24      In terms of the project that we're dealing with here, the

25  feasibility -- the reconnaissance occurred very, very early.  It

1  began in the '60s and continued through into the '70s when

2  President Carter got involved and began, you know, directing

3  consideration of looking at not building it at the Violet site

4  but moving it up to the IHNC.

5      And we got to the feasibility stage with the production of

6  the nine-volume new lock and connecting channels report in 1997.

7  And that's in the record as defendants' Exhibits -- I believe

8  it's 2 through 9, I believe.

9      It's a very lengthy report.  It also includes the

10  environmental impact statement.  That's volume two of the report.

11      So that phase was over with the production of the report in

12  1997.  Then when Congress authorized it, then they moved into the

13  preconstruction engineering and design, and after that then came

14  construction.

15      Now, the way this works is when you have a major project

16  like the lock project, you'll often have, if you will, contracts,

17  a variety of contracts within the overall project that sort of

18  move through these phases at their own pace.

19      In other words, we've talked about earlier you might have

20  one part of the project that is separated from other parts of the

21  project by decades.  And here, we had a contract with Washington

22  Group International to perform a part of this lock project, and

23  the part of this lock project that they were doing was the

24  preparation for the construction of the bypass channel.  And in

25  preparation for that, they needed to remove all of the

1    environmentally dangerous substances that were in that location.

2        The plaintiffs have claimed that a design documentation

3    report was required for the work that was going to be done by

4    Washington Group International, and they have cited to paragraph

5    13 and have cited some of the elements of the feasibility study

6    and argued that the design documentation report for the EBIA was

7    inadequate because it didn't have these elements.

8        But, the flaw in their reasoning is that the elements that

9    they are citing don't pertain to a design documentation report.

10   They don't have anything to do with a design documentation report

11   because feasibility precedes the creation of a design

12   documentation report.

13       And we can see that if we look in paragraph 8.2.  This talks

14   about the various documents, engineering documents, paragraph 8.

15   And paragraph 8.2 says, "The design documentation report, DDR, is

16   a record of final design effort after the feasibility phase."

17       So once feasibility is over, which we know that ended in

18   1997 with the production of the voluminous new lock and

19   connecting channels report, then they moved into the design

20   phase, the third phase.

21       And what the DDR does is it's basically a document that

22   tracks the project from that point on, when the design begins to

23   be developed, all the way through construction.  And it's not

24   complete until construction is complete because there is always

25   the chance that, as the work progresses, the plans and

1    specifications may need to be changed.

2        So while you have -- you may have plans and specifications,

3    as WGI developed, we know that as they encountered various

4    subterranean structures and they began to realize what was going

5    to be involved in removing those structures, then they had to

6    develop new plans and specifications.  So a DDR would have been a

7    document that was in process during the construction phase here

8    at the EBIA site.

9        And as paragraph 8.2 says, "It serves as a summary of the

10   final design.  It's not," and I'm quoting here, "it's not totally

11   complete until after the plans and specifications and

12   construction are completed."

13       "It's" -- the next sentence says, "It's an engineering

14   implementation document."  So it basically tracks what the design

15   is, what the plan is, and then it is the chronology of how those

16   designs and plans and specifications are implemented.

17           THE COURT:  Is it plaintiffs' contention, do you

18   understand it, that the Corps failed to comply with this since

19   geotechnical evaluations regarding excavations below 5 feet and

20   the effects that underseepage could have had under the

21   floodwalls -- is that what they are urging?

22           MR. SMITH:  Yes, I think they are urging.  I think what

23   they are saying, Judge, this regulation required the Corps to

24   have the district's engineering department do a geotechnical

25   study of all these excavations.

1          And when we look at the regulation, they are finding

2     provisions from various paragraphs that have nothing to do with

3     what was going on at that time and saying, oh, look, the

4     feasibility study was supposed to include X, Y and Z.  Well, they

5     didn't do a DDR that had one.  Therefore, they violated the

6     regulation.

7          And they're basically just taking bits and pieces and

8     bringing them together and quoting them out of context to create

9     an appearance of something that's not reality.  In fact, the --

10    if you look at paragraph 15, it doesn't say anything at all about

11    having a geotechnical study.  It doesn't even require that the

12    contractor's submittals be reviewed by engineering.

13         It says -- I want to talk a little bit more about DDR

14    because I sort of want to keep a little bit of this in order, but

15    the DDR begins, as I pointed out, with the third phase, the

16    design phase, preconstruction engineering and design phase, which

17    is set forth in paragraph 14.  And this is -- this is the phase

18    in which the design is finalized, the plans and specifications

19    are prepared, and the construction contract is prepared for

20    advertising.

21         And then if you look at paragraph 14.3, it says, "The

22    requirement for DDR's and their related ITR's" -- an ITR is an

23    independent technical review, a DDR is a design documentation

24    report, but, anyway -- they've got a lot of abbreviations here,

25    but, anyway, it says, "These requirements cannot be waived.

1   Complete design documentation must always be produced."

2        The next paragraph goes on to explain that, "For a large" --

3   and this is what I was referring to before, "For a large or

4   complex project which may have multiple construction contracts,

5   after the feasibility phase," again, here we are, "after the

6   feasibility phase, it may be appropriate to prepare an initial

7   DDR for the overall project, including initial design of all

8   major features of the project.  This initial DDR could then be

9   referenced by separate DDR's for the features in each contract."

10       So here we see that there is flexibility in this regulation,

11  even in the preparation of DDR's.  Depending on the size of the

12  project, you may have a single design documentation report for

13  the whole project, from the beginning to the end.  But in a

14  massive project like this, you may have an initial DDR which

15  sketches out the whole scope of the project, and then when you

16  get into the individual phases, for instance, here you would have

17  EBIA renovation, you would have bypass canal excavation, you

18  would have lock construction, you would have levee floodwall

19  construction, you might have separate DDR's for each of those

20  contracts.

21       THE COURT:  So when was the -- there was a 1999 DDR,

22  correct?

23       MR. SMITH:  Yes, that's correct.  There was a 1999 DDR

24  that dealt with -- that's Exhibit 15, that dealt with the levees

25  and floodwalls.  And --

1          THE COURT:  And when you say the levees and floodwalls,

2   that's the --

3          MR. SMITH:  The new, the ones that were to be

4   constructed, Your Honor, yes.

5          THE COURT:  Was there ever a DDR involving the

6   remediation project?

7          MR. SMITH:  I don't know, Your Honor.  I really don't

8   know whether there was or not.

9      If we look at -- this contract was in the construction

10  phase.  It wasn't complete.  WGI was still doing the work when

11  the conduct in question was at issue.  And that would have been

12  the fourth phase construction.

13      And paragraph 15 says that -- tells what engineering is

14  supposed to occur during this phase.  And it says, "It includes

15  completion of DDR's, modification of P&S," that's plans and

16  specifications, "where appropriate, and preparation of

17  engineering considerations and instructions to field personnel.

18  Additional effort is needed to review selected contractor

19  submittals, conduct site visits and prepare construction

20  foundation reports and concrete reports."  And then it talks

21  about other plans and reports that can be prepared during this

22  phase.

23      The plaintiffs' argument is that WGI's excavation plans were

24  required to be submitted to the Corps' engineering department.

25  And yet, this regulation not only doesn't say that it was, it

1    doesn't say anything at all about any particular contractor

2    operation being reviewed by engineering; but, it specifically

3    says that some selected -- it says, "It includes selected

4    contractor submittals."

5        And if we look at -- further down in paragraph 15, 15.4, it

6    talks about review of selected contractor submittals.  And it

7    says, "The shop drawings, samples, letters of certification,

8    tests, and other engineering information identified for review by

9    engineering on ENG form 4288 shall be processed in timely

10   manner."

11       The regulation leaves the discretion of whether to review a

12   particular contractor submittal in the engineering department.

13   The regulation does not require every contractor submittal to be

14   submitted to the engineering department for review, but allows

15   the engineering department to decide whether it's going to review

16   a particular contractor submittal or not.

17       And, in fact, that's what happened here.  We had the Corps'

18   contracting office representative reviewing -- as Your Honor

19   knows, he reviewed every -- the team reviewed every WGI

20   submittal, and, in his judgment, only one of the three

21   excavations that we're concerned about here was -- he deemed it

22   advisable to have it reviewed by the Corps' internal engineering

23   department.  And, in fact, they reviewed it and made some

24   suggested changes to it.

25       But he had reasons.  Now, they might have been bad reasons,

1   they might have been good reasons.  That's neither here not

2   there, but he had his reasons for choosing that excavation and

3   not other excavations.

4        THE COURT:  To get to some things that concern me,

5   just -- and I'm not sure what effect it's going to have legally

6   but they concern me -- the Corps seemingly was under the

7   impression that the floodwall depth penetrated to 25 feet, which

8   is incorrect, as you know.

9        It seems to me there might have been more geotechnical angst

10  or concern had they known it was to 10 feet.  And, of course they

11  have the drawings, they built it.  And I'm not sure how that's

12  policy or discretion, but just flat wrong, and what effect does

13  it have on this case.

14       MR. SMITH:  Right.  And, certainly, I think if anyone

15  had foreseen the magnitude of the surge that was going to enter

16  this canal during Hurricane Katrina, I think that would have

17  generated a lot more concern about analyzing --

18       THE COURT:  I'm not talking about that.  I'm talking

19  about when you're digging holes over there that go to 30 -- I

20  mean, some of them, the pilings may go in to 30 feet, when there

21  are holes all over the place, when you have something like in

22  Dr. Bea's report where you've got a little lagoon here.

23       I've seen pictures of all these excavations.  It seems to me

24  there may have been some comfort, and maybe there wasn't, in the

25  notion somehow that it was 25 feet in depth; therefore, the

1    seepage issue, which is really what this case is -- when you boil

2    it all down, should the Corps, and maybe in discretion, should

3    the Corps have realized, we've got a seepage issue here, we've

4    got holes all over the place in this project, more so than we

5    realized, some of them are a lot deeper than 5 feet, and there

6    are a bunch of them, should we do a seepage analysis.  Was a

7    seepage analysis ever done?

8            MR. SMITH:  It certainly was.  It's part of Exhibit 15,

9    the DDR that Your Honor referred to that was --

10           THE COURT:  In 1997.  That was before --

11           MR. SMITH:  No, 1999.

12           THE COURT:  1999.  That was before the work was done,

13   though.  I mean a seepage analysis after you realized you were

14   going way below 5 feet and you were digging up all of these

15   holes.  Should the Corps have said, whoa, we have to -- we have a

16   seepage issue?

17           MR. SMITH:  Well, Your Honor, the bypass canal was going

18   to go down to 30 feet.

19           THE CLERK:  25.

20           MR. SMITH:  On one side it was 22 feet, and on the other

21   side it was 30 feet.

22           THE COURT:  How far away from the floodwall?

23           MR. SMITH:  I'm not sure on how far away --

24           THE COURT:  Those things become important.  I don't know

25   that.

1           MR. SMITH:  Well, Your Honor, but what we're getting

2      into here is an examination of the care, whether reasonable care

3      was exercised.  And, you know, we can argue, well, it may have

4      been too close, it may have been too far away, there may have

5      been too many poles, the sheet pile might not have been deep

6      enough.  But, certainly --

7           THE COURT:  Well, if you see during the project -- I

8      mean, when you envision this project, you're talking about 5 feet

9      excavations, generally.  Ended up being a lot more than that in

10     many different places, as I recall.  I'm sure you know this

11     better than I do.

12          So, you see all of this happening, you, the Corps.  Do you

13     have any duty at that point, for instance, if I -- certainly, if

14     I saw, let's say, an old Air Force nuclear bomb that had

15     penetrated there, I would do something about it.  I mean, that

16     would be obvious.  That wouldn't be anything about my

17     supervision, that would be me being, oh, my goodness, look at

18     this thing, we have to do something.

19          If I see something that one could argue -- I'm not saying it

20     did -- one could argue was far more extensive than was originally

21     envisioned into the amount of holes being dug and when and where

22     they were dug -- you know, I'm not certain of all of them -- that

23     I'm -- should I have been on notice that there may be an issue

24     with the undermining of this levee?  Am I hurting my levee?  I

25     guess that's -- putting it that way.

```
 1              MR. SMITH:  Yes, and I think that's the crux of the
 2      plaintiffs' claim is that there wasn't sufficient attention given
 3      to that.  And if we ever got to a trial on the merits, that
 4      certainly would be a focus of the case.  It has nothing
 5      whatsoever to do with the motions in front of Your Honor right
 6      now.
 7              THE COURT:  Why?
 8              MR. SMITH:  Because it's just an abuse of discretion.
 9              THE COURT:  Well, it has a lot to do with it.  In other
10      words, you're saying the discretionary function exception would
11      apply.
12              MR. SMITH:  What I'm saying is whether he was right or
13      wrong, whether --
14              THE COURT:  Well, I mean, that means I can be -- I can
15      completely ignore a danger, and that's discretion?  I can
16      completely ignore an engineering situation?  I guess --
17              MR. SMITH:  He didn't completely ignore it, Your Honor.
18      He did take it into consideration.  But what Your Honor is
19      positing is that he didn't consider it fully enough.
20              THE COURT:  What was the original seepage analysis based
21      on, the one in '99 -- the one that's in the '99 report, I'm
22      sorry, the DDR of '99?
23              MR. SMITH:  Well, that was based upon studies of the
24      soils in the area and studies of the structures that existed and
25      that were going to be built.
```

 1           THE COURT:  Okay.

 2           MR. SMITH:  Your Honor, I'm informed that the bypass

 3    canal was going to come as close as 72 feet to the floodwalls,

 4    and perhaps even closer.

 5       Your Honor is talking --

 6           THE COURT:  I don't know how close some of these things

 7    are.

 8           MR. SMITH:  Well, Your Honor has talked about a number

 9    of holes, that there were scores of holes that were dug in the

10    EBIA, and that shouldn't this have alarmed the Corps and

11    shouldn't they have paid more attention.

12       It's as if the plans were already to remove all the

13    furniture in this courtroom, eventually.  Five years later, we're

14    going to remove all the -- all the furniture in this courtroom is

15    going to be removed because we're going to put a bypass channel

16    through here.

17       But, before we do that, we have to come in and we're going

18    to remove just some of the chairs in here that might be

19    contaminated.  But, when you get in, you find out, oh, maybe some

20    of the tables are contaminated, too.  And so we decide, well, we

21    better not just take out some chairs, we've got to take out some

22    tables.

23       But, in reality, you've already done a study that looks at

24    removing everything out of this -- out of this room, and that's

25    essentially where Lee Guillory was.  He said, hey, yeah, we're --

1  are we digging a score of holes here?

2       THE COURT:  Lee Guillory thought the floodwall was

3  10 feet beneath -- 25 feet beneath sea level.  And maybe it

4  wouldn't have made any difference if it was 10 feet.  I know

5  that's the testimony.

6       MR. SMITH:  He certainly could have been mistaken about

7  that, Your Honor.

8       THE COURT:  He was.

9       MR. SMITH:  And if he was --

10       THE COURT:  Well, I mean, not if.  You're telling me it

11  was 25 feet?

12       MR. SMITH:  No, I don't really know what he thought it

13  was, to be honest.  If that's in the record, then I'm --

14       THE COURT:  It's in the record.  Somebody thought it

15  was.

16       (WHEREUPON, at this point in the proceedings, there was

17  a bench conference held outside of the presence of the court

18  reporter.)

19       THE COURT:  Yes, sir.

20       MR. SMITH:  Your Honor, some of the floodwall sheet

21  piling depth was 25 feet.

22       THE COURT:  I know exactly where it was.  In 1980, the

23  floodwall on the north breach that was -- that didn't breach.  I

24  know exactly where it was.

25       MR. SMITH:  Right.  So it's near the north breach is

1   where --

2        THE COURT:  But it wasn't part of the north breach.  It

3   was a little bitty part of the -- it's where the north breach

4   commenced, where the 10 feet was.

5        MR. SMITH:  Right.  Near Florida Avenue.

6        THE COURT:  I do know that.  Yes.  Okay.

7        MR. SMITH:  Your Honor asked earlier about the stability

8   analysis, and I just was handed a note that -- United States

9   Exhibit 3, plates B89 --

10        THE COURT:  I've looked at the plates.

11        MR. SMITH:  -- to 93.

12        THE COURT:  Not that I understood them completely, but I

13   looked at them.

14        MR. SMITH:  They show the stability analysis.

15        THE COURT:  Yes, but they looked like they are the

16   new -- we don't know what stability analysis was done since it

17   might have been an eon and is going to be an eon from the time

18   the new floodwall is being built to the old one.  Did anybody

19   think about the old floodwall or the existing floodwall?

20        MR. SMITH:  Certainly, he did.  We know that.  We know

21   he thought about it because he said he did.

22        THE COURT:  Well, I know, but do you have any stability

23   analysis?  That's what I asked in the beginning about the

24   existing floodwall.  The existing floodwall, not one to be built

25   sometime in 2100, not that that's your fault.  I'm not blaming

1    that on the Corps.  But, anyway, that's what I was interested in.

2        But we have a time consideration, so I'm going to try to not

3    interrupt you too much.

4           MR. SMITH:  That's fine, Your Honor.  Let me just see if

5    I've got any other points to make here --

6           THE COURT:  Yes, sir.

7           MR. SMITH:  -- if I may, Your Honor.

8           THE COURT:  Let's make them snappy.

9           MR. SMITH:  We haven't talked about NEPA at all.  Are

10    you going to get into NEPA?

11           THE COURT:  You don't have to talk about NEPA too much,

12    but, I mean --

13           MR. SMITH:  Well, Your Honor --

14           THE COURT:  I think the plaintiffs' argument is weak

15    about NEPA, but I'm telling you that now.

16           MR. SMITH:  Well, you know, maybe you're focusing on --

17           THE COURT:  It's a lot different than the MRGO.  And I

18    realize you disagree with the MRGO, but this isn't the MRGO.

19    This isn't 30 years of watching.  I have -- I'm skeptical about

20    the NEPA, but you make your points.  You can follow up after

21    them.

22           MR. SMITH:  I'm thinking about what Your Honor says at

23    page 725 in his report, where he talks about the three ways in

24    which the Corps was negligent.  And you make a finding,

25    essentially, that the Corps knew about these things and didn't do

1   anything about them.  And that sort of took it out of the -- of

2   the optional decision-making framework, and we don't have

3   anything like that.

4          THE COURT:  I agree.  I mean, I'll let you respond to

5   that.

6          MR. SMITH:  Yes.  Thank you, Your Honor.

7          THE COURT:  But, no, I didn't mean to rush you that much

8   because I asked you a lot of questions.

9          MR. SMITH:  Well, no, Your Honor --

10          THE COURT:  Any other point you want to make because I'm

11   going to let you have the --

12          MR. SMITH:  If Your Honor wants me to say anything at

13   all about the administrative requirement, the exhaustion

14   requirement --

15          THE COURT:  No.

16          MR. SMITH:  If you don't want to hear about that, then

17   I'm sitting down, Your Honor.

18          THE COURT:  You can have a chance for rebuttal.

19       Mr. O'Donnell, nice to see you.

20          MR. O'DONNELL:  Good afternoon, Your Honor.  It's been

21   so long since last we met.  About 17 months, to be precise.

22       It's a pleasure to be back in your courtroom for an

23   uncompleted phase of the plaintiffs' litigation, Armstrong.  And

24   I'm going to urge the Court to, as we have in our papers, deny

25   the motion and let us proceed to trial.

1        There are three arguments.  I'm not going to argue the

2    Form 95.  The Corps openly admits that they want you to

3    reconsider a matter very thoroughly considered.  And, you know,

4    you gave them a 1292(b) order.

5            THE COURT:  I did.

6            MR. O'DONNELL:  They didn't accept the invitation, so I

7    think we should leave that where it is.

8        I do want to talk about 702(c) briefly, and then I want to

9    focus the majority of my effort on the fact that we believe there

10    were mandatory Corps regulations besides just good engineering

11    practices, which is good old negligence, which if we get to trial

12    we'll be arguing that; but, I have to deal with the specific

13    issue, were there precise mandatory requirements.

14        And I'm going to go through that.  I think it's been set up

15    nicely for us.  And my -- colleague, Mr. Owen, who we hope will

16    be a member of the bar by Thanksgiving, I had Tommy prepare a

17    PowerPoint which I have given to everybody ahead of time.

18            THE COURT:  Thank you.

19            MR. O'DONNELL:  Your Honor, this is a motion for summary

20    judgment.  They always like to call it a motion to dismiss

21    because, I guess, it's (b)(1), whatever, but when you have two

22    cart fulls of exhibits which are not in the complaint, I think

23    it's clear that we're dealing with a Rule 56 montes that you've

24    ruled on in many cases before.

25            THE COURT:  Right, right.

1          MR. O'DONNELL:  And all you need to know about the

2     denying this motion is to pick up a hundred and some pages of the

3     three different pleadings that the parties have filed about

4     undisputed facts, objections.  I mean, we have 55 objected out of

5     their 99, and God knows how many they object to on the Entergy.

6     And there's citations throughout this.

7          And certainly, there is disputed issues of fact, number one,

8     on -- well, I think it's clear as a matter of law, the LPV and

9     the IHNC are a sister situation with the breach to MRGO and the

10    levees, and not -- it's not Levee case.  It's not the 17th

11    Avenue/London.  This is much closer to Reach 2, as I'll explain

12    in a moment.

13         But we've got lots of disputed facts, both on flood

14    control -- although I think you can rule as a matter of law that

15    your four prior rulings indicate that they should lose the fifth

16    time on this 702(c).

17         And there are certainly disputes about whether prong one,

18    the one that I argued, mandatory regulations, are applicable

19    here.

20         Now, you could rule as a matter of law, as I'm going to urge

21    you to, that there was never a geotechnical analysis done on

22    underseepage and stability.  And I read the regulations, both

23    sets of which I think are applicable, I read that as requiring

24    such analysis.  You'll see the Corps witnesses admit they didn't

25    do it.  So you could rule against them.

 1          THE COURT:  Mr. Smith says that there was an

 2     underseepage analysis in '99 and a stability line, but it looks

 3     like -- but I'm not sure it relates to the existing floodwall,

 4     but to the futuristic one.

 5          MR. O'DONNELL:  We probably all remember the movie

 6     *Jerry Maguire*.  "Show me the money."  I'm turning to the

 7     government now, and show me an applicable geotechnical

 8     underseepage floodwall stability analysis about the existing LPV

 9     floodwalls and the holes that you were digging.  We will not get

10     that document because, as you'll see in a moment, their witnesses

11     admit they never did it.  And I submit to you that the

12     regulations apply.

13          Quickly, on 702(c), there is the two familiar arguments that

14     the government likes to make.  The first is you've always

15     rejected their expansive argument that just because floodwaters

16     emanate from a flood control project and they cause flooding,

17     that that is enough, you know, a drop of flood water.  We have

18     been through *Central Green*.  The Court's analysis is what was the

19     cause of the damage.

20          Again, as we alleged in Robinson, we allege that there is an

21     external independent actor here of negligence in the MRGO was the

22     widening of Reach 2, the destination of the levees, all of the

23     other things that the Court found happened over 30 years.  And

24     you likened that to the Navy ship, the Coast Guard cutter, which

25     caused the damage.  Well, I'll submit to you the same thing is

1    true with regard to the IHNC floodwalls.

2         Now, I didn't have much time today on Canal Avenue, and the

3    plaintiffs have a fairly low budget.  And I wanted to find a

4    submarine, because the analogy on the IHNC is that all those

5    holes, the myriad of holes, never properly backfilled with the

6    right soil and the right compaction, which, as you know, is

7    essentially our argument with the ILIT report, and then later

8    Dr. Bea has concluded in Technical Report Number 5, acted like a

9    submarine.

10        Well, I couldn't find a submarine, but I did find a paddle

11   wheeler.  It's the SS NEW ORLEANS, or I think it's the SS ARMY

12   CORPS.  And if I had a submarine, because a paddle wheeler won't

13   do it, I would go through those holes, I'd go under the

14   floodwalls, I'd destabilize them, and they'd fall over at the

15   north and the south breach.

16        It's the same situation, Your Honor.  An independent

17   external cause created by the Corps' negligence which is a

18   substantial factor, a contributing cause under Louisiana law, to

19   the demise of the levees.  And I think that that is dispositive.

20        There is always the argument they like to make and took some

21   time with you this afternoon, well, you know, there were these

22   LPV floodwalls adjacent to the IHNC.

23        We have put in detailed information to you, and I won't go

24   through all of it, but the lock replacement project was

25   originally authorized by what, the 1956 MRGO authorization,

 1   number one.  Number two, it was funded independently from

 2   maritime fees.  Three, it was never decreed by Congress to be

 3   part of the LPV or the Mississippi River and tributary project,

 4   which is, of course, the key distinction with the levee case.

 5        In fact, you said, I don't know if it's a judicial musing or

 6   whatever, but in your Levee decision you said, you know, but for

 7   Congress mandating the integration of those canals, those outfall

 8   canals into the LPV, the Court might have -- be reaching a

 9   different conclusion on the applicability of 702(c).

10        So I think the Court had in mind then, and hopefully would

11   have in mind now, the fact of the matter is there is not a shred

12   of evidence that the widening of the IHNC and the lock

13   replacement and the EBIA excavation and backfilling had anything

14   to do with the flood control purpose.

15        And think about it logically.  They are independent.  You

16   can widen the IHNC and put in a new lock without touching the LPV

17   and strengthening it some day in the future.  You can never do a

18   lock replacement project and widening of the IHNC, and go forward

19   and build yourself a much stronger levee.

20        So they're really not related to each other, and they have,

21   as you said with regard to the MRGO in Robinson, two independent

22   purposes.  One is a navigation project to promote shipping, in

23   this case between Lake Pontchartrain and the Mississippi River,

24   and, of course, MRGO between the Port of New Orleans and the

25   Gulf.  And secondly, the floodwalls, of course, are there for

1  flood production.   Two distinct purposes.

2      And to quote language that I've always liked of yours, the

3  MRGO did not morph into a hybrid flood control navigational aid

4  project.  So I think that that, Your Honor, adequately disposes

5  of that point.

6      And finally, by the way, you made a finding, I believe in

7  your WGI decision.  You said, quote, WGI was performing a

8  remediation project which did not involve any flood control

9  structure, unquote.  And that's exactly true.  It did not involve

10  it.  It doesn't implicate it.  And, if anything, it was the

11  negligent submarine of the Army Corps that did in the floodwalls

12  at the north and south breach.

13      Let's go now to our PowerPoint, if we may.  And the point I

14  want to make here is that we are making the prong one argument of

15  no choice.  It's not just that good engineers would see flashing

16  danger signs when you're digging a myriad of holes within 75 to a

17  hundred feet of a floodwall, and you're going down 30 feet, and

18  the floodwall is near you, perhaps only ten feet.  And in

19  Southeast Louisiana, if any other part of the country, the Army

20  Corps of Engineers knows -- I'm a Yankee, and I know it -- that

21  there's a real problem with underseepage.  We see it all the

22  time.

23      We've seen it when they've try to build better levees here.

24  We've seen it along the Mississippi River.  We know there is an

25  problem with the soil here, and there was certainly a problem

1   with the soil they were putting back into the holes and not

2   properly compacting.

3        Let's to go the slide that shows -- in fact, it's the one

4   you held up.  This is, of course, Dr. Bea's chart, Your Honor,

5   from his technical report.

6              THE COURT:  Yes.

7              MR. O'DONNELL:  And you can see the coincidence of the

8   excavation work on the north breach at the Boland Marine site and

9   then the south breach along the Saucer Marine, one 250 feet.

