United States Court of Appeals
Fifth Circuit

**UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

**F I L E D**

September 14, 2010

Lyle W. Cayce
Clerk

U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FILED   OCT 2 1 2010

LORETTA G. WHYTE
CLERK

No. 09-30449

D.C. Docket No. 2:05-CV-4182   K
D.C. Docket No. 2:05-CV-4181
D.C. Docket No. 2:05-CV-5237
D.C. Docket No. 2:05-CV-6073
D.C. Docket No. 2:05-CV-6314
D.C. Docket No. 2:05-CV-6324
D.C. Docket No. 2:05-CV-6327
D.C. Docket No. 2:06-CV-20
D.C. Docket No. 2:06-CV-225
D.C. Docket No. 2:06-CV-886
D.C. Docket No. 2:06-CV-2278
D.C. Docket No. 2:06-CV-2287
D.C. Docket No. 2:06-CV-4065
D.C. Docket No. 2:06-CV-4389
D.C. Docket No. 2:06-CV-4634
D.C. Docket No. 2:06-CV-4931
D.C. Docket No. 2:06-CV-5032
D.C. Docket No. 2:06-CV-5159
D.C. Docket No. 2:06-CV-5161
D.C. Docket No. 2:06-CV-5260
D.C. Docket No. 2:06-CV-5308
D.C. Docket No. 2:06-CV-5785
D.C. Docket No. 2:06-CV-5786
D.C. Docket No. 2:06-CV-5937
D.C. Docket No. 2:06-CV-8708
D.C. Docket No. 2:07-CV-1113
D.C. Docket No. 2:07-CV-1271
D.C. Docket No. 2:07-CV-1349
D.C. Docket No. 2:07-CV-3173
D.C. Docket No. 2:07-CV-3500
D.C. Docket No. 2:07-CV-4392
D.C. Docket No. 2:07-CV-4550
D.C. Docket No. 2:07-CV-4555
D.C. Docket No. 2:07-CV-4837

___ Fee_____
___ Process_____
_X_ Dktd_____
___ CtRmDep_____
___ Doc. No._____

D.C. Docket No. 2:07-CV-4945
D.C. Docket No. 2:07-CV-4976
D.C. Docket No. 2:07-CV-4979
D.C. Docket No. 2:07-CV-4995
D.C. Docket No. 2:07-CV-5007
D.C. Docket No. 2:07-CV-5012
D.C. Docket No. 2:07-CV-5013
D.C. Docket No. 2:07-CV-5016
D.C. Docket No. 2:07-CV-5067
D.C. Docket No. 2:07-CV-5254
D.C. Docket No. 2:07-CV-5286
D.C. Docket No. 2:07-CV-5339
D.C. Docket No. 2:07-CV-5343
D.C. Docket No. 2:07-CV-5344
D.C. Docket No. 2:07-CV-5350
D.C. Docket No. 2:07-CV-5355
D.C. Docket No. 2:07-CV-5356
D.C. Docket No. 2:07-CV-5375
D.C. Docket No. 2:07-CV-5397

IN RE: KATRINA CANAL BREACHES LITIGATION

-------------------------------------------------------------------

STEERING COMMITTEE,

        Plaintiff - Appellant

v.

WASHINGTON GROUP INTERNATIONAL INC,

        Defendant - Appellee

        Appeal from the United States District Court for the
        Eastern District of Louisiana, New Orleans

Before SMITH, WIENER, and ELROD, Circuit Judges.

J U D G M E N T

    This cause was considered on the record on appeal and was argued by counsel.

It is ordered and adjudged that the judgment of the District Court is reversed, and the cause is remanded to the District Court for further proceedings in accordance with the opinion of this Court.

IT IS FURTHER ORDERED that defendant-appellee pay to plaintiff-appellant the costs on appeal to be taxed by the Clerk of this Court.

ISSUED AS MANDATE:  21 OCT 2010

A True Copy
Attest

Clerk, U.S. Court of Appeals, Fifth Circ

By: _____
Deputy

New Orleans, Louisiana 21 OCT 2010

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

September 14, 2010

Lyle W. Cayce
Clerk

-----------

No. 09-30449

-----------

IN RE: KATRINA CANAL BREACHES LITIGATION.

