UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE  KATRINA CANAL BREACHES CONSOLIDATED LITIGATION | CIVIL ACTION<br>NUMBER:  05-4182 "K"(2)<br>JUDGE DUVAL<br>MAG. WILKINSON |
| PERTAINS TO:  *Entergy*<br>(No. 10-0077) | |

**ENTERGY PLAINTIFFS' SUPPLEMENTAL MEMORANDUM**

**NOW INTO COURT, come Plaintiffs, Entergy New Orleans, Inc. and Entergy Louisiana, L.L.C. (the "Entergy Companies") and Hartford Steam Boiler Inspection and Insurance Company ("Hartford") (collectively "Entergy Plaintiffs")**.  Oral argument was held on the United States' Motion to Dismiss (Doc. 19993), Entergy Plaintiffs' Motion for Partial Summary Judgment (Doc. 20033) and MRGO Plaintiffs' Opposition to Defendant's Motion to Dismiss, in the Alternative, For Summary Judgment (Doc. 20035).   Upon conclusion of oral argument, this Court ordered the parties to submit simultaneous supplemental briefing on the following questions:

1. **Whether the Corps "Engineering Regulations" and "Engineering Manuals" constitute mandated action so as to come within the *Berkovitz* exception to the DFE.**

2. **Outline the portions of the documents and the specific failures that place the action within the *Berkovitz* (prong one) rubric.**

3.   Outline the portions of the documents and the specific failures that place the action within the *Alabama Electric* (prong two) rubric.

4.   Whether the decision by the Corps that proper remediation (that is proper soil and proper compaction) was not necessary at the EBIA because the area was to be turned into a channel at a later date can be a "policy" decision.

5.   Did the fact that funding for the channel had not been approved change the duty on the part of the Corps?[1]

The Entergy Plaintiffs incorporate by reference the MRGO Plaintiffs' submission as to questions 1 and 2 and submit this Supplemental Memorandum to address questions 3, 4, and 5.

I.   **The Corps' Engineering Defalcations in the EBIA Place Its Actions Within the *Alabama Electric* ("Prong Two") Rubric and Prevent the Application of the Discretionary Function Exception ("DFE").**

A. **The DFE Does Not Apply Where the Agency Claiming Immunity Did Not Exercise a Policy Decision.**

"The burden of proving the applicability of the [DFE] is on the United States."[2]  In order for the DFE to apply, the United States must prove that the challenged conduct is ***both*** "a matter of choice for the acting employee," *i.e.*, discretionary rather than mandatory, and a decision exercised "based on considerations of public policy."[3]  The law is clear that in the absence of "a policy decision, the Corps must be held to the same professional standards of reasonableness and due care that a private engineer faces when he plies his trade."[4]  Moreover, the courts have held that the DFE will not protect a "contracting officer's decisions to permit the use of unsuitable material in construction."[5]

---

[1]   *In re Katrina*, Minute Entry, Oct. 13, 2010 (Doc. 20084).
[2]   *Alabama Electric Coop., Inc. v. U.S.,* 769 F. 2d 1523, 1537 (11th Cir 1985).
[3]   *Berkovitz v. United States*, 486 U.S. 531, 537 (1988).
[4]   *Alabama Elec*., 769 F.2d at 1531.
[5]   *Kennewick Irrigation Dist. v. U.S.*, 880 F.2d 1018, 1031 (9th Cir. 1989).

The Fifth Circuit has been extraordinarily careful to avoid any interpretation of the DFE that would embrace immunity for governmental acts merely because some decision-making power was exercised by the official whose act was questioned.[6]   An immune government decision, at a minimum, must involve an actual policy judgment to fall within the exception.[7]

Courts have routinely held that there is no permissible exercise of policy or discretion where the challenged governmental activity involves safety or the implementation of scientific and or professional decisions.[8]   In the absence of an express policy, the Corps' engineering decisions are subject to judicial review under the state law tort standards that would normally govern an action for engineering malpractice.[9]   Once the Corps exercises its discretion to pursue an endeavor, it is required to execute in a non-negligent manner.[10]

B. **The Failure to Conduct a Geotechnical Underseepage Analysis was Basic Professional Negligence, Not a Policy Decision Required by Prong Two of the DFE**.

