UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In Re:  KATRINA CANAL BREACHES CONSOLIDATED LITIGATION | CIVIL ACTION NUMBER:  05-4182 "K"(2) JUDGE Duval MAG. Wilkinson |
| PERTAINS TO:   MRGO *Armstrong*, No. 10-866 | |

## ARMSTRONG PLAINTIFFS' SUPPLEMENTAL SUBMISSION IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

I.    INTRODUCTION ............................................................................................ 1

II.   THE CORPS DISREGARED ITS POLICY OF PERFORMING ENGINEERING
      ANALYSES ON EXCAVATION PROJECTS THAT COULD IMPACT ADJACENT
      FLOOD CONTROL STRUCTURES............................................................................. 3

III.  THE CORPS DISREGARED ITS REGULATIONS AND MANUALS MANDATING
      ENGINEERING ANALYSES ON EXCAVATION PROJECTS THAT COULD
      IMPACT ADJACENT FLOOD CONTROL STRUCTURES ......................................... 9

   A.  Engineering Regulations............................................................................... 9

      1.  ER 1110-2-1150.......................................................................................... 9

         i.    Section 8:  Engineering Documents........................................................ 9

         ii.   Section 10: Technical Coordination...................................................... 11

         iii.  Section 15:  Engineering During Construction ..................................... 11

         iv.   Section 17:  Design Quality ................................................................. 13

   B.  Engineering Manuals .................................................................................. 15

      1.  EM 1110-2-1913........................................................................................ 16

      2.  EM 1110-2-2502........................................................................................ 17

      3.  EM 1110-2-2504........................................................................................ 17

      4.  EM 1110-2-5027........................................................................................ 18

IV.   THE CORPS'S FAILURE TO PERFORM THE REQUIRED ENGINEERING
      ANALYSES IS NOT THE TYPE OF DECISION THE DFE PROTECTS .................... 18

V.    CONCLUSION.............................................................................................. 20

# TABLE OF AUTHORITIES

## CASES

*Ashford v. United States*,
    511 F.3d 501 (5th Cir. 2007) ........................................................................ 4, 5, 8

*Bagner v. United States*,
    428 F.Supp.2d 101 (N.D.N.Y. 2006) ................................................................. 15

*Bean Horizon Corp. v. Tennessee Gas Pipeline Co.*,
    1998 WL 113935 (E.D. La. 1998) ...................................................................... 9

*Berkovitz v. United States*,
    486 U.S. 531 (1988) ......................................................................................... 18

*Cope v. Scott*,
    45 F.3d 445 (D.C. Cir. 1995) ............................................................................ 19

*In re Katrina Canal Breaches Consol. Litig.*,
    647 F.Supp.2d 644 (E.D. La. 2009) ..................................................... 1, 3, 13, 18

*Kennewick Irr. Dist. v. United States*,
    880 F.2d 1018 (9th Cir. 1989) ........................................................................... 13

*Marlys Bear Medicine v. United States*,
    241 F.3d 1208 (9th Cir. 2001) ........................................................................... 19

*United States v. Gaubert*,
    499 U.S. 315 (1991) ......................................................................................... 3, 8

## I.   INTRODUCTION

The Court has ordered additional briefing with respect to six issues. The following are the short answers which are elaborated in this Supplemental Memorandum and the Appendix:

**1.    Do the Army Corps of Engineers's "Engineering Regulations" and "Engineering Manuals" relied upon plaintiffs constitute mandated action so as to come within the *Berkowitz* exception to Discretionary Function Exception ("DFE")?**

Yes.  The Corps's Regulations and Manuals themselves prescribe that they are mandatory.  The Regulations' various requirements are couched in terms of "shall," "must," and "essential."  The Manuals state that they "contain mandatory requirements for engineering procedures and design standards" as well as "policy standards for uniform engineering practice related to civil works projects."  Corps witnesses testified that these engineering codes are mandatory and were not followed.  Corps witnesses also testified that the Corps's policy ("process and procedure") required geotechnical engineering analyses (underseepage, wall stability, and global stability) on the EBIA excavations' potential effect on nearby floodwalls before the excavations could be undertaken,  *See* Sections II, IIII, *infra*.

**2.    What specific portions of these documents and what specific alleged failures of the Corps place its actions within the *Berkowitz* ("Prong One") rubric and/or rubric and/or the *Alabama Electric* ("Prong Two") rubric so as to deny the Government immunity provided by DFE?**

ER 1110-2-1150, Sections 8, 10, 15, and 17; EM 1110-2-1913 (Design Construction of Levees); EM 1110-2-2502 (Retaining and Floodwalls); EM 1110-2-2504 (Design of Sheet Pile Walls); EM 1110-2-5027 (Confined Disposal of Dredged Materials).  *See* Section III. *infra*.

**3.    Explain the decision by the Corps that proper remediation (that is proper soil and proper compaction) was not necessary at the EBIA area—because the area was to be turned into a channel at a later date—did or did not constitute a "policy decision."**

There was never an immunized "policy" decision.  *See In re Katrina Canal Breaches Consol. Litig*., 647 F.Supp.2d 644, 705, 712-14 (E.D. La. 2009).  The Corps's own witnesses

1

attest that before the EBIA excavation commenced, the Corps's Regulations, Manuals, and standard policy and practice mandated a geotechnical evaluation of the EBIA project's potential impact on the nearby existing floodwalls.  Even if the Corps had performed the required engineering investigations as to the proposed bypass channel (which it did not), that evaluation would not qualify as substitute for, or relieve the agency from conducting, a proper geotechnical investigation of the potential impact of the EBIA excavations on the nearby floodwalls.  *See* Section IV, *infra*.  Moreover, the EBIA excavation work was planned to go beyond the bypass channel's eastern boundary and as close as 100 feet or less at Boland Marine and Saucer Marine.

