UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE: KATRINA CANAL BREACHES      CIVIL ACTION

CONSOLIDATED LITIGATION            NO. 05-4182 K2

                                   JUDGE DUVAL

PERTAINS TO                        MAG. WILKINSON

(Robinson, No. 06-2268)


        Deposition of WALTER O. BAUMY, JR.,

given at the U.S. Army Corps of Engineers New

Orleans District offices, 7400 Leake Avenue,

New Orleans, Louisiana 70118-3651, on April

9th, 2008.


REPORTED BY:

        JOSEPH A. FAIRBANKS, JR., CCR, RPR

        CERTIFIED COURT REPORTER #75005

WALTER BAUMY                                          1/9/2008

## Page 2

1    APPEARANCES:
2    REPRESENTING THE PLAINTIFFS:
3
4        LAMBERT AND NELSON
5        (BY:  HUGH P. LAMBERT, ESQUIRE)
6        701 Magazine Street
7        New Orleans, Louisiana 70130
8        504-581-1750
9    - and -
10       BRUNO & BRUNO
11       (BY:  JOSEPH M. BRUNO, ESQUIRE)
12       (BY:  FLORIAN BUCHLER, ESQUIRE)
13       (BY:  SCOTT JOANEN, ESQUIRE)
14       855 Baronne Street
15       New Orleans, Louisiana 70113
16       504-525-1335
17   - and -
18       SHER, GARNER, CAHILL, RICHTER, KLEIN &
19       HILBERT, L.L.C.
20       (BY:  MATTHEW CLARK, ESQUIRE)
21       909 Poydras Street, 28th Floor
22       New Orleans, Louisiana 70112-1033
23       504-299-2100
24
25

## Page 3

1    REPRESENTING THE UNITED STATES OF AMERICA:
2        UNITED STATES DEPARTMENT OF JUSTICE,
3        TORTS BRANCH, CIVIL DIVISION
4        (BY:  ROBIN SMITH, ESQUIRE)
5        P.O. Box 888
6        Benjamin Franklin Station
7        Washington, D.C. 20044
8        202-616-4289
9
10   REPRESENTING THE U.S. ARMY CORPS OF ENGINEERS:
11       CORPS OF ENGINEERS, OFFICE OF COUNSEL
12       (BY:  NICK MARZONI, ESQUIRE)
13       7400 Leake Avenue
14       New Orleans, Louisiana 70118-3651
15       504-862-2843
16
17   ALSO PRESENT:
18       JOSEPH E. BEARDEN, III, ESQ.
19       KEA SHERMAN, ESQ.
20       CHARLES SUTTON, ESQ.
21       ROBERT B. FISHER, JR., ESQ.
22       JOHN L. ROBERT, III, ESQ.
23       CHRISTOPHER THATCH, ESQ. (VIA I-DEP)
24       ADAM CHUD, ESQ. (VIA I-DEP)
25   VIDEOGRAPHER: KEN HART (HART VIDEO)

## Page 4

1           S T I P U L A T I O N
2        IT IS STIPULATED AND AGREED by and
3    among counsel for the parties hereto that the
4    deposition of the aforementioned witness may be
5    taken for all purposes permitted within the
6    Federal Rules of Civil Procedure, in accordance
7    with law, pursuant to notice;
8        That all formalities, save reading
9    and signing of the original transcript by the
10   deponent, are hereby specifically waived;
11       That all objections, save those as to
12   the form of the question and the responsiveness
13   of the answer, are reserved until such time as
14   this deposition, or any part thereof, is used
15   or sought to be used in evidence.
16
17
18                   * * *
19
20
21
22       JOSEPH A. FAIRBANKS, JR., CCR, RPR,
23   Certified Court Reporter in and for the State
24   of Louisiana, officiated in administering the
25   oath to the witness.

## Page 5

1        WALTER O. BAUMY, JR.
2    203 Reiher Road, Mandeville, Louisiana 70471, a
3    witness named in the above stipulation, having
4    been first duly sworn, was examined and
5    testified on his oath as follows:
6    MR. SMITH:
7        No stipulations.  It'll be
8    pursuant to the Federal Rules of Civil
9    Procedure.
10   MR. BRUNO:
11       Which I believe are the usual
12   stipulations, but anyway --
13   MR. SMITH:
14       Just for the record.
15   MR. BRUNO:
16       Just for the record, you know.
17       I'm happy to work with these people.
18   EXAMINATION BY MR. BRUNO:
19       Q.  All right.  Mr. Baumy, you've already
20   given your deposition in the Robinson case as a
21   30(b)(6) representative of the United States
22   Army Corps of Engineers, isn't that true?
23       A.  Yes.
24       Q.  And I have that deposition here, and
25   please know that I have no intent to recover

WALTER BAUMY                                                    1/9/2008

Page 6

1   the same ground.  And so I'd like to follow
2   along some of these things that have already
3   been covered.
4          You are the Chief of the Engineering
5   Division at the New Orleans District Office of
6   the United States Army Corps of Engineers here
7   in New Orleans; is that correct.
8       A.  Yes.
9       Q.  All right.  Would you please share
10  with us whether or not there is a written
11  description for that position that exists
12  within this district.
13      A.  Yes.  There is.
14      Q.  All right.  And where might I find
15  that?
16      A.  Personnel office.
17      Q.  Okay.
18         MR. BRUNO:
19             Robin, would you kindly give us a
20         copy of that, please?
21         MR. SMITH:
22             Yes.
23  EXAMINATION BY MR. BRUNO:
24      Q.  Can you, for the record -- and I know
25  that I'll be testing your memory, and I don't

Page 7

1   expect you to be able to recite it verbatim,
2   but can you give me a general sense of what
3   your job description is.
4       A.  Whew.  I haven't looked at that in a
5   while.  I can give you a sense of, um -- I have
6   oversight of the engineering program at the New
7   Orleans District.  And, you know, we
8   participate in new projects, design aspects, it
9   could be in the early report phase where a
10  project is being evaluated for suitability, is
11  it beneficial to put in a particular locale,
12  and then once done, document the design and
13  different phases of that project through, um --
14  through the advertisement phase, actually
15  preparing the plans and specifications.
16         So we produce plans and
17  specifications, we produce designs associated
18  with navigation, flood control and
19  environmental restoration type projects.  We
20  also participate in the operations phase in
21  some cases, sometimes limited, sometimes more
22  extensive.  We do have a formal periodic
23  inspection program for structures within the
24  New Orleans District, and there's approximately
25  forty to forty-five structures in that program.

Page 8

1   That's sort of the engineering side of it.
2          I'm also responsible for participating
3   on the district 's executive staff, um --
4   advising the commander in particular areas, as
5   well as helping to arrive at decisions on
6   anything that would -- we would come across.
7          Manage an organization that before the
8   storm was near 300 people, and associated with
9   that had broad personnel and organizational
10  management responsibilities, developing an
11  overall budget for the particular year, and
12  then execution of that budget.  Development of
13  personnel staff for the future, training and
14  also job selections, position descriptions,
15  things of that nature, disciplinary actions.
16  So it's a combination job of wearing numerous
17  hats to support the engineering efforts at the
18  district, but at the same time management of a
19  large workforce.
20      Q.  Just curious.  You said before Katrina
21  300.  How many now?
22      A.  Oh, I have 83 vacancies in my group
23  right now.  So it's probably in the 220 range
24  if I'm not mistaken.
25      Q.  Okay.  And those are folks who for

Page 9

1   whatever reason have moved away?
2       A.  It runs the gamut.  Some have retired,
3   some have accepted other jobs, some have moved
4   away.  It's just personal choice.
5       Q.  Okay.  All right.  You spoke quickly,
6   of course as you should, and I would like to
7   just make certain that I've written these
8   things down appropriately.
9          First, new projects.  What is a new
10  project?
11      A.  Well, the Corps has various phases of
12  a project.  Reconnaissance phase is generally
13  the start of a project from the engineering
14  standpoint, and that would move into the
15  feasibility phase, and again you're getting --
16  working towards authorization for construction
17  of a project.
18      Q.  All right.  Can I get a sense of,
19  though -- you know, the word project is a broad
20  word, I'm sure you'd agree.
21      A.  Sure.
22      Q.  -- generally, the kinds or types of
23  projects which fall within the ambit of
24  responsibility of your -- in your role as
25  chief.  What types of projects?  Do you billed

WALTER BAUMY                                                          1/9/2008

---

Page 10

1  buildings? Do you--
2      A.  Occasionally, but that's not the bulk
3  of our work.
4      Q.  Okay.
5      A.  It's a very broad brush.  We've, um --
6  we have projects as small as the local
7  community coming in and saying I have a little
8  problem on a stream.  And so we call those CAP
9  projects.  And I can't tell you what the CAP
10  stands for, but they're very small projects
11  within a special program of the Corps of
12  Engineers to something as big as the LACPR
13  project where you're looking at Category 5
14  protection, or some higher level of protection
15  across the entire state.  So we've got a broad
16  range of projects in the flood control arena,
17  but also the same applies for the navigation
18  and the, um -- hurricane protection.  I mean,
19  they're different types of projects.  It could
20  be dredges projects, it could be levee
21  construction, it could be a flood gate, it
22  could be a pump station, structures of those
23  types.
24      Q.  Would it be accurate for me to say
25  that the United States Army Corps of Engineers

---

Page 11

1  acts as an engineering consultant to the
2  Congress of the United States?
3      A.  We have a relationship with it.  I
4  can't tell you exactly how it works up in the
5  Washington area.  But yeah, we have a
6  relationship with the Congress.  Well, um --
7  projects are approved by Congress and they're
8  also funded by Congress, so we do supply them
9  information so they can make informed
10  decisions.
11      Q.  Who do you answer to?
12      A.  I answer to the commander of the New
13  Orleans District.
14      Q.  And who does he answer to?
15      A.  He answers to the commander of the
16  Mississippi Valley Division.
17      Q.  And who does he or she answer to?
18      A.  Um -- I would assume the Chief of
19  Engineers, but I don't know that for a fact.
20      Q.  And the Chief of Engineers, is he or
21  she the person in charge of the United States
22  Army Corps of Engineers?
23      A.  Um -- I don't know that for a fact.
24      Q.  Well, who is in charge, do you know?
25      A.  There's a relationship between the

---

Page 12

1  assistant secretary and the Chief of the Corps
2  of Engineers, and that's, you know, beyond my
3  levee.  I don't get involved with that aspect
4  of it.
5      Q.  All right.  Which assistant secretary
6  are you referencing in your response?
7      A.  Um -- deputy for civil works,
8  Mr. Woodly at this point.
9      Q.  All right.  The office of the
10  president?
11      A.  I don't know.
12      Q.  You don't know.
13      A.  No.
14      Q.  Well, how does a project begin?
15      A.  Not necessarily my lane.  Um -- in
16  today's society, I mean, I would be contacted
17  by a project manager asking for support.  So I
18  don't know the relationship between the project
19  manager and the, um -- local sponsor who may be
20  trying to get a project.  I'm not sure how
21  that's initiated and what's the protocol.
22      Q.  All right.  We'll, once again, can I
23  conclude from your answer that your engineering
24  division acts in a support role?
25      A.  Yes.

---

Page 13

1      Q.  Okay.  And the role of support is to
2  provide engineering services?
3      A.  Yes.
4      Q.  Okay.  Now, I think you've already
5  described for us that a project has phases --
6      A.  Yes.
7      Q.  -- is that true?
8          You described a reconnaissance phase,
9  you described a feasibility phase, and then you
10  described an authorization phase?
11      A.  And there's more phases than that.  I
12  mean, those were examples.
13      Q.  Right.  Well, there has to be, because
14  then there's a design phase.
15      A.  Yes.
16      Q.  And all that follows from design to
17  build.
18      A.  Yes.
19      Q.  Let's just focus, though, for the
20  moment, on the reconnaissance phase.
21          First of all, your use of the word
22  reconnaissance, is that a term of art within
23  the New Orleans district?
24      A.  No, that's within the Corps of
25  Engineers regulations.

---

WALTER BAUMY                                                          1/9/2008

Page 14

1    Q.  All right.  So what does
2  reconnaissance mean, then, in the context of
3  the regulations?
4    A.  It's a limited study.  Generally, we
5  would interpret that at the district based upon
6  available data at the time, and doing a broad
7  brush assessment of the types of features you
8  may expect for a particular project, the sizes
9  of those features, predominantly to come up
10  with a cost estimate and weigh that -- provide
11  that to the project management team so that
12  they can look at it from the economics
13  standpoint and try to see if -- is there a
14  possible project here?
15    Q.  All right.  Now, that sounds like
16  feasibility, to me as a layman.  I'm not
17  suggesting that it is in your world.
18    A.  Uh-huh.
19    Q.  But can you share for me, if you can,
20  the distinction between the reconnaissance
21  phase and the feasibility phase?
22    A.  The feasibility phase would typically
23  include more detailed engineering and more -- a
24  closer look, per se, at all the aspects of the
25  project.

Page 15

1    Q.  Okay.  Would your -- you are a
2  licensed engineer, are you not?
3    A.  Yes, I am.
4    Q.  Okay.  Are you familiar with an
5  engineering concept that I believe is generally
6  viewed to be almost axiomatic, that one, in
7  engineering, designs a product or a thing in
8  such a fashion so as to be as harmless to
9  persons or property as you can within the
10  constraints of economic and design feasibility?
11    Have you ever heard of such a thing?
12    A.  Um -- not the way you're putting it,
13  no.
14    Q.  Am I -- maybe I'm dancing around it
15  and I'm inarticulately describing it.  How have
16  you heard that concept articulated?
17    A.  Um -- I'm not sure -- I didn't
18  understand, I guess, the way you were putting
19  the concept together.
20    Q.  Well, you said not that way.  What
21  were you thinking about when you uttered the
22  answer not that way?
23    A.  I was trying to put together the
24  pieces in my mind where you were balancing
25  design requirements versus economics and other

Page 16

1  things that, um -- went in there.
2    Q.  Well, let me just make it simple,
3  then.  Should an engineer design something as
4  safe as they possibly can, using the definition
5  of the word safe to mean so that it doesn't
6  hurt people or property?
7    A.  Engineers are typically designing in
8  accordance with guidelines, that sometimes
9  could be in the form of a, um -- a national
10  code, for instance the American Institute on
11  Steel Construction, or the American -- ACI for
12  concrete construction, and then also the Corps
13  would have certain requirements that were
14  developed over time.
15    Q.  All right.
16    A.  So they should be designing to those
17  requirements is the way I would look at that.
18    Q.  Well, I understand that, but I don't
19  believe that's responsive to the question.
20  What I'm trying to learn is whether or not you
21  believe, as an engineer, that engineers should
22  he design things to make them as safe as
23  possible to people and property.  That's a yes
24  or a no.
25    A.  I have a hard time answering that with

Page 17

1  a yes or no.  It's, um --
2    Q.  That's fine.
3    A.  I really do.  You design to a
4  guideline.  You could always design it safer
5  than the guideline.  I mean, that's my, um --
6  my opinion.
7    Q.  Well, does the engineer have any
8  responsibility to suggest that the guideline
9  would produce a product that is unsafe to
10  people or property?  Is that part of the
11  discussion?
12    A.  If they thought that was the case,
13  certainly.
14    Q.  All right.  So you do agree that the
15  engineer has an obligation to at least measure
16  the design against the potential for harm to
17  people or properties.
18    A.  From a philosophy standpoint, I would
19  say yes.  Again, from a code standpoint, or a
20  guideline requirement, the safety aspects were
21  evaluated during the development of those
22  guidelines.  That's the way I would expect that
23  to happen.
24    Q.  All right.  So your assumption is that
25  if there's a guideline that was created by

JOHNS PENDLETON COURT REPORTERS                        800 562-1285

WALTER BAUMY                                                          1/9/2008

Page 18

1  someone else that you are comfortable in
2  concluding that that guideline covers safety
3  issues. Is that what you're saying to us?
4     A.  In general I'm saying, yes, if I was
5  looking at the concrete code, the steel code or
6  a, um -- requirement of the Corps of Engineers,
7  I would say yes. Absolutely.
8     Q.  Okay. All right.
9        Now you may have already answered
10 this, but maybe I didn't hear it or forgot:
11 The distinction between reconnaissance and
12 feasibility.
13    A.  Reconnaissance is a fairly quick
14 analysis of a particular -- a potential project
15 to determine the types of features that might
16 be possible for providing that function or that
17 mission and putting a relative -- putting a
18 cost on the different alternatives and saying,
19 okay, for this particular project we think this
20 would be a possibility, and here's the
21 approximate cost for that project.
22    Q.  All right. Now --
23    A.  From an engineering only standpoint.
24    Q.  I understand. Would you agree with me
25 that the engineering only standpoint would

Page 19

1  require an analysis of the deleterious effects,
2  if any, of a particular project?
3     A.  Yes.
4     Q.  All right. And do you agree with me
5  that if one were doing a cost-benefit analysis
6  part of any project must include an
7  analysis of the cost of the deleterious
8  effects?
9     A.  Again, that's not my lane. That's
10 more in the project management side of the
11 house with the economics group. They have
12 certain regulations that they abide by.
13    Q.  Well, I thought that you indicated on
14 the record that you assist with cost
15 estimation.
16    A.  I do.
17    Q.  Well, if you do that, who's in the
18 better position to know about the deleterious
19 effect of a project, the engineering technical
20 expert side or the project side which is simply
21 compiling information from other sources?
22    A.  I think it's broader than that. Um --
23 we would cost out anything associated with the
24 project, but again the economics group would
25 run the numbers as far as how they consider

Page 20

1  that in the overall BC ratio and so forth.
2     Q.  Fair enough. But who has the
3  responsibility of saying to somebody else, this
4  project has this potential down side? I'm not
5  going to calculate its cost, but I just want
6  you to be aware of it. Whose job, if anyone in
7  the Corps, has that job, has that job?
8     A.  I think that's the project manager at
9  this point because they're pulling all the
10 information together from the variety of
11 parties that are contributing. And PDT members
12 who participate on a project delivery team
13 would work that with them.
14    Q.  Well, I understand that that may be
15 the person who pulls the information together,
16 but I'm not certain that I understand who, if
17 anybody in this organization, has the
18 responsibility of ascertaining whether or not
19 there are deleterious effects in connection
20 with the feasibility study of a project.
21    MR. SMITH:
22        Object to the form. Is there a
23        question pending?
24    MR. BRUNO:
25        Yes.

Page 21

1     MR. SMITH:
2        What's the question?
3     MR. BRUNO:
4        Let's read it back.
5        (Whereupon the previous question was
6     read back.)
7  EXAMINATION BY MR. BRUNO:
8     Q.  And so, who is that person?
9     A.  And I thought I answered that with the
10 project manager.
11    Q.  Fair enough.
12        All right, now authorization is a
13 phase that you described, I believe. Right?
14    A.  Yes.
15    Q.  Now, what does authorization mean?
16    A.  I can only tell you from my role in
17 the organization. If a project is authorized,
18 then I have to start planning the engineering
19 resources to begin the design phases of that
20 work.
21    Q.  All right. So you're telling me that
22 beyond that, you have no concept of what the
23 word authorization means?
24    A.  I do, but I'm not the best person to
25 answer that because I don't have that

JOHNS PENDLETON COURT REPORTERS                          800 562-1285

WALTER BAUMY                                                    1/9/2008

---

Page 22

1  factual --
2      Q.  Oh.  Wait a minute.  Let's clear up
3  this record right now.  This is not a 30(b)(6)
4  notice of deposition, and I'm going to suggest
5  on the record, and if we have to go to the
6  judge let's do it right now.
7          MR. SMITH:
8              Joe.  Joe, I'm going to object to
9          your tone right here with this
10         witness.
11         MR. BRUNO:
12             Then let's go off the record.
13         MR. SMITH:
14             We don't need to clarify
15         anything.
16         MR. BRUNO:
17             Oh, yes we do.
18         MR. SMITH:
19             No, we don't.
20         MR. BRUNO:
21             Yes, we do.
22         MR. SMITH:
23             He will answer the questions to
24         the best of his knowledge and that's
25         all he's saying.

Page 23

1          MR. BRUNO:
2              You know what?  He just admitted
3          that he's not answering to the best of
4          his knowledge.
5          MR. SMITH:
6              No, he did not.
7          MR. BRUNO:
8              Yes, he did.
9          MR. SMITH:
10             We're staying on the record.
11         MR. BRUNO:
12             Fine.  We'll stay on the record
13         all day if you like.  He's said, I'm
14         not best person.  I'm not asking him
15         whether or not he's the best person.
16         I'm asking what he knows.
17         MR. SMITH:
18             And he told you.
19         MR. BRUNO:
20             And in his answer he is admitting
21         that he knows but there's somebody
22         else who has perhaps more knowledge
23         and therefore he's not answering.
24         MR. SMITH:
25             That not what he said.

Page 24

1          MR. BRUNO:
2              I want and demand an answer.
3          MR. SMITH:
4              No.
5          MR. BRUNO:
6              Fine.  Let's call the judge right
7          now.  And we'll do it on the record.
8              Where's the phone?  And give me a
9          number.
10             We're not going to have this.
11         There was a phone thing here?
12             Stay on.
13             Where's the phone thing that was
14         here yesterday?  Can we have access to
15         a phone?
16             (Whereupon the judge was called
17         and was not available.)
18     EXAMINATION BY MR. BRUNO:
19         Q.  Okay.  We're still on the record, so,
20     all right, sir, I want to see if I can
21     understand what you're saying to me.  I
22     recognize that there are other folks within the
23     organization that have more knowledge about the
24     authorization process than you.  Are you
25     telling me that you have absolutely no

Page 25

1      knowledge of the authorization process?
2          A.  No, I'm not.
3          Q.  All right.  I take it, then, you have
4      some knowledge.
5          A.  I have some understanding of it.
6          Q.  Fair enough.  Do you at least know who
7      is giving the --
8              (Brief interruption.)
9      EXAMINATION BY MR. BRUNO:
10         Q.  All right.  We had this issue come up
11     last week, and so to the extent we need some
12     assistance, we will.  But this is your
13     deposition, you understand that.
14         A.  Yes.
15         Q.  You're not here as a representative of
16     the Corps.  And I'm just going to suggest to
17     you that I believe, however wrong I may be, I
18     have the right to ask what you know.  I mean,
19     let me ask this way:  Don't you agree with
20     me that you have to have at least some
21     understanding of the authorization process in
22     order for you to do your job?
23         A.  An understanding is different as to
24     what I know about the facts of how the process
25     works when it leaves the district.

WALTER BAUMY                                                    1/9/2008

Page 26

1    Q.  All right.
2    A.  That's a different question in my
3  opinion.
4    Q.  So asking you what you know is
5  different from asking you what you understand.
6    A.  That's correct.
7       MR. LAMBERT:
8          Joe, can we use the chocolate
9       cake analogy so we can -- he
10      understands?
11      MR. BRUNO:
12         No.  I don't like the chocolate
13      cake analogy.
14      MR. LAMBERT:
15         I like it.
16      MR. BRUNO:
17         I know you do.
18      MR. LAMBERT:
19         Okay.  Never mind.
20  EXAMINATION BY MR. BRUNO:
21    Q.  I am going to be straight up about it,
22  which is, I will say to you that every time I
23  ask the word what do you know, I mean it to
24  mean what do you understand.  And I will
25  endeavor to use the phase, and I will put it on

Page 27

1  a big yellow piece of paper, what do you
2  understand, in place of what do you know.
3       And I would, for the record, like for
4  you to explain to me, in fairness to you,
5  because you have the right to have a different
6  opinion, what is your understanding of the
7  distinction between an understanding of an
8  issue and knowledge of an issue?
9    A.  Understanding of in issue, to me, is
10  here's my appreciation as to how it works,
11  compared to what I know as I would know facts
12  about that and say, here's how it does work.
13  So I may not be in tune to all the
14  requirements, all the facts and steps along the
15  way, but what I understand as a general process
16  of how it happens.
17    Q.  Right.  Well --
18    A.  It's a different question, to me.
19    Q.  I understand that.  But what's curious
20  to me about that is, for example, when I asked
21  you who's the authorizing agency, I believe you
22  said somebody else is better than you.  Right?
23    A.  Yes.
24    Q.  Well, as the person offering technical
25  assistance to the person who is trying to get

Page 28

1  authorization it would seem to me you would
2  want to know who you're dealing with.  And I
3  guess you're telling me you don't feel any need
4  to know who you're dealing with, factually.
5  Not understanding wise, but factually.
6    A.  I know exactly who I'm dealing with.
7    Q.  Okay.  All right.  And so all you care
8  about is the fact that you are dealing with,
9  for example, the project manager, right?
10    A.  No.
11    Q.  Well, who do you care about who you're
12  dealing with?
13    A.  Who do I care?
14    Q.  Yeah.  I mean, you told me --
15      MR. SMITH:
16         I'm going to object.  That's
17      vague.
18  EXAMINATION BY MR. BRUNO:
19    Q.  Let's back up and I'll read where the
20  phrase came from.  I took it from your answer.
21  At least I tried to.  I might not have done it
22  by mistake.  I want to know who you feel
23  compelled to know factually who you're dealing
24  with.  Tell me about that process.
25    A.  From the engineering project process,

Page 29

1  I will be dealing with a project manager and
2  the project management division here at the
3  district, also with the commander, also with my
4  peers around the -- for the other organizations
5  at the district.  We have a division office in
6  Vicksburg, so I would deal with those folks on
7  the engineering side directly, but I would not
8  deal generally with the engineering folks at
9  the headquarters directly unless I included --
10  unless I coordinated with the division office
11  and then we, together, contacted the
12  headquarters office.
13    Q.  All right.  I'm just trying to get --
14  I need to understand where you're coming from.
15    A.  Uh-huh.
16    Q.  Okay?  And I need to understand this
17  distinction you make between understanding and
18  knowledge.
19    A.  Uh-huh.
20    Q.  So you know you deal with those
21  folks --
22    A.  Yes, I do.
23    Q.  You know who they are?
24    A.  Yes.
25    Q.  You know their roles, you know their

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

WALTER BAUMY                                              1/9/2008

Page 30

1  positions.
2      A.  Yes.
3      Q.  So I guess what you're saying to me is
4  you have some understanding that there may be
5  some folks above them who will review your
6  work.
7      A.  That's correct.
8      Q.  And even though you have some general
9  understanding about who they might be, you're
10 not concerned about finding out who they truly
11 factually are.
12     A.  I know who they're on the engineering
13 side.
14     Q.  All right.  Where does the buck stop
15 at the engineering side?  Who's the top guy or
16 girl?
17     A.  James Dalton is the top person --
18     Q.  Okay.
19     A.  -- in Engineering today.
20     Q.  So you are factually concerned with
21 knowing that your engineering product needs to
22 satisfy this person, whoever he or she is, but
23 beyond that you don't have any need to
24 understand factually who may be reviewing your
25 engineering product.  Right?

Page 31

1      A.  Yes.
2      Q.  That's it.  End of the line.
3      A.  Yes.
4      Q.  Okay.  And you don't have any interest
5  in knowing who that person will take your
6  product to.  Right?  Because you just said he's
7  the top guy.
8      A.  Yes.
9      Q.  All right.  So what that means to me,
10 as a layman, is that as long as you satisfy
11 that top guy, you're good and you don't really
12 care about satisfying anybody else.
13     A.  That's -- no, I wouldn't say that.
14     Q.  Why not?  You don't even know who they
15 are?
16     A.  It's a different question.
17     Q.  Well, then tell me here.  You told me
18 the only person that you're interested in
19 knowing factually who will review your work and
20 therefore you want to make sure that that
21 person is satisfied with your product is this
22 end guy, whatever his name is?  You know, or
23 you have some vague understanding that he
24 reports to somebody else and you're not
25 interested in knowing factually who what person

Page 32

1  is, right?  I mean, we've already established
2  that.
3      A.  You're asking a very limited question,
4  and, um -- for a very broad field.  I mean,
5  that's --
6          (Brief interruption.)
7  EXAMINATION BY MR. BRUNO:
8      Q.  All right.  Well, we'll play it your
9  way.  What is your understanding of who is the
10 authorizing agency or agent or person in the
11 context of the work of supporting the
12 authorization process?
13     A.  My understanding is it goes to the
14 Chief of Engineers, and then goes to the
15 Assistant Secretary of the Army.
16     Q.  And that's where it stops?
17     A.  Then it would be coordinated with
18 other federal agencies and the Congress.
19     Q.  Well, do you have at least an
20 understanding of who gives you the
21 authorization?
22     A.  Congress.
23     Q.  All right.  Well, you know that.  So
24 would you agree with me that the Congress is
25 the person -- or the entity to whom you are

Page 33

1  supplying your technical expertise?  Do you,
2  Walter Baumy?
3      A.  In the report, sure.
4      Q.  Of course.
5      A.  Sure.
6      Q.  And would you agree with me that the
7  Congress is relying on what's contained in your
8  technical engineering support product?
9      A.  Yes.
10     Q.  All right.  Now, and would you agree
11 with me that the person who -- whoever the
12 entity may be, in deciding to authorize or not
13 authorizing a particular project, needs to know
14 what's good about the project?  Would you agree
15 with me?
16     A.  Yes.
17     Q.  And would you agree with me that the
18 person authorizing the project needs to know
19 what's bad about the project?  Right?
20     A.  It should be a comprehensive report.
21     Q.  Sue.  And it should include, then, a
22 discussion of all of the deleterious potential
23 effects of the project.  Don't you agree?
24     A.  Yes.
25     Q.  Okay.  Because without that, the

WALTER BAUMY                                                      1/9/2008

Page 34

1    person who is issuing the authorization doesn't
2    really have a fair amount of information upon
3    which to make its judgment.  Right?
4        A.  Yes.
5        Q.  Okay.  Now, just help me understand, b
6    because I thought -- maybe I didn't.  I thought
7    you told me that your branch supports the cost
8    estimating component.  And then I thought I
9    heard you say, well, that's really somebody
10   else.
11          What is your role -- let me just
12   finish the question.  And tell me if it needs
13   to be changed, because I'll change it.
14       A.  Okay.
15       Q.  But what is your, your meaning your
16   technical support role in cost estimation?
17       A.  In the project -- the reconnaissance
18   and the feasibility phases, there will be a
19   number of alternatives that are considered for
20   a project, and we will fully cost out the
21   project features.  And, um --
22       Q.  And forgive me for interrupting you,
23   but when you say to fully cost out the project
24   features, do I understand that to mean what it
25   would cost to build?

Page 35

1        A.  Yes.
2        Q.  Okay.  So can I assume, or can I glean
3    from that answer that you're not really
4    evaluating the costs of the deleterious effects
5    if any of a particular project, that's somebody
6    else.
7        A.  I guess I'm having difficulty with the
8    deleterious effects, trying to categorize that
9    in my mind as to what that may or may not mean.
10       Q.  Fair enough.  Well, you know we're
11   here about the MRGO?
12       A.  Yes.
13       Q.  And you know that the allegation made
14   by the plaintiffs are that there are
15   deleterious effects associated with the MRGO?
16       A.  Yes.
17       Q.  Do you know at least, or do you
18   understand -- do you understand what the
19   plaintiffs allege those deleterious effects to
20   be?
21       A.  No, I do not.
22       Q.  Okay.  Good enough.  Fair enough.  We
23   have, to assist us, those satellite photos.
24   And I'm going to --
25           MR. BRUNO:

Page 36

1            I don't know how much of this
2            gets into the picture.  Can you see
3            this?
4        A.  Yes.
5    EXAMINATION BY MR. BRUNO:
6        Q.  I know you can.  I wasn't talking to
7    you, Mr. Baumy, I was talking to the
8    videographer.
9            Do you recognize the location depicted
10   in this satellite photograph?
11       A.  Yes, I do.
12       Q.  All right.  And do you see -- and I
13   will share with you, I'm certain it's obvious
14   to you as an expert engineer, that there are
15   some overlays on this photograph, some yellow,
16   green and some numbers.
17       A.  Yes.
18       Q.  Okay?  All right.  And I will share
19   with you that the legend suggests what these
20   overlays are.  Which is pretty typical for
21   these kinds of maps, right?
22       A.  Yes.
23       Q.  That's why you have a legend.  The
24   legend tells you what the symbols mean; right?
25       A.  Yes.

