RICHARD JAMES VARUSO                                    April 1, 2008

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE: KATRINA CANAL BREACHES        CIVIL ACTION

CONSOLIDATED LITIGATION              NO. 05-4182 K2

                                     JUDGE DUVAL

PERTAINS TO                          MAG. WILKINSON

(Robinson, No. 06-2268)


          Deposition of RICHARD JAMES VARUSO,

given at the U.S. Army Corps of Engineers New

Orleans District offices, 7400 Leake Avenue,

New Orleans, Louisiana 70118-3651, on April

1st, 2008.


REPORTED BY:

          JOSEPH A. FAIRBANKS, JR., CCR, RPR

          CERTIFIED COURT REPORTER #75005

RICHARD JAMES VARUSO                                April 1, 2008

Page 2

```
1    APPEARANCES:
2    REPRESENTING THE PLAINTIFFS:
3
4         LAMBERT AND NELSON
5         (BY:  HUGH P. LAMBERT, ESQUIRE)
6         701 Magazine Street
7         New Orleans, Louisiana 70130
8         504-581-1750
9    - and -
10        BRUNO & BRUNO
11        (BY:  JOSEPH M. BRUNO, ESQUIRE)
12        (BY:  FLORIAN BUCHLER, ESQUIRE)
13        (BY:  SCOTT JOANEN, ESQUIRE)
14        855 Baronne Street
15        New Orleans, Louisiana 70113
16        504-525-1335
17   - and -
18        LAW OFFICE OF DANIEL E. BECNEL, JR.
19        (BY:  DARRYL BECNEL, ESQUIRE)
20        425 W. Airline Highway, Suite B
21        LaPlace, Louisiana 70068
22        985-651-6101
23   - AND -
24
25
```

Page 4

```
1    REPRESENTING THE U.S. ARMY CORPS OF ENGINEERS:
2         CORPS OF ENGINEERS, OFFICE OF COUNSEL
3         (BY:  RITA TROTTER, ESQUIRE)
4         7400 Leake Avenue
5         New Orleans, Louisiana 70118-3651
6         504-862-2843
7
8    ALSO PRESENT:
9         JOSEPH E. BEARDEN, III, ESQ.
10        KEA SHERMAN, ESQ.
11        THOMAS D. FORBES, ESQ.
12        THOMAS P. ANZELMO, ESQ.
13        NICK DIETZEN, ESQ.
14        CHRISTOPHER THATCH, ESQ. (VIA I-DEP)
15        ADAM CHUD, ESQ. (VIA I-DEP)
16
17
18
19
20
21
22
23
24   VIDEOGRAPHER:
25        GILLEY DELORIMIER (DEPO-VUE)
```

Page 3

```
1         ANDRY LAW FIRM
2         (BY:  JONATHAN B. ANDRY, ESQUIRE)
3         610 Baronne Street
4         New Orleans, Louisiana 70113
5         504-586-8899
6    - AND -
7         SHER, GARNER, CAHILL, RICHTER, KLEIN &
8         HILBERT, L.L.C.
9         (BY:  R. SCOTT HOGAN, ESQUIRE)
10        (BY:  MATTHEW CLARK, ESQUIRE)
11        909 Poydras Street, 28th Floor
12        New Orleans, Louisiana 70112-1033
13        504-299-2100
14
15   REPRESENTING THE UNITED STATES OF AMERICA:
16        UNITED STATES DEPARTMENT OF JUSTICE,
17        TORTS BRANCH, CIVIL DIVISION
18        (BY:  DAN BAEZA, ESQUIRE)
19        (BY:  RICHARD STONE, ESQUIRE)
20        P.O. Box 888
21        Benjamin Franklin Station
22        Washington, D.C. 20044
23        202-616-4289
24
25
```

Page 5

```
1              S T I P U L A T I O N
2              IT IS STIPULATED AND AGREED by and
3    among counsel for the parties hereto that the
4    deposition of the aforementioned witness may be
5    taken for all purposes permitted within the
6    Federal Rules of Civil Procedure, in accordance
7    with law, pursuant to notice;
8              That all formalities, save reading
9    and signing of the original transcript by the
10   deponent, are hereby specifically waived;
11             That all objections, save those as to
12   the form of the question and the responsiveness
13   of the answer, are reserved until such time as
14   this deposition, or any part thereof, is used
15   or sought to be used in evidence.
16
17
18                   * * *
19
20
21
22        JOSEPH A. FAIRBANKS, JR., CCR, RPR,
23   Certified Court Reporter in and for the State
24   of Louisiana, officiated in administering the
25   oath to the witness.
```

JOHNS PENDLETON COURT REPORTERS                    800   562-1285

RICHARD JAMES VARUSO                                        April 1, 2008

Page 6

1        RICHARD JAMES VARUSO
2    4624 Barnett Street, Metairie, Louisiana 70006,
3    a witness named in the above stipulation,
4    having been first duly sworn, was examined and
5    testified on his oath as follows:
6    EXAMINATION BY MR. BRUNO:
7        Q.  Good morning, Mr. Varuso.
8        A.  Good morning.
9        Q.  We've met in the past.  Good to see
10   you again.
11       A.  Likewise.
12           MR. BRUNO:
13              Richard Stone, it occurs to me
14           that what would make these depositions
15           move a little quicker, if you don't
16           have an objection, is if the deponents
17           would supply us with a vitae which we
18           could just attach to each deposition,
19           I think that would go -- just a
20           suggestion.  Whatever works.
21           MR. STONE:
22              We'll think about that.
23           MR. BRUNO:
24              Just give that some thought.
25           MR. STONE:

Page 7

1              Before you go any further I'd
2           like to ask, what do you mean by usual
3           stipulations?  What are the
4           stipulations that you have for this
5           deposition?
6           MR. LAMBERT:
7              It's the Federal Rules of Civil
8           Procedure --
9           MR. BRUNO:
10             Federal Rules and CMOS.
11          MR. LAMBERT:
12             And the case management order.
13          And objections, except to the form of
14          the question, are reserved.  And
15          objections to the form of the question
16          are appropriate for the record.
17          MR. BRUNO:
18             All right?  And I guess for
19          completeness, when I listen to an
20          objection to form I think it
21          appropriate and fair for the objector
22          to indicate what the problem with the
23          form is, because I will endeavor to
24          change the form to suit the objector.
25   EXAMINATION BY MR. BRUNO:

Page 8

1        Q.  With all of that, Mr. Varuso --
2        A.  Is that English?
3        Q.  You know, it's some form of English.
4            When we last met I didn't have the
5    opportunity to ask you a little bit about your
6    background, so I'd like to start there first.
7        A.  Sure.
8        Q.  Would you share with us where you went
9    to college and when?
10       A.  Started at the University of New
11   Orleans working on my undergraduate degree in
12   civil engineering in 1889.
13       Q.  Is that when you finished or started?
14       A.  That's when I started.  Finished,
15   graduated with a bachelor's degree in 1994,
16   immediately began working on my Master's degree
17   from the University of New Orleans and
18   graduated in 1998, and then in the fall of 2003
19   began my doctorate work at the Louisiana State
20   University, finished the course work as it is
21   now and began research, hoping to complete in
22   the next year or two.
23       Q.  Good.  Congratulations.
24       A.  Thank you.
25       Q.  What is you're Master's in?

Page 9

1        A.  Civil engineering.
2        Q.  Okay.  Mr. Varuso, are you a licensed
3    civil engineer in any state?
4        A.  Yes.  State of Louisiana.
5        Q.  Any other states?
6        A.  No.
7            (Brief interruption.)
8    EXAMINATION BY MR. BRUNO:
9        Q.  I asked you, are you a licensed civil
10   engineer?  And you said yes, in the state of
11   Louisiana.  And then I asked, are you a
12   licensed civil engineer in any other states?
13       A.  No.
14       Q.  Okay.  Let's talk about your job
15   history.  For whom were you first employed when
16   you I guess got your degree in civil
17   engineering in '94?
18       A.  Began working for New Orleans District
19   of the Corps of Engineers in the geotechnical
20   branch of engineering division.
21       Q.  Is it fair for me to conclude from
22   that answer to you've been with the United
23   States Army Corps of Engineers since 1994?
24       A.  That's correct.
25       Q.  Okay.  And have you worked exclusively

RICHARD JAMES VARUSO                                    April 1, 2008

Page 10

1  in the geotechnical branch since that time?
2      A.  Not exclusively. I would say the
3  majority of my time has been spent in that
4  office, but some other things -- opportunities
5  have come around, um -- you know, through that
6  time.  Spent some time in the office which is
7  called design services where I did some work as
8  kind of the engineering division 's version of
9  a project manager.  Um -- and then spent some
10  time on some emergency missions.  Obviously
11  Hurricane Katrina, that was about a year or so
12  of of effort, as well as Hurricane Ivan, emergency
13  mission in Mobile, Alabama.
14      Q.  I know this is going to be a question
15  which covers a long span of time, but perhaps
16  we can look at things as they are today and
17  then think about how they may have changed over
18  time.
19          Would you tell me about the
20  organizational structure of the geotechnical
21  division, starting with an indication of who's
22  in charge of that -- by the way, is that a
23  division?
24      A.  It's a branch.
25      Q.  It's a branch.

Page 11

1      A.  Geotechnical branch of engineering
2  division.
3      Q.  It's a branch of the engineering
4  division.
5          With that, who's the person in charge
6  of the branch?
7      A.  Richard Pinner.
8      Q.  What is his title?
9      A.  He is the chief of geotechnical
10  branch.
11      Q.  Okay.  And where are you?
12      A.  I'm his deputy.
13      Q.  So you're the second in command?
14      A.  I suppose so.
15      Q.  Do you share that responsibility with
16  anyone?
17      A.  No.
18      Q.  How many licensed civil engineers are
19  employed in the branch of civil engineering,
20  the geotechnical branch of civil engineering?
21      A.  I wouldn't sure want to give you an
22  exact answer on that.
23      Q.  I'm not going to hold you to it.
24      A.  A dozen, maybe.
25      Q.  And has that been true since 1994?

Page 12

1  Again, roughly.  I mean, I'm not asking you to
2  be --
3      A.  I would say that we probably have
4  maybe fewer licensed engineers today than we
5  did maybe, you know, five years ago.  Just a
6  lot of people have retired and moved on.  And
7  we have a lot of new employees that we're
8  training.
9      Q.  Okay.  Now, is there a job position, I
10  guess, again, from not knowing how you guys are
11  organized, called, um -- civil engineer, within
12  the geotechnical branch of the engineering
13  division?
14      A.  That's a position title?  Is that --
15      Q.  Yes.
16      A.  Yes, that is a position title.
17      Q.  Is it required -- is it a requirement
18  for that job that you be a licensed civil
19  engineer?
20      A.  No, it is not.
21      Q.  What are the requirements for the job
22  of civil engineer within the geotechnical
23  branch of the engineering division?
24      A.  Four-year degree from an accredited
25  college.

Page 13

1      Q.  In civil engineering?
2      A.  In civil engineering.  That's correct.
3      Q.  Would you share for us, for the
4  record, generally, because we are not experts
5  in you're field, what is geotechnical
6  engineering?
7      A.  Um -- let's see.  Best way to describe
8  it, I suppose, would be to say that it is the
9  engineering of everything below the ground
10  surface.  Anything that you build on top of the
11  ground is going to be supported by the ground,
12  and there are detailed engineering calculations
13  that need to be made to make sure that whatever
14  you construct on that foundation is stable.
15      Q.  Okay.  When is the branch, or perhaps
16  folks within the branch, called upon to give
17  assistance to a particular project; how does
18  that happen, exactly?
19      A.  Well, let's see.  Normally, what would
20  happen is, um -- Congress would fund a given
21  project, um -- usually you've got local
22  sponsors involved and for whatever reason we
23  were given the authorization to study, say, a
24  given project.  At that point, um -- project
25  management will contact engineering division

JOHNS  PENDLETON  COURT  REPORTERS                    800   562-1285

RICHARD JAMES VARUSO                                    April 1, 2008

Page 14

1  and we'll develop a team of people and develop
2  what's called a project management plan where
3  we develop the time and cost it would take to
4  go through the initial analysis of the
5  feasibility study or the reconnaissance study,
6  whatever it may be. At that time it would go
7  back to Congress -- the feasibility would go
8  back to Congress with benefit cost ratios and
9  different details of how we want to authorize
10 that particular project. If it's authorized by
11 Congress, then funds will come back down and
12 then usually the same team members will begin
13 is design for final plans and specifications
14 for construction.
15    Q.  All right.  Now, the process that
16 you've just described, let me -- before I go
17 there, let me ask you this:  Obviously, today
18 we're going to be discussing projects which
19 were authorized, designed, constructed before
20 you began your employment with the Corps.
21 Right?
22    A.  That's correct.
23    Q.  Okay.  And so what I want to know
24 first is what information or knowledge that you
25 have about the history of either the MRGO

Page 15

1  project, we'll just call it that, which would
2  include the navigation lock expansion
3  component, and/or the Lake Pontchartrain and
4  Vicinity Hurricane Protection Project.
5        MR. BAEZA:
6            Joe, before you continue, when
7        you're talking about the lock
8        expansion, are you talking about the
9        EBIA?
10       MR. BRUNO:
11           Yes.  That's a component of it,
12       as I understand it.  I'll ask the
13       witness if I'm wrong about that but
14       it's my assumption that it's a
15       component.  And I may be wrong, I
16       don't know.
17       MR. BAEZA:
18           I'm going to have to lodge an
19       objection to any references to the
20       EBIA because it hasn't been added to
21       the complaint.
22       MR. BRUNO:
23           I understand.  And we won't get
24       into a big dialogue.  You understand
25       our position, I've discussed it in

Page 16

1        detail with Robin.  We have responses
2        to interrogatories, your position is
3        that the original complaint is
4        deficient, et cetera, et cetera.  But
5        having said, can we note the objection
6        and make it continuing?
7        MR. BAEZA:
8            Yeah.
9        MR. BRUNO:
10           All right.  Because I acknowledge
11       your position.
12       MR. BAEZA:
13           All right.  Thank you.
14 EXAMINATION BY MR. BRUNO:
15    Q.  With that, I forgot the balance of my
16 question.  Oh, yeah.  Okay.
17       So I was asking you what information
18 or knowledge you have about the history of the
19 MRGO project on the one hand, including the
20 navigation lock expansion and the Lake
21 Pontchartrain and Vicinity Hurricane Protection
22 Project.  It's easier for me to say the words
23 than the acronym.
24    A.  Um -- well, as far as the MRGO
25 project, the experience I have with that has

Page 17

1  been since August 29th of 2005.  However, I
2  have spent a little bit of time on some
3  preliminary design aspects of looking at
4  raising some of those levees.  Those initial
5  efforts were, you know, a function of
6  anticipating some funds for future lifts for
7  some of those levees, funds that never came to
8  be.  So for the most part, my experience with
9  the area has come since 2005.  And, um -- which
10 obviously in the rebuilding of those levees
11 along the MRGO, as part of that, you know,
12 sound engineering judgment would want to go
13 back and look at the history of how it was
14 built from the very beginning.
15    Q.  I understand that.
16    A.  So I spent, you know, a good bit of
17 time reviewing all of the old plans and
18 specifications and design reports.
19    Q.  Okay.  All right.  You may or may not
20 know the answer to this question, but is there
21 a person in the New Orleans District who, with
22 regard to information about the history of that
23 project, has a lot of information, that you
24 could identify?
25    A.  Um -- probably the person with most

RICHARD JAMES VARUSO                                    April 1, 2008

Page 18

1  historical knowledge would be Al Naomi.
2      Q.  All right.  Let's talk now, then,
3  about the Lake Pontchartrain and Vicinity
4  Hurricane Protection Project.
5          What information or history do you
6  have about that?
7      A.  Well, let's see.  Why don't we go
8  through what the Lake Pontchartrain and
9  Vicinity project is.  It basically starts --
10     Q.  Fair enough.  Let me withdraw.  Let me
11 make it simple for you.  Let's talk about the
12 Chalmette plan.  Let's talk about the Chalmette
13 plan and let's talk about the components of the
14 LPVHPP.  And I'll just call it hurricane
15 protection plan for you guys, if you all don't
16 mind.
17         And to finish my question, I was going
18 to suggest that we also talk about New Orleans
19 East and those back levees there.
20     A.  Uh-huh.
21     Q.  But I don't need you to get into
22 anything on the west of the Industrial Canal
23 for the moment.
24     A.  Okay.
25     Q.  Let's just talk about that.

Page 19

1          Having reduced the scope of the
2  question --
3      A.  Okay.
4      Q.  -- tell me what you know about the
5  history.
6      A.  Well, likewise -- and the Chalmette
7  levee loop, again, the time that I spent with
8  that has really mainly just been since
9  Hurricane Katrina, as part of the rebuilding
10 process for that loop.
11     Q.  Got you.
12     A.  And, again, in doing so, you know,
13 I've felt, you know, it was necessary to go
14 back and look at the historical documents, the
15 old design documents and the old plans and
16 specs for the entire loop -- not just along the
17 MRGO itself, but for the entire Chalmette loop.
18         As far as New Orleans East, the back
19 levees, I really have no experience over my
20 time here, that wasn't a project that I was
21 assigned to.  So the levees and the flood walls
22 along the loop of New Orleans East, um -- I
23 don't have much experience with that.
24     Q.  Okay.  But you have appeared at a
25 variety of -- I don't know whether to call them

Page 20

1  seminars or presentations about the hurricane
2  protection project as it relates to areas other
3  than the MRGO, have you not?
4      A.  Sure.
5      Q.  I mean, you've -- in fact, I think you
6  recently had some questions to Bob Bea with
7  regard to his presentation about the 17th
8  Street Canal.
9      A.  Uh-huh.  I wouldn't say I have no
10 knowledge.  I thought you were asking about the
11 history of how it was designed and constructed.
12 So --
13     Q.  Well, and that's a good point because,
14 you know, again, I'm from the outside looking
15 in and I want to make sure you and I are
16 speaking the same language.
17         Let's just use that as a for example,
18 then, the business of Bob Bea making a
19 presentation about the 17th Street Canal.  What
20 would be your interest in appearing and asking
21 questions about that?
22     A.  Well, um -- we have a term that we
23 call the community of practice.
24     Q.  Okay.
25     A.  And what that is considered is, say,

Page 21

1  for geotechnical engineers, it's sort of a
2  specialty in the field of engineering, so we
3  kind of like to get together as often as we can
4  and discuss the state-of-the-art of the
5  practice.  Geotechnical engineering in
6  particular is something that is really
7  relatively new when it comes to engineering,
8  you're only talking about in the last maybe
9  sixty years or so.  It's relatively a new
10 science as opposed to maybe structural
11 engineering where, you know --
12     Q.  Hundreds of years?
13     A.  -- the Egyptians have been --
14     Q.  Sure.
15     A.  So it's a new science.  And so, the
16 geotechnical community of practice, you know --
17 it's always something where if somebody has got
18 something new and innovative to say, we all
19 want to get involved with it and try and
20 understand and see if it makes sense.  Um --
21 obviously, there are times that people might
22 have a philosophy that may pan out to be
23 incorrect.  Sometimes people have philosophies
24 that turn out to be something that we need to
25 consider in future designs.

JOHNS PENDLETON COURT REPORTERS                    800   562-1285

RICHARD JAMES VARUSO                                    April 1, 2008

Page 22

1    Q. I see.
2    A. So if a professor is going to make a
3  statement about, you know, design philosophies
4  or methodologies or, you know, a new way to
5  look at certain potential modes of failure, I
6  mean, obviously I want to know. I mean, you
7  know, that's something that we all need to be
8  as well informed as possible. Obviously -- now
9  getting down to as an employee of the U.S. Army
10 Corps of Engineers, if there's a professor
11 discussing something that's about one of our
12 projects in particular, then obviously we want
13 to know about that.
14   Q. I see.
15   A. It would be great if we could get that
16 information before a presentation and we could
17 have some dialogue with certain professors that
18 are going to have these -- these new
19 philosophies, but if that doesn't happen, then,
20 and if my option is to hear his new philosophy,
21 then I'll sit in the presentation and listen.
22   Q. Of course. And I guess -- you say we.
23 You're referring to the United States Army
24 Corps of Engineers, the New Orleans District
25 office, right?

Page 23

1    A. Yes.
2    Q. And I guess I'm just curious to know,
3  is the reason why you would be the person who
4  would appear at such a presentation because of
5  your geotechnical background?
6    A. Yes.
7    Q. Okay. Would anybody else, you know,
8  be selected to participate in those kind of
9  activities?
10   A. From our district?
11   Q. Yes.
12   A. Um -- there were other people at
13 the -- yes. Yes. There would be.
14   Q. What disciplines? I'm more interested
15 in the disciplines than I am the persons.
16   A. Well, possibly structural engineers,
17 as well.
18   Q. Okay. And so your reason for being
19 there is intellectual curiosity.
20   A. I suppose you could put it that way.
21   Q. All right. Do you feel compelled to
22 defend the Corps in the context of those
23 presentations?
24   A. Well, I wouldn't say defend insomuch
25 as -- well, let's back up.

Page 24

1    Are you asking me a question about
2  that particular presentation or --
3    Q. Let's use that one. Let's -- you're
4  right. In fairness to you, let's use that as
5  an example. I'm just trying to get a sense of,
6  you know, of what you're saying to be sure that
7  I understand it.
8    A. Yeah.
9    Q. I mean, you're there, I get it. The
10 guy's talking about underseepage, that's your
11 subject, right?
12   A. Uh-huh.
13   Q. You want to know about what this guy
14 has to say about underseepage and its possible
15 causative relationship to the failure. Got
16 that. And so then I'm thinking to myself,
17 well, do you feel compelled, in that context,
18 to defend the Corps at all, or are you just
19 there listening and considering whether these
20 things make sense or not?
21   MR. BAEZA:
22      Objection; compound question.
23 EXAMINATION BY MR. BRUNO:
24   Q. If you can answer, go ahead. If not,
25 I'll break it down.

Page 25

1    A. What I'll say is this: I'll say that
2  obviously we attend many conferences, you know,
3  either throughout the year or over the course
4  of years. There are technical conferences,
5  engineering conferences that are attended.
6  I've asked questions in numerous presentations
7  where I thought that whoever was presenting the
8  information may have something incorrect.
9    Q. Right.
10   A. So as an engineer, if I disagree with
11 something I'll feel compelled to ask a question
12 either to, you know, help understand -- help my
13 own understanding of the concept or to maybe
14 have that person rethink their philosophy.
15   Q. Okay.
16   A. Um -- the particular instance that
17 you're referring to, which I'm assuming you're
18 talking about the presentation in New Orleans.
19   Q. Yes.
20   MR. BAEZA:
21      For the record, can you give the
22      date of that presentation?
23   MR. BRUNO:
24      You're reaching now, man.
25   MR. BAEZA:

JOHNS PENDLETON COURT REPORTERS            800   562-1285

RICHARD JAMES VARUSO                                            April 1, 2008

Page 26

1          Well, he was there.
2    EXAMINATION BY MR. BRUNO:
3        Q.  Yeah.  If you know, Mr. Varuso, please
4    put it on the record.
5          To be specific for the record --
6        A.  It was earlier this month.
7        Q.  -- this was the presentation by Bob
8    Bea in connection with his paper on the failure
9    of the 17th Street Canal.  Right?
10       A.  Yes.
11       Q.  Okay.  Well, you know, again I don't
12   want to belabor this point, but the subject was
13   underseepage and the issue was whether
14   underseepage contributed to the failure, right?
15       A.  Yes.
16       Q.  And I mean, we agree that that's a
17   subject that you would be interested in.
18       A.  That's correct.
19       Q.  Because obviously that's a potential
20   mechanism of failure not only here but anywhere
21   you might have a hurricane protection structure
22   next to a body of water.
23       A.  With similar foundation conditions.
24       Q.  Sure.  Right.  So I asked the question
25   because I'm just curious to know, and I don't

Page 27

1    mean to ask it again but I don't know that I
2    understand your answer.
3        A.  Okay.
4        Q.  If I'm you, I want to know everything
5    this guy has to say about underseepage because
6    I want to know if it makes any sense.  Now,
7    that's different from me sitting in the room
8    thinking to myself, oh, he's attacking the
9    Corps and I need to respond in a defensive
10   manner.  At least in my mind.  I could be
11   crazy.
12         Do you see a distinction between those
13   two positions?
14       MR. BAEZA:
15           Objection; misleading.
16           You can answer.
17       A.  Okay.  I don't think any of the
18   questions that I asked Bob Bea at that
19   presentation had anything to do with being
20   defensive --
21   EXAMINATION BY MR. BRUNO:
22       Q.  Okay.
23       A.  -- at that time.
24       Q.  All right.
25       A.  He's discussing a concept that

Page 28

1    basically takes, you know, the last thirty
2    years of looking at seepage analyses and
3    throwing it out the window.
4        Q.  Really.  You think that's his position
5    is that dramatically different.
6        A.  It is very dramatic.  So obviously any
7    geotechnical engineer that understands those
8    concepts are going to ask him questions, and
9    should do so rightfully.
10       Q.  All right.  So I take it, then, that
11   you have a view that underseepage did not play
12   a role in the failure of the 17th Street levee.
13       A.  I didn't say that.
14       MR. BAEZA:
15           Objection.  You're asking for an
16       opinion from the witness.
17   EXAMINATION BY MR. BRUNO:
18       Q.  All right.  Yeah.  I think we -- we
19   understand that he may or may not be called as
20   an expert, but he, obviously within the context
21   of the Federal Rules, can give his own opinion.
22       MR. BAEZA:
23           Joe, are you asking about the
24       17th Street Canal or are you asking
25       about the levee breaches and flood

Page 29

1        wall breaches in Robinson?
2        MR. BRUNO:
3           Well, the question I just asked
4        was related specifically to the 17th
5        Street Canal.  No question about that.
6        MR. BAEZA:
7           I have to object on relevance
8        ground, then.
9        MR. BRUNO:
10          You don't have to be worried
11       about that at the moment.  But you may
12       be.  It ain't over.
13       MR. BAEZA:
14          I'll take that under advisement.
15       MR. BRUNO:
16          I'm sure you will.
17   EXAMINATION BY MR. BRUNO:
18       Q.  All right.  So I just wanted to get,
19   you know, just a general sense of the thinking
20   there.  Now, let's come back to the MRGO and
21   the hurricane protection project.  There's a
22   third component here, and that's the old IPET.
23          Are you familiar with the IPET?
24       A.  Yes.  I am.
25       Q.  You've read it.  You've studied it.

RICHARD JAMES VARUSO                                    April 1, 2008

Page 30

1       A.   (Nods affirmatively.)
2       Q.   And do you have opinions about whether
3   the conclusions reached in this report are true
4   or correct?
5          MR. BAEZA:
6            Objection, asking for opinions.
7   EXAMINATION BY MR. BRUNO:
8       Q.   That's fine.  You can give opinions.
9          MR. BAEZA:
10            Do you understand the question?
11          THE WITNESS:
12            I understand the question.  I'm
13            just making sure that I can answer it.
14   EXAMINATION BY MR. BRUNO:
15       Q.   Yes, you can.  You will answer all
16   questions unless you're instructed, and then if
17   he instructs you not to answer, then I got to
18   call the Magistrate and make all kind of noise,
19   which is really ugly.
20          MR. BAEZA:
21            And we don't want that.
22          MR. BRUNO:
23            We don't want to do that.
24   EXAMINATION BY MR. BRUNO:
25       Q.   So we're just making a record.  When

Page 31

1   he makes an objection he's preserving it for
2   the record because when we do go to court he
3   has a right to suggest to the judge that I
4   shouldn't have asked that question.  That's all
5   he's doing.
6       A.   Would you mind repeating the question?
7       Q.   If I can remember it, sure.
8            It's about IPET.  And you've read it,
9   you've evaluated it.
10            Do you have opinions about whether or
11   not the conclusions reached in this document
12   are correct, at least from an engineering
13   perspective?
14          MR. BAEZA:
15            I'm going object again in terms
16            of vagueness.
17          MR. BRUNO:
18            I understand.
19       A.   Yes.  I have reviewed the IPET report.
20   And, um -- I guess the best way to answer that
21   question would say substantially I agree with
22   the findings from the report.
23   EXAMINATION BY MR. BRUNO:
24       Q.   All right.  Fair enough.
25            Now, also, again to round this out,

Page 32

1   you'll remember that you were designated as a
2   30(b)(6) witness in connection with a
3   deposition that was noticed by the Murphy Oil
4   Company in connection with the oil spill
5   litigation over the past couple of years.
6       A.   Uh-huh.
7       Q.   Right?
8       A.   Yes.
9       Q.   You recall that.
10       A.   Yes.
11       Q.   And the subject of that deposition was
12   the hurricane protection system along the MRGO,
13   right?
14       A.   Yes.
15       Q.   Now, obviously that's above the ground
16   as opposed to below the ground.  At least
17   components of it are above the ground.
18       A.   Uh-huh.
19            (Off the record.)
20   EXAMINATION BY MR. BRUNO:
21       Q.   So I gather that, you know, your
22   training and experience is not limited to below
23   ground, you have information about what's above
24   ground.
25       A.   Absolutely.

