## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: KATRINA CANAL BREACHES | § | CIVIL ACTION |
| CONSOLIDATED LITIGATION | § | NO. 05-4182 "K" (2) |
| | § | |
| _____ | § | |
| | § | JUDGE DUVAL |
| PERTAINS TO:  MRGO | § | |
| *Armstrong,* No. 10-866 | § | |
| *Entergy,* No.  10-77 | § | MAG. WILKINSON |
| _____ | § | |

### DEFENDANT UNITED STATES' SUPPLEMENTAL BRIEF IN SUPPORT OF ITS MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT (Doc. 19993)

This brief responds to the Court's post-hearing minute entry, Doc. 20084, which ordered supplemental briefing on four topics relevant to the FTCA's discretionary function exception, 28 U.S.C. § 2680(a).  The first two topics are addressed below.  The last two are responded to by the submission of exhibits, as the minute entry contemplates.[1]

_____

[1]Exhibit 38 demonstrates where the new channel would sit in relation to Figure 5 of Plaintiffs' Exh. 17.  Exhibit 39 is a chronology of events using bullet points to explain why the relevant DDRs were substantially complete, although subject to change until the new lock becomes operational.

## I. THE ENGINEER REGULATIONS CITED BY PLAINTIFFS DID NOT REMOVE DISCRETION.

### A. ER 1110-1-8157 WAS NOT IN EFFECT, AND IT PERTAINS TO AN IRRELEVANT TOPIC:  EFFECTIVE, COST-EFFICIENT REMEDIATION OF HAZARDOUS,TOXIC, AND RADIOACTIVE WASTE.

Engineer Regulation 1110-1-8157 did not remove discretion, because the

regulation did not exist when the excavations in question occurred.  The

sewer-lift station was removed and backfilling occurred in November of

2001.[2]  By February 24, 2002, the "wedding cake" had been removed and

backfilling of the excavation had begun.[3]  "On March 27, 2002, the Final

Acceptance Report was rendered finding all work completed, acceptable and

in compliance with the contract. This acceptance would include the backfill

and compaction of the excavation at the Boland site."[4]  Six months later,  on

October 1, 2002, Engineer Regulation 1110-1-8157 took effect.[5]

---

[2]*See In re Katrina Canal Breaches Lit.,* 2008 WL 5234369, at *10-*11; WGI MSJ Mem.
[Doc. 15861-2] at 26 & nn. 160, 161.

[3]*See In re Katrina Canal Breaches Lit.,* 2008 WL 5234369, at *14; WGI MSJ Mem. [Doc.
15861-2] at 29 & n. 175.

[4]*In re Katrina Canal Breaches Lit.,* 2008 WL 5234369, at *14 (citing WGI Ex. 86,
Pre-Final Inspection Report, March 21, 2002 at 2; WGI Ex. 6, Guillory II at 129-30).

[5]See ER 1110-1-8157, at 1 [USA Ex. 34].

Even if the regulation had been in effect, it would be irrelevant.  Its "intent is to assure that a site is sufficiently characterized, and that geotechnical data of acceptable quality are obtained and used."[6]

> Collecting insufficient geotechnical data during the site characterization phase can lead to an incorrect or incomplete analysis of the risk posed by a site or of remedial alternatives during the feasibility study phase.  A thorough understanding of site geology, hydrogeology, and geochemistry is required for identifying contaminant fate and transport potential and to aid in identifying, evaluating, and properly designing remedial measures . . . . If physical and geochemical properties remain unknown, misunderstanding or misinterpretation of the site can lead to failure of a remediation project.[7]

The regulation promotes the "[c]ollect[ion of geotechnical] data at the appropriate level of quality . . . to meet project [HTRW] objectives."[8]

The regulation is not applicable, because the plaintiffs are not challenging the effectiveness of the environmental remediation.  They argue that additional geotechnical analysis should have been done, not "to assure that [the] site [was] sufficiently characterized, and that geotechnical data of acceptable quality [were] obtained and used,"[9] but to assure that WGI's

---

[6]*Id.* ¶ 1.

[7]*Id.* ¶ 6.

[8]*Id.* ¶ 7(b).

[9]*Id.* ¶ 1.

excavations would not reduce the protection provided by the LPV levee.  The regulation does not have any mandates related to that end.

