```
1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
2

3   ****************************************************************

4   IN RE:  KATRINA CANAL
    BREACHES CONSOLIDATED
5   LITIGATION

6                              CIVIL ACTION 05-4182
                               SECTION "K"(2)
7                              NEW ORLEANS, LOUISIANA
                               THURSDAY, AUGUST 16, 2007, 2:00 P.M.
8

9   ****************************************************************

10

                    TRANSCRIPT OF MOTIONS HEARING PROCEEDINGS
11         HEARD BEFORE THE HONORABLE STANWOOD R. DUVAL, JR.
                          UNITED STATES JUDGE
12

13
    APPEARANCES:
14

15  FOR THE PLAINTIFFS:              BRUNO & BRUNO
                                     BY:  JOSEPH M. BRUNO, ESQ.
16                                   855 Baronne Street
                                     New Orleans, LA 70113
17

18  FOR THE UNITED STATES
    OF AMERICA:                      U.S. DEPARTMENT OF JUSTICE
19                                   BY:  ROBIN D. SMITH, ESQ.
                                     TORTS BRANCH, CIVIL DIVISION
20                                   BENJAMIN FRANKLIN STATION
                                     P.O. BOX 888
21                                   WASHINGTON, D.C. 20044

22

23  ALSO APPEARING:
                                     CAYCE PETERSON, ESQUIRE
24                                   SCOTT JOANEN, ESQUIRE
                                     PRICE MOUNGER, ESQUIRE
25                                   KARL F. BUCHLER, ESQUIRE
```

```
 1   APPEARANCES:  (Continued)

 2

 3                              J. ROBERT WARREN II, ESQUIRE
                               FRANCIS J. BARRY, JR., ESQUIRE
 4                             LINDA J. NELSON, ESQUIRE
                               E. ALEXIS BEVIS, ESQUIRE
 5

 6                              WILLIAM J. PERRY, ESQUIRE
                               GERALD MEUNIER, ESQUIRE
 7                             PAUL AUCOIN, ESQUIRE
                               KEVIN KLIBERT, ESQUIRE
 8

 9

10   OFFICIAL COURT REPORTER:   CATHY PEPPER, CCR, RPR, CRR
                               500 POYDRAS STREET, ROOM B406
11                             NEW ORLEANS, LOUISIANA 70130
                               (504) 589-7779
12

13

14   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
     PRODUCED BY COMPUTER.
15

16

17

18

19

20

21

22

23

24

25
```

1                        P-R-O-C-E-E-D-I-N-G-S

2                    THURSDAY, AUGUST 16, 2007

3                 A F T E R N O O N   S E S S I O N

4                    (COURT CALLED TO ORDER)

5

6          THE DEPUTY CLERK:  All rise, please.

7          THE COURT:  Good afternoon.

8          THE DEPUTY CLERK:  This is Civil Action #05-4182, In re:

9   Katrina Canal Breaches Consolidated Litigation, here on motion

10  document number 6380.

11         THE COURT:  Okay.  Make your appearances.

12         MR. BRUNO:  Yes, Your Honor.  Good afternoon,

13  Your Honor.  My name is Joseph Bruno, plaintiffs' liaison counsel

14  for the plaintiffs.

15         MR. SMITH:  Your Honor, Robin Smith for the

16  United States of America.

17         THE COURT:  All right.  I thought we would allocate an

18  hour each.  I'm going to make just a few brief prefatory remarks.

19  You know, Einstein came up with a very elegant equation,

20  astonishingly elegant in its brevity but extraordinarily complex,

21  $E=mc^2$.

22              Therefore, the most complex things, even abstract

23  concepts in physics, can be reduced to some eloquence.  As I look

24  at this, with all the pages I've read and countless exhibits,

25  some of which I have not read, the real issue is, we have three

1    canals, outfall canals as they call them -- the 17th, the London,

2    Orleans.

3                Are the levees that failed along those canals

4    protected, is the Government protected from any negligent acts

5    under 702c?

6                It's sometimes helpful to have a good timeline as

7    to when things occurred because things the Court is interested

8    in, and I know you're going to give me a display, but when we

9    reduce this down, one, when was the first federal money

10   authorized as to each of the canals, because one could argue that

11   in order to gain 702c immunity, certainly at least Congress has

12   to appropriate money for the purposes of flood control.

13               Then I know we had permutations of that in that if

14   authorization took place and that plaintiffs argue that there was

15   no authorization when it was actually done and of course the

16   Government will argue that, Wait a minute, conceptually, the

17   flood controlled -- I'm going to call it the LVP for short -- the

18   LVP encompassed flood control protection from Lake Pontchartrain,

19   and whether it was the barrier plan or the parallel protection

20   plan, a high-level plan makes no difference.

21               And they also allege authorization.  And then the

22   case law supporting it.  What's the case law?  Not a lot of

23   precise case law on this.

24               And the nuances of each canal.  Which has a different

25   history.

1          To my understanding, and I could be wrong about

2     this because although I read the 70-page brief, it's not clear to

3     me, maybe it should be, whether the plaintiffs are arguing that

4     these, none of these canals were ever truly a flood control

5     project.  Of course, the question becomes, what is a flood

6     control project?  What requires 702c immunity to vest?

7          And the fallback, then there is another argument as

8     to the 17th Street Canal, specifically about the dredging, which

9     took place, exactly when did it take place, and the question of

10    the storm surge occurring after the failure of the levees's

11    absorption of the dredging.

12         And the granting of the permit and, one, we still

13    have the question of, Is that a federal, is the fact that it's a,

14    if it is a federal flood control project, does the fact that

15    flood occurred from waters not from the storm surge make any

16    difference?  And then, two, if that's so, the discretionary

17    function exception, which the Court is quite familiar with and of

18    course, we have two different arguments here.

19         The Government basically says the permit, if we get

20    to that, which it says we shouldn't, is the quintessential

21    discretionary act.

22         That's really, and then of course we get into the

23    argument of the character of the waters and the central drain,

24    and I think the plaintiff is arguing that the character of these

25    waters weren't floodwaters, as contemplated by the act.

1            On the MRGO aspect of this, I'm going to say that

2  separate.  I would rather not get into that right now.  That is,

3  to strike it, et cetera.  I would like to argue the federal FTC

4  stuff and then the third aspect of the Government's motion about

5  striking the MRGO allegations because there is another MRGO

6  category.  I think we need to sit down and we need to talk about

7  that separately.

8            But those are the questions that the Court's

9  pondering, and I'm not sure of the precise timeline of all of

10  this.  There is a ton of exhibits, and you can facilitate me in

11  that regard.  I'm going to be asking you specific questions about

12  that.

13            Mr. Bruno, are you going to be the primary arguer?

14  You might want to say because I'm going to try to stick to the

15  time schedule because it makes this more precise.  You might want

16  to, do you want to save 15 minutes in rebuttal or something like

17  that?

18            MR. BRUNO:  It's his motion, Your Honor, I'll be

19  responding.

20            THE COURT:  This is true.  This is true.

21            MR. BRUNO:  I messed up last time.  I got it right

22  today.

23            THE COURT:  It is the Government's motion, so Mr. Smith,

24  would you like to save 15 minutes or so in rebuttal?

25            MR. SMITH:  Your Honor, if I take the whole hour, I will

1   be astonished.  But I will hold 15 minutes back in case.

2           THE COURT:  I agree with you.  So Mr. Smith, with that

3   stated, you're up.

4           MR. SMITH:  Thank you, Your Honor, and may it please the

5   Court, my name is Robin Smith and I represent the United States

6   in these consolidated actions.  The United States has moved to

7   dismiss certain counts of the levee master consolidated class

8   action complaint on the basis that it alleges damages resulting

9   from floodwaters that a flood control project failed to control.

10          These facts are set forth plainly and in many

11  places throughout the superseding levee master class action

12  complaint.  Beginning in the first paragraph in which it is

13  alleged that there was a widespread inundation of the City of

14  New Orleans as a result of deficiencies in, quote, the hurricane

15  protection system.

16          This is also indicated in the complaint's

17  description of the common issues of fact that the class members,

18  putative class members will share in which it says the reasons

19  for the failures of the levees and the cause of the damages

20  resulting from the failures of those levees are common fact

21  issues to the class plaintiffs.

22          Under this Court's reading of controlling Supreme

23  Court precedent, *Central Green*, two elements need to be

24  established in order to find application of 33 USC Section 702c.

25  First, there must be water that has a nexus to a flood control

1    project, and second, those waters must be floodwaters.

2            THE COURT:  That's an accurate statement of my, and I

3    know you have a more expansive interpretation but that is an

4    accurate representation of this Court's understanding of

5    *Central Green*.

6            MR. SMITH:  Your Honor, it's the United States's

7    position here that under that standard alone, the claims set

8    forth in Counts 1 through 3 and Counts 5 through 7 of the

9    superseding master complaint must be dismissed, because both of

10   those elements are established on the face of the complaint.

11           There is a nexus between the waters and the flood

12   control project in which the complaint alleges that levees were,

13   failed to control these floodwaters and that as a result of that

14   failure, the plaintiffs suffered harm.

15           That these were floodwaters is also evident upon

16   the face of the complaint because the complaint itself alleges

17   that there was a widespread inundation of land as a result of the

18   escape of those waters from the outfall canals and from the IHNC.

19           These are facts that are not only shown by the

20   complaint but they are also facts of which this Court is well

21   aware and which is common knowledge throughout the jurisdiction

22   of this Court so that the Court could take judicial notice of

23   those facts, even if they were not pled in the complaint.

24           Faced with clear application of this Court's

25   understanding of *Central Green* to the claims in its complaint,

1  the plaintiffs allege that there is a further factor that must be

2  satisfied in order for section 702c to apply, and that is that

3  the project that to which there is a nexus must be a

4  Congressionally authorized project.

5          As an initial matter, this is an incorrect

6  statement of the law.

7          THE COURT:  I saw that in your brief and I'm sure you're

8  going to talk about it, and it made me think, and maybe to get

9  precisely what you mean, if the, if the Government performed work

10  where there was no act of Congress at all, if that's even

11  possible, but if there is no act of Congress at all, but it

12  performed some work from appropriated funds but the project,

13  let's say, it was not designated as a flood control project,

14  well, perhaps 702c immunity would not apply, perhaps.

15          MR. SMITH:  Yes, Your Honor.  And those are not the

16  facts here, Your Honor, but that is a scenario that we could

17  envision that there could be perhaps a multipurpose project that

18  was not designated as a flood control project but had flood

19  control as one of its purposes.

20          And there is no case law that he says that 702c

21  applies only to authorized flood control projects.

22          Now, it is true that in almost every instance, if

23  not all the instances in which 702c has been held to apply, there

24  was an authorized flood control project that was involved.

25          THE COURT:  Some of the cases, and I didn't see it in

1    *Central Green*, some of the cases talk about, in other words, do

2    you think there has to be money appropriated by the Congress for

3    at least one of the purposes being flood control for 702c

4    immunity to apply?

5         MR. SMITH:  No, Your Honor, we do not believe that that

6    is necessary.

7         THE COURT:  Then what case do you rely on for that

8    proposition?

9         MR. SMITH:  Your Honor, we rely on *Central Green* for

10    that proposition, because in *Central Green*, what the Court said

11    was, we're disavowing the line of cases in the Ninth Circuit in

12    which the test was reduced to, Is there some connection between

13    the damages and the flood control project?

14         And the Court said, No, 702c immunity isn't

15    measured by any connection to a flood control project.  You don't

16    look at the character of the project; you look at the character

17    of the waters that caused the damage.

18         THE COURT:  But I don't read it as, are you saying

19    *Central Green* says that there is not necessarily a nexus to a

20    flood control project at all, that there is not a requirement for

21    there to be a nexus to a flood control project?

22         MR. SMITH:  Yes, Your Honor, that's what I believe

23    that --

24         THE COURT:  Well, what it your secondary argument,

25    because I know you have a very persuasive secondary argument

1    because that one, that one doesn't persuade me.  I see no case

2    that clearly states that if you don't have appropriation or

3    Congressional act that 702c immunity applies.  And there is

4    language in other cases, not Supreme Court cases, that I found,

5    that intimate or state not necessarily as a, as salient to the

6    holding, but in prelude to the holding that a Congressional

7    authorization is necessary.

8              But be that as it may, was there not appropriated

9    funds for the purpose of flood control project here, so we don't

10   have to talk about something that doesn't exist?

11        MR. SMITH:  Certainly, Your Honor, but just before I

12   move on to the next point, just let me point out to Your Honor

13   that those cases were decided before *Central Green*.  We don't

14   have case law post *Central Green* which --

15        THE COURT:  Let me tell you how I look at *Central Green*.

16   *Central Green* actually reversed the Ninth Circuit and found, at

17   least remanded, and the Ninth Circuit held that there was

18   immunity.  And there really, the real question was, because it

19   was related, because there was a flood control project involved,

20   a very huge one, and the damage was, in fact, not wholly

21   unrelated to a flood control project, ergo, 702c immunity, Ninth

22   Circuit.

23             The Supreme Court says, Well, it could be that it

24   wasn't floodwaters.  It could be subterranean leeching, not

25   flood.  So you look at the character of the water is the way you

1   focus it.

2             Now, you could read that as that is all you look at

3   or in the context of that case.  I understand we have been

4   through *Central Green*.  My reading of it, my reading of it is

5   that it, in fact, slightly narrows 702c immunity and that it has

6   to be related to, and if it's not a flood control project, that

7   you don't have your immunity.

8             The Supreme Court is going to have to state that

9   more clearly, and this may or may not be the case that they do it

10  on, but I think and you are arguing and it's something I need to

11  understand is that if there was money appropriated, that's your

12  first argument.

13            But you are arguing that there was money

14  appropriated by the Congress for flood control purposes for the

15  Lake Pontchartrain, for the LVP as I call it.

16            MR. SMITH:  Right.

17            THE COURT:  And that the three canals were part of the

18  LVP.

19            MR. SMITH:  Certainly, Your Honor.

20            THE COURT:  Can you give me a little time, I'm just

21  curious, if you have it handy, when, the first argument I

22  understand and you've made it and I've read your brief, you're

23  saying that *Central Green* basically says you look at the

24  character of the waters, if the waters are floodwaters, you have

25  a 702c immunity.  I understand.  I think that is in essence what

1    you're saying.  It doesn't have to be some kind of federally

2    authorized, Congressionally authorized flood control project.

3    It's the character of the water.  If the waters are flood waters,

4    these are clearly floodwaters, we win.  I got that argument.

5              But as we get into the more factually driven areas,

6    do you have, can you tell me when these, if you're wrong about

7    *Central Green*, you certainly make a lot of secondary arguments,

8    when did these canals become part of a flood control project?

9         MR. SMITH:  Your Honor, the, as you know, Your Honor

10   knows, the, Lake Pontchartrain and Vicinity Louisiana Hurricane

11   Protection Project was authorized by Congress in 1965 following

12   Hurricane Betsy.

13         THE COURT:  I do know that.

14         MR. SMITH:  And it was authorized for hurricane flood

15   protection on Lake Pontchartrain.  At that time, when it was

16   authorized, it was the Corps' intention to build barriers at the

17   inlets to Lake Pontchartrain which would not require the raising,

18   at least of all the levees that were along the lakefront itself.

19   The theory being that by building barriers at the inlets to the

20   lake, hurricane-induced flood surge would not get into the lake,

21   so that only certain levees that were below a certain threshold

22   along the lake would need to be improved at all.  But for the

23   most part, most of the levees would not need to be improved.

24             In the 1970s, a lawsuit was brought which halted

25   certain aspects of the prosecution of that plan, which was known

as the barrier plan.  And because that injunction was in place
for a number of years and the United States was unable to satisfy
the district court that it could proceed under that plan, the
Corps decided to proceed under an alternate plan, which was
described as a high-level plan, based upon the fact that this
plan, in contrast to the barrier plan, would require widespread
raising of levees surrounding the lake.

THE COURT:  I know this thing took forever, and
certainly there was litigation that impeded it brought by some of
our good citizens, and so wasn't it around the 1990s that, and
that the so-called high-level and/or parallel protection plan
came into at least Congressional fruition, you argued?

MR. SMITH:  It was in the 1980s, Your Honor, when the
Corps decided to pursue the high-level plan.

THE COURT:  Do you regard that as synonymous with the
so-called parallel protection plan?

MR. SMITH:  No, Your Honor.  The parallel protection
plan --

THE COURT:  It wasn't that clear.  I'm not talking
about, from reading all of the papers, go ahead.

MR. SMITH:  Yes.  The high-level plan referred to the
raising of levees in many locations around the lake, and that was
envisioned immediately, I mean, in fact, that was discussed even
before 1965.  That plan was one of the alternatives that was
considered by the Corps but was thought to be more expensive and

1    have other drawbacks that made it less appealing than the barrier

2    plan.

3              But when the work was halted by the injunction, the

4    Corps revisited that plan, and so from even before 1965, even

5    before the authorization, there was a high-level plan that was in

6    place, but the parallel protection plan is a particular element

7    of the high-level plan that was not contemplated until the 1990s

8    when it became apparent that when hurricane-induced surges

9    entered the lake, it would also enter the outfall canals.

10             THE COURT:  Is that when I guess, and please correct

11    me -- that the outfall canals, particularly the Orleans and the

12    London were specifically mentioned, although I know it's your

13    contention that by, at the time Congress authorized the LVP in

14    1965, anything that was, shall we say an adjunct to that would

15    give you immunity.  I understand that.  But the specific canals,

16    I know the Orleans and London were mentioned in the 1991

17    reference conference; is that correct?

18             MR. SMITH:  Yes, Your Honor.

19             THE COURT:  And what about the 17th Street Canal?  It

20    was a little vague as to how that got swept into the parallel

21    protection plan and/or which is, shall we say, a subcategory of

22    the high-level plan.

23             MR. SMITH:  Well, the background for the law that

24    Your Honor is citing is set forth in a conference report.  But in

25    a nutshell, and it's also set forth in some of the plaintiffs'

1   exhibits.  If Your Honor is not going to strike them, if
2   Your Honor is going to consider those exhibits, I think you'll
3   find a number of places in the plaintiffs' own exhibits this
4   background --

5            THE COURT:  I shouldn't be looking at them because
6   you're admitting the allegations as true and I shouldn't be
7   looking at extraneous material?

8            MR. SMITH:  Your Honor need not look at them,
9   Your Honor.  Your Honor can find this based upon the
10  Congressional materials that the United States relied on to set
11  forth this background.

12            And most clearly, I think it's set forth in the
13  conference report that was behind the law or preceded the law and
14  explained the basis for the verbiage that Your Honor is familiar
15  with in the law.

16            The context was such that the Corps was proceeding
17  with plans to build parallel protection along the 17th Street
18  Canal but preferred to build barriers at the mouth of the Orleans
19  Avenue and the London Avenue Canals because building barrier
20  gates at those, at the mouths of those canals was less expensive
21  than raising the levees along those two canals.

22            But because of particular features, I guess you
23  could say, the way that the 17th Street Canal enters the lake,
24  building a barrier was not going to be less expensive there than
25  raising --

```
 1          THE COURT:  So the 17th was always, at least always, at
 2   least for a period of time, prior to the other two, was going to
 3   be a parallel protection and/or a parallel protection plan?
 4          MR. SMITH:  Yes, Your Honor.
 5          THE COURT:  The other two might have been a gate or
 6   something like that; however, ultimately, it became part of the
 7   parallel protection plan in the '90, '91, '92, whenever that was?
 8          MR. SMITH:  And that's why those two canals are
 9   referenced by name, because the Corps balked at local sponsors
10   who were interested in having the levees raised along all three
11   outfall canals because it would increase the volume capacity of
12   those canals and increase the ability for the local levee boards
13   to use them for drainage purposes when there were storms.
14          So there was a, to sort of force the issue, I guess
15   you could say, perhaps impolitely, a Congressional delegation
16   began to lobby the Corps to also build parallel protection along
17   Orleans Avenue and London Avenue Canals.  But the Corps resisted
18   that, which resulted in Congress mandating a particular kind of
19   hurricane flood protection along those two canals.
20          But what I think is instructive to see in the
21   conference report is that when the conferees refer to this, they
22   talk about the problems associated with the outfall canals in
23   general.  And what the conferees direct the Corps to do is to
24   treat the outfall canals, that is, in general, the three outfall
25   canals, as part of the authorized project, the LVP project as
```

1   Your Honor refers to it.

2              But in particular, the conferees direct the Corps

3   to consider favorably, those words, a plan for raising levees

4   along the Orleans Avenue and the London Avenue Canals.  In other

5   words, they didn't have to advise or exhort the Corps to consider

6   favorably a plan for raising levees along the 17th Street Canal

7   because, in fact, the Corps had already drawn up design

8   memorandums for the 17th Street Canal which showed that they were

9   planning to raise those levees.

10      THE COURT:  Keeping in mind your first argument under

11  *Central Green,* which I'm well aware, putting that to the side,

12  which I'm sure if this happens to go on elsewhere, it will be

13  argued, and ultimately this, you know, that may get to the

14  Supreme Court.

15             But putting aside that argument, when do you

16  consider that the three canals, and maybe you want to take them

17  individually -- we can lump, I think, the London and Orleans --

18  when do you consider, if we put aside that argument, because it

19  would be irrelevant if -- when did these three canals become part

20  of what I'm calling the LVP, and I appreciate you not making me

21  say the entire acronym, the LVP, what is your position as to when

22  they became part of that flood control project?

23      MR. SMITH:  In reality, Your Honor, any time after 1965,

24  they were part of the project, because they were part of --

25             THE COURT:  Something that might flood from

 1  Lake Pontchartrain?

 2          MR. SMITH:  Exactly, Your Honor.

 3          THE COURT:  So anything that would flood from, possibly

 4  from Lake Pontchartrain in '65, that's the first, your first

 5  argument, and I understand it.

 6          MR. SMITH:  Whenever the Corps undertook to do something

 7  related to flood control, along any of the waterways in the

 8  New Orleans area after 1965, that was authorized by the general

 9  authorization of a flood control project to protect this entire

10  region.

11          THE COURT:  From flooding from Lake Pontchartrain.

12          MR. SMITH:  Not just Lake Pontchartrain.  I think it's

13  fairly clear that it was more than just the lake.  It's

14  Lake Pontchartrain and Vicinity.

15          THE COURT:  That's the V.

16          MR. SMITH:  That's the V.  It's not just the lake, but

17  it's the entire New Orleans area.

18          THE COURT:  The particular, and when were the funds

19  first appropriated for that project?

20          MR. SMITH:  I believe the funds, the first funds weren't

21  appropriated until 1966.  I believe it was the following year.

22          THE COURT:  So basically it's your argument that from

23  that point on, that was the general concept, and any specifics

24  that were brought in later were part of the original

25  contemplation, at least part of the original concept?

1           MR. SMITH:  Yes, Your Honor, that's exactly our point.

2           THE COURT:  And you may be right about that, and if

3    you're not, when then would they have specifically been brought

4    into it?

5           MR. SMITH:  Well, Your Honor, I think, I mean,

6    conceptually, it's hard to posit that they, any less than any

7    other waterway, any other place where there was water in this

8    area that could be affected by a hurricane-induced storm surge

9    would not have been within that initial contemplation.

10          THE COURT:  I understand that.  Let me ask you just a

11   direct question:  Do you know when or ever did monies

12   appropriated by Congress and under the supervision of the Corps,

13   when was the first levee built to the 17th Street Canal?

14          MR. SMITH:  The work, on the 17th Street Canal,

15   Your Honor, I'm not sure when they began to improve, I'm not

16   actually sure of the exact year when they began the work for

17   improving those.

18          THE COURT:  Do you have a general time frame?

19          MR. SMITH:  Well, it would have been, it's in the '90s,

20   Your Honor, but I'm not sure of the exact year of --

21          THE COURT:  Right.  In the '90s?

22          MR. SMITH:  Yes.

23          THE COURT:  And would the same be true for the Orleans

24   and London?

25          MR. SMITH:  Yes, Your Honor, all three canals would have

1    been in the same general time frame.

2            THE COURT:  I understand your argument.  I just wanted

3    to get it, I need for my purposes to get all the permutations so

4    that when we look at the whole thing, I understand your argument,

5    '65, the flood control project for Lake Pontchartrain and

6    Vicinity was authorized by Congress, money was appropriated

7    shortly thereafter, and any details, that is, how it was

8    implemented and when various changes were made really make no

9    difference because that's part of the general concept of the

10   plan, and this is a way to implement that plan.  I understand.

11           But specifically, in fact, there were obviously

12   levees built under the supervision of the Corps and paid for by

13   federal funds in the '90s for all three, approximately the '90s.

14   Early 90s, we'll give it a --

15           MR. SMITH:  Yes, Your Honor, that would be correct.

16           THE COURT:  Okay.  Go ahead with your argument, sir.

17   I've probably gotten you way off course.

18           MR. SMITH:  Well, you have the general picture of our

19   argument, Your Honor.  I think at this point, I think it makes

20   sense for me to address some of the specific arguments that the

21   plaintiffs have made --

22           THE COURT:  Absolutely.

23           MR. SMITH:  -- as to why they contend these would not

24   have been part of an authorized project.

25           THE COURT:  Yes, sir.

1          MR. SMITH:  With respect to the London Avenue Canal, it

2    is the first one they address in their papers, they argue that

3    the work that the Corps performed or that was performed under the

4    Corps' auspices along the London Avenue Canal was not authorized

5    because it consisted of building I-walls rather than, quote,

6    raising levees.

7              But the authorizing legislation, at least the '92

8    legislation, which directed that this parallel protection system

9    be built along the London Avenue and the Orleans Avenue Canals

10   gave the Corps options.  It did not specify that levees be raised

11   along the entire lengths, but it said it could also improve

12   the --

13         THE COURT:  Let me say this.  I know this is a subject

14   of your general arguments, one, *Central Green* says a flood is a

15   flood is a flood, sort of like insurance policies.

