# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

IN RE KATRINA CANAL BREACHES                   CIVIL ACTION
CONSOLIDATED LITIGATION
                                               NO. 05-4182

PERTAINS TO:                                   SECTION "K"(2)
    *Armstrong,* No. 10-866
    *Entergy*, No. 10-77

### ORDER AND REASONS

On October 13, 2010, the Court held oral argument on three motions:

(1)    United States' Motion to Dismiss (Doc. 19993);

(2)    Entergy Plaintiffs' Motion for Partial Summary Judgment (Doc. 20033); and

(3)    Armstrong Plaintiffs' Opposition to Defendant's Motion to Dismiss or, in the

Alternative, for Summary Judgment (Doc. 20035).

The focus of these motions concerns certain claims brought by the MRGO Master Class Action

Plaintiffs ("Armstrong Plaintiffs") as alleged in the *Armstrong* matter and certain claims brought

by Entergy New Orleans, Inc. and Entergy Louisiana, L.L.C. (the "Entergy Companies") and

Hartford Steam Boiler Inspection and Insurance Company (" Hartford") (collectively referred to

as "Entergy Plaintiffs") in the *Entergy* matter. *Armstrong* is a re-filed version of the Master

Consolidated Class Action Complaint (Doc. 11471) as contemplated by this Court's previous

ruling on another Motion to Dismiss filed by the United States. *See* Order and Reasons,

February 2, 2010 (Doc. 19611). *Entergy* is a separate, non-class action suit brought by the

Entergy Plaintiffs, which suit has been consolidated into the *Katrina* umbrella, but will proceed

independently of the class action.

As the Court has described previously, the United States Army Corps of Engineers ("the Corps") contracted with Washington Group International, Inc. ("WGI") to clear abandoned industrial facilities and debris from the East Bank Industrial Area ("EBIA")  in preparation for the Corps to replace a lock on the Industrial Canal.   The EBIA is a 32-acre site located between Florida Avenue and Claiborne Avenue extending from the Inner Harbor Navigational Canal ("IHNC") or, as it is also known, the Industrial Canal to the floodwall at the Lower Ninth Ward. The EBIA was littered with assorted structures, contaminants, and debris that the Corps needed to remove before dredging a bypass channel that would operate while the Corps replaced the aforementioned lock.

Plaintiffs generally allege that the two floodwall failures on the east side of the IHNC, one at the northern end by Boland Marine site and the other near the southern end near  Saucer Marine site, occurred because of the Corps' "extensive excavation and subsurface activity [at that area], thereby undermining the integrity of the eastern shoreline of the IHNC abutting the Lower Ninth Ward of Orleans Parish, and ultimately contributing to the flooding caused in those areas by Hurricane Katrina." (*Entergy,* C.A. 10-77, Doc. 1) .   Armstrong Plaintiffs specifically contend that the Corps was negligent in the *Armstrong* complaint, *inter alia,* by:

(1)      allowing WGI to proceed with the work;
(2)      failing to caution WGI about the potential damage to the levee and/or flood wall system by its work;
(3)      failing to monitor and/or properly inspect the work of WGI; [1]
(4)      failing to adequately evaluate the potential damage to the levee and/or flood wall structure by the work of WGI; and
(5)      failing to correct the damage caused by the actions of WGI.

---

[1]While the Court had granted summary judgment in favor of WGI based on government-contractor immunity, that decision was reversed by the United States Court of Appeals for the Fifth Circuit.  *In re Katrina Canal Breaches Consol. Lit.(Washington Group International),* 620 F.3d 455 (5th Cir. 2010) (finding WGI was not entitled to immunity).

(*Armstrong,* C.A. 10-866, Doc. 1). Thus, in essence, Armstrong Plaintiffs maintain that because the Corps (whether through its own negligence or the negligence of WGI) failed to use proper geotechnical expertise to evaluate the potential for underseepage caused by the excavation and subsequent use of inadequate fill materials and the inadequate back filling of the various holes created in the remediation of the area, the integrity of the IHNC eastern flood wall during high water conditions was cataclysmically compromised.

