UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ALVIN LIVERS, CLIFFORD WASHINGTON, and
FRED HOLMES

NO. 05-4182

SECTION "K"(2)

v.

THE UNITED STATES OF AMERICA,
THROUGH THE ARMY CORP OF ENGINEERS

IN RE: KATRINA CANAL BREACHES CIVIL ACTION
CONSOLIDATED LITIGATION
PERTAINS TO: MRGO

_____

COMPLAINT IN INTERVENTION

NOW COME CLAIMANTS ALVIN LIVERS, CLIFFORD WASHINGTON AND FRED

HOLMES (HEREINAFTER COLLECTIVELY REFERRED TO AS "INTERVENORS" OR

"PLAINTIFFS/COMPLAINANTS) ALL OF WHOM HAVE BEEN GRANTED LEAVE OF

COURT TO FILE THIS INTERVENTION, WHO AVER AND STATE AS FOLLOWS:

1055983v.1

## INTRODUCTION

On or about August 29, 2005, Hurricane Katrina hit the Gulf Coast largely sparing Greater New Orleans, which fortunately lay in Katrina's rapidly deteriorating western eye-wall. The result was that Katrina laid waste to virtually everything in its path along the Mississippi Gulf Coast; but in Orleans and St. Bernard Parishes, Katrina's winds did not even register as a Category 3 on the Saffir-Simpson scale. The winds barely reached 100 miles per hour. Nevertheless, through the fault and negligence of Defendants, a tidal surge rushed from the Gulf though the MR-GO and collided at the nexus of the Gulf Intra-coastal Waterway ["GIWW"] and MR-GO with another storm surge from Lake Borgne which combined to flood the New Orleans east bank (downtown protected area), the Lower Ninth Ward and St. Bernard Parish by overwhelming levees/floodwalls and/or spoil banks that had been negligently designed, constructed, maintained, undermined, weakened and/or operated by the Defendants.

This action results from one of the most predictable and preventable man-made catastrophes in American history—the tragic devastation of homes and lives during and after Hurricane Katrina ["Katrina"] on or about August 29, 2005--caused by negligence, fault and/or strict liability of the United States Army Corps of Engineers ["Corps"], Washington Group International, Inc. ["Washington" or "Washington Group"], the Board of Commissioners of the Orleans Parish Levee District ["Orleans"], St. Paul Fire and Marine Insurance Company ["St. Paul"], and The Board of Commissioners of the Lake Borgne Basin Levee District ["Lake Borgne"] [collectively "Defendants"]. Class Representatives and the putative class they seek to represent ["Class"] seek to recover general and special damages from the Defendants for the following reasons to wit:

1055983v.1

## I.     JURISDICTION

1 (a). This Court maintains subject matter jurisdiction over this action pursuant to 28 U.S.C.§ 1346(b) (Defendant United States), and 28 U.S.C. § 2671, et seq. (Federal Tort Claims Act), 28 U.S.C. § 1332(d)(2), as amended by the Class Action Fairness Act of 2005, Pub. L. 109-2, violations of laws of the United States, including, but not limited to, 33 USC. § 1251, et. seq. and 16 U.S.C. § 1451 et. seq. and alternatively, for violation of the Constitution and Laws of the State of Louisiana as well as the Constitution and Laws of the United States.

1 (b). All named Plaintiffs/Complainants have presented their administrative claims in writing to the Corps as provided under appropriate federal law and regulation and a period of at least six months has expired since the filing of their claims. Further, named Plaintiffs/Complainants, individually, and on behalf of all others, reserve the right to contest the legal and/or jurisdictional necessity of administrative claim filing as a consequence of the inaction and failure to act on the part of the Corps in failing to process and evaluate said claims.

1(c). Alternatively, Plaintiffs/Complainants aver jurisdiction is proper pursuant to 28U.S.C. § 1331 (federal question jurisdiction). Additionally, and in the alternative, jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1367, in as much as this Court has supplemental jurisdiction over all state law claims herein arising out of the same case or controversy.

1(d). Alternatively, the Class Representatives plead admiralty and maritime jurisdiction and causes of action under the Admiralty Extension Act, 46 U.S.C. App. § 740, the Suits in

1055983v.1

Admiralty Act, 46 U.S.C. §§ 741-52, the Public Vessels Act, 46 U.S.C. §§ 781-90 and/or the Water Pollution Control Act, 33 U.S.C. §§ 1251, et seq.

**Futility Doctrine**

2. While the Intervenors have timely filed their administrative claims for damages with the Corps and have waited the requisite time to file suit against the Corps, Intervenors expressly plead the futility doctrine on behalf of any Intervenor herein who either did not timely file an administrative claim for monetary damages under any applicable law or regulation, or if they did and six months has not yet run from time of filing. All administrative exhaustion requirements imposed by 28 U.S.C. § 2675 (applicable to suits under FTCA) and 46 U.S.C. § 30101 (applicable to suits under the AEA) have been waived by the "futility of exhaustion" doctrine because they can serve no purpose at all. Requiring all potential claimants to present administrative claims to the Corps of Engineers prior to filing suit would serve no purpose at all because (1) the Corps of Engineers has made it clear through its actions and inactions that it does not intend to resolve any of these claims through its administrative claim process; (2) while many months have passed since many potential class members filed administrative claims, the Corps of Engineers has taken no action to resolve them, signaling its decision to let the judicial process decide them; (3) the regulations enacted by the Corps to handle the FTCA administrative claims, 28 CFR Sections 14.1- 14.11, do not provide a mechanism by which potential claimants can conduct the necessary discovery needed to prove their cases, and such discovery can only be provided by this Court; (4) many potential claimants will suffer irreparable harm if they are required to file administrative claims (which the Corps will not act upon) because they have no

- 4 -

knowledge of the need to file them in order to protect their rights; (5) no regulations have been enacted prescribing the manner in which claims brought under the AEA should be handled, leading to much confusion among potential class members; and (6) it is impossible to comply with the requirements of 46 U.S.C. § 30101 because there is no "agency owning or operating [all] vessel[s] causing the injury or damage."

