2008 WL 4449353
United States District Court,
S.D. New York.

AMERICAN STEAMSHIP OWNERS MUTUAL
PROTECTION AND INDEMNITY ASSOCIATION,
INC., Plaintiff,
v.
LAFARGE NORTH AMERICA, INC., Defendant.

No. 06 Civ. 3123(CSH).Sept. 29, 2008.

Opinion

*MEMORANDUM OPINION*

HAIGHT, Senior District Judge.

*1 This is an action within the Court's admiralty jurisdiction for a judicial declaration coverage *vel non* under a policy of marine insurance. The parties cross-moved for summary judgment. In an Order dated September 18, 2008, the Court granted Plaintiff's motion and denied Defendant's cross-motion. The Order stated that an Opinion explaining the Court's reasons would follow. This is that Opinion.

Plaintiff American Steamship Owners Mutual Protection and Indemnity Association, Inc. ("the American Club" or "the Club") sued for a declaration that a policy it issued to Defendant Lafarge North America, Inc. ("Lafarge") does not cover claims generated when the barge ING4727, owned by non-party Ingram Barge Company ("Ingram"), broke away from a terminal owned by Lafarge on the Mississippi River in New Orleans during Hurricane Katrina in August 2005 and allegedly struck and breached the 17th Street Canal Levee in New Orleans, causing flooding in the Lower Ninth Ward of New Orleans and parts of St. Bernard Parish, Louisiana. Residents of those affected areas have asserted claims for damages against, *inter alia,* Lafarge. The litigation that will determine liability issues is taking place in the United States District Court for the Eastern District of Louisiana.

The American Club issued to Lafarge a Protection and Indemnity policy ("P & I" in the vernacular of marine insurance). A P & I policy obligates the insurer to pay the insured's legal defense costs ("Protection") and indemnify it against claims for liability ("Indemnity").

Lafarge contends that its policy with the American Club covers the incident involving the barge ING4727. It demanded that the Club undertake and pay for its defense in the Louisiana actions and indemnify it for liability that may be adjudged against it in them. The American Club contends that its policy does not cover the ING4727 or the underlying claims.

The American Club commenced this action for a declaratory judgment of non-coverage. Lafarge counterclaimed for a declaration of coverage. Litigation that will determine insurance coverage issues-and there are several-is taking place in this Court. Following discovery, the parties cross-move for summary judgment under Fed.R.Civ.P. 56: the Club for a summary judgment of non-coverage, Lafarge for a summary judgment of coverage.

For the reasons that follow, the American Club's motion is granted and Lafarge's cross-motion is denied.

I. BACKGROUND

The circumstances giving rise to the underlying third-party claims involving the barge ING4727, Ingram, Lafarge, and Hurricane Katrina are set forth in Judge Berrigan's opinion in *Ingram Barge Company (Petition for Exoneration from or Limitation of Liability),* Civ. No. 05-4419, 2008 WL 906303 (E.D.La. March 31, 2008) (*"Ingram"*). The circumstances giving rise to the present cross-motions on insurance coverage are set forth in part in this Court's opinion reported at 474 F.Supp.2d 474 (S.D.N.Y.2007). Familiarity with both opinions is assumed. Those circumstances are restated in this opinion only to the extent necessary to explicate the Court's reasoning.

*2 Lafarge is a diversified construction materials company and supplier of cement, aggregates and concrete, and other materials in the United States and Canada. In the conduct of its business, Lafarge frequently uses barges owned by other companies to transport its cement in inland waterways. The incident in suit is typical of that business operation. Pursuant to a contract with Ingram, Lafarge loaded the barge ING4727 with a cement cargo at Lafarge's plant in Illinois for transportation under tow down river for unloading at Lafarge's New Orleans facility on the Inter Harbor Navigational Canal. The ING4727 had been unloaded but was still moored at the Lafarge facility when on August 29, 2005 Hurricane Katrina made landfall. Sometime during or after the storm struck, the ING4727 broke free from her moorings, giving rise to the third-party claims pending in the Louisiana actions.

