## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| | * | |
| **IN RE: KATRINA CANAL BREACHES** | * | |
| **CONSOLIDATED LITIGATION** | * | **CIVIL ACTION** |
| | * | |
| | * | **NO. 05-4182** |
| | * | **and consolidated cases** |
| **PERTAINS TO: BARGE** | * | |
| | * | **SECTION "K" (2)** |
| | * | |
| *Boutte v. Lafarge*      **05-5531** | * | |
| *Mumford v. Ingram*   **05-5724** | * | |
| *Lagarde v. Lafarge*   **06-5342** | * | **JUDGE** |
| *Perry v. Ingram*        **06-6299** | * | **STANWOOD R. DUVAL, JR.** |
| *Benoit v. Lafarge*      **06-7516** | * | |
| *Weber v. Lafarge*       **08-4459** | * | **MAGISTRATE** |
| *Parfait Family v. USA*  **07-3500[1]** | * | **JOSEPH C. WILKINSON, JR.** |

# LAFARGE NORTH AMERICA INC.'S MEMORANDUM OF LAW IN

# SUPPORT OF MOTION FOR SUMMARY JUDGMENT

---

[1] *Parfait Family v. USA,* No. 07-3500, remains stayed and administratively closed.  Doc. 13525.  However, this motion would apply equally to that case if it were ever to be reopened.  *See* Doc. 32 in No. 07-3500 (granting summary judgment to Zito Fleeting, LLC and Zito Fleeting, Inc.).

# TABLE OF CONTENTS

INTRODUCTION...................................................................................................................1

ARGUMENT.........................................................................................................................1

I.    SUMMARY JUDGMENT STANDARD ....................................................................1
      A.    General Standard..............................................................................................1
      B.    Plaintiffs Must Show a "Genuine Issue," Not Just a Fact Dispute. ................2
      C.    Summary Judgment on Causation is Appropriate. ..........................................4
      D.    Summary Judgment Based on the Trial Record is Proper ...............................5

II.   IT IS SCIENTIFICALLY IMPOSSIBLE FOR THE BARGE TO HAVE
      BEEN PRESENT WHEN THE BREACHES OCCURRED. ........................................7
      A.    Hurricane Winds Prevented the Barge from Being Present at Either
            Breach. ..............................................................................................................7
            1.    Multiple independent scientific data sources confirm wind
                  direction at the IHNC..............................................................................7
            2.    The barge could not have been present at the North Breach or
                  South Breach. ......................................................................................... 9
            3.    Plaintiffs' meteorological evidence does not create a genuine fact
                  dispute. .................................................................................................... 9
      B.    Other Evidence Confirms the Barge Was Not Present at the North Breach..........10
            1.    Waves, current and tidal flow could not have caused the barge to
                  be present. ............................................................................................. 11
            2.    Physical evidence shows the barge was not present. .............................. 11
            3.    Plaintiffs have no evidence to create a genuine dispute. ....................... 12
      C.    Other Evidence Confirms the Barge Was Not Present When the South
            Breach Occurred. ............................................................................................13
            1.    Waves and current could not have caused the barge to be present. .......... 14
            2.    Physical evidence shows the barge was not present. .............................. 15
            3.    Plaintiffs have no evidence to create a genuine dispute. .......................... 16

III.  IT IS SCIENTIFICALLY IMPOSSIBLE FOR A BARGE IMPACT WITH
      THE CONCRETE CAP TO HAVE CAUSED THE FLOODWALL TO
      FAIL. ...........................................................................................................................18

IV.   LEGAL PRESUMPTIONS DO NOT AFFECT THE SUMMARY
      JUDGMENT ANALYSIS. ...........................................................................................20
      A.    Plaintiffs Bear the Burden of Showing a Flood-Causing Allision........................20
      B.    Presumptions Are Pierced by Presentation of Evidence......................................22
      C.    Presumptions are Irrelevant Because No Reasonable Jury Could Find for
            Plaintiffs............................................................................................................23

CONCLUSION ....................................................................................................................24

## TABLE OF AUTHORITIES

**CASES:**                                                                      **PAGE**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................................1, 2

*Bach v. Trident S.S. Co.*, 920 F.2d 322 (5th Cir. 1991) ...................................................5

*Barker v. Norman*, 651 F.2d 1107 (5th Cir. 1981) .........................................................3

*Bd. of Comm'rs of Port of New Orleans v. M/V Farmsum*, 574 F.2d 289 (5th Cir. 1978)...... 21-22

*Beiswenger Enterprises Corp. v. Carletta*, 46 F. Supp. 2d 1297 (M.D. Fla. 1999) .......................6

*Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22 (1st Cir. 1989).......................................6

*Bright v. GB Bioscience Inc.*, 305 Fed. App'x 197 (5th Cir. 2008)............................................3, 13

*Candies Towing Co. v. M/V B&C Eserman*, 673 F.2d 91 (5th Cir. 1982)....................................21

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...............................................................1

*Dartez v. Fiberboard Corp.*, 765 F.2d 456 (5th Cir. 1985) .................................................6

*Deen v. Egleston*, 601 F. Supp. 2d 1331 (S.D. Ga. 2009) ...............................................6

*Evans v. McKinney Marine, Inc.*, No. 96-0132, 1997 U.S. Dist. LEXIS 2148
    (E.D. La. Feb. 21, 1997), *aff'd*, 127 F.3d 34 (5th Cir. 1997)....................................5

*Florida Dep't of Ins. v. Chase Bank of Texas Nat'l Ass'n*, 274 F.3d 924 (5th Cir. 2001)..............2

*Frakes v. Crete Carrier Corp.*, 579 F.3d 426 (5th Cir. 2009) .........................................2

*Ginsberg 1985 Real Estate P'ship v. Cadle Co.*, 39 F.3d 528 (5th Cir. 1994)..............................2

*Gosnell v. United States*, 262 F.2d 559 (4th Cir. 1959).........................................................20, 21

*In re Chavin*, 150 F.3d 726 (7th Cir. 1998) ...............................................................3

*In re Complaint of Nautilus Motor Tanker Co.*, 85 F.3d 105 (3d Cir. 1996) .............................21

*In re Ingram Towing Co.*, No. 93-3311, 1995 U.S. Dist. LEXIS 15034
    (E.D. La. Oct. 4, 1995) (Duval, J.)...........................................................................5, 20

*Kampen v. Am. Isuzu Motors, Inc.*, 157 F.3d 306 (5th Cir. 1998) (*en banc*).................................3

*Kelley v. Price-Macemon, Inc.*, 992 F.2d 1408 (5th Cir. 1993)........................................................5

*Kesinger v. Herrington*, 381 F.3d 1243 (11th Cir. 2004) ........................................................3

*Kraft Gen. Foods, Inc. v. Cattell*, 18 F. Supp. 2d 280 (S.D.N.Y. 1998)........................................6

*Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253 (5th Cir. 2009)........................................................6

*Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994) ....................................2, 4, 5, 17

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).......................................1

