UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re:  KATRINA CANAL BREACHES CONSOLIDATED LITIGATION | CIVIL ACTION |
| | Case No.:  05-4182 |
| PERTAINS TO:  BARGE | And consolidated cases |
| | SECTION "K" (2) |
| Boutte v. Lafarge        05-5531 | |
| Mumford v. Ingram    05-5724 | |
| Lagarde v. Lafarge    06-5342 | Hon. Stanwood R. Duval, Jr. |
| Perry v. Ingram         06-6299 | Magistrate Judge Joseph C. |
| Benoit v. Lafarge       06-7516 | Wilkinson, Jr. |
| Weber v. Lafarge       08-4459 | |

## LNA'S STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Local Rule 56.1, Lafarge North America Inc. ("LNA") submits this statement

of material facts not genuinely in dispute to accompany its motion for summary judgment.[1]

### Geography – The Inner Harbor Navigation Canal

1.  The Lafarge North America cement terminal ("LNA Terminal") is located on the west

    side of the Inner Harbor Navigation Canal ("IHNC").  The terminal is located in a turning

    basin or "inset" away from the main channel of the IHNC.

> *References*
> *Hall Tr. 1979:1-8 (Ex. 1.M).*
>
> *Cushing Tr. 2041:12-14 (Ex. 1.N).*
>
> *Cushing Report at 15, Fig. 8 (DX 196) (Ex. 2).*
>
> *Green Tr. 567:23 (Ex. 1.E).*

---

[1] Citations in this document are to trial testimony from the 2010 trial (*i.e.*, "Cushing Tr. [page:line]"), trial exhibits from the 2010 trial ("PX" or "DX"), the undisputed facts set forth in the Joint Pre-Trial Order (Doc. 19857, at 37-42) (*i.e.*, "LNA Pre-Trial Undisputed Fact xx" or "Plaintiffs' Pre-Trial Undisputed Fact xx"), and documents filed in the docket of this action ("Doc. xx").  Citations to "EX [#]" refer to the exhibits to this Statement of Material Facts. Except where noted, exhibits are provided in their entirety.

2.  On the morning of August 29, 2005, two breaches occurred in the floodwall on the east side of the IHNC.

> *References*
> *Cushing Report at 80, Fig. 52 (DX 196) (Ex. 2).*
>
> *Marino Report at 4-5, Photo 4.4 (PX 397) (Ex. 3).*
>
> *LNA Pre-Trial Undisputed Fact 23 ("On the morning of August 29, 2005, two breaches occurred in the floodwall on the east side of the IHNC.") (Ex. 4).*

3.  The "North Breach" occurred just south of the Florida Avenue Bridge, at a location to the north and east of the Lafarge Terminal and on the opposite side of the IHNC from the Terminal.

> *References*
> *Cushing Tr. 2042:5-6; 2046:4-7 (Ex. 1.N).*
>
> *Cushing Report at 80, Fig. 52 (DX 196) (Ex. 2).*
>
> *Marino Report at 4-5; Photo 4.4 (PX 397) (Ex. 3).*

4.  The "South Breach" occurred closer to the Claiborne Avenue Bridge, at a location to the south and east of the Lafarge Terminal and on the opposite side of the IHNC from the Terminal.

> *References*
> *Cushing Tr. 2042:7-8 (Ex. 1.N).*
>
> *Cushing Report at 80, Fig. 52 (DX 196) (Ex. 2).*
>
> *Marino Report at 4-5, Photo 4.4 (PX 397) (Ex. 3).*

**Barge ING 4727**

5.  Prior to the arrival of Hurricane Katrina, the unloaded Barge ING 4727 was moored at the LNA Terminal on the west side of the IHNC.

> *References*
> *Cushing Report at 26 (DX 196) (Ex. 2).*
>
> *Pazos Report at 7-8 (PX 402) (Ex. 5).*

6.  The Barge ING 4727 was a hopper barge with no motor or other means of self-propulsion.  Therefore, the Barge ING 4727 required an external force to propel it from the west side to the east side of the IHNC.  The only forces that could potentially have moved the Barge ING 4727 away from the LNA Terminal and across the canal to the location of the breach sites during Hurricane Katrina were (a) wind, (b) waves and/or (c) current (including tidal flow).

> *References*
> *Cushing Tr. 2042:15-2043:7(Ex. 1.N).*
>
> *Pazos Dep. 99-100 (barge "cannot move on its own" except for "wind conditions or currents"; barge requires "an external force" to move it) (DX 218) (Ex. 6).*
>
> *Marino 2009 Dep. 111 (admitting that in order for barge to move from one place to the other, something – wind or water – has to move it) (DX 229) (Ex. 7).*
>
> *Green 2009 Dep. 125 (barge was "at the mercy of the winds and current") (DX 216) (Ex. 8).*
>
> *Green 2009 Dep. 127 (barge was "dumb" and had no mode of power) (DX 216) (Ex. 8).*
>
> *Green 2009 Dep. 210 (barge movement could be affected by waves) (DX 216) (Ex. 8).*
>
> *LNA Pre-Trial Undisputed Fact 15 ("ING 4727 was a hopper barge with no motor or other means of self-propulsion.") (Ex. 4).*
>
> *LNA Pre-Trial Undisputed Fact 16 ("ING 4727 required an external force to propel it from the west side to the east side of the IHNC.") (Ex. 4).*

7.  The Barge ING 4727 was over 20 feet high from top to bottom (including hatch covers).

> *References*
> *Cushing Report at 124 (21 feet high) (DX 196) (Ex. 2).*
>
> *Pazos Dep. 102 ("23 feet, approximately") (DX 218) (Ex. 6).*
>
> *LNA Pre-Trial Undisputed Fact 17 ("ING 4727 was over twenty feet high from top to bottom (including hatch covers).") (Ex. 4).*

8.  On the morning of August 29, 2005, the unloaded Barge ING 4727 had a draft of approximately one-and-a-half feet and was sticking out of the water over 20 feet above the waterline, which gave it a large sail area.

