```
                                                                  237
 1                    UNITED STATES DISTRICT COURT
 2                    EASTERN DISTRICT OF LOUISIANA
 3
     ****************************************************************
 4
     IN RE:  KATRINA CANAL
 5   BREACHES CONSOLIDATED
     LITIGATION
 6
                                   CIVIL ACTION NO. 05-4182
 7                                 SECTION "K"(2)
                                   NEW ORLEANS, LOUISIANA
 8                                 TUESDAY, JUNE 22, 2010, 9:00 A.M.
 9   PERTAINS TO BARGE
10
     MUMFORD    C.A. NO. 05-5724
11   AS TO CLAIMS OF PLAINTIFFS
     JOSEPHINE RICHARDSON AND
12   HOLIDAY JEWELERS, INC.,
     ONLY
13
14   BENOIT    C.A. NO. 06-7516
     AS TO CLAIMS OF PLAINTIFFS
15   JOHN ALFORD AND JERRY
     ALFORD ONLY
16
17   ****************************************************************
18
                        DAY 2, MORNING SESSION
19            TRANSCRIPT OF NONJURY TRIAL PROCEEDINGS
           HEARD BEFORE THE HONORABLE STANWOOD R. DUVAL, JR.
20                       UNITED STATES JUDGE
21
22   APPEARANCES:
23
     FOR THE PLAINTIFFS:      BEST KOEPPEL TRAYLOR
24                            BY:  LAURENCE E. BEST, ESQUIRE
                              2030 ST. CHARLES AVENUE
25                            NEW ORLEANS LA  70130
```

**238**

APPEARANCES CONTINUED:

    LAW OFFICES OF BRIAN A. GILBERT
    BY:  BRIAN A. GILBERT, ESQUIRE
    2030 ST. CHARLES AVENUE
    NEW ORLEANS LA  70130

    KHORRAMI POLLARD ABIR
    BY:  SHAWN KHORRAMI, ESQUIRE
    44 FLOWER STREET, 33RD FLOOR
    LOS ANGELES CA  90071

    WILSON GROCHOW DRUKER & NOLET
    BY:  LAWRENCE A. WILSON, ESQUIRE
    223 BROADWAY, 5TH FLOOR
    NEW YORK NY  10279

    WIEDEMANN & WIEDEMANN
    BY:  LAWRENCE D. WIEDEMANN, ESQUIRE
        KARL WIEDEMANN, ESQUIRE
    821 BARONNE STREET
    NEW ORLEANS LA  70113

    PATRICK J. SANDERS
    ATTORNEY AT LAW
    3316 RIDGELAKE DRIVE
    SUITE 100
    METAIRIE LA  70002

    LAW OFFICE OF RICHARD T. SEYMOUR
    BY:  RICHARD T. SEYMOUR, ESQUIRE
    1150 CONNECTICUT AVENUE N.W.
    SUITE 900
    WASHINGTON DC  20036

FOR THE DEFENDANT:    CHAFFE MCCALL
    BY:  DEREK A. WALKER, ESQUIRE
    2300 ENERGY CENTRE
    1100 POYDRAS STREET
    NEW ORLEANS LA  70163

**239**

APPEARANCES CONTINUED:

    GORDON PROCTER
    BY:  JOHN D. ALDOCK, ESQUIRE
        MARK S. RAFFMAN, ESQUIRE
        ADAM M. CHUD, ESQUIRE
        KIRSTEN V. K. ROBBINS, ESQUIRE
        ERIC I. GOLDBERG, ESQUIRE
    901 NEW YORK AVENUE N. W.
    WASHINGTON DC  20001

    SUTTERFIELD & WEBB
    BY:  DANIEL A. WEBB, ESQUIRE
    650 POYDRAS STREET, SUITE 2715
    NEW ORLEANS LA  70130

    LAFARGE NORTH AMERICA, INC.
    BY:  PETER KEELEY, ESQUIRE
    12950 WORLDGATE DRIVE
    HERNDON VA  20170

OFFICIAL COURT REPORTER:    CATHY PEPPER, CCR, RMR, CRR
        500 POYDRAS STREET, ROOM B406
        NEW ORLEANS, LOUISIANA 70130
        (504) 589-7779

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT PRODUCED BY COMPUTER.

**240**

I N D E X

| EXAMINATIONS | PAGE |
|---|---|
| TERRY MARK ADAMS........................ | 242 |
| DIRECT EXAMINATION BY MR. BEST........................ | 242 |
| CROSS-EXAMINATION BY MR. WALKER........................ | 270 |
| REDIRECT EXAMINATION BY MR. BEST........................ | 294 |
| ROBERT D. BARTLETT..................... | 303 |
| DIRECT EXAMINATION BY MR. BEST........................ | 304 |

E X H I B I T S

| DESCRIPTION | PAGE |
|---|---|
| EXHIBIT NO. 429........................ | 263 |

**241**

P-R-O-C-E-E-D-I-N-G-S

TUESDAY, JUNE 22, 2010

M O R N I N G   S E S S I O N

(COURT CALLED TO ORDER)

    THE DEPUTY CLERK:  ALL RISE, PLEASE.

    THE COURT:  GOOD MORNING.  JUST ONE THING I DIDN'T NOTE, MR. -- IS IT MR. ROBIN, R-O-B-I-N, IS HE OFF THE LIST, ON THE LIST OR --

    MR. GILBERT:  HE'S ON THE LIST.  HE'S COMING TOMORROW.

    THE COURT:  THANK YOU.

    MR. GILBERT:  THANK YOU.

    THE COURT:  YES, SIR.  MR. BEST, ARE YOU READY TO PROCEED?

    MR. BEST:  READY TO PROCEED, YOUR HONOR.

    THE COURT:  YOUR FIRST WITNESS TODAY?

    MR. BEST:  IS MR. TERRY MARK ADAMS.

    THE COURT:  MR. ADAMS, IF YOU WOULD COME AND TAKE THE WITNESS STAND, PLEASE.

    THE DEPUTY CLERK:  WOULD YOU PLEASE RAISE YOUR RIGHT HAND.  DO YOU SOLEMNLY SWEAR THAT THE TESTIMONY WHICH YOU ARE ABOUT TO GIVE WILL BE THE TRUTH, THE WHOLE TRUTH AND NOTHING BUT THE TRUTH, SO HELP YOU GOD?

    THE WITNESS:  I DO.

**242**

1    TERRY MARK ADAMS
2  WAS CALLED AS A WITNESS AND, AFTER BEING FIRST DULY SWORN BY THE
3  CLERK, WAS EXAMINED AND TESTIFIED ON HIS OATH AS FOLLOWS:
4        THE DEPUTY CLERK: STATE YOUR NAME AND ALSO SPELL IT FOR
5  THE RECORD.
6        THE WITNESS: YES, MA'AM. TERRY MARK ADAMS, T-E-R-R-Y,
7  MIDDLE NAME MARK, M-A-R-K, LAST NAME ADAMS, A-D-A-M-S.
8              DIRECT EXAMINATION
9  BY MR. BEST:
10 Q.  HOW OLD ARE YOU, MR. ADAMS?
11 A.  47.
12 Q.  AND WHERE ARE YOU FROM?
13 A.  LOWER NINTH WARD.
14 Q.  FROM NEW ORLEANS?
15 A.  FROM NEW ORLEANS.
16 Q.  WHERE DO YOU LIVE NOW?
17 A.  DESLONDE STREET.
18 Q.  AT WHAT NUMBER?
19 A.  2604.
20 Q.  AND WHERE WERE YOU LIVING BEFORE HURRICANE KATRINA?
21 A.  2604 DESLONDE.
22 Q.  ARE YOU MARRIED?
23 A.  NO, I'M NOT.
24 Q.  HAVE YOU BEEN MARRIED?
25 A.  YES.

**243**

1  Q.  DIVORCED?
2  A.  YES.
3  Q.  HAVE CHILDREN?
4  A.  YES.
5  Q.  I GUESS MOSTLY GROWN BY NOW?
6  A.  YES.
7  Q.  ALL RIGHT. WHAT'S YOUR EDUCATION?
8  A.  FINISHED HIGH SCHOOL, TWO YEARS OF COLLEGE.
9  Q.  AND DO YOU HAVE ANY MILITARY SERVICE?
10 A.  UNITED STATES MARINE CORPS, THREE YEARS.
11 Q.  HONORABLE DISCHARGE?
12 A.  YES.
13 Q.  WHAT YEARS DID YOU SERVE IN THE MARINES?
14 A.  '82 TO '85.
15 Q.  WHAT SORT OF EMPLOYMENT HAVE YOU BEEN ENGAGED IN OVER THE
16 YEARS, IN GENERAL?
17 A.  I HELPED MY NEPHEW RUN HIS BODY SHOP, AND DRIVE MY TRANS
18 PRODUCE, AND RECENTLY, I WAS EMPLOYED BY DPC, DAMAGE PREVENTION
19 COMPANY FOR ENTERGY.
20 Q.  MAY I HAVE PLAINTIFF'S EXHIBIT 274. FOR THE RECORD, 274 WAS
21 THE SAME MAP OF THE NINTH WARD THAT MS. ALFORD TESTIFIED ABOUT,
22 AND WE HAVE HER ADDRESS UP THERE.
23       I'M SORRY, THE STREET ADDRESS, YOUR NUMBER ON
24 DESLONDE STREET WHAT WAS?
25 A.  2604.

**244**

Q.  YOU SEE UP HERE, WE HAVE NOTED, AND YOU CAN SEE IT ON THE
SCREEN IN FRONT OF YOU, MS. ALFORD LIVED AT 2423. WHICH
DIRECTION FROM HER DID YOU LIVE ON THIS MAP? YOU CAN SEE THE
CLAIBORNE AVENUE BRIDGE AT THE BOTTOM OF THE PHOTO.
     THE COURT: AND YOU CAN ACTUALLY POINT TO THAT SCREEN
AND IT WILL MAKE A MARK, SIR, WHEN YOU DO.
     THE WITNESS: RIGHT THERE.
     THE COURT: IT SHOULD MAKE A MARK, IF YOU TOUCH IT ABOUT
WHERE YOUR HOUSE WOULD HAVE BEEN, OR IS. THERE YOU GO.
              EXAMINATION
BY MR. BEST:
Q.  SO SHE WAS 2400, YOU WERE 2600. YOU'RE IN THE SECOND BLOCK
UP FROM HER?
A.  NO. NOT THE SECOND BLOCK.
Q.  THE FIRST BLOCK?
A.  I WAS TWO BLOCKS AWAY FROM HER.
Q.  WELL, I MEANT TWO BLOCKS. I THINK -- MAYBE I'M SAYING IT
POORLY, AND I APOLOGIZE.
     NOW, WHICH WAY DID YOUR HOUSE -- IF YOU WENT ON YOUR
FRONT PORCH, WERE YOU LOOKING TOWARDS THE INDUSTRIAL CANAL OR
AWAY FROM THE INDUSTRIAL CANAL?
A.  AWAY FROM THE INDUSTRIAL CANAL.
Q.  ALL RIGHT. SO THAT MEANS YOU WOULD HAVE TO GO ON YOUR BACK
PORCH TO LOOK TOWARDS THE INDUSTRIAL CANAL?
A.  YES.

**245**

Q.  AND HOW LONG HAD YOU LIVED THERE BEFORE HURRICANE KATRINA?
A.  BESIDES LIVING IN BIRMINGHAM, ALABAMA, AND THE MARINES AND
IN CHARLOTTE, I'VE BEEN THERE MOSTLY ALL OF MY LIFE.
Q.  IN THAT SAME RESIDENCE?
A.  YES.
Q.  THAT WAS YOUR FAMILY HOME YOU GREW UP IN?
A.  YES.
     THE COURT: DO YOU MIND, I'M GOING TO ASK THIS TO BE
CAPTURED AND BE INTRODUCED, WITH NO OBJECTION, SO I'LL HAVE
REFERENCE WHEN WE'RE DOING THIS, EXACTLY WHERE HIS HOME IS. ANY
OBJECTION FROM ANYONE?
     MR. BEST: NO OBJECTION.
     THE COURT: WHAT HAPPENS, IF YOU WANT SOMETHING CAPTURED
ON THIS, IN OUR NEW SYSTEM, WE HAVE TO DO IT REMOTELY. IN OUR
PREVIOUS SYSTEM, I COULD DO IT RIGHT HERE. SO WE'VE MADE GREAT
PROBLEMS.
     SHEENA, YOU'LL DO THAT FOR ME?
     THE DEPUTY CLERK: DO YOU WANT IT IN COLOR? DOES IT
MATTER?
     THE COURT: YES, I WOULD LIKE IT IN COLOR. IF YOU'RE
DOWN THERE, YOU MIGHT AS WELL DO IT IN COLOR.
     EXCUSE ME FOR THAT. YOU CAN PROCEED, SIR.
              EXAMINATION
     MR. BEST: WELL, THE NEXT THING IS GOING TO BE ANOTHER
EXHIBIT.

**246**

1    THE COURT:  I DON'T KNOW IF YOU WANT TO -- YOU CAN LET
2    ME KNOW WHEN IT'S CAPTURED.
3        SHEENA, IS IT CAPTURED AND HE CAN PROCEED?
4    THE DEPUTY CLERK:  YES.
5                EXAMINATION
6    BY MR. BEST:
7    Q.  WHERE YOU WERE AT THE TIME OF HURRICANE KATRINA?
8    A.  INSIDE THE HOUSE.
9    Q.  I TAKE IT YOU DID NOT EVACUATE FOR THE STORM?
10   A.  NO, I DID NOT.
11   Q.  AND WERE YOU WORKING AT THE TIME OF HURRICANE KATRINA?
12   A.  YES, I WAS.
13   Q.  AND WHAT WERE YOU DOING AT THE TIME?
14   A.  WORKING FOR VERNON KEELER CONSTRUCTION.
15   Q.  AND WHAT DAYS OF THE WEEK DID YOU TYPICALLY WORK?
16   A.  MONDAY THROUGH FRIDAY.
17   Q.  SO MONDAY MORNING, THE DAY OF THE HURRICANE, WOULD HAVE BEEN
18   A WORKDAY FOR YOU BUT FOR THE HURRICANE?
19   A.  YES.
20   Q.  AND WHERE DID YOU SPEND THAT WEEKEND, SATURDAY AND SUNDAY
21   BEFORE THE HURRICANE?
22   A.  AT HOME.
23   Q.  AND AFTER THE HURRICANE, JUST WHAT HAPPENED TO YOUR HOME?
24   WHAT DAMAGE DID YOUR HOME SUSTAIN?
25   A.  IT LIFT UP AND WENT DOWN THE STREET.

**247**

1    Q.  IT LIFTED UP AND WENT DOWN?
2    A.  DOWN THE STREET.
3    Q.  I TAKE IT, YOU WEREN'T ABLE TO SALVAGE IT OR RECONSTRUCT IT
4    BECAUSE IT WAS NO LONGER ON ITS FORMER LOCATION?
5    A.  NO, I COULDN'T SALVAGE IT OR RECONSTRUCT IT.
6    Q.  YOU GAVE THAT LOCATION AS YOUR CURRENT ADDRESS.  DO I
7    UNDERSTAND THAT YOU REBUILT ON THE SAME LOT?
8    A.  YES.  YES.
9    Q.  WHAT SORT OF HOUSE WERE YOU LIVING IN AT THE TIME OF
10   KATRINA?
11   A.  STICK HOME ON HOME PILLARS.
12   Q.  I'M SORRY, BRICK HOME?
13   A.  STICK.
14   Q.  STICK HOME.  A WOODEN HOME?
15   A.  YEAH.
16   Q.  HOW MANY STORIES?
17   A.  ONE STORY.
18   Q.  AND WHAT WAS THE FOUNDATION?
19   A.  THE FOUNDATION?
20   Q.  YEAH.  WHAT SORT OF FOUNDATION WAS YOUR ONE-STORY HOME
21   SITTING ON?
22   A.  ON PILLARS.
23   Q.  LIKE BRICK PIERS?
24   A.  YEAH.
25   Q.  OR CONCRETE BLOCK PIERS?

