```
                                                                    237
 1                   UNITED STATES DISTRICT COURT
 2                   EASTERN DISTRICT OF LOUISIANA
 3
     ****************************************************************
 4
     IN RE:  KATRINA CANAL
 5   BREACHES CONSOLIDATED
     LITIGATION
 6
                                    CIVIL ACTION NO. 05-4182
 7                                  SECTION "K"(2)
                                    NEW ORLEANS, LOUISIANA
 8                                  TUESDAY, JUNE 22, 2010, 9:00 A.M.
 9   PERTAINS TO BARGE
10
     MUMFORD    C.A. NO. 05-5724
11   AS TO CLAIMS OF PLAINTIFFS
     JOSEPHINE RICHARDSON AND
12   HOLIDAY JEWELERS, INC.,
     ONLY
13
14   BENOIT    C.A. NO. 06-7516
     AS TO CLAIMS OF PLAINTIFFS
15   JOHN ALFORD AND JERRY
     ALFORD ONLY
16
17   ****************************************************************
18
                      DAY 2, MORNING SESSION
19            TRANSCRIPT OF NONJURY TRIAL PROCEEDINGS
          HEARD BEFORE THE HONORABLE STANWOOD R. DUVAL, JR.
20                      UNITED STATES JUDGE
21
22   APPEARANCES:
23
     FOR THE PLAINTIFFS:    BEST KOEPPEL TRAYLOR
24                          BY:  LAURENCE E. BEST, ESQUIRE
                            2030 ST. CHARLES AVENUE
25                          NEW ORLEANS LA  70130
```

## Page 238

APPEARANCES CONTINUED:

    LAW OFFICES OF BRIAN A. GILBERT
    BY: BRIAN A. GILBERT, ESQUIRE
    2030 ST. CHARLES AVENUE
    NEW ORLEANS LA  70130

    KHORRAMI POLLARD ABIR
    BY: SHAWN KHORRAMI, ESQUIRE
    44 FLOWER STREET, 33RD FLOOR
    LOS ANGELES CA  90071

    WILSON GROCHOW DRUKER & NOLET
    BY: LAWRENCE A. WILSON, ESQUIRE
    223 BROADWAY, 5TH FLOOR
    NEW YORK NY  10279

    WIEDEMANN & WIEDEMANN
    BY: LAWRENCE D. WIEDEMANN, ESQUIRE
        KARL WIEDEMANN, ESQUIRE
    821 BARONNE STREET
    NEW ORLEANS LA  70113

    PATRICK J. SANDERS
    ATTORNEY AT LAW
    3316 RIDGELAKE DRIVE
    SUITE 100
    METAIRIE LA  70002

    LAW OFFICE OF RICHARD T. SEYMOUR
    BY: RICHARD T. SEYMOUR, ESQUIRE
    1150 CONNECTICUT AVENUE N.W.
    SUITE 900
    WASHINGTON DC  20036

FOR THE DEFENDANT:   CHAFFE MCCALL
    BY: DEREK A. WALKER, ESQUIRE
    2300 ENERGY CENTRE
    1100 POYDRAS STREET
    NEW ORLEANS LA  70163

## Page 239

APPEARANCES CONTINUED:

    GORDON PROCTER
    BY: JOHN D. ALDOCK, ESQUIRE
        MARK S. RAFFMAN, ESQUIRE
        ADAM M. CHUD, ESQUIRE
        KIRSTEN V. K. ROBBINS, ESQUIRE
        ERIC I. GOLDBERG, ESQUIRE
    901 NEW YORK AVENUE N. W.
    WASHINGTON DC  20001

    SUTTERFIELD & WEBB
    BY: DANIEL A. WEBB, ESQUIRE
    650 POYDRAS STREET, SUITE 2715
    NEW ORLEANS LA  70130

    LAFARGE NORTH AMERICA, INC.
    BY: PETER KEELEY, ESQUIRE
    12950 WORLDGATE DRIVE
    HERNDON VA  20170

OFFICIAL COURT REPORTER:   CATHY PEPPER, CCR, RMR, CRR
        500 POYDRAS STREET, ROOM B406
        NEW ORLEANS, LOUISIANA 70130
        (504) 589-7779

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY. TRANSCRIPT PRODUCED BY COMPUTER.

## Page 240

### INDEX

| EXAMINATIONS | PAGE |
|---|---|
| TERRY MARK ADAMS | 242 |
| DIRECT EXAMINATION BY MR. BEST | 242 |
| CROSS-EXAMINATION BY MR. WALKER | 270 |
| REDIRECT EXAMINATION BY MR. BEST | 294 |
| ROBERT D. BARTLETT | 303 |
| DIRECT EXAMINATION BY MR. BEST | 304 |

### EXHIBITS

| DESCRIPTION | PAGE |
|---|---|
| EXHIBIT NO. 429 | 263 |

## Page 241

P-R-O-C-E-E-D-I-N-G-S

TUESDAY, JUNE 22, 2010

MORNING SESSION

(COURT CALLED TO ORDER)

THE DEPUTY CLERK: ALL RISE, PLEASE.

THE COURT: GOOD MORNING. JUST ONE THING I DIDN'T NOTE, MR. -- IS IT MR. ROBIN, R-O-B-I-N, IS HE OFF THE LIST, ON THE LIST OR --

MR. GILBERT: HE'S ON THE LIST. HE'S COMING TOMORROW.

THE COURT: THANK YOU.

MR. GILBERT: THANK YOU.

THE COURT: YES, SIR. MR. BEST, ARE YOU READY TO PROCEED?

MR. BEST: READY TO PROCEED, YOUR HONOR.

THE COURT: YOUR FIRST WITNESS TODAY?

MR. BEST: IS MR. TERRY MARK ADAMS.

THE COURT: MR. ADAMS, IF YOU WOULD COME AND TAKE THE WITNESS STAND, PLEASE.

THE DEPUTY CLERK: WOULD YOU PLEASE RAISE YOUR RIGHT HAND. DO YOU SOLEMNLY SWEAR THAT THE TESTIMONY WHICH YOU ARE ABOUT TO GIVE WILL BE THE TRUTH, THE WHOLE TRUTH AND NOTHING BUT THE TRUTH, SO HELP YOU GOD?

THE WITNESS: I DO.

**302**

1  Q. YOU HAVE TO SPEAK YOUR ANSWER.
2  A. YES, IT IS.
3     THE COURT: JUST A MINUTE.
4     MR. WALKER: FIRST OF ALL, IT'S LEADING AND IT'S A
5  MISCHARACTERIZATION OF HIS TESTIMONY BECAUSE MR. ADAMS NEVER SAID
6  THAT HE SAW ANYTHING BREAK THROUGH. HE SAID IT FLOATED THROUGH.
7     THE COURT: WELL, THAT'S KIND OF CRITICAL. I'LL ASK YOU
8  TO CLARIFY.
9     MR. BEST: I THINK THE RECORD IS CLEAR, BUT I'LL JUST
10 ASK THE WITNESS.
11           EXAMINATION
12 BY MR. BEST:
13 Q. JUST DESCRIBE WHAT YOU SAW WHEN THIS OBJECT CAME INTO THE
14 NEIGHBORHOOD. TELL US WHAT YOU SAW.
15 A. IT APPEARED TO SKIM THE WALL A COUPLE OF TIMES AND THEN IT
16 BROKE THE WALL AND CAME INTO THE NEIGHBORHOOD.
17 Q. AND THEN WHAT EFFECT DID YOU SEE THAT HAVE ON BUILDINGS AND
18 STRUCTURES AND VEHICLES IN THE NEIGHBORHOOD DOWN THAT DIRECTION
19 IN GENERAL?
20 A. THE WATER CAME IN BEHIND IT WITH GREAT FORCE.
21    MR. BEST: THANK YOU, YOUR HONOR. THAT'S ALL I HAVE.
22    THE COURT: THANK YOU, SIR.
23    MR. WALKER: YOUR HONOR, MAY I? I KNOW THAT YOU DON'T
24 WANT ME TO GO LAST, AND I WON'T, BUT THERE IS AN AREA THAT'S BEEN
25 OPENED UP WITH RESPECT TO THIS ARTICLE THAT I THINK DESERVES A

**303**

1  CLARIFICATION.
2     THE COURT: THE ARTICLE? NO. THE ARTICLE IS GOING TO
3  HAVE NO MEANING TO ME. IS IT THE SAME ARTICLE? MR. SZYMANSKI?
4     MR. ALDOCK: YOUR HONOR, THE WITNESS IDENTIFIED HIS
5  BROTHER-IN-LAW AS THE PERSON SPEAKING.
6     THE COURT: NO. NO. NO. YOU SHOULD HAVE ASKED HIM
7  THAT. I'M NOT GOING TO DO IT. I'M NOT GOING TO HAVE RECROSS.
8     AND THE ARTICLE, IT ALSO SAID HE FLOATED A MILE
9  FROM HIS HOUSE. I'M NOT GOING TO PUT ANY STOCK IN THAT ARTICLE.
10 THAT'S NOT HOW YOU ARE GOING TO WIN YOUR CASE, NOT BY THAT
11 INTERNET ARTICLE THAT IS FULL OF INCORRECT STATEMENTS, FULL. SO
12 IT'S NOT GOING TO HAPPEN.
13    YOU MAY STEP DOWN, SIR.
14    THE WITNESS: THANK YOU.
15    THE COURT: WE'RE GOING TO TAKE A RECESS OF 15 MINUTES.
16    THE COURT SECURITY OFFICER: ALL RISE.
17    (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, A BRIEF
18 RECESS WAS TAKEN.)
19    THE DEPUTY CLERK: ALL RISE, PLEASE. COURT IS IN
20 SESSION. PLEASE BE SEATED.
21    WOULD YOU PLEASE RAISE YOUR RIGHT HAND? DO YOU SOLEMNLY
22 SWEAR THAT THE TESTIMONY YOU ARE ABOUT TO GIVE WILL BE THE TRUTH,
23 THE WHOLE TRUTH AND NOTHING BUT THE TRUTH, SO HELP YOU GOD?
24    THE WITNESS: YES.
25         ROBERT D. BARTLETT

**304**

WAS CALLED AS A WITNESS AND, AFTER BEING FIRST DULY SWORN BY THE
CLERK, WAS EXAMINED AND TESTIFIED ON HIS OATH AS FOLLOWS:
   THE DEPUTY CLERK: PLEASE BE SEATED.
   WOULD YOU PLEASE STATE YOUR NAME AND SPELL IT FOR
THE RECORD?
   THE WITNESS: ROBERT D. BARTLETT, MY LAST NAME IS
SPELLED B-A-R-T-L-E-T-T.
           DIRECT EXAMINATION
BY MR. BEST:
Q. YOUR ADDRESS, MR. BARTLETT?
A. MY OFFICE IS IN METAIRIE, 2617 EDENBORN AVENUE.
Q. WHAT'S YOUR OCCUPATION?
A. I'M A MECHANICAL ENGINEER AND A METALLURGICAL ENGINEER.
Q. WHAT'S YOUR EMPLOYMENT?
A. BARTLETT ENGINEERING. I'M THE SOLE PROPRIETOR.
Q. WHAT'S YOUR EDUCATIONAL BACKGROUND?
A. I HAVE A BACHELOR'S OF SCIENCE IN MECHANICAL ENGINEERING
FROM TULANE UNIVERSITY, 1979. I HAVE A MASTER'S OF SCIENCE IN
METALLURGICAL ENGINEERING FROM OHIO STATE UNIVERSITY, WHICH I
RECEIVED IN 1982.
Q. AND DO YOU HAVE PROFESSIONAL REGISTRATIONS IN YOUR FIELD?
A. YES, I'M REGISTERED AS A MECHANICAL ENGINEER IN BOTH
LOUISIANA AND FLORIDA, AND I'M ALSO REGISTERED AS METALLURGICAL
ENGINEER IN LOUISIANA AND FLORIDA.
Q. I'VE DEALT WITH METALLURGICS AND I'VE DEALT WITH MECHANICAL

**305**

ENGINEERS, BUT NOT USUALLY IN THE SAME PERSON. AM I TO
UNDERSTAND THAT YOU'VE BEEN REGULARLY ENGAGED IN THE PRACTICE OF
BOTH OF THOSE FIELDS, METALLURGY AND MECHANICAL ENGINEERING, OVER
THE COURSE OF YOUR CAREER?
A. THAT'S CORRECT, I PRACTICE IN BOTH AREAS.
Q. ALL RIGHT. AND JUST GIVE THE COURT A LITTLE INFORMATION.
NOW, THE COURT HAS YOUR REPORT AND THEY HAVE YOUR CV ALREADY, AND
THE COURT HAS READ YOUR REPORT, SO WE DON'T WANT TO BELABOR
EVERYTHING THAT'S IN THERE.
   IS IT FAIR TO SAY THAT YOU'VE TESTIFIED AS AN EXPERT IN
METALLURGY AND IN MECHANICAL ENGINEERING MANY TIMES IN THE PAST?
A. YES, AND IN FAILURE ANALYSIS.
Q. AND IN FAILURE ANALYSIS?
A. CORRECT.
Q. AND HAVE YOU BEEN ACCEPTED AS AN EXPERT IN THOSE FIELDS IN
THIS DISTRICT OF FEDERAL COURT?
A. YES.
Q. IN FACT, YOU AND I HAD A CASE A COUPLE YEARS AGO ON OPENS
SIDES IN JUDGE BEER'S COURT WHERE YOU WERE QUALIFIED IN THESE
SAME FIELDS; IS THAT CORRECT?
A. THAT'S CORRECT.
Q. AS I LOOK AT THE TYPES OF CASES AND CLIENTS YOU'VE
REPRESENTED, IT APPEARS TO ME THAT FOR THE MOST PART, YOU'VE BEEN
INVOLVED AND RETAINED IN YOUR LITIGATION WORK ON BEHALF OF
CORPORATE AND INSURANCE INTERESTS?

**306**

1   A. TYPICALLY, YES, BUT WE'VE WORKED FOR INDIVIDUAL PLAINTIFFS,
2   ALSO.
3   Q. OF COURSE, WHEN YOU REPRESENT -- WHEN YOU TESTIFIED FOR
4   CHEVRON, THEY WERE THE PLAINTIFF IN THAT CASE?
5   A. THAT'S CORRECT.
6   Q. AND WHAT IN PARTICULAR IN YOUR WORK AND PROFESSIONAL
7   EXPERIENCE HAVE YOU BROUGHT TO BEAR ON YOUR WORK IN THIS
8   PARTICULAR CASE? WHAT IN YOUR BACKGROUND IS OF PARTICULAR
9   RELEVANCE IN TERMS OF YOUR EXPERIENCE?
10  A. WELL, MY FIRST TEN YEARS OF MY OCCUPATIONAL HISTORY WAS
11  WORKING IN A SHOP WHERE WE DID THE CONSTRUCTION, DESIGN AND
12  CONSTRUCTION OF EQUIPMENT FOR THE OFFSHORE INDUSTRY AND THE
13  CHEMICAL HISTORY INDUSTRY, THE MARINE INDUSTRY, SO THERE WAS --
14  WE DID STRESS ANALYSIS, AND AS PART OF OUR BUSINESS PLAN, WE
15  WOULD SOLICIT PROJECTS FROM COMPANIES WHERE THEY WERE HAVING
16  PROBLEMS WITH THE ITEM, AND WE WOULD OFFER TO REDESIGN THE ITEM
17  AND BUILD IT FOR THEM IN ORDER TO GET THE PROJECT TO BUILD THE
18  JOB.
19       SO IN THAT SENSE, THAT WAS THE -- I THINK, THE GENESIS
20  OF MY FAILURE ANALYSIS CAREER BECAUSE WE HAD TO GET IT RIGHT,
21  OTHERWISE WHEN WE REVISED THE DESIGN, IT WOULDN'T WORK.
22       AND THEN IN 1990, I STARTED BARTLETT ENGINEERING. WE
23  STILL DO A GREAT DEAL OF DESIGN WORK FOR COMPANIES THAT BUILD
24  THINGS, BUT WE ALSO DO A LOT OF FAILURE ANALYSIS.
25  Q. AND THE FAILURE ANALYSIS, OF COURSE, INCLUDES SOME

**307**

1   CONSULTING WORK IN LITIGATION?
2   A. YES.
3   Q. AND YOU'VE USED THE TERM "WITNESS MARKS." WOULD YOU TELL
4   THE COURT WHAT WITNESS MARKS IS AND WHAT THAT HAS TO DO WITH WHAT
5   YOU'VE DONE IN YOUR ENGINEERING CONSULTING WORK THAT BEARS ON
6   LITIGATION?
7   A. SURE. ONE OF THE THINGS THAT WE FEEL WE BRING TO FAILURE
8   ANALYSIS IS THE ABILITY TO INTERPRET WITNESS MARKS OR ANY TIME
9   THERE IS A SCRATCH OR A DENT OR A CHANGE IN AN ITEM, THAT
10  INDICATES ITS HISTORY AND WHAT HAS HAPPENED TO THAT ITEM. AND
11  PART OF THE PROBLEM WITH FAILURE ANALYSIS IS THAT USUALLY THERE
12  ARE MULTIPLE STEPS SO THAT WITNESS MARKS DEVELOP OVERLAPS.
13       AN EXPLANATION I SAW BY A GENTLEMAN WITH THE FAA, HE
14  TOOK A PIECE OF PAPER AND DREW A LINE ON IT AND THEN HE TORE THE
15  PAPER, AND HE SAID, "WELL, OBVIOUSLY THERE ARE TWO WITNESS MARKS,
16  ONE IS THE LINE AND ONE IS THE TEAR. BUT WE CAN LOOK AT THIS AND
17  WE CAN SAY, WELL, THE LINE WAS PROBABLY DRAWN BEFORE THE TEAR."
18       AND WE HAVE THAT SORT OF PROBLEM, ESPECIALLY WITH THIS
19  CASE, WHERE ONE ITEM THEN CAUSES A FAILURE OF ANOTHER ITEM AND
20  THEN YOU WIND UP WITH OVERLAPPING WITNESS MARKS. SO THAT'S ONE
21  OF THE AREAS OF EXPERTISE THAT WE THINK WE BRING.
22       AS A MECHANICAL ENGINEER, THE ABILITY TO DO STRESS
23  ANALYSIS, THE ABILITY TO UNDERSTAND THE BEHAVIOR OF VARIOUS TYPES
24  OF MATERIALS IS THE UNTYING OF THAT KNOT OF OVERLAPPING WITNESS
25  MARKS.

