```
                                                                    351
 1                    UNITED STATES DISTRICT COURT
 2                    EASTERN DISTRICT OF LOUISIANA
 3
 4
 5     IN RE:  KATRINA DREDGING        *   Civil Action
       LIMITATION ACTION               *
 6     CONSOLIDATED LITIGATION         *   No. 05-4182
                                       *
 7                                     *   Section K(2)
       PERTAINS TO:                    *
 8     BARGE                           *   New Orleans, Louisiana
                                       *
 9     MUMFORD, C.A. NO. 05-5724, AS   *   June 22, 2010
       TO PLAINTIFFS JOSEPHINE         *
10     RICHARDSON AND HOLLIDAY         *   Afternoon Session
       JEWELERS, INC., ONLY            *
11     AND                             *
       BENOIT, C.A. NO. 06-7516, AS    *
12     TO PLAINTIFFS JOHN ALFORD AND   *
       JERRY ALFORD ONLY               *
13     * * * * * * * * * * * * * * * *
14                            DAY TWO
                      BENCH TRIAL BEFORE THE
15               HONORABLE STANWOOD R. DUVAL, JR.
                    UNITED STATES DISTRICT JUDGE
16
17
       APPEARANCES:
18
       For the Plaintiffs:       Best Koeppel
19                               BY:  LAURENCE E. BEST, ESQ.
                                 BY:  PETER S. KOEPPEL, ESQ.
20                               2030 St. Charles Avenue
                                 New Orleans, Louisiana 70130
21
       For the Plaintiffs:       Law Offices of Brian A. Gilbert
22                               BY:  BRIAN A. GILBERT, ESQ.
                                 2030 St. Charles Avenue
23                               New Orleans, Louisiana  70130
24
25
             JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                      UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF LOUISIANA
```

## 352

```
APPEARANCES:

    For the Plaintiffs:     Wiedemann & Wiedemann
                            BY:  KARL WIEDEMANN, ESQ.
                            BY:  LAWRENCE WIEDEMANN, ESQ.
                            821 Baronne Street
                            New Orleans, Louisiana  70113

    For the Plaintiffs:     Patrick J. Sanders, LLC
                            BY:  PATRICK J. SANDERS, ESQ.
                            3316 Ridgelake Drive
                            Suite 100
                            Metairie, Louisiana  70002

    For the Plaintiffs:     Law Office of Richard T. Seymour,
                              P.L.L.C.
                            BY:  RICHARD T. SEYMOUR, ESQ.
                            1150 Connecticut Avenue N.W.
                            Suite 900
                            Washington, D.C.  20036-4129

    For the Plaintiffs:     Khorrami, Pollard & Abir, LLP
                            BY:  SHAWN KHORRAMI, ESQ.
                            444 S. Flower Street
                            33rd Floor
                            Los Angeles, California  90071

    For the Plaintiffs:     Wilson, Grochow, Druker & Nolet
                            BY:  LAWRENCE A. WILSON, ESQ.
                            233 Broadway
                            5th Floor
                            New York, New York  10279

    For the Defendant:      Chaffe, McCall, L.L.P.
                            BY:  DEREK A. WALKER, ESQ.
                            BY:  CHARLES P. BLANCHARD, ESQ.
                            1100 Poydras Street, Suite 2300
                            New Orleans, Louisiana 70163
```

## 353

```
APPEARANCES:

    For the Defendant:      Goodwin Procter, L.L.P.
                            BY:  JOHN ALDOCK, ESQ.
                            BY:  MARK RAFFMAN, ESQ.
                            BY:  ADAM CHUD, ESQ.
                            BY:  KIRSTEN ROBBINS, ESQ.
                            BY:  ERIC I. GOLDBERG, ESQ.
                            901 New York Avenue, NW
                            Washington, D.C. 20001

    For the Defendant:      Sutterfield & Webb
                            BY:  DANIEL A. WEBB, ESQ.
                            650 Poydras Street, Suite 2715
                            New Orleans, Louisiana 70130

    For the Defendant:      Lafarge North America, Inc.
                            BY:  PETER KEELY, ESQ.
                            12950 Worldgate Drive
                            Herndon, Virginia  20170

    Official Court Reporter:  Jodi Simcox, RMR, FCRR
                              500 Poydras Street
                              Room HB-406
                              New Orleans, Louisiana 70130
                              (504) 589-7780

    Proceedings recorded by mechanical stenography, transcript
    produced by computer.
```

## 354

```
                          I N D E X
                                                        Page

ROBERT BARTLETT
    Cross-Examination                                   355
GERTRUDE LEBLANC
    Direct Examination                                  366
    Cross-Examination                                   379
    Redirect Examination                                385

FRAZIER TOMPKINS, III
    Direct Examination                                  387
    Cross-Examination                                   404
    Redirect Examination                                409
DONALD JOSEPH GREEN
    Direct Examination                                  417
    Voir Dire                                           424
    Direct Examination                                  431
    Voir Dire                                           437
    Direct Examination                                  441
    Direct Examination                                  452
```

## 355

```
12:44:21              AFTERNOON SESSION
12:44:21              (June 22, 2010)
12:44:21                  * * * * *
12:44:46         THE DEPUTY CLERK:  All rise.
13:08:34         THE COURT:  Be seated.  Okay.  Are you ready to
13:08:41   proceed?
13:08:42         MR. ALDOCK:  I am.  John Aldock for Lafarge.
13:08:47         (WHEREUPON, Robert Bartlett, having been previously
13:08:47   duly sworn, testified as follows.)
13:08:48                    CROSS-EXAMINATION
13:08:48   BY MR. ALDOCK:
13:08:49   Q.  Dr. Bartlett, let me show you a slide from your report --
13:08:55   well, actually, it's Defendant's 70, page 2, a familiar slide
13:09:00   to all of us.
13:09:02         The area we're talking about throughout your direct
13:09:07   testimony, Dr. Bartlett, is this little thing between the end
13:09:13   of the wall here and where it starts to curve; right?  It's
13:09:18   this piece?
13:09:19   A.  That's correct.  And if I could just -- I'm not
13:09:22   Dr. Bartlett.  It's Mr. Bartlett.
13:09:25   Q.  Okay.  Thank you.  Promotion.  You don't want it?
13:09:27   A.  That's fine.  Thank you.
13:09:29   Q.  Okay.
13:09:30         So that means, does it not, that you didn't concern
13:09:36   yourself with any of this?
```

## 384

```
13:44:38   THE COURT: Just one second. I'm sorry to interrupt
13:44:38   you.
13:44:38          (OFF THE RECORD)
13:44:39   THE WITNESS: Go ahead.
13:44:42   MR. WALKER: Thank you, Judge.
13:44:44   THE COURT: This is a systems issue --
13:44:47   MR. WALKER: We've had some of those.
13:44:50   THE COURT: -- that my Alabama friend and I've
13:44:53   discussed.
13:44:56   MR. WALKER: I'm happy to take a break, Your Honor.
13:44:59   THE COURT: No, no. That's okay.
13:45:02   BY MR. WALKER:
13:45:03   Q.  And Ms. LeBlanc, when you were telling the judge how close
13:45:06   the barge was, this car length, the water that you described
13:45:11   earlier, it was sort of halfway up the wall; is what you said?
13:45:14   A.  I'd say about halfway up that wall.
13:45:18   Q.  Okay.  Now, you don't know what happened to that barge
13:45:29   after you drove off to Pensacola, do you?  You never saw it
13:45:33   that day?
13:45:34   A.  Not that day.
13:45:34   Q.  Okay.  You don't know if the tug that left it there came
13:45:38   and picked it up that afternoon, do you?
13:45:40   A.  No.  I was gone.
13:45:57   MR. WALKER: Your Honor, I think that's all I have
13:45:59   for Ms. LeBlanc.  Thank you very much.
```

## 385

```
13:46:02   THE COURT: All right.  Thank you, sir.
13:46:03          Any redirect?
13:46:04   MR. BEST: Just very briefly.
13:46:05          REDIRECT EXAMINATION
13:46:05   BY MR. BEST:
13:46:06   Q.  Counsel asked you about your eyes.  Just for completeness,
13:46:09   that Sunday when you were going over the bridge with your
13:46:12   family, what was the weather like that Sunday morning as you
13:46:15   crossed the bridge?
13:46:16   A.  It was pleasant.
13:46:17   Q.  And what about sunshine, clouds, rain?
13:46:20   A.  No, there was no clouds, no rain.  It was a summer's day.
13:46:24   Q.  Sunny day?  Was it a sunny day as well?
13:46:27   A.  Yes, sunny day, uh-huh.
13:46:28   Q.  Did you have any trouble seeing this barge?
13:46:30   A.  No, sir.
13:46:32   Q.  Did -- did you see the entirety of this barge, that is
13:46:35   from one end to the other and side to side?
13:46:38   A.  I saw the whole barge sitting there.
13:46:40   Q.  And when you saw the whole barge sitting there, did you
13:46:44   see any other vessels moving around in the waterway at all?
13:46:48   A.  No, sir.
13:46:51   Q.  And I take it you don't know what time the waterway was
13:46:54   closed or the locks were closed to traffic?
13:46:56   A.  The locks?
```

## 386

```
13:46:57   Q.  Yeah.
13:46:57          You don't know what time they closed the locks?
13:47:00   A.  No, sir, I don't.
13:47:01   MR. BEST: Thank you, ma'am.
13:47:02   THE COURT: Thank you, ma'am.  You may step down.
13:47:04   You're released and thank you very much.
13:47:06   THE WITNESS: You're welcome, sir.
13:47:11          (OFF THE RECORD)
13:48:28   MR. BEST: Your Honor, our next witness is
13:48:30   approaching, Frazier Tompkins, III.
13:48:38   THE COURT: Yes.
13:48:38          (WHEREUPON, Frazier Tompkins, III, having been duly
13:48:38   sworn, testified as follows.)
13:49:44   THE DEPUTY CLERK: Please state your full name and
13:49:44   correct spelling for the record.
13:50:00   THE WITNESS: Frazier Tompkins.
13:50:04   THE DEPUTY CLERK: I need you to speak into the
13:50:06   microphone.  Could you move it a little bit?
13:50:08   THE WITNESS: Frazier Tompkins.
13:50:10   THE COURT: Perfect.  Do you want to spell it, sir,
13:50:12   just to make sure that we get your name right for posterity.
13:50:15   THE WITNESS: Frazier, F-R-A-Z-I-E-R, Tompkins,
13:50:19   T-O-M-P-K-I-N-S.
13:50:21   THE COURT: Thank you.
13:50:25          Mr. Walker, is the microphone there because he's
```

## 387

```
13:50:28   speaking --
13:50:28   THE DEPUTY CLERK: It sounds like it's --
13:50:29   MR. WALKER: I think he just has a very deep and
13:50:31   quiet voice, Your Honor.
13:50:33   THE COURT: I don't know.  Check that mic there,
13:50:36   Sheena.
13:50:48   MR. WALKER: It doesn't sound like the system is on,
13:50:52   Your Honor.
13:50:53   THE COURT: Oh, that's because the judge turned it
13:50:55   off.  The judge is, unfortunately, all too fallible himself.
13:50:58          Go ahead.
13:50:59          DIRECT EXAMINATION
13:50:59   BY MR. BEST:
13:51:00   Q.  Mr. Tompkins, as I understand it, it is Frazier Tompkins,
13:51:05   III?
13:51:05   A.  Correct.
13:51:05   Q.  And your address, sir?
13:51:06   A.  1310 Tricou, T-R-I-C-O-U, Street.
13:51:10   Q.  Where is that located?
13:51:11   A.  The Lower Ninth Ward.
13:51:12   Q.  How long have you lived there?
13:51:13   A.  Thirty-one years.
13:51:15   Q.  And did you -- obviously you lived there before Hurricane
13:51:18   Katrina?
13:51:19   A.  Correct.
```

## 388

```
13:51:20   Q.  All right.  Are you employed?
13:51:22   A.  Yes, I am.
13:51:23   Q.  What do you do?
13:51:24   A.  Truck driver.
13:51:26   Q.  And were you employed back in -- like August of 2005?
13:51:31   A.  Yes, sir.
13:51:32   Q.  What did you do then?
13:51:34   A.  Truck driver.
13:51:34   Q.  And what does it mean being a truck driver?  What did --
13:51:38   A.  I'm an owner/operator.
13:51:40   Q.  Owner/operator.  Of what?
13:51:41   A.  A dump truck.
13:51:43   Q.  And at that time, before the storm, did you have just a
13:51:45   single dump truck?
13:51:47   A.  No, I had several.
13:51:48   Q.  And so in addition to driving your own truck, did you have
13:51:51   other people that you would hire --
13:51:53   A.  Yes, I had other employees.
13:51:54   Q.  Okay.  Just to let you know, we can't talk at the same
13:51:57   time because it would be difficult for our court reporter.  And
13:52:00   if and when you wish to answer a question with a yes or no,
13:52:03   please say the word and don't just nod your head because we
13:52:06   want to get it down.
13:52:08           THE COURT:  Thank you, Mr. Best.
13:52:15           MR. BEST:  If the defendants would be so kind as to
```

## 389

```
13:52:17   have their tech operator call up DX-337, Exhibit 1, which is
13:52:24   the map that this witness used at the time of his deposition,
13:52:26   I'd be most appreciative.
13:52:29           THE COURT:  Thank you, defendants -- or defendant.
13:52:42   BY MR. BEST:
13:52:42   Q.  And you, sir, before you you'll see you have a screen
13:52:44   there with this same map that's close up that you can look at.
13:52:47   And up in the corner, there's a box you'll see that says,
13:52:54   "2143 Tricou Street."
13:52:58           That's your address?
13:53:00   A.  No, it isn't.
13:53:01   Q.  What was your number on Tricou Street?
13:53:07   A.  1310.
13:53:07           MR. BEST:  Okay.  Now, I remember.  I'm slow,
13:53:08   Your Honor.  We used this at the deposition, but it was not
13:53:11   originally his.
13:53:12   BY MR. BEST:
13:53:13   Q.  So 1310 -- Tricou Street runs which direction?
13:53:15   A.  It runs from the river to the lake.
13:53:18   Q.  Okay.  So we don't see the name on the map anywhere, but
13:53:22   if we go to the bottom of where that point is, that's Tricou
13:53:25   Street and we can follow it down to the river.
13:53:36           Well, let me ask it this way:  Do you also see
13:53:38   there's an X marked at 1310 Tricou Street?  Do you see we've
13:53:41   got the address written down at the paper with a line and the X
```

## 390

```
13:53:45   marked?
13:53:45   A.  Yes, I see it.
13:53:47   Q.  That's your home?
13:53:47   A.  Yes.
13:53:48   Q.  Okay.  And you lived at that address for many years prior
13:53:55   to the storm?
13:53:56   A.  Yes, sir.
13:53:56   Q.  Who lived there with you?
13:53:59   A.  Well, no one lived with me at the time.
13:54:01   Q.  At the time.  All right.
13:54:05       When did you last work before the storm?  Do you
13:54:08   remember your last workday?
13:54:11   A.  It must have been Friday before the storm.
13:54:14   Q.  All right.  And did you monitor the approach of the storm
13:54:17   Friday, Saturday and Sunday?
13:54:19   A.  Yes, I did.
13:54:19   Q.  And what decisions -- what did you decide to do about the
13:54:23   storm?
13:54:24   A.  Well, normally, what we do -- I would move my vehicles --
13:54:28   some of my vehicles out of harm's way.
13:54:33   Q.  Move them -- where did you normally keep your vehicles?
13:54:37   A.  At my house.
13:54:38   Q.  Okay.  And so you made a plan to move your vehicles
13:54:41   somewhere else?
13:54:42   A.  Yes, sir.
```

## 391

```
13:54:43   Q.  And for what purpose?
13:54:45   A.  In case water come.
13:54:47   Q.  Okay.  Is that something that you've done before for
13:54:52   storms?
13:54:53   A.  Yes, sir.
13:54:53   Q.  And how many vehicles did you have to move?
13:55:00   A.  I moved three vehicles.
13:55:02   Q.  And when did you do that?
13:55:07   A.  It must have been Saturday morning.
13:55:11   Q.  And did you do that alone or did you have help to do that?
13:55:15   A.  No, me and a friend of mine, we moved them together.
13:55:18   Q.  All right.  And then where did you stay Saturday night?
13:55:21   A.  At my home.
13:55:21   Q.  And what did you do on Sunday?
13:55:24   A.  Sunday morning I got up to go to church.
13:55:29   Q.  Okay.  I gather you had made a decision not to evacuate.
13:55:37   A.  Yes.
13:55:38   Q.  Okay.  Had you stayed through hurricanes before in the
13:55:40   Ninth Ward?
13:55:41   A.  Yes, sir.
13:55:41   Q.  Okay.  And Sunday morning, you say you got up to go to
13:55:44   church?
13:55:45   A.  Yes, sir.
13:55:45   Q.  All right.  What time did you leave your home?
13:55:50   A.  It must have been about 9:30, around 10:00.
```

## 392

```
13:55:54   Q.  And what time did your church usually start?
13:55:58   A.  I think about 10:00.
13:55:59   Q.  And you were dressed for church?
13:56:01   A.  Yes, I was.
13:56:02   Q.  All right.  Now, we also have a red dot on this map with
13:56:05       "church" written in.  And I believe you gave us that as an
13:56:09       indication, at the time of your deposition, as to where the
13:56:12       church you were going to was located.  Do you remember that?
13:56:15   A.  Yes, sir.
13:56:15   Q.  Is that an accurate representation of where the church you
13:56:18       were going to was located?
13:56:20   A.  Yes, sir.
13:56:20   Q.  What was the name of your church?
13:56:24   A.  Third Church of God and Christ.
13:56:27   Q.  I'm sorry.  Third Church of?
13:56:28   A.  God and Christ.
13:56:29   Q.  God and Christ.
13:56:30       How long had you been a member of that church?
13:56:31   A.  All my life.
13:56:32   Q.  And what did you do with respect to that church?  Were you
13:56:37       just somebody that went to church on Sunday, or did you have
13:56:39       other duties?
13:56:40   A.  I had other duties.
13:56:41   Q.  What were your other duties?
13:56:43   A.  One was I was assistant chairman of the finance board.
```

## 393

```
13:56:47       Another was I was a choir director.  I was a district choir
13:56:51       president at the church.  I was the maintenance man.  Whatever
13:56:59       you call -- I wore many hats.
13:57:02   Q.  You did it all?
13:57:02   A.  Yes, sir.
13:57:02   Q.  So when you went to go to church that Sunday morning, it
13:57:05       was to do more than just go to church for Sunday worship?
13:57:07   A.  Yes, sir.
13:57:08   Q.  It was to do all of those things that you ordinarily do?
13:57:11   A.  Yes, sir.
13:57:11   Q.  Had you had any communications from anybody before that
13:57:13       Sunday morning about whether or not services would be held?
13:57:16   A.  No, I didn't.
13:57:17   Q.  Okay.  So you got up and you left your house.  And about
13:57:20       how long did it take you to get from your house to the church?
13:57:23   A.  About three minutes.
13:57:24   Q.  Did you drive or did you walk?
13:57:26   A.  I drove.
13:57:26   Q.  And what did you drive?
13:57:28   A.  A van.
13:57:29   Q.  All right.  And what did you find when you got to the
13:57:33       church?
13:57:33   A.  I found the doors were locked.
13:57:35   Q.  And did you -- what did you do then?
13:57:37   A.  I sat and waited.
```

## 394

```
13:57:39   Q.  For how long?
13:57:42   A.  I sat about 15, 20 minutes.
13:57:45   Q.  All right.  So by the time you left the church -- and the
13:57:47       services normally would have started at 10:00?
13:57:50   A.  Yes, sir.
13:57:50   Q.  So it's about 10:15 or 10:20 when you gave up?
13:57:54   A.  Yes, sir.
13:57:55   Q.  Because no one else arrived?
13:57:57   A.  No one else arrived.
13:57:58   Q.  And you left.  And where did you go after that?
13:58:00   A.  I went toward Claiborne.
13:58:02   Q.  And where were you headed?
13:58:03   A.  I was going to go check the -- I had a problem with
13:58:06       checking the water level at the bridge.
13:58:10   Q.  Meaning the water level in the Industrial Canal?
13:58:12   A.  Correct.
13:58:13   Q.  You just wanted to go take a look-see?
13:58:17   A.  That's what I did.
13:58:17   Q.  Okay.  And was anybody with you?
13:58:19   A.  No, sir.
13:58:19   Q.  And so you left the church and you turned right on
13:58:22       Claiborne Avenue and went across the bridge over the Industrial
13:58:24       Canal?
13:58:25   A.  I turned left.
13:58:26       THE COURT:  Left.
```

## 395

```
13:58:26   BY MR. BEST:
13:58:27   Q.  I'm sorry, left.  And I'm looking right at the map.
13:58:33       MR. BEST:  Thank you both for correcting me.
13:58:34   BY MR. BEST:
13:58:35   Q.  And what do you remember about your trip over that bridge?
13:58:37   A.  Well, as I approached the bridge, I just went up normally
13:58:40       and I looked over to see the water level.  And I seen there
13:58:44       wasn't that much water in there at that time, but I seen the
13:58:48       barge sitting there.
13:58:49   Q.  Describe the barge to us.
13:58:52   A.  Pardon?
13:58:53   Q.  Describe the barge to us.
13:58:54   A.  It was just a large barge sitting there.
13:58:57   Q.  And somebody -- have you seen barges in the Industrial
13:59:01       Canal before during the years you've lived in the neighborhood?
13:59:05   A.  Yes.
13:59:05   Q.  Okay.  I guess what we'd kind of like to know is if you
13:59:08       remember anything about the shape or the color or the way this
13:59:11       thing looked.
13:59:12   A.  I don't remember the shape or color.  It was a big barge,
13:59:17       that's all.  I just noticed a barge.
13:59:19   Q.  Was there anything that stands out in your mind about it
13:59:22       being markedly different from other barges you saw routinely in
13:59:27       that canal?
13:59:27   A.  Not -- not really.
```

**396**

```
13:59:28  Q.  Okay.  Could you see inside the hull of the barge or not?
13:59:31  A.  I don't think I could see inside the hull.
13:59:33  Q.  Meaning it might have been a covered barge?
13:59:36  A.  It may have been.
13:59:37  Q.  And you don't remember anything as we sit here today about
13:59:40      the colors of whatever you saw?
13:59:42  A.  No, sir.
13:59:44  Q.  All right.  Now, as you're crossing the bridge, you're
13:59:50      looking and you're seeing this.  This is on your first crossing
13:59:53      over the bridge?
13:59:54  A.  Yes, sir.
13:59:54  Q.  So the barge is to your right?
13:59:58  A.  Yes, sir.
13:59:58  Q.  And you can see it over the bridge through the passenger
14:00:00      window?
14:00:01  A.  Yes, sir.
14:00:01  Q.  All right.  Could you see the whole barge or was part of
14:00:03      it under the bridge?
14:00:05  A.  I seen the whole barge.
14:00:06  Q.  The whole barge.
14:00:06      From one end to the other?
14:00:09  A.  Yes, sir.
14:00:09  Q.  Was it a single barge or more than one barge?
14:00:11  A.  One barge.
14:00:12  Q.  One barge.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**397**

```
14:00:13      And how was it situated or positioned in the waterway
14:00:16      as you saw it from your vehicle window?
14:00:20  A.  It was on a slight angle toward the levee.
14:00:23  Q.  Meaning one end of it was closer to the levee than the
14:00:26      other?
14:00:26  A.  Yes, it was.
14:00:27  Q.  Which levee are we talking about?
14:00:30  A.  The Chalmette side of the canal.
14:00:32  Q.  The Chalmette -- the east side and the Lower Ninth Ward
14:00:34      side?
14:00:34  A.  Yes, sir.
14:00:35  Q.  So one end of it was closer to that floodwall?
14:00:37  A.  Yes, sir.
14:00:38  Q.  And was it the end closest to you or the end furthest away
14:00:44      from you that was closest to the floodwall?
14:00:46  A.  The end closest -- say it again.
14:00:49  Q.  I'll ask it again.
14:00:50      You said one end was closer to the floodwall than the
14:00:53      other.  So I want to know if the end that was closest to the
14:00:55      floodwall was the end of it away from you or the end closest to
14:00:58      you.
14:00:59  A.  The end that was away from me.
14:01:01  Q.  All right.  And the end that was closer to the floodwall,
14:01:07      can you give us an estimate of its distance from the floodwall?
14:01:12  A.  It had -- the water hadn't really risen in there.  It was
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**398**

```
14:01:17      just sitting in there, in the water, near a buoy or whatever it
14:01:21      was.  That -- it was just sitting there --
14:01:22  Q.  The canal in that area has -- you said "near a buoy."
14:01:27      Tell the judge about that.  What kind of buoy are you talking
14:01:31      about?
14:01:31  A.  Well, it's -- I think it was just something that they put
14:01:33      there for the boats to tie down before they went in the locks.
14:01:37      Because we had an accident before down there.  And what they
14:01:39      would do is they would park there before they move through the
14:01:43      locks and moor up against there.
14:01:45  Q.  So you called it a buoy, but --
14:01:46  A.  Yes.
14:01:46  Q.  -- it's something that boats moored to?
14:01:48  A.  Correct.  That's what I'm talking about.
14:01:50  Q.  What was it made of?
14:01:52  A.  It looked like a big cement pillar.
14:01:57  Q.  Big cement pillar sticking up out of the water?
14:02:00  A.  Yes, sir.
14:02:00  Q.  And you've seen barges tied to it in the past before?
14:02:02  A.  I've seen them there before, yes.
14:02:05  Q.  Okay.  Could you tell if this one was tied to the cement
14:02:07      column or not?
14:02:09  A.  No, I couldn't tell you.
14:02:10  Q.  Okay.  But was there any other vessel in attendance of the
14:02:15      barge or with the barge?
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**399**

```
14:02:15  A.  Not any other.
14:02:15  Q.  Did you --
14:02:16      THE COURT:  One question.
14:02:17      When you've seen barges there in the past, were
14:02:19      the barges alone or did they have a tug with them?
14:02:25      THE WITNESS:  Most of the time they have a tug with
14:02:26      them.
14:02:27      THE COURT:  But you had seen them alone as well?
14:02:29      THE WITNESS:  Very seldom do you see them alone.
14:02:31      THE COURT:  Okay.
14:02:31  BY MR. BEST:
14:02:32  Q.  Did you see any tug or towboat anywhere in the canal?
14:02:36  A.  None at all.
14:02:36  Q.  Did you see any other marine traffic between the bridge
14:02:44      you were on and the Florida Avenue bridge?
14:02:47  A.  None at all.
14:02:48  Q.  And then what did you do after you saw this?
14:02:51  A.  I got disgusted.
14:02:56  Q.  Why was that?
14:02:56  A.  I was wondering why would a barge be in there when we have
14:03:01      a storm coming.  And that really got on my nerves.  That's why
14:03:04      I noticed.
14:03:05  Q.  All right.  And then what did you do?
14:03:06  A.  I drove up Claiborne to, maybe, Elysian Fields and turned
14:03:09      around and came back home.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

13 (Pages 396 to 399)

**400**

| | | |
|---|---|---|
| 1 | 14:03:10 | Q. Okay. Now, when you came back, did you come back -- and |
| 2 | 14:03:15 | what direction did you take to get home again? |
| 3 | 14:03:17 | A. I went to Elysian Fields and made a U-turn and just came |
| 4 | 14:03:20 | back home. |
| 5 | 14:03:20 | Q. Over the same bridge? |
| 6 | 14:03:21 | A. Over the same bridge. |
| 7 | 14:03:22 | Q. Okay. Did you look out when you came back? |
| 8 | 14:03:25 | A. No, I didn't look out. |
| 9 | 14:03:26 | Q. So you made no observation one way or the other about this |
| 10 | 14:03:28 | barge on the return trip? |
| 11 | 14:03:29 | A. I didn't. |
| 12 | 14:03:30 | Q. But if you're coming back on the other side of the bridge, |
| 13 | 14:03:32 | between you and the area where the barge was would be the |
| 14 | 14:03:36 | structure of the bridge, the other lanes of traffic going the |
| 15 | 14:03:38 | other direction; is that fair? |
| 16 | 14:03:40 | A. Yes. |
| 17 | 14:03:41 | Q. Would it have been more difficult to see from that side? |
| 18 | 14:03:44 | A. It would have to me. |
| 19 | 14:03:46 | Q. I think I neglected to ask you: When you were crossing |
| 20 | 14:03:50 | the first time and you saw the barge and you were able to see |
| 21 | 14:03:53 | the whole barge, about how far from the bridge up the waterway |
| 22 | 14:03:57 | was the closest end of the barge to you? |
| 23 | 14:04:00 | A. I think it was like between Derbigny and Roman Street, |
| 24 | 14:04:04 | somewhere in that area. |
| 25 | 14:04:09 | Q. And I may or may not have asked you, how far from the |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**401**

| | | |
|---|---|---|
| 1 | 14:04:12 | floodwall was that nearest point that was angled towards the |
| 2 | 14:04:15 | floodwall? |
| 3 | 14:04:20 | A. Approximately about 50 feet, I think. Something like |
| 4 | 14:04:22 | that. |
| 5 | 14:04:23 | Q. 50 feet. Okay. |
| 6 | 14:04:24 | Now, after you returned home, what did you do? |
| 7 | 14:04:27 | A. I really didn't do too much of nothing. Just sit and |
| 8 | 14:04:31 | wait. |
| 9 | 14:04:31 | Q. You stayed there for the storm? |
| 10 | 14:04:32 | A. Yes, sir. |
| 11 | 14:04:33 | Q. And tell us about the storm. Were you able to stay in |
| 12 | 14:04:39 | your home during the entirety of the storm or not? |
| 13 | 14:04:41 | A. No, I wasn't. |
| 14 | 14:04:43 | Q. What happened? |
| 15 | 14:04:43 | A. Well, basically, I always bring one of my trucks home when |
| 16 | 14:04:48 | a storm comes. Because, basically, that's how we got out |
| 17 | 14:04:53 | during the storms. My father had trucks. So I brought my |
| 18 | 14:04:56 | truck home, and I was putting some -- a tarpaulin in my attic |
| 19 | 14:05:01 | because the water was leaking through my attic. Then my |
| 20 | 14:05:04 | friend, which is my wife now, she said, "The water's on the |
| 21 | 14:05:07 | street now." |
| 22 | 14:05:07 | I said, "Well, it wasn't out there when I went up |
| 23 | 14:05:11 | there." So I went out -- I said, "Let me start my truck up in |
| 24 | 14:05:14 | case it's time to move out." |
| 25 | 14:05:15 | And by the time I started the truck up and built the |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**402**

| | | |
|---|---|---|
| 1 | 14:05:18 | air pressure up, the water was coming in my front door. So I |
| 2 | 14:05:22 | didn't have time to do nothing else but grab her, throw her in |
| 3 | 14:05:25 | the truck and we drove on out. |
| 4 | 14:05:27 | Q. And where did you go? |
| 5 | 14:05:28 | A. We went to her apartment, which was the 500 block of |
| 6 | 14:05:33 | Andry. |
| 7 | 14:05:33 | Q. The 500 block of Andry? |
| 8 | 14:05:33 | A. Yes, sir. |
| 9 | 14:05:34 | Q. Where is that in proximity to, say, to your house in |
| 10 | 14:05:37 | general? |
| 11 | 14:05:37 | A. It's one block before Flood, one block -- two, three |
| 12 | 14:05:40 | blocks on the other side of Caffin. |
| 13 | 14:05:43 | Q. I don't need to go through the whole long story of where |
| 14 | 14:05:45 | you went that day. Where did you wind up waiting out the rest |
| 15 | 14:05:49 | of the storm? |
| 16 | 14:05:50 | A. Well, after she went in her home to put on dry clothes, |
| 17 | 14:05:53 | because she got wet, I told her, "You need to come on out here |
| 18 | 14:05:57 | because the water's coming down the street." |
| 19 | 14:05:59 | And so we got back in the truck. And I wanted to |
| 20 | 14:06:03 | turn on Chartres Street, but they had lines -- power lines down |
| 21 | 14:06:04 | and trees down. So I backed the truck up, which I had the |
| 22 | 14:06:05 | trailer on the back of it. |
| 23 | 14:06:06 | Q. Now, this truck is what kind of truck? |
| 24 | 14:06:08 | A. It's an 18-wheeler dump truck. |
| 25 | 14:06:11 | Q. So you're higher off the ground than a regular -- |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**403**

| | | |
|---|---|---|
| 1 | 14:06:13 | A. Yes, sir, higher up. |
| 2 | 14:06:14 | Q. Thank you. |
| 3 | 14:06:15 | And where did you wind up? |
| 4 | 14:06:16 | A. On Alabo Street Wharf. I stayed on the levee after that. |
| 5 | 14:06:19 | Q. Okay. The levee on the Mississippi River? |
| 6 | 14:06:21 | A. Yes, sir. |
| 7 | 14:06:22 | Q. All right. Now, about what time was it when this water |
| 8 | 14:06:24 | started coming into your house and you-all had to get out? |
| 9 | 14:06:29 | A. Between 7:30, 8:00, something like that. |
| 10 | 14:06:31 | Q. In the morning? |
| 11 | 14:06:32 | A. It was in the morning. |
| 12 | 14:06:34 | Q. On Monday? |
| 13 | 14:06:34 | A. Yes, sir. |
| 14 | 14:06:35 | Q. And how fast was the water coming up as you and your -- |
| 15 | 14:06:37 | A. Real fast. Because when I looked outside -- when I went |
| 16 | 14:06:40 | to start my truck up, I had on some short boots. And the water |
| 17 | 14:06:44 | was not covering my boots; but by the time I built my air |
| 18 | 14:06:49 | pressure up, it was running over my legs and running up into my |
| 19 | 14:06:52 | house. |
| 20 | 14:06:52 | MR. BEST: One moment, Your Honor. |
| 21 | 14:06:53 | THE COURT: Yes, sir. |
| 22 | 14:06:54 | MR. BEST: Tender the witness. |
| 23 | 14:07:01 | Thank you, sir. |
| 24 | 14:07:25 | THE COURT: Go ahead, Mr. Walker. |
| 25 | 14:07:27 | MR. WALKER: Thank you. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 404

```
14:07:27   1    CROSS-EXAMINATION
14:07:27   2    BY MR. WALKER:
14:07:28   3    Q.  Good afternoon, Mr. Tompkins.
14:07:30   4    A.  Good afternoon.
14:07:30   5    Q.  Just to recap a little bit, the weather was very nice, not
14:07:31   6    windy, a calm, good, sunny day when you crossed the bridge?
14:07:37   7    A.  Yes, it was nice.
14:07:38   8    Q.  And as you drove, you just glanced over your right
14:07:41   9    shoulder and kept on driving; right?  You didn't stop?
14:07:44  10    A.  No, I didn't stop.
14:07:45  11    Q.  Okay.  So it's fair to say that your view of the barge was
14:07:48  12    a few seconds?
14:07:49  13    A.  It was a few seconds.
14:07:51  14    Q.  Okay.  And you were actually concentrating on the water
14:07:54  15    level because that's what interested you; that was your worry,
14:07:58  16    wasn't it?
14:07:58  17    A.  Well, my worry was -- yes, correct.
14:08:01  18    Q.  And when you drove back, you didn't even look at the
14:08:04  19    barge?
14:08:04  20    A.  No, I didn't.
14:08:11  21    Q.  And in those seconds when you did look at the water level
14:08:14  22    and the barge as you drove over, you could see that the water
14:08:18  23    was not up to the wall; right?
14:08:20  24    A.  It wasn't up to the wall at that time.
14:08:21  25    Q.  In fact, you could still see dirt and grass?
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 405

```
14:08:28   1    A.  Correct.
14:08:28   2    Q.  And you couldn't see any -- you didn't see any numbers or
14:08:29   3    markings or identifications on the barge?
14:08:32   4    A.  I didn't pay any attention to it.
14:08:34   5    Q.  Now, isn't it right that the barge that you saw had a
14:08:37   6    grayish white cover?
14:08:41   7    A.  I can't remember.
14:08:43   8    Q.  I'd like to show you your deposition, page 81, line 17 to
14:08:48   9    20.
14:08:55  10        I asked you:  "How about any color?
14:08:59  11        "I can't" -- "I can remember like -- looked like a
14:09:01  12    grayish white looking color, something like that."
14:09:03  13        Does that refresh your memory?
14:09:05  14    A.  Yeah, I did see that.  That's what I thought, you know.
14:09:07  15    Like I said, I'm 61 years old and I'm getting older, and I
14:09:11  16    can't remember everything I see.
14:09:12  17    Q.  Well, but I also did more than that.  I showed you some
14:09:16  18    photographs, Exhibit 3 to your deposition.  And I asked you, at
14:09:24  19    page 82, lines 12 through 20, and page 83, 22 through 24, if
14:09:30  20    the barge that you looked at, that you identified with that
14:09:34  21    cover, looked like one of these with the white cover.  And you
14:09:37  22    said it did.
14:09:39  23        Do you recall that?
14:09:42  24    A.  I guess so.
14:09:44  25    Q.  Okay.  Does that refresh your memory more about what the
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 406

```
14:09:48   1    barge looked like and what the colors of the covers were?
14:09:53   2    A.  All I can say is I know it was a colored barge.  The
14:09:56   3    colors -- I can't really remember.  I was trying to remember.
14:10:01   4    Q.  Well, I didn't leave it there either.  I showed you
14:10:04   5    Exhibit 4 to your deposition because I wanted to make sure that
14:10:07   6    we knew what you remembered.  And I'll show you that
14:10:10   7    photograph.
14:10:11   8        And I asked you, at page 82, lines 22 through 25, and
14:10:16   9    page 38, line 1 through 4, if it didn't look like that barge.
14:10:21  10        And you said, yes, it looked like that barge.
14:10:24  11        Do you recall that?
14:10:25  12        MR. BEST:  Objection to the form.  That's actually a
14:10:28  13    misstatement of the testimony.  He said, "It looked somewhat
14:10:32  14    like one of those over there with the cover on it, right, but I
14:10:35  15    don't think it was that long."
14:10:36  16    BY MR. WALKER:
14:10:38  17    Q.  Do you recall that?
14:10:38  18    A.  Yes, I recall that.
14:10:41  19    Q.  Okay.  Now, let's talk about the mooring points, mooring
14:10:54  20    buoys.  You've seen barges tied up there before; right?
14:10:59  21    A.  I've seen them -- I've seen them anchored there before,
14:11:02  22    but they're always -- mostly -- 90 percent of the time, they
14:11:07  23    have a tug with them.
14:11:08  24    Q.  So some 10 percent of the time, they don't have a tug and
14:11:10  25    the barge is there alone; right?
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 407

```
14:11:13   1    A.  I've very seldom seen them without a tug.
14:11:16   2    Q.  I understand.
14:11:17   3        And this particular barge, you don't remember seeing
14:11:19   4    any ropes or tie-downs?
14:11:22   5    A.  No, I don't remember.
14:11:23   6    Q.  And you described for Mr. Best the angle that you saw.
14:11:27   7    And I'll show you Deposition Exhibit 6.  And do you recall
14:11:36   8    drawing that at your deposition?  And does that accurately
14:11:40   9    depict what you described here for the judge today?
14:11:43  10    A.  That looked like the angle.
14:11:45  11    Q.  Okay.  And you see it right at that mooring buoy, the tail
14:11:49  12    end?
14:11:50  13    A.  I see that, yes.
14:11:51  14    Q.  Okay.  And, in fact, you corrected the little bigger box I
14:11:55  15    had drawn in the red outline, and you made the black outline to
14:12:01  16    say it ended right there at the buoy.  Do you remember that?
14:12:07  17    A.  I can't say it was at the end of the buoy because I drove
14:12:10  18    straight across the bridge and all I could see was the barge.
14:12:14  19    Q.  To the best of your recollection, as shown in this
14:12:17  20    photograph is the angle and the location of the barge?
14:12:19  21    A.  Correct.
14:12:23  22    Q.  And from the front end to the wall, there were some
14:12:26  23    50 feet, more or less?
14:12:30  24    A.  More or less.
14:12:39  25    Q.  After you returned, you got busy, you don't know what
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**408**

```
14:12:43   happened to that barge, do you?
14:12:44   A.  No, I don't.
14:12:45   Q.  You don't know if somebody came to pick it up and took it?
14:12:51   A.  No.  But I did go across there later that evening and it
14:12:53   was still there.
14:12:54   Q.  And what time was that?
14:12:56   A.  When I picked my wife -- she was my fiancée.  I picked my
14:12:59   wife up to bring her home and we rode across and it was still
14:13:02   sitting there.
14:13:02   Q.  And what time was that?
14:13:04   A.  Later that evening.
14:13:05   Q.  After or before 4:00?
14:13:06   A.  After 4:00, I guess.
14:13:24   Q.  Well, Mr. Tompkins, wasn't the bridge shut down by the
14:13:27   police before 4:00 on Sunday?
14:13:29   A.  Not that I know of.
14:13:31   Q.  Do you know of any police that were there that saw this
14:13:35   barge?
14:13:36   A.  Nope.  I don't recall the bridge being shut down at all.
14:13:43   Q.  Now, that barge that you saw could have been anybody's
14:13:46   barge; right?
14:13:47   A.  Correct.
14:13:48   Q.  In fact, it could have been a Boh Brothers barge, is what
14:13:51   you said previously; right?
14:13:52   A.  That's what people said, and I went with that.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**409**

```
14:13:57   Q.  And after you saw this barge that -- I think you said here
14:14:01   you got kind of aggravated about it, you didn't call 911 to
14:14:05   report it, did you?
14:14:06   A.  Nope.
14:14:06   Q.  You didn't call the Coast Guard?
14:14:08   A.  Nope.
14:14:08   Q.  You didn't call the Orleans Police or Jefferson Parish
14:14:15   Police Department or anybody, did you?
14:14:16   A.  No.
14:14:20       MR. WALKER:  Thank you, Your Honor.
14:14:21       Thank you, Mr. Tompkins.
14:14:22       THE COURT:  Anything, Mr. Best?
14:14:24       MR. BEST:  Briefly, Your Honor.  If we could leave
14:14:26   that exhibit up for just one moment.
14:14:28           REDIRECT EXAMINATION
14:14:28   BY MR. BEST:
14:14:29   Q.  Mr. Tompkins, you and counsel --
14:14:31       THE COURT:  What exhibit number is that?  Defendant
14:14:33   337-12; is that correct?
14:14:37       MR. BEST:  That's what I see on the screen.
14:14:38       THE COURT:  All right.  Thank you.
14:14:39   BY MR. BEST:
14:14:40   Q.  Counsel asked you -- you kept referring to buoys,
14:14:44   particularly a buoy at the rear corner of this barge where you
14:14:47   drew in the box.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**410**

```
14:14:48   A.  Uh-huh.
14:14:48   Q.  We see a little white circle there.  That's what you're
14:14:52   referring to; right?
14:14:53   A.  Yes, sir.
14:14:53   Q.  And that's what you told me was a cement column?
14:14:56   A.  Yes, sir.
14:14:56   Q.  And we see two more in the waterway, one to the north of
14:14:59   it and one to the south.  Were those additional mooring
14:15:02   columns?
14:15:02   A.  Yes, sir.
14:15:03   Q.  So a buoy to me is something that floats?
14:15:06   A.  Right, I'm sorry.
14:15:06   Q.  But these were fixed as you --
14:15:08   A.  They're fixed, yeah.
14:15:09   Q.  And you saw it next to -- the back end of it, one corner,
14:15:12   next to that column.  Could you tell if it was tied to that
14:15:18   column or if it was just resting against that column?
14:15:21   A.  I couldn't tell.
14:15:22   Q.  You didn't know one way or the other.
14:15:24   A.  I didn't know.
14:15:24   Q.  And as it was against that column, how was it riding in
14:15:28   the water?
14:15:29   A.  It was just sitting there.
14:15:30   Q.  But what about the elevation of the barge in the water?
14:15:33   Did you notice anything about that?
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**411**

```
14:15:35   A.  I didn't notice -- to me it was sitting up pretty high, so
14:15:39   I don't think it was loaded.
14:15:41   Q.  Thank you.
14:15:45       And counsel asked you about when you went -- you --
14:15:50   I'm sorry, you went across the bridge again at 4:00?
14:15:56   A.  Yes, sir.
14:15:57   Q.  Going with your lady friend out over the bridge?
14:15:59   A.  Yes, sir.
14:16:00   Q.  And that's when you saw it was still there?
14:16:02   A.  It was still there.
14:16:02   Q.  Where did you go after that?
14:16:04   A.  To my home.
14:16:04   Q.  So it's coming -- coming back across the bridge.
14:16:08   A.  No, we went that way.  We looked at the water level again.
14:16:12   Q.  Then where did you go after that?
14:16:13   A.  Turned around and came back home.
14:16:16   Q.  All right.  Do you have any knowledge one way or the other
14:16:21   whether the bridge at some point was closed that afternoon?
14:16:23   A.  No, I don't have no knowledge of the bridge being closed.
14:16:26   Q.  Okay.  And I saw you -- you brought some reading material
14:16:31   while you were waiting in the hall.  What was that I saw on
14:16:33   your lap?
14:16:34   A.  My Bible and a hymnal.
14:16:39       MR. BEST:  Thank you, sir.
14:16:39       THE COURT:  You can step down, sir.  Thank you very
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## Page 412

```
14:16:42   much.
14:16:42              THE WITNESS:  Thank you.
14:16:53              THE COURT:  Before you call your next witness, just a
14:16:55   couple of things that I wanted to talk to the attorneys about.
14:17:07              Just to let you know, I've been trying to note
14:17:11   it for the record, but I don't always do it, each time you
14:17:14   refer to an exhibit, you might state the number so that not
14:17:23   only us, because we're following it pretty well, but the poor
14:17:27   clerks at the Fifth Circuit would have an opportunity to find
14:17:30   it, if necessary.
14:17:32              I'm curious, do we have evidence coming as to
14:17:36   when the locks were closed to all traffic?  Is it --
14:17:40              MR. BEST:  I think there is a lock log in the bench
14:17:44   book of exhibits that shows when the last traffic left and what
14:17:47   time -- Mr. Gilbert would know better than me which exhibit it
14:17:51   is, but --
14:17:52              THE COURT:  But there is something in the record?
14:17:53              MR. BEST:  -- I'm pretty confident that there is a
14:17:55   lock log in our bench book.
14:17:57              THE COURT:  And is there any evidence in the record,
14:17:59   other than testimony, that would show when and if the Claiborne
14:18:02   Street bridge was closed?
14:18:04              MR. BEST:  There's nothing -- nobody has commented on
14:18:06   that other than these two witnesses, who just gave their
14:18:08   depositions in April of this year.
```

## Page 413

```
14:18:10              THE COURT:  So we don't have any official record?
14:18:12              MR. BEST:  No.
14:18:16              MR. SEYMOUR:  Your Honor, this is Richard Seymour.
14:18:19   The exhibit numbers, 24 through 26, I think is the range for
14:18:22   the lock transfer logs.
14:18:26              MR. BEST:  And that's referring to plaintiff
14:18:29   exhibits.
14:18:32              THE COURT:  Okay.  I will certainly look at all of
14:18:35   that.
14:18:40              All right.  Do we have a witness?
14:18:44              MR. BEST:  I think we're -- the video deposition is
14:18:46   not yet ready.  Is that correct?
14:18:48              MR. SNYDER:  No, it's not --
14:18:49              MR. BEST:  It's not entirely ready.  So our next
14:18:52   witness would be Mr. Donald Green, who is one of our experts.
14:18:58              THE COURT:  Do you want to take a little break before
14:19:00   you take him or do you want to take a little break before
14:19:03   Villavaso?
14:19:04              MR. BEST:  I guess we could take a break and check on
14:19:06   the status of --
14:19:06              THE COURT:  It's only 2:15, but let's take just a
14:19:10   ten-minute recess and then we'll come back and see where we
14:19:13   are.
14:19:13              MR. BEST:  Thank you, Your Honor.
14:19:14              THE COURT:  We'll need 15 minutes because I'm going
```

## Page 414

```
14:19:15   to install a printer here.
14:19:18              THE DEPUTY CLERK:  All rise.
14:19:28              (WHEREUPON, the Court took a recess.)
14:29:58              THE DEPUTY CLERK:  All rise.
14:46:15              Court's in session.  Please be seated.
14:46:23              THE COURT:  Yes, sir.
14:46:41              MR. BEST:  Just to update you, you asked a question
14:46:44   before we retired about our exhibit books and the lock logs.
14:46:47              THE COURT:  Yes.
14:46:49              MR. GILBERT:  Your Honor, it's Exhibit 24.  It's
14:46:51   already in evidence.  This is a log of the lock master showing
14:46:55   that the locks closed at 4:00 a.m. on Sunday, about seven hours
14:46:59   before the events described by Ms. LeBlanc and Mr. Tompkins.
14:47:09              THE COURT:  I mean, this case -- I keep seeing
14:47:14   interesting conundrums.  All right.  Thank you.  Meaning that
14:47:19   nothing could go out of the canal.
14:47:22              MR. BEST:  The locks were closed.
14:47:24              THE COURT:  I understand.
14:47:26              MR. GILBERT:  As of 4:00 a.m. Sunday morning.
14:47:28              THE COURT:  Right.  4:00 a.m. Sunday morning.  And
14:47:30   these events they were testifying to occurred subsequent to
14:47:34   that.
14:47:35              MR. GILBERT:  Correct.
14:47:35              THE COURT:  Of course.  I understand.
14:47:41              MR. BEST:  The status of the Villavaso video is it
```

## Page 415

```
14:47:44   can be shown to Your Honor this afternoon, but it would still
14:47:47   at this moment require our operator to edit on the fly.
14:47:52   Whereas, he has a final copy edited, which can be played
14:47:57   straight through, which he expects to have in his hands --
14:48:02              Tomorrow?  By what time?
14:48:03              MR. SNYDER:  Actually on my system by tomorrow, but
14:48:05   I'll hard copy --
14:48:06              MR. BEST:  You'll have it on your system to play
14:48:09   tomorrow morning when we start court?
14:48:10              THE COURT:  Okay.  That's fine.
14:48:12              MR. BEST:  So, of course -- or whatever time we get
14:48:15   to it.  So we thought Your Honor would prefer to do that rather
14:48:18   than have it edited on the fly.
14:48:20              THE COURT:  I think so.  That makes sense.
14:48:22              MR. BEST:  Okay.  Just wanted to let you know where
14:48:24   we are.
14:48:25              THE COURT:  Yeah.  And I think counsel for defense
14:48:27   would prefer that as well.
14:48:30              MR. ALDOCK:  Yes.
14:48:31              MR. BEST:  So what we're going to do now is call
14:48:33   Dr. Donald Green.
14:48:34              (WHEREUPON, Donald Joseph Green, having been duly
14:48:34   sworn, testified as follows.)
14:48:53              THE DEPUTY CLERK:  Please state your full name and
14:48:53   correct spelling for the record.
```