351

1                      UNITED STATES DISTRICT COURT
2                      EASTERN DISTRICT OF LOUISIANA
3
4
5       IN RE:  KATRINA DREDGING     *   Civil Action
        LIMITATION ACTION            *
6       CONSOLIDATED LITIGATION      *   No. 05-4182
                                     *
7                                    *   Section K(2)
        PERTAINS TO:                 *
8       BARGE                        *   New Orleans, Louisiana
                                     *
9       MUMFORD, C.A. NO. 05-5724, AS *  June 22, 2010
        TO PLAINTIFFS JOSEPHINE      *
10      RICHARDSON AND HOLLIDAY      *   Afternoon Session
        JEWELERS, INC., ONLY         *
11      AND                          *
        BENOIT, C.A. NO. 06-7516, AS *
12      TO PLAINTIFFS JOHN ALFORD AND *
        JERRY ALFORD ONLY            *
13      * * * * * * * * * * * * * * *
14                            DAY TWO
                     BENCH TRIAL BEFORE THE
15              HONORABLE STANWOOD R. DUVAL, JR.
                   UNITED STATES DISTRICT JUDGE
16
17
        APPEARANCES:
18
        For the Plaintiffs:        Best Koeppel
19                                 BY:  LAURENCE E. BEST, ESQ.
                                   BY:  PETER S. KOEPPEL, ESQ.
20                                 2030 St. Charles Avenue
                                   New Orleans, Louisiana 70130
21
22      For the Plaintiffs:        Law Offices of Brian A. Gilbert
                                   BY:  BRIAN A. GILBERT, ESQ.
23                                 2030 St. Charles Avenue
                                   New Orleans, Louisiana  70130
24
25
              JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                      UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF LOUISIANA

## 352

```
1   APPEARANCES:
2
3   For the Plaintiffs:   Wiedemann & Wiedemann
                          BY:  KARL WIEDEMANN, ESQ.
4                         BY:  LAWRENCE WIEDEMANN, ESQ.
                          821 Baronne Street
5                         New Orleans, Louisiana  70113
6
7   For the Plaintiffs:   Patrick J. Sanders, LLC
                          BY:  PATRICK J. SANDERS, ESQ.
8                         3316 Ridgelake Drive
                          Suite 100
9                         Metairie, Louisiana  70002
10
11  For the Plaintiffs:   Law Office of Richard T. Seymour,
                          P.L.L.C.
12                        BY:  RICHARD T. SEYMOUR, ESQ.
                          1150 Connecticut Avenue N.W.
13                        Suite 900
                          Washington, D.C.  20036-4129
14
15  For the Plaintiffs:   Khorrami, Pollard & Abir, LLP
                          BY:  SHAWN KHORRAMI, ESQ.
16                        444 S. Flower Street
                          33rd Floor
17                        Los Angeles, California  90071
18
19  For the Plaintiffs:   Wilson, Grochow, Druker & Nolet
                          BY:  LAWRENCE A. WILSON, ESQ.
20                        233 Broadway
                          5th Floor
21                        New York, New York  10279
22
23  For the Defendant:    Chaffe, McCall, L.L.P.
                          BY:  DEREK A. WALKER, ESQ.
24                        BY:  CHARLES P. BLANCHARD, ESQ.
                          1100 Poydras Street, Suite 2300
25                        New Orleans, Louisiana 70163
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 353

```
1   APPEARANCES:
2
3   For the Defendant:    Goodwin Procter, L.L.P.
                          BY:  JOHN ALDOCK, ESQ.
4                         BY:  MARK RAFFMAN, ESQ.
                          BY:  ADAM CHUD, ESQ.
5                         BY:  KIRSTEN ROBBINS, ESQ.
                          BY:  ERIC I. GOLDBERG, ESQ.
6                         901 New York Avenue, NW
                          Washington, D.C. 20001
7
8   For the Defendant:    Sutterfield & Webb
                          BY:  DANIEL A. WEBB, ESQ.
10                        650 Poydras Street, Suite 2715
                          New Orleans, Louisiana 70130
11
12  For the Defendant:    Lafarge North America, Inc.
                          BY:  PETER KEELY, ESQ.
14                        12950 Worldgate Drive
                          Herndon, Virginia  20170
15
16  Official Court Reporter:   Jodi Simcox, RMR, FCRR
17                        500 Poydras Street
                          Room HB-406
18                        New Orleans, Louisiana 70130
                          (504) 589-7780
19
20
21  Proceedings recorded by mechanical stenography, transcript
22  produced by computer.
23
24
25
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 354

I N D E X

|                              | Page |
|------------------------------|------|
| ROBERT BARTLETT              |      |
|   Cross-Examination          | 355  |
| GERTRUDE LEBLANC             |      |
|   Direct Examination         | 366  |
|   Cross-Examination          | 379  |
|   Redirect Examination       | 385  |
| FRAZIER TOMPKINS, III        |      |
|   Direct Examination         | 387  |
|   Cross-Examination          | 404  |
|   Redirect Examination       | 409  |
| DONALD JOSEPH GREEN          |      |
|   Direct Examination         | 417  |
|   Voir Dire                  | 424  |
|   Direct Examination         | 431  |
|   Voir Dire                  | 437  |
|   Direct Examination         | 441  |
|   Direct Examination         | 452  |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 355

```
12:44:21              AFTERNOON SESSION
12:44:21              (June 22, 2010)
12:44:21              * * * * *
12:44:46       THE DEPUTY CLERK:  All rise.
13:08:34       THE COURT:  Be seated.  Okay.  Are you ready to
13:08:41   proceed?
13:08:42       MR. ALDOCK:  I am.  John Aldock for Lafarge.
13:08:47       (WHEREUPON, Robert Bartlett, having been previously
13:08:47   duly sworn, testified as follows.)
13:08:48              CROSS-EXAMINATION
13:08:48   BY MR. ALDOCK:
13:08:49   Q.  Dr. Bartlett, let me show you a slide from your report --
13:08:55   well, actually, it's Defendant's 70, page 2, a familiar slide
13:09:02   to all of us.
13:09:02       The area we're talking about throughout your direct
13:09:07   testimony, Dr. Bartlett, is this little thing between the end
13:09:13   of the wall here and where it starts to curve; right?  It's
13:09:18   this piece?
13:09:19   A.  That's correct.  And if I could just -- I'm not
13:09:22   Dr. Bartlett.  It's Mr. Bartlett.
13:09:25   Q.  Okay.  Thank you.  Promotion.  You don't want it?
13:09:27   A.  That's fine.  Thank you.
13:09:29   Q.  Okay.
13:09:30       So that means, does it not, that you didn't concern
13:09:36   yourself with any of this?
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

14:16:42 much.
14:16:42 THE WITNESS: Thank you.
14:16:53 THE COURT: Before you call your next witness, just a
14:16:55 couple of things that I wanted to talk to the attorneys about.
14:17:07 Just to let you know, I've been trying to note
14:17:11 it for the record, but I don't always do it, each time you
14:17:14 refer to an exhibit, you might state the number so that not
14:17:23 only us, because we're following it pretty well, but the poor
14:17:27 clerks at the Fifth Circuit would have an opportunity to find
14:17:30 it, if necessary.
14:17:32 I'm curious, do we have evidence coming as to
14:17:36 when the locks were closed to all traffic? Is it --
14:17:40 MR. BEST: I think there is a lock log in the bench
14:17:44 book of exhibits that shows when the last traffic left and what
14:17:47 time -- Mr. Gilbert would know better than me which exhibit it
14:17:51 is, but --
14:17:52 THE COURT: But there is something in the record?
14:17:53 MR. BEST: -- I'm pretty confident that there is a
14:17:55 lock log in our bench book.
14:17:57 THE COURT: And is there any evidence in the record,
14:17:59 other than testimony, that would show when and if the Claiborne
14:18:02 Street bridge was closed?
14:18:04 MR. BEST: There's nothing -- nobody has commented on
14:18:06 that other than these two witnesses, who just gave their
14:18:08 depositions in April of this year.

14:18:10 THE COURT: So we don't have any official record?
14:18:12 MR. BEST: No.
14:18:16 MR. SEYMOUR: Your Honor, this is Richard Seymour.
14:18:19 The exhibit numbers, 24 through 26, I think is the range for
14:18:22 the lock transfer logs.
14:18:26 MR. BEST: And that's referring to plaintiff
14:18:29 exhibits.
14:18:32 THE COURT: Okay. I will certainly look at all of
14:18:35 that.
14:18:40 All right. Do we have a witness?
14:18:44 MR. BEST: I think we're -- the video deposition is
14:18:46 not yet ready. Is that correct?
14:18:48 MR. SNYDER: No, it's not --
14:18:49 MR. BEST: It's not entirely ready. So our next
14:18:52 witness would be Mr. Donald Green, who is one of our experts.
14:18:58 THE COURT: Do you want to take a little break before
14:19:00 you take him or do you want to take a little break before
14:19:03 Villavaso?
14:19:04 MR. BEST: I guess we could take a break and check on
14:19:06 the status of --
14:19:06 THE COURT: It's only 2:15, but let's take just a
14:19:10 ten-minute recess and then we'll come back and see where we
14:19:13 are.
14:19:13 MR. BEST: Thank you, Your Honor.
14:19:14 THE COURT: We'll need 15 minutes because I'm going

14:19:15 to install a printer here.
14:19:18 THE DEPUTY CLERK: All rise.
14:19:28 (WHEREUPON, the Court took a recess.)
14:29:58 THE DEPUTY CLERK: All rise.
14:46:15 Court's in session. Please be seated.
14:46:23 THE COURT: Yes, sir.
14:46:41 MR. BEST: Just to update you, you asked a question
14:46:44 before we retired about our exhibit books and the lock logs.
14:46:47 THE COURT: Yes.
14:46:49 MR. GILBERT: Your Honor, it's Exhibit 24. It's
14:46:51 already in evidence. This is a log of the lock master showing
14:46:55 that the locks closed at 4:00 a.m. on Sunday, about seven hours
14:46:59 before the events described by Ms. LeBlanc and Mr. Tompkins.
14:47:09 THE COURT: I mean, this case -- I keep seeing
14:47:14 interesting conundrums. All right. Thank you. Meaning that
14:47:19 nothing could go out of the canal.
14:47:22 MR. BEST: The locks were closed.
14:47:24 THE COURT: I understand.
14:47:26 MR. GILBERT: As of 4:00 a.m. Sunday morning.
14:47:28 THE COURT: Right. 4:00 a.m. Sunday morning. And
14:47:30 these events they were testifying to occurred subsequent to
14:47:34 that.
14:47:35 MR. GILBERT: Correct.
14:47:35 THE COURT: Of course. I understand.
14:47:41 MR. BEST: The status of the Villavaso video is it

14:47:44 can be shown to Your Honor this afternoon, but it would still
14:47:47 at this moment require our operator to edit on the fly.
14:47:52 Whereas, he has a final copy edited, which can be played
14:47:57 straight through, which he expects to have in his hands --
14:48:02 Tomorrow? By what time?
14:48:03 MR. SNYDER: Actually on my system by tomorrow, but
14:48:05 I'll hard copy --
14:48:06 MR. BEST: You'll have it on your system to play
14:48:09 tomorrow morning when we start court?
14:48:10 THE COURT: Okay. That's fine.
14:48:12 MR. BEST: So, of course -- or whatever time we get
14:48:15 to it. So we thought Your Honor would prefer to do that rather
14:48:18 than have it edited on the fly.
14:48:20 THE COURT: I think so. That makes sense.
14:48:22 MR. BEST: Okay. Just wanted to let you know where
14:48:24 we are.
14:48:25 THE COURT: Yeah. And I think counsel for defense
14:48:27 would prefer that as well.
14:48:30 MR. ALDOCK: Yes.
14:48:31 MR. BEST: So what we're going to do now is call
14:48:33 Dr. Donald Green.
14:48:34 (WHEREUPON, Donald Joseph Green, having been duly
14:48:34 sworn, testified as follows.)
14:48:53 THE DEPUTY CLERK: Please state your full name and
14:48:53 correct spelling for the record.

**416**

1  THE WITNESS:  My name is Donald Joseph Green.
2  D-O-N-A-L-D, J-O-S-E-P-H, Green, G-R-E-E-N.
3  MR. BEST:  Your Honor, Mr. Green's report is in
4  evidence as Plaintiffs' Exhibit 386.  The other exhibits in the
5  plaintiffs' bench book pertinent to Mr. Green's testimony
6  run -- correction --
7  MR. GILBERT:  The --
8  MR. GILBERT:  Your Honor, within 386, there is a
9  prior edit of Mr. Green's report that's inadvertently included.
10  It's June 2008.  The correct version is March 11th, 2009.
11  That's attached to his deposition as an exhibit.  We'll use
12  that exhibit to refer to his report today.
13  THE COURT:  Mr. Walker, are you straight on that?
14  MR. WALKER:  I'm looking at -- I missed the
15  beginning.  So you substituted --
16  MR. GILBERT:  The --
17  MR. WALKER:  You have one report twice?
18  MR. GILBERT:  No.  The June 2008 report is mistakenly
19  in there.  The March 11th, 2009 report is what should be in
20  what I gave you.
21  MR. WALKER:  Okay.
22  MR. GILBERT:  But it is attached to his deposition,
23  which is also in that exhibit number.
24  MR. BEST:  Actually, 387 are the exhibits to the
25  deposition of Mr. Green dated June 25th, 2009, which I
   understand includes the proper report, March 11th, 2009.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**417**

1  MR. GILBERT:  Yes.
2  MR. BEST:  And that's the report we're going to be
3  referring to.
4  THE COURT:  All right.
5  MR. BEST:  But with that exception, the exhibits
6  pertaining to Donald Green run from 386 to 395.
7  THE COURT:  Thank you.
8  MR. WALKER:  Your Honor, before we begin, if I may, I
9  noted that there was a demonstrative exhibit, their exhibit.
10  And we inspected it.  And the first three sections of that
11  exhibit refer to matters that Your Honor struck in Your Honor's
12  order.
13  THE COURT:  I did?  I recall.  I can't see it from
14  here, but I can see USCG and regulation.
15  MR. BEST:  I actually did not plan to use that, Your
16  Honor.
17  THE COURT:  All right.  Thank you, Mr. Best.  That
18  makes it much easier.
19  DIRECT EXAMINATION
20  BY MR. BEST:
21  Q.  What's your business, Mr. Green?
22  A.  I'm the president of Houston Exam-Prep Training Center in
23  Houston, Texas.
24  Q.  And what is the business of that training center?
25  A.  It's a Coast Guard-approved training facility for mariners

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**418**

1  seeking Coast Guard credentials.
2  Q.  And what sort of sea -- what sort of credentials do you
3  train them for?
4  A.  Master unlimited, all the way down to highly able
5  seamen, as well as mobile offshore drilling unit engineers,
6  unlimited engineers and the like.
7  Q.  And able-bodied seamen are some of the personnel most
8  commonly involved in mooring?
9  A.  Yes, that's correct.
10  Q.  And you're training those people to get what they need to
11  know to get their credentials?
12  A.  Yes.
13  Q.  And do you also train them in mooring?
14  A.  Yes, we do.
15  Q.  What's your educational background?
16  A.  I have an undergraduate degree from Urbana University in
17  business and a master's degree from Pepperdine University in
18  human resource management.
19  Q.  All right.  And the Court has your CV as an attachment to
20  your report, which is attached to your deposition, Exhibit 387.
21  Without going through your CV and recounting every item to the
22  Court, would you tell the Court what in particular of your
23  background qualifies you to address mooring practices and
24  issues in this case and application of the United States Coast
25  Guard regulations from a marine operations standpoint?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**419**

1  A.  I'm a retired Coast Guard commander.  I served
2  23 1/2 years with the Coast Guard.  Eight years were at sea.  I
3  served on five different vessels, from deckhand all the way up
4  to including relief master executive officer of Coast Guard
5  cutters.
6  And then after my tour at sea, I was assigned to
7  marine safety.  And I served the remainder of my career in
8  marine safety, including five years here in New Orleans as a
9  Coast Guard inspector, shipyard inspector, as well as an
10  investigator investigating casualties in reference to this
11  case, barge breakaways on the Mississippi River, the
12  Atchafalaya and other areas.
13  Q.  And what was your position at the time of your retirement
14  from the Coast Guard?
15  A.  I was assistant chief of merchant vessel safety here in
16  the district office, which is next door to this court.
17  Q.  What is your experience in actually operating vessels at
18  sea and on navigable waters?
19  A.  I just testified that I spent eight years at sea in
20  various Coast Guard cutters.  Then subsequent -- during my
21  career, I served six months with the American Waterways
22  Operators, riding tugs and tows throughout the young waters of
23  United States.
24  And I served, not as an employee, but as a
25  participant in various marine operations, including making up

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 420

1  14:54:41  tows, steering, deckhand duties, mate duties.  And it was my

2  14:54:51  job to become intimately familiar with the operations of the

3  14:54:53  young towing vessels.

4  14:54:54  Q.  And what's your total years of experience in maritime

5  14:54:58  operations?

6  14:54:59  A.  Over 50 years.  I began as a young boy, 14 years old, as a

7  14:55:00  deckhand on a family shrimp boat out of Pass Christian,

8  14:55:04  Mississippi.  I did that during the summers, and then I joined

9  14:55:08  the Coast Guard in 1958.

10  14:55:10  Q.  And what's your hurricane experience from a vessel

11  14:55:15  operation standpoint?

12  14:55:16  A.  I was assigned to Coast Guard cutters.  In the event of a

13  14:55:20  hurricane that got into the Gulf, we had to make plans whether

14  14:55:24  to go to sea to avoid the hurricane and/or seek a safe shelter.

15  14:55:31  And in one instance in Mobile, I participated in

16  14:55:35  mooring our ship up the Mobile River using a combination of

17  14:55:40  lines and cables to -- in the event that the hurricane hit our

18  14:55:43  area.

19  14:55:44  In addition to that, I rode through a hurricane in

20  14:55:47  1961 off of Galveston on that very ship, the same ship that I

21  14:55:55  just talked about just a few minutes ago.

22  14:55:58  Q.  In the course and scope of your duties?

23  14:56:00  A.  Yes.

24  14:56:01  Q.  And did you have vessel mooring experience even before

25  14:56:05  your United States Coast Guard service?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 421

1  14:56:07  A.  Yes.  And as a deckhand on the shrimp boat, it was my job

2  14:56:11  to tie the boat up, handle lines and shrimp, and all the duties

3  14:56:17  that the captain didn't want to do.

4  14:56:20  Q.  And over the years, in terms of your marine operations,

5  14:56:23  from a marine operations standpoint, have you had involvement

6  14:56:27  in understanding and complying with United States Coast Guard

7  14:56:32  regulations?

8  14:56:33  A.  Yes, I have.  I was a Coast Guard inspector, as well as an

9  14:56:37  investigator.  It was my job to enforce the marine statutes of

10  14:56:42  the United States and also investigate violations or supposed

11  14:56:49  violations of those regulations.

12  14:56:52  Q.  And have you been involved in the past in litigation

13  14:56:56  involving mooring?

14  14:56:57  A.  Yes, I have.  I testified in this very case in front of

15  14:57:02  Judge Berrigan.  I've also testified in other cases involving

16  14:57:07  moorings of barges and as well as breakaways.

17  14:57:12  Q.  And have you had occasion during your -- that part of your

18  14:57:16  work that involves consulting for purposes of litigation, have

19  14:57:20  you done -- qualified -- have you served as an expert in marine

20  14:57:24  operations, including for law firms like Chaffe McCall and

21  14:57:29  Liskow & Lewis, among other s?

22  14:57:32  A.  Yes, that's correct.

23  14:57:33  Q.  And have you previously qualified as an expert in marine

24  14:57:35  operations and the United States Coast Guard regulations as

25  14:57:39  they have -- with respect to marine operations?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 422

1  14:57:42  A.  Yes, I have.

2  14:57:43  Q.  Has your testimony as an expert in that field ever been

3  14:57:47  limited, to your knowledge?

4  14:57:48  A.  Not to my knowledge.

5  14:57:49  Q.  All right.

6  14:57:50  MR. BEST:  Your Honor, we tender Mr. Green as an

7  14:57:53  expert in marine operations and United States Coast Guard

8  14:57:56  regulations with respect to marine operations.

9  14:57:58  THE COURT:  Any objections?

10  14:58:00  MR. WALKER:  May I voir dire, Your Honor?

11  14:58:02  THE COURT:  You may.  Even though we've ruled on

12  14:58:08  Daubert issues, I'll allow voir dire, regardless, to some

13  14:58:14  degree.

14  14:58:29  MR. WALKER:  Your Honor, in the interest of the flow

15  14:58:31  that we're going to the case, since we're going to likely

16  14:58:34  defer examination to tomorrow, I'll defer my voir dire until

17  14:58:38  tomorrow, Your Honor.

18  14:58:39  THE COURT:  If you save it for tomorrow, he might be

19  14:58:42  through his direct by then.

20  14:58:45  Let me make sure I understand.  I may have

21  14:58:49  missed something.  I may have forgotten something.

22  14:58:53  MR. WALKER:  Based on the agreement that the parties

23  14:58:57  had because of the deposition situation with Mr. Villavaso, it

24  14:59:00  was our understanding that plaintiffs were going to put on

25  14:59:03  Mr. Green for direct only today, Your Honor.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 423

1  14:59:11  MR. ALDOCK:  We had an agreement, Your Honor, because

2  14:59:12  Mr. Green was moved up in the order, if he was going to go

3  14:59:16  today at all.

4  14:59:20  MR. GILBERT:  Your Honor this is a aspiration --

5  14:59:21  THE COURT:  Hold on.

6  14:59:21  MR. GILBERT:  I'm sorry.

7  14:59:21  THE COURT:  Let Mr. Aldock finish.

8  14:59:22  MR. ALDOCK:  We had an agreement with counsel that

9  14:59:25  there would be no cross today.

10  14:59:27  MR. GILBERT:  If we run out of time.  We may get

11  14:59:31  through Mr. Green today, both parties.  It's possible.

12  14:59:34  MR. ALDOCK:  Mr. Gilbert, we had a stipulation with

13  14:59:38  Mr. Khorrami.

14  14:59:39  MR. BEST:  Irrespective of the agreement or the

15  14:59:43  understanding that the cross-examination of the witness would

16  14:59:44  be deferred until tomorrow potentially, the cross-examination

17  14:59:47  of his credentials would ordinarily occur at the outset of my

18  14:59:50  presentation of his testimony.  And I think I'm entitled to a

19  14:59:53  ruling as to whether or not at the beginning --

20  14:59:56  THE COURT:  I've already ruled.  Daubert's gone.

21  14:59:58  This is simply for the record.  I mean, Daubert's gone.  I'm

22  15:00:02  going to accept him as qualified because there's been no

23  15:00:05  granted Daubert challenge.  So my allowing this is purely

24  15:00:11  cosmetic, but I will allow it.

25  15:00:16  MR. WALKER:  Your Honor, this is for the weight only.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**424**

```
15:00:18    THE COURT:  And that's why I allow it.
15:00:20    MR. WALKER:  And I'll be brief.
15:00:21         VOIR DIRE
15:00:21  BY MR. WALKER:
15:00:22  Q.  Mr. Green, presently you reside in Houston, Texas?
15:00:25  A.  No, sir, I reside in Alpine, Texas.
15:00:28  Q.  I'm sorry.
15:00:29  A.  My business is in Houston.
15:00:32  Q.  Have you been to the Ninth Ward recently?
15:00:38  A.  No, sir.
15:00:39  Q.  Have you visited the Ninth Ward in connection with this
15:00:41  case?
15:00:41  A.  Yes, sir.
15:00:41  Q.  Have you visited the Lafarge terminal?
15:00:44  A.  Yes, sir, I have.
15:00:44  Q.  And are you going to offer any opinions regarding mooring
15:00:47  in this case?
15:00:48  A.  Yes, I am.
15:00:49  Q.  And in your opinion, that has to do with marine practices
15:00:51  or operations?
15:00:52  A.  Yes.
15:00:53  Q.  Could you tell me what marine practices and operations
15:00:55  means?
15:00:56  A.  Marine practice and operations, in my opinion, covers the
15:01:00  operation of vessels, barges, all types of craft that -- used
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**425**

```
15:01:05  for transportation or float.  That includes the management of
15:01:09  those vessels, as well as the securing, mooring, operation,
15:01:15  navigation.  It's an all-encompassing term, in my opinion.
15:01:21  Q.  Okay.  And those operations in this case have to do with
15:01:21  the Lafarge terminal; is that right?
15:01:25  A.  Yes.
15:01:26  Q.  So your testimony is limited to the occurrences at the
15:01:29  Lafarge terminal on the West Bank of the Industrial Canal?
15:01:37  A.  In this case, yes.
15:01:37  Q.  You're not offering any opinions, are you, regarding the
15:01:40  movement of that barge after it broke away from its moorings?
15:01:45  A.  Only from the standpoint that -- I said in my report that,
15:01:49  at the end, it ended up in the Ninth Ward, in the neighborhood.
15:01:57  Q.  Right.  You're not offering any opinions of how it got
15:01:59  there or where it traveled?
15:02:01  A.  Not unless the question comes up.  It depends on what the
15:02:05  direct is.  If -- on your cross, if you ask me questions of
15:02:10  what my opinion is of how it got there, I'll certainly offer
15:02:13  some opinions.
15:02:14  Q.  I understand.
15:02:15       But the reports that you prepared in this case, based
15:02:17  on your marine operations experience, do not opine on the
15:02:22  movement of the barge?
15:02:24  A.  That's right.  My -- report stands as it reads.
15:02:29  Q.  Okay.  You're not a rope expert, are you?
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**426**

```
15:02:38  A.  No, sir.
15:02:39  Q.  Did you attend any Coast Guard academy?
15:02:42  A.  No, I didn't.
15:02:43  Q.  You're not a marine engineer or a naval architect?
15:02:45  A.  No, sir, I'm not.
15:02:45  Q.  You're not a hydrologist?
15:02:49  A.  No, sir.
15:02:49  Q.  I'm a little confused by your education at Urbana.  It was
15:02:54  since 1978?
15:02:55  A.  Yes.
15:02:55  Q.  So you've been working 20 years?  Did I --
15:02:58  A.  No, I came into the Coast Guard as an enlisted man in
15:03:02  1958.  As I told the Court, I came up through the ranks as a
15:03:06  seaman and went all the way through and went to officer
15:03:12  candidate school, then I rose to the rank of commander before I
15:03:16  retired.
15:03:17       And during that long period, I served in all
15:03:20  positions aboard a ship, except I was not an engineer.  I did
15:03:24  not serve in the engineering department.  I served in all deck
15:03:27  departments.
15:03:27  Q.  I'm sorry.  My question was:  You went to the university
15:03:30  in 1978?
15:03:31  A.  Yes.  At that time I was a lieutenant commander in the
15:03:34  Coast Guard and I went to night school.
15:03:36  Q.  I got you.  Okay.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**427**

```
15:03:37       Have you ever been a district hearing officer?
15:03:39  A.  Yes, I was.
15:03:41  Q.  What year?
15:03:43  A.  I was in that position before the district hearing officer
15:03:45  was established.  In other words, violations were sent to me,
15:03:51  and I had to determine whether a violation did, in fact, occur.
15:03:54  And I would issue civil fines against the party if it was
15:04:01  appropriate.
15:04:02       Subsequent to my assignment, a district hearing
15:04:05  officer was established.
15:04:06  Q.  So what was the name of the position at the time that you
15:04:09  had it?
15:04:10  A.  There was no such thing as a hearing officer at that time.
15:04:13  It was sent to me as the assistant marine safety officer for
15:04:20  the district.  And violations were sent to my desk for my
15:04:26  determination whether a violation existed.
15:04:29  Q.  Okay.  In other words, there's somebody above you who
15:04:32  determined whether your assessment of that was correct or not?
15:04:34  A.  Yes.
15:04:35  Q.  And who was that?
15:04:36  A.  That was the chief of merchant marine vessel safety.
15:04:41  Q.  And that would be the person who actually determined
15:04:43  whether or not a regulation had been violated?
15:04:45  A.  I don't think so.  I think at that time it stopped with
15:04:48  me.  If there was an appeal, it would go to the captain.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

20  (Pages 424 to 427)

428

| | | |
|---|---|---|
| 1 | 15:04:52 | Q. In 1989, you formed KDON Marine Consulting? |
| 2 | 15:04:57 | A. That's correct, yes. |
| 3 | 15:04:57 | Q. And is it fair to say about 50 percent of your consulting |
| 4 | 15:05:01 | is litigation-based? |
| 5 | 15:05:02 | A. I would say all of it. |
| 6 | 15:05:04 | Q. All of it? |
| 7 | 15:05:05 | A. Yes. |
| 8 | 15:05:05 | Q. Okay. Approximately how many times have you testified in |
| 9 | 15:05:10 | court? |
| 10 | 15:05:11 | A. Oh, I'd say 75, 100 times. |
| 11 | 15:05:16 | Q. And were you ever a commanding officer of any of the Coast |
| 12 | 15:05:19 | Guard vessels you served on? |
| 13 | 15:05:21 | A. I -- only from the standpoint of relief master. When the |
| 14 | 15:05:25 | master went on leave or took vacation or was called away on |
| 15 | 15:05:30 | TAD, I became the acting commanding officer. But I was never |
| 16 | 15:05:34 | assigned as the commanding officer of a ship. |
| 17 | 15:05:36 | Q. Do you hold any professional licenses other than your |
| 18 | 15:05:41 | Coast Guard license? |
| 19 | 15:05:43 | A. Yes -- I mentioned my Coast Guard license. That's my |
| 20 | 15:05:46 | credentials. |
| 21 | 15:05:46 | Q. You don't hold any other professional-type licenses? |
| 22 | 15:05:51 | A. No, sir. |
| 23 | 15:05:51 | Q. So you've never been a licensed officer on a river towboat |
| 24 | 15:05:57 | or on a fleet boat? |
| 25 | 15:05:58 | A. No, sir. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

429

| | | |
|---|---|---|
| 1 | 15:05:59 | Q. Have you ever run a barge fleet? |
| 2 | 15:06:01 | A. No, sir. |
| 3 | 15:06:01 | Q. Have you ever been an auditor or examiner in the towing |
| 4 | 15:06:05 | industry? |
| 5 | 15:06:06 | A. No, sir. Those are all duties that have popped up in the |
| 6 | 15:06:09 | last, oh, 20 years since I retired. |
| 7 | 15:06:13 | Q. And you never managed an inland marine company? |
| 8 | 15:06:16 | A. No, I have not. |
| 9 | 15:06:17 | Q. And isn't it correct that you have actually not moored or |
| 10 | 15:06:22 | physically tied up a barge since 1975? |
| 11 | 15:06:24 | A. That's true, but the procedures used in 1975 are the same |
| 12 | 15:06:30 | that they are today. |
| 13 | 15:06:32 | Q. Have you ever prepared a terminal for a hurricane? |
| 14 | 15:06:35 | A. No, I have not. |
| 15 | 15:06:36 | Q. Have you ever consulted with a terminal regarding their |
| 16 | 15:06:39 | hurricane preparedness? |
| 17 | 15:06:40 | A. No, sir. |
| 18 | 15:06:41 | Q. Have you ever consulted with a terminal regarding their |
| 19 | 15:06:43 | hurricane preparedness policies or manuals? |
| 20 | 15:06:49 | A. No, sir, I have not. |
| 21 | 15:06:54 | Q. Have you ever advised a marine terminal how to moor or tie |
| 22 | 15:06:57 | up barges? |
| 23 | 15:06:58 | A. No, I have not. |
| 24 | 15:07:01 | Q. Have you ever testified as an expert in hurricane |
| 25 | 15:07:04 | preparation? |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

430

| | | |
|---|---|---|
| 1 | 15:07:05 | A. No, I have not. Other than the two trials that I |
| 2 | 15:07:09 | talked -- one trial I talked about during my early testimony |
| 3 | 15:07:14 | today, and that was a trial here in Houston. And I testified |
| 4 | 15:07:19 | about the mooring preparation of a facility on the Mississippi |
| 5 | 15:07:22 | River during Hurricane Katrina. |
| 6 | 15:07:26 | Q. And you said Houston. |
| 7 | 15:07:28 | A. Excuse me, I'm sorry. In court here in New Orleans. |
| 8 | 15:07:32 | Q. Okay. Was that the Judge Berrigan case you're talking |
| 9 | 15:07:34 | about? |
| 10 | 15:07:35 | A. Yes. |
| 11 | 15:07:35 | Q. Okay. |
| 12 | 15:07:36 | A. Not this case, but another case in front of Judge |
| 13 | 15:07:38 | Berrigan. |
| 14 | 15:07:41 | Q. Have you actually testified as a mooring expert? |
| 15 | 15:07:44 | A. No, sir. |
| 16 | 15:07:48 | Q. Has any court rejected your credentials when you've been |
| 17 | 15:07:52 | offered as an expert in any capacity? |
| 18 | 15:07:54 | A. Not that I'm aware of. |
| 19 | 15:07:56 | Q. Has any court not found your testimony credible? |
| 20 | 15:08:02 | A. I think Judge -- what is his name -- I testified in a |
| 21 | 15:08:11 | crane case. And the judge's decision, he said -- one sentence, |
| 22 | 15:08:18 | he said, "Green's testimony was not credible." |
| 23 | 15:08:20 | Q. Was that a case here in the Eastern District of Louisiana |
| 24 | 15:08:23 | called Dexter Latulas versus Montco Offshore? |
| 25 | 15:08:27 | A. That's it, yes. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

431

| | | |
|---|---|---|
| 1 | 15:08:27 | Q. And the judge stated that he didn't find credible the |
| 2 | 15:08:31 | testimony of Commander Don Green, plaintiffs' liability expert? |
| 3 | 15:08:36 | A. That's true. |
| 4 | 15:08:38 | Q. Is that the only case you recall where you were not found |
| 5 | 15:08:41 | credible? |
| 6 | 15:08:41 | A. Yes, sir. |
| 7 | 15:08:44 | MR. WALKER: Thank you, Your Honor. |
| 8 | 15:08:45 | THE COURT: Thank you, sir. |
| 9 | 15:08:52 | MR. BEST: Just a couple of those same issues before |
| 10 | 15:08:55 | we get down to his testimony. |
| 11 | 15:08:56 | DIRECT EXAMINATION |
| 12 | 15:08:56 | BY MR. BEST: |
| 13 | 15:08:57 | Q. Counsel asked you about testimony you were going to give. |
| 14 | 15:09:00 | Your testimony in this case is your opinions within your field |
| 15 | 15:09:03 | of expertise about the acts and omissions of Lafarge at this |
| 16 | 15:09:07 | facility in this time frame that we're talking about; is that |
| 17 | 15:09:12 | right? |
| 18 | 15:09:12 | A. Yes. |
| 19 | 15:09:12 | Q. Okay. Now, although that's what you're testifying about, |
| 20 | 15:09:14 | it's based on your experience through the course of your career |
| 21 | 15:09:18 | in all the different capacities and doing all the different |
| 22 | 15:09:20 | activities you've described? |
| 23 | 15:09:22 | A. That's true. |
| 24 | 15:09:23 | Q. And one of the things I didn't ask you, but it's in your |
| 25 | 15:09:26 | CV, what is the title captain of the port? What does that mean |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 432

```
1    15:09:30   to somebody in the Coast Guard?
2    15:09:32   A.  It's the person designated by the Coast Guard as the chief
3    15:09:36   law enforcement regarding Coast Guard rules and regulations and
4    15:09:40   safety of the port.
5    15:09:41   Q.  Is that sort of the top Coast Guard man with respect to a
6    15:09:45   particular geographical area encompassed by given ports around
7    15:09:49   the country?
8    15:09:50   A.  Yes.
9    15:09:50   Q.  And did you serve as a captain of the port during your
10   15:09:53   career?
11   15:09:53   A.  Yes, for six months in Cincinnati.
12   15:09:59   Q.  Did you get involved in operating the port in New Orleans
13   15:10:02   during your work here?
14   15:10:03   A.  Yes.  As I mentioned before, I was a Coast Guard inspector
15   15:10:06   here in New Orleans.  My second assignment was as the
16   15:10:10   assistant chief of merchant vessel safety here in the district
17   15:10:14   office.
18   15:10:15   Q.  And counsel asked you a question about the opinions you
19   15:10:18   gave in your report.  And he was talking about not -- not
20   15:10:22   involving vessel movements.  Do you recall giving a declaration
21   15:10:28   in addition to your report which was used for us in connection
22   15:10:30   with responding to a motion for summary judgment?
23   15:10:33   A.  Yes.
24   15:10:33   Q.  And do you recall that, in that declaration, you gave
25   15:10:35   opinions about movements of a loose vessel due to tides, wind
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 433

```
1    15:10:39   and waves based on your experience as a mariner?
2    15:10:42   A.  Yes.
3    15:10:42   Q.  And you've been asked to and intend to give opinions of
4    15:10:45   that nature in this case?
5    15:10:46   A.  Yes.  If -- during your direct, if you ask me the
6    15:10:49   question, I'll respond.
7    15:10:49   Q.  Right.  And you also are knowledgeable by virtue of your
8    15:10:53   experience as a mariner of the effect of winds, tides, seas and
9    15:10:57   other vessel traffic on vessel mooring connections?
10   15:11:01   A.  Yes.
11   15:11:03        MR. BEST:  Thank you.
12   15:11:05        MR. WALKER:  Your Honor, may I?  This is an entirely
13   15:11:07   new aspect, then, if we're going to talk about the tidal and
14   15:11:13   the movement of the barge.  That's not --
15   15:11:14        THE COURT:  If it's not in his report, it's not
16   15:11:16   coming in.
17   15:11:18        MR. BEST:  Your Honor, it's in his declaration --
18   15:11:18        THE COURT:  I don't care if he's the world's greatest
19   15:11:20   expert in the world.
20   15:11:21        MR. BEST:  Your Honor, it's in his declaration, which
21   15:11:24   is in evidence as part of our exhibits and was used in the
22   15:11:28   motion for summary judgment.  And I might add --
23   15:11:30        THE COURT:  Hold on a minute because I want to check
24   15:11:32   something here.
25   15:11:36        MR. BEST:  His declaration is Exhibit --
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 434

```
1    15:11:38        THE COURT:  Just a second.
2    15:12:34             (OFF THE RECORD)
3    15:12:39        THE COURT:  Did I had a motion in limine to this
4    15:12:43   issue?
5    15:12:44        MR. BEST:  We're looking for that right now, Your
6    15:12:45   Honor.
7    15:12:49        THE COURT:  I generally have them all here.  I have a
8    15:12:55   lot of stuff, but not necessarily in the right --
9    15:12:56        MR. BEST:  If I may point out, the declaration -- the
10   15:12:58   reason the declaration contains things that are not in the
11   15:13:02   report is because we just obtained the testimony of these two
12   15:13:05   fact witnesses that just testified in April of 2010.
13   15:13:08        So this was new information to all parties.  And
14   15:13:11   the declaration of Mr. Green addresses those, and it serves as
15   15:13:15   a supplement to his report.  It served as part of our
16   15:13:19   opposition to the motion for summary judgment.
17   15:13:21        MR. WALKER:  May I, Your Honor?
18   15:13:23        THE COURT:  Wait until they finish.
19   15:13:25        MR. GILBERT:  I want to remind Your Honor, this
20   15:13:27   declaration that Mr. Green did was in response to arguments
21   15:13:31   that Lafarge was raising in their motion for summary judgment.
22   15:13:34        THE COURT:  I understand that.  And I had motions --
23   15:13:36   I had some motions on some of those declarations.  I just don't
24   15:13:41   recall my ruling on each motion.
25   15:13:43        MR. GILBERT:  I believe that it's 19733.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 435

```
1    15:13:47        MR. WALKER:  That's correct, Your Honor.
2    15:13:48        MR. GILBERT:  And let me get to the bottom line:
3    15:13:50   "Moreover, some of the testimony" --
4    15:13:57        MR. WALKER:  Your Honor, I can cut this short.  We
5    15:13:59   lost that motion.  My point is not the declaration as a
6    15:14:02   document.  It's the extent of the man's testimony based on the
7    15:14:05   expertise that he's testified here to today.
8    15:14:09        And it wasn't brought up in the original voir
9    15:14:12   dire.  There was nothing mentioned about tides.  I asked the
10   15:14:17   specific questions:  "Are you going to testify regarding the
11   15:14:19   movements of the barge across the canal?
12   15:14:22        He said he would not unless somebody asked him a
13   15:14:25   question.  And I think either I can ask him a couple more
14   15:14:28   questions on that topic or he's really not qualified to testify
15   15:14:32   regarding movements of the barge based on the tide.
16   15:14:35        MR. BEST:  Let me say, first, Your Honor, that the
17   15:14:41   declaration is in evidence without objection.  That's the first
18   15:14:41   point.
19   15:14:41        The second point is that I think it is pretty
20   15:14:43   common sense -- pretty much common sense that a mariner with
21   15:14:47   this man's experience has to know and, does, indeed, have --
22   15:14:52   he's not a hydrologist, he's not a meteorologist, but you can't
23   15:14:57   do what he has done and not have knowledge of movements of
24   15:15:01   vessels on the seas.  That's what mariners do.
25   15:15:03        THE COURT:  I don't know what he's opining about.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**436**

| | |
|---|---|
| 1 | 15:15:04   And I don't recall his declaration.  So I would like to look at |
| 2 | 15:15:08   the declaration myself.  Do you have it there?  I have so much |
| 3 | 15:15:13   stuff up here, I cannot put my hands on it. |
| 4 | 15:15:17   MR. BEST:  Plaintiffs' Exhibit 389. |
| 5 | 15:15:19   THE COURT:  Thank you. |
| 6 | 15:15:20   MR. WALKER:  Your Honor, to -- |
| 7 | 15:15:20   THE COURT:  Just let me read it. |
| 8 | 15:15:34   I don't think I've seen this.  If I have, it's |
| 9 | 15:15:37   been a while. |
| 10 | 15:16:07   Okay.  I don't want to take anybody's copy here |
| 11 | 15:16:09   because I know you need this.  So we have a declaration and we |
| 12 | 15:16:13   have an expert report and a declaration that expands the expert |
| 13 | 15:16:21   report.  We had -- I see it.  And I may need to pull it out in |
| 14 | 15:16:28   a minute -- did we have a motion in limine directed to this? |
| 15 | 15:16:32   Because I usually remember every motion in |
| 16 | 15:16:35   limine.  Again, I'm not omniscient.  Did we have a motion in |
| 17 | 15:16:39   limine directed to this affidavit? |
| 18 | 15:16:40   MR. WALKER:  Yes, Your Honor, that 19733 document. |
| 19 | 15:16:43   THE COURT:  Okay.  May I see that ruling, please? |
| 20 | 15:16:46   I'm going to get it.  Okay.  The Opinions 5.6 and 5.7 and -- at |
| 21 | 15:18:11   page 8 of the report do not relate to the declaration.  And the |
| 22 | 15:18:19   motion is -- |
| 23 | 15:18:20   MR. WALKER:  Your Honor, I'm sorry.  You were given |
| 24 | 15:18:22   the wrong one.  That's why it wasn't making sense to you. |
| 25 | 15:18:25   It's easily understood, Counsel. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**437**

| | |
|---|---|
| 1 | 15:19:50   I think the motion was couched as to being |
| 2 | 15:19:54   untimely.  So if you're going into whether -- whether I'm right |
| 3 | 15:19:58   or wrong on it being untimely, you're saying this opinion is |
| 4 | 15:20:02   not within his expertise and you want to question him on it? |
| 5 | 15:20:07   MR. WALKER:  Precisely, Your Honor. |
| 6 | 15:20:08   THE COURT:  And because of the late nature of the |
| 7 | 15:20:11   opinion, I'm going to allow you to do that. |
| 8 | 15:20:13   MR. WALKER:  Thank you, Your Honor. |
| 9 | 15:20:42   THE COURT:  Okay.  Sir. |
| 10 | 15:20:44   MR. WALKER:  Thank you, Your Honor. |
| 11 | 15:20:44   VOIR DIRE |
| 12 | 15:20:44   BY MR. WALKER: |
| 13 | 15:20:45   Q.  Mr. Green, I don't want to go into the areas that we're |
| 14 | 15:20:48   going to examine later, so I would ask you to listen to my |
| 15 | 15:20:51   question carefully. |
| 16 | 15:20:53   Prior to this declaration, you hadn't looked at any |
| 17 | 15:20:57   tide information, had you? |
| 18 | 15:20:59   A.  That's correct.  If -- |
| 19 | 15:21:01   Q.  And the reason that you looked at this tidal information |
| 20 | 15:21:04   is because you received Tompkins and LeBlanc's statements -- or |
| 21 | 15:21:07   depositions; correct? |
| 22 | 15:21:08   A.  I'm sure that's true, right. |
| 23 | 15:21:10   Q.  And you weren't aware that -- contrary to what was just |
| 24 | 15:21:14   stated, that in the spring of '08, not as late as the fall of |
| 25 | 15:21:18   '09 in your declaration, plaintiffs had in their possession |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**438**

| | |
|---|---|
| 1 | 15:21:22   interviews or statements of Tompkins and LeBlanc, so you could |
| 2 | 15:21:27   have been given this information previously? |
| 3 | 15:21:29   A.  I was unaware of those statements. |
| 4 | 15:21:31   Q.  Right.  Hence, your October 2009 declaration date.  That's |
| 5 | 15:21:36   when you received that information? |
| 6 | 15:21:38   A.  Some time period before that, yes. |
| 7 | 15:21:40   Q.  And you said previously you're not a hydrologist? |
| 8 | 15:21:43   A.  That's correct. |
| 9 | 15:21:44   Q.  You're not a meteorologist? |
| 10 | 15:21:46   A.  That's correct. |
| 11 | 15:21:46   Q.  In your tender and on the basis on which you wrote your |
| 12 | 15:21:50   original reports, you wrote them as an expert on marine |
| 13 | 15:21:54   operations and mooring practices, which is what you were |
| 14 | 15:21:57   tendered as here today; correct? |
| 15 | 15:21:58   A.  That's correct. |
| 16 | 15:21:59   Q.  And that does not include, does it, tidal information and |
| 17 | 15:22:06   information on how a barge moves from one side of the canal to |
| 18 | 15:22:08   the other, does it? |
| 19 | 15:22:10   You can answer yes or no. |
| 20 | 15:22:14   THE COURT:  You can explain it afterwards. |
| 21 | 15:22:17   THE WITNESS:  Yes. |
| 22 | 15:22:17   BY MR. WALKER: |
| 23 | 15:22:19   Q.  Yes, it does or yes, it doesn't? |
| 24 | 15:22:20   A.  Yes, my -- whether the judge finds that I'm qualified to |
| 25 | 15:22:25   testify in this regard, I teach tides and currents, I teach |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**439**

| | |
|---|---|
| 1 | 15:22:32   weather patterns, I teach hurricane avoidance.  And if the |
| 2 | 15:22:37   question is asked, "If a barge is free, unmoored, does it move |
| 3 | 15:22:42   with the current," and the answer's going to be, "Yes." |
| 4 | 15:22:45   And I think I'm totally qualified, as any seaman, any |
| 5 | 15:22:50   shrimp boat captain on the way up through master of an |
| 6 | 15:22:55   unlimited ship, that vessels move with the current if they're |
| 7 | 15:22:59   unmoored and they're not steaming against the current. |
| 8 | 15:23:03   It's a natural thing.  You don't have to be a |
| 9 | 15:23:06   hydrologist to be able to figure that out. |
| 10 | 15:23:09   Q.  Okay.  Well, if it's a natural thing and it's logical, |
| 11 | 15:23:12   then the judge does not need an expert opinion to determine |
| 12 | 15:23:15   that a barge may be moved in a direction of a current, does he? |
| 13 | 15:23:19   A.  I would say so, that's correct, yes. |
| 14 | 15:23:21   Q.  You don't think he needs that.  That's -- |
| 15 | 15:23:23   A.  That's logical. |
| 16 | 15:23:29   MR. WALKER:  In that case, Your Honor, I don't think |
| 17 | 15:23:31   Your Honor requires the assistance of an expert to determine |
| 18 | 15:23:35   whether a barge or other vessel would move in the direction of |
| 19 | 15:23:39   a current. |
| 20 | 15:23:39   THE COURT:  Well, it would be interesting -- if a |
| 21 | 15:23:41   wind's blowing one way and the current is going another way and |
| 22 | 15:23:44   if there's something that's a certain size and how many knots |
| 23 | 15:23:47   does the wind have to be to counter-prevail the current, those |
| 24 | 15:23:52   could be fairly involved.  And I'm not sure if that's where |
| 25 | 15:23:55   he's going or not. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**440**

| | |
|---|---|
| 1 | 15:23:57 |
| 2 | 15:23:59 |

15:23:57  MR. WALKER:  Well, you predicted the areas, and

15:23:59  precisely why I worded it, that you don't need assistance to

15:24:01  know that a vessel is going to go in the direction of a

15:24:05  current.

15:24:05  THE COURT:  Like I say, I --

15:24:05  MR. WALKER:  May I ask another question, then?

15:24:07  BY MR. WALKER:

15:24:07  Q.  You actually didn't do any calculations of the type that

15:24:10  the judge just suggested with research to any forces, either

15:24:14  wind or current, acting on the barge, did you?

15:24:17  A.  Yes.  In preparing -- that declaration, I looked at

15:24:21  the tide tables.  I looked at -- I know that in the Industrial

15:24:26  Canal, there are typically two tides a day, a flood and an ebb.

15:24:32  And that means the water comes in, the water goes out, the

15:24:35  water comes in, the water goes out, at least twice a day.

15:24:38  And if a barge is unmoored, free to float, the barge

15:24:43  will be affected and move with the tide.  If it goes out, it

15:24:47  will move in an outwardly direction with the tide.  If the tide

15:24:53  reverses and comes back in with the flood, it will move with

15:25:18  the flood and come back in.

15:25:19  Q.  Right.  You said everything that the judge said he

15:25:19  understood, but you didn't address my question.

15:25:19  Did you make any calculations of any type with

15:25:20  respect to the effects on the barge of the current or the wind

15:25:21  and the forces exerted upon it; yes or no?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**441**

15:25:22  A.  No.

15:25:23  MR. WALKER:  Your Honor, I don't think this man is

15:25:23  qualified to give Your Honor and the Court any assistance,

15:25:24  which is precisely what an expert is required to do based on a

15:25:26  certain area of expertise, not what the Court can assume on his

15:25:27  own.

15:25:28  THE COURT:  All right.

15:25:28  MR. BEST:  May I ask a couple more questions of the

15:25:29  witness?

15:25:29  THE COURT:  You may.

15:25:29  Let me just take one more second to glance over

15:25:32  this declaration again.

15:26:20  All right.

15:26:20  DIRECT EXAMINATION

15:26:20  BY MR. BEST:

15:26:23  Q.  Mr. Green, mariners of vessels have to know something

15:26:27  about the tides to operate those vessels in ports, don't they?

15:26:30  A.  Yes, that's correct.

15:26:31  Q.  They have to know something about tides to moor vessels

15:26:34  properly in ports, don't they?

15:26:37  A.  Yes, they take into consideration tides when making their

15:26:37  decision as to whether they tie it port side, starboard side or

15:26:42  whether or not they're going to have any problems getting it

15:26:44  against the dock.  But, yes, tides and currents are calculated

15:26:48  by a seaman operating a ship.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**442**

15:26:50  Q.  All right.  And in connection with the declaration you

15:26:53  gave, you reviewed local tidal records for certain locations

15:26:57  that I gather you concluded, based on your experience, were

15:27:01  pertinent to this location.

15:27:02  A.  Yes.  If I recall correctly, I looked at the tide tables

15:27:07  for the New Orleans Airport, of the Industrial Canal, and that

15:27:14  area for this.

15:27:16  Q.  And you've had to know about tides since you worked as

15:27:19  [sic] a shrimp boat when you were a kid?

15:27:21  A.  Yes.

15:27:21  Q.  So you know a lot more about tides than the average

15:27:24  landlubber who hasn't been to sea on a boat?

15:27:27  A.  And I've taught approximately 12,000 people how to use the

15:27:31  tide tables and the current tables.

15:27:33  Q.  So what is elementary to you may not be elementary to

15:27:36  someone who does not have your level of experience?

15:27:40  A.  I would agree with that.

15:27:42  Q.  And the opinions you've given in this declaration, as I

15:27:47  understand it, are based on your knowledge and experience for

15:27:50  all these years as a mariner who has to know tides and know how

15:27:53  they affect the vessels you operate and are responsible for in

15:27:57  port and out of port?

15:28:00  A.  Yes.  That's correct, yes.

15:28:01  MR. BEST:  Your Honor, I just don't know how you can

15:28:04  be --

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**443**

15:28:05  THE COURT:  Well, I can certainly -- let me say, one,

15:28:10  I read the reports in general.  I have not focused on this

15:28:15  declaration.  But there's certainly -- the defendants have

15:28:20  reports about the prevailing wind and, of course, that assumes

15:28:23  a certain wind -- it does not assume the vessel was loose in

15:28:28  the Industrial Canal, unmoored, at 12:00 on Sunday.  I

15:28:37  understand that.

15:28:39  But I guess if we get to what happens when

15:28:41  there's a 100-mile-an-hour wind or a 90-mile-an-hour wind or an

15:28:47  80-mile-an-hour wind from a given direction --

15:28:50  Let me finish, Counsel.

15:28:51  -- from a given direction at a certain time at a

15:28:54  certain place and the movement of a barge there, then we're

15:28:57  getting into more than common sense.  We're getting into the

15:29:01  size, the sail, the amount of freeboard on the barge.  We're

15:29:07  getting into what current, where was it flowing, what

15:29:10  direction, what was the hydrology.  We're getting beyond the

15:29:16  mundane at that point.

15:29:18  I'm talking about at the time of 5:00 in the

15:29:20  morning and 4:00 in the morning.  And also one of the problems

15:29:23  is, we're talking about a barge, which I'm sure the defendants

15:29:27  do not -- a barge that was loose as opposed to a barge that was

15:29:33  moored on Saturday, as several people have testified, at the

15:29:39  Lafarge terminal.

15:29:43  So all of this is fairly perplexing to the Court

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**24  (Pages 440 to 443)**

**444**

1    15:29:46   because the Court finds it extraordinarily hard to understand
2    15:29:49   how a barge that was moored, as the witnesses have testified,
3    15:29:52   at the Lafarge dock on Saturday would somehow come loose on
4    15:29:57   Sunday when the wind wasn't -- as we've all pointed out, when
5    15:30:01   we didn't have hurricane conditions.  I find it perplexing.
6    15:30:06         MR. BEST:  I think you will hear from Mr. Pazos on
7    15:30:11   that, who is a naval architect and a marine engineer, who has
8    15:30:15   in his report addressed things called -- I can't remember his
9    15:30:18   exact term, I have to pull his report out -- but the effect
10   15:30:19   that you have waves in a closed space -- sort of like a
11   15:30:22   swimming pool, that when they --
12   15:30:24         THE COURT:  That didn't happen Sunday morning.  I'm
13   15:30:26   not interrupting you, Mr. Best, but is he saying it happened
14   15:30:28   Sunday morning?  Then I'm going to find that really
15   15:30:30   interesting.  Sunday morning?
16   15:30:33         MR. BEST:  No.
17   15:30:34         THE COURT:  So how did it come loose from the dock
18   15:30:36   Saturday, sir?
19   15:30:37         MR. BEST:  I'm about to tell you, Your Honor.
20   15:30:40         THE COURT:  All right.  Good, then tell me.
21   15:30:42         MR. BEST:  I don't know because I wasn't there.  I
22   15:30:42   think it's fair to say that nobody --
23   15:30:44         THE COURT:  Any expert -- look, when I'm interrupting
24   15:30:47   you, sir, take it with grace --
25   15:30:49         MR. BEST:  I apologize.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**445**

1    15:30:49         THE COURT:  -- or you're going to continue to be
2    15:30:51   interrupted, and you may not even be able to speak.  Do you
3    15:30:53   understand that?  No wincing.  You got it?
4    15:30:56         MR. BEST:  Yes, Your Honor.  I understand.
5    15:30:56         THE COURT:  Please get it.  Because the wincing does
6    15:30:58   not help you.  It's not persuasive; it's not good lawyering; in
7    15:31:00   fact, it's counterproductive.  You need to let me finish my
8    15:31:04   thought, sir.  Then you can intelligently respond to it.  You
9    15:31:08   cannot intelligently respond to it until I have finished my
10   15:31:13   point.  Otherwise, it is simple infused rhetoric that is
11   15:31:19   nothing, that is not persuasive.
12   15:31:21         So let's just get that straight.
13   15:31:22         MR. BEST:  Yes, Your Honor.
14   15:31:23         THE COURT:  My point is:  Do you have any expert who
15   15:31:26   has opined how a vessel that was moored on Sunday, the way --
16   15:31:33   let's just take the average person who's testified here,
17   15:31:36   whether it was three lines, four lines, five lines -- it was
18   15:31:39   moored the way it was on Saturday, is loose in the canal at
19   15:31:44   11:00 to 12:00 on Sunday?
20   15:31:46         Now I will be quiet and listen to you.
21   15:31:52         MR. BEST:  Okay.  Mr. Pazos has given testimony and
22   15:31:56   opinions in his report about wave reflection and magnification,
23   15:32:00   particularly in closed areas.  Although, we're now talking
24   15:32:04   about a situation that is pre-storm, there are still waves in
25   15:32:08   there.  The lock logs show there was significant vessel traffic

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**446**

1    15:32:12   in the waterway after the Lafarge people moored the barge and
2    15:32:17   left.
3    15:32:18         There's pretty much a steady stream of barges --
4    15:32:22   of towboats moving things and themselves out of that canal
5    15:32:25   until the lock closure, which we've just shown by the exhibits
6    15:32:29   is about 4:00 p.m. on Saturday.
7    15:32:32         These barges, as you heard, were -- only got
8    15:32:34   about -- they weren't touching --
9    15:32:36         THE COURT:  I don't mean to interrupt you, but I
10   15:32:38   think it's 4:00 a.m. on Sunday morning.  Is that an
11   15:32:41   appropriate --
12   15:32:42         MR. BEST:  Yes.  The lock closure.
13   15:32:43         THE COURT:  You said 4:00 p.m. and I knew you didn't
14   15:32:46   mean it.
15   15:32:47         MR. BEST:  Right.  4:00 a.m. on Sunday.
16   15:32:50         And these vessels, as you heard from
17   15:32:53   Mr. Thigpen, they weren't touching, butted up against each
18   15:32:56   other in the manner that vessel barges typically are in a fleet
19   15:32:58   at the same elevation.  They were unable to bring them any
20   15:33:02   closer than about 2 feet.  This witness is going to testify
21   15:33:06   about the effect that has and the movement that it allows on
22   15:33:09   moored vessels.
23   15:33:11         And Mr. Pazos is prepared to testify about the
24   15:33:14   effect of this wave magnification and -- I've forgotten the
25   15:33:20   terms he used, quite frankly.  But when they're in an enclosed

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**447**

1    15:33:23   space and across from one another it intensifies the waves and
2    15:33:26   the pressure.  So while that is true in a hurricane, it's also
3    15:33:30   true at any time in an enclosed space, as I understand it.
4    15:33:34         So it is certainly possible -- I think when Your
5    15:33:37   Honor hears the evidence, it's conceivable that you could
6    15:33:40   conclude that the barge was loose Sunday morning; because it
7    15:33:44   was so poorly moored with vessels of differential height that
8    15:33:46   weren't touching one another and weren't properly moored and
9    15:33:47   secured, that these lines could have come loose even before
10   15:33:50   that.
11   15:33:51         This witness can only -- Mr. Pazos is the one
12   15:33:56   who talks about the waves from a scientific, naval
13   15:33:59   architecture, marine engineering standpoint.  This witness can
14   15:34:01   only talk about waves from his experience as a mariner and
15   15:34:06   working for the Coast Guard.
16   15:34:08         I have just submitted that I think his
17   15:34:09   declaration is from that perspective, from that experience, and
18   15:34:14   I think is limited to that.  And, of course, Your Honor can
19   15:34:16   give it whatever weight Your Honor thinks it deserves based
20   15:34:20   upon his qualifications and experience.  But I think it's a
21   15:34:22   legitimate opinion based upon his experience about the movement
22   15:34:26   of vessels under varying circumstances.
23   15:34:30         And he's not being specific.  He's not here
24   15:34:33   plotting a vessel trajectory over a particular time in a
25   15:34:37   particular direction and place.  He's more or less just saying,

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

25  (Pages 444 to 447)

**448**

15:34:40  1  you can't be for sure that it wouldn't do what it did here.
15:34:44  2  And I think he has the qualifications to do that.
15:34:46  3        But more particularly, this was submitted as an
15:34:49  4  exhibit.  It's in evidence without objection.  And I think any
15:34:54  5  objection the defendant has to its contents and to the opinion
15:34:56  6  of this witness and to his credentials in this regard has been
15:34:59  7  waived and comes too late.
15:35:00  8        THE COURT:  Thank you, sir.
15:35:01  9        MR. WALKER:  May I, Your Honor?
15:35:03  10        THE COURT:  Yes.  Let's get to the "too late" part
15:35:05  11  first, rather than the technical part.
15:35:07  12        MR. WALKER:  The "too late" part --
15:35:08  13        THE COURT:  Why wasn't there an objection lodged as
15:35:11  14  to this declaration?
15:35:16  15        MR. RAFFMAN:  Your Honor, my name is Mark Raffman
15:35:19  16  I prepared the motion to exclude the document as untimely.
15:35:23  17        THE COURT:  Right.
15:35:23  18        MR. RAFFMAN:  The motion to exclude the document as
15:35:25  19  untimely was filed because Your Honor ordered that the
15:35:29  20  plaintiffs' expert reports be served in the summer of 2009.
15:35:35  21        THE COURT:  I recall.  I recall that motion.
15:35:38  22        MR. RAFFMAN:  At the time, Mr. Green did not provide
15:35:40  23  any declaration regarding tidal movement of barges.
15:35:45  24        Our position is that the plaintiffs had had the
15:35:47  25  Tompkins and LeBlanc statements since the spring of 2008.  And

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**449**

15:35:52  1  if the plaintiffs wanted to rely on Tompkins and LeBlanc, they
15:35:56  2  had every opportunity to provide those statements to their
15:35:59  3  experts in time for the experts to provide their opinions in a
15:36:03  4  timely way.
15:36:04  5        The plaintiffs chose not to provide Tompkins and
15:36:07  6  LeBlanc to their experts.  They chose to keep that evidence
15:36:10  7  from their experts until after their reports were served, until
15:36:15  8  after our summary judgment was filed.
15:36:17  9        At that point, they changed their position,
15:36:19  10  provided the declarations to their experts, and their experts
15:36:22  11  came in with late declarations.
15:36:25  12        We move to strike those declarations in
15:36:28  13  connection with our summary judgment motion.  Your Honor
15:36:32  14  decided that that motion to strike -- which I argued to Your
15:36:36  15  Honor, and Your Honor was very interested in that motion, but
15:36:39  16  Your Honor decided it was moot when Your Honor decided that you
15:36:42  17  would not grant our summary judgment motion for reasons apart
15:36:46  18  from the expert opinions.
15:36:48  19        The plaintiffs then submitted the late
15:36:53  20  declarations of Mr. Green and some other experts as exhibits --
15:36:58  21  trial exhibits.  We moved -- we renewed our motion and Your
15:37:03  22  Honor denied our motion and allowed them to come in.
15:37:11  23        So that's the state --
15:37:13  24        THE COURT:  You never focused on the expertise.
15:37:15  25        What I'm going to do is this -- I'm going to

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**450**

15:37:17  1  make this simple.  This is a judge trial, and although I would
15:37:21  2  love a jury to be deciding this, in some instances, it's a
15:37:25  3  little easier because ultimately I'm going to get to the bottom
15:37:29  4  of it and I'm going to let a record be made here.  And I'm
15:37:32  5  going to give it --
15:37:32  6        Frankly, this opinion, this declaration, unless
15:37:37  7  I get overwhelmed, I'm going to just tell you right now --
15:37:40  8  later on I'm -- unless I get really overwhelmed, is going to
15:37:44  9  have little or no weight, but I'm going to let it get in the
15:37:48  10  record because of where we are now.
15:37:51  11        So I'm tired of haggling about it now.
15:37:55  12  Mr. Pazos, as I heard his expert report -- and I could be
15:38:01  13  wrong -- it certainly didn't regard the benign condition -- it
15:38:06  14  wasn't involving benign conditions Sunday morning.
15:38:10  15        But nevertheless, with all that in mind and
15:38:14  16  because of where we are now, and because of the ruling that I
15:38:14  17  made, and because we didn't focus on his expertise, I'm going
15:38:18  18  to let it go in and it will go -- I hate to sound like a state
15:38:22  19  judge, but it will go to the weight.  That's pretty much what
15:38:25  20  I'm going to do and I will let him testify.
15:38:31  21        You got your objections on the record.
15:38:33  22        MR. RAFFMAN:  Thank you, Your Honor.
15:38:34  23        I just -- if I might react to what Mr. Best
15:38:38  24  has --
15:38:38  25        THE COURT:  You may.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**451**

15:38:38  1        MR. RAFFMAN:  -- represented to the Court about
15:38:40  2  Mr. Pazos' opinion.
15:38:41  3        THE COURT:  I'll hear that.  And if you want to
15:38:42  4  counter --
15:38:42  5        MR. RAFFMAN:  I just want to preview for Your Honor
15:38:45  6  that the opinion that the barge broke away on Sunday morning as
15:38:49  7  a result of wave reflection is nowhere.
15:38:53  8        THE COURT:  Well, I've read the report.  And that's
15:38:56  9  why I asked Mr. Best, if he wondered why I was interrupting
15:39:00  10  him, that would be news to me, let me just say.  And again,
15:39:04  11  we've already discovered I'm not omniscient.
15:39:09  12        But I could be wrong.  It's got to be really
15:39:12  13  hard to believe that at 11:00 -- it's kind of a mystery, but
15:39:17  14  there are mysteries in the world.  If the two people I believe
15:39:20  15  who saw a barge and there's no record of the barge leaving,
15:39:23  16  well, that's another mystery that I'll have to resolve.  That's
15:39:26  17  why I'm here.  We'll see what happens.
15:39:29  18        By I appreciate your remarks.  Forgive the
15:39:33  19  Court's impatience, but I just want to be able to get my point
15:39:38  20  across.  I'm the trier of facts.  It's best to listen to me
15:39:43  21  because -- I do listen.  I talk, but I also listen.  So make
15:39:46  22  your points, but understand that I've read these reports and
15:39:51  23  understand, something's got to make sense to me or it's not
15:39:54  24  going to have much persuasive power.  Okay.
15:39:59  25        MR. RAFFMAN:  Thank you, Your Honor.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**452**

```
15:40:00    THE COURT:  All right.  Thank you very much.
15:40:00        Mr. Best?
15:40:01    MR. BEST:  In order not to belabor the declaration,
15:40:03  since it's been discussed and Your Honor has read it --
15:40:06    THE COURT:  Is this yours?  Did I take your
15:40:07  declaration?  Do you have one?
15:40:10    MR. BEST:  No, I have one.
15:40:11    THE COURT:  Okay.  I've read it.
15:40:12    MR. BEST:  Since Your Honor's read it and it's in
15:40:14  evidence, I'm not going to belabor it by having the witness
15:40:17  repeat and parrot simply what's in the declaration.  I think
15:40:20  it's been exhausted.
15:40:23    THE COURT:  Thank you.
15:40:24        You've never had a chance to start your
15:40:26  questioning, I don't think.
15:40:28    MR. BEST:  No, I haven't.
15:40:30    THE COURT:  Then you really will be genuinely
15:40:33  uninterrupted.  Go ahead, sir.
15:40:35    MR. BEST:  I don't know.  It's lengthy, Judge.
15:40:37  Things don't go that simply.
15:40:43    THE COURT:  Okay.
15:40:45        DIRECT EXAMINATION
15:40:45  BY MR. BEST:
15:40:46  Q.  In your report, which is part of Exhibit 387, you've
15:40:50  listed materials you had reviewed at the time that you prepared
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**453**

```
15:40:54  that report, which was dated March 11th, 2009.  For
15:41:01  completeness of the record, have you reviewed additional
15:41:04  materials since that time?
15:41:05  A.  Yes, sir.
15:41:06  Q.  What are the other materials you've reviewed since that
15:41:09  time?
15:41:10  A.  I've reviewed expert reports from the defense side,
15:41:15  Mr. Strouse and Captain Ryan and one other gentleman, and also
15:41:26  affidavits of the two people that testified today.
15:41:30  Q.  All right.  And you were here for their testimony?
15:41:34  A.  Yes, I was here for most of the testimony of the lady and
15:41:40  all the testimony of the gentleman.
15:41:42  Q.  Do the additional materials you reviewed include -- and I
15:41:46  don't know when you reviewed these, but we have listed in our
15:41:50  exhibits, 390 is the Coast Guardsman's Manual; 391, the Blue
15:41:56  Jacket Manual; 392, The Seamanship Fundamentals for Deck
15:42:00  Officers; 393, Naval Ship Handling; and 394, Dictionary of Old
15:42:05  Sea Terms; and finally, 395, Knight's Modern Seamanship.
15:42:12        Those are also materials you've reviewed?
15:42:14  A.  Yes.
15:42:14  Q.  And they pertain -- in most respects, do those materials
15:42:17  pertain to the mooring issues in this case?
15:42:19  A.  I'm sorry?
15:42:20  Q.  Those materials, those reference materials I just listed
15:42:23  from our exhibit list, pertain to the mooring issues in this
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**454**

```
15:42:26  case?
15:42:26  A.  Yes.
15:42:26  Q.  And has anything that you have reviewed since you've
15:42:30  prepared your report changed the opinions you gave in that
15:42:34  report?
15:42:35  A.  No.
15:42:35  Q.  And what has been the effect of the materials you reviewed
15:42:38  on the opinions you gave in the report?
15:42:40  A.  The fact that -- it's my opinion they supported the
15:42:44  opinions I offered.
15:42:50  Q.  And the exhibits I just listed, 390 through 395, are those
15:42:58  authorities typically relied upon by mariners and seamen and
15:43:02  those who teach mariners and seamen on subjects including
15:43:06  mooring?
15:43:07  A.  Yes, they come directly from textbooks that I use in my
15:43:11  lectures.
15:43:12  Q.  And they're considered authoritative text by you as a
15:43:15  teacher of seaman of these sorts of things?
15:43:17  A.  Yes.  They're publicly available and they're well known by
15:43:20  mariners.
15:43:20  Q.  And they've confirmed your opinions that you gave in your
15:43:23  report on mooring issues in this case?
15:43:25  A.  Yes.
15:43:27  Q.  Now, you were also at your deposition furnished with some
15:43:31  photographs by defense counsel of the barges -- of the barge
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**455**

```
15:43:37  that you did not have at the time that you prepared that
15:43:40  report; am I correct?
15:43:42  A.  That's correct.
15:43:42  Q.  And those photographs showed what that was of interest to
15:43:46  you?
15:43:47  A.  They showed wires, ratchets and other hardware that was on
15:43:55  the 4727 as it was when it was in the neighborhood, in the
15:44:01  Ninth Ward.
15:44:02  Q.  Okay.  These, likewise, just simply confirmed your
15:44:08  previous opinions and did not change them?
15:44:09  A.  That's correct.
15:44:10    MR. BEST:  I would ask if defense counsel would be so
15:44:12  kind as to demonstrate, through your technician, Defense
15:44:16  Exhibit 252, particularly photographs 35 through 41.  And those
15:44:21  are -- and we'll do one at a time.
15:44:26        What I'm going to ask him to do is to say what's
15:44:28  in the photograph and then later we'll get to his opinion.
15:44:30    THE COURT:  Thank you.
15:44:31    MR. BEST:  This is a predicate since this is
15:44:32  additional material he reviewed that did not have the final --
15:44:34    THE COURT:  Thank you, sir.
15:44:44    MR. BEST:  I'm sorry.  That's the wrong number.  I
15:44:46  think -- I'm sorry.  Those are the photographs recently
15:44:50  furnished, which is my next question.  I think these
15:44:53  photographs are attached in Plaintiffs' Exhibit 387, which is
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

27  (Pages 452 to 455)

**456**

```
1   15:45:01   the exhibits to the deposition of Donald Green, the
2   15:45:06   photographic exhibits. I'll give you a moment to see if you
3   15:45:09   can find those.
4   15:45:11        While you're locating those, sir, we can go
5   15:45:15   ahead -- I don't want to get ahead of myself.
6   15:45:31   BY MR. BEST:
7   15:45:33   Q.  Okay. Let's take them one at a time. We have Plaintiffs'
8   15:45:36   Exhibit 388. Is that one of the photographs furnished to you
9   15:45:39   by defense counsel at the time of your deposition?
10  15:45:41   A.  Yes, it is.
11  15:45:42   Q.  And what does that show that was of interest to you in
12  15:45:45   terms of the mooring issues in this case?
13  15:45:47   A.  It shows that there was standing wire attached to the
14  15:45:53   kevel on Barge 727, and the bitter end is over the side of the
15  15:46:02   barge -- it continues over the side of the barge.
16  15:46:04   Q.  And these you understood to be photographs taken of the
17  15:46:06   barge while it's sitting on the ground in the Ninth Ward after
18  15:46:09   the storm?
19  15:46:09   A.  That's what I understand, yes.
20  15:46:11   Q.  And the mooring wires coming down, we see the white thing
21  15:46:15   with the horns is the kevel?
22  15:46:18   A.  Yes.
23  15:46:18   Q.  And next to it we have what looks like a round thing. Is
24  15:46:21   that what somebody -- I think Mr. Thigpen described previously
25  15:46:24   as a button?
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**457**

```
1   15:46:25   A.  That's correct, yes.
2   15:46:26   Q.  So here we have what appears to be a steel cable attached
3   15:46:29   to the kevel, and doing what?
4   15:46:32   A.  It's just draped over the side.
5   15:46:35   Q.  Okay. And your understanding from the testimony you've
6   15:46:41   heard here in court and from the depositions that you reviewed
7   15:46:43   in preparing your report was that those wires were not used in
8   15:46:48   mooring the vessel?
9   15:46:49   A.  That's correct.
10  15:46:49   Q.  But they were, by virtue of this photo, available?
11  15:46:54   A.  Yes, they were on the vessel.
12  15:46:55        MR. BEST:  Next photo, please.
13  15:46:57   BY MR. BEST:
14  15:46:57   Q.  This is also part of Plaintiffs' Exhibit 388, a
15  15:47:08   photographic exhibit bearing No. 06-4132 below the 388. Is
16  15:47:14   this another photograph furnished to you at the time of your
17  15:47:16   deposition?
18  15:47:17   A.  Yes. Those are permanent ratchets as well as wire
19  15:47:20   attached to them.
20  15:47:21   Q.  What are these used for on barges like this?
21  15:47:23   A.  They're used to make up tows, marry barges together. They
22  15:47:31   use wires and ratchets -- you can pull the wires from one barge
23  15:47:37   to another, and they use the ratchet to take the slack out of
24  15:47:39   it and draw the barges close to each other.
25  15:47:43   Q.  So if a barge like this is being moored to another barge,
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**458**

```
1   15:47:46   in a fleet, for example, these are the wires that can be used
2   15:47:49   to moor them together?
3   15:47:50   A.  Yes. They are used for that.
4   15:47:52   Q.  And the ratchets tighten them and bring the vessels
5   15:47:56   together?
6   15:47:59   A.  Yes. The ratchets take the slack out of the cable,
7   15:47:59   exactly.
8   15:48:00   Q.  And you, likewise, understand that these were not in use
9   15:48:05   in the mooring of this vessel at the time it was moored at
10  15:48:08   Lafarge prior to the storm?
11  15:48:09   A.  Yes. All the testimony is that they only used soft line.
12  15:48:13   Q.  Okay.
13  15:48:17        MR. BEST:  Next photograph. That's it.
14  15:48:17   BY MR. BEST:
15  15:48:18   Q.  Now, in addition to those photographs that you got at the
16  15:48:22   deposition from defense counsel, you were more recently
17  15:48:24   furnished with additional photographs of mooring lines on the
18  15:48:31   barge that remained at the dock and of the mooring lines on
19  15:48:34   this vessel; is that correct?
20  15:48:36   A.  Yes. The -- those photographs also show hardware and
21  15:48:41   wires and --
22  15:48:43   Q.  We're going to get them. I'm going to call them up.
23  15:48:46        MR. BEST:  And now I would ask the defendants for the
24  15:48:48   exhibit I asked for prematurely a moment ago, DX-252, photos 35
25  15:48:57   through 41.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**459**

```
1   15:49:03        I believe we're loading them, Your Honor.
2   15:49:10        MR. BEST:  This photograph is labeled as Exhibit 5 on
3   15:49:15   the photo.
4   15:49:30        THE COURT:  Do you-all need a brief break?
5   15:49:31        MR. BEST:  Yes, I'm trying to figure out how to
6   15:49:33   identify it. We were given the materials. Okay. There it is
7   15:49:36   at the bottom. D -- on the lower right-hand corner, D252-035.
8   15:49:42   So it's identified by that for these purposes --
9   15:49:48        THE COURT:  Thank you very much, Counsel.
10  15:49:49        MR. BEST:  -- and then Exhibit 5.
11  15:49:49   BY MR. BEST:
12  15:49:50   Q.  And these photographs were more recently furnished to you,
13  15:49:53   and these were the ones that were photographs -- it was
14  15:50:00   represented to you, as I understand it, that these were taken
15  15:50:03   shortly after the hurricane during Lafarge's own investigation
16  15:50:07   by its staff and representatives?
17  15:50:09   A.  That's my understanding, yes.
18  15:50:11   Q.  Okay. And what is the photograph at the top significant
19  15:50:15   of to you?
20  15:50:16   A.  That's a -- eye of a piece of mooring line, the
21  15:50:20   remnants of a mooring line.
22  15:50:29        MR. BEST:  So it's kind of hard to tell in this
23  15:50:30   photograph where it is and what we're looking at, so let's go
24  15:50:31   to the next photograph in the sequence, which is D252-036.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**460**

1    15:50:35   BY MR. BEST:

2    15:50:35   Q.  Let me represent to you that these are photographs of the

3    15:50:38   barge to which 2747 [sic] was moored, which remained at the

4    15:50:42   dock at the Lafarge facility.  And these are photographs taken

5    15:50:47   by Lafarge as part of their investigation shortly after the

6    15:50:50   storm.  And these are the mooring lines found on that adjacent

7    15:50:56   barge.

8    15:50:57       You reviewed these photograph?

9    15:50:59   A.  Yes, I did.

10   15:51:01       MR. BEST:  Let's go to the next one in the sequence.

11   15:51:04   BY MR. BEST:

12   15:51:07   Q.  What's significant -- and this is D252-037.  What's

13   15:51:13   significant about these photos?

14   15:51:14   A.  Well, the top photo shows the piece of mooring line, a

15   15:51:20   remnant of a mooring line.  The eye was passed through the

16   15:51:24   kevel and draped over one horn of the kevel.

17   15:51:31       And the bitter end that looks like it's parted, I

18   15:51:36   understand was leading up to the 4727.

19   15:51:38   Q.  So just to put this photograph in context, if we assume

20   15:51:41   this is the barge that remained at the dock and these were the

21   15:51:44   blue mooring lines that moored it to the 4727, they would have

22   15:51:50   been going up from this kevel to the higher level of the 4727?

23   15:51:56   A.  That's correct, yes.

24   15:51:56   Q.  To kevels on the 4727.

25   15:51:58   A.  Yes.

**461**

1    15:52:01       MR. BEST:  And to the next photograph in this

2    15:52:04   sequence.  This is D252-038.

3    15:52:13   BY MR. BEST:

4    15:52:13   Q.  These are more photographs of parted lines.

5    15:52:16   A.  Yes, sir.

6    15:52:22   Q.  And the bottom photograph shows the actual dock itself,

7    15:52:26   including the cement bollards to which the inboard barge was

8    15:52:32   moored?

9    15:52:32   A.  That's correct, yes.

10   15:52:33       MR. BEST:  The next photograph in the sequence.

11   15:52:35   BY MR. BEST:

12   15:52:37   Q.  D252-039, the bottom photograph, again I'll represent to

13   15:52:43   you was on the barge that remained at the dock.  As you could

14   15:52:47   see, the barge is in the water, as opposed to the other barge

15   15:52:51   which was on the land in the neighborhood.

16   15:52:56       Now, this barge -- this photo at the bottom, again we

17   15:52:59   have a broken blue mooring line?

18   15:53:01   A.  Yes.  It looked like it parted right there at the eye.

19   15:53:05   Q.  Close -- at the knot, close to the kevel?

20   15:53:07   A.  Yes.

21   15:53:07   Q.  Okay.  We'll talk about the knot and the moorings later.

22   15:53:12       Now, in that same photo, beyond the kevel, we have

23   15:53:14   another button.  And what's on the button?

24   15:53:17   A.  It's a permanent wire.

25   15:53:18   Q.  And, of course, based upon the testimony, you have no

**462**

1    15:53:20   indication that that wire cable was used in the mooring of the

2    15:53:25   vessel prior to the storm to the 4727?

3    15:53:28   A.  No, all the information I have is that no wires were used.

4    15:53:32   Q.  All right.

5    15:53:32       MR. BEST:  And the next photograph in the sequence.

6    15:53:36   This is D252-040.

7    15:53:42   BY MR. BEST:

8    15:53:42   Q.  What are the significance, particularly -- what's the

9    15:53:48   significance of these photos?

10   15:53:51   A.  Well, again, it's pieces of mooring line that was, I

11   15:53:54   understand, used to moor the 4727 to the 4745.

12   15:53:58   Q.  Now, in the photograph on the right here, this kevel that

13   15:54:02   has the blue line around it is -- it appears to be somewhere in

14   15:54:07   midship.  That is, it's not at either end of the barge; is that

15   15:54:13   correct?

16   15:54:13   A.  That's correct.

17   15:54:14   Q.  So fair to say that would be generally consistent with the

18   15:54:15   testimony that you read that there were three single part lines

19   15:54:17   on the barge.  It was --

20   15:54:18   A.  Yes.  It was my understanding there were two breast lines,

21   15:54:21   one at each end, and a spring line between the two barges.

22   15:54:25   Q.  And just for the completeness of the record and the

23   15:54:27   benefit of the Court, should the Court need the information,

24   15:54:30   what is a spring line and how does it differ from the mooring

25   15:54:33   lines at each end of the barge?

**463**

1    15:54:35   A.  The mooring lines at the end of the barge would be

2    15:54:38   described as breast lines, which means they go perpendicular

3    15:54:44   from the barge, from barge to barge, straight to the barge and

4    15:54:50   not at an angle.

5    15:54:58       A spring line at an angle, meaning it's made fast

6    15:54:58   to one kevel and then it's led forward, or led aft, to a kevel

7    15:55:02   on the other barge, which means that it's at an oblique angle

8    15:55:08   or parallel to the barge.

9    15:55:14   Q.  So it's not a direct perpendicular mooring?

10   15:55:22   A.  That's correct.  It's used to prevent a vessel from moving

11   15:55:26   laterally against each other.

12   15:55:28   Q.  And I think you also read way back in the deposition

13   15:55:29   testimony of Mr. Thigpen, who observed the condition of all

14   15:55:34   this mooring when he came to assist in the topping around of

15   15:55:36   the vessels?

16   15:55:37   A.  Yes.

17   15:55:37   Q.  And did you see there where he said that, in addition to

18   15:55:39   the mooring at each end of the barge, there was also mooring

19   15:55:44   more or less at midships at an angle?

20   15:55:48   A.  Yes.

21   15:55:48   Q.  Is that consistent with a spring line, as you understand

22   15:55:50   it?

23   15:55:51   A.  Yes.

24   15:55:51   Q.  Is the location of this --

25   15:55:51       MR. WALKER:  Your Honor, that was not what

**464**

1    15:55:53   Mr. Thigpen testified to in this courtroom.

2    15:55:56        THE COURT:  Well, an objection like that is

3    15:55:59   extraordinarily difficult for me to rule on.  I'll note your

4    15:56:02   objection and we will -- it's in the record.  When I read the

5    15:56:06   whole transcript, I will make that determination.

6    15:56:10        MR. WALKER:  Thank you, Your Honor.

7    15:56:10   BY MR. BEST:

8    15:56:11   Q.  In any case, is this photo on the right of this

9    15:56:14   Exhibit 252-040 generally consistent with a spring line and

10   15:56:19   your understanding of that witness' deposition?

11   15:56:21   A.  Well, I can't tell -- I'm only going on the testimony that

12   15:56:25   was given that the line in the middle was going at an angle and

13   15:56:31   not straight across the barge.  And that would -- that would

14   15:56:35   lead me to believe that it was deployed as a spring line.

15   15:56:39   Q.  In any case, this certainly is a kevel that is not at

16   15:56:43   either end of the barge?

17   15:56:44   A.  That's right.  What remains on it is the remains of a

18   15:56:48   mooring line.

19   15:56:50        THE COURT:  Do you want to point to it and make a

20   15:56:51   mark on it just for the record?  You said this is not a kevel.

21   15:56:57   This is a kevel that is not being utilized.  Is that --

22   15:57:01        MR. BEST:  No, I didn't say it was not being

23   15:57:03   utilized.  I said this is a kevel that is at neither end of the

24   15:57:08   barge.  This is more or less at midships and is consistent with

25   15:57:13   what you have said was a spring line and what you understood

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**465**

1    15:57:17   Mr. Thigpen said.

2    15:57:17        THE COURT:  I got you.  Thanks.

3    15:57:17   BY MR. BEST:

4    15:57:18   Q.  Is that the point, where I put that purple mark?

5    15:57:20   A.  Yes.

6    15:57:20   Q.  Now, this line is bright blue?

7    15:57:22   A.  Yes.

8    15:57:23   Q.  That's consistent with perhaps being a new line, as you've

9    15:57:26   heard some of the testimony?

10   15:57:27   A.  Yes.

11   15:57:29   Q.  Had some new rope that they might have used?

12   15:57:33   A.  Yes, sir.

13   15:57:33   Q.  This barge is 200 feet long; am I right?

14   15:57:37   A.  Correct.  Yes, sir.

15   15:57:40   Q.  And the barge that was moored to it that's no longer at

16   15:57:42   the dock next to it was also 200 feet long?

17   15:57:45   A.  Yes.

18   15:57:46   Q.  Just so I got this photograph right, what we had, based on

19   15:57:49   everything you've reviewed, is three of these blue lines, like

20   15:57:59   we see in this picture, one at each end that went perpendicular

21   15:58:02   and one in the middle that may have been a spring line at an

22   15:58:06   angle?

23   15:58:06   A.  That's correct, yes.

24   15:58:07   Q.  And that's all?

25   15:58:07   A.  That's the testimony.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**466**

1    15:58:08   Q.  For two 200-foot-long barges, I guess, if you had gone up

2    15:58:12   five or six stories above the barges, would look like three

3    15:58:16   blue threads; is that fair?

4    15:58:18   A.  Yes.

5    15:58:18   Q.  And that's all the mooring that was between these two

6    15:58:18   barges?

7    15:58:19        THE COURT:  Do you have an objection?

8    15:58:20        MR. WALKER:  Your Honor, I realize Mr. Green is an

9    15:58:23   expert, but I would like to hear him, so my objection is

10   15:58:28   leading more than necessary.

11   15:58:29        THE COURT:  I'm going to overrule the objection.

12   15:58:32        Although, you're not by right entitled to lead

13   15:58:33   experts in federal court under the rule, the Court has ultimate

14   15:58:36   discretion over that and I'm going to allow you to lead.

15   15:58:39   BY MR. BEST:

16   15:58:41   Q.  Now --

17   15:58:41        THE COURT:  Not testify for him, but to lead.  Go

18   15:58:43   ahead, sir.

19   15:58:44        MR. BEST:  Thank you, Your Honor.

20   15:58:45        I think we may be almost finished.  There's one

21   15:58:48   more exhibit in this sequence that I think is the final one.

22   15:58:51   This is D252-041.

23   15:59:00   BY MR. BEST:

24   15:59:00   Q.  At the top, we have actually the 427 -- 4727, which is in

25   15:59:05   the Ninth Ward approximately at a time when the ground still looks

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**467**

1    15:59:09   wet.  Do you see that?

2    15:59:10   A.  Yes, sir.

3    15:59:10   Q.  And what do you see that is of significance on the deck of

4    15:59:15   the 4727?

5    15:59:17   A.  Well, the top photograph, if I can see correctly, it looks

6    15:59:21   like the remnants of a mooring line.

7    15:59:26   Q.  You're talking about --

8    15:59:28        THE COURT:  Is it the top photograph?

9    15:59:31        MR. BEST:  Yes.

10   15:59:31   BY MR. BEST:

11   15:59:31   Q.  The top photograph, what looks like a white kevel --

12   15:59:34   A.  Yes.

13   15:59:36   Q.  -- appears to have a little, thin blue thread of mooring

14   15:59:39   line going through the kevel and then laying up on the deck.

15   15:59:42        THE COURT:  Would you be kind enough to point that

16   15:59:44   out to the, obviously, vision-impaired Court.

17   15:59:50        MR. BEST:  I'm going to try to touch it just below

18   15:59:53   the kevel.  Well, I went over the line, but --

19   15:59:55        THE COURT:  Okay.  But that's where --

20   15:59:55        MR. BEST:  That's what I'm talking about.

21   15:59:55        MR. BEST:  I'll clear that.  I simply had trouble

22   15:59:58   seeing it.

23   15:59:58   BY MR. BEST:

24   15:59:59   Q.  And then it appears that blue line goes back behind the

25   16:00:01   kevel and the remnants of the line, or some length of it,

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**468**

1    16:00:06    appear to be stacked up against where the bulwark is?
2    16:00:09    A.  Yes.
3    16:00:11    Q.  So I know we don't have a measurement of that line from
4    16:00:13    the photo, but does the fact that we're not just looking at a
5    16:00:19    stub like we are at the piece at the dock where you saw it
6    16:00:22    broken past the knot -- but it certainly makes sense that there
7    16:00:28    could have been a longer piece of line on this barge and a
8    16:00:30    shorter piece of line that was left on the barge that stayed
9    16:00:33    moored at the dock?
10   16:00:34    A.  Yes.  And it would be my opinion that when it parted, that
11   16:00:37    line recoiled back and went up on top of the deck.
12   16:00:41    Q.  And finally, at the bottom of this last photographic
13   16:00:47    exhibit, 041, we have another kevel that again appears to be a
14   16:00:50    midships kevel; that is, it's at neither end of the barge?
15   16:00:53    A.  Yes, sir.
16   16:00:53    Q.  And it has a section of blue line made up to it, a single
17   16:00:58    part line draped down some distance, almost to the bottom of
18   16:00:58    the hull; is that correct?
19   16:01:00    A.  Yes, that's correct.
20   16:01:01    Q.  Would that be the counterpart of what you've described in
21   16:01:04    the previous photographs as being what you appreciated to be a
22   16:01:07    spring wire?
23   16:01:08    A.  Yes, that would the other end of it.
24   16:01:10    Q.  And the fact that we had a long length of blue line on the
25   16:01:14    vessel that remained at the dock at the midships kevel and we

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**469**

1    16:01:18    have a long length of blue line on this midships kevel also is
2    16:01:23    consistent, if you put the two lengths together, with it being
3    16:01:26    a spring line, which would have more length than a
4    16:01:29    perpendicular line?
5    16:01:30    A.  That's correct.
6    16:01:33    MR. BEST:  All right.  Thank you, Your Honor.
7    16:01:38    BY MR. BEST:
8    16:01:38    Q.  Again, just summarily, these new photographs that you got
9    16:01:43    recently don't change your previous opinions about the quality
10   16:01:46    of the mooring job that was done here?
11   16:01:48    A.  No.
12   16:01:48    Q.  They merely reinforce those opinions?
13   16:01:52    A.  That's correct.
14   16:01:52    Q.  All right.  In addition, I think you, since your report,
15   16:01:57    have gotten copies of the official documentation of the
16   16:02:00    Barge 4727?
17   16:02:01    A.  Yes.
18   16:02:02    Q.  At the time of your report, did you have that?
19   16:02:04    A.  No, I had -- during my deposition with Mr. Walker, I told
20   16:02:10    him I would try to look for copies of the document online, but
21   16:02:16    I was unsuccessful.  So I put in my report the documentation
22   16:02:20    was unknown.
23   16:02:21    Q.  Now, before we get further into your particular opinions
24   16:02:24    about the mooring and what wasn't done that should have been
25   16:02:27    done and whatnot, let me ask you another line of questioning

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**470**

1    16:02:31    that is included in your report.
2    16:02:35    Are there federal regulations that apply to the
3    16:02:37    mooring of vessels?
4    16:02:38    A.  Yes.
5    16:02:39    Q.  And have you referenced those in your report?
6    16:02:42    A.  Yes, I did.
7    16:02:43    Q.  Okay.  Now, there are just, I think, three or four of
8    16:02:47    them.
9    16:02:48    MR. BEST:  And, Your Honor, what I'd like to do for
10   16:02:51    continuity and context is -- they are not listed as exhibits.
11   16:02:56    They are not in evidence because they are law.  But what I was
12   16:03:00    going to do, since the witness referred to them in his report,
13   16:03:03    is just put them on the ELMO and have him put them in context
14   16:03:07    from a marine operations standpoint.
15   16:03:10    THE COURT:  All right.
16   16:03:13    MR. BEST:  All right.
17           BY MR. BEST:
18   16:03:13    Q.  The first one -- and that's one that you cited in your
19   16:03:16    report, is it not sir, 6.14-1 of Title 33, subpart 6.14?
20   16:03:24    A.  Yes.
21   16:03:25    Q.  And you could see -- this is my highlight on these, in
22   16:03:29    order save time and expedite matters.
23   16:03:32    What's the subject matter of this section of the Code
24   16:03:34    of Federal Regulations, in general?
25   16:03:36    A.  It gives the kind of authority to inspect and determine

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**471**

1    16:03:46    whether a barge is in danger or presents a danger to the port,
2    16:03:53    including its operation and its mooring, et cetera.
3    16:03:56    Q.  All right.  And the title of subpart 6.14, would you read
4    16:04:00    that, please?
5    16:04:01    A.  Yes.  It says "Safety Measures."
6    16:04:03    Q.  Actually, that's the title of 6.14.1.  That's the title of
7    16:04:10    subpart 6.14 above.
8    16:04:12    A.  Oh, its Title 33, Navigation -- Navigation and Navigable
9    16:04:21    Waters, Chapter 1 -- or Chapter I, whichever -- Coast Guard,
10   16:04:24    Department of Homeland Security, subchapter A.
11   16:04:28    Part 6, protection and security of vessels, harbors,
12   16:04:31    waterfront facilities.
13   16:04:33    Subpart 6.14, security of waterfront facilities and
14   16:04:36    vessels in port.
15   16:04:38    Q.  All right.  And based upon your experience and your
16   16:04:41    service in the Coast Guard, and your knowledge of these facts
17   16:04:45    and circumstances, are these provisions that, from a marine
18   16:04:48    operations standpoint, you, as somebody involved in marine
19   16:04:53    operations, would consult in order to determine what needed to
20   16:04:56    be done?
21   16:04:57    A.  Yes.  It gives the Coast Guard the authority to intervene,
22   16:05:00    in the event that it determined that a vessel is -- poses a
23   16:05:08    threat to the port.
24   16:05:09    Q.  All right.  Now, the first section here, entitled "Safety
25   16:05:12    Measures," refers to the commandant.  Is that the same as the

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**472**

1    16:05:17    captain of the port that you've been referring to or is that
2    16:05:19    somebody different?
3    16:05:20    A.   No, that's the ultimate person in the Coast Guard.
4    16:05:22    Q.   Okay.  He's even above the captains of various ports?
5    16:05:25    A.   Right.  But that authority is delegated down to the
6    16:05:28    captain of the port.
7    16:05:29    Q.   All right.  But this chapter says that the objective here
8    16:05:35    is the safety of waterfront facilities and vessels in port; am
9    16:05:38    I correct?
10   16:05:39    A.   That's correct.  Yes, sir.
11   16:05:39    Q.   And that's what we're concerned with in this section of
12   16:05:42    federal regulations?
13   16:05:43    A.   Yes.
14   16:05:44    Q.   Okay.  Moving next to 6.19-1, what's this about?
15   16:05:50    A.   This is the same part of the CFR, Navigation and Navigable
16   16:05:59    Waters, subpart 6.19, Responsibility for Security of Vessels in
17   16:06:05    Waterfront Facilities.  And it's -- 6.19-1, outlines the
18   16:06:12    primary responsibility for safety.
19   16:06:15    Q.   As being with whom?
20   16:06:16    A.   As being:  "Nothing in this part would be" -- "shall be
21   16:06:21    construed as relieving the masters, owners, operators and the
22   16:06:27    agents of vessels or other waterfront facilities from their
23   16:06:30    primary responsibility for the protection and security of such
24   16:06:32    vessels or waterfront facilities."
25   16:06:35    Q.   Is the Lafarge cement facility that is the subject of this

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**473**

1    16:06:38    case, a waterfront facility such as is being referred to here?
2    16:06:44    A.   Yes, it is.
3    16:06:46    Q.   And --
4    16:06:47         MR. WALKER:   Your Honor, I'm not sure of the purpose
5    16:06:49    of the display, but these are regulations that were struck by
6    16:06:56    Daubert.
7    16:06:59         MR. SANDERS:   Your Honor, I think that the Daubert
8    16:07:02    ruling was that he could not testify as to a violation.
9    16:07:05         MR. BEST:   That's correct.
10   16:07:05         MR. SANDERS:   Not as to other --
11   16:07:06         MR. BEST:   And I haven't asked him that.
12   16:07:08         MR. SANDERS:   -- matters.
13   16:07:08         MR. BEST:   I'm trying to get the marine operations
14   16:07:09    context of the applicable regulations.  I was not asking him
15   16:07:13    the question that Your Honor has prohibited.
16   16:07:15         THE COURT:   Let me look at my ruling, just to make
17   16:07:17    sure.  I think it's document 19554.
18   16:07:34         MR. BEST:   Yes.
19   16:07:34         THE COURT:   Yes.  No opinions of law.  That's me.  I
20   16:07:40    have to do that.
21   16:07:41         MR. BEST:   I understand that, Your Honor.  Thank you.
22   16:07:46              Moving to --
23   16:07:47         THE COURT:   You can cite me the law in your brief and
24   16:07:49    I can read it.
25   16:07:51         MR. BEST:   The last, 162.75.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**474**

        BY MR. BEST:
1    16:07:59    Q.   Now, we read down through the highlighted regulations.
2    16:08:04    Are there specific instructions down here -- let me move it up
3    16:08:09    a little -- at the bottom of the page about the mooring of
4    16:08:13    vessels that the people involved in marine operations and
5    16:08:16    vessel mooring operations need to know about?
6    16:08:18    A.   Yes.
7    16:08:18    Q.   And particularly moving down to the section that says
8    16:08:22    "Anchoring or mooring," and below that, "Vessels or Tows,"
9    16:08:27    subsection II, would you read that, please?
10   16:08:31    A.   Yes.  It says:  "When tied up individually, all vessels
11   16:08:33    and tows shall be moored by bow and stern lines.  Tows shall be
12   16:08:38    secured at sufficiently frequent intervals to ensure they're
13   16:08:44    not being drawn away from the bank by winds, currents, and the
14   16:08:51    suction of passing vessels."
15   16:08:53    Q.   In your experience in marine operations, are waterfront
16   16:08:56    facilities such as Lafarge, is this one of the places the
17   16:09:05    operators of waterfront facilities such as Lafarge, would look
18   16:09:09    to see what they were to do in the mooring of vessels?
19   16:09:12    A.   Yes.
20   16:09:16    Q.   And, of course, here, you do understand from the materials
21   16:09:19    you've read that the 4727 was moored by bow and stern lines?
22   16:09:30    A.   Yes.
23   16:09:30    Q.   This particular CFR doesn't get into doubling or single
24   16:09:32    part, double part, or anything like that, does it?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**475**

1    16:09:35    A.   No, sir.  The -- in my opinion, the operative words are
2    16:09:38    "shall be sufficient".  "Tows shall be secured at sufficiently
3    16:09:43    frequent intervals to ensure they're not being drawn away from
4    16:09:48    the bank by winds, currents, or the suction of passing
5    16:09:53    vessels."
6    16:09:54    Q.   And again, the purpose of this is for the safety of marine
7    16:09:55    operations and waterfront facilities and vessels?
8    16:09:59    A.   Yes.  It's to prevent breakaways, to prevent collisions,
9    16:10:04    or allisions of those vessels that might break away, and also
10   16:10:09    to protect the environment.
11   16:10:11    Q.   And in your experience, are vessels that are improperly
12   16:10:14    moored that break away a danger to waterfront facilities and
13   16:10:17    other vessels?
14   16:10:18    A.   Yes.  They endanger -- they endanger anything on the
15   16:10:22    waterway in their path.
16   16:10:24    Q.   In the circumstances of this case, on the Inner Harbor
17   16:10:29    Navigational Canal, which we are referring to as the Industrial
18   16:10:30    Canal, would the waterfront facilities that you would be
19   16:10:33    concerned about, in your opinion, extend to the floodwalls?
20   16:10:37    A.   Yes, it would extend to floodwalls, it would extend to the
21   16:10:42    bridges in proximity to that location, and it would extend to
22   16:10:44    other vessels moored nearby.
23   16:10:57    Q.   Thank you, sir.
24   16:11:21         And in terms of risk to bridges, what are the risks
25   16:11:23    to the bridges in this area in a hurricane context, involving

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**476**

```
16:11:27   the need for evacuation?
16:11:30   A.  The barge was -- the location that the barge was tied up
16:11:36   is between two bridges, main bridges, that are used for
16:11:43   evacuation of the Lower Ninth Ward and Chalmette.  That's the
16:11:48   Claiborne Avenue bridge and the Florida Avenue bridge.
16:11:53   Q.  And based upon all the materials you have reviewed, was
16:11:58   the 4727 moored to the adjacent barge and/or to the dock in an
16:12:06   adequate and proper manner, based upon your experience and
16:12:09   expertise?
16:12:10   A.  No.  It's my opinion that it was not moored adequately for
16:12:14   the conditions that they expected to arrive with the hurricane.
16:12:21   Q.  And is the fact that this barge was later found in the
16:12:35   Ninth Ward consistent with that opinion?
16:12:37   A.  Yes, it is.
16:12:38   Q.  Is it indicative of a breakaway?
16:12:40   A.  Yes.  It's my opinion the barge broke away and ended up in
16:12:44   the Ninth Ward.
16:12:45   Q.  And the photos of the ropes that we just referred to in
16:12:50   the last photographic series of exhibits that were furnished to
16:12:54   you as being taken by Lafarge's representatives, as part of
16:12:57   their investigation immediately following the storm, is the
16:13:00   state of those ropes, as we went through those photos, also
16:13:04   consistent with mooring failure and breakaway of the barge?
16:13:07   A.  Yes.
16:13:13   Q.  Given the -- and you've reviewed some weather records,
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**477**

```
16:13:16   have you not, as well?
16:13:18   A.  Yes, sir, I did.
16:13:18   Q.  What weather records did you review?
16:13:22   A.  They were the weather conditions at the Lakefront Airport.
16:13:28   Q.  In your opinion, based upon your experience, could a
16:13:31   reasonable and proper display of nautical skills have prevented
16:13:36   the vessel, in terms of mooring, from breaking away and
16:13:40   floating free, notwithstanding those conditions as evidenced by
16:13:40   the weather records you reviewed?
16:13:43   A.  Yes.  I think it could have been secured.
16:13:46   Q.  And that's, in fact, confirmed by the fact that the other
16:13:49   six barges at the location didn't breakaway.
16:13:51   A.  That's correct.
16:14:05   Q.  Now, have you reviewed the deposition of Roland Johnson,
16:14:14   who was another one of the crew members who was involved in the
16:14:17   mooring?
16:14:18   A.  Yes, sir.
16:14:19   Q.  Okay.
16:14:22       MR. BEST:  This is -- has been designated and put
16:14:24   into evidence by the parties, Your Honor.  But I'm just going
16:14:27   if ask him to assume that, as is shown with the ELMO on page 15
16:14:38   of the witness' deposition, when asked about -- talking about
16:14:42   the mooring of the northern tier of barges that did not break
16:14:46   away.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**478**

```
16:14:46   BY MR. BEST:
16:14:46   Q.  And if he testified that they were tied together in every
16:14:49   location on the barges, every little bitt, kevel, or cleat had
16:14:54   a rope on it, from what you have seen, was that methodology
16:14:58   which they applied to the northern tier applied to the 4727?
16:15:03   A.  No, sir.
16:15:04   Q.  Should it have been?
16:15:05   A.  It should have been, yes.
16:15:06   Q.  Do you see any explanation, from a marine operation
16:15:11   standpoint in the testimony of the fact witnesses you have
16:15:14   reviewed, for them having done every little bitt, kevel, or
16:15:19   cleat with a rope on it, on the northern tier and not doing
16:15:22   that on the southern tier?
16:15:25   A.  Yes.  The testimony of Mr. Smith and Mr. Busch indicated
16:15:37   that Mr. Busch wasn't really sure how many lines were on the
16:15:42   barge.
16:15:47       Mr. Smith did, and said there were three lines.  And
16:15:47   that the -- both gentlemen expected that the barge was going to
16:15:51   be picked up.
16:15:53   Q.  All right.  Let me show you, also, more of Mr. Roland's
16:15:58   deposition testimony at page 16, and ask you to assume that the
16:16:02   mooring of the northern tier, in addition to being every
16:16:05   bitt, kevel and mooring point, also that he did several
16:16:10   circles, that the rope went around each cleat more than once.
16:16:13       Do you see that?
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**479**

```
16:16:13   A.  Yes.
16:16:14   Q.  If you assume that to be true, is that a description of
16:16:18   doubling up or better?
16:16:20   A.  Yes.  I think Mr. Thigpen yesterday said it perfectly.  Is
16:16:25   that using all of the line, and that is, if the line is 30 feet
16:16:34   and the barges are snubbed up against each other and you wrap
16:16:40   as many wraps as you can and use it all, because it just makes
16:16:47   it safer, it's less likely to break away.
16:16:52   Q.  And did you see any indication that they used several
16:16:54   circles of rope or doubling up or two part or three part lines
16:16:58   on the mooring of the 4727?
16:17:00   A.  No.  All of the testimony is that there was only one part
16:17:05   line going from the 4727 to the 4745.  I think that's...
16:17:12   Q.  Now, in addition to the failure to moor at every cleat,
16:17:15   kevel, button, or whatever it was, and in addition to not
16:17:24   doubling up, when we're talking about the 4727, also had a
16:17:24   situation of what were the relative -- pertaining to the
16:17:29   heights of the vessels; is that correct?
16:17:31   A.  Yes.  The testimony is that there was six to eight feet of
16:17:37   difference in height between the deck of the 4727 and the 4745.
16:17:41   Q.  Okay.
16:17:42   A.  And so when they put the lines out, that meant that the
16:17:47   line had to go at an angle down to the loaded barge.  And
16:17:55   Mr. Thigpen testified that there was -- maybe yesterday, or I
16:17:58   know in his deposition -- that when he looked at the lines,
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**480**

1   16:18:02   there was not enough line to -- to -- not enough line left over

2   16:18:07   to make a two part or double up the lines.

3   16:18:19   Q.   Okay.  Now, assuming, hypothetically, that the vessels are

4   16:18:23   not on the same height, that the outboard of the 4727 is about

5   16:18:27   eight feet higher, and assuming that because of that, as

6   16:18:30   Mr. Thigpen said, they can't bring them any closer than about

7   16:18:33   two feet apart?

8   16:18:35   A.   That's correct, yes.

9   16:18:36   Q.   So what does that allow, in terms of movement between

10  16:18:40   these vessels while they are moored, after the people who have

11  16:18:43   moored them have gone for the day?

12  16:18:48   A.   That allows -- that height difference and that fleet angle

13  16:18:52   between the two barges and the lines going down means that they

14  16:18:57   cannot get barges butted up close to each other.  And that

15  16:19:04   allows the two barges to move, or the outboard barge, the 4727,

16  16:19:10   some movement within its confines.

17  16:19:18   MR. BEST:   And just one moment, Your Honor.  I'm

18  16:19:23   flipping through another photographic exhibit.  162.

19  16:19:45   BY MR. BEST:

20  16:19:45   Q.   You've seen is this photo before, Mr. Green?

21  16:19:48   A.   Yes, sir.

22  16:19:48   THE COURT:   And that's Plaintiffs' Exhibit --

23  16:19:50   MR. BEST:   162.

24  16:19:51   THE COURT:   -- 162?

25  16:19:51   Thank you.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**481**

1   BY MR. BEST:

2   16:19:54   Q.   Just, again, to put this in context for the record, would

3   16:19:58   you explain where you understand the 4727 to have been with

4   16:20:01   respect to these other barges which remained at the Lafarge

5   16:20:06   dock?

6   16:20:07   A.   It was abreast to the red barge, or the single barge,

7   16:20:10   against the dock.

8   16:20:15   Q.   Now, the barges in -- the five barges in the north tier

9   16:20:19   appear to be pretty close together?

10  16:20:20   A.   Yes.

11  16:20:22   Q.   Is it fair to say that, based on the height differential

12  16:20:25   of the 4727 and the red barge that remained against the dock,

13  16:20:28   that it could not have been brought as close to the red barge

14  16:20:31   as those white barges are to one another?

15  16:20:35   MR. WALKER:   Your Honor, these areas are beyond the

16  16:20:39   reports.

17  16:20:40   THE COURT:   Okay.  There's been an objection.

18  16:20:46   MR. BEST:   It is true that the aerial is not an

19  16:20:49   attachment to --

20  16:20:50   THE COURT:   He's not talking about the aerial.  He's

21  16:20:52   talking about the opinion he's rendering.

22  16:20:55   MR. WALKER:   That's correct.

23  16:20:56   MR. BEST:   Well, I just asked him where the barge

24  16:20:57   was, is the first one.  And second one -- I guess, Your Honor,

25  16:21:00   I have to say it's probably not in his report exactly as to

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**482**

1   16:21:03   what the -- I don't know how you have an expert --

2   BY MR. BEST:

3   16:21:07   Q.   Your report was how many pages, sir?

4   16:21:11   THE COURT:   Well, I've done it with -- I've done it

5   16:21:12   for 15 years, sir.  If we don't have rules as to expert

6   16:21:16   reports, we have anarchy.  So it has to be within the scope of

7   16:21:20   his report.  Logic and reason will prevail, I promise.

8   16:21:24   So if you can give me logic and reason, I'll --

9   16:21:27   that it's within the scope of his report, I'll listen.

10  16:21:31   What opinion are you seeking to elicit, before

11  16:21:33   we elicit it, just so I understand it?

12  16:21:35   MR. BEST:   First, the question I think I asked is:

13  16:21:36   "Based upon the testimony of Mr. Thigpen, which was also in his

14  16:21:41   deposition, that they couldn't get it any closer than two feet

15  16:21:43   apart between the missing barge and the red barge?"

16  16:21:46   The question I think last asked was:  "So you

17  16:21:49   couldn't get them as close as the barges in the northern tier?"

18  16:21:51   Now he has testified very clearly in his report

19  16:21:56   and in deposition that the height differential, they shouldn't

20  16:21:58   have been moored that way.  And this is really the consequences

21  16:22:01   of that that I'm talking about.

22  16:22:04   THE COURT:   I'm going to allow it, based on the

23  16:22:05   height differential, because it's certainly in his report.

24  16:22:08   MR. BEST:   Okay.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**483**

1   BY MR. BEST:

2   16:22:09   Q.   Going to -- the question was:  Could you bring those two

3   16:22:13   vessels, with the height differential, as close as the barges

4   16:22:16   in the north tier appear to be?

5   16:22:18   A.   Yes and no.  Let me explain, Your Honor.

6   16:22:21   Is that if they lay up against each other, then

7   16:22:25   they're against each.  But if there's any movement, any tide,

8   16:22:29   any wind, whichever, that would play against the light barge,

9   16:22:32   it would move out, at least two, three feet away from the

10  16:22:37   adjacent barge because of the angle of the line.

11  16:22:40   THE COURT:   I understand.

12  BY MR. BEST:

13  16:22:43   Q.   Okay.  Now, did you see any indication, in anything you

14  16:22:47   reviewed, that the northern tier of five and the southern tier

15  16:22:49   of two were moored together in any way?

16  16:22:53   A.   No.  The testimony is that they were not moored together.

17  16:22:57   Q.   Okay.  In addition to mooring, as Mr. Roland Johnson said,

18  16:23:04   the northern tier at every point, every kevel, would it be

19  16:23:08   possible -- assuming we didn't have the height differential --

20  16:23:10   I understand that's a problem -- but setting it aside, if you

21  16:23:13   had barges all of the same height, could you moor all of them

22  16:23:17   together here, the north tier to the south tier?

23  16:23:19   A.   Yes.  In fact, that would have been advisable that they

24  16:23:22   would, rather than have two separate tiers, that they could

25  16:23:26   have married the lower tier to the upper tier.  In the event

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**484**

```
1   16:23:31   this -- anything came loose, they would go away as a complete
2   16:23:36   package.
3   16:23:36   Q.   And that's commonly done in barge fleeting?
4   16:23:39   A.   Yes.
5   16:23:40   Q.   And it's commonly done with wires?
6   16:23:42   A.   Yes.
7   16:23:43   Q.   Such as the 4727 was equipped with, as we have seen?
8   16:23:48   A.   Yes.
9   16:23:49   Q.   Now, this -- and really, I had my questions all laid out,
10  16:24:08   and now I'm just kind of running by the seat of my pants.  So
11  16:24:12   forgive me if these are not -- if they do not appear to you to
12  16:24:13   be in any particular order.
13  16:24:16         You have heard the testimony, and you have seen it in
14  16:24:18   depositions before today, of Lafarge's description of
15  16:24:22   long-lining.
16  16:24:23   A.   Yes.
17  16:24:23   Q.   What did you understand, from materials you reviewed,
18  16:24:25   long-lining to be?
19  16:24:28   A.   The testimony that -- I think it was -- that the purpose
20  16:24:32   of it was to allow the fleet, or the tiers of barges, to, as
21  16:24:38   the surge came in, that they would obviously go up and float up
22  16:24:44   with the surge.  And that the long-lining on the pilings
23  16:24:49   against the dock would allow line to unwind from around the --
24  16:24:59   the post on the dock and wouldn't -- it would allow the vessel
25  16:25:06   to continue to float up, as opposed to putting it in a bind.
            JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                       UNITED STATES DISTRICT COURT
                        EASTERN DISTRICT OF LOUISIANA
```

**485**

```
1   16:25:11   Q.   Okay.  And you understood that the long-lining was
2   16:25:21   utilized only at the two barges that were right against the
3   16:25:25   wharf?
4   16:25:25   A.   Yes.
5   16:25:26   Q.   And long-lining, as I understand it, was something that
6   16:25:29   they did in lieu of the old hurricane checklist policy that
7   16:25:32   said, "cable all barges"?
8   16:25:34   A.   That's correct.  Their written policy was -- their written
9   16:25:38   policy was that they should use cables.  But they changed that
10  16:25:42   some time ago.
11  16:25:43   Q.   Well, there's no documentation of it having been changed.
12  16:25:46   A.   Well, there was testimony --
13  16:25:49   Q.   I understand.  Did you see any documentation of it having
14  16:25:52   been changed, such as a publication and distribution to the
15  16:25:55   employees of Lafarge of a new hurricane checklist that said
16  16:25:59   this?
17  16:25:59   A.   No, sir.
18  16:26:00   Q.   And the only hurricane checklist said "Cable all barges to
19  16:26:04   shore"?
20  16:26:04   A.   That's correct.
21  16:26:05   Q.   Now, that doesn't -- "Cable all barges to shore," to you,
22  16:26:08   as marine operations, do you understand that to be limited to
23  16:26:11   the barge adjacent to the wharf?
24  16:26:14   A.   No.  I would mean it -- I would interpret that to mean
25  16:26:19   that it would be -- each barge would be cabled to each other
            JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                       UNITED STATES DISTRICT COURT
                        EASTERN DISTRICT OF LOUISIANA
```

**486**

```
1   16:26:22   and then to the dock.
2   16:26:23   Q.   Okay.  So there would be multiple cables running to the
3   16:26:29   dock?
4   16:26:30   A.   Yes.  As the barges that we -- the pictures that you
5   16:26:34   showed me with the hardware on the deck of the 4727, I would
6   16:26:38   expect to see hardware and permanent cables on all those
7   16:26:43   barges.
8   16:26:44   Q.   So the checklist that said "Cable all barges to the dock,"
9   16:26:47   if we -- if we understand now we have the practice of
10  16:26:52   long-lining substituted for cabling here, were all these barges
11  16:26:56   long-lined to the dock?
12  16:26:58   A.   No.  Only the barge that was against the dock.
13  16:27:02   Q.   Right.  So in this particular exhibit that we're looking
14  16:27:07   at, Plaintiffs' Exhibit -- I'm sorry -- 162, we can see that
15  16:27:16   the northern tier of barges in this post-storm photograph is
16  16:27:21   canted?
17  16:27:22   A.   Yes.
18  16:27:22   Q.   And if we look close, it looks like there's still a line
19  16:27:26   running to the northern tier barge, where it has moved away
20  16:27:32   from the dock?
21  16:27:33   A.   That's correct.
22  16:27:33   Q.   Is that sort of consistent with the testimony about
23  16:27:36   long-lining that barge to the dock?
24  16:27:38   A.   Yes.
25  16:27:39   Q.   So it would appear that what happened is the vessels rose
            JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                       UNITED STATES DISTRICT COURT
                        EASTERN DISTRICT OF LOUISIANA
```

**487**

```
1   16:27:42   on the tides with the storm, and the loops, at least at that
2   16:27:45   end of the barge, came over the bollard, and the result was
3   16:27:50   that that northern tier canted out?
4   16:27:53   A.   That's correct.
5   16:27:55   Q.   What is your opinion of the suitability for long-lining at
6   16:28:00   a commercial facility like this?
7   16:28:01   A.   Well, I don't agree that it should be done.  I think that
8   16:28:05   it should have been moored properly, and the use of cables
9   16:28:09   would have been better than having the long-line.
10  16:28:12   Q.   Okay.
11  16:28:13   A.   Their rationale for doing that was that they didn't want
12  16:28:17   the barges to go up and go on top of the dock.
13  16:28:19   Q.   And what are the risks of long-lining?
14  16:28:22   A.   The risk of long-lining is that it gives movement to that
15  16:28:27   tier of barges, and could very well have allided with the 4727,
16  16:28:34   which was attached to the -- that barge right there below it.
17  16:28:40   Q.   Of course --
18  16:28:41   A.   Anyway, if they had all been married together, it would
19  16:28:44   have been my opinion that maybe it would not have broken away.
20  16:28:49         But the fact that the -- the upper tier of long-line
21  16:28:53   gave rise to the opportunity for that tier to bear down on the
22  16:29:00   4727.
23  16:29:01   Q.   And so we might have forces from that northern tier going
24  16:29:05   on the 4727, which is already eight feet higher, with lines
25  16:29:10   going down at a diagonal, with two feet between the vessels
            JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                       UNITED STATES DISTRICT COURT
                        EASTERN DISTRICT OF LOUISIANA
```

**488**

```
1   16:29:14   when the crew left?
2   16:29:16   A.  That's correct, yes.
3   16:29:17   Q.  And the potential for more movement there?
4   16:29:19   A.  That's correct, yes.
5   16:29:22   Q.  So is it fair to say that the long-lining of the northern
6   16:29:25   tier created -- or had the point for creating even more stress
7   16:29:30   on the 4727, in addition to the stresses on the lines created
8   16:29:33   by the height differential?
9   16:29:35   A.  That's also correct.
10  16:29:41       THE COURT:  Counsel, let me interrupt you for a
11  16:29:43   minute to make sure I understand something.
12  16:29:46       The doubling up issue.  Do you regard doubling
13  16:29:52   up -- is that two parts connecting the -- where the barge is
14  16:30:01   tied to, let's say, either another barge or the dock, by having
15  16:30:07   the rope come around twice?
16  16:30:09       THE WITNESS:  Yes, as a minimum.  But the -- the
17  16:30:12   Coast Guard and everyone else in the industry considers three
18  16:30:16   parts the minimum.  And that would be from the -- from the dock
19  16:30:23   to the other barge back and back again.
20  16:30:27       THE COURT:  Using the same rope, if you have enough
21  16:30:29   length?
22  16:30:30       THE WITNESS:  Yes, sir.
23  16:30:31       THE COURT:  And if you have -- and I've asked this
24  16:30:33   question previously -- if you have -- rather than doing that,
25  16:30:37   if you tie two separate ropes to the same cleat on -- from the
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**489**

```
1   16:30:46   dock to the barge, would that also be doubling up or is that
2   16:30:50   not doubling up?
3   16:30:51       THE WITNESS:  No, I don't consider that doubling up,
4   16:30:53   Your Honor.  Because by putting multiple parts in the same
5   16:30:57   line, you're adding elasticity to the -- to the fastening.
6   16:31:03       And in the event that there is movement that
7   16:31:06   those -- the multiple parts would be able to absorb that shock.
8   16:31:11   And also, it -- a single part line is not as strong as a double
9   16:31:20   part.
10  16:31:21       THE COURT:  All right.
11  16:31:22       THE WITNESS:  But it gives it -- it gives it an
12  16:31:23   opportunity to move and stretch together and not apart.
13  16:31:29       THE COURT:  Thank you, sir.
14  16:31:30       All right, Mr. Best.
15              BY MR. BEST:
16  16:31:32   Q.  On that subject, since I have that in my examination, too,
17  16:31:36   I might as well jump to that for a moment.
18  16:31:39       Does the Modern Seamanship, that's one of the things
19  16:31:43   that you have reviewed, have a specific definition on page 247
20  16:31:47   of double up secure and single up?
21  16:31:51   A.  Which part are you looking at?
22  16:31:53   Q.  This --
23  16:31:53   A.  The definition is doubling up the same line on multiple
24  16:32:00   parts.
25  16:32:00   Q.  One moment.  First, I need my exhibit number.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**490**

```
1   16:32:30       MR. BEST:  It's Exhibit 395.  It's Exhibit 395.  I
2   16:32:31   apologize for the delay, Your Honor.
3   16:32:32       It's Knight's Modern Seamanship.  And on page
4   16:32:39   247, if we may ELMO this.
5               BY MR. BEST:
6   16:32:50   Q.  Is this -- it gives us a definition of double up and
7   16:32:52   secure and single up?
8   16:32:53   A.  Yes.
9   16:32:54   Q.  Would you read "Double up and Secure"?
10  16:32:56   A.  Double up and Secure means run additional lines or bites
11  16:32:59   of lines as needed to make the mooring secure.
12  16:33:02   Q.  And "Single up"?
13  16:33:03   A.  Single up is to take all lines, but a single standing
14  16:33:06   part, to each station preparatory to getting underway.
15  16:33:11   Q.  So what we had in this situation is described as a single
16  16:33:14   up?
17  16:33:15   A.  Yes.
18  16:33:15   Q.  "Preparatory to getting underway," what does that mean?
19  16:33:18   A.  It means that -- this is -- it comes from commands for a
20  16:33:25   master of a ship, and preparatory to getting underway.  When
21  16:33:31   you come into the dock, you put a line out and the command is
22  16:33:36   given, double up and secure, which means they take the same
23  16:33:38   line and pass it back to the dock and double up.
24  16:33:42       When a vessel prepares to get underway, the command
25  16:33:45   is single up preparatory to getting underway.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**491**

```
1   16:33:50   Q.  Okay.  So is it fair to describe a singling up as a
2   16:33:54   temporary mooring in preparation for getting underway?
3   16:33:56   A.  That's correct, yes.
4   16:33:57   Q.  And your understanding of the mooring that existed on the
5   16:34:00   4727 was single part lines?
6   16:34:03   A.  Right.
7   16:34:03   Q.  Which, according to this definition, would be a temporary
8   16:34:07   mooring?
9   16:34:08   A.  Yes.  I would consider that to be a temporary mooring.
10  16:34:10   Q.  And that would be consistent with, I think, Mr. Smith's
11  16:34:14   testimony that he understood he'd been told somebody was going
12  16:34:17   to come pick up the barge?
13  16:34:19   A.  That's correct.
14  16:34:21   Q.  So is it fair to say that even without a hurricane coming,
15  16:34:25   these barges -- this barge, 4727, should have been doubled up
16  16:34:29   for a permanent mooring on a regular day?
17  16:34:32   A.  Yes.
18  16:34:32   Q.  Or, as Mr. -- the deckhand this morning --
19  16:34:38       THE COURT:  Thigpen.
20              BY MR. BEST:
21  16:34:40   Q.  -- Thigpen -- as Mr. Thigpen said, three parts is
22  16:34:46   standard?
23  16:34:46   A.  Right.  That's what we consider to be the minimum.
24  16:34:53   Q.  And I have, also, an illustration from when -- the judge
25  16:34:59   asked what a multiple part mooring looked like.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**492**

| | |
|---|---|
| 16:35:04 | This is Exhibit 391, page 415. |
| 16:35:07 | Can you explain to the judge what we're looking at in |
| 16:35:11 | the illustration? |
| 16:35:13 | A. Your Honor, that's one single line moor, and it's deployed |
| 16:35:20 | multiple times, the same line, back between two... |
| 16:35:23 | Q. And that's from the U.S. Navy Manual? |
| 16:35:26 | A. I think so, yes. |
| 16:35:27 | Q. This is the section on seamanship? |
| 16:35:31 | A. Yes. |
| 16:35:32 | Q. And so what we have -- it says, "Correct method for |
| 16:35:36 | doubling up." We've run -- but we have three parts. So is |
| 16:35:42 | this -- |
| 16:35:43 | A. Yes. |
| 16:35:44 | Q. So it's not -- doubling up does not just mean necessarily |
| 16:35:47 | a two part line? |
| 16:35:49 | A. Well, it could be a two part line, but that would be the |
| 16:35:53 | bare minimum. But the accepted practice is three parts. |
| 16:35:56 | Q. Okay. And if you have enough rope, you just keep running |
| 16:36:00 | it until you run out of rope. |
| 16:36:03 | A. Right. As Mr. Thigpen described, you use all the line |
| 16:36:06 | that you can, or that you have available to you. The objective |
| 16:36:11 | is to make it as strong as you possibly can. |
| 16:36:16 | Q. Now, we talked about, on the testimony of Mr. Johnson, I |
| 16:36:24 | think about using every kevel, every thing. And I think in |
| 16:36:28 | your report, you said, particularly with the storm, you should |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**493**

| | |
|---|---|
| 16:36:31 | use every connection possible; do you recall that? |
| 16:36:33 | A. Yes. |
| 16:36:34 | Q. Now, what does that mean in terms of mooring? Let's |
| 16:36:38 | assume that we have barges that are close to the same height, |
| 16:36:40 | which is not what we have here. But if you have barges at a |
| 16:36:43 | dock like that are close to the same height, and you want |
| 16:36:45 | to moor them for a storm, can you moor the outboard barge not |
| 16:36:49 | only to the inboard barge, but also directly to the wharf? |
| 16:36:54 | A. Yes. |
| 16:36:54 | Q. And is that advisable under storm condition preparations? |
| 16:36:57 | A. Yes. I would use all available resources. |
| 16:37:00 | Q. Okay. So then if the two barges had five kevels between |
| 16:37:04 | them, those kevels would all be used to moor them together? |
| 16:37:08 | A. Yes. |
| 16:37:08 | Q. And doubled up, as a minimum? |
| 16:37:10 | A. Yes. |
| 16:37:10 | Q. And then the outboard barge would also be tied directly to |
| 16:37:14 | the dock by ropes or cables? |
| 16:37:19 | A. Yes, that would be ideal. |
| 16:37:25 | Q. And the inboard barge with the five kevels inboard |
| 16:37:29 | adjacent to the wharf, could you also use all five kevels to |
| 16:37:34 | secure the bollards on the wharf? |
| 16:37:36 | A. Yes, but the bollards might not fit directly across from |
| 16:37:39 | each other. And -- but they should employ as many mooring |
| 16:37:43 | spots as they can. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**494**

| | |
|---|---|
| 16:38:20 | Q. Given the complexities presented by this situation, and |
| 16:38:23 | the risk where we have one barge that's eight feet higher than |
| 16:38:27 | the other -- scratch that. Let me ask it this way. |
| 16:38:33 | What is your experience, in your opinion, of the |
| 16:38:35 | proprietary of mooring vessels of different heights together |
| 16:38:39 | for a permanent mooring? |
| 16:38:40 | A. Well, first off, you -- you prefer not to have light |
| 16:38:46 | barges against loaded barges. It happens, but the preferred |
| 16:38:56 | situation is loads to loads and lights to lights. Mainly, |
| 16:39:00 | because the mooring between the two can be accomplished in a |
| 16:39:03 | more efficient manner and a stronger manner by going directly |
| 16:39:08 | at the same level straight across from barge to barge. |
| 16:39:10 | Q. Okay. So you're in agreement with what Mr. Thigpen |
| 16:39:13 | testified to today? |
| 16:39:14 | A. Yes, sir. Yes. |
| 16:39:16 | Q. And in your experience in general, when we're talking |
| 16:39:19 | about permanent mooring, not temporary mooring -- |
| 16:39:22 | A. Right. |
| 16:39:22 | Q. -- is that industry practice? |
| 16:39:24 | A. Yes. That's not to say that it doesn't happen. I think |
| 16:39:29 | the testimony you'll find is, occasionally, they're presented |
| 16:39:34 | that they have to do that. But the preferred method is |
| 16:39:40 | supposed to have loads to loads and empties to empties. |
| 16:39:47 | Q. And commercially with barges, there are times when, |
| 16:39:52 | because of the nature of the particular commercial operation, |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**495**

| | |
|---|---|
| 16:39:55 | they're loading a tier of barges, one's loaded and one's not |
| 16:39:59 | yet, as an example? |
| 16:40:02 | A. That's correct. |
| 16:40:02 | Q. But here we're talking about the work's done, we're at the |
| 16:40:04 | end of an operation and we have a hurricane that's coming. |
| 16:40:08 | What is your recommendation that one -- that a competent marine |
| 16:40:15 | operator should do faced with this situation of a |
| 16:40:17 | significant -- a barge that's significantly elevated above the |
| 16:40:21 | other barges that are still loaded? |
| 16:40:22 | A. I think the first thing I would do is recommend that they |
| 16:40:25 | get the barge out of there. |
| 16:40:26 | Q. Okay. |
| 16:40:27 | A. Secondly, if they brought it in, then in light of all the |
| 16:40:33 | announcements and the plethora of news events concerning the |
| 16:40:38 | approaching storm, that they should have not discharged the |
| 16:40:43 | barge. |
| 16:40:45 | Q. Stepping back just a moment, given the height differential |
| 16:40:49 | of the barges here and the fact that they couldn't be brought |
| 16:40:52 | close together, was this barge -- forget the storm -- at risk |
| 16:40:56 | for breakaway just by virtue of marine traffic in the |
| 16:40:59 | intercoastal water? |
| 16:41:01 | A. Yes, yes. |
| 16:41:04 | MR. WALKER: Your Honor -- |
| 16:41:04 | BY MR. BEST: |
| 16:41:04 | Q. And I've been referring to -- |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**496**

```
16:41:05        THE COURT:  Just a minute.  We have an objection.
16:41:07        MR. WALKER:  This is beyond the scope of his report,
         Your Honor.
16:41:08        THE COURT:  Okay.
16:41:11        MR. BEST:  Well, the report is faulty mooring and
         refers to the height of the barges, the problems and risks.
16:41:15   And he's just said that they should have got it out of the
16:41:18   canal.
16:41:21        BY MR. BEST:
16:41:23   Q.  Is that one of the reasons they should have got it out of
         the canal?
16:41:26   A.  Yes.
16:41:27        THE COURT:  Well, let me rule on the objection,
16:41:27   beyond the scope of the report.
16:41:29        In other words, you're saying that there is the
16:41:30   risk of a breakaway even in a non-hurricane situation, simply
16:41:34   from other river traffic?
16:41:37        MR. BEST:  Yes, because it's a temporary mooring.
16:41:39        THE COURT:  And he's saying -- I'm going to regard
16:41:41   it, for the purpose of this trial, as from the periphery of the
16:41:44   report, and I'll allow it.  The objection's noted.
16:41:49        MR. WALKER:  Thank you, Your Honor.
16:41:53        BY MR. BEST:
16:41:55   Q.  As a temporary mooring, as described in the literature and
16:42:00   as you've described it, is it proper to leave a vessel at a
```
JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**497**

```
16:42:04   marine waterfront facility unmanned with just temporary
16:42:08   moorings under any circumstances?
16:42:11   A.  No.
16:42:14   Q.  And because it is a risk to a waterfront facility?
16:42:18   A.  It's a risk to the entire -- that entire area.  It's a
16:42:20   risk to the bridge.  It's a risk for it to break away and the
16:42:25   result and damage and chaos that it could cause.
16:42:34   Q.  Now, you prepared a time line exhibit, which is one of the
16:42:37   attachments to your deposition, which is Plaintiffs'
16:42:39   Exhibits 387 and 388.  387 is his report, 388 is his
16:43:03   deposition, and I believe it was a deposition exhibit, as well.
16:43:24        But I'm going to demonstrate it on the ELMO -- well,
16:43:24   I'm sorry.  We can't get it all on at once, but I'm going to
16:43:27   start here with it.
16:43:30        One moment, your Honor.
16:43:42        BY MR. BEST:
16:43:42   Q.  Okay.  It is 387, page 12, and I'm going to take it off
16:43:45   the ELMO and ask you to bring it up, to bring it up in small
16:43:47   portions.
16:43:51        Okay.  This is something you prepared, Mr. Green?
16:43:53   A.  No.  I had a graphics person who prepared that under my
16:43:58   direction.
16:43:58   Q.  But you provided the content?
16:44:00   A.  Yes.
16:44:00   Q.  And it was done at your --
```
JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**498**

```
16:44:02        THE COURT:  By the way, just to let you know, in the
16:44:03   event the Court's going to utilize this and -- or look at it
16:44:09   after this trial in rendering its opinion, the copy we have is
16:44:14   fairly indecipherable, just to let you know.
16:44:18        MR. BEST:  Meaning the one we're looking at on the
16:44:21   screen?
16:44:22        THE COURT:  Yes.  That's what we'll have.
16:44:25        MR. BEST:  Okay.  So you won't have it in color?
16:44:28        THE COURT:  So far we don't.
16:44:30        You may not want to part with it right now, but
16:44:32   eventually if you want us to look at it and you're going to put
16:44:36   it in your brief, we're going to have a hard time using the one
16:44:40   we have.
16:44:53        MR. BEST:  We're going to go back to the ELMO,
16:44:56   Your Honor.  We're going to make an effort to get a copy of
16:44:56   this.
16:44:57        THE COURT:  You can provide it tomorrow if necessary,
16:44:58   or whenever.
16:44:59        MR. BEST:  We'll do so.
16:45:01        BY MR. BEST:
16:45:01   Q.  Now, you've just given the Court an opinion.  I think you
16:45:04   said that under the circumstances, given all the problems with
16:45:06   the height differential, what did you say should be done with
16:45:10   the barge?
16:45:10   A.  It should have been taken out.
```
JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**499**

```
16:45:12   Q.  Taken out of the canal.  Okay.  Let's look at this --
16:45:15   let's go back and look at the context a little bit.
16:45:18        As we're sitting in -- at the Lafarge facility on
16:45:23   August 27th and 28th -- or 26th, 27th, and 28th, and there's a
16:45:29   hurricane in the Gulf, that's not the first hurricane we had
16:45:34   had that year, is it?
16:45:34   A.  No, sir, they had several.
16:45:36   Q.  And, in fact, you have down on the left-hand side a
16:45:41   graphic of pre-Katrina 2005 hurricanes that shows the other
16:45:46   storms we had had that season?
16:45:47   A.  Yes.
16:45:48   Q.  And that even includes Hurricane Cindy, which went right
16:45:51   over the city --
16:45:52   A.  Yes.
16:45:52   Q.  Or Tropical Storm Cindy, I'm not sure what its status was.
16:45:56        THE COURT:  I think it became ambiguous after a
16:46:00   while.
16:46:01        MR. BEST:  Right.
16:46:02        BY MR. BEST:
16:46:02   Q.  But it's fair to say, by the time Katrina came, which is a
16:46:06   "K" storm, we had had a lot of storms that hurricane season?
16:46:09   A.  Yes.
16:46:10   Q.  Is that something that marine facility operators have to
16:46:13   be concerned about as they operate their facilities in the port
16:46:15   of New Orleans in the summer and towards the end of August and
```
JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**38  (Pages 496 to 499)**

## 500

```
1   16:46:18   early September?
2   16:46:19   A.  Yes.  That applies all along the coast.
3   16:46:21   Q.  Is that a particularly bad time to be mooring a light
4   16:46:25   barge to a loaded barge?
5   16:46:27   A.  In my opinion, yes.
6   16:46:32   Q.  Now, the -- just for completeness, on the August 26th,
7   16:46:44   Friday entry, there is a map up at the top.  Do you see the
8   16:46:48   map?
9   16:46:49   A.  Yes.
10  16:46:49   Q.  And the purpose of that map is to illustrate what?
11  16:46:51   A.  Just the location of the various entities, the Zito fleet,
12  16:46:59   locks, the Claiborne bridge, and the Florida bridge, and as
13  16:47:05   well as Lafarge.
14  16:47:06   Q.  And what we see here is Lafarge between the two bridges
15  16:47:09   that you've talked about --
16  16:47:11   A.  Yes, sir.
17  16:47:11   Q.  -- north of the locks?
18  16:47:13       But then the Zito fleet in Algiers -- and Zito's
19  16:47:18   relevant for what, based on your review of the --
20  16:47:22   A.  That's where the barge was destined to go, if it was going
21  16:47:28   to be picked up.
22  16:47:29   Q.  If and when it was picked up, that's where it would have
23  16:47:32   gone?
24  16:47:32   A.  Yes.
25  16:47:32   Q.  And we see that that's pretty proximate.  That's not a far
            JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA
```

## 501

```
1   16:47:36   distance from the Industrial Canal?
2   16:47:37   A.  No, it's not.
3   16:47:40   Q.  Now, going down to the hurricane cones.  And we have on
4   16:47:49   these, let me see -- let me see if I can zoom in on this any.
5   16:47:59   This first one, August 26th, which is Friday, at 11:00 a.m.
6   16:48:04       And these cones, by the way, are something that are
7   16:48:06   followed by operators of marine facilities, and waterfront
8   16:48:11   facilities in New Orleans, in particular?
9   16:48:12   A.  It should be followed by anyone with marine vessels,
10  16:48:16   facilities that have vessels at their facilities.
11  16:48:19   Q.  And these hurricane tracks are pretty much the same thing
12  16:48:23   that average citizens follow to make their decisions about what
13  16:48:27   they're going to do about the storm?
14  16:48:29   A.  Yes.
15  16:48:29   Q.  And so this one shows that Friday morning, 11:00 a.m., the
16  16:48:33   storm is -- the center of the track is the Florida Panhandle,
17  16:48:37   but the Port of New Orleans is already in the cone?
18  16:48:40   A.  Yes.  We call it the "cone of uncertainty."
19  16:48:43   Q.  Now, that's at 11:00 a.m.  What time is that with respect
20  16:48:47   to when the barge unloading began?
21  16:48:49   A.  I understand the barge came -- I have it here someplace.
22  16:48:54   Q.  In fact, it's the entry on August 26th, at 12:20?
23  16:48:57   A.  Yes.
24  16:48:58   Q.  So as you understand it, the unloading of the 4727 began
25  16:49:03   after we were in the cone?
            JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA
```

## 502

```
1   16:49:05   A.  That's correct.
2   16:49:07   Q.  All right.  And then the next advisory below that is 14.
3   16:49:22   On that same day, August 26th, at 5:00 p.m.  And now it's
4   16:49:27   shifted significantly west?
5   16:49:28   A.  Yes, sir.
6   16:49:29   Q.  And that didn't happen on Saturday, that happened before
7   16:49:32   5:00 p.m. on Friday?
8   16:49:33   A.  That's correct.
9   16:49:34   Q.  All right.  That's something -- again, something that
10  16:49:38   marine operators -- operators of marine facilities, in your
11  16:49:41   opinion, should be attending to and knowledgeable of?
12  16:49:46   A.  That's correct.
13  16:49:46   Q.  And is that, in your opinion, significant to the unloading
14  16:49:49   operation of the 4727 that is ongoing?
15  16:49:52   A.  Yes.  In my opinion, they should have stopped offloading,
16  16:49:56   if they were offloading.
17  16:49:57   Q.  That is if they started it despite the earlier cone?
18  16:50:01   A.  That's correct.
19  16:50:01   Q.  Okay.  Now, you also have here in your time line --
20  16:50:04   there's an entry of the unloading begins.  And that same day
21  16:50:08   Governor Blanko declared a state of emergency?
22  16:50:13   A.  Yes.
23  16:50:13   Q.  And where did you get the information for this -- you got
24  16:50:16   this from --
25  16:50:16   A.  The 1300?
            JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA
```

## 503

```
1   16:50:19   Q.  Yes.
2   16:50:20   A.  That was a report that was submitted to the Congressional
3   16:50:24   committee investigating Hurricane Katrina.
4   16:50:26   Q.  And that's a public document ---
5   16:50:26       THE COURT:  I'm sorry.  Mr. Walker, you're standing.
6   16:50:30   Are you wanting to lodge an objection?
7   16:50:30       MR. WALKER:  Your Honor, the time of that -- and
8   16:50:34   maybe Mr. Best was about to correct it.  It wasn't -- it's
9   16:50:39   11:00 p.m., not 1:00 p.m.  And that's a publicly-known --
10  16:50:48       THE COURT:  So it's not 1300?
11  16:50:49       MR. WALKER:  That's right, Your Honor.
12  16:50:50       THE COURT:  But 2300?
13  16:50:52       MR. WALKER:  Correct, Your Honor.
14  16:50:53       MR. BEST:  I'm not in a position to stipulate that,
15  16:50:55   Your Honor, because that's why I'm asking him where he got it
16  16:50:57   from.
17  16:50:59       THE COURT:  We'll get that -- we need to get that
18  16:51:03   straight.
19  16:51:04       MR. WALKER:  It's their own Exhibit 20, I believe,
20  16:51:06   Your Honor.
21  16:51:07       MR. BEST:  I just want him to say where he got this
22  16:51:09   information from.
23  16:51:10       THE COURT:  The Court will -- it's duly noted, and we
24  16:51:16   will certainly check and look at the other exhibit you
25  16:51:20   mentioned and ascertain the 2300.
            JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA
```

39 (Pages 500 to 503)

504

| | |
|---|---|
| 16:51:24 | MR. BEST: Okay. I just -- |
| 16:51:25 | THE COURT: 2300 actually makes a little more |
| 16:51:29 | temporal sense to the Court. |
| | BY MR. BEST: |
| 16:51:32 | Q. I just want to know where you got this. |
| 16:51:34 | A. Well, where I got this, it's the governor's time line to |
| 16:51:37 | Congress on October 7th, 2005. |
| 16:51:39 | Q. But in your file you have particulars, and you showed it |
| 16:51:41 | to me. |
| 16:51:42 | A. Yes. |
| 16:51:42 | Q. There were Congressional hearings after Katrina that |
| 16:51:46 | evaluated the whole series of events. And this is the time |
| 16:51:49 | line that was published in that document? |
| 16:51:52 | A. That's correct. |
| 16:51:52 | Q. And right or wrong, that was your source for it? |
| 16:51:55 | A. Yes, sir. |
| 16:51:55 | Q. In any event, the unloading began even after the city was |
| 16:51:59 | in the cone, and continued after the next advisory that we |
| 16:52:04 | already talked about of Friday, at 5:00 p.m. They continued |
| 16:52:11 | unloading it overnight; is that correct? |
| 16:52:14 | A. Yes, sir. |
| 16:52:15 | Q. And then the next advisory below this comes out at |
| 16:52:27 | 11:00 p.m. Friday night? |
| 16:52:29 | A. Yes. That would be Eastern Daylight time. It was 10:00. |
| 16:52:34 | Q. And, of course, by this time it's moved even further west? |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

506

| | |
|---|---|
| 16:53:50 | unload, as Mr. Busch testified, you need to make advance |
| 16:53:53 | planning if you want to accomplish that before, potentially, |
| 16:53:56 | you were exposed to hurricane conditions? |
| 16:53:58 | A. That's correct. |
| 16:54:01 | Q. And if you -- you either choose not to take it out of the |
| 16:54:06 | canal, or you fail to take it out of the canal, what else could |
| 16:54:10 | you do to ameliorate or mitigate in any way the height |
| 16:54:15 | differential between these barges for storm mooring? |
| 16:54:18 | A. Well, it's my opinion that they could have ballasted the |
| 16:54:23 | vessel by loading -- pumping water into the void tanks. |
| 16:54:30 | Q. Okay. Let me back up a little bit, because I think I |
| 16:54:32 | missed a question. I'll bring you back to that one. |
| 16:54:36 | One thing you can do is stop before the barge is |
| 16:54:38 | completely unloaded; is that right? |
| 16:54:41 | A. That's correct. They should have stopped, if my time line |
| 16:54:43 | is correct, when Governor Blanko declared an emergency. If |
| 16:54:50 | they had been aware of that, they should have taken that into |
| 16:54:53 | consideration and stopped unloading. |
| 16:54:54 | Q. Well, even if they had stopped at the 5:00 advisory, when |
| 16:54:57 | the significant shift came towards New Orleans, they would have |
| 16:55:00 | only, by that time, been unloading some, what four and a half |
| 16:55:03 | hours -- |
| 16:55:04 | A. That's correct. |
| 16:55:04 | Q. -- of what was going to ultimately take until the next |
| 16:55:07 | morning to do? |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

505

| | |
|---|---|
| 16:52:40 | A. Yes, it was coming right for us. |
| 16:52:41 | Q. And, of course, as you heard Mr. Busch's testimony, he was |
| 16:52:43 | completely unaware of all three of these cones? |
| 16:52:47 | A. Yes. |
| 16:52:47 | Q. Should an operator of a marine facility like this have |
| 16:52:51 | been aware of all of these cones? |
| 16:52:53 | A. Yes. It's my opinion that they should have been -- made |
| 16:52:57 | an opinion to that fact, that they should have been monitoring |
| 16:53:01 | the progress of the storm. |
| 16:53:02 | Q. Now, you said your opinion was it should have -- the barge |
| 16:53:05 | should have been moved out of the canal, preferably. |
| 16:53:11 | If a facility like this is accepting a loaded barge |
| 16:53:15 | for processing in hurricane season with a hurricane in the |
| 16:53:19 | Gulf, is it -- can arrangements be made for -- if they want to |
| 16:53:24 | unload it -- for somebody to pick it up? Can those |
| 16:53:27 | arrangements be made in advance? |
| 16:53:29 | A. Yes. |
| 16:53:30 | Q. And here, they didn't have that far to take that barge out |
| 16:53:33 | of the Industrial Canal through the lock into the Zito fleet? |
| 16:53:37 | A. That's correct. |
| 16:53:38 | Q. But to do that, you have to call before Zito Fleeting |
| 16:53:40 | closes? |
| 16:53:41 | A. Well, yes. |
| 16:53:42 | Q. So if you've got a barge that you're unloading that you |
| 16:53:46 | know is going to take 20 hours or so -- 12 to 20 hours to |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

507

| | |
|---|---|
| 16:55:07 | A. That's correct, yes. |
| 16:55:08 | Q. So by that time, I mean, we don't know exactly what the |
| 16:55:11 | height differential would have been. But is it fair to say |
| 16:55:14 | that it would have been significantly less than the eight feet |
| 16:55:16 | we wound up with an empty barge? |
| 16:55:18 | A. That's correct. |
| 16:55:19 | Q. If they stopped at 5:00? |
| 16:55:20 | A. Yes. |
| 16:55:20 | Q. And you heard the testimony that they have these little |
| 16:55:23 | front-end loaders that they lower into the barge to move the |
| 16:55:26 | cement around towards the end of the process? |
| 16:55:30 | A. Yes. |
| 16:55:30 | Q. And you heard that the unloading device that they used to |
| 16:55:35 | suction up the cement moves along the side of the barge? |
| 16:55:39 | A. Yes. |
| 16:55:45 | Q. It's not possible to say exactly what state that barge |
| 16:55:48 | would have been in at 5:00; is that fair? |
| 16:55:49 | A. Yes. I have no way to say. |
| 16:55:49 | Q. Well, let me ask you this: Suppose at 5:00 they decide to |
| 16:55:52 | stop, because they're aware of this hurricane advisory; and |
| 16:55:56 | let's say the barge is lower in the water at one end than the |
| 16:55:59 | other -- |
| 16:55:59 | A. Yes. |
| 16:55:59 | Q. -- and they don't know what to do. What can they do? |
| 16:56:03 | What exists? What authority exists that they can consult or |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

40  (Pages 504 to 507)

**508**

1  16:56:08  seek help from about this?
2  16:56:09  A.  Well, they can notify the Coast Guard that they have a
3  16:56:13  barge partially unloaded that might pose a problem.
4  16:56:21  They can ballast that end of the barge if it's -- if
5  16:56:23  it was down by the bow or down by the stern, they can ballast
6  16:56:27  the -- one end of it.
7  16:56:29  They can do that using two-inch pumps to load water
8  16:56:35  in the water tanks.  Or they can -- if they could use that
9  16:56:39  Bobcat, but Mr. Busch testified that that wasn't an option.
10  16:56:44  Q.  All right.  Well, if they're really in a bind and they
11  16:56:47  called the captain of the port, does he have the authority to
12  16:56:50  take matters into his own hands and to find a towboat or order
13  16:56:54  some vessel in there to pick it up and get it out before it's
14  16:56:57  too late?
15  16:56:58  A.  Yes.
16  16:56:59  Q.  He can even, if it's too late and the locks are closed, he
17  16:57:02  can reverse the lock closure and get it out of there, if he
18  16:57:04  thinks it's a hazard, can't he?
19  16:57:05  A.  Yes, he can.
20  16:57:05  Q.  But he is only going to act if somebody notifies him of
21  16:57:08  the problem?
22  16:57:08  A.  That's correct.
23  16:57:09  Q.  And you don't see any indication here that anybody
24  16:57:10  notified him of the problem or took advantage of that resource?
25  16:57:15  A.  That's correct.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**510**

1  16:58:44  A.  That's correct, yes.
2  16:58:51  Q.  Is that exactly what the Coast Guard and the captain of
3  16:58:53  the port are there for, to help you in emergencies?
4  16:58:56  A.  The Coast Guard attempts to apprize itself of all
5  16:59:05  conditions in a port.  The Coast Guard is patrolling the port.
6  16:59:09  They made forays into the Industrial Canal and other parts of
7  16:59:13  the port.  And, certainly, they were available.  If a facility
8  16:59:16  is in trouble or they perceive themselves to be in trouble,
9  16:59:20  they can certainly ask for -- ask for help from the Coast
10  16:59:24  Guard, advice.
11  16:59:24  And/or the Coast Guard could have said, "Well, we
12  16:59:28  can't send anyone in there, but we can help you contact a
13  16:59:32  towing company to come get it."
14  16:59:37  MR. BEST:  With that, Your Honor, I'm through with
15  16:59:39  this particular exhibit.  And I would like to offer -- it's my
16  16:59:42  personal copy, but I will offer it to the Court at this time,
17  16:59:46  if I may, as a supplement to the record.
18  16:59:48  THE COURT:  Yes.  Thank you, sir.  That will be filed
19  16:59:50  into the record.  That's simply the colored copy of the --
20  16:59:53  MR. BEST:  Of the time line we've been referring to.
21  16:59:55  THE COURT:  And, of course, your objection is noted
22  16:59:57  as to the 1300.  And Court will check that, because it was
23  17:00:01  11:00 p.m. when the forecast came out that put New Orleans more
24  17:00:08  in the center.
25  17:00:09  MR. WALKER:  Thank you, Your Honor.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**509**

1  16:57:15  Q.  And, in fact, there -- well, we'll get to that in a little
2  16:57:20  bit.
3  16:57:27  And then moving on your time line to the next day,
4  16:57:30  Saturday, the 27th.  We have there, 9:00 a.m. on Saturday
5  16:57:39  morning Lafarge completes unloading the 4727?
6  16:57:44  A.  Yes, sir.
7  16:57:45  Q.  And you see in the lock log, that the locks in the
8  16:57:49  Industrial Canal didn't close until 4:00 a.m. the next morning?
9  16:57:53  A.  No, I heard testimony -- I mean, I heard that today.
10  16:57:57  Q.  You heard that today.  Okay.
11  16:58:00  So it would appear that if you're going to -- if all
12  16:58:03  else fails and you don't get a telephone call back from your
13  16:58:05  fleeting service, there's certainly time to call the captain of
14  16:58:08  the port and make arrangements to deal with this problem when
15  16:58:11  they finish -- even when they finish the unloading at 9:00 a.m?
16  16:58:14  A.  Well, that was an option to him, and he could have called
17  16:58:16  other contractors or other boat companies.  Or he could have
18  16:58:20  asked Domino to take it out.
19  16:58:22  Q.  Is it reasonable and proper, in your opinion, for the
20  16:58:25  operator of this marine facility to have completed the
21  16:58:28  unloading, leave this barge in this waterway, with two bridges
22  16:58:32  and floodwalls, with temporary single part moorings?
23  16:58:35  A.  No.  I think that's unreasonable.
24  16:58:37  Q.  Particularly in the face of what is now known by Saturday
25  16:58:41  to be potentially a class 5 hurricane?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**511**

BY MR. BEST:
1  17:00:11  Q.  If it turns out that the time of the declaration of
2  17:00:14  emergency is different than what you said, does that change any
3  17:00:18  of the opinions that you've just given us?
4  17:00:21  A.  No.
5  17:00:21  Q.  All the information about the hurricane cones and the
6  17:00:24  weather forecasts available to operators of marine facilities,
7  17:00:27  irrespective of when the governor of the state or the mayor of
8  17:00:30  the city declares an emergency?
9  17:00:32  A.  No, it does not.
10  17:00:34  Q.  Certainly, in any case though, by the time they finished
11  17:00:38  unloading this barge, if we accept that it was at 11:00 that
12  17:00:42  night, there's still time that on Saturday morning to call the
13  17:00:45  captain of the port?
14  17:00:47  A.  Or -- yes.  And also get ahold of a contractor, another
15  17:00:50  boat company to come get it.  In fact, they called a towing
16  17:00:55  company to come in and turn it around.
17  17:00:57  Q.  And a declaration of emergency by the governor prior to
18  17:01:00  the time they completed the unloading of the barge, certainly
19  17:01:05  is an indication to an operator of this marine facility that if
20  17:01:10  he's got this unloaded barge with nothing else of that height
21  17:01:12  to tie it to, he's got an emergency?
22  17:01:15  A.  Yes.
23  17:01:16  Q.  That was not dealt with?
24  17:01:17  A.  Say that again?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**41  (Pages 508 to 511)**

512

```
1    17:01:19   Q.   That was not dealt with?
2    17:01:20   A.   It was not dealt with.  You're correct, yes.
3    17:01:22   Q.   They left?
4    17:01:23   A.   They left.
5    17:01:29   Q.   Okay.  Now, among the other documents you reviewed was the
6    17:01:33   United States Coast Guard Sector, New Orleans, Louisiana,
7    17:01:36   hurricane plan?
8    17:01:37   A.   Yes, I did.
9    17:01:39   Q.   And do you have an opinion about the applicability of the
10   17:01:45   New Orleans sector hurricane plan to the Inner Harbor
11   17:01:49   Navigational Canal and the Lafarge facility?
12   17:01:51   A.   Yes.  It's applicable to the Lafarge facility.
13   17:01:57        MR. BEST:  Let me get an exhibit number for this,
14   17:01:59   Your Honor, if I may.  I apologize for having lost my exhibit
15   17:02:04   list.
16   17:02:15        This, Your Honor, is Plaintiffs' Exhibit 28.
17              BY MR. BEST:
18   17:02:21   Q.   And I'm going to use the ELMO to go through a few
19   17:02:24   pertinent pages of this, if I may.
20   17:02:55        This document, which on the ELMO here bears number
21   17:03:00   IBCO-0070, this is the hurricane contingency port plan; is that
22   17:03:08   correct?
23   17:03:08   A.   Yes.  This was in effect at the time of the hurricane.
24   17:03:11   Q.   All right.  And going to page 73 of this document, this is
25   17:03:26   titled "Maritime Hurricane Contingency Port Plan."  The
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

513

```
1    17:03:31   background, in general, says what?
2    17:03:33        I know it speaks for itself, but I'm trying to
3    17:03:36   cite -- I'm asking you if these are part of the provisions that
4    17:03:39   make this document, in your opinion, applicable to this place
5    17:03:43   and time.
6    17:03:43   A.   Yes.  And background is:  "From June 1st to
7    17:03:47   November 3rd of each year, communities and ports of the Gulf
8    17:03:50   Coast face the threat of hurricanes.  In fact, Gulf Coast
9    17:03:54   hurricanes routinely make landfall and adversely impact
10   17:03:59   shoreline communities.  On average, hurricanes kill over 50
11   17:04:02   people and cause more than $100 million in property damage each
12   17:04:07   year.  New Orleans is particularly vulnerable to the hazards
13   17:04:11   associated with hurricanes."
14   17:04:13   Q.   I don't need you to read the whole thing, sir.  It's in
15   17:04:15   the record, and the judge will have the exhibit.  But it does
16   17:04:16   refer to the potential for bridge damage and vessel damage?
17   17:04:19   A.   Yes, it does.
18   17:04:20   Q.   That's part of the purpose of this plan, to protect and
19   17:04:22   avoid that?
20   17:04:23   A.   That's correct.
21   17:04:23   Q.   And down below it says:  "Threatened as we are by these
22   17:04:28   hazards, it is important that the entire port community share a
23   17:04:30   common understanding.
24   17:04:30        Is it your opinion that the Lafarge facility is
25   17:04:31   located in something that is part of the entire port community?
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

514

```
1    17:04:36   A.   That's correct, it is.
2    17:04:37   Q.   And down below it says:  "Authority applicability."  It
3    17:04:42   says it's applicable to all waterfront facilities and vessels
4    17:04:47   within the captain of the port.  Is that what COTP means?
5    17:04:52   A.   Yes.
6    17:04:53   Q.   Do you see any reason to think that that doesn't apply to
7    17:04:55   this facility?
8    17:04:56   A.   No.  It applies, in my opinion.
9    17:05:06   Q.   And going to page D-7, IBCO-0079 of this same exhibit,
10   17:05:15   under "Vessels" it says it applies to all seaworthy vessels,
11   17:05:21   doesn't it?
12   17:05:21   A.   Yes.
13   17:05:22   Q.   And it talks about barges; right?
14   17:05:25   A.   Yes, it does.
15   17:05:26   Q.   And, again, in the second-to-the-last full sentence it
16   17:05:29   says:  "All vessels"?
17   17:05:31   A.   Yes.
18   17:05:31   Q.   And actually, the last sentence says:  "Vessels in a
19   17:05:34   fully-loaded condition normally fare better than light vessels
20   17:05:37   in hurricanes," doesn't it?
21   17:05:40   A.   Yes, that's common knowledge.
22   17:05:41   Q.   Is there anything on this page that suggests to you that
23   17:05:44   this does not have applicability to this vessel in this
24   17:05:49   location?
25   17:05:50   A.   No.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

515

```
1    17:05:52        MR. BEST:  Your Honor, I beg the Court's indulgence,
2    17:05:55   and I apologize if this -- if it seems tedious.  But the
3    17:06:01   defense experts have offered opinions that this does not apply.
4    17:06:05        THE COURT:  Oh, I understand.
5    17:06:05        MR. BEST:  And I just felt this predicate might be
6    17:06:08   necessary in the -- it might be overlooked by the Court with
7    17:06:12   all the documentation.  I apologize.
8    17:06:14        THE COURT:  That's certainly possible.
9    17:06:15        I'm sure, in your briefing, you'll point it out,
10   17:06:17   and I won't overlook anything in your briefing.
11              BY MR. BEST:
12   17:06:24   Q.   Now, on -- I'm going now to D-8, which bears the
13   17:06:26   identification number at the bottom IBCO-0080.  All right?
14   17:06:31   A.   Yes, sir.
15   17:06:32   Q.   And this talks about waterfront facilities?
16   17:06:36   A.   Yes.
17   17:06:36   Q.   Again, is the -- the Lafarge facility, does it fall within
18   17:06:39   that, in your opinion?
19   17:06:41   A.   Yes, it does.
20   17:06:41   Q.   And what does it say to do about cargo operations in the
21   17:06:46   first sentence?
22   17:06:46   A.   "Waterfront facilities shall secure hazards and halt their
23   17:06:49   cargo operations in advance of the storm's arrival to prevent
24   17:06:55   unnecessary damage to life, property, or the environment."
25   17:06:59   Q.   Now, they don't establish here a precise time by which
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

42  (Pages 512 to 515)

## 516

```
1    17:07:02   that has to be done in this section, do they?
2    17:07:06   A.  That's correct.
3    17:07:06   Q.  But certainly, one of the things that a facility's
4    17:07:10   operator should take into consideration when deciding when to
5    17:07:13   halt cargo operations?
6    17:07:14   A.  Yes, that's correct.
7    17:07:15   Q.  One of the things would be being stuck with a light load
8    17:07:19   and nothing else to moor it to?
9    17:07:21   A.  That's correct, yes.
10   17:07:22   Q.  Actually, even based on the prior entry, just having a
11   17:07:27   light load, even if you didn't have -- you should have problems
12   17:07:28   even mooring it to the dock?
13   17:07:30   A.  That's correct.
14   17:07:42   Q.  Now, particularly, I want to jump ahead to Appendix B --
15   17:07:51   I'm sorry, annex B, appendix 1 and appendix 2, down at the
16   17:07:57   bottom of the page, IBCO-0085.  And the section at the bottom,
17   17:08:03   "Recommended precautionary measures for barges."
18   17:08:06        Do you have an opinion as to the applicability of
19   17:08:08   this section of the port hurricane plan to the Lafarge facility
20   17:08:12   and to the barge 4727?
21   17:08:14   A.  Yes, I do.  It applies, in my opinion, and particularly
22   17:08:19   item No. 2.
23   17:08:20   Q.  Okay.  Now, it has two columns "moored" and "anchored"?
24   17:08:24   A.  Yes.
25   17:08:25   Q.  We're not dealing with the anchored column, because the
```

## 517

```
1    17:08:28   4727 didn't have anchors?
2    17:08:29   A.  That's correct.
3    17:08:30   Q.  But we're dealing with the moored column, because it was
4    17:08:33   moored?
5    17:08:33   A.  Yes.
6    17:08:33   Q.  And what does it say the mooring of a barge should be?
7    17:08:37   A.  "Mooring lines doubled up and due consideration given to
8    17:08:39   the effects of the predicted storm surge.  And special
9    17:08:43   attention should be paid to barges moored in the proximity of
10   17:08:47   barges."
11   17:08:48   Q.  Of bridges.
12   17:08:49   A.  Oh, excuse me.  Bridges.
13   17:08:51   Q.  Okay.  And in your opinion, does this have applicability
14   17:08:54   to this barge in this facility?
15   17:08:56   A.  Yes, it does.
16   17:08:57   Q.  And I think you've already told us, it was not doubled up?
17   17:09:01   A.  It was not doubled up.
18   17:09:03   Q.  In your opinion, did the mooring give due consideration to
19   17:09:05   the effects of the predicted storm surge?
20   17:09:12   A.  No, it didn't, except the tiering of the five barges with
21   17:09:14   the long lines.
22   17:09:14   Q.  Okay.  I'm referring to this -- this barge, 4727.
23   17:09:18   A.  No, it did not.
24   17:09:20   Q.  Was there any indication that special attention had been
25   17:09:22   given to the 2747, given that it was moored in proximity to the
```

## 518

```
1    17:09:28   two bridges?
2    17:09:29   A.  No, it was not.
3    17:09:31   Q.  And particularly, these bridges connect the Greater New
4    17:09:33   Orleans area with St. Bernard Parish?
5    17:09:40   A.  That's correct, yes, the Lower Ninth Ward.
6    17:09:42   Q.  And is it fair to say that in terms of the port, those are
7    17:09:45   major evacuation routes?
8    17:09:47   A.  Yes.
9    17:09:48   Q.  So they're not just any bridges, they're evacuation route
10   17:09:52   bridges?
11   17:09:52   A.  Yes, that's my understanding.
12   17:09:53   Q.  And then going to "Recommended precautionary practice for
13   17:09:57   barge," No. 7.  What does it say?
14   17:10:00   A.  Where are you?
15   17:10:02   Q.  At the bottom of appendix 2, item No. 7?
16   17:10:06   A.  Yes, I see.  "Spare mooring lines and/or wires should be
17   17:10:10   readily available."
18   17:10:11   Q.  And based upon the testimony of Mr. Thigpen, who arrived
19   17:10:16   to assist in the topping around, you saw that he was unable to
20   17:10:20   find any extra mooring lines?
21   17:10:22   A.  He said he found a piece of line on the dock.
22   17:10:25   Q.  But he was unable to find the amount that he would have
23   17:10:28   liked -- the amount of rope he would have liked to apply?
24   17:10:32   A.  That's correct, yes.
25   17:10:33   Q.  So at least as to him, if there was some there, it was not
```

## 519

```
1    17:10:36   readily available to him?
2    17:10:37   A.  That's correct.
3    17:10:44   Q.  Now, these are just -- it's recommended.  I mean, this is
4    17:10:47   not carved in stone that somebody has to do this; right?
5    17:10:51   A.  No, that's correct.  It's recommendations.
6    17:10:55   Q.  And why do they just make recommendations instead of a
7    17:11:03   long, long list of ironclad, dozens and dozens of specifics?
8    17:11:05   A.  Well, each facility is an entity unto itself and
9    17:11:07   circumstances are different at different facilities.  And the
10   17:11:10   Coast Guard is -- strives to give as much leeway and discretion
11   17:11:16   to facility operators, as well as vessel operators, to take
12   17:11:21   these things into consideration and consider their own
13   17:11:27   situation in applying it.
14   17:11:28   Q.  Do you see any indication that the Lafarge facility did
15   17:11:30   anything remotely approaching these recommendations?
16   17:11:34   A.  No, they did not.
17   17:11:35   Q.  Is temporary single part lining remotely in compliance
18   17:11:40   with this recommendation?
19   17:11:41   A.  No, it's not.
20   17:11:49   Q.  Going to appendix C, bearing number -- designation
21   17:11:55   IBC-0086, the bottom section on C talks about setting a
22   17:12:04   voluntarily time for suspension of cargo handling operations.
23   17:12:07   Do you see that?
24   17:12:10   A.  Yes.
25   17:12:10   Q.  Okay.  You've reviewed Lafarge's hurricane checklist;
```

**520**

```
1    17:12:14   right?
2    17:12:15   A.  Yes.
3    17:12:15   Q.  Does it deal at all with suspension of cargo handling
4    17:12:19   operations?
5    17:12:19   A.  No.
6    17:12:20   Q.  So do you see any indication anywhere from any witness or
7    17:12:24   any document that Lafarge had any plan to follow in the event
8    17:12:27   of a hurricane, in terms of cargo handling operations, let
9    17:12:30   alone their suspension?
10   17:12:32   A.  No.  They only had a little checkoff list.
11   17:12:47   Q.  Did they have any plan that would have helped them decide
12   17:12:51   what to do to avoid having light vessels or to deal with
13   17:12:55   mooring of light and loaded vessels?
14   17:12:57   A.  No, they did not.
15   17:13:01       THE COURT:  Speaking of the waterfront, Mr. Best,
16   17:13:05   have you almost covered it?
17   17:13:07       MR. BEST:  I've probably more than covered it, ad
18   17:13:09   nauseam, Your Honor.  I apologize.  I think all the lawyers are
19   17:13:14   about to kill me, and it's 10 after 5:00.  I think I'm just
20   17:13:17   about through.  Let me just glance through this very quickly.
21   17:13:18       I tell you what.  I'm happy to quit for the day.
22   17:13:18       THE COURT:  No, we are going to finish this witness
23   17:13:20   on direct.
24   17:13:21       Oh, no, no.  Let me say that.  We will cover the
25   17:13:24   waterfront on direct.
```
JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**521**

```
1              BY MR. BEST:
2    17:13:26   Q.  In that entire plan, in all the sections that we've just
3    17:13:29   referred to, did you see anything that suggests this doesn't
4    17:13:32   apply to this barge?
5    17:13:33   A.  No, sir.
6    17:13:34   Q.  Did you see anything that carves out some exception for
7    17:13:37   the Industrial Canal and says it doesn't apply to the
8    17:13:39   Industrial Canal as part of the Port of New Orleans?
9    17:13:41   A.  No.
10   17:13:42   Q.  Did you see anything that says it only applies to
11   17:13:44   ocean-going barges?
12   17:13:46   A.  No.
13   17:13:48       THE COURT:  You can save a lot of this for
14   17:13:50   cross-examination of the opposing expert.
15             BY MR. BEST:
16   17:14:12   Q.  You've talked about removing the vessel from the canal.
17   17:14:14   We've seen -- and you had on your time line in entry, and I
18   17:14:18   won't put it back on, about when Zito's fleet closed.
19   17:14:22       Did you see testimony from Mr. Boudreaux that if the
20   17:14:25   vessel had been brought into Zito even after closure they would
21   17:14:29   have accepted it?
22   17:14:30   A.  Yes.
23   17:14:55   Q.  Also, you reached an opinion which I haven't covered yet,
24   17:14:57   and that is included in your report, that this single part
25   17:15:00   mooring arrangement, which was deployed on the 4727, would have
```
JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**522**

```
1    17:15:04   failed at approximately 36-mile per hour winds?
2    17:15:08   A.  That's correct, yes.
3    17:15:08   Q.  And that's based on some calculations done by someone else
4    17:15:12   for you to use?
5    17:15:15   A.  Yes.
6    17:15:14   Q.  And your report attaches a chart that was prepared by
7    17:15:19   Mr. Flory?
8    17:15:21   A.  That's also correct.
9    17:15:23   Q.  I just want to bring that up real quick.
10   17:15:33       And at the top line of that chart is the line that
11   17:15:35   actually, by his calculation, shows what wind it would take to
12   17:15:39   cause that -- that line to part?
13   17:15:42   A.  Yes.  He provided seven different scenarios -- I think
14   17:15:47   it's seven -- of how to -- that the barge could be attached and
15   17:15:54   the various amounts of wind that it would be able to withstand.
16   17:16:04   Q.  And it includes some different assumptions from light and
17   17:16:06   loaded barges.  And it includes a calculation for the failure
18   17:16:10   point of steel cable, too, doesn't it?
19   17:16:12   A.  Yes, it does.
20   17:16:13   Q.  And it shows the steel cable to be substantially stronger
21   17:16:16   than the rope?
22   17:16:17   A.  Yes, in all cases.
23   17:16:19   Q.  Of course, in fairness, even if we're using steel cable on
24   17:16:23   this light load, we still have greater problems with it
25   17:16:27   handling the forces associated with being a higher vessel
```
JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**523**

```
1    17:16:31   moored to a lower vessel?
2    17:16:33   A.  Yes.  But I think Mr. Flory took all of that into
3    17:16:37   consideration when he made these calculations.
4    17:16:41   Q.  Forgive me.  I have mislaid mine for the moment in my
5    17:16:44   stack of papers.  May I have yours to put it on the ELMO --
6    17:16:48   A.  Sure.
7    17:16:48   Q.  -- since you're referring to it?
8    17:17:08       THE COURT:  That's also part of Mr. Green's report?
9    17:17:11       MR. BEST:  That's correct, Your Honor.
10   17:17:12       THE COURT:  And we have --
11   17:17:13       MR. BEST:  ING 2747 mooring arrangement.
12             BY MR. BEST:
13   17:17:17   Q.  And the 36-mile-per-hour failure of a single part mooring
14   17:17:21   arrangement, which you've described in your report, is based on
15   17:17:24   line 1?
16   17:17:25   A.  Yes.
17   17:17:25   Q.  Which is the light barge.  And that mooring arrangement,
18   17:17:28   as I understand it, is supposed to represent the three moorings
19   17:17:33   that had been described by the witnesses?
20   17:17:35   A.  That's correct, yes.
21   17:17:36   Q.  Okay.  And under the column for 100-strength, that means a
22   17:17:43   brand-new rope?
23   17:17:44   A.  Yes.
24   17:17:44   Q.  And 75 is lower, based upon the fact that the longer we
25   17:17:47   use rope it may not be -- have 100 percent of its strength?
```
JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**44  (Pages 520 to 523)**

**524**

```
17:17:52   1    A.  Used rope.
17:17:53   2    Q.  And these other alternatives show the strength if you
17:17:55   3    had doubled arrangements; right?
17:17:59   4    A.  Yes.
17:18:02   5    Q.  But, of course, with the light barge, we still are
17:18:02   6    potentially going to have failure on line 4 at 70-mile an hour
17:18:05   7    winds?
17:18:12   8    A.  Yes.
17:18:12   9    Q.  That's one of the reasons you said the best thing to do
17:18:13  10    with this barge was to get it out of the canal?
17:18:15  11    A.  Yes.
17:18:17  12    Q.  Of course, then mooring the light barge with the wire, we
17:18:18  13    get up to 147-mile-an-hour winds; right?
17:18:21  14    A.  That's correct, yes.
17:18:25  15    Q.  But if you're facing a class 5 hurricane with unknown --
17:18:25  16    and we have gusts to deal with, in addition to sustained winds,
17:18:25  17    right --
17:18:30  18    A.  Yes.
17:18:30  19    Q.  -- in hurricane planning?
17:18:30  20    A.  Yes.
17:18:31  21    Q.  So this all supports your recommendation that this barge
17:18:32  22    be removed?
17:18:34  23    A.  Yes, it does.
17:18:35  24    Q.  Is it fair to say, based upon this information, that it
17:18:42  25
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**525**

```
17:18:45   1    was impossible to moor this light barge in such a way as to
17:18:50   2    ensure that it wouldn't break away from that location, given
17:18:53   3    you didn't know what was coming?
17:18:55   4    A.  In a Cat 5 hurricane, it would fail.
17:19:07   5    Q.  But it's possible, within these parameters set out on this
17:19:11   6    chart, to moor it so that it would stay and survive?
17:19:14   7    A.  Yes.
17:19:14   8    Q.  Even in light condition?
17:19:15   9    A.  Yes.
17:19:15  10    Q.  But it wasn't moored, other than in -- consistent with
17:19:21  11    line mooring?
17:19:22  12    A.  Yeah.  The first scenario, No. 1, is with -- is how the
17:19:27  13    barge was tied up.
17:19:36  14           THE COURT:  We do not appear to have that in the
17:19:42  15    report that was provided to the Court.
17:19:43  16           MR. BEST:  I think, because Mr. Gilbert told you the
17:19:45  17    report that, thus far, we had was for the wrong date, and we
17:19:47  18    substituted in the report with the later date, which has the
17:19:50  19    attachment.  Alternatively, it is also included, I believe, as
17:19:54  20    one of his deposition exhibits, which is the next -- 388, I
17:19:57  21    believe.
17:20:03  22           Pardon me, no.  It's 387.
17:20:04  23           MR. GILBERT:  Your Honor, this is Exhibit 387 to
17:20:07  24    Mr. Green's deposition.
17:20:09  25           MR. BEST:  Which is Exhibit 387.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**526**

```
17:20:12   1           Actually, Your Honor, I stand corrected.  It was
17:20:14   2    not part of the report that was produced at the time of the
17:20:18   3    deposition.  So it is part of Plaintiffs' Exhibit 387.
17:20:22   4           With that, Your Honor, just bear with me one
17:20:25   5    minute.
17:20:26   6           THE COURT:  All right.
           7    BY MR. BEST:
17:20:59   8    Q.  And although there was a prediction a CAT 5 storm it,
17:21:03   9    didn't turn out that way, did it?
17:21:05  10    A.  No, it did not.
17:21:06  11    Q.  And, in fact, the weather records you reviewed, the
17:21:10  12    highest thing at the Lakefront Airport before the gauge broke
17:21:13  13    there was what?
17:21:14  14    A.  I think it was 68 miles an hour, 80 miles an hour.
17:21:15  15    Q.  I think it was 86.
17:21:16  16    A.  86 miles an hour.
17:21:18  17    Q.  Okay.  So given the weather circumstances, and given the
17:21:20  18    fact that the other barges there at the facility did not break
17:21:23  19    away, in your opinion, was it possible, even with this as a
17:21:27  20    light barge, to moor it in such a fashion that it would not
17:21:31  21    have broken away?
17:21:32  22    A.  Yes, it could have.
17:21:35  23           MR. BEST:  I tender the witness, Your Honor.
17:21:37  24           THE COURT:  Thank you.
17:21:37  25           And Mr. Aldock, certainly, your wish to cross
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**527**

```
17:21:41   1    tomorrow was going to be granted anyhow.  But it's definitely
17:21:44   2    going to be granted now.
17:21:46   3           MR. ALDOCK:  I saw that coming.
17:21:47   4           THE COURT:  After our little back-and-forth, at
17:21:49   5    least, took some time and, of course, the direct of this
17:21:52   6    witness.
17:21:52   7           You may stand down, sir.  You, of course, will
17:21:55   8    be here in the morning.  We will see you.
17:21:57   9           I have a couple of questions to ask you.  Let
17:21:59  10    me -- New Orleans is the epicenter of news in disasters,
17:22:16  11    apparently.
17:22:43  12           (OFF THE RECORD)
17:23:14  13           THE COURT:  The time -- we don't have an exhibit that
17:23:16  14    shows the time the governor declared an emergency.  I'm looking
17:23:19  15    at 19 and 20 -- Defendant's 20.  We don't see --
17:23:24  16           MR. RAFFMAN:  Plaintiffs' 20.
17:23:26  17           THE COURT:  It has Defendant's -- Plaintiffs' 19 and
17:23:30  18    Defendant's 20.  I don't see the time.  So if we could find
17:23:34  19    something with it in the record, it would be helpful.
17:23:36  20           MR. ALDOCK:  It's Plaintiffs' 20, Your Honor.
17:23:38  21           THE COURT:  Plaintiffs' --
17:23:41  22           MS. DALEY:  Plaintiffs' 20 has nothing to do with --
17:23:45  23           MR. WALKER:  We'll find it right now.
17:23:46  24           THE COURT:  Okay.  And you don't have to do it now.
17:24:11  25           (OFF THE RECORD)
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

528

| | | |
|---|---|---|
| 1 | 17:24:12 | MR. GILBERT:  Not a problem, Judge.  Thank you. |
| 2 | 17:24:15 | MR. ALDOCK:  Thank you, Your Honor. |
| 3 | 17:24:22 | THE COURT:  Tomorrow we're going to go to 12:30, and |
| 4 | 17:24:27 | then we'll miss a day, and then we'll be back Friday.  That |
| 5 | 17:24:32 | will give you a little break from me and from each other. |
| 6 | 17:24:40 | ***** |
| 7 | 17:24:40 | CERTIFICATE |
| 8 | 17:24:40 | I, Jodi Simcox, RMR, FCRR, Official Court Reporter |
| 9 | 17:24:40 | for the United States District Court, Eastern District of |
| 10 | 17:24:40 | Louisiana, do hereby certify that the foregoing is a true and |
| 11 | 17:24:40 | correct transcript, to the best of my ability and |
| 12 | 17:24:40 | understanding, from the record of the proceedings in the |
| 13 | 17:24:40 | above-entitled and numbered matter. |
| 14 | 17:24:40 | |
| 15 | 17:24:40 | |
| 16 | 17:24:40 | S/ Jodi Simcox, RMR, FCRR |
| | | Jodi Simcox, RMR, FCRR |
| 17 | 17:24:40 | Official Court Reporter |
| 18 | | |
| 19 | 16:03:10 | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

529

1          UNITED STATES DISTRICT COURT
2          EASTERN DISTRICT OF LOUISIANA
3
    ****************************************************************
4
    IN RE:  KATRINA CANAL
5   BREACHES CONSOLIDATED
    LITIGATION
6
                            CIVIL ACTION NO. 05-4182
7                           SECTION "K" (2)
                            NEW ORLEANS, LOUISIANA
8                           WEDNESDAY, JUNE 23, 2010, 9:00 A.M.
9   PERTAINS TO BARGE
10
    MUMFORD   C.A. NO. 05-5724
11  AS TO CLAIMS OF PLAINTIFFS
    JOSEPHINE RICHARDSON AND
12  HOLIDAY JEWELERS, INC.,
    ONLY
13
14  BENOIT   C.A. NO. 06-7516
    AS TO CLAIMS OF PLAINTIFFS
15  JOHN ALFORD AND JERRY
    ALFORD ONLY
16
17  ****************************************************************
18
                    DAY 3, MORNING SESSION
19          TRANSCRIPT OF NONJURY TRIAL PROCEEDINGS
        HEARD BEFORE THE HONORABLE STANWOOD R. DUVAL, JR.
20                   UNITED STATES JUDGE
21
22  APPEARANCES:
23
    FOR THE PLAINTIFFS:   BEST KOEPPEL TRAYLOR
24                        BY:  LAURENCE E. BEST, ESQUIRE
                          2030 ST. CHARLES AVENUE
25                        NEW ORLEANS LA  70130

**530**

APPEARANCES CONTINUED:

LAW OFFICES OF BRIAN A. GILBERT
BY:  BRIAN A. GILBERT, ESQUIRE
2030 ST. CHARLES AVENUE
NEW ORLEANS LA  70130

KHORRAMI POLLARD ABIR
BY:  SHAWN KHORRAMI, ESQUIRE
44 FLOWER STREET, 33RD FLOOR
LOS ANGELES CA  90071

WILSON GROCHOW DRUKER & NOLET
BY:  LAWRENCE A. WILSON, ESQUIRE
223 BROADWAY, 5TH FLOOR
NEW YORK NY  10279

WIEDEMANN & WIEDEMANN
BY:  LAWRENCE D. WIEDEMANN, ESQUIRE
     KARL WIEDEMANN, ESQUIRE
821 BARONNE STREET
NEW ORLEANS LA  70113

PATRICK J. SANDERS
ATTORNEY AT LAW
3316 RIDGELAKE DRIVE
SUITE 100
METAIRIE LA  70002

LAW OFFICE OF RICHARD T. SEYMOUR
BY:  RICHARD T. SEYMOUR, ESQUIRE
1150 CONNECTICUT AVENUE N.W.
SUITE 900
WASHINGTON DC  20036

FOR THE DEFENDANT:     CHAFFE MCCALL
          BY:  DEREK A. WALKER, ESQUIRE
          2300 ENERGY CENTRE
          1100 POYDRAS STREET
          NEW ORLEANS LA  70163

**531**

APPEARANCES CONTINUED:

GORDON PROCTER
BY:  JOHN D. ALDOCK, ESQUIRE
     MARK S. RAFFMAN, ESQUIRE
     ADAM M. CHUD, ESQUIRE
     KIRSTEN V. K. ROBBINS, ESQUIRE
     ERIC I. GOLDBERG, ESQUIRE
901 NEW YORK AVENUE N. W.
WASHINGTON DC  20001

SUTTERFIELD & WEBB
BY:  DANIEL A. WEBB, ESQUIRE
650 POYDRAS STREET, SUITE 2715
NEW ORLEANS LA  70130

LAFARGE NORTH AMERICA, INC.
BY:  PETER KEELEY, ESQUIRE
12950 WORLDGATE DRIVE
HERNDON VA  20170

OFFICIAL COURT REPORTER:     CATHY PEPPER, CCR, RMR, CRR
          500 POYDRAS STREET, ROOM B406
          NEW ORLEANS, LOUISIANA 70130
          (504) 589-7779

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
PRODUCED BY COMPUTER.

**532**

I N D E X

EXAMINATIONS                                    PAGE

COMMANDER DONALD GREEN (CONTINUED).................... 533
CROSS-EXAMINATION BY MR. WALKER...................... 533
REDIRECT EXAMINATION BY MR. BEST...................... 564
LOUIS ROBIN........................................... 576
DIRECT EXAMINATION BY MR. SANDERS.................... 576
CROSS-EXAMINATION BY MR. WEBB........................ 583
REDIRECT EXAMINATION BY MR. SANDERS.................. 591
WILLIAM VILLAVASSO VIDEOTAPED DEPOSITION ............. 595


E X H I B I T S

DESCRIPTION                                     PAGE

EXHIBIT D338 WAS ADMITTED............................. 549

**533**

P-R-O-C-E-E-D-I-N-G-S

WEDNESDAY, JUNE 23, 2010

M O R N I N G   S E S S I O N

(COURT CALLED TO ORDER)

THE DEPUTY CLERK:  ALL RISE.

THE COURT:  GOOD MORNING.  THANK YOU.  BE SEATED.

ALL RIGHT.  MR. WALKER, YOU HAVE THE HONORS ON
CROSS-EXAMINATION?

MR. WALKER:  YES, THANK YOU, YOUR HONOR.  GOOD MORNING.
DEREK WALKER.  GOOD MORNING, YOUR HONOR.

THE COURT:  GOOD MORNING.

CROSS-EXAMINATION

BY MR. WALKER:

Q.  MR. GREEN, GOOD MORNING.

A.  GOOD MORNING, MR. WALKER.

Q.  YESTERDAY YOU WERE QUALIFIED AS AN EXPERT IN MARINE
PRACTICES AND MOORING, CORRECT?

A.  YES, SIR.

Q.  AND TO SUMMARIZE, GENERALLY YOUR OPINION IS THAT LAFARGE
DIDN'T PREPARE ITSELF AND THE TERMINAL PROPERLY IN ANTICIPATION
FOR A HURRICANE AND DIDN'T MOOR THE 4727 AND 4745 IN ANTICIPATION
OF THAT, CORRECT?

A.  THAT'S CORRECT.

534

1  Q.  YOU'VE ISSUED AT LEAST THREE REPORTS IN THIS CASE, HAVEN'T
2  YOU?
3  A.  YES, I HAVE.
4  Q.  AND YOUR FINAL REPORT WAS MARCH '09, CORRECT?
5  A.  YES, SIR.
6  Q.  OKAY.  AND IT'S YOUR UNDERSTANDING IN EACH OF THOSE REPORTS,
7  AND THE JUDGE IS FAMILIAR WITH THEM SO WE WON'T BELABOR IT, THAT
8  THE MOORING ARRANGEMENT BETWEEN THE TWO BARGES WHICH YOU
9  CRITICIZE WAS THREE ONE-PART TWO-INCH POLYPROP LINES, CORRECT?
10  A.  YES, SIR.
11  Q.  ONE AT EACH END AND ONE SOMEWHERE IN THE CENTER?
12  A.  THAT'S CORRECT.
13  Q.  IF WE LOOK AT YOUR REPORT OF MARCH '09, SECTION 3.1.2.
14       MR. WALKER:  AND, YOUR HONOR, THAT'S EXHIBIT
15  DEFENDANT 234-003.
16             EXAMINATION
17  BY MR. WALKER:
18  Q.  THIS IS THE FORMAT IN WHICH YOU WROTE ALL YOUR REPORTS,
19  ISN'T IT, DATING BACK TO JANUARY OF '07?
20  A.  THAT'S CORRECT, YES.
21  Q.  3.1 IS BREAKAWAY, 3.1.2 IS A GENERAL DESCRIPTION, AND THE
22  FIRST PARAGRAPH SAYS, "DURING THE EARLY MORNING HOURS" -- WE'LL
23  GET IT BLOWN UP -- "OF AUGUST 29, 2005, THE ING 4727 BROKE FREE
24  OF ITS MOORINGS DURING HURRICANE KATRINA AND DRIFTED SOUTH IN THE
25  IHNC," CORRECT?

535

1  A.  YES, SIR.
2  Q.  ALL RIGHT.  AND YOU SAID EXACTLY THE SAME THING IN JUNE OF
3  '08 AND JANUARY OF '07, AND WE CAN DISPLAY THOSE FOR THE JUDGE
4  JUST BRIEFLY.
5       THOSE ARE THE SITES FROM YOUR REPORT, SECTION 3.1.2, OF EACH
6  OF THOSE DATES.  BASICALLY THE SAME THING EXCEPT, EARLY ON IN
7  YOUR JANUARY 7 REPORT, YOU ACTUALLY PUT THE HOURS, THE BREAKAWAY
8  WAS 0530 TO 0600 DURING HURRICANE KATRINA AND DRIFTED SOUTH,
9  CORRECT?
10  A.  YES, SIR.
11  Q.  AND THAT'S STILL YOUR UNDERSTANDING TODAY, ISN'T IT?
12  A.  THAT IT BROKE LOOSE, YES.
13  Q.  AND THAT NO CABLE WAS USED?
14  A.  THAT'S CORRECT.
15  Q.  AND THERE WAS A DIFFERENCE IN APPROXIMATELY 8 FEET OF
16  FREEBOARD?
17  A.  YES, SIR.
18  Q.  OKAY.  AND YOUR OPINION IN THE REPORT THAT YOU WROTE IS THAT
19  THE BREAKAWAY WAS PRIMARILY DUE TO WIND AND RISING WATER LEVELS
20  OR SURGE, CORRECT?
21  A.  YES.  AS WELL AS I OPINED THAT IT IS A POSSIBILITY THAT THE
22  LONG LINE OF THE UPPER TIER, FIVE-BARGE TIER, DRIFTED DOWN OR
23  CAME IN CONTACT WITH THE 4727 AND POSSIBLY BROKE THE MOORING
24  LINES, AS WELL.
25  Q.  RIGHT.  YOU HAVE THREE ELEMENTS.  THE WIND, WHICH IS, WE

536

1  AGREE, THE PRIMARY ELEMENT ACTING ON THE 20-FOOT SAIL AREA OF A
2  LIGHT BARGE, RIGHT?
3  A.  YES, SIR.
4  Q.  AND YOU HAD RISING WATER LEVELS OR SURGE?
5  A.  YES.
6  Q.  AND YOU HAVE THIS POTENTIAL YOU HAVE ON THE SIDE, THE
7  FIVE-TIER BREAKING LOOSE, AS WELL, UNDER THOSE CONDITIONS AND
8  ALIGNING AGAINST THE TWO TIER, RIGHT?
9  A.  YES, SIR.
10  Q.  AND THE FIVE TIER WOULDN'T BREAK AWAY, AS YOU EXPLAINED,
11  UNLESS THERE WAS THE SAME RISE IN WATER LEVEL CAUSING THE LONG
12  LINING PROCESS TO SLIP OUT?
13  A.  THAT'S CORRECT.  YES.
14  Q.  OKAY.  AND IF WE LOOK AT YOUR REPORT, SECTION 5.2, IT
15  EXPLAINS YOUR CRITICISM OF LAFARGE AND THE MOORING.  AND IT'S
16  PRECISELY WHAT YOU'VE JUST RECITED.  I'M SORRY, 5.1:  SUBJECT TO
17  RECEIVING INFORMATION, THE CAUSE -- MY OPINION IS THAT THE CAUSE
18  OR CAUSES OF THE BREAKAWAY OF THE ING 4727 FROM ITS MOORINGS
19  DURING KATRINA WAS MOST LIKELY THE COMBINATION OF HURRICANE FORCE
20  WINDS AND RISING WATER LEVEL, CORRECT?
21  A.  YES.
22  Q.  AND THIS PARTICULAR ONE YOU DIDN'T HAVE THE FIVE-TIER, BUT
23  WE UNDERSTAND THAT'S PART OF YOUR OPINION.
24  A.  THAT'S CORRECT.
25  Q.  AND YOU RECITED THE SAME THING IN EACH OF YOUR PREVIOUS

537

1  REPORTS OF JANUARY '07 AND JUNE '08, RIGHT?
2  A.  I BEG TO DIFFER WITH YOU.  YOU STOPPED.  YOU SAID THAT MY
3  OPINION AT THIS TIME WAS ONLY ABOUT THE RISING WATER --
4  Q.  I STAND CORRECTED.  I SEE IT.  YOU'RE RIGHT.
5  A.  THANK YOU.
6  Q.  OKAY.  SO YOU HAD ALL THREE AT THAT TIME?
7  A.  YES.
8  Q.  AND THE REASON YOU STATED THOSE OPINIONS IN YOUR REPORT IS
9  BECAUSE AS AN EXPERT IN THE MOORING PRACTICES THAT YOU'VE BEEN
10  TENDERED AS, IT MADE SENSE TO YOU, DIDN'T IT?
11  A.  YES.
12  Q.  IT WAS SUPPORTABLE?
13  A.  PARDON ME?
14  Q.  IT WAS A SUPPORTABLE PREMISE THAT HAD SOME OBJECTIVITY TO
15  IT, THAT THIS IS WHAT HAPPENED DURING THE HURRICANE; IT MADE
16  SENSE TO YOU THIS IS HOW THIS BARGE BROKE AWAY?
17  A.  YES.
18  Q.  OKAY.  AND IT MADE SENSE TO YOU BECAUSE YOU HAD SOME
19  VERIFICATION OF THAT.  YOU KNEW THAT EARLY MORNING MONDAY,
20  AUGUST 29, 2005, THE SURGE WAS HIGH?
21  A.  YES.
22  Q.  YOU KNEW THAT THE WINDS WERE VERY STRONG COMING FROM NORTH
23  TO EAST, CORRECT?
24  A.  COMING FROM THE NORTHEAST.
25  Q.  CORRECT.  THAT'S ALMOST, AS THE JUDGE POINTED OUT, STRAIGHT

3  (Pages 534 to 537)

**538**

1  DOWN THE INDUSTRIAL CANAL, RIGHT?

2  A.  THAT'S CORRECT.

3  Q.  AND BY STRAIGHT DOWN, FOR THE RECORD, WE MEAN FROM

4  FLORIDA AVENUE TO CLAIBORNE AVENUE?

5  A.  YES, BUT THAT WAS THE WEATHER OBSERVATIONS AT THE LAKEFRONT

6  AIRPORT, NOT AT THE LAFARGE FACILITY.

7  Q.  YOU DON'T HAVE ANY BASIS TO STATE HERE TODAY, DO YOU, THAT

8  THE WIND IN GENERAL WAS, AS YOU JUST SAID, NORTHEAST, COMING FROM

9  THE NORTHEAST?

10  A.  THAT WAS THE WEATHER REPORT DOCUMENTS THAT I REVIEWED FROM

11  THE LAKEFRONT AIRPORT.

12  Q.  OKAY.  AND YOU ALSO LOOKED AT THE ROPES, DIDN'T YOU?

13  A.  YES, I DID.

14  Q.  AND YOU VERIFIED TO THE BEST OF YOUR KNOWLEDGE IN THAT AREA

15  THAT THEY BROKE UNDER TENSION?

16  A.  YES.

17  Q.  AND YOU THEREFORE, COMBINING ALL THOSE ELEMENTS, CRITICIZED

18  LAFARGE FOR THE INADEQUATE PREPARATION IN THE FACE OF AN INCOMING

19  HURRICANE, CORRECT?

20  A.  YES.

21  Q.  YOU DIDN'T CRITICIZE LAFARGE, DID YOU, FOR FAILING TO

22  PREPARE A BARGE FOR A CALM, SUNNY DAY WITH CALM WINDS WITH NO

23  SURGE, RIGHT?

24  A.  NO, I CRITICIZED LAFARGE FOR -- AS I TESTIFIED YESTERDAY,

25  FOR LEAVING THE BARGE IN A TEMPORARILY MOORED CONDITION, WHICH

**539**

1  I -- IT'S MY OPINION SINGLE PART MOORING LINES, IN MY OPINION, IS

2  A TEMPORARY MOORING.

3  Q.  YOU'VE NOW CHANGED YOUR OPINION, HAVEN'T YOU, FROM WHAT

4  YOU'VE SET FORTH SINCE '07, AT THE VERY LATEST, THROUGH YOUR

5  REPORT OF MARCH OF '09 BASED ON THE TESTIMONY OF TOMPKINS AND

6  LEBLANC, RIGHT?

7  A.  NO, SIR, I DON'T THINK I DID.  YOU -- TOMPKINS AND LEBLANC

8  SAW THE BARGE IN THE CANAL ON SUNDAY.  I HAVE NO EXPLANATION HOW

9  IT COULD BE THERE ON SUNDAY --

10  Q.  OKAY.

11  A.  -- OTHER THAN THE FACT THAT THE TESTIMONY IS, IS THAT THE

12  BARGE WAS LEFT BY THE LAFARGE PEOPLE WITH THREE SINGLE-PART LINES

13  SECURING THE BARGE, A LIGHT BARGE, TO A LOADED BARGE AT THE

14  FACILITY.  AND I HAVE OPINED NUMEROUS TIMES, AND I DON'T THINK MY

15  OPINIONS HAVE CHANGED, WITH REGARD TO THE INADEQUACY OF THAT

16  MOORING ARRANGEMENT.

17  Q.  YOU'RE AWARE, ARE YOU NOT, THAT -- I THINK IT WAS MR. BUSCH

18  WHO TESTIFIED THAT THERE HAD BEEN NO BREAKAWAYS AT THE LAFARGE

19  FACILITY IN 20 YEARS WITH THOSE PRECISE MOORINGS?

20  A.  I DON'T THINK HE TESTIFIED EXACTLY AS YOU'RE SAYING.  I

21  THINK THAT MR. BUSCH TESTIFIED THAT, YES, THEY MAY NOT HAVE HAD

22  ANY BREAKAWAYS, BUT I DON'T THINK MR. BUSCH SAID THAT IT WAS A

23  ROUTINE TO ONLY PUT ONE LINE BETWEEN BARGES AND LEAVE THE

24  FACILITY.  I DON'T THINK HE SAID THAT.

25  Q.  WELL, LET ME UNDERSTAND WHAT YOU'RE SAYING.  IS IT STILL

**540**

1  YOUR OPINION THAT THE BARGE BROKE AWAY DUE TO HURRICANE

2  CONDITIONS, YES OR NO?

3  A.  I THINK -- YES, I THINK IT BROKE AWAY DURING HURRICANE

4  CONDITIONS.

5  Q.  WERE THERE ANY --

6  A.  NOW --

7  Q.  I'M SORRY.

8  A.  -- HOWEVER, WE HAVE TWO WITNESSES THAT SAY THAT IT WAS IN

9  THE CANAL ON SUNDAY, AND THEY ALSO TESTIFIED THAT THE WEATHER WAS

10  CALM ON SUNDAY, SO I HAVE NO EXPLANATION OR OPINION AS TO HOW THE

11  BARGE GOT THERE ON A SUNDAY, IF THAT IS, IN FACT, THE BARGE.

12  Q.  AND THAT'S PRECISE MY POINT, SIR.  YOU'RE HERE TO TESTIFY AS

13  A MOORING EXPERT, AND YOU'VE JUST STATED THAT YOU HAVE NO OPINION

14  ON HOW THE BARGE BROKE AWAY BECAUSE YOU'RE RELYING, LET ME

15  FINISH, ON TOMPKINS AND LEBLANC, WHO SAW THE BARGE AT A TIME IN A

16  LOCATION WHERE THERE WERE NO HURRICANE CONDITIONS PRIOR TO THAT.

17  A.  THAT IS CORRECT.  HOWEVER, THE BARGE -- MR. FLORY, THE

18  EXPERT THAT CONDUCTED STUDIES ON THE MOORING AS IT WAS ON

19  SATURDAY, WHEN THE LAFARGE PERSONNEL DEPARTED THE FACILITY, HIS

20  ANALYSIS WAS THE TWO -- THE THREE, THREE ONE-PART LINES WOULD

21  HAVE PARTED UNDER 36-MILE-AN-HOUR WINDS.  WHETHER THEY HAD ANY

22  36-MILE-AN-HOUR WINDS ON SUNDAY, OR PASSING VESSELS COULD HAVE

23  SUCKED THE BARGE AWAY FROM THE OTHER BARGE, I DON'T KNOW, BUT IT

24  BROKE ITS MOORINGS.  AND IF IT HAPPENED ON SUNDAY, THEN STILL MY

25  OPINION IS THAT THE MOORINGS WERE INADEQUATE WHEN THEY LEFT ON

**541**

1  SATURDAY MORNING -- OR SATURDAY AT 12:30.  I HAVE NOT CHANGED MY

2  OPINION WITH THAT REGARD.

3  Q.  DOES THE WORD "TEMPORARY MOORINGS", "TEMPORARY

4  CONFIGURATION" OR "TEMPORARY ARRANGEMENT" APPEAR ANYWHERE IN YOUR

5  THREE OR FOUR REPORTS?

6  A.  NO, IT DOES NOT.

7  Q.  I'M STILL A BIT CONFUSED, AND I APOLOGIZE TO YOU AND THE

8  COURT.

9  A.  CONCERNING?

10  Q.  I'M GOING TO ASK THE QUESTION.

11  A.  OKAY.

12  Q.  YOU ARE SAYING THAT ALTHOUGH YOU DON'T KNOW UNDER WHAT

13  CONDITIONS THE BARGE BROKE AWAY SOMETIME PRIOR TO NOON ON SUNDAY,

14  THAT IT'S YOUR OPINION THAT REGARDLESS OF THE CONDITIONS YOU

15  DISAGREE WITH THE MOORING ARRANGEMENT; IS THAT WHAT YOU'RE

16  SAYING?

17  A.  YES, INDEED.

18  Q.  BUT YOUR REPORTS, UNTIL TOMPKINS AND LEBLANC TESTIFIED, ARE

19  TO THE EFFECT AND YOUR OPINION WAS AND IS IN THE REPORT THAT IT

20  REQUIRED HURRICANE FORCE CONDITIONS AND SURGE, RIGHT?

21  A.  I DON'T THINK SO.  I SAID IN MY REPORT SOMEPLACE THAT THE

22  EXPERT I DEPENDED ON ESTIMATED THAT THE BARGE COULD BREAK

23  AWAY AT 36 MILES AN HOUR.

24  NOW, WHEN THAT HAPPENED, IF IT HAPPENED ON SUNDAY OR IF IT

25  HAPPENED ON EARLY MORNING ON MONDAY, I'M NOT SURE WHEN, BUT THAT

**542**

1  WAS NOT THE ONLY CRITERIA THAT WOULD CAUSE THE BARGE TO BREAK
2  AWAY.  IT COULD BE PASSING VESSELS SUCKING THE BARGE AWAY FROM
3  THE SIDE OF THE 4745.
4  Q.   ARE YOU AWARE OF ANY PASSING VESSEL, PARTICULARLY IN LIGHT
5  OF YOUR KNOWLEDGE OF WHEN THE LOCKS CLOSED, THAT WENT BETWEEN
6  FLORIDA AND CLAIBORNE AVENUE BRIDGES ON SUNDAY?
7  A.   OTHER THAN THE TESTIMONY IS THAT THERE WERE A LOT OF TRAFFIC
8  IN THE CANAL OF BOATS AND TOWS PASSING THROUGH TO CLEAR THE LOCKS
9  BEFORE IT CLOSED DOWN PERMANENTLY BY THE CORPS OF ENGINEERS.
10  Q.   AND YOU WOULD EXPECT IF THERE WAS A LOT OF TRAFFIC THAT SOME
11  MARINER, SOME DECKHAND, SOME CAPTAIN OF A TUGBOAT, WOULD SEE A
12  LOOSE BARGE IF THAT HAD HAPPENED, RIGHT?
13  A.   ON SUNDAY I THINK THE LOCKS WERE ALREADY CLOSED.
14  Q.   RIGHT.  SO THEN YOU EITHER -- YOU HAVE NO TRAFFIC TO CAUSE A
15  WAVE WASH, OR YOU HAVE TRAFFIC AND THEY HAVEN'T SEEN IT?
16  A.   WELL, NO ONE KNOWS AFTER LAFARGE PEOPLE LEFT WHEN THE BARGE
17  BROKE LOOSE.  THERE IS NO EVIDENCE, THERE IS NO TESTIMONY.
18      WE CAN ONLY SURMISE THAT AT SOME TIME BETWEEN THE TIME
19  LAFARGE PERSONNEL LEFT THE FACILITY AND THE BARGE WAS MOORED AS
20  THE WITNESSES HAVE TESTIFIED, THAT IT BROKE ITS MOORINGS, CAME
21  FREE FROM ITS MOORINGS, AND THE LINES, AS YOU INDICATE, SHOW THAT
22  THE LINES PARTED UNDER PRESSURE -- OR TENSION, RATHER.
23      AND THE BARGE, IF IT WAS IN THE CANAL ON SUNDAY WHEN THOSE
24  TWO WITNESSES SAW THEM, THEN I CAN'T EXPLAIN HOW IT GOT THERE,
25  OTHER THAN WE KNOW THAT THE MOORINGS FAILED SOMETIME -- SOMETIME

**543**

1  BEFORE THAT.
2  Q.   NOW, YOU AGREE WITH ME, DON'T YOU, THAT PRIOR TO NOON ON
3  SUNDAY, AUGUST 28TH, THERE WERE NO WINDS RECORDED THAT WERE IN
4  EXCESS OF THE 36 MILES AN HOUR AS REQUIRED BY MR. FLORY ON WHOM
5  YOU RELIED?
6  A.   I -- NO, I DON'T HAVE ANY WEATHER DATA OTHER THAN THE
7  WEATHER DATA FROM LAKEFRONT AIRPORT ON MONDAY.
8  Q.   OKAY.  I WILL SHOW YOU EXHIBIT -- THIS IS YOUR OWN EXHIBIT,
9  IT'S BEEN MARKED AS DEFENDANTS' 21.  THIS IS THE LAKEFRONT DATA
10  ON THE RIGHT THAT YOU GATHERED, CORRECT, FOR AUGUST 28TH?
11  A.   MINE LOOKS DIFFERENT FROM THAT, BUT --
12  Q.   OKAY.  WELL, THIS IS LAKEFRONT AIRPORT WEATHER DATA, I'LL
13  REPRESENT TO YOU, ON THE RIGHT.
14  A.   YES.
15  Q.   YOU CAN READ THE TIME AT GMT, YELLOW COLUMN, AND THE MILES
16  PER HOUR UNDER SPEED, CORRECT?  DO YOU UNDERSTAND IT?
17  A.   YES.
18  Q.   OKAY.  SO YOU LOOK AT 11:53, WHICH IS ABOUT THREE-QUARTERS
19  OF THE WAY DOWN?
20  A.   I'M SORRY, I'M HAVING TROUBLE FINDING IT.  ON WHICH COLUMN?
21  Q.   I'LL POINT IT TO YOU.  THIS COLUMN IS THE TIME, RIGHT?
22  A.   11:53?
23  Q.   RIGHT.
24  A.   YES.
25  Q.   AND THAT'S GMT, SO --

**544**

A.   YOU SUBTRACT SIX HOURS FROM THAT.
Q.   RIGHT.  SO WE GO TO -- IN THIS AREA.
    AND THE WIND SPEEDS ARE 9, 10, 9, 13, 17.  EVEN IF WE GO
FORWARD IN TIME, 21, 23, 24.  WE COULD READ BOTH COLUMNS.  THERE
IS NO 36; IS THERE?
A.   NO, SIR.
Q.   SO ON SUNDAY, THE DAY THAT YOU NOW APPARENTLY ARE OPINING
THE BARGE MYSTERIOUSLY BROKE UNDER NONHURRICANE WIND CONDITIONS,
THERE WEREN'T THE WINDS NECESSARY FOR THE EXPERT ON WHOM YOU
RELY, MR. FLORY'S, THEORY TO WORK, CORRECT?
A.   WELL, YOU'RE ASSUMING THAT -- I GUESS, AND THE COURT WOULD
ASSUME THAT THE TWO WITNESSES THAT SAID THEY SAW THE BARGE IN THE
CANAL ON SUNDAY ARE TELLING THE TRUTH.  IT'S OBVIOUS IF THAT IS,
IN FACT, TRUE, THEN REGARDLESS OF THE WEATHER, SOMETHING BROKE
THAT BARGE LOOSE.
    AND WE KNOW THAT, BASED ON MY EXPERTS -- OR THE EXPERT THAT
I DEPENDED ON, 36 MILES AN HOUR OF WIND COULD POSSIBLY BREAK THE
BARGE LOOSE.  HOWEVER, THAT'S NOT THE ONLY CRITERIA THAT WOULD
PLAY EFFECT ON BREAKING THE BARGE LOOSE OR BREAKING THOSE LINES.
    IT COULD BE, AS I SAID BEFORE, VESSELS PASSING THROUGH THE
CANAL ON SATURDAY NIGHT BEFORE THE LOCKS CLOSED.  I THINK SOMEONE
TOLD ME THAT THE LOCKS' LOGS INDICATE BUSY -- THE LOCKS WERE BUSY
WITH TRANSITING VESSELS THROUGHOUT THAT PERIOD OF TIME BEFORE THE
LOCKS CLOSED.
    SO IT COULD BE VESSELS THAT SUCKED THE BARGE AWAY FROM THE

**545**

DOCK.  WE -- THE REGULATIONS TALK ABOUT MOORINGS SHOULD BE
ADEQUATE TO WITHSTAND EXPECTED WINDS, CURRENTS, AND PASSING
VESSELS SUCKING BARGES AWAY FROM THE DOCK.
Q.   SO ARE YOU NOW CHANGING YOUR THEORY FOR THE FIFTH TIME --
A.   NO.
Q.   LET ME FINISH BECAUSE I'VE LET YOU GO ON QUITE A BIT.
A.   YES.
Q.   ARE YOU CHANGING YOUR THEORY NOW FOR THE FIFTH TIME THAT IT
WASN'T HURRICANE WINDS, IT WASN'T SURGE, IT WASN'T THE ALLISION
FROM THE FIFTH TIER, AND IT WASN'T SOME OTHER CONDITION IN THE
MORNING, YOU NOW HAVE RELIANCE ON A PASSING VESSEL ABOUT WHICH
YOU KNOW NOTHING?
A.   NO, SIR.  THAT -- THAT ISN'T IT AT ALL.  I'M -- I HAVE NOT
STRAYED FROM MY OPINIONS THAT THE MOORING, AS IT WAS LEFT ON
SATURDAY AFTERNOON BY THE LAFARGE PEOPLE, WAS INADEQUATE.  I STAY
WITH THAT.
    NOW, YOU'VE ASKED ME A QUESTION ABOUT HOW THE BARGE ENDED UP
IN THE CANAL ON SUNDAY AS THE TWO WITNESSES TESTIFIED.
Q.   AND ISN'T --
A.   AND I'M GIVING YOU POSSIBLE SUGGESTIONS AS HOW IT COULD
HAVE -- THE LINES DID FAIL.
    NOW, ONE THING IS -- IT'S MY OPINION AND IT'S BEEN SUPPORTED
BY ALL THE LITERATURE AND THE WITNESSES, IS THAT THIS WAS A
TEMPORARY MOORING.  IT WAS NOT MOORED PERMANENTLY AS I SUGGESTED
THAT IT SHOULD BE.

5  (Pages 542 to 545)

## 546

1  Q.  IS IT YOUR --
2  A.  AND WHETHER IT FAILED AT SOME TIME, I HAVE NO IDEA WHEN IT
3  FAILED OR WHY IT FAILED PRIOR TO THE ONSET OF THE HURRICANE.
4      MR. WALKER:  I THINK THE JUDGE HAS A QUESTION.
5      THE COURT:  YES, SIR, JUST TO CLEAR IT UP.  I THINK I'VE
6  GOT IT, BUT IS IT TRUE THAT YOU DID NOT CONTEMPLATE THE TOMPKINS
7  AND LEBLANC TESTIMONY IN CRAFTING ANY OF YOUR REPORTS?
8      THE WITNESS:  THAT'S CORRECT, YOUR HONOR.
9      THE COURT:  THANK YOU.
10     EXAMINATION
11  BY MR. WALKER:
12  Q.  ALL RIGHT.  AND BEFORE WE LEAVE THIS REPORT, DIRECTION,
13  THAT'S BASICALLY FROM THE NORTH, CORRECT?
14  A.  WELL, THE FIRST ONE UP THERE IS THE 090, THAT'S FROM THE
15  EAST.  THEY ARE ALL FROM -- THEY ARE ALL FROM THE RIGHT QUADRANT.
16  Q.  AT THIS TIME, ON SUNDAY?
17  A.  YES.
18  Q.  OKAY.
19  A.  CAN YOU -- CAN YOU TELL ME WHERE IT SAYS -- OH, UP THERE IT
20  SAYS SUNDAY, 28TH, OKAY.
21  Q.  YEAH, RIGHT UP HERE.
22      NOW, WE HAVE THIS DOCUMENT THAT WE CAN BLOW UP, BUT I DON'T
23  WANT TO BELABOR THE POINT.  THERE WAS NO SURGE, WAS THERE, ON
24  SUNDAY?
25  A.  NOT THAT I'M AWARE OF.

## 547

1  Q.  OKAY.
2      THE COURT:  WHAT IS THAT DOCUMENT TO THE LEFT,
3  MR. WALKER?  YOU DON'T HAVE TO BLOW IT UP.
4      MR. WALKER:  THAT'S THE SURGE.
5      THE COURT:  IS THAT PART OF ANOTHER REPORT, JUST SO
6  WE'LL HAVE THE EXHIBIT?
7      MR. WALKER:  I THINK IT'S PART OF THE SAME.
8      THE COURT:  PART OF THE SAME.
9      MR. WALKER:  I WILL DOUBLE CHECK, YOUR HONOR.
10     THE COURT:  ALL RIGHT.  OF D21?
11     MR. WALKER:  YES, YOUR HONOR.
12     EXAMINATION
13  BY MR. WALKER:
14  Q.  SO TO UNDERSTAND YOU CORRECTLY, BECAUSE OF YOUR RELIANCE NOW
15  ON THIS TERM "TEMPORARY," IT'S YOUR OPINION -- LET ME FINISH --
16  THAT LAFARGE, RATHER THAN HAVING FAILED TO PREPARE FOR HURRICANE
17  CONDITIONS, FAILED TO PREPARE FOR A CALM, SUNNY DAY WITH NO SURGE
18  AND NO WINDS OVER ABOUT 18 MILES AN HOUR, AND YOU CRITICIZE THREE
19  BRAND-NEW -- OR AT LEAST TWO BRAND-NEW TWO-INCH POLYPROP LINES?
20  A.  YES.
21  Q.  OKAY.  NOW, I WANT TO UNDERSTAND A COUPLE OF OTHER THINGS
22  ABOUT YOUR OPINION.  A SPRING LINE IS A LINE THAT GOES AT AN
23  ANGLE, AND A BREAST LINE GOES STRAIGHT ACROSS, RIGHT?
24  A.  YES, SIR.
25  Q.  AND WOULD YOU AGREE THAT THE KEVELS ON THESE TWO BARGES WERE

## 548

1  APPROXIMATELY 50 FEET APART, AND YOU HAD FIVE KEVELS ON A
2  200-FOOT BARGE?
3  A.  YES, SIR.
4  Q.  AND THERE WAS 8-FOOT FREEBOARD DIFFERENTIAL BETWEEN THE TWO
5  OF THEM?
6  A.  YES, SIR.
7      THE COURT:  MR. WALKER, NOT TO DISTRACT YOU, AND I
8  APOLOGIZE, WE'RE TRYING TO FIND D21.  I THOUGHT IT WAS PART OF
9  MR. GREEN'S REPORT.  AND THE REPORT I HAVE -- AGAIN, I MAY NOT,
10  BECAUSE OF THE MIX-UP, IT MAY BE THE ONE ATTACHED TO THE
11  DEPOSITION, AND I DON'T HAVE THE FULL REPORT, BUT THE --
12     MR. WALKER:  THE WIND DATA.
13     THE COURT:  THE WIND DATA.
14     MR. WALKER:  YES, YOUR HONOR.  IN FACT, I THINK I HAVE A
15  COPY RIGHT HERE THAT --
16     MR. ALDOCK:  I THINK, YOUR HONOR, THERE WAS AN ILLEGIBLE
17  VERSION OF THE SAME DATA IN MR. GREEN'S DEPOSITION.  AND
18  MR. DOOLEY GOT THE ACTUAL DATA, AND I THINK IT SHOULD BE IN HIS
19  REPORT, BUT WE'LL GET THE --
20     MR. WALKER:  I'VE GIVEN THE COURT --
21     THE COURT:  WE NEED TO MARK THAT BECAUSE IT'S NOT PART
22  OF D21; IS IT NOT?
23     THE CLERK:  SHE'S GOING TO PUT THAT IN AS A NEW EXHIBIT.
24     THE COURT:  WE'RE GOING TO PUT THAT IN AS A NEW EXHIBIT.
25  THANK YOU.

## 549

1      MR. ALDOCK:  WE'LL GIVE IT A NEW EXHIBIT NUMBER, BUT
2  IT'S THE SAME DATA THAT WAS ALREADY IN.  IT'S JUST LEGIBLE.
3      THE COURT:  YES, WE LIKE LEGIBLE EXHIBITS.
4      THE DEPUTY CLERK:  THAT WILL BE D338.
5      THE COURT:  WE REALIZE IT'S A DUPLICATE BUT ONE THAT THE
6  COURT CAN COMPREHEND.
7      MR. WALKER:  YOU NOW HAVE A NICE COLOR COPY LIKE WHAT
8  WAS ON THE BOARD.
9      THE COURT:  WE'RE GOOD.  THANK YOU.
10     (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS,
11  EXHIBIT D338 WAS ADMITTED.)
12     MR. WALKER:  MAY I CONTINUE, YOUR HONOR?
13     THE COURT:  YES, SIR, YOU MAY.
14     MR. WALKER:  THANK YOU.
15     EXAMINATION
16  BY MR. WALKER:
17  Q.  JUST TO BACK UP SO WE'RE BACK ON TRACK, WE WERE TALKING
18  ABOUT THE SPRING AND BREAST LINE, AND WE STOPPED WITH THE
19  EIGHT-FOOT FREEBOARD DIFFERENTIAL BETWEEN THE TWO.  AND I BELIEVE
20  YOU AGREED WITH ME THAT THE KEVELS WOULD BE APPROXIMATELY 50 FEET
21  APART?
22  A.  YES.  I DID NOT MEASURE THEM, BUT I WOULD AGREE WITH THAT.
23  Q.  AND TO CREATE A SPRING LINE, IF WE NUMBER THE KEVELS FROM
24  ONE TO FIVE, BOW TO STERN, FOR EXAMPLE, IT WOULD BE TO PUT A LINE
25  ON KEVEL THREE ON THE BARGE 4727 AND ON KEVEL FOUR ON THE 4745,

6  (Pages 546 to 549)

**550**

1  RIGHT?
2  A.  AND/OR KEVEL NUMBER 6 ON THE OTHER BARGE.
3  Q.  RIGHT.
4  A.  BUT IT WAS AT AN -- A BREAST LINE IS AT AN ANGLE.  IT'S NOT
5  STRAIGHT ACROSS.
6  Q.  A SPRING LINE YOU MEAN?
7  A.  I MEAN, EXCUSE ME, SPRING LINE.
8  Q.  AND THAT WOULD CREATE, WITH THE EIGHT-FOOT DIFFERENTIAL,
9  FREEBOARD, AND THE 50 FEET AT MINIMUM, COULD BE A HUNDRED FEET,
10  AS YOU SAID --
11  A.  YES.
12  Q.  -- A PRETTY LARGE ANGLE IS WHAT YOU CRITICIZE ABOUT THAT,
13  RIGHT?
14  A.  I ONLY CRITICIZE FROM THE STANDPOINT OF ITS USEFULNESS IN
15  PERMANENTLY MOORING A BARGE.  THE -- AS I SAID IN MY TESTIMONY
16  YESTERDAY THAT BREAST LINES ARE STRAIGHT ACROSS, AT A 90-DEGREE
17  ANGLE.  AND SPRING LINES ARE PRIMARILY USED TO, AS THE WORD
18  IMPLIES, TO SPRING THE VESSEL AWAY FROM ANOTHER VESSEL, AWAY FROM
19  A WHARF OR A PIER.  AND THAT IF YOU DO USE BREAST LINES, IT
20  SHOULD BE USED IN A COMBINATION OF NUMEROUS -- EXCUSE ME, OF
21  SPRING LINES, YOU SHOULD USE THEM WITH A COMBINATION OF BREAST
22  LINES.
23  Q.  I KNOW YOU DIDN'T GET A LOT OF CHANCE TO TALK YESTERDAY.
24  SOMEBODY ELSE DID DURING YOUR QUESTIONS.  BUT TRY AND ANSWER MY
25  QUESTIONS AS DIRECTLY AS POSSIBLE.  OKAY.  AND MY QUESTION WAS

**551**

1  REALLY SIMPLE, AND THAT WAS, WOULD THAT CREATE A LARGE ANGLE?
2  A.  YES, SIR.
3  Q.  OKAY.  AND YOU RELY ON MR. THIGPEN AND HIS TESTIMONY
4  REGARDING THAT SPRING, POTENTIAL SPRING LINE CONFIGURATION AS
5  OPPOSED TO BEING A BREAST LINE?
6  A.  I THINK -- MR. THIGPEN AND I THINK MR. SMITH ALSO TESTIFIED
7  TO THAT.  I'M NOT SURE.
8  Q.  NOW, YOU WERE PRESENT DURING MR. THIGPEN'S TESTIMONY HERE IN
9  COURT?
10  A.  YES, I WAS.
11  Q.  AND ISN'T IT CORRECT THAT HE DIDN'T SAY ANYTHING ABOUT AN
12  ANGLE GOING FROM EIGHT FEET ALL THE WAY DOWN TO 50 FEET, 50 FEET
13  IS PROBABLY FROM WHERE I'M STANDING ALL THE WAY TO THE BACK OF
14  THE ROOM, AS TO WHAT HE RECALLS.  HE SIMPLY SAID HE WASN'T SURE,
15  RIGHT?
16  A.  I DON'T RECALL HIS TESTIMONY EXACTLY, BUT HE DID SAY IT WAS
17  A BREAST LINE -- I MEAN, A SPRING LINE.
18  Q.  AND DO YOU REMEMBER MR. BUSCH'S TESTIMONY?  WERE YOU
19  PRESENT?
20  A.  YES.
21  Q.  AND DO YOU REMEMBER HIM SAYING THAT FROM HIS PERSPECTIVE,
22  WHEN HE LEFT ALL THE LINES LOOKED ACROSS AND IN A BREASTING
23  CONFIGURATION?
24  A.  YES.  HE SAID THAT HE VIEWED THAT FROM ABOUT 200 FEET, AND
25  THAT HE NEVER WENT ON THE BARGE TO ACTUALLY LOOK AT THEM.

**552**

1  Q.  IT WOULD BE PRETTY EVIDENT TO YOU, WOULDN'T IT, IF A LINE
2  WAS DRAPED OR TIED EIGHT FEET ABOVE ANOTHER BARGE AND GOING
3  50 FEET ACROSS THAT THAT WASN'T BREASTED, RIGHT?
4  A.  THAT'S CORRECT, THAT'S NOT BREASTED.
5  Q.  YOU DON'T HAVE ANY CRITICISM, DO YOU, OF THE SIZE, THE
6  QUALITY AND THE CONDITION OF LAFARGE'S ROPES THAT WERE USED TO
7  TIE THE BARGE, DO YOU?
8  A.  NO.  THE INDICATION IS THAT IT WAS NEW LINE, TWO-INCH
9  EIGHT-STRAND PLATTED LINE.
10  Q.  RIGHT.  AND YOUR CRITICISM IS THAT THEY SHOULD HAVE BEEN
11  DOUBLE PARTED IN LIGHT OF THE INCOMING HURRICANE?
12  A.  YES.  THEY SHOULD HAVE USED EVERY AVAILABLE KEVEL AND USED
13  BREAST LINES BETWEEN THERE.  BUT MY ULTIMATE OPINION WAS THAT
14  THEY SHOULD HAVE REMOVED THE BARGE FROM THE CANAL.
15  Q.  I UNDERSTAND.  BUT TALKING ONLY ABOUT THE MOORING
16  ARRANGEMENT, YOU HAD NO CRITICISM ABOUT THE LINES USED, YOU
17  SIMPLY CRITICIZED THE FACT THAT BECAUSE OF THE INCOMING WEATHER,
18  THEY SHOULD HAVE PARTED -- DONE A DOUBLE PART?
19  A.  YES.  AND THEY SHOULD HAVE ALSO USED ALL AVAILABLE RESOURCES
20  WHICH BOTH BARGES HAD.
21  Q.  THEREFORE, IF THERE WAS NO HURRICANE WIND OR CONDITION OR
22  SURGE AS THERE WAS ON SUNDAY, MOORING WITH THREE ONE-INCH
23  BRAND-NEW LINES WHICH YOU DON'T CRITICIZE SHOULDN'T BE A PROBLEM,
24  RIGHT?
25  A.  NO, I DISAGREE WITH THAT.  MY WHOLE OPINION IS BASED ON MY

**553**

1  EXPERIENCE AND TRAINING, 50 YEARS OF MARITIME EXPERIENCE OF
2  SECURING VESSELS AND BARGES, AND A SINGLE PART LINE IS A
3  TEMPORARY MOORING.
4  Q.  AND THE LAST --
5  A.  IT IS NOT -- AND THE LAFARGE PEOPLE LEFT KNOWING FULL WELL
6  THAT A HURRICANE WAS HEADING FOR NEW ORLEANS, AND THEY
7  ANTICIPATED THAT SOMEONE WAS GOING TO COME PICK UP THE BARGE, AND
8  THEY LEFT IT WITH ONE SINGLE-PART -- THREE SINGLE-PART LINES,
9  WHICH I DISAGREE WITH.
10  Q.  AND THE LAST BARGE THAT YOU PERSONALLY MOORED WAS IN 1975?
11  A.  YES.  AND THE PROCEDURES TO DO THAT HAVE NOT CHANGED SINCE
12  CHRIST WAS A SEAMAN.  BUT, ALSO, ALSO, I'VE BEEN TEACHING
13  SEAMANSHIP, LINE HANDLING, MOORING, FOR THE LAST 25 YEARS IN MY
14  FACILITY.  AND I'VE TAUGHT, AS I'VE SAID BEFORE, OVER 12,000
15  PEOPLE.
16  Q.  YOU ALSO JUST MENTIONED, AND I BELIEVE YOU CRITICIZED
17  LAFARGE BECAUSE THEY DIDN'T USE CABLES, RIGHT?  THAT'S WHAT YOU
18  MEANT BY ALL AVAILABLE?
19  A.  YES, THEY HAD RESOURCES ON BOTH BARGES.  THEY HAD STANDING
20  WIRE AS WELL AS RATCHETS THAT THEY COULD HAVE WELL USED TO MARRY
21  THOSE TWO BARGES TOGETHER.
22  Q.  YOU'RE FAMILIAR WITH THE LONE STAR CEMENT FACILITY?
23  A.  NO, I'M NOT.
24  Q.  ARE YOU AWARE THAT THERE IS A CEMENT FACILITY IN THE
25  WATERWAYS PROXIMATE TO THE LAFARGE FACILITY?

554

1    A.  I'M NOT FAMILIAR WITH IT, NO, SIR.
2    Q.  WERE YOU AWARE THAT 28 BARGES BROKE AWAY DURING THE
3    HURRICANE FROM LONE STAR?
4         MR. BEST:  I OBJECT, YOUR HONOR.
5         THE COURT:  DON'T ANSWER.  WHEN YOUR ATTORNEY STANDS,
6    DON'T ANSWER.  YES, SIR.
7         MR. BEST:  THERE'S NO FOUNDATION SHOWING ANY RELEVANCE
8    OF THIS, AND THE WITNESS HAS ALREADY SAID TWICE HE DOESN'T KNOW
9    ANYTHING ABOUT IT.
10        THE COURT:  IF HE DOESN'T HAVE ANY PERSONAL KNOWLEDGE,
11   OF COURSE HE CAN'T TESTIFY TO IT, BUT -- UNLESS YOU'RE ASKING
12   SOME KIND OF HYPOTHETICAL QUESTION, BUT LET ME MAKE SURE I
13   UNDERSTAND YOUR QUESTION.  WOULD YOU REPEAT IT AGAIN, MR. WALKER,
14   PLEASE, AND I WILL RULE ON THE OBJECTION.
15             EXAMINATION
16   BY MR. WALKER:
17   Q.  I THINK MY QUESTION WAS, MAYBE --
18        THE COURT:  SOMETIME IT'S A LITTLE DIFFICULT.
19        MR. WALKER:  I'LL REPHRASE THE QUESTION AND SEE IF WE
20   CAN DO SOMETHING DIFFERENT.
21             EXAMINATION
22   BY MR. WALKER:
23   Q.  YOU'RE AWARE THAT HUNDREDS OF BARGES BROKE AWAY IN THE
24   GREATER NEW ORLEANS AREA DURING THE HURRICANE, RIGHT?
25        MR. BEST:  OBJECTION, YOUR HONOR, NO FOUNDATION.  NOT IN

555

1    EVIDENCE.
2         THE COURT:  IF HE'S AWARE OF IT, THEN THAT WILL
3    ESTABLISH THE FOUNDATION.  IF HE'S NOT AWARE OF IT, I GUESS WE'LL
4    HAVE TO ASK HYPOTHETICALS TO AN EXPERT.
5         THE WITNESS:  DURING MY DEPOSITION WITH YOU, YOU CAME UP
6    WITH THE SAME QUESTION, AND I WAS NOT AWARE OF ALL THE BARGES.  I
7    KNOW BARGES THAT BROKE LOOSE ON THE MISSISSIPPI RIVER ENDED UP ON
8    THE LEVEES AND SOME OTHER PLACES, BUT THEN YOU WENT ON TO SHOW ME
9    PHOTOGRAPHS OF BARGES IN DIFFERENT LOCATIONS AND DIFFERENT
10   ATTITUDES THAT I WAS UNAWARE OF BEFORE THE DEPOSITION.
11            EXAMINATION
12   BY MR. WALKER:
13   Q.  WELL, LET ME REMIND YOU OF THE PHOTOGRAPHS I SHOWED YOU.
14        MR. WALKER:  DEFENDANTS' 72, YOUR HONOR.
15        THE COURT:  YES.
16        MR. BEST:  IF I MAKE AN OBJECTION AND MAKE IT GENERAL,
17   YOUR HONOR.
18        THE COURT:  YES, YOU MAY.
19        MR. BEST:  THESE ARE PHOTOGRAPHS OF BARGES AT DIFFERENT
20   LOCATIONS.  THE LONE STAR FACILITY IN PARTICULAR WAS ON THE MRGO.
21   I DON'T KNOW WHERE THE LOCATION IS FOR THIS; BUT, UNLESS WE'RE
22   TALKING ABOUT BARGES IN THE INNER HARBOR NAVIGATIONAL CANAL UNDER
23   THE PECULIAR CIRCUMSTANCES OF THIS CASE, THERE IS NO RELEVANCE OF
24   BARGE BREAKAWAYS IN OTHER WATERWAYS AT OTHER TIMES UNDER
25   DIFFERENT HYDRODYNAMIC CONDITION, DIFFERENT WIND AND WEATHER

556

1    CONDITIONS.  AND WE KNOW NOTHING ABOUT THE SECURING OF ANY OF
2    THESE BARGES.
3         SO THE DEFENSE THAT, WELL, OTHER BARGES BROKE AWAY IS AKIN
4    TO SAYING, WELL, THIS CASE IS ABOUT AN AUTO ACCIDENT, BUT LET'S
5    TALK ABOUT ALL THE OTHER AUTO ACCIDENTS THAT HAPPENED IN NEW
6    ORLEANS ON THAT DAY OR THAT WEEK OR THAT MONTH.  IT IS ENTIRELY
7    IRRELEVANT.  WE CANNOT TRY EACH OF THOSE OTHER CASES TO KNOW THE
8    FACTS IN THOSE CASES TO KNOW WHETHER OR NOT THEY ARE RELEVANT.
9         THE COURT:  I UNDERSTAND YOUR OBJECTION.
10        YOUR RESPONSE.
11        MR. WALKER:  YOUR HONOR, MR. GREEN, AS A MOORING EXPERT,
12   HAS GONE TO GREAT LENGTHS TO SUGGEST THAT LAFARGE SHOULD HAVE
13   CABLED OR USED CABLES.  AND THIS LINE OF QUESTIONING GOES TO THE
14   FACT THAT THERE WERE HUNDREDS OF BARGES IN THE GREATER
15   NEW ORLEANS AREA, INDEED, AT LONE STAR, AND WE WILL HEAR FROM A
16   WITNESS ABOUT THAT, WHICH IS PROXIMATE TO LAFARGE WHICH WERE
17   CABLED AND BROKE UNDER THE SAME CONDITIONS.
18        THE COURT:  RATHER THAN HAVE A DEBATE OVER THIS, I'M
19   GOING TO ALLOW YOU TO PURSUE THIS TO SOME DEGREE.  THE COURT IS
20   AWARE OF THE ATTENUATION, AND UNTIL IT'S GET MORE PROXIMATE -- OF
21   COURSE, IT MIGHT HAVE LITTLE WEIGHT, BUT I'M GOING TO LET IT INTO
22   THE RECORD, ESPECIALLY IF WE'RE GOING TO TALK ABOUT CABLES.
23        I UNDERSTAND YOUR OBJECTION, SIR, AND IT'S NOT A SEXUAL
24   HARASSMENT CASE, SO THE SUBSTANTIAL SIMILAR TEST IS NOT QUITE AS
25   STRINGENT.  YOU HAVE A GOOD OBJECTION, BUT I'M GOING TO -- THERE

557

1    MAY BE SOME RELEVANCE THAT I CAN GLEAN FROM THIS.
2         MR. BEST:  I JUST WANT TO ADD, I BELIEVE THAT -- THE
3    LONE STAR FACILITY, AS I UNDERSTAND IT, IS ON THE MRGO, WHICH
4    IS -- NOT ON THE INNER NAVIGATIONAL CANAL, WHICH I THINK IS A
5    WHOLE DIFFERENT ISSUE.
6         THE COURT:  IT MAY WELL BE, AND I'LL LET YOU, TO THE
7    EXTENT HE GOES INTO THAT, EXPLORE THAT ON CROSS-EXAMINATION.
8         MR. WALKER:  TO BE ACCURATE ON, IT'S ON THE INTRACOASTAL
9    WATERWAY, YOUR HONOR, NOT THE MRGO.
10        THE COURT:  RIGHT.
11             EXAMINATION
12   BY MR. WALKER:
13   Q.  MR. GREEN, YOU'VE DONE NO STUDIES OR ANALYSIS TO SUPPORT
14   YOUR OPINIONS SET FORTH YESTERDAY, I BELIEVE, THAT IF LAFARGE HAD
15   CABLED THE BARGES AT THE LAFARGE FACILITY, THE BARGES WOULD NOT
16   HAVE BROKEN AWAY?
17   A.  DEPENDING ON MR. FLORY'S ANALYSIS, HE HAS A SCENARIO USING
18   WIRE CABLE, AND IN HIS CALCULATIONS USING WIRE CABLE DOUBLED, THE
19   BARGE WOULD HAVE BEEN ABLE TO -- THE MOORINGS WOULDN'T HAVE
20   PARTED WITH WINDS OF 147 MILES AN HOUR.
21   Q.  AND THAT'S WITH CABLES DOUBLED?
22   A.  YES.
23   Q.  AND THAT WOULD BE, AGAIN, A SITUATION UNDER HURRICANE
24   CONDITIONS NOT SUCH AS THOSE THAT APPEARED ON SUNDAY, RIGHT?
25   A.  THAT'S TRUE.

## 558

1  Q.  NOW, YOU DON'T HAVE ANY OBJECTIVE EVIDENCE, DO YOU, OF THE
2  ALLISION BETWEEN THE FIVE-TIER AND THE TWO-TIER BARGES, DO YOU?
3  A.  NO, ONLY THE PHOTOGRAPH, THE POST-KATRINA PHOTOGRAPH SHOWING
4  THE FIVE-TIER VESSELS ASKANCE AND LEANING DOWN TOWARD THE
5  TWO-TIER BARGES.
6  Q.  YOU'RE TALKING ABOUT THAT PHOTOGRAPH WHERE YOU SEE THEM
7  COCKEYED?
8  A.  YES, SIR.
9  Q.  OKAY.  BUT MY QUESTION WAS DO YOU HAVE ANY OBJECTIVE
10  EVIDENCE OF AN ALLISION.  DID YOU INSPECT THE BARGE FOR CONTACT
11  DAMAGE?  IS THERE AN INDENTATION, A FRACTURE, ANYTHING ON EITHER
12  BARGE WHERE YOU MARRY THE TWO, AS A SURVEYOR WOULD, TO SAY THERE
13  WAS A CONTACT HERE?
14  A.  NO.  I INSPECTED A BARGE, YES, BUT THE POSITION OF THE
15  BARGES, THE TWO-TIER BARGE AGAINST THE FIVE-TIER, I THINK THERE
16  WAS TESTIMONY THERE WAS ONLY LIKE FIVE FEET DIFFERENCE BETWEEN
17  THE -- THOSE TWO TIERS AND --
18  Q.  SO YOUR ANSWER WAS NO, RIGHT?
19  A.  NO.  I WOULD LIKE TO EXPLAIN THAT THERE WOULDN'T -- I
20  WOULDN'T EXPECT THERE TO BE EVIDENCE OF AN ALLISION BETWEEN THE
21  TWO BECAUSE OF THE PROXIMITY OF THE TWO VESSELS -- THE TWO TIERS
22  TOGETHER, THAT ONCE THE LONG LINE HAD BEGAN ON THE UPPER TIER, IT
23  WOULD SIMPLY MOVE OVER OR, AS THE PHOTOGRAPH INDICATED, IT WOULD
24  MOVE DOWN ON THE TWO-TIER BARGES, AND THAT WEIGHT OF THE
25  FIVE-TIER OR FIVE LOADED BARGES, THAT'S EACH BARGE I THINK HAS A

## 559

1  CARGO CAPACITY OF SOMETHING LIKE 1800 TONS OR 1500 TONS, AND YOU
2  MULTIPLY THAT BY FIVE, THAT IS A TREMENDOUS AMOUNT OF WEIGHT THAT
3  WOULD HAVE LANDED AGAINST THE 4727 AND COULD EASILY OVERCOME
4  THOSE MOORING LINES, THOSE SINGLE-PART MOORING LINES.
5  Q.  ON MONDAY, UNDER HURRICANE CONDITIONS, WHICH YOU'VE ALREADY
6  TESTIFIED WOULD BE REQUIRED TO RELEASE THE LONG LINING, RIGHT, SO
7  THAT COULDN'T HAVE HAPPENED ON SUNDAY TO COMPORT WITH TOMPKINS
8  AND LEBLANC, RIGHT?
9  A.  WE DON'T KNOW.  NO ONE KNOWS.
10      MR. WALKER:  YOUR HONOR, I'M ALMOST DONE.  I'M JUST
11  LOOKING AT NOTES HERE.
12      THE COURT:  NO, YOU'VE DONE WELL, MR. WALKER.
13      MR. WALKER:  ALL RIGHT.  JUST A COUPLE MORE, YOUR HONOR.
14      THE COURT:  CERTAINLY.
15          EXAMINATION
16  BY MR. WALKER:
17  Q.  AT THE TIME THE 4727 WAS MOORED AT THE LAFARGE FACILITY, IT
18  WAS NOT IN TOW, WAS IT?
19  A.  IT WAS PART OF -- THIS REMINDS ME OF YOUR TAKING MY
20  DEPOSITION.
21  Q.  YOU KNEW THIS WAS COMING IS WHAT YOU'RE SAYING?
22  A.  YES.  IT CAME IN AS A TOW, AND IT WAS MOORED AT THE
23  FACILITY.  AND SO THIS IS SIMPLY SEMANTICS ON YOUR PART TRYING TO
24  SUGGEST THAT THE VESSEL, BECAUSE IT'S NOT -- AS IT'S LAYING
25  AGAINST THE DOCK, IT'S NOT PART OF A TOW, THEREFORE IT'S NOT

## 560

SUBJECT TO THE REGULATIONS OF 33 CFR 165.75 WITH REGARD TO BEING
PULLED AWAY OR BEING MOORED TO WITHSTAND WINDS, CURRENT AND
PASSING VESSELS.  AND I DISAGREE WITH YOUR PREMISE.
    THE COURT:  THE COURT IS FAMILIAR -- UNDERSTANDS THAT
THERE WAS NOT A VESSEL ATTACHED, TIED, IN ANY WAY ADHERED TO THE
BARGE AT ALL RELEVANT TIMES HERE.
    MR. WALKER:  CORRECT.  THE POINT, YOUR HONOR, IS --
        EXAMINATION
BY MR. WALKER:
Q.  IS IT YOUR OPINION THAT THE BARGE, OR A BARGE, ANY BARGE,
BUT PARTICULARLY THIS ONE, WHEN IT'S TIED TO A DOCK ALL BY ITSELF
WITH NO FACE WIRES ON ANY MEANS OF PROPULSION LIKE A TUG IS IN
TOW?
A.  NO, SIR.
Q.  IS IT PART OF A TOW?
A.  NO, IT'S NOT.
Q.  DID YOU EVER HAVE THAT OPINION?
A.  NO.  I HAD AN OPINION THAT -- AND YOU ASKED ME IN MY
DEPOSITION EXHAUSTIVELY ABOUT THIS PARTICULAR REGULATION THAT I
CITED, AND TRYING TO MAKE THE POINT THAT IT WAS NOT -- YOU WERE
TRYING TO MAKE A POINT THAT IT WAS NOT SUBJECT TO THE REGULATIONS
THAT I CITED, AND I DISAGREED WITH THAT.
Q.  ALL RIGHT.
    THE COURT:  I GUESS THAT WILL ULTIMATELY BE -- THE
COURT'S AWARE OF THE FACTUAL SITUATION AND THE VERBIAGE OF THE

## 561

REGULATION, AND I'LL ULTIMATELY HAVE TO DECIDE WHETHER THE
REGULATION APPLIES OR NOT.
    MR. WALKER:  THANK YOU, YOUR HONOR.
        EXAMINATION
BY MR. WALKER:
Q.  YOU AGREE THAT THERE WAS NO WEATHER FORECAST OR INDICATION
THAT -- ON FRIDAY THAT THE HURRICANE WAS GOING TO MAKE A DIRECT
HIT ON NEW ORLEANS, RIGHT?
A.  NO.  HAVING SAID NO, THE -- I'VE ALSO TESTIFIED THAT THE
NEW ORLEANS AREA WAS IN THE CONE OF UNCERTAINTY AT THAT TIME ON
FRIDAY.
Q.  RIGHT.  MY QUESTION WAS DIRECT HIT ON FRIDAY.
A.  NO, SIR.
Q.  YOU AGREE WITH ME?
A.  I AGREE THAT IT WAS NOT -- IT WAS NOT PROJECTED TO BE A
DIRECT HIT ON FRIDAY.
Q.  I WOULD LIKE TO SHOW YOU DX249.  I THINK THERE IS A
PHOTOGRAPH --
    MR. GILBERT:  DEREK, YOU SAID 249?
    MR. WALKER:  EXCUSE ME, YOUR HONOR.
        EXAMINATION
BY MR. WALKER:
Q.  YOU'RE FAMILIAR WITH THE IHNC AT THIS TIME POINT.  YOU SEE
THE SOUTHERN BREACH, AND YOU SEE A BARGE DOWN THERE BY THE
SOUTHERN BREACH?

562

1  A.  YES, SIR.
2  Q.  AND RIGHT AROUND THE AREA WHERE IT SAYS SOUTHERN BREACH,
3  SOMEWHERE DOWN THERE IS WHERE TOMPKINS AND LEBLANC PLACED THE
4  BARGE ON SUNDAY -- OR A BARGE ON SUNDAY?
5  A.  YES, AS I UNDERSTAND THE TESTIMONY, AND I WAS HERE.
6  Q.  I WOULD LIKE TO SHOW YOU --
7      MR. WALKER:  THIS IS EXHIBIT 5 TO HIS DEPOSITION,
8  YOUR HONOR.
9              EXAMINATION
10  BY MR. WALKER:
11  Q.  AND YOU SEE THOSE RED ARROWS?
12  A.  YES.
13  Q.  AND THAT WAS YOUR INDICATION OF THE WIND COMING DOWN THE
14  CANAL, THE DIRECTION OF THE WIND AT THE TIME OF THE BREAKAWAY,
15  CORRECT?
16  A.  WELL, I -- I DON'T THINK IT WAS AT THE TIME OF THE
17  BREAKAWAY.  I SAID -- YOU WANTED TO KNOW WHERE THE PREVAILING --
18  THE WIND DIRECTION THAT THE WEATHER REPORTS CAME OUT WITH.
19  THAT'S WHAT THEY OBSERVED.  AND YOU HAD ME DRAW THOSE LINES IN
20  TRYING TO DESCRIBE THAT.
21  Q.  OKAY.  SO THAT WOULD BE THE PREVAILING WIND DIRECTION ON
22  MONDAY, STARTING AT MIDNIGHT MONDAY, FOR INSTANCE?
23  A.  YES.  AT THE LAKEFRONT AIRPORT --
24  Q.  RIGHT.
25  A.  -- BUT NOT AT THE LAFARGE FACILITY.

563

1  Q.  BUT AS YOU SAID, GENERALLY FROM A NORTHEASTERLY DIRECTION?
2  A.  THAT'S WHAT WAS REPORTED AT THE LAKEFRONT AIRPORT.  HOWEVER,
3  WE'RE ALL KNOW, ANYONE WHAT HAS STUDIED HURRICANES AND
4  EXPERIENCED HURRICANES, THERE ARE MICROBURSTS, THERE ARE WIND
5  SHEAR.
6      THE COURT:  WE'RE GOING TO SAVE THAT FOR A
7  METEOROLOGIST, SIR.  THE COURT'S WELL AWARE OF WHAT THE
8  PREVAILING WINDS ARE AS IT WAS.
9      MR. WALKER:  PREVAILING WIND.
10      THE COURT:  YES.
11      MR. WALKER:  PRECISELY, JUDGE, THAT'S ALL I WANT.
12      THE COURT:  I'M NOT GETTING INTO MICROBURSTS OR WIND
13  SHEAR AT THIS POINT --
14      MR. WALKER:  THANK YOU.
15      THE COURT:  -- WITH THIS WITNESS.
16      MR. WALKER:  YOUR HONOR, I TENDER THE WITNESS.  THANK
17  YOU, MR. GREEN.
18      THE COURT:  THANK YOU, SIR.
19      THE WITNESS:  THANK YOU, MR. WALKER.
20      THE COURT:  LET ME NOTE FOR THE YOUNG LAWYERS WHO ARE
21  STILL HERE THAT THE EXAMINATION WE'VE SEEN THUS FAR HAS BEEN VERY
22  PROFESSIONAL AND SKILLED, WE HAVE A VERY SKILLED AND
23  KNOWLEDGEABLE EXPERT WITNESS, AND THERE ARE GOOD LESSONS FOR YOU
24  TO LEARN.  THE CROSS-EXAMINATION ESTABLISHED THE POINTS THAT THE
25  EXAMINER WANTED TO ESTABLISH WITHOUT BEING VITRIOLIC OR

564

GRATUITOUSLY ATTACKING.
      YES, SIR.
      MR. BEST:  THANK YOU, YOUR HONOR.
      THE COURT:  IT TOOK THE COURT BECOMING A JUDGE TO LEARN
THAT, SO HOPEFULLY YOU'LL LEARN IT QUICKER.
      MR. WALKER:  THANK YOU FOR THAT, YOUR HONOR.  IT'S
APPRECIATED.
      REDIRECT EXAMINATION
BY MR. BEST:
Q.  ONE OF THE EARLY QUESTIONS WHICH YOU WERE ASKED,
MR. GREEN --
      AND BY THE WAY, THIS IS LARRY BEST, MADAM COURT REPORTER,
SPEAKING.
      -- HE ASKED YOU WHETHER OR NOT YOUR FIRST DESCRIPTION OF
THIS MOORING ARRANGEMENT THAT YOU CRITICIZED AS "TEMPORARY" WAS
HERE IN THIS COURTROOM.
A.  YES.
Q.  YOU REMEMBER HE ASKED YOU IF YOU HAD EVER USED THAT WORD IN
YOUR REPORT, AND YOU SAID, "NO"?
A.  THAT'S CORRECT.
Q.  MAY I REFRESH YOUR MEMORY WITH PAGE 9 OF YOUR REPORT, WHICH
IS PLAINTIFF'S EXHIBIT 387.
      WHICH I WOULD LIKE TO DISPLAY ON THE ELMO, MR. SNYDER.
      THE COURT:  AND THAT'S THE REPORT DATED, MR. BEST?
      MR. BEST:  THIS IS THE REPORT DATED MARCH 11, 2009.

565

      THE COURT:  THE FINAL REPORT?
      MR. BEST:  THAT'S CORRECT.
              EXAMINATION
BY MR BEST:
Q.  WOULD YOU READ WHAT YOU SAID IN PARAGRAPH 5.11, THE FIRST
SENTENCE?
      YOU CAN LOOK AT IT ON THE SCREEN RIGHT IN FRONT OF YOU.
A.  OH, I'M SORRY.  YEAH.
      "IN FURTHERANCE, MOORING OF THE VESSEL WITH THREE SINGLE
PART LINES WAS CLEARLY A TEMPORARY MOORING AND INSUFFICIENT FOR
HURRICANE CONDITIONS."
Q.  OKAY.  SO YESTERDAY, WHEN I ASKED YOU QUESTIONS ON DIRECT,
WAS NOT THE FIRST TIME YOU'VE DESCRIBED THIS MOORING ARRANGEMENT
AS "TEMPORARY"?
A.  THAT'S CORRECT, YES.
Q.  AND THAT REFRESHES YOUR MEMORY?
A.  YES, SIR.
Q.  AND AS I UNDERSTAND YOUR OPINIONS, TEMPORARY MOORING, A
VESSEL WHICH IS TEMPORARILY MOORED, PARTICULARLY ONE OF THIS TYPE
TEMPORARILY MOORED IN THIS FASHION, SHOULD NOT BE LEFT ALONE AND
ABANDONED AT A DOCK EVEN IN CALM WEATHER?
A.  THAT'S CORRECT.
Q.  MUCH LESS IN THE FACE OF A HURRICANE?
A.  YES.
Q.  AND I THINK YOU TESTIFIED YESTERDAY THAT THAT OPINION WAS

566

SUPPORTED BY THE DEFINITION OF DOUBLE UP AND SECURE AND SINGLE UP IN KNIGHT'S MODERN SEAMANSHIP, WHICH IS AN EXHIBIT WE DISCUSSED YESTERDAY?
A. YES. AND THERE IS A HOST OF OTHER TEXTBOOKS THAT OUTLINE AND DEFINE DOUBLING UP.
Q. NOW, YOU TALKED ABOUT THE FLORY CHART. AND THE LINE ON THIS BARGE, AS A LIGHT BARGE, COULD BREAK WITH 36-MILE-PER-HOUR WINDS. DO YOU RECALL THAT TESTIMONY --
A. YES, SIR.
Q. -- COUNSEL ASKED YOU ABOUT?
AND HE SHOWED YOU THE WEATHER RECORDS FOR WHAT THE WINDS WERE ON SUNDAY. DO YOU RECALL THAT LINE OF QUESTIONING?
A. YES.
Q. THAT CHART HAD ITS ONLY VARIABLE AS FORCE ON THE LINES SECURING THE BARGE AS WIND IN MILES PER HOUR, CORRECT?
A. YES, THAT'S CORRECT.
Q. IT DIDN'T INCLUDE OTHER FORCES SUCH AS WAVES, WATER, TIDES OR FORCES EXERTED ON THE VESSEL BY VESSELS MOORED ADJACENT TO IT?
A. THAT'S CORRECT.
Q. SO YOU CAN PRESUMABLY, THEN, REACH THE FORCE THAT IT WOULD TAKE TO BREAK THESE ROPES AT 36 MILES PER HOUR OF WIND IN OTHER WAYS SIMPLY THAN FROM THE WIND?
A. YES.
Q. IF, HYPOTHETICALLY, THE LOCK LOGS FOR THIS WATERWAY, PLAINTIFF'S EXHIBIT 24, SHOWS THAT BEFORE THE LOCKS WERE CLOSED

567

AT 4:00 A.M. ON SUNDAY MORNING, A SIGNIFICANT NUMBER OF VESSELS HAD PASSED THROUGH THERE, THAT'S ANOTHER THING THAT CAN EXERT FORCE ON THE LINES MOORING A POORLY, IMPROPERLY TEMPORARILY MOORED VESSEL?
A. YES.
Q. COUNSEL ASKED YOU WHETHER OR NOT SOMEONE WHO SEES A VESSEL FLOATING IN A CANAL WOULD REPORT IT. CERTAINLY THAT'S TRUE; AM I CORRECT?
A. YES.
Q. BUT, OF COURSE, IF THIS VESSEL PARTED ONE OR BOTH OF ITS LINES OR ALL THREE OF ITS LINES IN THE EARLY MORNING HOURS IN THE DARK AND IT'S OVER IN THE LAFARGE DOCK, THAT LOCATION IS NOT ACTUALLY IN THE NAVIGABLE CHANNEL OF THE INNER HARBOR NAVIGATION CANAL, IS IT?
A. YES, IT IS. I APOLOGIZE. COULD YOU REPEAT THE QUESTION AGAIN.
Q. THINK OF THE AERIAL PHOTOGRAPH THAT WE HAVE BEEN LOOKING AT THAT HAD THE SIX TIER, THE NORTHERN TIER THAT DID NOT BREAK AWAY AND THE REMAINING BARGE.
A. YES.
Q. WE HAVE THE INTRACOASTAL WATERWAY AND THE LAFARGE DOCK IS ACTUALLY SET TO THE SIDE A LITTLE BIT.
A. YES, IT'S IN A TURN BASIN.
Q. YEAH. THAT IS WHAT'S BEEN REFERRED TO IN SOME OF THE REPORTS AS A "TURNING BASIN."

568

MY POINT IS, THE BARGE COULD BE HANGING BY ONE LINE IN THAT TURNING BASIN, BECAUSE TWO HAVE FAILED, AND NOT DRIFT OUT INTO THE CENTER OF THE INTRACOASTAL WATERWAY?
A. THAT'S CORRECT.
THE COURT: THE IHNC.
MR. BEST: I'M SORRY. YES, THANK YOU, JUDGE. I SAID THE INTRACOASTAL WATERWAY AND I MEANT THE INDUSTRIAL CANAL OR THE IHNC.
MR. WALKER: YOUR HONOR, IF I COULD ASK, I KNOW HE'S AN EXPERT, I KNOW HE CAN BE LED, BUT, PARTICULARLY WITH RESPECT TO REDIRECT, IF MR. BEST WOULD ALLOW MR. GREEN TO GIVE THE ANSWERS RATHER THAN, ONCE AGAIN, MR. BEST TESTIFYING.
THE COURT: THE COURT HAS ALLOWED MR. BEST TO LEAD HIS EXPERT, AND, OF COURSE, THE DEGREE OF LEADING, THE MORE THE LEADING, PERHAPS THE LESS WEIGHT THE COURT WILL GIVE THE ANSWER. PERHAPS. NOT NECESSARILY, BUT JUST TO LET YOU KNOW.
MR. BEST: I UNDERSTAND, YOUR HONOR.
EXAMINATION
BY MR. BEST:
Q. COUNSEL ALSO ASKED YOU SOME QUESTIONS ABOUT THE CENTER MOORING ON THE 4727 THAT YOU DESCRIBED AS A "SPRING LINE."
A. YES.
Q. AND HE ASKED YOU WHETHER OR NOT YOU HEARD MR. THIGPEN IN COURT WHILE HE TESTIFIED REFER TO THAT LINE AS BEING AT AN ANGLE?
A. YES.

569

Q. WHERE DID YOU GET THAT INFORMATION ABOUT IT BEING AT AN ANGLE?
A. I THINK HIS TESTIMONY.
Q. IT WAS IN HIS DEPOSITION; WAS IT NOT?
A. I EITHER GOT IT FROM HIS TESTIMONY OR HIS DEPOSITION, ONE OR THE OTHER.
Q. BUT VERY CLEARLY, YOU HAD HIS DEPOSITION AT THE TIME YOU WROTE YOUR REPORT?
A. YES.
Q. AND YOU HAD RELIED ON THAT, AMONG MANY OTHER DOCUMENTS, IN PREPARATION OF YOUR OPINIONS?
A. YES. IN ADDITION TO THAT, I SAT THROUGH HIS TESTIMONY IN THE FIRST TRIAL IN JUDGE BERRIGAN'S COURT.
Q. AND I'M GOING TO SHOW YOU PAGE 27 OF MR. THIGPEN'S --
THIS IS NOT AN EXHIBIT, YOUR HONOR. IT IS NOT IN EVIDENCE BECAUSE MR. THIGPEN TESTIFIED. I'M SHOWING IT TO HIM TO REFRESH HIS MEMORY ABOUT A DOCUMENT THAT HE RELIED ON TO PREPARE HIS REPORT, IF I MAY.
-- PAGE 27, AND YOU CAN SEE THERE, WHAT IS THE QUESTION AT LINE 6 THERE?
A. "AND THEN THERE WAS A LINE IN THE MIDDLE, BUT --
"ANSWER: YES, SIR.
"QUESTION: -- YOU SAY IT WAS ON AN ANGLE?
"ANSWER: YEAH. I DIDN'T THINK IT WAS STRAIGHT UP AND DOWN, BUT I MAY BE -- I JUST --

570

1  "QUESTION:  WAS THAT A SINGLE LINE?
2  "ANSWER:  YES.  A ONE PART."
3  Q.  OBVIOUSLY, YOU WEREN'T THERE AT THE TIME MR. THIGPEN WAS TO
4  SEE IT, AND THE ONLY INFORMATION YOU CAN HAVE ABOUT THE MOORING
5  IS WHAT THE WITNESSES HAVE SAID?
6  A.  YES.  AND I'VE HEARD MR. THIGPEN TESTIFY ON TWO OCCASIONS.
7  Q.  RIGHT.  AND IF THERE IS OTHER EVIDENCE TO DISPUTE
8  MR. THIGPEN, HAVE YOU SEEN IT THUS FAR?
9  A.  NO, SIR.
10  Q.  NOW --
11      MR. WALKER:  YOUR HONOR, WHILE WE'RE ON THE SUBJECT,
12  SINCE HE'S CHOSEN TO BRING THIS DEPOSITION NOW, HE SHOULD ALSO
13  SHOW PAGE 25 WHERE THE DESCRIPTION IS "A LITTLE ANGLE."
14      THE COURT:  MR. BEST, DO YOU WANT TO DO THAT?
15      MR. BEST:  I'LL BE HAPPY TO DO THAT.
16          EXAMINATION
17  BY MR. BEST:
18  Q.  PAGE 25 AT THE TOP, THE QUESTION AND THE ANSWER, YOU CAN
19  READ THAT.
20  A.  I'M SORRY, I'M LOST.  WHERE?
21  Q.  PAGE 25, WHICH IS THE PAGE IN THE UPPER RIGHT-HAND CORNER,
22  THE TOP OF THE PAGE.
23  A.  OKAY.  ALL RIGHT.  LINE WHAT?
24  Q.  LINE 1, THE FIRST QUESTION AND THE ANSWER IS WHAT MR. WALKER
25  HAS ASKED THAT YOU READ AS WELL.

571

1  A.  "QUESTION:  DID YOU SEE HOW THE TWO BARGES WERE RIGGED TO
2  ONE ANOTHER, MOORED TO ONE ANOTHER?
3      "ANSWER:  I KNOW THAT IT WAS TWO ROPES ON THE -- YOU KNOW,
4  ON THE ENDS, BUT I THINK THE OTHER ROPE WAS KIND OF AT AN ANGLE A
5  LITTLE BIT."
6      DO YOU WANT ME TO GO ON?
7  Q.  YEAH, READ THE LAST SENTENCE.
8  A.  "ANSWER:  BUT I'M SURE WHAT BITTS IT WENT TO, WHICH ANGLE IT
9  WENT FROM WHAT BITTS."
10  Q.  SO THERE IS A SECOND PLACE IN HIS DEPOSITION WHERE HE REFERS
11  TO THAT LINE AS BEING AT AN ANGLE?
12  A.  YES, SIR.
13      MR. BEST:  THANK YOU, MR. WALKER.
14          EXAMINATION
15  BY MR. BEST:
16  Q.  AND THE PICTURES, THE PHOTOGRAPHS THAT WE LOOKED AT
17  YESTERDAY OF THE LINES AS THEY WERE PHOTOGRAPHED BY LAFARGE'S
18  REPRESENTATIVES AT THEIR INVESTIGATION IMMEDIATELY AFTER THE
19  STORM, THE PHOTOGRAPHS THAT WERE ONLY RECENTLY FURNISHED TO YOU,
20  DO YOU REMEMBER THE PHOTOGRAPHS OF THE TWO KEVELS THAT WERE NOT
21  AT THE ENDS OF THE BARGE?
22  A.  YES.
23  Q.  AND THE PIECES OF ROPE ON BOTH BARGES HAD SOME LENGTH TO
24  THEM, DIDN'T THEY?
25  A.  YES.

572

1  Q.  THAT, TOO, WOULD BE CONSISTENT WITH A SPRING LINE, IF YOU'VE
2  GOT A LONGER ROPE?  A SPRING LINE AT AN ANGLE TAKES MORE ROPE
3  THAN A BREAST LINE?
4  A.  YES, SIR.
5  Q.  AND COUNSEL ASKED YOU ABOUT BARGES THAT BROKE AWAY AT THE
6  LONE STAR FACILITY.  AT THIS FACILITY WE KNOW SIX BARGES DIDN'T
7  BREAK AWAY, DON'T WE?
8  A.  YES, WE DO.
9  Q.  SO WHATEVER PROBLEMS OTHER OPERATORS MIGHT HAVE HAD AT OTHER
10  FACILITIES ON THE INTRACOASTAL WATERWAY, THIS IS -- BY THE WAY,
11  THE INNER HARBOR NAVIGATION CANAL CONNECTS TO THE
12  INTRACOASTAL WATERWAY; DOES IT NOT?
13  A.  YES.  IT'S ALSO PART OF THE INTRACOASTAL WATERWAY, BUT IT'S
14  CALLED THE "INNER HARBOR NAVIGATION CANAL."
15  Q.  NOW, I WANT YOU TO ASSUME THAT LONE STAR IS NOT ON THE INNER
16  HARBOR NAVIGATION CANAL.  BUT IF YOU GO NORTH OUT OF THE CANAL
17  AND THEN MAKE A RIGHT TURN ON THE INTRACOASTAL WATERWAY, MY
18  UNDERSTANDING IS THAT THAT FACILITY IS LOCATED SOMEWHERE OUT
19  THERE.
20      IS IT FAIR TO SAY, AS A MARINER FAMILIAR WITH THESE AREAS,
21  THAT YOU CAN EXPERIENCE VASTLY DIFFERENT WIND, TIDE AND SURGE
22  CONDITIONS AT THOSE LOCATIONS?
23  A.  YES.
24  Q.  WHAT IS THE SIGNIFICANCE IN PARTICULAR OF THE ABILITY OF THE
25  LAFARGE STAFF TO SECURELY MOOR A VESSEL TO THEIR DOCK AS

573

1  DEMONSTRATED BY THE FACT THAT THE OTHER SIX BARGES AT THEIR OWN
2  DOCK DID NOT BREAK AWAY?
3  A.  YES.
4  Q.  NO, WHAT IS THE SIGNIFICANCE?
5  A.  THE SIGNIFICANCE IS THAT IT'S OBVIOUS TO ME THAT THE MOORING
6  OF THE 4727 WAS INADEQUATE.  THE OTHER BARGES DIDN'T BREAK LOOSE,
7  SO IT'S PROOF POSITIVE THAT IT WASN'T PROPERLY MOORED.
8  Q.  AND COUNSEL ASKED YOU A QUESTION ABOUT -- SAID, DID YOU HEAR
9  MR. SO AND SO, I THINK MR. BUSCH OR SOMEBODY, DID YOU SEE
10  SOMEBODY'S TESTIMONY THAT THEY HAD NO BREAKAWAYS THERE IN
11  20 YEARS.
12      HAVE YOU SEEN THAT TESTIMONY ANYWHERE?
13      THE COURT:  THE COURT WILL REVIEW THAT.  WHETHER HE'S
14  SEEN IT OR NOT, IS MEANINGLESS.  I'M GOING TO LOOK AT HIS
15  TESTIMONY AND READ IT ALL METICULOUSLY.
16      THE WITNESS:  I DON'T RECALL.
17          EXAMINATION
18  BY MR. BEST:
19  Q.  HYPOTHETICALLY, EVEN IF WE ASSUME THAT THEY'VE BEEN LEAVING
20  TEMPORARY MOORINGS UNATTENDED FOR 20 YEARS WITHOUT A BREAKAWAY,
21  IF THAT IS SHOWN IN THE EVIDENCE, DOES THAT MAKE IT RIGHT OR A
22  PROPER PRACTICE?
23  A.  NO, IT DOES NOT.
24  Q.  AND IN TERMS OF THE POOR MOORING PRACTICES YOU HAVE
25  DESCRIBED WITH RESPECT TO THIS BARGE, WHAT IS THE SIGNIFICANCE OF

574

1  THE ABSENCE OF ANY -- OF INSTRUCTIONS, WHETHER THEY BE POSTERS,
2  MANUALS, DRAWINGS, ON PROPER MOORING TECHNIQUES AT THIS FACILITY?
3  A.  WELL, THEY SHOULD HAVE INSTRUCTIONS THAT -- OR A MANUAL,
4  PLANS ON HOW TO PROPERLY SECURE BARGES IN THE FACE OF AN ONCOMING
5  HURRICANE.
6  Q.  IF YOU HAVE THAT KIND OF INSTRUCTION OR MATERIALS, ARE YOU
7  MORE LIKELY TO GET CONSISTENTLY GOOD MOORING FOR THE
8  CIRCUMSTANCES?
9       MR. WALKER:  YOUR HONOR, ONE QUESTION BEYOND CROSS I LET
10  GO.  WITH THE SECOND, I THINK -- I DIDN'T TALK ABOUT ANY OF THOSE
11  PRACTICES.
12      MR. BEST:  IT'S UNIMPORTANT, YOUR HONOR.  I WITHDRAW THE
13  QUESTION.
14      THE COURT:  SUSTAINED.  AND THANK YOU, MR. BEST.
15      MR. BEST:  I'M FINISHED.
16      THE COURT:  YOU'RE FINISHED.
17  THANK YOU, SIR.  YOU MANY STEP DOWN, PLEASE.
18      THE WITNESS:  AM I RELEASED, YOUR HONOR?
19      THE COURT:  YOU ARE RELEASED, I WOULD ASSUME.
20  MR. WALKER:  YES.
21      THE COURT:  YES, YOU ARE, SIR.
22      THE WITNESS:  THANK YOU, SIR.
23      THE COURT:  WHAT'S IN THE QUEUE -- I KNOW WE HAVE A
24  SHORT DAY.  WHO DO WE HAVE UP?
25      MR. SANDERS:  MR. LOUIS ROBIN.

575

1       MR. BEST:  THAT WAS THE GENTLEMAN WHO WAS SUPPOSED TO BE
2  HERE THE OTHER DAY.
3       THE COURT:  ARE WE GOING TO TRY MR. VILLAVASSO TODAY?
4       MR. GILBERT:  I BELIEVE SO, YOUR HONOR.
5       MR. SANDERS:  MR. ROBIN WILL BE VERY SHORT.
6       MR. SNYDER:  ABOUT AN HOUR AND 30 MINUTES IS THE LENGTH
7  OF THE VILLAVASSO PRESENTATION.
8       THE COURT:  IF WE TAKE A BREAK FOR THIS, ABOUT
9  10 MINUTES, WE OUGHT TO HAVE TIME.
10  AN HOUR AND WHAT?
11      MR. SNYDER:  AN HOUR AND 38 MINUTES.
12      THE COURT:  AND, COUNSEL, HOW ARE WE DOING TIME-WISE?
13  BECAUSE I MAY PUT THIS HOUR ON ME SINCE I'M ASKING THAT IT BE
14  SHOWN, BUT WE'LL SEE.  DO YOU THINK WE'RE DOING WELL TIME-WISE?
15      MR. GILBERT:  RICK, CAN YOU ANSWER THAT QUESTION?
16  BECAUSE YOU'VE BEEN KEEPING TRACK OF THE TIME.
17      THE COURT:  ANTICIPATING YOUR FLOW OF WITNESSES, HOW DO
18  YOU FEEL TIME-WISE?
19      MR. SEYMOUR:  YOUR HONOR, BY MY CALCULATION, PLAINTIFF
20  HAS USED 9.02 HOURS AND THE DEFENSE HAS USED 3.9 HOURS.
21      MR. GILBERT:  WE'RE ON TARGET.
22      THE COURT:  IT SEEMS SO.  THANK YOU.
23      THE DEPUTY CLERK:  WOULD YOU PLEASE RAISE YOUR RIGHT
24  HAND.  DO YOU SOLEMNLY SWEAR THAT THE TESTIMONY WHICH YOU ARE
25  ABOUT TO GIVE WILL BE THE TRUTH, THE WHOLE TRUTH AND NOTHING BUT

576

THE TRUTH, SO HELP YOU GOD?
       THE WITNESS:  I DO.
             LOUIS ROBIN
WAS CALLED AS A WITNESS AND, AFTER BEING FIRST DULY SWORN BY THE
CLERK, WAS EXAMINED AND TESTIFIED ON HIS OATH AS FOLLOWS:
             DIRECT EXAMINATION
BY MR. SANDERS:
Q.  MR. ROBIN, MY NAME IS PAT SANDERS AND I REPRESENT SOME OF
THE CLAIMANTS IN THIS ACTION.
     YOU GAVE A DEPOSITION IN THE CASE?
A.  YES, I DID.
Q.  AND WHEN YOU WORKED AT LAFARGE, WHAT WAS YOUR TITLE?
A.  JUST MAINTENANCE, AND IT WAS AN E6 AT THE TIME.
Q.  OKAY.  AND AT THE TIME YOU GAVE YOUR DEPOSITION DID YOU HAVE
AN ATTORNEY THERE?
A.  NO, I DIDN'T HAVE ANY.
Q.  I'M GOING TO REFER YOU TO PAGE 17 OF THE DEPOSITION.
     DO YOU HAVE A FATHER NAMED LOUIS ROBIN?
A.  NO.
Q.  COULD I HAVE THE ELMO.
     I HAD ASKED YOU ON LINE 5, "OH, YOU HIRED MR. RAFFMAN?"
     AND YOU SAID, "YES."  IS THAT CORRECT?
A.  WELL, WHEN I WENT TO THE DEPOSITION, THERE WAS ATTORNEYS
THERE.  BUT AS FAR AS ME GOING OUT AND HIRING ONE, I DIDN'T.
       THE COURT:  JUST A MINUTE.

577

       MR. WEBB:  YOUR HONOR, I'M TRYING TO FIND OUT WHAT PAGE
HE'S ON, BECAUSE I WENT TO THE PAGE HE SAID THAT HE'S TALKING
FROM AND IT'S NOT THE PAGE.
       THE COURT:  IT LOOKS LIKE 39.
       MR. WEBB:  THIS DOESN'T LOOK LIKE AN OFFICIAL TRANSCRIPT
EITHER.
       MR. SANDERS:  IS IT 39, YOUR HONOR?
       THE COURT:  IT LOOKS LIKE 39, WHAT I'M LOOKING AT.  IF
THOSE ARE PAGE NUMBERS, IT CERTAINLY APPEARS TO BE.
             EXAMINATION
BY MR. SANDERS:
Q.  DID YOU HAVE MR. RAFFMAN AS YOUR ATTORNEY FOR THE
DEPOSITION?
       THE COURT:  LET ME MAKE SURE MR. WEBB IS ON BOARD THERE.
WE'RE ON BOARD.  OKAY.
       MR. WEBB:  YES, SIR, HE JUST GAVE THE WRONG PAGE NUMBER.
       THE COURT:  OKAY.
       THE WITNESS:  THEY HAD A FEW ATTORNEYS THERE.
             EXAMINATION
BY MR. SANDERS:
Q.  BUT I ASKED YOU HAD YOU HIRED MR. RAFFMAN AND YOU SAID YES;
IS THAT CORRECT?
A.  NO, I DIDN'T HIRE ANYONE.  I DIDN'T HIRE ANYONE.  WHEN I GOT
THE PAPERS TO GO TO A DEPOSITION, THEY HAD ATTORNEYS THERE.
Q.  AND THEN I ASKED YOU ON LINE 16:  "OH, OKAY.  SO THAT'S WHEN