1          UNITED STATES DISTRICT COURT
2          EASTERN DISTRICT OF LOUISIANA
3

*****************************************************************
4

IN RE:  KATRINA CANAL
5    BREACHES CONSOLIDATED
     LITIGATION
6
                                CIVIL ACTION NO. 05-4182
7                               SECTION "K" (2)
                                NEW ORLEANS, LOUISIANA
8                               FRIDAY, JUNE 25, 2010, 9:00 A.M.
9    PERTAINS TO BARGE
10
     MUMFORD   C.A. NO. 05-5724
11   AS TO CLAIMS OF PLAINTIFFS
     JOSEPHINE RICHARDSON AND
12   HOLIDAY JEWELERS, INC.,
     ONLY
13
14   BENOIT   C.A. NO. 06-7516
     AS TO CLAIMS OF PLAINTIFFS
15   JOHN ALFORD AND JERRY
     ALFORD ONLY
16
17   *****************************************************************
18
                     DAY 4, MORNING SESSION
19         TRANSCRIPT OF NONJURY TRIAL PROCEEDINGS
        HEARD BEFORE THE HONORABLE STANWOOD R. DUVAL, JR.
20                  UNITED STATES JUDGE
21
22   APPEARANCES:
23
     FOR THE PLAINTIFFS:   BEST KOEPPEL TRAYLOR
24                         BY:  LAURENCE E. BEST, ESQUIRE
                           2030 ST. CHARLES AVENUE
25                         NEW ORLEANS LA  70130

**666**

APPEARANCES CONTINUED:

LAW OFFICES OF BRIAN A. GILBERT
BY:  BRIAN A. GILBERT, ESQUIRE
2030 ST. CHARLES AVENUE
NEW ORLEANS LA  70130

KHORRAMI POLLARD ABIR
BY:  SHAWN KHORRAMI, ESQUIRE
44 FLOWER STREET, 33RD FLOOR
LOS ANGELES CA  90071

WILSON GROCHOW DRUKER & NOLET
BY:  LAWRENCE A. WILSON, ESQUIRE
223 BROADWAY, 5TH FLOOR
NEW YORK NY  10279

WIEDEMANN & WIEDEMANN
BY:  LAWRENCE D. WIEDEMANN, ESQUIRE
     KARL WIEDEMANN, ESQUIRE
821 BARONNE STREET
NEW ORLEANS LA  70113

PATRICK J. SANDERS
ATTORNEY AT LAW
3316 RIDGELAKE DRIVE
SUITE 100
METAIRIE LA  70002

LAW OFFICE OF RICHARD T. SEYMOUR
BY:  RICHARD T. SEYMOUR, ESQUIRE
1150 CONNECTICUT AVENUE N.W.
SUITE 900
WASHINGTON DC  20036

FOR THE DEFENDANT:    CHAFFE MCCALL
     BY:  DEREK A. WALKER, ESQUIRE
2300 ENERGY CENTRE
1100 POYDRAS STREET
NEW ORLEANS LA  70163

**667**

APPEARANCES CONTINUED:

GOODWIN PROCTER
BY:  JOHN D. ALDOCK, ESQUIRE
     MARK S. RAFFMAN, ESQUIRE
     ADAM M. CHUD, ESQUIRE
     KIRSTEN V. K. ROBBINS, ESQUIRE
     ERIC I. GOLDBERG, ESQUIRE
901 NEW YORK AVENUE N. W.
WASHINGTON DC  20001

SUTTERFIELD & WEBB
BY:  DANIEL A. WEBB, ESQUIRE
650 POYDRAS STREET, SUITE 2715
NEW ORLEANS LA  70130

LAFARGE NORTH AMERICA, INC.
BY:  PETER KEELEY, ESQUIRE
12950 WORLDGATE DRIVE
HERNDON VA  20170

OFFICIAL COURT REPORTER:   CATHY PEPPER, CCR, RMR, CRR
     500 POYDRAS STREET, ROOM B406
     NEW ORLEANS, LOUISIANA 70130
     (504) 589-7779

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
PRODUCED BY COMPUTER.

**668**

I N D E X

EXAMINATIONS                         PAGE

ARTHUR MURPH............................................ 671
DIRECT EXAMINATION MR. GILBERT...................... 674
AUDIOTAPED STATEMENT OF MR. MURPH.................... 713
CROSS-EXAMINATION BY MR. WEBB........................ 738
REDIRECT EXAMINATION BY MR. GILBERT.................. 739
JOSEPHINE RICHARDSON VIDEOTAPED DEPOSITION............ 742
DIRECT EXAMINATION BY MR. BEST........................ 743
ARTHUR ANDERSON, III.................................. 765
DIRECT EXAMINATION MR. GILBERT:...................... 766
CROSS-EXAMINATION BY MR. WEBB........................ 767

E X H I B I T S

DESCRIPTION                          PAGE

EXHIBITS P430, P431, P432 AND P433 WERE ADMITTED....... 737

**669**

P-R-O-C-E-E-D-I-N-G-S

FRIDAY, JUNE 25, 2010

M O R N I N G   S E S S I O N

(COURT CALLED TO ORDER)

THE DEPUTY CLERK:  ALL RISE.  COURT IS IN SESSION.
PLEASE BE SEATED.

THE COURT:  MR. GILBERT, WHERE ARE WE AT THIS STAGE?
ARE YOU READY TO PROCEED?

MR. GILBERT:  WE ARE READY TO PROCEED, YOUR HONOR.  I'M
AWARE THAT YOUR HONOR IS AWAITING A RESPONSE FROM THE PLAINTIFFS
ON THE DEFENDANTS' MOTION TO STRIKE INAPPROPRIATELY-FILED
EXHIBITS.  I THINK THAT'S HOW IT'S STYLED.

TWO REASONS IT'S NOT HERE YET, AND I DON'T MEAN TO
TRY THE COURT'S PATIENCE OR DRAG THIS ON ANY LONGER THAN IT NEEDS
TO BE.  BUT FIRST, WE DON'T KNOW WHICH OF THOSE EXHIBITS THAT
THEY CHALLENGE ARE ACTUALLY GOING TO DRAW A RESPONSE FROM US,
BECAUSE WE MAY END UP NOT NEEDING THEM BASED ON THE FACTS THAT WE
ESTABLISHED.  WE MAY SAY, "OKAY, THE MOTION IS MOOT AS TO THOSE."
WE'LL KNOW THIS AS THE CASE PROGRESSES.

SECONDLY, I JUST SIMPLY HAVEN'T HAD TIME TO SIT
DOWN AND DRAFT A RESPONSE TO IT.  IF YOUR HONOR WANTS A RESPONSE
IN THE MIDST OF THE PROCEEDINGS, MY RESPECTFUL SUGGESTION IS IT
WILL BE PREMATURE BECAUSE SOME OF IT MAY END UP BEING MOOT, BUT

## 670

1  IF YOUR HONOR WANTS A RESPONSE ANYWAY, I CAN HAVE ONE FOR THE
2  COURT ON MONDAY.
3  THE COURT:  IF THE RESPONSE CAN JUST SAY WHAT THE
4  AGREEMENT WAS AND THE DISAGREEMENT WAS, IT WOULD CERTAINLY BE
5  HELPFUL SO THAT I CAN MAYBE COMMUNICATE A LITTLE BIT SO THAT I
6  CAN AT LEAST NARROW IT DOWN.  BECAUSE, OTHERWISE, IT WOULD BE THE
7  END OF THE TRIAL, WE'RE GOING TO HAVE TO DETERMINE WHAT EXHIBITS
8  WE'RE SUPPOSED TO LOOK AT AND NOT LOOK AT, AT LEAST FOR THE COURT
9  OF APPEALS, AND IT MAY COME UP DURING THE TRIAL WHEN SOMEBODY
10  LOOKS AT THEM.  THAT'S ANOTHER THING THAT CONCERNS ME.  IF THEY
11  NEVER ARE GOING TO BE LOOKED AT, CERTAINLY, IT WOULD BE MOOT AND
12  MAYBE YOU CAN TAKE A LITTLE TIME TO SEE WHICH ONES YOU THINK
13  MIGHT BE MOOT, WHICH ONES YOU MIGHT AGREE ON, AND THEN HAD BEEN
14  MOOTED OR AGREED UPON, AND THEN WE'LL KNOW.
15  MR. GILBERT:  I'LL SET PEN TO PAPER.
16  THE COURT:  THE BEST YOU CAN DO.
17  MR. GILBERT:  THANK YOU, SIR.
18  IF THE COURT IS READY TO PROCEED.
19  THE COURT:  YES, SIR.
20  MR. GILBERT:  ARE WE ON RECORD?  READY TO GO?
21  THE PLAINTIFFS CALL ARTHUR MURPH.
22  THE COURT:  CAN YOU GIVE ME ONE SECOND.
23  MR. GILBERT:  MR. MURPH, YOU CAN TAKE THE WITNESS STAND
24  OVER HERE.
25  THE DEPUTY CLERK:  WOULD YOU PLEASE RAISE YOUR RIGHT

## 671

1  HAND.  DO YOU SOLEMNLY SWEAR THAT THE TESTIMONY WHICH YOU ARE
2  ABOUT TO GIVE WILL BE THE TRUTH, THE WHOLE TRUTH AND NOTHING BUT
3  THE TRUTH, SO HELP YOU GOD.
4  THE WITNESS:  I DO.
5  ARTHUR MURPH
6  WAS CALLED AS A WITNESS AND, AFTER BEING FIRST DULY SWORN BY THE
7  CLERK, WAS EXAMINED AND TESTIFIED ON HIS OATH AS FOLLOWS:
8  THE DEPUTY CLERK:  PLEASE BE SEATED.
9  THE COURT:  GIVE ME ONE SECOND, COUNSEL, MYSELF.
10  MR. GILBERT:  YES, SIR.
11  THE COURT:  AS I RECALL, THERE WAS A MOTION -- THERE
12  HAVE BEEN SEVERAL MOTIONS, BUT THERE WAS A MOTION RATHER RECENTLY
13  CITING CASES TO STRIKE ANY STATEMENTS OR THE STATEMENT, THE ONE
14  THAT I'VE LOOKED AT MADE BY THE WITNESS BASED ON THE PROPOSITION
15  THAT HE'S BEING CALLED SIMPLY TO GET IN INADMISSIBLE EVIDENCE
16  THAT WOULD BE INAPPROPRIATE TO HAVE THAT TESTIMONY.  AND WHAT I'M
17  TRYING TO REMEMBER IS, IF I DID RULE ON IT, I THINK I DEFERRED IT
18  TO DETERMINE IF THAT WAS THE PRIMARY REASON IF HE WAS GOING TO BE
19  CALLED.  AND I CANNOT FIND THAT MINUTE ENTRY AT THIS POINT.
20  MR. GILBERT:  I DO BELIEVE, YOUR HONOR, IT IS DOCUMENT
21  NUMBER 19739, AND THAT IS AS TO PLAINTIFF'S EXHIBIT 264, AND I'LL
22  QUOTE THE REPORT.  IT SAYS, "OBJECTION SUSTAINED; HOWEVER, MAY BE
23  USED PURSUANT TO FEDERAL RULE OF EVIDENCE 613 AS DISCUSSED IN
24  DOCUMENT 19733," WHICH WAS THE COURT'S RULING ON THE MOTIONS IN
25  LIMINE DEALING WITH THE SAME MATTER.

## 672

1  THE COURT:  YEAH, I'M THINKING OF ANOTHER.  DOES DEFENSE
2  RECALL, THERE WAS A MEMORANDUM FILED CITING CASES, SORT OF
3  REVISITING THE ISSUE IN ANOTHER WAY BUT FOCUSING ON THE
4  PROPOSITION OF LAW THAT I'M TALKING ABOUT THAT IF A WITNESS IS --
5  THE CLERK:  THIS IS IT, JUDGE.
6  MR. ALDOCK:  YOUR HONOR, IT'S DOCUMENT 19733.
7  MR. GILBERT:  YOUR HONOR, COULD WE JUST EXCUSE THE
8  WITNESS WHILE WE'RE GOING TO ARGUE THIS?
9  THE COURT:  YES.
10  MR. GILBERT:  THANK YOU, SIR.
11  THE COURT:  MR. MURPH, YOU MAY STEP DOWN AND STEP OUT OF
12  THE COURTROOM.  WE'LL BE WITH YOU IN A SECOND.  WE APOLOGIZE FOR
13  THE DELAY.
14  IF WE COULD FIND THE NUMBER OF THE MEMORANDUM THAT
15  WAS FILED, AND I REMEMBER READING IT CITED FIFTH CIRCUIT LAW.
16  THE DOCKET NUMBER IS WHAT?
17  THE CLERK:  THE TWO DOCUMENTS --
18  THE COURT:  NO, I'M ASKING MR. ALDOCK OR ANY OF HIS TEAM
19  IF THEY RECALL THE MEMORANDUM THAT WAS RECENTLY FILED.
20  MR. ALDOCK:  THAT HAS TO DO WITH SIDNEY WILLIAMS,
21  YOUR HONOR, THE RECENT ONE.
22  MR. GILBERT:  THAT WAS MY MOTION, YOUR HONOR, TO
23  EXCLUDE --
24  THE COURT:  NO, NO.  I'M THINKING OF SOMETHING MAYBE
25  THAT WAS RELATED -- IT RELATES TO THE PROPOSITION, MAY YOU CALL A

## 673

1  WITNESS IF THE PRIMARY PURPOSE IS TO BRING OUT ANOTHER STATEMENT.
2  IT MAY BE RELATED TO MR. SIDNEY WILLIAMS AND NOT MR. MURPH.
3  MR. ALDOCK:  YOUR HONOR, I THINK THE PROPOSITION
4  YOUR HONOR HAS JUST STATED DOESN'T RELATE TO MR. MURPH.
5  MR. GILBERT:  NO, SIR, IT DOESN'T.  THAT'S NOW WHY WE'RE
6  HERE.  WE'RE HERE TO PUT ON THE RECORD HIS OBSERVATION OF EVENTS.
7  THE COURT:  I KNOW THERE'S A DIFFERENCE OF OPINION, I
8  JUST WANTED TO RESOLVE THAT AND I DIDN'T RECALL SPECIFICALLY
9  RESOLVING IT DEFINITIVELY.  THAT'S ALL.
10  MR. ALDOCK:  YOUR HONOR, THAT WAS OUR PROPOSITION WITH
11  REGARD TO MURPH, AND YOU HAVE AN ORDER HERE IN WHICH YOU SAY IT
12  DEPENDS ON WHETHER THEY CAN LAY THE ADEQUATE FOUNDATION FOR --
13  THE COURT:  WHAT DOCUMENT IS THAT?
14  MR. ALDOCK:  I THINK YOU HAVE THAT ONE.
15  MR. GILBERT:  THAT IS IN 19733.
16  THE COURT:  THANK YOU.
17  MR. GILBERT:  IT BEGINS ON PAGE 6 OF 8 IN 19733,
18  YOUR HONOR.
19  THE CLERK:  THANK YOU.
20  THE COURT:  I AM CROSS-ROUGHING WITH WILLIAMS, NO
21  QUESTION ABOUT THAT.  THE MEMORANDUM I'M THINKING ABOUT IS
22  RELATING TO WILLIAMS.  I DO REALIZE THAT AND I APOLOGIZE.
23  MR. GILBERT:  NO PROBLEM.
24  THE COURT:  SO AT THIS POINT, WE CAN CALL MR. MURPH IN
25  AND YOU CAN COMMENCE YOUR TESTIMONY.  Y'ALL CLEARED IT UP FOR ME.

**674**

1  I THOUGHT IT WAS THIS WITNESS. I'M GLAD TO KNOW WHO IT WAS.
2         DIRECT EXAMINATION
3  MR. GILBERT:
4  Q.  GOOD MORNING, MR. MURPH.
5  A.  GOOD MORNING.
6  Q.  LET'S START BY GETTING A LITTLE BIT OF BASIC INFORMATION.
7  WOULD YOU STATE YOUR FULL NAME FOR THE RECORD, PLEASE.
8  A.  ARTHUR MURPH, JR.
9         THE COURT:  EXCUSE ME. LET'S GET MR. MURPH SET UP
10  RIGHT. OKAY? LET'S GET THE MIKE SET UP SO HE CAN --
11         MR. GILBERT:  AND AT THE SAME TIME, MR. MURPH, I'D LIKE
12  TO ASK YOU TO SPEAK SLOWLY AND CLEARLY SO I'M CERTAIN THAT I CAN
13  HEAR EVERYTHING YOU SAY, AS WILL THE COURT REPORTER.
14         THE DEPUTY COURT CLERK:  WOULD YOU SPELL YOUR NAME FOR
15  THE RECORD.
16         THE WITNESS:  A-R-T-H-U-R, M-U-R-P-H.
17         EXAMINATION
18  BY MR. GILBERT:
19  Q.  MR. MURPH, WHAT'S YOUR CURRENT ADDRESS?
20  A.  105 BERKELEY.
21  Q.  COULD YOU STATE THE FULL ADDRESS, BERKELEY DRIVE, BERKELEY
22  STREET? WHAT IS IT?
23  A.  BERKELEY DRIVE.
24  Q.  WHAT CITY IS THAT IN?
25  A.  NEW ORLEANS.

**675**

1  Q.  JUST BY WAY OF A LITTLE BIT OF BASIC INFORMATION, WHAT IS
2  YOUR EDUCATION?
3  A.  11TH GRADE.
4  Q.  SO YOU DIDN'T GRADUATE FROM HIGH SCHOOL?
5  A.  NO.
6  Q.  DID YOU GET A GED OR ANY OTHER TYPE OF EQUIVALENCY DEGREE?
7  A.  NO.
8  Q.  WHAT HAVE YOU DONE FOR WORK SINCE 11TH GRADE?
9  A.  I'M A CARPENTER.
10  Q.  ANYTHING ELSE?
11  A.  NO. I WENT TO TRUCK DRIVING -- I WENT TO SCHOOL FOR TRUCK
12  DRIVING AND MECHANIC.
13  Q.  WERE YOU EVER IN THE MILITARY?
14  A.  YEP.
15  Q.  CAN YOU DESCRIBE THAT? LET ME ASK A MORE SPECIFIC QUESTION:
16  WHAT BRANCH OF THE MILITARY?
17  A.  WHAT?
18  Q.  WHAT BRANCH OF THE MILITARY?
19  A.  THE ARMY.
20  Q.  WHEN WAS THAT?
21  A.  JANUARY 28, '68 TO DECEMBER 10, '70.
22  Q.  AND WHERE WERE YOU STATIONED?
23  A.  FORTH BLISS, TEXAS.
24  Q.  AND DID YOU SERVE IN ANY COMBAT?
25  A.  YES.

**676**

1  Q.  WHERE?
2  A.  VIETNAM.
3  Q.  HOW LONG WERE YOU THERE?
4  A.  11 MONTHS.
5  Q.  WERE YOU DISCHARGED FROM THE ARMY?
6  A.  YES.
7  Q.  WAS THAT AN HONORABLE OR DISHONORABLE DISCHARGE?
8  A.  HONORABLE.
9  Q.  WHY DID YOU LEAVE THE ARMY?
10  A.  ATS.
11  Q.  I'M SORRY?
12  A.  IT WAS THE END OF MY TERM.
13  Q.  OKAY. SO THAT WAS THE END OF YOUR ENLISTMENT PERIOD. IS
14  THAT WHAT THAT MEANS?
15  A.  RIGHT.
16  Q.  WHERE DID YOU LIVE PRIOR TO KATRINA?
17  A.  105 -- I MEAN, 1739 JOURDAN AVENUE.
18  Q.  AND WHERE IS THAT LOCATED?
19  A.  NEW ORLEANS.
20  Q.  WHAT PART OF NEW ORLEANS?
21  A.  LOWER NINTH WARD.
22  Q.  CAN I GET THE ELMO.
23         I THINK, MR. MURPH, YOU CAN SEE ON YOUR SCREEN IN FRONT
24  OF YOU THE IMAGE THAT'S PROJECTED UP THERE. CAN YOU?
25  A.  I CAN SEE IT.

**677**

1  Q.  DO YOU SEE THE RED POINT, THE RED BUBBLE?
2  A.  YES.
3  Q.  IS THAT THE LOCATION WHERE 1739 JOURDAN IS?
4  A.  I DON'T KNOW. LET ME SEE.
5         THE COURT:  YOU MIGHT ORIENT HIM, COUNSEL, TO THE
6  CLAIBORNE AVENUE BRIDGE AND NORTH PRIEUR STREET, ET CETERA, TO
7  DETERMINE IF THAT IS THE APPROXIMATE LOCATION.
8         THE WITNESS:  THAT'S ABOUT WHERE IT'S AT.
9         EXAMINATION
10  BY MR. GILBERT:
11  Q.  OKAY. I'LL PUT ANOTHER IMAGE UP FOR YOU. LET ME ASK YOU TO
12  LOOK AT THAT. I'M GOING TO ZOOM IN ON THAT A LITTLE BIT MORE.
13         DO YOU SEE THE RED DOT?
14         MR. WEBB:  YOUR HONOR, MAY I ASK A QUESTION? IF WE'RE
15  GOING TO BE USING THESE AS EXHIBITS, I THINK TO MAKE THE RECORD
16  CLEAR, IT WOULD BE NICE IF WE SAID WHAT EXHIBIT NUMBER THEY ARE.
17         MR. GILBERT:  LET HIM ESTABLISH WHAT IT IS AND THEN I'LL
18  INTRODUCE IT.
19         THE COURT:  IF WE PUT IT UP, IT IS GOOD FOR THE RECORD,
20  IF YOU DON'T MIND. DO YOU KNOW THE EXHIBIT NUMBER?
21         MR. GILBERT:  I DON'T BELIEVE THAT IT'S NUMBERED AT THIS
22  POINT. WE WERE GOING TO OFFER IT TODAY.
23         MR. WEBB:  YOUR HONOR, PERHAPS SOME OF THE CONFUSION,
24  IT'S GOT "COMMON GROUND RELIEF, MAKE IT RIGHT" ON THERE. THAT
25  WOULD CONFUSE ANYBODY.

**4 (Pages 674 to 677)**

## 678

EXAMINATION

BY MR. GILBERT:

Q. MR. MURPH, ARE YOU CONFUSED BY THE WORDS "COMMON GROUND RELIEF, MAKE IT RIGHT" AS TO WHERE THE LOCATION OF YOUR HOUSE WAS?

A. NO, I DON'T KNOW WHAT THAT MEANS.

Q. CAN YOU SEE THE RED A?

A. I SEE IT.

Q. IS THAT WHERE YOUR HOUSE WAS?

A. ABOUT WHERE IT WAS, I GUESS, YEAH.

Q. IS THERE ANY WAY TO DO A SPLIT SCREEN ON THIS SYSTEM?

THE COURT: IT IS, BUT IT'S GENERALLY DONE WHEN IT'S ALREADY CONFIGURED THAT WAY. UNLESS YOU USE THE ELMO AND PUT TWO DIFFERENT OBJECTS UP AT THE SAME TIME. IT IS NOT IMAGED IN YOUR COMPUTER. OBVIOUSLY, IT WOULD BE IMPOSSIBLE, TO MY KNOWLEDGE. THE SYSTEMS PERSON COULD ANSWER IT BETTER THAN I COULD. BUT YOU COULD ALWAYS GO TO THE ELMO AND PUT TWO THINGS UP THERE.

MR. GILBERT: SO THERE IS NO WAY TO OVERLAY ELMO WITH THE ELECTRONIC PRESENTATION SYSTEM AT THE SAME TIME?

THE COURT: I HONESTLY DON'T KNOW.

MR. GILBERT: OKAY.

EXAMINATION

BY MR. GILBERT:

Q. OKAY. DO YOU SEE JOURDAN AVENUE ON THAT MAP?

A. YES.

## 679

Q. DO YOU SEE DESLONDE?

A. YEP.

Q. DO YOU SEE THE CANAL?

A. YES.

Q. IS THAT A FAIR AND ACCURATE DEPICTION OF THE APPROXIMATE LOCATION OF YOUR HOME?

A. YES, IT IS.

Q. AT 1739 JOURDAN AVENUE?

A. UH-HUH (AFFIRMATIVE RESPONSE).

Q. YOU NEED TO ANSWER YES OR NO AS OPPOSED TO UH-HUH (AFFIRMATIVE RESPONSE), SO SHE CAN TAKE DOWN WHAT YOU'RE SAYING. WHAT HAPPENED TO 1739 JOURDAN AVENUE?

A. THEY TORE IT DOWN.

Q. WHY?

A. I GUESS BECAUSE IT WAS IN THE STORM.

Q. WHAT HAPPENED TO IT IN THE STORM?

A. IT JUST GOT FLOODED. GOT UNDER WATER.

Q. DID ANYTHING ELSE HAPPEN TO IT ASIDE FROM IT GETTING FLOODED?

A. YEAH. BEFORE THE FLOOD OR AFTER?

Q. AT ANY POINT IN THE STORM, DID ANYTHING HAPPEN TO IT OTHER THAN IT GETTING FLOODED?

A. IT GOT HIT BY A BARGE.

Q. OKAY. WHAT BARGE WAS THAT?

A. I DON'T KNOW WHAT BARGE, BUT IT GOT HIT BY A BARGE.

## 680

Q. COULD YOU SPEAK A LITTLE LOUDER, PLEASE.

A. IT GOT HIT BY A BARGE.

Q. WHAT BARGE?

THE COURT: ARE YOU ASKING HIM TO DESCRIBE THE BARGE OR GIVE ITS NUMBER OR --

EXAMINATION

BY MR. GILBERT:

Q. DID YOU GET A NUMBER OFF THE BARGE?

A. I CAN'T REMEMBER. IT'S 4727 OR SOMETHING LIKE THAT.

Q. DO YOU KNOW WHERE THAT BARGE CAME FROM?

A. OUT THE CANAL.

Q. DO YOU KNOW WHERE THAT BARGE WAS BEFORE IT CAME OUT OF THE CANAL?

A. THEY HAD A COUPLE OF BARGES IN THE CANAL. I DON'T KNOW WHICH ONE IT WAS.

Q. DO YOU KNOW WHERE THOSE BARGES WERE IN THE CANAL?

A. TIED OFF ON THE OTHER SIDE OF THE CANAL.

Q. DO YOU KNOW WHO OWNED THE PLACE, WHEREVER IT WAS TIED OFF?

A. NOPE.

Q. DID YOU TELL ANYBODY THAT THERE WAS A BARGE ON YOUR HOUSE AFTER THE STORM?

A. I DIDN'T HAVE TO TELL NOBODY. A FEW PEOPLE IN THE HOUSE NEXT DOOR TO ME THAT SAW THE BARGE.

Q. I'M NOT ASKING IF YOU TOLD YOUR NEIGHBORS. DID YOU CALL ANY COMPANY AND SAY, "HEY, YOUR BARGE IS ON MY HOUSE"?

## 681

A. YES.

Q. WHAT COMPANIES DID YOU CALL?

A. I CAN'T REMEMBER THE NAME OF THEM.

Q. IF I TOLD YOU THAT YOU CALLED LAFARGE NORTH AMERICA, WOULD THAT BE ACCURATE? WOULD THAT REFRESH YOUR MEMORY?

A. I DIDN'T CALL LAFARGE.

Q. DID LAFARGE CALL YOU AT ANY POINT?

A. NO.

Q. DID YOU HAVE ANY CONTACT WITH LAFARGE NORTH AMERICA FOLLOWING THE STORM CONCERNING THE BARGE ON YOUR HOUSE?

A. I DON'T KNOW. MY WIFE DID ALL THE TALKING WITH THAT.

Q. YOU DON'T KNOW WHETHER YOU HAVE HAD ANY CONTACT IS WHAT YOU'RE TELLING US TODAY?

A. I'M PRETTY SURE I DID, BUT I DIDN'T SPEAK TO ANY OF THEM, I DON'T THINK. MY WIFE DID ALL THE TALKING. SHE SPOKE TO THE PEOPLE ON THE PHONE.

Q. OKAY. WERE YOU PRESENT WHEN YOUR WIFE HAD THIS CONVERSATION?

A. YES, I WAS.

Q. DID YOU HEAR BOTH ENDS OF THOSE CONVERSATIONS OR JUST YOUR WIFE'S END?

A. JUST MY WIFE'S END.

Q. AND DID SHE TELL YOU WHO SHE WAS SPEAKING WITH?

A. SHE PROBABLY DID. I CAN'T REMEMBER. IT'S BEEN FIVE YEARS AGO.

5 (Pages 678 to 681)

**682**

1 Q. OKAY. SO IF YOU HAD A RECOLLECTION OF THESE EVENTS --
2 STRIKE THAT.
3       IS YOUR MEMORY OF THESE EVENTS BETTER CLOSER TO THE
4 EVENTS OR FARTHER AWAY IN TIME IN THE FUTURE?
5 A. WHAT YOU MEAN?
6 Q. WELL, YOU SAID IT'S BEEN FIVE YEARS.
7 A. RIGHT.
8 Q. HAVE YOUR MEMORIES FADED IN THOSE FIVE YEARS?
9 A. I WENT THROUGH ABOUT THREE DEPOSITIONS.
10 Q. HAVE YOUR MEMORIES FADED IN THOSE FIVE YEARS?
11 A. YES, IT HAS.
12 Q. IF YOU TOLD SOMEBODY IN JANUARY OF 2006 -- WELL, FIRST,
13 LET'S BACK UP.
14       WHEN WAS THE STORM; DO YOU RECALL?
15 A. FOUR YEARS AGO. I DON'T REMEMBER THE DAY.
16 Q. IF I TOLD YOU THE STORM TOOK PLACE ON AUGUST 29, 2005, AND
17 WE'RE TALKING ABOUT KATRINA, WOULD YOU HAVE ANY REASON TO
18 DISAGREE WITH THAT?
19 A. NOT REALLY.
20 Q. IF A FEW MONTHS LATER, IN JANUARY OF 2006, YOU TOLD SOMEBODY
21 YOUR VERSION OF EVENTS THAT TOOK PLACE ON -- DURING THE STORM IN
22 THE HOURS SURROUNDING THE STORM, WOULD THAT BE -- WOULD YOU
23 EXPECT THAT YOU WOULD HAVE REMEMBERED BETTER WHAT YOU WERE
24 TELLING AT THAT TIME THAN WHAT YOU CAN TALK ABOUT TODAY?
25 A. I DON'T KNOW. I'M TRYING TO FORGET THIS WHOLE THING, AS A

**683**

1 MATTER OF FACT.
2 Q. DO YOU BELIEVE THAT YOUR MEMORIES OF WHAT TOOK PLACE DURING
3 THE STORM WOULD BE STRONGER IN JANUARY 2006 OR ON JUNE 25TH, I
4 BELIEVE THIS IS -- I'M LOSING TRACK -- 2010?
5 A. I'M NOT GOOD WITH DATES AND TIMES EITHER.
6 Q. DO YOU HAVE A BETTER RECOLLECTION TODAY OR FOUR MONTHS AFTER
7 THE STORM OF WHAT TOOK PLACE DURING THE STORM?
8 A. PRETTY MUCH.
9 Q. I'M NOT CERTAIN YOU UNDERSTOOD THE QUESTION.
10       THE COURT: I THINK THE BEST THING TO DO, MR. GILBERT,
11 FORGIVE ME FOR INTRUDING, BUT IF WE WERE TO ASK THIS WITNESS
12 SPECIFIC QUESTIONS ABOUT WHAT OCCURRED DURING THE STORM. THE
13 COURT HAS READ THE DEPOSITIONS, TWO OF THE DEPOSITIONS, I HAVE
14 READ THE STATEMENT, AND I HAVE LOOKED AT AND READ -- EXCUSE ME.
15 I HAVE HEARD THE UNREDACTED STATEMENT -- JUST TO LET EVERYBODY
16 KNOW WHAT I HAVE DONE, I HAVE HEARD THE ENTIRE UNREDACTED
17 STATEMENT, I HAVE READ THE REDACTED STATEMENT, AND I HAVE READ
18 THE TWO DEPOSITIONS THAT WERE TENDERED TO ME BY COUNSEL.
19       SO RIGHT NOW, HE'S HERE TESTIFYING LIVE. AND YOU
20 CAN PROBE HIS MEMORY OF WHAT OCCURRED, AND THEN AS HE RESPONDS,
21 THEN YOU MIGHT ATTEMPT TO DO WHATEVER YOU HAVE TO DO AND DEFENSE
22 COUNSEL CAN DO WHATEVER THEY HAVE TO DO.
23       MR. GILBERT: UNDERSTOOD. UNDERSTOOD.
24             EXAMINATION
25 BY MR. GILBERT:

**684**

1 Q. OKAY. COULD WE PULL UP 179 ON THE ELECTRONIC SYSTEM.
2       IS THAT THE BARGE THAT WAS ON YOUR HOUSE?
3 A. IT LOOKS LIKE IT.
4 Q. DO YOU SEE ANY PART OF YOUR HOUSE IN THAT PICTURE?
5 A. NO.
6 Q. DO YOU SEE YOUR DRIVEWAY?
7 A. NO.
8 Q. DO YOU SEE WHERE YOUR HOUSE USED TO BE?
9 A. NO.
10 Q. WAS YOUR HOUSE TO THE LEFT OR THE RIGHT OF WHAT'S IN THAT
11 PICTURE?
12 A. IT'S TO THE RIGHT.
13 Q. OKAY.
14       THE COURT: DO YOU WANT TO POINT OUT WHERE YOUR HOUSE
15 WAS, SIR, IF YOU CAN?
16       MR. GILBERT: WHAT YOU DO, MR. MURPH, IS YOU TOUCH THE
17 SCREEN.
18       THE COURT: YOU JUST TOUCH THE SCREEN.
19       MR. GILBERT: OR YOU CAN MAKE AN ARROW IN WHAT DIRECTION
20 YOUR HOUSE WAS.
21       THE WITNESS: HOW DO YOU DO THAT?
22       MR. GILBERT: BY TOUCHING THE SCREEN.
23       THE COURT: JUST TOUCH THE SCREEN AND A MARK WILL
24 APPEAR.
25       THE WITNESS: IT WAS OVER THERE.

**685**

1       THE COURT: DO YOU THINK THAT'S ABOUT RIGHT, THAT'S
2 WHERE YOUR HOUSE WAS, SIR?
3       THE WITNESS: YES. IT WAS ON THE OTHER SIDE OF THIS
4 HOUSE.
5             EXAMINATION
6 BY MR. GILBERT:
7 Q. DO YOU RECOGNIZE THAT BARGE?
8 A. SAY WHAT?
9 Q. DO YOU RECOGNIZE THAT BARGE?
10 A. YES.
11 Q. TELL ME WHAT YOU SPENT SUNDAY, AUGUST 28TH, DOING.
12 A. I DON'T KNOW.
13 Q. DID YOU EVACUATE?
14 A. NO.
15 Q. DID ANY OF YOUR FAMILY EVACUATE?
16 A. YES.
17 Q. HOW DID THEY DO THAT? TELL ME ABOUT THAT.
18 A. I MOVED INTO THE HYATT REGENCY.
19 Q. COULD YOU SAY THAT AGAIN?
20 A. I MOVED INTO THE HYATT.
21 Q. WHICH ONE?
22 A. THE ONE DOWNTOWN.
23 Q. WHO DID YOU TAKE TO THE HYATT?
24 A. MY WIFE AND MY DAUGHTER.
25 Q. DID YOU PERSONALLY TAKE THEM THERE OR DID YOU HAVE THEM

686

1  TAKEN THERE?
2  A.  I PERSONALLY TOOK THEM THERE.
3  Q.  WHAT TIME WAS THAT?
4  A.  I DON'T KNOW.
5  Q.  WAS IT MORNING?  WAS IT AFTERNOON?  WAS IT NIGHT?
6  A.  IT WAS IN THE AFTERNOON.
7  Q.  AND WAS THAT ON SUNDAY?
8  A.  I DON'T KNOW.  IT WAS THE DAY BEFORE THE STORM.
9  Q.  WAS IT LIGHT OR DARK WHEN YOU TOOK THEM DOWN?
10 A.  IT WAS GETTING DARK.
11 Q.  WHAT HAPPENED AFTER YOU TOOK THEM THERE?
12 A.  I CHECKED THEM IN.
13 Q.  WHAT HAPPENED AFTER YOU CHECKED THEM IN?
14 A.  I LEFT.
15 Q.  WHY DID YOU LEAVE?
16 A.  TO GO BACK TO MY HOUSE.
17 Q.  WHY DID YOU WANT TO GO BACK TO YOUR HOUSE?
18 A.  TO GET MY DOG.
19 Q.  HOW DID YOU GET BACK TO YOUR HOUSE?
20 A.  I HAD A FRIEND BRING ME.
21 Q.  WHAT FRIEND?
22 A.  FELTON.
23 Q.  AND DID HE PICK YOU UP AT THE HYATT?
24 A.  NO.
25 Q.  WHERE DID HE PICK YOU UP?

688

1  A.  PRETTY MUCH, I THINK SO.
2  Q.  DID YOU EVER GO LOOK UP AT THE LEVEE TO SEE THE HEIGHT OF
3  THE WATER?
4  A.  AS SOON AS I GOT HOME.
5  Q.  AS SOON AS YOU GOT HOME WHEN?
6  A.  WHEN I GOT BACK WITH FELTON.
7  Q.  OKAY.  IS THIS BEFORE OR AFTER YOU DROPPED YOUR CAR OFF?
8  A.  THAT WAS AFTER I DROPPED THE CAR OFF.
9  Q.  IS THIS BEFORE OR AFTER YOU TOOK YOUR WIFE AND DAUGHTER TO
10 THE HYATT?
11 A.  IT WAS AFTER.
12 Q.  YOU'RE POSITIVE YOU DIDN'T GO LOOK BEFORE?
13 A.  I LOOKED BEFORE AND LOOKED AFTER.
14 Q.  SO YOU SAY YOU LOOKED TWICE?
15 A.  RIGHT.
16 Q.  WHAT DID YOU SEE WHEN YOU LOOKED?
17 A.  HIGH WATER.
18 Q.  HOW HIGH WAS THE WATER?
19 A.  ABOUT TO THE TOP OF THE WALL.
20 Q.  WAS THERE ANY DISTANCE BETWEEN THE TOP OF THE WATER AND THE
21 TOP OF THE WALL?
22 A.  I DON'T KNOW.  THE WAVES WAS SPLASHING.
23 Q.  YOU DON'T KNOW, YOU SAY?
24 A.  I SAY, I DON'T KNOW.  THE WAVES WAS SPLASHING.  YOU KNOW, IT
25 WAS SPLASHING OVER THE WALL.

687

1  A.  HE PICKED ME UP BY A FRIEND'S.
2  Q.  SO HOW DID YOU GET TO THE OTHER FRIEND'S HOUSE?
3  A.  I DROVE.
4  Q.  OKAY.  WHY DIDN'T YOU JUST DRIVE HOME?
5  A.  I DIDN'T WANT TO LEAVE MY CAR THERE.
6  Q.  CAR WHERE?
7  A.  IN FRONT OF MY HOUSE UNDER THE CARPORT.
8  Q.  WHY?
9  A.  JUST IN CASE THE WATER GOT HIGH RIGHT THERE.  IT HAD FLOODED
10 THERE BEFORE FROM BETSY.
11 Q.  SO ONCE YOUR CAR WAS BROUGHT TO YOUR OTHER FRIEND'S HOUSE --
12 LET'S GET HIS NAME, JUST FOR CLARITY.  WHO IS YOUR OTHER FRIEND?
13 A.  IT'S WANDA.
14 Q.  WANDA.  OKAY.  ONCE YOUR CAR WAS AT WANDA'S HOUSE, THEN WHAT
15 DID YOU DO?
16 A.  I GOT A RIDE BACK WITH FELTON.
17 Q.  A RIDE BACK WHERE?
18 A.  TO MY HOUSE.
19 Q.  AND WHAT TIME DID YOU ARRIVE BACK AT YOUR HOUSE?
20 A.  AROUND NOON.  I CAN'T REMEMBER.
21 Q.  WAS IT DARK?
22 A.  YES.
23 Q.  WHAT WAS THE WEATHER LIKE?
24 A.  IT WAS DRIZZLING.
25 Q.  WAS THERE ANY WIND?

689

1  Q.  DID YOU EVER TELL ANYBODY THAT IT WAS ABOUT A FOOT, FOOT AND
2  A HALF FROM THE TOP AT THAT TIME?
3  A.  IT MIGHT HAVE BEEN A FOOT AND A HALF, A FOOT OR SO.  I DON'T
4  KNOW.  LIKE I SAY, THE WAVES WAS SPLASHING UP AGAINST THE WALL.
5  Q.  WAS WATER COMING OVER THE WALL?
6  A.  YES.
7  Q.  HOW MUCH WATER?
8  A.  JUST A SPLASH FROM THE SPLASHING OVER THE TOP.
9  Q.  DID YOU EVER TELL ANYBODY THAT IT WASN'T RUNNING CONSTANTLY
10 OVER THE TOP?
11 A.  I NEVER SAID THAT TO NOBODY.
12 Q.  IF I WERE TO --
13    THE COURT:  JUST ASK HIM.  WHEN YOU SAW IT AT THIS TIME,
14 WAS THE WATER FLOWING OVER THE TOP OR WAS IT JUST SPLASHING OVER
15 THE TOP?
16    THE WITNESS:  IT WAS JUST SPLASHING.
17    MR. GILBERT:  RIGHT.  YOUR HONOR, I'M TRYING TO LAY THE
18 FOUNDATION UNDER 613 FEDERAL RULE OF EVIDENCE.
19    THE COURT:  I UNDERSTAND.  I'M NOT SURE IF YOUR QUESTION
20 WAS CRYSTAL CLEAR TO HIM.  NOW IT'S CLEAR TO ME.  HE SAID IT WAS
21 SPLASHING.  I'M TRYING TO FIX SOMETHING, AND IT DOES.
22          EXAMINATION
23 BY MR. GILBERT:
24 Q.  WAS THE WATER RUNNING CONSTANTLY OVER THE TOP AT THAT TIME?
25 A.  IT WAS SPLASHING UP AGAINST THE LEVEE.  BLOWING OVER THE

7 (Pages 686 to 689)

**690**

1  TOP.

2  Q. DID YOU EVER TELL ANYBODY THAT IT WASN'T RUNNING CONSTANTLY

3  OVER THE TOP?

4  THE COURT: HE'S JUST SAYING RIGHT NOW, IT WASN'T. HE

5  SAID IT WAS SPLASHING. THAT'S WHAT THE COURT UNDERSTANDS, AND

6  THAT'S WHAT HE SAID IN THE DEPOSITION, IN HIS STATEMENT, AS I

7  RECALL.

8  MR. GILBERT: I JUST WANT TO MAKE SURE THE RECORD IS

9  CRYSTAL CLEAR.

10  THE COURT: IT'S CRYSTAL CLEAR TO ME AND HOPEFULLY TO

11  THE RECORD.

12  MR. GILBERT: THANK YOU, JUDGE.

13  EXAMINATION

14  BY MR. GILBERT:

15  Q. WAS THERE ANY WATER IN THE STREET AT THAT TIME?

16  A. FROM THE RAIN, IT WAS RUNNING DOWN THE LEVEE.

17  Q. HOW MUCH RAINWATER WAS THERE IN THE STREET?

18  A. ABOUT AS MUCH AS THEY HAD WHEN IT RAINED ANYWHERE ELSE.

19  Q. WHAT DO YOU MEAN FROM IT RUNNING DOWN THE LEVEE?

20  A. WATER SPLASHING OVER THE LEVEE AND RUNNING DOWN THE HILL.

21  Q. AND WHAT DID YOU DO AFTER YOU LOOKED AT THE WATER ON THE

22  LEVEE?

23  A. WENT BACK INSIDE.

24  Q. WHAT DID YOU DO ONCE YOU GOT INSIDE?

25  A. DRANK A FEW BEERS.

**691**

1  Q. HOW LONG DID YOU STAY INSIDE?

2  A. UNTIL THE HURRICANE WAS OVER.

3  Q. LET'S BACK UP A LITTLE BIT. WHEN YOU WENT OVER TO LOOK AT

4  THE LEVEE, WERE THE LIGHTS STILL ON?

5  A. YES.

6  Q. SO YOU COULD SEE?

7  A. THE STREETLIGHTS WAS ON, BUT YOU COULDN'T SEE BECAUSE IT WAS

8  REAL DARK, AND LIKE I SAY, IT WAS DRIZZLING.

9  Q. WERE THE LIGHTS IN YOUR HOUSE ON?

10  A. YEP.

11  Q. SO YOU WENT IN, DRANK A COUPLE BEERS. WHAT DID YOU DO AFTER

12  THAT?

13  A. WATCHED TELEVISION.

14  MR. WEBB: YOUR HONOR, I OBJECT. THE WITNESS TESTIFIED

15  "A FEW" AND NOW MR. GILBERT HAS TURNED THAT INTO A COUPLE.

16  MR. GILBERT: DID I SAY A COUPLE?

17  MR. WEBB: YES, YOU DID.

18  MR. GILBERT: I DON'T MEAN TO.

19  MR. WEBB: THAT'S WHY I HELPED YOU.

20  THE COURT: THE COURT NEVER ACCEPTS A COUPLE OF BEERS

21  LITERALLY, BUT WE'LL CERTAINLY --

22  MR. GILBERT: HONEY, I'M GOING OUT TONIGHT FOR A COUPLE

23  OF BEERS.

24  THE COURT: GO AHEAD, YOU CAN PROBE THAT IF YOU WISH. I

25  KNOW HE SAID, "A FEW BEERS." WHATEVER THAT MEANS.

**692**

1  MR. GILBERT: I THINK LAFARGE MADE SOMETHING OF THAT

2  OPINION TOO. IT'S OKAY.

3  EXAMINATION

4  BY MR. GILBERT:

5  Q. SO YOU JUST TESTIFIED THAT YOU DIDN'T GO BACK OUT OF YOUR

6  HOUSE UNTIL THE STORM WAS OVER?

7  A. NO.

8  Q. BUT YOU DID, IN FACT, GO BACK OUT OF YOUR HOUSE, DIDN'T YOU,

9  BECAUSE YOU WENT TO CHECK THE GENERATOR AT SOME POINT, RIGHT?

10  A. I WENT TO TURN THE GENERATOR ON.

11  Q. WHY DID YOU GO DO THAT?

12  A. BECAUSE THE LIGHTS WENT OFF.

13  Q. WHAT TIME DID THAT HAPPEN?

14  A. I DON'T KNOW.

15  Q. HAVE YOU EVER SAID THAT IT WAS AROUND 7:30, EIGHT O'CLOCK

16  SUNDAY NIGHT THAT THE LIGHTS WENT OUT?

17  A. IT MIGHT HAVE BEEN. I DON'T KNOW.

18  Q. WHAT HAPPENED WHEN YOU WERE OUT WITH THE GENERATOR? WHAT

19  DID YOU DO?

20  A. WENT OUT THERE TO HOOK IT UP.

21  Q. OKAY. WHAT ELSE?

22  A. THAT'S WHAT I WENT OUT THERE FOR, TO HOOK IT UP.

23  Q. DID ANYTHING UNUSUAL HAPPEN WHILE YOU WERE OUT THERE TRYING

24  TO HOOK UP THE GENERATOR?

25  A. NO, I JUST HEARD SOME NOISES.

**693**

1  Q. WHAT NOISES DID YOU HEAR?

2  A. JUST SOME STRANGE NOISES, SOMETHING LIKE A KNOCKING SOUND.

3  Q. A KNOCKING SOUND?

4  A. UH-HUH (AFFIRMATIVE RESPONSE).

5  Q. WHERE DID THAT KNOCKING SOUND COME FROM?

6  A. THE FRONT OF MY HOUSE.

7  Q. DID YOU EVER TELL ANYBODY THAT YOU WERE HEARING SCRAPING

8  SOUNDS?

9  A. YES.

10  Q. DID YOU EVER TELL ANYBODY THAT YOU WERE HEARING RUBBING AND

11  BANGING SOUNDS?

12  A. YES.

13  Q. HOW LONG DID YOU HEAR THESE SOUNDS?

14  A. NOT LONG.

15  Q. HOW LONG?

16  A. MAYBE A COUPLE OF MINUTES.

17  Q. OKAY. DID YOU GO TO INVESTIGATE, SEE IF YOU COULD FIND OUT

18  WHAT THESE SOUNDS WERE?

19  A. YES, I DID.

20  Q. WHAT DID YOU DO?

21  A. I WALKED TOWARDS THE FRONT OF THE HOUSE TO SEE WHAT THE

22  NOISE WAS. BEFORE I CAN GET ALL THE WAY TO THE FRONT, THE STREET

23  WATER STARTED COMING DOWN THE ROAD.

24  Q. DID YOU DISCOVER WHAT THOSE SOUNDS WERE?

25  A. NO.

694

1  Q.  DID YOU EVER TELL ANYBODY THAT THOSE SOUNDS WERE THE SOUND
2  OF A BARGE DRAGGING AGAINST THE WALL, BUMPING AGAINST THE WALL?
3  A.  I TOLD YOU THAT.
4  Q.  DID YOU TELL ANYBODY ELSE THAT?
5  A.  NO.
6  Q.  BUT YOU JUST SAID THAT YOU TOLD ME THAT?
7  A.  YES.  AND ALL THE OTHER PEOPLE THAT WAS IN THERE, LIKE Y'ALL
8  SITTING IN THE DEPOSITION.
9        THE COURT:  MR. MURPH, WOULD YOU PLEASE TELL ME WHAT
10  DIRECTION -- YOU SAID YOU SAW WATER COMING DOWN THE STREET.  WHAT
11  DIRECTION WAS THE WATER COMING?  DO YOU RECALL, SIR?
12        THE WITNESS:  IT WAS COMING FROM FLORIDA AVENUE, TOWARDS
13  CLAIBORNE.
14        THE COURT:  FLORIDA TOWARDS CLAIBORNE, IN ESSENCE, NOT
15  EXACTLY, BUT FROM NORTH TO SOUTH; WOULD THAT BE CORRECT?
16        THE WITNESS:  YES.
17        THE COURT:  OKAY.
18              EXAMINATION
19  BY MR. GILBERT:
20  Q.  SO YOU TOOK ME TO THE POINT WHERE YOU'RE WALKING TOWARDS THE
21  LEVEE TO SEE IF YOU CAN FIND OUT WHAT THESE SOUNDS ARE AND YOU
22  DIDN'T FIND OUT.
23        WHAT HAPPENED NEXT?
24  A.  I TURNED AROUND AND RAN BACK TO THE HOUSE.
25  Q.  WHY?

695

1  A.  BECAUSE THE WATER WAS COMING DOWN THE STREET LIKE A LITTLE
2  WAVE.
3  Q.  WHEN DID THAT WATER START?
4  A.  SOMEWHERE WHILE I WAS LISTENING TO THE SOUND TO GO TO SEE.
5  Q.  I DIDN'T CATCH THE LAST PART OF YOUR SENTENCE.
6  THE WATER STARTED WHILE THE SOUND WAS GOING.
7  Q.  DID YOU HEAR A BOOM SOUND AT ANY POINT?
8  A.  NO.
9  Q.  DID YOU EVER TELL ANYBODY THAT YOU HEARD A BOOM SOUND?
10  A.  NO.
11  Q.  DID YOU EVER TELL ANYBODY THAT YOU HEARD A BIG BOOM?
12  A.  NO.
13  Q.  DID YOU TELL ANYBODY EVER THAT THE SOUND YOU HEARD SOUNDED
14  LIKE A WRECK?
15  A.  NO.
16  Q.  I'M SORRY?
17  A.  I DON'T THINK SO.
18  Q.  DID THE SOUND STOP BEFORE THE WATER CAME?
19  A.  I DON'T KNOW.
20  Q.  DID YOU HEAR THE SOUND ANY MORE AFTER THE WATER CAME?
21  A.  NO, BECAUSE I RAN INSIDE.
22  Q.  OKAY.  HOW MUCH WATER CAME?
23  A.  IT NEVER STOPPED COMING.
24  Q.  WELL, AT THAT POINT IN TIME, HOW MUCH WATER DID YOU SEE
25  COMING?

696

1  A.  A LITTLE WAKE OF WATER.
2  Q.  I'M SORRY?
3  A.  THE WATER WAS JUST RUSHING DOWN THE STREET.
4  Q.  WAS IT RUSHING TOWARDS YOU?
5  A.  IT WAS RUSHING TOWARDS CLAIBORNE AVENUE.
6  Q.  OKAY.  BUT WAS IT ON YOUR PROPERTY?
7  A.  IT WAS ON EVERYBODY'S PROPERTY.
8  Q.  AT THAT POINT IN TIME, AND I'M TALKING ABOUT ONLY WHEN
9  YOU'RE RUNNING BACK INTO THE HOUSE, IS THE WATER GETTING ON TO
10  YOUR LAND?
11  A.  IT WAS COMING DOWN THE DRIVEWAY, TURNING IN THE DRIVEWAY.
12  Q.  DO YOU KNOW HOW DEEP IT WAS?
13  A.  NO.
14  Q.  DO YOU KNOW HOW FAST IT WAS MOVING?
15  A.  REAL FAST.
16  Q.  DID YOU PANIC?
17  A.  YEP.
18  Q.  WHAT DID YOU DO?
19  A.  I RAN INSIDE.
20  Q.  WHAT DID YOU DO AFTER YOU RAN INSIDE?
21  A.  SHUT THE DOOR.
22  Q.  WHAT DID YOU DO AFTER YOU SHUT THE DOOR?
23  A.  SIT DOWN ON THE SOFA.
24  Q.  SO THIS WATER IS COMING AND YOU'RE SITTING ON THE SOFA?
25  A.  RIGHT.

697

1  Q.  DID YOU NOT GO AND IMMEDIATELY GRAB AN AXE AND GO TO THE
2  ATTIC?
3  A.  GRABBED THE AXE BEFORE THAT.
4  Q.  YOU GRABBED THE AXE BEFORE WHAT?
5  A.  BEFORE THE HURRICANE EVEN CAME, I GOT IT OUT THE GARAGE AND
6  I PUT IT IN MY HOUSE.
7  Q.  WHAT DAY WAS THAT?
8  A.  THE DAY BEFORE THE STORM.
9  Q.  WAS THAT SUNDAY THAT YOU GRABBED THE AXE?
10  A.  WHAT DAY THE STORM WAS?
11        THE COURT:  THE STORM WAS MONDAY, SIR.
12        THE WITNESS:  SO SUNDAY, I GRABBED THE AXE.
13        THE COURT:  THE STORM WAS MONDAY, THE STORM MADE
14  LANDFALL.
15              EXAMINATION
16  BY MR. GILBERT:
17  Q.  DID YOU GO UP INTO THE ATTIC?
18  A.  YES, I DID.
19  Q.  WHEN DID YOU DO THAT?
20  A.  THAT NIGHT LATE.
21  Q.  THAT NIGHT WHAT?
22  A.  LATE THAT NIGHT.
23  Q.  HOW LONG AFTER THE WATER COMING DOWN YOUR DRIVEWAY DID YOU
24  GO UP INTO THE ATTIC?
25  A.  AFTER I SEEN THE WATER COMING FROM AROUND THE WINDOWS AND

**698**

1  AROUND THE DOORS.
2  Q.  HOW LONG AFTER WHEN YOU SAW THE WATER IN YOUR DRIVEWAY?
3  A.  WHAT YOU MEAN?
4  Q.  HOW MUCH TIME PASSED BETWEEN THE TIME THAT YOU RAN INTO THE
5  HOUSE AND WENT INTO THE ATTIC?
6  A.  I DON'T KNOW.
7  Q.  DID YOU PANIC?
8  A.  I PANICKED ONCE I SAW THE WATER COMING DOWN THE STREET.
9  Q.  DID THAT MAKE YOU MOVE ANY FASTER?
10  A.  EVERYTHING WAS MOVING FAST.
11  Q.  I'M SORRY?
12  A.  EVERYTHING WAS MOVING FAST.
13      THE COURT:  TO ANSWER HIS QUESTION, WERE YOU MOVING
14  FASTER THAN YOU WOULD NORMALLY?  MR. MURPH, DID YOU ACT FASTER
15  THAN --
16      THE WITNESS:  YES, I DID.
17          EXAMINATION
18  BY MR. GILBERT:
19  Q.  WHEN YOU GOT INTO THE ATTIC, DID YOU TAKE THE AXE WITH YOU?
20  A.  YES, I DID.
21  Q.  DID YOU USE THE AXE?
22  A.  YES.
23  Q.  WHAT DID YOU DO?
24  A.  CHOPPED A HOLE IN THE ROOF.
25  Q.  WHAT PART OF THE ROOF DID YOU CHOP THE HOLE IN?

**699**

1  A.  IN THE MIDDLE OF MY HOUSE, RIGHT ABOVE THE ATTIC -- RIGHT
2  ABOVE THE ATTIC THE DOOR.
3  Q.  WHEN SAY THE MIDDLE OF THE HOUSE, ARE YOU TALKING ABOUT
4  MIDDLE FROM FRONT TO BACK OR MIDDLE FROM SIDE TO SIDE?
5  A.  BOTH WAYS.
6  Q.  WHAT TYPE OF ROOF WAS ON YOUR ATTIC?
7  A.  A SHINGLE.
8  Q.  WAS IT A --
9  A.  SLATE.  A SLATE ROOF WAS ON THE ROOF.
10  Q.  WHAT WAS THE SHAPE OF THE ROOF?  WAS IT A FLAT ROOF OR DID
11  IT GO UP --
12  A.  PITCHED.
13  Q.  IT WAS A PITCHED ROOF.
14      WHERE WAS THE HOLE IN TERMS OF THE PITCHED ROOF; WAS IT
15  ON --
16  A.  ABOUT TWO-FOOT FROM THE PITCH -- FROM THE RIDGE.
17  Q.  WHICH SIDE OF THE RIDGE?
18  A.  THE LEFT SIDE.
19  Q.  AND THE LEFT SIDE --
20  A.  ON THE RIGHT SIDE, IF YOU STAND IN FRONT THE HOUSE, YOU'RE
21  IN THE ATTIC.  IT'S ON THE LEFT.
22  Q.  SO THE RIGHT SIDE, IF YOU'RE STANDING IN FRONT OF THE HOUSE?
23  A.  YES.
24  Q.  AND THE LEFT SIDE IF YOU'RE IN THE ATTIC?
25  A.  RIGHT.

**700**

1  Q.  AND DID YOU LOOK OUT OF THE HOLE IN YOUR ROOF?
2  A.  YES, I DID.
3  Q.  WHAT DID YOU SEE?
4  A.  DARKNESS.
5  Q.  DID YOU SEE A BARGE?
6  A.  NO.  NOT THEN, I DIDN'T.
7  Q.  WHEN DID YOU SEE A BARGE?
8  A.  I THINK THAT NIGHT WHEN I LOOKED AND SAW THE WATER UP AS
9  HIGH AS THE GUTTER.
10  Q.  FROM THE HOLE IN THE LEFT SIDE OF YOUR HOUSE, THAT HOLE
11  FACES WHAT; THE CLAIBORNE AVENUE BRIDGE?
12  A.  YES, IT DOES.
13  Q.  IT DOESN'T FACE FLORIDA AVENUE?
14  A.  NO.  YOU CAN SEE FLORIDA AVENUE.
15  Q.  YOU CAN SEE FLORIDA AVENUE FROM THE HOLE IN YOUR ROOF?
16  A.  IF IT WAS DAYLIGHT, YOU COULD.
17  Q.  OKAY.
18  A.  THE HOLE WAS UP HIGH ENOUGH IN THE ROOF.
19  Q.  SAY AGAIN.
20  A.  THE HOLE WAS HIGH ENOUGH TO THE RIDGE OF THE ROOF TO SEE
21  EVERYTHING.
22  Q.  YOU WOULD HAVE TO CLIMB OUT THAT HOLE TO SEE FLORIDA AVENUE,
23  THOUGH, WOULDN'T YOU?
24  A.  NO.
25  Q.  CAN YOU EXPLAIN THAT TO US BECAUSE THAT'S A LITTLE

**701**

1  CONFUSING.  YOU SAID THAT YOU MADE A HOLE ON THE LEFT SIDE OF
2  YOUR ROOF.
3  A.  RIGHT.
4  Q.  AND THE LEFT SIDE OF YOUR HOUSE FACES THE CLAIBORNE AVENUE
5  BRIDGE?
6  A.  YES, SIR.
7  Q.  HOW CAN YOU SEE FLORIDA AVENUE OUT OF THAT HOLE?
8  A.  WHEN YOU STAND UP, YOU CAN SEE EVERYTHING.  YOU CAN SEE ALL
9  AROUND THE WHOLE NEIGHBORHOOD.
10  Q.  YOU HAVE TO STICK YOUR HEAD UP OUT THROUGH THE HOLE IS WHAT
11  YOU'RE SAYING, RIGHT?
12  A.  YES, YOU WOULD.
13  Q.  WHEN YOU SAW THE BARGE, WAS YOUR HEAD OUT THROUGH THE HOLE
14  OR WERE YOU JUST LOOKING THROUGH THE HOLE?
15  A.  I WAS OUT THE HOLE.
16  Q.  I'M SORRY?
17  A.  I WAS OUT THE HOLE.
18  Q.  WHERE WERE YOU?
19  A.  STANDING UP IN THE ATTIC.
20  Q.  SO PART OF YOUR BODY WAS STICKING UP OUT OF THE HOLE?
21  A.  YES.
22  Q.  OKAY.  HOW LONG AFTER YOU GOT IN THE ATTIC DID YOU STICK
23  YOUR BODY UP OUT OF THE HOLE?
24  A.  WHEN THE WATER IN THE BACK DOOR BURST OPEN.
25  Q.  WHEN THE WATER IN THE BACK DOOR BURST OPEN.  WHAT BACK DOOR?

702

1    A.  THE BACK DOOR TO MY HOUSE.
2    Q.  THE BACK DOOR DOWNSTAIRS?
3    A.  YES.
4    Q.  WHILE YOU'RE IN THE ATTIC?
5    A.  YES.
6    Q.  HOW DID YOU KNOW THE BACK DOOR BURST OPEN?
7    A.  I WASN'T IN THE ATTIC THEN.  I WAS IN THE DEN.
8    Q.  SO YOU WENT BACK DOWN TO THE DEN IS WHAT YOU'RE SAYING?
9    A.  WELL, I WAS IN THE DEN, THEN I WENT UP AND I CUT A HOLE AND
10   I COME BACK DOWN.
11   Q.  LET'S GO BACK OVER THIS AGAIN BECAUSE IT'S GETTING EVEN MORE
12   CONFUSING.
13       THE WATER IS COMING UP THE DRIVEWAY, OKAY?
14   A.  YES.
15   Q.  LET'S GO BACK THERE.  YOU PANIC?
16   A.  YES.
17   Q.  YOU GO UP INTO THE ATTIC?
18   A.  NO, I GOT THE AXE OUT THE -- THE WATER WAS COMING DOWN THE
19   DRIVEWAY, I RUN IN MY HOUSE.  I GO UP IN THE ATTIC AND I CHOP A
20   HOLE, AND I COME BACK DOWN, AND I SIT IN THE LIVING ROOM DRINKING
21   BEERS.  THEN THE WATER BUST THE BACK DOOR.
22   Q.  CAN YOU SEE OUTSIDE FROM YOUR LIVING ROOM?
23   A.  I DIDN'T GO IN THE LIVING ROOM.
24   Q.  WHERE WERE YOU SITTING DRINKING BEER?
25   A.  IN THE DEN.

703

1    Q.  CAN YOU SEE OUTSIDE FROM THE DEN?
2    A.  YEAH, BUT I HAD THE STORM SHUTTERS DOWN.
3    Q.  SO YOU COULDN'T SEE THAT NIGHT?
4    A.  I COULDN'T SEE NOTHING.
5        MR. GILBERT:  PARDON ME, YOUR HONOR, I'M MISSING A PAGE
6    OF SOMETHING.  I'M LOOKING FOR IT.
7            EXAMINATION
8    BY MR. GILBERT:
9    Q.  WHAT WAS THE BARGE DOING WHEN YOU SAW IT THE FIRST TIME?
10   A.  SITTING.
11   Q.  WAS IT MOVING?
12   A.  NO, IT WAS SITTING.
13   Q.  DID YOU EVER TELL ANYBODY THAT THE BARGE WAS FLOATING
14   SIDEWAYS?
15   A.  IT WAS LANDED SIDEWAYS.
16   Q.  DID YOU EVER TELL ANYBODY THAT THE BARGE WAS A BLOCK OF
17   STEEL COMING AT YOU RIDING SIDEWAYS?
18   A.  I TOLD YOU THAT, I THINK.
19   Q.  ARE YOU TELLING ME THAT NOW?
20   A.  NO.
21       THE COURT:  WHEN YOU SAY YOU TOLD MR. GILBERT THAT, WAS
22   THAT AT A DEPOSITION?
23       THE WITNESS:  YES, IT WAS.
24       THE COURT:  OKAY.
25           EXAMINATION

704

BY MR. GILBERT:
1    Q.  ALL RIGHT.  LET ME CLARIFY SOMETHING BECAUSE I'M LOOKING
2    HERE AT THE NOTES THAT ARE COMING OUT OF YOUR TESTIMONY.  YOU'VE
3    JUST TESTIFIED THAT YOU TOLD ME THAT THE BARGE WAS LIKE A BLOCK
4    OF STEEL COMING AT YOU RIDING SIDEWAYS; IS THAT WHAT YOU JUST
5    SAID?
6    A.  THAT'S WHAT YOU JUST SAID.
7    Q.  OKAY.  DID YOU EVER TELL ANYBODY THAT, "THE BARGE WAS LIKE A
8    BLOCK OF STEEL COMING AT ME RIDING SIDEWAYS"?
9        MR. WEBB:  YOUR HONOR, HE'S ALREADY ANSWERED THIS
10   QUESTION.
11       THE COURT:  I'M NOT QUITE SURE.  I'M GOING TO ALLOW THE
12   QUESTION.
13       MR. WEBB:  YES, SIR.
14       THE COURT:  WE'RE GOING TO GET THIS.  DON'T FORGET THE
15   COURT HAS READ EVERYTHING.
16       MR. WEBB:  YES, SIR.
17       THE COURT:  IT'S NOT CLEAR TO ME WHAT HE'S SAYING RIGHT
18   NOW --
19       MR. WEBB:  YES, SIR.
20       THE COURT:  -- OTHER THAN -- AND I'VE READ ALL OF THE
21   DEPOSITIONS, AND I KIND OF REMEMBER THEM PRETTY WELL.  SO YOU CAN
22   GO AHEAD.
23       MR. WEBB:  YES, SIR.
24           EXAMINATION

705

BY MR. GILBERT:
1    Q.  MR. MURPH, DID YOU EVER TELL ANYBODY, "THE BARGE WAS A BLOCK
2    OF STEEL COMING AT ME"?
3    A.  WHEN I GOT UP -- NO.
4    Q.  DID YOU EVER TELL ANYBODY THAT THE BARGE WAS RIDING
5    SIDEWAYS?
6    A.  I MIGHT HAVE TOLD YOU THAT.
7    Q.  DID YOU EVER TELL ANYBODY ELSE THAT?
8        THE COURT:  THERE YOU GO.
9        THE WITNESS:  EVERYBODY THAT WAS AT THE DEPOSITION.
10           EXAMINATION
11   BY MR. GILBERT:
12   Q.  DID YOU EVER TELL ANYBODY OUTSIDE OF THE DEPOSITION THAT?
13   A.  NO.
14       THE COURT:  ARE YOU SAYING AT THE DEPOSITION YOU TOLD
15   MR. GILBERT THE BARGE WAS RIDING SIDEWAYS; IS THAT WHAT YOU'RE
16   SAYING, SIR?
17       THE WITNESS:  I MIGHT HAVE TOLD HIM THAT.
18       THE COURT:  BUT WAS IT RIDING SIDEWAYS?
19       THE WITNESS:  NO, I DIDN'T SEE IT RIDING NO WAYS.
20       THE COURT:  ALL RIGHT.  SO YOU'RE SAYING TODAY, UNDER
21   OATH IN THIS COURT NOW, THAT YOU DID NOT SEE THE BARGE MOVING OR
22   RIDING SIDEWAYS; IS THAT CORRECT?
23       THE WITNESS:  RIGHT.
24       THE COURT:  AND YOU MAY HAVE SAID -- ARE YOU SAYING THAT

706

1  ON ANOTHER OCCASION YOU MAY HAVE SAID SOMETHING DIFFERENT?
2       THE WITNESS:  AT THE DEPOSITION I MIGHT HAVE SAID
3  SOMETHING DIFFERENT.
4       THE COURT:  WHAT ABOUT OVER THE TELEPHONE TO SOMEONE
5  TAKING YOUR STATEMENT; DID YOU EVER TELL THEM SOMETHING
6  DIFFERENT?
7       THE WITNESS:  I MIGHT HAVE TOLD THEM ANYTHING,
8  YOUR HONOR.
9       THE COURT:  YOU MIGHT HAVE DONE WHAT?
10      THE WITNESS:  TOLD THEM ANYTHING.
11      THE COURT:  WELL, THAT'S INTERESTING.  GO AHEAD.  DON'T
12  TELL ANYTHING HERE BECAUSE YOU'VE GOT A REAL PROBLEM IF YOU DO.
13      THE WITNESS:  NO, I'M TELLING YOU, JUDGE, THE HONEST TO
14  GOD TRUTH HERE.
15      THE COURT:  GO AHEAD.
16           EXAMINATION
17  BY MR. GILBERT:
18  Q.  WAS THE BARGE KNOCKING HOUSES DOWN WHEN YOU FIRST SAW IT?
19  A.  I DON'T KNOW.
20  Q.  DID YOU EVER TELL ANYBODY THAT YOU SAW THE BARGE FLOATING
21  SIDEWAYS WIPING HOUSES OUT?
22  A.  I MIGHT HAVE.
23  Q.  YOU MIGHT HAVE?
24  A.  YES.
25      MR. GILBERT:  YOUR HONOR, I'M AT A POINT WHERE I CAN

707

1  DEMONSTRATE A NUMBER OF INCONSISTENCIES IN ACCORD WITH
2  FEDERAL RULE OF EVIDENCE 613, AND IF THE COURT PERCEIVES THEM, I
3  WOULD OFFER AND INTRODUCE EXHIBIT, WHICH IS THE AUDIO RECORDING,
4  AND PLAY IT HERE FOR MR. MURPH AND QUESTION HIM ON IT.
5      THE COURT:  THERE HAVE BEEN GLARING INCONSISTENCIES.
6      MR. GILBERT:  THANK YOU, YOUR HONOR.
7      MR. WEBB:  YOUR HONOR, WE OBJECT TO THE INTRODUCTION OF
8  THAT EXHIBIT BECAUSE HE'S ATTEMPTING TO USE -- A PRIOR
9  INCONSISTENT STATEMENT IS ONLY USED TO IMPEACH A WITNESS, AND
10  MR. GILBERT HAS BEEN VERY CAREFULLY ASKING QUESTIONS FROM THE
11  STATEMENT TRYING TO GET AN INCONSISTENCY FROM THE STATEMENT --
12  RATHER, FROM THE DEPOSITIONS TO TRY TO GET THAT STATEMENT IN.
13  AND I OBJECT TO THAT, YOUR HONOR.
14      I HAVE FIFTH CIRCUIT CASES THAT SAY YOU CAN'T HAVE
15  A PRIOR INCONSISTENT STATEMENT ADMITTED JUST TO IMPEACH THE
16  WITNESS -- I MEAN, IT CAN ONLY GO TO IMPEACH THE WITNESS.  IT
17  CAN'T GO FOR THE TRUTH OF THE STATEMENT.  HE'S TRYING TO GET IT
18  IN FOR THE TRUTH OF THE STATEMENT.
19      THE COURT:  WELL, IF IT'S THE SAME LINE OF CASES I
20  LOOKED AT, CERTAINLY, IF THE -- THIS WITNESS HAS RELEVANT
21  KNOWLEDGE, REGARDLESS OF THE INCONSISTENCIES.  HE LIVED ON
22  JOURDAN AVENUE AND HE WAS THERE DURING THE STORM.
23      BUT I THINK MR. WEBB IS ARGUING THAT -- I THINK
24  YOU'RE ARGUING THAT THE SOLE PURPOSE OF CALLING MR. MURPH CANNOT
25  BE SIMPLY TO GET THIS WHAT WOULD NORMALLY BE INADMISSIBLE

708

1  STATEMENT INTO EVIDENCE.
2      MR. WEBB:  THAT'S CORRECT, YOUR HONOR.
3      MR. GILBERT:  IDEALLY, MR. MURPH SAYS WHAT'S IN THE
4  STATEMENT.  THE STATEMENT WAS TAKEN JUST MONTHS AFTER THE EVENTS
5  THAT THE STATEMENT CONCERNS, BUT HE HASN'T -- AND IT'S
6  INCONSISTENT WITH HIS DEPOSITION TESTIMONY AND INCONSISTENT WITH
7  WHAT HE'S SAYING HERE, ALSO.
8      THE COURT:  WELL, CERTAINLY, PART OF IT IS, ALTHOUGH IN
9  ONE OF THE DEPOSITIONS HE SAID THERE WAS A BOOM, SO HIS -- AS I
10  RECALL.  BUT THERE IS NO QUESTION THAT THIS IS INCONSISTENT.  YOU
11  ASKED HIM DID HE SEE ANYTHING -- SEE THE BARGE DOING CERTAIN
12  THINGS.  SO TELL ME WHY, WHY THIS -- WHY HE CAN'T PLAY THAT AND
13  ASK HIM IF THAT WAS HIS STATEMENT.
14      MR. WEBB:  YOUR HONOR, WE HAVE TWO SWORN DEPOSITIONS,
15  ONE AND TWO.
16      THE COURT:  I READ THEM.
17      MR. WEBB:  AND WE HAVE HIS STATEMENT.
18      THE COURT:  YOU ALSO HAVE THIS WITNESS WHO SAID HE WOULD
19  SAY ANYTHING -- HE MIGHT HAVE SAID ANYTHING.  SO, YOU KNOW, THAT
20  DOESN'T ENDEAR -- THE COURT WANTS TO GET TO THE TRUTH OF THIS
21  MATTER, AND THE COURT WILL --
22      MR. WEBB:  YES, SIR.
23      THE COURT:  THE COURT WILL NOT ALLOW ANY KIND OF, SHALL
24  WE SAY -- WHATEVER, THAT WE'RE GOING TO GET TO THE TRUTH AS BEST
25  WE CAN, EVEN THOUGH THERE MIGHT BE THREE DIFFERENT VERSIONS OF

709

1  IT.  GO AHEAD.
2      MR. WEBB:  YES, SIR.  I UNDERSTAND.  AND I'M NOT TRYING
3  TO HIDE THE TRUTH.
4      THE COURT:  RIGHT.
5      MR. WEBB:  THE TELEPHONE STATEMENT THAT WAS TAKEN DOES
6  NOT HAVE A DATE ON IT.  THE TELEPHONE STATEMENT WAS TAKEN WITHOUT
7  TELLING MR. MURPH THAT THE TELEPHONE STATEMENT WAS BEING TAKEN,
8  AND WE DON'T KNOW WHETHER HE HAD HAD A COUPLE BEERS WHEN HE WAS
9  TALKING WITH WHOEVER HE WAS TALKING TO OVER THE TELEPHONE.
10      BUT YOU ADD ALL OF THAT UP, IT DOESN'T HAVE THE
11  SUPPORT AND THE -- IT'S A WEAK DOCUMENT.  FOR THAT REASON --
12      THE COURT:  WELL, I'M GOING TO OVERRULE YOUR OBJECTION
13  IN PART.  I'M GOING TO -- LET'S -- BECAUSE NOT ALL OF THE
14  STATEMENT IS INCONSISTENT.  SOME PARTS OF IT ARE.
15      AND THE WITNESS DOES HAVE RELEVANT KNOWLEDGE AS TO
16  WHEN THE WATER CAME, THE SOUNDS THAT HE HEARD AND ALL OF THAT,
17  INDEPENDENT OF THE STATEMENT WHICH HE'S TESTIFIED HERE UNDER
18  OATH.
19      MR. WEBB:  YES, SIR.
20      THE COURT:  BUT I AM GOING TO, IF YOU WANT TO, IF YOU
21  WANT TO IMPEACH HIM ON THE DISCRETE ISSUES, YOU MAY.  IN OTHER
22  WORDS, YOU MAY READ OR PLAY THE STATEMENT, BUT NOT THE WHOLE --
23  WE'RE NOT GOING TO HEAR THE WHOLE THING.  YOU'RE GOING TO GO
24  RIGHT TO THE PART WHERE HE SAID ABOUT THE -- FIRST, ESTABLISH
25  THAT HE REMEMBERS GIVING A STATEMENT.

710

```
 1              EXAMINATION
 2   BY MR. GILBERT:
 3   Q.  MR. MURPH, DO YOU REMEMBER IN YOUR DEPOSITION I SHOWED YOU A
 4   TRANSCRIPT OF PART OF AN INTERVIEW THAT YOU GAVE TO AN ATTORNEY
 5   BY THE NAME OF RICHARD JOSEPH GUIDRY OF THE COCHRAN FIRM?
 6   A.  SAY THAT AGAIN.
 7   Q.  DO YOU REMEMBER ME PRODUCING FOR YOU A STATEMENT DURING YOUR
 8   DEPOSITION OR AT ANY TIME WHICH IS A WRITTEN TRANSCRIPT OF A
 9   TELEPHONE CALL BETWEEN YOU AND JOSEPH GUIDRY OF THE COCHRAN LAW
10   FIRM?
11   A.  DO I REMEMBER YOU GIVING ME SOMETHING?
12   Q.  DO YOU REMEMBER MAKING SUCH A STATEMENT?
13   A.  I DON'T KNOW.
14   Q.  DO YOU REMEMBER HAVING A CONVERSATION WITH JOSEPH GUIDRY OF
15   THE COCHRAN LAW FIRM?
16   A.  NOT REALLY.
17   Q.  DO YOU REMEMBER HAVING A CONVERSATION WITH ANY ATTORNEY AT
18   THE COCHRAN LAW FIRM?
19   A.  I MAY HAVE.
20       THE COURT:  WHEN YOU WERE AT THE DEPOSITION, THE FIRST
21   DEPOSITION YOU GAVE, DID MR. GILBERT SHOW YOU THE TRANSCRIPT OF
22   PART OF A STATEMENT YOU MIGHT HAVE MADE?  DID YOU LOOK AT IT
23   THEN?
24       THE WITNESS:  I CAN'T REMEMBER, YOUR HONOR.
25       THE COURT:  YOU CAN'T REMEMBER.  OKAY.  WELL, THE COURT
```

711

```
 1   IS GOING TO REMEMBER FOR YOU.
 2       I'M GOING TO ALLOW YOU TO DO IT.
 3       MR. GILBERT:  THANK YOU.  CAN WE START THE AUDIO OF 264
 4   AT 6 MINUTES, PLEASE.
 5       MR. WEBB:  COUNSEL, COULD YOU FAVOR ME WITH A PAGE AND
 6   LINE?
 7       THE COURT:  AND I'M GOING TO HAVE YOUR OBJECTION NOTED
 8   AND MADE GENERAL, AS YOUR MOTION IN LIMINE MADE GENERAL, AS WELL,
 9   SINCE YOU FILED A MOTION AND I DENY IT.  IT'S MADE GENERAL FOR
10   APPELLATE PURPOSES.  YOU HAVE RESERVED.
11       MR. WEBB:  YOUR HONOR, AND, ALSO, AT THE BREAK, IF
12   PERMISSIBLE, I WOULD LIKE TO GIVE THE COURT THE MEMO THAT WE HAVE
13   IN SUPPORT OF THE ARGUMENT THAT WAS MADE.
14       THE COURT:  RIGHT.  YOU CERTAINLY MAY.
15       MR. WEBB:  THANK YOU.
16       THE COURT:  AND IT'S THE SAME, I THINK, LINE OF CASES
17   THAT THE COURT HAS LOOKED AT ABOUT THE FIFTH CIRCUIT LAW.  I FIND
18   IT'S NOT THE PRIMARY PURPOSE HE CALLED HIM BECAUSE THERE WAS
19   SUFFICIENT RELEVANT KNOWLEDGE NOTWITHSTANDING THE STATEMENT THAT
20   HE'S ALREADY GIVEN.
21       MR. GILBERT:  AND, YOUR HONOR, I WOULD OBJECT TO ANOTHER
22   MEMO COMING IN.  THE COURT HAS ALREADY RULED ON THIS ISSUE.
23       THE COURT:  I'M GOING TO ALLOW MEMORANDUMS TO COME IN.
24   FOR THE RECORD, I THINK COUNSEL IS ENTITLED TO THAT.  AND THIS
25   COURT, WHEN I GET THIS MANY PERMUTATIONS, WE'RE GOING TO HAVE ALL
```

712

```
 1   OF THEM TO LOOK AT.
 2       BECAUSE WE WOULD LIKE THIS TO BE DONE WITH SOME
 3   PRECISION, DO YOU NEED A FEW MINUTES TO GET THIS HOOKED UP, OR
 4   ARE YOU READY TO GO?
 5       MR. GILBERT:  A MOMENT.
 6       MR. WEBB:  YOUR HONOR, IF I COULD HAVE A BRIEF MINUTE.
 7       THE COURT:  OH, YOU WANT A RECESS?  WE'RE GOING TO DO A
 8   10-MINUTE RECESS.
 9       MR. GILBERT:  LET THE TECHNICAL ISSUES BE WORKED OUT.
10       THE COURT:  YOU MAY.
11       MR. GILBERT:  THANK YOU, SIR.
12       YOUR HONOR, COULD WE JUST ASK THAT THE WITNESS
13   SPEAK WITH NOBODY, SPEAK WITH NO ATTORNEYS?
14       THE COURT:  YES, YOU'RE INSTRUCTED NOT TO SPEAK TO
15   ANYONE.
16       (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, A BRIEF
17   RECESS WAS TAKEN.)
18       THE DEPUTY CLERK:  ALL RISE, PLEASE.
19       COURT IS IN SESSION.  PLEASE BE SEATED.
20       THE COURT:  AND JUST TO NOTE, IN POSTTRIAL BRIEFING THE
21   COURT WILL BE INTERESTED IN WHAT EFFECT, IF ANY, I CAN GIVE TO
22   CERTAIN TESTIMONY UNDER THESE CIRCUMSTANCES.
23       SO I UNDERSTAND THE IMPORT OF THE MEMORANDUM.  I
24   GLANCED AT IT.  YOU HAVE NOT GOTTEN TO LOOK AT IT.  SO THAT WILL
25   BE AN ISSUE FOR POSTTRIAL BRIEFS.
```

713

```
 1       GO AHEAD, SIR.
 2       MR. GILBERT:  IF WE COULD PLAY THE AUDIO, AND WE'RE ALSO
 3   GOING TO DISPLAY THE WRITTEN AT THE SAME TIME.
 4       THE COURT:  BY THE WAY, JUST TO LET EVERYONE KNOW, THE
 5   COURT HAS READ -- HAS LISTENED TO THE ENTIRE STATEMENT.  AND THE
 6   PART THAT WAS NOT REDACTED, A LOT OF IT IS JUST CHATTER AND NOT
 7   REALLY RELATED TO THE EVENT.
 8       MR. GILBERT:  AND WE'RE NOT GOING TO GO INTO IT SINCE
 9   IT'S OF NO INTEREST.
10       (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE
11   AUDIOTAPED STATEMENT OF MR. MURPH WAS PLAYED AS FOLLOWS:)
12   A.  SO I'M OUT IN THE GARAGE AND I'M CHECKING ON, YOU KNOW,
13   TRYING TO FIRE UP THE GENERATOR AND GET THESE EXTENSION CORDS AND
14   EVERYTHING TOGETHER.
15   Q.  UH-HUH.
16   A.  AND I HEARD THE BIG SCRAPING SOUND, YOU KNOW.  YOU KNOW, IT
17   WAS JUST AN ER, ER, ER, YOU KNOW.  I SAID, WHAT THE HELL THAT IS?
18   SO ME AND THE DOG IS OUTSIDE IN THE GARAGE.
19   Q.  RIGHT.
20   A.  SO I STARTED HERE HEADING TOWARD THE GARAGE -- I MEAN THE
21   FRONT OF THE HOUSE TO SEE WHAT THAT NOISE WAS.  BY THE TIME I GOT
22   MIDWAY IN THE DRIVEWAY I HEARD A BIG BOOM SOUND.  BOOM.  SO I
23   START TO WALK A LITTLE QUICKER TOWARD THE FRONT.  BECAUSE MY
24   DRIVEWAY -- MY GARAGE IS IN THE BACKYARD BY THE APARTMENT, YOU
25   KNOW, WE HAD IN THE BACK.  SHIT, BY THE TIME I GOT ABOUT
```

**714**

1  THREE-QUARTERS OF THE WAY TO THE FRONT OF THE HOUSE THERE'S
2  TWO-FOOT WAVES OF WATER MET ME.  AND I TURNED AROUND -- ME AND
3  THE DOG TURNED AROUND AND WE RAN BACK TO THE BACK OF THE HOUSE.
4  Q.  UH-HUH.
5  A.  BECAUSE I KNEW WHAT DONE HAPPENED WHEN I HEARD THE BIG BOOM
6  SOUND.  BOOM.  BUT I DIDN'T KNOW WHAT IT WAS.
7  Q.  IT WAS A BOOM LIKE AN EXPLOSION OR JUST BREAKING OF THE
8  CONCRETE AND THE STEEL LEVEE -- I MEAN PARTS OF THE LEVEE?
9  A.  IT DIDN'T SOUND LIKE NO EXPLOSION OR ANYTHING.  IT JUST
10  SOUND LIKE A WRECK, YOU KNOW.
11  Q.  LIKE A BIG BREAK, RIGHT, RIGHT, RIGHT.
12  A.  YEAH.
13  Q.  DO YOU THINK -- I MEAN, BASED ON THAT, DO YOU THINK IT WAS
14  THE SOUND OF THE BARGE CRASHING THROUGH?
15  A.  I KNOW IT THE SOUND OF THE BARGE AFTER I -- WHEN I -- AFTER
16  I HAD CLIMBED IN MY ATTIC AND CHOPPED A HOLE IN THE ATTIC.
17  Q.  RIGHT.
18  A.  BECAUSE THE WATER WAS RISING REAL, REAL FAST.
19  Q.  RIGHT.
20  A.  AND I CHOPPED ME A HOLE IN THE ATTIC, YOU KNOW.
21  Q.  AND LET ME ASK YOU THIS QUESTION, THOUGH:  BEFORE THAT HAD
22  HAPPENED, HAD THE WATER BEEN -- THE WATER WAS NOT, LIKE, FLOODING
23  OVER THE LEVEE WHEN YOU WENT OUT --
24  A.  IT WASN'T OVER THE TOP.  LIKE I TOLD YOU WHEN I WENT OVER
25  THERE AND LOOKED TO SEE HOW HIGH IT WAS.

**715**

1  Q.  UH-HUH.
2  A.  WHEN IT WAS ABOUT A FOOT, MAYBE A FOOT AND A HALF.
3  Q.  NOW, WAS THE BARGE THERE WHEN YOU SAW IT?
4  A.  I DIDN'T PAY NO MIND TO LOOK DOWN THERE.
5  Q.  OKAY.  ALL RIGHT.
6  A.  I JUST LOOKED TOWARD THE CLAIBORNE BRIDGE, AND I WAS LOOKING
7  TO SEE BECAUSE THE LIGHTS WAS SHINING THERE.
8  Q.  UH-HUH.
9  A.  AND I COULD SEE THE WATER SPLASHING.  IT WAS SPLASHING AND
10  POPPING OVER THE TOP OF THE LEVEE.
11  Q.  RIGHT.
12  A.  BUT IT WASN'T, YOU KNOW, WATER JUST RUNNING CONSTANTLY OVER
13  THE TOP.  FROM THE WIND AND EVERYTHING BLOWING, YOU KNOW, YOU GET
14  THE LITTLE WAKES, YOU GET A LITTLE BREEZING AND SPLASHING AND
15  HITTING THE WALL.
16  Q.  OKAY.
17  A.  IT WAS SPRINKLING OVER THE TOP.
18  Q.  BUT IT WASN'T, LIKE, FLOWING OVER THE TOP ENOUGH TO ERODE
19  THE WHOLE LEVEE SYSTEM LIKE THEY'RE CLAIMING?
20  A.  NO.  NO.  NO.  NO.  UNH-UNH (NEGATIVE RESPONSE).  IT
21  WAS UP HIGH.  IT WAS UP HIGH ON THE CONCRETE WALL.
22  Q.  RIGHT.
23  A.  AND, YOU KNOW, AS HIGH AS I EVER SAW IT, YOU KNOW.  BUT IT
24  WASN'T FLOWING OVER THE TOP, YOU KNOW, CONSTANTLY.
25  Q.  RIGHT.

**716**

1  A.  IT WAS JUST THE WATER WAS FLOWING BACK AND FORTH.  YOU KNOW,
2  WITH THE WIND BLOWING AND EVERYTHING, IT WAS SPLASHING UP AGAINST
3  IT AND SPRAYING OVER THE TOP.
4  Q.  AND THE SOUND THAT YOU WERE HEARING WITH -- THE GRINDING
5  SOUND, YOU BELIEVE THAT WAS THE BARGE GRINDING AGAINST --
6  A.  I KNOW IT WAS THE BARGE JUST DRAGGING AGAINST THE WALL.  AND
7  THEN THE WATER WAS RUNNING, YOU KNOW, FLOWING BACK AND FORTH WITH
8  THE WAKE, YOU KNOW, AND EVERYTHING.
9  Q.  RIGHT.
10  A.  IT WAS BUMPING UP AGAINST THE WALL.
11  Q.  YEAH.
12  A.  BUT I NEVER LOOKED THAT WAY, YOU KNOW.
13  Q.  AND YOU THINK -- I MEAN, IT LOOKS LIKE IT PROBABLY BROKE
14  THAT WALL THAT'S ON TOP AND THEN --
15  A.  NO PROBABLY MY ASS.  IT BUST THAT WALL.
16  Q.  YEAH.  AND THAT'S WHAT --
17  A.  THAT WATER CAME THROUGH TOO QUICK.
18  Q.  AND ONCE THE WATER STARTED COMING THROUGH, IT PROBABLY JUST
19  MADE A BIG OLD HOLE.  I MEAN, THE FORCE OF THE WATER JUST --
20  A.  SUNDAY NIGHT --
21  Q.  THIS FLOOD WHICH STARTED HAPPENING SUNDAY NIGHT --
22      MR. WEBB:  YOU HONOR --
23      THE COURT:  MR. GILBERT --
24      MR. GILBERT:  STOP.
25      THE COURT:  I'LL LET YOU PLAY WHAT YOU WANT, BUT RIGHT

**717**

NOW WE STOPPED IT BECAUSE IT SEEMS TO HAVE COVERED THE AREAS THAT
I REGARDED AS --
      MR. GILBERT:  THERE WILL BE SOME MORE DEPENDING ON THE
ARISING OF OTHER POSSIBLE --
      THE COURT:  MR. WEBB, YOU HAD --AND I'LL LET YOU PLAY
WHATEVER -- YOU KNOW, IF YOU WANT TO PLAY SOMETHING, SUBJECT TO
YOUR OBJECTION, YOU MAY, SIR.
      MR. WEBB:  JUDGE, I WAS JUST GOING TO SAY IT WAS
STARTING TO GET A LITTLE BIT PAST WHERE --
      THE COURT:  I AGREE.  AND I WAS GOING TO SUSTAIN YOUR
OBJECTION.  GO AHEAD.
      MR. WEBB:  THANK YOU, JUDGE.
               EXAMINATION
BY MR. GILBERT:
Q.  MR. MURPH, DO YOU RECOGNIZE YOUR VOICE ON THAT RECORDING?
A.  YES, I DO.
Q.  IS THAT YOU?
A.  SOUND LIKE ME.
Q.  DO YOU REMEMBER THAT PHONE CALL?
A.  THAT WAS A PHONE CALL?
Q.  DO YOU REMEMBER SAYING THOSE WORDS?
A.  I MIGHT HAVE.
Q.  WERE YOU TELLING THE TRUTH?
A.  PRETTY MUCH.
Q.  WERE YOU LYING ABOUT ANYTHING?

**718**

1  A.  I DON'T HAVE NO REASON TO LIE.
2  Q.  WERE YOU TELLING THE TRUTH?
3  A.  PRETTY MUCH.
4  Q.  SO PRETTY MUCH MEANS YES, YOU WERE TELLING THE TRUTH?
5       MR. WEBB:  YOUR HONOR, I OBJECT TO THE FORM OF THE
6  QUESTION.
7       THE COURT:  LET ME ASK IT.  WAS THERE ANYTHING THAT WAS
8  JUST PLAYED ON THE -- SHOWN ON THE SCREEN OR YOU HEARD THAT YOU
9  THOUGHT MAY HAVE NOT BEEN ACCURATE?
10       THE WITNESS:  IT WAS PRETTY MUCH, PRETTY MUCH RIGHT.  I
11  DON'T KNOW ABOUT THE TIMING, THOUGH, ON IT.
12       THE COURT:  OKAY.
13            EXAMINATION
14  BY MR. GILBERT:
15  Q.  ALL RIGHT.  YOU SAID THE BARGE BUSTED THE LEVEE, CORRECT?
16  A.  I SAID IT SOUNDED LIKE.
17       MR. WEBB:  YOUR HONOR --
18       THE COURT:  YES, SIR.  DO YOU WANT TO MAKE AN OBJECTION,
19  MR. WEBB?
20       MR. WEBB:  THE WITNESS CORRECTED IT.  MR. GILBERT IS
21  TAKING STUFF AND SELECTIVELY DROPPING WORDS OUT.
22       THE COURT:  WELL, I UNDERSTAND HE DID NOT SEE THE BARGE
23  BURST OR IMPAIR THE LEVEE.  HE HEARD SOUNDS.  ACCORDING TO
24  THIS --
25       MR. WEBB:  RIGHT.

**719**

1       THE COURT:  -- HEARD SOUNDS.  WE'VE GOT THE -- I
2  UNDERSTAND WHAT HE PERCEIVED, AT LEAST IN THIS STATEMENT.
3            EXAMINATION
4  BY MR. GILBERT:
5  Q.  OKAY.  NOW, BACK TO YOU ON THE ROOF.  AT SOME POINT YOU LEFT
6  YOUR ROOF; AM I CORRECT?
7  A.  YES.
8  Q.  WHERE DID YOU GO?
9  A.  NEXT DOOR.
10  Q.  WHOSE HOUSE WAS NEXT DOOR?
11  A.  MY NEIGHBOR'S.
12  Q.  WHAT'S YOUR NEIGHBOR'S NAME?
13  A.  OH, I CAN'T REMEMBER THEIR NAME.
14  Q.  WAS IT JOYCE?
15  A.  YES, YES, IT WAS JOYCE.
16  Q.  DID YOU TELL JOYCE THAT THE WATER THAT WAS THERE RIGHT
17  NOW -- RIGHT THEN, RATHER, WAS FROM THE BARGE BECAUSE THIS STORM
18  HASN'T EVEN COME YET?
19  A.  I CAN'T REMEMBER WHAT I TOLD JOYCE.
20  Q.  THE EVENTS THAT YOU'VE DESCRIBED SO FAR, DID YOU EVER TELL
21  ANYBODY THAT THEY HAPPENED BEFORE THE STORM EVEN PASSED?
22  A.  LIKE I SAY, IT WAS THAT SUNDAY NIGHT.  THAT'S WHEN ALL OF
23  THIS HAPPENED.
24  Q.  DO YOU REMEMBER THE EYE OF THE STORM?
25  A.  NO.

**720**

1  Q.  WHEN DID THE STORM REALLY GET BAD?
2  A.  IT WAS LATE.  I DON'T KNOW -- I THOUGHT IT WAS LATE, LATE
3  THAT NIGHT.
4  Q.  WHAT NIGHT?
5  A.  SUNDAY NIGHT.
6  Q.  DID THE STORM GET WORSE AFTER YOU SAW THE BARGE?
7  A.  YES, IT DID.
8       MR. GILBERT:  YOUR HONOR, IF I MAY, I WOULD LIKE TO
9  DISPLAY -- WE CAN SKIP THE AUDIO FOR NOW, BUT I WOULD LIKE TO
10  DISPLAY PAGE 24 OF EXHIBIT 264 CONCERNING THE TIMING, THE
11  SEQUENCE OF WHEN HE SAW THE BARGE VERSUS THE KATRINA EVENTS
12  BECAUSE IT WILL BE RELEVANT LATER ON IN THIS CASE.
13       THE COURT:  I'M GOING TO, SUBJECT TO THE OBJECTION
14  PREVIOUSLY HEARD THAT'S MADE GENERAL, ALLOW IT.
15       MR. GILBERT:  CAN YOU SHOW ME PAGE 24.
16            EXAMINATION
17  BY MR. GILBERT:
18  Q.  JUST FOR THE RECORD, WE'RE SHOWING PAGE 24 OF THE WRITTEN
19  TRANSCRIPT THAT'S CONTAINED IN EXHIBIT 264.  AND I'M GOING TO
20  DIRECT YOU, MR. MURPH, TO LINE 21 DOWN AT THE BOTTOM, WHERE IT
21  SAYS, "YEAH, THAT -- UM, Y'ALL AIN'T SEEN THE WORST OF IT YET.
22  THIS IS JUST GOD DAMN WATER THAT COME UP FROM THAT BARGE.  I SAY
23  THE HURRICANE HAS YET TO COME TOMORROW."  WAS THAT ACCURATE --
24  A.  YES.
25  Q.  -- WHEN YOU MADE THAT STATEMENT?

**721**

1  A.  YES.
2  Q.  OKAY.
3       MR. WEBB:  WHAT LINE WAS THAT?
4       MR. GILBERT:  21 THROUGH 24.
5       THE COURT:  CAN YOU REMOVE THAT NOW, MR. GILBERT?
6       MR. GILBERT:  YES, SIR.
7            EXAMINATION
8  BY MR. GILBERT:
9  Q.  MR. MURPH, IT'S TRUE THAT YOU'VE REACHED A SETTLEMENT WITH
10  LAFARGE NORTH AMERICA; IS IT NOT?
11  A.  YES.
12  Q.  AND YOU KNOW THAT THERE ARE CERTAIN CONFIDENTIALITY
13  PROVISIONS IN THAT SETTLEMENT, CORRECT?
14  A.  YES.
15       MR. WEBB:  YOUR HONOR, I OBJECT TO THIS ENTIRE LINE OF
16  QUESTIONING.  IT'S IRRELEVANT.
17       THE COURT:  OVERRULED.
18       MR. GILBERT:  JUST FOR THE RECORD, I UNDERSTAND THE
19  COURT HAS OVERRULED IT, BUT JUST SO THE RECORD IS CLEAR I'M
20  TRYING TO SHOW BIAS AND PREJUDICE UNDER 408.
21       THE COURT:  HOPEFULLY, THE COURT WILL BE ABLE TO DISCERN
22  THAT.
23       MR. GILBERT:  I HOPE SO.  I TRUST IT.
24       I WANT TO BRING UP EXHIBIT 236, PLEASE.  THAT'S NOT
25  IT.  THAT'S NOT WHAT I'M LOOKING FOR.

**722**

1  THE COURT:  IS THAT WHAT YOU WERE LOOKING FOR?
2  MR. GILBERT:  I'M SORRY.  I NEED -- MAY I HAVE
3  EXHIBIT 272, PLEASE.  I WANT TO SCROLL DOWN.  IS THAT ALL THERE
4  IS OF 272?  I WANT TO SCROLL DOWN TO THE AFFIDAVIT AT THE END OF
5  THAT EXHIBIT, PLEASE.
6  EXAMINATION
7  BY MR. GILBERT:
8  Q.  MR. MURPH, DO YOU RECOGNIZE THE DOCUMENT UP ON THE SCREEN?
9  A.  YES.
10  Q.  DO YOU KNOW WHAT IT IS?  CAN WE SHOW THE ENTIRE DOCUMENT,
11  PLEASE.
12  DO YOU KNOW WHAT IT IS?
13  A.  IT SAYS AFFIDAVIT.
14  Q.  DO YOU KNOW WHAT AN AFFIDAVIT IS?
15  A.  NOT REALLY.
16  Q.  IS THAT YOUR SIGNATURE AT THE BOTTOM?
17  A.  YES, IT IS.
18  Q.  DID YOU GIVE -- DID YOU TELL ANYBODY WHAT TO SAY IN THIS
19  AFFIDAVIT?
20  A.  DID I TELL ANYBODY WHAT TO SAY?  NO.
21  Q.  WHERE DID THIS AFFIDAVIT COME FROM?
22  A.  I CAN'T REMEMBER.
23  Q.  IS THAT YOUR SIGNATURE AT THE BOTTOM?
24  A.  YES, IT IS.
25  Q.  WAS THIS AFFIDAVIT PART OF THE SETTLEMENT AGREEMENT WITH

**723**

1  LAFARGE?
2  A.  I DON'T REMEMBER.
3  Q.  DO YOU SEE THE PART AT THE BOTTOM OF -- I'M GOING TO MAKE A
4  MARK ON IT -- I DON'T THINK I'M ABLE TO MAKE A MARK ON IT --
5  THERE IT IS.  DO YOU SEE THE PURPLE MARK?
6  A.  YES.
7  Q.  WHEN INGRAM'S BARGE 4727 WAS SWEPT THROUGH A BREACH IN THE
8  INDUSTRIAL CANAL FLOODWALL; DO YOU SEE THAT PART?
9  A.  YES, I DO.
10  Q.  DID YOU TELL THEM TO PUT THAT THERE, WHOEVER TYPED UP THIS
11  AFFIDAVIT?
12  A.  I DIDN'T TELL NOBODY ANYTHING.
13  Q.  SO YOU DIDN'T SAY THAT HAPPENED, DID YOU?
14  A.  NO.
15  Q.  WHY DID YOU SIGN THIS AFFIDAVIT?
16  A.  I SIGNED IT FOR -- I CAN'T REMEMBER WHO DID I SIGN THAT FOR.
17  THE COURT:  WE COULDN'T HEAR YOU, MR. MURPH.  WOULD YOU
18  JUST REPEAT WHY YOU SIGNED IT, SIR?
19  THE WITNESS:  I SIGNED IT BECAUSE ME AND MY WIFE WAS
20  TOGETHER AND SHE SAID IT'S OKAY.
21  EXAMINATION
22  BY MR. GILBERT:
23  Q.  WAS YOUR WIFE WITH YOU DURING THE TIME OF KATRINA?
24  A.  YES, SHE WAS.
25  Q.  SHE WAS AT THE HOUSE WITH YOU?

**724**

1  A.  NO.
2  Q.  THAT'S WHAT I WANT TO MAKE SURE.  SHE WAS IN THE HOTEL THE
3  WHOLE TIME THAT THE --
4  A.  RIGHT.
5  Q.  -- THE WHOLE TIME THAT YOU WERE AT HOME AND THE BOOM AND THE
6  WATER AND ALL THAT HAPPENED, CORRECT?
7  A.  I WAS HOME ALONE.
8  Q.  OKAY.
9  HAS LAFARGE TOLD YOU WHAT TO SAY OR NOT SAY IN THIS
10  CASE?
11  A.  NO.
12  Q.  BUT IS IT YOUR UNDERSTANDING THAT THERE ARE CERTAIN THINGS
13  THAT YOU CAN'T SAY ABOUT THE SETTLEMENT?
14  A.  YES.
15  Q.  DOES THAT AFFECT YOUR ABILITY TO TESTIFY IN THIS CASE?
16  A.  NOT WHEN IT COMES TO THE LAW.
17  Q.  I'M SORRY?
18  A.  NOT WHEN IT COMES TO THIS.
19  Q.  BY THIS YOU MEAN WHAT?  WHAT YOU'VE SAID HERE SO FAR TODAY,
20  IS THAT WHAT YOU MEAN?
21  A.  YEAH.
22  Q.  WERE THERE TIMES DURING YOUR DEPOSITIONS THAT YOU FELT THAT
23  YOU WERE UNABLE TO ANSWER QUESTIONS BECAUSE YOU MIGHT LOSE YOUR
24  HOUSE?
25  MR. WEBB:  YOUR HONOR, I OBJECT TO THE RELEVANCY OF

**725**

1  THIS.  HE'S GOT TO LAY A FOUNDATION FOR IT.  HE CAN'T JUST COME
2  OUT OF LEFT FIELD WITH THIS.
3  THE COURT:  I'M GOING TO ALLOW THE QUESTION IN GENERAL.
4  THE WITNESS:  WHAT WAS THE QUESTION AGAIN?
5  EXAMINATION
6  BY MR. GILBERT:
7  Q.  WERE THERE TIMES DURING YOUR DEPOSITION THAT YOU FELT THAT
8  YOU COULDN'T ANSWER QUESTIONS BECAUSE YOU MIGHT LOSE YOUR HOUSE?
9  A.  NOT REALLY, BUT THINGS WAS A LITTLE SHAKY.
10  Q.  WHAT DO YOU MEAN WHEN YOU SAY THEY WERE SHAKY?
11  A.  BECAUSE OF SOME THINGS, BUT I WASN'T REALLY AFRAID THAT I
12  WAS GOING TO LOSE MY HOUSE.
13  Q.  DO YOU KNOW WHAT A COLLATERAL MORTGAGE IS?
14  A.  NO.
15  Q.  I WANT TO BRING UP EXHIBIT 271, PLEASE.  AND LET'S EXPAND AT
16  LEAST THE TOP PART OF IT.
17  DO YOU RECOGNIZE THE DOCUMENT THAT'S IN FRONT OF YOU?
18  A.  YES, I DO.
19  Q.  AND YOU RECOGNIZE THAT IT'S AN ACT OF COLLATERAL MORTGAGE
20  BASED UPON THE TITLE OF THE THING RIGHT THERE?
21  A.  THAT WHAT?
22  Q.  YOU RECOGNIZE THAT IT'S AN ACT OF COLLATERAL MORTGAGE BASED
23  UPON THE TITLE OF THE THING ON THE LEFT, RIGHT?
24  A.  RIGHT.
25  Q.  AND YOU'VE SEEN THIS DOCUMENT BEFORE?

16 (Pages 722 to 725)

**726**

1 A. YES.

2 Q. BUT YOU DON'T KNOW WHAT IT IS; IS THAT CORRECT?

3 A. RIGHT.

4     THE COURT: A LOT OF PEOPLE TAKING THE BAR HAVE

5 DIFFICULTY DEFINING A COLLATERAL MORTGAGE.

6     MR. WEBB: YOUR HONOR, I BELIEVE THAT'S ON CODE THREE.

7     THE COURT: THAT'S EXACTLY RIGHT.

8     MR. WEBB: WHICH, AS FORMER CHAIR OF THE COMMITTEE ON

9 BAR ADMISSIONS, HAS A VERY LOW PASS RATE.

10     THE COURT: I CAN CERTAINLY UNDERSTAND THAT, SIR.

11     MR. GILBERT: LET'S GO TO WHAT IS PAGE 2 OF THAT

12 TEN-PAGE DOCUMENT. LET'S --

13     I'M NOT ABLE TO ADJUST THE ZOOM FROM HERE, AM I?

14     THE COURT: THE ZOOM WOULD HAVE TO BE -- IT'S FROM THE

15 ASSISTANCE PERSON WHO IS READY TO DO IT.

16     MR. GILBERT: CAN YOU ZOOM IN ON SECTION 1 THAT SAYS

17 COMMENTS. IT'S UP AT THE TOP.

18     THE COURT: 1.1.

19     MR. GILBERT: ALL OF THE SECTIONS, 1.1. THERE YOU GO.

20     EXAMINATION

21 BY MR. GILBERT:

22 Q. DO YOU UNDERSTAND WHAT IS WRITTEN THERE? AND IT'S ON YOUR

23 SCREEN.

24 A. NOT REALLY.

25 Q. WHY DID YOU SIGN THIS --

**727**

1     WELL, LET'S GO TO THE LAST PAGE. LET'S GO TO THE

2 SIGNATURE PAGE OF THAT DOCUMENT, WHICH IS GOING TO BE PAGE 4 OF

3 THAT -- NOPE, PAGE 4 --

4     THE COURT: THAT'S IT.

5     EXAMINATION

6 BY MR. GILBERT:

7 Q. OKAY. DO YOU RECOGNIZE YOUR SIGNATURE ON THAT PAGE?

8 A. YES, I DO.

9 Q. WHY DID YOU SIGN IT?

10 A. BECAUSE MY WIFE SAID IT'S OKAY TO SIGN.

11 Q. DID YOU PAY -- THIS PERTAINS TO BERKLEY DRIVE, DOESN'T IT?

12 A. I DIDN'T READ NONE OF THAT STUFF. MY WIFE SAID IT'S OKAY TO

13 SIGN, AND I SIGNED.

14     MR. GILBERT: LET'S GO BACK TO THE FIRST PAGE OF IT.

15     THE COURT: MR. MURPH HAS CONFIRMED THAT WE ARE NOT ONLY

16 EMERGING, WE HAVE EMERGED INTO A MATRIARCHAL SOCIETY.

17     MR. GILBERT: I WANT TO GO DOWN PROBABLY ABOUT

18 50 PERCENT. I MEAN, SCROLL DOWN ABOUT 50 PERCENT.

19     MR. BEST: GO A LITTLE FURTHER TO WHERE -- DOESN'T IT

20 DESCRIBE PROPERTY?

21     MR. GILBERT: I'M LOOKING FOR THE PROPERTY DESCRIPTION

22 THAT IT'S ON.

23     THE COURT: THAT WOULD BE UNDER "THE FOLLOWING DESCRIBED

24 IMMOVABLE PROPERTY" --

25     EXAMINATION

**728**

1 BY MR. GILBERT:

2 Q. DO YOU SEE THAT PART, MR. MURPH? DO YOU SEE THAT THAT

3 PERTAINS TO YOUR HOUSE, 105 BERKLEY DRIVE?

4 A. YES.

5 Q. DO YOU SEE THAT YOU ARE ACKNOWLEDGING A $250,000 DEBT IN

6 THIS COLLATERAL MORTGAGE?

7 A. I SEE IT NOW.

8 Q. HOW DID YOU PAY FOR THE HOUSE ON BERKLEY DRIVE?

9 A. WITH A CHECK.

10 Q. DID YOU WRITE THAT CHECK?

11 A. NO, I DIDN'T.

12 Q. DID YOU PAY THE ENTIRE PRICE FOR THE HOUSE AT ONE TIME?

13 A. YES, I DID.

14 Q. SO DO YOU OWN THAT HOUSE OUTRIGHT?

15 A. NO.

16 Q. WHY NOT?

17 A. I DO NOW.

18 Q. WHY DIDN'T YOU AT THE TIME?

19 A. WHERE AM I GOING TO GET $250,000 FROM?

20 Q. I'M SORRY, SIR?

21 A. HUH?

22 Q. I'M SORRY, SIR? COULD YOU REPEAT YOUR ANSWER?

23     THE COURT: HE SAID WHERE AM I GOING TO BE GETTING

24 $250,000 FROM.

25     IS THAT WHAT YOU SAID?

**729**

1     THE WITNESS: THAT'S EXACTLY WHAT I SAID.

2     EXAMINATION

3 BY MR. GILBERT:

4 Q. PULL UP 267, PLEASE. LET ME GET RID OF THESE THINGS.

5     MR. MURPH, WHAT DOES THAT IN THAT CIRCLE MEAN?

6 A. IT'S PAID FOR.

7 Q. IT MEANS IT'S PAID FOR. IT MEANS THAT THERE'S NO -- YOU'RE

8 NOT PAYING NOTES ON THAT HOUSE OF ANY TYPE, RIGHT?

9 A. NO.

10 Q. YOU DIDN'T HAVE TO PAY ANY NOTES ON THAT HOUSE AT ANY TIME,

11 DID YOU?

12 A. NO.

13 Q. THAT HOUSE WAS YOURS ONCE YOU WENT THROUGH THE ACTS OF

14 SIGNING THESE DOCUMENTS, RIGHT?

15 A. RIGHT.

16 Q. DID YOU KNOW WHY ANYBODY HELD A MORTGAGE OVER THAT HOUSE?

17 A. NO.

18 Q. DID YOU ASK ANYBODY?

19 A. NO.

20 Q. DID ANYBODY TELL YOU WHY THERE WAS GOING TO BE A MORTGAGE ON

21 YOUR HOUSE?

22 A. NO.

23 Q. DID THEY TELL -- ANYBODY TELL YOU THAT YOUR HOME COULD BE

24 TAKEN FROM YOU UNDER THAT MORTGAGE?

25 A. YES.

**730**

1   Q. DID THEY TELL YOU WHY ANYONE -- WHO TOLD YOU THAT, FIRST OF
2   ALL?
3   A. AT THE PLACE WHERE WE WENT AND SIGNED FOR THE -- FOR THE
4   HOUSE.
5   Q. MY QUESTION IS WHO TOLD YOU THAT?
6   A. I CAN'T REMEMBER.
7   Q. WAS IT ANY OF THE ATTORNEYS AT THE TABLE OVER HERE?
8   A. I'M NOT GOOD AT FACES EITHER.
9   Q. DO YOU WANT TO LOOK CLOSER? DO YOU ACTUALLY WANT TO LOOK
10  CLOSER AT THESE GENTLEMEN?
11  A. I CAN SEE THEM FROM HERE.
12  Q. SO YOU CAN'T IDENTIFY TODAY THE PERSON WHO TOLD YOU THAT
13  THEY COULD -- LET'S MAKE SURE THAT I HAVE IT CLEAR. WHO TOLD YOU
14  THAT THEY COULD TAKE YOUR HOUSE?
15  A. WHEN WE WAS AT THE MEETING, WHATEVER THAT -- WHEREVER WE WAS
16  AT, IN THE HIGH-RISE BUILDING, HE TOLD ME.
17  Q. WHAT BUILDING WAS THAT?
18  A. I CAN'T REMEMBER THE BUILDING. IT'S ONE OF THESE BUILDINGS
19  DOWNTOWN DOWN HERE.
20  Q. WAS IT AT A LAW FIRM?
21  A. I GUESS IT WAS A LAW FIRM.
22  Q. WAS IT IN AT A LAW FIRM NAMED CHAFFE, MCCALL?
23  A. MAY HAVE.
24  Q. DID YOUR WIFE EVER EXPLAIN TO YOU WHAT THE EFFECT OF THE
25  COLLATERAL MORTGAGE WAS?

**731**

1   A. NO.
2   Q. DID YOU EVER TELL ANYBODY THAT LAFARGE WAS TRYING TO PUT A
3   GAG ORDER ON YOU?
4   A. NO.
5   Q. WERE YOU EVER CONCERNED THAT THEY COULD SUE YOU FOR TALKING
6   ABOUT WHAT YOU SAW DURING KATRINA?
7   A. WHEN WE STARTED THAT DEPOSITION STUFF, YEAH.
8   Q. I WOULD LIKE TO CALL UP PAGE 44 OF --
9        THE COURT: IS THIS A PART OF THE STATEMENT THAT HAS
10  BEEN GIVEN TO LAFARGE?
11       MR. GILBERT: THEY HAVE THE ENTIRETY.
12       THE COURT: THEY HAVE THE ENTIRE --
13       MR. GILBERT: THEY HAVE THE ENTIRE AUDIO AND THE ENTIRE
14  WRITTEN.
15       THE COURT: IN OTHER WORDS, IT'S NOT A PART OF THE
16  UNREDACTED PORTION?
17       MR. GILBERT: NO, CORRECT, IT'S PART OF THE ENTIRE
18  STATEMENT.
19       THE COURT: OKAY.
20       MR. GILBERT: PAGE 24.
21            EXAMINATION
22  BY MR. GILBERT:
23  Q. DO YOU SEE UP AT THE TOP WHERE I'VE MARKED WITH GREEN?
24  A. YES, I DO.
25  Q. YOU DID SAY THAT, DIDN'T YOU?

**732**

1   A. YES.
2   Q. DID YOUR WIFE EVER EXPRESS ANY CONCERN TO YOU THAT IF YOU
3   TOLD YOUR STORY LAFARGE WOULD TAKE THE HOUSE?
4   A. SHE SPOKE SOMETHING ABOUT IT.
5   Q. DID THAT HAVE ANY EFFECT ON YOU?
6   A. NO, BECAUSE I WASN'T GOING TO SAY ANYTHING TO ANYBODY.
7   Q. I WANT TO GET YOU BACK TO THE BARGE FOR JUST A COUPLE OF
8   SECONDS. DID YOU EVER GO ON THE BARGE? DID YOU EVER GO ON THE
9   BARGE?
10  A. YES, I DID.
11  Q. DID YOU LOOK INSIDE?
12  A. YES.
13  Q. WHAT DID YOU SEE?
14  A. SOME GRAY STUFF.
15  Q. SOME WHAT?
16  A. SOME GRAY STUFF.
17  Q. HOW MUCH OF IT?
18  A. NOT MUCH. IT WAS ALMOST EMPTY.
19  Q. DID YOU NOTICE HOW HIGH THE BARGE WAS FLOATING?
20  A. YES, I DID.
21  Q. WHAT WOULD YOU SAY? AND I UNDERSTAND YOU'RE JUST GUESSING,
22  BUT WHAT WOULD YOU SAY?
23  A. WHAT, HOW HIGH IT WAS FLOATING?
24       THE COURT: EXCUSE ME, SIR, WHEN YOU SAY FLOATING --
25            EXAMINATION

**733**

1   BY MR. GILBERT:
2   Q. ABOVE THE WATERLINE. WELL, ABOVE THE WATER. HOW MUCH BARGE
3   WAS EXPOSED ABOVE THE WATER?
4        MR. WEBB: JUDGE, HE HADN'T ESTABLISHED WHETHER THE
5   BARGE WAS ON LAND OR IN THE WATER.
6        THE COURT: YES, I THINK WE NEED TO ESTABLISH -- I
7   AGREE.
8            EXAMINATION
9   BY MR. GILBERT:
10  Q. YOU'VE ALREADY ACKNOWLEDGED THAT YOU SAW THE BARGE FLOATING,
11  CORRECT?
12  A. YES.
13  Q. IT WAS FLOATING AROUND WIPING OUT HOUSES. THAT WAS THE
14  GIST --
15  A. NO, IT WASN'T.
16  Q. -- OF YOUR TESTIMONY.
17       MR. WEBB: I OBJECT TO THE FORM OF THE QUESTION,
18  YOUR HONOR.
19       THE COURT: LET'S GO BACK. IT'S SOMETIMES BEST TO LEAVE
20  CERTAIN THINGS ALONE AND GO BACK. WHEN WE SAW THE BARGE, IT WAS
21  ON LAND, CORRECT? WHERE WAS IT WHEN HE SAW IT FIRST?
22            EXAMINATION
23  BY MR. GILBERT:
24  Q. YOU SAW THE BARGE WHILE IT WAS STILL FLOATING, DIDN'T YOU?
25  A. YES, I DID.

## 734

1  Q.  AND HOW HIGH WAS IT UP OUT OF THE WATER, IF YOU CAN TAKE --
2  APPROXIMATELY, IF YOU CAN TAKE A GUESS?
3       THE COURT:  I GOT YOU.
4       THE WITNESS:  I GUESS, ABOUT 12 -- 12, 13 FEET.
5            EXAMINATION
6  BY MR. GILBERT:
7  Q.  DID YOU SPEAK WITH ANY ATTORNEYS BEFORE COMING HERE TODAY?
8  A.  NO.
9  Q.  HAVE YOU HAD ANY CONTACT WITH THE ATTORNEYS AT DEFENSE TABLE
10 OR ANY OTHER ATTORNEYS ASSOCIATED WITH LAFARGE OR ANY OF THEIR
11 INSURERS, LET'S SAY, SINCE YOUR DEPOSITION IN JANUARY OF 2008?
12 A.  I HAVEN'T TALKED WITH ANYBODY THAT'S IN THIS COURTROOM
13 BEFORE I GOT HERE.  THE ONLY PERSON I SPOKE WITH WAS RICHTHOFEN.
14 Q.  DID YOU MEET WITH HIM IN PREPARATION FOR GIVING THIS
15 TESTIMONY?
16 A.  YES, I DID.
17 Q.  WHY DID YOU MEET WITH AN ATTORNEY BEFORE COMING HERE TODAY?
18 A.  TO ASK HIM WAS IT OKAY.
19 Q.  DID YOU SPEAK WITH ANY ATTORNEYS FROM LAFARGE BEFORE YOU
20 GAVE ANY OF YOUR DEPOSITION TESTIMONY?
21 A.  I DON'T THINK.
22 Q.  BUT YOU MIGHT HAVE?
23 A.  SAY WHAT?
24 Q.  BUT YOU MIGHT HAVE?
25 A.  I MIGHT HAVE.  I DON'T KNOW.

## 735

1       THE COURT:  JUST FOR RECORD, DID WE GET THE ATTORNEY'S
2  LAST NAME THAT YOU SPOKE TO, RICK --
3       THE WITNESS:  RICK RICHTHOFEN.
4       MR. GILBERT:  RICK RICHTHOFEN.
5            EXAMINATION
6  BY MR. GILBERT:
7  Q.  SO YOU SPOKE WITH MR. RICHTHOFEN BECAUSE YOU'RE STILL NOT
8  SURE WHETHER YOU COULD TALK ABOUT THIS CASE; IS THAT CORRECT?
9  A.  RIGHT.
10 Q.  MR. MURPH, DO YOU KNOW IF ANYBODY EVER CALLED YOUR WIFE AND
11 SCARED HER ABOUT HAVING THE HOUSE TAKEN AWAY?
12 A.  NO, I DON'T KNOW.
13      THE COURT:  THIS HORSE IS ABOUT TO END BEING BEATEN,
14 SIR.
15      MR. GILBERT:  I THINK SO.  TENDER.  RESERVE RIGHTS.
16      ACTUALLY, YOUR HONOR, I'D LIKE TO MOVE THE WRITTEN
17 TRANSCRIPT AND THE AUDIO INTO EVIDENCE AS 264, AS WELL AS THE
18 GOOGLE -- I DON'T KNOW WHAT YOU CALL THIS -- DRAWING MAP AND THE
19 GOOGLE SATELLITE PHOTO MAP THAT WE USED EARLIER.  AND WE CAN ADD
20 AN EXHIBIT NUMBER TO THESE OR WE COULD JUST INCLUDE THEM EN GLOBO
21 AS ONE OF THE EXHIBITS ASSOCIATED WITH MR. MURPH'S TESTIMONY,
22 WHICHEVER BEST PLEASES THE COURT.
23      I WOULD ALSO LIKE TO MOVE HIS DECEMBER 17, 2007,
24 AND JANUARY 28, 2008, DEPOSITIONS INTO EVIDENCE AS PART OF THE
25 PACKAGE.

## 736

1       THE COURT:  MR. WEBB.
2       MR. WEBB:  DAN WEBB ON BEHALF OF LAFARGE NORTH AMERICA.
3  YOUR HONOR, I DO, AGAIN, OBJECT TO THE TELEPHONE RECORDED
4  STATEMENT THAT WAS TAKEN BY MR. GUIDRY BEING ENTERED IN.
5       AND, YOUR HONOR, IF YOU COULD GIVE ME ABOUT FIVE
6  MINUTES, I COULD MAYBE TUCK MY 45-MINUTE PRESENTATION DOWN TO
7  ABOUT FIVE.
8       THE COURT:  SIR, HOW CAN I REFUSE THAT?
9       WELL, FIRST, LET ME RULE ON THE OBJECTION.  I'M
10 GOING TO OVERRULE THE OBJECTION, BUT I'M GOING TO WANT
11 BRIEFING -- LAFARGE HAS ALREADY SUBMITTED ME WITH A MEMORANDUM --
12 BASICALLY AS TO WHAT, IF ANY, CREDIBILITY I CAN GIVE THIS WITNESS
13 IN LIGHT OF ALL OF THE STATEMENTS, SO IT'S A POINT OF LAW, FROM A
14 POINT OF LAW.
15      MR. GILBERT:  YES, SIR.
16      THE COURT:  AND WITH THAT, WHY DON'T YOU -- SHEENA, CAN
17 WE MAYBE -- SHEENA AND YOU CAN COME UP WITH SOME NUMBERS, AND
18 THEN YOU CAN MAYBE FORMALLY INTRODUCE THEM INTO EVIDENCE, SUBJECT
19 TO THE OBJECTION.
20      AND WHY DON'T YOU DO THAT MAYBE AT THE BREAK.
21 ALL RIGHT?
22      MR. GILBERT:  YES, SIR.
23      THE COURT:  WE'LL TAKE -- HOW MUCH DO YOU NEED.
24 10-MINUTE RECESS?
25      MR. WEBB:  YES, THAT WOULD BE FINE.  THANK YOU, SIR.

## 737

1       COURT SECURITY OFFICER:  ALL RISE.
2       MR. GILBERT:  THIS IS GOING TO BE -- WE'LL OFFER, FILE
3  AND INTRODUCE -- THIS IS THE GOOGLE MAP AS P430; OFFER, FILE AND
4  INTRODUCE THE GOOGLE SATELLITE IMAGE AS P431; OFFER, FILE AND
5  INTRODUCE THE DECEMBER 17, 2007, DEPOSITION OF ARTHUR MURPH AS
6  P432; OFFER, FILE AND INTRODUCE THE JANUARY 28, 2008, DEPOSITION
7  OF ARTHUR MURPH AS P433.  AND, 264 IS IN, FROM WHAT I UNDERSTAND.
8  THAT'S THE AUDIO AND THE WRITTEN TRANSCRIPT OF THE AUDIO.
9       DEPUTY CLERK:  WHICH SHOULD BE LISTED HERE, ON THE
10 EXHIBIT LIST.
11      (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS,
12 EXHIBITS P430, P431, P432 AND P433 WERE ADMITTED.)
13      MR. GILBERT:  YOUR HONOR, THE DEFENSE COUNSEL HAS
14 GRACIOUSLY ALLOWED ME ONE MORE QUESTION.  IT WILL NOT RESULT IN A
15 LINE OF QUESTIONING.  IT'S SIMPLY ONE QUESTION.
16      THE COURT:  WELL, THE COURT ACKNOWLEDGES DEFENSE
17 COUNSEL'S GRACIOUSNESS.
18      GO AHEAD, SIR.
19           EXAMINATION
20 BY MR. GILBERT:
21 Q.  MR. MURPH, DO YOU KNOW ARTHUR ANDERSON, III?
22 A.  YES, I DO.
23      MR. GILBERT:  THANK YOU.  I TENDER.
24      MR. WEBB:  AGAIN, YOUR HONOR, DAN WEBB, FOR THE RECORD,
25 APPEARING ON BEHALF OF LAFARGE NORTH AMERICA.

19 (Pages 734 to 737)

738

CROSS-EXAMINATION

BY MR. WEBB:

Q.  MR. MURPH, I HAVE JUST A FEW QUESTIONS FOR YOU.

    YOU TESTIFIED THAT YOU DROVE YOUR WIFE DOWN TO THE HYATT HOTEL; IS THAT CORRECT?

A.  YES, IT IS.

Q.  AND TO DO THAT, YOU HAD TO GO OVER A BRIDGE, RIGHT?

A.  RIGHT.

Q.  AND THEN COMING BACK, YOU DROPPED YOUR CAR SOMEWHERE, AND YOU WERE DRIVEN BACK TO YOUR HOUSE; SO YOU HAD TO GO OVER A BRIDGE, RIGHT?

A.  RIGHT.

Q.  AND SO WHEN YOU WERE GOING OVER THOSE BRIDGES, YOU DIDN'T SEE ANY BARGES OUT IN THE CANAL, DID YOU?

A.  NO.  I WASN'T LOOKING FOR NONE.

Q.  AND YOU ALSO WENT TO THE WALL, I THINK YOU SAID, TWO TIMES, ONCE BEFORE YOU TOOK YOUR WIFE AND ONCE AFTER YOU TOOK YOUR WIFE; IS THAT CORRECT?

A.  YES, IT IS.

Q.  AND WHEN YOU LOOKED OUT, YOU DIDN'T SEE ANY BARGES THEN, DID YOU?

A.  NO.

Q.  NOW, YOU TOLD THE JUDGE THAT YOU FIRST SAW THE BARGE AFTER YOU CLIMBED OUT OF YOUR ATTIC; IS THAT CORRECT?

A.  THAT'S RIGHT.

739

Q.  OKAY.  THAT WAS AFTER YOU HEARD A NOISE IN THE YARD, AFTER YOU HAD WATER RISING IN YOUR YARD, AFTER YOU WENT BACK IN YOUR HOUSE, AFTER YOU SAT IN YOUR DEN DRINKING BEER AND AFTER THE WATER BURST THROUGH YOUR BACK DOOR; IS THAT CORRECT?

A.  YES.

Q.  AND I KNOW YOUR WIFE IS DECEASED, BUT I HAVE TO ASK YOU THIS QUESTION, WHAT IS HER LEVEL -- WAS HER LEVEL OF EDUCATION?

A.  SIX YEARS OF COLLEGE.  SHE WAS A REGISTERED NURSE.

Q.  AND IS THAT WHY YOU RELIED ON HER TO --

A.  SHE ALWAYS TOOK CARE OF THE BUSINESS.

Q.  SHE TOOK CARE OF THE BUSINESS?

A.  YEP.

Q.  AND, SIR, YOU'RE TESTIFYING HERE HONESTLY TODAY, AREN'T YOU?

A.  YES, I AM.

    MR. WEBB:  ONE MINUTE, YOUR HONOR.

    THANK YOU VERY MUCH FOR YOUR TIME.

    AND THANK YOUR HONOR FOR INDULGING ME.  I SAVED ABOUT 45 MINUTES.

    THE COURT:  THANK YOU, COUNSEL.  WE APPRECIATE IT.

    REDIRECT EXAMINATION

BY MR. GILBERT:

Q.  MR. MURPH, WHAT BRIDGE DID YOU TAKE GOING TO OR COMING BACK FROM THE HYATT?

A.  I THINK WE TOOK THE BLUE BRIDGE.

Q.  THE FLORIDA AVENUE BRIDGE?

740

A.  YES.

Q.  DID YOU TAKE THE SAME BRIDGE BOTH THERE AND BACK?

A.  I CAN'T REMEMBER.  IT MIGHT HAVE BEEN THE BLUE BRIDGE COMING BACK, TOO.  I DON'T KNOW.

Q.  DID YOU TAKE THE ST. CLAUDE BRIDGE AT SOME POINT?

A.  I CAN'T REMEMBER.

    MR. GILBERT:  THANK YOU, SIR.

    THE COURT:  YOU MAY STEP DOWN, MR. MURPH.

    IS THIS WITNESS RELEASED?

    MR. WEBB:  YES, YOUR HONOR.

    MR. GILBERT:  HANG ON, YOUR HONOR.

    THE COURT:  WE'RE HANGING ON.

    MR. GILBERT:  HE'S EXCUSED.

    THE COURT:  YOU'RE EXCUSED, SIR.  YOU'RE RELEASED.

    THE WITNESS:  I CAN GO?

    THE COURT:  YES, SIR, YOU CAN GO.  SORRY ABOUT THE LOSS OF YOUR WIFE.

    MR. ANDERSON IS THE NEXT WITNESS?

    MR. GILBERT:  HE IS, BUT HE'S EN ROUTE.  SO I THINK IF WE CAN REACH AN AGREEMENT WITH LAFARGE, WE'VE GOT SOME FILL MATERIAL.

    DO YOU WANT TO CLEAR THAT UP?

    MR. ALDOCK:  YOUR HONOR, I DON'T WANT TO BE UNCOOPERATIVE.  THEY WANT TO PLAY THE RICHARDSON DEPOSITION FROM HER HOUSE.  THAT'S FINE WITH ME.  I DON'T UNDERSTAND WHY WE WOULD

741

TAKE VALUABLE TRIAL TIME FOR THAT, HOWEVER.

    MR. GILBERT:  BECAUSE WE'RE DOING IT IN THE COURTROOM ON THE RECORD.  THAT'S WHY.

    THE COURT:  IS THIS ONE NOT TENDERED TO ME BY --

    MR. GILBERT:  THIS IS HOT, HOT OUT OF THE CAN.

    THE COURT:  AND IT'S NOT A DEPOSITION THAT I HAVE READ?

    MR. GILBERT:  CORRECT.

    THE COURT:  IN LIEU OF LIVE TESTIMONY?

    MR. GILBERT:  CORRECT.  BECAUSE IT ONLY OCCURRED YESTERDAY.  THIS WAS THE LADY THAT WAS TOO SICK TO COME.

    MR. ALDOCK:  WE HAVE NO OBJECTION TO IT.

    MR. BEST:  JUST FOR COMPLETENESS OF THE RECORD, YOUR HONOR, THIS IS ONE OF THE PLAINTIFFS WHO WAS UNABLE TO COME TO TRIAL BECAUSE OF HEALTH REASONS.

    THE COURT:  OH, YEAH, I RECALL.

    MR. BEST:  AND WHAT WE AGREED BETWEEN COUNSEL TO DO IS WE HAD DESIGNATED HER DISCOVERY DEPOSITION BEFORE, WHICH HAS NOT YET BEEN DELIVERED TO THE COURT, BUT WILL BE SHORTLY.  WE'VE AGREED ON THOSE DESIGNATIONS.

    AND THEN WE TOOK A SHORT VIDEO SUPPLEMENT TO THAT PREVIOUS DEPOSITION IN ORDER THAT YOUR HONOR COULD ACTUALLY SEE THE PERSON AND HEAR A FEW RESPONSES TO PUT TOGETHER WITH THE DISCOVERY DEPOSITION, WHICH WILL BE TURNED IN.

    AND THIS IS, AS I RECALL, WAS ROUGHLY 20 MINUTES OR SO.  AND COUNSEL AGREED AT THE TIME OF THE DEPOSITION TO JUST