770

1                   UNITED STATES DISTRICT COURT
2                   EASTERN DISTRICT OF LOUISIANA
3

4

5       IN RE:  KATRINA DREDGING        *   Civil Action
        LIMITATION ACTION               *
6       CONSOLIDATED LITIGATION         *   No. 05-4182
                                        *
7                                       *   Section K(2)
        PERTAINS TO:                    *
8       BARGE                           *   New Orleans, Louisiana
                                        *
9       MUMFORD, C.A. NO. 05-5724, AS   *   June 25, 2010
        TO PLAINTIFFS JOSEPHINE         *
10      RICHARDSON AND HOLLIDAY         *   Afternoon Session
        JEWELERS, INC., ONLY            *
11      AND                             *
        BENOIT, C.A. NO. 06-7516, AS    *
12      TO PLAINTIFFS JOHN ALFORD AND   *
        JERRY ALFORD ONLY               *
13      * * * * * * * * * * * * * * *

14                          DAY FOUR
                    BENCH TRIAL BEFORE THE
15              HONORABLE STANWOOD R. DUVAL, JR.
                    UNITED STATES DISTRICT JUDGE
16

17      APPEARANCES:
18      For the Plaintiffs:        Best Koeppel
                                   BY:  LAURENCE E. BEST, ESQ.
19                                 BY:  PETER S. KOEPPEL, ESQ.
                                   2030 St. Charles Avenue
20                                 New Orleans, Louisiana 70130
21

22      For the Plaintiffs:        Law Offices of Brian A. Gilbert
                                   BY:  BRIAN A. GILBERT, ESQ.
23                                 2030 St. Charles Avenue
                                   New Orleans, Louisiana  70130
24

25

            JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA

### 771

APPEARANCES:

For the Plaintiffs:   Wiedemann & Wiedemann
    BY: KARL WIEDEMANN, ESQ.
    BY: LAWRENCE WIEDEMANN, ESQ.
    821 Baronne Street
    New Orleans, Louisiana 70113

For the Plaintiffs:   Patrick J. Sanders, LLC
    BY: PATRICK J. SANDERS, ESQ.
    3316 Ridgelake Drive
    Suite 100
    Metairie, Louisiana 70002

For the Plaintiffs:   Law Office of Richard T. Seymour,
    P.L.L.C.
    BY: RICHARD T. SEYMOUR, ESQ.
    1150 Connecticut Avenue N.W.
    Suite 900
    Washington, D.C. 20036-4129

For the Plaintiffs:   Khorrami, Pollard & Abir, LLP
    BY: SHAWN KHORRAMI, ESQ.
    444 S. Flower Street
    33rd Floor
    Los Angeles, California 90071

For the Plaintiffs:   Wilson, Grochow, Druker & Nolet
    BY: LAWRENCE A. WILSON, ESQ.
    233 Broadway
    5th Floor
    New York, New York 10279

For the Defendant:   Chaffe, McCall, L.L.P.
    BY: DEREK A. WALKER, ESQ.
    BY: CHARLES P. BLANCHARD, ESQ.
    1100 Poydras Street, Suite 2300
    New Orleans, Louisiana 70163

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

### 772

APPEARANCES:

For the Defendant:   Goodwin Procter, L.L.P.
    BY: JOHN ALDOCK, ESQ.
    BY: MARK RAFFMAN, ESQ.
    BY: ADAM CHUD, ESQ.
    BY: KIRSTEN ROBBINS, ESQ.
    BY: ERIC I. GOLDBERG, ESQ.
    901 New York Avenue, NW
    Washington, D.C. 20001

For the Defendant:   Sutterfield & Webb
    BY: DANIEL A. WEBB, ESQ.
    650 Poydras Street, Suite 2715
    New Orleans, Louisiana 70130

For the Defendant:   Lafarge North America, Inc.
    BY: PETER KEELEY, ESQ.
    12950 Worldgate Drive
    Herndon, Virginia 20170

Official Court Reporter:   Jodi Simcox, RMR, FCRR
    500 Poydras Street
    Room HB-406
    New Orleans, Louisiana 70130
    (504) 589-7780

Proceedings recorded by mechanical stenography, transcript produced by computer.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

### 773

I N D E X

                   Page

HECTOR V. PAZOS

  Direct Examination     774
  Voir Dire     778
  Direct Examination     797
  Cross-Examination     842
  Redirect Examination     903

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

### 774

```
12:44:04              AFTERNOON SESSION
12:44:04              (June 25, 2010)
12:44:05              * * * * *
12:44:06         THE COURT:  Good afternoon, everybody.
13:11:01         THE DEPUTY CLERK:  All rise.
13:27:06         Court's in session.  Please be seated.
13:27:09         THE COURT:  Sir, are you ready to proceed?
13:27:11         MR. GILBERT:  Yes, sir.
13:27:11         THE COURT:  Mr. Best?
13:27:12         MR. BEST:  We'll proceed with Mr. Hector Pazos.
13:27:14         Sir, would you take the stand.
13:27:32         For purposes of reference, Your Honor,
13:27:34    Mr. Pazos' report is listed as Plaintiffs' Exhibit 402.  His
13:27:39    deposition exhibit is Plaintiffs' Exhibit 403 and his
13:27:42    declaration is Plaintiffs' Exhibit 404.
13:27:45         THE COURT:  Thank you.
13:27:45         (WHEREUPON, Hector V. Pazos, having been duly sworn,
13:27:45    testified as follows.)
13:27:45         THE DEPUTY CLERK:  Please state your full name and
13:27:45    correct spelling for the record.
13:28:00         THE WITNESS:  Hector V. Pazos, P-A-Z-O-S.
13:28:11              DIRECT EXAMINATION
13:28:12    BY MR. BEST:
13:28:12    Q.  Mr. Pazos, your CV is already attached as Exhibit 402.
13:28:15    I'm not going to go through it line by line, but I want to ask
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**775**

1  13:28:21  you a few questions.
2  13:28:22      You do have two degrees, one in naval architecture
3  13:28:25  and marine engineering and one in mechanical engineering?
4  13:28:26  A.  Yes, two master degrees.
5  13:28:28  Q.  Two masters.
6  13:28:28      And those are two separate areas of science?
7  13:28:31  A.  Yes.  The university I attended after taking original
8  13:28:35  courses allowed for two degrees, and there are two different
9  13:28:40  board of registration.
10  13:28:44  Q.  All right.  And are you a registered professional engineer
11  13:28:47  in mechanical engineering in Louisiana?
12  13:28:49  A.  Yes, because they don't have a registration for naval
13  13:28:52  architects.
14  13:28:55  Q.  Now, first, with respect to the mooring issues in this
15  13:28:59  case, what particular aspects of your long career bear on the
16  13:29:02  mooring issues in this case?
17  13:29:06  A.  I been involved in moorings for probably over 50 years
18  13:29:12  since I've been all -- entire professional life in the marine
19  13:29:16  business in all levels of activities, from the size,
20  13:29:21  contraction operation and field operations.
21  13:29:26  Q.  How does your vessel design experience that is included in
22  13:29:29  your CV bear on mooring?
23  13:29:31  A.  Well, I did work in design and construction on a number of
24  13:29:36  different vessels, including barges.  And, of course, all have
25  13:29:40  mooring equipment, so you have to be familiar with mooring to

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**777**

1  13:31:09  A.  Yes, surely.
2  13:31:12  Q.  And did your mechanic education -- mechanical engineering
3  13:31:16  education also include instruction in soil mechanics?
4  13:31:20  A.  Yes.  I took two courses in soil mechanics in order to be
5  13:31:26  eligible for the mechanical engineering degree.
6  13:31:30  Q.  And tell the Court about your relevant work with the
7  13:31:32  Department of Civil Works in Argentina.
8  13:31:36  A.  Yes.  For several years, I worked for the Department of
9  13:31:41  Public Work, which is very similar to the U.S. Corps of
10  13:31:44  Engineers.  And they own and operate a substantial number of
11  13:31:50  vessels, including up to 300 dredges, and working levees and
12  13:31:57  canals and seaside structures of all types.
13  13:32:06  Q.  All right.  And I think your CV on the last page lists
14  13:32:10  some other experience in soil-related installations?
15  13:32:14  A.  Yes.  In many situations, I've been involved as an
16  13:32:20  engineer, I was -- I designed soil-related structure.  Like I
17  13:32:27  was vice president of Petro Marine Engineering, which
18  13:32:31  specialized in offshore structures.  And we did a lot of pile
19  13:32:36  design.
20  13:32:37      I did over -- work in 44 countries in marine salvage.
21  13:32:43  Many of the salvage operations required installation of
22  13:32:49  deadman, which required pilings.  So I designed the deadman.
23  13:32:55  So I've been involved in shore installations substantially
24  13:32:57  also.
25  13:32:59  Q.  Given that the floodwall issues in this case involved

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**776**

1  13:29:44  decide where to locate equipment.  I worked with appropriate
2  13:29:49  equipment for each different vessel.
3  13:29:52  Q.  Is the same true for your design experience in terms of
4  13:29:55  marine structures and facilities both on- and offshore?
5  13:30:00  A.  Yes.
6  13:30:00  Q.  Well, that's sort of the other side of mooring from the
7  13:30:03  vessel?
8  13:30:03  A.  Yes.
9  13:30:04  Q.  And have you been involved in -- as a consultant in vessel
10  13:30:08  breakaway cases in the past?
11  13:30:10  A.  Yes.  I believe I have two or three breakaway situations,
12  13:30:16  yes.
13  13:30:17  Q.  And in terms of mooring, what's the role of your
14  13:30:22  experience and education in hydrodynamics?  What's that have to
15  13:30:27  do with mooring?
16  13:30:28  A.  Well, hydrodynamics is important for moorings to realize
17  13:30:34  and understand that a mooring regimen has to be able to
18  13:30:42  withstand different type of waves or hydrodynamic action.
19  13:30:48  Q.  And in addition to your education and your professional
20  13:30:50  experience, have you also owned and operated commercial vessels
21  13:30:54  yourself in addition to recreational vessels?
22  13:30:57  A.  Yes, I own and operate four commercial vessels.  Yes.
23  13:31:00  Q.  And moving to the floodwall issues in the case, does the
24  13:31:05  field of mechanical engineering include failure analysis and
25  13:31:08  materials analysis?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**778**

1  13:33:03  interaction between a vessel on a waterway and a floodwall on
2  13:33:07  the edge of the waterway, am I incorrect in gathering that
3  13:33:11  those issues sort of involve the overlap between naval
4  13:33:16  architecture and marine engineering on the one hand and
5  13:33:20  mechanical engineering on the other?
6  13:33:26  A.  Yes.  Both requires basic height are and related --
7  13:33:30  overlapping each other -- to each other.
8  13:33:33      MR. BEST:  Your Honor, we tender the witness as an
9  13:33:34  expert in naval architecture and marine engineering and
10  13:33:38  separately in mechanical engineering.
11  13:33:41      THE COURT:  Any objection?
12  13:33:43      MR. WALKER:  May I, Your Honor?
13  13:33:45      THE COURT:  The Court accepts the witness as
14  13:33:47  tendered.
15  13:33:50      Oh, I thought you said no.
16  13:33:52      MR. WALKER:  No, I said "May I, Your Honor?"
17  13:33:57      THE COURT:  Oh, I apologize.  I'll hold off.
18  13:34:01      VOIR DIRE
19  13:34:02  BY MR. WALKER:
20  13:34:03  Q.  Good afternoon, Mr. Pazos.
21  13:34:04  A.  Good afternoon.
22  13:34:10  Q.  You're going to testify regarding mooring configurations;
23  13:34:16  is that correct?
24  13:34:18  A.  Well, I'm going to testify in response to questions on
25  13:34:24  this subject, yes.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

3  (Pages 775 to 778)

779

```
13:34:32   Q.  Your training and education is naval architecture, marine
13:34:38   engineering and mechanical engineering; correct?
13:34:40   A.  Yes.
13:34:40   Q.  Have you ever qualified in areas specifically with respect
13:34:47   to flood control structures?
13:34:54   A.  I don't believe so, the words as specifically.  I've been
13:35:00   involved in court cases in which a shore facility understanding
13:35:07   was required.  But I don't recall if I was specifically
13:35:16   approved by the court in the specific wording that you
13:35:22   mentioned.
13:35:23   Q.  Well, you mentioned two courses that you took with respect
13:35:28   to soil; is that right?
13:35:30   A.  Soil mechanics.
13:35:30   Q.  And that was in 1958?
13:35:34   A.  About 1958, yes.
13:35:35   Q.  And those were the two courses that any student in
13:35:39   Argentina graduating as a mechanical engineer were required to
13:35:42   take; right?
13:35:44   A.  Well, the university -- National University of Buenos
13:35:47   Aires that I attended required that, in order to get the dual
13:35:54   degree, you had to take some additional specific courses and do
13:35:58   some other activities.  So I complied with what they required.
13:36:02   So that's why I took two semesters in soil mechanics.
13:36:09   Q.  So the answer was, yes, those are the courses that any
13:36:14   student graduating from the university in your field had to
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

781

```
13:37:52   similar to levees.
13:37:57   Q.  When you say you did work, what did you personally do?
13:38:03   Were you out there as a young man helping them do construction
13:38:06   or were you designing something?
13:38:09   A.  At the time, before my graduation, I was a technician.
13:38:14   And I was part of a group of over 15 different engineers and
13:38:20   technicians that used to oversee many different aspects of the
13:38:30   maintenance of waterfront facilities, canals, levees,
13:38:38   breakwaters.  And I worked both in the office and mostly in the
13:38:42   field.
13:38:43       Because, among other activities, we developed a large
13:38:49   book of information for the floating equipment.  And for plenty
13:38:55   of time at one time, for almost six months, I was doing nothing
13:39:01   but that, and going with different vessels at different
13:39:05   location where they had marine equipment to inspect and make
13:39:09   records of information about this equipment.
13:39:13   Q.  This case does not involve dredging, does it?
13:39:17   A.  No, correct.
13:39:18   Q.  And by "a waterfront facility," you mean a dock, don't
13:39:21   you?
13:39:22   A.  Could you repeat, please.
13:39:24   Q.  By "a waterfront facility," you mean a dock, don't you?
13:39:27   A.  Not necessarily.  In some navigational canals, in order to
13:39:33   avoid settling of the material on the boat or -- reduce the
13:39:40   tip, it can be done by accelerating the flow by building levees
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

780

```
13:36:18   take back in 1958; correct?
13:36:20   A.  Yes.
13:36:20   Q.  And it's correct that since that time, you have not taken
13:36:23   any course, you've not taught any course, you've not published
13:36:26   anything with respect to that field, specifically geotechnical
13:36:30   engineering?
13:36:33   A.  Not in the field of geotechnical engineering, correct.
13:36:37   Q.  Or soil mechanics?
13:36:39   A.  I'm sorry, repeat, please.
13:36:41   Q.  Or soil mechanics?
13:36:42   A.  Correct.  I have not taken any recent courses in this
13:36:45   field.
13:36:45   Q.  And you would agree with me that seepage and the effect of
13:36:53   seepage on soil has to do with soil mechanics and geotechnical
13:36:59   engineering; correct?
13:37:01   A.  Correct.
13:37:02   Q.  Now, you talked also about your experience with civil
13:37:06   works in Argentina.  Again, that would be pre-1960; correct?
13:37:11   A.  Yes.
13:37:12   Q.  Okay.  And could you tell me specifically -- I didn't
13:37:22   understand your answer -- what is it that you did in Argentina
13:37:25   back then that's relevant to this case?
13:37:33   A.  I worked for the Department of Public Works, which is the
13:37:35   same as the U.S. Army Corps of Engineers.  We did a lot of work
13:37:42   in dredging, canals, levees and different type of facilities
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

782

```
13:39:46   alongside the canal so the current is as strong in the canal.
13:39:53   So we developed levees, among other things, and breakwaters.
13:39:59   Q.  And your role and your capacity in that work was as a
13:40:06   naval architect?
13:40:09   A.  Well, at the time, I was qualified as a technician in
13:40:13   maritime affairs.  And the group that I fall a party of -- that
13:40:24   I fall a part, have about 15 to 20 technicians and engineers,
13:40:28   and developed the different projects.
13:40:32   Q.  That was my point precisely.  Your specialization, your
13:40:36   input was in the maritime affairs and you had specialists in
13:40:41   soil and other aspects of the levee and waterfront construction
13:40:45   in which you did not have the expertise; correct?
13:40:48   A.  Correct.  But we all discussed the projects and we all
13:40:54   participated in the decision of what can be done because many
13:40:59   of the areas of discussion overlap.
13:41:03   Q.  And you left Argentina in what year?
13:41:07   A.  In 1960.
13:41:08   Q.  And so that's 50 years ago.  And that was your last
13:41:11   involvement with that kind of project; correct?
13:41:15   A.  No.  I mentioned to you I did work in many countries, 44
13:41:20   countries, actually, in maritime salvage.  And in many of those
13:41:26   projects, I was involved in facilities or developing facilities
13:41:36   which were not in the water.
13:41:42   Q.  Could you tell me what you mean by "not in the water"?
13:41:45   A.  Well, for instance, to upright a passenger vessel in
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

4 (Pages 779 to 782)

783

| | | |
|---|---|---|
| 1 | 13:41:50 | Mexico that capsized, we set up deadmans on the dry side of the |
| 2 | 13:42:00 | land in order to install winches and cables to pull the vessel. |
| 3 | 13:42:06 | So I designed the deadman to right the passenger vessel. |
| 4 | 13:42:13 | Q.  Okay.  Let me make it shorter. |
| 5 | 13:42:13 | All those works that you're talking about pertain to |
| 6 | 13:42:16 | salvage projects of maritime casualties; correct? |
| 7 | 13:42:20 | A.  Well, yes.  The reason for this work was to salvage a |
| 8 | 13:42:25 | vessel, yes. |
| 9 | 13:42:27 | Q.  Right.  Not construction projects on land of something |
| 10 | 13:42:30 | like a floodwall? |
| 11 | 13:42:33 | A.  No.  Construction projects on land I work when I was with |
| 12 | 13:42:39 | Petro Marine Engineering, substantially because this is what -- |
| 13 | 13:42:43 | all we were doing. |
| 14 | 13:42:45 | Q.  Well, tell me about that. |
| 15 | 13:42:47 | A.  Well, we designed platform, both offshore, shallow water |
| 16 | 13:42:55 | and working installation for oil and gas in dry land. |
| 17 | 13:43:01 | Q.  So you designed oil-producing platforms? |
| 18 | 13:43:04 | A.  Foundation of equipment, you know.  So not necessarily |
| 19 | 13:43:10 | installation of oil and gas alone.  Foundations of any type of |
| 20 | 13:43:21 | equipment. |
| 21 | 13:43:21 | Q.  No flood control structures? |
| 22 | 13:43:23 | A.  I'm sorry, repeat. |
| 23 | 13:43:25 | Q.  No flood control structures involved at Petro Marine? |
| 24 | 13:43:30 | A.  No. |
| 25 | 13:43:37 | Q.  According to your CV, you profess to have over 30 areas of |

784

| | | |
|---|---|---|
| 1 | 13:43:40 | expertise.  And without boring the Court, they range from |
| 2 | 13:43:46 | diesel engines to personal injury, crew, negligence, cargo |
| 3 | 13:43:50 | vessels.  You don't have a single reference to meteorology, do |
| 4 | 13:43:55 | you?  You're not an expert meteorologist? |
| 5 | 13:43:57 | A.  Correct.  I'm very familiar with meteorology, but I don't |
| 6 | 13:44:01 | consider myself an expert in meteorology. |
| 7 | 13:44:03 | Q.  And you don't list within your areas of expertise soil |
| 8 | 13:44:07 | mechanics or geotechnical engineering either, do you? |
| 9 | 13:44:09 | A.  Correct. |
| 10 | 13:44:12 | Q.  And you've never published any peer-review articles with |
| 11 | 13:44:16 | respect to meteorology, soil mechanics or geotechnical |
| 12 | 13:44:19 | engineering, have you? |
| 13 | 13:44:24 | A.  I'm not quite sure.  I believe that some of the articles |
| 14 | 13:44:29 | that I wrote and were published may make comments regarding |
| 15 | 13:44:37 | weather, because I've been involved in several other |
| 16 | 13:44:39 | hurricanes, typhoons.  And I wrote so many papers, I don't |
| 17 | 13:44:46 | quite remember.  Some may mention weather situations. |
| 18 | 13:44:52 | MR. WALKER:  Does Your Honor want to take a break? |
| 19 | 13:45:13 | THE COURT:  Is this distracting -- it's distracting |
| 20 | 13:45:13 | me.  Is it distracting the witness and you, Counsel? |
| 21 | 13:45:13 | MR. WALKER:  I'd be happy to stop, but I'm fine |
| 22 | 13:45:13 | otherwise, Your Honor.  But I know that you're being |
| 23 | 13:45:13 | distracted.  And the court reporter, it's bothering her. |
| 24 | 13:45:13 | THE COURT:  Yes, it is.  So we're going to get it |
| 25 | 13:45:13 | stopped.  We'll move on, but we now have -- Sheena's going to |

785

| | | |
|---|---|---|
| 1 | 13:45:13 | go check. |
| 2 | 13:45:13 | MR. WALKER:  You want me to continue? |
| 3 | 13:45:15 | THE COURT:  Yes, please continue. |
| 4 | 13:45:16 | MR. WALKER:  Okay.  Yes, Your Honor. |
| 5 | 13:45:17 | BY MR. WALKER: |
| 6 | 13:45:17 | Q.  Do you know what "peer review" means? |
| 7 | 13:45:21 | A.  Repeat, please. |
| 8 | 13:45:23 | Q.  Do you know what "peer review" means? |
| 9 | 13:45:24 | A.  Yes. |
| 10 | 13:45:24 | Q.  And I want to make sure that you understood my question. |
| 11 | 13:45:29 | I asked you for peer-reviewed publications or |
| 12 | 13:45:29 | articles, not things that you quote in a newspaper, which I |
| 13 | 13:45:34 | know you have many of those, but something that was |
| 14 | 13:45:37 | peer-reviewed. |
| 15 | 13:45:38 | A.  Yes. |
| 16 | 13:45:39 | Q.  Have you had such publications in those areas that I |
| 17 | 13:45:42 | mentioned? |
| 18 | 13:45:43 | A.  Well, I wrote three courses which engineers purchase, and |
| 19 | 13:45:52 | read, and go through an examination in order to be accepted by |
| 20 | 13:45:58 | the Oceanic Board of Registration for Professional Engineers. |
| 21 | 13:46:02 | And the company I've been doing this with sold over |
| 22 | 13:46:08 | 100-something -- maybe 120 of my courses.  So they are peers, |
| 23 | 13:46:18 | that is, people in my profession, that has read my courses. |
| 24 | 13:46:24 | And they must like it because they purchase. |
| 25 | 13:46:28 | Q.  I understand that you're popular in the area of marine |

786

| | | |
|---|---|---|
| 1 | 13:46:31 | fields, which, according to your résumé, is the area in which |
| 2 | 13:46:35 | those courses are published, what you're describing. |
| 3 | 13:46:39 | A.  Yeah.  Generally, I related to marine. |
| 4 | 13:46:44 | Q.  Marine field. |
| 5 | 13:46:44 | A.  I think. |
| 6 | 13:46:44 | Q.  And my question, if we go back to it, was peer-reviewed |
| 7 | 13:46:48 | journals, articles with respect to soil engineering, mechanics, |
| 8 | 13:46:52 | and geotechnical engineering.  So the answer is, to your |
| 9 | 13:46:54 | knowledge, no? |
| 10 | 13:46:56 | A.  Well, in many of the articles I wrote, being published by |
| 11 | 13:47:05 | publications in the engineering field.  And I have been |
| 12 | 13:47:12 | receiving comments by peers that have been reading these |
| 13 | 13:47:18 | articles. |
| 14 | 13:47:18 | MR. WALKER:  Well, if we're going to belabor the |
| 15 | 13:47:22 | point, could we go to DX-218, deposition, page 29 and top of |
| 16 | 13:47:29 | 30? |
| 17 | 13:47:36 | BY MR. WALKER: |
| 18 | 13:47:36 | Q.  Do you remember, when we took your deposition, Mr. Raffman |
| 19 | 13:47:39 | and I jointly took it over the course of two days, and |
| 20 | 13:47:41 | Mr. Raffman asked you:  "How many articles have you written for |
| 21 | 13:47:45 | publication over the course of your long career?" |
| 22 | 13:47:47 | "I never counted, so I couldn't give you a number. |
| 23 | 13:47:50 | In the hundreds." |
| 24 | 13:47:51 | "In the hundreds?  And have you -- any of those |
| 25 | 13:47:56 | hundreds of articles ever been published in a peer-reviewed |

### 787

| | | |
|---|---|---|
| 1 | 13:48:01 | scholarly journal?" |
| 2 | 13:48:04 | Jumping down to line 8. |
| 3 | 13:48:05 | "No, I don't know what you're referring to." |
| 4 | 13:48:10 | Does that refresh your memory? |
| 5 | 13:48:13 | A. Yes. But I understood the question was referring a |
| 6 | 13:48:19 | journal of a specific professional associations. And the |
| 7 | 13:48:27 | answer is correct, none of my articles, I never offered, were |
| 8 | 13:48:35 | published by journals or professional associations. |
| 9 | 13:48:39 | Q. Let me move on to something a little different. |
| 10 | 13:48:43 | When were you hired in this case? |
| 11 | 13:48:44 | A. I believe in 2007. |
| 12 | 13:48:48 | Q. And -- |
| 13 | 13:48:49 | A. Well, I'm sorry. I apologize. I was hired previously by |
| 14 | 13:48:58 | another attorney in 2005, but the principal for which I've been |
| 15 | 13:49:09 | working recently, I was hired in 2007. |
| 16 | 13:49:15 | Q. Okay. And what were your instructions? What was your |
| 17 | 13:49:19 | expertise to be applied to? |
| 18 | 13:49:23 | A. I never was given specific instructions. I've been |
| 19 | 13:49:30 | offered and received a large number of documents. And every |
| 20 | 13:49:36 | time I receive a document, I review it and I write comments. |
| 21 | 13:49:39 | And I asked to my principal if I want to receive my comments. |
| 22 | 13:49:45 | Q. Well, do you know if you were being hired as an expert in |
| 23 | 13:49:49 | meteorology, naval architecture, marine engineering, mooring? |
| 24 | 13:49:54 | What were your instructions? |
| 25 | 13:49:57 | MR. BEST: Note an objection, Your Honor. We've |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

### 788

| | | |
|---|---|---|
| 1 | 13:49:58 | already established he's not a meteorologist. |
| 2 | 13:50:01 | THE COURT: Yes, that is true. |
| 3 | 13:50:02 | THE WITNESS: I never asked what I was being offered |
| 4 | 13:50:05 | and I never was told. I only concentrate in the areas that I |
| 5 | 13:50:11 | believe I have sufficient knowledge to consider myself an |
| 6 | 13:50:18 | expert. |
| 7 | 13:50:20 | BY MR. WALKER: |
| 8 | 13:50:20 | Q. Were you told at some point in time that your involvement |
| 9 | 13:50:25 | was to determine the involvement of the barge with the IHNC |
| 10 | 13:50:34 | breaches? |
| 11 | 13:50:35 | A. Can you repeat, please? |
| 12 | 13:50:37 | Q. Were you ever told or did you ever reach the conclusion |
| 13 | 13:50:40 | that your contribution to this case was to determine the |
| 14 | 13:50:43 | involvement of the 4727 to the breaches? |
| 15 | 13:50:49 | A. Yes, I understood this. |
| 16 | 13:50:51 | Q. And that means, if I can interpret, what the barge did; |
| 17 | 13:50:55 | right? |
| 18 | 13:50:55 | A. Repeat, please? |
| 19 | 13:50:57 | Q. And that would mean, what did the barge do, in your |
| 20 | 13:51:00 | opinion? |
| 21 | 13:51:00 | A. Yes. |
| 22 | 13:51:01 | Q. Okay. |
| 23 | 13:51:03 | A. Well, let me elaborate. I believe that the main intention |
| 24 | 13:51:14 | of the documents review and writing comments about the |
| 25 | 13:51:18 | documents and eventually writing a report was to determine what |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

### 789

| | | |
|---|---|---|
| 1 | 13:51:24 | happened to the flood, the failure of the levees, and what |
| 2 | 13:51:31 | happened in relation to this barge. |
| 3 | 13:51:34 | Q. Well, that's why I'm asking the question, sir. Because |
| 4 | 13:51:37 | your own report states that you were hired to do -- to |
| 5 | 13:51:41 | determine the contribution of the barge. And are you now |
| 6 | 13:51:44 | saying that your expertise also goes to what happened to the |
| 7 | 13:51:52 | walls? |
| 8 | 13:51:53 | A. The two items, barge and sea -- floodwall are related. So |
| 9 | 13:52:03 | you cannot -- essentially, the flooding, development of the |
| 10 | 13:52:10 | breaches in the seawall. |
| 11 | 13:52:12 | Q. But you agree, don't you, that the collapse of the walls, |
| 12 | 13:52:18 | by your own content of your reports, has to do with soil |
| 13 | 13:52:22 | seepage, piping, water migration, and you're not qualified to |
| 14 | 13:52:27 | testify regarding the mechanism of failure of the walls, are |
| 15 | 13:52:32 | you? |
| 16 | 13:52:32 | A. No, I believe that I qualified, otherwise I would not |
| 17 | 13:52:36 | express my ideas in writing. |
| 18 | 13:52:40 | Q. But you're not a geotechnical engineer. And it's a |
| 19 | 13:52:44 | geotechnical engineer that would have to give testimony |
| 20 | 13:52:47 | regarding the mechanism of failure, the seepage and the soil |
| 21 | 13:52:51 | conditions; correct? |
| 22 | 13:52:52 | A. I don't disagree that a geotechnical engineer would have |
| 23 | 13:52:57 | deeper knowledge in these areas, but also I want to let you |
| 24 | 13:53:03 | know that I believe I have enough knowledge to understand how |
| 25 | 13:53:10 | underseepage occurs. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

### 790

| | | |
|---|---|---|
| 1 | 13:53:12 | Q. Well, isn't your understanding of underseepage actually |
| 2 | 13:53:17 | gained from your reading and almost direct quoting from the |
| 3 | 13:53:18 | IPET, ILIT and other reports? |
| 4 | 13:53:21 | A. Or many other previous readings of different books. I |
| 5 | 13:53:26 | mean, I told you, it's not the first time I run into this |
| 6 | 13:53:31 | subject. |
| 7 | 13:53:32 | Q. When you say "this subject," which one are you talking |
| 8 | 13:53:34 | about? |
| 9 | 13:53:38 | A. I'm sorry, repeat? |
| 10 | 13:53:40 | Q. I'm sorry. When you said "this subject," what subject are |
| 11 | 13:53:43 | you now talking about? |
| 12 | 13:53:44 | A. I think you are talking about the subject of underseepage. |
| 13 | 13:53:50 | Q. Correct. And soil mechanics. |
| 14 | 13:53:53 | A. Correct. |
| 15 | 13:53:54 | Q. And you're saying this is not the first time you've had an |
| 16 | 13:53:57 | opinion on that in a litigation? |
| 17 | 13:54:01 | A. No. I don't remember other litigation in which |
| 18 | 13:54:08 | underseepage was a subject. I'm saying I read and I was |
| 19 | 13:54:17 | familiar with this subject before. It's not the first time I |
| 20 | 13:54:22 | ran into this subject. |
| 21 | 13:54:23 | Q. Did you perform any hydrological modeling in this case? |
| 22 | 13:54:28 | A. No. |
| 23 | 13:54:57 | Q. Now, I may have asked you this, and I apologize, but |
| 24 | 13:54:59 | you've never written an expert report or provided any testimony |
| 25 | 13:55:03 | or opinion regarding the cause or failure or collapse of a |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

791

| | | |
|---|---|---|
| 1 | 13:55:07 | fixed structure anchored in soil, have you? |
| 2 | 13:55:11 | A. A fixed structure anchored in soil, yes. I've been |
| 3 | 13:55:19 | involved in several cases -- I apologize, I call it cases -- in |
| 4 | 13:55:27 | several projects in which I was involved in a structure's |
| 5 | 13:55:34 | anchor in soil. |
| 6 | 13:55:38 | Q. Well, I'll refer you again to our deposition. |
| 7 | 13:55:47 | I'm sorry, you said you gave opinions in litigation |
| 8 | 13:55:52 | or you wrote about it? |
| 9 | 13:55:54 | A. No, no. I did work in projects involving structures |
| 10 | 13:55:59 | connected to the soil. |
| 11 | 13:56:00 | Q. Could you give us -- do you remember what structures we're |
| 12 | 13:56:03 | talking about here? |
| 13 | 13:56:04 | A. For instance, jackup drilling rigs, foundation of |
| 14 | 13:56:11 | equipment, foundation of pressure vessels. All these are |
| 15 | 13:56:18 | structures attached to the soil. |
| 16 | 13:56:20 | Q. Again, those are marine structures, offshore rigs, that |
| 17 | 13:56:23 | kind of -- |
| 18 | 13:56:24 | A. Not purely marine. I mentioned to you deadman happens in |
| 19 | 13:56:28 | the solid ground. It's not marine; it's the ground. Solid. |
| 20 | 13:56:32 | The earth. |
| 21 | 13:56:33 | Q. And I'm sorry, which of those structures was in the solid |
| 22 | 13:56:37 | ground? |
| 23 | 13:56:38 | A. Support of pressure vessels, foundations. And that meant |
| 24 | 13:56:44 | for salvage operations. So all those are structures on the |
| 25 | 13:56:48 | ground, not marine. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

792

| | | |
|---|---|---|
| 1 | 13:56:51 | Q. Again, those go back to that salvage operation? |
| 2 | 13:56:55 | A. I'm sorry? |
| 3 | 13:56:56 | Q. Those go back to the salvage operations you talked about? |
| 4 | 13:56:59 | A. No. Foundations -- for instance, I designed launching |
| 5 | 13:57:01 | ways on the ground and on piles. |
| 6 | 13:57:09 | Q. That's a launching way for dry dock of a vessel, you're |
| 7 | 13:57:14 | talking about? |
| 8 | 13:57:15 | A. For a shipyard leaving off a vessel. |
| 9 | 13:57:18 | Q. Right. So that's where the ship goes down, that's what |
| 10 | 13:57:21 | you're talking about? |
| 11 | 13:57:22 | A. Yes, yes. |
| 12 | 13:57:23 | Q. Have you ever designed a permanent structure, a structure |
| 13 | 13:57:25 | that was meant to be permanent in the ground, such as a |
| 14 | 13:57:28 | floodwall? |
| 15 | 13:57:31 | A. I designed -- or I work on the design of structures |
| 16 | 13:57:35 | connected to the ground, but not in a floodwall. |
| 17 | 13:57:40 | Q. You talked about mooring. Have you ever taught courses on |
| 18 | 13:57:48 | mooring? |
| 19 | 13:57:48 | A. No. |
| 20 | 13:57:50 | Q. Have you ever taken courses on mooring? |
| 21 | 13:57:54 | A. I don't know of any course on mooring that exists. |
| 22 | 13:57:58 | Q. So as a naval architect, even back in 1958, you didn't |
| 23 | 13:58:02 | take any courses on mooring? |
| 24 | 13:58:03 | A. I don't believe that any university offer any courses |
| 25 | 13:58:07 | specifically on mooring. Mooring is a part of certain overall |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

793

| | | |
|---|---|---|
| 1 | 13:58:13 | courses, but I don't believe anybody is going to spend the time |
| 2 | 13:58:18 | actually creating a course, whether it's a semester or |
| 3 | 13:58:22 | whatever, just on mooring. |
| 4 | 13:58:24 | Q. You did take courses in hydrodynamics as a naval |
| 5 | 13:58:28 | architect? |
| 6 | 13:58:30 | A. I took courses in hydrodynamics, yes. |
| 7 | 13:58:33 | Q. The last being in 1958 or before? |
| 8 | 13:58:37 | A. No, I took course in hydrodynamics at University of |
| 9 | 13:58:40 | Michigan. I don't remember what year. But I took several |
| 10 | 13:58:44 | courses at the University of Michigan. |
| 11 | 13:58:47 | Q. And hydrodynamics is the movement of the water? |
| 12 | 13:58:50 | A. Well, it's much more than the movement of water. I was a |
| 13 | 13:58:53 | hydrodynamics for a FMC Corporation in California, designing |
| 14 | 13:59:02 | hydrofoils. So it's much more than just movement of water. |
| 15 | 13:59:08 | Q. Well, tell us how hydrodynamics applies to mooring in this |
| 16 | 13:59:12 | case. |
| 17 | 13:59:14 | A. In order to design moorings and in order to evaluate the |
| 18 | 13:59:17 | mooring, you have to understand waves, and waves is |
| 19 | 13:59:25 | hydrodynamics. And waves are a specific, large, important area |
| 20 | 13:59:37 | of hydrodynamics. And I was a hydrodynamicist for several |
| 21 | 13:59:43 | years. |
| 22 | 13:59:44 | Q. So your opinions now in this case that you're going to |
| 23 | 13:59:46 | give deal with waves and that aspect of hydrodynamics? |
| 24 | 13:59:53 | A. One of the aspect of hydrodynamics is waves and, in this |
| 25 | 13:59:57 | case, is one of the aspect, although there are several other |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

794

| | | |
|---|---|---|
| 1 | 14:00:00 | things. For instance, the six degrees of motion of the barge, |
| 2 | 14:00:06 | roll, pitch, heave, et cetera, are related to hydrodynamics. |
| 3 | 14:00:12 | So hydrodynamics is a large subject encompassing many areas. |
| 4 | 14:00:22 | Q. Okay. Well, I'd like to understand that the hydrodynamics |
| 5 | 14:00:23 | you're going to testify about deal with the movement of the |
| 6 | 14:00:27 | barge after the breakaway or do they deal with the breakaway? |
| 7 | 14:00:31 | A. Movement of the barge at any time. |
| 8 | 14:00:35 | Q. So you're going to testify regarding the application of |
| 9 | 14:00:39 | hydrodynamic principles both at the time the barge was moored |
| 10 | 14:00:45 | and after it became loose; is that correct? |
| 11 | 14:00:47 | A. Well, I'm going to testify in answering the specific |
| 12 | 14:00:55 | question, if I have the knowledge or ability to answer. |
| 13 | 14:01:03 | Q. My question, sir, however, is: Since this is the first we |
| 14 | 14:01:12 | hear of this testimony in this area, I'd like to understand if |
| 15 | 14:01:14 | you are applying the hydrodynamic principles to both the |
| 16 | 14:01:19 | mooring component of the barge and/or the subsequent movement |
| 17 | 14:01:24 | of the barge? |
| 18 | 14:01:26 | MR. BEST: Objection to the form of the question. |
| 19 | 14:01:30 | THE WITNESS: I will -- |
| 20 | 14:01:30 | THE COURT: Noted. |
| 21 | 14:01:41 | THE WITNESS: I will answer the question depending on |
| 22 | 14:01:42 | what is the question. So anything related to water is |
| 23 | 14:01:44 | certainly related to hydrodynamics. |
| 24 | 14:01:54 | BY MR. WALKER: |
| 25 | 14:01:54 | Q. Has your testimony ever been rejected or limited by a |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

795

| | |
|---|---|
| 1 | 14:02:01   court? |
| 2 | 14:02:02   A.   Only one time some 20 or 25 years ago when the attorney |
| 3 | 14:02:06   for which I was testifying want me to testify about economics. |
| 4 | 14:02:16   And there was a CPA in the court.  And the judge said that |
| 5 | 14:02:24   since there is a CPA, he only want to hear a CPA testify about |
| 6 | 14:02:29   economics.  So the only time that I was rejected from |
| 7 | 14:02:34   testifying. |
| 8 | 14:02:35   Q.   Well, haven't you once tried to testify about insurance |
| 9 | 14:02:38   and claims handling, medicine, biochemistry?  Have you ever |
| 10 | 14:02:44   attempted to testify in those fields? |
| 11 | 14:02:47   A.   Let's talk one at a time. |
| 12 | 14:02:49       No, in medicine, I will not testify because I don't |
| 13 | 14:02:52   believe that I have knowledge enough. |
| 14 | 14:02:57       Some areas of chemistry I may not testify because I |
| 15 | 14:03:02   may not have knowledge enough. |
| 16 | 14:03:03       So you have to be specific what areas are you asking |
| 17 | 14:03:08   the question. |
| 18 | 14:03:08   Q.   Well, do you remember the case of Randy Thompson versus |
| 19 | 14:03:11   Rowan Companies, 2007, U.S. District, Lexis 15 822, March 6th, |
| 20 | 14:03:18   2007, where you rendered a report relating to medical, |
| 21 | 14:03:22   physiological, biochemical issues and rig operations, training |
| 22 | 14:03:28   and claims handling, and Judge Barbier found you were not |
| 23 | 14:03:32   qualified in those areas? |
| 24 | 14:03:34   A.   I don't remember the case you're talking about.  You may |
| 25 | 14:03:36   have to refresh my memory.  I don't remember at all. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

796

| | |
|---|---|
| 1 | 14:03:43   Q.   You don't remember those circumstances at all? |
| 2 | 14:03:55   A.   No. |
| 3 | 14:03:56   Q.   Okay.  I'll ask you another case. |
| 4 | 14:03:56       Do you remember the case of Kiger, K-I-G-E-R, versus |
| 5 | 14:04:02   Doucet & Adams, 1998, U.S. District, Lexis 7473, 1998, a |
| 6 | 14:04:09   personal injury case where a plaintiff tripped on a tugboat and |
| 7 | 14:04:13   was injured.  And your opinion was that the plaintiff's brain |
| 8 | 14:04:16   had to recognize there was a dangerous area in order to lift |
| 9 | 14:04:20   his foot, and the brain is what would alert the foot to move in |
| 10 | 14:04:24   a less automatic way. |
| 11 | 14:04:27       But the court held that, as a naval architect and |
| 12 | 14:04:30   marine engineer, you weren't qualified to testify about the |
| 13 | 14:04:34   workings of the brain.  Do you remember that? |
| 14 | 14:04:37   A.   No, I don't remember.  You are being a long time. |
| 15 | 14:04:40   I've been on too many cases. |
| 16 | 14:04:40   MR. BEST:  If I might just make an objection and make |
| 17 | 14:04:42   it general.  We already had a Daubert motion and Your Honor has |
| 18 | 14:04:45   ruled and denied it, and I think this is rehashing much of that |
| 19 | 14:04:49   same material. |
| 20 | 14:04:50   THE COURT:  Just to let it be known that none of the |
| 21 | 14:04:53   subject matter will be covered on cross, not the same, as to |
| 22 | 14:05:00   his expertise after we finish this.  I'm not going to hear it |
| 23 | 14:05:04   twice, that's all I'm saying.  I don't want to hear it twice. |
| 24 | 14:05:07       You can go on and do what you're doing now.  I |
| 25 | 14:05:10   just don't want to hear it again. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

797

| | |
|---|---|
| 1 | 14:05:12   MR. WALKER:  I understand, Your Honor. |
| 2 | 14:05:14   BY MR. WALKER: |
| 3 | 14:05:14   Q.   I just have one more, Billiot versus Kim Susan, a case |
| 4 | 14:05:20   before Judge Duval, 2002.  You offered opinions concerning |
| 5 | 14:05:25   ladders utilized on vessels and the effectiveness of |
| 6 | 14:05:29   ventilation systems.  And the judge held that you weren't |
| 7 | 14:05:31   allowed to comment on ventilation systems because there was no |
| 8 | 14:05:34   factual basis from other relevant sources to the effect that |
| 9 | 14:05:41   paint fumes debilitated the plaintiff.  And Judge Duval found |
| 10 | 14:05:44   you not qualified to testify on the effect of the paint on the |
| 11 | 14:05:47   plaintiff's central nervous system. |
| 12 | 14:05:51       Do you remember attempting to testify in those areas? |
| 13 | 14:05:54   A.   No, I'm sorry.  I don't remember.  It's been a while. |
| 14 | 14:05:58   MR. WALKER:  Thank you, Your Honor. |
| 15 | 14:05:58   THE COURT:  Thank you, sir. |
| 16 | 14:06:05       Mr. Best, do you want to make your tender now |
| 17 | 14:06:08   for the record? |
| 18 | 14:06:09   MR. BEST:  I would like just to ask a couple of |
| 19 | 14:06:10   questions before I do that. |
| 20 | 14:06:12   THE COURT:  Okay. |
| 21 | 14:06:14       DIRECT EXAMINATION |
| 22 | 14:06:15   BY MR. BEST: |
| 23 | 14:06:22   Q.   Mr. Pazos, you've been consulted in -- over the years in, |
| 24 | 14:06:24   I suppose, dozens of collision and allision cases? |
| 25 | 14:06:30   A.   Yes. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

798

| | |
|---|---|
| 1 | 14:06:31   Q.   And in those cases, you've testified about vessel movement |
| 2 | 14:06:35   and vessel contact, both with other vessels and with fixed |
| 3 | 14:06:40   structures? |
| 4 | 14:06:40   A.   Yes. |
| 5 | 14:06:40   Q.   And you've been involved in allisions and contact with |
| 6 | 14:06:44   different types of waterfront facilities, including docks, for |
| 7 | 14:06:47   example? |
| 8 | 14:06:48   A.   Absolutely, yes. |
| 9 | 14:06:49   Q.   And you've been involved in failure analysis of some of |
| 10 | 14:06:52   the materials involved at those contact points, have you not? |
| 11 | 14:06:56   A.   Yes, absolutely. |
| 12 | 14:06:59   Q.   And the sheet piles driven into the soil that constituted |
| 13 | 14:07:08   this levee with the concrete cap are not a particularly |
| 14 | 14:07:12   sophisticated or complex type of construction, are they? |
| 15 | 14:07:16   A.   Correct, it's fairly simple. |
| 16 | 14:07:18   Q.   Fairly simple compared to your experience in design and |
| 17 | 14:07:20   construction even of the landside facilities you have |
| 18 | 14:07:22   described? |
| 19 | 14:07:24   A.   It's a simple design, yes. |
| 20 | 14:07:30   Q.   And you've been involved, I think you said, in the design |
| 21 | 14:07:32   and construction of both fixed platforms standing in the water |
| 22 | 14:07:36   and involved in cases involving the failure of jackup vessels |
| 23 | 14:07:41   that were standing in the water when they failed? |
| 24 | 14:07:43   A.   Absolutely, yes. |
| 25 | 14:07:46   Q.   Whether standing in the water or built in the water, |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

799

| | | |
|---|---|---|
| 1 | 14:07:49 | they're either standing on the soil or they're on foundations |
| 2 | 14:07:52 | built into the soil or the sea bottom? |
| 3 | 14:07:54 | A. Yes, sir. |
| 4 | 14:08:00 | Q. And counsel asked you about the fact that you weren't a |
| 5 | 14:08:02 | geotechnical engineer. Do you recall that line of questioning? |
| 6 | 14:08:06 | A. Yes. |
| 7 | 14:08:07 | Q. Geotechnical engineers looking at this same situation |
| 8 | 14:08:12 | don't have your knowledge of hydrodynamics and vessel movement, |
| 9 | 14:08:20 | do they? |
| 10 | 14:08:21 | A. Correct. |
| 11 | 14:08:23 | Q. And in this case, the movement of this vessel, whether |
| 12 | 14:08:29 | while at the dock or in transit from the dock or while in |
| 13 | 14:08:33 | contact with the floodwalls, is all a matter that involves |
| 14 | 14:08:36 | hydrodynamics? |
| 15 | 14:08:37 | A. Absolutely, yes. |
| 16 | 14:08:39 | MR. BEST: Your Honor, we repeat our tender of this |
| 17 | 14:08:41 | witness as an expert in the fields designated previously. |
| 18 | 14:08:45 | THE COURT: Yes, sir? |
| 19 | 14:08:46 | MR. WALKER: May I? |
| 20 | 14:08:47 | THE COURT: May you... |
| 21 | 14:08:49 | MR. WALKER: Well, we object to Mr. Pazos testifying |
| 22 | 14:08:53 | outside the areas of naval architecture and marine engineering, |
| 23 | 14:08:58 | specifically as it relates to anything that happened to the |
| 24 | 14:09:02 | wall. We understand that his expertise may relate to the |
| 25 | 14:09:05 | marine sides. And when he gets to the wall, Your Honor, and |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

800

| | | |
|---|---|---|
| 1 | 14:09:10 | becomes involved in soil cell mechanics -- |
| 2 | 14:09:13 | THE COURT: The Court's already denied the Daubert |
| 3 | 14:09:17 | motion based on his expertise as a mechanical engineer and |
| 4 | 14:09:19 | naval architect. The Court has ruled that he may opine on the |
| 5 | 14:09:24 | matters set forth in his report and/or declaration. |
| 6 | 14:09:26 | MR. WALKER: Thank you, Your Honor. |
| 7 | 14:09:27 | THE COURT: Your objection is noted for the record. |
| 8 | 14:09:33 | MR. WALKER: Thank you, Your Honor. |
| 9 | 14:09:34 | BY MR. BEST: |
| 10 | 14:09:35 | Q. Now, your report lists the numerous materials you've |
| 11 | 14:09:38 | reviewed, and I'm not going to repeat that here. Since the |
| 12 | 14:09:41 | time you issued your report, I think you reviewed some |
| 13 | 14:09:45 | additional materials. |
| 14 | 14:09:45 | A. Yes, I received and reviewed -- briefly reviewed some |
| 15 | 14:09:51 | additional materials. |
| 16 | 14:09:51 | Q. Can you list those for us? |
| 17 | 14:09:53 | A. Yes, I have a list in my briefcase. |
| 18 | 14:09:55 | Q. Well, let me save you the time and maybe I can ask it this |
| 19 | 14:09:58 | way: Did you get some additional photographs of the broken |
| 20 | 14:10:02 | lines on both the barge that broke away and the barge that |
| 21 | 14:10:05 | remained at the dock? |
| 22 | 14:10:11 | A. I seen some photographs that I received. I believe that's |
| 23 | 14:10:14 | one photograph of showing a line that broke. |
| 24 | 14:10:19 | Q. Have you seen the 2010 depositions of Tompkins and |
| 25 | 14:10:24 | Frazier? |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

801

| | | |
|---|---|---|
| 1 | 14:10:25 | A. I believe so. |
| 2 | 14:10:27 | Q. Have you seen the March 2009 report of Donald Green? |
| 3 | 14:10:34 | A. I believe so, yes. |
| 4 | 14:10:37 | Q. And I think you've seen the lock logs, Plaintiffs' Exhibit |
| 5 | 14:10:40 | 24? |
| 6 | 14:10:41 | A. Repeat, please? |
| 7 | 14:10:43 | Q. I'm sorry? |
| 8 | 14:10:43 | I think you've also seen Plaintiffs' Exhibit 24, the |
| 9 | 14:10:46 | lock logs? The logs of the traffic in the Inner Harbor |
| 10 | 14:10:56 | Navigational Canal? |
| 11 | 14:10:58 | A. Oh, yes. Absolutely, yes. |
| 12 | 14:10:59 | Q. All right. Now, I'm going to deal first with the mooring. |
| 13 | 14:11:03 | MR. BEST: And, Your Honor, in view of the fact that |
| 14 | 14:11:05 | we had exhaustive testimony on mooring by Mr. Green, and in |
| 15 | 14:11:10 | view of the fact that their testimony is similar in many |
| 16 | 14:11:11 | respects, I do not intend to belabor the entirety of this |
| 17 | 14:11:15 | witness' opinions on mooring, which are in his report. |
| 18 | 14:11:18 | THE COURT: Thank you. |
| 19 | 14:11:19 | MR. BEST: But I do wish to make some points and |
| 20 | 14:11:21 | highlights on it, if I may. |
| 21 | 14:11:23 | THE COURT: Yes, you may. |
| 22 | 14:11:24 | BY MR. BEST: |
| 23 | 14:11:25 | Q. Now, in your report, Exhibit 402, you said, and I quote, |
| 24 | 14:11:29 | "In the early morning hours of August 29, '05, 4727 broke from |
| 25 | 14:11:35 | its moorings." |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

802

| | | |
|---|---|---|
| 1 | 14:11:36 | Do you recall that in the beginning of your report? |
| 2 | 14:11:38 | A. Yes. |
| 3 | 14:11:39 | Q. At the time you wrote that report or made that statement, |
| 4 | 14:11:42 | had you yet reviewed the testimony of LeBlanc and Tompkins? |
| 5 | 14:11:46 | A. No, I don't believe so. |
| 6 | 14:11:50 | Q. Setting aside when 4727 broke away, do your opinions about |
| 7 | 14:11:54 | the moorings used in this case on the 4727 remain the same? |
| 8 | 14:12:02 | A. Repeat your question. |
| 9 | 14:12:03 | Q. Okay. Setting aside when the breakaway actually occurred, |
| 10 | 14:12:08 | whether it was as Tompkins and Frazier suggest, that perhaps on |
| 11 | 14:12:14 | Sunday, or whether, as you put in your report, it happened in |
| 12 | 14:12:18 | the early morning hours of the 29th at the time of the storm, |
| 13 | 14:12:21 | it seems to me your opinions on the adequacy of the mooring of |
| 14 | 14:12:26 | the vessel would be the same in either case? |
| 15 | 14:12:28 | A. Yes, they were improper. Temporary. |
| 16 | 14:12:34 | Q. And the possibility of an earlier breakaway does not |
| 17 | 14:12:38 | change your opinions that the moorings were unsuitable? |
| 18 | 14:12:41 | A. Correct. The moorings could have been broken at any time. |
| 19 | 14:12:46 | Q. Would it be fair to say that the possibility of an earlier |
| 20 | 14:12:48 | breakaway confirms your concerns and opinions about the |
| 21 | 14:12:52 | inadequacy of this mooring? |
| 22 | 14:12:54 | A. Absolutely. My concerns and concerns of other people that |
| 23 | 14:12:59 | the moorings were improper. |
| 24 | 14:13:02 | Q. Now, in your report, you have, in several places, talked |
| 25 | 14:13:06 | about the inadvisability of mooring light to loaded. Do you |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

803

| | |
|---|---|
| 1 | 14:13:10 | recall that? |
| 2 | 14:13:11 | A.  Absolutely, yes. |
| 3 | 14:13:12 | Q.  And I think you referred to it repeatedly as "common |
| 4 | 14:13:15 | sense"? |
| 5 | 14:13:15 | A.  Correct. |
| 6 | 14:13:16 | Q.  Okay.  Would you explain to the Court and for the record, |
| 7 | 14:13:18 | what are the problems and concerns you have, particularly from |
| 8 | 14:13:22 | an engineering standpoint, about light to loaded mooring? |
| 9 | 14:13:27 | A.  Yes.  The mooring of two vessels that have a different |
| 10 | 14:13:38 | elevation of the mooring equipment, like cleats, and -- results |
| 11 | 14:13:46 | in additional stresses and forces on the stresses to the |
| 12 | 14:13:50 | mooring lines; and the stresses in the mooring lines could be |
| 13 | 14:13:58 | several -- a dozen times or hundreds of times larger than the |
| 14 | 14:14:06 | stresses that you would have had if you were on the same level. |
| 15 | 14:14:16 | Because a force -- a force in the mooring line can be |
| 16 | 14:14:19 | divided in two components, a horizontal component and a |
| 17 | 14:14:21 | vertical component.  The force in the line is many times larger |
| 18 | 14:14:28 | than the horizontal component, which is the force that affects |
| 19 | 14:14:34 | a floating vessel, the barge, from moving away. |
| 20 | 14:14:37 | Q.  Let me interrupt you and just see if I understand this |
| 21 | 14:14:40 | right, and I can clarify it a little bit for the record. |
| 22 | 14:14:43 | Mr. Webb earlier in the week had a big section of new |
| 23 | 14:14:47 | blue, presumably polypropylene rope.  And you've read in this |
| 24 | 14:14:52 | case the testimony that it was 2-inch diameter blue |
| 25 | 14:14:57 | polypropylene rope that was used to moor the 4727, okay? |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

804

| | |
|---|---|
| 1 | 14:15:02 | A.  Yes. |
| 2 | 14:15:02 | Q.  As I understand you, if that rope is applied horizontally |
| 3 | 14:15:05 | between two barges or between a barge and a dock and they are |
| 4 | 14:15:09 | close in height, you get maximum benefit of that rope's |
| 5 | 14:15:13 | strength? |
| 6 | 14:15:14 | A.  Absolutely. |
| 7 | 14:15:15 | Q.  But if you moor it so that the line is not horizontal, but |
| 8 | 14:15:19 | diagonal, whether up or down, what have you done to the |
| 9 | 14:15:27 | strength of the rope that is available to sustain the mooring |
| 10 | 14:15:30 | as an engineering matter? |
| 11 | 14:15:33 | A.  Well, the decision of mooring two vessels that have |
| 12 | 14:15:36 | different elevations, one alongside the other, will result in |
| 13 | 14:15:41 | forces in the mooring line many times larger than the force |
| 14 | 14:15:51 | that will receive the mooring line if the two decks were |
| 15 | 14:15:54 | approximately the same level. |
| 16 | 14:15:56 | Q.  Okay.  Is it fair to say then that of all of the forces |
| 17 | 14:16:01 | that can act on two vessels moored together, the line is going |
| 18 | 14:16:06 | to less tolerate those forces and fail sooner if it is |
| 19 | 14:16:11 | diagonally installed as opposed to horizontally? |
| 20 | 14:16:14 | A.  Absolutely.  Will receive many times larger forces if it's |
| 21 | 14:16:19 | not on the same level. |
| 22 | 14:16:22 | Q.  All right.  Now, I want you to assume that, according to |
| 23 | 14:16:28 | the persons involved, whose testimony before you came here and |
| 24 | 14:16:31 | I think in depositions you have reviewed, that the light barge |
| 25 | 14:16:34 | was approximately eight feet higher than the loaded barge when |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

805

| | |
|---|---|
| 1 | 14:16:39 | they were moored and left at the Lafarge dock on Saturday. |
| 2 | 14:16:42 | A.  Yes. |
| 3 | 14:16:42 | Q.  And that when they moored them in that fashion, the crew |
| 4 | 14:16:45 | was only able to bring them to a position where they were about |
| 5 | 14:16:49 | two feet apart, that is, they were not touching.  Okay? |
| 6 | 14:16:53 | Now, when you have that situation, even with three |
| 7 | 14:16:56 | single part lines, what hydrodynamic forces, if you will -- |
| 8 | 14:17:03 | what effect do hydrodynamic forces, that is, the movement of |
| 9 | 14:17:10 | these two structures with that mooring on the water, what does |
| 10 | 14:17:13 | that do to those lines and that mooring arrangement? |
| 11 | 14:17:16 | A.  Okay.  The two barges are two floating independent |
| 12 | 14:17:22 | vessels.  Both are moving all the time because are floating in |
| 13 | 14:17:28 | water and they're moving all the time, and both not necessarily |
| 14 | 14:17:32 | moving in the same direction at the same time. |
| 15 | 14:17:34 | So one may be moving up and the other may be moving |
| 16 | 14:17:41 | down.  So the forces in the lines are very much increasing due |
| 17 | 14:17:53 | to the differential movement of the two vessels in different |
| 18 | 14:17:58 | directions, you know, in heave, pitch, draw, sway, so there are |
| 19 | 14:18:06 | six different movements -- six different actions that each |
| 20 | 14:18:11 | vessel, independent, adopt depending on the incoming waves and |
| 21 | 14:18:17 | incoming waves and tides and current. |
| 22 | 14:18:23 | So it's very difficult to predict what these forces |
| 23 | 14:18:30 | will do unless the lines are firmly at the same level, which in |
| 24 | 14:18:38 | this case didn't occur. |
| 25 | 14:18:39 | Q.  So since you said these two vessels are floating |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

806

| | |
|---|---|
| 1 | 14:18:42 | independently, you could have a wave that could come through, |
| 2 | 14:18:45 | raise one, drop it, raise the other, and result in shock |
| 3 | 14:18:48 | loading of those lines? |
| 4 | 14:18:50 | A.  Absolutely.  This is what I've been trying to explain. |
| 5 | 14:18:55 | Q.  All right.  Now, you also, in your report, have talked |
| 6 | 14:19:00 | about wave reflection and wave superposition due to barriers on |
| 7 | 14:19:05 | waterways. |
| 8 | 14:19:06 | A.  Correct. |
| 9 | 14:19:06 | Q.  Docks at Lafarge are barriers, are they not? |
| 10 | 14:19:10 | A.  Repeat, please. |
| 11 | 14:19:11 | Q.  The docks at this Lafarge waterfront facility are barriers |
| 12 | 14:19:15 | to water movement, are they not? |
| 13 | 14:19:17 | A.  Yes, correct. |
| 14 | 14:19:18 | Q.  Do the principles of wave reflection and wave |
| 15 | 14:19:20 | superposition that you described in your report, I think at |
| 16 | 14:19:24 | page 40, apply to that type of barrier? |
| 17 | 14:19:28 | A.  Absolutely. |
| 18 | 14:19:28 | Q.  Just explain to the Court briefly, and to, laypeople who |
| 19 | 14:19:33 | may be reading this, us lawyers who are not engineers, what |
| 20 | 14:19:38 | wave reflection and wave superposition mean. |
| 21 | 14:19:41 | A.  Okay.  Waves are in relation of the water.  And a wave |
| 22 | 14:19:52 | crest approach sort of the structure, like a dock, it will |
| 23 | 14:20:00 | reflect.  And if approached at an angle, when the reflecting |
| 24 | 14:20:08 | wave meets an incoming wave, there is a possibility occur often |
| 25 | 14:20:16 | that the height of the wave and, therefore, the results of the |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

10  (Pages 803 to 806)

## 807

```
14:20:24  wave are doubled.
14:20:26      Now, this is -- can be shown in many illustrations,
14:20:31  and there are in hundreds of books in hydrodynamics.  This
14:20:37  superposition of incoming and reflecting waves could result in
14:20:44  sometimes in the double the height of incoming wave.
14:20:48      So if you have a six-foot wave incoming and at a
14:20:53  certain point the two crests coincide, could result in a
14:20:57  12-foot wave.
14:20:59  Q.  Okay.  So at the Lafarge facility, what some people
14:21:02  have referred to as a turning basin, it's three-sided; am I
14:21:08  correct?
14:21:08  A.  Plenty of reflecting waves.
14:21:10  Q.  And three reflecting surfaces?
14:21:12  A.  Yes.
14:21:13  Q.  And so that's going to come into play, from a
14:21:17  hydrodynamics standpoint, on these vessels that have an
14:21:20  eight-feet height differential and are two -- two feet apart
14:21:23  when the crew leaves?
14:21:25  A.  Correct.  And they're two feet apart, sometimes maybe more
14:21:29  than two feet, and sometimes maybe close together.
14:21:32  Q.  That's what I was also going to ask you.  If they leave it
14:21:34  two feet apart, does that mean, from an engineering and
14:21:38  hydrodynamic standpoint, it's going to stay two feet apart?
14:21:41  A.  Well, it's going to vary all the time, and so...
14:21:46  Q.  They can move closer, and they can move further apart
```

## 808

```
14:21:51  stretching the ropes?
14:21:52  A.  Correct.  Absolutely.
14:21:52  Q.  And those movements put additional stresses on these
14:21:57  diagonal lines that are not going to hold as much -- have as
14:21:58  much strength as if they were horizontal?
14:21:59  A.  Well, it puts shocking stresses.
14:22:00  Q.  Shocking stresses.
14:22:03      And these effects, these hydrodynamic effects of wave
14:22:15  reflection and wave superposition due to barriers, is it -- I
14:22:22  guess the effects exist even at low levels of winds.  But they
14:22:28  increase with higher levels of winds?
14:22:30  A.  Well, you're talking about a wind in relation to waves; is
14:22:35  right?  Repeat your question, please.
14:22:37  Q.  I guess what I'm -- well --
14:22:42      MR. WALKER:  Your Honor.
14:22:43  Q.  Maybe I need to let you tell me, instead of me asking the
14:22:46  question back.
14:22:47      MR. WALKER:  I just need to make the comment, as the
14:22:47  other day.  I know he's an expert and can be led, but I think
14:22:50  even Mr. Pazos would prefer a question so that he can
14:22:53  understand the question.
14:22:55      MR. BEST:  Obviously, I asked it badly.
14:22:56  BY MR. BEST:
14:22:56  Q.  How do the winds --
```

## 809

```
14:22:57      THE COURT:  Noted.  You're allowed to lead, but if I
14:22:59  get to the point where I think Mr. Best is testifying again,
14:23:02  I'll note that.  And, two, the Court's interested in what the
14:23:05  witness has to say.
14:23:07  BY MR. BEST:
14:23:07  Q.  What do winds have to do with wave reflection and wave
14:23:11  superposition in an area with barriers?
14:23:15  A.  Okay.  The winds, although the majority of people think
14:23:19  it's horizontal, it never horizontal.  However, there are four
14:23:20  degrees of elevation.  Deflection of the wind on the surface of
14:23:29  the water, it will create the waves.
14:23:32      And the waves are at the relation, whereas I think
14:23:37  the crest always starts late.  So the winds acting in the waves
14:23:44  will increase eventually the displacement or the speed of a
14:23:52  crest and the height of a crest.
14:23:54      And when this, again, in the case of water like the
14:24:00  Intercoastal Harbor Canal is so surrounding for a structure,
14:24:11  that allows a number of different reflecting waves, which when
14:24:20  the crest launches, will increase the height of the water of
14:24:26  these locations.
14:24:29      So the winds and the waves and the reflected waves
14:24:37  are all interrelated all the time, and changing all the time.
14:24:44  Q.  But the phenomenon doesn't cease to exist, say, at
14:24:49  25-mile-per-hour winds.  It's still there, it's just not having
14:24:54  the same effect as maybe at 75-mile-per-hour winds?
```

## 810

```
14:24:59  A.  Correct.  But, you know, a 25-mile-per-hour wind can also
14:25:02  develop substantial wave when the incoming and deflecting waves
14:25:08  interfere, yes.
14:25:09  Q.  Does wave reflection and wave superposition due to
14:25:14  barriers, can that also result from vessel traffic?
14:25:18  A.  Yes.
14:25:20  Q.  Independent of the wind?
14:25:22  A.  Yes.
14:25:22  Q.  And are all these types of water movements you've been
14:25:56  describing important to your mooring opinions that you've
14:25:58  already given in your report?
14:26:00  A.  Absolutely, yes.
14:26:18  Q.  You referenced in your report CFR 162.75, which I'd like
14:26:23  to put on the ELMO, particularly this portion at the bottom.
14:26:41      And then you've quoted this in your report, that they
14:26:44  have be moored by bow and stern lines.  And this next line:
14:26:49  "Tows shall be secured sufficiently" -- "at sufficiently
14:26:52  frequent intervals to ensure" --
14:26:52      THE COURT:  I'm sorry, Mr. Best.  There's an
14:26:54  objection.
14:26:54      Yes, sir?
14:26:55      MR. WALKER:  Yes, Your Honor.  I'm not sure where
14:26:57  this line of questioning is going, but he has not been
14:27:00  qualified as an expert in any regulations.
14:27:04      MR. BEST:  That's true, but he's referenced this
```

**811**

| | | |
|---|---|---|
| 1 | 14:27:06 | provision at three places in his report and talked about the |
| 2 | 14:27:08 | mooring. |
| 3 | 14:27:09 | THE COURT:  Yes, interpreting the regulations will be |
| 4 | 14:27:11 | my job.  But you're asking him how it applies to this case? |
| 5 | 14:27:14 | MR. BEST:  I'm about to ask him about this phrase: |
| 6 | 14:27:17 | "Ensure they're not being drawn away from the bank by winds and |
| 7 | 14:27:22 | currents and suction of passing vessels," which is what we've |
| 8 | 14:27:26 | been talking about. |
| 9 | 14:27:28 | THE COURT:  I'll allow the question. |
| 10 | 14:27:28 | MR. BEST:  Okay. |
| 11 | | BY MR. BEST: |
| 12 | 14:27:29 | Q.  Now, this regulation talks about mooring vessels, and |
| 13 | 14:27:31 | you've cited in your report. |
| 14 | 14:27:33 | What's important, from an engineering standpoint, in |
| 15 | 14:27:36 | terms of the issues you've been talking about, of securing |
| 16 | 14:27:39 | vessels to ensure they're not being drawn away from the bank by |
| 17 | 14:27:46 | winds, currents, or suction of passing vessels?  How does that |
| 18 | 14:27:48 | play in with what you've been talking about? |
| 19 | 14:27:49 | A.  Well, absolutely, these regulations, really, are common |
| 20 | 14:27:53 | sense, are correct, appropriate and common sense.  Anybody can |
| 21 | 14:27:57 | realize that the -- vessel is allowed to move away from the |
| 22 | 14:28:03 | dock, it's in a most dangerous situation, that it will be tied |
| 23 | 14:28:12 | with four or enough lines alongside the dock. |
| 24 | 14:28:14 | Q.  Fair to say that this CFR is concerned with these types of |
| 25 | 14:28:19 | hydrodynamics that you've been describing as they bear on |

**812**

| | | |
|---|---|---|
| 1 | 14:28:24 | mooring? |
| 2 | 14:28:24 | A.  Absolutely. |
| 3 | 14:28:25 | Q.  Fair to say -- and there's no mention -- and this isn't a |
| 4 | 14:28:29 | section on hurricanes or storm preparation, is it? |
| 5 | 14:28:31 | A.  These are common sense regulations. |
| 6 | 14:28:46 | Q.  In your opinion, given the testimony that these two barges |
| 7 | 14:28:53 | were only moored to each other, not to the northern tier, that |
| 8 | 14:28:56 | one was eight feet above the other, that they were left with |
| 9 | 14:28:59 | three single part lines about two feet apart, one of which was |
| 10 | 14:29:05 | a spring line, I think you said, what's the role -- what's the |
| 11 | 14:29:09 | significance of that spring line and in your opinions about the |
| 12 | 14:29:12 | inadequacy of the mooring? |
| 13 | 14:29:14 | A.  It's -- the spring line will not help at all to maintain |
| 14 | 14:29:21 | the barge alongside the dock, so much that the crew of the |
| 15 | 14:29:28 | tugboat emphasized that the line around this ship was at an |
| 16 | 14:29:35 | angle.  That means, it was intended to be a spring line and not |
| 17 | 14:29:39 | necessarily a mooring line. |
| 18 | 14:29:43 | Q.  And a spring -- the bow and stern lines would have been |
| 19 | 14:29:48 | perpendicular moorings? |
| 20 | 14:29:50 | A.  Yes. |
| 21 | 14:29:51 | Q.  Perpendicular as between the two vessels? |
| 22 | 14:29:54 | A.  Yes. |
| 23 | 14:29:55 | Q.  A spring line is what type of mooring, if not |
| 24 | 14:29:58 | perpendicular? |
| 25 | 14:30:00 | A.  Well, it's in a diagonal -- diagonal direction.  It's at |

**813**

| | | |
|---|---|---|
| 1 | 14:30:02 | an angle, which is -- is good if you don't want the barges to |
| 2 | 14:30:10 | move forward in a far enough direction, but will not help for |
| 3 | 14:30:14 | the barge moving sideways away from the dock or away from the |
| 4 | 14:30:19 | other barge. |
| 5 | 14:30:19 | Q.  And given the eight feet height differential, this |
| 6 | 14:30:22 | diagonal line is going diagonally down, and as a spring line |
| 7 | 14:30:27 | diagonally across? |
| 8 | 14:30:29 | A.  Diagonally down, so it's very -- and useful for moving |
| 9 | 14:30:38 | purposes. |
| 10 | 14:30:39 | Q.  Given this arrangement, as you understand it, and I've |
| 11 | 14:30:41 | asked you to assume it based on the eight-foot height |
| 12 | 14:30:44 | differential, the -- being left at about two feet apart in this |
| 13 | 14:30:51 | turning basin at Lafarge, what's your opinion as to the |
| 14 | 14:30:57 | adequacy of that mooring in terms of people leaving the |
| 15 | 14:31:01 | facility and leaving it like that? |
| 16 | 14:31:05 | A.  It was absolutely a very poor mooring situation.  Mostly |
| 17 | 14:31:09 | when they claim that they have one line, leaving one on |
| 18 | 14:31:17 | the -- a line at one end, an old defective line, which could |
| 19 | 14:31:23 | part very easily. |
| 20 | 14:31:25 | Q.  Is that type of mooring arrangement at risk for failure, |
| 21 | 14:31:28 | even before the onset of hurricane winds? |
| 22 | 14:31:31 | A.  Absolutely.  It was improper. |
| 23 | 14:31:33 | Q.  Is that type of hurricane -- mooring arrangement at risk |
| 24 | 14:31:36 | for failure simply from vessel traffic alone? |
| 25 | 14:31:39 | A.  Absolutely.  It's just extremely temporary and extremely |

**814**

| | | |
|---|---|---|
| 1 | 14:31:46 | poor for the location. |
| 2 | 14:31:58 | Q.  Now, you've seen Mr. Green's report, I think you said, and |
| 3 | 14:32:02 | he had just referencing you, so I can ask you a question.  He |
| 4 | 14:32:05 | talks about the potential for this rope to fail at |
| 5 | 14:32:08 | 36-mile-per-hour winds.  Do you recall that? |
| 6 | 14:32:11 | A.  Yes. |
| 7 | 14:32:11 | Q.  Okay.  Hydrodynamically, am I to understand you can create |
| 8 | 14:32:15 | forces on those ropes which would cause it to fail irrespective |
| 9 | 14:32:20 | of the winds? |
| 10 | 14:32:21 | A.  Yes.  By movement of the water in the enclosed -- fairly |
| 11 | 14:32:30 | enclosed area. |
| 12 | 14:32:31 | Q.  So winds could cause the mooring to fail, but |
| 13 | 14:32:34 | hydrodynamics could cause it to fail as well? |
| 14 | 14:32:37 | A.  Are interrelated, yes. |
| 15 | 14:32:38 | Q.  Or a combination of the two? |
| 16 | 14:32:40 | A.  Yes. |
| 17 | 14:32:41 | Q.  Is it possible to say exactly when, how, or why this |
| 18 | 14:32:44 | mooring failed? |
| 19 | 14:32:49 | A.  No, unless we had -- we had a witness at the location with |
| 20 | 14:32:55 | a -- watching the time very closely. |
| 21 | 14:32:58 | Q.  Is there anything from an engineering standpoint, in your |
| 22 | 14:33:00 | experience, that makes the testimony of LeBlanc and Tompkins |
| 23 | 14:33:05 | impossible? |
| 24 | 14:33:06 | A.  No. |
| 25 | 14:33:18 | Q.  Okay.  Now, you made some recommendations in your report, |

**815**

1  14:33:21  moving on from the mooring arrangement to you've talked about
2  14:33:25  ballasting of this vessel.
3  14:33:27      Why was it you recommended that some consideration be
4  14:33:30  given to ballasting?
5  14:33:32  A.  Well, it's very common sense and obvious that it was
6  14:33:40  improper to attach one barge to another when the differential
7  14:33:48  height of the decks is substantial, like eight feet.  They
8  14:33:53  don't make any sense.  And, therefore, they should have applied
9  14:34:02  any attempt to reduce the differential height of the decks.
10  14:34:08      And, of course, the simple thing would be to ballast,
11  14:34:11  since this is a barge that had a double hull, the double bottom
12  14:34:17  and wing tanks.  So it's very easy to ballast down.  And they
13  14:34:23  could have reduced the differential elevation of the decks at
14  14:34:29  least by 50 percent or more.
15  14:34:31  Q.  Okay.  Let's just say -- you said -- let's talk about,
16  14:34:34  first, what do you ballast with when you're contemplating
17  14:34:38  ballasting?  What are you talking about?
18  14:34:40  A.  Well, this -- this hopper barge.  They have a double hull,
19  14:34:44  have a double bottom tanks and wing tanks.
20  14:34:49  Q.  I'm sorry.  Double bottom tanks --
21  14:34:52  A.  Tanks --
22  14:34:52  Q.  -- and wing tanks?
23  14:34:52  A.  -- and wing tanks.  They all have manholes and either wing
24  14:34:58  tank manholes on deck.  And they can open the manhole -- the
25  14:35:02  manhole cover and put a hose of a power pump and pump, you

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**816**

1  14:35:09  know, water from the canal into the body very easy.  So they
2  14:35:18  could have ballasted the barge by filling with ballast water
3  14:35:23  very easy, to reduce the elevation of the deck.
4  14:35:29  Q.  Okay.  Now, why just the void spaces, or the spaces
5  14:35:33  between -- and/or the spaces between the double hull, instead
6  14:35:36  of just pouring water in all the hulls?
7  14:35:39  A.  Well, it's possible to do it.  But putting water in the
8  14:35:47  main hull will eventually reduce the stability of the barge and
9  14:35:56  it's not recommended, because what is called free surface.
10  14:36:00  While the tanks, the wing tanks and the double bottoms can be
11  14:36:05  ballasted with no problems, the other thing is stability.
12  14:36:08  Q.  Okay.  So we don't compromise the stability of the barge
13  14:36:11  if we just ballast the void spaces in the double hulls?
14  14:36:15  A.  Absolutely.  We help the stability.
15  14:36:17  Q.  To ballast, though, even the voids and the double hull,
16  14:36:22  you have to have some planning so you have the right pumps and
17  14:36:25  equipment there to get this done?
18  14:36:27  A.  Correct.
19  14:36:27  Q.  You don't see any indication that that existed here?
20  14:36:30  A.  Well, either they have to have pumps, or they can call
21  14:36:35  the -- almost every vessel have pumps which they can pump
22  14:36:40  water.  So they could retain the services of a tugboat or other
23  14:36:47  vessels in the area.
24  14:36:48  Q.  Okay.  Now, you also included in your report an opinion
25  14:36:51  that the unloading should have been stopped before the -- and I

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**817**

1  14:36:55  gather you mean before you the height differential of the
2  14:36:59  vessels got significant?
3  14:37:00  A.  Correct.  Because when they realized that the hurricane
4  14:37:04  was approaching, they should have paid attention to the
5  14:37:10  different recommendations, including, cautionary in taking
6  14:37:16  action to prevent what I suspect that when a hurricane is
7  14:37:21  getting close.
8  14:37:22  Q.  Now, I'm not going to get into when they should have
9  14:37:27  stopped unloading in terms of the time line, because I think
10  14:37:30  that's been covered by Mr. Green already.
11  14:37:30      But let me just ask you this:  Assuming that at some
12  14:37:34  point during the unloading they decided maybe they should stop.
13  14:37:38  I want you to further assume that in the pretrial order Lafarge
14  14:37:42  says that they completed unloading, and that that was
15  14:37:46  reasonable because it was best not to leave the
16  14:37:50  partially-unloaded vessel sitting unbalanced in the water.
17  14:37:54      Let's just assume, say, they decided to stop
18  14:37:55  unloading halfway through and that the barge is higher at one
19  14:37:59  end than the other when they would do that.
20  14:38:02      Is -- what are the consequences of that in terms of
21  14:38:07  the ability to, say, move this vessel out of the canal with a
22  14:38:10  towboat?
23  14:38:12  A.  For shorter distance towing, no problem whatsoever.
24  14:38:19  Q.  Meaning hypothetically, if where they were going to take
25  14:38:21  it was the Zito fleet nearby in the Mississippi River -- and

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**818**

1  14:38:25  you understand where that is, based on materials you've
2  14:38:27  reviewed?
3  14:38:28  A.  Yes, yes.
4  14:38:28  Q.  Would it being in that condition create such a stability
5  14:38:32  problem that it could not have been moved in that condition to
6  14:38:35  the Zito feet had arrangements been made?
7  14:38:38  A.  None whatsoever.  It would not have any instability
8  14:38:42  problem of any kind.  The only problem for long tow will be
9  14:38:47  directional instability, because the barge will not follow the
10  14:38:52  tugboat properly for a long distance towing in open waters.
11  14:38:57  Q.  Okay.  Now, you've also given an opinion in your report
12  14:39:02  that the three single part lines should have been doubled.  All
13  14:39:05  right?
14  14:39:05      And with reference to that, this same CFR 162.95, you
15  14:39:14  saw where it talked about mooring the vessel both at bow and
16  14:39:18  stern.
17  14:39:18      From a marine engineering standpoint, what does that
18  14:39:22  mean to you in terms of how you moor a vessel bow and stern,
19  14:39:26  whether there's a storm coming or not?
20  14:39:29  A.  Well, to me, the intention of the Coast Guard and any
21  14:39:41  other entity will be to double the strength capacity of the
22  14:39:47  mooring lines at both ends to force the barge to remain
23  14:39:53  parallel to the dock and not sway away from the dock.
24  14:39:58  Q.  Well, assuming here that when they prepared this vessel
25  14:40:03  for the storm they put a new line on one end and left an

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**13 (Pages 815 to 818)**

819

| | | |
|---|---|---|
| 1 | 14:40:06 | existing line on the other end, what does that do to the |
| 2 | 14:40:10 | relative strength of the lines at the two ends of the barge? |
| 3 | 14:40:14 | A.  Well, it was a real bad decision to only double the lines |
| 4 | 14:40:22 | or the capacity of the lines at one end and not do anything |
| 5 | 14:40:26 | with the other end. |
| 6 | 14:40:28 | Because the other end, you'd have a mooring line that |
| 7 | 14:40:33 | was damaged by use, would be failing, afraid the barge would |
| 8 | 14:40:39 | move away from the dock or the other barge it was attached to. |
| 9 | 14:40:43 | Q.  Are the moorings going to be of equal strength at both |
| 10 | 14:40:46 | ends, as described? |
| 11 | 14:40:49 | A.  This is idea, idea is not to let a vessel move away from |
| 12 | 14:40:54 | the dock area or from the barge it was attached to. |
| 13 | 14:40:59 | Q.  And I think in your report you've done some calculations |
| 14 | 14:41:01 | about the effect of not having the same strength line at each |
| 15 | 14:41:06 | end? |
| 16 | 14:41:07 | A.  Very briefly.  I don't know if it's in my report. |
| 17 | 14:41:11 | Q.  Okay.  Now -- but in addition to having single part lines |
| 18 | 14:41:16 | at each end that were of unequal strength, we also did not have |
| 19 | 14:41:21 | those lines doubled or looped twice or more, did we? |
| 20 | 14:41:29 | A.  Well, it's not clear how they were attached.  The key is |
| 21 | 14:41:34 | they should have amended or doubled the strength capacity of |
| 22 | 14:41:40 | the line at both ends of the barge. |
| 23 | 14:41:43 | Q.  From a strength standpoint and an engineering standpoint |
| 24 | 14:41:45 | is your concern? |
| 25 | 14:41:46 | A.  Yes. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

820

| | | |
|---|---|---|
| 1 | 14:41:53 | Q.  Now, moving on to the wall issues that you've included in |
| 2 | 14:41:58 | your report. |
| 3 | 14:42:00 | What did you do to put yourself in a -- I'm not going |
| 4 | 14:42:02 | to go through everything you've reviewed.  I'll save that. |
| 5 | 14:42:06 | Do you feel that you had enough material at your |
| 6 | 14:42:08 | disposal that you reviewed, as you've listed it in your report, |
| 7 | 14:42:13 | to arrive -- to give you enough information to give an expert |
| 8 | 14:42:17 | opinion about the causes of the wall failures? |
| 9 | 14:42:19 | A.  Absolutely. |
| 10 | 14:42:23 | Q.  Did you document and material review include the other |
| 11 | 14:42:29 | studies done as to the causes of wall failure? |
| 12 | 14:42:32 | A.  Yes. |
| 13 | 14:42:34 | Q.  Now, going first to the north breach.  Just summarize |
| 14 | 14:42:42 | briefly for the Court what your report says and your opinions |
| 15 | 14:42:45 | are about the failure at the north breach. |
| 16 | 14:42:49 | A.  Well, as assuming for the north breach is that the north |
| 17 | 14:43:04 | breach floodwall had this continuity, because the normal piling |
| 18 | 14:43:13 | were about 23 feet in length, while at this location they have |
| 19 | 14:43:24 | piling 35 feet.  And it appears that it was welding that was |
| 20 | 14:43:35 | not proper.  And with no major force of impact, this welding |
| 21 | 14:43:48 | was disturbed, or it started cracking, and appears like the |
| 22 | 14:43:54 | barge contacted the piling that was related to this change of |
| 23 | 14:44:03 | continuity. |
| 24 | 14:44:03 | Q.  Let me interrupt you and put up Exhibit 378, figure 2, and |
| 25 | 14:44:08 | ask you if that's what you're talking about. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

821

| | | |
|---|---|---|
| 1 | 14:44:13 | MR. BEST:  And maybe we can enlarge it just a little |
| 2 | 14:44:16 | bit, Mr. Snyder. |
| 3 | 14:44:22 | BY MR. BEST: |
| 4 | 14:44:22 | Q.  So the joint that you're talking about is that which we -- |
| 5 | 14:44:26 | this vertical surface going down into the ground that we see? |
| 6 | 14:44:30 | A.  Yes.  It's clear in this picture that there was a weld |
| 7 | 14:44:37 | that become separated, cut. |
| 8 | 14:44:39 | Q.  And if I could summarize what you're saying, if I may, the |
| 9 | 14:44:43 | sheet pilings in the levee here at this point, shift from one |
| 10 | 14:44:49 | length or depth to another? |
| 11 | 14:44:51 | A.  Correct. |
| 12 | 14:44:52 | Q.  And then there's a weld that welds them together? |
| 13 | 14:44:54 | A.  Correct. |
| 14 | 14:44:55 | Q.  Okay.  So what happens then, we have this -- is it fair to |
| 15 | 14:45:00 | char- -- you called it a discontinuity? |
| 16 | 14:45:03 | A.  Yes. |
| 17 | 14:45:04 | Q.  Does that make is it stronger or weaker than other parts |
| 18 | 14:45:07 | of the wall? |
| 19 | 14:45:08 | A.  Well, no.  It's a structural discontinuity that makes the |
| 20 | 14:45:12 | location weak, because the stresses come in magnified very |
| 21 | 14:45:18 | easy. |
| 22 | 14:45:19 | Q.  And you've read Mr. Villavaso's testimony? |
| 23 | 14:45:23 | A.  Repeat, please. |
| 24 | 14:45:24 | Q.  You've read Mr. Villavaso's testimony? |
| 25 | 14:45:26 | A.  Yes, absolutely. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

822

| | | |
|---|---|---|
| 1 | 14:45:27 | Q.  And if you assume that he's right when he stood there in |
| 2 | 14:45:31 | the doorway of that building in the back and he said he saw |
| 3 | 14:45:33 | something that looked like a corner of the barge come through |
| 4 | 14:45:36 | the wall, how does that connect with these findings in this |
| 5 | 14:45:39 | photo and the failure of the wall at this point? |
| 6 | 14:45:45 | A.  It absolute matches.  Matches because the locations can be |
| 7 | 14:45:49 | seen in this photograph.  Where he was standing, he could have |
| 8 | 14:45:53 | seen this situation very easy. |
| 9 | 14:45:57 | Q.  Okay.  Now, if what he says is true, that he saw two or |
| 10 | 14:46:01 | three panels adjacent that were there go down, what would that |
| 11 | 14:46:09 | do to the rest of the wall? |
| 12 | 14:46:12 | A.  Well, I believe he -- he used the words "the panels" -- I |
| 13 | 14:46:19 | believe the panels were inclined or tilted, and continued doing |
| 14 | 14:46:27 | so for several panels, creating gaps by pushing the panel and |
| 15 | 14:46:36 | the attached sheet pile inland a few inches. |
| 16 | 14:46:40 | Q.  Okay.  So when the sections of the wall that -- south of |
| 17 | 14:46:45 | this failed area that we see, if it leans back, you say it |
| 18 | 14:46:50 | creates a gap, meaning a gap between the base of the wall and |
| 19 | 14:46:54 | the sheet pile and the soil levee? |
| 20 | 14:46:56 | A.  Correct.  In the water side of the soil levee. |
| 21 | 14:47:00 | Q.  And then what happens?  What fills that gap? |
| 22 | 14:47:02 | A.  Well, then the hydrostatic pressure will easily get to the |
| 23 | 14:47:09 | bottom of the sheet pile and will -- it pulls the hydraulic |
| 24 | 14:47:17 | pressure to the areas of the soil on the protected side of the |
| 25 | 14:47:24 | levee, and in addition to the failure of the elastomeric |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

823

| | |
|---|---|
| 1 | 14:47:39  joints. |
| 2 | 14:47:39  Q.  And I'm going to now show you Exhibit 397, page 13.  I'm |
| 3 | 14:47:44  going to ask you what's the significance of this photo, which |
| 4 | 14:47:48  is standing where we just were at the crack in the -- I'm |
| 5 | 14:47:53  sorry.  I forgot to ask you a question about the last photo. |
| 6 | 14:47:57          MR. BEST:  Mr. Snyder, would you bring it back up?  I |
| 7 | 14:48:00  got ahead of myself just a little bit. |
| 8 | BY MR. BEST: |
| 9 | 14:48:03  Q.  Going back now to Plaintiffs' Exhibit 378, what's the |
| 10 | 14:48:08  significance of the fact that the part of the wall on the left |
| 11 | 14:48:11  side of the figure that's north of the discontinuity that you |
| 12 | 14:48:14  just told us about, looks like it's standing up pretty straight |
| 13 | 14:48:20  and vertical here? |
| 14 | 14:48:22  A  Absolutely.  Almost undisturbed. |
| 15 | 14:48:23  Q.  Is there any indication, in that almost undisturbed |
| 16 | 14:48:26  section of the wall that this wall is failing because of -- it |
| 17 | 14:48:29  was failing before the contact for any reason? |
| 18 | 14:48:33  A.  None whatsoever.  It's absolutely immovable, so have not |
| 19 | 14:48:39  been affected at all, which indicates that something have to |
| 20 | 14:48:45  have pushed the area of the weld of the connection between the |
| 21 | 14:48:53  two sheet piles in order to initiate the continuation of the |
| 22 | 14:49:00  crack. |
| 23 | 14:49:00  Q.  Going back now to Exhibit 397, page 13. |
| 24 | 14:49:06          I think -- so now, assuming we're at the -- this is |
| 25 | 14:49:11  taken from the perspective of the crack we just looked at in |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

824

| | |
|---|---|
| 1 | 14:49:15  the last exhibit looking south.  How does the -- do the events |
| 2 | 14:49:18  that Mr. Villavaso described result in the bowing in and |
| 3 | 14:49:24  failure of the wall as we see it in this photo? |
| 4 | 14:49:28  A.  Well, this photo shows clearly that underseepage was an |
| 5 | 14:49:35  important explanation for the failure.  Because this photograph |
| 6 | 14:49:44  shows that at the southern end of the north breach, the seawall |
| 7 | 14:49:52  titled with the concrete panels going flat from hydraulic |
| 8 | 14:50:06  pressure. |
| 9 | 14:50:06          While at the other end, the north end of the north |
| 10 | 14:50:09  breach, the sheet piling rotates, indicating that seepage |
| 11 | 14:50:18  was -- had more time to act at the north end of the northern |
| 12 | 14:50:25  breach in relation to the initiation of the failure due to the |
| 13 | 14:50:31  barge pushing on the first panel. |
| 14 | 14:50:35  Q.  And, in fact, we can see in the center of this photograph |
| 15 | 14:50:38  some of the sheet piles were pulled completely out of the |
| 16 | 14:50:40  ground as the wall collapsed? |
| 17 | 14:50:42  A.  Yes. |
| 18 | 14:50:42  Q.  And as I understand what you're saying, is this |
| 19 | 14:50:48  underseepage that resulted in this failure that we're looking |
| 20 | 14:50:51  at, is a result of that gap and water being able -- the gap |
| 21 | 14:50:55  created by the impact, allowing water to get in and undermine |
| 22 | 14:51:00  this section of the wall? |
| 23 | 14:51:02  A.  Absolutely. |
| 24 | 14:51:04  Q.  And is -- you've seen the testimony of Mr. Terry Adams, |
| 25 | 14:51:13  that when we woke up and there's water on the floor, he gets to |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

825

| | |
|---|---|
| 1 | 14:51:18  the attic and gets out on the roof and he looks over and he |
| 2 | 14:51:21  sees the water coming through the wall.  Do you remember that |
| 3 | 14:51:24  testimony? |
| 4 | 14:51:25  A.  Yes, yes. |
| 5 | 14:51:29  Q.  And assuming he's correct when he says that what he saw was |
| 6 | 14:51:32  water both coming over and coming up at the base of the |
| 7 | 14:51:35  floodwall, is that consistent with the scenario you've just |
| 8 | 14:51:42  described? |
| 9 | 14:51:42  A.  Yes. |
| 10 | 14:51:43  Q.  Does it support the scenario you've just described? |
| 11 | 14:51:45  A.  Yes. |
| 12 | 14:51:46  Q.  Does it explain the findings in this photograph? |
| 13 | 14:51:57  A.  Yes. |
| 14 | 14:51:58  Q.  Now, the water level in the inner -- you've reviewed some |
| 15 | 14:51:59  information about the water levels in the canal at the time of |
| 16 | 14:52:03  this breach? |
| 17 | 14:52:04  A.  Yes. |
| 18 | 14:52:04  Q.  And it's on page 19 of your report.  But if, as I -- if I |
| 19 | 14:52:07  may summarize, at 5:00 a.m. it was 10 to 10 1/2 feet of water |
| 20 | 14:52:13  in the canal? |
| 21 | 14:52:13  A.  Yes. |
| 22 | 14:52:14  Q.  7:00 a.m. it would have been 12 1/2? |
| 23 | 14:52:17  A.  Yes. |
| 24 | 14:52:17  Q.  And you've done sort of a time line.  What is your opinion |
| 25 | 14:52:19  about the time frame within which this failure was initiated? |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

826

| | |
|---|---|
| 1 | 14:52:24  A.  Well, the failure was initiated at a relatively low |
| 2 | 14:52:31  elevation of the water, which indicate there has to be a |
| 3 | 14:52:35  standard fault, which is the barge, initiating the failure of |
| 4 | 14:52:42  the north part of the north breach. |
| 5 | 14:52:44  Q.  The floodwall height was 15 feet; is that correct? |
| 6 | 14:52:46  A.  Yes. |
| 7 | 14:52:47  Q.  So at 5:00 a.m., if the water is 10 to 10 1/2 feet, the |
| 8 | 14:52:51  floodwall at 15 feet is substantially above the top of the |
| 9 | 14:52:54  water but for wind and wave action? |
| 10 | 14:52:57  A.  Correct.  Absolutely. |
| 11 | 14:52:58  Q.  Okay. |
| 12 | 14:52:59          So am I understanding you correctly that with the |
| 13 | 14:53:03  water level of 10 to 10 1/2 feet, you would not have enough |
| 14 | 14:53:07  hydrostatic force existing alone to comprise this wall? |
| 15 | 14:53:12  A.  It was common -- common date type, hydro 34, nothing |
| 16 | 14:53:15  unusual. |
| 17 | 14:53:16  Q.  And that's also consistent with the photo of the vertical |
| 18 | 14:53:20  straight upright wall to the north of the broken connection and |
| 19 | 14:53:25  discontinuity? |
| 20 | 14:53:26  A.  Yes, correct. |
| 21 | 14:53:26  Q.  No indication of hydrostatic pressure or effect on that |
| 22 | 14:53:30  wall, whatsoever? |
| 23 | 14:53:31  A.  Yeah, no problem whatsoever. |
| 24 | 14:53:46  Q.  And these sheet piles in this photograph we're looking at |
| 25 | 14:53:50  are corrected to one another in what manner? |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**827**

1  14:53:52   A.  They have an interlock at the driver pile, so one pile is
2  14:53:58   driven and the next pile is pushed down by the cover to the
3  14:54:05   sliding and the interlock.
4  14:54:08   Q.  So they each hook together?
5  14:54:09   A.  Yes.
6  14:54:10   Q.  Like if my fingers and my hand --
7  14:54:13   A.  Absolutely.
8  14:54:14   Q.  So, now, when we have that break in the previous exhibit
9  14:54:18   at the point where the wall remained vertical, where the, in
10  14:54:22   your opinion, the impact occurred, what effect does that
11  14:54:25   have -- what does that create, given that the rest of this wall
12  14:54:28   is all hooked together and we've now had a break at the point
13  14:54:31   of discontinuity?
14  14:54:32   A.  Well, it looks like it took a little while, a few minutes,
15  14:54:39   for the crack to spread.  But the interlock remains
16  14:54:48   substantially intact.  So the failure of the connection between
17  14:54:54   the short sheet pile and the long sheet pile was as a result of
18  14:55:02   the initiation of the crack of the wall, which it continued
19  14:55:08   standing as the hydrostatic pressure increased.
20  14:55:12   Q.  Now, when this wall is in place and it's all together --
21  14:55:16   A.  Yes.
22  14:55:17   Q.  -- and there's water in the canal, is there pressure
23  14:55:21   exerted against this interlocked structure?
24  14:55:25   A.  Well, yes.  The entire floodwall have two -- three anchor
25  14:55:35   in places, let's call it, and will stretch as they protect the

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**828**

1  14:55:42   side of the -- of the levee gets compressed and pushed a few
2  14:55:51   inches inland, so the entire series of sheet pile will stretch.
3  14:56:01   Q.  And so, like, if I take a rubber band and I stretch it a
4  14:56:05   little bit --
5  14:56:05   A.  Correct.
6  14:56:06   Q.  -- and then I cut it with scissors, what happens?
7  14:56:11   A.  Well, it will be jumped, very sudden.  A sudden
8  14:56:12   displacement.
9  14:56:14   Q.  That's probably an oversimplification.  But how does that
10  14:56:18   analogy comport with this --
11  14:56:22   A.  Well, it's obvious that this happened in this case in both
12  14:56:26   breaches.
13  14:56:36   Q.  And given the size and dimensions and weight of the barge
14  14:56:42   at issue in this case, is that sufficient to have caused the
15  14:56:48   blow or the contact with the north breach as described by
16  14:56:53   Mr. Villavaso?
17  14:56:55   A.  Oh, absolutely, yes.
18  14:56:57   Q.  And is there anything else that I've missed with respect
19  14:57:03   to the north breach before I move on to the south breach?
20  14:57:07   A.  Well, we could talk for hours.
21  14:57:09   Q.  I know.  And that's what I'm trying to avoid.  But your
22  14:57:13   other opinions about this are sufficiently fleshed out in your
23  14:57:16   report and your declaration --
24  14:57:17   A.  Yes.
25  14:57:18   Q.  -- that are in evidence?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**829**

1  14:57:20   THE COURT:  For the record, what was the size of the
2  14:57:22   length of the north breach, approximately?  Do you recall?
3  14:57:27   THE WITNESS:  Approximately 280 feet.
4  14:57:27   THE COURT:  All right.  Thank you.
5  14:57:27   BY MR. BEST:
6  14:57:27   Q.  And in that regard, would it be --
7  14:57:27   THE COURT:  You said 280; correct?
8  14:57:38   THE WITNESS:  Yes.
9  14:57:38   THE COURT:  2-8-0?
10  14:57:39   THE WITNESS:  Yes, 280.  Some people call it
11  14:57:39   300 feet.  It's very close.
12  14:57:45   MR. ALDOCK:  We'll come back do that, Your Honor.  I
13  14:57:47   think it's a little big.
14  14:57:49   THE COURT:  All right.  Thank you.
15  14:57:51   BY MR. BEST:
16  14:57:51   Q.  What would be the significance of the water levels in the
17  14:57:54   canal at the time you estimate this failure occurred and the
18  14:57:59   failure of this failure to propagate further south?
19  14:58:04   A.  I'm sorry.  Repeat your question.
20  14:58:06   Q.  I'm sure it was badly put.
21  14:58:10   I think it's been your opinion that by the time the
22  14:58:12   south breach happened, the water levels were higher in the
23  14:58:16   canal than the time of the north breach?
24  14:58:18   A.  Correct.  It was going up all the time.
25  14:58:19   Q.  And that would increase the hydrostatic forces?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**830**

1  14:58:21   A.  Yes.
2  14:58:22   Q.  And if you've got gapping involved at either location, the
3  14:58:26   higher water levels will cause more underseepage and quicker
4  14:58:30   failure and higher water conditions?
5  14:58:33   A.  Correct.  And, of course, the failure was depending on the
6  14:58:40   time.  And that's why the configuration of the final resting
7  14:58:46   location of the seawall after the failure is deeper in the
8  14:58:53   protected area in the north side -- or end of the north -- the
9  14:58:59   north break.
10  14:59:01   Q.  Okay.  Listen, this is, quite frankly, way over my head,
11  14:59:04   and I don't want to be reading into this something that's wrong
12  14:59:06   or be incorrect about this.
13  14:59:08   But is there a relationship between the water levels
14  14:59:10   in the canal and the size of the two breaches that occurred at
15  14:59:13   different times and different water levels?
16  14:59:17   A.  Yes.  At the time of the north breach was much lower.
17  14:59:20   Q.  All right.
18  14:59:22   Now, going to the south breach.  And I'm not -- you
19  14:59:37   were present and inspected the barge after it was cut apart and
20  14:59:43   you all could get it and look at it from underneath; is that
21  14:59:46   correct?
22  14:59:47   A.  We photographed it.
23  14:59:48   Q.  And you took photographs of that that are attached to your
24  14:59:51   report?
25  14:59:51   A.  Yes.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

831

```
14:59:51   Q.  And you've given your opinions about that.  I'm not going
14:59:53   it belabor it with you today, because it's already been covered
14:59:57   by Mr. Bartlett.
15:00:00        And as I appreciate it -- correct me if I'm wrong --
15:00:01   you and he are pretty much in agreement in terms of the
15:00:04   significance of those scratches on the bottom of the hull and
15:00:07   how they match with the steel rebar at the southern end of the
15:00:10   south breach?
15:00:11   A.  Yes.
15:00:20   Q.  So let's go back, then, to after the north breach.  What,
15:00:24   in your opinion, did the barge, since it didn't go through at
15:00:27   this location -- by the way, did the failure of the barge to go
15:00:30   through at the north breach, is that consistent with the lower
15:00:33   water levels in the canal at the time?
15:00:37   A.  Repeat your question again, please.
15:00:39   Q.  The fact that the north -- that the barge didn't go
15:00:41   through at the north breach -- we had Mr. Villavaso say he saw
15:00:44   the corner of what he felt was a barge protruding or visible in
15:00:51   a notch that had been created in the wall.
15:00:54        Does the fact -- is the fact that the barge did not
15:00:59   go through there at that time consistent with lower water
15:01:02   levels in the canal at that time?
15:01:05   A.  Correct.  Absolutely.
15:01:06   Q.  And what -- I think you've told us, and I may have
15:01:10   forgotten to mentioned it earlier on when I was talking about
```

                    JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                              UNITED STATES DISTRICT COURT
                              EASTERN DISTRICT OF LOUISIANA

832

```
15:01:12   the water level and the floodwall height.
15:01:16        What was the barge height and draft, and what's the
15:01:19   basis for your opinion on that?
15:01:21   A.  Well, the model depth of the barge was 12 feet, and they
15:01:32   had about 5-foot calming, and they would have fiberglass covers
15:01:37   and -- for an overall of around 15 feet.  So a total of about
15:01:43   23 feet.
15:01:44   Q.  And I think at the time of your inspection of the barge
15:01:46   hull, you reached some conclusion about the elevation at which
15:01:51   the barge was floating in the water?
15:01:53   A.  Yes, correct.
15:01:54   Q.  What was that conclusion and what was its basis?
15:01:57   A.  Yeah.  The line draft of the barge, when it was built, it
15:02:04   was indicated to be about one foot five to six inches.  And I
15:02:13   noticed that the barge have a clear mark by corrosion and
15:02:20   marine growth, indicating that for a period of time was
15:02:26   throwing in the range of two to two and a half feet.  So had
15:02:29   probably some water in the boats.
15:02:32   Q.  And is then the barge -- light barge riding in the water
15:02:36   consistent with your observations, is that also consistent with
15:02:41   the damage at the north breach and the time and the water
15:02:44   levels in the canal?
15:02:46   A.  Yes.  No problem.
15:02:53   Q.  Now, moving to -- I have a couple of photos of the south
15:02:57   breach.  Exhibit 402, page 81 at 165.
```

                    JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                              UNITED STATES DISTRICT COURT
                              EASTERN DISTRICT OF LOUISIANA

833

```
15:03:07        Now, I've not included here, Mr. Pazos, the point of
15:03:14   impact of the barge on the wall and the notch which has already
15:03:19   been described by Mr. Bartlett in his testimony, in terms of
15:03:24   the notching at the turn of the bilge and all of that, because
15:03:27   we've been there, and you've already told me that your opinions
15:03:32   pretty much comport with his.
15:03:34        So these two photographs on this exhibit are looking
15:03:38   north from that point; am I correct?
15:03:39   A.  Yes.
15:03:39   Q.  Okay.  Summarize again, as you did with the north breach
15:03:42   failure -- well, scratch that, before I ask you that question.
15:03:45        After the barge -- after the north breach failure,
15:03:50   what happens to the barge, in your opinion, and what's the
15:03:53   basis of that opinion?
15:03:56   A.  The barge continue going south, and off and on is scraping
15:04:04   the floodwall.  And about 1,700 feet of the Claiborne
15:04:17   bridge, it evidently contacted seriously the floodwall again,
15:04:23   and continued scraping seriously until getting close to the end
15:04:31   of the south breach, which is about some 900 feet from the
15:04:39   initial -- call it serious contact.
15:04:42        Evidently, it damaged --
15:04:44   Q.  Let me stop you there.  Because I'm still talking about
15:04:46   the movement of the barge from north to south.  Is the
15:04:49   testimony that Mr. Villavaso gave, that he saw this large wave
15:04:54   come down the waterway from the north to the south consistent
```

                    JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                              UNITED STATES DISTRICT COURT
                              EASTERN DISTRICT OF LOUISIANA

834

```
15:04:58   with the movement of the barge from the north to the south
15:05:01   after the north breach was initiated?
15:05:05   A.  Yes, absolutely.
15:05:06   Q.  And is --
15:05:06        MR. WALKER:  Just the same objection.  And, in fact,
15:05:10   Mr. Best is testifying, Your Honor.
15:05:12        MR. BEST:  Well, I'm trying to move things along, and
15:05:15   I already thought I would be finished by now, for which I
15:05:17   apologize, Your Honor.
15:05:19        I don't think that there's any mystery about
15:05:21   what his opinions are.
15:05:22        THE COURT:  No.  I agree, based on the fact that he's
15:05:25   rendered a report and talked about the Villavaso testimony, I'm
15:05:28   going to allow it.
15:05:29        MR. BEST:  I don't -- I truly -- and what I'm
15:05:31   covering here, I don't think there's going to be any surprises.
15:05:33   And if this -- but for the magnitude of this case, I would just
15:05:36   stand on the report.
15:05:37        THE COURT:  Right.
15:05:38        MR. BEST:  But I'm being excessively vigilant and
15:05:42   cautious, I suppose.
15:05:45   BY MR. BEST:
15:05:45   Q.  So do you remember my question and can you answer it?
15:05:47   A.  Can you repeat it?
15:05:49   Q.  I think I said:  Is the movement that you just described
```

                    JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                              UNITED STATES DISTRICT COURT
                              EASTERN DISTRICT OF LOUISIANA

835

1   15:05:52   of the barge, from the point of initiation of the north breach
2   15:05:55   to the south breach that we're about to discuss, is that
3   15:05:59   consistent with Mr. Villavaso's description of a surge that he
4   15:06:02   said came down the intercoastal from the north to the south,
5   15:06:06   leaving -- he heard debris contact against the Florida Avenue
6   15:06:09   bridge.  Do you remember that?
7   15:06:11   A.  Yes.
8   15:06:12   Q.  So is the movement of the barge from north to south
9   15:06:15   consistent with that testimony that he gave?
10  15:06:17   A.  Yes.
11  15:06:17   Q.  Is it consistent with increasing water levels in the
12  15:06:19   waterway during this period of time?
13  15:06:21   A.  Yes.
14  15:06:22   Q.  Okay.  Now you've told us, and I interrupted you.  I asked
15  15:06:35   you to then summarize what happens at the south breach.  And I
16  15:06:38   think you talked about -- you were about to begin with the
17  15:06:41   barge making -- after having scraped and dragged, making a
18  15:06:46   major contact.  Would you resume your description and summary
19  15:06:50   of the south breach from that point?
20  15:06:53   A.  Well, at the south breach, it shows clear and serious
21  15:06:58   contact damage by several pictures, indicating the concrete was
22  15:07:07   broken in several places, and cracks.
23  15:07:09        And then there are additional photographs showing a
24  15:07:15   scrape of about two and a half to three inches of concrete in
25  15:07:20   several areas of the concrete panels, indicating that the barge

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

---

836

1   15:07:24   was rubbing or scraping the concrete -- there's no other way
2   15:07:32   that this concrete will disappear from the surface of a
3   15:07:37   concrete panel -- until it got close to the end of the south
4   15:07:41   breach, where evidently it knocked down the concrete and ran on
5   15:07:49   top of the seawall.
6   15:07:52   Q.  Just let me ask you that if, as Mr. Bartlett says, the
7   15:07:58   barge makes this contact at the south end of the south breach
8   15:08:02   and kind of makes a gap, which it knocks through with the front
9   15:08:07   end of barge and knocks off the cap of the floodwall, goes in,
10  15:08:12   pivots, and goes down --
11  15:08:14        THE COURT:  When you say "gap," here, you're talking
12  15:08:15   about in a gap above the surface?
13  15:08:16        MR. BEST:  In the top of the floodwall.
14  15:08:17        THE COURT:  All right.
15            BY MR. BEST:
16  15:08:19   Q.  What does that event have to do with the failure of the
17  15:08:23   floodwall north of that point, which we see in this exhibit?
18  15:08:27   A.  Okay.  As we are seeing, the top of these two photographs
19  15:08:33   is that the barge penetrated or crossed the levee at the
20  15:08:42   south-most end of the south breach.  Because of the formation
21  15:08:52   of the rebars down clearly in the pages that we have seen over
22  15:09:01   there, the top photograph, shows the rebar flat close to the
23  15:09:08   right side, while the other photograph that is lower showed
24  15:09:14   different direction of the rebars.
25  15:09:17        So it's clear that the barge enters on top of the

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

---

837

1   15:09:22   levee after knocking these concrete panels and gliding on top
2   15:09:32   of the rebar.
3   15:09:33   Q.  So, again, I want to make clear.  What we're looking at,
4   15:09:36   particularly in the top photo of this exhibit, is a whole
5   15:09:39   section of the floodwall that's come out absolutely from the
6   15:09:42   bottom of the sheet piles and been moved inland, some point --
7   15:09:46   A.  Yes.
8   15:09:46   Q.  -- from where it was standing before?
9   15:09:49   A.  Yes.
10  15:09:49   Q.  Tell the Court what your opinion is about how and why that
11  15:09:52   happened.
12  15:09:57   A.  Well, definitely, the -- the seepage requires time for the
13  15:10:02   hydrostatic pressure to put a range of soil away and create
14  15:10:10   piping, that means the flow of water, under the protected side.
15  15:10:17        And the configuration of the final shape of the
16  15:10:26   floodwall that collapsed shows clearly that the seepage had
17  15:10:34   more time at the northern portion of the south breach, compared
18  15:10:39   with the southern portion of the south breach.
19  15:10:43   Q.  Okay.  So if I may summarize, you're saying that the
20  15:10:48   effect of the barge making contact with and scraping along the
21  15:10:53   wall to the north of the point where it actually finally went
22  15:10:56   in had already created a gap there, allowing underseepage and
23  15:11:00   gradual failure of that section of the wall?
24  15:11:02   A.  Yes.
25  15:11:02   A.  Yes.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

---

838

1   15:11:03        THE COURT:  We're going to take a break now.
2   15:11:05        MR. BEST:  Sure.
3   15:11:07        THE COURT:  I want to talk to you, Jodi, just for a
4   15:11:08   second.
5   15:11:17        (WHEREUPON, the Court took a recess.)
6   15:20:10        THE DEPUTY CLERK:  All rise.
7   15:31:32        THE COURT:  Please be seated.
8   15:31:34   BY MR. WALKER:
9   15:31:42   Q.  Now, that we've covered that in summary form, let me ask
10  15:31:46   you:  Did you, in reaching your opinions or considering your
11  15:31:50   opinions, look at some of the other I-wall levee failures in
12  15:31:55   the metropolitan area for purposes of comparison?
13  15:31:59   A.  Absolutely.  Almost every area.
14  15:32:03   Q.  And what were the significant differences about this south
15  15:32:06   breach failure -- and maybe the north as well -- from the other
16  15:32:09   I-wall failures that were important to your opinion that this
17  15:32:13   was different?
18  15:32:14   A.  Very clear measure of differences.  The failures of the
19  15:32:19   17th Street alone, though, show clearly a failure through
20  15:32:27   hydrostatic pressure by displacing the concrete panels with a
21  15:32:37   measure in damage.
22  15:32:39   Q.  To the concrete panels?
23  15:32:40   A.  Yes.
24  15:32:42   Q.  Okay.
25  15:32:43   A.  It also shows that failures of the elastomeric jarring was

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**839**

| | |
|---|---|
| 1 | 15:32:56 |
| 2 | 15:32:58 |
| 3 | 15:33:03 |
| 4 | 15:33:12 |
| 5 | 15:33:18 |
| 6 | 15:33:22 |
| 7 | 15:33:23 |
| 8 | 15:33:27 |
| 9 | 15:33:28 |
| 10 | 15:33:28 |
| 11 | 15:33:31 |
| 12 | 15:33:36 |
| 13 | 15:33:36 |
| 14 | 15:33:38 |
| 15 | 15:33:41 |
| 16 | 15:33:46 |
| 17 | 15:33:51 |
| 18 | 15:33:58 |
| 19 | 15:34:08 |
| 20 | 15:34:16 |
| 21 | 15:34:21 |
| 22 | 15:34:25 |
| 23 | 15:34:30 |
| 24 | 15:34:32 |
| 25 | 15:34:33 |

1 major -- a major importance in displacing -- allowing the
2 displacement of the concrete panels. So it's the photography
3 and -- that I took in all the area I observed is outcome a
4 substantial difference between the failures of the outer
5 floodwalls compared with the failures of the north and south
6 breach.
7 Q. Okay. You were here for Mr. Murph's testimony today;
8 right?
9 A. Yes.
10 Q. And you heard those portions of the testimony that dealt
11 with the south breach failure occurring well before the worst
12 of the storm?
13 A. Yes.
14 Q. Is the timing of these north and south -- how does the
15 timing of these failures on the Intercoastal Waterway compare
16 with the timing of the other levee failures that you looked at?
17 A. Well, definitely, the timing of the north breach and south
18 breach are independent of the other because it showed clearly
19 the location of the barge and a reasonable speed of the barge.
20 Q. And at both the north and the south breach on the
21 Industrial Canal, we have those straight upright vertical
22 sections that show no indication of failure or beginnings,
23 even, of failure from hydrostatic pressure?
24 A. Correct, absolutely.
25 Q. That's also a unique feature, is it not?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**840**

| | |
|---|---|
| 1 | 15:34:36 |
| 2 | 15:34:37 |
| 3 | 15:34:40 |
| 4 | 15:34:45 |
| 5 | 15:34:50 |
| 6 | 15:34:53 |
| 7 | 15:35:01 |
| 8 | 15:35:05 |
| 9 | 15:35:12 |
| 10 | 15:35:14 |
| 11 | 15:35:18 |
| 12 | 15:35:26 |
| 13 | 15:35:31 |
| 14 | 15:35:40 |
| 15 | 15:35:46 |
| 16 | 15:35:49 |
| 17 | 15:35:52 |
| 18 | 15:35:57 |
| 19 | 15:36:03 |
| 20 | 15:36:08 |
| 21 | 15:36:09 |
| 22 | 15:36:12 |
| 23 | 15:36:16 |
| 24 | 15:36:22 |
| 25 | 15:36:26 |

1 A. Absolutely. Very clear.
2 Q. And it appears in both breaches here?
3 A. Exactly.
4 Q. Now, based upon -- do you see anything in your analysis of
5 all these facts and circumstances, and given your knowledge of
6 hydrodynamics, to suggest that this barge was drawn into the
7 notch that it took out of the south end of the south breach by
8 suction resulting from an earlier failure of the bowed-out
9 section of the wall north of that point?
10 A. Totally impossible. If the south breach would have
11 occurred before the arrival of the barge, number one, the barge
12 would have been sucked to the side of the protected side but
13 much farther north where, actually, it went over the levee. So
14 this is really common sense.
15 Q. And you would expect if that were the case, that instead
16 of having a movement of the barge going directly through the
17 wall nearly perpendicular, if not quite so, that if it were
18 being sucked and drawn in, it would be more likely to drag
19 against the wall and enter further north from where it did?
20 A. Correct, absolutely.
21 Q. Let me go back. I'm just about done. Let me just go
22 back to one more question about the mooring.
23 Although you've said we don't know exactly what the
24 winds, the wave reflection, and the wave heights were, or the
25 conditions as a totality were at the moment that the ropes

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**841**

| | |
|---|---|
| 1 | 15:36:30 |
| 2 | 15:36:35 |
| 3 | 15:36:38 |
| 4 | 15:36:44 |
| 5 | 15:36:45 |
| 6 | 15:36:46 |
| 7 | 15:36:56 |
| 8 | 15:36:59 |
| 9 | 15:37:01 |
| 10 | 15:37:05 |
| 11 | 15:37:15 |
| 12 | 15:37:23 |
| 13 | 15:37:25 |
| 14 | 15:37:30 |
| 15 | 15:37:36 |
| 16 | 15:37:42 |
| 17 | 15:37:47 |
| 18 | 15:37:53 |
| 19 | 15:37:59 |
| 20 | 15:38:03 |
| 21 | 15:38:07 |
| 22 | 15:38:11 |
| 23 | 15:38:19 |
| 24 | 15:38:27 |

1 snapped, okay, and the mooring failed, was the vessel properly
2 moored, whenever that happened and under whatever circumstances
3 it happened?
4 A. Absolutely was not properly moored. It was a temporary
5 mooring.
6 MR. BEST: One moment.
7 I tender the witness, Your Honor.
8 THE COURT: I just have a couple of questions, and
9 then, of course, you'll have cross-examination.
10 As to the south breach, is it your opinion, sir,
11 that the barge had impacted the floodwall along the south
12 breach before it went -- before the concrete cap was broken at
13 the very south end?
14 THE WITNESS: Absolutely. We have concrete panel
15 damages at the beginning of the north part of the south breach.
16 We have the scrapes removing substantial areas, 15, 20, 30 feet
17 of concrete, one and a half to three inches deep, on several of
18 the panels in the middle of the south breach, which indicated,
19 where barge was scraping, which was witnessed by several
20 witnesses, and was removing this concrete, it would not have
21 been removed as cleanly as was removed otherwise.
22 THE COURT: Is it your testimony that when the barge
23 ostensibly broke the concrete cap at the very south end of the
24 south breach, that the -- how long did it take for the other
25 almost 800 feet of the floodwall that was ultimately breached,

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**842**

| | |
|---|---|
| 1 | 15:38:35 |
| 2 | 15:38:39 |
| 3 | 15:38:42 |
| 4 | 15:38:53 |
| 5 | 15:39:03 |
| 6 | 15:39:09 |
| 7 | 15:39:18 |
| 8 | 15:39:23 |
| 9 | 15:39:26 |
| 10 | 15:39:31 |
| 11 | 15:39:37 |
| 12 | 15:39:44 |
| 13 | 15:39:46 |
| 14 | 15:39:48 |
| 15 | 15:39:50 |
| 16 | 15:39:50 |
| 17 | 15:40:22 |
| 18 | 15:40:29 |
| 19 | 15:40:37 |
| 20 | 15:40:44 |
| 21 | 15:40:47 |
| 22 | 15:40:51 |
| 23 | 15:40:54 |
| 24 | 15:40:56 |
| 25 | 15:41:05 |

1 how long did it take that to happen?
2 THE WITNESS: Okay. Since, at the location where the
3 barge crossed the levee, was the only damage to the interlock
4 of the sheet pile is -- and the sheet pile was like elastic
5 pile. To me, the collapse, entire collapse, of the entire
6 900 feet occurred as the barge was crossing within a matter of
7 one minute, two minutes, if not immediately, because of the
8 formation of the protected side.
9 And the shape of the seawall -- floodwall at the
10 rest of the failure show that the northern part went farther
11 inland than the south part just because of the time it required
12 for the underseepage.
13 THE COURT: All right, sir. I'm going to leave it at
14 that and cross-examination.
15 CROSS-EXAMINATION
16 BY MR. WALKER:
17 Q. Mr. Pazos, I'm going to put on the screen here Exhibit 8,
18 and what I'd like you to do is you can touch your screen and it
19 will make a permanent mark on the -- on the screen that the
20 judge can then print.
21 So with your finger, could you show the Court the
22 trajectory of the barge from the Lafarge facility to the
23 northern breach site?
24 A. If you cannot repeat -- you want me to show the trajectory
25 of the barge from the Lafarge facility to the East Bank of the

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

843

```
 1   15:41:10    canal?
 2   15:41:11    Q.  Correct.
 3   15:41:12    A.  No, I cannot show you the trajectory because I don't know
 4   15:41:16    the trajectory.
 5   15:41:18    Q.  Well, I asked you and Mr. Raffman asked you the same
 6   15:41:22    question in your deposition in July 2009.  I'd like to show you
 7   15:41:25    your answer.
 8   15:41:26        MR. BEST:  I'm sorry.  Page and line, counsel?
 9   15:41:27    BY MR. WALKER:
10   15:41:28    Q.  "QUESTION:  Let's take the barge across the canal to
11   15:41:30    somewhere near the north breach, and then we'll give you
12   15:41:34    another photo.
13   15:41:35        "ANSWER:  Well, okay.  I'm going to repeat what I
14   15:41:37    said before" --
15   15:41:35        MR. BEST:  May I have page and line?
16   15:41:39        THE COURT:  Wait a minute.  Let me stop you for just
17   15:41:39    a minute.  Give him the page and line -- I'm sorry -- and I'll
18   15:41:44    let you back it up.  So you can follow in the written
19   15:41:45    deposition.
20   15:41:46        MR. WALKER:  In fact, it's shown there, Your Honor,
21   15:41:48    but --
22   15:41:49        MR. BEST:  Well, it's moving kind of quick, and I
23   15:41:51    just would appreciate the courtesy of the page and line so I
24   15:41:54    can locate it before you start because I might have some
25   15:41:56    objections.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

844

```
 1   15:41:57        THE COURT:  I'm going to allow you to do that.  We're
 2   15:41:57    not going to let that happen.
 3   15:41:59        MR. WALKER:  Thank you, Your Honor.  Page 120 and
 4   15:42:03    123, Your Honor.
 5   15:42:04        MR. BEST:  Now, the question is at line what?
 6   15:42:07        MR. WALKER:  It begins at line 20.
 7   15:42:11        MR. BEST:  Page 120?  The question.
 8   15:42:13        MR. WALKER:  I'm sorry, page 120.
 9   15:42:16        MR. BEST:  Page 120, line 20, that's the question?
10   15:42:20        MR. WALKER:  123, sorry.
11   15:42:22        MR. BEST:  123, line 20, is the question?  I'm sorry.
12   15:42:25    Page 123, line 20 is the middle of an answer.
13   15:42:31        THE COURT:  Where does the colloquy start that we
14   15:42:33    just --
15   15:42:35        MR. RAFFMAN:  123, line 1.
16   15:42:37        THE COURT:  That's what it says on here.  "Let's take
17   15:42:39    the barge across the canal..."  It's page 123, line 1 on the
18   15:42:44    right-hand corner of the video clip I'm looking at now.
19   15:42:54        MR. WALKER:  It's all going to be displayed, Your
20   15:42:55    Honor, both the sound and the words.  Could we start it over,
21   15:42:59    Your Honor?
22   15:43:01        THE COURT:  Mr. Best, are you prepared, sir?  Are you
23   15:43:04    ready?
24   15:43:04        MR. BEST:  Yes, I'm sorry.  Thank you, Your Honor.
25
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

845

```
 1   15:43:05    BY MR. WALKER:
 2   15:43:05    Q.  "QUESTION:  Let's take the barge across the canal to
 3   15:43:07    somewhere near the north breach, and then we'll give you
 4   15:43:09    another photo.
 5   15:43:11        "ANSWER:  Well, okay, I'm going to repeat what I say
 6   15:43:14    before.  If you want me to mark the trajectory of the barge --
 7   15:43:19        "QUESTION:  I do.
 8   15:43:05        "ANSWER:  Okay.  I will have to make lines all over
 9   15:43:22    the place because the winds and the reflection incoming -- and
10   15:43:27    the waves, the impacting waves, the reflecting waves and the
11   15:43:34    winds are a combination, and the barge rotating and change
12   15:43:38    headings will allow me to ascribe all over the place and to get
13   15:43:44    to this point.  You want to do that?
14   15:43:47        "QUESTION:  Yes.
15   15:43:48        "ANSWER:  Okay.  So all I'm saying is I don't believe
16   15:43:58    the barge was here.  The barge was in this area for the time
17   15:44:03    before contacting the seawall in the northern breach."
18   15:44:12        Mr. Pazos, do you remember that question and that
19   15:44:16    answer?
20   15:44:19    A.  Yes.  I was kind of forced to mark something in the chart,
21   15:44:23    but I was trying to clarify that I couldn't know the trajectory
22   15:44:31    of the barge.  I don't -- I didn't have any information or I
23   15:44:35    don't have any means to be able to develop a believable
24   15:44:43    trajectory of the barge.
25   15:44:45    Q.  At the time the believable trajectory that your report of
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

846

```
 1   15:44:48    June 2009 opined about was a trajectory from the Lafarge
 2   15:44:53    terminal north, and you showed the lines that you showed.  And,
 3   15:44:59    in fact, you off-camera said, "I wouldn't think it would be
 4   15:45:04    down here," pointing down towards Claiborne Avenue; correct?
 5   15:45:08    A.  Correct.
 6   15:45:08        MR. BEST:  Excuse me.  If I may make an objection,
 7   15:45:10    Your Honor.
 8   15:45:10        If you read the page, it reads the testimony,
 9   15:45:12    the witness has essentially has said he doesn't know, and then
10   15:45:15    he draws something anyway.  I think this is meaningless
11   15:45:18    cross-examination.  I object to it.
12   15:45:19        THE COURT:  The objection is noted, and the Court
13   15:45:21    will ascertain that ultimately.
14                 BY MR. WALKER:
15   15:45:24    Q.  And three and a half months later, on November 1, 2009,
16   15:45:26    you submitted a declaration in support of an opposition to
17   15:45:29    summary judgment with the only new information being Tompkins
18   15:45:33    and LeBlanc's version that they saw a barge down by Claiborne
19   15:45:39    Avenue; correct?
20   15:45:41    A.  I don't believe that your statement is correct.  I don't
21   15:45:45    have the document in front of me.  But I think they saw the
22   15:45:50    barge in the canal, but they were not as specific where they
23   15:45:54    saw it.
24   15:45:55    Q.  Oh, so you haven't been told of their specific testimony
25   15:45:58    that they saw it down by the mooring points, at a mooring
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**847**

1  15:46:03  point, at a mooring bollard, close to Claiborne Avenue?
2  15:46:09  A.  I remember them talking about a mooring bollard, but I
3  15:46:15  don't remember them saying a specific location, marking a map.
4  15:46:20      They are in a bridge driving, looking at the canal,
5  15:46:23  and I don't know how they even could determine what is a
6  15:46:28  mooring bollard.
7  15:46:29  Q.  Right.  The point is that you changed your opinion in
8  15:46:34  what you showed in this clip as far as the trajectory of the
9  15:46:39  barge solely on the basis of the testimony of Mr. Tompkins and
10  15:46:45  Mrs. LeBlanc; correct?
11  15:46:48  A.  Wait, wait.  No, no.  I know that the barge moved from the
12  15:46:55  west side of the canal to the east side of the canal.  I don't
13  15:46:59  know when and how.  At the time I wrote my report and I talked
14  15:47:05  about the post, I was under impression it was early in the
15  15:47:09  morning of the 29th.  Now, later on I learned that there were
16  15:47:16  two witnesses that saw the barge the day before, when they were
17  15:47:20  crossing the bridge.
18  15:47:22      So I have two different times, so -- and I keep
19  15:47:30  insisting I don't know the trajectory of the barge.  I thought
20  15:47:34  it was -- the trajectory occurred on the 29th, but then they
21  15:47:39  have two witnesses saying they saw the barge on the 28th.
22  15:47:42  Q.  Okay.  It wasn't perfectly clear during the examination,
23  15:47:52  but if I understand the current bases of your opinions, this is
24  15:47:56  the Lafarge facility; right?
25  15:47:58  A.  Yes.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**848**

1  15:47:59  Q.  You're no longer saying the barge did this as you showed;
2  15:48:03  right?
3  15:48:03  A.  No, no, no.  I didn't say "no longer."  I don't know.  I'm
4  15:48:06  repeating.  I'm repeating the testimony and repeating now:
5  15:48:10  I don't know for sure the trajectory of the barge.
6  15:48:13  Q.  Okay.  But you credit Mr. LeBlanc and Mrs. Tompkins'
7  15:48:17  testimony or do you not credit that testimony on which you
8  15:48:20  based your declaration of November 1, 2009?
9  15:48:23  MR. BEST:  For the record, I don't believe there is
10  15:48:26  anywhere, in any report or declaration, a statement of opinion
11  15:48:28  as to the trajectory of the barge at any particular point in
12  15:48:32  time.
13  15:48:33      Counsel has tried to pin the witness down to
14  15:48:34  something, the witness resisted, and now he's trying to
15  15:48:38  cross-examine him on it.  I object.  It's improper cross.
16  15:48:42  THE COURT:  Well, I'm not looking at the declaration
17  15:48:44  now, but I guess -- are you asking him in making the
18  15:48:52  declaration -- you can ask it the way you want, but in
19  15:48:55  making -- I assume you're trying to ask him, in making his
20  15:48:57  declaration, did he factor in the testimony of Mr. Tompkins and
21  15:49:03  Ms. LeBlanc.
22  15:49:05  MR. WALKER:  That's one way.
23  13:38:54  BY MR. WALKER:
24  15:49:08  Q.  Do you understand the judge's way of asking my question,
25  15:49:10  which gets to the same core?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**849**

1  15:49:13  A.  Can you repeat your question?
2  15:49:15  Q.  I'll try again.
3  15:49:16  A.  I'm getting confused on these questions.  I hate to answer
4  15:49:19  without understanding a question.
5  15:49:32  Q.  I'm going to put on the ELMO your -- no, I won't do that
6  15:49:35  right now.
7  15:49:36      I'm trying to understand, because it wasn't clear in
8  15:49:39  your examination, how this barge traveled to that point.  Okay?
9  15:49:47  I understand that you say it broke away at some point.  You
10  15:49:51  don't know when that happened; is that right?
11  15:49:53  A.  Correct.
12  15:49:54  Q.  You understand that there's testimony that puts the barge
13  15:49:57  here Sunday at noon, do you not?
14  15:49:59  A.  No.
15  15:50:00  Q.  You're not aware of that testimony?
16  15:50:01  A.  No.  I'm--
17  15:50:04  THE COURT:  Let me just point out for the record
18  15:50:05  since I just heard a Court of Appeals judge at a seminar I
19  15:50:08  attended gripe about the "here."  So counsel is pointing near
20  15:50:16  the Claiborne Avenue bridge.
21  15:50:18  MR. WALKER:  If I touch my screen, does it do
22  15:50:21  anything, Judge?
23  15:50:22  THE COURT:  I'm not sure it will on this, but I think
24  15:50:25  it does.  We'll see.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**850**

1  15:50:26  BY MR. WALKER:
2  15:50:28  Q.  I pointed around here.  Okay?  That green square.
3  15:50:33      So, I'm sorry, you said you're not aware that the two
4  15:50:36  witnesses, Tompkins and LeBlanc, placed the barge there at noon
5  15:50:44  on Sunday?
6  15:50:45  A.  I read only walls.  I didn't see any chart that they
7  15:50:50  pointing a finger.  You know, maybe I received it, but I just
8  15:50:57  received a transcript only.
9  15:50:59      I mean, the transcript gave me impression they saw
10  15:51:01  the barge in the canal, but I don't know if they can pinpoint,
11  15:51:04  when they're driving, crossing a bridge, the exact location of
12  15:51:07  a barge in a canal that they see in the distance.
13  15:51:12  Q.  Okay.  And it's correct that the north breach is here, and
14  15:51:15  I'll mark it.  Is that right?
15  15:51:18  A.  Around there.
16  15:51:19  Q.  Okay.  And you say that the barge hit at that location;
17  15:51:28  right?
18  15:51:28  A.  Well, approximately.
19  15:51:31  Q.  Approximately.
20  15:51:32  A.  Yes.
21  15:51:32  Q.  Assume we believe Tompkins and LeBlanc, you have to move
22  15:51:36  the barge from the southern point of the IHNC to the northern
23  15:51:43  point of the IHNC, somehow, sometime, after Sunday at noon,
24  15:51:47  without anybody having seen it; correct?
25  15:51:50  A.  Again, I don't recognize the green mark you put on the

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

851

| | |
|---|---|
| 1 | 15:51:58 south end because I only read the printed testimony. I didn't |
| 2 | 15:52:06 see any diagram. |
| 3 | 15:52:07 THE COURT: Why don't you ask him to assume for the |
| 4 | 15:52:10 sake of your question that that's where they said it was. |
| 5 | 15:52:12 MR. WALKER: Thank you, Your Honor. |
| 6 | 15:52:13 THE COURT: Can you do that? Okay. Assume for the |
| 7 | 15:52:15 sake of the question that that's where -- approximately where, |
| 8 | 15:52:17 LeBlanc and Tompkins said they saw a barge around noon on |
| 9 | 15:52:25 Sunday. |
| 10 | 15:31:59 BY MR. WALKER: |
| 11 | 15:52:28 Q. Do you understand that assumption? |
| 12 | 15:52:30 A. Yes, I understand the assumption. Thank you. |
| 13 | 15:52:32 Q. Okay. And under that assumption, based on your opinion |
| 14 | 15:52:36 that the barge, in fact, hit at the northern breach site, you |
| 15 | 15:52:44 have no basis, no means, no objective method, to migrate this |
| 16 | 15:52:50 barge from the south to the north sometime after Sunday at |
| 17 | 15:52:54 noon, do you? |
| 18 | 15:52:57 A. What I have is not very solid. It's a remote possibility |
| 19 | 15:53:06 that, with variable winds that always exist, it could have |
| 20 | 15:53:13 traveled. Although, it's not the most possible answer. |
| 21 | 15:53:18 THE COURT: That was variable winds, you said; |
| 22 | 15:53:21 correct? Variable winds? |
| 23 | 15:53:22 THE WITNESS: Yes. |
| 24 | 15:53:22 BY MR. WALKER: |
| 25 | 15:53:23 Q. You're familiar with the concept of prevailing winds; |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

852

| | |
|---|---|
| 1 | 15:53:26 right? |
| 2 | 15:53:26 A. Yes. Which I totally disagree the way I've been reading |
| 3 | 15:53:32 the word "prevailing winds" in this case. |
| 4 | 15:53:38 Q. Well, is it your opinion that on the evening of Monday -- |
| 5 | 15:53:41 early morning hours of Monday, August 29th, 2005, the |
| 6 | 15:53:46 prevailing winds were not from the north-northeast in the IHNC? |
| 7 | 15:53:52 A. Well, I believe that I noted the word "prevailing winds" |
| 8 | 15:54:00 must be defined. And my definition of prevailing winds are not |
| 9 | 15:54:05 local winds, and the thing that I related was just local winds. |
| 10 | 15:54:05 Q. Well, there's no local surge, is it? There's just one |
| 11 | 15:54:12 surge, and that surge went straight south, didn't it? So is it |
| 12 | 15:54:16 your testimony that these variable winds might somehow overcome |
| 13 | 15:54:20 the 20-foot sail area of this barge, the prevailing winds, |
| 14 | 15:54:24 whether you believe they exist or not, and take the barge from |
| 15 | 15:54:27 the south all the way to the north? Is that your testimony? |
| 16 | 15:54:30 MR. BEST: Object. That's compound. |
| 17 | 15:54:32 THE COURT: It is compound. |
| 18 | 15:54:32 MR. BEST: At least two questions. |
| 19 | 15:54:32 THE COURT: It is. I sustain the objection. It's |
| 20 | 15:54:34 difficult to answer because you have a lot of thoughts in |
| 21 | 15:54:38 there. |
| 22 | 15:54:39 MR. WALKER: I'll try and break it up. |
| 23 | 15:54:41 BY MR. WALKER: |
| 24 | 15:54:41 Q. The barge has about a 20-foot sail area; right? |
| 25 | 15:54:47 A. Yes, 23. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

853

| | |
|---|---|
| 1 | 15:54:47 Q. Okay. |
| 2 | 15:54:48 A. Wait, wait. Twenty three the total there. Okay. So it's |
| 3 | 15:54:54 somewhere about 21 or something. |
| 4 | 15:54:57 Q. And you will agree that one of the elements, if not the |
| 5 | 15:54:59 element, that most affects a barge with a high sail area is the |
| 6 | 15:55:06 wind; right? |
| 7 | 15:55:07 A. Primarily the wind. |
| 8 | 15:55:09 Q. And you will agree with me also that on Monday |
| 9 | 15:55:11 August 29th, 2005, there was a surge, and there was increased |
| 10 | 15:55:15 water levels in the IHNC? |
| 11 | 15:55:20 A. Regarding -- you have to specify the time. Otherwise, |
| 12 | 15:55:25 sometime there was no surge. |
| 13 | 15:55:28 Q. Any time after, say, 3:00 a.m. in the morning on Monday, |
| 14 | 15:55:32 August 29th. |
| 15 | 15:55:35 A. Well, that's not my understanding. |
| 16 | 15:55:38 Q. That's not your understanding? |
| 17 | 15:55:39 A. No. |
| 18 | 15:55:40 Q. When do you say the surge started and it was appreciable |
| 19 | 15:55:44 in the canal? |
| 20 | 15:55:45 A. Well, the water start going up and then went down around |
| 21 | 15:55:53 4:00 in the morning, 4:00 or 5:00, it went down, according to a |
| 22 | 15:55:58 graph I have. So what is called a surge is a |
| 23 | 15:56:03 quick elevation of the water surface later on, after 8:00 or |
| 24 | 15:56:13 9:00 a.m. |
| 25 | 15:56:14 Q. Well, do you have any data that would disagree with the |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

854

| | |
|---|---|
| 1 | 15:56:17 fact that the water in the Industrial Canal Monday night and -- |
| 2 | 15:56:27 I'm sorry -- Sunday night and Monday evening was flowing from |
| 3 | 15:56:32 north to south? |
| 4 | 15:56:35 A. You have to repeat your question. I don't understand it. |
| 5 | 15:56:38 There is something wrong in the question. |
| 6 | 15:56:40 Q. Do you have any data to disagree with the fact that the |
| 7 | 15:56:47 water in the Industrial Canal Sunday night and Monday morning |
| 8 | 15:56:52 was flowing generally in a north-to-south direction? |
| 9 | 15:56:56 MR. BEST: Objection, Your Honor. No foundation. |
| 10 | 15:56:58 The locks were closed. There's nothing in the record to |
| 11 | 15:57:01 establish flow in a direction in a canal with closed locks that |
| 12 | 15:57:06 I have heard in this case. |
| 13 | 15:57:07 THE COURT: Well, I'm going to allow him to answer |
| 14 | 15:57:09 the question subject to your objection, if he can. |
| 15 | 15:57:13 THE WITNESS: Again, I believe there is, I apologize, |
| 16 | 15:57:16 a small error in your question because you used the word |
| 17 | 15:57:21 "Monday night." Monday night is after all these things |
| 18 | 15:57:25 happens. |
| 19 | 15:57:25 BY MR. WALKER: |
| 20 | 15:57:25 Q. If I did, I apologize. I think I said Sunday night and |
| 21 | 15:57:29 Monday morning. |
| 22 | 15:57:30 A. Oh, okay. I understood Monday night. |
| 23 | 15:57:32 Okay. Can you repeat your question, please? |
| 24 | 15:57:35 Q. Do you have any basis to disagree with the concept that |
| 25 | 15:57:43 Monday night -- I'm sorry -- Sunday night and Monday morning |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**855**

1  15:57:48  the surge or water flow in the Industrial Canal was from north
2  15:57:56  to south; yes or no?
3  15:57:58  A.  And I'm sorry again.  You have to specify the time because
4  15:58:04  I have the hydrographic surveys, and you have to tell me at
5  15:58:08  what time.  Because, like, about 4:00 in the morning, 4:00 to
6  15:58:15  5:00, the water declined.  It went down.
7  15:58:18  Q.  I won't belabor the point.  You have no explanation, I
8  15:58:20  think is what you said, for how the barge gets from where
9  15:58:24  Mr. Tompkins and Mrs. LeBlanc saw it to the point of the
10 15:58:27  northern breach is what you're saying?
11 15:58:30  A.  I repeat my testimony:  Except for the possible local
12 15:58:34  winds.
13 15:58:42  Q.  And I assume you have no explanation, then, for how the
14 15:58:47  barge migrated from the Lafarge terminal to the point where
15 15:58:54  Mr. Tompkins and Mrs. LeBlanc saw it on Sunday at noon?
16 15:59:01  A.  I repeat:  Except for the possibility of local winds.
17 15:59:07  Q.  So are you saying there were local winds at some point
18 15:59:12  prior to Sunday, at noon, that pushed the barge in the
19 15:59:17  southward direction to the point where they saw it?
20 15:59:20  A.  I'm saying there is a possibility.  Not impossible.
21 15:59:26  Q.  Well, there weren't any northern winds pushing it, were
22 15:59:29  there?
23 15:59:30  A.  Local winds, no prevailing -- so-called prevailing winds.
24 15:59:35  Otherwise, no other wind will exist, you know.  Otherwise, that
25 15:59:41  we never have to sustain an airport because, you know, there

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**856**

1  15:59:46  are winds that are unexpected locally which are hard to predict
2  15:59:54  and are not prevailing winds.
3  15:59:57  Q.  Well, you're not a meteorologist, are you?
4  15:59:59  A.  No.
5  16:00:04  MR. WALKER:  Your Honor, I would like to preserve
6  16:00:06  this.  I will use this photograph again.
7  16:00:07  THE COURT:  Right.  Sheena, would you please capture
8  16:00:11  that?
9  16:00:14  We can do it a lot quicker now, we think.
10 16:00:46  MR. WALKER:  Is there any way to put numbers on them,
11 16:00:47  or letters or anything like that, Judge?  Or is it just an
12 16:00:48  imprint --
13 16:00:50  THE COURT:  No, you could.
14 16:00:51  MR. WALKER:  Oh, I see.  I could have written on it
15 16:00:53  myself, right.
16 16:01:13  Okay.  Thank you, Judge.  Thank you, Sheena.
17 16:01:17  BY MR. WALKER:
18 16:01:18  Q.  I'm a little confused with your current opinion and
19 16:01:22  position.  How is it that the barge broke away?
20 16:01:32  A.  The barge broke away because the mooring lines were
21 16:01:37  improper.  They have so-called weak mooring line at one end and
22 16:01:43  so-called strong mooring line at the other end.  They --
23 16:01:46  Q.  Let me interrupt you.  That's the why.  I'm asking you
24 16:01:49  how.
25 16:01:51  A.  Oh, how the line broke.  There are, at least, two possible

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**857**

1  16:01:57  causes, and to me the most probable cause were the action of
2  16:02:03  the waves and the wind.  But there is also the possibility of
3  16:02:11  the slipping of the mooring lines of the five barges that were
4  16:02:17  tied north of the barge that broke away, may have contacted the
5  16:02:26  barge that broke away.
6  16:02:27  Q.  You're talking about the five-barge tier to the north?
7  16:02:33  A.  Yes.
8  16:02:33  Q.  And those lines would have slipped because the rope would
9  16:02:36  have become loose as the surge or water level rises and the
10 16:02:41  rope slips off the bollard?
11 16:02:46  A.  No.  No, we don't know why they slip.
12 16:02:48  Q.  Well, do you have any other plausible explanation why that
13 16:02:51  line would have slipped?
14 16:02:52  A.  Yes.  The one that slipped is the one that I don't agree.
15 16:02:58  It's a possibility that slippage from the piling, it's a
16 16:03:03  possibility that they were improperly tied, and there's a
17 16:03:06  possibility they broke.
18 16:03:08  There are several other possibilities besides
19 16:03:13  slipping.  The only report I have seen is an aerial photograph,
20 16:03:17  which will not show anything what happened to the lines.
21 16:03:21  Q.  So you haven't inspected those lines or anything with
22 16:03:23  regard to the five-tier lines to know as a matter of fact
23 16:03:27  whether there were broken lines or slipped lines?
24 16:03:31  A.  Correct.  I learned all of this recently.
25 16:03:34  Q.  You also said, then, another possibility -- strike that.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**858**

1  16:03:40  You would agree, however, that one of the
2  16:03:42  possibilities that would cause a line to slip is, as the barges
3  16:03:45  rise in the water surge, the line slips; correct?
4  16:03:50  A.  Yes.  But the possibility in regard to this system is very
5  16:03:57  improperly like this line in the piling.  (CCK).
6  16:04:02  Q.  I understand your position.
7  16:04:03  You also said that the other possibility was waves;
8  16:04:05  right?
9  16:04:06  A.  Waves, yes.
10 16:04:07  Q.  Waves created by what, by whom, propagated from where?  I
11 16:04:13  don't understand you.
12 16:04:17  A.  But traffic -- water traffic and wind.
13 16:04:19  Q.  Well, those are two different things.  Are you suggesting
14 16:04:22  to the Court that what happened was this barge configuration
15 16:04:26  was tied on a sunny, calm Saturday or Sunday, with winds less
16 16:04:33  than 18 miles an hour, and broke away due to some wind?
17 16:04:38  A.  I disagree with your 18 miles an hour.  I never heard
18 16:04:40  about this volume.
19 16:04:43  Q.  I know you haven't because you didn't look at the weather
20 16:04:45  records, did you?
21 16:04:46  A.  Because there is no local weather information for this
22 16:04:49  location.
23 16:04:50  Q.  Did you look at the lakefront weather records?
24 16:04:53  A.  It's far away for local winds.
25 16:04:55  Q.  Did you look at them?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 859

```
16:04:56   A.  No.
16:04:57   Q.  Okay.  Do you know the distance between the lakefront
16:05:05   airport station and the Industrial Canal?
16:05:08   A.  No.  I can estimate it.
16:05:12   Q.  How far?
16:05:13   A.  Maybe five miles.
16:05:15   Q.  It's four miles.  It's close.
16:05:17   A.  Okay.
16:05:18   Q.  So possibility one is waves.  You were going to explain to
16:05:22   me how these waves were created on -- what I suggested to you
16:05:27   were calm days before the storm.  So please tell me how these
16:05:33   2-inch poly lines -- ropes, break?
16:05:42   A.  Again, one line was a well off line.  A used line, that
16:05:48   even some of the so-called experts indicated that the strength
16:05:53   was reduced to one-third of the initial strength.  And there is
16:06:01   traffic in the Industrial Canal and there are local winds.
16:06:04   Q.  Maybe I'm not clear.  I just want you to tell me how these
16:06:10   winds were created, how these -- where they came from, what
16:06:13   day.
16:06:14   A.  Okay.  Then one answer is microburst.  A microburst
16:06:19   develop local horizontal winds because it creates a downdraft
16:06:29   that heat the ground, and the winds are local in the area of
16:06:33   one to two miles, are local winds.
16:06:36   Q.  Are you aware and have you analyzed or reviewed any
16:06:39   meteorological data at all that suggests there were any
```

           JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA

## 860

```
16:06:43   microbursts in the New Orleans area Saturday or Sunday before
16:06:46   the storm?
16:06:48   A.  I don't analyze it because, again, I'm not a
16:06:51   meteorologist, and I was expecting other people to concentrate
16:06:56   in this area.  But I know there were microbursts because
16:07:02   Mr. Villavaso opened the doors of the pumping station and the
16:07:08   door blew up.
16:07:11   Q.  Don't confuse yourself, because you'll confuse us and the
16:07:13   record.  I'm not talking about the hurricane.  I'm asking you
16:07:16   to explain to the Court how the barge broke away sometime
16:07:20   before Sunday at noon.  Okay?  And you said waves or wind or
16:07:29   wave-wash, and I'm trying to get you to explain to us what you
16:07:34   mean and what support you have for that.
16:07:37   A.  Well, we knew they were somewhere before noon, and we
16:07:45   don't know for sure when the barge broke away.  I was under the
16:07:48   impression it was in the early morning of the 29th, but now it
16:07:54   is a possibility it broke away the day before.
16:07:57   Q.  Well, don't you have to choose one of those to give a
16:08:00   credible opinion?
16:08:02   A.  No, I don't believe so.  I have enough information of the
16:08:08   presence of the barge along the East Bank that is overwhelming.
16:08:16   Q.  That's when you start from the north with the barge
16:08:19   already there?
16:08:20   A.  Yes.
16:08:20   Q.  So what you're suggesting is that you're going to provide
```

           JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA

## 861

```
16:08:25   testimony, an opinion to this Court, about what happened at the
16:08:29   Lafarge facility on the West Bank; right?
16:08:34   A.  Yes.
16:08:34   Q.  Which is the barge broke away; right?
16:08:37   A.  Correct.
16:08:37   Q.  You don't know when or how; right?
16:08:40   A.  Correct.
16:08:40   Q.  And then you're just going to forget everything else as to
16:08:43   the barge going to some location to the south or straight
16:08:47   across to the north and just place it at the north, ignoring
16:08:51   this time frame in between.  Is that what you are saying?
16:08:57        MR. BEST:  Objection.  Argumentative and rhetorical.
16:08:59        THE WITNESS:  No, I disagree with you.
16:09:00        THE COURT:  It is a bit argumentative, but I'm going to
16:09:04   allow him to try to answer the question.  This is an expert
16:09:06   witness.
16:09:06        THE WITNESS:  Okay.  In my opinion, the presence of
16:09:09   the barge of the north breach is overwhelming.  Otherwise, with
16:09:19   the elevation of the water in the canal so low, around 4:30,
16:09:27   5:00 in the morning, there is no reason for the pumping station
16:09:34   to be shut down at 5:30.
16:09:36        So the only possible cause, which is supported
16:09:41   by Villavaso's statements and the position, is that it was
16:09:48   pushed the pilings.  Otherwise, with low water, how are you
16:09:53   going to transport the barge station 200 feet away?
```

           JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA

## 862

```
17:16:27   BY MR. WALKER:
16:09:57   Q.  So what you're saying is, to support Mr. Villavaso's
16:10:00   version, which you want to credit, you simply have no
16:10:04   explanation of how the barge got to the northern site, but
16:10:08   that's where you're going to believe it started from; right?
16:10:13   A.  Well, my answer is not that simple.  They shut the
16:10:15   electricity off at the pumping station at 5:30.  They're not
16:10:18   going to shut it when it was flooded.  It was getting flooded.  So
16:10:24   around 5:00, something had to measure in order to flood the
16:10:31   station 300 feet away.
16:10:32   Q.  I understand -- and I don't want to be talking about two
16:10:34   different things with you.  I understand what you believe
16:10:37   happened at the north breach because you choose to believe
16:10:40   Mr. Villavaso.  I understand that.  But it's --
16:10:45        MR. BEST:  I really have to object to counsel's
16:10:46   testifying and arguing.  That's not a question; it's a
16:10:50   statement.  And it's abusive.
16:10:52        THE COURT:  I'm not sure it's abusive, but -- it is a
16:10:58   statement, but I think he understands the question.  In other
16:11:00   words, he's saying that if he didn't believe Mr. Villavaso,
16:11:09   obviously -- in other words, he's saying certainly a portion of
16:11:18   his opinion is based on the credibility of Mr. Villavaso.  I
16:11:21   assume that's what you're asking.
16:11:23        MR. BEST:  I wouldn't object to that question.
16:11:24        THE COURT:  I think that's what he saying.
```

           JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA

863

| | |
|---|---|
| 16:11:25 | MR. BEST: I don't have a problem with that. |
| 16:11:26 | THE COURT: If he chooses to believe it. Exactly. |
| 15:33:28 | BY MR. WALKER: |
| 16:11:31 | Q. My problem and my question that I'm not sure we've |
| 16:11:32 | answered is: You placed the barge at the north because you |
| 16:11:37 | believe Mr. Villavaso, but you have no explanation of how it |
| 16:11:40 | got there; right? |
| 16:11:41 | A. I disagree with your statement. It's nothing to do with |
| 16:11:47 | Mr. Villavaso. They shut down the power in the pumping station |
| 16:11:50 | just because they were getting flooded. |
| 16:11:52 | Q. Okay. You can give me all the reasons you want why you |
| 16:11:55 | believe the barge did it at the north. That's not my question. |
| 16:11:59 | My question is: You don't have any opinion how the barge got |
| 16:12:02 | there, do you? |
| 16:12:03 | A. Correct. I just said I don't know the trajectory of the |
| 16:12:07 | barge. |
| 16:12:07 | Q. All right. Let's go back to your mooring issues. You |
| 16:12:12 | said waves, variable winds, and you also said passing vessels. |
| 16:12:16 | So are you suggesting that the barge broke away as a result of |
| 16:12:21 | a wake or wave-wash incident? |
| 16:12:24 | A. I'm sorry. Repeat again your question. |
| 16:12:27 | Q. I thought you said earlier that one of the possibilities |
| 16:12:31 | for the barge breakaway sometime Saturday or Sunday was a |
| 16:12:36 | wave-wash from a passing vessel. |
| 16:12:39 | A. One of the possible -- one of a superimposition of |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

864

| | |
|---|---|
| 16:12:45 | possibilities. |
| 16:12:45 | Q. Is that different than when you said waves, or did you |
| 16:12:48 | mean waves from a passing vessel? |
| 16:12:50 | A. Wave from wind and all passing vessels that are -- can be |
| 16:12:59 | superimposed. |
| 16:13:00 | Q. Do you have any evidence of any marine incident with |
| 16:13:06 | respect to a wave-wash having occurred in the Industrial Canal |
| 16:13:09 | Saturday or Sunday? |
| 16:13:12 | A. There is some details on some Coast Guard statements of |
| 16:13:21 | traffic in the area which have not been mentioned at all in |
| 16:13:27 | the -- much in this record or likely in the record. So there |
| 16:13:32 | was some information from the Coast Guard, some publication |
| 16:13:38 | from the Coast Guard, regarding traffic in the area. |
| 16:13:41 | Q. Please try and answer my questions because it's a Friday |
| 16:13:44 | afternoon, and we're all trying to get home. My question was: |
| 16:13:49 | Do you have any information regarding -- |
| 16:13:50 | THE COURT: I think he did answer. He said that |
| 16:13:51 | there was vessel traffic. I think. I mean, maybe I'm missing |
| 16:13:55 | something. |
| 16:13:55 | MR. WALKER: I'm sorry, Your Honor. I said "marine |
| 16:13:57 | incident." |
| 16:13:58 | THE COURT: Oh, a marine incident, okay. |
| 16:13:59 | MR. WALKER: Incident. |
| 15:34:33 | BY MR. WALKER: |
| 16:13:59 | Q. Do you have any information that there was a marine |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

865

| | |
|---|---|
| 16:14:01 | incident of a wave-wash in the Industrial Canal Saturday or |
| 16:14:04 | Sunday; yes or no? |
| 16:14:06 | A. I don't understand what is a marine -- what marine |
| 16:14:07 | accident [sic] are you referring to? What's a marine accident |
| 16:14:11 | [sic]? |
| 16:14:11 | Q. Do you know what a Coast Guard 2692 form is? |
| 16:14:15 | A. Not from the top of my head. |
| 16:14:17 | Q. You're not aware of anybody reporting a wave-wash incident |
| 16:14:22 | on Saturday or Sunday, are you? |
| 16:14:24 | A. I don't know. |
| 16:14:25 | Q. And with all this traffic that you say was in the canal |
| 16:14:29 | Saturday, you're not aware of any tugboat captain, any |
| 16:14:33 | deckhand, any crew member, any Coast Guard, anybody, reporting |
| 16:14:40 | a breakaway or wave-wash incident, are you? |
| 16:14:43 | A. Again, I don't know of any Coast Guard records except that |
| 16:14:54 | I read that some Coast Guard printed information discussed |
| 16:15:00 | traffic of several vessels that sought protection in the area |
| 16:15:03 | of the Lafarge facility. |
| 16:15:05 | Q. Okay. You will agree with me that, for a wave-wash to |
| 16:15:09 | occur, based on hydrodynamics, you need displacement of a |
| 16:15:14 | vessel, creating suction against the bank, which works the |
| 16:15:17 | vessel moored outwards; correct? |
| 16:15:21 | A. No. |
| 16:15:21 | Q. That's not how it works? |
| 16:15:22 | A. I disagree with your statement. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

866

| | |
|---|---|
| 16:15:27 | Q. Okay. So are you suggesting that the wave-wash that |
| 16:15:29 | you're talking about was just surface waves? |
| 16:15:32 | A. Well, the waves are surface waves. It's at the formation |
| 16:15:37 | at the surface of the water. If a tugboat with |
| 16:15:41 | 5,000-horsepower decide to put power full power with propeller, |
| 16:15:47 | it can create waves sufficient to part the lines of the barge, |
| 16:15:51 | yes. |
| 16:15:53 | Q. So you're speaking of surface waves created by the speed |
| 16:15:58 | of a tug? |
| 16:15:59 | A. Not only the speed. If a tugboat of 5,000-horsepower is |
| 16:16:05 | close to the barge, is not moving, but all of a sudden puts |
| 16:16:09 | full power, it can certainly break one line on the barge. |
| 16:16:14 | Q. You're not aware of any reports of any speeding tugs in |
| 16:16:22 | the heavily trafficked Industrial Canal on Saturday, are you? |
| 16:16:29 | A. Don't -- no, it don't has to be speeding. As I mentioned |
| 16:16:31 | an example of a vessel of not even moving that can be |
| 16:16:37 | considered speeding. If the area is static where it's hard to |
| 16:16:38 | maneuver, I put full power, full power in 30 seconds will |
| 16:16:44 | develop enough drag on the water to move the barge and break |
| 16:16:51 | the rope. |
| 16:16:52 | Q. You agree that the -- between the two bridges, Claiborne |
| 16:16:56 | and Florida, is just over half a mile, three quarters of a |
| 16:17:01 | mile? |
| 16:17:02 | A. More or less. I don't -- didn't measure. |
| 16:17:06 | Q. And you agree that as any tugs or barges approach either |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 867

1  16:17:09  bridge, the normal maneuver is to slow down?

2  16:17:15  A. Well, repeat your question. I don't understand your

3  16:17:19  question.

4  16:17:19  Q. You would agree that, waiting for a bridge opening, tugs

5  16:17:23  would go about half-throttle; they would not generate the kind

6  16:17:29  of engine speed that you're discussing?

7  16:17:31  A. The reason for a vessel to navigate is not necessarily to

8  16:17:36  try to cross a bridge. There may be other reasons.

9  16:17:46  Q. I think you testified about tugs, 500-horsepower --

10  16:17:50  5,000-horsepower, I'm sorry.

11  16:17:53  A. I mentioned that as an example.

12  16:17:55  Q. Well, you're aware, aren't you, that the tugs that transit

13  16:17:59  the canal through those locks are actually 800- to

14  16:18:01  1200-horsepower maximum?

15  16:18:06  A. No, I'm not aware. I'm not talking only tugs that

16  16:18:10  transfer the locks. Just vessels in the Industrial Canal.

17  16:18:15  Q. Did you see any such vessels in the lock master's logs for

18  16:18:18  Saturday or Sunday, which would have been recorded going

19  16:18:21  through the locks which can only take a vessel of a maximum

20  16:18:25  beam of 78 feet?

21  16:18:26  A. No, I didn't see any logs. I only read information from

22  16:18:29  the Coast Guard regarding traffic in the canal at the time of

23  16:18:37  the incident.

24  16:18:39  Q. All right. You've hypothesized about these possibilities.

25  16:18:45  But it's correct, isn't it, that you've made absolutely no

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 868

1  16:18:49  calculations regarding any of the forces which would be

2  16:18:55  required to have parted those lines based on either wind,

3  16:18:58  wave-wash, or a combination of the two; right?

4  16:19:02  A. Correct. I didn't make any calculation regarding the

5  16:19:05  failure of the ropes because I did not know the strength of the

6  16:19:11  ropes.

7  16:19:37  MR. WALKER: Your Honor, if I may have a minute.

8  16:19:39  THE COURT: You certainly may.

9  16:19:43  MR. WALKER: There's plenty of questions I may cut

10  16:19:46  out.

11  16:19:47  THE COURT: Yes, sir.

12  16:19:47  BY MR. WALKER:

13  16:20:06  Q. You reviewed a lot of testimony, a lot of documents. And

14  16:20:10  I realize that the LeBlanc and Tompkins version is new to you,

15  16:20:18  but based on your review of the testimony and the

16  16:20:22  documentation, are you aware of anybody who saw a barge Sunday

17  16:20:28  morning drifting south in the Industrial Canal, unassisted by a

18  16:20:36  tug?

19  16:20:39  A. The only thing I remember is, which I learned recently,

20  16:20:46  that two eyewitness saw the barge from the bridge.

21  16:20:50  Q. Okay. And similarly, I asked you the question: Are you

22  16:20:53  aware of any witness who, after Sunday at noon, saw a barge

23  16:20:58  drifting back north by itself, unassisted by a tug?

24  16:21:05  A. No, I didn't see anything of this sort.

25  16:21:11  Q. Including Mr. Villavaso's testimony. If you remember, he

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 869

1  16:21:13  went out on the platform from where you say he saw this object

2  16:21:19  20 times during the morning on Monday. Do you remember that?

3  16:21:23  A. I don't remember 20 times. Maybe he says so. I couldn't

4  16:21:26  memorize everything.

5  16:21:27  Q. And Sunday as well. Do you remember that?

6  16:21:30  A. Oh, I thought he went to work at midnight on Sunday. So I

7  16:21:40  don't understand your question because I thought he actually

8  16:21:44  went to work on Sunday night.

9  16:21:47  Q. That's how you remember his testimony, Sunday night?

10  16:21:50  A. Yeah. I don't memorize every word of his testimony.

11  16:21:54  Q. Okay. Regardless of the time period, he went out 20 times

12  16:21:58  or so, he testified, and he never testified seeing a barge

13  16:22:01  anywhere loose in the canal, did he?

14  16:22:04  A. I don't remember the 20 times; so, therefore, maybe I

15  16:22:07  missed whatever he was saying.

16  16:22:09  Q. Five times, ten times, 20 times. I can show you the

17  16:22:13  deposition cite. It's 20 times. He didn't see a barge

18  16:22:16  floating loose in the canal Sunday, did he?

19  16:22:18  A. Well, I believe you. This part, I didn't -- I didn't

20  16:22:26  remember this part.

21  16:22:36  Q. Now, if I understand your reports correctly, if we can put

22  16:22:29  up DX-8 again, do I understand that you positioned the barge

23  16:22:49  somewhere up here, north of the actual breach site, prior to it

24  16:22:55  contacting the wall? Is that still your opinion?

25  16:23:02  A. I don't believe that, you know -- I don't believe I say in

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 870

1  16:23:07  the report, apparently, what you're saying.

2  16:23:10  Q. Okay. Well, then that's why I was confused when I showed

3  16:23:13  you this initially.

4  16:23:14  So are you saying that the barge came from the south

5  16:23:16  and hit the north beach, or was it north of the north breach

6  16:23:19  and it came south and hit the north breach?

7  16:23:22  A. Well, to me, at a certain time, the barge was in the area

8  16:23:30  of initiation of the north breach and then drifted south to

9  16:23:36  this location of the south breach.

10  16:23:39  Q. Where was the barge before it was at the point of contact,

11  16:23:42  that discontinuity that you've talked about? Where was it

12  16:23:48  before that? Where did it come from?

13  16:23:51  A. Well, I repeat what I say several times: I don't know the

14  16:23:54  trajectory of the barge.

15  16:24:20  Q. Were there any winds affecting the barge when it contacted

16  16:24:25  the north breach?

17  16:24:28  A. Yes, certainly.

18  16:24:29  Q. From what direction?

19  16:24:32  A. I don't know the direction, but if using the testimony of

20  16:24:38  Mr. Villavaso, the wind should have been from the northwest.

21  16:24:47  Q. Did you do anything, review any documentation of any type,

22  16:24:49  to corroborate his observation or your interpretation of his

23  16:24:56  observation that there were either prevailing or variable or

24  16:24:58  sudden winds from the northwest?

25  16:25:03  A. No, except that there is no local information regarding

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**26 (Pages 867 to 870)**

871

| | | |
|---|---|---|
| 1 | 16:25:09 | local winds. |
| 2 | 16:25:18 | Q.  You, I believe, talk about a meteotsunami.  Is that |
| 3 | 16:25:25 | something that is still part of your opinion? |
| 4 | 16:25:28 | A.  Well, this is what it's called sometimes. |
| 5 | 16:25:30 | Q.  Do you still hold that opinion today, that a meteotsunami |
| 6 | 16:25:36 | was involved in this event? |
| 7 | 16:25:39 | A.  This is what it's called. |
| 8 | 16:25:40 | Q.  Yes or no, is it still your opinion that a meteotsunami is |
| 9 | 16:25:45 | involved in this event? |
| 10 | 16:25:46 | A.  No, I don't believe that I expressed that opinion.  This |
| 11 | 16:25:50 | is -- I was trying to explain what Mr. Villavaso saw, which |
| 12 | 16:25:57 | indicated that he saw a surge.  And I explained that these |
| 13 | 16:26:05 | sometimes occur, and it's called this name. |
| 14 | 16:26:08 | Q.  Well, is it your opinion today that a 20-foot wave carried |
| 15 | 16:26:17 | this barge anywhere; yes or no? |
| 16 | 16:26:21 | A.  No, I don't express that opinion.  It's not my opinion.  I |
| 17 | 16:26:26 | just was elaborating in the information I read.  The |
| 18 | 16:26:30 | 20 feet is an estimation from a person looking three-quarters |
| 19 | 16:26:36 | of a mile away, so I don't believe that can be considered a set |
| 20 | 16:26:41 | number. |
| 21 | 16:26:42 | Q.  Well, don't you consider it good practice as a naval |
| 22 | 16:26:46 | architect, marine engineer, and expert witness to corroborate |
| 23 | 16:26:47 | scientifically and objectively the information that you hear |
| 24 | 16:26:49 | from a witness to determine whether or not it's valid? |
| 25 | 16:26:54 | A.  Any information that can be corroborated, yes.  But if |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

872

| | | |
|---|---|---|
| 1 | 16:26:58 | there is no local information and there is turbulence from |
| 2 | 16:27:03 | surrounding buildings, I cannot invent.  I have to use |
| 3 | 16:27:07 | information based on something more solid than just inventions. |
| 4 | 16:27:14 | Q.  I agree with you.  And do you have any solid information |
| 5 | 16:27:17 | of any type, from any source, that suggests to you that there |
| 6 | 16:27:20 | was a 20-foot wave that suddenly appeared and came down the |
| 7 | 16:27:27 | Industrial Canal? |
| 8 | 16:27:27 | A.  I don't have any solid information.  I just was |
| 9 | 16:27:31 | elaborating in which an eyewitness said. |
| 10 | 16:27:40 | Q.  The location of the initiation of the north breach, as you |
| 11 | 16:27:44 | called it, was at the structural discontinuity; right? |
| 12 | 16:27:48 | A.  Close.  Not at; close. |
| 13 | 16:27:51 | Q.  Close? |
| 14 | 16:27:52 | A.  Within a few feet.  I don't know how many feet. |
| 15 | 16:27:56 | Q.  You're talking now about the point of contact of the |
| 16 | 16:27:58 | barge; right? |
| 17 | 16:28:00 | A.  Correct. |
| 18 | 16:28:00 | Q.  That structural discontinuity was a preexisting condition |
| 19 | 16:28:03 | of the levee wall, wasn't it? |
| 20 | 16:28:05 | A.  Was it -- sir, can you repeat? |
| 21 | 16:28:08 | Q.  I'm sorry.  I'm taking a little fast.  A preexisting |
| 22 | 16:28:11 | condition, wasn't it? |
| 23 | 16:28:13 | A.  According to a professional engineer that observe it, his |
| 24 | 16:28:19 | opinion was that there was a defective weld, but the crack is |
| 25 | 16:28:30 | not clear it was preexisting or occurred because it was a |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

873

| | | |
|---|---|---|
| 1 | 16:28:36 | defective weld. |
| 2 | 16:28:38 | Q.  Defective weld, or whatever you want to call it, it was |
| 3 | 16:28:41 | already there and existed before the barge ever came; right? |
| 4 | 16:28:44 | A.  The defective weld, yes; but the crack, no. |
| 5 | 16:28:47 | Q.  The weakness was already there? |
| 6 | 16:28:49 | A.  Well, with the respect to what strength?  It was -- if |
| 7 | 16:28:55 | there was no contact or no force breaking it, it will have |
| 8 | 16:28:59 | broken.  So something has to be applying a force in order to |
| 9 | 16:29:06 | crack the defective weld. |
| 10 | 16:29:09 | Q.  And what is it that you say was cracked, concrete or |
| 11 | 16:29:12 | something else? |
| 12 | 16:29:13 | A.  No, the steal. |
| 13 | 16:29:15 | Q.  So you said that -- your opinion is that the preexisting |
| 14 | 16:29:18 | defective weld, based on the contact with the barge, then |
| 15 | 16:29:22 | cracked? |
| 16 | 16:29:24 | A.  This is my understanding of the facts developed by this |
| 17 | 16:29:29 | professional engineer. |
| 18 | 16:29:29 | Q.  And what professional engineer is that? |
| 19 | 16:29:32 | A.  Well, I don't remember the name off the top of my head, |
| 20 | 16:29:36 | but it's in my report. |
| 21 | 16:29:39 | Q.  Is he from IPET, ILIT, or one of these other |
| 22 | 16:29:41 | organizations? |
| 23 | 16:29:42 | A.  He was from an engineering organization.  I don't know |
| 24 | 16:29:45 | exactly from the top of my head. |
| 25 | 16:29:49 | Q.  And your opinion is that this contact that the barge |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

874

| | | |
|---|---|---|
| 1 | 16:29:51 | made is more or stronger than hydrostatic pressure; right? |
| 2 | 16:29:54 | A.  Well, there was no hydrostatic pressure to start with. |
| 3 | 16:29:59 | The hydrostatic pressure was at the level of the base of the |
| 4 | 16:30:03 | concrete slab. |
| 5 | 16:30:08 | Q.  Where was the water? |
| 6 | 16:30:10 | A.  Repeat? |
| 7 | 16:30:11 | Q.  So where was the water level? |
| 8 | 16:30:13 | A.  The water was close to the level of the base of the |
| 9 | 16:30:18 | concrete slab. |
| 10 | 16:30:20 | Q.  Do you know that the levee has a slope and that, based on |
| 11 | 16:30:22 | your -- |
| 12 | 16:30:24 | A.  I'm sorry.  Repeat again. |
| 13 | 16:30:26 | Q.  Do you know that the levee has a slope? |
| 14 | 16:30:27 | A.  Yes. |
| 15 | 16:30:28 | Q.  And wouldn't the barge have run aground under your |
| 16 | 16:30:31 | scenario before it contacted the wall at the level that you |
| 17 | 16:30:34 | have the water? |
| 18 | 16:30:36 | A.  The barge was -- was drawing only about two feet, and so |
| 19 | 16:30:45 | it would be no problem if the barge was moving to contact the |
| 20 | 16:30:50 | concrete slab because the sloping side of the water side of the |
| 21 | 16:31:00 | levee is soft mud. |
| 22 | 16:31:02 | Q.  So you had -- |
| 23 | 16:31:02 | A.  And its irregular.  It's not solid.  It's not rock; it's |
| 24 | 16:31:06 | not cement.  So I don't see any reason to -- for the barge to |
| 25 | 16:31:15 | run aground or something like that.  It's impossible. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

27 (Pages 871 to 874)

875

| | |
|---|---|
| 16:31:17 | Q. Well, let me understand you correctly. You concede, then, |
| 16:31:19 | that based on the numbers that you testified to earlier, that |
| 16:31:22 | the barge would indeed contact the ground, but you're |
| 16:31:31 | suggesting that it wouldn't have run aground; it would have |
| 16:31:33 | continued its momentum and hit the wall? |
| 16:31:43 | A. What you're saying is not representing the reality. We |
| 16:31:46 | have the water side of the levee. It's at a over a slope |
| 16:31:59 | such that, if the barge contact the mud line, will be a |
| 16:32:07 | significant force to reach the concrete slab. Soft mud in a |
| 16:32:14 | sloping levee, there is no resistance whatsoever. |
| 16:32:17 | Q. I understand what you're saying. But you're agreeing with |
| 16:32:20 | me, then, that the bottom of the barge, under your scenario, |
| 16:32:23 | would have to have contacted the levee slope? |
| 16:32:27 | A. With the mud, but not run aground, will not -- run aground |
| 16:32:32 | means stop the forward velocity, would be impossible to run |
| 16:32:38 | aground. |
| 16:32:39 | Q. I understand. I'm sorry if I used a term of art that |
| 16:32:41 | running aground would stop the forward velocity. |
| 16:32:45 | To be clear, then, it would have contacted the mud; |
| 16:32:48 | correct? |
| 16:32:49 | A. It would get muddy, yes. |
| 16:32:52 | Q. Right. |
| 16:32:52 | Did you see any such evidence at any time, |
| 16:32:55 | personally, of such a contact? |
| 16:32:57 | A. None whatsoever. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

876

| | |
|---|---|
| 16:32:58 | Q. Okay. And did you see any evidence of that or any |
| 16:33:01 | observation of that in IPET, ILIT, Team Louisiana, or any other |
| 16:33:08 | reports? |
| 16:33:09 | A. Impossible. Nobody can see any evidence. How are they |
| 16:33:11 | going to see if the bottom of the barge is muddy? |
| 16:33:13 | Q. Did you see any scrapes or scratches of that type on the |
| 16:33:17 | bottom of the barge? |
| 16:33:18 | A. The mud cannot produce the scratches in the steel. |
| 16:33:20 | Q. I thought you said there were some other materials there. |
| 16:33:24 | A. I'm sorry? |
| 16:33:25 | Q. I thought you had said there was some other materials |
| 16:33:27 | there. |
| 16:33:27 | A. No, no. The mud is mud. It's firmly liquid dirt. |
| 16:33:33 | Q. Let me ask you: Did you ever make any calculations with |
| 16:33:36 | respect to the hydrostatic pressure that would be required to |
| 16:33:41 | fail the weld; yes or no? |
| 16:33:44 | Q. Fail the wall? |
| 16:33:47 | Q. Weld. |
| 16:33:48 | THE COURT: Weld, W-E-L-D. |
| 15:34:39 | BY MR. WALKER: |
| 16:33:49 | Q. The weak point. The discontinuity. Did you make any |
| 16:33:52 | calculations of the hydrostatic pressure required to fail that |
| 16:33:56 | weld? |
| 16:33:57 | A. No. |
| 16:33:57 | Q. Did you make any calculations of the momentum, forces of |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

877

| | |
|---|---|
| 16:34:03 | the barge, that would be required to fail that weld? |
| 16:34:08 | A. No. |
| 16:34:17 | Q. I'm going to show you HP-001. Do you recognize that as -- |
| 16:34:22 | MR. WALKER: Do you want to take a break, Your Honor? |
| 16:34:25 | THE COURT: No, no. |
| 16:34:25 | MR. WALKER: Okay. |
| 16:34:25 | BY MR. WALKER: |
| 16:34:26 | Q. Do you recognize that as one your artistic renditions in |
| 16:34:31 | your report? |
| 16:34:32 | A. Yes. It's a simplified hand sketch. |
| 16:34:35 | Q. Right. Is that how you opined that the barge contacted |
| 16:34:38 | the wall? |
| 16:34:40 | A. Again, it's a simplified kind of sketch just to show the |
| 16:34:45 | Court my general idea. |
| 16:34:47 | Q. Okay. Well, did it hit at that corner? Did it hit at |
| 16:34:51 | this corner? Did it hit -- |
| 16:34:53 | A. I don't know. There are probably 500 to 1,000 scratches |
| 16:35:01 | or small indents in the barge. I don't know what part. This |
| 16:35:09 | is a suggested possibility. |
| 16:35:10 | Q. And I think I also misspoke, according to your opinion, |
| 16:35:13 | because it -- you don't have the opinion, you don't hold the |
| 16:35:14 | opinion, that the barge hit; right? Your opinion is that it |
| 16:35:18 | lightly rested on the wall; right? |
| 16:35:19 | A. I used the word "contacted" in order to differentiate from |
| 16:35:24 | "impacted." |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

878

| | |
|---|---|
| 16:35:25 | Q. Right. You wanted to be very careful to differentiate |
| 16:35:29 | between an impact load situation and a contact, which for you |
| 16:35:34 | is simply a pushing against the panels; right? |
| 16:35:37 | A. Yes. |
| 16:35:38 | Q. Okay. I'm going to show you another, HP-002. Oh, I'm |
| 16:36:01 | sorry. Let's go to HP-009. Do you see the pump station? |
| 16:36:07 | A. Yes. |
| 16:36:07 | MR. WALKER: Okay. I'll mark it, Your Honor, if I |
| 16:36:08 | could. |
| 16:36:08 | BY MR. WALKER: |
| 16:36:09 | Q. Just -- I put a green dot fairly close just to the left as |
| 16:36:14 | we face the photograph of the door that blew out; right? Can |
| 16:36:19 | you see that? |
| 16:36:20 | A. Yes. |
| 16:36:21 | Q. And isn't it correct that that is your scientific basis |
| 16:36:24 | for winds, the fact that Mr. Villavaso testified that that door |
| 16:36:31 | blew out? |
| 16:36:35 | A. You use the word "scientific basis." This is telling me |
| 16:36:38 | that, in order for the door to blew out, the waves were running |
| 16:36:46 | almost parallel to the front of the house that is showing in |
| 16:36:57 | the photograph. |
| 16:37:01 | Q. I'm not sure you answered my question. |
| 16:37:03 | It's correct, isn't it, that the only basis that you |
| 16:37:06 | have an opinion for wind directions at the time of the northern |
| 16:37:10 | breach is Mr. Villavaso's testimony that that door blew out? |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

28  (Pages 875 to 878)

**879**

| | | |
|---|---|---|
| 1 | 16:37:15 | A.  Correct.  This is the only solid statement I have for wind |
| 2 | 16:37:20 | direction. |
| 3 | 16:37:20 | Q.  All right.  You earlier testified that this breach that |
| 4 | 16:37:24 | we're talking about -- and I'll put two dots there -- the |
| 5 | 16:37:27 | northern breach, was 280 feet.  In fact, isn't it 180 feet? |
| 6 | 16:37:32 | A.  Okay.  Maybe.  You know, my memory's not perfect. |
| 7 | 16:37:36 | Q.  So you could have been wrong in that?  I have a diagram |
| 8 | 16:37:39 | that I was going to show you, but I misplaced it.  Here it is. |
| 9 | 16:37:42 | MR. WALKER:  DX-132, Your Honor, and that comes from |
| 10 | 16:37:54 | IPET, I believe. |
| 11 | 16:38:02 | BY MR. WALKER: |
| 12 | 16:38:02 | Q.  Does that refresh your memory as to the dimensions of the |
| 13 | 16:38:05 | breach? |
| 14 | 16:38:06 | A.  I never seen what you're showing, but again I apologize if |
| 15 | 16:38:10 | my memory was not perfect.  I can look in my briefcase and get |
| 16 | 16:38:14 | information that I have. |
| 17 | 16:38:15 | Q.  Okay.  Well, we don't need to do that. |
| 18 | 16:38:18 | Let's go back to the photo we had -- |
| 19 | 16:38:20 | MR. WALKER:  Which, Your Honor, is DX-106 for the |
| 20 | 16:38:24 | record. |
| 21 | 16:38:24 | BY MR. WALKER: |
| 22 | 16:38:30 | Q.  So we see the pump house that I pointed to.  We see the |
| 23 | 16:38:35 | breach.  There's still water in the neighborhood, so that's |
| 24 | 16:38:37 | sometime fairly close to the date of the flooding; correct? |
| 25 | 16:38:40 | A.  Yes. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**880**

| | | |
|---|---|---|
| 1 | 16:38:41 | Q.  Okay.  Now, I'm going to show you -- and obviously, this |
| 2 | 16:39:02 | is after the supposed contact with the barge; correct?  In your |
| 3 | 16:39:05 | opinion? |
| 4 | 16:39:05 | A.  Yes. |
| 5 | 16:39:06 | Q.  And the barge would have come from whatever direction you |
| 6 | 16:39:11 | had it to make the contact with the panel? |
| 7 | 16:39:15 | A.  Yes. |
| 8 | 16:39:16 | Q.  Well, let's look at the same photograph, but with |
| 9 | 16:39:20 | something on it.  HP-015, I think it is. |
| 10 | 16:39:25 | Do you see that phone pole? |
| 11 | 16:39:28 | A.  Yes. |
| 12 | 16:39:30 | Q.  Had you missed it before in the photographs?  Have you |
| 13 | 16:39:33 | been out to the Ninth Ward and simply not seen it? |
| 14 | 16:39:36 | A.  No, I never seen this photograph. |
| 15 | 16:39:38 | Q.  It makes it quite difficult, doesn't it, for a 200-foot |
| 16 | 16:39:42 | barge to cause any contact or have any contact with that wall |
| 17 | 16:39:46 | without having splintered that phone pole; isn't that right? |
| 18 | 16:39:53 | A.  Well, this is the first time I see this photograph. |
| 19 | 16:39:57 | Evidently, somebody broke telephone pole.  I don't know how |
| 20 | 16:40:04 | this telephone pole end up over there. |
| 21 | 16:40:07 | Q.  Well, you're not suggesting that -- |
| 22 | 16:40:09 | THE COURT:  That's Exhibit 106; correct? |
| 23 | 16:40:12 | MR. WALKER:  Yes, Your Honor.  It's the same one that |
| 24 | 16:40:14 | we've seen previously, with the phone pole now designated. |
| 25 | 16:40:18 | THE COURT:  Okay.  Thanks.  Your question was? |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**881**

| | | |
|---|---|---|
| 1 | 16:40:24 | BY MR. WALKER: |
| 2 | 16:40:25 | Q.  And I can show you HP-017, and that has the barge to |
| 3 | 16:40:35 | scale, I represent to you.  As you see, it's just slightly |
| 4 | 16:40:39 | longer than the gap.  The barge is 200-by-35, and the gap of |
| 5 | 16:40:42 | the floodwall is 180.  There's no way that you could have the |
| 6 | 16:40:46 | contact that you suggest this barge made or the approach that |
| 7 | 16:40:48 | you suggest it came from without it having absolutely |
| 8 | 16:40:53 | obliterated that phone pole; correct? |
| 9 | 16:40:57 | MR. BEST:  Note an objection.  No foundation.  The |
| 10 | 16:40:58 | witness has said he didn't know the trajectory. |
| 11 | 16:41:02 | THE COURT:  All right.  The objection is noted, and |
| 12 | 16:41:03 | overruled. |
| 13 | 16:41:05 | THE WITNESS:  Should I answer? |
| 14 | 16:41:07 | THE COURT:  Yes. |
| 15 | 16:41:08 | THE WITNESS:  Okay.  I see in this photograph I've |
| 16 | 16:41:10 | never seen before, I see tracks, building, levee.  So I don't |
| 17 | 16:41:16 | know how this so-called phone pole end up over there.  But to |
| 18 | 16:41:23 | me it's a possibility that it's part of the work done to |
| 19 | 16:41:30 | reconstruct temporarily the levee. |
| 20 | 16:41:32 | BY MR. WALKER: |
| 21 | 16:41:33 | Q.  Okay.  Assume hypothetically that it was there at the time |
| 22 | 16:41:37 | of the hurricane.  You would agree that there's no way the |
| 23 | 16:41:40 | barge would have missed that phone pole? |
| 24 | 16:41:43 | A.  Correct.  I don't understand how a phone pole could be in |
| 25 | 16:41:49 | that Industrial Canal.  It looks ridiculous to me. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**882**

| | | |
|---|---|---|
| 1 | 16:41:56 | THE COURT:  To make sure I understand your testimony, |
| 2 | 16:42:00 | Mr. Pazos, you're saying that that pole is on the water side of |
| 3 | 16:42:09 | the flood-control structure? |
| 4 | 16:42:10 | THE WITNESS:  Yes. |
| 5 | 16:42:12 | THE COURT:  And you say that you don't see how -- why |
| 6 | 16:42:17 | it would be there, certainly prior to the hurricane. |
| 7 | 16:42:20 | THE WITNESS:  Correct.  The Industrial Canal, a phone |
| 8 | 16:42:25 | pole in the levee? |
| 9 | 16:42:28 | THE COURT:  So by that you deduce, at least, that it |
| 10 | 16:42:32 | was placed there after the event? |
| 11 | 16:42:37 | THE WITNESS:  During reconstruction.  It's probably |
| 12 | 16:42:46 | not a phone pole.  Probably some antenna. |
| 13 | 15:41:18 | BY MR. WALKER: |
| 14 | 16:42:46 | Q.  All right.  I think you testified previously that the |
| 15 | 16:42:48 | barge had a little more than 20 feet sail area; correct? |
| 16 | 16:42:53 | A.  Yes. |
| 17 | 16:42:54 | Q.  And you would agree with me that Mr. Villavaso's testimony |
| 18 | 16:42:57 | is that he saw an object and he saw two feet of that object? |
| 19 | 16:43:04 | A.  He clearly said that it was raining, it was dark, and he |
| 20 | 16:43:13 | couldn't distinguish clearly except for the levee and the |
| 21 | 16:43:20 | concrete slab -- I mean, this floodwall, probably for the |
| 22 | 16:43:24 | influence of the prevailing lights. |
| 23 | 16:43:29 | Q.  Would you agree with me that the height of the court's |
| 24 | 16:43:29 | ceiling, floor to ceiling, is 20 feet or more?  Approximately |
| 25 | 16:43:35 | 20 feet? |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**883**

1    16:43:36   A.  It could be.

2    16:43:37   Q.  And your testimony is that Mr. Villavaso, regardless of

3    16:43:40   the weather conditions, didn't see these 20 feet but saw only

4    16:43:46   two feet?

5    16:43:47   A.  In the dark, you can see only things that are illuminated.

6    16:43:52   Probably the lighting surrounding illuminate the protected side

7    16:43:58   of the levee and part of the concrete slab but did not

8    16:44:04   illuminate it high enough for him to be able to see the rest of

9    16:44:09   the barge.

10   16:44:11   Q.  And is it your opinion that what he saw as the barge ING

11   16:44:18   4727?

12   16:44:19   A.  It's my opinion that it's the only barge in the area and

13   16:44:27   the rest of the operation of the barge is clearly because of

14   16:44:32   the scrapes and damages in different portions and final

15   16:44:36   location of the barge.

16   16:44:38   Q.  You've read his deposition; correct?

17   16:44:40   A.  Yes.

18   16:44:42   Q.  Okay.  I'd like to refresh your recollection regarding

19   16:44:50   that deposition.  When Mr. Gilbert showed him a photo of the

20   16:44:54   4727, this is what Mr. Villavaso said.

21   16:45:51        MR. WALKER:  Do you have the page and lines first

22   16:45:51   before you play it, Your Honor.

23   16:45:51        While they find it, Your Honor, I will move on

24   16:45:53   to something else so we don't waste the Court's time.

25   16:45:56        Page 65 and 66.  Do we have a video clip of

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**884**

1    16:46:05   that?

2    16:46:06   BY MR. WALKER:

3    16:46:13   Q.  Let me refer to you what we're going to call Villavaso 4.

4    16:46:40        MR. WALKER:  I'll come back to that, Your Honor.

5    16:46:42   BY MR. WALKER:

6    16:46:42   Q.  You talked also about scrapes.

7    16:46:44   A.  I'm sorry.  Can you repeat?

8    16:46:46   Q.  Scrapes on --

9    16:46:46   A.  Yes.

10   16:46:47   Q.  -- the levee wall?

11   16:46:47   A.  Yes, yes.

12   16:46:48   Q.  Okay.  And if I understood your testimony, you're talking

13   16:46:50   about horizontal scrapes on the floodwall?

14   16:46:55   A.  Yes.

15   16:46:55   Q.  Okay.  And those are uniform down the length of the wall

16   16:47:01   from the northern breach to the southern breach?

17   16:47:05   A.  I -- no, I don't believe that I ever say "uniform."  I

18   16:47:10   don't know where the word come from.  I said there are scrapes

19   16:47:14   in different photographs at different locations of the concrete

20   16:47:19   slab.

21   16:47:19   Q.  Well, did you go visit the floodwall and inspect those

22   16:47:23   scrapes?

23   16:47:25   A.  I visit the floodwall at -- yes, after.  But, no, at the

24   16:47:33   time, I wasn't -- it had no foundation.  I was looking at all

25   16:47:39   kinds of things, but I didn't pay attention to the scrapes.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**885**

1    16:47:44   Q.  Okay.

2    16:47:45   A.  I -- oh, I apologize.  Except I took pictures of them.  I

3    16:47:49   realized what the scrapes were just from the pictures.

4    16:47:54   Q.  My question is very simple:  Is it your testimony that the

5    16:47:58   scrapes go uninterruptedly, or are they intermittent?

6    16:48:02   A.  Are intermittent.

7    16:48:06   Q.  And your opinion is that where those scrapes appear, that

8    16:48:09   was the barge scraping?

9    16:48:14   A.  Well, there are scrapes in all the panels I observe and

10   16:48:20   took pictures.  Some scrapes are much substantial than others

11   16:48:26   in order to remove one and a half to three inches of concrete

12   16:48:32   from the surface of the concrete wall, some of the scrapes are

13   16:48:37   lighter scrape from some other light action where the barge

14   16:48:42   caught other things.

15   16:48:44   Q.  You would agree that those scrapes that you have noted

16   16:48:46   intermittently are at the same level?

17   16:48:50   A.  No.

18   16:48:50   Q.  You see them at different levels?

19   16:48:54   A.  Yes.

20   16:48:54   Q.  Okay.  And how do you explain that?  Because the barge was

21   16:49:02   going up and down; is that right?

22   16:49:03   A.  The barge -- there are many scrapes, from minute to large,

23   16:49:14   produced by the barge and/or other miscellaneous floating

24   16:49:19   trash.

25   16:49:21   Q.  Let's go back to DX-8 again.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**886**

1    16:49:31        All right.  You have the barge somewhere up there --

2    16:49:34   A.  Yes.

3    16:49:35   Q.  -- having struck the wall.  And you say it intermittently

4    16:49:44   goes down the wall until it touches the northern point of the

5    16:49:49   southern breach; right?

6    16:49:51   A.  No.

7    16:49:52   Q.  Okay.  Where did it first strike, then, with respect to

8    16:49:56   the southern breach?

9    16:50:00   A.  In my opinion, the barge had contacted the northern end of

10   16:50:03   the northern breach and off and on, a matter of different

11   16:50:12   seconds or minutes, contacted other parts of the northern

12   16:50:15   breach and then move away from the northern breach and until it

13   16:50:27   reached again at the seawall some 1,750 feet from the Claiborne

14   16:50:34   bridge where the south breach started.

15   16:50:38   Q.  Okay.  Try and just answer my question.  If you would,

16   16:50:41   then, show us by marking as I have done on this, starting from

17   16:50:45   where the box is, where these intermittent contacts were down

18   16:50:50   the wall, including the southern breach.  Could you show the

19   16:50:55   judge how this barge migrated south?

20   16:50:59   A.  Well, I never say that I believed there were intermittent

21   16:51:05   contacts before the southern breach.  After the barge left the

22   16:51:09   northern breach, contacted again the seawall at the -- the

23   16:51:16   north end of the south breach.

24   16:51:19   Q.  Show us where the next contact was.

25   16:51:21   A.  I don't have a scale.  I don't see in this.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

887

| | |
|---|---|
| 1 | 16:51:23 Q. Well, isn't that the start of the southern breach right |
| 2 | 16:51:25 there? Doesn't that orient you? |
| 3 | 16:51:27 A. Okay. Okay. |
| 4 | 16:51:28 Q. So start from that. |
| 5 | 16:51:29 A. That would be the northern part of the south breach, yes. |
| 6 | 16:51:31 Q. Was there a contact there? |
| 7 | 16:51:32 A. I'm sorry? |
| 8 | 16:51:33 Q. Was there contact there? |
| 9 | 16:51:35 A. Yes. |
| 10 | 16:51:35 Q. Okay. Some let's -- I'll mark one for you. "Contact |
| 11 | 16:51:38 there." |
| 12 | 16:51:40 THE COURT: I'm going to interrupt you just for a |
| 13 | 16:51:42 second. |
| 14 | 16:51:44 MR. WALKER: Yes, Your Honor. |
| 15 | 16:51:44 THE COURT: Mr. Pazos, let me make sure I understand |
| 16 | 16:51:46 you. Did you say you saw photographs of scour marks on the |
| 17 | 16:51:51 floodwall itself? |
| 18 | 16:51:52 THE WITNESS: Yes. |
| 19 | 16:51:54 THE COURT: Are those -- where are those photographs? |
| 20 | 16:51:56 THE WITNESS: Are part of my report. I have it in my |
| 21 | 16:51:59 briefcase. |
| 22 | 16:52:00 THE COURT: Okay. I'm looking at your report, and if |
| 23 | 16:52:05 you could just give me -- I have it right here, sir. Do you |
| 24 | 16:52:13 have it? |
| 25 | 16:52:14 THE WITNESS: I have it. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

889

| | |
|---|---|
| 1 | 16:54:47 it is in the -- has the plaintiff tendered that to me yet? |
| 2 | 16:54:50 MR. BEST: The witness' report with attachments and |
| 3 | 16:54:52 exhibits? |
| 4 | 16:54:53 THE COURT: I have the witness' report here. That is |
| 5 | 16:54:55 not on it. At least, I didn't see it. |
| 6 | 16:55:01 MR. BEST: That meaning that which is on the video |
| 7 | 16:55:03 right now? |
| 8 | 16:55:05 THE COURT: If it's attachment No. 4, he's saying. |
| 9 | 16:55:08 Attachment No. 4, 32 pages: "Additional photographic and other |
| 10 | 16:55:13 evidence supporting the conclusions and opinions presented in |
| 11 | 16:55:16 this report." I don't have it in that book. I may have it |
| 12 | 16:55:20 somewhere in the myriad of things that I have. |
| 13 | 16:55:26 MR. WALKER: Does Your Honor have the sketches? |
| 14 | 16:55:27 THE COURT: No. |
| 15 | 16:55:27 MR. WALKER: It's just before the sketches. It's |
| 16 | 16:55:27 just before the sketches. So if you don't have these, then |
| 17 | 16:55:30 you're missing that portion of -- |
| 18 | 16:55:33 THE COURT: I don't have it. |
| 19 | 16:55:33 MR. WALKER: Yeah. |
| 20 | 16:55:33 THE COURT: All right. Well, I'll ask that to be |
| 21 | 16:55:36 provided with that. |
| 22 | 16:55:39 MR. WALKER: Would you like me to -- |
| 23 | 16:55:41 THE COURT: No, sir. It's up to whomever wants to do |
| 24 | 16:55:44 it. If you don't want to do it, I'm not going to -- I just |
| 25 | 16:55:45 wanted to get an example. I assume that the -- the scratches |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

888

| | |
|---|---|
| 1 | 16:52:17 THE COURT: Okay. I just want to see what we're |
| 2 | 16:52:22 talking about. |
| 3 | 16:52:23 MR. WALKER: Your Honor, I can ELMO them, if you |
| 4 | 16:52:23 want, for the benefit of anybody else. I have them here. |
| 5 | 16:52:58 THE COURT: Okay. |
| 6 | 16:52:58 This is the report I have from the plaintiffs, |
| 7 | 16:53:01 and I want to make sure I've got the full thing here. |
| 8 | 16:53:06 THE WITNESS: This is the scrapes. |
| 9 | 16:53:09 THE COURT: Can you tell me -- okay. What picture is |
| 10 | 16:53:14 that? How is that labeled? |
| 11 | 16:53:17 THE WITNESS: Yes, attachment No. 4 -- |
| 12 | BY MR. WALKER: |
| 13 | 16:53:23 Q. Mr. Pazos, if you could tell us the LNA number, then I can |
| 14 | 16:53:26 put it up. |
| 15 | 16:53:29 A. Well, it's not -- |
| 16 | 16:53:31 THE COURT: I just want to find it to make sure I |
| 17 | 16:53:33 have it for my own reference, if it's in this report that I |
| 18 | 16:53:37 have. I have, like, group 5 page 4, group 3, page -- |
| 19 | 16:53:41 THE WITNESS: You're looking at a different |
| 20 | 16:53:43 attachment. Look at attachment No. 4. |
| 21 | 16:54:17 THE COURT: I'm not sure I have that. Just from the |
| 22 | 16:54:19 plaintiffs' standpoint, I'm not sure I have it, so -- |
| 23 | 16:54:36 MR. WALKER: I have one up there, Your Honor. |
| 24 | 16:54:38 THE COURT: All right. I see it. If I were to look |
| 25 | 16:54:40 at that, where I don't have to comb through all the exhibits, |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

890

| | |
|---|---|
| 1 | 16:55:48 I'm seeing there are an example. |
| 2 | 16:55:51 MR. BEST: What is the designation, if I may know, of |
| 3 | 16:55:53 this photo that's on the screen right now, defendant exhibit |
| 4 | 16:55:56 number? |
| 5 | 16:55:57 MR. WALKER: It comes from Mr. Pazos' report. It's |
| 6 | 16:55:59 his attachment 4, photograph -- it looks like maybe 6, |
| 7 | 16:56:03 Mr. Pazos? What photograph number? |
| 8 | 16:56:06 THE WITNESS: Photo No. 5 of attachment No. 4. |
| 9 | 16:56:11 MR. ALDOCK: Your Honor, it's in Plaintiff's Exhibit |
| 10 | 16:56:13 402. |
| 11 | 16:56:14 THE COURT: Okay. So if I go to the exhibit -- I |
| 12 | 16:56:17 have copies of the reports here that were provided to me. And |
| 13 | 16:56:20 what I use for my own reference, I don't go through all the |
| 14 | 16:56:23 exhibits when I look at the reports and I synopsize them. |
| 15 | 16:56:25 That's what I do. |
| 16 | 16:56:26 MR. GILBERT: For clarity, this photo is page 127 of |
| 17 | 16:56:29 the 165-page exhibit, photo 2. |
| 18 | 16:56:32 THE COURT: So if we look at Exhibit 402, we can find |
| 19 | 16:56:34 it? |
| 20 | 16:56:35 MR. GILBERT: Correct. |
| 21 | 16:56:35 THE COURT: Okay. I just didn't have it in this, |
| 22 | 16:56:37 which was provided to me as the expert report, which I reviewed |
| 23 | 16:56:42 and synopsized. |
| 24 | 16:56:45 MR. GILBERT: Page 426 -- |
| 25 | 16:56:47 MR. BEST: Mr. Pazos' report. So if the judge |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**891**

| | |
|---|---|
| 1 | 16:56:50 |
| 2 | 16:56:51 |
| 3 | 16:56:53 |
| 4 | 16:56:56 |
| 5 | 16:56:59 |
| 6 | 16:57:01 |
| 7 | 16:57:02 |
| 8 | 16:57:06 |
| 9 | 16:57:08 |
| 10 | 16:57:14 |
| 11 | 16:57:47 |
| 12 | 16:57:49 |
| 13 | 16:57:52 |
| 14 | 16:57:58 |
| 15 | 16:58:06 |
| 16 | 16:58:08 |
| 17 | 16:58:10 |
| 18 | 16:58:10 |
| 19 | 16:58:10 |
| 20 | 16:58:10 |
| 21 | 16:58:14 |
| 22 | 16:58:20 |
| 23 | 16:58:25 |
| 24 | 16:58:29 |
| 25 | 16:58:33 |

doesn't have it --

THE COURT:  I can always go to Exhibit 402.

MR. BEST:  No.  That is Exhibit 402.

THE COURT:  No, no.  I have a discrete --

MR. BEST:  Oh, I misunderstand.

THE COURT:  -- expert report that I thought was the
report that apparently, is not the report.  All right.

Mr. Walker.

MR. GILBERT:  It's page 127 of 402.  It's the two
guys with the hard hats.

THE COURT:  We can proceed.  I'm sorry for the
interruption.  I just wanted to make sure I have everything
complete.  And I wanted to make sure it's in the exhibit book
as well.  Just for my sake.

Okay.  Mr. Walker, whenever you want to resume.
I interrupted you.

MR. WALKER:  Thank you, Your Honor.

THE COURT:  I'll give you a little time.

MR. WALKER:  I don't have much more.

BY MR. WALKER:

Q.  Mr. Pazos, what we were doing was we have DX-8 back on the
board, and we have the two green squares indicating at least
two locations where you place the barge.  Could you place
similar squares from the north breach to the south breach of
the northern point where you say the barge went?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**892**

| | |
|---|---|
| 1 | 16:58:36 |
| 2 | 16:58:38 |
| 3 | 16:58:46 |
| 4 | 16:58:52 |
| 5 | 16:58:53 |
| 6 | 16:58:55 |
| 7 | 16:58:58 |
| 8 | 16:59:03 |
| 9 | 16:59:06 |
| 10 | 16:59:07 |
| 11 | 16:59:10 |
| 12 | 16:59:13 |
| 13 | 16:59:14 |
| 14 | 16:59:21 |
| 15 | 16:59:25 |
| 16 | 16:59:26 |
| 17 | 16:59:28 |
| 18 | 16:59:31 |
| 19 | 16:59:32 |
| 20 | 16:59:35 |
| 21 | 16:59:37 |
| 22 | 16:59:43 |
| 23 | 16:59:44 |
| 24 | 16:59:47 |
| 25 | 16:59:50 |

And I realize you don't know exactly, but please
depict for the Court the migration of the barge south.

A.  You want me to describe the starting of the northern end
of the south breach?

Q.  No.  And I don't want you to describe it either.  You've
done that already.  I think you've told us that the barge went
down and intermittently contacted the wall from the north
breach to the northern point of the southern breach; correct?

A.  No, incorrect.

Q.  So there was no contact from the northern -- there was no
contact of the barge with the wall between these two green
spots?

A.  In my opinion, there was no contact from the barge from
the southern end of the north breach to the northern end of the
south breach.

Q.  Okay.  I have misunderstood you.

THE COURT:  I did too, so I'm glad you clarified it.

BY MR. WALKER:

Q.  So there wouldn't be any scrapes between those two green
points; right?

A.  It would be only a scrape from previous occasion, floating
trash, lighter scrapes.

Q.  So nothing from this barge between those two green spots,
which I'll -- now that I've learned -- will mark the first one
with -- that's supposed to be a "1" and this will be a "2."

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**893**

| | |
|---|---|
| 1 | 16:59:53 |
| 2 | 16:59:54 |
| 3 | 16:59:54 |
| 4 | 16:59:54 |
| 5 | 17:00:00 |
| 6 | 17:00:05 |
| 7 | 17:00:06 |
| 8 | 17:00:07 |
| 9 | 17:00:10 |
| 10 | 17:00:13 |
| 11 | 17:00:14 |
| 12 | 17:00:18 |
| 13 | 17:00:24 |
| 14 | 17:00:26 |
| 15 | 17:00:31 |
| 16 | 17:00:35 |
| 17 | 17:00:43 |
| 18 | 17:00:47 |
| 19 | 17:00:50 |
| 20 | 17:00:51 |
| 21 | 17:00:54 |
| 22 | 17:01:00 |
| 23 | 17:01:07 |
| 24 | 17:01:13 |
| 25 | 17:01:16 |

A.  Correct.

MR. WALKER:  Sorry, Your Honor.

BY MR. WALKER:

Q.  Okay.  So your testimony is that the intermittent contact
began only after the first contact at the north point of the
southern breach?

A.  Correct.

Q.  I see, okay.  And obviously you can't show us that because
that wall is gone; correct?

A.  Correct.

Q.  But it contacted several times, pushing panels, as you
said, and then contacted again down here at the southern end of
the southern breach?

A.  Okay.  The only part I don't agree with your statement is
that contacting in several places.  And I observed and I took
pictures of the several of the major contacts.

Q.  Okay.  You have actual pictures of that portion of the
southern breach wall where you say contact was made?

A.  Yes.

Q.  And how many contact points do you have?

A.  Well, it's hard for me to tell you how many points in
900 feet of a floodwall.  I walk the 900 feet of floodwall, and
I took pictures in several major areas of contact.

Q.  So you just have examples.  There may be others that
evidence was destroyed due to the flood?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**894**

| | |
|---|---|
| 1 | 17:01:18 |
| 2 | 17:01:18 |
| 3 | 17:01:22 |
| 4 | 17:01:27 |
| 5 | 17:01:31 |
| 6 | 17:01:33 |
| 7 | 17:01:37 |
| 8 | 17:01:46 |
| 9 | 17:01:52 |
| 10 | 17:01:53 |
| 11 | 17:01:54 |
| 12 | 17:01:55 |
| 13 | 17:01:56 |
| 14 | 17:01:58 |
| 15 | 17:02:04 |
| 16 | 17:02:04 |
| 17 | 17:02:06 |
| 18 | 17:02:08 |
| 19 | 17:02:12 |
| 20 | 17:02:13 |
| 21 | 17:02:15 |
| 22 | 17:02:20 |
| 23 | 17:02:23 |
| 24 | 17:02:27 |
| 25 | 17:02:33 |

A.  Correct.

Q.  Okay.  All right.  Let's mark with a "3" here the last
point of contact.  There.

And after that contact, the barge went into the
neighborhood; correct?

A.  Yeah.  After the -- after the -- the contact in different
places of the 900 feet and then was the collision and breaking
apart the top of the floodwall, then the barge went into the --

Q.  Now, if we --

A.  -- protect --

Q.  I'm sorry if I interrupted you.

A.  -- in the protected area.

Q.  I believe you've testified that, for this contact up at
the north breach, you needed a northwest variable wind;
correct?

A.  No, I didn't testify like that.

Q.  Well, how did the barge get there again?

MR. BEST:  Objection, repetitive.  It's been asked
several times.

THE COURT:  Well, yes, it may have been asked, but
it's not clear to me.  It may have been asked.  It's still not
clear to me.  So he can answer.

THE WITNESS:  I don't know the exact trajectory of
the barge.  The only thing I know, from all the documentation
available, it's clear to me that a barge arrived there and

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**895**

17:02:37  contacted the seawall and did some -- created gaps in the area
17:02:46  of the northern breach.
17:02:47  Q.  Okay.  Well, both the judge and I are having a hard time
17:02:47  BY MR. WALKER:
17:02:51  with this.  Because if you credit Tompkins and LeBlanc, where
17:02:55  we started this examination, they had the barge down by the
17:02:58  mooring points, then the barge had to be coming from the south;
17:03:02  correct?  From this mooring point up to the south.  So I still
17:03:06  don't understand what is it that was propelling that barge to
17:03:12  that location.
17:03:14       MR. BEST:  Just objection.  Vague in point of time.
17:03:18  I don't know which day, which hour, which time frame we're
17:03:22  talking about.
17:03:22       THE COURT:  At any time, let's say, between Sunday
17:03:25  morning and the time of the breach -- of the northern breach.
17:03:33       MR. WALKER:  Yes.
17:03:33       THE COURT:  Is that fair enough?
17:03:35       MR. WALKER:  That's the wide one and then if you
17:03:36  can --
17:03:38       THE COURT:  You might narrow it down, if you wish.
17:03:42       MR. WALKER:  I am.
17:03:43       THE WITNESS:  Thank you.  Well, I don't know for sure
17:03:46  of the location of the barge in the canal, and I don't know
17:03:55  exactly what propelled it.  All I said, there is a possibility
17:04:02  that the barge was moved by winds.

           JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA

**896**

17:04:06  BY MR. WALKER:
17:04:08  Q.  Let me stop you there.  Winds from what direction?
17:04:13  A.  Local winds.  Local winds sometimes come from -- from
17:04:20  local situations.
17:04:22       If there is a cloud that is locally dropping water, I
17:04:26  mean, raining locally, will it create a downward draft that
17:04:32  create horizontal winds in 360 degrees in all directions,
17:04:39  because the wind comes down, hit the ground, and it spread.
17:04:42       So this is called line bursts.  So there are local
17:04:51  winds that don't have a constant direction, are active only for
17:04:58  a few minutes.
17:04:59  Q.  Let's start at the other end, then.  Just briefly, shortly
17:05:03  before Mr. Villavaso saw this object which you suggest is the
17:05:08  barge, from what direction was the barge coming?  North, south,
17:05:12  or west?
17:05:15  A.  Was there, but I don't know from what direction was
17:05:16  coming.
17:05:18  Q.  And you don't know what winds, variable or otherwise, were
17:05:21  affecting the 20-foot sail area of that barge at that time?
17:05:24  A.  The only information I have on local winds is the damage
17:05:30  of the doors when he opened the doors.
17:05:33  Q.  And those, you suggest, are northwesterly winds?
17:05:38  A.  Yes.
17:05:38  Q.  So how does the barge then go from that position south, if
17:05:42  you're suggesting that only moments before, there was a

           JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA

**897**

17:05:45  northwesterly wind?  Is it now moving against that wind?
17:05:49  A.  I'm sorry.  Repeat again your question.
17:05:52  Q.  How does the barge, then, after it makes contact at the
17:05:54  north, go south --
17:05:56  A.  Yes.
17:05:57  Q.  -- if you just said that it was a northwesterly wind which
17:06:01  acted upon it to cause the northern breach?  Did the wind shift
17:06:05  again?
17:06:06  A.  Well, if there was a northwesterly wind as Villavaso
17:06:11  described, well, the barge would be going south the way it did,
17:06:15  actually did.  So --
17:06:16       THE COURT:  A north wind blows something south; south
17:06:19  wind blows it north.
           BY MR. WALKER:
17:06:20  Q.  So then you're suggesting that the barge was actually
17:06:25  north of this point when Mr. Villavaso --
17:06:26  A.  No, I'm suggesting -- I don't know the trajectory.  I know
17:06:29  the barge was there and after the point of contacts are going
17:06:34  south.
17:06:36  Q.  Okay.  From the north breach to the point -- from point
17:06:39  No. 1 to point No. 2, you don't know the trajectory exactly.
17:06:44  All you know is that it did not contact the wall?
17:06:51  A.  Yes.
17:06:52  Q.  What force moved the barge away from the water, which was
17:06:59  rushing into the neighborhood, to overcome that force and cause

           JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA

**898**

17:07:01  it to come back out in the canal so it could float down?
17:07:05  A.  The water was, in my opinion, not really rushing in the
17:07:10  neighborhood.  At the time of this happens, the water was
17:07:14  pouring to the broken water stop of elastomeric besides a
17:07:22  relatively light inclination of the panels that were affected
17:07:29  by the barge.
17:07:31  Q.  And so what moved the barge out?  Wouldn't it have
17:07:35  grounded in that same mud that you just described earlier?
17:07:43  A.  Remember I mentioned many times reflecting waves?  So you
17:07:45  have incoming waves.  They are reflecting waves.  The waves --
17:07:48  the barge is floating free, so the reflecting wave can move the
17:07:54  barge 50 feet away from the floodwall, and the wind will travel
17:08:02  south a distance from the floodwall.
17:08:04  Q.  So you're suggesting there were reflecting waves that hit
17:08:07  the wall and caused the barge to push away from the wall?
17:08:12  A.  It's a possible way besides the local winds because the
17:08:17  turbulence of the bridge and other buildings made the local
17:08:21  winds constantly varying in direction.
17:08:27  Q.  Okay.  I'll move on.
17:08:29       You talked about tension cracks or gaps formed at the
17:08:33  southern breach, didn't you?
17:08:36       MR. WALKER:  Could we make a --
17:08:40       THE DEPUTY CLERK:  You want to capture this one?
17:08:41       MR. WALKER:  Yes, please.
17:09:18       We don't need to mark the exhibit for this, but

           JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA

**899**

| | |
|---|---|
| 1 | 17:09:21  I just have another question. |
| 2 | 17:09:22  BY MR. WALKER: |
| 3 | 17:09:24  Q.  How long did it take the barge to go from point 1 to |
| 4 | 17:09:27  point 2? |
| 5 | 17:09:31  A.  According to the documents I reviewed and the testimony of |
| 6 | 17:09:38  witness, it looked like the contact of the northern breach |
| 7 | 17:09:48  occurred in the area of 5:00 a.m.  Could be 4:45; could be |
| 8 | 17:09:58  five, ten minutes after 5:00.  Approximately around 5:00 a.m. |
| 9 | 17:10:04     And according to the testimony of the witness, the |
| 10 | 17:10:07  contact at the northern end of the south breach occurred around |
| 11 | 17:10:13  6:00 a.m.  So it looked like -- I don't have exact times, but |
| 12 | 17:10:20  it looks like it took about an hour, maybe an hour and a half, |
| 13 | 17:10:25  maybe three-quarters of an hour, to move from the end south of |
| 14 | 17:10:30  the north breach to the north end of the south breach. |
| 15 | 17:10:37  Q.  And the witnesses you are referring to is Mr. Villavaso's |
| 16 | 17:10:41  time at the north breach and Terry Adams seeing it at the south |
| 17 | 17:10:46  breach; right? |
| 18 | 17:10:46  A.  I'm sorry.  Can you repeat? |
| 19 | 17:10:49  Q.  The two witnesses that you're referring to for your time |
| 20 | 17:10:51  calculation are Mr. Villavaso at the north and Terry Adams at |
| 21 | 17:10:56  the south? |
| 22 | 17:10:57  A.  I use more information than just witness.  The pump |
| 23 | 17:11:01  station was shut down because of flooding at 5:30.  So probably |
| 24 | 17:11:06  it start flooding about 5:15, you know, in order for them to, |
| 25 | 17:11:11  in fact, shut it.  That means water started flowing around |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**900**

| | |
|---|---|
| 1 | 17:11:14  5:00, which makes sense that the barge contacted around 5:00 or |
| 2 | 17:11:20  4:45, or five minutes after 5:00, around there, in order for |
| 3 | 17:11:25  the manager and principals of the management of the pumping |
| 4 | 17:11:33  station to decide to shut the electricity on |
| 5 | 17:11:36  Q.  Okay.  We were talking about tension cracks.  That's not |
| 6 | 17:11:39  the same as the weld at the northern breach; right?  The |
| 7 | 17:11:42  tension cracks? |
| 8 | 17:11:43  A.  I don't know what you're talking about.  Tension cracks? |
| 9 | 17:11:46  Q.  Gaps that you talked about? |
| 10 | 17:11:47  A.  Oh, gaps.  Okay. |
| 11 | 17:11:48  Q.  You called them gaps.  That's different from the |
| 12 | 17:11:51  discontinuity at the northern breach; right? |
| 13 | 17:11:55  A.  Wait, wait.  The gaps are spaced between the sheet pile |
| 14 | 17:12:00  and the water side of the levee. |
| 15 | 17:12:03  Q.  Correct.  It's a different mechanism of failure? |
| 16 | 17:12:06  A.  Yes. |
| 17 | 17:12:07  Q.  Okay.  And you agree that those same gaps were found at |
| 18 | 17:12:12  the London Avenue and 17 Street Canal? |
| 19 | 17:12:16  A.  No. |
| 20 | 17:12:18  Q.  What was found at the London Avenue and 17 Street Canal in |
| 21 | 17:12:23  terms of wall failure? |
| 22 | 17:12:26  A.  That the hydrostatic pressure broke the wall stops and |
| 23 | 17:12:35  then pushed the panels and the levee inboard, inland, a few |
| 24 | 17:12:43  feet. |
| 25 | 17:12:44  Q.  And there were tests also conducted by the U.S. Corps of |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**901**

| | |
|---|---|
| 1 | 17:12:46  Engineers, the E-99 tests, you're familiar with; right? |
| 2 | 17:12:49  A.  Yes. |
| 3 | 17:12:50  Q.  And those were also -- those were with respect to gaps? |
| 4 | 17:12:54  A.  Yes. |
| 5 | 17:12:55  Q.  Caused by hydrostatic pressure? |
| 6 | 17:12:57  A.  Yes. |
| 7 | 17:12:57  Q.  But it's your testimony that the gaps that you conclude at |
| 8 | 17:13:02  the southern breach were not caused by hydrostatic pressure, |
| 9 | 17:13:06  only by a barge? |
| 10 | 17:13:09  A.  Correct.  Because they moved -- the hydrostatic pressure |
| 11 | 17:13:12  was very low when the northern breach is started.  And also, |
| 12 | 17:13:19  the area where the barge didn't touch the floodwall, the |
| 13 | 17:13:25  floodwall did not develop a gap. |
| 14 | 17:13:43  Q.  You're familiar with IPET, obviously.  And I don't think |
| 15 | 17:13:49  I'm confused, but maybe I am, and I apologize, their executive |
| 16 | 17:13:53  summary suggests that -- and I'll put it on the ELMO if I |
| 17 | 17:13:56  could.  You see this part I marked in yellow. |
| 18 | 17:14:06     MR. WALKER:  Should I take this off? |
| 19 | 17:14:06     MR. BEST:  Could we have a page number, Counsel, for |
| 20 | 17:14:06  the record? |
| 21 | 17:14:11     MR. WALKER:  It's V-1 of the IPET, DX-145. |
| 22 | 17:14:25  BY MR. WALKER: |
| 23 | 17:14:26  Q.  Doesn't it say that:  "A common element in the I-wall |
| 24 | 17:14:26  failures was the development of a gap between the wall and the |
| 25 | 17:14:30  soil"? |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**902**

| | |
|---|---|
| 1 | 17:14:34  A.  Is this a question? |
| 2 | 17:14:35  Q.  Yes.  Doesn't it state that? |
| 3 | 17:14:37  A.  Yes, but they -- they're also talking about the 17 Street |
| 4 | 17:14:39  Canal, or I'd say the Inner Harbor Navigation Canal. |
| 5 | 17:14:48  Q.  And I thought I asked you a question that weren't the gaps |
| 6 | 17:14:52  found at the London Avenue and 17 Street Canal caused by |
| 7 | 17:14:58  hydrostatic pressure as concluded by IPET the same as the gaps |
| 8 | 17:15:00  that you found at the southern breach of the IHNC? |
| 9 | 17:15:04  A.  Okay.  You may interpret this as you mentioned, but I want |
| 10 | 17:15:13  to express my opinion that there were opposing organization |
| 11 | 17:15:17  that prepares reports, and many of these reports are |
| 12 | 17:15:23  contradictory. |
| 13 | 17:15:24     And in my opinion, to use the word "gap" at the |
| 14 | 17:15:31  17 Street Canal and comparing with the gaps at the Industrial |
| 15 | 17:15:37  Canal is totally erroneous because the type of the final |
| 16 | 17:15:45  failure of the seawall and that took place is completely |
| 17 | 17:15:49  different. |
| 18 | 17:15:51  Q.  You're right, Mr. Pazos, there are many |
| 19 | 17:15:54  contradictions amongst IPET, ILIT, Team Louisiana and others. |
| 20 | 17:16:01  You're nodding your ahead in agreement; right? |
| 21 | 17:16:04  A.  Correct. |
| 22 | 17:16:04  Q.  But there's one thing that they agree with, and that is |
| 23 | 17:16:07  that the barge did not cause the northern or the southern |
| 24 | 17:16:09  breach; isn't that right? |
| 25 | 17:16:12  A.  I'm not too sure because I didn't memorize so many reports |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 903

| | | |
|---|---|---|
| 1 | 17:16:18 | I read. There are many contradictions. |
| 2 | 17:16:22 | Q. Well, that's a pretty big conclusion, and I'm sure you |
| 3 | 17:16:25 | would remember it. |
| 4 | 17:16:26 | A. Well, I don't believe they expressing these walls. |
| 5 | 17:16:28 | Q. Isn't it correct that the conclusion of every one of those |
| 6 | 17:16:32 | reports is that something other than the barge, if you'd like |
| 7 | 17:16:34 | me to say it that way, caused these breaches? |
| 8 | 17:16:38 | A. I don't remember this cause. |
| 9 | 17:16:39 | MR. WALKER: Thank you, Your Honor. |
| 10 | 17:16:40 | THE COURT: Thank you, Mr. Walker. |
| 11 | 17:16:41 | Mr. Best? |
| 12 | 17:16:50 | REDIRECT EXAMINATION |
| 13 | 17:16:51 | BY MR. BEST: |
| 14 | 17:16:52 | Q. Mr. Pazos, you were asked a number of questions about, if |
| 15 | 17:16:55 | the barge on Sunday morning was seen by the Claiborne Avenue |
| 16 | 17:16:59 | bridge at the southern end of this section of the Industrial |
| 17 | 17:17:01 | Canal, how did it get up to the north breach. Do you recall |
| 18 | 17:17:05 | that line of questions? |
| 19 | 17:17:06 | A. Yes. |
| 20 | 17:17:07 | Q. Now, if, in fact, it was there, as those two witnesses |
| 21 | 17:17:12 | said, on Sunday morning, 10:00, 11:00, we don't know how long |
| 22 | 17:17:16 | before that it had been there, do we? |
| 23 | 17:17:20 | A. Correct. |
| 24 | 17:17:20 | Q. We don't know how long it remained in that area either, do |
| 25 | 17:17:22 | we? |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 904

| | | |
|---|---|---|
| 1 | 17:17:22 | A. Correct. |
| 2 | 17:17:23 | Q. If it was there. |
| 3 | 17:17:25 | Now, this area even after -- this area of the |
| 4 | 17:17:28 | Industrial Canal is subject not only to winds and local winds |
| 5 | 17:17:31 | that you've talked about, it's also subject to tides, isn't it? |
| 6 | 17:17:35 | A. Yes. |
| 7 | 17:17:35 | Q. Tides can move in from Lake Borgne and the other areas, |
| 8 | 17:17:38 | the other waterways, that come into the northern end beyond the |
| 9 | 17:17:42 | Florida bridge? |
| 10 | 17:17:44 | A. Yes. |
| 11 | 17:17:44 | Q. And once they close the locks, it's still subject to |
| 12 | 17:17:47 | tides that both go in and go out? |
| 13 | 17:17:49 | A. It's likely less, but, yes. |
| 14 | 17:17:51 | Q. Yes. And that would be the case on Saturday, and that |
| 15 | 17:17:55 | would be the case on Sunday, and that would be the case on |
| 16 | 17:17:59 | Monday? |
| 17 | 17:17:59 | A. Yes. |
| 18 | 17:17:59 | THE COURT: I assume the Court will be given an |
| 19 | 17:18:05 | exhibit that shows the tidal movements and the range of tide |
| 20 | 17:18:08 | for the appropriate days? |
| 21 | 17:18:10 | MR. BEST: I can't answer that as I stand here, Your |
| 22 | 17:18:11 | Honor. This is something that occurred to me when he was being |
| 23 | 17:18:14 | asked that question. |
| 24 | 17:18:14 | THE COURT: I understand. Maybe they'll be in the |
| 25 | 17:18:15 | record. I understand. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 905

| | | |
|---|---|---|
| 1 | 17:18:17 | MR. BEST: But, certainly -- |
| 2 | 17:18:18 | MR. WALKER: Hold on, Mr. Best. Mr. Best has |
| 3 | 17:18:20 | admitted, the reason I'm objecting: It's just occurred to him. |
| 4 | 17:18:23 | It's never occurred to the witness, it's not part of his |
| 5 | 17:18:26 | report, and nor was it part of my cross-examination, so it's |
| 6 | 17:18:28 | improper redirect on several lines. |
| 7 | 17:18:30 | MR. BEST: It's responsive to his questions. |
| 8 | 17:18:33 | THE COURT: I'm going to allow it, understanding it's |
| 9 | 17:18:34 | not part of his report, but related to the cross-examination. |
| 10 | 17:18:37 | What caused it to move? Could it have been tides? He says -- |
| 11 | 17:18:42 | I'll let him answer. |
| 12 | 17:18:43 | BY MR. BEST: |
| 13 | 17:18:43 | Q. As a matter of hydrodynamics, can a loose, light barge of |
| 14 | 17:18:49 | this type and description move on a waterway like this with the |
| 15 | 17:18:52 | tides? |
| 16 | 17:18:53 | A. Yes. |
| 17 | 17:18:54 | Q. And with reference to the winds that you say may have |
| 18 | 17:19:01 | acted on it, with a 21-foot sail area on this light barge, from |
| 19 | 17:19:07 | whatever time it broke away, if it was in the early morning |
| 20 | 17:19:10 | hours of Sunday, through the day Sunday, and up through Monday |
| 21 | 17:19:14 | and, indeed, the time of the storm, we have a lot of hours for |
| 22 | 17:19:17 | winds of whatever varying degrees, local or otherwise, to act |
| 23 | 17:19:22 | on a 21-foot sail area, don't we? |
| 24 | 17:19:25 | A. Correct, yes. |
| 25 | 17:19:32 | Q. Counsel asked you a lot of questions about the specific |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 906

| | | |
|---|---|---|
| 1 | 17:19:35 | mechanism and the time and the reasons for this barge to part |
| 2 | 17:19:39 | its mooring. Do you recall those? |
| 3 | 17:19:41 | A. Yes. |
| 4 | 17:19:42 | Q. And you recall that you had -- you enumerated a number of |
| 5 | 17:19:46 | possibilities but could not say more likely than not what |
| 6 | 17:19:49 | happened or when? |
| 7 | 17:19:50 | A. Correct. |
| 8 | 17:19:51 | Q. You can say the mooring failed? |
| 9 | 17:19:53 | A. Yes. |
| 10 | 17:19:53 | Q. With certainty? |
| 11 | 17:19:54 | A. Absolutely. |
| 12 | 17:19:55 | Q. And the barge was loose? |
| 13 | 17:19:57 | A. Absolutely. |
| 14 | 17:19:58 | Q. With certainty? |
| 15 | 17:19:59 | A. Certainly. |
| 16 | 17:20:07 | Q. And it could have failed at virtually any time from the |
| 17 | 17:20:13 | time those men left that facility and left it there up until |
| 18 | 17:20:17 | the time it was seen Sunday morning? |
| 19 | 17:20:21 | A. Well, from the time that the tugboat moved the barge |
| 20 | 17:20:27 | around, toppled the barge. |
| 21 | 17:20:31 | Q. And you've seen, as I think you referenced when counsel |
| 22 | 17:20:36 | asked you about the effect of other vessels, you saw the |
| 23 | 17:20:39 | traffic logs for the canal, which showed significant movement |
| 24 | 17:20:41 | of vessels up until the last vessel passed, I think, at about |
| 25 | 17:20:46 | 3:30 in the early morning on Sunday? |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**907**

17:20:49  A.  Well, I don't remember the timing, but I read in some
17:20:52  causal publication about a lot of traffic.
17:21:00  MR. BEST:  For Your Honor's information, that is
17:21:03  Exhibit 24, Plaintiff's Exhibit 24.
17:21:05  THE COURT:  Thank you, sir.
17:21:05  BY MR. BEST:
17:21:06  Q.  And given that this barge was moored in what's been
17:21:12  referred to as a turning basin, it's conceivable that it could
17:21:17  break away and float in that vicinity where it would not become
17:21:20  an obstruction to traffic even if traffic was still moving in
17:21:23  the waterway?
17:21:24  A.  Correct.
17:21:24  Q.  And it's conceivable that if that happens in the
17:21:26  early-morning hours on Sunday after midnight in the dark, and
17:21:31  it's off to the side, that remaining vessel traffic exiting the
17:21:35  area for the storm or coming and going in both directions might
17:21:39  not see it?
17:21:40  A.  Yeah, there is enough room.
17:21:42  Q.  It did not have navigation lights on it?
17:21:51  A.  Correct.
17:21:52  Q.  And we have no record of whether or not any of that
17:21:55  traffic that was coming and going to escape the storm may have
17:22:05  used the turning basin?
17:22:07  A.  Correct.
17:22:21  Q.  Counsel asked you about the degree to which

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**908**

17:22:24  Mr. Villavaso's testimony formed a basis of your opinions about
17:22:27  the north breach.  Do you recall that?
17:22:29  A.  Yes.
17:22:30  Q.  Was his testimony consistent with water levels in the
17:22:37  waterway at that time?
17:22:39  A.  Absolutely, yes.
17:22:43  Q.  Was his testimony consistent with other things, such as
17:22:46  the records of when the power was turned off to his facility?
17:22:50  A.  Absolutely, it's in the records.
17:22:53  Q.  So you didn't accept his testimony in a vacuum?
17:22:56  A.  Correct.
17:22:57  Q.  Was his testimony contradicted by any other evidence that
17:23:00  you saw?
17:23:01  A.  None whatsoever.
17:23:05  Q.  Now, counsel showed you that photograph with some sort of
17:23:20  vertical structure in it that fit rather neatly with your
17:23:24  drawing of one manner in which the barge might have made
17:23:27  contact with the northern wall in such a manner as to be
17:23:30  visible to Mr. Villavaso.  You recall that?
17:23:32  A.  Yes.
17:23:32  Q.  And, of course, you've already said you don't know what
17:23:35  that structure is or when it was put there?
17:23:37  A.  Correct.
17:23:37  Q.  But separate and apart from that, what we also don't know
17:23:42  is when that barge, if it was there as described by

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**909**

17:23:45  Mr. Villavaso -- and in your opinion, it was there -- when it
17:23:48  got into that position either, do we?
17:23:53  If it was as you've put it in that drawing that he
17:23:56  overlaid with the pole, whatever it was, okay, we don't know
17:24:00  how long before the storm it might have lain there, do we?
17:24:06  A.  I'm sorry.  Repeat your question.  I'm a little confused.
17:24:10  Q.  Isn't it possible that the barge could have drifted, even
17:24:12  if the pole was there at the time, which I don't know, but even
17:24:16  if it was, isn't it conceivable that the barge could have
17:24:19  drifted into that location with one end of it between the pole
17:24:22  and the levee just as it was in the superimposed two exhibits?
17:24:28  A.  Well, it's not impossible, but it's hard for me to believe
17:24:35  there is a telephone pole in the Industrial Canal.  This is
17:24:38  ridiculous.
17:24:39  Q.  I know.  You didn't see any other poles connecting it with
17:24:41  anything else?
17:24:41  A.  I've navigated the Industrial Canal 500 times.  I've never
17:24:45  seen a pole in the Industrial Canal.
17:24:47  Q.  I understand, and I'm not arguing with you.  I can't
17:24:50  answer that right now, and I'm not trying to.  I'm just asking
17:24:53  you that the fact is you made the drawing with the barge in the
17:24:56  position with a corner of it at the north breach where
17:24:59  Mr. Villavaso -- in such a position as it may have been that
17:25:03  it's consistent with Mr. Villavaso's testimony?
17:25:05  A.  Yes.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**910**

17:25:06  Q.  You don't know when it got there before it might have made
17:25:09  contact with the wall, caused the joint failure, and opened the
17:25:13  notch so that he saw something through the wall?
17:25:16  A.  Correct, I don't know.
17:25:17  Q.  You don't know how long it might have lain there?
17:25:20  A.  I have no idea.
17:25:21  Q.  Or how it got there?
17:25:22  A.  No.
17:25:23  Q.  But certainly, the surge coming through as Mr. Villavaso
17:25:28  described it, if it was laying there, could have been also
17:25:31  enough to make it make contact with the wall, cause the
17:25:34  fracture, open the opening that he described?
17:25:37  A.  Yes.
17:25:44  Q.  And then counsel asked you about the movement from the
17:25:47  north breach to the south breach, and you talked about your
17:25:49  estimate of the northwest winds that were consistent with the
17:25:51  door being blown off the hinges.  But in addition to that as a
17:25:57  motive, power, to move it southward, there's also the surge
17:25:59  Mr. Villavaso described?
17:26:01  A.  Yeah, but we don't know exactly.
17:26:04  Q.  Well, whatever it was, some water movement that he
17:26:07  described, would also be capable of affecting the position of
17:26:11  this barge and --
17:26:12  A.  Yes.
17:26:12  Q.  -- working with the winds to move it south?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**911**

| | | |
|---|---|---|
| 1 | 17:26:15 | A.  Yes. |
| 2 | 17:26:31 | MR. BEST:  Just one moment, Your Honor. |
| 3 | 17:26:57 | BY MR. BEST: |
| 4 | 17:26:57 | Q.  And with respect to your drawing of the position or |
| 5 | 17:27:03 | potential attitude of that barge so that a corner of it would |
| 6 | 17:27:07 | have been showing through where Mr. Villavaso saw it, as I |
| 7 | 17:27:10 | understand it, that's not a firm opinion; that's just one |
| 8 | 17:27:13 | possible explanation or one possible consistent position of the |
| 9 | 17:27:16 | vessel? |
| 10 | 17:27:17 | A.  Yeah.  It's not to scale.  It's sketch, a free-handed |
| 11 | 17:27:24 | sketch. |
| 12 | 17:27:25 | MR. BEST:  Thank you, Your Honor. |
| 13 | 17:27:25 | THE COURT:  Thank you, sir. |
| 14 | 17:27:26 | Sir, you may step down.  Thank you, sir. |
| 15 | 17:27:29 | THE WITNESS:  Thank you. |
| 16 | 17:27:29 | THE COURT:  Of course, it's that time of the day |
| 17 | 17:27:31 | where we're going to recess until Monday morning at 9:00.  I |
| 18 | 17:27:39 | thank you for your professional presentation and your crisp |
| 19 | 17:27:45 | presentation.  The Court's going to have some challenges here, |
| 20 | 17:27:47 | no question, in reconciling all of this. |
| 21 | 17:27:51 | MR. BEST:  Your Honor, a housekeeping measure.  You |
| 22 | 17:27:51 | asked earlier if we had any more information about the time of |
| 23 | 17:27:55 | Governor Blanco's press release.  The only additional thing |
| 24 | 17:27:59 | we've been able to find is a fax from the governor's press |
| 25 | 17:28:03 | office on that day, at 5:03 p.m., saying that she today issued |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**912**

| | | |
|---|---|---|
| 1 | 17:28:16 | a proclamation. |
| 2 | 17:28:17 | So that doesn't tell us the exact time of the |
| 3 | 17:28:19 | proclamation.  I'm just offering this.  I'm not putting it into |
| 4 | 17:28:23 | evidence.  I don't know what to do about it, quite frankly, |
| 5 | 17:28:25 | other than to -- Your Honor asked the question and I -- |
| 6 | 17:28:28 | THE COURT:  I appreciate at least the due diligence |
| 7 | 17:28:29 | in trying. |
| 8 | 17:28:31 | MR. ALDOCK:  Your Honor, before the case is over, |
| 9 | 17:28:32 | we'll provide maybe a composite because there's a lot of |
| 10 | 17:28:37 | different things, but we'll give it all to you. |
| 11 | 17:28:40 | THE COURT:  Thank you very much, Mr. Aldock.  Have a |
| 12 | 17:28:42 | nice weekend.  I hope you from out of town enjoy some New |
| 13 | 17:28:45 | Orleans cuisine, at least. |
| 14 | 17:29:02 | THE DEPUTY CLERK:  The printed exhibits were D-339, |
| 15 | 17:29:15 | and the other one is D-340. |
| 16 | 17:29:38 | (WHEREUPON, the proceedings were concluded.) |
| 17 | 17:29:38 | ***** |
| 18 | 17:29:38 | CERTIFICATE |
| 19 | 17:29:38 | I, Jodi Simcox, RMR, FCRR, Official Court Reporter |
| | | for the United States District Court, Eastern District of |
| 20 | 17:29:38 | Louisiana, do hereby certify that the foregoing is a true and |
| | | correct transcript, to the best of my ability and |
| 21 | 17:29:38 | understanding, from the record of the proceedings in the |
| | | above-entitled and numbered matter. |
| 22 | 17:29:38 | |
| 23 | 17:29:38 | |
| | | S/ Jodi Simcox, RMR, FCRR |
| 24 | 17:29:38 | Jodi Simcox, RMR, FCRR |
| | | Official Court Reporter |
| 25 | | |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA