1025

<pre>
 1                   UNITED STATES DISTRICT COURT
 2                   EASTERN DISTRICT OF LOUISIANA
 3
 4
 5      IN RE:  KATRINA DREDGING        *   Civil Action
        LIMITATION ACTION               *
 6      CONSOLIDATED LITIGATION         *   No. 05-4182
                                        *
 7                                      *   Section K(2)
        PERTAINS TO:                    *
 8      BARGE                           *   New Orleans, Louisiana
                                        *
 9      MUMFORD, C.A. NO. 05-5724, AS   *   June 28, 2010
        TO PLAINTIFFS JOSEPHINE         *
10      RICHARDSON AND HOLLIDAY         *   Afternoon Session
        JEWELERS, INC., ONLY            *
11      AND                             *
        BENOIT, C.A. NO. 06-7516, AS    *
12      TO PLAINTIFFS JOHN ALFORD AND   *
        JERRY ALFORD ONLY               *
13      * * * * * * * * * * * * * * *   *
14                          DAY FIVE
                   BENCH TRIAL BEFORE THE
15             HONORABLE STANWOOD R. DUVAL, JR.
                 UNITED STATES DISTRICT JUDGE
16
17      APPEARANCES:
18      For the Plaintiffs:        Best Koeppel
                                   BY:  LAURENCE E. BEST, ESQ.
19                                 BY:  PETER S. KOEPPEL, ESQ.
                                   2030 St. Charles Avenue
20                                 New Orleans, Louisiana 70130
21
22      For the Plaintiffs:        Law Offices of Brian A. Gilbert
                                   BY:  BRIAN A. GILBERT, ESQ.
23                                 2030 St. Charles Avenue
                                   New Orleans, Louisiana  70130
24
25
</pre>

JODI SIMCOX, RMR, FCRR – OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**1026**

APPEARANCES:

For the Plaintiffs:   Wiedemann & Wiedemann
                      BY:  KARL WIEDEMANN, ESQ.
                      BY:  LAWRENCE WIEDEMANN, ESQ.
                      821 Baronne Street
                      New Orleans, Louisiana 70113

For the Plaintiffs:   Patrick J. Sanders, LLC
                      BY:  PATRICK J. SANDERS, ESQ.
                      3316 Ridgelake Drive
                      Suite 100
                      Metairie, Louisiana 70002

For the Plaintiffs:   Law Office of Richard T. Seymour,
                      P.L.L.C.
                      BY:  RICHARD T. SEYMOUR, ESQ.
                      1150 Connecticut Avenue N.W.
                      Suite 900
                      Washington, D.C. 20036-4129

For the Plaintiffs:   Khorrami, Pollard & Abir, LLP
                      BY:  SHAWN KHORRAMI, ESQ.
                      444 S. Flower Street
                      33rd Floor
                      Los Angeles, California 90071

For the Plaintiffs:   Wilson, Grochow, Druker & Nolet
                      BY:  LAWRENCE A. WILSON, ESQ.
                      233 Broadway
                      5th Floor
                      New York, New York 10279

For the Defendant:    Chaffe, McCall, L.L.P.
                      BY:  DEREK A. WALKER, ESQ.
                      BY:  CHARLES P. BLANCHARD, ESQ.
                      1100 Poydras Street, Suite 2300
                      New Orleans, Louisiana 70163

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

---

**1027**

APPEARANCES:

For the Defendant:    Goodwin Procter, L.L.P.
                      BY:  JOHN ALDOCK, ESQ.
                      BY:  MARK RAFFMAN, ESQ.
                      BY:  ADAM CHUD, ESQ.
                      BY:  KIRSTEN ROBBINS, ESQ.
                      BY:  ERIC I. GOLDBERG, ESQ.
                      901 New York Avenue, NW
                      Washington, D.C. 20001

For the Defendant:    Sutterfield & Webb
                      BY:  DANIEL A. WEBB, ESQ.
                      650 Poydras Street, Suite 2715
                      New Orleans, Louisiana 70130

For the Defendant:    Lafarge North America, Inc.
                      BY:  PETER KEELEY, ESQ.
                      12950 Worldgate Drive
                      Herndon, Virginia 20170

Official Court Reporter:   Jodi Simcox, RMR, FCRR
                      500 Poydras Street
                      Room HB-406
                      New Orleans, Louisiana 70130
                      (504) 589-7780

Proceedings recorded by mechanical stenography, transcript
produced by computer.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

---

**1028**

I N D E X

                                          Page

DAVID L. MITCHELL

    Cross-Examination                     1029
    Redirect Examination                  1070

GENNARO GERALD MARINO

    Direct Examination                    1079

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

---

**1029**

13:04:30         AFTERNOON SESSION
13:04:30         (June 28, 2010)
12:40:14         * * * * *
13:20:12         THE DEPUTY CLERK:  All rise.  Court's in session.
13:20:26    Please be seated.
13:20:28         THE COURT:  Yes, sir.  Are you ready to proceed?
13:20:30         THE WITNESS:  Yes, Your Honor.
09:20:43         (WHEREUPON, David L. Mitchell, having been previously
09:20:43    duly sworn, testified as follows.)
13:20:31         CROSS-EXAMINATION
13:20:31    BY MR. RAFFMAN:
13:20:31    Q.  Good afternoon, Dr. Mitchell.
13:20:34         I want to ask you a few questions about the H-wind
13:20:38    data.  You have included the H wind data in your report; right?
13:20:46    A.  Correct.
13:20:47    Q.  And the H-wind data is reliable wind data; right?
13:20:53    A.  Yes, sir.
13:20:54    Q.  The National Weather Service used data from the lakefront
13:21:01    airport in their H-wind analysis for as long as the airport was
13:21:07    functioning; right?
13:21:08    A.  What they did -- and I can't comment on how much of the
13:21:11    lakefront airport they used, counselor, in their H-wind
13:21:14    analysis.  I know if an official land site or a site is
13:21:17    operational and they deem the data valid, they will include it
13:21:21    in their H-wind analysis.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1078

| | |
|---|---|
| 1 | 14:59:34 | THE COURT: Okay. |
| 2 | 14:59:35 | MR. WILSON: There's also a December 18th, 2009 |
| 3 | 14:59:38 | declaration of Dr. Marino that I believe defendant Lafarge has |
| 4 | 14:59:43 | agreed that that can come into evidence. |
| 5 | 14:59:45 | MR. RAFFMAN: Your Honor, we have consented to the |
| 6 | 14:59:49 | admission in evidence of the December 2009 declaration on the |
| 7 | 14:59:54 | condition that our experts be permitted to address the matters |
| 8 | 15:00:00 | contained in that declaration in their testimony. |
| 9 | 15:00:04 | I should add that I think our experts' testimony |
| 10 | 15:00:12 | will not be added to in any meaningful way regardless of |
| 11 | 15:00:18 | whether that comes in or not. But I would not want to hear |
| 12 | 15:00:23 | from the plaintiffs an objection that responsive testimony to |
| 13 | 15:00:27 | this December 2009 report, which has not been offered as an |
| 14 | 15:00:32 | exhibit until this moment, is somehow beyond the scope of my |
| 15 | 15:00:36 | experts' reports. |
| 16 | 15:00:39 | MR. KHORRAMI: Your Honor, we absolutely stipulated |
| 17 | 15:00:41 | to that. We reserved the right, obviously, to cross those |
| 18 | 15:00:43 | defendant's experts as to all matters. |
| 19 | 15:00:46 | THE COURT: Of course. |
| 20 | 15:00:47 | MR. KHORRAMI: But we will not object to them |
| 21 | 15:00:48 | responding specifically to the 12/18/09 declaration of |
| 22 | 15:00:54 | Dr. Marino. |
| 23 | 15:00:57 | THE COURT: That's satisfactory to the Court. The |
| 24 | 15:00:58 | Court accepts that stipulation. |
| 25 | 15:01:02 | MR. WILSON: Your Honor, before I start, I may want |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1079

| | |
|---|---|
| 1 | 15:01:02 | to apologize to the Court that this witness may be a little |
| 2 | 15:01:04 | long and tedious, and we may not get to the interesting part |
| 3 | 15:01:07 | until tomorrow. But with that said -- |
| 4 | 15:01:10 | THE COURT: Don't forget that, even in a complex |
| 5 | 15:01:14 | witness, brevity is the soul of persuasion. As well as wit. |
| 6 | 15:01:19 | MR. WILSON: I'll keep that in mind. |
| 7 | 15:01:20 | (WHEREUPON, Gennaro Gerald Marino, having been duly |
| 8 | 15:01:20 | sworn, testified as follows.) |
| 9 | 15:01:24 | THE DEPUTY CLERK: Please state your full name and |
| 10 | 15:01:24 | correct spelling for the record. |
| 11 | 15:01:38 | THE WITNESS: Gennaro Gerald Marino, G-E-N-N-A-R-O, |
| 12 | 15:01:46 | G-E-R-A-L-D, M-A-R-I-N-O. |
| 13 | 15:01:51 | DIRECT EXAMINATION |
| 14 | 15:01:52 | BY MR. WILSON: |
| 15 | 15:01:52 | Q. Good afternoon, Doctor. |
| 16 | 15:01:54 | A. Good afternoon. |
| 17 | 15:01:54 | Q. I understand there's already been Daubert motions in this |
| 18 | 15:01:57 | case, but could you tell the Court a little bit about your |
| 19 | 15:02:00 | background, your education, and work experience? |
| 20 | 15:02:03 | A. Sure. I have a bachelor's in civil engineering from the |
| 21 | 15:02:08 | University of Dayton in 1972. I worked for almost about a year |
| 22 | 15:02:15 | in the field and then decided to go back for my master's in |
| 23 | 15:02:21 | civil engineering, with the emphasis on soil mechanics and |
| 24 | 15:02:26 | foundation engineering, in 1973 and continued and got my |
| 25 | 15:02:35 | master's in 1975. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1080

| | |
|---|---|
| 1 | 15:02:37 | During the latter part of that time I was in school, |
| 2 | 15:02:39 | I was working full-time as well. About four years of work in |
| 3 | 15:02:45 | this area, I decided to go and get a Ph.D., and I received a |
| 4 | 15:02:52 | Ph.D. from the University of Illinois in 1985, during which |
| 5 | 15:02:59 | time I was consulting on various projects. Since that time, I |
| 6 | 15:03:07 | have been consulting, and the business has grown over the |
| 7 | 15:03:11 | years. And now I have 13 staff and am president of Marino |
| 8 | 15:03:18 | Engineering Associates. |
| 9 | 15:03:22 | I have membership in several engineering societies. |
| 10 | 15:03:27 | I am on the committee for testing of soil and rock through |
| 11 | 15:03:36 | ASTM, which is a widely known organization. And our job as |
| 12 | 15:03:46 | committee members is to review soil and rock testing procedures |
| 13 | 15:03:49 | and to make comments on them. |
| 14 | 15:03:55 | I've also been elected to the board of consultants to |
| 15 | 15:04:01 | investigate a breach failure of a slurry impoundment in |
| 16 | 15:04:07 | Kentucky by the National Academy of Sciences. |
| 17 | 15:04:18 | I've also have a professional license in ten states |
| 18 | 15:04:24 | or more. I also have done -- I've done about over 30 years of |
| 19 | 15:04:36 | work in the -- in this field, and it includes doing failure and |
| 20 | 15:04:41 | damage investigations. I've done over 100 failure and damage |
| 21 | 15:04:47 | investigations of various kinds. Part of some of that work was |
| 22 | 15:04:53 | summarized in a textbook on Earthquake Damage: Inspection, |
| 23 | 15:04:59 | Evaluation, and Repair. The book also covers damage from other |
| 24 | 15:05:04 | sources as well. |
| 25 | 15:05:06 | I've done numerous analyses of stability with |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1081

| | |
|---|---|
| 1 | 15:05:13 | groundwater or seepage conditions, and I have about 70 |
| 2 | 15:05:22 | publications on advanced engineering topics. |
| 3 | 15:05:26 | Q. Okay. You said you had a BA in civil engineering? Is |
| 4 | 15:05:30 | that what -- |
| 5 | 15:05:31 | A. A BS. |
| 6 | 15:05:32 | Q. A BS. |
| 7 | 15:05:33 | Okay. A master's in civil engineering also? |
| 8 | 15:05:36 | A. Yes. |
| 9 | 15:05:37 | Q. And then you got a Ph.D. in geotechnical engineering; |
| 10 | 15:05:41 | correct? |
| 11 | 15:05:42 | A. It's in civil engineering, with an emphasis on |
| 12 | 15:05:46 | geotechnical engineering. |
| 13 | 15:05:46 | Q. Okay. Could you tell the Court what geotechnical |
| 14 | 15:05:48 | engineering is? |
| 15 | 15:05:50 | A. Geotechnical engineering is basically evaluating -- |
| 16 | 15:05:54 | investigating and evaluating the behavior of soils or earth |
| 17 | 15:05:59 | materials to various man-made structures. |
| 18 | 15:06:05 | MR. WILSON: I tender, Your Honor. |
| 19 | 15:06:07 | THE COURT: Questions, sir? |
| 20 | 15:06:09 | MR. RAFFMAN: Your Honor, everything I have goes to |
| 21 | 15:06:11 | weight, not admissibility. We'll accept him. |
| 22 | 15:06:15 | THE COURT: All right. Thank you, counsel. |
| 23 | 15:06:17 | The Court accepts Dr. Marino as tendered. |
| 24 | 15:06:20 | MR. WILSON: Thank you, Your Honor. |
| 25 | 15:06:21 | THE COURT: Specifically, he's tendered in the field |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1082

```
1    15:06:22  of?
2    15:06:23        MR. WILSON:  He's tendered in the field of
3    15:06:25  geotechnical engineering, engineering, and failure analysis.
4    15:06:30  BY MR. WILSON:
5    15:06:34  Q.  Dr. Marino, were you asked to perform a failure analysis
6    15:06:38  of the eastern floodwall in the Industrial Canal?
7    15:06:41  A.  Yes.
8    15:06:41  Q.  And did you perform an analysis?
9    15:06:44  A.  Yes.
10   15:06:45  Q.  And as part of that analysis, did you perform a limit
11   15:06:50  equilibrium analysis?
12   15:06:53  A.  Yes.
13   15:06:53  Q.  And is that also known as a stability analysis or a
14   15:07:00  stability study?
15   15:07:01  A.  Yes.
16   15:07:02  Q.  And did you also perform a seepage study?
17   15:07:04  A.  Yes.
18   15:07:06  Q.  And both of those studies were for the levee system in the
19   15:07:11  Industrial Canal?
20   15:07:11  A.  Yes.
21   15:07:12  Q.  Okay.  And did you also analyze the damage deformation
22   15:07:18  patterns relative to the failures of the eastern wall of the
23   15:07:21  Industrial Canal?
24   15:07:22  A.  Yes.
25   15:07:23  Q.  And I should say "eastern floodwall"; correct?
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1083

```
1    15:07:26  A.  Right.
2    15:07:27  Q.  Okay.  Did you create a PowerPoint presentation to assist
3    15:07:32  you in explaining your opinion to the Court?
4    15:07:35  A.  Yes, I have.
5    15:07:36  Q.  Okay.
6    15:07:38        MR. WILSON:  And, Your Honor, I believe that the
7    15:07:40  demonstrative evidence, which I have a copy that I could hand
8    15:07:44  to the Court, it's previously been agreed that they be marked
9    15:07:47  as No. 428.
10   15:07:50        MR. KHORRAMI:  It's 438.
11   15:07:52        MR. WILSON:  438?  I had it as 428.
12   15:07:55        MR. KHORRAMI:  I apologize.
13   15:07:56        MR. WILSON:  428.  Did you want a copy, Your Honor?
14   15:08:00  Should I hand it up?
15   15:08:01        THE COURT:  Yes, please.  I have a copy of his
16   15:08:03  report, but I'd like the PowerPoint.
17   15:08:06        MR. WILSON:  I appreciate it.  Thank you.
18   15:08:13        THE COURT:  I assume most of these come out of the
19   15:08:15  report, most of the --
20   15:08:16        MR. WILSON:  Correct.  That's correct, Your Honor.
21   15:08:23        Okay.  Could we put up the first slide?
22   15:08:28        MR. ALDOCK:  Your Honor, before we go forward, we may
23   15:08:30  want a better marking system because 428 is "any demonstrative
24   15:08:34  exhibit to illustrate the testimony of any expert witness,"
25   15:08:37  which may not do it for us.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1084

```
1    15:08:41        THE COURT:  No.
2    15:08:42        MR. KHORRAMI:  We'll be more specific, then.
3    15:08:48        THE COURT:  Why don't we just put "Dr. Marino's
4    15:08:55  demonstrative exhibits."
5    15:08:57        MR. WILSON:  As 437?
6    15:09:00        THE COURT:  Well, whatever the number is.
7    15:09:00        MR. WILSON:  Okay.  437, correct.  Thank you.
8    15:09:03        THE COURT:  If there's something that's a surprise or
9    15:09:07  unusual -- you've seen the demonstrative exhibits?
10   15:09:11        MR. RAFFMAN:  Yes.  Yes, Your Honor.
11   15:09:13  BY MR. WILSON:
12   15:09:13  Q.  And Dr. Marino, this is what we -- I just asked you to --
13   15:09:17  you were asked to determine the causes of the -- likely causes
14   15:09:20  of the north and south breach?
15   15:09:22  A.  Yes, sir.
16   15:09:23  Q.  Okay.  And this is some of the things that you reviewed;
17   15:09:32  right, Doctor?
18   15:09:34  A.  That's correct.
19   15:09:34        MR. WILSON:  If I may lead a little, Your Honor, so I
20   15:09:36  can move along.
21   15:09:37        THE COURT:  You may.  I'll allow that to the defense
22   15:09:40  as well.
23   15:09:41        MR. WILSON:  Okay.
24   15:09:41  BY MR. WILSON:
25   15:09:41  Q.  You reviewed the IPET, ILIT, and Team Louisiana reports;
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1085

```
1    15:09:46  correct?
2    15:09:47  A.  That's correct.
3    15:09:48  Q.  You collected, evaluated, and summarized site information
4    15:09:52  on floodwall, levee characteristics, and subsoil conditions?
5    15:09:57  A.  That's correct.
6    15:09:58  Q.  You summarized eyewitness accounts of failure-related
7    15:10:00  conditions?
8    15:10:01  A.  That's correct.
9    15:10:02  Q.  You collected and analyzed data on flooding and time of
10   15:10:05  failure?
11   15:10:07  A.  That's correct.
12   15:10:08  Q.  You collected and examined data on scouring from wall
13   15:10:12  overtopping?
14   15:10:13  A.  That's correct.
15   15:10:15  Q.  You performed modeling to determine if seepage was a
16   15:10:17  likely cause of the failure; true?
17   15:10:20  A.  Yes.
18   15:10:21  Q.  You performed modeling to determine if insufficient
19   15:10:24  lateral wall support was the likely cause of the failure; yes?
20   15:10:29  A.  That's correct.
21   15:10:30  Q.  And you reviewed and analyzed information on floodwall
22   15:10:33  damage at the breaches; correct?
23   15:10:36  A.  That's correct.
24   15:10:37  Q.  And you reviewed and analyzed information on barge damage;
25   15:10:43  correct?
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

### 1086

```
 1  15:10:43  A.  That's correct.
 2  15:10:44  Q.  You also reviewed and analyzed information on other
 3  15:10:47  floodwall damage; correct?
 4  15:10:50  A.  That's correct.
 5  15:10:51  Q.  And that would be around the City of New Orleans; correct?
 6  15:10:54  At the time of Katrina?
 7  15:10:56  A.  Right.  And Plaquemines Parish as well.
 8  15:11:02  Q.  And you examined and evaluated IPET and ILIT seepage
 9  15:11:06  analysis?
10  15:11:07  A.  That's correct.
11  15:11:07  Q.  Examined and evaluated IPET and ILIT lateral stability
12  15:11:11  analysis; correct?
13  15:11:13  A.  Yes.
14  15:11:13  Q.  And you also reviewed other documents, including the
15  15:11:15  defendant's expert report, some of them; correct?
16  15:11:19  A.  Yes.
17  15:11:19  Q.  That related to the issues that we're talking about today;
18  15:11:22  right?
19  15:11:23  A.  That's correct.
20  15:11:23  Q.  Okay.  And you've also been given trial testimony and
21  15:11:32  other documents as well; correct?
22  15:11:33  A.  I'm sorry?  Say that again.
23  15:11:34  Q.  You've also been given other documents and trial
24  15:11:37  testimony, the depositions, and other things as well; correct?
25  15:11:43  A.  I've been given trial testimony, but I haven't really
         JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                   UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF LOUISIANA
```

### 1087

```
 1  15:11:47  looked at it.
 2  15:11:48  Q.  Okay.  Well, we'll talk about that.
 3  15:11:51  A.  Okay.
 4  15:11:55  Q.  Why did you want to show this photograph to the judge?
 5  15:11:58  A.  Well, just to introduce that we're going to talk about the
 6  15:12:01  north breach first.
 7  15:12:03  Q.  Is this a photograph of the north breach?
 8  15:12:05  A.  Yes.
 9  15:12:05  Q.  Okay.  What is this, Doctor?
10  15:12:09  A.  These are the instruction plans that refer to the area of
11  15:12:14  the north breach.  They are highlighted with a red arrow here
12  15:12:25  on the left side of the slide.
13  15:12:27       This is the design plan during -- for 1980, so this
14  15:12:34  is not when it was constructed, actually.  It was constructed
15  15:12:37  after this.  This portion of the work.
16  15:12:39  Q.  Is this the wall that's next to the northern breach?
17  15:12:43  There was a 1969 levee construction and also a 1980 levee
18  15:12:48  construction; is that correct?
19  15:12:49  A.  Yes.
20  15:12:50  Q.  And you reviewed the design plans for the 1980 levee
21  15:12:55  construction?  Is that what this is?
22  15:12:57  A.  Yes.
23  15:12:59  Q.  And the next slide, this is the as-builts for the 1969
24  15:13:04  levee construction?
25  15:13:05  A.  That's correct.
         JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                   UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF LOUISIANA
```

### 1088

```
 1  15:13:06  Q.  And is the 1969 construction, is that where the north and
 2  15:13:10  south breaches occurred --
 3  15:13:11  A.  In essence, yes.
 4  15:13:11  Q.  -- to the eastern floodwall?
 5  15:13:14  A.  Yes.
 6  15:13:16  Q.  Sorry.  We can't speak over each other because the court
 7  15:13:18  reporter will never be able to get it down.  I apologize.
 8  15:13:22       Down here you actually show the area on the as-builts
 9  15:13:26  where the north breach occurred; correct?
10  15:13:28  A.  Yes.
11  15:13:29  Q.  Okay.  And this is what a cross-section of the -- you tell
12  15:13:34  the judge.  What is this up here?
13  15:13:37  A.  Basically, this is an as-built cross-section of the levee,
14  15:13:41  the work that was done for the 1969 as-built plans.  And what
15  15:13:48  it shows is that the levee was bolstered with more fill on both
16  15:13:54  sides of the original levee, and it also shows that the
17  15:13:59  concrete cap was placed on the existing sheet pile.
18  15:14:03       If you notice, that concrete wall, that it's not on
19  15:14:07  center.  And it's an interesting point.  Because the Corps
20  15:14:14  thought that it would be better to put the wall on the flood
21  15:14:18  side because that way you get more resistance, more soil
22  15:14:20  resistance, from any floodwaters that may be retained by the
23  15:14:23  wall.
24  15:14:25  Q.  What you're talking about is that, right here, there's
25  15:14:27  less of earthen levee than there is on this side.  Is that what
         JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                   UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF LOUISIANA
```

### 1089

```
 1  15:14:31  you're talking about, Doctor?
 2  15:14:33  A.  That's correct.
 3  15:14:33  Q.  And this is the protected side, and this would be what
 4  15:14:35  they call the flood side or the canal side?
 5  15:14:39  A.  Yes.
 6  15:14:39  Q.  Is there anything else you wanted to tell the Court about
 7  15:14:41  that?
 8  15:14:42  A.  No.
 9  15:14:46  Q.  Okay.
10  15:14:46  A.  Oh, just go back for a second.  This is a representative
11  15:14:49  cross-section, basically, throughout both the north and south
12  15:14:54  breaches.
13  15:14:56  Q.  Okay.  And actually in the '69 design, this sheet pile --
14  15:15:00  is this the sheet pile right here?
15  15:15:03  A.  Yes.
16  15:15:03  Q.  And that extended down, what, 18 feet?
17  15:15:17  A.  When you say "extended down," are you talking from the
18  15:15:20  levee surface?
19  15:15:22  Q.  Well, in 1980, they built a levee right next to this one;
20  15:15:26  correct?
21  15:15:30  A.  Yes.  I mean, if you're talking about extended down from
22  15:15:31  the ground surface, that would be 17 feet.
23  15:15:34  Q.  Okay.  And then it also extended above the ground surface?
24  15:15:38  A.  Yes.
25  15:15:39  Q.  And how far above the ground surface?
         JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                   UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF LOUISIANA
```

## 1090

1   15:15:42   A.  It would be two and a half feet.

2   15:15:44   Q.  Okay.  And in 1980, how far did it extend down; do you

3   15:15:51   recall, Doctor?

4   15:15:53   THE COURT:  Hold on one minute.

5   15:15:55   MR. WILSON:  Sure.

6   15:15:55   (OFF THE RECORD)

7   15:17:56   THE COURT:  What is the expert report of Dr. Marino,

8   15:18:00   the exhibit number?

9   15:18:01   MR. WILSON:  It's 397.  I believe I have a copy here.

10  15:18:07   THE COURT:  We have a copy, but we wanted -- and I

11  15:18:13   think you're going to see exactly what I'm seeing here.  Hold

12  15:18:17   on just a minute.  I'm going to have to slow this up.

13  15:18:25   One of the problems is -- and it's not going to

14  15:18:28   work.  One of the problems is, in the PowerPoint -- I have the

15  15:18:32   expert report here.  I'm looking at figure 2.4 here.  Of

16  15:18:37   course, and you've extrapolated from 2.4, which has a number of

17  15:18:42   diagrams on it in your actual expert report.  I assume that's

18  15:18:49   taken from the actual expert report, a portion of a lot of the

19  15:18:49   information.

20  15:18:49   THE WITNESS:  Yes.

21  15:18:50   THE COURT:  Then we make notes on the testimony.

22  15:18:56   It's so small, it's hard to do.  So the only way we can do it

23  15:19:02   is go through the report in that way.  And see, I have this one

24  15:19:06   here.  So -- hold on just one second, please.

25  15:19:17   (OFF THE RECORD)

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1091

1   15:19:19   THE COURT:  We'll just do the best we can.

2   15:19:22   MR. WILSON:  For the record, it's the bottom left.

3   15:19:23   THE COURT:  Oh, I know exactly what it is.  What I'm

4   15:19:26   saying is these things are so miniature, we can't do it like

5   15:19:30   we'd like to do it, but we're going to have to it.  We're just

6   15:19:33   going to have to make due the way it is.

7   15:19:36   MR. WILSON:  Would you like -- do you want to print

8   15:19:38   this out, or would you like me to hand it to the Court after

9   15:19:42   the examination, or...

10  15:19:43   THE COURT:  You don't have -- you mean, you have --

11  15:19:48   yes.  I assume so.  Even though we won't have notes on it.

12  15:19:57   MR. WILSON:  You know, what, Judge --

13  15:20:03   MR. KHORRAMI:  Your Honor, you have the one that's

14  15:20:04   three to a page.

15  15:20:06   THE COURT:  Right.  Yeah, I have it, but I have to

16  15:20:06   get the right one.  Getting the right one is not necessarily

17  15:20:09   intuitive.

18  15:20:11   MR. KHORRAMI:  Allow me to get a copy run of that and

19  15:20:14   get that over to the Court.

20  15:20:15   MR. WILSON:  Actually, I have a copy here, Judge.

21  15:20:18   THE COURT:  Okay.

22  15:20:19   MR. WILSON:  May I approach?

23  15:20:41   THE COURT:  I'm looking at the actual expert report.

24  15:20:44   We get the general -- we realize we're talking

25  15:20:47   about -- not right now -- the as-built in 1969.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1092

1   15:20:51   MR. WILSON:  Correct.

2   15:20:51   BY MR. WILSON:

3   15:20:52   Q.  And just for the sake of completeness of the record, how

4   15:20:55   much above the earthen levee does the cement aspect of that

5   15:21:00   levee extend, how high up?

6   15:21:01   A.  The way you figure that out is this -- is you look at the

7   15:21:10   elevations.  And you can see on the top of the wall it says 15.

8   15:21:13   And then if you look at the top of the levee, the elevation

9   15:21:17   shows 9.  So you just subtract the two, and then you get 6.  So

10  15:21:23   that's how you would determine the height of that wall.

11  15:21:26   Q.  Okay.  And then the -- where I'm pointing, this is cement;

12  15:21:29   is that correct?

13  15:21:29   A.  Excuse me?

14  15:21:30   Q.  That's cement, this structure right here.

15  15:21:32   A.  Yes, with that -- that embeds the sheet pile.

16  15:21:37   Q.  And that's that black line that goes right down here;

17  15:21:40   correct?

18  15:21:41   A.  That's the vertical line.  There's two vertical lines.

19  15:21:43   Q.  And the sheet metal extends above the earthen levee;

20  15:21:48   correct?

21  15:21:49   A.  Yes.

22  15:21:49   Q.  And is there a cap on this -- what do you call it, a

23  15:21:53   cement -- what would you call it?

24  15:21:56   A.  Well, the cap would be the -- there's two different types

25  15:21:58   of I-walls.  One is a capped I-wall and one is an uncapped.  An

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1093

1   15:22:04   uncapped I-wall has no concrete.

2   15:22:07   MR. GILBERT:  Pardon me, counsel.

3   15:22:09   Your Honor, can I approach the witness stand and

4   15:22:11   hand him this pointer?  It may be a little bit easier if he has

5   15:22:15   one of his own.

6   15:22:16   THE COURT:  Absolutely.

7   15:22:22   MR. GILBERT:  Thank you, Your Honor.

8   15:22:24   BY MR. WILSON:

9   15:22:25   Q.  Why don't you explain the I-wall to the Court.  It's got a

10  15:22:29   3-foot cap, you said?

11  15:22:32   A.  No.  The cap is the concrete part, and it goes from

12  15:22:36   elevation 7 to elevation 15.  So that would be an 8-foot tall

13  15:22:46   concrete wall, part of it being embedded.

14  15:22:49   Q.  Okay.  And on top of that 8-foot wall, is there a 3-foot

15  15:22:53   cap or am I mistaken?

16  15:22:56   A.  You're mistaken.

17  15:22:57   Q.  Okay.  All right.

18  15:22:58   THE COURT:  We had had discussion about a cap that

19  15:23:00   was seemingly separate from the other part of the concrete

20  15:23:05   because we had a line marked where it was placed.  So I know

21  15:23:08   exactly what you're talking about, sir.

22  15:23:12   BY MR. WILSON:

23  15:23:12   Q.  Well, I think there is a joint there, though.  Is there?

24  15:23:14   A.  Yes.  Well, there was an optional joint.  It depended on

25  15:23:16   what the contractor wanted to do.  And the contractor chose to

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1094

1　15:23:19　put a construction joint when he poured the wall.  I guess that

2　15:23:24　was more convenient or efficient for him.

3　15:23:26　Q.  Okay.  So at the east side of the floodwall in the

4　15:23:30　Industrial Canal, all along the monoliths is a 3-foot cap; is

5　15:23:38　that correct?

6　15:23:40　A.  Your definition, yes.

7　15:23:41　Q.  Okay.  And what would your definition be?

8　15:23:45　A.  Well, there's an uncapped wall and there's an uncapped --

9　15:23:46　I've seen also where you call an uncapped wall is just a sheet

10　15:23:50　pile wall, and then a capped wall would be a concrete wall that

11　15:23:54　embeds the sheet pile and extends up further in terms of

12　15:23:58　elevation.

13　15:23:59　Q.  So, actually, in the City of New Orleans, there's certain

14　15:24:02　levees that are just sheet pile; is that what you're saying?

15　15:24:06　A.  That's correct.

16　15:24:07　Q.  Okay.

17　15:24:08　A.  And these are just profiles through the ground using the

18　15:24:14　as-built drawings as to how much they wanted to raise the levee

19　15:24:19　and where the floodwall be placed.

20　15:24:26　Q.  What is this, Doctor?

21　15:24:28　A.  This is a plan view of both the north and south breach

22　15:24:33　sections, and what it shows is all the borings that we were

23　15:24:38　able to find that were available to us, and it shows that where

24　15:24:42　we plotted those borings and the red lines indicate slices

25　15:24:46　through the ground that were taken.  And we extrapolated from

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1095

1　15:24:54　these borings the ones closest -- you know, closest to us, a

2　15:24:58　certain slice, what the layering would be.

3　15:25:04　And you can see we did a number of slices because we

4　15:25:07　wanted to have all the sections consistent with one another.

5　15:25:12　In other words, do the best job we can with the layering across

6　15:25:15　the north breach as well as the south breach.

7　15:25:18　Q.  And this was used in your analysis; is that correct?

8　15:25:22　A.  Yes.  I think it's -- you know, an important part of your

9　15:25:26　analysis is you have to have -- do the best job you can with

10　15:25:29　the soil-layering system that exists.

11　15:25:33　Q.  And we're going to get to the soil layering; correct?

12　15:25:34　A.  Yes.

13　15:25:34　Q.  Is this for your seepage analysis, or is that for your

14　15:25:41　stability analysis, or is this for both?

15　15:25:43　A.  Well, both of your analysis or your soil layering that you

16　15:25:48　assume is critical to what the results you're going to get.

17　15:25:52　Q.  And you find out the soil layering through these borings;

18　15:25:56　is that correct?

19　15:25:56　A.  Right.  These borings are like ledgers, if you will, and

20　15:26:02　they basically describe what the soils are like as they're

21　15:26:04　drilling down and sampling it.  So you use the descriptions

22　15:26:08　that are given from the samples that are taken, and you -- if

23　15:26:14　you go to the next slide.

24　15:26:16　THE COURT:  When were these borings taken?

25　15:26:19　MR. WILSON:  I'm sorry?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1096

1　15:26:19　THE COURT:  When were the borings taken?

2　15:26:21　THE WITNESS:  They were taken at various times.  Some

3　15:26:23　were taken after Katrina, maybe less than a year after Katrina;

4　15:26:28　and then there were some that were taken -- the ones on the

5　15:26:32　waterfront area are generally in the area of 2001, 2002.

6　15:26:38　THE COURT:  And the borings were taken by?

7　15:26:41　THE WITNESS:  By -- they were taken under -- by a

8　15:26:43　subcontractor to WGI, Washington International -- Washington

9　15:26:50　Group International.

10　15:26:53　THE COURT:  Thank you.

11　15:26:54　THE WITNESS:  Sure.  And then there were some borings

12　15:26:56　also that were taken during the time of when they were

13　15:26:59　designing, you know, the levee and the floodwall system.

14　15:27:05　BY MR. WILSON:

15　15:27:05　Q.  Do you want them to go to the next slide, Doctor?

16　15:27:07　A.  Yes.  So this is kind of a rough draft, or, basically, a

17　15:27:13　work product of our -- of having all these logs, these ledgers,

18　15:27:19　pasted on a sheet at different -- you know, at different

19　15:27:23　locations where they exist and looking at what the descriptions

20　15:27:26　are for the -- you know, each -- you know, you can see here is

21　15:27:31　one log that's been pasted on, and you can see here that

22　15:27:35　there's descriptions of the different soil layers.

23　15:27:39　And based on the descriptions of the different soil

24　15:27:42　layers, you can see if there's any continuity from one boring

25　15:27:46　to another.  And also what you can do is you can tell what the

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1097

1　15:27:49　composition of that soil is.  You can see this kind of writing

2　15:27:54　on the side that I have.  That's basically summarizing within

3　15:27:58　that layer what the descriptions are that whoever logged the

4　15:28:04　hole had given the material.

5　15:28:09　THE COURT:  Wait.  Let me say this:  We're referring

6　15:28:11　to various things, some of which may have absolutely no

7　15:28:14　significance in the ultimate opinion and which should not --

8　15:28:18　would not be referred to.

9　15:28:21　It's conceivable that some extraordinarily

10　15:28:23　diligent clerk and/or judge at the Fifth Circuit would want to

11　15:28:27　actually look at this.  Maybe they have a fascination for

12　15:28:35　geotechnical engineering or esoteric plans.  How would they

13　15:28:39　know how to find this?  When it goes to the Court of Appeals.

14　15:28:43　MR. WILSON:  Okay.

15　15:28:43　THE COURT:  Unless this group has a reproach molded,

16　15:28:46　it's not yet been anticipated, it seems like it will.

17　15:28:51　MR. WILSON:  I think that the borings themselves are

18　15:28:53　going to be legible.  This was just an illustration.

19　15:28:58　THE COURT:  If you're just showing it to me, and it

20　15:29:00　will stay here and forever more only stay here to edify the

21　15:29:04　trial judge, then that's fine.

22　15:29:05　MR. BEST:  It's from the Marino declaration of

23　15:29:08　December 18, 2009, which we just put into evidence.

24　15:29:09　THE COURT:  I understand it's from it, but who's

25　15:29:12　going to find it?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

19 (Pages 1094 to 1097)

**1098**

1  15:29:13    MR. BEST:  I misunderstood the question.

2  15:29:13    THE COURT:  No, but somebody's got to find it.  It's

3  15:29:14    not just one page.

4  15:29:15    Anyway, I just point that out.  If there's

5  15:29:18    something really significant you think the Court of Appeal

6  15:29:21    might be in interested in, it's not just to educate the

7  15:29:24    trial judge, just to let you know that.  I'm going to leave

8  15:29:27    that up to you.

9  15:29:28    MR. WILSON:  Okay.

10 15:29:29    BY MR. WILSON:

11 15:29:32    Q.  This is to illustrate the method of you taking the borings

12 15:29:34    and then plotting them, and it's just to show the Court the

13 15:29:40    process that you went through; is that correct?

14 15:29:41    THE COURT:  You're showing your work, so to speak.

15 15:29:43    THE WITNESS:  Correct.  The methodology, how I went

16 15:29:46    about determining layers.

17 15:29:47    BY MR. WILSON:

18 15:29:47    Q.  Okay.  Is there any other reason we put this up, Doctor?

19 15:29:52    A.  None that I can think of.

20 15:29:54    MR. WILSON:  And I do believe the -- his PowerPoint

21 15:29:59    was moved into evidence; am I correct about that?

22 15:30:02    THE COURT:  I think so.

23 15:30:02    BY MR. WILSON:

24 15:30:07    Q.  Again, this is the boring -- showing the boring locations?

25 15:30:11    A.  Yes.  This is just to show that what we did is -- the

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**1100**

1  15:31:39    Q.  Okay.

2  15:31:42    A.  This is one of the borings that was critical to our

3  15:31:47    assessment of how the levee was shaped in that area.  And this

4  15:31:56    is a plan that shows where the boring is shown here when it was

5  15:32:02    drilled by the WGI contractor.

6  15:32:06    Q.  And this is the Boland Marine borehole that was done?

7  15:32:13    A.  This is Boland Marine property.  These are all the borings

8  15:32:18    that were done by WGI.  A lot of these are fairly short

9  15:32:22    borings, so we really didn't consider them because they

10 15:32:26    wouldn't have that much information for soil strata.  Although,

11 15:32:29    we did look at them for the purposes of determining what the

12 15:32:32    water level was.

13 15:32:33    THE COURT:  What the water level was?

14 15:32:35    THE WITNESS:  That's correct.

15 15:32:35    THE COURT:  And is there a scale at the bottom there?

16 15:32:38    Is that what that is?

17 15:32:39    THE WITNESS:  I believe this is the scale here.

18 15:32:41    THE COURT:  Yes.  I just can't read it.  Okay.  But

19 15:32:43    I'll be able to -- okay.  Thank you.  I've got a general idea.

20 15:32:52    THE WITNESS:  Yeah.  We have these all plotted, Your

21 15:32:54    Honor, on another figure.

22 15:32:56    THE COURT:  I got you.  Thank you.

23 15:32:57    THE WITNESS:  Okay.  An important point about this is

24 15:32:59    one of these borings was moved, and it was given in this table.

25 15:33:03    So we took that into consideration when we evaluated that area

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**1099**

1  15:30:14    cross-sections that we used in our analysis was at the north

2  15:30:18    end of the north breach because that's where the failure

3  15:30:23    initiated as the localized failure.

4  15:30:27    So we wanted to get the best representation of what

5  15:30:29    the soil layer would be at that location.

6  15:30:35    Q.  Is there anything else you wanted to tell the Court about

7  15:30:38    this slide?

8  15:30:41    THE COURT:  When I look at the slide, what's the red

9  15:30:44    indicate from 1 to 1?

10 15:30:47    THE WITNESS:  That this right here is -- 1, 1, that

11 15:30:47    means Section 1 to 1.  Slice 1, basically.  If the arrow is

12 15:30:52    painting -- going upwards, it means that you're cutting the

13 15:30:57    ground.  This is looking down, and you're cutting the ground.

14 15:30:59    And you're going to be looking northward, if you will, or in

15 15:31:05    this direction.  Upwards.

16 15:31:06    BY MR. WILSON:

17 15:31:06    Q.  And that's figure 5.11 from your report, Doctor?

18 15:31:17    A.  Yes.  I'll show you what that soil-laying profile from

19 15:31:18    this slice looks like.

20 15:31:22    Q.  Go to the next slide.

21 15:31:23    A.  Yes.  One of the things that we had to do --

22 15:31:26    Q.  Doctor -- okay.  I'm sorry.  Go ahead.

23 15:31:28    A.  -- was to evaluate the levee configuration on the flood

24 15:31:34    side, and this is just an illustration of how we went about

25 15:31:37    that.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**1101**

1  15:33:08    for levee failure.

2  15:33:11    Next slide.

3  15:33:13    MR. WILSON:  And it's right in the middle, actually.

4  15:33:16    Can you blow that up?

5  15:33:29    THE COURT:  It's resistant to being magnified,

6  15:33:30    apparently.  If you want to isolate it, you can put it on the

7  15:33:30    ELMO and zoom in if you wish.  Or you may have another way to

8  15:33:30    do that.

9  15:34:07    BY MR. WILSON:

10 15:34:07    Q.  Well, while he's doing that, let me ask you what boring

11 15:34:08    this refers to.

12 15:34:10    A.  This is 81-A, the one I referred to on the previous slide.

13 15:34:15    THE COURT:  Why is this significant, Dr. Marino?

14 15:34:17    THE WITNESS:  Because -- the reason why it's

15 15:34:18    significant is because it shows that there is sand fill down to

16 15:34:24    a depth of about almost 17 feet, and if it was -- if it was

17 15:34:30    actually drilled where it shows on the plan, that would

18 15:34:34    represent a concern.  But since it was moved, it's consistent

19 15:34:40    with what the Corps was saying they were going to do at the

20 15:34:43    time, and I'll explain that.

21 15:34:44    THE COURT:  Explain to me what you mean when you say

22 15:34:46    it was moved.

23 15:34:48    THE WITNESS:  This -- if you could go back to the

24 15:34:50    previous slide.

25 15:34:59    THE COURT:  Yes, please.  Because I can't see this.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1102

```
 1   15:35:01   If you tell me conceptually what it means -- there's a plan
 2   15:35:04   that shows the boring, and there's a finding.
 3   15:35:09        THE WITNESS:  Yeah.  Can we go back to the next
 4   15:35:11   slide?  It would be easier.
 5   15:35:17        THE COURT:  Are you talking about the plan itself?
 6   15:35:21        THE WITNESS:  Your Honor, I can explain it to you,
 7   15:35:23   but my hands are -- you know, I'm Italian, so I use my hands a
 8   15:35:29   lot so I can --
 9   15:35:30        THE COURT:  I'm just wondering what "moved" means.
10   15:35:33   Does it mean that -- explain to me what "moved" means.
11   15:35:33        THE WITNESS:  Do you see the floodwall here?
12   15:35:35        THE COURT:  Of course, yes.
13   15:35:36        THE WITNESS:  Do you see this road here?
14   15:35:38        THE COURT:  You can point it out to me, sir, and make
15   15:35:40   a mark if you want.  And I can clear it, so you don't --
16   15:35:44        THE WITNESS:  Sure.
17   15:35:46        THE COURT:  There should be a stylus there now.
18   15:35:50        Okay.  I see that.
19   15:35:51        THE WITNESS:  That's the road.  And then there's a
20   15:35:54   floodwall.
21   15:35:57        THE COURT:  Yes.
22   15:35:57        THE WITNESS:  Okay.  And that -- that hole, as it's
23   15:36:03   shown in that drawing, would fall between the road and the
24   15:36:07   levee.  And what that would represent is, basically, that this
25   15:36:11   hole was drilled in a ravine.
```
JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1103

```
 1   15:36:14        Because the wall -- the road is higher in
 2   15:36:17   elevation and has an embankment still coming down toward the
 3   15:36:21   floodwall.  And then you have the floodwall levee, and so which
 4   15:36:26   creates a "V" like it's a small ravine.  So you really can't
 5   15:36:31   get a drill rig in there.
 6   15:36:38        So, in the table, they say that the levee was in
 7   15:36:39   the way and that they had to move the hole.  And the only real
 8   15:36:44   practical place that that would be moved would be next to the
 9   15:36:47   floodwall on this side.  If you note on the borings, there's no
10   15:36:51   mention of it being drilled on the road.  And that area, if you
11   15:36:57   look at some of the photographs, is fairly flat and easy
12   15:37:00   access.  It wouldn't block the road as well.
13   15:37:00        So the importance of that boring being moved is
14   15:37:09   that, you know, it's not directly in front of where the breach
15   15:37:17   was, and that there was this sand material being present in
16   15:37:21   that boring.
17   15:37:23        THE COURT:  So when you say it was moved -- forgive
18   15:37:25   me for being opaque.  It's Monday.  When you say it was moved,
19   15:37:29   was the location as shown on this incorrect, or was it rebored?
20   15:37:33        THE WITNESS:  This location is the planned locations
21   15:37:37   of those holes.
22   15:37:39        THE COURT:  It's a plan location, but it wasn't
23   15:37:41   actually bored there.
24   15:37:47        THE WITNESS:  Exactly.
25   15:37:47        THE COURT:  Ah, I got you.  That's what I thought.
```
JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1104

```
 1   15:37:48   BY MR. WILSON:
 2   15:37:49   Q.  On the bottom of this -- I'm going to call it WGI-357824.
 3   15:37:56   On the bottom, there are all these numbers listed.  Could you
 4   15:38:01   explain that to the Court?
 5   15:38:02   A.  Those are just a grid system that they use for placing the
 6   15:38:05   borings.  You know, you'll see numbers going in one direction
 7   15:38:10   and then letters in another direction.
 8   15:38:12        So if you see "A," you know those borings are going
 9   15:38:15   to be closer to the floodwall than the Bs.  And farther --
10   15:38:20   know, the ones that are J or K are the farthest apart --
11   15:38:25   farthest from the floodwall.
12   15:38:29   Q.  Explain to the Court what this is, if you may.
13   15:38:37   A.  If we can go to the next slide.
14   15:38:39   Q.  The next one?
15   15:38:40   A.  Yes.  I'm sorry.  Keep going.
16   15:38:44   Q.  Backwards, you mean?
17   15:38:45   A.  No keep going.
18   15:38:47        THE COURT:  No, he means forward.
19   15:38:47        THE WITNESS:  Forward.  Keep going.  Keep going.
20   15:38:51   After this slide.  Okay.
21   15:38:53        This is -- this is a note that's on the as-built
22   15:38:59   plans.  Your Honor, you probably could see it better in my
23   15:39:04   report.
24   15:39:04        THE COURT:  And I have your report.  What's the
25   15:39:06   figure in your report?
```
JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1105

```
 1   15:39:07   BY MR. WILSON:
 2   15:39:09   Q.  Or is that attached to your declaration?
 3   15:39:12   A.  That is attached to my declaration.  But it should be
 4   15:39:15   around 2.4.  It's one of those figures.
 5   15:39:20        MR. WILSON:  That's December 2009.  That was just
 6   15:39:23   submitted into evidence, Your Honor.
 7   15:39:25   BY MR. WILSON:
 8   15:39:29   Q.  That's 437; is that correct?
 9   15:39:30   A.  Yes.  If you have a copy, I can point out which figure it
10   15:39:39   is.
11   15:39:43        Basically, Your Honor, what that note says is that
12   15:39:45   there's shells adjacent to the sheet pile, and it says that you
13   15:39:55   have -- you know, the contractor has to go in and remove that
14   15:39:59   material.
15   15:39:59        THE COURT:  Okay.  I can see --
16   15:39:59        THE WITNESS:  So they were aware of that condition,
17   15:40:00   basically.
18   15:40:04        So I assume that they did what they said they
19   15:40:06   were going to do and replaced that levee that's -- that
20   15:40:11   sandy -- silty sand and shelling material with levee material,
21   15:40:17   which is, you know, specified to be essentially impermeable.
22   15:40:20        Another reason I say that is, when they did the
23   15:40:27   1980 design to the north -- if you could go back to the slide
24   15:40:32   that shows the depression.
25   15:40:41        THE COURT:  By the way, counsel, as I did in another
```
JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1106

1  15:40:43  trial in which I had enumerable experts, it sometimes helps to
2  15:40:50  say, "The witness is now going to..." And I think the whole
3  15:40:52  purpose of this is one of the significant factors in this case
4  15:40:55  is the nature and condition of the soil beneath the sheet
5  15:40:58  pile -- beneath the floodwall structure and the permeability of
6  15:41:07  that soil; thereby, either making it more or less susceptible
7  15:41:13  to underseepage.
8  15:41:16      MR. WILSON:  Thank you, Your Honor.
9  15:41:16      THE COURT:  I understand that.  So this all goes to,
10 15:41:19  ultimately, not only the construction of the structure itself
11 15:41:25  but the soil in or around and under.
12 15:41:29      MR. WILSON:  Stability, seepage.  Correct.
13 15:41:30      THE COURT:  And the borings, of course, are how we
14 15:41:34  determine what that soil -- the nature of the soil.  Not how
15 15:41:39  "we," how an expert determines it.
16 15:41:41  BY MR. WILSON:
17 15:41:42      Q.  So, Dr. Marino, what you were just referring to was from
18 15:41:47  the as-builts of the --
19 15:41:55      A.  Okay.  Well, can you go -- no, stay on the figure.  What I
20 15:41:59  wanted to show Your Honor if --
21 15:42:02      Q.  Well, I want to put on the record that this is from the
22 15:42:04  1969 as-builts for the I-wall.  The note, I want you to read on
23 15:42:11  the record what it states.
24 15:42:15      THE COURT:  Do you want to blow it up again?
25 15:42:18      THE WITNESS:  I can't read it from my --

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1107

1  15:42:18      THE COURT:  It was readable just a little while ago.
2  15:42:23  BY MR. WILSON:
3  15:42:24      Q.  This is part of your declaration.  It's attached to your
4  15:42:27  declaration dated December 18th, 2009, Dr. Marino?
5  15:42:31      A.  That's correct.
6  15:42:37      THE COURT:  Let me ask counsel.  The document that I
7  15:42:38  have here, which I summarized, this document -- I'll ask one of
8  15:42:43  the plaintiffs, this document, the declaration is separate and
9  15:42:49  apart from that document?
10 15:42:50      MR. WILSON:  Correct.
11 15:42:51      MR. KHORRAMI:  The declaration was submitted as part
12 15:42:53  of the Daubert motion responses.
13 15:42:57      THE COURT:  Right.
14 15:42:58      MR. KHORRAMI:  So it's --
15 15:43:00      THE COURT:  I know I've looked at the declaration one
16 15:43:02  time.  It's not handy to me right now.
17 15:43:05      MR. WILSON:  Right.  It's part of the court file.
18 15:43:07      MR. KHORRAMI:  We're happy to provide the Court with
19 15:43:10  a copy.
20 15:43:11      THE COURT:  I'm sure I have a copy of this.  Anyway,
21 15:43:14  I understand this comes from the declaration.
22 15:43:16  BY MR. WILSON:
23 15:43:17      Q.  Dr. Marino, are you able to read the note on the as-built,
24 15:43:20  the 1969 as-built, for the I-wall?
25 15:43:24      A.  Some of it.  It says, "Note:  Shells against sheet piling

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1108

1  15:43:28  on flood side from station" --
2  15:43:32      THE COURT:  You might put the microphone there, sir.
3  15:43:34      THE WITNESS:  Okay.
4  15:43:35      THE COURT:  Let me see if I can read it.  "Shell
5  15:43:36  against sheet piling on flood"?
6  15:43:42      THE WITNESS:  "Flood side."
7  15:43:43      THE COURT:  "Flood side from" -- go ahead.
8  15:43:46      THE WITNESS:  "From 54 plus 40 to 56 plus 20, plus or
9  15:43:51  minus, to be removed and replaced after I-wall is completed."
10 15:43:56      So that says to me that they were aware of that
11 15:44:01  situation, and they were going to remove that material and
12 15:44:03  place levee material.
13 15:44:05      THE COURT:  And place what material?
14 15:44:07      THE WITNESS:  Levee-like material.
15 15:44:11      THE COURT:  Meaning just -- "levee-like material"
16 15:44:14  meaning material that wouldn't be as --
17 15:44:16      MR. WILSON:  Permeable.
18 15:44:20      THE WITNESS:  Permeable.
19 15:44:21      THE COURT:  Okay.
20 15:44:22      THE WITNESS:  Right.  I mean, obviously -- you know,
21 15:44:22  if you think about, if they want to take the shells out, which
22 15:44:24  is permeable, they're going to put something in that's not
23 15:44:29  permeable.
24 15:44:30      THE COURT:  Is there any record as to what displaced?
25 15:44:33  We don't know that?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1109

1  15:44:33      THE WITNESS:  We don't know that.
2  15:44:34      THE COURT:  We don't know.  Okay.  Thank you.
3  15:44:39  BY MR. WILSON:
4  15:44:46      Q.  Just so the record is clear, levee material is what,
5  15:44:48  Doctor?
6  15:44:49      A.  It's a clay-like material.  It's not very permeable.
7  15:44:53      Q.  Okay.  And what is this, Doctor?
8  15:44:58      A.  I had one more point.
9  15:44:59      THE COURT:  Can I say that's optimum levee material.
10 15:45:03  Go ahead.
11 15:45:04      MR. WILSON:  Yes.
12 15:45:05  BY MR. WILSON:
13 15:45:05      Q.  Go ahead, Doctor.  Please make your point.
14 15:45:08      A.  If you could go back to the one, the depression figure.
15 15:45:13      Q.  Yes.
16 15:45:14      A.  Okay.  What I tried to depict in this figure, Your Honor,
17 15:45:26  was the depression that would have existed in that area, given
18 15:45:29  the borings that we know, the existence of the fill and how
19 15:45:33  deep it is.  And you can see from these -- these borings around
20 15:45:39  it, these small numbers, that's the elevation of the depth of
21 15:45:47  the fill material.
22 15:45:49      So the fill material is really concentrated in this
23 15:45:52  area, and that's consistent with the sheet piling they put in
24 15:45:57  in 1980.  Being aware of that situation, they drove this sheet
25 15:46:02  piling down to about negative 25, which would mean that they --

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1110

1  15:46:07  you know, they'd draw it down another 17 feet.
2  15:46:12  THE COURT: Another 17 feet?
3  15:46:13  THE WITNESS: Yes. Because we're talking about an
4  15:46:15  elevation 8 to 25; right? 25 minus 8, 17 feet.
5  15:46:21  THE COURT: Okay.
6  15:46:22  BY MR. WILSON:
7  15:46:22  Q. Doctor, for the record, you're referring to declaration --
8  15:46:26  an exhibit attached to your declaration, December 18th, 2009,
9  15:46:30  entitled, "The Proximate Contour Elevations of the Preexisting
10 15:46:35  Depression and the Levee Surface from the Relevant Borings on
11 15:46:39  the Flood Side North Breach"?
12 15:46:42  A. That's correct.
13 15:46:42  THE COURT: And you're saying that, in 1980, the
14 15:46:45  sheet pile in this -- in the area of the north breach was --
15 15:46:52  THE WITNESS: Made significantly longer.
16 15:46:55  THE COURT: Significantly longer. By 17 feet deeper?
17 15:46:59  THE WITNESS: Down further.
18 15:47:01  THE COURT: Gotcha.
19 15:47:02  THE WITNESS: And they were obviously aware of the
20 15:47:03  situation just by the note that you can see on the plans.
21 15:47:10  BY MR. WILSON:
22 15:47:11  Q. Okay.
23 15:47:12  A. Keep going.
24 15:47:15  Q. And this, again, Doctor, referring to what I call
25 15:47:19  WGI-357828, what was the purpose of putting this up for the

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1111

1  15:47:25  Court?
2  15:47:26  A. To show that that boring had been moved. In the previous
3  15:47:32  slide that we looked at, the slide of the depression, I showed
4  15:47:36  where the most likely place that that boring was drilled.
5  15:47:42  Q. Okay. And you're referring again back to the attachment
6  15:47:48  to your declaration, the approximate contour elevations? When
7  15:47:53  you say you're showing where -- and we're referring to 81A when
8  15:47:57  we're talking about this boring; correct?
9  15:47:59  A. That's correct.
10 15:47:59  Q. And you're showing where it was moved to?
11 15:48:01  A. That's correct.
12 15:48:02  THE COURT: Hold on for a minute.
13 15:48:20  (OFF THE RECORD)
14 15:48:21  THE COURT: Is there an extra copy of the declaration
15 15:48:22  for the Court?
16 15:48:24  MR. WILSON: Yes.
17 15:48:25  THE COURT: Because I have this report, and I have
18 15:48:26  looked at the declaration, but it's not -- we brought all the
19 15:48:30  reports in.
20 15:48:30  MR. WILSON: May I approach?
21 15:48:30  THE COURT: Yes. Is that a copy that you can afford
22 15:48:32  to give me right now?
23 15:48:39  MR. WILSON: Well, Your Honor, if it's a problem,
24 15:48:41  I'll --
25 15:48:44  MR. BEST: We can download another one from our

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1112

1  15:48:45  database.
2  15:48:47  THE COURT: Well, I have another one in chambers. We
3  15:48:49  just have to go find it. I've been given reports from the
4  15:48:51  trial that we had and we put together --
5  15:48:56  MR. SEYMOUR: Your Honor, I've loaded it on my jump
6  15:48:58  drive. We'll have another copy back here in a few minutes.
7  15:49:02  THE COURT: All right. You go ahead and hold on to
8  15:49:04  that, and I'll get to you in a minute.
9  15:49:12  Okay. Counsel, go ahead and proceed.
10 15:49:17  BY MR. WILSON:
11 15:49:18  Q. Doctor, what is this?
12 15:49:21  A. That's the flood ledger of that hole, of the 81A hole.
13 15:49:25  Q. It's a -- it's the boring record?
14 15:49:28  A. Yes.
15 15:49:29  Q. Is there anything you want to say about this at this time
16 15:49:32  or...
17 15:49:33  A. I think I've already summarized it.
18 15:49:37  Q. Okay. And again, that's log of boring 81A; correct?
19 15:49:45  A. That's correct.
20 15:49:47  This is that section we talked about, that 1/1 that's
21 15:49:52  sliced through the ground.
22 15:49:54  MR. WILSON: For the record, that's figure 5.12
23 15:49:56  that's attached to your initial report. Or I should say
24 15:49:59  Exhibit 397 for the Court.
25 15:50:07  THE COURT: What figure is that?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1113

1  15:50:09  THE WITNESS: That would be figure 5.12.
2  15:50:25  THE COURT: Do you know what page it's on?
3  15:51:03  MR. WILSON: I could actually hand a copy to the
4  15:51:05  Court if that would help.
5  15:51:07  THE COURT: I would like to locate it so that I know
6  15:51:09  what I have and don't have. There's a lot of things in here.
7  15:51:12  Do you know what page on the report it appears?
8  15:51:14  THE WITNESS: Your Honor, there's an index not
9  15:51:16  beginning of the report that maybe would assist on what page
10 15:51:20  numbers.
11 15:51:21  THE COURT: All right. I'll look at the beginning of
12 15:51:22  report, and it should be under Section 5; correct?
13 15:51:25  THE WITNESS: Yes.
14 15:51:26  THE COURT: I've got it.
15 15:51:30  MR. KHORRAMI: Your Honor, it's 5-13. The last
16 15:51:36  printed page is 5-12. So the following page is figure 5.12,
17 15:51:39  and that's in the report.
18 15:51:58  THE COURT: I think this is it. I've got it. Okay.
19 15:52:01  THE WITNESS: Great.
20 15:52:04  THE COURT: Hold on one second.
21 15:52:07  (OFF THE RECORD)
22 15:52:39  THE COURT: It's in the report -- that exhibit is not
23 15:52:42  in this report. It may be portions thereof, but it's not the
24 15:52:50  entire report. Clearly. It's clearly not there, just to let
25 15:52:50  you know. I have the entire report here except for the

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1114

1  15:52:59  declaration. That entire report --

2  15:53:02  MR. GILBERT: The declaration is not part of the

3  15:53:04  report. The declaration was submitted --

4  15:53:05  THE COURT: I completely understand. But what I'm

5  15:53:07  trying to say is I have the report as of -- let me make it

6  15:53:12  crystal clear. "As of July 1st, 2009, Revisions to Photograph

7  15:53:17  designations May 14th, 2010." I have that report. It was

8  15:53:22  given to me. I have synopsized it. It is separate and apart

9  15:53:26  from the declaration of December 2009. I understand that. I

10 15:53:32  do not have that right now in my presence.

11 15:53:33  What I'm trying to tell you is that what you

12 15:53:35  have introduced into evidence and labeled as exhibit

13 15:53:39  whatever --

14 15:53:40  THE MARSHAL: 397.

15 15:53:42  THE COURT: -- Exhibit 397 is not the entire report,

16 15:53:45  excluding the declaration. It's only a portion thereof.

17 15:53:52  That may be your intent. You may not want to

18 15:53:55  introduce the entire report. That is simply not in the exhibit

19 15:53:59  book.

20 15:54:02  MR. KHORRAMI: Your Honor, we'll get that addressed

21 15:54:02  immediately today. But what's in front of you, Your Honor, is

22 15:54:03  the right report.

23 15:54:05  THE COURT: Right. I understand what's in front of

24 15:54:06  me, but --

25 15:54:08  MR. KHORRAMI: We'll get that.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1115

1  15:54:09  THE COURT: -- the record's kind of important.

2  15:54:12  MR. KHORRAMI: We'll get that resolved, Your Honor.

3  15:54:14  THE COURT: Please do because it's hard for us to

4  15:54:16  follow along, frankly.

5  15:54:19  MR. WILSON: I have actually two -- an extra copy. I

6  15:54:20  could hand it up to the Court if that would help.

7  15:54:22  THE COURT: I have one so you can hand it up to -- if

8  15:54:25  you have an extra copy, without impairing your direct.

9  15:54:50  We're going to let you roll along. Look, it's

10 15:54:53  your record. I'm going to quit worrying about it.

11 15:54:56  MR. WILSON: All right, Judge. I'll try to keep

12 15:54:58  things as clear as I can.

13 15:55:02  BY MR. WILSON:

14 15:55:02  Q. This is figure 5.12 that should be attached to Exhibit

15 15:55:06  No. 397, which is your report; right, Doctor?

16 15:55:09  A. Yes.

17 15:55:10  Q. Can you explain to the Court what this is?

18 15:55:12  A. Basically what this is, as we discussed earlier, is about

19 15:55:19  using all the boring logs that are available and trying to put

20 15:55:23  together the soil layering across the floodwall from one side

21 15:55:27  to the other, and this is basically what we came up with, or I

22 15:55:35  came up with, after analyzing those borings and, for example,

23 15:55:39  that worksheet that we looked at earlier.

24 15:55:42  So we have different layerings. We have a waterfront

25 15:55:46  fill, and we have the levee material and that depression area

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1116

1  15:55:50  that we discussed earlier. We have also a silt and clay zone

2  15:55:56  here. This is all based on the descriptions of the borings

3  15:56:01  that were present in this area.

4  15:56:05  THE COURT: This cross-section would represent -- I

5  15:56:08  see the negatives. The distance from the floodwall, like,

6  15:56:11  100 feet one way and 100 feet another way, in essence?

7  15:56:16  THE WITNESS: Actually, from the floodwall, it

8  15:56:17  actually extends out further, probably 300 feet, 400 feet, in

9  15:56:23  that direction.

10 15:56:25  BY MR. WILSON:

11 15:56:25  Q. But he's asking you, I believe, are the markings on the

12 15:56:29  bottom showing the distance from the floodwall?

13 15:56:33  A. That's correct. That's correct.

14 15:56:34  Q. Okay.

15 15:56:34  A. So then you can see this darkened gray zone, which would

16 15:56:39  be the marsh area, which is described -- you know, which is

17 15:56:42  basically an organic layer, and it's basically made of various

18 15:56:50  clays with organic material. Some of it's all broken down.

19 15:56:56  There can be roots, there can be wood, and there can be

20 15:57:01  localized areas that maybe have peat-rich zones.

21 15:57:11  Like, for example, this zone here, based on the

22 15:57:13  borings, is a peat-rich zone. It's not all peat. There's

23 15:57:16  layers of it. Sometimes it's described as a peaty clay. So

24 15:57:20  that means that it's peat as you would know it, but it's filled

25 15:57:24  in with clay.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1117

1  15:57:25  THE COURT: What would this show you? If the sheet

2  15:57:26  pile were the 1980 version, where would the sheet pile be

3  15:57:33  resting?

4  15:57:34  THE WITNESS: That's a good point. I was going to

5  15:57:36  mention that to you.

6  15:57:37  Since we drew this cross-section looking north,

7  15:57:40  okay, what you're looking at is the depth of the deeper sheet

8  15:57:44  pile. Okay? Where the sheet pile would be for the 1969 wall,

9  15:57:49  or the wall that sheared off, would be up about here.

10 15:57:56  THE COURT: Okay. And the -- what you labeled --

11 15:57:59  THE WITNESS: Negative --

12 15:58:02  THE COURT: -- "Upper Silts and Clays"?

13 15:58:04  THE WITNESS: Yes.

14 15:58:06  THE COURT: Except there's a levee embankment. But

15 15:58:09  upper silts and clays.

16 15:58:11  THE WITNESS: Yes.

17 15:58:11  THE COURT: Then the sheet pile -- the sheet pile as

18 15:58:15  augmented would be where?

19 15:58:19  THE WITNESS: The longer sheet pile?

20 15:58:24  THE COURT: Yes.

21 15:58:24  THE WITNESS: The tip of that would be right here.

22 15:58:26  THE COURT: That would go into the actual bottom

23 15:58:29  clay.

24 15:58:30  THE WITNESS: This would be the layer described as

25 15:58:32  "Lower silts and clay."

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1118

1　15:58:33　　　THE COURT: Oh, I'm sorry. Lower silts and clay.

2　15:58:35　　　Yeah, that makes sense.

3　15:58:36　　　THE WITNESS: And above that is the marsh zone, the

4　15:58:38　　marsh zone in question.

5　15:58:41　　BY MR. WILSON:

6　15:58:41　　Q. Why did you show -- I'm sorry. Why did you show the newer

7　15:58:47　　1985 I-wall on this cross-section?

8　15:58:53　　A. It was just a drafting thing because, you know, you're

9　15:58:55　　looking north. It's actually the other wall superimposed on

10　15:59:01　　it, but you can't see it.

11　15:59:03　　Q. Is what you're saying where the I-wall broke is the last

12　15:59:07　　section of the 1969 I-wall, and the next section was the newer

13　15:59:16　　1980 I-wall?

14　15:59:18　　A. That's correct.

15　15:59:18　　Q. So that's what you showed in this cross-section?

16　15:59:21　　A. That's correct.

17　15:59:22　　　THE WITNESS: And another point about this, Your

18　15:59:23　　Honor, is that you can see these wiggly lines here.

19　15:59:27　　　THE COURT: Yes.

20　15:59:27　　　THE WITNESS: What that represents is that most of

21　15:59:29　　the borings on this side, I'd say 95 percent of them, are all

22　15:59:36　　these WGI borings. There's no other borings in this area.

23　15:59:40　　　THE COURT: Yes.

24　15:59:40　　　THE WITNESS: And they were done visually. I mean,

25　15:59:42　　they described the soils visually. So they didn't do any

## 1119

1　15:59:47　　laboratory tests.

2　15:59:49　　　THE COURT: There wasn't laboratory testing?

3　15:59:51　　　THE WITNESS: Exactly. But, you know, my 15-year-old

4　15:59:53　　daughter would know the difference between sand and, you know,

5　15:59:56　　a fibrous peat and a clay. So, I mean, there is some validity

6　16:00:02　　to the differences in soil types that they do give. And it was

7　16:00:07　　logged by a geologist.

8　16:00:11　　　But on this side, these are mostly done by the

9　16:00:14　　Corps and investigator teams, and those had more bases in their

10　16:00:23　　exact descriptions.

11　16:00:24　　　THE COURT: And that's the side that -- tell me

12　16:00:27　　again, that side relates to the -- to which floodwall?

13　16:00:31　　　THE WITNESS: This is the protection side. This is

14　16:00:33　　the flood side.

15　16:00:35　　　THE COURT: Okay. I understand. The levee

16　16:00:38　　embankment, that's the flood side.

17　16:00:40　　　THE WITNESS: That's correct.

18　16:00:40　　　THE COURT: So what you're telling me is that the

19　16:00:42　　soil samples taken on the flood side are more -- may not be

20　16:00:50　　more accurate but were more precisely tested?

21　16:00:52　　　THE WITNESS: That's correct. There was no

22　16:00:53　　laboratory tests done on them for classification purposes.

23　16:00:56　　Whereas, on this side, that's a different story.

24　16:00:58　　　THE COURT: Okay.

25　16:00:59　　　THE WITNESS: And in this side, they're showing that

## 1120

1　16:01:01　　the clays, you know, in this unit, right, silts and clays, are

2　16:01:07　　much finer, a much finer clay. And even the marsh is much

3　16:01:12　　finer. But for the purposes of our work, we assumed that these

4　16:01:16　　clays are coarser as they are described, since we didn't have

5　16:01:22　　anything else to really --

6　16:01:23　　　THE COURT: Is there any reason why, on one -- just

7　16:01:26　　by sheer happenstance, on one side, why on the protected -- on

8　16:01:32　　the protected side -- or excuse me -- on the flood side would

9　16:01:37　　they be finer and on the other side they would be more coarse?

10　16:01:42　　　THE WITNESS: There could be, you know, depositional

11　16:01:47　　changes, but there are some indications that they could be

12　16:01:50　　clayier just based on, you know, some of the descriptions

13　16:01:55　　given. But for the purposes of our analysis, what we did is

14　16:02:01　　assumed that this was, as they said, coarser clays than the

15　16:02:08　　finer clays on this side. So it's on --

16　16:02:13　　　THE COURT: Based on the anecdotal evidence as

17　16:02:16　　observed by the geologist who said -- who was categorizing the

18　16:02:23　　borings WGI II?

19　16:02:27　　　THE WITNESS: That's correct.

20　16:02:28　　BY MR. WILSON:

21　16:02:29　　Q. Again, still referring to figure 5.12 out of your report,

22　16:02:35　　Exhibit 397, you have here an area that's circled that says

23　16:02:40　　"Marsh" --

24　16:02:42　　　THE COURT: Again, I might say this is an exhibit

25　16:02:43　　that's understandable to the Court and, certainly, to anyone

## 1121

1　16:02:46　　else, I think, who looks at it. So it's the kind of thing we

2　16:02:49　　need to make our little notes on. Go ahead.

3　16:02:52　　BY MR. WILSON:

4　16:02:52　　Q. You have a circle here in the middle of that, and it's not

5　16:02:56　　a perfect circle by any means. It's gray, and it says "Marsh."

6　16:03:00　　Can you explain what you mean by that to the Court?

7　16:03:03　　A. Yes. What we did is we identified the predominant

8　16:03:09　　layering, and then within that layering, from the borings, the

9　16:03:13　　way the soils were described, you could see that there were

10　16:03:16　　changes. There are variations within that layer. What we did

11　16:03:25　　is we modeled those changes based on the information we had

12　16:03:29　　from the borings.

13　16:03:31　　　For example, this area here --

14　16:03:31　　Q. And you're referring to the surface area that says

15　16:03:33　　"marsh," that gray section?

16　16:03:35　　A. Yes. That area is described as "peaty." Okay? So, in

17　16:03:39　　our model, when we did our computations and everything, we

18　16:03:42　　described -- we used different values for that area, especially

19　16:03:48　　in terms of permeability. But you can see it's not continuous

20　16:03:51　　across the entire layer.

21　16:03:54　　　THE COURT: And just for reference and for the

22　16:03:56　　record, would the peat be more or less permeable than the

23　16:04:01　　remainder of what is classified as marsh?

24　16:04:05　　　THE WITNESS: It would be more permeable.

## 1122

```
1    16:04:07   BY MR. WILSON:
2    16:04:08   Q.  And so the circled area on figure 5.12, where it's circled
3    16:04:12   "marsh," okay, that particular area right there would be more
4    16:04:18   permeable, in your opinion, Doctor; is that correct?
5    16:04:21   A.  Yes.  And the remainder of marsh, yes.
6    16:04:23   Q.  But the other marsh that's not circled, could you explain
7    16:04:32   to the Court your opinion on that marsh?
8    16:04:35   A.  That is described as essentially clays, and it can have
9    16:04:39   varying amounts of organics.  When they usually say "organics,"
10   16:04:47   it would be something that's -- you know, it's like topsoil.
11   16:04:48   You know, it's carbon; it's broken down.  And it could have --
12   16:04:53   they'll also describe if they hit wood or they'll hit, you
13   16:04:56   know, some roots, they'll also describe that.
14   16:05:03       But predominantly, the material is a clay, and that's
15   16:05:06   why we have -- you know, we have this zigzag here because these
16   16:05:09   areas outside this peaty area are described as a clay, but
17   16:05:16   they're described as a coarser clay than on this side.
18   16:05:19   Q.  And you still listed that in your cross-section at the
19   16:05:22   north end of the north breach as marsh; correct?
20   16:05:26   A.  Yes.
21   16:05:27   Q.  But yet when the borings were done, they found clay; is
22   16:05:32   that correct?  In parts of --
23   16:05:33   A.  Well, the clay is organic, and so, you know, it falls
24   16:05:38   within the category of marsh.
25   16:05:41   Q.  Okay.  And these permeabilities that are assigned, is that
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1124

```
1    16:07:12   A.  Yes.
2    16:07:13   Q.  Okay.  Should we go on to the next side, Doctor?
3    16:07:17   A.  Yes.  And you'll see a sequence of these graphs where we
4    16:07:28   plotted these densities for the different units and came up
5    16:07:32   with an average value.
6    16:07:33   Q.  And density, when you're talking about density, does that
7    16:07:36   have to do with your seepage analysis or your stability
8    16:07:40   analysis or both?
9    16:07:41   A.  It's more related to the stability analysis.
10   16:07:43   Q.  Okay.  And I should move on; correct?
11   16:07:52   A.  Yes.  This is the one for the marsh, and this would be for
12   16:07:54   the densities underneath the embankment area.
13   16:07:57   Q.  And we're referring to Exhibit 397, figure 5.20, marsh
14   16:08:04   unit for the upper embankment?
15   16:08:07   A.  Yes.
16   16:08:08   Q.  Do you need to tell the Court anything else about this?
17   16:08:11   A.  We can just continue, I think.  Unless the Court has some
18   16:08:14   questions.  It's the same procedure that we used for every one
19   16:08:17   of the units.
20   16:08:19   Q.  And just explain to me because I'm not sure I --
21   16:08:24       THE COURT:  Well, what comprises a unit?
22   16:08:27       THE WITNESS:  Okay.  If we go back to --
23   16:08:29   BY MR. WILSON:
24   16:08:30   Q.  Let me ask you a question.  Okay?  When you say a "soil
25   16:08:33   unit," is that a soil category?
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1123

```
1    16:05:47   something that's done by geotechnical engineers?
2    16:05:53   A.  Yes.
3    16:05:53   Q.  And there are standards for it?
4    16:05:55   A.  Yes.
5    16:05:56   Q.  Should we go on to the next slide --
6    16:05:59   A.  Yes.
7    16:05:59   Q.  -- and maybe come back to it?
8    16:06:01   A.  Yes.  There's a number of graphs here, Your Honor.
9    16:06:04   Basically, what they are is we talked about the different
10   16:06:06   units, the upper silt and clay units, and we also talked about
11   16:06:11   the marsh unit, and we talked about the waterfront unit.  So
12   16:06:15   what this is is, basically, a plot of the values reported for
13   16:06:22   the upper silt and clay unit with regard to its density or
14   16:06:28   weight.  Okay?
15   16:06:28       And the importance of that is that the weight is
16   16:06:34   important when you're determining the stability of the levee.
17   16:06:44   And so, this was done for all the different soil units.
18   16:06:47       THE COURT:  And I note just for the record, this is
19   16:06:49   in the original report, not the declaration?
20   16:06:53       MR. WILSON:  Correct.  It's Exhibit 397, figure 5.15.
21   16:07:00   BY MR. WILSON:
22   16:07:00   Q.  This is the upper silts and clay units of the prior
23   16:07:03   exhibit that we showed, which was the same exhibit number, 397,
24   16:07:07   but figure 5.12, the cross-section that you had prepared;
25   16:07:12   correct?
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1125

```
1    16:08:35   A.  It's a layer.  It's one of the layers.  If you go back to
2    16:08:39   the section, see, this is a layer here.  This upper silt and
3    16:08:44   clay layer.  The marsh layer.
4    16:08:46       So what we're doing, Your Honor, is taking all the --
5    16:08:51   there's holes that are drilled through all these layers; right?
6    16:08:55   And there's samples taken out of each one of these layers,
7    16:08:59   okay, and they're measured for properties.
8    16:09:02       So what we're doing is, okay, we're saying, for the
9    16:09:04   silt and clay layer, we are taking all those samples and the
10   16:09:09   tests that were run on those samples and plotting them on one
11   16:09:12   plot to get an idea of what the average property is for that
12   16:09:17   material or what would be a representative property to use once
13   16:09:21   we get to the modeling stage later on.
14   16:09:25   Q.  Okay.
15   16:09:25   A.  So this is more background into getting to the point of
16   16:09:29   being able to evaluate the seepage and stability conditions.
17   16:09:33       THE COURT:  Okay.
18   16:09:33   BY MR. WILSON:
19   16:09:33   Q.  And you're now referring again to Exhibit 397, figure
20   16:09:37   5.12; correct?
21   16:09:40   A.  That's correct.
22   16:09:42   Q.  And this is just showing the Court what you did to come up
23   16:09:47   with your soil units; is that what you're saying?
24   16:09:52   A.  This is -- this is to show -- this is the data that was
25   16:09:55   available.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1126

```
1   16:10:00   Q.  What were you referring to?
2   16:10:01   A.  This here ledger shows where that data came from, what
3   16:10:06   boring it came from.
4   16:10:08   Q.  You're referring to the right-hand side of figure 5.15 of
5   16:10:12   Exhibit 397; correct?
6   16:10:13   A.  That's correct.
7   16:10:15   Q.  And figure 5.20 of Exhibit 397 is the same thing except
8   16:10:22   it's a different soil unit.  It's the marsh unit; correct?
9   16:10:25   A.  That's correct.
10  16:10:28   Q.  And you're just showing the Court what you did to come up
11  16:10:32   with your analysis; correct?
12  16:10:33   A.  Right.
13  16:10:36   Q.  And --
14  16:10:36   A.  We did the same thing for all the different units.  We
15  16:10:41   separated it out because of the different -- you know, the
16  16:10:45   different conditions.  Like you had under the embankment, you
17  16:10:49   would have more compression because of the weight of the
18  16:10:55   embankment than you would on the toe side.
19  16:10:58       Keep in mind, there was no tests run -- these types
20  16:11:01   of tests run on the flood side.  Although, they really wouldn't
21  16:11:05   have much significance in terms of strength and density.
22  16:11:09   Q.  Okay.
23  16:11:10   A.  Because the failure, Your Honor, it's occurring -- it's
24  16:11:16   occurring on the protection side.
25  16:11:18   Q.  Okay.  And we're just showing to the Court figure 5.12 of
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1127

```
1   16:11:23   the Exhibit 397; correct?
2   16:11:25   A.  That's correct.
3   16:11:28   Q.  5.21, I'm sorry.
4   16:11:31       And this is more of the same except it's the lower
5   16:11:36   silts and clay and bottom clay units for upper embankment area;
6   16:11:43   correct?
7   16:11:44   A.  That's correct.
8   16:11:44   Q.  And that's figure 5.27 of Exhibit 397?
9   16:11:48   A.  That's correct.
10  16:11:49   Q.  And same thing here except this is lower silts and clays
11  16:11:52   and bottom clay units for toe area, figure 5.28?
12  16:11:56   A.  That's correct.
13  16:11:57   Q.  Okay.
14  16:11:58   A.  Okay.  We did the same thing -- the same procedure was
15  16:12:00   used to assess for each unit or layer what the strength would
16  16:12:06   be for that layer.
17  16:12:07   Q.  Okay.  So what were you doing before, the seepage?
18  16:12:11   A.  No.  We were determining the weight.
19  16:12:13   Q.  The weight.  I'm sorry.
20  16:12:15   A.  We were just getting properties -- right now, for each
21  16:12:18   layer, we're trying to get the properties that we're going to
22  16:12:21   input in our models.  So we went about getting all this
23  16:12:26   information and putting it all together in order to summarize
24  16:12:29   what the most likely properties would be.
25  16:12:32   Q.  And so we were talking about the weight before, and now
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1128

```
1   16:12:35   figure 5.16 of Exhibit 397 is referring to the strength of the
2   16:12:42   soils; is that correct?
3   16:12:43   A.  That's correct.
4   16:12:44   Q.  Or the different soil units; is that correct?
5   16:12:49   A.  That's correct.
6   16:12:50   Q.  Okay.  Figure 5.23 is also showing the strength of the
7   16:12:55   different units.  This is a marsh unit; correct?  And that's
8   16:13:00   also Exhibit 397.
9   16:13:01       Is there anything else you wanted to tell the Court
10  16:13:03   about?
11  16:13:03   A.  This -- I mean, it's the same procedure.  We got -- from
12  16:13:07   these charts, we identified values that we were going to use
13  16:13:11   later on in our model.
14  16:13:33   MR. WILSON:  Your Honor --
15  16:13:37   THE COURT:  Yes.
16  16:13:38   MR. WILSON:  -- I have something that may help.  It's
17  16:13:39   a printout of the PowerPoint of where you might be able to
18  16:13:46   read.
19  16:13:46   THE COURT:  Good.  All right.
20  16:13:50   MR. KHORRAMI:  Your Honor, we've put Post-its where
21  16:13:53   we currently are in this PowerPoint.
22  16:13:56   THE COURT:  Well, thank you very much.  We appreciate
23  16:13:56   it.  That does help.  All right.  Thank you.
24  16:14:11   BY MR. WILSON:
25  16:14:11   Q.  All right.  Again, this is more of the same, figure 5.27,
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1129

```
1   16:14:18   5.30, showing the strength of the soil units that you assigned
2   16:14:24   and --
3   16:14:25   A.  Yes.  This one, Your Honor, you can see a distinctive
4   16:14:30   change with depth, and so a linear line was used to represent
5   16:14:36   the strength and when we developed our model with the
6   16:14:39   properties.
7   16:14:39   Q.  And you're referring to Exhibit 397, figure 5.30?
8   16:14:45   A.  That's correct.
9   16:14:45   THE COURT:  Is that model a regression model or
10  16:14:47   something similar thereto?  What type of model is it?
11  16:14:54   THE WITNESS:  This would be used in the -- okay.  We
12  16:14:59   would get -- for example, when we're trying to assess what the
13  16:15:03   strength is, okay, at a certain depth, right, in this layer of
14  16:15:11   material, right, we would come to this chart, this line, and we
15  16:15:16   would identify, okay, at 20-foot depth, if it's under the upper
16  16:15:22   embankment, this is the strength we would have.  And if we
17  16:15:28   would go to 40 feet, this would be the strength that we would
18  16:15:31   have.
19  16:15:31   THE COURT:  Okay.  I understand.
20  16:15:36   THE WITNESS:  This is, again, the same type of a
21  16:15:38   correlation.
22  16:15:40   BY MR. WILSON:
23  16:15:40   Q.  And on the right is the -- on the upper right of
24  16:15:43   figure 5.31, again, that shows the borings that were used?
25  16:15:48   A.  That's correct.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

27  (Pages 1126 to 1129)

## 1130

```
1   16:15:48   Q.   Okay.  And that's Exhibit 397 also?
2   16:15:52   A.   Right.  And, Your Honor, this slide, basically, what it is
3   16:15:58   is --
4   16:15:59   Q.   Referring to the "Undrained Shear Strengths, Su Values
5   16:16:04   Assumed for Each Soil Unit by Different Investigators," and
6   16:16:07   that's part of your declaration, December 18th, 2009?
7   16:16:10   A.   That's correct.  What this shows is what we did is we
8   16:16:16   compared our values that we got by the methodology that we --
9   16:16:19   that I used versus the values that were used by other
10  16:16:24   investigators.
11  16:16:27        THE COURT:  A very basic question -- I'm sorry to
12  16:16:29   interrupt you, but how does one determine shear strength?
13  16:16:33        THE WITNESS:  There's various ways that you can do
14  16:16:36   it.  You can do it in the laboratory by -- you can do it by
15  16:16:40   crushing a soil sample.  Okay.  That would give you a strength
16  16:16:44   value.
17  16:16:44        You can do it in the field.  There is a test
18  16:16:49   that's called a band shear test which is, basically, a device
19  16:16:54   that has fins on it; and you rotate it, and you measure the
20  16:16:58   torque that results from the spin of that, and then you can
21  16:17:04   tell what the strength of the soil is.
22  16:17:06        THE COURT:  How did you make your valuation?
23  16:17:09        THE WITNESS:  Basically, what I did is I took all the
24  16:17:11   information that was available from all the laboratory testing,
25  16:17:15   all the field testing, took all that into consideration.
```

## 1131

```
1   16:17:18        THE COURT:  Then you made your own conclusion based
2   16:17:20   on that information?
3   16:17:22        THE WITNESS:  That's correct.
4   16:17:22        THE COURT:  All right.
5   16:17:24        THE WITNESS:  And here we have a comparison of the
6   16:17:27   values that were assumed -- we have a little bit different
7   16:17:31   layers here, but they're in the same vicinity in terms of the
8   16:17:35   layering sequence.  And you can see that our values are in line
9   16:17:42   or less than the other investigators.
10  16:17:48   BY MR. WILSON:
11  16:17:49   Q.   That's also attached to your declaration of December 18th,
12  16:17:52   2009, Doctor?
13  16:17:53   A.   Yes.
14  16:17:54   Q.   Okay.  And --
15  16:17:58   A.   Another critical property that we had to look at is --
16  16:18:01   Q.   Before you start, let my just try to get on the record
17  16:18:05   what it is.
18  16:18:06   A.   I'm sorry.
19  16:18:06   Q.   This is attached to your declaration of December 18th,
20  16:18:09   2009.  It's a "Conceptual Illustration of Choosing a Permeable
21  16:18:14   Marsh Versus Not Choosing One During a Hurricane Surge"; is
22  16:18:18   that correct?
23  16:18:19   A.   That's correct.
24  16:18:19   Q.   Okay.  Let's go to the top because there's two different
25  16:18:24   illustrations on this exhibit -- well, illustration; correct?
```

## 1132

```
1   16:18:30   A.   That's correct.
2   16:18:31   Q.   Okay.  And you want to explain to the Court what this
3   16:18:39   illustrates?
4   16:18:41   A.   Yes.  This is a conceptual -- try to give the Court a
5   16:18:46   conceptual idea of the critical factors.  I think the Court has
6   16:18:52   already said that they understand that this is a critical
7   16:18:57   issue.  You know, here --
8   16:18:57   Q.   What are we talking about?  Are we talking about seepage
9   16:19:02   or --
10  16:19:02   A.   Yes.  This is a seepage, conceptual -- conceptual diagram
11  16:19:08   showing the various effects that would relate to the seepage
12  16:19:13   condition.
13  16:19:15        In the upper diagram what is shown is that we have a
14  16:19:21   permeable marsh, and in the ILIT report, they assume this marsh
15  16:19:29   to be permeable enough to come from the canal at the south
16  16:19:33   breach and make its way 400 feet past -- past the floodwall
17  16:19:39   onto the other side and cause uplift pressures.
18  16:19:39   Q.   When you say -- I'm sorry.
19  16:19:44        THE COURT:  So we're talking about a permeable marsh,
20  16:19:48   just to get a location in reality -- I know this is
21  16:19:50   conceptual -- but this would be a permeable marsh in the area
22  16:19:55   of the north breach?
23  16:19:56        THE WITNESS:  This is considering both breaches, Your
24  16:19:58   Honor.
25  16:19:59        THE COURT:  Okay.
```

## 1133

```
1   16:20:00        THE WITNESS:  This is just a general schematic to
2   16:20:07   give an idea of what the different flow of mechanisms were that
3   16:20:07   were considered.
4   16:20:08   BY MR. WILSON:
5   16:20:08   Q.   Okay.  And this was considered by ILIT?  Is this what ILIT
6   16:20:13   thought the permeable conditions of the soil units were?  Is
7   16:20:17   this how they -- is that what they opined?
8   16:20:20   A.   Well, they considered that the marsh is very permeable,
9   16:20:23   and on the south breach, the flow in their model shows it came
10  16:20:29   from the canal and went all the way down to this side and
11  16:20:32   caused instability of the levee.
12  16:20:35        THE COURT:  And what depth would the permeable marsh
13  16:20:40   be?  I know.  It's a range.
14  16:20:43        THE WITNESS:  I would say it would be on the order of
15  16:20:46   15 feet on the flood side.
16  16:20:48   BY MR. WILSON:
17  16:20:48   Q.   Just so I'm clear --
18  16:20:51        THE COURT:  15 feet, but wait a minute.  Wait a
19  16:20:52   minute, counsel.
20  16:20:54        MR. WILSON:  I'm sorry.
21  16:20:55        THE COURT:  15 feet beginning where and ending where?
22  16:20:58        THE WITNESS:  Okay.  On this side --
23  16:21:01        THE COURT:  When we say "This side," just for the
24  16:21:03   record...
25  16:21:03        THE WITNESS:  It's the flood side.
```

## 1134

```
1    16:21:04      THE COURT:  On the flood side.
2    16:21:05      THE WITNESS:  You're talking about elevation -- let's
3    16:21:08   see -- 15, let's say 15 to 25, in that range.
4    16:21:14      THE COURT:  So it would be -- it would be -- if we
5    16:21:19   take 1980, tell me how -- where the -- well, let's take 1969.
6    16:21:27   Where would the floodwall be vis-à-vis the marsh, the bottom of
7    16:21:33   the floodwall?
8    16:21:34      THE WITNESS:  Okay.  That's what's shown here.
9    16:21:37   Here's your floodwall.
10   16:21:37      MR. WILSON:  And, Your Honor, do you mean the bottom
11   16:21:39   of the sheet pile that extended all the way down?
12   16:21:42      THE COURT:  Yes.  The bottom of the sheet pile is
13   16:21:44   where?  Point it out to me.
14   16:21:46      THE WITNESS:  It's right there.  Do you see this
15   16:21:49   vertical line here?
16   16:21:50      THE COURT:  All right.  I see it.
17   16:21:51      THE WITNESS:  And this line represents the floodwall.
18   16:21:53      THE COURT:  Now, the way that's -- let me just say,
19   16:21:56   looking at this, so the sheet pile would be partially in the,
20   16:22:01   according to this, in the marsh layer; correct?  In the marsh
21   16:22:06   zone?
22   16:22:06      THE WITNESS:  That's correct.
23   16:22:07   BY MR. WILSON:
24   16:22:07   Q.  The permeable marsh layer?
25   16:22:10   A.  That's correct.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1135

```
1    16:22:10   Q.  And, Doctor, just for the record --
2    16:22:12      THE COURT:  Never heard of impermeable marsh, but go
3    16:22:14   ahead.
4    16:22:15   BY MR. WILSON:
5    16:22:16   Q.  Doctor, is there a less permeable marsh and a more
6    16:22:19   permeable marsh?
7    16:22:21   A.  Yes.  You can have varying values depending on the nature
8    16:22:25   of the marsh itself.
9    16:22:26   Q.  So depending on the nature of marsh, you can assign
10   16:22:29   different values as to its permeability?
11   16:22:33   A.  Yes.
12   16:22:33   Q.  And that depends on what?  How do you assign a different
13   16:22:36   value to marsh?  I mean, isn't marsh marsh or it's not?
14   16:22:41   A.  If you look at a description of what it says, you know,
15   16:22:44   what they classify the marsh soil as, for example, if it's
16   16:22:48   classified as a fat clay, like a modeling clay, you wouldn't
17   16:22:53   think it would be very permeable at all.
18   16:22:56      If it's a zone that has a significant amount of peat,
19   16:23:00   it would be much higher.
20   16:23:01   Q.  For purposes of our conversation, we should ignore this
21   16:23:05   square box that's in the middle, at the top of the
22   16:23:07   illustration?
23   16:23:08   A.  Well, I was going to get --
24   16:23:10   Q.  Just for right now.  Okay?
25   16:23:15      ILIT did an analysis of the permeability of the soils
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1136

```
1    16:23:19   at the Industrial Canal levee; is that correct?
2    16:23:23   A.  Yes.
3    16:23:23   Q.  Okay.  And their determination was what, Doctor?
4    16:23:28   A.  Their -- oops.  I'm sorry.  Their determination was that
5    16:23:34   there was significant permeability of this marsh to allow it on
6    16:23:37   the south breach to transfer from the canal all the way to the
7    16:23:41   protection side.
8    16:23:42   Q.  Okay.
9    16:23:43   A.  They -- they assumed -- or they determined that the south
10   16:23:49   breach, that the tip of the sheet pile did not extend into the
11   16:23:52   marsh.  Okay?  Like I said, this is a conceptual illustration
12   16:23:58   trying to show both the north and south breaches.
13   16:24:01      On the north breach, they determined that there was a
14   16:24:05   gap that occurred, or they assumed the gap occurred, between
15   16:24:10   the sheet pile and the soil on this side and that it was large
16   16:24:16   enough that gap would cause a significant flow down below
17   16:24:20   the sheet pile and down to the protection-side levee and cause
18   16:24:28   instability.
19   16:24:30      That size of gap that was assumed was on the order of
20   16:24:34   1.3 feet all the way down.
21   16:24:37   Q.  Okay.  And -- still referring to your Conceptual
22   16:24:41   Illustration of Choosing a Permeable Marsh versus Not Choosing
23   16:24:44   One During a Hurricane Surge that's attached to your
24   16:24:50   declaration of December 18th, 2009; correct?
25   16:24:53   A.  Yes, that's where it's from.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1137

```
1    16:24:55   Q.  And so if I understand this correctly, ILIT more or less
2    16:24:59   said that there was an underground river that would go from the
3    16:25:04   canal all the way through past where the levee was, and it
4    16:25:09   would weaken the subsoils; is that -- or the soils; is that
5    16:25:14   correct?  Or you state it however you think best, Doctor.  Is
6    16:25:18   say it.
7    16:25:18   A.  Yes.
8    16:25:19   Q.  You agree with that?
9    16:25:21   A.  Well, I mean, basically, it created a natural conduit
10   16:25:26   across -- you know, across the waterfront and down to the
11   16:25:32   protection side into the Lower Ninth Ward.
12   16:25:36   Q.  And just so the record's clear, you agree that that's what
13   16:25:39   ILIT thought; correct?
14   16:25:41   A.  Yes.
15   16:25:41      THE COURT:  Just to make sure I'm following, counsel,
16   16:25:43   are we're talking about north breach now?
17   16:25:48      THE WITNESS:  Both breaches, the marsh was identified
18   16:25:50   as very permeable.
19   16:25:52      THE COURT:  Okay.  Because I -- and it was your
20   16:25:55   understanding that the -- on the south breach, the sheet pile
21   16:26:02   did not go all the way into the permeable marsh; is that
22   16:26:06   correct?
23   16:26:07      THE WITNESS:  Yes.
24   16:26:08      THE COURT:  Thank you.
25   16:26:08      THE WITNESS:  And, in fact, you know, in the report,
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1138

1　16:26:10　there's no gap assumed for the south breach for one reason or
2　16:26:15　another. Maybe because they thought it doesn't make a
3　16:26:18　difference, we won't assume it.
4　16:26:21　　　　THE COURT:  So since there was no gap, what was the
5　16:26:23　mechanism -- what did they determine the mechanism of failure
6　16:26:26　then?
7　16:26:26　　　　THE WITNESS:  It was the flow coming from -- from the
8　16:26:30　canal. The canal intersects this marsh layer. Okay? They
9　16:26:36　assume that the canal intersects this marsh layer and creates
10　16:26:40　an axis for the water to come down.
11　16:26:43　　　　THE COURT:  I do understand that. But the gap, is
12　16:26:46　the assumed gap assumed prior to the onset of the hurricane,
13　16:26:50　that the gap was preexisting to the hurricane?
14　16:26:54　　　　THE WITNESS:  They assumed the gap to be present at
15　16:26:57　the time of the maximum surge.
16　16:26:58　　　　THE COURT:  Okay.
17　16:26:59　BY MR. WILSON:
18　16:26:59　Q.  And we're referring to the north breach; correct?
19　16:27:06　A.  That's correct, where they assumed the gap.  That's
20　16:27:07　correct.
21　16:27:07　Q.  And you're talking about a hydrostatic-pressure gap; is
22　16:27:10　that what you're talking about?
23　16:27:13　A.  Yes.  I mean, basically, the gap is large enough to cause
24　16:27:17　water to flow straight down into the peat.  It's like a foot,
25　16:27:24　foot and a half wide.

　　　　JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
　　　　　　　　UNITED STATES DISTRICT COURT
　　　　　　　　EASTERN DISTRICT OF LOUISIANA

## 1139

1　16:27:25　　　　THE COURT:  And in the south breach, no gap was
2　16:27:27　necessary to be assumed because the water was simply flowing
3　16:27:31　underneath the sheet pile, in essence?
4　16:27:34　　　　THE WITNESS:  Yes.  Or that it wouldn't have made
5　16:27:36　much difference because the top of the sheet pile, even if you
6　16:27:39　had a gap, was in clay.  It wouldn't have made any difference.
7　16:27:41　I don't know why they didn't assume it in both places.
8　16:27:46　BY MR. WILSON:
9　16:27:47　Q.  Okay. What did IPET say about ILIT's analysis of the
10　16:27:52　floodwall failures in the Industrial Canal on the east side of
11　16:27:58　the canal?  What did they say?
12　16:28:01　A.  They basically said that the permeability values were very
13　16:28:07　unrealistic and that they are, at least, 1,000 times lower than
14　16:28:13　what were assumed by ILIT.
15　16:28:15　Q.  So the marsh values that were assigned by ILIT, IPET,
16　16:28:20　totally disagreed with; correct?  IPET?
17　16:28:25　　　　THE COURT:  You got it.
18　16:28:26　　　　THE WITNESS:  That's correct.
19　16:28:27　BY MR. WILSON:
20　16:28:27　Q.  Correct?
21　16:28:28　A.  That's correct.
22　16:28:28　Q.  Okay.
23　16:28:29　A.  There were some strong comments made by IPET about --
24　16:28:33　Q.  Okay.
25　16:28:33　A.  -- about that.

　　　　JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
　　　　　　　　UNITED STATES DISTRICT COURT
　　　　　　　　EASTERN DISTRICT OF LOUISIANA

## 1140

1　16:28:36　Q.  All right.  I don't know that I moved the --
2　16:28:40　A.  You went the wrong direction.  Actually, we need to talk
3　16:28:44　about that a little bit more.
4　16:28:45　Q.  Yeah.  Okay.  You want to leave that up; right?
5　16:28:48　A.  Yes.
6　16:28:49　　　　THE COURT:  Okay.  Counsel, we're going to give you a
7　16:28:51　little break.  We're going to take a recess.  We're probably
8　16:28:54　going to go until 5:30 today, just to let everybody know.
9　16:28:57　We've got another hour of this fun -- well, 45 minutes of this
10　16:28:59　fun left.
11　16:29:02　　　　MR. WILSON:  All right, Judge.
12　16:29:03　　　　THE COURT:  And it is.  It's very interesting once we
13　16:29:06　start comprehending it.
14　16:29:09　　　　THE DEPUTY CLERK:  All rise.
15　16:30:15　　　　(WHEREUPON, the Court took a recess.)
16　16:41:39　　　　THE DEPUTY CLERK:  All rise.
17　16:41:53　　　　THE COURT:  We surprised you.  Take your time.
18　16:43:33　　　　MR. WALKER:  I'm sorry, Your Honor.
19　16:43:35　　　　THE COURT:  That's quite all right.  Go ahead, you
20　16:43:39　may proceed.
21　16:43:40　BY MR. WILSON:
22　16:43:41　Q.  So we're still looking at the Conceptual Illustration of
23　16:43:45　Choosing a Permeable Marsh versus Not Choosing One During the
24　16:43:50　Hurricane Surge. It's attached to the Marino declaration
25　16:43:54　December 18th, 2009; correct, sir?

　　　　JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
　　　　　　　　UNITED STATES DISTRICT COURT
　　　　　　　　EASTERN DISTRICT OF LOUISIANA

## 1141

1　16:43:56　A.  That's correct.
2　16:43:56　Q.  And we're still on the top illustration on that
3　16:44:00　illustration, and I want to refer you to the center where
4　16:44:05　there's a square box.  Do you see that, sir?
5　16:44:08　A.  Yes.
6　16:44:09　Q.  Okay.  Can you explain to me what that square box is in
7　16:44:14　the figure?
8　16:44:15　A.  Well, it can be either a square book or a slot excavation.
9　16:44:24　What I mean by a slot excavation would be it's an excavation
10　16:44:30　that existed along the entire breach.
11　16:44:32　　　　And this was another avenue that has been postulated
12　16:44:37　by Dr. Bea as a way that you can get excessive pressures from
13　16:44:46　it intersecting these marsh layers and going over to the other
14　16:44:50　side of the sheet pile and creating instability conditions.
15　16:44:58　Q.  Okay.  When you say -- did you want to say something else?
16　16:45:02　A.  Yeah.
17　16:45:03　　　　THE COURT:  And it's my understanding that you're
18　16:45:05　saying that it has been postulated that the remediation work
19　16:45:09　done at the EBIA could have affected and undermined the
20　16:45:16　floodwall protective devices, we will call them, on both the
21　16:45:22　north and the south breaches.  Is that your understanding, sir?
22　16:45:25　　　　THE WITNESS:  That's correct.
23　16:45:25　　　　THE COURT:  So you're assuming for this conceptual
24　16:45:28　drawing you've done here that this condition, this sand-filled
25　16:45:34　continuous slot applies to both the north and the south

　　　　JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
　　　　　　　　UNITED STATES DISTRICT COURT
　　　　　　　　EASTERN DISTRICT OF LOUISIANA

## 1142

```
 1    16:45:38   breaches?
 2    16:45:39        THE WITNESS:  That's correct.
 3    16:45:39        THE COURT:  Okay.  Go ahead, sir.
 4    16:45:40        THE WITNESS:  And you can see the various range of
 5    16:45:42   width that was assumed, 50 to 70 feet.  And the range and depth
 6    16:45:47   from the edge of the toe of the wall is shown as modeled from
 7    16:45:53   25 to 60 feet away.  And also that these are deep excavations
 8    16:46:02   that go into the marsh, you know, about 23 feet or so from the
 9    16:46:06   ground surface.
10    16:46:08        THE WITNESS:  Yes, sir.
11    16:46:08        THE WITNESS:  Also, the sand that was used, it's
12    16:46:11   postulated that that sand consists of, basically, like a sand
13    16:46:18   that you would get for cement -- you know the cement sand that
14    16:46:22   you might use for your playground?
15    16:46:25        THE COURT:  Yes.
16    16:46:25        THE WITNESS:  Or likened to sand and gravel, that was
17    16:46:28   placed in that excavation.
18    16:46:30   BY MR. WILSON:
19    16:46:30   Q.  Let me just stop you right there.  Are there different
20    16:46:33   types of sands?
21    16:46:34   A.  Yes.
22    16:46:35   Q.  Some are more permeable than other types of sands?
23    16:46:39   A.  Yes.
24    16:46:40   Q.  Is a silty sand as permeable as, let's say, a playground
25    16:46:44   sand?

              JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                     UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
```

## 1143

```
 1    16:46:44   A.  No, no way near.  It's about a thousand times less
 2    16:46:48   permeable.
 3    16:46:48        THE COURT:  And river sand, as an example, would be?
 4    16:46:51        THE WITNESS:  It's a silty sand.
 5    16:46:52        THE COURT:  Yes.  River sand would be less permeable
 6    16:46:54   than --
 7    16:46:55        THE WITNESS:  Than a clean sand.
 8    16:46:56        THE COURT:  -- than a clean sand?
 9    16:46:57        THE WITNESS:  Much, much less permeable.
10    16:46:59   BY MR. WILSON:
11    16:47:00   Q.  All right.  So now we've talked about ILIT.  Initially,
12    16:47:05   they indicated that under the soils was a permeable marsh;
13    16:47:10   correct?  And that the water could travel horizontally through
14    16:47:15   this permeable material; is that correct?
15    16:47:18   A.  Yes.
16    16:47:18   Q.  Okay.  Now, after IPET criticized ILIT, did Dr. Bea then
17    16:47:31   come up with another theory?
18    16:47:33   A.  I mean, I just know that in 2008, I mean, this is -- in
19    16:47:37   his report, he talks about these excavations being present to
20    16:47:41   23 feet and being, you know, as I stated, the characterization
21    16:47:45   of those excavations.  The models were considered box-shaped as
22    16:47:50   well as long slots along the entire breach area.
23    16:47:54   Q.  Okay.  And so tell me what -- is this a way now for water
24    16:48:00   to travel down in a vertical manner?
25    16:48:05   A.  Yes.  It gives you another big access to put water into

              JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                     UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
```

## 1144

```
 1    16:48:11   the marsh close to the levee wall.
 2    16:48:14   Q.  And that's if that was a regular sand; is that right?
 3    16:48:18   A.  Right.  With a very clean sand or -- it classified as a --
 4    16:48:21   the permeability he used classifies as a very clean sand,
 5    16:48:27   coarse, like a playground sand or equivalent to a
 6    16:48:31   sand-and-gravel mix.
 7    16:48:33   Q.  Okay.  So where should we go now?  We're still on this
 8    16:48:40   conceptual illustration of yours, Doctor?
 9    16:48:42   A.  And the other way to look at this is, if you have a marsh
10    16:48:50   that's basically made of clay -- maybe it has some pockets of
11    16:48:53   peat.  It's not going to transfer any water pressure in the
12    16:48:57   short amount time we're talking about.  The major surge
13    16:49:00   occurred over 11 hours, and that's not a long time, if you have
14    16:49:06   these more clayey materials, to get it to transfer to the other
15    16:49:09   side.
16    16:49:10        THE COURT:  So depending on the type of soil, in
17    16:49:15   essence, beneath the floodwall, the sheet pile, it's
18    16:49:21   conceivable that if the soil were constituted a certain way or
19    16:49:26   classified a certain way, in the amount of time we're talking
20    16:49:30   about, that the floodwall would not be undermined because of
21    16:49:35   the nature of this soil.
22    16:49:37        So one of my determinations is to determine what
23    16:49:44   type of material it was --
24    16:49:47        THE WITNESS:  Exactly.
25    16:49:47        THE COURT:  -- and then determine its permeability

              JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                     UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
```

## 1145

```
 1    16:49:51   and whether that -- in the period of time that involved,
 2    16:49:55   whether the undermining could have taken place.  I understand.
 3    16:49:57        MR. WILSON:  Thank you, Your Honor.
 4    16:49:58        THE WITNESS:  Very good.  Very good.
 5    16:50:00        MR. WILSON:  Thank you, Your Honor.
 6    16:50:02   BY MR. WILSON:
 7    16:50:02   Q.  So if there is -- if there was a vertical access to the
 8    16:50:07   lower soil units, is your opinion, Doctor, that it still
 9    16:50:15   wouldn't have caused an undermining or seepage?
10    16:50:18   A.  Yes.  Especially if it was a silty sand, you know.  I
11    16:50:21   mean, you're talking about a thousand times less permeability,
12    16:50:26   even if it was backfilled with a silty sand.
13    16:50:29   Q.  You're talking about if the box was filled with a silty
14    16:50:33   sand?
15    16:50:33   A.  Yes.
16    16:50:34   Q.  Okay.  And what about the soil units next to the box?
17    16:50:44   A.  Right.  I mean, if they're of the clays' nature that I
18    16:50:46   believe they are of, you wouldn't get that transfer pressure
19    16:50:49   which would cause significant -- any stability problems on the
20    16:50:55   protection side.
21    16:50:58   Q.  Anything else on this diagram that you'd like to tell the
22    16:51:02   Court?
23    16:51:03   A.  I think that covers it.
24    16:51:04   Q.  Okay.
25    16:51:06        THE COURT:  Just a minute, please.  Okay.

              JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                     UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
```

1146

```
1   16:51:35  BY MR. WILSON:
2   16:51:35  Q.  Moving on from your Conceptual Illustration of Choosing a
3   16:51:39  Permeable Marsh, what is this, Doctor?  It's Appendix M.
4   16:51:43  A.  What we did -- what I'm showing here is some of the
5   16:51:47  ledgers that indicate what the descriptions of that marsh were.
6   16:51:52      THE COURT:  Now, when we talk about Boland Marine --
7   16:51:54  and I'm familiar with the area, both from description with maps
8   16:52:01  and by my own visualization of the area, but -- so Boland
9   16:52:06  Marine would have been where prior to its removal and
10  16:52:11  remediation?
11  16:52:12      THE WITNESS:  Boland Marine is where the north breach
12  16:52:14  is.  It's the property where the north breach is.
13  16:52:16      THE COURT:  So it would be relatively near Southern
14  16:52:19  Scrap, the pumping station, et cetera?
15  16:52:23      THE WITNESS:  Yes.  It's right at the -- it's the
16  16:52:26  first property that used to be owned by Boland Marine as you
17  16:52:33  enter Surekote -- is that the way you pronounce that road,
18  16:52:35  Surekote Road?
19  16:52:36      THE COURT:  Yes.  Surekote, S-U-R-E-K-O-T-E.  We'll
20  16:52:38  both spell it.  But, yes, that would be the first property as
21  16:52:50  you entered.
22  16:52:51      THE WITNESS:  The first property, yes.
23  16:52:51      THE COURT:  Okay.  Thank you.
24  16:52:53      THE WITNESS:  And what this is I've got a number
25  16:52:57  of the logs that were utilized to assess what the marsh
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1147

```
1   16:53:01  material consisted of that were described by the people that
2   16:53:06  saw the soils as they came out of the ground.
3   16:53:09      And this one report here is from WGI, and I have
4   16:53:13  some of those logs attached that you can see for yourself what
5   16:53:18  they say the soil is.
6   16:53:21  Q.  And --
7   16:53:21  A.  These are just classifications of patterns that they use
8   16:53:27  on their ledger of their boring logs.
9   16:53:31  Q.  And that's the page that follows Appendix M; correct?
10  16:53:34  A.  Yes.
11  16:53:35  Q.  And you called it geological fill patterns?
12  16:53:38  A.  Yes.
13  16:53:38  Q.  It talks about soil types; correct?
14  16:53:43  A.  It just gives you a symbol.  If you wanted to quickly look
15  16:53:46  at a log, you could say, okay, we've got all this kind of
16  16:53:50  material down there, and it gives you a quick-glance feel for
17  16:53:56  what you have.
18  16:53:57  Q.  And that's on the boring records themselves?
19  16:53:59  A.  Yes.
20  16:54:00  Q.  Okay.
21  16:54:02  A.  And this is a common classification system that's used by
22  16:54:10  geotechnical engineers, and you can see that there's a column
23  16:54:15  here.  This column.  It gives you letters.
24  16:54:17  Q.  You're referring to the group symbols, Doctor?
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1148

```
1   16:54:20  A.  Group symbols, okay.
2   16:54:21      And if you look next to them, it describes what kinds
3   16:54:24  of soil it is.  So that's -- you know, that's a key to someone,
4   16:54:27  you know, of what type of soil it is, and then you can identify
5   16:54:31  the general properties in terms of permeability as related to
6   16:54:36  that soil type.
7   16:54:39  BY MR. WILSON:
8   16:54:39  Q.  And that's a generally accepted practice by geotechnical
9   16:54:44  engineers, Doctor?
10  16:54:44  A.  Yes.  I mean, there's established permeability tables in
11  16:54:48  almost virtually every geotechnical textbook that gives you
12  16:54:56  permeability values for different types of soils.
13  16:55:01  Q.  Okay.
14  16:55:01  A.  This is one of these logs --
15  16:55:03  Q.  This is referring to log 81 -- I think it's L; is that
16  16:55:11  correct?
17  16:55:12  A.  Or "I."  I think it's an "I."
18  16:55:16  Q.  All right.  And on the left here, you see -- can you read
19  16:55:21  that, Doctor?
20  16:55:23  A.  On the left?
21  16:55:24      THE COURT:  That log goes by depth, of course;
22  16:55:27  correct?
23  16:55:27      THE WITNESS:  Yes.  Yes.  And if you remember, Your
24  16:55:31  Honor, the number gives you a clue where the hole is.  81 would
25  16:55:35  be the northern row; right?  And "I" would be out to the west.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1149

```
1   16:55:38  You know, "A" starts right next to the floodwall.
2   16:55:46      MR. WILSON:  If the Court would give me a moment.
3   16:55:51  Earlier we talked about the Boland Marine borehole map.
4   16:55:58      THE COURT:  That's correct.
5   16:55:59      MR. WILSON:  And it kind of looked like a ship with
6   16:56:02  dots on it.
7   16:56:03      THE COURT:  The Court recalls it well.  We talked
8   16:56:06  about the one that moved.
9   16:56:10      MR. WILSON:  That's correct.  It's 81A.
10  16:56:12      THE COURT:  Right, 81A.
11  16:56:14  BY MR. WILSON:
12  16:56:14  Q.  Okay.  And so what you have here is 81I.  That was your
13  16:56:21  testimony; right, Doctor?
14  16:56:22  A.  Yes.
15  16:56:23  Q.  And on the bottom, it says "WGI-357981"; correct?
16  16:56:28  A.  Yes.
17  16:56:29  Q.  And then it has the graphics, a column of graphics, that
18  16:56:34  would describe the type of soil units --
19  16:56:36  A.  Yes.
20  16:56:37  Q.  -- is that correct?
21  16:56:37  A.  Yes.
22  16:56:38  Q.  And as -- just for my own edification, a soil unit is a
23  16:56:43  soil category?
24  16:56:46  A.  Basically, what this is is --
25  16:56:49      THE COURT:  A broad classification, generally:  Clay,
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1150

1  16:56:53   marsh, et cetera?

2  16:56:54   THE WITNESS:  Right.

3  16:56:54   THE COURT:  I understand.  And it could be gradients

4  16:56:59   within that, but I understand it.

5  16:57:01   THE WITNESS:  Very good.  So you would take this log,

6  16:57:03   and you would try to interpret where the layer changes are.

7  16:57:06   You know, within general ranges of soil.  You know, you're not

8  16:57:10   going to have this.  You know, when you're trying to assess a

9  16:57:13   layer, you're going to have variations.

10  16:57:16   So if you could flip to the next page, I have an

11  16:57:21   "M" marked here as where we identified -- or I have identified

12  16:57:26   marsh.  And you can see it's called a lean clay.  And it's

13  16:57:30   gray, soft.

14  16:57:31   THE COURT:  Now, we're at a different depth here than

15  16:57:37   we were at the page -- the first --

16  16:57:41   MR. WILSON:  The prior page?  Yeah, that would be --

17  16:57:41   we're on the same boring log, but this is actually --

18  16:57:45   THE COURT:  The same boring log.  And I don't mean to

19  16:57:46   insult the log.  I don't mean to insult the log.  It's

20  16:57:48   certainly not boring.  But it is a boring log.  Go ahead.

21  16:57:52   BY MR. WILSON:

22  16:57:52   Q.  And now we're at page 2 of 3 of the log boring 81I;

23  16:57:57   correct?

24  16:57:58   A.  That's correct.

25  16:57:58   THE COURT:  And this would be depths between --

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1151

1  16:58:02   THE WITNESS:  That's correct.

2  16:58:02   THE COURT:  -- 9 and 18?

3  16:58:05   THE WITNESS:  Yeah.  It starts at 14 feet.  You can

4  16:58:07   see I have a line here.  This represents --

5  16:58:07   THE COURT:  Oh, 14 feet, okay.  Oh, I see so the line

6  16:58:09   represents where it starts?  I got you.

7  16:58:14   THE WITNESS:  Yes.  And these lines are all

8  16:58:16   determined in the field when they see changes when they're

9  16:58:19   taking samples.

10  16:58:20   BY MR. WILSON:

11  16:58:20   Q.  Okay.

12  16:58:21   A.  And you can see here's the geologist's name down here.  I

13  16:58:25   can't actually read it, but you can see that's his name.

14  16:58:27   THE COURT:  I can't read it either unless we blow it

15  16:58:29   up.  All I can read is the lean clay.

16  16:58:31   THE WITNESS:  But he's the one that described it.

17  16:58:31   THE COURT:  It says "lean clay" and then other

18  16:58:32   stuff -- words behind it.  I can't...

19  16:58:35   MR. WILSON:  Well, I'm going to ask the doctor to

20  16:58:37   read that because I want to know why he assigned a marsh to a

21  16:58:40   lean clay.  And if I may approach, Your Honor and hand --

22  16:58:45   BY MR. WILSON:

23  16:58:45   Q.  Can you read what that says?

24  16:58:47   THE COURT:  Is there any way that we can blow that up

25  16:58:48   to make it easier?  Maybe put it on the ELMO.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1152

1  16:59:22   (OFF THE RECORD)

2  16:59:23   THE COURT:  Okay.  There you go.  Somebody got it up

3  16:59:25   to where I can read it.  Okay.  One second, please.

4  16:59:29   (OFF THE RECORD)

5  17:00:07   THE COURT:  Okay.  I can read it, sir.  And I think

6  17:00:09   the doctor can read it as well.

7  17:00:11   THE WITNESS:  Yes.  So, I mean, it tells -- it tells

8  17:00:14   you what the geologist described.

9  17:00:16   And what we were looking for was an increase in

10  17:00:19   organics to identify where that marsh would be, and you can see

11  17:00:22   here it's saying "High organic content," and that is a lean

12  17:00:27   clay.  Which means, as I mentioned before, that the WGI borings

13  17:00:32   were indicating without doing any actual laboratory tests that

14  17:00:37   the clays were coarser than on the protection side.  This is a

15  17:00:43   good example of that, calling it a lean clay.

16  17:00:47   Okay.  A lean clay means it's a coarser clay.

17  17:00:50   It's not as plastic as, for example, a fat clay.  And you can

18  17:00:57   tell that by this symbol, the "CL."  The "CL," if you went back

19  17:01:01   to that chart, it would give you a description of what that

20  17:01:06   type of soil is.

21  17:01:09   So you can again see the next layer that they

22  17:01:12   describe is a dark gray.  Dark gray is usually a color

23  17:01:17   associated with organics.  And it shows increasing organics.

24  17:01:22   THE COURT:  If we translated this to your

25  17:01:25   figure 5.12, it would be in the -- that would be in the

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1153

1  17:01:28   marsh -- would we be in the marsh layer yet?

2  17:01:33   THE WITNESS:  Yes.  In fact, if you want, we can go

3  17:01:35   back to the cross-section and show you where that boring is if

4  17:01:37   you want.

5  17:01:37   THE COURT:  I think I can figure it out, but it might

6  17:01:39   be helpful later on.  But the thing that clues you in when we

7  17:01:43   say "higher organic content," as a geotechnical engineer, you

8  17:01:49   something -- something's different.

9  17:01:51   THE WITNESS:  Right.  And you'll have other -- you

10  17:01:53   know, you have to look at the adjacent borings, and you see a

11  17:01:57   continuity, you know, of the organic content.

12  17:01:59   And in these kind of deltaic environments, you

13  17:02:04   get a rapid change of things, so you can -- you'll get

14  17:02:07   variations you might find locally.  Higher up, there might be

15  17:02:12   an organic layer.  But it's not continuous.  It's not this

16  17:02:17   persistent layer that we've been talking about.

17  17:02:19   This continues onto the next page.

18  17:02:21   BY MR. WILSON:

19  17:02:21   Q.  Before we go there, I wanted to ask you a question.  Now,

20  17:02:25   you've designated this as marsh; correct?

21  17:02:27   A.  Yes.

22  17:02:28   Q.  Now, is this a permeable -- a very permeable marsh?  What

23  17:02:33   is it?

24  17:02:34   A.  Well, I mean, it's a clay.  It's a lean clay.  It's not

25  17:02:38   going to very permeable.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1154

1  17:02:41  Q.  Thank you.  Did you want to go --

2  17:02:42  THE COURT:  A fat clay would be --

3  17:02:44  THE WITNESS:  Even less.

4  17:02:45  THE COURT:  -- even less permeable?  Of course.

5  17:02:47  THE WITNESS:  Yes.

6  17:02:47  BY MR. WILSON:

7  17:02:48  Q.  Did you want to go through all of these or --

8  17:02:50  A.  We can finish this boring and --

9  17:02:52  Q.  And then move -- okay.

10  17:02:56  MR. WILSON:  Bob, if I could go --

11  17:02:58  THE WITNESS:  If the Court would like to see more

12  17:03:00  examples, I've got a number of them in here.

13  17:03:04  BY MR. WILSON:

14  17:03:05  Q.  We've now moved to page 3 of 3 of 81I.

15  17:03:08  A.  Right.  And you can see here, again, it's a continued unit

16  17:03:13  with organics, and then you've got -- it's actually got so much

17  17:03:18  organic that they're saying it's an organic rich clay.  Okay.

18  17:03:23  And it's called an "OL."  The "O" represents "organic."

19  17:03:29  THE COURT:  Okay.  What would be interesting to me is

20  17:03:32  if you could compare where the, let's say, organic rich clay

21  17:03:39  started on figure 5.12.  Can you do that?

22  17:03:43  THE WITNESS:  If we went back to the cross-section

23  17:03:46  that shows --

24  17:03:48  BY MR. WILSON:

25  17:03:48  Q.  This one or --

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1155

1  17:03:49  A.  No, no.  Go back even further where it shows that 1/1

2  17:03:54  section.  You remember that?

3  17:03:55  THE COURT:  Yes.

4  17:03:55  THE WITNESS:  Because you'll see that boring -- you

5  17:03:57  should see that boring on there.

6  17:03:58  THE COURT:  Oh, I see.  You mean the one -- the

7  17:03:59  Boland boring.

8  17:04:00  MR. WILSON:  The one that looks like a boat with a

9  17:04:02  bunch of circles.

10  17:04:04  THE WITNESS:  You know where all the holes are shown

11  17:04:04  to --

12  17:04:06  THE COURT:  Yes.

13  17:04:06  THE WITNESS:  Then you can see where that hole is

14  17:04:06  located.

15  17:04:07  THE COURT:  Let's go back to that because I might

16  17:04:09  have one question about it.

17  17:04:10  BY MR. WILSON:

18  17:04:10  Q.  Okay.  Are you referring to this one, Doctor?  It's got a

19  17:04:13  red line right there.

20  17:04:18  A.  It kind of looks like that from here, but I can't see it

21  17:04:22  very well.

22  17:04:23  Q.  Let me see if I can put it in the ELMO.

23  17:04:26  A.  There you go.

24  17:04:26  Q.  Is that what you're referring to?

25  17:04:28  A.  Yes.  So you can see where 81A is.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1156

1  17:04:33  THE COURT:  And in reference to the floodwall.

2  17:04:35  THE WITNESS:  Yes.  Here's "I" and here's that

3  17:04:37  section we were drawing.  So, you know, that's where you would

4  17:04:41  expect to see that organic.  I think we saw it at 14 feet.

5  17:04:45  THE COURT:  Okay.

6  17:04:45  THE WITNESS:  So we would identify that as 14-foot

7  17:04:48  depth as where that marsh layer would start, at that location.

8  17:04:53  THE COURT:  Just to make sure we are oriented

9  17:04:55  properly and for the record, the canal side would be?

10  17:04:58  THE WITNESS:  The left side.

11  17:04:59  THE COURT:  The left side.

12  17:05:01  THE WITNESS:  Right.

13  17:05:01  BY MR. WILSON:

14  17:05:02  Q.  Doctor, this line right here, what does that represent?

15  17:05:06  A.  That's the --

16  17:05:08  Q.  The one that's attached to 9A at the end.

17  17:05:10  A.  That's the floodwall --

18  17:05:12  Q.  Okay.

19  17:05:12  A.  -- as it goes north.

20  17:05:14  Q.  The 1980 floodwall, Doctor?

21  17:05:16  A.  Well, that's the -- it was actually constructed after --

22  17:05:18  let's say post-1980, yeah.

23  17:05:21  Q.  And the line that has 77A on it, okay, that is the 1969

24  17:05:30  levee construction?

25  17:05:32  A.  Yes.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1157

1  17:05:33  Q.  Okay.  And we're referring to figure 5.11 of Exhibit 397;

2  17:05:40  correct?

3  17:05:41  A.  Yes.

4  17:05:41  Q.  Okay.  And this -- this one here, 81A, that's not there;

5  17:05:45  right?  That was moved?

6  17:05:48  A.  No.  81A is there.  We were talking -- I'm sorry.  81A,

7  17:05:51  yes, that's correct.

8  17:05:52  Q.  That was moved; right?

9  17:05:54  A.  Yes.

10  17:05:55  Q.  Yes?

11  17:05:55  A.  Yes.

12  17:05:56  Q.  Thank you.

13  17:05:56  THE COURT:  If you could do me one favor, counsel.

14  17:05:58  I'm sorry to interrupt you.  It may be a terrible question, but

15  17:06:04  go back to the one you referred to as the -- the one with the

16  17:06:05  multi -- the number -- any number of borings --

17  17:06:09  MR. WILSON:  The one that looked like a ship?

18  17:06:11  THE COURT:  The ship.  Okay.  That one.

19  17:06:12  MR. WILSON:  The boring marine -- Boland Marine

20  17:06:16  boring log.

21  17:06:16  THE COURT:  Boland Marine.  There you go.

22  17:06:18  MR. WILSON:  Okay.  Let me just put it in the ELMO.

23  17:06:22  THE COURT:  I appreciate that, that's helpful.

24  17:06:24  What I wanted to ask you, Doctor, is if we look

25  17:06:28  at this in terms of the breach -- and it may not be a really

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

34  (Pages 1154 to 1157)

## 1158

1  17:06:32  good -- would the breach go through all the numbers, in
2  17:06:38  essence, from 81 to 60 or 60 to 82?
3  17:06:43  THE WITNESS: The breach actually is located here,
4  17:06:48  about this location here.
5  17:06:51  THE COURT: Okay.
6  17:06:52  THE WITNESS: And then south about 200 feet or so.
7  17:07:00  So 81A is up here. What it does is it
8  17:07:02  provides -- you know, you have to know what that -- the water,
9  17:07:05  if it's going to seep from the canal, for example, you have to
10 17:07:09  know what the conditions are of the ground in front of it as
11 17:07:14  it's seeping. If you understand what I'm saying.
12 17:07:19  THE COURT: So the breach -- what we're looking at,
13 17:07:22  just so everybody can understand this, we see the IHNC and
14 17:07:27  Boland Marine, and we're looking at a -- are we looking at a
15 17:07:32  cross-section?
16 17:07:33  THE WITNESS: No. We're looking down, downward.
17 17:07:35  THE COURT: Looking down. A bird's-eye.
18 17:07:38  THE WITNESS: Yes.
19 17:07:38  THE COURT: Looking down along the floodwall, and the
20 17:07:40  floodwall would run at the bottom here.
21 17:07:43  THE WITNESS: Yes. You can see where it says
22 17:07:46  "floodwall," that's their sign.
23 17:07:48  THE COURT: And how many feet of the floodwall are we
24 17:07:51  looking at?
25 17:07:51  THE WITNESS: Well, they're not showing it all, but

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1159

1  17:07:54  it would continue this way.
2  17:07:55  THE COURT: And the breach would have occurred around
3  17:07:58  81?
4  17:07:59  THE WITNESS: Yes.
5  17:08:00  THE COURT: Okay. I've got it.
6  17:08:03  THE WITNESS: Okay.
7  17:08:09  BY MR. WILSON:
8  17:08:10  Q. Okay. So are we finished, Doctor, with boring 81?
9  17:08:16  A. I think so. Unless the Court has a question about it.
10 17:08:19  THE COURT: No, sir.
11 17:08:19  THE WITNESS: Okay.
12 17:08:23  MR. WILSON: Bob, can you skip it ahead to --
13 17:08:26  BY MR. WILSON:
14 17:08:27  Q. Did you want to go through any more of the borings,
15 17:08:30  Doctor?
16 17:08:30  THE WITNESS: Does the Court like to see?
17 17:08:32  THE COURT: I understand. Unless it's essential to
18 17:08:34  part of his opinion, I don't need to see any more. I'm sure
19 17:08:40  you're going to render opinions based on these ultimately.
20 17:08:44  THE WITNESS: Yes. And you have them for your own
21 17:08:46  view if you need them, so....
22 17:08:47  THE COURT: Right.
23 17:08:48  BY MR. WILSON:
24 17:08:48  Q. Doctor, if you want to come back to it, please let me
25 17:08:51  know.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1160

1  17:08:52  MR. WILSON: Bob, can we skip ahead to 115?
2  17:08:59  THE WITNESS: Oh, there's -- I'm sorry. I wanted to
3  17:09:02  point out one other thing so the Court is not confused later
4  17:09:05  on.
5  17:09:06  BY MR. WILSON:
6  17:09:06  Q. Okay.
7  17:09:06  A. The different types of boring logs by different companies.
8  17:09:11  Okay. Let's -- I'm sorry. After -- what's after this?
9  17:09:15  Q. Do you want me to skip ahead?
10 17:09:17  A. Until you see something different, a different type of
11 17:09:19  log, let's just stop.
12 17:09:21  THE COURT: Yeah, it's page 3.
13 17:09:21  THE WITNESS: There's a lot of these, and then
14 17:09:24  there's two different types of logs, other types.
15 17:09:28  MR. WILSON: Bob, if you could go to No. 60.
16 17:09:32  THE WITNESS: Keep going.
17 17:09:33  BY MR. WILSON:
18 17:09:34  Q. Keep going?
19 17:09:35  A. These are all Washington Group International.
20 17:09:39  Q. Oh, I see. There's. 64.
21 17:09:47  A. Okay. These are taken from the plans that were drawn and
22 17:09:53  prepared by the Corps of Engineers for some of their work, and
23 17:09:57  what they would do is they would put the borings for the
24 17:10:01  contractors to see. If you're doing an earthquake, they want
25 17:10:05  to know what kinds of soils they're going to encounter. So

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1161

1  17:10:08  they show the borings on the construction.
2  17:10:10  THE COURT: Is this part of the --
3  17:10:12  MR. WILSON: For the record, this is part of the
4  17:10:13  PowerPoint presentation. It's --
5  17:10:19  BY MR. WILSON:
6  17:10:19  Q. What would you call that drawing, Doctor?
7  17:10:23  A. It's one of the drawings related to the as-builts, you
8  17:10:28  know, that identifies the areas of construction and the type of
9  17:10:31  conditions that you would encounter in terms of soils.
10 17:10:34  Q. And it's a drawing marked H-425157; correct?
11 17:10:42  THE COURT: I see it.
12 17:10:42  BY MR. WILSON:
13 17:10:42  Q. Yes, Doctor?
14 17:10:43  A. Yes. Are we in the right place?
15 17:10:44  Q. My co-counsel is asking me to identify this better.
16 17:11:23  Doctor, maybe you could identify it better for us.
17 17:11:26  A. It's like a cover sheet for a construction plan, and it --
18 17:11:32  those triangles -- or those rectangles indicate drawing numbers
19 17:11:37  for along that section of floodwall.
20 17:11:42  Q. All right. I'm going to see if I can blow up the corner.
21 17:11:48  A. This is only merely here to illustrate where the boring
22 17:11:51  came from -- boring sources came from.
23 17:11:55  THE COURT: Well, I understand that. I know what it
24 17:11:57  was.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**1162**

1  17:11:58   BY MR. WILSON:
2  17:11:59   Q.  All right.  It's the U.S. Army Corps of Engineers?
3  17:12:04   MR. GILBERT:  Page 1 of 15.
4  17:12:05   MR. WILSON:  Thank you.
5  17:12:06   BY MR. WILSON:
6  17:12:06   Q.  Page 1 of 15, for the record.
7  17:12:08   A.  All right.  This is one of the borings that they have in
8  17:12:14   the plans, and you can see that they're identified here at the
9  17:12:21   end.  Okay?  I don't know if you can see the descriptions.
10  17:12:29   THE COURT:  I can see it pretty well.
11  17:12:31   MR. WILSON:  I just wanted to identify that for the
12  17:12:32   record.  It's No. 8, 6 December 1965, and it's station 57 plus
13  17:12:39   32 on the eastern levee.
14  17:12:42   THE WITNESS:  And these bars that you see that go
15  17:12:45   across, if you look in the plans, they have -- they have a
16  17:12:48   chart that gives what these patterns look like.  When you see
17  17:12:53   bars like that, that means it's a fat clay.  And the "O" in the
18  17:12:58   middle means it's organic.  Okay?
19  17:13:01   And then if you look at the descriptions here,
20  17:13:04   it tells you the strength, the color, how the consistency of
21  17:13:11   the soil is in terms of its softness in soft, medium, stiff and
22  17:13:16   this gives you moisture content.
23  17:13:19   But the thing that we're trying to show here is
24  17:13:22   the nature of the marsh layer.
25  17:13:24   THE COURT:  And your point was you wanted to show the

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**1164**

1  17:14:51   that it has organic content in it.
2  17:14:54   Q.  Okay.  And you're referring to the summary of laboratory
3  17:14:57   tests; is that correct?
4  17:14:59   A.  Yes.
5  17:15:00   Q.  Project U.S. Army Corps of Engineers?
6  17:15:03   A.  Right.
7  17:15:03   Q.  And that's for the levee at issue in this case; correct?
8  17:15:11   A.  Yes.  These are -- these last two are either on the levee
9  17:15:14   itself or -- I'm sorry, on the toe of the levee.  So they're on
10  17:15:18   the protection side.
11  17:15:30   Q.  Keep going.
12  17:15:31   A.  I think that's the three types that we have.
13  17:15:33   Q.  Okay.  And this on the bottom left-hand corner, it's the
14  17:15:53   Eustis Engineering Company?
15  17:15:57   A.  Yes.  They're a company down here.  I'm familiar with
16  17:15:59   them.  They do a lot of -- they did a lot of the Corps work for
17  17:16:01   many, many, many years.
18  17:16:03   Q.  And this is the second page of what we just looked at;
19  17:16:07   correct?
20  17:16:07   A.  Yes.
21  17:16:08   Q.  Okay.  One more.
22  17:16:18   A.  We're back into the WGI borings.
23  17:16:22   MR. WILSON:  So, Bob, if we could move ahead to 116.
24  17:16:29   THE WITNESS:  Just so the Court is aware, the first
25  17:16:32   group that you see in this PowerPoint, where we have the WGI,

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**1163**

1  17:13:26   Court different -- not the same log methodology or the same
2  17:13:31   type of log as I looked at earlier?
3  17:13:34   THE WITNESS:  Right.  And if you remember, these were
4  17:13:36   done by the Corps.  There was testing done.  Okay?  These are
5  17:13:45   more exact logs.  Even though there's not verbal -- you know,
6  17:13:46   it's not typed out, the description.  But they did laboratory
7  17:13:50   tests.  You know, here's some strength values, your moisture
8  17:13:53   content.  They did a more detailed job of identifying what that
9  17:13:56   soil consists of.
10  17:13:57   THE COURT:  All right.
11  17:13:59   BY MR. WILSON:
12  17:13:59   Q.  And you reviewed a number of different borings done by a
13  17:14:03   number of different people; is that correct?
14  17:14:05   A.  Yes.  I mean, this is another type, and I just wanted the
15  17:14:08   Court to understand what -- how to interpret that log.
16  17:14:13   Q.  Okay.  Approximately how many borings did you look at,
17  17:14:17   Doctor?
18  17:14:19   A.  I want to say about 180 borings.
19  17:14:22   Q.  And if we could go to the next slide.
20  17:14:28   A.  Here's another -- it's the same thing, but it's just in
21  17:14:29   table format.  Here's the marsh layer.
22  17:14:32   And you see the "CH" here, "CHO."  Okay.  If you went
23  17:14:37   back to that chart that I told you about, that unified
24  17:14:42   classification chart with the symbols, and if you looked at CH,
25  17:14:46   that would be a fat clay.  Okay.  And the "O" after it means

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**1165**

1  17:16:35   and then we have borings from other agencies or parties, are
2  17:16:38   from the north breach.
3  17:16:39   THE COURT:  I understand.
4  17:16:40   THE WITNESS:  And then we start again with the south
5  17:16:42   breach with the WGI, and there's borings --
6  17:16:45   THE COURT:  The sequential -- we go to the various --
7  17:16:49   the borings in each, starting with WGI, so on, and then again
8  17:16:53   the WGI and so on?
9  17:16:56   THE WITNESS:  Exactly.
10  17:16:59   THE COURT:  I gotcha.
11  17:17:01   THE WITNESS:  Okay.
12  17:17:02   BY MR. WILSON:
13  17:17:02   Q.  What is this, Doctor?  It says, "Peated Marsh Permeability
14  17:17:07   Values."  It's designated as figure 5.25 of Exhibit 397.
15  17:17:13   A.  This is a chart that was prepared by the Corps of
16  17:17:14   Engineers.  This has in it values that they measured, and this
17  17:17:18   is the premise of their conclusion that the marsh is not very
18  17:17:22   permeable.
19  17:17:28   First off we have here, so the Court understands --
20  17:17:31   Q.  I want to stop you.  Who prepared this?
21  17:17:34   A.  This was prepared by IPET, I'm sorry.  I think I said the
22  17:17:38   Corps, but there's a lot of Corps people in IPET.
23  17:17:44   So what we have here is a chart on this side that
24  17:17:48   gives a permeability rating.  Okay?  And each line represents
25  17:17:55   tenfold.  So if you have a point here and a point here, this

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1166

| | |
|---|---|
| 1 | 17:17:58    means that this point is ten times slower seepage than this |
| 2 | 17:18:04    point.  So it's not an arithmetic scale is what I'm trying to |
| 3 | 17:18:10    point out. |
| 4 | 17:18:11        So these diamonds here that we have are plotted |
| 5 | 17:18:13    points that the Corps took to illustrate what a peat might have |
| 6 | 17:18:19    as permeability.  And these triangular points are what they are |
| 7 | 17:18:24    saying is New Orleans marsh, okay, which they're saying is not |
| 8 | 17:18:29    peat.  Okay? |
| 9 | 17:18:29        Then you can see that the variation in the |
| 10 | 17:18:31    permeabilities for the IPET New Orleans marshes goes down |
| 11 | 17:18:36    significantly compared to these peat permeabilities. |
| 12 | 17:18:42        THE COURT:  When you say it's not arithmetic, you |
| 13 | 17:18:47    mean it's more geometric or it's -- explain what you mean when |
| 14 | 17:18:48    you say it's not arithmetic. |
| 15 | 17:18:53        THE WITNESS:  It's like a power -- do you know what a |
| 16 | 17:18:55    power scale is? |
| 17 | 17:18:56        THE COURT:  I understand. |
| 18 | 17:18:57        THE WITNESS:  It's like a -- okay.  This is -- |
| 19 | 17:19:00        THE COURT:  Is it exponential, rather than geometric, |
| 20 | 17:19:01    something like that? |
| 21 | 17:19:04        THE WITNESS:  Yes, it's more exponential. |
| 22 | 17:19:07        THE COURT:  Right.  I understand.  We'll leave it at |
| 23 | 17:19:08    that.  That's probably the limit of the Court's understanding. |
| 24 | 17:19:11        THE WITNESS:  Yes.  For example, here you would |
| 25 | 17:19:12    have -- minus 4 means that you have point three zeros and then |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1168

| | |
|---|---|
| 1 | 17:20:27        THE COURT:  A five-minute break would probably morph |
| 2 | 17:20:31    into the break of the day.  It's 5:20, and we will let you |
| 3 | 17:20:36    resume in the morning at 9:00 sharp. |
| 4 | 17:20:39        MR. WILSON:  Thank you, Your Honor. |
| 5 | 17:20:40        THE COURT:  All right.  We're going along fairly well |
| 6 | 17:20:43    according to schedule, it appears.  Does that plaintiff agree? |
| 7 | 17:20:46        MR. WILSON:  I believe so.  I may be a number of |
| 8 | 17:20:47    hours with the doctor tomorrow, and I expect his |
| 9 | 17:20:51    cross-examination might be lengthy. |
| 10 | 17:20:57        But overall, how are we doing, Mr. Seymour? |
| 11 | 17:21:00        MR. SEYMOUR:  Plaintiffs expect to rest either at the |
| 12 | 17:21:01    end of day tomorrow or very early on Wednesday. |
| 13 | 17:21:04        THE COURT:  Okay. |
| 14 | 17:21:06        MR. SEYMOUR:  We discussed that with the defense, and |
| 15 | 17:21:07    we're all on the same page. |
| 16 | 17:21:08        THE COURT:  I'm glad the defendant knows that so you |
| 17 | 17:21:10    can be prepared.  Thank you very much for doing that. |
| 18 | 17:21:14        MR. SEYMOUR:  Thank you, Your Honor. |
| 19 | 17:21:15        THE COURT:  All right.  We are in recess until |
| 20 | 17:21:17    tomorrow at 9:00. |
| 21 | 17:21:19        (WHEREUPON, the proceedings were concluded.) |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1167

| | |
|---|---|
| 1 | 17:19:19    a "1." |
| 2 | 17:19:20        THE COURT:  I've got the general concept.  All right. |
| 3 | 17:19:23    BY MR. WILSON: |
| 4 | 17:19:23    Q.  You're referring to the left-hand column of figure 5.25; |
| 5 | 17:19:26    correct? |
| 6 | 17:19:26    A.  Yes. |
| 7 | 17:19:27        THE COURT:  So you mean the ultimate point being |
| 8 | 17:19:30    that, according to this diagram, that Louisiana -- New Orleans |
| 9 | 17:19:34    marsh, I should say, is far less permeable substantially -- |
| 10 | 17:19:40        THE WITNESS:  Yes. |
| 11 | 17:19:40        THE COURT:  -- less permeable, than the California |
| 12 | 17:19:44    delta peat? |
| 13 | 17:19:45        THE WITNESS:  Yes. |
| 14 | 17:19:46    BY MR. WILSON: |
| 15 | 17:19:47    Q.  Correct.  Thank you. |
| 16 | 17:19:49    A.  Yes.  And this is what they used to determine their |
| 17 | 17:19:55    permeabilities.  They took their own laboratory values that |
| 18 | 17:19:59    they had tested on the marsh in New Orleans.  And I used the |
| 19 | 17:20:05    same values that -- in the range of these values that are given |
| 20 | 17:20:11    in this chart. |
| 21 | 17:20:13        Unless you're -- unless I did have a peat layer, Your |
| 22 | 17:20:17    Honor, I would put an appropriate value for a peat layer. |
| 23 | 17:20:21        THE COURT:  Yes. |
| 24 | 17:20:21        MR. WILSON:  Okay.  I hate to ask this of Your Honor. |
| 25 | 17:20:24    Could I take a five-minute break? |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1169

| | |
|---|---|
| 1 | 17:21:19        ***** |
| 2 | 17:21:19        CERTIFICATE |
| 3 | 17:21:19        I, Jodi Simcox, RMR, FCRR, Official Court Reporter |
| 4 | 17:21:19    for the United States District Court, Eastern District of |
| 5 | 17:21:19    Louisiana, do hereby certify that the foregoing is a true and |
| 6 | 17:21:19    correct transcript, to the best of my ability and |
| 7 | 17:21:19    understanding, from the record of the proceedings in the |
| 8 | 17:21:19    above-entitled and numbered matter. |
| 9 | 17:21:19 | |
| 10 | 17:21:19 | |
| 11 | 17:21:19        S/ Jodi Simcox, RMR, FCRR |
| 12 | 17:21:19        Jodi Simcox, RMR, FCRR |
| 13 | 17:21:19        Official Court Reporter |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA