1287

1    UNITED STATES DISTRICT COURT
2    EASTERN DISTRICT OF LOUISIANA
3
4
5    IN RE:  KATRINA DREDGING        *    Civil Action
     LIMITATION ACTION              *
6    CONSOLIDATED LITIGATION        *    No. 05-4182
                                    *
7                                   *    Section K(2)
     PERTAINS TO:                   *
8    BARGE                          *    New Orleans, Louisiana
                                    *
9    MUMFORD, C.A. NO. 05-5724, AS  *    June 29, 2010
     TO PLAINTIFFS JOSEPHINE        *
10   RICHARDSON AND HOLLIDAY        *    Afternoon Session
     JEWELERS, INC., ONLY           *
11   AND                            *
     BENOIT, C.A. NO. 06-7516, AS   *
12   TO PLAINTIFFS JOHN ALFORD AND  *
     JERRY ALFORD ONLY              *
13   * * * * * * * * * * * * * * *
14                    DAY SIX
                BENCH TRIAL BEFORE THE
15          HONORABLE STANWOOD R. DUVAL, JR.
             UNITED STATES DISTRICT JUDGE
16
17   APPEARANCES:
18   For the Plaintiffs:      Best Koeppel
                              BY:  LAURENCE E. BEST, ESQ.
19                            BY:  PETER S. KOEPPEL, ESQ.
                              2030 St. Charles Avenue
20                            New Orleans, Louisiana 70130
21
22   For the Plaintiffs:      Law Offices of Brian A. Gilbert
                              BY:  BRIAN A. GILBERT, ESQ.
23                            2030 St. Charles Avenue
                              New Orleans, Louisiana  70130
24
25
         JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA

## 1288

APPEARANCES:

For the Plaintiffs:     Wiedemann & Wiedemann
                        BY:  KARL WIEDEMANN, ESQ.
                        BY:  LAWRENCE WIEDEMANN, ESQ.
                        821 Baronne Street
                        New Orleans, Louisiana  70113

For the Plaintiffs:     Patrick J. Sanders, LLC
                        BY:  PATRICK J. SANDERS, ESQ.
                        3316 Ridgelake Drive
                        Suite 100
                        Metairie, Louisiana  70002

For the Plaintiffs:     Law Office of Richard T. Seymour,
                        P.L.L.C.
                        BY:  RICHARD T. SEYMOUR, ESQ.
                        1150 Connecticut Avenue N.W.
                        Suite 900
                        Washington, D.C.  20036-4129

For the Plaintiffs:     Khorrami, Pollard & Abir, LLP
                        BY:  SHAWN KHORRAMI, ESQ.
                        444 S. Flower Street
                        33rd Floor
                        Los Angeles, California  90071

For the Plaintiffs:     Wilson, Grochow, Druker & Nolet
                        BY:  LAWRENCE A. WILSON, ESQ.
                        233 Broadway
                        5th Floor
                        New York, New York  10279

For the Defendant:      Chaffe, McCall, L.L.P.
                        BY:  DEREK A. WALKER, ESQ.
                        BY:  CHARLES P. BLANCHARD, ESQ.
                        1100 Poydras Street, Suite 2300
                        New Orleans, Louisiana 70163
                        JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                        UNITED STATES DISTRICT COURT
                        EASTERN DISTRICT OF LOUISIANA

## 1289

APPEARANCES:

For the Defendant:      Goodwin Procter, L.L.P.
                        BY:  JOHN ALDOCK, ESQ.
                        BY:  MARK RAFFMAN, ESQ.
                        BY:  ADAM CHUD, ESQ.
                        BY:  KIRSTEN ROBBINS, ESQ.
                        BY:  ERIC I. GOLDBERG, ESQ.
                        901 New York Avenue, NW
                        Washington, D.C. 20001

For the Defendant:      Sutterfield & Webb
                        BY:  DANIEL A. WEBB, ESQ.
                        650 Poydras Street, Suite 2715
                        New Orleans, Louisiana 70130

For the Defendant:      Lafarge North America, Inc.
                        BY:  PETER KEELEY, ESQ.
                        12950 Worldgate Drive
                        Herndon, Virginia  20170

Official Court Reporter:    Jodi Simcox, RMR, FCRR
                            500 Poydras Street
                            Room HB-406
                            New Orleans, Louisiana 70130
                            (504) 589-7780

Proceedings recorded by mechanical stenography, transcript
produced by computer.

                        JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                        UNITED STATES DISTRICT COURT
                        EASTERN DISTRICT OF LOUISIANA

## 1290

                    I N D E X

                                                    Page

GENNARO GERALD MARINO

    Direct Examination                             1291
    Cross-Examination                              1301

                        JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                        UNITED STATES DISTRICT COURT
                        EASTERN DISTRICT OF LOUISIANA

## 1291

                    AFTERNOON SESSION
                    (June 29, 2010)

13:02:46               * * * * *
13:39:33        THE DEPUTY CLERK:  All rise.  Court's in session.
13:39:44   Please be seated.
13:39:49        MR. WILSON:  Let's see if I can't wrap this up
13:39:51   quickly, Your Honor.
13:39:56        THE COURT:  Okay.
13:39:57        MR. WILSON:  Bob, could we have slide 235 of
13:39:57   Plaintiff's Exhibit 437?
09:20:43        (WHEREUPON, Gennaro Gerald Marino, having been
09:20:43   previously duly sworn, testified as follows.)
13:39:59        DIRECT EXAMINATION
13:40:02   BY MR. WILSON:
13:40:15   Q.  Okay.  Doctor, when we left on break, you were talking
13:40:20   about some damage deformation to the floodwall at the southern
13:40:26   part of the Industrial Canal's east floodwall.
13:40:33        I'm pointing to the bottom right-hand corner of
13:40:37   slide 235, where the cement I-wall is located, and it actually
13:40:47   looks like there's a white object and then another white object
13:40:51   kind of pointing to the I-wall.  Do you see that area on the
13:40:54   photograph?
13:40:55   A.  Yes.
13:40:55   Q.  Okay.  Is that the deformation on the top of the floodwall
13:41:03   that you were talking about?

                        JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                        UNITED STATES DISTRICT COURT
                        EASTERN DISTRICT OF LOUISIANA

## 1292

1 13:41:03  A.  Yes.  That's scraping on the top of the floodwall.

2 13:41:07  Q.  Okay.

3 13:41:07  A.  And like I stated before our break, that I don't see how

4 13:41:11  you could get scraping on the top of a floodwall like that if

5 13:41:16  the floodwall isn't somewhat vertical and the barge is riding

6 13:41:20  over it.

7 13:41:21  Q.  Okay.

8 13:41:25  THE COURT:  How far would that be from the -- just to

9 13:41:28  orient us -- from where the -- there was a gap we had talked

10 13:41:39  about in earlier testimony, not yours, between one part of the

11 13:41:46  floodwall and another, I think, on the south breach.  I think

12 13:41:50  there was.

13 13:41:51  THE WITNESS:  I think I understand.

14 13:41:51  THE COURT:  If you could just orient us from the far

15 13:41:54  end of the south breach -- from the -- excuse me -- let me be

16 13:41:58  more specific -- from the southernmost end of the south breach,

17 13:42:01  how far is that?  Approximately.  I know you haven't measured

18 13:42:07  that.  I know you're a meticulous person.  So just an estimate.

19 13:42:12  THE WITNESS:  That would be the first panel that's

20 13:42:14  flat on the ground that hasn't been sheared off.

21 13:42:17  THE COURT:  Okay.  So that's immediately adjacent to

22 13:42:20  the area that was sheared off?

23 13:42:22  THE WITNESS:  Exactly.

24 13:42:23  THE COURT:  Okay.  I got it.

25

JODI SIMCOX, RMR, FCRR – OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1293

1 13:42:25  BY MR. WILSON:

2 13:42:25  Q.  And just quickly, Doctor, I'd like to go to slide 237.

3 13:42:31  The Court has already seen this photograph.

4 13:42:36  THE COURT:  True.

5 13:42:38  BY MR. WILSON:

6 13:42:39  Q.  Why did you want to show that to the Court, Doctor?

7 13:42:43  A.  Well, it shows that you, know, the scraping is right up

8 13:42:45  the side of the barge.

9 13:42:46  Q.  Now, you say the side of the barge.  Do you mean the front

10 13:42:49  of the barge?

11 13:42:50  A.  Yes, whatever front -- it could be bow or stern.

12 13:42:55  Q.  All right.  The front side?

13 13:42:57  A.  This would be the side that contacted the sheared wall

14 13:43:00  first.  I mean, that would make sense if you had scrapings up

15 13:43:04  the side of the barge.

16 13:43:07  Q.  Meaning not on the bottom of the barge; correct?

17 13:43:09  A.  Right.

18 13:43:10  Q.  Okay.  And, Doctor, I don't know if the Court needs to see

19 13:43:24  the other photos like this, unless there's a reason you want to

20 13:43:24  show it to the judge?

21 13:43:28  A.  No, that's fine.  Unless the Court has a question.

22 13:43:30  MR. WILSON:  Okay.  Can we move to slide 241, please?

23 13:43:37  BY MR. WILSON:

24 13:43:38  Q.  Doctor, what is this?  It says "Barge Collision at South

25 13:43:43  End of South Breach."

JODI SIMCOX, RMR, FCRR – OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1294

1 13:43:46  A.  What I'm trying to show here is here's the barge after the

2 13:43:51  broadside collision, where the wall has been displaced.

3 13:43:56  Q.  And you're referring to the top of this illustration where

4 13:43:59  the I-wall is bowed in; is that correct?

5 13:44:03  A.  That's correct.

6 13:44:03  Q.  Okay.  And the first -- the barge is here first, up

7 13:44:08  against -- the side of the barge is up against the side of the

8 13:44:11  I-wall, and it's kind of moved in until it hits the land side;

9 13:44:17  correct?

10 13:44:18  A.  That's correct.

11 13:44:18  Q.  Okay.

12 13:44:19  A.  And if you remember the photograph that we looked at

13 13:44:22  just -- just before this, on this end of the -- on this end of

14 13:44:27  the barge is where we saw those scrapes that went up -- up the

15 13:44:32  side of the wall of the barge.

16 13:44:35  Q.  Okay.

17 13:44:35  A.  And these are -- these lines are scrapings on the bottom

18 13:44:40  of the barge.  And so with the barge in this position, it was

19 13:44:46  driven up this direction and scraping along this corner.  This

20 13:44:52  corner would have first contact with the sheared area.  And as

21 13:44:58  its going up, it's rotating this way because of the wind and

22 13:45:02  just the resistance of the shearing.

23 13:45:04  Q.  The resistance of the wall, you mean?

24 13:45:06  A.  Yes.  Shearing up against the wall.

25 13:45:08  Q.  Okay.  And then is it -- go ahead, Doctor, please.

JODI SIMCOX, RMR, FCRR – OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1295

1 13:45:14  A.  And then this notch in the barge, this indentation in the

2 13:45:19  barge is consistent with, you know, the limits of these

3 13:45:22  scrapes.  And, basically, as this rotates, that indentation is

4 13:45:29  where that wall is vertically sheared to the top of the wall,

5 13:45:35  stopping the barge from going this direction.

6 13:45:38  And then from that point, the wall fails, and the

7 13:45:43  flow of the water causes the wall -- causes the barge to come

8 13:45:48  back around and slide back in this direction.

9 13:45:51  Q.  Okay.  You are saying that that indentation was formed on

10 13:45:55  the side of the barge; right?

11 13:45:57  A.  Yes.

12 13:45:58  Q.  Okay.  And actually, you have a notch in the barge there.

13 13:46:00  I didn't see that, okay.

14 13:46:02  And then what happened, Doctor?

15 13:46:06  A.  I thought I explained it, but...

16 13:46:09  Q.  Okay.  I thought we were moving to the bottom part.  Did

17 13:46:11  you explain it and I missed it?

18 13:46:14  A.  Yes.

19 13:46:15  THE WITNESS:  Did the Court understand that?

20 13:46:17  THE COURT:  Yes.

21 13:46:18  BY MR. WILSON:

22 13:46:19  Q.  Okay.  And what is this right here?  It's a little square

23 13:46:22  with a dot on it.

24 13:46:24  A.  I can't see your pointer.

25 13:46:26  THE COURT:  Is that the school bus?

JODI SIMCOX, RMR, FCRR – OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1296

```
1    13:46:27    THE WITNESS:  Yes, that's the school bus.  And then
2    13:46:28    that's the sign, "No Parking" sign.
3    13:46:31         If you look at some of the old photographs,
4    13:46:34    you'll see cars -- a bunch of cars parked in this direction
5    13:46:38    along -- Jourdan Avenue.  I guess they didn't like that.
6    13:46:41    Somebody put up a "No Parking" sign.
7    13:46:44    BY MR. WILSON:
8    13:46:44    Q.  Okay.  All right.  Is there anything else that you wanted
9    13:46:46    to tell the Court about that illustration?
10   13:46:50    A.  No.
11   13:46:58    Q.  Next slide, please.
12   13:47:09    A.  Given the damage characteristics of the wall and the
13   13:47:13    barge, it puts the wall -- it puts the barge, essentially, next
14   13:47:20    to the wall, in the southern direction.
15   13:47:23    Q.  Okay.  Next slide, please.
16   13:47:27         Oh, okay.  Doctor, then there are a number of slides,
17   13:47:31    but we've already seen them -- the Court's already seen them
18   13:47:34    regarding the other damage at other levees throughout the city
19   13:47:38    area.
20   13:47:39    A.  Right.  Right.  I guess I should say a little bit more
21   13:47:42    about that last slide in that, if we had a full breach, that
22   13:47:48    barge going in the southern direction would have to -- it would
23   13:47:52    have to converse or traverse across the entire breach and not
24   13:47:59    get drawn into the breach, if those walls were already
25   13:48:04    collapsed and 195 feet away from where the floodwall was and
              JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                      UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF LOUISIANA
```

## 1297

```
1    13:48:12    the levee already eroded.
2    13:48:15    Q.  So what you're saying, Doctor, is that if the breach was
3    13:48:19    already there, the barge would have got sucked into the open
4    13:48:22    area of the I-wall?
5    13:48:24    A.  Right.  It wouldn't have anything to retain it.  The wall
6    13:48:26    has to be up there to retain it at the southern area.
7    13:48:31    Q.  Okay.  Can we move to slide 249, please?
8    13:48:50    A.  You know, again, if I went through a comparison with the
9    13:48:52    other floodwalls, the things that we would see would be that
10   13:48:58    the concrete panel damage is less intense.
11   13:49:04         Again, you know, the floodwall -- those floodwalls
12   13:49:07    remained in the ground.  There's a regular displacement
13   13:49:11    pattern.  It doesn't have this unusual bowl -- bow shape and
14   13:49:16    then a straight shape.  There's no shearing of a top of the
15   13:49:21    wall or the localized coiling, there's no significant
16   13:49:27    back-scour, and there's no violent rush of water that causes
17   13:49:37    residential homes to be, essentially, wiped out adjacent to the
18   13:49:41    breaches.
19   13:49:45    Q.  Next slide, please.
20   13:49:50    A.  So in summary of my investigation of the south breach, I
21   13:49:55    broke it up -- I broke it up into two slides:  One more related
22   13:50:00    to the surge effects, and then the barge effects.
23   13:50:03    Q.  Next slide, please.
24   13:50:06    A.  So in terms of the -- you know, the surge effects, you
25   13:50:11    know, first off there were three basic areas of wall failure:
              JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                      UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF LOUISIANA
```

## 1298

```
1    13:50:17    Two involved excessive wall displacement; and another, the
2    13:50:23    shearing of the wall.  Two of the failure areas involved
3    13:50:28    yielding or loss of land side support.  These areas were
4    13:50:34    exhibited by the bowing and uniform displacement sections of
5    13:50:43    the wall.
6    13:50:44         Based on the study of the site conditions that we
7    13:50:47    talked about, the cross-sections that were developed -- two for
8    13:50:50    the south and one for the north -- in the failure areas, we
9    13:50:55    examined the effects of the surge.  We looked at the effects of
10   13:51:01    the surge from both a standpoint of seepage and water-loading
11   13:51:05    on the wall and analyzed those and found that it was unlikely
12   13:51:11    that these were the causes of the failure of the wall, and thus
13   13:51:16    the barge impacts were required to cause the wall failure.
14   13:51:21    Q.  Okay.  Next slide, please.
15   13:51:28    A.  These three areas of failure that we've talked about
16   13:51:33    represent three primary areas of collision of the barge.  The
17   13:51:39    floodwall failure characteristics of the other floodwall
18   13:51:44    failures are not consistent with what we see here in terms of a
19   13:51:53    wall exhumed from the ground or a collapsed wall, irregular
20   13:52:00    deformation pattern, and large wall displacements.
21   13:52:04         The shearing of the wall at the south breach, the
22   13:52:07    third collision, is the third collision by the barge which is
23   13:52:15    essentially undisputed.  The barge and the wall damage at the
24   13:52:21    south end indicate that the collision was initiated with a
25   13:52:26    southerly movement of the vessel.  With the southerly movement
              JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                      UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF LOUISIANA
```

## 1299

```
1    13:52:32    of the vessel, this means that the barge was in the position
2    13:52:36    against the wall to the north where the second primary
3    13:52:40    collision occurred in a broadside position.
4    13:52:45         This position is consistent with the uniform
5    13:52:48    displaced floodwall to the east before the second collision.
6    13:52:57    Being in this broadside position next to the wall, the
7    13:53:00    floodwall, the barge would have clearly flowed into the Ninth
8    13:53:05    Ward if the wall had already collapsed and not had struck the
9    13:53:10    end of the breach -- it would have not have struck the end of
10   13:53:14    the breach.
11   13:53:15         Also, consistent with the fact that the wall had not
12   13:53:18    collapsed were the boom sounds uniformly heard prior to any
13   13:53:25    violent flooding.  One of these booms was clearly -- clearly
14   13:53:32    occurred at the south end of the breach where the concrete was
15   13:53:35    shattered and was undisputedly hammered by the barge.
16   13:53:47         Even if the wall was leaning prior to any barge
17   13:53:51    collision, it was -- it was not too great given that there was
18   13:53:58    not any significant flooding prior to the on-rush of water
19   13:54:03    reported.
20   13:54:05         THE COURT:  Just a couple of questions, Doctor.  The
21   13:54:08    boom sound -- and it's been a rather ubiquitous term in this
22   13:54:09    case, but there have been others.  But do you regard the boom
23   13:54:20    sound as, among other things, the sound of the wall collapsing
24   13:54:28    or -- you tell me what you regard it as.
25   13:54:31         THE WITNESS:  I regard it as the impact of the barge
              JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                      UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF LOUISIANA
```

## 1300

1  13:54:33   against -- against the wall.
2  13:54:39        THE COURT:  And I'll leave that to cross-examination.
3  13:54:44   I'm not going to cross-examine him, so -- not too much anyway.
4  13:54:51        MR. WILSON:  Just to follow up on your question, Your
5  13:54:52   Honor.
6  13:54:54   BY MR. WILSON:
7  13:54:54   Q.  Have you worked with breaking concrete?
8  13:54:56   A.  Yes.
9  13:54:57   Q.  Explain to the Court how you -- what you've done.
10 13:55:00   A.  I have done work with the University of Illinois where
11 13:55:04   we've tested large beams, concrete beams, and failed them.
12 13:55:10   Q.  What did they sound like when they failed?
13 13:55:12   A.  Not very loud.  In fact, I had an office in the civil
14 13:55:16   engineering building, and -- which has a large crane bay, and
15 13:55:23   this crane bay is where large-scale testing is done.  And I
16 13:55:28   don't remember ever hearing anything that consisted of the
17 13:55:32   sounds that these witnesses were describing.
18 13:55:58   Q.  Okay.  Doctor, the grinding or a screeching sound could be
19 13:56:03   attributable to a barge scraping against the wall?
20 13:56:07   A.  Right.  It could be that when the barge was in the second
21 13:56:09   collision location, being trapped because of the indentation,
22 13:56:13   it could have been banging up against the wall or rubbing back
23 13:56:18   and forth.
24 13:56:19   Q.  Okay.  And that's your opinion; correct, Doctor?
25 13:56:24   A.  Yes.

          JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                  UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF LOUISIANA

## 1301

1  13:56:24   Q.  And, Doctor, is it your opinion that the barge was a
2  13:56:30   substantial cause of the failure of the north part of the
3  13:56:33   eastern floodwall in the Industrial Canal on August 29th, 2005?
4  13:56:38   A.  Yes.
5  13:56:39   Q.  And the same question, Doctor, with regard to the southern
6  13:56:44   breach of the eastern part of the Industrial Canal floodwall?
7  13:56:49   A.  Yes.
8  13:56:51   Q.  Have all your opinions been with a reasonable degree of
9  13:56:55   geotechnical engineering and civil engineering certainty?
10 13:56:58   A.  Yes.
11 13:57:00        MR. WILSON:  I tender the witness, Your Honor.
12 13:57:04        THE COURT:  Thank you.  Wait a minute.
13 13:57:06        Counsel, you had something?
14 13:57:11        Fine.  Thank you.
15 13:57:13        MR. WILSON:  Thank you.
16 13:57:15        THE COURT:  Cross-examination, sir.  I'll give you
17 13:57:17   time to get up here, of course.
18 13:57:37        I assume, if you want to examine him, reference
19 13:57:40   any of the PowerPoint, the plaintiffs will be kind enough to
20 13:57:44   place that -- put them up on the screen for you.
21 13:57:50        MR. RAFFMAN:  Thank you, Judge.  I believe we're
22 13:57:51   going to be okay.
23 13:58:07        CROSS-EXAMINATION
24 13:58:08   BY MR. RAFFMAN:
25 13:58:08   Q.  Good afternoon, Dr. Marino.

          JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                  UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF LOUISIANA

## 1302

1  13:58:10   A.  Good to see you again, Mark.
2  13:58:13   Q.  Good to see you again too.
3  13:58:15        I'll start where the judge suggested maybe I should
4  13:58:19   start, with the boom sounds.
5  13:58:23   A.  The infamous boom sounds.
6  13:58:25   Q.  The infamous boom sounds.
7  13:58:28        So, Dr. Marino, you have created a table in your
8  13:58:34   report summarizing the sounds that people heard in the
9  13:58:40   neighborhood of the Industrial Canal on the morning of
10 13:58:43   August 29th; right?
11 13:58:45   A.  That's correct.
12 13:58:45   Q.  And that table is Table 3.1?
13 13:58:52   A.  That's correct.
14 13:58:56   Q.  Table 3.1 of your report; right?
15 13:59:00   A.  Yes.
16 13:59:01        MR. RAFFMAN:  This is Plaintiff's Exhibit 397, Table
17 13:59:03   3.1.  May I have 21?
18 13:59:15        THE COURT:  There's four pages.
19 13:59:16        MR. RAFFMAN:  It's four pages long.
20 13:59:18   BY MR. RAFFMAN:
21 13:59:18   Q.  And you've got reports from, I guess, about 16 witnesses
22 13:59:27   who got reports of the sounds that they heard; am I right,
23 13:59:31   Dr. Marino?
24 13:59:32   A.  That's true.
25 13:59:33   Q.  And will you accept my representation that ten of those

          JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                  UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF LOUISIANA

## 1303

1  13:59:36   witnesses used the word "boom" to describe the sound they heard
2  13:59:40   as it's rendered in your report?
3  13:59:42   A.  If you say it was ten.  I haven't counted them.
4  13:59:46   Q.  And --
5  13:59:47   A.  And they may have used other terms.  I noticed that some
6  13:59:51   witnesses used several different terms.
7  13:59:53   Q.  Well, I believe that 12 of the 16 used "boom," and then --
8  14:00:03   I'm sorry.  We have 16 entries, 12 separate witnesses, so the
9  14:00:08   record is clear.  Ten of the 12 used the word "boom"; and the
10 14:00:15   other two, Williams and Sartin, used the word "bang" and
11 14:00:21   "crash."  Will you accept my representation, or do we need to
12 14:00:25   go through it?
13 14:00:26   A.  I remember "crash."  I don't remember the exact witnesses,
14 14:00:28   but I remember "crash."
15 14:00:30   Q.  All right.  You're familiar, Dr. Marino, with reports in
16 14:00:36   IPET of witnesses at other breaches who also used the word
17 14:00:39   "boom" to describe sounds that they heard?
18 14:00:46        MR. WILSON:  I would object, Your Honor, in that, you
19 14:00:49   know, we don't know what happened at those other breaches.
20 14:00:52        THE COURT:  Overruled.
21 14:00:53        THE WITNESS:  Yeah, this one says "Crackling," "loud
22 14:00:57   crackling sound," "boom."
23 14:00:59   BY MR. RAFFMAN:
24 14:00:59   Q.  And that one, I'll represent for the Court, is from
25 14:01:02   Defendant's Exhibit 145, IPET, Volume IV, Appendix Page

          JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                  UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF LOUISIANA

## 1304

1  14:01:07  IV-7-27, and it relates to the London Avenue Canal.

2  14:01:14      MR. RAFFMAN:  23, please.

3  14:01:15  BY MR. RAFFMAN:

4  14:01:17  Q.  Because you've reviewed IPET, you know that witnesses near

5  14:01:20  the 17 Street Canal also used the word "boom" to refer to

6  14:01:25  sounds that they heard in connection with the breaches that

7  14:01:28  occurred at that location; right?

8  14:01:30  A.  That's correct.

9  14:01:31  Q.  And I'm referring now to Defendant's Exhibit 145, IPET

10  14:01:36  volume IV, Appendix Page IV-7-3 where the witness said he

11  14:01:45  heard -- reported hearing a loud "boom" and "rumbling like

12  14:01:49  thunder."

13  14:01:51      I have maybe one or two more of these.

14  14:01:51      MR. RAFFMAN:  24, please.

15  14:01:53  BY MR. RAFFMAN:

16  14:01:53  Q.  And because you read the IPET report, you know that, in

17  14:01:57  the vicinity of the London Avenue Canal, an eyewitness, an

18  14:02:01  elderly lady, said that the rain stopped, when she had heard a

19  14:02:06  loud "boom," and then saw water rising.  At IPET, Defendant's

20  14:02:10  Exhibit 145, Volume IV, Appendix Page IV-7-21.  You've seen

21  14:02:18  that?

22  14:02:18  A.  Yes.

23  14:02:18      MR. RAFFMAN:  And we have one more, 25.

24  14:02:20  BY MR. RAFFMAN:

25  14:02:21  Q.  In the location of the Inner Harbor Navigation Canal west

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1305

1  14:02:26  breaches report, IPET reports that a witness heard a loud

2  14:02:29  "boom," and then the water started quickly rising.  This is

3  14:02:32  from Defendant's Exhibit 145, Volume IV, Appendix Page IV-7-37.  You've

4  14:02:38  seen that report as well; right?

5  14:02:40  A.  That's correct.

6  14:02:40  Q.  And you're not suggesting to the Court that any of those

7  14:02:44  "boom" sounds that were heard at any of those other breaches

8  14:02:50  were created by a barge impact; am I right, Dr. Marino?

9  14:02:55  A.  That's correct.  In fact, at those other breaches, if you

10  14:02:58  remember my testimony this morning, Mark, where I talked about

11  14:03:02  the structural failure, you could see at the joint -- the joint

12  14:03:06  between the concrete and the steel.  The sheet pile; remember

13  14:03:12  that?  You could see that structural failure.

14  14:03:17      And in our case, we don't have that condition.  We

15  14:03:19  don't have that break.  There's no structural failure, unless

16  14:03:24  you're talking about the south end, that, in my mind, would

17  14:03:28  cause that kind of sound.

18  14:03:32  Q.  I guess --

19  14:03:33  A.  Also, some of these witnesses may be hearing what's going

20  14:03:35  on over on the east side.

21  14:03:37  Q.  Well, to be clear, Dr. Marino, none of the witnesses at

22  14:03:41  the 17 Street Canal or none of the witnesses at the London

23  14:03:45  Avenue Canal are hearing booms associated with the east side of

24  14:03:50  the Inner Harbor Navigation Canal; right, Dr. Marino?

25  14:03:55  A.  I'm saying that some are clearly saying that it is related

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1306

1  14:03:59  to these canals, the 17th Street and London.

2  14:04:03  Q.  Okay.

3  14:04:03  A.  There's others that are farther away that may be and not

4  14:04:05  be -- and may not be hearing the "booms" from here.

5  14:04:10  Q.  All right.  Well -- okay.

6  14:04:11  A.  There's, for example, a newspaper article I read about a

7  14:04:17  Ramirez, who was in New Orleans Parish, who talks about hearing

8  14:04:24  "bang" sounds from the barge hitting the wall.

9  14:04:30  Q.  Are you telling the Court, Dr. Marino, that the Court

10  14:04:33  should rely on a newspaper account from -- I'm sorry.

11  14:04:35      THE COURT:  The Court won't, so we can --

12  14:04:38      MR. RAFFMAN:  Judge, I apologize.

13  14:04:42      THE COURT:  I am, shall we say, by the very nature of

14  14:04:44  my profession, intensely skeptical of newspaper articles.

15  14:04:49      MR. RAFFMAN:  Thank you, Your Honor.

16  14:04:50      THE COURT:  Especially if they've even mentioned

17  14:04:53  something about any decision I may have made.  But go ahead.

18  14:04:56  I'm joking.  I'm joking.

19  14:04:57      MR. RAFFMAN:  Well, I promise not to quote you to the

20  14:05:00  press.

21  14:05:01  BY MR. RAFFMAN:

22  14:05:02  Q.  But just to put a cap on this line of inquiry, Dr. Marino,

23  14:05:06  will you agree with me that, based on these eyewitness

24  14:05:09  accounts, you could have a "boom" sound associated with a

25  14:05:12  breach of a floodwall that doesn't require a barge impact?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1307

1  14:05:16  A.  Yes.

2  14:05:26  Q.  Dr. Marino, because we didn't do this earlier, let me ask

3  14:05:29  you a few questions about your professional background and what

4  14:05:32  you do.

5  14:05:34      Am I correct, Dr. Marino, that you've never designed

6  14:05:37  a hurricane levee or protection floodwall for the United States

7  14:05:41  Army Corps of Engineers?

8  14:05:43  A.  No.

9  14:05:46      THE COURT:  It is -- the answer is yes, he's correct,

10  14:05:49  but I know what you mean.  We have the same problem.

11  14:05:51      MR. RAFFMAN:  Thank you, Your Honor.

12  14:05:52      THE WITNESS:  We've had this problem in depositions

13  14:05:54  as well.

14  14:05:56      MR. RAFFMAN:  Dr. Marino and I will, we will

15  14:05:57  communicate.  We will.

16  14:05:59  BY MR. RAFFMAN:

17  14:05:59  Q.  Dr. Marino, am I correct that you've never designed a

18  14:06:02  levee or a floodwall in Louisiana?

19  14:06:04  A.  Yes.

20  14:06:05  Q.  Am I correct that you've never been asked by the United

21  14:06:08  States Army Corps of Engineers to evaluate the safety of a

22  14:06:12  hurricane protection levee or floodwall at any location?

23  14:06:17  A.  Yes.

24  14:06:20  Q.  Am I correct that, before this case, you had never

25  14:06:24  evaluated the safety of a hurricane levee or floodwall in the

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1308

1  14:06:28  state of Louisiana?

2  14:06:35  A.  Yes.

3  14:06:39  Q.  Am I correct that, before this case, you had never

4  14:06:43  evaluated the failure of a hurricane protection structure in

5  14:06:47  hurricane conditions?

6  14:06:50  A.  Yes.

7  14:06:53  Q.  Am I correct that you have never published any articles on

8  14:06:55  the failure of a hurricane protection floodwall or levee?

9  14:07:00  A.  Yes.

10  14:07:02  Q.  And am I correct that you've never taught courses about

11  14:07:05  the design of hurricane protection levees or floodwalls?

12  14:07:13  A.  Yes.

13  14:07:14  Q.  Am I correct that before this case, you had never

14  14:07:16  conducted a seepage study of a hurricane protection system that

15  14:07:20  failed?

16  14:07:27  A.  Yes.

17  14:07:30  Q.  Am I correct that, before this case, you had never

18  14:07:32  conducted a stability analysis or a limit equilibrium analysis

19  14:07:39  of a hurricane protection system that failed?

20  14:07:49  A.  Can you repeat that question?

21  14:07:53  Q.  Sure.  Am I correct that, before this case, you had never

22  14:07:56  conducted a stability analysis or a limit equilibrium analysis

23  14:08:00  of a hurricane protection system that failed?

24  14:08:10  A.  I -- I guess the answer is yes.

25  14:08:18  Q.  Now, you have described yourself as a forensic engineer;

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1309

1  14:08:22  am I right?

2  14:08:24  A.  I may have used that term.

3  14:08:26  Q.  And you don't have any certifications in the field of

4  14:08:30  forensic engineering, do you?

5  14:08:33  A.  No.  I've written a textbook that covers areas of

6  14:08:37  forensics.

7  14:08:43  Q.  You're not a member of the American Society of Civil

8  14:08:45  Engineers Committee on Forensic Engineering; right?

9  14:08:49  A.  That's correct.

10  14:08:49  Q.  And you don't teach forensic engineering courses; right?

11  14:08:53  A.  That's correct.

12  14:08:54  Q.  This case is the first time that you've ever evaluated in

13  14:08:58  any respect the impact of a marine vessel on a fixed structure;

14  14:09:03  right?

15  14:09:04  A.  That's correct.

16  14:09:05  Q.  And you don't hold yourself out as an expert in the

17  14:09:09  reconstruction of marine vessel casualties; right?

18  14:09:18  A.  That's correct.

19  14:09:23  Q.  All right.  You mentioned a textbook.  Am I right that

20  14:09:28  your textbook is called Earthquake Damage:  Inspection,

21  14:09:31  Evaluation, and Repair?

22  14:09:33  A.  That's correct.

23  14:09:39  Q.  Am I right that all of the work you've done in connection

24  14:09:42  with the breaches at the Inner Harbor Navigation Canal has been

25  14:09:48  performed for the plaintiffs' lawyers in this case?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1310

1  14:09:51  A.  Yes.

2  14:09:52  Q.  And your work has been performed purely for the purpose of

3  14:09:56  providing expert evidence or testimony in litigation?

4  14:10:06  A.  I was asked to perform an investigation of what I thought

5  14:10:08  the likely causes were, and I went about an independent

6  14:10:11  investigation to do that.

7  14:10:27  Q.  And as you understand it, the purpose of the investigation

8  14:10:29  you undertook was to assist the plaintiffs' lawyers in either

9  14:10:35  presenting evidence or, at least, evaluating or developing a

10  14:10:41  litigation case; correct?

11  14:10:45  MR. WILSON:  Objection, Judge, compound.

12  14:10:50  THE COURT:  Okay.  The question is:  "As you

13  14:10:55  understand, the purpose of the investigation you undertook was

14  14:10:58  to assist the plaintiffs' lawyers in, at least, evaluating or

15  14:11:04  developing a litigation case; correct?"  I'm going to allow the

16  14:11:07  question.

17  14:11:09  MR. WILSON:  Well, I also object to "developing" --

18  14:11:12  THE COURT:  Whenever you object, you stand.

19  14:11:14  MR. WILSON:  I'm sorry, Your Honor.

20  14:11:16  THE COURT:  And the mic picks you up better, and I

21  14:11:16  know you are objecting --

22  14:11:16  MR. WILSON:  I apologize.

23  14:11:16  THE COURT:  -- and who it comes -- that's all right.

24  14:11:19  MR. WILSON:  I would also object to the term

25  14:11:21  "developing a litigation case."

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1311

1  14:11:25  THE COURT:  That is certainly, I guess, what's good

2  14:11:29  for the goose is good for the gander.  I will assume, then,

3  14:11:33  that all your experts developed a litigation case as well.  I

4  14:11:36  don't think we discern one expert from another even though they

5  14:11:39  may have different experiences.  So maybe the word "develop" is

6  14:11:44  infused with something else.  I'm not sure.

7  14:11:48  MR. RAFFMAN:  I actually don't --

8  14:11:49  THE COURT:  "Developed a litigation case."

9  14:11:51  MR. RAFFMAN:  I don't mean to impart any sinister

10  14:11:54  meaning, Judge.

11  14:11:56  THE COURT:  Then I'm going to allow it.

12  14:11:56  MR. RAFFMAN:  All I'm trying to do is to distinguish

13  14:11:58  what this expert has done from other experts who may testify

14  14:12:00  who've reached their opinions before they were ever retained to

15  14:12:06  do any litigation.

16  14:12:06  THE COURT:  That's fair enough.

17  14:12:07  Go ahead.  You can answer the question.

18  14:12:07  BY MR. RAFFMAN:

19  14:12:08  Q.  You reached your opinions in this case after you were

20  14:12:12  retained by lawyers in litigation; right?

21  14:12:14  A.  That's correct.

22  14:12:14  Q.  And you haven't taken part in any of the independent

23  14:12:16  investigations that were established after Katrina to study the

24  14:12:19  New Orleans levee or floodwall failures; right?

25  14:12:22  A.  That's correct.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

7 (Pages 1308 to 1311)

## 1312

1  14:12:22   Q.  You didn't participate on the IPET team; right?

2  14:12:28   A.  That's correct.

3  14:12:28   Q.  You didn't participant in ILIT; right?

4  14:12:30   A.  That's correct.

5  14:12:30   Q.  You didn't participant in Team Louisiana; right?

6  14:12:33   A.  That's correct.

7  14:12:34   Q.  All right.  And your work on this case has not been

8  14:12:37   subject to any sort of independent oversight, has it?

9  14:12:45   A.  Other than my own staff.

10  14:12:52   Q.  The only persons who have provided comments on your report

11  14:12:56   before it was completed were the lawyers for the plaintiffs and

12  14:12:59   people either working for the plaintiffs' lawyers or for you?

13  14:13:03   A.  You know, I know I said that in my deposition, but I

14  14:13:07   actually don't think the lawyers really had any comments on my

15  14:13:10   report.

16  14:13:16   Q.  Okay.

17  14:13:16   A.  I mean, I think maybe there was a word here and there, but

18  14:13:19   it wasn't -- you know, it wasn't anything substantial.

19  14:13:22   Q.  No, I'm not going to impeach you with your deposition on

20  14:13:25   that, Dr. Marino, because my question was not whether the

21  14:13:29   plaintiffs' lawyers provided comments or not.  My question is

22  14:13:32   that nobody other than they or your staff have ever commented on

23  14:13:38   your report?

24  14:13:38   A.  Oh, I understand.  Okay.

25  14:13:40   Q.  Is that right?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1313

1  14:13:41   A.  That's correct.

2  14:13:49   Q.  Now, I heard you -- this is photo 4.14 in your report,

3  14:14:10   Dr. Marino?

4  14:14:11   A.  That's correct.

5  14:14:11   Q.  Plaintiff's Exhibit 397?

6  14:14:13   A.  That's correct.

7  14:14:13   Q.  And I heard you this morning correct an error in your

8  14:14:16   report, where you had said in your report this photo was taken

9  14:14:20   during Katrina and, in fact, it was taken during Rita.  Did I

10  14:14:23   hear that right?

11  14:14:24   A.  Yes.

12  14:14:29   Q.  So the record is clear, I'm putting up Figure 2.15 from

13  14:14:32   the report that you issued in this case.  This is, in fact,

14  14:14:36   Figure 2.15 in your report, isn't it?

15  14:14:40   A.  Prior to being corrected, yes.

16  14:14:44   Q.  I'm sorry.  I didn't hear what you said.

17  14:14:45   A.  Prior to being corrected, yes.

18  14:14:47   Q.  Prior to being corrected.

19  14:14:50   Well, I have a copy of your report dated July 1,

20  14:15:02   2009, with revisions to photograph designations dated May 14th,

21  14:15:06   2010.  At least as of May 14th, 2010, that photo had not been

22  14:15:14   corrected; am I right?

23  14:15:16   A.  Well, my understanding was that I could not correct the

24  14:15:19   photos; all I could do was change figure and photo

25  14:15:25   designations.  But if you look at my slide presentation, it is

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1314

1  14:15:29   in my slide presentation.

2  14:15:30   Q.  You've corrected it in your slide presentation?

3  14:15:32   A.  That's correct.

4  14:15:34   Q.  All right.  And so you would agree with me, Dr. Marino,

5  14:15:37   this slide that was in your report, which depicts the barge

6  14:15:43   moored outside of the five-barge tier, is incorrect?

7  14:15:47   A.  Yes.  But it doesn't have any -- it doesn't really -- it's

8  14:15:51   for information purposes.  It has nothing to do with my

9  14:15:55   analysis.

10  14:16:02   Q.  Your conclusions in this case are informed by your

11  14:16:08   examination of eyewitness accounts; right, Dr. Marino?

12  14:16:12   A.  Can you say that again?

13  14:16:16   Q.  Sure.  Maybe I'll --

14  14:16:29   Dr. Marino, do you believe that examination of

15  14:16:32   eyewitness observations and relevant damage conditions are

16  14:16:38   determinative analyses of the barge's contribution to the

17  14:16:42   failures?

18  14:16:43   A.  Yes.

19  14:16:44   Q.  You recognize that language from your December 2009

20  14:16:46   declaration?

21  14:16:48   A.  Yes.

22  14:16:52   Q.  So with eyewitness observations being determinative, I

23  14:16:56   want to ask you some questions about the eyewitness

24  14:17:00   observations.

25  14:17:01   At the north breach, you have identified William

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1315

1  14:17:05   Villavaso as an important witness, and you've discussed his

2  14:17:09   testimony this morning; right?

3  14:17:10   A.  That's correct.

4  14:17:12   Q.  And regarding witnesses, when you looked at witness

5  14:17:17   accounts, you had to decide which accounts were credible given

6  14:17:21   the facts that you know to exist; right?

7  14:17:27   A.  That's correct.

8  14:17:29   Q.  And, for instance, as one example, informing the opinions

9  14:17:35   that led to the preparation of your report, you credited the

10  14:17:41   transcript of the interview with Sidney Williams more than you

11  14:17:48   credited the deposition testimony of Sidney Williams?

12  14:17:54   A.  That's correct.  And the reason I did that was because the

13  14:17:57   transcript, it was, in my mind, more of an impromptu interview.

14  14:18:05   In his deposition, he was saying that the barge hit the wall,

15  14:18:09   and it wasn't consistent with his transcript where he was

16  14:18:15   specifically asked about that, had he seen the barge prior to

17  14:18:18   the failure.  So I discounted the -- that part of his

18  14:18:24   deposition information.

19  14:18:26   Q.  Well, with respect to some witnesses, would you agree with

20  14:18:36   me that the event times reported by some witnesses are

21  14:18:44   obviously off, and you have to take that into consideration?

22  14:18:47   A.  Yeah.  I think I talked about that in my direct, that

23  14:18:51   there's a lot of variation in time.  And what I found most

24  14:18:56   consistent was the "daylight" or the, you know, "dark" or

25  14:19:01   "turning" -- "turning to daylight."  And that's why I more

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

8  (Pages 1312 to 1315)

**1316**

```
 1   14:19:07   relied on other -- the 911 call, for example, for the south
 2   14:19:11   breach, for the time.
 3   14:19:25   Q.  I guess I want to go through a couple of examples of
 4   14:19:28   witness accounts that you've rejected on the basis of your
 5   14:19:32   expert opinion, and I want to start with Table 3.1, the first
 6   14:19:37   page, GM-005.
 7   14:19:41       You have included in your table some accounts from
 8   14:19:49   Arthur Murph Jr.; right?
 9   14:19:53   A.  Yes.
10   14:19:53   Q.  And next to the accounts where it says "Date and Timing,"
11   14:19:59   you wrote "TNV"; right?
12   14:20:02   A.  Yes.
13   14:20:03   Q.  And when you wrote "TNV," that meant "time not valid";
14   14:20:12   right?
15   14:20:15   A.  I can deduce that.  I don't remember what that symbol
16   14:20:17   meant, but now I remember -- yeah.
17   14:20:19   Q.  Yes?
18   14:20:20   A.  Yes.
19   14:20:21   Q.  Okay.
20   14:20:21   A.  And because he, Mr. Murph, was saying it was on a Sunday
21   14:20:24   night, and it obviously was not a Sunday night.
22   14:20:29   Q.  Okay.  So you rejected that account from Arthur Murph
23   14:20:32   because it can't possibly be true?
24   14:20:35   A.  That's correct.
25   14:20:36   Q.  And as an expert, it's proper to reject accounts that, as
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**1317**

```
 1   14:20:42   an expert, you conclude can't possibly be true?
 2   14:20:48   A.  That's correct.
 3   14:20:50   Q.  And, in fact, an expert who uncritically accepts whatever
 4   14:21:01   a witness has to say without approaching it in some sort of
 5   14:21:05   scientific manner isn't really doing science; right?
 6   14:21:16   A.  Yes.
 7   14:21:16   Q.  Now, in your expert report -- in your expert report, you
 8   14:21:37   included a section of factual narrative, and among the factual
 9   14:21:43   narrative, you included -- it was a statement that wave heights
10   14:21:47   during this time were at least 4 feet and up to about 20 feet;
11   14:21:51   right?
12   14:21:51   A.  That's correct.
13   14:21:52   Q.  Plaintiff's Exhibit 397 at page 3-17.
14   14:21:57       You're talking there about wave heights in the
15   14:22:01   Industrial Canal; right?
16   14:22:04   A.  Yes.  There's two witnesses I can think of offhand.
17   14:22:13   Q.  If I understood you right, you've relied on witness
18   14:22:17   observations as the basis to conclude that a 20-foot wave in
19   14:22:24   the Inner Harbor Navigation Canal was plausible or credible?
20   14:22:28   A.  Well, that's why I think I prefaced it with "about."  I'm
21   14:22:37   not a hydrologist.  I can't tell you what -- I think this is a
22   14:22:43   pretty complicated science to figure out what spurious waves
23   14:22:48   are in terms of size or height.  I mean, this is not -- it's a
24   14:22:53   very complicated situation in terms of weather conditions.
25   14:22:58       But I reported what the witness said was present --
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**1318**

```
 1   14:23:00   there was two witnesses:  One was Villavaso; and there was
 2   14:23:04   another one, I want to say D'Antoinette Johnson, who said she
 3   14:23:11   was not exaggerating.  This wave was, at least, 15 or 20 feet.
 4   14:23:19   Q.  Now, when Ms. Johnson testified that the wave was 15 or
 5   14:23:23   20 feet, do you remember, Dr. Marino, that Ms. Johnson was in a
 6   14:23:27   home on the protected side of the floodwall; right?
 7   14:23:33   A.  Yes.
 8   14:23:33   Q.  And the wave that she described was not a wave that was
 9   14:23:39   propagating inside the Inner Harbor Navigation Canal but,
10   14:23:43   rather, a wave of water that was coming toward her from the
11   14:23:46   canal as the floodwall broke.  Do you remember that to be true?
12   14:23:51   A.  I believe it was after the floodwall broke.  It was
13   14:23:53   actually during the time period when the flooding occurred.
14   14:23:57   But it was -- you know, it -- it was, basically, just reporting
15   14:24:02   what these witnesses said.
16   14:24:04   Q.  All right.
17   14:24:05   A.  I mean, this really -- really has nothing to do with the
18   14:24:09   work I did.
19   14:24:10   Q.  Sure.  And don't have any science to support your
20   14:24:15   statement and the 20-foot wave about heights being --
21   14:24:18   A.  I didn't do any analysis, and I wouldn't pretend to be one
22   14:24:22   who can do such a sophisticated analysis to figure out if these
23   14:24:29   occasional, very occasional, waves could be that high.
24   14:24:37   Q.  So as you sit here today, you're not going to tell the
25   14:24:40   Court words to the effect of "I don't think you need to have
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**1319**

```
 1   14:24:48   science if someone sees it?
 2   14:24:52   A.  That's -- that's -- that's correct.  I mean, if -- if you
 3   14:25:01   have -- there's certain things that -- certain things that are
 4   14:25:08   not possible and certain things that are.  This is one of the
 5   14:25:12   things that I wouldn't find myself being able to determine
 6   14:25:16   whether a 20-foot wave was possible or not.  This was provided
 7   14:25:22   just for information only.
 8   14:25:25       MR. RAFFMAN:  Let me have deposition 83, lines 2 --
 9   14:25:29   BY MR. RAFFMAN:
10   14:25:29   Q.  You gave a deposition in the summer of 2009; right?  Do
11   14:25:34   you remember?
12   14:25:35   A.  Yes.
13   14:25:35   Q.  I took your deposition, and I want to show the Court what
14   14:25:38   you said on that subject at your deposition because I think
15   14:25:42   it's not quite the same as what you just said.  The Court will
16   14:25:45   evaluate it, of course:
17   14:25:46       "QUESTION:  Anything -- any science other than the
18   14:25:49   observation?
19   14:25:50       "ANSWER:  I don't think you need to have science if
20   14:25:52   someone sees it."
21   14:25:56       MR. WILSON:  What are we talking about?
22   14:25:58       MR. RAFFMAN:  The 20-foot wave.  I can go back and
23   14:25:59   play the rest of the clip -- I'm sorry.  Would Your Honor like
24   14:26:02   to see the rest of the clip so we can get the context, or will
25   14:26:05   Your Honor accept my representation that we're talking about
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1320

```
1    14:26:07   the 20-foot wave?
2    14:26:08        THE COURT: I'll certainly accept your representation
3    14:26:10   as an officer of the court.
4    14:26:12        MR. RAFFMAN: Thank you, Your Honor.
5               BY MR. RAFFMAN:
6    14:26:19   Q.  You have accepted Mr. Villavaso's testimony that the
7    14:26:21   object that he saw was the barge -- well, you -- I'm sorry.
8    14:26:25   Let me go back.
9    14:26:27        You've relied on Mr. Villavaso's testimony about
10   14:26:30   seeing an object on the morning of August 29th, 2005; right?
11   14:26:35   A.  That's correct.
12   14:26:35   Q.  And you have inferred or opined that the object that
13   14:26:40   Mr. Villavaso saw was the barge ING 4727?
14   14:26:46   A.  Well, I don't believe that he has said what barge it was,
15   14:26:49   but he said several times in his deposition that he saw what
16   14:26:56   appeared to be a barge and that he knows what a barge is
17   14:27:00   because he's worked in this area for a long time.
18   14:27:04   Q.  You've studied IPET as part of your work on this case;
19   14:27:08   right?
20   14:27:09   A.  That's correct.
21   14:27:14   Q.  And IPET -- whoops.  So IPET took a report from an
22   14:27:26   individual who was an operator at Pump Station 5 during the
23   14:27:29   storm.  You've read that account; right?
24   14:27:35        MR. RAFFMAN: For the record this is Defendant's
25   14:27:36   Exhibit 147, IPET Volume IV, Appendix Page IV-7-53.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1321

```
1    14:27:43   A.  If I remember this account correctly, that -- from what
2    14:27:45   Villavaso stated was that he was the only one that would have
3    14:27:49   seen it.  The other people were not -- it wasn't their job to
4    14:27:53   keep an eye on the floodwalls and observe what was going on.
5    14:27:56   He was the only one that was doing that.
6               BY MR. RAFFMAN:
7    14:28:07   Q.  So if Mr. Villavaso was the only one who was keeping an
8    14:28:09   eye on what was happening outside, and if the narrator of this
9    14:28:16   report is saying that, by 4:30, the water was halfway up the
10   14:28:21   chain-link fence of the station, and by 5:30 a.m., the fence
11   14:28:25   was completely under water, do you infer from putting two and
12   14:28:28   two together that this is an account that Mr. Villavaso also
13   14:28:32   gave?
14   14:28:35   A.  I didn't get the impression that this was from Villavaso.
15   14:28:46        But this individual, maybe he wasn't looking at -- I
16   14:28:46   mean, his job wasn't to look at these walls.  I don't know.
17   14:28:50   Q.  Okay.
18   14:28:51   A.  You know, these times, you know, as I've said before, I've
19   14:28:54   found from reviewing a number of different witnesses, there's
20   14:28:58   different times that are given.
21   14:29:00   Q.  In any event, regardless of which pump station employee
22   14:29:04   this account is, whether it's Mr. Villavaso or one of the other
23   14:29:07   employees, there's nothing about a barge in the pump station
24   14:29:13   report in the IPET; right?
25   14:29:14   A.  That's correct.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1322

```
1    14:29:15   Q.  And there's no mention of -- whoever this individual is
2    14:29:18   that's reporting this, there's no mention that this individual
3    14:29:23   ever heard anyone else say that anyone saw a barge; right?
4    14:29:26   A.  That's correct.  And Villavaso's deposition --
5    14:29:29        THE COURT: Keep in mind the credibility of
6    14:29:30   Mr. Villavaso is going to be determined by one person.
7    14:29:33        MR. RAFFMAN: Your Honor, I understand.
8    14:29:35        THE COURT: Sitting right up here.
9    14:29:36        But we're going to see how much he relied on
10   14:29:40   Mr. Villavaso, which is fair cross-examination.  I'm just
11   14:29:43   giving you the overarching.  Thank you.
12   14:29:46        MR. RAFFMAN: Thank you, Your Honor, and this is --
13   14:29:47        THE COURT: I know you knew that, but -- go ahead.
14   14:29:51        THE WITNESS: If I can make a comment, Your Honor?
15   14:29:54        THE COURT: As long as it's responsive to the
16   14:29:56   question, yes, sir; or explanation.
17   14:29:58        THE WITNESS: Yes, in Villavaso's testimony, he says
18   14:30:01   that he didn't talk to anybody about -- about that occurring,
19   14:30:07   having seen the barge.
20   14:30:08        THE COURT: The Court has read the depositions
21   14:30:09   designated by the defense in this as well.
22   14:30:13        MR. RAFFMAN: And that was my last question.
23   14:30:15        THE COURT: And its familiar that Mr. Villavaso is
24   14:30:16   the only person at the pumping station who ostensibly saw some
25   14:30:21   object in the vicinity of the floodwall.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1323

```
1    14:30:23        MR. RAFFMAN: I understand.  And in evaluating
2    14:30:26   Mr. Villavaso's credibility, I know Your Honor will evaluate
3    14:30:29   all aspects.
4    14:30:30        THE COURT: True.  And I realize you have a right to
5    14:30:33   probe this witness as to the degree on which he relied on that
6    14:30:38   testimony to make his conclusions, which you, of course, can
7    14:30:39   do.
8    14:30:40        MR. RAFFMAN: And that's my last -- well, I guess I
9    14:30:43   have a couple of other questions if Your Honor will bear with
10   14:30:46   me.
11   14:30:46        THE COURT: Go ahead.  Certainly.
12              BY MR. RAFFMAN:
13   14:30:48   Q.  You're aware that Mr. Villavaso testified he only saw the
14   14:30:50   tip of whatever it was he saw?
15   14:30:51   A.  That's correct.
16   14:30:52   Q.  And you're aware that Mr. Villavaso's vision was obscured
17   14:30:53   by rain and darkness to some degree?
18   14:31:00   A.  Yes.
19   14:31:00   Q.  And you're aware that Mr. Villavaso testified he didn't
20   14:31:03   have "a clear focused picture," words he used?
21   14:31:08   A.  I don't remember those exact words, but I -- I -- that
22   14:31:11   sounds reasonable, what you're saying.
23   14:31:14   Q.  And that he wasn't wearing the glasses that he would wear
24   14:31:19   for distance vision; right?
25   14:31:21   A.  Yeah.  But I don't wear my glasses all the time and I can
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**1324**

1   14:31:25   see distances and things.

2   14:31:26   Q.   I want to ask some more questions about what Mr. Villavaso

3   14:31:32   said he saw on top of the floodwall.

4   14:31:35        He said that what he saw was only a foot or two above

5   14:31:37   the top of the floodwall.  You recall that testimony; right?

6   14:31:41   A.   Yeah.  And we went -- I reread that part of his

7   14:31:46   deposition, and what I remember him saying, "I'm not really

8   14:31:50   good with numbers, I'm not good with dimensions," and he was

9   14:31:54   pushed to give a number.  And some people are not really good

10  14:31:58   at seeing what a distance is, something -- you know, a height

11  14:32:01   or something that is 400 or 500 feet away.

12  14:32:05        Also, in my direct, we talked about, well, maybe he's

13  14:32:09   talking about that tip of the barge that we showed him by

14  14:32:12   PowerPoint.

15  14:32:13   Q.   We're going to go into that in some detail.

16  14:32:16   A.   Great.

17  14:32:16   Q.   But just to get a sense of when Mr. Villavaso says "a foot

18  14:32:19   or two," you also recall from Mr. Villavaso's deposition that

19  14:32:22   he said that the water was splashing three or four or five feet

20  14:32:25   above the top of the floodwall before the breach happened.

21  14:32:28   You're familiar with that testimony?

22  14:32:30   A.   I remembered him saying that there was splashing.  There

23  14:32:34   was no overtopping.  There was splashing.

24  14:32:36   Q.   Sure.  But when we compare the foot or two above the top

25  14:32:38   of the wall for this object, we can, at least, get a frame of

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**1325**

1   14:32:42   reference from it was smaller than the amount that went

2   14:32:45   splashing over the top of the wall?  We can take that --

3   14:32:49   A.   I mean, I don't know if, you know -- have you looked at

4   14:32:51   his pictures to his exhibit?  I mean, they're like kindergarten

5   14:32:56   drawings.  I mean, I don't know if he has -- he qualified that

6   14:32:59   "I'm not really good with numbers and dimensions," so...

7   14:33:07   Q.   Well, let's move away from Mr. Villavaso's metrics,

8   14:33:21   1 foot, 3 feet, and let's move to something that we can measure

9   14:33:24   maybe better.

10  14:33:24        You would agree with me that the barge ING 4727, if

11  14:33:29   it were present at the wall, would be sticking up above the top

12  14:33:31   of the floodwall by at least 15 feet and probably more; right?

13  14:33:35   A.   Yes.

14  14:33:41        MR. RAFFMAN:  This is going to be -- now, we've

15  14:33:51   written here "Marino North Breach Presentation, Page 50," and

16  14:33:56   I'm not sure that that is the correct number, Your Honor.  This

17  14:34:01   was a number that we used last night with the set of slides we

18  14:34:08   received, so --

19  14:34:14        THE COURT:  That would have been part of his slide

20  14:34:16   presentation yesterday, of course.

21  14:34:18        MR. RAFFMAN:  Part of the presentation that was given

22  14:34:20   yesterday, and it's in the book for this morning.

23  14:34:29        I guess I'm going to have to ask Dr. Marino.

24             BY MR. RAFFMAN:

25  14:34:31   Q.   This is a slide that you created, and it's part of your

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**1326**

1   14:34:33   PowerPoint from this morning; right?

2   14:34:36   A.   That's correct.

3   14:34:37        MR. RAFFMAN:  And the Court can locate this slide

4   14:34:39   within the demonstrative slide exhibit; right?  If Your Honor

5   14:34:43   likes, I will pause and locate it.

6   14:34:47        THE COURT:  Only if this becomes --

7   14:34:49        MR. RAFFMAN:  I don't believe --

8   14:34:50        THE COURT:  -- something other than I think it will.

9   14:34:53        MR. RAFFMAN:  Sure.

10             BY MR. RAFFMAN:

11  14:34:55   Q.   So, Dr. Marino, this is your rendering of the barge as it

12  14:34:58   arrives at the location of the north breach; am I right?

13  14:35:02   A.   That's correct.

14  14:35:03   Q.   And for clarity, the water level is represented by this

15  14:35:13   upward horizontal line at the top of the notation that says

16  14:35:17   "2 feet"; right?

17  14:35:19   A.   That's correct.

18  14:35:19   Q.   And the barge has a 2-foot draft.  So the bottom

19  14:35:22   horizontal line on this graph is your rendition of the bottom

20  14:35:27   of the barge; right?

21  14:35:29   A.   That's correct.

22  14:35:29   Q.   So the water level as the barge approaches the wall, as

23  14:35:32   you have it, prior to breaching is about a foot and a half

24  14:35:36   below the top of the wall; right?

25  14:35:41   A.   Say that again.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**1327**

1   14:35:42   Q.   The water level, as you rendered in this drawing, the

2   14:35:47   water level is up here and about a foot and a half below the

3   14:35:51   wall top; right?

4   14:35:52   A.   If we assume the 13-foot elevation and at 12-2, it would

5   14:36:01   be 1.8 feet.

6   14:36:03   Q.   1.8 feet.  We'll be precise as an engineer.  1.8 feet.

7   14:36:08        And I guess my point is this, Dr. Marino:  We heard

8   14:36:12   testimony the other day about a barge approaching the wall at a

9   14:36:17   time when the water was low and the barge grounding in the mud

10  14:36:19   or some such thing.  As you portray it, this barge is not

11  14:36:24   grounding or hitting the mud; it's hitting the wall -- this

12  14:36:28   upper part of the wall.  Right?

13  14:36:30   A.   Yeah, just below the construction joint.

14  14:36:32   Q.   Just below the construction joint?

15  14:36:35   A.   That's correct.

16  14:36:37   Q.   At the north breach, we're talking?

17  14:36:43   A.   Right.

18  14:36:43   Q.   Okay.

19  14:36:43   A.   Right.  And that assumes the 6:00 time, based on, you

20  14:36:46   know, Villavaso saying that --

21  14:36:54   Q.   Sure.  I'm sorry to interrupt you.  I didn't mean to do

22  14:36:57   that.

23  14:36:57   A.   That water level is based upon the 6:00 time, based on the

24  14:37:00   control -- power control log that shows a call at 6:10.  Now,

25  14:37:11   if he called a little earlier than that, then it would be a

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1328

1  14:37:15   little lower than that.
2  14:37:16   Q.  But just to be clear for the record here, the water level
3  14:37:19   you have is substantially up the wall; it's not down here below
4  14:37:22   the wall or grounding in the mud.  Right?
5  14:37:26   A.  That's correct.  I mean, you couldn't have a barge
6  14:37:28   collision if it was -- the water level was below the levee.
7  14:37:34   Q.  Thank you.
8  14:37:36       Now, I've created a graphic.
9  14:37:43       MR. RAFFMAN:  GM-098, please.
10 14:37:45   BY MR. RAFFMAN:
11 14:37:48   Q.  What we've done, Dr. Marino, is we've taken your -- I'm
12 14:37:53   sorry.  We've taken your previous graphic and assumed that the
13 14:37:58   barge has got 12-foot height, plus the coaming and the covers?
14 14:38:10   A.  I like your depiction.  There's nice colors and it looks
15 14:38:14   well.  But you have the barge going sideways, and that's not
16 14:38:18   the orientation that I was trying to portray.
17 14:38:24   Q.  Okay.
18 14:38:24   A.  It's not a broadside collision, in other words.
19 14:38:27   Q.  So if we were to portray it the way you were to portray
20 14:38:31   it, the barge would be at somewhat of an angle or it would be
21 14:38:35   approaching headfirst somehow?
22 14:38:36   A.  Right.
23 14:38:37   Q.  And regardless of the angle, Dr. Marino, would you agree
24 14:38:40   with me that the stick-up of the barge over the top of the wall
25 14:38:45   is going to be substantially higher than a foot or two?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1329

1  14:38:48   A.  As I said before, you know, I know you're trying to say
2  14:38:51   about this -- about that Villavaso said a foot, but he, in my
3  14:38:57   mind, gave enough inference or -- because he said it three or
4  14:39:05   four times, it appeared to be a barge to him.  He's been there.
5  14:39:08   He knows what a barge looks like.  He was pressed for a number,
6  14:39:11   and he said, "I'm not good with dimensions."
7  14:39:14       And if you look at his -- if you look at any of his
8  14:39:17   sketches, I mean, they're terrible sketches.  He's not very
9  14:39:20   good at drawing either.  So I -- you know, I understand your
10 14:39:24   point.
11 14:39:24   Q.  I understand -- thank you, Dr. Marino.  I understand it
12 14:39:28   too.  But I would like the record to be clear about how this
13 14:39:32   barge, if it's present, is going to appear.  Maybe the judge is
14 14:39:35   going to tell me to move on.
15 14:39:37       THE COURT:  Well, I mean, it does -- assuming it's
16 14:39:39   coming at the angle Dr. Marino says, it's obvious that, because
17 14:39:43   of the level of the water, a substantial amount of footage
18 14:39:48   would be seen more than the 1 or 2-foot; assuming
19 14:39:52   Mr. Villavaso's vision, which we've impugned, is clear enough
20 14:39:57   to see that in the rain and the dark.
21 14:40:00       MR. RAFFMAN:  Thank you, Your Honor.
22 14:40:00       THE COURT:  I just don't want to get anybody, but I
23 14:40:03   understand how high the barge was, and I understand that the
24 14:40:07   1-foot or 2-foot estimate is certainly in question.  And the
25 14:40:16   whole credibility issue and how much can be relied on him, it's

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1330

1  14:40:20   fairly elementary.  It's a question of perception and how the
2  14:40:27   Court looks at it all eventually.
3  14:40:30       By I understand the point.
4  14:40:32       MR. RAFFMAN:  Thank you, Your Honor.  I'm going to
5  14:40:33   move on.
6  14:40:34       May I please see slide 216 from this morning's
7  14:40:43   presentation.
8  14:40:44   BY MR. RAFFMAN:
9  14:40:44   Q.  I want to move away from the north breach now, and I want
10 14:40:47   to ask you about the witness summary to the south breach.
11 14:40:49       Am I right, Dr. Marino, that this slide, 216, from
12 14:40:53   your demonstratives this morning, represents your summary of
13 14:40:56   the salient witness information regarding the south breach?
14 14:41:00   A.  Yes.
15 14:41:00   Q.  And as we look at this summary of the salient witness
16 14:41:06   impact -- information, one thing that struck me, Dr. Marino, is
17 14:41:11   there's nothing here about any eyewitnesses to the south
18 14:41:13   breach.  Would you agree with me that none of these entries
19 14:41:18   refers to an eyewitness who saw the barge at the south breach?
20 14:41:24   A.  I'm not sure I understand -- I'm saying barge in the
21 14:41:26   vicinity or impacting the wall.
22 14:41:29   Q.  But it doesn't say --
23 14:41:31       THE COURT:  Is that a hearing witness or a seeing
24 14:41:33   witness or both?
25 14:41:35       THE WITNESS:  A seeing witness.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1331

1  14:41:37       THE COURT:  Okay.
2  14:41:38       MR. RAFFMAN:  I'm sorry.
3  14:41:41       THE WITNESS:  I mean, Terry Mark Adams, for example,
4  14:41:45   and Arthur Murph are examples of that.
5  14:41:49   BY MR. RAFFMAN:
6  14:41:49   Q.  Well, I want to ask you some questions about Terry Mark
7  14:41:57   Adams.  The Court has heard Arthur Murph, and you've told the
8  14:42:01   Court a little about Arthur Murph yourself this morning, so let
9  14:42:01   me ask about --
10 14:42:01       THE COURT:  And Mr. Adams as well.  I've heard both
11 14:42:05   of them.
12 14:42:06       MR. RAFFMAN:  That's right.  Your Honor has heard
13 14:42:07   both of them.
14 14:42:08       THE COURT:  And I've read Mr. Williams' statements as
15 14:42:12   well.
16 14:42:12   BY MR. RAFFMAN:
17 14:42:14   Q.  Your opinion about the south breach was that there were
18 14:42:18   three separate impacts; right?  A primary collision at the
19 14:42:25   north.
20 14:42:25   A.  Yes.
21 14:42:26   Q.  A second primary in the middle, and then a third --
22 14:42:29   A.  The key is that you said "primary."
23 14:42:34   Q.  Did you mean to imply by that that there are more impacts
24 14:42:37   than those three?
25 14:42:38   A.  Well, I've always said in my report, in my deposition,

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1332

1  14:42:43  "primary" in that there can be -- you know, this grinding and
2  14:42:48  bumping, especially in the second collision, when it's in the
3  14:42:52  broadside position.
4  14:42:53  Q. Well, for the moment, at least, we'll take it that your
5  14:42:57  account of the floodwall failure at the south breach is
6  14:43:00  something other than a barge coming toward the levee and then
7  14:43:08  creating a bang and then floating through; right?
8  14:43:14  A. If that's a witness' account, it could be that the first
9  14:43:25  two bangs, they weren't all heard. They all didn't hear each
10 14:43:29  three bangs. Some heard three and some heard different ones,
11 14:43:33  you know, depending upon -- I don't know the -- if you consider
12 14:43:39  the conditions during the hurricane, you know, what people
13 14:43:44  remember.
14 14:43:46         You know, I don't think that each collision would
15 14:43:50  have the same sound or the same decibel. Obviously, the last
16 14:43:58  collision, there's, in my mind, no doubt that that's going to
17 14:44:03  cause a large explosion-like boom. And right after that
18 14:44:08  occurred, invariably, you see in witness accounts the violent
19 14:44:12  rushing of flooding occurred.
20 14:44:14  Q. And let me -- because I don't think you quite answered my
21 14:44:17  question. Your account of how this happened is something other
22 14:44:21  than this simple report of something comes toward the levee,
23 14:44:28  toward the levee, and then there's a bang, and then it floats
24 14:44:34  through; right?
25 14:44:37  A. If -- if it's just one collision with the levee?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1333

1  14:44:40  Obviously, that's not what I believe.
2  14:44:44  Q. So let's look at what Mr. Adams said in his deposition.
3  14:44:49  Adams -- page 25 of his deposition. Mr. Adams was asked -- let
4  14:44:58  me just wait until it comes up:
5  14:45:13  "QUESTION: Okay. Did you see anything else after
6  14:45:20  you were on your roof at 5:30 or thereabouts?"
7  14:45:24  That's the question; right, Dr. Marino? You've read
8  14:45:27  that question, and you've read this account.
9  14:45:28  A. Yes, I've read his deposition.
10 14:45:29  Q. So the question is a very general question, and Mr. Adams
11 14:45:33  answered with his account, and what Mr. Adams says in his
12 14:45:36  deposition is:
13 14:45:36  "QUESTION: When I looked toward the Claiborne
14 14:45:39  bridge, I could see something coming toward the levee, toward
15 14:45:41  the wall. I couldn't see exactly what it was, and I kept
16 14:45:47  watching it. Then I heard something that sounded like a
17 14:45:51  'bang,' and when I heard the 'bang,' I seen the barge come
18 14:45:56  floating through."
19 14:45:58  That's Mr. Adams' account that you've read and you've
20 14:46:03  relied on in your report; right?
21 14:46:05  A. That's correct.
22 14:46:05  Q. And would you agree with me, Dr. Marino, that this account
23 14:46:09  from Terry Adams is not the same as watching a barge make
24 14:46:17  multiple impacts against the wall?
25 14:46:24  A. That indicates that there was -- he saw one collision.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1334

1  14:46:28  Q. Okay. Thank you.
2  14:46:44         Now, I want to ask you some questions about the
3  14:46:50  movement of the barge and your conclusions about where it went,
4  14:46:59  how it got there, to the extent you have those.
5  14:47:03         Am I right, Dr. Marino, that you don't know how the
6  14:47:07  barge got to the north breach?
7  14:47:11  A. That's correct.
8  14:47:13  Q. And in order for the barge to move from one place to the
9  14:47:19  other, something has to move it; right?
10 14:47:22  A. That's correct.
11 14:47:24  Q. And that something in this case has got to be wind or
12 14:47:29  water; right?
13 14:47:32  A. As I've said before, I'm not claiming to be a person that
14 14:47:37  is able to determine the routing of a vessel given the complex
15 14:47:43  nature of the climatic conditions that existed at the time.
16 14:47:47  Q. Well, so your report does not include any explanation of
17 14:47:54  how the barge got from one place to another; right?
18 14:47:59  A. That's correct.
19 14:48:01  Q. And for the south breach as well as the north, you don't
20 14:48:04  know how the barge got from one place to the next?
21 14:48:09  A. I did not -- I did not do any -- or I wouldn't be the one
22 14:48:18  to be able to tell you how the barge would route from one
23 14:48:21  location to the other.
24 14:48:23  Q. You've done no studies or scientific calculations or
25 14:48:25  literature review that could shed light on how an empty barge

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1335

1  14:48:28  sticking out of the water 20 feet could move in a direction
2  14:48:32  counter to that of the prevailing wind in order to arrive at
3  14:48:37  either breach?
4  14:48:38  A. I wouldn't be able to do that.
5  14:48:40  Q. Now, I wanted to ask you some questions about this impact
6  14:48:43  analysis that you showed on the PowerPoint this morning.
7  14:48:49         You prepared a preliminary report in 2008; right?
8  14:48:54  A. That's correct.
9  14:48:55  Q. And that was in connection with the class certification
10 14:48:59  proceedings that the Court was then considering?
11 14:49:02  A. That's correct.
12 14:49:05  Q. And your preliminary report said that you were performing
13 14:49:08  engineering calculations related to a barge impact on a
14 14:49:12  floodwall; right?
15 14:49:13  A. I personally wasn't doing that. It was Dr. Gamal with my
16 14:49:20  company.
17 14:49:21  Q. Dr. Gamal, all right. Whoever was doing the work,
18 14:49:28  Dr. Marino, the impact analysis and the engineering
19 14:49:33  calculations were not included in the reports you did in 2009
20 14:49:40  because that analysis never got finished, at least, of last
21 14:49:45  summer; right?
22 14:49:46  A. That's correct, and I don't feel like I needed to have it
23 14:49:50  done in order to conclude what I concluded.
24 14:49:56  Q. You reported as of --
25 14:49:58  A. I mean, I could have -- you know, we could have put

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1336

1   14:50:01   together, or I could have had somebody put together some

2   14:50:04   analysis, but I didn't feel that -- my judgment was that this

3   14:50:09   is such a difficult structure -- soil-structure interaction

4   14:50:15   that it required --

5   14:50:17        THE COURT:  Doctor, could you get a little closer to

6   14:50:18   the microphone.  It's a little hard for me to hear you.  I'm

7   14:50:23   sure counsel, as well, would appreciate it.

8   14:50:23        THE WITNESS:  -- and it required much more work in

9   14:50:26   order to do a responsible job.

10  14:50:36   BY MR. RAFFMAN:

11  14:50:36   Q.  I'm sorry.  I was just trying to make sure I understood

12  14:50:39   your testimony.  Dr. Marino, you thought that this was a

13  14:50:44   sufficiently complicated analysis, that you didn't want to rush

14  14:50:46   through anything; right?

15  14:50:49   A.  That's correct.

16  14:50:52   Q.  In November of 2009, you reported in your summary judgment

17  14:50:57   declaration that a barge impact load analysis is underway by

18  14:51:06   Dr. Issam Harik.  Do you remember reporting that?

19  14:51:13   A.  Yes.

20  14:51:13   Q.  And when you gave your declaration in December of 2009,

21  14:51:20   which I hope is Plaintiff's Exhibit 428, you didn't report any

22  14:51:26   new results in December 2009; right?

23  14:51:29   A.  I know one of the declarations had an attachment from

24  14:51:33   Professor Harik on potential barge loads that could occur on a

25  14:51:42   rigid wall.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1337

1   14:51:46   Q.  Plaintiff's Exhibit 401, Marino Declaration Exhibit F, is

2   14:52:03   that the document you're talking about?

3   14:52:05   A.  It looks familiar.

4   14:52:11   Q.  But even as of the time that document was provided, you

5   14:52:13   had not created the impact demonstration that you provided the

6   14:52:21   Court this morning, had you?

7   14:52:24   A.  Can you say that again?  I'm sorry.

8   14:52:27   Q.  You gave an animation this morning of an impact with the

9   14:52:30   wall at the north breach and at the south breach, and what I

10  14:52:34   want to know was, in December 2009, did you have that impact

11  14:52:40   analysis.  Had that been done?

12  14:52:44   A.  I don't know if I can say this, but since you asked the

13  14:52:47   question, those -- those animations that I provided were actual

14  14:52:54   models, that it was ongoing of the barge impact.

15  14:53:06   Q.  So --

16  14:53:07   A.  You asked me if there was anything going on in December

17  14:53:11   that was new, and I -- and some of those models that we showed,

18  14:53:16   we're using them as demonstratives, but they were actually

19  14:53:21   models that were used during -- as part of our impact analysis.

20  14:53:27   Q.  And you don't know whether those models that you've showed

21  14:53:30   this morning for the first time were ready to be shown in

22  14:53:38   December of 2009?

23  14:53:41   A.  No, they weren't ready to be shown.

24  14:53:46   Q.  Are those models created by Dr. Harik?

25  14:53:55   A.  Those -- that -- there's two parts of this analysis:  One

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1338

1   14:54:00   is how much the soil will give under the load; and then the

2   14:54:04   effect of the barge and its momentum to that -- to that wall

3   14:54:10   soil response.  The wall soil response is the end that we're

4   14:54:15   performing, and the other portion of the work is being done by

5   14:54:21   Dr. Harik.

6   14:54:23   Q.  And you need both portions --

7   14:54:25   A.  Yes.  It's half the story.  One is half the story.  You

8   14:54:28   have to have both.

9   14:54:33        MR. RAFFMAN:  Your Honor, I don't want to admonish

10  14:54:35   the witness, but I do want to say that the dialogue would be

11  14:54:39   better if we don't interrupt each other's questions and

12  14:54:41   answers.

13  14:54:42        THE COURT:  Absolutely.  Thank you.  And I will ask

14  14:54:44   the witness to wait until the question is completed prior to

15  14:54:47   answering it.

16  14:54:48        THE WITNESS:  I'm sorry, Mark.

17  14:54:50   BY MR. RAFFMAN:

18  14:54:50   Q.  So there's two halves of the analysis:  One requires you

19  14:54:55   to know what's happening to the barge as it approaches the

20  14:54:59   wall; the other requires you to know what's happening to the

21  14:55:03   wall as it is impacted by the barge, in your opinion.  Right?

22  14:55:11   A.  And the vessel itself, the momentum of the vessel and the

23  14:55:15   impact of that vessel on the floodwall.

24  14:55:17   Q.  And what you're -- I think you suggested is that your area

25  14:55:21   of expertise is about the wall, and Dr. Harik's area of

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1339

1   14:55:25   expertise is about the vessel and its movement and momentum.

2   14:55:31   A.  Exactly.

3   14:55:32   Q.  So if I want to ask questions about the inputs and the

4   14:55:37   assumptions that are made regarding that vessel movement, I've

5   14:55:42   got to ask Dr. Harik?

6   14:55:44   A.  That's correct.

7   14:55:46   Q.  Well, I'm going to ask you, Dr. Marino, since you're here.

8   14:55:51   If you can't answer it, I will throw up my hands.

9   14:55:56        MR. RAFFMAN:  I guess, Judge, and I don't mean to

10  14:55:58   make speeches.  I'm sorry.

11  14:56:00   BY MR. RAFFMAN:

12  14:56:02   Q.  In order to evaluate the impact of a barge on a wall, you

13  14:56:07   need to know something about how fast the barge is moving;

14  14:56:11   right?

15  14:56:12   A.  That's correct.

16  14:56:14   Q.  And --

17  14:56:17   A.  Sorry.

18  14:56:20   Q.  -- the impact force requires you also to know the

19  14:56:25   direction in which the barge is moving vis-à-vis the wall;

20  14:56:28   right?

21  14:56:32   A.  I'm sorry, Mark.  I have something on my mind that I -- if

22  14:56:35   I may, if you don't mind me saying that first.

23  14:56:39   Q.  I --

24  14:56:40   A.  It's a clarification on this that I just realized.

25  14:56:44   Q.  Please clarify your testimony, Dr. Marino.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**1340**

1  14:56:46   A.  Okay.  When this was done by Dr. Harik, he performed the
2  14:56:52   analysis with the wall being rigid.  So this is -- this is not
3  14:56:56   with any soil-giving conditions.  So it doesn't account for the
4  14:57:03   input that we would give from our modeling.  This was more he's
5  14:57:09   working on his collision processes in determining what kind of
6  14:57:15   loads we would get once I give him the input for the give of
7  14:57:20   the wall.  If you understand what I'm saying.
8  14:57:22   Q.  I think I do, and maybe for the benefit of the Court -- I
9  14:57:24   was going to ask you about this later -- when we're talking
10 14:57:27   about an infinitely rigid wall, that's in distinction to a wall
11 14:57:37   that will allow for some give in the soil; right?
12 14:57:37   A.  Oh, exactly.  We're talking about much lower -- lower
13 14:57:41   loads, much lower loads.
14 14:57:43   Q.  And so when you got involved, you allowed for some give in
15 14:57:46   the soil when you performed your impact analysis; right?
16 14:57:50   A.  When I got involved?
17 14:57:54   Q.  Well, I --
18 14:57:55   A.  You mean the part of the work that I was doing?
19 14:57:57   Q.  I don't mean to be unclear.  When you took the analysis
20 14:58:07   from Dr. Harik and provided your own input to it, you added
21 14:58:12   some soil give to the infinitely rigid wall that Dr. Harik had
22 14:58:19   assumed initially; right?
23 14:58:21   A.  I'm sorry.  Can you repeat that again?
24 14:58:25   Q.  I actually am going to come back to it, Dr. Marino.  This
25 14:58:30   was somewhat of a detour here.  I need to ask a couple other

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**1341**

1  14:58:34   questions first.
2  14:58:35   THE COURT:  All right.
3  14:58:36   BY MR. RAFFMAN:
4  14:58:38   Q.  Am I right, Dr. Marino, that your impact model requires an
5  14:58:44   impact force in order to drive it?
6  14:58:49   A.  That's correct.
7  14:58:51   MR. RAFFMAN:  And what I'm showing the Court, for the
8  14:58:55   record, is a slide that was provided to us by Dr. Marino before
9  14:59:01   the animation this morning.
10 14:59:05   BY MR. RAFFMAN:
11 14:59:05   Q.  The slide has at the top, when you click it:  "Job Title:
12 14:59:09   Model 1 Impact Force 1,000,000 E equals 1,000 Su."  I'm not
13 14:59:15   asking about units, but the point is there is an impact force
14 14:59:18   that drives the model; right?
15 14:59:21   A.  Yes.
16 14:59:23   Q.  Now, Dr. Marino, what assumption did you make in your
17 14:59:33   impact analysis this morning about how fast the barge was
18 14:59:36   traveling when it hit the wall?
19 14:59:45   A.  This was an illustrative example.  I mean, it's not -- as
20 14:59:49   I said, it's not a finished product.  What you're asking is
21 14:59:53   something that, actually, Dr. Harik will be able to answer once
22 14:59:58   he's done with his work.
23 15:00:00   Q.  So you have provided the Court with a model of an impact
24 15:00:06   and yet, as you sit here today, you can't tell the Court that
25 15:00:10   the model represents an actual barge impact under actual

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**1342**

1  15:00:16   Katrina conditions?
2  15:00:17   A.  Well, this was meant to be an illustration of what I
3  15:00:21   believe as the effect of the wall.  It's not meant to be any
4  15:00:30   calculations or final calculations.  In fact, I thought that
5  15:00:36   this title had been removed.  I'm surprised it's on there,
6  15:00:41   actually.
7  15:00:42   THE COURT:  It's my understanding that the animations
8  15:00:45   that I saw was really illustrative of Dr. Marino's opinion as
9  15:00:50   to the mechanism of failure of, wherever it was, of the
10 15:00:56   floodwall; but not taken into account was the actual dynamics
11 15:01:03   of the barge, including speed, weight, and any other factor
12 15:01:09   that's necessary.  That was not calculated in that animation.
13 15:01:19   It's simply an illustration of his opinion, and that's all it
14 15:01:22   is.  That's what I'm getting.
15 15:01:25   Without the mathematics, physics, or whatever
16 15:01:30   else is necessary to determine, at least, in their opinion,
17 15:01:35   precisely what the barge was doing at that time vis-à-vis
18 15:01:38   speed, et cetera.
19 15:01:41   MR. RAFFMAN:  I understand, Judge.
20           BY MR. RAFFMAN:
21 15:01:48   Q.  But I guess my question for you is:  It's without the
22 15:01:49   mathematics or physics or whatever else is necessary to
23 15:01:53   determine that it's real?
24 15:01:55   A.  Mark, as I said, it's an illustration.
25 15:01:59   Q.  Now, if you -- if you wanted to actually know what really

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**1343**

1  15:02:05   happened, what really moved this barge around, then
2  15:02:16   meteorological data would be germane; right?
3  15:02:24   A.  Yes.
4  15:02:25   Q.  And meteorological data is germane to wind conditions in
5  15:02:31   the IHNC because it helps assess what the barge impact loads
6  15:02:37   could potentially be; right?
7  15:02:42   A.  Yes.
8  15:02:43   Q.  And the weather data helps you assess what, in fact, the
9  15:02:48   wind loads were on the barge in the IHNC at the time of the
10 15:02:54   failure?
11 15:02:57   A.  Yes.
12 15:02:59   Q.  Well, in your report, you included some data about the
13 15:03:04   wind speed and direction, and I'm referring now to Section 3.2.
14 15:03:09   MR. RAFFMAN:  May I have GM-027, please.
15 15:03:15   A.  Yes.
16 15:03:15   BY MR. RAFFMAN:
17 15:03:15   Q.  You included a graphic from the IPET report in your own
18 15:03:19   report; right?
19 15:03:21   A.  Yes.  And as I said in my deposition, you know, this was
20 15:03:26   for information only.  I didn't use it in any of my work.  I'm
21 15:03:31   not -- I don't consider myself to understand exactly the
22 15:03:36   localized conditions that might occur during a hurricane.  I
23 15:03:40   hope you're not going to ask me that.
24 15:03:49   MR. RAFFMAN:  I promise, Your Honor, I will not go
25 15:03:50   through this in excruciating detail, but I will ask a few
           questions.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

15  (Pages 1340 to 1343)

## 1344

```
1    15:03:57        GM-100, please.
2    15:03:59   BY MR. RAFFMAN:
3    15:03:59   Q.  As depicted in your report, Dr. Marino, for 5:00 in the
4    15:04:03        morning, the IPET meteorological investigation shows wind
5    15:04:08        directions in a northeast-to-southwest direction; right?
6    15:04:15        THE COURT:  I think this witness has said he has no
7    15:04:17        idea how the barge got there.  You know, I'm not sure what this
8    15:04:21        means.  I know we're going to have witnesses testify about the
9    15:04:23        wind, et cetera, and we have eyewitnesses.  And it's going to
10   15:04:27        be a giant mystery that the Court will resolve in its own
11   15:04:33        extraordinarily, shall we say un-omniscient self.
12   15:04:45        THE WITNESS:  Thank you, Your Honor.
13   15:04:45        THE COURT:  He doesn't know how it got there.
14   15:04:47        MR. RAFFMAN:  I understand.  I guess with Your
15   15:04:50        Honor's indulgence that --
16   15:04:58        THE COURT:  If you have another point, that's fine.
17   15:05:00        I've got this one.  But if there's another one that I'm not
18   15:05:04        talking about, go ahead.
19   15:05:04        MR. RAFFMAN:  There might be.  It won't take me long.
20   15:05:06        THE COURT:  Okay.
21   15:05:06   BY MR. RAFFMAN:
22   15:05:07   Q.  As a scientist investigating the failures of the
23   15:05:10        floodwall, you thought that the meteorological data that you
24   15:05:15        included in your report from IPET and from the lakefront
25   15:05:17        airport, which the Court will peruse at its leisure, you
              JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                         UNITED STATES DISTRICT COURT
                         EASTERN DISTRICT OF LOUISIANA
```

## 1346

```
1    15:31:08        would cause the barge adjacent to the wall to be contact -- for
2    15:31:14        the barge being adjacent to the wall to be contacting or
3    15:31:19        knocking into the wall.
4    15:31:21   Q.  And are you going to tell the Court what direction the
5    15:31:24        wind was blowing when the barge contacted the wall at the north
6    15:31:28        end of the north breach?  Are you going to testify about that?
7    15:31:32   A.  No.
8    15:31:32   Q.  Are you going to testify about what direction the waves
9    15:31:35        were moving when the barge contacted the wall, as you say, at
10   15:31:39        the north breach?
11   15:31:40   A.  Obviously, there's one or two or a combination of both
12   15:31:43        that propelled the barge into the wall.
13   15:31:46   Q.  Well --
14   15:31:47   A.  In terms of a quantity, a direction, I cannot opine upon
15   15:31:52        that.
16   15:31:52   Q.  It's an inference you made that, because the barge is
17   15:31:55        there, there must be a wind or there must be a wave; otherwise,
18   15:31:59        it can't get there.  Is that fair?
19   15:32:04   A.  That's -- well, I mean, that's fair in terms of the
20   15:32:10        components of wind and wave.
21   15:32:13        But I have other things that I have opined upon that
22   15:32:16        I believe are the reasons why I believe the barge caused the
23   15:32:19        wall to tear, which I can go over again.
24   15:32:36   Q.  Well, I'm going to ask questions, and if your other
25   15:32:39        reasons are responsive to my questions --
              JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                         UNITED STATES DISTRICT COURT
                         EASTERN DISTRICT OF LOUISIANA
```

## 1345

```
1    15:05:23        thought that data was sufficiently reliable and germane and
2    15:05:27        helpful to be included in a report about what happened in
3    15:05:32        Hurricane Katrina; is that fair?
4    15:05:33   A.  Yeah.  I mean, for background information, yes.
5    15:05:39        MR. RAFFMAN:  With that, I'll move on, Judge.
6    15:05:42        THE COURT:  Okay.  We'll take a 10- to 15-minute
7    15:05:44        recess.  I'll try to give you a little warning before I come
8    15:05:49        in, a little two-minute prewarning before I come in.
9    15:05:50        MR. RAFFMAN:  Thank you, Judge.
10   15:05:51        THE DEPUTY CLERK:  All rise.
11   15:05:52        (WHEREUPON, the Court took a recess.)
12   15:30:10        THE DEPUTY CLERK:  All rise.  Court's in session.
13   15:30:30        Please be seated.
14   15:30:31        THE COURT:  Yes, sir.  You may proceed.
15   15:30:34        MR. RAFFMAN:  Thank you, Your Honor.
16   15:30:34   BY MR. RAFFMAN:
17   15:30:37   Q.  Dr. Marino, I'm going to ask you some questions about the
18   15:30:40        rip and the tear in the north breach.  But before I do that, I
19   15:30:43        just want to make clear:  You are not opining about what gave
20   15:30:48        the barge whatever momentum it had when it approached the wall;
21   15:30:52        right?
22   15:30:52   A.  You mean in terms of a number, a quantity?
23   15:30:56   Q.  Well, the force, Dr. Marino.  What caused -- what impelled
24   15:31:00        it to the wall?  You're not opining about that, are you?
25   15:31:04   A.  The only thing I could say is there's wind and wave that
              JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                         UNITED STATES DISTRICT COURT
                         EASTERN DISTRICT OF LOUISIANA
```

## 1347

```
1    15:32:43        MR. RAFFMAN:  I'm sorry, Judge.
2    15:32:44        THE COURT:  No.  He's answered it as well as he can
3    15:32:48        at this point.
4    15:32:48   BY MR. RAFFMAN:
5    15:32:55   Q.  So this is your photo 4.8 from Plaintiff's Exhibit 397,
6    15:33:02        and this shows the torn sheet pile that you say resulted from
7    15:33:09        impact by a barge; right, Dr. Marino?
8    15:33:11   A.  That's correct.
9    15:33:12   Q.  And according to your depiction, the barge is going to be
10   15:33:15        coming into contact with the wall a short distance from where
11   15:33:19        the wall is ripped; right?
12   15:33:21        THE COURT:  So we know what we're talking about for
13   15:33:23        the record on your cross, and I think you stated it, would that
14   15:33:25        be slide 48 in the first --
15   15:33:30        MR. RAFFMAN:  Your Honor, I don't know what slide it
16   15:33:31        is in the dec.  It is photo --
17   15:33:35        THE COURT:  It's just going to be hard for anybody
18   15:33:37        that's looking at this to compare the two.
19   15:33:39        MR. RAFFMAN:  I can find it, your Honor.  I was given
20   15:33:41        the dec this morning and --
21   15:33:43        THE COURT:  I know, and I'll give you a little extra
22   15:33:46        time.  Just so we can compare it up for the record, sir.  I
23   15:33:52        don't mean to make your examination more tedious.
24   15:33:58        MR. RAFFMAN:  Believe me, Judge, I don't want my
25   15:34:00        examination to be the least bit tedious to you.
              JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                         UNITED STATES DISTRICT COURT
                         EASTERN DISTRICT OF LOUISIANA
```

## 1348

```
 1   15:34:03        THE COURT:  I know.  And I hate to make it worse, but
 2   15:34:06   I am.  It's just that the record needs to reflect what you're
 3   15:34:10   talking about, and it is -- to make it simple, it's figure 4.8
 4   15:34:15   in the report in the --
 5   15:34:19        MR. RAFFMAN:  Yes, Your Honor.  And what Your Honor's
 6   15:34:20   going to observe is that, in each of our slides, at the bottom
 7   15:34:27   right-hand corner, Your Honor will see a reference to the
 8   15:34:30   exhibit and to the photo.
 9   15:34:31        THE COURT:  Great.  And we'll say it for the record
10   15:34:34   so the Court of Appeal will know .
11   15:34:35        What I was concerned about is, if we
12   15:34:38   cross-examine him on some of the slide presentation, it might
13   15:34:41   not be in the report.  So we'll try to identify that if we get
14   15:34:45   there.  But this one here, so we don't -- I made a -- we don't
15   15:34:48   need to worry about at this point -- a mountain out of a
16   15:34:49   molehill here.
17   15:34:50        MR. RAFFMAN:  I'll do my very best to keep the record
18   15:34:53   clear, Your Honor.
19   15:34:54        THE COURT:  Okay.  Good.
20   15:34:54        MR. RAFFMAN:  Thank you, Your Honor.
21   15:34:56        So it's photo slide 118.  So now the record is
22   15:34:59   doubly clear.
23   15:35:01        THE COURT:  Thank you.
24   15:35:01   BY MR. RAFFMAN:
25   15:35:05   Q.  I'm not sure what the answer to my question was.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1349

```
 1   15:35:08   A.  Yeah, there was a lot of conversation, so I was waiting.
 2   15:35:11   Q.  As the barge hits the wall, so you have it, close to this
 3   15:35:14   rip; right?
 4   15:35:18   A.  Again, you know, the routing and the amount of distance
 5   15:35:23   between the barge, where it is, and to where it hits the wall,
 6   15:35:29   I wouldn't know what that is.
 7   15:35:32   Q.  Let me go to your illustrative slide for a second and see
 8   15:35:41   if this illustration has anything to do with it.  This would be
 9   15:35:46   GM-038 and 39.  Part of your --
10   15:35:55        MR. RAFFMAN:  038 first, please.
11   15:35:55        THE COURT:
12   15:35:55   Q.  These are two slides from your illustration, which are not
13   15:35:58   numbered.
14   15:35:59   A.  Yeah.  And if you remember, I qualified this, Mark, and I
15   15:36:02   said that this direction was just an illustration.  It could be
16   15:36:06   moving laterally into the wall.  I didn't have -- I couldn't have
17   15:36:10   a direction that is -- it has to be.  Other than that
18   15:36:18   there's -- which I realized probably a year and a half ago that
19   15:36:22   there was a pole that exists in this area somewhere.  So, you
20   15:36:26   know, it would have to be within that distance between the pole
21   15:36:29   and the wall.
22   15:36:31        And when I realized that I actually -- I remember
23   15:36:35   having one of my engineers plot it, and he looked at it and,
24   15:36:38   yeah, surely the barge can fit between the pole and the wall
25   15:36:42   and create a collision.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1350

```
 1   15:36:48   Q.  I haven't asked you about the pole yet.  I promise you I
 2   15:36:53   will.
 3   15:36:53   A.  I just thought we were going to talk about that.
 4   15:36:56   Q.  I promise you, Dr. Marino.  But before I do that, let me
 5   15:36:58   just -- since you volunteered in nonresponse to a question that
 6   15:37:01   I didn't ask, I guess I should move to strike the answer.
 7   15:37:05   Until I ask the question, I don't...
 8   15:37:07        THE COURT:  We'll strike -- we weren't talking about
 9   15:37:10   the pole.  We were going to get there, so that's fine.  Why
10   15:37:14   don't you ask your question again, and listen to it carefully,
11   15:37:17   Dr. Marino, and attempt to answer it as best you can.
12   15:37:20   BY MR. RAFFMAN:
13   15:37:20   Q.  I want to know how close to that rip the barge struck the
14   15:37:25   wall.
15   15:37:27   A.  I believe it was in the first panel.
16   15:37:29   Q.  The first panel, thank you.
17   15:37:31   A.  Yes.
18   15:37:33   Q.  Now, let's have that photo 4.8 back.
19   15:37:43        This barge -- before I say anything more, this barge
20   15:37:45   is 35 feet wide; right?
21   15:37:47   A.  That's correct.
22   15:37:47   Q.  And the barge is 200 feet long; right?
23   15:37:51   A.  That's correct.
24   15:37:51   Q.  And a barge that's being propelled by the winds is most
25   15:37:55   likely going to be broadside to the wind; right?
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1351

```
 1   15:38:02   A.  I'm not sure what the wind direction's going to be at the
 2   15:38:05   time that this happened.
 3   15:38:08   Q.  I'm not asking what the direction of the wind is.  What
 4   15:38:10   I'm asking is that if the wind is going to act on the sail area
 5   15:38:13   of the barge, the biggest sail area of the barge is along its
 6   15:38:17   200-foot length; isn't that right?
 7   15:38:19   A.  If you want to assume that that's the direction that the
 8   15:38:21   wind was relative to the barge, I mean, you can assume that.
 9   15:38:26   Q.  Well, the barge will align itself in the wind so that the
10   15:38:29   wind is acting on the sail, won't it?  Isn't that that how a
11   15:38:35   sailboat works?
12   15:38:37   A.  I don't know.  Maybe it was catty-corner; maybe it was
13   15:38:39   spinning.  I don't know.
14   15:38:41   Q.  Regardless, the smallest surface is 35 feet because that's
15   15:38:45   the width; right?
16   15:38:47   A.  That's correct.
17   15:38:47   Q.  And so we have here a force that's sufficient to push the
18   15:38:52   wall back 2 to 3 feet, as you've said; right?  In response to
19   15:38:57   the judge's question?
20   15:38:58   A.  That's correct.
21   15:38:59   Q.  And yet, Dr. Marino, you can see that this panel here,
22   15:39:02   just a few feet away, is undisturbed by this barge hit that's
23   15:39:08   got sufficient momentum to drive the wall back 2 to 3 feet;
24   15:39:11   isn't that right?
25   15:39:14   A.  That's correct.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1352

```
1   15:39:14   Q. And are you suggesting, Dr. Marino, that the barge somehow
2   15:39:18   stopped on a dime and changed direction after driving the wall
3   15:39:20   back 2 to 3 feet?
4   15:39:23   A. The testimony has been that the barge was -- protruded the
5   15:39:27   wall, or was just through the wall, and then wasn't seen again.
6   15:39:31   So it -- my -- my understanding and what I believe is that the
7   15:39:36   barge was there, and then the wind or wave blew it away.
8   15:39:41   Q. Well, the barge is going to have considerable momentum,
9   15:39:45   won't it, because it's blowing --
10  15:39:46   A. Well, the momentum's going to be -- the momentum is going
11  15:39:51   to be gone by the time -- it's like -- it's like -- Mark, it's
12  15:39:54   like a shock absorber. It's not a rigid wall. It's like
13  15:39:59   something stretching and consuming that momentum to a point
14  15:40:03   where there's no momentum.
15  15:40:05   Q. The wall doesn't absorb all the barge's momentum,
16  15:40:08   Dr. Marino. Instead of absorbing the momentum, the wall gives
17  15:40:14   way and rips and moves back 2 to 3 feet; isn't that right?
18  15:40:19   A. Well, you're assuming that the barge has enough momentum
19  15:40:21   that it will carry itself further into the protection area,
20  15:40:29   based on my opinion that it doesn't take a large barge load to
21  15:40:41   cause that rip.
22  15:40:46      THE COURT: And by "that rip," precisely what do you
23  15:40:48   mean?
24  15:40:50      THE WITNESS: What we talked about this morning, Your
25  15:40:53   Honor, this -- these areas here that caused that tearing.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1353

```
1   15:40:59      THE COURT: You're talking about the two areas on
2   15:41:01   what we've been calling the isolated sheet pile in the direct
3   15:41:05   examination?
4   15:41:06      THE WITNESS: That's correct.
5   15:41:06   BY MR. RAFFMAN:
6   15:41:08   Q. Just -- just so we're clear, in your opinion of what
7   15:41:13   happens, the barge moves into the wall with sufficient
8   15:41:18   momentum, whatever it is, to drive this metal sheet pile back 2
9   15:41:24   to 3 feet, and then before it can come into contact with this
10  15:41:30   unfailed panel, the barge ceases to move in that direction and
11  15:41:37   comes to a stop and just does something else; right?
12  15:41:42   A. Yes. Or the wind or wave causes it to go away from the
13  15:41:46   wall.
14  15:41:47   Q. And you don't know anything about the wind or the waves,
15  15:41:54   you just assume that must have happened; right?
16  15:41:56   A. That's my opinion.
17  15:41:57   Q. These scratches here, do you see these scratches in your
18  15:42:00   photo?
19  15:42:01   A. Yes.
20  15:42:01   Q. Barge cannot possibly have caused those scratches; am I
21  15:42:06   right?
22  15:42:06   A. I don't believe that those scratches are caused by the
23  15:42:09   barge.
24  15:42:13   Q. I want to ask you a couple of questions about the faulty
25  15:42:22   weld. You didn't know anything about the faulty weld when I
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1354

```
1   15:42:26   asked you about it at your deposition; right?
2   15:42:29   A. This is true. I've since learned much about it.
3   15:42:32   Q. You have. And, in fact, Mr. Pazos --
4   15:42:37      MR. RAFFMAN: Let me have GM-123.
5   15:42:37   BY MR. RAFFMAN:
6   15:42:37   Q. This is Defendant's Exhibit 404. This is Mr. Pazos'
7   15:42:41   summary judgment declaration. Mr. Pazos has testified that
8   15:42:44   there was a rupture of a defective weld at this location on the
9   15:42:50   wall; right?
10  15:42:51   A. That's what says. I haven't read his declaration,
11  15:42:55   so...
12  15:42:57   Q. This is -- in your slide 118, you refer to a double rip;
13  15:43:02   right?
14  15:43:02   A. That's correct.
15  15:43:03   Q. And one of those rips is the faulty weld; right?
16  15:43:06   A. That's correct.
17  15:43:07   Q. And you have done no calculations to rule out the
18  15:43:13   possibility that a faulty weld failed under a hydrostatic load;
19  15:43:20   am I right?
20  15:43:20   A. Well, I wouldn't say that I haven't done anything related
21  15:43:24   to that. As I discussed in my -- in my direct, that the
22  15:43:33   deflection of the sheet pile from the water load alone would
23  15:43:37   not be sufficient --
24  15:43:38      THE COURT: Can you get a little closer?
25  15:43:40      THE WITNESS: I'm sorry.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1355

```
1   15:43:40      THE COURT: My hearing may wane as the day goes on.
2   15:43:43   Just a little closer. Thank you.
3   15:43:47      THE WITNESS: You're welcome.
4   15:43:48      THE COURT: Go ahead, sir. You were saying?
5   15:43:50      THE WITNESS: That the deflection of the sheet pile
6   15:43:52   from the water load alone wouldn't be sufficient to make or
7   15:43:56   cause the tear that we observed at the north end.
8   15:43:58      We're talking about -- if you remember, we
9   15:44:01   talked about a quarter-of-an-inch or a part-of-an-inch gap at
10  15:44:06   the top. And if you recall, we talked about the flexibility of
11  15:44:11   that sheet piling. And this defective weld doesn't mean that
12  15:44:18   it doesn't have any strength, rupture of a defective weld.
13  15:44:21   Maybe -- maybe it didn't have the full capacity that the sheet
14  15:44:24   pile had, but that doesn't mean it doesn't have any.
15  15:44:31      And I haven't seen anybody come up with, okay,
16  15:44:34   this is what the defective weld's strength was. IPET doesn't
17  15:44:39   talk about it. ILIT doesn't talk about it. You know, I don't
18  15:44:46   know -- to me, it really doesn't have a lot of relevance.
19  15:44:50      MR. RAFFMAN: All right. Let me have page 116, line
20  15:44:50   12 to 15, in the deposition to make the record complete.
21  15:44:54   BY MR. RAFFMAN:
22  15:44:54   Q. I asked you the same question at your deposition.
23  15:44:57   "QUESTION: Have you done any calculations to rule
24  15:45:01   out the possibility that a faulty weld failed under a
25  15:45:04   hydrostatic load?
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1356

```
1    15:45:07      "ANSWER: I haven't done those calculations, no."
2    15:45:14         You haven't supplemented your report with any
3    15:45:17    calculations since your deposition, have you?
4    15:45:19    A.  I still haven't done any calculations about it.  What I've
5    15:45:22    done is I've looked at that problem, and I said that the
6    15:45:26    deflection of wall from water hydrostatic pressure alone is not
7    15:45:31    going to give you the tears that we're looking at.
8    15:45:36    Q.  Now, you have not ruled out the possibility that
9    15:45:44    hydrostatic pressure caused the rubber water stops in the
10   15:45:49    concrete monolith to dislodge as the water rose up the
11   15:45:54    floodwall on the morning of August 29th, have you?
12   15:46:00    A.  Can you repeat that question, Mark?
13   15:46:05    Q.  You have not ruled out the possibility that hydrostatic
14   15:46:10    pressure caused water stops in the concrete monoliths to
15   15:46:19    dislodge as the water rose up the wall on the morning of
16   15:46:22    August 29th at the north breach?
17   15:46:27    A.  I haven't ruled out whether the hydrostatic pressure --
18   15:46:31         THE COURT:  You are repeating the question, not
19   15:46:33    answering it.
20   15:46:34         THE WITNESS:  Yeah.  I'm trying to understand the
21   15:46:36    question.  Exactly.
22   15:46:37         THE COURT:  He's asking you -- I don't want to ask
23   15:46:39    it.  Do you want to ask it again, sir?
24   15:46:41         THE WITNESS:  I think I know the answer, but I'm not
25   15:46:43    sure I'd be answering the right question.

           JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                    UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF LOUISIANA
```

## 1357

```
1    15:46:46         THE COURT:  If you don't mind, counsel, I'll impose
2    15:46:49    upon you to ask it again.
3    15:46:50         MR. RAFFMAN:  Thank you, Your Honor.
4    15:46:50    BY MR. RAFFMAN:
5    15:46:51    Q.  The wall has panels; right?
6    15:46:54    A.  Yes.
7    15:46:54    Q.  And in between those panels, there are rubber water stops.
8    15:46:58    You testified about them this morning; right?
9    15:47:00    A.  That's correct.
10   15:47:00    Q.  And those rubber water stops in this wall go to the level
11   15:47:03    of the construction joint, but not all the way down to the
12   15:47:07    levee.  That's what you testified about this morning.
13   15:47:10    A.  I said they went down to the -- at least, to the sheet
14   15:47:16    pile, which would be below the construction joint.
15   15:47:19    Q.  Below the construction joint?
16   15:47:22    A.  Yes.
17   15:47:23    Q.  At the Inner Harbor Navigation Canal, you have water stops
18   15:47:24    that are going all the way down to the top of the sheet pile,
19   15:47:27    below the construction joint?
20   15:47:29    A.  Yes.
21   15:47:30    Q.  And as the water rises along the wall, it can exert
22   15:47:34    pressure on the wall, and maybe those panels will want to move
23   15:47:37    out a little bit, and maybe the water can dislodge the water
24   15:47:43    stop and start squirting through.
25   15:47:46         Have you done any calculations to rule out the

           JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                    UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF LOUISIANA
```

## 1358

```
1    15:47:51    possibility that the water pressure on the wall could cause the
2    15:47:51    water stops to dislodge and allow water through?
3    15:47:55    A.  Again, I mean, if we're talking about the north, it's
4    15:48:01    common sense that tells you, if you've got a deflection of only
5    15:48:04    a fraction of an inch, the differential that you're going to
6    15:48:10    have at a joint to cause that stop to rupture, I mean, even if
7    15:48:17    it does rupture, we're talking about an eighth-of-an-inch gap
8    15:48:25    at the construction joint.  So how much water are you going to
9    15:48:28    get through there?
10   15:48:30         Plus, the water is above that -- whatever's happening
11   15:48:33    there, the water would be above the levee.  It's not -- as we
12   15:48:36    talked about earlier, the sheet pile -- I'm sorry -- the sheet
13   15:48:42    pile is above the levee surface.  So if we have a leak up here,
14   15:48:49    a little squirt of water out here, I don't know what the
15   15:48:51    relevance of that is.
16   15:48:53    Q.  Well, at the time of the north breach, the water level is
17   15:49:01    1.8 feet below the top of what you tell me is a 13-foot wall;
18   15:49:08    right?
19   15:49:08    A.  Yes.
20   15:49:09    Q.  And I'll grant you, for purposes of the argument, the
21   15:49:12    13 feet.  We're going to talk about that a little later.  But
22   15:49:16    the construction joint is 3 feet below the top of the wall;
23   15:49:23    isn't that right?
24   15:49:26    A.  Are you talking about the horizontal construction joint?
25   15:49:30    What joint are you talking about?  Or the vertical joint?

           JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                    UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF LOUISIANA
```

## 1359

```
1    15:49:32    Q.  Well, the first question is the construction joint.  Then
2    15:49:35    we're going to get to the sheet pile, which is underneath the
3    15:49:39    construction joint.
4    15:49:41    A.  Okay.
5    15:49:41    Q.  The construction joint is 3 feet below the top of the
6    15:49:44    wall.
7    15:49:45    A.  So you're talking not about the vertical construction --
8    15:49:47         THE COURT:  There are two construction joints, as the
9    15:49:49    Court understands it:  A horizontal, where the various segments
10   15:49:53    of the floodwall are joined; and a vertical, as we saw in
11   15:49:57    pictures earlier.  Or photographs, as he said.
12   15:49:59    BY MR. RAFFMAN:
13   15:49:59    Q.  And the vertical, to be clear, is where the water stops
14   15:50:02    are; right?
15   15:50:04    A.  Yes.
16   15:50:04    Q.  And horizontal is just for purposes of orienting the Court
17   15:50:09    to where the water is vis-à-vis the wall.  The construction
18   15:50:13    joint is 3 feet below the top.
19   15:50:17    A.  Okay.
20   15:50:17    Q.  The top of the sheet pile is no less than 6 inches below
21   15:50:20    the construction joint?
22   15:50:22    A.  That's correct.
23   15:50:22    Q.  So if you have water that has risen to about a foot and a
24   15:50:27    half or 1.8 feet below the top of the wall, that water is going
25   15:50:30    to be about 2 feet on top of the level of the sheet pile?

           JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                    UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF LOUISIANA
```

## 1360

1  15:50:36   A.  Okay.

2  15:50:38   Q.  And so if you have water 2 feet high up there, and that

3  15:50:45   water is pushing on the wall, and that water dislodges the

4  15:50:50   water stop, you could have 2 feet of water that are now being

5  15:50:57   forced in like a jet onto the protected side of the floodwall,

6  15:51:05   if that happens; isn't that right?

7  15:51:07   A.  I don't think it would be a jet.  I mean, I don't know

8  15:51:11   that -- that doesn't sound like good science to me.  To me.

9  15:51:24   Q.  Have you done any calculations to rule out the

10  15:51:27   possibility, whether it's a jet or not --

11  15:51:31   A.  Okay.

12  15:51:32   Q.  -- to rule out the possibility that the water stop fails

13  15:51:40   under the pressure of the water as it rises up the wall?

14  15:51:45   A.  I haven't done any calculations.

15  15:51:47   Q.  Now, let me ask you about the transition between the deep

16  15:51:50   sheet pile in 1980 and the shallow 1969 sheet pile so that the

17  15:51:59   Court understands -- and the Court probably does understand,

18  15:52:01   but let me ask anyway.

19  15:52:04          THE COURT:  Never assume, you're right.  Ask, please.

20  15:52:07   Go ahead.

21  15:52:07   BY MR. RAFFMAN:

22  15:52:08   Q.  The 1980 sheet pile is buried to what depth?

23  15:52:14   A.  A negative 27.5.

24  15:52:18   Q.  The 1969 sheet pile is buried to what depth?

25  15:52:22   A.  Negative 10.5.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1361

1  15:52:23   Q.  So you've got a 17-foot sheet pile next to a 10.5 sheet

2  15:52:28   pile, and they're connected together; right?

3  15:52:31   A.  That's correct.

4  15:52:31   Q.  And when the water rises on the wall, that deeper sheet

5  15:52:37   pile has got more structural integrity than that shallower

6  15:52:41   sheet pile; isn't that right?

7  15:52:45   A.  In what way?

8  15:52:46   Q.  Well, let me ask it this way:  Am I correct, Dr. Marino,

9  15:52:58   that the junction between the failed sheet pile and the deeper

10  15:53:01   sheet pile is a weaker point on the wall because the panel to

11  15:53:04   the north has more structural integrity?

12  15:53:11   A.  Well, what I could say is that the wall to the north has

13  15:53:19   more resistance than -- for lateral movement from -- for the

14  15:53:27   water than the wall to the south.

15  15:53:29   Q.  So as the water rises on the wall, that deeper sheet pile

16  15:53:34   wants to stick and that shallower sheet pile wants to give; is

17  15:53:41   that a colloquial expression of the science you're using?

18  15:53:48   A.  I think the terms you are using are fairly dramatic, but I

19  15:53:51   don't know about give.  But as I said before, we're talking

20  15:53:55   about a fraction-of-an-inch deflection with the smaller sheet

21  15:54:02   pile.  So when you're talking "give" and "weak link," it sounds

22  15:54:07   more severe than it is.

23  15:54:09   Q.  Well, I haven't asked you to quantify it yet.

24  15:54:14   A.  But I want to make sure we're using the right terminology.

25  15:54:17      THE COURT:  Counsel, can you give me one second to

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1362

1  15:54:19   fix something on my realtime?

2  15:55:47          (OFF THE RECORD)

3  15:55:47      THE COURT:  I apologize, counsel.  I'm sorry.

4  15:55:48   BY MR. RAFFMAN:

5  15:55:49   Q.  If you put pressure on the wall to the south where you

6  15:55:52   have the weaker sheet pile, you will induce tension, torsion,

7  15:56:00   between the deeper and the shallower pile; right?

8  15:56:05   A.  Yeah, but it wouldn't be very significant.

9  15:56:10   Q.  Have you quantified the torsion?

10  15:56:14   A.  I don't need to.  I mean, if it's only the deflection --

11  15:56:17   if you look at the twisted sheet pile on the north end, I mean,

12  15:56:20   this -- sheet pile is flexible.  Okay.  An eighth-of-an-inch

13  15:56:24   difference is not going to make a difference.

14  15:56:25      THE COURT:  When you're saying "an eighth-of-an-inch

15  15:56:28   difference," explain that eighth of an inch to me.

16  15:56:29      THE WITNESS:  If one sheet pile is moving, say -- the

17  15:56:32   stiffer one is moving, say, an eighth of an inch, and the other

18  15:56:37   is moving, say, a half an inch, so you have an

19  15:56:40   eighth-of-an-inch difference between the two, that's not a

20  15:56:41   significant deflection.

21  15:56:43      THE COURT:  Where do we get the difference of an

22  15:56:45   eighth an inch?  Where do you get it?

23  15:56:48      THE WITNESS:  Basically, by looking at the gaps, the

24  15:56:50   gap formation, in terms of the deflection of the wall.

25  15:56:54      If you remember, Your Honor, we looked at those

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1363

1  15:56:59   E-99 tests, the E-99 field tests, that showed deflections at

2  15:57:07   the top of the crown.  Remember it was a fraction of an inch?

3  15:57:11      THE COURT:  I recall.  I do recall where that comes

4  15:57:13   from.  Okay.  Thank you.

5  15:57:14   BY MR. RAFFMAN:

6  15:57:14   Q.  Well, if you have --

7  15:57:18   A.  And, remember, if I could qualify, that that's over a much

8  15:57:22   longer period of time.

9  15:57:23      THE COURT:  I do.  I recall.  Yes, sir.

10  15:57:26   BY MR. RAFFMAN:

11  15:57:27   Q.  Dr. Marino, are you telling the Court that because the

12  15:57:33   E-99 test was over a much longer period of time, that during

13  15:57:41   Hurricane Katrina, the floodwalls throughout the New Orleans

14  15:57:44   area didn't have time for tension cracks to form?  Is that what

15  15:57:49   you're telling the Court?

16  15:57:50   A.  Absolutely not.  I'm saying the tension cracks are not

17  15:57:54   going to be large prior to overtopping.  Or some back -- or

18  15:58:00   some erosion on the back side or the protection side of the

19  15:58:06   levee.

20  15:58:06   Q.  The tension crack forms on the --

21  15:58:10   A.  Flood side.

22  15:58:10   Q.  -- flood side.

23  15:58:20      And tension cracks formed at the London Avenue Canal;

24  15:58:25   right?

25  15:58:26   A.  Yes.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1364

1  15:58:26  Q.  And tension cracks formed at the 17 Street Canal; right?

2  15:58:32  A.  Yes.

3  15:58:32  Q.  And those walls were not overtopped?

4  15:58:36  A.  Yes.  But there was erosion of the protection levee.

5  15:58:47  Q.  And, in fact, at the London Avenue Canal and at the

6  15:59:03  17 Street Canal, you could see tension cracks that formed at

7  15:59:11  places where the walls were not overtopped?

8  15:59:17  A.  Okay.

9  15:59:18  Q.  Okay?

10  15:59:20  THE COURT:  And you're saying that's a "yes"?

11  15:59:22  THE WITNESS:  Yes.

12  15:59:25  MR. RAFFMAN:  Thank you, Judge.

13  15:59:27  THE WITNESS:  I'm saying "okay" because that's what

14  15:59:28  he's telling me.

15  15:59:30  THE COURT:  That's what concerned me.  But do you

16  15:59:32  agree with that proposition?

17  15:59:34  THE WITNESS:  Yes.  As I said, Your Honor, there

18  15:59:35  would be a gap that would form.  It would be limited in size

19  15:59:39  and it would be limited in depth.  Until there's some support

20  15:59:46  that's lost on the protection side in terms of erosion or

21  15:59:52  overtopping from erosion.

22  15:59:54  BY MR. RAFFMAN:

23  15:59:55  Q.  Did you go to the London Avenue Canal?

24  15:59:58  A.  No, sir.

25  15:59:58  Q.  Did you go to the 17 Street Canal?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1365

1  16:00:00  A.  No, sir.

2  16:00:02  Q.  You've read IPET; you've read ILIT.  They all say that

3  16:00:07  tension cracks formed on the canal side.  Significant tension

4  16:00:10  cracks; right?

5  16:00:16  A.  Yes.

6  16:00:16  Q.  And they formed in Katrina over the 24 hours, or whatever

7  16:00:19  the amount of storm surge time was that they had to form.  It

8  16:00:23  didn't take 52 days; right?

9  16:00:26  A.  That's correct.  As I've said, I'm not saying that there

10  16:00:28  isn't tension cracks that formed.  I'm saying that the tension

11  16:00:32  cracks are limited in size and depth.

12  16:00:35  Q.  Did you measure the tension cracks at the London Avenue

13  16:00:37  Canal?

14  16:00:38  A.  No.

15  16:00:38  Q.  Did you measure the tension cracks at the 17 Street Canal?

16  16:00:42  A.  No.  I don't know if anybody could measure it anyway.

17  16:00:49  Q.  There will be testimony about it, tension cracks forming

18  16:00:53  at all canals.

19  16:01:08  Let's look at the power pole, or the pole.

20  16:01:11  MR. RAFFMAN:  Let me have photo 4.6.  I'm sorry,

21  16:01:19  GM-033.  I'm sorry.

22  16:01:27  BY MR. RAFFMAN:

23  16:01:27  Q.  This is photo 4.6 from your report, Plaintiff's Exhibit

24  16:01:31  397.  It's also slide 149 in Dr. Marino's dec from this

25  16:01:36  morning.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1366

1  16:01:40  Dr. Marino, the pole is readily observable right in

2  16:01:46  the middle of the area where the north breach occurred; right?

3  16:01:49  A.  That's correct.

4  16:01:51  Q.  That's a photo that's included in your report; right?

5  16:01:54  A.  It looks like it.

6  16:01:58  Q.  How long is the breach from end to end?

7  16:02:04  A.  Over 200 feet.

8  16:02:06  Q.  The barge from end to end?

9  16:02:08  A.  200 feet.

10  16:02:11  Q.  You want to tell the Court that one of your engineers has

11  16:02:14  done some calculation to say that a 200-foot barge can sneak

12  16:02:20  around that pole to get into that breach under the forces of

13  16:02:25  what plaintiffs' experts have called unpredictable wind and

14  16:02:29  unpredictable waves?  Do you want to tell the Court that?

15  16:02:33  A.  I am not a routing person, so I can't tell you how the

16  16:02:35  barge got there.  All I can say is that the damage patterns

17  16:02:39  that I've observed are not indicative of what I would expect to

18  16:02:45  occur if it failed from soil yielding or seepage conditions.

19  16:02:50  THE COURT:  Counsel, I'm sorry.  Forgive me.  I

20  16:02:53  was -- I was typing a note here, and I want to make sure I'm

21  16:03:00  looking at the right pole.  Would you point that one out to me,

22  16:03:05  sir?

23  16:03:06  MR. RAFFMAN:  Of course, Judge.  It's slide 149 in

24  16:03:09  Dr. Marino's dec from this morning.  It is also -- I'm so

25  16:03:16  sorry.  It's right here.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1367

1  16:03:18  THE COURT:  You want to -- you can mark it, sir.

2  16:03:21  Okay.

3  16:03:23  MR. RAFFMAN:  I just pointed it right there, Judge.

4  16:03:26  THE COURT:  Okay.  All right.  I'm looking in the

5  16:03:28  wrong place.  I'm glad you did.

6  16:03:31  MR. RAFFMAN:  I'm so sorry.

7  16:03:32  THE COURT:  No, I've got it.  It was my own glitch.

8  16:03:35  MR. RAFFMAN:  We've all gotten used to looking at it

9  16:03:38  over the weekend.  But here's this power pole -- pole right

10  16:03:41  here.

11  16:03:41  THE COURT:  Yes.

12  16:03:41  MR. RAFFMAN:  In the middle of the breach.

13  16:03:42  THE COURT:  I see it.

14  16:03:43  MR. RAFFMAN:  This is the pole that Mr. Pazos

15  16:03:45  testified would be reduced to splinters if the barge was

16  16:03:47  anywhere near it.

17  16:03:49  MR. WILSON:  Objection, Judge.  That's a

18  16:03:50  mischaracterization of his testimony.

19  16:03:53  THE COURT:  I'll look at the testimony eventually.

20  16:03:56  MR. RAFFMAN:  I'll withdraw the characterization.

21  16:03:57  The Court will look at the testimony.

22  16:04:00  BY MR. RAFFMAN:

23  16:04:01  Q.  200-foot barge, 200-foot breach.  Dr. Marino, you're not

24  16:04:06  here to testify that that barge is going to sneak into that

25  16:04:11  breach without touching that pole, are you?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1368

1  16:04:13   A.  As I said, I'm not a routing person, so...

2  16:04:19   Q.  So let's now look at some other photos --

3  16:04:19       MR. RAFFMAN:  I'm sorry.

4  16:04:19       THE COURT:  I'm just going to ask Dr. Marino to --

5  16:04:26   you could do it by pointer -- show where you think the breach

6  16:04:30   is vis-à-vis the pole.

7  16:04:32       THE WITNESS:  I believe that the breach occurred --

8  16:04:35   began here at the corner of the barge.  Would have to be in

9  16:04:40   this direction.

10  16:04:41       THE COURT:  All right.

11  16:05:07       MR. RAFFMAN:  Slide 04 in Dr. Marino's dec -- Your

12  16:05:11   Honor, may we clear the screen?

13  16:05:12       THE COURT:  Yes, you certainly may.

14  16:05:14   BY MR. RAFFMAN:

15  16:05:16   Q.  Dr. Marino, this is slide 4 in your dec.

16  16:05:21       MR. RAFFMAN:  Plaintiffs' Exhibit 397, Marino report

17  16:05:24   photo 4.3, Your Honor.

18  16:05:24   BY MR. RAFFMAN:

19  16:05:26   Q.  Dr. Marino, can you see the same pole in the location

20  16:05:30   where I've placed my mark?

21  16:05:37   A.  Yes.

22  16:05:37   Q.  Now, in this photo, this is a photo taken shortly after

23  16:05:41   Katrina; right?

24  16:05:43   A.  Yes.

25  16:05:43   Q.  You don't see any repair works in this photo?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1369

1  16:05:52   A.  I don't believe so, no.

2  16:05:53   Q.  All right.

3  16:05:54       MR. RAFFMAN:  Your Honor, would you please clear the

4  16:05:56   screen?

5  16:05:56       THE COURT:  Okay.

6  16:05:56   BY MR. RAFFMAN:

7  16:06:13   Q.  Here we have a couple of other photos.  I don't -- there

8  16:06:17   should be exhibit numbers here.  DX-263 is the one on the

9  16:06:41   right, and the one on the right is DX-106.  Is that not --

10  16:06:50   left.  I'm sorry, the one on the left is DX-106.

11  16:06:55       Dr. Marino, again, you can see the pole readily

12  16:06:57   visible in both of these photos; correct?

13  16:07:01   A.  That's correct.

14  16:07:01   Q.  And the one on the right, the water's still rushing out of

15  16:07:07   the neighborhood after Katrina; right?

16  16:07:13   A.  If you say that's Katrina.  I don't know that that's

17  16:07:16   Katrina.

18  16:07:16   Q.  Well, did the northern breach re-breach in Rita?

19  16:07:22   A.  I'm not sure.

20  16:07:23   Q.  All right.  I'm going to ask you to assume that the

21  16:07:26   northern breach did not rebreak in Rita, and I'll ask you

22  16:07:30   again:  The water's rushing out of the neighborhood immediately

23  16:07:34   following Katrina; right?

24  16:07:36   A.  Yes.

25  16:07:37   Q.  And so would you agree with me that that pole was present

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1370

1  16:07:41   before any repair work started in the neighborhood?

2  16:07:46   A.  Mark, I've already stated that I thought that the pole was

3  16:07:49   there.

4  16:07:49   Q.  All right.  Let me just show a couple of other pieces for

5  16:07:52   the record in case it's ever disputed by anybody else.

6  16:07:58       THE COURT:  Just one second, sir.

7  16:08:00       (OFF THE RECORD)

8  16:08:31       THE COURT:  Go ahead, counsel.

9  16:08:33       MR. RAFFMAN:  I'm sorry, Your Honor.  Next slide

10  16:08:34   please.  I have just a couple more.

11  16:08:37   BY MR. RAFFMAN:

12  16:08:40   Q.  Dr. Marino, I'm showing you a New Orleans Times-Picayune

13  16:08:44   article from Wednesday, August 31st, 2005, in which --

14  16:08:50       MR. WILSON:  Objection, Your Honor.  Is this in

15  16:08:51   evidence?

16  16:08:54       MR. RAFFMAN:  Well, it's going to be as soon as I

17  16:08:56   offer it.

18  16:08:59       THE COURT:  Which one -- it looks like the same

19  16:09:03   photograph as the other one, but okay.

20  16:09:06   BY MR. RAFFMAN:

21  16:09:07   Q.  Do you recognize this as the same photograph that I just

22  16:09:09   showed you, DX-106?

23  16:09:21       MR. RAFFMAN:  No?  263, I'm sorry.  My colleagues

24  16:09:23   have all reminded me that it's 263.

25  16:09:28       MR. WILSON:  Judge, I can't see the date on the

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1371

1  16:09:29   Times-Picayune newspaper that he's producing.  And I haven't

2  16:09:39   even been provided with what he's putting up here.

3  16:09:41       THE COURT:  So this is an exhibit you haven't seen?

4  16:09:42   You are objecting to it because it wasn't on the exhibit list.

5  16:09:48   Is that the nature of your objection, sir?

6  16:09:50       MR. WILSON:  I'm going to allow it, judge.

7  16:09:52       THE COURT:  All right.  Thank you.

8  16:09:53       MR. RAFFMAN:  So we'll offer this one as Exhibit 344.

9  16:10:03   BY MR. RAFFMAN:

10  16:10:04   Q.  Dr. Marino, the pole appears in a newspaper article dated

11  16:10:06   August 31st, 2005?

12  16:10:09   A.  Yes.

13  16:10:11   Q.  All right.  I have one more.  Dr. Marino, you have

14  16:10:15   reviewed documents created by -- or for Washington Group

15  16:10:19   International regarding the works that were done on the East

16  16:10:23   Bank industrial area; am I right?

17  16:10:26   A.  Yes.

18  16:10:27   Q.  And among those documents were soil borings that were

19  16:10:30   taken as those works were being demobilized as part of the work

20  16:10:36   that was being done by Washington Group; right?

21  16:10:42   A.  Can you repeat that question?

22  16:10:45   Q.  The documents you reviewed included soil borings that were

23  16:10:51   taken as the East Bank industrial works at Boland Marine and

24  16:10:56   other sites were being decommissioned or demobilized or

25  16:11:02   removed?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1372

| | |
|---|---|
| 1 | 16:11:03  A.  The borings were removed? |
| 2 | 16:11:05  Q.  No.  The Boland Marine businesses and buildings and other |
| 3 | 16:11:10  things were being removed? |
| 4 | 16:11:12  A.  That's correct. |
| 5 | 16:11:13  Q.  And you've reviewed documents involving the removal of |
| 6 | 16:11:17  those buildings and things; right? |
| 7 | 16:11:19  A.  That's correct. |
| 8 | 16:11:20  Q.  So I'm going to show you a document -- |
| 9 | 16:11:22        MR. RAFFMAN:  May I have the ELMO, please? |
| 10 | 16:11:24  BY MR. RAFFMAN: |
| 11 | 16:11:32  Q.  This document bears the Bates number WGI-013699A. |
| 12 | 16:11:47  Dr. Marino, do you recognize this as a photo of the East Bank |
| 13 | 16:11:51  industrial area, looking from north to south, taken prior to |
| 14 | 16:11:55  Hurricane Katrina? |
| 15 | 16:12:04  A.  Yes. |
| 16 | 16:12:06  Q.  And you can see at least one -- and actually, several more |
| 17 | 16:12:12  poles -- in that area at that time; right? |
| 18 | 16:12:15  A.  Yes. |
| 19 | 16:12:15        MR. RAFFMAN:  And I'm going to offer this one as |
| 20 | 16:12:17  Defendant's Exhibit 345. |
| 21 | 16:12:22        THE COURT:  Any objection? |
| 22 | 16:12:25        MR. WILSON:  No objection, Your Honor. |
| 23 | 16:12:26        THE COURT:  Let it be admitted. |
| 24 | 16:12:27  BY MR. RAFFMAN: |
| 25 | 16:12:36  Q.  Let's keep going here. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1373

| | |
|---|---|
| 1 | 16:12:47        MR. RAFFMAN:  I'm going to need one for the Court. |
| 2 | 16:12:50  We'll bring one for the Court of that one and the New York -- |
| 3 | 16:12:50  the Times-Picayune.  I know what the newspaper is. |
| 4 | 16:12:56        THE COURT:  Yes.  Thank you. |
| 5 | 16:13:02        MR. RAFFMAN:  May I have GM-016, please? |
| 6 | 16:13:05  BY MR. RAFFMAN: |
| 7 | 16:13:07  Q.  Dr. Marino, this is slide 217 in the Marino dec for the |
| 8 | 16:13:13  record.  And you recognize this as your depiction of three |
| 9 | 16:13:17  impacts at the south breach; right, Dr. Marino? |
| 10 | 16:13:20  A.  Yes. |
| 11 | 16:13:20  Q.  And for each of these impacts, you've got a side view at |
| 12 | 16:13:24  the bottom; right? |
| 13 | 16:13:25  A.  Yes. |
| 14 | 16:13:26  Q.  And in your opinion, the water level at the time these |
| 15 | 16:13:30  impacts takes place is the same; right? |
| 16 | 16:13:32  A.  Well, that's -- that would be more consistent with the |
| 17 | 16:13:37  exit point. |
| 18 | 16:13:38  Q.  How much higher was the water at the exit point, |
| 19 | 16:13:42  Dr. Marino? |
| 20 | 16:13:42  A.  No, no.  I'm saying that would be more consistent with the |
| 21 | 16:13:45  exit point. |
| 22 | 16:13:46  Q.  That side view is? |
| 23 | 16:13:48  A.  Yes. |
| 24 | 16:13:48  Q.  My question is:  All three of these impacts are taking |
| 25 | 16:13:52  place within a window of no less than half an hour; right? |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1374

| | |
|---|---|
| 1 | 16:13:56  A.  I would say approximately. |
| 2 | 16:13:57  Q.  Well, you've got the north breach happening at 6:00; |
| 3 | 16:14:00  right? |
| 4 | 16:14:00  A.  I said -- I said to you that that's an approximate time. |
| 5 | 16:14:03  Q.  Okay.  But what I want to do -- right.  And the water |
| 6 | 16:14:07  level at the time of the north breach, as I remember, was |
| 7 | 16:14:09  11.2 feet NAVD88; right? |
| 8 | 16:14:13  A.  Yes. |
| 9 | 16:14:13  Q.  And the water level at the time of the south breach is |
| 10 | 16:14:17  11.8 feet NAVD88; right? |
| 11 | 16:14:20  A.  That's correct.  That assumes that it is at 6:00 on the |
| 12 | 16:14:23  north breach. |
| 13 | 16:14:25  Q.  6:00 on the north breach. |
| 14 | 16:14:27  A.  And the next -- |
| 15 | 16:14:27  Q.  6:30 at the south breach? |
| 16 | 16:14:29  A.  6:30 is when the flooding, the violent flooding, occurred. |
| 17 | 16:14:32  Q.  Obviously, then, Dr. Marino, whatever impact the barges |
| 18 | 16:14:36  had in any of these places has to have been completed by 6:30; |
| 19 | 16:14:43  right? |
| 20 | 16:14:43  A.  Approximately. |
| 21 | 16:14:45  Q.  So between 6:00 and 6:30 is when all of this is happening; |
| 22 | 16:14:51  right? |
| 23 | 16:14:51  A.  Approximately. |
| 24 | 16:14:52  Q.  And the water level within 6 inches as you've put it; |
| 25 | 16:14:57  right? |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1375

| | |
|---|---|
| 1 | 16:14:57  A.  Approximately. |
| 2 | 16:14:59  Q.  So the water level at the time the barge exits in the |
| 3 | 16:15:05  neighborhood is 6 inches higher than the water level at the |
| 4 | 16:15:09  time of north breach; right? |
| 5 | 16:15:14  A.  Approximately. |
| 6 | 16:15:15  Q.  And all times in between are in that 6-inch water level |
| 7 | 16:15:21  window; right?  Approximately? |
| 8 | 16:15:25  A.  Approximately. |
| 9 | 16:15:31  Q.  Dr. Marino, you haven't calculated the amount of seepage |
| 10 | 16:15:37  that occurs between the time that the barge first comes into |
| 11 | 16:15:42  contact with the wall at this primary impact, as you put it, |
| 12 | 16:15:45  and the time of the massive flood that takes place at 6:30, |
| 13 | 16:15:50  have you? |
| 14 | 16:15:54  A.  Calculated the amount of seepage? |
| 15 | 16:15:56  Q.  Yes, sir. |
| 16 | 16:15:57  A.  I'm not understanding the question. |
| 17 | 16:16:01  Q.  Deposition 151, line 11 to 14, please: |
| 18 | 16:16:07        "QUESTION:  You have not calculated the amount of |
| 19 | 16:16:09  seepage that occurs during that less than a half an hour; |
| 20 | 16:16:17  right? |
| 21 | 16:16:20        "ANSWER:  That's correct." |
| 22 | 16:16:26  A.  I think the context -- I would need the context, but I |
| 23 | 16:16:29  think what you're talking about is -- what we're talking about |
| 24 | 16:16:33  at that point is how much water would be going underneath the |
| 25 | 16:16:39  sheet pile during that period of time. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

23  (Pages 1372 to 1375)

1376

```
1   16:16:43  Q.  And you haven't calculated --
2   16:16:45  A.  I don't know how you would calculate that.
3   16:16:47  Q.  Sure.
4   16:16:48  A.  But, as I said earlier in my deposition, that when you
5   16:16:54  have that impact and you create that channel, and the rush of
6   16:16:58  water coming down from the barge impact down to the tip of the
7   16:17:05  sheet pile, that's a very dramatic effect that's being caused.
8   16:17:10  We're talking about a drop of 16 or 17 feet.  Rush of water
9   16:17:18  that's -- with a channel, that's over 2 feet or so.  And that
10  16:17:24  would cause a great impact on the soils, particularly on the
11  16:17:29  protection side.
12  16:17:33  Q.  What you haven't done is a calculation of how much water
13  16:17:37  goes under the sheet pile and undermines the soil on the
14  16:17:40  backside.  That's a calculation you have not done; right?
15  16:17:44  A.  No.  I mean, if you look at Villavaso's testimony how
16  16:17:48  quickly it occurred, I did a -- I was involved in the
17  16:17:56  investigation of a dam in South Carolina where the water didn't
18  16:17:59  even reach the top of -- they were pounding the water behind
19  16:18:05  the dam, and it completely eroded out before they could get it
20  16:18:10  to the top.
21  16:18:19  Q.  You mentioned, Doctor, Mr. Villavaso's testimony.  So that
22  16:18:22  the record is clear, he's at the north breach; right?
23  16:18:24  A.  That's correct.
24  16:18:24  Q.  Nothing he's offering has anything to do with the south
25  16:18:27  breach, does it?
```

1377

```
1   16:18:28  A.  It's just a demonstration that it can occur fairly
2   16:18:31  rapidly.
3   16:18:32  Q.  So your conclusion about the south breach is informed by
4   16:18:34  your conclusion about the north breach and Mr. Villavaso's
5   16:18:38  testimony; is that fair?
6   16:18:40  A.  In part.
7   16:18:55  Q.  Am I right, Dr. Marino, that with respect to the
8   16:18:57  PowerPoint demonstration you did, the animation you did about
9   16:19:01  the south breach, that that's just an illustration; that
10  16:19:05  doesn't purport to be a real representation of what actually
11  16:19:09  happened when the barge approached the wall?
12  16:19:13  A.  Yes.  We've -- we've put that in as a demonstrative
13  16:19:17  exhibit.
14  16:19:22  Q.  And, in fact, if you wanted to know what really happened,
15  16:19:26  you'd want to know something about the angle as the barge
16  16:19:29  approached the wall; right?
17  16:19:34  A.  It's not only the angle.  I mean, there's a lot of
18  16:19:37  variables that relate to the momentum that's going to be
19  16:19:40  imparted in a wall.
20  16:19:42  Q.  So let's talk about all those variables you'd want to know
21  16:19:44  about.  You'd want to know about the angle; right?
22  16:19:47  A.  Yes.
23  16:19:48  Q.  You'd want to know about the speed; right?
24  16:19:50  A.  Yes.
25  16:19:50  Q.  You'd want to know about the wind force acting on the
```

1378

```
1   16:19:54  barge; right?
2   16:19:55  A.  That's correct.
3   16:19:58  Q.  You'd want to know the barge's momentum when it comes into
4   16:20:01  contact with the wall; right?
5   16:20:03  A.  That's correct.
6   16:20:03  Q.  We don't know any of those things?
7   16:20:05  A.  That's correct.
8   16:20:17  Q.  Dr. Marino, this is a slide taken from slide 177 in your
9   16:20:20  PowerPoint and magnified.  It's also Plaintiff's Exhibit 397,
10  16:20:25  Marino report, figure 2.12.
11  16:20:27      You referred earlier to a construction detail in the
12  16:20:30  wall, and I've highlighted that.  Do you see, Dr. Marino, that
13  16:20:34  in the as-built drawings, in the area of the south breach,
14  16:20:37  there a curvature in the wall toward the south -- part of the
15  16:20:40  south breach?
16  16:20:41  A.  That's correct.
17  16:20:42      MR. RAFFMAN:  Let me have the next slide.  Slide 178
18  16:20:51  in Dr. Marino's dec.  Plaintiffs' Exhibit 397, Marino report
19  16:20:53  figure 2.13.
20  16:20:57  BY MR. RAFFMAN:
21  16:20:57  Q.  You can see, Dr. Marino, that in the area around the
22  16:21:00  northern boundary of the south breach, there's another
23  16:21:05  curvature in the wall in the design of the wall; right?
24  16:21:07  A.  That's correct.
25  16:21:08  Q.  Have you ever seen an overhead photo of the wall before
```

1379

```
1   16:21:11  the storm?
2   16:21:12  A.  Yes.
3   16:21:13  Q.  Have you ever compared that overhead photo to the limits
4   16:21:16  of the breach?
5   16:21:17  A.  I have eyeballed it.  I haven't superimposed it exactly.
6   16:21:23  Q.  Let me see GM-92.  Does that overhead photo look like an
7   16:21:30  overhead photo you've seen with the curvature in the wall?
8   16:21:34  A.  That's correct.
9   16:21:34      MR. RAFFMAN:  93.
10  16:21:35  BY MR. RAFFMAN:
11  16:21:39  Q.  Does that overhead photo on the top look like a photo of
12  16:21:44  the limits of the breach?
13  16:21:47  A.  Yes.
14  16:21:47  Q.  And would you agree with me, Dr. Marino, that the limits
15  16:21:49  of the breach correspond fairly closely to these two points of
16  16:21:58  curvature in the floodwall?
17  16:21:59  A.  Yes.
18  16:22:01  Q.  Dr. Marino, you haven't studied whether the curvature in
19  16:22:08  the wall creates a point of weakness that could affect the
20  16:22:16  location of the south breach, have you?
21  16:22:19  A.  A curvature of the wall -- the structural curvature of the
22  16:22:23  wall?
23  16:22:23  Q.  You haven't evaluated that feature at all in your
24  16:22:25  analysis, have you?
25  16:22:26  A.  In my -- in my feeling, that's just ridiculous to think
```

1380

| | |
|---|---|
| 16:22:31 | 1 that curvature is going to cause an effect on the wall, |
| 16:22:35 | 2 given the flexibility of the sheet piling. |
| 16:22:39 | 3 Q.  You haven't done -- |
| 16:22:39 | 4 A.  No. |
| 16:22:40 | 5 Q.  -- any calculations or studies? |
| 16:22:42 | 6 A.  No, sir. |
| 16:22:51 | 7 MR. WILSON:  What exhibit number is this? |
| 16:22:53 | 8 MR. RAFFMAN:  This is DX-205, Dr. Bakeer's report, |
| 16:22:59 | 9 figure 74, at the bottom.  And at the top, it's Dr. Bakeer's |
| 16:23:04 | 10 figure 46.  I'm sorry.  I probably should have noted that for |
| 16:23:07 | 11 the record.  Thank you, counsel. |
| 16:23:21 | 12 MR. RAFFMAN:  GM-049, please. |
| 16:23:23 | 13 BY MR. RAFFMAN: |
| 16:23:28 | 14 Q.  Dr. Marino, I did have one question about this |
| 16:23:32 | 15 illustration you drew.  This is your demonstrative of what |
| 16:23:40 | 16 happens when the barge hits the wall at the south breach; |
| 16:23:42 | 17 right? |
| 16:23:42 | 18 A.  Yes. |
| 16:23:43 | 19 Q.  And the way you've bottled it, you've got -- |
| 16:23:46 | 20 THE COURT:  Wait.  Have you finished your answer, |
| 16:23:46 | 21 sir? |
| 16:23:49 | 22 THE WITNESS:  I haven't finished. |
| 16:23:50 | 23 BY MR. RAFFMAN: |
| 16:23:50 | 24 Q.  I'm sorry.  I'm sorry.  I didn't mean to interrupt. |
| 16:23:52 | 25 A.  That's fine.  It's no big deal.  I just wanted to qualify |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1381

| | |
|---|---|
| 16:23:59 | 1 that that -- this is the northern part.  That's all. |
| 16:24:01 | 2 Q.  Northern -- the primary impact, the one that -- the |
| 16:24:03 | 3 northern above? |
| 16:24:04 | 4 A.  That's correct. |
| 16:24:04 | 5 THE COURT:  This would have been the first impact? |
| 16:24:06 | 6 THE WITNESS:  The first impact. |
| 16:24:08 | 7 BY MR. RAFFMAN: |
| 16:24:08 | 8 Q.  The way you've drawn it, the barge creates an angled shape |
| 16:24:13 | 9 in the wall; isn't that right, Dr. Marino? |
| 16:24:17 | 10 A.  Yes. |
| 16:24:18 | 11 Q.  And that angled shape, if it were apparent in the sheet |
| 16:24:24 | 12 pile, you would expect to see some evidence of an angular form |
| 16:24:36 | 13 or an angled impact or a point-load impact when you look at the |
| 16:24:39 | 14 apex of the bow after the storm, wouldn't you? |
| 16:24:42 | 15 A.  Absolutely not.  I mean, this is -- this is the start of |
| 16:24:46 | 16 the condition.  And afterwards this -- this floodwall is |
| 16:24:49 | 17 stretching, and there's concrete that's being displaced to the |
| 16:24:57 | 18 south with the floodwall.  And so if you look at that bow, you |
| 16:25:09 | 19 can see that the sheet pile itself is stretched out. |
| 16:25:09 | 20 So, you know, you don't see a corner like that |
| 16:25:11 | 21 because this is the initiation of the failure. |
| 16:25:14 | 22 Q.  So -- just so I understand your testimony, you've got a |
| 16:25:17 | 23 barge that strikes a wall with sufficient force to knock that |
| 16:25:23 | 24 wall and all the soil behind it back and to create a massive |
| 16:25:30 | 25 in-rush of water, and yet you don't expect to see a scratch or |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1382

| | |
|---|---|
| 16:25:37 | 1 a dent -- |
| 16:25:37 | 2 A.  No. |
| 16:25:37 | 3 Q.  -- or any other impact on the wall -- |
| 16:25:39 | 4 A.  No.  No, that's not -- |
| 16:25:39 | 5 Q.  -- that you can identify as a barge impact? |
| 16:25:41 | 6 A.  No, that's not what I'm saying.  You asked me if I would |
| 16:25:44 | 7 see this -- this dent, this corner, in the displaced shape that |
| 16:25:54 | 8 existed on Jourdan Avenue, and I'm saying to you that, by the |
| 16:25:57 | 9 time you get that -- by the time this failure completes, that |
| 16:26:02 | 10 wall is completely stretched out. |
| 16:26:05 | 11 In fact, there's a lot -- much of the concrete is |
| 16:26:09 | 12 missing.  So you wouldn't see evidence of this dent in the |
| 16:26:12 | 13 final shape of the floodwall as it existed at Jourdan Avenue. |
| 16:26:18 | 14 Q.  No peak, no point, nothing? |
| 16:26:21 | 15 A.  I wouldn't think so. |
| 16:26:26 | 16 Q.  Now, this barge is -- |
| 16:26:32 | 17 MR. RAFFMAN:  Slide 214, please. |
| 16:26:38 | 18 BY MR. RAFFMAN: |
| 16:26:38 | 19 Q.  All right.  This is slide 214 from the Marino dec.  That |
| 16:26:45 | 20 hole that's right there, that deep scour hole, you've |
| 16:26:48 | 21 identified in your testimony this morning? |
| 16:26:50 | 22 A.  Here? |
| 16:26:53 | 23 Q.  Yes.  With your laser pointer, that's it. |
| 16:26:55 | 24 So the barge is hitting this wall.  As you described |
| 16:27:01 | 25 it this morning, Dr. Marino, there's a very violent in-rush of |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1383

| | |
|---|---|
| 16:27:06 | 1 water, a violent event.  And the water moves into the |
| 16:27:11 | 2 neighborhood with enough force to do some real damage there; |
| 16:27:16 | 3 right? |
| 16:27:17 | 4 A.  Yes.  What it does is you have a violent rush of water |
| 16:27:21 | 5 that comes around the sheet pile, and then the sheet pile |
| 16:27:24 | 6 starts becoming a bow shape.  And this bow continues out as |
| 16:27:32 | 7 there's more wash-out that occurs. |
| 16:27:36 | 8 Q.  And the barge, during the time that this is all |
| 16:27:37 | 9 happening -- this is going to happen at 6:30; right -- before |
| 16:27:44 | 10 6:30? |
| 16:27:45 | 11 A.  That's correct. |
| 16:27:45 | 12 Q.  And the barge is in this area, somewhere in here, as the |
| 16:27:49 | 13 water is rushing into the neighborhood; right? |
| 16:27:50 | 14 A.  That's your supposition.  What I'm saying is that it could |
| 16:27:53 | 15 very well be that it hits here, and it comes to this location |
| 16:27:56 | 16 fairly rapidly. |
| 16:27:59 | 17 Q.  And your testimony is that when this massive rush of water |
| 16:28:05 | 18 sweeps into the neighborhood, wiping out houses, that the |
| 16:28:10 | 19 barge -- |
| 16:28:11 | 20 A.  I'm sorry.  I'm sorry.  I think you're mischaracterizing |
| 16:28:13 | 21 what I'm saying.  What I'm saying is -- okay.  You're just |
| 16:28:20 | 22 using the wrong words, so go ahead.  I'm sorry. |
| 16:28:23 | 23 Q.  I'll finish my question, and then if you -- |
| 16:28:29 | 24 MR. RAFFMAN:  I'm sorry, Your Honor.  The witness and |
| 16:28:30 | 25 I just need to allow each other to finish. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1384

```
1    16:28:33        THE COURT:  Oh, I understand.  Are you using --
2    16:28:39        MR. RAFFMAN:  I'm using words that I'm using, and he
3    16:28:42   doesn't want to agree with them, so I'll try to use different
4    16:28:45   words.
5    16:28:46        THE COURT:  Or you could use them and he can explain
6    16:28:48   why he disagrees.
7    16:28:49        MR. RAFFMAN:  Sure.
8    16:28:49   BY MR. RAFFMAN:
9    16:28:50   Q.  I mean, and my point is simple, Dr. Marino.  The barge is
10   16:28:52   around here.  You've got a very violent in-rush of water, and
11   16:28:55   yet your testimony is that somehow the barge manages to avoid
12   16:28:58   being swept into that neighborhood by that water.  That's your
13   16:29:02   testimony?
14   16:29:02   A.  The "violent rush of water" is the word that I disagree
15   16:29:06   with in terms of I don't want it to be equated to the violent
16   16:29:10   flooding that occurred once this wall collapsed.  When I talk
17   16:29:14   about severe or violent water, I'm talking -- flow of water,
18   16:29:19   I'm talking about associated with -- in perspective to the
19   16:29:24   dramatic effect that channel would have, and the flow around
20   16:29:28   that channel.
21   16:29:30        THE COURT:  At what point, looking at that diagram,
22   16:29:36   we have multicolors.  That's the incremental movement of the
23   16:29:40   sheet pile; correct?
24   16:29:41        THE WITNESS:  Exactly.  Exactly so.
25   16:29:42        At what point would you say that the
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1385

```
1    16:29:45   failure was sufficient so that the water would rush in in a
2    16:29:53   rather rapid fashion?
3    16:29:54        THE WITNESS:  Your Honor, all the testimony has been
4    16:29:56   that we have this "boom"; right?  And we know the boom, this
5    16:30:02   would create a "boom."  I mean, there's no doubt the shattering
6    16:30:06   of this concrete would create a "boom."
7    16:30:09        And it's universal that, after the last "boom,"
8    16:30:11   this violent rush of water occurred.
9    16:30:13        THE COURT:  So sometime -- sometime in between -- I
10   16:30:17   guess I'm wondering at what level of the -- if you know.  If
11   16:30:21   you don't know, please tell me -- at what level of the lines
12   16:30:25   you've drawn there would approximately the failure be such that
13   16:30:28   the water's really rushing in as the sheet pile incrementally
14   16:30:31   moves back over a period of whatever minutes we're talking
15   16:30:35   about.
16   16:30:35        THE WITNESS:  From my understanding of the testimony
17   16:30:37   that's been given is that there's no real discussion of a lot
18   16:30:42   of water, of rushing of water, until afterwards.
19   16:30:47        THE COURT:  Okay.
20   16:30:48        THE WITNESS:  So, you know, during this time of
21   16:30:51   bowing, there is water obviously being disbursed into the Lower
22   16:30:57   Ninth Ward, but it's not what's caused all this displacement
23   16:31:01   and violent rushing of water of these homes.
24   16:31:05        THE COURT:  Go ahead.  Proceed.
25
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1386

```
1    16:31:11   BY MR. RAFFMAN:
2    16:31:14   Q.  The rush of water through that channel is a violent rush
3    16:31:17   of water.  It's digging out a channel; right?
4    16:31:22   A.  If we're using the same term, yes.  Same adjective for the
5    16:31:28   same reason.
6    16:31:29   Q.  And somehow the barge, wherever it is in this area of
7    16:31:32   several hundred feet, manages to avoid being entrained in
8    16:31:36   whatever current is created by that violent rush of water;
9    16:31:39   right?
10   16:31:40   A.  Obviously.
11   16:31:42   Q.  In your opinion?
12   16:31:43   A.  Yes.
13   16:31:43   Q.  Before I leave this subject, Dr. Marino, you haven't done
14   16:31:56   any calculations to determine whether an impact with the
15   16:31:59   concrete cap would cause the cap to dislodge off rather than
16   16:32:06   pulling the sheet pile wall from the soil; right?
17   16:32:13   A.  I don't think it's as simple as that.
18   16:32:17        THE COURT:  But you first might answer the question.
19   16:32:19   Have you done any calculations in that estimate?
20   16:32:23        THE WITNESS:  No.
21   16:32:24        THE COURT:  If you want to explain your answer, you
22   16:32:26   may.
23   16:32:26        THE WITNESS:  I don't think it's as simple as that.
24   16:32:30   Even if you -- I believe that the barge hit the lower portion
25   16:32:36   of the wall, either near the construction joint or below it,
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1387

```
1    16:32:39   and so you would have a different set of forces that would be
2    16:32:43   imposed on the wall.  That would happen would be that you would
3    16:32:50   end up with more -- if we could show -- Mark, can you bring
4    16:32:56   back that first impact on the south?
5    16:32:59        MR. RAFFMAN:  I'll do whatever the judge tells me to
6    16:33:01   do.
7    16:33:01        THE COURT:  I'm not sure -- he just asked you if you
8    16:33:05   had done any calculations.  So I'll let your attorney ask you
9    16:33:09   something on redirect.
10   16:33:11        Go ahead, counsel.  I opened the door, but I'm
11   16:33:13   going to close it.
12   16:33:15        MR. RAFFMAN:  Thank you, Your Honor.  I do have a
13   16:33:16   clock.
14   16:33:16        THE COURT:  Right.
15   16:33:17   BY MR. RAFFMAN:
16   16:33:30   Q.  Dr. Marino, I'm showing you a photograph.  It's
17   16:33:34   Plaintiff's Exhibit 397, Marino report photograph 4.31.
18   16:33:39        Dr. Marino, the concrete damage you've observed in
19   16:33:41   this panel is not the consequence of a barge hitting the wall
20   16:33:45   and knocking the concrete off it; right?
21   16:33:50   A.  Well, it depends on what you mean by "consequences."
22   16:33:53   Like, if I believe that the wall -- that the impact was caused
23   16:33:58   by -- I'm sorry, if the -- if the failure was caused by the
24   16:34:04   barge, then this would be a consequence of that.
25   16:34:09   Q.  The water has stretched the panels and caused the concrete
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1388

```
 1   16:34:18   to crack off; correct?
 2   16:34:20   A.  That's correct.
 3   16:34:20   Q.  The barge has not scraped the concrete off by acting like
 4   16:34:23   some sort of a plane as it's going down the wall; right?
 5   16:34:32   A.  I don't believe so.
 6   16:34:37   Q.  If, hypothetically, Mr. Pazos were to have opined at
 7   16:34:41   page 43 of his report that the barge acted like a plane and
 8   16:34:46   scraped the concrete off, that's not something you would agree
 9   16:34:49   with; right?
10   16:34:50   A.  I don't know what the basis of -- you know, I haven't read
11   16:34:53   his report.  I don't know what the basis of him saying that is.
12   16:34:57       MR. RAFFMAN:  Okay.  Next slide, 063, please.
13   16:35:00   BY MR. RAFFMAN:
14   16:35:04   Q.  This photo is Plaintiff's Exhibit 397, Marino report photo
15   16:35:08   4.35.  Dr. Marino, based on this photo and every other photo
16   16:35:14   you've seen in this case, am I correct that the sheet pile at
17   16:35:21   the south breach is and remains a continuous length of sheet
18   16:35:28   pile?
19   16:35:29   A.  Yes.
20   16:35:29   Q.  The sheet pile did not snap like a rubber band at any
21   16:35:35   location at the south breach, did it?
22   16:35:37   A.  That's correct.
23   16:35:38   Q.  And so if another witness were to have opined that "If I
24   16:35:43   take a rubber band and stretch it a little bit and then cut it
25   16:35:46   with a scissors" as an analogy to the south breach, that
```

1389

```
 1   16:35:51   analogy would not, in your opinion, be an appropriate analogy;
 2   16:35:56   right?
 3   16:35:56   A.  I wouldn't -- I mean, I haven't seen the evidence of the
 4   16:36:00   sheet pile being disconnected.
 5   16:36:03       MR. RAFFMAN:  And for the Court's -- for the record,
 6   16:36:05   I'm referring to page 828 of the transcript in which Mr. Pazos
 7   16:36:11   opined that:  "This is obvious that this happened in the case
 8   16:36:14   of both breaches."
 9   16:36:15       Slide 217, please.
10   16:36:29   BY MR. RAFFMAN:
11   16:36:29   Q.  All right.  Now, this is your sequence of events at the
12   16:36:35   south breach; right?  Marino slide 217.
13   16:36:38   A.  That's correct.
14   16:36:40   Q.  And here you have the barge lined up square with the
15   16:36:45   floodwall in the second impact, and that wall is now upright;
16   16:36:54   correct?
17   16:36:54   A.  That's at the time -- as you can see, for both the first
18   16:36:57   and second, that would be the condition just at the time of
19   16:37:01   impact.
20   16:37:02   Q.  And now what's happened at the third is that the wall has
21   16:37:08   now translated into the neighborhood; right?
22   16:37:12   A.  It's been displaced eastward.
23   16:37:15   Q.  It's been displaced.  And it's been displaced because it's
24   16:37:19   been knocked over and now it's lying down; right?
25   16:37:23   A.  No.
```

1390

```
 1   16:37:24   Q.  How does this wall become that -- how does this wall in
 2   16:37:29   the second image become that wall in the third image without
 3   16:37:32   being displaced and falling over?
 4   16:37:36   A.  As I showed in my animation, the broadside collision
 5   16:37:42   causes a gap to form, and it's just like the northern breach
 6   16:37:48   where the wall did not collapse because of the erosion that
 7   16:37:54   occurred under the tip.  It displaced southward without
 8   16:38:06   collapsing.
 9   16:38:06   Q.  This wall here has displaced to the east --
10   16:38:17   A.  That's correct.
11   16:38:17   Q.  -- by whatever amount is the bottom of the triangle, whose
12   16:38:23   hypotenuse is that angle of that wall and whose long angle is
13   16:38:27   this dotted line; isn't that right?
14   16:38:29   A.  That's correct.
15   16:38:31   Q.  And in so displacing, necessarily, the top of that wall is
16   16:38:36   going to have to be a reduced elevation, probably below the
17   16:38:41   level of the barge; wouldn't you imagine, Dr. Marino?
18   16:38:43   A.  I would say that by the time that the barge got to the
19   16:38:46   south end, that's -- that's exactly what happened.
20   16:38:50       In fact, you can see that in one of the slides that
21   16:38:53   we talked about this morning, where the barge was riding on top
22   16:38:57   of the wall, that scrape that we were -- that photograph that
23   16:39:01   showed the scrape on the top of the wall.  Of course, when the
24   16:39:05   barge gets -- when the wall gets displaced that much, the barge
25   16:39:11   is going to be riding on top of that wall as it's going in this
```

1391

```
 1   16:39:15   direction.
 2   16:39:16   Q.  I guess what I'm suggesting, Dr. Marino, is that you've
 3   16:39:18   got the barge traveling -- you've got the wall translating
 4   16:39:22   inward to the east, and you've got the barge moving to the
 5   16:39:24   south as if it's being pushed by a tug.  Isn't that what your
 6   16:39:30   diagram depicts?
 7   16:39:31   A.  Say that again?
 8   16:39:32   Q.  Well, you've got your wall moving from west to east,
 9   16:39:35   presumably under the force of whatever momentum is being
10   16:39:38   imparted; and yet your barge, rather than moving into the east
11   16:39:42   over this wall, your barge continues to the south on its
12   16:39:50   long-wise axis, as if something is pushing it in a tow, so that
13   16:39:57   it could come into contact with the rebar at that location.
14   16:40:00       Isn't that what your --
15   16:40:05   A.  There is a driving force of wind or wave that caused the
16   16:40:08   barge to go southward.  It wasn't a tug boat.
17   16:40:15   Q.  Well, whatever that driving force is, wind and waves, the
18   16:40:18   barge is being pushed by that as if it's a tugboat, because
19   16:40:23   it's not traveling broadside of the wind in your example; it's
20   16:40:29   traveling as if the wind and the waves are pushing on its back.
21   16:40:32   Or its "stern" I guess is what we call it in the maritime
22   16:40:35   field.
23   16:40:36   A.  At the initial impact, that's correct.  And if you look at
24   16:40:39   my illustration, I show it to be sweeping as it's going up the
25   16:40:43   construction joint.
```

1392

```
1  16:40:44  Q.  All right.  Dr. Marino, one last question about the entry
2  16:40:51  of the barge into the neighborhood -- maybe two.  You
3  16:41:03  testified --
4  16:41:04      MR. RAFFMAN:  Let me have the picture of the photo
5  16:41:07  4.38.  May I have that, please?
6  16:41:31      Sorry for the delay.
7  16:41:32  BY MR. RAFFMAN:
8  16:41:32  Q.  All right.  This is photo 4.38, slide 236, in your dec.
9  16:41:36  You recognize that one; right, Dr. Marino?
10 16:41:39  A.  Yes, I do.
11 16:41:32  Q.  So what you testified to earlier this morning is that that
12 16:41:42  barge, as it's riding on top of this bent rebar panel, it's
13 16:41:47  going to have to be having a lot of force -- a lot of force --
14 16:41:51  to do that; right?
15 16:41:52  A.  Sufficient force to cause those panels to shear off.
16 16:41:56  Q.  And that's a significant force, as you testified this
17 16:41:59  morning; right?
18 16:42:00  A.  Significant enough to cause that, that's correct.
19 16:42:02  Q.  Okay.  And in your scenario, what's happening is that the
20 16:42:08  barge, having impacted the wall once and stopped, and swung
21 16:42:16  around and stopped, now it's going to have, you know, 100 to
22 16:42:22  200 feet to pick up a head of steam; isn't that right?
23 16:42:26  A.  That's correct.
24 16:42:28  Q.  And you haven't done any calculations to figure out
25 16:42:30  whether the barge could pick up enough head of steam in 100 to
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1393

```
1  16:42:35  200 feet to do the kind of significant damage to the rebar that
2  16:42:38  your opinion says it did, have you?
3  16:42:40  A.  If you're trying to say that barge didn't cause that,
4  16:42:45  that's just -- to me, that doesn't need a calculation.
5  16:42:48      THE COURT:  I hope -- I'm sure a briefing would
6  16:42:52  explain -- will explain -- I think we're talking about position
7  16:42:57  No. 2 rather than the actual damage caused by No. 3.
8  16:43:00      MR. RAFFMAN:  What I'm trying to do, Your Honor, is
9  16:43:02  because the witness has asked me what I'm trying to do, I'm
10 16:43:05  trying to explain this damage, and I'm trying to test whose
11 16:43:10  scenario is better.  All right?  The scenario of Dr. Marino, as
12 16:43:14  he's testified -- I want to make sure that I understand it --
13 16:43:17  is that the barge picks up enough of a head of steam in a very
14 16:43:21  short distance to create this significant damage.
15 16:43:23      THE COURT:  Did you understand my point that you are
16 16:43:28  concerned about position Nos. 1 and 2 than No. 3?
17 16:43:32      MR. RAFFMAN:  Well --
18 16:43:34      THE COURT:  Maybe I'm being opaque.  Are you saying
19 16:43:36  the barge didn't cause those rebars to go down --
20 16:43:38      MR. RAFFMAN:  Your Honor, I'm not saying that at all.
21 16:43:40      THE COURT:  Well, that's what I'm trying to point out
22 16:43:42  to you.  That was out -- I was trying to point out to you to
23 16:43:42  get you to agree with me about.  That's all I was saying.
24 16:43:46      THE WITNESS:  I'm not listening to Your Honor.
25 16:43:48  Yes, yes, our experts all opined about what's happened at the
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1394

```
1  16:43:53  southern end of the south breach.
2  16:43:56      THE COURT:  I didn't mean -- right.  That's all -- so
3  16:43:56  we're talking about what happened before those rebars -- and
4  16:43:58  the scenario makes more sense.
5  16:44:01      MR. RAFFMAN:  What came first, that makes more sense.
6  16:44:03      THE COURT:  I got you.
7  16:44:05  BY MR. RAFFMAN:
8  16:44:06  Q.  Dr. Marino, your scenario is that the barge, from more or
9  16:44:09  less a resting position, in 100 to 200 feet, picks up enough
10 16:44:14  a head of steam to cause that damage with whatever force it
11 16:44:18  required.  That's your scenario; right?
12 16:44:21  A.  Yes.  Because of the damage and the scrapes that indicate
13 16:44:23  that the barge is going in a southerly direction.
14 16:44:27  Q.  Now, another scenario might be that the wall is already
15 16:44:33  down; that these panels are leaning; and that the barge --
16 16:44:38  after the break -- after the breach has happened, the barge
17 16:44:43  breaks from its moorings, and is blown by a wind from the
18 16:44:48  northwest to the southeast, after the eye of the storm has
19 16:44:52  passed by New Orleans and after the hurricane winds have come
20 16:44:54  around to the point where they're blowing from the northwest to
21 16:45:00  the southeast and imparting their force broadside to this
22 16:45:04  barge, and it's traveling across the canal, and it picks up
23 16:45:07  enough of a head of steam so that it comes into contact with a
24 16:45:11  single panel at the far southern end of the south breach with
25 16:45:15  enough force to do that damage.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1395

```
1  16:45:19      That's another scenario that could cause those rebars
2  16:45:23  to bend if that happened, isn't it, Dr. Marino?
3  16:45:27  A.  I don't think that scenario is possible.  Because you have
4  16:45:30  floodwall sitting here with scrapes on the top of the wall.
5  16:45:35  You can't tell me that wall is flat like that and the barge is
6  16:45:39  floating over.  How does that scratch get on the top of the
7  16:45:42  wall?
8  16:45:43  Q.  Let's suppose, Dr. Marino, that before the barge flattens
9  16:45:46  the rebar, that the barge scrapes the very top of that wall,
10 16:45:50  because that wall is already tilted so that the top of that
11 16:45:54  wall is lower -- lower -- than the panel next to it, so that
12 16:46:03  the barge scrapes the top of that panel, and it continues to
13 16:46:07  the south, and then it comes into contact with the rebar.
14 16:46:10      Would the barge then be able to have enough force to
15 16:46:14  bend the rebar?
16 16:46:15  A.  So what you're saying is that the wall is tilted already
17 16:46:19  in somewhat of a, you know, slanted position?
18 16:46:23  Q.  Hypothetically, Dr. Marino, I'm asking you to assume
19 16:46:25  that's true, and I'm asking you whether, in that scenario, the
20 16:46:30  barge could impart enough force to bend the rebar.
21 16:46:34  A.  Okay.  So if I understand you, you're talking about a wall
22 16:46:37  that's slanted like this, and the barge comes in and scrapes on
23 16:46:41  top of this wall, this wall collapses and then shears off the
24 16:46:45  end; is that correct?
25 16:46:47  Q.  That first panel; right -- this is my hypothetical.  I'm
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1396

| | |
|---|---|
| 1 | 16:46:49  just asking you a question. |
| 2 | 16:46:51      THE COURT:  He's just trying to understand it. |
| 3 | 16:46:53      MR. RAFFMAN:  Yes, that's fine. |
| 4 | 16:46:54  BY MR. RAFFMAN: |
| 5 | 16:46:55  Q.  In the hypothetical, the wall is tilted.  It's a little -- |
| 6 | 16:46:57  at the top is lower than this one. |
| 7 | 16:47:01      THE COURT:  It's tilted towards the protected side? |
| 8 | 16:47:02  BY MR. RAFFMAN: |
| 9 | 16:47:03  Q.  It's tilted toward the protected side, and it's angled |
| 10 | 16:47:06  down. |
| 11 | 16:47:06      THE COURT:  Angled down. |
| 12 | 16:47:06  BY MR. RAFFMAN: |
| 13 | 16:47:06  Q  So that the top is lower than this panel here.  And so |
| 14 | 16:47:10  when the barge comes into contact with that panel, it just |
| 15 | 16:47:14  shaves off a little bit, leaving a couple of rebars poking out. |
| 16 | 16:47:22  But because this panel is higher, the barge comes into contact |
| 17 | 16:47:26  with that panel, and because part of the barge is already in |
| 18 | 16:47:29  the neighborhood, that part of the barge doesn't get scrapes, |
| 19 | 16:47:35  and the part of the barge that gets scrapes is the part of the |
| 20 | 16:47:40  barge that actually comes into contact with the rebar. |
| 21 | 16:47:42      So that's my hypothesis.  What I'm asking you, |
| 22 | 16:47:47  Dr. Marino, is, if that happened, wouldn't that be another way |
| 23 | 16:47:50  that the barge could take the rebar and bend it? |
| 24 | 16:47:54  A.  If you want to say that.  I don't agree with that.  I |
| 25 | 16:47:57  mean, there's clear evidence that that impact at the end was |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1397

| | |
|---|---|
| 1 | 16:48:05  heard and then there was violent water. |
| 2 | 16:48:08      If you want to say that the -- you know, if you want |
| 3 | 16:48:11  to say that the wall is leaning like some of these other walls |
| 4 | 16:48:14  that we saw, these floodwalls, there's still protection, and |
| 5 | 16:48:19  maybe you don't have complete protection; the wall is now |
| 6 | 16:48:21  displaced and its lower. |
| 7 | 16:48:24      But once you collapse that wall from that barge |
| 8 | 16:48:27  impact, you have no protection, and you have eroded a part of |
| 9 | 16:48:32  that levee and caused -- and caused this violent rush of water |
| 10 | 16:48:39  into the neighborhood. |
| 11 | 16:48:48      THE COURT:  Let me make sure I understand.  Let me |
| 12 | 16:48:46  make sure I understand this. |
| 13 | 16:48:50      Are you saying without -- and I may be -- I just |
| 14 | 16:48:54  want to make sure.  Are you saying, without the third hit, you |
| 15 | 16:48:58  would not have a violent rush of water into the neighborhood? |
| 16 | 16:49:02      MR. RAFFMAN:  No. |
| 17 | 16:49:03      THE COURT:  No, I'm asking the witness. |
| 18 | 16:49:04      THE WITNESS:  I think that, eventually, those two |
| 19 | 16:49:06  hits would have caused the floodwall to extend out, and I'm not |
| 20 | 16:49:15  sure whether or not it would have collapsed or not. |
| 21 | 16:49:20      But what I'm saying is that, for sure, given the |
| 22 | 16:49:24  scenario I was just given, that if that wall is leaning, and -- |
| 23 | 16:49:32  if it's leaning, that it would not have come out of the ground. |
| 24 | 16:49:36  Because none of the other floodwalls came out of the ground. |
| 25 | 16:49:41  And I believe that that wouldn't have occurred in this location |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1398

| | |
|---|---|
| 1 | 16:49:47  unless the barge hit the wall. |
| 2 | 16:49:51  BY MR. RAFFMAN: |
| 3 | 16:49:53  Q.  All right.  I'm going to move on. |
| 4 | 16:49:56      THE COURT:  Before you move on, counsel, I'm going to |
| 5 | 16:49:58  ask just a couple of questions.  It may relate to what you're |
| 6 | 16:50:01  talking about; it may not.  I won't be long. |
| 7 | 16:50:03      MR. RAFFMAN:  Your Honor, always. |
| 8 | 16:50:05      THE COURT:  As concisely as you can, and just to |
| 9 | 16:50:08  summarize it so I can benchmark this before counsel |
| 10 | 16:50:12  cross-examines you on it, if he does, describe to me as |
| 11 | 16:50:17  concisely as you can the different mechanisms of failure, why |
| 12 | 16:50:25  you think the mechanisms of failure at the London Avenue and |
| 13 | 16:50:29  17th Avenue floodwalls are different than the mechanism of |
| 14 | 16:50:36  failure that occurred here. |
| 15 | 16:50:38      And you don't have to give every explanation. |
| 16 | 16:50:42  Just highlight to me the primary differences.  Based on the |
| 17 | 16:50:49  photographic evidence you've observed since we know you didn't |
| 18 | 16:50:52  actually go to the 17 Street Canal location or the London |
| 19 | 16:50:54  Avenue Canal.  Is that fair? |
| 20 | 16:50:58      THE WITNESS:  Yes. |
| 21 | 16:50:58      THE COURT:  What would that be, sir? |
| 22 | 16:51:01      THE WITNESS:  I think I have summarized it in one of |
| 23 | 16:51:03  my PowerPoint slides, but number one, none of those -- those |
| 24 | 16:51:10  failures or any of the other failures has the wall coming out |
| 25 | 16:51:14  of the ground, okay, and been exhumed from the ground. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1399

| | |
|---|---|
| 1 | 16:51:22      I believe that what caused it to come out of the |
| 2 | 16:51:25  ground was that there was severe eroding of the back side |
| 3 | 16:51:30  caused by this channel that's created from the impact of the |
| 4 | 16:51:37  barge into the wall.  That would be the main -- the main |
| 5 | 16:51:49  differences that I see. |
| 6 | 16:51:50      THE COURT:  Because, in your examination of the |
| 7 | 16:51:53  photographs of the 17th Street and London Avenue failures, |
| 8 | 16:51:58  there was no exhumation of the sheet pile? |
| 9 | 16:52:02      THE WITNESS:  Not even close. |
| 10 | 16:52:04      THE COURT:  Okay. |
| 11 | 16:52:04      THE WITNESS:  Not even close. |
| 12 | 16:52:05      THE COURT:  That is -- I know there are others, but |
| 13 | 16:52:06  that's the central focal difference. |
| 14 | 16:52:10      THE WITNESS:  That's the central focal -- |
| 15 | 16:52:10      THE COURT:  Is that correct? |
| 16 | 16:52:12      THE WITNESS:  Yes. |
| 17 | 16:52:12      THE COURT:  Okay.  Counsel. |
| 18 | 16:52:13  BY MR. RAFFMAN: |
| 19 | 16:52:13  Q.  Let me just ask a couple of other questions about the |
| 20 | 16:52:17  other floodwall failures to follow on Your Honor's questions. |
| 21 | 16:52:21      Dr. Marino, you've done no stability analysis about |
| 22 | 16:52:23  why those other floodwalls failed; correct? |
| 23 | 16:52:25  A  That's correct. |
| 24 | 16:52:25  Q.  You've never done any seepage analysis to determine why |
| 25 | 16:52:28  those other floodwalls failed; right? |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1400

```
1    16:52:30   A.  That's correct.
2    16:52:30   Q.  Any conclusion you've done about those floodwall failures
3    16:52:33   is purely the result of inspecting photos?
4    16:52:37   A.  Well, it's clearly, and I don't have to do a stability
5    16:52:40   analysis to see that the sheet pile didn't come out of the
6    16:52:42   ground.
7    16:52:43   Q.  So you haven't studied whether similar mechanisms at those
8    16:52:47   other failures can produce results that look different because
9    16:52:52   they operate in a different physical environment, have you?
10   16:53:00   A.  That's kind of a complex question.
11   16:53:03   Q.  Have you read the deposition of Dr. Mosher?
12   16:53:09   A.  I may have read a few pages of it.
13   16:53:15   Q.  Did you read what Dr. Mosher had to say about comparison
14   16:53:21   between the Inner Harbor Navigation Canal failures and the
15   16:53:29   failure at the Citrus back levee?
16   16:53:32   A.  No.
17   16:53:33   Q.  Did you read that?
18   16:53:35   A.  No.
19   16:53:35   MR. RAFFMAN:  Well, then I'm going to -- it's page 76
20   16:53:37   of Dr. Mosher's deposition.  I won't question the witness about
21   16:53:42   it.
22   16:53:42   THE COURT:  And that's in evidence, so -- I mean, it
23   16:53:44   will be in evidence, at least.
24   16:53:45   MR. RAFFMAN:  Yes, yes.
25   16:53:46   THE COURT:  I don't know if you made your
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1401

```
1    16:53:47   introduction of that, but it will be in evidence.
2    16:53:49   MR. RAFFMAN:  Your Honor, it's one of our exhibits.
3    16:53:51   THE COURT:  Right.  I've read it, summarized it, so
4    16:53:53   it's fair.  You want to ask him about it?  You wanted to ask
5    16:53:57   him about something in Dr. Mosher's deposition?
6    16:54:00   MR. RAFFMAN:  No, no, no.  He hasn't read it.  I'm
7    16:54:03   content to let Your Honor read it and infer what Your Honor
8    16:54:06   wants.
9    16:54:08   THE COURT:  All right.
10   16:54:09   BY MR. RAFFMAN:
11   16:54:09   Q.  I do want to ask some questions about overtopping.  Your
12   16:54:13   opinion today is that the wall top along the east side of the
13   16:54:20   navigational canal is 12.9 feet NAVD88; right?
14   16:54:25   A.  That's based on the survey data that we have.
15   16:54:28   Q.  Yes.  And when I took your deposition, it was 12.5 because
16   16:54:31   you didn't have the survey data; right?
17   16:54:34   A.  That's correct.
18   16:54:35   Q.  So now we'll give you another few inches because you've
19   16:54:39   taken a survey that the defendant's experts have looked at and
20   16:54:43   said, "Well, I like that.  It's reliable.  I'm going to take
21   16:54:47   it."
22   16:54:49   A.  That's correct.
23   16:54:49   Q.  But you're also aware --
24   16:54:51   A.  GM-66, please.
25   16:54:52   BY MR. RAFFMAN:
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1402

```
1    16:54:53   Q.  You're also aware, that IPET did a survey, and
2    16:54:59   they reported that floodwall-top heights along the canal had
3    16:55:06   some significant differences; right?
4    16:55:10   A.  I remember seeing this.  When you brought it up in my
5    16:55:16   deposition, I did not recognize it.  But afterwards when I
6    16:55:23   looked it, I realize I didn't use it because it didn't extend
7    16:55:27   far enough down towards the south breach.
8    16:55:30   Q.  For the record, we're looking at Defendant's Exhibit 145,
9    16:55:32   IPET report Volume IV, Appendix Page IV-9-8.
10   16:55:38   What we see here, Dr. Marino, is wall top heights in
11   16:55:41   the northern portion of the east part of the Industrial Canal
12   16:55:47   that are reported to be including 11.29, 10.1, 10.9.
13   16:55:54   You see that; right, Dr. Marino?
14   16:55:56   A.  I can see those numbers.
15   16:55:58   Q.  Yes.  And if the IPET wall top heights are correct, then
16   16:56:06   you could have the opportunity for earlier overtopping of the
17   16:56:09   floodwall there; right?
18   16:56:11   MR. WILSON:  Objection, Your Honor.  I don't see that
19   16:56:13   this is the north breach or Florida bridge.  I can't tell what
20   16:56:16   this is.
21   16:56:16   BY MR. RAFFMAN:
22   16:56:17   Q.  Dr. Marino, do you recognize --
23   16:56:19   THE COURT:  All right.  If you can clarify it,
24   16:56:20   counsel, please.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1403

```
1    16:56:21   BY MR. RAFFMAN:
2    16:56:21   Q.  Well, it's Figure 9-5, Floodwall Elevations at the IHNC.
3    16:56:28   Do you see that at the bottom of the page, Dr. Marino?
4    16:56:31   A.  Yes.
5    16:56:31   Q.  Is there any other place in the IHNC where there's a
6    16:56:35   bridge and then there's a slip with what appears to be a cement
7    16:56:40   terminal over at the side there?  That's the area of the
8    16:56:42   Florida Avenue bridge, isn't it?
9    16:56:45   A.  Can you point to that again?
10   16:56:47   Q.  Florida Avenue bridge.  The area of the north breach.  The
11   16:56:52   Lafarge terminal slip over here.  Do you recognize that?
12   16:57:00   A.  That's correct.
13   16:57:01   Q.  Thank you.  So I'll ask again:  If the wall top heights in
14   16:57:05   IPET are correct, then you have some lower wall top heights;
15   16:57:09   correct?
16   16:57:11   A.  That's correct.  But when I looked at the other -- I
17   16:57:13   looked at what IPET assumed for their stability analysis, and
18   16:57:16   that's what I used at the time.
19   16:57:18   Q.  All right.
20   16:57:18   A.  I thought that was representative of those areas.
21   16:57:21   And then when I looked at the additional information
22   16:57:28   prepared by the defendant consultant, I -- I saw that the
23   16:57:38   survey -- well, one survey is wrong.  Either this one's wrong
24   16:57:42   or the other one's wrong, because they're not matching.
25   16:57:45   Q.  And you don't know which one's wrong because you haven't
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1404

```
 1   16:57:47   done it independently, have you?
 2   16:57:49   A.  Well, I wouldn't think your own consultant would put in
 3   16:57:53   wrong survey data.
 4   16:57:57   Q.  So you are prepared to rely on my consultants and my
 5   16:58:00   experts when they give you opinions that support your
 6   16:58:02   conclusions, but when my consultant does something that you
 7   16:58:06   don't -- doesn't agree with --
 8   16:58:09   MR. WILSON:  Objection, Your Honor.
 9   16:58:11   THE COURT:  I understand.  Counsel, it's
10   16:58:13   argumentative.
11   16:58:14   MR. RAFFMAN:  Well, I'll move along.
12   16:58:15   THE COURT:  He doesn't have to disagree with
13   16:58:16   everything.
14   16:58:20   MR. RAFFMAN:  I'll move along.
15   16:58:22   THE COURT:  Okay.  Thank you.
16   16:58:22   MR. RAFFMAN:  Let me have GM-067, please.
17   16:58:26   BY MR. RAFFMAN:
18   16:58:28   Q.  Team Louisiana wrote -- DX-144, Team Louisiana report,
19   16:58:32   page 126:  "Given the variation in crown elevations that IPET
20   16:58:38   documented farther north" --
21   16:58:40   MR. WILSON:  Your Honor, the slide he just had up,
22   16:58:43   I'm sorry, the one I was objecting, it says "Entrance to Lake
23   16:58:47   Pontchartrain" underneath it.  If we went back with the heights
24   16:58:51   of the wall, the varying heights of the wall, it says "Entrance
25   16:58:54   to Lake Pontchartrain" underneath it.  DX-145, IPET Volume IV.
                 JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                          UNITED STATES DISTRICT COURT
                          EASTERN DISTRICT OF LOUISIANA
```

## 1405

```
 1   16:59:01   THE COURT:  Well, I'm not sure what we're objecting
 2   16:59:05   to right now.
 3   16:59:06   MR. WILSON:  Just previously he had up DX-145, IPET
 4   16:59:11   Volume IV.  It had varying heights of the wall, and it had it
 5   16:59:15   less than 12 feet.  It has -- underneath it, it's entitled
 6   16:59:17   "Entrance to Lake Pontchartrain."
 7   16:59:19   THE COURT:  I understand, but I think he pointed out
 8   16:59:21   the topographical features that seems to be in the area of the
 9   16:59:25   relevant area.  If I'm wrong about that, you know, we can look
10   16:59:31   at it again.  There it is.  Okay.
11   16:59:44   MR. RAFFMAN:  I see "Floodwall Elevations in the
12   16:59:50   IHNC."  We both looked at this, all three of us, and --
13   16:59:54   MR. WILSON:  Your Honor, my version says right after
14   16:59:56   that "To Lake Pontchartrain."  Those words are missing from
15   16:59:59   that photograph.
16   17:00:00   THE COURT:  Okay.  Wherever it's to, if it's to
17   17:00:05   Hoboken, I'm just interested if that shows elevations in the
18   17:00:10   relevant area, and if the witness can recognize that as the
19   17:00:17   area of the north breach and/or the south breach.  That's all
20   17:00:20   I'm interested in.
21   17:00:22   And I'm interested in it does come from the IPET
22   17:00:27   study.
23   17:00:28   THE WITNESS:  If I may point out, Your Honor.  Some
24   17:00:30   of these elevations may be from the deflected sheet pile to the
25   17:00:37   east.  If you look, you can see that they increased from the
                 JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                          UNITED STATES DISTRICT COURT
                          EASTERN DISTRICT OF LOUISIANA
```

## 1406

```
 1   17:00:42   south end of the -- of the north breach, 10.1, 11.29.
 2   17:00:50   There's -- then there's a 10.35, and they're up to 12.06 and 12
 3   17:00:58   point --
 4   17:01:01   THE COURT:  Can you show me where you are, sir,
 5   17:01:03   because if you point it out to me --
 6   17:01:05   MR. WILSON:  You know what, Judge?  I withdraw it.
 7   17:01:07   withdraw it.
 8   17:01:07   THE COURT:  Okay.  Thank you, sir.
 9   17:01:09   THE WITNESS:  In this area.
10   17:01:11   THE COURT:  Yes, I see that.
11   17:01:15   BY MR. RAFFMAN:
12   17:01:16   Q.  So Team Louisiana wrote:  "Given the variation in
13   17:01:21   floodwall crown elevations that IPET documented farther north,
14   17:01:24   it's possible that the floodwall crest elevation at the point
15   17:01:27   where overtopping initiated the south breach into the Lower
16   17:01:32   Ninth Ward could have been a foot lower than the 12.5 feet
17   17:01:37   found in surviving adjacent segments."
18   17:01:42   Isn't that right, that's what Team Louisiana wrote?
19   17:01:45   A.  That's correct.
20   17:01:46   Q.  And in our consultant's report -- let me see if I can find
21   17:01:54   that.  I want to show it now.  So I want to put up our
22   17:02:10   consultant's report.  I need a couple of seconds to get it.
23   17:02:22   THE COURT:  All right.  Go ahead.
24   17:02:23   MR. RAFFMAN:  I'm sorry to interrupt the flow here.
25   17:02:23   I can't find it.  So let me just ask the question when the
                 JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                          UNITED STATES DISTRICT COURT
                          EASTERN DISTRICT OF LOUISIANA
```

## 1407

```
 1   17:02:26   judge is ready.
 2   17:02:30   (OFF THE RECORD)
 3   17:03:02   THE WITNESS:  Are you ready, Judge?
 4   17:03:03   THE COURT:  Yes.
 5   17:03:04   MR. RAFFMAN:  You know what they say:  If you can't
 6   17:03:06   get it in 15 seconds, you're out of luck."  So we're going
 7   17:03:09   to -- your Honor will understand my question.
 8   17:03:11   BY MR. RAFFMAN:
 9   17:03:12   Q.  In our consultant's wall top surveys that you relied on,
10   17:03:17   Dr. Marino, he hasn't got a wall top height anywhere in the
11   17:03:20   800-foot south breach, does he?
12   17:03:22   A.  No one does.
13   17:03:23   Q.  Nobody does?
14   17:03:24   A.  That's correct.
15   17:03:25   Q.  And so according to Team Louisiana, your wall top in the
16   17:03:30   middle of the breach would be a foot lower; right?
17   17:03:36   A.  I don't know how you can measure -- consider crown
18   17:03:42   elevations to be equivalent to the settlement of the floodwall
19   17:03:48   itself.  They're not necessarily connected.
20   17:03:50   Q.  Well, that's what Team Louisiana concluded; right?
21   17:03:53   A.  That's -- that's what they're saying, yes.
22   17:03:56   Q.  You haven't studied it?
23   17:03:58   A.  Yeah.  And they're saying that the floodwall on the
24   17:04:00   adjacent side is 12.5, where it's almost closer to 13 based on
25   17:04:06   your own defendants.
                 JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                          UNITED STATES DISTRICT COURT
                          EASTERN DISTRICT OF LOUISIANA
```

## 1408

```
 1    17:04:07   Q.  And whatever you choose for your elevation, in the breach
 2    17:04:10   segment, IPET's telling the public that the top would be a foot
 3    17:04:18   lower; right?
 4    17:04:19   A.  Okay.  Well, let's assume --
 5    17:04:19       THE COURT:  Okay.  Team Louisiana.
 6    17:04:21   BY MR. RAFFMAN:
 7    17:04:22   Q.  Team Louisiana.  I'm sorry if I missed that.
 8    17:04:30   A.  Let's assume that it's a foot below the 12.9 that's
 9    17:04:32   surveyed.  So we're talking about 11.9.  That still doesn't --
10    17:04:35   that gets you almost to the top of the wall.  It still doesn't
11    17:04:35   give you significant overtopping.
12    17:04:38   Q.  Well, I'm going to come to that.  My question was:  You
13    17:04:42   haven't studied whether it could have been a foot lower; right?
14    17:04:46   A.  I don't have anything to base that on.
15    17:04:49       MR. RAFFMAN:  Okay.  Just to complete the circle on
16    17:04:51   this.  Let me have GM-068, please.
17    17:04:55   BY MR. RAFFMAN:
18    17:04:56   Q   What Team Louisiana wrote, DX-144, Team Louisiana, page
19    17:05:00   219:  "It's more likely that the I-wall crest elevation was
20    17:05:04   lower within the breach reached, perhaps as a result of local
21    17:05:09   settlement."
22    17:05:09       You saw that; right?  You read Team Louisiana?
23    17:05:12   A.  Yes.
24    17:05:13   Q.  So you saw that that was what Team Louisiana wrote?
25    17:05:16   A.  Yes.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1409

```
 1    17:05:18   Q.  Okay.  Now, you also saw that IPET, DX-145, Volume IV,
 2    17:05:46   Page IV-185, IPET wrote that:  "It is possible that waves could
 3    17:05:53   have been putting significant amounts of water over the
 4    17:05:56   floodwalls and levees."
 5    17:05:58       You saw that; right?
 6    17:06:00   A.  Yes.
 7    17:06:00   Q.  And you saw the testimony from Mr. Villavaso that, as
 8    17:06:04   early as whatever time he observed this -- earlier than
 9    17:06:09   whatever time he observed this object, he was talking about
10    17:06:12   waves 3 to 4 to 5 feet over the top of the wall.  You remember
11    17:06:16   that testimony; right?
12    17:06:17   A.  I remember him talking about splashing over the walls.
13    17:06:21   Q.  So it could have been significant amounts of water before
14    17:06:24   the surge level got all the way to the top; right?
15    17:06:27   A.  Say that again.
16    17:06:28   Q.  Could have had significant amounts of water come over
17    17:06:30   the walls before the surge level got all the way to the top?
18    17:06:35   A.  I don't know if it's significant.
19    17:06:36   Q.  Okay.
20    17:06:42   A.  If someone is saying "splashing" to me, I don't think of
21    17:06:47   it as significant.
22    17:06:48   Q.  Team Louisiana -- well, okay.  Team Louisiana wrote:
23    17:06:52   DX-144 -- Team Louisiana, page 66, they wrote:  "At
24    17:06:57   approximately 0600, levees and floodwalls along both banks of
25    17:07:02   the IHNC were overtopped, beginning on the south and where the
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1410

```
 1    17:07:06   surge was highest."
 2    17:07:07       You read that in Team Louisiana's report; right?
 3    17:07:10   A.  I don't remember reading that, no.
 4    17:07:11   Q.  All right.  If Team Louisiana were correct, that would
 5    17:07:17   mean that there was 30 minutes of overtopping along the
 6    17:07:20   southern portion of the Inner Harbor Navigation Canal before
 7    17:07:25   the flooding started as you have it; right?
 8    17:07:28   A.  That's correct.
 9    17:07:29   Q.  And your time of flooding at 6:30 is geared to, what you
10    17:07:32   say, 911 calls and other evidence you reviewed?
11    17:07:36   A.  Yes.
12    17:07:37   Q.  Now, I want to ask you about another witness that we
13    17:07:41   haven't talked about yet, and his name Ernest Edwards, locally
14    17:07:44   known as "All-Night Shorty."  And you know from, at least,
15    17:07:50   looking at his deposition that he -- well, maybe you don't.
16    17:07:54       Do you know that he rescued people in the Lower Ninth
17    17:07:57   Ward during Hurricane Katrina?
18    17:07:58   A.  I remember reading his deposition, but I don't remember
19    17:08:01   that specific point.
20    17:08:03   Q.  All right.  You're aware that Mr. Edwards went up to the
21    17:08:08   Claiborne Avenue bridge around 3:00 in the morning on the
22    17:08:13   morning of August 29th?  You remember that deposition
23    17:08:15   testimony?
24    17:08:16   A.  Yes.
25    17:08:22   Q.  And in his deposition he was asked:
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1411

```
 1    17:08:24   "QUESTION:  At what time did you get to the bridge?"
 2    17:08:25   "ANSWER:  About a quarter to 2:00."
 3    17:08:30       And he was asked -- I'm at page 77 and 78 for my
 4    17:08:36   colleagues.
 5    17:08:37   "QUESTION:  Okay.  So around quarter to 2:00 you got
 6    17:08:42   there, and what did you see when you got out of the truck and
 7    17:08:46   started looking at the Ninth Ward?
 8    17:08:49   "ANSWER:  The water rising."
 9    17:08:55       MR. RAFFMAN:  Let me have the next slide, please.
10    17:08:57   BY MR. RAFFMAN:
11    17:08:57   Q   This is DX-211, Edwards' deposition, page 78.
12    17:09:03   He says:  "So maybe around a quarter to 3:00?"
13    17:09:06   "Yeah.
14    17:09:07   "QUESTION:  It started overtopping?
15    17:09:08   "Answer:  It started topping.
16    17:09:11   Next slide.  DX-221, Edwards' deposition, page 79:
17    17:09:17   "QUESTION:  Describe to me the trench that it was
18    17:09:20   created from falling over.
19    17:09:21   "ANSWER:  I don't know how much trenches, but it was
20    17:09:24   coming over the wall pretty fast.  Pretty heavy too.
21    17:09:28   "QUESTION:  Sort of like spilling over a bucket;
22    17:09:31   right?
23    17:09:31   "ANSWER:  Right.
24    17:09:32   "QUESTION:  And those are your words; right?
25    17:09:36   "ANSWER:  Yes.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1412

```
1    17:09:37    "QUESTION:  Would you have used the word trench?
2    17:09:41    "ANSWER:  Right.
3    17:09:43    "QUESTION:  And I was using your words.
4    17:09:44    "ANSWER:  It cut a trench in there."
5    17:09:49        My question for you, Dr. Marino, is:  At the time of
6    17:09:51    your deposition in this case, you had never seen the testimony
7    17:09:53    of that witness before; correct?
8    17:09:55    A.  That's correct.
9    17:09:57    Q.  I showed it to you for the first time at your deposition?
10   17:10:00    A.  That's correct.
11   17:10:01    Q.  And since your deposition, you haven't changed your
12   17:10:03    conclusion about the time that the surge waters overtopped the
13   17:10:08    IHNC floodwall; that is to say, you haven't revised your
14   17:10:12    conclusion to state that the water was coming over the wall
15   17:10:14    pretty fast and pretty heavy and cutting a trench at 3:00 in
16   17:10:17    the morning, have you?
17   17:10:19    A.  Yeah.  As I said before, you know, I -- I didn't rely on
18   17:10:22    the times that much because there were varying times from
19   17:10:26    different witnesses.  So I didn't place that much emphasis on
20   17:10:30    times.
21   17:10:32    Q.  And to be clear, you've testified in your summary judgment
22   17:10:35    declaration and throughout that both breaches occurred before
23   17:10:38    any significant overtopping could have caused erosion and scour
24   17:10:42    trenches; right?
25   17:10:44    A.  That's correct.
                JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                        UNITED STATES DISTRICT COURT
                        EASTERN DISTRICT OF LOUISIANA
```

## 1413

```
1    17:10:44    Q.  And if Mr. Edwards were correct that overtopping happened
2    17:10:49    at 3:00 in the morning, or 4:00 in the morning, or even 5:00 in
3    17:10:56    the morning, your conclusion that the breaches happened before
4    17:10:59    overtopping would be incorrect; isn't that right?
5    17:11:02    A.  Yes.  But it would be contrary to the elevations of the
6    17:11:05    floodwall that that we know of and also of the canal water
7    17:11:08    levels that we know of.
8    17:11:10    Q.  And the canal water levels are levels taken by the lock
9    17:11:14    master; right?
10   17:11:16    A.  That's correct.
11   17:11:16    Q.  And taken by visual observations from considerable
12   17:11:19    distance; right?
13   17:11:20    A.  And digital camera pictures.
14   17:11:23    Q.  All right.
15   17:11:30        MR. RAFFMAN:  Your Honor, I have reached a point
16   17:11:33    where I'm going to move to another line.  My next line could be
17   17:11:38    an hour -- it's no more than an hour, but it could be an hour.
18   17:11:42    We've reached 5:00, and I don't want to -- I want -- I'm at
19   17:11:48    your Honor's disposal.  I'll do whatever Your Honor desires.
20   17:11:52        THE COURT:  Well, tell me, what is your estimate,
21   17:11:56    without holding you to it, about how much longer you think --
22   17:12:00    you said the next line would be an hour.  How much longer do
23   17:12:01    you think?
24   17:12:02        MR. RAFFMAN:  It's the last line.
25   17:12:03        THE COURT:  Okay.  And just while we're talking, who
                JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                        UNITED STATES DISTRICT COURT
                        EASTERN DISTRICT OF LOUISIANA
```

## 1414

```
1    17:12:08    does the plaintiff have for tomorrow?
2    17:12:12        MR. GILBERT:  Your Honor, actually, there's some
3    17:12:15    procedural housekeeping matters that are going to determine how
4    17:12:19    tomorrow goes.  There are a couple -- we're going to be putting
5    17:12:23    on Dr. Spinks, our hydrologist.  Then there's some lay
6    17:12:31    witnesses, a couple of rebuttal witnesses.  There's going to
7    17:12:34    rebut some evidence that's already come in.
8    17:12:39        One of them --
9    17:12:40        THE COURT:  Wait.  Wait a second.  Rebuttal witnesses
10   17:12:42    in your case in chief?
11   17:12:45        MR. GILBERT:  Well, that's the thing.  It's up to the
12   17:12:47    Court how we organize this.  I mean, I don't have any
13   17:12:51    preference.  They can come in after.
14   17:12:53        THE COURT:  If I get consent from the other side, you
15   17:12:57    know, I'll -- maybe you need to talk with them first.  That
16   17:13:02    makes it easy.  If I don't -- I don't know who they are or what
17   17:13:06    they're about.
18   17:13:07        MR. GILBERT:  I'm content for them to come in after
19   17:13:09    the defendant's case or before.  It doesn't matter to us.  And
20   17:13:13    actually, one of them is going to rebut witnesses that haven't
21   17:13:18    testified yet, but I have an idea what they're going to testify
22   17:13:22    to.
23   17:13:23        THE COURT:  Well, it might be best to have them come
24   17:13:26    in at the appropriate time.
25   17:13:29        You have Spinks tomorrow?
                JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                        UNITED STATES DISTRICT COURT
                        EASTERN DISTRICT OF LOUISIANA
```

## 1415

```
1    17:13:32        MR. GILBERT:  Spinks tomorrow.  I've also got the two
2    17:13:40    Centanni witnesses.  Mr. Webb is waiting for my signal as to
3    17:13:40    when to send them out.
4    17:13:41        But I'm waiting for a ruling from Your Honor on
5    17:13:44    our motion to strike -- I'm waiting for a decision from Your
6    17:13:50    Honor on our motion to strike the Sidney Williams statement as
7    17:13:56    an attachment to his deposition designations, because that's
8    17:14:00    going to determine the scope of my examination of these two
9    17:14:05    Centanni witnesses.
10   17:14:07        If that motion is granted, my examination
11   17:14:10    shrinks considerably.
12   17:14:13        THE COURT:  You mean you move to strike the
13   17:14:15    transcript, you're talking about?
14   17:14:17        MR. GILBERT:  Move to strike that interview, the
15   17:14:19    transcript of that interview.
16   17:14:21        THE COURT:  We will get that done tonight.
17   17:14:23        MR. GILBERT:  Okay.  So we've got Dr. Spinks;
18   17:14:30    presumably the two Centanni witnesses, which are either going
19   17:14:38    to be short or very short.
20   17:14:44        THE COURT:  And I'll have to rule on that.
21   17:14:46        MR. GILBERT:  I guess we're going to have to wait to
22   17:14:49    rest until after we've put on Mr. Glaser out of turn because he
23   17:14:55    couldn't get off until July 6th to come and testify.
24   17:15:01        THE COURT:  And do you have consent?
25   17:15:03        MR. ALDOCK:  Consent to Mr. Glaser.  I think they
                JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                        UNITED STATES DISTRICT COURT
                        EASTERN DISTRICT OF LOUISIANA
```

33  (Pages 1412 to 1415)

1416

| | | |
|---|---|---|
| 1 | 17:15:05 | could rest subject to Mr. Glaser -- |
| 2 | 17:15:07 | THE COURT: Certainly they could. |
| 3 | 17:15:07 | MR. GILBERT: -- so we could make the appropriate |
| 4 | 17:15:09 | motions at the appropriate -- |
| 5 | 17:15:11 | THE COURT: On factual findings, yes. I don't think |
| 6 | 17:15:13 | Mr. Glaser is going to be testifying to any of the factual |
| 7 | 17:15:16 | findings that you would be making your Rule 52 motions |
| 8 | 17:15:19 | concerning. |
| 9 | 17:15:20 | MR. ALDOCK: Right. He would only be speaking to |
| 10 | 17:15:22 | that. |
| 11 | 17:15:23 | MR. GILBERT: So that's what tomorrow looks like. So |
| 12 | 17:15:25 | it's a little bit nebulous, but generally -- |
| 13 | 17:15:28 | THE COURT: In all likelihood, it's possible you |
| 14 | 17:15:32 | finish tomorrow. |
| 15 | 17:15:33 | MR. GILBERT: It's possible we finish tomorrow, Your |
| 16 | 17:15:35 | Honor. |
| 17 | 17:15:36 | MR. ALDOCK: Could we ask them if there will redirect |
| 18 | 17:15:39 | of this witness? |
| 19 | 17:15:39 | THE COURT: I'm sure there will be some redirect. |
| 20 | 17:15:41 | MR. GILBERT: Some redirect. |
| 21 | 17:15:42 | MR. WILSON: Absolutely, Your Honor. |
| 22 | 17:15:43 | THE COURT: Hopefully, incisive. |
| 23 | 17:15:46 | All right. With that, sir, your day is done, |
| 24 | 17:15:48 | and we will see you at 9:00 in the morning. We'll try to have |
| 25 | 17:15:52 | the rulings out that are necessary for us to proceed with |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1417

| | | |
|---|---|---|
| 1 | 17:15:58 | alacrity. |
| 2 | 17:15:59 | MR. GILBERT: Thank you, Your Honor. |
| 3 | 17:15:59 | MR. RAFFMAN: Your Honor, in connection with the |
| 4 | 17:16:01 | rulings on the objections, Your Honor may wish to look at the |
| 5 | 17:16:04 | transcript of this witness' testimony insofar as he's relied on |
| 6 | 17:16:07 | the one document that they're now seeking to strike. |
| 7 | 17:16:12 | MR. GILBERT: No, sir. No, sir. That's -- I can't |
| 8 | 17:16:17 | believe that, Mark, you're under a misimpression. |
| 9 | 17:16:20 | THE COURT: I'm looking at it all. |
| 10 | 17:16:21 | MR. GILBERT: I'm not trying to strike. |
| 11 | 17:16:23 | THE COURT: We are adjourned -- recessed for the day. |
| 12 | 17:16:29 | Off the record. |
| 13 | 17:16:38 | (WHEREUPON, the proceedings were concluded.) |
| 14 | | ***** |
| 15 | | CERTIFICATE |
| 16 | | I, Jodi Simcox, RMR, FCRR, Official Court Reporter |
| 17 | | for the United States District Court, Eastern District of |
| 18 | | Louisiana, do hereby certify that the foregoing is a true and |
| 19 | | correct transcript, to the best of my ability and |
| 20 | | understanding, from the record of the proceedings in the |
| 21 | | above-entitled and numbered matter. |
| 22 | | |
| 23 | | |
| 24 | | S/ Jodi Simcox, RMR, FCRR |
| | | Jodi Simcox, RMR, FCRR |
| 25 | | Official Court Reporter |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

34 (Pages 1416 to 1417)