1418

1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF LOUISIANA

3

      ****************************************************************

4

      IN RE:  KATRINA CANAL

5     BREACHES CONSOLIDATED

      LITIGATION

6

                                    CIVIL ACTION NO. 05-4182

7                                   SECTION "K" (2)

                                    NEW ORLEANS, LOUISIANA

8                                   WEDNESDAY, JUNE 30, 2010, 9:00 A.M.

9     PERTAINS TO BARGE

10

      MUMFORD    C.A. NO. 05-5724

11    AS TO CLAIMS OF PLAINTIFFS

      JOSEPHINE RICHARDSON AND

12    HOLIDAY JEWELERS, INC.,

      ONLY

13

14    BENOIT    C.A. NO. 06-7516

      AS TO CLAIMS OF PLAINTIFFS

15    JOHN ALFORD AND JERRY

      ALFORD ONLY

16

17    ****************************************************************

18

                         DAY 7, MORNING SESSION

19            TRANSCRIPT OF NONJURY TRIAL PROCEEDINGS

          HEARD BEFORE THE HONORABLE STANWOOD R. DUVAL, JR.

20                 UNITED STATES DISTRICT JUDGE

21

22    APPEARANCES:

23

      FOR THE PLAINTIFFS:    BEST KOEPPEL TRAYLOR

24                           BY:  LAURENCE E. BEST, ESQUIRE

                             2030 ST. CHARLES AVENUE

25                           NEW ORLEANS LA  70130

**1419**

APPEARANCES CONTINUED:

LAW OFFICES OF BRIAN A. GILBERT
BY:  BRIAN A. GILBERT, ESQUIRE
2030 ST. CHARLES AVENUE
NEW ORLEANS LA  70130

KHORRAMI POLLARD ABIR
BY:  SHAWN KHORRAMI, ESQUIRE
44 FLOWER STREET, 33RD FLOOR
LOS ANGELES CA  90071

WILSON GROCHOW DRUKER & NOLET
BY:  LAWRENCE A. WILSON, ESQUIRE
223 BROADWAY, 5TH FLOOR
NEW YORK NY  10279

WIEDEMANN & WIEDEMANN
BY:  LAWRENCE D. WIEDEMANN, ESQUIRE
     KARL WIEDEMANN, ESQUIRE
821 BARONNE STREET
NEW ORLEANS LA  70113

PATRICK J. SANDERS
ATTORNEY AT LAW
3316 RIDGELAKE DRIVE
SUITE 100
METAIRIE LA  70002

LAW OFFICE OF RICHARD T. SEYMOUR
BY:  RICHARD T. SEYMOUR, ESQUIRE
1150 CONNECTICUT AVENUE N.W.
SUITE 900
WASHINGTON DC  20036

FOR THE DEFENDANT:    CHAFFE MCCALL
BY:  DEREK A. WALKER, ESQUIRE
2300 ENERGY CENTRE
1100 POYDRAS STREET
NEW ORLEANS LA  70163

**1420**

APPEARANCES CONTINUED:

GOODWIN PROCTER
BY:  JOHN D. ALDOCK, ESQUIRE
     MARK S. RAFFMAN, ESQUIRE
     ADAM M. CHUD, ESQUIRE
     KIRSTEN V. K. ROBBINS, ESQUIRE
     ERIC I. GOLDBERG, ESQUIRE
901 NEW YORK AVENUE N. W.
WASHINGTON DC  20001

SUTTERFIELD & WEBB
BY:  DANIEL A. WEBB, ESQUIRE
650 POYDRAS STREET, SUITE 2715
NEW ORLEANS LA  70130

LAFARGE NORTH AMERICA, INC.
BY:  PETER KEELEY, ESQUIRE
12950 WORLDGATE DRIVE
HERNDON VA  20170

OFFICIAL COURT REPORTER:    CATHY PEPPER, CCR, RMR, CRR
500 POYDRAS STREET, ROOM B406
NEW ORLEANS, LOUISIANA 70130
(504) 589-7779

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
PRODUCED BY COMPUTER.

**1421**

I N D E X

EXAMINATIONS                            PAGE

GENNARO G. MARINO, PH.D., P.E. (CONTINUED)............1422
CROSS-EXAMINATION BY MR. RAFFMAN......................1422
REDIRECT EXAMINATION BY MR. WILSON....................1478


E X H I B I T S

DESCRIPTION                             PAGE

PLAINTIFF'S EXHIBITS 438 AND 439 WERE ADMITTED.........1478
PLAINTIFF'S EXHIBIT 441 WAS ADMITTED..................1491
EXHIBITS 440, 441 AND 442 WERE ADMITTED...............1508

**1422**

P-R-O-C-E-E-D-I-N-G-S

WEDNESDAY, JUNE 30, 2010

M O R N I N G   S E S S I O N

(COURT CALLED TO ORDER)

THE DEPUTY CLERK:  ALL RISE, PLEASE.  COURT IS IN
SESSION.  PLEASE BE SEATED.

THE COURT:  MANY PEOPLE HAVE SAID I'M IN THE DARK, AND
YOU CAN PROVE ME TO BE TRUE.  SORRY ABOUT THE ELECTRONIC
PROBLEMS, BUT, COUNSEL, ARE YOU READY TO PROCEED?

MR. RAFFMAN:  YES, I AM, YOUR HONOR.

CROSS-EXAMINATION

BY MR. RAFFMAN:

Q.  DR. MARINO, AM I RIGHT THAT BECAUSE THE IMPACT ILLUSTRATIONS
THAT YOU DID YESTERDAY WERE NOT DONE WITH ANY REAL INFORMATION
ABOUT BARGE SPEED, DIRECTION, OR MOMENTUM, THAT REALLY WHAT YOU
WERE RELYING ON FOR YOUR OPINIONS ARE THE WITNESSES, THE DAMAGE
PATTERNS, THE STABILITY ANALYSIS, AND THE SEEPAGE ANALYSIS; IS
THAT RIGHT?

A.  THAT'S CORRECT.

Q.  WE TALKED ABOUT THE WITNESSES AND THE DAMAGE PATTERNS
YESTERDAY, AND I'M NOT GOING TO PLOW A SINGLE INCH OF OLD GROUND,
SO I WANT TO ASK YOU ABOUT THE SEEPAGE ANALYSIS AND THE STABILITY

## 1423

1  ANALYSIS THIS MORNING.
2      AM I RIGHT THAT WHAT YOU'VE DONE IN YOUR SEEPAGE AND
3  STABILITY ANALYSIS IS TO RULE OUT SEEPAGE AS A CAUSE OF THE TWO
4  FLOODWALL FAILURES AND TO RULE OUT STABILITY FAILURE AS A CAUSE
5  OF THE TWO FAILURES?  IS THAT RIGHT?
6  A.  YES.
7  Q.  AND SO WHAT YOU'VE DONE IS, YOU'VE ARRIVED AT THE CONCLUSION
8  THAT THE BARGE CAUSED THE FAILURES, AT LEAST INSOFAR AS THIS
9  ANALYSIS IS CONCERNED, BY A PROCESS OF ELIMINATION?
10  A.  WELL, AT LEAST IN TERMS OF THE SEEPAGE AND STABILITY
11  ANALYSIS.  I BELIEVE THAT THE DAMAGE PATTERNS CLEARLY DEMONSTRATE
12  THAT THERE WAS OTHER CONDITIONS INVOLVED IN THE FAILURE OF THOSE
13  FLOODWALLS.
14  Q.  LET ME HAVE DEPOSITION LINES 15 TO 19.  I'M SO SORRY,
15  PAGE 34, LINES 15 TO 19.
16      (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, AN EXCERPT
17  OF THE VIDEOTAPED DEPOSITION OF DR. MARINO WAS PLAYED.)
18  Q.  SO BY USING SEEPAGE AND STABILITY, THEN ADDING WITNESS
19  ACCOUNTS AND FLOODWALL DAMAGE, YOU ARRIVE AT THE CONCLUSION THAT
20  THE BARGE CAUSED THE FAILURES BY A PROCESS OF ELIMINATION?
21  A.  USING PROCESS OF ELIMINATION.
22      (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THIS
23  CONCLUDED THE EXCERPT OF THE VIDEOTAPED DEPOSITION.)
24      THE WITNESS:  AND I BELIEVE I CLARIFIED THAT IN ANOTHER
25  PLACE IN MY DEPOSITION WHERE I SAID THAT IT WAS ALSO, IN ADDITION

## 1424

1  TO THE SEEPAGE -- WHAT I SHOULD HAVE SAID AT THAT POINT WAS THAT
2  THE SEEPAGE AND STABILITY ANALYSIS WAS A PROCESS OF ELIMINATION,
3  BUT THE OTHER -- AND I THINK I ADDRESSED THIS IN MY DECLARATION,
4  THAT THE OTHER ASPECTS, THE WITNESS ACCOUNTS AND THE DAMAGE
5  CONDITIONS, WERE NOT RELATED TO THE PROCESS OF ELIMINATION.
6      EXAMINATION
7  BY MR. RAFFMAN:
8  Q.  AND I THINK WE ACTUALLY UNDERSTAND EACH OTHER.
9  A.  WELL, THE WAY YOU PUT IT UP THERE, IT KIND OF MISCONSTRUES
10  THE ENTIRE DEPOSITION.
11  Q.  SO THE RECORD IS CLEAR, AS FAR AS SEEPAGE AND STABILITY GO,
12  IT IS A PROCESS OF ELIMINATION, RIGHT?
13  A.  YES, YES, JUST LIKE IPET USES SEEPAGE ANALYSIS TO DETERMINE
14  THAT IT WASN'T THE CAUSE.
15  Q.  OKAY.  SO LET ME START WITH SLIDE 20 IN THE MARINO SLIDE
16  DECK.
17      THIS IS YOUR CHARACTERIZATION OF THE SOILS AT THE NORTH
18  BREACH, RIGHT?
19  A.  THAT'S CORRECT.
20  Q.  AND THIS LOBE OF LEVEE EMBANKMENT SOIL GOES DOWN TO ABOUT
21  18 FEET, RIGHT?
22  A.  THAT'S CORRECT.
23  Q.  THIS IS STRONG SOIL, IMPERMEABLE SOIL, RIGHT?
24  A.  IT'S FAIRLY IMPERMEABLE SOIL.  I WOULDN'T SAY IT'S STRONG.
25  Q.  WE'LL REST WITH IMPERMEABLE.  THIS FEATURE OF THE SOIL IS

## 1425

1  IMPORTANT TO THE RESULTS THAT YOU'VE REACHED, RIGHT?
2  A.  IN TERMS OF SEEPAGE, NOT NECESSARILY.
3  Q.  THE SOIL LAYERING IS IMPORTANT TO THE RESULTS YOU'VE
4  REACHED?
5  A.  YES.  WHAT I'M SAYING IS THAT IF THAT UPPER SILT AND CLAY
6  LAYER EXTENDED AND WE DIDN'T HAVE THE LOBE, IT WOULDN'T -- YOU
7  STILL WOULDN'T HAVE A SEEPAGE PROBLEM.
8  Q.  YOUR CHARACTERIZATION OF THE SOIL HERE DOES NOT MATCH THE
9  CHARACTERIZATION OF THE IPET AND ILIT REPORTS, RIGHT?
10  A.  THAT'S CORRECT.  I THINK ALL THE CHARACTERIZATIONS ARE
11  DIFFERENT.
12  Q.  THE LOBE THAT YOU'VE GOT HERE --
13  A.  YOU KNOW, IF I COULD -- I'M SORRY.
14      MR. RAFFMAN:  I'M SORRY.  COUNSEL HAS ASKED WHETHER THE
15  WITNESS MAY BE GIVEN A LASER POINTER.  I HAVE NO OBJECTION.
16      MR. WILSON:  OH, YOU HAVE ONE.  I APOLOGIZE.
17      EXAMINATION
18  BY MR. RAFFMAN:
19  Q.  SO GOING BACK TO THIS LOBE, YOU HAVE RELIED ON SAMPLE 81A
20  AND SIMILAR WGI SAMPLES TO CHARACTERIZE THAT LOBE, RIGHT?
21  A.  SAMPLES --
22  Q.  LET'S GO TO SLIDE 11, PLEASE.  MAYBE THIS WILL HELP.
23      THE COURT:  AND JUST FOR CLARITY, THE LOBE YOU'RE
24  TALKING ABOUT, LET'S DESCRIBE IT SO THAT --
25      EXAMINATION

## 1426

1  BY MR. RAFFMAN:
2  Q.  THERE IS A -- ON THE WEST SIDE OF THE FLOODWALL, WE HAVE AN
3  AREA OF BROWN IN MARINO SLIDE 20 IN THE TOP LAYER AT THE WALL,
4  AND THEN IT EXTENDS DOWNWARD IN A U SHAPE TO ABOUT A LEVEL OF
5  18 FEET AT ITS BOTTOM, AND THEN COMES BACK UP.  THIS FEATURE IS
6  BETWEEN MINUS 50 AND THE FLOODWALL AS A FUNCTION OF DISTANCE FROM
7  THE CENTER OF THE WALL.
8      THE COURT:  I'LL LET YOU -- AND THE COLOR WOULD BE --
9  I'LL LEAVE THAT TO YOU.
10      MR. RAFFMAN:  IT'S A MIDDLE -- TAUPE.  IT'S TAUPE.
11      THE COURT:  THAT'S WHY I REALIZE I WAS OUT OF MY MILIEU.
12  GO AHEAD.
13      MR. RAFFMAN:  THANK YOU.
14      EXAMINATION
15  BY MR. RAFFMAN:
16  Q.  SO SLIDE 11, PLEASE.  WE SEE IN SLIDE 11 THE BORINGS THAT
17  WERE TAKEN CLOSEST TO THE FLOODWALL AS 77A, 79A AND 81A; IS THAT
18  RIGHT, DR. MARINO?
19  A.  ON THIS SLIDE, THIS IS PRIOR TO THE MOVING OF -- NO, I GUESS
20  THAT'S THE CORRECT LOCATION, YES.
21  Q.  SO WHEN YOU SAY THIS IS THE CORRECT LOCATION FOR 81A,
22  DR. MARINO, WHAT YOU'RE SAYING IS THAT THIS IS WHERE YOU BELIEVE
23  81A WAS ACTUALLY TAKEN?
24  A.  YES.
25  Q.  WHAT ARE THE GPS COORDINATES, IF YOU KNOW, FOR THE LOCATION

## 1427

1 WHERE YOU BELIEVE 81A WAS ACTUALLY TAKEN?
2 A. I DON'T KNOW OFFHAND WHAT THE GPS COORDINATES ARE. I FOUND
3 WHEN WE PLOTTED THE GPS COORDINATES OF SOME OF THE OTHER HOLES,
4 THAT THEY WEREN'T EXACTLY IN THE RIGHT LOCATION. I DON'T KNOW
5 HOW ACCURATE THE GPS COORDINATES WERE. IN MY MIND, THEY MAY HAVE
6 BEEN OFF BY SOME DEGREE. I THINK THAT IS THE ONLY PRACTICAL
7 LOCATION THAT HOLE COULD BE IN THAT AREA.
8 Q. I'M GOING TO COME BACK TO THAT TOPIC AND PURSUE MY LINE, BUT
9 BEFORE I GET THERE, AM I RIGHT, DR. MARINO, THAT 81A, 79A AND 77A
10 ARE THE SAMPLES THAT ARE CLOSEST TO THE FLOODWALL IN THE AREA OF
11 THE NORTH BREACH?
12 A. YES. YOU SAY SAMPLES --
13 Q. BORINGS. I'M SORRY TO CUT YOU OFF, DR. MARINO. I
14 UNDERSTAND THAT "BORINGS" IS THE CORRECT WORD. AND I APPRECIATE
15 BEING CORRECTED. THE BORINGS THAT ARE CLOSEST TO THE WALL.
16 OKAY.
17     NOW, BACK TO SLIDE 20, PLEASE.
18     AM I CORRECT, DR. MARINO, THAT YOU DO NOT HAVE A BORING LOG
19 THAT SHOWS THAT SOMEBODY REACHED IN THE GROUND AND TOOK A BORING
20 AND PULLED THE BORING OUT, AND THAT BORING HAS LEVEE EMBANKMENT
21 SOIL DOWN TO 18 FEET; IS THAT CORRECT?
22 A. THE ONLY BORING THAT WE HAVE IS 81A THAT'S CLOSE BY WHERE
23 THERE IS A DESCRIPTION BY THE GEOLOGIST AT THE BOTTOM OF A HOLE
24 WHERE HE DESCRIBES THAT THERE IS APPARENTLY LEVEE MATERIAL.
25 Q. I DON'T THINK -- YOUR ANSWER IS NOT AS -- I'M SORRY.

## 1428

1     AM I RIGHT, DR. MARINO, THAT YOU DON'T HAVE A BORING LOG
2 WHICH SHOWS THAT THE SAMPLERS OR THE BORING PEOPLE PUT THEIR
3 EQUIPMENT IN THE GROUND AND PULLED UP A BORING WHICH HAD LEVEE
4 EMBANKMENT SOIL FOR THAT FIRST 18 FEET? THAT'S MY QUESTION.
5 A. YOU USED A LOT OF WRONG TERMS, BUT I THINK I UNDERSTAND WHAT
6 YOU'RE SAYING. YOU'RE ASKING ME BASICALLY IF THERE WAS A BORING
7 PUT EXACTLY RIGHT IN THE MIDDLE WHERE THAT LOBE IS; IS THAT
8 CORRECT?
9 Q. THAT'S ANOTHER WAY TO PUT IT, AND WHETHER YOU HAVE A LOG
10 WHICH SHOWS THAT THAT SOIL WAS ACTUALLY PULLED OUT OF THE GROUND.
11 A. WELL, I GUESS THAT'S A DOUBLE QUESTION, BUT THE FIRST PART
12 OF IT IS, NO, I DON'T KNOW OF ANY BORING THAT WAS PUT IN THAT
13 LOCATION.
14     THE COURT: AND MAKE SURE I UNDERSTAND WHAT THE LOCATION
15 IS, COUNSEL. IF YOU WOULDN'T MIND --
16     MR. RAFFMAN: SLIDE 14, PLEASE.
17     THE COURT: IT WOULD HELP ME UNDERSTAND.
18         EXAMINATION
19 BY MR. RAFFMAN:
20 Q. ALL RIGHT. SLIDE 14, DR. MARINO, SHOWS THE LOCATION OF 81A
21 AT THE LOCATION OF MY LASER POINTER AND IT'S THE CLOSEST BORING
22 TO THE FLOODWALL TOWARD THE NORTH END OF THE WALL, RIGHT?
23 A. THAT'S NOT CORRECT.
24 Q. IT'S NOT 81A?
25 A. THAT'S THE PRECORRECTED LOCATION OF THAT HOLE.

## 1429

1 Q. WELL, JUST TO BE CLEAR, THAT'S WHERE THE PEOPLE SAID THEY
2 WERE TAKING THE BORING, RIGHT?
3 A. NO.
4 Q. I'M SORRY.
5     THE COURT: THAT DIAGRAM SHOWS OSTENSIBLY THAT A BORING
6 WAS TAKEN AT THAT LOCATION.
7     THE WITNESS: THAT WAS THE PREPLANNED LOCATION OF THE
8 HOLE.
9     THE COURT: THAT A BORING WAS TO BE TAKEN AT THAT
10 LOCATION --
11     THE WITNESS: EXACTLY.
12     THE COURT: -- IS CORRECT.
13         EXAMINATION
14 BY MR. RAFFMAN:
15 Q. SURE. THAT'S THE ONLY DOCUMENT -- I'M SORRY, YOUR HONOR. I
16 DIDN'T MEAN TO CUT YOU OFF.
17     THE COURT: NO, NO, I'M DONE.
18         EXAMINATION
19 BY MR. RAFFMAN:
20 Q. THAT'S THE ONLY DOCUMENT WHICH SHOWS A LOCATION FOR 81A
21 RIGHT? YOU'VE PUT IT A DIFFERENT PLACE, I UNDERSTAND YOU,
22 DR. MARINO, BUT AS FAR AS THE DOCUMENTATION FOR THE BORING GOES,
23 THIS IS THE ONLY DOCUMENT WHICH SHOWS THE ACTUAL LOCATION OF 81A,
24 RIGHT?
25 A. WE KNOW IT'S MOVED. IT SAYS IT IN THE TABLE.

## 1430

1     THE COURT: FIRST, IF YOU COULD ANSWER HIS QUESTION. IS
2 THERE ANY OTHER DOCUMENT THAT PLACES 81A IN ANOTHER PLACE?
3     THE WITNESS: NO.
4     THE COURT: THANK YOU.
5     THE WITNESS: YOU'RE WELCOME.
6         EXAMINATION
7 BY MR. RAFFMAN:
8 Q. OKAY. I WANT TO NEXT TURN TO THE BORING LOG OF 81A. WE'RE
9 GOING TO USE SLIDE 16 FROM THE MARINO DECK.
10     ARE WE ABLE TO ENHANCE THE LEFT-HAND SIDE OF THE LOG?
11     AM I RIGHT, DR. MARINO, THAT BORING 81A, AS IT WAS TAKEN
12 FROM THE GROUND AT WHATEVER LOCATION IT WAS TAKEN, INCLUDES
13 PERVIOUS MATERIAL SUCH AS SHELL, SILTY SAND, DOWN TO A LEVEL OF
14 ABOUT 18 FEET?
15 A. YOU KNOW, I WOULDN'T SAY THAT SPECIFICALLY. IF YOU GO TO
16 THE NEXT PAGE OF THIS --
17     THE COURT: IF WE JUST STAY ON THIS, SO I UNDERSTAND.
18 DO YOU WANT TO POINT OUT -- I'M LOOKING AT MY SCREEN, AND
19 SOMETIMES I DON'T SEE WHERE YOU SHOT THE LASER.
20     MR. RAFFMAN: YOUR HONOR, I'M SORRY.
21         EXAMINATION
22 BY MR. RAFFMAN:
23 Q. THE MATERIALS THAT ARE PULLED OUT OF THE GROUND INCLUDES
24 SHELL WITH SILT, RIGHT?
25 A. YES.

## 1431

1  Q.  AND IT'S YOUR UNDERSTANDING, DR. MARINO, THAT SHELL MATERIAL
2  IS PERVIOUS?
3  A.  WITH THE SILT IN IT, IT WOULD HAVE -- IT WOULDN'T HAVE A
4  PERMEABILITY OF A CLEAN SAND OR A SAND AND GRAVEL.  I MEAN, IT
5  WOULD HAVE A MODERATE PERMEABILITY.
6  Q.  IT'S CERTAINLY MORE PERVIOUS THAN LEVEE EMBANKMENT MATERIAL,
7  RIGHT?
8  A.  YES.
9  Q.  AND I BELIEVE YOU SAID WORDS YESTERDAY TO THE EFFECT THAT IF
10 YOU ACTUALLY HAD PERVIOUS MATERIALS AT THE LOCATION OF THE LEVEE
11 WALL IN THE AREA OF THE BREACH, THAT COULD BE A DANGEROUS
12 CONDITION BECAUSE IT COULD ALLOW WATER TO SEEP DOWN THE WALL AND
13 UNDERMINE THE WALL UNDERNEATH IT, RIGHT?
14 A.  YES.  I THINK THAT ANY CIVIL ENGINEER WOULD BE AWARE OF THAT
15 KIND OF CONDITION, AND THAT'S WHY I BELIEVE, IN THE PLANS WHEN
16 THEY RECOGNIZE THIS MATERIAL THAT'S ADJACENT TO THE WALL, THAT
17 THEY WOULD HAVE HANDLED THIS SITUATION.
18     ALSO, IF I MAY SAY SOMETHING ABOUT THIS LOG, I WOULD EXPECT,
19 IF IT WAS DONE ON THE ROAD, THAT THERE WOULD BE SOME MATERIAL
20 HAULED, ROADBED OR SOMETHING, IN THE FIRST SO MANY INCHES OF THE
21 LOG.  AND IT DOESN'T SHOW IT WAS ON THE ROAD AND THAT'S WHY I PUT
22 IT OFF THE ROAD.
23     ALSO, IF YOU WOULD GO TO THE NEXT PAGE OF THIS LOG, IF YOU
24 WOULDN'T MIND.
25     MR. RAFFMAN:  MY QUESTION, YOUR HONOR, WAS ABOUT

## 1432

1  WHETHER, IF YOU HAVE PERVIOUS MATERIAL AT THE WALL, THAT WOULD
2  CREATE DANGEROUS CONDITIONS.  SO IF YOUR HONOR TELLS ME TO GO TO
3  THE NEXT PAGE, I CERTAINLY WILL DO THAT.
4      THE COURT:  IT'S YOUR EXAMINATION.  I'M GLAD TO LET HIM
5  EXPLAIN IT, BUT THE BASIC SCOPE OF YOUR QUESTION IS, ISN'T IT
6  TRUE THAT THE MATERIAL SHOWN IN THIS SLIDE IS -- IF IT WERE IN
7  THE LOCATION YOU DESCRIBED, IT WOULD NOT BE A SAFE CONDITION?
8      MR. RAFFMAN:  THAT WAS MY QUESTION, YOUR HONOR.
9      THE COURT:  I UNDERSTAND.  I THINK HE'S ANSWERED IT.
10     MR. RAFFMAN:  I THINK SO, TOO.  I JUST WANT TO CONTINUE
11 MY EXAMINATION.
12     THE COURT:  I UNDERSTAND.
13         EXAMINATION
14 BY MR. RAFFMAN:
15 Q.  AND I WOULD LIKE TO CONTINUE MY EXAMINATION BY ASKING FOR
16 SLIDE GM077, PLEASE.
17     NOW, THIS IS A LOG OF BORING 79A.  ALL RIGHT?  AND TO CALL
18 TO MIND FOR THE COURT, WHERE 79A IS, I'M GOING TO ASK FOR
19 SLIDE 11 BACK.
20     DR. MARINO, SAMPLE 79A IS RIGHT HERE IN THE MIDDLE OF THE
21 NORTH BREACH, RIGHT?
22 A.  YES.
23 Q.  AND YOU'RE NOT CONTENDING THAT THE SAMPLING LOCATION FOR
24 THAT SAMPLE WAS MOVED SOMEWHERE ELSE, RIGHT?
25 A.  I BELIEVE THAT THERE WAS A NUMBER OF THESE HOLES THAT WERE

## 1433

1  RIGHT NEXT TO THE LEVEE THAT WERE ACTUALLY DRILLED OUTSIDE THE
2  TOE OF THE LEVEE BECAUSE OF THE SAND THAT WAS ENCOUNTERED IN THE
3  UPPER PORTION ALL ALONG THIS ALIGNMENT.
4  Q.  SO WHAT YOU'RE TELLING THE COURT IS THAT 79A WAS MOVED TO A
5  DIFFERENT LOCATION AS WELL?
6  A.  NO.  I'M SAYING THAT -- WELL, I'M SAYING THAT I BELIEVE THAT
7  79A WAS OFFSET MAYBE A LITTLE BIT TO THE WEST, NOT SIGNIFICANTLY.
8  Q.  OKAY.  NOT SIGNIFICANTLY.  THEN LET ME GO TO THE LOG FOR
9  79A, WHICH I'M SORRY, IS THE SLIDE I JUST ASKED FOR -- YEAH.
10 THERE WE GO.  GM077.
11     SO WOULD YOU AGREE WITH ME, DR. MARINO, THAT IN THE BORING
12 LOG FOR 79A, WE HAVE ALSO ENCOUNTERED SOME OF THESE PERVIOUS
13 MATERIALS, SILTY SAND OR SHELL, AT LEAST AT SOME STRATUM?
14 A.  I CAN'T REALLY SEE IT IN THE SCREEN, IF YOU WOULDN'T MIND --
15     THE COURT:  YOU'RE TRYING TO REPRESENT IT BY THE LARGER
16 DIAGRAM?
17     MR. RAFFMAN:  YES, YOUR HONOR, I AM, AND BECAUSE IT WAS
18 NOT IN DR. MARINO'S OWN SLIDE DECK, I HAD TO USE IT FROM THE
19 MARINO RELIANCE MATERIALS.  AND FOR THE RECORD, IT'S GOT A BATES
20 NUMBER OF WGI 357961, AND PERHAPS -- ARE WE ABLE TO ENHANCE THE
21 LEFT SIDE?
22     THE WITNESS:  AND, YOUR HONOR, THIS WAS --
23     THE COURT:  WAIT.  WAIT.  WAIT.  HOLD ON.  LET'S ANSWER
24 ONE QUESTION AT A TIME.
25     THE WITNESS:  OKAY.

## 1434

1      THE COURT:  WOULD YOU REPEAT YOUR QUESTION AGAIN NOW
2  THAT IT'S ENHANCED.
3      MR. RAFFMAN:  YES, YOUR HONOR.
4          EXAMINATION
5  BY MR. RAFFMAN:
6  Q.  WOULD YOU AGREE WITH ME, DR. MARINO, THAT THE BORING LOG FOR
7  SLIDE 79A, TAKEN FROM SOMEWHERE NEAR THE MIDDLE OF THE NORTH
8  BREACH, ALSO INCLUDES, IN SOME LAYERS, PERVIOUS MATERIALS SUCH AS
9  SHELL?
10 A.  IT SHOWS THAT DOWN TO SIX FEET.
11 Q.  NEXT SLIDE WOULD BE 78, I BELIEVE.  I'VE GOT HERE THE BORING
12 LOG OF 77A, AND THIS IS IN THE MARINO RELIANCE MATERIALS.  FOR
13 THE RECORD, THE BATES NUMBER IS WGI 357952.  AND BEFORE I ASK YOU
14 A QUESTION, WE'LL ENHANCE IT, DR. MARINO.  YOU DON'T HAVE TO
15 SQUINT AT IT.
16     THE LOG FOR THIS BORING ALSO INCLUDES PERVIOUS MATERIALS
17 SUCH AS SHELL?
18 A.  YEAH, I WOULDN'T CHARACTERIZE THE PERVIOUS MATERIAL.  I
19 CAN'T SEE THE DEPTH BECAUSE YOU HAVE SHELL THERE, BUT I WOULD SAY
20 DOWN TO FIVE FEET.
21 Q.  AND WHATEVER IS THERE DOWN TO FIVE FEET INCLUDES PERVIOUS
22 MATERIALS, RIGHT?
23 A.  YES, I MEAN, DIFFERENT -- YOU KNOW, THERE IS DIFFERENT
24 PERMEABILITY THAT I WOULD ASSIGN TO DIFFERENT LAYERS GIVEN THERE.
25 Q.  PLEASE GO BACK TO SLIDE 11.  SLIDE 11 IN THE MARINO DECK,

## 1435

1  JUST SO WE'VE PLACED THAT LAST SAMPLE, 77A, THE ONE WE JUST
2  LOOKED AT IS RIGHT HERE AT THE SOUTHERN END OF THE NORTH BREACH,
3  RIGHT?
4  A.  YES.
5  Q.  OKAY.  NOW, GM081.  YOU'RE AWARE, DR. MARINO, THAT TEAM
6  LOUISIANA CONCLUDED OR SAID THAT ONCE WATER CAN MOVE DOWN THE
7  FLOOD SIDE SHEET PILE FACE, IT CAN INCREASE PRESSURE ON THE FACE
8  OF THE WALL AND ANY PERVIOUS MATERIALS CAN POTENTIALLY MIGRATE
9  AROUND SHEET PILE, THUS ENHANCING THE FAILURE.  YOU READ THAT IN
10 TEAM LOUISIANA'S REPORT, RIGHT?
11 A.  I READ THIS REPORT SOME TIME AGO.  I DON'T REMEMBER THIS
12 SPECIFIC PASSAGE OF IT.
13 Q.  SO IF THERE IS SAND OR SHELL OR OTHER PERVIOUS MATERIAL IN
14 THE VICINITY OF THE FLOODWALL, WATER CAN POTENTIALLY MIGRATE
15 AROUND THE SHEET PILE AND CREATE A DANGEROUS SITUATION?
16 A.  MY OPINION IS THAT THIS SAND AND SHELL, PARTICULARLY IF
17 WE'RE LOOKING AT THESE HOLES, 79A AND 77A, THE SAND IS NOT DEEP
18 ENOUGH TO REALLY PRESENT A PROBLEM UNLESS YOU HAVE CLAY AND
19 PERMEABLE MATERIALS RIGHT BELOW IT.
20 Q.  SO AT THOSE LOCATIONS, YOU'VE STATED YOUR OPINION.  BUT IF
21 THE PERVIOUS MATERIALS ARE DEEP ENOUGH -- YOU'RE NOT SAYING TEAM
22 LOUISIANA WAS WRONG TO MAKE THAT STATEMENT, ARE YOU, DR. MARINO?
23 A.  I WOULD WANT TO KNOW THE EXACT SCENARIO THAT WE'RE TALKING
24 ABOUT, YOU KNOW, LIKE SAND, WE DON'T HAVE SAND HERE, FOR EXAMPLE,
25 AT THE TIP OF THE SHEET PILE.  AND YOU DON'T HAVE PEAT AT THE TIP

## 1436

1  OF THE SHEET PILE.
2     SO THIS IS -- I'M NOT SURE WHERE YOU GOT THIS FROM, BUT IT
3  MAY BE A GENERAL CHARACTERIZATION OF THE WHOLE HURRICANE
4  PROTECTION SYSTEM.
5  Q.  THE REASON THAT YOU'VE CONCLUDED THAT WE DON'T HAVE SAND
6  HERE AT THE TIP OF THE SHEET PILE IS BECAUSE YOU'VE CONCLUDED
7  THAT SAMPLE 81A, WHICH SHOWED SAND DOWN TO A DEEPER LEVEL, WAS
8  MOVED AND TAKEN AT A DIFFERENT PLACE, RIGHT?
9  A.  THAT'S CORRECT.  AND ALSO ALL THE OTHER BORINGS ALONG THAT
10 LINE OF BORINGS, THAT WGI DID SHOW CLAY THAT -- IF IT'S FILLED,
11 CLAY EXISTING AT DEPTHS OF MAYBE ABOUT NO MORE THAN SIX FEET IN
12 THOSE CLOSER HOLES.
13 Q.  I WANT TO ASK A COUPLE OF QUESTIONS THAT ARE DIRECTED AT THE
14 PROPOSITION THAT SAMPLE 81A WAS MOVED OR WHERE IT IS.  SO LET ME
15 HAVE SLIDE 16, PLEASE.
16    THIS IS SLIDE 16.  THIS IS THE FIRST PAGE OF THE BORING LOG
17 OF 81A.  YOU RECOGNIZE IT AS SUCH, RIGHT, DR. MARINO?
18 A.  YES.
19 Q.  WOULD YOU ENHANCE THE GPS COORDINATES IN THE TOP RIGHT.
20    THE COURT:  I'M SORRY, COUNSEL, CAN WE STOP JUST FOR A
21 SECOND.
22    (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, AN
23 OFF-THE-RECORD DISCUSSION WAS HELD.)
24        EXAMINATION
25 BY MR. RAFFMAN:

## 1437

1  Q.  SO THIS IS THE BORING LOG OF SAMPLE 81A TAKEN FROM SLIDE 16
2  OF YOUR DEMONSTRATIVES.  AND YOU CAN SEE, DR. MARINO, THAT IT HAS
3  GPS COORDINATES WITH A LATITUDE AND LONGITUDE OF THE LOCATION
4  WHERE THE SAMPLE WAS TAKEN, RIGHT?
5  A.  I'M NOT SURE IF THAT'S THE ACTUAL LOCATION, GIVEN WHAT THE
6  TABLE STATED THAT IT WAS MOVED.
7  Q.  WELL, DR. MARINO, HAVE YOU ACTUALLY TAKEN THOSE GPS
8  COORDINATES AND PLOTTED THEM TO DETERMINE WHAT LOCATION THOSE GPS
9  COORDINATES REPRESENT?
10 A.  I BELIEVE A GEOLOGIST IN MY OFFICE ORIGINALLY PLOTTED THEM
11 FROM GPS COORDINATES.
12 Q.  THE LOCATION AT WHICH YOU'VE PLACED 81A IS NOT THE LOCATION
13 OF THOSE GPS COORDINATES, IS IT, OR DO YOU KNOW?
14 A.  I BELIEVE THAT IT WAS MOVED FROM THIS LOCATION.
15 Q.  ALL RIGHT.  SO YOU BELIEVE THAT THE GPS COORDINATES THAT ARE
16 REPORTED IN THE BORING LOG FOR THE ACTUAL SAMPLE THAT WAS TAKEN
17 ARE INCORRECT?  THAT'S WHAT YOU BELIEVE?
18 A.  YES.  AND IF YOU LOOK AT WHERE THIS LOCATION FALLS, AS I
19 TALKED ABOUT YESTERDAY, IT FALLS IN THE MIDDLE OF A VALLEY, WHICH
20 IS NOT REALLY A PRACTICAL LOCATION TO DRILL IN.  AND IT'S
21 CONSISTENT WITH WHAT THE TABLE STATES, THAT THE BORING WAS MOVED
22 BECAUSE OF THE LEVEE.
23 Q.  THE TABLE, TO BE CLEAR, BECAUSE YOU'RE MENTIONING THE TABLE.
24 SLIDE 15.  PLEASE HIGHLIGHT THE YELLOW BAND.  IS THERE ANY WAY TO
25 MAKE IT READABLE?  WHAT I REALLY WANT IS THE TEXT.  THANK YOU.

## 1438

1  "NEAR LEVEE, LOCATION ADJUSTED."  THIS IS THE TABLE THAT YOU'RE
2  RELYING ON AS YOUR BASIS FOR SAYING THE SAMPLE WAS MOVED, RIGHT?
3  A.  IT SEEMS CLEAR TO ME.
4  Q.  AND IT SAYS, "LOCATION ADJUSTED."  IT DOESN'T SAY IT MOVED.
5  IT SAYS "ADJUSTED."
6  A.  RIGHT.  SO IF THE COORDINATES GIVE YOU THE SAME LOCATION AS
7  IT'S SHOWN ON THE PLAN, THAT MEANS IT'S NOT THE ADJUSTED
8  LOCATION.
9  Q.  WELL, COULD IT BE ADJUSTED BY A COUPLE OF FEET HERE OR THERE
10 SO THAT THE COORDINATES ARE STILL BASICALLY ACCURATE, AS REPORTED
11 IN THE LOG?
12 A.  I DOUBT IT.
13 Q.  ISN'T THAT POSSIBLE?
14 A.  I DON'T THINK THEY WOULD MAKE A NOTE LIKE THAT FOR A COUPLE
15 OF FEET, NOT DRILLERS.
16    THE COURT:  COUNSEL, I'M GOING TO ASK YOU, DO YOU HAVE
17 ANY DISPLAY WHICH SHOWS THE ACTUAL RELEVANT CROSS-SECTIONS AND
18 DIAGRAMS OF THE ACTUAL, SAY, AREA, THE LEVEE OR THE FLOODWALL
19 FROM A BIRD'S-EYE VIEW AND THEN A DOT WHERE YOU MIGHT CONTEND --
20 YOUR SIDE MAY CONTEND THAT 81A WAS BORED?
21    MR. RAFFMAN:  YOUR HONOR, I AM CONFIDENT THAT BY THE
22 TIME MY WITNESSES TESTIFY, WE CAN CREATE --
23    THE COURT:  I DON'T MEAN THAT.  I JUST WAS CURIOUS.
24 I'VE GOT A REALLY GOOD IDEA.  I JUST WAS WONDERING.  I DON'T WANT
25 YOU TO HAVE TO CREATE IT.

## 1439

1  MR. RAFFMAN: IF YOUR HONOR WILL INDULGE ME, I THINK WE
2  COULD GET PRETTY CLOSE HERE NOW.
3  MAY I HAVE DEFENDANT'S EXHIBIT 8. WOULD YOU PLEASE ENHANCE
4  THE AREA OF THE NORTH BREACH.
5  EXAMINATION
6  BY MR. RAFFMAN:
7  Q. DR. MARINO, I'M GOING TO ASK YOU TO ASSUME FOR ME THAT THE
8  LOCATIONS OF THE SAMPLES WERE, AS REPORTED IN THE -- WHAT WE'VE
9  CALLED "THE SHIP," WHICH, FOR THE RECORD, IS SLIDE 14 IN YOUR
10  DECK --
11  A. I DON'T KNOW WHAT "THE SHIP" MEANS.
12  THE COURT: THE SHIP IS WHAT YOUR COUNSEL REFERRED TO AS
13  A VESSEL OR A BOAT, THAT, WHAT MY LAW CLERK IS DEMONSTRATING.
14  THE WITNESS: OH, OKAY.
15  EXAMINATION
16  BY MR. RAFFMAN:
17  Q. THANKS TO EVERYONE FOR YOUR HELP THERE.
18  NOW, AM I RIGHT, DR. MARINO, THAT YOU CAN SEE HERE WHAT
19  APPEARS TO BE THE NORTH END OF THE NORTH BREACH WHERE MY LASER
20  POINTER IS?
21  A. YES.
22  Q. AND WHAT APPEARS TO BE THE SOUTH END OF THE NORTH BREACH
23  WHERE MY LASER POINTER IS?
24  A. YES.
25  Q. AM I RIGHT THAT 81A IS TAKEN RIGHT ABOUT HERE AT THE

## 1440

1  NORTHERN END OF THE NORTH BREACH, IF THAT LOG IS CORRECT, IF THAT
2  DOCUMENT IS CORRECT?
3  A. WELL, WHAT I WANT TO SAY IS HERE IS THE ROAD --
4  THE COURT: YOU CAN ANSWER THE QUESTION FIRST, THEN
5  EXPLAIN IT BECAUSE I'M INTERESTED IN WHERE YOUR OPINION IS,
6  LOOKING AT IT VISUALLY. SO IN ANSWER TO COUNSEL'S QUESTION, IF
7  81A IS AS SHOWN ON WHAT WE'LL CALL SLIDE 15, "THE SHIP,"
8  WHATEVER, THE DEMONSTRATION OF WHERE THE BORINGS WERE TO BE TAKEN
9  IN COUNSEL'S QUESTIONS WAS, WOULD IT BE -- DO YOU WANT THE ASK IT
10  AGAIN, COUNSEL.
11  EXAMINATION
12  BY MR. RAFFMAN:
13  Q. SURE. WOULDN'T 81A, IF IT'S AS REPRESENTED AND NOT MOVED,
14  WOULDN'T IT BE RIGHT AROUND THE NORTHERN END OF THE NORTH BREACH?
15  A. YES, IT WOULD BE RIGHT AROUND HERE, RIGHT BETWEEN THIS ROAD,
16  AND HERE IS THE LEVEE WALL, IT WOULD BE RIGHT IN BETWEEN THIS
17  ROAD AND THIS LEVEE WALL. IN THAT VALLEY.
18  THE COURT: WHERE?
19  MR. RAFFMAN: THE JUDGE WANTS TO KNOW WHERE YOU MOVED
20  IT, DR. MARINO. SHOW THE JUDGE WHERE YOU MOVED IT.
21  THE WITNESS: I MOVED IT UP CLOSER TO THE NORTHERN PART
22  OF THE WALL WHERE THE GROUND IS FLAT AND THE RIG COULD EASILY
23  BACK INTO OFF THE ROAD. THAT'S THE ONLY ACCESSIBLE PLACE THAT I
24  KNOW OF THAT A RIG CAN MOVE IN AND HAVE A LEVEL FOUNDATION IN
25  ORDER TO DRILL A HOLE.

## 1441

1  EXAMINATION
2  BY MR. RAFFMAN:
3  Q. AS LONG AS WE'RE HERE, DR. MARINO, AND JUDGE DUVAL, 77A IS
4  TAKEN SOMEWHERE HERE IN THE MIDDLE, RIGHT?
5  A. YES.
6  Q. AND YOU'RE NOT SAYING THAT 77A WAS MOVED ANYWHERE FAR AWAY,
7  JUST A SHORT DISTANCE, IF AT ALL, RIGHT?
8  A. YES. IF YOU RECALL, THAT ROAD ELEVATION DROPS AS YOU GET TO
9  THE SOUTH, SO IT DOESN'T HAVE THE VALLEY THAT IT HAS WHEN YOU'RE
10  FIRST ENTERING INTO THE BOLAND MARINE PROPERTY.
11  THE COURT: THANK YOU, COUNSEL.
12  EXAMINATION
13  BY MR. RAFFMAN:
14  Q. I WANT TO GO BACK TO THE BORING LOG THAT WE HAD UP. I HOPE
15  IT'S SLIDE 16. NO, THAT'S NOT IT. YES, THAT'S IT. SLIDE 16.
16  AND I WANT TO GO BACK AND HIGHLIGHT THE TOP PART AGAIN, JUST AS
17  WE DID BEFORE.
18  ALL RIGHT. SO WE SHOWED EARLIER THESE GPS COORDINATES, AND
19  YOU ANSWERED THE WAY YOU'VE ANSWERED ABOUT -- YOU'VE MOVED IT TO
20  A PLACE THAT YOU DON'T THINK REPRESENTS THOSE GPS COORDINATES; IS
21  THAT RIGHT? I'M SORRY TO GO OVER OLD GROUND.
22  A. IF THOSE GPS COORDINATES MATCHED APPROXIMATELY WHERE THE
23  HOLE IS SHOWN ON THE PLAN, THAT IS CORRECT.
24  Q. THERE IS A DRILLING AGENCY HERE. IT SAYS, "DRILLING AGENCY,
25  FUGRO." DO YOU KNOW WHO FUGRO IS?

## 1442

1  A. YES.
2  Q. AND THEY ARE A REPUTABLE DRILLING AGENCY, RIGHT?
3  A. YES.
4  Q. HAVE YOU EVER CALLED ANYBODY AT FUGRO, ANY OF THESE PEOPLE
5  THAT TOOK THESE BORINGS, AND ASKED THEM, "DID YOU MOVE THAT
6  BORING? DID YOU PUT IT SOMEWHERE ELSE?" DID YOU EVER CALL
7  ANYBODY THERE?
8  A. YOU KNOW, IF SOMEONE COULD REMEMBER THAT, I WOULD BE VERY
9  SURPRISED.
10  Q. SO THE ANSWER TO MY QUESTION IS NO, YOU DIDN'T CALL, RIGHT?
11  A. NINE YEARS AGO AND YOU'VE DONE ALL OF THESE BORINGS, YOU'RE
12  GOING TO REMEMBER WHERE YOU MOVED ONE HOLE?
13  THE COURT: FIRST, YOU HAVE TO ANSWER THE QUESTION, SIR,
14  AND THEN YOU CAN EXPLAIN. THE ANSWER IS NO, I TAKE IT.
15  THE WITNESS: YES. I'M SORRY.
16  THE COURT: EXPLAIN THAT YOU WOULD FIND IT IMPROBABLE
17  THAT ONE WOULD REMEMBER.
18  THE WITNESS: YES.
19  EXAMINATION
20  BY MR. RAFFMAN:
21  Q. AND IF ONE WERE TO BE ASKED A QUESTION -- ALL RIGHT. I'LL
22  LEAVE IT THERE.
23  MARINO SLIDE 06, PLEASE.
24  NOW, I'M GOING TO HIGHLIGHT THIS SLIDE IN A MOMENT TO SHOW
25  SOME LANGUAGE, BUT TO RECALL YOUR TESTIMONY, TO CALL IT TO MIND,

**1443**

1 WHAT YOU'VE TOLD THE COURT IS THAT YOU MADE AN ASSUMPTION THAT IN
2 THE AREA OF THE FLOODWALL WHERE THE BREACH OCCURRED, THE
3 GOVERNMENT HAD TAKEN PERMEABLE SHELL MATERIAL OUT AND REPLACED IT
4 WITH IMPERVIOUS LEVEE MATERIAL, RIGHT?
5 A.  THAT'S CORRECT.
6 Q.  AND THE ASSUMPTION IS BASED -- I'M SORRY, GO BACK.  GM079.
7 NO.  I'M SORRY.
8     THE ASSUMPTION IS BASED ON THE DRAWING THAT WE SHOWED EARLY,
9 THAT SHELL AGAINST SHEET PILE WOULD BE REMOVED AND REPLACED,
10 RIGHT?
11 A.  THAT'S ONE CONSIDERATION.
12 Q.  THAT'S WHAT IT SAID IN THAT DESIGN DRAWING?
13 A.  RIGHT.  THAT'S ONE OF THE REASONS I BELIEVE THAT.
14 Q.  AND I HAVEN'T HIGHLIGHTED THAT PORTION.  LET'S GO TO 080
15 NOW.  THIS IS PLAINTIFF'S EXHIBIT 397, MARINO FIGURE 2.2.  ISN'T
16 THERE ANOTHER NOTATION IN THAT SAME DESIGN DRAWING WHICH SAYS,
17 "THE POWER POLES ON THE FLOOD SIDE OF THE LEVEE WILL BE REMOVED
18 FROM THE LEVEE BY OTHERS"?  DID YOU SEE THAT IN THE SAME DRAWING?
19 A.  I PROBABLY READ IT AT ONE TIME.
20 Q.  SO THE SAME DRAWINGS THAT YOU'VE RELIED ON ESTABLISHES
21 NUMBER ONE, THAT AT LEAST AS OF 1969, THERE WERE POWER POLES ON
22 THE FLOOD SIDE OF THE LEVEE, RIGHT?
23 A.  YES.
24 Q.  AND IF THOSE POWER POLES REMAINED FOR YEARS AFTERWARD, WOULD
25 YOU AGREE WITH ME THAT THAT STATEMENT WAS NOT CARRIED OUT?

**1444**

1     MR. WILSON:  I'M GOING TO OBJECT, YOUR HONOR, BECAUSE
2 THE POWER POLES SHOWN ON THAT DRAWING ARE DIFFERENT THAN THE
3 POWER POLES THAT WE'RE TALKING ABOUT.
4     THE COURT:  THE CONCEPT MAY BE, AS I'M UNDERSTANDING IT,
5 THAT NOT EVERYTHING -- MERELY BECAUSE IT APPEARS ON THE DIAGRAM
6 DOES NOT MEAN IT WAS, IN FACT, DONE.  THAT IS THE OVERALL
7 CONCEPT, RATHER THAN THE POLE WHICH MAY OR MAY NOT HAVE BEEN A
8 POWER POLE BECAUSE IT DIDN'T SEEM TO HAVE CROSS STRUCTURES.  IT
9 DOESN'T DEAL WITH THE POLE AND THE BARGE CONUNDRUM AT THIS POINT.
10     MR. RAFFMAN:  YOUR HONOR IS CORRECT -- I DIDN'T MEAN TO
11 INTERRUPT, YOUR HONOR.
12     THE COURT:  EXCUSE ME.
13     MR. RAFFMAN:  YOUR HONOR HAS CORRECTLY INFERRED THE
14 THRUST OF MY QUESTION.
15     THE COURT:  HOPEFULLY SO.
16     MR. RAFFMAN:  SO I'LL ASK THE WITNESS.
17     THE COURT:  THE OBJECTION IS OVERRULED.
18     THE WITNESS:  COULD YOU REPEAT IT AGAIN.
19         EXAMINATION
20 BY MR. RAFFMAN:
21 Q.  YOU KNOW WHAT, I'M GOING TO REPHRASE THE QUESTION.
22     JUST BECAUSE THE GOVERNMENT SAYS IT'S GOING TO DO SOMETHING
23 DOESN'T MEAN THE GOVERNMENT DOES IT, RIGHT?
24 A.  NO, BUT THIS IS NOT AS RELEVANT AS HAVING SAND MATERIAL OR
25 SHELL MATERIAL THAT YOU ACKNOWLEDGE NEXT TO THE FLOODWALL THAT

**1445**

1 YOU'RE SAYING NEEDS TO BE REPLACED AS MOVING A POWER POLE.
2 Q.  ALL RIGHT.  NOW, IF YOU'RE GOING TO REPLACE -- SO WHAT
3 YOU'RE SAYING BEFORE I -- WHAT YOU'RE SAYING IS, TAKING THAT SAND
4 AWAY FROM THE WALL AND REPLACING IT, THAT WAS PRETTY IMPORTANT,
5 RIGHT?
6 A.  I WOULD THINK SO.
7 Q.  AND IT'S IMPORTANT BECAUSE IF THAT SAND WAS NEXT TO THE
8 WALL, IT'S A DANGEROUS CONDITION?
9 A.  YOU KNOW, IT'S NOT A CONDITION YOU WANT TO HAVE THERE.
10 Q.  NOW, IN ORDER TO TAKE THE SAND AWAY FROM THE WALL AND TO
11 REPLACE IT WITH EMBANKMENT MATERIAL DOWN TO A LEVEL OF 18 FEET,
12 YOU'RE GOING TO HAVE TO GO BELOW THE WATER TABLE, RIGHT?
13 A.  YES.
14 Q.  AND IN ORDER TO GO BELOW THE WATER TABLE AND DO A WORK OF
15 THAT KIND, YOU'RE GOING TO HAVE TO BUILD A COFFERDAM OR DO SOME
16 OTHER TECHNOLOGY TO MAKE THAT POSSIBLE TO DO, RIGHT?
17 A.  YOU KNOW, I'M NOT SURE.  I'VE SEEN EXCAVATIONS THAT DEEP
18 BEFORE WITHOUT A COFFERDAM.  IF YOU'RE NOT GOING TO GO IN AND
19 COMPACT THE SOIL, IF YOU'RE JUST GOING TO DROP FILL IN THE
20 BOTTOM, PACK IT WITH A SHOVEL OR SOME MEANS WITHOUT HAVING A
21 PERSON DOWN THERE, AND THEY DO IT SLICE BY SLICE, YOU DON'T DO IT
22 ALL AT ONCE -- I DON'T KNOW THE WAY THAT THEY DID IT.  THERE'S NO
23 RECORDS OF HOW THEY WOULD HAVE GONE ABOUT DOING IT.
24 Q.  NOT ONLY ARE THERE NO RECORDS OF HOW THEY WOULD HAVE GONE
25 ABOUT DOING IT, DR. MARINO, BUT, IN FACT, YOU HAVEN'T SEEN ANY

**1446**

1 RECORDS THAT IT WAS ACTUALLY DONE?
2 A.  WELL, YOU KNOW, I WOULD HAVE THOUGHT THAT IPET, GIVEN THAT
3 THE CORPS IS PART OF IPET, WOULD HAVE EVALUATED THAT SITUATION
4 WHEN THEY DID THEIR SEEPAGE ANALYSIS.  IT'S SORT OF LIKE THE
5 FAULTY WELL.  I MEAN, THE QUOTE/UNQUOTE -- THEY SAW THE FAULTY
6 WELL.  YOU SEE NOTHING IN THEIR REPORT ABOUT A FAULTY WELL BEING
7 A CONSIDERATION FOR THEIR FAILURE ANALYSIS.
8 Q.  AND YET, DR. MARINO, WE KNOW THERE WAS A FAULTY WELL THERE.
9 DR. PAZOS TESTIFIED ABOUT A FAULTY WELL.  THERE'S PLENTY OF OTHER
10 TESTIMONY.  SO MAYBE I HAVE MISSED A FAULTY WELL.
11 A.  OR THEY THOUGHT IT WASN'T REALLY RELEVANT.
12 Q.  WHATEVER IPET THOUGHT OR DIDN'T THINK, I DIDN'T GET AN
13 ANSWER TO THE QUESTION I REALLY WANTED AN ANSWER TO.
14     NOT ONLY ARE THERE NO RECORDS OF HOW THEY WOULD HAVE GONE
15 ABOUT IT, BUT YOU HAVEN'T SEEN ANY RECORDS THAT THIS EXCAVATION,
16 BY WHATEVER MEANS IT WOULD HAVE BEEN UNDERTAKEN, WAS ACTUALLY
17 PERFORMED; AM I RIGHT?
18 A.  YOU KNOW, THE ONE THING HERE -- THERE'S TWO THINGS, TWO
19 OTHER THINGS THAT LEAD ME TO BELIEVE THAT THIS WAS DONE:  ONE IS
20 THAT THE BORING 81A AT THE BOTTOM OF IT SHOWS WHAT THE GEOLOGIST
21 DESCRIBES AS LEVEE MATERIAL; NUMBER TWO, THAT THE POST-1980
22 SECTION OF THE FLOODWALL WAS INEXPLICABLY, IF YOU DON'T THINK
23 THAT THEY REALIZED THAT THIS MATERIAL WAS PRESENT, DRIVEN 17 FEET
24 LOWER TO BELOW THE SAND AREA.
25 Q.  AND THESE ARE INFERENCES YOU'VE MADE, BUT MY QUESTION IS

**1447**

1 DIFFERENT, DR. MARINO. IT'S, DO YOU HAVE ANY RECORDS FROM A
2 CONTRACTOR, FROM THE GOVERNMENT, FROM ANYBODY ELSE THAT SAYS THAT
3 DOCUMENTS -- THAT THE WORK WAS ACTUALLY PERFORMED THAT YOU'RE
4 SAYING, YOU'RE TELLING THE COURT WAS PERFORMED?
5 A. I DON'T HAVE ANY RECORDS.
6 Q. NOW, IN CARRYING OUT YOUR ANALYSIS, YOU'VE ASSIGNED A
7 STRENGTH VALUE TO EVERY SOIL LAYER THAT YOU'VE INCLUDED IN YOUR
8 CHARACTERIZATION; IS THAT RIGHT?
9 A. YES.
10 Q. AND I THINK IT MIGHT BE HELPFUL FOR THE COURT, IF I COULD
11 FIND IT, TO SHOW THE LAYERING ANALYSIS.
12     LET'S GO BACK TO FIGURE 5.12. I JUST WANT TO SHOW A PICTURE
13 OF THE LAYERS. SLIDE 20. THIS ISN'T THE SLIDE WHERE YOU
14 ACTUALLY GIVE THE VALUES, BUT FOR EACH OF THESE LAYERS YOU'VE GOT
15 A NUMBER, AND THAT NUMBER REPRESENTS THE STRENGTH OF THE LEG,
16 RIGHT?
17 A. YES.
18 Q. NOW, I WANT TO ASK HOW YOU'VE DONE IT. LET ME HAVE FIGURE
19 5.11 FROM THE REPORT. I APOLOGIZE THAT THIS FIGURE IS SO
20 DIFFICULT TO READ, BUT IT IS WHAT IT IS.
21     DR. MARINO, THIS FIGURE REPRESENTS THE SOIL BORINGS THAT
22 YOU'VE INCLUDED IN YOUR ANALYSIS, RIGHT?
23 A. IN ONE WAY OR ANOTHER.
24 Q. ALL RIGHT. AND IN ORDER TO ARRIVE AT THE VALUES FOR THE
25 LAYERS, WHAT YOU'VE DONE IS YOU'VE TAKEN EVERY BORING FOR WHICH A

**1448**

1 VALUE WAS OBTAINED, AND YOU HAVE AVERAGED THE VALUES FOR THOSE
2 BORINGS WITHIN EACH LAYER. IS THAT FAIR?
3 A. WITH CONSIDERATION FOR ONES THAT SEEMED TO BE EITHER HIGHER
4 OR LOWER -- ABNORMALLY HIGHER OR LOWER.
5 Q. SO WHAT YOU DO IS, YOU EXCLUDE THE ABNORMALLY HIGH VALUES,
6 YOU EXCLUDE THE ABNORMALLY LOW VALUES, AND YOU TAKE THE AVERAGE
7 OF ALL OF THE VALUES AND REPRESENT THEM AS THE VALUE FOR THE
8 ENTIRE SOIL LEG, RIGHT?
9 A. YES.
10 Q. LET'S GIVE THE COURT AN EXAMPLE OF HOW THAT'S DONE, GM083.
11 OH, HERE IT IS. I'M SORRY. THIS IS THE SLIDE I WAS LOOKING FOR.
12     AND SO THIS SLIDE, WHICH IS FIGURE 5.42 IN YOUR REPORT, HAS
13 THE VALUES INCLUDED WITHIN THE LAYERS, RIGHT?
14 A. YES.
15 Q. FOR EXAMPLE HERE, YOU'VE GOT A VALUE OF 722 POUNDS PER
16 SQUARE FOOT FOR THIS EMBANKMENT LAYER, RIGHT?
17 A. YES.
18 Q. AND IF YOU DO THE ARITHMETIC, THAT CORRESPONDS TO 0.361 TONS
19 PER SQUARE FOOT, RIGHT?
20 A. YES.
21 Q. SO LET'S LOOK AT GM105. THIS IS PLAINTIFF'S EXHIBIT 397,
22 MARINO REPORT, PAGE 5-23.
23     FOR THAT LAYER WE JUST LOOKED AT, WHAT YOU DID IS, YOU HAD
24 13 AVAILABLE UNCONFINED COMPRESSION TESTS AND ONE VANE SHEAR
25 TEST, WHICH SHOWED UNDRAINED SHEAR STRENGTH RANGING FROM 0.170 TO

**1449**

1 1.598 TONS PER SQUARE FOOT, AND FROM THAT, YOU EXCLUDED A HIGH
2 OUTLIER AND YOU DERIVED AN AVERAGE OF 0.361. IS THAT RIGHT, DR.
3 MARINO?
4 A. THAT'S CORRECT.
5 Q. SO THE VALUE OF THE WEAKEST OF THESE 14 SAMPLES WAS ABOUT
6 0.170, RIGHT?
7 A. THAT'S CORRECT.
8 Q. AND THE VALUE OF THE WEAKEST SAMPLE WAS LESS THAN HALF OF
9 THE AVERAGE VALUE THAT YOU DERIVED AND APPLIED IN YOUR REPORT,
10 RIGHT?
11 A. YES.
12 Q. CAN I HAVE GM114.
13     THE AVERAGING METHODOLOGY THAT YOU'VE APPLIED WAS DONE FOR
14 OTHER LAYERS, RIGHT?
15 A. YES.
16 Q. SO USING THIS AS AN EXAMPLE, THIS IS PLAINTIFF'S
17 EXHIBIT 397, MARINO REPORT FIGURE 5.22, WHICH REPRESENTS
18 UNDRAINED SHEAR STRENGTH VERSUS DEPTH FOR THE M UNIT, WHICH
19 REPRESENTS THE MARSH UNIT, RIGHT?
20 A. YES.
21 Q. AND SO EACH OF THESE LITTLE DOTS HERE REPRESENTS A BORING,
22 RIGHT?
23 A. YES -- NO.
24 Q. NO. SOME OF THEM REPRESENT A VANE SHEAR TEST OR SOMETHING
25 OTHER THAN A BORING?

**1450**

1 A. YES.
2 Q. AND THE SOIL BORINGS OR THE VANE SHEAR TEST THAT YOU USED
3 WERE TAKEN AT DIFFERENT TIMES, RIGHT?
4 A. THAT'S CORRECT.
5 Q. AND THESE WERE TAKEN FROM DIFFERENT LOCATIONS ALL ALONG AND
6 UP AND DOWN THAT STRETCH FROM FLORIDA AVENUE TO CLAIBORNE AVENUE,
7 RIGHT?
8 A. THAT'S CORRECT.
9 Q. WHAT YOU'VE DONE IS YOU'VE TAKEN THE RESULTS FOR DIFFERENT
10 KINDS OF TESTS, UNCONFINED COMPRESSION, UNCONSOLIDATED, UNDRAINED
11 COMPRESSION WHICH IS ALSO KNOWN AS UU, RIGHT?
12 A. YES.
13 Q. AND UNCONFINED COMPRESSION IS UCC, RIGHT?
14 A. YES.
15 Q. AND A VANE SHEAR TEST IS A VST, RIGHT?
16 A. YES.
17 Q. AND YOU TAKE THE VALUES FROM THESE DIFFERENT KIND OF TESTS
18 AND YOU AVERAGE THOSE VALUES TOGETHER, RIGHT?
19 A. YES.
20 Q. YOU DON'T APPLY ANY WEIGHTING TO ADJUST FOR WHAT MIGHT BE A
21 DIFFERENT METHOD OF TESTING, RIGHT?
22 A. MY EXPERIENCE HAS BEEN THAT THE UNCONFINED COMPRESSION TESTS
23 AND THE UNDRAINED COMPRESSION TESTS GIVE VERY CLOSE VALUES TO ONE
24 ANOTHER. THE VANE SHEAR TESTS NEED TO BE ADJUSTED. THE VALUES
25 THAT WE USED FOR THE VANE SHEAR TESTS WERE IN THE SAME VALUES

1451

1    THAT THE CORPS USED AFTER THEY MADE THEIR ADJUSTMENTS.
2    Q.  ALL RIGHT.  I UNDERSTAND.
3      AND YOU INCLUDED VALUES WHERE THE METHODOLOGY WAS NOT
4    AVAILABLE, RIGHT?
5    A.  YES.
6    Q.  NOW, IF THE METHODOLOGY WAS NOT AVAILABLE, YOU WERE NOT ABLE
7    TO MAKE AN ADJUSTMENT BECAUSE YOU DIDN'T KNOW WHAT THE METHOD
8    WAS, RIGHT?
9    A.  RIGHT.  BUT IT WOULD ONLY BE -- IT WOULD BE AN UNCONFINED --
10   IF IT'S A LABORATORY TEST, IT'S ONLY GOING TO BE AN UNCONFINED
11   COMPRESSION TEST OR IT'S GOING TO BE AN UNDRAINED COMPRESSION
12   TEST.  IT'S GOING TO BE ONE OF THOSE TWO.  AND AS I SAID, THOSE
13   TWO BASICALLY GIVE YOU THE SAME RESULTS.
14   Q.  I'M GOING TO COME BACK TO THE AVERAGING POINT IN A MOMENT,
15   BUT BEFORE I DO, IN CREATING YOUR VALUES, YOU DID NOT CONSIDER
16   THE ILIT CONE PENETROMETER BORINGS FOR PURPOSES OF STRENGTH; AM I
17   RIGHT?
18   A.  NO, I DON'T REALLY -- I'M NOT REALLY A PROPONENT OF USING
19   THAT TESTING METHOD FOR STRENGTH ASSESSMENT.
20   Q.  AND SO YOUR ANALYSIS DID NOT INCLUDE THE CONE PENETRIMETER
21   TEST BY THE ARMY CORPS OF ENGINEERS, RIGHT?
22   A.  WELL, I USE THOSE TESTS FOR EVALUATION OF STRATA DEPTHS.
23   Q.  I'M SORRY?
24   A.  I USE THOSE TESTS FOR EVALUATION OF STRATA DEPTHS BUT NOT
25   FOR STRENGTH VALUES.

1452

1    Q.  NOT FOR STRENGTH VALUES.  ALL RIGHT.  I SHOULD HAVE
2    CLARIFIED.
3      SO YOUR STRENGTH VALUES DON'T INCLUDE THOSE?
4    A.  THAT'S CORRECT.
5    Q.  OKAY.  NOW, WHEN YOU -- LET ME GO BACK.  WE JUST -- GM-105,
6    PLEASE.  I'M SORRY, WAIT A MINUTE.  GO BACK TO THE ONE WE JUST
7    HAD UP.
8      SO WHAT YOU HAVE HERE IS YOU'VE TAKEN FOR THE MARSH LAYER
9    0.149 TONS PER SQUARE FOOTAGE, YOUR OVERALL AVERAGE, RIGHT?
10      IF YOU WANT TO ENHANCE IT, WE CAN ENHANCE IT.
11      THE COURT:  CAN YOU SEE THE 0.149?
12          EXAMINATION
13   BY MR. RAFFMAN:
14   Q.  0.149 IS THE OVERALL AVERAGE YOU DERIVED FOR THE MARSH UNIT,
15   RIGHT?
16   A.  YES.
17   Q.  ZOOM BACK OUT.
18      AND YOU CAN SEE HERE THAT YOU HAVE BORINGS OR SAMPLES, OR
19   WHATEVER YOU WANT TO CALL THEM, WITH VALUES OF 0.050; AM I RIGHT?
20   A.  YES.
21   Q.  NOW, AND THIS METHODOLOGY YOU'VE APPLIED, THIS IS
22   REPRESENTATIVE OF WHAT YOU'VE DONE WITH THE OTHER LAYERS, TOO,
23   RIGHT?
24   A.  YES.
25   Q.  NOW -- OKAY.  SO IF -- IF THE STRENGTH VALUES ARE ALL

1453

1    ACCURATE FOR THE VARIOUS LOCATIONS, THEN WHEN YOU USE AVERAGES,
2    YOU TEND TO YIELD STRENGTH VALUES THAT ARE HIGHER THAN THE ACTUAL
3    STRENGTH VALUES AT THE WEAKEST LOCATIONS, RIGHT?
4    A.  THE QUESTION IS NOT REAL CLEAR, BUT I THINK I UNDERSTAND
5    WHAT YOU'RE SAYING.  BECAUSE WE DON'T -- BECAUSE WE DON'T HAVE A
6    FAILURE THAT'S ISOLATED TO ONE LOCATION, ONE BORING, IF YOU WILL,
7    WHERE ONE SAMPLE IS TAKEN, YOU HAVE A FAILURE OF SLIDE THAT
8    EXISTS OVER, YOU KNOW, IF YOU'RE LOOKING AT THE SOUTH BREACH,
9    200, 300 FEET.
10      SO WHAT HAPPENS IS, IF YOU HAVE A HORIZONTAL SLIDING PLANE
11   AND YOU HAVE SOME STRENGTHS THAT ARE HIGHER AND SOME STRENGTHS
12   THAT ARE LOWER, THEY TEND TO AVERAGE OUT, AND PARTICULARLY GIVEN
13   THE DUCTILITY OF THIS KIND OF SOIL.
14      IN ADDITION, WHAT I DIDN'T CONSIDER WAS THE EFFECT OF AGING
15   ON SOME OF THE SAMPLES OR COMPRESSION.  A LOT OF THESE SAMPLES
16   WERE TAKEN IN 1965 AFTER THERE WAS SOME LEVEE FILL PLACED ON
17   THEM, WHICH WOULD HAVE ACTUALLY INCREASED THE STRENGTHS.  AND
18   ALSO, I DIDN'T ACCOUNT FOR ANY ROOTS THAT WOULD ALLOW FOR
19   ADDITIONAL EARTH REINFORCEMENT.
20      THE COURT:  JUST TO PUT A QUESTION TO YOU BEFORE YOU GO
21   ON, THIS MAY NOT RELATE TO THIS METHODOLOGY:  WHEN YOU SAY
22   "AVERAGE," IS THIS A MEAN OR AN ACTUAL --
23      THE WITNESS:  IT'S AN AVERAGE OF THE -- OF THE DATA THAT
24   I --
25      THE COURT:  SO IT'S NOT A MEAN, BUT AN ACTUAL AVERAGE?

1454

1      THE WITNESS:  YEAH.  IF YOU MEAN "MEAN" THE MINIMUM AND
2    MAXIMUM AND THEN TAKING THE MIDDLE OF THAT, THAT'S NOT WHAT I
3    DID.  I TOOK THE AVERAGE OF ALL OF THIS.
4      THE COURT:  THE ACTUAL AVERAGE.
5          EXAMINATION
6    BY MR. RAFFMAN:
7    Q.  THE AVERAGE.  AND JUST AS A MATTER -- LEAVING ASIDE THE LAST
8    ANSWER, WHICH I'M AFRAID DIDN'T ANSWER MY QUESTION, IT'S A MATTER
9    OF ARITHMETIC.  IT'S A MATTER OF ARITHMETIC.  WHEN YOU AVERAGE
10   SOMETHING, YOU'RE MOVING THE --
11   A.  WELL, THERE'S --
12      THE COURT:  LET HIM FINISH HIS QUESTION, SIR.
13      THE WITNESS:  I'M SORRY.
14          EXAMINATION
15   BY MR. RAFFMAN:
16   Q.  WHEN YOU AVERAGE SOMETHING, YOU'RE MOVING THE LOWER
17   VALUES -- THE RESULT -- THE RESULT OF YOUR AVERAGING IS THAT THE
18   NUMBER YOU GET WILL BE HIGHER THAN THE LOW VALUE, JUST AS A
19   MATTER OF ARITHMETIC; ISN'T THAT RIGHT?
20   A.  YES.
21      THE COURT:  SIR, ARE YOU ASKING HIM, IS AVERAGING A
22   STATISTICALLY VIABLE METHODOLOGY TO MAKE THIS DETERMINATION?
23      MR. RAFFMAN:  WELL, WE'RE GOING TO TEST THAT
24   PROPOSITION.
25      THE COURT:  ALL RIGHT.  GO AHEAD.

## 1455

1  MR. RAFFMAN: HE'S GIVEN HIS ANSWER, YOUR HONOR. WE'LL
2  HAVE --
3  THE COURT: GO AHEAD, PROCEED.
4  EXAMINATION
5  BY MR. RAFFMAN:
6  Q. LET ME ASK THIS QUESTION: IF YOU HAD OTHERWISE UNIFORM
7  CONDITIONS IN THE WALL, DR. MARINO, AND IF THERE IS VARIATION IN
8  SOIL ALONG A PARTICULAR STRETCH, WOULDN'T YOU EXPECT TO HAVE THE
9  FAILURE AT THE PLACE WHERE THE SOIL IS THE WEAKEST?
10 A. IT DEPENDS ON THE TYPE OF -- TYPE OF FAILURE AND WHAT THE
11 WIDTH OF THE FAILURE IS. AND IF YOU'RE LOOKING AT -- I'M SORRY.
12 Q. NO, I DIDN'T MEAN TO INTERRUPT. I APOLOGIZE FOR DOING IT.
13 A. OKAY. YOU KNOW, IF YOU'RE LOOKING AT A LARGER FAILURE, THE
14 AVERAGING EFFECT IS MORE PRONOUNCED.
15 IF YOU'RE LOOKING AT A LOCALIZED FAILURE, MEANING WHERE
16 THERE IS VARIATIONS, FOR EXAMPLE, WITHIN 30 FEET, SAY, 60 FEET,
17 THEN YOU'RE LOOKING AT MORE OF A 3-D PROBLEM OR A
18 THREE-DIMENSIONAL PROBLEM, LIKE WE LOOKED AT NORTH BREACH. AND
19 YOU CAN SEE THAT YOU HAVE SAFETY FACTORS MUCH HIGHER IN THOSE
20 AREAS BECAUSE IT ENCOMPASSES JUST A SMALL AREA, AND IT HAS SIDE
21 FRICTION FORCES THAT ARE ALSO INVOLVED.
22 SO IF YOU HAVE A LOCALIZED AREA THAT IS MAYBE OF A LOWER
23 STRENGTH, THAT FAILURE HAS TO BE A 3-D FAILURE, AND IF THAT
24 FAILURE IS 3-D, YOU'RE GOING TO HAVE HIGHER SAFETY FACTORS
25 BECAUSE YOU HAVE SIDE FORCES INVOLVED.

## 1456

1  Q. A FAILURE OF THE WALL HAS TO START SOMEWHERE, DOESN'T IT?
2  IT HAS TO START SOMEWHERE.
3  A. YES.
4  Q. OKAY. AND SO REGARDLESS OF HOW LONG THE FAILURE ENDS UP
5  BEING, IT'S GOING TO START AT A WEAK SPOT ON THE WALL, ISN'T IT?
6  A. NOT IF YOU'RE TALKING ABOUT THE PURPOSES OF THIS ANALYSIS
7  THAT WE'RE TALKING ABOUT, WE'RE TALKING ABOUT AN ANALYSIS THAT
8  ENCOMPASSES SEVERAL HUNDRED FEET. SO, YOU KNOW, THE WAY YOU'RE
9  CHARACTERIZING IT AS A WEAK AREA REALLY DOESN'T PLAY A PART.
10 IT'S LIKE, FOR EXAMPLE, SAY YOU HAVE AN AREA WITH A HOLE IN
11 IT, OKAY, AND SO THAT HAS NO STRENGTH. ARE YOU GOING TO TELL ME
12 THAT THERE IS GOING TO BE A FAILURE BECAUSE WE HAVE A HOLE THERE?
13 THE COURT: I THINK THE QUESTION WAS, AND I MAY BE A
14 LITTLE -- IS IT A GENERAL PROPOSITION THAT WHEN THERE IS A
15 FAILURE, THE FAILURE COMMENCES AT THE WEAKEST PART OF THE
16 STRUCTURE THAT FAILED?
17 MR. RAFFMAN: THAT'S A FAIR CHARACTERIZATION OF MY
18 QUESTION. AND I --
19 THE COURT: THAT'S THE QUESTION. IF IT'S -- IF YOU CAN
20 ANSWER IT, PLEASE DO SO. IF IT'S CORRECT OR NOT OR WHATEVER.
21 THE WITNESS: CAN YOU REPEAT THE QUESTION.
22 EXAMINATION
23 BY MR. RAFFMAN:
24 Q. I THINK THE JUDGE SAID IT BETTER THAN I EVER COULD.
25 IS IT A GENERAL PROPOSITION THAT WHEN THERE IS A FAILURE,

## 1457

1  THE FAILURE COMMENCES AT THE WEAKEST PART OF THE STRUCTURE THAT
2  FAILED?
3  A. IT HAS TO BE A CERTAIN SIZE. IT CAN'T BE 1 FOOT. IT CAN'T
4  BE 3 FEET. IT CAN'T BE 30 FEET. FOR OUR SITUATION, IT CAN'T
5  EVEN BE 60 FEET.
6  THE COURT: RIGHT. I'M LEAVING THIS SITUATION OUT.
7  WE'RE IN THE ABSTRACT NOW. WE'RE AWAY FROM LEVEES OR WIDGETS OR
8  ANYTHING ELSE, BUT AS A GENERAL ENGINEERING PROPOSITION IS WHAT
9  THE QUESTION IS.
10 THE WITNESS: OH, I SEE. OKAY.
11 YEAH, OF COURSE.
12 EXAMINATION
13 BY MR. RAFFMAN:
14 Q. ALL RIGHT. LET ME HAVE SLIDE 85, PLEASE. GM-85.
15 YOU'VE READ THE TEAM LOUISIANA REPORT, AND THIS IS A COVER
16 LETTER ENCLOSING THE REPORT TO THE SECRETARY OF TRANSPORTATION
17 AND DEVELOPMENT. AND IT SAYS, IN DEFENDANT'S EXHIBIT 144,
18 PAGE 1, "AS ONE OF THE SENIOR TEAM LOUISIANA GEOTECHNICAL
19 ENGINEERS POINTED OUT, IT'S THE ANOMALOUS STRATUM, RATHER THAN
20 THE AVERAGE SOILS CONDITION, THAT GENERALLY CAUSES FOUNDATION
21 FAILURE."
22 YOU READ THAT, RIGHT?
23 A. AT ONE TIME. I DON'T REMEMBER THAT PARTICULAR -- IT'S A
24 GENERAL STATEMENT.
25 Q. ALL RIGHT. LET ME HAVE GM-106, PLEASE.

## 1458

1  AND YOU'VE READ IPET, SO YOU'VE READ THE CRITIQUES OF THE
2  DRAFT IPET REPORTS THAT WERE DONE BY THE NATIONAL ACADEMY OF
3  ENGINEERING AND THE NATIONAL RESEARCH COUNCIL, AM I RIGHT,
4  DR. MARINO?
5  A. I DON'T BELIEVE I'VE READ THE REVIEWS BY THE NATIONAL
6  ACADEMY OF ENGINEERING.
7  Q. BEFORE I ASK YOU ABOUT THIS DOCUMENT, YOUR OWN WORK HAS
8  NEVER BEEN REVIEWED BY THE NATIONAL ACADEMY OF ENGINEERING, THE
9  NATIONAL RESEARCH COUNCIL OR ANY OTHER INDEPENDENT ORGANIZATION,
10 RIGHT?
11 A. THAT'S CORRECT.
12 Q. AND WHAT THE NATIONAL ACADEMY OF ENGINEERING REPORTED IN
13 TALKING ABOUT IPET, IT SAID, "THE PROBABILITY OF FAILURE AS
14 DETERMINED IN THE IPET SECOND REPORT ASSUMES THAT A MEAN VALUE
15 APPLIES AT THE LOCATIONS OF POTENTIAL FAILURE. IN REALITY,
16 UNDRAINED STRENGTH VARIES SPATIALLY, AND A PROCESS FOR ADDRESSING
17 ITS SPATIAL VARIABILITY SHOULD BE DEVELOPED."
18 WILL YOU ACCEPT MY REPRESENTATION THAT THIS IS A STATEMENT
19 MADE BY THE NATIONAL ACADEMY OF ENGINEERING --
20 MR. WILSON: OBJECTION, JUDGE, THIS IS HEARSAY. THIS
21 ISN'T IN EVIDENCE.
22 MR. RAFFMAN: IT IS. DEFENDANT'S EXHIBIT --
23 THE COURT: THE OBJECTION IS OVERRULED. GO AHEAD.
24 EXAMINATION
25 BY MR. RAFFMAN:

11 (Pages 1455 to 1458)

**1459**

1  Q.  WILL YOU ACCEPT MY REPRESENTATION THAT THE NATIONAL ACADEMY
2  OF ENGINEERING MADE THIS COMMENT ABOUT THE IPET DRAFT REPORT?
3  A.  I UNDERSTAND THIS COMMENT, AND I LOOKED AT THAT
4  CONSIDERATION.  AND GIVEN THE LENGTH OF THE SLIDE AREAS THAT
5  WE'RE TALKING ABOUT, I DON'T SEE THAT AS BEING A CONCERN.
6  OBVIOUSLY, IPET DIDN'T SEE IT AS A CONCERN EITHER.  IT'S NOT
7  SOMETHING THEY WEREN'T AWARE OF.
8  Q.  DO YOU KNOW WHETHER IPET WENT BACK AND CHANGED THE METHOD BY
9  WHICH THEY EVALUATED STRENGTH AS A RESULT OF THIS COMMENT IN THIS
10  FINAL REPORT?  DO YOU KNOW?
11  A.  I HAVEN'T SEEN THEIR FINAL REPORT, THE 2009 VERSION OF THAT
12  REPORT.  BUT I DO KNOW THAT THERE ARE METHODS THAT ARE
13  STATISTICAL METHODS THAT ARE USED, AND IN MY MIND, I KNOW THERE
14  ARE OTHERS THAT FEEL THE SAME WAY, THAT YOU'RE MISSING -- YOU
15  KNOW, YOU'RE MISSING CERTAIN ASPECTS OF THE VARIABILITY SO IT
16  MAKES THAT STATISTICAL METHOD NOT AS VALID.
17  Q.  SO JUST TO BE CLEAR FOR THE COURT, YOUR ANALYSIS ASSUMES
18  THAT A MEAN VALUE APPLIES, RIGHT?
19  A.  YES.
20  Q.  I HAVE JUST A COUPLE MORE QUESTIONS ABOUT SOILS.
21       MAY I HAVE GM -- MAY I HAVE SLIDE 72, PLEASE, IN THE MARINO
22  DECK.
23       THE COURT:  I HATE TO HARP ON THIS, DO YOU MEAN AN
24  AVERAGE VALUE RATHER THAN A MEAN VALUE OR AN ACTUAL MEAN VALUE?
25       MR. RAFFMAN:  YOUR HONOR, I APOLOGIZE FOR TESTIFYING TO

**1460**

1  WHAT I THINK -- I BELIEVE, YOUR HONOR, THAT MEAN AND AVERAGE ARE
2  THE SAME THING AND THAT A MEDIAN -- A MEDIAN IS WHAT YOU HAVE
3  WHEN YOU TAKE A HIGH VALUE AND A LOW VALUE AND STICK IT IN THE
4  MIDDLE.
5       THE COURT:  I JUST WANT TO MAKE SURE YOU AGREE WITH
6  THAT.
7       THE WITNESS:  YEAH, I AGREE WITH THAT.
8       THE COURT:  YOU THINK A MEAN VALUE AND AN AVERAGE VALUE
9  IS, IN ESSENCE, THE SAME THING?
10       THE WITNESS:  YEAH.  IT'S LIKE YOU TAKE A BUNCH OF
11  NUMBERS THAT YOU CONSIDER VALID AND THEN YOU AVERAGE THEM.  THAT
12  WOULD BE THE SAME.  MEAN AND AVERAGE WOULD BE THE SAME.
13       MEDIAN, I AGREE WITH MARK, IS YOU TAKE BOTH LIMITS THEN
14  IT'S THE NUMBER IN THE MIDDLE.
15       THE COURT:  OKAY.
16              EXAMINATION
17  BY MR. RAFFMAN:
18  Q.  I'VE HIGHLIGHTED HERE SLIDE 72 IN THE MARINO DEMONSTRATIVES.
19  THIS IS A BORING LOG OF BORING 25-A.
20       AND FOR THE COURT'S BENEFIT I WANT TO TRY TO LOCATE THE
21  BORING.
22       LET ME TRY SLIDE 009 FROM THE MARINO DECK.  WHAT I NEED TO
23  DO IS TO HIGHLIGHT THE SOUTH -- NO, I NEED TO HIGHLIGHT THE SOUTH
24  BREACH AREA.  ALL RIGHT.  AND NOW WHAT I WANT TO DO IS HIGHLIGHT
25  THE MIDDLE OF THE SOUTH BREACH.  WELL, MAYBE WE DON'T HAVE TO DO

**1461**

1  THAT.
2       DR. MARINO, WOULD YOU AGREE WITH ME THAT SAMPLE 25-A --
3  THANKS TO WHOEVER JUST DID THAT.  THAT WAS MY COLLEAGUE.
4       -- 25-A IS TAKEN FROM SOMEWHERE IN THE MIDDLE OF THE SOUTH
5  BREACH?
6  A.  YES.
7  Q.  MAYBE RIGHT IN THE AREA OF THE NORTHERN BOWED FEATURE OF THE
8  BREACH, GIVE OR TAKE?
9  A.  YES.
10  Q.  NOW, LET'S GO BACK TO THE BORING LOG FOR 25-A.
11       AND I WANT TO HIGHLIGHT THE FEATURE HERE JUST UNDER THE
12  WATER TABLE.  UNDER, UNDER, UNDER.
13       SO AT A DEPTH JUST UNDER THE WATER TABLE, THE BORING LOG
14  SHOWS NO RECOVERY.  DO YOU SEE THAT?
15  A.  YES.
16  Q.  AND A NO-RECOVERY SAMPLE OR A NO-RECOVERY BORING COULD BE --
17  IT REPRESENTS A BORING FOR WHICH THERE IS NO SOIL IN THAT 4-FOOT
18  AREA, RIGHT?
19  A.  NO.  THAT MEANS THAT THAT SAMPLER -- THE SOIL SLIPPED OUT OF
20  THE SAMPLER.
21  Q.  YES, I'M SORRY.
22       IT COULD BE THAT THE SOIL WAS SO WET AND MUSHY THAT IT
23  WOULDN'T EVEN HOLD IN THE SAMPLER, RIGHT?
24  A.  I WOULD THINK THAT'S ONE POSSIBILITY.
25  Q.  ANOTHER POSSIBILITY IS THE SOIL IS GRANULAR, SAND-TYPE

**1462**

1  MATERIAL, AND SO WHEN THE SAMPLE COMES UP, IT SLIPS OUT OF THE
2  SAMPLER, RIGHT?  THAT'S ANOTHER POSSIBILITY?
3  A.  I WOULD THINK THAT IT WOULD BE CONSISTENT WITH THE MATERIAL
4  BELOW, BUT I GUESS THAT'S ANOTHER POSSIBILITY.
5  Q.  ANOTHER POSSIBILITY IS THAT YOU HAD SOME ORGANIC MATERIAL,
6  LIKE A TREE STUMP OR SOME OTHER BURIED ITEM THERE THAT OVER TIME
7  HAS DECAYED AND DEGRADED AND GONE AWAY AND SO YOU HAVE A VOID.
8  THAT'S ANOTHER POSSIBILITY, RIGHT?
9  A.  I WOULD THINK THAT A TREE STUMP YOU WOULD BE ABLE TO
10  RECOVER.
11  Q.  SO THAT'S NOT A POSSIBILITY.  THE VOID IS NOT A POSSIBILITY?
12  A.  VOID, NO, ABSOLUTELY NOT.
13       NOW, KEEP IN MIND, THERE IS CLAY ON TOP OF THAT.
14  Q.  WOULD YOU AGREE WITH ME, DR. MARINO, THAT A ZONE OF NO
15  RECOVERY REPRESENTS A POTENTIAL WEAK AREA IN THE SOIL?
16  A.  I MEAN, YOU CAN SAY THAT, BUT IT REALLY HAS NO RELEVANCE
17  BECAUSE THE AREA -- THE STRENGTHS THAT YOU'RE REALLY INTERESTED
18  IN ARE THE ONES ON THE PROTECTION SIDE.  THOSE ARE THE SOILS THAT
19  ARE RESISTING ANY OF THE WATER PRESSURE.
20  Q.  LET ME HAVE THE -- I GUESS I'M GOING TO NEED TO GO BACK TO
21  SLIDE --
22       I APOLOGIZE, YOUR HONOR.  I'M WORKING WITH A DECK THAT --
23  20, PLEASE.  LET ME GO BACK TO SLIDE 20.  SLIDE 20.
24       SO YOU POINTED OUT THAT THAT NO-RECOVERY SAMPLE WAS TAKEN ON
25  THE PROTECTION -- ON THE CANAL SIDE AND NOT THE WATER SIDE.  BUT,

1463

1 DR. MARINO, WHAT YOU'VE DONE WITH YOUR LAYERING IS YOU'VE
2 INCLUDED LAYERS THAT EXTEND FROM ONE SIDE TO THE OTHER SIDE OF
3 THE FLOODWALL, RIGHT?
4 A.  YEAH.  BUT THIS IS THE WRONG CROSS-SECTION.
5 Q.  I UNDERSTAND, DR. MARINO.  THIS IS THE NORTH BREACH
6 CROSS-SECTION.
7     THE COURT:  HE'S JUST TRYING TO ILLUSTRATE SOMETHING.
8     THE WITNESS:  OH, I SEE.
9     THE COURT:  YOU'RE JUST TRYING TO ILLUSTRATE SOMETHING.
10    MR. RAFFMAN:  I AM.  AND I DON'T HAVE THE SOUTH
11 CROSS-SECTION HANDY.  I'M SORRY.
12    THE COURT:  THE QUESTION IS --
13        EXAMINATION
14 BY MR. RAFFMAN:
15 Q.  THE QUESTION IS:  THE SAME LAYER THAT'S OVER ON ONE SIDE OF
16 THE WALL EXTENDS TO THE OTHER SIDE OF THE WALL, RIGHT?
17 A.  YES.
18 Q.  OKAY.  SO A NO-RECOVERY SAMPLE IN THE IMMEDIATE VICINITY OF
19 THE FLOODWALL ON THE CANAL SIDE COULD POTENTIALLY INDICATE A WEAK
20 ZONE THAT EXTENDS TO THE OTHER SIDE OF THE FLOODWALL; IS THAT
21 RIGHT?
22 A.  I THINK THAT'S A GREAT EXTRAPOLATION.  BUT YOU HAVE TO
23 REALIZE THAT THERE IS NOT JUST ONE BORING THAT'S BEING
24 CORRELATED.  WHEN THERE WAS AN AREA WHERE THERE WAS NO RECOVERY,
25 THERE IS BORINGS ON BOTH SIDES AND THERE WOULD BE AN

1464

1 EXTRAPOLATION THAT WOULD OCCUR IN BETWEEN.
2 Q.  DID WGI TAKE BORINGS ON THE PROTECTED SIDE OF THE FLOODWALL
3 DURING THE SAMPLING IN 2001 THAT YOU'VE REFERENCED IN YOUR
4 REPORT?
5 A.  NOT THAT I'M AWARE OF, NO.
6 Q.  I HAVE SOME QUESTIONS ABOUT SEEPAGE.
7    AND I'LL REPRESENT TO THE COURT THAT I'M ALMOST DONE.
8    THE COURT:  COUNSEL, WHILE I'M THINKING ABOUT IT, THIS
9 IS ON ME, I HAD FORGOTTEN TO DO SOMETHING BECAUSE I AM -- IT
10 HELPS ME TO CONCEPTUALIZE THINGS.  WOULD YOU MIND MY PLACING WHAT
11 YOU CALLED IT -- AND I'VE WRITTEN A NUMBER DOWN.  I CAN'T
12 REMEMBER IT -- WHAT WE'RE CALLING THE BOAT, THAT IS THE --
13    MR. RAFFMAN:  YES, YOUR HONOR.  I WILL DO THAT.
14    THE WITNESS:  THE SHIP.
15    THE COURT:  THE SHIP OR WHATEVER.
16    MR. RAFFMAN:  AND I'LL REPRESENT TO YOUR HONOR THAT THE
17 SHIP IS ONLY GOING TO GIVE YOU THE NORTH BREACH, SO WE'RE NOT
18 GOING TO GET 25-A IN THE SHIP, BUT THAT'S SLIDE 14.
19    THE COURT:  I KNOW, THIS IS SOMETHING ELSE.
20    MR. RAFFMAN:  SLIDE 14, PLEASE.
21    THE COURT:  I'M GOING TO ASK THE WITNESS, CAN YOU TELL
22 ME WHAT NUMBERS ON THIS WOULD CORRELATE TO THE NORTH BREACH?  IN
23 OTHER WORDS, WHAT WOULD ENCOMPASS THE NORTH BREACH,
24 APPROXIMATELY?
25    THE WITNESS:  I WOULD SAY FROM ABOUT 81 THROUGH 76.

1465

1    THE COURT:  OKAY.
2    THE WITNESS:  AND THEN -- YOU KNOW, THEN ALL THE LETTERS
3 BEHIND IT, THAT WOULD ALSO APPLY.
4    THE COURT:  OKAY.  THANK YOU.
5    THE WITNESS:  YOU'RE WELCOME.
6    THE COURT:  THANK YOU, COUNSEL.  IT WAS JUST A
7 VISUALIZATION FOR ME.
8    MR. RAFFMAN:  IF YOUR HONOR WILL INDULGE ONE MORE
9 QUESTION, IT MAY BE HELPFUL FOR THE COURT.  MAYBE IT'S REDUNDANT.
10    THE COURT:  SURE.
11        EXAMINATION
12 BY MR. RAFFMAN:
13 Q.  WHEN WE'RE LOOKING AT THIS, THE NORTH BREACH EXTENDS FROM 81
14 TO ABOUT 76 AND THEN THE CANAL IS IN THE DIRECTION OF THE TOP OF
15 THE CHART, RIGHT?
16 A.  YES.
17 Q.  OKAY.
18    MR. RAFFMAN:  I WILL REPRESENT TO YOUR HONOR, I DON'T
19 HAVE MUCH MORE, SO IF YOUR HONOR WAS THINKING OF A BREAK, BUT LET
20 ME -- IF I COULD INDULGE THE COURT'S PATIENCE AND FINISH MY
21 EXAMINATION?
22    THE COURT:  ABSOLUTELY, PLEASE.
23        EXAMINATION
24 BY MR. RAFFMAN:
25 Q.  YOUR SEEPAGE ANALYSIS, DR. MARINO, WAS BASED ON THE CONCEPT

1466

1 THAT WATER IN THE CANAL THAT ROSE AS A RESULT OF THE SURGE DID
2 NOT HAVE SUFFICIENT TIME TO PENETRATE HORIZONTALLY THROUGH THE
3 LAYERS TO REACH THE FLOODWALL AND GET UNDERNEATH, RIGHT?
4 A.  YES.
5 Q.  YOU HAVEN'T DONE AN ANALYSIS OF WHETHER -- OF WHAT I'LL CALL
6 HYDRAULIC PRESSURE ACTING IN AN ALREADY SATURATED LAYER, HAVE
7 YOU?
8 A.  HYDRAULIC PRESSURE -- YOU'LL HAVE TO CLARIFY THAT.
9 Q.  ALL RIGHT.  I WANT YOU TO ASSUME WITH ME THAT THE WATER IN
10 THE GROUNDWATER TABLE HAS REACHED A LEVEL THAT INCLUDES THE MARSH
11 LAYER, SO THAT THE GROUND IN THE MARSH LAYER IS ALREADY SATURATED
12 WITH WATER.  CAN YOU MAKE THAT ASSUMPTION?
13 A.  YOU'RE SAYING THAT THE WATER LEVEL HAS SATURATED THE
14 GROUND -- ALL THE GROUND WAS SATURATED, BASICALLY.
15 Q.  THE GROUND IS SATURATED.  SO WE'RE THERE.
16 A.  OKAY.
17 Q.  BEFORE THE STORM, THE MARSH IS SITTING IN GROUND THAT'S
18 ALREADY GOT WATER IN IT.  IT'S SATURATED.  THERE'S ALREADY WATER
19 IN IT, RIGHT?
20 A.  YES.
21 Q.  NOW, WHAT HAPPENS THEN IS THAT THE SURGE WATER COMES IN AND
22 BECAUSE THE CANAL IS DUG TO A DEPTH THAT INCLUDES THE MARSH
23 LAYER, NOW THE SURGE WATER COMES IN AND IT IMPOSES PRESSURE ON
24 THE MARSH LAYER IN THE CANAL, NOT SEEPAGE, BUT PRESSURE, RIGHT?
25 LIKE A HYDRAULIC PUMP.  CAN YOU IMAGE THAT?

**1467**

1  A.  YOU'RE SAYING THAT THERE IS A CONNECTION BETWEEN THE MARSH
2  AND THE CANAL THAT'S CAUSING PRESSURE TO DEVELOP IN THE MARSH
3  LAYER FROM THE CANAL; IS THAT CORRECT?
4  Q.  WELL, THE MARSH LAYER --
5      LET'S GO TO SLIDE 20, PLEASE.
6          THE COURT:  ARE WE GOING NOW -- WE'RE BELOW THE SHEET
7  PILE?
8          MR. RAFFMAN:  YES, SIR.
9          THE COURT:  WE'RE IN THE CANAL, UNDER THE WATER.  WE'RE
10 LOOKING AT THE SIDE OF THE CANAL AND IT'S A MARSH LAYER.
11         MR. RAFFMAN:  YES, YOUR HONOR, THAT'S RIGHT.
12     AND THE PROBLEM WITH THIS SLIDE IS THAT, AS DR. MARINO
13 TESTIFIED EARLIER, THIS IS THE 1980 SHEET PILE, RIGHT, THAT WE'RE
14 LOOKING AT?
15         THE WITNESS:  YES.
16             EXAMINATION
17 BY MR. RAFFMAN:
18 Q.  AND IF WE IMAGINE THE 1969 SHEET PILE, WE HAVE TO IMAGINE A
19 SHEET PILE THAT IS CUT OFF ABOVE THE MARSH LAYER, RIGHT?
20 A.  YES.
21 Q.  AND THAT 1969 SHEET PILE IS CUT OFF ABOVE THE MARSH LAYER
22 ALL THE WAY DOWN THE CANAL, NOT JUST AT THE NORTH BREACH, BUT
23 ALSO AT THE SOUTH BREACH, RIGHT?
24 A.  YES, OF COURSE.
25 Q.  AND SO NOW WHAT WE'RE IMAGING IS, IS THAT THE WATER IS

**1468**

1  RISING HERE IN THE CANAL.  AND IF WE GO INTO THE CANAL, THE MARSH
2  LAYER, IT'S COMMUNICATING WITH THE MARSH LAYER BECAUSE THE CANAL
3  IS DEEP ENOUGH TO DO THAT.  AND AS THE WATER RISES, IT PRESSES
4  DOWN, IT PRESSES, AND THAT PRESSURE IS COMMUNICATED -- LET ME GET
5  A PEN THAT WORKS.  THE PRESSURE IS COMMUNICATED THROUGH THE MARSH
6  LAYER, LIKE A HYDRAULIC PUMP, AND THAT PRESSURE IS COMMUNICATED.
7  IF THERE IS NOT ENOUGH SOIL ON THE TOP OF THAT TOE, THAT PRESSURE
8  COMING FROM UNDERNEATH CAN CAUSE AN UPLIFT ON THE OTHER SIDE OF
9  THE WALL.
10     CAN YOU IMAGINE THAT HAPPENING, DR. MARINO?
11 A.  YEAH.  BUT I WANT TO CORRECT SOMETHING YOU SAID JUST SO THE
12 COURT DOESN'T HAVE A MISUNDERSTANDING.
13     IN OUR ANALYSIS, WE DID NOT CONSIDER THE SHEET PILE TO BE AT
14 A DEPTH OF NEGATIVE 25 -- OR 27.5.  WE ACTUALLY TOOK A
15 CONSERVATIVE VIEW AND ASSUMED THAT THAT SHEET -- THAT THE SHEET
16 PILE ON THE NORTHERN END WAS NOT AS DEEP AS IT IS, WHICH WOULD
17 HELP MITIGATE SEEPAGE, BUT WE TOOK IT AT THE DEPTH OF THE 1969
18 SHEET PILE.
19     IN TERMS OF -- I'M STILL NOT REALLY CLEAR ON WHAT YOU'RE
20 TRYING TO SAY, BUT --
21         THE COURT:  WELL, I THINK HE'S ASKING, IF THE SHEET PILE
22 WERE, AS YOU FIGURED IT WAS, THAT IS, NOT LEAVING SPACE WHERE
23 THERE IS NO SHEET PILE IN THE MARSH LAYER, WOULD THE INCREASING
24 HEIGHT OF THE WATER, DEPTH OF THE WATER, I SHOULD SAY, THEN
25 CREATE A PRESSURE WHICH WOULD ALLOW FOR ACCELERATED COMMUNICATION

**1469**

1  OF THE WATER THROUGH THE MARSH LAYER TO OTHER SIDE?  THAT'S MY
2  UNDERSTANDING OF THE QUESTION.
3             EXAMINATION
4  BY MR. RAFFMAN:
5  Q.  RIGHT.  AND NOT SO MUCH THAT THE ACTUAL PARTICLES OF THE
6  WATER FROM THE CANAL ARE MIGRATING, IT'S JUST THAT THE PRESSURE
7  OF THE WATER IS COMMUNICATED IN THE SATURATED, THE ALREADY
8  SATURATED LAYER, LIKE A HYDRAULIC PUMP WITH AIR IN IT.  YOU PUSH
9  ON A PUMP AND THE OTHER SIDE OF -- THE CAR GOES UP ON THE JACK.
10 IS IT POSSIBLE, IS IT CONCEIVABLE?
11 A.  I DON'T THINK SO.  I MEAN, AS I SAID, THAT'S WHAT THE
12 ANALYSIS DOES.  THAT'S WHAT IT'S SUPPOSED TO DO.  IT'S THE
13 ANALYSIS TO DETERMINE HOW MUCH FLOW AND HOW MUCH PRESSURE IS
14 GOING TO BE ACHIEVED ON THE PROTECTION SIDE.  I MEAN, THAT'S THE
15 PURPOSE OF THE ANALYSIS.
16 Q.  BUT YOUR ANALYSIS, DOCTOR, TALKS ABOUT THE TIME FOR WATER TO
17 FLOW, RIGHT?  RIGHT?  YES?
18 A.  "TIME FOR WATER TO FLOW"?
19 Q.  TIME FOR WATER TO FLOW.  WATER STARTS IN THE CANAL AND IT
20 HAS TO SEEP THROUGH AND THERE IS NOT ENOUGH TIME FOR THE WATER TO
21 SEEP THROUGH.  THAT'S YOUR ANALYSIS, RIGHT?
22 A.  RIGHT.
23 Q.  RIGHT.
24 A.  THAT BASED ON OUR ANALYSIS, THAT AS THE WATER -- USING THE
25 SURGE RECORDS AND MONITORING HOW THE WATER RISES OVER TIME, THAT

**1470**

1  WHEN YOU EVEN REACH THE PEAK ELEVATION OF THE SURGE, YOU DON'T
2  GET ANY EFFECTS ON THE PROTECTION SIDE FROM SEEPAGE.
3  Q.  FROM SEEPAGE.  MEANING WATER THAT STARTS IN THE CANAL AND
4  MAKES ITS WAY THROUGH TO THE OTHER SIDE, THAT'S YOUR DEFINITION
5  OF SEEPAGE?
6  A.  RIGHT.  AND IT'S CONSISTENT WITH IPET SAYS.
7  Q.  YOU HAVEN'T EVALUATED THE SCENARIO THAT I GAVE WHERE THE
8  WATER ACTUALLY MIGRATING THROUGH IS IRRELEVANT BECAUSE THERE IS
9  ALREADY WATER AND IT'S THE PRESSURE OF THE WATER THAT'S
10 COMMUNICATED THROUGH THE ALREADY SATURATED LAYER?
11         THE COURT:  SO YOU'RE SAYING THE PRESSURE OF THE WATER,
12 INCREASED PRESSURE OF THE WATER WOULD THEN AFFECT THE WATER THAT
13 WAS ALREADY THERE RATHER THAN ADDITIONAL WATER COMING THROUGH?
14         MR. RAFFMAN:  YES, YOUR HONOR.  THAT'S MY --
15         THE COURT:  ALL RIGHT.
16             EXAMINATION
17 BY MR. RAFFMAN:
18 Q.  AND YOU HAVEN'T EVALUATED THAT SCENARIO?
19 A.  WELL, IT'S BECAUSE IT HASN'T REACHED THAT SIDE YET.  THERE
20 IS NOTHING TO EVALUATE.
21 Q.  IF THE WATER IN THE MARSH LAYER -- IF THE MARSH LAYER IS
22 ALREADY PERMEATED, DR. MARINO, THEN THE WATER FROM THE CANAL
23 DOESN'T HAVE TO REACH THE OTHER SIDE TO ACT ON IT BY IMPOSING
24 PRESSURE, DOES IT?
25 A.  I GUESS -- I GUESS THE WAY YOU'RE PHRASING IT IS A LITTLE

## 1471

1  CONFUSING TO ME.  IF YOU HAVE -- YOU KNOW, IF YOU HAVE A WATER
2  TABLE THAT'S NOT CHANGING ON THE OTHER SIDE, THAT MEANS THAT THE
3  LEVEL OF THE WATER PRESSURE HASN'T CHANGED.
4  Q.  LET ME ASK THIS QUESTION THIS WAY, BECAUSE I DON'T MEAN TO
5  CONFUSE YOU, IF I'VE CONFUSED YOU.
6      MY QUESTION IS:  YOU HAVEN'T EVALUATED THAT SCENARIO?
7  A.  YES, I THINK SO.
8  Q.  YOU HAVE?
9  A.  YES.
10  Q.  AND YOU'VE DONE CALCULATIONS TO SHOW THAT THE TRANSMISSION
11  OF PRESSURE --
12  A.  YES.
13  Q.  AND WHERE IS THAT IN YOUR REPORT?
14  A.  IF YOU WANT TO GO BACK TO THE SLIDES, IT SHOWS THE TOTAL
15  PRESSURE DIAGRAM, IF YOU REMEMBER, LIKE, A POINT C, WHICH IS ON
16  THE PROTECTION SIDE, IT SHOWS NO CHANGE IN PRESSURE.
17  Q.  AS A RESULT OF THE SEEPAGE?
18  A.  THAT'S WHAT IT WAS FROM, THE SEEPAGE ANALYSIS.
19  Q.  RIGHT.  THE SEEPAGE ANALYSIS.  SO THE SEEPAGE AS YOU'VE
20  DESCRIBED IT.
21      BEFORE I LEAVE THE POINT, YOU DON'T HAVE ANY FIELD
22  PERMEABILITY TEST DATA AT THE SITE, DO YOU?
23  A.  I DON'T THINK ANYBODY HAS.  THAT'S RIGHT, I DON'T.
24  Q.  YOU HAVEN'T EXAMINED PHYSICAL SAMPLES OF THE MARSH LAYER
25  SOIL, HAVE YOU?

## 1472

1  A.  NO.  I RELIED ON DESCRIPTIONS.
2  Q.  AND ALL OF YOUR CONCLUSIONS ARE BASED ON SECONDHAND
3  KNOWLEDGE MADE BY OTHERS?
4  A.  YES.
5  Q.  YOUR REPORT DID NOT ANALYZE THE SOIL PROFILE THAT INCLUDES
6  SAND-FILLED EXCAVATIONS ON THE FLOOD SIDE AT EITHER THE NORTH
7  BREACH OR SOUTH BREACH?
8  A.  I DIDN'T ANALYZE IT BECAUSE I DON'T BELIEVE THEY EXISTED
9  CLOSE TO THE LEVEE.
10  Q.  AND THE STABILITY AND SEEPAGE ANALYSIS IN YOUR REPORT DIDN'T
11  INCLUDE SAND-FILLED EXCAVATIONS AT THE SITE OF THE SOUTH BREACH,
12  RIGHT?
13  A.  YES, THE SAME ANSWER.
14      THE COURT:  DID NOT INCLUDE.
15      THE WITNESS:  YES.
16          EXAMINATION
17  BY MR. RAFFMAN:
18  Q.  OKAY.  YOUR STABILITY ANALYSIS USED A PROGRAM CALLED CLARA,
19  C-L-A-R-A, RIGHT?
20  A.  SOME OF THE ANALYSIS.
21  Q.  YOU DIDN'T USE THE UTEXAS PROGRAM, DID YOU?
22  A.  NO.
23  Q.  YOU DIDN'T USE THE SLIDE PROGRAM, DID YOU?
24  A.  NO.
25  Q.  YOU DIDN'T USE THE SLOPE/W PROGRAM, DID YOU?

## 1473

1  A.  YES.
2  Q.  YOU DID USE THE SLOPE/W?
3  A.  YES.
4  Q.  ALL RIGHT.  AND THAT IS REFLECTED IN YOUR STABILITY
5  ANALYSIS?
6  A.  YES.
7  Q.  YOU POINTED TO PICTURES OF LONDON AVENUE AND 17TH STREET
8  CANAL, AND YOU WOULD AGREE WITH ME, DR. MARINO, THAT THOSE
9  FAILURES HAPPENED WITHOUT AN IMPACT FROM A BARGE, RIGHT?
10  Q.  YOU DIDN'T CARRY OUT ANY STABILITY ANALYSIS OR A SEEPAGE
11  ANALYSIS AT THOSE FAILURES TO SHOW THAT, UNDER THE METHODOLOGY
12  YOU USED, THOSE FAILURES WILL HAPPEN WITHOUT A BARGE, DID YOU?
13  A.  I DIDN'T DO ANY STABILITY ANALYSIS, NO.
14  Q.  RIGHT.
15      THE COURT:  OR SEEPAGE ANALYSIS EITHER?
16      THE WITNESS:  NO, SIR.
17          EXAMINATION
18  BY MR. RAFFMAN:
19  Q.  ALL RIGHT.  LET ME HAVE GM-094, PLEASE.
20      IN PLAINTIFF'S EXHIBIT 397, MARINO REPORT TABLE 5.2, YOU
21  SAID IN YOUR REPORT, "IT'S SCIENTIFIC UNLIKELY THAT THE
22  FLOODWALLS WOULD FAIL FROM THE SURGE WATER ALONE."
23      THAT'S WHAT YOU SAID, RIGHT?
24  A.  YES.

## 1474

1  Q.  YOUR FACTOR OF SAFETY ANALYSIS FOR STABILITY -- LET ME
2  JUST -- TABLE 5.2 REPRESENTS YOUR FACTOR OF SAFETY ANALYSIS FOR
3  STABILITY, RIGHT?
4  A.  YES.
5  Q.  AND IN YOUR FACTOR OF SAFETY ANALYSIS FOR STABILITY, THE
6  HIGHEST WATER SURGE YOU EVALUATED WAS 12.5 FEET, RIGHT?
7  A.  YES.
8  Q.  AND SO YOUR STABILITY ANALYSIS DID NOT GO UP TO THE FULL
9  14.2 FEET OF SURGE, RIGHT?
10  A.  THAT'S CORRECT.
11  Q.  SO YOU HAVE NOT ASCERTAINED IN YOUR REPORT WHETHER, EVEN IF
12  THE BARGE HAD REMAINED AT THE DOCK, WHETHER THE WALL WOULD HAVE
13  SURVIVED KATRINA'S 14.2-FOOT STORM SURGE, THAT'S SOMETHING YOU
14  HAVEN'T DONE, RIGHT?
15  A.  THE SAFETY FACTORS ARE HIGH ENOUGH THAT I DON'T BELIEVE THAT
16  THAT'S A PROBLEM.
17      AS I HAD STATED IN MY DEPOSITION, IPET USED THE SAME
18  ELEVATION WHEN THEY DID THEIR ANALYSIS FOR THE SURGE LEVEL, AND,
19  YOU KNOW, WHAT WE'RE TALKING ABOUT REALLY IS THE TIME AT FAILURE,
20  WHAT THE SURGE LEVEL WAS AT THAT TIME.
21  Q.  I HAVE A DIFFERENT QUESTION FOR YOU, BECAUSE THERE IS A
22  POTENTIAL LEGAL ISSUE IN THE CASE THAT, YOU KNOW, MAY OR MAY NOT
23  BE AN ISSUE, PROBABLY NOT.  BUT IF THE -- IF THE BARGE STAYS AT
24  THE DOCK AND THE SURGE REACHES 14.2 FEET, YOU HAVEN'T CALCULATED
25  THE SAFETY FACTOR FOR THAT SCENARIO IN YOUR REPORT, HAVE YOU?

1475

1  MR. WILSON: OBJECTION, JUDGE. HE JUST ANSWERED THAT
2  QUESTION.
3      THE COURT: I THINK HE HAS. BUT FOR THE RECORD, DO YOU
4  WANT TO ANSWER IT AGAIN?
5      THE WITNESS: YES. I DON'T KNOW IF 14.2 WOULD BE THE
6  RIGHT NUMBER BECAUSE YOU HAVE OVERTOPPING. IT WOULD PROBABLY BE
7  A LOWER NUMBER THAN THAT. THE WATER CAN'T BE RETAINED AT 14.2 IS
8  WHAT I'M SAYING.
9      THE COURT: I GUESS, AREN'T YOU TRYING TO GET IS THAT NO
10  ANALYSIS WAS MADE BASED ON THE PEAK OF THE SURGE?
11     MR. RAFFMAN: THAT'S CORRECT, YOUR HONOR. THAT THEY
12  HAVEN'T PROVED THAT THE WALL WAS SUFFICIENTLY STABLE TO SURVIVE
13  THE STORM EVEN IF THEIR EXPERT ANALYSIS IS FULLY ACCEPTED.
14     THE COURT: IS THAT TRUE, SIR?
15     THE WITNESS: YES, I HAVE NOT EVALUATED IT TO THE PEAK
16  OF THE SURGE.
17     THE COURT: ALL RIGHT. THANK YOU.
18         EXAMINATION
19  BY MR. RAFFMAN:
20  Q. YOUR PHYSICAL MODEL -- YOUR PHYSICAL MODEL DEPARTED FROM THE
21  IPET PHYSICAL MODEL IN THE MATERIAL WAYS THAT IT AFFECTED THE
22  RESULT OF THE ANALYSIS, RIGHT?
23  A. I'M SORRY, CAN YOU SAY THAT AGAIN.
24  Q. YOUR PHYSICAL MODEL OF THE SOILS DEPARTED FROM THE IPET
25  PHYSICAL MODEL IN MATERIAL WAYS THAT AFFECTED THE RESULTS OF THE

1476

1  ANALYSIS?
2  A. WELL, OF COURSE. I'VE GOT DIFFERENT ANSWERS. EACH
3  INVESTIGATOR HAS GOTTEN DIFFERENT ANSWERS.
4  Q. AND THE SAME IS TRUE FOR THE ILIT PHYSICAL MODEL, RIGHT?
5  A. YES.
6  Q. AND YOUR CONCLUSION THAT THE -- AND YOUR SOIL PROFILES AND
7  THE SOIL PROPERTIES DIFFERED FROM IPET AND ILIT SIGNIFICANT
8  ENOUGH TO CAUSE THE SAFETY FACTOR TO INCREASE 20 PERCENT OR SO?
9  A. I DON'T THINK IT'S -- I DON'T BELIEVE IT'S RELATED TO THE
10  SOIL PROPERTIES. IT MAY BE RELATED TO LAYERING. IF YOU
11  REMEMBER, WHEN YOU COMPARE THE NUMBERS, THEY ARE NOT -- THEY ARE
12  IN LINE WITH THE OTHER NUMBERS THAT OTHERS USED.
13     WHEN WE DID OUR ANALYSIS, WE USED ALL THE WGI BORINGS, WE
14  DID A DETAILED CROSS-SECTION OF EACH AREA FAILURE, SO I BELIEVE
15  OUR LAYERING SYSTEM IS BETTER.
16     AND WE USED THE WGI BORINGS, WHICH NO OTHER INVESTIGATOR
17  THAT I KNOW OF HAS USED IN DEVELOPING THEIR STRATIGRAPHY.
18  Q. JUST TO GET AN ANSWER TO MY QUESTION, YOUR SOIL
19  CHARACTERIZATION, THE SOIL PROFILES AND THE SOIL PROPERTIES IN
20  YOUR REPORT DIFFER FROM IPET AND ILIT SIGNIFICANT ENOUGH TO CAUSE
21  THE SAFETY FACTOR TO INCREASE 20 PERCENT OR SO, CORRECT?
22  A. I HAVEN'T DONE THE NUMBER OF 20 PERCENT, BUT IF THAT'S WHAT
23  YOU'RE SAYING IT IS, THAT'S CORRECT.
24  Q. 198, 13 -- DEPOSITION 198, 13 TO 18.
25     (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, AN EXCERPT

1477

1  OF THE VIDEOTAPED DEPOSITION OF DR. GENNARO MARINO WAS PLAYED.)
2     QUESTION: WELL, YOUR -- YOUR SOIL CHARACTERIZATION, THE
3  SOIL PROFILES AND THE SOIL PROPERTIES DIFFER IN SIGNIFICANT
4  RESPECTS FROM IPET AND ILIT; AM I RIGHT?
5     ANSWER: YES. WELL, I -- OBVIOUSLY, SIGNIFICANT ENOUGH
6  TO CAUSE THE SAFETY FACTOR TO INCREASE 20 PERCENT OR SO.
7     (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THIS
8  CONCLUDED THE EXCERPT OF THE VIDEOTAPE DEPOSITION.)
9         EXAMINATION
10  BY MR. RAFFMAN:
11  Q. YOUR CONCLUSION THAT THE BARGE CAUSED THE NORTH BREACH AND
12  THE SOUTH BREACH DIFFERS FROM AND DISAGREES WITH IPET, RIGHT?
13  A. SAY THAT AGAIN NOW.
14  Q. YOUR CONCLUSION THAT THE BARGE CAUSED THE NORTH BREACH AND
15  THE SOUTH BREACH DIFFERS FROM IPET, RIGHT?
16     MR. WILSON: OBJECTION. IPET DIDN'T REACH A CONCLUSION,
17  YOUR HONOR.
18     THE COURT: OBJECTION OVERRULED.
19     I'VE LOOKED AT THE REPORTS MYSELF. IN OTHER WORDS, YOU CAN
20  JUST SAY, ISN'T IT TRUE THAT NONE OF THEM CONCLUDED THAT THE
21  BARGE CAUSED THE BREACH?
22     MR. RAFFMAN: THAT'S A SHORTER WAY TO SAY IT, JUDGE.
23  THANK YOU. THANK YOU, YOUR HONOR.
24     THE COURT: IS THAT TRUE, SIR?
25     THE WITNESS: WELL, I --

1478

1     THE COURT: IS IT TRUE, SIR, OR NOT? TELL ME.
2     THE WITNESS: YES.
3     MR. RAFFMAN: I HAVE NO OTHER QUESTIONS.
4     THE COURT: THANK YOU.
5     WE'LL TAKE A 10- TO 15-MINUTE RECESS. WE'LL GIVE YOU A
6  LITTLE MORE.
7     THE DEPUTY CLERK: ALL RISE.
8     (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, A BRIEF
9  RECESS WAS TAKEN.)
10     THE DEPUTY CLERK: ALL RISE, PLEASE. COURT IS IN
11  SESSION. PLEASE BE SEATED.
12         REDIRECT EXAMINATION
13  BY MR. WILSON:
14  Q. GOOD MORNING, DR. MARINO.
15  A. GOOD MORNING.
16     MR. WILSON: BOB, IF I COULD HAVE SLIDE 15 PUT UP ON THE
17  SCREEN. ACTUALLY, GIVE ME SLIDE 16, I THINK. OKAY. IF YOU
18  COULD BLOW UP THE RIGHT-HAND CORNER OF THE TOP THERE, OKAY.
19     AND ACTUALLY, BEFORE I DO THIS, JUDGE, I THINK ON DIRECT, I
20  FORGOT TO MOVE IN PLAINTIFF'S EXHIBITS 438 AND 439, WHICH WERE
21  CAPTURES, INTO EVIDENCE.
22     THE COURT: YES, SIR. AND LET THOSE BE INTRODUCED.
23     (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS,
24  PLAINTIFF'S EXHIBITS 438 AND 439 WERE ADMITTED.)
25     MR. WILSON: THANK YOU, YOUR HONOR.

## 1479

1  EXAMINATION
2  BY MR. WILSON:
3  Q.  DOCTOR, THIS IS BORING 81A, CORRECT?
4  A.  YES.
5  Q.  IN THE RIGHT-HAND CORNER IT HAS A DATE ON THERE, 10/4/01; DO
6  YOU SEE THAT?
7  A.  YES.
8  Q.  NOW, IF WE COULD GO TO SLIDE 15, PLEASE.  AND, BOB, IT'S
9  GOING TO BE HARD, BUT IN THE BOTTOM, RIGHT IN THE MIDDLE -- AND I
10  DO HAVE A POINTER -- NO, BRING IT BACK, I'LL SHOW YOU, IF THE
11  POINTER WORKS.  RIGHT THERE (INDICATING).  CAN YOU BLOW THAT UP,
12  PLEASE.
13  WHAT'S THE DATE ON THAT?  CAN YOU READ THAT, DOCTOR?
14  A.  IT'S -- LOOKS LIKE -- IT LOOKS LIKE AUGUST 27, 2002.
15  Q.  OKAY.  BOB, COULD YOU COME BACK AND BLOW UP THE MIDDLE OF
16  THE YELLOW SECTION, AGAIN.
17  OKAY.  IN THE MIDDLE HERE IT SAYS, NEAR LEVEE, COMMA,
18  LOCATION ADJUSTED, CORRECT?
19  A.  YES.
20  Q.  AND THAT'S AFTER THE DATE LISTED ON 81 A, CORRECT?
21  A.  YES.
22  Q.  CORRECT?
23  A.  YES.
24  Q.  THANK YOU.
25  NOW, IF I COULD GO TO THE ELMO.

## 1480

1  DR. MARINO, I BELIEVE THE COURT ASKED YOU -- OR THE
2  DEFENDANT DID, WHERE IS THE VALLEY THAT YOU WERE REFERRING TO.
3  ARE YOU ABLE TO SEE IT ON THIS PHOTOGRAPH?  IS THAT SUREKOTE
4  ROAD?
5  A.  THIS WOULD BE A RECONSTRUCTION OF THAT ROAD.  IT MAY BE
6  SIMILAR --
7  Q.  RIGHT.
8  A.  -- IN ELEVATION AS IT WAS PRIOR TO THE RECONSTRUCTION, BUT I
9  WOULDN'T KNOW IF THAT'S THE CASE OR NOT.
10  Q.  WHERE DID YOU PUT YOUR BORING, 81 A?  WHERE DID YOU
11  DETERMINE IT WOULD HAVE BEEN?
12  A.  OVER HERE (INDICATING).
13  Q.  AND THAT IS INCLINED IN THAT AREA?
14  A.  WHEN I EVALUATED THAT, I LOOKED AT PHOTOGRAPHS OF THAT AREA,
15  AND THAT WAS ABOUT THE ONLY AREA THAT I THOUGHT WAS FEASIBLE TO
16  HAVE FLAT GROUND AND BACK YOUR DRILL RIG IN.
17  Q.  IS THE DRILL RIG ATTACHED TO A TRUCK?  TELL ME WHAT A DRILL
18  RIG IS.
19  A.  IT'S LIKE A TOW TRUCK, SIMILAR SIZE AND --
20  Q.  AND IF YOU ARE ON AN ANGLE, YOU CAN'T DRILL; IS THAT
21  CORRECT?
22  A.  RIGHT.  I MEAN, IF WE WANTED TO GET A BETTER VIEW OF IT, WE
23  COULD LOOK AT MY ANIMATION.  I THINK I POINTED OUT YESTERDAY
24  ABOUT WHERE THAT BORING WAS -- WOULD BE.  IT GIVES MORE OF A 3-D
25  DEPICTION OF WHAT -- YOU KNOW, WHAT THE ROAD WOULD HAVE LOOKED

## 1481

1  LIKE AND THE SLOPE OF THE LEVEE.
2  Q.  I THINK I KNOW WHAT YOU'RE TALKING ABOUT.
3  COULD WE LOOK AT SLIDE 12 OF EXHIBIT 437, PLEASE.
4  IS THAT WHAT YOU'RE REFERRING TO, DOCTOR?
5  A.  NO, THE ANIMATION ACTUALLY.
6  Q.  OH, THE ANIMATION.
7  A.  YES.  THE GREEN ANIMATION WOULD SHOW -- IT GIVES -- I THINK
8  THERE IS A RECORD OF IT SO THAT THE COURT WOULD BE ABLE TO
9  IDENTIFY THAT LOCATION, BUT I DON'T KNOW IF YOU --
10  MR. WILSON:  OKAY.  FOR THE COURT, DO YOU WANT ME TO GO
11  TO THE ANIMATION OR SHOULD I LEAVE IT AS IT IS?
12  THE COURT:  JUST LET ME ASK YOU THIS.  YOU HAVE,
13  OBVIOUSLY, THE TOP OF THE LEVEE.
14  THE WITNESS:  YES.
15  THE COURT:  NOW, YOU'RE SAYING THAT -- OF COURSE, AT THE
16  TIME THESE BORINGS WERE TAKEN, WAS THERE A LEVEE THERE AT ALL?
17  THE WITNESS:  YEAH, THERE WAS.
18  THE COURT:  AND WAS IT IN SUBSTANTIALLY THE SAME PLACE
19  IT WAS --
20  THE WITNESS:  THIS IS BEFORE, BEFORE KATRINA, SO --
21  THE COURT:  RIGHT.  BUT WAS IT IN SUBSTANTIALLY -- IN
22  '69 WE'RE TALKING ABOUT, RIGHT?  OR '80?
23  THE WITNESS:  THE BORING WAS DONE IN 2001.
24  THE COURT:  SO THE LEVEE WAS IN PLACE, I'M SORRY.
25  THE WITNESS:  THAT'S RIGHT.

## 1482

1  THE COURT:  SO YOU HAVE THE TOP OF THE LEVEE, THERE IS A
2  ROAD -- THERE IS THE PUMPING STATION, THE LEVEE, AND THERE IS THE
3  ROAD THAT GOES UP ONTO THE LEVEE.
4  THE WITNESS:  YES.
5  THE COURT:  AND ARE YOU SAYING THAT THIS 81 A, IS IT
6  YOUR OPINION THAT 81 A WAS TAKEN ALONG THE SLOPE OF THE LEVEE?
7  THE WITNESS:  NO, I'M SAYING IT WAS MOVED UP TO THE --
8  WHERE THE -- IF YOU REMEMBER, THIS CORNER OF THE FLOODWALL, IF
9  YOU REMEMBER THAT, YOU REMEMBER SEEING THAT IN ANY OF THE
10  PHOTOGRAPHS?
11  THE COURT:  YES.
12  THE WITNESS:  THAT'S FLAT GROUND RIGHT THERE.  SO THE
13  DRILL RIG WOULD HAVE JUST WORKED OFF THE ROAD INTO THAT FLAT
14  AREA.  THAT'S THE ONLY AREA THAT WOULD BE FLAT AND OFF THE ROAD.
15  THE COURT:  SHOW ME THE PHOTOGRAPH AGAIN.  I DO BETTER
16  WITH PHOTOGRAPHS EVEN THOUGH IT'S NOT LITERAL.
17  MR. WILSON:  THERE IT IS.
18  THE COURT:  I MEAN, I REALIZE THIS IS --
19  MR. WILSON:  POST --
20  THE COURT:  -- AFTER THE INCIDENT, OF COURSE.  THE TOP
21  OF THE LEVEE WOULD BE WHERE?  YOU CAN JUST SHOW IT WITH YOUR
22  MARKER?
23  THE WITNESS:  WELL, THE TOP OF THE LEVEE IS MISSING
24  HERE, YOUR HONOR.
25  THE COURT:  RIGHT.  BUT IT WOULD HAVE BEEN RIGHT THERE.

1483

1  THE WITNESS: YES. AND SO YOU WOULD HAVE A SLOPE IN
2  THAT DIRECTION.
3  THE COURT: AND THE SLOPE IN THAT DIRECTION. THE CANAL
4  SIDE WOULD BE?
5  THE WITNESS: WOULD BE THE SLOPE OF THIS ROAD IN THIS
6  DIRECTION. AND SO --
7  THE COURT: THE CANAL SIDE WOULD BE ON WHICH SIDE OF
8  THE --
9  THE WITNESS: ON THIS SIDE (INDICATING).
10  THE COURT: AND YOU'RE SAYING THAT 81 A WAS TAKEN ABOUT
11  WHERE? AND YOU CAN JUST POINT IT RIGHT OUT WITH YOUR --
12  THE WITNESS: IN THIS FLAT GROUND AREA HERE.
13  THE COURT: WAIT. WAIT. WAIT. JUST, SEE IF YOU CAN
14  KEEP IT ON ONE POINT. WHERE IS THAT, NOW?
15  THE WITNESS: RIGHT HERE.
16  THE COURT: IS THAT -- AND THE FLOODWALL WOULD BE WHERE?
17  THE WITNESS: THE FLOODWALL IS HERE.
18  THE COURT: ALL RIGHT. SO HOW FAR AWAY FROM THE
19  FLOODWALL WOULD YOU SAY THAT 81 A WAS TAKEN?
20  THE WITNESS: IF WE COULD GO BACK TO THE ONE THAT YOU
21  HAD, THAT SLIDE BEFORE.
22  MR. WILSON: SURE.
23  THE COURT: OKAY.
24  MR. WILSON: SLIDE 12, PLEASE, BOB.
25  AND FOR THE RECORD, JUDGE, THAT WAS PHOTO 4.6 OUT OF HIS

1484

1  REPORT, WHICH IS EXHIBIT, I BELIEVE, 397.
2  THE COURT: HOW FAR AWAY FROM THE FLOODWALL WAS IT?
3  THE WITNESS: YOU CAN SEE A SCALE HERE, YOUR HONOR.
4  THE COURT: YES.
5  THE WITNESS: AND SO IT'S ABOUT 20 FEET FROM HERE TO
6  HERE (INDICATING).
7  THE COURT: AND IT WAS ON THE -- TAKEN ON THE CANAL SIDE
8  OF THE FLOODWALL?
9  THE WITNESS: CORRECT.
10  THE COURT: AND WAS THERE ANY SLOPE 20 FEET OUT FROM THE
11  FLOODWALL?
12  THE WITNESS: FROM THE PHOTOGRAPHS I LOOKED AT, THAT
13  AREA IS FLAT GROUND.
14  THE COURT: SO YOU JUST HAVE THE FLOODWALL AND FLAT
15  GROUND?
16  THE WITNESS: YES.
17  THE COURT: ALL RIGHT.
18  YOU WOULD HAVE HAD A SLOPE ON THE PROTECTED SIDE OF THE
19  FLOODWALL?
20  THE WITNESS: SLOPE ON THE PROTECTED SIDE OF THE
21  FLOODWALL? YES.
22  THE COURT: AN EARTHEN WALL?
23  THE WITNESS: YOU'RE TALKING ABOUT ON THIS SIDE OF IT?
24  THE COURT: YES.
25  THE WITNESS: YES, THERE IS A SLOPE ON BOTH SIDES. BOTH

1485

SIDES OF THAT WALL THERE ARE SLOPES.
THE COURT: BUT THE SLOPE ENDS BEFORE THE 20 FEET ON THE
CANAL SIDE OF THE FLOODWALL?
THE WITNESS: THE SLOPE GOES THIS WAY (INDICATING),
OKAY. AND THEN YOU HAVE THE ROAD, OKAY, THIS ROAD HERE HAS A
SLOPE GOING THIS WAY, WHICH CREATES, LIKE, A DRAINAGE DITCH, IF
YOU WILL, OR A SMALL RAVINE WHERE YOU CAN'T REALLY ACCESS AND PUT
A HOLE IN.
THE COURT: ALL RIGHT. I WOULD LIKE TO SEE A PHOTOGRAPH
FROM 2001 JUST SO I CAN REALLY -- BELIEVE ME, I CAN'T REALLY
VISUALIZE IT FROM WHAT WE HAVE HERE, NOR CAN, I THINK, MOST
PEOPLE. BUT GO AHEAD. I'VE GOT THE GENERAL DISTANCE.
MR. WILSON: OKAY.
EXAMINATION
BY MR. WILSON:
Q.  IF WE COULD GO BACK TO THE ELMO, PLEASE.
OKAY. THIS IS SOMETHING I JUMPED UP ABOUT YESTERDAY. IT'S
A LIDAR TAKEN POST-KATRINA. IT'S IN THE IPET REPORT,
VOLUME 4-9-8. DEFENSE COUNSEL HAD PUT IT UP YESTERDAY. DO YOU
RECALL THAT?
A.  YES. I WAS CURIOUS LAST NIGHT TO HOW THIS SURVEY WAS
MEASURED. I DIDN'T HAVE THAT VOLUME WITH ME, BUT IF IT IS THE
LIDAR, IT WOULDN'T BE VERY ACCURATE, IT IS FROM LIDAR.
Q.  AND WHY IS THAT, DOCTOR?
A.  BECAUSE IT'S COMMON KNOWLEDGE THAT THE ABILITY FOR LIDAR TO

1486

MEASURE SHARP OBJECTS IS NOT VERY GOOD. AND IT'S PROBABLY THE
REASON WHY THE DEFENDANTS' CONSULTANTS, WHEN THEY PLOTTED THE
POINTS OF THE TOP OF THE LEVEE WALL, THEY DIDN'T PLOT ALL THE
IPET POINTS BECAUSE THEY -- THESE POINTS BECAUSE THEY ARE NOT AS
ACCURATE AS DOING A LAND LINE SURVEY, AS THE DEFENDANTS'
CONSULTANT DID.
Q.  ARE YOU REFERRING TO -- AND FOR THE RECORD, THAT'S ALSO
FIGURE 9.5, OKAY.
ARE YOU REFERRING TO DR. CUSHING'S, DEFENDANTS' EXPERT
REPORTS REGARDING THE HEIGHT OF THE FLOODWALL?
A.  YES. AS YOU CAN SEE, THERE IS -- NONE OF THESE POINTS ARE
SHOWN. I MEAN, THEY DO HAVE SOME OF THE IPET POINTS, THESE RED
DOTS. YOU KNOW, THEY DIDN'T INCLUDE THOSE AS A COMPARISON WHERE
THOSE SURVEY POINTS ARE SHOWN IN THE PREVIOUS SLIDE IN THIS AREA
(INDICATING).
Q.  WELL, I DON'T KNOW IF YOU RECALL, DOCTOR, BUT I'M GOING TO
REFER YOU TO YOUR REPORT. AND FOR THE RECORD, THAT WAS
FIGURE 5.1 FROM DR. MARINO'S REPORT WHERE HE REFERENCES
DR. CUSHING'S ILLUSTRATION OF THE TOP OF THE FLOODWALL
ELEVATIONS.
OKAY. I WOULD ALSO LIKE TO GO NOW TO FIGURE 5.3 FROM
DR. MARINO'S REPORT. AND YOU HAVE PREKATRINA LIDAR IN THE UPPER
RIGHT-HAND CORNER, POST-KATRINA LIDAR 2005, AND THE IPET FIELD
SURVEY, DECEMBER 2005.
THE COURT: YES, SIR. I'M SORRY.

**1487**

1  MR. RAFFMAN:  I DO HAVE AN OBJECTION, YOUR HONOR, TO THE
2  CHARACTERIZATION OF FIGURE 5.1 OF DR. MARINO'S REPORT AS
3  REFERENCING THE REPORT OF DR. CUSHING IN COUNSEL'S QUESTION.
4  I'VE LOOK AT FIGURE 5.1 OF DR. MARINO'S REPORT, AND IT DOES
5  NOT REFERENCE DR. CUSHING'S REPORT.  FURTHERMORE, I BELIEVE
6  DR. MARINO TESTIFIED YESTERDAY THAT HE DID NOT HAVE DR. CUSHING'S
7  REPORT AT THE TIME HE GAVE HIS REPORT.  SO I OBJECT TO THE
8  QUESTION.
9  MR. WILSON:  WELL, I WANT TO CORRECT SOMETHING.  I DID
10  SAY 5.1, AND I APOLOGIZE TO THE COURT.  IT'S ACTUALLY 5.11.
11  THE COURT:  OKAY.  I'M LOOKING AT -- WHAT AM I LOOKING
12  AT RIGHT NOW?
13  MR. WILSON:  I'M SORRY, I'LL SWITCH IT BACK FOR YOU,
14  JUDGE.
15  THE COURT:  ALL RIGHT.  THANK YOU.
16  MR. WILSON:  AND I'LL SHOW THE FIGURE THERE.
17  THE COURT:  ALL RIGHT.  THAT IS --
18  THE WITNESS:  I CAN -- I CAN CLEAR THIS UP, YOUR HONOR,
19  IF I MAY.
20  THE COURT:  OKAY.
21  MR. RAFFMAN:  SAME OBJECTION.  I'M HOLDING A COPY OF
22  DR. MARINO'S REPORT FROM MAY 14, AND I'VE GOT FIGURE 5.11, WHICH
23  IS NOT THIS DOCUMENT.
24  MR. WILSON:  DID I SAY FIGURE?  NO, I DO HAVE FIGURE.
25  THE COURT:  IT DOES SAY FROM CUSHING, SO LET'S FIRST

**1488**

1  ESTABLISH FROM WHENCE DID THIS COME?  WHEN WAS THIS PARTICULAR
2  DOCUMENT GENERATED?
3  THE WITNESS:  YOUR HONOR, THIS IS A FIGURE IN OUR DRAFT
4  OR A CORRECTION TO OUR REPORT THAT WE'RE CONTINUALLY WORKING ON,
5  AND SO --
6  THE COURT:  SO IT WAS GENERATED WHEN?
7  THE WITNESS:  IT WAS GENERATED PROBABLY TWO OR THREE
8  MONTHS AGO.
9  THE COURT:  I UNDERSTAND.  HAVE I ALREADY LOOKED AT THIS
10  DOCUMENT?
11  THE WITNESS:  YOU HAVE LOOKED AT THIS, BUT THE TITLE WAS
12  NOT ON IT.  IT'S NOT PART OF THE REPORT THAT'S BEEN SUBMITTED.
13  MR. WILSON:  BUT IT WAS PART OF YOUR DECLARATION, I
14  BELIEVE?
15  THE WITNESS:  I BELIEVE SO, YES.
16  THE COURT:  IF I JUST LOOK AT DR. CUSHING'S SURVEY DATA,
17  I ASSUME I CAN GET THE SAME INFORMATION.
18  THE WITNESS:  YOU CAN.
19  MR. RAFFMAN:  YES, YOUR HONOR.  THE MATERIAL IS IN THE
20  RECORD.  I JUST OBJECT TO THE INJECTION OF NEW MATERIAL AND NEW
21  DESIGNATIONS THAT ARE NOT ACTUALLY PART OF DR. MARINO'S REPORT.
22  DR. MARINO HAS NEVER SUPPLIED A REPORT TO US OR, TO MY
23  KNOWLEDGE, TO THE COURT IN WHICH HE HAS ADOPTED WORK BY OUR
24  EXPERT, DR. CUSHING, AND HAS INCLUDED HIS OWN FIGURE ON IT.  AND
25  SO I OBJECT TO THIS BEING INCLUDED IN THE RECORD AS A -- WITH A

**1489**

FIGURE DESIGNATION THAT DOESN'T REFLECT ANYTHING THAT'S IN THE
RECORD.
THE COURT:  LEAVING OFF THE FIGURE 5.11, I HAVE SEEN
THIS.  WE HAD QUESTIONING ABOUT IT, I THINK, WITHOUT OBJECTION,
ON THE -- AND I RECALL THE TESTIMONY ABOUT USING DR. CUSHING'S
SURVEY DATA -- OR AT LEAST ABOUT DR. CUSHING'S SURVEY DATA.  THE
COURT UNDERSTANDS IT WAS NOT USED BY DR. MARINO AS PUBLISHED IN
HIS REPORTS TO THE COURT AND TO COUNSEL.
MR. RAFFMAN:  YES, YOUR HONOR.
THE COURT:  I UNDERSTAND.
MR. WILSON:  BUT IT WAS ALSO RAISED IN
CROSS-EXAMINATION.  AND I WOULD ASK THAT IT BE CAPTURED, THEN,
AND MARKED AS PLAINTIFF'S EXHIBIT 440, SO THAT IT'S CLEAR, IF I'M
NOT REFERENCING THE RIGHT EXHIBIT NUMBER.
THE COURT:  THAT WHAT, SIR?
MR. WILSON:  I SAID I WOULD ASK THAT IT BE CAPTURED AND
MARKED AS PLAINTIFF'S EXHIBIT 440 IF I'M NOT REFERENCING THE
CORRECT EXHIBIT NUMBER, BEING THAT IT'S ALREADY IN THE RECORD.
THE COURT:  I'M NOT QUITE SURE I UNDERSTAND YOUR TENDER,
BUT IS THERE ANY OBJECTION?
MR. RAFFMAN:  NO, YOUR HONOR.  IT'S ALREADY IN THE
RECORD.
THE COURT:  ALL RIGHT.  GO AHEAD, THAT'S FINE.
SO YOU WANTED TO ASK THE WITNESS ABOUT THIS, COUNSEL?
MR. WILSON:  SHE JUST WANTED ME TO --

**1490**

THE COURT:  GO AHEAD.
EXAMINATION
BY MR. WILSON:
Q.  DR. MARINO, WHAT HEIGHT DID YOU USE FOR THE FLOODWALL
ELEVATIONS IN YOUR CALCULATION?
A.  IN MY CALCULATIONS I USED -- FOR THE SEEPAGE ANALYSIS AND
THE STABILITY ANALYSIS, I USED 12.5.
Q.  THANK YOU, DOCTOR.
MR. WILSON:  JUST SO I DON'T HAVE A PROBLEM, JUDGE.
THIS IS ALSO FROM DR. MARINO'S REPORT.  IT'S EXHIBIT NUMBER 397.
AND THIS IS FIGURES 5.8 AND 5.9.  IF I COULD BACK THIS UP.
EXAMINATION
BY MR. WILSON:
Q.  AND, AGAIN, THIS HAS IN IT THE LIDAR FROM POST-KATRINA 2005
AND THE LIDAR FROM PREKATRINA 2002.  AND WOULD YOU AGREE WITH ME,
DOCTOR, THAT THE FIGURES GIVEN FOR THE HEIGHTS ARE CONSIDERABLY
DIFFERENT?
A.  YES, THAN WHAT THE SURVEY SHOWS, A LAND LINE SURVEY, AN
ACTUAL SURVEY.
Q.  THANK YOU, DOCTOR.
AND, BOB, IF WE COULD GO TO THE IPET, VOLUME 2, FINAL
REPORT, MARCH 26, 2007, TABLE 24.  COULD YOU BLOW THAT UP SO WE
COULD SEE IT A LITTLE BETTER.  THERE WE GO.
OKAY.  COULD YOU READ FOR THE COURT THE HIGHLIGHTED
PARAGRAPH UNDERNEATH THE TABLE, PLEASE?

19  (Pages 1487 to 1490)

1491

1 A. "FROM THE ABOVE DATA, TABLE 24, PREKATRINA ELEVATIONS ALONG
2 THE EAST BANK FLOODWALL NORTH OF THE BREACH AREA WERE AROUND 12.6
3 TO 12.7 NAVD 88, 2004.65. SOUTH OF THE BREACH AREA THE
4 ELEVATIONS RANGED FROM 12.7 TO 13.4 NEAR THE CLAIBORNE AVENUE
5 BRIDGE."
6 MR. WILSON: AND MAY I CAPTURE THIS, YOUR HONOR, AND
7 MARK IT PLAINTIFF'S EXHIBIT 441 FROM IPET?
8 THE COURT: ANY OBJECTION, COUNSEL?
9 MR. RAFFMAN: NO, YOUR HONOR.
10 THE COURT: LET IT BE INTRODUCED.
11 (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS,
12 PLAINTIFF'S EXHIBIT 441 WAS ADMITTED.)
13 MR. WILSON: THANK YOU, YOUR HONOR.
14 EXAMINATION
15 BY MR. WILSON:
16 Q. OKAY. DOCTOR, I'D LIKE TO REPRESENT TO YOU AND THE COURT
17 THAT I HAVE SENT SOMEBODY OUT TO THE INDUSTRIAL CANAL TO MEASURE
18 A STRAIGHT LINE FROM WHERE THE LEVEE WALL WAS LOCATED TO THE
19 TELEPHONE POLE THAT HAS BECOME AN ISSUE IN THIS CASE. AND I'D
20 LIKE YOU TO ASSUME FOR PURPOSES OF MY QUESTION THAT THE TELEPHONE
21 POLE IS 88 FEET, 10 INCHES FROM THE FLOODWALL.
22 AND, BOB, IF YOU COULD PUT UP -- IF YOU COULD PUT UP -- IT'S
23 DX 106 AND DX 263. I THINK WE HAVE THEM SPLIT. YEAH.
24 I'D LIKE YOU TO ASSUME THAT THAT TELEPHONE POLE IS 88 FEET
25 IN A STRAIGHT LINE GOING ACROSS TO THE AREA WHERE THE NORTH

1492

1 BREACH IS. DO YOU HAVE AN OPINION, DOCTOR, WHETHER THAT BARGE
2 COULD FIT BETWEEN THE TELEPHONE POLE AND THE LEVEE WALL WHERE THE
3 NORTH BREACH OCCURRED?
4 A. YES. AS I SAID IN MY TESTIMONY YESTERDAY, THAT WE WERE
5 AWARE OF THIS A YEAR AND A HALF AGO, AND I HAD ONE OF MY
6 ENGINEERS TO KIND OF PLACE WHERE THAT POLE WAS, AND WE LOOKED AT
7 WHETHER OR NOT THE BARGE COULD -- THE TIP OF A BARGE COULD BE IN
8 THE LOCATION OF WHERE THE NORTH END OF THE BREACH WAS AND FOUND
9 THAT IT WAS A FEASIBLE LOCATION.
10 Q. AND, DOCTOR, IF YOU WERE TO DRAW A LINE -- I MEAN, I WAS
11 NEVER VERY GOOD IN GEOMETRY, BUT IF WERE TO DRAW A LINE STRAIGHT
12 HERE AND IT'S 88 FEET, AND THEN ANOTHER LINE, AND THEN PUT THE
13 TOP OF THE TRIANGLE THERE, YOU WOULD HAVE A HYPOTENUSE, CORRECT?
14 A. YES.
15 Q. AND THE DISTANCE OF THE HYPOTENUSE WOULD BE LARGER THAN THE
16 88 FEET, CORRECT, IF IT'S A RIGHT ANGLE?
17 A. YES.
18 Q. WHAT I'M SAYING IS, IF YOU DRAW A STRAIGHT LINE TO THE
19 LEVEE, A STRAIGHT LINE THIS WAY, AND THEN CONNECT THE TWO AND YOU
20 HAVE A HYPOTENUSE. OKAY.
21 I WOULD LIKE YOU TO ASSUME THAT THE HYPOTENUSE IS 125 FEET.
22 DO YOU HAVE AN OPINION WHETHER THE BARGE COULD ENTER THAT AREA AT
23 AN ANGLE AND IMPACT THE WALL, EASTERN WALL OF THE LEVEE?
24 A. YES. I THINK -- AS WE TALKED -- AS I ANSWERED THE LAST
25 QUESTION.

1493

1 Q. OKAY. I UNDERSTAND.
2 AND, DOCTOR, REFERRING TO DX 263, YOU SEE THAT TELEPHONE
3 POLE THERE? WELL, I SAID A TELEPHONE POLE, BUT IT'S A POLE. LET
4 ME JUST CALL IT A POLE. I'M NOT SURE IF IT'S A TELEPHONE POLE OR
5 WHAT TYPE OF POLE IT IS. DO YOU SEE IT THERE?
6 A. YES.
7 Q. OKAY. NOW, I'M GOING TO COME BACK TO THIS. JUST GIVE ME
8 ONE MOMENT.
9 I'M SORRY, DOCTOR?
10 A. IS THERE SOMETHING THAT -- COULD I SAY SOMETHING? IS THIS A
11 GOOD PHOTOGRAPH TO LOOK AT FOR A MINUTE?
12 Q. I'M GOING TO COME RIGHT BACK TO IT, OKAY?
13 A. OKAY.
14 Q. IF I COULD GO TO THE ELMO RIGHT NOW, THIS WAS MOVED INTO
15 EVIDENCE YESTERDAY BY THE DEFENDANTS. I BELIEVE IT'S THEIR LAST
16 EXHIBIT. I'M NOT SURE WHAT THE NUMBER IS. I BELIEVE IT'S
17 DEFENDANTS' 345. IT'S WGI013699A, A PHOTOGRAPH. AND YESTERDAY
18 YOU TESTIFIED THAT THAT WAS THE EASTERN FLOODWALL
19 OF THE INDUSTRIAL CALL. DO YOU RECALL THAT?
20 A. YES.
21 Q. DO YOU SEE ALL OF THOSE TELEPHONE POLES OR POWER POLES
22 LOCATED IN THAT AREA?
23 A. YES.
24 Q. OKAY. DO YOU KNOW WHEN THAT PHOTOGRAPH WAS TAKEN?
25 A. PROBABLY IN THE -- BETWEEN 2000, YEAR 2000 TO 2005.

1494

1 Q. OKAY. AND I WANT TO GO BACK TO DX 293, IF I MAY.
2 DOCTOR, DO YOU BELIEVE THAT THE BARGE AT ISSUE IN THIS
3 CASE IS CAPABLE OF KNOCKING DOWN A TELEPHONE POLE --
4 A. YES.
5 Q. -- OR A POLE OR TWO OR THREE OR WHATEVER NUMBER IT MAY BE?
6 A. YES.
7 Q. OKAY. IN THIS PHOTOGRAPH, DX 263, DO YOU SEE ANY TELEPHONE
8 POLES ALONG THE LEVEE AREA THERE?
9 A. NO.
10 Q. OKAY. DID YOU WANT TO SAY SOMETHING ELSE ABOUT THIS
11 PHOTOGRAPH, DOCTOR?
12 A. YES. SINCE THE COURT WAS CURIOUS ABOUT A PHOTOGRAPH SHOWING
13 THE AREA WHERE THAT -- THE HOLE 81 A, I BELIEVE, WAS DRILLED, YOU
14 CAN SEE IT FROM THIS VIEW HERE. YOU CAN SEE THE GROUND IS FAIRLY
15 FLAT.
16 Q. THANK YOU, DOCTOR.
17 THE COURT: THANKS.
18 EXAMINATION
19 BY MR. WILSON:
20 Q. DO YOU WANT TO CIRCLE THAT.
21 MR. WILSON: MAY I GET THAT CAPTURED AS PLAINTIFF'S
22 EXHIBIT 441?
23 THE DEPUTY CLERK: YOU MEANT 442. YOU USED 441 ALREADY.
24 THE COURT: 442. OKAY.
25 MR. WILSON: OKAY, WE HAVE THAT CAPTURED?

1495

1   THE DEPUTY CLERK:  YES.
2                   EXAMINATION
3   BY MR. WILSON:
4   Q.  MY COLLEAGUES WANT ME TO COME BACK TO THIS QUESTION AND ASK
5   YOU THIS.  DOCTOR, I WOULD LIKE YOU TO ASSUME THAT AT 88 FEET,
6   10 INCHES FROM THE POLE TO THE WALL AT A RIGHT ANGLE, THE
7   HYPOTENUSE OF THAT TRIANGLE IS 125 FEET.  CAN A BARGE THAT'S
8   35 FEET IN WIDTH FIT IN THAT AREA AND CAUSE THE BREACH IN THE
9   NORTHERN PART OF THE EASTERN FLOODWALL OF THE INDUSTRIAL CANAL?
10  A.  YES.
11  Q.  THANK YOU.
12      AND, BOB, IF YOU CAN GO TO PHOTO 4.47 OF EXHIBIT 397.
13      BEFORE I GET THERE, DOCTOR, JUST TO BE CLEAR, THE BARGE
14  DOESN'T HAVE TO GO IN THERE SIDEWAYS 200 FEET, RIGHT?  IT COULD
15  GO IN THERE 35 FEET, RIGHT?  THAT'S THE WIDTH OF THE BARGE --
16  A.  YEAH.
17  Q.  -- 35.  THANK YOU.  I'D LIKE YOU TO CLEAR THAT.
18      DOCTOR, COULD YOU BLOW UP THIS AREA RIGHT HERE?  CAN YOU SEE
19  WHAT THAT IS, DOCTOR?
20  A.  PART OF THE BARGE?
21  Q.  I'M SORRY.  I DIDN'T HEAR WHAT YOU SAID, DOCTOR.  IS THAT A
22  TREE?  IS THAT A TREE, DOCTOR?
23  A.  IS THAT THREE?
24  Q.  IS THAT A TREE?
25      THE COURT:  WHICH ONE ARE YOU TALKING ABOUT NOW?

1496

1       MR. WILSON:  TO THE RIGHT-HAND SIDE OF THE PHOTOGRAPH --
2       THE COURT:  THERE ARE TWO OBJECTS TO THE RIGHT-HAND
3   SIDE.
4       MR. WILSON:  I'M SORRY.
5                   EXAMINATION
6   BY MR. WILSON:
7   Q.  THAT'S CORRECT.  THERE'S A TELEPHONE POLE AND A TREE.  DO
8   YOU SEE THAT, DOCTOR?
9   A.  YES.
10  Q.  DID THE BARGE LAND ON TOP OF THAT TREE?
11  A.  OBVIOUSLY NO.
12  Q.  AND IT GOT IN THERE WITHOUT HITTING THAT TREE, DIDN'T IT,
13  DOCTOR?
14  A.  YES.
15      THE COURT:  THE COURT UNDERSTANDS THAT THIS IS THE SOUTH
16  BREACH.  IT PROBABLY HAS ABSOLUTELY NOTHING TO DO WITH THE
17  TELEPHONE POLE ON THE NORTH BREACH.  BUT, LET'S ROLL -- WE'LL GO
18  AHEAD.  I FIND IT ANNOYING, BUT GO AHEAD.  MOVE ON, COUNSEL.
19  MOVE ON.  MOVE ON.
20      MR. WILSON:  OKAY.  I'M JUST TRYING TO SHOW IT CAN COME
21  CLOSE TO AN OBJECT BUT NOT HIT IT.
22      THE COURT:  IT CAN COME CLOSE TO ANYTHING -- WELL,
23  THAT'S CERTAINLY TRUE.  IT PROBABLY DIDN'T DO ANYTHING ON THE
24  17TH STREET CANAL EITHER, NOT TO DENIGRATE THE POINT.
25                  EXAMINATION

1497

BY MR. WILSON:
Q.  REFERRING TO THE 17TH STREET CANAL, CAN WE GO TO
EXHIBIT 397, PHOTO 4.77.  AND, ACTUALLY, IT'S THE LONDON AVENUE
CANAL.
    WHAT IS THIS A PHOTOGRAPH OF, DOCTOR?
A.  IT SHOWS THE STRUCTURAL BREAK BETWEEN THE SHEET PILE AND THE
CONCRETE WALL.
Q.  AND IS THAT WHERE THE WATERSTOPS ARE?
A.  YES.
Q.  AND IF WE COULD GO TO 4.7 -- I'M SORRY, 4.72.  IF YOU
COULD -- AND THIS IS ALSO FROM DR. MARINO'S REPORT IN
EXHIBIT 397.
    IF WE COULD GET A LITTLE CLOSER HERE.
    WHAT IS THAT, DOCTOR?  IS THAT THE SHEET PILE?
A.  YES, YOU CAN SEE -- YOU CAN SEE THE BOTTOM OF THE SHEET
PILE.  THERE IS A CUTOUT AT THIS JOINT.
Q.  AND THE WALL IS STILL ATTACHED TO IT, CORRECT?  I MEAN, IT'S
STILL THERE, I SHOULD SAY?
A.  YES.
Q.  IF THERE WAS HYDROSTATIC PRESSURE ENOUGH FOR A WATERSTOP TO
FAIL, OKAY, THE HYDROSTATIC PRESSURE ALL ALONG A WALL IS SO
SUFFICIENT THAT A WATERSTOP COULD FAIL, WOULD YOU EXPECT THAT
JUST ONE WATERSTOP WOULD FAIL OR THAT THERE WOULD BE NUMEROUS
WATERSTOPS THAT FAILED IF THE HYDROSTATIC PRESSURE IS SUFFICIENT
ENOUGH?

1498

A.  IT WOULD DEPEND ON THE SITUATION.
Q.  OKAY.  OKAY.  LET ME ASK YOU THIS:  IF WE COULD GO TO --
IT'S ^ FROM THE CAR, DX 205, FIGURE 74.  THE TOP PHOTOGRAPH WOULD
BE A LITTLE BETTER, FIGURE 74.
    IF IT'S AS DEFENDANTS CONTEND, I WOULD LIKE YOU TO ASSUME
THAT A WALL IS WEAKENED IN AN AREA, IT'S JUST A STRUCTURAL
WEAKNESS, OKAY, AND THAT THERE IS A BARGE COMING ALONG THAT AREA,
AND IT KNOCKS INTO THE WALL.  WOULD THE WALL FAIL EASIER BECAUSE
THERE IS A WEAKNESS IN THAT AREA IF IT BANGS INTO THAT WALL?
A.  I MEAN, IF IT'S RIGHT AT THAT LOCATION.  I MEAN, IT'D HAVE
TO BE CLOSE ENOUGH TO THAT LOCATION FOR THAT TO OCCUR.
Q.  THANK YOU.
    YESTERDAY, YOU WERE ASKED ABOUT -- YOU DIDN'T KNOW THE SPEED
OR THE ANGLE OF THE BARGE, BUT YOU DO KNOW THE BARGE BROKE THE
WALL; ISN'T THAT TRUE, DOCTOR?
A.  THAT'S MY OPINION.
Q.  OKAY, THANK YOU.
    I'D LIKE TO GO TO FIGURE 2.16 OF DR. MARINO'S REPORT.  I
COULD PUT IT ON THE -- YOU GOT IT, BOB?  OKAY.
    THIS IS THE DIMENSIONS OF THE BARGE THAT'S AT ISSUE IN THIS
CASE, THE ING 4727; IS THAT CORRECT, DOCTOR?
A.  WHAT DID YOU SAY?
Q.  ARE THESE THE MEASURED DIMENSIONS OF THE ING 4727 BARGE
THAT'S AT ISSUE IN THIS CASE?
A.  YES.

1499

1  Q.  AND LOOKING AT THIS, IT APPEARS THAT THE BOTTOM OF THE
2  BARGE, I'LL CALL IT, OR THE LOWER HALF OF THE BARGE IS 12 FEET,
3  CORRECT?
4  A.  YES.
5  Q.  AND THE CAP OR THE COVERING IS 11 FEET?
6  A.  YES.
7  Q.  IT'S ALMOST HALF, THE TOP OF THAT COMPARED TO THE BOTTOM OF
8  IT, CORRECT?
9  A.  YES.
10 Q.  OKAY.  NOW, IF I COULD GO TO PHOTO 4.45 -- I THINK I'M
11 RIGHT.  YES, THAT SHOULD BE IT -- OF DR. MARINO'S REPORT.
12 ACTUALLY, BOB, LET ME PUT THIS ON THE ELMO.
13     OKAY.  NOW, YOU TOLD ME THAT THE COVER OR THE TOP OF THE
14 BARGE IS ALMOST HALF THE SIZE -- IS IT ALMOST THE SAME SIZE -- I
15 MIGHT HAVE REPHRASED IT.  IS THE TOP ALMOST THE SAME SIZE AS THE
16 BOTTOM, MEANING THE BOTTOM HALF --
17 A.  YES.
18 Q.  -- WHEN YOU LOOK AT IT?  ONE IS 12 FEET, ONE IS 11 FEET?
19 A.  YES.
20 Q.  THEY'RE ALMOST EQUAL IN SIZE, CORRECT?
21 A.  YES.
22 Q.  WHEN YOU LOOK AT THIS PHOTOGRAPH, DOCTOR, WHY IS IT THAT IT
23 DOESN'T APPEAR TO BE ABOUT HALF -- YOU KNOW, ABOUT THE SAME SIZE,
24 THE TOP AS COMPARED TO THE BOTTOM?
25 A.  IT WILL DEPEND UPON YOUR ANGLE OF VIEW.

1500

1  Q.  YOUR ANGLE OF VIEW OR YOUR PERSPECTIVE, CORRECT?
2  A.  YES.
3  Q.  SO IF SOMETHING IS BLOCKING, YOU MAY NOT SEE, OR IF YOU'RE
4  DOWN LOW, YOU MAY NOT SEE -- AND A LEVEE WALL IS IN FRONT OF YOU,
5  WOULD THAT CHANGE YOUR PERSPECTIVE?
6      THE COURT:  JUST A MINUTE.
7      MR. RAFFMAN:  I OBJECT TO THE HYPOTHETICAL.  IT ASSUMES
8  THAT THE VIEWER IS AT A LOCATION LOWER THAN THE BARGE.  IN THE
9  CONTEXT OF MR. VILLAVASSO, WHO IS LOOKING AT THE BARGE FROM THE
10 PUMP STATION, WHICH IS ELEVATED, THE HYPOTHETICAL QUESTION IS
11 EITHER IRRELEVANT OR --
12     THE COURT:  THE COURT WILL TAKE NOTE OF THE OBJECTION
13 AND STATE THAT THE QUESTION IS BASED ON FACTS CONTRADICTORY TO
14 WHAT HAS BEEN STATED TO THE COURT.  AND SUBJECT TO THAT
15 OBJECTION, I'LL ALLOW THE WITNESS TO ANSWER THE QUESTION.
16     MR. RAFFMAN:  THANK YOU, YOUR HONOR.
17     THE WITNESS:  CAN YOU REPEAT THE QUESTION, PLEASE.
18         EXAMINATION
19 BY MR. WILSON:
20 Q.  WELL, THE QUESTION REALLY IS BASED ON A PERSON'S
21 PERSPECTIVE, THINGS CAN LOOK DIFFERENT THAN WHAT THE REAL
22 MEASUREMENTS ARE; ISN'T THAT TRUE?
23     THE COURT:  THE COURT WILL TAKE JUDICIAL NOTICE.
24     MR. WILSON:  THANK YOU, YOUR HONOR.
25     THE COURT:  ALTHOUGH THE FIFTH CIRCUIT'S ^ CHERRY ABOUT

1501

1  IT, WE REALIZE IF WE LOOK AT AN OBJECT, SAY, FIVE MILES AWAY, IT
2  APPEARS SMALLER THAN IT REALLY IS.  I USE FIVE MILES SO I WON'T
3  UPSET ANYBODY IN THE CASE, BUT THE GENERAL PROPOSITION IS --
4          EXAMINATION
5  BY MR. WILSON:
6  Q.  EYEWITNESSES ARE JUST ONE OF THE MANY THINGS YOU HAVE
7  CONSIDERED TO GIVE OPINIONS IN THIS CASE; ISN'T THAT TRUE?
8  A.  YES.
9  Q.  I'D LIKE YOU TO ASSUME THAT THERE WAS TRIAL TESTIMONY BY A
10 MR. ADAMS WHO SAW WHAT HE DESCRIBED AS A LARGE OBJECT THAT LOOKED
11 LIKE A HOUSE IN THE CANAL BUMPING UP AGAINST THE WALL BEFORE IT
12 MADE A LOUD NOISE AND WENT THROUGH THE WALL.  WOULD THAT FURTHER
13 CORROBORATE YOUR ENGINEERING CONCLUSIONS IN THIS CASE?
14 A.  YES.
15 Q.  DOCTOR, IF THE BARGE HAD ENTERED THE PROTECTED SIDE OF THE
16 LEVEE AFTER IT HAD FLOODED, THERE WOULD BE WATER ON THE PROTECTED
17 SIDE OF THE LEVEE, CORRECT?
18 A.  YES.
19 Q.  BUT IF THE BARGE BROKE THE WALL BEFORE THE PROTECTED SIDE OF
20 THE LEVEE COULD FILL UP, THERE WOULD BE FRICTION ON THE BOTTOM OF
21 THE BARGE, WOULDN'T IT?  WOULDN'T THERE BE?  IF THERE IS NOT --
22 IF IT'S NOT MORE THAN TWO FEET OF WATER, BECAUSE THAT'S THE DRAFT
23 OF THE BARGE, CORRECT?
24 A.  I'M NOT SURE I UNDERSTAND THE QUESTION.
25 Q.  OKAY.  THE QUESTION IS:  IF THE BARGE BROKE THE WALL AND

1502

1  ENTERED SHORTLY THEREAFTER, IN YOUR OPINION WOULD THERE BE LESS
2  THAN TWO FEET OF WATER FOR THE BARGE -- IT WOULD HIT THE GROUND,
3  IT WOULDN'T GO VERY FAR IS WHAT I'M TRYING TO SAY, CORRECT?
4  A.  RIGHT.  IT WOULD BE OFF THE AVENUE OF WHERE THE VIOLENT RUSH
5  OF WATER WOULD BE, AS WELL.
6  Q.  ALL RIGHT.  OKAY.  I'M PUTTING BEFORE THE COURT PHOTO 4.2
7  FROM DR. MARINO'S REPORT.
8      DOCTOR, YOU SEE HOW THOSE HOUSES ARE STILL -- THE HOMES ARE
9  STILL STANDING BEHIND THE BARGE OVER THERE?
10 A.  YES.
11 Q.  WOULD THAT BARGE THAT WAS STUCK THERE PROVIDE PROTECTION FOR
12 THAT HOME FROM THE RUSHING WATERS?
13 A.  I WOULD THINK SO, YES.
14 Q.  IS THIS THE SECOND TIME YOU'VE EVER TESTIFIED IN A COURT OF
15 LAW, DOCTOR?
16 A.  YES.
17 Q.  YOU'VE WRITTEN OVER 70 ARTICLES IN THE SCIENTIFIC FIELD OF
18 GEOTECHNICAL ENGINEERING?
19 A.  YES.
20 Q.  TELL ME ABOUT -- YOU WERE ASKED BY THE NATIONAL ACADEMY OF
21 SCIENCE, I BELIEVE --
22 A.  YES.
23 Q.  -- AM I CORRECT?  TO DO WHAT, DOCTOR?
24 A.  I WAS ELECTED TO A BOARD OF CONSULTANTS TO EVALUATE A BREACH
25 OF AN IMPOUNDMENT IN KENTUCKY.  I BELIEVE IT KILLED SOME --

22  (Pages 1499 to 1502)

1503

1 SEVERAL INDIVIDUALS AS A RESULT, UNFORTUNATELY.
2 Q. I'M SORRY, I JUST DIDN'T HEAR YOU.  IT WAS SOMETHING IN
3 KENTUCKY.  WHAT DID YOU CALL IT?
4 A. IT WAS A -- IT WAS AN IMPOUNDMENT.
5 Q. YESTERDAY, DEFENSE COUNSEL ASKED YOU ABOUT A CRACKING BOOM,
6 OR A BOOM AND THEN A ROLLING THUNDER.  DO YOU REMEMBER HIM ASKING
7 YOU ABOUT BOOMS AT OTHER LEVEE LOCATIONS?
8 A. YES.
9 Q. DID ANY OF THOSE PEOPLE THAT TALKED ABOUT BOOMS SAY THAT
10 THEY THEN SAW A BARGE NEXT TO THE LEVEE WALL?
11 A. NO.
12 Q. DID ANY OF THEM SAY THEY HEARD A GRINDING OR A SCRAPING
13 NOISE?
14 A. NO.
15     MR. WILSON:  JUDGE, IF I COULD JUST TAKE A --
16     THE COURT:  YOU CERTAINLY MAY.
17     MR. WILSON:  THANK YOU, YOUR HONOR.  A FIVE-MINUTE
18 BREAK?
19     THE COURT:  OH, YOU WANT A FIVE-MINUTE BREAK?
20     MR. WILSON:  A TWO-MINUTE BREAK.  TWO-MINUTE BREAK.
21     THE COURT:  OH, A TWO-MINUTE BREAK, OKAY.  A TWO-MINUTE
22 BREAK TO DETERMINE IF THERE ARE ANY OTHER QUESTIONS?
23     MR. WILSON:  YES.
24     THE COURT:  OKAY.  LET'S GET TO IT THEN.
25     MR. WILSON:  SORRY, YOUR HONOR.

1504

1     THE COURT:  ALL RIGHT.
2         EXAMINATION
3 BY MR. WILSON:
4 Q. EARLIER YOU WANTED TO CLARIFY SOMETHING ABOUT THE SOIL
5 CHARACTERIZATIONS, WERE YOURS THE SAME AS ILIT AND IPET.  DO YOU
6 RECALL THAT?
7 A. NOT REALLY.
8 Q. WELL, LET ME ASK YOU THIS:  YOU REVIEWED THE CONCLUSIONS
9 REACHED IN ILIT AND IPET?
10 A. YES.
11 Q. DO YOU AGREE WITH THOSE CONCLUSIONS?
12 A. PARTS OF EACH OF THE REPORTS.
13 Q. BUT THE OVERALL CONCLUSIONS?
14 A. NO.
15 Q. AND WHY NOT?
16 A. BECAUSE I DON'T BELIEVE THAT SEEPAGE OR LATERAL STABILITY
17 WOULD BE THE LONE CAUSE OF THESE FAILURES.
18 Q. OKAY.  BEFORE -- I THINK THE JUDGE ASKED YOU THIS, IS THERE
19 ANY OTHER DOCUMENT THAT PLACES 81 A IN ANOTHER PLACE, AND YOU
20 ANSWERED "NO."  BUT, IN ACTUALITY, THERE WAS.  IT WAS THE FIRST
21 THING I SHOWED YOU.  IT HAD THE YELLOW HIGHLIGHT BAR; IS THAT
22 CORRECT?
23     THE COURT:  JUST A MINUTE.  COUNSEL, DO YOU HAVE AN
24 OBJECTION?  I WANT TO MAKE SURE YOU GET --
25     MR. RAFFMAN:  I THINK THAT COUNSEL HAS MISCHARACTERIZED

1505

1 THE QUESTION AND THE ANSWER THAT WAS ASKED.
2     MR. WILSON:  I WROTE IT DOWN, YOUR HONOR.
3     THE COURT:  OKAY.  I MAY HAVE ASKED THE QUESTION.
4 SOMEONE DID, AND IT MAY HAVE BEEN ME.  I THINK IT WAS.
5     MR. RAFFMAN:  I'LL WITHDRAW THE OBJECTION.  I THINK
6 THERE MAY BE SOME -- IT'S NEITHER HERE NOR THERE.  I'M SORRY.
7     THE COURT:  DO YOU WANT TO SHOW THE DOCUMENT?
8     MR. RAFFMAN:  THERE'S NO NEED.
9     THE COURT:  I'M ASKING FOR IT BECAUSE I RECALL THE --
10     MR. WILSON:  JUST FOR THE RECORD, THIS IS PART OF
11 DR. MARINO'S DEMONSTRATIVE POWERPOINT PRESENTATION.
12     THE COURT:  SLIDE 15.
13     MR. WILSON:  YEAH.  I ALSO BELIEVE IT'S IN HIS REPORT,
14 BUT, FOR THE RECORD, IT'S SLIDE 15 OF THE POWERPOINT.  AND IF YOU
15 WANT TO DO THE BLOWUP --
16     THE COURT:  WELL, I THINK COUNSEL DID QUESTION HIM ABOUT
17 THIS, AND IT SAID ADJUSTED.
18     MR. WILSON:  CORRECT.
19     THE COURT:  AND WE WERE TRYING TO DETERMINE WHAT
20 ADJUSTED MEANT.
21     MR. WILSON:  CAN WE BLOW UP WHAT IT SAYS ABOUT THE
22 MIDDLE SECTION SO IT'S CLEAR.
23     LOCATION ADJUSTED.  YOU'RE CORRECT, YOUR HONOR.
24     THE COURT:  AGAIN, THE QUESTION IS?
25         EXAMINATION

1506

1 BY MR. WILSON:
2 Q. THERE IS ANOTHER DOCUMENT FROM THE ORIGINAL 81 A BORING THAT
3 SAYS THAT IT WAS RELOCATED, CORRECT?
4 A. YES.
5     MR. RAFFMAN:  YOUR HONOR, I JUST WANTED THE RECORD TO BE
6 CLEAR.
7     THE COURT:  THE COURT UNDERSTANDS THE WORD "ADJUSTED"
8 DOES NOT NECESSARILY MEAN RELOCATED.  WE DON'T KNOW HOW MUCH.
9     MR. WILSON:  IT SAYS LOCATION.  YOU KNOW, I SAW IT IN
10 THE RECORD, AND I JUST WANTED TO CLARIFY IT FOR THE --
11     THE COURT:  RIGHT, AND IT WAS DISCUSSED ON
12 CROSS-EXAMINATION AS WELL.
13     MR. WILSON:  THANK YOU.
14         EXAMINATION
15 BY MR. WILSON:
16 Q. DO YOU AGREE THAT NO REASONABLE ENGINEER WOULD BUILD A LEVEE
17 WITH PERMEABLE MATERIAL?
18 A. I'M NOT LAUGHING AT YOU, SIR.  IF YOU LIVE IN NEW ORLEANS --
19 I DON'T KNOW ABOUT THE REST OF THE WORLD.
20     THE COURT:  GO AHEAD, YOU CAN ANSWER THE QUESTION THE
21 BEST WAY YOU CAN.
22     MR. WILSON:  GO AHEAD.
23     THE WITNESS:  I WOULDN'T THINK SO, NOT WITH PERMEABLE
24 MATERIAL, WITHOUT HAVING A CORE, A CLAY CORE OR A COVER OVER IT
25 OF IMPERMEABLE MATERIAL.

1507

```
 1              EXAMINATION
 2   BY MR. WILSON:
 3   Q.  WOULD YOU PUT UP 5.22 OF EXHIBIT 397.
 4        OKAY.  AND YOU TESTIFIED THAT YOU DIDN'T CONSIDER THE AGING
 5   OF THE SOIL AND SETTLING OF THE SOIL?
 6   A.  WELL, AGING IS A LITTLE DIFFERENT THAN THAT.  SOILS TEND TO
 7   GAIN STRENGTH SLOWLY OVER TIME.
 8   Q.  AND SO --
 9   A.  THERE ARE SOME OF THESE BORINGS THAT ARE 1965 VINTAGE, SO
10   YOU HAVE 35, 40 YEARS.
11   Q.  AND WHEN YOU USED THE STATISTICAL AVERAGING, AND YOU DIDN'T
12   TAKE THAT INTO CONSIDERATION, AND YOU DIDN'T TAKE INTO
13   CONSIDERATION ROOTS, YOU WERE BEING CONSERVATIVE, CORRECT,
14   DOCTOR?
15   A.  I BELIEVE SO, YES.
16   Q.  AND I WAS ASKING YOU ABOUT THE PROJECT THAT THE NATIONAL
17   ACADEMY OF SCIENCE HAD ASKED YOU TO WORK ON.  THAT WAS IN THE
18   NEWS.  IT HAD TO DO WITH A COAL MINE CONTAINING SLURRY THAT HAD
19   FAILED?
20   A.  YES.
21   Q.  AND THAT WAS INVOLVING SOILS IN A MAN-MADE STRUCTURE,
22   CORRECT?
23   A.  YES.
24        MR. WILSON:  I HAVE NOTHING FURTHER, YOUR HONOR.
25        THE COURT:  THANK YOU, SIR.  YOU MAY STEP DOWN.
```

1508

```
 1        THE WITNESS:  THANK YOU.  NICE TO MEET YOU.
 2        THE COURT:  NICE TO MEET YOU, SIR.  GOOD TRIP BACK IF
 3   YOU'RE LEAVING.  AND WE'RE ARE APPROXIMATELY 1 O'CLOCK.
 4        MR. WILSON:  I'M SORRY, YOUR HONOR.  I WOULD LIKE TO
 5   MOVE INTO EVIDENCE THE ITEMS THAT WE HAD CAPTURED.  I BELIEVE IT
 6   WAS 440 AND 441.
 7        THE COURT:  LET THEM BE ADMITTED.
 8        MR. WILSON:  AND 442.
 9        (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS,
10   EXHIBITS 440, 441 AND 442 WERE ADMITTED.)
11        THE COURT:  1:05.
12                  *  *  *
13
14
15              REPORTER'S CERTIFICATE
16     I, CATHY PEPPER, CERTIFIED REALTIME REPORTER, REGISTERED
     MERIT REPORTER, REGISTERED PROFESSIONAL REPORTER, CERTIFIED COURT
17   REPORTER OF THE STATE OF LOUISIANA, OFFICIAL COURT REPORTER FOR
     THE UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF LOUISIANA,
18   DO HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT
     TRANSCRIPT, TO THE BEST OF MY ABILITY AND UNDERSTANDING, FROM THE
19   RECORD OF THE PROCEEDINGS IN THE ABOVE-ENTITLED AND NUMBERED
     MATTER.
20
21              S/CATHY PEPPER
                CATHY PEPPER, CRR, RMR, CCR
22              OFFICIAL COURT REPORTER
                UNITED STATES DISTRICT COURT
23
24
25
```

24 (Pages 1507 to 1508)