10  And, of course, the south one, a gaping 900 feet.

11       And Dr. Bea's opinion, and I think it was ILIT's opinion as

12  well, is it's not coincidental that the walls failed at that

13  point, it's because of the myriad of holes, the porous soils that

14  was put back in there, the lack of compaction, the lack of

15  stability walls, a whole bunch of factors.  That's the

16  plaintiffs' theory.  That's our allegation of independent

17  negligence, and there was a substantial factor.

18       Next slide.  The Corps has the burden of showing that there

19  was -- next slide, that there was a choice.  The Court says as

20  least as to prong one, we know the government has the burden.  I

21  don't need to persuade you on prong two because I'm only dealing

22  with prong one.

23       And we submit the Court had absolutely no choice, that it

24  had mandatory engineering regulations.  We haven't talked about

25  the manuals today.  We have that in our brief.  I'm going to deal

1   with --

2            THE COURT:  Right.  The regulations which you consider

3   as mandates under *Bercovitz*?

4            MR. O'DONNELL:  Absolutely.  I think they are mandates.

5            THE COURT:  When I say under *Bercovitz*, the *Bercovitz*

6   rubric.

7            MR. O'DONNELL:  The rubric, exactly, Your Honor.

8            THE COURT:  Right.

9            MR. O'DONNELL:  And if we look at Slide 6, it's not just

10  my reading or perhaps your reading of the regulations, but the

11  Corps' 30(b)(6) witnesses testified that there were specific

12  engineering mandates concerning the analyses they're required to

13  perform on the EBI excavation project.

14       I don't know how to pronounce the name, I think it's

15  Grieshaber --

16            THE COURT:  Grieshaber.

17            MR. O'DONNELL:  -- Grieshaber, Mr. G, 30(b)(6) witness

18  testifies that:  "If you have a hole near a flood control

19  structure, it merits evaluation?"

20       "That's correct."

21       "Go further.  And it's not discretionary, it's mandatory

22  that you do something, right?"

23       "Correct."

24       The issue here is what was the something you were supposed

25  to do.

1          THE COURT:  And the mandate comes from?

2          MR. O'DONNELL:  It comes from two regulations.  It comes

3     from -- I'll shorthand 1150, that's the last four digits, and it

4     also comes from the other regulation which --

5          THE COURT:  87?

6          MR. SMITH:  8157, whose applicability I'll get to in a

7     moment.  So those are the two regulations.

8        And Mr. G assumes, of course, that he didn't do it, but it

9     would certainly be part of the design, and he thought it was

10    done.

11       Grieshaber also says they would have done their wall

12    stability analysis, their seepage analysis, and their global

13    stability analysis assuming the worst case.  And he then goes on

14    to say in the highlighted, "Well, I just -- I assume it was done.

15    I mean, I'm sure it's in the folder because good engineering and

16    sound engineering principles require that you document that kind

17    of analysis, correct."

18       Mr. G continues on slide ten.  "Would you have to evaluate

19    the potential negative impact of the pile removal on the

20    floodwall before letting WGI go forward with that pile removal?"

21       Answer, "Yes."

22       "And your first expectation is that not only would they have

23    done it, but there would be some documentation of that

24    evaluation?"

25       "Right."

 1      By the way, the regulations are clear, you don't just think

 2  about something, you don't worry about something, you document

 3  what you were thinking about and what your analysis was.  So to

 4  say Mr. Guillory was thinking about things doesn't cut the muster

 5  under the regulations.  So there will be documentation.

 6      And then Mr. G says, "And the fellow to look to is

 7  Mr. Guillory.  If he's the guy, that would be my understanding of

 8  the way construction division would work.  They tell somebody in

 9  engineering to undertake that evaluation."

10      Slide 11 is basically of the same import.  "We'd expect to

11  see documentation of the seepage, et cetera, analysis, global

12  stability, and temporary restraining structure."

13      "Yes."

14      THE COURT:  Now, when you say a seepage analysis, that's

15  upon the creation of the excavation?

16      MR. O'DONNELL:  Twofold.  You have to think about, okay,

17  I'm going to be digging this hole, I found this sewer lift, the

18  wedding cake, whatever those things were.

19      By the way, the borrow pit was very shallow, not 10 feet, so

20  that's probably why it might not have been a cause; we don't know

21  if it was, but that would explain that question you raised,

22  whereas we're dealing with down to 30 feet --

23      THE COURT:  Right.

24      MR. O'DONNELL:  -- in the other two sites.

25      I think you have to do two things.  You have to say, okay,

1  we're digging this hole, and what is going to happen when we put

2  soil back in and we compact it, and are we doing the right thing

3  here.

4      Because the whole ground is porous, and they are taking out

5  all these objects which filled up space, and they have got to put

6  something back in and they have to compact it.  So they have to

7  do an analysis of how that might impact when they're only 70,

8  80 feet away from the floodwall; the existing floodwall, not some

9  future floodwall, Your Honor.

10      Slide 12 is to the same effect:  "Our process and procedures

11  say you have to do such an analysis."

12      "Yes."

13      Okay.  So that's the background.  The 30(b)(6) witness,

14  Mr. Grieshaber says, you've got to do this.  Let's find out what

15  he was talking about.  And we'll to go the first regulation.  No

16  dispute that this regulation was in effect.

17      I'm going to kind of cut through this and get to the chase,

18  as they say.  I'll go through, but there clearly are sections of

19  this regulation that apply to work that was done between 2000,

20  2001.  They were still doing work, you know, up until the time of

21  Katrina.

22          THE COURT:  Right.

23          MR. O'DONNELL:  There had not been completion or, as

24  you'll see in a moment, the term "closeout" yet.

25          THE COURT:  Is this the DDR issue?

1          MR. O'DONNELL:  Partly the DDR issue, but that's a red

2    herring if you want to say that's the only issue because there's

3    engineering considerations and other things that have to be done.

4    But, ultimately, you've got to come up with a document, which, by

5    the way, evolve.  It will be amended with modifications to the

6    project.

7          So if you dig a hole here, and all of a sudden you find,

8    let's say, a nuclear submarine, not a nuclear bomb, wow, that's a

9    lot more space that's going to have to be filled up than we had

10   imagined originally back in 1999 and 1997.  And you'll see the

11   regulations require that you do a new engineering consideration

12   and review for continuity of the project.

13         And what is the ultimate thing we're looking at?  Safety.

14   It's a factor of safety.  These are not idle requirements.  For

15   better or worse, and they do good work and they've done some

16   shoddy work, as we've seen, the Army Corps of Engineers are the

17   experts.

18         These regulations are the codification of decades, centuries

19   of practice, and these are mandatory, as you'll see in a moment.

20   They are not something you can sort of consider.  The words

21   shall, must, and mandatory have a plain English meaning, even

22   with engineers.  It means you've got to do them.  I think we've

23   got the history and the English majors here, but I can read -- I

24   can read the words, and they are mandatory.

25         Mr. Smith, in his brief and his oral argument, never really

1  touches on that issue, whether they're mandatory or not.  If

2  they're mandatory, *Bercovitz* says the employee has no discretion.

3  He has no room for choice.  He can't say, well, I thought about

4  it, I'm not going to document it but I thought about it, and I

5  decided I don't need to do a safety analysis of what the

6  implications are of these holes we're digging here and here.

7       Let's go to Slide 14.  Their own witnesses say mandatory,

8  not discretionary.  The 30(b)(6), Mr. Grieshaber, says that

9  that's a definition, mandatory policy requirements for management

10 of engineering functions.  No question that the EBIA project was

11 an engineering function.  These regulations are specific as to

12 what they are applied to.

13      Let's go to Slide 16.  ER's, engineering regulations, and

14 EM's, engineering manuals, contain mandatory requirements for

15 engineering procedures and design standards as discussed in

16 paragraph 19.

17      Let's to go 19.  And what does 19 say?  They are mandatory

18 requirements.

19      Okay.  Slide 18, we start with the DDR.  You have to do a

20 DDR for all engineering design products.  I guess EBIA is an

21 engineering product, Your Honor.  It's a project.  And they did

22 not have an updated relevant DDR for the work that we're

23 challenging here.  They will not present one to you.  It was done

24 at an earlier period of time and didn't deal with the issues that

25 we're dealing with here.

1          The EBIA backfilling and excavation required a DDR, but the

2     DDR that they did, as I just said, did not have the mandatory

3     elements, which quintessentially here are --

4              THE COURT:  Is this the '99 DDR that they did?

5              MR. O'DONNELL:  Yes, or any one that they did after

6     that.  I've not found any one -- anything that deals with the

7     issues that we have here.

8              THE COURT:  Right.

9              MR. O'DONNELL:  Robin's right, paragraph 13 of the

10    regulations deal with feasibility studies; but, from the very

11    beginning, you have to develop geotechnical information.  And if

12    you're going to come close to a flood control structure, that

13    must be done.  But, there is no geotechnical engineering analysis

14    done in the feasibility phase, the construction phase, any phase

15    of this project dealing with the discrete, serious issues that

16    are raised in this case about the holes at the Boland Marine site

17    and the Saucer Marine site.

18         In fact, we don't have to speculate whether flooding is a

19    concern of the Corps.  If you to go the next page, section 13.3

20    on tab 22, you see that they have to study as early as possible

21    induced flooding impacts from the project that they are

22    undertaking.

23         23, Slide 23, these two regulations also require that they

24    take into account probable performance of the plan.  And that

25    means, well, if you do this, what impact is it going to have on

1   the vicinity.

2       13.5.13, Slide 24, requires adequate engineering analysis in

3   the feasibility phase to assess and document the intended project

4   performance.  And, again, that was not done either in '99 or 2001

5   or 2003 or 2005.

6       THE COURT:  Well, I guess, what was the feasibility

7   phase for this specific project?  I know there was a feasibility

8   study done starting in the '60s, but what was the feasibility

9   phase -- and I'm assuming we segment these projects, Mr. Smith

10  may disagree and may say they are all one -- pieces of the same,

11  they are indivisible but separate.  Sounds like the Declaration

12  of Independence.

13      MR. O'DONNELL:  The whole project had one feasibility

14  study, and I believe it was in the '90s.  I don't believe it was

15  later than that.

16      THE COURT:  So the feasibility phase would have been

17  over at the time that remediation work was being done?

18      MR. O'DONNELL:  Well, remediation work was part of the

19  project.  They knew they had to put in a bypass channel.

20      THE COURT:  I guess, is there something that says that

21  if you encounter something along the way that's not contemplated,

22  you've got to do something about it?  Now, I'm being very general

23  here.

24      MR. O'DONNELL:  Yes.  In fact, if we can get the Elmo

25  switched here, a good question, Your Honor.

 1          THE COURT:  You can zoom it.  It will automatically

 2    focus.  Okay.  That's good.

 3          MR. O'DONNELL:  I think I can zoom a little more.

 4       This is in Section 15, which I believe is construction,

 5    Your Honor.  Yes, construction.  And it says, "15.6, Engineering

 6    Support for Claims and Modifications."

 7       So as you go along, if there is modifications to your

 8    original plan, like you find more embedded structures and you

 9    find, you know, the sewerage lift station, whatever, engineering

10    input into this process is essential to ensure continuity of the

11    design process through construction to help improve the viability

12    of future designs, and then there are some cost considerations.

13       So, aside from common sense, they have a regulation that

14    says if there are modifications to the original design plan,

15    you've got to evaluate those.  So I think that that is the answer

16    to your question lies in 15.6, Your Honor.

17       I'm going to skip the rest of the feasibility stuff and go

18    to Slide 28, Your Honor.  Again, we're --

19          THE COURT:  Are we off of Elmo now?

20          MR. O'DONNELL:  I'm sorry, again we're in the regulation

21    of 1150.

22       A very important document in the overall engineering

23    documentation process for a project like this is called

24    engineering considerations and instructions for field personnel.

25    This tells them what you're supposed to do and what you should be

1    careful about.

2        Let's to go the next slide.  Now, we're in the construction

3    phase, okay, Your Honor.  We're not dealing with feasibility.

4    We're not dealing with design.  We're dealing with construction.

5    You've got to complete your DDR's; and, if there is a change in

6    circumstances, you've got to reflect that.

7        And then you have to prepare engineering consideration and

8    instructions to field personnel, which is what I just showed you

9    in the prior regulation.  You also have to do as-built drawings.

10       Now, let's go to Slide 31.  It's clear that in terms of

11   designing the work that they were doing in the EBIA area with the

12   holes and the backfilling, engineering -- engineering, not

13   geochemists, not other personnel -- engineering department must

14   provide input for development of the plan.  And only qualified

15   engineers can perform that function.

16           THE COURT:  There is something in the briefing about

17   certain people not being qualified engineers.

18           MR. O'DONNELL:  We're going to get to that a moment,

19   absolutely, Your Honor.

20           THE COURT:  I need to take a five-minute recess.  I'm

21   sorry, I hope I'm not slowing anybody up.  We're doing all right.

22   Thank you.

23           (WHEREUPON, at this point in the proceedings, a brief

24   recess was taken.)

25           THE DEPUTY CLERK:  Court is in session.  Please be

1    seated.

2          THE COURT:  Yes, sir.

3          MR. O'DONNELL:   Thank you, Your Honor.

4      Now, let's get to the issue that the Court talked to

5    Mr. Smith about, which is the second regulation, I'll call it

6    8157.  It's Engineering Design, Geotechnical Data Quality,

7    Management for Hazardous Waste and Remedial Activities, which I

8    think from the title would suggest to you that it's dead on to

9    our situation, but the question is, is it applicable.

10      The regulation was enacted, I believe, in October 2002,

11   okay, Your Honor.  And the question is -- and EBIA was still

12   ongoing at that time -- would it be applicable.

13      I think from its very statement one, the purpose, that these

14   regulations, responsibilities and requirements obtained from

15   initial investigation through closeout at contaminated sites.

16   Well, we didn't have closeout at all, I don't think even up until

17   the time of Katrina.  The holes were there --

18          THE COURT:  So is it your understanding, and I'm sure

19   Mr. Smith will clear this up, it's your understanding that it's

20   his argument that at the time the project commenced, this ER was

21   not in effect; but, during the project, it came into effect?  Is

22   that your understanding that it came into effect during the

23   project?

24          MR. O'DONNELL:  It did come into effect during the

25   project.  I'm not aware whether there was a predecessor or not.

1    I think this was actually a new regulation for hazardous
2    activities, Your Honor.
3             THE COURT:  So the question is, then, what applicability
4    does it have to the closeout of this site?  In other words --
5             MR. O'DONNELL:  Yes, I do.  I think that you can also
6    say that 8157 particularizes what they are talking about in 1150,
7    too.  In other words, it sheds some light on the kind of analyses
8    that were already required, Your Honor, by 1150.
9        I'm not saying 1150 didn't apply.  I think it fully applies
10   to this situation.  And the Corps witnesses said they had
11   requirements of doing underseepage and stability analyses.
12            THE COURT:  But does it relate to, really, the
13   geotechnical investigation into whether the site has been
14   appropriately remediated rather than whether the site -- in the
15   remediation, whether there was some impairing of a levee that
16   might create underseepage?  So I'm wondering if this is a fit.
17            MR. O'DONNELL:  It may not be a fit, but it makes all
18   the more apparent the fit of 1150, because 1150 talks about
19   geotechnical investigations, induced flood impacts, et cetera.
20   So there is no dispute that 1150 was in existence --
21            THE COURT:  No question.
22            MR. O'DONNELL:  -- and we say governed and was
23   mandatory, and the witnesses said it was mandatory.
24       Now, I'm not just putting in --
25            THE COURT:  Where do you specifically say that 1150 was

1   violated?

2          MR. O'DONNELL:  Well, it was violated in multiple

3   sections that I've just been through.  The DDR was never updated

4   and made relevant to what they were doing in the 2000, that's for

5   sure.

6          THE COURT:  Do you think that you -- you argued about a

7   seepage analysis.  Where is it -- you imply that a seepage

8   analysis should have been done from looking at 1150.  I guess,

9   where do you get that?

10         MR. O'DONNELL:  The witnesses said in the prior slides,

11  we are required to do a seepage analysis and a wall stability and

12  a global stability analysis.  Okay?  We're required to do that.

13  And --

14         THE COURT:  When are you required to do that, though?

15         MR. O'DONNELL:  Certainly before you're finished.

16         THE COURT:  But under what circumstance?  If I'm doing a

17  project in the middle of the desert, what's the -- I assume that

18  it has to be in relation to a floodwall or a levee?

19         MR. O'DONNELL:  Yes.

20         THE COURT:  And when does 1150 say you have to do that

21  in relation to a floodwall?  When you're a hundred feet away,

22  when you're 200 feet away, when you're 30 feet away?  I guess I'm

23  trying to get the context.

24         MR. O'DONNELL:  I don't think the regulation specifies.

25  But if there is a potential for induced flood impact, as I showed

 1    you in one of the regulations, you have to do the analysis; but,

 2    you also have to do hydrologic -- I never get this right,

 3    hydrologic and hydraulic, there's a slight difference between

 4    them.  You must do those two.  You must do structural and you

 5    know must do geotechnical analyses.  That's 13.6.6, slide 27.

 6            THE COURT:  And you must do those if there is a --

 7    what's the trigger for doing those, if you understand my

 8    question?

 9            MR. O'DONNELL:  Oh, I understand your question.

10            THE COURT:  It may be inartfully framed.

11            MR. O'DONNELL:  Apparently, there is testimony in the

12    record.  And I'll submit it to the Court that it's their policy

13    that if you're within 250 feet of the center line of a floodwall,

14    you must do these analyses, including seepage, a wall analysis

15    and global.

16            THE COURT:  That would be interesting testimony for me

17    to see.

18            MR. O'DONNELL:  Okay.  Mr. Bruno, I hope you're right.

19    He took the depositions.  I hope he's right.  We'll supplement

20    it, Your Honor.

21        But, by the way, when I get to engineering requirements,

22    slide 29, slide 29, you have to do the DDR, which would require

23    this analysis, Your Honor, and you have to do engineering

24    considerations and instructions.

25        Well, among those engineering considerations and

1   instructions, they're saying, hey, you're within 75 feet of the
2   eastern perimeter of the IHNC floodwall, you're digging down to
3   30 feet, we only thought about five feet.  Okay, we know there is
4   underseepage potential here.  You've got to do the analysis.  And
5   they never did it, and they said they had to do it.

6        And so I'm pointing you to regulations.  Look, they are
7   mandatory, and they are somewhat broad, okay, I mean, I
8   understand that, but it doesn't mean they are not required.
9   Okay.  Because these are engineers reading engineering
10  regulations, and they know what they have to do.  And they
11  testified, I've showed you, that they had to do it.  I thought we
12  did it.  Oh, by the way, Guillory says we didn't do it.  And that
13  is enough to satisfy 401, Your Honor.

14            THE COURT:  All right.  I understand.

15            MR. O'DONNELL:  On 8157, I'll go through it briefly
16  because I think the key here is going to be whether you decide
17  whether it's applicable to the project at the stage -- at the
18  phase it was at in October of 2002, Your Honor.  If nothing else,
19  I think it puts more meat on the bones of 1150.  Certainly, I
20  would argue that it's good engineering practices.

21       But they had to have a qualified geotechnical engineer,
22  okay, Your Honor, and that was required, by the way, under 1150.
23  1150 required -- slide 31, paragraph 17, slide 310 -- you may
24  recall, Your Honor, required qualified engineers to do the work,
25  so you don't have to go to the later regulation, 8157, to know

1   that you need to have qualified Corps field engineers doing the

2   documentation and review.

3       Your Honor, you have my PowerPoint on the second regulation,

4   but we do know the Corps appointed -- slide 38, the Corps

5   appointed an Alvin Clouatre, okay, on the project.  However, he

6   was not qualified for the position.  And he testified in his

7   deposition, Slide 39, that he was not the guy.  This is not what

8   he focuses on.  He looks at other things, and you need people

9   with geotechnical-type expertise to look at the flood

10  implications of the work that they were doing.

11      Slide 41, the Corps never had a geotechnical engineer

12  perform field oversight, and there was no engineering

13  considerations and instructions developed or provided to

14  Mr. Clouatre.  You remember, 1150 requires engineering

15  considerations and instructions, not just the later regulation,

16  8157.  So they never did that.  They've admitted that, okay.

17      The Corps' own testimony acknowledges that their engineering

18  mandates, both 1150 and 8157, were never performed and were never

19  followed.  And they never evaluated, the Corps never evaluated,

20  nobody in geotechnical engineering division, of which they have

21  one, and a number of people here, never evaluated WGI's plan for

22  removal of the sewer lift station, which was Saucer Marine.

23      And then Slide 44 makes the point that there was never a

24  geotechnical section review of this work.

25      "In fact, it was just your conclusion was you pull the pile,

1   the hole seals up, and everybody is happy, right?"

2       "Correct."

3           THE COURT:  And it's your argument that 1150 requires

4   it?

5           MR. O'DONNELL:  Absolutely.  Because it says,

6   "Engineering considerations and instructions for field personnel

7   must be done by a qualified engineer."  The record is clear that

8   they did not have a qualified engineer.  They admit they didn't

9   have a qualified engineer.

10      And the final fallback as they're leaving this argument, in

11  Slide 45, is what was -- some other dude.  Now, I know there is a

12  back and forth on WGI and Fifth Circuit, and I'm not getting into

13  that situation; but, they said that the WGI was going to perform

14  these engineering services, and, guess what, the Corps' testimony

15  when we go to 46 and now we look at 47, was, "Washington Group

16  was not expected to provide input regarding geotech stability of

17  levees or floodwalls of the east bank?"  Answer, "That is

18  correct."  That's Mr. DiCharry.

19          THE COURT:  Right.  And I started out with that question

20  with Mr. Smith.

21          MR. O'DONNELL:  And the answer from the testimony is,

22  "No, that was not their responsibility."

23      Now, Guillory testified that one George Bacuta -- he was a

24  geochemist, not an engineer.  And there's a big difference

25  between a geochemist and an engineer.  And they said, here, you

1    look at whatever excavation plan we have.  It wasn't much of a

2    plan.

3         And the next slide shows the testimony that says that it was

4    Mr. Bacuta.  But, guess what, he never actually reviewed the

5    plan.  So he wasn't qualified; but, that might be moot since he

6    never reviewed the plan.  And that's what he testifies to in

7    Slide 51.

8         So if he didn't do it, and Guillory didn't do it, and

9    DiCharry didn't do it, and Mr. G didn't do it, who did it?  Where

10   is the phantom evaluation?  We know.  It doesn't exist.

11        The same is true not of Saucer, but also of Boland Marine.

12   The testimony is that, "Did engineering review either the revised

13   final proposal number 113 or the cofferdam installation and

14   concrete foundation removal final work plan?  Did engineering

15   review it?  They have to."

16        "No."

17        "Did anybody in the geotechnical section of the engineering

18   division review either the revised final excavation and disposal

19   of additional surface foundations, ACM, and concrete wastes for

20   the cofferdam installation and concrete foundation removal final

21   work plan?"

22        Answer, says Mr. Guillory, "No."

23         THE COURT:  Mr. O'Donnell, is it your contention that

24   there was never a stability analysis done reference the existing

25   floodwall?

1          MR. O'DONNELL:  Correct, not with regard to these

2    massive excavations which may not have been foreseen back in the

3    late 1990s, but they happened.  They have to be evaluated.  There

4    are modifications.  Engineering considerations and instructions

5    must be done.  A qualified geotechnical engineer must review the

6    plan.  None of that happened.

7          THE COURT:  And, also, in the plates that I've gotten

8    reference the stability line -- and I'm going to give you each a

9    few days to give some submissions, and I'm going to put page

10   limits on it because we've got enough pages -- the plates seem to

11   indicate that the stability line was on the proposed levee rather

12   than the existing levee.  I haven't seen one on the existing

13   levee.

14         MR. O'DONNELL:  No, and that line would change over time

15   depending on the circumstances in situ when you get there.

16      They don't know what they are going to get into.  And it was

17   a much bigger mess -- pardon me, a holier mess than they had

18   originally contemplated, and so they need to modify their

19   analyses and their plans and look at the impact of the new work.

20   Lots of change orders and modifications, you know, look at the

21   impact of the new work on the levee.

22         THE COURT:  Go ahead, sir.

23         MR. O'DONNELL:  The short of it is, both at Saucer

24   Marine and Boland Marine, the areas contiguous to the north and

25   south breaches, there was no geotechnical analysis done of the

1   mandated seepage analysis, wall analysis and of global stability

2   analysis.

3       The consequence is not difficult to fathom.  We believe the

4   evidence will show that there was a direct causal link, a nexus,

5   if you will, between the improper excavations, the backfilling

6   and the failure to do the analyses, which very well, very well

7   could have prevented this catastrophe.  And that the holes became

8   the submarine, if you will, the efficient pathway for the

9   floodwaters in the swollen, engorged IHNC, and the demise of the

10  levees because they went under it and destabilized it.

11      As a consequence of this, while I think the regulations are

12  clear, I think they clearly apply here, and I think the Corps'

13  testimony is devastating, I think you could grant us summary

14  judgment.  I decided not to burden you with that and more paper.

15  But, certainly, you must deny summary judgment for the

16  government.

17      And, secondly, if there is any question in your mind about

18  what a DDR is and this and that and what might be applicable,

19  then there is a disputed issue of fact on prong one, and that

20  would also warrant the denial of summary judgment.

21          THE COURT:  Thank you, sir.

22          MR. O'DONNELL:  Thank you very much, Your Honor.

23          MS. GILBERT:  Your Honor, my name is Elisa Gilbert.  I

24  am here on behalf of one of the Entergy plaintiffs, and we adopt

25  the plaintiffs' arguments on behalf of Armstrong, as well.

 1          In addition, and our argument dovetails with the arguments

 2     that were presented by Mr. O'Donnell for the Armstrong

 3     plaintiffs, but, in essence, we take their -- the argument that

 4     it's a prong one violation of the DFE, and extend that also to a

 5     prong two violation because the discretionary function exception

 6     on prong two only prevents the government from -- or protects the

 7     government from liability for its torts where it's acting as a

 8     normal private contractor would act if there's a policy basis for

 9     their failure to adhere to general engineering standards.

10          And in this instance, there has been no representation, no

11     suggestion or otherwise, that any of the engineering failures

12     that underlay the tort of the failure here with the IHNC levees

13     had any policy basis supporting it.

14          In fact, the challenged conduct that we actually present is

15     the ill-conceived plan by the Corps that, either intentionally or

16     unintentionally, but certainly without any social policy analysis

17     or rational, neglected the basic engineering in its excavations,

18     and should defeat their claim for discretionary function immunity

19     under prong two.

20          We also argue that the Corps was aware of the significance

21     of the conduct that it was engaging in prior to the time that it

22     filed its 1997 environmental impact statement.  And within the

23     1997 environmental impact statement, it included no evaluation or

24     analysis of the impact that its work would have or potentially

25     would have on the adjacent IHNC levees.

 1      Now, it's the government's burden to demonstrate that it

 2 evaluated all of the necessary impacts, the significant impact of

 3 its work, and presented it in an environmental impact statement,

 4 and the government hasn't even suggested that it has in the

 5 instance.

 6      The negligence that the plaintiffs contend the Corps is

 7 responsible for under the Federal Tort Claims Acts is a failure

 8 to analyze the engineering impact of the alteration of the

 9 foundations of the soil surrounding the levee and the floodwall

10 by the removal and replacement of those foundations, specifically

11 the failure to employ basic engineering standards to preserve the

12 integrity of the levees and adequately present hydraulic

13 conductivity through the foundations of the IHNC levees by

14 improperly backfilling its excavations upon removal of the

15 cofferdams that were used to preserve the structural stability of

16 the levees.

17      Mr. Guillory has testified --

18      Prong two, as I noted, does not shield the Corps from its

19 own engineering negligence and failure -- prong two of the DFE

20 does not shield the Corps from its engineering negligence for

21 failure to adhere to safety in engineering standards.

22      Failing to properly analyze the underseepage properties of

23 the backfilled material used after the removal of the cofferdams

24 in the vicinity of the levee is not protected conduct where it's

25 admitted basic engineering requirement.

1    Mr. Guillory testified that -- I mean, Mr. Grieshaber

2    testified that -- in his 30(b)(6) deposition at page 47, lines

3    two through ten, that the Corps -- that Guillory had the

4    responsibility to make judgments based on engineering

5    considerations as to whether the work they were overseeing would

6    jeopardize the integrity of the adjacent flood control

7    structures.

8        So not a policy decision.  He had the engineering

9    requirements to make that judgment.

10           THE COURT:  I don't recall what -- do you recall what

11   Mr. Guillory's expertise was in?

12           MS. GILBERT:  Mr. Guillory was the team leader for task

13   order 26.  He was responsible for all of the excavations that

14   were done.

15           THE COURT:  Do you recall what type of engineer he was?

16           MS. GILBERT:  He was a civil engineer --

17           THE COURT:  Just a civil engineer?

18           MS. GILBERT:  -- but he was the Corps' designated team

19   leader for the excavations under task order 26 of the TERC.

20       The government concedes in response to the plaintiffs'

21   statement of undisputed facts that basic engineering judgments

22   and not policy were employed in evaluation of whether the work

23   conducted with regard to task order 26 at the EBIA would

24   jeopardize the IHNC floodwalls.

25       The Corps engineering manual detailed their engineering duty

1    to evaluate the working of the levees.  The government concedes

2    that their engineering manual, and I'm going to abbreviate it

3    also, as -- well, 1110-2-1913, which is the design and

4    construction of levees, sets out the basic principles of design

5    and construction of levees.  Those principles include the

6    responsibility to perform specific evaluations of the mechanisms

7    of levee failure and the effects of construction in the vicinity

8    of levees on the factor of safety of the flood control

9    structures.

10        As noted by Mr. O'Donnell, these include an analysis of

11   underseepage propensity and for the properties of backfill

12   material to be used in excavations in the vicinity of levees.

13   Where the basic engineering and safety are the only guidance that

14   the Corps relies upon, the DFE cannot shield the Corps from

15   failing to or improperly performing these engineering

16   evaluations.

17        The Corps' engineering manual 1110-2-5027 sets out that

18   greater engineering evaluations of the mechanisms of failure must

19   be employed where the proposed work in the vicinity of -- where

20   work is proposed in the vicinity of dikes and levees.

21            THE COURT:  Is vicinity defined anywhere?  Do you know

22   what vicinity means?

23            MS. GILBERT:  Well, there is several places where the

24   definition of what kind of work can be done in -- construction

25   work can be done in the testimony within the vicinity of levees.

1    In some instances, it's not digging more than 12 feet within

2    150 feet of a levee.  In other instances, it's as Mr. Bruno

3    suggested, that any excavations within 250 feet of the center

4    line of the levee are the vicinity of the levee.

5         Clearly, within the channel of the IHNC levee digging, and

6    we'll get into this a little bit more, where the Corps was aware

7    that the actual understructure, the foundation of these levees,

8    is fragile because of the work that was done when they were

9    originally constructing the levees, they are on a heightened

10   duty.  And their own manual suggests that, as engineering, basic

11   engineering principles suggest, that you have to undergo much

12   greater evaluations of the mechanisms of failure.

13        And these manuals outline what you have to do, what you can

14   do, and what the Corps has at its disposal.  And it's made very

15   easy for their own engineers as tried and true mechanisms for

16   developing these calculations in order to do work within the

17   vicinity of levees.

18        In fact, this particular engineering manual expressly warns

19   that nearby excavations in the vicinity of levees poses the

20   potential for dike instability failure caused by uplift pressure,

21   which is exactly what was experienced in the IHNC levees.

22        Here, the Corps has specific knowledge of the unique

23   characteristics of the geography of the foundation of the IHNC

24   levees.  The Corps had the geotechnical analysis done at the time

25   of the LPV levees for the IHNC, that the soils -- that the IHNC

1   had soil stability problems.  And when it was doing the LPV

2   levees, it mandated that the soils for fill material for the

3   levees be stiff Pleistocene clays obtained from a borrow area at

4   the bottom of Lake Pontchartrain along the north shore.

5       Nonetheless, the Corps neglected to incorporate the

6   appreciation of the fragile geotechnical structure of these

7   levees in any of the excavation work done in the vicinity of the

8   these levees.

9       The Corps' engineering investigations for this site for this

10  project note that stability and settlement were major concerns

11  presented by the foundational soils in the vicinity of the IHNC

12  floodwalls because of the low shear strength and compressibility

13  of the sediment.  The Corps was also aware that there were large

14  sand deposits in the subsurface of the IHNC levees that rendered

15  the levees conducive to seepage and uplift.  These were in their

16  own analyses of this particular -- of the EBIA lock replacement

17  project, and they still did not do the underseepage analysis

18  necessary to determine what materials should be used in the

19  backfill of the excavations at the levee.

20      The Corps knew, also, that the hydrology and groundwater

21  flow at the foundation of the EBIA adjacent to the IHNC

22  floodwalls was influenced by the surrounding physical conditions

23  of those floodwalls and defined what those physical conditions

24  that influenced the groundwater movement were as the topography

25  of the ground surface, the nature of the contact between the fine

1  grain clays and silts within the fill material and the floodwalls

2  and varied building foundations within the vicinity of the EBIA.

3  Even with this knowledge, the Corps neglected to analyze the

4  material that it intended to use for fill upon disturbing these

5  physical conditions.

6       Applying the Corps' basic engineering guidelines documented

7  in their own engineering manuals to the unique conditions known

8  to exist at the EBIA in performing work at the EBIA, the Corps

9  was to undergo analysis of the foundation stability of levees

10  using known and tried analytical methods and calculations set

11  forth in engineering manual 1110-2-1902, their own manual for

12  analyzing the slope stability of levees, which was made available

13  to them and highlighted in this manual that there are technical

14  reports and computer programs on the mainframe at the Corps that

15  will assist any engineers for the Corps in doing that work.

16  These were not employed.

17       The Corps' witnesses, Grieshaber, testified that the Corps

18  understood that the only way that this project could endanger the

19  floodwalls was through inappropriate excavation or inappropriate

20  backfill.  The Corps' testimony illustrates that it didn't

21  delegate its responsibility to conduct the geotechnical

22  evaluations of the excavations and backfill; rather, Grieshaber

23  testified that it was the Corps' duty alone to make sure that the

24  fill was appropriate and its conditions were appropriate.

25       Consistently, testimony, as we've heard from DiCharry,

1  demonstrated that the Corps didn't expect its contractor, WGI, to

2  provide input regarding geotechnical stability of the levees or

3  the floodwalls at the east bank.  It assumed that responsibility

4  on its own.

5       Rather, the government concedes in its opposition to our

6  brief and the Corps' witnesses, Lee Guillory, testifies that it

7  engaged in no geotechnical engineering analysis of the project's

8  excavation and backfill.

9       Indeed, after a review of the same evidence, the

10  Fifth Circuit has recently ruled that there was no indication

11  that the Corps applied any testing process to evaluate the

12  backfill material before approving its use.  The Fifth Circuit

13  also concluded that the Corps provided imprecise and, at times,

14  nonexistent specifications regarding the composition of the

15  backfill material, and noted that the evidence in the record

16  before it showed that the sole consideration for the Corps in

17  evaluating backfill was the cost of the material.

18       THE COURT:  Well, wouldn't that be a policy argument?

19       MS. GILBERT:  No.  As a matter of fact, that's

20  specifically not a policy basis for deviating from safety and

21  engineering pursuant to -- this Court has noted that failing to

22  properly exercise engineering judgment or adhere to professional

23  standards does not constitute a matter of policy in an exercise

24  of policy judgment.  Decisions involving the application of

25  objective scientific standards are not insulated by the DFE

1   because they don't involve the weighing of economic, political

2   and social policy.

3       Budgetary constraints -- this Court has also followed the

4   long tradition of rejecting the government's invocation of

5   general economic considerations, reasoning that budgetary

6   considerations underlie virtually all government activities.  And

7   that's citing to *Cope v. Scott*, 45 F.3d 445; it's at *Kennewick*

8   *Irrigation v. United States*, 880 F.2nd 1018; *Whisnant*, 400 F.3d

9   1177 --

10          THE COURT:  We've seen those and cited them.

11          MS. GILBERT:  Ad nauseam.  And *ARA Leisure*.

12          THE COURT:  I understand.

13          MS. GILBERT:  In conclusion, clearly the Corps neglected

14   basic engineering principles in its excavation without invoking

15   any policy basis for its negligence.  Where there is no policy

16   basis for avoiding basic engineering and safety, the DFE, under

17   prong two, can't shield what a normal private engineer would not

18   be protected from doing.

19       Having noted the obvious significance of excavations and the

20   harm that can come as a result of potentially damaging levees

21   which are designed for the health and safety of the human

22   environment, the failure to include any analysis of excavation

23   work in the vicinity of the levees in the 1997 environmental

24   impact statement, even if that was for the bypass channel, if the

25   bypass channel was part of the original plan and those

1    excavations might have been within the vicinity of the levees,

2    they should have been included in the Corps' 1997 EIS.  An

3    analysis of that potential harm was never included.

4        In fact, according to the Eastern District's analysis of the

5    entire administrative record in *Holy Cross*, no discussion of --

6    of the thousands of pages in the administrative record, only a

7    few paragraphs mention hurricane protection or flood control, and

8    neither of the paragraphs that are mentioned deal at all with the

9    potential that excavations associated with this project might

10   jeopardize the structural integrity of those levees.

11       Now, the 1997 EIS and the documentation associated with the

12   design of the actual lock expansion project does mention the need

13   to do remedial -- hazardous waste remediation.  And it never

14   mentions in there -- in that analysis the impact of the potential

15   three-to-five-foot light skimming of the soils at the IHNC and

16   their potential to actually impact the levees.

17       Then, without any kind of additional analysis, the Corps

18   expanded that project from a light skimming of three to five feet

19   to random excavations of up to 25 and 30 feet.

20            THE COURT:  Where does the light skimming of three to

21   five feet come from?

22            MS. GILBERT:  That was originally based on the boring

23   samples that were done when they first determined that there was

24   hazardous waste at the base --

25            THE COURT:  And I don't recall, is that in the EIS, the

1    three to five feet?

2          MS. GILBERT:  There were bore samples that were included

3    in the actual design documentation, and -- the three to five

4    feet, I don't know if it actually said that, three to five feet,

5    but the initial plans to do the work after 1997 and 1999 were

6    three feet.

7          Now, the EIS was drafted in 1997.  The Corps developed its

8    plan to excavate or remediate under task order 26 for three feet,

9    and then it decided to change the scope of that project from a

10   three-foot skimming in the vicinity of potential hazardous wastes

11   to what became the massive excavations of the structures at

12   Boland and Saucer Marine.

13         And in the process of doing that, the Corps changed the

14   scope of even that light skimming to the construction of new work

15   orders that had to be done, scopes of work that had to be

16   designed, cofferdams that had to be designed.  None of this was

17   included in the original environmental impact statement.

18         Now, among the concerns that this raises is that given that

19   the Corps understood the geotechnical -- the foundational

20   structure of the fragility of the IHNC, and the fact that they

21   were now expanding the project to these enormous excavations that

22   required stability, they knew that these projects required

23   stability and cofferdam bracing because they were so deep.  Why

24   did they need them, because the soils were so weak.

25         Now, you're removing those cofferdams, and they are doing

1   nothing to evaluate what the change from a solid structure will

2   have to sand and loose silt, or whatever material they happen to

3   use, none of which they analyzed and none which of is documented.

4        And at this point, they realized, through all of the

5   engineering manuals that they have that highlight this danger

6   that this work can do, that they're having -- the work they are

7   doing poses a significant impact on -- may pose, doesn't

8   necessarily have to have a negative impact if they address it

9   properly and they remedy it by using the proper backfill or

10   bracing the work that they are doing or creating some kind of

11   obstacle to the hydraulic conductivity that's going to now be

12   introduced to these levees and floodwalls.

13        All of this, though, is very significant to the health and

14   safety of the human environment in the vicinity of those levees.

15   The Corps cannot believe and cannot say that this was not

16   relevant or significant to mention in its analysis of the

17   environmental impact of the project.  And yet, it's nowhere in

18   the 1997 EIS and the expansion of this project in 1999, and again

19   when the excavations were proposed in 2001, in an EA, an EIS, a

20   supplemental EIS.

21        And if, ultimately, the Corps had done the analysis that

22   Guillory says -- that counsel says that concluded that these

23   changes from three to five feet to 25 feet were insignificant,

24   NEPA provides a mechanism for analyzing what you determine to be

25   significant.  It's an EA, and a FONSI.  And you can't come back

 1   later and say, I did neither because I concluded that it would be

 2   insignificant.  The regulations outline how you can document that

 3   you've evaluated a significant impact and concluded that it was

 4   insignificant, and none of that was done with regard to this

 5   project.

 6              THE COURT:  I've got your argument there.  Anything

 7   else?

 8              MS. GILBERT:  In short, Your Honor, the Corps was

 9   obligated to take a hard look at what it was doing, and it failed

10   to do it.  So, for both reasons, and the reasons mentioned by

11   counsel, the Entergy plaintiffs believe that the Corps should be

12   denied immunity under the discretionary function exemption.

13              THE COURT:  Thank you.

14              MS. GILBERT:  And we know that the Court has not heard

15   argument on the administrative challenge to the 495.

16              THE COURT:  I'm not going to hear it.

17              MR. EGAN:  Your Honor, I'm Tim Egan from Entergy.  And I

18   hear you talking.  I remember in *I Love Lucy*, when Lucy was

19   blabbering on, Desi would scream at her, enough is too much.  And

20   I think I've just heard the Desi principle spoken from the bench.

21       I do have one comment to make, and it goes back to the

22   702(c) thing ably described by Mr. O'Donnell.  And it is this:

23   If you look at the 1997 evaluation report on this project, and

24   you look for mention of the flood control components, and you

25   look -- you look in the statutory ancestry, the statement of

 1   purpose and scope, the abstract, the planning objectives, the

 2   cost benefit analysis, not mentioned.  You would think they would

 3   put in it the cost benefit analysis and say, by the way, we're

 4   going to get some better flood protection.

 5       The government dismisses this as, you know, this is a

 6   formalistic argument.  Maybe it is, but I think it's of interest,

 7   and I wanted to stress that to the Court.  Thank you, sir.

 8            THE COURT:  Duly noted.  Thank you, sir.

 9       Mr. Smith.

10            MR. SMITH:  I don't want to test the Court's patience

11   either, but Mr. O'Donnell used the Elmo to put section 15.6 on

12   the screen for Your Honor, and he read from the last part of that

13   paragraph.

14       The first part of the paragraph says engineering review is

15   optional, and he didn't read that part.  It says, "Engineering

16   shall provide," and they emphasize, oh, these are mandatory

17   regulations, therefore discretionary function doesn't apply.

18   Well, just because the word "shall" appears doesn't mean that

19   there is not discretion.  It means that the regulations are

20   mandatory, but it doesn't mean that the actors had no discretion.

21       And here is the perfect example.  "Engineering shall provide

22   design assistance for claims and modifications when requested."

23   And Mr. O'Donnell said, oh, Your Honor, it wasn't enough for them

24   to just think about these things.  They had to write these things

25   down.  If they didn't write it down, they violated the

1  regulation.  But the regulation says, to the contrary,

2  engineering is only required to, quote, be knowledgeable about

3  contract modifications arising on a project as they relate to the

4  designs produced in the plans and specifications.

5      The part he quoted follows, "Engineering input into the

6  process is essential to ensure continuity of the design process

7  through construction."  Why?  Because they are concerned about

8  improving the viability of future designs and providing feedback

9  and advice to the cost engineer and project manager.

10      The plaintiffs' arguments depend upon taking general

11  provisions and then saying, oh, this general provision required

12  specific things that didn't happen here, Your Honor.  They filed

13  it as a regulation.

14      And a perfect example, the perfect example is in their

15  slides, where on Slide 19 they say, oh, the DDR, it had to

16  contain these mandatory elements.  Well, Your Honor says, well,

17  when did they have to do a DDR?  I mean, the one they did in '99,

18  was that good enough?  Mr. O'Donnell, can you show me in here

19  where it says they had to do another one for the EBI?  No, he

20  couldn't find it.

21      Then he says, there's these mandatory -- you said, well,

22  where is that?  Well, Your Honor, it's in paragraph 13.  Well, I

23  believe paragraph 13 doesn't have anything to do with the DDR.

24  Paragraph 13 has to do with the feasibility phase, and a DDR

25  doesn't even begin until feasibility is over.

1        So basically, Your Honor, I think when the regulation is
2   read as a whole without pulling things out, when it's viewed from
3   beginning to end, what we see is that this prescribes a process.
4   It's a process, it's a general process that all projects go
5   through.  And engineering is going to be involved in this project
6   from the beginning till the end, but the specific failings that
7   they say occurred in this case are things which they wish had
8   occurred.  They argue that if they hadn't occurred, the parade of
9   horribles that, in fact, occurred wouldn't have happened; and,
10  therefore, it was a violation, and the discretionary function
11  exception can't apply.

12        But, Your Honor, the test is what does the regulation itself
13  say.  And if the regulation itself doesn't say they had to do
14  that, if it doesn't say -- Mr. O'Donnell said paragraph 15 says
15  geotechnical engineers have to be involved; but, if you read it,
16  geotechnical doesn't appear.  That word just plainly doesn't
17  appear.

18        And they've tried to manufacture a case out of various
19  players who were involved saying, oh, I think so and so reviewed
20  this, but he didn't review it.  And they say, oh, well, these are
21  material facts, Your Honor, they are not in dispute.  He said,
22  oh, 55 of these things were disputed by us, 55 of the
23  government's facts.  When you read their response, disputed to
24  the extent that this implies so and so.  They don't say the
25  statement of fact is disputed.  They say, Judge, look, okay,

 1   maybe the statement of fact is true, but don't draw all these

 2   inferences from the statement.

 3       If Your Honor goes through the statement of facts, I think

 4   you can see that the facts that are material here, they are not

 5   in dispute.  This is not a case that needs further development.

 6   We have the facts in front of us.  We have the law in front of

 7   us.  When the facts and the law are applied, dismissal is

 8   appropriate here.  And I would urge Your Honor to grant the

 9   government's motion.  Thank you.

10           THE COURT:  Thank you, sir.

11       What I would like is a submission from each of you

12   simultaneously, not more than 20 pages.  And if you have an

13   exhibit you want to submit, a couple of exhibits that we haven't

14   talked about, you can do that as well.  Be sure the other side

15   knows about it.

16       And I'm really interested in the focus being on why these

17   regulations are mandatory in this instance and why -- anything

18   else you want to do in 20 pages, double spaced I might add,

19   because I've gotten a lot of -- you know, I know this thing

20   pretty well.  Don't forget, I just had a long trial on this --

21   not on this issue, but on the IHNC, which, by the way -- we'll

22   talk about that after I get off, after I finish this.

23       So I'm interested in the *Bercovitz* aspects of this.  And

24   I've got the policy down.  You know, I know the argument that

25   engineering failures may or may not be policy.  The plaintiff

1   said it's not.  But I'm interested in the -- why these

2   regulations, particularly the one that's extant, the one that we

3   relied on --

4            MR. O'DONNELL:  1150.

5            THE COURT:  -- I think 1150, why it mandates certain

6   conduct here with a little more precision.  In other words, where

7   Mr. Smith said they are general, and where is the mandate.  I

8   just need a little more meat there to the extent you want to give

9   it to me.

10       You don't have -- you can make it five pages and say, Judge,

11  we said all we're going to say.  If you don't get it now, you'll

12  never -- whatever you want to do.  But 20 pages limit,

13  simultaneous, two weeks from -- I'll tell you what, from Friday.

14  What day is that?  The 29th.

15       We're going to be busy because we have to -- we have heard

16  and I have done a lot of work on the *Barge* case, so we're going

17  to probably write that case before we get to this.  I want it

18  done.  So we've gone over everything, and I'm molding a decision.

19       And you understand in that case we may have to discuss this

20  issue because it is -- when I say "this issue," the issue of

21  permeability and -- so I'm sorry none of you got to participate

22  in that, you know, but there it is.

23            MR. O'DONNELL:  That's not to say we haven't read the

24  transcript.

25            THE COURT:  I'm sure you have.

 1         MR. O'DONNELL:  Your Honor, could I suggest that the

 2    limit be ten pages?  We filed the shortest brief in the five

 3    years of this case in opposition.  It was only 16 pages.  I hope

 4    the Court appreciated that.  Can't we do this in ten pages?

 5         MR. SMITH:  Your Honor, they filed theirs in 12 point

 6    type.  We filed ours in 14 point type.  Page limits in the 21st

 7    Century are -- you know.  I mean, 20 pages.  I mean, we won't tax

 8    Your Honor.

 9         THE COURT:  I said 20, so if you want to make it ten,

10    you can, and they make it 20, they can.

11         MR. O'DONNELL:  Maybe I'll use 16 point type.

12         THE COURT:  The larger the better.  The Fifth Circuit

13    has much more meticulous rules than we do about this kind of

14    thing.

15      So I'm going to let you do that.

16      Now, you know, we're off the record here and just discussing

17    other issues.

18         (WHEREUPON, at this point in the proceedings, there was

19    an off-the-record discussion.)

20         THE COURT:  With that, we wish you adieu, and have a

21    safe trip wherever you're going.

22         VOICES:  Thank you, Your Honor.

23         (WHEREUPON, at 4:08 p.m., the proceedings were

24    concluded.)

25                         *    *    *

1                        REPORTER'S CERTIFICATE

2

3        I, Cathy Pepper, Certified Realtime Reporter, Registered

4   Merit Reporter, Registered Professional Reporter, Certified Court

5   Reporter of the State of Louisiana, Official Court Reporter for

6   the United States District Court, Eastern District of Louisiana,

7   do hereby certify that the foregoing is a true and correct

8   transcript, to the best of my ability and understanding, from the

9   record of the proceedings in the above-entitled and numbered

10  matter.

11

12

13                              *s/Cathy Pepper*_____

14                              Cathy Pepper, CRR, RMR, CCR

15                              Official Court Reporter

16                              United States District Court

17

18

19

20

21

22

23

24

25

## #

**#05-4182** [1] - 4:10
**#10-77** [1] - 4:11
**#10-866** [1] - 4:11

## '

**'60s** [3] - 29:18, 31:1, 61:8
**'70** [1] - 7:2
**'70s** [1] - 31:1
**'90s** [1] - 61:14
**'99** [7] - 41:21, 41:22, 49:2, 60:4, 61:4, 88:17

## 0

**05-4182** [1] - 1:6

## 1

**1** [1] - 23:23
**1.3** [1] - 23:23
**10** [5] - 38:10, 43:3, 43:4, 44:4, 56:19
**10-088** [1] - 1:9
**10-77** [1] - 1:9
**1000** [1] - 1:18
**10022** [1] - 2:10
**1018** [1] - 82:8
**11** [1] - 56:10
**1110-1-8157** [1] - 27:25
**1110-2-1150** [1] - 28:10
**1110-2-1902** [1] - 80:11
**1110-2-1913** [1] - 77:3
**1110-2-5027** [1] - 77:17
**113** [1] - 71:13
**1150** [19] - 55:3, 62:21, 65:6, 65:8, 65:9, 65:18, 65:20, 65:25, 66:8, 66:20, 68:19, 68:22, 68:23, 69:14, 69:18, 70:3, 91:4, 91:5
**1177** [1] - 82:9
**12** [4] - 29:12, 57:10, 78:1, 92:5
**1292(b** [1] - 47:4
**13** [10] - 1:7, 4:2, 29:23, 29:25, 30:6, 32:5, 60:9, 88:22,

88:23, 88:24
**13.3** [1] - 60:19
**13.5.13** [1] - 61:2
**13.6.6** [1] - 67:5
**14** [4] - 30:7, 34:17, 59:7, 92:6
**14.3** [1] - 34:21
**15** [8] - 30:13, 34:10, 35:24, 36:13, 37:5, 39:8, 62:4, 89:14
**15.4** [1] - 37:5
**15.6** [3] - 62:5, 62:16, 87:11
**150** [1] - 78:2
**16** [3] - 59:13, 92:3, 92:11
**17** [2] - 46:21, 68:23
**17th** [4] - 14:17, 14:24, 14:25, 48:10
**18** [1] - 59:19
**19** [4] - 59:16, 59:17, 88:15
**1955** [1] - 13:2
**1956** [1] - 50:25
**1969** [1] - 7:2
**1980** [2] - 7:3, 43:22
**1990s** [1] - 72:3
**1993** [1] - 4:12
**1997** [14] - 31:6, 31:12, 32:18, 39:10, 58:10, 74:22, 74:23, 82:23, 83:2, 83:11, 84:5, 84:7, 85:18, 86:23
**1999** [8] - 28:11, 35:21, 35:23, 39:11, 39:12, 58:10, 84:5, 85:18
**1:30** [1] - 1:7

## 2

**2** [3] - 31:8, 48:11, 49:22
**20** [6] - 90:12, 90:18, 91:12, 92:7, 92:9, 92:10
**200** [1] - 66:22
**2000** [2] - 57:19, 66:4
**2001** [3] - 57:20, 61:4, 85:19
**2002** [3] - 28:1, 64:10, 68:18
**2003** [1] - 61:5
**20033** [1] - 4:12
**20035** [1] - 4:12
**20044** [1] - 2:18
**2005** [1] - 61:5
**201** [1] - 2:6
**2010** [2] - 1:7, 4:2

**2100** [1] - 44:25
**21st** [1] - 92:6
**22** [2] - 39:20, 60:20
**23** [2] - 60:23
**24** [1] - 61:2
**25** [8] - 38:7, 38:25, 39:19, 43:3, 43:11, 43:21, 83:19, 85:23
**25-by-3-foot** [1] - 24:3
**250** [2] - 53:9, 67:13, 78:3
**26** [4] - 76:13, 76:19, 76:23, 84:8
**27** [1] - 67:5
**28** [1] - 62:18
**29** [1] - 67:22
**29th** [1] - 91:14

## 3

**3** [1] - 44:9
**30** [11] - 38:19, 38:20, 39:18, 39:21, 45:19, 49:23, 52:17, 56:22, 66:22, 68:3, 83:19
**30(b)(6** [5] - 54:11, 54:17, 57:13, 59:8, 76:2
**31** [2] - 63:10, 68:23
**310** [1] - 68:23
**325** [1] - 2:9
**33** [1] - 28:11
**38** [1] - 69:4
**39** [1] - 69:7

## 4

**4** [1] - 3:5
**400** [1] - 82:8
**4000** [1] - 2:6
**401** [1] - 68:13
**41** [1] - 69:11
**4288** [1] - 37:9
**44** [1] - 69:23
**445** [1] - 82:7
**45** [2] - 70:11, 82:7
**46** [2] - 3:6, 70:15
**47** [2] - 70:15, 76:2
**495** [1] - 86:15
**4:08** [1] - 92:23

## 5

**5** [5] - 33:19, 39:5, 39:14, 40:8, 50:8
**500** [1] - 2:22
**504** [1] - 2:23
**51** [1] - 71:7

**5221** [1] - 2:12
**533** [1] - 14:16
**55** [3] - 48:4, 89:22
**550** [1] - 1:17
**556** [1] - 1:24
**56** [1] - 47:23
**57TH** [1] - 2:9
**589-7779** [1] - 2:23

## 6

**6** [1] - 54:9
**6.1** [1] - 28:21
**638** [1] - 14:16

## 7

**70** [1] - 57:7
**70113** [1] - 1:22
**70115** [1] - 2:13
**70130** [1] - 2:22
**70170** [1] - 2:6
**702(c** [9] - 5:6, 5:17, 5:20, 14:22, 15:22, 17:8, 47:8, 49:13, 86:22
**702(c)** [2] - 48:16, 51:9
**70502** [1] - 1:25
**72** [1] - 42:3
**725** [1] - 45:23
**73** [1] - 3:7
**75** [2] - 52:16, 68:1

## 8

**8** [1] - 32:14
**8.2** [3] - 32:13, 32:15, 33:9
**80** [1] - 57:8
**8157** [7] - 55:6, 64:6, 65:6, 68:15, 68:25, 69:16, 69:18
**855** [1] - 1:21
**86** [1] - 3:8
**87** [2] - 3:9, 55:5
**880** [1] - 82:8
**888** [1] - 2:18

## 9

**9** [1] - 31:8
**90** [1] - 3:10
**900** [1] - 53:10
**90071** [1] - 1:18
**93** [1] - 44:11
**95** [1] - 47:2
**99** [1] - 48:5

## A

**abbreviate** [1] - 77:2
**abbreviations** [1] - 34:24
**ability** [1] - 93:12
**ably** [1] - 86:22
**above-entitled** [1] - 93:13
**absence** [1] - 24:18
**absolutely** [5] - 16:10, 53:23, 54:4, 63:19, 70:5
**abstract** [1] - 87:1
**abuse** [2] - 24:25, 41:8
**accept** [1] - 47:6
**acceptable** [1] - 13:16
**accordance** [1] - 6:17
**according** [2] - 11:9, 83:4
**account** [1] - 60:24
**acknowledges** [1] - 69:17
**ACM** [1] - 71:19
**ACORN** [1] - 13:20, 13:23, 13:25
**Act** [3] - 4:24, 9:8, 18:19
**act** [1] - 74:8
**acted** [1] - 50:8
**acting** [1] - 74:7
**action** [1] - 16:11
**Action** [1] - 4:10
**ACTION** [1] - 1:6
**Activities** [1] - 64:7
**activities** [2] - 65:2, 82:6
**activity** [1] - 18:3
**actor** [1] - 49:21
**actors** [1] - 87:20
**Acts** [1] - 75:7
**actual** [4] - 23:7, 78:7, 83:12, 84:3
**ad** [1] - 82:11
**add** [1] - 90:18
**addition** [1] - 74:1
**additional** [4] - 7:24, 36:18, 71:19, 83:17
**address** [2] - 30:1, 85:8
**adequate** [1] - 61:2
**adequately** [2] - 52:4, 75:12
**adhere** [3] - 74:9, 75:21, 81:22
**adieu** [1] - 92:20
**adjacent** [10] - 9:7, 10:7, 10:20, 22:23, 24:16, 27:5, 50:22,

74:25, 76:6, 79:21
**adjunct** [1] - 7:18
**administrative** [4] - 46:13, 83:5, 83:6, 86:15
**admit** [3] - 48:24, 49:11, 70:8
**admits** [1] - 47:2
**admitted** [2] - 69:16, 75:25
**adopt** [1] - 73:24
**advertising** [2] - 30:11, 34:20
**advice** [1] - 88:9
**advisable** [1] - 37:22
**affect** [2] - 21:15, 21:22
**affected** [3] - 17:1, 21:21, 24:16
**afternoon** [5] - 4:9, 4:14, 4:15, 46:20, 50:21
**ago** [1] - 13:18
**agree** [4] - 12:22, 16:9, 46:4
**ahead** [10] - 14:2, 19:7, 20:9, 20:10, 20:21, 22:12, 23:18, 47:17, 72:22
**aid** [2] - 10:18, 52:3
**Air** [1] - 40:14
**alarmed** [1] - 42:10
**allegation** [2] - 16:7, 53:16
**allege** [1] - 49:20
**alleged** [3] - 16:23, 17:2, 49:20
**allows** [2] - 12:12, 37:14
**alluded** [1] - 13:1
**almost** [1] - 16:14
**alone** [1] - 80:23
**alteration** [1] - 75:8
**Alvin** [1] - 69:5
**amended** [1] - 58:5
**AMERICA** [1] - 2:15
**amount** [1] - 40:21
**analogous** [2] - 16:23, 18:3
**analogy** [1] - 17:23, 50:4
**analyses** [8] - 54:12, 65:7, 65:11, 67:5, 67:14, 72:19, 73:6, 79:16
**analysis** [61] - 8:10, 21:21, 22:1, 23:6, 24:9, 24:13, 25:7, 39:6, 39:7, 39:13, 41:20, 44:8, 44:14,

44:16, 44:23, 48:21, 48:24, 49:2, 49:8, 49:18, 55:12, 55:13, 55:17, 56:3, 56:11, 56:14, 57:7, 57:11, 59:5, 60:13, 61:2, 66:7, 66:8, 66:11, 66:12, 67:1, 67:14, 67:23, 68:4, 71:24, 72:25, 73:1, 73:2, 74:16, 74:24, 77:10, 78:24, 79:17, 80:9, 81:7, 82:22, 83:3, 83:4, 83:14, 83:17, 85:16, 85:21, 87:2, 87:3
**analytical** [1] - 80:10
**analyze** [5] - 23:21, 24:10, 75:8, 75:22, 80:3
**analyzed** [3] - 21:17, 24:22, 85:3
**analyzing** [3] - 38:17, 80:12, 85:24
**ancestry** [1] - 86:25
**ancillary** [2] - 8:12, 15:16
**ANGELES** [1] - 1:18
**angst** [1] - 38:9
**answer** [5] - 55:21, 62:15, 70:17, 70:21, 71:22
**anyway** [5] - 13:24, 14:1, 34:24, 34:25, 45:1
**apart** [2] - 12:8, 13:8
**apparent** [1] - 65:18
**appear** [2] - 89:16, 89:17
**appearance** [1] - 34:9
**APPEARANCES** [2] - 1:15, 2:1
**applicability** [3] - 51:9, 55:6, 65:3
**applicable** [8] - 28:3, 48:18, 48:23, 49:7, 64:9, 64:12, 68:17, 73:18
**application** [2] - 18:23, 81:24
**applied** [4] - 5:20, 59:12, 81:11, 90:7
**applies** [7] - 5:10, 5:17, 10:9, 15:22, 17:8, 28:25, 65:9
**apply** [9] - 19:17, 29:5, 41:11, 49:12, 57:19, 65:9, 73:12, 87:17, 89:11
**applying** [2] - 28:15,

80:6
**appointed** [2] - 69:4, 69:5
**appreciated** [1] - 92:4
**appreciation** [1] - 79:6
**appropriate** [6] - 30:16, 35:6, 36:16, 80:24, 90:8
**appropriately** [1] - 65:14
**approval** [3] - 20:7, 20:16, 20:20
**approved** [1] - 20:20
**approving** [1] - 81:12
**ARA** [1] - 82:11
**ARATA** [1] - 2:3
**area** [6] - 8:3, 8:24, 13:7, 41:24, 63:11, 79:3
**Area** [1] - 19:21
**areas** [1] - 72:24
**argue** [8] - 28:13, 40:3, 40:19, 40:20, 47:1, 68:20, 74:20, 89:8
**argued** [4] - 15:15, 32:6, 48:18, 66:6
**arguing** [3] - 6:8, 12:14, 47:12
**argument** [33] - 8:11, 8:19, 13:10, 14:9, 15:6, 15:20, 16:13, 16:21, 17:25, 18:6, 25:2, 25:3, 25:9, 26:14, 28:14, 29:7, 36:23, 45:14, 49:15, 50:7, 50:20, 52:14, 58:25, 64:20, 70:3, 70:10, 74:1, 74:3, 81:18, 86:6, 86:15, 87:6, 90:24
**arguments** [7] - 12:14, 15:19, 47:1, 49:13, 73:25, 74:1, 88:10
**arising** [1] - 88:3
**Armstrong** [3] - 46:23, 73:25, 74:2
**ARMSTRONG** [1] - 1:9
**ARMY** [1] - 50:11
**Army** [3] - 52:11, 52:19, 58:16
**as-built** [1] - 63:9
**aside** [1] - 62:13
**aspects** [4] - 14:4, 25:14, 28:13, 90:23
**assess** [2] - 20:1, 61:3
**assist** [1] - 80:15
**assistance** [1] - 87:22
**associated** [2] - 83:9, 83:11

**ASSOCIATES** [1] - 1:16
**assume** [3] - 17:24, 55:14, 66:17
**assumed** [1] - 81:3
**assumes** [1] - 55:8
**assuming** [2] - 55:13, 61:9
**attach** [5] - 4:25, 9:3, 9:9, 9:17, 10:13
**attention** [3] - 14:4, 41:2, 42:11
**attractive** [1] - 26:10
**August** [1] - 28:11
**authorization** [4] - 6:9, 6:12, 30:6, 50:25
**authorized** [4] - 6:5, 6:15, 31:12, 50:25
**automatically** [1] - 62:1
**available** [1] - 80:12
**AVENUE** [1] - 2:6
**Avenue** [2] - 44:5, 50:2
**Avenue/London** [1] - 48:11
**avoiding** [1] - 82:16
**aware** [4] - 64:25, 74:20, 78:6, 79:13

**B**

**b)(1** [1] - 47:21
**B406** [1] - 2:22
**B89** [1] - 44:9
**backfill** [9] - 77:11, 79:19, 80:20, 80:22, 81:8, 81:12, 81:15, 81:17, 85:9
**backfilled** [2] - 50:5, 75:23
**backfilling** [5] - 51:13, 60:1, 63:12, 73:5, 75:14
**background** [1] - 57:13
**Bacuta** [2] - 70:23, 71:4
**bad** [1] - 37:25
**BAEZA** [1] - 2:16
**Bank** [1] - 19:21
**bank** [3] - 21:8, 70:17, 81:3
**bar** [1] - 47:16
**Barge** [1] - 91:16
**barge** [2] - 26:15
**BARONNE** [1] - 1:21
**base** [2] - 22:25, 83:24

**based** [6] - 5:6, 28:18, 41:20, 41:23, 76:4, 83:22
**basic** [10] - 74:17, 75:11, 75:25, 76:21, 77:4, 77:13, 78:10, 80:6, 82:14, 82:16
**basis** [6] - 30:5, 74:8, 74:13, 81:20, 82:15, 82:16
**Bea** [1] - 50:8
**Bea's** [3] - 38:22, 53:4, 53:11
**bear** [1] - 14:13
**became** [2] - 73:7, 84:11
**become** [7] - 22:19, 26:6, 26:23, 26:24, 30:5, 39:24
**becomes** [1] - 8:10
**becoming** [1] - 26:9
**BEFORE** [1] - 1:12
**began** [5] - 29:18, 29:20, 31:1, 31:2, 33:4
**begin** [1] - 88:25
**beginning** [5] - 35:13, 44:23, 60:11, 89:3, 89:6
**begins** [2] - 32:22, 34:15
**behalf** [2] - 73:24, 73:25
**below** [2] - 33:19, 39:14
**bench** [4] - 19:4, 19:9, 43:17, 86:20
**beneath** [2] - 43:3
**benefit** [2] - 87:2, 87:3
**benefits** [1] - 30:3
**BENJAMIN** [1] - 2:17
**Bercovitz** [5] - 54:3, 54:5, 59:2, 90:23
**Bernard** [1] - 5:16
**best** [1] - 93:12
**better** [9] - 13:25, 14:11, 26:20, 40:11, 42:21, 52:23, 58:15, 87:4, 92:12
**between** [10] - 5:9, 5:11, 20:17, 51:23, 51:24, 57:19, 67:3, 70:25, 73:5, 79:25
**big** [1] - 70:24
**bigger** [1] - 72:17
**bit** [3] - 34:13, 34:14, 78:6
**bits** [1] - 34:7
**bitty** [1] - 44:3
**blabbering** [1] - 86:19

**blaming** [1] - 44:25
**body** [1] - 6:23
**boil** [1] - 39:1
**Boland** [5] - 53:8, 60:16, 71:11, 72:24, 84:12
**bomb** [2] - 40:14, 58:8
**bones** [1] - 68:19
**bore** [1] - 84:2
**boring** [1] - 83:22
**borrow** [10] - 24:4, 24:8, 26:3, 26:4, 26:16, 26:24, 27:4, 27:5, 56:19, 79:3
**bottom** [3] - 7:20, 16:15, 79:4
**bought** [1] - 13:6
**bounded** [2] - 6:21
**BOX** [1] - 2:18
**bracing** [2] - 84:23, 85:10
**BRANCH** [1] - 2:17
**breach** [11] - 27:5, 43:23, 43:25, 44:2, 44:3; 48:9, 50:15, 52:12, 53:8, 53:9
**breached** [1] - 6:2
**breaches** [3] - 9:11, 9:13, 72:25
**BREACHES** [1] - 1:5
**breaching** [1] - 5:21
**break** [1] - 16:6
**breeding** [1] - 26:6
**BRENDAN** [1] - 1:3
**BRIAN** [2] - 2:5
**brief** [6] - 27:24, 53:25, 58:25, 63:23, 81:6; 92:2
**briefing** [1] - 63:16
**briefly** [2] - 47:8, 68:15
**bring** [1] - 8:7
**bringing** [1] - 34:8
**broad** [3] - 15:4, 22:18, 68:7
**broadened** [1] - 22:25
**broken** [1] - 16:5
**BRUNO** [3] - 1:20, 1:20
**Bruno** [2] - 67:18, 78:2
**budget** [1] - 50:3
**budgetary** [2] - 82:3, 82:5
**build** [4] - 5:24, 6:11, 51:19, 52:23
**building** [5] - 6:5, 7:25, 23:24, 31:3, 80:2
**built** [12] - 5:14, 10:25,

15:13, 16:15, 16:16, 21:23, 22:3, 38:11, 41:25, 44:18, 44:24, 63:9
**bunch** [2] - 39:6, 53:15
**burden** [4] - 53:18, 53:20, 73:14, 75:1
**busy** [1] - 91:15
**BY** [9] - 1:17, 1:20, 1:24, 2:4, 2:8, 2:12, 2:16, 2:24, 2:25
**bypass** [11] - 11:6, 11:17, 13:7, 31:24, 35:17, 39:17, 42:2, 42:15, 61:19, 82:24, 82:25

# C

**CA** [1] - 1:18
**cabined** [1] - 27:18
**cake** [4] - 24:10, 26:17, 56:18
**calculations** [2] - 78:16, 80:10
**CALLED** [1] - 4:4
**CAMP** [1] - 2:12
**CANAL** [1] - 1:4
**Canal** [6] - 5:16, 14:17, 14:24, 15:1, 22:21, 50:2
**canal** [18] - 6:20, 8:3, 8:5, 9:23, 9:24, 10:5, 10:6, 10:10, 10:11, 15:3, 16:5, 17:13, 26:5, 35:17, 38:16, 39:17, 42:3
**canals** [8] - 5:22, 5:24, 6:9, 6:11, 16:3, 51:7, 51:8
**cannot** [4] - 34:25, 77:14, 85:15
**capped** [1] - 5:7
**care** [3] - 25:24, 40:2
**careful** [1] - 63:1
**carefully** [1] - 6:18
**carried** [1] - 17:4
**cart** [1] - 47:22
**Carter** [1] - 31:2
**case** [26] - 5:2, 5:11, 9:5, 13:20, 16:24, 19:18, 25:14, 26:15, 29:17, 30:23, 38:13, 39:1, 41:4, 48:10, 51:4, 51:23, 55:13, 60:16, 89:7, 89:18, 90:5, 91:16, 91:17, 91:19, 92:3

**cases** [1] - 47:24
**catastrophe** [1] - 73:7
**Cathy** [2] - 93:7, 93:18
**CATHY** [1] - 2:21
**causal** [1] - 73:4
**causation** [1] - 27:3
**caused** [4] - 10:12, 17:18, 49:25, 78:20
**causes** [1] - 12:12
**CCR** [2] - 2:21, 93:18
**cease** [1] - 20:9
**center** [2] - 67:13, 78:3
**Central** [6] - 8:15, 9:21, 9:22, 9:23, 9:25, 49:18
**centuries** [1] - 58:18
**Century** [1] - 92:7
**certain** [5] - 28:13, 28:15, 40:22, 63:17, 91:5
**certainly** [21] - 8:19, 11:9, 16:9, 16:17, 25:13, 25:19, 38:14, 39:8, 40:6, 40:13, 41:4, 43:6, 44:20, 48:7, 48:17, 52:25, 55:9, 66:15, 68:19, 73:15, 74:16
**CERTIFICATE** [1] - 93:5
**certification** [1] - 37:7
**Certified** [2] - 93:7, 93:8
**certify** [1] - 93:11
**cetera** [2] - 56:11, 65:19
**chairs** [2] - 42:18, 42:21
**challenge** [1] - 86:15
**challenged** [3] - 19:14, 27:21, 74:14
**challenging** [1] - 59:23
**chance** [2] - 32:25, 46:18
**change** [5] - 63:5, 72:14, 72:20, 84:9, 85:1
**changed** [2] - 33:1, 84:13
**changes** [2] - 37:24, 85:23
**channel** [9] - 11:6, 11:17, 13:7, 31:24, 42:15, 61:19, 78:5, 82:24, 82:25
**channels** [3] - 21:13, 31:6, 32:19
**characteristics** [1] -

78:23
**CHARLES** [1] - 2:6
**chart** [1] - 53:4
**chase** [1] - 57:17
**chief** [1] - 6:17
**children** [1] - 26:11
**choice** [6] - 19:14, 20:23, 52:15, 53:19, 53:23, 59:3
**choices** [1] - 19:19
**choosing** [1] - 38:2
**chronology** [1] - 33:15
**Circuit** [5] - 20:8, 70:12, 81:10, 81:12, 92:12
**circumstance** [1] - 66:16
**circumstances** [3] - 25:21, 63:6, 72:15
**citations** [1] - 48:6
**cite** [1] - 28:10
**cited** [4] - 27:17, 32:4, 32:5, 82:10
**citing** [2] - 32:9, 82:7
**Civil** [1] - 4:10
**CIVIL** [2] - 1:6, 2:17
**civil** [2] - 76:16, 76:17
**claim** [3] - 27:17, 41:2, 74:18
**claimed** [1] - 32:2
**claims** [5] - 4:23, 5:5, 18:21, 25:23, 87:22
**Claims** [3] - 18:19, 62:6, 75:7
**clays** [2] - 79:3, 80:1
**clear** [12] - 8:16, 14:13, 17:25, 21:24, 25:25, 47:23, 48:8, 56:1, 63:10, 64:19, 70:7, 73:12
**clearly** [4] - 57:18, 73:12, 78:5, 82:13
**CLERK** [4] - 4:7, 4:10, 39:19, 63:25
**close** [7] - 5:19, 23:15, 24:21, 40:4, 42:3, 42:6, 60:12
**closeout** [4] - 57:24, 64:15, 64:16, 65:4
**closer** [2] - 42:4, 48:11
**closest** [1] - 27:4
**Clouatre** [2] - 69:5, 69:14
**Coast** [1] - 49:24
**codification** [1] - 58:18
**cofferdam** [4] - 24:14, 71:13, 71:20, 84:23

**cofferdams** [4] - 75:15, 75:23, 84:16, 84:25
**coincidence** [1] - 53:7
**coincidental** [1] - 53:12
**colleague** [1] - 47:15
**comfort** [1] - 38:24
**commence** [1] - 4:13
**commenced** [2] - 44:4, 64:20
**commencement** [1] - 13:1
**comment** [1] - 86:21
**common** [1] - 62:13
**community** [4] - 25:22, 26:2, 26:9, 26:11
**compact** [2] - 57:2, 57:6
**compacting** [1] - 53:2
**compaction** [3] - 25:10, 50:6, 53:14
**complaint** [1] - 47:22
**complete** [6] - 32:24, 33:11, 35:1, 36:10, 63:5
**completed** [2] - 9:6, 33:12
**completely** [4] - 41:15, 41:16, 41:17, 44:12
**completion** [3] - 30:14, 36:15, 57:23
**complex** [1] - 35:4
**comply** [1] - 33:18
**components** [1] - 86:24
**composition** [1] - 81:14
**compressibility** [1] - 79:12
**COMPUTER** [1] - 2:25
**computer** [1] - 80:14
**concedes** [3] - 76:20, 77:1, 81:5
**conceived** [1] - 74:15
**concern** [5] - 38:4, 38:6, 38:10, 38:17, 60:19
**concerned** [3] - 22:22, 37:21, 88:7
**concerning** [1] - 54:12
**concerns** [2] - 79:10, 84:18
**concluded** [6] - 50:8, 81:13, 85:22, 86:1, 86:3, 92:24
**conclusion** [3] - 51:9, 69:25, 82:13

**concrete** [4] - 36:20, 71:14, 71:19, 71:20
**conditions** [5] - 79:22, 79:23, 80:5, 80:7, 80:24
**conducive** [1] - 79:15
**conduct** [16] - 14:25, 16:23, 17:12, 19:14, 19:16, 20:1, 27:21, 28:5, 36:11, 36:19, 74:14, 74:21, 75:24, 80:21, 91:6
**conducted** [1] - 76:23
**conductivity** [2] - 75:13, 85:11
**conference** [3] - 19:4, 19:9, 43:17
**confuse** [1] - 25:15
**Congress** [9] - 5:23, 6:5, 6:10, 6:14, 6:15, 31:12, 51:2, 51:7
**Congressional** [1] - 30:6
**connect** [1] - 26:5
**connecting** [3] - 21:13, 31:6, 32:19
**connection** [2] - 14:8, 27:19
**consequence** [2] - 73:3, 73:11
**consequences** [1] - 24:2
**consider** [3] - 41:19, 54:2, 58:20
**considerable** [3] - 7:9, 25:20, 25:21
**consideration** [6] - 31:3, 41:18, 45:2, 58:11, 63:7, 81:16
**considerations** [14] - 30:17, 36:17, 58:3, 62:12, 62:24, 67:24, 67:25, 69:13, 69:15, 70:6, 72:4, 76:5, 82:5, 82:6
**considered** [2] - 24:1, 47:3
**considering** [1] - 24:2
**consistently** [1] - 80:25
**CONSOLIDATED** [1] - 1:5
**consolidated** [1] - 4:11
**constitute** [1] - 81:23
**constraints** [1] - 82:3
**construct** [1] - 6:16
**constructed** [7] - 9:9, 9:18, 11:5, 11:7, 15:11, 22:7, 36:4

**constructing** [1] - 78:9
**construction** [36] - 8:22, 11:5, 11:20, 12:2, 15:23, 28:23, 30:10, 30:13, 30:14, 30:20, 31:14, 31:24, 32:23, 32:24, 33:7, 33:12, 34:19, 35:4, 35:18, 35:19, 36:9, 36:12, 36:19, 56:8, 60:14, 62:4, 62:5, 62:11, 63:2, 63:4, 77:4, 77:5, 77:7, 77:24, 84:14, 88:7
**contact** [1] - 79:25
**contain** [2] - 59:14, 88:16
**contained** [1] - 6:13
**contaminated** [3] - 42:19, 42:20, 64:15
**contemplated** [5] - 7:21, 12:17, 12:19, 61:21, 72:18
**contend** [1] - 75:6
**contention** [2] - 33:17, 71:23
**context** [3] - 10:20, 34:8, 66:23
**contiguous** [1] - 72:24
**continue** [1] - 11:20
**continued** [1] - 31:1
**CONTINUED** [1] - 2:1
**continues** [1] - 55:18
**continuity** [3] - 58:12, 62:10, 88:6
**contract** [8] - 19:25, 20:2, 30:10, 31:21, 34:19, 35:9, 36:9, 88:3
**contracting** [5] - 17:6, 19:19, 19:24, 20:3, 37:18
**contractor** [10] - 30:18, 36:18, 37:1, 37:4, 37:6, 37:12, 37:13, 37:16, 74:8, 81:1
**contractor's** [1] - 34:12
**contracts** [4] - 31:16, 31:17, 35:4, 35:20
**contrary** [1] - 88:1
**contributing** [1] - 50:18
**Control** [2] - 4:24, 9:8
**control** [42] - 5:4, 5:8, 5:10, 5:11, 5:18, 5:25, 6:22, 6:25, 7:1, 8:23, 9:3, 9:19, 9:24,

10:1, 10:16, 10:18, 11:1, 12:15, 12:16, 12:17, 13:11, 14:18, 15:3, 15:16, 16:15, 16:16, 16:17, 17:13, 18:1, 18:2, 48:14, 49:16, 51:14, 52:3, 52:8, 54:18, 60:12, 76:6, 77:8, 83:7, 86:24
**controlled** [1] - 8:6
**Cope** [1] - 82:7
**Corps** [79] - 5:23, 6:10, 6:15, 6:16, 12:2, 12:4, 12:6, 12:11, 14:19, 14:22, 17:6, 20:18, 20:20, 20:22, 20:23, 21:9, 24:1, 27:19, 33:18, 33:23, 38:6, 39:2, 39:3, 39:15, 40:12, 42:10, 45:1, 45:24, 45:25, 47:2, 47:10, 48:24, 52:11, 52:20, 53:18, 58:16, 60:19, 65:10, 69:1, 69:4, 69:11, 69:19, 74:15, 74:20, 75:6, 75:18, 75:20, 76:3, 76:25, 77:14, 78:6, 78:14, 78:22, 78:24, 79:5, 79:13, 79:20, 80:3, 80:8, 80:14, 80:15, 80:17, 81:1, 81:11, 81:13, 81:16, 82:13, 83:17, 84:7, 84:13, 84:19, 85:15, 85:21, 86:8, 86:11
**CORPS** [1] - 50:12
**Corps'** [17] - 36:24, 37:17, 37:22, 50:17, 54:11, 69:17, 70:14, 73:12, 76:18, 77:17, 79:9, 80:6, 80:17, 80:20, 80:23, 81:6, 83:2
**correct** [14] - 7:11, 7:22, 21:2, 26:25, 35:22, 35:23, 54:20, 54:23, 55:17, 70:2, 70:18, 72:1, 93:11
**correspond** [1] - 29:11
**cost** [5] - 62:12, 81:17, 87:2, 87:3, 88:9
**costs** [1] - 30:3
**counsel** [2] - 85:22, 86:11
**country** [1] - 52:19
**couple** [1] - 90:13

**course** [9] - 11:3, 19:16, 38:10, 51:4, 51:24, 51:25, 53:4, 53:10, 55:8
**Court** [25] - 4:20, 8:10, 8:17, 9:15, 10:3, 10:8, 22:11, 46:24, 49:23, 51:8, 51:10, 53:19, 53:23, 64:4, 67:12, 81:21, 82:3, 86:14, 87:7, 92:4, 93:8, 93:9, 93:10, 93:19, 93:20
**court** [4] - 4:7, 8:16, 19:4, 19:9, 43:17, 63:25
**Court's** [2] - 49:18, 87:10
**COURT...................... ........................** [1] - 3:10
**courtroom** [4] - 14:11, 42:13, 42:14, 46:22
**create** [3] - 8:13, 34:8, 65:16
**created** [2] - 14:21, 50:17
**creating** [2] - 14:20, 85:10
**creation** [2] - 32:11, 56:15
**Cross** [1] - 83:5
**CRR** [2] - 2:21, 93:18
**crux** [1] - 41:1
**cut** [2] - 56:4, 57:17
**cutter** [1] - 49:24

## D

**D.C** [1] - 2:18
**damage** [10] - 4:25, 5:2, 5:3, 5:9, 10:4, 10:12, 12:12, 17:14, 49:19, 49:25
**damages** [1] - 12:12
**damaging** [2] - 14:20, 82:20
**danger** [3] - 41:15, 52:16, 85:5
**dangerous** [1] - 32:1
**DANIEL** [1] - 2:16
**Data** [1] - 64:6
**days** [1] - 72:9
**DDR** [30] - 32:15, 32:21, 33:6, 34:5, 34:13, 34:15, 34:23, 35:7, 35:8, 35:14, 35:21, 35:23, 36:5, 39:9, 41:22, 57:25, 58:1, 59:19, 59:20, 59:22, 60:1, 60:2, 60:4, 66:3, 67:22, 73:18, 88:15, 88:17, 88:23, 88:24
**DDR's** [6] - 34:22,

35:9, 35:11, 35:19, 36:15, 63:5
**dead** [1] - 64:8
**deal** [6] - 16:21, 47:12, 53:25, 59:24, 60:10, 83:8
**dealing** [11] - 15:7, 15:9, 30:24, 47:23, 53:21, 56:22, 59:25, 60:15, 63:3, 63:4
**deals** [1] - 60:6
**dealt** [3] - 13:18, 35:24
**decades** [3] - 13:1, 31:21, 58:18
**decide** [4] - 20:12, 37:15, 42:20, 68:16
**decided** [4] - 26:3, 59:5, 73:14, 84:9
**decision** [5] - 46:2, 51:6, 52:7, 76:8, 91:18
**decision-making** [1] - 46:2
**decisions** [1] - 81:24
**Declaration** [1] - 61:11
**decreed** [1] - 51:2
**deemed** [2] - 13:15, 37:21
**deep** [2] - 40:5, 84:23
**deeper** [1] - 39:5
**defalcations** [2] - 14:23, 15:5
**defeat** [1] - 74:18
**defendants'** [1] - 31:7
**defense** [1] - 11:21
**defined** [2] - 77:21, 79:23
**definition** [2] - 59:9, 77:24
**delegate** [1] - 80:21
**demise** [2] - 50:19, 73:9
**demonstrate** [1] - 75:1
**demonstrated** [1] - 81:1
**denial** [1] - 73:20
**denied** [1] - 86:12
**deny** [2] - 46:24, 73:15
**denying** [1] - 48:2
**department** [10] - 24:9, 24:20, 27:13, 33:24, 36:24, 37:12, 37:14, 37:15, 37:23, 63:13
**DEPARTMENT** [1] - 2:15
**deposition** [2] - 69:7, 76:2
**depositions** [1] -

67:19
**deposits** [1] - 79:14
**depth** [3] - 38:7, 38:25, 43:21
**DEPUTY** [3] - 4:7, 4:10, 63:25
**described** [1] - 86:22
**desert** [1] - 66:17
**Desi** [2] - 86:19, 86:20
**design** [36] - 28:23, 28:25, 30:8, 30:9, 30:14, 31:13, 32:2, 32:6, 32:9, 32:10, 32:11, 32:15, 32:16, 32:19, 32:22, 33:10, 33:14, 34:16, 34:18, 34:23, 35:1, 35:7, 35:12, 55:9, 59:15, 59:20, 62:11, 62:14, 63:4, 77:3, 77:4, 83:12, 84:3, 87:22, 88:6
**Design** [1] - 64:6
**designated** [2] - 76:18
**designed** [3] - 82:21, 84:16
**designing** [1] - 63:11
**designs** [5] - 30:4, 33:16, 62:12, 88:4, 88:8
**destabilize** [1] - 50:14
**destabilized** [1] - 73:10
**destination** [1] - 49:22
**destroy** [1] - 12:5
**detailed** [2] - 50:23, 76:25
**determine** [5] - 8:18, 10:8, 22:16, 79:18, 85:24
**determined** [2] - 5:20, 83:23
**devastating** [1] - 73:13
**develop** [2] - 33:6, 60:11
**developed** [5] - 27:16, 32:23, 33:3, 69:13, 84:7
**developing** [1] - 78:16
**development** [2] - 63:14, 90:5
**deviating** [1] - 81:20
**devise** [1] - 24:14
**DFE** [7] - 18:24, 19:11, 74:4, 75:19, 77:14, 81:25, 82:16
**diagonal** [1] - 23:8
**DiCharry** [7] - 21:1, 21:4, 21:5, 70:18,

71:9, 80:25
**dictated** [1] - 15:17
**differ** [1] - 25:7
**difference** [4] - 29:3, 43:4, 67:3, 70:24
**different** [5] - 16:6, 40:10, 45:17, 48:3, 51:9
**difficult** [1] - 73:3
**dig** [1] - 58:7
**digging** [12] - 17:3, 38:19, 39:14, 43:1, 49:9, 52:16, 56:17, 57:1, 59:6, 68:2, 78:1, 78:5
**digits** [1] - 55:3
**digress** [1] - 14:1
**dike** [1] - 78:20
**dikes** [1] - 77:20
**direct** [3] - 8:21, 14:8, 73:4
**directed** [2] - 6:10, 6:15
**directing** [1] - 31:2
**disagree** [3] - 8:15, 45:18, 61:10
**discrete** [1] - 60:15
**discretion** [12] - 24:19, 24:24, 24:25, 25:1, 37:11, 38:12, 39:2, 41:8, 41:15, 59:2, 87:19, 87:20
**discretionary** [12] - 18:19, 18:23, 19:13, 27:2, 41:10, 54:21, 59:8, 74:5, 74:18, 86:12, 87:17, 89:10
**discuss** [1] - 91:19
**discussed** [1] - 59:15
**discussing** [1] - 92:16
**discussion** [2] - 83:5, 92:19
**dismiss** [2] - 4:22, 47:20
**dismissal** [2] - 18:20, 90:7
**dismisses** [1] - 87:5
**displace** [1] - 22:17
**disposal** [2] - 71:18, 78:14
**disposes** [1] - 52:4
**dispositive** [2] - 5:5, 50:19
**dispute** [5] - 6:4, 57:16, 65:20, 89:21, 90:5
**disputed** [7] - 6:4, 48:7, 48:13, 73:19, 89:22, 89:23, 89:25
**disputes** [1] - 48:17

**distance** [2] - 23:2, 23:5
**distinct** [1] - 52:1
**distinction** [3] - 17:10, 17:11, 51:4
**distinguish** [1] - 6:7
**District** [2] - 93:10, 93:20
**DISTRICT** [3] - 1:1, 1:2, 1:13
**district's** [1] - 33:24
**District's** [1] - 83:4
**disturbing** [1] - 80:4
**division** [3] - 56:8, 69:20, 71:18
**DIVISION** [1] - 2:17
**Document** [1] - 4:12
**document** [11] - 32:21, 33:7, 33:14, 49:10, 55:16, 56:2, 58:4, 59:4, 61:3, 62:22, 86:2
**documentation** [17] - 30:15, 32:2, 32:6, 32:9, 32:10, 32:12, 32:15, 34:23, 35:1, 35:12, 55:23, 56:5, 56:11, 62:23, 69:2, 83:11, 84:3
**documented** [2] - 80:6, 85:3
**documents** [2] - 32:14
**DOMENGEAUX** [1] - 1:23
**done** [41] - 12:4, 22:6, 24:9, 25:8, 25:20, 32:3, 39:7, 39:12, 42:23, 44:16, 48:21, 55:10, 55:11, 55:14, 55:23, 57:19, 58:3, 58:15, 59:23, 60:13, 60:14, 61:4, 61:8, 61:17, 66:8, 70:7, 71:24, 72:5, 72:25, 76:14, 77:24, 77:25, 78:8, 78:24, 79:7, 83:23, 84:15, 85:21, 86:4, 91:16, 91:18
**double** [1] - 90:18
**dovetails** [1] - 74:1
**down** [11] - 8:24, 37:5, 39:2, 39:18, 46:17, 52:17, 56:22, 68:2, 87:25, 90:24
**downward** [2] - 23:9, 23:21
**Dr** [4] - 38:22, 50:8, 53:4, 53:11
**drafted** [1] - 84:7
**draw** [1] - 90:1

**drawings** [3] - 37:7, 38:11, 63:9
**dredge** [1] - 11:16
**dredging** [4] - 14:23, 14:25, 16:24, 17:2
**drink** [1] - 21:4
**drop** [1] - 49:17
**dry** [1] - 17:3
**dude** [1] - 70:11
**dug** [3] - 40:21, 40:22, 42:9
**duly** [1] - 87:8
**DUPLANTIS** [1] - 2:3
**during** [12] - 12:3, 12:11, 30:14, 30:19, 33:7, 36:14, 36:21, 38:16, 40:7, 64:21, 64:22, 64:24
**duty** [4] - 40:13, 76:25, 78:10, 80:23
**DUVAL** [1] - 1:12

**E**

**EA** [2] - 85:19, 85:25
**EAGAN** [1] - 2:3
**early** [3] - 29:16, 30:25, 60:20
**East** [1] - 19:21
**EAST** [1] - 2:9
**east** [4] - 21:8, 22:21, 70:17, 81:3
**EASTERN** [1] - 1:2
**Eastern** [2] - 83:4, 93:10
**eastern** [1] - 68:2
**easy** [1] - 78:15
**EBI** [2] - 54:13, 88:19
**EBIA** [21] - 4:23, 12:20, 18:8, 19:21, 24:6, 32:6, 33:8, 35:17, 42:10, 51:13, 59:10, 59:20, 60:1, 63:11, 64:11, 76:23, 79:16, 79:21, 80:2, 80:8
**economic** [2] - 82:1, 82:5
**EDWARDS** [1] - 1:23
**effect** [9] - 28:10, 38:5, 38:12, 57:10, 57:16, 64:21, 64:22, 64:24
**effects** [2] - 33:20, 77:7
**efficient** [1] - 73:8
**effort** [3] - 32:16, 36:18, 47:9
**EGAN** [2] - 2:4, 86:17

Egan [1] - 86:17
EGAN.........................
.................... [1] -
3:8
EIS [7] - 83:2, 83:11,
83:25, 84:7, 85:18,
85:19, 85:20
either [7] - 17:8, 28:7,
61:4, 71:12, 71:18,
74:15, 87:11
elaborate [1] - 20:16
elements [5] - 32:5,
32:7, 32:8, 60:3,
88:16
elevation [1] - 8:6
eliminated [1] - 19:19
Elisa [1] - 73:23
ELISA [1] - 2:8
Elmo [3] - 61:24,
62:19, 87:11
EM's [1] - 59:14
emanate [2] - 5:18,
49:16
embedded [1] - 62:8
emphasize [1] - 87:16
employ [1] - 75:11
employed [3] - 76:22,
77:19, 80:16
employee [2] - 19:15,
59:2
enacted [1] - 64:10
encompass [1] - 15:4
encompassed [1] -
10:1
encounter [1] - 61:21
encountered [1] -
33:3
end [4] - 28:11, 35:13,
89:3, 89:6
endanger [1] - 80:18
ended [2] - 32:17,
40:9
ENG [1] - 37:9
engaged [1] - 81:7
engaging [1] - 74:21
engineer [14] - 24:14,
68:21, 69:11, 70:7,
70:8, 70:9, 70:24,
70:25, 72:5, 76:15,
76:16, 76:17, 82:17,
88:9
Engineering [5] -
62:5, 64:6, 70:6,
87:15, 88:5
engineering [104] -
22:13, 24:9, 24:20,
25:3, 25:13, 25:17,
27:13, 28:23, 28:24,
30:8, 30:14, 30:17,
31:13, 32:14, 33:13,

33:24, 34:12, 34:16,
36:13, 36:17, 36:24,
37:2, 37:8, 37:9,
37:12, 37:14, 37:15,
37:22, 41:16, 47:10,
53:24, 54:12, 55:15,
55:16, 56:9, 58:3,
58:11, 59:10, 59:11,
59:13, 59:14, 59:15,
59:20, 59:21, 60:13,
61:2, 62:9, 62:22,
62:24, 63:7, 63:12,
63:13, 67:21, 67:23,
67:25, 68:9, 68:20,
69:12, 69:14, 69:17,
69:20, 70:14, 71:12,
71:14, 71:17, 72:4,
74:9, 74:11, 74:17,
75:8, 75:11, 75:19,
75:20, 75:21, 75:25,
76:4, 76:8, 76:21,
76:25, 77:2, 77:13,
77:16, 77:17, 77:18,
78:10, 78:11, 78:18,
79:9, 80:6, 80:7,
80:11, 81:7, 81:21,
81:22, 82:14, 82:16,
85:5, 87:14, 87:21,
88:2, 89:5, 90:25
engineers [10] - 52:15,
58:22, 63:15, 63:17,
68:9, 68:24, 69:1,
78:15, 80:15, 89:15
Engineers [2] - 52:20,
58:16
engineers' [1] - 6:17
ENGLISH [1] - 2:4
English [2] - 58:21,
58:23
engorged [1] - 73:9
enlarged [1] - 7:4
enormous [1] - 84:21
ensure [2] - 62:10,
88:6
enter [2] - 26:12,
38:15
Entergy [4] - 48:5,
73:24, 86:11, 86:17
ENTERGY [1] - 1:9
entering [1] - 5:15
enters [1] - 5:8
entire [1] - 83:5
entitled [1] - 93:13
environment [2] -
82:22, 85:14
environmental [7] -
31:10, 74:22, 74:23,
75:3, 82:23, 84:17,
85:17
environmentally [3] -

13:15, 13:16, 32:1
envision [2] - 9:5,
40:8
envisioned [2] -
11:10, 40:21
eon [2] - 44:17
ER [3] - 27:25, 28:10,
64:20
ER's [1] - 59:13
erected [2] - 6:1,
14:19
escaped [2] - 10:6,
10:12
ESQUIRE [13] - 1:17,
1:20, 1:21, 1:24, 2:4,
2:4, 2:5, 2:5, 2:8,
2:9, 2:12, 2:16, 2:16
essence [2] - 15:17,
74:3
essential [2] - 62:10,
88:6
essentially [5] - 25:23,
26:8, 42:25, 45:25,
50:7
establishing [1] -
22:13
esthetics [1] - 22:22
et [2] - 56:11, 65:19
ethereal [2] - 15:9,
15:25
evaluate [5] - 55:18,
62:15, 77:1, 81:11,
85:1
evaluated [6] - 69:19,
69:21, 72:3, 75:2,
86:3
evaluating [1] - 81:17
evaluation [7] - 54:19,
55:24, 56:9, 71:10,
74:23, 76:22, 86:23
evaluations [6] -
33:19, 77:6, 77:16,
77:18, 78:12, 80:22
event [2] - 11:25, 12:2
eventually [4] - 6:21,
6:24, 14:19, 42:13
evidence [4] - 51:12,
73:4, 81:9, 81:15
evolve [1] - 58:5
EWELL [1] - 2:4
exactly [6] - 13:21,
43:22, 43:24, 52:9,
54:7, 78:21
examination [1] - 40:2
examined [2] - 21:14,
22:1
example [3] - 87:21,
88:14
excavate [1] - 84:8
excavating [1] - 26:4

excavation [18] -
24:10, 24:20, 27:3,
35:17, 36:23, 38:2,
51:13, 53:8, 54:13,
56:15, 60:1, 71:1,
71:18, 79:7, 80:19,
81:8, 82:14, 82:22
excavations [27] -
24:15, 24:22, 26:22,
33:19, 33:25, 37:21,
38:3, 38:23, 40:9,
72:2, 73:5, 74:17,
75:14, 76:13, 76:19,
77:12, 78:3, 78:19,
79:19, 80:22, 82:19,
83:1, 83:9, 83:19,
84:11, 84:21, 85:19
exception [8] - 18:20,
18:23, 19:13, 19:17,
27:2, 41:10, 74:5,
89:11
exemption [1] - 86:12
exercise [3] - 19:20,
81:22, 81:23
exercised [1] - 40:3
exercising [1] - 24:19
exhaustion [1] - 46:13
Exhibit [4] - 28:11,
35:24, 39:8, 44:9
exhibit [1] - 90:13
exhibits [2] - 47:22,
90:13
Exhibits [1] - 31:7
exist [3] - 28:6, 71:10,
80:8
existed [1] - 41:24
existence [2] - 28:4,
65:20
existing [25] - 7:6, 8:1,
8:23, 11:13, 11:20,
11:22, 16:9, 17:24,
21:19, 21:20, 21:22,
22:2, 22:7, 22:17,
23:3, 44:19, 44:24,
49:3, 49:8, 57:8,
71:24, 72:12
exists [1] - 23:7
expanded [1] - 83:18
expanding [1] - 84:21
expansion [2] - 83:12,
85:18
expansive [1] - 49:15
expect [2] - 56:10,
81:1
expectation [1] -
55:22
expected [2] - 21:6,
70:16
experienced [1] -
78:21

expertise [2] - 69:9,
76:11
experts [1] - 58:17
explain [3] - 35:2,
48:11, 56:21
explained [1] - 24:12
expressly [1] - 78:18
extant [1] - 91:2
extend [1] - 74:4
extending [1] - 16:13
extensive [1] - 40:20
extent [3] - 26:19,
89:24, 91:8
external [2] - 49:21,
50:17

## F

F.2nd [1] - 82:8
F.3d [2] - 82:7, 82:8
F.Supp.2d [1] - 14:16
face [1] - 9:17
fact [30] - 6:18, 6:21,
8:25, 9:15, 14:5,
14:20, 15:25, 25:19,
27:20, 34:9, 37:17,
37:23, 47:9, 48:7,
51:5, 51:11, 53:3,
60:18, 61:24, 69:25,
73:19, 74:14, 78:18,
81:19, 83:4, 84:20,
89:9, 89:25, 90:1
factor [5] - 23:24,
50:18, 53:17, 58:14,
77:8
factors [2] - 23:20,
33:15
facts [13] - 5:5, 6:4,
6:8, 8:9, 48:4, 48:13,
76:21, 89:21, 89:23,
90:3, 90:4, 90:6,
90:7
fail [1] - 14:20
failed [6] - 5:4, 6:1,
17:15, 33:18, 53:12,
86:9
failing [5] - 16:5, 18:2,
75:22, 77:15, 81:21
failings [1] - 89:6
failure [14] - 9:6,
16:11, 73:6, 74:9,
74:12, 75:7, 75:11,
75:19, 75:21, 77:7,
77:18, 78:12, 78:20,
82:22
failures [2] - 74:11,
90:25
fair [1] - 12:19
faired [1] - 13:25

**fairly** [2] - 20:15, 50:3
**fall** [2] - 17:18, 50:14
**fallback** [1] - 70:10
**familiar** [2] - 30:22, 49:13
**far** [5] - 26:2, 39:22, 39:23, 40:4, 40:20
**fathom** [1] - 73:3
**fault** [1] - 44:25
**feasibility** [30] - 28:22, 29:19, 29:22, 29:23, 29:24, 30:1, 30:3, 30:5, 30:25, 31:5, 32:5, 32:11, 32:16, 32:17, 34:4, 35:5, 35:6, 60:10, 60:14, 61:3, 61:6, 61:7, 61:8, 61:13, 61:16, 62:17, 63:3, 88:24, 88:25
**features** [2] - 35:8, 35:9
**Federal** [2] - 18:19, 75:7
**federal** [2] - 7:5, 13:9
**feedback** [1] - 88:8
**fees** [1] - 51:2
**feet** [46] - 33:19, 38:7, 38:10, 38:20, 38:25, 39:5, 39:14, 39:18, 39:20, 39:21, 40:8, 42:3, 43:3, 43:4, 43:11, 43:21, 44:4, 52:17, 52:18, 53:9, 53:10, 56:19, 56:22, 57:8, 66:21, 66:22, 67:13, 68:1, 68:3, 78:1, 78:2, 78:3, 83:18, 83:19, 83:21, 84:1, 84:4, 84:6, 84:8, 85:23
**fellow** [1] - 56:6
**felt** [1] - 24:13
**few** [2] - 72:9, 83:7
**field** [7] - 30:17, 36:17, 62:24, 63:8, 69:1, 69:12, 70:6
**Fifth** [5] - 20:8, 70:12, 81:10, 81:12, 92:12
**fifth** [1] - 48:15
**filed** [6] - 48:3, 74:22, 88:12, 92:2, 92:5, 92:6
**fill** [4] - 79:2, 80:1, 80:4, 80:24
**filled** [2] - 57:5, 58:9
**filling** [1] - 25:10
**final** [8] - 11:11, 32:16, 33:10, 70:10, 71:13, 71:14, 71:18, 71:20

**finalized** [2] - 30:9, 34:18
**finally** [1] - 52:6
**fine** [1] - 45:4, 79:25
**fingertip** [1] - 22:8
**finish** [1] - 90:22
**finished** [2] - 26:4, 66:15
**FIRM** [2] - 2:8, 2:11
**first** [11] - 4:17, 4:23, 12:23, 13:2, 19:13, 29:13, 49:14, 55:22, 57:15, 83:23, 87:14
**fit** [3] - 65:16, 65:17, 65:18
**five** [16] - 28:18, 28:20, 28:22, 29:10, 42:13, 63:20, 68:3, 83:15, 83:18, 83:21, 84:1, 84:3, 84:4, 85:23, 91:10, 92:2
**five-minute** [1] - 63:20
**flashing** [1] - 52:15
**flat** [1] - 38:12
**flaw** [1] - 32:8
**flexibility** [1] - 35:10
**Flood** [2] - 4:24, 9:8
**flood** [49] - 5:4, 5:8, 5:10, 5:11, 5:18, 5:25, 6:22, 6:24, 7:1, 8:23, 9:3, 9:18, 9:23, 10:1, 10:16, 10:18, 11:1, 12:15, 12:16, 13:11, 14:18, 15:3, 15:16, 16:14, 16:16, 16:17, 17:13, 17:24, 18:1, 25:24, 48:13, 49:16, 49:17, 51:14, 52:1, 52:3, 52:8, 54:18, 60:12, 65:19, 66:25, 69:9, 76:6, 77:8, 83:7, 86:24, 87:4
**flooding** [11] - 5:15, 5:21, 6:2, 6:22, 8:25, 10:3, 11:22, 15:4, 49:16, 60:18, 60:21
**floods** [1] - 5:1
**floodwall** [47] - 12:5, 12:12, 17:15, 17:16, 17:17, 17:20, 21:19, 21:20, 21:22, 22:2, 22:7, 22:8, 22:21, 22:23, 22:24, 22:25, 23:3, 24:3, 24:21, 35:18, 38:7, 39:22, 43:2, 43:20, 43:23, 44:18, 44:19, 44:24, 49:3, 49:8, 52:17, 52:18, 55:20, 57:8,

57:9, 66:18, 66:21, 67:13, 68:2, 71:25, 75:9
**floodwalls** [38] - 5:13, 5:21, 5:24, 6:5, 6:12, 6:19, 7:7, 7:8, 7:9, 9:7, 14:7, 14:19, 14:21, 16:1, 16:2, 17:1, 21:7, 21:16, 27:4, 33:21, 35:25, 36:1, 42:3, 49:9, 50:1, 50:14, 50:22, 51:25, 52:11, 70:17, 76:24, 79:12, 79:22, 79:23, 80:1, 80:19, 81:3, 85:12
**floodwaters** [12] - 5:1, 5:3, 5:4, 5:9, 5:12, 5:18, 6:2, 10:12, 14:20, 17:14, 49:15, 73:9
**Florida** [1] - 44:5
**flow** [1] - 79:21
**flowing** [1] - 8:3
**focus** [6] - 26:24, 28:9, 41:4, 47:9, 62:2, 90:16
**focuses** [1] - 40:8
**focusing** [1] - 45:16
**folder** [1] - 55:15
**follow** [2] - 20:24, 45:20
**followed** [3] - 19:17, 69:19, 82:3
**following** [1] - 5:25
**follows** [1] - 88:5
**FONSI** [1] - 85:25
**foot** [2] - 83:15, 84:10
**FOR** [2] - 1:16, 2:15
**Force** [1] - 40:14
**forces** [2] - 23:21, 23:22
**foregoing** [1] - 93:11
**foreseen** [2] - 38:15, 72:2
**forget** [1] - 90:20
**Form** [1] - 47:2
**form** [1] - 37:9
**formalistic** [1] - 87:6
**formulate** [1] - 30:1
**forth** [6] - 20:17, 30:7, 30:13, 34:17, 70:12, 80:11
**forward** [2] - 51:18, 55:20
**foundation** [8] - 22:19, 36:20, 71:14, 71:20, 78:7, 78:23, 79:21, 80:9
**foundational** [2] -

79:11, 84:19
**foundations** [5] - 71:19, 75:9, 75:10, 75:13, 80:2
**four** [2] - 48:15, 55:3
**fourth** [2] - 30:12, 36:12
**fragile** [2] - 78:8, 79:6
**fragility** [1] - 84:20
**framed** [1] - 67:10
**framework** [1] - 46:2
**FRANKLIN** [1] - 2:17
**frankly** [2] - 21:24, 24:17
**Friday** [1] - 91:13
**front** [3] - 41:5, 90:6
**fruition** [1] - 7:20
**fulfilled** [1] - 19:25
**fulls** [1] - 47:22
**fully** [2] - 41:19, 65:9
**function** [13] - 9:24, 18:20, 18:23, 19:13, 27:2, 41:10, 59:11, 63:15, 74:5, 74:18, 86:12, 87:17, 89:10
**functions** [1] - 59:10
**funded** [1] - 51:1
**funding** [1] - 10:11
**funny** [1] - 25:21
**furniture** [2] - 42:13, 42:14
**future** [8] - 12:17, 12:20, 15:12, 21:23, 51:17, 57:9, 62:12, 88:8
**futuristic** [2] - 11:3, 49:4

## G

**gaping** [1] - 53:10
**general** [8] - 8:15, 61:22, 74:9, 82:5, 88:10, 88:11, 89:4, 91:7
**generally** [4] - 19:22, 25:1, 28:19, 40:9
**generated** [1] - 38:17
**geochemist** [2] - 70:24, 70:25
**geochemists** [1] - 63:13
**geography** [1] - 78:23
**geometry** [1] - 10:22
**George** [1] - 70:23
**geotech** [1] - 70:16
**geotechnical** [30] - 21:7, 22:13, 24:1, 33:19, 33:24, 34:11,

38:9, 48:21, 49:7, 60:11, 60:13, 65:13, 65:19, 67:5, 68:21, 69:9, 69:11, 69:20, 69:24, 71:17, 72:5, 72:25, 78:24, 79:6, 80:21, 81:2, 81:7, 84:19, 89:15, 89:16
**Geotechnical** [1] - 64:6
**geotechnical-type** [1] - 69:9
**GILBERT** [14] - 2:8, 2:8, 73:23, 76:12, 76:16, 76:18, 77:23, 81:19, 82:11, 82:13, 83:22, 84:2, 86:8, 86:14
**Gilbert** [1] - 73:23
**GILBERT..................
........................** [1] - 3:7
**given** [3] - 41:2, 47:17, 84:18
**glacially** [1] - 13:3
**global** [5] - 55:12, 56:11, 66:12, 67:15, 73:1
**God** [1] - 48:5
**goodness** [1] - 40:17
**GORDON** [1] - 2:3
**governed** [2] - 28:5, 65:22
**government** [15] - 13:9, 16:7, 19:15, 49:7, 49:14, 53:20, 73:16, 74:6, 74:7, 75:4, 76:20, 77:1, 81:5, 82:6, 87:5
**government's** [4] - 75:1, 82:4, 89:23, 90:9
**grain** [1] - 80:1
**grant** [2] - 73:13, 90:8
**granting** [1] - 19:23
**greater** [2] - 77:18, 78:12
**Green** [5] - 8:15, 9:21, 9:22, 9:23, 49:18
**Grieshaber** [9] - 54:15, 54:16, 54:17, 55:11, 57:14, 59:8, 76:1, 80:17, 80:22
**ground** [4] - 17:3, 26:6, 57:4, 79:25
**grounds** [2] - 4:23, 18:20
**groundwater** [2] - 79:20, 79:24
**Group** [4] - 19:23,

31:22, 32:4, 70:15
**Guard** [1] - 49:24
**guess** [16] - 11:24, 12:14, 15:7, 16:18, 17:15, 21:8, 40:25, 41:16, 47:21, 59:20, 61:6, 61:20, 66:8, 66:22, 70:14, 71:4
**guidance** [1] - 77:13
**guidelines** [1] - 80:6
**Guillory** [19] - 19:24, 20:6, 24:12, 25:25, 27:9, 42:25, 43:2, 56:4, 56:7, 68:12, 70:23, 71:8, 71:22, 75:17, 76:1, 76:3, 76:12, 81:6, 85:22
**Guillory's** [3] - 24:17, 27:18, 76:11
**GUILLOT** [1] - 2:5
**Gulf** [1] - 51:25
**guy** [2] - 56:7, 69:7

### H

**handed** [1] - 44:8
**happy** [1] - 70:1
**Harbor** [1] - 5:16
**hard** [3] - 8:20, 17:19, 86:9
**harm** [2] - 82:20, 83:3
**hatched** [1] - 13:3
**hate** [1] - 25:15
**Hazardous** [1] - 64:7
**hazardous** [4] - 65:1, 83:13, 83:24, 84:10
**health** [2] - 82:21, 85:13
**hear** [4] - 15:18, 46:16, 86:16, 86:18
**HEARD** [1] - 1:12
**heard** [4] - 80:25, 86:14, 86:20, 91:15
**heavy** [1] - 22:18
**height** [1] - 22:24
**heighten** [1] - 14:4
**heightened** [1] - 78:9
**held** [4] - 19:4, 19:9, 43:17, 53:4
**help** [1] - 62:11
**helpful** [1] - 29:8
**hereby** [1] - 93:11
**herein** [1] - 14:20
**herring** [1] - 58:2
**high** [1] - 22:22
**higher** [1] - 9:1
**highlight** [1] - 85:5
**highlighted** [2] - 55:14, 80:13

**himself** [1] - 20:4
**history** [1] - 58:23
**holding** [2] - 8:15, 18:5
**hole** [6] - 26:11, 54:18, 56:17, 57:1, 58:7, 70:1
**holes** [28] - 17:3, 24:16, 25:8, 25:9, 25:10, 25:12, 26:16, 26:18, 38:19, 38:21, 39:4, 39:15, 40:21, 42:9, 43:1, 49:9, 50:5, 50:13, 52:16, 53:1, 53:13, 59:6, 60:16, 63:12, 64:17, 73:7
**holier** [1] - 72:17
**Holy** [1] - 83:5
**honest** [1] - 43:13
**Honor** [54] - 4:14, 4:17, 5:6, 5:17, 7:5, 7:11, 7:25, 12:18, 12:25, 13:13, 14:3, 14:10, 14:17, 15:2, 15:21, 18:6, 18:14, 18:22, 19:12, 19:22, 20:5, 20:11, 20:14, 21:3, 21:10, 21:20, 21:25, 22:11, 23:4, 23:19, 25:6, 26:22, 26:25, 27:7, 28:7, 28:11, 29:18, 30:21, 36:4, 36:7, 37:18, 39:9, 39:17, 40:1, 41:5, 41:17, 41:18, 42:2, 42:5, 42:8, 43:7, 43:20, 44:7, 45:4, 45:7, 45:13, 45:22, 46:6, 46:9, 46:12, 46:17, 46:20, 47:19, 50:16, 52:4, 53:4, 54:7, 57:9, 59:21, 61:25, 62:5, 62:16, 62:18, 63:3, 63:19, 64:3, 64:11, 65:2, 65:8, 67:20, 67:23, 68:13, 68:18, 68:22, 68:24, 69:3, 73:22, 73:23, 86:8, 86:17, 87:12, 87:23, 88:12, 88:16, 88:22, 89:1, 89:12, 89:21, 90:3, 90:8, 92:1, 92:5, 92:8, 92:22
**Honor's** [4] - 5:19, 6:7, 17:20, 27:8
**HONORABLE** [1] - 1:12
**hope** [6] - 14:1, 47:15,

63:21, 67:18, 67:19, 92:3
**HOPE** [1] - 1:17
**hopefully** [1] - 51:10
**horribles** [1] - 89:9
**human** [2] - 82:21, 85:14
**hundred** [4] - 21:13, 48:2, 52:17, 66:21
**hurricane** [3] - 5:14, 8:7, 83:7
**Hurricane** [2] - 9:6, 38:16
**hurting** [1] - 40:24
**hybrid** [1] - 52:3
**hydraulic** [3] - 67:3, 75:12, 85:11
**hydrologic** [2] - 67:2, 67:3
**hydrology** [1] - 79:20
**hypothetical** [1] - 11:25
**hypotheticals** [1] - 12:1

### I

**idea** [2] - 13:2, 13:19
**identified** [1] - 37:8
**identify** [2] - 29:15, 29:20
**idle** [1] - 58:14
**ignore** [3] - 41:15, 41:16, 41:17
**IHNC** [32] - 5:13, 6:6, 6:13, 6:19, 7:8, 10:17, 16:1, 31:4, 48:9, 50:1, 50:4, 50:22, 51:12, 51:16, 51:18, 68:2, 73:9, 74:12, 74:25, 75:13, 76:24, 78:5, 78:21, 78:23, 78:25, 79:11, 79:14, 79:21, 83:15, 84:20, 90:21
**ILIT** [1] - 50:7
**ILIT's** [1] - 53:11
**ill** [1] - 74:15
**ill-conceived** [1] - 74:15
**illustrates** [1] - 80:20
**imagine** [1] - 8:20
**imagined** [1] - 58:10
**immunity** [15] - 5:10, 9:2, 9:8, 9:11, 9:12, 9:17, 10:9, 10:13, 12:6, 12:15, 14:22, 15:12, 16:14, 74:18, 86:12

**impact** [25] - 23:1, 23:13, 25:22, 26:2, 31:10, 55:19, 57:7, 60:25, 66:25, 72:19, 72:21, 74:22, 74:23, 74:24, 75:2, 75:3, 75:8, 82:24, 83:14, 83:16, 84:17, 85:7, 85:8, 85:17, 86:3
**impacts** [3] - 60:21, 65:19, 75:2
**impair** [2] - 12:5, 16:8
**impairing** [1] - 65:15
**impinged** [1] - 10:23
**implementation** [1] - 33:14
**implemented** [2] - 20:7, 33:16
**implicate** [1] - 52:10
**implications** [3] - 14:14, 59:6, 69:10
**implies** [1] - 89:24
**imply** [1] - 66:7
**import** [1] - 56:10
**important** [3] - 29:2, 39:24, 62:22
**importing** [1] - 28:15
**imprecise** [1] - 81:13
**impression** [1] - 38:7
**improper** [1] - 73:5
**improperly** [2] - 75:14, 77:15
**improve** [2] - 9:1, 62:11
**improved** [2] - 9:16, 9:19
**improving** [1] - 88:8
**IN** [1] - 1:4
**inadequate** [1] - 32:7
**inappropriate** [2] - 80:19
**inartfully** [1] - 67:10
**include** [4] - 34:4, 77:5, 77:10, 82:22
**included** [5] - 74:23, 83:2, 83:3, 84:2, 84:17
**includes** [5] - 30:14, 30:18, 31:9, 36:14, 37:3
**including** [2] - 35:7, 67:14
**incorporate** [2] - 6:9, 79:5
**incorporated** [3] - 5:22, 14:18, 15:13
**incorporation** [1] - 15:2
**incorrect** [1] - 38:8
**indeed** [1] - 81:9

**Independence** [1] - 61:12
**independent** [8] - 4:23, 18:20, 34:23, 49:21, 50:16, 51:15, 51:21, 53:16
**independently** [1] - 51:1
**indicate** [2] - 48:15, 72:11
**indication** [1] - 81:10
**individual** [1] - 35:16
**indivisible** [1] - 61:11
**induced** [3] - 60:21, 65:19, 66:25
**Industrial** [2] - 19:21, 22:21
**inextricably** [2] - 8:13, 14:5
**inferences** [1] - 90:2
**influenced** [2] - 79:22, 79:24
**information** [3] - 37:8, 50:23, 60:11
**informed** [1] - 42:2
**initial** [7] - 30:4, 35:6, 35:7, 35:8, 35:14, 64:15, 84:5
**Inner** [1] - 5:16
**input** [6] - 21:6, 62:10, 63:14, 70:16, 81:2, 88:5
**insignificant** [3] - 85:23, 86:2, 86:4
**inspections** [1] - 20:1
**instability** [1] - 78:20
**installation** [2] - 71:13, 71:20
**instance** [5] - 35:16, 40:13, 74:10, 75:5, 90:17
**instances** [2] - 78:1, 78:2
**instruction** [1] - 5:25
**instructions** [10] - 30:17, 36:17, 62:24, 63:8, 67:24, 68:1, 69:13, 69:15, 70:6, 72:4
**insulated** [1] - 81:25
**integration** [1] - 51:7
**integrity** [3] - 75:12, 76:6, 83:10
**intended** [3] - 6:22, 61:3, 80:4
**intentionally** [1] - 74:15
**interconnected** [1] - 14:6
**interest** [2] - 13:9,

9

87:6
**interested** [5] - 18:12, 45:1, 90:16, 90:23, 91:1
**interesting** [3] - 15:20, 24:23, 67:16
**internal** [1] - 37:22
**International** [2] - 31:22, 32:4
**International's** [1] - 19:23
**interrupt** [3] - 19:2, 19:6, 45:3
**intersection** [1] - 8:18
**intricate** [3] - 20:7, 20:8, 20:16
**intrinsic** [1] - 16:11
**introduced** [1] - 85:12
**investigation** [2] - 64:15, 65:13
**investigations** [2] - 65:19, 79:9
**invitation** [1] - 47:6
**invocation** [1] - 82:4
**invoking** [1] - 82:14
**involve** [3] - 52:8, 52:9, 82:1
**involved** [4] - 31:2, 33:5, 89:5, 89:15, 89:19
**involvement** [2] - 7:5, 17:7
**involves** [1] - 13:11
**involving** [3] - 27:12, 36:5, 81:24
**irrelevant** [1] - 27:2
**irrigation** [2] - 9:24, 10:2
**Irrigation** [1] - 82:8
**issue** [17] - 36:11, 39:1, 39:3, 39:16, 40:23, 47:13, 54:24, 57:25, 58:1, 58:2, 59:1, 64:4, 73:19, 90:21, 91:20
**issues** [5] - 48:7, 59:24, 60:7, 60:15, 92:17
**ITR** [1] - 34:22
**ITR's** [1] - 34:22
**itself** [6] - 12:11, 23:14, 27:22, 29:14, 89:12, 89:13

**J**

**JAMES** [1] - 1:24
**JEFFERSON** [1] - 1:24

**jeopardize** [3] - 76:6, 76:24, 83:10
**Jerry** [1] - 49:6
**JOANEN** [1] - 1:21
**JOSEPH** [1] - 1:20
**JR** [3] - 1:12, 2:4, 2:16
**Judge** [3] - 33:23, 89:25, 91:10
**JUDGE** [1] - 1:13
**judgment** [16] - 14:12, 19:19, 19:24, 20:23, 25:3, 25:17, 27:12, 27:18, 37:20, 47:20, 73:14, 73:15, 73:20, 76:9, 81:22, 81:24
**judgments** [3] - 25:13, 76:4, 76:21
**judicial** [1] - 51:5
**JUSTICE** [1] - 2:15

**K**

**K"(2** [1] - 1:6
**Katrina** [7] - 7:1, 7:8, 9:6, 16:1, 38:16, 57:21, 64:17
**KATRINA** [1] - 1:4
**KEA** [1] - 2:12
**keep** [2] - 29:4, 34:14
**Kennewick** [1] - 82:7
**kept** [1] - 26:17
**key** [3] - 14:12, 51:4, 68:16
**kind** [9] - 4:24, 17:3, 55:16, 57:17, 65:7, 77:24, 83:17, 85:10, 92:13
**knowledge** [2] - 78:22, 80:3
**knowledgeable** [1] - 88:2
**known** [3] - 38:10, 80:7, 80:10
**knows** [9] - 12:25, 13:13, 18:22, 20:5, 29:18, 37:19, 48:5, 52:20, 90:15

**L**

**LA** [4] - 1:22, 1:25, 2:6, 2:13
**lack** [2] - 53:14
**LAFAYETTE** [1] - 1:25
**lagoon** [1] - 38:22
**laid** [5] - 6:18, 8:19, 19:22, 20:5, 20:14
**Lake** [10] - 5:13, 5:23,

6:6, 6:10, 6:16, 10:15, 10:23, 15:1, 51:23, 79:4
**land** [3] - 13:6, 13:9
**language** [1] - 52:2
**large** [4] - 7:2, 35:2, 35:3, 79:13
**larger** [3] - 7:24, 9:25, 92:12
**largest** [1] - 27:3
**last** [5] - 28:24, 30:21, 46:21, 55:3, 87:12
**late** [1] - 72:3
**lateral** [1] - 23:22
**law** [8] - 6:14, 48:8, 48:14, 48:20, 50:18, 90:6, 90:7
**LAW** [1] - 2:11
**leader** [2] - 76:12, 76:19
**learned** [1] - 26:14
**least** [2] - 7:2, 53:20
**leave** [2] - 8:24, 47:7
**leaves** [1] - 37:11
**leaving** [2] - 12:4, 70:10
**Lee** [3] - 42:25, 43:2, 81:6
**legally** [1] - 38:5
**Leisure** [1] - 82:11
**length** [1] - 6:19
**lengthy** [1] - 31:9
**less** [3] - 15:13, 23:12, 25:11
**letters** [1] - 37:7
**letting** [1] - 55:20
**Levee** [7] - 5:19, 6:8, 6:20, 14:12, 18:5, 48:10, 51:6
**levee** [29] - 8:7, 8:11, 9:13, 9:18, 11:13, 16:6, 16:8, 16:14, 16:24, 18:2, 35:18, 40:24, 51:4, 51:19, 65:15, 66:18, 72:11, 72:12, 72:13, 72:21, 75:9, 75:24, 77:7, 78:2, 78:4, 78:5, 79:19
**levees** [74] - 5:12, 5:24, 6:5, 6:13, 6:18, 7:13, 7:24, 9:7, 9:9, 9:15, 10:5, 10:11, 11:4, 11:6, 11:7, 11:11, 11:13, 12:24, 14:7, 14:21, 15:13, 15:24, 15:25, 16:2, 16:5, 16:10, 16:11, 16:12, 18:11, 21:7, 35:24, 36:1, 48:10,

49:22, 50:19, 52:23, 70:17, 73:10, 74:12, 74:25, 75:12, 75:13, 75:16, 77:1, 77:4, 77:5, 77:8, 77:12, 77:20, 77:25, 78:7, 78:9, 78:17, 78:19, 78:21, 78:24, 78:25, 79:2, 79:3, 79:7, 79:8, 79:14, 79:15, 80:9, 80:12, 81:2, 82:20, 82:23, 83:1, 83:10, 83:16, 85:12, 85:14
**level** [3] - 8:7, 9:1, 43:3
**liability** [3] - 4:24, 5:7, 74:7
**liaison** [1] - 20:2
**licensed** [1] - 24:13
**lies** [1] - 62:16
**lift** [4] - 24:11, 56:17, 62:9, 69:22
**light** [5] - 65:7, 83:15, 83:18, 83:20, 84:14
**likened** [1] - 49:24
**limit** [2] - 91:12, 92:2
**limits** [2] - 72:10, 92:6
**line** [12] - 7:20, 16:15, 22:6, 22:14, 23:3, 23:5, 49:2, 67:13, 72:8, 72:11, 72:14, 78:4
**lines** [1] - 76:2
**link** [2] - 8:13, 73:4
**listened** [1] - 16:20
**literally** [1] - 10:21
**LITIGATION** [1] - 1:5
**litigation** [3] - 5:20, 26:24, 46:23
**load** [1] - 22:15
**location** [5] - 8:1, 11:19, 14:7, 15:17, 32:1
**locations** [1] - 13:13
**lock** [44] - 7:12, 7:18, 8:1, 8:3, 8:22, 9:4, 9:12, 9:14, 10:17, 10:20, 10:24, 11:5, 11:7, 11:12, 11:14, 11:15, 11:16, 11:19, 11:20, 11:22, 12:8, 12:20, 13:8, 13:17, 14:6, 15:24, 21:11, 21:12, 21:17, 31:6, 31:16, 31:22, 31:23, 32:18, 35:18, 50:24, 51:12, 51:16, 51:18, 79:16, 83:12
**logically** [1] - 51:15

**look** [30] - 9:21, 10:8, 10:10, 22:15, 24:20, 27:3, 30:3, 32:13, 34:1, 34:3, 34:10, 34:21, 36:9, 37:5, 40:17, 54:9, 56:6, 68:6, 69:9, 70:15, 71:1, 72:19, 72:20, 86:9, 86:23, 86:24, 86:25, 89:25
**looked** [3] - 44:10, 44:13, 44:15
**looking** [12] - 10:3, 14:3, 25:14, 29:4, 29:5, 29:18, 29:20, 29:23, 31:3, 58:13, 66:8
**looks** [5] - 42:23, 49:2, 69:8
**loose** [1] - 85:2
**LOS** [1] - 1:18
**lose** [1] - 48:15
**Louisiana** [4] - 50:18, 52:19, 93:9, 93:10
**LOUISIANA** [3] - 1:2, 1:7, 2:22
**Love** [1] - 86:18
**low** [2] - 50:3, 79:12
**lower** [2] - 5:15, 9:7
**lowered** [1] - 22:24
**LPV** [14] - 4:18, 14:21, 15:3, 16:2, 16:10, 17:16, 48:8, 49:8, 50:22, 51:3, 51:8, 51:16, 78:25, 79:1
**Lucy** [2] - 86:18

**M**

**Madeira** [1] - 9:23
**magnitude** [1] - 38:15
**Maguire** [1] - 49:6
**mainframe** [1] - 80:14
**maintaining** [1] - 23:16
**maintenance** [1] - 28:24
**major** [3] - 31:15, 35:8, 79:10
**majority** [1] - 47:9
**majors** [1] - 58:23
**Management** [1] - 64:7
**management** [1] - 59:9
**manager** [1] - 88:9
**managing** [1] - 19:20
**mandate** [2] - 55:1,

91:7
**mandated** [2] - 73:1, 79:2
**mandates** [6] - 25:4, 54:3, 54:4, 54:12, 69:18, 91:5
**mandating** [1] - 51:7
**mandatory** [23] - 47:10, 47:13, 48:18, 53:24, 54:21, 58:19, 58:21, 58:24, 59:1, 59:2, 59:7, 59:9, 59:14, 59:17, 60:2, 65:23, 68:7, 87:16, 87:20, 88:16, 88:21, 90:17
**manner** [1] - 37:10
**manual** [8] - 76:25, 77:2, 77:17, 78:10, 78:18, 80:11, 80:13
**manuals** [5] - 53:25, 59:14, 78:13, 80:7, 85:5
**manufacture** [1] - 89:18
**Marine** [9] - 53:8, 53:9, 60:16, 60:17, 69:22, 71:11, 72:24, 84:12
**maritime** [1] - 51:2
**massive** [3] - 35:14, 72:2, 84:11
**master** [1] - 11:10
**material** [11] - 75:23, 77:12, 79:2, 80:1, 80:4, 81:12, 81:15, 81:17, 85:2, 89:21, 90:4
**materials** [1] - 79:18
**matter** [10] - 19:14, 24:25, 47:3, 48:8, 48:14, 48:20, 51:11, 81:19, 81:23, 93:14
**MCCOLLAM** [1] - 2:3
**mean** [26] - 8:2, 12:8, 12:10, 12:18, 15:18, 25:7, 25:23, 38:20, 39:13, 40:8, 40:15, 41:14, 43:10, 45:12, 46:4, 46:7, 48:4, 55:15, 68:7, 68:8, 76:1, 87:18, 87:20, 88:17, 92:7
**meaning** [1] - 58:21
**meaningful** [1] - 17:11
**means** [5] - 41:14, 58:22, 60:25, 77:22, 87:19
**meat** [2] - 68:19, 91:8
**MECHANICAL** [1] -

2:24
**mechanism** [1] - 85:24
**mechanisms** [4] - 77:6, 77:18, 78:12, 78:15
**member** [2] - 20:6, 47:16
**mention** [5] - 25:16, 83:7, 83:12, 85:16, 86:24
**mentioned** [3] - 83:8, 86:10, 87:2
**mentions** [1] - 83:14
**Merit** [1] - 93:8
**merits** [2] - 41:3, 54:19
**mess** [2] - 72:17
**met** [1] - 46:21
**methods** [1] - 80:10
**meticulous** [1] - 92:13
**middle** [1] - 66:17
**might** [20] - 14:23, 22:9, 26:12, 31:19, 35:19, 37:25, 38:1, 38:9, 40:5, 42:18, 44:17, 51:8, 56:20, 57:7, 65:16, 71:5, 73:18, 83:1, 83:9, 90:18
**mind** [4] - 29:4, 51:10, 51:11, 73:17
**minute** [2] - 19:1, 63:20
**Mississippi** [4] - 8:8, 51:3, 51:23, 52:24
**mistaken** [1] - 43:6
**misunderstood** [1] - 15:21
**modification** [6] - 7:12, 8:23, 10:25, 18:10, 30:15, 36:15
**Modifications** [1] - 62:6
**modifications** [7] - 58:5, 62:7, 62:14, 72:4, 72:20, 87:22, 88:3
**modified** [2] - 11:14, 22:20
**modify** [1] - 72:18
**modifying** [1] - 14:7
**molding** [1] - 91:18
**moment** [8] - 48:12, 49:10, 55:7, 57:24, 58:19, 63:18
**money** [1] - 49:6
**montes** [1] - 47:23
**months** [1] - 46:21
**moot** [1] - 71:5

**morph** [1] - 52:3
**mosquitoes** [1] - 26:7
**most** [1] - 13:15
**motion** [7] - 4:17, 19:23, 46:25, 47:19, 47:20, 48:2, 90:9
**motions** [1] - 41:5
**MOTIONS** [1] - 1:12
**move** [3] - 13:3, 18:14, 31:18
**moved** [3] - 4:22, 31:12, 32:19
**movement** [1] - 79:24
**moves** [1] - 28:19
**movie** [1] - 49:5
**moving** [1] - 31:4
**MR** [151] - 3:5, 3:6, 3:8, 3:9, 4:14, 4:16, 4:20, 4:22, 7:4, 7:11, 7:15, 7:25, 8:5, 8:20, 11:11, 11:19, 12:8, 12:18, 12:23, 13:4, 13:12, 13:20, 13:22, 13:25, 14:3, 14:10, 15:21, 16:22, 17:1, 17:10, 17:19, 18:4, 18:6, 18:8, 18:10, 18:14, 18:17, 19:12, 20:11, 20:14, 21:3, 21:10, 21:20, 21:25, 22:10, 22:15, 23:4, 23:8, 23:11, 23:19, 24:5, 24:8, 25:6, 25:19, 26:21, 27:11, 27:15, 27:25, 28:5, 28:9, 28:13, 29:9, 33:22, 35:23, 36:3, 36:7, 38:14, 39:8, 39:11, 39:17, 39:20, 39:23, 40:1, 41:1, 41:8, 41:12, 41:17, 41:23, 42:2, 42:8, 43:6, 43:9, 43:12, 43:20, 43:25, 44:5, 44:7, 44:11, 44:14, 44:20, 45:4, 45:7, 45:9, 45:13, 45:16, 45:22, 46:6, 46:9, 46:12, 46:16, 46:20, 47:6, 47:19, 48:1, 49:5, 53:7, 54:4, 54:7, 54:9, 54:17, 55:2, 55:6, 56:16, 56:24, 57:23, 58:1, 60:5, 60:9, 61:13, 61:18, 61:24, 62:3, 62:20, 63:18, 64:3, 64:24, 65:5, 65:17, 65:22, 66:2, 66:10, 66:15, 66:19, 66:24,

67:9, 67:11, 67:18, 68:15, 70:5, 70:21, 72:1, 72:14, 72:23, 73:22, 86:17, 87:10, 91:4, 91:23, 92:1, 92:5, 92:11
**MRGO** [12] - 1:8, 10:16, 30:23, 45:17, 45:18, 48:9, 49:21, 50:25, 51:21, 51:24, 52:3
**MS** [13] - 3:7, 73:23, 76:12, 76:16, 76:18, 77:23, 81:19, 82:11, 82:13, 83:22, 84:2, 86:8, 86:14
**multi** [2] - 10:1, 10:13
**multi-purpose** [2] - 10:1, 10:13
**multiple** [2] - 35:4, 66:2
**musing** [1] - 51:5
**must** [14] - 35:1, 58:21, 60:13, 63:13, 67:4, 67:5, 67:6, 67:14, 70:7, 72:5, 73:15, 77:18
**muster** [1] - 56:4
**myriad** [3] - 50:5, 52:16, 53:13

# N

**name** [3] - 21:1, 54:14, 73:23
**nature** [2] - 10:10, 79:25
**nauseam** [1] - 82:11
**Navigation** [1] - 5:16
**navigation** [9] - 8:12, 8:21, 9:10, 9:19, 10:17, 10:18, 15:16, 16:18, 51:22
**navigational** [1] - 52:3
**Navy** [1] - 49:24
**near** [4] - 43:25, 44:5, 52:18, 54:18
**nearby** [1] - 78:19
**necessarily** [1] - 85:8
**necessary** [2] - 75:2, 79:18
**need** [13] - 10:8, 30:2, 33:1, 48:1, 53:21, 59:5, 63:20, 69:1, 69:8, 72:18, 83:12, 84:24, 91:8
**needed** [8] - 8:7, 11:14, 13:6, 24:21, 25:10, 25:11, 31:25,

36:18
**needs** [1] - 90:5
**negative** [2] - 55:19, 85:8
**neglected** [4] - 74:17, 79:5, 80:3, 82:13
**negligence** [9] - 17:17, 47:11, 49:21, 50:17, 53:17, 75:6, 75:19, 75:20, 82:15
**negligent** [3] - 25:1, 45:24, 52:11
**neighborhood** [2] - 6:3, 22:23
**NEPA** [6] - 45:9, 45:10, 45:11, 45:15, 45:20, 85:24
**never** [25] - 7:20, 20:9, 48:21, 49:11, 50:5, 51:2, 51:17, 58:25, 66:3, 67:2, 68:5, 69:11, 69:16, 69:18, 69:19, 69:21, 69:23, 71:4, 71:6, 71:24, 83:3, 83:13, 91:12
**NEW** [7] - 1:7, 1:22, 2:6, 2:10, 2:13, 2:22, 50:11
**New** [1] - 51:24
**new** [27] - 8:1, 8:2, 8:22, 9:3, 9:12, 9:14, 11:13, 11:14, 11:15, 11:19, 13:8, 21:12, 22:17, 22:18, 31:6, 32:18, 33:6, 36:3, 44:16, 44:18, 51:16, 58:11, 65:1, 72:19, 72:21, 84:14
**newly** [1] - 9:9
**next** [9] - 29:22, 30:12, 32:13, 35:2, 53:18, 53:19, 60:19, 63:2, 71:3
**nexus** [7] - 5:9, 5:11, 8:13, 8:19, 8:21, 12:16, 73:4
**nice** [1] - 46:19
**Nice** [1] - 4:15
**nicely** [1] - 47:15
**NINA** [1] - 2:4
**nine** [2] - 21:12, 31:6
**nine-volume** [2] - 21:12, 31:6
**Ninth** [2] - 5:15, 9:7
**NO** [2] - 1:9, 1:9
**nobody** [1] - 69:20
**none** [6] - 72:6, 84:16, 85:3, 86:4, 91:21
**nonetheless** [1] - 79:5
**nonexistent** [1] -

81:14
**normal** [2] - 74:8, 82:17
**north** [11] - 8:1, 9:12, 43:23, 43:25, 44:2, 44:3, 50:15, 52:12, 53:8, 72:24, 79:4
**note** [2] - 44:8, 79:10
**noted** [7] - 10:4, 75:18, 77:10, 81:15, 81:21, 82:19, 87:8
**nothing** [5] - 7:6, 34:2, 41:4, 68:18, 85:1
**notice** [1] - 40:23
**notion** [2] - 5:7, 38:25
**nowhere** [1] - 85:17
**nuclear** [3] - 40:14, 58:8
**nuisance** [2] - 26:9, 26:10
**Number** [3] - 4:12, 50:8, 51:1
**number** [5] - 42:8, 48:7, 51:1, 69:21, 71:13
**numbered** [1] - 93:13
**numbers** [2] - 29:10, 29:11
**NY** [1] - 2:10

**O**

**O'BRIEN** [1] - 2:9
**O'DONNELL** [49] - 1:16, 1:17, 46:20, 47:6, 47:19, 48:1, 49:5, 53:7, 54:4, 54:7, 54:9, 54:17, 55:2, 56:16, 56:24, 57:23, 58:1, 60:5, 60:9, 61:13, 61:18, 61:24, 62:3, 62:20, 63:18, 64:3, 64:24, 65:5, 65:17, 65:22, 66:2, 66:10, 66:15, 66:19, 66:24, 67:9, 67:11, 67:18, 68:15, 70:5, 70:21, 72:1, 72:14, 72:23, 73:22, 91:4, 91:23, 92:1, 92:11
**O'Donnell** [9] - 46:19, 71:23, 74:2, 77:10, 86:22, 87:11, 87:23, 88:18, 89:14
**O'DONNELL**............
.......................... [1] - 3:6
**object** [1] - 48:5

**objected** [1] - 48:4
**objections** [1] - 48:4
**objective** [1] - 81:25
**objectives** [1] - 87:1
**objects** [1] - 57:5
**obligated** [1] - 86:9
**obstacle** [1] - 85:11
**obtained** [2] - 64:14, 79:3
**obvious** [2] - 40:16, 82:19
**obviously** [1] - 25:7
**occur** [2] - 12:12, 36:14
**occurred** [9] - 9:11, 9:13, 15:5, 17:17, 30:25, 89:7, 89:8, 89:9
**occurs** [1] - 29:16
**October** [3] - 28:1, 64:10, 68:18
**OCTOBER** [2] - 1:7, 4:2
**off-the-record** [1] - 92:19
**office** [1] - 37:18
**officer** [2] - 19:24, 20:4
**officer's** [1] - 19:20
**OFFICIAL** [1] - 2:21
**Official** [2] - 93:9, 93:19
**often** [1] - 31:16
**old** [4] - 40:14, 44:18, 44:19, 47:11
**once** [1] - 32:17
**Once** [1] - 14:17
**one** [50] - 22:20, 24:20, 25:24, 26:13, 26:18, 27:4, 27:20, 27:23, 28:15, 28:24, 31:20, 34:5, 37:20, 39:20, 40:19, 40:20, 41:21, 44:18, 44:24, 48:7, 48:17, 48:18, 49:4, 51:1, 51:22, 52:14, 53:3, 53:9, 53:10, 53:20, 53:22, 59:23, 60:5, 60:6, 61:10, 61:13, 64:13, 67:1, 69:21, 70:23, 72:12, 73:19, 73:24, 74:4, 86:21, 88:17, 88:19, 91:2
**ones** [2] - 21:23, 36:3
**ongoing** [1] - 64:12
**openly** [1] - 47:2
**operation** [2] - 28:24, 37:2

**operations** [1] - 30:23
**opinion** [4] - 19:22, 20:15, 53:11
**opinions** [2] - 14:11, 20:6
**opposed** [1] - 24:22
**opposition** [2] - 81:5, 92:3
**optional** [2] - 46:2, 87:15
**oral** [1] - 58:25
**orchard** [1] - 10:7
**ORDER** [1] - 4:4
**order** [7] - 34:14, 47:4, 76:13, 76:19, 76:23, 78:16, 84:8
**orders** [2] - 72:20, 84:15
**original** [6] - 11:16, 41:20, 62:8, 62:14, 82:25, 84:17
**originally** [7] - 9:18, 40:20, 50:25, 58:10, 72:18, 78:9, 83:22
**Orleans** [1] - 51:24
**ORLEANS** [6] - 1:7, 1:22, 2:6, 2:13, 2:22, 50:11
**otherwise** [1] - 74:11
**outfall** [7] - 5:22, 5:24, 6:9, 6:11, 16:3, 16:5, 51:7
**outline** [2] - 78:13, 86:2
**outside** [5] - 15:5, 16:3, 19:4, 19:9, 43:17
**overall** [3] - 31:17, 35:7, 62:22
**overlapping** [1] - 10:22
**overseeing** [1] - 76:5
**oversight** [1] - 69:12
**overtopped** [1] - 6:2
**Owen** [1] - 47:15
**own** [10] - 31:18, 59:7, 69:17, 75:19, 78:10, 78:15, 79:16, 80:7, 80:11, 81:4

**P**

**P&S** [1] - 36:15
**P.M** [1] - 1:7
**p.m** [1] - 92:23
**P.O** [1] - 2:18
**pace** [1] - 31:18
**paddle** [2] - 50:10, 50:12

**page** [6] - 14:16, 45:23, 60:19, 72:9, 76:2, 92:6
**PAGE** [1] - 3:3
**pages** [12] - 21:14, 48:2, 72:10, 83:6, 90:12, 90:18, 91:10, 91:12, 92:2, 92:3, 92:4, 92:7
**paid** [1] - 42:11
**paper** [2] - 15:10, 73:14
**papers** [1] - 46:24
**parade** [1] - 89:8
**paragraph** [29] - 28:21, 29:10, 29:11, 29:12, 29:23, 29:25, 30:6, 30:7, 30:13, 32:4, 32:13, 32:14, 32:15, 33:9, 34:10, 34:17, 34:21, 35:2, 36:13, 37:5, 59:16, 60:9, 68:23, 87:13, 87:14, 88:22, 88:23, 88:24, 89:14
**paragraphs** [3] - 34:2, 83:7, 83:8
**parallel** [1] - 6:11
**parcel** [1] - 13:10
**pardon** [1] - 72:17
**Parish** [1] - 5:16
**part** [55] - 5:13, 6:6, 7:2, 7:3, 7:17, 7:20, 8:5, 9:4, 9:9, 9:18, 9:19, 9:25, 10:23, 10:25, 11:10, 11:12, 12:15, 12:16, 12:20, 12:23, 12:25, 13:10, 14:21, 15:1, 15:13, 15:24, 16:2, 16:10, 16:24, 17:16, 17:18, 17:25, 21:11, 21:12, 21:17, 23:19, 24:5, 25:16, 28:16, 29:13, 31:20, 31:22, 31:23, 39:8, 44:2, 44:3, 51:3, 52:19, 55:9, 61:18, 82:25, 87:12, 87:14, 87:15, 88:5
**participate** [1] - 91:21
**particular** [6] - 19:16, 37:1, 37:12, 37:16, 78:18, 79:16
**particularizes** [1] - 65:6
**particularly** [1] - 91:2
**parties** [1] - 48:3
**partly** [1] - 58:1
**parts** [2] - 11:14, 31:20

**party** [1] - 17:4
**passage** [2] - 14:12, 15:7
**passed** [2] - 6:14, 6:15
**pathway** [1] - 73:8
**patience** [1] - 87:10
**penalize** [1] - 19:2
**penetrated** [2] - 38:7, 40:15
**people** [5] - 25:7, 26:10, 63:17, 69:8, 69:21
**PEPPER** [1] - 2:21
**Pepper** [3] - 93:7, 93:17, 93:18
**per** [1] - 15:5
**perfect** [3] - 87:21, 88:14
**perform** [6] - 31:22, 54:13, 63:15, 69:12, 70:13, 77:6
**performance** [2] - 60:24, 61:4
**performed** [1] - 69:18
**performing** [4] - 20:2, 52:7, 77:15, 80:8
**perhaps** [4] - 27:1, 42:4, 52:18, 54:10
**perimeter** [1] - 68:2
**period** [2] - 7:10, 59:24
**permeability** [2] - 25:11, 91:21
**permission** [1] - 17:5
**permitting** [2] - 14:23, 17:5
**personnel** [7] - 24:1, 30:17, 36:17, 62:24, 63:8, 63:13, 70:6
**persuade** [1] - 53:21
**pertain** [1] - 32:9
**PERTAINS** [1] - 1:8
**phantom** [1] - 71:10
**phase** [44] - 25:25, 29:5, 29:11, 29:12, 29:13, 29:17, 29:22, 29:24, 30:1, 30:7, 30:9, 30:12, 30:13, 30:20, 30:21, 30:23, 33:7, 34:15, 34:16, 34:17, 35:5, 35:6, 36:10, 36:12, 36:14, 36:22, 46:23, 60:14, 61:3, 61:7, 61:9, 61:16, 63:3, 68:18, 88:24
**phases** [8] - 28:18, 28:19, 28:20, 28:22, 29:10, 31:18, 35:16

**physical** [5] - 10:4, 10:22, 79:22, 79:23, 80:5

**physically** [3] - 10:19, 10:20, 10:21

**pick** [1] - 48:2

**pictures** [1] - 38:23

**pieces** [2] - 34:7, 61:10

**PIERCE** [1] - 1:17

**pile** [4] - 40:5, 55:19, 55:20, 69:25

**piling** [1] - 43:21

**pilings** [1] - 38:20

**pistachio** [1] - 10:7

**pit** [8] - 24:4, 24:8, 26:3, 26:4, 26:24, 27:5, 27:6, 56:19

**pits** [1] - 26:16

**place** [13] - 5:1, 6:25, 7:6, 11:12, 11:15, 11:16, 11:23, 12:7, 13:16, 17:13, 26:18, 38:21, 39:4

**places** [2] - 40:10, 77:23

**plain** [2] - 5:12, 58:21

**plainly** [1] - 89:16

**plaintiff** [1] - 90:25

**PLAINTIFFS** [1] - 1:16

**plaintiffs** [13] - 6:7, 14:20, 18:13, 25:5, 27:17, 28:2, 28:13, 32:2, 50:3, 73:24, 74:3, 75:6, 86:11

**plaintiffs'** [11] - 4:23, 25:23, 33:17, 36:23, 41:2, 45:14, 46:23, 53:16, 73:25, 76:20, 88:10

**plan** [21] - 6:6, 11:9, 11:10, 13:11, 30:4, 33:15, 60:24, 62:8, 62:14, 63:14, 69:21, 71:1, 71:2, 71:5, 71:6, 71:14, 71:21, 72:6, 74:15, 82:25, 84:8

**planned** [2] - 11:4, 15:11

**planning** [1] - 87:1

**plans** [18] - 7:7, 20:19, 27:15, 30:9, 30:15, 32:25, 33:2, 33:6, 33:11, 33:16, 34:18, 36:15, 36:21, 36:23, 42:12, 72:19, 84:5, 88:4

**plates** [4] - 44:9, 44:10, 72:7, 72:10

**players** [1] - 89:19

**pleadings** [1] - 48:3

**pleasure** [1] - 46:22

**Pleistocene** [1] - 79:3

**point** [26] - 8:17, 11:24, 12:7, 13:4, 15:12, 17:15, 17:20, 18:7, 18:15, 19:3, 19:8, 32:22, 40:13, 43:16, 46:10, 52:5, 52:13, 53:13, 63:23, 69:23, 85:4, 92:5, 92:6, 92:11, 92:18

**pointed** [1] - 34:15

**pointing** [1] - 68:6

**points** [2] - 45:5, 45:20

**poles** [1] - 40:5

**policy** [18] - 28:25, 38:12, 59:9, 67:12, 74:8, 74:13, 74:16, 76:8, 76:22, 81:18, 81:20, 81:23, 81:24, 82:2, 82:15, 90:24, 90:25

**political** [1] - 82:1

**politically** [2] - 13:14, 13:16

**Pontchartrain** [10] - 5:13, 5:23, 6:6, 6:10, 6:16, 10:15, 10:23, 15:1, 51:23, 79:4

**porous** [2] - 53:13, 57:4

**Port** [1] - 51:24

**portion** [1] - 5:19

**pose** [1] - 85:7

**poses** [2] - 78:19, 85:7

**positing** [1] - 41:19

**position** [2] - 15:22, 69:6

**possible** [1] - 60:20

**potential** [11] - 29:16, 29:20, 55:19, 66:25, 68:4, 78:20, 83:3, 83:9, 83:14, 83:16, 84:10

**potentially** [2] - 74:24, 82:20

**PowerPoint** [3] - 47:17, 52:13, 69:3

**POYDRAS** [1] - 2:22

**practice** [1] - 58:19

**practices** [2] - 47:11, 68:20

**precedes** [1] - 29:19, 32:11

**preceding** [1] - 7:4

**precise** [3] - 22:5, 46:21, 47:13

**precision** [1] - 91:6

**preconstruction** [4] - 28:23, 30:8, 31:13, 34:16

**predecessor** [2] - 28:6, 64:25

**preliminary** [1] - 29:24

**preparation** [5] - 30:16, 31:24, 31:25, 35:11, 36:16

**prepare** [5] - 30:4, 35:6, 36:19, 47:16, 63:7

**prepared** [6] - 30:10, 30:11, 30:19, 34:19, 36:21

**prescribes** [1] - 19:16, 89:3

**presence** [2] - 19:4, 19:9, 43:17

**present** [4] - 28:24, 59:23, 74:14, 75:12

**presented** [3] - 74:2, 75:3, 79:11

**preserve** [3] - 22:1, 75:11, 75:15

**President** [1] - 31:2

**pressure** [1] - 78:20

**pretty** [3] - 7:8, 20:15, 90:20

**prevent** [5] - 5:15, 6:22, 15:4, 22:25, 24:15

**prevented** [1] - 73:7

**prevents** [1] - 74:6

**previously** [1] - 5:6

**principle** [2] - 23:21, 86:20

**principles** [5] - 55:16, 77:4, 77:5, 78:11, 82:4

**private** [2] - 74:8, 82:17

**probable** [1] - 60:24

**problem** [7] - 9:2, 29:15, 29:20, 30:5, 52:21, 52:25

**problems** [3] - 20:3, 79:1

**procedures** [2] - 57:10, 59:15

**proceed** [1] - 46:25

**proceedings** [7] - 19:3, 19:8, 43:16, 63:23, 92:18, 92:23, 93:13

**PROCEEDINGS** [3] - 1:12, 2:24, 4:1

**process** [19] - 17:4, 17:5, 17:6, 17:7,

20:7, 20:17, 28:25, 33:7, 57:10, 62:10, 62:11, 62:23, 81:11, 84:13, 88:6, 89:3, 89:4

**processed** [1] - 37:9

**produced** [2] - 35:1, 88:4

**PRODUCED** [1] - 2:25

**product** [1] - 59:21

**production** [4] - 31:5, 31:11, 32:18, 52:1

**products** [2] - 29:1, 59:20

**Professional** [1] - 93:8

**professional** [2] - 24:14, 81:22

**programs** [1] - 80:14

**progresses** [1] - 32:25

**project** [134] - 5:4, 5:10, 5:11, 5:14, 5:18, 5:23, 6:10, 6:16, 7:12, 7:15, 7:19, 7:21, 7:23, 8:11, 8:12, 8:21, 9:4, 9:5, 9:10, 9:19, 9:25, 10:1, 10:13, 10:15, 10:16, 10:17, 10:21, 10:23, 10:24, 11:1, 11:12, 12:6, 12:9, 12:10, 12:11, 12:16, 12:17, 12:19, 12:21, 12:23, 12:25, 13:11, 14:19, 15:1, 15:3, 15:5, 15:14, 15:16, 15:17, 15:24, 16:15, 16:16, 16:18, 17:13, 18:1, 18:2, 18:8, 21:11, 21:15, 21:17, 24:6, 27:19, 28:18, 28:19, 29:6, 29:13, 29:22, 30:7, 30:23, 30:24, 31:15, 31:16, 31:17, 31:20, 31:21, 31:22, 31:23, 32:22, 35:4, 35:7, 35:8, 35:12, 35:13, 35:14, 35:15, 36:6, 39:4, 40:7, 40:8, 49:16, 50:24, 51:3, 51:18, 51:22, 52:4, 52:8, 54:13, 58:6, 58:12, 59:10, 59:21, 60:15, 60:21, 61:3, 61:7, 61:13, 61:19, 62:23, 64:20, 64:21, 64:23, 64:25, 66:17, 68:17, 69:5, 79:10, 79:17, 80:18, 83:9, 83:12,

83:18, 84:9, 84:21, 85:17, 85:18, 86:5, 86:23, 88:3, 88:9, 89:5

**project's** [1] - 81:7

**projects** [10] - 5:8, 10:2, 10:15, 10:19, 14:5, 14:8, 28:25, 61:9, 84:22, 89:4

**promote** [1] - 51:22

**promulgated** [2] - 27:21, 28:1

**prong** [15] - 18:22, 19:13, 48:17, 52:14, 53:20, 53:21, 53:22, 73:19, 74:4, 74:5, 74:6, 74:19, 75:18, 75:19, 82:17

**prongs** [2] - 19:12, 25:15

**pronounce** [1] - 54:14

**pronouncing** [1] - 21:1

**proof** [1] - 23:25

**propensity** [1] - 77:11

**proper** [2] - 28:17, 85:9

**properly** [5] - 50:5, 53:2, 75:22, 81:22, 85:9

**properties** [2] - 75:22, 77:11

**property** [1] - 10:7

**proposal** [1] - 71:13

**proposed** [4] - 72:11, 77:19, 77:20, 85:19

**prospective** [1] - 15:23

**prospectively** [1] - 15:23

**protected** [2] - 75:24, 82:18

**protection** [5] - 5:14, 6:11, 8:7, 83:7, 87:4

**protects** [1] - 74:6

**provide** [6] - 21:6, 63:14, 70:16, 81:2, 87:16, 87:21

**provided** [2] - 69:13, 81:13

**provides** [2] - 4:24, 85:24

**providing** [1] - 88:8

**provision** [3] - 28:15, 29:5, 88:11

**provisions** [2] - 34:2, 88:11

**proximity** [1] - 24:2

**prudence** [1] - 27:9

**public** [1] - 30:2

**published** [1] - 14:16
**pull** [1] - 69:25
**pulling** [1] - 89:2
**purpose** [10] - 9:24, 10:1, 10:13, 15:3, 29:14, 29:15, 29:25, 51:14, 64:13, 87:1
**purposes** [2] - 51:22, 52:1
**pursuant** [1] - 81:21
**put** [14] - 13:17, 14:6, 27:23, 29:2, 42:15, 50:23, 51:16, 53:14, 57:1, 57:5, 61:19, 72:9, 87:3, 87:11
**puts** [1] - 68:19
**putting** [3] - 40:25, 53:1, 65:24

## Q

**qualified** [11] - 63:14, 63:17, 68:21, 68:24, 69:1, 69:6, 70:7, 70:8, 70:9, 71:5, 72:5
**quality** [1] - 16:12
**Quality** [1] - 64:6
**quandary** [1] - 9:17
**questions** [3] - 18:17, 27:8, 46:8
**quickly** [1] - 49:13
**quintessentially** [1] - 60:3
**quite** [3] - 7:9, 7:19, 15:19
**quote** [5] - 5:18, 5:19, 52:2, 52:7, 88:2
**quoted** [1] - 88:5
**quoting** [2] - 33:10, 34:8

## R

**raise** [1] - 9:1
**raised** [3] - 18:19, 56:21, 60:16
**raises** [1] - 84:18
**random** [1] - 83:19
**rather** [4] - 65:14, 72:11, 80:22, 81:5
**rational** [1] - 74:17
**RE** [1] - 1:4
**reach** [1] - 14:14
**Reach** [2] - 48:11, 49:22
**reached** [1] - 7:15
**reaching** [1] - 51:8

93:8
**read** [10] - 48:22, 48:23, 58:23, 58:24, 87:12, 87:15, 89:2, 89:15, 89:23, 91:23
**reading** [5] - 29:14, 29:24, 54:10, 68:9
**real** [1] - 52:21
**reality** [4] - 6:12, 15:8, 34:9, 42:23
**realize** [5] - 7:7, 11:25, 26:19, 33:4, 45:18
**realized** [4] - 39:3, 39:5, 39:13, 85:4
**really** [11] - 24:23, 25:21, 26:23, 29:3, 36:7, 39:1, 43:12, 51:20, 58:25, 65:12, 90:16
**Realtime** [1] - 93:7
**reason** [2] - 27:22, 28:17
**reasonable** [1] - 40:2
**reasoning** [2] - 32:8, 82:5
**reasons** [7] - 13:14, 37:25, 38:1, 38:2, 86:10
**rebuilding** [1] - 13:8
**rebuttal** [1] - 46:18
**recently** [1] - 81:10
**recess** [2] - 63:20, 63:24
**recommended** [1] - 30:4
**reconnaissance** [6] - 28:22, 29:12, 29:13, 29:15, 29:17, 30:25
**reconsider** [1] - 47:3
**record** [13] - 23:25, 31:7, 32:16, 43:13, 43:14, 67:12, 70:7, 81:15, 83:5, 83:6, 92:16, 92:19, 93:13
**RECORDED** [1] - 2:24
**red** [1] - 58:1
**reference** [3] - 6:14, 71:24, 72:8
**referenced** [1] - 35:9
**referred** [1] - 39:9
**referring** [2] - 17:21, 35:3
**reflect** [1] - 63:6
**regard** [5] - 50:1, 51:21, 72:1, 76:23, 86:4
**regarded** [1] - 25:1
**regarding** [5] - 21:7, 33:19, 70:16, 81:2, 81:14
**Registered** [2] - 93:7,

**regulation** [41] - 19:15, 19:18, 20:24, 24:18, 27:22, 28:6, 28:9, 28:14, 28:16, 28:18, 28:21, 29:4, 29:14, 29:25, 33:23, 34:1, 34:6, 35:10, 36:25, 37:11, 37:13, 55:4, 57:15, 57:16, 57:19, 62:13, 62:20, 63:9, 64:5, 64:10, 65:1, 66:24, 68:25, 69:3, 69:15, 88:1, 88:13, 89:1, 89:12, 89:13
**regulations** [28] - 27:17, 47:10, 48:18, 48:22, 49:12, 53:24, 54:2, 54:10, 55:2, 55:7, 56:1, 56:5, 58:11, 58:18, 59:11, 59:13, 60:10, 60:23, 64:14, 67:1, 68:6, 68:10, 73:11, 86:2, 87:17, 87:19, 90:17, 91:2
**rejected** [1] - 49:15
**rejecting** [1] - 82:4
**relate** [2] - 65:12, 88:3
**related** [2] - 34:22, 51:20
**relates** [1] - 49:3
**relation** [2] - 66:18, 66:21
**relevant** [3] - 59:22, 66:4, 85:16
**relied** [1] - 91:3
**relies** [1] - 77:14
**remedial** [1] - 83:13
**Remedial** [1] - 64:7
**remediate** [1] - 84:8
**remediated** [1] - 65:14
**remediating** [2] - 13:5, 13:9
**remediation** [16] - 12:3, 12:10, 12:11, 12:20, 16:17, 19:21, 24:2, 24:3, 26:19, 36:6, 52:8, 61:17, 61:18, 65:15, 83:13
**remedy** [1] - 85:9
**remember** [4] - 26:13, 49:5, 69:14, 86:18
**removal** [8] - 55:19, 55:20, 69:22, 71:14, 71:20, 75:10, 75:14, 75:23
**remove** [4] - 31:25, 42:12, 42:14, 42:18

**removed** [1] - 42:15
**removing** [3] - 33:5, 42:24, 84:25
**rendered** [1] - 79:14
**renovation** [1] - 35:17
**replace** [2] - 11:13, 13:7
**replaced** [1] - 9:16
**replacement** [16] - 7:12, 9:4, 9:10, 10:17, 10:21, 10:24, 12:9, 12:21, 12:24, 15:24, 21:11, 50:24, 51:13, 51:18, 75:10, 79:16
**Report** [1] - 50:8
**report** [23] - 6:17, 20:3, 21:13, 31:6, 31:9, 31:10, 31:11, 32:3, 32:6, 32:9, 32:10, 32:12, 32:15, 32:19, 34:24, 35:12, 38:22, 41:21, 45:23, 50:7, 53:5, 86:23
**reporter** [3] - 19:5, 19:10, 43:18
**REPORTER** [1] - 2:21
**Reporter** [6] - 93:7, 93:8, 93:9, 93:19
**REPORTER'S** [1] - 93:5
**reports** [6] - 30:15, 30:19, 36:20, 36:21, 80:14
**representation** [1] - 74:10
**representative** [3] - 19:20, 19:24, 37:18
**requested** [1] - 87:22
**require** [8] - 25:10, 25:11, 34:11, 37:13, 55:16, 58:11, 60:23, 67:22
**required** [24] - 10:24, 18:10, 19:20, 19:25, 20:18, 20:23, 24:18, 32:3, 33:23, 36:24, 54:12, 60:1, 65:8, 66:11, 66:12, 66:14, 68:8, 68:22, 68:23, 68:24, 84:22, 88:2, 88:11
**requirement** [4] - 34:22, 46:13, 46:14, 75:25
**requirements** [11] - 28:15, 34:25, 47:13, 58:14, 59:9, 59:14, 59:18, 64:14, 65:11, 67:21, 76:9

**requires** [5] - 8:22, 19:14, 61:2, 69:14, 70:3
**requiring** [1] - 48:23
**residents** [1] - 22:22
**respect** [1] - 27:7
**respond** [1] - 46:4
**response** [2] - 76:20, 89:23
**responsibilities** [1] - 64:14
**responsibility** [7] - 21:9, 70:22, 76:4, 77:6, 80:21, 81:3
**responsible** [2] - 75:7, 76:13
**rest** [4] - 4:25, 62:17
**restraining** [1] - 56:12
**result** [9] - 5:9, 6:1, 7:21, 7:22, 8:12, 11:14, 25:24, 26:14, 82:20
**resulted** [1] - 5:21
**resulting** [1] - 6:2
**review** [18] - 30:18, 34:23, 36:18, 37:6, 37:8, 37:11, 37:14, 37:15, 58:12, 69:2, 69:24, 71:12, 71:15, 71:18, 72:5, 81:9, 87:14, 89:20
**reviewed** [9] - 34:12, 37:2, 37:19, 37:22, 37:23, 71:4, 71:6, 89:19
**reviewing** [2] - 27:15, 37:18
**revised** [2] - 71:12, 71:18
**rise** [1] - 4:7
**river** [2] - 8:3, 8:6
**River** [4] - 8:8, 51:3, 51:23, 52:24
**riverine** [1] - 11:21
**RMR** [2] - 2:21, 93:18
**Robin** [1] - 4:16
**ROBIN** [1] - 2:16
**robin's** [1] - 60:9
**Robinson** [3] - 23:20, 49:20, 51:21
**ROBINSON** [1] - 2:5
**room** [2] - 42:24, 59:3
**ROOM** [1] - 2:22
**ROY** [2] - 1:23, 1:24
**rubric** [2] - 54:6, 54:7
**Rule** [1] - 47:23
**rule** [3] - 48:14, 48:20, 48:25
**ruled** [4] - 5:6, 13:13, 47:24, 81:10

**rules** [1] - 92:13
**ruling** [2] - 5:19, 6:7
**rulings** [1] - 48:15
**runs** [1] - 23:8
**rush** [1] - 46:7

# S

**s/Cathy** [1] - 93:17
**safe** [1] - 92:21
**safety** [12] - 23:20, 23:24, 58:13, 58:14, 59:5, 75:21, 77:8, 77:13, 81:20, 82:16, 82:21, 85:14
**salient** [1] - 13:4
**samples** [3] - 37:7, 83:23, 84:2
**sand** [2] - 79:14, 85:2
**satisfy** [1] - 68:13
**Saucer** [6] - 53:9, 60:17, 69:22, 71:11, 72:23, 84:12
**save** [1] - 25:5
**saw** [1] - 40:14
**scientific** [1] - 81:25
**scope** [4] - 35:15, 84:9, 84:14, 87:1
**scopes** [1] - 84:15
**score** [1] - 43:1
**scores** [2] - 26:21, 42:9
**Scott** [1] - 82:7
**SCOTT** [1] - 1:21
**scream** [1] - 86:19
**screen** [1] - 87:12
**se** [1] - 15:5
**sea** [1] - 43:3
**seals** [1] - 70:1
**seated** [2] - 4:8, 64:1
**second** [3] - 18:14, 64:5, 69:3
**secondly** [2] - 51:25, 73:17
**Section** [5] - 5:6, 5:17, 5:20, 14:22, 62:4
**SECTION** [1] - 1:6
**section** [5] - 28:21, 60:19, 69:24, 71:17, 87:11
**sections** [2] - 57:18, 66:3
**sediment** [1] - 79:13
**see** [28] - 4:15, 9:21, 9:22, 17:10, 18:12, 19:25, 20:12, 25:14, 32:13, 35:10, 40:7, 40:12, 40:19, 45:4, 46:19, 48:24, 49:10,

52:15, 52:21, 53:7, 56:11, 57:24, 58:10, 58:19, 60:20, 67:17, 89:3, 90:4
**seem** [1] - 72:10
**seemingly** [1] - 38:6
**seepage** [18] - 10:5, 10:6, 39:1, 39:3, 39:6, 39:7, 39:13, 39:16, 41:20, 55:12, 56:11, 56:14, 66:7, 66:11, 67:14, 73:1, 79:15
**segment** [1] - 61:9
**selected** [5] - 30:18, 36:18, 37:3, 37:6
**sense** [3] - 15:10, 16:23, 62:13
**sentence** [1] - 33:13
**separate** [5] - 10:14, 28:20, 35:9, 35:19, 61:11
**separated** [1] - 31:20
**serious** [1] - 60:15
**serves** [1] - 33:9
**services** [1] - 70:14
**session** [2] - 4:8, 63:25
**set** [6] - 6:8, 30:7, 30:13, 34:17, 47:14, 80:10
**sets** [3] - 48:23, 77:4, 77:17
**settlement** [1] - 79:10
**several** [2] - 21:13, 77:23
**sewer** [2] - 24:10, 56:17, 69:22
**sewerage** [1] - 62:9
**shall** [6] - 4:25, 37:9, 58:21, 87:16, 87:18, 87:21
**shallow** [1] - 56:19
**shear** [1] - 79:12
**sheds** [1] - 65:7
**sheet** [2] - 40:5, 43:20
**SHERMAN** [2] - 2:11, 2:12
**shield** [4] - 75:18, 75:20, 77:14, 82:17
**ship** [1] - 49:24
**shipping** [1] - 51:22
**shoddy** [1] - 58:16
**shop** [1] - 37:7
**shore** [1] - 79:4
**short** [2] - 72:23, 86:8
**shortest** [1] - 92:2
**shorthand** [1] - 55:3
**show** [4] - 44:14, 49:7, 73:4, 88:18

**Show** [1] - 49:6
**showed** [4] - 63:8, 66:25, 68:11, 81:16
**showing** [1] - 53:18
**shows** [3] - 24:19, 53:3, 71:3
**shred** [1] - 51:11
**side** [4] - 22:21, 39:20, 39:21, 90:14
**significance** [2] - 74:20, 82:19
**significant** [7] - 23:16, 75:2, 85:7, 85:13, 85:16, 85:25, 86:3
**signs** [1] - 52:16
**silt** [1] - 85:2
**silts** [1] - 80:1
**similar** [5] - 6:12, 9:22, 17:3, 17:12
**simply** [1] - 8:11
**simultaneous** [1] - 91:13
**simultaneously** [1] - 90:12
**single** [1] - 35:12
**sister** [1] - 48:9
**site** [31] - 30:19, 31:3, 33:8, 36:19, 53:8, 60:16, 60:17, 65:4, 65:13, 65:14, 79:9
**sites** [2] - 56:24, 64:15
**sitting** [1] - 46:17
**situ** [1] - 72:15
**situation** [12] - 9:10, 9:22, 10:14, 14:14, 16:6, 17:12, 41:16, 48:9, 50:16, 64:9, 65:10, 70:13
**situations** [1] - 17:11
**size** [1] - 35:11
**skeptical** [1] - 45:19
**sketches** [1] - 35:15
**skimming** [5] - 83:15, 83:18, 83:20, 84:10, 84:14
**skip** [1] - 62:17
**slants** [1] - 23:9
**slide** [16] - 53:3, 53:18, 53:19, 55:18, 56:10, 57:10, 59:19, 63:2, 67:5, 67:22, 68:23, 69:4, 69:11, 71:3
**Slide** [12] - 54:9, 59:7, 59:13, 60:23, 61:2, 62:18, 63:10, 69:7, 69:23, 70:11, 71:7, 88:15
**slides** [2] - 66:10, 88:15

**slight** [1] - 67:3
**slope** [3] - 23:10, 23:11, 80:12
**slowing** [1] - 63:21
**small** [1] - 25:14
**SMITH** [100] - 2:16, 4:14, 4:16, 4:20, 4:22, 7:4, 7:11, 7:15, 7:25, 8:5, 8:20, 11:11, 11:19, 12:8, 12:18, 12:23, 13:4, 13:12, 13:20, 13:22, 13:25, 14:3, 14:10, 15:21, 16:22, 17:1, 17:10, 17:19, 18:4, 18:6, 18:8, 18:10, 18:14, 18:17, 19:12, 20:11, 20:14, 21:3, 21:10, 21:20, 21:25, 22:10, 22:15, 23:4, 23:8, 23:11, 23:19, 24:5, 24:8, 25:6, 25:19, 26:21, 27:11, 27:15, 27:25, 28:5, 28:9, 28:13, 29:9, 33:22, 35:23, 36:3, 36:7, 38:14, 39:8, 39:11, 39:17, 39:20, 39:23, 40:1, 41:1, 41:8, 41:12, 41:17, 41:23, 42:2, 42:8, 43:6, 43:9, 43:12, 43:20, 43:25, 44:5, 44:7, 44:11, 44:14, 44:20, 45:4, 45:7, 45:9, 45:13, 45:16, 45:22, 46:6, 46:9, 46:12, 46:16, 55:6, 87:10, 92:5
**Smith** [13] - 4:15, 4:16, 11:2, 14:2, 19:1, 49:1, 58:25, 61:9, 64:5, 64:19, 70:20, 87:9, 91:7
**SMITH.......................
........................** [2] -
3:5, 3:9
**snappy** [1] - 45:8
**social** [2] - 74:16, 82:2
**socially** [1] - 13:16
**soil** [8] - 23:13, 23:16, 50:6, 52:25, 53:1, 57:2, 75:9, 79:1
**soils** [10] - 22:16, 22:17, 24:16, 41:24, 53:13, 78:25, 79:2, 79:11, 83:15, 84:24
**sole** [1] - 81:16
**solid** [1] - 85:1
**solution** [2] - 29:16,

30:1
**solutions** [1] - 29:21
**solve** [1] - 30:5
**sometime** [1] - 44:25
**sometimes** [2] - 12:1, 18:24
**somewhat** [1] - 68:7
**sorry** [9] - 14:1, 17:19, 19:6, 23:4, 24:5, 41:22, 62:20, 63:21, 91:21
**sort** [5] - 15:9, 31:17, 34:14, 46:1, 58:20
**sought** [1] - 6:7
**sound** [2] - 27:12, 55:16
**sounds** [1] - 61:11
**south** [7] - 8:2, 9:13, 50:15, 52:12, 53:9, 53:10, 72:25
**SOUTH** [1] - 1:17
**Southeast** [1] - 52:19
**space** [2] - 57:5, 58:9
**spaced** [1] - 90:18
**SPEAKERS** [1] - 3:3
**specific** [10] - 6:9, 30:2, 47:12, 54:11, 59:11, 61:7, 77:6, 78:22, 88:12, 89:6
**specifically** [5] - 6:13, 37:2, 65:25, 75:10, 81:20
**specifications** [12] - 20:19, 30:10, 30:16, 33:1, 33:2, 33:6, 33:11, 33:16, 34:18, 36:16, 81:14, 88:4
**specifies** [1] - 66:24
**speculate** [1] - 60:18
**speculative** [1] - 11:4
**spoken** [1] - 86:20
**SS** [2] - 50:11
**St** [1] - 5:16
**ST** [1] - 2:6
**stability** [40] - 17:1, 21:7, 21:15, 21:21, 22:2, 22:6, 22:14, 23:2, 23:5, 23:6, 23:13, 23:17, 24:8, 44:7, 44:14, 44:16, 44:22, 48:22, 49:2, 49:8, 53:15, 55:12, 55:13, 56:12, 65:11, 66:11, 66:12, 70:16, 71:24, 72:8, 72:11, 73:1, 75:15, 79:1, 79:10, 80:9, 80:12, 81:2, 84:22, 84:23
**stage** [3] - 7:15, 31:5, 68:17

**stages** [1] - 8:6
**staging** [1] - 11:2
**stagnant** [1] - 26:6
**standards** [6] - 59:15, 74:9, 75:11, 75:21, 81:23, 81:25
**STANWOOD** [1] - 1:12
**start** [1] - 59:19
**started** [1] - 70:19
**starting** [1] - 61:8
**State** [1] - 93:9
**statement** [13] - 31:10, 64:13, 74:22, 74:23, 75:3, 76:21, 82:24, 84:17, 86:25, 89:25, 90:1, 90:2, 90:3
**States** [7] - 4:16, 4:22, 4:25, 44:8, 82:8, 93:10, 93:20
**STATES** [3] - 1:1, 1:13, 2:15
**States'** [1] - 5:7
**station** [3] - 24:11, 62:9, 69:22
**STATION** [1] - 2:17
**statute** [2] - 19:15, 19:18
**statutory** [1] - 86:25
**STENOGRAPHY** [1] - 2:24
**stiff** [1] - 79:3
**still** [5] - 12:14, 36:10, 57:20, 64:11, 79:17
**straightforward** [1] - 15:19
**STREET** [6] - 1:17, 1:21, 1:24, 2:9, 2:12, 2:22
**Street** [3] - 14:17, 14:24, 14:25
**strength** [1] - 79:12
**strengthening** [1] - 51:17
**stress** [1] - 87:7
**stronger** [1] - 51:19
**struck** [1] - 16:1
**structural** [3] - 67:4, 75:15, 83:10
**structure** [16] - 22:15, 22:17, 22:18, 23:12, 23:13, 23:22, 24:10, 24:14, 26:17, 52:9, 54:19, 56:12, 60:12, 79:6, 84:20, 85:1
**structures** [17] - 5:25, 6:22, 6:25, 7:1, 7:4, 8:23, 9:3, 10:25, 22:16, 23:24, 33:4, 33:5, 41:24, 62:8, 76:7, 77:9, 84:11

**struggle** [1] - 16:19
**struggling** [1] - 17:10
**studies** [5] - 30:3, 30:5, 41:23, 41:24, 60:10
**study** [8] - 32:5, 33:25, 34:4, 34:11, 42:23, 60:20, 61:8, 61:14
**stuff** [1] - 62:17
**submarine** [7] - 50:4, 50:9, 50:10, 50:12, 52:11, 58:8, 73:8
**submission** [2] - 22:10, 90:11
**submissions** [1] - 72:9
**submit** [7] - 20:19, 22:10, 49:11, 49:25, 53:23, 67:12, 90:13
**submittal** [4] - 37:12, 37:13, 37:16, 37:20
**submittals** [5] - 30:18, 34:12, 36:19, 37:4, 37:6
**submitted** [2] - 36:24, 37:14
**substances** [1] - 32:1
**substantial** [2] - 50:18, 53:17
**subsurface** [1] - 79:14
**subterranean** [2] - 10:6, 33:4
**sudden** [1] - 58:7
**sufficient** [2] - 24:15, 41:2
**suggest** [3] - 64:8, 78:11, 92:1
**suggested** [5] - 37:24, 75:4, 78:3
**suggestion** [1] - 74:11
**suggests** [1] - 78:10
**SUITE** [2] - 1:18, 2:6
**summary** [6] - 19:23, 33:9, 47:19, 73:13, 73:15, 73:20
**superimposition** [1] - 23:6
**supervision** [1] - 40:17
**supplement** [1] - 67:19
**supplemental** [2] - 22:10, 85:20
**Support** [1] - 62:6
**supporting** [1] - 74:13
**supposed** [4] - 34:4, 36:14, 54:24, 62:25
**Supreme** [1] - 10:3
**Surekote** [1] - 24:3
**surface** [2] - 71:19,

79:25
**surge** [1] - 38:15
**surprise** [1] - 20:10
**surround** [1] - 24:14
**surrounding** [4] - 6:3, 22:16, 75:9, 79:22
**susceptible** [1] - 8:25
**swim** [1] - 26:12
**swimming** [1] - 26:11
**switched** [1] - 61:25
**swollen** [1] - 73:9

## T

**tab** [1] - 60:20
**tables** [2] - 42:20, 42:22
**talks** [5] - 32:13, 36:20, 37:6, 45:23, 65:18
**tandem** [1] - 7:23
**task** [6] - 20:22, 20:23, 76:12, 76:19, 76:23, 84:8
**tasked** [1] - 20:22
**tax** [1] - 92:7
**team** [4] - 20:6, 37:19, 76:12, 76:18
**tear** [1] - 8:24
**Technical** [1] - 50:8
**technical** [3] - 34:23, 53:5, 80:13
**temporal** [1] - 28:19
**temporary** [1] - 56:12
**ten** [6] - 52:18, 55:18, 76:3, 92:2, 92:4, 92:9
**tends** [1] - 14:4
**TERC** [1] - 76:19
**term** [1] - 57:24
**terms** [6] - 17:12, 19:25, 23:16, 27:12, 30:24, 63:10
**test** [4] - 18:22, 19:13, 87:10, 89:12
**testified** [10] - 21:6, 54:11, 68:11, 69:6, 70:23, 75:17, 76:1, 76:2, 80:17, 80:23
**testifies** [3] - 54:18, 71:6, 81:6
**testimony** [14] - 23:20, 24:17, 43:5, 67:11, 67:16, 69:17, 70:14, 70:21, 71:3, 71:12, 73:13, 77:25, 80:20, 80:25
**testing** [1] - 81:11
**tests** [1] - 37:8

**Thanksgiving** [1] - 47:16
**THE** [172] - 1:12, 1:16, 2:8, 2:15, 3:10, 4:7, 4:9, 4:10, 4:13, 4:15, 4:19, 4:21, 6:24, 7:6, 7:14, 7:17, 8:4, 8:9, 11:2, 11:18, 11:24, 12:10, 12:22, 13:2, 13:10, 13:18, 13:21, 13:23, 14:1, 14:9, 15:6, 16:4, 16:25, 17:8, 17:15, 17:22, 18:5, 18:7, 18:9, 18:12, 18:16, 19:1, 19:6, 19:11, 20:8, 20:13, 20:25, 21:5, 21:19, 21:21, 22:4, 22:12, 23:2, 23:5, 23:10, 23:18, 23:25, 24:7, 24:23, 25:18, 26:13, 27:10, 27:14, 27:23, 28:2, 28:8, 28:12, 29:7, 33:17, 35:21, 36:1, 36:5, 38:4, 38:18, 39:10, 39:12, 39:19, 39:22, 39:24, 40:7, 41:7, 41:9, 41:14, 41:20, 42:1, 42:6, 43:2, 43:8, 43:10, 43:14, 43:19, 43:22, 44:2, 44:6, 44:10, 44:12, 44:15, 44:22, 45:6, 45:8, 45:11, 45:14, 45:17, 46:4, 46:7, 46:10, 46:15, 46:18, 47:5, 47:18, 47:25, 49:1, 53:6, 54:2, 54:5, 54:8, 54:16, 55:1, 55:5, 56:14, 56:23, 57:22, 57:25, 60:4, 60:8, 61:6, 61:16, 61:20, 62:1, 62:19, 63:16, 63:20, 63:25, 64:2, 64:18, 65:3, 65:12, 65:21, 65:25, 66:6, 66:14, 66:16, 66:20, 67:6, 67:10, 67:16, 68:14, 70:3, 70:19, 71:23, 72:7, 72:22, 73:21, 76:10, 76:15, 76:17, 77:21, 81:18, 82:10, 82:12, 83:20, 83:25, 86:6, 86:13, 86:16, 87:8, 90:10, 91:5, 91:25, 92:9, 92:12, 92:20
**theirs** [1] - 92:5
**theory** [1] - 53:16

**therefore** [5] - 8:6, 34:5, 38:25, 87:17, 89:10
**they've** [5] - 34:24, 52:23, 58:15, 69:16, 89:18
**thinking** [4] - 26:8, 45:22, 56:3, 56:4
**third** [4] - 17:4, 30:7, 32:20, 34:15
**thoroughly** [1] - 47:3
**thousand** [1] - 21:14
**thousands** [1] - 83:6
**three** [17] - 4:23, 26:22, 37:20, 45:23, 47:1, 48:3, 51:2, 83:15, 83:18, 83:20, 84:1, 84:3, 84:4, 84:6, 84:8, 84:10, 85:23
**three-foot** [1] - 84:10
**three-to-five-foot** [1] - 83:15
**throughout** [1] - 48:6
**Tim** [1] - 86:17
**timely** [1] - 37:9
**title** [1] - 64:8
**TO** [2] - 1:8, 4:4
**to-be-constructed** [1] - 22:7
**today** [2] - 50:2, 53:25
**together** [1] - 34:8
**Tommy** [1] - 47:16
**took** [5] - 13:6, 28:10, 46:1, 50:20, 67:19
**topography** [2] - 23:7, 79:24
**tort** [1] - 74:12
**Tort** [2] - 18:19, 75:7
**TORTS** [1] - 2:17
**torts** [1] - 74:7
**totally** [1] - 33:10
**touches** [1] - 59:1
**touching** [1] - 51:16
**tracks** [2] - 32:22, 33:14
**tradition** [1] - 82:4
**transcript** [2] - 91:24, 93:12
**TRANSCRIPT** [2] - 1:12, 2:24
**trial** [5] - 23:20, 41:3, 46:25, 47:11, 90:20
**tributaries** [1] - 8:8
**tributary** [1] - 51:3
**tried** [4] - 26:15, 78:15, 80:10, 89:18
**trigger** [1] - 67:7
**trip** [2] - 18:24, 92:21
**trouble** [1] - 22:5

**true** [8] - 16:4, 50:1, 52:9, 71:11, 78:15, 90:1, 93:11
**try** [3] - 26:12, 45:2, 52:23
**trying** [3] - 17:22, 29:20, 66:23
**turning** [1] - 49:6
**two** [32] - 5:5, 10:19, 14:5, 14:8, 15:15, 18:22, 19:12, 24:15, 25:15, 26:23, 27:17, 31:10, 47:21, 49:13, 51:1, 51:21, 52:1, 53:21, 55:2, 55:7, 56:24, 56:25, 60:23, 67:4, 74:5, 74:6, 74:19, 75:18, 75:19, 76:3, 82:17, 91:13
**two-prong** [1] - 18:22
**twofold** [1] - 56:16
**type** [5] - 69:9, 76:15, 92:6, 92:11
**typically** [1] - 20:18

### U

**ultimate** [2] - 22:24, 58:13
**ultimately** [3] - 8:16, 58:4, 85:21
**unacceptable** [2] - 13:14, 13:15
**unavoidably** [1] - 13:12
**uncompleted** [1] - 46:23
**undeniably** [1] - 10:16
**under** [18] - 14:22, 25:21, 33:20, 38:6, 50:13, 50:18, 54:3, 54:5, 56:5, 66:16, 68:22, 73:10, 74:19, 75:7, 76:19, 82:16, 84:8, 86:12
**undergo** [2] - 78:11, 80:9
**underlay** [1] - 74:12
**underlie** [1] - 82:6
**undermining** [1] - 40:24
**underseepage** [11] - 33:20, 48:22, 49:2, 49:8, 52:21, 65:11, 65:16, 68:4, 75:22, 77:11, 79:17
**understood** [4] - 9:8, 44:12, 80:18, 84:19
**understructure** [1] -

78:7
**undertake** [1] - 56:9
**undertaking** [1] - 60:22
**underway** [1] - 11:21
**undisputed** [7] - 5:2, 5:3, 5:5, 5:12, 8:9, 48:4, 76:21
**undoubtedly** [1] - 14:18
**unintentionally** [1] - 74:16
**unique** [2] - 78:22, 80:7
**UNITED** [3] - 1:1, 1:13, 2:15
**United** [8] - 4:16, 4:22, 4:25, 5:7, 44:8, 82:8, 93:10, 93:20
**unless** [1] - 9:8
**unquote** [1] - 52:9
**unstable** [1] - 22:19
**up** [20] - 8:7, 8:16, 20:18, 29:2, 31:4, 39:14, 40:9, 45:20, 47:14, 48:2, 53:4, 57:5, 57:20, 58:4, 58:9, 63:21, 64:16, 64:19, 70:1, 83:19
**updated** [2] - 59:22, 66:3
**uplift** [2] - 78:20, 79:15
**urge** [3] - 46:24, 48:20, 90:8
**urging** [2] - 33:21, 33:22
**uses** [1] - 28:22

### V

**Valley** [1] - 9:25
**varied** [1] - 80:2
**variety** [2] - 13:13, 31:17
**various** [5] - 14:4, 32:14, 33:3, 34:2, 89:18
**version** [1] - 14:16
**viability** [2] - 62:11, 88:8
**vicinity** [20] - 5:14, 61:1, 75:24, 77:7, 77:12, 77:19, 77:20, 77:21, 77:22, 77:25, 78:4, 78:17, 78:19, 79:7, 79:11, 80:2, 82:23, 83:1, 84:10, 85:14

**view** [1] - 26:11
**viewed** [1] - 89:2
**violated** [7] - 27:18, 27:19, 28:14, 34:5, 66:1, 66:2, 87:25
**violation** [3] - 74:4, 74:5, 89:10
**Violet** [1] - 31:3
**virtually** [1] - 82:6
**vis** [2] - 11:5
**vis-a-vis** [1] - 11:5
**visits** [2] - 30:19, 36:19
**visual** [1] - 23:1
**VOICES** [1] - 92:22
**volume** [3] - 21:12, 31:6, 31:10
**voluminous** [1] - 32:18

### W

**waived** [1] - 34:25
**wall** [6] - 23:15, 23:17, 55:11, 66:11, 67:14, 73:1
**walls** [2] - 53:12, 53:15
**wants** [1] - 46:12
**Ward** [2] - 5:15, 9:7
**warns** [1] - 78:18
**warrant** [1] - 73:20
**WASHINGTON** [1] - 2:18
**Washington** [4] - 19:23, 31:21, 32:4, 70:15
**waste** [2] - 83:13, 83:24
**Waste** [1] - 64:7
**wastes** [2] - 71:19, 84:10
**watching** [1] - 45:19
**water** [6] - 6:23, 8:2, 10:5, 10:6, 26:5, 49:17
**waters** [1] - 10:8
**ways** [1] - 45:23
**weak** [2] - 45:14, 84:24
**wedding** [4] - 24:10, 26:16, 26:17, 56:18
**WEDNESDAY** [2] - 1:7, 4:2
**weeks** [1] - 91:13
**weighing** [1] - 82:1
**WENDY** [1] - 2:5
**WGI** [21] - 12:4, 20:1, 20:2, 20:17, 20:18,

20:20, 21:6, 21:8, 25:9, 26:13, 26:14, 27:16, 33:3, 36:10, 37:19, 52:7, 55:20, 70:12, 70:13, 81:1
**WGI's** [2] - 36:23, 69:21
**whatsoever** [1] - 41:5
**wheeler** [2] - 50:11, 50:12
**whereas** [1] - 56:22
**whereby** [1] - 20:7
**WHEREUPON** [6] - 19:3, 19:8, 43:16, 63:23, 92:18, 92:23
**Whisnant** [1] - 82:8
**whoa** [1] - 39:15
**whole** [6] - 35:13, 35:15, 53:15, 57:4, 61:13, 89:2
**widen** [1] - 51:16
**widening** [4] - 7:18, 49:22, 51:12, 51:18
**wish** [2] - 89:7, 92:20
**witness** [2] - 54:17, 57:13
**witnesses** [9] - 48:24, 49:10, 54:11, 59:7, 65:10, 65:23, 66:10, 80:17, 81:6
**wondering** [2] - 21:8, 65:16
**word** [4] - 7:18, 20:16, 87:18, 89:16
**words** [10] - 10:22, 18:25, 23:9, 31:19, 41:10, 58:20, 58:24, 65:4, 65:7, 91:6
**works** [1] - 31:15
**world** [1] - 11:8
**worry** [1] - 56:2
**worse** [1] - 58:15
**worst** [1] - 55:13
**wow** [2] - 13:23, 58:8
**WRIGHT** [1] - 1:23
**write** [3] - 87:24, 87:25, 91:17

### Y

**Yankee** [1] - 52:20
**years** [6] - 12:7, 13:18, 42:13, 45:19, 49:23, 92:3
**yonder** [1] - 15:9
**YORK** [1] - 2:10
**yourself** [1] - 51:19

### Z

**zoom** [2] - 62:1, 62:3