STEERING COMMITTEE,

                    Plaintiff-Appellant,

versus

WASHINGTON GROUP INTERNATIONAL, INC.,

                    Defendant-Appellee.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

---

No. 09-30428

---

IN RE: KATRINA CANAL BREACHES LITIGATION.

QUINTESSA HUEY,
CARYN L. FONG, as Trustees of the Huey & Fong Trust;
AMY HUEY, as Trustee of the Kenneth Huey Family Trust;
RADIO PARTS, INC.; ENTERCOM COMMUNICATIONS CORPORATION;
ET AL.,

Plaintiffs-Appellants,

versus

WASHINGTON GROUP INTERNATIONAL, INC.,

Defendant-Appellee.

* * * * * * * * * * * * * *

---

No. 09-30438

---

IN RE: KATRINA CANAL BREACHES LITIGATION.

BETTY LUNDY; FREDERICK ADAMS; JEAN ADDISON;
JONATHAN AKERS; OLLIE P. ALEXANDER; ET AL.,

Plaintiffs-Appellants,

versus

WASHINGTON GROUP INTERNATIONAL, INC.,

Defendant-Appellee.

2

----

Appeals from the United States District Court
for the Eastern District of Louisiana

----

Before SMITH, WIENER, and ELROD, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Washington Group International, Inc. ("WGI") provided engineering, construction, and management services. The United States Army Corps of Engineers ("the Corps") contracted with WGI for a large project in New Orleans. The plaintiffs sued WGI, claiming that its negligent and improper actions in fulfilling the contract were a cause of flood damage resulting from Hurricane Katrina. The district court granted summary judgment for WGI based on government-contractor immunity ("GCI"). Because the specifications for the work at issue were not reasonably precise, WGI has no GCI, so we reverse the summary judgment and remand.

## I.

In 1994, the Corps and WGI entered into an indefinite delivery/indefinite quantity contract for the remediation of some hazardous, toxic, and radioactive waste sites in the southwestern United States. That "umbrella contract," known as the Total Environmental Restoration Contract ("TERC"), set forth general requirements for all of WGI's anticipated work in the region, with the understanding that the Corps would approve a specific Statement of Work ("SOW") for each Task Order it would issue to WGI.

3

Nos. 09-30449, 09-30428, 09-30438

In 1999, the Corps began its Inner Harbor Navigation Canal Lock Replacement Project in New Orleans, one aspect of which was the cleanup of the East Bank Industrial Area. Pursuant to the TERC, WGI was obligated (1) to demolish existing structures in that area by removing surface and subsurface obstructions, (2) to characterize contaminants on the site, and (3) to remediate the site in accordance with any applicable environmental standards. This specific task was contracted for and identified as Task Order 26 of the TERC.

In June 1999, the Corps issued a SOW for Task Order 26 that was brief and provided only a general description of the work to be done. From that SOW, WGI submitted a more detailed work plan to the Corps. After receiving the work plan, the Corps engaged WGI in a review process during which the Corps would comment on issues it had with WGI's proposals, solicit a response from WGI on those comments, and continue in such a back-and-forth manner until the Corps and WGI had come to an agreement regarding any matters that were in conflict.

The review process included the completion of various technical analyses and recommendation reports by the Corps and additional work plans by WGI. A final Recommendation Report was formally issued in January 2000, after which it became "the basis of subsequent specifications for work and work orders and proposals."

After completion of the Recommendation Report process, the Corps issued another SOW that, once again, provided general directions to WGI. From that SOW, WGI drafted eight work plans for the specific project and submitted them to the Corps for comment and approval. The most important of those work plans, for our purposes, was the Project Work Plan, which dealt with the equipment, the excavation, and the remediation process for the areas at issue in the

4

Nos. 09-30449, 09-30428, 09-30438

plaintiffs' claim.

Once work had begun, WGI discovered previously unknown subsurface structures in the area to be remediated.  In August 2001, the Corps issued another SOW to address the excavation and disposal of those newly discovered structures.  Pursuant to that SOW, and in compliance with all the previously approved plans, WGI submitted Proposal #113, which dealt with the excavation and disposal of the new subsurface structures.

In its Technical Analysis of Proposal #113, the Corps deemed WGI's proposal too costly, rejected it, and suggested several elements of the proposal as to which cost savings could be achieved.  One of those suggestions was to use on-site borrow matter as the primary source of backfill material.[1]  The final proposal submitted by WGI, and approved by the Corps, incorporated that suggestion by stating that "[t]he excavations . . . will be backfilled with borrow material obtained from either the on-site borrow source or an off-site source."

The final approved proposal also stated that the backfill "material will be placed in lifts and compacted; however, no compaction testing will be required."[2] The work plans derived from the final proposal also specified that compaction should occur "with previous excavated soil in 2' lifts," that "[i]nitial backfill operations will be to the bottom of the whalers inside the [subsurface obstruction]," and that backfilling should be completed "to the top of sheet piles with material to be provided by WGI after whalers are removed."  Working from that approved proposal and from subsequent work plans derived from it, WGI completed the

---

[1] Backfill material is the physical matter used to refill holes created by the removal of subsurface structures.

[2] Compaction is the process of increasing the bulk density of an aggregate of matter by driving out air.

5

Nos. 09-30449, 09-30428, 09-30438

project in the spring of 2005.

In August 2005, Hurricane Katrina made landfall near New Orleans. As a result, the flood protection system in the Inner Harbor Navigation Canal project, consisting of levees and floodwalls, failed. Two of the breaches in the levees were near areas that were part of the zone where WGI had conducted extensive work. The plaintiffs claim that the failure of those levees was a result of the negligent and improper backfilling and compaction of the excavated locations by WGI in violation of a state-law duty of care. Specifically, the plaintiffs allege that the method of excavation and backfilling employed by WGI allowed for underseepage, which undermined the integrity of the levees, resulting in their failure and the subsequent flooding of New Orleans East, the Lower Ninth Ward, and St. Bernard Parish.

## II.

In 2007, the plaintiffs, in several consolidated actions, sued WGI, the Corps, and numerous other defendants for harm resulting from Hurricane Katrina-related damages. In 2008, WGI moved for summary judgment, asserting the GCI defense. The plaintiffs opposed summary judgment on the grounds that (1) GCI does not apply because there was no conflict with state law, and (2) even assuming such a conflict, WGI failed to satisfy the Supreme Court's three-part test for GCI. The district court granted summary judgment for WGI, concluding that displacement of state law is built into the GCI defense and that WGI had satisfied all the requirements for GCI.

Nos. 09-30449, 09-30428, 09-30438

### III.

We review a summary judgment *de novo*, "using the same standard as that employed by the district court under Rule 56." *Kerstetter v. Pac. Scientific Co.*, 210 F.3d 431, 435 (5th Cir. 2000).  Summary judgment is warranted where "there is no genuine issue as to any material fact and [] the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2).  There is no genuine issue for trial "[i]f the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party." *Kipps v. Caillier*, 197 F.3d 765, 768 (5th Cir. 1999).

### A.

The Supreme Court first recognized the federal GCI defense to state tort law in *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988). The GCI defense preempts state law to immunize government contractors from liability in spite of the absence of legislation specifically immunizing them.[3]  The rationale for GCI flows from two basic principles: "[S]tate tort law is preempted by federal common law in areas of unique federal interests" and "the procurement of equipment by the United States is such an area." *Trevino v. Gen. Dynamics Corp.*, 865 F.2d 1474, 1479 (5th Cir. 1989).  In *Boyle*, the Court specified the precise scope of the displacement of state law, using a three-part test:

Liability for design defects in military equipment cannot be im-

---

[3] In their reply brief, the plaintiffs contend that the GCI defense from *Boyle* is applicable only to military contractors and should not be extended. That argument is waived, because it was not made in the plaintiffs' opening brief. *Morgan v. Swanson*, 610 F.3d 877, 884 n.10 (5th Cir. 2010) (stating that issues raised for the first time in appellant's reply brief are waived).

Nos. 09-30449, 09-30428, 09-30438

posed, pursuant to state law, when (1) the United States approved
reasonably precise specifications; (2) the equipment conformed to
those specifications; and (3) the supplier warned the United States
about the dangers in the use of the equipment that were known to
the supplier but not to the United States.

*Boyle*, 487 U.S. at 512.

### B.

The plaintiffs argue that the district court erred in failing to conduct a
threshold inquiry into the existence of a significant conflict between federal poli-
cy and state law. They incorrectly assert that this inquiry is necessary to an
application of the *Boyle* test. Although a conflict between federal policy and
state law is a necessary element of any finding of GCI, a threshold inquiry on
that specific issue is not necessary but, rather, is built into the three-part *Boyle*
test.

Following oral argument in the instant case, a different panel of this court
decided *Jowers v. Lincoln Electric Co.*, No. 09-60396, 2010 U.S. App. LEXIS
17862 (5th Cir. Aug. 26, 2010). There, the district court had included in the jury
instructions a threshold inquiry that the government contractor challenged on
appeal. This court held that "an additional instruction that the jury find a 'sig-
nificant conflict' between federal interests and Mississippi law in the instant
matter is superfluous and forces the jury to construe an issue of law, which is
outside its purview as a fact-finder." *Id.* at *9. Though the panel focused on the
role of the jury as a factfinder, its conclusion that a threshold inquiry is "super-
fluous" is a statement on the general applicability of the GCI defense.

Additionally, though this circuit never had occasion, before *Jowers*, to ad-
dress the "significant conflict" issue, we have consistently applied the *Boyle* test

8

Nos. 09-30449, 09-30428, 09-30438

without conducting any sort of threshold inquiry similar to the one these plaintiffs request.[4] Preemption of state law by federal law without a statutory mandate can occur only where "a 'significant conflict' exists between an identifiable federal policy or interest and the operation of state law, or the application of state law would frustrate specific objections of federal legislation," *Boyle*, 487 U.S. at 507 (internal quotation marks and citations omitted), but, importantly, "[t]he first two of these conditions assure that the suit is within the area where the policy of the 'discretionary function' would be frustrated," *id.* at 512.

By assuring that the suit involves a situation in which the discretionary function is frustrated, the first of the three *Boyle* conditions necessarily satisfies the earlier-stated requirement of a significant conflict. *See Lewis v. Babcock Indus., Inc.*, 985 F.2d 83 (2d Cir. 1993); *Kerstetter*, 210 F.3d at 438. "Whether [the GCI defense] will apply to a particular claim depends *only* upon whether Boyle's three conditions are met with respect to the *particular product feature* upon which the claim is based." *Bailey*, 989 F.2d at 801-02 (5th Cir. 1993) (emphasis in original). A threshold inquiry into whether there is a significant state conflict has never been required by any court,[5] nor should it be. The only analysis

---

[4] *See, e.g., Miller v. Diamond Shamrock Co.*, 275 F.3d 414, 419 (5th Cir. 2001); *Kerstetter*, 210 F.3d at 435; *In re Air Disaster at Ramstein Air Base, Germany*, 81 F.3d 570, 574 (5th Cir. 1996); *Bailey v. McDonnell Douglas Corp.*, 989 F.2d 794, 798 (5th Cir. 1993); *Stout v. Borg-Warner Corp.*, 933 F.2d 331, 334 (5th Cir. 1991); *Trevino*, 865 F.2d at 1479.

[5] In *Lewis*, 985 F.2d at 83, the court directly addressed the issue of whether the *Boyle* test requires a threshold inquiry into the presence of a "significant conflict" with state law. It held that "answering the question whether the Government approved reasonably precise specifications for the design feature in question necessarily answers the question whether the federal contract conflicts with state law." *Id.* at 86.

The plaintiffs argue that *Lewis* was implicitly overruled by *In re World Trade Center*
(continued...)

9

Nos. 09-30449, 09-30428, 09-30438

necessary to determine the application and scope of government contractor im-
munity is the three-step *Boyle* test.

### C.

The first *Boyle* step requires that the government approved reasonably
precise specifications. That entails both the existence of reasonably precise spe-
cifications and the approval of those specifications by the government.

Specifications are reasonably precise "as long as the specifications address,
in reasonable detail, the product design feature, alleged to be defective." *Kerstet-
ter*, 210 F.3d at 438. *See also Trevino*, 865 F.2d at 1481. "The requirement that
the specifications be precise means that the discretion over significant details
and all critical design choices will be exercised by the government." *Id.* Reason-
ably precise specifications for one aspect of a large project do not create an um-
brella of protection for an entire project. Instead, the requirement of reasonably

---

[5] (...continued)
*Disaster Site Litigation*, 521 F.3d 169 (2d Cir. 2008), in which the court stated that "[a]s a
threshold matter, the defense only arises in an area of uniquely federal interest, where a sig-
nificant conflict exists between an identifiable federal policy or interest and the [operation] of
state law." *Id.* at 194 (internal quotation marks and citations omitted). The plaintiffs read
too much into the wording of that sentence. The court in *World Trade Center* did not believe
a threshold inquiry was necessary. Rather, it merely stated that, as a matter of first princi-
ples (i.e., as a "threshold matter"), GCI arises from the significant conflict between federal in-
terests and state law.

Importantly, the court went on to apply the *Boyle* factors without conducting, or even
mentioning again, any sort of threshold inquiry. Furthermore, the court specifically stated
that the first *Boyle* factor was "designed to ensure that a conflict with state law exists, and,
along with the second requirement, to assure that the suit is within the area where the policy
of the discretionary function would be frustrated." *Id.* at 196 (internal quotation marks and
citations omitted). With this statement, *World Trade Center* not only did not implicitly over-
rule *Lewis* but explicitly reaffirmed it.

Nos. 09-30449, 09-30428, 09-30438

precise specifications must be met by the specific feature at issue in the claim.[6] In this case, the specific features at issue are the backfill material used and the method of compaction employed by WGI.[7]

1.

The Corps, driven by cost concerns, approved specifications that mandated on-site material as the primary source of the backfill material. The Corps also specified that if there was insufficient on-site material, WGI should import off-site backfill material to complete the project. Two factors render those specifications imprecise.

First, the specifications that authorized the use of on-site backfill material were not reasonably precise in regard to how WGI should parse through all the on-site material to determine which was suitable. The Corps neither mandated the composition of the backfill material nor established precise procedures to test material for its suitability as backfill. The only Corps specification was that the material had to be clean, not contaminated, and not full of debris. Given, how-

---

[6] *See Trevino*, 865 F.2d at 1486 ("The government contractor defense as reformulated in *Boyle* protects government contractors from liability for defective designs if discretion over *the design feature in question* was exercised by the government." (emphasis added)).

[7] At various points in their briefs, the plaintiffs seem to urge that the government failed to provide reasonably precise specifications for dealing with the possibility of underseepage in the area near the project. That argument, however, is irrelevant to our current analysis of the scope of GCI, because the reasonably precise specifications that are required by the first prong of the *Boyle* test "need not address the specific *defect* alleged; the government need only evaluate the *design feature* in question." *Kerstetter*, 210 F.3d at 435 (emphasis added). The underseepage erosion of the flood walls is not a design feature; it is a defect that is alleged to be the result of two design features (i.e., the backfill material used and the compaction method employed). Thus, under the first prong, the government must only have approved precise specifications for the backfill material and the method of compaction; it need not have addressed underseepage erosion specifically.

11

Nos. 09-30449, 09-30428, 09-30438

ever, the wide variety in the types of matter that could be used as backfill mate-
rial, that specification is not reasonably precise.[8] The composition of the backfill
used by WGI serves as one factor in plaintiffs' tort claim, so it cannot be said
that "the specifications address, in reasonable detail, the product design feature,
alleged to be defective." *Kerstetter*, 210 F.3d at 438.

The Corps did not approve any specifications regarding the precise compo-
sition of the on-site backfill material. As Guillory noted in his deposition,

> Q: And there were no real specifications for backfill in terms of what
> they could use and the degree of compaction, right?
>
> A: Right. We just backfilled with the adjacent soil that was excavat-
> ed out, removed, stockpiled on the side. After the lift station was re-
> moved, that soil was put back in layers and compacted to the com-
> paction of the adjacent soil.

Later in that deposition, Guillory confirmed that the specifications were "gen-
eral" and did not indicate the type of backfill material that could be used to back-
fill the hole:

> Q: And Number 7 is a discussion of the backfill. It says, the excava-
> tion resulting from concrete foundation removal will be backfilled
> with borrowed material obtained from either the on-site borrow
> source or an off-site source as required. An estimated 900 Cys will
> be needed . . . . Okay, so would you regard this as a general specifi-
> cation?
>
> A: Yes.

---

[8] As the Corps's Contracting Officer Representative, Lee Guillory, acknowledged, back-
fill material need not be homogenous and could consist of various types of matter, including
crushed stone, clays, silts, sand layers, wood debris, and more.

12

Nos. 09-30449, 09-30428, 09-30438

Q: Okay. It's certainly not a prescribed specification, right?

A: Right.

Q: And it doesn't indicate what kind of material you can use to back-fill the hole, does it?

A: No, it doesn't.

The second reason that the specifications are imprecise concerns the off-site material imported by WGI and used as backfill material. The Corps provided no reasonably precise specifications regarding the composition of that off-site backfill material. The Corps was not even fully aware of the contents of the backfill material used to fill the holes it had created. Guillory's statements during his deposition are indicative of the degree of precision of the Corps's specifications:

Q: Okay. So we really don't know what's in the hole, do we? ...

A: I cannot tell you for a fact of everything that's in that hole, no.

Q: All right. It says, additional fill material necessary to complete the backfill operations will be provided by WGI.

Q: Doesn't that allow WGI to use other kinds of material to fill up the hole?

A: It just says provided to the subcontractor. It could be indigenous, on site clay material, it could have been commercially truck hauled clay material.

It is true that in addition to the Corps's standing requirement that the backfill material be clean, not contaminated, and not full of debris, any off-site

13

Nos. 09-30449, 09-30428, 09-30438

backfill material imported by WGI had to receive some sort of approval from the Corps before it could be used. But there is no information in the record indicating that the Corps imposed additional requirements regarding the composition of the off-site material, nor is there any indication that the Corps applied any testing process to evaluate the off-site backfill material before approving its use.[9] Given the absence of reasonably precise specifications in the proposal under which WGI was operating, any such additional evidence is necessary to find that the Corps approved reasonably precise specifications and did not merely allow WGI to exercise principal discretion over the composition of the off-site backfill material.

Significantly, the evidence in the record shows that the sole consideration for the Corps in evaluating the backfill was the cost of the material. If that was the extent of its analysis, the Corps cannot be said to have approved reasonably precise specifications regarding the *composition* of the off-site backfill material.

Given that the Corps provided imprecise, and at times non-existent, specifications regarding the composition of the on-site and off-site backfill material, WGI is not entitled to claim GCI for its exercise of discretion in choosing the composition of that material.

---

[9] There is also no evidence that the approval given by the Corps for the off-site backfill material was anything more than a rubber stamp, which is unacceptable under the *Boyle* test. *See Trevino*, 865 F.2d at 1480 ("If the government contractor exercised the actual discretion over the defective feature of the design, then the contractor will not escape liability via the government contractor defense—the government's rubber stamp on the design drawings notwithstanding."). We focus our discussion, however, on the precision of the specifications, not the process of approval. Although those two issues are intertwined as elements of the first prong of *Boyle*, they are still two separate conditions that can be analyzed independently. If the specifications are not reasonably precise, it does not matter whether the imprecise specifications were properly approved: The first prong would not be satisfied.

14

Nos. 09-30449, 09-30428, 09-30438

2.

The Corps specified that the backfill "material will be placed in lifts and compacted." The Corps also directed that compaction occur "with previous excavated soil in 2' lifts," that "[i]nitial backfill operations will be to the bottom of the whalers inside the [subsurface obstruction]," and that backfilling should be completed "to the top of sheet piles with material to be provided by WGI after whalers are removed."

The WGI Project Manager, Dennis O'Connor, described, in his deposition, his understanding of the specifications for compaction in his deposition:

> Q: Tell me what was the specification for compaction?
>
> A: There were no specifications for compaction.
>
> Q: OK.
>
> A: Simply a general directive that if we backfilled the hole, depending on the piece of equipment and size of the hole, we would compact the soil mechanically, be it with an excavator or backhoe if it was very small, or a wheel roller if it was extremely small. And it would depend on the size of the lifts and we would bring it up to grade.

As O'Connor admitted, WGI understood there to be no precise specifications for compaction. Additionally, though we do not ascribe a legal conclusion to O'Connor's declaration that the Corps's directive was a "general" specification, his detailed statement of what the general directive entailed shows the lack of reasonable precision. By his own terms, WGI could have used an excavator, backhoe, or wheel roller for compaction, based on the size of the hole and the size of the lifts. There is no information in the record, however, to show that the Corps provided specifications for when a certain piece of equipment should be used for

15

Nos. 09-30449, 09-30428, 09-30438

a particular type of hole.

Furthermore, the specifications are not reasonably precise, because they fail to dictate any standards for compaction. The extent of compaction can be measured using a proctor compaction test. The Corps chose not to require any specific standard that could be measured by that test. Instead, it unequivocally emphasized its lack of interest in mandating specifications for compaction density by stating that "no compaction testing will be required." To explain this lack of specification, the Corps cited cost concerns and the fact that the Corps could visually observe the result of the compaction method that WGI used. That explanation, even if it is credible, has no effect on our conclusion that the specifications that were approved were not reasonably precise.

The Corps's failure to specify a standard for compaction also meant that WGI could choose a method of compaction that did not require a particular final result. For example, if the Corps had specified that the holes should be compacted to 95% Standard Proctor density,[10] WGI would be limited, in its choice of a compaction method, to a process that would achieve that result. By not specifying any compaction method, the Corps allowed WGI the discretion to choose a method without a required result.

One could argue that the Corps' failure to provide standards for compac-

---

[10] These plaintiffs suggest the "95 percent Standard Proctor density" standard. We use it, however, only as an example of a possible standard of compaction, not as an approval of that standard. The issue is not whether the government chose the correct standard, because the GCI defense is meant to prevent the second-guessing of such decisions. *See Boyle*, 487 U.S. at 511 (stating that "permitting 'second guessing' of these judgments through state tort suits against contractors would produce the same effect sought to be avoided by the FTCA exemption") (internal citation omitted). Rather, the issue is whether the government chose any standard of compaction at all. There is no second-guessing here of a government decision, because none was made.

16

Nos. 09-30449, 09-30428, 09-30438

tion or to provide details for the equipment to be employed was, in itself, a precise specification. The approved work plan stated that "[t]he material will be placed in lifts and compacted" and affirmed that "no compaction testing will be required." Given that those general specifications were the result of an intricate approval process, it is reasonable to conclude that the decision not to specify more than basic compaction was a decision made by the Corps, as WGI contends in its brief.

The question, however, is not whether the Corps approved of *any* decision regarding the compaction method. The relevant inquiry, instead, is whether the Corps approved sufficiently *precise* specifications, such that it is evident that the government was the primary agent of decision over the compaction method. "If the government approved imprecise or general guidelines, then discretion over important design choices would be left to the government contractor." *Trevino*, 865 F.2d at 1481. By providing only general instructions regarding the compaction method, the Corps ensured that WGI would have significant discretion over the method chosen. The exercise of that discretion by WGI is not protected by the GCI doctrine.

To decide otherwise would lead to an absurdity: The government could provide general specifications, inform the court that it "precisely" chose to approve only general specifications, and thus render all subsequent, discretionary decisions of a government contractor protected under the GCI doctrine. Such an analysis would controvert the very purpose of the GCI defense. The government contractor defense in *Boyle*, "[s]tripped to its essentials," is fundamentally a

Nos. 09-30449, 09-30428, 09-30438

claim that "[t]he Government made me do it."[11] To adhere to this basic principle, it is essential that the specifications approved by the government are reasonably precise. "If the government approved imprecise or general guidelines, then discretion over important design choices would be left to the government contractor." *Trevino*, 865 F.2d at 1481.

The Corps did not "make" WGI use the exact backfill material that was utilized, nor did it "require" WGI select the compaction method that was employed. In the absence of reasonably precise Corps specifications, those decisions were made by WGI. Thus, WGI fails the first step of the *Boyle* test and is not entitled to GCI for its choice of backfill material and compaction method. The summary judgment is REVERSED, and this matter is REMANDED for further proceedings as needed. We impose no limitations on what matters the district court can consider on remand, and we express no view as to what decisions that court should make.

---

[11] *In re Joint E. & S. Dist. N.Y. Asbestos Litig.*, 897 F.2d 626, 632 (2d Cir. 1990). *See also Trevino*, 865 F.2d at 1482 ("[T]he purpose of the [*Boyle*] test is to deny the defense to a government contract that is itself ultimately responsible for the defect.") (internal quotation marks and citation omitted).

18