This Court has already ruled that when the Corps' "decisions concern safety and engineering judgments, [the DFE] is not an absolute shield."[11] The actions and omissions that Plaintiffs challenge are matters of objective scientific, safety, and professional judgment—not of social, economic, or political policy.  As noted by the Corps' own witnesses, it is a widely understood basic engineering principle that a geotechnical underseepage evaluation is necessary

---

[6]        *Denham v. United States,* 834 F.2d 518, 520 (5th Cir.1987).
[7]        *Berkovitz,* 486 U.S. at 536;  *Dalehite v. U.S.,* 346 U.S. 15, 34 (1953).
[8]        *Alabama Electric,* 769 F.2d at 1536-37; *Soldano v. U.S.*, 453 F.3d 1140, 1149 (9th Cir. 2006); ARA *Leisure Servs. v. U.S.*, 831 F.2d 193 (9th Cir.1987); *Aslakson v. U.S.*, 790 F.2d 688 (8th Cir. 1986); *Henderson v. U.S.*, 784 F.2d 942, 943 n. 2 (9th Cir.1986); *Begay v. U.S.*, 768 F.2d 1059, 1064 (9th Cir.1985); *Whisnant v. U.S.,* 400 F.3d 1177, 1181(9th Cir. 2005) (duty to maintain safe and healthy premises not discretionary); *Indian Towing Co. v. U.S.*, 350 U.S. 61 (1955) (duty to maintain that lighthouse in good repair was not discretionary); *Seaboard Coastline RR v. U.S.,* 413 F.2d 714, 716, (5th Cir. 1973) (duty to perform the operational functions of building the drainage ditch in a non-negligent manner is non discretionary); *Caplan v. U.S.*, 877 F.2d 1314, (6th Cir. 1989) (duty to protect persons from falling trees during deforestation progress is non-discretionary); *Oberson v. U.S.,*  514 F.3d 989 (9th Cir 2008) (duty to warn of a hazardous location was not a discretionary decision).
[9]        *Alabama Electric* 769 F. 2d at 1537.
[10]       *Seaboard Coastline,* 473 F.2d 417 (5th Cir. 1973).
[11]       *In re Katrina*, 647 F. Supp. 2d 644, 706 (E.D. La. 2009); *Alabama Electric* 769 F. 2d at 1537.

when excavating near a levee.[12]   The Corps' own engineering manuals outline the engineering

analysis required to evaluate the materials for backfill and levels of compaction necessary to

safely excavate within the water side of the centerline of a flood control structures.   These

manuals also direct the procedure necessary for performing appropriate evaluations of the

foundation of the levees in relation to proposed excavations, as well as the consequences of the

failure to perform those evaluations:

- EM 1110-1-1804 "Geotechnical Investigations," caution that "[i]nsufficient geotechnical investigation, faulty interpretation of results, or failure to portray results in a clearly understandable manner" may result in: "inappropriate designs, delays in construction schedules, costly construction modifications, *use of substandard borrow material, environmental damage to the site, post construction remedial work, and even failure of a structure and subsequent litigation*." [13]

- EM 1110-2-1902 "Basic Design Considerations" for Engineering Slope Stability "require" evaluations of the site "utilizing pertinent geologic information" specifically, "groundwater and seepage, conditions." EM 1110-2-1902 sets out in the chain of procedures required for evaluating slope stability and therein direct that the Corps implement the guidelines set out in  EM 1110-2-1901 to "[e]stablish the seepage and groundwater conditions …for the design load condition."[14]

- EM-1110-2-1901 "Seepage Analysis and Control for Dams," contains analysis of the geotechnical elements of foundations of floodwalls and levees to compensate for underseepage. [15]  This manual highlights the basic seepage analysis necessary to engineer excavations to prevent excessive uplift pressures, sloughing of the downstream slope, piping through the embankment and foundation, and by loss of material through erosion into open joints in the foundation and abutments.[16]

---

[12]   *See infra* at pg. 6, notes 19-21.

[13]   EM 1110-1-1804, Geotechnical Investigations January 1, 2001, supplants 1110-1-1804 (1984) and EM 1110-1-1906, at page 1-1. (Emphasis added), attached as (Exhibit 29).

[14]   EM 1110-2-1902, Engineering and Design of Slope Stability 1970 updated in 2003, attached as (Exhibit 30).

[15]   EM-1110-2-1901, Engineering and Design Seepage Analysis and Control for Dams at 1, 9-1 (Sept, 30, 1986), (Exhibit 21 to MRGO Plaintiffs' Opposition (Doc. 20035-1)) ("MRGO Opp. Exhibit 21").

[16]   *Id*. at 9-1.

- EM 1110-2-1913, "Design and Construction of Levees" referenced in the Corps New Lock and Connecting Channels Evaluation Report repeats and further elucidates the objective engineering requirement to perform geotechnical, seepage and stability evaluations for the mechanisms of levee failures and the effects of construction in the vicinity of the levees.[17]

- EM 1110-2-5027, "Confined Disposal of Dredged Materials," also available to the Corps when creating its New Lock and Connecting Channels Evaluation Report, outlines known potential engineering dike instability problems created by failing to properly analyze foundation conditions and the means by which the Corps should properly engineer excavations to compensate for potential underseepage instability problems through "positive means such as impervious linings"

- EM1110-2-5027, also advises the Corps to perform "[m]ore extensive" field analysis of potential mechanisms of levee failure "where *the consequences of the failure involve life, property, or damage to the environment.*"[18] The manual, highlights problematic conditions for more extensive analysis where: **"pervious foundation materials or where previous materials are near the surface or exposed *as a result of nearby excavation"*** and cautions that this condition that may lead to seepage problems through the development of large uplift pressures beneath and at the outer toe of the dike, causing overall instability from inadequate shear strength or may result in piping near the embankment base."

Notwithstanding the "mandatory" nature of these manuals, which is this Court's focus under the *Berkovitz* ("prong one") analysis, the mere existence of manuals authored by the Corps on this subject establishes that the dangers posed by underseepage and the corresponding need to conduct a geotechnical underseepage analysis are general engineering concerns that were widely understood by the Corps during the time of the excavations in question. In fact, the Corps' own 30(b)(6) witnesses have admitted that basic "standard engineering principles and practices"

---

[17]     EM 1110-2-1913, Design and Construction of Levees, see seepage control discussions at Chapter 5 (1978), (Exhibit 11 to Entergy Plaintiffs' Statement of Undisputed Facts (Doc. 20033-2)) ("PSUF Exhibit 11").
[18]     EM 1110-2-5027, Confined Disposal of Dredged Materials Engineering Manual at NPM 156-000011410. (PSUF Exhibit 14).  (emphasis added).

required specialized architectural-engineering and geotechnical analysis to ensure that proposed excavations were "safe for the levees."[19]

These witnesses also testified that the critical "area" for analysis with regard to subsurface work on the waterside of a flood control levee is within 300 feet of the centerline of the adjacent levee.[20]   These witnesses acknowledged that they would have "expected" engineering evaluations to be done for these proposed excavations on the water-side of the lower ninth ward flood control project.[21]   **Nonetheless, these same witnesses conceded that no engineering analysis of the soil wall stability, underseepage propensity, global stability, or proper compression for backfill material analysis was conducted for the excavations at the EBIA.**[22]

It is well established that "actions based on technical or scientific standards are not the kind of judgments meant to be protected from liability by [the DFE] because those actions do not involve a weighing of policy considerations."[23]   By disregarding these widely known basic engineering principles, the Corps endangered the floodwall and failed in its duty to protect the safety of the human environment. [24]   The Corps failed to consider its own manuals and ignored basic engineering concerns that its own engineers considered "standard engineering practices and principles."[25]   As such, these failures were not the result of a policy decision, but basic professional engineering negligence, which precludes the application of the DFE under the *Alabama Electric* ("Prong Two") rubric.

---

[19]     *See*, Deposition of Lee Guillory, Vol I, 165:12-25, 166:1-12, (Exhibit 18 to U.S. Motion to Dismiss (Doc. 19988-1)) ("U.S. Exhibit 18"); *see also* Deposition of John Grieshaber, Vol. I, 53:7-12, 54:7-13, (PSUF Exhibit 16).
[20]     *See* Deposition of Gerald Colletti, 34:3-12, 35:3-12, (Exhibit 24 to MRGO Plaintiffs' Supplemental Brief) ("MRGO Supp. Exhibit 24"); Deposition of Richard Varuso, Vol. I, 159:3-13, (MRGO Supp. Exhibit 25).
*[21]*     *See* Deposition of Walter Baumy, Vol. I, 236:1-13, (MRGO Supp. Exhibit  23).
[22]     *See* Deposition of John Grieshaber, Vol. I, 95:2-10, (PSUF Exhibit 16).
[23]     *Marlys Bear Medicine v. United States*, 241 F.3d 1208, 1214 (9th Cir. 2001); *Kennewick*, 880 F.2d at 1030.
[24]     *Seaboard Coastline, 473 F. 2d 417 (5th Cir. 1973).*
[25]     *See*, Deposition of Lee Guillory, Vol I, 165:12, 166:1-12, (U.S. Exhibit 18); *see also* Deposition of John Grieshaber, Vol. I, 53:7-12, 54:7-13, (PSUF Exhibit 16).

**II.     The Decision by the Corps That Proper Remediation was not Necessary at the EBIA Because the Area Was to be Turned into a Channel at a Later Date was not a Policy Decision.**

Defendant's argument that proper remediation was not necessary because the area was to be turned into a channel at a later date was not a policy decision for several reasons: (1) no geotechnical underseepage analysis was ever conducted on the bypass channel that could serve as a substitute for a geotechnical underseepage analysis on these excavations; (2) the proposed bypass channel was to be located west of the remedial excavations that undermined the levees; and (3) the Corps' decision regarding the timing of its construction of the bypass channel does not alter its professional obligation to engineer the remedial excavations non-negligently.

**A. The Corps Failed to Utilize the Express Technical Guidelines Necessary to Safely Engineer "Scores of Excavations" in the EBIA.**

Defendant's design documentation contains no pre-Katrina underseepage analysis for any excavation work within the EBIA.[26]   Defendant contradicted its initial representation at the October 13, 2010 hearing that a seepage analysis was in fact conducted on the proposed excavations when it later admitted, during the same hearing, that the engineering department did not analyze any of the scores of remediation excavations in the EBIA.[27]    Defendant also conceded that it acted on incorrect geotechnical interpretations of the floodwall's depth which, as

---

[26]         *See*, MRGO Plaintiffs' Chronology of East Bank Industrial Area Project and DDRS. The omission of this relevant engineering analysis from the EBIA proposed excavations is made all the more glaring upon a review of the Corps 3/31/2009 SEIS in which complete Geotechnical Information and Calculations for the proposed floodwalls and cofferdams for the lock installation were performed and the Corps calculations were Appended to the report at B.  Included in these calculations are:

> *Global Stability analysis* (and related calculations) for the pilings (noting that the designed piles did NOT meet the requisite factors of safety.)  (NMP 9022). *Global analysis* for the proposed Lock cofferdam (also noting that the proposal requiring extending berm length to preserve stability. (9025).
>
> *Seepage Analysis calculations* (which revealed that the initially proposed design resulted in **inadequate** factors of safety for heave in adjoining sand and, provided design alternatives. (9128-29).   Additionally,   Appendix D of the 2010 New Lock Proposal now contains 50 pages of *Quantity Calculations* regarding the proposed dredge material and fill material. (9342-9372).

[27]         October 13, 2010, Hearing Transcript at 38:23-25, 39:1-16.  A careful review of Defendant's referenced DDR1 will uncover no seepage analysis. Indeed, defendant later concedes that no seepage analysis was ever performed. *Id*. at .24:8-25, 25, 26:1-2.

the Court noted, is not policy or discretion, but "just flat wrong."[28]   Defendant further admitted

that it may have been "wrong about fill and compaction of the holes," conceding also that this

error "certainly" "could have a considerable…community impact."[29]

Significantly, the Corps did not engineer the bypass channel in its 1995 New Lock and

Connecting Channel evaluation Report, (Design Documents Reports 1) ("DDR1").   The plates

referenced by Defendant and contained in DDR 1 are proposed feasibility drawings of a bypass

channel **without supporting geotechnical analysis**.   In other words, at the time of the

excavations, the Corps had not performed any underseepage analysis or necessary geotechnical

engineering evaluations on the bypass channel itself.

Defendant argues that it was unnecessary to conduct underseepage evaluations on the

excavations because they were set to become a part of the future bypass channel.   However, the

relevant engineering analysis for the bypass channel itself was never performed.   Put differently,

**a bypass channel that lacks a geotechnical underseepage analysis cannot serve as a**

**substitute for excavations that lack a geotechnical underseepage analysis**.   No matter how

Defendant spins it, an underseepage analysis to ensure that the IHNC floodwalls would not be

compromised was never conducted—not on the future bypass channel or on the excavations in

question.   This was not a policy decision—but pure professional negligence.

### B. The Excavations in Question Were Not Set To Become Part of the Bypass Channel at a Later Date.

As noted, the plates referenced by defendant and contained in DDR 1 reflect that the

location of the bypass channel was to be west of the remedial excavations that undermined the

---

[28]         *Id*. at 38:4-13.
[29]         *Id*. at .25:19-22.

levees.[30]   As illustrated in Entergy Plaintiffs' Supplemental Exhibits 31 through 35, attached

hereto, the many excavations at the Boland site to depths of elevations of > -24' are located 157

feet from the existing floodwall.[31]   Likewise, as demonstrated through Entergy Plaintiffs'

Supplemental Exhibit 36, the excavations at Saucer Marine came to within 80 feet of the

floodwall and reached depths of approximately -20 feet.  In contrast, as illustrated in the Entergy

Plaintiffs' Supplemental Exhibits 31, 36, the excavations for the bypass channel at Boland were

not proposed to be closer than 157 ft. from the existing IHNC floodwall and the excavations at

Saucer were not proposed to be closer than 150 ft.

Accordingly, in answer to this Court's inquiry, it could not have been policy decision to

forgo "proper remediation" since the excavations were to be turned into a channel at a later date

because, among other reasons stated, **the remedial excavations that undermined the levees

were located east of the proposed location of the bypass channel.**   Thus, even if an

underseepage analysis was conducted on the bypass channel—and it was not—the Corps could

not rely on this analysis as a basis for not conducting an underseepage analysis on the

excavations that it actually conducted that were east of the proposed channel.

### C. The Corps' Duty to Use Basic Engineering Principles to Ensure Safety Cannot be Alleviated by its Potential Future Actions.

The law on the DFE is well established that while the Corps may have exercised policy in

determining when to commence its construction of the bypass channel, that decision cannot alter

its professional obligation to engineer the remedial excavations it did perform in a non-negligent

---

[30]     *See* Entergy Plaintiffs' Demonstrative, attached as (Exhibit 38).
[31]     *See* Entergy Plaintiffs' Demonstratives, attached as (Exhibits 31-36); *see also* Morris Demonstratives, (MRGO Supp. Exhibit 28).

manner.[32]  Simply put, "the Corps' must be held to the same standard of reasonableness and due care that a private engineer faces when he plies his trade."[33] Defendant cites no authority that absolves the Corps of its duty to exercise a "standard of reasonableness and due care" and to perform a project in a safe, non-negligent manner because of a potential future project.  As such, this Court should reject this argument and conclude that prong two cannot be satisfied.

As in *Alabama Electric,* the Corps acknowledges that it did not consider in advance the effects of improper design and construction (here, faulty excavation and backfill); did not consult authoritative treatises; and did not assess "all engineering factors" in an effort to determine the effects of its work "as accurately as possible," opting instead for reliance on "rules of thumb." [34] The Corps does not and cannot articulate a single example of a policy consideration underlying its conduct in giving short shrift to underseepage analysis, or failing to provide for proper backfilling.

Moreover, the Corps' failure to obtain adequate funds for the future IHNC lock project cannot relieve the Corps of its duty to perform a complete analysis of the engineering for the TERC funded excavations.  Regardless of where the funding originates, this Court has also followed the long tradition of rejecting the government's invocation of general "economic considerations," as a basis to forego professional standards of care reasoning that "[b]udgetary constraints underlie virtually all government activity."[35]  As this Court has noted, failing to

---

[32]     *Arizona Maintenance*, 864 F.2d 1497 (9th Cir 1989)*; Indian Towing Co. v. United States*, 350 U.S. 61 (1955); *Kennewick Irrigation Dist. v. U.S.*, 880 F.2d 1018, 1031 (9th Cir. 1989).
[33]     *Alabama Electric,* 769 F. 2d at.1531.
[34]     *Id.* at 1525.
[35]     *In re Katrina* 647 F. Supp. 2d at 710; *Cope,* 45 F.3d at 449 (quoting *ARA Leisure Servs. v. United States,* 831 F.2d at 196); *Hayes v. U.S.,* 539 F. Supp. 2d 393, 402-03 (D. D.C.  2008).

properly exercise "engineering judgment" or adhere to professional standards does not constitute a "matter of policy" or an "exercise of policy judgment."[36]

## III.    Conclusion

Because the Corps bears the burden of proving DFE immunity, and has not shown by summary judgment evidence that its conduct qualifies for such a privilege, *Alabama Electric* dooms its argument.[37]  Despite (1) the overwhelming engineering knowledge that underseepage analysis for the excavations was necessary and (2) the Corps' concession that the work proposed in the EBIA was "fairly simplistic" and that "the only way to endanger the flood system [was] by some form of inappropriate excavation or inappropriate backfill,"[38]  Defendant has conceded that basic engineering calculations were never done.[39]  Because this engineering analysis was professionally necessary, there can be no policy basis for the Corps' failure. Thus, immunity is simply not available.[40]

---

[36]      *Cope,* 45 F.3d at 452 (citing *Berkovitz v. U.S.* 486 U.S. at 545;  *In re Katrina*, 647 F. Supp. 2d at 710-14 (quoting *Bear Medicine*, 241 F.3d at 1217)); *In re Glacier Bay*, 71 F.3d 1447, 1453 (9th Cir. 1995).
[37]      *Alabama Electric,* 769 F. 2d at 1535 n.8 (citing and adopting the dissent in *Wright v. United States*, 568 F .2d 153 (10th Cir. 1977), *cert. denied*, 437 U.S. 824, 99 S.Ct. 94, 58 L.Ed.2d at 117 (1978)).
[38]      See Deposition Transcript of John Grieshaber, Vol. II, 14:23-25, 15: 1-11,  (U.S. Exhibit 12).
[39]      PSUF at ¶ 55, 57, 61, 62; U.S. Motion to Dismiss at 15-16, # 48-49 (Doc. 19988-4).
[40]      *Alabama Electric,* 769 F. 2d at 1531 n. 5.

Respectfully submitted on October   28  , 2010,

Ewell E. Eagan Jr. (La. Bar No. 5239), T.A.
Nina Wessel English (La. Bar No. 29176).
Brian L. Guillot (La. Bar No. 31759)
Gordon, Arata, McCollam,
  Duplantis & Eagan, L.L.C.
201 St. Charles Avenue, 40th Floor
New Orleans, Louisiana  70170-4000
Telephone: (504) 582-1111
Fax: (504) 582-1121

By:      /s/Brian L. Guillot

and

Marcus V. Brown (La. Bar No. 18817)
Wendy Hickok Robinson (La. Bar No. 25225)
Entergy Services, Inc.
639 Loyola Avenue, Suite 2600
New Orleans, LA  70113
Tel:  504-576-2765

Attorneys for Plaintiffs, **Entergy New Orleans, Inc.,
Entergy Louisiana, L.L.C.,**

and

Elisa T. Gilbert (ETG 5713), T.A.
Brendan R. O'Brien (BO 9033)
Kea Sherman, Esq (La. Bar No. 30299)
The Gilbert Firm, LLC
325 East 57th Street
New York, NY 10022

Attorneys for Hartford Steam Boiler Inspection and Insurance Company

12

## CERTIFICATE OF SERVICE

I certify that a true copy of the foregoing Motion for Leave was served by ECF on October __28_, 2010.

By:       /s/Brian L. Guillot
           BRIAN L. GUILLOT