**4.     Did the fact that the funding for the channel had not been approved change the duty on the part of the Corps?**

No.  Regardless of when or whether the bypass channel or proposed LPV floodwalls were built (which has not yet occurred), once the Corps learned about the need for massive, additional excavation, the agency had a mandatory duty to perform the geotechnical analysis of seepage, wall stability, and global stability for the existing floodwalls as a result of the nearby EBIA excavations and backfilling and the potential for creating dangerous conditions jeopardizing the floodwalls.  The Corps's duty to perform this geotechnical analysis was all the more imperative since the additional EBIA excavations commencing in the latter part of 2001 were going to be much closer to the existing floodwalls than the proposed bypass channel boundaries.  *See* Plaintiffs' Exh. 27, Declaration of Chad Morris at ¶¶ 13-15, Exh. 28, Figs. 3-4.

**5.     Provide photographic representation demonstrating where the new channel would sit in relation to the Figure 5 of Plaintiffs' Exhibit 17 (Bea Technical Report V), Jan. 2009.**

The Declaration of Chad Morris (Plaintiffs' Exh. 27) and its attachments (Plaintiffs' Exh. 28) provide a graphic depiction of the proposed boundaries of the future channel and the areas where the EBIA work and excavations (and ultimate North and South breaches) occurred.

2

6.     **Provide a specific chronology of events using bullet points explaining why the relevant DDR(s) was or was not (or were or were not) incomplete and required amendment.**

*See* Appendix A, "Chronology of East Bank Industrial Area Project and DDRs."

II.     **THE CORPS DISREGARED ITS <u>POLICY</u> OF PERFORMING ENGINEERING ANALYSES ON EXCAVATION PROJECTS THAT COULD IMPACT ADJACENT FLOOD CONTROL STRUCTURES**

"It's in our process and procedures, we follow our process and procedures."

-John Greishaber, Corps 30(b)(6) witness.[1]

Independent of any Corps Engineering Regulation or Manual discussed in Section III, *infra*, the consistent and unrefuted testimony of Corps witnesses reveals that it is the Corps's specific policy and practice to perform geotechnical analyses on the potential impact that excavations within 300 feet of the adjacent levee's centerline may have on adjacent flood control structures.  The consistent and unrefuted testimony also demonstrates that this Corps policy and practice was ignored because the mandated engineering analyses were never done.  As a result, the Corps's admitted failure to adhere to its own policy and practice removes the shield of the discretionary function exception ("DFE") and exposes the Government to negligence liability under the FTCA.  *In re Katrina Canal Breaches Consol. Litig.*, 647 F.Supp.2d 644, 703 (E.D. La. 2009) (citing *United States v. Gaubert*, 499 U.S. 315, 322-23 (1991)).

There is no rule or requirement that the agency's policy be codified in a writing.  To the contrary, "[s]ome [agencies] establish policy on a case-by-case basis…[o]thers promulgate regulations on some topics, but not on others.  In addition, an agency may rely on *internal guidelines rather than on published regulations.*"  *Gaubert*, 499 U.S. at 324 (emphasis added). Fifth Circuit precedent also holds that an agency's policy does not have to emanate from a

---

[1] Plaintiffs' Exh. 16 at 173:8-174:19 (Greishaber Depo. Vol. I).

writing.  Rather, policy can be based on the agency's past process and procedures as testified to by Government witnesses.

For example, in *Ashford v. United States*, 511 F.3d 501 (5th Cir. 2007), federal prisoner Edward Ashford was transferred to a high-security prison in Washington D.C.  *Id.* at 503. Ashford had previously been involved in several fights with another prison inmate Kelvin Smith. *Ibid*.  Upon arrival at the high-security prison, Ashford allegedly informed his intake interview officer that he should not be placed in the general population if Smith was also in general population, and officials erroneously assured him that Smith was not at that facility.  *Ibid*. Officials placed Ashford in general population, where he was then attacked at Smith's direction. *Id.* at 504.

Ashford sued the Government under the FTCA for the severe injuries he sustained in the attack, but the District Court granted summary judgment for the Government on DFE grounds. *Ibid*.  The Fifth Circuit reversed.  The court cited the *testimony* of two prison officials who said that if an inmate raised safety concerns like the ones Ashford allegedly raised, the prison's policy required segregation.  *Ibid.*  The Fifth Circuit observed: "that *procedure* was not followed and Ashford was placed in the general population."  *Ibid*. (emphasis added).  Because this *testimony* suggested the existence of a mandatory policy to which the prison officials allegedly did not adhere, the Fifth Circuit concluded that a factual dispute existed making summary judgment on the DFE improper.  *Id.* at 505.

In our case, just as in *Ashford*, Plaintiffs presented the *testimony* of six Corps witnesses concerning the Corps's policy mandating geotechnical analyses on the potential impact that an excavation project like the EBIA could have on a nearby existing (or proposed) flood control structure.  Plaintiffs also presented *testimony* that this policy was ignored when the Corps failed

to perform the requisite geotechnical analyses after WGI discovered substantial contaminants and structures at the Boland Marine and Saucer Marine locations well within 300 feet of the adjacent IHNC floodwall.  And, while the *Ashford* court cited a factual dispute as to whether Ashford actually informed the intake officer about not being housed with Smith as grounds for reversing summary judgment (*Ashford*, 511 F.3d at 505), our case presents no factual dispute that the mandatory geotechnical analyses were never done.  Thus, this Court could find that, as a matter of law, the DFE does not apply.  At a minimum, however, the Corps's testimony about its policy and related Engineering Regulations and Manuals create a genuine issue of material fact precluding summary judgment.

Six Corps witnesses testified that the Corps's policy mandated engineering analyses and acknowledged the undisputed failure to undertake these analyses:

John Greishaber:  Corps 30(b)(6) witness who testified on the Corps's process and procedure for analyzing and offsetting the potential impact of EBIA excavations on the adjacent IHNC floodwalls, including underseepage, wall and global stability.

- "In the course of the design, we look at all aspects of the **geotechnical loading that a wall could see**.  And one of the aspects we would look at is the **effect of seepage**."[2]

- "We'd follow the design guidelines.  We **make sure** that whatever is done does not violate the integrity of whatever the flood protection is."[3]

- "The way **we would evaluate** an excavation near the floodwall is to **verify** that the excavation does not jeopardize the integrity of the floodwall…**we make sure** that we do not compromise the stability of the walls…."[4]

- This engineering review would entail **"wall stability analysis, [] seepage analysis, and [] global stability analysis."**[5]

---

[2] Plaintiffs' Exh. 16 at 36:7-37:1 (Greishaber Depo. Vol. I) (all emphasis in all witness quotations is added).
[3] *Id.* at 41:20-42:10.
[4] *Id.* at 53:4-12; 54:2-16.
[5] *Id.* at 123:5-124:7.

- If there is a hole near a flood control structure, engineering evaluation of the hole's potential impact on the structure is **mandatory** and not discretionary.[6]

- To perform this evaluation, the Corps's policy is to "go in and rerun the loading on the sheetpile," analyze "the difference between the ground line **that was assumed in the plans and specifications** for the design of the wall **and modify it** to the new ground line that results from having excavated the hole."[7]

- It was the Corps's **"process and procedure"** at the design phase, and to **"revisit"** the design upon modifications, to perform a geotechnical analysis on the potential for underseepage in the backfilled holes at the EBIA and the potential impact that underseepage could have on the adjacent floodwalls.[8]   Indeed, "**good engineering and sound engineering principles require[d] [the Corps to] document those kinds of analyses.**"[9]

- The removal of the hundreds of piles at the Boland Marine site [North Breach] **"[had] to be looked at"** by the Corps because it was the Corps's **"own internal procedure[]"** to evaluate whether there was any potential impact on nearby flood control structures.[10]

- If Mr. Guillory encountered a hole or excavation down to 20-25 feet, he was **"required to give that to the engineering department for their review."**[11]

- Once WGI discovered the massive contaminants and Boland and Saucer Marine, **wall stability analysis, seepage analysis, and global stability analysis had to occur before WGI could continue its excavations**.[12]

<u>Walter Baumy</u>:  Corps 30(b)(6) witness who is Chief of the Engineering Division at the New Orleans District Office.  The Engineering Division's participation in new projects includes analyzing design aspects, preparing plans and specifications, and determining whether excavations would have impacts on adjacent flood control structures.

- The Corps **"would expect"** to perform engineering evaluations of any excavations done by WGI at the Boland and Saucer Marine excavations.[13]

---

[6] *Id.* at 88:7-21.
[7] *Id.* at 91:2-93:13.
[8] *Id.* at 103:3-18.
[9] *Id.* at 123:5-124:7.
[10] *Id.* at 145:22-146:6; 147:1-148:14; 173:8-174:19.
[11] *Id.* at 168:9-22.
[12] *Id.* at 147:1-148:14.
[13] Plaintiffs' Exh. 23 at 236:6-13 (Baumy Depo. Vol. I).

- The Corps's **geotechnical engineering division would perform an engineering evaluation** on a hole that is dug 20 feet down and within 300 feet of the center line of a flood control structure.[14]

<u>Gerald Colletti</u>:  Corps witness and employee since 1977 with experience on the Corps's procedure for analyzing a project's potential impact on adjacent flood control structures.

- The Corps's **geotechnical branch** performs **stability analyses** for projects within the vicinity of floodwalls and levees on projects **to determine if there may be any adverse impact on those structures**.[15]

- If the Corps (or its contractors) performs **excavations as deep as 25 feet, that are within 300 feet of the IHNC eastern floodwall**, then "**geotechnical looks at it** from a…geotechnical structural standpoint.  **Factor of safety, what impact it may have on the adjacent wall or levee**."[16]

- "[W]hat you've got is you've got a federal navigation project that has a potential to affect or impact a federal flood control hurricane protection project.  So, **those two managers** [project and engineering] **need to get together**…**get engineering involved** and say, okay, what's actually happening here?  So, the technical evaluation comes from engineering."[17]

<u>Richard Varuso</u>:  Corps witness and Corps employee since 1994.  Mr. Varuso is a licensed civil engineer and knowledgeable about the EBIA excavations and backfill.  Since 1994, Mr. Varuso has spent the majority of his time with the Corps in the geotechnical branch.

- The excavations near the floodwalls along the IHNC "**have to be reviewed**" by the geotechnical engineers.  Geotechnical would "**have to look at** the site specific data for that location and determine…**how close we could get and how deep we could go with that excavation**."[18]

- It is a "fair assessment" to conclude that the Corps "needs to do some kind of an assessment; they **need to figure out whether or not there is an underseepage potential**…."[19]

---

[14] Plaintiffs' Exh. 23 at 237:24-239:13 (Baumy Depo. Vol. I).
[15] Plaintiffs' Exh. 24 at 30:10-19 (Colletti Depo.).
[16] *Id.* at 32:21-35:9; 40:17-43:9; 103:12-20.
[17] *Id.* at 103:21-105:1.
[18] Plaintiffs' Exh. 25 at 177:15-178:5 (Varuso Depo.).
[19] *Id.* at 198:7-21.

<u>Lee Guillory</u>:  Corps 30(b)(6) witness designated to testify concerning, among other things, the EBIA and all related excavations and analyses, including underseepage analyses, the TERC and Task Order 26, and any and all changes and modifications thereto.

- The geotechnical division **did not evaluate** WGI's plan for the removal of the sewer lift station at the Saucer Marine (South Breach) location.[20]

- After the EBIA excavation project was approved, there were **hundreds of poles** discovered and subsequently excavated near the Saucer Marine location.[21]  The poles averaged 30 feet and protruded to -10 to -30 feet below the surface.[22]  Not only was there **no geotechnical engineering analysis performed**, but there was **not any engineering analysis performed** on the impact the pole excavation could have on the adjacent flood control structure.[23]

- Guillory **never presented** the excavation plans for the Boland Marine (North Breach) site to the Corps's engineering department.[24]

<u>Gerarld DiCharry, Jr.</u>:  Corps witness and employee from 1969 to 2003 who was the Senior Project Manager for the IHNC Lock Replacement Project.

- Despite the Government contending that **WGI was responsible for "'all engineering services,'"**[25] the Corps **actually never expected WGI** to provide any geotechnical input on the stability or design of levees and floodwalls along the east bank.[26]

At bottom, the Corps's own policy mandated specific conduct.  The Corps had no choice "but to adhere to" this policy.  *Gaubert*, 499 U.S. at 322-23.  Mr. Guillory testified that the Corps did not adhere to this policy by inexplicably failing to perform the required engineering analyses where the North and South breaches ultimately occurred.  As a result, the Corps cannot meet its burden of proof under the DFE's Prong One.  *See Ashford*, 511 F.3d at 505 (Government bears burden of proof on Prong One).

---

[20] USA Exh. 18 at 153:2-7; 157:24-158:12, 198:6-16 (Guillory Depo. Vol. I).
[21] Plaintiffs' Exh. 17 at pp. 25-26 (Bea Tech. Report V, Jan. 2009).
[22] *Ibid.*
[23] USA Exh. 18 at 198:6-16 (Guillory Depo. Vol. I).
[24] *Id.* at 206:23-207:10.
[25] Government's Opening Brief at p. 40 (Doc. No. 19988-4) (emphasis added).
[26] USA Exh. 9 at 42:7-43:3 (DiCharry Depo.).

III.   **THE CORPS DISREGARED ITS <u>REGULATIONS</u> AND <u>MANUALS</u> MANDATING ENGINEERING ANALYSES ON EXCAVATION PROJECTS THAT COULD IMPACT ADJACENT FLOOD CONTROL STRUCTURES**

In addition to the Corps totally ignoring its own policy mandating geotechnical evaluations that addressed seepage, wall stability, and global stability, the agency failed to adhere to mandatory Engineering Regulations and Manuals requiring engineering analyses on excavation projects that could potentially impact the integrity of nearby flood control structures.

### A.  Engineering Regulations

Initially, there can be no dispute that Engineering Regulations are mandatory[27] and that the provisions of ER 1110-2-1150 detailed specific conduct for Corps employees.[28]  *See Bean Horizon Corp. v. Tennessee Gas Pipeline Co.*, 1998 WL 113935, *5 (E.D. La. 1998).  In addition to the sections addressed in Plaintiffs' prior pleadings and at oral argument, Plaintiffs draw special attention to the following sections of ER 1110-2-1150 that mandated conduct that the Corps indisputably failed to follow.

### 1.   <u>ER 1110-2-1150</u>

### i.   <u>Section 8:  Engineering Documents</u>

Section 8 required a Design Documentation Report ("DDR") for the EBIA excavations.[29] A DDR is a "record of final design effort after the feasibility phase" and "provides the technical basis for the plans and specifications and serves as a summary of the final design."[30]  The DDR covers the preconstruction engineering and design phase *and the construction phase* of the project.[31]  In effect, the DDR is the engineering master plan for a Corps project containing a

---

[27] USA Exh. 12 at 64:2-11; 82:2-23 (Greishaber Depo. Vol. II).
[28] USA Exh. 33 at p. 4, §10.1; p. 23, §19.1.1.
[29] *Id.* at p. 3, §8.2.
[30] *Ibid*.
[31] *Ibid.*

discussion of all the engineering, geotechnical, and other analyses for the Corps's field personnel implementing the master plan.

As Appendix D instructs Corps employees, the DDR is "not finalized until project construction is completed.  During the construction phase, *design decisions made in connection with contract modifications shall be added to the DDR*."[32]  Amendments to the DDR must reflect changes in the original DDR and the new engineering, geotechnical and other analyses relating to these changes.[33]  Accordingly, the DDR must include "*results of geotechnical investigations, which supplement previous studies*...."[34]

The initial DDR was drafted in 1999, and it did not address the EBIA excavation project as it eventuated.[35]  As the Court knows, the EBIA excavation project that accompanied the IHNC Lock Replacement was modified several times when WGI began excavating in 2001 and found massive contaminants and large, sunken objects at the Boland Marine and Saucer Marine locations.[36]  In line with Section 8's mandates and the required contents of the DDR, Mr. Greishaber testified that the discovery and subsequent removal of these subsurface structures at Boland Marine and Saucer Marine required "wall stability analysis[,] seepage analysis[,] and global stability analysis" on the excavations' potential impact on the adjacent flood control structure,[37] which were as close as 100 feet in some places.[38]  However, Mr. Guillory admitted that none of the engineering analyses—that Mr. Greishaber testified were mandatory and were

---

[32] USA Exh. 33 at p. D-1, §D-1.4 (emphasis added).
[33] *Id.* at p. D-1, §D-1.4; D-3, §D-7.11.
[34] *Id.* at p. D-3, §D-7.11 (emphasis added).
[35] *See* Plaintiffs' Appendix A, "Chronology of East Bank Industrial Area Project and DDRs."
[36] Plaintiffs' Exh. 16 at 113:1-116:20 (Greishaber Depo. Vol. I); USA Exh. 18 at 198:17-199:13 (Guillory Depo. Vol. I).
[37] Plaintiffs' Exh. 16 at 88:7-21; 123:5-124:7 (Greishaber Depo. Vol. I).
[38] *See* Plaintiffs' Exh. 27, Morris Declaration at ¶¶ 13-14; Exh. 28 at Figures 3, 4.

required to be in the completed DDR—were ever performed by the Corps.[39]  Indeed, neither the 1999 DDR nor the amended 2001 DDR No. 2 contain such analyses.[40]

As a result, the DFE is not available to the Government.

### ii.  Section 10: Technical Coordination

Section 10 states that "Districts *shall conduct* analyses and investigations in accordance with approved engineering criteria and guidance, coordinate engineering activities, and seek advice on problems encountered during project development from appropriate MSC, HQUSACE, and other engineering staffs."[41]  As discussed above, once WGI encountered the problems of the unforeseen structures at the Boland Marine and Saucer Marine locations, the DDR required modification and geotechnical needed to address the potential for the removal of these massive structures to negatively impact the adjacent IHNC floodwalls.[42]  In addition to being the Corps's policy, it was also "good engineering and [a] sound engineering principle[]" to coordinate engineering activities with geotechnical and seek geotechnical's advice on this significant safety issue that the Corps encountered during the EBIA excavation.[43]  As the Corps concedes, however, this coordination never occurred, and geotechnical's advice was never sought to deal with these substantial excavations and their impact on the adjacent floodwalls.[44]

Thus, the DFE does not apply.

### iii.  Section 15:  Engineering During Construction

The Government would have this Court believe that once the original project design is in place, no additional analysis on the impact that a subsequent modification could have on the

---

[39] USA Exh. 18 at 153:2-7; 157:24-158:12; 198:6-16; 206:23-207:10 (Guillory Depo. Vol. I).
[40] Plaintiffs' Appendix A, "Chronology of East Bank Industrial Area Project and DDRs."
[41] USA Exh. 33 at p. 4, §10 (emphasis added).
[42] *Ibid.*
[43] Plaintiffs' Exh. 16 at 123:5-124:7 (Greishaber Depo. Vol. I).
[44] USA Exh. 18 at 153:2-7; 157:24-158:12; 198:6-16; 206:23-207:10 (Guillory Depo. Vol. I);
USA Exh. 29 at 176:20-178:12 (Bacuta Depo.); Oral Argument Transcript at 23:25-24:11.

nearby floodwall is required, regardless of what unforeseen, significant circumstances develop during construction and render the DDR outmoded.  This position is simply untenable as a matter of sound engineering practice and the Corps's own policy and regulations.  This is particularly true when WGI discovered massive contaminants and structures buried below the surface at the Boland Marine and Saucer Marine locations that *neither WGI nor the Corps expected when the EBIA excavation began*.

Section 15 of ER 1110-2-1150 unequivocally requires engineering be involved in "modification of [Plans & Specifications]…and preparation of engineering considerations and instructions to field personnel.  The engineers must also provide support for contract claims and modifications…."[45]  Indeed, Mr. Greishaber went into elaborate detail about the Corps's mandatory policy of reevaluating any changes and modifications that could impact adjacent flood control structures at the EBIA.[46]  This engineering evaluation must include analyses of underseepage, global stability, and the actual temporary retaining structures at both the Boland Marine and Saucer Marine locations.[47]  In fact, these analyses had to be completed *before WGI could go forward with its work*.[48]

In addition, Section 15.6 ("Engineering support for claims and modifications") states that "[e]ngineering *shall* provide design and cost estimating assistance for claims and modifications when requested and be knowledgeable of all claims and modifications….  Engineering input into this process is *essential to ensure the continuity of the design process through construction*…."[49]

---

[45] USA Exh. 33 at p. 19.
[46] Plaintiffs' Exh. 16 at 90:14-96:15 (Greishaber Depo. Vol. I).
[47] *Id.* at 123:5-124:7; 159:20-160:25; 173:8-174:19.
[48] *Id.* at 147:1-148:14.
[49] USA Exh. 33 at p. 20, §15.6 (emphasis added).

Indisputably, the Corps did not abide by this mandate because Mr. Guillory testified that he never allowed engineering to provide design assistance on the EBIA excavations at Boland Marine and Saucer Marine.[50]  Engineering could not "be knowledgeable of all claims and modifications" because Mr. Guillory never informed them of these claims and modifications generated by WGI's deep excavations and pile removal along the EBIA.

The Government contends that Section 15.6 was triggered only if Mr. Guillory actually made the request for assistance to engineering.[51]  But Mr. Guillory's undisputed failure to make this mandatory request is not the type of negligence that the DFE protects.  As discussed in Section IV, below, deciding whether to let engineering evaluate the potential impact that the massive, unforeseen excavations could have on the nearby IHNC floodwalls clearly invoked issues of safety, engineering judgment, and accepted professional standards.  Such issues do not constitute a "matter of policy" or an "exercise of policy judgment."  *In re Katrina Canal Breaches Consol. Litig.*, 647 F.Supp.2d at 705, 712-14 (citing *Kennewick Irr. Dist. v. United States*, 880 F.2d 1018, 1030 (9th Cir. 1989)).

Because of the Corps's failure to follow Sections 15 and 15.6 of ER 1110-2-1150, it cannot satisfy its burden of proof under the DFE's Prong One.

### iv.  <u>Section 17:  Design Quality</u>

As much as the Government believes that a project's design quality is "too general"[52] a concept for it to apply to the EBIA excavations, the plain language of Section 17 required engineering to have responsibility for the "[e]xecution of the design and technical quality" of the project.[53]  To these ends, it was "*essential* that coordination and planning the work effort occur at

---

[50] USA Exh. 18 at 153:2-7; 157:24-158:12; 198:6-16; 206:23-207:10 (Guillory Depo. Vol. I).
[51] Oral Argument Transcript at p. 87:10-88:13.
[52] USA Opening Brief at p. 47 (Doc. No. 19988-4).
[53] USA Exh. 33 at p. 22, §17.

the earliest stages of project development, *through preparation and execution of the Management Plan*."[54]  In addition, Section 17 mandates that "[t]echnical quality *shall* be achieved mainly through a process that includes…*adequate coordination among the project team and technical disciplines*."[55]  Finally, [q]uality is further achieved by participation in *value engineering studies* and thorough internal checking and review by *qualified engineers*."[56]

In this case, as Mr. Guillory admits, there was not "adequate coordination" with geotechnical because there was *no* "coordination and planning the work effort" with geotechnical once WGI discovered the massive subsurface structures at the Boland Marine and Saucer Marine sites.[57]  Confirming what Section 17 states, Mr. Greishaber testified that such coordination and planning was required.[58]  Indeed, the Corps should not have allowed WGI to proceed with the excavations at Boland and Saucer without evaluating "the potential negative impact of the pile removal on the floodwall…."[59]

Moreover, Section 17 required a "qualified engineer" to check and review the excavation plans at these two locations.[60]  The Corps tasked George Bacuta with reviewing the excavation plans.[61]  Two problems: (1) Mr. Bacuta is a geochemist and not a "qualified engineer,"[62] and (2) Mr. Bacuta never reviewed any excavation plans.[63]

---

[54] USA Exh. 33 at p. 22, §17 (emphasis added).
[55] *Ibid.*
[56] *Ibid.*
[57] USA Exh. 18 at 153:2-7; 157:24-158:12; 198:6-16; 206:23-207:10 (Guillory Depo. Vol. I); USA Exh. 29 at 176:20-178:12 (Bacuta Depo.).
[58] Plaintiffs' Exh. 16 at 88:7-21; 123:5-124:7; 147:1-148:14; 159:20-160:25; 173:8-174:19 (Grieshaber Depo Vol. I)
[59] *Id.* at 147:1-148:14.
[60] USA Exh. 33 at p. 22, §17.
[61] USA Exh. 18 at 188:8-17 (Guillory Depo. Vol. I).
[62] USA Exh. 29 at 145:18-146:6 (Bacuta Depo.).
[63] *Id.* at 142:21-25; 177:4-13.

14

In the end, the Corps completely failed to follow Section 17's critical design quality requirements.  Incredibly, it never coordinated with geotechnical on the Boland Marine and Saucer Marine excavations, and it never had anyone—let alone a qualified engineer—review WGI's excavation plans.  As a result, the Government cannot avail itself of the DFE.

### B.  Engineering Manuals

According to the Corps, its Engineering Manuals "contain *mandatory requirements* for engineering procedures and design standards" as well as "policy standards for uniform engineering practice related to civil works projects."[64]  *See Bagner v. United States*, 428 F.Supp.2d 101, 104 (N.D.N.Y. 2006) (citing Army Corps Standards Manual).  Certain of these requirements are designed "to ensure project safety and function."[65]  Moreover, Dr. Bea—who has over 30 years experience as a licensed professional engineer and has worked for the Corps on projects involving flood protection structures—observes that these manuals "clearly demonstrate the intent that any foundation condition that may impact the seepage potential under a levee must be evaluated."[66]

The Government has not offered any testimony that these manuals are not applicable to the EBIA excavations.  To the contrary, the Government's *ipse dixit* argument rests only on its assertion that the manuals simply do not apply, and that if there is any ambiguity, the Court "should seek clarification in the agency's construction."[67]  The Corps expressly interprets its Engineering Manuals as "mandatory requirements," and the Government has not offered any evidence or proof of the "agency's construction" to the contrary.

---

[64] USA Exh. 33 at p. 4, §10.1; p. 23, §19.1.2 (emphasis added).
[65] *Id.* at p. 23, §19.1.2.
[66] Plaintiffs' Exh. 18 at pp. 3, 21 (Bea Tech. Report IV, July 2008).
[67] USA Reply Brief at p. 15 (Doc. No. 20061).

In addition to the sections addressed in Plaintiffs' prior pleadings and at oral argument, Plaintiffs draw special attention to the following sections of Engineering Manuals that mandated specific engineering analyses that the Corps indisputably failed to follow.[68]

### 1.   EM 1110-2-1913

According to the Corps, "flood protection is extremely important," and they must assure that their projects "do not jeopardize the flood protection."[69]   To adhere to this critical safety policy, Mr. Greishaber testified that the Corps follows EM 1110-2-1913.[70]

EM 1110-2-1913 demonstrates that any foundation condition that may impact the seepage potential under a levee must be evaluated.   In particular, "[w]ithout control, underseepage in pervious foundations beneath levees may result in (a) excessive hydrostatic pressures beneath an impervious top stratum on the landside, (b) sand boils, and (c) piping beneath the levee itself."[71]   Indeed, these are the very conditions that resulted at the North and South breach locations because the Corps failed to analyze these dangerous conditions before allowing WGI continue its excavations.[72]

Despite EM 1110-2-1913's explicit warnings, the Corps failed to perform any geotechnical analysis on the potential for the Boland Marine and Saucer Marine excavations to cause underseepage near the adjacent IHNC floodwalls.[73]   Therefore, the DFE does not apply.

---

[68] Entergy also demonstrates the applicability of two other Engineering Manuals:  1110-1-1804 and 1110-2-1902.  *See* Entergy Plaintiffs' Supplemental Memorandum at pp. 4-5.
[69] Plaintiffs' Exh. 16 at 72:3-73:11 (Greishaber Depo. Vol. I.).
[70] *Ibid*.
[71] Plaintiffs' Exh. 11 at p. 5-1, §5-1; *see also* Plaintiffs' Exh. 18 at pp. 4-5 (Bea Tech. Report IV, July 2008).
[72] Plaintiffs' Exh. 17 (Bea Tech. Report V, Jan. 2009).
[73] USA Exh. 18 at 153:2-7; 157:24-158:12; 198:6-16; 206:23-207:10 (Guillory Depo. Vol I); *see also* USA Exh. 29 at 176:20-178:12 (Bacuta Depo.).

### 2.   EM 1110-2-2502

The Corps's own Lock Evaluation Report states that the "structural components *shall* be designed according to the applicable portions of…EM-1110-2-2502."[74]  This manual states that "[w]ater-retaining structures are subject to through-seepage, underseepage, and seepage around their sides or ends" and that "[u]ncontrolled seepage may result in water pressures and uplift forces on the wall base in excess of design assumptions and consequent structural instability…."[75]  Because of this seepage threat, "[s]eepage control entails the design of measures *to ensure that seepage pressures and velocities are maintained below tolerable values*."[76]  As a result, "the seepage aspects and the foundation stability of walls which have had basements excavated on either side of and adjacent to the wall since the original design and construction were completed *should be investigated*."[77]

Once again, this is precisely what happened during Katrina[78] and precisely the required engineering analysis of this well-known phenomenon.[79]  As a result, the DFE does not apply.

### 3.   EM 1110-2-2504

EM 1110-2-2504 concerns the design of sheet pile walls.[80]  As this Court pointed out, there was a significant miscalculation on the Corps's behalf with respect to the sheet pile depth along the east bank of the IHNC.[81]  This manual states that "[c]oordination and cooperation among hydraulic, geotechnical, and structural engineers must be continuous from the inception

---

[74] Plaintiffs' Exh. 2, Vol. 3 at B-86, §B.2.8 (emphasis added).
[75] Plaintiffs' Exh. 20 at p. 7-3, §7-3; *see also* Plaintiffs' Exh. 18 at pp. 6-7(Bea Tech. Report IV, July 2008).
[76] Plaintiffs' Exh. 20 at p. 7-3, §7-3 (emphasis added).
[77] *Id.* at p. 7-25, §g (emphasis added).
[78] Plaintiffs' Exh. 17 (Bea Tech. Report V, Jan. 2009).
[79] Plaintiffs' Exh. 18 at pp. 6-7 (Bea Tech. Report IV, July 2008).
[80] Plaintiffs' Exh. 22.
[81] Oral Argument Transcript at 43:2-44:5.

of the project to final placement in operation."[82]  It also mandates that "for floodwalls, foundation underseepage conditions *must also be assessed*."[83]  Of course, since such underseepage analysis was never performed,[84] the DFE does not apply.

### 4.   EM 1110-2-5027

EM 1110-2-5027 concerns confined disposal of dredged material.[85]  Specifically, this manual required more extensive field investigations where "foundation deposits are weak and compressible," "highly variable," and where "[u]nderseepage and/or settlement problems are severe" and where "the consequences of the failure involve life, property, or damage to the environment."[86]  As the Corps admits, there was no "more extensive field investigation" because there was not *any* investigation performed on the Boland Marine and Saucer Marine excavations' potential impact on the adjacent IHNC floodwall.[87]  Thus, the DFE does not apply.

### IV.   THE CORPS'S FAILURE TO PERFORM THE REQUIRED ENGINEERING ANALYSES IS NOT THE TYPE OF DECISION THE DFE PROTECTS

To succeed under the DFE's Prong Two, the Government must prove that its decision to forego the required engineering analyses "involve[d] the permissible exercise of policy judgment."  *Berkovitz v. United States*, 486 U.S. 531, 538 n.3 (1988).  As this Court previously held, however, decisions involving safety, engineering judgment, and accepted professional standards do not constitute a "matter of policy" or an "exercise of policy judgment."  *In re Katrina Canal Breaches Consol. Litig.*, 647 F.Supp.2d at 705, 712-14 (citing *Cope v. Scott*, 45

---

[82] Plaintiffs' Exh. 22 at p. 2-1, §2-1.
[83] *Id.* at p. 3-1, §3-1*a*. ("Geotechnical Investigation") (emphasis added).
[84] USA Exh. 18 at 153:2-7; 157:24-158:12; 198:6-16; 206:23-207:10 (Guillory Depo. Vol. I); USA Exh. 29 at 176:20-178:12 (Bacuta Depo.); Oral Argument Transcript at 23:25-24:11.
[85] Plaintiffs' Exh. 14.
[86] *Id.* at p. 6-4, Table 6-1.
[87] USA Exh. 18 at 153:2-7; 157:24-158:12; 198:6-16; 206:23-207:10 (Guillory Depo. Vol. I); USA Exh. 29 at 176:20-178:12 (Bacuta Depo.); Oral Argument Transcript at 23:25-24:11.

F.3d 445, 452 (D.C. Cir. 1995) and *Marlys Bear Medicine v. United States*, 241 F.3d 1208, 1217 (9th Cir. 2001)).

In this case, the Corps's failure to perform the required engineering analyses on the potential deleterious impact of the EBIA excavations on the adjacent IHNC floodwalls was a decision that indisputably concerned safety, engineering judgments, and accepted professional standards.  In particular, Mr. Grieshaber testified that performing an analysis on wall stability, seepage, and global stability was not only the Corps's policy but also a matter of "good engineering and sound engineering principles."[88]  Mr. Greishaber further emphasized that because "flood protection is extremely important" to the Corps, it must assure that it does "not jeopardize the flood protection."[89]  And the issue of safety with respect to the EBIA excavations is best exemplified by Mr. Greishaber's testimony:

> 13 Q. No. But it's mandatory. What you
> 14 just described to me is mandatory. You either
> 15 stop or you let us look at it, and if we can
> 16 assess it and we're comfortable that you're not
> 17 going to do something to hurt our levee, we'll
> 18 let you do it. The point I think you're making
> 19 to us on this record is that **it's a mandatory**
> 20 **evaluation, this not something that you take**
> 21 **very lightly, because you could flood[] the**
> 22 **city. Isn't that right?**
> 23 MR. STONE:
> 24 Objection. Ambiguous.
> 25 **A. Yes.**[90]

Flood the city, indeed!

As the Court noted at oral argument, this case is not *Robinson* because there the MRGO's defalcations were obvious to the Corps for decades, while the alleged defalcations here were subterranean.  But the DFE analysis does not change because the Corps was well aware of this

---

[88] Plaintiffs' Exh. 16 at 123:5-124:7 (Greishaber Depo. Vol. I).
[89] *Id.* at 72:3-73:11.
[90] *Id.* at 80:13-25.

significant flooding risk.  In fact, because the threat to the floodwalls was not in plain view, it was all the more incumbent upon the Corps to undertake the mandated engineering evaluation. To address these subterranean issues, the Corps's policy admittedly mandated that once WGI's excavations revealed massive contaminants and structures at Boland Marine and Saucer Marine, the Corps had to perform engineering analyses on wall stability, seepage, and global stability before WGI could continue.[91]  Why?  Because (1) it was "good" and "sound" engineering to do so, and (2) a failure to do so could "flood the city."

It is uncontested here that these engineering analyses were not performed.[92]  Because this failure to perform these engineering analyses involves safety, engineering judgment, and accepted professional standards, the Government cannot satisfy the DFE's Prong Two.

## V.      CONCLUSION

For the foregoing reasons, the Government's summary judgment motion should be denied.

Dated:  October 29, 2010

**Respectfully Submitted,**
**PLAINTIFFS LIAISON COUNSEL**

    /s/ Joseph M. Bruno
JOSEPH M. BRUNO (La. Bar # 3604)
Bruno & Bruno, LLP
855 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 525-1335
Facsimile: (504) 561-6775
Email: jbruno@brunobrunolaw.com

**MR-GO PLAINTIFFS SUB-GROUP LITIGATION**
**COMMITTEE**

---

[91] Plaintiffs' Exh. 16 at 88:7-21; 147:1-148:14 (Greishaber Depo. Vol. I).
[92] USA Exh. 18 at 153:2-7; 157:24-158:12; 198:6-16; 206:23-207:10 (Guillory Depo. Vol. I); *see also* USA Exh. 29 at 176:20-178:12 (Bacuta Depo.); Oral Argument Transcript at 23:25-24:11.

      /s/ James Parkerson Roy
JAMES PARKERSON ROY
MR-GO PSLC Liaison Counsel
LA. Bar Roll Number: 11511
Domengeaux Wright Roy & Edwards LLC
P.O.Box 3668
Lafayette, LA. 70502
Telephone: (337) 593-4190 or (337) 233-3033
Facsimile: 337-233-2796
Email: jimr@wrightroy.com

      /s/Pierce O'Donnell
PIERCE O'DONNELL
MR-GO PSLC Liaison Counsel
*Admitted Pro Hac Vice*
O'Donnell & Associates PC
800 Wilshire Blvd, Suite 800
Los Angeles, CA 90017
Telephone: (213) 347-0290
Facsimile: (213) 347-0299
Email: pod@oslaw.com

**MR-GO PLAINTIFFS SUB GROUP LITIGATION COMMITTEE**

Jonathan Andry (The Andry Law Firm, New Orleans, LA)
Clay Mitchell (Levin, Papantonio, et al., Pensacola, FL)
Pierce O'Donnell (O'Donnell & Associates, Los Angeles, CA)
James Parkerson Roy (Domengeaux, Wright, et al., Lafayette, LA)

## <u>CERTIFICATE OF SERVICE</u>

    I certify that a true and correct copy of the foregoing was served upon all counsel of record by ECF on October 29, 2010.

           /s/ Joseph M. Bruno