Page 37

1        Q.  All right.  Now, first thing is, the
2    markings, they are over the -- or would you
3    agree with me that the markings are over the
4    location of the MRGO channel up to the point
5    where the channel intersects with the Inner
6    Harbor Navigation Canal?
7        A.  Yes.
8        Q.  Okay.  I don't expect you to do any
9    kind of technical analysis here, but last week
10   during the deposition it was suggested that
11   maybe the mile markers were wrong.  Is it
12   possible for you, as you sit there, to look at
13   this map and tell me whether or not you think
14   the view that they're wrong or that they may be
15   close or whatever?
16       A.  No, I can't do that.
17       Q.  Fair enough.  All right.  But would
18   you agree with me that the end of the mile
19   markers is the point at which the MRGO comes
20   into the Inner Harbor Navigation Canal?
21       A.  I don't know that for a fact.
22       Q.  Okay.  Do you know how the mile
23   markers are oriented, that is, going away from
24   the Industrial Canal or coming into the MRGO
25   from the gulf?

10 (Pages 34 to 37)

WALTER BAUMY                                                    1/9/2008

Page 38

1    A.  No, I don't.
2    Q.  All right.  How about stations; do you
3  know what stations are?
4    A.  Yes.
5    Q.  Would you describe for the record what
6  stations are?
7    A.  Stations are markers along a
8  particular alignment that are surveyed out --
9  laid out in the field that would actually
10  relate to a particular point along that
11  alignment.
12    Q.  All right.  Now, I put this board up
13  there just to see if there was some
14  understanding of what the plaintiffs allege.
15    You know that the United States Army
16  Corps of Engineers received an authorization
17  from the Congress to build this channel called
18  the MRGO; right?
19    A.  Yes.
20    Q.  Now, when you get an authorization,
21  does the authorization just simply say build
22  it?  Or does the authorization generally
23  contain a description with specifications,
24  depending upon the degree of specificity, of
25  what you're supposed to build?

Page 39

1    A.  I don't know that for a fact.  I
2  really don't.
3    Q.  Okay.  All right.  If Mr. Accardo
4  testified on Friday -- do you know him?
5    A.  Yes.
6    Q.  All right.  Would you have any reason
7  or any knowledge upon which to disagree with
8  his suggestion that the Congress tells you to
9  build, in the case of a MRGO, a channel so
10  wide, so deep?
11    A.  No, I wouldn't have any reason to
12  disagree with him.
13    Q.  Fair enough.  Now, you see the green
14  line?
15    A.  Yes.
16    Q.  Okay.  And again, I'm not asking you
17  to accept that this thing is accurate.  I'm
18  asking this in the context of understanding an
19  allegation which is something we assert, that
20  we will ultimately have to prove.  Do you
21  understand that?
22    A.  Yes.
23    Q.  All right.  The green is the top of
24  the channel design width, and then the yellow
25  is the 2005 shoreline.  Do you see the

Page 40

1  difference between the yellow and the green?
2    A.  Yes.
3    Q.  Okay.  All right.  Now, first of all,
4  do you know, Mr. Baumy, today, as you sit in
5  that chair, know, not understand, using your
6  words, your comprehension of the word know,
7  whether or not the shoreline as it exists today
8  is where the channel design width says it's
9  supposed to be?
10    A.  It's not.
11    Q.  Okay.  And is it outside or inside
12  or -- do you know what I mean when I say inside
13  or outside the line?
14    A.  I believe I do.
15    Q.  Is it inside or outside the channel
16  design width?
17    A.  Outside.
18    Q.  All right.  And do you know why?
19    A.  Um -- in general, yes.
20    Q.  Just generally.  That's fair enough.
21  Tell me.
22    A.  Erosion and overall subsidence.
23    Q.  All right.  Now, deleterious is my
24  word, in fairness to you.
25    A.  Okay.

Page 41

1    Q.  And do you have some general
2  understanding of the use of that word?
3    A.  Yes.
4    Q.  Okay.  So I'm wondering, sir, whether
5  or not you would agree with me that erosion
6  and/or subsidence, I think you said, would
7  those be deleterious effects of the MRGO?
8    A.  Erosion could be, yes.  Subsidence I
9  would say no.
10    Q.  Okay.  All right.  Now, so do you
11  understand that the plaintiffs allege that the
12  construction of the MRGO had as a deleterious
13  effect the erosion of the shoreline?  That's an
14  allegation.  I'm not asking you to say that
15  it's true.  Okay?  But just understand that's
16  what we allege?
17    A.  Okay.  Yes.
18    Q.  You understand that.  Fair enough.
19  With that understanding, I just want to clarify
20  that understanding so that I can ask you some
21  more questions.  Okay?  Fair enough?
22    A.  Yep.
23    Q.  All right.  Now, let me ask you this
24  question, just while we're up:  This is a
25  second map.  And I'll share with you it just

JOHNS PENDLETON COURT REPORTERS                         800 562-1285

WALTER BAUMY                                                      1/9/2008

Page 42

1  continues from the first map, this is the rest
2  of the MRGO channel out into the gulf.
3       Do you recognize the depiction on this
4  satellite photo to be reasonably accurate?
5       A.  Yes.
6       Q.  Okay.  Fair enough.  The area to the
7  north, what would you call this?  You, you
8  know, as an expert engineer, what would you
9  call this?
10      A.  I would just call it the marshlands
11 north of the project.
12      Q.  All right.  So you'd call it marsh.
13      A.  Yeah.
14      Q.  All right.  How about the area to the
15 south; would you also call that marsh?
16      A.  Generally, yes.
17      Q.  Okay.  And going back to the other
18 one, would you call this area marsh?
19      A.  Yes.
20      Q.  This area marsh?
21      A.  Yes.
22      Q.  And this area marsh?
23      A.  Yes.
24      Q.  Okay.  Okay.  When you assumed the
25 role as chief, obviously there were a lot of

Page 43

1  projects that were in place already when you
2  took over that position.  Right?
3       A.  Yes.
4       Q.  Okay.  There was the flood protection
5  structures on the river from Baton Rouge to the
6  gulf, right?
7       A.  Yes.
8       Q.  And there is in fact an operations
9  division with a person who is in charge of the
10 day-to-day operation of that project, right?
11      A.  Yes.
12      Q.  And your engineering division is
13 expected to provide support to that person,
14 right?
15      A.  Yes.
16      Q.  Okay.  Same thing with the Atchafalaya
17 basin, right?
18      A.  Yes.
19      Q.  And the Calcasieu River and Pass,
20 right?
21      A.  Yes.
22      Q.  And the Mississippi River Gulf Outlet,
23 right?
24      A.  Yes.
25      Q.  And I believe it's called completed

Page 44

1  projects, which would include the hurricane
2  protection structures built pursuant to the
3  1965 Lake Pontchartrain and Vicinity Hurricane
4  Protection plan.  Right?
5       A.  Yes.
6       Q.  Okay.  I want to understand generally,
7  what did you do to learn about the history of
8  these projects in order to be in a position to
9  offer the technical assistance to these various
10 folks, if anything?  I'm not saying you had to
11 do it, I'm just asking you what did you do?
12      A.  We provided support in the operation
13 and maintenance phase.  So in the example of
14 structures, there was a formal program for
15 periodic inspection of those structures.  And
16 we provided that service to operations
17 division.  And so we would actually complete a
18 report every three to five years, depending on
19 the structure, that would assess the current
20 condition of the structure and the -- any
21 suggestions from observations or suggested
22 remedial actions from that standpoint.
23      In the case of the MRGO, we provided
24 dredging support to operations division; if
25 there was a segment of the channel that, um --

Page 45

1  that was shoaling and needed to be opened for
2  navigation, then we would go in and prepare
3  that when requested.  There were also some
4  earlier documents that documented the means for
5  providing erosion protection along the channel,
6  and so we worked from that document.
7       Q.  Okay.  Well, let me -- that really
8  wasn't responsive to what I was asking.
9       A.  Okay.
10      Q.  Which is okay.  I'm happy for the
11 response.  Let me see if I can clarify.
12      Oftentimes when a person takes a new
13 position, you know, you walk in the first day,
14 and obviously your job has got a lot of
15 responsibility to it, and I don't know about
16 you but a lot of folks like you just kind of
17 get some understanding of what's happened in
18 the past, what's going on around the office.
19 That's what I meant.  Specifically with
20 regard -- let's use MRGO.  What the heck?
21      A.  Uh-huh.
22      Q.  What if anything did you do to learn
23 about the history, in other words, before you
24 got there stuff, of the MRGO?  And again, I not
25 suggesting you had to in my question, I just

WALTER BAUMY                                                    1/9/2008

Page 46

1    want know what you did.
2        A.  Uh-huh.
3        Q.  Perhaps learn about the authorization,
4    um -- you know, perhaps learn about, you know,
5    whether or not the -- it had to be a certain
6    width or a certain depth.  Just general stuff
7    like that.  What did you do?
8        A.  Generally, we talked to people that
9    were involved with the project for some period
10   of time, found out about the ongoing works
11   initiatives, the basis of the work that they
12   were doing, and if they observed any particular
13   issues that had to, um -- come to my attention.
14       Q.  Okay.  Is -- I should say was.  When
15   you began, that was in 2002, was there a person
16   or persons who, you know, you felt like were
17   the go to people in connection with the MRGO
18   within your organization at that time?
19       A.  No, there were several people that
20   were involved.  Several different functions
21   were involved from various aspects.
22       Q.  Okay.  Well, were there -- I said
23   person or persons.  So there was a bunch of
24   folks?
25       A.  A handful, yes.

Page 47

1        Q.  A handful.  Who would be those folks
2    who would be your go to people for MRGO?
3        A.  On the period inspection it would be
4    Joe Chrysoverges, and that would be the
5    Bienvenue and the Bayou Dupre structures.
6    Um -- Keith O'Cane would be go to person for me
7    on the MRGO, and Rick Broussard was more on the
8    technical side supporting Keith.  He worked for
9    Keith.
10           Don Rawson worked in the revetment
11   area.  And on the geotechnical side, I don't
12   recall who that was.  I'm not sure if they're
13   still with us.
14           I'm trying to think of who else.
15       Q.  Yeah.  Do you have a name for the
16   geotechnical person, even though they're not
17   with us?  I'm just trying to identify names
18   now.
19       A.  Might have been, um -- Shung Chiu, but
20   I'm not 100 percent certain.
21       Q.  Now, I know that you have a BS from
22   the University of New Orleans in civil
23   engineer, you've got a Master's of engineering
24   from Tulane, and that you really have a
25   specialty in the structural side.

Page 48

1        A.  Yes.
2        Q.  Okay.  Do you have any particularized
3    knowledge of the soils?
4        A.  General knowledge.
5        Q.  Just general?
6        A.  Yeah.
7        Q.  Okay.  All right.  Would that general
8    knowledge include an understanding that the
9    soils in south Louisiana are pretty spongy and
10   difficult to work with?
11       A.  Yes.
12       Q.  But again, you probably would rely on
13   somebody with specific knowledge to answer
14   specific questions about soils.
15       A.  Yes.
16       Q.  Am I right?
17       A.  Yes.
18       Q.  Okay.  All right.  Now you told us, I
19   believe, in answer to the question, that, um --
20   there were periodic inspections.  Right?
21       A.  For the Bienvenue and the Dupre
22   control structures, yes.
23       Q.  Okay.  That's where I got lost.  I
24   thought you told me that there were periodic
25   inspections for each of the ongoing projects.

Page 49

1        A.  No.
2        Q.  Okay.  I wrote the words currents
3    condition and suggested remedial action.
4        A.  That would be as part of the periodic
5    inspection program.  There's a limited number
6    of structures within that program.
7        Q.  Okay.  All right.  There's a periodic
8    inspection program.
9        A.  Yes.
10       Q.  And that's the right name.
11       A.  Yes.
12       Q.  And who designed the program?  Or
13   developed.
14       A.  I would have to guess that that would
15   be the headquarters of the Corps of Engineers.
16       Q.  All right.  Headquarters.  Help me
17   because -- is that Vicksburg?
18       A.  Washington.
19       Q.  Washington, D.C.
20       A.  Yes.  It's a national program.
21       Q.  It's a national program.  All right.
22           Does the district office have any role
23   in determining which projects get included in
24   this periodic inspection program?
25       A.  They -- yes.  Yes.

JOHNS PENDLETON COURT REPORTERS                          800 562-1285

WALTER BAUMY                                                  1/9/2008

Page 50

1      Q.  Explain for me, please, if you know,
2   the process.
3      A.  The process would have been in the
4   design memorandum phase back in the -- what you
5   would call the feasibility phase now.  There
6   would be a discussion of that operations and
7   maintenance throughout the project, and as part
8   of that, if the project was going to go into
9   the periodic inspection program, there would be
10  some discussion about that.
11     Q.  Well, I take your answer to mean that
12  the periodic inspection program predated the
13  building of the MRGO.
14       Is that wrong?
15     A.  I don't know.
16     Q.  Okay.  Did your office, by office,
17  let's say your division, have anything to do
18  with the inclusion of the MRGO components in
19  that periodic inspection program?
20     A.  I don't know that for a fact.  But I
21  would assume yes for the two -- the bigger
22  structures, the Bienvenue and the Dupre
23  structures.
24     Q.  All right.  Now, those were built in
25  the nineties, right?

Page 51

1      A.  No.
2      Q.  When were they built?
3      A.  Um -- late sixties, early seventies.
4      Q.  The structures were there?
5      A.  I would, um -- I would guess at that.
6   Again, I don't know that as a fact.  But I
7   would -- just based on my recollection, I would
8   say the late sixties or early seventies.
9      Q.  Perhaps I'm reading this sentence of
10  the IPET report at Page 27 incorrectly.
11     A.  Okay.
12     Q.  I'll show it to you, and I have it
13  highlighted in yellow.  And you just verify
14  that in fact is the IPET Volume 1, if you want
15  to.  I have it all there.  (Tendering.)
16     A.  I don't know.  I don't see a specific
17  time mentioned here.
18     Q.  You see the closure of the -- there's
19  a sentence which specifically says, sheet pile
20  closures at bayous and pipelines were placed in
21  1992.
22     A.  The Bayou Bienvenue and Bayou Dupre
23  structures are not sheet pile closures.
24     Q.  Okay.  Fair enough.  So in 1992, there
25  were sheet pile closures at bayous and

Page 52

1   pipelines on the MRGO.  Do you know anything
2   about that?
3      A.  No specific knowledge.  I know they
4   were out there.  I don't know exactly where.
5      Q.  Do you know why they were put there?
6      A.  Not, um -- not factually.
7      Q.  Do you have an understanding of why
8   they're there?
9      A.  Um -- I have a general understanding
10  of why they're there.
11     Q.  All right, sir.
12     A.  And, um -- but again, it's not a
13  factual understanding.
14     Q.  Doesn't matter.  I want your
15  understanding.
16     A.  Um -- they were put there most likely
17  for one or two reasons.  One, there was, um --
18  difficulty in obtaining borrow material to
19  raise that area or, two, you may have had some
20  weak soil strength that prevented you from
21  putting fill on the back -- on the protected
22  side berm to stabilize it at a higher
23  elevation.
24     Q.  Okay.  Is that the kind of thing --
25  and you may not know this -- that would have

Page 53

1   been done with an O&M budget dollar, or would
2   that would be a capital dollar?
3      A.  I believe that would have been a,
4   um -- project dollar and not an O&M dollar.
5      Q.  Why is that?  Just curiosity.
6      A.  But the project was under construction
7   at that point.  We were scheduled to do future
8   lifts on it.  So if there were future lifts
9   scheduled, then I assume that was still in the
10  project phase and not necessarily in the full
11  O&M phase.
12     Q.  So your understanding is if the
13  project is not complete you can use --
14       (Whereupon Judge Wilkinson returned
15  the earlier call.)
16       JUDGE WILKINSON:
17         Mr. Smith?
18       MR. SMITH:
19         Good morning, judge.
20       JUDGE WILKINSON:
21         Good morning.  How are you?
22       MR. SMITH:
23         Very good, thank you.
24       JUDGE WILKINSON:
25         Mr. Bruno.

                                    14  (Pages 50 to 53)

WALTER BAUMY                                                    1/9/2008

Page 54

1  MR. BRUNO:
2      Good morning, Your Honor.  I
3  thank you for taking this call.  May
4  we have the court reporter read to you
5  the exchange which provoked the --
6  JUDGE WILKINSON:
7      Yeah.  I want the court reporter
8  to take down this, as well.  Okay?
9  MR. BRUNO:
10     All right.
11 JUDGE WILKINSON:
12     She can read it first and then
13 take everything down that we say as
14 part of the deposition record.
15     (Whereupon the question at issue was
16 read back as follows: Question: All right.  So
17 you're telling me that beyond that, you have no
18 concept of what the word authorization means?
19 Answer: I do, but I'm not the best person to
20 answer that because I don't have that
21 factual --)
22 MR. BRUNO:
23     And judge, my problem was he had
24 answered negatively in the earlier
25 part of the deposition, and it became

Page 55

1  clear to me that the witness was
2  somehow making the distinction between
3  knowledge and understanding, which I
4  still don't know that I get, but I
5  wanted to --
6  JUDGE WILKINSON:
7      Read to me the question one more
8  time, please.
9      (Whereupon the question at issue was
10 read back as follows:  Question:  All right.
11 So you're telling me that beyond that, you have
12 no concept of what the word authorization
13 means?  Answer:  I do, but I'm not the best
14 person to answer that because I don't have that
15 factual --)
16 MR. BRUNO:
17     That's where it stopped.
18 JUDGE WILKINSON:
19     All right, Mr. Bruno, go ahead.
20 MR. BRUNO:
21     Yeah, and my point is, Judge, I
22 had asked questions of the witness and
23 he had indicated that he had no
24 knowledge, and then when I pressed him
25 on it I learned that he was making

Page 56

1  this distinction between what he calls
2  factual and he calls understanding of
3  a particular issue.  I suggested to
4  counsel and the witness that this is
5  not a 30(b)(6), that he doesn't have
6  the right in thinking about how to
7  answer question that there may be
8  somebody else who has more knowledge
9  which would give him the right to not
10 answer a question or to say that he
11 has no knowledge.  It's of particular
12 importance to me, particularly in this
13 discovery deposition, to know what the
14 witness knows, and so I thought it
15 appropriate to frankly nip this
16 problem in the bud before we got to
17 too far because it could taint the
18 entire deposition.
19 JUDGE WILKINSON:
20     All right.
21     Mr. Smith?
22 MR. SMITH:
23     Yes your Honor, I think the
24 pertinent point to be made here is
25 that Mr. Bruno interrupted Mr. Baumy

Page 57

1  in the midst of answering the question
2  and began to berate him for not giving
3  a response that was full and complete.
4  Mr. Bruno jumped the gun and assumed
5  that Mr. Baumy was not going to give a
6  complete answer without even giving
7  him a chance to answer the question.
8      Mr. Baumy has not refused to
9  answer any question that's been posed
10 to the fullest extent of his
11 knowledge.  He did not, contrary to
12 what Mr. Bruno says, disclaim
13 knowledge about that.  He gave the
14 information that he had and was simply
15 clarifying and qualifying that his
16 knowledge was incomplete, and that if
17 Mr. Bruno wanted to know everything
18 that was to know about that, there
19 would be other people who could
20 address it better.
21 JUDGE WILKINSON:
22     Okay.  All right.  I assume that
23 you all are familiar with the process
24 of questioning under oath.  And, you
25 know, the process should go with a

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

WALTER BAUMY                                                          1/9/2008

|                                                            Page 58 |
|---|
| 1   question and then an answer being |
| 2   permitted to be given as completely as |
| 3   the witness wants to give it.  And if |
| 4   there's follow-up clarification that |
| 5   needs to be done, then there should be |
| 6   follow-up clarification.  Now, if |
| 7   Mr. Baumy has some knowledge in |
| 8   response to a question, and, you know, |
| 9   the fragment of an answer that was |
| 10  just read to me indicates that he does |
| 11  have some additional knowledge about |
| 12  which he has not testified, he should testify. |
| 13  should testify.  The fact that he's |
| 14  not the best person to provide the |
| 15  information doesn't mean that he's |
| 16  somehow excused from providing the |
| 17  information that he has. |
| 18       So, you know, as to that |
| 19  question -- first of all, Mr. Bruno, |
| 20  you need to let him finish.  It didn't |
| 21  sound like he was finished.  Okay? |
| 22       If he does have additional |
| 23  knowledge that's responsive to the |
| 24  question, then he should provide it |
| 25  whether he's the best person to |

|                                                            Page 59 |
|---|
| 1   provide it or not.  If there's some |
| 2   explanation he wants to make for his |
| 3   answer, for example, you know, I have |
| 4   some knowledge, I guess it's limited |
| 5   but here it is, X, Y and Z, the best |
| 6   person to answer that is so and so, |
| 7   he'd know more about it than me, then |
| 8   he should be permitted to give that |
| 9   explanation.  The question should be |
| 10  asked, answer should be provided |
| 11  without interruption, and when the |
| 12  answer is finished, if there needs to |
| 13  be explanation or follow-up, that can |
| 14  follow. |
| 15       Beyond that, I don't know what to |
| 16  say about this little dispute, |
| 17  gentlemen.  But Mr. Bruno, let him |
| 18  finish his answers. |
| 19  MR. BRUNO: |
| 20       Absolutely, judge.  And again, I |
| 21  didn't burden you with the exchange |
| 22  for the, you know, pages before that |
| 23  point in time, but if you will recall |
| 24  the question I was asking him do you |
| 25  really believe that you don't know |

|                                                            Page 60 |
|---|
| 1   something, and then -- |
| 2   JUDGE WILKINSON: |
| 3        No, what you asked was, beyond |
| 4   that you don't have any concept of the |
| 5   term authorization? |
| 6   MR. BRUNO: |
| 7        Right. |
| 8   JUDGE WILKINSON: |
| 9        And he said, I do, but I'm not |
| 10  the best person.  Maybe he was going |
| 11  to tell you what he does know before |
| 12  you interrupted him. |
| 13  MR. BRUNO: |
| 14       Well, the problem -- |
| 15  JUDGE WILKINSON: |
| 16       He should tell you what he does |
| 17  know. |
| 18  MR. BRUNO: |
| 19       I agree.  And remember, this is |
| 20  the Corps of Engineers.  I was asking |
| 21  him who authorizes projects, and he |
| 22  claimed not to know.  So that's what |
| 23  got me a little exercised.  But judge, |
| 24  I hear you loud and clear, and -- |
| 25  JUDGE WILKINSON: |

|                                                            Page 61 |
|---|
| 1        Listen, if I don't know is a |
| 2   truthful answer it's a perfectly |
| 3   acceptable answer. |
| 4   MR. BRUNO: |
| 5        Right.  And then if the witness |
| 6   does know he's required to answer. |
| 7   JUDGE WILKINSON: |
| 8        That's correct. |
| 9   MR. BRUNO: |
| 10       That's it.  That's all I need. |
| 11  JUDGE WILKINSON: |
| 12       All right. |
| 13  MR. BRUNO: |
| 14       Thank you, judge. |
| 15  JUDGE WILKINSON: |
| 16       But if he's got some explanation |
| 17  that goes with his answer, he needs to |
| 18  be permitted to give it. |
| 19  MR. BRUNO: |
| 20       Right. |
| 21  JUDGE WILKINSON: |
| 22       Okay? |
| 23  MR. BRUNO: |
| 24       Yes, judge. |
| 25  JUDGE WILKINSON: |

WALTER BAUMY                                                    1/9/2008

**Page 62**

1      All right.  Anything else?
2      MR. BRUNO:
3          No.
4  EXAMINATION BY MR. BRUNO:
5    Q.  Does the witness understand the
6  Court's admonition?
7      MR. SMITH:
8          Your Honor, in fact Mr. Bruno
9      continued that line of questioning for
10     some time after he placed the call.
11     MR. BRUNO:
12         I did.
13     MR. SMITH:
14         This area has been completely
15     covered now.
16     JUDGE WILKINSON:
17         Okay.  Fine.
18     MR. BRUNO:
19         I just don't want this to
20     happen -- the reason I called you,
21     Judge, and I don't do this lightly,
22     but I don't want to have a deposition
23     go eight hours and then at the end of
24     the deposition find out that the
25     witness in his own brain made a

**Page 63**

1   distinction between the words
2   knowledge and understanding.  And now,
3   I'll be happy at another time to share
4   with you this dialogue between us
5   about how he makes a distinction
6   between understanding and knowledge,
7   which is for another day.  I think
8   we're good, I think the witness
9   understands your admonition and we can
10  go forward.
11     JUDGE WILKINSON:
12         Do you understand my admonition,
13     too, Mr. Bruno?
14     MR. BRUNO:
15         Yes, sir.
16     JUDGE WILKINSON:
17         Then go forward.
18     MR. BRUNO:
19         Thank you.
20     JUDGE WILKINSON:
21         Okay.
22  EXAMINATION BY MR. BRUNO:
23    Q.  All right.  We got it now?  If you
24  have any knowledge you have to give it to me.
25     MR. SMITH:

**Page 64**

1      Joe.  Joe.  Joe.
2      MR. BRUNO:
3          Joe, Joe what?
4      MR. SMITH:
5          He heard the Judge.  You don't
6      need to admonish him.  That's not your
7      role.  You're here to ask him
8      questions.  If you have a question,
9      ask the question.
10     MR. BRUNO:
11         I have a question.  I just don't
12     want to have that issue come up again,
13     because I know you will agree with me,
14     Robin, it will taint the whole
15     deposition if we have some little --
16     MR. SMITH:
17         One thing I will agree is this
18     was unnecessary.
19     MR. BRUNO:
20         I won't agree with that at all.
21     No, on the contrary, I think we have
22     different testimony since the call.
23     MR. LAMBERT:
24         And I think it's clear that the
25     witness --

**Page 65**

1      MR. SMITH:
2          Skip, you're not participating in
3      this deposition.
4      MR. LAMBERT:
5          Okay.  I'll be quiet.
6      MR. SMITH:
7          Is this time for a break?
8          (Brief recess.)
9  EXAMINATION BY MR. BRUNO:
10    Q.  All right.  Let me see if I can
11  clarify just one or two things for me, if not
12  the record.  We're talking about your role as
13  chief, and we're therefore limiting these
14  questions to 2002 to the present time.  Okay?
15  And I just got a little confused by your use of
16  the word periodic inspection, and I wanted to
17  make certain that we're all clear as to what
18  that meant.  I think before the break you were
19  just telling us about a periodic inspection
20  program that comes out of the Washington
21  office.  Right?
22    A.  Yes.
23    Q.  All right.  Give us the name of that
24  program.
25    A.  It's the periodic inspection program,

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

WALTER BAUMY                                                                1/9/2008

                                                                    Page 66

1   to my knowledge.
2       Q.   That's brilliant.  There is no
3   acronym?
4       A.   I don't use it, if there is.
5       Q.   Okay.  Y'all have more acronyms than
6   any organization on the planet.
7           All right.  So the periodic inspection
8   program.  Now, I'm going to walk through, if
9   you don't mind, each of the operation division
10  operations manager for each project in order to
11  ascertain if you know whether or not a
12  particular project is in that periodic
13  inspection program or a component of that
14  project is in the periodic inspection program.
15  Okay?
16      A.   Are these current managers or past?
17      Q.   No, I wasn't going to use their name,
18  I was going to use their title.
19      A.   Okay.
20      Q.   You understand?
21      A.   Yes.
22      Q.   First, the Mississippi River Baton
23  Rouge to Gulf.  Are there any components of
24  that that would fall within the ambit of
25  oversight responsibility of that op manager, to

                                                                    Page 67

1   your knowledge, that fall within the periodic
2   inspection program?
3       A.   There are projects along the
4   Mississippi River.  As far as how ops has them
5   separated with authorities, fundings, I really
6   don't know.  But yes, there are projects along
7   the Mississippi River.
8       Q.   I just want an example.  I don't need
9   you to go through each of them.
10      A.   Okay.  An example?
11      Q.   Just one.
12      A.   Yeah, the Inner Harbor Navigational
13  Canal lock.  Well, maybe that could be GIWW,
14  so.
15      Q.   I was going to say, you threw my.
16      A.   That's where my distinctions are a
17  little cloudy.  Port Allen lock could be on the
18  Mississippi.
19      Q.   All right.  And give us a little, if
20  you can, some understanding of the support role
21  that your division gives in the context of the
22  periodic inspection of something like that lock
23  at Port Allen.
24      A.   Okay.  Yeah.  On the Port Allen lock,
25  we would go out on a five-year basis and, um --

                                                                    Page 68

1   we would actually inspect the project, we would
2   look back at the history of the project and see
3   if there were any, um -- engineering issues
4   that needed attention for those projects.  So
5   we would put a diverse team together of
6   engineering disciplines that would include the
7   civil, the structural, hydraulic engineer and
8   so forth, they would go out, inspect that
9   particular structure, then write a report that
10  would include here are the recommendations for
11  operations division to implement.  And then we
12  turn that over to operations, and it's their
13  responsibility to implement those as funding
14  and desires permit.
15      Q.   All right.  How does your division
16  come to some understanding about the scope of
17  what it is that you're expected to do in the
18  context of periodic inspections?  Is there a
19  writing, for example, or is this an oral or is
20  this just something that you just formulate
21  yourself?
22      A.   No, it's -- we follow written guidance
23  from the, um -- as part of the program, and
24  there's a longstanding history of what's been
25  in the periodic inspections over the years.  So

                                                                    Page 69

1   what you do is you mesh the guidance with the
2   past practices and come up with a report at
3   that time.
4       Q.   Okay.  Clearly, you're looking to
5   determine whether or not the structure is
6   functional, right?
7       A.   Yes.
8       Q.   Are you looking, though, to ascertain
9   whether or not the structure is failing?
10      A.   Yes.
11      Q.   Okay.
12      A.   Yes.
13      Q.   And is your division interested, in
14  any way, as to what the source of funding may
15  be for a particular recommendation, or does
16  your division simply make an engineering
17  recommendation based upon guidelines and the
18  experience of past inspections?
19      A.   For periodic inspection, we would make
20  an assessments of that structure and we would
21  make engineering recommendations based upon our
22  observations and analysis.
23      Q.   All right.  But the question was, does
24  money play a role?
25      A.   No.

JOHNS PENDLETON COURT REPORTERS                            800 562-1285

WALTER BAUMY                                                    1/9/2008

Page 70

1     Q.  Okay.  That's my point.  You don't
2  really care how much it costs or who's paying
3  for it, you're offering your engineering
4  advice, right?
5     A.  Yes.
6     Q.  Okay.  Is there a division or a person
7  or a section who evaluates your recommendation
8  to determine the money side, that is, how much
9  it would cost, whether it comes out of the
10  maintenance budget, capital outlay budget, et
11  cetera, et cetera, et cetera?
12     A.  That would be the operations division
13  for structures in the periodic inspection
14  program.  They are generally in the O&M phase.
15     Q.  Good.  And we've talked to
16  Mr. Accardo, as I said, about that.  All I want
17  to know from you is, from your side, the
18  engineering side, whether or not you offer any
19  technical advice with regard to money other
20  than perhaps the cost of a suggested repair?
21  Or the cost of a suggested anything?  Take out
22  the word repair.
23     A.  No, not on periodic inspection.
24     Q.  Okay.  Atchafalaya basin.  Is that or
25  any component of the basin part of the periodic

Page 71

1  inspection?
2     A.  Yes.
3     Q.  All right.  Just generally, kind of
4  things.
5     A.  Charenton flood gate, Berwick lock.
6  Those would be examples.
7     Q.  Good.  Calcasieu.
8     A.  Um --
9     Q.  River and Pass, to be complete for the
10  record.
11     A.  Yes.  There are structures out there.
12     Q.  Okay.  The Mississippi River Gulf
13  Outlet?
14     A.  Not -- the structures are not on the
15  gulf outlet.  They're on part of the hurricane
16  protection.
17     Q.  Okay.  I hear you.  And so that means
18  that that would fall within I think it's called
19  completed projects ops.  Right?
20     A.  Which aspect?
21     Q.  Um -- the Bienvenue and --
22     A.  Dupre.
23     Q.  -- Dupre locks?
24     A.  Yes.
25     Q.  Because they're part of hurricane

Page 72

1  protection, they would fall within the
2  responsibility of the operations -- the op
3  manager for completed projects.
4     A.  That's my understanding.
5     Q.  Okay.  Anyway, but I was asking the
6  question about the gulf outlet.  Is the gulf
7  outlet itself, or any component thereof, in
8  this periodic inspection program?
9     A.  No.
10     Q.  Okay.  All right.  Gulf Intracoastal
11  Waterway?
12     A.  There would be locks along the Gulf
13  Intracoastal Waterway.  Yes.
14     Q.  All right.  Now, it sounds to me,
15  Mr. Baumy, but, you know, please tell me if I'm
16  incorrect, that the periodic inspection program
17  really regards structures, like locks --
18     A.  Yes.
19     Q.  -- as opposed to canals or levees or
20  I-walls or T-walls.  Is that a reasonable --
21     A.  In general, that is correct.  But
22  there are selected projects where I-walls or
23  T-walls are included in those inspections.
24     Q.  In this periodic inspection program.
25     A.  Yes.

Page 73

1     Q.  Can you give me an example, just an
2  example, of a project where the T-wall or the
3  I-wall is a component to be inspected pursuant
4  to the periodic inspection program?
5     A.  Morgan City floodwall.
6     Q.  Okay.  Do you know, Mr. Baumy, what it
7  is about the Morgan City floodwall that
8  suggests that it be included in this periodic
9  inspection program, given the fact that, as we
10  know, there are miles and miles and miles and
11  miles of I-walls, T-walls and earth berm levees
12  in the system?
13     A.  I did at one time, but I really don't
14  remember exactly at this point.
15     Q.  Can you suggest to me who I might
16  speak to to find out the answer to that
17  question?
18     A.  I think it would come back to me,
19  eventually, with going back through the
20  historical documents, but I hadn't done that.
21     Q.  All right.  Well, which branch would
22  be in charge -- I'm sorry.  Which op manager
23  would be in charge of that particular, um --
24     A.  I would surmise the Atchafalaya Basin,
25  because that's it's location.  But it could be

JOHNS PENDLETON COURT REPORTERS                          800 562-1285

WALTER BAUMY                                                          1/9/2008

Page 74

1  inspection of completed works, I really don't
2  know.
3       Q.  So, um -- let's see if we can kind of
4  walk through this:  How does one know which
5  components of a particular project are in this
6  periodic inspection program?
7       A.  It's a formalized program, and we
8  coordinate with operations division in our
9  division office, and we have what we call a
10  five-year schedule.  So all the projects that
11  are inspected as part of that program are
12  listed, and not only listed but the financial
13  requirement to inspect them in which year is
14  included so we can manage that overall program.
15       Q.  I'm gathering from your answer the
16  this is written down, then.
17       A.  Yes.
18       Q.  Okay.  And it's a writing that's in
19  the possession of each of these op managers.
20       A.  I would assume it is.
21       Q.  But it comes from Washington.
22       A.  Um -- I don't -- no.  No.  That does
23  not come from Washington.
24       Q.  All right.  Well, where --
25       A.  Coordination is between the district

Page 75

1  and the division as to which structures are in
2  that program, as far as the execution of that
3  periodic inspection program.
4       Q.  All right.  So it's the division --
5  it's at the division level, to ask the question
6  a little better, that the decision is made to
7  include a project or a component of a project
8  in the periodic inspection program.
9       A.  Yes.
10       Q.  And maybe I should have asked this
11  first:  Is it possibly part of the original
12  authorization?
13       A.  I don't know that.
14       Q.  All right.  Do you know the criteria
15  for inclusion of a particular component of the
16  project itself for inclusion in the periodic
17  inspection?
18       A.  I don't remember.
19       Q.  Okay.  But the actual decision to
20  include or not include is at the division
21  level.
22       A.  Yes.
23       Q.  Is there a process by which
24  recommendations are made by the district office
25  to the division office for the inclusion of a

Page 76

1  particular project or component of a project?
2       A.  I would assume so, yes.
3       Q.  All right.  Do I gather from your
4  answer that that's not within the ambit of
5  engineering -- of the engineering division?
6       A.  We would certainly weigh in on that
7  decision -- on that recommendation.
8       Q.  Well, weigh in, I take that answer to
9  mean that you're not the initiator of the
10  request or thought to include but, rather, it
11  sounds like you're responding to else 's
12  suggestion for inclusion and you're offering
13  your technical advices to that entity or
14  person.
15       A.  I don't know that answer, um -- I
16  don't know it today.
17       Q.  All right.  Well, I'm just trying to
18  understand your answer.  Weigh in clearly would
19  suggest to me -- tell me if I'm crazy here, but
20  weigh in would suggest to me that somebody else
21  is asking for your opinion.
22       A.  Okay.
23       Q.  Is that fair?
24       A.  Yeah.
25       Q.  All right.  And so I take that -- I

Page 77

1  wonder if there's a logical, um -- conclusion
2  that can be made therefrom would be that
3  somebody else has got the thought in their
4  brain to include a project or a component
5  thereof in this periodic inspection.
6       A.  Um -- I'm not sure how to answer you
7  at this point in time.
8       THE WITNESS:
9            Um -- I may have to talk to you
10       offline.  I don't know if I want to do
11       that or you want --
12  EXAMINATION BY MR. BRUNO:
13       Q.  Feel free to.
14       MR. SMITH:
15            Okay.  Can we take a little
16       break?
17       MR. BRUNO:
18            Yeah.
19       (Off the record.)
20  EXAMINATION BY MR. BRUNO:
21       Q.  Got it?
22       A.  Yes.
23       Q.  Do you want to read back?
24       (Whereupon the previous question was
25  read back.)

20 (Pages 74 to 77)

JOHNS PENDLETON COURT REPORTERS                          800 562-1285

WALTER BAUMY                                                      1/9/2008

Page 78

1    MR. SMITH:
2        And I'm not sure that's a
3    question, but if it is, it's certainly
4    vague and ambiguous.  So maybe we
5    could --
6    EXAMINATION BY MR. BRUNO:
7    Q.  Well, you know, it's like Jerry Spence
8    would always say, isn't that true?
9    MR. SMITH:
10       Yeah.  But which part of what you
11   said?  That.
12   MR. BRUNO:
13       All right.
14   EXAMINATION BY MR. BRUNO:
15   Q.  Listen, maybe I'm crazy here, but it
16   would seem to me that the division of this
17   district office that has the most knowledge
18   with regard to how things work, how they break,
19   would be your division.  Is that accurate?
20   A.  I would say no.
21   Q.  No?  Well, who would that be?
22   A.  It would be a combination of
23   engineering division and operations division,
24   because they operate many of these projects.
25   Q.  Okay.  All right.  So they're out

Page 79

1    there having, then, the opportunity to observe,
2    and then they can put you on notice of what
3    they observe, and then you can offer
4    engineering expertise?
5    A.  Yes.
6    Q.  Is that it?
7    A.  Yes.
8    Q.  So I guess what you're saying is,
9    without knowing that there's something to
10   evaluate, you can't evaluate it.  Right?
11   A.  In the case of a periodic inspection,
12   yes.
13   Q.  All right.  So I'm gathering then that
14   the business of ascertaining the need for
15   inspection is one that's based competely on
16   experience with a particular project or a
17   component thereof, you watch it, you observe
18   it, see how it performs.  Right?
19   A.  That's part of it.  Yes.
20   Q.  Well, what else is there?
21   A.  Um -- most of the structures that we
22   operate as the Corps of Engineers where our
23   folks actually operate it, we set out the
24   periodic inspection requirements at the
25   inception of the project.

Page 80

1    Q.  We meaning your division?
2    A.  Yes.  And, um -- so that's the way
3    it's -- it comes to light.  You know, that's
4    just a natural part of the process is the O&M
5    phase.  And, um -- those inspections will be
6    part of that phase.
7    Q.  Well, let's remember, now, I asked you
8    specifically whether or not your division had a
9    role in ascertaining whether or not a project
10   or a component thereof would be included in the
11   periodic inspection, and you said no.  Now
12   you're telling me that it's part of the
13   original design.
14   A.  Is that what I said?  I don't recall
15   saying no, that we didn't have a role in that.
16   Q.  Well, I specifically asked the
17   question -- not only did I ask it generally,
18   but I went through each project.  So let's talk
19   about the Morganza project.  Those would be
20   I-walls or T-walls that are part of -- you'll
21   remember, I thought --
22   A.  Mostly T-walls.  But there probably
23   are some, um -- I-walls there.  But it's mostly
24   large T-walls.
25   Q.  Okay.  Large T-walls.  Now, do you

Page 81

1    know whether or not the original design for the
2    construction called for the inclusion of these
3    T-walls or I-walls in the periodic inspection
4    program?
5    A.  No, I don't.  I'd have to go back and
6    look at the references.
7    Q.  Do you know why those T-walls or
8    I-walls are in -- by do you know, I'm using the
9    understanding and the knowledge business.
10   A.  Uh-huh.
11   Q.  Are included in the periodic
12   inspection program?
13   A.  I would have to look at the written
14   word as to why they were in there, but, um --
15   from my experience, they're very, very tall
16   walls.  Some of them are 19, 20 feet tall.  And
17   so that is my, um -- I would call it
18   speculation at this point, or my general
19   understanding is you've got a very, very tall
20   wall there, which is pretty unusual.
21   Q.  Right.
22   A.  And they were entered into the program
23   at an earlier time.
24   Q.  Well, on that note, I think I
25   understand your own Corps specifications to

WALTER BAUMY                                                      1/9/2008

Page 82

1    suggest that you don't use an I-wall if the
2    I-wall is going to be above a certain height.
3    Is that correct?
4        A.  I don't think that's correct.
5        Q.  Okay.  Is there any limit on the
6    height above the surface for an I-wall in your
7    Corps specifications?
8        A.  There are suggested limitations in
9    past -- yes.
10       Q.  What is the suggested limitation in
11   the Corps -- I'm going to call them generally
12   guides.
13       A.  I don't remember the exact numbers,
14   but I would suspect there are various pieces of
15   guidance that may have different numbers in
16   them.  But it will give you a generality.
17       Q.  Is it fair for me to conclude that in
18   the instance that an I-wall, in particular,
19   exceeds those guidelines, that that would be a
20   basis for inclusion in the periodic inspection
21   program?
22       A.  No, it would not.
23       Q.  Okay.  All right.  Do you know -- and
24   I only ask the question because I thought your
25   answer was that the Morganza T-walls and/or

Page 83

1    I-walls that are included are included because
2    they're so high.
3        A.  That is my guess at this point in time
4    without looking at the documentation.
5        Q.  All right.  And you can understand why
6    I would ask the question.
7        A.  Uh-huh.
8        Q.  That I'm wondering if it's because
9    they exceed the guideline height suggested
10   limit, that that's the reason why they would be
11   included.  Do you understand that?
12       A.  I don't know that they exceed the
13   suggested limit.  The T-walls are different
14   than I-walls.
15       Q.  All right.  How about the T-walls, do
16   you know why they are in the periodic
17   inspection program?
18       A.  Um --
19           MR. SMITH:
20              Asked and answered.
21           MR. BRUNO:
22              No, We asked for I-walls.  I
23   broke it down into two parts, Robin.
24           MR. SMITH:
25              No, you asked about the Morganza

Page 84

1    project and whether they were in
2    there.
3        MR. BRUNO:
4           No, I didn't.  I broke it down
5    between I-walls and T-walls --
6        MR. SMITH:
7           Go ahead.
8        MR. BRUNO:
9           -- specifically for this reason.
10       MR. SMITH:
11          That's fine.  He will answer.  I
12   apologize if I'm incorrect.
13       MR. LAMBERT:
14          Is this the same as Morgan City?
15       THE WITNESS:
16          That's really what it is.  It's
17   Morgan City, it's not Morganza.
18   EXAMINATION BY MR. BRUNO:
19       Q.  I'm sorry.  Then I misspoke.  But
20   again, we talked about I-walls, let's talk
21   about T-walls.  Do you know why those are in
22   the periodic inspection program?
23       A.  Again, it's just -- my opinion at this
24   point in time, without looking at the written
25   word, is that they were brought in because of

Page 85

1    their large, unusual heights.  But, I don't
2    know.  It could be their critical location for
3    all I know.  I'd have to look at the written
4    word.
5        Q.  All right.  Fine.  Now, Mr. Baumy,
6    outside of this periodic inspection program
7    which is a Washington-based program, is there
8    any other periodic inspection that your
9    division does on any of the projects or
10   components thereof in the op division?
11       A.  We participate in the inspection of
12   completed works, but it's not, um -- it's not
13   necessarily a formalized participation.
14       Q.  All right.  Is that the -- I've used
15   the word periodic purposefully.  Okay?
16       A.  Uh-huh.
17       Q.  Is the annual inspection that the
18   manager of completed ops does on the hurricane
19   protection structures in and around New Orleans
20   one of those things that you participate in?
21       A.  I have not participated in any of
22   those.
23       Q.  Your division, I'm sorry.  Your
24   division.
25       A.  We do participate, but it's not

                                        22  (Pages 82 to 85)

WALTER BAUMY                                                          1/9/2008

Page 86

1    consistent participation.
2        Q.  All right.  And who makes the decision
3    as to whether or not you participate or not?
4        A.  Ops will generally send a request to
5    somebody who may have been working on the
6    project at one time, or who has participated in
7    past inspections.
8        Q.  All right.
9        A.  And they will support them as
10   requested.
11       Q.  All right.  Now, the word
12   reconnaissance.  You use that in the context of
13   a phase of the project development.  Is the
14   word reconnaissance also used in the context of
15   a study or an evaluation?
16       A.  Yes.
17       Q.  I take it that reconnaissance in the
18   context of evaluating a project for future
19   possible authorization is different from the
20   reconnaissance that is done by the operations
21   folks.  Is that correct?
22       A.  I don't know if operations actually
23   does reconnaissance.  I'm not sure what you
24   mean by that.  I'm not aware of them doing what
25   you call reconnaissance.

Page 87

1        Q.  All right.  Who does the
2    reconnaissance that we just talked about a few
3    seconds ago?
4        A.  Well, what we were talking about a few
5    seconds ago, I thought, was reconnaissance
6    phase of a project, and it's really a study
7    phase.
8        Q.  No.
9        A.  A reconnaissance study.  That's the
10   way I took it.
11       Q.  Okay.  It's one of these.
12   (Tendering.)
13       A.  Okay.  That's a reconnaissance report.
14   That would be the same as a study phase, but
15   it's a different, um -- I'm not sure where that
16   one went, but -- I've seen it, but I hadn't
17   looked at it in a long time.
18       Q.  Well, for the record we're referring
19   to the Mississippi River Gulf Outlet
20   St. Bernard Parish Bank Erosion Reconnaissance
21   Report.
22       A.  Okay.
23       Q.  Have you ever seen this before?
24       A.  Yes, I have.
25       Q.  And so are you testifying that this

Page 88

1    thing is a study done in connection with a
2    reconnaissance phase that might be in
3    connection with some project?
4        A.  I don't know how that came about, that
5    study, as far as how it tied into the normal
6    Corps process of recon, feasibility, plans and
7    specifications, operations and so forth.
8        Q.  All right.  Well, I need to sort of --
9    I need to get just a fundamental understanding
10   of the use of the word.  Okay?  You've already
11   testified about a reconnaissance phase report
12   that comes from a reconnaissance phase
13   evaluation that your office -- or I should say
14   your division may do for a particular project.
15   Okay?  I'm trying to now learn whether or not
16   this report, because it uses the word
17   reconnaissance, necessarily then is a component
18   of the process by which the germ of a project
19   goes from the germ to authorization.  Can I
20   make that conclusion?
21       A.  I don't know that you can in this
22   case.
23       Q.  Okay.  All right.  So then I have to
24   ask you, if the phrase reconnaissance report,
25   does that have any special meaning in this

Page 89

1    district office?
2        A.  Yes.
3        Q.  All right.  What does it mean?
4        A.  I would look at the word
5    reconnaissance on the report and say it was a
6    limited analysis, with further design to follow
7    at some point in time.
8        Q.  Okay.  All right, sir.  Now, can you
9    answer this question:  Is this a true statement
10   or a false statement?  We do reconnaissance
11   studies on all of our projects on a regular
12   basis.  Is that a true statement or a false
13   statement?
14       A.  I would say generally true.
15       Q.  All right.  Explain that.
16       A.  Okay.  If you start with the inception
17   of a project, you would do the reconnaissance
18   study generally first, then move to the
19   feasibility phase, and then move to the post
20   feasibility phase --
21       Q.  Right.
22       A.  -- which would include design and then
23   construction, and O&M and so forth.  So that
24   would be the general how projects work at this
25   point in time.

JOHNS PENDLETON COURT REPORTERS                              800 562-1285

WALTER BAUMY                                                    1/9/2008

Page 90

1      That report I would have to look at,
2  because the project was already in the O&M
3  phase, so I don't know the connection without
4  looking at the details.
5      Q.  Okay.  I understand your answer and
6  perhaps I didn't ask the question as well as I
7  should have, because I meant to ask the
8  question, is it true or false that the Corps
9  does a reconnaissance study on every project
10 after it's completed, on a regular basis?
11     A.  I would say generally not.
12     Q.  Okay.  All right.  Let's talk very
13 specifically about the MRGO channel.  Okay?  If
14 we can.  And we have got these two boards to
15 assist us in connection with these questions.
16 Now, I know this predates you.  This is --
17 obviously this is long before you became the
18 chief.  And so obviously if you don't know the
19 answer you don't know the answer.  But if you
20 have some information I'd like to know the
21 information.
22     A.  Okay.
23     Q.  And if, you know, if you happen to
24 know the name of some lady or man that I should
25 talk to to get more information, I would

Page 91

1  appreciate that, too.  But one thing we accept,
2  you and I, this is a project of the United
3  States Army Corps of Engineers, the MRGO.
4  Right?
5      A.  It's a project with the Corps of
6  Engineers and a local sponsor and some
7  surrounding parishes who put this project
8  together.
9      Q.  All right.  It's a project which the
10 Corps designed, right?
11     A.  Yes.
12     Q.  It's a project which the Corps
13 conducted a reconnaissance phase study on,
14 right?
15     A.  I don't know.
16     Q.  Okay.  You don't know if the business
17 of doing a reconnaissance phase evaluation was
18 in place back in the fifties.
19     A.  Right.  There were earlier reports, I
20 just don't know what they were called.
21     Q.  Okay.  Would there have been some kind
22 of evaluation of the proposed project that may
23 have been called something else at the time but
24 is now called a reconnaissance report --
25     A.  I don't --

Page 92

1      Q.  -- for the MRGO?
2      A.  You lost me.  I didn't follow your
3  question.
4      Q.  Well, what I was asking you is this:
5  We know today we have these nice phrases which
6  describe a particularized process for moving a
7  project from a thought to authorization --
8      A.  Yes.
9      Q.  -- to building and completion.  And
10 you've already told me, and I understand that
11 you may not be aware of the nomenclature
12 employed by the Corps back in the fifties and
13 the sixties.
14     A.  I've seen it, I just don't remember it
15 sitting here.
16     Q.  I understand.  And I'm not asking you
17 to tell me the words.
18     A.  Okay.
19     Q.  I'm asking you whether or not you
20 would agree with me that something that would
21 likely be called a reconnaissance phase study
22 was done in the fifties.
23     A.  I would agree that there was an
24 earlier report that was done around that time
25 period.

Page 93

1      Q.  Okay.  And it would have been done by
2  the Corps.
3      A.  I would have to assume yes.
4      Q.  Okay.  All right.  Now, do you know if
5  the Corps had any role in suggesting to the
6  Congress where to put the channel?
7      A.  I would believe that would be detailed
8  in the reports.
9      Q.  Okay.  Am I wrong to assume that the
10 district office in New Orleans would have been
11 the office that would have conducted these
12 types of studies that may have been done in
13 connection with the idea of digging this
14 channel?
15     A.  I would say yes.
16     Q.  Okay.  So it would have been the
17 Corps?
18     A.  Yes.
19     Q.  All right.  Now, we got that much.  So
20 what I'm trying to figure out is, you know,
21 just the process here.
22     A.  Uh-huh.
23     Q.  So, um -- specifically with regard to
24 the MRGO, do you know how the Corps approached
25 the problem, that is, were they just simply

WALTER BAUMY                                                          1/9/2008

Page 94

1    told, hey, guys, we need a back channel to get
2    from the gulf to the river?  Tell us?  Or, is
3    there more to it than that?
4        A.  I think there's more to it.
5        Q.  If you know.
6        Okay.  What would be the -- what do
7    you know about that process?
8        A.  The way the process generally works,
9    and I would assume it was no different here but
10   do not know this factually, that the, um -- the
11   Corps would be approached by a local --
12       MR. SMITH:
13           I'm going to object that it's
14       calling for speculation.
15           Go ahead and answer.
16       A.  Okay.  The Corps would generally work
17   with a local sponsor who wants project in a
18   particular area, and they together would put
19   that project together.  The Corps could be the
20   lead in a design role, and sometimes the
21   sponsor may do certain things on their own and
22   filter that into the overall project.
23   EXAMINATION BY MR. BRUNO:
24       Q.  Okay.  I'm just curious, have you ever
25   built a house?

Page 95

1        A.  Pardon?
2        Q.  Have you ever built a house?
3        A.  Yes.
4        Q.  Have you ever hired an architect --
5        A.  No.
6        Q.  -- to build a house?
7        A.  No.
8        Q.  Did you ever hire a contractor to
9    build a house?
10       A.  Yes.
11       Q.  Okay.  You know, I'm gathering that
12   when you built your house with your contractor
13   you are told the contractor generally what you
14   wanted.
15       A.  Yes.
16       Q.  You told them how big you wanted the
17   house.  Right?
18       A.  Yes.
19       Q.  You gave them some sense of the
20   design.  Right?
21       A.  Yes.
22       Q.  And you had an expectation, did you
23   not, that the contractor would tell you how
24   much what you wanted to build would cost?
25   Right?

Page 96

1        A.  Yes.
2        Q.  I mean, you know, you -- as the guy
3    spending the money, you want to know how much
4    it's going to cost you to build what you tell
5    the guy to build.
6        A.  Uh-huh.
7        Q.  Right?  You don't want to be told at
8    the end of completion of the project, pay me,
9    and it be more than you can afford.  Right?
10       A.  Yes.
11       Q.  Okay.  I'm just trying to understand
12   if that dynamic is in place in the context of
13   ideas like the MRGO where there's this local
14   sponsor and then there's the Corps who are
15   interacting with one another and who are just
16   kind of talking through, in a reconnaissance
17   phase, using today's words, not the fifties
18   words, is that the kind of thing that happens
19   in the development phase of these kinds of
20   projects?
21       A.  Generally, yes.
22       Q.  Okay.  Is there a part of this process
23   which would include, you know, again, whether
24   or not what you build would cause damage to
25   your neighbor 's land?  Is that part of the

Page 97

1    analysis, or the discussion at that early
2    phase?
3        A.  Generally, you look at with and
4    without project conditions.
5        Q.  Okay.
6        A.  And you may look at a variety of
7    alternatives.  That's generally what you would
8    do.
9        Q.  All right.  Do you know whether or not
10   the Corps expected, once it received the
11   authorization to build this channel, that the
12   banks of the MRGO would erode?
13       A.  I don't know.  I'd have to look at the
14   report.
15       Q.  Okay.  Do you know whether or not the
16   Corps expected salt water to intrude into areas
17   that it would not have otherwise intruded into
18   but for the MRGO?
19       A.  No, I don't.
20       Q.  Okay.  You, you're the engineering
21   guy.  Is it an engineering division issue to
22   determine whether or not saltwater intrusion
23   into an area where saltwater didn't ordinarily
24   go was a good thing or a bad thing?
25       A.  In today's environment, we would look

JOHNS  PENDLETON  COURT  REPORTERS                        800  562-1285

WALTER BAUMY                                                          1/9/2008

Page 98

1    at environmental modeling. We have tools that
2    can look at it today.
3        Q. So the answer is yes?
4        A. For today, yes.
5        Q. I mean, today --
6        A. Yes.
7        Q. -- it's an engineering division
8    function. I'm just trying to decide who I need
9    to talk to. It's an engineering division
10   function.
11       A. We're part of the overall function.
12       Q. Well, back in the fifties and the
13   sixties, would there have been somebody other
14   than an engineering guy who would have been
15   responsible for answering the question, if it
16   was posed, is saltwater going to cause any
17   damage?
18       A. I don't know where they would reside.
19       Q. Okay.
20       A. I mean, I don't know what the
21   organization looked like back then.
22       Q. Understood. Would you agree with me
23   that the most logical person to talk to would
24   be a guy who's got education and experience in
25   that area?

Page 99

1        A. Yes. You would have to --
2        Q. And would that likely be an engineer?
3        A. I could be an engineer, it could be a
4    biologist. It could be a variety of folks,
5    different scientists.
6        Q. Your biologists -- do you have any
7    biologists today?
8        A. We have an environmental group. I
9    don't know what their titles are, but we have
10   an environmental group in our project
11   management division, and operations division
12   also has some environmental types within their
13   organization.
14       Q. Okay. All right.
15       A. And we would have modelers in our
16   organization.
17       Q. All right. Now, let me just ask you
18   today, you are the chief of the engineering
19   division --
20       A. Yes.
21       Q. -- of the United States Army Corps of
22   Engineers. Is it your opinion that the MRGO
23   channel caused the erosion of its banks since
24   the channel was dug until today?
25       A. I would say it contributed. I don't

Page 100

1    know if it caused everything or not. I would
2    say it contributed.
3        Q. Okay. Fair enough. What are the
4    other contributing factors, in your opinion?
5        A. Um -- overall subsidence of the region
6    and traffic up and down the waterway.
7        Q. Okay. Well, wouldn't traffic be,
8    really, in fairness, a component of the
9    channel, because if there's no channel there's
10   no traffic?
11       A. Could be. Yes. You could look at it
12   that way.
13       Q. All right. Now, how about saltwater
14   intrusion, is it your opinion that the MRGO
15   provided a means by which saltwater could
16   intrude into lands and waterways that it did
17   not intrude into before the construction of the
18   MRGO?
19       A. With my limited expertise in that
20   area, I would say in general there would be
21   some additional saltwater movement in the lower
22   part of the channel. How far it moved up, I
23   wouldn't know.
24       Q. Understood, Mr. Baumy. Who should I
25   talk to to ask the question to get a definitive

Page 101

1    answer as to the Corps 's view about whether or
2    not the MRGO contributed to saltwater intrusion
3    into areas that were not exposed to saltwater
4    at the levels that they were before the MRGO
5    was constructed?
6        A. I would look to the modeling experts.
7        Q. And who are they and where are they?
8        A. I would think they're a variety of
9    people.
10       Q. All right. Are they in the district
11   office?
12       A. We have some in the district. Well,
13   we had some in the district office.
14       Q. Who are they?
15       A. Harley Winer was one.
16       Q. Title?
17       A. Um -- hydraulic engineer. He was a
18   modeler.
19          Part of the coastal restoration group
20   with Troy Constance. I'm not sure who in his
21   office, but they're looking more at the coastal
22   effects and the newer projects, and they've
23   been looking at this for some time.
24       Q. Sure.
25       A. You've got scientists at the

JOHNS PENDLETON COURT REPORTERS                          800 562-1285

WALTER BAUMY                                                    1/9/2008

Page 102

```
1   universities, you've got folks that
2   participated on the IPET investigation both
3   Corps and non Corps people.
4       Q.  Anybody in your division?
5       A.  I have people that have participated,
6   but I'd have to look at their role.
7       Q.  All right.  By title, what would be
8   the title of the person that would do that,
9   hydraulic?
10      A.  It would be out of my hydraulics
11  branch.  Hydraulics and hydrology branch.
12      Q.  That's in your division; right?
13      A.  Yes.
14      Q.  So all these folks that you've just
15  described reside in the engineering division.
16      A.  No, they don't.  The folks I described
17  were broad context, university, other folks
18  around the district, IPET and so forth.
19      Q.  I'm sorry.  All of the folks who are
20  employed by the Corps reside in your division.
21      A.  No, they don't.
22      Q.  Where else do they reside?
23      A.  The project management branch and now
24  an extension of that is what they call the
25  protection and restoration office.
```

Page 103

```
1       Q.  Okay.
2       A.  So they reside between the various
3   organizations.
4       Q.  Has your division, since you've been
5   there -- I'm going to divide it into two
6   pieces, since you've been there and then before
7   you got there, so that you can -- you
8   understand?
9       A.  (Nods affirmatively.)
10      Q.  Has your division, since you got
11  there, had anything to do with the evaluation
12  of bank erosion on the MRGO?
13      A.  Yes.
14      Q.  All right.  What if anything did your
15  division have to do with that evaluation?
16      A.  We have worked placing rock along the
17  banks of the MRGO to, um -- mitigate the, um --
18  the ship wakes and so forth, preserve the bank
19  as it is now.
20      Q.  All right.
21      A.  We have likely had some modelers
22  participate in these other studies, but I have
23  not, um -- I'd have to look at those studies
24  today and see exactly what's there.  I don't
25  remember what's in the studies.  I'm not sure
```

Page 104

```
1   if the studies have been completed, to tell you
2   the truth.
3       Q.  Let me divide that question into two
4   parts just for my own benefit.  Okay?
5       A.  Okay.
6       Q.  The first part of the question would
7   be the evaluation of what's happening.  And the
8   second part of the question would be what one
9   does in response to what's happening.
10      A.  Okay.
11      Q.  Does that make any sense to you?
12      A.  Yeah.
13      Q.  In other words, am I crazy here?  But
14  as an engineer, in order for you to determine
15  what's the appropriate fix, don't you need to
16  know what's causing the problem to happen in
17  the first place?
18      A.  It depends.
19      Q.  Well, in the context of bank erosion,
20  do you need to know what's causing the problem?
21      A.  You would look at the factors that
22  contribute to the problem, sure.
23      Q.  Okay.
24      A.  Yeah.
25      Q.  Well, in the context of bank erosion,
```

Page 105

```
1   what did your division, if it did, ascertain to
2   be the cause of bank erosion?
3       A.  I'd have to look at the reports to go
4   back and refresh.
5       Q.  Okay.  Well, I thought you just
6   said -- maybe I'm wrong -- I thought you just
7   said that the rocks were put there because of
8   the ship wakes.
9       A.  That was part of it --
10      Q.  Well --
11      A.  -- but there's other contributing
12  factors.
13      Q.  That's at least one, right?  You just
14  gave me the answer, you know, a minute ago, and
15  now I asked the same question and you're not
16  giving me the answer.
17          Is it true that --
18          MR. SMITH:
19              Well, then, I think maybe it was
20          asked and answered.
21          MR. BRUNO:
22              No.  The record will establish
23          who's right or wrong on this point.  I
24          don't want to fight with you anymore,
25          Robin.  I just -- you know, I'm just
```

27 (Pages 102 to 105)

WALTER BAUMY                                          1/9/2008

Page 106

1      listening here.
2    EXAMINATION BY MR. BRUNO:
3      Q.  I thought you said -- I mean, I'm
4    asking you real simple, okay?  You're the head
5    engineering person in this district office,
6    you're the guy, you're the man.  Right?
7      A.  I'm in charge of the engineering
8    division.
9      Q.  You're in charge.  Okay.  So I'm
10   asking the guy in charge to teach me how you
11   determine how to put protection on the banks of
12   the MRGO to protect against erosion, and I
13   thought you told me you put the rocks there.
14   That's what you guys decided to do, you put
15   rocks.
16     A.  Yes.
17     Q.  Okay.  And is there a -- what do you
18   call that?  Is there some kind of -- foreshore
19   protection?  Is that right?
20     A.  Yeah.
21     Q.  Is it the right thing to call it?
22     A.  Yeah.
23     Q.  Foreshore protection?  All right.
24         Did you put foreshore protection on
25   the banks of the MRGO since you've been chief?

Page 107

1      A.  Yes.
2      Q.  Okay.  So let's understand the process
3    then, since you were here.
4      A.  Okay.
5      Q.  How did the issue get brought to your
6    attention in the first instance?
7      A.  It was an ongoing O&M program to
8    stabilize banks along the MRGO, and so
9    engineering division was executing that program
10   based upon previous studies that engineering
11   division participated in.  I was not involved
12   in those earlier studies, and hence I'm having
13   a little trouble trying to tell you why and so
14   forth certain things were done.  What I know is
15   that we had a program to execute and we were
16   doing that.
17     Q.  Okay.  Fine.  So you had a program to
18   execute, and you have described it generally as
19   foreshore protection on the entire length of
20   the MRGO.  Right?
21     A.  Selected portions, yes.
22     Q.  All right.  Well, that's why you know
23   where I'm going.  I'm trying to know whether or
24   not the engineering division had a role in
25   determining what portions of the MRGO would be,

Page 108

1    um -- chosen for foreshore protection either as
2    part of an ongoing plan where there is a first,
3    second and third section, or whether or not
4    there was some sections which were the sections
5    you were going to deal with?  Can you tell us
6    how that occurred?
7      A.  There was a role -- you've shown me a
8    copy of a report that was produced, and, um --
9    we participated in that study.  Again, I have
10   not looked at that study in many, many years,
11   and was not involved with it personally, so I
12   can't tell you what the study says.
13     Q.  Well, I'm asking you if you remember,
14   yourself, since --
15     A.  No, I don't.  I was not involved.
16     Q.  Okay.  Because I thought you told us
17   that since 2002 you did install some foreshore
18   protection.
19     A.  I did.
20     Q.  Okay.  And you don't know why the
21   particular locations at which the foreshore
22   protection was installed were chosen, right?
23     A.  I thought I answered that by saying
24   that there was a previous plan what was put
25   together and we were executing that plan.

Page 109

1      Q.  All right.
2    MR. SMITH:
3         And just let me interpose this:
4    You're using the word you in two
5    different sentences.  Sometimes you
6    say you and you're referring to the
7    engineering division, sometimes you
8    use the word you and you're referring
9    to Mr. Baumy personally.  So there's
10   some ambiguity there.
11   MR. BRUNO:
12        All right.  Okay.
13   EXAMINATION BY MR. BRUNO:
14     Q.  Do you know whether or not the cost of
15   the foreshore protection that was done while
16   you were the chief of the division was paid for
17   with funds from the MRGO project operations and
18   maintenance budget or whether it was paid for
19   with funds from the Lake Pontchartrain and
20   Vicinity Hurricane Protection Project
21   operations and maintenance budget?
22     A.  I know some of it was paid out of the
23   operations and maintenance budget.  I don't
24   know if all of it was paid for under that
25   budget.

                          28 (Pages 106 to 109)

Page 110

1    Q.  Which one?  Which project?
2    A.  The, um --
3    Q.  They both have O&M budgets.
4        Well, let me ask you.  Do you know
5    whether or not there is a budget for Lake
6    Pontchartrain and Vicinity operations and
7    maintenance as opposed to a budget for MRGO?
8    A.  No, I do not.
9    Q.  You do not.  Okay.
10       That's an operations issue.  Right?
11   A.  Um -- not necessarily.
12   Q.  Well, whose issue is it?
13   A.  If there is a Lake Pontchartrain
14   budget for O&M, then it would be a Lake
15   Pontchartrain manager.
16   Q.  That's operations.
17   A.  I don't know of a Lake Pontchartrain
18   manager in operations.
19   Q.  Didn't we already establish that the
20   Lake Pontchartrain and Vicinity Hurricane
21   Protection Project is under the auspices of the
22   manager of completed projects?
23   A.  But that's not the Lake Pontchartrain
24   manager.  That person has many, many duties.
25   Q.  I didn't say that.

Page 111

1    A.  Many other areas.
2    Q.  Okay.  Do you understand whether or
3    not the office of the manager for completed
4    projects has a budget which is different from
5    the budget of the manager of the Mississippi
6    River Gulf Outlet?
7    A.  Yes.
8    Q.  Okay.  Are you aware of a dialogue
9    within this office about whether to have the
10   O&M budget of the completed projects as opposed
11   to the O&M budget from the Mississippi River
12   Gulf Outlet budget pay for foreshore
13   protection?
14   A.  No, I am not.
15   Q.  Okay.  Are you aware of a discussion
16   on that issue that occurred in the late
17   sixties?
18   A.  No, I'm not.
19   Q.  All right.  Let me show you a document
20   which is entitled Design Memorandum Number 1-A,
21   Channels Mile 63.77 to Mile 68.85, Mississippi
22   River Gulf Outlet, Louisiana.
23   A.  Okay.
24   Q.  I'm sorry it doesn't have a Bates
25   number on it.  I think there's --

Page 112

1        MR. SMITH:
2            Is there a date?
3        MR. BRUNO:
4            Yes.  April, 1957, and below that
5        in paren there is revised July, 1957.
6    EXAMINATION BY MR. BRUNO:
7    Q.  Okay?
8    A.  Okay.
9    Q.  And I'm going to hand it to you but I
10   want to mark this page.  So let me ask you,
11   first, Mr. Baumy, have you ever seen this
12   document?
13   A.  I don't recall.
14   Q.  Okay.  All right.  Now, we've already
15   established, I think, I hope we have, the
16   Congress of the United States authorized the
17   Corps of Engineers to design and build the
18   MRGO.  Right?
19   A.  I would assume, yes.
20   Q.  You assume.  Okay.  Do you know
21   whether or not that authorization called for
22   the channel to have a certain width?
23       MR. SMITH:
24           Well, if he doesn't know whether
25       they authorized it, it's going to be

Page 113

1        kind of hard for him to know whether
2        the authorization had a certain width.
3        MR. BRUNO:
4            Maybe that's true.
5    EXAMINATION BY MR. BRUNO:
6    Q.  Is that --
7    A.  So what's the question?
8    Q.  Do you know -- I'm sorry.  Your
9    testimony is you don't know?  Are you telling
10   me on the record that you do not know, as you
11   sit here today, that the Congress of the United
12   States authorized the United States Army Corps
13   of Engineers to design and build the MRGO
14   channel?  Is that your testimony?
15   A.  No, I'm not saying that.
16   Q.  Well, do you know it or you don't
17   know?  Or do I have to use the word
18   understanding?  Do I have to play that game?
19   A.  It wouldn't be a project if it wasn't
20   authorized.
21   Q.  Well, so are you making the
22   distinction between understanding and know now?
23   A.  Is that a question?
24   Q.  Yeah.  Are you making a distinction
25   between my use of the word understanding versus

WALTER BAUMY                                                    1/9/2008

Page 114

1  my use of the word know?
2        MR. SMITH:
3        Look, joe.
4        MR. BRUNO:
5        Yes or no?
6        MR. SMITH:
7        Look, this is fairly obvious what
8  he's trying to say.
9        MR. BRUNO:
10        On the contrary, I thought my
11  question was fairly easy and obvious.
12        MR. SMITH:
13        Okay, look.
14        MR. BRUNO:
15        In fact, it's stipulated between
16  me and the government --
17        MR. SMITH:
18        That's fine.
19        MR. BRUNO:
20        -- and he doesn't know?  He's the
21  chief.
22        MR. SMITH:
23        Well, I'm sorry.  When was it
24  authorized, Joe?  Maybe he wasn't an
25  employee here then.

Page 115

1        MR. BRUNO:
2        I didn't ask him --
3        MR. SMITH:
4        And maybe he's never reviewed the
5  authorization, so maybe he doesn't
6  know for a fact that it was authorized
7  but he knows that it's a project --
8        MR. BRUNO:
9        Good grief, robin.  Now we're way
10  out there, man.
11        MR. SMITH:
12        I'm sorry, but that's what he's
13  trying to say, I believe.  You can ask
14  him whether he's ever read the
15  authorization --
16        MR. BRUNO:
17        Listen, if that's his testimony
18  you are absolutely correct.  And I
19  respect you and I respect the witness.
20        All I want to do is make a record.
21  EXAMINATION BY MR. BRUNO:
22     Q.  If it's your testimony you don't know,
23  I would like the record to so reflect.
24        So tell me, Mr. Baumy, you're telling
25  this record, you're telling this court, you're

Page 116

1  telling this jury, you're telling this judge,
2  you don't know --
3        MR. SMITH:
4        Joe, if you're not going to use
5  the exhibits, please sit down.
6        MR. BRUNO:
7        Why?
8        MR. SMITH:
9        I'm not going to have you
10  standing over the witness.
11        MR. BRUNO:
12        For the record, and everybody in
13  the room will testify, I am not
14  standing over the witness.  In fact,
15  I'm over here a good four or five feet
16  from the witness.  Yes, I'm standing
17  up, and yes, I am walking, but I'm not
18  standing over the witness.
19        MR. SMITH:
20        Okay.
21        MR. BRUNO:
22        All right?
23  EXAMINATION BY MR. BRUNO:
24     Q.  Now, let's ask it one more time.
25  Because I didn't think this stuff was

Page 117

1  controversial, I got to tell you.  We have a
2  stipulation with the government that it's an
3  authorized project.  But you don't know?  Fine,
4  you don't know.  But just put on the record, do
5  you know whether or not the Congress of the
6  United States authorized the United States Army
7  Corps of Engineers to design and build the
8  MRGO?  Yes or no?
9     A.  I'm going to say yes.
10     Q.  Yes.
11     A.  All right.
12     Q.  Do you know whether or not that
13  authorization included channel design criteria?
14     A.  Yes.
15     Q.  And do you know whether or not the
16  channel design criteria included a channel
17  width?
18     A.  Yes.
19     Q.  And did it include a channel depth?
20     A.  Yes.
21     Q.  All right.  Now, all of that to ask
22  this:  I asked Mr. Accardo on Friday -- and
23  I'll just let you read it, and I want you to
24  tell me whether or not you agree with his
25  assessment.

30 (Pages 114 to 117)

WALTER BAUMY                                                    1/9/2008

Page 118

1     (Brief recess.)
2  EXAMINATION BY MR. BRUNO:
3     Q.  Let me just show this to you,
4  Mr. Baumy, just to get it -- I know that -- you
5  don't remember it, but I'm just -- this is
6  Page 4 of the Design Memorandum Number 1-A, and
7  it is under the paragraph entitled Channel
8  Design Criteria.
9     A.  Uh-huh.
10    Q.  And if you would just take a quick
11 look at the channel design criteria.
12 (Tendering.)  And the reason why I want you to
13 look at that is because I want to ask this
14 question, and if you know the answer:  Does the
15 Corps have the authorization to deviate from
16 those design criteria?
17    A.  Not without, um -- further
18 documentation or approvals.
19    Q.  All right.  So let's talk about
20 something like the degree of curvature.  First
21 of all, do you know what that is?
22    A.  Yeah.
23    Q.  It's 1 degree 7 minutes.
24    A.  Okay.
25    Q.  And I'm told that that has something

Page 119

1  to do with what a vessel needs to turn.
2     Is that -- am I wrong about that?
3     A.  Could be, sure, a consideration.
4     Q.  All right.  So obviously if you change
5  that dimension you may -- may -- impact the
6  ability of a vessel to turn.  Right?
7     A.  Without further studies.  You would
8  have to do additional work to do that.
9     Q.  Right.  And that's why, as you
10 indicate on the record, you have to do
11 additional studies and you have to have
12 additional documentation for the deviation from
13 the authorization.  Right?
14    A.  In that case, I don't know if there
15 was any such occurrence or not, but, um -- I
16 would do that today, yes.
17    Q.  All right.  Now, we know that the
18 channel width is no longer 500 feet.  Don't you
19 agree?
20    MR. SMITH:
21       Are you talking about the top
22    width or the bottom width?
23    MR. LAMBERT:
24       That's the bottom width.  Top is
25    about 680.  But it's a 2 on 1 slope.

Page 120

1  EXAMINATION BY MR. BRUNO:
2     Q.  All I see here, I have to tell you,
3  I'll show you what I'm looking at, I don't see
4  anything other than one width, unless --
5  there's two widths on here, for the record.
6  One says channel width, authorized, 500 feet,
7  the other one says channel depth, 36 feet, and
8  then it says berm width, 140 feet.
9     A.  Okay.
10    Q.  Okay?  (Tendering.)  I don't see any
11 other width.
12    A.  Okay.  The question?
13    Q.  Okay.  The question is, because Robin
14 objected, do you know what the channel width
15 refers to?  (Indicating.)  Is it the top, the
16 surface, or is it the bottom?
17    A.  I don't know.
18    Q.  Okay.  Do you know what berm width is?
19    A.  Yes.
20    Q.  What is berm width?
21    A.  It's a flattened area above the
22 channel dimension that would bench out.
23    Q.  All right.  But that's onshore?
24    A.  I don't know.
25    Q.  All right.  Well, it is what it is.

Page 121

1  It says channel width, 500 feet.  Whatever that
2  means.  You don't know what it means.
3     A.  I would look in the document for
4  additional graphics that would depict exactly
5  what they're talking about.
6     Q.  Well, I'm glad to let you have the
7  entire -- you're going to need a magnifying
8  glass, though, unfortunately.  Take a look at
9  it.  I don't know if you can see it or read it
10 or interpret it or not, but first of all, is
11 that the kind of thing you would look to?
12    A.  Yeah.
13    Q.  Oh.  (Tendering.)
14    A.  So they're showing the 500-foot as the
15 bottom width in this.  I don't see anything
16 that tells me what the bench would be.
17    Q.  I'm sorry.  The bench?
18    A.  Yeah.  There was -- you asked me about
19 the bench.
20    Q.  Oh, berm.  Berm.
21    A.  Berm.
22    Q.  Berm, not bench.
23    A.  Okay.  And this says typical section,
24 so there could be other sections that differ
25 from this, but this is the one predominantly

WALTER BAUMY                                                1/9/2008

Page 122

1   used.
2        MR. SMITH:
3            Just so the record is clear, what
4   page or drawing are you looking at?
5   THE WITNESS:
6            Plate 5. It says Design
7   Memorandum Number 1-A, channels, and
8   it's gives some miles that I can't
9   really read.
10  MR. SMITH:
11           Is there a date at bottom?
12  MR. BRUNO:
13           April, 1957?
14  MR. SMITH:
15           No, for this drawing.
16  THE WITNESS:
17           That's what it looks like. It's
18  hard to tell, but that's what it
19  appears to be.
20  MR. SMITH:
21           All right.
22  EXAMINATION BY MR. BRUNO:
23       Q.  All right. The south side -- let's
24  see. If I look at the top one, it says Station
25  4 plus 15, typical section Station 0 plus 00 to

Page 123

1   Station 4 plus 15. First of all, using our
2   map, can we -- do you know -- we know the
3   stations are intended to give us a way to align
4   the plans with the actual geography, right?
5        A.  Yes.
6        Q.  Okay. Can we agree that the stations
7   start with 0 at or near the Industrial Canal
8   and go up until they reach the gulf?
9        A.  Yes. Zero is at the Industrial Canal.
10       Q.  All right. So Station 4 plus 15, is
11  that 100 feet or 40 feet, do you know?
12       A.  It would be 415 feet, I believe.
13  Unless there's some zeros behind it somewhere.
14  But if it's just 0 plus 415, that would be 415
15  feet as typically laid out. But I cannot read
16  them on here. I'm trying but I cannot read
17  them.
18       Q.  Okay. It says, um -- Mile 63.77 to
19  Mile 68.85. So if this was accurate, that
20  would be about from, let's see -- 63, about
21  right here, to 68 here.
22       A.  Okay.
23       Q.  Just roughly. Correct?
24       A.  It's your map. Yeah. You're just
25  reading the numbers off your map to me and I'm

Page 124

1   saying yes.
2        Q.  Okay. All right. So since we don't
3   know if this 500 is a top width or bottom
4   width, let me just ask the question generally.
5        MR. LAMBERT:
6            He said it was the bottom width,
7   Joe.
8   EXAMINATION BY MR. BRUNO:
9        Q.  Is it the bottom?
10       A.  According to this, um -- document you
11  handed me, yes. In that particular typical
12  section it was the bottom width.
13       Q.  And just to complete the slope is
14  supposed to be 1 on 2?
15       A.  Theoretical cut, it says, where they
16  were having to cut a slope. One side they're
17  not cutting a slope.
18       Q.  But on Page 4, it says, channel side
19  slopes -- you with me on Page 4? 1 on 2?
20       A.  Okay.
21       Q.  What does that mean?
22       A.  That means coming off the bottom on a
23  1 on 2 slope.
24       Q.  But for the record, what does 1 on 2
25  mean?

Page 125

1        A.  Oh, okay. Um -- 1 vertical on 2
2   horizontal.
3        Q.  Okay.
4        A.  It doesn't say that, but that's the
5   way it would -- I would typically interpret
6   this.
7        Q.  All right. Now, here is the question:
8   Let's assume -- well, we don't know --
9   according to your testimony, we don't know what
10  the channel width on the top is authorized by
11  this piece of paper. Right?
12       A.  I don't understand.
13       Q.  Or do we? Well, it says channel width
14  is 500 on the bottom. What is the maximal
15  authorized channel width on the top?
16       A.  You would go with that bottom
17  elevation and then just project up that
18  distance, and wherever it fell out that would
19  be your distance.
20       Q.  Okay. I see.
21       A.  That's the way you would -- that's
22  where you would go from here, at least.
23       Q.  I see. Okay. So if the bottom is
24  authorized to be 500 and the depth is
25  authorized to be 36 feet, then it's simply a

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

Page 126

1  mathematical equation to calculate using the 1
2  on 2 slope what the surface width should be.
3  Is that right?
4       A.  That's not what this drawing shows,
5  though.  This typical section does not show
6  that.  And I don't know how typical this was
7  throughout it.  But that's not what it shows.
8       Q.  All right.  How does it show something
9  different from that?
10      A.  It's showing a 1 on 2 cut on one side,
11 but the other side it seems to be hitting some
12 water at the GIWW location.  Some elevation
13 down there that looks common to that minus 36,
14 approximately.  It's a little bit above the
15 minus 36.
16      Q.  So I'm wondering if it's logical --
17 it's showing a center line here, right?
18      A.  Uh-huh.  Yes.
19      Q.  Okay.  So that if you draw the center
20 line where the channel is supposed to be, along
21 the route selected by the Corps or authorized
22 by the Congress -- okay? -- then we know that
23 the maximal bottom width is 500 feet, and we
24 know the depth is maximally 36 feet, and we
25 know that the slope is 1 on 2, so that for any

Page 127

1  particular point along the length of the MRGO
2  we can ascertain the authorized surface width.
3       A.  The channel width, yes.
4       Q.  Okay.  All right.  Now, whatever that
5  calculation may be at a particular given point
6  along the route, here's the question:  Is the
7  Corps authorized to have a wider channel,
8  either on the bottom or on the surface?
9       A.  You have a bottom surface channel
10 width, I know that.
11      Q.  Okay.
12      A.  I don't know about the surface.
13      Q.  All right.  Well, you didn't answer my
14 question.  Is the Corps authorized to allow the
15 channel, either through its own devices,
16 dredging, or through other natural occurrences,
17 allow the bottom of that channel to get wider
18 than 500 feet?  That's the question.  If you're
19 only authorized the 500-foot bottom, I'm trying
20 to understand if the Corps is supposed to keep
21 that channel at 500 or not.
22      A.  Generally, channels are kept open a
23 minimum distance.
24      Q.  Okay.
25      A.  And if they were wider, you would not

Page 128

1  go spend federal dollars to fill it in to say
2  you could only have a 500-foot channel.
3       Q.  All right.  So the answer, I guess, to
4  the question is --
5       A.  It's a navigation channel.
6       Q.  Well, I understand that it's a
7  navigational channel, but the question is this:
8  And if the answer is yes, the answer is yes.
9  It's okay.  But I'm gathering from your
10 testimony that the Corps believes that it is
11 authorized to allow the channel bottom to get
12 wider than 500 feet.
13      A.  I don't know the answer to that.  I
14 don't know what the authorization says in that
15 regard.
16      Q.  Well, assume for the sake of the
17 question that this document is accurate, this
18 document being the Design Memorandum Number 1A,
19 channels Mile 63.77 to Mile 68.85, at Page 4
20 shows a channel bid of 500 feet and that the
21 channel width is for the bottom.  Assume that
22 to be true.
23      A.  Okay.
24      Q.  I just want to get an understanding of
25 your view as the chief of the engineering

Page 129

1  division of this district office here in New
2  Orleans.
3       A.  Okay.
4       Q.  Do you understand that the Corps can
5  allow, through dredging or through natural
6  processes, that channel bottom to get wider
7  than 500 feet?
8            MR. SMITH:
9                I'm going to object.  That was
10           the same question you asked a few
11           minutes ago.
12           MR. BRUNO:
13                And there was no answer.
14           MR. SMITH:
15                No, there was an answer.  And it
16           can be read back.  We can read the
17           question back and the answer back.
18           MR. BRUNO:
19                It's a yes or no --
20           MR. SMITH:
21                He answered the question.
22           MR. BRUNO:
23                -- question.
24 EXAMINATION BY MR. BRUNO:
25      Q.  Well, did you answer yes or did you

WALTER BAUMY                                                          1/9/2008

Page 130

1  answer no?
2      MR. SMITH:
3          He gave you a statement.  He
4  answered the question.
5      MR. BRUNO:
6          I want an answer which requires a
7  yes or a no answer.
8      MR. SMITH:
9          No.  No.  He answered the
10  question.
11         Go ahead.  You may answer again.
12     A.  Okay.  I cannot answer that yes or no
13  because you're asking different pieces of
14  questions.  So it's not yes and no for both
15  pieces.  So again, you're not clear.
16  EXAMINATION BY MR. BRUNO:
17     Q.  I'm not clear?
18     A.  At least it's not clear in my mind.
19     Q.  All right.  What's not clear?  What do
20  you need to know to answer that question?
21     A.  I thought you asked about the
22  navigation channel with a 500-foot width, and
23  can we make it bigger, smaller, and a variety
24  of other offshoots of that question.
25     Q.  I didn't ask that.

Page 131

1      A.  And that's the way I interpreted that.
2      Q.  Well, that wasn't the question.
3      A.  And that was combined with, okay, now
4  take the surface area at the top and give me
5  yes or no and include all the parts.  And I
6  can't do that.
7      Q.  I didn't ask that either.  I didn't
8  ask any of that.  So we'll try it one more
9  time.
10     A.  Okay.
11     Q.  I'm only talking about the bottom
12  width.
13     A.  Bottom width.
14     Q.  Bottom width.  Okay?
15     A.  Got it.
16     Q.  I ask you to assume the bottom width
17  as authorized is 500, period.
18     A.  Okay.
19     Q.  I want to know, is the Corps
20  authorized to allow that bottom width to go
21  larger than 500 feet for whatever reason,
22  through any process?
23     MR. SMITH:
24         Same objection, asked and
25         answered.

Page 132

1          But go ahead.
2      A.  And the answer is I don't know.
3  EXAMINATION BY MR. BRUNO:
4      Q.  Who do I ask?
5      A.  I would ask, um -- operations division
6  because they were maintaining the channel.
7      Q.  Okay.  I take it then if I asked that
8  question to the chief of operations division
9  who is Mr. Accardo, and he gave me an answer,
10  that you would rely on that answer.  Right?
11     A.  Yes.
12     Q.  You'd defer to him.
13     A.  Yes.
14     Q.  Okay.  And so you would also agree
15  with his answer to this question:  We allege in
16  our complaint against the United States of
17  America that the MRGO caused the erosion of the
18  marsh and caused the death of trees and swamps
19  and things like that, and in that sense reduced
20  the capacity of the marsh to act as a buffer
21  for surge.  Okay?  That's our allegation.
22         Now here's the question:  Does the
23  Corps have any interest in ascertaining whether
24  or not as they continue to dredge the MRGO that
25  they are in fact contributing to the loss of

Page 133

1  that buffer, the marsh?
2          His answer:  We were doing what
3  Congress told us to do.  Through authorization,
4  the channel was authorized for navigation
5  purposes.  The navigation industry needed that
6  channel to exist.  So it was not whether I felt
7  we were hurting the marsh, or the project
8  management felt that we were hurting the marsh,
9  it was irrelevant.  Congress of the United
10  States says, you will dredge that channel and
11  provide project dimensions for the navigation
12  industry.  It was not anybody within operations
13  division to question and say, we're
14  destroying the marsh.  Okay?
15         Do you agree with that or not?
16     A.  I don't know what his responsibility
17  is in regard to destroying the marsh, so I
18  would have to defer to him.  I really don't
19  know his responsibility there.
20     Q.  Fair enough.  So you defer to his
21  answer.
22     A.  Yes.
23     Q.  As the chief of engineers, since you
24  don't have responsibility for this area and
25  you've testified it's the operations that has

WALTER BAUMY                                                    1/9/2008

Page 134

1   responsibility, you defer to him.
2       A.  For that question.
3       Q.  For that question.
4       A.  Yes.
5       Q.  Thank you.
6       A.  And that's for navigation purposes.
7   That's what you're talking about.
8       Q.  Do I gather what you're saying now to
9   mean that, okay, the Congress authorized the
10  building of the MRGO channel for navigation
11  purposes, to let vessels move across its
12  surface, that because of that that the Corps
13  did what it did to make certain that those
14  ships could navigate that channel?  Is that
15  what you're saying?
16      A.  Yes.
17      Q.  Okay.  Now, in general, as the chief
18  of engineering, do you, in that capacity, have
19  any responsibility of ascertaining whether or
20  not in serving the purpose of navigation you
21  have any duty, not moral, not legal, but as the
22  chief of engineering -- okay? -- given the
23  responsibility of you acting as the chief, do
24  you have any duty to ascertain whether or not
25  that navigation channel is damaging the marsh

Page 135

1   which is, as we established earlier in the
2   deposition, near this MRGO?
3       A.  As the chief of engineering, we were
4   aware of the widening of the channel and we
5   were working on bank erosion protection
6   measures to mitigate and stabilize that
7   channel.  There were other ongoing studies that
8   we had involvements with but weren't in the
9   lead for the studies, and I'm not sure the
10  studies have progressed to the point where
11  anything would come to bear in a way of
12  construction or a new project, Coastal
13  Louisiana, for instance.  So there were
14  activities happening at the district that was
15  looking at the overall coastal restoration, and
16  this was a part of it.
17      Q.  Right.
18      A.  That area.
19      Q.  Well, I understand, Mr. Baumy, that
20  your answer discusses the things that were
21  done --
22      A.  Okay.
23      Q.  -- in response to this issue.  But the
24  question was, do you, as the chief engineer,
25  based upon your understanding of your job

Page 136

1   description, what you're here to do for this
2   Corps, in this position, in this office, did
3   that duty include assessing whether or not this
4   navigation channel damaged the neighboring
5   marsh?  Yes or no?
6       A.  No.
7       Q.  Okay.  Do you know if anybody at the
8   Corps had that duty?
9       A.  I don't know who had the duty, but I
10  know there were ongoing studies.
11      Q.  Fair enough.
12      A.  That's what I can tell you.
13      Q.  Fair enough.  We're going to talk
14  about those studies in a minute.
15      A.  Okay.
16      Q.  I'm just trying to figure out if
17  anybody -- I'm trying to figure out if there
18  is, quite frankly -- okay?  And on the record,
19  I want to know if there is a job description
20  within this district which would include in the
21  ambit of responsibility evaluating projects to
22  ascertain whether or not those projects damaged
23  either people or property.
24          Is there such a department or division
25  or a branch at this office?

Page 137

1       A.  I don't think there's a separate
2   branch or office to do that very thing.
3       Q.  All right.  Is there an office or a
4   branch within which that obligation is to be
5   found?
6       A.  Again, I'd have to go back and --
7   maybe I'm not clear as to what you're asking,
8   but there were ongoing activities looking at
9   the overall coastal restoration, and this was a
10  part of that, and the district was
11  participating in that, including engineering
12  and people outside the Corps of Engineers,
13  frankly lots of other, um -- groups, um -- in
14  the mix in trying to put these projects on the
15  board and get them moving.
16      Q.  All right.  I understand.  Now, let's
17  talk about -- we talked about the business of
18  damaging the marsh.  Let's talk about damaging
19  the hurricane protection structure.  Okay?
20          In this particular location, we have
21  the MRGO.  And forgive me, I have to stand up
22  again to illustrate.  We've got the MRGO, and
23  we know we have a hurricane protection
24  structure from -- well, we have it from really
25  approximately here, which is where the

WALTER BAUMY                                                    1/9/2008

Page 138

1  Intracoastal Waterway meets the Industrial
2  Canal, along the north bank of the -- I'm
3  sorry -- south bank of MRGO going all the way
4  to Violet, and then making a hard right turn --
5      MR. SMITH:
6          Verret.
7  EXAMINATION BY MR. BRUNO:
8      Q.  Is it Verret?  It's Verret, right?
9  Making a hard right turn here, and then going I
10  guess that would be west back to the river.
11      MR. SMITH:
12          Yes.  To Caernarvon.
13      A.  Yes.
14  EXAMINATION BY MR. BRUNO:
15      Q.  So we know that the MRGO is in close
16  proximity of that hurricane protection
17  structure, at least from the Intracoastal
18  Waterway to where it makes that hard right turn
19  at Verret.
20      A.  Okay.
21      Q.  Okay.  Now, here's the question:  Is
22  the Corps interested in knowing whether or not
23  that navigation project damaging its adjacent
24  hurricane protection project?
25      A.  I would turn that around and say the

Page 139

1  Corps is interested in the integrity of the
2  hurricane protection project and would observe
3  what's happening with that project to determine
4  whether it was infringing on the hurricane
5  protection project.
6      Q.  Okay.  Well, that's fine, but that
7  sort of tells me that the guy in charge of the
8  MRGO project is not really interested in who
9  he's hurting.
10          Is that what you're meaning to say?
11      A.  No, I'm not saying that.
12      Q.  All right.  Okay.  All right.  Well --
13  so again, we're talking about the MRGO now.
14  I'm the guy -- I mean, we have already
15  established on this record we have a guy whose
16  job it is to oversee the daily operations of
17  the MRGO.  There is an op manager for that
18  project.  That's his daily job, right?
19      A.  Yes.
20      Q.  Okay.  And I'm just -- and would you
21  agree with me that the business of whether or
22  not that MRGO, through erosion, is causing
23  potential damage to the hurricane protection
24  structure is an engineering question, at least
25  in part?

Page 140

1      A.  There is an engineering connection
2  there, yes.
3      Q.  Right.  Okay.  And you've already told
4  me that you're in a support role here, right?
5      A.  Yes.
6      Q.  So the only way that the engineering
7  question can be answered is if the engineering
8  question is asked, right?
9      A.  Yes.
10      Q.  Okay.  All right.  And so I'm
11  wondering, would you expect the operations
12  manager for the MRGO, if he sees erosion --
13  well, withdraw.  You would expect, I hope, your
14  engineering manager of the MRGO to be aware of
15  the erosion.  Right?
16      A.  Repeat it, please.
17      Q.  Would you expect -- we've already
18  established on this record, I hope, that the
19  Corps was well aware of the fact that the banks
20  on the MRGO were eroding over time.  For
21  whatever reason.
22      A.  Okay.
23      Q.  Right?  All right.  I'm wondering
24  whether or not you would expect the operations
25  manager in charge of the MRGO to have been

Page 141

1  aware of that fact.
2      A.  Yes.
3      Q.  In fact, he's the guy who -- the buck
4  stops with him with regard to knowledge of that
5  particular fact, wouldn't you agree?
6      A.  Pertaining to the MRGO I would say
7  yes.
8      Q.  Absolutely.  Okay.  So he's the guy
9  who has the ultimate responsibility for being
10  aware of what maintenance issues exist on his
11  project, in this case the MRGO.
12      A.  Yes.
13      Q.  All right, sir.  So having established
14  that, A, the Corps knew, and B, the op manager
15  for MRGO should know, would you expect the op
16  manager for MRGO to make an inquiry to the
17  engineering division to ascertain whether or
18  not the erosion on the banks of the MRGO at the
19  hurricane protection project could potentially
20  damage that hurricane protection project?
21      A.  I would expect that the ops manager,
22  the project manager for the hurricane
23  protection project, and then the engineering
24  participants on the two different PDTs were
25  conversing on that and they were well aware of

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

WALTER BAUMY                                                    1/9/2008

Page 142

1    the requirements for the hurricane protection
2    levee and were observing what was happening in
3    the MRGO to determine is there a problem on the
4    hurricane protection levee.
5        Q.  Where in the structure are the PDTs?
6    Where are they?  Are they in operation?
7        A.  They're lead by the project manager in
8    the project management division, and
9    engineering division will supply team members
10   for the various teams in the variety of
11   projects.
12       Q.  All right.  Now, I was given to
13   understand that project management no longer
14   has a role when the project is finished.  Is
15   that incorrect?
16       A.  But the hurricane protection project
17   was not finished.  There were still lifts to be
18   put on that project.
19       Q.  In 2005?
20       A.  Yes.
21       Q.  Okay.  So as far as you know, the
22   hurricane protection structures along the MRGO
23   were never finished before Katrina.
24       A.  The levees were not completely
25   finished.

Page 143

1        Q.  Okay.
2        A.  They needed lifts.
3        Q.  Okay.  And so your testimony is, and I
4    guess I'm a little confused by this, you just
5    sort of expect both of these two guys, your
6    project manager on the hurricane protection
7    side and your operations manager on the MRGO
8    side, to have just been in communication on
9    this point.
10       A.  Sure.
11       Q.  All right.  Do you know whether or not
12   the -- never mind.  It's a different subject.
13   It was not within your area.
14           Now, is that, that dialogue, okay?
15   That is, the potential for damaging the
16   property of the -- let's take out of the
17   analysis the fact that is a hurricane
18   protection structure, and let's say there's a
19   house there.  All right?  There happens to be a
20   little shack on the banks of the MRGO right
21   where the hurricane protection structure
22   exists, and your manager of the MRGO sees the
23   erosion, he sees the banks eroding away, and
24   every year the water gets closer and closer to
25   the fellow's house.  Okay?  Would you expect

Page 144

1    the manager of the operations for the MRGO to
2    ask you as the engineering division head, or
3    somebody in your office, not you in particular,
4    about the potential for that erosion damaging
5    this fellow's property?
6        A.  There's so many ways I could answer
7    that question, but, um -- there wouldn't be a
8    structure there unless it was there by permit.
9    And if it was going in by permit, we would be
10   looking at its potential -- its proximity to
11   the hurricane protection system and determining
12   in advance if we thought that would harm the
13   hurricane protection system.  So the ops
14   manager as well as the project managers or
15   engineer, just like we have specialty engineers
16   in the engineering division, they're also
17   engineers, and they could look at a
18   cross-section of the hurricane protection
19   levees and determine whether that channel was
20   infringing on that protection or not.
21       Q.  Okay.  I think you misunderstood my
22   question.
23       A.  Okay.  I.
24       Q.  I asked you to assume there's no
25   hurricane protection.  In fact, let's make it

Page 145

1    easy for you.  Let's go down here.  The house
2    is right there.
3        A.  Uh-huh.
4        Q.  The guy has a little cabin and he
5    likes to go kill some duck every now and then.
6    He's right there.  Okay?  And the manager for
7    your -- and you can see -- in particular, you
8    can see right here where there's a big space
9    between the yellow line and the green line at
10   mile 48.
11       A.  Okay.
12       Q.  A big space.  And, you know, let's
13   assume that his house is right there on that
14   yellow, but when the MRGO was built there was a
15   nice little piece of dirt between him and the
16   MRGO.
17       A.  Uh-huh.
18       Q.  You see where I'm going?  I'm just
19   trying to understand whether or not the
20   operations manager for MRGO would call upon you
21   guys to say, well, wait, you know, this guy 's
22   house is close to the banks of the MRGO and now
23   the bank is moving toward his house.  I mean,
24   I'm just asking myself, wouldn't somebody --
25   wouldn't that raise some kind of red flag to

Page 146

1  somebody to ask the question could this guy 's
2  house possibly be damaged?
3       Do you understand my question?
4       A.  Not really.  I don't understand what
5  you're asking me.
6       Q.  I'm asking whether or not anybody
7  within the Corps, particularly the manager of
8  operations for the MRGO, would feel compelled
9  to and make the inquiry as to whether that
10  erosion which he sees getting worse and worse
11  every year, and getting closer and closer to
12  the guy 's house, it's getting closer and
13  closer to the guys house, it's trending.  I
14  mean, you know, the green line is where the
15  channel began, the yellow line is where it is
16  today, so clearly there's a trend in his mind.
17  I'm just trying to ascertain, if there's some
18  interest on the part of the Corps in
19  ascertaining whether or not there is the
20  potential to harm the guy 's house, and what do
21  you do about it?  If you don't do anything,
22  that's fine.  If you don't care, that's fine.
23  I just need to get an answer from you.
24       A.  And I would say we definitely care,
25  but you would have to ask the operations

Page 147

1  manager because they're responsible for
2  managing their project.  What would they do?  I
3  don't know.
4       Q.  That's fine.  Okay.  I got you.  All
5  you can tell me is that if he decides to ask
6  you the question, that is, if he says,
7  Mr. Baumy, I need some engineering help with
8  these, you would give him help.
9       A.  Sure.
10       Q.  Okay.  All right.  That's your role.
11       Certainly you would agree that your
12  role is not to inspect the MRGO and tell
13  anybody that there's some potential for harm.
14  Right?  That's not your job.
15       A.  I did not inspect the MRGO.  No.
16       Q.  That's not my question.
17       A.  Okay.
18       Q.  It's not the job of the chief of the
19  engineering division, or anybody within his
20  division, to go out to the MRGO and inspect it
21  for the purpose of ascertaining whether or not
22  the MRGO could possibly do damage to somebody's
23  property.  That's not in your job description;
24  isn't that true?
25       A.  I would defer to the operations

Page 148

1  manager.
2       Q.  Right.  And you would respond to his
3  request, of course.  If he asked you for that
4  help, you'd give it to him, right?
5       A.  If he could -- if it was tied to the
6  federal project and he could pay for it, sure,
7  I would do it.
8       Q.  Does he have to -- your answer
9  provokes the question, does the -- before you
10  can give assistance, do you have to ascertain
11  whether there's money in the budget for you to
12  give assistance; in other words, is there a
13  money issue involved?
14       A.  I'm funded by, generally, operations
15  or project management to provide services at
16  the district.
17       Q.  So does that mean before you can give
18  assistance you have to see if it's in your
19  budget?
20       A.  No, it doesn't have to be in my
21  budget.  They have to send funds to me in some
22  capacity, whether it was put in the initial
23  budget or something has come up and I'm going
24  to give you money --
25       Q.  Oh, I see.

Page 149

1       A.  -- that's the way I would work.
2       Q.  Oh, I see.  So that in the instance
3  that the op manager says, okay, Mr. Baumy, I
4  need some help, he has to pay for it.
5       A.  Sure.
6       Q.  How -- I mean, you know, now I got to
7  ask you, at what point in -- I guess all you
8  have to sell is your time, right?  So don't you
9  agree?  I mean, you get paid -- you guys get
10  paid for your time.  Isn't that true?
11       A.  It could be more than that, but yes,
12  that's part of it.
13       Q.  That's part of it.
14       Well, I mean, how small -- I should
15  perhaps ask it a different way.  How large a
16  project is involved when there's a requirement
17  for money to change hands between the, um --
18       A.  We account for our time.
19       Q.  -- divisions?  All the time?
20       A.  We have an accounting system where we
21  account -- we charge our time to particular
22  labor codes which are tied to projects.
23       Q.  Okay.  I take it then, clearly
24  before -- let's say I'm a guy what wants your
25  assistance.  Before I call you on the phone I

WALTER BAUMY                                                         1/9/2008

---

Page 150

1   need to make certain that I've got money in my
2   budget to pay for the services that I would ask
3   you to give me. Right?
4       A.  Generally, yes.
5       Q.  Okay. All right. So then but you
6   have your own budget. Right?
7       A.  My budget is built around the various
8   offices of the district providing funds for my
9   organization.
10      Q.  Okay. So you don't have your own
11  budget that's yours alone, that you get to
12  spend the way you want to spend it.
13      A.  No.
14      Q.  Okay. Does the operations division
15  have its own budget to spend the way it wants
16  to spend money?
17      A.  There is an operations division
18  budget.
19      Q.  Is there a real estate division
20  budget?
21      A.  Yes, there is also an engineering
22  division budget, but they're built around
23  projects. Same as real estate. Built around
24  projects, generally.
25      Q.  Okay. All right. And planning,

---

Page 151

1   programs and project management, they obviously
2   have a budget built around projects.
3       A.  Well, they are the ones who work -- we
4   have a program management office that works
5   within project management, and so you've got
6   funds in two areas, project management and
7   operations, generally are the way the budget --
8   in general. There's other smaller things, but
9   those are the big ticket items.
10      Q.  Okay. Do you know whether or not the
11  authorization for the construction of the MRGO
12  included authorization for foreshore protection
13  against erosion by wave wash from shipping?
14      A.  No, I don't.
15      Q.  Okay. Who is responsible for the
16  quality of the design of the MRGO, if anybody?
17  Which entity?
18      A.  The quality of the design?
19      Q.  Yeah. The quality.
20      A.  If it's a design feature, the, um --
21  channel size, it would be engineering division.
22      Q.  Okay. Would you -- and using my
23  analogy to the building of a home, if you knew
24  there was the potential for -- if you were a
25  contractor and you knew that there was a

---

Page 152

1   potential that a particular design would cause
2   a particular maintenance problem, would you
3   expect your contractor to tell you?
4       A.  I have no idea.
5       Q.  Well, okay. What role does
6   engineering play in the design of projects?
7       A.  There are documents produced that
8   would show the basis of the design. So in the
9   early formulation phase, engineering would be
10  participating with the PDT in putting that part
11  together of the document. And then a project
12  manager would coordinate the entire document.
13      Q.  Okay. Now, if the engineering group
14  suggests the need for protection for erosion,
15  it puts it in the plan, there is the
16  possibility that somebody higher up could take
17  it out, isn't that true?
18      A.  I don't know. I don't know if that is
19  true, actually.
20      Q.  Okay. And would you expect that if
21  your engineering group had suggested the need for erosion
22  protection then that suggestion should have
23  been communicated to the authorizing agency,
24  whoever that may be.
25      A.  Documents such as those would be

---

Page 153

1   reviewed by higher authority. And, um -- if
2   there was a disagreement in a conclusion, then
3   you would have discussions upon the merits of
4   both arguments and hopefully you could come to
5   a conclusion, a consensus as to what's the
6   right thing to do in that situation, what's the
7   correct thing? And that's the way it would
8   generally work. I don't know what happened
9   here because I hadn't seen the documents in a
10  long time.
11      Q.  Understood. So that I gather from
12  your answer that you would expect that if
13  somebody higher up disagreed, that you should
14  be told and you should have an opportunity to
15  explain why you believe this thing is in or out
16  of your proposal.
17      A.  In the processes that we use now,
18  there would be a formal comment back to us and
19  we would respond to that comment, agreeing,
20  disagreeing, and we could continue that process
21  until there was a conclusion that was bought by
22  all parties.
23      Q.  Okay. But would you generally agree
24  with the notion that the authorizing agency
25  really needs to know, in order to make

---

WALTER BAUMY                                                    1/9/2008

Page 154

1  intelligent judgments about whether to go
2  forward or not, that there, you know, was a
3  suggestion for the need for some protective
4  let's use the word devices, without getting
5  into foreshore protection, that they should
6  know that in order to make an intelligent
7  judgment?
8      A.  At some point through the various
9  documents that are produced, there will be --
10 there will be recognition of all features that
11 need to be a part of that project, and also
12 what's expected during the O&M phase.
13     Q.  Okay.
14     A.  So, I mean, that's -- I have to go
15 back to the record.
16     Q.  Right.  Yeah.  And again, we don't
17 have the whole record in front of us but,
18 again, let's assume for the sake of this
19 hypothet Congress is the authorizing agency.
20 Let's assume for the sake of the hypothet that
21 the proposal before the Congress includes no
22 mention of protection of the banks.  None.  No
23 riprap, no nothing.  Okay?  And let's also
24 assume that there is an engineer in the New
25 Orleans District who felt like foreshore

Page 155

1  protection was a necessary component in order
2  to prevent future erosion.  Would you agree
3  with me that the authorizing agency should have
4  the benefit of that piece of information?
5      A.  We do our work in documents.  And our
6  thoughts are in those documents at that
7  time.  Whatever we thought the best information
8  was at that particular time should be in that
9  document.
10     Q.  And I agree with you, Mr. Baumy.  I'm
11 asking the question, suppose somebody higher up
12 removed the document from the proposal to the
13 Congress?  I mean, you didn't do it, somebody
14 above you did it.  I'm just wondering if you --
15 the way you understand this whole thing works,
16 if you would agree with me that the authorizing
17 agency does have a right to know about the need
18 for protection.
19     A.  I don't know the answer to that.
20     Q.  All right.  Do you understand whether
21 or not the United States Army Corps of
22 Engineers understood when it designed the MRGO
23 that there would be an erosion problem?
24     A.  I don't know that.
25     Q.  Okay.  Do you know whether or not the

Page 156

1  United States Army Corps of Engineers proposed,
2  as a component part of the project, erosion
3  protection?
4      A.  I don't know.
5      Q.  All right.  Do you know what the right
6  of way width was for the MRGO?
7      A.  I haven't looked at the documents.
8      Q.  All right.  But you certainly would
9  agree with me that if the erosion got to the
10 point where you were encroaching beyond the
11 right of way, that that would be a problem?
12     A.  No, I wouldn't agree with you.
13     Q.  You wouldn't?
14     A.  No.
15     Q.  Well, wouldn't you be taking
16 somebody's -- wouldn't you be violating
17 somebody's right to own property?
18     A.  That's what we have lawyers for.  I
19 don't know.
20     Q.  Okay.  Let me just show you this
21 document.  I know you haven't seen the
22 document, you don't remember the document, but
23 I just ask if at Page 7 if this document is
24 accurate.
25     A.  What is the document?

Page 157

1      Q.  You can look at it again.  I showed it
2  to you a little while ago.  It's the Design
3  Memo 1-A.
4          MR. SMITH:
5              Is this the same one you handed
6          him before?
7      A.  It looks like it.  What's the
8  difference?
9          MR. SMITH:
10             There's no difference.  He's just
11         giving you his highlighted copy, I
12         guess.
13 EXAMINATION BY MR. BRUNO:
14     Q.  Yeah.  I was trying to make it easy on
15 you.  But we can go the other way.
16     A.  No, I'm all right.
17     Q.  I just want to see if this document
18 doesn't confirm that no recommendation was made
19 by the Corps for erosion protection when it
20 sought authorization to build the channel.
21     A.  I find it confusing, just reading it
22 quickly here without understanding the context
23 for the whole document.
24     Q.  Okay.  So the Corps document is
25 confusing?

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

WALTER BAUMY                                                      1/9/2008

Page 158

1       A.  Just reading this one piece without
2   looking at the -- more of the document, um --
3       Q.  So you would tell the Congress,
4   beware, don't read one piece, read the whole
5   document.
6       A.  Sure.
7       Q.  Okay.
8       A.  So what's the question?
9       Q.  The question was whether or not this
10  document confirms that the United States Army
11  Corps of Engineers, in seeking authorization
12  from the Congress to build the MRGO, made no
13  recommendation for foreshore protection on the
14  banks of the channel.
15      MR. SMITH:
16          This goes without saying, but my
17      objection is there's going to be a
18      lack of foundation because he hasn't
19      read the whole document, he's looked
20      at one page, he's told you just
21      looking at that one page he's not
22      sure.
23      MR. BRUNO:
24          But that's an answer, though, and
25      I need that answer.

Page 159

1       MR. SMITH:
2           Well --
3       MR. BRUNO:
4           He's telling me he has to read
5       the whole document, and somebody else
6       may say, no, you don't need to read
7       whole document you, you just need to
8       read that paragraph, and that's why I
9       want the answer.
10      A.  I can tell you, I mean, reading this,
11  I mean, it says no channel protection is
12  recommended initially.  But there's a big
13  however, erosion in open areas -- and you'd
14  have to look where do they expect open areas --
15  can be expected in the upper part of the
16  channel where the peat and highly organic clays
17  are exposed.
18          So this is referencing particular
19  areas.  I don't know which areas they're
20  referencing.
21      Q.  Well, but it says --
22      A.  And it says, protection can be
23  provided if and when the need for it becomes
24  necessary.
25      Q.  That's fine.  But the question wasn't

Page 160

1   if and when the need arises, the question was
2   whether or not when the Corps sought
3   authorization it didn't recommend any shore
4   protection at that time.  If you want to
5   substitute the word initially, fine, we'll use
6   the word initially.
7       A.  I don't know at that time.
8       Q.  Okay.  All right.  But you would agree
9   with me, the words are no channel protection is
10  recommended initially, right?
11      A.  Yes.  Yes, that's what it says.
12      Q.  Now, here's the question:  Let's say
13  I'm right.  God forbid.  Then the next sentence
14  says, protection for this area can be provided
15  if and when the need for it becomes necessary.
16          Okay, here's the question:  Since
17  money and budgeting obviously is important, if
18  it becomes necessary to put channel protection,
19  how do we go about getting the money to get
20  that protection?
21      A.  I don't know.  It would not be my job
22  to figure that out and go forward.  That would
23  be an authorization issue that would have to be
24  looked at by others.
25      Q.  And would you agree with me, knowing

Page 161

1   what you know about the budget process and
2   Congress and how hard it is to get money out of
3   anybody, that it's more difficult to get money
4   after the fact than it is to get money when you
5   initially request authorization?
6       MR. SMITH:
7           I'm going to object for lack of
8       foundation.
9           Go ahead and answer.
10      A.  I don't know.
11  EXAMINATION BY MR. BRUNO:
12      Q.  You don't know?
13      A.  I don't know.
14      Q.  You have no opinion on that one way or
15  the other.
16      A.  No.
17      Q.  Okay.  So it could be just as easy to
18  get money after the fact as it is to get money
19  when you initially apply, you just don't know.
20      A.  I don't know.
21      Q.  Fair enough.
22          Do you know if the United States Army
23  Corps of Engineers, since this project was
24  authorized, has ever gone back to Congress to
25  request money for channel protection?

                            41  (Pages 158 to 161)

WALTER BAUMY                                                    1/9/2008

Page 162

1    A.  No.  I don't know.
2    Q.  You don't know.  Okay.  Do you know
3  whether or not it is necessary to get Corps
4  authorization in order to do channel
5  protection?
6    A.  No, I don't.
7      MR. SMITH:
8        Sorry.  When you said Corps you
9      meant Congressional authorization?
10     MR. BRUNO:
11       You're right.  I'm sorry, Robin.
12     Let me ask it again if I screwed it
13     up.
14  EXAMINATION BY MR. BRUNO:
15   Q.  Do you know -- let's me just ask is
16  this way:  Channel protection generally, is
17  that a maintenance item or is that a capital
18  item?
19   A.  I don't know.  I'm not used to dealing
20  with capital items versus -- are you talking
21  about initial construction, I'm assuming?
22   Q.  Yeah.
23   A.  I don't know.  I mean, I just looked
24  at that document and it gives me a -- it says
25  when deemed necessary.  So I don't know.  I

Page 163

1  could be different for different situations.
2    Q.  Now, it further says, the reach
3  covered by this report lies in the proposed New
4  Harbor Development Area, and the construction
5  of slips, wharves, piers and other structures
6  will probably provide for some channel
7  protection that may be required.
8    A.  (Nods affirmatively.)
9    Q.  Now, do you have any understanding as
10  to what that reference is, this building of
11  wharves?  Page 7.  Robin is showing it to you
12  now.
13   A.  I can tell you what I believe, um --
14  it's referencing that there may be some future
15  development in that area and these types of
16  facilities may come here and here's what may
17  happen if they do.
18   Q.  Okay.
19   A.  That's --
20   Q.  Well, here's what's troubling me:  The
21  document says, in black and white, erosion due
22  to wave wash in open areas can be expected in
23  the upper part of the channel slope where the
24  peat and highly organic clays are exposed.
25  Right?

Page 164

1    A.  Yes.
2    Q.  Now they're not talking about a
3  particular location, they're talking about the
4  whole length of the channel.  Right?
5    A.  Maybe.  You would have to look at the
6  geological profile, or if they make reference
7  to specific areas.  I don't know that without
8  looking at.
9    Q.  All right.  I'm just asking more of a
10  general question.  So I'm just asking you as, a
11  you know, reading the words, the document at
12  least suggests that erosion is expected.
13  Right?  Even if you say in some locations, it's
14  expected.
15   A.  It says, can be expected in the upper
16  part of the channel slope, with some
17  qualifiers, yes.
18   Q.  Of course.  And then it says, channel
19  protection, because of that, may be necessary.
20  Right?
21   A.  Yes.
22   Q.  Okay.  So can you explain for us what
23  is the process by which the Corps goes through
24  to ascertain, one, when erosion is a problem,
25  and two, how do you deal with it?

Page 165

1    A.  At that point in time, the project
2  would be in the hands of the operations manager
3  and operations division.
4    Q.  Okay.
5    A.  So they would lead that effort in,
6  um -- figuring out the course of action that's
7  necessary.
8    Q.  All right.  You would expect the
9  operations manager in charge of the MRGO --
10  let's just assume this is an authentic and
11  accurate document -- to be aware of the
12  thoughts expressed here, and you would expect
13  the operations manager for MRGO to respond to
14  whatever issues these sentences may suggest.
15  Fair enough?
16   A.  Yes.
17   Q.  Okay.
18     (Lunch break.)
19  EXAMINATION BY MR. BRUNO:
20   Q.  Mr. Baumy, if you would, we've asked
21  you just to very generally, not tie it down to
22  the millimeter, but evaluate these satellite
23  maps and the mile markers as indicated and then
24  to compare them to the mile markers as shown on
25  the design memorandum plates which are appended

WALTER BAUMY                                                    1/9/2008

Page 166

1    to Design Memo 1-A and 1-B and see if you
2    wouldn't agree that generally the mile markers
3    are consistent with the plates insofar as they
4    relate to certain geographic features.
5        A.  I would say generally yes.  I looked
6    at Mile 60 on your board and I compared it on
7    the scale here and it looks about the same.
8    Same proximate location.
9        Q.  Okay.  Now, and we've put in front of
10   you Design Memo 1-B.  I think that Design Memo
11   1-A we agree discussed the section from the
12   Industrial Canal to about, you know, somewhere
13   where the MRGO turns into the Intracoastal
14   waterway.
15       A.  Okay.
16       Q.  Okay?  And now what you have in front
17   of you, Design Memo 1-B, and if you look at the
18   cover page, it suggests that this design memo
19   covers Mile 39.01 to Mile 63.77?
20       A.  Okay.
21       Q.  And would you agree that, you know,
22   again very generally, Mr. Baumy, covers the
23   section of the MRGO which is generally near to
24   the hurricane protection structures from the
25   Intracoastal Waterway to about Verret.

Page 167

1        A.  It runs a little further out than
2    Verret, yes.  It continues down to the bayou.
3        Q.  All right.  I just want to cover,
4    very, very quickly, this design memo, very much
5    like Design Memo 1-A, describes the authorized
6    channel design criteria at Page 2.
7            You with me?
8        A.  Okay.
9        Q.  All right.  First perhaps I should ask
10   this, but can you tell by looking at the cover
11   piece of this document who prepared the
12   document?
13       A.  Yes.  It would be the New Orleans
14   District of the United States Army Corps of
15   Engineers.
16       Q.  All right.  And does it further
17   indicate within the New Orleans District who
18   may have prepared it, that is, engineering as
19   opposed to planning or operations or --
20       A.  Not by the cover, no.
21       Q.  All right.  Is there any other pages
22   that might suggest who prepared it?
23       A.  No, not that I can find.
24       Q.  Okay.  All right.  Now, again, for the
25   record, what is a design memorandum?

Page 168

1        A.  It's a document that lays out the
2    concept of the design, the -- and you can look
3    at the table of contents, and it pretty much
4    tells you about what's included, project
5    authorization, location, the channel location,
6    the design criteria, the hydrology, geology,
7    soils, rights of way, and then a host of other
8    materials to support that.  But it generally
9    gives you a description of the overall project
10   and the costs associated with it.  And a lot of
11   times there will be a schedule for
12   implementation of the project to go with it.
13       Q.  All right.  What is it used for?  If
14   you know.
15       A.  It's a basis for design for proceeding
16   to the contract plans and specifications.
17       Q.  All right.  If we go to Page 2, at
18   Number 6, does this suggest that it was the
19   Corps who selected the route?
20       A.  I would say yes.  But there may have
21   been others who had input into that selection.
22       Q.  All right.  And then in Number 7, the
23   channel design criteria, would this be the
24   description of the width of the bottom, the
25   depth and the channel slopes that's authorized?

Page 169

1        A.  Yes, it would.
2        Q.  Okay.  And in connection with this
3    paragraph, the questions that I asked you about
4    does the Corps have the authorization to go
5    outside of these numbers, would your answer be
6    the same?
7        A.  Yes.
8        Q.  Thank you.
9            And then finally, if we would look at
10   the plates in the back, I just wanted to
11   confirm the business about the 500 feet
12   referring to the bottom as opposed to the
13   surface.  I think if you'll look at Plate
14   Number 12, which I think is the last piece of
15   paper in the stack, is that the right plate to
16   look at?
17       A.  Yes.
18       Q.  And what would your answer be with
19   regard to the 500 feet?
20       A.  Yes.  It's shown as the channel bottom
21   width.
22       Q.  All right.  And does it also show the
23   slope?
24       A.  Yes, it does.
25       Q.  Okay.  And it's still 1 over 2?

JOHNS PENDLETON COURT REPORTERS                          800 562-1285

WALTER BAUMY                                                      1/9/2008

Page 170

1      A.  Yes.
2      Q.  Did I say that right?
3      A.  Well, let me verify that.  Yes.
4      Q.  Okay.  All right.  And of course at
5  Page 3, Number 12, would you agree with me that
6  there was at least some consideration to
7  whether or not the channel would allow
8  hurricane swell to reach New Orleans in this
9  document?
10     A.  Okay.  What was the question?
11     Q.  The question was, would you agree that
12  Paragraph 12 would seem to indicate that the
13  Corps considered whether or not the existence
14  of the channel would contribute to increased
15  height of the water in the case of a hurricane?
16     A.  Yes.
17     Q.  Okay.  And in Paragraph 11, would you
18  agree what the Corps considered the impact of
19  the channel on increases in salinity in a
20  variety of areas in and around the MRGO?
21     A.  Okay.  I'm going to have to read it.
22     Q.  Yes.  Pleas do.
23     A.  It looks like it was addressed.
24     Q.  Okay.  And would you agree that -- how
25  do I say this?  I don't want to -- is increased

Page 171

1  salinity a potential problem in the marsh?
2      A.  I'm having a hard time answering that
3  question by reading the paragraph.
4      Q.  Well, here's where I'm going with
5  that, Mr. Baumy:  If you look at the last
6  sentence where it says, if the channel is
7  separated by spoil from the surrounding area,
8  except for a few openings, the salinities in
9  the area inland from Shell Beach to the west of
10  the channel will tend to be fresher and Lake
11  Borgne should remain essentially unchanged.
12        Now, before I ask you about the
13  particulars of that sentence, it just occurs to
14  me from reading that sentence that there was a
15  consideration that the salinities ought to
16  remain unchanged.  Would you agree with that?
17     A.  No, I cannot -- I don't know.  I don't
18  know what their intent was there.
19     Q.  Okay.  As an engineer, do you know
20  whether or not increased salinities in the
21  marsh could pose a threat to the marsh in
22  general?  Let's start there and then work our
23  way down.
24     A.  I know it would be a threat to
25  hardwoods and other species, but I'm not sure

Page 172

1  about the marsh itself.
2      Q.  Okay.  Is there any difference in the
3  ability of a freshwater marsh as opposed to
4  brackish marsh to act as a buffer to hurricane
5  surge?
6      A.  I don't know.
7      Q.  Who should I ask that question to; is
8  that a hydrologist again?
9      A.  Pardon?
10     Q.  Who should I ask that question to; is
11  that a hydrologist?
12     A.  I would ask the Louisiana coastal
13  experts that are involved.  It may not be a
14  hydrologist.  It may be a biologist.
15     Q.  Okay.
16     A.  More likely a biologist or some other
17  scientist in that area.
18     Q.  All right.  Would you agree, though,
19  that there was a desire to use the spoil to
20  keep the salinity down?  Now again, I'm
21  referring to that last sentence again.  I'm
22  trying to see if I'm reading it correctly.
23     A.  Just looking at that one sentence by
24  itself, it does reference if you separate the
25  channel by spoil.

Page 173

1      Q.  Okay.
2      A.  And here's what you would expect.
3      Q.  Maybe you can help us.  Where is Shell
4  Beach, if you can, on either of the two maps?
5  And you can use a mile marker as a general
6  reference, I think.
7      A.  I don't know exactly where it's at,
8  but I would think it's back in this area.
9      Q.  Okay.  In the neighborhood of Mile 45?
10     A.  39 to 45.
11     Q.  Okay.  And then it says from Shell
12  Beach to the west of the channel.
13        To the west.  Do you know where that
14  might be?  What that might be referencing?
15     A.  I would come this way, and maybe this
16  side.
17     Q.  Okay.  All right.
18        MR. SMITH:
19          Just so the record is clear, when
20        he references the mile markers it's as
21        depicted on these maps that are here.
22        MR. BRUNO:
23          Yes.  You're right.  As depicted
24        on these maps, which I think we've
25        established are pretty close although

JOHNS  PENDLETON  COURT  REPORTERS                        800  562-1285

WALTER BAUMY                                                    1/9/2008

Page 174

1       maybe not identical to the plats that
2       are attached to the Design Memos 1-A
3       and 1-B.
4   EXAMINATION BY MR. BRUNO:
5       Q.   And finally, on this document,
6   Mr. Baumy, if you'd go to Page 519, this is
7   again the channel protection.  You'll see that
8   no channel protection is recommended?
9       A.   Yes.
10      Q.   Okay.  And once again, we have that
11  same sentence, erosion due to wave wash in open
12  areas can be expected in the upper part of the
13  channel slope where the peat and high organic
14  clays are exposed.  Right?
15      A.   Yes.
16      Q.   So your answers to the questions I
17  posed with regard to 1-A would be the same as
18  here?
19      A.   Yes.
20      Q.   Because there's no change in the
21  words, right?
22      A.   Yes.
23      Q.   Okay.  Good.
24          All right.  I'm going to show you -- I
25  guess the best way to describe it is as a memo.

Page 175

1   It is appended to General Design Memorandum
2   Number 2, Supplement Number 4, Foreshore
3   Protection.  Okay?  And it is dated 21 March
4   1966.  And then it says LMNED.  (Tendering.)
5   All right.  I'm at the top of the page,
6   Mr. Baumy, where it says LMED --
7       A.   Okay.
8       Q.   -- dash PP?
9       A.   Yes.
10      Q.   All right.  LM is the lower
11  Mississippi, right?
12      A.   Yes.
13      Q.   And then N is the New Orleans office.
14      A.   Correct.
15      Q.   And then E is --
16      A.   Engineering division.
17      Q.   - PP?  If you know.
18      A.   Those were, um -- project engineers or
19  project manager types at that time.
20      Q.   Okay.  But it would be the engineering
21  division.
22      A.   At that time, yes.
23      Q.   Okay.  And there's -- if you would,
24  take a moment to just read the document.  I
25  just have a few questions.

Page 176

1       A.   Okay.
2           MR. SMITH:
3               I'm just trying to see what the
4   reference to is.
5   EXAMINATION BY MR. BRUNO:
6       Q.   Okay?  You with me?
7           All right.  First, Mr. Baumy, do you
8   happen to know what he's referencing here when
9   he says at Paragraph 2, the decision of the
10  Chief of Engineers in the first IND?
11      A.   First endorsement.  That would be a
12  previous letter on the same subjects.
13      Q.   Okay.  And the chief of the engineers,
14  that's the head guy in Washington.
15      A.   It appears that way, yes.
16      Q.   Okay.  Well, is that title used by
17  anybody else other than the --
18      A.   No.
19      Q.   Okay.  All right.  And you can see
20  that this discusses this business of whether to
21  characterize the cost of foreshore protection
22  as either hurricane protection or MRGO, right?
23      A.   Correct.
24      Q.   Okay.  And I just wanted to see if I
25  could understand, through your eyes, what he is

Page 177

1   saying in Paragraph 5.  This principle is in no
2   wise comparable to that of taking action to
3   correct an unforeseen condition which has been
4   brought on by the functioning of a project.
5           I didn't understand that sentence.
6       A.   I don't understand it either.  I would
7   have to look at the whole set of correspondence
8   and see what the real issue is here.
9       Q.   All right.
10      A.   I mean, by itself, I don't understand
11  it.
12      Q.   Well, I'm wondering if you would agree
13  with me that bank erosion on the MRGO is not
14  unforeseen.
15      A.   It was referenced in the previous
16  documents that we looked at as a possibility.
17      Q.   Right.  And because it's -- because it
18  was foreseeable, and then certainly it's
19  something that should have been addressed by
20  that project budget as opposed to some other
21  project budget, right?
22      A.   I don't know that.
23      Q.   Okay.  Who makes that call?
24      A.   Apparently, this set of correspondence
25  made the call in this case and I don't know

WALTER BAUMY                                                    1/9/2008

Page 178

1    what it says.
2        Q.  I don't mean -- I mean, what level of
3    hierarchy makes that call, is what I meant, in
4    your organization?
5        A.  If it happened today, I would have my
6    office of counsel working with the project
7    managers and us to define what needs to be done
8    and where is the proper place for it to be
9    funded.
10       Q.  Okay.  Let me ask you, I think, one
11   more question about this.
12       A.  Okay.
13       Q.  I says, the application of the cost
14   shifting principle violates the cardinal
15   principle of incremental justification and
16   could be utilized to bring an unfavorable
17   benefit/cost ratio to above unity by having a
18   completed project bear part of the costs.
19           Okay?  Now, rather than ask you what
20   the whole sentence means, let me see if I can
21   get some help from you about some of these
22   phrases.
23           First of all, the cost shifting
24   principle, does that -- is that phrase used
25   today?

Page 179

1        A.  That's the first time I have ever seen
2    it.
3        Q.  Okay.  So do you have any idea what
4    he's talking about?
5        A.  No.  No.
6        Q.  Okay.  Second thing is, he says there
7    is the cardinal principle of incremental
8    justification.
9            Is the phrase incremental
10   justification used in your office today?
11       A.  Not by me, no --
12       Q.  Okay.
13       A.  -- or the folks in my office.
14       Q.  All right.  Have you heard that
15   utilized in this office?
16       A.  No.  No.
17       Q.  Okay.  So you don't know -- we don't
18   know what he's meaning there.
19       A.  No.
20       Q.  Okay.  Fine.  And then he says -- he
21   talks about the above unity.  Unity.  Is
22   that -- does that, unity, have any -- is that a
23   word that has some peculiar meaning to this
24   district office?
25       A.  Yeah, 1.0 is what -- the benefit cost

Page 180

1    ratio above 1.
2        Q.  Oh.  Explain that to us, please.  So
3    unity means something?
4        A.  That's the way I take it reading
5    this -- what's here.
6        Q.  All right.  And so a cost/benefit
7    ratio above 1 is when you compare the cost to
8    the benefit the benefit is larger than 1?  Or
9    .1?
10       A.  It's a benefit/cost ratio, so the
11   benefit is higher than 1.
12       Q.  Higher than 1.
13       A.  Versus the cost that it, um --
14       Q.  Now, is 1 meaning -- higher than 1
15   means -- 1 to 1 is equal, so 1.1 is higher than
16   1?
17       A.  Yes.
18       Q.  All right.  Thank you.
19           And then it says, such action would
20   bring up many awkward funding problems,
21   particularly where fully completed projects are
22   involved.
23           Any idea what he's trying to convey
24   there?
25       A.  I have a limited understanding of

Page 181

1    that, but -- and there may be a better
2    understanding, but it would appear that if you
3    had a completed project then it seems to be one
4    of those hypotheticals.  If you had a completed
5    project and another project was there and you
6    tried to come back to that completed project
7    for increased requirements, then how do you
8    fund that if the project is already completed?
9    I mean, that's what it appears to be.
10       Q.  Right.  That's sort of alludes to the
11   question I asked you before, which is, that if
12   you had the problem of going back to ask for
13   more money for capital improvement to the
14   project, as opposed to a maintenance item, then
15   I think he's recognizing here that that's
16   somewhat more difficult.  Isn't that what he's
17   really saying?
18       A.  I don't know.
19       Q.  Okay.  Well, what do you mean by --
20   maybe I misinterpreted what you just said.  I
21   thought that's what you were saying, that once
22   it's completed, you know you got a maintenance
23   budget, that's there, but don't have a capital
24   budget, you got to go back and get that
25   approved.  Isn't that accurate?

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

WALTER BAUMY                                                    1/9/2008

Page 182

1     A.  A completed project could be turned
2  over to local interests for maintenance and we
3  wouldn't have any maintenance funds or
4  responsibility.  So I think there's several
5  different directions you can run here.
6     Q.  Well, the point, though, is the same,
7  that whether you have a maintenance budget or
8  not, you know you don't have a capital budget.
9  Once the project is finished, you spent all the
10  money the government gave you to spend.  Am I
11  wrong about that?
12     A.  I don't know.  Projects are authorized
13  and they're funded to a certain level.
14     Q.  Right.  And so when you spend the
15  money, it's gone.  Or am I missing something
16  here?
17     A.  Those are long-term projects.  I mean,
18  there are, um -- operations and maintenance
19  extended for many years on these projects.
20     Q.  I'm not talking about operations and
21  maintenance.  I said, once you've finished the
22  project, the money is over, when it comes to --
23  I mean, if you've been allocated an amount of
24  money to build it, you build it, then you get
25  no more money.  I mean, what am I missing here?

Page 183

1     A.  Okay.
2     Q.  Is that true?
3     A.  It sounds like it, from the way you've
4  presented it, yes.
5     Q.  Okay.
6     A.  I mean, in that scenario I'd say yes.
7     Q.  All right.  The Lake Pontchartrain and
8  Vicinity Hurricane Protection Act of '65
9  authorized the Corps to build some hurricane
10  protection structures, right?
11     A.  I don't know.  I mean I haven't read
12  it is what I should say.
13     Q.  Do you know whether or not this
14  district office was authorized to build
15  hurricane protection structures, yes or no?
16     A.  Yes.
17     Q.  And do you know whether or not the
18  engineering division would have had a role in
19  designing those hurricane protection
20  structures?
21     A.  Yes.
22     Q.  You would agree with me that the
23  authorizing legislation required the Corps to
24  build hurricane protection to a standard
25  project hurricane.

Page 184

1     A.  Yes.
2     Q.  Okay.  Now, would your division, the
3  engineering division, have been responsible for
4  determining what the standard project hurricane
5  was, to which the hurricane protection should
6  have been designed?  Or is that some other
7  division or department or branch or whatever?
8     A.  That was worked with other agencies
9  with -- the Corps ultimately put that in the
10  document as the design storm, but they worked
11  with other agencies to do that.
12     Q.  Okay.  All right.  Now, work with
13  other agencies versus relying on other agencies
14  is two different things, would you agree?
15     A.  Yeah.
16     Q.  All right.  So what I'm trying to
17  figure out is, did you have a role in it or
18  not?  Or did you get it from the weather
19  service?
20     A.  I know the weather service provided a
21  storm.  I'm not sure how the interaction
22  occurred at that time.
23     Q.  Okay.  Well, the IPET says that the
24  weather service provided the storm.
25     A.  Okay.

Page 185

1     Q.  And the IPET report seems to suggest
2  that the period of time on which the weather
3  service relied was 1900 to 1956.
4        Do you know that to be true or false?
5     A.  I don't know it to be either.
6     Q.  Okay.  Now, standard project hurricane
7  provides information as to a projected surge
8  height in a standard project hurricane, right?
9     A.  Could you repeat that?
10     Q.  The standard project hurricane
11  provides a projected still water height against
12  which you designed your hurricane protection.
13     A.  I believe the standard project
14  hurricane that is utilized to determine the
15  surge heights that are then used to design the
16  protective structures to.
17     Q.  Okay.  Now, the model, the standard
18  project hurricane, is simply a matter of
19  looking back in time and evaluating hurricanes
20  that occurred in the past to determine what is
21  the highest amount of water, in surge, still
22  water level, now, that we might be able -- that
23  we might forecast we would get in the future,
24  right?
25     A.  I'm not sure that's actually the way

WALTER BAUMY                                                    1/9/2008

---

Page 186

1    it works. I'm not an expert in that area, but,
2    um -- you work with the parameters of the
3    standard project hurricane to develop the surge
4    heights, based upon the characteristics as
5    described in the standard project hurricane.
6        Q. Well, for example, do you know whether
7    or not the path of the hurricane is relevant to
8    the determination of standard project
9    hurricane?
10       A. No, I don't.
11       Q. Okay. Is there anybody in the
12   district office that I could go to to ask that
13   question?
14       A. There were a couple of people, but
15   they're no longer with us, so I don't know.
16       Q. Okay. Who were those folks?
17       A. Harley Winer and Jay Combe.
18       Q. What were their titles?
19       A. Hydraulic engineers.
20       Q. Okay. All right. The truth of it is,
21   hurricane protection, before Katrina, was
22   designed to deal with a certain height of water
23   expected to be generated by a future hurricane.
24       Is that true?
25       A. Yeah.

---

Page 187

1        Q. Okay. And that's why -- you know,
2    we've heard this before, but that's why the
3    Corps didn't design any armoring or protection
4    for the back side of the I-walls, the T-walls
5    or the earth berm levees, right?
6        A. Yes.
7        Q. Okay. The part that I'm missing,
8    Mr. Baumy, is how -- I mean, I know that the
9    surge we get, from a review of past
10   hurricanes -- how do you figure the wave
11   component on top of the still water height? Do
12   you know?
13       A. It's specified in various, um --
14   design documents and guidance. I don't know
15   the mechanics of doing it, but I know it's,
16   um -- it's -- there's a specified procedure for
17   doing so.
18       Q. Do you know if the calculation of wave
19   run-up is a component of the determination of
20   the standard project hurricane, or is it an
21   add-on?
22       A. I don't know.
23       Q. Okay. And that's hydrology again?
24       A. Yep.
25       Q. Okay. Do you know what was different

---

Page 188

1    about Katrina, if anything, as opposed to
2    hurricanes that came through this area between
3    1900 and 1956?
4        A. Not the full range, no.
5        Q. Okay.
6        A. I don't -- I'm not familiar with all
7    the hurricanes in that earlier period.
8        Q. All right. Well, is there anything
9    that you know of that -- about Katrina that
10   made it peculiar, let's use that word first, as
11   opposed to hurricanes that may have passed
12   through here from 1900 to 1956?
13       A. I would suspect the size of it.
14       Q. Okay. And to be fair for the record,
15   size meaning it's breadth. I mean, just the
16   number of miles under this thing, the diameter,
17   if you will.
18       A. That, and also the power of it as it
19   approached the Louisiana coast.
20       Q. Okay. Utilizing the Saffir-Simpson
21   scale.
22       A. Just utilizing the parameters of the
23   storm itself.
24       Q. Well, isn't that what the
25   Saffir-Simpson scale does?

---

Page 189

1        A. Um -- I'm not sure it takes in all
2    those parameters together. It takes some of
3    the parameters, but not all of them.
4        Q. I understand. Would you agree that --
5    and if you can follow with me if you'd like.
6    I'm reading from Page 2 of Volume 1 of the IPET
7    report. (Tendering.) I guess it would be I-2.
8    That's going to be little I, keep going.
9        A. Okay.
10       Q. All right. Do you see where it says
11   the performance?
12       A. Yeah.
13       Q. Okay. If you would go to the second
14   page where it says, ironically, the structures
15   that ultimately breached performed as
16   designed -- you see that phrase?
17       A. Yes.
18       Q. Would you agree that the hurricane
19   protection structures designed and built by the
20   United States Army Corps of Engineers along the
21   MRGO -- okay?
22       A. Uh-huh.
23       Q. You with me-- as far as those whatever
24   length that is, performed as designed?
25       A. Yes.

---

48 (Pages 186 to 189)

WALTER BAUMY                                                    1/9/2008

Page 190

1    Q.  Now, do you know, Mr. Baumy, whether
2  or not the surge -- and let me just represent,
3  I think it's Figure Number 14, if you would
4  look at that, that will help you and me with
5  this question -- Figure 14 and Figure 15.
6    A.  Okay.
7    Q.  You with me there?
8    A.  Yes.
9    Q.  And you can also, if you like, look at
10 Page 9.  By the way, have you seen this before?
11   A.  I've seen it.  I've skimmed through
12 it.
13   Q.  All right.  I'm just wondering if you
14 know whether or not the weather conditions,
15 let's just be general, the weather conditions
16 to which the hurricane protection structure
17 alongside the MRGO -- okay? -- was subjected to
18 the same weather conditions as the hurricane
19 protection structure built from Verret all the
20 way to --
21   A.  Caernarvon.
22   Q.  -- Caernarvon.
23   A.  Overall scheme of thing, general
24 weather conditions, yes.  Actual wave
25 direction, height and surge elevations?

Page 191

1  Probably not.
2    Q.  Okay.  All right.  So you think that
3  there are different surge and waves along the
4  let's call it the Verret/Caernarvon levee as
5  opposed to the MRGO levee.
6    A.  That's what I would suspect, but I
7  would have to look through here to see how they
8  categorized it.
9    Q.  All right.  And of course we also know
10 that the Verret/Caernarvon levee didn't really
11 breach.
12   A.  Correct.
13   Q.  Do you know why?
14   A.  No.
15   Q.  Okay.  Do you know --
16   A.  I'm sorry.  What page are we on now?
17   Q.  Not on a page yet.  But generally
18 speaking, did the Corps undertake any
19 evaluation to assess whether or not the digging
20 of the channel, the MRGO channel, would have
21 any impact on the rate of settlement of the
22 MRGO hurricane protection structures?
23   A.  I don't know that.
24   Q.  Okay.  Is that something that your
25 division could do?

Page 192

1    A.  Degree of settlement?
2    Q.  Yeah.  In other words, the speed.  By
3  degree, I mean over time.  So in fairness to
4  the question, the question would be this:
5  Mr. Baumy, can you tell me whether or not the
6  MRGO contributed to the speed with which the
7  MRGO lifts settled over time?
8    A.  I would go to my geologists and
9  geotechnical engineers.  I wouldn't expect that
10 to happen, but they would probably have a more
11 informed opinion.
12   Q.  Okay.  Why wouldn't you expect that to
13 happen?
14   A.  Because the weight of the levee is
15 sufficiently away from the channel that the
16 loads imposed are, um -- not necessarily in the
17 same area.
18   Q.  Do you know -- and this may be a
19 question better left to the hydrology, I'll
20 tell you in advance, but do you know whether or
21 not wave period is affected by depth?  Water
22 depth.
23   A.  I would be speculating.
24   Q.  Good.  So I should ask the wave
25 questions to the hydrologists.

Page 193

1    A.  Yep.
2      MR. BRUNO:
3        Robin, your guess is as good as
4      mine on this.
5  EXAMINATION BY MR. BRUNO:
6    Q.  But anyway, best I can do is give you
7  the document and describe it.  There is a Bates
8  number on it from CACI, C-A-C-I, but I can't
9  read it.  I'm looking at a document entitled,
10 first of all, it says L-M-V-R-E:  So that's
11 lower Mississippi, Vicksburg, right?  You can
12 keep that.  I mean, you can't keep it keep it
13 but you can look at.
14   A.  Yeah.  I would think that's from our
15 division office in Vicksburg.
16   Q.  R-E?
17   A.  I would assume that's real estate.
18   Q.  -A?
19   A.  Don't know.
20   Q.  Okay.  Fair enough.  If you would go
21 to the third page of the document, and I don't
22 know why it's stapled this way, I guess it came
23 to us this way, okay?  So I can't vouch for why
24 these things are together.
25      Having said that, if you look at the

WALTER BAUMY                                            1/9/2008

Page 194

1  document dated 19 February 87, it's the third
2  letter from the top --
3      A.  Okay.
4      Q.  You with me?
5      A.  Uh-huh.
6      Q.  All right.  L-M-N.  So here we're in
7  the New Orleans District, right?
8      A.  If it's an N.  I can't, um -- Oh,
9  you're at the top of the page?
10     Q.  Top left, yeah.  - 20, I think.  I'm
11 guessing there.
12     A.  Your guess is as good as mine.
13     Q.  Okay.  But if you look at the
14 signature, it says, Cletis R. Wagenaar, chief
15 of the planning division, and that would be
16 consistent with Lower Mississippi, New Orleans
17 PD, which is the planning division.
18     A.  Yes.
19     Q.  Fair enough?
20     A.  Yes.
21     Q.  All right.  It says, initiation of the
22 Mississippi River Gulf Outlet bank erosion
23 reconnaissance study.
24     A.  Okay.
25     Q.  All right?  And if you look at the

Page 195

1  third -- second paragraph, it says, the subject
2  study was initiated in December, 1986, and is
3  scheduled for completion, December, '87.  All
4  right?
5      Do you know anything about this study?
6  A.  Just that it was done.
7  Q.  All right.
8  MR. BRUNO:
9      And Robin, if I may, we haven't
10 been able to find the initial one.  We
11 do have '88, we do have '94.  May I
12 ask that -- it's entitled The
13 Mississippi River Gulf Outlet:  A
14 Study of Bank Stabilization, December,
15 '84 be produced, if you don't mind?
16 MR. SMITH:
17     If we have a copy.  If we have a
18 copy, it probably has been produced,
19 I'd venture to say, but I can't
20 promise.  We'll look.
21 MR. BRUNO:
22     I understand.  And we gave it our
23 best shot to find it.  Okay?
24 MR. SMITH:
25     We'll look.

Page 196

1  EXAMINATION BY MR. BRUNO:
2      Q.  Okay.  Now, first thing I note, it
3  says, the planning division is initiating this
4  study.  Can you explain why it would be the
5  planning division?
6      A.  Because it's a reconnaissance study.
7      Q.  Okay.  All right.  Well, that's --
8  this really corroborates what you've told me in
9  the past, that if it's got the word
10 reconnaissance on it, then it really does
11 relate to the initial thinking about whether or
12 not someone wants to do some kind of a project.
13     A.  Uh-huh.  Yes.
14     Q.  Right?  And doesn't that imply that
15 it's not -- it's no longer a maintenance issue,
16 somebody's thinking in the back of their head,
17 we need to go back and get some more funding,
18 um -- because you need funding for a project.
19     A.  That's what it would appear.
20     Q.  Am I making -- is that reasonable?
21     A.  Yeah.  I would think so.
22     Q.  Okay.  All right.  Well, since we
23 don't have the '84, let me just jump to the
24 '88.  Do these things, these things, these
25 reconnaissance studies -- I just sort of got

Page 197

1  the impression from you this morning that this
2  was something that you did kind of relatively
3  quickly just to kind of see if there was a
4  reason to go forward.  So I'm just wondering,
5  is this something that takes years and years
6  and years to do, and milli and millions of
7  dollars, or could it take ten years to do and
8  lots of money, as opposed to a brief, limited
9  inquiry with a limited budget?
10     A.  Generally, you would have a limited
11 budget in a recon phase.
12     Q.  Okay.
13     A.  And you could have starts and stops in
14 any of our studies due to funds available in a
15 particular fiscal year.
16     Q.  All right.  I'm going to show you the
17 '88, and really the first thing I want us to do
18 is see if we can't agree that -- forgive me,
19 I'm trying to find Page 1.  Okay.  I could be
20 wrong, I'm just hoping that this is Page 1.
21 (Tendering.)
22     Okay.  You with me?
23     A.  Yes.
24     Q.  Can you tell me from your, and again,
25 brief opportunity to review -- well, have you

WALTER BAUMY                                                          1/9/2008

Page 198

1  seen this before?  Let me ask you that.
2      A.  I believe I've seen it before.  But it
3  was quite some ago.
4      Q.  Are you able to tell me what it's
5  about?
6      A.  I can tell you what it says it's
7  about.  And that's the, um -- present the
8  findings of a recon study of bank erosion and
9  erosion-related problems in the vicinity of the
10 Mississippi River Gulf Outlet with apparently
11 some specific reach in mind.
12     Q.  Okay.  Now, you'll remember that you
13 told us that a recon study is usually sort of
14 one of those kind of test the water, if you
15 will, for a project.  So the first thing that
16 strikes me is that there doesn't seem to be a
17 project involved here.  Or is there?
18     A.  It says, in the vicinity of the gulf
19 outlet.  I'd have to look at the --
20     Q.  Right.
21     A.  It says Mississippi River Gulf Outlet
22 at the top of the page.
23     Q.  Well, that's already there.  I was
24 given to understand that the recon study was to
25 sort of test the water about a new project.

Page 199

1      A.  And that would have been a generality.
2  This seems like a more specific case.
3      Q.  Okay.  Of what?
4      A.  Exactly what it says, is that a recon
5  study of the bank erosion problems, and it
6  talks about the gulf outlet.
7      Q.  Okay.  Do I take it then that this
8  particular recon study is not a study to
9  determine whether or not a particular project
10 should be pursued but, rather, it is a study of
11 the erosion issues that the Corps has come to
12 realize are associated with the MRGO?
13     A.  It appears to be specifically related
14 to erosion issues along the channel.
15     Q.  Okay.  All right.  So what -- is there
16 some way that a person like myself could
17 understand what the purpose of this report is?
18     A.  I think if you digested the entire
19 report you would come away clearly with what
20 the purpose is.
21     Q.  Well, I mean, having read it and
22 digested it, it seems to me that it states the
23 obvious, that the MRGO is causing erosion, but,
24 you know, I'm just a layman.
25     Does it say anything more than that?

Page 200

1  Do you know?  That the MRGO is causing erosion?
2      A.  It appears to be a -- looking for a
3  solution to erosion that's occurring along the
4  MRGO.
5      Q.  All right, sir.
6      A.  And presenting the alternatives and, I
7  would suspect, identifying a path forward.
8      Q.  All right.  So where might I look for
9  these proposed solutions to the problem?
10     A.  Further back in the document, I would
11 suspect.
12     Q.  Okay.  All right.  Would you look at
13 Page 30?  Is that the right place to look?
14     A.  Let me -- yeah.  It appears that way.
15     Q.  All right.  One of the alternatives
16 discussed is closure.
17     A.  And it's on Page 30?  Where is that
18 at?
19     Q.  I'm sorry.  I misspoke.  It doesn't
20 discuss closure --
21     A.  Okay.
22     Q.  -- on Page 30, right?
23     Now, what I see -- what are the
24 alternatives that are discussed on Page 30?
25     A.  First they talking about management

Page 201

1  measures, and without reading this it looks
2  like they're discussing non structural
3  measures, and then structural measures.  So
4  they're looking at both of those from some sort
5  of management, and apparently that's along the
6  waterway.  Then they're looking at alternative
7  plans, and the first plan being looked at on
8  Page 30 is a no action plan where you just let
9  the, um -- development take place over time.
10 So what's going to occur in the long run here.
11     Q.  Okay.
12     A.  So that's the first alternative there.
13     And then the second alternative is
14 some sort of structural bank protection.  And
15 maybe they're looking at a variety of options
16 here, I don't know.  There's quite a few pages
17 here.
18     Q.  All right.  Would you agree with me
19 that by 1984 the Corps recognized that -- I'm
20 sorry, by 1988 the Corps recognized that the
21 erosion was causing increased salinity in the
22 surrounding marshes and in the waterways?
23     A.  I don't know that.
24     Q.  Okay.  Now --
25     (Off the record.)

                                         51 (Pages 198 to 201)

WALTER BAUMY                                                    1/9/2008

Page 202

1   EXAMINATION BY MR. BRUNO:
2       Q.  All right.  Mr. Baumy, the document
3   that you are looking at was presented to us
4   with those papers in the front.  Okay?
5       A.  Okay.
6       Q.  It's got this nice pretty cover sheet,
7   Reconnaissance Report.  And I'd like to see if
8   I can understand what these pieces of paper
9   are.  And I have them here.  And I have a
10  duplicate.
11      A.  Do you want this back?
12      Q.  Yeah.  I'll give you the whole stack.
13  (Tendering.)
14      A.  Okay.
15      Q.  Let's look at the first -- first of
16  all, is it customary within your organization
17  to have this nice front cover piece and then
18  have a bunch of memos and such, and then get to
19  the first page of the actual report?  Is that
20  common?
21      A.  Yes, it is.
22      Q.  Can you explain generally, you know,
23  what the purpose of that is?
24      A.  Okay.  That is a record of the reviews
25  that had taken place, usually between the

Page 203

1   district and the division.  And sometimes
2   you'll have the district, the division and the
3   headquarters for different types of projects.
4   And this would be the original, then the
5   various endorsements that would resolve the
6   comments that the other officers may have had
7   on the project and how they were resolved.  It
8   should lay a record of that.
9       Q.  I understand.  Now, for this
10  particular project that we have already agreed
11  emanates from the planning division, what would
12  be the normal course of review; in other words,
13  who's first, who's second, who's third and who
14  blesses?
15      A.  It would come normally from the
16  district to the division office.  And we would
17  have to reach concurrence with the division on
18  comments.  And I don't know if they would have
19  sent this one to the headquarters office or
20  not.
21      Q.  Okay.  All right.  In terms of what
22  pieces of paper go first, second or third, is
23  that important?  In other words, as we walk
24  through this, the first thing I see is
25  November 30th, 1988, which seems to be the most

Page 204

1   recent document in the stack.
2       A.  Apparently it's a memorandum of a
3   conference that they had on that date.
4       Q.  Okay.  All right.  And it says, as you
5   say, the purpose of the design conference was
6   to discuss comments that were made on the
7   reconnaissance report for the subject project.
8   The responses to these comments are to be
9   incorporated into the GDM supplement.
10          But what does that mean, the GDM
11  supplement?
12      A.  That would be a general design
13  memorandum.
14      Q.  Okay.  All right.  Now, we're at the
15  reconnaissance stage, so the next thing that
16  would happen to this is that it should go to
17  the feasibility phase, right?
18      A.  I don't know that based upon what I'm
19  seeing right here.  Sometimes you will go from
20  a reconnaissance phase straight into plans and
21  specifications on a particular project.  It
22  just depends upon the type of project or the
23  scope of it.
24      Q.  Okay.  Looking at Comment 8 C, they're
25  talking about slower ship speed as maybe one of

Page 205

1   the ways to resolve the problems?  Is that what
2   I'm seeing?
3       A.  Where are you?
4       Q.  I'm on the second -- the very next
5   page, F.  Comment 8 C.
6       A.  Okay.
7       Q.  Do I take it that the Corps has some
8   influence on ship speed?
9       A.  I don't know if the Corps has
10  influence, but apparently they were identifying
11  the benefits of reducing -- or the improvements
12  that they could see by reducing ship speed.
13      Q.  Okay.
14      A.  I would think the Coast Guard would
15  have to address that.
16      Q.  All right.  If you look at B where it
17  says comment 1B, as stated earlier, the erosion
18  right along Lake Borgne is about 15 feet a
19  year?
20      A.  Okay.
21      Q.  Would you agree with me that's a
22  pretty aggressive erosion rate?
23      A.  Yeah.
24      Q.  Okay.  So I can assume then that this
25  document is the final comment on the comments.

JOHNS PENDLETON COURT REPORTERS                         800 562-1285

WALTER BAUMY                                                          1/9/2008

Page 206

1    Am I right?
2        A.  I don't know that, from what's in
3    here.
4        Q.   Okay.  What should I look --
5        A.   I'm looking for some official
6    endorsements, and I'm having difficulty with,
7    um -- there are some LMVD comments back here on
8    the reconnaissance report.  And then here's the
9    design conference.
10       Q.   Wait.  You're going a little too fast
11   for me.
12       A.   Okay.
13       Q.   Did you skip past this -- let's see
14   if -- did we identify it?  The first thing we
15   had been talking about November 30th, '88, was
16   this memorandum of this design conference.
17       A.   Yes.
18       Q.   All right.  We finished that.  Now,
19   the next thing I see is it looks like a sign-in
20   sheet.
21       A.   Correct.
22       Q.   And that's the folks who showed up at
23   the design conference.
24       A.   Yes.
25       Q.   Okay.  That's fine.  Let's go to next

Page 207

1    thing.  Next thing I see is an agenda, which
2    obviously relates to the design conference.
3    Right?
4        A.   Yep.
5        Q.   And then we see the LMVD comments.
6    And that's Vicksburg.
7        A.   But usually those comments would come
8    in the form of a memorandum as we were looking
9    at only some of the others that would have
10   first endorsements or something, but I don't
11   see that here.
12       Q.   Okay.  All we see is --
13       A.   An apparent list of comments.
14       Q.   Just a list.  Okay.  And I note it
15   says, at Paragraph 2, the alternative to
16   completely close the MRGO waterway should be
17   evaluated and a discussion of the evaluation
18   should be included in the report.
19           You see that?
20       A.   Yes.
21       Q.   Okay.  Do you see that it's lined out?
22   Not on yours, but on mine it is.  That's part
23   of the problem with multiple copies.  Take a
24   look at mine.  It's line out and it says,
25   Chatry says no?

Page 208

1        A.   Right.
2        Q.   And then I see a line -- what appears
3    to be a line through the sentence.
4        A.   All right.
5        Q.   Okay.  Do you have any knowledge about
6    Mr. Chatry 's opinion about closing the MRGO?
7        A.   No, I do not.
8        Q.   Okay.  For the record, he's a
9    predecessor of yours, is he not?
10       A.   Yes, he was.
11       Q.   Okay.  And he was the chief of the
12   engineering division at the time that this
13   reconnaissance report was done.
14       A.   That's correct.
15       Q.   Now, it says here, this alternative
16   will control all future channel maintenance
17   problems by controlling bank erosion,
18   preventing the associated biological --
19       A.   Excuse me, where are you?
20       Q.   I'm in the same place.
21           MR. SMITH:
22              Page?
23   EXAMINATION BY MR. BRUNO:
24       Q.   Same page.  Page 30, alternate plan.
25       A.   Uh-huh.

Page 209

1        Q.   And it's the next sentence.  This
2    alternative will control all future channel
3    maintenance problems by controlling bank
4    erosion, preventing the associated -- can you
5    not find it?
6        A.   Okay, I see it.  It's not highlighted.
7        Q.   Did you speak to Chatry about this
8    issue?
9        A.   No, I did not.
10       Q.   All right.  Where was I?  This
11   alternative will control all future channel
12   maintenance problems by controlling bank
13   erosion, preventing the associated biological
14   resources problems, preventing saltwater
15   intrusion and lessening the recreational
16   losses.
17           Can I assume by this comment that the
18   author thought those were all problems?
19           MR. SMITH:
20              Objection.  Calls for
21           speculation.  He's asking you what
22           Mr. Bruno can conclude.  Do you know
23           what Mr. Bruno can conclude from this?
24           MR. LAMBERT:
25              Mr. Bruno?

JOHNS PENDLETON COURT REPORTERS                          800 562-1285

WALTER BAUMY                                                1/9/2008

---

Page 210

1    EXAMINATION BY MR. BRUNO:
2        Q.  How about a judge?
3            MR. SMITH:
4                He asked whether he could
5            conclude.
6    EXAMINATION BY MR. BRUNO:
7        Q.  Yeah.  I asked that question.  Can I
8    reasonably conclude from this sentence that the
9    author is describing what he or she perceives
10   to be problems with the MRGO?  That's exactly
11   the question.
12       A.  I think what it's saying, when I read
13   the first part combined with that, is saying we
14   want to you do an evaluation of this
15   alternative.  And they're throwing out some
16   specific information that they want to offer
17   there.
18       Q.  Right.  This -- that's your
19   interpretation despite the language that says
20   this will control, right?
21       A.  Yes.  They're still asking for an
22   evaluation of the alternative.
23       Q.  Not a problem.  It goes on to say, in
24   addition to solving the aforementioned
25   problems, is it still your testimony that the

---

Page 211

1    author is not suggesting that these are
2    problems?
3        A.  Again, he may be suggesting that, but
4    he's saying to the district, evaluate it.
5        Q.  All right.  Well, again, despite the
6    language that says it will also reduce the
7    possibility of catastrophic damage to urban
8    areas by a hurricane surge coming up this
9    waterway and also greatly reduce the need to
10   operate (and could possibly eliminate) the
11   control structures at Bayous Dupre and
12   Bienvenue, right?
13       A.  That's what it reads.
14       Q.  Okay.  Well, I know it reads that, but
15   I'm asking you if it's reasonable to conclude
16   that the author believes that this closure will
17   reduce the possibility of catastrophic damage
18   to urban areas.  Okay?  That's what I'm asking
19   you.
20       A.  It appears that way.
21       Q.  All right.  Do you know who wrote this
22   paper?
23       A.  No, I don't.
24       Q.  Do you know who at Vicksburg, by
25   title, not by name, would have had the

---

Page 212

1    responsibility of evaluating the reconnaissance
2    report and giving his or her comments?
3        A.  It would have been a broad evaluation
4    where you would have counterparts to the folks
5    at the district office.  So if you had a
6    planning division, an engineering division, a
7    real estate, operations and so forth, you would
8    have the same group of people complementary
9    reviewing the document up there.
10       Q.  Okay.
11       A.  And, um --
12       Q.  All right.
13       A.  Okay.
14       Q.  At Paragraph 3, there's a suggestion
15   that -- there is recommend the economic
16   justification of continued maintenance of the
17   existing project be demonstrated.
18           Does that mean that the cost of
19   maintenance should be compared against the
20   value to the shipping industry who uses this
21   channel for navigation purposes?
22       A.  That's what it appears to say.
23       Q.  All right.  Do you know whether or not
24   the district, New Orleans District, ever
25   conducted such an evaluation?

---

Page 213

1        A.  I don't know.
2        Q.  Okay.  Which division would be
3    responsible for conducting such an evaluation,
4    if one had been requested?
5        A.  It would have been a multiple division
6    approach.
7        Q.  It would have included engineering?
8        A.  Yes.
9        Q.  With regard to Paragraph 2, I
10   neglected to ask you this question:  The study
11   that's recommended there, would that have
12   included the participation of the engineering
13   division?
14       A.  This report?
15       Q.  Yes, sir.
16       A.  Yes.
17       Q.  All right.  And then finally, Table
18   13.  Is that a part of Vicksburg comments, do
19   you think, or is that just -- it says Enclosure
20   2 at the bottom.
21       A.  Is it talking about a table?
22       Q.  Yes.  The table 13.
23       A.  Is that right behind it?
24       Q.  Yes, it was right behind it.  And I
25   don't have what you're looking at.

---

JOHNS PENDLETON COURT REPORTERS                        800 562-1285

WALTER BAUMY                                                                    1/9/2008

<table>
<tr><td colspan="2">

Page 214

1    A. I don't see that.
2    Q. Okay. All right. We have two
3  different versions. All right. Let's see.
4  Let's just take a look at '94. Now-- you want
5  to -- you're welcome to continue looking. I
6  went to show you '94, because we're trying to
7  kind of get through this.
8       All right. Now, we have this second
9  report, this is '94, it's entitled, again,
10 Reconnaissance Report. There's a syllabus, and
11 I guess what strikes me first is that there
12 doesn't seem to be this comment, um -- you
13 know, the series of papers reflecting a
14 comment, but then it goes into the syllabus
15 then.
16    A. Uh-huh.
17    Q. Can we agree that the cover sheet is
18 identical to the cover sheet for '88?
19    MR. SMITH:
20       Well, with the exception of the
21    dates, you mean?
22    MR. BRUNO:
23       Yes. Thank you.
24    A. It appears to be the same subject.
25    MR. BRUNO:

</td></tr>
</table>

Page 216

1  preliminary analysis indicate the construction
2  of bank stabilization measures along the MRGO
3  may be warranted based upon an evaluation of
4  project costs and both monetary and
5  non-monetary benefits, continuation into the
6  feasibility phase is advisable.
7       Now, does this assist you in sort of
8  figuring out whether or not the reconnaissance
9  phase, by this document, has been completed?
10    A. Um -- it's -- this is certainly a,
11 um -- a report that was produced. Whether it's
12 the final report or not, I can't tell without
13 the appropriate correspondence to go with it.
14    Q. What would I look for to know that
15 this is the final document? What should I
16 be --
17    A. I would look for the correspondence
18 that would have the -- just as you had in the
19 previous one, the district forwarding it to the
20 division and then a closeout from the division,
21 saying approved. It's approved.
22    Q. All right. So approval comes from the
23 division.
24    A. Yeah.
25    Q. It doesn't have to go to Washington.

Page 215

1       Thank you, Robin. Yes.
2  EXAMINATION BY MR. BRUNO:
3    Q. And I ask the question because the
4  very next page of the '94 one goes into a
5  letterhead with the Department of the Army, it
6  has January, 1994, and then it has reply to the
7  attention of CELMN.
8       What is that?
9    A. New Orleans District.
10    Q. C-E?
11    A. C-E? I don't recognize that symbol.
12 Let me see.
13    Q. (Tendering.)
14    A. C-E-L-M-N-P-D, right?
15    Q. -FJ.
16    A. So that would be planning division,
17 most likely.
18    Q. Okay. So that's New Orleans?
19    A. Yes.
20    Q. Okay. First sentence under the
21 syllabus says, this report presents the results
22 of continued reconnaissance phase investigation
23 of bank erosion and erosion-related problems in
24 the vicinity of the Mississippi River Gulf
25 Outlet channel. The results of this

Page 217

1    A. I don't --
2    Q. Or does it?
3    A. I don't know. I don't believe so, but
4  I don't know.
5    Q. Well, to go to the feasibility phase,
6  do you need Washington's approval, or can you
7  get -- can you get division approval to go to
8  the feasibility phase?
9    A. I believe they go to Washington.
10    Q. Okay. All right. The feasibility
11 phase, is it also characterized by a report
12 like this?
13    A. Yes.
14    Q. And does it say feasibility report?
15    A. It should, yes.
16    Q. Okay. Do you know whether or not
17 there was a feasibility report on bank erosion
18 in connection with the MRGO?
19    A. No, I don't.
20    Q. Who should I ask?
21    A. I would ask, um -- probably the
22 project manager.
23    Q. Who's the project manager of this, for
24 lack of a better word, inquiry?
25    A. I don't know. We have an operations

JOHNS PENDLETON COURT REPORTERS                                    800 562-1285

Page 218

1  manager --
2      Q.  We know that's Russo.
3      A.  -- today.  And then you have a project
4  manager for the broader LCA project, and
5  whether they provided oversight for any of this
6  I don't know.
7      Q.  You said LCA.  What does that refer
8  to?
9      A.  Louisiana Coastal Authority.  That was
10 an earlier environmental.  And it probably had
11 some different names as you go back in time and
12 probably different people.  So I don't know who
13 it would have been back here.
14     Q.  All right.  Well, I have -- we've been
15 using this organizational chart which shows
16 Col. Wagenaar as the commander?
17     A.  But that's -- this predates
18 Col Wagenaar.
19     Q.  Oh, it does?
20     A.  Yes.
21     Q.  Okay.
22         MR. BRUNO:
23             Robin, let me just ask you,
24         because I haven't seen any feasibility
25         phase, if you could advise --

Page 219

1         MR. SMITH:
2             Okay.  I don't think this ever
3         made it to the feasibility phase,
4         but --
5         MR. BRUNO:
6             Well, I'll take that.  That's why
7         when I look I don't see.
8         MR. SMITH:
9             I don't think it made it that
10        far, but we'll see.  I think it was
11        funding issues, I believe -- is my
12        understanding as to why it never made
13        it to feasibility.  I think it
14        required a local sponsor.
15 EXAMINATION BY MR. BRUNO:
16     Q.  Let me, before it gets too late, ask
17 you about the TERC.  I mean the T-E-R-C.
18         You know what I'm talking about?
19     A.  I believe I do, yes.
20     Q.  Did you have anything to do with the
21 Task Order 26?
22     A.  May have.  I don't recall exactly with
23 the TERC itself.
24     Q.  All right.  Now, we have in the past
25 talked to you and others about the process by

Page 220

1  which, and now we've got, frankly, further
2  information, reconnaissance, feasibility,
3  authorization, planning, drawing up of
4  specifications.
5      A.  Uh-huh.
6      Q.  Okay?  Now, as I understand it, in
7  connection with Task Order Number 26, the
8  United States Army Corps of Engineers did not
9  draft plans and specifications for the use of
10 the contractor to do the environmental
11 remediation on the water side of the Inner
12 Harbor Navigation Canal between the what we now
13 know to be the north and south breaks of the
14 east side hurricane protection structure.
15 Okay?
16     A.  Okay.
17     Q.  Are you with me?
18     A.  Yes.
19     Q.  All right.  Now, is that a true
20 statement?
21     A.  I don't remember that.  I don't know.
22     Q.  Okay.  Does the Corps, in the way it
23 does business, distinguish between those
24 projects where it draws the plans and
25 specifications as opposed to contracting with

Page 221

1  someone to perform general work for it?
2      A.  There's different mechanisms for
3  getting work done, and I'm not, um -- I guess
4  very, very knowledgeable on the TERC process,
5  but if we're going out for advertisement for
6  bid, obviously we'll produce a set of plans and
7  specifications.  If you're going out for a
8  contractor design and then execute, you would
9  maybe have knowledge or limited contract
10 documents.  And I don't know what was done in
11 that particular case.
12     Q.  All right.  Will, do you know, very
13 generally, what the scope of the work was in
14 connection with the TERC, particularly Task
15 Order 26?
16     A.  I don't -- I know generally the scope
17 of the work, but I'm not -- I don't remember it
18 by Task Order 26.
19     Q.  Okay.
20     A.  I can't make that connection.
21     Q.  I see.  I see.  Well, let me just for
22 the record ask you to accept that 26 refers to
23 this area.
24     A.  Okay.
25     Q.  Recognizing that you can you always

WALTER BAUMY                                                    1/9/2008

Page 222

1    object, or Robin will object at a later date.
2    I'm just going to use 26 for these questions.
3        A.   Uh-huh.
4        Q.   But do you at least know that the work
5    that the Corps contracted to do at that
6    location was the removal of wharves, piling,
7    other debris, et cetera?
8        A.   In general terms, yes.
9        Q.   In other words, what I'm driving at
10   is, Mr. Baumy, it wasn't building something, it
11   was removing something.
12       A.   Yes.  I understand that.
13       Q.   Okay.  And is that the kind of a thing
14   that the Corps would develop plans and
15   specifications for?
16       A.   Um -- again, I don't remember.  I,
17   um --
18       Q.   And this is a general question, not a
19   specific one:  Just generally, when the Corps
20   wants something removed, you know, does the
21   Corps generally draft plans and specifications?
22   I mean, demolition projects and the like.
23       A.   A task order is a contract document.
24   So the Corps may have information or
25   requirements contained in that task order that

Page 223

1    would be reflective of a set of plans and
2    specifications.  That, in essence, would lay
3    the scope of the contract and contractual
4    requirements that would supplement the bigger
5    TERC contract, if you just put that into, um --
6    into those types terms.
7        Q.   Well, I guess I'm not being -- when I
8    think of plans and specifications I think of a
9    drawing that would show you the building, or
10   the thing that you're building, specifications
11   would indicate to you the kind of materials to
12   use, how big, how wide, how thick, the types of
13   materials, et cetera.
14            Do you see any distinction at all
15   between building something and tearing out
16   something in terms of the need for plans and
17   specifications?  Or are they the same?
18       A.   It's a different contract mechanism.
19       Q.   Exactly.
20       A.   If someone -- if you're executing a
21   contract to remove something, then I would
22   expect that, um -- you would have whatever data
23   is available in some form of contract document
24   or reference so the contractor knows what he's
25   going to be removing.

Page 224

1        Q.   Sure.  Right.  But there's a whole lot
2    of difference between the degree to which
3    you're controlling the work product as between
4    a contract to build something versus contract
5    to remove something, wouldn't you agree?
6        A.   Not necessarily.
7        Q.   If I ask you to go take the debris off
8    the site of my backyard, are you suggesting to
9    me that's exactly the same as asking you to
10   build me a house?
11       A.   If it's got a levee next to it, yes.
12       Q.   Well, who said anything about a levee?
13       MR. SMITH:
14            Who says this has anything to do
15       with this case?
16       MR. BRUNO:
17            Robin, just give me a fair answer
18       to a fair question.  It has a lot to
19       do with this case, and you well know
20       where I'm going with this.
21       MR. SMITH:
22            Your house?  Just ask your
23       questions about this case and not
24       about your house.
25       MR. BRUNO:

Page 225

1            I'm asking about this case.
2            Okay?  The witness is telling me --
3    EXAMINATION BY MR. BRUNO:
4        Q.   And that's fine.  If that's your
5    testimony, just tell the judge.  You're going
6    to tell the judge --
7        MR. SMITH:
8            That's his testimony, Joe.
9    EXAMINATION BY MR. BRUNO:
10       Q.   That's fine.  I just want to make sure
11   that's your testimony.  You're going to tell
12   the judge from the witness stand after you
13   swear the oath that plans and specifications
14   that would be utilized to build a house would
15   exhibit the same degree of control over the
16   work as a request for somebody to remove debris
17   from a site.  And the answer is yes.  You think
18   those two are exactly the same, right?
19       MR. SMITH:
20            Objection.  It's argumentative.
21       MR. BRUNO:
22            I just want to know what he says.
23   EXAMINATION BY MR. BRUNO:
24       Q.   Are they the same?
25       A.   I said yes in the proximity of

WALTER BAUMY                                                    1/9/2008

---

Page 226

1   something that's important to me. Yes.
2       Q.  All right.  Well, what do you mean --
3   I didn't put in my question anything proximate
4   to anything.
5       A.  Okay.
6       Q.  I put into the question what I put.
7   You're adding the floodwall, not me.  I didn't
8   ask you about floodwall.  I didn't ask you
9   about hurricane protection.  I asked you very
10  generally about contracts.
11      Do you understand that?
12      MR. SMITH:
13          Joe, you've asked him this
14      question.  You've got his answer.  If
15      you don't --
16      MR. BRUNO:
17          I don't have an answer.
18      MR. SMITH:
19          You do have an answer, and if you
20      don't agree with it, that's different.
21      MR. BRUNO:
22          Robin, I don't have an answer
23      because I didn't ask about hurricane
24      protection, I didn't ask about the
25      proximity to anything.

---

Page 227

1       MR. SMITH:
2           You asked about building a house.
3       Move on and ask something that's
4       relevant to this case.
5       MR. BRUNO:
6           I'm going to get as answer to
7       this question.
8       MR. SMITH:
9           You've gotten an answer to this
10      question.
11      MR. BRUNO:
12          I have no answer.  I don't intend
13      to ask about the proximity to
14      anything.  That wasn't in the
15      question.  The witness supplied that
16      himself.  That's not fair.  That's not
17      playing the game.  Okay?
18      MR. SMITH:
19          You ask a relevant question and
20      you'll get an answer.
21      MR. BRUNO:
22          This is an extremely relevant
23      question, as you well know.
24      EXAMINATION BY MR. BRUNO:
25      Q.  Now, without regard to the proximity

---

Page 228

1   of the house to anything, and without regard to
2   the pile of trash to anything, I simply want
3   for you to confirm for this record that in your
4   opinion you believe that a contract which
5   includes very precise plans and specifications
6   for the building of something exhibits the same
7   degree of control over the work as a contract
8   to remove a big pile of debris off of a piece
9   of land.
10      MR. SMITH:
11          Objection.  Asked and answered.
12      EXAMINATION BY MR. BRUNO:
13      Q.  All right.  Now if I can get my answer
14  we'll move on.
15      MR. SMITH:
16          We're going to answer it one more
17      time and then we're going to move on
18      or we'll call the judge.
19      MR. BRUNO:
20          I'm happy to call the judge.  If
21      I get the a reference to something
22      else, then we'll call the judge.
23      Because I didn't ask that.
24      EXAMINATION BY MR. BRUNO:
25      Q.  Now what's your answer?

---

Page 229

1       A.  So if you have a house in the middle
2   of nowhere and you're building and hauling
3   material, I'd say yeah, there's a significant
4   difference.
5       EXAMINATION BY MR. BRUNO:
6       Q.  Thank you.  And your government thanks
7   you.  Will one day.
8           Do you know whether or not this
9   district has, since now we're talking -- I will
10  now ask you the question that you thought I was
11  asking.  You are building in the vicinity of a
12  hurricane protection structure.  Okay?  Now,
13  does this district office have a set of written
14  guidelines that will assist me in knowing
15  whether or not I have to take any precautions
16  if I choose to build or dig or do anything
17  around a hurricane protection structure?
18      A.  Yeah.  There are permit requirements.
19      Q.  All right.  What are the permit
20  requirements, and who issues the permit?
21      A.  I don't have those in front of me.  I,
22  um -- engineering division would issue
23  technical requirements related to the permit,
24  but there's other parts that go with it.
25      Q.  All right.  But what kind of permit do

---

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

WALTER BAUMY                                                    1/9/2008

Page 230

1    I ask for?  Is it a digging permit?  Is it a
2    building next to a hurricane protection
3    structure permit?  What is it called?
4        A.  It's called a permit.
5        Q.  It's called a permit.
6        A.  You come in with a permit to build --
7    take some action in the vicinity of a project.
8    That's what a contractor or individual would
9    do.
10       Q.  All right.  So your testimony is that
11   anytime anybody builds in the vicinity of a
12   Corps project they need to get a permit.
13       A.  Yes.
14       Q.  All right.  Now how do I know how
15   close I can go without getting a permit?
16       A.  That would be published somewhere,
17   through the Corps and through the levee
18   districts.  The levee districts also
19   participate in the permit process.
20       Q.  All right. we're not talking about the
21   levee districts, we're talking about the Corps.
22   You told me Corps has published guidelines.  I
23   want to see the Corps' published guidelines.
24   So where do I go to understand --
25       A.  Permits.

Page 231

1        Q.  Permits office?
2        A.  Yeah.
3        Q.  All right.  Where on the chart is the
4    permits office?
5        A.  Operations division.
6        Q.  Operations division.  Now how do I
7    know which division?
8        A.  I just said it.
9        Q.  Well, there's a technical support
10   branch, there's a readiness branch, there's a
11   physical support branch, there's a regulatory
12   branch, a management support branch, and then
13   it goes into various op managers, including the
14   Mississippi River Baton Rouge to Gulf.
15       A.  Regulatory.
16       Q.  I go to them.  Okay.  Now, is there a
17   written set of guidelines that I can pick up
18   and read to help me understand this process?
19       A.  I have not looked at them lately, but
20   there should be, yes.
21       Q.  All right.
22       A.  I would expect there are.
23       Q.  Does the Corps have a written set of
24   guidelines that would discuss rules,
25   regulations, advisories, about digging or

Page 232

1    excavating around a flood control project?
2        A.  I don't know what's written that's in
3    the public sector.
4        Q.  Okay.  All right.  Let me show you
5    this.  (Tendering.)  I will represent to you
6    that this is a print from a website.  Okay?
7        A.  Okay.
8        Q.  From the Kansas City District office
9    of the United States Army Corps of Engineers.
10   And you will see at least at Page 3 of the
11   document, it says in black and white, guidance
12   for work proposed near or within a federally
13   constructed flood control project.
14       Fair enough?
15       A.  Yes.
16       Q.  It says that.  All right.  Now, would
17   you agree with me that if such a document
18   exists in this district that it would have been
19   prepared by the engineering division, or at
20   least with the input from the engineering
21   division?
22       A.  It certainly would have had the input.
23       Q.  Okay.  All right.  Have you ever seen
24   a document like this in the New Orleans
25   District office?

Page 233

1        A.  Not a comprehensive document like
2    this, no.
3        Q.  Well, would you at least agree with me
4    that this document gives some guidance about
5    how close you can get to a federal flood
6    control project?  It says here, this
7    information has been compiled to provide
8    general guidance regarding engineering,
9    operation and maintenance aspects of
10   construction within the critical area of flood
11   control projects constructed by the Corps of
12   Engineers.
13       You see that?
14       A.  Yeah.
15       Q.  Okay.  So this does give some
16   information about what you should do or should
17   not do depending upon how close you are to a
18   federal flood control project, right?
19       A.  It appears to.
20       Q.  Okay.  Fair enough.
21       Now, do you know if there's a permit
22   required to do work outside of 300 feet on the
23   water side of a flood control project?
24       A.  Okay.  What was the question again?
25       Q.  If you take a look at the top, you see

                                    59 (Pages 230 to 233)

WALTER BAUMY                                                    1/9/2008

Page 234

1  where it says --
2    A.  I'm reading the text.
3    Q.  Yeah, the text says, the critical area
4  is, and then it says 300 water side, 500 land
5  side.
6    A.  And what is your question?
7    Q.  My question is, do you know if you
8  need a permit to do work?
9    A.  No, I don't.  I'd have to review the
10  requirements.
11       MR. SMITH:
12          You're talking about in this
13       district or --
14       MR. BRUNO:
15          Yes.
16       MR. SMITH:
17          -- in Kansas City?
18       MR. BRUNO:
19          No.  This district.
20    A.  I'd have to review the requirements.
21  EXAMINATION BY MR. BRUNO:
22    Q.  Okay.  Now, as an engineer, Mr. Baumy,
23  for this district, knowing what you know about
24  the flood control projects in this district,
25  and knowing what you know about the geology of

Page 235

1  the soils and the subsurface, et cetera, et
2  cetera, et cetera -- okay?  Do you agree that
3  the critical area is 300 feet riverward and
4  500 feet landward?
5    A.  I'd have to look at that in detail.
6    Q.  Where would you go to look?
7    A.  I would go to my geotechnical section
8  and look at criteria that we're using right now
9  as permits come in.
10    Q.  Do you have to do an analysis every
11  time a permit comes in?
12    A.  Sure, you do.
13    Q.  You do?
14    A.  Yeah.
15    Q.  So in other words, the 300 feet may be
16  400 feet for a particular project, or 600 feet?
17    A.  It would be whatever our requirements
18  are, and that may mean we want to see work
19  within those confines and do an engineering
20  evaluation as to the potential effects it may
21  have on the flood protection works.
22    Q.  Okay.  Would you agree with me that
23  whatever that distance ultimately is determined
24  to be dependent upon a particular project --
25  okay?

Page 236

1    A.  Uh-huh.
2    Q.  -- that an engineering evaluation
3  needs to be done with regard to proposed
4  excavation?
5    A.  Yeah.
6    Q.  Okay.  Do you know if your department
7  did any engineering evaluation of any
8  excavations done by the Washington Group
9  International on the water side of the Lower
10  Nine flood control project between where we now
11  know the breaks occurred?
12    A.  I would have to look at the record,
13  but I, um -- I would expect that we did.
14    Q.  All right.
15       MR. BRUNO:
16          Robin, may I call for the
17       production of any such tests or
18       evaluations or, I guess the best
19       word --
20  EXAMINATION BY MR. BRUNO:
21    Q.  Tell me the best way to describe that
22  stuff so Robin and I will know what we're
23  talking about.  Is it an evaluation, is it a
24  permit request?  What --
25    A.  It would be a -- probably a submittal

Page 237

1  by the contractor on any proposed excavation.
2  Or there would be some guidance given to the
3  contractor that would, um -- not require him to
4  submit an excavation plan if he met certain
5  parameters.
6    Q.  Okay.  Let me see if I'm hearing you
7  right.  So that at the end of the evaluation
8  process, what the contractor would get back
9  from you is an excavation plan?
10    A.  No.
11    Q.  Oh.  All right.  What would he get?
12    A.  You could -- generally, for projects,
13  you could do it one or two ways:  You could
14  give parameters and say, okay, if you're
15  outside of these parameters then we don't have
16  a problem with it.  If you're within these
17  parameters, then we need to review your plan
18  and we will approve it or in some way signify
19  that it's okay --
20    Q.  All right.
21    A.  -- from our view.  We have no problems
22  with it, essentially; not that it's okay, but
23  we don't have any objections to it.
24    Q.  Now, Mr. Baumy, in fairness to you,
25  Mr. Colletti -- do you know who he is?

WALTER BAUMY                                                    1/9/2008

Page 238

1    A.  Yes.
2    Q.  All right.  He testified that in this
3  district, on the water side, it's 300 feet.
4       Do you have any reason to believe that
5  he's wrong?
6    A.  No.
7    Q.  Okay.  And he said that on the land
8  side -- and by the way, 300 feet from center
9  line.  I should have -- in fairness to you, I
10  should have told you that.  And then on the
11  land side, 500 feet from center line.
12       Would you have any reason to say to us
13  that that -- if he said that, that it is
14  incorrect?
15    A.  No, I wouldn't.
16    Q.  All right, sir.  Did you think the
17  300 feet is arbitrary?
18    A.  No.
19    Q.  Okay.  And would you agree that if a
20  contractor dug a hole 20 feet down within
21  30 feet of the center line of a hurricane
22  protection structure then there should be some
23  kind of engineering evaluation?
24    A.  Yes.
25    Q.  All right.  Now, who in your division

Page 239

1  would be responsible for doing the evaluation?
2  By that -- I didn't mean the person.  I should
3  have said which of your branches would be
4  responsible for the evaluation?
5    A.  There were two branches that would
6  have been responsible at that time, and one of
7  them is no longer in the organization.  And the
8  general engineering branch would have worked
9  the, um -- package with construction for the
10  TERC contract.  The geotechnical branch would
11  have worked with the general engineering branch
12  to either provide appropriate guidance or do
13  detailed reviews when submittals came in.
14    Q.  Okay.  Our understanding is that the
15  work was done between 1999 and 2005.  Okay?
16    A.  Okay.
17    Q.  Would you kindly tell me, if you know
18  or can remember, who was chief of the
19  geotechnical branch in '99?
20    A.  Bill Caver.
21    Q.  And would that have been true up to
22  2005, or were there other folks who took his
23  place?
24    A.  I don't remember exactly.  There was a
25  change in leadership of that branch somewhere

Page 240

1  around that time period.
2    Q.  That time period being what, '99,
3  2000?
4    A.  2005.
5    Q.  Oh.
6    A.  Around the 2005 time period.
7    Q.  No, I think that was my end date.
8    A.  Right.
9    Q.  In other words, this gentleman was
10  there up until 2005?  Or close?
11    A.  Close.
12    Q.  Close is good.
13    A.  Yeah.
14    Q.  I think the work ended in like June.
15    A.  He retired somewhere between 2004 and
16  2005.  I don't remember exactly when.
17    Q.  Okay.  All right.  Well, that's fine.
18       I have to say I'm still a little
19  confused about when -- how on earth would a
20  third party know that they need a permit to
21  work around the hurricane protection structure?
22  How would I figure that out?
23    A.  You didn't like my answer last time,
24  but the levee boards are involved with this,
25  with the permits.  We coordinate permit reviews

Page 241

1  with the levee boards.  And they are actually
2  out there.  So, um -- I'm not sure what they
3  put out.  I don't look at their website.  And
4  the Corps has a regulatory branch that would
5  put information out, and I have not looked at
6  that recently.
7    Q.  Well, it's not that I didn't like your
8  answer, it's that it's inconsistent with what I
9  heard all last week, which is that there are no
10  permits required to work, by the Corps, around
11  hurricane protection structures; rather, that
12  it is in fact the levee board that issue the
13  permit.  So, you know, but you're telling me
14  that there is some kind of a permit that the
15  Corps issues.
16    A.  You asked me an individual.  You
17  didn't ask me about the Corps.
18    Q.  All right.  Well, does the Corps issue
19  permits for work proposed near or around
20  federally constructed flood control projects?
21    A.  Not my lane, but I don't believe so.
22    Q.  Okay.  It's the levee boards; right?
23    A.  Uh-huh.  Yes.
24    Q.  All right.  So to kind of get the
25  cases, you know, Mr. Colletti said there are no

WALTER BAUMY                                                    1/9/2008

Page 242

```
1   written guidelines for work proposed near or
2   within federally constructed flood control
3   projects, that these Kansas City ones were the
4   first time he had seen written guidelines.
5        Do you have any reason to say that
6   that's inaccurate?
7        A.  But that doesn't mean there are not
8   guidelines used within particular offices for
9   reviewing permits as they come in.
10       Q.  Well, except that wasn't the question.
11  The question was written guidelines.  Just like
12  this.  (Indicating.)
13       A.  They're not going to be just like
14  that.
15       Q.  Okay.  All right.  Do you know what
16  the sheet pile depths is of the sheet pile at
17  the Lower Nine hurricane protection structure
18  between where we now know the breaks occurred?
19       A.  No, I don't.
20       MR. SMITH:
21            Wait.  What time period are we
22       talking about?
23       MR. BRUNO:
24            Pre-Katrina.  I'm not asking any
25       questions post-Katrina.
```

Page 243

```
1        A.  I'd have to look at the plans.
2   EXAMINATION BY MR. BRUNO:
3        Q.  Do you have any knowledge of the E-99
4   sheet pile test in the Atchafalaya basin?
5        A.  Yes, I have some knowledge of it, but
6   not -- I hadn't looked at it in a long time.
7        Q.  What was your involvement, if any?
8        A.  I reviewed the report at one time.  I
9   remember that.  Um -- I can't remember too much
10  past that right now.
11       Q.  Well, in the usual course, as you've
12  indicated, there is an opportunity to comment
13  on documents, and here's a comment:  It's
14  C-E-L-M-V.
15            Is that Vicksburg?
16       A.  If there's no other letter behind it,
17  it's probably a district.  A division.
18       Q.  No.  There is.  It's CELMV-ED-TS.
19  (Tendering.)
20       A.  Let me see it.  That would be the
21  division office.
22       Q.  So it says, for the commander New
23  Orleans District, attention, CELMN-ED-DD.
24       A.  That would be structural design
25  section in design branch.
```

Page 244

```
1        Q.  All right.  So it's the -- it's
2   actually the division office that's telling the
3   district office to change the word performed
4   for the word failed in the memorandum as
5   described at Paragraph A, right?
6        A.  I hadn't seen it.
7        Q.  (Tendering.)
8        A.  That's what they said.
9        Q.  All right.  Now, this test was the
10  test that was used to justify using less sheet
11  pile in I-walls, isn't that true?
12       A.  I believe it resulted in that.
13       Q.  Right.
14       A.  Yes.
15       Q.  In other words, the idea was you could
16  drive the sheet pile into the earth to a, um --
17  less of a depth than you all previously thought
18  you had to.  Right?
19       A.  That would be the end result, yes.
20       Q.  All right.  The only problem was, when
21  you did that there was a deflection problem.
22  Wasn't there?  Actually, the pile would fall
23  over.
24       A.  I don't know that that's accurate.
25       Q.  Okay.  All right.  Well, do you know
```

Page 245

```
1   what failed refers to?
2        A.  No, I'd have to go through the text.
3        Q.  Okay.
4        A.  What year was that?
5        Q.  Here's the memo.  18 November 88.
6        A.  Okay.
7        Q.  Okay?  And it's Chatry.  It's subject,
8   I-wall deflection.  And here's the minutes
9   about which -- and you can check this out if
10  you like -- about which the comment is being
11  made, and it's Paragraph 5 where the word
12  failed appears, and there's a suggestion to
13  change the word failed to the word performed.
14       A.  Okay.  So what's the question?
15       Q.  I think the question was, didn't the
16  test indicate a failure as it relates to the
17  propensity of the pile to, um -- fall over?
18       A.  I really don't remember all the
19  details, but my recollection was the pile did
20  not fall over.
21       Q.  Well, not 100 percent, but just leaned
22  a whole lot.  Is that right?
23       A.  I don't recall that happening either.
24       Q.  Well, why did they use the word
25  failed?
```

62 (Pages 242 to 245)

WALTER BAUMY                                                    1/9/2008

Page 246

1     A.  I don't know.
2     Q.  Okay.  So my question actually
3   originally was what does the word failed refer
4   to there?
5     A.  Again, I would have to look at the
6   report, but, um -- I don't recall the sheet
7   piling failing in that test.
8     Q.  Okay.  Somebody thought so.
9     A.  Yeah.
10    Q.  Okay.
11    A.  Well, somebody used the word, at
12  least.
13    Q.  Well, yeah.  And however somebody used
14  the word.  Okay.
15    A.  And the -- I mean, the thing I recall
16  about that test was that there was difficulty
17  keeping the water against the wall and there
18  was some failures in that area of just the
19  water stops.  So I don't know what this is
20  really referring to.
21    Q.  Okay.  Do you know whether or not the
22  actual Atchafalaya E-99 test was videotaped or
23  not?
24    A.  No, I don't.
25    Q.  Okay.  Or audio -- or there was any

Page 247

1   kind of audio?
2     A.  I do not.
3     Q.  Would you expect any kind of a boom to
4   be associated with a deflection?
5     A.  A what?
6     Q.  A deflection of the sheet pile?
7     A.  Expect a what?
8     Q.  Any kind of a boom.  A sound.  A sound
9   to be emitted?
10    A.  No, I wouldn't.
11    Q.  By the way, what was your role?  Is
12  your name on here somewhere?  What was your
13  role on the E-99?
14    A.  I was a structural engineer at the
15  time.  I don't know if I really had a role in
16  the E-99 test.  I did a review at the district
17  of the findings and commented on that.
18  Participated in the meeting.
19    Q.  Do you recall your comments?
20    A.  Um -- no, I think a few of them are
21  written down, but I don't recall the -- much
22  detail about the meeting.  I'd have to go back
23  to the record.
24    Q.  Let me show you this document.  And
25  it's NED.  Is that your designation, NED?  Or

Page 248

1   is that -- that's the government?
2     Okay, this is a document which does
3   have a Bates number.  NED-149-000000005, 6 and
4   7.
5     All right.  Is that your signature on
6   the document?
7     A.  Yes.
8     Q.  Do you know what that is?
9     A.  Yes.
10    Q.  What is it?
11    A.  It's a quality control plan for review
12  of the project.
13    Q.  What project?
14    A.  The Inner Harbor Navigation Canal Lock
15  Replacement Project, showing a design
16  documentation report.
17    Q.  All right.
18    A.  For preparation and demolition.
19    Q.  Okay.  Now, is that the whole project,
20  or is it limited to preparation and demolition?
21    A.  It's limited to preparation and
22  demolition.
23    Q.  Okay.  All right.  And the quality
24  control plan was to accomplish what?
25    A.  Look at the, um -- the work of the AE

Page 249

1   contractor.
2     Q.  AE?
3     A.  Waldemar Nelson and Company in
4   association.  It says Hartman Engineering and
5   also Dames & Moore, so there were three
6   consultants involved with this work.
7     Q.  Okay.  I'm confused.  What's the work?
8     A.  Well, right here it says part of the
9   navigation canal lock replacement project,
10  design documentation report for site
11  preparation and demolition.  So that would have
12  been some work along the Inner Harbor
13  Navigation Canal.
14    Q.  Okay.  And the work was done by?
15    A.  The work was done by Waldemar Nelson,
16  Hartman Engineering and Dames & Moore.
17    Q.  Okay.  And what got me confused was
18  the quality control.  What is the -- I guess
19  what I was trying to figure out was, were you
20  evaluating quality control or was the document
21  itself a quality control?
22    A.  This is an independent technical team
23  to review the contractor's quality procedures.
24    Q.  All right.  So Waldemar and Nelson are
25  evaluating the contractors --

WALTER BAUMY                                                    1/9/2008

Page 250

1    A.  No, no, no.
2    Q.  Please help me.  I don't know who's
3  evaluating who and for what.
4    A.  This is a design report that's being
5  prepared by three contractors with a review
6  team of the government.  The names here are
7  government employees reviewing the work of this
8  other contractor.
9    Q.  Okay.  All right.  So the government
10  is reviewing something that Waldemar Nelson and
11  Dames & Moore have prepared.
12    A.  Yes.
13    Q.  Okay.  So the quality control plan is
14  what the Corps is doing, right?
15    A.  It's the overall execution of the
16  project.  It's the contractors doing certain
17  work and then the Corps is doing certain, um --
18  has a certain role.
19    Q.  All right.  You'll forgive me, because
20  on this thing I'm just not getting it.  I can
21  understand that the quality control -- there is
22  a quality control component in making certain
23  that the person that you've asked to do
24  something does it the way they're supposed to
25  do it.  Right?

Page 251

1    A.  And it varies for different projects,
2  and I'd have to look at that in more detail or
3  go back to the record, but, um -- a lot of
4  times when we hired contractors, we hired the
5  contractor to do the design, and we also hired
6  them to have an independent review of their
7  work.  And in that case, we'd only provide a
8  quality assurance review that the independent
9  check was done by a properly, um -- proper
10  team.
11    Q.  Okay.
12    A.  And it looked -- you know, we'd have
13  some interaction with them there.  In other
14  cases, we've had the contractor do work and
15  then we would have a technical support team
16  that would sort of take an independent look at
17  the contractor's work.
18    Q.  Do you know what the case was --
19    A.  No, I would have to go back and see.
20    Q.  You can't tell?
21    A.  I can't tell with just that there.
22    (Off the record.)
23  EXAMINATION BY MR. BRUNO:
24    Q.  All right.  Mr. Baumy, we have given
25  you during the break a copy of the TERC Order

Page 252

1  Number 26.
2    A.  Okay.
3    Q.  And it references work done by
4  Waldemar Nelson and Dames deems and --
5    A.  Dames & Moore.
6    Q.  Let me have it back and I can read it
7  to you.  For the record, it says that -- first
8  of all, for the record, this is WGI 1000001 in
9  seriatim to 000229.  It's the first thing WGI
10  produced.  It's entitled Order for Supplies And
11  Services.  Showing you Number 3 in the series.
12    Do you know what that is?
13    A.  I'm vaguely familiar with it, but I do
14  not remember much about it.
15    Q.  Well, I mean the form.  Let's just
16  talk about the form.  It's a government form,
17  isn't it?
18    A.  Yes, issued by the Tulsa District.
19    Q.  Tulsa District of --
20    A.  U.S. Army Corps of Engineers.
21    Q.  All right.  And when does the Corps
22  use this form?
23    A.  Apparently, it's a contracting issued
24  form, so looks like for issuing some sort of
25  delivery order to a particular contractor.  It

Page 253

1  says, requisition purchase request.
2    Q.  All right.  It says the contractor is
3  Morrison Knudsen Corporation, right?
4    A.  Yes.
5    Q.  And then it says, see scope of work.
6    Is this the kind of order that's used
7  when you have a contract and specifications?
8    A.  Generally not.
9    Q.  When is this form used?
10    A.  That was used with a TERC contract,
11  and I really don't have a lot of -- I hadn't
12  used the TERC contractor a lot, so I don't have
13  much memory of that back then.
14    Q.  Well, I know that.  But that really
15  wasn't the question.
16    A.  Okay.
17    Q.  When is this form used?
18    A.  Um -- again, it looks like a
19  contracting document, it's to procure some sort
20  of service.
21    Q.  Supplies or services.
22    A.  Yeah.
23    Q.  And it says, schedule of supplies and
24  services, and it just describes demolition and
25  site preparation for Inner Harbor Navigation

WALTER BAUMY                                                    1/9/2008

Page 254

1  Canal Lock Replacement Project, East Bank
2  Industrial Area, New Orleans, Louisiana, right?
3     A.  Uh-huh.
4     Q.  Let me ask you this:  If this was a
5  contract which called upon somebody to build
6  something that had as its purpose the building
7  of something that had plans and specifications,
8  what -- how would that be done?  What would the
9  contract look like?
10    A.  I don't understand the question.
11    Q.  Well, how would it be different from
12 this, if it had plans and specifications
13 attached?
14    A.  It could have specifications attached.
15 It could have work requirements.  It may not be
16 called specifications, but it could be very
17 similar.
18    Q.  Well, I'm talking about -- you've
19 already testified this is different from the
20 kind of piece of paper that would be used if
21 you had a contract for the building of
22 something, and consistent with plans and
23 specifications, so --
24    A.  Well, I may have misspoken because I
25 don't know that for a fact.  That is a

Page 255

1  contracting document issued to a contractor to
2  procure a service.  When they issue a
3  construction contract, whether they issue the
4  same form or not I really can't tell you.
5     Q.  Okay.  When you do a -- when you have
6  a contractor perform work consistent with a
7  contract plans and specifications, is there
8  usually a scope of work?
9     A.  Yes.
10    Q.  All right.  The scope of work is the
11 plans and specifications, though, isn't it?
12    A.  That's where the contract requirements
13 are defined.
14    Q.  Right.  Now, this contract says,
15 contractor shall furnish all services,
16 materials, supplies, labor, travel, as required
17 in connection with the coordination and
18 technical review of site documents for the
19 remediation and demolition of the east bank of
20 the Inner Harbor Navigation Canal, IHNC,
21 between Claiborne Avenue and Florida Avenue
22 from the IHNC east to the floodwall.
23 Interagency partners involved in this project
24 consist of the U.S. Army Corps of Engineers,
25 Tulsa District, U.S. Army Corps of Engineers

Page 256

1  New Orleans District and Morrison Knudsen
2  Corporation.
3        Now, what are site documents?
4     A.  Could be a variety of documents.  I
5  don't remember if this work document here
6  produced any of those site documents or did
7  research to get those site documents.  I would
8  assume, without again looking at that file in
9  great detail, that the site documents are
10 probably old plans and specifications or
11 available information of features that were out
12 in that area.
13    Q.  Okay.  And then there's a section
14 called government furnished information.
15    A.  Okay.
16    Q.  And that would be where I would look
17 for the plans and specifications, right?  That
18 would be the thing that would tell me what I
19 was building.  Right?
20    A.  Um -- again, you need to look at the
21 whole document.  There may be other
22 requirements besides reference documents.
23    Q.  Okay.  Well, would you agree with me
24 that if there are plans and specifications this
25 big stack of paper should refer to them?

Page 257

1     A.  Yeah.
2     Q.  Fair enough.
3     A.  Uh-huh.
4     Q.  Okay.  All right.  Now, under
5  government furnished documents, there's this
6  reference to Waldemar Nelson and this Dames &
7  Moore, and which is the purpose why I showed it
8  to you.
9     A.  Okay.
10    Q.  To see if you could connect this that
11 to that.  That other piece of paper.
12    A.  Uh-huh.
13    Q.  It says, and this is under the section
14 government furnished documents, 1999 final
15 submittal, demolition, design memorandum input,
16 demolition of buildings, foundations and
17 facilities along the Inner Harbor Navigation
18 Canal for the lock replacement submitted to the
19 USACE-NOD by Waldemar Nelson, Inc.
20        You think that's the document that's
21 referenced by your quality control?
22    A.  I would think so.
23    Q.  Okay.  All right.  Now, and then so
24 your evaluation -- your technical team
25 evaluation would be to make certain that this

65 (Pages 254 to 257)

WALTER BAUMY                                                    1/9/2008

Page 258

1    thing that Waldemar Nelson did complied with
2    your rules and regulations.
3        A.  Uh-huh.
4        Q.  Okay.
5            MR. SMITH:
6                That was a yes?
7            THE WITNESS:
8                Yes.
9    EXAMINATION BY MR. BRUNO:
10       Q.  That was a yes.
11           And likewise, above ground structures
12   report, environmental support to Inner Harbor
13   Navigation Canal New Lock and Connecting
14   Channels, Final Draft submitted to USACE-NOD by
15   Dames & Moore.  And then there's two more,
16   mixed waste mounds, environmental support to
17   Inner Harbor Navigation Canal New Lock and
18   Connecting Channels, Final Draft submitted to
19   USACE-NOD by Dames & Moore, and then finally
20   the above ground storage tanks report,
21   environmental support to Inner Harbor
22   Navigation Canal New Lock and Connecting
23   Channels Final Draft submitted to USACE-NOD by
24   Dames & Moore.
25           You think those are the Dames & Moore

Page 259

1    reports that are referenced by your quality
2    control evaluation?
3        A.  More than likely.
4        Q.  And again, you would have evaluated
5    them to make sure that those reports met your
6    quality control requirements.
7        A.  Yes.
8        Q.  Okay. Do you know the names of any of
9    the folks in your division who worked on the,
10   this TERC, Task Order 26?
11       A.  Gary Brouse and Rubin Mabry.
12       Q.  Brouse?
13       A.  Brouse.  I believe he was on it, if I
14   recall correctly.  But I don't recall seeing
15   his name on this sheet.  I thought he was
16   involved with it.  Rubin Mabry was definitely
17   involved with it.  George Bacuta, Gene Vossen,
18   Rick Broussard --
19           (Off the record.)
20       A.  Spadaro.
21   EXAMINATION BY MR. BRUNO:
22       Q.  Have we got all the names?
23       A.  No.
24       Q.  Okay.  I know where we stopped?
25       A.  Rick Broussard, Mark Gonski, David

Page 260

1    Elmore, Dave Wurtzel, and that may have been
2    others but those are at least documented on
3    this plan.
4        Q.  Okay.  All right.  Thank you.
5            Let me show you this document and see
6    if you can help us with that.
7            All right.  Do you know what this
8    document is?
9        A.  I know generally what it is, but not
10   the detail of it, no.
11       Q.  All right.  Would your office have had
12   anything to do with this?  It says it's
13   prepared by the foundation and materials branch
14   and the hydraulics and hydrologic branch of the
15   engineering division -- these guys are under
16   you.
17       A.  Today, yes.
18       Q.  All right.  And this was done in '93,
19   which is before your time.
20       A.  Yes.
21       Q.  All right.  So do you have any
22   knowledge of this document?
23       A.  I may have seen it, but I don't
24   remember at this point.
25       Q.  All right.  This is becoming my

Page 261

1    favorite question of all these depositions:
2    Chain-link fences on top of earth berms which
3    may or may not contain sheet pile I-walls.
4        A.  Okay.
5        Q.  Okay?  Can you think of any potential
6    deleterious impact to the integrity of the
7    earth berm by having a chain-link fence
8    embedded into the -- I guess it's the crown, or
9    near the crown, of the earth berm in an I-wall
10   scenario?
11       A.  I think that would be better answered
12   by a geotechnical expert.
13       Q.  All right.  Do you know whether or not
14   there were chain-link fences on the flood
15   control structure on the Lower Nine east bank
16   between where we now know the breaks
17   occurred --
18       A.  No, I don't recall.
19       Q.  All right.  I didn't finish -- during
20   the time that WGI did its work in connection
21   with the Task Order Number 26?
22       A.  I don't know for sure.
23       Q.  All right, sir.
24       A.  Or don't remember.
25       Q.  Do you know if there is any policy

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

WALTER BAUMY                                                    1/9/2008

Page 262

1   about having chain-link fences on flood
2   protection structures at all?
3       A.  On the structure?
4       Q.  Yeah.  The earth berm --
5       A.  Oh, on the levee.
6       Q.  On the levee.  Well, I'm using
7   I-walls, too, which might have an earth berm.
8   Right?
9       A.  Uh-huh.  I'd have to look at the
10  requirements.  I don't recall at this point.
11      Q.  All right.  Let me show you a document
12  which is marked NED-141-000000139.  Appears to
13  be signed by you, if not authored by you.
14      A.  Okay.
15      Q.  All right.  Tell us what that's about,
16  please.
17      A.  This was a test section done on the
18  bank of the IHNC where we hired a contractor to
19  go in and use soils cement technology, a
20  strengthening of the soils, and then loaded
21  those soils to see how it performed.
22      Q.  Was that Mr. McElwee?
23      A.  I don't know.  I don't recall that
24  name.
25      Q.  Do you know the name?

Page 263

1       A.  No.
2       Q.  Was this -- what's it called?  What's
3   the material?  Is that bentonite?
4       A.  I don't know what's in the material.
5   I know it's a cement-based application.
6       Q.  All right.  Is it also used to fill
7   holes, you know, that are -- for example, if
8   you pull a pile out next to a hurricane
9   protection structure, you fill it with
10  bentonite.  Have you ever heard if such a
11  thing?
12      A.  Um -- I've, in the flood walls we had
13  used a sand bentonite slurry mix.  So I've
14  heard of mixtures of material.  I can't tell
15  you if bentonite by itself has been used.
16      Q.  Well, so let's talk about the mixture.
17          You're familiar with the use of
18  bentonite with, apparently, some other
19  materials.
20      A.  Yes.
21      Q.  And what is the purpose of that --
22  what is the purpose of filling a hole with that
23  mixture of materials?
24      A.  You're filling a void.
25      Q.  And why is it -- well, is it important

Page 264

1   to fill a void?
2       A.  Yeah.
3       Q.  All right.  And why would you use this
4   bentonite and sand mixture, as opposed to --
5       A.  In which application?
6       Q.  In any application that you use it.
7       A.  If you're using it adjacent to sheet
8   pile, you're effectively sealing that area.
9   You're making sure that you don't have voids,
10  when you -- because you can't compact that
11  material with equipment with a high degree of
12  reliability.
13      Q.  All right.  So essentially you're
14  using it in order to cut of potential
15  underseepage problems, right?
16      A.  Not necessarily underseepage.  It
17  could be seepage from the ground surface.
18  Usually it's in a higher application.
19      Q.  Well, it's there -- you're doing it to
20  deal with seepage problems; how about that?
21      A.  That's part of it.  But that's not the
22  whole story.
23      Q.  Never said it was.
24      A.  All right.
25      Q.  But part of it is to deal with seepage

Page 265

1   problems, right?
2       A.  Part of it is to deal with water.  And
3   could be rainwater, could be seepage, could be
4   anything.
5       Q.  Right.  And when you have a hole in
6   the ground which allows one layer of material
7   to communicate with another layer of material
8   under the earth, there's a potential for
9   seepage there, as well, right?  I mean, water
10  can go up and down the strata.  If you put a
11  hole through it, whereas if there was no hole
12  perhaps that there may be a clay layer or
13  something to prevent the water from going up
14  and down, so you're blocking the ability of
15  water to move.  That's what I was referring to.
16      A.  I don't know that for a fact.
17      Q.  You don't know what for a fact?
18      A.  What -- your statement.
19      Q.  Well, are you telling me that it
20  wouldn't block the movement of water?
21          THE WITNESS:
22              Could you repeat the statement so
23  I can understand it?
24          (Whereupon the previous question was
25  read back.)

                                    67 (Pages 262 to 265)

WALTER BAUMY                                                    1/9/2008

Page 266

1       A.  Then I'd say yes.
2   EXAMINATION BY MR. BRUNO:
3       Q.  Okay.  Thank you.  Thank you so much.
4   I really appreciate that.  That's a nice way to
5   end the day, I got to tell you.  Let's take a
6   break, see if I'm finished.
7           (Off the record.)
8   EXAMINATION BY MR. BRUNO:
9       Q.  Okay.  Mr. Baumy, Ms. Arlene Smith, do
10  you know her?
11      A.  Eileen Smith?
12      Q.  Arlene.  A-R-L-E-N-E.
13      A.  I always called her by Eileen.  If
14  it's the same person, I don't know.
15      Q.  I know.  I had the same problem the
16  other day.  Let me just show you -- she's
17  contracting officer and she was the contracting
18  officer for this TERC Number 26.
19      A.  Okay.
20      Q.  Do you know whether or not she's an
21  engineer?
22      A.  Um -- no.
23      Q.  Meaning you don't know, or she's not
24  an engineer?
25      A.  I don't know.  I don't know.

Page 267

1       Q.  Is a contracting officer the person
2   that you would expect to do -- remember we
3   spoke a little bit ago about the evaluation of
4   excavations?
5       A.  Yes.
6       Q.  You remember that?
7       A.  Yes.
8       Q.  Is a contracting officer the person
9   that you would expect to do that, or should it
10  be somebody in engineering?
11      A.  To perform the technical review?
12      Q.  Yes.
13      A.  It would be engineering to perform a
14  technical review.
15      Q.  All right.  Lee Guillory.  Is
16  Mr. Guillory an engineer?
17      A.  Yes.
18      Q.  George Baruta?
19      A.  Bacuta.
20      Q.  Bacuta.
21      A.  He's a geologist.
22      Q.  Gary Brouse?
23      A.  Civil engineer.
24      Q.  And Rubin Mabry?
25      A.  Civil and environmental engineer.

Page 268

1       Q.  Okay.  I think one last question, that
2   is, when water, in an I-wall setting -- okay?
3   Where the water actually on a daily basis comes
4   in contact with the I-wall, there's no earth
5   berm, is that acceptable within the guidelines
6   of the United States Army Corps of Engineers
7   for I-walls at water locations?
8       A.  I don't know of any reason why it
9   would not be.  I don't know if the regulations
10  are silent or elaborate on that or not.  But
11  I'm not aware of any limitations.
12      Q.  Okay.  Guillory.  Does Guillory have a
13  specialty?
14      A.  He worked in our construction division
15  at that time.
16      Q.  Structural engineer?
17      A.  No, construction.
18      Q.  I'm sorry.  But is he a structural
19  engineer?
20      A.  I don't know.
21      Q.  You don't know.
22          In the I-wall setting adjacent to
23  water, in a flood control -- in other words,
24  the I-wall is a flood control structure, can
25  water travel down the sheet pile and go

Page 269

1   underneath?
2       A.  Water can travel, um -- a variety of
3   paths, under an I-wall or through it, actually.
4   Sheet pile is not impervious.  Water is going
5   to move.  I mean, you have groundwater movement
6   all the time.
7       Q.  All right.  Just to round out some
8   questions that I'm now remembering I didn't ask
9   you:  Southern boundary of New Orleans East at
10  the Intracoastal Waterway, the Citrus back
11  levee, the breach there, would you agree that
12  the hurricane protection structures at that
13  location performed as designed?
14      A.  I would have to look at the IPET
15  findings.  I don't recall exactly what was
16  said.
17      Q.  Well, I have them.  I think the way
18  that they did it was there's only four
19  locations where there's foundation failure.
20      A.  And that wasn't one of them.  I know
21  that.
22      Q.  All right.  But do you remember that
23  there was only four foundation failures.
24      A.  That's what IPET had, yes.
25      Q.  All right.  17th Street Canal is one

WALTER BAUMY                                                  1/9/2008

Page 270

1  of them, the two at London --
2      A.  Yes.
3      Q.  And then the one at north breach of
4  the east bank of the Industrial Canal.
5      A.  Correct.
6      Q.  Okay.  So that can we then deduce that
7  the Citrus back levee performed as designed?
8      A.  Yes.
9      Q.  And the hurricane protection structure
10 at the southern location of breaching also
11 performed as designed?
12     A.  Yes.
13     Q.  Now, do you know whether or not the
14 Corps ever investigated, in connection with the
15 north breach, where even the IPET suggests some
16 foundation issue, whether anybody investigated
17 the possible connection between that breach and
18 holes that were dug by the TERC contractor in
19 connection with the remediation of that area?
20     A.  I believe the IPET team looked at
21 that, but I don't know.
22     Q.  Well, I'm asking, did you guys look at
23 it?  Did you?  Did your engineering --
24     A.  My engineers looked at it.  They
25 provided the IPET team a variety of information

Page 271

1  in that area and also, um -- asked them to look
2  at things from a different perspective related
3  to that area.  So they provided information.  I
4  don't recall exactly what they provided, but
5  they did engage them.
6      Q.  All right.  I can find no reference
7  whatsoever by IPET, and candidly by anybody who
8  evaluated the potential connection between the
9  work by WGI and the failures.  I mean, you
10 remember that there was a specific reference to
11 that somewhere?
12     A.  I don't remember a specific to WGI,
13 but I remember a specific, um -- on the
14 northern breach of us supplying additional
15 information to the IPET team.  May have been
16 verbal, may have been hard copy.  I don't know.
17 But we did provide some interaction there.
18     Q.  No, understanding that, can you say
19 for certain that that additional information
20 related to the holes backfilled by WGI in
21 connection with the environmental remediation
22 project?
23     A.  I don't remember that specifically.
24     Q.  All right.  That's what I'm saying.
25 And really, as far as you know, nobody has

Page 272

1  really studied that.
2      A.  Um --
3      Q.  That is, the connection between
4  backfilled holes and foundation failure, north
5  breach, Industrial Canal, east side, Lower
6  Nine.
7      A.  I know there's been discussion on it.
8  But as far as a study, I don't know.
9      Q.  Okay.  Do you recall the discussions?
10 Were they -- they were when and with whom?
11     A.  It would have been, again, providing
12 the IPET additional information on soil
13 characteristics, observations from the people
14 who saw the area immediately after the
15 hurricane and for some time, just giving them
16 additional information.
17     Q.  Okay.  But any names that you can
18 recall?
19     A.  Rich Varuso would be one, yeah.
20         MR. SMITH:
21             Maybe you should depose
22         Mr. Varuso.
23         MR. BRUNO:
24             I think I did, and I think I
25         asked him that precise question,

Page 273

1          Mr. Smith.
2              That's all I've got.  Thank you
3          very much for your patience,
4          Mr. Baumy.
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

WALTER BAUMY                                                    1/9/2008

Page 274

1          WITNESS' CERTIFICATE
2
3          I, WALTER O. BAUMY, JR., do hereby
4   certify that the foregoing testimony was given
5   by me, and that the transcription of said
6   testimony, with corrections and/or changes, if
7   any, is true and correct as given by me on the
8   aforementioned date.
9
10  _____   _____
11  DATE SIGNED        WALTER O. BAUMY, JR.
12
13  _____ Signed with corrections as noted.
14
15  _____ Signed with no corrections noted.
16
17
18
19
20
21
22
23
24
25  DATE TAKEN:  April 9th, 2008

Page 275

1          REPORTER'S CERTIFICATE
2          I, JOSEPH A. FAIRBANKS, JR., CCR, RPR,
3   Certified Court Reporter in and for the State
4   of Louisiana, do hereby certify that the
5   aforementioned witness, after having been first
6   duly sworn by me to testify to the truth, did
7   testify as hereinabove set forth;
8          That said deposition was taken by me
9   in computer shorthand and thereafter
10  transcribed under my supervision, and is a true
11  and correct transcription to the best of my
12  ability and understanding.
13         I further certify that I am not of
14  counsel, nor related to counsel or the parties
15  hereto, and am in no way interested in the
16  result of said cause.
17
18
19
20
21
22
23  _____
24  JOSEPH A. FAIRBANKS, JR., CCR, RPR
25  CERTIFIED COURT REPORTER #75005