Page 33

1       Q.   All right.  And obviously the Corps
2   thinks enough about your knowledge and
3   information to have designated you as a person
4   most knowledgeable, or a person with knowledge,
5   I should say, about the hurricane protection
6   project that exists along MRGO.
7       A.   That's correct.
8       Q.   Well, did you study the history of
9   that particular piece of the hurricane
10   protection system in order to facilitate your
11   acting as a 30(b)(6) witness in that
12   litigation?
13       A.   Not solely.
14       Q.   Okay.
15       A.   As I mentioned earlier, part of the
16   review of the history of the design and
17   construction of those levees was a function of
18   the rebuilding --
19       Q.   I see.
20       A.   -- of those levees --
21       Q.   I see.
22       A.   -- after the hurricane.
23       Q.   All right.  And so in order for you to
24   be able to make recommendations as to how to
25   rebuild, it was necessary for you to go back

RICHARD JAMES VARUSO                                    April 1, 2008

Page 34

1   and study its history, when it was built -- or
2   I should say when the lifts were made and the
3   materials of construction, et cetera, et
4   cetera, et cetera.
5       A.  That is correct.
6       Q.  Okay.  Good.  All right.  And
7   likewise, your information about the MRGO, its
8   construction, comes from the same process.
9       A.  Yes.
10      Q.  Okay.  Now, all the way around to the
11  first question which was, you described a
12  process by which the -- and I guess I didn't
13  understand what came first.  Does Congress say
14  to -- withdraw.
15          Have you ever built a house?
16      A.  No, I have not.
17      Q.  You ever engaged an architect or an
18  engineer to build anything for you?
19      A.  No, but I'm familiar with the --
20      Q.  You know the process.
21      A.  Yes.
22      Q.  All right.  You know that from time to
23  time folks will engage an engineer or an
24  architect to design a house.  Right?
25      A.  Yes.

Page 35

1       Q.  And the client will tell the owner or
2   the engineer what kind of house they want,
3   generally how big it should be, and maybe
4   what -- you know, how many rooms it should
5   have.  Right?
6       A.  Sure.
7       Q.  All right.  And generally, the
8   architect/engineer, based upon that
9   information, tells the client how much it's
10  going to cost.  Right?  Fair enough?
11      A.  I think that's fair.
12      Q.  Okay.  And of course it's up to the
13  client to decide whether or not he wants to pay
14  the price --
15      A.  Right.
16      Q.  -- right?
17      A.  Yeah.
18      Q.  It's generally not the
19  architect/engineer who decides how to spend a
20  client's money.
21      A.  True.
22      Q.  Okay.  Would you agree with me that
23  the relationship between the Congress of the
24  United States of America and the United States
25  Army Corps of Engineers is similar --

Page 36

1           MR. BAEZA:
2               Objection.  Vague.
3           MR. BRUNO:
4               Let me just finish my question.
5           You can object all day long.
6   EXAMINATION BY MR. BRUNO:
7       Q.  -- with the Congress being the client
8   and the United States Army Corps of Engineers
9   being the architect/engineer.
10          MR. BAEZA:
11              Objection.  Ambiguous and vague.
12      A.  I find it to be a difficult analogy to
13  make.  I would reserve myself to make that
14  analogy without really kind of sitting down and
15  thinking about it.
16  EXAMINATION BY MR. BRUNO:
17      Q.  Okay.  All right.  Well, then, let's
18  understand then what your understanding is
19  about the relationship between the Congress of
20  the United States and the United States Army
21  Corps of Engineers.
22          Who generally comes up with the idea
23  to do a certain project, is it the Army Corps
24  of Engineers or is it the Congress?
25      A.  It could be Congress, it could be the

Page 37

1   locals.  Local governments may approach
2   Congress with a particular project that they --
3   you know, that they are interested in.  Maybe
4   local government goes to their local senator
5   and the senator brings it up to Congress and it
6   works in that fashion.  But certainly the Corps
7   of Engineers, we don't make up our own
8   projects.
9       Q.  Okay.  All right.  Again, similar to
10  the example I gave, the architect/engineer
11  doesn't begin the work until someone asks them
12  to go to work.  Fair enough?
13      A.  Fair enough.
14      Q.  All right.  Okay.  So, in the context
15  of the MRGO, do you know -- and you may not --
16  who asked the Corps to start thinking about
17  that project?
18      A.  The channel or the levees?
19      Q.  The channel.
20      A.  The channel.  My understanding of that
21  is that the local government was interested in
22  the channel and then approached Congress and
23  attempt to get the project authorized.
24      Q.  Okay.
25      A.  Once it was authorized, then they

JOHNS PENDLETON COURT REPORTERS                    800   562-1285

RICHARD JAMES VARUSO                                      April 1, 2008

Page 38

1   approached the Corps of Engineers with
2   designing the channel.
3       Q.  All right.  Now, before we go any
4   further, let's see if we can clarify something,
5   or at least let me make certain that my
6   understanding from my limited review of those
7   many pages of documents is accurate or not.
8           From reading these documents one might
9   come to the conclusion that the MRGO project is
10  separate and distinct from the hurricane
11  protection project both in authorization and
12  funding.  Is that incorrect?
13          MR. BAEZA:
14              Objection.  Ambiguous.
15              You can answer.
16      A.  Again, my understanding is that the
17  MRGO channel authorization and construction of
18  the MRGO channel is separate from the levees
19  that were constructed as part of the Lake
20  Pontchartrain and Vicinity Hurricane Protection
21  Project.
22  EXAMINATION BY MR. BRUNO:
23      Q.  Okay.  So in fairness, then, for the
24  record, I'm going to be asking you questions
25  based upon that answer, that they are two

Page 39

1   separate projects.
2       A.  Okay.
3       Q.  So when I ask about MRGO, I'm talking
4   about the channel and potentially about the
5   lock expansion project which, again, I
6   understand to be a component of that
7   authorization.
8           By the way, is that accurate, is the
9   lock expansion project a component?  If you
10  know?
11          MR. BAEZA:
12              Objection.  Ambiguous, calls for
13          a legal conclusion.
14      A.  I don't know.
15          MR. BRUNO:
16              I don't think it calls for a
17          legal conclusion.  It either is in the
18          authorization or it's not.
19          MR. BAEZA:
20              You're asking if it's part of the
21          MRGO project.  You want to know
22          whether it's part of a statutory
23          authorization.
24          MR. BRUNO:
25              Right.  It's not legal.  It's

Page 40

1           either in the works --
2           MR. BAEZA:
3               It's a matter of statutory
4           interpretation.
5           MR. BRUNO:
6               Oh, no it's not.  Come on, man.
7           Statutory interpretation is what we do
8           all day long about communities and
9           such.  But either it's in there or
10          it's not.
11          MR. BAEZA:
12              My objection stands.
13          MR. BRUNO:
14              Fair enough.
15  EXAMINATION BY MR. BRUNO:
16      Q.  Okay.  I forgot where we were, now,
17  again.
18          Likewise, the hurricane protection
19  project is a separate authorization with
20  separate funding.
21      A.  Yes.
22      Q.  And one of the curious facts about the
23  funding issue is that in connection with
24  expenditures on the hurricane protection
25  project, the local interests are required to

Page 41

1   put up 30 percent of those expenditures, as
2   opposed to the MRGO project which is
3   100 percent funded by the Congress.
4           Is that not true?
5       A.  The 30 percent on the Lake
6   Pontchartrain, I do understand that to be
7   30 percent --
8       Q.  Right.
9       A.  -- locally funded.
10      Q.  How about MRGO?
11      A.  The MRGO, I'm not sure how that was
12  paid.  I couldn't answer that question.
13      Q.  Okay.  All right.
14          Do you know anything about the process
15  by which the United States Army Corps of
16  Engineers decides how to spend money?  Is that
17  something that you have any information about?
18      A.  You need to elaborate on your question
19  a little bit.  I'm not quite following you.
20      Q.  Well, I'll reserve that question,
21  then, to a specific example.
22      A.  Okay.
23      Q.  And let me not clutter the record,
24  then.  Let me just wait.
25          Well, I guess -- yeah, I don't know.

RICHARD JAMES VARUSO                                         April 1, 2008

Page 42

1       MR. BRUNO:
2           Counsel, if you want to, why
3   don't you take a look at that so we
4   can get over the legal interpretation
5   issue.  It's pretty back and white to
6   me.  That's my point, Richard, it says
7   what it says.
8       MR. STONE:
9           Just put it in the record and say
10  it says what it says.  I mean --
11  EXAMINATION BY MR. BRUNO:
12  Q.  Just for the record, the -- what are
13  we looking at here?
14      Mr. Varuso, do you know -- and again,
15  you may not -- whether or not -- I should say
16  when the Congress authorized the Mississippi
17  River Gulf Outlet project?
18  A.  Do not know the exact date off the top
19  of my head, no.
20  Q.  Okay.
21      MR. BRUNO:
22          Can we stipulate, gentlemen, that
23      it was authorized by the River and
24      Harbor Act of '56?
25      MR. STONE:

Page 43

1           No stipulations here.
2       MR. BRUNO:
3           No stipulations?
4       MR. STONE:
5           No.  No stipulations.
6       MR. BRUNO:
7           Okay.  Interesting.  All right.
8       MR. STONE:
9           Can I make a recommendation, Joe?
10  If you have the document there that
11  authorizes it, just attach it as an
12  exhibit.
13      MR. BRUNO:
14          Well, I have a document which
15  refers to the authorization which is
16  why I was thinking to myself -- I
17  really don't want to clutter the
18  record, Richard.  I hear you, and I'm
19  trying to find a simple way to do
20  this, because I just can't stand when
21  records have a lot of extraneous junk
22  in them.
23      MR. STONE:
24          We will be able to stipulate to
25  that at some point with you.  It's not

Page 44

1   a difficult concept.
2       MR. BRUNO:
3           Well, how about I do this for the
4   record:  I am referencing Public Law
5   455, 84th congress, approved 29 March,
6   1956.  For the record, that's what
7   we're talking about.  Richard's point
8   is well taken, it says what it says.
9       MR. BAEZA:
10          Right.
11  EXAMINATION BY MR. BRUNO:
12  Q.  Do you know whether or not -- well,
13  let's talk about generally and not
14  specifically.  Clearly, the Corps of Engineers
15  does a lot of work on a project before the
16  Congress actually decides to authorize it.
17  A.  Yes.
18  Q.  In other words, the date on which the
19  Congress authorizes the project to go forward
20  is not the first day in time or moment in time
21  that anybody thought about it or planned for it
22  or thought about different designs.
23  A.  Generally that's true.
24  Q.  Okay.  And likewise, in connection
25  with the hurricane protection project which --

Page 45

1   do you know when that was authorized, roughly?
2   A.  Late sixties.
3   Q.  Like '65.
4   A.  Yeah.
5   Q.  Somewhere around there.
6       MR. BRUNO:
7           Do we have a statute number for
8       that?  I just want to reference the
9       statute.  And I'll go forward in the
10      meantime.
11  EXAMINATION BY MR. BRUNO:
12  Q.  Clearly -- or I should say, do you
13  know whether or not the Corps of Engineers
14  began its work in connection with the hurricane
15  protection project before its authorization by
16  the Congress?
17  A.  What do you mean by -- I guess what do
18  you mean by work on it?  I mean, I would --
19  Q.  Well, I thought you told me that the
20  process generally was that either the local
21  interests or the Congress comes up with an
22  idea.  The local interest, if it comes up with
23  an idea, approaches Congress and the Congress
24  tells the Corps to start thinking about this
25  project.  Okay?

12 (Pages 42 to 45)

RICHARD JAMES VARUSO                                April 1, 2008

Page 46

1    A.  (Nods affirmatively.)
2    Q.  Is there some legislation by the
3  Congress necessary before the Corps starts even
4  thinking about the project?
5        MR. BAEZA:
6            Objection.  Vague.  What do you
7        mean by think about?
8  EXAMINATION BY MR. BRUNO:
9    Q.  Well, I mean considering potential
10  designs, um -- you know, just sort of -- I
11  mean, again, in the example of a house, the
12  architect might have a white piece of paper and
13  he might start some sketches, and he'd look at
14  the client and say, well, you know, what do you
15  think?
16    A.  I think the only way I can answer that
17  question is to say that prior to the
18  authorization of the Lake Pontchartrain and
19  Vicinity project I've not seen any documents --
20  any engineering documents related to
21  preliminary designs or anything along those
22  lines prior to the authorization of the
23  project.
24    Q.  Prior to '65?  There's tons of
25  documents that predate '65 on the HPV.

Page 47

1        MR. BAEZA:
2            Joe, are we asking about his
3        personal knowledge?
4  EXAMINATION BY MR. BRUNO:
5    Q.  Yeah, I'm just curious, you've never
6  seen any?
7    A.  Prior to 1965.
8    Q.  Yeah.
9    A.  Engineering documents.
10    Q.  Well, yeah.  None?
11    A.  I haven't seen any that were that old,
12  no.
13    Q.  Okay.  All right.  Fair enough.
14        MR. BRUNO:
15            Again, this is just for the
16        record:  The LPV is Public Law 89-298,
17        27 October 65, which as you know
18        references House Document 231, 89th
19        Congress, First Session, the Flood
20        Control Act of 1965.  For the record.
21        MR. BAEZA:
22            Okay.
23  EXAMINATION BY MR. BRUNO:
24    Q.  Are you familiar with something called
25  the Chalmette Plan?

Page 48

1    A.  Yes.
2    Q.  Do you know when the Corps started
3  working on the Chalmette Plan?
4    A.  I believe the first, um -- the first
5  general design memorandum was, again, late
6  sixties; '67, you know, time frame, '66,
7  somewhere in that time frame.
8    Q.  All right.  Isn't that when the first
9  lift was?
10    A.  Um -- Joe, I mean, to be honest with
11  you, the dates are -- there's lot of dates out
12  there.  It's difficult for me to keep all of
13  that straight.
14    Q.  That's fine.  And I appreciate that.
15  I'm just remembering your deposition that you
16  gave to us in the Murphy case.
17    A.  All right.
18    Q.  But that's not critical to where we
19  are.
20    A.  All right.
21    Q.  Let's just get back to some of the
22  basics here.  You'll remember in the Murphy
23  deposition we asked questions about how it was
24  that the Corps came up with the design for any
25  hurricane protection in connection with the

Page 49

1  protection of St. Bernard and the Lower Ninth
2  Ward.  You remember that?
3    A.  Yeah, sure.
4    Q.  Okay.  All right.  What you told us
5  before was that before you get into the
6  business of designing protection you have to
7  have some understanding of the storm you're
8  going to protect against.
9    A.  Yes.
10    Q.  Right?
11    A.  Yes.
12    Q.  Okay.  You have to have some
13  understanding about the winds?
14    A.  Possibly.
15    Q.  Possibly?
16    A.  Yeah.
17    Q.  Okay.  But the real thing that you are
18  interested in is the surge and the waves.
19    A.  That's correct.  The storm surge and
20  the waves.
21    Q.  That's it.
22    A.  Yeah.
23    Q.  I mean, you really want to put the
24  hammer to the nail.
25        When it came to hurricane protection,

RICHARD JAMES VARUSO                                    April 1, 2008

---

Page 50

1   at least with regard to the Chalmette Plan, the
2   focus of the United States Army Corps of
3   Engineers was the surge that one could expect
4   in a storm and the wave action on top of that
5   surge. Fair enough?
6       A.   Yes. Fair enough.
7       Q.   Okay. Now, since you can't really
8   look into the future and predict what storms
9   you're going to get, you look in the past to
10  try to get some understanding of the storms
11  that this particular area has experienced,
12  right?
13      A.   Yes.
14      Q.   And that's been the philosophy of the
15  Corps for many, many years.
16      A.   That's correct. It's a probability.
17      Q.   It's a probability.
18          And the probabilities are based upon
19  how far back in time -- forgive me -- the
20  probability, or I should say the level of
21  protection that you contemplate, is based upon
22  your determination of the particular
23  probability number that you want to focus on,
24  that is, you can look back a hundred years or
25  two hundred years or three hundred years or a

---

Page 51

1   thousand years.
2       MR. BAEZA:
3          Objection.
4   EXAMINATION BY MR. BRUNO:
5       Q.   Is that right?
6       MR. BAEZA:
7          Ambiguous.
8       A.   Assuming you have the data.
9   EXAMINATION BY MR. BRUNO:
10      Q.   Right. Well, maybe I'm
11  inarticulately -- I'm sure I'm inarticulately
12  asking the question. Please explain for the
13  record the notion of the probability factor in
14  terms of designing protection structures in
15  connection with hurricane protection.
16          What difference does it make whether
17  you look back a hundred years or two hundred
18  years or three hundred years?
19      MR. BAEZA:
20          Objection. You haven't laid a
21      foundation that he has personal
22      knowledge of --
23      MR. BRUNO:
24          I'm sorry. We went heavy into
25      this in Murphy Oil, and that's why --

---

Page 52

1       MR. BAEZA:
2          But in Murphy Oil he was acting
3      as a representative of the Corps.
4      He's not -- here he's Mr. Varuso.
5       MR. BRUNO:
6          He didn't lose his brain since
7      then, I hope.
8   EXAMINATION BY MR. BRUNO:
9       Q.   Did you, Richard? You didn't lose
10  your mind since Murphy, did you?
11      A.   No.
12      Q.   And you did testify about standard
13  project hurricane and all that business back
14  then.
15          Am I asking you stuff that you don't
16  know about?
17      A.   I can answer the question.
18      Q.   I thought you could. But in fairness
19  to counsel, share with us what general
20  information or knowledge you have about the
21  business of looking back in time to get a sense
22  of the experience that a particular area has
23  with hurricanes.
24      A.   I think you're basically saying it
25  yourself. It's not very complicated. In other

---

Page 53

1   words, why don't I make an analogy between
2   something simple that we'd all understand, you
3   know, a wooden beam. Okay? Engineering of a
4   wooden beam, it is what it is, it's very
5   simple. And you can calculate it very
6   specifically knowing the properties of the
7   wooden beam and how much force you're going to
8   put on it. That's kind of easy engineering.
9   All right?
10          Hydraulic engineering is a little more
11  complicated. It's not as an exact of a
12  science, say, as a structural engineering
13  calculation. So what the hydraulic engineers
14  need to do is to take data that they have based
15  on previous events, and they utilize that
16  information to extrapolate probabilities of
17  certain storm surges and the likelihood of
18  those storm surges to occur in a certain area.
19  And that's what was done to establish what the
20  standard project hurricane was.
21      Q.   Now, what is the connection between
22  the probability and, or -- let's define. What
23  is the -- how would you define the probability
24  factor in terms of the 100, 200 or 300-year
25  storm?

---

JOHNS PENDLETON COURT REPORTERS                    800   562-1285

RICHARD JAMES VARUSO                                              April 1, 2008

Page 54

1    A.  The 100-year event is the
2  likelihood -- or a better way to phrase it is
3  it's the 1 percent chance, or there's a
4  1 percent chance of that storm occurring in any
5  one year, or the chance for that storm
6  occurring once in 100 years.
7    Q.  All right.  Let me just slow you down,
8  because again you're smarter than me in this.
9    A.  It's complicated.
10   Q.  So if you go back a hundred years, and
11 since we're talking about this year, you want
12 to understand the likelihood of a storm
13 happening today.  And so if you understand how
14 many storms occurred over the past hundred
15 years, and the kinds of storms you had, then
16 you can talk about the 1-in-100 chance of
17 what's going to happen today.  Right?
18   A.  Let me make sure I'm understanding the
19 question.  Are you asking me do I need 100
20 years of data to establish the 100-year event?
21   Q.  Yes.  I am, actually.
22   A.  No, you don't.
23   Q.  Why is that?
24   A.  My understanding is that you don't.
25 I'm not a hydraulic engineer, so maybe I'm not

Page 55

1  the best person to answer those questions.
2       (Brief interruption.)
3  EXAMINATION BY MR. BRUNO:
4    Q.  All right.  Well, without getting into
5  that, what is the difference between the a 1 in
6  100 year storm, 1 in 200, 1 in 300?
7    A.  The 1 in 200 year event, or the
8  200-year event, would be the chance of a storm
9  occurring once in a 200-year period.  Also, you
10 would refer to that as a -- let me make sure
11 I'm saying this right now because I got to
12 think about this sometimes, too.  That would be
13 the .5 percent storm.
14   Q.  Okay.  Well, without getting into too
15 much detail, the further back in time you go,
16 the smaller the percentage of the likelihood of
17 it occurring, right?
18   A.  You should probably think about it as
19 the further in time you go back, the more data
20 you have to have a better feel for the
21 probability of the event occurring.
22   Q.  All right.  In the context of the LPV,
23 the Corps took data from 1900 to about 1956,
24 right?
25   A.  That sounds about right.

Page 56

1    Q.  Okay.  And that was a 1 in 100 year
2  storm.
3    A.  I believe that to be true, yes.
4    Q.  All right.  Now, even with the data of
5  that time frame, you can still understand the
6  likelihood of that storm occurring over 200
7  years and 300 years, right?
8    A.  Yes.
9    Q.  Explain for the record how you do
10 that.  If you know.  If you don't --
11   A.  I would hesitate to answer that
12 question.
13   Q.  All right.  Let's just leave that with
14 this question:  Who at the Corps should I ask
15 these questions to?
16   A.  The best person would probably by
17 Nancy Powell.
18   Q.  Nancy Powell.  Okay.  Good enough.
19 Okay.  We'll leave that alone.
20   A.  Okay.
21   Q.  Now, so that in any case, once we have
22 done this exercise we now know what is the
23 highest level of surge that has been
24 experienced over this period of time, whatever
25 period of time we pick.

Page 57

1    A.  I'm not sure you want to phrase it
2  like that.
3    Q.  Tell me how to phrase it.
4      MR. BAEZA:
5        Objection.  You're putting words
6    in the witness' mouth.
7      MR. BRUNO:
8        That's why I'm telling him to
9    speak.
10   A.  Okay.  What you've established is the
11 elevation of the storm surge that you would
12 expect for a storm that would occur once in 100
13 years, or the 1 percent event.
14 EXAMINATION BY MR. BRUNO:
15   Q.  All right.  And where is this
16 elevation, is it for the whole geographic --
17 let's be specific -- of the Chalmette area, or
18 is it the whole New Orleans area or --
19   A.  It varies tremendously.  I mean, in
20 the New Orleans area, the storm surge
21 elevations, for the new 100-year elevations
22 that we've established in the last year or so,
23 the elevations vary dramatically between the
24 MRGO and, say, St. Charles Parish.
25   Q.  Okay.

RICHARD JAMES VARUSO                                      April 1, 2008

Page 58

1    A.  It's not one elevation.
2    Q.  I understand.  How specific of an area
3  do you consider?  I mean, I shouldn't say how
4  specific.  How small an area do you get to in
5  trying to understand the probability of surge?
6    A.  These are a function of the hydraulic
7  models.  Which, again, Nancy Powell is the best
8  person to probably ask those questions to, but
9  the answer comes out of the hydraulic models
10  that they run to establish where the heights
11  are for those -- what the given storm surge
12  elevations would be for a given event.
13    Q.  All right.  Well, let me show you a
14  page, and specifically Page I 41 of the
15  Performance Evaluation of the New Orleans and
16  Southeast Louisiana Hurricane Protection
17  System, the Final Report of the Interagency
18  Performance Evaluation Task Force, 26 March
19  2007.  Page 141, and I'm going to read the
20  caption, it's Figure 15:  General Comparison of
21  Wave Height and Period assumed in HPS Design D
22  and estimated from Katrina K.
23        Now, at least, if I'm reading this
24  figure correctly, there was a design
25  calculation made for surge height in the area

Page 59

1  of the MRGO and the proximate work in
2  connection with the LPV alongside the MRGO.
3  Right?
4    A.  Okay.  Yeah.
5    Q.  All right.  Now, and you see there the
6  design surge height is what?
7    A.  Well, I think maybe you're
8  misunderstanding what the figure says.  It says
9  general comparison of wave height.
10    Q.  And?
11    A.  These are the wave height.  This isn't
12  the storm surge elevation.
13    Q.  And?
14    A.  And period.
15    Q.  And period.  But it combines both,
16  does it not?
17    A.  This is not storm surge elevation.
18  This is the height of the wave on top of the
19  storm surge.
20    Q.  Right.  That's what I'm saying, it
21  combining the two.  You can't figure out the
22  total height without knowing the design surge
23  height because you put the waves on top of
24  that.
25    A.  Why don't you give me the page before

Page 60

1  this that refers to this figure and we'll see
2  if we can work this out.
3    Q.  Of course.  Maybe I gave you the wrong
4  one.  And by the way, for the record, I'm
5  showing you Page I 40.  Roman.
6      MR. BAEZA:
7        This is Volume 1 of IPET?
8      MR. BRUNO:
9        Yeah.
10    A.  Now we're getting somewhere.  Right.
11  Figure 14 is a comparison of the surge levels.
12  EXAMINATION BY MR. BRUNO:
13    Q.  I showed you the wrong one.  I
14  apologize.  My mistake.
15        The surge levels.  So again, all of
16  this to just understand this one small point:
17  The designed surge level height, is it the same
18  for the entire length of the LPV as it was
19  intended to be built along the MRGO, or does it
20  change?
21      MR. BAEZA:
22        Objection.  Ambiguous.
23    A.  I don't believe that the storm surge
24  elevation changed -- the design storm elevation
25  changed along that stretch of MRGO.  Are you

Page 61

1  referring to from the Bayou Bienvenue structure
2  to the turn?
3    Q.  Exactly.
4    A.  Yes.  Correct.
5    Q.  And if I'm reading this correctly, the
6  surge height that the United States Army Corps
7  of Engineers understood it was designing to
8  protect against was 13 feet in that area.
9    A.  That was the -- what we call the still
10  water level.
11    Q.  Still water.  Let's go ahead --
12    A.  This is what you're calling that
13  elevation plus 13.
14    Q.  All right.  And again, forgive me, I
15  would prefer to be correct as opposed to being
16  elegant.  So --
17      MR. STONE:
18        That's not going to be a problem.
19      MR. BRUNO:
20        That's for sure.
21  EXAMINATION BY MR. BRUNO:
22    Q.  We looked back over time, and again
23  we've established from 1900 to 1956, we've
24  looked at the hurricanes, and the United States
25  Army Corps of Engineers determines that the

RICHARD JAMES VARUSO                                            April 1, 2008

Page 62

1   still water height of the surge that could be
2   expected in a hurricane at the location of the
3   MRGO was 13 feet.
4       A.  Yes.
5       Q.  All right.  Now, that doesn't
6   determine the height of the embankment or levee
7   that you're going to put there, right?
8       A.  It determines it, but it's not the
9   same elevation.
10      Q.  It's not the same elevation because
11  you take the still water height and you add to
12  it wave run-up.
13      A.  Right.
14      Q.  Okay.  Can you explain for the record
15  why you do that?
16      A.  Well, it's more than just wave run-up.
17  I mean, let's understand that you've got issues
18  with subsidence of the area, you've got
19  settlement, you've got the wave run-up, all
20  those are factors that go into what the
21  ultimate elevation of a levee needs to be.
22      Q.  Okay.
23      A.  Wave is part of it.
24      Q.  Wave is part of it.
25          So focusing on the information that

Page 63

1   one gets from looking at past hurricanes, you
2   do look at past hurricanes to get some
3   understanding of what the waves are like so
4   that you can have some understanding of the
5   waves that you can design your levee to protect
6   the people against.
7       A.  Well, I'm not too sure about that, to
8   be honest with you.  You may have to ask a
9   hydraulic engineer that question, but my
10  understanding is that -- I should say I'm not
11  sure if they use previous hurricanes to
12  determine wave height.  I think there's -- I
13  think there's separate analyses they perform to
14  establish wave height.
15      Q.  Okay.  Well, forgive me, because I
16  thought that's what you said in your Murphy
17  deposition.  All right.  Well, then, the one
18  thing we do agree on, though, that the magic
19  number 13 is a number that is derived from the
20  review of data that was collected with regard
21  to hurricanes that occurred in this particular
22  area from 1900 to 19 whatever it is -- '56,
23  right?
24      A.  That's my understanding, yes.
25      Q.  All right.  Now, do you, as an

Page 64

1   engineer --
2       MR. STONE:
3           Joe, can I interrupt you just for
4       a second?
5       MR. BRUNO:
6           Yes, of course you can.
7       MR. STONE:
8           When you said particular area,
9       you mean the New Orleans or
10      southeastern Louisiana?
11      MR. BRUNO:
12          No, no, no, no.  You're right.  I
13      was referring specifically to, as I
14      said, the magic 13.  I'm referring
15      specifically to the MRGO from Bayou
16      Bienvenue to Bayou La Loutre.  I'm
17      being very specific.  And again,
18      referring to Figure 14, which has a
19      box and an arrow that seems to be
20      pointing in that area.
21      MR. BAEZA:
22          Okay.
23      MR. BRUNO:
24          Okay?
25  EXAMINATION BY MR. BRUNO:

Page 65

1       Q.  Well, I thought my memory was not
2   terribly bad.  I'm going to read what you said,
3   and I'll show it to you if you'd like.
4       A.  Sure.
5       Q.  You said, as I stated before, the
6   levee is designed for one thing, and that is to
7   prevent a given storm surge from overtopping
8   that particular levee at the still water level
9   of 13 plus the four and a half feet of wave
10  run-up.
11      A.  Okay.
12      Q.  Okay?  And maybe I misinterpreted
13  that, but what I thought that meant was in
14  addition to looking at how high you expect the
15  water to get based upon your evaluation --
16      A.  Right.
17      Q.  -- of previous hurricanes, you also
18  need to understand how high the water will be
19  on top of that because of the waves.
20      A.  That is correct.
21      Q.  Okay.  And I think maybe, in fairness
22  to you, what you're saying to me is you can't
23  tell me today whether or not the calculation of
24  the four and half feet is based upon a
25  historical review of hurricanes or whether or

JOHNS  PENDLETON  COURT  REPORTERS              800   562-1285

RICHARD JAMES VARUSO                                    April 1, 2008

Page 66

```
 1   not there's some other method by which the
 2   Corps establishes the four and half feet.
 3        A.  That's correct.
 4        Q.  Okay.
 5        A.  You got it.
 6        Q.  Good.
 7        A.  You got it.
 8        Q.  I want to be fair to you.
 9             Now, do you agree -- as an engineer,
10   Mr. Varuso, do you agree that marshes provide
11   hurricane and storm surge buffering capacity?
12        MR. BAEZA:
13             Objection.  Asks for opinion.
14             Calls for speculation.  You haven't
15             laid a foundation about his knowledge
16             of wetlands.
17   EXAMINATION BY MR. BRUNO:
18        Q.  You can answer.
19        A.  My understanding is that, yes, marsh
20   in front of, um -- or flood side of hurricane
21   protection or risk reduction structure does
22   help reduce the potential storm surge.
23        Q.  Now, to satisfy counsel 's objection,
24   is that something that you know based upon your
25   training and experience as a civil engineer?
```

Page 67

```
 1        A.  I would say it's based upon my
 2   involvement with projects, with people that are
 3   more experienced with determining those
 4   potential reductions in storm surge.
 5        Q.  All right.  Now, would you also agree
 6   that coastal wetlands absorb large amounts of
 7   wave energy and hold large quantities of water
 8   that would otherwise allow storms to do much
 9   more damage inland?
10        MR. BAEZA:
11             Again, I renew my objection.
12        MR. BRUNO:
13             Of course.  Can make it
14             continuing if you like.
15        A.  And my answer to that is the same as
16   the previous question.  My understanding of
17   that is based on being involved with projects
18   with people that are experienced in that
19   information.
20   EXAMINATION BY MR. BRUNO:
21        Q.  All right.  Would you also agree that
22   wetlands also provide a natural flood control
23   by detaining and by slowing floodwaters which
24   reduces the intensity and destructiveness of
25   flooding?
```

Page 68

```
 1        MR. BAEZA:
 2             I'm going to just enter a
 3             continuing objection to the questions
 4             related to the wetlands.
 5        MR. BRUNO:
 6             I thought I gave you that, but
 7             that's okay.
 8        A.  Same answer.
 9   EXAMINATION BY MR. BRUNO:
10        Q.  Okay.  Same answer.
11             And finally, you would agree that
12   wetland vegetation anchors shorelines and
13   reduces the amount of erosion that would
14   normally take place along an unvegetated bank
15   line.
16        A.  Same answer.
17        Q.  Okay.
18        MR. BRUNO:
19             And for the record, I was reading
20             from the Mississippi River Gulf Outlet
21             St. Bernard Parish, Louisiana Bank
22             Erosion Reconnaissance Report dated
23             January, 1994.
24        A.  Okay.
25   EXAMINATION BY MR. BRUNO:
```

Page 69

```
 1        Q.  Are you familiar with this document?
 2        A.  Somewhat, yeah.
 3        Q.  Do you believe that this document
 4   contains statements that are true?
 5        MR. BAEZA:
 6             Objection.  Calls for
 7             speculation.
 8        MR. BRUNO:
 9             It does.  Absolutely does.
10   EXAMINATION BY MR. BRUNO:
11        Q.  If you want to tell me that you don't
12   think they're true, I'm more than happy to hear
13   it.
14        A.  I believe them to be true.
15        Q.  Of course.  Okay.  And you believe
16   these to be opinions of the United States Army
17   Corps of Engineers, as well, correct?
18        A.  Yes.
19        Q.  Now, I'm wondering if you would agree
20   with me that in view of what we've just read,
21   that the standard project hurricane which was
22   utilized by the Corps in designing the
23   hurricane protection structures along the MRGO,
24   um -- were based upon how a past hurricane
25   interacted with the then existing geography,
```

                                    18  (Pages 66 to 69)

RICHARD JAMES VARUSO                                      April 1, 2008

Page 70

1    marsh, trees, swamps and the like.
2         MR. BAEZA:
3              Objection.  Vague and broad.
4         A.  I believe it to be true, but, again, I
5    think that a hydraulic engineer would be more
6    apt to answer that question a little more
7    fully.
8    EXAMINATION BY MR. BRUNO:
9         Q.  Okay.  And that would be the --
10        A.  Ms. Powell.
11        Q.  Ms. Powell.
12        MR. BAEZA:
13             Nancy Powell.
14        MR. BRUNO:
15             Nancy Powell.
16   EXAMINATION BY MR. BRUNO:
17        Q.  But of course it's basic logic, is it
18   not, that if you're looking in the past and
19   you're trying to understand the potential for
20   future storm surge, and you've decided to use
21   past hurricanes, then you have to acknowledge
22   that the hurricanes did what they did to the
23   land and the marsh that was existent at that
24   time.
25        MR. BAEZA:

Page 71

1              Objection.  Complex and
2              ambiguous.
3         A.  I'll prefer to relay those questions
4    to Ms. Powell.
5    EXAMINATION BY MR. BRUNO:
6         Q.  Okay.  All right.
7              Would you at the very least agree with
8    me that the geography, the existence or
9    nonexistence of swamp, freshwater versus salt,
10   forest and the like, are different in 2005 than
11   they were in 1965 in the area of the MRGO?
12        A.  Yes.
13        Q.  Okay.  And would you agree with me
14   that there's at least the potential that
15   because the geography, the forest, the swamps,
16   saltwater versus freshwater, are different in
17   2005 than they were in 1965 that, through no
18   fault of the Corps, predictions intended --
19   predictions that were made about past storms
20   may not have been applicable to a 2005 storm
21   because of the change in the geography and the
22   trees and the swamps and the like?
23        MR. BAEZA:
24             Objection.  Overbroad, calls for
25             speculation, and the witness is not an

Page 72

1              expert.
2         A.  I think the way to answer that
3    question is to say that it's more than just
4    saying what the potential is.  Is the potential
5    difference half an inch?  Maybe.
6    EXAMINATION BY MR. BRUNO:
7         Q.  I didn't ask you to quantify it.
8         A.  Well, but I mean, that's an important
9    aspect of it.  It may have changed, but by how
10   much?
11        Q.  Well, I understand that's a defense of
12   the Corps.  All I want to know is whether or
13   not you agree with me whether or not there's
14   likely to be a difference, period.  The extent
15   of the difference is what we're going to fight
16   about in the courtroom.
17        MR. BAEZA:
18             Objection.  Asked and answered.
19   EXAMINATION BY MR. BRUNO:
20        Q.  Do you agree with me there's a
21   difference?
22        A.  I would prefer to defer that question
23   to Ms. Powell.
24        Q.  Fair.  With that --
25        A.  I would defer to the expert for that.

Page 73

1              (Brief recess.)
2    EXAMINATION BY MR. BRUNO:
3         Q.  All right.  Richard, let's see where
4    we were.  We were talking about things that the
5    Corps relied on in connection with its design
6    of the hurricane protection along the MRGO.
7    And I think where we are is while we disagree
8    as to the extent to which land loss, marsh
9    loss, forest loss contributed to surge, and we
10   acknowledge that disagreement, we do agree, do
11   we not, that the data on which the Corps relied
12   to calculate the still water height was data
13   based upon past hurricanes which obviously
14   caused surges to then existent marshes, land,
15   trees and the like.
16        A.  Yes.
17        Q.  Okay.  And we can also agree that the
18   design of the hurricane protection structure
19   did not take into consideration any deleterious
20   effects, whether or not they exist, from the
21   MRGO channel from the date of its construction
22   until 2005.
23        A.  I'm not aware of any, but Nancy Powell
24   would be the best person to ask that question
25   to.

JOHNS PENDLETON COURT REPORTERS                         800  562-1285

RICHARD JAMES VARUSO                                    April 1, 2008

Page 74

1      Q.   All right.  But let's -- I'm not
2  asking you whether there were any, I'm asking
3  you whether or not we admit the obvious, that
4  MRGO didn't exist at the time --
5      A.   Oh, I understand your question now.
6      Q.   Okay?
7      A.   All right.  Yes.
8      Q.   Yes.
9      A.   All right.
10     Q.   And we'll fight over whether or not
11 there are any deleterious effects from the MRGO
12 channel.  Right?  We'll duke it out in court
13 another day.
14     A.   That's up to you.
15     Q.   Well, we'll get there in a minute.
16 I'll find out.  Maybe you don't agree.  Who
17 knows?  But again, not to beat a dead horse,
18 but the way the Corps did business was it did
19 not try to predict future land loss, future
20 marsh loss, future forest loss in coming up
21 with a still water height.
22     MR. BAEZA:
23         Objection, vagueness regarding
24         try to predict.
25     A.   I would prefer to defer that question

Page 75

1  again to hydraulic engineers.
2  EXAMINATION BY MR. BRUNO:
3      Q.   Okay.  Well, you make me ask this
4  question, now:
5      A.   Okay.
6      Q.   Because we asked you these same
7  questions when you were the 30(b)(6) witness,
8  and you answered them.
9      A.   Yes, I did.
10     Q.   You did answer those questions, right?
11     A.   My understanding is, um -- the type of
12 witness I am today is different than what I was
13 in that 30(b)(6) deposition.  So --
14     Q.   I agree.
15     A.   -- if there is a person that is more
16 apt to answer that question and you can depose
17 that person and ask them those questions as
18 part of this litigation, that is more
19 appropriate.
20     Q.   Well, and that's not exactly true,
21 Richard.  Here's the problem:
22     MR. BAEZA:
23         Joe, can we just talk about what
24         Mr. Varuso knows, how he knew it, what
25         he saw, what he did?

Page 76

1      MR. BRUNO:
2          You are right on.
3  EXAMINATION BY MR. BRUNO:
4      Q.   And let me tell you where I'm going
5  with this.  Where I'm getting a little confused
6  is how you knew it when I took your deposition
7  in Murphy Oil and now you don't know it.  Now,
8  either you know it or you don't know it.  Now,
9  I understand that you are not today, and I
10 recognize and I'll stipulate that you are not a
11 30(b)(6) designee today.  I'm taking your
12 deposition as a Corps employee.  I'm
13 entitled to know what you know, and you're
14 entitled to tell me whether or not there are
15 limitations on that knowledge.  You're also
16 entitled to tell me that there's somebody else
17 out there that's smarter than you or more
18 experienced or more knowledgeable than
19 you.  But if you know something, you can't tell
20 me you don't know it.  And if you know
21 something -- let me just finish because this is
22 in fairness to me, now, because we have to make
23 a record.  If you know something, or you
24 believe something, I'm entitled to know what
25 you know and what you believe.

Page 77

1          Subject to all those caveats that I
2  gave you, which is, you know what?  This person
3  is more knowledgeable, this person is more
4  experienced -- I can handle that.  But I'm just
5  respectfully suggesting to counsel and you, I
6  got a record, man.  And you've answered these
7  questions, and I don't want to put you in the
8  position where I get to go in court and say,
9  you said it on Tuesday and on Wednesday you're
10 not saying it.  Okay?  And I'll let you qualify
11 it because that's fair, you can qualify it, but
12 I think it's a bad play to say I don't know
13 today what I knew before.
14     MR. STONE:
15         The difference here is that when
16         he spoke to you in Murphy Oil he was
17         speaking for the Corps as a 30(b)(6)
18         witness with a script.
19     MR. BRUNO:
20         Whoa.  With a script?
21     MR. LAMBERT:
22         That's fine.  Let him go.  Let
23         him talk.
24     MR. BAEZA:
25         It's the Corps' information that

RICHARD JAMES VARUSO                                    April 1, 2008

Page 78

1   he's providing.  It's the Corps'
2   position.  That information is the
3   Corps' position.
4   MR. BRUNO:
5       Okay.
6   MR. STONE:
7       And here today, he's speaking as
8   a fact witness from his personal
9   knowledge of things he saw, he heard
10  and --
11  MR. BRUNO:
12      All right.  Listen, I agree --
13  MR. BAEZA:
14      Script may be a bad word to use
15  here but he's told by the Corps what
16  his position can be as a 30(b)(6)
17  witness.
18  MR. LAMBERT:
19      Wait.  Wait.  Let me chime in
20  here for a second.  I gave a birthday
21  cake -- chocolate cake birthday cake
22  analogy in the beginning of
23  yesterday's deposition.  The truth is
24  what this witness is supposed to be
25  speaking.  Okay?

Page 79

1   MR. STONE:
2       And we agree with that.
3   MR. LAMBERT:
4       And if he knows something, he can
5   tell us that.  If he doesn't know it,
6   or he has an idea of about it, he can
7   give us that answer.  But to say I
8   don't know --
9   A.  I don't think --
10  MR. LAMBERT:
11      Wait one second.
12  THE WITNESS:
13      I think I have to interrupt you,
14  because I never said I didn't know.
15  I've never used those words.
16  MR. BRUNO:
17      Rick, it's okay.  It's okay.
18  MR. LAMBERT:
19      Please don't interrupt me right
20  now.  Let me finish putting on the
21  record what I need to put on the
22  record.
23  MR. BRUNO:
24      I'll give you a chance.
25  THE WITNESS:

Page 80

1       Okay.
2   MR. LAMBERT:
3       Now, the point is, is that in the
4   example I gave yesterday, when is the
5   last time you had some chocolate cake,
6   and the answer is I'm not sure, but
7   you know that it was at a birthday
8   party of some individual and you tell
9   us that because this is a discovery
10  deposition, then we can go and find
11  the information from the person who
12  knows more about it, who knows the
13  exact -- let me finish.  It is wrong
14  to script or to prepare a witness to
15  the point where he feels
16  comfortable -- let me finish -- where
17  he feels comfortable denying that he
18  has a competent answer, particularly
19  when he's given one under oath before.
20  He can qualify it any way he wants to,
21  but please, let us stick to the truth
22  here.
23  MR. STONE:
24      Right.  And I want you to do
25  that.  And I want you to do that.  But

Page 81

1   what I'm saying here is that he was
2   speaking for the Corps as a 30(b)(6)
3   witness in that instance, and you have
4   that information and you're entitled
5   to rely on.
6   MR. LAMBERT:
7       If he wasn't lying then --
8   MR. STONE:
9       No, he's not lying then, he's not
10  lying now.
11  MR. LAMBERT:
12      So we need the qualification, but
13  let's got not go stray here and have a
14  United States government witness who's
15  speaking in the Corps of Engineers
16  office in New Orleans, Louisiana, feel
17  comfortable under oath giving
18  representations which are different
19  from what he's given before, for
20  whatever reason.
21  MR. STONE:
22      And he's not doing that.
23  MR. LAMBERT:
24      Okay.  Well, the record is going
25  to speak clearly for itself.

                                    21  (Pages 78 to 81)

RICHARD JAMES VARUSO                                              April 1, 2008

Page 82

1    MR. STONE:
2        And he's not doing that.  If
3    you're asking him about his personal
4    knowledge --
5    MR. BRUNO:
6        I am.
7    MR. STONE:
8        -- or about his personal
9    experience --
10   MR. BRUNO:
11       I am.
12   MR. STONE:
13       -- this is different deposition
14   today than it was when you asked him
15   as a 30(b)(6) witness, because the
16   Corps is entitled to put up anybody
17   they want to to speak to the Corps',
18   um --
19   MR. BRUNO:
20       Agreed.
21   MR. LAMBERT:
22       No.  Not agreed.  That's wrong.
23   MR. STONE:
24       -- to the Corps' positions --
25   MR. LAMBERT:

Page 83

1        That is wrong.
2    MR. STONE:
3        -- as a witness for 30(b)(6).
4    MR. BRUNO:
5        Why is it wrong?
6    MR. LAMBERT:
7        The Corps is not entitled under
8    Rule 30(b)(6) to put up anybody they
9    want.  They could put up a janitor
10   knows nothing.
11   MR. LAMBERT:
12       Wait a second.
13   MR. STONE:
14       That didn't happen here.  That
15   didn't happen here.
16   MR. LAMBERT:
17       Wait a second.  They are not
18   entitled to put up anyone they want.
19   They're required under the Rule
20   30(b)(6) to put up a person that's
21   knowledgeable, not necessarily the
22   most knowledgeable, but knowledgeable
23   in the area.
24       Now, what's happening here that
25   this very fine gentleman is being

Page 84

1    comfortable with the interpretations
2    given by three, count them, three
3    United States attorneys, officers of
4    the court, in this room on United
5    States government property.
6    MR. STONE:
7        You're making things up now.
8    MR. LAMBERT:
9        No, I'm not.
10   MR. STONE:
11       Yes, you are.
12   MR. LAMBERT:
13       I'm just telling you, this
14   witness needs to understand that he is
15   under oath and he's subject to the
16   same penalties for perjury as if he
17   was sitting in a courtroom, regardless
18   of the fact that he's protected by
19   three U.S. Attorneys.
20   MR. STONE:
21       The witness specifically
22   understands that.
23   MR. LAMBERT:
24       Okay, good.
25   MR. STONE:

Page 85

1        And you have to Murphy Oil
2    deposition that was a 30(b)(6)
3    deposition, and that is the Corps'
4    position.
5    MR. LAMBERT:
6        And we can use that in this
7    litigation.
8    MR. STONE:
9        And for this witness, you can you
10   ask him any of those questions, let
11   him see the deposition, talk to him
12   about the questions and ask him if
13   that was the Corps' position that he
14   was stating.  But if you're calling
15   him as a fact witness today, he's here
16   to speak from his personal knowledge
17   what he saw, what he did, what he
18   heard.
19   MR. LAMBERT:
20       I understand.
21   MR. STONE:
22       And if you want to ask him about
23   that Murphy Oil deposition, you should
24   be fair to the witness and take him to
25   that deposition, show him what you

RICHARD JAMES VARUSO                                    April 1, 2008

Page 86

1     want to ask him, and say, do you have
2     a different opinion in your fact
3     witness category?
4         MR. LAMBERT:
5             Richard, I understand your
6     position, and believe me --
7         MR. STONE:
8             Nobody here is trying, in any
9     way, to short change any of you on any
10    deposition or any document or
11    anything, and we are not trying to
12    prevent the witness from answering
13    questions.
14        MR. BRUNO:
15            This is my deposition, and I
16    think you will agree with me, Richard,
17    that I have attempted to be fair.  I'm
18    the one that brought it up.  I'm the
19    one that suggested that I was in the
20    deposition.  I took the deposition.
21    And you gave -- and I said to Richard,
22    you gave any some answers before that
23    you're not giving me now.  And I even
24    said -- went so far as to say, now, I
25    don't want to embarrass you and I want

Page 87

1     to give you fair warning.
2     EXAMINATION BY MR. BRUNO:
3         Q.   But in a court of law what lawyers do
4     is they hold up that old deposition and they
5     say, you see, you said this.  Okay?  Now, and
6     I've even told you, in fairness to you guys,
7     that -- go ahead and qualify it.  I got no
8     problem with that.  But here's the problem:
9     There was an answer in the Murphy Oil -- an
10    answer, whatever it was, and today there is no
11    answer.  What there is is I would prefer to --
12    now.  What I want to make you understand is, I
13    recognize your preference, but I don't believe
14    you have that luxury.  Because I'm trying to
15    understand, Richard, what you know.  And
16    counsel is going to say, because Richard knows
17    or doesn't know or believes or doesn't believe,
18    doesn't bind the United States of America as a
19    30(b)(6) witness.
20        MR. BRUNO:
21            And Richard, I agree with you.
22        MR. STONE:
23            All I'm saying is this is not a
24    30(b)(6) deposition.
25        MR. BRUNO:

Page 88

1             I agree, and I told you that.
2         MR. STONE:
3             He comes to a 30(b)(6) deposition
4     prepared to speak for the government
5     on particular issues.
6         MR. BRUNO:
7             I know that.  But in fairness to
8     me, I just --
9     EXAMINATION BY MR. BRUNO:
10        Q.   Listen, I would be half a lawyer if I
11    didn't tell you what lawyers do at trial.  They
12    trot out these old depositions and they say,
13    you see.  And in fairness to you, I don't want
14    you to be in that position.  I would prefer
15    that you just tell me what your thoughts are on
16    this subject.  Okay?  Now, let me -- for
17    example, I asked you, in the Murphy Oil
18    deposition, about the business of calculating
19    wave run-up.  And you went into a long -- you
20    remember that?
21        A.   Sure.
22        Q.   You went into a long discussion about
23    wave run-up.  And, you know -- and you were a
24    30(b)(6) witness then and now you're not.  So I
25    would prefer.

Page 89

1         MR. BAEZA:
2             Joe, do you have a copy of the
3     Murphy Oil deposition?
4         MR. BRUNO:
5             Yeah.  Absolutely.  If you want,
6     we can make a copy and you can read it
7     during the break.
8         MR. STONE:
9             I don't think that's fair to the
10    witness, tell him to read it during
11    the break.  If you have something to
12    ask him about --
13        MR. BRUNO:
14            Richard, wait a minute.  Hold the
15    phone.  Don't accuse me of not being
16    fair.  I'm trying to be overly fair,
17    which is to let him have the whole
18    deposition.  Of course I'll make a
19    reference.  But don't suggest that I'm
20    not being fair, because you know
21    that's not true.
22        MR. STONE:
23            Give him the reference.
24        MR. BRUNO:
25            Okay?  Fine.  But that's that

23  (Pages 86 to 89)

RICHARD JAMES VARUSO                                    April 1, 2008

Page 90

1       what I was talking about.
2    EXAMINATION BY MR. BRUNO:
3       Q.  I was saying I'll break my back to be
4    fair to you.  I'm telling you about the tactics
5    that lawyers use.  I'm trying to prevent that
6    from happening to you in a court of law,
7    Richard.  That's all I'm trying to do.  Okay?
8          MR. STONE:
9             That's Mr. Varuso.
10   EXAMINATION BY MR. BRUNO:
11      Q.  I'm sorry.  Mr. Varuso.  I just want
12   you to know that, you know, this is not just a
13   dog eat dog world sometimes.  We have respect
14   for you and your position and what you do.
15      A.  Okay.
16      Q.  But we also know where battle lines
17   are drawn.  We know what we're going to fight
18   about.  But there's some stuff that we don't
19   have to fight about.  Okay?  We know we're
20   going to fight about whether or not the MRGO
21   contributed to excess surge.  Let's leave that
22   off the table.  But there are some basic things
23   that I need to get established as facts because
24   we know them to be true.
25         We know absolutely, do we not, that

Page 91

1    when the United States Army Corps of Engineers
2    was determining the standard project hurricane
3    it only had the past to look to, it did not
4    look to the future.  We know that to be an
5    absolute truth, do we not?
6       A.  Yes.
7       Q.  Okay.  Those are the kind of things I
8    want to establish.  We can fight about the
9    other stuff.
10         Now, wave run-up.  Let's talk about
11   wave run-up.  The fact is that you told me in
12   that deposition that there was a determination
13   of an amount of wave run-up.  Right?
14      A.  Yes.
15      Q.  And you even -- you told me how much
16   it was.  I forget --
17      A.  Four and a half feet.
18      Q.  Four and a half feet.  And I think, in
19   fairness to you today, you're telling me that
20   when you told me that in Murphy you don't know
21   how they got there.
22      A.  I don't believe in Murphy that I told
23   you exactly how they got the wave run-up.  I
24   believe I just told you what the calculation
25   was.

Page 92

1       Q.  Exactly.  Now we're back on track.
2       A.  Okay.
3       Q.  All right.  And that's where I want to
4    stay.
5       A.  All right.
6       Q.  Okay.  And we also know as a matter of
7    fact that --
8       A.  Can I --
9       Q.  Go ahead.  I said I'll give an
10   opportunity to explain.  Go ahead.
11      A.  I was actually wondering if we could
12   just take like a one-minute break because I
13   have a question just based on what was
14   discussed.  I just want to ask my two attorneys
15   one question.  I'll be back in a minute.
16      Q.  Yes.  Off the record.
17         (Off the record.)
18      A.  If I may, I wanted to say one thing
19   based on the last discussions that were on the
20   record.  First is that I'd like to go on the
21   record as saying I don't recall saying at any
22   point in your questions previously that I
23   didn't know in answer to a question that I may
24   have previously given an answer to.
25      Q.  No, you did.

Page 93

1       A.  I think that's important the note.
2       Q.  And I agree with you.
3       A.  And the second point that I would like
4    people to understand is that my interest in
5    deferring questions, if they're more
6    hydraulically based, to somebody that would
7    be -- have more experience in answering those
8    questions is only that y'all get the best
9    answer for that question.  The previous
10   deposition, I was speaking on behalf of the
11   government, and I was giving facts as I
12   understood them.  I can give you the same facts
13   right now.
14      Q.  That's what I want.
15      A.  All right?  I'm only stating those
16   facts as wanting to defer those questions to,
17   say, a hydraulic engineer because if that
18   person is more prepared to answer those
19   questions then that would be a better position
20   for the government.  If you're going to ask me
21   a hydraulic engineer question, then the
22   hydraulic engineer should answer it.  If you're
23   going to ask me a geotechnical engineering
24   question, then I'm more prepared to answer
25   those questions.  So I just want to make sure

RICHARD JAMES VARUSO                                    April 1, 2008

Page 94

1  we understand that is the reason I was trying
2  to defer those questions, because I know in the
3  back of my mind although I can answer the
4  question there is somebody that can answer the
5  question probably better than I can.
6      Q.  All right.  Now --
7      A.  Is that fair?
8      Q.  That's fair.  In fairness to me, I
9  want your knowledge.  Even though I will be
10  more than happy to let you qualified your
11  answer with a suggestion that there is in this
12  United States Army Corps of Engineers New
13  Orleans office someone with more experience
14  and/or knowledge, I'm anxious to know what you
15  know or what you believe.
16      A.  Okay.
17      Q.  So with that, can we go forward with
18  that understanding between each other?
19      A.  Absolutely.
20      Q.  All right.  Now --
21      A.  All right.
22      Q.  -- I'd like to finish this notion and
23  then move on, and that is, that you would agree
24  that the United States Army Corps of Engineers
25  did not, because it could not, build into the

Page 95

1  calculation of the standard project hurricane
2  the effects, whatever they may have been, good,
3  bad or ugly, of the MRGO channel in the future.
4      A.  No.  It did not.
5      Q.  Okay.  And quite frankly, that's a
6  perfectly sound engineering practice, isn't it,
7  that is, not to build into the calculation of
8  the standard project hurricane what may or may
9  not occur in the future because you dug a
10  particular channel.
11      A.  I think that's reasonable.
12      Q.  Okay?  Now, let's move to the MRGO
13  side.  And I'm going to be very specific.  We know
14  that in 1968, if I have the date right, or '69,
15  the United States Army Corps of Engineers
16  changed the MRGO project to include a foreshore
17  protection of the southern bank of the MRGO
18  between, approximately, Bayou Dupre and Bayou
19  La Loutre.  Right?
20      A.  Yes.
21      Q.  And that was done at the discretion of
22  the Corps.  If you don't know if
23  it was done at the discretion --
24      A.  I don't know.
25      Q.  It was done.

Page 96

1      A.  Okay.
2      Q.  All right.  Now, do you know whether
3  or not that work was beyond the initial
4  authorization for the project, that is, was it
5  something that was specified to be done in
6  connection with the design and build of the
7  MRGO or was it something the Corps decided to
8  do after the authorization to design and build?
9      A.  I don't know.
10      MR. BAEZA:
11          Objection.  Compound.
12      MR. BRUNO:
13          Sorry.  I didn't hear you.
14      MR. BAEZA:
15          I said compound.
16      MR. BRUNO:
17          Fine.
18  EXAMINATION BY MR. BRUNO:
19      Q.  Now, the fact of the matter is that
20  the Corps determined that there was a need for
21  foreshore protection on the southern bank of
22  the MRGO because that bank was eroding.  Isn't
23  that true?
24      A.  I believe that to be true.
25      Q.  All right.  And isn't it also true

Page 97

1  that if the Corps had not put into place the
2  foreshore protection that there was the
3  potential that the erosion could impair the
4  hurricane protection then in place?
5      MR. BAEZA:
6          Objection.  Calls for
7      speculation.
8      A.  I believe that would be the concern.
9  EXAMINATION BY MR. BRUNO:
10      Q.  All right.  Now, are you familiar,
11  Mr. Varuso -- I hate to call you Mr. Varuso,
12  but I will -- are you familiar with the
13  dialogue that took place within the Corps over
14  who -- I shouldn't say who -- over what project
15  should pay for that foreshore protection?
16      A.  I'm not aware of that, no.
17      Q.  Okay.  All right.  Do you know which
18  project paid for that foreshore protection;
19  that is, MRGO or hurricane protection?
20      A.  I do not know.
21      Q.  Okay.  I was going to ask you about
22  waves, but I think you've told me already that
23  waves are not within your particular area of
24  expertise.  Is that not correct?
25      A.  That's correct.  Yeah.

RICHARD JAMES VARUSO                                              April 1, 2008

Page 98

1       Q.  All right.  And I should ask --
2           MR. BAEZA:
3               Nancy Powell.
4    EXAMINATION BY MR. BRUNO:
5       Q.  -- Nancy Powell about waves.
6       A.  Yes.
7       Q.  All right.  We'll do that, then.
8           Then I guess I got sidetracked because
9    it was my intent to ask you this before in a
10   very general sense:  What did you do to prepare
11   for this deposition, if anything?  I'm not
12   saying you had to.
13      A.  Um -- unfortunately, I didn't really
14   spend much time preparing for this particular
15   deposition.
16      Q.  All right.  We have talked a little
17   bit about the Murphy Oil deposition.  Have you
18   ever read your Murphy Oil deposition?
19      A.  Yes.  I did.
20      Q.  Okay.  And when is the last time that
21   you read it?
22      A.  Well, I guess I could not give you the
23   exact date.  It would have been when I received
24   the deposition from the court reporter as an
25   opportunity to review it, make any corrections.

Page 99

1       Q.  So that was the review opportunity.
2       A.  Yes.
3       Q.  And you haven't looked at it since.
4       A.  No, I have not.
5       Q.  Okay.  Did you receive any critique,
6    and I don't mean criticism, I mean critique,
7    about that deposition by anybody?
8       A.  Not that I recall.
9       Q.  Now, I am reading from the IPET report
10   again, and it's the same version that I
11   referenced earlier, which is the final -- I'm
12   sorry -- is the interim final, 26 March 2007,
13   to be precise, Page --
14          MR. BAEZA:
15              Volume 1?
16          MR. BRUNO:
17              Yeah.
18   EXAMINATION BY MR. BRUNO:
19      A.  Volume 1, Page 2.  Now, there is this
20   sentence at the top of Page 3 -- well, I guess
21   in fairness to you let me give you the context.
22   It's the paragraph that begins "the
23   performance."
24          MR. BAEZA:
25              Do you have a copy for him?

Page 100

1           MR. BRUNO:
2               Yes, I do.  I sure do.
3           (Tendering.)
4    EXAMINATION BY MR. BRUNO:
5       Q.  Would you read the first three
6    sentences.
7       A.  Okay.  With the exception of four
8    foundation design failures, all of the major
9    breaches were caused by overtopping and
10   subsequent erosion.  Reduced protective
11   elevations increased the amount of overtopping,
12   erosion and subsequent flooding, particularly
13   in Orleans East.  Ironically, the structures
14   that ultimately breached performed as designed,
15   providing protection until overtopping occurred
16   and then becoming vulnerable to catastrophic
17   breaching.
18      Q.  Okay.  Fine.  Now, here's my question,
19   Mr. Varuso:  The hurricane protection structure
20   that was actually built by the United States
21   Army Corps of Engineers along the MRGO?
22          MR. BAEZA:
23              Objection.  Are you saying that
24          the Corps built --
25          MR. BRUNO:

Page 101

1               No, no.  I know that y'all
2           subcontracted.
3           MR. BAEZA:
4               Okay.
5           MR. BRUNO:
6               I mean, let's get over that.
7    EXAMINATION BY MR. BRUNO:
8       Q.  We understand that the Corps doesn't
9    do its own construction, but the Corps
10   designed, prepared the specifications for, put
11   out bid packages and contracted with others to
12   build the hurricane protection system.
13          Isn't that true?
14      A.  Yes.
15      Q.  Okay.  So when I say the word build,
16   I'm referencing design, let out the bid,
17   contracted to some third party.  Okay?
18      A.  Okay.
19      Q.  Fair enough?
20      A.  Fair enough.
21      Q.  Now, where I was going with this is
22   this:  Do you agree that the hurricane
23   protection structures built by the United
24   States Army Corps of Engineers along the MRGO
25   between Bayou Dupre and Bayou La Loutre

RICHARD JAMES VARUSO                                    April 1, 2008

Page 102

1    performed as designed?
2        A.  Do I believe that they performed as
3    designed?
4        Q.  Yes, sir.
5        A.  Yes, I do.
6        Q.  You do.  Okay.  All right.
7            Do you believe that there was any
8    inherent design defect in that hurricane
9    structure?  And again, for the record,
10   referring to the hurricane protection structure
11   that the Corps built along the MRGO between
12   Bayou Dupre and Bayou La Loutre?
13       A.  No.
14       Q.  Good.  Do you believe, sir, that there
15   was any defect in the way that hurricane
16   protection structure was constructed?  Again
17   referring to hurricane protection structure
18   along the MRGO between Bayou Dupre and Bayou La
19   Loutre.
20       A.  I would say no, because I have no
21   documentation to show how it was -- you know,
22   construction QA information from when it was
23   constructed.
24       Q.  All right.  Now, but we know that, and
25   I want to use the word breached because that's

Page 103

1    what's in the IPET report.  We know those
2    structures breached; right?
3        A.  Yes.
4        Q.  Okay.
5            (Brief interruption.)
6    EXAMINATION BY MR. BRUNO:
7        Q.  All right.  Now, again, we touched on
8    this a little bit in the Murphy Oil deposition.
9    And I believe you testified that the United
10   States Army Corps of Engineers was authorized
11   to build the hurricane protection system up to
12   the standard project hurricane, um --
13   parameter.
14       A.  Yes.
15       Q.  All right.  And the logic of that was
16   to build a hurricane protection structure that
17   was high enough to keep the water that would be
18   produced through surge and wave action in a
19   particular hurricane from entering the
20   protected area.
21       A.  That's correct.
22       Q.  All right.  And the Corps knew full
23   well that it was not designing that hurricane
24   protection structure to withstand overtopping.
25   Right?

Page 104

1        A.  Yes.
2        Q.  All right.  And it is the Corps'
3    understanding, and it's the Corps' position,
4    that the overtopping caused the breaching of
5    those levees.
6        A.  Yes.
7        Q.  All right.  And the Corps takes the
8    position that it really is not our fault
9    because we were only authorized to build to the
10   standard project hurricane consideration, which
11   meant a certain height, and we did that.  Isn't
12   that true?
13       A.  Yes.
14       Q.  Okay.  Let me just ask you to conform
15   just some of the words here.  I'm referring to
16   Page 26, if you want to follow along with me.
17   And just to kind of tie it altogether, SPH --
18   that is the actual acronym SPH -- that in fact
19   appears in the project authorization by the
20   Congress, does it not?
21       A.  My belief is that that is correct,
22   yes.
23       Q.  All right.  And in the report it says
24   that the SPH, if you'll follow with me, was
25   intended to represent the most severe

Page 105

1    meteorological conditions considered reasonably
2    characteristic for the region.  And is that a
3    true statement?
4        A.  To my knowledge, yes.
5        Q.  Okay.  Now, if you look at the next
6    paragraph, it says, following Hurricane Betsy
7    in 1965, the wind speed criterion was revised
8    but all other characteristics remain the same.
9    The 1965 version of the SPH was used for the
10   design of both the Lake Pontchartrain and
11   Vicinity and New Orleans to Venice projects.
12   Okay?
13           Do you know what that sentence refers
14   to in connection with the change in wind
15   speeds?
16       A.  Not exactly sure what they're
17   referring to, no.
18       Q.  All right.  All right.  At 27 -- and
19   this will just allow us to cut through this
20   very quickly.  If you look at the second
21   paragraph, and I think you testified to this --
22   I know you testified to this in Murphy Oil.
23       A.  Page 27?
24       Q.  Page 27, second paragraph.
25       A.  Okay.

27 (Pages 102 to 105)

RICHARD JAMES VARUSO                                    April 1, 2008

Page 106

1    Q.  These are the facts, are they not:
2  The first major structures -- this is with
3  regard to the hurricane protection structures
4  built along the MRGO?
5    A.  (Nods head affirmatively.)
6      (Brief interruption.)
7  EXAMINATION BY MR. BRUNO:
8    Q.  Again, let me just ask a whole
9  question again.  I just want to confirm these
10 dates and times, and again you testified to
11 this already.
12   A.  Okay.
13   Q.  This, I believe, is referring to the
14 construction of hurricane protection on the
15 MRGO between Bayou Dupre and Bayou La Loutre.
16 I'm going to ask you to confirm that the first
17 major structures were the levee and floodwall
18 structures within the -- I'm sorry.  Withdrawn.
19 The levees and structures along the east side
20 of St. Bernard Parish from Bayou Bienvenue to
21 bayou Dupre were built in the same time frame,
22 which was the sixties and seventies.  And then
23 it says, the initial levee lifts were placed by
24 hydraulic fill from '67 to '70, and subsequent
25 lifts were added from '72 to '87.

Page 107

1      And finally, sheet pile closures at
2  bayous and pipelines were placed in '92.
3      Is that, to the best of your
4  knowledge, accurate?
5    A.  Yes.
6    Q.  Okay, fine.
7      And just to round this out, there's no
8  armoring on the back side of that hurricane
9  protection structure, that is, the hurricane
10 protection structure along the MRGO between
11 Bayou Bienvenue and Bayou La Loutre because the
12 Congress of the United States did not authorize
13 you to put that there.
14     MR. BAEZA:
15       Objection.  Vague.  Um -- define
16     what armoring is, first of all.
17   A.  I was going to say, is that what
18 you're asking, you're referring to it as
19 armoring?  Is there any armoring on the back
20 side?
21 EXAMINATION BY MR. BRUNO:
22   Q.  Yes.
23   A.  To an extent, yes, there is.  If you
24 look at the engineering manuals that have to
25 deal with, you know, building back in the

Page 108

1  fifties and the sixties, up until now, when
2  they refer to potential for overtopping and
3  erosion, they say that good grass cover on clay
4  fill is a good form of erosion protection.  And
5  there's a lot of studies out there that show
6  that good grass cover is, you know, a good
7  means of armoring an earthen levee.  So to that
8  extent, there wasn't concrete or rock, but
9  there was good grass cover on the levees.
10     MR. LAMBERT:
11       Wait.  One second.
12 EXAMINATION BY MR. BRUNO:
13   Q.  I should have been more specific.
14   A.  Okay.
15   Q.  I thought you told me in the Murphy
16 Oil deposition that the Corps was not directed
17 to or authorized by the Congress to put
18 concrete armoring on the back side of the
19 hurricane protection structure along the MRGO
20 between Bayou Bienvenue and Bayou La Loutre.
21   A.  That's correct.
22   Q.  Okay.  That's true.  I wasn't -- the
23 last one wasn't a trick question.
24   A.  No.  I want to make sure that it's
25 understood.  That's all.

Page 109

1    Q.  Okay.  Now, but now that you've gotten
2  into it, when you tell the Congress you're
3  going to build a levee -- you, and I'm
4  referring to the Corps of Engineers -- we're
5  going to build a levee, Congress, the Congress
6  understands that the reference to levee is a
7  reference to what the Corps means a levee is in
8  its many manuals that describe building levees.
9  Right?
10   A.  Okay.
11   Q.  Do you agree with that?
12   A.  Fair enough.  Sure.
13   Q.  All right.  And the Corps has manuals
14 which describe what kind of levee one builds
15 when one is building inland as opposed to the
16 kind of levee one builds when one is protecting
17 a shoreline.  Isn't that true?
18   A.  I believe there's some verbiage about
19 that.
20   Q.  All right.  And you would agree with
21 me that the specifications and manuals utilized
22 by the Corps in connection with the design and
23 construction of the MRGO hurricane protection
24 structure between Bayou Bienvenue and Bayou La
25 Loutre was the inlands manuals because the

RICHARD JAMES VARUSO                                    April 1, 2008

Page 110

1  Corps understood that to be an inland location
2  because of the location relative to Lake
3  Borgne.
4      MR. BAEZA:
5          Objection. Ambiguous, complex.
6      A. I'm not sure I can answer that
7  question as far as how the decision was made to
8  use, you know, one form of the EM versus
9  another.
10 EXAMINATION BY MR. BRUNO:
11     Q. Wait. I didn't ask about the
12 decision. What I asked was simply to confirm
13 whether or not it's true. If it's not true,
14 it's not true.
15         In fact, did the Corps use its manuals
16 which described levee construction and design
17 for inland as opposed to shoreline protection
18 when it designed and built the hurricane
19 protection structure along the MRGO between
20 Bayou Dupre and Bayou La Loutre?
21     A. In the 1960s, and the seventies, I'm
22 not aware that there was a difference between
23 the two. If you could show me the difference
24 between those two manuals, I'd like to take a
25 look at it and read it. But I'm not aware of

Page 111

1  there being a difference at that time.
2      Q. Okay. All right. Bottom line is, as
3  far as you appreciate it, Mr. Varuso, the
4  manuals that describe levee building that were
5  likely utilized in connection with the design
6  and construction of the hurricane protection
7  along MRGO between Bienvenue and La Loutre was
8  the same whether the hurricane protection
9  structure was inland as opposed to being on a
10 shoreline.
11         MR. BAEZA:
12             Joe, before he answers, are you
13         talking about Bayou La Loutre? Do you
14         mean Bayou La Loutre or Bayou Dupre?
15         MR. BRUNO:
16             I don't remember. They're very
17         close. I mean Bayou Dupre. I mean,
18         aren't they like --
19     A. Well, Bayou La Loutre is actually
20 further south, and there's some levees south of
21 Bayou Dupre, but I understand what you're
22 talking about.
23 EXAMINATION BY MR. BRUNO:
24     Q. Yeah. Because counsel is correct, in
25 fairness to him. La Loutre is a little further

Page 112

1  south.
2      A. There are no levees between Verret and
3  La Loutre. But we're still between --
4      Q. Between the two. And the other,
5  Dupre, I think, is a little further -- so no
6  matter what you do --
7      A. If you want to call it to Verret, we
8  can say from Bayou Bienvenue to Verret, and
9  that would be the turn.
10     Q. We all know what we're talking about,
11 and that is whatever is out there along the
12 bank of the MRGO.
13     A. Yes.
14     Q. And now I forgot my question.
15         MR. BAEZA:
16             Not my intention.
17         MR. BRUNO:
18             Okay.
19         (Whereupon the previous question was
20 read back as follows: Bottom line is, as far
21 as you appreciate it, Mr. Varuso, the manuals
22 that describe levee building that were likely
23 utilized --)
24 EXAMINATION BY MR. BRUNO:
25     Q. Were the same.

Page 113

1      A. I'm not aware of any differences,
2  let's put it that way.
3      Q. Okay. All right. And I may be
4  launching into a subject that you really don't
5  know about, but from time to time, third
6  parties do work around your hurricane
7  protection structures, I'm sure. Isn't that
8  true?
9      A. Could you be more specific? Third
10 parties meaning like pipeline owners, or what
11 are you referring to?
12     Q. Third-party means not you.
13     A. Okay.
14     Q. Somebody else does work in and around
15 your --
16     A. Sure.
17     Q. All right. And the Corps of Engineers
18 has an interest in making certain that those
19 third parties do no damage to their hurricane
20 protection structures.
21     A. Yes.
22     Q. All right. Do you know what if
23 anything the United States Army Corps of
24 Engineers does in order to make certain that no
25 damage is done to its hurricane protection

RICHARD JAMES VARUSO                                      April 1, 2008

Page 114

1  structures by third parties?
2      A.  Those third parties are required to
3  put in, um -- permit requests to the Corps of
4  Engineers, and depending on what the permit
5  request entails, certain offices will conduct a
6  review of that permit, we may request
7  engineering calculations from the third-party
8  to validate that there's no potential damage or
9  potential future damage to that structure.
10     Q.  Okay.  Now, what is the criterion; in
11 other words, how close do you get when you have
12 to make this permit application?
13     A.  That's really going to be very
14 dependent on what the structure is and what's
15 around it.
16     Q.  All right.
17     A.  The foundation conditions and --
18     Q.  Now, we talked about third parties.
19 Let's talk about the Corps.  We've recognized
20 in the course of this deposition that the Corps
21 engages in a variety of projects; in other
22 words, the work of the Corps is not limited to
23 hurricane protection.  Right?
24     A.  That's true.
25     Q.  Okay.  And so I can imagine that from

Page 115

1  time to time the Corps may be engaged in a
2  project which is not hurricane protection,
3  which may have some proximity to a hurricane
4  protection structure.  Is that possible?
5      A.  Sure.
6      Q.  All right.  Does the Corps have in
7  place any process by which it evaluates the
8  potential for impact -- I should say -- I'm
9  going to use your words over there on the blue
10 page.  Does the Corps evaluate the risk that
11 may be associated with a project which is not
12 hurricane protection related that may be so
13 close to a hurricane project that the same kind
14 of evaluative process takes place?
15     A.  Yes.
16     Q.  Would you describe that for us?
17     A.  Um -- if we're going to do additional
18 construction around a hurricane protection
19 structure, then -- well, let's put it this way:
20 Any new set of plans and specifications that
21 are developed, that will eventually go out to
22 be constructed, will be reviewed in what's
23 called a BCOE review.  Buildability,
24 constructability, operability.
25     Q.  Now, I'm sorry.  Got to make you go

Page 116

1  slow on that one, man.
2      A.  Buildability, constructability and
3  operability.  BCO.
4      Q.  Buildability, constructability, and --
5      A.  Operability.
6      Q.  -- operability.
7      A.  Yeah.
8      Q.  All right.  Now, whose job is it to
9  initiate that evaluation?
10     A.  The person that, or the office that
11 prepares that set of plans and specification.
12 And that review is conducted by almost every
13 division office in the Corps.
14     Q.  And what is the criteria that would
15 require the initiation of such an evaluation;
16 in other words, how close can you get without
17 the necessity of this evaluation?
18     A.  Let me see if I can, um -- you're
19 asking about how close.  And I think maybe I
20 need to elaborate on the answer to the
21 question.
22     Q.  Sure.
23     A.  Every set of plans and specifications
24 that the government completes for ultimate bid
25 and construction is going to go through this

Page 117

1  review.  And even prior to that BCOE review
2  there is an independent or an internal
3  technical review that's also completed by the
4  various offices within the district.  Now,
5  that's going to be done for every set of plans
6  and specifications that is prepared.  So what I
7  will tell you is, if some particular set of --
8  and I'll call it P&S instead of saying plans
9  and specifications every time.  If that set of
10 P&S is going to have the potential to impact
11 some existing structure, then that would be
12 caught as part of this review.  I will just
13 make a general example:  If some structure has
14 the potential to cause an instability to an
15 existing levee, then somebody probably in
16 either the geotechnical branch or civil branch
17 would catch that as part of their review.  The
18 criteria for that impact is going to vary
19 depending on what you're building and what
20 you're building it up against.  I couldn't give
21 you an exact distance.  There's no set distance
22 saying if you're going to build something it
23 has to stay, you know, 200 feet away from --
24 there's no set criteria for that.
25     Q.  All right.  Now, let's switch gears

RICHARD JAMES VARUSO                                      April 1, 2008

Page 118

1    for a moment.  We have talked about whether you
2    build something --
3        (Brief interruption.)
4    EXAMINATION BY MR. BRUNO:
5        Q.  Now, let's ask the same question, and
6    let's talk about third parties again.  Not in
7    the context of building something new.  Okay?
8    But something that's ongoing, something that's
9    there, something that's deteriorating.  You
10   know, there's a guy who's got a building next
11   to a levee and the thing starts falling down.
12   What is -- is there any process by which the
13   Corps evaluates the potential effect of such
14   deterioration on its hurricane protection
15   structures?
16       MR. BAEZA:
17           Objection.  That's an incomplete
18       and misleading hypothetical.
19       MR. BRUNO:
20           It's incomplete.  Why is it
21       incomplete?  I got a building, it's
22       deteriorating, it's next to a flood
23       protection structure.  What else do I
24       need?
25       A.  I think I can answer the question.

Page 119

1        MR. BAEZA:
2            You can answer it?
3        A.  The -- we go through inspections,
4    levee inspections, routinely, once a year.
5    EXAMINATION BY MR. BRUNO:
6        Q.  Okay.
7        A.  So if as part of that levee inspection
8    we see a building deteriorating, as you
9    hypothetically --
10       Q.  Sure.
11       A.  Then if the engineer on that
12   inspection saw the potential for damage,
13   potential damage to the government structure,
14   then that would be noted as part of the
15   inspection and then appropriate action would be
16   taken.
17       Q.  Okay.  All right.  Now, Mr. Varuso, do
18   you know how the Corps came to believe that
19   erosion along the banks, the southern banks of
20   the MRGO, could potentially harm hurricane
21   protection between -- and I'm going to say
22   Bienvenue and La Loutre again just because we
23   know what we're talking about, such that the
24   decision was made to put foreshore protection?
25   How did that come about?

Page 120

1        A.  Okay.  What I can say is, and this
2    is -- almost predates my time, or very early on
3    in my years here, but from a geotechnical
4    standpoint what I can tell you is that if the
5    bank of the MRGO would substantially erode and
6    propagate its way -- the bank would propagate
7    its way toward the toe of the levee, then you
8    could destabilize the levee and have a
9    rotational type failure into the MRGO.  The
10   ground surface elevation that exists now
11   between the bank of the MRGO and the toe of
12   that levee needs to maintain a certain
13   distance.  Otherwise, there is a potential for
14   that destabilization for the levee.
15       Q.  What is that distance, sir?
16       A.  Like I said -- there is no set
17   distance.  I couldn't give you one number.
18   Let's put it that way.
19       Q.  Is there a range?
20       A.  I'm sure there's a range, but I would
21   have to go back and look at the stability
22   analyses and telling what you that is.
23       Q.  Oh, I see.  I see.
24       A.  It's a function of foundation, the
25   height of the levee and the depth of the

Page 121

1    channel.  There's a lot of factors involved in
2    it.
3        Q.  So bottom line, somebody, you would
4    agree with me, needs to determine what that is
5    in order to figure out whether or not the
6    erosion is going to ultimately impair the
7    hurricane protection structure.
8        A.  Yes.
9        Q.  All right.  Who does that kind of
10   thing?  By discipline?  I don't mean --
11       A.  Geotechnical engineers.
12       Q.  Okay.  All right.  And do you know
13   who's the person -- who is the person that I
14   should ask the question to about the decision
15   to put foreshore protection at the southern
16   bank of the MRGO?  If you don't know, it's
17   okay.
18       A.  Yeah.  I don't want to tell you the
19   wrong person.
20       Q.  All right.  Do you know when that was
21   done, though, Mr. Varuso?  Do you know when the
22   foreshore protection was put in on the southern
23   bank?
24       A.  I believe it started in the mid
25   nineties, early to mid nineties, but I'm a

31 (Pages 118 to 121)

RICHARD JAMES VARUSO                                April 1, 2008

Page 122

1    little hazy on so many of those dates. But I
2    believe it was in the nineties.
3        Q. And that was just shortly before you
4    got here.
5        A. Yeah. I started in 1994.
6        Q. All right. Now, the United States
7    Army Corps of Engineers has known for a
8    reasonably long period of time that the MRGO
9    was causing problems in connection with
10   erosion. Isn't that true?
11       MR. BAEZA:
12           Objection. Vague and ambiguous.
13       A. If you could elaborate, actually I'm
14   not sure what you mean by erosion. I mean,
15   where? If you could elaborate on your question
16   it would help.
17   EXAMINATION BY MR. BRUNO:
18       Q. All right. Are you familiar with
19   these reconnaissance reports?
20       A. Somewhat, yes.
21       Q. Okay. Is a reconnaissance report
22   something that the Corps does for each and
23   every project that it does?
24       A. Well, reconnaissance reports are
25   something that, um -- that have kind of evolved

Page 123

1    over time. So, I mean, older documents in
2    older projects may not have had reconnaissance
3    reports. I would say that most projects now do
4    have reconnaissance reports to evaluate the,
5    um -- the cost-benefit ratio of those
6    particular projects. They then usually move
7    into feasibility, which is a more detailed
8    analysis where you get a better idea of cost,
9    and then ultimately it goes to Congress for
10   final funding, and final design and
11   construction.
12       Q. All right. Well, the word
13   reconnaissance, to me, means that there is an
14   evaluation of a particular project to kind of
15   see just what's going on. Would you agree?
16       A. That's a fair way to put it.
17       Q. All right. And the Corps has, I
18   guess, it's projects too numerous to count for
19   which this district is responsible today.
20       A. Fair enough also.
21       Q. Yeah. And you guys just don't do
22   reconnaissance reports for all of them, do you?
23       A. I would say a vast majority of them
24   probably do have reconnaissance reports.
25       Q. All right. I asked the question

Page 124

1    because the very first sentence of the
2    reconnaissance report says, this report
3    presents the results of continued
4    reconnaissance phase investigation of bank
5    erosion and erosion-related problems in the
6    vicinity of the Mississippi River Gulf Outlet
7    MRGO channel.
8        A. Okay.
9        Q. All right. And it sounds to me
10   like -- maybe I'm wrong -- that the purpose of
11   this reconnaissance is to evaluate a problem
12   with that project. Is that not a fair
13   conclusion?
14       A. For this particular reconnaissance
15   report, that's possible.
16       Q. Well, can you identify any other
17   reconnaissance report, with regard to the MRGO,
18   that doesn't talk about bank erosion but talks
19   about some other issue?
20       A. Not that I'm aware of.
21       Q. All right. The fact is that all of
22   the reconnaissance reports that regard the MRGO
23   regard bank erosion and erosion-related
24   problems?
25       A. Like I said, I don't know of every

Page 125

1    reconnaissance report along the MRGO, so I
2    couldn't answer that question.
3        Q. All right. Well, good. Who is the
4    person who is -- that I should talk to about
5    reconnaissance reports in general?
6        A. Probably Al Naomi.
7        Q. Al Naomi, okay. And who is the person
8    that I should talk to about reconnaissance
9    reports that specifically deal with the MRGO?
10       A. Al Naomi.
11       Q. Would you agree, though, with me that
12   this -- and I use the words of the report --
13   bank erosion and erosion-related problems have
14   been known by the Corps for a long, long time?
15       A. Do they refer to it as being a problem
16   in the reconnaissance report?
17       Q. I'll let you -- you judge for
18   yourself. (Tendering.)
19       A. Okay.
20       MR. BAEZA:
21           Do you have a copy?
22       MR. BRUNO:
23           Do I? How about if I give you
24   the '88 one first. I think it said
25   the same thing. Let me see.

RICHARD JAMES VARUSO                                    April 1, 2008

Page 126

1    A.  Okay, I think I've read enough.
2  That's fine.
3  EXAMINATION BY MR. BRUNO:
4    Q.  All right.
5    A.  Okay.  So repeat your question?
6    Q.  Okay.
7    A.  Instead of having you repeat the
8  question let me see if I can summarize it
9  answer it.  According to that document that is
10 dated in 1994, there were erosion issues that
11 were observed along the MRGO.  And from that
12 time they, um -- saw the need to, you know,
13 mitigate for those issues.
14   Q.  Right.  And all I'm -- I mean, the
15 fact of the matter is that the -- where's the
16 design memos?  The erosion problem -- well, let
17 me ask you this:  Is it fair to call this a
18 problem?
19   A.  I suppose you could call it a problem.
20   Q.  Well, I mean, is it acceptable?  Does
21 the United States Army Corps of Engineers
22 accept that whatever was going on in connection
23 with the MRGO which has now been described by
24 these bank erosion reports as bank erosion and
25 erosion-related issues?

Page 127

1    A.  Uh-huh.
2    Q.  Is that acceptable?
3    A.  No.
4    Q.  So it's not acceptable, but it's a
5  problem.
6    A.  That's fair enough.
7    Q.  All right.  Well, let me ask you
8  generally.  Does the Corps of Engineers believe
9  it has the discretion to destroy the
10 marshlands?
11      MR. BAEZA:
12        Objection.
13 EXAMINATION BY MR. BRUNO:
14   Q.  I know it's stupid but I got to ask
15 it.
16   A.  You know, I'm not in the position to
17 answer that question.
18   Q.  Oh.  You think they might have the
19 discretion?
20   A.  I didn't say that.
21   Q.  Well, then, give me an answer.  Either
22 you believe they do or you believe they don't.
23      MR. BAEZA:
24        Objection.  It's ambiguous.
25   A.  Let me give you a hypothetical to

Page 128

1  answer the question.
2  EXAMINATION BY MR. BRUNO:
3    Q.  We can start with that.
4    A.  Okay.  Let's say we've got to build a
5  levee and there's some wetlands that have been
6  provided to us for use for borrowing to
7  construct the levees.  So we go in and we dig a
8  big borrow pit and we draw material out and we
9  construct our levee with it.
10   Q.  All right.
11   A.  That's destroying wetlands, but we
12 mitigate for it, and that's usually how that's
13 handled.
14   Q.  Well, that's the key, though.  You
15 mitigate for it, meaning you fill the hole.
16   A.  Um -- or you -- some other place you
17 build some trees or --
18   Q.  Right.  The point is that you fix what
19 you broke.  Right?
20      MR. BAEZA:
21        Objection.
22   A.  I wouldn't call it fix what you broke.
23 EXAMINATION BY MR. BRUNO:
24   Q.  Well, now, wait a minute.
25   A.  I'm not going to put it that way.  I

Page 129

1  didn't say we broke anything.
2    Q.  Let's understand the meaning of the
3  word mitigate.  What do you appreciate the --
4      (Brief interruption.)
5  EXAMINATION BY MR. BRUNO:
6    Q.  Mitigate.  I understand the meaning of
7  the word mitigate is to fix something that's
8  broken.
9    A.  I'm not sure if you could find those
10 exact terms mentioned anywhere in the
11 definition of mitigate.
12   Q.  Really.  What do you think mitigate
13 means?
14   A.  My appreciation of mitigate is, if we
15 have to cut down a certain amount of trees or
16 affect a certain portion of marsh then we're
17 going to help the environment by creating new
18 marsh in another place, planting new trees
19 or -- just to help the environment.  That's my
20 appreciation of mitigate.  I don't think they
21 use the word fix and broke in any part of the
22 definition of mitigate.
23   Q.  All right.  Well, if it is a true
24 statement that the United States Army Corps of
25 Engineers recognizes that marsh, swampland,

33 (Pages 126 to 129)

RICHARD JAMES VARUSO                                          April 1, 2008

Page 130

1  trees and the like, in the area of the MRGO,
2  has value as a buffer to hurricane surge, does
3  it make sense to remove or reduce the marsh,
4  the swamp or the trees without replacing
5  whatever protective characteristic was there
6  before the removal?
7       MR. BAEZA:
8          Objection.  It's ambiguous and
9       compound.
10      A.  Those determinations are usually done
11  by the environmental staff of the district.
12      I don't think I answered that question
13  in my last deposition.  I don't recall these --
14      Q.  You're CYA-ing now, man.
15      A.  -- questions, but I honestly thing I
16  would have to defer that question, because
17  they're the ones that are responsible for
18  establishing what is wetlands, what needs to be
19  mitigated, what does not have to be mitigated.
20      Q.  I'm talking -- now, I recognize that
21  in the context of development there's a Corps
22  of Engineers program which allows for the
23  payment for wetlands use through the
24  substitution of or the payment of either money
25  or provision of other land.  I'm not talking

Page 131

1  about that.  I'm talking about the wetlands,
2  the marsh, that preexisted the building of the
3  MRGO.  All right?  So we're clear.  You've been
4  up in an airplane, you've seen those marshes.
5      A.  Sure.
6      Q.  And you've already acknowledged that
7  those marshes, those swamps, those trees
8  provide a buffer to hurricane surge.  Right?  I
9  mean, there's no issue there.
10      A.  Right.
11      Q.  Okay.  Maybe we can fight over how
12  much --
13      A.  Quantifying the effects, right.
14      Q.  But we agree that they provide a
15  buffer.  And I'm just curious that despite your
16  belief that that's the case that you would have
17  a view that it would be acceptable to remove
18  any of that buffer without replacing or
19  mitigating that buffer.
20      A.  It's not my area.  I mean, I couldn't
21  answer whether or not that marsh would have to
22  be mitigated after it was dug or not.
23      Q.  All right.  Now, would you agree with
24  me that the Corps has known about a problem
25  with erosion since at least 1968 when the

Page 132

1  deputy chief, through his discretionary
2  authority, altered the MRGO authorization to
3  include funding for foreshore protection?
4       THE WITNESS:
5          Could you repeat his question?
6          (Whereupon the previous question was
7  read back.)
8      A.  I'm not that familiar with those
9  documents.
10  EXAMINATION BY MR. BRUNO:
11      Q.  All right.  The documents speak for
12  themselves.
13      A.  Okay.
14      Q.  Is salinity a subject about which you
15  have some knowledge?
16      A.  Some knowledge, yes.
17      Q.  Okay.  Do you know whether or not the
18  construction of the MRGO caused increases in
19  the salinity of the waters in the marsh at or
20  near the MRGO?
21      A.  More hearsay, that people discuss
22  that's what happened.
23      Q.  Do you know whether or not increased
24  salinity damages, in any way, the marsh?
25      A.  My understanding is that there's a

Page 133

1  potential for damage, depending on the amount
2  of salinity in the water.
3      Q.  All right.  Do you know whether or not
4  increased salinity has the potential to damage
5  trees?
6      A.  I believe that there is a potential
7  for that.
8      Q.  All right.  Who should I speak to,
9  here, to get a better understanding of the
10  Corps' knowledge about saltwater intrusion
11  and/or erosion that was caused or may have been
12  caused by the MRGO?
13      A.  Can I get back to you on that?  I'm
14  not really sure.
15      Q.  No problem.  No problem.
16          Is there not anybody here whose job it
17  is to look for that?
18      A.  Oh, I'm not saying -- I'm sure there
19  is.  I'm sure there's somebody that knows about
20  it.  I'm just not sure I can give you the name.
21      Q.  Okay.  In going back historically to
22  understand the MRGO, the hurricane protection
23  system that was in place pre-Katrina in order
24  to do your work in assisting with the rebuild,
25  did you learn anything about the nature of that

RICHARD JAMES VARUSO                                April 1, 2008

Page 134

1   piece of ground between the MRGO -- I'm
2   sorry -- the hurricane protection structure
3   along the MRGO and the 40 Arpent Canal?
4       A.  You want to show me on the map exactly
5   what you're referring to?
6       Q.  Yeah.  I sure will.
7       MR. BAEZA:
8           We have a map right here.
9       A.  The marsh between here?
10  EXAMINATION BY MR. BRUNO:
11      Q.  Yeah.  Exactly.
12      A.  No.
13      Q.  Okay.  Was that not relevant to your
14  determination?
15      A.  Determination --
16      Q.  Rebuild.
17      A.  The only investigation that was done
18  with the marsh between the levee here and then
19  the 40 Arpent Canal was the adjacent borrow
20  pit.  We've got that long ditch, basically,
21  that parallels the levee.
22      Q.  Okay.
23      A.  Roughly, give or take, 400 feet from
24  the center line of the levee is where that
25  borrow pit exists.

Page 135

1       Q.  Okay.  Well, let me just go ahead and
2   ask you, do you know whether or not saltwater
3   intrusion in that area, from whatever source or
4   whatever cause, damaged the marsh and/or trees
5   that may have been there before the MRGO was
6   constructed?
7       A.  I don't know.
8       Q.  Okay.  Do you know who I should ask?
9       A.  Probably the same person from the last
10  question.
11      Q.  That we'll figure out.
12      A.  Right.
13      Q.  All right.  No problem.
14          All right, I think we can switch to
15  another area now.
16          Let's talk about New Orleans East just
17  for a moment.  There's a hurricane protection
18  structure that was built by the Corps along the
19  southern -- I guess southern border is the best
20  way to describe -- New Orleans East, right?
21      A.  Yes.
22      Q.  Okay.  And would your answer be the
23  same, that is, with regard to the breaching of
24  levees there, that is, do you agree that the
25  levees constructed -- I shouldn't say levees,

Page 136

1   I'll get punished -- would you agree with me
2   that the hurricane protection structures built
3   there performed as designed in Hurricane
4   Katrina?
5       A.  I'm going to have to ask you if
6   you're -- I guess we're referring to the
7   earthen structures that I would call a levee?
8       Q.  Yeah.
9       A.  Yes.  They did.
10      Q.  Well, I'm also referring to the
11  I-walls?  There are some I-walls and some
12  T-walls.
13      A.  There are some T-walls.
14      Q.  They performed as designed, too.
15      A.  Right.  Besides being overtopped.
16      Q.  I mean, the truth of it -- as I
17  understand the IPET report, there's only four
18  admitted design defects.  Isn't that true?
19  There is one at 17, two at London and one at
20  the Industrial Canal.
21      A.  I would hesitate to call them defects.
22      Q.  Give me a word.
23      A.  That's okay.
24      Q.  What do they say?
25      A.  Let's call them issues.  Let's call

Page 137

1   them issues.
2       Q.  Issues.  Design issues.  All right.
3   But I want to -- I guess I'm trying to go the
4   other way.  At the Lower Nine, is it the
5   northern breach or the southern breach where
6   there's some issues?
7       A.  The northern breach.
8       Q.  The northern breach.  Okay.
9       A.  According to IPET.
10      Q.  And the southern breach, though,
11  you're comfortable in saying that the hurricane
12  protection structures, including I-walls and
13  levees, performed as designed.
14      A.  Yes.
15      Q.  Okay.  All right.  And so again, going
16  back to New Orleans East because I want to kind
17  of finish that before lunch, and then after
18  lunch we'll get into the below-the-ground
19  stuff -- the Citrus back levee performed as
20  designed.
21      A.  Yes.
22      Q.  All right.  So the failures there were
23  caused by overtopping, right?
24      A.  Yes.
25      Q.  Okay.

35 (Pages 134 to 137)

RICHARD JAMES VARUSO                                    April 1, 2008

Page 138

1        MR. BAEZA:
2            I'm just going to object to the
3        characterization of failure of the
4        levee.
5    EXAMINATION BY MR. BRUNO:
6        Q.  I'll change it.  Breaches.  Tell me
7    the word to use.  They breached.  Water got
8    through them, right?
9        A.  Unfortunately.
10       Q.  I understand that.  But I mean we're
11   not making light of it but I don't want to play
12   games with words.  We're making a distinction
13   between overtopping only such that there was no
14   breach or failure and a situation where there
15   is a reduction in hurricane protection height
16   such that that would be called a breach or a
17   failure.  Fair enough?
18       A.  That's fair enough.
19       Q.  All right.  You may not be able to
20   answer this question either but I'll just ask
21   you anyway:  If some third party breaks your
22   levee, does the Corps believe it has the right
23   to bring an action against that thirty party
24   for the recovery of the cost of the repair?
25       MR. BAEZA:

Page 139

1            Objection.  Misleading and
2        complete hypothetical.
3        A.  It's not my area, but I believe that
4    the federal government does.
5    EXAMINATION BY MR. BRUNO:
6        Q.  Common sense.  You break my stuff, you
7    fix it, right?
8        A.  (Nods affirmatively.)
9        Q.  You got to say yes.
10       A.  Oh, I'm sorry.  I thought that was --
11   I didn't realize it was a question.
12       Q.  I'll make it, would you agree with me
13   that it is fair that if you break my stuff you
14   should fix it?  That's a question.
15       A.  Okay, yes.
16       Q.  All right.  I'm sorry.  I just wanted
17   to clarify that.
18            Now, again, I'm going to ask this:  I
19   know you're going to respond negatively, but
20   let me ask it anyway.  If some third party --
21   if the Corps of Engineers designs a hurricane
22   protection system for a surge height and some
23   third party causes that surge height to be much
24   higher such that there is overtopping, do you
25   believe whoever may be responsible for that

Page 140

1    excess surge should be held accountable for the
2    damage to your hurricane protection structure?
3        MR. BAEZA:
4            Objection.  It's another
5        hypothetical and calls for
6        speculation.
7        MR. BRUNO:
8            All right.
9        A.  I don't mind answering a question like
10   if you break my staff you fix it.  That's
11   something that's, um -- that isn't, um -- vague
12   enough to -- but the hypothetical you're giving
13   now, you know, I have trouble answering a
14   question like that because, I mean, how would
15   somebody raise the storm surge?  It's a little
16   too ambiguous to -- I think, to answer.
17   EXAMINATION BY MR. BRUNO:
18       Q.  Okay.  All right.  Well, if I drive my
19   truck into the leg of a water tower and the
20   water tower falls over and the water crashes
21   into your levee and goes over the top of the
22   levee and causes some damage to the other side
23   of it, you would agree with me the person that
24   ran into that water tower should be held
25   accountable.

Page 141

1        A.  More than likely.
2        Q.  Okay.  Now, you've talked about
3    cost-benefit analysis, and I want to get into
4    that a little, but maybe if you're not the guy
5    we'll find out, but -- the United States Army
6    Corps of Engineers puts, it seems to me, if
7    only because of the number of times I've heard
8    it, a great deal of stock into a cost-benefit
9    analysis.  Is that true?
10       A.  A great deal of stock you said?
11       Q.  Yeah.  A great deal of importance.
12       A.  Because Congress wants to know that
13   there's a BC ratio that's appropriate.
14       Q.  Right.  And what that means is that
15   you evaluate the costs of a project and then
16   you evaluate the benefits of the project and
17   then you compare the two.  Right?
18       A.  Yes.
19       Q.  Okay.  And we know, do we not, that in
20   evaluating the cost versus the benefits of the
21   MRGO that part of the benefit component was a
22   calculation of the value of reclaimed land on
23   the shore side of the hurricane protection
24   system between that and the 40 Arpent Canal.
25       A.  I'm not sure if that was in the

RICHARD JAMES VARUSO                                    April 1, 2008

Page 142

1    calculation or not.
2        Q.  You don't.  All right.  All right.
3            MR. BRUNO:
4                This is a good time to break for
5            lunch.  I think when we come back all
6            we have left to talk about is the
7            Lower Nine and the underground stuff.
8    EXAMINATION BY MR. BRUNO:
9        Q.  Are you familiar with -- you said you
10   work with McElwee.  Did you work with him on
11   the project?
12       A.  Which project?
13       Q.  What's it called, Michoud?
14           MR. LAMBERT:
15               Dwyer Road.
16       A.  Dwyer Road?  To a very minor extent,
17   yeah.  I'm familiar enough with it, but I
18   didn't work with Melvin.
19   EXAMINATION BY MR. BRUNO:
20       Q.  Who worked with him?
21           MR. BAEZA:
22               Joe, I'm going to object to this.
23           How is this relevant the Robinson?
24           MR. BRUNO:
25               Oh, it's extremely relevant to

Page 143

1            Robinson because it relates to the
2            navigation lock project which of
3            course we have a battle about.  But
4            that's how it's relevant.  It gets
5            into the business of underseepage and
6            making holes and all that stuff.  So
7            I'm preparing you for -- I don't have
8            a whole lot after lunch, but what I
9            want to talk about is the holes and
10           backfilling the holes.
11           THE WITNESS:
12               Okay.
13               (Lunch break.)
14   EXAMINATION BY MR. BRUNO:
15       Q.  All right.  We're back on, and as
16   promised let's talk a little bit about the
17   IHNC.  And let's talk about the west side
18   first.
19       A.  Okay.
20       Q.  Now, there was overtopping on the west
21   of the IHNC, right?
22       A.  South of the GIWW.
23       Q.  Right.  And would your answer be the
24   same with regard to the performance of the IHNC
25   structures built for hurricane protection; did

Page 144

1    they perform as designed?
2        A.  My understanding is that, yes, issues
3    didn't occur until they were overtopped.
4        Q.  Right.  And although we're talking
5    about a little different type of structure,
6    that is, we're talking about I-wall as opposed
7    to a levee, I think that the documents speak
8    out pretty clearly that, just like the earth
9    berm levee, the I-walls were built to a certain
10   height the accommodate the standard project
11   hurricane and that there was not any intention
12   the consider land side protection in the case
13   of overtopping.  Isn't that correct?
14           MR. BAEZA:
15               Objection.  Argumentative as to
16           intent to consider.
17       A.  Other than the grass growth on the
18   earthen sections, right.
19   EXAMINATION BY MR. BRUNO:
20       Q.  Okay.  Not talking about I-walls now.
21       A.  You talking about -- you're asking me
22   about erosion protection on the protected side?
23       Q.  Yeah.  But for I-walls.  Let me
24   clarify the -- the reason I'm asking the
25   question -- I've already asked you this

Page 145

1    question in the context of an earth berm levee.
2    On the western side of the IHNC, are there
3    I-walls as opposed to earth berm levees?
4        A.  The I-wall is a sheet pile wall that
5    exists inside of an earthen session.  It wasn't
6    flat.  You didn't have flat ground surface.
7    There was an earthen section that the I-wall
8    penetrated, so you've got a little bit of both
9    there.
10       Q.  Right.  And I'm trying to avoid going
11   through each section, but not every section had
12   grass, some had gravel, some had dirt, there is
13   any number --
14       A.  Okay.
15       Q.  -- of surfaces there, and regardless
16   of the surface the Corps understood that if
17   those I-walls were overtopped there was the
18   potential for scour and the potential for
19   failure as a result of that scour.
20       A.  Okay.
21       Q.  Are you following me now?
22       A.  Yes.  Fine.
23       Q.  And that was -- although not intended,
24   it was understood that based upon what the
25   Corps perceived to be its mandate, that is,

RICHARD JAMES VARUSO                                    April 1, 2008

Page 146

1  build the I-wall to a height consistent with
2  the standard project hurricane, that's what you
3  did.
4      A.  Yes.
5      Q.  And so in the instance that -- maybe
6  I'll just ask is this way:  Do you know whether
7  or not any of the I-walls on the west bank of
8  the Industrial Canal failed?
9      A.  Yes.  They did.
10     Q.  Okay.  And those that failed performed
11  as designed.
12     A.  Prior to being overtopped, yes.
13     Q.  Right.  Well --
14     A.  I understand.  Yes.  Yes, they did.
15     Q.  But they performed as designed even
16  after overtopping, because there was no --
17     A.  Exactly.
18     Q.  Okay.
19     A.  I understand what you're saying.
20     Q.  All right.  Bottom line:  All of the
21  answers to the questions relative to
22  performance and performing as designed for
23  earth berm levees were the same as regards to
24  the I-walls except for the I-walls at 17,
25  London and possibly the north break at the east

Page 147

1  side of IHNC.
2      A.  Yes.
3      Q.  Okay.  Thanks.  I just wanted to get
4  that out of the way.
5      A.  Okay.
6      Q.  Now, this may or may not be in your
7  area, but the business of the funnel:  All
8  right?
9      A.  (Nods affirmatively.)
10     Q.  Do you, by experience, training or
11  education have opinions as to the existence or
12  nonexistence of a -- I'm going to call it a
13  funnel effect, for lack of a better
14  descriptor --
15         MR. BAEZA:
16             Objection.  Improper lay opinion.
17     A.  No.
18  EXAMINATION BY MR. BRUNO:
19     Q.  And so now that I know that you are
20  not able to give me an opinion --
21         MR. BRUNO:
22             Counsel, because of his answer,
23         which I couldn't get without asking
24         the question.
25  EXAMINATION BY MR. BRUNO:

Page 148

1      Q.  -- who is the person that I should ask
2  about the existence of nonexistence of a funnel
3  effect?
4      A.  You could probably start with Nancy
5  Powell.
6      Q.  Thank you.  Good.  Now we can move on
7  to the -- we covered it in the Murphy Oil, but
8  let's kind of just walk through it on the IHNC.
9          Roughly, without pinning you down to a
10  precise number, what was the designed elevation
11  of the IHNC floodwall?
12     A.  Um -- you referring to the section on
13  the west side south of GIWW?
14     Q.  If they're different --
15     A.  Yes, they're different.
16     Q.  -- let's start there first.  Fair
17  enough.
18     A.  Okay.
19     Q.  West side, south of the Intracoastal
20  Waterway, what was the design?
21     A.  About 15.
22     Q.  And what was the Katrina surge there?
23  If you know.
24     A.  I'm not exactly positive what it was.
25     Q.  All right.  Do you think that the IPET

Page 149

1  has a reasonably accurate --
2      A.  I would imagine so.
3      Q.  And I think that was Figure 14 or --
4      A.  Yeah.  Figure 14.
5          MR. BAEZA:
6              On Page?
7          MR. BRUNO:
8              On Page 40, Volume 140, but
9          unfortunately for me I don't see it
10         shown, so.
11  EXAMINATION BY MR. BRUNO:
12     Q.  Take a quick peak.
13     A.  Yeah.
14     Q.  It's not shown.
15     A.  No, it's not shown.
16     Q.  Okay.  All right.  But we can agree,
17  can we not, that the Katrina surge exceeded the
18  height of the designed height of the hurricane
19  protection structures on the west bank.
20     A.  I think what you need to say is that
21  Hurricane Katrina exceeded the existing
22  elevation of the flood walls at the time of
23  Hurricane Katrina.
24     Q.  Fair enough.  Let's move then to the
25  east side, north breach first.  Okay?

RICHARD JAMES VARUSO                                    April 1, 2008

Page 150

1      A.  Okay.
2      Q.  That was one of the breaches which
3  there is at least a suggestion in the IPET
4  report that there was some foundation issues.
5          MR. BAEZA:
6              Objection.  Ambiguous as to
7          foundation issues.
8          MR. BRUNO:
9              I'm using his --
10     A.  But I think that, um -- let's back up
11  for a second.
12  EXAMINATION BY MR. BRUNO:
13     Q.  Yeah.
14     A.  Um -- on the west side of the IHNC,
15  south of GIWW --
16     Q.  Right.
17     A.  -- there were two areas where the
18  existing I-walls failed.
19     Q.  Right.
20     A.  There was a south end, which was the
21  south end of close to North Claiborne Avenue.
22  On the same west side, closer to Florida
23  Avenue, there was a second failure of the
24  I-wall.  Is that what you're referring to?
25     Q.  No.  I mean, I don't know where I'm

Page 151

1  referring to.
2     A.  Okay.
3     Q.  In the IPET --
4     A.  I think in the IPET report --
5     Q.  -- there is -- let me just find it for
6  you so we don't get sideways, because I read it
7  to you before.  I had it all highlighted.  It
8  talks about four foundation issues, and I
9  wasn't clear as to the fourth so let's --
10     A.  Yeah.
11     Q.  Okay.
12         MR. BRUNO:
13             At Page 2, counsel --
14         MR. BAEZA:
15             All right.
16  EXAMINATION BY MR. BRUNO:
17     Q.  You got it Richard?
18     A.  Yeah.
19     Q.  Where it says the performance?
20     A.  Okay.  Whoa.  Wait.  I'm sorry.
21     Q.  The performance.  Page 2.
22     A.  Yep.
23     Q.  Okay.  You see where it says with the
24  exception of four foundation design failures?
25     A.  Uh-huh.

Page 152

1     Q.  Okay.  I was trying to count in my
2  head -- I've guessed, and maybe I'm wrong, but
3  the first was 17, 2 and 3 are London, and the
4  fourth was -- I thought we discussed this
5  before, was the north on the east side --
6     A.  I think that's where the mistake is.
7  It's the north breach on the west side.
8     Q.  Oh, okay.
9     A.  I'm not sure if there was a
10  misunderstanding before.  Maybe I misspoke
11  before.
12     Q.  Maybe it's my fault.  So it's on the
13  west.
14     A.  It's on the west side.  The north
15  breach of the I-wall along the Lower Ninth Ward
16  along the north end close to Florida Avenue.
17     Q.  You keep saying lower Ninth Ward,
18  though.  That's where you're throwing me,
19  because the Lower Ninth is on the east.
20     A.  East side.  I am misspeaking.
21     Q.  That's why -- my mind is about to
22  break.
23     A.  So is mine.
24     Q.  So let's slow down.
25     A.  I apologize.

Page 153

1     Q.  Upper Ninth is on the west, Lower
2  Ninth is on the east.
3     A.  Yes.  I apologize.
4     Q.  So where are we, Richard?
5     A.  On the east side.  You're correct.
6     Q.  So we're on the east.
7     A.  On the east side, yes.
8     Q.  And we're on the north breach.
9     A.  Yes.
10     Q.  Closer to the Sewerage & Water Board
11  pumping station.
12     A.  Yes.
13     Q.  All right.  Now, now that we've got
14  that cleared up -- and let's just clarify it
15  for the record.  No question.  West side
16  breaches, overtopping only, and then scouring
17  and then failure, no foundation --
18     A.  Yes.
19     Q.  -- issues.
20     A.  Correct.
21     Q.  All right.  East side, south breach,
22  overtopping and scouring and, according to the
23  IPET, at least, no foundation failures.
24     A.  Correct.
25     Q.  Okay.  According to my guys, some

RICHARD JAMES VARUSO                                           April 1, 2008

Page 154

1  other issues which we'll talk about in a
2  moment.
3       North breach:  I believe the
4  suggestion is that the mechanism of failure is
5  similar to that experienced at 17.
6     A.   Yes.
7     Q.   That is, separation between the earth
8  berm and the I-wall, water filling, and then
9  some subsequent failure.
10    A.   (Nods affirmatively.)
11    Q.   But I want to clarify.  There was
12  overtopping after that, not before.
13    A.   According to the IPET report.
14    Q.   I'm going to place this in front of
15  you.  Let me just place this in front of you.
16  I will tell you that we got it off of the
17  website of the Kansas City District office, and
18  my questions will be focused on the third page.
19    A.   This is from the Kansas City District
20  office?
21    Q.   Yes.  We can go online and verify all
22  that if we need to, but please trust me on
23  that.
24    A.   Okay.  Did you need me to read the
25  highlighted --

Page 155

1     Q.   No.  I just wanted you to just --
2  okay.  Now, you will see that the title of this
3  document is Guidance for Work Proposed Near or
4  Within a Federally Constructed Flood Control
5  Project.  Right?  There it is.  That's what you
6  and I were talking about a little bit ago.
7       So my first question to you is, have
8  you ever seen anything like that?
9     A.   No.
10    Q.   Okay.
11    A.   I mean, not with this specific title
12  on it.
13    Q.   All right.  Well, can I as a layman,
14  non military guy, non Corps guy, assume that
15  those guidelines are something that I would
16  read in order to ascertain the potential impact
17  of some excavation that I might be doing near a
18  federal flood control project?
19    A.   I would have to read through the
20  guides and see what it's referring to.
21    Q.   Okay.  Well, then, I'll let you go
22  ahead and do that.  In fact, we can get off the
23  record because I really need to understand this
24  to see if you all have one here in New Orleans.
25    A.   Okay.

Page 156

1     Q.   So if it will take you a little time,
2  let's go off the record and you just do that.
3       (Off the record.)
4  EXAMINATION BY MR. BRUNO:
5     Q.   Okay.  Mr. Varuso, you have had a
6  chance to look at what I've represented to you
7  is off of the web side of the Kansas City
8  District.
9       Make any sense out of what we've given
10  you?
11    A.   Well, I'm not sure what you mean by
12  make any sense.
13    Q.   In other words, does it look like what
14  it purports to be, guidelines?
15    A.   Guidelines.
16    Q.   All right.  And does it appear to you
17  to be something that comes specifically and
18  only out of Kansas City, or is this a Corps
19  document that's accessible by all of the
20  district offices?
21    A.   It's accessible if you're saying it's
22  on the Internet.  But it doesn't appear to be
23  an official Corps of Engineers document.  It
24  doesn't have an official em, etl, er, what have
25  you, designation to it.

Page 157

1     Q.   Okay.  Now, may I have that back,
2  please?
3     A.   Sure.  (Tendering.)
4     Q.   Does the New Orleans office have such
5  a guideline?  And by such a guideline, I'm
6  referring to the something called -- does the
7  New Orleans office have a written guideline
8  which would have given information about
9  guidance for work proposed near or within a
10  federally constructed flood control project?
11    A.   I'm not sure.
12    Q.   Okay.  All right.  Now -- now, let me
13  just show you --
14       MR. BRUNO:
15          And again, it's hard for me to
16       reference this but I'll give counsel
17       an opportunity to make a photocopy of
18       this thing.  And perhaps we should
19       attach it, Richard, and I'm just going
20       to mark it as Varuso Number 1 because
21       it's a document that you're not
22       familiar with.
23       MR. STONE:
24          Yes.
25  EXAMINATION BY MR. BRUNO:

RICHARD JAMES VARUSO                                    April 1, 2008

Page 158

1     Q.  And I'll ask you to look at the pages
2  entitled excavation and backfill, the
3  paragraphs that we've highlighted, which are 1,
4  2, 3 and 3.1.  (Tendering.)  Just quickly read
5  those -- or read them.  Take whatever time you
6  need, I'm sorry, to digest them.
7     A.  Okay.
8     Q.  All right.  First question to you is
9  whether or not the subject excavation and
10 backfill falls within your area of expertise
11 and knowledge.
12    A.  Yes.
13    Q.  Okay.  All right.  Now, let me have it
14 back so I can ask you some --
15    A.  All right.
16    Q.  We had chatted earlier a little bit
17 about the necessity of getting Corps approval
18 on projects that were near or around hurricane
19 protection structures, and we referred, really,
20 to I guess what would be called capital
21 projects.  Here there is a discussion about
22 excavations.
23       So my first question to you is, is it
24 necessary for the Corps to evaluate excavations
25 that may be, using the words as outlined here,

Page 159

1  in the critical area of a flood control
2  project?
3     A.  Well, let's get to the definition of
4  what they're defining the critical area to be.
5  They're very specific in the beginning of this
6  document that it's 300 feet on the river side
7  and 500 feet on the landward side.  That's
8  obviously been established based on, um --
9  various site specific information about a
10 typical levee, say, or a typical structure for
11 their district.  So that critical area is going
12 to change depending on where you are and the
13 type of structure it is.  The critical area in
14 New Orleans might be smaller than that, in
15 Sacramento it might be bigger than that.  So we
16 need to get into the definition of what they're
17 defining as critical because it may not apply
18 everywhere.
19    Q.  I need to slow you down, because if
20 New Orleans doesn't even have this, how are you
21 able to say that in New Orleans criteria could
22 be larger or smaller?
23    A.  They're defining their critical area
24 based on what zone -- I mean, they probably
25 looked at a worst case scenario --

Page 160

1     Q.  Right.
2     A.  -- and said, okay, for this worst case
3  levee section, if I dig within this 800-foot
4  zone, 300 feet on one side and 500 on the other
5  side, I may have a problem.
6     Q.  I understand that, Mr. Varuso, but my
7  problem is this.  Would you agree with me,
8  based upon all that you know about the soils in
9  this area --
10    A.  Uh-huh.
11    Q.  -- that if anything, excavating around
12 a flood control project in New Orleans is far
13 more hazardous than excavating around a flood
14 control project in Kansas City?  Based upon
15 your knowledge of the soil structures alone?
16       MR. BAEZA:
17          Objection.  Argumentative.
18    A.  I wouldn't use the term more
19 hazardous.
20 EXAMINATION BY MR. BRUNO:
21    Q.  Would you pick any term?
22    A.  I would say that, um -- it's -- I
23 mean, they even mentioned in one of the
24 paragraphs in there that each structure has to
25 be looked at on a case-by-case basis.  So it's

Page 161

1  a case-by-case situation.  If I'm going to dig
2  within -- and I'm just throwing an example out
3  there -- if I'm going to dig within 200 feet of
4  a levee, you know, and it's all compact clay
5  and the foundation is all clay and, um --
6  foundation of the material is all Pleistocene
7  and they're very strong, my factors for safety
8  for that particular levee are 3 or more, then I
9  don't care.
10    Q.  All right.
11    A.  But, so it's -- it's very difficult to
12 generalize.
13    Q.  Well, do you often, in New Orleans,
14 come in contact with a large layer of clay
15 strata?
16    A.  Sure.
17    Q.  All the time?
18    A.  Not all the time.
19    Q.  No.  Rarely.
20    A.  Um -- what do you mean by large layers
21 of --
22    Q.  All right.  Let's get the cases.
23 Lower Nine.  Okay?  Water side.
24    A.  Okay.
25    Q.  There ain't no clay there, is there?

RICHARD JAMES VARUSO                                                    April 1, 2008

Page 162

1     A.  Sure there's clay there.
2     Q.  How much clay is there?
3     A.  In the Lower Ninth Ward.
4     Q.  No.  In the water side of the Lower
5  Nine breach, north and south, there is not a
6  lot of clay there.
7         MR. BAEZA:
8            Objection.  Vague.  What do you
9         mean by not a lot?
10    A.  There isn't sand until around
11  elevation minus 60.
12  EXAMINATION BY MR. BRUNO:
13    Q.  Okay.
14    A.  It's all clay.  From the ground
15  surface down to elevation minus 60 is
16  predominantly clay.
17    Q.  No peat, no --
18    A.  Well --
19    Q.  You're including within the definition
20  of the clay, peat, humus, wood, logs, all that
21  stuff?
22    A.  No, I'm not defining peat as clay.
23    Q.  I didn't think so.
24    A.  Okay.
25    Q.  I mean, you know --

Page 163

1     A.  Yes, there are some inconsistent zones
2  of peat that do exist in some of the borings
3  along IHNC.
4     Q.  Well, we know, do we not, that along
5  the IHNC, particularly there, of all places --
6  that's where there was a breach in Betsy,
7  right?
8     A.  From what I've heard.
9     Q.  From what you heard.  And we know that
10  the breach in Betsy gave us some instruction
11  about the soils at that location, and they were
12  not typically strong, um -- maybe I'm using the
13  wrong words and I shouldn't use strong, but
14  soils, um -- that were the best to underlay a
15  flood protection structure.
16        MR. BAEZA:
17            Objection.  Argumentative.
18    A.  Let's talk about the use of the word
19  best in this -- and I'm only saying that
20  because I think I understand what you're trying
21  to ask me, and let's see if I can iron it out.
22  EXAMINATION BY MR. BRUNO:
23    Q.  All right.
24    A.  Um -- every foundation is going to
25  have its own challenges.  Okay?  Whether -- a

Page 164

1  sand strata, for example.  The foundation is
2  completely made of sand.  It's a lot stronger
3  than clay.  But now I have seepage problems.  A
4  real weak clay would have no seepage problems,
5  but maybe I have a strength problem.  So
6  difficult to define any one type of foundation
7  as good, bad or what have you.
8     Q.  Right.
9     A.  There's different challenges.  But let
10  me finish, if I may.  And that's the job of the
11  geotechnical engineer, is to find out what does
12  exist and to design accordingly.  So however --
13  whatever the case may have been for the
14  existing foundation along the Lower Ninth Ward
15  walls, a geotechnical engineer's responsibility
16  is to analyze that and to make recommendations
17  and designs accordingly.  Nothing is
18  unexpected, or nothing was unexpected about
19  what was seen in the foundations in that
20  particular area given the soil conditions that
21  we typically see in southern Louisiana.
22    Q.  All right.  Well, then, let's do it
23  this way:  Let's see if you agree with me, as
24  an expert in the field.  Excavation and
25  backfill in the critical area of a flood

Page 165

1  control project could have a direct impact on
2  the stability of the flood control project.  Do
3  you agree with that or not?
4     A.  It could.
5     Q.  And do you agree with me that at the
6  Lower Nine, north and south breach -- let's use
7  300 feet.  Okay?  Based upon your knowledge of
8  that soil, the sand, the whole nine yards, if
9  you will --
10    A.  Okay.
11    Q.  -- would you agree with me that that's
12  a critical area of a flood control project?
13    A.  I'm not trying to get into the details
14  of words, but I have to make sure I understand
15  the question.
16    Q.  All right.
17    A.  What do you mean by a critical area?
18  Are you meaning critical area based on what's
19  in this document or critical area using it as a
20  general term?  This document from Kansas City
21  gives a very specific definition of what a
22  critical area is.
23    Q.  No.
24    A.  And I do not think that definition
25  applies to the Lower Ninth Ward.

42  (Pages 162 to 165)

RICHARD JAMES VARUSO                                    April 1, 2008

Page 166

1     Q.  I thought that you told us that this
2  document defined the critical area in terms of
3  distance from the flood control project center
4  line.  Are you now suggesting --
5     A.  No.  In Kansas City.
6     Q.  I understand that.
7     A.  Okay.
8     Q.  But I'm telling you, it doesn't matter
9  to me where you are, it's a space, it's a
10  distance, and according to this it's 500 land
11  side, 300 river side.  Are you using some other
12  measure other than feet?
13     A.  No.  What I'm saying is that when the
14  Kansas City District put this document
15  together --
16     Q.  Right.
17     A.   -- they did that with their levees
18  and their structures in mind.
19     Q.  Exactly.
20     A.  Okay?  So for -- they may have -- I
21  can't tell you what they based those numbers
22  on.
23     Q.  I'm not talking about them.  I asked
24  you, based upon what you know about --
25     A.  Okay.

Page 167

1     Q.  -- one, the hurricane protection
2  structure on the IHNC --
3     A.  Yes.
4     Q.  -- at the location where there was
5  overtopping and a breach --
6     A.  Yes.
7     Q.  -- on the south, and at the location
8  where there was a breach on the north, at those
9  precise locations, and I'm asking you to assume
10  an area 300 feet to the water side of the
11  center line of those two points.  Okay?
12        Now, and I'm suggesting, and maybe you
13  need to do some further study, and if you do,
14  that's fine, but if you can, as you sit here
15  talking to me today, based upon what you know
16  about the soils in that area, whether you can
17  tell me whether that is a critical area of a
18  flood control project.  And if you can't, it's
19  okay.
20     MR. BAEZA:
21        Objection.  It's a misleading and
22     incomplete hypothetical.
23     MR. BRUNO:
24        Why is it misleading?
25     MR. BAEZA:

Page 168

1        Because you're creating facts
2     here.  We're not talking about
3     particular facts that are within this
4     witness' knowledge.
5     MR. BRUNO:
6        Which facts?  On the contrary,
7     I'm asking him if he has those facts.
8     So how can that be incomplete if I'm
9     trying to find out what facts he's
10     got?
11     A.  I don't mind answering the question.
12  EXAMINATION BY MR. BRUNO:
13     Q.  I know, but I need to satisfy his
14  objection first because he's saying it's
15  incomplete.
16        I'm asking if you have the facts, and
17  if you don't you don't, that's fine, but I
18  can't find out if you got the facts without
19  asking you the facts, which makes it somewhat
20  difficult for me.
21     MR. BRUNO:
22        And in terms of incomplete, what
23     am I missing?
24     A.  I usually define critical area.
25  EXAMINATION BY MR. BRUNO:

Page 169

1     Q.  Well, do they define critical area?
2     A.  For the Kansas City District.  I'm not
3  sure why this isn't clear.
4     Q.  I'm not sure why it's not clear
5  either, because it says here the critical area
6  is generally considered the area from 300 feet
7  to 500 feet.
8     A.  For the structures in the Kansas City
9  District.
10     Q.  Okay.  And I'm asking you the question
11  would 300 feet be appropriate for this area at
12  the Lower Ninth, given your knowledge, if you
13  have any, of the soils, the sands, the clay,
14  the peat, the marsh, the buried logs underlying
15  that 300 feet -- together with your knowledge
16  of the hurricane protection structure, is that
17  enough for you to be able to tell us whether in
18  fact that is a critical area?
19        (Brief interruption.)
20  EXAMINATION BY MR. BRUNO:
21     Q.  I also have East Bank IHNC Geological
22  Section to the South Breach and North Breach,
23  if you want to take a quick peek.  It's from
24  IPET.
25     A.  I'm familiar with it.

43 (Pages 166 to 169)

RICHARD JAMES VARUSO                                    April 1, 2008

Page 170

1     Q.  I thought you were, that's why I asked
2  the question.
3     A.  Okay.
4     Q.  Maybe I'm wrong.
5     A.  Maybe we're not on the same page with
6  the question and what you're looking for for an
7  answer, but let's --
8     Q.  Well, then, let me explore it then.
9     A.  Let's do this:  Let me read the first
10  paragraph and tell you how I'm interpreting the
11  use of the word critical area.
12     Q.  All right.
13     A.  Okay?  It says, the information has
14  been provided general guidance regarding
15  engineering operation and maintenance aspects
16  of construction within the critical area of
17  flood control projects constructed by the Corps
18  of Engineers.  The critical area is generally
19  considered the area from 300 feet riverward to
20  500 feet landward of flood control project
21  center line.  Okay.  So they're defining an
22  area that says if you do anything within these
23  two -- the limites of this, 300 feet on one
24  side, 500 feet on the other --
25     Q.  Right.

Page 171

1     A.  -- if you do anything within there we
2  want to know about it because there might be an
3  issue.
4     Q.  Right.
5     A.  Okay.  Might be.  Right?
6     Q.  Can I press the pause button?
7     A.  Sure.
8     Q.  The reason why they might be
9  interested is because they have some -- it's
10  about excavation, it's about digging holes,
11  it's about all that stuff.
12     A.  Sure.
13     Q.  And there's a whole bunch of stuff
14  about underseepage and undermining the slope of
15  the levee, et cetera.  Maybe I'm stupid, dut
16  I'm thinking to myself, if you're digging a
17  hole within a critical area there must be the
18  potential to impact the hurricane protection
19  structure.
20     A.  Right.
21     Q.  And these guys in Kansas City figured
22  out 300 feet, for them, is the area of concern
23  based upon their knowledge of the soils and the
24  hurricane protection structure.
25     Is that insane?

Page 172

1     A.  No.
2     Q.  Okay.  Now, so, if that's not insane,
3  and if it has any reasonable logic to it at
4  all, then one might conclude, well, if I go to
5  New Orleans and I know something about the
6  flood control structure and I know something
7  about the soils, maybe -- maybe --
8     A.  Yes.
9     Q.  -- I might be able to ascertain what a
10  critical area would be for that location in the
11  Industrial Canal near the breach.
12     Am I making any sense?
13     A.  Yes.
14     Q.  Okay.
15     MR. BAEZA:
16         I going to have to object again.
17     You're arguing with the witness.
18     You've asked about the Kansas City
19     District.  He has told you it only
20     applies to the Kansas City District,
21     and now you're asking him, though, to
22     take judgments made by the folks in
23     Kansas City and impart them into
24     southeastern Louisiana.
25     MR. BRUNO:

Page 173

1         No, I'm not.
2  EXAMINATION BY MR. BRUNO:
3     Q.  Let's go back to where we were.
4     MR. BAEZA:
5         I'm just going to keep on
6     objecting then.
7     MR. BRUNO:
8         I will graciously agree to make
9     your objection continuing as to form
10     because I don't know how to better ask
11     the question.  Because I've thought
12     about it a great deal.
13  EXAMINATION BY MR. BRUNO:
14     Q.  So anyway, back to where we were.
15     A.  I'm sure you have.
16     Q.  Mr. Varuso, based upon that analysis,
17  do you think, based upon your knowledge -- and
18  you have knowledge of the soils there.
19     A.  (Nods affirmatively.)
20     Q.  This is your -- you're the man.
21  Right?  Are you the man?
22     A.  I'm not answering that question.
23     MR. BAEZA:
24         You can answer.  You can answer.
25  EXAMINATION BY MR. BRUNO:

44 (Pages 170 to 173)

JOHNS PENDLETON COURT REPORTERS                    800  562-1285

RICHARD JAMES VARUSO                                      April 1, 2008

Page 174

1    Q.  Forgive that little aside --
2    A.  That's fine.
3    Q.  -- but you certainly possess the
4  requisite training, experience and knowledge of
5  that particular area --
6    A.  Yes.
7    Q.  -- to talk to us about the soils --
8    A.  Okay.
9    Q.  -- et cetera.  And you can talk to us
10  about whether there are any hazards associated
11  with digging in that area or not.  Maybe there
12  are no hazards, I don't know.  But that's why
13  I'll asking you the question.  Based upon your
14  understanding of the soils and the peculiar,
15  and I don't mean odd, but just specific, nature
16  of that flood control structure, are there any
17  concerns such that it would be appropriate to
18  call it a critical area as the Kansas City guys
19  contemplate the use of that phrase?
20    A.  What I will tell you is this:  Is that
21  when the excavation was considered along the
22  IHNC --
23    Q.  Wait, wait.  Now you're getting
24  specific.  I'm all general.  I'm still at the
25  general stage.  I'm not -- I don't want to even

Page 175

1  talk about that hole yet.  I need to get the
2  rules of engagement with you down.  And so
3  that's why I'm asking it this way, with all
4  respect to me, and the good news is I get to
5  ask the questions.  I need to understand
6  generally if there is a critical area.  And
7  I'll define critical area for this question.
8  These guys say critical area is a place where
9  certain rules are going to apply, and here are
10  the rules.  Right?  Not that hard to
11  understand.  They determine that area based
12  upon their own assessment of whatever things
13  they want to assess.  Enough.
14       Now we got it here.  We come to New
15  Orleans.  We got an assessment of the soils, we
16  got an assessment of the hurricane protection
17  structure.  The question on the table is this:
18  And I'll make it general.  Do you believe that
19  there is a need for some guidelines for
20  excavation within any distance of the hurricane
21  protection structure on the Industrial Canal
22  east -- at the location of the north or south
23  breach, based upon your knowledge of the soils
24  and the peculiar design and construction of the
25  hurricane protection structures there.

Page 176

1       MR. BAEZA:
2          And I'm going to object because
3       it calls for an improper lay opinion.
4    A.  You can appropriately analyze any
5  potential for, you know, negative impact on
6  that existing structure along the IHNC in this
7  area without having official guidelines as was
8  put together by Kansas City.
9  EXAMINATION BY MR. BRUNO:
10    Q.  Of course.  That's not the question,
11  though.
12    A.  Well, you asked me if we need a
13  guidelines.
14    Q.  Well, yeah.  So the answer is no, we
15  don't need guidelines.
16    A.  I don't think you have to have
17  specific --
18    Q.  No, no.  The question is, do we need
19  guidelines, yes or no?  In fairness to me, it's
20  either a yes or no.  If we know we don't need
21  guidelines because we'll do it on a
22  case-by-case basis, I'm with you.  If yes, we
23  need guidelines, find, what are the guidelines?
24  I need you to answer the yes or no question,
25  and then you can explain it till the cows come

Page 177

1  home as my father used to say.
2    A.  My opinion is that you don't need
3  specific guidelines.
4    Q.  All right.  So that means, then, does
5  it not, that you have to evaluate the
6  excavations on a case-by-case basis?
7    A.  Sure.
8    Q.  Sure you do.
9    A.  Yes.
10    Q.  How critical is that?  This is New
11  Orleans.  This is a levee.  Not critical?  Not
12  important?
13    A.  I didn't say that.
14    Q.  I want to know how --
15    A.  You're asking for me to quantify
16  importance.  I'm not sure how to do that.
17    Q.  Okay.  I'm now a contractor, and I'm
18  digging around your levee, and I just want to
19  know -- I'm going to call up my local district
20  office of the United States Army Corps of
21  Engineers, I'm going to ask for "the man," that
22  geotechnical guy, and I'm going to say, hey,
23  man, can I dig, yes or no?  And if I can dig,
24  how deep?
25       Right?  What's your answer?

RICHARD JAMES VARUSO                                    April 1, 2008

Page 178

1    A.  The answer would be it would have to
2  be reviewed, we'd have to look at the site
3  specific data for that location and determine
4  whether or not, how close we could get and how
5  deep we could go with that excavation.
6    Q.  Exactly.  When should I call you?
7  There's no guidelines now, right?  So when do I
8  call?
9    A.  We're still talking about
10 hypotheticals?
11   Q.  Hypothetical.  There's no guidelines,
12 so now --
13   A.  Well, you're within --
14   Q.  I don't know.  There's no guidelines.
15 So what do I do?
16   A.  Well, as I mentioned before, this is
17 part of the permit process.  So before a
18 private individual, third party as you
19 mentioned before, would do work in the vicinity
20 of a government structure, Corps of Engineers
21 structure, they would have to go through a
22 permit process.
23   Q.  From?  And from whom do I get this
24 permit?
25   A.  You would submit the permit through

Page 179

1  our operations division.
2    Q.  I would submit the request for a
3  permit.
4    A.  You would submit a permit request.
5    Q.  Permit request.
6    A.  Yeah.
7    Q.  Okay.  Now, how do I know when I'm
8  supposed to ask for a permit?  How close can I
9  get?  I should say, how far away can I get
10 without asking you for a permit?
11   A.  That's guidelines that are put
12 together as far -- that's two question.
13   Q.  You told me you didn't need
14 guidelines.  Sorry.
15   A.  No, no, no, no.
16   Q.  Penalty button.
17   A.  That's two separate questions.  You
18 asked me about guidelines as far as analyzing.
19   Q.  Right.
20   A.  Guidelines as far as when you need to
21 put in a permit application is another
22 question.  That's a function of --
23   Q.  In fairness to me, I asked you whether
24 or not there was any need for guidelines at
25 all.  And you said no.  You said case-by-case

Page 180

1  basis.
2    A.  Well, then, I misunderstood your
3  question.
4    Q.  Well, are there need for guidelines,
5  yes or no?  There are?
6    A.  Guidelines for what?
7    Q.  About when to ask for a permit.
8    A.  That wasn't your question the first
9  time.
10   Q.  I think it was, but I'm happy to
11 disagree over your interpretation.
12   A.  Okay.
13   Q.  I need to know --
14   A.  I would imagine those exist.  I'm not
15 sure what the exact guidelines are.  Those are
16 usually taken care of by our operations
17 division.
18   Q.  All right.  Now, here, as you know,
19 Richard, the work that was done by the WGI was
20 a Corps project.  Okay?  Right?
21   A.  Yes.
22   Q.  And you told me before, you said, when
23 it's a Corps project the Corps in preparing the
24 plans and specifications will in that process
25 evaluate how close the work would be and the

Page 181

1  digging and so forth.  Right?
2    A.  Yes.
3    Q.  Now, but in this case, the United
4  States Army Corps of Engineers did not prepare
5  plans and specifications, isn't that true?
6    A.  Um -- I'm not familiar with who put
7  the plans and specifications together for that.
8    Q.  Are there any plans and specifications
9  that you're aware of?
10   A.  I'm not sure.
11   Q.  All right.  There's a work order,
12 that's all it is, let's go clean up the site.
13 Or do you know that?
14   A.  I don't know that.
15   Q.  You don't know that.
16   A.  No.
17   Q.  Okay.  All right.  Okay.  Are you
18 familiar with something called a statement of
19 work?
20   A.  Statement of work?
21   Q.  Yes, sir.
22   A.  Um --
23   Q.  I mean, if it -- I'm not trying to
24 test you.  It just happens to be what the words
25 that are on the Task Order 26.

                                46 (Pages 178 to 181)

RICHARD JAMES VARUSO                                    April 1, 2008

Page 182

1      A.  Okay.
2      Q.  Are you familiar with Task Order 26?
3      A.  That specific task order?
4      Q.  Yeah.
5      A.  No.  But, now, let's back up a second.
6  If it's a task order, then my take on that
7  would be we already have a contract with an
8  organization, and as part of that contract we
9  allowed so many task orders, and the task
10 orders are the specific documents which tell,
11 you know, the contractor what to do.
12     Q.  Right.  Well, my information is, and
13 it could be wrong, that the June 1, 1999
14 statement of work for Task Order 26 set forth
15 the project requirements that WGI, the
16 Washington Group, would furnish all engineering
17 services, materials, supplies, labor, as
18 required in connection with the technical
19 review of site documents associated with the
20 demolition and remediation of EBIA.
21     So before I get into the specifics of
22 that, do you have any familiarity with how the
23 Corps evaluates task orders?
24     A.  Construction task orders?
25     Q.  Well, in fairness, this is -- we both

Page 183

1  know this wasn't construction.  This was an
2  EBIA, which I understand to be an acronym for
3  what, East Bank Industrial Area.  And it's the
4  total environmental remediation contract.
5  They're pulling stuff up.
6      A.  Uh-huh.
7      Q.  And you know, in fact, that the WGI
8  had a contract to remove the piling and the
9  wharfage and the buildings and the underground
10 stuff --
11     A.  Uh-huh.
12     Q.  -- on the water side of the Lower
13 Nine, right?
14     A.  Yes.
15     Q.  So it's not construction, it's removal
16 of materials.
17     A.  Okay.
18     Q.  And you also know, in fact, that that
19 contract called on -- no, that the work which
20 was the subject of the contract required the
21 WGI to dig holes and remove things from below
22 the surface of the water, right?
23     A.  To my knowledge, yeah.
24     Q.  Okay.  Now, in this context, does the
25 Corps review what these fellows propose to do

Page 184

1  in connection with the digging of the holes?
2      A.  I'm not familiar with that task order
3  I'm not really sure what the process was in
4  that.
5      Q.  Would you expect the contractor WGI to
6  evaluate the soils, the proximity to the flood
7  control project, if it knew it was going to
8  have to dig holes and excavate, et cetera?
9      A.  I would imagine an assessment would be
10 made either by the contractor or by the
11 government.
12     Q.  All right.  And do you have any
13 understanding as to whether or not if the
14 government signs a contract like this where
15 it's telling them -- I mean, just assume this
16 be correct.  I know you haven't tested it, so
17 just assume I'm telling you the truth.  This
18 peculiar contract required Washington Group to
19 furnish all the engineering.  All right?  If
20 that were true, would you expect the Washington
21 Group to have evaluated, from an engineering
22 perspective, the digging of the holes and the
23 potential impact of those holes and the
24 backfilling of those holes on the hurricane
25 protection structure?

Page 185

1      MR. BAEZA:
2          I'm going to object to this.  The
3      witness has already said he lacks
4      personal knowledge about this project.
5      MR. BRUNO:
6          I understand that.
7      A.  Yeah.  Honestly, to answer that
8  question I think I have to read through the
9  whole task order and see what it said.
10 EXAMINATION BY MR. BRUNO:
11     Q.  Based upon your knowledge of the soils
12 in that area, if you were going to dig a hole
13 25 feet, what would you say would be the
14 appropriate material to backfill that hole with
15 if that hole was in -- within 20 feet of that
16 hurricane protection structure?
17     A.  Probably either, um -- and just off
18 the cuff now --
19     Q.  Sure.
20     A.  -- either dredge type material,
21 hydraulic dredge type material or sand.
22     Q.  You'd put sand there.
23     A.  You're replacing material underwater.
24 You have to put rock, sand -- it's very
25 difficult to place clay type material

47 (Pages 182 to 185)

RICHARD JAMES VARUSO                                          April 1, 2008

Page 186

1   underwater.  So you --
2       Q.  Are you familiar with a material --
3   you said that you had some knowledge of
4   Mr. McElwee.
5       A.  Yes.
6       Q.  Do you have any knowledge of the Dwyer
7   Road project?
8       A.  Some knowledge.
9       Q.  And do you know whether or not
10  Mr. McElwee suggested to Corps that because
11  piling were being pulled that the holes created
12  by having pulled the pile necessitated filling
13  those holes with a material called bentonite?
14  Bentonite?
15      A.  I'm not aware of him making that
16  recommendation.  This is -- doesn't have
17  anything to do with Dwyer Road then.  The
18  question you're asking me is about the IHNC
19  site?  Or are you asking about Dwyer Road?  I
20  kind of missed your question.
21      Q.  Dwyer Road.  I was referring
22  specifically to Mr. McElwee and specifically to
23  his suggestion that because he was pulling
24  piles underwater --
25      A.  At Dwyer Road.

Page 187

1       Q.  -- at Dwyer Road, that there was a
2   necessity, in his view, and apparently the
3   Corps agreed, to put this material called
4   bentonite into the holes.
5           MR. BAEZA:
6               For the record, can we just
7           specify where Dwyer Road is located?
8   EXAMINATION BY MR. BRUNO:
9       Q.  And let's be specific.  This project
10  was the removal -- it was the removal of some
11  pipes and the installation of a new intake and
12  pipes for a Sewerage & Water Board discharge
13  station at or around that location.
14      A.  For the Dwyer Road pump station.
15      Q.  Exactly.
16      A.  I'm not familiar with what piles that
17  Mr. McElwee was referring to pulling and then
18  basically backfilling.  There could be a myriad
19  of reasons to want tod the backfill those holes
20  with bentonite.
21      Q.  All right.  Give me some.  What would
22  be some of the reasons why you would use
23  bentonite?
24      A.  Oh, Jeezum.  I really prefer so see
25  the specific, um -- you know, job details and

Page 188

1   that before I would comment on that.
2       Q.  Do you know what it is?
3       A.  I know what the job is.
4       Q.  No, no.  What bentonite is.
5       A.  Yeah, I know what bentonite is.
6       Q.  What is it?
7       A.  Bentonite is kind of a, um -- it's a
8   slurry, um -- sort of a powdery mix that you
9   mix with water, makes almost like a real weak
10  clay type slurry.
11      Q.  Okay.  What's it used for?
12      A.  In some cases if we're taking a soil
13  boring, for example, they'll flush bentonite
14  down the hole of the boring, it keeps the sides
15  in tact so you can continue with the boring
16  without the hole caving in.  It's also used to
17  backfill holes, say, those borings -- once we
18  complete the boring, we'll backfill with the
19  bentonite.  And the top couple of feet will be,
20  you know, regular type clay material.  And
21  that's just one example what it's used for.
22  It's a backfill type material.
23      Q.  All right.
24      A.  It's like a man-made type clay.
25      Q.  Okay.  It's also used to prevent

Page 189

1   underseepage that may be caused by putting a
2   whole into strata that before the hole there
3   was something blocking the ability of the water
4   to get into the sand and go through the sand
5   under the flood protection project.  Right?
6       A.  Usually those slurry walls are
7   continues type walls, if you're trying to stop
8   water from coming from one side of the IHNC
9   canal, say, to another one.  Or if you're
10  penetrating into a deep sand and you didn't
11  want -- you didn't want to have a direct route
12  for that sand to reach the ground surface, then
13  you might fill that hole with bentonite.
14      Q.  That's what I just said.
15      A.  For that particular hole.
16      Q.  Well, that's what I just said.
17      A.  I'm not sure that's what you just
18  said, but --
19      Q.  It is.  What I said is if you
20  punctured a hole through whatever barrier kept
21  the water from entering the sand layer and
22  traveling laterally, then you might use this
23  bentonite to keep that water from going down
24  the hole and communicating with the sand layer,
25  which I thought is what you just said.

                                        48 (Pages 186 to 189)

RICHARD JAMES VARUSO                                    April 1, 2008

Page 190

1    A.  What I'm saying is that if the sand
2  strata is being charged -- if you got a sand
3  strata that is higher up in elevation, that
4  it's being charged by some waterway, and it's
5  got some piezometric --
6    Q.  We didn't say that.
7    A.  Okay.
8    Q.  What we said was we punctured -- we
9  had a sand strata which before the hole was
10  protected.
11    A.  By the overburden of that clay.
12    Q.  Exactly.
13    A.  Okay.
14    Q.  And you punched a hole through it
15  because you took the piling out.  And now
16  there's a hole which allows water to
17  communicate through the clay into the sand and
18  travel laterally.  Makes sense, does it not, to
19  plug that hole?
20    A.  That's -- the last statement -- I'm
21  not following you on the last statement.  If
22  you puncture the hole through the sand, the
23  concern is the water that's already in the sand
24  is going to come up through the hole that you
25  just made.

Page 191

1    Q.  Well, you also have water going down,
2  don't you?  It goes both ways?
3    A.  Down from -- are we still talking
4  about Dwyer Road?
5    Q.  We're talking about the water side,
6  though.  The water side of Dwyer Road, yeah.
7    A.  The water side of Dwyer Road.
8    Q.  Yeah.
9    A.  Okay.  Right.  Okay.  I understand you
10  now.
11    Q.  All right.  So that water can go
12  laterally --
13    A.  Okay.
14    Q.  -- and go underneath the flood control
15  project.  Cause a problem, couldn't it?
16    A.  You would have -- for such a small
17  hole you would have a very difficult time
18  developing steady state seepage characteristics
19  for a very finite hole to cause a stability
20  problem on the other side.
21    Q.  All right.  Fair enough.
22      Can we at least agree, then, that you
23  disagree with the Kansas City boys who believe
24  that it is very important according to the
25  documents that I've just shown you to be very

Page 192

1  particular about what you backfill these holes
2  with?  You can read it.  It's right there.
3    A.  Backfill which holes?
4    Q.  The holes that you create when you
5  work around or near a flood control project.
6  Let me show it to you.
7    A.  Okay.
8    Q.  I could be reading this wrong.  Maybe
9  I'm crazy, but it says both the construction
10  and permanent cases should be addressed within
11  the submittal.  In general, the designer should
12  address the impact on the flood control
13  project's seepage through and under stability,
14  earthen and structural, ponding area storage,
15  hydraulic conveyance, channels, drainage
16  structures and ditches, restoration of all
17  features to original condition, and maintenance
18  of flood protection within the critical area
19  during construction.  The designer should
20  coordinate with the local sponsor and become
21  familiar with the features of the flood control
22  project within the vicinity of the proposed
23  work.  Common features include earthen
24  embankments, flood walls, stability berms,
25  underseepage berms, rock slope protection,

Page 193

1  foreshore and landward blankets, pressure
2  relief wells, collector pipes, toe drains,
3  drainage structures and ditches, ponding areas,
4  closure structures, pump stations, levee ramps
5  and levee turnouts.
6      Do you agree with that statement?
7    A.  That's great.
8    Q.  Do you agree with it?
9    A.  Yes.
10    Q.  Okay.
11    A.  And the key words in there are assess.
12    Q.  Right.
13    A.  You need to assess the situation
14  because every situation is going to be
15  different and you have to assess it based on
16  the specific characteristics of all those
17  things that you just said.
18    Q.  Right.  Exactly.  In this case, the
19  designer would be WGI, right?
20    A.  Not familiar enough with the job to
21  tell you whether or not --
22    Q.  Okay.
23    A.  Don't put me in that position.  I got
24  to read the scope of work and I got to read the
25  task order.

49 (Pages 190 to 193)

RICHARD JAMES VARUSO                                    April 1, 2008

Page 194

1    Q.  All right.  Well, it's either the WGI
2  or the Corps, right?
3    A.  That made an assessment?
4    Q.  No, that's the designer.
5    A.  It says, make an assessment.
6    Q.  It says, the designer should.  I'm
7  trying to define the designer.  It's either the
8  WGI in the instance of this TERC, or it's the
9  Corps.
10    A.  Right.
11    Q.  One of the two.
12    A.  Okay.
13    Q.  So either the Corps or WGI should have
14  done the assessment.
15    A.  Done the assessment.  Okay.  Fair
16  enough.
17    Q.  Do you know if the assessment was
18  done?
19    A.  I'm not familiar enough with that
20  project.
21    Q.  Who should I ask?
22    A.  Can I get back with you with that name
23  also?
24    Q.  Yes, sir.  All right, now, I told you
25  I was going to talk about excavation.  It says,

Page 195

1  again at Page 1 -- I'll give you the whole
2  copy.  It says, excavation and backfill - 1.
3  That's the only page it has with it.  It says,
4  at Paragraph 1, general, excavation and
5  backfill in the critical area of a flood
6  control project could have a direct impact on
7  the stability of the flood control project.
8    Do you agree with that?
9    A.  Let me ask another question.  I know
10  I'm supposed to be being deposed here, but let
11  me ask a question.
12    Q.  I'm cool man, you know that.
13    A.  I know.  You're the man.
14    Q.  Thank you.  I was waiting for that.
15    A.  We're continuing to keep addressing
16  this document that was put together by Kansas
17  City District --
18    Q.  Right.
19    A.  -- which is not something that is a
20  directive of the Corps of Engineers.
21    Q.  I know that.
22    A.  This is guidelines.
23    Q.  I know.
24    A.  That they felt like they needed to put
25  together for one reason or another.

Page 196

1    Q.  Sure.  Right.
2    A.  So I'm not really following why we
3  have to keep referring to this document.  If
4  you have some specific questions for me about
5  the IHNC and how it was analyzed for this
6  particular contract, why don't we just focus on
7  that and stop referring to this document that
8  is not a Corps of Engineers document?
9    Q.  Well, because there seems to be -- and
10  I could be wrong, and I want to make sure that
11  I'm wrong and not you -- there seems to be some
12  inconsistency between the guidelines
13  promulgated by the Kansas City office and what
14  you're testifying to today.  Because you said,
15  um -- you got a hole, you just fill it with
16  sand, don't worry about it.  That doesn't sound
17  very consistent with what these guys are
18  saying.  These guys are saying, hold the phone.
19    A.  No.  What I said, I never used -- you
20  just put words in my mouth, and I don't
21  think --
22    Q.  No, I said --
23    A.  You said I said don't worry about it.
24  I never said that.
25    Q.  I said what should you put?  And you

Page 197

1  said sand.
2    A.  You asked me, off the cuff, what
3  should I -- and I'm thinking, you know, if I'm
4  placing fill underwater, then that's, that
5  might be a reasonable alternative.
6    MR. BAEZA:
7       Joe, this has been asked and
8       answered.  Let's talk about what the
9       New Orleans District requires, if
10       there is any requirement for
11       excavation and fill, and if these
12       standards or regulations or principles
13       are applied to the IHNC.
14  EXAMINATION BY MR. BRUNO:
15    Q.  What you're really telling us, Mr.
16  Varuso is before you backfill any hole you need
17  to make an evaluation and an assessment as to
18  whether or not there's a potential for
19  underseepage because that might dictate that
20  you use something other than sand or other fill
21  material.  Right?
22    A.  Yes.
23    Q.  Okay.  I mean, what we're really
24  saying here is you got to do your homework, you
25  don't just dig a hole and put anything in it

RICHARD JAMES VARUSO                                          April 1, 2008

Page 198

1  that you feel you may want to put in it.
2  Right?
3      A.  Fair enough.
4      Q.  And what I'm tying to get -- look, I'm
5  not playing games with you either.
6      A.  Okay.
7      Q.  We're talking about flood protection.
8  You would agree with me this is pretty serious
9  business, right?
10     A.  I take it very seriously.
11     Q.  You don't want anybody digging a hole
12 and causing some problem with the levee, and
13 you've already told me you would recommend that
14 if you're going to dig holes around the levee,
15 that, yeah, somebody needs to do some kind of
16 an assessment, they need to figure out whether
17 or not there is an underseepage potential, and
18 if there is not an underseepage potential,
19 then, sure put the sand, put the other
20 backfill, right?
21     A.  That sounds like a fair assessment.
22     Q.  But if you go down to the strata
23 where, you know, you got a potential for
24 underseepage, then you have to rethink it,
25 study it and apply some good engineering

Page 199

1  principles.  That's all I'm getting at.  Right?
2      A.  That's fine.  And let's do that
3  without referring to this document that's
4  unofficial.
5      Q.  That doesn't make it bad, does it?
6      A.  I haven't read it enough to comment on
7  it.
8      Q.  But you've made it sound like because
9  it's unofficial there's something wrong with
10 it.
11     A.  I never said that.
12     Q.  All right.  It's unofficial meaning
13 it's not -- it doesn't have the --
14     A.  You might have had one guy write that
15 all by himself without anybody doing a review
16 on it to make sure that it's addressing all the
17 issues.
18     Q.  Let me ask you this:
19     A.  Just as a hypothetical.
20     Q.  Was it a bad idea to add some
21 guidelines?
22     MR. BAEZA:
23         Objection.  Calls for
24     speculation.
25 EXAMINATION BY MR. BRUNO:

Page 200

1      Q.  Is it?
2      A.  Wed have guidelines.
3      Q.  I know you have guidelines.
4      A.  And we've got guidelines that we're
5  working on right now that are being reviewed by
6  headquarters.  I don't know if this has been
7  reviewed by headquarters.
8      Q.  Are you suggesting to me that all of
9  your guidelines in the New Orleans office,
10 before they become guidelines, have to be
11 reviewed by the head office?
12     A.  No, but I wouldn't expect another
13 district to have to use them, if they weren't
14 reviewed by other people.
15     Q.  I didn't mean to suggest you had to
16 use them.
17     A.  Okay.
18     Q.  I never asked that once, in fairness
19 to me.
20     A.  Well, you keep referencing it.
21     Q.  Well, sure I'm referencing them.
22         (Brief interruption.)
23 EXAMINATION BY MR. BRUNO:
24     Q.  I am absolutely referencing them
25 because they seem to give some guidance as to

Page 201

1  what one should do if one was going to dig a
2  hole next to a flood control project.  That's
3  the only reason why I'm referencing them.  I'm
4  not suggesting that you did something wrong or
5  you did something bad.  Okay?  Because these
6  things exist.  Please don't take it that way.
7      A.  I'm not taking it that way.
8      Q.  All right.  Good.
9      A.  I'm having trouble answering questions
10 from a document that I'm not that familiar
11 with.
12     Q.  Now, you talked about, well, Joe, if
13 you're only taking out one piling it's no big
14 deal.  Suppose you're taking out -- how many?
15     A.  Please don't put words in my mouth.
16     MR. BAEZA:
17         Joe, I'm going to object to that.
18     That's a mischaracterization of his
19     testimony.
20 EXAMINATION BY MR. BRUNO:
21     Q.  Hundreds.  Well, you want me to find
22 it?  You said it was only one pile.
23     MR. BAEZA:
24         Did he say, Joe, it's no big
25     deal?

51 (Pages 198 to 201)

RICHARD JAMES VARUSO                                    April 1, 2008

Page 202

1        MR. BRUNO:
2            Yeah, he did.
3    EXAMINATION BY MR. BRUNO:
4        Q.   In so many words, yes, you did.  Okay?
5    And I'm suggesting to you that in the case of
6    the Washington Group work it was hundreds and
7    hundreds of piling.  Isn't that -- do you know
8    that to be true or not true?
9        A.   I'm not sure how many pilings there
10   were.
11       Q.   Okay.  More than one.
12       A.   I'm sure it was more than one.
13       Q.   Does the Corps have piezometers in
14   place at the Lower Nine at this moment?
15       A.   Yes.
16       Q.   At or near.
17       A.   Yes.
18       Q.   You do?
19       A.   Yes.
20       Q.   Where are they?
21       A.   They're located, um -- somewhere
22   between the -- there are two rows of
23   piezometers.  One row is about halfway between
24   Claiborne Avenue and Florida Avenue.  I believe
25   the cross Street is somewhere around Law, give

Page 203

1    or take.
2        Q.   Okay.
3        A.   One piezometer on the flood side,
4    three on the protected side.
5            And then closer to Florida Avenue
6    there's another set of piezometer, same
7    configuration; one on the flood side and two on
8    the protected side.
9        Q.   What purpose do they serve?
10       A.   They monitor the, um -- piezometric
11   surface of two strata within the foundation.
12       Q.   All right.  And for us laymen, you're
13   trying to determine whether or not there is any
14   underseepage.
15       A.   We're trying to determine what -- if
16   there is any effect between the variation in
17   elevation of IHNC and the piezometric surface
18   in those clay strata.
19       Q.   Which relates to underseepage.
20       A.   Not necessarily.
21       Q.   You're trying to see if water is going
22   underneath it.  Aren't you trying to figure out
23   if water is going underneath the structure?
24   The flood control structure?
25       A.   There is water under neath the control

Page 204

1    structure.  It's called groundwater.
2        Q.   Is that -- Thanks, Richard.
3            Is that where your piezometers are
4    measuring?
5        A.   Possibly.
6        Q.   So you're measuring groundwater?
7        A.   It's possible that they're only
8    measuring groundwater.
9        Q.   All right.
10       A.   And they'll change.  It will change
11   based on numerous factors in the area.  Pumping
12   stations have a large impact on the piezometric
13   surface of those stratum.
14       Q.   All right.  Well, what in situ
15   measurements have been performed recently in
16   the vicinity of the Lower Ninth Ward new
17   T-walls that would provide information on the
18   hydraulic conductivity of the marsh or swamp
19   layers?  See, when I'm stupid I get an expert
20   to write me a question.
21       A.   Why don't you read the question one
22   more time so I'm sure I'm answering it
23   correctly.
24       Q.   What in situ measurements have been
25   performed recently in the vicinity of the Lower

Page 205

1    Ninth Ward new T-wall that would provide
2    information on the hydraulic conductivity of
3    the marsh/swamp layers?
4        MR. BAEZA:
5            Now are we talking about
6    post-Katrina?
7        MR. BRUNO:
8            Yes.
9        MR. BAEZA:
10           Objection on relevance grounds.
11       A.   You can try to extrapolate hydraulic
12   conductivity out of the, um -- the falling head
13   test that was done when the piezometers were
14   placed, but those values are somewhat
15   unreliable.
16   EXAMINATION BY MR. BRUNO:
17       Q.   Right.  So the answer is none?
18       A.   In situ, no.
19       Q.   The answer is in situ --
20       A.   Not in situ.
21       Q.   Okay.  It's none.  Okay.
22       A.   No.
23       Q.   All right.  As you've indicated that
24   you're probably not the guy, where would I go
25   in order to get the documentation of the

RICHARD JAMES VARUSO                                          April 1, 2008

<table>
<tr><td>

Page 206

1  evaluation of the holes that were created by
2  the WGI -- okay -- through the removal of the
3  piling and/or other debris as to how these
4  things should be backfilled and whether they
5  should be backfilled, and if they should be
6  backfilled, with what material.
7      A.  Okay.
8      Q.  All right.  Can I --
9      A.  That's -- I believe you asked me that
10 question before.  So I'm not sure who let the
11 task order out, the specific point of contact
12 that let that task order out.  I would have to
13 check on that and see.
14     Q.  And you'll provide that to counsel.
15     A.  I can do that.
16     Q.  All right.
17         MR. STONE:
18             You've asked us to supply you a
19         30(b)(6) witness on that.
20         MR. BRUNO:
21             Oh, we have?  Well, never mind
22         then.  We'll help you with that
23         process.
24         MR. STONE:
25             That's essentially most of the

</td><td>

Page 208

1  show some organic material laid in with the
2  clay.  You would still classify this as a clay,
3  it will be a clay, it would be a clay -- they
4  call it a C-H-O, it's a clay with some organic
5  material, and a few of the borings indicate
6  that there are some peat in the, um -- in that
7  material.
8      Q.  All right.  I guess I need to ask you
9  because -- does that cause an interest -- I
10 won't say concerns -- in the potential for
11 underseepage at that layer?
12     A.  We're referring to this particular
13 location?
14     Q.  Sure.
15     A.  Okay.  Our evaluation of that is no.
16     Q.  Well, the fact that you evaluated it
17 means there was an interest.
18     A.  Okay.  Fine.  Sure.
19     Q.  So the answer is yes --
20     A.  Yes.  Okay.
21     Q.  Okay?  And so yes, you were
22 interested, and therefore you studied it and
23 apparently concluded that there was no problem.
24 I'm guessing.  Now I'm guessing.
25     A.  I think that's fair enough to say.

</td></tr>
<tr><td>

Page 207

1         things having to do with the TERC Task
2         Order 26.
3         MR. BRUNO:
4             That will get us the same
5         answers, you're right.  You're
6         absolutely correct.
7  EXAMINATION BY MR. BRUNO:
8      Q.  All right.  What was the sheet pile
9  tip depth at the north breach on the east side
10 of the IHNC?
11     A.  It's approximately minus 9, I believe.
12     Q.  All right.  And at that level what was
13 the soil, was it sand, clay?
14     A.  Clay.
15     Q.  It's clay?
16     A.  Uh-huh.
17     Q.  How about -- how far down did the clay
18 layer go, do you know?
19     A.  Like I said, the clay, um -- is
20 substantial -- it's substantially clay from the
21 ground surface down to approximately elevation
22 minus 60, where there's a sand strata.  In the
23 upper portion of the strata, around maybe minus
24 12 to minus 17, roughly 5 feet from my
25 evaluation of the borings.  Some of the borings

</td><td>

Page 209

1      Q.  All right.  So y'all didn't -- what
2  kind of evaluation did y'all do of that layer
3  of peat and organic material?
4      A.  Well, referring to --
5      Q.  By the way, is this north or south?
6      A.  Huh?
7      Q.  Is this the north or south breach?
8      A.  You tell me which question you're
9  asking me.
10     Q.  I guess I need the remember or connect
11 your answer about that layer of peat and
12 hydraulic fill.  Was it referring to the north
13 bleach or the south breach or the whole thing?
14         MR. BAEZA:
15             I think what the witness was
16         saying was that he was referring to
17         the clays and not hydraulic fill.
18         MR. BRUNO:
19             And then he said within that clay
20         layer there was a span of about I
21         forgot how many feet, of peat -- five
22         feet of peat and organic material.
23 EXAMINATION BY MR. BRUNO:
24     Q.  And I guess I didn't or failed to ask
25 whether or not that was the whole length

</td></tr>
</table>

RICHARD JAMES VARUSO                                    April 1, 2008

Page 210

1  between the two breaks or just the north break
2  or the south break?
3      A.  I would have to look at the borings
4  and see, you know, exactly where those
5  materials show up.
6      Q.  Okay.
7      A.  It's --
8      Q.  One of the two.
9      A.  It varies.  I mean, they show up in
10  some borings and they don't show up in others.
11  It's in consistent.
12      Q.  Let's me show you -- this is it's Bob
13  Bea 's Appendix C.  But you can look at the
14  figure, you don't have to look at anything
15  else.  See if the figure --
16      A.  I don't have to or you don't want me
17  to.
18      Q.  Well, no, you can.  I actually do want
19  you to fully evaluate all of Bob 's work.
20      A.  Okay.  And the question is?
21      Q.  The question is whether or not the
22  peat layer that's shown on that figure is --
23      A.  There is no peat layer shown on this
24  figure.
25      Q.  I thought -- let me see.  Maybe I

Page 211

1  missed it.  Well, he calls it marsh.
2      A.  Marsh.  Well, marsh and peat are two
3  different things.
4      Q.  Okay.  So you weren't referring to
5  that.  Because it looks to be in about the same
6  area.  It's within the CH?
7      A.  It is a deposit that varies
8  tremendously.
9      Q.  Okay.
10      A.  So that marsh -- in one boring, that
11  marsh material may just be very weak clay
12  material.  It would be defined as a CH with a
13  liquid limit of 100 and that's how it would
14  classify.  And in another boring you may have,
15  you know, one foot of peat and the rest of it
16  be clay material with some organics.  It's very
17  mixed.  That's why they call it marsh.  It's a
18  very generic term.
19      Q.  That's fine.  All I was trying to get
20  at is, once you found it there was someone
21  interest in it, and the next question was, what
22  if anything did you do to evaluate it?
23      A.  Well, let's back up.  You're asking
24  about my particular evaluation of it.  Okay?
25      Q.  Right.

Page 212

1      A.  My particular evaluation of this
2  particular job is during and after the
3  reconstruction of that floodwall, which is now
4  a pile founded T-wall with a sheet pile cutoff.
5      Q.  Uh-huh.
6      A.  So in that evaluation, the sheet pile
7  now extends through the marsh material.  The
8  tip elevation of that sheet pile is now around
9  elevation minus -- you know, minus 19, minus
10  20, give or take.
11      Q.  Why?
12      A.  The main reason, we utilized the
13  existing sheet pile that was already there as
14  opposed to pulling the sheets that were there
15  for the existing I-wall out, we drove them down
16  to grade and then poured the concrete T-wall
17  on top of that structure.
18      Q.  Why not just cut them off, which is
19  what y'all have done many times in the past?
20      A.  It was twofold.  It's a bit of belts
21  and suspenders, you know, we noticed that there
22  was some material down there -- we said, why
23  not just drive the sheets deeper and get a
24  little more cutoff.
25      Q.  Well, in fact, Mr. Varuso, part -- at

Page 213

1  least part of the reason for driving it deeper
2  was to cut off that marsh layer -- or however
3  you want to refer to it, peat, organic
4  material, part of the reason was to cut it off
5  with a sheet pile.
6      A.  I would say that the, um -- decision
7  to drive those sheets down was more than just
8  one decision.  Not primarily because of the
9  marsh material.
10      Q.  I didn't say that.
11      A.  Okay.  I didn't say you said it.
12      Q.  You know I didn't say that.
13      MR. BRUNO:
14          Read the question back.
15  EXAMINATION BY MR. BRUNO:
16      Q.  Now you're not being fair to me.  I'm
17  sorry.
18      A.  I didn't realize I was being unfair.
19      Q.  I'll tell you why in a minute.
20      MR. BRUNO:
21          Just read it back.  Because I
22      didn't say it was the only reason or
23      the principal reason, I said one of
24      the reasons.  Because I knew that's
25      what you were going to say.

RICHARD JAMES VARUSO                                         April 1, 2008

Page 214

1      (Whereupon the previous question was
2  read back.)
3  EXAMINATION BY MR. BRUNO:
4      Q.  You remember the question?
5      A.  Yes.
6      Q.  Go ahead.
7      A.  And I'm being fair.
8      Q.  So am I, if you want to ply that game.
9      A.  The way I'll answer that question is,
10  for that particular job on that T-wall that was
11  reconstructed as part of the Task Force
12  Guardian effort after Hurricane Katrina, for
13  the particular floodwall, and for a lot of the
14  designs that we did for that particular effort,
15  a lot of things were done as, say, overkill.
16  Because, you know, short time frame, we say,
17  you know what, as opposed to spending time
18  analyzing this and analyzing that, let's just
19  go with it and we'll make some belts and
20  suspended and we'll do some things that are
21  very conservative regardless of whether or not
22  they're needed.  A lot of things were done that
23  way --
24      Q.  I understand.
25      A.  -- with -- you know, for these

Page 215

1  repairs.
2      Q.  But the belts and suspenders, as you
3  referred to it, was cutting off that layer with
4  a sheet pile, right?
5      A.  I only hesitate to answer the question
6  because the layer as you're putting it is not a
7  layer that is made of any one consistent
8  material.
9      Q.  Who cares?
10      A.  So we drilled the tips down to -- the
11  existing sheet that was there was driven down
12  to minus 19 --
13      Q.  Right.
14      A.  -- and that's what it was.
15      Q.  Well, then, how about this:  Why don't
16  you explain to me, then, what you meant by
17  belts and suspenders?  What on earth would be
18  accomplished by driving any sheet pile deeper?
19      A.  It's a longer piping it distance
20  for -- that's another method of seepage
21  analysis is a drop of water basically following
22  along the base of the T-wall, down the sheet
23  wall on the flood side, back up the other side.
24   So we're giving a longer piping distance for
25  that particular sheet.

Page 216

1      Q.  Which is exactly what I said; the
2  belts and suspenders was to an extra, more
3  conservative, however you want to call it --
4      A.  Okay.
5      Q.  -- cut off underseepage.  Right?
6      A.  Piping and underseepage are two
7  different things.  I'm sorry, man.  Don't get
8  frustrated at me.  It's two different things.
9      Q.  All right.  Well, the piping is water
10  going underneath the -- the water travels its
11  merry way along the earth and then runs into a
12  sheet pile --
13      A.  Right.
14      Q.  -- and then it goes down the sheet
15  pile and then it goes up the back side of the
16  sheet pile, and the water keeps going on its
17  merry way.  If there is no sheet pile there, it
18  just keeps going.
19      A.  It will go straight under the base of
20  the T-wall.
21      Q.  Call it seepage or not, that little
22  molecule of water, he's walking straight, and
23  now he's got to make a detour.
24      A.  Yes.
25      Q.  Okay?

Page 217

1      A.  Okay.
2      Q.  And why do we want to keep that little
3  water molecule out?
4      A.  The potential for moving material from
5  one side of the structure to the other.
6      Q.  What do you mean by moving material?
7      A.  There's no inherent problem with
8  having water -- just water moving from one side
9  of the flood control structure to the other.  I
10  mean that's ground water doing its thing.
11      Q.  Sure.  Does it all day long.
12      A.  Right.  You've got an average
13  elevation in the IHNC of zero, we'll call, plus
14  1.  The ground surface on the inside might be
15  around minus 6, minus 7.  The ground water is
16  going to do its thing, it's going to find a
17  natural equilibrium from one side to the other.
18  So there will be some sort of movement of this
19  water.  That's not something that is going to
20  destabilize the floodwall.
21      Q.  All right.
22      A.  If you get excessive volume, that's
23  what we calculate in a true flow net seepage
24  type analysis, you will calculate flows, what
25  type of flow do I have to be concerned with?

RICHARD JAMES VARUSO                                    April 1, 2008

Page 218

1  Excessive flows could propagate movement of
2  soil from one side of the structure to the
3  other one, possibly destabilizing the
4  foundation and destabilizing the wall.  That's
5  the concern.
6      Q.  Right.  And that's frankly what
7  Professor Bea suggested occurred at the 17th
8  Street Canal, right?
9          MR. BAEZA:
10             Objection.  Relevance.
11     A.  I haven't read through his report
12  fully.
13  EXAMINATION BY MR. BRUNO:
14     Q.  Oh.  I thought you -- all right.
15  Never mind.
16     A.  I think I mentioned earlier on that
17  what I've seen so far is somewhat incomplete.
18  There isn't enough data there to put a true
19  evaluation on it.
20     Q.  All right.  You have at least a
21  minimal understanding that Professor Bea
22  suggests that underseepage at least played a
23  role at the north breach of the IHNC on the
24  east side.
25     A.  Yes.

Page 219

1      Q.  All right.  And you think that's
2  incorrect.
3      A.  I'm not prepared to make an opinion on
4  it.
5      Q.  Okay.  All right.  But --
6      A.  I have questions about it.
7      Q.  Okay.  So do I take it from that
8  answer that there's at least the possibility
9  that a hole filled with some material other
10  than what may have been appropriate, given the
11  strata through which the hole pierced, could --
12  and I'm asking you this from an engineering
13  perspective, not that it happened, okay?  I
14  just want to understand the mechanics of
15  failure.
16         Let me ask it this way:  How could the
17  digging of a hole next to a flood control
18  project undermine that project if you filled it
19  with something like sand or some, um -- organic
20  material?  Let's not even talk about Ninth Ward
21  or the Lower Nine or the Industrial Canal.
22     A.  Okay.
23     Q.  Just as an engineer.
24     A.  Okay.  If in the act of digging that
25  hole you made a direct connection to a

Page 220

1  continuous strata -- by continues I mean
2  laterally and perpendicular to the structure,
3  within that zone, a continuous strata that had
4  a high enough permeability, then there could be
5  the potential for seepage from one end to the
6  other.
7      Q.  Okay.
8      A.  Assuming that steady state conditions
9  would occur.
10     Q.  And then so --
11     A.  And it's also a function of the
12  hydraulic conductivity of that strata.
13     Q.  Right.  Okay.  So but like what's the
14  big deal?  How would that hurt the flood
15  control structure if that happened?
16         MR. BAEZA:
17             Objection.  You're asking the
18         witness to create a hypothetical.
19         MR. BRUNO:
20             No, I'm not.  He created the
21         hypothetical.  I'm asking him to just
22         finish it.
23     A.  Well, in all fairness again, you were
24  asking me to create the hypothetical.
25  EXAMINATION BY MR. BRUNO:

Page 221

1      Q.  I know.  No, of course I did.  And
2  that's why -- I'm not giving you, I'm giving
3  him a hard time right now.
4          MR. BAEZA:
5              Yeah.  He's just giving me a hard
6          time is the problem.
7  EXAMINATION BY MR. BRUNO:
8      Q.  Honestly, I'm just trying to
9  understand if there is an engineering
10  explanation for this hole business or not.
11     A.  You would have to have an appropriate
12  factor of safety.
13     Q.  Again, I'm missing -- what is the
14  mechanism of failure?  In other words, so you
15  dig the hole and you fill it with sand, and so
16  now water is getting below the surface where it
17  shouldn't belong.
18     A.  Right.
19     Q.  What is that water doing that's
20  causing the problem?
21     A.  It's moving material.  Um -- put it to
22  you this way:  An example would be in an area
23  where you've got a very fine sand material with
24  a very low hydraulic -- I mean a high hydraulic
25  conductivity, that has a high propensity to

RICHARD JAMES VARUSO                                    April 1, 2008

Page 222

1   move water within the strata, then you could
2   move not just water but soil from one end to
3   the other --
4       Q.  Okay.
5       A.  -- creating what they call sand boils
6   where you see the sand actually move from its
7   subsurface elevation -- to make up a
8   hypothetical again, let's just say it's at
9   minus 20, and that sand moves from elevation
10  minus 20 up to the ground surface because of
11  the high pressure in that sand strata, there's
12  enough weight of the material on top of that
13  strata to hold it down, and the soil has no
14  other choice but to find its equilibrium, so it
15  creates sand boils on the opposite side.
16      Q.  Right.  And could that potentially
17  allow the pressure that's created by the
18  buildup of water on the water side of the flood
19  control structure to actually push the entire
20  structure landward?  I mean, the levee and all?
21      A.  The pressures would have to be high
22  enough.  Yeah, that's another -- that's another
23  issue other than seepage.  Now we're
24  considering uplift pressures in the strata
25  itself and whether or not that has the

Page 223

1   possibility of destabilizing the foundation.
2       Q.  Well, I didn't mean to suggest that
3   the underseepage was the sole -- I mean, you
4   have a lot of mechanisms at work at the same
5   time.
6       A.  Yes, you do.
7       Q.  And so I'm just wondering if the
8   underseepage combined with all this pressure,
9   that the end result might not be the movement
10  of the entire structure landward.
11      A.  That would depend on the geometry of
12  the structure.  I mean, that's a very difficult
13  hypothetical to answer.
14      Q.  Right.  But it could happen.
15      A.  I suppose there's that's possibility.
16      Q.  Okay.  All right.
17          MR. LAMBERT:
18              I got photos.
19      A.  That doesn't do much.  Just a picture.
20          MR. BRUNO:
21              Let's take a break and see if
22      I've got it done.
23          (Brief recess.)
24  EXAMINATION BY MR. BRUNO:
25      Q.  All right.  Mr. Varuso, are you

Page 224

1   familiar with the title contracting officer?
2       A.  Yes.
3       Q.  Okay.  What is that?
4       A.  That is the government employee that
5   is responsible for handling the contract, you
6   know, payments, any modifications to the
7   contract, that sort of thing.
8       Q.  All right.  You have to help me.  But
9   as I understand it, when you're doing work for
10  the government there's a contracting officer on
11  site?
12      A.  There's a contracting officer's
13  representative on site.
14      Q.  On site.
15      A.  Yeah.
16      Q.  And what is his job on site, if you
17  know?
18      A.  Well, I'm not sure you're asking the
19  right question, I guess, as far as the people
20  that are on site.
21      Q.  All right.  Here's exactly what I want
22  to know:  Whatever his job is, can you tell me
23  whether or not the contracting officer has the
24  requisite skill, training or experience to
25  evaluate whether or not a hole that the

Page 225

1   contractor may be contemplating digging may
2   have some adverse impact on a flood control
3   structure?
4           MR. BAEZA:
5               Objection.  He witness may not
6           have personal knowledge.
7       A.  No.
8           MR. BRUNO:
9               He may not, I don't know.
10      A.  You're asking another hypothetical.  I
11  wouldn't know the specific employee you're
12  talking about and what his background would be.
13  EXAMINATION BY MR. BRUNO:
14      Q.  No.  What I'm asking you is, you told
15  me, I thought -- I thought we'd established
16  pretty clearly that if you're digging holes
17  near a flood control structure that it needs to
18  be evaluated.  Did we not establish that?
19      A.  Assessed.
20      Q.  Assessed.  Whatever.
21      A.  Okay.
22      Q.  Let's find a word, man, and then we'll
23  move on.  So it's got to be assessed.
24      A.  (Nods affirmatively.)
25      Q.  Well, I just want to understand

RICHARD JAMES VARUSO                                      April 1, 2008

Page 226

1   whether that assessment is by an expert who has
2   some knowledge about engineering and the
3   potential for the impact -- I'm mean, I'm
4   sorry -- and an understanding of how that hole
5   might impact flood control projects, or is it
6   just somebody that I can just walk up to at the
7   Corps and say, here, can I dig this hole?
8           MR. BAEZA:
9               Objection.  Argumentative.
10   A.   You would have to ask somebody with
11   some knowledge.
12  EXAMINATION BY MR. BRUNO:
13   Q.   Well, sure.
14   A.   Okay.  All right.
15   Q.   I mean, you want somebody with some
16   knowledge.
17   A.   All right.
18   Q.   Okay?  And somebody with some expert
19   knowledge, like yourself.
20          MR. BAEZA:
21              Objection.  Argumentative.
22   A.   Okay.
23  EXAMINATION BY MR. BRUNO:
24   Q.   Wait.  Are you telling me it's okay
25   not to ask somebody who's an expert?

Page 227

1    A.   They don't have to be an expert.
2    Q.   Who would it be?  Give me some sense
3   of who would have the requisite training,
4   experience, knowledge, to assess whether or not
5   it's safe to dig a hole and backfill it with, I
6   don't know, you know, garbage or not.  I don't
7   know.  Whatever the material -- what level of
8   training or experience would you would say
9   would be required?
10   A.   An engineer.  It would be an engineer.
11   An engineer.
12   Q.   An engineer.  Okay.  Not that hard.
13   A.   Okay.
14   Q.   Do you know George Bacuda?
15   A.   Yes, I do.
16   Q.   Is he a geotechnical guy?
17   A.   He's a geologist.
18   Q.   He's a geologist.  Okay.
19       Marlene Smith; do you know her?
20   A.   Oh, Aline Smith?  A-L-I-N-E, I believe
21   Smith?
22   Q.   I think so.  Do you know her?
23   A.   Aline Smith, yes.  I know her.
24   Q.   Is she a geotechnical person?
25   A.   No.

Page 228

1    Q.   Is she an engineer?
2    A.   No.
3    Q.   Do you know what a recommendation
4   report is?
5    A.   Not familiar with it.
6    Q.   Okay.  Do you know if Arlene Smith is
7   a contracting officer?
8    A.   Arlene Smith?
9    Q.   Arlene.
10   A.   What's her name?
11   Q.   Arlene Smith.  Apparently we're not
12   talking about the same person.
13   A.   I'm not sure I know an Arlene Smith.
14   I know an Aline Smith.  Don't know Arlene.  She
15   may be -- I don't know.  I'm not familiar with
16   that name.
17   Q.   So it's not the same person you're
18   thinking about.
19   A.   Doesn't sound that way.
20   Q.   But the person you're thinking about
21   is not an engineer.  What is she?
22   A.   She works in contracting.  I'm not
23   sure what her exact position is.
24   Q.   Okay.  Well, sounds like she could be
25   a contracting officer.

Page 229

1    A.   She could be.  I'm not sure.
2    Q.   All right.  But you know she's not an
3   engineer.
4    A.   Aline Smith is not an engineer.
5    Q.   Aline Smith.
6    A.   Right.
7    Q.   Okay.  Do you know if the Aline Smith
8   that you know --
9    A.   All right.
10   Q.   -- the one you know, does that Aline
11   Smith have the training, expertise, experience
12   to evaluate -- I'm sorry.  What word did you
13   use?
14   A.   Assess.
15   Q.   Assess an excavation for the purposes
16   of determining whether or not there may be a
17   risk associated with the hurricane protection
18   structure?
19   A.   No.
20          MR. BAEZA:
21              Objection. ambiguous, vague,
22          calls for improper lay opinion.
23          MR. BRUNO:
24              No, he said she does not.
25   A.   She does not.

RICHARD JAMES VARUSO                                            April 1, 2008

Page 230

1   EXAMINATION BY MR. BRUNO:
2       Q.  Okay.  Does the geotechnical section
3   review recap submittal reports?
4       A.  I'm not sure what a recap submittal
5   report is.
6       Q.  Okay.  Do you know what a project work
7   plan is?
8       A.  Yes.
9       Q.  Okay.  Does your group review project
10  work plans?
11      A.  I suppose that there's a possibility
12  that we might.
13      Q.  Are you familiar with the MRGO New
14  Lock and Connecting Evaluation Report?
15      A.  No.
16      Q.  Okay.  Connecting Channel?  It's an
17  evaluation report apparently from 1997.
18      A.  No.  Not really.
19      Q.  No problem.  Okay.
20          All right.  Were you aware of the fact
21  that there was a chain link fence -- do you
22  know if during the work performed by WGI there
23  was a chain-link fence along the hurricane
24  protection structure at the Industrial Canal
25  between those two?

Page 231

1       A.  I don't know.
2       Q.  Okay.  Do you have any opinion as to
3   whether or not a chain-link fence installed on
4   the -- in the berm, the earth berm, would have
5   any impact on the potential for erosion in the
6   event of overtopping?
7           MR. BAEZA:
8               Objection.  Improper lay opinion.
9       A.  A chain-link fence on the protected
10  side?
11  EXAMINATION BY MR. BRUNO:
12      Q.  Yes.
13      A.  In the event of overtopping?
14      Q.  Yes.
15      A.  Um -- and let me make sure I
16  understand your question.  Would that
17  chain-link fence cause an erosion problem?
18      Q.  Well, would it have any impact at all,
19  positive or negative?  And then we'll ask the
20  next question whether you think it would be
21  positive or negative.
22      A.  It's difficult to say.
23      Q.  Fair enough.  Okay.  And so obviously
24  you have no opinion as to whether it's a
25  positive or a negative effect.

Page 232

1       A.  That's correct.
2       Q.  All right.  Now, just for the sake of
3   completion, if the chain-link fence were just
4   on the water side of the floodwall, not the
5   land side, would your opinion be the same with
6   regard to the potential effect of such a
7   chain-link fence in connection with
8   overtopping?
9           MR. BAEZA:
10              Objection.  Misleading,
11          incomplete hypothetical, calls for an
12          improper lay opinion.
13          MR. BRUNO:
14              How is it misleading?
15          MR. BAEZA:
16              Because you're using a
17          hypothetical situation, and if the
18          witness can't answer it you're going
19          to be asking what facts would allow
20          you to answer.
21          MR. BRUNO:
22              No I wouldn't be.  In a
23          hypothetical it's my obligation to
24          establish that the facts utilized --
25          I'm sorry, that the hypothetical facts

Page 233

1           utilized in the hypothet are true, but
2           you don't ask the guy you're asking
3           the question of, you do it with other
4           witnesses.  But anyway --
5           MR. BAEZA:
6               Reasserting my objection.
7           MR. BRUNO:
8               I understand.  You don't do it
9           with the same guy, you get Joe Schmoe
10          and John Doe.  Anyway -- okay, look,
11          I'm not asking this question, somebody
12          else is.  Give me a break.
13  EXAMINATION BY MR. BRUNO:
14      Q.  So just assume for this question
15  there's a chain-link fence on the water side of
16  the I-wall.  Do you have a view -- maybe even
17  if you don't -- that that would have an impact
18  on erosion if there was overtopping?
19      A.  Difficult to say without the
20  specifics.
21      Q.  Fair enough.  Okay.
22      A.  Yeah.
23      Q.  I think I already asked this:  The
24  Corps did not plan for overtopping.  We have
25  already covered that a hundred times.

                                        59  (Pages 230 to 233)

RICHARD JAMES VARUSO                                        April 1, 2008

Page 234

1         MR. BAEZA:
2             Objection. Argumentative.
3    EXAMINATION BY MR. BRUNO:
4         Q.  Right?
5         A.  No.  Right.
6         Q.  We have already established the
7    standard project hurricane, built to the
8    height --
9         A.  Exactly.
10        Q.  -- end of discussion.
11        A.  Right.
12        Q.  All right.  Now, just a last few
13   questions:  You've been listed on the
14   government 's witness list as a witness.  You
15   know that?
16        A.  Yes.
17        Q.  Did they tell you that you were being
18   listed as on the witness list?
19        MR. BAEZA:
20            Objection.  That's privileged.
21   EXAMINATION BY MR. BRUNO:
22        Q.  Well, I don't know what they tell you.
23        MR. BAEZA:
24            It's innocuous, but that's
25            privileged.

Page 235

1    EXAMINATION BY MR. BRUNO:
2         Q.  I mean, is it a surprise?  Did you
3    know?
4         A.  Um -- well, I knew I was being
5    deposed.
6         Q.  Well, do you know why you're being
7    deposed?  You're being deposed because you're
8    on the list.
9         A.  Okay.
10        Q.  Anyway, there is an indication of the
11   subject matter of your testimony.
12        A.  Okay.
13        Q.  And it says, design, construction and
14   maintenance of the MRGO.  Okay, now I know you
15   didn't do this, and I didn't do this so I got
16   to ask you, what do you know about the design
17   of the MRGO?
18        A.  Pre-Katrina?
19        Q.  Well, yeah.  It was built before
20   Katrina, wasn't it?
21        A.  Well, it's been rebuilt since.
22        Q.  MRGO?
23        A.  Oh.  Well, I'm sorry.
24        Q.  I'm sorry.
25        A.  I'm thinking levees.

Page 236

1         Q.  Right.  We're talking about MRGO.
2         A.  You define MRGO.  You're right.
3         Q.  MRGO is all -- look, this is what the
4    words are on the paper.  I'll show them to you.
5         A.  I understand.
6         Q.  It's MRGO.
7         A.  Okay.
8         Q.  Anyway, what do you know about the
9    design of the MRGO?
10        A.  Only what I've read in the old
11   documents.
12        Q.  All right.  And that's the same with
13   construction?
14        A.  Correct.
15        Q.  And the maintenance?  I mean, you're
16   really not a maintenance guy on MRGO, are you?
17        A.  No.
18        Q.  I mean, did you have any anything to
19   do with dredging or recommendations for
20   dredging or things like that?
21        A.  No.
22        Q.  Given your background, I mean, how
23   would -- would the decision to dredge or not
24   dredge be something that you or a person with
25   your expertise would be called upon to address,

Page 237

1    like this business of box cutting or, you know,
2    angle of cut; is that related to your area of
3    knowledge?
4         A.  Um -- only in that the, um -- the
5    effect of the bank stability on the dredging
6    would come out of our office.
7         Q.  The effects?
8         A.  Evaluating the effects.
9         Q.  Of the bank stability.
10        A.  Yeah.  In other words, if you were
11   going to change the shape of the bank of deepen
12   the elevation of the dredge, the bottom
13   elevation of the channel, then it would have to
14   be reevaluated if that elevation were to change
15   from the original analysis.
16        Q.  Now, let's just kind of walk through
17   that, because it's my understanding that the
18   water depth really never changed.
19        A.  I don't believe that it did.
20        Q.  Okay.  But the only thing that we've
21   been discussing that may be something that you
22   would look at is this business of box cutting?
23   Are you familiar with box cutting as opposed
24   to -- what do you call it, scale -- box cutting
25   versus step cutting?

RICHARD JAMES VARUSO                                    April 1, 2008

Page 238

1    A.  Not really.
2    Q.  Okay.  It's not something you work
3  with.
4    A.  No.
5    Q.  All right.  We learned yesterday about
6  something called what, advanced -- what's the
7  word -- advance maintenance.  And my
8  understanding of advance maintenance is that
9  you would dredge deeper than you would normally
10  dredge in anticipation of fill so that you
11  would dredge less often.
12          Would you have any knowledge about
13  that?
14    A.  I don't personally, no.
15    Q.  All right.  Were you asked to do any
16  calculations that may have anything to do with
17  changing water depths or advance maintenance
18  issues, things of that nature?
19    A.  Not personally.
20    Q.  Okay.  Do you have any idea what you
21  might be called upon to testify to if you do
22  show up in a courtroom one day and I have to
23  figure out what to ask you?
24      MR. BAEZA:
25          Objection.  Ambiguous.

Page 239

1    A.  You could call me and let me know what
2  you plan on asking me and then I'll know.
3  EXAMINATION BY MR. BRUNO:
4    Q.  No, the way it works is you get called
5  by your team, and the reason why I'm asking
6  these questions is for me to try to figure out
7  what your team is going to ask you so that I
8  can prepare a cross-examination.
9    A.  I understand.
10    Q.  Okay.  So that's why I'm asking do you
11  have any earthly idea what you may be called
12  upon to talk about if you are batter up
13  Number 4?
14      MR. BAEZA:
15          Objection.  Calls for
16      speculation.
17    A.  Not at this point.
18  EXAMINATION BY MR. BRUNO:
19    Q.  Guy on first, guy on second, third guy
20  is out and you're up.
21          Okay.  No clue.
22      MR. BAEZA:
23          How many balls, how many strikes?
24  EXAMINATION BY MR. BRUNO:
25    Q.  All right.  If you go from, say,

Page 240

1  32 feet -- 36 feet and then there's what, four
2  feet of --
3      MR. LAMBERT:
4          There's two feet maintenance
5      dredging, two more feet for tolerance,
6      and they let them go other two feet,
7      so it's 36 --
8  EXAMINATION BY MR. BRUNO:
9    Q.  Did you guys do any calculations at
10  all, that is, to determine whether or not
11  dredging deeper may impact the stability of the
12  slope of the sides of the canal or the
13  embankment?
14    A.  I don't know.
15    Q.  All right.  With regard to foreshore
16  protection -- who would be the right guy to ask
17  that question?
18    A.  I would have to find that out.
19    Q.  Foreshore protection, is that
20  something your department would have a say in?
21    A.  Not particularly.  Foreshore
22  protection is handled out of the civil branch.
23    Q.  Right.  And maybe I'm just guessing
24  here, but that sounds like more of a hydrology
25  issue.

Page 241

1    A.  That's right.
2    Q.  The way the water impacts the sides.
3    A.  Yes.
4    Q.  And the material -- nature of the
5  material would prevent that from occurring.
6          Is it true or false that the bank
7  stability will be affected if you dredge deeper
8  than you have customarily dredged; that is, if
9  you have been dredging at 36 feet for years and
10  then all of a sudden you start dredging at
11  42 feet, will that as a matter of fact impact
12  the bank stability?
13    A.  No, not necessarily.
14      MR. BAEZA:
15          Objection.  It's a hypothetical.
16      MR. BRUNO:
17          Oh.  We have asked in a request
18      and got the big X, for the Inner
19      Harbor Navigation Canal Floodwall
20      Alternatives Concept Study.  We've
21      been able to acquire only Appendix 3
22      and nothing else.  Could you please
23      look into whether or not that's
24      accessible to you guys and let me know
25      whether or not you will produce it?

JOHNS PENDLETON COURT REPORTERS                    800  562-1285

RICHARD JAMES VARUSO                                    April 1, 2008

Page 242

1      MR. STONE:
2          Yes.
3  EXAMINATION BY MR. BRUNO:
4      Q.  Are you familiar with the document?
5      A.  I believe HPO is putting that document
6  out.
7      Q.  I'm sorry?
8      A.  HPO.  That's the Hurricane Protection
9  Office.  That's another branch of the --
10          (Whereupon the deposition was
11  concluded.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 243

1          WITNESS' CERTIFICATE
2
3          I, RICHARD JAMES VARUSO, do hereby
4  certify that the foregoing testimony was given
5  by me, and that the transcription of said
6  testimony, with corrections and/or changes, if
7  any, is true and correct as given by me on the
8  aforementioned date.
9
10  _____   _____
11  DATE SIGNED        RICHARD JAMES VARUSO
12
13  _____ Signed with corrections as noted.
14
15  _____ Signed with no corrections noted.
16
17
18
19
20
21
22
23
24
25  DATE TAKEN: April 1st, 2008

Page 244

1          REPORTER'S CERTIFICATE
2          I, JOSEPH A. FAIRBANKS, JR., CCR, RPR,
3  Certified Court Reporter in and for the State
4  of Louisiana, do hereby certify that the
5  aforementioned witness, after having been first
6  duly sworn by me to testify to the truth, did
7  testify as hereinabove set forth;
8          That said deposition was taken by me
9  in computer shorthand and thereafter
10  transcribed under my supervision, and is a true
11  and correct transcription to the best of my
12  ability and understanding.
13          I further certify that I am not of
14  counsel, nor related to counsel or the parties
15  hereto, and am in no way interested in the
16  result of said cause.
17
18
19
20
21
22
23
24  _____
   JOSEPH A. FAIRBANKS, JR., CCR, RPR
25  CERTIFIED COURT REPORTER #75005