### B.   ER 1110-2-1150 WAS FOLLOWED DURING THE ADMINISTRATION OF T.O. 26.

Engineer Regulation 1110-2-1150 "defines engineering responsibilities, requirements, and procedures during the planning, design, construction, and operations phases of civil works projects."[10]  Using these five phases as a framework, it "provides guidance for developing and documenting quality engineering analyses and designs for projects and products on time and in accordance with project management policy for civil works activities."[11]  "This regulation provides policy guidance to be used with professional engineering judgement in the development of engineering products."[12]

The regulation brought a "major change . . . in the types of Engineering documents used in the project development process. The old system of General Design Memorandum (GDM) and Design Memorandum (DM) following a Feasibility Report [was] replaced by a system of Engineering

---

[10]ER 1110-2-1150 ¶ 1 [USA Ex. 33].

[11]*Id.; see also id.* ¶¶ 6.1, 6.3.

[12]*Id.* ¶ 6.

Appendices to the Feasibility Report, Design Documentation Reports (DDR), and Engineering Documentation Reports (EDR)."[13]  Under this regulation, the District is required to "prepare Design Documentation Reports (DDR's) which are implementation documents."[14]  The DDR is one of four "basic Engineering Documents used in the development of projects."[15]

> The DDR provides the technical basis for the plans and specifications and serves as a summary of the final design.  The DDR covers the preconstruction engineering and design phase and the construction phase of the project.  It is used by the ITR team and for future reference. *The DDR is not totally completed until after the plans and specifications and construction are completed.*[16]

Crucially, the DDR is a "living" document that remains subject to change until the project is fully constructed and  moves into the operations phase.  It is developed "at the beginning of the design phase" and is "expanded or modified as the design progresses."[17]  It "contain[s] a full record of design decisions, assumptions and methods, subsequent to the Feasibility Report," and is "sufficiently clear so that an engineer or other individual not familiar

---

[13]*Id.* ¶ 6.4.

[14]*Id.*

[15]*Id.* ¶ 8.

[16]*Id.* ¶ 8.2 (emphasis added).

[17]*Id.* ¶ D-1.2.

with the project could review the DDR and understand how the project evolved into its final configuration, and why each key decision was made."[18] "The DDR is not finalized until project construction is completed.  During the construction phase, design decisions made in connection with contract modifications shall be added to the DDR."[19]

As these provisions reveal, the DDR is descriptive rather than prescriptive. It records the all of the design decisions, assumptions, and methods of engineering and construction that occur after the Feasibility Report.[20]  The DDR does not prescribe design decisions during the Construction phase but merely incorporates them so that there is a single reference document for people who want to know "how the project evolved" and why key decisions were made.[21]

Because the DDR is merely descriptive, it could not serve as a basis for this action or, as is relevant here, function to eliminate discretion in the administration of Task Order 26.  Even if it were true that the relevant DDRs

---

[18]*Id.* ¶ D-1.3.

[19]*Id.* ¶ D-1.4.

[20]*Id.* ¶ D-1.3.

[21]*Id.*

"did not contain mandatory elements including engineering analysis, wall stability analysis, seepage analysis, global stability analysis and temporary restraining struction analysis,"[22] the absence of a record of those analyses in the DDRs would be irrelevant.  If the analyses had been performed but not recorded in a DDR, then the DDR would be flawed.[23]  But the failure to record them in a DDR would not have caused the plaintiffs' alleged damage or eliminated the Corps's discretion in overseeing WGI's work.  If the analyses were not performed, then failing to find a record of them in the DDRs would not even call into question the adequacy of the DDRs themselves.  And although the plaintiffs allege that failing to perform those analyses would amount to negligence, the only question relevant to the discretionary-function exception is this:  Did ER 1110-2-1150 mandate those analyses?  The answer to that question is:  No, it did not.

Engineer Regulation 1110-2-1150 sets forth "policy guidance" at a level of generality far above that which would eliminate discretion concerning he

---

[22]*Armstrong* Plt. Slide 19 (provided to the Court at oral argument and attached here as USA Ex. 40) (underscoring omitted).

[23]*See* ER 1110-2-1150 ¶ D-7 (providing that "[r]esults of investigation, analyses, and calculations made for the design shall be included").

specific analyses a particular project would require.[24]  Paragraphs 12 through

16 outline the process of engineering involvement through the five phases of a

civil works project.[25]  "The detail in this regulation discusses the process for

large complex projects," such as the IHNC Lock Replacement Project.[26]

　　The demolition and remediation performed by WGI at the EBIA occurred

during the Construction phase of the lock project.  The TERC (Total

Environmental Remediation Contract) was a construction contract to

remediate contaminated material at the EBIA.  It was but one of several such

construction contracts.  Other contracts were awarded for the demolition of

the Galvez Street Wharf, which was completed in February 2003; the

installation of mooring buoys, completed in April 2003; and a pile test,

completed in August 2003.  Anticipated future contracts include demolition of

the Coast Guard facility, bypass-channel construction, and new-lock

construction.

　　Prior to entering the Construction phase, the lock project moved through

the first three project phases.  The Reconnaissance phase comprised several

---

[24]*Id.* ¶ 6; *see also id.* ¶ 1.

[25]*See id.* ¶ 11.

[26]*Id.*

studies that were conducted over three decades, beginning in 1961 and

culminating in the preparation of a Project Management Plan in 2001.[27]   The

Feasibility phase culminated in the preparation of the nine-volume MRGO

New Lock and Connecting Channels Evaluation Report (Mar. 1997).[28]   The

third project phase, Preconstruction Engineering and Design, has resulted in

the production of four Design Documentation Reports.[29]

   Task Order 26, which was performed from June 1999 through May 2005,

composed just one part of the Construction phase.  WGI's work, including its

preparation of the 1999 Recommendation Report for Demolition and Site

---

[27]*See* USA Opening Brief 5-7; IHNC Lock Replacement Project Project Management Plan (Feb. 2001) [USA Ex. 41].

[28]1 New Lock Eval. MVD-006-000000151 ("The Evaluation Report presents the results of studies that address the feasibility of improving navigation between the Mississippi River in New Orleans, Louisiana, and the Gulf Intracoastal Waterway and the Mississippi River-Gulf Outlet on the east side of the River."); *accord id.* at MVD-006-000000166.

[29]DDR No. 1, Site Preparation and Demolition (Feb. 1999) comprises eight volumes. Volume 1, which addresses the demolition of the Coast Guard facility, the Galvez Street Wharf, and the EBIA, is USA Ex. 20.  DDR No. 2, Levees, Floodwalls and Channels (Jan. 2001) is USA Ex. 15.  Neither DDR No. 3, Lock Foundation Report (May 2002), nor DDR No. 4, Lock Structure (2006), are in the record.  Because this project is extremely complex and is far from completion, additional DDRs may be published in the future.

   ER 1110-2-1150 recognizes that the PED and Construction phases will sometimes overlap during complex projects involving multiple contracts.  *See id.* ¶ 15.2.  Accordingly here, the project moved into the Construction phase with the demolition of the Galvez Street Wharf, the installation of mooring buoys, the pile testing, and the EBIA remediation even as plans and specifications and design documentation reports were being generated for future construction contracts.

Preparation Activities, the eight work plans, the contract modifications for the two excavations at issue, and the August 2005 Technical Completion Report and Record Drawings, occurred during this phase.  The lock project will not move into the Operations phase until construction of the new lock is completed and the lock becomes operational.

Paragraph 15 of ER 1110-2-1150 generally describes the processes by which "Engineering effort" occurs during the Construction phase of project development.[30]  This phase "includes completion of DDR's, modification of P&S (where appropriate), and preparation of engineering considerations and instructions to field personnel.  Additional effort is needed to review selected contractor submittals, conduct site visits, and prepare construction foundation reports and concrete reports."[31]  "Appropriate engineering personnel shall attend preconstruction conferences to develop an awareness of any contractor construction concerns and assist with any technical questions that may arise."[32]  "Site visits shall verify that conditions match the assumptions used in designing the project features.  Site visits may also be

---

[30]ER 1110-2-1150 ¶ 15.

[31]*Id.*

[32]*Id.* ¶ 15.3.

necessary to brief construction division personnel on any issues affecting the construction . . . ."[33] "Engineering shall provide design and cost-estimating assistance for claims and modifications when requested and be knowledgeable of all claims and modifications arising on a project as they relate to the designs produced in the P&S."[34]

The Corps followed the process described in ER 1110-2-1150 paragraph 15 in administering Task Order 26. The Project Delivery Team ("PDT") met with WGI personnel, reviewed WGI's work plans and other submittals, conducted site visits, and provided design assistance when requested.[35] The PDT included personnel from the District's Engineering Division.[36] When the team saw a need for geotechnical support, it requested and received support from Engineering.[37]

The *Armstrong* plaintiffs' assertion that "[t]he Corps never performed a geotechnical engineering analysis for the EBIA project" is incorrect and

---

[33]*Id.* ¶ 15.5.

[34]*Id.* ¶ 15.6.

[35]1 Guillory Dep. 50:24 – 51:19; 66:7 – 69:7; 2 Guillory 27:25 – 32:15; 59:3-13.

[36]*Id.* at 53:7-22; 150:10-12.

[37]*Id.* at 141:13-15; 150:7-15; 158:20 – 159:7.

irrelevant.[38]  It is incorrect because the Corps did do a geotechnical analysis of the borrow pit.[39]  It is irrelevant because ER 1110-2-1150 did not mandate a geotechnical analysis of the borrow pit or the sewer-lift-station excavation or the wedding-cake excavation.  Whether to request a geotechnical analysis was a matter of discretion for the PDT leader, Lee Guillory.[40]

The plaintiffs rely heavily on the testimony of John Grieshaber, who assumed that the Corps's Engineering Division would have performed stability and seepage analyses of the wedding cake excavation.[41]  But Grieshaber was never asked whether any regulation mandated those analyses.  Instead, he based his testimony on the District's internal "process and procedures."[42]  And he acknowledged that those procedures required the exercise of judgment and choice.[43]  It was up to the Construction Division to decide whether to request an Engineering analysis:

---

[38]*Armstrong* Slide 21, provided to the Court at oral argument, makes this assertion.

[39]*See* 1 Guillory Dep. 134:16 – 141:15; 2 Guillory Dep. 153:3-20.

[40]*See* 2 Guillory Dep. 153:3-20.

[41]*See Armstrong* Plt. Oral Arg. Slides 8-12; 1 Grieshaber Dep. 145:22 – 148:14.

[42]1 Greishaber 174:15-16.

[43]*See id* at 119:10-17 (stability control line allows excavation); 126:22 – 127:4 (same); *Cf.* 1 Guillory 175:18-22 (Guillory considered control line in evaluating excavations).

[A] task order was set up with certain requirements in it.  There was someone from construction division who oversaw that contract.  And as far as the geotechnical branch would go, problems or concerns of a geotechnical nature that are identified by the construction individual would come back through engineering, and if they're geotechnical in nature they would go to the geotech branch to look at, make recommendations on, interpretations of.

. . . .

There are site visits.  There's no one restricting site visits.  But as far as going out to look at a particular aspect, it's usually a request from the construction side of the house to have an engineering individual come look at something.  We send individuals out to jobs so they're knowledgeable of what's going on, to see just the day-to-day operations of the jobs.  But it's strictly as an oversight, you know, so that they're—they can learn what's going on out there and hopefully take some of that and have a better understanding the next time we get into a situation like this.  But problems, you know, that's a totally different thing; there's a formal process where they actually go to engineering division for help.[44]

Guillory exercised his discretion concerning WGI's excavations, seeking Engineering review of some plans but not others.  His decisions may have been erroneous, but they did not violate any mandatory directive.  Neither ER 1110-2-1150 nor any other agency regulation or policy deprived him of that choice.  Accordingly, the conduct in question satisfies the first prong of the discretionary-function-exception test.

---

[44]1 Greishaber 28:5 – 30:6; 166:4 – 168:18.

## II.  ENGINEERING DECISIONS, INCLUDING BACKFILLING DECISIONS, ARE SUSCEPTIBLE TO ANALYSIS IN TERMS OF THE POLICIES UNDERGIRDING THE LOCK PROJECT

Engineering decisions, including the backfilling of deep excavations, were not isolated from the social, economic, and political policies that animated the lock project as a whole: aiding commerce, bolstering national defense, and maintaining community relations.[45]  Completing the project expeditiously served the first of these policies, but that end could not be pursued in isolation from the competing, if not conflicting, policy of minimizing social and cultural impacts "to the maximum extent practicable."[46] The East Bank Industrial Area remediation and demolition plan recited these policies before the work began.  The Project Execution Plan ["PEP"] dated June 1, 1999, and signed by the heads of the Corps District's various Divisions, the Senior Project Manager, and the Contracting Officer's Representative, among others, cited "the importance of this lock replacement project to the nation and the constant delays and associated costs experienced by the inland waterway industry resulting from the use of the current obsolete lock" as

---

[45]*See* 1 MRGO New Lock and Connecting Channels Eval. Rep., at unpaginated syllabus [Mo. Ex. 1, at NPM-006-00000004 to -00000007; *id.* at 8 [NPM-006-000000022].

[46]*Id.* at NPM-006-000000006.

bases for requiring expeditious preparation and remediation of the EBIA.[47]

The PEP also noted that "the use of remediation, demolition and disposal

methods which are least disruptive/objectionable to the neighboring

residents" would be required because "the project site is adjacent to a

sensitive residential area."[48]

The Corps's Project Delivery Team, which was most immediately

responsible for overseeing WGI's performance under Task Order 26, paid

close attention to this requirement:

> [W]e were highly aware that the adjacent Ninth Ward neighborhood was
> a very sensitive and historic neighborhood, and we wanted to use special
> considerations during the project to monitor air quality, dust control,
> dust suppression, noise suppression, various demolition methods that
> would reduce all of those features, and we wanted to mitigate the amount
> of truck and marine traffic that could adversely affect the quality of life of
> the adjacent neighborhoods.[49]

From prior experience the PDT knew that "demolition, piling removal and

that sort of thing could have an adverse effect on the foundations and houses

of the adjacent neighborhoods if it wasn't done properly."[50]  Consequently, the

---

[47]Project Execution Plan and Signature Sheet at 5 [Mo. Ex. 28, at NCS-002-000000025].

[48]*Id.*

[49]2 Guillory Dep. 36:1-11 [Mo. Ex. 11]..

[50]*Id.* at 36:24 – 37:2.

Corps "review[ed] the choice of equipment that Washington Group proposed to use to make sure that it would not cause excessive vibrations. . . . [I]f Washington Group had proposed to use a wrecking ball, and in [the Project Delivery Team's] judgment that was inappropriate . . . [the PDT would have] object[ed] . . . and recommend[ed] alternative means and methods."[51]

This testimony by Lee Guillory, the team leader, illustrates how operations that in other circumstances might be driven entirely by engineering considerations were influenced by policy considerations. Demolishing buildings with a wrecking ball might have been the fastest and cheapest way to clear the EBIA for channel excavation, but it would not have been acceptable if it threatened to damage nearby homes. Likewise, the means and methods of excavating subterranean objects involved considerations of cost, speed, and community impact. The fastest and cheapest way of removing the so-called wedding cake and the sewer lift station would not necessarily have been acceptable. The PDT considered the impact of these operations on the Lower Ninth Ward.

---

[51]*Id.* at 37:6-24.

As noted in our opening brief, both engineering considerations and adverse community impacts affected the design of the borrow pit.[52] The expansion of the pit called for an engineering analysis, and concerns about community impacts led the Corps to request that the pit be made contiguous to the canal when its use as a borrow pit ended. If the pit had been dug in another place, quite possibly neither of these considerations would have arisen. But under the circumstances, even operations that were guided by engineering considerations were also shaped by concerns about their community impact.

The Court's minute entry assumes that backfilling was performed improperly.[53] It also implies that the Corps approved improper backfilling "because the area was to be turned into a channel at a later date."[54] These implications are unwarranted. The decision not to require compacting to specified Proctor standards was based on the Senior Project Engineer's judgment that the use of Proctor measurements would be wasteful and superfluous:

---

[52]*See* USA Opening Brief 21-22.

[53]*See* Min. Entry [Doc. 20084] at 1-2.

[54]*Id.*

[A]s far as the backfill I'm talking about, what my thought process was is that a Proctor is good, you know, it proves something, it shows that compaction was achieved.  But I didn't need a Proctor, I had other things in my favor here that didn't make it necessary to spend our taxpayers' money on a Proctor.  Because chances are if I would have gotten a Proctor, you guys would be here asking me why I didn't take two Proctors or three Proctors.  What I had in my—you know, I guess the luxury that I had was two things; I had the luxury of time on my side because this job was—I believe you said it was in '01 or '02 at this time.

. . .

We were still going to be on site for another two to three years.  Washington wasn't going anywhere.  I had them under contract, under a cost reimbursable contract.  And if we had a problem with any of these backfill operations it would have been nothing—that's a poor choice of words— it would have been quite simple for me to direct them, as contracting officer's representative, to correct deficient work and to go in and to do whatever it took, probably just add fill material.  And it would have been very easy to notice if there was a problem because material, over time, it will achieve a certain amount of compaction on its own.  Rain and just elements, natural vibrations, would cause the material to settle and compact on its own.  Had it—if it were not compacted properly, the area that was excavated would have subsided and there would have been a depression or a hole in the ground at that site.  It would have been very simple to notice that and to direct Washington to go back and fix it.  So that was my thought process at the time.[55]

The Corps's decisions concerning backfilling were driven by the same

imperatives that drove the entire project:  finding the fastest, most cost-

effective ways to build a desperately needed lock with as little impact on the

Lower Ninth Ward as possible.  Seeing that the work was performed safely

---

[55]Montegut Dep. 73:2 – 74:16.

was integral to attaining those goals.  There was no attempt to cut corners or approve unsafe procedures because the area was eventually going to be turned into a channel, and the fact that funds for the channel had not been appropriated was irrelevant to the Corps's duty.  It was understood that WGI was to accomplish Task Order 26 without harming the levee or any other private property in the vicinity.[56]

After Tropical Storm Isidore flooded the EBIA to a depth of more than three feet of water in September 2002, the Corps inspected the entire job site to see if there was any damage to the project.[57]  Two years later Hurricane Ivan covered the EBIA with as much as a foot of water.[58]  The post-hurricane inspection did not reveal any damage to the levee or any underseepage problem.[59]  Had the sewer-lift-station or wedding-cake excavations been improperly backfilled, "it would have been very easy to notice."[60]  But no

---

[56]1 Guillory 85:12-18; 166:25 – 167:6.

[57]2 Guillory Dep. 171:1 – 172:20.

[58]*Id.* at 173:10-24.

[59]*Id.* at 174:1-12.

[60]Montegut Dep. 72:4-5.

subsidence was observed because the backfilling had been performed

properly and posed no threat to the adjacent levee.[61]

## CONCLUSION

The Corps's administration of Task Order 26 violated no agency regulation

or mandatory directive and was grounded in considerations of policy.  Its

review and approval of WGI's excavation plans was properly a matter of

judgment grounded not just in engineering but also in policy considerations.

For these reasons, the United States' motion to dismiss should be granted.

Respectfully Submitted,

TONY WEST                                   s/ Robin Doyle Smith
Assistant Attorney General         ROBIN DOYLE SMITH
                                                  Senior Trial Counsel, Torts Branch
PHYLLIS J. PYLES                       Civil Division
Director, Torts Branch               U.S. Department of Justice
                                                  Box 888, Washington, D.C.  20044
JAMES G. TOUHEY, JR.             (202) 616-4400/616-5200 (fax)
Assistant Director, Torts Branch   robin.doyle.smith@usdoj.gov
                                                  Attorneys for the United States

---

[61]Neither excavation was anywhere near a breach.  The wedding-cake excavation was at
the southern end of the Boland Marine parcel, and the north breach occurred at the
northern end.  *See* USA Ex. 42  ("Sketch 1:  Boland Marine Subsurface Foundations")
(showing the location of the "southern block") [WGP-008-111106695].  The sewer-lift-
station excavation was at the northern end of the Saucer Marine parcel, and the south
breach occurred at the southern end.  *See* USA Ex. 43 ("Figure 1: Construction Water
System Plan") (showing location of sewer lift station) WGP-008-000022248.  A slide
provided to the Court by WGI during oral argument on WGI's motion for summary
judgment illustrates these locations.  It is submitted here as USA Ex. 44.

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true copy of the foregoing was served upon all counsel of

record by ECF on October 29, 2010.


<u>/s  Robin Doyle Smith</u>
ROBIN DOYLE SMITH