16              Two -- that was a joke -- by the way, as a quick

17   aside, I noticed you quoted about the overflow, quoted by the

18   Fifth Circuit.  Let me say this, not getting into the merits of

19   that opinion, which, but the overflow word is, whether the

20   Fifth Circuit says it, the Supreme Court or the universal

21   galactic court, the levees broke.  So overflow is really not

22   relevant to me.  But it doesn't have anything to do with this

23   case.

24              And I also want to compliment you, as an aside, on

25   the conciseness of your brief.

1      But getting back to the point on the canals, all

2 this is subject to your central argument, basically a flood is a

3 flood is a flood, and two, that it is all part of a flood control

4 project authorized in '65, and nothing else more need be done.

5 And so you're arguing these specific points, I understand subject

6 to those other arguments.

7      MR. SMITH:  Right.  But after 1992, Congress, even if

8 that were true, now, this is what I would say, even if it were

9 true that protecting New Orleans from flooding via the outfall

10 canals from Lake Pontchartrain, I think it's undeniable that the

11 outfall canals broke as a result of hurricane-induced storm

12 surge, that storm surge would have entered the canals through the

13 lake.

14      Even if that weren't encompassed in the original

15 authorizing legislation, in 1992, Congress specifically directed

16 that parallel protection, a complete parallel protection system

17 be constructed for the outfall canals, so that even failing the

18 broad argument which Your Honor has recapitulated a couple of

19 times now, even apart from that and if that argument fails, the

20 plaintiffs' attempt to found liability on flooding from the

21 outfall canals during Hurricane Katrina must fail because

22 specifically in 1992, Congress authorized hurricane flood

23 protection along those three canals.  And it gave the Corps a

24 choice of means of providing that protection, which is why the

25 fact that I-walls were constructed along the London Avenue Canal

1    rather than levees being built up is protected.

2              It's also the reason why, the fact that the Orleans

3    Avenue Canal is protected, even though the work wasn't complete

4    when Katrina struck, because as the plaintiffs acknowledge, the

5    work that was done there was the work of raising levees along

6    that canal.

7              And it's also the reason why the 17th Street Canal

8    work is protected by 702c, because Congress authorized them to

9    build a complete parallel protection system, and there is no

10   explanation how the Corps could build a complete parallel

11   protection system and omit one of the, what Your Honor has

12   described as the three outfall canals.  They are side by side.

13   Any person who is familiar with this area knows those three

14   outfall canals parallel each other and flow into the lake

15   carrying off drainage.

16             So the premise of the plaintiffs' argument that

17   somehow Congress would have mandated parallel protection or

18   hurricane flood-induced protection along two of the outfall

19   canals while omitting any protection at all for the city from the

20   17th Street Canal defies belief.

21             The conference report as I've mentioned,

22   Your Honor, makes it clear that resolving the, quote, problems

23   associated with outfall canals had to be addressed within the

24   Lake Pontchartrain hurricane project.

25             That in a nutshell, Your Honor, is the

1  United States' argument with respect to the application of 702c.

2  If Your Honor has no further questions, I'm going to move along

3  to the discretionary function exception.

4        THE COURT:  Basically your argument on the permit and

5  dredging.

6        MR. SMITH:  Yes, Your Honor.

7        THE COURT:  And your argument is that a permit is a

8  quintessential discretionary act whether you balanced it right or

9  not, it's not the kind of regulation that if one, if one doesn't

10  comply with, it's not a mandate, a specific mandate, that it's

11  different because you grant a permit, and you're supposed to

12  weigh certain things and this is the absolute definition, in

13  essence, of discretion.

14        You can go ahead and amplify on that.

15        MR. SMITH:  And Your Honor --

16        THE COURT:  And you cite many cases.  I haven't found a

17  permit case yet.  I don't think the plaintiff has either, where a

18  permit was found to be not a discretionary function.  So you're

19  ahead on that one now.

20        MR. SMITH:  Maybe I should keep going if I'm ahead on

21  something here, but Your Honor reminded me that I do want to make

22  one more point before I move on to that, which is the permitting

23  itself would be part, would be protected by 702c as well as by

24  the discretionary function exception.

25        THE COURT:  You did argue that in your reply memorandum,

1   sir.

2          MR. SMITH:  And that fits into our argument that from

3   1965 on, the Corps was charged with protecting New Orleans from

4   hurricane-induced flooding, so that when someone approached the

5   Corps and said, We want to change this outfall canal, and the

6   Corps began evaluating -- by dredging -- and the Corps began

7   evaluating what would be the impact of that dredging, that was

8   within the purview of the authorization Congress gave to protect

9   the city from flooding.

10         THE COURT:  I understand.

11         MR. SMITH:  So with respect to the discretionary

12   function exception, Your Honor has already encapsulated our

13   position, which is simply that the regulations does not mandate

14   any specific conduct.  Would it have been an abuse of discretion

15   to authorize dredging if, in fact, certain minimum safety

16   standards, as the plaintiffs refer to them, were not met?

17          Arguably, yes, it would be an abuse of discretion.

18   It would be, quote, a bad choice.  But the fact remains that

19   under the governing regulations and statutes, that determination

20   of whether that's a good decision or a bad decision involves the

21   application of judgment and implicates a whole host of policy

22   matters that are listed and illustrated by the list of factors

23   that are to be considered.

24          So that the sense that there may have been an

25   engineering analysis to this decision whether to grant the permit

1  certainly can't be gainsaid.  I mean, there would have been an

2  engineering analysis as part of this, but the plaintiffs' premise

3  essentially is, if there is an engineering analysis, if it has a

4  scientific dimension, then it can't implicate policies.  And I

5  think the regulation itself belies that.  It says you look at

6  safety, but you look at other things, too.  And then you put all

7  those things together, and the Corps in its own discretion has to

8  decide whether issuing that permit is in the public interest or

9  not.

10        THE COURT:  One thing you might want to argue, just

11  since it's your first time up, and I guess I'm sure that the

12  plaintiffs are going to argue it, they argued in their brief that

13  the character of the waters under *Central Green* were not

14  floodwaters from the 17th Street Canal certainly, because as a

15  result of the dredging, the waters that may have caused the

16  levee, assisted the levee in failing were the catalyst, were not

17  floodwaters but were drainage waters.  I think they made that

18  argument.  I think you may want to, for the record, to get that

19  one.

20        MR. SMITH:  Thank you for asking me, reminding me to do

21  that.  I think that, Your Honor, it's a little cryptic in the

22  plaintiffs' papers but my understanding, and Mr. Bruno will

23  explain exactly what they mean, is that they contend that because

24  the levees gave way before the storm surge entered the canals,

25  the water that escaped from the canals essentially was not

1   floodwaters, so that the plaintiffs' damages were not caused by

2   floodwaters.

3              And with all due respect, Your Honor, our quotation

4   of the Fifth Circuit's recent opinion in the insurance case

5   wasn't intended --

6          THE COURT:  *Central Green* is much more persuasive to me

7   in your favor in that regard because the insurance case, they

8   weren't looking at 702c.  So it really has nothing, and they used

9   the word overflow, by the way, it's quoted in your brief.  It

10  wasn't an overflow.  If it was an overflow, I don't know if any

11  of us would be here on any of this.  Well, maybe against the

12  Corps because it wasn't high enough.  But anyway, just an

13  overflow, who can stop that?

14             But it would have been truly a flood under any

15  man's or woman's definition.  So I've got your argument there.

16  *Central Green* says look at the character of the waters, and these

17  were, in my mind, Mr. Bruno would have to convince me clearly of

18  floodwaters.  I have to be candid about that.

19         MR. SMITH:  Your Honor, I don't want to belabor the

20  point because Your Honor has already indicated that.  But I would

21  say that even if there was some merit in Mr. Bruno's position, it

22  seems to me that it's the character of the waters that caused the

23  damage.

24             In other words, it wasn't really, as long as those

25  waters stayed in those canals, they weren't damaging anybody.  It

 1    was when they got out of that canal and --

 2              THE COURT:  I tend to agree with you on that.

 3              MR. SMITH:  -- flooded New Orleans that they caused

 4    damage.

 5              THE COURT:  It would be a real stretch for me to find

 6    that drainage waters weren't floodwaters under *Central Green*.

 7              MR. SMITH:  Thank you, Your Honor.  I have no more

 8    questions at this time.  I reserve my time.

 9              THE COURT:  Mr. Bruno, do you know, you're climbing up a

10    hill here.

11              MR. BRUNO:  I'm always climbing up a hill, Judge.

12              THE COURT:  Sometimes people make it to the top, so

13    don't be discouraged.

14              MR. BRUNO:  Judge, I'm never discouraged because there

15    is no point in being discouraged.  You just have to keep plugging

16    away.

17              THE COURT:  Just while you're all here, I'm going to let

18    you, when we write this opinion, however it is, we're going to

19    make it very, we're going to be very careful to make sure we

20    don't collateral estoppel or res judicata the Government or the

21    plaintiffs in the *Robertson* case in the MRGO.

22                   So I'm going to be very mindful when we write this

23    opinion, however it is, it's not going to be a holding in those

24    cases.  To the extent we are able to do so.  If anybody has those

25    concerns.  If it becomes impossible, then it is.  But I would

1    rather that stand on its own because it's a different context but

2    they do conflict to some degree.

3              (WHEREUPON, at this point there was a brief delay in the

4    proceedings.)

5              THE COURT:  I'll subtract this from your time.

6              MR. BRUNO:  Judge, first of all, thank you very much for

7    indulging us.  I know our brief was lengthy, but we, as you well

8    know, consider these issues to be monumentally important to the

9    people of this community.

10             THE COURT:  Well, they are.  I want to make sure they

11   are clear.  Go ahead.

12             MR. BRUNO:  There is very little, Judge, upon which we

13   can agree with the Government.  They've really misstated all of

14   the facts.  They really don't understand what happened here, and

15   quite frankly, embarrassingly do not know what they themselves

16   did over the past 25 or 30 years.

17              The first point I would like to make to you is this

18   business of this flood stuff because they've got that all wrong.

19   What you see before you, if you have it on your screen, it's not

20   on the big screen.

21             THE COURT:  I've got it.  Why isn't it on the big

22   screen?

23             THE DEPUTY CLERK:  It's coming.

24             THE COURT:  I'm looking at it.

25             MR. BRUNO:  What this is, what I asked my expert, Chad

1    Morris, to do would be to show Your Honor where lake water would

2    be today, right now, if there was no seawall and if there was no

3    Orleans Levee District levee along the lakefront.  You can see

4    the blue would basically inundate about basically 80 percent of

5    the entire city.  That's not flood water, that's lake water at

6    its normal tidal level.

7              In 1915, 1925, thereabouts, the Orleans Levee Board

8    set about to reclaim this land by building levees and seawalls

9    along the lakefront.  The purpose was to, frankly, make some

10   money.  They dried out all of this land and sold it for a

11   handsome profit.

12             Now, so that the first thing that has to be

13   understood with regard to this business of flood is that this was

14   a land reclamation project.  The purpose of levees and seawalls

15   was to keep the water out that would otherwise normally be there.

16             So if you look at all the dictionaries that talk

17   about flooding, they talk about water that normally overflows its

18   banks.  That's not what we have here.  We have a man-made land

19   reclamation project.  We have a lot more in common with the

20   Netherlands than most folks really understand.

21             Judge, this is a more interesting picture because

22   this is a picture of the flooding in the City of New Orleans when

23   the water in the city was at its deepest.  And you'll note that

24   it's September 1st, three days after the hurricane.  Not the day

25   of the hurricane, but three days later that the water in the city

1   was as deep as it was ever going to get.

2           Take a look at Jefferson Parish:  It was as dry as

3   a bone.  Look at Orleans Parish:  It's underwater.  There is no

4   hurricane, there is no surge, there is no extra water, it's the

5   same old lake water that we contend with every single day.  Is it

6   a flood?  Well, sure.  In the way that we use that word to

7   describe damage to property and in particular water damage to

8   property, it is a flood.

9           However, it's important to understand the nuance

10  here because if we're going to apply the strict meaning of the

11  words that are used by the Supreme Court, we have to get through

12  this process.

13          Now, I ask you to also take particular note of this

14  little business right here.  You will see that there is grass and

15  there is a little bit of land that's easily visualized on the

16  1st.

17          This is a picture of the break of the 17th Street

18  Canal as it occurred.  Take a look at that.  You see that same

19  vegetation.  The point, Judge, is that the water level in that

20  17th Street Canal is no more than about a foot higher than it is

21  on every day in this community.

22          And the expert testimony is going to tell you that

23  the reason why it was a foot higher is because the pumps were on

24  and they were pumping water out of the city because they had

25  36 inches of rain.  Also the experts will tell you that there was

1  tidal flow.

2          Now, so we talk about the business of the flooding

3  and the water.  We're not making any argument that the water

4  inside of the homes of the people in this community was not flood

5  water.  That's not the argument.  The argument is that the water

6  that made that wall fall down was not flood water.  Your Honor

7  ruled already that that canal is a drainage ditch.  Its sole

8  purpose is to move water.  It was, it is, and tomorrow will

9  continue to be a drainage ditch.

10          The only component that can remotely be claimed to

11  have any part of any flood control project is that concrete wall

12  right there.  And I know counsel didn't answer your question, but

13  that concrete wall was built in 1994, the first time funds were

14  ever appropriated to build that wall and only that wall was in

15  1992.  But more about that later.  Because what I want to kind of

16  get crystal clear to everybody are the facts as we allege.  The

17  damage is the damage to the flood wall itself caused by

18  underseepage, that, Judge, started occurring in November of 2004.

19  This thing started to fail in 2004.

20          THE COURT:  You might tell me where, and of course I've

21  read your papers, but and I assume all of this is accurate, but

22  clearly in 2005 there was a federally constructed levee, we'll

23  call it, that failed.  A federally authorized levee that failed.

24          MR. BRUNO:  That's my point, Judge.  The wall didn't

25  fail.  The wall, the concrete monolith wall did not fail.  What

1  failed was the sheet pile that was put there, paid for

2  100 percent by the Orleans Levee District and the New Orleans

3  Sewerage and Water Board.

4           The United States of America did not spend a penny,

5  not a single penny.  If you look at our papers on page 34, you'll

6  find that the Congress appropriated almost $60 million for

7  outfall canal protection.  Do you know how much they spent on

8  that 17th Street Canal?  $2.5 million.  $2.5 million.  That's it.

9           100 percent of the levee underneath that concrete

10 thing, 100 percent of the sheet pile costs that underlays the

11 levee was paid for by the Orleans Levee District.

12          THE COURT:  Let me make sure I understand, and this

13 question may seem simplistic to you who really knows the ins and

14 outs and nuts and bolts of the levees, various levee systems.

15 There was a break in, there was a break that caused flooding.

16          MR. BRUNO:  Fair enough.

17          THE COURT:  And I'm using the word break generically.

18          MR. BRUNO:  I understand.

19          THE COURT:  And you're not saying that one side of the

20 levee, one side of the 17th Street Canal is federal and the other

21 side isn't, are you?

22          MR. BRUNO:  Yes, actually, that's part of the argument.

23 But if you'll indulge me, let me get to that in a little bit,

24 because the fact, that actually is true and the papers show that

25 to be absolutely correct.

1           Now, they are not talking about, Judge, when you

2    read those papers, they are not talking about this concrete wall

3    now.  They are talking about the earth below and they are talking

4    about the sheet piling that was in the ground.

5           You'll have to let me walk through a little bit of

6    the history because what the Government doesn't want to do and

7    the reason why they want you to dismiss this case on the papers

8    without looking at any of the facts is because they don't want

9    the people of this community to know any of the facts.

10          Before we get there, I can't help but refer to the

11   learned Justice Stephens, who was the author of *Central Green*,

12   who was in the dissent in *James* and who first wrote in *Hiersche*,

13   "Today [702c] this obsolete legislative remnant is nothing more

14   than an engine of injustice."

15          That's because, Judge, you have got cases where a

16   person is injured on a rope swing hanging above a flood control

17   project, they have a cause of action, there is no immunity, but

18   the diver who is told to go under the water, he's told it's safe,

19   they switch the thing on, they kill him, they have immunity for

20   that.

21          THE COURT:  I know those cases.

22          MR. BRUNO:  And I know you know those cases and I'm not

23   going over that.  I'm not going to go there.  The point of

24   making, the point of describing that to you at all is because our

25   law clearly recognizes that there is this big black line; on one

1   side of the line, you have a right of action.  On the other side

2   of the line, you have immunity.

3           So the question has to be then, Under what

4   circumstances is the immunity applied?  And that's what the

5   Government doesn't want to get to.  It's not automatic.  The

6   immunity does not belong to the Corps.  The immunity belongs to

7   the United States of America.  The Corps of Engineers is not a

8   Congress, it's not a president, it's not a court.  It acts at the

9   direction of, at the discretion of, the Congress of the

10  United States.

11          But again, before we get there, we have to really

12  look at 702c.

13          THE COURT:  I've looked at 702c.  I've really looked at

14  it.  And I've looked at your brief and all of this stuff.  And

15  all of the history, et cetera.

16          MR. BRUNO:  I'm not, I knew you would.

17          THE COURT:  Don't spend a lot of time on this.  I want

18  to know the facts right now.  We're talking about a complaint, a

19  12, your complaint, why is it that when water escaped from the

20  17th Street Canal, it's not flood water.  Tell me why.  I need to

21  know why.

22          MR. BRUNO:  I don't want to go into the history at all

23  but I cannot find a single solitary case that looks at the second

24  sentence of 702c.  Not a single case because there is a colon,

25  there is a capital P, and it says, Provided that, it says,

1    Provided that it has been carried out for the purpose of the

2    section -- that it's impractical to build a levee.  You have to

3    expropriate the land.  Not a single case.  You have --

4            THE COURT:  You have to make that argument before the

5    nine persons who are in Washington, DC, if you ever get there.

6            MR. BRUNO:  I'll move along.  We have to talk about the

7    business of authorization and what the plaintiffs, because it is

8    absolutely true, Judge, the application of the 702c requires

9    certain basic things to be true.  There has to be a flood control

10   plan.  There has to be an authorization of, the cases hold that.

11   Judge Rubin in --

12           THE COURT:  What's your best case on authorization of

13   Congress?  Your esteemed counsel says there isn't any.

14           MR. BRUNO:  *Creppel*.  Judge Rubin in the Fifth Circuit

15   said he would have granted the summary judgment to the Defendant,

16   the Government on the 702c but for the fact they hadn't put on

17   any evidence of the fact that they had completed an environmental

18   impact study.

19               In other words, he said, You've got to cross your

20   T's; you've got to dot your I's.  You just don't get the summary

21   judgment.  You've got to prove it.

22           THE COURT:  One, what constitutes a flood control?  When

23   is something a flood control project, so that 702c immunity

24   applies?

25               Now, understand your opposing counsel has argued

 1   that *Central Green* says that it's not the project, it's the

 2   character of the water.

 3            MR. BRUNO:  Well, that's not all that *Central Green*

 4   says.

 5            THE COURT:  That's what he's arguing.

 6            MR. BRUNO:  *James* may say that.  Let's forget about

 7   *Central Green* for a moment.  Let's go to *James* because *James* says

 8   there has to be a flood control project.  There are a whole host

 9   of cases --

10            THE COURT:  I am agreeing with you on this and have thus

11   far.  Tell me what a flood control project, when it's, why in

12   1965 wasn't it a flood control project?

13            MR. BRUNO:  Here it is.  Well, because in 1965, this is

14   what the Congress directed the Corps to do.  On the outfall

15   canals, Judge, they were very specific.  They told them that,

16   "The low bridge crossings over London Avenue at Robert E. Lee

17   Boulevard and Gentilly Boulevard will require minor sandbagging

18   for the occurrence of a design hurricane."

19            Put some sandbags is what the Congress told the

20   Corps to do in 1965.  That's their direction.

21            What did they do?  They said we should build a

22   barrier across the east side of Lake Pontchartrain to consist of

23   a levee, blah, blah, blah.  The point is, keep the surge out of

24   the lake.  That is what they directed the Corps to do.

25            They said also, improvement of the levees along the

1    lakeshore, make them a little bit higher, two feet.

2            They said, "The proposed plan shall be generally in

3    accordance with the plan of improvements described herein and as

4    shown on...as shown on the attached plates."

5            In other words, if you don't get it, we've got a

6    diagram attached that will show you what we are doing.  Here it

7    is.  This is the protected area.  Notice, it goes all the way to

8    the north, it goes all the way to the west.  That's the area

9    that's supposed to be protected by the barrier plan.

10           The logic was simple.  You keep the surge out of

11   the lake, the water won't get high, you won't flood the north,

12   you won't flood the west and you won't flood the south.

13           What's the area covered by it?  Well, there it is.

14   There is your lines.  Okay.  Nothing for the outfall canals.

15   Nothing, zero.  No discussion.

16           So what happens, it's 1978, they haven't done

17   anything.  The Congress says, Hey, fellows, what are you doing?

18   You better tell us what's going on here.  So they call the

19   Corps --

20       THE COURT:  There is litigation about the barrier plan

21   unquestionably, right?

22       MR. BRUNO:  Absolutely.  So what the Corps is saying to

23   the Congress about this high-level business, in 1978, high-level

24   would take a long time to complete.  The levees would require

25   rights of ways.  In some locations, flood walls which are more

 1    vulnerable to severe damage, that's what they told the Congress

 2    in '78, will also destroy the esthetic quality of the lakefront.

 3              They say more rights of way.  They say with higher

 4    lake levels, the interior drainage system would be severely

 5    hampered.  This is their own view of the high-level plan.  The

 6    lakefront levees would have to be six to nine feet higher.

 7              And here is the real killer.  The high-level plan

 8    was determined to cost approximately 50 percent more than the

 9    barrier plan.  50 percent more.  Why?  Because the plan would

10    have called upon the Corps to build more stuff and spend more

11    money.

12              Now, when I built my house, I hired an architect

13    and I said, I want a house that's got so many square feet.  My

14    budget is, this is what it is.  And the engineer and the

15    architect tell me, Well, this is what I can build for you,

16    Mr. Bruno.  And they tell me what I can and cannot have.

17              Now, the Congress is the same way.  The Congress

18    says, Mr. Engineer expert, best engineering firm in the world,

19    you tell me what to build, how much it's going to cost.  That's

20    what they did.  And they told the Congress in '65, build a

21    barrier plan.

22              What happened?  I'm sorry, I'm a little ahead of

23    myself.  They ran into some opposition; they got an injunction.

24    And let's examine what the injunction was about.  The Corps

25    failed to do the basic environmental impact study.  Judge Fallon

1   issued the same injunction against the Corps with regard to the

2   lock project not more than eight months ago.  He told them, You

3   didn't do an environmental impact study with regard to the

4   Industrial Canal locks.  He shut them down.

5           Do you know why?  Because that's the thing you have

6   to do to understand whether or not this thing is going to work.

7   And you have to understand whether or not if it does work it's

8   going to destroy the environment.

9           These guys didn't want to do that, so they start

10  thinking to themselves, You know what, we're not really liking

11  this barrier plan anymore.  They start thinking about, Well, what

12  do we need to do to change the plan?

13          So here is the question:  Do you consider that the

14  chief of the engineers has the authority to abandon the barrier

15  plan and substitute a high-level plan without reference to

16  Congress?  What's their answer?  No.

17          Well, if that's not enough, Colonel Rush takes the

18  stand, raises his right hand and swears, just like the cigarette

19  manufacturers did, he said, what kind of, Senator Breaux says,

20  What kind of major changes can you make in this project under

21  your current authorization?

22          Well, if we make a major change in the

23  Lake Pontchartrain barrier plan, we would have to come back to

24  Congress for reauthorization.  And they never did.

25          Now, by the way, Judge, I want to command your

1    attention, if I may, a couple of cases, a Supreme Court case I

2    neglected to cite, *General Electric versus Gilbert.*  It's 429

3    U.S. 125 97 S. Ct. 401 and 50, in Lawyer's Edition 2nd 343.  This

4    case --

5            THE COURT:  (Addressing the court reporter) Cathy, did

6    you get those?  You did?  Very good.

7            MR. BRUNO:  This stands for the proposition that where

8    an agency has a history of doing business a certain way, they

9    can't change it.  In other words, if they have their own internal

10   discussions and they decide for themselves that they can't, like

11   in this case, they decide for themselves that they need

12   Congressional, they need reauthorization, then they can't then

13   change their mind.

14           But anyway, let's get more to the facts.  Here are

15   the facts:  Why, why did they really want to go from the barrier

16   plan to the high-level plan?  Well, here it is, 1981, "The degree

17   of study effort to produce an adequate environmental impact study

18   depends to a large extent upon the recommended plan.  Of the two

19   basic design concepts under consideration, the barrier concept

20   poses the most study problems."

21           In other words, it's going to cost a lot of money

22   to figure out how to do this.  So what do they do?  They say,

23   Well, a recommended high-level concept plan would, in this

24   district's opinion, require a lesser degree of environmental

25   analysis than for any barrier concept alternative.  So we now

```
 1    know why.  So what do they do?
 2              Well, they talk to the boss, and they say, Boss,
 3    what do you think?  Boss says, I have serious reservations about
 4    exercising the chief's discretionary authority when a
 5    substantially different solution to the problem is proposed.
 6              Well, but they press on.  They press on anyway.  So
 7    they do a reevaluation study in 1984, and now they recognize that
 8    they've got to deal with outfall canals because the barrier plan,
 9    remember, sandbags.
10         THE COURT:  I understand.
11         MR. BRUNO:  And this is the worst part about it, Judge,
12    because they don't have a clue as to what they want to do.  They
13    say, Well, one thing we can do is raise and strengthen the
14    levees.  That will cost 200 million.  Well, we could do the same
15    as number 1, but no house relocations for 250 million.
16              Now, the interesting thing about the difference
17    between plan A and plan B, plan B involves I-walls, so they
18    didn't have to move the properties.  And what's really amazing
19    is, I-walls back in the day, cost a whole lot more money than
20    you'll find later.
21              The third concept is $20 million, these gates, and
22    finally $124 million to put some pumps with the gates so that
23    they can continue pumping during a hurricane.
24              So what do they do?  Well, they say, For our
25    purposes, we're going to pick $124 million and so we're going to
```

1   go to this machination to persuade everybody who would listen

2   that really these two things cost about the same.  It's only

3   three to five percent higher, only $3 million.

4           But, of course, that's a bald-faced lie.  Their

5   documents reflect that the Rigolets barrier was going to cost

6   $300 million, so you take that out of the budget.

7           The Mandeville improvements, now you don't have any

8   Mandeville improvements because, remember, you're now going to

9   put all of your walls on the south shore.  You're going to ignore

10  Mandeville.  That will cost 250 million.

11          Because now you have to build higher levees in

12  St. Charles, Jefferson and Orleans, that's going to cost 170

13  million.

14          So before you do anything, it's going to cost you

15  $120 million extra before you consider what you're going to do to

16  the outfall canals.

17          Now, why is that so significant?  Because these

18  guys now want to be Congress.  These guys want to act like they

19  know what's in our best interest, and these guys are wanting to

20  decide what kind and quality of protection we're going to have.

21  And that's why it's so critically important to get into the

22  business of authorization.

23          And that's why, if you go back to 1928, and if you

24  read all of those cases that talk about the Corps of Engineers,

25  it's really fascinating to me, you can see time and time again,

1    expert engineering.  They use those words.  Don't second guess

2    the experts.

3                 Judge, they are no longer acting as experts.

4                 Here is the best part of it all.  Lieutenant

5    General Elvin R. Heiberg wrote a letter to the editor, June 22nd,

6    last month.  What does he say?  "I was discouraged and decided to

7    stop fighting for the barriers any longer.  In retrospect, that

8    was the biggest mistake I made during my 35 years as an Army

9    officer.  I gave up too easily.  Now I hope that the studies

10   reconsider barriers at the east end of the lake."

11                Now, Judge, I'm not suggesting for a moment that I

12   win.  All I'm suggesting to you is that there is enough factual

13   controversy here in order to ascertain what, for you to decide --

14        THE COURT:  Let me ask you the $64 question:  Counsel

15   has pointed to, as his fallback argument, that in the '90s there

16   was authorization reference to outfall canals.

17        MR. BRUNO:  We're going to get to that.  And that's,

18   this is exactly, this is --

19        THE COURT:  That's where the rug meets the road,

20   Mr. Bruno, frankly.

21        MR. BRUNO:  Just the point about why you can't allow the

22   Corps to do this kind of thing, here is their internal

23   memorandum.

24        THE COURT:  You know, maybe, don't forget, I'm not

25   Congress.

1         MR. BRUNO:  I know.  No, you're not.  You are not

2    Congress, but you have the power to determine whether or not they

3    are entitled to this immunity, and that's based on factual --

4         THE COURT:  That's true.  Assuming he's wrong about

5    the '65, you know, assuming, from a legal standpoint, because the

6    case is going to dictate that, not necessarily facts, and I'm,

7    because I understand the outfall canals certainly were not

8    contemplated in 1965.

9              But I'm interested in, it gets right down to it,

10   tell me why that isn't an authorization.  They specifically

11   mentioned the canal.

12        MR. BRUNO:  Exactly.  Let me touch on one final point.

13        THE COURT:  I'm telling you where the rug meets the road

14   whether you get there or not.

15        MR. BRUNO:  But the problem is here that now you've got

16   to get --

17        THE COURT:  Let's assume the Corps was flagrantly

18   horribly negligent, that they did not do what they should do,

19   that the levees were horribly done.  I understand all of that.  I

20   got that.

21        MR. BRUNO:  I'll skip this.  This is basically where

22   they take a test, it failed and they substitute the word

23   "performed" for the word "failed."  This is what happens when you

24   run amuck.

25              In any case, let's go back to what really occurred.

1    What really occurred --

2         THE COURT:  You have to go back to 1928 when Congress

3    passed this act, and then the courts have interpreted it since

4    1928.

5         MR. BRUNO:  Here we are in 1990.  1990.  Here is what

6    really happened.  The Corps manufactured a justification for the

7    change from the barrier plan to the high-level plan.  They

8    manufactured this change by making themselves believe that the

9    costs were roughly the same.

10         They then turned around to each, the levee boards,

11    the local levee boards and they told them, Even though we're

12    going to use a $124 million figure as a budget, we're only going

13    to build the gates for 20 million.

14         So they said to the Levee Board, We expect you to

15    pay your 30 percent of those gates, and if you want some

16    protection for your drainage, your drainage ditches, you have to

17    pay for it yourself, yourself.  Proof.  He says they were built,

18    Robin said they were building it, in 1990, the Orleans Levee

19    District prepared this general design memorandum to build the

20    flood walls and the London Avenue itself with its own money.

21         And the thing that's so amazing about this is they

22    say, Well, you know, in '86 we actually looked at this and we

23    used the Corps' current geotechnical design standards, and we got

24    a cost of $44 million, so we said that was too stringent, so we

25    used the geotechnical criteria for the American Society of Civil

1    Engineers, we came up with a lower number, and with that we ended

2    up with a sheet pile wall that's 27 feet in the ground and

3    actually it's an E-27, a thick, thick sheet pile.

4            What's fascinating is that later on, the Corps,

5    when they decided to build the same thing, they built it to

6    16 feet below the level of the ground and they used a much

7    cheaper sheet pile.

8            Now, why is that significant?  Here is why.  I have

9    to go backwards -- Robin says that this language here, this

10   language is the language that indicates that the Congress knew

11   what they were up to.  This language resulted because the Orleans

12   Levee District was sick and tired of being directed what to do by

13   the Corps of Engineers.

14           The Corps said, We're not going to build the

15   parallel protection.  We're not going to give you the levees, so

16   you're on your own.  So they decide to go to Congress on their

17   own.  They go to Congress and they get a house bill out, and the

18   house bill says that the conferees do not believe it was the

19   intent of Congress in authorizing this project to direct the

20   Corps to treat the outfall canals as part of the overall

21   hurricane protection project and to favorably consider a plan

22   that raises the levees along the entire length.

23           Raising the levees, they are telling them precisely

24   and specifically what to do.  Now, here is the fun part.  Here is

25   how they respond.

1          This is Colonel Gorski writing to Senator

2    John Breaux.  "I've read what you wrote.  We have carefully

3    considered the conference report and we believe we do not have

4    authority to deviate from the most economical plan for hurricane

5    protection."

6          Judge, there it is.  They are telling the Congress

7    of the United States, who has just told them to build parallel

8    protection, We're not going to do it.  So what happens?

9          THE COURT:  Did Congress appropriate funds to

10   incorporate parallel protection along the Orleans and London?

11         MR. BRUNO:  Sure did.  Here is the language.  But wait,

12   here is the language.  It says, this is an appropriations bill;

13   there is one case out there that says you cannot do this with an

14   appropriations bill, but let's assume for the sake of argument

15   that you can.

16         THE COURT:  What is case is that?

17         MR. BRUNO:  *Atchinson*.

18         THE COURT:  *Atchinson* is not a good case for you.

19         MR. BRUNO:  *Atchinson* says you cannot use appropriation

20   bills to change the Congress's intent.  Even so, it says the --

21         THE COURT:  Is *Atchinson* in the context of the Flood

22   Control Act of 1928?

23         MR. BRUNO:  This is.

24         THE COURT:  I'm talking about *Atchinson*.

25         MR. BRUNO:  Yes.

1              THE COURT:  I don't remember reading that.

2              MR. BRUNO:  This says that the secretary is authorized

3    and directed, he's directed to provide parallel hurricane

4    protection along the entire lengths of the Orleans Avenue and

5    London Avenue outfalls by raising levees, Judge, by raising

6    levees.

7              Now, that is significant because now we're talking

8    about what, me, now I'm Congress, what I expect to get for my

9    dollars, because it's my money and I'm telling you, Corps of

10   Engineers, you go build me a levee.

11             So what do they do?  This should tell you a whole

12   world about the way these guys think.  This is a memo from the

13   local district office to Senator Johnston's office.  He sees this

14   language, the committee has provided $12 million for this project

15   in 1995 using these funds the Corps, he's saying, You know what,

16   we have a problem with that language because we may have to spend

17   the whole 12 million on London and we don't want to do that.  So

18   we want you to change the language so we only have to spend

19   $2 million.

20             Our guys are concerned that the terminology, using

21   these funds, may be interpreted by some as freezing the entire

22   12 million for the use on outfall canals only.  Sure would be

23   helpful if the words, like, "within these funds," could be used

24   instead.

25             Now, why is that significant?  Because I'm the

1   Congress, it's my money, I told you to go build levees.  You

2   didn't do it, and I gave you the money for it, and you refused to

3   do it.

4            You asked this question, you said, when was this

5   money authorized?  I will tell you, on page 34 of my brief, the

6   Appropriations Act of '92 and '93 appropriated $26.2 million for

7   protection along the lengths of the Orleans and London Avenue

8   Canals.

9            In addition, the Energy Act of 1994 and '96

10  appropriated an additional $42.8 million.  How much did they

11  spend?  The Corps spent 6.7 million on London in 1993, with Boh,

12  and 4.6 million in '94 on the London and 2.9 million on the

13  Orleans, and they spent $2.5 million on the 17th Street Canal.

14  They didn't spend the money.  They didn't do what Congress told

15  them to do.

16            So how on earth can they claim that they have an

17  immunity when they haven't done the most basic thing that

18  Congress asked them to do?  They just flat out didn't do it.

19            So Johnston writes back, Oh, by the way, what's

20  going on with Orleans and London?  Now, this gets us into the

21  permit.  Before, I want to make this one final point.  The fact

22  of the matter is, Judge, that the Corps of Engineers went back to

23  the Congress on seven different occasions, ending in 2000, and,

24  in fact, got modifications to the 1965 hurricane protection plan.

25            It's not like you can't do it or it's an

 1   impossibility.  They just didn't do it.  Even after the so-called

 2   change from the barrier plan to the high-level plan, they never

 3   bothered to give Congress any information that they were going to

 4   do it.  And that is sacrosanct.  You must have a federal flood

 5   protection program.

 6             Again, the immunity belongs to the United States.

 7   The immunity does not belong to the United States Army Corps of

 8   Engineers.  There are some basic things that these guys have got

 9   to do and they just flat out didn't do it.

10             Now, let's move directly to the 17th Street Canal.

11   Mr. Smith --

12        THE COURT:  Let me ask you a legal question.  What do

13   you think your best case is reference authorization?  If you

14   don't have it ready, that's all right.  I've read them all.  I

15   don't remember the actual --

16        MR. BRUNO:  Judge, I will be, there is not a single case

17   out there that addresses the question of authorization as it

18   relates to 702c.  Every case out there --

19        THE COURT:  They talk about *Pierce*.

20        MR. BRUNO:  But when you analyze what's going on, the

21   plaintiff is saying --

22        THE COURT:  In *Allison v. Froehlke*, which is a

23   Fifth Circuit case.

24        MR. BRUNO:  Judge, you're right, but in all of those

25   cases, they are trying, the burden of proof, here is my way of

1    analyzing those cases:  In each of those cases, the burden of

2    proof is on the plaintiff because the plaintiff is saying, I

3    don't want the Corps to do, I want to stop them from building

4    this dam, I want to keep them from condemning my property.  I

5    have the burden of proof.

6              Here, I respectfully suggest they have the burden

7    of proof because they have to demonstrate that they have met the

8    requisites of 702c.  Now, there is no case, not a single case

9    that evaluates precisely what you need to do in this business of

10   authorization.

11   THE COURT:  Now, Mr. Smith argues that under the rule,

12   you have the burden to show jurisdiction.

13   MR. BRUNO:  I have the burden of showing jurisdiction,

14   absolutely.  And I haven't in, not one sentence in my papers used

15   the word federal flood protection.  In fact, in my papers, I say

16   there is no federal flood protection.  But once I get over the

17   12(b)(1), the next issue would be the 12(b)(6) or perhaps the

18   summary judgment, and it would be his burden.  It will be his

19   burden to prove that there is an immunity.

20             So I respectfully suggest on that fine issue, it's

21   just like the insurance cases, hurricane damage, high wind.  They

22   have to show the exclusion.  He has to show that there is an

23   federal flood protection authorized project and that is in place

24   and that's what caused the problem.

25             Now, we have an entirely different, completely

 1  different thinking and theory with regard to the 17th Street

 2  Canal.

 3          THE COURT:  Right.  I'm familiar with it.

 4          MR. BRUNO:  There is a reason, there is a very good

 5  reason why 17th Street Canal is not contained in that house

 6  language.  And it's not contained in any of the authorization

 7  bills either.  And that's because, and please, it is absolutely

 8  false, the Corps wanted to put a gate in front of all three.

 9  There is no doubt about that.  But at the same time, the Sewerage

10  and Water Board wanted to dredge the bottom of the 17th Street

11  Canal.  Wholly independent of, and it started in --

12          THE COURT:  In the '70s.

13          MR. BRUNO:  '79.

14          THE COURT:  '74, I think.

15          MR. BRUNO:  You're right.  The absolute first permit

16  application was '74, I mean, just do the math.

17          THE COURT:  It took awhile to get it, but I think they

18  started actually dredging in the late '80s.

19          MR. BRUNO:  How about this, the dredging was finished in

20  '92, two years before the concrete monoliths, and in the same

21  year that the authorization came down from Congress to pay for

22  those monoliths.  That project has nothing whatsoever to do with

23  flood protection and, in fact, I mean, it's a joke for Robin to

24  suggest that the reason why the Corps was evaluating the permit

25  was because of their flood protection, oh, no, no, no.

1            They are required under the Rivers and Harbors Act

2    of 1899 to ascertain whether or not when someone wants to do work

3    on water to make certain it doesn't affect navigation.

4            THE COURT:  You've got your discretionary function

5    issues?

6            MR. BRUNO:  Let's start with what they told us.

7            THE COURT:  I will say I have not found a case, nor has

8    one been cited to me where a permit, the discretionary function

9    chapter has gotten rather large lately, I must say.  But I'll let

10   you argue it.

11           MR. BRUNO:  I would say it's *Berkowitz*, but first --

12           THE COURT:  Remember, we are familiar with *Berkowitz*.

13   From FEMA on through --

14           MR. BRUNO:  On down.  Nobody knows it better than you,

15   but what's missing are the facts.  Here are the facts, cold dead

16   facts:  They write, they being the Corps, write Lindy Boggs,

17   20 April 81, and they tell the Congresswoman, among the factors

18   which must, not may, no discretion, are stability of hurricane

19   protection levees paralleling the canal.

20           Now, this is when they were considering giving the

21   Sewerage and Water Board a permit to dredge.  And, in fact, in

22   fact, they required the Sewerage and Water Board to give them

23   engineering information about the stability of the levees.

24           And what did the engineer say?  He said, the

25   levees, this is before the permit now, the levees are currently,

1  I won't say on the point of collapse, he says, but they currently

2  violate the Corps of Engineers' standards for levee stability.

3  They violate that standard virtually along the entire canal.  Any

4  attempt by us to dig more dirt away adjacent to these levees

5  tends to worsen that stability problem.  1981, an engineer, he's

6  telling everybody, Boy, just whatever you do, don't take any

7  earth away from the water side of the levee.

8           Now, they say they have discretion to do that

9  anyway?  Judge, I suggest *Berkowitz* says exactly the opposite.

10          So what do they end up approving?  What do they

11 approve actually?  This is 1990.  1990.  On the Orleans side,

12 remember the engineer said, Don't take away the earth?  Well,

13 they allow him to reduce the earth to 1.5 feet and on the

14 Jefferson side it's 2.5 feet.  It's a foot difference, how can

15 anybody argue they have the discretion to evaluate the safety of

16 a levee on one side of the body of water and ignore the other

17 side of the body of water?

18          And, in fact, here it is, the Board of

19 Commissioners Excavation and Flood Protection, 17th Street Canal,

20 paid as I told you before, 100 percent of the dollars to dredge

21 and put the sheet pile in.  This was not a federal flood

22 protection project.  In no way, shape or form.

23          And what did they do?  They removed the earth.  See

24 that nice big chunk of solid earth?  The experts are going to

25 tell you that's why the thing failed.  The experts are going to

1    say that they dredged too deep, they never should have permitted

2    them to dredge, and we have the affidavit of our expert attached

3    to our opposing papers.

4         And because the water went underneath the levee,

5    and when, when the pressure from the drainage on that morning

6    started at 6:00, water got between this sheet pile and the earth,

7    which was underwater, and they opened up a little bit, water went

8    below, and here is the most amazing thing, the entire levee

9    moved.  It didn't, the whole, like it was on roller bearings,

10   moved 40 feet because of the underseepage.  The water went under

11   the levee, causing it to move.

12        Now, here is your discretionary function.  The

13   Government wants to tell us that they have the discretion to

14   evaluate whether or not the dredging would impact these levees,

15   by the way, the levee, this is a levee.  Here is your federal

16   flood protection part, here is the Orleans Levee Board part, they

17   made them keep this here, and they allowed them to remove it over

18   here.  Why?

19        THE COURT:  On the Orleans side.

20        MR. BRUNO:  They took it away.  And recently, I'm sorry,

21   this, this is out of line.  All the authorizations and

22   modifications, so we'll just run through those real quick.  There

23   are seven of those.

24        Why?  Because the Corps says, We only have

25   jurisdiction on the west bank.  And if you don't believe me, this

1   is what they say, in their decision-making chronology, it says,

2   The district engineering branch evaluates, this is a chronology

3   so it's in the present tense, the district engineering branch

4   evaluates the proposed work for its possible effects on the

5   existing federal levee on the west bank of the canal.

6           Now, Judge, I don't care what words you use to

7   define the word discretion, but I cannot imagine any situation on

8   the planet where the regulations say, You are required, you must

9   evaluate the dredging for its impact on flood protection.  That's

10  their job, and you treat one side of the levee of this body of

11  water differently than you treat the other side.

12          That is beyond any level of comprehension that I

13  possess.  So when you talk about --

14          THE COURT:  Hold on just a second, Joe.  Okay.  I was

15  about to ask you both, my law clerk and I had a simultaneous

16  thought; that is, are you contending, and we've got to get this

17  straight, don't forget you know it better than virtually anyone,

18  are you saying one bank of the 17th was characterized as a

19  federal project and the other --

20          MR. BRUNO:  Yes.

21          THE COURT:  -- a levee board project?

22          MR. BRUNO:  Here's why, in 1950 --

23          THE COURT:  The Orleans side.

24          MR. BRUNO:  Was built by and paid for by Mr. Anzelmo's

25  client in 1950.

1           THE COURT:  And the Jefferson side was.

2           MR. BRUNO:  Paid for by Uncle Sam in 1950.  That's

3   before the concrete monolith.

4           THE COURT:  The monolith.

5           MR. BRUNO:  Was added in '94.

6           THE COURT:  On both sides?

7           MR. BRUNO:  Correct.

8           THE COURT:  And that was then?

9           MR. BRUNO:  Yes.

10          THE COURT:  Okay.

11          MR. BRUNO:  So forgive me.  It is what it is.  It's

12  confusing, but it's remarkable.

13          THE COURT:  You're saying the monolith didn't fail.

14          MR. BRUNO:  The monolith did not fail.  The monolith did

15  not fail.  What failed was the sheet piling, which the Orleans

16  Levee Board owned and paid for, and which the Corps of Engineers

17  said, It's okay --

18          THE COURT:  So a portion of it is not a federal, at the

19  very least is not a federal flood protection project?

20          MR. BRUNO:  Even if it was, it's there by virtue of an

21  engineering analysis, which the Corps was required to perform in

22  connection with a grant of a permit to dredge pursuant to the

23  Rivers and Harbors Act of 1899, and they are public record.

24              This is not, they are telling the world, We are

25  going to evaluate, in fact, there was a public hearing, I cite it

1    in my papers, I didn't want to go through it here, but one of the

2    folks comes to the meeting and said, You better not let that

3    dredging project flood us.  I mean, he says it, because in the

4    notice of public hearing the Corps of Engineers is telling

5    everybody, One of the things we're going to evaluate is whether

6    or not this dredging permit is going to impact the public good.

7            Now, I don't know how you exercise discretion and

8    you allow somebody to dredge so that it destroys a levee which is

9    there, remember as I pointed out in the beginning, the levee is

10   there not for the hurricane, the levee is there to keep -- the

11   levee is there to keep the ditch waters in the ditch and the

12   Lake Pontchartrain out of my backyard.  That's why the levee is

13   there.

14           This whole business of hurricane protection is

15   interesting because they talk about Cat 3, Cat 4, Cat 5 and all

16   that business.  What that really relates to, Cat 3, Cat 4, Cat 5

17   relates to the speed of the wind.  The speed of the wind relates

18   to the potential for surge.  So when the Government talks about

19   how much money to spend, between a Cat 3 and a Cat 5, all they

20   are really talking about is how high to build the wall.  They are

21   not talking about the integrity of the wall.  The wall has to

22   have integrity, I don't care what you do, it has to be, it has to

23   be built according to their own specification, which they didn't

24   do.  That's the MRGO allegation.  They never did it.

25           And that's why, Judge, frankly, I see a remarkable

parallel between this case and the MRGO case, because in this

case, we're alleging the water in that canal is, it's a ditch,

it's a drainage ditch, you so held, what, three weeks ago, four

weeks ago, the water in that ditch was undermining that wall for

years, as I said, the earliest actual eyewitness testimony I

could find is my client, Beth LeBlanc who calls the Sewerage and

Water Board on Thanksgiving in 2004 and says, There is water in

my yard.  My trees are falling over.

THE COURT:  What you're saying is the character of the

waters being non-floodwaters, we're not talking about August 29,

2005?

MR. BRUNO:  No.

THE COURT:  The characters of the water, to articulate,

the character of waters, i.e., the subterranean waters in

*Central Green*, the character of the waters being non-flood,

undermined the levee.

MR. BRUNO:  The levee.  Right.  And which makes it

remarkably more similar to *Central Green* than anything out there.

Now, I admit, I admit.  In *Central Green*, that seepage, the

actual seepage is, for example, it would be like Beth LeBlanc

suing the Government because her grass rotted or something.

THE COURT:  Right.

MR. BRUNO:  No doubt, Judge, that it's appalling in that

situation, that the water undermines the barrier, the barrier

falls down, the water comes in and inundates everybody.  But as I

1 | pointed out, the water that came in would be the water that comes
2 | in under any circumstance.

3 | The surge never got to the design specification of
4 | the wall.  The wall was 10 feet.  It was supposed to be a
5 | Category 3.  There was no Saffir-Simpson scale back then.

6 | THE COURT:  Make sure, and I want Mr. Smith to talk
7 | about this, but you wouldn't be getting into the discretionary
8 | function if you can show that at least in part the
9 | non-floodwaters caused damage.  But if it was to a flood control
10 | project that's -- but it caused damage to the underlying
11 | structure?

12 | MR. BRUNO:  Precisely.  I admit, first of all, if you
13 | look at *Central Green*, it talks about the character of the water
14 | that causes the damage.  I'm with you there, but the fact which
15 | they cannot dispute, cannot dispute at all is that the water that
16 | undermined the levee was, without any doubt, drainage water.
17 | There is no doubt about it.

18 | THE COURT:  Are you saying that undermining has been
19 | taking place --

20 | MR. BRUNO:  For a long, chronically, just like in
21 | *Central Green*.  As I said, I have actual factual testimony that I
22 | can put somebody that witness stand and testify that they tested
23 | the water in November of '04.

24 | THE COURT:  I do appreciate you pointing out the
25 | distinction, and of course the Court will have, that if those

1   waters would have damaged the third parties' property, that may

2   be one thing; but if it damaged the flood control project itself,

3   that is, the portion built by the Government, then that is the

4   concrete monolith, whatever we call it, then that becomes --

5           MR. BRUNO:  Well, how about this --

6           THE COURT:  Ultimately the concrete monolith was

7   breached.

8           MR. BRUNO:  It's this crazy.  In my lawsuit against the

9   Sewerage and Water Board, it is my belief that the Sewerage and

10  Water Board has a claim against, I'm sorry, in my lawsuit against

11  the Orleans Levee District, the Orleans Levee District, because

12  it's their levee that got undermined, that they paid for, was

13  undermined because the grant of the permit to the Sewerage and

14  Water Board.

15          The Orleans Levee District has a claim against the

16  Corps for negligently issuing that permit and ruining their

17  levee.  Because that's a fact.  That's an absolute fact.  So it

18  is very similar to your logic and your reasoning in the MRGO case

19  in that there are two separate components.

20          Now, just very briefly, the water in the canal is

21  drainage water.  It's a drainage ditch.  The levee is an Orleans

22  Levee Board levee.  The sheet pile is sheet pile that was

23  required by the Corps because the Corps found in considering the

24  permit that if you let them dredge, it was going to kill the

25  levee, so they made them work on that levee in order to give them

1   the permit.  And you can see the documents from 1984 when -- by

2   the way, the permit was granted in 84.  And they had no, no idea

3   that they were going to later build this concrete monolith on

4   top.  That was much, much later.  Okay.

5           They extended the permit on two occasions.  Now,

6   you have to ask, why would they extend the permit if they were

7   going to subsume this thing and make it into a flood control

8   project?  They didn't.  They extended the permit, the dredging

9   permit all the way to 1998, which is two years after they

10  finished building the monolith on top of the sheet pile.  So with

11  respect, Your Honor, the one thing I am utterly convinced of,

12  after having the unfortunate experience with the *Chehardy* case,

13  is that the plaintiffs desire, request, pray for, beg for an

14  opportunity to make a record of the facts in this case before

15  any, the Court entertains any thought of dismissal because these

16  facts need to be elucidated.

17          The public needs to, the public needs to understand

18  what occurred.  The Congress needs to know what the Corps did.

19  Nobody knows what really, really occurred.  This is just a, this

20  is just a tiny tip of the iceberg.  And you have to admit, what

21  we've seen so far would indicate that there is some potential

22  here for skullduggery.  And I think it's critical for us, in view

23  of what's occurred, in view of what's happened to this country,

24  in view of what may happen with Corps projects all over the rest

25  of this country, that we have an opportunity to explore this

1    completely.

2              And if you're going to apply a 702c, that's fine,

3    you know, if, like the Fifth Circuit says, Overflow is the same

4    as going through, I have a problem with that, but before I get

5    there, I would like to make a record.

6              Thank you, sir.

7              THE COURT:  Thank you, sir.  I appreciate it.

8    Mr. Smith.

9              One second.  Let me talk to.

10             Yes, sir.

11             MR. SMITH:  Thank you, Your Honor.  Your Honor, the

12   plaintiff has conceded, I think, essentially the two points that

13   need to be made in order for 702c to apply to these actions.

14             Your Honor asked counsel, Why would water escape

15   from 17th Street Canal?  Was it not flood water?

16             And counsel's answer, if I understand it, was,

17   Because there was drainage water that had been undermining the

18   levees for many, many years prior to August 29th.

19             But, Your Honor, that does not explain why the

20   waters that caused the relative damages in this case were not

21   floodwaters.  Because undoubtedly, the waters that inundated

22   Orleans Parish on August 29th were floodwaters.  Regardless of

23   the elevation of those waters in that canal, in those three

24   canals, when two of those levees were breached, and the third, I

25   think the plaintiffs would concede Orleans Avenue was, in fact,

1    an overtopping of that canal and through a gap where the

2    protection had not been raised.

3                But those waters that escaped from those flood

4    works, that entered the developed areas of Orleans Parish were

5    undeniably floodwaters.

6         THE COURT:  I think the point, and I'm not sure it was

7    more precise to me in oral argument, was that the dredging, which

8    that's a discretionary function, I understand, but that which is

9    there, whether there is a flood control project or not and your

10   argument is that the permit is purely discretionary.  I

11   understand that.

12               But I think one of the arguments was that the levee

13   was not a, the levee, I don't know if the levee marked the flood

14   control project but the monolith was federal, the levee upon

15   which it rested was the Orleans, and that, and I'm not sure, I'm

16   not sure where we go with this, but that the waters for years had

17   been, because of the dredging, had been undermining the integrity

18   of the underlying levee, ultimately causing the --

19        MR. SMITH:  I'm not sure where we go with this either,

20   Your Honor, because I think counsel conceded the whole stretcher

21   was moved during the storm.  The whole thing was obliterated.

22   It's gone.  Counsel showed you pictures.  It's not there.  The

23   idea that 702c requires this Court to examine and take apart the

24   various elements of that flood protection system to determine

25   which parts of it failed and which parts of it doesn't, doesn't

 1  withstand scrutiny.  The whole thing failed.  Whether it failed

 2  initially through underseepage of levees that were constructed

 3  initially by local elements or not is irrelevant to this

 4  analysis.

 5          The whole project which was finally analyzed as a

 6  whole by the Corps, I mean, this is the other part which

 7  conceptually just makes no sense.  Plaintiffs' argument is, Well,

 8  if you look at certain parts of it and they weren't paid for by

 9  the Government, then that's not really part of the hurricane

10  protection project.

11          Well, of course, that's false, Your Honor.  I mean,

12  the Corps built on top of what was there, but it used what was

13  there to build a hurricane protection system.  It couldn't have

14  built a hurricane system any other way.  And the fact that that

15  system did not withstand the forces that were exerted upon it on

16  August 29th is what caused a flood of historic proportions in

17  Orleans Parish.

18          The plaintiff has conceded the two elements that

19  must be shown in this case to have the application of 702c result

20  in dismissal of these actions.  One, there were waters that had a

21  nexus to a flood control project, and, two, those waters were

22  floodwaters.

23          Counsel has again conflated in arguing that the

24  Corps did not do what Congress told it to do, and conflated the

25  means of achieving the end with the project itself.  Congress did

1    not require that the Corps pursue a particular plan.  Congress

2    required and authorized the creation of a flood protection system

3    to protect the developed areas around Lake Pontchartrain.

4             As the Fifth Circuit said in *Creppel*, "It imparts

5    both stupidity and impracticality to Congress to conclude that

6    the statute impliedly forbids any change in a project once

7    approved, and thus prevents the agency official for providing for

8    the unseen or unforeseeable, from accommodating newly discovered

9    facts or from adjusting for changes in physical or legal

10   conditions."

11            Or legal conditions, exactly what happened here.

12   It wasn't a change in physical conditions that led the Corps to

13   adopt a high-level plan.  It was a change in the legal

14   circumstances that existed at the time.  The Corps was authorized

15   in the cases, 26,006 acres of land, *Allison* as Your Honor has

16   referred to, counsel is long on argument but short on the law.

17   The law is clear here that the Corps possessed the discretion to

18   change its mind about how it was going to provide the mandated

19   protection.

20            Further, Counsel has admitted that Congress

21   appropriated funds that were used by the Corps to improve the

22   existing levees along the three outfall canals, providing that

23   necessary nexus between those waters that escaped from those

24   canals and a hurricane protection, a flood protection project.

25            Your Honor, counsel has spoken the truth, but it's

1  misleading, because it doesn't explain the whole situation when

2  he says that the Corps was planning to build gates at the mouths

3  of all three of the outfall canals.

4           Perfectly true, Your Honor, but that doesn't blunt

5  the fact that Congress appropriated these funds to build a

6  complete parallel protection system.

7           The reason why two canals were mentioned by name is

8  that at the behest of the Orleans Levee District, the Corps

9  changed its plan from building a gate at the end of the

10  17th Street Canal and agreed, We won't build a gate on

11  17th Street Canal.  We'll improve those levees because the cost

12  is about the same.  We're not here to make your life difficult,

13  but neither are we here to use taxpayers' dollars, federal

14  taxpayers' dollars to build a better drainage system for the City

15  of New Orleans.

16           If the cost is the same, we don't care, we'll build

17  that parallel protection system along 17th Street Canal.  We'll

18  take that gate out of our plans.  And so they agreed to do that.

19  But when they looked at Orleans and when they looked at

20  London Avenue, they said, The costs aren't comparable.  We're not

21  going to use federal dollars to improve a drainage system for the

22  City of New Orleans on those two canals because it would be more

23  expensive.

24           Counsel admitted that; it was costs that were

25  driving these things.  But when Congress mandated for those two

1   canals the creation of the parallel protection system, that

2   objection melted away, because at that point there was expressed

3   authorization for those two canals to do what the Corps had

4   already planned to do for the 17th Street Canal.

5            Your Honor, counsel has conceded that it was a

6   break in the levees that caused the flooding.  It was a break in

7   the levees that caused the flooding.  The notion that the

8   stretcher of this flood protection system can be torn apart and

9   analyzed piece by piece to see which part failed and which part

10  didn't fail is a complete myth.

11           The entire structure was one unified structure when

12  it was in place on March 29, 2005, by virtue of the fact that the

13  Corps had been expressly authorized to improve the flood works.

14  Those are the words:  Improving flood protection works along and

15  parallel to the entire lengths of the outfall canals and other

16  pertinent work necessary to complete an entire parallel

17  protection system.

18           By virtue of that authorization, and by virtue of

19  the nature of the work that the Corps was performing, those

20  structures that failed on August 29th were federal structures

21  through and through, regardless of how they initially came to be

22  there.  They were part and parcel of that hurricane protection

23  system, which failed on August 29th.

24           And because the waters that escaped from those

25  canals were floodwaters and because they escaped from a federal

1    hurricane system that was designed to protect from flooding from

2    those outfall canals, these cases must be dismissed for lack of

3    jurisdiction.  Thank you, Your Honor.

4           THE COURT:  Thank you, sir.  The Court will take this

5    matter under advisement, and obviously it's a significant matter,

6    and -- but --

7           MR. BRUNO:  Judge, forgive me.  I neglected to move for

8    the introduction of the exhibits.  May I do so now?

9           THE COURT:  Yes.

10          MR. BRUNO:  May I move for introduction of Exhibits A-1

11   through A-21, B-1 through B-17, C-1 through C-19, D-1 through

12   D-8, E-1 through E-45 and F-1 through F-27, as well as the

13   PowerPoint presentation which I have supplied to the Court.

14   Thank you.

15          THE COURT:  Do you want to make an objection?

16          MR. SMITH:  Your Honor, we would like to object to the

17   admission of those exhibits.  For the purpose of deciding this

18   motion under 12(b)(1), they are not necessary and should not be

19   considered.

20          THE COURT:  The Court is going to take that under

21   advisement as well.

22          MR. BRUNO:  Thank you, Judge.

23          THE COURT:  Just let me say that the Court will give

24   this its assiduous attention.  Unfortunately, we are, we have so

25   many motions that our normal alacrity pre-Katrina has slowed up.

1   We'll get it as soon as possible.

2            And I will say that what I'm about to say will have

3   no bearing on my decision, but from 1928 to now, 2007, there have

4   been precious few cases, at least decided by the Supreme Court on

5   this, but, on this issue, but there is no question that whatever

6   the Court does, it's indeed lamentable, that it certainly, that

7   it may be that if I rule in favor of the Government, that in

8   essence, the King can do no wrong.  But the Court must follow the

9   will of Congress and the Supreme Court and the Fifth Circuit, but

10  I will look at this very carefully and render a decision.

11          MR. BRUNO:  Thank you, Judge.

12          MR. SMITH:  Thank you, Your Honor.

13          THE COURT:  One question, sorry, sorry.  The MRGO thing.

14  Can we talk about that?  Let talk about it a little bit.  I'm

15  sorry.  I apologize.  What I'm concerned about, Mr. Smith, is I

16  take your point on the MRGO, but I, there is a gap there where

17  the MRGO may not cover, the MRGO as presently constituted may not

18  cover all of the area that's here.  I'm wondering if there is any

19  kind of solution to --

20          MR. BRUNO:  Sure.  We can just change the proposed class

21  definition on the MRGO side.  It's a no-brainer.

22          THE COURT:  And just take this out?

23          MR. SMITH:  Take it out.

24          THE COURT:  I don't expect you to make a decision now

25  but that may be one way to rectify this.

1          MR. SMITH:  Yes.

2          THE COURT:  So he can let us know.

3          MR. BRUNO:  I proposed that.

4          THE COURT:  We are now adjourned.  Thank you.

5          (WHEREUPON, at 3:52 p.m. on Thursday, August 16, 2007,

6    the proceedings were adjourned.)

7                         *    *    *

8

9

10                    REPORTER'S CERTIFICATE

11

12     I, Cathy Pepper, Certified Realtime Reporter, Registered

13   Professional Reporter, Certified Court Reporter, Official Court

14   Reporter, United States District Court, Eastern District of

15   Louisiana, do hereby certify that the foregoing is a true and

16   correct transcript, to the best of my ability and understanding,

17   from the record of the proceedings in the above-entitled and

18   numbered matter.

19

20

21                              *S/Cathy Pepper*

22                              Cathy Pepper, CCR, RPR, CRR

23                              Official Court Reporter

24                              United States District Court

25

# #

**#05-4182** [1] - 3:8

# $

**$12** [1] - 50:14
**$120** [1] - 44:15
**$124** [3] - 43:22,
  43:25, 47:12
**$20** [1] - 43:21
**$300** [1] - 44:6
**$44** [1] - 47:24
**$60** [1] - 34:6
**$64** [1] - 45:14

# '

**'04** [1] - 62:23
**'65** [5] - 19:4, 21:5,
  23:4, 40:20, 46:5
**'70s** [1] - 54:12
**'74** [2] - 54:14, 54:16
**'78** [1] - 40:2
**'79** [1] - 54:13
**'80s** [1] - 54:18
**'86** [1] - 47:22
**'90** [1] - 17:7
**'90s** [5] - 20:19, 20:21,
  21:13, 45:15
**'91** [1] - 17:7
**'92** [4] - 17:7, 22:7,
  51:6, 54:20
**'93** [1] - 51:6
**'94** [1] - 51:12, 59:5
**'96** [1] - 51:9

# 0

**05-4182** [1] - 1:6

# 1

**1** [2] - 8:8, 43:15
**1.5** [1] - 56:13
**10** [1] - 62:4
**100** [4] - 34:2, 34:9,
  34:10, 56:20
**12** [3] - 36:19, 50:17,
  50:22
**12(b)(1** [2] - 53:17,
  71:18
**12(b)(6** [1] - 53:17
**125** [1] - 42:3
**15** [3] - 6:16, 6:24, 7:1
**16** [4] - 1:7, 3:2, 48:6,

73:5
**170** [1] - 44:12
**17th** [30] - 4:1, 5:8,
  15:19, 16:17, 16:23,
  17:1, 18:6, 18:8,
  20:13, 20:14, 24:7,
  24:20, 27:14, 32:17,
  32:20, 34:8, 34:20,
  36:20, 51:13, 52:10,
  54:1, 54:5, 54:10,
  56:19, 58:18, 65:15,
  69:10, 69:11, 69:17,
  70:4
**1899** [1] - 55:2, 59:23
**1915** [1] - 31:7
**1925** [1] - 31:7
**1928** [5] - 44:23, 47:2,
  47:4, 49:22, 72:3
**1950** [3] - 58:22,
  58:25, 59:2
**1965** [12] - 13:11,
  14:24, 15:4, 15:14,
  18:23, 19:8, 26:3,
  38:12, 38:13, 38:20,
  46:8, 51:24
**1966** [1] - 19:21
**1970s** [1] - 13:24
**1978** [2] - 39:16, 39:23
**1980s** [1] - 14:13
**1981** [2] - 42:16, 56:5
**1984** [2] - 43:7, 64:1
**1990** [5] - 47:5, 47:18,
  56:11
**1990s** [2] - 14:10, 15:7
**1991** [1] - 15:16
**1992** [4] - 23:7, 23:15,
  23:22, 33:15
**1993** [1] - 51:11
**1994** [2] - 33:13, 51:9
**1995** [1] - 50:15
**1998** [1] - 64:9
**1st** [2] - 31:24, 32:16

# 2

**2** [1] - 50:19
**2.5** [4] - 34:8, 51:13,
  56:14
**2.9** [1] - 51:12
**20** [2] - 47:13, 55:17
**200** [1] - 43:14
**2000** [1] - 51:23
**2004** [3] - 33:18,
  33:19, 61:7
**20044** [1] - 1:21
**2005** [3] - 33:22,
  61:11, 70:12
**2007** [2] - 1:7, 3:2,
  72:3, 73:5

**22nd** [1] - 45:5
**25** [1] - 30:16
**250** [2] - 43:15, 44:10
**26,006** [1] - 68:15
**26.2** [1] - 51:6
**27** [1] - 48:2
**29** [2] - 61:10, 70:12
**29th** [5] - 65:18, 65:22,
  67:16, 70:20, 70:23
**2:00** [1] - 1:7
**2nd** [1] - 42:3

# 3

**3** [6] - 8:8, 44:3, 60:15,
  60:16, 60:19, 62:5
**30** [2] - 30:16, 47:15
**33** [1] - 7:24
**34** [2] - 34:5, 51:5
**343** [1] - 44:9
**35** [1] - 45:8
**36** [1] - 32:25
**3:52** [1] - 73:5

# 4

**4** [2] - 60:15, 60:16
**4.6** [1] - 62:11
**40** [1] - 57:10
**401** [1] - 42:3
**42.8** [1] - 51:10
**429** [1] - 42:2

# 5

**5** [4] - 8:8, 60:15,
  60:16, 60:19
**50** [3] - 40:8, 40:9,
  42:3
**500** [1] - 2:10
**504** [1] - 2:11
**589-7779** [1] - 2:11

# 6

**6.7** [1] - 51:11
**6380** [1] - 3:10
**6:00** [1] - 57:6

# 7

**7** [1] - 8:8
**70-page** [1] - 5:2
**70113** [1] - 1:16
**70130** [1] - 2:11
**702c** [31] - 4:5, 4:11,

**5:6**, 7:24, 9:2, 9:14,
  9:20, 9:23, 10:3,
  10:14, 11:3, 11:21,
  12:5, 12:25, 24:8,
  25:1, 25:23, 28:8,
  35:13, 36:12, 36:13,
  36:24, 37:8, 37:16,
  37:23, 52:18, 53:8,
  65:2, 65:13, 66:23,
  67:19

# 8

**80** [1] - 31:4
**81** [1] - 55:17
**84** [1] - 64:2
**855** [1] - 1:16
**888** [1] - 1:20

# 9

**90s** [1] - 21:14
**97** [1] - 42:3

# A

**A-1** [1] - 71:10
**A-21** [1] - 71:11
**abandon** [1] - 41:14
**ability** [2] - 17:12,
  73:16
**able** [1] - 29:24
**above-entitled** [1] -
  73:17
**absolute** [3] - 25:12,
  54:15, 63:17
**absolutely** [6] - 21:22,
  34:25, 37:8, 39:22,
  53:14, 54:7
**absorption** [1] - 5:11
**abstract** [1] - 3:22
**abuse** [2] - 26:14,
  26:17
**accommodating** [1] -
  68:8
**accordance** [1] - 39:3
**according** [1] - 60:23
**accurate** [3] - 8:2, 8:4,
  33:21
**achieving** [1] - 67:25
**acknowledge** [1] -
  24:4
**acres** [1] - 68:15
**acronym** [1] - 18:21
**Act** [5] - 49:22, 51:6,
  51:9, 55:1, 59:23
**act** [8] - 5:21, 5:25,
  9:10, 9:11, 11:3,

25:8, 44:18, 47:3
**acting** [1] - 45:3
**ACTION** [1] - 1:6
**Action** [1] - 3:8
**action** [4] - 7:8, 7:11,
  35:17, 36:1
**actions** [3] - 7:6,
  65:13, 67:20
**acts** [2] - 4:4, 36:8
**actual** [4] - 52:15,
  61:5, 61:20, 62:21
**added** [1] - 59:5
**addition** [1] - 51:9
**additional** [1] - 51:10
**address** [2] - 21:20,
  22:2
**addressed** [1] - 24:23
**addresses** [1] - 52:17
**Addressing** [1] - 42:5
**adequate** [1] - 42:17
**adjacent** [1] - 56:4
**adjourned** [2] - 73:4,
  73:6
**adjunct** [1] - 15:14
**adjusting** [1] - 68:9
**admission** [1] - 71:17
**admit** [4] - 61:19,
  62:12, 64:20
**admitted** [2] - 68:20,
  69:24
**admitting** [1] - 16:6
**adopt** [1] - 68:13
**advise** [1] - 18:5
**advisement** [2] - 71:5,
  71:21
**affect** [1] - 55:3
**affected** [1] - 20:8
**affidavit** [1] - 57:2
**afternoon** [2] - 3:7,
  3:12
**agency** [2] - 42:8, 68:7
**ago** [3] - 41:2, 61:3,
  61:4
**agree** [3] - 7:2, 29:2,
  30:13
**agreed** [2] - 69:10,
  69:18
**agreeing** [1] - 38:10
**ahead** [7] - 14:20,
  21:16, 25:14, 25:19,
  25:20, 30:11, 40:22
**alacrity** [1] - 71:25
**ALEXIS** [1] - 2:4
**allegation** [1] - 60:24
**allegations** [2] - 6:5,
  16:6
**allege** [3] - 4:21, 9:1,
  33:16
**alleged** [1] - 7:13

alleges [3] - 7:8, 8:12, 8:16
alleging [1] - 61:2
Allison [2] - 52:22, 68:15
allocate [1] - 3:17
allow [3] - 45:21, 56:13, 60:8
allowed [1] - 57:17
almost [2] - 9:22, 34:6
alone [1] - 8:7
ALSO [1] - 1:23
alternate [1] - 14:4
alternative [1] - 42:25
alternatives [1] - 14:24
amazing [3] - 43:18, 47:21, 57:8
America [3] - 3:16, 34:4, 36:7
AMERICA [1] - 1:18
American [1] - 47:25
amplify [1] - 25:14
amuck [1] - 46:24
analysis [6] - 26:25, 27:2, 27:3, 42:25, 59:21, 67:4
analyze [1] - 52:20
analyzed [2] - 67:5, 70:9
analyzing [1] - 53:1
answer [3] - 33:12, 41:16, 65:16
anyway [4] - 28:12, 42:14, 43:6, 56:9
Anzelmo's [1] - 58:24
apart [3] - 23:19, 66:23, 70:8
apologize [1] - 72:15
appalling [1] - 61:23
apparent [1] - 15:8
appealing [1] - 15:1
APPEARANCES [2] - 1:13, 2:1
appearances [1] - 3:11
APPEARING [1] - 1:23
application [7] - 7:24, 8:24, 25:1, 26:21, 37:8, 54:16, 67:19
applied [1] - 36:4
applies [3] - 9:21, 11:3, 37:24
apply [7] - 9:2, 9:14, 9:23, 10:4, 32:10, 65:2, 65:13
appreciate [3] - 18:20, 62:24, 65:7
approached [1] - 26:4
appropriate [2] - 4:12,

49:9
appropriated [15] - 9:12, 10:2, 11:8, 12:11, 12:14, 19:19, 19:21, 20:12, 21:6, 33:14, 34:6, 51:6, 51:10, 68:21, 69:5
appropriation [2] - 11:2, 49:19
appropriations [2] - 49:12, 49:14
Appropriations [1] - 51:6
approve [1] - 56:11
approved [1] - 68:7
approving [1] - 56:10
April [1] - 55:17
architect [2] - 40:12, 40:15
area [8] - 19:8, 19:17, 20:8, 24:13, 39:7, 39:8, 39:13, 72:18
areas [3] - 13:5, 66:4, 68:3
arguably [1] - 26:17
argue [10] - 4:10, 4:14, 4:16, 6:3, 22:2, 25:25, 27:10, 27:12, 55:10, 56:15
argued [4] - 14:12, 18:13, 27:12, 37:25
arguer [1] - 6:13
argues [1] - 53:11
arguing [5] - 5:3, 5:24, 12:10, 12:13, 23:5, 38:5, 67:23
argument [37] - 5:7, 5:23, 10:24, 10:25, 12:12, 12:21, 13:4, 18:10, 18:15, 18:18, 19:5, 19:22, 21:2, 21:4, 21:16, 21:19, 23:2, 23:18, 23:19, 24:16, 25:1, 25:4, 25:7, 26:2, 27:18, 28:15, 33:3, 33:5, 34:22, 37:4, 45:15, 49:14, 66:7, 66:10, 67:7, 68:16
arguments [6] - 5:18, 13:7, 21:20, 22:14, 23:6, 66:12
Army [2] - 45:8, 52:7
articulate [1] - 61:13
ascertain [2] - 45:13, 55:2
aside [4] - 18:15, 18:18, 22:17, 22:24
aspect [2] - 6:1, 6:4
aspects [1] - 13:25

assiduous [1] - 71:24
assisted [1] - 27:16
associated [2] - 17:22, 24:23
assume [3] - 33:21, 46:17, 49:14
assuming [2] - 46:4, 46:5
astonished [1] - 7:1
astonishingly [1] - 3:20
Atchinson [5] - 49:17, 49:18, 49:19, 49:21, 49:24
attached [3] - 39:4, 39:6, 57:2
attempt [2] - 23:20, 56:4
attention [2] - 42:1, 71:24
AUCOIN [1] - 2:7
August [7] - 61:10, 65:18, 65:22, 67:16, 70:20, 70:23, 73:5
AUGUST [2] - 1:7, 3:2
auspices [1] - 22:4
author [1] - 35:11
authority [3] - 41:14, 43:4, 49:4
authorization [21] - 4:14, 4:15, 4:21, 11:7, 15:5, 19:9, 26:8, 37:7, 37:10, 37:12, 41:21, 44:22, 45:16, 46:10, 52:13, 52:17, 53:10, 54:6, 54:21, 70:3, 70:18
authorizations [1] - 57:21
authorize [1] - 26:15
authorized [25] - 4:10, 9:4, 9:21, 9:24, 13:2, 13:11, 13:14, 13:16, 15:13, 17:25, 19:8, 21:6, 21:24, 22:4, 23:4, 23:22, 24:8, 33:23, 50:2, 51:5, 53:23, 68:2, 68:14, 70:13
authorizing [3] - 22:7, 23:15, 48:19
automatic [1] - 36:5
Avenue [19] - 16:19, 17:17, 18:4, 22:1, 22:4, 22:9, 23:25, 24:3, 38:16, 47:20, 50:4, 50:5, 51:7, 65:25, 69:20
aware [3] - 8:21, 18:11
awhile [1] - 54:17

## B

B-1 [1] - 71:11
B-17 [1] - 71:11
B406 [1] - 2:10
background [3] - 15:23, 16:4, 16:11
backwards [1] - 48:9
backyard [1] - 60:12
bad [2] - 26:18, 26:20
balanced [1] - 25:8
bald [1] - 44:4
bald-faced [1] - 44:4
balked [1] - 17:9
bank [5] - 57:25, 58:5, 58:18
banks [1] - 31:18
Baronne [1] - 1:16
barrier [23] - 4:19, 14:1, 14:6, 15:1, 16:19, 16:24, 38:22, 39:9, 39:20, 40:9, 40:21, 41:11, 41:14, 41:23, 42:15, 42:19, 42:25, 43:8, 44:5, 47:7, 52:2, 61:24
barriers [5] - 13:16, 13:19, 16:18, 45:7, 45:10
BARRY [1] - 2:3
based [4] - 14:5, 16:9, 46:3
basic [5] - 37:9, 40:25, 42:19, 51:17, 52:8
basis [2] - 7:8, 16:14
bearing [1] - 72:3
bearings [1] - 57:9
became [3] - 15:8, 17:6, 18:22
become [2] - 13:8, 18:19
becomes [3] - 5:5, 29:25, 63:4
BEFORE [1] - 1:11
beg [1] - 64:13
began [5] - 17:16, 20:15, 20:16, 26:6
beginning [2] - 7:12, 60:9
behest [1] - 69:8
behind [1] - 16:13
belabor [1] - 28:19
belief [2] - 24:20, 63:9
belies [1] - 27:5
belong [2] - 36:6, 52:7
belongs [2] - 36:6, 52:6
below [4] - 13:21, 35:3, 48:6, 57:8

B

BENJAMIN [1] - 1:20
Berkowitz [3] - 55:11, 55:12, 56:9
best [6] - 37:12, 40:18, 44:19, 45:4, 52:13, 73:16
Beth [2] - 61:6, 61:20
Betsy [1] - 13:12
better [5] - 39:18, 55:14, 58:17, 60:2, 69:14
between [7] - 8:11, 10:12, 43:17, 57:6, 60:19, 61:1, 68:23
BEVIS [1] - 2:4
beyond [1] - 58:12
big [4] - 30:20, 30:21, 35:25, 56:24
biggest [1] - 45:8
bill [4] - 48:17, 48:18, 49:12, 49:14
bills [2] - 49:20, 54:7
bit [6] - 32:15, 34:23, 35:5, 39:1, 57:7, 72:14
black [1] - 35:25
blah [3] - 38:23
blue [1] - 31:4
blunt [1] - 69:4
board [1] - 58:21
Board [14] - 31:7, 34:3, 47:14, 54:10, 55:21, 55:22, 56:18, 57:16, 59:16, 61:7, 63:9, 63:10, 63:14, 63:22
boards [3] - 17:12, 47:10, 47:11
body [3] - 56:16, 56:17, 58:10
Boggs [1] - 55:16
Boh [1] - 51:11
bolts [1] - 34:14
bone [1] - 32:3
boss [2] - 43:2, 43:3
Boss [1] - 43:2
bothered [1] - 52:3
bottom [1] - 54:10
Boulevard [2] - 38:17
BOX [1] - 1:20
Boy [1] - 56:6
brainer [1] - 72:21
BRANCH [1] - 1:19
branch [2] - 58:2, 58:3
breached [2] - 63:7, 65:24
Breaches [1] - 3:9
BREACHES [1] - 1:4
break [6] - 32:17, 34:15, 34:17, 70:6

Breaux [2] - 41:19, 49:2

brevity [1] - 3:20

bridge [1] - 38:16

brief [11] - 3:18, 5:2, 9:7, 12:22, 22:25, 27:12, 28:9, 30:3, 30:7, 36:14, 51:5

briefly [1] - 63:20

broad [1] - 23:18

broke [2] - 22:21, 23:11

brought [4] - 13:24, 14:9, 19:24, 20:3

BRUNO [74] - 1:15, 1:15, 3:12, 6:18, 6:21, 29:11, 29:14, 30:6, 30:12, 30:25, 33:24, 34:16, 34:18, 34:22, 35:22, 36:16, 36:22, 37:6, 37:14, 38:3, 38:6, 38:13, 39:22, 42:7, 43:11, 45:17, 45:21, 46:1, 46:12, 46:15, 46:21, 47:5, 49:11, 49:17, 49:19, 49:23, 49:25, 50:2, 52:16, 52:20, 52:24, 53:13, 54:4, 54:13, 54:15, 54:19, 55:6, 55:11, 55:14, 57:20, 58:20, 58:22, 58:24, 59:2, 59:5, 59:7, 59:9, 59:11, 59:14, 59:20, 61:12, 61:17, 61:23, 62:12, 62:20, 63:5, 63:8, 71:7, 71:10, 71:22, 72:11, 72:20, 73:3

Bruno [7] - 3:13, 6:13, 27:22, 28:17, 29:9, 40:16, 45:20

Bruno's [1] - 28:21

BUCHLER [1] - 1:25

budget [3] - 40:14, 44:6, 47:12

build [29] - 13:16, 16:17, 16:18, 17:16, 24:9, 24:10, 33:14, 37:2, 38:21, 40:10, 40:15, 40:19, 40:20, 44:11, 47:13, 47:19, 48:5, 48:14, 49:7, 50:10, 51:1, 60:20, 64:3, 67:13, 69:2, 69:5, 69:10, 69:14, 69:16

building [9] - 13:19, 16:19, 16:24, 22:5, 31:8, 47:18, 53:3,

64:10, 69:9

built [13] - 20:13, 21:12, 22:9, 24:1, 33:13, 40:12, 47:17, 48:5, 58:24, 60:23, 63:3, 67:12, 67:14

burden [8] - 52:25, 53:1, 53:5, 53:6, 53:12, 53:13, 53:18, 53:19

business [11] - 30:18, 31:13, 32:14, 33:2, 37:7, 39:23, 42:8, 44:22, 53:9, 60:14, 60:16

BY [4] - 1:15, 1:19, 2:14, 2:14

**C**

C-1 [1] - 71:11

C-19 [1] - 71:11

CALLED [1] - 3:4

canal [14] - 4:24, 24:6, 26:5, 29:1, 33:7, 34:7, 46:11, 55:19, 56:3, 58:5, 61:2, 63:20, 65:23, 66:1

CANAL [1] - 1:4

Canal [33] - 3:9, 5:8, 15:19, 16:18, 16:23, 18:6, 18:8, 20:13, 20:14, 22:1, 22:4, 23:25, 24:3, 24:7, 24:20, 27:14, 32:18, 32:20, 34:8, 34:20, 36:20, 41:4, 51:13, 52:10, 54:2, 54:5, 54:11, 56:19, 65:15, 69:10, 69:11, 69:17, 70:4

Canals [5] - 16:19, 17:17, 18:4, 22:9, 51:8

canals [56] - 4:1, 4:3, 4:10, 5:4, 8:18, 12:17, 13:8, 15:9, 15:11, 15:15, 16:20, 16:21, 17:8, 17:11, 17:12, 17:19, 17:22, 17:24, 17:25, 18:16, 18:19, 20:25, 23:1, 23:10, 23:11, 23:12, 23:17, 23:21, 23:23, 24:12, 24:14, 24:19, 24:23, 27:24, 27:25, 28:25, 38:15, 39:14, 43:8, 44:16, 45:16, 46:7, 48:20, 50:22, 65:24, 68:22, 68:24,

69:3, 69:7, 69:22, 70:1, 70:3, 70:15, 70:25, 71:2

candid [1] - 28:18

cannot [7] - 36:23, 40:16, 49:13, 49:19, 58:7, 62:15

capacity [1] - 17:11

capital [1] - 36:25

care [3] - 58:6, 60:22, 69:16

careful [1] - 29:19

carefully [1] - 49:2, 72:10

carried [1] - 37:1

carrying [1] - 24:15

case [43] - 4:22, 4:23, 7:1, 9:20, 10:7, 11:1, 11:14, 12:3, 12:9, 22:23, 25:17, 28:4, 28:7, 29:21, 35:7, 36:23, 36:24, 37:3, 37:12, 42:1, 42:4, 42:11, 46:6, 46:25, 49:13, 49:16, 49:18, 52:13, 52:16, 52:18, 52:23, 53:8, 55:7, 61:1, 61:2, 63:18, 64:12, 64:14, 65:20, 67:19

cases [22] - 9:25, 10:1, 10:11, 11:4, 11:13, 25:16, 29:24, 35:15, 35:21, 35:22, 37:10, 38:9, 42:1, 44:24, 52:25, 53:1, 53:21, 68:15, 71:2, 72:4

Cat [8] - 60:15, 60:16, 60:19

catalyst [1] - 27:16

category [1] - 6:6

Category [1] - 62:5

CATHY [1] - 2:10

Cathy [3] - 42:5, 73:12, 73:22

caused [14] - 10:17, 27:15, 28:1, 28:22, 29:3, 33:17, 34:15, 53:24, 62:9, 62:10, 65:20, 67:16, 70:6, 70:7

causes [1] - 62:14

causing [2] - 57:11, 66:18

CAYCE [1] - 1:23

CCR [2] - 2:10, 73:22

Central [29] - 7:23, 8:5, 8:25, 10:1, 10:9, 10:10, 10:19, 11:13,

11:14, 11:15, 11:16, 12:4, 12:23, 13:7, 18:11, 22:14, 27:13, 28:6, 28:16, 29:6, 35:11, 38:1, 38:3, 38:7, 61:15, 61:18, 61:19, 62:13, 62:21

central [5] - 5:23, 23:2

certain [10] - 7:7, 13:21, 13:25, 25:12, 26:15, 37:9, 42:8, 55:3, 67:8

certainly [9] - 4:11, 11:11, 12:19, 13:7, 14:9, 27:1, 27:14, 46:7, 72:6

CERTIFICATE [1] - 73:10

Certified [2] - 73:12, 73:13

certify [1] - 73:15

cetera [2] - 6:3, 36:15

Chad [1] - 30:25

change [15] - 26:5, 41:12, 41:22, 42:9, 42:13, 47:7, 47:8, 49:20, 50:18, 52:2, 68:6, 68:12, 68:13, 68:18, 72:20

changed [1] - 69:9

changes [2] - 21:8, 41:20, 68:9

chapter [1] - 55:9

character [15] - 5:23, 5:24, 10:16, 11:25, 12:24, 13:3, 27:13, 28:16, 28:22, 38:2, 61:9, 61:14, 61:15, 62:13

characterized [1] - 58:18

characters [1] - 61:13

charged [1] - 26:3

Charles [1] - 44:12

cheaper [1] - 48:7

Chehardy [1] - 64:12

chief [1] - 41:14

chief's [1] - 43:4

choice [2] - 23:24, 26:18

chronically [1] - 62:20

chronology [2] - 58:1, 58:2

chunk [1] - 56:24

cigarette [1] - 41:18

Circuit [11] - 10:11, 11:16, 11:17, 11:22, 22:18, 22:20, 37:14, 52:23, 65:3, 68:4, 72:9

Circuit's [1] - 28:4

circumstance [1] - 62:2

circumstances [2] - 36:4, 68:14

cite [3] - 25:16, 42:2, 59:25

cited [1] - 55:8

citing [1] - 15:24

citizens [1] - 14:10

city [6] - 24:19, 26:9, 31:5, 31:23, 31:25, 32:24

City [4] - 7:13, 31:22, 69:14, 69:22

CIVIL [2] - 1:6, 1:19

Civil [2] - 3:8, 47:25

claim [3] - 51:16, 63:10, 63:15

claimed [1] - 33:10

claims [2] - 8:7, 8:25

class [6] - 7:7, 7:11, 7:17, 7:18, 7:21, 72:20

clear [8] - 5:2, 8:24, 14:19, 19:13, 24:22, 30:11, 33:16, 68:17

clearly [7] - 11:2, 12:9, 13:4, 16:12, 28:17, 33:22, 35:25

CLERK [3] - 3:6, 3:8, 30:23

clerk [1] - 58:15

client [2] - 58:25, 61:6

climbing [2] - 29:9, 29:11

clue [1] - 43:12

cold [1] - 55:15

collapse [1] - 56:1

collateral [1] - 29:20

colon [1] - 36:24

Colonel [2] - 41:17, 49:1

coming [1] - 30:23

command [1] - 41:25

Commissioners [1] - 56:19

committee [1] - 50:14

common [4] - 7:17, 7:20, 8:21, 31:19

community [4] - 30:9, 32:21, 33:4, 35:9

comparable [1] - 69:20

complaint [12] - 7:8, 7:12, 8:9, 8:10, 8:12, 8:16, 8:20, 8:23, 8:25, 36:18, 36:19

complaint's [1] - 7:16

complete [8] - 23:16,

24:3, 24:9, 24:10,
39:24, 69:6, 70:10,
70:16
**completed** [1] - 37:17
**completely** [2] -
53:25, 65:1
**complex** [2] - 3:20,
3:22
**compliment** [1] -
22:24
**comply** [1] - 25:10
**component** [1] - 33:10
**components** [1] -
63:19
**comprehension** [1] -
58:12
**COMPUTER** [1] - 2:14
**concede** [1] - 65:25
**conceded** [4] - 65:12,
66:20, 67:18, 70:5
**concept** [7] - 19:23,
19:25, 21:9, 42:19,
42:23, 42:25, 43:21
**concepts** [2] - 3:23,
42:19
**conceptually** [3] -
4:16, 20:6, 67:7
**concerned** [2] - 50:20,
72:15
**concerns** [1] - 29:25
**conciseness** [1] -
22:25
**conclude** [1] - 68:5
**concrete** [10] - 33:11,
33:13, 33:25, 34:9,
35:2, 54:20, 59:3,
63:4, 63:6, 64:3
**condemning** [1] - 53:4
**conditions** [3] - 68:10,
68:11, 68:12
**conduct** [1] - 26:14
**conferees** [4] - 17:21,
17:23, 18:2, 48:18
**conference** [6] -
15:17, 15:24, 16:13,
17:21, 24:21, 49:3
**conflated** [2] - 67:23,
67:24
**conflict** [1] - 30:2
**confusing** [1] - 59:12
**Congress** [56] - 4:11,
9:10, 9:11, 10:2,
12:14, 13:11, 15:13,
17:18, 20:12, 21:6,
23:7, 23:15, 23:22,
24:8, 24:17, 26:8,
34:6, 36:8, 36:9,
37:13, 38:14, 38:19,
39:17, 39:23, 40:1,
40:17, 40:20, 41:16,

41:24, 44:18, 45:25,
46:2, 47:2, 48:10,
48:16, 48:17, 48:19,
49:6, 49:9, 50:8,
51:1, 51:14, 51:18,
51:23, 52:3, 54:21,
64:18, 67:24, 67:25,
68:1, 68:5, 68:20,
69:5, 69:25, 72:9
**Congress's** [1] - 49:20
**Congressional** [6] -
11:3, 11:6, 14:12,
16:10, 17:15, 42:12
**Congressionally** [2] -
9:4, 13:2
**Congresswoman** [1] -
55:17
**connection** [3] -
10:12, 10:15, 59:22
**consider** [9] - 16:2,
18:3, 18:5, 18:16,
18:18, 30:8, 41:13,
44:15, 48:21
**consideration** [1] -
42:19
**considered** [4] -
14:25, 26:23, 49:3,
71:19
**considering** [2] -
55:20, 63:23
**consist** [1] - 38:22
**consisted** [1] - 22:5
**consolidated** [2] - 7:6,
7:7
**Consolidated** [1] - 3:9
**CONSOLIDATED** [1] -
1:4
**constituted** [1] - 72:17
**constitutes** [1] - 37:22
**constructed** [4] -
23:17, 23:25, 33:22,
67:2
**contained** [2] - 54:5,
54:6
**contemplated** [3] -
5:25, 15:7, 46:8
**contemplation** [2] -
19:25, 20:9
**contend** [3] - 21:23,
27:23, 32:5
**contending** [1] - 58:16
**contention** [1] - 15:13
**context** [4] - 12:3,
16:16, 30:1, 49:21
**continue** [2] - 33:9,
43:23
**Continued** [1] - 2:1
**contrast** [1] - 14:6
**Control** [1] - 49:22
**control** [46] - 4:12,

4:18, 5:4, 5:6, 5:14,
7:9, 7:25, 8:12, 8:13,
9:13, 9:18, 9:19,
9:21, 9:24, 10:3,
10:13, 10:15, 10:20,
10:21, 11:9, 11:19,
11:21, 12:6, 12:14,
13:2, 13:8, 18:22,
19:7, 19:9, 21:5,
23:3, 33:11, 35:16,
37:9, 37:22, 37:23,
38:8, 38:11, 38:12,
62:9, 63:2, 64:7,
66:9, 66:14, 67:21
**controlled** [1] - 4:17
**controlling** [1] - 7:22
**controversy** [1] -
45:13
**convince** [1] - 28:17
**convinced** [1] - 64:11
**Corps** [75] - 14:4,
14:14, 14:25, 15:4,
16:16, 17:9, 17:16,
17:17, 17:23, 18:2,
18:5, 18:7, 19:6,
20:12, 21:12, 22:3,
22:10, 23:23, 24:10,
26:3, 26:5, 26:6,
27:7, 28:12, 36:6,
36:7, 38:14, 38:20,
38:24, 39:19, 39:22,
40:10, 40:24, 41:1,
44:24, 45:22, 46:17,
47:6, 48:4, 48:13,
48:14, 48:20, 50:9,
50:15, 51:11, 51:22,
52:7, 53:3, 54:8,
54:24, 55:16, 56:2,
57:24, 59:16, 59:21,
60:4, 63:16, 63:23,
64:18, 64:24, 67:6,
67:12, 67:24, 68:1,
68:12, 68:14, 68:17,
68:21, 69:2, 69:8,
70:3, 70:13, 70:19
**Corps'** [3] - 13:16,
22:4, 47:23
**correct** [6] - 15:10,
15:17, 21:15, 34:25,
59:7, 73:16
**cost** [13] - 40:8, 40:19,
42:21, 43:14, 43:19,
44:2, 44:5, 44:10,
44:12, 44:14, 47:24,
69:11, 69:16
**costs** [4] - 34:10, 47:9,
69:20, 69:24
**counsel** [12] - 3:13,
33:12, 37:13, 37:25,
65:14, 66:20, 66:22,

67:23, 68:16, 68:25,
69:24, 70:5
**Counsel** [2] - 45:14,
68:20
**counsel's** [1] - 65:16
**countless** [1] - 3:24
**country** [2] - 64:23,
64:25
**counts** [1] - 7:7
**Counts** [2] - 8:8
**couple** [2] - 23:18,
42:1
**course** [9] - 4:15, 5:5,
5:18, 5:22, 21:17,
33:20, 44:4, 62:25,
67:11
**COURT** [129] - 1:1,
2:10, 3:4, 3:7, 3:11,
3:17, 6:20, 6:23, 7:2,
8:2, 9:7, 9:25, 10:7,
10:18, 10:24, 11:15,
12:17, 12:20, 13:13,
14:8, 14:15, 14:19,
15:10, 15:19, 16:5,
17:1, 17:5, 18:10,
18:25, 19:3, 19:11,
19:15, 19:18, 19:22,
20:2, 20:10, 20:18,
20:21, 20:23, 21:2,
21:16, 21:22, 21:25,
22:13, 25:4, 25:7,
25:16, 25:25, 26:10,
27:10, 28:6, 29:2,
29:5, 29:9, 29:12,
29:17, 30:5, 30:10,
30:21, 30:24, 33:20,
34:12, 34:17, 34:19,
35:21, 36:13, 36:17,
37:4, 37:12, 37:22,
38:5, 38:10, 39:20,
42:5, 43:10, 45:14,
45:19, 45:24, 46:4,
46:13, 46:17, 47:2,
49:9, 49:16, 49:18,
49:21, 49:24, 50:1,
52:12, 52:19, 52:22,
53:11, 54:3, 54:12,
54:14, 54:17, 55:4,
55:7, 55:12, 57:19,
58:14, 58:21, 58:23,
59:1, 59:4, 59:6,
59:8, 59:10, 59:13,
59:18, 61:9, 61:13,
61:22, 62:6, 62:18,
62:24, 63:6, 65:7,
66:6, 71:4, 71:9,
71:15, 71:20, 71:23,
72:13, 72:22, 72:24,
73:2, 73:4
**court** [4] - 14:3, 22:21,

67:23, 68:16, 68:25,
69:24, 70:5
36:8, 42:5
**Court** [32] - 4:7, 5:17,
7:5, 7:23, 8:20, 8:22,
10:10, 10:14, 11:4,
11:23, 12:8, 18:14,
22:20, 32:11, 42:1,
62:25, 64:15, 66:23,
71:4, 71:13, 71:20,
71:23, 72:4, 72:6,
72:8, 72:9, 73:13,
73:14, 73:23, 73:24
**Court's** [4] - 6:8, 7:22,
8:4, 8:24
**courts** [1] - 47:3
**cover** [2] - 72:17,
72:18
**covered** [1] - 39:13
**crazy** [1] - 63:8
**creation** [2] - 68:2,
70:1
**Creppel** [2] - 37:14,
68:4
**criteria** [1] - 47:25
**critical** [1] - 64:22
**critically** [1] - 44:21
**cross** [1] - 37:19
**crossings** [1] - 38:16
**CRR** [2] - 2:10, 73:22
**cryptic** [1] - 27:21
**crystal** [1] - 33:16
**Ct** [1] - 42:3
**curious** [1] - 12:21
**current** [2] - 41:21,
47:23

**D**

**D-1** [1] - 71:11
**D-8** [1] - 71:12
**D.C** [1] - 1:21
**dam** [1] - 53:4
**damage** [13] - 10:17,
11:20, 28:23, 29:4,
32:7, 33:17, 40:1,
53:21, 62:9, 62:10,
62:14
**damaged** [2] - 63:1,
63:2
**damages** [5] - 7:8,
7:19, 10:13, 28:1,
65:20
**damaging** [1] - 28:25
**days** [2] - 31:24, 31:25
**DC** [1] - 37:5
**dead** [1] - 55:15
**deal** [1] - 43:8
**decide** [6] - 27:8,
42:10, 42:11, 44:20,
45:13, 48:16

5

**decided** [6] - 11:13, 14:4, 14:14, 45:6, 48:5, 72:4
**deciding** [1] - 71:17
**decision** [7] - 26:20, 26:25, 58:1, 72:3, 72:10, 72:24
**decision-making** [1] - 58:1
**deep** [2] - 32:1, 57:1
**deepest** [1] - 31:23
**Defendant** [1] - 37:15
**deficiencies** [1] - 7:14
**defies** [1] - 24:20
**define** [1] - 58:7
**definition** [3] - 25:12, 28:15, 72:21
**degree** [3] - 30:2, 42:16, 42:24
**delay** [1] - 30:3
**delegation** [1] - 17:15
**demonstrate** [1] - 53:7
**DEPARTMENT** [1] - 1:18
**DEPUTY** [3] - 3:6, 3:8, 30:23
**describe** [1] - 32:7
**described** [3] - 14:5, 24:12, 39:3
**describing** [1] - 35:24
**description** [1] - 7:17
**design** [6] - 18:7, 38:18, 42:19, 47:19, 47:23, 62:3
**designated** [2] - 9:13, 9:18
**designed** [1] - 71:1
**desire** [1] - 64:13
**destroy** [2] - 40:2, 41:8
**destroys** [1] - 60:8
**details** [1] - 21:7
**determination** [1] - 26:19
**determine** [2] - 46:2, 66:24
**determined** [1] - 40:8
**developed** [2] - 66:4, 68:3
**deviate** [1] - 49:4
**diagram** [1] - 39:6
**dictate** [1] - 46:6
**dictionaries** [1] - 31:16
**difference** [5] - 4:20, 5:16, 21:9, 43:16, 56:14
**different** [8] - 4:24, 5:18, 25:11, 30:1,

43:5, 51:23, 53:25, 54:1
**differently** [1] - 58:11
**difficult** [1] - 69:12
**dig** [1] - 56:4
**dimension** [1] - 27:4
**direct** [4] - 17:23, 18:2, 20:11, 48:19
**directed** [7] - 22:8, 23:15, 38:14, 38:24, 48:12, 50:3
**direction** [2] - 36:9, 38:20
**directly** [1] - 52:10
**dirt** [1] - 56:4
**disavowing** [1] - 10:11
**discouraged** [4] - 29:13, 29:14, 29:15, 45:6
**discovered** [1] - 68:8
**discretion** [12] - 25:13, 26:14, 26:17, 27:7, 36:9, 55:18, 56:8, 56:15, 57:13, 58:7, 60:7, 68:17
**discretionary** [14] - 5:16, 5:21, 25:3, 25:8, 25:18, 25:24, 26:11, 43:4, 55:4, 55:8, 57:12, 62:7, 66:8, 66:10
**discussed** [1] - 14:23
**discussion** [1] - 39:15
**discussions** [1] - 42:10
**dismiss** [2] - 7:7, 35:7
**dismissal** [2] - 64:15, 67:20
**dismissed** [2] - 8:9, 71:2
**display** [1] - 4:8
**dispute** [2] - 62:15
**dissent** [1] - 35:12
**distinction** [1] - 62:25
**DISTRICT** [2] - 1:1, 1:1
**district** [4] - 14:3, 50:13, 58:2, 58:3
**District** [12] - 31:3, 34:2, 34:11, 47:19, 48:12, 63:11, 63:15, 69:8, 73:14, 73:24
**district's** [1] - 42:24
**ditch** [8] - 33:7, 33:9, 60:11, 61:2, 61:3, 61:4, 63:21
**ditches** [1] - 47:16
**diver** [1] - 35:18
**DIVISION** [1] - 1:19

**document** [1] - 3:10
**documents** [2] - 44:5, 64:1
**dollars** [5] - 50:9, 56:20, 69:13, 69:14, 69:21
**done** [6] - 4:15, 23:4, 24:5, 39:16, 46:19, 51:17
**dot** [1] - 37:20
**doubt** [4] - 54:9, 61:23, 62:16, 62:17
**down** [8] - 4:9, 6:6, 33:6, 41:4, 46:9, 54:21, 55:14, 61:25
**drain** [1] - 5:23
**drainage** [17] - 17:13, 24:15, 27:17, 29:6, 33:7, 33:9, 40:4, 47:16, 57:5, 61:3, 62:16, 63:21, 65:17, 69:14, 69:21
**drawbacks** [1] - 15:1
**drawn** [1] - 18:7
**dredge** [7] - 54:10, 55:21, 56:20, 57:2, 59:22, 60:8, 63:24
**dredged** [1] - 57:1
**dredging** [16] - 5:8, 5:11, 25:5, 26:6, 26:7, 26:15, 27:15, 54:18, 54:19, 57:14, 58:9, 60:3, 60:6, 64:8, 66:7, 66:17
**dried** [1] - 31:10
**driven** [1] - 13:5
**driving** [1] - 69:25
**dry** [1] - 32:2
**due** [1] - 28:3
**during** [4] - 23:21, 43:23, 45:8, 66:21
**DUVAL** [1] - 1:11

**E**

**E-1** [1] - 71:12
**E-27** [1] - 48:3
**E-45** [1] - 71:12
**E=mc2** [1] - 3:21
**earliest** [1] - 61:5
**early** [1] - 21:14
**earth** [8] - 35:3, 51:16, 56:7, 56:12, 56:13, 56:23, 56:24, 57:6
**easily** [2] - 32:15, 45:9
**east** [2] - 38:22, 45:10
**EASTERN** [1] - 1:1
**Eastern** [1] - 73:14
**economical** [1] - 49:4

**Edition** [1] - 42:3
**editor** [1] - 45:5
**effects** [1] - 58:4
**effort** [1] - 42:17
**eight** [1] - 41:2
**Einstein** [1] - 3:19
**either** [3] - 25:17, 54:7, 66:19
**Electric** [1] - 42:2
**elegant** [2] - 3:19, 3:20
**element** [1] - 15:6
**elements** [5] - 7:23, 8:10, 66:24, 67:3, 67:18
**elevation** [1] - 65:23
**eloquence** [1] - 3:23
**elsewhere** [1] - 18:12
**elucidated** [1] - 64:16
**Elvin** [1] - 45:5
**embarrassingly** [1] - 30:15
**encapsulated** [1] - 26:12
**encompassed** [2] - 4:18, 23:14
**end** [4] - 45:10, 56:10, 67:25, 69:9
**ended** [1] - 48:1
**ending** [1] - 51:23
**Energy** [1] - 51:9
**engine** [1] - 35:14
**engineer** [5] - 40:14, 40:18, 55:24, 56:5, 56:12
**engineering** [9] - 26:25, 27:2, 27:3, 40:18, 45:1, 55:23, 58:2, 58:3, 59:21
**Engineers** [6] - 36:7, 44:24, 48:1, 48:13, 50:10, 51:22, 52:8, 59:16, 60:4
**engineers** [1] - 41:14
**Engineers'** [1] - 56:2
**enter** [1] - 15:9
**entered** [4] - 15:9, 23:12, 27:24, 66:4
**enters** [1] - 16:23
**entertains** [1] - 64:15
**entire** [13] - 18:21, 19:9, 19:17, 22:11, 31:5, 48:22, 50:4, 50:21, 56:3, 57:8, 70:11, 70:15, 70:16
**entirely** [1] - 53:25
**entitled** [2] - 46:3, 73:17
**environment** [1] - 41:8
**environmental** [5] -

37:17, 40:25, 41:3, 42:17, 42:24
**envision** [1] - 9:17
**envisioned** [1] - 14:23
**equation** [1] - 3:19
**ergo** [1] - 11:21
**escape** [2] - 8:18, 65:14
**escaped** [6] - 27:25, 36:19, 66:3, 68:23, 70:24, 70:25
**ESQ** [2] - 1:15, 1:19
**ESQUIRE** [12] - 1:23, 1:24, 1:24, 1:25, 2:3, 2:3, 2:4, 2:4, 2:6, 2:6, 2:7, 2:7
**essence** [3] - 12:25, 25:13, 72:8
**essentially** [3] - 27:3, 27:25, 65:12
**established** [2] - 7:24, 8:10
**esteemed** [1] - 37:13
**esthetic** [1] - 40:2
**estoppel** [1] - 29:20
**et** [2] - 6:3, 36:15
**evaluate** [5] - 56:15, 57:14, 58:9, 59:25, 60:5
**evaluates** [3] - 53:9, 58:2, 58:4
**evaluating** [3] - 26:6, 26:7, 54:24
**evidence** [1] - 37:17
**evident** [1] - 8:15
**exact** [2] - 20:16, 20:20
**exactly** [8] - 5:9, 19:2, 20:1, 27:23, 45:18, 46:12, 56:9, 68:11
**examine** [2] - 40:24, 66:23
**example** [1] - 61:20
**Excavation** [1] - 56:19
**exception** [4] - 5:17, 25:3, 25:24, 26:12
**exclusion** [1] - 53:22
**exercise** [1] - 60:7
**exercising** [1] - 43:4
**exerted** [1] - 67:15
**exhibits** [7] - 3:24, 6:10, 16:1, 16:2, 16:3, 71:8, 71:17
**Exhibits** [1] - 71:10
**exhort** [1] - 18:5
**exist** [1] - 11:10
**existed** [1] - 68:14
**existing** [2] - 58:5, 68:22
**expansive** [1] - 8:3

**expect** [3] - 47:14, 50:8, 72:24
**expensive** [4] - 14:25, 16:20, 16:24, 69:23
**experience** [1] - 64:12
**expert** [5] - 30:25, 32:22, 40:18, 45:1, 57:2
**experts** [5] - 32:25, 45:2, 45:3, 56:24, 56:25
**explain** [3] - 27:23, 65:19, 69:1
**explained** [1] - 16:14
**explanation** [1] - 24:10
**explore** [1] - 64:25
**expressed** [1] - 70:2
**expressly** [1] - 70:13
**expropriate** [1] - 37:3
**extend** [1] - 64:6
**extended** [2] - 64:5, 64:8
**extent** [1] - 29:24, 42:18
**extra** [2] - 32:4, 44:15
**extraneous** [1] - 16:7
**extraordinarily** [1] - 3:20
**eyewitness** [1] - 61:5

## F

**F-1** [1] - 71:12
**F-27** [1] - 71:12
**face** [2] - 8:10, 8:16
**faced** [2] - 8:24, 44:4
**facilitate** [1] - 6:10
**fact** [32] - 5:13, 5:14, 7:17, 7:20, 11:20, 12:5, 14:5, 14:23, 18:7, 21:11, 23:25, 24:2, 26:15, 26:18, 34:24, 37:16, 37:17, 51:21, 51:24, 53:15, 54:23, 55:21, 55:22, 56:18, 59:25, 62:14, 63:17, 65:25, 67:14, 69:5, 70:12
**factor** [1] - 9:1
**factors** [2] - 26:22, 55:17
**facts** [19] - 7:10, 8:19, 8:20, 8:23, 9:16, 30:14, 33:16, 35:8, 35:9, 36:18, 42:14, 42:15, 46:6, 55:15, 55:16, 64:14, 64:16, 68:9

**factual** [3] - 45:12, 46:3, 62:21
**factually** [1] - 13:5
**fail** [8] - 23:21, 33:19, 33:25, 59:13, 59:14, 59:15, 70:10
**failed** [17] - 4:3, 7:9, 8:13, 33:23, 34:1, 40:25, 46:22, 46:23, 56:25, 59:15, 66:25, 67:1, 70:9, 70:20, 70:23
**failing** [2] - 23:17, 27:16
**fails** [1] - 23:19
**failure** [2] - 5:10, 8:14
**failures** [2] - 7:19, 7:20
**fair** [1] - 34:16
**fairly** [1] - 19:13
**fall** [1] - 33:6
**fallback** [2] - 5:7, 45:15
**falling** [1] - 61:8
**Fallon** [1] - 40:25
**falls** [1] - 61:25
**false** [2] - 54:8, 67:11
**familiar** [5] - 5:17, 16:14, 24:13, 54:3, 55:12
**far** [2] - 38:11, 64:21
**fascinating** [2] - 44:25, 48:4
**favor** [2] - 28:7, 72:7
**favorably** [3] - 18:3, 18:6, 48:21
**features** [1] - 16:22
**federal** [21] - 4:9, 5:13, 5:14, 6:3, 21:13, 34:20, 52:4, 53:15, 53:16, 53:23, 56:21, 57:15, 58:5, 58:19, 59:18, 59:19, 66:14, 69:13, 69:21, 70:20, 70:25
**federally** [3] - 13:1, 33:22, 33:23
**feet** [9] - 39:1, 40:6, 40:13, 48:2, 48:6, 56:13, 56:14, 57:10, 62:4
**fellows** [1] - 39:17
**FEMA** [1] - 55:13
**few** [2] - 3:18, 72:4
**Fifth** [8] - 22:18, 22:20, 28:4, 37:14, 52:23, 65:3, 68:4, 72:9
**fighting** [1] - 45:7
**figure** [2] - 42:22,

47:12
**final** [2] - 46:12, 51:21
**finally** [2] - 43:22, 67:5
**fine** [2] - 53:20, 65:2
**finished** [2] - 54:19, 64:10
**firm** [1] - 40:18
**first** [21] - 4:9, 7:12, 7:25, 12:12, 12:21, 18:10, 19:4, 19:19, 19:20, 20:13, 22:2, 27:11, 30:6, 30:17, 31:12, 33:13, 35:12, 54:15, 55:11, 62:12
**fits** [1] - 26:2
**five** [1] - 44:3
**flagrantly** [1] - 46:17
**flat** [2] - 51:18, 52:9
**flood** [97] - 4:12, 4:17, 4:18, 5:4, 5:5, 5:14, 5:15, 7:9, 7:25, 8:11, 9:13, 9:18, 9:21, 9:24, 10:3, 10:13, 10:15, 10:20, 10:21, 11:9, 11:19, 11:21, 11:25, 12:6, 12:14, 13:2, 13:3, 13:8, 13:14, 13:20, 17:19, 18:22, 18:25, 19:3, 19:7, 19:9, 21:5, 22:14, 22:15, 23:2, 23:3, 23:22, 24:18, 28:14, 30:18, 31:5, 31:13, 32:6, 32:8, 33:4, 33:6, 33:11, 33:17, 35:16, 36:20, 37:9, 37:22, 37:23, 38:8, 38:11, 38:12, 39:11, 39:12, 39:25, 47:20, 52:4, 53:15, 53:16, 53:23, 54:23, 54:25, 56:21, 57:16, 58:9, 59:19, 60:3, 61:15, 62:9, 63:2, 64:7, 65:15, 66:3, 66:9, 66:13, 66:24, 67:16, 67:21, 68:2, 68:24, 70:8, 70:13, 70:14
**Flood** [2] - 49:21, 56:19
**flood-induced** [1] - 24:18
**flooded** [1] - 29:3
**flooding** [12] - 19:11, 23:9, 23:20, 26:4, 26:9, 31:17, 31:22, 33:2, 34:15, 70:6, 70:7, 71:1
**floodwaters** [21] -

5:25, 7:9, 8:1, 8:13, 8:15, 11:24, 12:24, 13:4, 27:14, 27:17, 28:1, 28:2, 28:18, 29:6, 61:10, 62:9, 65:21, 65:22, 66:5, 67:22, 70:25
**flow** [2] - 24:14, 33:1
**focus** [1] - 12:1
**folks** [2] - 31:20, 60:2
**follow** [1] - 72:8
**following** [2] - 13:11, 19:21
**foot** [3] - 32:20, 32:23, 56:14
**FOR** [2] - 1:15, 1:18
**forbids** [1] - 68:6
**force** [1] - 17:14
**forces** [1] - 67:15
**foregoing** [1] - 73:15
**forever** [1] - 14:8
**forget** [3] - 38:6, 45:24, 58:17
**forgive** [2] - 59:11, 71:7
**form** [1] - 56:22
**forth** [6] - 7:10, 8:8, 15:24, 15:25, 16:11, 16:12
**four** [1] - 61:3
**frame** [2] - 20:18, 21:1
**FRANCIS** [1] - 2:3
**FRANKLIN** [1] - 1:20
**frankly** [4] - 30:15, 31:9, 45:20, 60:25
**freezing** [1] - 50:21
**Froehlke** [1] - 52:22
**front** [1] - 54:8
**fruition** [1] - 14:12
**FTC** [1] - 6:3
**fun** [1] - 48:24
**function** [10] - 5:17, 25:3, 25:18, 25:24, 26:12, 55:4, 55:8, 57:12, 62:8, 66:8
**funds** [13] - 9:12, 11:9, 19:18, 19:20, 21:13, 33:13, 49:9, 50:15, 50:21, 50:23, 68:21, 69:5

## G

**gain** [1] - 4:11
**gainsaid** [1] - 27:1
**galactic** [1] - 22:21
**gap** [2] - 46:1, 72:16
**gate** [5] - 17:5, 54:8, 69:9, 69:10, 69:18

**gates** [6] - 16:20, 43:21, 43:22, 47:13, 47:15, 69:2
**general** [10] - 17:23, 17:24, 19:8, 19:23, 20:18, 21:1, 21:9, 21:18, 22:14, 47:19
**General** [2] - 42:2, 45:5
**generally** [1] - 39:2
**generically** [1] - 34:17
**Gentilly** [1] - 38:17
**geotechnical** [2] - 47:23, 47:25
**GERALD** [1] - 2:6
**Gilbert** [1] - 42:2
**Gorski** [1] - 49:1
**governing** [1] - 26:19
**Government** [15] - 4:4, 4:16, 5:19, 9:9, 29:20, 30:13, 35:6, 36:5, 37:16, 57:13, 60:18, 61:21, 63:3, 67:9, 72:7
**Government's** [2] - 6:4, 6:23
**grant** [4] - 25:11, 26:25, 59:22, 63:13
**granted** [2] - 37:15, 64:2
**granting** [1] - 5:12
**grass** [2] - 32:14, 61:21
**Green** [29] - 7:23, 8:5, 8:25, 10:1, 10:9, 10:10, 10:19, 11:13, 11:14, 11:15, 11:16, 12:4, 12:23, 13:7, 18:11, 22:14, 27:13, 28:6, 28:16, 29:6, 35:11, 38:1, 38:3, 38:7, 61:15, 61:18, 61:19, 62:13, 62:21
**ground** [3] - 35:4, 48:2, 48:6
**guess** [5] - 15:10, 16:22, 17:14, 27:11, 45:1
**guys** [7] - 41:9, 44:18, 44:19, 50:12, 50:20, 52:8

## H

**halted** [2] - 13:24, 15:3
**hampered** [1] - 40:5
**hand** [1] - 41:18
**handsome** [1] - 31:11

**handy** [1] - 12:21
**hanging** [1] - 35:16
**Harbors** [2] - 55:1, 59:23
**hard** [1] - 20:6
**harm** [1] - 8:14
**HEARD** [1] - 1:11
**hearing** [2] - 59:25, 60:4
**HEARING** [1] - 1:10
**Heiberg** [1] - 45:5
**held** [3] - 9:23, 11:17, 61:3
**help** [1] - 35:10
**helpful** [2] - 4:6, 50:23
**hereby** [1] - 73:15
**herein** [1] - 39:3
**Hiersche** [1] - 35:12
**high** [22] - 4:20, 14:5, 14:11, 14:14, 14:21, 15:5, 15:7, 15:22, 28:12, 39:11, 39:23, 40:5, 40:7, 41:15, 42:16, 42:23, 47:7, 52:2, 53:21, 60:20, 68:13
**high-level** [18] - 4:20, 14:5, 14:11, 14:14, 14:21, 15:5, 15:7, 15:22, 39:23, 40:5, 40:7, 41:15, 42:16, 42:23, 47:7, 52:2, 68:13
**higher** [7] - 32:20, 32:23, 39:1, 40:3, 40:6, 44:3, 44:11
**hill** [2] - 29:10, 29:11
**hired** [1] - 40:12
**historic** [1] - 67:16
**history** [5] - 4:25, 35:6, 36:15, 36:22, 42:8
**hold** [3] - 7:1, 37:10, 58:14
**holding** [3] - 11:6, 29:23
**homes** [1] - 33:4
**Honor** [68] - 3:12, 3:13, 3:15, 6:18, 6:25, 7:4, 8:6, 9:15, 9:16, 10:5, 10:9, 10:22, 11:11, 11:12, 12:19, 13:9, 14:13, 14:17, 15:18, 15:24, 16:1, 16:2, 16:8, 16:9, 16:14, 17:4, 18:1, 18:23, 19:2, 20:1, 20:5, 20:15, 20:20, 20:25, 21:15, 21:19, 23:18, 24:11,

24:22, 24:25, 25:2, 25:6, 25:15, 25:21, 26:12, 27:21, 28:3, 28:19, 28:20, 29:7, 31:1, 33:6, 64:11, 65:11, 65:14, 65:19, 66:20, 67:11, 68:15, 68:25, 69:4, 70:5, 71:3, 71:16, 72:12
**HONORABLE** [1] - 1:11
**hope** [1] - 45:9
**horribly** [2] - 46:18, 46:19
**host** [2] - 26:21, 38:8
**hour** [2] - 3:18, 6:25
**house** [6] - 40:12, 40:13, 43:15, 48:17, 48:18, 54:5
**huge** [1] - 11:20
**hurricane** [30] - 7:14, 13:14, 13:20, 15:8, 17:19, 20:8, 23:11, 23:22, 24:18, 24:24, 26:4, 31:24, 31:25, 32:4, 38:18, 43:23, 48:21, 49:4, 50:3, 51:24, 53:21, 55:18, 60:10, 60:14, 67:9, 67:13, 67:14, 68:24, 70:22, 71:1
**Hurricane** [3] - 13:10, 13:12, 23:21
**hurricane-induced** [5] - 13:20, 15:8, 20:8, 23:11, 26:4

## I

**I's** [1] - 37:20
**I-walls** [4] - 22:5, 23:25, 43:17, 43:19
**i.e** [1] - 61:14
**iceberg** [1] - 64:20
**idea** [2] - 64:2, 66:23
**ignore** [2] - 44:9, 56:16
**IHNC** [1] - 8:18
**II** [1] - 2:3
**illustrated** [1] - 26:22
**imagine** [1] - 58:7
**immediately** [1] - 14:23
**immunity** [24] - 4:11, 5:6, 9:14, 10:4, 10:14, 11:3, 11:18, 11:21, 12:5, 12:7, 12:25, 15:15, 35:17, 35:19, 36:2, 36:4,

36:6, 37:23, 46:3, 51:17, 52:6, 52:7, 53:19
**impact** [8] - 26:7, 37:18, 40:25, 41:3, 42:17, 57:14, 58:9, 60:6
**imparts** [1] - 68:4
**impeded** [1] - 14:9
**implement** [1] - 21:10
**implemented** [1] - 21:8
**implicate** [1] - 27:4
**implicates** [1] - 26:21
**impliedly** [1] - 68:6
**impolitely** [1] - 17:15
**important** [3] - 30:8, 32:9, 44:21
**impossibility** [1] - 52:1
**impossible** [1] - 29:25
**impractical** [1] - 37:2
**impracticality** [1] - 68:5
**improve** [6] - 20:15, 22:11, 68:21, 69:11, 69:21, 70:13
**improved** [2] - 13:22, 13:23
**improvement** [1] - 38:25
**improvements** [3] - 39:3, 44:7, 44:8
**improving** [2] - 20:17, 70:14
**IN** [1] - 1:4
**inches** [1] - 32:25
**incorporate** [1] - 49:10
**incorrect** [1] - 9:5
**increase** [2] - 17:11, 17:12
**indeed** [1] - 72:6
**independent** [1] - 54:11
**indicate** [1] - 64:21
**indicated** [2] - 7:16, 28:20
**indicates** [1] - 48:10
**individually** [1] - 18:17
**induced** [6] - 13:20, 15:8, 20:8, 23:11, 24:18, 26:4
**indulge** [1] - 34:23
**indulging** [1] - 30:7
**Industrial** [1] - 41:4
**information** [2] - 52:3, 55:23
**initial** [2] - 9:5, 20:9

**injunction** [5] - 14:1, 15:3, 40:23, 40:24, 41:1
**injured** [1] - 35:16
**injustice** [1] - 35:14
**inlets** [2] - 13:17, 13:19
**inside** [1] - 33:4
**instance** [1] - 9:22
**instances** [1] - 9:23
**instead** [1] - 50:24
**instructive** [1] - 17:20
**insurance** [4] - 22:15, 28:4, 28:7, 53:21
**integrity** [3] - 60:21, 60:22, 66:17
**intended** [1] - 28:5
**intent** [2] - 48:19, 49:20
**intention** [1] - 13:16
**interest** [2] - 27:8, 44:19
**interested** [3] - 4:7, 17:10, 46:9
**interesting** [3] - 31:21, 43:16, 60:15
**interior** [1] - 40:4
**internal** [2] - 42:9, 45:22
**interpretation** [1] - 8:3
**interpreted** [2] - 47:3, 50:21
**intimate** [1] - 11:5
**introduction** [2] - 71:8, 71:10
**inundate** [1] - 31:4
**inundated** [1] - 65:21
**inundates** [1] - 61:25
**inundation** [2] - 7:13, 8:17
**involved** [2] - 9:24, 11:19
**involves** [2] - 26:20, 43:17
**irrelevant** [2] - 18:19, 67:3
**issue** [5] - 3:25, 17:14, 53:17, 53:20, 72:5
**issued** [1] - 41:1
**issues** [4] - 7:17, 7:21, 30:8, 55:5
**issuing** [2] - 27:8, 63:16
**itself** [8] - 8:16, 13:18, 25:23, 27:5, 33:17, 47:20, 63:2, 67:25

## J

**James** [4] - 35:12, 38:6, 38:7
**Jefferson** [4] - 32:2, 44:12, 56:14, 59:1
**JOANEN** [1] - 1:24
**job** [1] - 58:10
**Joe** [1] - 58:14
**John** [1] - 49:2
**Johnston** [1] - 51:19
**Johnston's** [1] - 50:13
**joke** [2] - 22:16, 54:23
**JOSEPH** [1] - 1:15
**Joseph** [1] - 3:13
**JR** [2] - 1:11, 2:3
**Judge** [25] - 29:11, 29:14, 30:12, 32:19, 33:18, 33:24, 35:1, 35:15, 37:8, 37:11, 37:14, 38:15, 40:25, 41:25, 43:11, 45:11, 50:5, 51:22, 52:16, 52:24, 58:6, 60:25, 61:23, 71:22, 72:11
**JUDGE** [1] - 1:11
**judge** [6] - 30:6, 31:21, 45:3, 49:6, 56:9, 71:7
**judgment** [4] - 26:21, 37:15, 37:21, 53:18
**judicata** [1] - 29:20
**judicial** [1] - 8:22
**June** [1] - 45:5
**jurisdiction** [5] - 8:21, 53:12, 53:13, 57:25, 71:3
**JUSTICE** [1] - 1:18
**Justice** [1] - 35:11
**justification** [1] - 47:6

## K

**K"(2** [1] - 1:6
**KARL** [1] - 1:25
**Katrina** [4] - 3:9, 23:21, 24:4, 71:25
**KATRINA** [1] - 1:4
**keep** [9] - 25:20, 29:15, 31:15, 38:23, 39:10, 53:4, 57:17, 60:10, 60:11
**keeping** [1] - 18:10
**KEVIN** [1] - 2:7
**kill** [2] - 35:19, 63:24
**killer** [1] - 40:7
**kind** [9] - 13:1, 17:18, 25:9, 33:15, 41:19,

41:20, 44:20, 45:22, 72:19
**King** [1] - 72:8
**KLIBERT** [1] - 2:7
**knowledge** [1] - 8:21
**known** [1] - 13:25
**knows** [5] - 13:10, 24:13, 34:13, 55:14, 64:19

## L

**LA** [1] - 1:16
**lack** [1] - 71:2
**Lake** [17] - 4:18, 12:15, 13:10, 13:15, 13:17, 19:1, 19:4, 19:11, 19:12, 19:14, 21:5, 23:10, 24:24, 38:22, 41:23, 60:12, 68:3
**lake** [18] - 13:20, 13:22, 14:7, 14:22, 15:9, 16:23, 19:13, 19:16, 23:13, 24:14, 31:1, 31:5, 32:5, 38:24, 39:11, 40:4, 45:10
**lakefront** [5] - 13:18, 31:3, 31:9, 40:2, 40:6
**lakeshore** [1] - 39:1
**lamentable** [1] - 72:6
**land** [8] - 8:17, 31:8, 31:10, 31:14, 31:18, 32:15, 37:3, 68:15
**language** [11] - 11:4, 48:9, 48:10, 48:11, 49:11, 49:12, 50:14, 50:16, 50:18, 54:6
**large** [2] - 42:18, 55:9
**last** [2] - 6:21, 45:6
**late** [1] - 54:18
**lately** [1] - 55:9
**law** [14] - 4:22, 4:23, 9:6, 9:20, 11:14, 15:23, 16:13, 16:15, 35:25, 58:15, 68:16, 68:17
**lawsuit** [3] - 13:24, 63:8, 63:10
**Lawyer's** [1] - 42:3
**learned** [1] - 35:11
**least** [12] - 4:11, 10:3, 11:17, 13:18, 14:12, 17:1, 17:2, 19:25, 22:7, 59:19, 62:8, 72:4
**LeBlanc** [2] - 61:6,

61:20
**led** [1] - 68:12
**Lee** [1] - 38:16
**leeching** [1] - 11:24
**legal** [5] - 46:5, 52:12, 68:9, 68:11, 68:13
**legislation** [2] - 22:7, 22:8, 23:15
**legislative** [1] - 35:13
**length** [1] - 48:22
**lengths** [4] - 22:11, 50:4, 51:7, 70:15
**lengthy** [1] - 30:7
**less** [4] - 15:1, 16:20, 16:24, 20:6
**lesser** [1] - 42:24
**letter** [1] - 45:5
**levee** [48] - 7:7, 7:11, 17:12, 20:13, 27:16, 31:3, 33:22, 33:23, 34:9, 34:11, 34:14, 34:20, 37:2, 38:23, 47:10, 47:11, 50:10, 56:2, 56:7, 56:16, 57:4, 57:8, 57:11, 57:15, 58:5, 58:10, 58:21, 60:8, 60:9, 60:10, 60:11, 60:12, 61:16, 61:17, 62:16, 63:12, 63:17, 63:21, 63:22, 63:25, 66:12, 66:13, 66:14, 66:18
**Levee** [14] - 31:3, 31:7, 34:2, 34:11, 47:14, 47:18, 48:12, 57:16, 59:16, 63:11, 63:15, 63:22, 69:8
**levees** [49] - 4:3, 7:19, 7:20, 8:12, 13:18, 13:21, 13:23, 14:7, 14:22, 16:21, 17:10, 18:3, 18:6, 18:9, 21:12, 22:6, 22:10, 22:21, 24:1, 24:5, 27:24, 31:8, 31:14, 34:14, 38:25, 39:24, 40:6, 43:14, 44:11, 46:19, 48:15, 48:22, 48:23, 50:5, 50:6, 51:1, 55:19, 55:23, 55:25, 56:4, 57:14, 65:18, 65:24, 67:2, 68:22, 69:11, 70:6, 70:7
**levees's** [1] - 5:10
**level** [22] - 4:20, 14:5, 14:11, 14:14, 14:21, 15:5, 15:7, 15:22, 31:6, 32:19, 39:23, 40:5, 40:7, 41:15,

42:16, 42:23, 47:7, 48:6, 52:2, 58:12, 68:13
**levels** [1] - 40:4
**liability** [1] - 23:20
**liaison** [1] - 3:13
**lie** [1] - 44:4
**lieutenant** [1] - 45:4
**life** [1] - 69:12
**LINDA** [1] - 2:4
**Lindy** [1] - 55:16
**line** [5] - 10:11, 35:25, 36:1, 36:2, 57:21
**lines** [1] - 39:14
**list** [1] - 26:22
**listed** [1] - 26:22
**listen** [1] - 44:1
**litigation** [2] - 14:9, 39:20
**LITIGATION** [1] - 1:5
**Litigation** [1] - 3:9
**lobby** [1] - 17:16
**local** [5] - 17:9, 17:12, 47:11, 50:13, 67:3
**locations** [1] - 14:22, 39:25
**lock** [1] - 41:2
**locks** [1] - 41:4
**logic** [2] - 39:10, 63:18
**London** [22] - 4:1, 15:12, 15:16, 16:19, 17:17, 18:4, 18:17, 20:24, 22:1, 22:4, 22:9, 23:25, 38:16, 47:20, 49:10, 50:5, 50:17, 51:7, 51:11, 51:12, 51:20, 69:20
**look** [21] - 3:23, 10:16, 11:15, 11:25, 12:2, 12:23, 16:8, 21:4, 27:5, 27:6, 28:16, 31:16, 32:2, 32:3, 32:18, 34:5, 36:12, 62:13, 67:8, 72:10
**looked** [6] - 36:13, 36:14, 47:22, 69:19
**looking** [5] - 16:5, 16:7, 28:8, 30:24, 35:8
**looks** [1] - 36:23
**LOUISIANA** [3] - 1:1, 1:7, 2:11
**Louisiana** [2] - 13:10, 73:15
**low** [1] - 38:16
**lower** [1] - 48:1
**lump** [1] - 18:17
**LVP** [8] - 4:17, 4:18, 12:15, 12:18, 15:13, 17:25, 18:20, 18:21

## M

**machination** [1] - 44:1
**major** [2] - 41:20, 41:22
**man** [1] - 31:18
**man's** [1] - 28:15
**man-made** [1] - 31:18
**mandate** [3] - 25:10, 26:13
**mandated** [3] - 24:17, 68:18, 69:25
**mandating** [1] - 17:18
**Mandeville** [3] - 44:7, 44:8, 44:10
**manufactured** [2] - 47:6, 47:8
**manufacturers** [1] - 41:19
**March** [1] - 70:12
**marked** [1] - 66:13
**master** [3] - 7:7, 7:11, 8:9
**material** [1] - 16:7
**materials** [1] - 16:10
**math** [1] - 54:16
**matter** [5] - 9:5, 51:22, 71:5, 73:18
**matters** [1] - 26:22
**mean** [10] - 9:9, 14:23, 20:5, 27:1, 27:23, 54:16, 54:23, 60:3, 67:6, 67:11
**meaning** [1] - 32:10
**means** [2] - 23:24, 67:25
**measured** [1] - 10:15
**MECHANICAL** [1] - 2:14
**meeting** [1] - 60:2
**meets** [2] - 45:19, 46:13
**melted** [1] - 70:2
**members** [2] - 7:17, 7:18
**memo** [1] - 50:12
**memorandum** [3] - 25:25, 45:23, 47:19
**memorandums** [1] - 18:8
**mentioned** [5] - 15:12, 15:16, 24:21, 46:11, 69:7
**merit** [1] - 28:21
**merits** [1] - 22:18
**messed** [1] - 6:21
**met** [2] - 26:16, 53:7
**MEUNIER** [1] - 2:6
**might** [6] - 6:14, 6:15,

17:5, 18:25, 27:10, 33:20
**million** [26] - 34:6, 34:8, 43:14, 43:15, 43:21, 43:22, 43:25, 44:3, 44:6, 44:10, 44:13, 44:15, 47:12, 47:13, 47:24, 50:14, 50:17, 50:19, 50:22, 51:6, 51:10, 51:11, 51:12, 51:13
**mind** [4] - 18:10, 28:17, 42:13, 68:18
**mindful** [1] - 29:22
**minimum** [1] - 26:15
**minor** [1] - 38:17
**minute** [1] - 4:16
**minutes** [3] - 6:16, 6:24, 7:1
**misleading** [1] - 69:1
**missing** [1] - 55:15
**misstated** [1] - 30:13
**mistake** [1] - 45:8
**modifications** [1] - 51:24, 57:22
**moment** [2] - 38:7, 45:11
**money** [17] - 4:9, 4:12, 10:2, 12:11, 12:13, 21:6, 31:10, 40:11, 42:21, 43:19, 47:20, 50:9, 51:1, 51:2, 51:5, 51:14, 60:19
**monies** [1] - 20:11
**monolith** [11] - 33:25, 59:3, 59:4, 59:13, 59:14, 63:4, 63:6, 64:3, 64:10, 66:14
**monoliths** [2] - 54:20, 54:22
**month** [1] - 45:6
**months** [1] - 41:2
**monumentally** [1] - 30:8
**morning** [1] - 57:5
**Morris** [1] - 31:1
**most** [9] - 3:22, 13:23, 16:12, 31:20, 42:20, 49:4, 51:17, 57:8
**motion** [5] - 3:9, 6:4, 6:18, 6:23, 71:18
**motions** [1] - 71:25
**MOTIONS** [1] - 1:10
**MOUNGER** [1] - 1:24
**mouth** [1] - 16:18
**mouths** [2] - 16:20, 69:2
**move** [10] - 11:12, 25:2, 25:22, 33:8, 37:6, 43:18, 52:10,

57:11, 71:7, 71:10
**moved** [4] - 7:6, 57:9, 57:10, 66:21
**MR** [124] - 3:12, 3:15, 6:18, 6:21, 6:25, 7:4, 8:6, 9:15, 10:5, 10:9, 10:22, 11:11, 12:16, 12:19, 13:9, 13:14, 14:13, 14:17, 14:21, 15:18, 15:23, 16:8, 17:4, 17:8, 18:23, 19:2, 19:6, 19:12, 19:16, 19:20, 20:1, 20:5, 20:14, 20:19, 20:22, 20:25, 21:15, 21:18, 21:23, 22:1, 23:7, 25:6, 25:15, 25:20, 26:2, 26:11, 27:20, 28:19, 29:3, 29:7, 29:11, 29:14, 30:6, 30:12, 30:25, 33:24, 34:16, 34:18, 34:22, 35:22, 36:16, 36:22, 37:6, 37:14, 38:3, 38:6, 38:13, 39:22, 42:7, 43:11, 45:17, 45:21, 46:1, 46:12, 46:15, 46:21, 47:5, 49:11, 49:17, 49:19, 49:23, 49:25, 50:2, 52:16, 52:20, 52:24, 53:13, 54:4, 54:13, 54:15, 54:19, 55:6, 55:11, 55:14, 57:20, 58:20, 58:22, 58:24, 59:2, 59:5, 59:7, 59:9, 59:11, 59:14, 59:20, 61:12, 61:17, 61:23, 62:12, 62:20, 63:5, 63:8, 65:11, 66:19, 71:7, 71:10, 71:16, 71:22, 72:11, 72:12, 72:20, 72:23, 73:1, 73:3
**MRGO** [12] - 6:1, 6:5, 29:21, 60:24, 61:1, 63:18, 72:13, 72:16, 72:17, 72:21
**multipurpose** [1] - 9:17
**must** [13] - 7:25, 8:1, 8:9, 9:1, 9:3, 23:21, 52:4, 55:9, 55:18, 58:8, 67:19, 71:2, 72:8
**myth** [1] - 70:10

## N

**name** [4] - 3:13, 7:5,

17:9, 69:7
**narrows** [1] - 12:5
**nature** [1] - 70:19
**navigation** [1] - 55:3
**necessarily** [3] - 10:19, 11:5, 46:6
**necessary** [5] - 10:6, 11:7, 68:23, 70:16, 71:18
**need** [16] - 6:6, 7:23, 12:10, 13:22, 13:23, 16:8, 21:3, 23:4, 36:20, 41:12, 42:11, 42:12, 53:9, 64:16, 65:13
**needs** [3] - 64:17, 64:18
**neglected** [2] - 42:2, 71:7
**negligent** [2] - 4:4, 46:18
**negligently** [1] - 63:16
**NELSON** [1] - 2:4
**Netherlands** [1] - 31:20
**never** [6] - 29:14, 41:24, 52:2, 57:1, 60:24, 62:3
**NEW** [2] - 1:7, 2:11
**New** [11] - 1:16, 7:14, 19:8, 19:17, 23:9, 26:3, 29:3, 31:22, 34:2, 69:15, 69:22
**newly** [1] - 68:8
**next** [2] - 11:12, 53:17
**nexus** [7] - 7:25, 8:11, 9:3, 10:19, 10:21, 67:21, 68:23
**nice** [1] - 56:24
**nine** [2] - 37:5, 40:6
**Ninth** [4] - 10:11, 11:16, 11:17, 11:21
**no-brainer** [1] - 72:21
**nobody** [2] - 55:14, 64:19
**non** [3] - 61:10, 61:15, 62:9
**non-flood** [1] - 61:15
**non-floodwaters** [2] - 61:10, 62:9
**none** [1] - 5:4
**normal** [2] - 31:6, 71:25
**normally** [2] - 31:15, 31:17
**north** [2] - 39:8, 39:11
**note** [2] - 31:23, 32:13
**nothing** [6] - 23:4, 28:8, 35:13, 39:14, 39:15, 54:22

**notice** [3] - 8:22, 39:7, 60:4
**noticed** [1] - 22:17
**notion** [1] - 70:7
**November** [2] - 33:18, 62:23
**nuance** [1] - 32:9
**nuances** [1] - 4:24
**number** [5] - 3:10, 14:2, 16:3, 43:15, 48:1
**numbered** [1] - 73:18
**nuts** [1] - 34:14
**nutshell** [2] - 15:25, 24:25

## O

**object** [1] - 71:16
**objection** [2] - 70:2, 71:15
**obliterated** [1] - 66:21
**obsolete** [1] - 35:13
**obviously** [2] - 21:11, 71:5
**occasions** [2] - 51:23, 64:5
**occurred** [8] - 4:7, 5:15, 32:18, 46:25, 47:1, 64:18, 64:19, 64:23
**occurrence** [1] - 38:18
**occurring** [2] - 5:10, 33:18
**OF** [4] - 1:1, 1:10, 1:18
**office** [2] - 50:13
**officer** [1] - 45:9
**OFFICIAL** [1] - 2:10
**official** [1] - 68:7
**Official** [2] - 73:13, 73:23
**old** [1] - 32:5
**omit** [1] - 24:11
**omitting** [1] - 24:19
**on...as** [1] - 39:4
**once** [2] - 53:16, 68:6
**One** [1] - 60:5
**one** [40] - 4:9, 4:10, 5:12, 9:19, 10:3, 11:1, 11:20, 14:24, 22:2, 22:14, 24:11, 25:9, 25:19, 25:22, 27:10, 27:19, 34:19, 34:20, 35:25, 37:22, 43:13, 46:12, 49:13, 51:21, 53:14, 55:8, 56:16, 58:10, 58:18, 60:1, 63:2, 64:11, 65:9, 66:12, 67:20,

70:11, 72:13, 72:25
**opened** [1] - 57:7
**opinion** [5] - 22:19, 28:4, 29:18, 29:23, 42:24
**opportunity** [2] - 64:14, 64:25
**opposing** [2] - 37:25, 57:3
**opposite** [1] - 56:9
**opposition** [1] - 40:23
**options** [1] - 22:10
**oral** [1] - 66:7
**ORDER** [1] - 3:4
**order** [6] - 4:11, 7:24, 9:2, 45:13, 63:25, 65:13
**original** [3] - 19:24, 19:25, 23:14
**ORLEANS** [2] - 1:7, 2:11
**Orleans** [50] - 1:16, 4:2, 7:14, 15:11, 15:16, 16:18, 17:17, 18:4, 18:17, 19:8, 19:17, 20:23, 22:9, 23:9, 24:2, 26:3, 29:3, 31:3, 31:7, 31:22, 32:3, 34:2, 34:11, 44:12, 47:18, 48:11, 49:10, 50:4, 51:7, 51:13, 51:20, 56:11, 57:16, 57:19, 58:23, 59:15, 63:11, 63:15, 63:21, 65:22, 65:25, 66:4, 66:15, 67:17, 69:8, 69:15, 69:19, 69:22
**otherwise** [1] - 31:15
**outfall** [30] - 4:1, 8:18, 15:9, 15:11, 17:11, 17:22, 17:24, 23:9, 23:11, 23:17, 23:21, 24:12, 24:14, 24:18, 24:23, 26:5, 34:7, 38:14, 39:14, 43:8, 44:16, 45:16, 46:7, 48:20, 50:22, 68:22, 69:3, 70:15, 71:2
**outfalls** [1] - 50:5
**outs** [1] - 34:14
**overall** [1] - 48:20
**overflow** [7] - 22:17, 22:19, 22:21, 28:9, 28:10, 28:13
**Overflow** [1] - 65:3
**overflows** [1] - 31:17
**overtopping** [1] - 46:22
**own** [9] - 16:3, 27:7, 30:1, 40:5, 42:9,

47:20, 48:16, 48:17, 60:23
**owned** [1] - 59:16

## P

**P.M** [1] - 1:7
**p.m** [1] - 73:5
**P.O** [1] - 1:20
**page** [2] - 34:5, 51:5
**pages** [1] - 3:24
**paid** [9] - 21:12, 34:1, 34:11, 56:20, 58:24, 59:2, 59:16, 63:12, 67:8
**papers** [12] - 14:20, 22:2, 27:22, 33:21, 34:5, 34:24, 35:2, 35:7, 53:14, 53:15, 57:3, 60:1
**paragraph** [1] - 7:12
**parallel** [28] - 4:19, 14:11, 14:16, 14:17, 15:6, 15:20, 16:17, 17:3, 17:7, 17:16, 22:8, 23:16, 24:9, 24:10, 24:14, 24:17, 48:15, 49:7, 49:10, 50:3, 61:1, 69:6, 69:17, 70:1, 70:15, 70:16
**paralleling** [1] - 55:19
**parcel** [1] - 70:22
**Parish** [5] - 32:2, 32:3, 65:22, 66:4, 67:17
**part** [30] - 12:17, 13:8, 13:23, 17:6, 17:25, 18:19, 18:22, 18:24, 19:24, 19:25, 21:9, 21:24, 23:3, 25:23, 27:2, 33:11, 34:22, 44:15, 45:4, 48:20, 48:24, 57:16, 62:8, 67:6, 67:9, 70:9, 70:22
**particular** [8] - 15:6, 16:22, 17:18, 18:2, 19:18, 32:7, 32:13, 68:1
**particularly** [1] - 15:11
**parties** [1] - 63:1
**parts** [3] - 66:25, 67:8
**passed** [1] - 47:3
**past** [1] - 30:16
**PAUL** [1] - 2:7
**pay** [3] - 47:15, 47:17, 54:21
**penny** [2] - 34:4, 34:5
**people** [4] - 29:12,

30:9, 33:4, 35:9
**Pepper** [2] - 73:12, 73:22
**PEPPER** [1] - 2:10
**percent** [9] - 31:4, 34:2, 34:9, 34:10, 40:8, 40:9, 44:3, 47:15, 56:20
**perfectly** [1] - 69:4
**perform** [1] - 59:21
**performed** [5] - 9:9, 9:12, 22:3, 46:23
**performing** [1] - 70:19
**perhaps** [5] - 9:14, 9:17, 17:15, 53:17
**period** [1] - 17:2
**permit** [27] - 5:12, 5:19, 25:4, 25:7, 25:11, 25:17, 25:18, 26:25, 27:8, 51:21, 54:15, 54:24, 55:8, 55:21, 55:25, 59:22, 60:6, 63:13, 63:16, 63:24, 64:1, 64:2, 64:5, 64:6, 64:8, 64:9, 66:10
**permitted** [1] - 57:1
**permitting** [1] - 25:22
**permutations** [2] - 4:13, 21:3
**PERRY** [1] - 2:6
**person** [2] - 24:13, 35:16
**persons** [1] - 37:5
**persuade** [2] - 11:1, 44:1
**persuasive** [2] - 10:25, 28:6
**pertinent** [1] - 70:16
**PETERSON** [1] - 1:23
**physical** [2] - 68:9, 68:12
**physics** [1] - 3:23
**pick** [1] - 43:25
**picture** [4] - 21:18, 31:21, 31:22, 32:17
**pictures** [1] - 66:22
**piece** [2] - 70:9
**Pierce** [1] - 52:19
**pile** [10] - 34:1, 34:10, 48:2, 48:3, 48:7, 56:21, 57:6, 63:22, 64:10
**piling** [2] - 35:4, 59:15
**place** [9] - 4:14, 5:9, 14:1, 15:6, 20:7, 53:23, 62:19, 70:12
**places** [2] - 7:11, 16:3
**plainly** [1] - 7:10
**plaintiff** [7] - 5:24,

25:17, 52:21, 53:2, 65:12, 67:18
**plaintiffs** [14] - 3:14, 4:14, 5:3, 7:21, 8:14, 9:1, 21:21, 24:4, 26:16, 27:12, 29:21, 37:7, 64:13, 65:25
**PLAINTIFFS** [1] - 1:15
**plaintiffs'** [9] - 3:13, 15:25, 16:3, 23:20, 24:16, 27:2, 27:22, 28:1, 67:7
**plan** [62] - 4:19, 4:20, 13:25, 14:1, 14:3, 14:4, 14:5, 14:6, 14:11, 14:14, 14:16, 14:18, 14:21, 14:24, 15:2, 15:4, 15:5, 15:6, 15:7, 15:21, 15:22, 17:3, 17:7, 18:3, 18:6, 21:10, 37:10, 39:2, 39:3, 39:9, 39:20, 40:5, 40:7, 40:9, 40:21, 41:11, 41:12, 41:15, 41:23, 42:16, 42:18, 42:23, 43:8, 43:17, 47:7, 48:21, 49:4, 51:24, 52:2, 68:1, 68:13, 69:9
**planet** [1] - 58:8
**planned** [1] - 70:4
**planning** [2] - 18:9, 69:2
**plans** [2] - 16:17, 69:18
**plates** [1] - 39:4
**pled** [1] - 8:23
**plugging** [1] - 29:15
**point** [23] - 11:12, 19:23, 20:1, 21:19, 23:1, 25:22, 28:20, 29:15, 30:3, 30:17, 32:19, 33:24, 35:23, 35:24, 38:23, 45:21, 46:12, 51:21, 56:1, 66:6, 70:2, 72:16
**pointed** [2] - 45:15, 60:9, 62:1
**pointing** [1] - 62:24
**points** [2] - 23:5, 65:12
**policies** [2] - 22:15, 27:4
**policy** [1] - 26:21
**pondering** [1] - 6:9
**Pontchartrain** [17] - 4:18, 12:15, 13:10, 13:15, 13:17, 19:1, 19:4, 19:11, 19:12,

19:14, 21:5, 23:10, 24:24, 38:22, 41:23, 60:12, 68:3
**portion** [2] - 59:18, 63:3
**poses** [1] - 42:20
**posit** [1] - 20:6
**position** [4] - 8:7, 18:21, 26:13, 28:21
**possess** [1] - 58:13
**possessed** [1] - 68:17
**possible** [3] - 9:11, 58:4, 72:1
**possibly** [1] - 19:3
**post** [1] - 11:14
**potential** [2] - 60:18, 64:21
**power** [1] - 46:2
**PowerPoint** [1] - 71:13
**POYDRAS** [1] - 2:10
**pray** [1] - 64:13
**pre** [1] - 71:25
**pre-Katrina** [1] - 71:25
**preceded** [1] - 16:13
**precedent** [1] - 7:23
**precious** [1] - 72:4
**precise** [4] - 4:23, 6:9, 6:15, 66:7
**precisely** [4] - 9:9, 48:23, 53:9, 62:12
**prefatory** [1] - 3:18
**preferred** [1] - 16:18
**prelude** [1] - 11:6
**premise** [2] - 24:16, 27:2
**prepared** [1] - 47:19
**present** [1] - 58:3
**presentation** [1] - 71:13
**presently** [1] - 72:17
**president** [1] - 36:8
**press** [2] - 43:6
**pressure** [1] - 57:5
**prevents** [1] - 68:7
**PRICE** [1] - 1:24
**primary** [1] - 6:13
**problem** [6] - 43:5, 46:15, 50:16, 53:24, 56:5, 65:4
**problems** [3] - 17:22, 24:22, 42:20
**proceed** [2] - 14:3, 14:4
**proceeding** [1] - 16:16
**proceedings** [3] - 30:4, 73:6, 73:17
**PROCEEDINGS** [3] - 1:10, 2:14, 3:1

**process** [1] - 32:12
**produce** [1] - 42:17
**PRODUCED** [1] - 2:14
**Professional** [1] - 73:13
**profit** [1] - 31:11
**program** [1] - 52:5
**project** [66] - 5:5, 5:6, 5:14, 7:9, 8:1, 8:12, 9:3, 9:4, 9:12, 9:13, 9:17, 9:18, 9:24, 10:13, 10:15, 10:16, 10:20, 10:21, 11:9, 11:19, 11:21, 12:6, 13:2, 13:8, 17:25, 18:22, 18:24, 19:9, 19:19, 21:5, 21:24, 23:4, 24:24, 31:14, 31:19, 33:11, 35:17, 37:23, 38:1, 38:8, 38:11, 38:12, 41:2, 41:20, 48:19, 48:21, 50:14, 53:23, 54:22, 56:22, 58:19, 58:21, 59:19, 60:3, 62:10, 63:2, 64:8, 66:9, 66:14, 67:5, 67:10, 67:21, 67:25, 68:6, 68:24
**Project** [1] - 13:11
**projects** [2] - 9:21, 64:24
**proof** [5] - 47:17, 52:25, 53:2, 53:5, 53:7
**properties** [1] - 43:18
**property** [4] - 32:7, 32:8, 53:4, 63:1
**proportions** [1] - 67:16
**proposed** [5] - 39:2, 43:5, 58:4, 72:20, 73:3
**proposition** [3] - 10:8, 10:10, 42:7
**prosecution** [1] - 13:25
**protect** [4] - 19:9, 26:8, 68:3, 71:1
**protected** [8] - 4:4, 24:1, 24:3, 24:8, 25:23, 39:7, 39:9
**protecting** [2] - 23:9, 26:3
**Protection** [2] - 13:11, 56:19
**protection** [63] - 4:18, 4:19, 7:15, 13:15, 14:11, 14:16, 14:17, 15:6, 15:21, 16:17,

17:3, 17:7, 17:16, 17:19, 22:8, 23:16, 23:23, 23:24, 24:9, 24:11, 24:17, 24:18, 24:19, 34:7, 44:20, 47:16, 48:15, 48:21, 49:5, 49:8, 49:10, 50:4, 51:7, 51:24, 52:5, 53:15, 53:16, 53:23, 54:23, 54:25, 55:19, 56:22, 57:16, 58:9, 59:19, 60:14, 66:2, 66:24, 67:10, 67:13, 68:2, 68:19, 68:24, 69:6, 69:17, 70:1, 70:8, 70:14, 70:17, 70:22
**prove** [2] - 37:21, 53:19
**provide** [2] - 50:3, 68:18
**Provided** [2] - 36:25, 37:1
**provided** [1] - 50:14
**providing** [3] - 23:24, 68:7, 68:22
**public** [7] - 27:8, 59:23, 59:25, 60:4, 60:6, 64:17
**pumping** [2] - 32:24, 43:23
**pumps** [2] - 32:23, 43:22
**purely** [1] - 66:10
**purpose** [6] - 11:9, 31:9, 31:14, 33:8, 37:1, 71:17
**purposes** [7] - 4:12, 9:19, 10:3, 12:14, 17:13, 21:3, 43:25
**pursuant** [1] - 59:22
**pursue** [2] - 14:14, 68:1
**purview** [1] - 26:8
**put** [10] - 18:18, 27:6, 34:1, 37:16, 38:19, 43:22, 44:9, 54:8, 56:21, 62:22
**putative** [1] - 7:18
**putting** [2] - 18:11, 18:15

## Q

**quality** [2] - 40:2, 44:20
**questions** [4] - 6:8, 6:11, 25:2, 29:8
**quick** [2] - 22:16,

57:22
**quintessential** [2] - 5:20, 25:8
**quite** [2] - 5:17, 30:15
**quotation** [1] - 28:3
**quote** [4] - 7:14, 22:5, 24:22, 26:18
**quoted** [3] - 22:17, 28:9

### R

**rain** [1] - 32:25
**raise** [2] - 18:9, 43:13
**raised** [3] - 17:10, 22:10, 66:2
**raises** [2] - 41:18, 48:22
**raising** [12] - 13:17, 14:7, 14:22, 16:21, 16:25, 18:3, 18:6, 22:6, 24:5, 48:23, 50:5
**ran** [1] - 40:23
**rather** [5] - 6:2, 22:5, 24:1, 30:1, 55:9
**RE** [1] - 1:4
**re** [1] - 3:8
**read** [11] - 3:24, 3:25, 5:2, 10:18, 12:2, 12:22, 33:21, 35:2, 44:24, 49:2, 52:14
**reading** [5] - 7:22, 12:4, 14:20, 50:1
**ready** [1] - 52:14
**real** [5] - 3:25, 11:18, 29:5, 40:7, 57:22
**reality** [1] - 18:23
**really** [25] - 5:22, 11:18, 21:8, 22:21, 28:8, 28:24, 30:13, 30:14, 31:20, 34:13, 36:11, 36:13, 41:10, 42:15, 43:18, 44:2, 44:25, 46:25, 47:1, 47:6, 60:16, 60:20, 64:19, 67:9
**Realtime** [1] - 73:12
**reason** [8] - 24:2, 24:7, 32:23, 35:7, 54:4, 54:5, 54:24, 69:7
**reasoning** [1] - 63:18
**reasons** [1] - 7:18
**reauthorization** [2] - 41:24, 42:12
**rebuttal** [2] - 6:16, 6:24
**recapitulated** [1] -

23:18
**recent** [1] - 28:4
**recently** [1] - 57:20
**reclaim** [1] - 31:8
**reclamation** [2] - 31:14, 31:19
**recognize** [1] - 43:7
**recognizes** [1] - 35:25
**recommended** [2] - 42:18, 42:23
**reconsider** [1] - 45:10
**record** [5] - 27:18, 59:23, 64:14, 65:5, 73:17
**RECORDED** [1] - 2:14
**rectify** [1] - 72:25
**reduce** [2] - 4:9, 56:13
**reduced** [2] - 3:23, 10:12
**reevaluation** [1] - 43:7
**refer** [3] - 17:21, 26:16, 35:10
**reference** [4] - 15:17, 41:15, 45:16, 52:13
**referenced** [1] - 17:9
**referred** [2] - 14:21, 68:16
**refers** [1] - 18:1
**reflect** [1] - 44:5
**refused** [1] - 51:2
**regard** [7] - 6:11, 14:15, 28:7, 31:13, 41:1, 41:3, 54:1
**regardless** [2] - 65:22, 70:21
**region** [1] - 19:10
**Registered** [1] - 73:12
**regulation** [2] - 25:9, 27:5
**regulations** [3] - 26:13, 26:19, 58:8
**related** [1] - 11:19, 12:6, 19:7
**relates** [4] - 52:18, 60:16, 60:17
**relative** [1] - 65:20
**relevant** [1] - 22:22
**relied** [1] - 16:10
**relocations** [1] - 43:15
**rely** [2] - 10:7, 10:9
**remains** [1] - 26:18
**remanded** [1] - 11:17
**remarkable** [2] - 59:12, 60:25
**remarkably** [1] - 61:18
**remarks** [1] - 3:18
**remember** [7] - 43:9, 44:8, 50:1, 52:15, 55:12, 56:12, 60:9

**reminded** [1] - 25:21
**reminding** [1] - 27:20
**remnant** [1] - 35:13
**remotely** [1] - 33:10
**remove** [1] - 57:17
**removed** [1] - 56:23
**render** [1] - 72:10
**reply** [1] - 25:25
**report** [5] - 15:24, 16:13, 17:21, 24:21, 49:3
**reporter** [1] - 42:5
**Reporter** [5] - 73:12, 73:13, 73:14, 73:23
**REPORTER** [1] - 2:10
**REPORTER'S** [1] - 73:10
**represent** [1] - 7:5
**representation** [1] - 8:4
**request** [1] - 64:13
**require** [6] - 13:17, 14:6, 38:17, 39:24, 42:24, 68:1
**required** [6] - 55:1, 55:22, 58:8, 59:21, 63:23, 68:2
**requirement** [1] - 10:20
**requires** [3] - 5:6, 37:8, 66:23
**requisites** [1] - 53:8
**res** [1] - 29:20
**reservations** [1] - 43:3
**reserve** [1] - 29:8
**resisted** [1] - 17:17
**resolving** [1] - 24:22
**respect** [5] - 22:1, 25:1, 26:11, 28:3, 64:11
**respectfully** [2] - 53:6, 53:20
**respond** [1] - 48:25
**responding** [1] - 6:19
**rest** [1] - 64:24
**rested** [1] - 66:15
**result** [6] - 7:14, 8:13, 8:17, 23:11, 27:15, 67:19
**resulted** [2] - 17:18, 48:11
**resulting** [1] - 7:8, 7:20
**retrospect** [1] - 45:7
**reversed** [1] - 11:16
**revisited** [1] - 15:4
**rights** [2] - 39:25, 40:3
**Rigolets** [1] - 44:5
**rise** [1] - 3:6

**Rivers** [2] - 55:1, 59:23
**road** [2] - 45:19, 46:13
**Robert** [1] - 38:16
**ROBERT** [1] - 2:3
**Robertson** [1] - 29:21
**ROBIN** [1] - 1:19
**Robin** [5] - 3:15, 7:5, 47:18, 48:9, 54:23
**roller** [1] - 57:9
**ROOM** [1] - 2:10
**rope** [1] - 35:16
**rotted** [1] - 61:21
**roughly** [1] - 47:9
**RPR** [2] - 2:10, 73:22
**Rubin** [2] - 37:11, 37:14
**rug** [2] - 45:19, 46:13
**ruining** [1] - 63:16
**rule** [2] - 53:11, 72:7
**ruled** [1] - 33:7
**run** [2] - 46:24, 57:22
**Rush** [1] - 41:17

### S

**sacrosanct** [1] - 52:4
**safe** [1] - 35:18
**safety** [3] - 26:15, 27:6, 56:15
**Saffir** [1] - 62:5
**Saffir-Simpson** [1] - 62:5
**sake** [1] - 49:14
**salient** [1] - 11:5
**Sam** [1] - 59:2
**sandbagging** [1] - 38:17
**sandbags** [2] - 38:19, 43:9
**satisfied** [1] - 9:2
**satisfy** [1] - 14:2
**save** [2] - 6:16, 6:24
**saw** [1] - 9:7
**scale** [1] - 62:5
**scenario** [1] - 9:16
**schedule** [1] - 6:15
**scientific** [1] - 27:4
**SCOTT** [1] - 1:24
**screen** [3] - 30:19, 30:20, 30:22
**scrutiny** [1] - 67:1
**seawall** [1] - 31:2
**seawalls** [2] - 31:8, 31:14
**second** [5] - 8:1, 36:23, 45:1, 58:14, 65:9
**secondary** [3] - 10:24,

10:25, 13:7
**secretary** [1] - 50:2
**SECTION** [1] - 1:6
**Section** [1] - 7:24
**section** [2] - 9:2, 37:2
**see** [12] - 9:25, 11:1, 17:20, 30:19, 31:3, 32:14, 32:18, 44:25, 56:23, 60:25, 64:1, 70:9
**seem** [1] - 34:13
**seepage** [2] - 61:19, 61:20
**sees** [1] - 50:13
**Senator** [3] - 41:19, 49:1, 50:13
**sense** [3] - 21:20, 26:24, 67:7
**sentence** [2] - 36:24, 53:14
**separate** [2] - 6:2, 63:19
**separately** [1] - 6:7
**September** [1] - 31:24
**serious** [1] - 43:3
**set** [7] - 7:10, 8:7, 15:24, 15:25, 16:10, 16:12, 31:8
**seven** [2] - 51:23, 57:23
**severe** [1] - 40:1
**severely** [1] - 40:4
**Sewerage** [8] - 34:3, 54:9, 55:21, 55:22, 61:6, 63:9, 63:13
**shall** [3] - 15:14, 15:21, 39:2
**shape** [1] - 56:22
**share** [1] - 7:18
**sheet** [12] - 34:1, 34:10, 35:4, 48:2, 48:3, 48:7, 56:21, 57:6, 59:15, 63:22, 64:10
**shore** [1] - 44:9
**short** [2] - 4:17, 68:16
**shortly** [1] - 21:7
**show** [7] - 31:1, 34:24, 39:6, 53:12, 53:22, 62:8
**showed** [2] - 18:8, 66:22
**showing** [1] - 53:13
**shown** [4] - 8:19, 39:4, 67:19
**shut** [1] - 41:4
**sick** [1] - 48:12
**side** [20] - 18:11, 24:12, 34:19, 34:20, 34:21, 36:1, 38:22,

56:7, 56:11, 56:14, 56:16, 56:17, 57:19, 58:10, 58:11, 58:23, 59:1, 72:21

**sides** [1] - 59:6

**significant** [4] - 44:17, 48:8, 50:7, 50:25, 71:5

**similar** [2] - 61:18, 63:18

**simple** [1] - 39:10

**simplistic** [1] - 34:13

**simply** [1] - 26:13

**Simpson** [1] - 62:5

**simultaneous** [1] - 58:15

**single** [7] - 32:5, 34:5, 36:23, 36:24, 37:3, 52:16, 53:8

**sit** [1] - 6:6

**situation** [3] - 58:7, 61:24, 69:1

**six** [1] - 40:6

**skip** [1] - 46:21

**skullduggery** [1] - 64:22

**slightly** [1] - 12:5

**slowed** [1] - 71:25

**Smith** [9] - 3:15, 6:23, 7:2, 7:5, 52:11, 53:11, 62:6, 65:8, 72:15

**SMITH** [54] - 1:19, 3:15, 6:25, 7:4, 8:6, 9:15, 10:5, 10:9, 10:22, 11:11, 12:16, 12:19, 13:9, 13:14, 14:13, 14:17, 14:21, 15:18, 15:23, 16:8, 17:4, 17:8, 18:23, 19:2, 19:6, 19:12, 19:16, 19:20, 20:1, 20:5, 20:14, 20:19, 20:22, 20:25, 21:15, 21:18, 21:23, 22:1, 23:7, 25:6, 25:15, 25:20, 26:2, 26:11, 27:20, 28:19, 29:3, 29:7, 65:11, 66:19, 71:16, 72:12, 72:23, 73:1

**so-called** [3] - 14:11, 14:16, 52:1

**Society** [1] - 47:25

**sold** [1] - 31:10

**sole** [1] - 33:7

**solid** [1] - 56:24

**solitary** [1] - 36:23

**solution** [2] - 43:5, 72:19

**someone** [2] - 26:4, 55:2

**sometimes** [2] - 4:6, 29:12

**soon** [1] - 72:1

**sorry** [6] - 40:22, 57:20, 63:10, 72:13, 72:15

**sort** [2] - 17:14, 22:15

**south** [2] - 39:12, 44:9

**specific** [6] - 6:11, 15:15, 21:20, 23:5, 25:10, 26:14, 38:15

**specifically** [8] - 5:8, 15:12, 20:3, 21:11, 23:15, 23:22, 46:10, 48:24

**specification** [2] - 60:23, 62:3

**specifics** [1] - 19:23

**specify** [1] - 22:10

**speed** [2] - 60:17

**spend** [8] - 34:4, 36:17, 40:10, 50:16, 50:18, 51:11, 51:14, 60:19

**spent** [3] - 34:7, 51:11, 51:13

**spoken** [1] - 68:25

**sponsors** [1] - 17:9

**square** [1] - 40:13

**St** [1] - 44:12

**stability** [4] - 55:18, 55:23, 56:2, 56:5

**stand** [3] - 30:1, 41:18, 62:22

**standard** [2] - 8:7, 56:3

**standards** [3] - 26:16, 47:23, 56:2

**standpoint** [1] - 46:5

**stands** [1] - 42:7

**STANWOOD** [1] - 1:11

**start** [3] - 41:9, 41:11, 55:6

**started** [5] - 33:18, 33:19, 54:11, 54:18, 57:6

**state** [2] - 11:5, 12:8

**statement** [2] - 8:2, 9:6

**states** [1] - 11:2

**STATES** [3] - 1:1, 1:11, 1:18

**States** [13] - 3:16, 7:5, 7:6, 14:2, 16:10, 34:4, 36:7, 36:10, 49:7, 52:6, 52:7, 73:14, 73:24

**States'** [1] - 25:1

**States's** [1] - 8:6

**STATION** [1] - 1:20

**statute** [1] - 68:6

**statutes** [1] - 26:19

**stayed** [1] - 28:25

**STENOGRAPHY** [1] - 2:14

**Stephens** [1] - 35:11

**stick** [1] - 6:14

**still** [1] - 5:12

**stop** [3] - 28:13, 45:7, 53:3

**storm** [7] - 5:10, 5:15, 20:8, 23:11, 23:12, 27:24, 66:21

**storms** [1] - 17:13

**straight** [1] - 58:17

**Street** [28] - 1:16, 5:8, 15:19, 16:17, 16:23, 18:6, 18:8, 20:13, 20:14, 24:7, 24:20, 27:14, 32:17, 32:20, 34:8, 34:20, 36:20, 51:13, 52:10, 54:1, 54:5, 54:10, 56:19, 65:15, 69:10, 69:11, 69:17, 70:4

**STREET** [1] - 2:10

**strengthen** [1] - 43:13

**stretch** [1] - 29:5

**stretcher** [2] - 66:20, 70:8

**strict** [1] - 32:10

**strike** [2] - 6:3, 16:1

**striking** [1] - 6:5

**stringent** [1] - 47:24

**struck** [1] - 24:4

**structure** [2] - 62:11, 70:11

**structures** [2] - 70:20

**studies** [1] - 45:9

**study** [7] - 37:18, 40:25, 41:3, 42:17, 42:20, 43:7

**stuff** [4] - 6:4, 30:18, 36:14, 40:10

**stupidity** [1] - 68:5

**subcategory** [1] - 15:21

**subject** [3] - 22:13, 23:2, 23:5

**substantially** [1] - 43:5

**substitute** [2] - 41:15, 46:22

**subsume** [1] - 64:7

**subterranean** [2] - 11:24, 61:14

**subtract** [1] - 30:5

**suffered** [1] - 8:14

**suggest** [4] - 53:6, 53:20, 54:24, 56:9

**suggesting** [2] - 45:11, 45:12

**suing** [1] - 61:21

**summary** [3] - 37:15, 37:20, 53:18

**superseding** [2] - 7:11, 8:9

**supervision** [2] - 20:12, 21:12

**supplied** [1] - 71:13

**supporting** [1] - 4:22

**supposed** [3] - 25:11, 39:9, 62:4

**Supreme** [10] - 7:22, 11:4, 11:23, 12:8, 18:14, 22:20, 32:11, 42:1, 72:4, 72:9

**surge** [12] - 5:10, 5:15, 13:20, 20:8, 23:12, 27:24, 32:4, 38:23, 39:10, 60:18, 62:3

**surges** [1] - 15:8

**surrounding** [1] - 14:7

**swears** [1] - 41:18

**swept** [1] - 15:20

**swing** [1] - 35:16

**switch** [1] - 35:19

**synonymous** [1] - 14:15

**system** [20] - 7:15, 22:8, 23:16, 24:9, 24:11, 40:4, 66:24, 67:13, 67:14, 67:15, 68:2, 69:6, 69:14, 69:17, 69:21, 70:1, 70:8, 70:17, 70:23, 71:1

**systems** [1] - 34:14

# T

**T's** [1] - 37:20

**talks** [2] - 60:18, 62:13

**taxpayers'** [2] - 69:13, 69:14

**tend** [1] - 29:2

**tends** [1] - 56:5

**tense** [1] - 58:3

**terminology** [1] - 50:20

**test** [2] - 10:12, 46:22

**tested** [1] - 62:22

**testify** [1] - 62:22

**testimony** [3] - 32:22, 61:5, 62:21

**Thanksgiving** [1] - 61:7

**THE** [132] - 1:11, 1:15, 1:18, 3:6, 3:7, 3:8, 3:11, 3:17, 6:20, 6:23, 7:2, 8:2, 9:7, 9:25, 10:7, 10:18, 10:24, 11:15, 12:17, 12:20, 13:13, 14:8, 14:15, 14:19, 15:10, 15:19, 16:5, 17:1, 17:5, 18:10, 18:25, 19:3, 19:11, 19:15, 19:18, 19:22, 20:2, 20:10, 20:18, 20:21, 20:23, 21:2, 21:16, 21:22, 21:25, 22:13, 25:4, 25:7, 25:16, 25:25, 26:10, 27:10, 28:6, 29:2, 29:5, 29:9, 29:12, 29:17, 30:5, 30:10, 30:21, 30:23, 30:24, 33:20, 34:12, 34:17, 34:19, 35:21, 36:13, 36:17, 37:4, 37:12, 37:22, 38:5, 38:10, 39:20, 42:5, 43:10, 45:14, 45:19, 45:24, 46:4, 46:13, 46:17, 47:2, 49:9, 49:16, 49:18, 49:21, 49:24, 50:1, 52:12, 52:19, 52:22, 53:11, 54:3, 54:12, 54:14, 54:17, 55:4, 55:7, 55:12, 57:19, 58:14, 58:21, 58:23, 59:1, 59:4, 59:6, 59:8, 59:10, 59:13, 59:18, 61:9, 61:13, 61:22, 62:6, 62:18, 62:24, 63:6, 65:7, 66:6, 71:4, 71:9, 71:15, 71:20, 71:23, 72:13, 72:22, 72:24, 73:2, 73:4

**themselves** [5] - 30:15, 41:10, 42:10, 42:11, 47:8

**theory** [2] - 13:19, 54:1

**thereabouts** [1] - 31:7

**thereafter** [1] - 21:7

**therefore** [1] - 3:22

**they've** [3] - 30:13, 30:18, 43:8

**thick** [2] - 48:3

**thinking** [3] - 41:10, 41:11, 54:1

**third** [4] - 6:4, 43:21, 63:1, 65:24

**three** [19] - 3:25,

12:17, 17:10, 17:24, 18:16, 18:19, 20:25, 21:13, 23:23, 24:12, 24:13, 31:24, 31:25, 44:3, 54:8, 61:3, 65:23, 68:22, 69:3
**threshold** [1] - 13:21
**throughout** [2] - 7:11, 8:21
**THURSDAY** [2] - 1:7, 3:2
**Thursday** [1] - 73:5
**tidal** [2] - 31:6, 33:1
**timeline** [2] - 4:6, 6:9
**tiny** [1] - 64:20
**tip** [1] - 64:20
**tired** [1] - 48:12
**TO** [1] - 3:4
**today** [2] - 6:22, 31:2
**Today** [1] - 35:13
**together** [1] - 27:7
**tomorrow** [1] - 33:8
**ton** [1] - 6:10
**took** [5] - 4:14, 5:9, 14:8, 54:17, 57:20
**top** [4] - 29:12, 64:4, 64:10, 67:12
**torn** [1] - 70:8
**TORTS** [1] - 1:19
**touch** [1] - 46:12
**transcript** [1] - 73:16
**TRANSCRIPT** [2] - 1:10, 2:14
**treat** [4] - 17:24, 48:20, 58:10, 58:11
**trees** [1] - 61:8
**true** [13] - 6:20, 9:22, 16:6, 20:23, 23:8, 23:9, 34:24, 37:8, 37:9, 46:4, 69:4, 73:15
**truly** [2] - 5:4, 28:14
**truth** [1] - 68:25
**try** [1] - 6:14
**trying** [1] - 52:25
**turned** [1] - 47:10
**two** [26] - 5:16, 5:18, 7:23, 16:21, 17:2, 17:5, 17:8, 17:19, 22:16, 23:3, 24:18, 39:1, 42:18, 44:2, 54:20, 63:19, 64:5, 64:9, 65:12, 65:24, 67:18, 67:21, 69:7, 69:22, 69:25, 70:3

## U

**U.S** [2] - 1:18, 42:3

**ultimately** [4] - 17:6, 18:13, 63:6, 66:18
**unable** [1] - 14:2
**Uncle** [1] - 59:2
**undeniable** [1] - 23:10
**undeniably** [1] - 66:5
**Under** [1] - 36:3
**under** [23] - 4:5, 7:22, 8:7, 14:3, 14:4, 18:10, 20:12, 21:12, 22:3, 26:19, 27:13, 28:14, 29:6, 35:18, 41:20, 42:19, 53:11, 55:1, 57:10, 62:2, 71:5, 71:18, 71:20
**underlays** [1] - 34:10
**underlying** [2] - 62:10, 66:18
**undermined** [4] - 61:16, 62:16, 63:12, 63:13
**undermines** [1] - 61:24
**undermining** [4] - 61:4, 62:18, 65:17, 66:17
**underneath** [2] - 34:9, 57:4
**underseepage** [3] - 33:18, 57:10, 67:2
**understood** [1] - 31:13
**undertook** [1] - 19:6
**underwater** [2] - 32:3, 57:7
**undoubtedly** [1] - 65:21
**unforeseeable** [1] - 68:8
**unfortunate** [1] - 64:12
**unfortunately** [1] - 71:24
**unified** [1] - 70:11
**UNITED** [3] - 1:1, 1:11, 1:18
**United** [15] - 3:16, 7:5, 7:6, 8:6, 14:2, 16:10, 25:1, 34:4, 36:7, 36:10, 49:7, 52:6, 52:7, 73:14, 73:24
**universal** [1] - 22:20
**unquestionably** [1] - 39:21
**unrelated** [1] - 11:21
**unseen** [1] - 68:8
**up** [15] - 3:19, 6:21, 7:3, 18:7, 24:1, 27:11, 29:9, 29:11, 45:9, 48:1, 48:2,

48:11, 56:10, 57:7, 71:25
**USC** [1] - 7:24
**utterly** [1] - 64:11

## V

**vague** [1] - 15:20
**various** [3] - 21:8, 34:14, 66:24
**vegetation** [1] - 32:19
**verbiage** [1] - 16:14
**versus** [1] - 42:2
**vest** [1] - 5:6
**via** [1] - 23:9
**Vicinity** [3] - 13:10, 19:14, 21:6
**view** [4] - 40:5, 64:22, 64:23, 64:24
**violate** [2] - 56:2, 56:3
**virtually** [2] - 56:3, 58:17
**virtue** [4] - 59:20, 70:12, 70:18
**visualized** [1] - 32:15
**volume** [1] - 17:11
**vulnerable** [1] - 40:1

## W

**Wait** [1] - 4:16
**wait** [1] - 49:11
**walk** [1] - 35:5
**wall** [17] - 33:6, 33:11, 33:13, 33:14, 33:17, 33:24, 33:25, 35:2, 48:2, 60:20, 60:21, 61:4, 62:4
**wholly** [1] - 11:20, 54:11
**walls** [7] - 22:5, 23:25, 39:25, 43:17, 43:19, 44:9, 47:20
**wants** [2] - 55:2, 57:13
**WARREN** [1] - 2:3
**Washington** [1] - 37:5
**WASHINGTON** [1] - 1:21
**water** [54] - 7:25, 11:25, 13:3, 20:7, 27:25, 31:1, 31:5, 31:15, 31:17, 31:23, 31:25, 32:4, 32:5, 32:7, 32:19, 32:24, 33:3, 33:5, 33:6, 33:8, 35:18, 36:19, 36:20, 38:2, 39:11, 55:3, 56:7, 56:16, 56:17, 57:4, 57:6, 57:7, 57:10, 58:11, 61:2, 61:4, 61:7,

61:13, 61:24, 61:25, 62:1, 62:13, 62:15, 62:16, 62:23, 63:20, 63:21, 65:14, 65:15, 65:17
**Water** [4] - 34:3, 54:10, 55:21, 55:22, 61:7, 63:9, 63:10, 63:14
**waters** [33] - 5:15, 5:23, 5:25, 8:1, 8:11, 8:18, 10:17, 12:24, 13:3, 27:13, 27:15, 27:17, 28:16, 28:22, 28:25, 29:6, 60:11, 61:10, 61:14, 61:15, 63:1, 65:20, 65:21, 65:23, 66:3, 66:16, 67:20, 67:21, 68:23, 70:24
**waterway** [1] - 20:7
**waterways** [1] - 19:7
**ways** [1] - 35:21
**weeks** [2] - 61:3, 61:4
**weigh** [1] - 25:12
**west** [4] - 39:8, 39:12, 57:25, 58:5
**whatsoever** [1] - 54:22
**WHEREUPON** [2] - 30:3, 73:5
**whole** [15] - 6:25, 21:4, 26:21, 38:8, 43:19, 50:11, 50:17, 57:9, 60:14, 66:20, 66:21, 67:1, 67:5, 67:6, 69:1
**wholly** - 11:20, 54:11
**widespread** [3] - 7:13, 8:17, 14:6
**WILLIAM** [1] - 2:6
**win** [2] - 13:4, 45:12
**wind** [3] - 53:21, 60:17
**withstand** [2] - 67:1, 67:15
**witness** [1] - 62:22
**woman's** [1] - 28:15
**wondering** [1] - 72:18
**word** [8] - 22:19, 28:9, 32:6, 34:17, 46:22, 46:23, 53:15, 58:7
**words** [13] - 10:1, 18:3, 18:5, 28:24, 32:11, 37:19, 39:5, 42:9, 42:21, 45:1, 50:23, 58:6, 70:14
**works** [3] - 66:4, 70:13, 70:14
**world** [3] - 40:18,

50:12, 59:24
**worsen** [1] - 56:5
**worst** [1] - 43:11
**write** [3] - 29:18, 29:22, 55:16
**writes** [1] - 51:19
**writing** [1] - 49:1
**wrote** [3] - 35:12, 45:5, 49:2

## Y

**yard** [1] - 61:8
**year** [4] - 19:21, 20:16, 20:20, 54:21
**years** [8] - 14:2, 30:16, 45:8, 54:20, 61:5, 64:9, 65:18, 66:16
**yourself** [2] - 47:17

## Z

**zero** [1] - 39:15