The allegations in the *Entergy* complaint are more general in nature and include negligence in the actual construction of the canal and its effects on the slope stability of the "dikes" on either side of the canal. (¶¶ 38-40 *Entergy*, C.A. No. 10-77, Doc. 1). In addition, with respect to the EBIA remediation, they allege that "[t]he Corp, through its agents, undertook extensive excavation and subsurface activity, thereby undermining the integrity of the eastern shoreline of the IHNC abutting the Lower Ninth Ward of Orleans Parish, and ultimately contributing to the flooding cased in those areas by Hurricane Katrina." (*Entergy*, C.A. No. 10-77, Doc. 1, ¶ 42).

All of these allegations are those which the United States seeks to dismiss in its instant motion. In essence, the United States seeks the dismissal of the claims against it concerning its actions at East Bank Industrial Area ("EBIA") based on three theories:

1.     Section 702c of the Flood Control Act of 1928, 33 U.S.C. § 702(c): the United States contends that it is immune for flood damage caused by the management of a flood-control project.

2.     The Discretionary Function Exception ("DFE") to liability under the Federal Tort Claim Act, 28 U.S.C. § 1346(a) ("FTCA"): the United States contends that the Corps' decisions concerning excavations at the EBIA involved discretion that is related to the lock-replacement project's commercial and national-defense purposes and the project's community impact thus immunizing the United States from liability.

3.    Plaintiffs' Failure to Exhaust Administrative Remedies: the United States maintains that all plaintiffs could not exhaust their respective administrative remedies by filing suits that the Corps of Engineers lacked authority to compromise.

The Entergy Plaintiffs' Motion for Partial Summary Judgment is in essence their cross-motion to the United States' filing seeking a declaration that the United States' is not immune from suit and that the Court is properly exercising jurisdiction over their suit.  They contend that §702c is inapplicable because:

1.    § 702c immunity does not apply to U.S.'s negligent site preparation for the IHNC lock expansion.

2.    The IHNC is a navigation channel that remained wholly independent of the adjacent flood control projects.

3.    This Court's reasoning  with respect to the 17th Street Canal and London Ave. Canal failures and immunity does not extend to the IHNC.

As to the Corps' invocation of the Discretionary Function Exception, they maintain it is inapplicable because:

1.    National Environmental Protection Act's  clear and unambiguous mandates take the Corps actions outside of the DFE.

2.    The Corps' negligent excavations of subsurface structures in the vicinity of the levees were not the result of immune policy judgments because (1) the Corps acted in contravention of its own standards and (2) the Corps' Actions were not based on policy considerations.

And finally, as to the Corps' third contention that plaintiffs could not have exhausted their respective administrative remedies by filing suits that the Corps of Engineers lacked authority to compromise, the Entergy Plaintiffs maintain that this Court has already ruled that it has subject matter jurisdiction over the Entergy Companies Lawsuit.

4

As to the third motion, Armstrong Plaintiffs' Opposition to Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment, these plaintiffs oppose the United States' motion and seek judgment because:

1.    Section 702c is not available because the Corps' alleged negligence is not related to a flood control project or defective design, construction or maintenance of levees.

2.    The Government cannot establish the first prong of the DFE because it failed to comply with specific legal mandates in that (a) the Corps' regulations, guidelines and engineering standards qualify as specific legal mandates under the first prong of the DFE test, and (b) the Corps violated several of its own mandatory engineering requirements in the planning and execution of the EBIA excavation and backfilling work at the breach sites.

3.    The Court has previously ruled that Armstrong Plaintiffs properly exhausted their administrative remedies.

**Background**

The IHNC Lock was constructed in 1923 under the auspices of the Dock Board.  It was 75-feet wide, 640-feet long, and 31.5 feet deep.[2] In the mid-1950's, when Congress authorized the construction of the MRGO, it also authorized "construction of a new lock and connecting channel when economically justified by obsolescence of the existing lock or by increased traffic."  Rivers and Harbors Act of 1956, Pub. L. No. 84-455, 70 Stat. 655.  ( United States Exh. 1, 1 New Lock Eval. MVD-006-151).[3]  By 1960 anticipated obsolescence prompted new-lock

---

[2]The facts contained in this section are set forth in the United States' Statement of  Undisputed Facts in support of its Motion to Dismiss. (Doc. 19988-4) and are undisputed.  To the degree there is a dispute, it will be noted appropriately.

[3]The Court shall refer to the exhibits filed by the United States in  Defendant United States' Motion to Dismiss or, in the Alternative for Summary Judgment (No. 19993) as "United States Exh. ___".  Likewise with respect to the exhibits filed in conjunction with Entergy Plaintiffs' Motion for Partial Summary Judgment on Discretionary Function Exception (Doc. 20033) as "Entergy Plaintiffs' Exh. ___", etc.

studies.  Ship traffic delays averaged 10 hours and stretched up to 24-36 hours per lockage at that time.

Thus, a significant amount of study ensued concerning the placement of this new lock which engendered as much opposition from those who would be effected by its placement in a new location.  In 1986, Congress passed the Water Resources Development Act of 1986, ("WRDA") Pub. L. No. 99-662, §844(a), 100 Stat. 4082, 4177, which modified the Rivers and Harbors Act, to direct the Secretary of the Army to consult with affected local communities before selecting the location for the new lock.  By 1996, Congress directed the location of the new lock be based on a community-impact mitigation plan focusing on mitigation or compensation for the direct and indirect social and cultural impacts of the project.  Finally, the plan known as the "North of Claiborne Avenue Plan" was chosen to be implemented as it would not require the relocation of any residents in the Lower Ninth Ward.

In March, 1997, the Corps published a nine-volume Final Evaluation Report describing the proposed plan, alternatives, an Environmental Impact Statement ("EIS"), a Community Impact Plan, and technical data. (Plaintiffs' Exhibit 2, MRGO New Lock and Connecting Channels Evaluation Report).  The Corps noted  in the EIS that the IHNC Lock Expansion Project planning objectives were to develop plans (1) to reduce or eliminate delays to navigation between the Mississippi River and tidewater facilities and waterways to the east of the river; (2) avoid and minimize relocations and other impacts to local residents and businesses to the maximum extent practicable; (3) avoid and minimize environmental impacts to the maximum extent practicable; and (4) to design and recommend appropriate mitigation features for unavoidable impacts to local residents, cultural resources, ad environmental resources.

6

Case 2:05-cv-04182-SRD-JCW   Document 20164   Filed 02/11/11   Page 7 of 20

(Plaintiffs' Exhibit 2, MRGO New Lock and Connecting Channels Evaluation Report, Vol. 1, Main Report and Environmental Impact Statement, March 1997, § 3.3 Planning Objectives, EIS-17- IES-18).

While this Report outlined "a summary of the conceptual construction sequence for the major elements of the project," which included new bridges at Florida Avenue, construction of new levees and floodwalls, a bypass channel that would be carved out of the EBIA area, and eventually the new lock, the Corps obtained funding from the relevant general cargo inland navigation interests to pursue only two phases prior to Hurricane Katrina–those being (1) an assessment of the existing conditions of the IHNC and site preparation including "tree removal, demolition and relocation of the US Coast Guard station, removal of the Galvez Street Wharf and (2) the relocation of the business along the east side of the IHNC. (Exh. 2, Vol. 1 at 119).

In essence, the activities that ensued as the Corps prepared the EBIA land for that bypass channel are at the core of these proceedings. The Corps planned to cut a temporary, two-way bypass canal that was to be 220-feet wide, with a depth of 31 feet on the canal side and 22 feet on the floodwall side. A 157 foot berm was to remain between the new canal and the existing floodwall. However, it appears that most if not all of the studies done with respect to the impact of such remediation and new canal was in the context of new, non-funded floodwalls–**not** those that were already in existence and which ultimately cataclysmically failed during Hurricane Katrina. There was no stability analysis or geotechnical studies done as to those existing floodwalls in relation to the wide-spread excavation that ultimately occurred. Furthermore, there is testimony presented that raises questions of fact as to the Corps' knowledge as to the depth of the sheetpile of the existing floodwalls and the depth of the remediation/excavation that

7

occurred adjacent thereto.  Thus, the seminal issue is whether the Government ever contemplated the potential impact of underseepage that the excavation for a wider canal or removal of toxic material and structures could have on the existing floodwalls.  Indeed, the Government has argued that because this area was to become a waterway, the backfilling of the excavated areas was irrelevant or unimportant.  However, it is clear that the portions of the remediated area was to serve a berm which by definition impacts the stability of a floodwall.  (Document 20105, Armstrong Plaintiffs' Supplemental Submission, Exh. 28, pp 1-4).

        With this as background, the Court will now turn to the motions filed.  As these motions are in essence cross-motions concerning specific issues, the analysis will be issue driven.

### I.      SECTION 702c IMMUNITY

        The United States makes three arguments with respect to the applicability of § 702c of the Flood Control Act to immunize it from liability.  First it contends that the plain language of the statute, that "no liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place," bars these actions.  This Court has rejected this simplistic argument based on its reading of *Central Green Co. v. United States,* 531 U.S. 425 (2001) and the Fifth Circuit's analysis on this subject in *Graci v. United States,* 456 F.2d 20 (5th Cir. 1971) insofar as the United States may be found liable for damages caused by its negligence that are extrinsic to the LPV. *See In re Katrina Canal Breaches Litigation (Robinson)*, 647 F. Supp.2d 644 (E.D.La. 2009);  *In re Katrina Canal Breaches Consolidated Litigation (Robinson)*, 577 F. Supp.2d 802, 825 (E.D.La. 2008).  This Court remains convinced

of this holding and thus again rejects the United States argument in that regard for the reasons previously stated.

The United States next argues that because the IHNC was part of a flood control project, then §702c immunity should attach based on this Court reasoning concerning the 17th Street and London Avenue canal analysis. *In re Katrina Canal Breaches Consol. Lit.,* 533 F. Supp. 2d 615, 635 (2008); *accord id.* at 637; *In re Katrina Canal Breaches Consol. Lit.*, 577 F. Supp. 2d 802, 824 (2008); *see also* In re Katrina Canal Breaches Consol. Lit. 471 F. Supp.2d 684, 692 (E.D.La. 2007) (FCA bars actions for floodwater damage caused by negligence connected with flood-control project); *In re Katrina Canal Breaches Consol Lit.*, 2007 WL 3270768, at *5-*6 (E.D. La. Nov. 2, 2007) (§ 702c applies if damage results from floodwaters that escape from a canal that is part of a flood control project).  The Government argues that because the IHNC was bounded by LPV levees and floodwalls, § 702c immunity attaches.

This position misinterprets the Court's reasoning with respect to 17th Street Canal decision and the facts surrounding the breaching at the 17th Street Canal, the London Avenue Canal and the Orleans Avenue Canal.  In those instances, each of those were **drainage canals** that had been specifically incorporated into the LPV as a result of Congressional action in 1992 in the Energy and Water Development Act of 1992 to insure that the United States would pay a significant part of the cost of increasing the height of those floodwalls. *In re Katrina Canal Breaches,* 533 F.Supp. 2d 615, 627-28 (E.D. La. 2008).  Here, the IHNC is a navigational canal the purpose of which had nothing to do with the drainage of the city or flood protection.  In fact, the flood protection improvements slated for the area  which were in the "plan" as noted above, had not even been funded.  Furthermore, the activities undertaken with respect to the remediation

needed to create a temporary canal likewise had nothing to do with flood control.  The proper

analysis with respect to liability for the actions at the EBIA are those this Court applied in

*Robinson.*  There are significant questions of fact concerning whether this remediation activity

once again invokes the metaphor previously used by the Court, i.e.,  the Navy vessel hitting the

levee.  *See In re Katrina Canal Breaches (Robinson)*,

647 F. Supp. 2d 644, 648 (E.D.La. 2009).

      One point made by the United States that does have validity is the allegation made in

Paragraph 54 of the *Entergy* complaint wherein it states:

>       Additionally, in 1984, the Corps intentionally and/or negligently with
> wanton and reckless disregard for the consequences of its actions abandoned the
> Barrier Plan, which had been approved by congress, but implemented the High
> Level Plan, despite its many known defects and its rejection by Congress, taking
> no action to compensate for this change of plans with respect to the floodwalls
> along the IHNC, leaving them at considerably lower height than safety designs
> called for.

(*Entergy,* C.A. No. 10-77, Doc. 1, Complaint, ¶ 54).  Under §702c, the Corps is immune for such

defects under the Court's analysis found in the drainage canal decisions noted above.

      In its third attempt at invocation of § 702c, the United States argues that the Flood

Control Act ("FCA") applies because the new lock project was "directly related to two flood-

control projects." The Government reasons that because the LPV levees and floodwalls between

the replacement lock and the river were to be raised to the design standards and elevations of the

Mississippi River and Tributaries ("MR&T") Project to prevent riverine flooding, the EBIA

activity was thus "directly related" to the flood control project.  (United States Exh. 15  IHNC

Lock Replacement Project Design Documentation Report No. 2: Levees, Floodwalls and

Channels) at 1-1 to 1-2 (NED-143-3336-37); *see also* United States Exh.1, (1997 Eval. Rpt. Vol.

1, 75, 112, MVD-0060274) Plate 12 (Riverside Flood Protection: Ship and Barge Lock), Plate 13 (River Side Flood Protection (Mar. 1995). This argument ignores the plain fact that there was no funding in place for the construction of these new floodwalls at the time that the EBIA remediation occurred and that the extant floodwalls were to provide all the hurricane flood protection available during the entire project construction and were not to be "selectively demolished" until, if ever, the new MRL levee/floodwall would be built to elevation of 22.4 feet NGVD. *Armstrong* Plaintiffs Exh. 1, 1997 Evaluation Report, Vol. 1, at 112). The United States' argument in this regard is likewise without merit. Accordingly,

        **IT IS ORDERED** that the United States' Motion to Dismiss based on the immunity granted under § 702c of the Flood Control Act of 1928 is **DENIED** and the Entergy Plaintiffs' Motion for Partial Summary Judgment and the Armstrong Plaintiffs' Opposition to Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment are **GRANTED** insofar as the United States may be found liable for damages caused by its negligence that is extrinsic to the LPV if proven at trial. It is noted, however, that to the extent that the Entergy plaintiffs base their claims on Paragraph 54 of the *Entergy* complaint concerning the change from the "Barrier Plan" to the "High Level Plan", the United States' Motion to Dismiss is **GRANTED**.

        **2.**      **DISCRETIONARY FUNCTION EXCEPTION TO FTCA LIABILITY**

        The Government has moved for summary judgment contending that the Corps' management of the new lock project was a discretionary function that is not actionable under the FTCA since Entergy Plaintiffs challenge conduct that is (1) discretionary and (2) susceptible to policy analysis. To that end, the United States contends that the Corps' supervision of WGI

involved considerable policy-based decision and that its review of the WGI work plans likewise involved policy based decisions.  Specifically it argues the Corps' decision as to whether to seek further geotechnical review of the WGI work plans was not foreclosed by any regulation and that the Corps' construction manager for the project,  Lee Guillory's decisions, were influenced by considerations of efficiency and risk, including the risk of adverse community impact.

As noted, in their cross-motion, Entergy Plaintiffs contend that certain  National Environmental Policy Act ("NEPA") mandates take the Corps' actions outside of the DFE. In addition, the Corps' actions with respect to the excavation of subsurface structures were in contravention of its own standards and were not based on policy considerations.  The Armstrong Plaintiffs argue that the Corps' regulations, guidelines and engineering standards themselves qualify as specific legal mandates and thus takes their actions outside of DFE protection particularly considering their failure to follow their own mandatory engineering requirements. in their actions.

As this Court has noted before, 28 U.S.C.  § 2680(a) provides that the Government is not liable for "[a]ny claim based upon an act or omission of an employee of the Government, . . .based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." This part of the relevant  statute is known as discretionary function exception ("DFE").

The United States Court of Appeals for the Fifth Circuit set forth a succinct and workable explanation of the two distinct prerequisites for the application of the discretionary function exception.

The Supreme Court has added some flesh to that bare-boned statutory skeleton, setting up a two-part test to determine whether the discretionary-function exception has been triggered. [*United States v. Gaubert,* 499 U.S. 315, 322-23, 111 S.Ct. 1267, 1273-74, 113 L.Ed.2d 335 (1991)]. First, for the exception to apply, the challenged act must involve an element of judgment. [*Id.* at 322, 111 S.Ct. at 1273]. In other words, the Government needs to establish there was "room for choice" in making the allegedly negligent decision. [*Id.* at 323, 111 S.Ct. at 1274]. **If a "federal statute, regulation or policy" specifically prescribes a course of action for the federal employee to follow, the employee has no choice but to adhere to the directive. [*Id.* at 322, 111 S.Ct. at 1273]**. If the Government can establish that the challenged act involved an element of judgment, step two of the test is met and the discretionary-function exception will apply only if that judgment is of the kind that the exception was designed to shield. [*Id.* at 322-23, 111 S.Ct. at 1273-74].

*See Ashford v. United States,* 511 F.3d 501, 504-05 (5th Cir. 2007) (emphasis added) (Government could not show as a matter of law that it had discretion where prison policy required placing plaintiff in solitary where inmate raised safety concern)("Government needs to establish there was room for choice in making the allegedly negligent decision" for first DFE exception to apply).

Indeed, the Supreme Court case law interpreting the discretionary function exception unequivocally denies the Government its protection where the actions are unauthorized because they are unconstitutional, proscribed by statute or exceed the scope of an official's authority. *Castro v. United States,* 560 F.3d 381 (5th Cir. 2009), *citing Thames Shipyard & Repair Co. v. United States,* 350 F.3d 247, 254 (1st Cir. 2003), *rev'd on reh'g en banc,* 608 F.3d 266 (5th Cir. 2010) (finding district court's analysis correct that Border Patrol Agents' decision to let minor accompany her father back to Mexico was the product of a judgment or choice; Border patrol Agents' conduct not mandated by any statute, regulation or policy and the decision was unequivocally subject to policy analysis as it involved the use of government resources and

necessarily involved a decision as to what the Border Patrol should do with a United States citizen child in unique circumstances).

So, if there is no "prescribed course of action," the second inquiry focuses on whether that judgment or choice is based on considerations of public policy.  As stated in *Berkovitz v. United States*, 486 U.S. 531 (1988), "'[t]he basis for the discretionary function exception was Congress' desire to 'prevent judicial "second-guessing" of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.'  *United States v. Varig Airlines* [467 U.S.] at 814."  *Berkovitz* 486 U.S. at 537.  "[T]he discretionary function exception insulates the Government from liability if the action challenged in the case involves the permissible exercise of policy judgment."  *Id*.  Thus, the Fifth Circuit has stated:

> that if Government activity involves conduct that is rooted in policy, the discretionary function exception bars a cause of action based on that conduct unless the Government employee violated a mandatory regulation that restricts his discretion or judgment.  Under this interpretation two types of activity would fall within the exception: violations of specific, mandatory regulations or statutes and ordinary common law torts where the exercise of discretion is not based on policy considerations.

*Lively v. United States*, 870 F.2d 296, 299 (5th Cir. 1989).

However, the inquiry into what constitutes a "policy" decision is not an easy one. [4] The Government often seeks its cover arguing that virtually every decision is one based in policy. However, the Fifth Circuit specifically rejected the contention of an overly broad application of the exception; the exception is not so limited.  The appellate court found that such an interpretation:

> would subsume the FTCA: virtually any decision to act or not to act could be characterized as a decision grounded in economic, social or public policy and, thus, exempt.  Although we construe the exception broadly, we have never construed it so that the exception swallows the rule.  We therefore reaffirm our holding that in determining whether the discretionary function exception applies, we examine the nature and quality of the activity to determine if it is the type that Congress sought to protect.

*Id.*

The Court has discussed these concepts in great detail in the Court's Finding of Facts and Conclusions of Law rendered after a full trial in the *Robinson* which concerned the Corps' defalcations with respect to the MRGO.  In that case,  the Court found the DFE unavailable to the Corps because the Corps' failure to provide foreshore protection and to address the effects of salt water intrusion along the MRGO were non-policy decisions concerning technical, engineering and professional judgments that directly involved safety.  These defalcations were

---

[4]In a 2009 decision in *Robinson*, this Court relying on *Ashford v. United* , 511 F.3d. 501, 505 (5ᵗʰ Cir. 2007), the court found that the burden of proof was on the United States with respect to the first prong of the discretionary function to demonstrate that the decisions it claims are shielded by the discretionary function exception are indeed subject to the exercise of judgment assuming plaintiff has properly pleaded a mandate as to the first prong.  *In re Katrina Canal Breaches Consol. Lit.,* 6127 F. Supp.2d 656, 666-67 (E.D.La. 2009).  Since the Court rendered its decision in *Robinson*, the Fifth Circuit in an unpublished decision has stated that "once the Government asserts the discretionary function exception, the party bringing suit must establish that it does *not* apply in order to establish jurisdictions.  *See Osprey Ship Mgmt Inc. v. Foster,* 2010 WL 2725236, at *3 (5ᵗʰ Cir. 2010).  However, in a published decision, *St. Tammany Parish v. Federal Emergency Management Agency*, 556 F.3d 307, 315 n.3 (5ᵗʰ Cir. 2009) the appellate court again noted that there is a split in the circuits on this issue.  Regardless of the burden of proof, plaintiffs here have pled mandate and there are questions of fact as to whether there is one (prong 1) or more violations of mandate(s) well as whether the Corps' decisions were susceptible to policy choices.  As such, this matter shall proceed to trial.

found to be the substantial cause of the demise of the MRGO levee.   *In re Katrina Canal Breaches Consol. Lit. (Robinson)*, 647 F. Supp.2d 644, 714 (E.D.La. 2009) (DFE second prong). In addition, the Court found that the Corps violated a mandatory duty in its preparation of various statements required under NEPA making the discretionary function exception unavailable.   *Id.* at 725 (DFE first prong).

The Court has reviewed the voluminous exhibits, deposition testimony and arguments of counsel.  In so doing, it finds that there are material questions of fact as to both DFE prongs. The evidence and arguments presented raise a genuine issue of material fact as to whether the Government violated mandates contained in their own manuals or their engineering regulations, including whether the appropriate Design Documentation Report (DDR) was done. Simply put, the Court cannot make any findings in this regard  without a trial on this issue.  For example, there was Corps' witness testimony that the engineering codes are mandatory and were not followed and that the Corps' policy required geotechnical engineering analysis for underseepage, wall stability and global stability on the EBIA excavations' potential effect on the IHNC floodwalls before the excavation was undertaken.   No such engineering investigations were undertaken.

As to the second prong, another illustrative example creating a material question of fact is that apparently Mr. Guillory thought that the IHNC floodwall sheetpiling was 25 feet deep in all areas, not just in the area north of the North Breach.  Such a failure could demonstrate extreme negligence and might not constitute a policy based decision in light of Mr. Guillory's failure to require a geotechnical analysis.  Likewise, the failure to undertake a stability analysis of the existing flood wall which might fall in that category as well.

However, the Court does find that it finds no merit in the Entergy Plaintiffs' argument that NEPA provides a mandate in this instance. Entergy maintains that there is no dispute that the EBIA project was a "major federal action" that "significantly affected the human environment" such that the mandates of 42 U.S.C. § 4332(C) of NEPA would apply requiring an Environmental Impact Statement that meets the statute's requirements.[5] The Entergy Plaintiffs maintain that the Corps failed to comply with NEPA's requirements because it:

(1)     did not include the site work's potential hazards to the nearby floodwalls in its 1997 EIS;

(2)     did not submit an EA and FONSI regarding the potential hazards to the nearby floodwall;

(3)     did not submit an EIS, EA, or SEIS regarding the impact of the work done under the Task order 26 of the TERC on the floodwalls; and

(4)     did not submit an EIS, EA or SEIS when the work done pursuant to the TERC underwent drastic changes that posed a potential threat to the nearby floodwalls.

As to the failure to address floodwall danger in the initial 1997 EIS, Entergy argues that the Corps had an obligation under NEPA to take a "hard look" at the potential impacts of a federal action on the health and safety of the human environment; however, the Corps did not

---

[5]The statute requires an EIS to include a detailed statement by the responsible official on–
　　　　　(i) the environmental impact of the proposed action,
　　　　　(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
　　　　　(iii) alternatives to the proposed action,
　　　　　(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long term productivity, and
　　　　　(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.
42 U.S.C. § 4332(C); *see also  Coliseum Square Ass'n, Inc. v. Jackson*, 465 F.3d 215, 224 (5th Cir. 2006).  In some cases Supplemental Environmental Impact Statements (SEISs) are required as well.  An Environmental Assessment is contemplated by the regulation which provides sufficient evidence and analysis for determining whether to prepare an EIS.  An EA is Where the governmental agency finds no significant impact, a FONSI should issue.  *See In re Katrina Canal Breaches Consol. Lit.*, 647 F. Supp. 2d 644, 718-24 (E.D. La. 2009) (detailed explanation of NEPA regulatory scheme).

identify the potential impact of the construction of the bypass channel and proposed remedial excavations in the area of the IHNC eastbank floodwall.

In the aforementioned *Robinson* decision, *In re Katrina Canal Breaches Consol. Lit.*, 647 F. Supp. 2d 644 (E.D.La. 2009), the Court indeed found that the Corps had violated its mandate with respect to NEPA as concerned an on-going decades long dredging operation of the MRGO and its effects on the wetlands surrounding the MRGO and the Corps reporting about that activity.  There, the Corps segmented its reports and failed in its duty to provide mandated SEISs. in that regard.   In that case there was overwhelming evidence of the Corps' blatant, intentional disregard of the NEPA requirements, particularly in light of its own reports concerning the deleterious effects of the MRGO on the adjacent areas.  In this case, however, there is no such record or evidence presented.  The EIS that was prepared was in the context of the overall lock replacement project; that project was a "major federal action." The Court cannot however find that the NEPA violations alleged herein are of a magnitude sufficient to find that a mandate has been violated.  The remediation was a small part of a very large program; there was no history of subterfuge and 40 years of degradation of the channel and surrounding wetlands as there was in the *Robinson* case.  As such, that portion of the Entergy claims shall be dismissed. Accordingly,

**IT IS ORDERED** that the United States' Motion to Dismiss (Doc. 19993) is **DENIED** with respect to its claim of the applicability of the Discretionary Function Exception except as to the claims based on NEPA violations alleged by the Entergy plaintiffs which motion is **GRANTED** in that regard.

**IT IS FURTHER ORDERED** that  Entergy Plaintiffs'  Motion for Partial Summary Judgment  (Doc. 20033) and Armstrong Plaintiffs' Opposition to Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment  (Doc. 20035) as concerns the DFE claims is **DENIED**.

> **3.     NEITHER MRGO PLAINTIFFS NOR THE ENTERGY PLAINTIFFS HAVE EXHAUSTED THEIR ADMINISTRATIVE REMEDIES BY FILING SUIT, BECAUSE THE ARMY CORPS OF ENGINEERS HAS NO AUTHORITY TO COMPROMISE CLAIMS IN LITIGATION.**

The United States again argues that the service of a complaint commencing an action in federal court cannot satisfy the first step in the requirements of 28 U.S.C. §2675(a) which requires that  "the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been denied" before an action is instituted on the claim.  It argues that by filing suit as the first step in the process, that action  precludes the second and third steps.  It contends that the agency could not consider the claim or act on it because with the filing of the suit,  §2677 vests the authority to "arbitrate, compromise, or settle" the claim in the Attorney General and thus the agency would be without power to make a final disposition of the claims.

This Court rejected this argument at to the Armstrong Plaintiffs with respect to their EBIA claims as well as with respect to the Entergy Plaintiffs in its February 2010 ruling.  *In re Katrina Canal Breaches Consol Lit.*, 2010 WL 487431, *12-15 (C.A. 07-4609 (Doc. 7) at 28) and the Court re-iterates those conclusions herein as if copied in full.  Indeed, the Court certified the issue for immediate appeal with that decision,  and the Government chose to forego that opportunity.  To take this position in light of the totality of the circumstances as outlined in that opinion is without merit.  Accordingly,

**IT IS ORDERED** that the United States Motion is **DENIED** as to subject matter jurisdiction for Armstrong Plaintiffs' and Entergy Plaintiffs' failure to exhaust their administrative remedies.

**IT IS FURTHER ORDERED**  Entergy Plaintiffs'  Motion for Partial Summary Judgment  (Doc. 20033) and Armstrong Plaintiffs' Opposition to Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment  (Doc. 20035) are **GRANTED** in this regard.

New Orleans, Louisiana, this  11th February, 2011.

_____
        **STANWOOD R. DUVAL, JR.**
    **UNITED STATES DISTRICT COURT JUDGE**