3. Additionally as to the Corps' administrative claim requirements, Intervenors challenge those requirements as a violation of the rights of Intervenors under the United States Constitution, as amended. Enforcement of administrative filings will cause denial of access to the Courts and a denial of due process. Intervenors further aver that the Corps is incapable of providing administrative relief in any reasonable time frame because of the massive, unprecedented, number of claims and the inherent inability of the Corps to properly staff and run any meaningful claims administration, and thus the Corps' administrative procedure (and thus any future relief) is inadequate under the special circumstances following Hurricane Katrina. The requirement by the Corps that an administrative procedure be followed following Katrina is an unreasonable governmental action that is not substantially justified. Unless Intervenors are able to proceed in Court immediately, Intervenors are threatened or will be threatened with impending irreparable injury from the delay of the Corps proscribed administrative procedure. Accordingly, Intervenors plead for that individuals and entities harmed due to the negligence and fault of the Corps be relieved of need to file administrative claims as a requirement precedent to suit against the Corps. Intervenors further complain of an illegal and unconstitutional denial of equal access to justice through the Corps' administrative filing claim as predicate to suit. Intervenors further expressly plead for attorney fees and costs to be awarded through in addition to any other right to

- 5 -

claim attorney fees and costs pursuant to the Equal Access to Justice Act passed by the United States Congress (5 U.S.C. § 504).

## II. VENUE

4. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because the Defendants' negligent and wrongful actions occurred in the Eastern District of Louisiana, a substantial part of the events and omissions giving rise to this action occurred in the Eastern District of Louisiana, Intervenors all reside in the Eastern District of Louisiana, and the damages to Intervenors occurred within the Eastern District of Louisiana.

## III. WAIVER OF SOVEREIGN IMMUNITY

5. The United States of America and the Corps waived its sovereign immunity in connection with the claims asserted in this suit by the enactment of the Federal Tort Claims Act, 28 U.S.C. § 2671, et seq. ["FTCA"]. While Intervenors believe that all of their claims against the Corps are derived from the FTCA applying the tort and other laws of the State of Louisiana, out of an abundance of caution, the Intervenors alternatively plead admiralty and maritime jurisdiction and causes of action under the Admiralty Extension Act, 46 U.S.C. App. § 740, the Suits in Admiralty Act, 46 U.S.C. §§ 741-52, the Public Vessels Act, 46 U.S.C. §§781-90 and/or the Water Pollution Control Act, 33 U.S.C. §§ 1251, et seq. Furthermore, The United States Court of Appeals for the Fifth Circuit, in connection with the MR-GO, has already held that the Flood Control Act of 1928, 33 U.S.C. §§ 702c does not immunize the United States of America for its maritime activities. Graci v. United States, 456 F.2d 20 (5th Cir. 1971).

1055983v.1

## IV. PARTIES

**Intervenors**

6. Intervenors are all persons of the full age of majority and residents of and domiciled

in the State of Louisiana and/or were residents of and domiciled in the State of Louisiana at the

time of Hurricane Katrina. The action into which Intervenors seek to intervene is styled as a class

action. Intervenors seek to intervene into the class action to assert claims on their own behalf for

all claims made in the AMENDED MR-GO MASTER CONSOLIDATED CLASS ACTION

COMPLAINT, and in particular for the claims made in Count Three of the AMENDED MR-GO

MASTER CONSOLIDATED CLASS ACTION COMPLAINT, as it is believed that Intervenors

will not be adequately represented as to Count III claims. All of said Intervenors resided in the

proposed Class Geography when Hurricane Katrina struck Greater New Orleans: The geographic

area bounded to the north by Gentilly Boulevard/Gentilly Road to North Broad Street (Gentilly

Ridge), to the south by the Mississippi River, to the east by the IHNC, the East Bank of Orleans

Parish (downtown protected area), all of Orleans Parish east of theIHNC/ Industrial Canal

(Lower Ninth Ward and New Orleans East), and St. Bernard Parish.

**Defendants**

7. The UNITED STATES OF AMERICA ["USA"] is a sovereign government amenable

to suit for civil liability in accordance with the FTCA, 28 U.S.C.§ 2671 et seq., and/or admiralty

and maritime law, and/or the Constitution and Laws of the United States, and/or the Constitution

and Laws of the State of Louisiana, as plead herein. USA is the proper named party defendant

for negligent or delictual actions or inactions of the UNITED STATES ARMY CORPS OF

- 7 -

ENGINEERS ("CORPS"), a division of the United States Government under the direct jurisdiction of the Department of the Army. The USA and Corps are referred to herein simply as "The Corps."

8. The WASHINGTON GROUP INTERNATIONAL, INC. (f/k/a Morrison Knudsen Corporation, f/k/a MK-Ferguson Company, f/k/a The H. K. Ferguson Company), a non-Louisiana corporation, authorized to do, and doing business in, the State of Louisiana, and in the Parish of Orleans, with its domicile in the State of Ohio, its principal place of business in the State of Idaho, and its Louisiana principal place of business in Baton Rouge, Louisiana.

9. The BOARD OF COMMISSIONERS OF THE ORLEANS PARISH LEVEE DISTRICT ["ORLEANS"], a local governmental entity responsible for the creation, maintenance, and inspection of certain levees/floodwalls and/or spoil banks and water protection areas in Orleans Parish with its domicile in New Orleans, Louisiana.

10. The BOARD OF COMMISSIONERS OF THE LAKE BORGNE BASIN LEVEE DISTRICT ["LAKE BORGNE"], a local governmental entity responsible for the creation, maintenance, and inspection of certain levees/floodwalls and/or spoil banks and water protection areas in St. Bernard Parish with its domicile in Violet, Louisiana.

11. ST. PAUL FIRE AND MARINE INSURANCE COMPANY ["ST. PAUL"], a foreign insurance company, authorized to do and doing business within the State of Louisiana, who at all times relevant herein had in full force and effect a policy or policies of liability insurance, under the terms, provisions, and conditions of which it assumed liability for the acts

1055983v.1

and/or negligence of its insureds, ORLEANS and LAKE BORGNE, and against whom Class Representatives assert their claim under the Louisiana Direct Action Statute, La. R.S. 22:655.

**ALLEGATIONS REGARDING WHAT IS ALLEGED IN THE AMENDED MASTER COMPLAINT AS THE LOWER NINTH WARD AND ST. BERNARD SUB-CLASS:**

**V. COUNT ONE:**

THE MR-GO ALLEGATIONS AGAINST THE CORPS

12. With its inception over forty years ago, The Mississippi River Gulf Outlet navigational canal ["MR-GO"] runs from the Gulf of Mexico alongside St. Bernard and into the Gulf Intra Coastal Waterway and the IHNC/Industrial Canal in New Orleans.

13. The Intervenors damages were sustained as a direct result of the breach by the Corps of its legal duty to adequately design, construct, maintain, inspect and operate the MR-GO. Thus, the Corps is liable to the Intervenors for all damages sustained by them. But for the fault and/or negligence of the Corps, most or all of the severe flooding of Greater New Orleans would not have occurred.

14. The FTCA places the United States in the same shoes as a private defendant and authorizes Intervenors to recover damages based on the Corps' faulty design, construction, repair, and maintenance of the MR-GO. Such negligent acts and/or fault on the part of the Corps were approximate or legal cause of the flooding of Greater New Orleans. Katrina and its devastating aftermath were clearly foreseeable and foreseen events to the Corps.

**The MR-GO's Faulty Design and Construction**

- 9 -

1055983v.1

15. The Corps' negligence and/or fault in designing, engineering, inspecting and/or constructing MR-GO, inter alia, included, without limitation (1) failing to take account of the waterway's inherent and known capability of serving as a funnel or conduit for rapidly-accelerated, storm-driven surges which would magnify the storm surge's force against levees, flood walls and spoil banks in New Orleans and St. Bernard Parish; (2) failing to "armor" levees on both banks of the MR-GO; and (3) failing to account for the devastation (through the construction itself as well as subsequent salt water intrusion and accelerated erosion) of the wetlands, forests and land masses thus denuding and destroying a critical natural buffer against storm surge, thereby further exacerbating the funnel effect created by the MR-GO's design.

**Negligent Operation and Maintenance of the MR-GO**

16. The Corps is responsible for the operation and maintenance of the MR-GO. This on-going responsibility included dredging the bottom of the waterway to remove deposited soil and silt. The Corps knew, or in the exercise of reasonable care and discretion should have known, that proper dredging of the MR-GO would ameliorate the "funneling effect" of the waterway by maintaining its design depth, thereby diminishing the lethal threat to residents and businesses in Orleans and St. Bernard Parishes during hurricanes such as Katrina. Notwithstanding that dredging is a critical safety requirement for the MR-GO, the Corps negligently failed to maintain the MR-GO and failed to properly dredge the canal. While the negligent design of the MR-GO caused destruction of the surrounding wetlands, the Corps' ongoing negligent maintenance of the MR-GO, further exacerbated it. The loss of thousands of acres of marshlands due to the MR-GO contributed significantly to the drowning of Greater New Orleans, including each of the Plaintiffs' respective properties.

- 10 -

1055983v.1

17. The banks of the MR-GO and especially the northeast shore juncture of the MR-GO and the GIWW is particularly susceptible to erosion induced by saltwater intrusion and the force of waves from passing vessels. The Corps was negligent and/or at fault in failing to provide bank stabilization measures, as well as in allowing the saltwater intrusion which degraded the wetlands adjacent to MR-GO.

**Regulatory Violations of the Corps**
**Illegal Failure of Corps to Coordinate with State of Louisiana**

18. The Corps designed, constructed, operated and maintained the MR-GO according to faulty plans and specifications in violation of the River and Harbor Act of 1945, P.L. 79-14, 50 Stat.10 (March 2, 1945) [ "MR-GO Planning Law"] which reflected clear Congressional intent to involve the State of Louisiana (through its Governor or the Governor's designee), as an "affected state" in investigation and planning . Congress also directed the Corps to "coordinate" its investigation and planning with the United States Department of Interior ["DOI"]. The Corps failed to coordinate with and involve the Governor and the DOI, and thus violated its duties and obligations established under the MR-GO Planning Law as well as the FWCA, *infra*.

**Violation of Fish and Wildlife Coordination Act of 1934, as amended – Failure to coordinate with Louisiana and Department of Interior and to do required study**

19. The Fish and Wildlife Coordination Act ["FWCA"], 16 U.S.C. § 662, as amended in 1946 and 1958, also required coordination between any federal agency, proposing to "impound," "divert," or "control" a waterway or body of water, and the Fish and Wildlife Service. The MR-GO is such a waterway. The FWCA statute also required the Corps to consult with officials of the State of Louisiana and DOI during all phases of the MR-GO project, including investigation, planning and construction. The Corps was also directed therein to incorporate any of the

1055983v.1

observations or concerns raised by these state and federal agencies into any plans and specifications for the design and construction of the MR-GO. The Corps failed in its duties under said laws. In fact, a 1958 DOI report concluded that detailed investigations, coordinating hydrological, vegetative, fish and wildlife findings , as well as a model study would be a prerequisite to predictions of the MR-GO's effects and establishment of mitigatory measures. 1958 Interior Report at 19. The report further concluded that "…this project should be thoroughly investigated from the biological standpoint before construction through the marshes below Paris Road and the Sound is undertaken." 1958 Interior Report at 19-20. A four year regime of testing and study to assess the impact of the MR-GO was recommended. The Corps negligently, recklessly, wantonly, and illegally proceeded to build the MR-GO without waiting for the completion of the essential four year study requested by the DOI. The Corps knew or should have known that construction of the MR-GO through the wetlands from the GIWW to the Gulf would devastate Louisiana and wetlands and result in the negligent, reckless, wanton, or illegal destruction by the Corps of the best "speed-brake" and inhibitor to tidal surges.

**Failure of the Corps to Follow MR-GO 1951 Authorization Report**

20. On September 25, 1951, the Corps submitted a report to Congress with its recommendations for construction of the MR-GO ["MR-GO Authorization Report"]. This report contained a letter from the former Corps Chief of Engineers stating that the proposed MR-GO would be connected to the IHNC/Industrial Canal by its own separate canal running parallel to the GIWW. MR-GO Authorization Report at 5. However, as built, such a separate parallel canal was not built and, instead, the Corps unilaterally deviated from the MR-GO Authorization Report and did not dig a separate parallel canal to the IHNC/Industrial Canal. Rather the Corps connected the MR-GO into the existing GIWW and significantly deepened and widened the

1055983v.1

GIWW from the point of connection to the IHNC/Industrial Canal, thus increasing vessel traffic and producing significantly increased hydrologic consequences that were a proximate cause of the flooding of Greater New Orleans. Failure of Corps to do studies recommended by its own Board of Engineers

21. The MR-GO Authorization Report further included a report from the Corps' Board of Engineers recommending further studies into the MR-GO's impact on the Louisiana coast and opined: "… [t]he exact location of the outlet to the Gulf and the alignment of the seaway should be determined after more complete studies of sand movement, wave action, and local currents are made in cooperation with the Beach Erosion Board. Hence, if the improvement is authorized, ample provision should be made for modifications of the location and alignment of the canal should further studies show that a more suitable location is available." MR-GO Authorization Report at 14. No such studies were done and thus the Corps did not consider alternatives that would be less destructive to the lands and wetlands of Louisiana; such negligent, reckless, wanton or illegal acts or omissions were a proximate cause of the damages sustained by the Intervenors.

**Other Regulatory Violations by Corps**

22. The Corps further failed to follow requirements of 33 CFR §§ 335-38, particularly 33 CFR § 336.1(c) (4) and 33 CFR § 320.4(b) and Executive Order 11990. The Corps deviated from and/or failed to execute their dredging activities (maintenance and operation of the MR-GO) in the manner required by the Corps pursuant to 33 CFR §§ 337.5 and 338.2. Furthermore, the Corps failed to follow requirements of the State of Louisiana (made applicable by 33 CFR § 337.2) including those contained in Chapter 7, Sections 701 and 707 of the Louisiana Administrative Code relating to dredging activities. In its actions and omissions set forth above,

1055983v.1

the Corps also violated several federal and state statutes implicated in the design, construction, maintenance and operation of the MR-GO, including the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332 ©; the Water Resources Development Act of 1990 (WRDA), 33 U.S.C. §§ 2316 and 2317; the Coastal Zone Management Act, 16 U.S.C. § 1452, et. seq. and the Louisiana State and Local Coastal Resources Management Act, La. R.S. 49:214.21 et. seq. Additionally, the Corps and its contractors (with the actual knowledge or under the direction of the Corps) illegally and improperly transported or otherwise disposed of dredge spoil including, but not limited to in negligent and illegal placement of said spoil as spoil banks.

**Illegal and/or negligent failure of Corps to follow authorized design, route, and alignment**

23. After hearings, Congress authorized the construction of the MR-GO in 1956 (P.L.-455) and the record thereof that the Corps unlawfully did not follow the Congressionally authorized design, route, or alignment, and it did not conduct required studies, consultation and coordination to mitigate adverse environmental impact to Louisiana in the destruction of highly productive estuarine water and marsh areas; nor did the Corps reduce or eliminate what would prove to be disastrous hydrologic consequences to Greater New Orleans.

**Failure of Corps to heed multiple warnings of impending disaster**

24. After the hurricanes of 1947 and 1965 (Betsy), the Corps knew or should have known of the hazards posed by the MR-GO and the effects of its negligent design, construction, operation and maintenance. Additionally, the Corps knew or should have known of the high probability of future damages likely to result from the inundation of Greater New Orleans. In recognition of the probability of further future damage to Greater New Orleans from the MR-GO project consequences, the Corps illegally and/or negligently (or through gross negligence, wonton and/or reckless acts and/or omissions) failed to close the MR-GO, construct Control

- 14 -

Structures, and/or constructed levees, floodwalls, and other structures in a defective, negligent, sub-standard fashion; such "Levee" allegations are detailed separately herein.

25. Virtually from inception of planning and construction, the Corps received many warnings of impending disaster that would fall upon Greater New Orleans as a result of the negligent design, construction, operation and maintenance of the MR-GO and the failure of the Corps to timely do what it should have done to eliminate or at least ameliorate the impending inundation of Greater New Orleans. Such notices were received from private citizens, scholars, scientists, engineers, journalists, municipal and Parish government (especially that of St. Bernard), and the State of Louisiana. Such notices put the Corps repeatedly on notice of massive destruction to marshes, wetlands and other land and forest areas—all resulting from the negligent and/or faulty inspection, design, construction, operation and maintenance of MR-GO.

26. As a result of the negligence and/or fault of the Corps, during and/or immediately following Hurricane Katrina an accelerated/enhanced hurricane surge was propelled up the MR-GO rushing through and/or over the so-called levees and/or I-Walls and/or spoil banks, including but not limited to a Forty Arpent Canal, and then said surge further rushed through the MR-GO/GIWW in an even greater surge smashing into the I-Walls and/or levees along the MR-GO/GIWW and the IHNC/Industrial Canal causing massive inundation of all of the class geography.

27. As a proximate result of the negligent, grossly negligent, reckless, wanton and/or illegal acts or omissions of the Corps described herein, the Intervenors sustained damages.

## VI. COUNT TWO:

## CREATING A NUISANCE IN VIOLATION OF LOUISIANA AND/OR FEDERAL

1055983v.1

**COMMON LAW**

28. Intervenors re-allege all previous allegations contained herein, and allege that, as the proprietor of the MR-GO, the Corps had a duty, pursuant to Louisiana Civil Code article 667, to refrain from creating a nuisance with respect to the MR-GO that has deprived, and threatens imminently to deprive, the Intervenors from the enjoyment of their property in the event of a hurricane. Defendants have violated this state statutory duty by creating the MR-GO's hazardous conditions.

29. As the owner and operator of the MR-GO, the Corps also had a federal common law duty to avoid creating a hazardous condition that harms, and threatens imminently to harm, the lives and property of nearby residents in the event of a hurricane. Defendants have violated this federal common law duty by allowing the MRGO to become a lethal threat to human life, property, and the environment.

30. Accordingly, the Intervenors are entitled to recover damages sustained by them as a result of such nuisance.

**VII. COUNT THREE:**

**THE IHNC/INDUSTRIAL NAVIGATION CANAL: AGAINST WASHINGTON GROUP (For the Lower Ninth Ward and St. Bernard Parish from Orleans Parish to Paris Road), THE CORPS and ORLEANS**

31. Intervenors re-allege all previous allegations contained herein, and in addition to the allegations regarding the MR-GO set forth above, Intervenors aver, upon information and belief, that the breaches and failure of the hurricane protection levees and flood walls of the

1055983v.1

IHNC/Industrial Canal were caused by the negligence and fault of the Defendants Corps, Washington Group, and Orleans all as set forth herein.

32. Defendant Washington Group contracted with the Corps in connection with the IHNC/Industrial Canal Lock Replacement Project, which was authorized by the River and Harbor Act of 1956, the Water Resources Development Acts of 1986 and 1996, and which was intended to enlarge and deepen the lock. Defendant Washington Group was hired to level and clear abandoned industrial sites along the IHNC/Industrial Canal between the flood wall and the canal itself for the purpose of clearing acreage to make way for the digging of a new canal, which would be used temporarily for the same purpose as the existing IHNC/Industrial Canal while the new system of larger locks was constructed.

33. The initial phases of work included demolition and site preparation of what was referred to as the East Bank Industrial Area—a 32-acre site located between Florida Avenue and Claiborne Avenue and extending from the canal to the floodwall. Defendant Washington Group's tasks included, but were not limited to, the removal of wharfage, salvage, debris, and other materials from the IHNC/Industrial Canal and/or its banks.

34. More specifically, Defendant Washington Group's scope of work included, but were not limited to: demolition of abandoned industrial structures on the east side of the canal; removal of underground structures described in Defendant's own recommendation reports as "extensive excavation and subsurface activity"; abatement of vegetation, including numerous oak trees; removal of canal side obstructions; removal of the Jordan Street wharf, which included the removal of a concrete deck and support pilings to a depth of 36 feet below mean water level; removal of all electrical, sewer, gas, water, and telephone facilities on the site, including Boland sewer lift station;"bank removal" that included the vibratory extraction of bulkheads along the

- 17 -

canal water's edge; removal of more than fifty structures and more than forty concrete slabs; grid trenching of the entire East Bank Industrial Area; removal of ten sunken or partially sunken barges; removal of barges that served as building foundations; removal of an estimated 3,000 pilings at the site, both on land and in the canal, by use of a vibratory extractor (to a depth of 30 feet for land-based pilings and 40-50 feet for canal/waterbased pilings); grading and hydro-mulching the site; and other such work to be demonstrated through the course of discovery and trial.

35. In performing the work, Defendant Washington Group, based on information and belief, undermined the integrity of the levee, and/or flood wall along the eastern shoreline of the IHNC/Industrial Canal, abutting the Lower Ninth Ward of Orleans Parish.

36. Defendant Washington Group's acts and/or omissions resulted in underseepage-induced erosion and other damage to the levee and/or flood wall(s), ultimately causing and/or contributing to its/their catastrophic failure.

37. Defendant Washington Group was negligent and/or at fault in the following non-exclusive respects: (1) it knew or should have known that its work was causing damage to the levee and/or flood wall structures and did nothing to correct the problem; (2) it failed to follow proper procedures in performing its work; (3) it failed to comply with appropriate regulations and standards in performing its work; (4) it failed to notice the damage caused by its work and failed to call that damage to the attention of the appropriate authorities; (5) and any other acts of fault or negligence to be proven upon the trial of the cause.

38. The negligence and/or fault of the Corps, caused or contributed to cause the failure of the levee and/or flood wall and/or spoil bank on the sides of the IHNC/Industrial Canal.

1055983v.1

39. The negligence of the Corps consisted of the following non-exclusive particulars: (1) allowing the work to proceed; (2) failing to caution the Washington Group about the potential damage to the levee and/or flood wall system by its work; (3) failing to monitor and/or properly inspect the work of the Washington Group; (4) failing to adequately evaluate the potential damage to the levee and/or flood wall structure by the work of Washington Group; (5) failing to correct the damage caused by the actions of the Washington Group; (6) failing to discharge its duty to maintain the integrity of the levee and/or flood wall system of the IHNC/Industrial Canal; (7) and in addition, as a result of the negligence and/or fault of the Corps during and/or immediately following hurricane Katrina, an accelerated/enhanced hurricane surge was propelled up the MR0GO and then through the MR-GO/GIWW, in an even greater surge, overtopping the I-walls, and/or levees along the MR-GO/GIWW causing massive innundation of the Orleans Parish East Bank (downtown protected area); (8) and other acts of negligence or fault to be shown at trial of the cause;

40. The negligence and/or fault of Defendant Orleans caused or contributed to the cause of the failure of the levee and/or flood wall and/or I-Walls and/or spoil banks on the sides of the IHNC/Industrial Canal.

41. Defendant Orleans was granted the authority to establish adequate drainage and flood control in Orleans Parish and other areas within the jurisdiction including the IHNC/Industrial Canal Orleans was specifically granted authority to erect flood control works as they relate to tidewater flooding, hurricane protection and saltwater intrusion. Orleans was required to engage in the construction and maintenance of levees/floodwalls and/or spoil banks. All levee districts and their commissioners, including Orleans, have the responsibility for the care and inspection of levees.

1055983v.1

42. The negligence and/or fault of Defendant Orleans consist of the following non-exclusive particulars: (1) failure to adequately inspect and/or supervise the activities of Defendant Washington Group; (2) failure to ensure the adequacy of Defendant Washington Group's procedures; (3) failure to ensure that Defendant Washington Group complied with appropriate regulations and standards; (4) failing to note the resulting damage to the levee and/or flood wall system caused by Defendant Washington Group's activities; (5) failing to note the under-seepage resulting from the undermining of the integrity of the levee and/or flood wall by the work performed by Defendant Washington Group; (6) having noted the under-seepage, in failing to take steps to correct the problems created by Defendant Washington Group, or to notify other authorities, of the damage to the levee and/or flood wall system caused by the work performed by Defendant Washington Group. As a proximate result of the negligent grossly negligent, reckless, wanton and or illegal acts or omissions of the Defendants described herein this Complaint in Intervention, the Intervenors sustained damages.

## VIII. COUNT FOUR:

## NEGLIGENCE OF LAKE BORGNE

43. Intervenors re-allege all allegations contained herein, and aver that Defendant Lake Borgne was granted the authority to establish adequate drainage and flood control in St. Bernard Parish and other areas within its jurisdiction including 40 Arpent Canal. Lake Borgne was specifically granted authority to erect flood control works as they relate to tidewater flooding, hurricane protection and saltwater intrusion. Lake Borgne was required to engage in the construction and maintenance of levees/floodwalls and/or spoil banks. All levee districts and their commissioners, including Lake Borgne, have the responsibility for the care and inspection of levees.

- 20 -

44. The levees/floodwalls/spoil banks protecting St. Bernard Parish along the area near the MR-GO and 40 Arpent Canal failed in some instances during August 29, 2005, and were overtopped in others. Following the storm, it was determined by independent engineers that the levees/spoil banks in St. Bernard Parish had subsided significantly since their initial construction. These independent studies concluded that this change in elevation also caused and contributed to the failure and overtopping of levees/spoil banks in St. Bernard Parish. The responsibility for this failure lies, in whole or in part, with Lake Borgne.

45. Lake Borgne failed to discharge its statutorily mandated responsibilities relative to flood control and maintenance of levees along the MRGO and the 40 Arpent Canal, and such failure caused and/or contributed to the damages alleged by the plaintiffs. As a proximate result of the negligent, grossly negligent, reckless, wanton and or illegal acts or omissions of the Lake Borgne described herein this Complaint in Intervention, the Intervenors sustained damages.

## IX. COUNT FIVE

## LAKE PONCHARTRAIN AND VICINITY HURRICANE PROTECTION PROJECT LEVEE ALLEGATIONS AGAINST CORPS ONLY

### Factual Background of The Navigation Canals Involved The Inner Harbor Navigation Canal

46. In July, 1914, New Orleans received authorization from the State Legislature to locate and construct a deep water canal between the Mississippi River and Lake Pontchartrain. Construction of the IHNC commenced on June 6, 1918. Excavation work initiated with the construction of parallel dikes on either side of the canal. The more resistant clay materials that were excavated were dragged up onto the dikes, and were gradually built up to become permanent protective levees. From the onset, contractors battled problems with slope stability, as

- 21 -

the soft oozy soils constantly slid back into the excavation. During construction, the Port Authority decided to increase the size of the channel to a minimum depth of 30 feet at low water, with a minimum bottom width of 150 feet and a minimum channel width of 300 feet, roughly double the original design. When new wharves were constructed, the bottom width was increased to 300 feet, with a minimum canal width of 500 feet near piers and slips, and 600 feet adjacent to quays. The canal excavation was completed in September 1919. The lock structure was completed on January 29, 1923. At that time, water level in the IHNC was controlled by the tides in Lake Pontchartrain.

**The Gulf Intracoastal Waterway**

47. GIWW") forms a protected shipping lane between Port Isabel, Texas (the Mexican border) and Apalachee Bay, Florida. The GIWW was a navigation canal project completed between New Orleans and Corpus Christi, Texas by mid-1942. The GIWW was officially completed in June 1949. In 1944, under the authority of the Corps, the GIWW was rerouted to pass through the southern part of the IHNC, creating the first shallow channel through the wetlands that would facilitate propagation of hurricane surge from Lake Borgne into the heart of New Orleans. The Corps had negligently created the first part of a "Hurricane Alley" right into the heart of New Orleans.

48. The "Hurricane Highway" was enlarged in the 1960s by construction of the MR-GO, and this enlargement exponentially enhanced the surge risk and likelihood for Greater New Orleans. This threat was first realized during Hurricane Betsy in September 1965. Both sides of the IHNC experienced breaks and overtopping. 6,560 homes and 40 businesses were flooded in water up to 7 feet deep on the west side of the IHNC. The east side of the IHNC also failed, flooding the west end of St. Bernard Parish. The Corps' report on Hurricane Betsy (USACE,

- 22 -

1055983v.1

1965) states that both internal levee failures and overtopping occurred along the Inner Harbor Navigation Canal, on both the west and east sides.

**The Mississippi River Gulf Outlet**

**The Lake Pontchartrain, and Vicinity, Hurricane Protection Project**

49. Most of the levee and/or I-Wall structures that surround the New Orleans metropolitan area were constructed, in part, under the authority of the "Lake Pontchartrain, Louisiana and Vicinity, Hurricane Protection Project" (hereinafter referred to as "Lake Pontchartrain Project"). Congress first authorized construction of the Lake Pontchartrain Project in the Flood Control Act of 1965 to provide hurricane protection to areas around the Lake Pontchartrain. The Corps was responsible for project design and construction.

**NEGLIGENT AND INHERENTLY DANGEROUS DESIGN CRITERIA AND REGULATORY VIOLATION BY CORPS**

(I) Standard Project Hurricane

50. The overall design criterion of the Lake Pontchartrain Project mandated by Congress was to protect the area from "the most severe combination of meteorological conditions considered characteristic for the region." The Corps expected these conditions to occur once in 200 to 300 years, and they were deemed to be equivalent with the "Standard Project Hurricane" ("SPH"). However, the Corps based its overall design specifications on the 1959 U.S. Weather Bureau 1-in-100 year SPH, which was contradictory to Congress' mandate to protect from a 1 in-200 years to a 1-in-300 year hurricane.

51. The 1959 SPH was known by the Corps to be obsolete by 1972, just as construction of initial parts of the Lake Pontchartrain Project and the floodwalls along the IHNC were getting underway. The 1959 SPH specification of maximum sustained wind speeds of 107 mph was

increased by the National Weather Service to 129 mph. An increase of 20 percent in maximum winds results in up to a 40 percent elevation of maximum surge elevation. In 1979, the National Oceanic and Atmospheric Administration ("NOAA") raised the maximum sustained winds again to 140 mph, a category 4 hurricane (Technical Report NWS 23), which further exacerbated the Corps' design deficiencies. In 1981, the Office of the Chief of Engineers in Washington issued Engineering Regulation ER 1110-2-1453. The regulation provides direction for the development of SPH and Probable Maximum Hurricane wind fields along the Gulf and east coast of the United States. The regulation states specifically: 5. Requirements. ER 1110-2-1453 provides direction on the selection of the level of protection to be afforded by Corps flood damage prevention projects in urban areas. All field operating activities having Civil Works responsibilities are required to use the National Oceanic and Atmospheric Administration (NOAA) Technical Report NWS 23 for specifying meteorological criteria for SPH and PMH wind fields along the gulf and east coasts of the United States. Notwithstanding these events and the history of the area to date, the Corps negligently failed to consider any alteration of the project to strengthen the protection from flooding and in failing to do so negligently or intentionally violated this regulation. In ignoring this order to revise all SPH-based analysis to reflect the new understanding of threat, the Corps elected to base its designs for the Lake Pontchartrain Project on the 1959 SPH. Such negligence or intentional act in violation of law significantly increased the flooding risk to the Greater New Orleans Area from Hurricane storm surge.

**(ii) Negligent and Inherently Dangerous Design Criteria – the Elevation Datum**

52. In addition to the application of the wrong SPH, the Corps' elected to base the overall design specifications on the wrong elevation datum. The Corps applied the National Geodetic

1055983v.1

Vertical Datum of 1929 ("NGVD29"), even though they were aware of the fact that NGVD29 was not any longer equal to - and interchangeable with - local mean sea level ("LMSL"). LMSL was the only relevant datum for superimposition of hurricane surge and wave height from a 1950's era oceanographic analysis. However, when the Corps' adopted design specifications for the Lake Pontchartrain Project in 1965, zero NGVD29 was already between 1.3 and 1.6 feet below LMSL at different parts of the system, and thus, the floodwalls crowns were constructed lower by this margin. This design flaw was continued with the use by the Corps of the outdated NGVD29 adjustment for elevation control up to the time of Katrina. As a result, no provision was made to account for the 3 to 4 feet/century subsidence rates characteristic of the Greater New Orleans metropolitan area even though this rate was known or should have been known by the Corps at the time of congressional authorization of the Lake Pontchartrain Project.

53. Crown elevation deficiencies ranging up to 6 feet at the time Katrina struck resulted in prolonged overtopping of floodwalls and levees along IHNC that otherwise would have been overtopped only briefly, if at all. Prolonged overtopping led to catastrophic breaches into the Greater New Orleans area east of the IHNC in New Orleans East and the Lower Ninth Ward of Orleans Parish, as well as in St. Bernard Parish.

**(iii) Negligent and Inherently Dangerous Design Criteria – the Barrier Plan**

54. The original and only project design authorized by Congress, known as the "Barrier Plan," included a series of levees along the lakefront, concrete floodwalls along the IHNC, and control structures, including barriers and flood control gates located at the Rigolets, Chef Menteur Pass, and Seabrook at the northern end of the IHNC. These structures were intended to prevent storm surges from entering Lake Pontchartrain and the IHNC via the MR-GO's

- 25 -

1055983v.1

confluence with GIWW, all thus protecting from overflowing the levees along the lakefront and the floodwalls along the IHNC and other areas.

55. The Barrier Plan was selected by the Corps and authorized by Congress over another alternative, known as the "High-Level Plan", which excluded the barriers and flood control gates at the Rigolets, Chef Menteur Pass, and Seabrook complexes, and instead employed higher levees and flood protection structures along the lakefront and along the IHNC. The estimated completion date of the Barrier Plan was 1978. The Barrier Plan was selected because the High-Level Plan was believed to have many serious drawbacks, including the following:

- High Level Levees would take years longer to construct because of subsidence problems;

- They would be wider, thus requiring more rights of way;

- In some locations floodwalls (which are more vulnerable to severe damage and/or rupture by impact of runaway vessels during a hurricane and would virtually destroy the esthetic quality of the lakefront) are required rather than levees;

- More rights of way would result in displacement of more residences, businesses, et cetera;

- With higher Lake levels, the interior drainage system would be severely hampered;

- The High Level Plan would offer no protection to less densely populated areas such as the North Shore;

- Lakefront Levees would have to be 6 to 9 feet higher than the present design grade;

- In studies leading to project authorization, the high level plan was determined to cost approximately 50 percent more than the Barrier Plan.

The final design memoranda for the floodwalls along the IHNC/Industrial Canal were completed in the late 1960s, and construction was completed in the 1970s.

- 26 -

1055983v.1

**(iv) Illegal and/or Grossly Negligent Change from Barrier to High-Level Plan**

56. During the 1970s, the control complexes at the Rigolets and Chef Menteur faced significant opposition from environmentalists. The Corps was unable to produce a satisfactory Environmental Impact Statement for the Barrier Plan and in 1984 abandoned the Barrier Plan and elected to implement the High-Level Plan, even though the High-Level Plan was believed to have many serious flaws. Despite this unilateral, unauthorized negligent, grossly negligent, wanton and/or reckless abandonment of the Barrier Plan by the Corps, it took no action to adjust the floodwalls that were built along the IHNC/Industrial Canal and elsewhere to the new high-level design, thus leaving them at a considerably lower design.

57. At the time of Hurricane Katrina on or about August 29, 2005, the Lake Pontchartrain Project was still under construction, 40 years after its authorization. While most public works structures would be scheduled for replacement or rehabilitation after 40 years, planning for a more modern system was negligently, grossly negligently, wantonly or recklessly put off while the original project remained incomplete and continued to fall further behind in achieving a completion date. The Corps' design assumptions and policy negligently made in 1965 continue to diminish the Lake Pontchartrain Project today, and were a proximate cause of the flooding of the Greater New Orleans Area.

**The Failure of the Hurricane Protection System**

58. As Katrina's storm surge increased in intensity, water levels within the MRGO, the GIWW, and the IHNC/Industrial Canal began to rise, and certain levees and floodwalls collapsed or were otherwise compromised or overtopped due to construction by the Corps with porous, erodible lightweight "shell sand" fill, or other inappropriate fill material not suitable for levee construction, especially without sheetpile cutoff, concrete armoring or similar features to prevent

1055983v.1

erosion, undercutting, collapse or failure, or due to negligently inadequate height. The effects of such negligent and defective design and construction of levees and floodwalls by the Corps was further exacerbated along certain levees and flood walls along the GIWW, MR-GO and/or IHNC/Industrial Canal by the speeding impact of the surge jet entering from the east through the MRGO/GIWW ship channel at the "Funnel."

59. These breaches in the Greater New Orleans area caused extensive harm and damage in Orleans and St. Bernard Parishes. These breaches were the result of the negligence, fault, gross negligence and/or reckless or wanton conduct of the Corps and resulted from violations by the Corps, or those working on their behalf for whom they are responsible, of Federal and State and other mandated or generally accepted designs for and methods of construction for levees, I-Walls, flood walls and other similar structures that failed during and following Hurricane Katrina which conduct/actions/inactions, engineering errors, were a proximate cause of the damages sustained by the Class alleged herein. Negligent, grossly negligent, wanton or reckless engineering lapses and/or lapses in oversight during design and construction were also proximate causes.

60. Additionally, based upon information and belief, floodwalls, levees, and or other structures failed causing harm to the class through the negligent design, construction, engineering, maintenance and/or inspection by the Corps and/or its contractors and sub-contractors involved in levee, I-wall, spoil banks or similar construction in or around New Orleans East, Lower Ninth Ward and St. Bernard Parish.

**Violation by Corps of its own Design and Construction Criteria**

61. Additionally, the Corps and its contractors violated its/their own design, engineering and construction criteria for levees, flood walls, and/or spoil banks, and violated the Coastal Zone

- 28 -

1055983v.1

Management Act in failing to comply with the Louisiana and/or Federal regulations affecting design, engineering, construction, maintenance and operations of levees, flood walls and spoil banks. As such the Corps is liable pursuant to law unto the Class Representatives and the putative class they seek to represent herein. As a proximate result of the negligent grossly negligent, reckless, wanton and or illegal acts or omissions of the Corps described herein this Complaint, the Named Plaintiffs and the class they seek to represent sustained damages.

## X. ALLEGATIONS RELATING TO ALL COUNTS NEGLIGENCE

62. All of the Defendants owed a duty to Intervenors to refrain from negligent acts and omissions in carrying out their responsibilities described in the above paragraphs. The Defendants breached that duty. Defendants are specifically liable for damages to Intervenors pursuant to Louisiana Civil Code Articles 667, 2315, 2316, 2317, 2322 (and other laws of the State of Louisiana.)

63. Congress charged the Corps with the task of the design, construction, operation, maintenance, and repair of IHNC/Industrial Canal and MR-GO, and the Corps compliance with this Congressional mandate did not involve acts of a discretionary function. Moreover, the Corps had an obligation to design, construct, operate, maintain, and repair the MR-GO channel in such a way as to avoid having it pose a threat to residents like Plaintiffs and serve as a "hurricane highway" for surge water directed at Orleans and St. Bernard Parishes, and to maintain and repair the IHNC/Industrial Canal in such a manner as to prevent its catastrophic failure.

## LIABILITY PURSUANT TO LA. C.C ART 2317, AND 2322

64. The Defendants had, at all relevant times, the care, custody, and control, and thus the garde of the IHNC/Industrial Canal, MR-GO, and/or the 40 Arpent Canal and the levees/floodwalls adjacent thereto, including such other levees/floodwalls and/or spoil banks in

- 29 -

Orleans Parish (East of the IHNC/Industrial Canal) and St. Bernard Parish; as such they are liable

to Intervenors for their damages resulting from the vices and/or defects therein, in accordance

with Louisiana Civil Code articles 2317, and 2322 et seq.

65. The levees/floodwalls of the IHNC/Industrial Canal are buildings pursuant to

Louisiana Civil Code article 2322 and are owned by the Orleans Levee Board, and the banks of

the MR-GO are buildings pursuant to Louisiana Civil Code article 2322 and are owned by the

Army Corps. The owner of a building is liable to the class for their damages caused by the

owners' neglect to repair these buildings, or from defects in the original construction of these

buildings.

66 The Defendants knew, or in the exercise of reasonable care should have known, of the

vices and/or defects that caused Plaintiffs' damages, and further in the exercise of reasonable care

by the defendants, said damages could have been prevented.

67. Intervenors expressly plead the doctrine of Res Ipsa Loquitur against each and all of

the Defendants, as may be appropriate under the circumstances and permitted by law.

## XI. DAMAGES

68. As a result of the Defendants' negligent, grossly negligent, reckless, wanton and or

illegal inactions described throughout this Complaint, the Intervenors sustained damages

including but not limited to: (a). PROPERTY AND OTHER SPECIAL DAMAGES: As a direct

and proximate result of the Defendants' negligence, Intervenors suffered property damages and

other special damages including but not limited to the following: loss of property (real and

personal), immovable and movable; diminution of property value; loss of income; costs of

relocation; loss of business opportunities and business interruption; evacuation expenses; and

other special damages to be proven at trial. (b). PERSONAL INJURY AND OTHER GENERAL

- 30 -

1055983v.1

DAMAGES: As a direct and proximate result of the Defendants' negligence, Intervenors suffered personal injury and other general damages including but not limited to the following: wrongful death, survival damages, fear, fright and emotional distress, grief, mental anguish, inconvenience, pain and suffering, loss of the capacity to enjoy life; loss of consortium; and costs of suit.

## PRAYER FOR RELIEF

**WHEREFORE**, Intervenors demand judgment against the defendants for: Economic and compensatory damages in amounts to be determined at trial;

1.   Pre-judgment and post-judgment interest as allowed by law;

2.   Attorney fees and costs of litigation pursuant to the Federal Tort Claims Act and/or the Equal Access to Judgment Act;

3.   Such other relief to the Intervenors as is available under Louisiana and/or Federal law; and

4.   Such other relief as the Court deems just and equitable

Respectfully Submitted,

APPROVED PLAINTIFFS LIAISON COUNSEL

/s/ Joseph M. Bruno
JOSEPH M. BRUNO
LA Bar Roll Number: 3604
Bruno & Bruno, L.L.P.
855 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 525-1335
Facsimile: (504) 561-6775
Email: jbruno@brunobrunolaw.com

MR-GO PLAINTIFFS SUB-GROUP LITIGATION COMMITTEE

1055983v.1

/s/ James Parkerson Roy
JAMES PARKERSON ROY
MR-GO PSLC Liaison Counsel
LA. Bar Roll Number: 11511
Domengeaux Wright Roy & Edwards LLC
P.O.Box 3668
Lafayette, LA. 70502
Telephone: (337) 593-4190 or (337) 233-3033
Facsimile: 337-233-2796
Email: jimr@wrightroy.com

For

MR-GO PLAINTIFFS SUB GROUP LITIGATION COMMITTEE
Jonathan Andry
Clay Mitchell
James Parkerson Roy

1055983v.1