WestlawNext © 2011 Thomson Reuters. No claim to original U.S. Government Works.

EXHIBIT
4

1

Lafarge owned vessels in its own name. The owners and/or operators of vessels run the risk of third-party claims arising out of that operation. A vessel may collide, run aground, or catch fire, causing deaths, injuries, and cargo and property loss or damage. She may spill oil, causing cause pollution of the waters and shorelines. She may through unseaworthiness or negligence of her crew or operators cause death or injury to passengers, crew members, or harbor workers on board. The resulting claims can result in substantial damages awards and attorney's fees in defending against the owner or operator of the offending vessel. Admiralty law personifies the vessel. Her liability is traditionally *in rem*. The liability of her owner or other operator is *in personam*.

Prudent owners and operators of vessels take out P & I insurance against such third-party liability. Lafarge took out P & I insurance with the American Club. The Club is a non-profit mutual insurance association, operated by its members for their exclusive benefit. There are a number of such associations in the world of marine insurance, headquartered in a number of different countries.

Companies which obtain insurance through these mutual associations are not generally called "policy holders." They are called "members." A shipowner's membership in the association is evidenced by a document called a "Certificate of Entry." The American Club issued to Lafarge a Certificate of Entry dated at New York, N.Y. on March 3, 2005. Given certain of the parties' contentions discussed in Part II, it is useful to examine that document with some care.

The top of the document bears the name "The American Club" and a logo, under which the full Club name appears: "American Steamship *Owners* Mutual Protection and Indemnity Association, Inc." (emphasis added). The document recites that it is a "Certificate of Entry of the vessel(s) set out herein for account of the Member named hereunder ...." The title "Class 1-Protection & Indemnity Insurance" appears, followed by a table with four captioned columns and notations: "VESSEL(S)-As per Schedule"; "FLAG-As per Schedule"; "GROSS TONNAGE-As per Schedule"; and "COVER TO COMMENCE," giving the date when P & I cover commenced, February 20, 2005, and the renewal date, February 20, 2006.1 The "Member" holding the Certificate is identified as "Lafarge North America, Inc." A "Schedule of Vessels" is attached, with four columns captioned "VESSEL NAME," "TYPE," "FLAG," and "GROSS TONNAGE." What one may refer to as the "Lafarge Fleet" is then listed. There are 72 vessels. They all fly the American flag. The type of most of them is specified as "Barge (dry)" with a gross tonnage of 1,400 (there are some variations in tonnage). The Schedule also lists six vessels described respectively as "Tank Barge," "Tug/Supply," "Dirty Oil Tank," "Bulk," "Tank Barge," and "Tug."

*3 It is worth noting at this juncture that admiralty law and marine insurance regard a barge as a "vessel." A distinction is drawn between "self propelled" and "non-self propelled" vessels, barges falling within the latter category are sometimes characterized by the unflattering phrase "dumb barge." However, while a barge cannot proceed one inch through the water without being pulled or pushed by another, self propelled vessel, she is capable of various acts of mischief giving rise to third-party claims. Hence a barge owner's need for P & I insurance, of the sort that Lafarge obtained for its fleet of barges from the American Club.

Reverting to the Certificate of Entry, it states that it is "subject to the By-Laws and Rules of the Association from time to time in force and to any special terms and conditions endorsed hereon and/or as may be from time to time be circularized." The Certificate also states:

> The Certificate of Entry is evidence only of the contract of indemnity insurance between the above-named Member and the Association and shall not be construed as evidence of any undertaking, financial or otherwise, on the part of the Association to any other party....

> The Member named in this Certificate of Entry is liable to pay Mutual Premium as provided for in Rule 4. Furthermore, the Member may become liable under the said Rule 4 to pay Overspill Calls to meet the Association's proportion of any Overspill Claims up to the limit per vessel as provided in the said Rule 4.

Thus, the contract of indemnity insurance between the Club and its Members is found in the Cluh's By-Laws and Rules. And one may also discern in these notations on the Certificate the concept of mutuality that underlies such associations. The Members pay premiums for coverage of their vessels in accordance with formulae contained in Rule 4. The Club divides its business into "policy years" for the "purposes of adjusting mutual premium in relation to any surpluses or deficiencies to the Association's funding...." Rule 4.4. Each Member hopes that during a given policy year the premiums paid by all Memhers exceed paid claims, resulting in a surplus, since they may face an additional call if there is a deficiency in the Club's funding. The arrangement may be analogized to that of a landlocked country club: the members pay fixed annual dues, but if the clubhouse needs a new roof they may be hit with a capital assessment.

The Certificate of Entry also contains a clause whose meaning presents the core question in the case. It is captioned "CHARTERED BARGES." I quote it in full:

> If Lafarge Corporation et al. acquires an insurable interest in any vessel in addition to or in substitution for

those set forth herein, through purchase, charter, lease or otherwise, such insurance as is afforded hereunder to any other similar vessel shall automatically cover such additional vessel effective from the date and time the Assured acquires an insurable interest in such additional vessel. With respect to a chartered, leased or similarly acquired vessel, the insurance hereunder automatically includes the owner as an additional Assured with waiver of subrogation against the owner, if required, effective from the date and time such vessel is insured thereunder.

*4 The above provision shall not apply to vessels which are chartered under a contract whereby the owner (or Demise Owner) and Charterer agree that the owner (or Demise Owner) shall procure Protection and Indemnity Insurance on the vessel and such insurance shall include the charterer as an Assured.

The Assured Agrees to report the name and gross tonnage of any vessel in which they acquire an insurable interest at the expiration of this policy and pay any additional premium as may be required annually, at expiry at daily pro-rate the annual rates agreed.

One must now consider the status of the barge ING4727. Lafarge did not own the barge. Ingram owned her. The record contains a copy of the United States Coast Guard Certificate of Documentation issued October 6, 2005 identifying Ingram Barge Company as the owner of the ING4727. Lafarge did not charter the ING4727 from Ingram. Lafarge's use of the ING4727 at the pertinent times was governed by a written Transportation Agreement entered into between Lafarge and Ingram on December 14, 2004. The Agreement refers to Ingram as the "Carrier" and Lafarge as the "Shipper." It recites that it is "for the transportation of dry cargo by barge," the cargo being identified as "cement," the point of origin being Lafarge's facility at Joppa, Illinois, and the destination being "New Orleans, LA (Lafarge-France Road Wharf)."

Clause 51 of the Transportation Agreement provides:

> **Independent Contractor:** Nothing contained in this Contract shall be construed as a contract by Shipper [Lafarge] for the chartering, hiring or leasing of any barge, towboat or other equipment of Carrier [Ingram] to be provided hereunder; nor shall any of the agents, servants, subcontractors or employees of Carrier [Ingram] be regarded as employees of Shipper [Lafarge], it being understood that Carrier [Ingram] is in all respects an independent contractor and that Shipper [Lafarge] shall exercise no control over the operation of any barge, towboat or other equipment of Carrier [Ingram] or over Carrier's [Ingram's] agents, servants, subcontractors or employees.

Both the Certificate of Entry between the American Club and Lafarge and the Transportation Agreement between Lafarge and Ingram contain the word "charter" (which can be used as a verb or a noun). It is useful to summarize what the word means in maritime commerce. Companies may wish to engage in the business of transporting cargoes or passengers but do not own vessels. So they *charter* vessels owned by another company. I have just used the word as a verb. The contract by which they do so is called a "charter" or a "charterparty" (sometimes spelled "charter party"). I have just used the word as a noun. The three principal forms of charterparty are the Bareboat (or Demise) Charter, the Time Charter, and the Voyage Charter. In each form the company owning the vessel is called the "Owner" and the company chartering the vessel is called the "Charterer." A bareboat or time charterer who sub-charters the vessel to another company on time or voyage terms is called a "Disponent Owner," the adjective reflecting the company's power to "dispose" of the vessel's use. In a bareboat charter, the charterer mans and supplies the chartered vessel and during its term directs her movements. In time charters and voyage charters, the owner employs the officers and crew and furnishes all supplies necessary for operating the chartered vessel: fuel, victuals, etc. A time charter is for a stated period of time, months or years, during which the charterer uses the vessel for its commercial purposes, directing her movements from port to port. A voyage charter is for a single voyage, with the charterer designating the cargo and the ports of loading and discharge. What is common to all forms of charterparties is that they are for a specific vessel, named in the charter.2

*5 The core question presented by the case at bar is whether the American Club and Lafarge intended the contract of indemnity insurance between them to cover the barge ING4727. The answer turns principally upon the meaning of the provision in the Chartered Barges clause of the Certificate of Entry, which extends coverage to additional vessels not listed in the Schedule in which Lafarge acquires an insurable interest "through purchase, charter, lease or *otherwise.*" (emphasis added). The parties give diametrically opposed meanings to the adverb "otherwise." The American Club says "otherwise" means "any interest akin to or in the nature of a purchase, charter or lease," Main Brief at 7; "in the nature of or akin to," Reply Brief at 4. Lafarge says "otherwise" means "in a different way or manner," Reply Brief at 3; "in another or different manner," *id.*

The Court addresses these conflicting interpretations in Part II.

II. DISCUSSION

Case 2:05-cv-04182-SRD-JCW Document 20404-5 Filed 08/30/11 Page 4 of 8

American Steamship Owners Mut. Protection and Indem...., Not Reported in...

2008 A.M.C. 2343

## A. *Standards of Review*

Summary judgment may be appropriate in cases of contract interpretation, whether before or after discovery.3 In *World Trade Center Properties, L.L.C. v. Hartford Fire Insurance Co.*, 345 F.3d 154 (2d Cir.2003) ( *"World Trade Center I"* ), the question was whether the destruction of the World Trade Center ("WTC") by two hijacked aircraft was caused by one or two "occurrences" as that phrase was used in insurance binders covering the property against loss, the binders specifying total amounts of coverage "per occurrence." Considering the propriety of summary judgment in this context, the Second Circuit said:

> Summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." (citing Fed.R.Civ.P. 56(c)). Thus, even where facts are disputed, in order to defeat summary judgment, the non-moving party must offer enough evidence to enable a reasonable juror to return a verdict in that party's favor. When ruling on a motion for summary judgment, a court is required to construe the evidence in the light most favorable to the non-moving party and to draw all reasonable inferences in its favor.
> *Id.* at 165-66 (citations to cases and internal quotation marks omitted).

These familiar standards apply to all summary judgment motions. They apply to both parties in the case at bar because both cross-move for summary judgment. Additional standards are applicable to cases of contract construction. In *Zurich American Insurance Co. v. ABM Industries, Inc.*, 397 F.3d 158, 164-65 (2d Cir.2005), the Second Circuit said:

> With respect to a contract claim, a court may construe the contract and grant summary judgment when the contractual language is plain and unambiguous. Whether contractual language is ambiguous is a question of law that we review *de novo.* Ambiguity exists when a contract is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, uses and terminology as generally understood in the particular trade or business.

*6 (citations and internal quotation marks omitted). In *World Trade Center I*, 345 F.3d at 184, the Second Circuit amplified these principles:

> Moreover, a contract may be ambiguous when applied to one set of facts but not another. Therefore, the ambiguity is detected claim by claim.
>
> Once a court finds that a contract is ambiguous, it may look to extrinsic evidence to determine the parties' intended meaning. If factfinding is necessary to determine the parties' intent, however, the matter must be submitted to the finder of fact.

(citations and internal quotation marks omitted).

As this quotation from *World Trade Center I* makes plain, the core question for a court in determining whether a particular insurance policy covers a particular claim is to divine the parties' intent. The Second Circuit elaborated on that subject in *SR International Business Insurance Co., Ltd. v. World Trade Center Properties, LLC*, 467 F.3d 107, 125-26 (2d Cir.2006) ( *"iWorld Trade Center II"* ), in which the Court of Appeals revisited the WTC destruction after trial on the meaning of "occurrence" in the several policies in suit. The Second Circuit's analysis in *World Trade Center II* is instructive in the case at bar, and I quote it at some length:

> The cardinal principle for the construction and interpretation of insurance contracts-as with all contracts-is that the intentions of the parties should control. Under New York law, this is accomplished by looking to the objective manifestations of the intent of the parties as gathered by their expressed words and deeds. The parties' communicated expressions are interpreted objectively to give effect to the reasonable expectations of the parties, not necessarily their actual expectations. The manifestation of a party's intention rather than the actual or real intention is ordinarily controlling. Thus, it has been said that the existence of a binding contract is not dependent on the subjective intent of either party....
>
> Under the objective theory of contract, the parties' reasonable expectations are determined based on an objective understanding of the attendant circumstances in which the agreement was made, the situation of the parties, and the objectives they were striving to attain.... At least with respect to a negotiated agreement, a party's subjective understanding, while not controlling, may shed light on the state of those negotiations and could bear on that party's objective actions. A factfinder might well believe that what a party thought he was doing would show in what he did.

(citations, internal quotation marks, and brackets omitted).

Guided by these principles, I turn to the insurance contract in the case at bar.

## B. *The Insurance Contract Between the American Club and Lafarge*

The parties agree that the insurance contract between them is unambiguous, but reach diametrically opposite conclusions about what the unambiguous provisions mean. *Compare* the American Club's main brief at 7 ("Thus, the barge ING4727 was never automatically insured by the American Club under the Chartered Barge Clause. That is unambiguous from the wording of the clause and the undisputed facts of this case.") *with* Lafarge's main brief at 1 ("The plain meaning of the automatic acquisition provision encompasses LNA's interest in barge ING4727 and compels the conclusion that LNA is covered for any liability it may have in the New Orleans litigation arising from the barge."). The Court's task is to ascertain the parties' intent, applying the principles discussed in Part II.A.

*7 As noted in Part I, the core of the case is the meaning of "otherwise" in the Chartered Barge Clause. To reiterate: The American Club says "otherwise" means any interest *akin to* or in the nature of a purchase, charter or lease; Lafarge says "otherwise" means anything *different* from a purchase, charter or lease. One thing is clear enough: the parties could not have intended both meanings to apply. One of them is right. The other is wrong.

The American Cluh relies upon the canon *ejusdem generis.* Lafarge argues that *ejusdem generis* is available to the Club "only if the Court should deem the language to he ambiguous." Main brief at 2. I do not agree. *Ejusdem generis* is a canon of construction, applicable to statutes, *see United States v. Amato,* 540 F.3d 153 (2d Cir.2008), and to contracts, *see Zurich American Insurance Co.,* 397 F.3d 158. When properly applied, *ejusdem generis* operates to avoid ambiguity, not resolve it.

*Amato* is the Second Circuit's most recent consideration of *ejusdem generis.* At issue was the proper reading of the Mandatory Victims Restitution Act, 18 U.S.C. § 3663A, as applied to the defendants, who had been convicted of mail and wire fraud. The Act, a part of the statutory scheme for sentencing in criminal cases, requires district courts to "reimburse the victim for lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense," 18 U.S.C. § 3663A(b)(4). The corporate victim of defendants' fraud incurred over $3 million in attorney fees and accounting costs as a result of its participation in the investigation and prosecution of defendant's offenses. The district court included those amounts in its restitution order. Defendants appealed. They invoked "the principle of *ejusdem generis* in urging us lo exclude attorney fees and accounting costs from the definition of 'other expenses' under § 3663A(b)(4), arguing that "the term 'other expenses' should be read to include only those expenses similar in nature to the ones specifically listed in this provision: lost income, child care expenses, and travel expenses." 540 F.3d at 160.

The Second Circuit rejected that argument. Its discussion of *ejusdem generis* is instructive on what the principle means and how it should be applied:

> *Ejusdem generis* is a canon of statutory construction that dates back in Anglo-American law at least as far as the *Archbishop of Canterbury's Case,* 76 Eng Rep. 519, 520-21 (K.B.1596). It literally means 'of the same kind or class,' *Black's Law Dictionary* 535 (7th ed.1999). Under this canon, general terms that follow specific ones arc interpreted to embrace only objects of the same kind or class as the specific ones, (citing cases).

> *Ejusdem generis* has its limits. Like other canons of statutory construction, it is simply a helpful guide to legislative intent, not a dispositive one, and it does not require a court to give it unthinking reliance. Moreover, it has long been recognized that *ejusdem generis* cannot be called into play when the specific terms preceding the general one do not themselves have a common attribute from which a 'kind or class' may be defined, (citing cases).

*8 *Id.* At that point in its analysis the *Amato* court cited and discussed the Supreme Court's decision in *Alt v. Federal Bureau of Prisons,* 552 U.S. 214, 128 S.Ct. 831 (2008), in which the Court rejected *ejusdem generis* as a guide for interpreting the meaning of "any other law enforcement officer" in 28 U.S.C. § 2680. The Second Circuit continued in *Amato:*

> While that general term is preceded in § 2680 by the phrase "officer of customs or excise," the Supreme Court found no relevant common attribute linking customs officers to excise officers. In other words, the specific terms did not define any *generis* within which the meaning of the general term could be circumscribed.

> Similarly, we find no relevant common attribute linking lost income, child care expenses, and transportation expenses in 18 U.S.C. § 3663A(b)(4).

*Id.*

*Zurich,* 397 F.3d 158, considers *ejusdem generis* in the context of an insurance contract. The case involved an insurance policy covering a contractor's business interruption. The contractor, ABM, provided janitorial and HVAC services in common and tenanted areas of the World Trade Center buildings. The destruction of the buildings interrupted the contractor's business and it claimed its losses under the policy. Zurich, the insurer,

sought a judicial declaration as to the extent of its coverage of ABM's losses. Section 7.A(1) of the policy covered loss or damage to "real and personal property, including but not limited to property owned, controlled, used, leased, or intended for use by the insured." *Id.* at 162. Zurich argued that under *ejusdem generis* "a property interest such as ownership or tenancy is necessary for coverage regardless of the level of 'use' or 'control,' " *id.*, so that ABM was not covered for business interruption caused by the destruction of common and tenants' areas in the buildings, whose use formed a vital part of the services ABM provided. The Second Circuit rejected that contention and held that § 7.A(1) of the policy required only that ABM have an "insurable interest" in those areas, a requirement that was satisfied because "[t]hese areas and premises were the means by which ABM derived its income and were as essential to that function as ABM's cleaning tools." *Id.* at 165-66. In the Second Circuit's view, the contract "unambiguously includes the actual situation for which coverage is sought." *Id.* at 165 (citation and internal quotation marks omitted).

Lafarge cites *Amato* and *Zurich* as cases in its favor because they rejected narrow applications of *ejusdem generis*, a sin into which Lafarge says the American Club has fallen. However, analysis shows that these cases support the Club's invocation of *ejusdem generis* in ascertaining the intent of the parties to the contract in suit.

*Amato* and *Ali*, the Supreme Court decision it cites, stand for the proposition that *ejusdem generis* has no legitimate interpretive role to play "when the specific terms preceding the general one do not themselves have a common attribute from which a 'kind or class' may be defined." *Amato*, 540 F.3d at 160. The Second Circuit rejected *ejusdem generis* in *Amato* because it could not discern the requisite common attribute linking the specific terms in the restitution statute: lost income, child care expenses, and transportation expenses. The specific terms in Lafarge's Certificate of Entry in the American Club are "purchase, charter, lease." These three nouns precede the general phrase "or otherwise." In the world of maritime commerce, the "purchase" of a vessel, the "charter" of a vessel, and the "lease" of a vessel have two readily discernible common attributes. These contracts (1) traditionally involve a single, readily identifiable vessel; and (2) confer upon the party thereby acquiring an interest in the vessel the right to control her operation in maritime commerce. A *purchaser* of a vessel obviously has that right; it owns the vessel outright and can do with her what it will. A *charterer* of a vessel-demise, time or voyage-has the same right of operation, albeit limited by concepts of time or the boundaries of the cargo-carrying voyage the charterer has arranged and for which it has chartered the vessel." The *lease* of a vessel is a landsman's synonym for "charter."

\*9 Neither of these attributes is demonstrated by the Transportation Agreement between Lafarge and Ingram, to which we must look to discern Lafarge's status *vis-a-vis* the barge ING4727. Under that contract, Lafarge is simply a "Shipper" of cement cargoes making use of unidentified (and unidentifiable pre-voyage) barges Ingram owns as the Carrier. Lest there be any doubt about it, the Transportation Agreement specifically provides that it shall not be construed "as a contract by Shipper for the *chartering, hiring or leasing* of any barge ... of Carrier to be provided hereunder." Lafarge tells Ingram it needs a cement cargo to be transported from Joppa to New Orleans on a particular date. Ingram selects from its fleet of barges one to perform the work: it could be the ING4727, or 4726, or 4728, or any other Ingram barge. Lafarge neither knows or cares. All it knows is that if all goes well, an Ingram barge will arrive at Lafarge's New Orleans facility to discharge a cement cargo.

In these circumstances, and as Judge Berrigan correctly held in *Ingram,* Lafarge's relationship to the barge ING4727 was that of a bailee and its duty that of a wharfinger. *See* 2008 WL 906303, at \*4-\*5. If Lafarge negligently failed to secure the ING4727 at its wharf as Hurricane Katrina bore down, its negligence was that of a wharfinger. *See also Dow Chemical Co. v. Barge UM-23B*, 424 F.2d 307, 311 (5th Cir.1970), involving damages caused by breakaway barges and a transportation agreement indistinguishable from the contract between Ingram and Lafarge: "As a wharfinger, Cargo Carriers was not an insurer of the barges BC-598 and UM-22B entrusted to its care; it was, however, a bailee for hire and was required to see to it that the barges were adequately moored at all times." (citing cases).

In the case at bar, Lafarge has wharfinger's insurance, but the catastrophic amount of damages far exceeds the coverage, and Lafarge would like to claim under additional policies. Understandable enough: but *ejusdem generis,* together with "the attendant circumstances in which the agreement was made," *World Trade Center II*, 467 F.3d at 125, preclude Lafarge from seeking coverage under its P & I policy with the American Club.

In *Zurich*, the Second Circuit refused to apply the *ejusdem generis* limitation because it decided that the contract of insurance plainly included the situation for which coverage was sought. Given the terms of the policy set forth in its opinion, it is difficult to see how the court of appeals could have reached a different conclusion (although the district court managed to do so). But the contract of insurance between the American Club and Lafarge is quite different.

Lafarge, having specifically agreed with Ingram in the Transportation Agreement that it could not be characterized as having chartered, hired or leased the

barge, may not now be heard to say that its relationship with the barge falls within the phrase "purchase, charter, lease, or otherwise" contained in its contract with the American Club. Lafarge's construction loads "otherwise" with a heavier cargo than it can carry, given the immediately preceding references to specific kinds of contracts and the limitations imposed by *ejusdem generis*. It is telling that Lafarge depends upon dictionary definitions-*Black* and lay-for the meaning the Court should give to "otherwise." In dictionaries, the word in question stands alone, connected with the preceding and following words solely by the alphabet. For example, in the dictionary that saw me through college the word before "otherwise" is "otherwhile" and the word after is "otherworldly ." *Webster's New Collegiate Dictionary* (1951) at page 595. This approach is of no assistance in ascertaining the parties' intent when "otherwise" does not standalone, but is part of a phrase and preceded by specific terms.

*\*10* The conclusion I reach is reinforced by the Second Circuit's instruction in *World Trade Center II* that in ascertaining the parties' contractual intent, "the parties' communicated expressions are interpreted objectively to give effect to the reasonable expectations of the parties," expectations that "are determined based on an objective understanding of the attendant circumstances in which the agreement was made, The situation of the parties, and the objectives they were trying to striving to attain." 467 F.3d at 125. In the case at bar, Lafarge, among other things a *shipowner*, applied to a steamship *owners* mutual club for P & I Club coverage of the vessels it owned, listed on a schedule. The Club needed to know the names, flags and capacities of the covered vessels to calculate a member's annual premium. The Chartered Barges clause extended automatic coverage to vessels in which Lafarge subsequently acquired an interest "through purchase, charter, lease or otherwise," but Lafarge agreed to report the name and gross tonnage of any such vessel at the expiration of the policy and pay any additional premium required by the Club rules. The attendant circumstances, then, are a Club of shipowners extending P & I coverage to member shipowners for vessels specifically listed by the member in the schedule to the Certificate of Entry or subsequently acquired by the member and specifically identified to the Club. I find it impossible to conclude that the parties to this insurance contract intended to extend coverage to Ingram's fleet of barges supplied to transport Lafarge's cement, barges in which Lafarge contractually renounced any interest through charter, hire or lease, and whose identity was unknown and unknowable until Ingram dispatched one of its barges to load a particular Lafarge cement cargo.

Lastly, I note that prior to a transparently tactical assertion of coverage authored by counsel, Lafarge never acted as if the Club's P & I policy covered the Ingram barges. It never reported its use of an Ingram barge (and there were many) to the Club, and consequently paid no additional premium. Another lesson the Second Circuit teaches in *World Trade Center II* is that one "might well believe that what a party thought he was doing would show in what he did." 467 F.3d at 126. In the case at bar, it is pertinent to consider what Lafarge *did not* do. Lafarge never suggested to the American Club that its P & I policy extended to the fleet of Ingram barges until Hurricane Katrina made it economically imperative to do so.

### III. CONCLUSION

For the foregoing reasons, the Court granted the American Club's motion for summary judgment and denied Lafarge's cross-motion for summary judgment.

Parallel Citations

2008 A.M.C. 2343

Footnotes

1    In consequence, this Cerificate of Entry and the underlying insurance cover were in effect when Hurricane Katrina came ashore in August 2005.

2    On occasion a charter party, usually a voyage charter, is for a vessel "TBN" (to be named). However, a specific vessel must be identified (the maritime word is "nominated") well before she arrives at the loading port to begin the voyage, in order that ship's agents may be appointed, berthing arrangements made, longshoremen, tugs and pilots retained, and the vessel granted free pratique upon arrival (official permission from the port health authorities reciting that the ship is without infectious diseases or plague and the crew is allowed to make physical contact with shore; otherwise, the ship must wait at the quarantine anchorage for clearance).

3    For an example of the latter, *see U.S. Express, Inc. v. Intercargo Insurance Co.*, 841 F.Supp. 1328 (E.D.N.Y.1994) (granting summary judgment following discovery on question whether a corporate entity was an "insured" under a professional liability policy).

Case 2:05-cv-04182-SRD-JCW   Document 20404-5   Filed 08/30/11   Page 8 of 8

American Steamship Owners Mut. Protection and Indem...., Not Reported in...

2008 A.M.C. 2343

**End of Document**

© 2011 Thomson Reuters. No claim to original U.S. Government Works.