*Michaels v. Avitech, Inc.*, 202 F.3d 746 (5th Cir. 2000)................................4, 10, 13, 17

*Molden v. Ga. Gulf Corp.*, 465 F. Supp. 2d 606 (M.D. La. 2006).......................................3, 5, 20

*Moser v. Texas Trailer Corp.*, 623 F.2d 1006 (5th Cir. 1980).........................................................4

*Nat'l Bank v. Rosenfield*, 679 F.2d 467 (5th Cir. 1982) ........................................................6

*Pennzoil Producing Co. v. Offshore Express, Inc.*, 943 F.2d 1465 (5th Cir. 1991) .....................22

*Poulis-Minott v. Smith*, 388 F.3d 354 (1st Cir. 2004)........................................................22

*Ralston Purina Co. v. Hobson*, 554 F.2d 725 (5th Cir. 1977) ................................................3, 5, 13

*Scott v. Harris,* 550 U.S. 372 (2007) ........................................................2

*Seshadri v. Kasraian*, 130 F.3d 798 (7th Cir. 1997)........................................................3

*Sievers v. Beechcraft Mfg. Co.*, 497 F. Supp. 197 (E.D. La. 1980) ............................................4, 5

*Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254 (5th Cir. 2002)........................................................3

*The Pennsylvania*, 86 U.S. (19 Wall.) 125 (1874)........................................................20, 22

*United States v. McDonald*, 837 F.2d 1287 (5th Cir. 1988) ........................................................6

*Wells v. SmithKline Beecham Corp.*, 601 F.3d 375 (5th Cir. 2010) ............................................9

*White v. Black & Decker (U.S.) Inc.*, No. Civ. A. 03-0874, 2004 WL 1373271
   (E.D. La. June 16, 2004), *aff'd*, 122 Fed App'x 795 (5th Cir. 2005) ...................................3-4

*White v. Omega Protein Corp.*, 390 F. Supp. 2d 604 (S.D. Tex. 2005),
   *aff'd on other grounds*, 226 Fed. App'x 360 (5th Cir. 2007) ................................................6-7

*Wickware v. Thaler*, 404 Fed. App'x 856 (5th Cir. 2010) ...............................................................3

*Wills v. Amerada Hess Corp.*, 379 F.3d 32 (2d Cir. 2004) ...........................................................22

## **RULES:**

Fed. R. Civ. P. 56(a) .......................................................................................................................1

Fed. R. Evid. 804(b)(1) ...................................................................................................................6

**INTRODUCTION**

Causation is the dispositive issue in all of the remaining Barge Track cases, as it was for the claims tried to the Court in the summer of 2010.  Following a three-week trial, the Court ruled that the Barge ING 4727 played no role in causing either of the two floodwall breaches on the eastern side of the Inner Harbor Navigation Canal during Hurricane Katrina, finding: "***Simply put, the Barge did not do it.***"  Findings of Fact and Conclusions of Law ("FFCL"), Doc. 20149 at 41 (emphasis added).

No reasonable jury could conclude otherwise.  It is simply physically impossible for the barge to have been present at the site of either of the two IHNC breaches – the North Breach or the South Breach – at the time those breaches occurred.  The barge could not have caused either breach.  The extensive record, developed over the nearly six years that these cases have been pending, will brook no other conclusion.  Accordingly, the Court should enter summary judgment in favor of defendant Lafarge North America Inc. ("LNA") on all remaining claims, and bring this litigation to a close.

**ARGUMENT**

**I.      SUMMARY JUDGMENT STANDARD**

      **A.      General Standard.**

Summary judgment is proper when there is "no genuine dispute as to any material fact" and "the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and internal quotation marks omitted); *Anderson v.*

1

*Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  Once the moving party has identified those portions of the record which it believes show the absence of a genuine issue of material fact, the non-moving party must proffer **sufficient** evidence to show that a reasonable jury could find in its favor – that is, that "reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict." *Anderson*, 477 U.S. at 249-50, 252.[2]  The existence of "some evidence" favoring the non-moving party will not prevent summary judgment unless the evidence is "of such a character that it would warrant the jury in finding a verdict in favor of that party." *Anderson*, 477 U.S. at 251 (quoting *Improvement Co. v. Munson,* 14 Wall. 442, 448 (1872)).

### B.  Plaintiffs Must Show a "Genuine Issue," Not Just a Fact Dispute.

A "genuine issue" may be lacking even when the non-moving party purports to "dispute" facts in issue.  In particular, summary judgment is proper, even when a "dispute" exists, if the evidence would not allow a reasonable jury to find for the non-moving party.  *See id.* at 248-49. The United States Supreme Court has cautioned that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris,* 550 U.S. 372, 380 (2007).  The Fifth Circuit, sitting en banc, has held that "summary judgment is appropriate in any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (citation

---

[2] *See also Frakes v. Crete Carrier Corp.*, 579 F.3d 426, 430-31 (5th Cir. 2009) ("[P]laintiff has the burden to put forth sufficient evidence to create a genuine dispute" as to a material fact); *Florida Dep't of Ins. v. Chase Bank of Texas Nat'l Ass'n*, 274 F.3d 924, 928 (5th Cir. 2001) ("After a defendant properly moves for summary judgment, the non-movant plaintiff must bring forward sufficient evidence to demonstrate that a genuine issue of material fact exists on every element of a claim."); *Ginsberg 1985 Real Estate P'ship v. Cadle Co.*, 39 F.3d 528, 531 (5th Cir. 1994) ("An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party.").

and internal quotation marks omitted).  Thus, "[e]vidence purporting to create doubts as to the

facts that is too incredible to be accepted by reasonable minds will not prevent summary

judgment." *Barker v. Norman*, 651 F.2d 1107, 1127 (5th Cir. 1981) (citation and internal

quotation marks omitted).

Several points of law follow from these basic principles.  First, "[e]vidence manifestly at

variance with the laws of nature and the physical facts is of no probative value and may not

support a jury verdict." *E.g., Ralston Purina Co. v. Hobson*, 554 F.2d 725, 729 (5th Cir. 1977)

(holding that trial court properly disregarded the plaintiff's testimony because "[w]hat Hobson

says his chickens did, chickens do not do"); *Molden v. Ga. Gulf Corp.*, 465 F. Supp. 2d 606, 613-

14 (M.D. La. 2006) (scientific evidence showed it was impossible for plaintiffs' injuries to have

been caused by toxic release); *In re Chavin*, 150 F.3d 726, 729 (7th Cir. 1998) (noting "the

thoroughly orthodox proposition … that the trial judge may not permit the jury to accept

testimony that is contrary to a law of nature") (citation omitted).[3]

Second, equivocal or vague testimony cannot be relied on to overcome summary

judgment.  *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 271-72 (5th Cir. 2002) (holding that

"equivocal and ill-supported [expert] testimony is simply insufficient to preclude summary

judgment on [plaintiff's] inadequate warning claim"); *Kampen v. Am. Isuzu Motors, Inc.*, 157

F.3d 306, 318 (5th Cir. 1998) (en banc) (expert testimony consisting of "conclusory, unsupported

assertions" does not create genuine issue).[4]

---

[3] *See also Wickware v. Thaler*, 404 Fed. App'x 856, 860 (5th Cir. 2010) (summary judgment appropriate where plaintiff's claim was "both belied by the record and impossible"); *Seshadri v. Kasraian*, 130 F.3d 798, 802 (7th Cir. 1997) ("Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it. … [T]estimony can and should be rejected without a trial if, in the circumstances, no reasonable person would believe it.") (citation and internal quotation marks omitted); *Kesinger v. Herrington*, 381 F.3d 1243, 1249 (11th Cir. 2004) (eyewitness testimony was contradicted by physical evidence as well as other witness testimony).

[4] *See also Bright v. GB Bioscience Inc.*, 305 Fed. App'x 197, 203-04 (5th Cir. 2008) (plaintiff's reliance on vague testimony failed to raise genuine issue); *White v. Black & Decker (U.S.) Inc.*, No. Civ. A. 03-0874, 2004 WL

3

Finally, a party may not avoid summary judgment by relying on an unsubstantiated interpretation of its own evidence – *i.e.*, by interpreting the evidence in a manner the evidence simply will not bear.  *Michaels v. Avitech, Inc.*, 202 F.3d 746, 753-54 (5th Cir. 2000) (affirming summary judgment, finding that inference of causation did not follow from plaintiff's expert evidence); *Little*, 37 F.3d at 1077 (rejecting plaintiff's inference that "nasal fatigue" caused decedent's failure to smell combustible gas where evidence did not support that inference).[5]

Here, the overwhelming evidence establishes as a matter of scientific fact that the Barge ING 4727 could not have caused and did not cause either of the IHNC floodwall breaches.  Plaintiffs' "evidence" raises no genuine issues because it contravenes the laws of nature and physical science, consists of equivocal accounts, and will not bear the interpretation plaintiffs give it.  No reasonable jury could find in plaintiffs' favor.

### C.     Summary Judgment on Causation is Appropriate.

The core principle of the substantive law of causation is that "[a] defendant's actions must be the cause in fact of a plaintiff's injuries in order for the plaintiff to be able to recover."  *Moser v. Texas Trailer Corp.*, 623 F.2d 1006, 1013 (5th Cir. 1980).  As this Court observed in its Findings of Fact and Conclusions of Law following the June 2010 trial, this principle requires the plaintiff to show that the event at issue "would not have occurred but for the defendant's negligent acts."  FFCL at 37 (quoting *Moser,* 623 F.2d at 1012-13).  Similarly, applying the "substantial factor" test that is sometimes used in multiple-cause settings, the Court noted that "if the plaintiff's harm would have occurred in the absence of the defendant's act or omission, the act is not a substantial factor" in causing the injury.  FFCL at 37 (quoting Thomas J.

---

1373271, at *9 (E.D. La. June 16, 2004) (summary judgment granted where plaintiff's expert did not provide adequate factual support for assertions), *aff'd* 122 Fed App'x 795 (5th Cir. 2005).

[5] *See also Sievers v. Beechcraft Mfg. Co.*, 497 F. Supp. 197, 199-202 (E.D. La. 1980) (causal connection between airplane crash and alleged aircraft defect could not be inferred from physical evidence).

Schoenbaum, *Admiralty and Maritime Law*, § 5-3 (4th ed. 2004)).  Applying these principles, courts have not hesitated to grant summary judgment in cases where it was clear, and without genuine dispute, that the defendant's actions did not cause the plaintiff's injuries.  *Little*, 37 F.3d at 1075-78 (no genuine issue of fact in gas leak explosion case); *Bach v. Trident S.S. Co.*, 920 F.2d 322, 327 (5th Cir. 1991) (summary judgment was proper where "no rational factfinder could conclude that the crew's failure to administer CPR more likely than not caused Bach's death").[6]

### D.    Summary Judgment Based on the Trial Record is Proper.

The record in these cases encompasses dozens of fact depositions, two rounds of expert reports and depositions, and a three-week bench trial.  Although the trial considered only the claims of four plaintiffs, the sworn testimony of the trial witnesses is properly before the Court in a motion for summary judgment against the remaining plaintiffs.[7]  The Fifth Circuit and other courts routinely allow parties to rely on sworn testimony and other evidence from prior proceedings to support motions for summary judgment regardless of whether the party opposing the evidence was involved in the prior litigation.  *Kelley v. Price-Macemon, Inc.*, 992 F.2d 1408, 1415 (5th Cir. 1993) (affirming lower court's reliance "upon the testimony offered at the prior trial" and noting that "[i]t is well-settled that a certified transcript of a judicial proceeding may be considered on a motion for summary judgment") (citing *Langston v. Johnson*, 478 F.2d 915, 918

---

[6] *See also, e.g.*, *Ralston Purina Co. v. Hobson*, 554 F.2d 725, 729 (5th Cir. 1977) (setting aside jury verdict on causation of poultry mortality); *In re Ingram Towing Co.*, No. 93-3311, 1995 U.S. Dist. LEXIS 15034, at *3 (E.D. La. Oct. 4, 1995) (Duval, J.) (granting summary judgment on causation in toxic exposure case, finding that it was "impossible for any person to have become ill due to the oil spill from drinking tap water in the days following the accident"); *Evans v. McKinney Marine, Inc.*, No. 96-0132, 1997 U.S. Dist. LEXIS 2148 (E.D. La. Feb. 21, 1997) (granting summary judgment on causation of marine casualty), *aff'd*, 127 F.3d 34 (5th Cir. 1997); *Molden v. Ga. Gulf Corp.*, 465 F. Supp. 2d 606, 613-14 (M.D. La. 2006) (granting summary judgment on causation in chemical exposure case); *Sievers v. Beechcraft Mfg. Co.*, 497 F. Supp. 197, 203-04 (E.D. La. 1980) (granting summary judgment on causation of air crash).

[7] LNA has also submitted declarations from its expert witnesses (Exhibits 36-42 to the Statement of Material Facts) that confirm that if called to testify again, each witness would testify to the same effect.

5

(D.C. Cir. 1973)); *see also Deen v. Egleston*, 601 F. Supp. 2d 1331 (S.D. Ga. 2009) (permitting

plaintiff to rely on depositions from other actions not involving defendant to support motion for

summary judgment); *Beiswenger Enterprises Corp. v. Carletta*, 46 F. Supp. 2d 1297, 1299

(M.D. Fla. 1999) ("Trial testimony, even when from a proceeding in which the parties, subject

matter, and counsel are not the same can be used because it is sworn testimony which is at least

as reliable as that found in affidavits.") *(*citing *Langston*, 478 F.2d at 917 n.17); *Kraft Gen.*

*Foods, Inc. v. Cattell*, 18 F. Supp. 2d 280, 284 (S.D.N.Y. 1998) ("Sworn testimony from another

trial is admissible on a motion for summary judgment. ... Transcript testimony serves the same

purpose as an affidavit under [Rule] 56, and is comparable in that each form of testimony is

sworn and submitted without cross-examination by the adverse party.") (citations omitted);

*Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 24 (1st Cir. 1989) ("Reference to prior trial

testimony and exhibits is proper in summary judgment cases.") (citation omitted).[8]

     LNA's motion for summary judgment based on the record established at the June 2010

trial (among other evidence) does not ask or require the Court to make any credibility or other

determinations that would be within the province of the jury in a subsequent trial.  As noted

above (at 3-4), witness testimony that is equivocal, or that is contrary to the laws of nature, or

that will not support the inferences ascribed to it by the non-moving party, will not prevent

summary judgment.[9]  Necessarily, then, the Court is authorized to determine that witness

---

[8] In addition, the cited trial testimony and evidence would be admissible at trial because the remaining plaintiffs had identical interests to the four plaintiffs whose claims were at issue in the first trial, and they are represented by the same group of lawyers. *See* Fed. R. Evid. 804(b)(1) (former testimony admissible where party or predecessor in interest had opportunity and similar motive to cross-examine); *Dartez v. Fiberboard Corp.*, 765 F.2d 456, 462-63 (5th Cir. 1985) (identity of interest supported introduction of former testimony); *United States v. McDonald*, 837 F.2d 1287, 1291 (5th Cir. 1988) (same).

[9] *See* cases cited above at 3-4; *see also, e.g., Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 258 (5th Cir. 2009) ("speculative inferences" are "insufficient to demonstrate the existence of a genuine issue of material fact"); *New England Merch. Nat'l Bank v. Rosenfield*, 679 F.2d 467, 473 (5th Cir. 1982) ("[w]hile neither we nor the trial judge may make credibility choices, neither court is required to accept, as credible, unsupported self-serving testimony that flies in the teeth of unimpeachable contradictory evidence and universal experience") (citations omitted); *White*

testimony falls within one of these categories, and to determine on that basis that no reasonable jury could rule in the plaintiffs' favor. That is a proper ground for the Court to enter summary judgment in LNA's favor on the remaining plaintiffs' claims.

## II.   IT IS SCIENTIFICALLY IMPOSSIBLE FOR THE BARGE TO HAVE BEEN PRESENT WHEN THE BREACHES OCCURRED.

### A.   Hurricane Winds Prevented the Barge from Being Present at Either Breach.

#### 1.   Multiple independent scientific data sources confirm wind direction at the IHNC.

The record in this case establishes what the Court found to be "clear and beyond peradventure" – that "the winds at the IHNC blew in a northeasterly direction" between 4:00 a.m. and 7:45 a.m. on the morning of August 29, and thus "would have pushed the Barge towards the west and away from the east bank where the breaches occurred." FFCL at 17. Fundamental principles of atmospheric science and several sets of mutually-reinforcing scientific data compel this conclusion, and no reasonable jury could find otherwise.

First, according to "fundamental laws of physics applied to the atmosphere" (FFCL at 15), hurricane winds in the northern hemisphere blow in a counterclockwise direction around the center (or "eye") of the hurricane. Statement of Material Facts ("SMF") ¶ 12. Thus, "the area experiencing the north-west quadrant of the wind field of a hurricane will experience winds blowing in a north, north-easterly direction prior to the passage of the eye past that area." FFCL at 15. Katrina's undisputed storm track, accepted by experts on both sides, shows that the eye of the storm was to the southeast of the IHNC at all times prior to 8:00 a.m. on the morning of August 29, placing the IHNC in the northwest quadrant of the storm. FFCL at 15-16 & App. 5, 6, Map 2; SMF ¶¶ 13, 14. Thus, Katrina's counterclockwise hurricane winds blew ***from the***

---

*v. Omega Protein Corp.*, 390 F. Supp. 2d 604, 609 (S.D. Tex. 2005) (court on summary judgment is "not required to accept as true a statement that no reasonable person would believe"), *aff'd on other grounds*, 226 Fed. App'x 360 (5th Cir. 2007).

*northeast* at the IHNC during the critical morning hours (between 4:00 a.m. and 7:45 a.m.) when the two breaches occurred.  FFCL at 16 ("prevailing winds were in a northeasterly direction"); SMF ¶¶ 15, 16.

Second, data from the system-wide hindcast prepared by Oceanweather Inc. ("OWI"), a leading authority on hurricane and tropical storm hindcasting, showed that hurricane winds at the IHNC blew from the northeast at all times prior to 7:42 a.m.  SMF ¶ 17; FFCL at 16-17.  IPET relied on this same OWI hindcast in reporting on Katrina's wind field.  FFCL at 16.

Third, local data taken from the Lakefront Airport, four miles from the IHNC location, also showed winds blowing from the northeast during the early morning hours of August 29.  SMF ¶ 18.  The Court noted that this data, taken between 3:00 a.m. and 7:53 a.m., is "in line with the hindcast models."  FFCL at 17.

Fourth, radar data from the National Weather Service's weather station at Slidell, Louisiana, showed a "uniform wind field from the northeast" during all relevant times on the morning of August 29.  SMF ¶ 19.  Every six-minute image showed "base radial velocity" data expressed in shades of red, indicating winds blowing away from the radar at the IHNC location (*i.e.*, from the northeast).  SMF ¶ 20.

Fifth, the independent investigations conducted by IPET, ILIT, and Team Louisiana separately arrived at the same conclusion.  *See* SMF ¶ 43.  As this Court noted, Team Louisiana concluded that the wind at the IHNC came from the northeast until no earlier than 8:30 a.m. or 9:00 a.m. on August 29, "making it impossible for the Barge to be traveling in an easterly direction" prior to that time.  FFCL at 29.

2.      The barge could not have been present at the North Breach or South Breach.

The North Breach occurred no later than 6:00 a.m. on the morning of August 29.  SMF ¶ 29.  At that time – and at all times between the hours of 4:00 a.m. and at least 7:45 a.m. – the winds at the IHNC blew from a northeasterly direction, pushing the barge toward the west and away from the site of the breach.  SMF ¶¶ 16-20, 31.  Thus, as the Court concluded, "the evidence is overwhelming that the wind could not have moved the Barge" to the site of the North Breach.  FFCL at 17.  It was therefore "impossible" for the barge to have been present at the North Breach.  *Id.* at 17, 23.

The South Breach occurred at approximately 7:00 a.m. on the morning of August 29.  SMF ¶ 30; FFCL at 26, 29.  Winds at the IHNC blew from the northeast through and including that time.  SMF ¶¶ 16-20, 31.  Thus, as the Court concluded, "[t]he inextricable fact is that there was no wind blowing from the west at 7:00 a.m. in the morning," but rather, "[f]rom 4:30 a.m. to 7:00 a.m., it is clear that the wind was blowing in a northeasterly direction at the IHNC," and thus, "the wind was blowing the Barge into the dock not away from the dock."  FFCL at 28.  Therefore, "the Barge could not have been present when the South Breach began around 7:00 a.m. on the morning of August 29, 2005."  FFCL at 26.

3.      Plaintiffs' meteorological evidence does not create a genuine fact dispute.

The record contains no evidence that could create a genuine dispute of fact regarding the direction of the prevailing wind and its implications for the movement of the barge.  In particular, the Court found that the testimony of Dr. Mitchell, plaintiffs' meteorological expert, was "unreliable" because it relied on radar data that had not been dealiased.  FFCL at 18 & n.12.  Expert evidence that a court finds to be "unreliable" cannot be used to create a genuine dispute of material fact.  *Wells v. SmithKline Beecham Corp.*, 601 F.3d 375, 381 (5th Cir. 2010)

9

("unreliable" scientific evidence could not be used to forestall summary judgment); *Michaels*, 202 F.3d at 753-54 (affirming summary judgment where plaintiff's expert evidence was "not significantly probative").

Moreover, and in any event, Dr. Mitchell's testimony does not create a genuine fact dispute regarding the movement of the barge.  In particular, Dr. Mitchell's testimony regarding supposed microburst winds does not create a genuine fact dispute because, as the Court found, microburst winds last only 3 to 5 seconds and are random in direction (per Dr. Mitchell), and thus "no evidence was presented to demonstrate, nor can this Court envision, that a three to five second wind burst(s) occurred, and if so, such was or were sufficient to move the Ingram Barge in the manner which is required for plaintiffs' theory of the case to be based in reality."  FFCL at 18-19; Mitchell Tr. 955:22-25, 1036:3-21 (SMF Ex. 1.H).

### B.      Other Evidence Confirms the Barge Was Not Present at the North Breach.

Wind was the predominant force acting on the empty barge, which was sticking twenty feet out of the water and thus had a large "sail area" exposed to the wind.  SMF ¶¶ 8, 9.  There was no other force in the IHNC that could have acted on the barge to move it in a direction other than that of the prevailing wind.  Accordingly, the Court found that there was "no possible way for a Barge without motor power to travel north … to near the Florida Avenue Bridge with the wind blowing from the north," and that plaintiffs' contentions to the contrary "belie physics and common sense."  FFCL at 17.

Additional evidence reinforces and confirms that the barge was not present at the North Breach, and plaintiffs have failed to supply any evidence to create a genuine fact dispute.

10

    1.    <u>Waves, current and tidal flow could not have caused the barge to be present.</u>

The undisputed evidence shows that waves and/or current and/or tidal flow in the IHNC could not have moved the barge to the site of the North Breach.  Regarding waves, photographic evidence showed that at the height of the storm, waves in the IHNC were on the order of one to three feet, and these modest wave heights were confirmed by water level data from the IHNC lockmaster and scientific modeling of wave heights.  SMF ¶ 25.  Regarding current, the presence of the IHNC lock caused the flow of water in the canal to be "akin to filling a bathtub with water" (FFCL at 27); thus, plaintiffs' own expert acknowledged that current in the IHNC was "insignificant," and scientific modeling showed that the effect of current was 700 times less than the strength of wind on the barge.  SMF ¶¶ 21, 22.  Similarly, tidal flow could not have moved the barge because tidal flow in the IHNC is on the order of only one inch per hour, and because Katrina's gradually-rising storm surge caused the net flow during each hourly interval to be ***into*** the IHNC, opposite the direction the barge would have had to travel to reach the site of the North Breach.  SMF ¶ 23.  In short, there was no force in the IHNC to counteract the effect of the prevailing wind moving the barge away from the site of the breaches, and no reasonable jury could conclude otherwise.

    2.    <u>Physical evidence shows the barge was not present.</u>

Physical evidence confirms that it was impossible for the barge to have been present at the site of the North Breach.  First, a utility pole left standing after the storm on the IHNC side of the breach, smack in the middle of the path the barge would have had to take to approach the breached area, proves that the barge could not have been present – otherwise the pole would have been destroyed.  SMF ¶¶ 36, 37.  Second, there was ***no*** evidence of any impact damage on the floodwall or the barge that could be associated with an allision at the site of the North

Breach.  SMF ¶ 38.[10]  Thus the Court found that "an allision did not occur" at the North Breach –

and, indeed, that it was "impossible" for such an allision to have occurred.  FFCL at 24-25.

> 3.      Plaintiffs have no evidence to create a genuine dispute.

Plaintiffs' evidence does not suffice to create a genuine dispute of fact with regard to the

North Breach.  In particular, the testimony of William Villavasso – plaintiffs' lone fact witness

with regard to the North Breach – would not allow a reasonable jury to find in their favor.  First,

Mr. Villavasso's testimony was equivocal in the extreme.  All he could say was that, in the dark

and rain and without his glasses, he thought he saw the "tip" of a "metal structure"; but when

shown a picture of the ING 4727 and asked whether it "look[ed] anything like that," he

answered, ***"I really couldn't tell."***  Villavasso Dep. 64:4-24, 65:1-2, 66:5-6 (SMF Ex. 34)

(emphasis added).[11]  Second, Mr. Villavasso's testimony cannot support plaintiffs' version of the

facts because the object he described could not have been the ING 4727.  In particular, the object

that Mr. Villavasso described was sticking up only "two feet at most" above the top of the

floodwall, while the ING 4727, had it been present, would have been sticking up at least fourteen

feet above the top of the wall.  *Id.* at 202:11-17; Cushing Tr. 2100:11-14 (SMF Ex. 1.N); Marino

Tr. 1325:10-13 (SMF Ex. 1.I).  Finally, for the reasons noted above (at 7-10), it was impossible

for the barge to have traveled to the North Breach against Katrina's winds blowing from the

northeast.  The Court rejected plaintiffs' reliance on Mr. Villavasso's testimony, finding the

testimony "***equivocal***" and "***physically impossible***," and noting that if the barge had been

present, Mr. Villavasso would necessarily have seen more than the "tip" of it.  FFCL at 22-23

(emphasis added).  For all three of these reasons, Mr. Villavasso's testimony does not create a

---

[10] The Court handily rejected the suggestion of plaintiffs' expert that "scrape marks" on the wall represented
evidence that the barge had been present at the North Breach, finding it "clear that the 'scrape marks' are nothing
more than the remnants of grass cutting machines used along the levee."  FFCL at 25 n.17.

[11] Mr. Villavasso's testimony was by video deposition as he is deceased.

genuine dispute of fact, and summary judgment is appropriate.  *See Bright*, 305 Fed. App'x at 203-04 (equivocal testimony); *Ralston Purina*, 554 F.2d at 729 (impossible testimony); *Michaels*, 202 F.3d at 753-54 (unsupported inference).

Plaintiffs likewise cannot manufacture a genuine dispute of fact based on the testimony of Mr. Tompkins and Ms. LeBlanc, who purportedly saw the barge loose in the canal on Sunday morning, August 28.  Their testimony was no less equivocal than that of Mr. Villavasso, given that neither of them had more than "a few seconds" to observe the Canal as they drove across the Claiborne Avenue Bridge, and neither of them definitively identified the object they saw as the ING 4727.  LeBlanc Tr. 381:8-9 ("a couple of seconds") (SMF Ex. 1.C); Tompkins Tr. 404:11-13 ("a few seconds") (SMF Ex. 1.D).  Moreover, it is undisputed that the weather was calm on Sunday, with no high winds that could have caused the barge to break free or move within the canal, whereas plaintiffs' own expert opined that the barge "broke away during hurricane conditions," and the fused and melted mooring ropes confirmed the breakaway occurred under extreme conditions.  SMF ¶ 10.  Thus, not only did the Court find that the barge did ***not*** break away in calm weather on Sunday August 28 (FFCL at 12-14), but also that plaintiffs' contentions regarding the transit of the barge "belie physics and common sense."  *Id.* at 17.  No reasonable jury could find in plaintiffs' favor based on such contentions.

**C.      Other Evidence Confirms the Barge Was Not Present When the South Breach Occurred.**

As detailed in above (at 7-10), Katrina's prevailing hurricane winds blowing from the northeast could not have caused the barge to travel to the site of the South Breach at the time that the breach occurred (*i.e.*, before 7:00 a.m.).  As is true for the North Breach, moreover, ample additional evidence reinforces and confirms the conclusion that the barge was not present – and

could not have been present – when the South Breach occurred, and plaintiffs have no evidence that could create a genuine fact dispute on this issue.

        1.      <u>Waves and current could not have caused the barge to be present.</u>

As discussed above (at 10-11), photographic evidence and scientific modeling alike confirmed that waves in the IHNC during Hurricane Katrina reached heights of only one to three feet.  Though plaintiffs at one time speculated that a twenty-foot "meteotsunami" might have caused the barge to move to the site of the South Breach, that speculation fails to present a genuine dispute of fact because:  (a) measurements taken by the lockmaster (Mr. O'Dowd), and his own testimony, showed there was no twenty-foot wave; (b) photographic evidence showed actual wave heights were only between one and three feet at the height of the storm; (c) a twenty-foot wave is scientifically impossible because the IHNC is too shallow to support such a wave; and, (d) a twenty-foot wave, had it occurred, would have destroyed buildings and facilities, such as the lockmaster's office, that remained intact after the storm.  SMF ¶¶ 24-28.  At trial, not even plaintiffs' own experts would espouse the theory of a twenty-foot wave in the IHNC.  Pazos Tr. 872:4-9 (admitting he did not have "any solid information" to support meteotsunami theory) (SMF Ex. 1.G); Spinks Tr. 1614:21-24 (no evidence of 20-foot waves) (SMF Ex. 1.J).

Based on the evidence, the Court found that "it is clear that there was no 20-foot monster wave."  FFCL at 20.  The Court further found that there was "no physical or scientific evidence that there was any kind of giant wave or tidal action in the IHNC at the time of the South Breach that could have propelled the Barge" toward that breach, and that "[a]ny current would have had minimal effect on [the] Barge compared to the wind acting on the [B]arge."  FFCL at 27.  Plaintiffs have no basis to contend otherwise, nor any evidence to show that a genuine dispute exists as to any of these facts.

14

2.        Physical evidence shows the barge was not present.

As the Court found, physical evidence from the South Breach "indicates overwhelmingly that the floodwall cataclysmically failed prior to the Barge coming into contact with the floodwall." FFCL at 26.  The Court noted, "the most telling physical evidence that this Barge floated into the Lower Ninth Ward at a time when the water was already at a catastrophic level are photographs that show unequivocally that the Barge floated over a bus on its path and over telephone lines upon which the vessel settled when the water subsided." FFCL at 35.  The barge could not have floated over top of the school bus and settled on top of the telephone lines unless the floodwaters were higher than the top of the school bus and the telephone lines when the barge arrived; otherwise, the bus would have been crushed and the telephone lines toppled. SMF ¶¶ 40, 41.

The damage patterns on the floodwall and the barge likewise confirm that the barge did not arrive at the floodwall until the South Breach had already occurred.  In particular, the physical evidence showed that the barge came into contact with the concrete cap of the floodwall at the far southern end of the South Breach, away from the area where the breach formed (*i.e.*, the area where the floodwall was pushed back in a "bow" shape).  SMF ¶ 39.  That physical evidence included striations on the bottom of the barge that matched the bent rebar at the far southern end of the breach, away from the main "bow" where the breach had already formed, and concrete debris showing the barge had necessarily passed over a portion of the fallen floodwall before coming into contact with the concrete cap at the end of the already-existing

15

breach.  *Id.*  The Court concluded that this physical evidence "convincingly demonstrated that the Barge came into the Ninth Ward after the South Breach had occurred."  FFCL at 34.[12]

        3.    <u>Plaintiffs have no evidence to create a genuine dispute.</u>

Plaintiffs' evidence does not suffice to create a genuine fact dispute regarding the South Breach.  As with the North Breach, plaintiffs supplied no fact witness or expert testimony that would permit a reasonable jury to rule in their favor.

Plaintiffs' attempted reliance on supposed "eyewitness" testimony must fail because the witnesses' testimony is equivocal and because the events described therein (at least, as plaintiffs interpret the testimony) are scientifically impossible.  For instance, the testimony of Terry Adams does not create a genuine fact dispute because, although he purported to have seen an object approach and then pass through the floodwall from a vantage point over half a mile away, he could not identify that object as a barge.  Adams Tr. 261:24-25, 262:7, 264:9 ("big object" that "looked like a big black house"); *id*. at 280:6-7 (Adams vantage point was 2,950 feet away) (SMF Ex. 1.A).  Moreover, as the Court found, even if plaintiffs' gloss on Mr. Adams' testimony were accepted, that testimony would require the barge to "be moving in a direction contrary to the prevailing winds which have been established beyond peradventure" and thus to describe an impossible event.  FFCL at 24.  The testimony of Arthur Murph similarly does not create a genuine fact dispute because his testimony was equivocal – or, as the Court described it, "inconsistent and virtually impossible to follow" and "lack[ing] reasonable specificity" (FFCL at 32) – and because, in any event, he did not testify to having seen the barge until after the breach

---

[12] Physical evidence also established that the barge could not have departed the area of the LNA Terminal prior to 9:00 a.m. on the morning of August 29.  As the Court found, a covered gantry protruding over the water toward the south end of the Terminal area provided "substantial physical proof" that the barge did not exit the terminal area until after 9:00 a.m., because otherwise the gantry would have suffered damage based on the water levels in the IHNC prior to that time, but no such damage was observed on the gantry or on the fiberglass covers of the barge. FFCL at 27-28.

had occurred and the floodwaters had risen "as high as the gutter" on his home.  Murph Tr. 700:7-9 (SMF Ex. 1.F).  Finally, the deposition testimony of Sidney Williams (who did not appear at trial) was internally "contradictory" (FFCL at 32) and, indeed, was "discounted" by plaintiffs' own expert.  Marino Tr. 1315:8-18 (SMF Ex. 1.I).

Similarly, the testimony of "boom witnesses" does not create a genuine fact dispute.  As the Court observed, "[b]ooms were heard all over indicating the rupturing of waterstops and the failures of the floodwalls."  FFCL at 31 n.18.  Accordingly, the fact that witnesses heard "boom" noises or other loud noises in the vicinity of the IHNC breaches provides no basis to infer that the noises were created by a barge.  *See Little*, 37 F.3d at 1077 (no basis to infer "nasal fatigue" caused failure to evacuate); *Michaels*, 202 F.3d at 753-54 (no basis to infer negligence caused contaminated pump lines).

Finally, plaintiffs' expert evidence fails to present a genuine fact dispute regarding the South Breach.  Plaintiffs' experts utterly failed to explain how the barge could possibly have been present at the site of the South Breach at the time that the breach occurred.  As the Court found, plaintiffs' expert on causation "was unable to testify as to the angle of the barge's trajectory, the speed of the barge, the force acting on the barge or its momentum when it contacted the wall," and their expert regarding barge movement "did not supply an explanation either."  FFCL at 28.  Thus plaintiffs' expert evidence cannot prevent summary judgment with respect to the South Breach.  *See, e.g.*, *Michaels,* 202 F.3d at 753-54 (expert evidence that lacked "probative value" did not create genuine fact dispute).

The bottom line, as the Court found, is that "there is simply ***no proof in the record*** that there was a force at work that could have propelled the Barge to hit the floodwall at the South Breach at 6:30 a.m."  FFCL at 29 (emphasis added).  The determination that the barge did not

17

cause the flooding resulting from the South Breach "is consistent with all of the other independent studies issued concerning the flooding which occurred in the aftermath of Hurricane Katrina" including "IPET, ILIT, and Team Louisiana."  FFCL at 33; SMF ¶ 43.  All of the evidence points in a single direction: the barge passed through the open breach after the flooding had already occurred.  FFCL at 36 ("Simply put, the Barge was a consequence not a cause.").  There is no basis on which a reasonable jury could conclude otherwise.

## III.     IT IS SCIENTIFICALLY IMPOSSIBLE FOR A BARGE IMPACT WITH THE CONCRETE CAP TO HAVE CAUSED THE FLOODWALL TO FAIL.

The record establishes a second, independent ground for the entry of summary judgment in favor of LNA – that it was impossible for a barge impact, if it had occurred, to have caused the floodwall to lose the support of its embedded sheetpile and anchoring soil.  Plaintiffs have no evidence from which a reasonable jury might conclude that a barge impact was even capable of causing the sheetpile to dislodge as occurred at the site of both breaches.

The floodwalls along the IHNC were "I-wall" structures consisting of twenty-foot-long steel sheet pile driven into the ground to a depth of around seventeen feet, topped by a six-foot concrete monolith.  SMF ¶ 32.  The concrete portion of the wall was comprised of two "pours," separated by a horizontal construction joint located about six inches above the top of the steel sheet pile.  *Id.*  At trial, the witnesses referred to the upper section of concrete, rising three feet above the construction joint, as the "cap."  Bartlett Tr. 317:10-14 (SMF Ex. 1.B); Cushing Tr. 2071:12-2072:12 (SMF Ex. 1.N).

As the Court observed, "[h]ow deep an I-wall is embedded into the ground controls the stability of the structure."  FFCL at 5.  Thus, the floodwall depended upon the embedded steel sheet pile and its anchoring soils for stability.  SMF ¶ 33.  The concrete cap did ***not*** provide

stability for the floodwall, but rather was intended to provide aesthetic appeal, to protect against rust, and to add some height to the wall.  SMF ¶ 34.

The undisputed evidence at trial showed that a barge impact with the concrete cap, if it had occurred, would cause only localized damage to the concrete cap but would ***not*** deflect or disturb the sheet pile or the soil in which it was buried.  SMF ¶ 35.  Dr. Cushing provided unrebutted calculations demonstrating that this is so, and analogized the situation to pushing a book on top of a table – the book moves, but the table does not.  *Id.*  Physical and photographic evidence from other barge impacts with floodwalls demonstrates exactly this phenomenon – localized damage to the concrete cap, but no disturbance of the underlying sheet pile.  *Id.*  Indeed the localized shearing damage that was evident at the southern end of the South Breach, where the barge made contact with the wall as it passed through the already-open breach, demonstrates that a barge impact does ***not*** affect the underlying sheet pile.  *Id.*

Plaintiffs offered no competent expert evidence to rebut this showing that a barge impact with the concrete cap could not possibly have caused the deflection of the steel sheetpile anchoring the floodwall.  As the Court noted, neither of plaintiffs' principal experts (Dr. Marino and Mr. Pazos) provided any analysis or explanation of how the barge could possibly have impacted the wall and caused it to fail.  FFCL at 28 (plaintiffs' experts unable to testify "as to the angle of the barge's trajectory, the speed of the barge, the force acting on the barge or its momentum when it contacted the wall").  Indeed, plaintiffs' expert Mr. Bartlett ***conceded*** that the force of a barge impact "could not be transferred down to the sheet pile to cause the sheet pile to be disturbed."  Bartlett Tr. 364:15-19 (SMF Ex. 1.B).  Thus the record contains no evidence that could support a finding that a barge impact (if one had occurred) was even capable of causing the floodwall to lose the support of the embedded sheetpile and anchoring soil.

The situation here is directly analogous to a toxic exposure case in which proof of causation fails – and summary judgment is appropriate – because the claimed exposure cannot have caused the physical symptoms alleged by the plaintiff.  *E.g., In re Ingram Towing Co.*, No. 93-3311, 1995 U.S. Dist. LEXIS 15034, at *3 (E.D. La. Oct. 4, 1995) (Duval, J.) (finding no causation because it was "impossible for any person to have become ill due to the oil spill from drinking tap water in the days following the accident"); *Molden v. Ga. Gulf Corp.*, 465 F. Supp. 2d 606, 613 (M.D. La. 2006) (finding no causation where "the level of exposure was not sufficiently high to give rise to the physical injuries complained of by Plaintiffs").  The supposed barge impact here was simply not capable of causing the IHNC floodwall failures.

## IV.   LEGAL PRESUMPTIONS DO NOT AFFECT THE SUMMARY JUDGMENT ANALYSIS.

Plaintiffs cannot avoid summary judgment by invoking burden-shifting presumptions such as the "*Pennsylvania* Rule."  That rule comes into play when an injury results from a maritime collision in which a party has violated a statutory provision designed to avoid collisions, and requires that party to show its violation did not cause the collision.  *The Pennsylvania*, 86 U.S. (19 Wall.) 125 (1874).  The *Pennsylvania* Rule has no application here because plaintiffs have not shown that there was an injury-causing allision and because, in any event, the presumption has been pierced by the presentation of evidence showing that the barge did not cause – and could not have caused – either of the two IHNC floodwall breaches.

### A.   Plaintiffs Bear the Burden of Showing a Flood-Causing Allision.

The *Pennsylvania* Rule only operates *after* the plaintiffs have established that their injuries resulted from a maritime collision (as well as that the defendant violated the law).[13]  It does not create a presumption that an injury-causing collision occurred.  In *Gosnell v. United*

---

[13] Though LNA denies any statutory or other violation, this summary judgment motion does not depend on that position.

*States*, 262 F.2d 559, 563-64 (4th Cir. 1959), a statutory violation led to the breakup of the

defendant's vessel eight days before the sinking of the plaintiff's vessel, but it was disputed

whether the defendant's vessel had caused the sinking of plaintiff's vessel, that is, whether the

sinking was the result of a collision or something else.  The Fourth Circuit held that the

*Pennsylvania* Rule did not apply to that issue.  The court observed that, in *The Pennsylvania*, the

"damage resulted from the ***known*** collision between a ***known*** steamer and a ***known*** schooner."

262 F.2d at 563 (emphasis added).  "The rule, thus stated [in *The Pennsylvania*], was not there

invoked to establish either the 'physical cause' or the identity of one of two colliding objects, as

here sought, but simply placed the burden upon the schooner to show that its statutory violation

could not have been the cause, or one of the causes, of the collision between the known ships."

*Id.*  As such, the *Pennsylvania* Rule cannot "begin[] to operate [until] after" the plaintiff proves

"(1) the physical cause of his injuries; [and] (2) fault on the part of the person sought to be held

responsible."  *Id.* at 563-64.[14]

The Fifth Circuit has twice refused to apply the *Pennsylvania* Rule in the absence of a

showing that the plaintiff's injury resulted from a collision or other maritime incident involving

the defendant's vessel or property.  *Candies Towing Co. v. M/V B&C Eserman*, 673 F.2d 91, 95

(5th Cir. 1982) (adopting district court finding that "Plaintiffs failed to show that any of the

[statutory violations] above, either individually or collectively, were in any way connected to the

sinking of the barge."); *Bd. of Comm'rs of Port of New Orleans v. M/V Farmsum*, 574 F.2d 289,

---

[14] *See also In re Complaint of Nautilus Motor Tanker Co.*, 85 F.3d 105, 114-15 (3d Cir. 1996) (*Pennsylvania* Rule did not apply because plaintiff failed to establish that "the physical cause of the [plaintiff's] harm" was a collision involving the defendant, and holding that "a contrary rule ... would result in a presumption of liability following any statutory violation no matter how remote or inconsequential such a violation may have been to the subsequent accident").

297 (5th Cir. 1978) (*Pennsylvania* Rule did not apply due to lack of connection between fault and casualty).[15]  Other courts have reached the same conclusion.[16]

In sum, the *Pennsylvania* Rule does not relieve plaintiffs of their burden of establishing that their injuries resulted from a maritime allision, *i.e.,* of showing that the ING 4727 allided with, and caused the breaches in, the IHNC floodwalls.  Here, however, plaintiffs cannot prove that an injury-causing allision occurred.  With respect to the North Breach, the Court found that "[p]laintiffs' theory of liability as concerns the North Breach rests on the Barge alliding with the floodwall," and that "such an allision did not occur."  FFCL at 25.  With respect to the South Breach, the Court found that the evidence "indicates overwhelmingly that the floodwall cataclysmically failed prior to the Barge coming into contact with the floodwall."  FFCL at 25-26.  For the reasons described above, there is no genuine fact dispute about those two conclusions.  Thus, there is no occasion for the *Pennsylvania* Rule to come into play.

### B.      Presumptions Are Pierced by Presentation of Evidence.

In any event, the presentation of evidence eliminates the need to rely on burden-shifting presumptions such as the *Pennsylvania* Rule.  As the Court has found, "[o]nce evidence is presented … presumptions become superfluous because the parties have introduced evidence to dispel the mysteries that gave rise to the presumptions."  FFCL at 39 (quoting *Combo Maritime, Inc. v. United Bulk Terminal, LLC*, 615 F.3d 599, 605 (5th Cir. 2010)).  Here, it is important to remember the origin of the *Pennsylvania* Rule – a collision at sea between two vessels in a dense fog.  *The Pennsylvania*, 86 U.S. (19 Wall.) at 126.  In that case, no evidence remained for the

---

[15] *See also Pennzoil Producing Co. v. Offshore Express, Inc.*, 943 F.2d 1465, 1471 (5th Cir. 1991) (declining to apply Rule where violation occurred two days earlier for a brief time and was otherwise unrelated to incident).

[16] *See also Poulis-Minott v. Smith*, 388 F.3d 354, 365 (1st Cir. 2004) (refusing to apply *Pennsylvania* Rule based on "speculation" because information regarding what happened to vessel – including whether it sank at all – was lacking); *Wills v. Amerada Hess Corp*., 379 F.3d 32, 42-43 (2d Cir. 2004) (declining to apply the Rule absent showing that vessel's actions were related to plaintiff's cancer).

court to assess liability.  Here, by contrast, there is a vast body of evidence from which the Court

can determine (and has determined) that the barge did not cause the IHNC floodwall breaches.

The presentation of evidence has pierced whatever presumption might have applied in the

absence of such evidence.

> **C.      Presumptions are Irrelevant Because No Reasonable Jury Could Find for Plaintiffs.**

Finally, burden-shifting presumptions are irrelevant to this motion for summary judgment

because LNA has shown that no reasonable jury could conclude that the barge caused either of

the floodwall breaches.  As the Court found in its Findings of Fact and Conclusions of Law,

LNA "has proven that it was not only 'not a contributory cause of the accident' but it simply was

not a cause of the breaching and catastrophic flooding that damaged plaintiffs," and thus LNA

has fully satisfied whatever burden the *Pennsylvania* Rule might have imposed.  FFCL at 41.

That conclusion applies equally to the remaining plaintiffs as it does to those whose claims were

adjudicated in the three-week trial that formed the basis for the Court's Findings of Fact and

Conclusions of Law.  As the Court found, "where as here there is overwhelming evidence that

the ING 4727 did not cause in any manner cataclysmic flooding of the Lower Ninth Ward, the

Court must so find."  FFCL at 41.

## CONCLUSION

The Court should enter summary judgment in favor of Lafarge North America Inc. on the claims of all remaining plaintiffs in all "Barge Track" cases.

Dated: August 30, 2011

Respectfully submitted,

Derek A. Walker (#13175)
Robert B. Fisher, Jr., T.A. (#5587)
**CHAFFE MCCALL, L.L.P.**
2300 Energy Centre
1100 Poydras Street
New Orleans, LA  70163-2300
Telephone:  (504) 585-7000
Facsimile:  (504) 585-7075
Fisher@chaffe.com
Walker@chaffe.com

 /s/ John D. Aldock
John D. Aldock
Richard M. Wyner
Mark S. Raffman
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC  20001
Telephone:  (202) 346-4240
jaldock@goodwinprocter.com
rwyner@goodwinprocter.com
mraffman@goodwinprocter.com

Daniel A. Webb (#13294)
**SUTTERFIELD & WEBB, LLC**
Poydras Center
650 Poydras Street, Suite 2715
New Orleans, LA  70130
Telephone:  (504) 598-2715

*Attorneys for Lafarge North America Inc.*