3

*References*
*Cushing Report at 124 (barge stickup of approximately 20 feet and had a draft of 1 foot, 4 inches) (DX 196) (Ex. 2).*

*Pazos Dep. 100 (barge draft of 1 foot, 5 inches); 103-04 (barge sticking up out of water "in excess of twenty feet") (DX 218) (Ex. 6).*

*Marino Report at 2-34 (unloaded draft is 1.5 feet) (PX 397) (Ex. 3).*

*Green 2008 Dep. 75-76 (barge's light draft is 1 foot, 4.5 inches – the remainder of the barge is above water) (DX 224) (Ex. 9).*

*Marino 2009 Dep. 66 (barge was unloaded, and sticking up over 20 feet) (DX 221) (Ex. 7).*

9. This "sail area" made the barge susceptible to being moved in the direction of the prevailing wind.

*References*
*Cushing Tr. 2042:15-2043:7 ("hurricane winds were strong," "barge has a lot of sail area," current was "insignificant," and "waves would have been moving in the direction of the wind, so they would have only added to the force of the wind") (Ex. 1.N).*

*Pazos Tr. 853:4-7 ("Primarily the wind" affects a barge with a high sail area) (Ex. 1.G).*

*Pazos Dep. 104 ("wind is the predominant item" acting on the barge) (DX 218) (Ex. 6).*

*Green 2009 Dep. 45 (agreeing that barge has a "large sail area" and that "the greater the sail area, the more susceptible to wind") (DX 216) (Ex. 8).*

**Hurricane Katrina – Winds**

10. During the day before the storm, Sunday August 28, 2005, the weather was calm and there was no wind or other force capable of causing the mooring ropes on the barge to melt, fuse, and break in the manner that they did.

*References:*
*Skaer Tr. 2524:22-25 (ropes melted and fused) (Ex. 1.P).*

*Cushing Report at B-10 (lockmaster record showed "no wind of 36 mph on Sunday) (DX 196) (Ex. 2).*

*Green Tr. 541:18-23 (barge required 36 mph wind to break free) (Ex. 1.E).*

*LeBlanc Tr. 380:5-10 (weather was "nice" and "pleasant" and "not windy") (Ex. 1.C).*

*Tompkins Tr. 404:5-7 ("nice" weather) (Ex. 1.D).*

*Marino Report at 3-11 and Figure 3.3 (PX 397) (Ex. 3).*

11. Weather data, particularly involving winds, is important to analyze wind loads on the barge and potential barge movement in the IHNC during the relevant time period.

> *References*
> *Cushing Report at 77-80 (analyzing wind data and noting its importance for barge movement) (DX 196) (Ex. 2).*
>
> *Marino Tr. 1342:25-1343:3 ("if you wanted to actually know what really happened, what really moved this barge around, then meteorological data would be germane") (Ex. 1.I).*
>
> *Marino Tr. 1343:4-11 (weather data helps assess what the barge impact loads could potentially be, and what the wind loads were on the barge at the time of the failure) (Ex. 1.I).*
>
> *Marino 2009 Dep. 71:20-23 (Q: "The weather data helps you to assess what in fact the wind loads were on the barge in the IHNC at the time of the failure; correct?"  A: "Yes.") (DX 221) (Ex. 7).*

12. According to Buys Ballot's law, hurricane winds in the northern hemisphere blow counterclockwise around the center (or "eye") of the hurricane.  Thus, the direction of the prevailing wind at a given time and location during a hurricane can be determined by comparing that location to the location of the eye of the storm at that same time.

> *References*
> *Dooley Tr. 1840:16-1842:14 (describing counter-clockwise flow around the low pressure and the relationship of the low pressure center to wind direction) (Ex. 1.L).*
>
> *Dooley Slide AD-011 (DX 347) (Ex. 21).*
>
> *Dooley Tr. 1841:22-24 ("Q: Is there any dispute about the validity of Buys Ballot's Law?  A: No, not at all.") (Ex. 1.L).*
>
> *Dooley Tr. 1929:25-1932:5 ("if you know where the low is and if you're in a particular location, you can get an idea of what the synoptic scale of wind direction will be") (Ex. 1.L).*

*Cushing Tr. 2043:13-25 & Cushing Slide CC-009 (DX 349) ("where you face into the wind, and the eye of the hurricane is two points of abaft the beam on your starboard side, or approximately so") (Ex.1.N).*

*Cushing Report at 35-36 ("counter-clockwise circulation around the center") (DX 196) (Ex. 2).*

*Mitchell Tr. 1031:4-10 (agreeing that "[h]urricanes circulate in a cyclonic counterclockwise motion" and "if you stand with your back to the wind in a hurricane in the northern hemisphere, you expect the low-pressure area to be to your left") (Ex.1.H).*

*Pazos Dep. 107:23-108:14, 117:2-5 ("the hurricane[s] in the Gulf of Mexico have a counterclockwise rotation"; agreeing that "hurricane winds swirl counterclockwise along the storm eye") (DX 218) (Ex. 6).*

*LNA Pre-Trial Undisputed Fact 18 ("In the northern hemisphere, the counterclockwise cyclonic motion of a hurricane means that the area of low-pressure (the eye of the storm) is to the left of a person standing with his back to the wind.") (Ex. 4).*

13. The track of Hurricane Katrina was to the east of New Orleans and the IHNC, along the path described in Appendix 5 to the Court's Findings of Fact and Conclusions of Law (Dkt. No. 20149). The center of the storm was located to the east of New Orleans and the IHNC throughout the duration of the storm.

> *References*
> *Cushing Report at 39 & Fig. 24 (DX 196) (Ex. 2).*
>
> *Dooley Report at 16, Map 2 (close-up view of storm track near New Orleans) (DX 198) (Ex. 10).*
>
> *Dooley Report at 35 (storm center passed to the east of New Orleans) (DX 198) (Ex. 10).*
>
> *Spinks Report at 8, Fig. 1 (showing track of Hurricane Katrina) (PX 421) (Ex. 11).*
>
> *Mitchell Tr. 1030:17-25 (Ex. 1.H).*

14. At all times prior to 7:30 a.m. on the morning of August 29, 2005, the eye of Hurricane Katrina was at a latitude to the south of New Orleans and the IHNC; the eye did not pass through the latitude of New Orleans and the IHNC until after 8:00 a.m.

> *References*

LIBW/1791984.8

*Dooley Report at 16, Map 2 (showing position of storm center was south-east of New Orleans at these times) (DX 198) (Ex. 10).*

*Dooley Report at 16-17 (eye of Hurricane Katrina did not pass latitude of New Orleans until 8:54 a.m.) (DX 198) (Ex. 10).*

*Cushing Report at 43 (DX 196) (Ex. 2).*

*Mitchell Tr. 1031:1-3 ("Q: The storm center passed to the east of New Orleans around 9:00 in the morning on August 29th?  A: Correct.") (Ex. 1.H).*

*Green 2009 Dep. 119-120 (at 6:00 a.m., the storm was South-Southeast of New Orleans) (DX 216) (Ex. 8).*

*Spinks 2008 Dep. 60:18-61:3 (storm made landfall at Buras, LA around 6:10 a.m.) (DX 226) (Ex. 12).*

*Pazos Dep. 118-19 ("Hurricane Katrina's eye passed to the east of New Orleans about 8:30 a.m. central daytime on 29 August 2005.") (reading from report and adopting statement) (DX 218) (Ex. 6).*

*LNA Pre-Trial Undisputed Fact 19 ("The eye of Hurricane Katrina did not pass through the latitude of New Orleans and the IHNC until after 8:00 a.m. CDT on the morning of August 29, 2005.") (Ex. 4).*

15. As Hurricane Katrina approached New Orleans and the IHNC from the south, the

    prevailing winds in the IHNC blew first from east to west, then from northeast-to-

    southwest, and then from north-to-south until the storm eye reached the latitude of the

    IHNC, and only after that from west to east.

> *References*
> *IPET Report Vol. IV at IV-17 ("winds first from the east, then northeast, then from the north, then northwest, and finally from the west") (DX 145) (Ex. 13).*
>
> *Dooley Tr. 1839:4-9 (when Katrina was to the south of New Orleans, the winds were northeasterly) (Ex. 1.L).*
>
> *Dooley Tr. 1848:6-15 (at 7:00 a.m., winds blew from the northeast); 1849:8-24 (from 7:00-8:45 a.m., the northeasterly winds gradually became more northerly until the system passed and they became slightly westerly) (Ex. 1.L).*
>
> *Dooley Tr. 1884:15-19; 1885:18-1886:4 (prevailing direction was mostly out of the northeast, and any type of downdrafts, swirls or eddies would have moved in the downwind direction from the northeast toward the southwest) (Ex. 1.L).*
>
> *Dooley Report at 35 (prevailing winds turned from easterly to northerly to westerly as Katrina moved along its track) (DX 198) (Ex. 10).*

*Lemon Tr. 1719:11-15 (from 7:00 p.m. on August 28 through 9:00 a.m. on August 29, winds blew from the northeast toward the southwest until very late in the period when they turned to a more northerly direction) (Ex. 1.K).*

*Cushing Report at 77-80 & Fig. 52 (showing wind direction as a function of time) (DX 196) (Ex. 2).*

*Kemp Tr. 2989:1-16 (Team Louisiana ruled out the barge as a potential cause of the IHNC breaches because at all relevant times the wind was out of the northeast) (Ex. 1.R).*

*Marino 2009 Dep. 74:13-17 (Q: "Do you accept IPET's conclusion that, during this storm, winds came first from the east, then the northeast, then the north, then the northwest and finally from the west?"  A: "I guess in general, yes.") (DX 221) (Ex. 7).*

*Green 2008 Dep. 56:12-20 (winds between 4:00 a.m. and 6:00 a.m. blew "from either the northeast or due from the north") (DX 224) (Ex. 9).*

16.  From 4:00 am to approximately 7:45 am on August 29, 2005, Hurricane Katrina's

prevailing winds included no component blowing across the IHNC from the LNA

Terminal toward the east bank of the IHNC.

> *References*
> *Dooley Tr. 1856:1-10 (the first time the wind has a component blowing from the west is between 7:30 and 7:45 a.m.) (Ex. 1.L).*
>
> *Dooley Tr. 1887:19-1888:9 (at 7:45 a.m., the winds still had a strong southerly component and it was not until after 9:00 that the wind takes a more westerly than northerly direction) (Ex. 1.L).*
>
> *Cushing Tr. 2128:10-20 ("By 7:30, the wind would have been blowing more parallel to the canal, and it isn't until after 8 o'clock that it starts to take a more westerly component.") (Ex. 1.N).*
>
> *Cushing Report at 45, 78 (winds prior to 8:00 a.m. had no cross-canal component) (DX 196) (Ex. 2).*
>
> *Dooley Report at 35 ("up until 0742 CDT, the wind direction would push the barge toward the dock") (DX 198) (Ex. 10).*
>
> *IPET Report Vol. IV at IV-50 Fig. 26 (wind direction was from the northeast during the 6:00 a.m. to 7:00 a.m. time period) (DX 145) (Ex. 13).*
>
> *Marino Report at 3-11 (winds remained "essentially parallel" to IHNC before 9:00 a.m.) (PX 397) (Ex. 3).*

17. A hindcast performed by Oceanweather Inc. ("OWI") is consistent with respect to the direction of the prevailing wind in the IHNC during Hurricane Katrina, and supports the conclusion that winds blew from the east and then northeast and north during the early morning hours of August 29. The OWI hindcast may be used to interpolate wind directions at the IHNC during Katrina.

> *References:*
> *Dooley Tr. 1852:3-1857:4 (findings and application of OWI hindcast) (Ex. 1.L).*
>
> *Dooley Tr. 1838:3-6; 1851:1-11; 1851:17-20 (hindcast "would give us an excellent understanding of the synoptic scale winds surrounding Katrina") (Ex. 1.L).*
>
> *Dooley Tr. 1852:3-1853:1 (grid points A, B, C, and D, each located 3 miles or less from the Canal and used to interpolate wind directions and speed at the IHNC and plotted in Table 6-A of Dr. Dooley's Report (DX 198) (Ex. 10)) (Ex. 1.L).*
>
> *Dooley Tr. 1916:13-24 (the hindcast shows "the synoptic scale flow," "the prevailing winds") (Ex. 1.L).*
>
> *Dooley Tr. 1853:5-1856:21 (Ex. 1.L.)*
>
> *Dooley Slides AD-020, AD-022, AD-024, and AD-026-029 (DX 347) (Ex. 35).*
>
> *Dooley Report at 21 (DX 198) (Ex. 10).*

18. Lakefront Airport data applies to the IHNC four miles away, and is representative of the type of wind directions and speeds that one would see at the IHNC. Local meteorological data from Lakefront Airport confirm that the direction of the prevailing wind in the IHNC during Hurricane Katrina was from the east and northeast, and would not have permitted the barge to be present at the east floodwall when the breaches occurred.

> *References:*
> *Dooley Report at 17-18, 34 (DX 198) (Ex. 10).*
>
> *Dooley Tr. 1875:2-9 ("representative of the type of [wind] directions and speeds that one would see at [the] IHNC"); 1881:7-12 (Ex. 1.L).*

LIBW/1791984.8

*Dooley Tr. 1857:14-17 (distance from the anemometer at Lakefront Airport to the IHNC was approximately 4 miles) (Ex. 1.L)*

*Dooley Slide AD-031 (Google Map) (DX 347) (Ex. 35).*

*Dooley Tr. 1862:18-20 (no west-to-east winds from 3:03 a.m. to 6:53 a.m.) (Ex. 1.L).*

*Dooley Tr. 1908:1-16 (there is "consistency" between the Lakefront data and the hindcast) (Ex. 1.L).*

*Dooley Tr. 1876:13-1877:3(Ex. 1.L).*

*Dooley Slides AD-049-59 (showing consistency between OWI hindcast and Lakefront Airport weather data) (DX 347) (Ex. 35*

*).*

*Marino Tr. 1344:22-1345:4 (considered the Lakefront data sufficiently reliable to include it in his report) (Ex. 1.I).*

*Marino Report at 3-11 (PX 397) (Ex. 3).*

*Lakefront Airport data (DX 338) (Ex. 14).*

*Green 2009 Dep. Exh. B (Lakefront Airport data) (PX 387) (Ex. 8).*

19. The National Weather Service's radar station at Slidell was about 23 nautical miles to the northeast of the IHNC.  Data from that station confirmed that the winds blew consistently from the northeast at the IHNC during the relevant hours on the morning of August 29, 2005.

> *References:*
> *Lemon Tr. 1746:10-12 (location of Slidell) (Ex. 1.K).*
>
> *Lemon Tr. 1719:11-14, 1720:4-15, 1775:13-16, 1777:14-19, 1778:13-1779:25 ("The data indicates a strong northeast wind, that is, northeast to southwest.") (Ex. 1.K).*
>
> *Lemon Slide LL-021 (radar images exemplify northeasterly winds seen throughout the period) (DX 346) (Ex. 15).*
>
> *Lemon Tr. 1823:5-17 ("uniform wind field from the northeast") (Ex. 1.K).*
>
> *Lemon Report at 2, 19, 35 ("winds were sustained northeasterly") (DX 311) (Ex. 16).*

20. Every six-minute image from the Slidell station showed "base radial velocity" data expressed in shades or red, indicating winds blowing away from the radar at the IHNC location (*i.e.*, from the northeast).

> *References:*
> *Lemon Tr. 1723:9-16(Ex. 1.K).*
>
> *Lemon Tr. 1726:23- 1727:9 (Ex. 1.K).*
>
> *Lemon Report at Fig. 1 (DX 311) (Ex. 16).*
>
> *Mitchell Tr. 1002:9-15, 1011:11-1012:5 (Ex. 1.H).*

## Hurricane Katrina – Current and Tides

21. The IHNC below the Florida Avenue Bridge was a "closed system" in the sense that the lock at its southern end prevented the flow of water to or from the Mississippi River.  Therefore, when Hurricane Katrina storm surge reached this part of the IHNC, it filled up "like a bathtub" without generating appreciable currents.

> *References*
> *Cushing Tr. 2052:23-2053:13 (Ex. 1.N).*
>
> *Cushing Report at App. B at B25-26 (water was "filling the bathtub" with no appreciable currents) (DX 196) (Ex. 2).*
>
> *Mosher Dep. 171:12-16 (end of IHNC was closed off; lock gates were closed) (DX 283) (Ex. 17).*
>
> *Pazos Dep. 104:8-11 ("Current is very insignificant because the current needs to flow in order to exist. And the locks were closed, so the flow – the flow was very limited or local …") (DX 218) (Ex. 6).*
>
> *LNA Pre-Trial Undisputed Fact 20 ("The IHNC below the Florida Avenue Bridge was a 'closed system' in the sense that the lock at its southern end prevented the flow of water to or from the Mississippi River.") (Ex. 4).*

22. Currents in the IHNC could not have overcome the hurricane winds and moved the barge from the LNA Terminal to either breach site until after both breaches occurred. Indeed, the winds were 700 times stronger than the currents in their effect on the barge.

> *References*

*Cushing Report at 48, 166-68 (currents did not flow toward north or south breach and "were very nearly zero" prior to breaching) (DX 196) (Ex. 2).*

*Cushing Tr. 2042:24-2043:2 ("the current in the water was very, very small. I would say insignificant.") (Ex. 1.N).*

*Cushing Tr. 2053:14-23 ("The currents that we calculated and that existed in the canal were very, very weak, on the order of a hundredths of a knot. And, therefore, they would have had very, very little effect compared to the wind, which would have been, say, 700 times more forceful on the barge.") (Ex. 1.N).*

*Cushing Tr. 2170:3-8 ("at 9 o'clock, 9:15 and 9:30, . . ., the north and south breaches had already formed. And in doing so, they were then . . . contributing . . . to the currents of the canal, which prior to the breaches were insignificant, but once the breaches had formed, they were then adding to the track of the [barge]") (Ex. 1.N).*

*Pazos Dep. 104:8 (current "very insignificant") (DX 218) (Ex. 6).*

23. Tides could not have moved the barge to the site of the breaches. Tidal movement in the New Orleans area is "on the order of a foot to a foot and a half" diurnally, which means there is "one high and one low tide per day." Tides in the IHNC take 12 hours to rise one foot and to fall one foot, which means water rises and falls at a rate of approximately 1 inch per hour.

> *References:*
> *Cushing Tr. 2054:5-2055:20 (Ex. 1.N).*
>
> *IPET Report Vol. V Fig. 51 (hydrograph for IHNC) (DX 145) (Ex. 13).*
>
> *Cushing Report at B-10 (IHNC Lockmaster's Record showing flow into the IHNC on the IHNC Lock Canal Gage) (DX 196) (Ex. 2).*

## Hurricane Katrina – Waves

24. IPET conducted a scientific study and concluded that wave heights in the IHNC during Hurricane Katrina reached 1 foot before 5:30 a.m. CDT on August 29, 2005, and 2-3 feet after that.

> *References*
> *IPET Report Vol. IV at IV-4 (DX 145) (Ex. 13).*
>
> *Cushing Tr. 2065:7-16 (confirming IPET's analysis of wave heights with his own calculations of wave height using Navy Charts) (Ex. 1.N).*

*Spinks Tr. 1613:17-1614:10, 1614:17-20 (IPET found that maximum wave heights during peak wind conditions were 1 foot before 5:30 a.m., and 2-3 feet after that; IPET went through a scientific process to come up with those figures) (Ex. 1.J).*

*Pazos Report at 37 (reviewing IPET's study and noting that waves associated with the surge "decay rapidly, and within less than a mile have been reduced to about 1.2 feet") (PX 402) (Ex. 5) .*

*Pazos Report at 39-40 (quoting IPET's study at IV-227, which states that "[s]imilar to waves entering the MRGO/GIWW, these waves [entering the IHNC] decay rapidly and within less than a mile have been reduced to about 1.2 feet" and also noting that the maximum waves in the IHNC during Katrina occurred at 9:30 a.m.) (PX 402) (Ex. 5).*

25. Photographic and other evidence confirms wave heights in the IHNC during the morning of August 29 of approximately one to three feet as set forth in the IPET Report, and discredits any allegation of a purported twenty-foot wave.

*References*
*O'Dowd Tr. 2225:19- 2227:6 (Ex. 1.O).*

*LNA001345 and LNA001347 (photographs taken by O'Dowd the morning of August 29, showing small waves) (DX 35) (Ex. 18).*

*Cushing Tr. 2065:17-2066:7 (discussing DX 35 at LNA001345 (Ex. 18): "This is the time when conditions were the greatest. The wind had backed around from the northeast and was coming from a more northerly direction. So the wind would have had the greatest possible fetch and the greatest possible strength. And here we see waves of about 3 feet high.") (Ex. 1.N).*

*Cushing Tr. 2067:2-12 (twenty-foot wave would have destroyed structures found standing after Katrina) (Ex. 1.N).*

26. Wind-activated waves tend to propagate in the direction of the prevailing wind.

*References*
*Cushing Tr. 2063:10-20 (Ex. 1.N).*

*Cushing Report at 47, 79 ("Another important property of wind-generated waves is that they travel in the same direction as the prevailing wind.") (DX 196) (Ex. 2).*

*Spinks 2009 Dep. 23:17-20 (matter of "common sense") (DX 222) (Ex. 19).*

*Pazos Dep. 151:5-9 (asked whether he had an opinion about the prevailing direction of waves at the time the barge supposedly contacted the wall at the north breach, response was "[a]bsolutely no") (DX 218) (Ex. 6).*

LIBW/1791984.8

27. Waves reflecting off a surface have less energy than "incoming" waves approaching that same surface.

> *References*
> *Cushing Tr. 2067:23-2068:6 ("a reflective wave is never as strong as a . . . primary wave . . . reflective waves wouldn't overcome the primary waves") (Ex. 1.N).*
>
> *Cushing Report at 79 ("Reflected waves lose energy when reflection takes place.") (DX 196) (Ex. 2).*
>
> *Spinks 2009 Dep. 23:23-24:2 (reflected waves have less energy) (DX 222) (Ex. 19).*

28. LNA has applied scientific principles to determine the effect of waves on a free-floating barge, including performing calculations, the results of which show that waves could not have moved the barge from the LNA terminal across the canal to either breach site.

> *References*
> *Cushing Tr. 2042:18-2043:7 (waves "moving in the direction of the wind, so they would have only added to the force of the wind" and would not have moved the barge against the prevailing winds) (Ex. 1.N).*
>
> *Cushing Tr. 2063:10-20 (waves could not have moved the barge "[b]ecause waves move with the wind . . . [s]o they would be moving in the same direction that the wind would be moving") (Ex. 1.N).*
>
> *Cushing Tr. 2067:13-15 (not possible for waves to move barge against wind) (Ex. 1.N).*
>
> *Cushing Report at 79 (wind-generated waves, which were the only waves present in the IHNC during Hurricane Katrina, "could not possibly move any floating object in a direction counter to the wind"; reflected wave "can never have as much energy as the primary wave, and [reflected waves] can never force a floating object in the direction from which the primary wave is coming") (DX 196) (Ex. 2).*
>
> *Cushing Report at 131-32 (waves had insufficient energy to propel barge) (DX 196) (Ex. 2).*
>
> *Cushing Report at 164 (calculations show pitching motion of barge in waves in IHNC would involve maximum vertical motion of slightly more than one foot) (DX 196) (Ex. 2).*

LIBW/1791984.8

> *Dooley Report at 32 (waves moving with the prevailing wind "would also prevent the barge from moving northward" to the North Breach") (DX 198) (Ex. 10).*

### *The Floodwall Breaches on the IHNC*

29. The North Breach occurred no later than 6:00 a.m. on August 29, 2005.  The North Breach was approximately 215 feet in length.

> *References*
> *Cushing Tr. 2046:17-20 (Ex. 1.N).*
>
> *Cushing Report at 51, 103-04 (DX 196) (Ex. 2).*
>
> *Bea Report at 45-47 & App. C at 9 (DX 206) (Ex. 20).*
>
> *Bea Tr. 2752:21-2753:1 (Ex. 1.Q).*
>
> *Pazos Report at 8, 37 (PX 402) (Ex. 5).*
>
> *Marino Report at 3-16 (PX 397) (Ex. 3).*
>
> *LNA Pre-Trial Undisputed Fact 28 ("The North Breach was approximately 215 feet in length.") (Ex. 4).*

30. The South Breach occurred at approximately 7:00 a.m. on August 29, 2005.  The South Breach was more than 800 feet in length.

> *References*
> *Cushing Tr. 2051:18-19 (Ex. 1.N).*
>
> *Cushing Report at 114 (DX 196) (Ex. 2).*
>
> *Bea Report at 48-50, App. C at 9 (DX 206) (Ex. 20).*
>
> *Marino Report at 3-16 (PX 397) (Ex. 3).*
>
> *Pazos Report at 8, 37 (PX 402) (Ex. 5).*
>
> *LNA Pre-Trial Undisputed Fact 29 ("The South Breach was more than 800 feet in length.") (Ex. 4).*

31. Both the North Breach and the South Breach had already occurred before the prevailing winds came to include any component blowing from the direction of the LNA Terminal toward the east bank of the IHNC.

> *References*
> *Cushing Tr. 2046:13-16; 2047:1-7, 2051:5-2052:10 (Ex. 1.N).*

*Cushing Report at 104, 166-67 & Fig. 109 (at the time of the north breach, winds "prevented the barge from moving to the north breach site") (DX 196) (Ex. 2).*

*Cushing Report at 129, 166 (impossible for wind to have pushed barge into wall at North Breach) (DX 196) (Ex. 2).*

*Cushing Report at 114 ("it is clear that the [south] breach had to have occurred before the winds had a west-to-east component") & Fig. 110 (DX 196) (Ex. 2).*

*Marino Report at 3-11 (winds "essentially parallel" to canal before 9:00 a.m. [i.e., blowing north to south along axis of the canal]) (PX 397) (Ex. 3).*

## Floodwall Design and Potential Barge Impact

32.   The floodwalls on the IHNC were "I-walls" comprised of a twenty-foot-long steel sheet pile driven into an earthen levee and subsoil to a depth of approximately seventeen feet and capped by a six-foot concrete monolith (cap).  The concrete monolith was poured in two segments, the first encasing the top of the sheet pile and the second extending three feet above the top of the sheet pile.  The upper "pour" consisted of three feet of concrete and reinforcing bar ("rebar") extending above the sheet pile.  The floodwall had a horizontal construction joint between the two "pours" of concrete.  A schematic of the floodwall, including the concrete cap and the construction joint between the two pours of concrete, is attached as Findings of Fact Appendix 4.

> *References*
> *Cushing Report at 29-30 & Fig. 21 (describing sheet pile I-wall) (DX 196) (Ex. 2).*
>
> *Cushing Tr. 2071:13-2073:8 (referring to Cushing Slide CC-038 (DX 349)) (Ex. 1.N).*
>
> *Mosher Dep. 28:19-29:2 ("It was ... what we called an I-wall, which is essentially a sheet pile wall with a concrete header section sticking above the ground") (DX 283) (Ex. 17).*
>
> *Bartlett Tr. 312:13-314:1 (construction joint) (Ex 1.B).*
>
> *Marino 2009 Dep. 58:13-59:10 (floodwall had a six-foot concrete monolith, with a construction joint three feet below the top of the monolith) (DX 221) (Ex. 7).*
>
> *Pazos Report at 35-36 (floodwall "is a flexible cantilever (I type) structure embedded in a soil mass of soft saturated clay"; sheetpile extends 5 feet into the 8 foot wall) (PX 402) (Ex. 5).*

16

*Marino Report Fig. 2.3 (dimensions of I-wall) (PX 397) (Ex. 3).*

*Marino Report at 2-23 (describing two pours of concrete on monoliths) (PX 397) (Ex. 3).*

*Bartlett Report App. A & B (schematic of floodwall and concrete cap) (PX 378) (Ex. 21).*

33.  The sheetpile was embedded and anchored in the supporting soils and derived its

strength from those soils.  Accordingly, the failures that occurred at the North Breach

and South Breach required a failure in the soil into which the steel sheet pile was sunk.

The floodwall failed when it lost the support of the soils on the protected side of the

floodwall.

*References*
*Bakeer Report at 20-21 (DX 205) (Ex. 23).*

*Cushing Report at 51 (sheet piling requires "passive soil pressure to resist overturning forces") (DX 196) (Ex. 2).*

*Mosher Dep. 17:12-17 ("The wall was founded in a levee, which is made up of soil, and the principal resisting forces to any loads that are applied to the wall were resisted by the soils that the wall was setting in, and so that it's a classical soil-structure interaction problem") (DX 283) (Ex. 17).*

*Pazos Dep. 201:15-18 (Q:  "And so in order for the wall to do its job, it needs to have support in the soil on the protected side, right?"  A:  "Yes.") (DX 218) (Ex. 6).*

*Marino 2009 Dep. 55:14-17 (Q:  "[I]n a flood stage, you need to have the sheet pile provide resistance in the soil and then below the levee; isn't that right?"  A: "Yes.") (DX 221) (Ex. 7).*

*Marino 2009 Dep. 55:18-22 (Q: "And if you're going to fail the sheet pile, you've got to fail the soil; isn't that right?"  A:  "I haven't thought of all instances of whether that's true or not, but I would say in general, it's true.") (DX 221) (Ex. 7).*

*Marino 2008 Dep. 40:13-15 (Q: "And in order to fail the floodwall, you have to have some failure of the soil."  A: "Yes.") (DX 225) (Ex. 24).*

*Marino 2008 Dep. 46:16-47:2 (agreeing that "the fundamental principle is that in order for a wall to resist a load it needs to have some sort of anchor somewhere so that when the load is exerted the wall can push back" and that "embedment depth" is one way to do that) (DX 225) (Ex. 24).*

34.  The concrete cap did not provide stability for the floodwall, but rather was intended to provide aesthetic appeal, to protect against rust, and to add some height to the wall.

>   *References*
>   *Bakeer Tr. 2294:9-2296:11 (Ex. 1.S).*
>   *Team Louisiana Report at 151 (DX 144) (Ex. 25).*

35.  LNA's experts performed calculations showing that a barge impact, if it occurred, would cause local damage to the concrete cap but would not affect the steel sheet pile or supporting soil.  The Army Corps' expert (Mosher) and even plaintiffs' experts (Marino and Bartlett) expressed agreement with this concept.

>   *References*
>   *Cushing Report at 158-63 & App. D, E, F (analysis showing that a "barge striking the concrete cap of the floodwall could not cause the sheetpile to fail" but would only create localized damage (a "crack" or a "notch") in the concrete cap, with no effect in the sheet pile below) (DX 196) (Ex. 2).*
>
>   *Cushing Tr. 2074:11-2076:25, 2077:25-2080:7, 2078:8-11 (identifying agreement with plaintiffs' expert Mr. Bartlett that barge would hit above the construction joint) (Ex. 1.N).*
>
>   *Mosher Dep. 91-92, 267 (identifying "[o]ther places where we saw barges hit walls" and noting they "can cause damage to the walls, but it's usually very local damage to the wall[s]"; "punching through" the concrete cap but not "causing the collapse") (DX 283) (Ex. 17).*
>
>   *Marino 2009 Dep. 59:5-60:3 (admitting that construction joint in concrete cap constitutes a point of weakness, and that he would expect the wall to shear at the construction joint if the impact was sufficient) (DX 221) (Ex. 7).*
>
>   *Bartlett Tr. 359:25-360:1 (barge causes "localized damage to th[e] cap") (Ex. 1.B).*

**Physical Evidence the Barge Did Not Cause the North Breach**

36.  Photographs taken both immediately before and after Hurricane Katrina show a utility pole standing on the canal-side bank of the IHNC, close to the site of the North Breach and in a location that would have been in the path of the barge had the barge been present at or near the site of the North Breach.

*References*
*DX 345 (pre-Katrina photographs) (Ex. 26).*

*DX 106 (Ex. 27).*

*DX 263 (Ex. 28).*

*DX 344 (newspaper article from August 31, 2005) (post-Katrina) (Ex. 29).*

*Marino Tr. 1368:16-1371:12; 1372:11-18 (Ex. 1.I).*

*Marino Report at 4-7, Photo 4.6 (PX 397) (Ex. 3).*

37. Had the barge been floating free near the site of the North Breach, it would have

toppled this utility pole.

*References*
*Cushing Tr. 2098:23-2099:20 (barge travels perpendicular to wind and therefore cannot arrive at breach without toppling pole) (Ex. 1.N).*

*Pazos Tr. 881:21-25 ("there's no way the barge would have missed that phone pole") (Ex. 1.G).*

*Marino Tr. 1365:23-1366:3 (the pole is right in the middle of the breach) (Ex. 1.I).*

38. There was no damage at the site of the North Breach that could be associated with

impact from a barge.

*References*
*Bea Tr. 2683:13-21 (Bea personally examined sheet pile and floodwall in area of North Breach and found no evidence a barge had come in contact with the floodwall) (Ex. 1.Q).*

*Cushing Tr. 2095:17-2096:2 (Ex. 1.N).*

*Cushing Report at 63, 88, 175 (DX 196) (Ex. 2).*

*Bea Report at 54 (DX 206) (Ex. 20).*

*Bartlett Dep. 63:14-17 (DX 219) (Ex. 30).*

*Mosher Dep. 130:15-131:4 (physical evidence at North Breach was different from what would have been seen had barge been present) (DX 283) (Ex. 17).*

**Physical Evidence the Barge Did Not Cause the South Breach**

39. The physical evidence showed that the barge came into contact with the concrete cap of the floodwall at the far southern end of the South Breach, away from the area where the breach formed (i.e., the area where floodwall was pushed back in a "bow" shape).

> *References*
> *Bakeer Tr. 2368:10-14 (South Breach began in the northern end of "bow" shaped section) (Ex. 1.S).*
>
> *Bea Tr. 2692:1-16 (Ex. 1.Q).*
>
> *Cushing Tr. 2103:1-22 (there was no damage from the barge on the floodwall at the point of initiation; the only damage to the concrete on the floodwall was caused by the expansion of the sheet pile) (Ex. 1.N).*

40. Physical and photographic evidence in the damaged neighborhood shows the barge must have floated into the neighborhood after the water was already high.  The barge floated over the top of a small school bus to arrive at its post-Katrina location.  Thus, the water in the Lower Ninth Ward must have been higher than the top of the school bus when the barge entered the neighborhood.

> *References*
> *Bea Tr. 2619:24-2620:8, 2656:9-23, 2684:21-2685:10, 2685:16-2686:7, 2792:6-19 (Ex. 1.Q)*
>
> *DX 360 (identifying school bus next to barge before floodwaters receded) (Ex. 31).*

41. In addition, photographs show the barge landed on top of telephone wires rather than knocking the wires or telephone poles over.  The barge could not possibly have landed on top of the telephone wires unless the water in the neighborhood was already quite high at the time the barge arrived.

> *References*
> *LNA010209-10 (photographs) (DX 100) (Ex. 32).*
>
> *Cushing Tr. 2127:1-11 (Ex. 1.N).*
>
> *Cushing Slide CC-108 (DX 349) (Ex. 33).*
>
> *Cushing Report at 120, 121 (telephone wire) (DX 196) (Ex. 2).*

42. Striations on the bottom of the barge matched the bent rebar at the far southern end of the South Breach, away from the main "bow" where the breach had already formed. In addition, concrete debris showed that the barge had necessarily passed over a portion of the fallen floodwall before coming into contact with the concrete cap at the end of the already-existing breach.

> *References*
> *Cushing Slides CC-086-91 (DX 349) (Ex. 33).*
>
> *Cushing Report at 90-91 (scratches matched rebar; panels inclined before contact) (DX 196) (Ex. 2).*
>
> *Pazos Tr. 836:25-837:2 ("So it's clear that the barge enters on top of the levee after knocking these concrete panels and gliding on top of the rebar") (Ex. 1.G).*
>
> *Bartlett Tr. 336:5-9 (scratches on barge matched rebar) (Ex. 1.B).*
>
> *Team Louisiana Report at 67 (angle of rebar suggested this section of the wall "was already leaning having failed earlier") (DX 144) (Ex. 25).*
>
> *LNA Pre-Trial Undisputed Fact 27 ("The barge passed through the floodwall at the extreme southern end of the South Breach, at a location where bent rebar was found which matched scratches found in the bottom of the barge.") (Ex. 4).*

## Independent Investigations

43. The IPET, Team Louisiana and ILIT investigations all concluded that the failure of the IHNC floodwall was the result of failure in the supporting soils, due to foundation instability or underseepage or both, and all expressly or implicitly found that the barge did not cause either breach.

> *References*
> *IPET Report Vol. V at V-68 (DX 145) (Ex. 13).*
>
> *Mosher Dep. 77:25-78:12 (IPET considered the barge as a potential cause of the South Breach and "rejected that conclusion") (DX 283) (Ex. 17).*
>
> *ILIT Report at 6-7 (barge impact "was not the cause of the breach and failure") (DX 141) (Ex. 22).*
>
> *Team Louisiana Report at 67 ("[t]he barge had clipped the end of the already formed breach as it was sucked through") (DX 144) (Ex. 25).*

21

*Kemp Tr. 2982:11-13, 2986:1-4, 2987:25-2988:2 (Ex. 1.R).*

Dated:  August 30, 2011

Respectfully submitted,

Derek A. Walker (#13175)
Robert B. Fisher, Jr., T.A. (#5587)
CHAFFE MCCALL, L.L.P.
2300 Energy Centre
1100 Poydras Street
New Orleans, LA 70163-2300
Telephone:  (504) 585-7000
Facsimile:  (504) 585-7075
Fisher@chaffe.com
Walker@chaffe.com

/s/ John D. Aldock
John D. Aldock
Richard M. Wyner
Mark S. Raffman
GOODWIN PROCTER LLP
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 346-4240

Daniel A. Webb (#13294)
SUTTERFIELD & WEBB, LLC
Poydras Center
650 Poydras Street, Suite 2715
New Orleans, LA 70130
Telephone:  (504) 598-2715

Attorneys for Lafarge North America Inc.