**248**

A.  CONCRETE BLOCK PIERS.
Q.  AND ABOUT HOW HIGH OFF THE GROUND WAS THE GROUND LEVEL?
A.  ABOUT TWO-FOOT OFF THE GROUND.
Q.  IF WE'RE SPEAKING OVER ONE ANOTHER, IT'S HARDER FOR HER TO
GET OUR TESTIMONY DOWN.
    MAY I SEE PLAINTIFF'S EXHIBIT 165.
    ALL RIGHT, SIR.  YOU CAN SEE THAT THAT'S THE
INDUSTRIAL CANAL ON THE TOP OF THIS AERIAL PHOTOGRAPH?
A.  YES.
Q.  AND TOWARDS WHICH END OF THE PICTURE WAS YOUR HOME AT THE
TIME OF HURRICANE KATRINA?  TOWARDS THE RIGHT?
A.  YES.
    MR. BEST:  I'M GOING TO ASK NOW TO SEE IF YOU CAN ZOOM
IN ON THE SECTION OR THE PHOTO THAT CONSTITUTES THE RIGHT SECTION
OF THIS SO THAT THE WITNESS CAN TELL US ABOUT WHERE HIS HOUSE
WAS.
    JUDGE, THESE PHOTOGRAPHS HAVE A LOT OF DATA IN
THEM, AND SO IT TAKES A WHILE FOR THEM TO COME UP.  WE APOLOGIZE
FOR THE DELAY.
    THE COURT:  I UNDERSTAND.  I HAVE USED GOOGLE MAPS
MYSELF.
            EXAMINATION
BY MR. BEST:
Q.  NOW, USING THIS PHOTOGRAPH, YOU'VE INDICATED THE POSITION OF
YOUR HOME ON THE OTHER PHOTOGRAPH.  WE CAN SEE DESLONDE STREET

**249**

DOWN HERE.
    CAN YOU TELL US ON THIS PHOTOGRAPH WHERE YOUR HOUSE WAS
BEFORE KATRINA WASHED IT FROM ITS FOUNDATION?
A.  IT WAS THE SECOND HOUSE OFF THE CORNER ON LAW STREET, THE
SECOND HOUSE OFF THE CORNER ON LAW STREET, IT WAS THE SECOND
HOUSE.
Q.  SO THE PURPLE MARK YOU JUST PUT THE -- THE SECOND -- THAT'S
YOUR LOT --
A.  YEAH.
Q.  -- WHERE YOUR HOUSE WAS.
    NOW, IN THIS PHOTOGRAPH, WHICH IS AFTER THE STORM AND
WE SEE HOUSES MOVED ABOUT, IS ONE OF THOSE HOUSES THAT'S MOVED
ABOUT YOUR HOUSE?
A.  YES.
Q.  CAN YOU PUT ANOTHER, WHAT I GUESS WILL BE A THIRD COLORED
DOT, ON YOUR HOUSE?
A.  RIGHT THERE.
Q.  AFTER THE STORM.  NOW WE'VE GOT FOUR.
    MR. BEST:  JUDGE, MAY WE CLEAR THIS AND DO IT AGAIN?
    THE COURT:  I'LL CLEAR IT.  YES.
            EXAMINATION
BY MR. BEST:
Q.  WHAT I WOULD LIKE TO HAVE, SIR, IS JUST TWO OF THE MARKS,
ONE WHERE THE LOT IS AND WHERE YOUR HOUSE WAS BEFORE THE STORM,
AND THE SECOND ONE ON THE ROOF OF THE HOUSE THAT IS YOURS AFTER

**250**

1  THE STORM.
2  A.  IT'S NOT COMING OUT.  EVERY TIME I PRESS THE HOUSE, IT COMES
3  OUT TO THE RIGHT OF THE HOUSE.
4       THE COURT:  YOU MIGHT CALIBRATE IT A LITTLE BIT.
5       MR. BEST:  UNDO IT AND TRY AGAIN?
6       THE COURT:  UNDO IT.  YOU MIGHT JUST -- THERE YOU GO.
7  THAT'S IT.  I SEE IT.
8            EXAMINATION
9  BY MR. BEST:
10 Q.  AND ANOTHER ONE ON THE LOT WHERE IT WAS LOCATED BEFORE IT
11 WAS MOVED.  THAT'S THE SECOND DOT.
12 A.  RIGHT THERE.
13      MR. BEST:  NOW, I'M JUST GOING TO LEAVE THIS UP FOR A
14 WHILE, YOUR HONOR, AS I MOVE THROUGH THE TESTIMONY BECAUSE I
15 THINK THIS WILL PROBABLY BE THE NEXT EXHIBIT WE'LL BE REFERRING
16 TO IN DUE COURSE.
17      THE COURT:  IF ANY COUNSEL WANTS TO CAPTURE ANYTHING,
18 YOU JUST NEED TO LET SHEENA KNOW AND SHE WILL DO SO TO PRINT.
19      MR. BEST:  WELL, I SUPPOSE FOR COMPLETENESS OF THE
20 RECORD, WE MIGHT AS WELL CAPTURE THIS ONE.
21      THE COURT:  I'LL HAVE TO WAIT TILL SHEENA GETS BACK IN
22 HERE.  BUT GO AHEAD.  I'LL TELL HER WHEN SHE GETS HERE.
23      MR. WALKER:  YOUR HONOR, IF I MAY, NOT ONLY DO WE HAVE
24 TOO MANY DOTS OR SQUARES, BUT FROM LISTENING TO THE TESTIMONY,
25 THE ADDRESS IS 2604 DESLONDE, AND THOSE MARKS, AT LEAST FROM WHAT

**251**

1  I HAVE HERE, AREN'T ON DESLONDE.  MAYBE I'M NOT UNDERSTANDING THE
2  EXERCISE.
3            EXAMINATION
4  BY MR. BEST:
5  Q.  LET ME ASK MR. ADAMS, AS I UNDERSTOOD, THE FRONT OF YOUR
6  HOUSE WAS ON DESLONDE STREET.
7  A.  RIGHT.
8  Q.  AND THEN YOUR LOT WOULD HAVE RUN ROUGHLY HALFWAY BETWEEN
9  DESLONDE AND JORDAN AVENUE?
10 A.  150 FEET.
11 Q.  OR DID YOU GO ALL THE WAY THROUGH TO JORDAN AVENUE?
12 A.  NO, 150 FEET UP DESLONDE STREET TO THE BACK OF OUR LOT.
13      THE COURT:  WHY DON'T YOU DRAW, AS BEST YOU CAN, THE
14 LENGTH OF YOUR LOT ON THERE, IF YOU WOULDN'T MIND.  IN OTHER
15 WORDS, JUST WHERE YOUR LOT BEGINS AND ENDS STARTING AT
16 DESLONDE STREET, I WOULD ASSUME.
17      THE WITNESS:  IT WOULD HAVE STARTED ON DESLONDE STREET
18 AND WENT ABOUT 150 FEET BACK.
19           EXAMINATION
20 BY MR. BEST:
21 Q.  SO IT WENT FROM THE DOT YOU PUT ON DESLONDE STREET BACK TO
22 THE THREE DOTS AT THE BACK -- AT THE REAR END OF YOUR LOT?
23 A.  YES.
24 Q.  AND THE HOUSE WAS IN BETWEEN THERE?
25 A.  UH-HUH (AFFIRMATIVE RESPONSE).

**252**

1  Q.  AND THEN OF COURSE, THE OTHER DOT TO THE LEFT MOST DOT, THAT
2  IS ON THE ROOF OF THE STRUCTURE --
3  A.  THAT IS THE ACTUAL HOUSE.
4  Q.  NOW, WAS ANYBODY ELSE LIVING WITH YOU IN THE RESIDENCE AT
5  THE TIME?
6  A.  MY LITTLE NEPHEW, KENNETH DUCROS.
7  Q.  WAS ANYBODY IN THE RESIDENCE WITH YOU DURING YOUR EXPERIENCE
8  OF HURRICANE KATRINA?
9  A.  NO.
10 Q.  YOU WERE ALONE?
11 A.  YES.
12 Q.  OKAY.  WHAT DID YOU DO ON SUNDAY EVENING?
13 A.  I WENT ON FLOOD STREET FOR A LITTLE WHILE AND A GUY WAS
14 PUTTING A RADIO IN MY TRUCK, AND THEY WAS SAYING A LOT OF STUFF
15 ABOUT HURRICANES.  I WENT BACK HOME, AND BASICALLY THEY CRIED
16 WOLF LIKE EVERY YEAR, SO I WAS LIKE, "I AIN'T GOING NOWHERE."
17 Q.  DID YOU GO TO BED SUNDAY NIGHT?
18 A.  YES, I DID.
19 Q.  ABOUT WHAT TIME?
20 A.  I GOT IN ABOUT 8:00.  I MUST HAVE WENT TO SLEEP.  I DON'T
21 KNOW WHAT TIME I ACTUALLY FELL OFF TO SLEEP, BUT I DIDN'T LEAVE
22 THE HOUSE AT ALL AFTER THAT.
23 Q.  AND WHAT TIME DID YOU NEXT WAKE UP?
24 A.  ABOUT 5:00 IN THE MORNING.
25 Q.  DO YOU KNOW EXACTLY WHAT TIME IT WAS WHEN YOU WOKE UP?

**253**

1  A.  WELL, I MEAN, I'M USED TO GETTING UP AROUND THAT TIME, AND,
2  YOU KNOW, I CAN TELL BY, YOU KNOW, WHAT'S GOING ON AROUND ME.
3  Q.  WHEN YOU WOKE UP AT WHAT YOU THINK WAS AROUND 5:00 A.M., DID
4  YOU HAVE POWER?
5  A.  NO.
6  Q.  DID YOU HAVE ANY SORT OF CLOCK THAT YOU LOOKED AT THAT YOU
7  COULD RELY ON?
8  A.  THE CLOCK WAS BLINKING.  THE POWER HAD WENT OFF.
9  Q.  SO IT HAD BEEN AN ELECTRIC DIGITAL CLOCK, AND WHEN THE POWER
10 WENT OUT, IT WENT OUT AND IT WAS JUST BLINKING?
11 A.  (WITNESS NODS HEAD AFFIRMATIVELY.)
12 Q.  YOU HAVE TO SPEAK YOUR ANSWER, SIR.
13 A.  OKAY.  THE CLOCK WAS JUST BLINKING.
14 Q.  WHAT I MEANT WAS, YOU WERE NODDING YOUR HEAD YES AND SHE
15 CAN'T RECORD A NOD, SO IF YOU WANT TO SAY YES, YOU HAVE TO SAY
16 THE WORD "YES" RATHER THAN JUST NODDING YOUR HEAD.  OKAY?
17 A.  YES.
18 Q.  THANK YOU.
19      BUT YOU'VE ESTIMATED IT WAS 5 O'CLOCK BECAUSE THAT WAS
20 THE TIME YOU USUALLY GOT UP FOR WORK?
21 A.  RIGHT AT ABOUT 5 O'CLOCK.
22 Q.  AND WHAT DID YOU DO AFTER YOU WOKE UP?
23 A.  I TURNED AND PUT MY FEET ON THE FLOOR AND THE CARPET WAS
24 WET.
25 Q.  AND DID YOU GET UP?

**254**

1  A. YES.
2  Q. DO YOU HAVE A RECOLLECTION OF ABOUT HOW MUCH WATER WE'RE
3  TALKING ABOUT WHEN YOU SAY YOUR FEET WERE WET, OR THE CARPET WAS
4  WET?
5  A. AT THAT POINT, THE WATER -- JUST MY FEET GOT WET.
6  Q. AND WHAT WAS YOUR REACTION TO THAT?
7  A. I WENT TO THE BATHROOM.
8  Q. WHY?
9  A. I WANTED TO GO CHECK THE BATHTUB.
10 Q. AND WHAT DID YOU FIND THERE?
11 A. THE WATER WAS COMING UP THROUGH THE DRAIN.
12 Q. AND WHAT DID YOU DECIDE TO DO?
13 A. I KNEW I WAS IN SOME KIND OF TROUBLE IF THEY'VE GOT WATER
14 COMING THROUGH A DRAIN. A DRAIN IS FOR WATER TO LEAVE, NOT TO
15 COME THROUGH IT. SO I STARTED PREPARING AND TRYING TO -- AT
16 LEAST TRY TO GET UPSTAIRS, GET IN THE ATTIC.
17 Q. AND YOUR HOUSE WAS A ONE-STORY HOME; YOU HAD AN ATTIC?
18 A. YEAH.
19 Q. HOW WAS IT ACCESSIBLE?
20 A. PULL-DOWN STAIRS.
21 Q. AND WHAT ELSE DID YOU DO?
22 A. WENT IN THE ROOM, GOT MY WALLET AND PHONE AND EVERYTHING AND
23 PUT IT IN A BREAD BAG. WENT TO THE REFRIGERATOR, GOT SOME WATER,
24 GOT WHAT I NEEDED, A LIFE JACKET, FLASHLIGHT. AS I WAS DOING
25 THAT, THE WATER WAS RISING, SO I WENT IN THE FRONT ROOM, GOT A

**255**

1  FEW THINGS, THEN I PULLED THE ATTIC DOWN.
2  Q. NOW, BY THE TIME -- YOU SAY YOU PULLED THE ATTIC DOWN WITH
3  THE INTENT OF CLIMBING IN THE ATTIC?
4  A. YES.
5  Q. NOW, AS YOU PULLED THE ATTIC STAIRS DOWN TO GET READY TO
6  LEAVE THE FLOOR AND GO INTO THE ATTIC, HOW HIGH IS THE WATER AT
7  THIS POINT?
8  A. THE WATER IS ABOUT WAIST DEEP BY THEN.
9  Q. AND ABOUT HOW MUCH TIME HAD PASSED?
10 A. I DON'T KNOW. I COULDN'T REALLY TELL YOU. I WAS JUST
11 SCUFFLING, TRYING TO GET THINGS, BUT IT MIGHT HAVE TOOK ME ABOUT
12 FIVE OR SIX MINUTES TO GATHER THAT UP.
13 Q. ALL RIGHT. AND THEN WHAT DID YOU DO WHEN YOU WENT UPSTAIRS?
14 A. I WENT UP THERE, BUT I FORGOT I HAD LEFT A HAMMER, SO I HAD
15 TO GO BACK AND GET THE HAMMER.
16 Q. AND WHAT DID YOU NEED A HAMMER FOR?
17 A. TO GET THROUGH THE ROOF. I MEAN, I DIDN'T HAVE NOTHING TO
18 BREAK NOTHING OUT. I WOULD HAVE BEEN STUCK IN THE ROOF.
19 Q. DID YOU ACCOMPLISH THAT?
20 A. YEAH.
21 Q. GOT YOUR HAMMER?
22 A. YES.
23 Q. WHAT DID YOU DO NEXT?
24 A. I WENT BY THE WIND TURBINE, AND I FIGURED THAT WOULD BE THE
25 EASIEST SPOT TO BREAK OUT BECAUSE THEY HAD ALREADY CUT A HOLE FOR

**256**

1  THE WIND TURBINE AND I BROKE THE WIND TURBINE OUT.
2  Q. WERE YOU SUCCESSFUL IN THAT EFFORT?
3  A. YES.
4  Q. WHAT DID YOU DO AFTER YOU BROKE THE WIND TURBINE OUT?
5  A. I'M ASSESSING, LOOKING AT THE NEIGHBORHOOD AND THE WATER
6  RISING AND BASICALLY GETTING ON THE ROOFTOP.
7  Q. AFTER YOU KNOCKED THE WIND TURBINE OUT WITH YOUR HAMMER,
8  WERE YOU ABLE TO EXIT YOUR ATTIC TO THE ROOF?
9  A. YES, I WAS.
10 Q. AND DID YOU DO THAT?
11 A. YES.
12 Q. ALL RIGHT. AND WHEN YOU GOT ON THE ROOF, WHAT WAS IT
13 LIKE -- WHAT WAS THE WEATHER LIKE, IF YOU WILL, IF YOU WOULD
14 DESCRIBE IT TO THE COURT.
15 A. IT WAS RAINING REAL HARD, WIND BLOWING.
16 Q. AND IN TERMS OF THE LIGHTNESS OR DARK, WHAT WAS THE GENERAL
17 APPEARANCE OF THINGS AT THAT TIME?
18 A. IT WAS LIKE WE WAS COMING IN, LIKE, DUSK. IT WASN'T DARK,
19 DARK, DARK, BUT IT WASN'T YET LIGHT. YOU KNOW WHAT I'M SAYING?
20 SO WHEN I GOT UP THERE, I COULDN'T BASICALLY -- YOU KNOW, IT
21 WASN'T THAT BAD.
22 Q. IT WASN'T LIKE THE MIDDLE OF THE NIGHT?
23 A. NO, UNH-UNH (NEGATIVE RESPONSE).
24 Q. NOW, ABOUT HOW FAR ARE YOU AS YOU'RE ON YOUR ROOF FROM THE
25 ACTUAL FLOODWALL ON THE INDUSTRIAL CANAL?

**257**

1  A. A HALF A BLOCK MAYBE.
2  Q. BEFORE I ASK YOU WHAT YOU SAW WHEN YOU LOOKED AROUND, LET ME
3  BACK UP A BIT.
4      YOU RECALL I ASKED YOU AS YOU BEGAN YOUR CLIMB TO GET
5  INTO THE ATTIC HOW DEEP THE WATER WAS. YOU SAID IT WAS ABOUT HOW
6  DEEP?
7  A. WHEN I FIRST WENT, IT WAS ABOUT WAIST HIGH -- WHEN I FIRST
8  PULLED THE ATTIC STAIRS DOWN, ABOUT WAIST HIGH.
9  Q. DO YOU REMEMBER TELLING US AT YOUR DEPOSITION IT WAS ABOUT
10 AT YOUR ANKLES?
11 A. IT MIGHT HAVE BEEN AT MY ANKLES, BUT NOT WHEN I PULLED THE
12 STAIRS DOWN.
13 Q. NOW, I'M NOT TALKING ABOUT AFTER YOU'VE NOW FORGOTTEN THE
14 HAMMER AND YOU HAD TO GO BACK AND GET THE HAMMER AND GO AGAIN.
15 I'M TALKING ABOUT THE FIRST TIME. THAT WAS WHEN I ASKED YOU WHEN
16 YOU PULLED THE ATTIC STAIRS DOWN AND WERE GOING TO GO UP THE
17 FIRST TIME, ROUGHLY WHERE WAS THE WATER AT YOUR BODY THEN?
18 A. WHEN I WENT UP THERE THE FIRST TIME, IT WAS ABOUT WAIST
19 HIGH.
20 Q. NOW, WHEN YOU'RE ON THE ROOF AND YOU'RE LOOKING AROUND,
21 WHAT'S THE FIRST THING YOU REMEMBER SEEING?
22 A. I WENT TO THE END OF THE ROOF AND LOOKED AT THE LEVEE.
23 Q. NOW, YOU SAY YOU LOOKED AT THE LEVEE. IN WHAT DIRECTION
24 WERE YOU LOOKING? I MEAN, THE LEVEE RUNS FROM THE FLORIDA BRIDGE
25 ALL THE WAY TO THE CLAIBORNE BRIDGE, RIGHT?

**258**

1  A. I WAS LOOKING STRAIGHT OFF MY HOUSE RIGHT AT THE LEVEE.
2  Q. AT THE PART NEAREST TO YOUR HOME?
3  A. RIGHT.
4  Q. SO DIRECTLY OUT OF YOUR BACKYARD ACROSS --
5  A. DIRECTLY OUT OF MY BACKYARD ACROSS THE STREET.
6  Q. TO THE NEAREST PART OF THE FLOODWALL.
7     AND WHAT DID YOU SEE THERE?
8  A. THE WATER WAS BASICALLY HITTING THE LEVEE, COMING OVER, AND
9  IT LOOKED LIKE IT WAS COMING FROM UNDER, TOO, AT THE SAME TIME.
10 Q. AND IT LOOKED LIKE IT WAS COMING OVER THE LEVEE IN THAT AREA
11 AND DOING WHAT?
12 A. IT WAS COMING FROM UNDER THERE. IT MUST HAVE GOT FROM UNDER
13 THERE, IT MUST HAVE WENT UNDER THERE AND CREATED A LITTLE SUCTION
14 SOME KIND OF WAY BECAUSE IT WAS COMING FROM UNDER AND FROM OVER.
15 Q. I UNDERSTAND THE OVER PART. THE PART THAT WAS COMING UNDER,
16 WHEREABOUTS WITH RESPECT TO THE FLOODWALL WAS IT COMING OVER?
17 ARE WE TALKING ABOUT ON THE STREET, ON JORDAN AVENUE, ARE WE
18 TALKING ABOUT ON THE EARTHEN LEVEE, ARE WE TALKING ABOUT AT THE
19 BASE OF THE CONCRETE AND STEEL FLOODWALL?
20 A. IT HAD TO BE AT THE BASE OF THE FLOODWALL.
21 Q. THAT'S WHERE IT APPEARED TO YOU TO BE?
22 A. UH-HUH (AFFIRMATIVE RESPONSE).
23    THE COURT: SAY "YES," SIR.
24    THE WITNESS: YES.
25    THE COURT: THANK YOU.

**259**

1                EXAMINATION
2  BY MR. BEST:
3  Q. AND WHERE YOU SAW THE WATER COMING OVER THE TOP OF THE
4  FLOODWALL, WHAT DID YOU OBSERVE ABOUT THE FLOODWALL, ITSELF, IN
5  THAT GENERAL VICINITY?
6  A. IT WAS STILL INTACT.
7  Q. WAS IT STILL STRAIGHT UP AND DOWN?
8  A. YEAH, IT WAS BASICALLY STILL STRAIGHT UP AND DOWN.
9  Q. WERE YOU LOOKING AT IT, ABLE TO COME TO ANY CONCLUSION, IF
10 IT WAS STILL STRAIGHT UP AND DOWN, WHAT WAS ALLOWING THE WATER TO
11 COME OVER JUST IN THAT SECTION?
12 A. THE WAY THE WAVES WAS HITTING IT, THE WAY THE WAVES WAS
13 HITTING IT AND, YOU KNOW, IT WAS COMING OVER.
14 Q. HOW WIDE WAS THE SECTION WHERE -- IF YOU CAN ESTIMATE, WHERE
15 YOU SAW THE WATER COMING OVER THE TOP OF THE FLOODWALL RIGHT
16 BEHIND YOUR HOUSE?
17 A. THE LEVEE IS IN SECTIONS. I DON'T KNOW HOW BIG THE SECTIONS
18 IS ON A LEVEE, BUT, YOU KNOW, ALL OVER THE LEVEE, IT WAS COMING
19 OVER. SO I MEAN, I DON'T KNOW HOW BIG THE SECTION WAS THAT WAS
20 COMING OVER, BUT I KNOW IT WAS COMING, LIKE, ALL THE WAY DOWN TO
21 FLORIDA AVENUE.
22 Q. WHAT WAS THE WIND LIKE AT THE TIME?
23 A. THE WIND WAS PRETTY STRONG.
24 Q. COULD YOU SEE WAVES AND WATER BEING BLOWN OVER THE TOP OF
25 THE FLOODWALL?

**260**

1  A. YES.
2  Q. BUT THIS AREA RIGHT BEHIND YOUR HOUSE, THE AREA WHERE YOU
3  SAID WATER WAS SPILLING OVER THE TOP OF THE FLOODWALL, WHAT I
4  WANT TO KNOW, I'M NOT TALKING ABOUT WIND-DRIVEN WATER COMING --
5  BLOWING OVER THE WALL, I'M TALKING ABOUT JUST THIS SECTION RIGHT
6  BEHIND THIS HOUSE WHERE YOU SAW THE WATER COMING OVER, ABOUT HOW
7  WIDE OR LONG WAS THAT SECTION?
8  A. I MEAN, I COULD GIVE YOU A GUESS, BUT ABOUT 10-FOOT OF IT.
9  Q. AND YOU SAY IT'S COMING OVER IN THAT SECTION. IN WHAT
10 MANNER IS IT COMING OVER? I MEAN, WHAT QUANTITY OF WATER ARE WE
11 TALKING ABOUT THAT'S COMING OVER IN THIS SECTION AS COMPARED --
12 A. AS THE WATER IS HITTING THE LEVEE, IT'S RUNNING ALL THE WAY
13 DOWN AND IT'S COMING INTO THE NEIGHBORHOOD.
14 Q. NOW, WERE YOU ABLE TO -- OTHER THAN THIS SECTION BEHIND YOUR
15 HOUSE WHERE IT'S COMING OVER, WHAT WAS THE APPEARANCE OF THE REST
16 OF THE FLOODWALL DOWN TOWARDS THE CLAIBORNE AVENUE BRIDGE?
17 A. THE LEVEE WAS INTACT.
18 Q. THIS WATERFALL EFFECT, I TAKE IT, WAS NOT GOING ON ANYWHERE
19 ELSE DOWN THE FLOODWALL?
20 A. YEAH, THE WATER WAS HITTING EVERYWHERE COMING OVER. THAT'S
21 WHY IT WAS COMING IN THE NEIGHBORHOOD.
22 Q. WELL, I'M NOT TALKING ABOUT WIND-DRIVEN. I'M TALKING ABOUT
23 THIS -- YOU MADE THE DISTINCTION. YOU SAID THE WATER IS COMING
24 OVER THIS SECTION BEHIND YOUR HOUSE. AND IN WHAT QUANTITY IS
25 COMING OVER RIGHT IN THAT SECTION BEHIND YOUR HOUSE?

**261**

1  A. IT'S COMING OVER THERE PRETTY GOOD.
2     THE COURT: THE QUESTION I WANT TO ASK YOU IS, WAS THE
3  WATER THAT YOU'RE OBSERVING COMING OVER NEAR YOUR HOUSE, WAS IT
4  COMING OVER IN MORE OR LESS QUANTITY LOOKING DOWN TOWARDS
5  CLAIBORNE AVENUE? IN OTHER WORDS, WAS THE WATER COMING IN MORE
6  WHERE YOU WERE LOOKING BY YOUR HOUSE THAN IT WAS LOOKING TOWARDS
7  CLAIBORNE AVENUE?
8     THE WITNESS: YEAH, I THINK WE HAD A LITTLE MORE WATER
9  DOWN THERE WHERE WE WAS AT.
10                EXAMINATION
11 BY MR. BEST:
12 Q. AND THIS WATER THAT YOU SAW COMING UP AT THE BASE OF THE
13 FLOODWALL BEHIND YOUR HOUSE, YOU DIDN'T SEE THAT ANYWHERE ELSE?
14 A. NO. UNH-UNH (NEGATIVE RESPONSE).
15 Q. NOW, AS YOU LOOKED DOWN TOWARDS THE
16 CLAIBORNE AVENUE BRIDGE -- AND YOU SAID THE REST OF THE FLOODWALL
17 LOOKED GOOD DOWN THERE, AS FAR AS YOU COULD TELL, RIGHT?
18 A. YES, IT DID.
19 Q. NOW, THERE IS WATER BEING BLOWN OVER BY THE WIND?
20 A. YES.
21 Q. WHAT ELSE DID YOU SEE AS YOU STOOD ON YOUR ROOF AND YOU
22 LOOKED IN THAT DIRECTION DOWN TOWARDS THE
23 CLAIBORNE AVENUE BRIDGE?
24 A. I JUST SEEN A BIG OBJECT, LOOKED LIKE IT WAS GOING DOWN --
25 EASING DOWN THE WALL JUST BUMPING INTO THE WALL. I WAS, LIKE,

## 262

1  "WHAT IS IT?" I DIDN'T KNOW WHAT IT WAS AT FIRST.
2  Q. ABOUT HOW FAR DOWN FROM, SAY, NORTH DORGENOIS BEYOND THAT
3  WAS THIS LARGE OBJECT THAT YOU SAW IN TERMS OF BLOCKS OR FEET,
4  WHATEVER ESTIMATE YOU WANT TO GIVE US?
5  A. ABOUT FIVE BLOCKS.
6  Q. AND TELL ME AGAIN WHAT YOU SAW.
7  A. IT LOOKED LIKE A BIG OBJECT. I MEAN, I WAS FASCINATED WITH
8  IT. I'M LOOKING AT IT, SAYING, "WHAT IS THIS?" I KNEW IT WASN'T
9  A HOUSE BECAUSE, YOU KNOW, THE LEVEE WAS STILL INTACT. SO I'M
10 SAYING, YOU KNOW, IT HAD TO BE SOMETHING THAT HAD BEEN ON THE
11 WATER.
12 Q. OKAY. SO THIS OBJECT THAT YOU SEE SEVERAL BLOCKS DOWN, DID
13 YOU CONTINUE TO WATCH IT?
14 A. YEAH.
15 Q. FOR ABOUT HOW LONG DID YOU CONTINUE TO WATCH IT?
16 A. ABOUT TWO TO THREE MINUTES.
17 Q. AND DURING THE TWO TO THREE MINUTES THAT YOU WATCHED IT,
18 WHAT DID IT DO?
19 A. WENT ALONG THE WALL, LOOKED LIKE IT WOULD BUMP IT A FEW
20 TIMES AND THEN IT JUST CRASHED INTO IT.
21 Q. AND THEN WHAT HAPPENED?
22 A. IT LOOKED LIKE A TIDAL WAVE CAME IN WITH IT. ALL THE
23 HOUSES, CARS STARTED FLOATING AWAY AND HOUSES STARTED BREAKING
24 APART.
25 Q. GO BACK TO EXHIBIT 165, PLEASE.

## 263

1       THE COURT: I'M GOING TO CLEAR THESE OTHER MARKS NOW,
2  SIR. IS THAT OKAY?
3       MR. BEST: DID WE PRESERVE THAT?
4       THE DEPUTY CLERK: YES.
5       (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, A
6  DISCUSSION WAS HELD OFF THE RECORD.)
7       THE COURT: WE DID NOT CAPTURE THE IMAGES, AND I NEED TO
8  HAVE YOU -- WE CAN MARK -- I THINK THIS IMAGE -- REALLY, WE JUST
9  NEED TO MARK WHERE HIS HOUSE WAS AND I THINK IT'S DONE ON THE
10 SECOND IMAGE, IT SHOWS WHERE HIS LOT WAS. SO THAT OUGHT TO DO IT
11 ALL.
12      MR. BEST: THAT'S SUFFICIENT.
13      THE DEPUTY CLERK: DO WE WANT TO NUMBER THIS?
14      THE COURT: YES. SHEENA, WHAT NUMBER WOULD BE
15 APPROPRIATE? WE'RE GOING TO NUMBER THIS PRINTED EXHIBIT.
16      THE DEPUTY CLERK: 429.
17      THE COURT: WE'RE GOING TO MARK IT EXHIBIT 429. EXCUSE
18 THE INTERRUPTION.
19      THE DEPUTY CLERK: 429 WILL BE THE ONE WE JUST CAPTURED.
20      (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, EXHIBIT
21 NO. 429 WAS ADMITTED INTO EVIDENCE.)
22      THE COURT: COUNSEL, ARE WE READY TO PROCEED?
23      MR. BEST: YES.
24            EXAMINATION
25 BY MR. BEST:

## 264

Q. NOW, AS YOU LOOKED DOWN AND YOU SAW THIS OBJECT THAT YOU
SAID YOU FOLLOWED FOR TWO TO THREE MINUTES, HOW BIG WAS IT -- AND
I KNOW YOU CAN'T, FROM YOUR HOUSE, TELL ME IN FEET OR INCHES, BUT
WHAT WAS YOUR IMPRESSION AS YOU STOOD ON THE ROOF OF YOUR HOUSE
WATCHING THIS THING UP AGAINST THE LEVEE DOWN THE
INDUSTRIAL CANAL? WHAT WAS YOUR IMPRESSION OF THE GENERAL SIZE
OF THIS OBJECT? ARE WE TALKING ABOUT SOMETHING THAT LOOKED LIKE
A ROWBOAT OR A SAILBOAT OR SOMETHING, OR WHAT SIZE?
A. IT LOOKED LIKE A BIG BLACK HOUSE.
Q. NOW, YOU SAY THAT THEN IT WENT THROUGH THE LEVEE?
A. (WITNESS NODS HEAD AFFIRMATIVELY.)
Q. AS IT WENT THROUGH THE LEVEE, WERE YOU ABLE TO DETERMINE TO
GET A BETTER LOOK AT IT AND SEE WHAT IT WAS?
A. NOT REALLY.
Q. AND AS IT MOVED, CAN YOU DESCRIBE ITS MOVEMENT, THIS LARGE
OBJECT THROUGH THE LEVEE?
A. IT WENT ALONG THE LEVEE WALL, BUMPED IT A COUPLE OF TIMES,
AND THEN I JUST HEARD A BIG BOOM AND IT CAME INTO THE
NEIGHBORHOOD.
Q. DID YOU SEE WHAT IT DID ONCE IT CAME INTO THE NEIGHBORHOOD?
WHAT DID IT DO IN THE NEIGHBORHOOD?
A. IT BROUGHT THE WATER WITH A WAY MORE POWERFUL FORCE THAN
DOWN THERE BY ME. I MEAN, THE WATER CAME LIKE IT WAS FEROCIOUS,
I MEAN.
Q. WHAT EFFECT DID THAT HAVE ON THE HOUSES AND THE STRUCTURES

## 265

DOWN AT THAT END FROM YOUR VANTAGE POINT?
A. THAT'S WHEN THE CARS STARTED FLOATING AWAY AND THE HOUSES
STARTED BREAKING APART AND PEOPLE WERE RETREATING TO TREES AND
ALL THAT.
Q. AND YOU SAW THAT FROM YOUR ROOF?
A. YEAH.
Q. NOW, WE CAN SEE, IF WE LOOK AT EXHIBIT 165 -- THIS IS TAKEN
AFTER THE STORM, WE SEE THE GREENERY OF SOME OF THE TREES IN THE
NEIGHBORHOOD. YOUR NEIGHBORHOOD HAD TREES?
A. YEAH.
Q. WHATEVER TREES -- DID THE TREES PREVENT YOU FROM SEEING THE
ENTIRETY OF THIS LARGE OBJECT YOU'VE DESCRIBED?
A. NO.
Q. AND AFTER THE OBJECT WENT THROUGH THE LEVEE AND YOU
DESCRIBED THIS LARGE AMOUNT OF WATER THAT CAME INTO THE
NEIGHBORHOOD DOWN THERE, WHAT HAPPENED IN YOUR PART OF THE
NEIGHBORHOOD?
A. MY HOUSE -- WHEN THE WATER CAME IN MY DIRECTION, IT DIDN'T
HAVE AS MUCH FORCE BUT IT MADE MY HOUSE LIFT UP.
Q. ABOUT HOW LONG WAS IT AFTER YOU SAW THE OBJECT CROSS OVER
THE LEVEE -- THE FLOODWALL INTO THE NEIGHBORHOOD WAS IT THAT YOUR
HOUSE LIFTED UP?
A. IT WAS LESS THAN A MINUTE. IT WAS A MATTER OF SECONDS THE
WATER MADE IT DOWN -- IT WAS A MATTER OF SECONDS THE WATER MADE
IT DOWN THERE BY ME.

**266**

1  Q. NOW, AS YOU WATCHED THESE EVENTS UNFOLD THAT YOU DESCRIBED
2  TO US, PARTICULARLY GOING BACK TO THE TIME YOU SAID THE TWO TO
3  THREE MINUTES YOU WATCHED THE BARGE IN THE CANAL BEFORE IT
4  CROSSED THE FLOODWALL INTO THE NEIGHBORHOOD, DID YOU HEAR
5  ANYTHING?
6  A. I MEAN, LIKE WHAT? LIKE WHAT?
7  Q. WERE THERE ANY NOISES, ANY SOUNDS THAT YOU HEARD ASSOCIATED
8  WITH THESE EVENTS THAT YOU DESCRIBED TO THE COURT?
9  A. I MEAN, THE WHOLE THING, I COULD SAY THAT IT MIGHT HAVE HIT
10 THAT WALL ONCE OR TWICE BEFORE IT ACTUALLY BROKE IT, YOU KNOW, IN
11 DIFFERENT PARTS OF IT, BUT AS FOR HEARING ANYTHING, THERE IS WIND
12 BLOWING, YOU HEAR PEOPLE HOLLERING, THERE'S STUFF BEING TOSSED
13 AROUND. I MEAN, I HEARD A LOT OF THINGS. I MEAN, FOR YOU TO ASK
14 ME THAT, YOU WOULD HAVE TO ASK ME TO PINPOINT WHAT I HEARD
15 BECAUSE THERE WAS SO MUCH GOING ON, I MEAN, I CAN'T FOCUS ON ONE
16 THING.
17 Q. WELL, MAYBE YOU CAN'T ANSWER THIS, BUT I'LL ASK ANYWAY. DID
18 YOU HEAR ANY SOUNDS THAT YOU ASSOCIATED WITH THE MOVEMENT OF THAT
19 OBJECT AT THE FLOODWALL?
20 A. YEAH. I THINK IT HIT THAT WALL ABOUT TWO OR THREE TIMES
21 BEFORE IT CAME THROUGH.
22 Q. AND WHAT SOUNDS DID YOU HEAR THAT CAUSED YOU TO MAKE THAT
23 ASSOCIATION OR REACH THAT CONCLUSION?
24 A. LIKE AN EMPTY CONTAINER SQUEEZING UP AGAINST SOMETHING, LIKE
25 A SQUEAKING SOUND.

**267**

1  Q. AS YOU STOOD ON YOUR ROOF WATCHING -- BY THE WAY, HOW BIG
2  WAS YOUR ROOF OF YOUR HOUSE? WHAT WAS IT ROUGHLY --
3  A. I THINK THE HOUSE WAS -- THAT HOUSE MIGHT HAVE BEEN ABOUT
4  60-FOOT LONG FROM END TO END.
5  Q. AND AS YOU WATCHED THESE EVENTS UNFOLD, WERE YOU ABLE TO
6  MOVE ABOUT THE ROOF OF YOUR HOUSE?
7  A. I COULD RUN THE WHOLE ROOF OF MY HOUSE.
8  Q. SO IF THERE WAS A TREE OR SOMETHING BLOCKING YOUR VIEW, WERE
9  YOU IN A POSITION, GIVEN THE AMOUNT OF ROOM YOU HAD, TO MOVE
10 AROUND ON YOUR ROOF?
11 A. YEAH, I COULD MOVE AROUND, BUT THE TALLER TREES WERE RAPED
12 CLEAN. NOW, THE SMALLER TREES MIGHT HAVE HAD LEAVES, BUT THE
13 TREES THAT WERE WAY UP THERE WERE RAPED CLEAN.
14 Q. NOW, GOING BACK AGAIN TO JUST BEFORE YOU SAW THIS LARGE
15 OBJECT CROSS THE FLOODWALL INTO THE NEIGHBORHOOD, JUST BEFORE
16 THAT POINT, WHAT DID YOU OBSERVE ABOUT THE CONDITION OF THE
17 FLOODWALL, ITSELF, BEFORE THE BARGE CAME THROUGH?
18 A. IT WAS HOLDING. IT WAS INTACT.
19 Q. NOW, HOW LONG DID YOU STAY ON YOUR ROOF AFTER THIS?
20 A. FROM MONDAY TO WEDNESDAY.
21 Q. DURING THAT TIME AND AS THE DAY WORE ON ON MONDAY THE 29TH,
22 WERE YOU ABLE -- DID IT GET LIGHTER THAN IT WAS WHEN THESE EVENTS
23 FIRST STARTED TO UNFOLD AND YOU FIRST GOT ON THE ROOF?
24 A. YES, IT DID.
25 Q. AND AS TIME PASSED, WERE YOU ABLE TO MAKE OUT WITH ANY

**268**

CLARITY THE OBJECT THAT HAD CROSSED THROUGH THE FLOODWALL?
A. YES, I DID.
Q. AND WHAT DID YOU SEE IT TO BE AS IT BECAME LIGHT?
A. A BARGE.
Q. NOW, JUST FOR COMPLETENESS, ON THE PHOTO EXHIBIT THAT WE
HAVE UP HERE, THIS BLOW-UP, DOWN AT THE END OF DESLONDE STREET,
THERE IS A STRUCTURE DOWN THERE. DO YOU KNOW WHAT THAT IS, THE
BIGGER BUILDING DOWN TOWARDS THE END?
    THE COURT: YOU MIGHT WANT TO POINT TO IT.
    MR. BEST: I THINK WHAT WE MAY CAN DO IS GO TO THE
LARGER PICTURE THAT WE HAVE, THE BLOW-UP OF THE PORTION ON THE
LEFT.
    THE COURT: DO YOU HAVE A LASER POINTER?
    MR. BEST: YES, SOMEBODY JUST GAVE ME ONE.
    MR. GILBERT: HERE IS ANOTHER ONE.
    MR. BEST: OH, HERE IT IS.
            EXAMINATION
BY MR. BEST:
Q. I'M TALKING ABOUT THIS BUILDING OVER HERE. DO YOU KNOW WHAT
THAT IS?
A. THAT'S THE PUMPING STATION.
Q. THAT'S THE PUMPING STATION?
A. UH-HUH (AFFIRMATIVE RESPONSE).
Q. YOU'RE FAMILIAR WITH THAT BECAUSE IT'S DOWN AT THE END OF
YOUR STREET?

**269**

A. UH-HUH (AFFIRMATIVE RESPONSE).
    THE COURT: JUST SAY YES INSTEAD OF "UH-HUH" BECAUSE
IT'S HARD FOR HER TO TAKE IT DOWN.
    THE WITNESS: YES.
    THE COURT: THANK YOU.
            EXAMINATION
BY MR. BEST:
Q. AND JUST AFTER YOUR HOUSE, YOU SAY AT SOME POINT, IT BEGAN
FLOATING AWAY AFTER THE BARGE WENT THROUGH THE WALL DOWN AT THE
OTHER END OF THE STREET. WHERE DID YOUR HOUSE GO? I MEAN, WE'VE
SEEN IN THE PICTURE, BUT JUST TELL US WHAT HAPPENED. WHAT DID
YOU DO AS THE HOUSE MOVED?
A. THE HOUSE MOVED DOWN DESLONDE STREET ABOUT A BLOCK, ALMOST
TO DORGENOIS, AND THEN WHEN THE WATER STARTED TO RECEDE, THE
HOUSE STARTED GOING BACK AND IT LODGED UP AGAINST -- THAT'S A
POST IT'S LODGED UP AGAINST, RIGHT THERE. THERE'S A POST THAT --
OUR ENERGY POST RIGHT THERE THAT IT'S SITTING UP AGAINST.
Q. SO IT MOVED FURTHER TO THE LEFT SIDE OF THE PICTURE AT ONE
POINT THAN IT IS WHERE IT CAME TO REST?
A. YEAH.
Q. AT SOME POINT, IT MOVED BACK?
A. YEAH. AS THE WATER STARTED GOING BACK INTO THE
INDUSTRIAL CANAL, IT PULLED A LOT OF STUFF WITH IT.
Q. AND DID YOU STAY ON YOUR ROOF UNTIL YOU WERE RESCUED?
A. THERE IS A HOUSE NEXT DOOR TO MINE, I JUMPED ON THAT ROOF,

## 270

1  YOU KNOW, MESSING AROUND.
2  Q. BUT, I MEAN, ESSENTIALLY, YOU STAYED IN THIS AREA UNTIL YOU
3  WERE RESCUED?
4  A. YES.
5  Q. AND HOW WERE YOU RESCUED?
6  A. BY HELICOPTER.
7  Q. AND WHERE WERE YOU TAKEN AFTER THAT?
8  A. WE WERE DROPPED RIGHT DOWN INTO THE SUPERDOME.
9      MR. BEST: I THINK I'M ALMOST DONE, YOUR HONOR. LET ME
10  LOOK THROUGH MY NOTES HERE AND MAKE SURE I'VE GOTTEN IT ALL.
11     THE COURT: JUST A SECOND.
12     MR. BEST: YOUR HONOR, WE TENDER THE WITNESS.
13     MR. WALKER: MAY I PROCEED, YOUR HONOR?
14     THE COURT: YOU CERTAINLY MAY.
15         CROSS-EXAMINATION
16  BY MR. WALKER:
17  Q. GOOD MORNING, MR. ADAMS.
18  A. GOOD MORNING.
19  Q. YOU ARE TERRY ADAMS, RIGHT?
20  A. YES, I AM.
21  Q. AND YOUR HOUSE IS A BLOCK FROM THE LEVEE, APPROXIMATELY,
22  2604 DESLONDE?
23  A. YES.
24  Q. AND YOU TESTIFIED YOU HEARD A NOISE WHEN THE LEVEE BROKE AND
25  YOU SAW RUSHING WATER, AND GOT UP ON YOUR ROOF BASICALLY, RIGHT?

## 271

1  A. NO. THE LEVEE BROKE -- THE LEVEE BROKE WHILE I WAS HOME.
2  IT WAS THE SECOND BREAK WITH THE BARGE.
3  Q. AND YOU WENT UP ON YOUR ROOF?
4  A. I WAS ALREADY UP THERE WHEN THE BARGE HIT THE LEVEE.
5  Q. THAT'S WHAT YOU TOLD THE JUDGE HERE TODAY, CORRECT?
6  A. YEAH.
7  Q. HAVE YOU EVER TOLD SOMEBODY ANYTHING DIFFERENT THAN THAT?
8  A. NO.
9  Q. REMEMBER I TOOK YOUR DEPOSITION A COUPLE YEARS AGO. DID YOU
10  TELL ANYTHING DIFFERENT IN THAT DEPOSITION?
11     MR. BEST: PAGE AND LINE, COUNSEL?
12     THE WITNESS: NO.
13         EXAMINATION
14  BY MR. WALKER:
15  Q. YOU DON'T REMEMBER SAYING ANYTHING DIFFERENT.
16     DO YOU REMEMBER A PERSON NAMED GREG SZYMANSKI? DO YOU
17  REMEMBER TELLING HIM SOMETHING DIFFERENT?
18  A. I NEVER MET HIM.
19  Q. YOU DON'T REMEMBER MEETING HIM IN JANUARY OF 2006, JUST
20  SHORTLY AFTER THE HURRICANE WHEN THINGS WERE FRESH IN YOUR MIND,
21  AND TELLING HIM ALL ABOUT WHAT YOU EXPERIENCED?
22     MR. BEST: OBJECTION, YOUR HONOR, NO FOUNDATION.
23     THE WITNESS: NO.
24     THE COURT: WELL, I ASSUME HE'S TRYING TO LAY THE
25  FOUNDATION. I'M NOT SURE WHAT YOU MEAN.

## 272

1     MR. BEST: I DON'T THINK IT CAN BE DONE AND I WOULD LIKE
2  TO EXPLAIN MY OBJECTION TO YOUR HONOR.
3     THE COURT: RATHER THAN IN FRONT OF THE WITNESS, WE DO
4  THAT BY SIDEBAR.
5     MR. WALKER: MAY I CONTINUE LAYING THE FOUNDATION?
6     THE COURT: LET ME SEE WHAT HIS OBJECTION IS SO I CAN
7  GET A BETTER CONTEXT.
8     (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THERE WAS
9  A CONFERENCE HELD AT THE BENCH.)
10    MR. BEST: YOUR HONOR, THIS LINE OF QUESTIONING ARISES
11 OUT OF A LITTLE STORY THAT WAS PUBLISHED BY A SO-CALLED
12 JOURNALIST NAMED GREG SZYMANSKI.
13    THE COURT: WHERE WAS IT PUBLISHED?
14    MR. BEST: I DON'T KNOW WHERE IT WAS PUBLISHED. I FOUND
15 IT ON THE INTERNET, AND THEN IT WAS REPUBLISHED IN ABOUT 50 OTHER
16 PLACES.
17    AND IT IS ABOUT THE 17TH STREET CANAL, AND HE SAYS
18 TERRY ADAMS LIVES BY THE 17TH STREET CANAL AND HE HEARD A BOMB GO
19 OFF AND THAT HE WAS THERE. SO MR. ADAMS, IN HIS DEPOSITION, HAS
20 DENIED THAT HE IS THIS TERRY ADAMS.
21    NOW, I DON'T KNOW IF THIS FELLOW MIXED UP HIS
22 NOTES, IF SOMEBODY TOLD HIM, "YOU SHOULD TALK TO TERRY ADAMS WHO
23 LIVED BY THE CANAL AND WAS THERE." I DON'T KNOW WHERE IT CAME
24 FROM, BUT NOBODY HAS TAKEN MR. SZYMANSKI'S DEPOSITION, AND HE IS
25 NOT HERE TO TESTIFY, NOR IS HE LISTED AS A WITNESS.

## 273

1     AND SO THIS WITNESS IS BEING CROSS-EXAMINED ABOUT
2  THIS PUBLICATION, WHICH HE KNOWS NOTHING ABOUT OTHER THAN HE'S
3  ALREADY SAID "THAT'S NOT ME."
4     SO THE REST OF THIS IS JUST --
5     THE COURT: CERTAINLY HE WASN'T AT THE 17TH STREET
6  CANAL, IT DOESN'T APPEAR, SINCE HE LIVED AT THE OTHER ONE.
7     MR. WALKER: IT SAYS THE LOWER NINTH WARD, YOUR HONOR,
8  AND IF YOU LOOK AT THE RECITATION OF EVENTS, IT'S IDENTICAL TO
9  WHAT HE SAID. AND IT GIVES HIS ADDRESS, IT SAYS HE'S A BLOCK
10 FROM THE LEVEE. CLEARLY, THE 17TH STREET CANAL IS --
11    THE COURT: I'M GOING TO LET YOU ASK ABOUT IT AND I'M
12 GOING TO LET THIS BE AN ARGUMENT. BUT I'M GOING TO LET YOU ASK
13 HIM ABOUT IF HE SAID IT. HE'LL SAY HE DID OR HE DIDN'T.
14    MR. WALKER: HE'S GOING TO DENY IT.
15    (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE BENCH
16 CONFERENCE WAS CONCLUDED.)
17    THE COURT: I'M GOING TO DEFER RULING ON IT AS TO WHAT
18 CONSTITUTES A PRIOR CONSISTENT STATEMENT. DOES THIS SUFFICE? IS
19 THIS A STATEMENT THAT QUALIFIES UNDER THE RULES AS AN
20 INCONSISTENT STATEMENT? BUT I'M GOING TO LET IT IN. I'M GOING
21 TO LET YOU DO THIS AND THEN I'LL THINK ABOUT THAT LATER.
22    MR. WALKER: THANK YOU, YOUR HONOR.
23         EXAMINATION
24 BY MR. WALKER:
25 Q. SO MR. ADAMS, YOU DENY EVER TALKING TO A REPORTER CALLED

**274**

1  GREG SZYMANSKI?
2  A.  YES, I DO.
3  Q.  I WOULD LIKE TO SHOW YOU AN ARTICLE AND SEE IF IT REFRESHES
4  YOUR RECOLLECTION.
5      YOU SEE THIS ARTICLE BY MR. SZYMANSKI, ARCTIC BEACH, IT
6  SAYS, "NEW ORLEANS RESIDENT, TERRY ADAMS, HEARD A BOMB-LIKE
7  EXPLOSION BEFORE HE WAS FORCED TO HIS ROOFTOP."
8      YOU WERE FORCED TO YOUR ROOFTOP, WEREN'T YOU?  YES OR
9  NO WILL SUFFICE.
10     DID YOU TO GO TO YOUR ROOFTOP?
11 A.  YES, I DID.
12 Q.  ARE YOU TERRY ADAMS?
13 A.  YES, I AM.
14 Q.  DO YOU LIVE IN THE NINTH WARD?
15 A.  YES, I DO.
16 Q.  AND DO YOU REMEMBER NOW TELLING MR. SZYMANSKI WHAT YOU HEARD
17 WAS A BOMB-LIKE EXPLOSION BECAUSE YOU THOUGHT THE LEVEE HAD BEEN
18 BLOWN?
19 A.  NO, I DON'T.
20 Q.  LET'S READ ON, AND YOU'LL SEE THAT THERE IS NO MENTION OF A
21 BARGE HERE, BY THE WAY.  CAN YOU READ THAT?  "EYEWITNESSES ARE
22 STARTING TO COME FORWARD, SOME ONLY A BLOCK AWAY FROM THE
23 INDUSTRIAL CANAL LEVEE."
24     THAT'S YOU, RIGHT, ABOUT A BLOCK FROM THE INDUSTRIAL
25 CANAL LEVEE?

**275**

1       THE COURT:  WELL, YOU'RE SAYING EYEWITNESSES.  THAT'S
2  NOT OVERWHELMING ME.  I READ ABOUT 40 OF THEM IN DEPOSITIONS,
3  HALF OF WHOM THOUGHT THERE MAY HAVE BEEN A BOMB.
4               EXAMINATION
5  BY MR. WALKER:
6  Q.  LET'S GO TO THE NEXT PARAGRAPH.  "TERRY ADAMS, WHO LIVES A
7  BLOCK FROM THE INDUSTRIAL CANAL, REMEMBERS HEARING WHAT SOUNDED
8  LIKE A BOMB GOING OFF WHERE THE LEVEE GAVE-WAY BEFORE RUSHING
9  WATER FORCED HIM TO HIS ROOFTOP."
10     YOU DON'T REMEMBER TELLING MR. SZYMANSKI THAT?
11 A.  NOPE.
12 Q.  NEXT PARAGRAPH.  YOU DON'T REMEMBER TELLING HIM THAT YOU
13 THOUGHT YOU DODGED A BULLET?  "'THERE WAS NO WATER IN MY HOUSE.
14 I WAS ONLY A BLOCK AWAY FROM THE INDUSTRIAL CANAL,' SAID ADAMS, A
15 LOWER NINTH RESIDENT, IN AN EXTENDED CONVERSATION THIS WEEK FROM
16 NEW ORLEANS."
17     YOU DON'T REMEMBER TALKING TO HIM THE WEEK OF JANUARY
18 --
19 A.  WHY WOULD I TELL HIM THERE IS NO WATER IN MY HOUSE?
20 Q.  I DON'T KNOW WHY YOU WOULD TELL HIM ANYTHING.  I'M JUST
21 ASKING IF YOU REMEMBER HIM THIS.
22 A.  NO, I DON'T.  I NEVER SPOKE WITH THE GENTLEMAN.
23 Q.  THE NEXT PARAGRAPH:  "'THEN I HEARD WHAT SOUNDED LIKE A BOMB
24 GO OFF FROM THE DIRECTION OF WHERE THE LEVEE GAVE-WAY.  WITHIN A
25 MATTER OF MINUTES, I WAS FORCED ON MY ROOFTOP WHERE I FLOATED

**276**

ABOUT A MILE INTO TOWN BEFORE SOMEHOW GETTING TO SAFETY.'"
       MR. BEST:  YOUR HONOR, I'M BEING URGED BY MY CO-COUNSEL
TO REITERATE MY OBJECTION AT THE BENCH.  THIS IS ALL HEARSAY.
HE'S NOT A WITNESS.
       THE COURT:  CERTAINLY, HE DIDN'T FLOAT A MILE INTO TOWN.
THAT'S QUITE A FLOAT.  BUT ANYWAY --
       MR. BEST:  THERE IS NO PRIOR STATEMENT THAT HAS PROVEN
--
       THE COURT:  I'VE GOT IT, COUNSEL.  I AM NOT THAT OPAQUE.
I UNDERSTAND.  THIS IS A JUDGE TRIAL.  I'M GIVING A LITTLE
LATITUDE HERE SO WE'LL HAVE A FULL RECORD.
       MR. BEST:  I APPRECIATE IT, YOUR HONOR.
               EXAMINATION
BY MR. WALKER:
Q.  AND IN THESE PARAGRAPHS THAT WE'VE READ, THERE IS NOTHING
ABOUT A BARGE OR AN OBJECT THAT LOOKED LIKE AN ARC OR ANYTHING
LIKE THAT, IS THERE?
A.  NOT IN THOSE PARAGRAPHS.
Q.  DO YOU KNOW WHAT A PLAINTIFF IS?
A.  YES, I DO.
Q.  AND YOU ARE A PLAINTIFF IN THIS CASE, ARE YOU NOT?
A.  YES, I AM.
Q.  AND YOUR ATTORNEYS ARE MR. GILBERT OR MR. WIEDEMANN?
A.  YES, SIR.
Q.  AND DO YOU REMEMBER WHEN YOU SIGNED ON WITH THEM AS A

**277**

CLIENT?
A.  NO, I DON'T.  I DON'T REMEMBER THE EXACT DATE OR ANYTHING.
Q.  IT WAS AFTER JANUARY 2006, WASN'T IT?
A.  I ACTUALLY THINK THEY FOUND ME.  I DON'T THINK I WENT TO A
LAWYER AND ACTUALLY CAMPAIGNED ABOUT A LEVEE SUIT.  I THINK THEY
FOUND ME AND ASKED ME OR TALKED TO ME ABOUT A STORY.
Q.  SOMETIME AFTER JANUARY 2006?
A.  I DON'T KNOW THE EXACT DATE.
Q.  AND DO YOU REMEMBER TAKING YOUR DEPOSITION -- GIVING YOUR
DEPOSITION UNDER OATH?
A.  YES.
Q.  AND YOU UNDERSTAND WHAT AN OATH IS.  YOU'VE GIVEN
DEPOSITIONS AND TESTIFIED IN COURT BEFORE, HAVEN'T YOU?
A.  YES.
Q.  YOU'RE SWORN TO TELL THE TRUTH IN YOUR DEPOSITION, RIGHT?
A.  YES.
Q.  JUST LIKE YOU'RE SWORN TO TELL THE TRUTH HERE TODAY?
A.  YES.
Q.  DID YOU MEET WITH MR. BEST OR MR. GILBERT OR THE ATTORNEYS
PRIOR TO TESTIFYING HERE TODAY TO PREPARE FOR YOUR TESTIMONY?
A.  YES.
Q.  AND DO YOU UNDERSTAND THAT YOU'VE SAID THINGS HERE IN COURT
TODAY THAT ARE DIFFERENT THAN WHAT YOU TOLD ME UNDER OATH IN YOUR
DEPOSITION?
       MR. BEST:  OBJECTION TO THE FORM.

**278**

1  THE COURT: YEAH, COUNSEL, LET'S GET RIGHT TO IT.
2  MR. BEST: THANK YOU, YOUR HONOR.
3  THE COURT: IF YOU'RE GOING TO IMPEACH HIM, IMPEACH HIM.
4                    EXAMINATION
5  BY MR. WALKER:
6  Q.  I WOULD LIKE TO SHOW YOU A PHOTOGRAPH, DX9.  BLOW THAT UP A
7  BIT.
8       AND YOU'VE DONE THIS BEFORE FOR THE COURT.  WE HAD DONE
9  IT EARLIER.  THAT'S ABOUT AN ACCURATE LOCATION OF YOUR HOUSE ON
10 DESLONDE, WOULD YOU SAY?
11 A.  IT'S PRETTY SMALL, BUT, YES, I GUESS.
12 Q.  WE CAN BLOW IT UP, BUT LOOKING AT DESLONDE AND LAW, BASED ON
13 WHAT YOU'VE MARKED EARLIER, THAT'S PRETTY ACCURATE?
14 A.  YES, IT IS.
15 Q.  WOULD YOU AGREE THAT THERE ARE TREES BETWEEN YOU AND THE
16 SOUTHERN BREACH?
17 A.  YES, THERE ARE.
18 Q.  SO BEFORE KATRINA, IF WE WERE AT THE LOCATION OF YOUR HOUSE
19 BECAUSE OF THE TREES AND THE HOUSES BETWEEN YOUR HOUSE AND THE
20 SOUTHERN BREACH, YOU COULDN'T HAVE SEEN THE SOUTHERN BREACH,
21 COULD YOU?
22 A.  IF YOU GOT ON TOP OF MY HOUSE, YOU COULD HAVE.
23 Q.  YOU COULD.  YOU'RE SAYING THAT THE TREES AND THE HOUSES FROM
24 YOUR LOCATION COULD NOT HAVE BLOCKED YOUR VIEW OF THE SOUTHERN
25 BREACH?

**279**

1  A.  JORDAN AVENUE IS NOT A VERY TREE-POPULATED STREET.
2  Q.  WHAT IS THE CONDITION OF THE TREES AFTER KATRINA WHEN YOU'RE
3  ON YOUR ROOF?
4  A.  THE TALLER TREES WERE PRETTY WELL, YOU KNOW,
5  DISCOMBOBULATED.  I MEAN, THEY STILL HAD BUSH.  I'M NOT SAYING
6  NONE OF THE TREES HAD LEAVES ON IT, BUT THE TALLER TREES, THEY
7  WERE PRETTY WELL DONE WITH.
8  Q.  SO YOU'RE SAYING THAT AT 5:15, 5:30 IN THE MORNING ON
9  MONDAY, THE TREES BETWEEN YOU AND THE SOUTHERN BREACH ALREADY HAD
10 NO LEAVES?
11 A.  MOST OF THEM.
12 Q.  IS THAT WHAT YOU'RE SAYING?
13 A.  YES.
14 Q.  I'M GOING TO SHOW YOU A DEMONSTRATIVE EXHIBIT WE HAVE.  AND
15 AGAIN, IT SHOWS THE LOCATION OF YOUR HOUSE AND THE SOUTHERN
16 BREACH.  YOU REALIZE THAT THAT WAS OVER HALF A MILE FROM YOUR
17 HOUSE TO THE SOUTHERN BREACH?
18     MR. BEST:  EXCUSE ME, JUST NOTE AN OBJECTION FOR THE
19 RECORD.  I DON'T KNOW -- I DON'T HAVE REASON TO DOUBT THE
20 MEASUREMENT SHOWN ON THE PHOTO OF 2,950 FEET.  I PRESUME THERE'S
21 A FOUNDATION.
22     THE COURT:  THE COURT IS NOT TAKING ANYTHING LITERALLY
23 UNTIL SUCH TIME AS IT IS DOCUMENTED.
24     MR. ALDOCK:  YOUR HONOR, THERE'S A STIPULATION BY THE
25 PLAINTIFFS IN WRITING AND IN THE PRETRIAL ORDER.  I GUESS THEY

**280**

1  FORGOT.
2      MR. BEST:  ANYTHING IS POSSIBLE, YOUR HONOR.
3      THE COURT:  COUNSEL, THAT'S IMPORTANT.
4      MR. WALKER:  IT'S UNDISPUTED FACT NUMBER 30, ALSO, YOUR
5  HONOR.
6      THE COURT:  SO THERE IS AN UNDISPUTED FACT THAT IT IS
7  2,950 FEET.  THE COURT TAKES COGNIZANCE OF THAT.
8                    EXAMINATION
9  BY MR. WALKER:
10 Q.  SO MR. ADAMS, IT'S YOUR TESTIMONY THAT ALL OF THE EVENTS
11 THAT YOU RELATED HERE EARLIER TO THE JUDGE, YOU SAW FROM A
12 LOCATION APPROXIMATELY 2604 DESLONDE DOWN 2,950 FEET TO THE
13 SOUTHERN BREACH?
14 A.  YES.
15 Q.  NOW, WHEN YOU WOKE UP, IT'S CORRECT THAT THE POWER HAD GONE
16 OUT ALREADY, RIGHT?
17 A.  YES.
18 Q.  AND THE POWER HAD GONE OUT AROUND MIDNIGHT, HADN'T IT?
19 A.  I THINK IT WENT OUT ABOUT MIDNIGHT.
20 Q.  AND THE WEATHER CONDITIONS WHEN YOU GOT UP ON YOUR ROOF
21 WERE, IT WAS RAINING, IT WAS RAINING HARD, WASN'T IT?
22 A.  YES, SIR.
23 Q.  AND IT WAS DARK, WASN'T IT?
24 A.  I WOULD SAY, LIKE, DUSK.  I DON'T GIVE IT PITCH DARK
25 BECAUSE, LIKE I SAID, IT WAS MORNING TIME.  MY EYES NEVER HAD TO

**281**

1  READJUST BECAUSE I NEVER WAS INTRODUCED TO NO LIGHT, SO WHEN I
2  FIRST GOT OUT THE BED, I COULD SEE PRETTY GOOD.
3  Q.  LET'S LOOK AT THE DEPOSITION THAT WE HAVE BEEN REFERRING TO,
4  PAGE 77, LINE 24:  "WHEN YOU FIRST" --
5      MR. BEST:  OBJECTION.  OBJECTION.  COUNSEL DIDN'T ASK
6  THAT QUESTION IN THE LINE OF QUESTIONING.
7      THE COURT:  OVERRULED, OVERRULED.
8                    EXAMINATION
9  BY MR. WALKER:
10 Q.  "WHEN YOU FIRST SAW THE BARGE, WAS IT STILL DARK?
11     "YES."
12 A.  YES.
13 Q.  AND LET'S LOOK AT DEPOSITION PAGE 20.
14     "WHEN YOU GOT ON THE ROOF AT 5:30 OR THEREABOUTS, WAS
15 IT DAYLIGHT AT THAT TIME?
16     "NO, IT WASN'T QUITE DAYLIGHT YET."
17     DOES THAT REFRESH YOUR MEMORY?
18 A.  YES.
19 Q.  SO YOU'RE UP ON YOUR ROOFTOP IN THE MIDDLE OF HURRICANE WIND
20 CONDITIONS, CORRECT?
21 A.  YES, I AM.
22 Q.  AND YOU CAN SEE THE ENTIRE LENGTH OF THE LEVEE WALL FROM
23 FLORIDA AVENUE DOWN TO THE SOUTHERN BREACH; IS THAT YOUR
24 TESTIMONY?
25 A.  YES.

**282**

1  Q.  AND COULD YOU DESCRIBE THE WATER THAT WAS COMING OVER IN
2  FRONT OF YOU?
3  A.  IT WAS COMING OVER IN LIKE WAVES, COMING IN FROM THE -- I
4  BELIEVE THE LEVEE DOWN BY ME HAD BREACHED DOWN AT THE BOTTOM OR
5  SOMETHING LIKE THAT BECAUSE IT LOOKED LIKE WATER WAS COMING UP
6  FROM THE BOTTOM.
7  Q.  YOU'RE TALKING ABOUT THE SEEPING THAT YOU SAW?
8  A.  YEAH.
9  Q.  AND IT WAS CONTINUING TO RAIN HARD WHEN YOU WERE LOOKING OUT
10 THERE?
11 A.  YES, IT WAS.
12 Q.  AND I ASSUME, SO WE DON'T HAVE TO REPEAT IT, DURING THE
13 WHOLE TIME YOU WERE ON THE ROOF AND SAW ALL OF THIS, IT WAS
14 RAINING HARD?
15 A.  IT WAS RAINING.
16 Q.  AND IT WAS WINDY?
17 A.  YES.
18 Q.  NOW, AT SOME POINT IN TIME, WHILE YOU WERE LOOKING AT THE
19 WALL IN FRONT OF YOU, YOU SAW IT TILT, TUMBLE AND COLLAPSE,
20 RIGHT?
21 A.  WELL, IT KIND OF LIKE LATER ON, THE WALL JUST KIND OF LIKE
22 LAID DOWN.  IT DIDN'T, YOU KNOW, REALLY...  BUT WHEN ALL THE
23 DAMAGE WAS DONE, IT JUST KIND OF LIKE LAID DOWN.
24 Q.  WELL, IS THERE A DIFFERENCE TO YOU BETWEEN TILTING DOWN AND
25 COLLAPSING AND LAYING DOWN?  DID IT FALL OVER?  DID YOU SEE IT

**283**

1  FALL OVER?
2  A.  YES.
3  Q.  AND WHEN IT FELL OVER, DID YOU ALSO SEE ANY STEEL SHEET PILE
4  TUMBLE AND ROLL?
5  A.  NOT BY ME.  THE LEVEE JUST LAID DOWN BY ME.  IT LAID DOWN.
6  IT DIDN'T COLLAPSE, IT DIDN'T FALL, IT'S JUST KIND OF LIKE THE
7  WATER PUSHED IT A LITTLE BIT AND EVERY LITTLE BIT THE WATER
8  PUSHED IT, IT JUST LAID DOWN.
9  Q.  OKAY.  SO YOU'RE TALKING ABOUT THE CONCRETE WALL?
10 A.  YEAH.
11 Q.  AND YOU DIDN'T SEE ANY STEEL SHEET PILING ASSOCIATED WITH
12 THAT CONCRETE WALL, RIGHT?
13 A.  NOT DOWN THERE BY ME.
14 Q.  NOW, YOU NEVER SAW A BARGE IN FRONT OF YOU IN THAT AREA,
15 RIGHT?
16 A.  NOT DOWN ON MY END.
17 Q.  NO ONE ELSE WAS ON THE ROOF WITH YOU WHEN YOU WERE LOOKING
18 AT THESE THINGS; YOU WERE THERE BY YOURSELF?
19 A.  CHRIS EVENTUALLY CAME UP THERE, BUT HE -- I DON'T KNOW WHERE
20 HE WAS AT WHEN THE BARGE HIT.
21 Q.  HE CAME UP THERE AFTER YOU HAD SEEN ALL THIS?
22 A.  (WITNESS NODS HEAD AFFIRMATIVELY.)
23 Q.  RIGHT?
24 A.  YES.
25 Q.  ALL RIGHT.  LET'S TALK ABOUT WHAT YOU SAW DOWN BY THE

**284**

SOUTHERN BREACH.  ISN'T THAT RIGHT THAT WHAT YOU SAW WAS
FOUR FEET OF AN OBJECT THAT YOU COULDN'T IDENTIFY?
A.  YES.
Q.  YOU JUST SAW FOUR FEET FROM A HALF MILE AWAY, RIGHT?
A.  YES.
Q.  YOU COULDN'T TELL EXACTLY WHAT IT WAS?
A.  JUST APPEARED TO BE A BIG OBJECT ABOUT THE SIZE OF A HOUSE.
Q.  I THOUGHT YOU JUST SAID YOU SAW FOUR FEET?
A.  HUH?
Q.  I THOUGHT YOU JUST SAID --
A.  IT WAS LONG.  IT WAS LONG.  I DIDN'T SAY IT WAS STICKING UP
OUT THE WATER 20 FEET HIGH.  IT WAS LONG AND BLACK.
Q.  ALL RIGHT.  SO ALL YOU COULD SEE STICKING UP OUT OF THE
WATER WAS FOUR FEET?
A.  YEAH, ABOUT FOUR FEET OF IT.
Q.  FROM A HALF MILE?
A.  YEAH.
Q.  AND THAT OBJECT THAT YOU SAW WAS BLACK YOU SAID?
A.  BLACK.
Q.  AND ISN'T IT RIGHT THAT YOU ACTUALLY ONLY HEARD THAT OBJECT
ONE TIME?
A.  I ONLY HEARD IT ONE TIME?
Q.  UM-HUM.
A.  I HEARD ONE BOOM WHEN IT CAME THROUGH THE WALL.
Q.  I'M SORRY?

**285**

A.  I HEARD ONE BOOM WHEN IT CAME THROUGH THE WALL, BUT
ACTUALLY, THROUGH THE NOISE, I MEAN, IT COULD HAVE GRAZED THE
WALL A COUPLE OF TIMES.  I DID HEAR SOMETHING THAT SOUNDED LIKE
IT WAS SQUEEZING UP AGAINST IT, AND IT DIDN'T HAPPEN BY ME, SO IT
HAD TO BE DOWN ON THE STREET.
Q.  BUT YOU DON'T KNOW WHAT THAT WAS THAT YOU HEARD HERE AND YOU
CAN'T SAY IT WAS THAT OBJECT, CAN YOU?
A.  I CANNOT SAY THAT.
Q.  SO WITH RESPECT TO THE OBJECT, YOU HEARD, AT ONE TIME, BOOM
AS IT WENT THROUGH THE WALL, RIGHT?
A.  RIGHT.
Q.  NOW, WHEN YOU SAW THAT OBJECT GO THROUGH THE WALL, IT
FLOATED IN WITH THE WATER, RIGHT?
A.  YES.
Q.  AND WHAT YOU SAW AFTER IT FLOATED IN WAS THIS RUSH OF WATER
THAT I THINK YOU DESCRIBED AS A TSUNAMI?
A.  YES.
Q.  AND IT TOOK THAT OBJECT, HOUSES, TELEPHONE POLES, EVERYTHING
IN ITS WAY, RIGHT?
A.  RIGHT.
Q.  AND YOU COULD SEE THAT, JUST THAT RUSH OF WATER?
A.  YES.
Q.  AND RIGHT AFTER THE RUSH OF WATER, YOU ALSO SAW THE WATER IN
THE NEIGHBORHOOD RISE RAPIDLY, DIDN'T YOU?
A.  REALLY FAST.

**286**

1  Q. REALLY FAST. I THINK YOU SAID ABOUT 12 FEET A SECOND --
2  A. YES, IT DID.
3  Q. -- IS THAT STILL RIGHT?
4     AND THAT'S WHEN YOUR OWN HOUSE MOVED. I THINK YOU SAID
5  IT LIFTED AND MOVED?
6  A. YES, IT DID.
7  Q. NOW, YOU TALKED EARLIER ABOUT THE SPLASHING YOU SAW UP BY
8  THE NORTH, CLOSE TO YOUR HOUSE. WHAT YOU ACTUALLY SAW WAS WATER
9  COMING OVER THE LEVEE, RIGHT?
10 A. YES.
11 Q. AND DID YOU ALSO SEE, AS THAT WATER CAME OVER THE LEVEE,
12 WHERE YOU COULD SEE THE BUBBLING OR THE SEEPING YOU CALLED IT AT
13 THE JOINT BETWEEN THE WALL AND THE LEVEE?
14 A. YES.
15 Q. DID YOU ALSO SEE THAT THE GROUND WAS STARTING TO ERODE THERE
16 AS THE WATER CASCADED OVER?
17 A. YES.
18 Q. AND IT WAS KIND OF FORMING LIKE A LITTLE TRENCH?
19 A. YES, IT WAS.
20 Q. YOU COULD SEE THAT, RIGHT?
21 A. YES, I COULD.
22    MR. WALKER: YOUR HONOR, COULD I HAVE A SECOND?
23    THE COURT: YES, SIR.
24          EXAMINATION
25 BY MR. WALKER:

**287**

1  Q. NOW, YOU SAID EARLIER THAT YOU HEARD SOME NOISES, DIDN'T
2  REALLY KNOW WHAT THEY WERE. YOU COULDN'T ASCRIBE THEM TO THIS
3  OBJECT. I WOULD LIKE TO BE PERFECTLY CLEAR ON THAT, AND SHOW YOU
4  YOUR DEPOSITION AT PAGE 25.
5     MR. BEST: WHICH LINE, COUNSEL, AND QUESTION?
6          EXAMINATION
7  BY MR. WALKER:
8  Q. STARTING AT 4.
9     "OKAY. DID YOU SEE ANYTHING ELSE AFTER YOU WERE ON THE
10 ROOF AT 5:30 OR THEREABOUTS?
11    "WHEN I LOOKED TOWARDS THE CLAIBORNE BRIDGE, I COULD
12 SEE SOMETHING COMING TOWARD THE LEVEE, TOWARD THE WALL."
13    THAT WOULD BE THAT OBJECT, RIGHT?
14 A. YES, IT WOULD.
15 Q. SO WHEN YOU SAW IT, IT WASN'T CLOSE TO THE WALL, IT WASN'T
16 ON THE WALL, IT WASN'T BUMPING AT THE WALL, YOU SAW IT COMING
17 FROM THE WATER SIDE TOWARDS THE WALL, RIGHT?
18 A. IT WAS KIND OF LIKE FLOATING ALONGSIDE THE WALL. I MEAN,
19 THE QUESTION WAS ASKED AND I ANSWERED THE WAY, YOU KNOW, LIKE
20 THAT, BUT IT KIND OF LIKE WAS FLOATING ALONGSIDE THE WALL.
21 Q. IN THE WATER, YOU SAW IT COME TOWARDS THE WALL?
22 A. UH-HUH (AFFIRMATIVE RESPONSE).
23    THE COURT: SAY "YES" OR "NO", PLEASE.
24    THE WITNESS: YES.
25    THE COURT: THANK YOU.

**288**

      COUNSEL.
         EXAMINATION
BY MR. WALKER:
Q. "THEN I HEARD SOMETHING THAT SOUNDED LIKE A BANG, AND THEN I
SAW THE BARGE FLOATING THROUGH."
      RIGHT?
A. YES.
Q. BUT AT THAT TIME, AS YOU'VE ALREADY EXPLAINED TO COURT, YOU
DIDN'T KNOW IT WAS A BARGE?
A. I DIDN'T KNOW IT WAS A BARGE.
Q. YOU ONLY KNEW IT WAS A BARGE OR THOUGHT IT WAS A BARGE, THIS
OBJECT THAT YOU SAW, BECAUSE WHEN DAYLIGHT CAME, YOU SAW IT IN
THE NEIGHBORHOOD?
A. BY THE TIME THIS DEPOSITION WAS DONE, I KNEW IT WAS A BARGE.
YOU SEE WHAT I'M SAYING? I DIDN'T KNOW IT WAS A BARGE THEN, BUT
WHEN THEY ASKED ME THESE QUESTIONS, IT HAD ALREADY BEEN
ESTABLISHED BY THE WHOLE WORLD THAT IT WAS A BARGE.
Q. OKAY. WELL, LET ME UNDERSTAND THAT. SO YOU DIDN'T HAVE AN
IMPRESSION THAT IT WAS A BARGE, YOU REALIZED IT WAS A BARGE ONLY
AFTER THE WHOLE WORLD --
A. WHAT ELSE WOULD BE --
Q. WAIT, LET ME FINISH. LET ME FINISH.
      YOU ONLY REALIZED IT WAS A BARGE AFTER YOU SAW IT
SITTING IN THE NEIGHBORHOOD AND WE ALL SAW IT IN THE PAPERS AND
ON TV, AND THEN YOU REALIZED, THAT MUST HAVE BEEN WHAT I SAW; IS

**289**

THAT RIGHT?
      MR. BEST: OBJECTION TO THE FORM.
      THE COURT: I THINK THE COURT HAS GOT THE DRIFT. YOU
COULD NOT NOMINATE IT AS A BARGE WHEN HE FIRST PERCEIVED IT. HE
SAID IT LOOKED LIKE A BIG HOUSE, SOMETHING LIKE THAT. IT WAS
BLACK AND LONG. HE SAW IT FOUR FEET ABOVE THE FLOODWALL.
      SUBSEQUENTLY, HE SAW AN OBJECT WHICH WAS THE BARGE
DURING DAYLIGHT IN ITS LOCATION, THEREFORE, HE MADE -- HE
CONTENDS THE LOGICAL DEDUCTION THAT THAT'S WHAT CAME IN.
      THE WORLD'S GREATEST LAWYER IS NOT GOING TO CHANGE
THAT ULTIMATE DEDUCTION THAT HE MADE, AND I UNDERSTAND THAT
THAT'S A DUCTION HE MADE AFTER SEEING IT.
      MR. WALKER: THANK YOU, YOUR HONOR, AND I DON'T HAVE
MUCH MORE.
         EXAMINATION
BY MR. WALKER:
Q. MR. ADAMS, AGAIN, JUST TO BE CLEAR, AND I KNOW THE JUDGE
UNDERSTANDS WHAT WE'RE TALKING ABOUT HERE, YOU SAW THE OBJECT
FLOATING IN THE CANAL, MOVING TOWARDS THE WALL. YOU DID NOT HEAR
ANY BOOM, BOOM, BOOM OR ANY BANG, BANG, BANG OR SCRAPES OF
SOMETHING MOVING ALONG THE WALL, DID YOU?
A. I HEARD SOMETHING THAT SOUNDED LIKE IT WAS SCRAPING THE
WALL. NOW, THE BARGE GOING THAT WAY TOWARDS THE SCRAPE, I'M
AUTOMATICALLY THINKING IT'S THE BARGE THAT'S MAKING THAT NOISE
BECAUSE I'M THINKING WHAT ELSE WOULD MAKE THAT NOISE? THE HOUSES

**290**

1  ARE STILL INTACT. THE NEIGHBORHOOD IS STILL INTACT.
2  Q. SO WHAT NOISE IS THIS NOW THAT YOU'RE SAYING?
3      THE COURT: OKAY. LET ME TELL YOU THE COURT'S
4  UNDERSTANDING OF WHAT HE SAID. HE SAID THAT -- HE DID SAY HE SAW
5  THE BARGE MOVE ALONG THE FLOODWALL FROM NORTH TO SOUTH. HE
6  FURTHER SAID THAT HE HEARD -- HE SAID A SQUEALING OR SCREECHING
7  NOISE, THAT HE DID NOT KNOW IF THAT WAS THE BARGE OR NOT, BUT IN
8  RETROSPECT, HE'S MAKING THAT ASSUMPTION.
9      THAT'S WHAT HE TESTIFIED TO HERE, AND YOU'RE
10 CERTAINLY FREE TO CROSS-EXAMINE HIM ABOUT THAT, BUT THAT'S WHAT
11 HE HAS TESTIFIED TO, NOW THAT WE'RE BRINGING THIS UP AGAIN.
12              EXAMINATION
13 BY MR. WALKER:
14 Q. MR. ADAMS, THE TESTIMONY THAT YOU'VE SAID HERE TODAY ABOUT
15 THE BARGE, AS THE JUDGE PUT IT, SQUEALING OR SCRAPING, HAVE YOU
16 EVER STATED THAT PREVIOUSLY?
17 A. I NEVER WAS ASKED, NO.
18 Q. SO WHEN WE ASKED IN YOUR DEPOSITION ABOUT THE DESCRIPTION OF
19 YOUR OBSERVATIONS AND YOU SAID, "IT CAME THROUGH, HIT ONCE AND
20 WENT THROUGH," YOU DIDN'T FEEL IT WAS NECESSARY TO SAY ANYTHING
21 FURTHER ABOUT YOUR OBSERVATIONS REGARDING ANY SCRAPING OR
22 BUMPING?
23     MR. BEST: OBJECTION.
24     THE WITNESS: YOU ASKED QUESTIONS AND I ANSWER.
25     THE COURT: WHEN A LAWYER STANDS UP, DON'T ANSWER.

**291**

1      WHAT'S YOUR OBJECTION, SIR?
2      MR. BEST: OBJECTION, PAGE AND LINE. IT'S IMPROPER
3  IMPEACHMENT UNLESS HE TELLS ME THE PAGE AND LINE OF THE QUESTION.
4  AND I DON'T RECALL THE QUESTION HE JUST SAID HE ASKED BEING
5  ASKED, AND I COULD BE WRONG, AND THAT'S WHY I'M ASKING FOR THE
6  REFERENCE.
7      THE COURT: OKAY. I THINK HE SIMPLY ASKED DID YOU SAY
8  THAT IN YOUR DEPOSITION --
9      MR. WALKER: THAT'S RIGHT, JUST A GENERAL --
10     THE COURT: -- AND I'M GOING TO ALLOW THE QUESTION.
11     MR. WALKER: THANK YOU, YOUR HONOR.
12              EXAMINATION
13 BY MR. WALKER:
14 Q. YOU DIDN'T SAY THAT, DID YOU?
15 A. NO.
16 Q. NOW, YOU HAD A WORKING CELL PHONE AFTER THE HURRICANE,
17 DIDN'T YOU, ONE OF THE FEW PEOPLE?
18 A. YES, I DID.
19 Q. AND YOU CALLED 911, DIDN'T YOU?
20 A. YES, I DID.
21 Q. YOU CALLED LOTS OF PEOPLE?
22 A. YES, I DID.
23 Q. YOU DIDN'T TELL A SINGLE ONE OF THEM THAT YOU HAD SEEN AN
24 OBJECT, A BARGE, AN ARK OR ANYTHING LIKE THAT, DID YOU?
25 A. I CAN'T REALLY REMEMBER WHAT WE TALKED ABOUT. I MIGHT HAVE

**292**

SAID IT AND I MIGHT HAVE NOT SAID IT, BUT I WAS BUSY TRYING TO
GET AN OPERATOR TO GET SOME HELP. I MIGHT HAVE TOLD IT TO TONY.
I CALLED A BUNCH OF PEOPLE FROM THE ROOF. I COULDN'T REALLY
RECOLLECT, YOU KNOW, EXACTLY WHAT WAS SAID.
Q. AS WE SIT HERE TODAY, YOU DON'T REMEMBER TELLING A 911
OPERATOR OR ANYBODY ELSE YOU TALKED TO ABOUT A BARGE, AN ARK, THE
TUMBLING OF THE LEVEE WALLS OR ANYTHING LIKE THAT, CAN YOU?
A. NO.
Q. AND WHEN YOU WERE RESCUED AND -- YOU WERE RESCUED BY THE
NATIONAL GUARD?
A. COAST GUARD.
Q. YOU DIDN'T TELL THEM ABOUT THIS EITHER, DID YOU?
A. WE DIDN'T TALK.
Q. YOU DIDN'T TELL THEM, THOUGH, DID YOU?
A. NO.
Q. AND HAVE YOU EVER BEEN CONVICTED OF A FELONY?
A. YES, I HAVE.
Q. AND YOU SERVED FIVE YEARS IN PRISON FOR THAT?
A. YES, I DID.
Q. JUST A COUPLE OF LAST QUESTIONS.
    IN ANSWERING MR. BEST'S QUESTIONS, I BELIEVE YOU
DESCRIBED THAT BY THE TIME YOU GOT INTO YOUR ATTIC IT WAS ABOUT
SIX MINUTES FROM WHEN YOU HAD AWAKENED AND FELT THE WATER ON YOUR
FLOOR?
A. SOMETHING OF THAT NATURE, YES.

**293**

Q. AND WHEN YOU GOT INTO YOUR ATTIC SIX MINUTES AFTER YOU WOKE
UP, THE WATER WAS WAIST HIGH?
A. YES.
Q. SO AS YOU GOT INTO YOUR ATTIC, IN A ONE-STORY HOUSE, WHICH I
ASSUME YOU HAD EIGHT-FOOT CEILINGS OR SO?
A. YES, I WOULD SAY THAT.
Q. I IMAGINE THAT WATER WAS CHASING YOU RIGHT UP THE ATTIC AND
MUST HAVE BEEN ALMOST TO YOUR CEILING?
A. BY THE SECOND TIME, WHEN I GOT THE HAMMER, IT WAS BASICALLY
ON MY FEET.
Q. ON YOUR FEET OF THE ATTIC STAIRS AS YOU WENT UP?
A. YES.
Q. AND THAT MUST HAVE BEEN ABOUT A MINUTE LATER WHEN YOU WENT
UP AND BACK DOWN. SO SIX OR SEVEN -- SEVEN, EIGHT MINUTES AFTER
YOU WOKE UP, THE WATER WAS EIGHT FEET UP IN YOUR HOUSE?
A. MIGHT HAVE BEEN A LITTLE LONGER; MIGHT HAVE BEEN A LITTLE
LESS. I MEAN, IT AIN'T LIKE I WAS WATCHING MY WATCH SAYING,
WELL, I GOT ANOTHER TWO MINUTES TO MAKE IT UP THIS LADDER. I
MEAN, I CAN ONLY GUESSTIMATE ON THE TIMES, AND I'M DOING THE BEST
I CAN.
Q. I UNDERSTAND.
    MR. ADAMS, YOU WERE RESCUED ON WEDNESDAY.
A. YES, I WAS.
Q. SO THE FIRST TIME YOU SAW THE BARGE ALREADY IN THE
NEIGHBORHOOD SITTING WHERE ALL THE MANY PHOTOGRAPHS WERE TAKEN OF

**294**

1  IT BY THE PRESS WAS WEDNESDAY MORNING FROM YOUR ROOFTOP?
2  A.  NO.  I NEVER ACTUALLY SEEN THE BARGE FROM MY ROOFTOP COME
3  AND SIT IN THE NEIGHBORHOOD, BECAUSE FROM THE TIME I STARTED --
4  CHRIS CAME ON THE ROOF, HE WAS CUT.  I STARTED TRYING TO GET HIM
5  MEDICAL ATTENTION AND HELP HIM.  MY FOCUS JUST WENT OFF OF THAT
6  BECAUSE HE WAS BLEEDING REAL BAD.
7  Q.  THAT'S RIGHT.
8  A.  SO WE GOT ON THE ROOF AND WE WAS CONTENDING WITH THE
9  SITUATION, YOU KNOW, LET'S GET HIM SOME HELP AND GET SOME HELP
10 AND GET OUT OF HERE.
11 Q.  AND CHRIS IS THE FELLOW YOU RESCUED WITH SOME CHRISTMAS TREE
12 LIGHTS --
13 A.  YES.
14 Q.  -- RIGHT?  YOU YANKED HIM OVER, HELPED HIM ON.
15 A.  I PULLED HIM ON THE ROOF WITH ME.
16 Q.  AND SO YOU ACTUALLY SAW THE BARGE DAYS LATER AFTER YOU WERE
17 RESCUED ON TV OR IN THE NEWSPAPER, SOMETHING LIKE THAT.  THAT WAS
18 THE FIRST TIME YOU SAW THE BARGE?
19 A.  THE FIRST TIME I SAW THE BARGE, IT PROBABLY WAS ON THE NEWS.
20 I MEAN, ACTUALLY SITTING IN THE NEIGHBORHOOD.
21     MR. WALKER:  ALL RIGHT.  THANK YOU, YOUR HONOR.
22     THE COURT:  THANK YOU, SIR.
23     REDIRECT.
24     REDIRECT EXAMINATION
25 BY MR. BEST:

**295**

1  Q.  LET'S BE CLEAR, MR. ADAMS.  YOU WERE FIRST QUESTIONED ABOUT
2  MR. GREG SZYMANSKI.  DID YOU EVER GIVE AN INTERVIEW OR HAVE A
3  CONVERSATION THAT YOU KNEW ABOUT WITH SOMEBODY WHO IDENTIFIED
4  THEMSELVES AS GREG SZYMANSKI?
5  A.  I NEVER MET MR. SZYMANSKI, NEVER.
6  Q.  DO YOU KNOW MR. SZYMANSKI?
7  A.  NO, I DON'T.
8  Q.  I PULLED A STORY OFF THE INTERNET AND IT SAYS YOU LIVED BY
9  THE 17TH STREET CANAL.  DID YOU LIVE BY THE 17TH STREET CANAL?
10 A.  I NEVER LIVED BY THE 17TH STREET CANAL.
11 Q.  IN THIS SAME STORY, AGAIN, BY MR. SZYMANSKI, IT SAYS THERE
12 WAS NO WATER IN YOUR HOUSE.  DID YOU EVER TELL ANYBODY THERE WAS
13 NO WATER IN YOUR HOUSE?
14 A.  NO.
15 Q.  I TAKE IT YOU HAVE NO WAY OF ACCOUNTING FOR HOW THESE
16 THINGS --
17 A.  THE NAME RYAN WASHINGTON, THAT'S A BROTHER-IN-LAW OF MINE.
18 HE PROBABLY TOLD HIM THAT STORY, BECAUSE HE KNEW THAT I WAS ON
19 THE ROOF.  BUT I NEVER ACTUALLY TALKED WITH RYAN ABOUT THAT.
20 Q.  YOU NEVER TALKED WITH MR. SZYMANSKI EITHER ABOUT --
21 A.  NEVER.
22 Q.  -- THESE EVENTS?
23 A.  NEVER.
24 Q.  NOW, YOU SAID THAT YOU REBUILT THE HOUSE WHERE YOU LIVE.
25 A.  UH-HUH (AFFIRMATIVE RESPONSE).

**296**

Q.  WHAT TYPE OF HOUSE DID YOU REBUILD ON THAT SITE?
A.  THE SAME TYPE OF HOUSE.  STICK HOUSE.
Q.  AND HOW HIGH IS IT?  HOW MANY STORIES IS IT?
A.  IT'S ONE STORY.
Q.  AND WHAT SORT OF FOUNDATION DOES IT HAVE?
A.  FOUR CINDER BLOCKS HIGH THIS TIME.
Q.  HOW MANY CINDER BLOCKS HIGH WAS IT BEFORE?
A.  TWO.
Q.  DID YOU HAVE ANY INVOLVEMENT IN BUILDING THE HOUSE?
A.  YES, I DID.
Q.  DID YOU HAVE ANY INVOLVEMENT IN CONSTRUCTING THE ROOF?
A.  YES, I DID.
Q.  HAVE YOU BEEN ON THE ROOF DURING AND AFTER THE CONSTRUCTION?
A.  YES, I HAVE.
Q.  AS YOU STAND ON THE ROOF -- AND WHAT YEAR DID YOU BUILD IT?
A.  THE NEW HOUSE OR THE OLD HOUSE?
Q.  THE NEW HOUSE.
A.  I JUST COMPLETED IT.
Q.  WELL, SAY THEN THIS YEAR, AS YOU STAND ON THE HOUSE IN 2010,
ARE YOU ABLE TO LOOK DOWN TOWARDS THE FLORIDA AVENUE BRIDGE?
A.  I CAN SEE ALL THE WAY TO CLAIBORNE OFF THE ROOF.
Q.  JUST AS YOU COULD IN 2005?
A.  UNOBSTRUCTED.  THE SAME WAY.
Q.  NOW, COUNSEL ASKED YOU ABOUT -- THEY PUT THE CHART UP THAT
SHOWED THE 2,950 FEET FROM YOUR HOUSE TO THE BARGE WHERE IT WAS

**297**

SITTING IN THE NEIGHBORHOOD IN THAT PHOTO.  YOU RECALL THAT?
A.  YES, I DO.
Q.  BUT AS I UNDERSTOOD YOUR TESTIMONY, YOU WATCHED THIS BARGE
FOR A COUPLE OF MINUTES BEFORE IT CAME THROUGH THE WALL?
A.  YES, I DID.
     THE COURT:  THE COURT IS FAMILIAR, I DON'T WANT COUNSEL
TO GET EXCITED, THAT HE'S USING THE WORD "BARGE," BUT --
     EXAMINATION
BY MR. BEST:
Q.  THE DARK OBJECT.
     THE COURT:  YEAH, BUT I JUST --
     EXAMINATION
BY MR. BEST:
Q.  OKAY.  YOU FOLLOWED -- I THINK THE WORD IN YOUR DEPOSITION
WAS, ON PAGE 25 THAT COUNSEL PUT UP THERE, "I KEPT WATCHING IT,"
REFERRING TO THE DARK SHAPE; IS THAT CORRECT?
A.  UH-HUH (AFFIRMATIVE RESPONSE).  YES, SIR.
Q.  AND I THINK YOU ALSO TOLD THE JUDGE IT WAS MOVING AGAINST
THE WALL FOR SOME DISTANCE?
A.  YES, IT WAS.
Q.  DO YOU KNOW HOW FAR AWAY FROM YOUR ROOFTOP IT WAS WHEN YOU
FIRST SAW IT MOVING ALONG THE WALL?
A.  IT MIGHT HAVE -- IF IT'S AT ROMAN STREET, IT MIGHT HAVE
STARTED AT MAYBE GALVEZ OR JOHNSON STREET.
Q.  NOW, COUNSEL ASKED YOU ABOUT THE FACT THAT YOU SAID YOU SAW

**298**

1  Q. THIS LONG, DARK SHAPE OVER THE WALL WHAT LOOKED TO YOU TO BE
2  ABOUT FOUR FEET. DO YOU RECALL THAT TESTIMONY?
3  A. YES.
4  Q. THAT'S FROM YOUR ROOFTOP. THAT'S LOOKING DOWN SEVERAL
5  BLOCKS?
6  A. YES.
7  Q. DID YOU HAVE A TAPE MEASURE TO GO OUT THERE AND MEASURE THE
8  DISTANCE FROM THE TOP OF THE DARK OBJECT THAT YOU SAW OVER THE
9  FLOODWALL?
10 A. NO, I DIDN'T.
11 Q. IT'S AN ESTIMATE THAT YOU MADE WHEN YOU GAVE YOUR
12 DEPOSITION?
13 A. YES.
14 Q. AND COUNSEL ASKED YOU ABOUT THE LIGHTING WHEN YOU GOT UP AND
15 YOU WENT THROUGH THE HOLE IN THE ROOF TO YOUR HOUSE. WHAT WAS
16 THE LIGHT LIKE INSIDE YOUR HOUSE WHEN YOU WOKE UP AND PUT YOUR
17 FEET ON THE WET FLOOR?
18 A. IT WAS -- I MEAN, IT WAS DUSK. I MEAN, YOU MIGHT CALL IT
19 DARK. A LOT OF PEOPLE MIGHT SAY DARK. BUT, I MEAN --
20 Q. DID YOU HAVE POWER WHEN YOU WOKE UP AND PUT YOUR FEET ON THE
21 FLOOR?
22 A. NO, I DIDN'T HAVE NO POWER.
23 Q. HOW WOULD YOU DESCRIBE -- YOU OPEN YOUR EYES AND WHAT DOES
24 IT LOOK LIKE?
25 A. I COULD SEE THAT -- THE ROOM, THE DRESSER, THE HEADBOARD,

**299**

1  THE MIRROR. I COULD SEE EVERYTHING IN THE ROOM.
2  Q. HOW DID THE LEVEL OF LIGHT INSIDE YOUR HOUSE COMPARE WITH
3  THE LEVEL OF LIGHT OR VISIBILITY AFTER YOU GOT OUT ON THE ROOF?
4  A. IT DIDN'T. IT WASN'T MUCH OF A CHANGE BECAUSE I NEVER SEEN
5  A LIGHT TO HAVE TO READJUST.
6  Q. SO YOU SAID YOUR EYES DIDN'T HAVE TO ADJUST TO ANY CHANGE IS
7  WHAT YOU'RE SAYING?
8  A. NOT MUCH.
9  Q. OKAY. AND YOUR IMPRESSION WAS, ALTHOUGH IT WAS STILL DARK,
10 IT WASN'T DAYTIME YET; THAT IT WAS, I THINK YOU USED THE WORD
11 "DUSK"?
12 A. YES, I DID.
13 Q. THE WAY THE LIGHT LOOKS SHORTLY BEFORE OR AROUND DAWN --
14 A. YES.
15 Q. -- IS THAT FAIR?
16 A. YES.
17 Q. AND YOU WERE ASKED ABOUT WHAT YOU TOLD ANYBODY IN YOUR CALLS
18 TO 911. DID YOU EVER GET THROUGH TO ANYBODY WHEN YOU CALL 911?
19 A. I DIDN'T -- I GOT IN TOUCH WITH AN OPERATOR IN OKLAHOMA.
20 Q. AND YOU WERE ASKED ABOUT WHAT, IF ANYTHING, YOU TOLD THE
21 PEOPLE IN THE HELICOPTER THAT RESCUED YOU. DO YOU REMEMBER THOSE
22 QUESTIONS?
23 A. YES, I DO.
24 Q. AND DO YOU REMEMBER WHAT THEY HAD ON THEIR HEADS, THE PEOPLE
25 WHO WERE WORKING ON THE HELICOPTER?

**300**

1  A. THE COAST GUARD HAD EAR -- EAR -- EAR -- THEY HAD EAR
2  STOPPERS ON. THEY BROUGHT US RIGHT ACROSS THE CANAL AND DROPPED
3  US OFF AND THEY WENT BACK. I DIDN'T HAVE A CHANCE TO TALK TO
4  THOSE GUYS.
5  Q. WHILE YOU WERE ON THE HELICOPTER DID ANYBODY INTERVIEW YOU
6  OR QUESTION YOU IN ANY DETAIL ABOUT ANYTHING?
7  A. NO, SIR.
8  Q. THEY DIDN'T EVEN ASK YOU WHERE YOU WANTED TO GO, DID THEY?
9  A. NO.
10 Q. THEY JUST TOOK YOU.
11    AND THIS BUSINESS, WE'VE HEARD A COUPLE OF REFERENCES
12 TO CHRIS AND IT'S -- MORE INFORMATION IN YOUR DEPOSITION, BUT
13 JUST FOR COMPLETENESS OF THE RECORD, WHO IS CHRIS?
14 A. CHRIS WEAVER WAS A RESIDENT LIVING EXACTLY BEHIND ME ON
15 JORDAN AVENUE. HIS HOUSE WAS ONE OF THOSE THAT BROKE APART ON
16 HIM.
17 Q. AND YOU'RE ON YOUR ROOF, YOUR HOUSE HAS -- AT WHAT POINT IN
18 THESE EVENTS DID YOU COME INTO CONTACT WITH THIS GENTLEMAN?
19 A. I CAME INTO CONTACT WITH CHRIS, LIKE AFTER THE BARGE HIT THE
20 WALL, AND A COUPLE OF MINUTES LATER, I DON'T KNOW, HE CAME
21 FLOATING BY ON A PIECE OF THE ROOF.
22 Q. FLOATING BY YOUR HOUSE?
23 A. YEAH.
24 Q. AND YOU WERE ON YOUR ROOF?
25 A. RIGHT.

**301**

1  Q. AND YOUR ROOF IS -- IS YOUR HOUSE FLOATING AT THIS POINT?
2  A. YES, IT WAS.
3  Q. AND SO DID YOU GET THIS FELLOW ONTO YOUR ROOF?
4  A. YES, I DID. I THREW HIM SOME CHRISTMAS LIGHTS AND PULLED
5  HIM ON THE ROOF WITH ME.
6  Q. AND WHAT CONDITION DID YOU FIND HIM TO BE IN?
7  A. SEVERAL CUTS. HE HAD A BIG DEEP CUT ON HIS LEG AND A COUPLE
8  OF CUTS ALL OVER HIS BODY, ARMS AND NECK AND ALL THAT.
9  Q. AND WHAT DID YOU DO FOR HIM?
10 A. I ACTUALLY WENT BACK IN THE HOUSE INSIDE THE WATER AND GOT
11 HIM SOME CLOTHES AND GRABBED WHAT I COULD GRAB.
12 Q. AND DID HE REMAIN THERE WITH YOU UNTIL THE TIME OF RESCUE?
13 A. YES, HE DID.
14 Q. WAS HE RESCUED AT THE SAME TIME AS YOU?
15 A. YES, HE WAS.
16 Q. AND AGAIN, JUST TO BE CLEAR AND FOR COMPLETENESS OF THE
17 RECORD, THIS LONG, DARK OBJECT THAT YOU SAW STICKING UP ABOVE THE
18 FLOODWALL OF THE LEVEE, IS THAT THE SAME OBJECT THAT YOU SAW
19 BREAK THROUGH THE FLOODWALL AND COME INTO THE NEIGHBORHOOD?
20 A. YES, IT IS.
21 Q. WITH THE RESULTS THAT YOU'VE ALREADY DESCRIBED OF HOUSES
22 BEING MOVED AND TREES AND CARS?
23    MR. WALKER: YOUR HONOR --
24         EXAMINATION
25 BY MR. BEST:

## Page 302

1  Q. YOU HAVE TO SPEAK YOUR ANSWER.
2  A. YES, IT IS.
3      THE COURT: JUST A MINUTE.
4      MR. WALKER: FIRST OF ALL, IT'S LEADING AND IT'S A
5  MISCHARACTERIZATION OF HIS TESTIMONY BECAUSE MR. ADAMS NEVER SAID
6  THAT HE SAW ANYTHING BREAK THROUGH. HE SAID IT FLOATED THROUGH.
7      THE COURT: WELL, THAT'S KIND OF CRITICAL. I'LL ASK YOU
8  TO CLARIFY.
9      MR. BEST: I THINK THE RECORD IS CLEAR, BUT I'LL JUST
10 ASK THE WITNESS.
11            EXAMINATION
12 BY MR. BEST:
13 Q. JUST DESCRIBE WHAT YOU SAW WHEN THIS OBJECT CAME INTO THE
14 NEIGHBORHOOD. TELL US WHAT YOU SAW.
15 A. IT APPEARED TO SKIM THE WALL A COUPLE OF TIMES AND THEN IT
16 BROKE THE WALL AND CAME INTO THE NEIGHBORHOOD.
17 Q. AND THEN WHAT EFFECT DID YOU SEE THAT HAVE ON BUILDINGS AND
18 STRUCTURES AND VEHICLES IN THE NEIGHBORHOOD DOWN THAT DIRECTION
19 IN GENERAL?
20 A. THE WATER CAME IN BEHIND IT WITH GREAT FORCE.
21      MR. BEST: THANK YOU, YOUR HONOR. THAT'S ALL I HAVE.
22      THE COURT: THANK YOU, SIR.
23      MR. WALKER: YOUR HONOR, MAY I? I KNOW THAT YOU DON'T
24 WANT ME TO GO LAST, AND I WON'T, BUT THERE IS AN AREA THAT'S BEEN
25 OPENED UP WITH RESPECT TO THIS ARTICLE THAT I THINK DESERVES A

## Page 303

1  CLARIFICATION.
2       THE COURT: THE ARTICLE? NO. THE ARTICLE IS GOING TO
3  HAVE NO MEANING TO ME. IS IT THE SAME ARTICLE? MR. SZYMANSKI?
4       MR. ALDOCK: YOUR HONOR, THE WITNESS IDENTIFIED HIS
5  BROTHER-IN-LAW AS THE PERSON SPEAKING.
6       THE COURT: NO. NO. NO. YOU SHOULD HAVE ASKED HIM
7  THAT. I'M NOT GOING TO DO IT. I'M NOT GOING TO HAVE RECROSS.
8       AND THE ARTICLE, IT ALSO SAID HE FLOATED A MILE
9  FROM HIS HOUSE. I'M NOT GOING TO PUT ANY STOCK IN THAT ARTICLE.
10 THAT'S NOT HOW YOU ARE GOING TO WIN YOUR CASE, NOT BY THAT
11 INTERNET ARTICLE THAT IS FULL OF INCORRECT STATEMENTS, FULL. SO
12 IT'S NOT GOING TO HAPPEN.
13      YOU MAY STEP DOWN, SIR.
14      THE WITNESS: THANK YOU.
15      THE COURT: WE'RE GOING TO TAKE A RECESS OF 15 MINUTES.
16      THE COURT SECURITY OFFICER: ALL RISE.
17      (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, A BRIEF
18 RECESS WAS TAKEN.)
19      THE DEPUTY CLERK: ALL RISE, PLEASE. COURT IS IN
20 SESSION. PLEASE BE SEATED.
21      WOULD YOU PLEASE RAISE YOUR RIGHT HAND? DO YOU SOLEMNLY
22 SWEAR THAT THE TESTIMONY YOU ARE ABOUT TO GIVE WILL BE THE TRUTH,
23 THE WHOLE TRUTH AND NOTHING BUT THE TRUTH, SO HELP YOU GOD?
24      THE WITNESS: YES.
25              ROBERT D. BARTLETT

## Page 304

WAS CALLED AS A WITNESS AND, AFTER BEING FIRST DULY SWORN BY THE
CLERK, WAS EXAMINED AND TESTIFIED ON HIS OATH AS FOLLOWS:
     THE DEPUTY CLERK: PLEASE BE SEATED.
     WOULD YOU PLEASE STATE YOUR NAME AND SPELL IT FOR
THE RECORD?
     THE WITNESS: ROBERT D. BARTLETT, MY LAST NAME IS
SPELLED B-A-R-T-L-E-T-T.
             DIRECT EXAMINATION
BY MR. BEST:
Q. YOUR ADDRESS, MR. BARTLETT?
A. MY OFFICE IS IN METAIRIE, 2617 EDENBORN AVENUE.
Q. WHAT'S YOUR OCCUPATION?
A. I'M A MECHANICAL ENGINEER AND A METALLURGICAL ENGINEER.
Q. WHAT'S YOUR EMPLOYMENT?
A. BARTLETT ENGINEERING. I'M THE SOLE PROPRIETOR.
Q. WHAT'S YOUR EDUCATIONAL BACKGROUND?
A. I HAVE A BACHELOR'S OF SCIENCE IN MECHANICAL ENGINEERING
FROM TULANE UNIVERSITY, 1979. I HAVE A MASTER'S OF SCIENCE IN
METALLURGICAL ENGINEERING FROM OHIO STATE UNIVERSITY, WHICH I
RECEIVED IN 1982.
Q. AND DO YOU HAVE PROFESSIONAL REGISTRATIONS IN YOUR FIELD?
A. YES, I'M REGISTERED AS A MECHANICAL ENGINEER IN BOTH
LOUISIANA AND FLORIDA, AND I'M ALSO REGISTERED AS METALLURGICAL
ENGINEER IN LOUISIANA AND FLORIDA.
Q. I'VE DEALT WITH METALLURGICS AND I'VE DEALT WITH MECHANICAL

## Page 305

ENGINEERS, BUT NOT USUALLY IN THE SAME PERSON. AM I TO
UNDERSTAND THAT YOU'VE BEEN REGULARLY ENGAGED IN THE PRACTICE OF
BOTH OF THOSE FIELDS, METALLURGY AND MECHANICAL ENGINEERING, OVER
THE COURSE OF YOUR CAREER?
A. THAT'S CORRECT, I PRACTICE IN BOTH AREAS.
Q. ALL RIGHT. AND JUST GIVE THE COURT A LITTLE INFORMATION.
NOW, THE COURT HAS YOUR REPORT AND THEY HAVE YOUR CV ALREADY, AND
THE COURT HAS READ YOUR REPORT, SO WE DON'T WANT TO BELABOR
EVERYTHING THAT'S IN THERE.
     IS IT FAIR TO SAY THAT YOU'VE TESTIFIED AS AN EXPERT IN
METALLURGY AND IN MECHANICAL ENGINEERING MANY TIMES IN THE PAST?
A. YES, AND IN FAILURE ANALYSIS.
Q. AND IN FAILURE ANALYSIS?
A. CORRECT.
Q. AND HAVE YOU BEEN ACCEPTED AS AN EXPERT IN THOSE FIELDS IN
THIS DISTRICT OF FEDERAL COURT?
A. YES.
Q. IN FACT, YOU AND I HAD A CASE A COUPLE YEARS AGO ON OPENS
SIDES IN JUDGE BEER'S COURT WHERE YOU WERE QUALIFIED IN THESE
SAME FIELDS; IS THAT CORRECT?
A. THAT'S CORRECT.
Q. AS I LOOK AT THE TYPES OF CASES AND CLIENTS YOU'VE
REPRESENTED, IT APPEARS TO ME THAT FOR THE MOST PART, YOU'VE BEEN
INVOLVED AND RETAINED IN YOUR LITIGATION WORK ON BEHALF OF
CORPORATE AND INSURANCE INTERESTS?