**308**

Q. VERY GOOD. NOW, THE COURT HAS, AS I SAID, YOUR REPORT WHICH
INCLUDES YOUR CV.
     MR. BEST: AND FOR YOUR HONOR'S INFORMATION, THAT'S
PLAINTIFF'S EXHIBIT 378.
     WE WILL OFFER MR. BARTLETT AS AN EXPERT IN
METALLURGY AND IN MECHANICAL ENGINEERING AND FAILURE ANALYSIS.
     THE COURT: FIRST, LET ME LET THE DEFENSE KNOW THAT ANY
OBJECTIONS YOU'VE URGED IN THE PAST ARE PRESERVED FOR APPEAL BY
YOUR MOTIONS, BY WHATEVER YOU URGED IN YOUR MOTION IN LIMINE AND
MY RULING THEREON, BUT SUBJECT TO THAT, ANYTHING YOU ...
     MR. ALDOCK: WE'LL EXAMINE HIM A BIT ON THE CREDENTIALS,
BUT I WON'T QUARREL WITH YOU AS BEING A QUALIFIED METALLURGIC,
JUST FOR PURPOSES OF SUBMISSION.
     THE COURT: ALL RIGHT. THANK YOU SIR.
     MR. ALDOCK: NOW, ARE YOU READY TO --
     THE COURT: DO YOU WANT TO TRAVERSE THE CREDENTIALS NOW?
     MR. ALDOCK: WELL, I THINK IT GOES TO WEIGHT.
     THE COURT: SO YOU PREFER TO DO IT ON JUST REGULAR
CROSS?
     MR. ALDOCK: YES.
     THE COURT: ABSOLUTELY.
     MR. BEST: TO BE CLEAR, YOUR HONOR, THE TENDER IS
METALLURGY, MECHANICAL ENGINEERING AND FAILURE ANALYSIS.
     THE COURT: I UNDERSTAND.
     MR. BEST: THANK YOU, YOUR HONOR.

**309**

     THE COURT: THANK YOU.
                    EXAMINATION
BY MR. BEST:
Q. ALL RIGHT, SIR. NOW, WHAT WERE YOU ASKED TO DO IN THIS
CASE, MR. BARTLETT?
A. WE WERE CONTACTED BY THE FIRM OF WIEDEMANN & WIEDEMANN AND
ASKED TO HELP THEM UNDERSTAND THE SIGNIFICANCE OF SOME OF THE
INFORMATION THAT WAS AVAILABLE REGARDING THE FLOODWALL ON THE
EAST SIDE OF THE INDUSTRIAL CANAL.
Q. AND WHAT INFORMATION HAVE YOU BEEN PROVIDED WITH?
A. WE HAD PHOTOGRAPHS FROM THE CORPS OF ENGINEERS, FROM
LAFARGE, FROM MR. O'DWYER, FROM MR. PAZOS THAT WE OBVIOUSLY
LOOKED AT. WE WERE ABLE TO PERSONALLY INSPECT THE BARGE, BOTH AS
IT SAT IN THE LOWER NINTH WARD AND ALSO AFTER IT WAS CUT UP AND
MOVED TO THE WAREHOUSE IN MAY OF 2006, AND THEN WE HAVE OUR
PHOTOGRAPHS AND OTHER PEOPLE'S PHOTOGRAPHS OF THAT BARGE.
Q. ALL RIGHT. AND YOUR REPORT LISTS ALL OF THE OTHER MATERIALS
THAT YOU'VE REVIEWED, INCLUDING DEPOSITION TESTIMONY AND VARIOUS
OTHER THINGS?
A. THAT'S CORRECT.
Q. NOW, FIRST, I WANT TO TALK ABOUT THE SOUTH BREACH FIRST.
AND YOUR REPORT CONTAINS A NUMBER OF PHOTOGRAPHS, AND I WANT YOU
TO FEEL FREE TO REFER TO THOSE AS WE GO ON, AND IF YOU IDENTIFY
THEM BY YOUR FIGURE NUMBER THAT'S IN YOUR REPORT, MR. SNYDER IS
PREPARED TO BRING UP THAT PHOTOGRAPH FOR US FROM THE PLAINTIFF'S

**310**

1  BENCH BOOK OF EXHIBITS.
2       WHAT WERE YOUR PARTICULAR OBSERVATIONS THAT WERE
3  SIGNIFICANT TO YOU IN YOUR EXAMINATION OF THE SOUTH BREACH?  AND
4  FEEL FREE TO REFER TO THE PARTICULAR FIGURES AS YOU GO ALONG, IF
5  YOU WISH.
6  A.  IN OUR REPORT, THE FIRST FIGURE THAT ILLUSTRATES THE SOUTH
7  BREACH IS FIGURE 4.
8  Q.  WE'LL HAVE THAT IN JUST A MOMENT, I EXPECT.
9       MR. BEST:  THAT'S FIGURE 4.36.  AND WE'RE LOOKING FOR
10 FIGURE 4, WHICH IS DIFFERENT.
11      IN YOUR REPORT, IS THIS THE SAME PHOTOGRAPH?  IT
12 LOOKS LIKE THE SAME PHOTOGRAPH AS IN YOUR REPORT THAT --
13      THE COURT:  YES, THAT'S 4.  THAT'S FIGURE 4 IN THE
14 REPORT.
15      THE WITNESS:  THAT'S CORRECT.
16      MR. BEST:  I'M JUST POINTING IT OUT FOR THE RECORD.
17      THE COURT:  IN THE REPORT THAT I HAVE, IT SURE APPEARS
18 TO BE THE SAME FIGURE 4 THAT'S IN THE REPORT.
19                EXAMINATION
20 BY MR. BEST:
21 Q.  AND ACTUALLY, BEFORE I LET YOU START TALKING ABOUT THIS, BY
22 THE WAY, THIS IS THE SOUTH END OF THE SOUTH BREACH; IS THAT
23 CORRECT?
24 A.  THAT'S CORRECT.
25 Q.  THIS IS THE DAMAGED AREA OF THE WALL CLOSEST TO THE

**311**

1  CLAIBORNE AVENUE BRIDGE?
2  A.  THAT'S CORRECT.
3  Q.  BEFORE I LET YOU START TALKING ABOUT THIS PHOTOGRAPH, I WANT
4  TO ASK YOU IF YOU HAVE PREPARED AND INCLUDED IN YOUR REPORT A
5  CROSS-SECTION OF THE FLOODWALL THAT WOULD SHOW THE COURT THE
6  DETAILS OF THE CONSTRUCTION AT THAT POINT?
7  A.  YES, I HAVE.  THEY ARE IN MY APPENDICES.
8  Q.  BEFORE YOU START TALKING ABOUT YOUR FINDINGS, JUST GIVE THE
9  COURT A BRIEF EXPLANATION OF WHAT THIS FLOODWALL CONSISTS OF, HOW
10 IT'S CONSTRUCTED AND, IN PARTICULAR, THE CAP THAT YOU'RE GOING TO
11 TALK ABOUT AND THE OTHER FEATURES THAT YOU'RE GOING TO DESCRIBE
12 IN YOUR PHOTOGRAPHS.
13      THE COURT:  AND THIS WOULD BE IN HIS REPORT, AND ON IT
14 IS, JUST FOR OUR IDENTIFICATION, AT THE BOTTOM, AND THIS JUST
15 HELPS US WHEN WE'RE GOING THROUGH THE RECORD BECAUSE WHAT WE DO
16 IS WE'LL READ THE ENTIRE TRANSCRIPT, WE WILL LOOK AT THE
17 APPROPRIATE EXHIBITS, AND THE ONES THAT WERE POINTED OUT TO US,
18 AND TO FACILITATE IT, IT'S NOT A PAGE NUMBER, BUT IT HAS NO COVER
19 PAGE, PAGE 11 OF 16 WRITTEN ON THE BOTTOM.
20      MR. BEST:  IT'S ALSO THE FIRST DRAWING THAT FOLLOWS
21 APPENDIX A OF THE WITNESS' REPORT.
22      THE COURT:  OKAY.
23      THE WITNESS:  SO THAT DRAWING IS OUR APPENDIX A, AND
24 THAT'S A DRAWING THAT WE RECEIVED, I BELIEVE IT MIGHT HAVE BEEN
25 FROM MR. O'DWYER.  IT WAS AN AS-BUILT DRAWING OF THE FLOODWALL ON

**312**

THE EAST SIDE OF THE INNER HARBOR NAVIGATION CANAL.
     AS YOU CAN PROBABLY SEE THAT, THAT DRAWING WAS NOT
GIVEN TO US IN VERY GOOD CONDITION, SO WE HAD TO TRY TO UNTIE THE
KNOT AND WORK BACKWARDS TO DETERMINE WHAT THIS DRAWING WAS
SAYING.  SO ON MY --
                EXAMINATION
BY MR. BEST:
Q.  YOU PREPARED YOUR OWN DRAWING THAT APPEARS AS APPENDIX B OF
YOUR REPORT; IS THAT CORRECT?
A.  THAT'S CORRECT.  SO WE DREW SECTIONS OF THAT DRAWING.
Q.  I THINK WE COULD ELMO THAT.
     THE COURT:  AND I'M LOOKING AT IT, I SEE IT.
     THE WITNESS:  SO THAT IS -- THAT'S THE FIRST PAGE OF OUR
APPENDIX B.  IT'S OUR DRAWING, 1046 UNDERSCORE 01 UNDERSCORE DASH
ONE, AND THAT SHOWS THE REDRAWN PORTION OF THE AS-BUILT DRAWING
FROM THE -- OF THE FLOODWALL.  AND IT SHOWS THE -- EXACTLY THE
TEXT, THE NOTATIONS AND THE FEATURES FROM THE OTHER DRAWING.
Q.  ALL RIGHT.
A.  SO IT SHOWS THAT THE BOTTOM OF THE FLOODWALL CONSISTS OF
SHEET PILING, AND THEN ON TOP OF THE SHEET PILING, THERE'S A
CONCRETE PIECE THAT'S POURED OVER THE TOP OF THE SHEET PILING.
THERE ARE REBARS THAT ARE THREADED THROUGH HOLES IN THE SHEET
PILING, AND THEN TURNED VERTICALLY.  AT ABOUT THE UPPER PORTION
OF THAT DRAWING, THERE'S A LINE THAT SAYS, "EL 12.0".  THAT'S
ELEVATION 12 FEET FOR THE CONSTRUCTION OF THE -- PURPOSES.  AND

**313**

THERE'S A LINE THAT GOES ACROSS THE MONOLITH OF THE FLOODWALL
LABELED "C.J.", WHICH WE INTERPRETED TO MEAN CONSTRUCTION JOINT.
IN ESSENCE, A STOPPING POINT IN THE POURING OF THE CEMENT, OR THE
CONCRETE, RATHER, AND SO A SECOND POUR WAS THEN ON TOP OF THAT
CONSTRUCTION JOINT.
Q.  JUST A COUPLE OF THINGS I WOULD LIKE TO POINT OUT.  ON THE
RIGHT-HAND SIDE OF THE DRAWING, AT THE TOP OF THE DRAWING, AT THE
TOP, IT SAYS, "FLOOD SIDE."  THE LEFT-HAND DRAWING AT THE TOP
SAYS, "PROTECTED SIDE."
     SO AS I UNDERSTAND THIS, IF I'M IN A TOWBOAT GOING UP
AND DOWN THE WATERWAY, THE INDUSTRIAL CANAL, AND I LOOK TO THE
EAST TOWARDS THIS FLOODWALL, IT JUST LOOKS -- THE CONCRETE CAP IS
JUST FLAT FROM THAT PERSPECTIVE; IS THAT CORRECT?
A.  THAT'S CORRECT.
Q.  BUT IF YOU LIVE ON JORDAN AVENUE AND YOU LOOK AT THE TOP OF
THE FLOODWALL, IT'S ANGLED TO THE TOP?
A.  THAT'S CORRECT.
Q.  AND WHAT YOU'RE TELLING US IS THAT THE CONCRETE CAP WAS
POURED IN TWO SECTIONS, THE LOWER SECTION BELOW THE 12-FOOT
ELEVATION IS -- ENCAPSULATED THE TOPS OF THE SHEET PILINGS?
A.  YES.
Q.  AND THEN THEY POURED ON THE TRIANGULAR SHAPED TOP AS A
SECOND POUR?
A.  THAT'S CORRECT.
Q.  AND, OF COURSE, THIS IS A CROSS-SECTION?

314

1  A. YES.
2  Q. AND IF WE'RE LOOKING AT THIS FROM EITHER SIDE, THE CONCRETE
3  CAPS ARE POURED IN SECTIONS OF -- THAT ARE WHAT LENGTH?
4  A. BY MEASURING THE SHEET PILE, AND THAT WOULD BE THE NEXT
5  PAGE, THE SHEET PILE WERE 18 INCHES FROM JOINT TO JOINT, OR
6  36 INCHES, WHAT SEEMS TO BE 36 INCHES IF YOU LOOK AT ONE SIDE OF
7  THE WALL. WE CAN LOOK AT PHOTOGRAPHS OF THE WALL AND SEE THAT
8  EACH PANEL OF THE FLOODWALL IS ABOUT 30 FEET.
9  Q. SO WE HAD THESE CONCRETE CAPS THAT ARE 30 FEET LONG, AND,
10 AGAIN, JUST FOR COMPLETENESS OF THE RECORD, WHAT IS BETWEEN -- WE
11 HAVE THESE SECTIONS OF CONCRETE MEETING ONE ANOTHER, WHAT IS
12 BETWEEN THERE AND WHAT DO YOU CALL IT?
13 A. THERE'S AN ELASTOMER OR RUBBERY TYPE SHAPE THAT'S SHOWN ON
14 THE FIRST DRAWING, THAT AS-BUILT DRAWING, ON THE BOTTOM. IT'S A
15 SORT OF A BULBOUS FIN THAT THE CONCRETE IS POURED AROUND.
16    I'VE HEARD PEOPLE REFER TO IT AS A WATER STOP OR A
17 SEAL.
18 Q. VERY GOOD. THANK YOU. NOW, WE'RE GOING TO GO BACK TO THE
19 FIRST PHOTOGRAPH THAT WE HAD UP THERE, WHICH IS YOUR FIGURE.
20 I'LL TELL YOU WHAT, MAYBE I'LL JUST USE THE ELMO BECAUSE THE ONES
21 IN YOUR REPORT HAVE SOME ARROWS ON THEM THAT MIGHT BE USEFUL.
22    SO THIS IS FIGURE 4 FROM YOUR REPORT. AM I CORRECT
23 THAT THIS IS LOOKING SOUTH AT THE SOUTH END OF THE SOUTH BREACH?
24 A. THAT'S CORRECT.
25 Q. AND WE'RE LOOKING AT THE FLOODWALL FROM THE FLOOD SIDE OR

315

1  THE WATER SIDE?
2  A. THAT'S CORRECT.
3  Q. OKAY. TELL THE JUDGE WHAT ARE THE IMPORTANT FINDINGS YOU
4  MADE AS REGARDS TO YOUR REPORT.
5  A. SO THIS PHOTOGRAPH SHOWS THE FRACTURE OF THE CONCRETE CAP OF
6  THE FLOODWALL THAT OTHER PHOTOGRAPHS WILL MAKE CLEAR IS FOLLOWING
7  THE CONSTRUCTION JOINT. AND THE FRACTURE EXTENDS ALONG THE WALL
8  AT THE -- AT THE JOINT BETWEEN TWO PANELS, WHICH IS THE ARROW
9  THAT'S POINTING EXACTLY VERTICALLY DOWN, LINED UP SOMEWHAT WITH
10 THE RIGHT-HAND SIDE OF THE BARGE.
11    THE COURT: YOU CAN POINT TO IT IF YOU WANT, BUT I CAN
12 SEE WHERE IT IS, WHERE THERE'S A GAP. I UNDERSTAND.
13        EXAMINATION
14 BY MR. BEST:
15 Q. AND YOUR ARROW ON YOUR REPORT IS LABELED NUMBER 3, THE ONE
16 YOU'RE TALKING ABOUT?
17 A. THAT'S CORRECT.
18    THE COURT: I SEE IT NOW. I MAY NEED MY GLASSES AS
19 WELL.
20        EXAMINATION
21 BY MR. BEST:
22 Q. BY THE WAY, BEFORE WE GO A LITTLE FURTHER, AND JUST FOR
23 COMPLETENESS OF THE RECORD AGAIN, IN THIS PHOTOGRAPH, IN THE
24 FOREGROUND, THERE'S A LOT OF RIPRAP AND RUBBLE?
25 A. CORRECT.

316

Q. THAT'S A TEMPORARY LEVEE THAT THEY PUT UP TO PROTECT THIS --
    THE COURT: I WAS GOING TO THAT VERY QUESTION, THANK
YOU.
    SO THAT THE RUBBLE THAT I SEE, IN OTHER WORDS, THE
WHITE SUBSTANCE, THE STONES, ET CETERA, WHATEVER YOU WANT TO CALL
THEM, THAT'S PUT THERE AFTER THE INCIDENT; IS THAT CORRECT?
    THE WITNESS: THAT'S CORRECT. AND I BELIEVE THAT IF YOU
WANT TO SEE THAT, THE MISSING -- IN MR. MARINO'S REPORT, THAT'S
EXHIBIT 397, IT'S PAGE 38, IT SHOWS THIS SAME VIEW WITHOUT THAT
RUBBLE THERE.
    THE COURT: OKAY, THANK YOU, SIR.
        EXAMINATION
BY MR. BEST:
Q. NOW, AND JUST AGAIN FOR COMPLETENESS, IF AT -- ON
AUGUST 29TH, 2005, IF WE WERE IN THIS SAME LOCATION LOOKING AT
THIS, THE RUBBLE IS NOT THERE. WE WOULD HAVE SEEN THIS CONCRETE
WALL CONTINUING TO THE LEFT SIDE OF THE PHOTOGRAPH, AND AN
EARTHEN BERM UP AGAINST IT ON THE WATER SIDE?
A. THE LEVEL OF THE SOIL WOULD HAVE BEEN APPROXIMATELY AT THE
BOTTOM OF THE CONCRETE CAP. YOU CAN SORT OF SEE THAT ON THE FAR
SIDE OF THE RUBBLE.
Q. WHERE UP AT THE END WE SEE A LITTLE PATCH OF GREEN, THAT'S
GRASS GROWING AT THE BOTTOM OF THE CONCRETE CAP?
A. YES.
    THE COURT: WHEN WE REFER TO THE CONCRETE CAP, JUST FOR

317

THE RECORD, THE -- WHEN YOU LOOK AT THIS, THE CONCRETE LOOKING
SUBSTANCE EMERGING FROM THE GROUND, IS THAT THE FLOODWALL OR THE
CONCRETE CAP?
    THE WITNESS: TO BE CONSISTENT WITH THE DRAWINGS, I
WOULD SUGGEST THAT WE MIGHT REFER TO THAT AS THE CONCRETE
FLOODWALL, AND THE TOP THREE FEET, WE MIGHT CALL THAT THE CAP.
    THE COURT: THAT HELPS, THANK YOU.
        EXAMINATION
BY MR. BEST:
Q. SO THE SECOND POUR IS -- FROM THE 12-FOOT ELEVATION UP IS
THE THREE-FOOT CAP?
A. I THINK THAT WOULD BE ONE WAY THAT WE COULD SPEAK AND KNOW
EXACTLY WHAT WE'RE TALKING ABOUT.
    THE COURT: YES, IT DOES HELP.
        EXAMINATION
BY MR. BEST:
Q. SO WE HAVE THE CONCRETE CAP, WE HAVE THE CONCRETE FLOODWALL
AND THEN WE HAVE THE SHEET PILE EXTENDING BELOW THAT?
A. YES.
Q. AND, OF COURSE, THE OTHER FEATURE OF THIS PHOTOGRAPH IN THE
BACKGROUND IS THE BARGE AT ISSUE IN THIS CASE?
A. YES.
Q. NOW, AT THE TIME THAT THESE PHOTOS WERE TAKEN, AS I
UNDERSTAND IT, YOU WERE NOT INVOLVED IN THAT PROCESS AND DID NOT
HAVE ACCESS TO THIS SCENE AS IT LOOKED AT THIS TIME?

**318**

1  A. THAT'S CORRECT.
2  Q. SO YOU RELIED ON PHOTOS THAT WERE TAKEN BY OTHERS WHO WERE
3  AT THE SCENE AT THAT TIME?
4  A. THAT'S CORRECT.
5     THE COURT: I'M NOT GOING TO DISRUPT YOUR FLOW TOO MUCH,
6  MR. BEST --
7     MR. BEST: THAT'S ALL RIGHT, YOUR HONOR.
8     THE COURT: -- BUT JUST TO CLARIFY THIS POINT, IF WE
9  LOOK TOWARDS THE FAR RIGHT OF THAT PICTURE WHERE YOU SEE THE
10 GREEN ABUTTING THE CONCRETE STRUCTURE, WOULD THE SEAM THAT I SEE
11 THERE BE -- ABOVE THE SEAM WOULD BE THE CONCRETE CAP AND BELOW
12 THE SEAM WOULD BE THE CONCRETE FLOODWALL?
13    THE WITNESS: I WOULD SAY THAT THE ENTIRE THING IS
14 CALLED A CONCRETE FLOODWALL. MAYBE WE CAN REFER TO THE CAP AS
15 THE TOP ABOVE THE JOINT AND THE LOWER SECTION AS THE PART BELOW
16 THE JOINT.
17    THE COURT: IT'S ALL PART OF THE FLOODWALL?
18    THE WITNESS: CORRECT.
19    THE COURT: AND YOU SEE THE SEAM I'M REFERRING TO THERE
20 ON THE FAR RIGHT?
21    THE WITNESS: YES.
22    THE COURT: WOULD THAT BE -- WOULD ABOVE THAT BE THE
23 CONCRETE CAP?
24    THE WITNESS: THAT'S CORRECT. THAT IS THE -- YOU'RE
25 SEEING THE TWO CHAMFERS THAT DELINEATE OR MARK THE LOCATION OF

**319**

1  THE JOINT.
2     THE COURT: THANK YOU. I UNDERSTAND.
3     WE'RE LOOKING AT FIGURE 4 FOR THE RECORD.
4     ALL RIGHT, GO AHEAD.
5           EXAMINATION
6  BY MR. BEST:
7  Q. HAVE YOU FINISHED WITH YOUR COMMENTS ABOUT THE SIGNIFICANT
8  FINDINGS IN THIS PHOTOGRAPH?
9  A. YES.
10    MR. BEST: ALL RIGHT, I'M GOING TO --
11    THE COURT: I'LL CLEAR THAT.
12    MR. BEST: UNLESS YOUR HONOR WANTED YOUR MARKS.
13    YOU CLEARED IT, I'M SORRY.
14          EXAMINATION
15 BY MR. BEST:
16 Q. GOING TO FIGURE 5, WHAT ARE WE LOOKING AT HERE?
17 A. SO FIGURE 5, THE PHOTOGRAPHER HAS MOVED A LITTLE CLOSER TO
18 THE SAME AREA OF THE FLOODWALL, AND HE'S SHOWING THE SOUTH END OF
19 THE SOUTHERN BREACH. HE'S STANDING SOMEWHAT IN LINE WITH THE
20 FLOODWALL LOOKING SOUTH, AND WE CAN SEE THAT THE REBARS THAT USED
21 TO BE VERTICAL ARE NOW FOLDED OVER SHARPLY HORIZONTALLY, POINTING
22 TOWARDS THE PROTECTED SIDE OF THE FLOODWALL, AND THEY ARE ALL
23 SOMEWHAT EVENLY BENT AND THAT EVEN THE BARS THAT USED TO BE
24 VERTICAL THAT ARE IN THE -- A PORTION OF THE FLOODWALL THAT WAS
25 ONLY HALF BROKEN, AT THE VERY SOUTHERNMOST FLOODWALL PORTION,

**320**

THOSE ARE ALSO FOLDED OVER SHARPLY TO THE SIDE.
Q. AND JUST BY WAY OF ADDITIONAL EXPLANATION, THE BRIDGE IN THE
BACK IS THE CLAIBORNE AVENUE BRIDGE?
A. YES.
Q. AND AS WE ARE IN THIS PHOTOGRAPH LOOKING SOUTH?
A. THAT'S CORRECT.
Q. AND THIS IS EXACTLY THE SAME POINT, JUST A CLOSE-UP OF THE
END OF THE CAP? AND WHEN I SAY, "THE END," I MEAN WHERE THE
ARROW IS IS THE POINT WHERE THE CAP IS STILL INTACT, WHEREAS TO
LEFT OF THE ARROW, THE CAP IS GONE FOR SOME DISTANCE?
A. THAT'S CORRECT.
Q. AND THAT WAS SHOWN IN THE PRIOR PHOTO AS WELL?
A. YES.
Q. AND BY THE WAY, FROM WHAT -- WE DON'T HAVE THE WHOLE WALL IN
THESE PHOTOGRAPHS, AND I'LL GET TO THAT, BUT FOR WHAT DISTANCE IS
THE ENTIRE CAP MISSING?
   THE COURT: YOU MEAN ALONG -- ALONG WHERE, SIR?
   MR. BEST: ALONG THE SOUTHERN BREACH.
   THE WITNESS: WE OBTAINED THAT INFORMATION FROM THE IPET
REPORT VOLUME 4, APPENDIX 9. IT'S ON PAGE 2 OF MY REPORT. THE
SOUTHERN BREACH WAS APPROXIMATELY 793 FEET WIDE.
           EXAMINATION
BY MR. BEST:
Q. AND THE CAP PORTION OF THE WALL, BASED UPON THE PHOTOGRAPHS
YOU REVIEWED, APPEARS TO BE MISSING OR DESTROYED FOR THAT

**321**

DISTANCE?
A. WELL, THAT'S -- THAT WOULD BE MAYBE A TOPIC FOR THE NEXT
PHOTOGRAPH.
Q. ALL RIGHT. WE'LL MOVE ON THEN. IS THERE ANYTHING ELSE YOU
NEED TO COMMENT ABOUT THIS PHOTOGRAPH?
A. NO.
Q. MOVING ON TO FIGURE 6.
A. SO FIGURE 6, IN MY REPORT, THE PHOTOGRAPH THAT WAS PROVIDED
BY MR. O'DWYER, IS NOW STANDING NEAR THE PORTION OF THE FLOODWALL
THAT WAS UNDAMAGED OR REMAINING. WE'RE LOOKING NORTHWARDS, AND
ALONG THE LINE OF THE FLOODWALL, AND WE CAN SEE THE REBARS FOLDED
OVERLY SHARPLY. THESE ARE REBARS THAT USED TO BE STICKING
STRAIGHT UP IN THE AIR, AND THESE REBARS ARE NOW FOLDED OVER WITH
A TIGHT BEND, AND THAT'S TRUE FOR THE PORTION OF THE FLOODWALL
THAT IS STILL PARTLY STANDING UP.
    IF WE ALSO LOOK AT THE -- CAN I BORROW THAT POINTER?
    IF WE ALSO LOOK A LITTLE BIT FURTHER DOWN THE
FLOODWALL -- IF WE LOOK A LITTLE FURTHER DOWN THE FLOODWALL, DOWN
HERE, THIS IS A PORTION OF THE CAP OF THE FLOODWALL THAT STILL
REMAINS. SO IN THIS AREA OF THE FLOODWALL, THE CAP IS MISSING,
THE BARS ARE FOLDED OVER SHARPLY, AND WHAT WE CAN'T SEE IN THE
PHOTOGRAPH OVER HERE, THE CAP ALSO REMAINS, THAT WAS THE
SOUTHERNMOST END OF THE SOUTHERN BREACH, AND THEN OVER HERE, THE
CAP EXISTS AGAIN. THIS IS -- THIS PHOTOGRAPH -- IF I MIGHT ASK
MR. SCHNEIDER TO PULL UP FOR US MR. MARINO'S EXHIBIT 397,

**322**

PAGE 41.
YES. SO THIS IS THE SAME AREA, BUT FROM THE OPPOSITE DIRECTION, SO THESE ARE THE REBARS THAT USED TO BE VERTICAL THAT ARE FOLDED OVER SHARPLY. THIS IS THE REMAINING PORTION OF THE FLOODWALL AT THE SOUTHERNMOST END, AND THIS IS THE FLOODWALL CAP THAT STILL IS INTACT.
    THE COURT: WHEN YOU SAY, "INTACT," MEANING THAT IT IS NOT PULVERIZED OR BROKEN INTO VARIOUS PARTS; IS THAT WHAT YOU MEAN, SIR?
    THE WITNESS: THAT'S A MORE CORRECT STATEMENT. THANK YOU.
    THE COURT: THANK YOU.
    THE WITNESS: IT'S STILL CONNECTED TO THE FLOODWALL.
            EXAMINATION
BY MR. BEST:
Q. OKAY. THE CONTRAST ON THIS PHOTO IS A LITTLE DIFFERENT. JUST SHOW US AGAIN WITH YOUR POINTER WHERE THE INTACT PORTION OF THE CAP BEGINS UP BETWEEN THOSE GENTLEMEN IN THE MIDDLE AND ON THE LEFT.
A. SO THIS IS THE INTACT PORTION AT THE VERY SOUTHERNMOST END OF THE SOUTHERN BREACH.
Q. AND THE EDGE OF IT APPEARS LIKE A VERTICAL SHADOW, AM --
A. ACTUALLY, I THINK YOU'RE RIGHT.
Q. THAT'S THE BREAK POINT?
A. YES, WE CAN SEE THE REBARS UP IN WHAT WOULD BE THE AIR, SO

**323**

THESE ARE REBARS THAT ARE COMING OUT OF THE SIDE OF THAT VERTICAL FRACTURE AT THE SOUTHERNMOST END.
Q. SO IF ONE WERE VISUALLY OR WITH A COMPUTER ANIMATION ABLE TO TAKE THIS DEBRIS SECTION HERE AND RIGHT IT BACK UP, IT APPEARS TO ME WE WOULD HAVE A SECTION THAT, WHERE THE CAP OF THE FLOODWALL WAS MISSING, THAT WOULD LOOK LIKE A VERY LONG TOOTH CAP?
A. THAT'S EXACTLY CORRECT. WE WOULD HAVE A GATE LOOKING THING.
Q. DO WE HAVE A MEASUREMENT OR AN ESTIMATE OF THE SIZE OF THAT THE GATE WHERE THE CAP WAS KNOCKED OFF FOR THAT DISTANCE?
A. IT'S A LITTLE BIT OF A CHALLENGE. I WOULD SAY THAT WE'RE ABOUT 40 FEET. IF WE SAY THAT THE FLOODWALL SECTIONS ARE APPROXIMATELY 30 FEET WIDE, AND THAT'S BASED ON COUNTING THE SHEET PILE INCREASES, IF WE HAVE APPROXIMATELY -- APPROXIMATELY EIGHT FEET ON SOUTH OF THE VERTICAL JOINT DOWN HERE, THEN WE HAVE 30 FEET HERE, THIS LOOKS LIKE THIS MIGHT BE A JOINT, AND IT LOOKS LIKE WE MIGHT BE MISSING A LITTLE BIT OF THE CAP HERE, SO WE'RE IN THE NEIGHBORHOOD OF 40 FEET, YOU KNOW, TO THE BEST THAT YOU CAN DO TRYING TO MEASURE THE PHOTOGRAPH.
Q. OKAY. MAY WE GO BACK TO FIGURE 6?
A. YES.
Q. ON THE ELMO.
    NOW, JUST AGAIN FOR HOUSEKEEPING PURPOSES, FROM THE MIDDLE OF THE LEFT FRAME OF THE PICTURE GOING BACK TO THE CENTER IN THE DISTANCE, AGAIN, APPEARS TO BE THE RIPRAP TEMPORARY LEVEE WITH THE CONSTRUCTION EQUIPMENT. NONE OF THAT WAS THERE AT THE

**324**

TIME OF THE STORM?
A. YOU'RE TALKING ABOUT UP HERE?
Q. YES.
A. THAT'S CORRECT. THAT IS THE RIPRAP.
    THE COURT: AND FOR THE RECORD, WE'RE OBVIOUSLY LOOKING IN A GENERALLY NORTHERLY DIRECTION HERE TOWARDS THE FLORIDA STREET BRIDGE.
            EXAMINATION
BY MR. BEST:
Q. NOW, AS WE LOOK DOWN WHERE THE MAN WITH THE -- IT LOOKS LIKE A SURVEYING ROD OR SOME VERTICAL STICK IS STANDING AND WE LOOK BACK BEHIND HIM, WE SEE THE WAVES OF STEEL SHEET PILING THAT FORMED THE WALL BEFORE ITS COLLAPSE; IS THAT CORRECT?
A. YES.
Q. AND IT APPEARS TO ME, AND I THINK THE COURT WOULD LIKE TO KNOW, AM I CORRECT THAT THAT SECTION OF THE WALL HAS BEEN COMPLETELY PULLED OUT AND FLOATED SORT OF INLAND AWAY FROM THE POSITION WHERE IT STOOD PREVIOUSLY?
A. YES.
Q. IN FACT, WHERE IT STOOD PREVIOUSLY IS PROBABLY ROUGHLY AT THE FOOT OF THIS TEMPORARY RIPRAP LEVEE?
A. YES.
Q. SO IT WAS JUST TOTALLY RIPPED OUT OF THE GROUND AND MOVED?
A. YES. NOW, I WILL SAY THIS IS AN AREA THAT I KNOW THAT MR. MARINO IS GOING TO COVER IN MUCH GREATER DETAIL.

**325**

Q. I UNDERSTAND.
    THE COURT: JUST FOR MY INFORMATION, I'VE LOOKED AT A LOT OF PHOTOGRAPHS, AND THE SOUTH BREACH IS, AT LEAST IN PART, HAS A BOW IN IT. WOULD THE SHEET PILE PART OF IT BE THE PART OF THE BOW?
    MR. BEST: THAT YOU SEE ON AN AERIAL SHOT, LOOKING DOWN AT AN AERIAL SHOT?
    THE WITNESS: YES, THAT'S WHAT CREATES THE LINE OF THE BOW THAT YOU SEE.
    THE COURT: OKAY. THANKS.
            EXAMINATION
BY MR. BEST:
Q. AND IN ADDITION TO THE ARROW POINTING TO THE REBAR THAT IS THE BENT OVER, WE HAVE HERE PULVERIZED OR GROUND UP, BROKEN UP CONCRETE.
A. WELL, I BELIEVE, AND I THINK I'M CORRECT, AND IT'S NOT A DIFFICULT STRETCH, THIS IS JUST THE FRACTURED CAP FROM --
Q. THOSE ARE PIECES OF REMAINS OF THE CAP?
A. CORRECT. WE CAN SEE REBAR THAT THREADS THROUGH THOSE PIECES OF CONCRETE SO THAT IT'S -- THIS WAS THE REMAINS OF WHAT FRACTURED THE CAP.
Q. THANK YOU. WE'RE THROUGH WITH FIGURE 6?
A. YES.
Q. LET'S GO TO THE FIGURE 7, WHICH I THINK MAY BE A LITTLE REPETITIVE, BUT MIGHT AS WELL FINISH WHAT WE STARTED. SO TELL US

**326**

1  ABOUT THIS ONE.
2  A. WHAT IS SIGNIFICANT HERE, THIS IS THE SOUTHERNMOST END OF
3  THE SOUTH BREACH, AND THE FRACTURE FOLLOWS THE CONSTRUCTION
4  JOINT. HERE THE BARS THAT USED TO BE VERTICAL ARE NOW SHARPLY
5  BENT OVER AND CREASED, I'M POINTING HORIZONTALLY, AND THEN THE
6  FRACTURE TURNS AND EXTENDS VERTICALLY. AND ALONG THIS FRACTURE,
7  THE BARS ARE ALSO CREASED HARD.
8  Q. I MAY BE GETTING AHEAD OF MYSELF IN TERMS OF GETTING YOUR
9  OPINION, I REALLY WAS INTENT ON LAYING THE FOUNDATION WITH THE
10 PHOTOGRAPHS, BUT THIS IS A PRETTY INTERESTING PICTURE TO ME. SO
11 I WOULD LIKE YOU TO TELL THE COURT WHAT IS THE SIGNIFICANCE,
12 PARTICULARLY OF THE CHANGES WE SEE IN THE CONCRETE CAP FROM WHERE
13 IT IS INTACT TO WHERE IT SLOPES, IT GOES SHARPLY VERTICALLY DOWN
14 AND THEN IT SLOPES ALMOST TO THE HORIZONTAL?
15 A. WELL, THE -- SO THIS IS, IN EFFECT, A WITNESS MARK, AS WE
16 SPOKE OF BEFORE. THIS KNOCKOUT OF THIS WALL WOULD INDICATE TO US
17 THAT THERE WAS AN OBJECT THAT CAUSED THAT KNOCKOUT BECAUSE
18 OTHERWISE WE WOULD EXPECT -- IF, FOR EXAMPLE, IF IT WAS A FORCE
19 FROM THE WATER, A UNIFORM FORCE APPLIED ALONG THE WALL FROM ONE
20 END TO THE OTHER, WE WOULD EXPECT THAT FRACTURE AT THE
21 CONSTRUCTION JOINT TO HAVE JUST GIVEN WAY. WE WOULDN'T EXPECT
22 THE FRACTURE TO TURN UPWARDS LIKE THIS.
23 Q. OKAY. HOW DOES THIS REMNANT OF THE CONCRETE CAP, AS SHOWN
24 IN THIS PHOTOGRAPH, COMPARE TO THE SHAPE OF THE -- WHAT I THINK
25 YOU ALL HAVE BEEN REFERRING TO AS THE BOTTOM OF THE BARGE OR THE

**327**

1  TURN OF THE BILGE?
2  A. SURE. WELL, THE BOTTOM CORNER OF A BARGE HULL IS SIMILAR IN
3  RADIUS AND CURVATURE.
4  Q. AND YOU INSPECTED THE BARGE?
5  A. WELL, THAT'S CORRECT, AND IT'S LIKE JUST ABOUT EVERY OTHER
6  BARGE YOU SEE, TOO.
7  Q. OKAY. AND THE -- ARROW NUMBER THREE, DID YOU COVER THAT
8  ONE? I KNOW WE TALKED ABOUT THE REBAR IN ONE AND THREE.
9  A. NUMBER THREE JUST SHOWS WHERE THE LOWER PORTION OF THE
10 CONCRETE FLOODWALL HAS BROKEN AWAY AND IS EXPOSING SOME OF SHEET
11 PILING.
12 Q. OKAY.
13 A. SO --
14 Q. IT DOESN'T SHOW UP SO WELL ON THIS BLOWUP, BUT IF WE LOOK AT
15 THIS SMALL SCREEN, YOU CAN ACTUALLY SEE WHERE NUMBER THREE IS,
16 PART OF THE ACCORDION SHAPE OF THE TOP OF THE STEEL SHEET PILING?
17 A. THAT'S CORRECT.
18 Q. BECAUSE THE STEEL SHEET PILING, AS WE HAVE SEEN FROM YOUR
19 DRAWING, DOES NOT EXTEND INTO THE CAP?
20 A. THAT'S CORRECT.
21 Q. AND THIS FLAT SURFACE OF CONCRETE BETWEEN ONE AND THREE
22 ROUGHLY CORRESPONDS TO THE SEAM BETWEEN THE CAP AND THE LOWER
23 PART OF THE FLOODWALL, IF I'M CORRECT?
24 A. YES. AND I WOULDN'T SAY ROUGHLY, I WOULD SAY THAT IS THE
25 CONSTRUCTION JOINT.

**328**

Q. VERY GOOD.
    THE COURT: I'M HAVING TROUBLE DISCERNING THE SHEET PILE
ON HERE. IT MAY JUST BE MY POOR VISION. IS THAT THE TOP OF
ARROW NUMBER THREE?
    MR. BEST: THE TOP OF ARROW NUMBER THREE LOOKS LIKE IT
IS JUST AT THE TOP OF THE STEEL SHEET PILING.
    THE COURT: OKAY. AND THE SHEET PILING GOES HOW FAR UP
THE PORTION OF THE FLOODWALL THAT'S NOT THE CAP? IT'S NOT FLUSH
WITH THE JOINT, IS IT?
    THE WITNESS: IT'S LESS THAN FOOT. THE VERY TOP OF THE
SHEET PILE IS LESS THAN A FOOT FROM THE CONSTRUCTION JOINT.
    THE COURT: GOT YOU. THANK YOU. THAT'S WHAT I NEEDED
TO KNOW. THANK YOU.
                    EXAMINATION
BY MR. BEST:
Q. NOW, YOU'VE ALREADY TALKED ABOUT THIS CONSTRUCTION JOINT AS
BEING WHERE THE TWO SEPARATE POURS OF CONCRETE MEET. IN TERMS
OF -- I GUESS WHAT I WANT TO ASK YOU IS IS IT A COINCIDENCE THAT
WHAT WE SEE HERE IS A SEPARATION AT THE CONSTRUCTION JOINT, OR
DOES THAT HAVE SIGNIFICANCE FROM AN ENGINEERING STANDPOINT THAT
THIS HAPPENED AT A CONSTRUCTION JOINT?
A. WELL, THE -- TO GET TO THE SIGNIFICANCE OF THESE WITNESS
MARKS, THE FACT THAT THE BARS ARE FOLDED OVERLY SHARPLY LIKE THIS
TELLS US WHERE THE FORCE HAD TO BE APPLIED. IF THE FORCE WERE
APPLIED AT THE TIP OF A LONG BAR, THE RADIUS THAT YOU PRODUCE IS

**329**

A LARGE SWEEPING RADIUS. IN ORDER TO GET A TIGHT, SHARP RADIUS,
THE FORCE NEEDS TO BE APPLIED MORE CLOSER TO THE BEND. AND THAT
WAS SOMETHING THAT WE SHOWED MATHEMATICALLY. WE DISCUSSED IT IN
THE REPORT.
    WHAT THIS SHOWS IS THAT THE LOCATION OF THE ITEM THAT
PUSHED ON THE BARS HAD TO BE CLOSE TO THE LOCATION OF THE BEND,
SO THAT PLACES THE, WHAT WE'RE SAYING, OF COURSE, IS THE BOTTOM
OF THE BARGE, THAT CAUSED THESE BENDS, IT PLACES THE BOTTOM OF
THE BARGE AT AN ELEVATION AT THE TIME THAT THE BARGE WENT THROUGH
THIS WALL.
Q. NOW, GIVEN ALL OF THESE THINGS YOU'VE TALKED ABOUT IN THIS
PHOTOGRAPH AND THE PRECEDING PHOTOGRAPHS, WHAT DOES THIS TELL YOU
ABOUT THE ITEM THAT BENT THESE BARS AND CAUSED THIS GAP?
A. WELL, IT ALSO -- NOW GETTING INTO THE INTERPRETATION OF ALL
OF THIS, IF I COULD GO BACK TO MY FIGURE 6, IF YOU WOULD BACK UP
ONE PAGE.
Q. SURE.
A. SO THE REBARS ARE ALL FOLDED SOMEWHAT UNIFORMLY OVER AND
SHARPLY, AND THEY ALSO POINT IN A DIRECTION THAT IS PERPENDICULAR
TO THE AXIS OF THE WALL. EVEN THOUGH THE WALL IS NOW CURVED,
WHICH MEANS THAT THE BARS POINT TO, IF YOU WOULD CALL IT A FOCAL
POINT. THE BARS HAVE MAINTAINED THEIR BEND PERPENDICULAR TO THE
DIRECTION OF THE WALL, BUT NOW THE WALL IS CURVED. SO THIS IS AN
EXAMPLE OF OVERLAPPING WITNESS MARKS.
    AND WHAT WE'RE SAYING IS THAT THE BARS WERE BENT OVER,

**330**

1  THE WALL IS NOW CURVED. IT'S NOT -- IT'S VERY DIFFICULT, OF
2  COURSE, TO FIND SOME WAY TO BEND THE BARS AND HAVE THEM POINT TO
3  A FOCAL POINT. IT'S MORE LIKELY THAT THE BARS WERE BENT OVER AND
4  POINTED PARALLEL TO EACH OTHER, WHICH IS ALSO CONSISTENT WITH THE
5  SCRATCHES ON THE BOTTOM OF THE BARGE AND -- WHICH IS FIGURE 8.
6  Q. WELL, LET'S GO TO THOSE REAL QUICKLY.
7  A. SO IF I CAN JUST REAL QUICKLY, SO THE SIGNIFICANCE OF THAT
8  IS IT TELLS US THAT THE BARS WERE BENT BEFORE THE WALL DEVELOPED
9  ITS CURVATURE. THAT'S ALSO SIGNIFICANT. IT TELLS US --
10  Q. MEANING THAT THE BARS BEGAN TO BEND WHEN IT WAS IN AN
11  UPRIGHT VERTICAL POSITION LIKE THE UNDAMAGED PORTION?
12  A. YES. SO NOT ONLY DOES IT TELL US THAT ALL THE BARS WERE ALL
13  AT THE SAME ELEVATION, BECAUSE OF THE CONSTRUCTION JOINT, IT
14  ESTABLISHES AN ELEVATION, IT ALSO TELLS US THAT THE WALL WAS --
15  THE FLOODWALL WAS NOT CURVED, IT HAD NOT DEVELOPED A CURVATURE AT
16  THE TIME THAT THE BARGE WENT THROUGH BECAUSE THE BARS WOULD THEN
17  BE POINTING IN A DIFFERENT DIRECTION.
18       SO IN ORDER TO -- IN ORDER TO UNROLL THE WALL AND HAVE
19  THE BARS ALL BE POINTING PARALLEL TO EACH OTHER, WHICH IS WHAT WE
20  WOULD EXPECT IF WE MASHED THEM OVER WITH THE BOTTOM OF THE BARGE,
21  THE FLOODWALL WOULD HAVE HAD TO HAVE BEEN STRAIGHT.
22  Q. THE LONG AND THE SHORT OF IT, THESE PHOTOGRAPHS ARE
23  CONSISTENT WITH YOUR OPINION IN THE BARGE COMING THROUGH THIS
24  LOCATION?
25  A. YES.

**331**

1  Q. AND LET'S GO NOW TO THE PHOTOS THAT HAVE TO DO WITH THE --
2  CALLED THE INSPECTION OF THE BARGE ITSELF, AND THERE ARE I
3  THINK -- 8, 9, 10 AND 11 ARE THE FIGURES.
4       LET'S START WITH FIGURE 8.
5  A. FIGURE 8 IS -- THESE ARE SCRATCH MARKS ON THE BOTTOM OF THE
6  BARGE AS PHOTOGRAPHED FROM MR. PAZOS.
7       FIGURE 9 -- GO AHEAD.
8  Q. ALTHOUGH IT'S MR. PAZOS' PHOTOGRAPH, YOU WERE THERE?
9  A. I WAS THERE. I HAVE PHOTOGRAPHS ALSO. THIS WAS JUST ABOUT
10  THE TIME THAT I WAS TRANSITIONING FROM FILM TO DIGITAL, AND
11  MR. PAZOS GOT BETTER PHOTOGRAPHS, SO I USED HIS PHOTOGRAPHS.
12  Q. OKAY. BUT JUST TO BE CLEAR, THESE PARALLEL SCRATCH MARKS
13  THAT LOOK LIKE RUSTY MARKS ON -- THIS IS THE BOTTOM OF THE BARGE
14  TURNED UPSIDE DOWN IN AN INSPECTION THAT WAS DONE?
15  A. THAT'S CORRECT.
16  Q. JUST EXPLAIN BRIEFLY FOR COMPLETENESS OF THE RECORD, WHERE
17  WAS THIS WHEN YOU SAW IT AND IN WHAT CONDITION OF DISASSEMBLY OR
18  ASSEMBLY WAS THE HULL OF THE BARGE?
19  A. SO THAT -- THE BARGE WAS RAISED ON RUBBER ROLLERS IN PLACE
20  SO THAT WE COULD --
21  Q. INVERTED?
22  A. NO, RIGHT SIDE UP. WHEN IT WAS IN THE LOWER NINTH WARD, IT
23  WAS RAISED ON RUBBER ROLLERS SO THAT WE COULD CLIMB UNDERNEATH IT
24  AND VIEW IT AND LOOK AT IT, NOT EXACTLY A NICE ENVIRONMENT TO
25  WORK, SLOPPY MUD AND JUST A LITTLE SPACE, A LITTLE CRAWL SPACE

**332**

BETWEEN THE BARGE AND THE MUD. SO WE DOCUMENTED THE MARKINGS TO
BE ABLE TO KNOW WHICH END OF THE BARGE WAS WHICH AND TO BASICALLY
BE ABLE TO REASSEMBLE THE BARGE MENTALLY LATER ON.
Q. SO AM I RIGHT THAT IF WE TURN THIS UPSIDE DOWN, THAT'S MORE
WHAT IT LOOKED LIKE AS YOU STOOD UNDER THE ELEVATED BARGE?
A. THAT'S EXACTLY CORRECT. SO WE'RE LOOKING AT THE BOW LOOKING
TOWARD THE STERN.
Q. WHAT ARE THESE, JUST FOR COMPLETENESS, THESE PARALLEL LINES
THAT WE SEE IN THIS PHOTOGRAPHS?
A. THESE PARALLEL LINES ARE SCRATCHES IN THE RUST ON THE BOTTOM
OF THE BARGE.
Q. AND THEY'RE SIGNIFICANT TO YOU IN TERMS OF THE PHOTOGRAPHS
OF THE COLLAPSED LEVEE AND BROKEN TOP IN WHAT MANNER?
A. YES. THERE ARE OTHER PHOTOGRAPHS THAT HAVE RULERS IN THEM
AND THOSE SHOW THAT IF YOU MEASURE A LONG DISTANCE, COUNT UP THE
SCRATCHES, THAT THE AVERAGE SPACING OF THE SCRATCHES IS ABOUT
9 INCHES.
     THAT'S SIGNIFICANT BECAUSE IF WE TO GO THE DRAWING OF
THE FLOODWALL THAT SHOWS THE SPACING OF THE REBARS, THE VERTICAL
REBARS THAT ARE FOLDED OVER AND IRONED FLAT, THOSE BARS ARE ALSO
ON A 9-INCH SPACING.
Q. AND FIGURE 9 IS A TAPE MEASURE BETWEEN THESE SCRATCH MARKS
THAT SHOWS WHAT?
A. WELL, THIS IS HOW -- HOW WE -- IT'S ONE OF THE WAYS THAT WE
USED TO DETERMINE THE SPACING OF THE MARKS.

**333**

     BUT MORE IMPORTANTLY, THIS SHOWS THE CURVATURE OF THE
BOTTOM OF THE HULL AT THE BOW, AND THE SCRATCH MARKS ARE SEEN TO
GO AROUND THAT CURVATURE. WHICH THE SIGNIFICANCE OF THAT IS THAT
AT THE TIME THE BARGE PRESSED ON THOSE BARS, THE BARS WERE
UPRIGHT ENOUGH THAT THEY COULD SCRATCH A SOMEWHAT VERTICAL
SURFACE ON THE BARGE.
Q. AND BEFORE THE BARS COULD SCRATCH THAT TURN OF THE BILGE, AS
I'VE SEEN IT REFERRED TO, THE CONCRETE CAP COVERING THAT REBAR
HAD TO HAVE BEEN PULVERIZED OR DAMAGED SUFFICIENTLY TO EXPOSE AT
LEAST THE TOPS OF THE STEEL BARS?
A. THAT'S CORRECT. SO THE REBARS ARE NOT EXPOSED NORMALLY.
THE CONCRETE HAS TO BE DAMAGED IN ORDER TO EXPOSE THE REBARS.
Q. ALL RIGHT. THAT'S FIGURE 9.
     GOING TO FIGURE 10. AGAIN, I'LL PUT IT UPSIDE DOWN.
     THIS JUST SHOWS THE LINES GOING FURTHER BACK UNDER THE
HULL?
A. THAT'S CORRECT.
Q. NOW, THERE IS AN ARROW ON THIS ONE TO A BLACK LINE. WOULD
YOU EXPLAIN THAT FOR COMPLETENESS OF THE RECORD, WHAT THAT BLACK
LINE ACROSS THE HULL IS?
A. SO THE BLACK LINE THAT GOES ACROSS THE PHOTOGRAPH IS A
SHADOW. IT'S A DARK STRIPE. THAT'S BECAUSE OF THE FACT THAT THE
BARGE WAS CUT INTO ROUGHLY, I THINK, 20-FOOT LONG SECTIONS, SO
WHEN THEY WERE PLACED IN THE FLOOR OF THE WAREHOUSE ON THE
INDUSTRIAL CANAL, THERE WAS A SPACE BETWEEN THE SECTIONS SO THAT

**334**

1  WHEN YOU PHOTOGRAPHED FROM ONE END AND LOOKED AT THE OTHER YOU
2  SAW THE GAP BETWEEN THE SECTIONS.
3  Q.  OKAY.  I FIGURED THAT'S WHAT IT WAS, BUT AGAIN, FOR
4  COMPLETENESS, WE NEED TO HAVE THE RECORD SAY WHAT IT IS.
5      SO WHEN IT WAS REASSEMBLED FOR YOUR INSPECTION, IT'S
6  THERE IN PIECES WITH GAPS IN BETWEEN SECTIONS OF THE HULL?
7  A.  CORRECT.
8  Q.  BUT IT HAD BEEN REASSEMBLED, AS YOU UNDERSTOOD IT, IN THE
9  ORDER IN WHICH IT HAD BEEN CUT APART?
10 A.  THAT'S CORRECT.
11 Q.  AND THESE SCRATCH MARKS THAT WE SAW STARTING UP AT THE
12 VERTICAL SURFACE OF THE TURN OF THE BILGE AND GOING UNDERNEATH
13 THE BOTTOM OF THE BARGE GO ON FOR WHAT DISTANCE?
14 A.  A LITTLE BIT MORE THAN HALF OF THE BARGE.
15 Q.  AND FROM -- THE BARGE, WE'VE SEEN FROM, I THINK, RECORDS AND
16 STIPULATIONS, IS ABOUT 30-FEET WIDE, 35-FEET WIDE?
17 A.  THAT'S CORRECT.
18 Q.  AND OVER WHAT PORTION OF THE 35-FOOT WIDTH OF THE BEGINNING
19 OF THE FRONT END -- AND I'M SAYING "THE FRONT END."  WE DON'T
20 KNOW EXACTLY WHICH IS THE BOW OR THE STERN IN THESE PHOTOS, DO
21 WE?
22 A.  WELL, WE REFER TO -- THE END THAT'S LABELED "THE BOW," IN
23 THE PHOTOGRAPH OF THE BARGE IN THE NINTH WARD IT WAS LABELED
24 "BOW," SO WE CALL THAT THE BOW.  AND THAT KNUCKLE WE SAW, THAT'S
25 THE END CONSISTENT WITH THE LABEL THAT HAD BEEN REFERRED TO AS

**335**

1  THE BOW.
2  Q.  AND WE'RE REFERRING TO IT AS THE BOW BECAUSE THE MARKS ON
3  THE HULL INDICATE THAT THAT'S THE SECTION THAT FIRST CAME THROUGH
4  THE WALL WHERE THE SCRATCHES MARKS GO UP ONTO THE VERTICAL
5  SURFACE OF THE HULL?
6  A.  CORRECT.
7  Q.  WE DON'T KNOW AS A MATTER OF THE DESIGN, THE DESIGN ENGINEER
8  WHO DESIGNED THE BARGE, WHETHER ONE END OR THE OTHER WAS INTENDED
9  TO BE A BOW, BUT WE'RE REFERRING TO THAT AS THE BOW BECAUSE IT
10 WAS THE FIRST END THAT WENT THROUGH THE OPENING?
11 A.  YES.  AND THERE IS A PHOTOGRAPH OF THE BARGE, I DON'T HAVE
12 IT IN MY REPORT, BUT THE PHOTOGRAPH OF THE BARGE IN THE
13 LOWER NINTH WARD AND SOMEONE HAD WRITTEN "BOW" IN PAINT MARKER ON
14 THE BARGE, SO WE JUST MAINTAINED THAT TERMINOLOGY ALL THE WAY
15 THROUGH.
16 Q.  OKAY.  THAT'S GOOD.
17     AND AGAIN, I'M NOT SURE IF YOU ANSWERED THE QUESTION I
18 WAS ASKING YOU, OF THE 35-FOOT WIDTH OF THE BARGE AT THE BOW END,
19 THESE SCRATCH MARKS COVERED WHAT PORTION?
20 A.  I SAW THEM FROM ONE END TO THE OTHER, ALL THE WAY ACROSS THE
21 BARGE.
22 Q.  AND THEN YOU SAY THEY CONTINUED TO ROUGHLY HALF THE LENGTH
23 OF THE 200-FOOT BARGE?
24 A.  A LITTLE BIT OVER HALF.
25 Q.  A LITTLE BIT OVER HALF.

**336**

1      AND THEN, FINALLY, WE GO TO FIGURE 11.
2  A.  SO 11 IS AN OVERVIEW OF THE FACILITY ON THE INDUSTRIAL CANAL
3  SHOWING THE MULTIPLE PIECES OF THE BARGE THAT ARE STACKED ON THE
4  FLOOR.
5  Q.  AND BOTTOM LINE, YOUR OPINION IS THE MARKS YOU FOUND ON THE
6  HULL AT THE TIME OF YOUR INSPECTION RELATE HOW, TO THE REBAR YOU
7  SEE IN THE PHOTOGRAPHS OF THE WALL AT THE SOUTH BREACH, AT THE
8  SOUTH END OF THE SOUTH BREACH?
9  A.  THEY ARE THE SAME SPACING.
10 Q.  AND WHAT CONCLUSION DID YOU REACH FROM ALL OF THOSE -- ALL
11 OF YOUR OBSERVATIONS AND FINDINGS THAT WE'VE DISCUSSED?
12 A.  THAT THE -- AT THE TIME THAT THE BARGE WENT THROUGH THE
13 WALL, THE ELEVATION -- THE BARGE WAS FLOATING AT AN ELEVATION
14 SUCH THAT THE BARGE COULD CONTACT THE CAP OF THE FLOODWALL, THE
15 UPPER PORTION OF THE FLOODWALL; AND THAT THE BARGE THEN WAS ABLE
16 TO GO THROUGH THE FLOODWALL AND FOLD THE REBARS DOWN FLAT USING
17 ITS BOTTOM PLATE; AND THAT THE SPACING OF THE REBARS, OF COURSE,
18 IS CONSISTENT WITH THE SPACING OF THE SCRATCHING ON THE BOTTOM OF
19 THE BARGE; AND ALSO THAT THE CAP IS MISSING ON THE FLOODWALL FOR
20 A WIDTH THAT'S CONSISTENT WITH THE WIDTH OF THE BARGE.
21 Q.  FORGIVE ME FOR ASKING I GUESS WHAT MAY BE A SUBJECTIVE
22 QUESTION, BUT IS THIS ROCKET SCIENCE?  HOW OBVIOUS WAS THIS
23 DEDUCTION?
24 A.  WELL, THIS IS A VERY IMPORTANT MATTER SO WE DIDN'T TAKE THIS
25 LIGHTLY.

**337**

1  Q.  I DON'T MEAN TO SUGGEST YOU DID.  BUT WHAT I SEE HERE, I
2  DON'T SEE ANY OTHER EXPLANATION --
3      THE COURT:  ARE YOU ASKING FOR AN "ELEMENTARY, MY DEAR
4  WATSON" ANSWER?
5      MR. BEST:  I SUPPOSE.  LET ME ASK IT ANOTHER WAY.  VERY
6  POOR QUESTION, YOUR HONOR.
7                   EXAMINATION
8  BY MR. BEST:
9  Q.  CAN YOU SEE ANY OTHER EXPLANATION FOR THESE PARTICULAR
10 FINDINGS THAN THE BARGE?
11 A.  THAT WOULD BE HOW I WOULD ANSWER IT, IS THAT I CAN SEE NO
12 OTHER WAY FOR THESE FACTS AND THIS EVIDENCE THAT I'VE PRESENTED
13 TO YOU AND DESCRIBED TO YOU TO HAVE OCCURRED OTHER THAN THAT THE
14 BARGE WENT THROUGH THE FLOODWALL, KNOCKED OUT THE GAP IN THE
15 UPPER CAP, FOLDED OVER THE REBARS, AND IT SCRATCHED THE BOTTOM OF
16 THE BARGE.
17 Q.  OKAY.  NOW, ONCE AGAIN, GOING TO THIS CONSTRUCTION JOINT
18 BETWEEN THE SEPARATELY POURED CAP AND THE REST OF THE CONCRETE
19 TOP OF THE FLOODWALL, YOU REFERRED TO THAT CONSTRUCTION JOINT IN
20 YOUR REPORT ON PAGE 4 AS A NATURAL WEAK SPOT IN THE WALL.  JUST
21 TELL US WHAT YOU MEANT BY THAT AND WHAT IS THE SIGNIFICANCE OF
22 THAT?
23 A.  WELL, YOU'RE DEPENDING UPON TWO SEPARATE POURS OF CONCRETE
24 TO BOND TO EACH OTHER, WHICH IS IT'S GOING TO BE WEAKER THAN IF
25 IT WAS -- THAN IF THERE WAS NOT A JOINT THERE.  THAT'S ALL.

**338**

1  Q. AND BASED UPON YOUR FINDINGS, DO YOU HAVE AN OPINION ABOUT
2  WHAT THIS SECTION OF THE WALL THAT WE'RE TALKING ABOUT LOOKED
3  LIKE BEFORE CONTACT WITH THE BARGE, PULVERIZATION OF THE CONCRETE
4  AND FOLDING OF THE REBAR?
5  A. YES.
6  Q. AND WHAT'S THAT OPINION?
7  A. THAT THE -- THAT PRIOR TO CONTACT BY THE BARGE, THE CAP OF
8  THE WALL WAS THERE.
9  Q. AND IN WHAT MANNER WAS IT STANDING?
10  A. AND IT WAS ESSENTIALLY UPRIGHT.
11  Q. OKAY. THAT IS PRETTY MUCH CONFIRMED BY FIGURE 5, IS IT NOT,
12  WHERE WE SEE THE UNDAMAGED PORTION OF THE FLOODWALL?
13  A. THAT'S CORRECT.
14       SO THIS GOES BACK TO MY DISCUSSION THAT THE FLOODWALL
15  ADJACENT TO THE SOUTHMOST FLOODWALL WAS NOT CURVED, WHICH MEANT,
16  SO IT HADN'T DEVELOPED A CURVATURE FROM THE FRACTURES IN THE
17  CONCRETE, AND THE BENT REBARS ESTABLISH THE ELEVATION OF THE
18  BOTTOM OF THE BARGE.
19       SO THOSE THINGS, IN COMBINATION WITH ALL OF THE OTHER
20  THINGS WE TALKED ABOUT, TELLS US THAT THE SECOND PANEL FROM THE
21  SOUTH WAS NOT FRACTURED AND ALSO SOMEWHAT UPRIGHT SO THAT ITS
22  ELEVATION WOULD BE CONSISTENT WITH THE SOUTHMOST PANEL.
23  Q. SO IS IT GOING TOO FAR FOR ME TO CONCLUDE THEN THAT BEFORE
24  THE BARGE MADE THE CONTACT THAT LEFT THESE MARKS, THAT THIS WALL
25  WAS FAIRLY VERTICAL AND WAS NOT BEING BOWED OUT BEFORE IT WAS

**339**

1  HIT?
2  A. I THINK THAT'S CORRECT, YES.
3  Q. NOW, DID YOU CONSIDER THE POSSIBILITY THAT THIS SECTION OF
4  THE WALL MIGHT HAVE FAILED DUE TO HYDROSTATIC WATER PRESSURES?
5  A. WE DID.
6  Q. AND WHAT DID YOU DO TO EVALUATE THAT?
7  A. WE CALCULATED THE FORCE --
8       THE COURT: EXCUSE ME FOR INTERRUPTING. ARE YOU TALKING
9  ABOUT THE PORTION OF THE WALL WE'RE TALKING ABOUT NOW, WHICH IS
10  40 FEET?
11       THE WITNESS: WELL, YES.
12       THE COURT: APPROXIMATELY. GIVE OR TAKE.
13       THE WITNESS: CORRECT. BUT THE CALCULATIONS THAT WE DID
14  ONLY LOOKED AT THE FORCE OF THE WATER ON THE TOP 3 FEET, ON THE
15  CAP. AND SO WE CALCULATED THE FORCE OF THE WATER.
16                 EXAMINATION
17  BY MR. BEST:
18  Q. IT'S ON PAGE 5 OF 6 OF YOUR REPORT IF THAT EXPEDITES
19  MATTERS.
20  A. THANK YOU.
21       THE COURT: THANK YOU.
22       THE WITNESS: ACTUALLY, PAGE 6, THAT -- SO THE TOTAL
23  HORIZONTAL FORCE WOULD HAVE BEEN A LITTLE OVER 200 POUNDS. THE
24  FORCE REQUIRED TO BEND THE BARS WAS IN THE NEIGHBORHOOD OF 350 TO
25  OVER 500 POUNDS AS A MINIMUM.

**340**

       WE MADE SOME ASSUMPTIONS. WE USED A CONCEPT CALLED
A "PLASTIC HINGE," WHAT IT TAKES TO BEND A BAR UNTIL IT BENDS
PERMANENTLY.
       THE HYDROSTATIC, THE UTILIZATION OF THE HYDROSTATIC
FORCE ON THE WALL TOOK INTO CONSIDERATION THE FORM OF THE BEND.
SO IN ORDER FOR THE -- IN ORDER FOR THE CAP OF THE WALL TO HAVE
CAUSED THE BEND THAT WE SEE, THE CAP WOULD HAVE HAD TO HAVE JUST
SHIFTED SIDEWAYS AS OPPOSED TO A ROLLING BACKWARDS.
       SO THAT'S NOT THE FORCE AND THE STRESSES WE
CALCULATED. WE SAID, OKAY, IF THIS WAS DONE DUE TO THE
HYDROSTATIC FORCE OF THE WATER, THE CAP WOULD HAVE HAD TO HAVE
JUST PUSHED SIDEWAYS.
       AND THE BOTTOM LINE IS THAT THE FORCE FROM THE
WATER IS A LITTLE OVER 200 POUNDS, AND THE FORCE REQUIRED TO BEND
THE RODS WAS 300 TO 500 POUNDS AS A MINIMUM, AS A MINIMUM. SO
WHAT WE'RE SAYING IS THAT THE WATER PRESSURE COULD NOT HAVE
CAUSED THIS TOP CAP TO COME OFF IN THE WAY THAT IT DID.
                 EXAMINATION
BY MR. BEST:
Q. VERY GOOD.
       AGAIN, CONFIRMING AND FURTHER SUPPORTING YOUR OPINION
THAT THE FINDINGS YOU DISCUSSED WERE CAUSED BY THE BARGE COMING
THROUGH THIS LOCATION?
A. THAT'S CORRECT.
Q. AND IN THE PHOTOGRAPHS THAT YOU LOOKED AT, GOING NOW TO THE

**341**

SECTION OF THE FLOODWALL NORTH OF THE SOUTH BREACH AND FROM THE
SOUTH BREACH TO THE NORTH BREACH, DID YOU LOOK AT PHOTOGRAPHS OF
THAT PORTION OF THE FLOODWALL?
A. YES.
Q. AND WHAT FINDINGS OF SIGNIFICANCE WERE THERE?
A. THE SECTION OF THE FLOODWALL BETWEEN THE NORTH AND THE SOUTH
BREACHES HAD -- HAD MULTIPLE HORIZONTAL SCRATCHES THAT HAD A
WAVINESS TO THEM BUT THEY WERE ESSENTIALLY HORIZONTAL AND
PARALLEL.
Q. AND WOULD THOSE BE CONSISTENT WITH THIS SAME BARGE MOVING
FOR SOME DISTANCE DOWN THE CANAL AGAINST THAT FLOODWALL?
A. YES. THERE IS ALSO A PHOTOGRAPH -- AND I DON'T HAVE IT IN
MY REPORT -- OF THE NORTHERN END OF THE SOUTHERN BREACH WHERE THE
WALL IS CURVING AND TILTING, THAT'S THE VERY BEGINNING OF THE
SOUTHERN BREACH, AND THESE SCRATCH MARKS CAN BE SEEN TO FOLLOW
THE CURVATURE AROUND.
       THE COURT: JUST A MINUTE.
       MR. ALDOCK: YOUR HONOR, I HATE TO INTERRUPT. WE ARE
GOING OUTSIDE HIS REPORT. HE HAS NOT TALKED ABOUT SCRATCHES AT
ANY AREA OTHER THAN THE LITTLE -- THE PANELS AT THE SOUTH END OF
THE SOUTH BREACH THAT YOUR HONOR IDENTIFIED. THERE IS NO
CONCLUSION IN HIS REPORT, THERE IS NO OBSERVATION IN HIS REPORT
WITH REGARD TO ANYTHING ELSE.
       THE COURT: COUNSEL, CAN YOU -- DO YOU WANT TO TAKE A
SECOND TO DETERMINE IF THAT IS WITHIN THE SCOPE OF HIS REPORT?

**342**

1  MR. BEST: IT MAY TAKE ME MORE THAN A SECOND.
2  THE COURT: THAT'S WHAT I MEAN. I'LL GIVE YOU A LITTLE
3  TIME TO DO THAT. AND I'M GOING TO GET MY REPORT HERE, TOO.
4  MR. BEST: THIS MAY HAVE BEEN COVERED IN HIS DEPOSITION
5  AS WELL, YOUR HONOR. IT'S GOING TO TAKE ME AWHILE TO FIND IT.
6  THE COURT: IT'S THE REPORT THAT CONTROLS, NOT THE
7  DEPOSITION.
8  MR. ALDOCK: YOUR HONOR, IF WE LOOK AT DEPOSITION --
9  THE COURT: WAIT. LET ME GET YOU BACK ON AUDIO.
10  MR. ALDOCK: IF WE LOOK AT DEPOSITION PAGE 49, LINES 2
11  TO 11.
12  "QUESTION: IN FACT, YOU DIDN'T CONCERN YOURSELF
13  WITH ANY FRACTURES MORE THAN 15 OR 20 FEET AWAY FROM THE SOUTH
14  END OF THE SOUTH BREACH, CORRECT?
15  "YES -- "YEAH," IT SAYS.
16  AND THE CONCLUSIONS ARE ALL -- THERE ARE FOUR
17  CONCLUSIONS. THEY ARE ALL LABELED "SOUTH END OF SOUTH BREACH."
18  AND YOUR HONOR SUSTAINED AN OBJECTION TO THE FIFTH CONCLUSION,
19  WHICH WENT TO THE NORTH BREACH.
20  MR. BEST: BUT THE OBJECTION HAD NOTHING TO DO WITH THE
21  FACT THAT IT WAS THE NORTH BREACH. THE OBJECTION TO THE FIFTH
22  CONCLUSION WAS BECAUSE IT REFERRED TO THE WEIGHT OF THE WITNESS'
23  TESTIMONY.
24  AND FURTHERMORE, THIS TESTIMONY IS ABOUT SCRATCHES
25  THAT CONTINUE FROM THE SOUTH BREACH THAT HE EXAMINED UP TO THE

**343**

1  NORTH BREACH, AND NOT ABOUT FRACTURES. SO THE FACT THAT HIS
2  FRACTURE ANALYSIS HAS TO DO WITH THE SOUTH BREACH DOESN'T MEAN
3  THAT HE'S DEAF, DUMB AND BLIND AS TO FACTUAL -- THIS IS A FACTUAL
4  OBSERVATION THAT HE MADE FROM REVIEW OF PHOTOGRAPHS, AND I DON'T
5  THINK IT HAS TO BE IN HIS REPORT FOR HIM TO HAVE RECOUNTED IT.
6  MR. ALDOCK: YOUR HONOR, MAY I READ ONE MORE DEPOSITION
7  QUESTION AND ANSWER?
8  THE COURT: YES, YOU MAY.
9  MR. ALDOCK: PAGE 59, LINE 10.
10  "ARE YOU SAYING THAT -- IN HOW MANY PANELS DID YOU
11  SEE THE FRACTURE?
12  "WELL, WE'RE ONLY TALKING ABOUT THE SOUTHERNMOST
13  PANEL AND THE SECOND TO THE SOUTHERNMOST PANEL. THESE ARE THE
14  ONLY PANELS THAT WE LOOKED AT."
15  MR. BEST: FOR FRACTURES.
16  MR. ALDOCK: PANELS.
17  EXAMINATION
18  BY MR. BEST:
19  Q. AM I CORRECT, SIR?
20  A. EXACTLY CORRECT.
21  MR. BEST: THE SUBJECT OF THAT IS FRACTURES. THE
22  WITNESS HAS JUST TESTIFIED HE'S LOOKED AT A NUMBER OF PHOTOGRAPHS
23  FOR HIS WORK.
24  THE COURT: HAS ANY EXPERT USED THIS INFORMATION TO
25  RENDER AN OPINION? THE FACT THAT HE SAYS HE SAW SCRATCHES, HE'S

**344**

NOT GOING TO BE ABLE TO RENDER AN OPINION ON IT. SO IS ANYBODY
ELSE GOING TO MAKE ANY EXTRAPOLATION FROM THIS THAT HE RELIED ON?
SO WHAT, IS MY -- IF HE'S NOT GOING TO RENDER AN EXPERT OPINION.
I'M CERTAINLY NOT GOING TO.
MR. ALDOCK: HERE WE GO. PAGE 97 OF HIS DEPOSITION HE
WAS ASKED BY THE DEFENSE, I BELIEVE, "HAVE YOU SEEN ANY
PHOTOGRAPHIC OR OTHER EVIDENCE OF ANY CONTACT BELOW THE CAP OR
THE 3-FOOT MARK IN THE NORTHERN BREACH AREA?"
HE SAYS, "I DO HAVE PHOTOGRAPHS OF SCRAPE MARKS ON
THE WALL. AND I BELIEVE THEY ARE BELOW THE CONSTRUCTION JOINT.
AND THOSE SCRAPE MARKS, I WOULD EXPECT TO HAVE ALSO BEEN CAUSED
BY THE BARGE BECAUSE THAT IS ORDINARILY DRY LAND IN FRONT OF THE
FLOODWALL."
THE COURT: THAT'S AN OPINION, SIR.
MR. BEST: AND IT WAS GIVEN AT THE TIME OF HIS
DEPOSITION.
THE COURT: I UNDERSTAND. DEPOSITIONS ARE NOT EXPERT
REPORTS. THEY ARE NOT. YOU NEED TO SUPPLEMENT IT IF IT'S NOT IN
HIS REPORT. THEY ARE NOT. I MEAN, I TRIED TO MAKE THAT CLEAR.
MR. BEST: OKAY.
THE COURT: THAT'S WHY WE HAVE A RULE.
MR. BEST: BUT, YOUR HONOR, IT'S NOT STRIKING HIS
TESTIMONY THAT THE PHOTOGRAPHS HE REVIEWED SHOW MARKS ALONG THE
WALL BETWEEN THE NORTH AND SOUTH BREACH. THAT IS NOT AN OPINION,
THAT IS AN OBSERVATION OF A PHOTOGRAPH.

**345**

THE COURT: IT'S FACTUAL TESTIMONY. I'LL ALLOW HIM TO
SAY SOMETHING OBSERVED.
MR. BEST: WELL, HE SAID IT. I DON'T NEED HIM TO SAY IT
AGAIN. I JUST WANTED TO MAKE SURE IT WASN'T STRICKEN.
EXAMINATION
BY MR. BEST:
Q. FINALLY, SIR, YOU'VE GOT THREE OTHER PHOTOGRAPHS WE HAVEN'T
REFERRED TO YET ON THE ELMO. FIGURE NUMBER 1, THIS IS THE
FLORIDA AVENUE BRIDGE; IS THAT CORRECT?
A. THAT'S CORRECT.
Q. AND WHAT WE SEE HERE IS THE NORTH BREACH?
A. THAT'S CORRECT.
Q. AND THIS --
THE COURT: DO YOU WANT TO -- IT'S PRETTY OBVIOUS,
BUT -- YOU PROBABLY DON'T WANT THAT FOR THE RECORD. GO AHEAD.
MR. BEST: THE NORTH BREACH WOULD BE, OBVIOUSLY, TO THE
RIGHT OF WHERE THE FLORIDA BRIDGE.
MR. ALDOCK: YOUR HONOR, I'M NOT SURE WHERE WE'RE GOING,
BUT YOUR HONOR SUSTAINED AN OBJECTION TO THE ONLY CONCLUSION THAT
HE HAD IN HIS REPORT DEALING WITH THE NORTH BREACH.
THE COURT: I DON'T KNOW WHERE WE'RE GOING EITHER.
MR. BEST: WELL, THIS IS A FACTUAL MATTER.
EXAMINATION
BY MR. BEST:
Q. THE BUILDING UP IN THE UPPER LEFT-HAND PHOTOGRAPH THAT -- IN

**346**

1  FACT, I ASKED OUR LAST WITNESS ABOUT, MR. ADAMS -- BASED UPON THE
2  MATERIALS YOU'VE REVIEWED, THAT'S THE PUMP STATION WHERE
3  MR. VILLAVASSO WAS STANDING?
4  A.  THAT'S CORRECT.
5      THE COURT:  THAT'S FAIR ENOUGH.  NOT A MATTER OF
6  CONTROVERSY, I DON'T THINK.
7              EXAMINATION
8  BY MR. BEST:
9  Q.  AND FIGURE NUMBER 2, IS THE FLOODWALL FAILURE AT THE NORTH
10 BREACH?
11 A.  THIS IS THE NORTHERNMOST END OF THE NORTHERN BREACH SHOWING
12 THE PUMPING STATION THE BACKGROUND AND THE DOOR THAT
13 MR. VILLAVASSO REPORTEDLY STOOD AT.
14 Q.  NOW, YOUR OPINION IS THAT THERE WAS ENTRY OF THE BARGE AT
15 THE SOUTH BREACH; IS THAT CORRECT?
16 A.  THAT'S CORRECT.
17 Q.  AND YOU'VE NOT GIVEN ANY OPINION THAT THE BARGE ENTERED AT
18 THIS LOCATION?
19 A.  THAT'S CORRECT.
20 Q.  IN FACT, THE PHOTOGRAPHS DO NOT INDICATE A BARGE ENTERING AT
21 THIS LOCATION?
22 A.  WE DON'T HAVE ANY INFORMATION TO INDICATE THE BARGE WENT
23 THROUGH AT THIS LOCATION.
24 Q.  AND JUST HYPOTHETICALLY, ASSUMING THAT AT THE TIME, IF THAT
25 THE BARGE WAS EARLIER AT THAT LOCATION, THE WATER LEVELS WERE

**347**

1  LOWER, IT WAS SOME PERIOD OF TIME BEFORE THE SOUTH BREACH, THE
2  CIRCUMSTANCES WOULD NOT HAVE BEEN PRESENT AS THEY WERE AT THE
3  SOUTH BREACH WHERE THE BARGE DID GO THROUGH?
4  A.  THAT'S CORRECT.
5  Q.  SO THERE IS NO INCONSISTENCY BETWEEN THE TWO LOCATIONS IN
6  TERMS OF YOUR OPINION ABOUT WHAT HAPPENED AT THE SOUTH BREACH?
7  A.  THAT'S CORRECT.
8      AS WE REPORTED IN OUR REPORT, IF THE BARGE STRIKES THE
9  FLOODWALL AT A LOWER ELEVATION, AN ELEVATION WHERE ITS STRIKE
10 WOULD BE ABSORBED BY THE INTERLOCKING SHEET PILES.  THE SHEET
11 PILES, BEING MADE OF STEEL WITH THEIR BENDS IN THEM AND THEIR
12 INTERLOCKING JOINTS, WOULD BE ABLE TO DISSIPATE ENERGY MORE
13 READILY THAN A BRITTLE MATERIAL LIKE THE CONCRETE ABOVE A
14 CONSTRUCTION JOINT.
15     SO IT WOULD BE ABLE TO ABSORB AND DISSIPATE THE ENERGY
16 FROM A CONTACT WITH THE BARGE WITHOUT LEADING TO THE DAMAGE WE
17 SEE AT THE SOUTHERN BREACH.
18 Q.  OKAY.  NOW, YOU ALSO DID A SECOND AND A SUPPLEMENTAL REPORT
19 ON THE EFFECT OF SALTWATER WETTING OF THINGS INSIDE THE
20 NINTH WARD?
21 A.  THAT'S CORRECT.
22 Q.  AND THAT REPORT IS ALSO IN EVIDENCE.  THE COURT ALREADY HAS
23 IT.  THE COURT HAS READ IT.
24     WHAT WAS THE BASIS, WHAT INFORMATION DID YOU USE TO
25 REACH THE CONCLUSIONS YOU DID ABOUT SALTWATER DAMAGE IN THE

**348**

NINTH WARD?
A.  WELL, AS A CORROSION ENGINEER, WE ARE FREQUENTLY ASKED TO
ISSUE AND OFFER OPINIONS WITH REGARDS TO EFFECT OF SALT.  AND SO
OUR OPINION SIMPLY WAS THAT IF SALTWATER IS ALLOWED TO INUNDATE A
STRUCTURE, THAT THE SALT WILL REMAIN BEHIND INSIDE THE CAVITIES
OF THE STRUCTURE AND COAT ANY METALLIC ITEMS IN THERE, NAILS,
SCREWS, SEWER PIPES, HANGERS, DUCTS, AND THAT THE SALT WILL
PERSIST AND THAT THE SALT WILL CAUSE ACCELERATED CORROSION OF
THESE ITEMS.
    IT CAN'T BE REMOVED WITHOUT BEING RINSED OFF BECAUSE
SALT IS NOT A REACTANT OF THE CHEMICAL REACTION.  IT JUST LOWERS
THE DEW POINT AND IT MAKES THE CORROSION REACTION GO MORE EASILY
AND MORE QUICKLY.
Q.  I PROBABLY OVERSTATED MY QUESTION.  I WAS LOOKING FOR
SOMETHING MORE IN THE NATURE OF A PREDICATE.
    I UNDERSTAND YOUR OPINION ABOUT THE EFFECTS OF SALT AND
WHAT IT DID TO ITEMS IN THE NINTH WARD.  WHAT WAS THE BASIS FOR
THE OPINION OTHER THAN YOUR KNOWLEDGE AS A METALLURGIST?  WHAT
WAS THE STARTING POINT?  I THINK YOU HAD SOME TEST RESULTS FROM
SOMEONE ELSE.
A.  YES.  WE HAD RESULTS FROM AN ENVIRONMENTAL ENGINEER WHO HAD
SHOWN THAT THERE WAS RESIDUAL SALT IN THE SOIL.
Q.  THAT WAS AURORA ENVIRONMENTAL?
A.  YES.
Q.  YOU HAD A REPORT FROM THEM ABOUT THE RESULTS OF THEIR

**349**

TESTING FOR SALT?
A.  YES.
Q.  AND I GATHER YOU'VE ALSO SEEN THE DEPOSITION TESTIMONY OF
MR. FOSSIER, WHO ACTUALLY WENT OUT AND DID THE SAMPLING?
A.  I BELIEVE SO, YES.
Q.  AND SO BASED UPON THOSE SALINITY LEVELS DISCLOSED IN THAT
TESTING OF ITEMS WITHIN THE NINTH WARD, YOU REACHED AN OPINION,
FROM A METALLURGICAL STANDPOINT, THAT THERE IS GOING TO BE A LOT
OF DAMAGE THAT PERSISTS LONG AFTER THE FLOODWATERS HAVE
RETREATED?
A.  THAT'S CORRECT.
Q.  AND THINGS INSIDE HOMES, LIKE WIRING AND PLUMBING AND EVEN
NAILS AND STAPLES AND HURRICANE STRAPS, ALL SORTS OF THINGS OF
THAT NATURE ARE GOING TO BE DAMAGED AND CONTINUE TO BE DAMAGED
FOR SOME PERIOD OF TIME AFTER THE FLOODWATERS HAVE GONE AWAY?
A.  THAT'S CORRECT.
Q.  SO IF SOMEBODY IS LOOKING TO REPAIR THOSE HOUSES, THEY HAVE
GOT A LOT OF METAL THEY'VE GOT TO LOOK AT?
A.  YES.
Q.  HAVE I -- DID I -- HAVE I INCLUDED ALL THE SIGNIFICANT
THINGS FROM YOUR IS SALINITY REPORT?
A.  YES.
    MR. BEST:  JUST ONE MOMENT.
     I TENDER THE WITNESS.
    THE COURT:  THANK YOU VERY MUCH, MR. BEST.

```
                                                              350
 1           SINCE THE CROSS WILL TAKE A LITTLE WHILE, WE'LL
 2   TAKE A LUNCHEON BREAK.  AND IS AN HOUR SUFFICIENT FOR LUNCH?
 3           MR. ALDOCK:  FINE, YOUR HONOR.
 4           THE COURT:  WE WILL COME BACK APPROXIMATELY
 5   1:00 O'CLOCK.
 6           THANK YOU, SIR.
 7           THE COURT SECURITY OFFICER:  ALL RISE.
 8           (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE COURT
 9   WAS IN LUNCHEON RECESS.)
10                            * * *
11
12                     REPORTER'S CERTIFICATE
13
         I, CATHY PEPPER, CERTIFIED REALTIME REPORTER, REGISTERED
14   MERIT REPORTER, REGISTERED PROFESSIONAL REPORTER, CERTIFIED COURT
     REPORTER OF THE STATE OF LOUISIANA, OFFICIAL COURT REPORTER FOR
15   THE UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF LOUISIANA,
     DO HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT
16   TRANSCRIPT, TO THE BEST OF MY ABILITY AND UNDERSTANDING, FROM THE
     RECORD OF THE PROCEEDINGS IN THE ABOVE-ENTITLED AND NUMBERED
17   MATTER.
18
                         S/CATHY PEPPER
19                       CATHY PEPPER, CRR, RMR, CCR
                         OFFICIAL COURT REPORTER
20                       UNITED STATES DISTRICT COURT
21
22
23
24
25
```

```
                                                                      351
                       UNITED STATES DISTRICT COURT
                       EASTERN DISTRICT OF LOUISIANA


    IN RE:  KATRINA DREDGING       *   Civil Action
    LIMITATION ACTION              *
    CONSOLIDATED LITIGATION        *   No. 05-4182
                                   *
                                   *   Section K(2)
    PERTAINS TO:                   *
    BARGE                          *   New Orleans, Louisiana
                                   *
    MUMFORD, C.A. NO. 05-5724, AS  *   June 22, 2010
    TO PLAINTIFFS JOSEPHINE        *
    RICHARDSON AND HOLLIDAY        *   Afternoon Session
    JEWELERS, INC., ONLY           *
    AND                            *
    BENOIT, C.A. NO. 06-7516, AS   *
    TO PLAINTIFFS JOHN ALFORD AND  *
    JERRY ALFORD ONLY              *
    * * * * * * * * * * * * * * * *
                              DAY TWO
                       BENCH TRIAL BEFORE THE
                  HONORABLE STANWOOD R. DUVAL, JR.
                     UNITED STATES DISTRICT JUDGE


    APPEARANCES:

    For the Plaintiffs:        Best Koeppel
                               BY:   LAURENCE E. BEST, ESQ.
                               BY:   PETER S. KOEPPEL, ESQ.
                               2030 St. Charles Avenue
                               New Orleans, Louisiana 70130

    For the Plaintiffs:        Law Offices of Brian A. Gilbert
                               BY:   BRIAN A. GILBERT, ESQ.
                               2030 St. Charles Avenue
                               New Orleans, Louisiana  70130


             JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                       UNITED STATES DISTRICT COURT
                       EASTERN DISTRICT OF LOUISIANA
```

## 352

APPEARANCES:

For the Plaintiffs:    Wiedemann & Wiedemann
                       BY: KARL WIEDEMANN, ESQ.
                       BY: LAWRENCE WIEDEMANN, ESQ.
                       821 Baronne Street
                       New Orleans, Louisiana 70113

For the Plaintiffs:    Patrick J. Sanders, LLC
                       BY: PATRICK J. SANDERS, ESQ.
                       3316 Ridgelake Drive
                       Suite 100
                       Metairie, Louisiana 70002

For the Plaintiffs:    Law Office of Richard T. Seymour,
                       P.L.L.C.
                       BY: RICHARD T. SEYMOUR, ESQ.
                       1150 Connecticut Avenue N.W.
                       Suite 900
                       Washington, D.C. 20036-4129

For the Plaintiffs:    Khorrami, Pollard & Abir, LLP
                       BY: SHAWN KHORRAMI, ESQ.
                       444 S. Flower Street
                       33rd Floor
                       Los Angeles, California 90071

For the Plaintiffs:    Wilson, Grochow, Druker & Nolet
                       BY: LAWRENCE A. WILSON, ESQ.
                       233 Broadway
                       5th Floor
                       New York, New York 10279

For the Defendant:     Chaffe, McCall, L.L.P.
                       BY: DEREK A. WALKER, ESQ.
                       BY: CHARLES P. BLANCHARD, ESQ.
                       1100 Poydras Street, Suite 2300
                       New Orleans, Louisiana 70163

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 353

APPEARANCES:

For the Defendant:     Goodwin Procter, L.L.P.
                       BY: JOHN ALDOCK, ESQ.
                       BY: MARK RAFFMAN, ESQ.
                       BY: ADAM CHUD, ESQ.
                       BY: KIRSTEN ROBBINS, ESQ.
                       BY: ERIC I. GOLDBERG, ESQ.
                       901 New York Avenue, NW
                       Washington, D.C. 20001

For the Defendant:     Sutterfield & Webb
                       BY: DANIEL A. WEBB, ESQ.
                       650 Poydras Street, Suite 2715
                       New Orleans, Louisiana 70130

For the Defendant:     Lafarge North America, Inc.
                       BY: PETER KEELY, ESQ.
                       12950 Worldgate Drive
                       Herndon, Virginia 20170

Official Court Reporter:   Jodi Simcox, RMR, FCRR
                           500 Poydras Street
                           Room HB-406
                           New Orleans, Louisiana 70130
                           (504) 589-7780

Proceedings recorded by mechanical stenography, transcript produced by computer.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 354

                            I N D E X
                                                  Page

ROBERT BARTLETT
    Cross-Examination                              355
GERTRUDE LEBLANC
    Direct Examination                             366
    Cross-Examination                              379
    Redirect Examination                           385

FRAZIER TOMPKINS, III
    Direct Examination                             387
    Cross-Examination                              404
    Redirect Examination                           409
DONALD JOSEPH GREEN
    Direct Examination                             417
    Voir Dire                                      424
    Direct Examination                             431
    Voir Dire                                      437
    Direct Examination                             441
    Direct Examination                             452

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 355

12:44:21            AFTERNOON SESSION
12:44:21            (June 22, 2010)
12:44:21            * * * * *
12:44:46            THE DEPUTY CLERK: All rise.
13:08:34            THE COURT: Be seated. Okay. Are you ready to
13:08:41    proceed?
13:08:42            MR. ALDOCK: I am. John Aldock for Lafarge.
13:08:47            (WHEREUPON, Robert Bartlett, having been previously
13:08:47    duly sworn, testified as follows.)
13:08:48                    CROSS-EXAMINATION
13:08:48    BY MR. ALDOCK:
13:08:49    Q. Dr. Bartlett, let me show you a slide from your report --
13:08:55    well, actually, it's Defendant's 70, page 2, a familiar slide
13:09:00    to all of us.
13:09:02        The area we're talking about throughout your direct
13:09:07    testimony, Dr. Bartlett, is this little thing between the end
13:09:13    of the wall here and where it starts to curve; right? It's
13:09:18    this piece?
13:09:19    A. That's correct. And if I could just -- I'm not
13:09:22    Dr. Bartlett. It's Mr. Bartlett.
13:09:25    Q. Okay. Thank you. Promotion. You don't want it?
13:09:27    A. That's fine. Thank you.
13:09:29    Q. Okay.
13:09:30        So that means, does it not, that you didn't concern
13:09:36    yourself with any of this?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

356

```
13:09:40   1   A.  The evaluation of that area was done by Mr. Marino and
13:09:44   2   Mr. Pazos.  That was not an area that I was asked to
13:09:48   3   investigate.
13:09:48   4   Q.  So you have no views about this huge bow that -- in the
13:09:55   5   floodwall that is in the photographs here, you have no views at
13:09:57   6   all?
13:09:58   7   A.  Correct.
13:09:59   8   Q.  Right.
13:10:00   9       The -- in fact, you really only concerned yourself
13:10:06  10   with what you said, I think at your deposition, was the
13:10:11  11   panel -- the two panels here and no more than 15, 20 feet on
13:10:17  12   either side of it.
13:10:18  13   A.  Well, that was the -- that general area, the southern end
13:10:22  14   of the south breach.
13:10:23  15   Q.  Right.
13:10:24  16   A.  That, as I pointed out --
13:10:26  17   Q.  Where there is no wall.  We can see it, right before the
13:10:31  18   curve; right?
13:10:32  19   A.  As I pointed out earlier, the adjacent panel that has the
13:10:37  20   cap still remained.
13:10:38  21   Q.  Right.  And the fractures that you refer to in your report
13:10:40  22   involve the bending of the rebar inside the concrete cap,
13:10:46  23   right, and the concrete cap around it?  That's the fractures
13:10:51  24   you're referring to?
13:10:52  25   A.  Well, just to make sure that -- not the bending of the
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

357

```
13:11:00   1   rebar while it was inside the cap.  In other words, the bending
13:11:04   2   of the rebar above the construction joint.
13:11:13   3   Q.  Right.
13:11:14   4       MR. ALDOCK:  Your Honor, I'm going to be -- just
13:11:15   5   notice to Counsel -- as Your Honor knows from our summary
13:11:19   6   judgment motion, that we agree with very much of what this
13:11:23   7   witness says.
13:11:23   8       THE COURT:  Yes.
13:11:23   9       MR. ALDOCK:  The barge came through at that point, it
13:11:26  10   bent that rebar, and this is not --
13:11:28  11       THE COURT:  I realize that.
13:11:30  12       MR. ALDOCK:  It's not rocket science, it's not in
13:11:32  13   contest, but -- so I'll be brief, maybe 15 minutes.
13:11:38  14   BY MR. ALDOCK:
13:11:38  15   Q.  When the barge contacted the southern end of the southern
13:11:41  16   breach, the water was quite high, wasn't it?
13:11:44  17   A.  Yes.
13:11:45  18   Q.  Would you say about 12 feet?
13:11:48  19   A.  Well, the -- I understand the elevations marked on the
13:11:54  20   blueprint don't necessarily correspond to, for example, sea
13:11:59  21   level.  So if we would just say that the bottom of the barge
13:12:02  22   was at or above the elevation of the construction joint --
13:12:06  23   Q.  Correct.
13:12:06  24   A.  -- on the floodwall.
13:12:11  25   Q.  Well, let's look at slide 6 from your report.  This is
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

358

```
13:12:18   1   something you talked about on direct.  The -- this is the --
13:12:25   2   what we're referring to as the concrete cap, what I've shaded?
13:12:29   3   A.  Yes.
13:12:29   4   Q.  It wasn't shaded in your report?
13:12:33   5   A.  That's correct.
13:12:34   6   Q.  And the construction joint here?
13:12:34   7   A.  That's correct.
13:12:34   8   Q.  And the rebar is sort of a foot or so below?
13:12:38   9   A.  Well, no.  I believe what you are pointing at is the top
13:12:43  10   of the sheet pile.
13:12:44  11   Q.  Yes, the sheet pile.  I'm sorry.  I misspoke.  I meant to
13:12:48  12   say the sheet pile.  About a foot and a half below?
13:12:52  13   A.  I believe it's 6 inches.
13:12:57  14   Q.  Okay.  I'll take that for now.  We may quarrel later, but
13:13:01  15   for now that's all right.
13:13:02  16   A.  I think I had said earlier less than a foot.
13:13:05  17   Q.  Okay.  So what you're telling us today is that the barge
13:13:08  18   contact that we discussed in your direct was about where the
13:13:12  19   line is, somewhere right around here; right?
13:13:17  20   A.  No.  I'm saying --
13:13:19  21   Q.  Near or above the line?
13:13:21  22   A.  Well, you're saying the contact.  I'm saying the bottom --
13:13:27  23   Q.  The bottom of the barge.
13:13:29  24   A.  Right.  So because the front of the barge has curvature to
13:13:32  25   it, the point of contact would have been above.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

359

```
13:13:35   1   Q.  It would have been higher?
13:13:37   2   A.  Correct.
13:13:37   3   Q.  Right.  So the contact is all up here above there?
13:13:41   4       MR. BEST:  Objection to the form.  You mean the
13:13:42   5   initial contact.
13:13:46   6       MR. ALDOCK:  Let him answer the question.
13:13:47   7       MR. BEST:  Well, I object to the question as vague
13:13:50   8   and ambiguous.
13:13:52   9       THE COURT:  Just to let Mr. Aldock know, I'm assuming
13:13:55  10   you mean the initial contact.  I'm assuming when the -- when
13:13:58  11   the barge first impacted that area.  That's what I'm assuming.
13:14:03  12   So I have to -- I know we're talking about the entire continuum
13:14:08  13   of the barge movement through the wall, which would be a lot
13:14:11  14   more complex.
13:14:13  15       MR. ALDOCK:  Well, I'm not sure.
13:14:14  16   BY MR. ALDOCK:
13:14:15  17   Q.  Mr. Bartlett, the initial contact was up here; right?
13:14:18  18   A.  Yes, just a few inches above the construction joint, or
13:14:21  19   above that.
13:14:22  20       THE COURT:  Let him finish his answers.  Okay?
13:14:25  21       He's finished.  Go ahead.
13:14:26  22   BY MR. ALDOCK:
13:14:26  23   Q.  And then the barge comes through?
13:14:28  24   A.  Correct.
13:14:29  25   Q.  And that's -- and it does localized damage to that cap?
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

### 360

```
13:14:35   1   A.  Yes.
13:14:46   2   Q.  So the impact's at least 6 inches, if not a foot or more,
13:14:53   3   above the sheet pile?
13:14:55   4   A.  Yes.
13:15:08   5   Q.  Now, you say that once the cap is damaged, the water can
13:15:12   6   flow over the top of the cap where the concrete is sheared off?
13:15:18   7       I mean, if what you're saying, as I understand it --
13:15:20   8   tell me if I've got it right.  If you displace some of this --
13:15:24   9   this concrete cap makes a hole, and to the extent there's a
13:15:31  10   hole, water comes through?
13:15:32  11   A.  Correct.  But -- and you started that question -- were you
13:15:36  12   reading from my report when you -- when you made that
13:15:38  13   statement?  I just didn't know what you --
13:15:41  14   Q.  I was reading from your declaration for summary judgment.
13:15:45  15   A.  All right.
13:15:46  16   Q.  Okay.  So you also said, I believe, in your declaration --
13:15:55  17   and we could put it up.  It's slide 8.
13:16:00  18        MR. BEST:  Just note an objection to the form.  I
13:16:02  19   don't know that there's anything to impeach the witness over to
13:16:06  20   cross him on his declaration.
13:16:08  21        MR. ALDOCK:  If I put it up there, you're going to
13:16:11  22   tell me you want me to show it to you, and if I don't show it
13:16:13  23   to you --
13:16:14  24        MR. BEST:  I just think the proper way --
13:16:16  25        MR. ALDOCK:  -- I'm happy -- I'm not impeaching him.
```

### 361

```
13:16:18   1   I am not impeaching the witness.
13:16:18   2        THE COURT:  If he's not impeaching him, this is just
13:16:20   3   to facilitate the question, I'm going to allow it.
13:16:24   4        MR. BEST:  Thank you.
13:16:24   5   BY MR. ALDOCK:
13:16:24   6   Q.  So what you're saying here is that -- that -- you prefaced
13:16:28   7   it by saying that you agreed with Dr. Cushing, as long as he's
13:16:40   8   not referring to secondary effects to water flowing through the
13:16:43   9   opening.  That's what you basically just said.
13:16:46  10        You agreed with Dr. Cushing on the -- on the impact.
13:16:49  11   But you wanted to make sure, as I understand that, that he's
13:16:53  12   not minimizing the fact that if you displace concrete, water
13:16:56  13   comes through?
13:16:57  14   A.  Yes.
13:17:06  15   Q.  But let's go back to the opening slide, Defendant's 70.
13:17:11  16        Mr. Bartlett, I take it that if the entire
13:17:14  17   neighborhood is flooded as a result of this failure -- take
13:17:19  18   this as a hypothetical.  The entire neighborhood is flooded as
13:17:23  19   a result of this failure.  Any -- no extra water really is
13:17:29  20   going to come through as a result of this localized contact,
13:17:32  21   because the water level would always be the same in the canal
13:17:38  22   and on the other side.
13:17:41  23   A.  Well, you're making a presumption --
13:17:44  24   Q.  I am.  I'm giving you a hypothetical.
13:17:47  25        MR. BEST:  To which I object, for the record.
```

### 362

```
13:17:50   1        THE COURT:  Well, the objection's overruled.  But I'd
13:17:52   2   like the questions to end and the answers to begin, and the
13:17:57   3   answers to --
13:17:58   4        MR. ALDOCK:  Sorry.
13:17:59   5        THE COURT:  -- from both of you.
13:18:01   6        Go ahead and answer that.
13:18:05   7        THE WITNESS:  So could you -- could you clarify the
13:18:06   8   presumption that you'd like me to understand on your part?
13:18:10   9   BY MR. ALDOCK:
13:18:10  10   Q.  Yes.
13:18:12  11       I want you to presume that as a result of all of this
13:18:16  12   movement of the floodwall, that this area has already been
13:18:22  13   flooded.  And I think that becomes obvious that then the -- if
13:18:28  14   the area is all flooded and the barge comes through, then the
13:18:33  15   water level is the same on both sides, the incremental concrete
13:18:39  16   that was displaced that we just talked about isn't going to do
13:18:43  17   anything.
13:18:44  18        MR. BEST:  I just object, to protect the record, that
13:18:45  19   there's no foundation for that hypothetical.
13:18:49  20        THE COURT:  Overruled.  This is an expert.
13:18:50  21        MR. BEST:  I understand, Your Honor.
13:18:51  22        THE COURT:  Overruled.  Overruled, sir.
13:18:52  23        MR. BEST:  May I finish what I was saying?
13:18:54  24        THE COURT:  You can finish, but I think you're
13:18:56  25   wasting a lot of time.  This is an expert witness.
```

### 363

```
13:18:58   1        MR. BEST:  It's an irrational hypothetical, I submit.
13:19:02   2        THE COURT:  Sir, that's not an objection.  That's
13:19:04   3   your speaking and trying to make an objection under the Federal
13:19:08   4   Rules of Evidence.  Where precisely -- what federal rule are
13:19:11   5   you relying on?  What federal rule are you relying on, sir?
13:19:13   6        MR. BEST:  There's not going to be supporting
13:19:15   7   evidence for that hypothetical.
13:19:16   8        THE COURT:  Well, that -- that requires a Nostradamus
13:19:19   9   ruling, which you're not.  Overruled.
13:19:26  10        THE WITNESS:  The -- the evaluation of the hydrology,
13:19:30  11   water levels and that sort of thing, this is -- these are areas
13:19:33  12   that Mr. Pazos and Mr. Marino are handling.
13:19:41  13        But I will tell you that if you're asking me, I
13:19:42  14   doubt that the water level could be high enough for the barge
13:19:45  15   to float with its bottom over the construction joint if this
13:19:50  16   entire 793 feet of floodwall is displaced and out of position
13:19:55  17   as you see it in this photograph.
13:19:56  18   BY MR. ALDOCK:
13:19:56  19   Q.  And is that an opinion that you have as a metallurgist?
13:19:59  20   A.  It's an opinion that I have as a mechanical engineer who
13:20:02  21   is knowledgeable in the area of fluid mechanics.
13:20:06  22       But as I said, this is an area that is covered in
13:20:09  23   more detail by Mr. Pazos and Mr. Marino.  But if you're asking
13:20:14  24   me -- if you're requiring me to answer --
13:20:17  25        THE COURT:  Once you ask a question, sir, you then --
```

4 (Pages 360 to 363)

## 364

```
13:20:19  you then open the gate to this witness answering as best he
13:20:22  can, regardless of his tendered area of expertise.
13:20:26          You may continue your answer, sir.
13:20:28          THE WITNESS:  Oh, I believe that I'm finished,
13:20:32  Your Honor.  Thank you.
13:20:32          THE COURT:  All right.  Thank you.
13:20:33  BY MR. ALDOCK:
13:20:33  Q.  The force by which the barge struck the cap, it was not
13:20:35  enough to break the rebar.  It only bent it; right?
13:20:40  A.  It's unlikely that you would break rebar by any force,
13:20:45  because it's typically not dull enough to bend without
13:20:52  fracturing it.
13:20:54  Q.  And the force in the area that we're discussing was not
13:20:57  enough to cause the sheet pile to separate; correct?
13:21:03  A.  Well, you have to get the force down to the sheet pile.
13:21:06  And that was, of course, one of the things we talked about in
13:21:11  our report, that the force was enough to cause the -- a cap to
13:21:16  come loose.  But the force could not be transferred down to the
13:21:21  sheet pile to cause the sheet pile to be disturbed.
13:21:28          So that, again, is another thing that says that the
13:21:31  wall was -- that the foundation of the wall, the soil, was
13:21:33  intact.
13:21:45          MR. ALDOCK:  That's all I have, Your Honor.
13:21:47          THE COURT:  Thank you, sir.
13:21:47          MR. BEST:  Nothing, Your Honor.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 365

```
13:21:48          THE COURT:  Thank you, sir.
13:21:49          And thank you, sir.
13:21:51          THE WITNESS:  Thank you very much.
13:22:46          THE COURT:  Okay.
13:22:52          MR. BEST:  One moment, Your Honor.
13:22:54          THE COURT:  Sure.
13:22:55          MR. BEST:  I'm assembling my materials.
13:23:10          Your Honor, we call Gertrude LeBlanc as our next
13:23:13  witness.
13:23:15          THE COURT:  Thank you, sir.
13:23:20          While Ms. LeBlanc is coming, just as a matter of
13:23:27  inquiry, is the -- has the Villavaso deposition been vetted?
13:23:31  Because we'll probably get to it today.
13:23:36          MR. SNYDER:  We're working on it, Your Honor.
13:23:38          THE COURT:  You're still working on it?
13:23:40          MR. SNYDER:  Yes, Your Honor.
13:23:55          THE COURT:  Okay.
13:23:55          Mr. Gilbert, I think you have a witness coming
13:23:57  in here.  There you go.  It's sort of hard to find your way up
13:24:01  here, ma'am.
13:24:02          (WHEREUPON, Gertrude LeBlanc, having been duly sworn,
13:24:02  testified as follows.)
13:25:04          THE DEPUTY CLERK:  Please state your full name and
13:25:04  correct spelling for the record.
13:25:08          THE WITNESS:  Gertrude LeBlanc, it's G-E-R-T-R-U-D-E,
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 366

```
13:25:16  L-E-B-L-A-N-C.
13:25:24                DIRECT EXAMINATION
13:25:25  BY MR. BEST:
13:25:32  Q.  Good afternoon, ma'am.  How old are you?  And I hate to
13:25:40  start with that question, and I apologize.
13:25:42  A.  74.
13:25:43  Q.  74.  And where do you live today?
13:25:45  A.  1738 Tennessee Street, New Orleans.
13:25:47  Q.  And is that the same Tennessee Street that's in the Ninth
13:25:52  Ward?
13:25:53  A.  Yes.
13:25:53  Q.  The Lower Ninth Ward?
13:25:55  A.  Yes.
13:25:56  Q.  How long have you lived at that address?
13:25:58  A.  About 45 years.  It might be longer.
13:25:59  Q.  So you lived at that address before Hurricane Katrina?
13:26:01  A.  Yes.
13:26:01  Q.  And since the storm, you've come back and rebuilt and
13:26:04  moved in again?
13:26:05  A.  Yes.
13:26:06  Q.  All right.
13:26:08          And at the time of Hurricane Katrina, who lived with
13:26:11  you at that address?
13:26:13  A.  Jennifer, my oldest daughter, and my granddaughter,
13:26:18  Leaura.  And my grandsons go and come.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 367

```
13:26:27  Q.  All right.  As Hurricane Katrina approached, what plans
13:26:29  did you make to deal with the storm?
13:26:30  A.  Well, I was -- like you see, you fill a container with
13:26:36  different things, items, but I didn't do that.  I really sat
13:26:42  down and watched what was going on in the Gulf.
13:26:51          MR. WALKER:  Your Honor, may I ask Mrs. LeBlanc to
13:26:57  come a little closer to the mic?
13:26:59          THE COURT:  Yes.  You were perfectly positioned a
13:27:00  little while ago.
13:27:00          THE WITNESS:  All right.
13:27:00          THE COURT:  That's good.  That's great.  Just stay
13:27:00  right there.
13:27:00          Go ahead, Mr. Best.
13:27:00  BY MR. BEST:
13:27:01  Q.  Before I get too far down that road, let us pull up again
13:27:05  the map of the neighborhood that we've been using.  That was
13:27:10  Plaintiffs' Exhibit 274.
13:27:11          And you have it on the screen in front of you as
13:27:14  well, Mrs. LeBlanc, so you can look at it.  I think you told us
13:27:18  you lived on Tennessee Street.
13:27:19  A.  Uh-huh.
13:27:20  Q.  Whereabouts on Tennessee?
13:27:22  A.  Between Derbigny and -- Roman does not go all the way
13:27:31  through, but Prieur would be the next street that goes through.
13:27:34  Q.  Okay.  So on Tennessee Street between the cross-street
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA