1059

1    UNITED STATES DISTRICT COURT
2    EASTERN DISTRICT OF LOUISIANA
3
4
5    IN RE:  KATRINA DREDGING          *   Civil Action
     LIMITATION ACTION                 *
6    CONSOLIDATED LITIGATION           *   No. 05-4182
                                       *
7                                      *   Section K(2)
     PERTAINS TO:                      *
8    BARGE                             *   New Orleans, Louisiana
                                       *
9    MUMFORD, C.A. NO. 05-5724, AS *   June 30, 2010
     TO PLAINTIFFS JOSEPHINE           *
10   RICHARDSON AND HOLLIDAY           *   Afternoon Session
     JEWELERS, INC., ONLY              *
11   AND                               *
     BENOIT, C.A. NO. 06-7516, AS  *
12   TO PLAINTIFFS JOHN ALFORD AND *
     JERRY ALFORD ONLY                 *
13   * * * * * * * * * * * * * * *
14                   DAY SEVEN
             BENCH TRIAL BEFORE THE
15       HONORABLE STANWOOD R. DUVAL, JR.
            UNITED STATES DISTRICT JUDGE
16
17   APPEARANCES:
18   For the Plaintiffs:        Best Koeppel
                                BY:  LAURENCE E. BEST, ESQ.
19                              BY:  PETER S. KOEPPEL, ESQ.
                                2030 St. Charles Avenue
20                              New Orleans, Louisiana 70130
21
22   For the Plaintiffs:        Law Offices of Brian A. Gilbert
                                BY:  BRIAN A. GILBERT, ESQ.
23                              2030 St. Charles Avenue
                                New Orleans, Louisiana  70130
24
25
          JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA

## 1060

APPEARANCES:

For the Plaintiffs:     Wiedemann & Wiedemann
                        BY:  KARL WIEDEMANN, ESQ.
                        BY:  LAWRENCE WIEDEMANN, ESQ.
                        821 Baronne Street
                        New Orleans, Louisiana  70113


For the Plaintiffs:     Patrick J. Sanders, LLC
                        BY:  PATRICK J. SANDERS, ESQ.
                        3316 Ridgelake Drive
                        Suite 100
                        Metairie, Louisiana  70002


For the Plaintiffs:     Law Office of Richard T. Seymour,
                        P.L.L.C.
                        BY:  RICHARD T. SEYMOUR, ESQ.
                        1150 Connecticut Avenue N.W.
                        Suite 900
                        Washington, D.C.  20036-4129

For the Plaintiffs:     Khorrami, Pollard & Abir, LLP
                        BY:  SHAWN KHORRAMI, ESQ.
                        444 S. Flower Street
                        33rd Floor
                        Los Angeles, California  90071

For the Plaintiffs:     Wilson, Grochow, Druker & Nolet
                        BY:  LAWRENCE A. WILSON, ESQ.
                        233 Broadway
                        5th Floor
                        New York, New York  10279

For the Defendant:      Chaffe, McCall, L.L.P.
                        BY:  DEREK A. WALKER, ESQ.
                        BY:  CHARLES P. BLANCHARD, ESQ.
                        1100 Poydras Street, Suite 2300
                        New Orleans, Louisiana 70163

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1061

APPEARANCES:

For the Defendant:      Goodwin Procter, L.L.P.
                        BY:  JOHN ALDOCK, ESQ.
                        BY:  MARK RAFFMAN, ESQ.
                        BY:  ADAM CHUD, ESQ.
                        BY:  KIRSTEN ROBBINS, ESQ.
                        BY:  ERIC I. GOLDBERG, ESQ.
                        901 New York Avenue, NW
                        Washington, D.C. 20001

For the Defendant:      Sutterfield & Webb
                        BY:  DANIEL A. WEBB, ESQ.
                        650 Poydras Street, Suite 2715
                        New Orleans, Louisiana 70130

For the Defendant:      Lafarge North America, Inc.
                        BY:  PETER KEELEY, ESQ.
                        12950 Worldgate Drive
                        Herndon, Virginia  20170

Official Court Reporter:    Jodi Simcox, RMR, FCRR
                        500 Poydras Street
                        Room HB-406
                        New Orleans, Louisiana 70130
                        (504) 589-7780


Proceedings recorded by mechanical stenography, transcript
produced by computer.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1062

I N D E X

                                                    Page

MELVIN G. SPINKS

     Direct Examination                            1063
     Cross-Examination                             1163

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1063

| | |
|---|---|
| 12:41:27 | AFTERNOON SESSION |
| 12:41:27 | (June 30, 2010) |
| 12:41:28 | * * * * * |
| 13:25:17 | THE DEPUTY CLERK:  All rise.  Court's in session. |
| 13:25:33 | Please be seated. |
| 13:25:33 | THE COURT:  Sorry about the delay.  The court had a |
| 13:25:36 | phone conference at 1:00 that lasted longer than I wanted it |
| 13:25:40 | to. |
| 13:25:45 | MR. SEYMOUR:  Thank you, Your Honor.  My name is |
| 13:25:46 | Richard Seymour, and the plaintiffs call their next witness, |
| 13:25:50 | Melvin G. Spinks. |
| 13:25:53 | THE COURT:  Yes, sir. |
| 13:25:53 | (WHEREUPON, Melvin G. Spinks, having been duly sworn, |
| 13:25:53 | testified as follows.) |
| 13:26:07 | THE DEPUTY CLERK:  Please state your full name and |
| 13:26:07 | correct spelling for the record. |
| 13:26:22 | THE WITNESS:  Melvin G. Spinks.  M-E-L-V-I-N, last |
| 13:26:30 | name S-P-I-N-K-S. |
| 13:26:36 | DIRECT EXAMINATION |
| 13:26:37 | BY MR. SEYMOUR: |
| 13:26:37 | Q.  Please state your address for the record. |
| 13:26:40 | A.  12702 Secret Forest Court, Cypress, Texas 77429. |
| 13:26:52 | Q.  Mr. Snyder, would you please display Appendix A to Exhibit |
| 13:27:01 | 421? |
| 13:27:02 | A.  Yes.  Can I reference it in my document here? |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**1064**

| | |
|---|---|
| 1 | 13:27:06   Q.   Certainly. |
| 2 | 13:27:14   A.   I'm sorry.  Yes, Appendix A is my résumé with CivilTech |
| 3 | 13:27:19   Engineering. |
| 4 | 13:27:26   MR. SEYMOUR:  Could you please highlight the |
| 5 | 13:27:29   left-hand column, upper half? |
| 6 | 13:27:30   THE WITNESS:  This includes my education, my |
| 7 | 13:27:32   professional licenses, my technical skills in modeling, and my |
| 8 | 13:27:38   professional activities in terms of organizations. |
| 9 | 13:27:43   BY MR. SEYMOUR: |
| 10 | 13:27:43   Q.   Please describe your education. |
| 11 | 13:27:45   A.   I have a bachelor's and a master's degree in civil |
| 12 | 13:27:49   engineering from Texas A&M University.  My bachelor's was |
| 13 | 13:27:54   obtained in 1985; my master's in 1997 [sic], with a |
| 14 | 13:27:58   specialization in water resources engineering. |
| 15 | 13:28:02   Q.   I'm sorry.  Did you say 1997 or '87? |
| 16 | 13:28:05   A.   '87. |
| 17 | 13:28:08   Q.   And please go to the next section below that, the |
| 18 | 13:28:11   licenses. |
| 19 | 13:28:14   A.   I'm a licensed professional engineer in three states -- |
| 20 | 13:28:16   Texas, Oklahoma, and Louisiana -- since the early '90s. |
| 21 | 13:28:23   Q.   And the next section down below refers to computer |
| 22 | 13:28:27   modeling skills.  Could you please zoom in on that and explain |
| 23 | 13:28:32   what all this stands for -- I don't want to ask you about |
| 24 | 13:28:38   specific programs.  What is this all about? |
| 25 | 13:28:40   A.   I spent 23 years in hydrologic and hydraulic modeling for |

**1065**

| | |
|---|---|
| 1 | 13:28:49   various surface-water drainage systems.  And as a technical |
| 2 | 13:28:52   professional, one of the backgrounds is having experience in |
| 3 | 13:28:57   hydrologic and hydraulic models, and these are the symbols for |
| 4 | 13:29:01   typical models that are used in the type of work that I do. |
| 5 | 13:29:04   Q.   Have you been working with these programs, to the extent |
| 6 | 13:29:06   they were then in existence, for the last 23 years? |
| 7 | 13:29:09   A.   Yes. |
| 8 | 13:29:11   Q.   Did you use any of these programs in this particular case? |
| 9 | 13:29:16   A.   We reviewed a few of these programs, the information that |
| 10 | 13:29:20   was developed, and we also added to the skills in this |
| 11 | 13:29:24   particular project a new program called Sobek, S-O-B-E-K. |
| 12 | 13:29:31   Q.   Where does that come from? |
| 13 | 13:29:33   A.   It's from the Netherlands, Delft University. |
| 14 | 13:29:37   Q.   Why did you choose to use that program instead of one of |
| 15 | 13:29:41   the other programs that are up here on the screen? |
| 16 | 13:29:43   A.   Any time you begin a study or research project, you look |
| 17 | 13:29:46   at some of the tools that you would believe have the capability |
| 18 | 13:29:51   to perform the type of analysis, hydrology and hydraulics, |
| 19 | 13:29:56   specific for that project. |
| 20 | 13:29:59   And given that we had substantial breaching in a |
| 21 | 13:30:02   large area and wanted to understand the dynamics of those |
| 22 | 13:30:07   breaches and the flooding depths over time, we looked around at |
| 23 | 13:30:13   some of the previous research and felt that the Sobek model |
| 24 | 13:30:17   would be superior in its ability to predict the hydrologic and |
| 25 | 13:30:24   hydrology effects. |

**1066**

| | |
|---|---|
| 1 | 13:30:25   Q.   In what terms would it be superior? |
| 2 | 13:30:28   A.   In terms of being able to look at the stage of hydrographs |
| 3 | 13:30:32   at each location -- or any location, for that matter -- |
| 4 | 13:30:34   throughout the area.  And when I refer to the stage |
| 5 | 13:30:37   hydrographs, I'm referring to water levels over time.  And |
| 6 | 13:30:43   specific, in this case, would be for Hurricane Katrina's event. |
| 7 | 13:30:47   Q.   Do you mean a snapshot of the water level at a given |
| 8 | 13:30:51   location at a given time? |
| 9 | 13:30:52   A.   Yes. |
| 10 | 13:30:53   Q.   Does the Sobek software enable you to handle more complex |
| 11 | 13:30:58   data and do more complex analyses? |
| 12 | 13:31:02   A.   Yes.  I mean, it is a two-dimensional model in terms of |
| 13 | 13:31:07   its surface analysis.  And normally, when we're working with |
| 14 | 13:31:10   other agencies, such as the Federal Emergency Management |
| 15 | 13:31:16   Agency, a lot of times we're working with one-dimensional |
| 16 | 13:31:20   models, whether that's HEC-2 or HEC-RAS.  This particular model |
| 17 | 13:31:27   has some more robust numerical schemes in order to analyze the |
| 18 | 13:31:33   surface as a two-dimensional aspect. |
| 19 | 13:31:36   Q.   Are you satisfied as to whether it performed accurately? |
| 20 | 13:31:38   A.   Yes, I am. |
| 21 | 13:31:39   Q.   And did it perform accurately? |
| 22 | 13:31:41   A.   Yes, it did. |
| 23 | 13:31:43   Q.   Please zoom in on the next part of the left column, the |
| 24 | 13:31:49   "Professional Activities."  I see that the first entity listed |
| 25 | 13:31:53   is the American Society of Civil Engineers.  Have you held any |

**1067**

| | |
|---|---|
| 1 | 13:31:58   leadership positions within the local, state, or national |
| 2 | 13:32:00   organizations? |
| 3 | 13:32:02   A.   Yes.  All three in ASCE.  Of course, being a civil |
| 4 | 13:32:07   engineer, that's kind of the organization you fall to when |
| 5 | 13:32:09   you're getting your education.  And I continue to be involved |
| 6 | 13:32:13   in ASCE through the branch, the local chapter through the |
| 7 | 13:32:19   state, holding the role as the president of the eastern branch |
| 8 | 13:32:24   and various, also, officer positions within the branch level. |
| 9 | 13:32:27   Also, up to the Texas section level, I was -- I ran |
| 10 | 13:32:31   through the ranks up to vice president; and then on the |
| 11 | 13:32:34   national level, involved in several of the activities of ASCE |
| 12 | 13:32:40   as well as being the host of the 2001 national convention in |
| 13 | 13:32:42   Houston. |
| 14 | 13:32:45   Q.   In looking farther down on the sheet, you've got a |
| 15 | 13:32:47   reference to the Harris County Flood Control District Task |
| 16 | 13:32:52   Force.  Please explain that. |
| 17 | 13:32:55   A.   That is a position that you're nominated to and then |
| 18 | 13:33:01   approved by the commissioners of Harris County, and based on |
| 19 | 13:33:08   your level of expertise or adding to it as an oversight role, |
| 20 | 13:33:12   basically for the Harris County Flood Control District in the |
| 21 | 13:33:16   guidance of policy and the activities that that agency |
| 22 | 13:33:20   participates in. |
| 23 | 13:33:21   The Harris County Flood Control is a special district |
| 24 | 13:33:24   that was created to be a partner with the U.S. Army Corps of |
| 25 | 13:33:27   Engineers and major federal projects that are done in Harris |

**1068**

```
13:33:33   County.
13:33:33   Q.  Have you ever held an officer position within that body?
13:33:37   A.  Yes.  I actually chaired the -- task force for a
13:33:42   couple of years.
13:33:46        MR. SEYMOUR:  Mr. Snyder, would you please display
13:33:49   the top half of the second column?
13:33:54        THE WITNESS:  Yes.  You want me to describe my
13:33:56   background with CivilTech Engineering?
13:33:58   BY MR. SEYMOUR:
13:33:59   Q.  That's right.  But I'd like you to highlight those parts
13:34:03   that you consider most significantly related to the work that
13:34:07   you did in this case.
13:34:09   A.  Okay.  First of all, this first piece here -- and then
13:34:12   we'll move over to some of the projects as well, but my
13:34:15   background with CivilTech engineering is I've spent 23 years
13:34:19   with the firm.  I am the president of the firm.  I'm also the
13:34:22   managing principal.  I have several other principals within our
13:34:26   firm.
13:34:27        Part of my responsibility is twofold:  One is the
13:34:31   management responsibility; but also, I'm a working principal in
13:34:35   terms of doing projects related to the work that we do.
13:34:40   Q.  How many employees does the firm have?
13:34:42   A.  Close to 30.
13:34:44   Q.  Please continue.
13:34:48   A.  As far as my background has been for the last 23 years,
```
JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**1069**

```
13:34:52   it's really been in surface-water hydrology, hydraulics,
13:34:58   dealing with river systems.  It's very similar to what we're
13:35:01   doing here in Louisiana, looking at flooding situations within
13:35:05   an interior area.
13:35:07        I spent many years working on various projects.  I
13:35:10   think I list 200 here.  But most of our documents -- we are an
13:35:14   engineering firm.  We're documenting actual
13:35:18   infrastructure-related projects that are either going to be
13:35:22   built at that time or sometime in the future.
13:35:29        I have other experience as well, but those are a few
13:35:31   items.
13:35:33        Bob, can you go to some of the kind of experience
13:35:37   level?
13:35:37        What I'd just like to mention about some of my
13:35:44   experience related to hurricanes.  I'm very involved in the
13:35:44   aspect of looking at flooding and economic damages related to
13:35:48   hurricanes.  We've been very involved over the years, and
13:35:54   during Hurricane Ike, doing large-scale assessments of the
13:35:59   storm surge --
13:36:01        MR. SEYMOUR:  Just a second.  Could you display the
13:36:03   whole page, please?
13:36:04        THE WITNESS:  -- as well as putting together some
13:36:10   capabilities for municipality, being the city of Houston, for
13:36:14   the public in order to understand what the threat of a
13:36:17   hurricane would be.  We developed a Web site called
```
JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**1070**

```
13:36:20   www.houstonhidefromthewind, which allows our community to
13:36:29   prepare for the disaster.
13:36:31        We were heavily involved during Rita, during
13:36:35   Tropical Storm Edouard, and are engaged currently to look at
13:36:40   any future potential hurricanes in the area.
13:36:43        One of the projects that are of significance in
13:36:46   terms of federal-related projects, I probably have about seven
13:36:50   or eight different projects on this résumé here.  And I can try
13:36:54   to highlight it, if I can see it in front of me.
13:37:00        But let me go to the next page, Bob.
13:37:02        I think, Your Honor, when you get older, there's
13:37:17   so many things you did, you don't know unless you make lists of
13:37:19   them anymore.  But I believe I highlighted it.  Okay.
13:37:47        Listed there is the White Oak Bayou Federal
13:37:51   Flood Control Project, Section 21 1F, with the Harris County
13:37:56   Flood Control District.  This is a federal project that
13:37:58   encompasses over 300 square miles of area in order to establish
13:38:03   the reduction of flooding damages in the area.
13:38:07        These types of federal studies that are
13:38:09   conducted with the U.S. Army Corps of Engineers look at all
13:38:14   sorts of flood-control reduction measures:  Levees,
13:38:18   channelization, the size of the areas to be very large
13:38:24   detention systems.
13:38:27        So we go through an extensive array of various
13:38:30   measures to reduce damage.  Similar to some of the activities
```
JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**1071**

```
13:38:35   that we're looking to into this project:  Levees, falls, things
13:38:42   of that nature.
13:38:43   BY MR. SEYMOUR:
13:38:43   Q.  Is it fair to say that part of your work has been the
13:38:46   analysis of past failures in flood-control efforts?
13:38:51   A.  A lot has to do with flooding because every -- when we're
13:38:56   looking at, certainly, new projects, it's to fix past flooding
13:39:01   situations, things in the area that did not work or the aged
13:39:06   that need to be replaced.  So, yes.
13:39:11   Q.  Is it also fair to say that some of your work involves
13:39:14   preventative efforts to try to make sure, as much as you can,
13:39:19   that flooding does not occur in the future?
13:39:21   A.  Yes.  We're currently engaged with -- actually, with
13:39:26   Galveston County in the full recovery after Hurricane Ike.
13:39:31   We're actually planning the island's recovery system, and we'll
13:39:35   be part of a team that's looking at what we're referring to as
13:39:39   the "Ike Dike," one of the large storm-surge protection
13:39:43   systems.
13:39:45   Q.  Is that "Ike" as is I-K-E, as in the hurricane in general?
13:39:50   A.  Yes, Hurricane Ike.
13:39:52   Q.  Please turn to page 5 of your résumé.  There's three and a
13:39:55   half pages of projects there.  Turn to page 5.  And in the
13:40:06   left-hand column, you have a listing of litigation expert
13:40:08   services.  About how much of your firm's income comes from
13:40:14   litigation-related work?
```
JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1072

```
13:40:16   A.   Our firm started in 1997, up to present, and you'll see
13:40:21   probably about ten or so litigation cases that I have taken on.
13:40:27   And on an average basis, it's probably less than 5 percent of
13:40:32   our work.
13:40:34   Q.   Is there any case that you've worked on that you think
13:40:36   relates most closely to the type of work you did in this case?
13:40:41   A.   Actually, there's one here that's not highlighted as well,
13:40:47   but it has to do with, in fact, a federal project that we're
13:40:51   doing, but it's called the White Oak Bayou litigation case.
13:40:56   It's a flood event that occurred in 2004 in that 300 homeowners
13:41:08   have filed a lawsuit against the Harris County Flood Control
13:41:11   District.
13:41:12   Q.   In the cases in which you've been an expert witness, were
13:41:16   you ever found not qualified?
13:41:17   A.   No.
13:41:18   Q.   In the cases in which you've been an expert witness, to
13:41:22   the extent you're aware, were you ever found not credible?
13:41:26   A.   No.
13:41:27   Q.   Have you personally gone to the area that you studied in
13:41:32   this case?
13:41:33   A.   Yes.  I spent quite a bit of time, probably a little over
13:41:38   a week of time, a few days initially, going into the entire
13:41:43   area and visited, looking at the physical features, the land
13:41:46   uses, the types of information that we would include in our
13:41:51   model.  And then, over a period of time, going back out and
```

## 1073

```
13:41:56   re-verifying and just kind of seeing some of the changes that
13:42:00   occurred after Katrina.
13:42:02   Q.   You mentioned earlier that you worked in both hydrology
13:42:05   and hydraulics.  Could you give a laymen's understanding -- or
13:42:12   excuse me, give an understanding that a layman could understand
13:42:15   of the difference between hydrology and hydraulics?
13:42:19   A.   Well, yes.  The hydrology part of the field, it relates to
13:42:25   the understanding of precipitation, as that precipitation falls
13:42:32   on the earth, the accumulation of the precipitation, and the
13:42:36   concentration of it into our waterways.  Okay.  So, in terms of
13:42:44   hydrology, what you're predicting is flow, discharge, like the
13:42:49   flow over the levee system.
13:42:54         In terms of hydraulics, you're dealing with the flow
13:42:58   of that water on the earth's surface, the hydraulics:
13:43:03   Determining depths, water depths, velocities.
13:43:09         MR. SEYMOUR:  Thank you, sir.
13:43:11         Your Honor, plaintiffs offer Mr. Spinks as an
13:43:14   expert in the field of civil engineering, hydrology, and
13:43:17   hydraulics.
13:43:19         MR. CHUD:  Your Honor, Adam Chud for Lafarge.  We
13:43:20   don't object.  We'll have discussion before the day's over
13:43:21   about some things that go to weight.
13:43:25         THE COURT:  All right.  The Court accepts Mr. Spinks
13:43:27   as tendered.
13:43:30         MR. SEYMOUR:  Thank you, Your Honor.
```

## 1074

```
13:43:55   BY MR. SEYMOUR:
13:43:55   Q.   Did you create a model of the flooding of the Lower Ninth
13:43:58   Ward and parts of St. Bernard Parish?
13:44:01   A.   Yes, we did.  We created a simulation model that's based
13:44:07   on the Sobek-1D2D.
13:44:12   Q.   You mentioned before that some flooding modeling programs
13:44:17   are a 1-D analysis, and Sobek is a 2-D analysis.  What is the
13:44:23   difference between 1-D and 2-D?
13:44:26   A.   One-dimensional is basically including the discharge and
13:44:30   the flow down a single channel section.  Okay.  You can only
13:44:37   model in one direction.  In terms of two-dimensional, you can
13:44:44   model the depths in two directions.  So you have the ability to
13:44:49   gain information with the two-dimensional model.
13:44:59   Q.   Did you form your opinions before you were retained in
13:45:02   this case?
13:45:03   A.   No.
13:45:05   Q.   Did you wait to form your opinions until you had examined
13:45:08   the available evidence?
13:45:11   A.   Yes.
13:45:21         MR. SEYMOUR:  Your Honor, we have a set of
13:45:24   demonstrative slides for Mr. Spinks showing how the building
13:45:50   blocks of his analysis were put together, but we think it may
13:45:52   make sense first to take a short tour of his report to look at
13:45:53   the building blocks themselves, and then the demonstratives may
13:45:54   more easily be understood.
```

## 1075

```
13:45:55   THE COURT:  All right, sir.
13:45:56         MR. SEYMOUR:  Mr. Snyder, would you please put on the
13:45:56   screen page 1 of the report, the table of contents, and the
13:45:58   next page.
13:45:58   BY MR. SEYMOUR:
13:45:58   Q.   Without getting into too much detail, could you please
13:46:00   describe the major divisions of your report?
13:46:05   A.   Yes.  In any engineering investigation or type of study
13:46:08   like this, we'll issue a report that documents, basically, the
13:46:11   study's objective, some information related to the issues at
13:46:16   hand -- and, of course, that's where Section 1, the
13:46:21   introduction, comes in -- and any of our prior research, such
13:46:25   as the investigative studies that were previously performed for
13:46:32   Hurricane Katrina.
13:46:34         Our report then goes into the details of the type of
13:46:38   modeling, its approach, that we did -- and in this case, to
13:46:45   determine the flood elevation and stage hydrographs throughout
13:46:49   the area -- and it will also include, then, some verification
13:46:53   and a statement of conclusions, which is listed here as well.
13:47:01         So we try to be as comprehensive in providing as much
13:47:06   information for the reader to understand.
13:47:07   Q.   Does part 2 of your report explain how you put together
13:47:11   your model?
13:47:13   A.   It includes our model inputs, yes.
13:47:16   Q.   And in part 3 of your report?
```

## 1076

1  13:47:19  A.  Presents our findings and some verification.

2  13:47:24  Q.  What do you mean "verification"?

3  13:47:27  A.  The verification in terms of what we do is that we model

4  13:47:31  the flood elevations at particular locations, and we look at

5  13:47:37  our results in comparison to the evidence in terms of

6  13:47:40  eyewitness observations, stopped clocks, various evidence that

7  13:47:46  would relate to what actually happened on that particular

8  13:47:50  event.

9  13:47:54      And so that's where model verification comes in.

10 13:47:57  Q.  You check your theory against the real world?

11 13:48:01  A.  Yes.

12 13:48:06  Q.  And what is part 4 of your report?

13 13:48:13  A.  One of the things that we did in this particular study is

14 13:48:17  look at independently the flooding related from MRGO, or the

15 13:48:24  Mississippi River Gulf Outlet, breaches versus the flooding

16 13:48:28  related to the IHNC, or the Industrial Canal, breaches, so

17 13:48:31  we're able to separate some of the information for our

18 13:48:39  understanding.

19 13:48:40  Q.  And your conclusions are in part 5 and your references are

20 13:48:44  in part 6.

21 13:48:46      Could you please turn to the next page, page 2?

22 13:48:51      There are some terms that are used here in the list

23 13:48:54  of figures that I'd just like to clarify for the record.

24 13:48:57  Figure 10 refers to "Interior Hydrographs."  What is that?

25 13:49:04  A.  As I mentioned to you, the model or eyewitness information

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1077

1  13:49:10  can provide flood elevations or evidence related to a flood

2  13:49:17  elevation at a particular location over time.

3  13:49:22  Q.  And Figure 13, there's reference to "HWMs."  Is that high

4  13:49:26  water marks?

5  13:49:28  A.  Yes.

6  13:49:33  Q.  And in Figures 15 through 19, it refers to "Computed Stage

7  13:49:42  Hydrographs."  Does that simply refer to what your model says

8  13:49:45  would be the water levels at given locations at given times?

9  13:49:52  A.  Yes.

10 13:49:53      MR. SEYMOUR:  Please display Exhibit 1.

11 13:49:59  BY MR. SEYMOUR:

12 13:50:01  Q.  Exhibit 1 to the report.  What is an orthophotograph?

13 13:50:09  A.  Okay.  What this actually represents is the study area,

14 13:50:13  first of all, for the St. Bernard Parish.  This represents the

15 13:50:17  area which we looked at in terms of our model simulation.  I

16 13:50:24  know you want to define, I believe, for Your Honor, what a

17 13:50:27  digital orthophoto is; and basically, that is a corrected image

18 13:50:34  of a picture that's taken from an airplane down at the ground.

19 13:50:40      And any time an airplane takes a picture of the

20 13:50:43  ground, it's -- because the camera expands out, it skews some

21 13:50:50  of the orientation, I guess, of the photo, and then it's --

22 13:50:53  what they refer to as correcting the photo is orthophotography.

23 13:50:59  That's about all I know on it.

24 13:51:01  Q.  Basically, you're saying that the camera takes a picture

25 13:51:05  at an angle, and it has to be corrected so it's straight down?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1078

1  13:51:08  A.  It's a corrected map for measurement purposes, yes.  And

2  13:51:12  that's a picture from the sky of the earth's surface.

3  13:51:16  Q.  And you have a large -- the exhibit is a large folded map

4  13:51:20  inside your report, is it not?

5  13:51:24  A.  Yes.

6  13:51:26      MR. SEYMOUR:  Please display Exhibit 2.

7  13:51:26  BY MR. SEYMOUR:

8  13:51:30  Q.  What is this?

9  13:51:32  A.  That's also a digital orthophoto for pre-Katrina showing

10 13:51:41  our study area.  In terms of what our study area is, again,

11 13:51:46  this is the IHNC.  This is the Mississippi River.  This is the

12 13:51:50  Lower Ninth Ward area.  We'll get into more detail related to

13 13:52:00  the description of the study here in a few minutes.

14 13:52:06      MR. SEYMOUR:  I should say, Your Honor, that the

15 13:52:07  exhibit numbers being referred to are exhibits to Mr. Spinks'

16 13:52:12  report, which is Plaintiffs' Exhibit 421.

17 13:52:17      THE COURT:  Thank you very much.

18 13:52:17  BY MR. SEYMOUR:

19 13:52:18  Q.  Are these high-resolution photographs?

20 13:52:21  A.  Yes.

21 13:52:23  Q.  Okay.  All right.

22 13:52:26      MR. SEYMOUR:  Mr. Snyder, could you try to zoom in to

23 13:52:32  show the degree of resolution?  And can you zoom in further?

24 13:52:52      Thank you.

25 13:52:54      Please put up Exhibit 3 to Plaintiffs'

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1079

1  13:52:57  Exhibit 421.

2  13:53:01  BY MR. SEYMOUR:

3  13:53:02  Q.  What is this?

4  13:53:04  A.  This is also an aerial digital orthophoto, but actually

5  13:53:10  during Katrina.  And if I'm looking at it, actually after

6  13:53:16  Katrina when the water's flowing back out into the IHNC, this

7  13:53:19  area.

8  13:53:21  Q.  Is there anything that you can point to that shows that

9  13:53:24  the water is flowing out?

10 13:53:26  A.  That right there.

11 13:53:29  Q.  Okay.

12 13:53:30  A.  I'll erase it, but...

13 13:53:31  Q.  Please describe for -- let's make a little circle around

14 13:53:35  that, and we'll mark that for the record.

15 13:53:38      But please describe in words what you are marking.

16 13:53:41  A.  That is the south breach location, and it shows --

17 13:53:47      THE COURT:  Have you made your circle yet, sir?

18 13:53:50  Okay.

19 13:53:55      THE WITNESS:  That is the south breach location of

20 13:53:58  the IHNC east wall.

21 13:54:02      THE COURT:  Just for the record, in this photograph

22 13:54:07  there are little panes, P-A-N-E-S, that appear that are either

23 13:54:17  square or rectangular, that are not in the other pictures.

24 13:54:22  Could you explain what that is?

25 13:54:24      THE WITNESS:  I'm sorry, Your Honor.  I didn't follow

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1080

| | |
|---|---|
| 1 | 13:54:25 you on that question. |
| 2 | 13:54:26 THE COURT: If you look at the picture, it's not |
| 3 | 13:54:28 conclusive, it's not clear, and there seems to be little panes, |
| 4 | 13:54:36 P-A-N-E-S, segmented panes, that are a reflection of some sort. |
| 5 | 13:54:44 To me, at least. |
| 6 | 13:54:45 THE WITNESS: Yes. I see. It's kind of the glare |
| 7 | 13:54:49 edge in all these panels? |
| 8 | 13:54:51 THE COURT: Yes, panels. |
| 9 | 13:54:52 THE WITNESS: I'm not sure that isn't some of |
| 10 | 13:54:57 the production of the image just when it's being printed or |
| 11 | 13:55:01 captured in this PDF. |
| 12 | 13:55:05 But, yes, what happens is that digital |
| 13 | 13:55:09 orthophotos, we don't have one picture that covers this area. |
| 14 | 13:55:14 It has to be spliced together. So what it is, this is probably |
| 15 | 13:55:20 1-meter data, and each panel, what it looks to me -- I'm going |
| 16 | 13:55:26 to draw the line -- each panel comes in separately into our |
| 17 | 13:55:30 geographic information system. |
| 18 | 13:55:32 And so we're pulling into our geographic |
| 19 | 13:55:36 information system different panel points, or panels. |
| 20 | 13:55:40 THE COURT: And the reason that wasn't in the other |
| 21 | 13:55:42 photographs is because of the scope of this one? The other two |
| 22 | 13:55:48 didn't have that phenomenon, as I recall. The first two we |
| 23 | 13:55:55 looked at. |
| 24 | 13:55:56 THE WITNESS: Right. |
| 25 | 13:55:56 THE COURT: And why? |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1081

| | |
|---|---|
| 1 | 13:55:58 THE WITNESS: I can't tell you why. |
| 2 | 13:55:59 THE COURT: All right. |
| 3 | 13:56:00 BY MR. SEYMOUR: |
| 4 | 13:56:01 Q. Where did you get this, sir? |
| 5 | 13:56:02 A. We created this in our office, our GIS group. |
| 6 | 13:56:07 Q. If you look in lower right-hand corner credit, it says |
| 7 | 13:56:12 that the data was downloaded from N-O-A-A? Is that correct? |
| 8 | 13:56:16 A. Actually, I can't see that part. But there's a map |
| 9 | 13:56:22 reference to its source. |
| 10 | 13:56:30 MR. SEYMOUR: Okay. Could you please restore the |
| 11 | 13:56:32 prior picture, Mr. Snyder? Thank you for that. |
| 12 | 13:56:35 And then we'd ask the clerk to capture that, |
| 13 | 13:56:39 please. |
| 14 | 13:56:39 BY MR. SEYMOUR: |
| 15 | 13:56:43 Q. Oh, please redraw the circle around the outflow of water |
| 16 | 13:56:46 from the... |
| 17 | 13:56:50 A. (COMPLIES.) |
| 18 | 13:56:50 Q. Thank you. |
| 19 | 13:56:51 MR. SEYMOUR: And could that image be captured? I |
| 20 | 13:56:54 believe it's Plaintiffs' Exhibit 443. |
| 21 | 13:56:59 THE DEPUTY CLERK: 443, for the record. |
| 22 | 13:57:09 MR. SEYMOUR: Okay. Mr. Snyder, would you please |
| 23 | 13:57:11 display Exhibit 4 to Plaintiffs' Exhibit 421. |
| 24 | 13:57:17 BY MR. SEYMOUR: |
| 25 | 13:57:18 Q. What is this photograph? |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1082

| | |
|---|---|
| 1 | 13:57:21 A. It is a post-Katrina orthophoto that was prepared, again, |
| 2 | 13:57:30 after Katrina. |
| 3 | 13:57:31 Q. And what is the reason for this picture? |
| 4 | 13:57:35 A. To be able to evaluate the changes in the land surfaces |
| 5 | 13:57:42 after Katrina's event. |
| 6 | 13:57:48 Q. Please display Exhibit 5 to Plaintiffs' Exhibit 421. |
| 7 | 13:57:56 A. This is the LiDAR data that is developed, again, within |
| 8 | 13:58:05 our GIS system. LiDAR being light detention and ranging. It's |
| 9 | 13:58:09 a digital elevation model that references the elevations within |
| 10 | 13:58:15 our study area. |
| 11 | 13:58:15 The different colors, if we look into the Lower Ninth |
| 12 | 13:58:19 Ward here, the elevation is about a negative 10, and the |
| 13 | 13:58:32 symbols, or the legend, is down here. |
| 14 | 13:58:34 Q. Down at the bottom of the slide? |
| 15 | 13:58:35 A. Right. So we have elevations ranging from a negative 10 |
| 16 | 13:58:39 upwards to about positive 8 feet in elevation to 10 feet. |
| 17 | 13:58:47 Q. And are those the elevations of interest in your study? |
| 18 | 13:58:52 A. Yes. This is probably a good exhibit right now just to |
| 19 | 13:58:58 talk about some of the key physical features and the |
| 20 | 13:59:01 boundaries. If I could spend a couple minutes on the study |
| 21 | 13:59:08 area. |
| 22 | 13:59:08 Q. Please do, sir. |
| 23 | 13:59:09 A. First of all, let me make a mention that the study area |
| 24 | 13:59:12 that I've mentioned is a -- basically, it's composed of the |
| 25 | 13:59:19 St. Bernard folder and basin, and it's protected by a |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1083

| | |
|---|---|
| 1 | 13:59:23 continuous ring of levees. The ring of levees run on the south |
| 2 | 13:59:29 along the Mississippi River. And I'm just going to draw that |
| 3 | 13:59:31 on this map here. |
| 4 | 13:59:35 Then a floodwall along the IHNC to the -- and that |
| 5 | 13:59:42 goes to the Gulf Intercoastal Waterway, and it runs northeast |
| 6 | 13:59:46 along the Gulf Intercoastal Waterway, down through the |
| 7 | 13:59:51 Mississippi River Gulf Outlet, referred to as "the MRGO," and |
| 8 | 13:59:53 then back down. And I believe this is the Chalmette extension |
| 9 | 14:00:00 levee. |
| 10 | 14:00:01 So this entire study area encompasses about |
| 11 | 14:00:07 50,000 acres of land. It's referred to as the "New Orleans |
| 12 | 14:00:11 Hurricane Protection System." |
| 13 | 14:00:14 Internal to this ring of levees around the entire |
| 14 | 14:00:20 area is an interior levee called the 40-Arpent Levee. I |
| 15 | 14:00:30 believe that's built by the state. This interior levee, the |
| 16 | 14:00:36 40 Arpent, separates the northeastern half, which is called by |
| 17 | 14:00:46 reference a 32,000-acre wetland area. That's all this area |
| 18 | 14:00:51 here from MRGO -- oops. |
| 19 | 14:01:06 Q. Okay. That's -- |
| 20 | 14:01:06 A. That's the 32,000-acre wetland. |
| 21 | 14:01:07 What the 40-Arpent Levee does is protect the more |
| 22 | 14:01:10 populated areas in the southwest region, which is on the south |
| 23 | 14:01:16 here. All these, which are the populated areas. |
| 24 | 14:01:20 Q. Okay. And this is where you've placed the arrow? |
| 25 | 14:01:23 A. Yes -- well, I mean the south part, that's composed of |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**1084**

```
1   14:01:27   about 18,000 acres of land.  The north piece is about
2   14:01:30   32,000 acres, but -- can I clear this?
3   14:01:35       THE COURT:  Yes, you can.
4   14:01:36   BY MR. SEYMOUR:
5   14:01:37   Q.  But before you do that, could you please mark the eastern
6   14:01:41   edge of the study area?
7   14:01:45   A.  Yes.  I want to clear that so I can do this.
8   14:01:48   Q.  Okay.  We don't want you to clear this because we want to
9   14:01:51   capture this.  But before you clear it, I'd like you to mark
10  14:01:54   the eastern part of the study area.
11  14:01:59   A.  This whole study area is part of our study area.  I think
12  14:02:04   maybe what you're referring to is that there is a physical --
13  14:02:07   there is a feature that bisects our study area called Paris
14  14:02:13   Road.
15  14:02:13   Q.  Yes.
16  14:02:14   A.  Paris Road. runs, basically, and divides, from the levee
17  14:02:20   standpoint, an area west to the IHNC and then, of course the
18  14:02:27   area east.  And that was kind of one of the things I wanted to
19  14:02:30   highlight in this ground image.
20  14:02:35   Q.  And the mark that you made to indicate Paris Road, is the
21  14:02:40   one line that bisects both the northern and the southern
22  14:02:44   portions; is that correct?
23  14:02:45   A.  Correct.
24  14:02:46       MR. SEYMOUR:  Okay.  Would you please capture that
25  14:02:48   exhibit as No. 444?
```

**1085**

```
1   14:02:51       THE COURT:  I know you need this for the record, but
2   14:02:53   as I'm sure you are aware, the Court is extraordinarily
3   14:02:58   familiar with this.
4   14:03:00       MR. SEYMOUR:  Yes.  I know Your Honor is.  I'm
5   14:03:02   thinking of the record on appeal.
6   14:03:04       THE COURT:  Absolutely.  I understand that, and you
7   14:03:06   certainly need to do that.
8   14:03:09       MR. SEYMOUR:  Thank you.  Now I can clear it.
9   14:03:12       THE WITNESS:  I just really want to make a mention
10  14:03:14   here is that, as I've talked about the ground elevations
11  14:03:19   between 8 and 10 feet along the Mississippi River, what you'll
12  14:03:23   see on this is that -- again, Paris Road being here, is that
13  14:03:27   you see the ground surface through here being higher along just
14  14:03:37   west of Paris Road, and that's -- I wanted to make sure we
15  14:03:41   noted that at this point.
16  14:03:45   BY MR. SEYMOUR:
17  14:03:46   Q.  Paris Road is a higher elevation than the area surrounding
18  14:03:52   it?
19  14:03:53   A.  Yes.  Forward the 40-Arpent Levee.
20  14:03:57       THE COURT:  Some of the deponents are smart enough to
21  14:04:00   mark the grid.  Go ahead.
22  14:04:01       MR. SEYMOUR:  Yes, Your Honor.
23  14:04:04       Please turn to Exhibit 6, Mr. Snyder.
24  14:04:09       THE WITNESS:  This is a work map of the entire study
25  14:04:15   area.
```

**1086**

```
1   14:04:17       Mr. Snyder, if you can zoom in on about this
2   14:04:20   area here.  Keep going.  A little bit more.
3   14:04:36       We have in the work map that's going to identify
4   14:04:39   all the key information that we relied upon or that we gathered
5   14:04:44   in the study.  So any time we're referencing an I.D. of
6   14:04:54   somebody or a high water mark, you'll be able to go to
7   14:04:57   Exhibit 6 as the exhibit of reference.
8   14:05:02       Can you zoom back out?  Let's just go to the
9   14:05:09   legend and the list of witnesses.
10  14:05:12   BY MR. SEYMOUR:
11  14:05:12   Q.  This is one of the circles that you had right there, is
12  14:05:17   that where you're referring to as a marker?
13  14:05:21   A.  Go ahead on the legend and then...
14  14:05:25       What the legend has is a -- the various information
15  14:05:31   that we gathered.  You can see additional witnesses, 911 calls,
16  14:05:36   IPET witness data, Team Louisiana stopped clocks, pump
17  14:05:42   stations, survey points, IPET high water marks, FEMA high water
18  14:05:47   marks, hydrographic locations, levee breach, federal levee,
19  14:05:53   state levees, and then some general information and
20  14:05:56   characteristics, like the Paris boundary, where the canals are
21  14:06:01   located and names.
22  14:06:02       Also, on this exhibit is the list of eyewitnesses
23  14:06:06   that we have relied upon in gathering some evidence in terms of
24  14:06:11   flooding information during Hurricane Katrina with an I.D.
25  14:06:17   number.
```

**1087**

```
1   14:06:24   Q.  Is it fair to say that, with the use of Exhibit 6, you can
2   14:06:27   track the particular type of information by person and by
3   14:06:30   whether it's a 911 call, an IPET witness, an ILIT witness, that
4   14:06:36   sort of thing?
5   14:06:36   A.  Yes.
6   14:06:37   Q.  Is there anything else you'd like to point out about this
7   14:06:40   exhibit before we move to the next?
8   14:06:41   A.  No.
9   14:06:42   Q.  Please turn to Exhibit 7.  Please explain.
10  14:06:53   A.  This exhibit is the modeled water depth.  This is what we
11  14:07:00   simulated during Hurricane Katrina and the depths at 9:00 a.m.,
12  14:07:05   CDT.  We'll talk more about our results later, but I'm just
13  14:07:12   introducing a map at this point.
14  14:07:14       Bob, if you want to highlight just this map so we can
15  14:07:19   show what I mean by depth location.
16  14:07:31       The upper or Lower Ninth Ward area, our model
17  14:07:38   results at 9:00 a.m. would be presented here as a depth of
18  14:07:43   11.2 feet at that particular location, 9.8 at that location.
19  14:07:48       THE COURT:  And the IHNC in reference to that, would
20  14:07:51   be where, sir?
21  14:07:55       THE WITNESS:  Bob, zoom out just a little.
22  14:07:59       THE COURT:  Okay.  There you go.  Thank you.
23  14:08:03       THE WITNESS:  The IHNC is right to the left.
24  14:08:07       MR. SEYMOUR:  If you zoom in to where we were before,
25  14:08:10   I would like to capture that image.
```

1088

```
1   14:08:20        Please capture that image as Exhibit 445.
2   14:08:26        Actually, the -- before you capture that, let's clear those
3   14:08:31   because we no longer have the arrows pointing at the right
4   14:08:35   places.  Could you please replace the arrows?  Thank you.
5   14:08:43        Now that will be 445.
6   14:08:45   BY MR. SEYMOUR:
7   14:08:50   Q.  I mean, sorry to Exhibit 8.
8   14:09:01   A.  A similar map at a different time, at 9:50.  And we'll
9   14:09:06   talk more about this exhibit in the presentation.  But it also
10  14:09:11   has the flood depths.
11  14:09:13   Q.  In the lower left corner of the screen, you have a type of
12  14:09:17   color-coded depth chart or gauge; is that correct?
13  14:09:21   A.  Yes.
14  14:09:22   Q.  Is it a fair inference that the more intensely blue in the
15  14:09:27   area is the more water it's under?
16  14:09:30   A.  Yes.
17  14:09:32        Can you zoom up on that area?
18  14:09:35        That's the color code for the maps that we're
19  14:09:38   looking at depths less than .5 feet; within a half-foot to 1
20  14:09:45   foot; 1 to 2 feet; 2 to 3 feet; and then greater than 10 feet,
21  14:09:50   and the gradation getting deeper in color as the depths get
22  14:09:55   deeper.
23  14:09:57        MR. SEYMOUR:  Very well.  Please show appendix --
24  14:10:01   we've already seen Appendix A, which is the résumé.  Please put
25  14:10:06   Appendix B on the screen.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1089

```
1   14:10:10   BY MR. SEYMOUR:
2   14:10:11   Q.  Please explain that.
3   14:10:15   A.  In our model development, we rely on various pieces of
4   14:10:20   information.  One of the critical parts of our hydrologic and
5   14:10:26   hydraulic model, and the Sobek model in this case is to
6   14:10:29   populate it with an accurate digital elevation model, and
7   14:10:34   that's basically the ground topology.
8   14:10:37        In doing that type of data development, there's
9   14:10:40   various things that we have to look at and verify in terms of
10  14:10:49   the accuracy.  The first piece is actually when we do the data
11  14:10:54   development, what we relied upon is the 2002 LiDAR, which is a
12  14:10:58   15-foot digital elevation model.  We've also have included USGS
13  14:11:05   1/3 Arc DEM.  We have pre-Katrina (2000) 1-foot Levee LiDAR
14  14:11:14   Survey, and then we have Post-Katrina 2-foot Levee LiDAR
15  14:11:15   Survey.  And then we actually have IPET's Field Survey Data.
16  14:11:22        So in terms of data development, we utilized quite a
17  14:11:26   bit of information that was available through IPET and others
18  14:11:31   in terms of determining ground topology, levee heights,
19  14:11:37   floodwall heights, things of that nature.
20  14:11:40        MR. SEYMOUR:  Mr. Snyder, would you please zoom in on
21  14:11:42   the bottom half of the page, beginning with number 1, 2, 3.
22  14:11:58   BY MR. SEYMOUR:
23  14:11:58   Q.  What are these referring to?  Did you have to make changes
24  14:12:01   in the information that you were able to obtain from the
25  14:12:09   government?
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1090

```
1   14:12:10   A.  It's not making changes; it's actually correcting
2   14:12:13   information.  There is -- in terms of this case, there
3   14:12:16   was one panel of the DEM data missing, which we supplemented
4   14:12:20   with USGS data.  We had to convert the 2002 LiDAR 15-foot DEM.
5   14:12:30   The data conversion, up to the reference data that everybody --
6   14:12:37   or all the other information is based upon, which is the North
7   14:12:40   American Vertical Datum of 1988, 2004.65 adjustment.
8   14:12:49        And then for MRGO, we had to reconstruct the levee
9   14:12:56   crest profile based on the -- on the survey data information
10  14:13:01   for -- to study all the breaches along the MRGO.
11  14:13:06   BY MR. SEYMOUR:
12  14:13:07   Q.  Why was it necessary to reconstruct the profile?
13  14:13:12   A.  To construct the profile?
14  14:13:14   Q.  To reconstruct it.
15  14:13:16   A.  To reconstruct it.  It was necessary because, again, we
16  14:13:19   had pre-Katrina's information, which is 2002.  And then we had
17  14:13:23   2005 data related to MRGO's levee profile.
18  14:13:29        During the 2002 period to 2005, you have subsidence
19  14:13:39   issues that came into effect that we needed to account for as
20  14:13:42   well as also some differences in areas that we had to make sure
21  14:13:49   that we -- they were accurate based on the survey data.
22  14:14:01   Q.  Now, while we're talking about LiDAR, there was a LiDAR
23  14:14:05   picture that was used in the cross-examination of Dr. Marino.
24  14:14:09        MR. SEYMOUR:  Mr. Snyder, could you please put that
25  14:14:11   up on the screen?
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1091

```
1   14:14:13   BY MR. SEYMOUR:
2   14:14:56   Q.  Mr. Spinks, do you know when this picture was taken?
3   14:14:59        MR. CHUD:  Your Honor, objection.  This is not in
4   14:15:01   Mr. Spinks' report.  He doesn't have an opinion on it in his
5   14:15:05   report.  It's beyond the scope.
6   14:15:09        MR. SEYMOUR:  Your Honor, the cross-examination of
7   14:15:09   Dr. Marino had not taken place at the time this report was
8   14:15:12   submitted in June of 2009.  But the witness is familiar with
9   14:15:15   LiDAR data and has information about this.  It's necessary to
10  14:15:19   fill out the record.
11  14:15:20        THE COURT:  Well, it seems that Dr. Marino would have
12  14:15:23   been the appropriate person.  It was in his testimony.  He's
13  14:15:28   getting -- let me make -- it's giving what he did
14  14:15:34   reference various elevations based on LiDAR data and his
15  14:15:38   adjustment of that data; is that correct?
16  14:15:40        MR. SEYMOUR:  Yes, Your Honor.
17  14:15:45        THE COURT:  And he did not utilize this in his
18  14:15:46   report; is that correct?
19  14:15:50        MR. SEYMOUR:  That's correct.  But he did a study
20  14:15:52   of the heights of floodwalls as part of his report that he's
21  14:15:56   just testified to, and there's some observations that would be
22  14:16:00   useful in the record with respect to the information here.
23  14:16:03   There's also a hydrological point that is being made --
24  14:16:10        THE COURT:  Again, we have his report.  He's saying
25  14:16:12   this is beyond the scope of his report.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1092

| | |
|---|---|
| 1 | 14:16:14 | He did opine, obviously, on this subject of |
| 2 | 14:16:19 | floodwall heights. |
| 3 | 14:16:21 | MR. SEYMOUR:  Yes, sir. |
| 4 | 14:16:22 | THE COURT:  This was not one of the items he utilized |
| 5 | 14:16:26 | in making that opining.  What you want to do now is to, in |
| 6 | 14:16:35 | essence, mitigate this document in some way through this |
| 7 | 14:16:40 | witness.  I understand that. |
| 8 | 14:16:52 | If he didn't use it, it's not part of his |
| 9 | 14:16:56 | report, I'm not sure -- if he didn't rely on it at all, I'm not |
| 10 | 14:17:01 | sure if you're opening up a box that you may be sorry you |
| 11 | 14:17:05 | opened when the defense experts testify, because I'm trying to |
| 12 | 14:17:09 | be even-handed about this when I do this. |
| 13 | 14:17:13 | So understand that once you open it, I can't |
| 14 | 14:17:15 | then close it for the other side.  I'm wrestling with all of |
| 15 | 14:17:20 | this as I'm thinking about it. |
| 16 | 14:17:22 | MR. SEYMOUR:  Yes, sir.  We'll take the thing down, |
| 17 | 14:17:24 | but I do want to ask Mr. Spinks one general question. |
| 18 | 14:17:29 | THE COURT:  Just also remember that when their |
| 19 | 14:17:31 | experts testify, they will be -- I will try to apply the same |
| 20 | 14:17:36 | protocol. |
| 21 | 14:17:37 | MR. CHUD:  Yes, Your Honor. |
| 22 | 14:17:40 | BY MR. SEYMOUR: |
| 23 | 14:17:40 | Q.  Mr. Spinks, when one is looking at an aerial photograph, |
| 24 | 14:17:44 | you had one of your exhibits that showed the outflow of the |
| 25 | 14:17:47 | water after the hurricane, and then you could identify that as |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1093

| | |
|---|---|
| 1 | 14:17:51 | being a post-hurricane picture because of the outflow of water |
| 2 | 14:17:55 | and give some idea of the timing of it; is that correct? |
| 3 | 14:18:01 | A.  Yes.  That's the discharge out of the Lower Ninth Ward |
| 4 | 14:18:06 | back into the IHNC. |
| 5 | 14:18:07 | Q.  And how is an outflow of water ordinarily shown in an |
| 6 | 14:18:10 | aerial photograph as it's taking place?  We saw sort of a |
| 7 | 14:18:15 | whitish tail of water coming out in that one picture.  Is that |
| 8 | 14:18:18 | how one generally recognizes it, or are there other things to |
| 9 | 14:18:23 | look for? |
| 10 | 14:18:24 | A.  That's generally recognized. |
| 11 | 14:18:42 | MR. SEYMOUR:  Please put Appendix C on the screen. |
| 12 | 14:18:46 | BY MR. SEYMOUR: |
| 13 | 14:18:46 | Q.  Please explain what you have here. |
| 14 | 14:18:47 | A.  This appendix, which all our data assumptions are usually |
| 15 | 14:18:51 | documented in our report as an appendix, and this includes a |
| 16 | 14:18:55 | discussion of how we arrived at the various model inputs, such |
| 17 | 14:19:02 | as Manning Roughness Coefficients, that documents the land uses |
| 18 | 14:19:08 | that we based our opinion on, and then how we computed rainfall |
| 19 | 14:19:12 | losses.  So it's going to give the reader specific information |
| 20 | 14:19:17 | related to, again, the data inputs. |
| 21 | 14:19:22 | In this particular case, what you have here is |
| 22 | 14:19:25 | Manning Roughness Coefficients, which are based upon the type |
| 23 | 14:19:29 | of land uses and our interpretation of the type of frictional |
| 24 | 14:19:35 | losses associated with those land uses based on our years of |
| 25 | 14:19:40 | experience in doing flood-related work. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1094

| | |
|---|---|
| 1 | 14:19:42 | Q.  Why do you need to take roughness coefficients into |
| 2 | 14:19:46 | account in the model? |
| 3 | 14:19:47 | A.  It's a required model input in order to calculate water |
| 4 | 14:19:51 | depths as well as the speed, the progression of the flood wave |
| 5 | 14:19:58 | would be. |
| 6 | 14:19:58 | Q.  Is it fair to say that the function of a roughness |
| 7 | 14:20:03 | coefficient is to determine how quickly water will tend to flow |
| 8 | 14:20:06 | over a particular kind of surface? |
| 9 | 14:20:08 | A.  Or how slow or quick, yes, based on roughness. |
| 10 | 14:20:14 | Q.  Now, when you use one of these Manning Roughness |
| 11 | 14:20:18 | Coefficients, is it like a cooking recipe, where you simply |
| 12 | 14:20:24 | look up a table and then automatically apply them; or is it |
| 13 | 14:20:27 | something else? |
| 14 | 14:20:28 | A.  In terms of a hydraulic engineer, it takes a lot of |
| 15 | 14:20:31 | experience and expertise in determining Manning Coefficients. |
| 16 | 14:20:37 | And particularly in the field of modeling, when you do |
| 17 | 14:20:40 | flood-related modeling, it's one of those parameters that we |
| 18 | 14:20:45 | hear the word "calibration." |
| 19 | 14:20:46 | It's usually one of those parameters within our |
| 20 | 14:20:50 | hydraulics models that becomes calibrated.  Because, again, as |
| 21 | 14:20:55 | an engineer in the field, you have a idea, based on the |
| 22 | 14:21:03 | representation of the type of land use, of the Manning |
| 23 | 14:21:06 | coefficient in a grid. |
| 24 | 14:21:09 | Q.  For how many years have you been using Manning |
| 25 | 14:21:11 | coefficients? |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1095

| | |
|---|---|
| 1 | 14:21:13 | A.  Have I? |
| 2 | 14:21:14 | Q.  That's right. |
| 3 | 14:21:18 | A.  Since my practice in school.  For a long time. |
| 4 | 14:21:25 | Q.  Please turn to page 2 of that appendix.  And could you |
| 5 | 14:21:33 | zoom on the legend -- the legend and the graph at the top. |
| 6 | 14:21:41 | A.  I think any time when you do a flood simulation model, and |
| 7 | 14:21:46 | in this particular instance, lots of data is looked at.  We |
| 8 | 14:21:50 | just talked about the digital elevation model.  I don't want to |
| 9 | 14:21:55 | discount how much work and time goes into accurately defining |
| 10 | 14:21:58 | the topography and making sure that you have accuracy and |
| 11 | 14:22:05 | completeness. |
| 12 | 14:22:06 | Also, part of the analysis is a thorough |
| 13 | 14:22:09 | understanding of the land uses that existed prior to the |
| 14 | 14:22:12 | hurricane of 2005.  And what these color codes are is a |
| 15 | 14:22:20 | representation of the various land-use types.  The first one is |
| 16 | 14:22:24 | residential.  The next one is commercial. |
| 17 | 14:22:27 | THE COURT:  Well, I can read those as part of the |
| 18 | 14:22:30 | record.  We don't need to read them.  I can see they're |
| 19 | 14:22:33 | different and they're different colors, and we would use those |
| 20 | 14:22:36 | appropriately in determining any coefficients for referencing |
| 21 | 14:22:41 | hydraulics. |
| 22 | 14:22:43 | BY MR. SEYMOUR: |
| 23 | 14:22:44 | Q.  Please turn to the next page of Appendix C.  What are |
| 24 | 14:22:49 | hydrologic soil groups and how do they relate to modeling? |
| 25 | 14:22:53 | A.  In terms of predicting direct runoff -- and what direct |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**1096**

1  14:22:59  runoff is is that precipitations, like is the rain out of the
2  14:23:04  sky, in terms of how much water runs over the land is called
3  14:23:07  direct runoff.  And what a soil group is, or a hydrologic soil
4  14:23:13  group is, is the type of soil that either is going to rapidly
5  14:23:19  intake water into the soil or slowly.
6  14:23:22       The green color here -- and if you go on to the
7  14:23:30  legend, really, we have C and D, which is low permeability
8  14:23:39  soils.  Basically, you don't have a lot of infiltration into
9  14:23:42  the ground with hydrologic soil groups C and D, and so you have
10 14:23:45  a lot more runoff potential for those types of soils.
11 14:23:49  Q.  In other words, the rain does not soak into the ground; it
12 14:23:52  runs off?
13 14:23:53  A.  Versus, yeah, like an A group or a B group, which has more
14 14:23:57  infiltration, much more sandy.  D is typical of clay-type of
15 14:24:01  soils.
16 14:24:02  Q.  Please turn to the next page.  What is a curve number?
17 14:24:12  A.  Based on the soil group and, again, the land-use type
18 14:24:14  that's out there, a curve number is the sign which in terms of
19 14:24:24  direct runoff, and computing direct runoff, that is also
20 14:24:27  another factor.
21 14:24:29  Q.  Is it derived from the information we spoke of earlier, or
22 14:24:32  is it an independent set of information?
23 14:24:34  A.  It's based upon the type land use -- residential,
24 14:24:40  commercial -- and the degree of development.
25 14:24:42  Q.  Please turn to Appendix D.  And what is this?  Turn to the

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**1097**

1  14:24:55  next page.
2  14:24:58  A.  One of the pieces of information that we relied upon is
3  14:25:04  IPET's time line of flooding.  And this is an excerpt out of
4  14:25:13  IPET's Volume IV, which presents their time line of flooding in
5  14:25:19  the Lower Ninth Ward and St. Bernard Parish.  And this
6  14:25:22  particular exhibit that's on here talks -- or IPET has
7  14:25:25  identified flooding as early as 4:30 to 5:30 from the
8  14:25:30  eyewitnesses within the Lower Ninth Ward that was caused by the
9  14:25:35  failure of a portion of IHNC floodwall.
10 14:25:39       And there's other times within IPET's
11 14:25:41  evaluation, and it's kind of hard for me to read this, but 5:30
12 14:25:47  to 6:00, it identifies some critical information in terms of
13 14:25:52  overtopping of the IHNC as well.
14 14:25:57  Q.  Did you feel bound by IPET's conclusions?
15 14:26:01  A.  No.  Any time that you start a study of this nature, you
16 14:26:06  really want to gather all the investigative studies that have
17 14:26:11  been done, and you really want to take a look -- I mean, these
18 14:26:14  are experts -- a lot of times in the research field and
19 14:26:18  academics field -- that are doing these investigative studies,
20 14:26:21  and you want to take a look at what the type of information
21 14:26:27  that they've been able to gather and assumptions and certainly
22 14:26:31  their conclusions.
23 14:26:33       So very important for us to get a background
24 14:26:36  knowledge before we actually develop our simulation models.
25 14:26:42  Q.  Would it be fair to say that you consider their facts but

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**1098**

1  14:26:45  did not feel yourself bound by their conclusions?
2  14:26:48  A.  Correct.  Our conclusions are independent.
3  14:26:59  Q.  If you turn to page --
4  14:27:01       MR. SEYMOUR:  Turn to Appendix E, please.  And then
5  14:27:08  blow that up so it can be more readable.
6  14:27:12  BY MR. SEYMOUR:
7  14:27:12  Q.  Okay.  Now, is Appendix E a large fold-out inside your
8  14:27:18  report?
9  14:27:22  A.  Yes.  What this matrix represents on the left-hand
10 14:27:28  column -- Bob, if you can kind of zoom in up here, we'll work
11 14:27:35  across -- is an eyewitness that was deposed and that we were
12 14:27:41  able to gather information in terms of their recollection of
13 14:27:48  the flood levels or, actually, the storm event during Hurricane
14 14:27:53  Katrina.
15 14:27:54       And if you look at this first one, it's actually this
16 14:27:58  Terry Adams, the source of information.  You have the time line
17 14:28:02  up on the top figure.  But if you go across, you'll see that
18 14:28:06  this particular -- the evidence from the deposition of
19 14:28:12  Mr. Ernest Adams mentioned at 5:00 a.m.:  "Woke up at
20 14:28:17  5:00 a.m., carpet on the floor was wet."  And we documented the
21 14:28:20  page number within his deposition where this is located at.
22 14:28:26       And in this particular instance, we assigned a data
23 14:28:30  point of N1 to that, knowing that his carpet was wet at about
24 14:28:35  5:00 a.m.
25 14:28:36       Can we still pan across?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**1099**

1  14:28:39       Okay.  Again, this top line is still Terry Adams
2  14:28:45  here.  Mr. Adams mentioned at 5:30, got on roof, somewhere
3  14:28:51  between 5:20 and 5:30.  Actually, he mentioned that he got on
4  14:28:57  the roof sometime between 5:20 and 5:30, and we assigned a time
5  14:29:03  of 5:30.  And that's, again, on page 78 of his deposition.
6  14:29:06       We also acknowledge that he says in the deposition:
7  14:29:09  "See barge upward," and that's at page 78.  "Water about at
8  14:29:14  car-door level, 4 feet."  Page 83.  We were able to assign that
9  14:29:18  a data point at 6:00.
10 14:29:24  Q.  Is it correct to say that one individual can have multiple
11 14:29:27  data points?
12 14:29:27  A.  Yes.  It's wherever we could -- we felt that the
13 14:29:31  observation of the eyewitness account could provide some
14 14:29:37  information on the flood levels that we could correlate with,
15 14:29:40  we assigned a value to that.
16 14:29:43       Can you keep going?
17 14:29:47       Also, on this table in our report is the location of
18 14:29:51  this eyewitness account.  In this particular case, this is for
19 14:29:57  the north breach, but it has the distance from the north breach
20 14:30:00  400 feet; the ground elevation at his structure being negative
21 14:30:06  3; the data -- or data collection, which is, again, his
22 14:30:13  deposition in this case, the reference, and a comment that he
23 14:30:18  had made:  "The slab is 2-foot high."  The map I.D. number of
24 14:30:27  1, and then a map layer called additional witness, which is
25 14:30:31  really just one of our key information for our GIS.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**1100**

1  14:30:38  Q.  For your what?

2  14:30:39  A.  For our GIS, or geographical information system.  It's

3  14:30:43  just a map of the area.

4  14:30:44  Q.  Is that same code of N1 assigned to the various maps you

5  14:30:48  have showing the locations of information?

6  14:30:50  A.  Yes.

7  14:30:51  Q.  So it's possible to trace an individual, where the

8  14:30:54  individual appears on each map, and then see all the data on

9  14:30:57  this individual in Appendix E?

10  14:30:59  A.  Yes.  Either through the data point number or this map

11  14:31:12  number that I just referenced this -- right in that column, map

12  14:31:12  I.D.

13  14:31:13  Q.  And map layer, the rightmost column?

14  14:31:18  A.  I'm sorry.  Repeat that.

15  14:31:21  Q.  I see that it is.

16  14:31:22       This is information for the north breach.  Do you

17  14:31:26  have information for the south breach later in the chart?

18  14:31:28  A.  Yes.

19  14:31:28       Can you go back, Bob, to the first piece, real quick?

20  14:31:41  I want to make sure that, in this table, it's clear

21  14:31:46  that the -- all the eyewitness information is listed as far as

22  14:31:52  the source from which individual on the left-hand side.  We've

23  14:31:57  even included IPET's information, and some other key

24  14:32:00  information as well, within this data table.

25  14:32:03  I assume we will go over this data during -- later in

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**1101**

1  14:32:07  the presentation.

2  14:32:11  Q.  Would you please display Appendix F?

3  14:32:18  A.  Given the evidence from the observations -- this is a

4  14:32:22  flood simulation time line and notes, so it can help the reader

5  14:32:27  understand the time, the surge heighth within the IHNC, some

6  14:32:35  event information at that particular time, the modeled water

7  14:32:39  depth at that location at that time, and witness information

8  14:32:44  that we have related to that time.

9  14:32:50       So it can give you quite a bit of information about

10  14:32:53  what was happening at that particular time.  And as you can see

11  14:32:59  on the left-hand, we have 4:00, 5:15, and 5:30, and key

12  14:33:05  information.  It helps us to keep a lot of information straight

13  14:33:10  as we begin the modeling process.

14  14:33:16  Q.  There are bracketed numbers after these entries, such as a

15  14:33:21  bracketed "1" for Mr. Villavaso.  Do those correspond to the --

16  14:33:24  are they, like, footnotes or end notes with reference that you

17  14:33:29  have at the end of Appendix F?

18  14:33:33  A.  Yes.  I think there's a note on here that says, "Brackets

19  14:33:37  indicate reference number as listed in the report."

20  14:33:42  Q.  Please display Appendix G.  What is this appendix?

21  14:33:54  A.  It's a reference to all the high water marks that we were

22  14:33:57  able to obtain, either from IPET or other sources of

23  14:34:02  information, for the entire study area, as well as along the

24  14:34:07  MRGO and the IHNC.

25  14:34:12  Q.  In the first column for HWM underscore I.D., what do these

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**1102**

1  14:34:19  letters indicate?

2  14:34:20  A.  High water mark I.D., which is the I.D. of the high water

3  14:34:24  mark, its location in terms of latitude and longitude, the

4  14:34:31  elevation of the high water mark referenced in terms of NAVD88

5  14:34:39  2004.65, and then the source of information.

6  14:34:44       THE COURT:  It's fairly self-explanatory.

7  14:34:54  BY MR. SEYMOUR:

8  14:34:54  Q.  I was actually looking for the type of KLA-USGS versus LA.

9  14:34:56  Can you explain those codes.

10  14:34:58  A.  They're different high water marks throughout the area.

11  14:35:01  Q.  Okay.  Please turn to Appendix H.  What is that?

12  14:35:10  A.  This includes a technical paper on depth versus damage

13  14:35:16  curves.

14  14:35:17       There's not a lot said in the report about this.  We

15  14:35:20  put it in an appendix, because one of the things that we do

16  14:35:24  quite a bit in our field of practice is the ability to compute

17  14:35:27  damages based on depth versus damage functions.

18  14:35:32       The U.S. Army Corps of Engineers, as well as some

19  14:35:37  other agencies, have developed quite a few different types of

20  14:35:41  curves to represent the percent flooding damage -- the percent

21  14:35:43  damage you would get based on the depth of flooding in a

22  14:35:50  structure, a home, a business, whatever it may be.

23  14:35:53  Q.  Please turn to the third page of the appendix.  The

24  14:36:04  preceding page had one-story buildings.  This has two or more

25  14:36:08  stories.  Is the chart at the top which you're referring to in

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**1103**

1  14:36:11  terms of the depth damage curve?

2  14:36:13  A.  Yes.

3  14:36:15  Q.  For purposes of applying this depth damage curve, how long

4  14:36:21  does a dwelling have to have that amount of flooding in order

5  14:36:25  to have the amount of damage which is stated here?

6  14:36:30  A.  These curves are not based on any duration of flooding or

7  14:36:41  saltwater.  But if you need to get those specific curves, you

8  14:36:41  can obtain those as well from the Corps.  These are actually

9  14:36:44  the standard national curves that are use throughout the

10  14:36:48  country.

11  14:36:49  Q.  So if you have any flooding for any length of time to that

12  14:36:53  degree, that would be the percentage of damage the Corps of

13  14:36:55  Engineers uses; is that correct?

14  14:36:58  A.  Yes.  On a national basis.

15  14:37:05  Q.  And please turn to Appendix I.

16  14:37:13  A.  That is a sensitivity analysis that we performed in order

17  14:37:18  to evaluate different breaching times for the north and the

18  14:37:23  south IHNC breaches.

19  14:37:25  Q.  We'll get more into that later.

20  14:37:28       Please turn to Appendix J.

21  14:37:39  A.  The plaintiff locations are shown on this particular map.

22  14:37:43  Three of the plaintiffs, John and Jerry Alford, the address is

23  14:37:47  shown on this map, their location.  They're located close to

24  14:37:51  the north breach of the IHNC.

25  14:37:54  Josephine Richardson is located south of North

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**1104**

1  14:37:58  Claiborne Road, west of the railroad tracks, and south of the
2  14:38:03  breach location -- I didn't mean to do that.
3  14:38:06         And then the business for Jacob Glaser down Perez,
4  14:38:11  the past the railroad tracks but before Paris Road.
5  14:38:20  Q.  Please go to the next page.  Please explain how to read
6  14:38:23  this.
7  14:38:28  A.  These are the results for our model simulation of the
8  14:38:31  water depth versus time at those -- at each -- for this
9  14:38:36  particular plaintiff, being John and Jerry Alford.  What we're
10  14:38:40  able to determine through our flood simulation model is the
11  14:38:43  depth of water over time, depth being in terms of the
12  14:38:51  elevation, and NAVD, you'll see 2, 4, 6 on this of the graph,
13  14:39:00  and then versus time at 5:00 a.m., 6:00 a.m., 7:00 a.m. and
14  14:39:05  throughout that period.
15  14:39:06         What this graph shows is at -- again, John and Jerry
16  14:39:11  Alford are located right close to the north breach.  You'll see
17  14:39:15  that the IHNC floodwaters were really building in depth close
18  14:39:23  to the 12 feet prior to 10:00 a.m. and the mixing of water
19  14:39:30  between the IHNC and MRGO at their location.
20  14:39:33         So we're able to determine with the flood simulation
21  14:39:40  model the level of flooding associated with the IHNC flood
22  14:39:43  waters and then the combination of the two.
23  14:39:47  Q.  Okay.  Is the zero point for water depth ground level, or
24  14:39:51  is the zero point the mean sea level from the NAVD88 data?
25  14:39:59  A.  Actually, I take this back.  I'm sorry.  This is depth.

**1105**

1  14:40:02  This is not elevation.  This is depth above the ground, at the
2  14:40:06  surface.
3  14:40:09         MR. SEYMOUR:  Would you please display page 13 of the
4  14:40:46  report?  Would you please highlight part 2.1, the basic
5  14:40:55  modeling assumptions?
6  14:40:57  BY THE WITNESS:
7  14:41:01  Q.  Please explain these assumptions in the creation of your
8  14:41:10  model.
9  14:41:11  A.  Okay.  Any time you're conducting any flood simulation,
10  14:41:15  there are certain assumptions that must be made.  These are
11  14:41:16  mathematical models that, again, you're trying to predict a
12  14:41:20  real-world event.
13  14:41:23         So these models have to have certain engineering
14  14:41:25  judgments made.  And what -- this lists here are all our
15  14:41:29  assumptions; first being that wave overtopping is not
16  14:41:32  considered directly in the model, in the Sobek model.
17  14:41:37         But the reason also -- it is included in storm surge
18  14:41:43  hydrographs at some points along the model, but in terms of the
19  14:41:51  IHNC, that it would be insignificant because the breach timing
20  14:41:56  was before the actual wave overtopping or splashing would have
21  14:42:00  been occurring at 6:00 a.m.  So that's the first assumption.
22  14:42:05         MR. CHUD:  Your Honor, I have to object to the
23  14:42:07  opinion -- the new opinion about the time of wave overtopping
24  14:42:11  in the Industrial Canal which is not in the report and not an
25  14:42:15  opinion he's given before.

**1106**

1  14:42:16         THE COURT:  Okay.  This 2.1 is where, sir?  Is
2  14:42:20  that --
3  14:42:21         MR. SEYMOUR:  That's on page 13 of his report.  He's
4  14:42:21  explaining how -- the handling of data, but there's a
5  14:42:28  clarification.  You may or may not want to make the objection
6  14:42:32  after the clarification.  But let me ask another question.
7  14:42:37         THE COURT:  Which one are we reading, sir?
8  14:42:40         MR. SEYMOUR:  He was referring to the first bullet
9  14:42:42  point.
10  14:42:42         THE COURT:  "Overtopping by waves is not taken into
11  14:42:47  account directly, by when levee erosion occurred due to wave
12  14:42:52  overtopping, this is taken into account in the crest
13  14:42:52  elevation."
14  14:42:52         THE WITNESS:  Yes, sir.
15  14:42:53  BY MR. SEYMOUR:
16  14:42:53  Q.  Are you referring to the water levels being higher than
17  14:42:55  the level of the floodwall, or are you referring to splashing?
18  14:42:59  A.  Wave overtopping is when the wave is over the top.
19  14:43:03  Q.  That's what other people would call a splash?
20  14:43:07  A.  Yes.
21  14:43:08         THE COURT:  What's the objection, sir?
22  14:43:09         MR. CHUD:  The objection is that there's no opinion
23  14:43:11  in the report about the time that the wave overtopping
24  14:43:14  commenced in the Industrial Canal.
25  14:43:15         THE COURT:  He's reading from his report right now,

**1107**

1  14:43:16  which is in evidence.  Was there a question beyond him reading
2  14:43:19  this or --
3  14:43:21         MR. SEYMOUR:  No, just --
4  14:43:22         THE COURT:  I'm not sure I understand your objection.
5  14:43:25         MR. CHUD:  I heard the witness say, when describing
6  14:43:25  this paragraph, that wave overtopping had commenced at 6:00 in
7  14:43:29  the morning, and I don't read this last sentence in the report
8  14:43:32  as giving an --
9  14:43:33         THE COURT:  By "wave overtopping," he's talking about
10  14:43:37  splashing.  He's clarified that.  Not the constant flow.
11  14:43:40         MR. SEYMOUR:  Yes, Your Honor.
12  14:43:43         THE COURT:  At least, that's what the Court
13  14:43:45  understands wave overtopping is too.  I've heard a lot about
14  14:43:48  wave overtopping, I'm sure, more than anybody else here, except
15  14:43:53  some of the experts.
16  14:43:54  BY MR. SEYMOUR:
17  14:43:55  Q.  Mr. Spinks, please continue with the explanation of the
18  14:43:58  assumptions that you made in creating the model.
19  14:44:02  A.  Yes.  There are -- the other one is that storm drainage
20  14:44:08  systems are not included in the model, that this is a much
21  14:44:12  grander model and that there could have been some initial
22  14:44:16  spreadings of the floodwaters through these systems.  But,
23  14:44:19  again, that would have a negligible influence on the maximum
24  14:44:23  water levels of the model.
25  14:44:25         Buildings and other structures are not incorporated

**1108**

```
14:44:28   1  in the model.  You can't incorporate it usually in a hydraulics
14:44:35   2  model in terms for a large area like this, but you take it into
14:44:39   3  account in terms of the Manning's "N" value.
14:44:43   4       And then there's no distinction made between surface
14:44:47   5  features, such as houses or other items that -- there's no
14:44:56   6  distinction between the surface features, such as houses and
14:45:00   7  streets in the elevation model.  But different sets of
14:45:07   8  Manning's coefficients are used that represent those
14:45:12   9  differences.
14:45:13  10  Q.  In lay terms, would it be accurate to say that you account
14:45:17  11  for the impedance of water flow by using a higher Manning
14:45:21  12  coefficient?
14:45:23  13  A.  By using a Manning's coefficient relevant to that type of
14:45:26  14  development, yes.
14:45:29  15       THE COURT:  Inhabited areas, you would extract -- use
14:45:31  16  a different Manning's coefficient.
14:45:33  17       THE WITNESS:  Correct.  I mean, we wouldn't use a
14:45:36  18  pipes Manning coefficient for a flow in a pipe.
14:45:42  19  BY MR. SEYMOUR:
14:45:42  20  Q.  Please continue.
14:45:43  21  A.  Okay.  Infiltration losses from the rain are taken into
14:45:56  22  account -- into consideration into the model runoff.  The
14:46:01  23  direct impact of wind and speed and direction is not taken into
14:46:05  24  account directly as far as the interior part of the study area.
14:46:13  25       And then underseepage below and through the levee is
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**1109**

```
14:46:17   1  not taken into account in the model as well.  And all the
14:46:20   2  evidence that we've looked at is that seepage is not
14:46:24   3  significant in terms of the rate of volume in the area.
14:46:43   4  Q.  On page 14, could you please turn to the next page.  This
14:46:51   5  is a list of the types of data that you relied upon, and I want
14:46:56   6  to draw your attention to -- we talked about the IPET
14:47:00   7  information that you relied upon.  You have eyewitness reports,
14:47:04   8  and you talked about those in connection with Appendix E.  I'd
14:47:08   9  like to find out what your approach was to the eyewitness
14:47:13  10  reports.
14:47:18  11  A.  In terms of our data collection, which is listed here, one
14:47:24  12  of the major tasks that we had was to really review all
14:47:28  13  the eyewitness information, including IPET's, as well as the
14:47:34  14  additional eyewitnesses that were provided by counsel through
14:47:38  15  the depositions.
14:47:41  16       And so in going through those depositions, for to us
14:47:46  17  really identify key factors, what we call data points -- which
14:47:50  18  I think we referred to those data points a while ago, N1, N2.
14:47:56  19  Q.  When we were looking at Appendix E, you mentioned that
14:47:59  20  Terry Adams had given a time of between 5:20 and 5:45 a.m. for
14:48:03  21  when he found that there was water on his carpet, and you
14:48:07  22  assigned a value of 5:30.  Is that typical of your approach to
14:48:12  23  the eyewitnesses?
14:48:15  24  A.  I wouldn't say it's typical, but we usually extract the
14:48:24  25  best value we could for that particular -- for a data point,
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**1110**

```
14:48:27   1  and we acknowledge a time frame as well.
14:48:31   2  Q.  When you were trying to find out the causes of flooding
14:48:35   3  and the progress of flooding in an area, do you often have
14:48:39   4  absolutely pure data, with pinpoint precision?
14:48:44   5  A.  No.  It's usually an interpretation of the information as
14:48:53   6  you would do in many other engineering fields.
14:48:57   7  Q.  If one were to insist upon having absolutely pinpoint
14:49:01   8  precision on data before it is considered, would it be possible
14:49:05   9  to do flooding analysis?
14:49:08  10  A.  Most likely not.
14:49:13  11  Q.  There is a document that is in evidence as -- I believe
14:49:26  12  it's -- let me just make sure I've got the right exhibit
14:49:31  13  number -- Plaintiffs' Exhibit 163 [sic].  Would you display
14:49:35  14  that, please?
14:49:36  15       This is the log for the pump station in the Lower
14:49:40  16  Ninth Ward for Mr. Villavaso, who was directing operations --
14:49:45  17  where Mr. Villavaso was directing operations.
14:49:58  18       THE COURT:  That's Plaintiffs' 263; correct?
14:50:00  19       MR. SEYMOUR:  Yes, Your Honor.
14:50:06  20       Can you blow that up, please?
14:50:14  21  BY MR. SEYMOUR:
14:50:14  22  Q.  This page starts with a time of 5:54.  Actually, if you
14:50:20  23  look at the next page of the exhibit, which I believe starts
14:50:23  24  earlier.
14:50:31  25       MR. SEYMOUR:  Blow that up, please.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**1111**

```
14:50:38   1  BY MR. SEYMOUR:
14:50:43   2  Q.  Is this one of the pieces of information that you examined
14:50:45   3  in performing your analysis?
14:50:49   4  A.  Yeah.  In terms of our model input, timing is a critical
14:50:55   5  part of the information because of the breaches.  The initial
14:51:06   6  breach times, at least for the north breach, was considered at
14:51:06   7  between 4:00 a.m. and 4:30.
14:51:10   8       And the basis of that initial breach time came from
14:51:14   9  eyewitness information talking about the flooding within the
14:51:18  10  Lower Ninth Ward in the northeast -- or northwest section.  And
14:51:25  11  what this particular piece of evidence is kind of showing to us
14:51:29  12  is that starting, again, here just showing at 4:23, and then
14:51:36  13  you have 4:15, you have 4:14, you have 4:28, and these are
14:51:41  14  various pump stations here within the total study area, but you
14:51:46  15  have a lot of activity going on.
14:51:49  16       And in terms of pump station 5, which I believe the
14:51:57  17  first recorded one there at 5, said "Denied D," and that was at
14:52:04  18  about 4:40 a.m.  You see another --
14:52:10  19  Q.  I'm sorry.  I misspoke.  I thought that was just pump
14:52:13  20  station 5, but, apparently, it's a number of different
14:52:16  21  stations.  Please continue.
14:52:17  22  A.  Right.  I mean, it represents -- what this represents to
14:52:19  23  us and to myself is a lot of activity started happening after
14:52:24  24  4:20, after really 4:15.  You have several pumps going on, and
14:52:32  25  that represents that -- that much activity, that there's a
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**1112**

```
14:52:39   1   large amount of water, a significant amount of water, that they
14:52:46   2   were dealing with.
14:52:48   3        And given the time frame at 4:00, we know that
14:52:51   4   rainfall from the storm at 4:00 in the morning was probably
14:52:57   5   less than 2 inches of rainfall.  So, clearly, that's a lot of
14:53:03   6   pump activity going on for having only 2 inches of rain.
14:53:07   7   Q.  And then if you look down at the bottom of the page, do
14:53:11   8   you see for pump station 5, "Shut down all pumps at 6:10"?
14:53:17   9   A.  Yeah.  There's quite a few references that go to 5, time
14:53:21  10   to start pumps, load pumps.
14:53:24  11        I can't be 100 percent what all this activity is
14:53:26  12   because I'm not a pump operator.  But given that they're
14:53:33  13   starting several of these and trying to load them, and by 5:00,
14:53:38  14   I guess -- excuse me, by 6:10, everything shuts down.
14:53:42  15   Q.  Would you expect to see all of that activity if there had
14:53:45  16   only been rainwater in the area?
14:53:47  17   A.  No.
14:53:51  18        MR. SEYMOUR:  Please turn to Mr. Spinks' report
14:54:03  19   page 27, Figure 10.
14:54:04  20   BY MR. SEYMOUR:
14:54:23  21   Q.  Please explain how one can read this chart.
14:54:29  22   A.  Yes.  These are the water-level hydrographs that the
14:54:36  23   models -- that we modeled for the various eyewitnesses'
14:54:43  24   accounts.  What you'll see in this exhibit here is that, in the
14:54:47  25   legend, there is an eyewitness with a symbol.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**1113**

```
14:54:50   1   This one is Terry Adams.  He has data points N1 and
14:54:54   2   N2, and is represented by a triangle.  For the sake, I'll put
14:55:00   3   his triangle data --
14:55:03   4   Q.  That's an orange triangle?
14:55:05   5   A.  That's one of his triangles.  That's the other -- oops.  I
14:55:09   6   didn't mean to do that.
14:55:17   7   Q.  Okay.  Then there are a number of names that are mentioned
14:55:20   8   there on the right-hand side, but please continue with how one
14:55:24   9   is to read the chart.
14:55:27  10   A.  So in terms of what we modeled at each location, of each
14:55:30  11   of these eyewitnesses, there is a data point that we have
14:55:33  12   established.  And for Terry Adams, the data points are from
14:55:37  13   triangles, and what the line represents is our modeled
14:55:42  14   water-surface elevation versus time.
14:55:45  15        It's a little difficult in this particular exhibit
14:55:48  16   here, but I'm going to trace --
14:55:51  17        THE COURT:  In essence, you're comparing your
14:55:52  18   modeling to the eyewitness testimony?
14:55:55  19        THE WITNESS:  Exactly.
14:55:56  20        THE COURT:  I got it.  Let's not -- get to your
14:56:00  21   points because I understand the graph.
14:56:03  22        MR. SEYMOUR:  Okay.
14:56:04  23   BY MR. SEYMOUR:
14:56:04  24   Q.  There are crosses on some of these figures.  What do they
14:56:10  25   mean?
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**1114**

```
14:56:11   1   A.  Those are air bars, what we refer to, is that what we've
14:56:16   2   identified with evidence that we collected is that sometimes
14:56:19   3   they said from 5:00 to 5:30.  So we represented that time of
14:56:26   4   5:00 to 5:30 with an air bar.
14:56:30   5   Q.  That's the horizontal line?
14:56:32   6   A.  Yes.  In terms of depth, sometimes we may have seen or
14:56:35   7   gathered from the evidence that the depth would have been
14:56:39   8   between 1 or 2 feet.  So we identified that by the horizontal
14:56:44   9   bars if there was uncertainty.
14:56:46  10        MR. SEYMOUR:  Okay.  Now, could you please show the
14:56:50  11   bottom half of the page with text and blow that up.
14:56:59  12   BY MR. SEYMOUR:
14:57:00  13   Q.  I direct your attention again to the paragraph that
14:57:02  14   begins, "Mr. T. Adams."  And it states that the carpet was wet.
14:57:08  15   You got the reference note, going to the references at the end.
14:57:12  16   But this paragraph deals with T. Adams, D. Weber, and D'A
14:57:24  17   Johnson.
14:57:24  18        Now, the last sentence of the paragraph says that:
14:57:30  19   "At 6:10 a.m., the water depth was higher than 5.2 feet in the
14:57:34  20   street" -- that's from report -- "and the simulation model
14:57:36  21   computed a flood depth of 5.9 feet."  What's the significance
14:57:39  22   of the difference of .7 feet?
14:57:44  23   A.  Well, I think what we were representing within this report
14:57:47  24   is that we felt our model was correctly competing -- or close
14:57:53  25   to competing with the observed witness' depth at that time
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**1115**

```
14:57:59   1   6:10 a.m.
14:58:03   2   Q.  How much time -- given the rate at which water was coming
14:58:06   3   into the area, how much time would it take to get from 5.2 feet
14:58:11   4   to 5.9 feet?
14:58:15   5   A.  In many of the cases in our table of -- that we
14:58:21   6   provided -- particularly our sensitivity analysis that we've
14:58:24   7   listed, that we're on a rapid surge of water increase at
14:58:30   8   various times.  Like at 4:30 when the north breaches occurred,
14:58:34   9   between 4:00 and 4:30, it's a rapid increase; and then the
14:58:41  10   south breach occurs between 5:30 and 5:45 a.m., another rapid
14:58:44  11   increase in water levels.
14:58:46  12        So some of the differences, like a 7/10ths foot of a
14:58:50  13   difference, can be only minutes away.
14:58:54  14        THE COURT:  I'm sure you'll be asked about this, and
14:58:57  15   we're take a recess on this, but it's your opinion based on
14:59:02  16   everything that the -- that's in your report that the north
14:59:07  17   breach occurred at what time?
14:59:10  18        THE WITNESS:  It's initiated at 4:00 a.m. and it
14:59:13  19   breached by 4:30.
14:59:15  20        THE COURT:  Okay.  And it took an hour and a half to
14:59:18  21   shut down the pumps?
14:59:22  22        THE WITNESS:  To reach a depth of about 6 to 7 feet
14:59:26  23   at that location, it took about that amount of time.
14:59:29  24        MR. SEYMOUR:  Your Honor, Mr. Villavaso testified in
14:59:31  25   his deposition that at the time when he shut off the pumps --
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1116

1  14:59:34  they tried to keep the things going, but --
2  14:59:35  THE COURT:  I remember what he testified to, and I
3  14:59:37  got it right here.
4  14:59:38  MR. SEYMOUR:  Okay.
5  14:59:38  THE COURT:  It seemed to me, it was rather -- it
6  14:59:41  was -- it was rather immediately after the wall fell downwards,
7  14:59:49  he said.  We'll check all that out.  I just was curious.  I got
8  14:59:52  these records --
9  14:59:53  MR. GILBERT:  There may be delay in the entry, Your
10 14:59:55  Honor, but the --
11 14:59:55  THE COURT:  I understand.  I understand.  I'm sure
12 14:59:59  there will be cross-examination about it.  I remember the
13 15:00:03  deposition.  All right.  We'll take a break.
14 15:00:07  (WHEREUPON, the Court took a recess.)
15 15:18:08  THE DEPUTY CLERK:  All rise, please.  Court's in
16 15:18:20  session.  Please be seated.
17 15:18:22  THE COURT:  Whenever you're ready to proceed, sir.
18 15:18:26  MR. SEYMOUR:  Thank you, Your Honor.  And I think,
19 15:18:26  through the second half of this, we can proceed much more
20 15:18:31  quickly now that the building blocks have been gone through.
21 15:18:32  BY MR. SEYMOUR:
22 15:18:32  Q.  Now, Mr. Spinks, on pages 27 and 28 of your report, just
23 15:18:36  by example, you mentioned several individuals, but not all the
24 15:18:43  individuals in the graph on top of Figure 10 are mentioned in
25 15:18:46  the text of the report.  Some are only mentioned in Appendix E

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1117

1  15:18:50  to the report.
2  15:18:52  Did it make any difference to your analysis whether a
3  15:18:55  person is mentioned in Appendix E or is mentioned in the body
4  15:18:59  of the report?
5  15:19:00  A.  No.  The report is all-inclusive.  I think, in the main
6  15:19:05  body of the report, we're just trying to clarify our conclusion
7  15:19:10  points and our points of relevancy.  Whereas, in our
8  15:19:13  appendices, we're providing all the information to -- so that
9  15:19:25  you can look at it.
10 15:19:26  Q.  Do you consider your appendices a part of your report?
11 15:19:30  A.  Yes.
12 15:19:35  MR. SEYMOUR:  Your Honor, we have some
13 15:19:38  demonstratives.
14 15:19:41  THE COURT:  All right.
15 15:19:42  MR. SEYMOUR:  First, there is one order of business.
16 15:19:44  The clerk has informed us that we did not move into evidence
17 15:19:48  the three charts that were blown up:  Exhibit 433 from Exhibit
18 15:19:51  3, Exhibit 444 from Exhibit 4 to Mr. Spinks' report, and
19 15:19:56  Exhibit 445 from Exhibit 7 to Mr. Spinks' report.  We move them
20 15:20:02  into evidence at this time.
21 15:20:05  MR. CHUD:  No objection.
22 15:20:05  THE COURT:  Let them be admitted.  Thank you.
23 15:20:08  MR. SEYMOUR:  Thank you, Your Honor, we have --
24 15:20:10  THE COURT:  The PowerPoint?
25 15:20:13  MR. SEYMOUR:  We have as Exhibit 446, the

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1118

1  15:20:15  demonstrative slides, a copy for the Court and for the clerk.
2  15:20:19  THE COURT:  Thank you.
3  15:20:20  MR. SEYMOUR:  And we move that into evidence.
4  15:20:34  In the printing of this report there are three
5  15:20:36  slides, Nos. 666 and 668, that did not print out correctly
6  15:20:41  because these are very densely packed maps.  They only did a
7  15:20:46  small area.  But the actual maps are all drawn from his
8  15:20:49  reports.  The actual maps are in the report.
9  15:20:52  THE COURT:  Thank you, counsel.
10 15:20:54  MR. SEYMOUR:  Okay.
11 15:20:55  BY MR. SEYMOUR:
12 15:20:55  Q.  Mr. Spinks, I think we can go through some of these fairly
13 15:20:59  clearly based upon what you've already said.  Is there anything
14 15:21:03  about slide No. 2 that you want to add to from what is on the
15 15:21:09  text here?
16 15:21:11  A.  Well, I think there's just two points.  I mean, our -- the
17 15:21:15  exercise that we are involved in is to look at the flood time
18 15:21:19  sequence and the contribution of the flooding from the
19 15:21:23  breaches, the overtopping and the rainfall, that led to the
20 15:21:25  flooding of the Lower Ninth Ward during Katrina.
21 15:21:28  The second point there is that one of the key
22 15:21:32  considerations in this matter was what area was flooded within
23 15:21:38  the Lower Ninth Ward and the St. Bernard Parish by the failure
24 15:21:42  of the IHNC east floodwall, both the north and the south
25 15:21:47  breaches, and that being prior to the inundation from the

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1119

1  15:21:54  MRGO's floodwaters.
2  15:21:56  Q.  Okay.  Then we turn directly to slide No. 4.  This is the
3  15:22:07  Sobek-1D2D computer-simulation model that you referred to
4  15:22:10  before.  Is there anything that we have not previously covered
5  15:22:14  that you want to point out from the slide?
6  15:22:17  A.  I think we covered it.  It's a 1D2D model.  It's a
7  15:22:20  flood-simulation model.  It's used quite often worldwide, and
8  15:22:24  we're using it much more, even throughout the United States.
9  15:22:28  Q.  Is this generally accepted within the field of hydrology
10 15:22:33  and hydraulics?
11 15:22:34  A.  Yes.
12 15:22:37  Q.  Slide No. 5 is a figure that is taken from the report.  I
13 15:22:43  just want to ask you.  The lower left-hand corner, you have a
14 15:22:49  Figure 2.  Does that refer to Figure 2 in your report?
15 15:22:54  A.  Yes, that's in Figure 2.  The notation down below is
16 15:22:57  within our report, and that what page within our report is
17 15:23:03  on.
18 15:23:04  And this study area which we talked about earlier
19 15:23:09  was -- the study area that we're referring to in our research
20 15:23:14  here is called the St. Bernard folder or the St. Bernard
21 15:23:19  Parish, and we talked about the continuous rings of levees
22 15:23:24  around the study area, the 40-Arpent Levee that separates the
23 15:23:30  marshland, the 32,000 acres of marsh, from the populated areas
24 15:23:35  on the south; that being the Lower Ninth Ward and the Chalmette
25 15:23:40  area.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**1120**

15:23:41    And then the key area of Paris Road that bisects the
15:23:46    area.
15:23:47        MR. SEYMOUR:  Okay.  We have a usable printout to
15:23:50    replace slide 6, and plaintiffs ask that this be made
15:23:56    Plaintiff's Exhibit 447.
15:24:03        MR. CHUD:  No objection, Your Honor.
15:24:05        THE COURT:  Thank you, counsel.
15:24:12    BY MR. SEYMOUR:
15:24:18    Q.  We've already seen slide No. 8 from Appendix J, location
15:24:23    of the plaintiffs, and talked about that.
15:24:26        Let's go to slide No. 9.
15:24:34    A.  Okay.  One of the key facts that I'd like to talk about,
15:24:37    there are some things that happened and I think all the
15:24:41    researchers have generally agreed upon, and I want to present
15:24:46    these as statement of facts.
15:24:48        We all know that Hurricane Katrina occurred on
15:24:51    August 29th.  It came through Buras, Louisiana, at about 6:10,
15:24:55    with wind speeds at around 115 miles an hour.
15:25:00        The second thing is it produced rainfall amounts
15:25:03    between 10 1/2 and 11 inches in St. Bernard Parish, starting on
15:25:08    the evening of August 28th to the late afternoon or evening of
15:25:12    August 29th.
15:25:13        We'll talk more about rainfall in a few minutes, but
15:25:18    that's the hyetograph, which is the hourly rainfall over time.
15:25:23    Q.  Would you spell that word?

**1121**

15:25:25    A.  Hyetograph?  H-Y-E-T-O-G-R-A-P-H.
15:25:35    Q.  And please turn to slide 10.
15:25:43    A.  In terms of MRGO flooding --
15:25:48        MR. SEYMOUR:  And, Your Honor, if you indulge me, I
15:25:51    know you know the study area fairly well, so I've kind of
15:25:54    briefly gone over the explanation of the study area itself.
15:25:58        THE COURT:  Yes.
15:25:58        THE WITNESS:  Between 5:00 a.m. and 8:30, the erosion
15:26:03    of the MRGO levee takes place.  After 6:30, substantial volumes
15:26:06    of water from the surge, from MRGO flow, actually enters the
15:26:12    wetlands central unit between MRGO and the 40-Arpent Levee.
15:26:20        Second thing here is the 40-Arpent Levee starts
15:26:24    to overflow at about 8:00 a.m.  At about 8:20, the first waters
15:26:29    enter Chalmette east of Paris Road, from the northeast
15:26:32    direction, as a consequence of the 40-Arpent Levee being
15:26:37    overtopped.
15:26:38        There are statements and video feeds from a
15:26:42    security camera at the Channel 8 TV tower near the intersection
15:26:47    of Magistrate Street and Marietta Drive.  We'll refer to that
15:26:51    as IPET site 6, which shows water entering from the northeast
15:26:57    at the time of about 8:20.
15:26:58    BY MR. SEYMOUR:
15:26:58    Q.  Is that location to the east of Paris Road?
15:27:00    A.  Yes, it is.
15:27:02    Q.  Please turn to slide 11.

**1122**

15:27:08    A.  Continuing along MRGO's flooding is that there's also
15:27:12    video footage in the Corinne, the state subdivision in
15:27:16    Chalmette, which is IPET site 5, that shows large clumps of
15:27:22    marsh grass moving in a northeast-to-southwest direction,
15:27:25    clearly indicating flows from the marshlands surrounding Lake
15:27:29    Borgne and MRGO.
15:27:30        One of the notes that IPET had mentioned is that the
15:27:33    presence of marsh grass was -- was a common feature on houses
15:27:37    and other structures through the Chalmette area, which is
15:27:41    really east of Paris Road, but that grass was rarely ever seen
15:27:45    west of Paris Road within the Lower Ninth Ward.
15:27:49    Q.  Did Paris Road function as a kind of inadvertent levee for
15:27:54    a period of time?
15:27:55    A.  It is where we refer to as the high area, so there is a
15:28:02    ground elevation increase along -- or just west of Paris Road.
15:28:05    Q.  And did it separate the waters from the MRGO and the
15:28:08    waters from the IHNC for a period of time?
15:28:14    A.  Yes.  And, of course, there's a timing difference as well
15:28:18    that we'll talk about.  But, you know, again, this is what the
15:28:22    evidence has shown, is that the floodwaters from MRGO didn't
15:28:26    enter really the area west of Paris Road, including the Ninth
15:28:31    Ward, until after 8:20 sometime.
15:28:33    Q.  Did not enter?
15:28:34    A.  Yes.
15:28:37    Q.  I say "did not" because contractions sometimes are -- get

**1123**

15:28:43    lost.  If you could avoid contractions, that helps the clarity
15:28:47    of the record.
15:28:48        Please turn to slide No. 12.
15:28:52    A.  In terms of IHNC flooding, things that have been
15:28:55    documented by other researchers -- for instance, this first
15:28:59    one, IPET time line for the overtopping or breaches along the
15:29:02    IHNC, which is the east floodwall, provides evidence in the
15:29:07    form of stopped clocks, as well as eyewitness accounts, that
15:29:12    show -- or that indicates that water was entering the Lower
15:29:16    Ninth Ward prior to 5:30 a.m., and they mentioned that it could
15:29:20    be as early as 4:30 a.m.
15:29:24        There's also the reference that we just mentioned,
15:29:27    the central logbook for pump station No. 5, that shows, by
15:29:32    6:10, all pumps at pump station No. 5 were shut down.  Water --
15:29:38    given that at the time of the 6:10, the water depth would have
15:29:42    been 6 to 7 feet.  But I then also pointed out that there
15:29:46    was lots of activity in that logbook going on before 6:10,
15:29:51    which is an indicator that there was a significant or a
15:29:54    substantial amount of water to deal with.
15:30:00        We also have within evidence emergency 911 calls in
15:30:05    the Lower Ninth Ward which shows times as early as 6:30 with
15:30:11    individuals on their -- in their attics or on their rooftops.
15:30:16    There's a substantial number of these 911 calls that show the
15:30:22    flood depths to be extremely high prior to 7:30, and a lot of
15:30:27    them between 6:30 and 7:30.

## 1124

```
1    15:30:30   Q.  You mentioned IPET time lines with stopped clocks.  Did
2    15:30:34       the Interagency Performance Evaluation Team rely on
3    15:30:39       stopped-clock information?
4    15:30:41   A.  That was one of the pieces of evidence that they gathered.
5    15:30:44       IPET only had, in the Lower Ninth Ward, two locations -- and
6    15:30:50       we'll go over those -- C-1 and C-2.
7    15:30:53       One location they had 9 stopped clocks only; and then
8    15:30:56       the other, they had about eight stopped clocks.  So as far as
9    15:31:00       reporting, there was about 17 stopped clocks that IPET has
10   15:31:05       referenced.
11   15:31:06   Q.  Did Team Louisiana also rely on stopped-clock information?
12   15:31:10   A.  Yes.  And I believe in our study area, there may be six or
13   15:31:17       seven Team Louisiana stopped clocks.  A fairly small number.
14   15:31:24   Q.  Please turn to slide 13.  And explain that.
15   15:31:29   A.  Okay.  Some other statement of facts related to the IHNC,
16   15:31:34       and this is some more science that's been presented in IPET,
17   15:31:38       where IPET reported wave heights of about 1 foot in the IHNC
18   15:31:43       prior to 5:30 a.m., with the maximum wave heights during peak
19   15:31:50       wind conditions of about 2 to 3 feet by 7:30.  So there's a
20   15:31:56       general statement that wave overtopping or splashing of the
21   15:32:00       IHNC floodwall occurred sometime after 6:00 a.m.
22   15:32:05       A source of water -- the second note there, a source
23   15:32:09       of water would be the IHNC overtopping.  Again, storm surge
24   15:32:16       levels overtopped the IHNC east floodwall, which is at an
25   15:32:20       elevation of anywhere from 12.5 feet to 13.1 in the Lower Ninth
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1125

```
1    15:32:26       Ward at about 7:30, based on water levels recorded by an
2    15:32:31       operator at the IHNC lock, which is located south of the south
3    15:32:37       breach, along the IHNC.
4    15:32:40       There's another point that was made by IPET.  Several
5    15:32:45       eyewitness accounts at the water-treatment facility which is
6    15:32:48       located north of the sheet pile levee at Florida Avenue, along
7    15:32:53       the 40-Arpent Levee, and what was reported at that site is that
8    15:32:59       that local levee didn't get overtopped until about 9:00 a.m.,
9    15:33:04       and that levee is about 11 feet.
10   15:33:07   Q.  Okay.  And if you turn to the next page, slide 14.  What
11   15:33:15       is this type of picture?  Actually, you've referred to it
12   15:33:19       before.  This is the elevation-type photograph.
13   15:33:23   A.  Yes.  In IPET's document, the way they represented their
14   15:33:27       eyewitnesses and the flooding times -- and I know it's somewhat
15   15:33:31       difficult to see here, and we'll clarify it in a few minutes,
16   15:33:35       but for the sake of the Court, there are nine sites, eyewitness
17   15:33:42       sites, on this chart.
18   15:33:44       And, again, this is -- I want to mark some things.
19   15:33:46       This is Paris Road that runs down through.  This is the IHNC
20   15:33:51       area -- oops -- with the north and the south breach.  What this
21   15:34:00       shows is that around -- around the north area, Your Honor, in
22   15:34:11       that area, that stopped clocks, which is C-1 here and C-2, have
23   15:34:20       times of stopping between 5:00 and 6:00 a.m.
24   15:34:24       That means water levels in these cases would have to
25   15:34:28       rise significantly in a house, usually above 5 to 6 feet, for
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1126

```
1    15:34:37       those clocks to stop.  There's eyewitnesses that they have --
2    15:34:42       THE COURT:  I assume those are nonelectronic clocks?
3    15:34:47       THE WITNESS:  Correct.
4    15:34:51       Also, what IPET reported was that there's
5    15:34:54       eyewitness accounts that showed that there was flooding also by
6    15:34:59       these others between 4:00 and 5:00 in this area.  So from
7    15:35:06       4:00 to 6:00 a.m., there was identification of significant
8    15:35:11       flooding going on within the northern half of the Lower Ninth
9    15:35:17       Ward.
10   15:35:21       What -- also, IPET indicates that, as the
11   15:35:25       progression of the flood wave continued to fill the area, that
12   15:35:29       on the south piece, up in this area, flooding started somewhere
13   15:35:35       after 7:00 a.m.  That's close to the location of Jackson
14   15:35:39       Barracks.  And there's actually time-stamped photographs
15   15:35:46       showing when that flood, about 8:15, in this area began to
16   15:35:52       occur.
17   15:35:53   BY MR. SEYMOUR:
18   15:35:54   Q.  Please turn to slide 15.  You had referred to the paucity
19   15:36:08       of stopped clocks found in the Lower Ninth Ward.  Does this
20   15:36:11       illustrate that?
21   15:36:12   A.  Yeah.  I wanted to make a point.  In relying on this
22   15:36:15       information, IPET had nine sites of information.  They -- those
23   15:36:19       were stopped clocks.  One site had nine clocks; the other site
24   15:36:22       had eight.  And then here, Team Louisiana had seven stopped
25   15:36:27       clocks.  And so from that this figure is kind of bleeded out,
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1127

```
1    15:36:33       the locations are shown there.
2    15:36:41   Q.  Please turn to slide 16 and explain this slide.
3    15:36:54   A.  In our particular study, one of the things we were able to
4    15:36:58       gather is additional information related to the evidence of
5    15:37:07       flooding in the area.  Through the depositions, 35 depositions,
6    15:37:11       we were able to gather data information, basically, from the
7    15:37:15       IHNC all the way to Paris Road.
8    15:37:19       And the location of each of these -- the eyewitnesses
9    15:37:23       are shown on this map.  So when we're referring to eyewitness
10   15:37:27       accounts of data, you can refer to this Figure 6, to their I.D.
11   15:37:32       number and their name, or location.
12   15:37:36   Q.  And what they had to say as to that location is shown in
13   15:37:40       Appendix E; is that correct?
14   15:37:46   A.  Correct.
15   15:37:46   Q.  And if you turn to slide 17.  Does that just show this is
16   15:37:49       on a normal map with street names more visible?
17   15:37:52   A.  Right.  Kind of the purpose here also is that we start
18   15:37:55       with IPET's information, and now we just added 35 more points
19   15:37:59       of information within our study to gather more information
20   15:38:05       about the flooding event.
21   15:38:10   Q.  And turn to slide 18.  Please explain that.
22   15:38:23   A.  Okay.  Another piece of information that I just mentioned
23   15:38:27       earlier was 911 calls.  Those were provided to us for the area
24   15:38:31       within the Lower Ninth Ward, west of the railroad and, of
25   15:38:37       course, east of the IHNC.  There was about 47 calls, 911 calls,
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1128

| | | |
|---|---|---|
| 1 | 15:38:43 | throughout the area that helped us as a good indicator to |
| 2 | 15:38:48 | understand some of the very high levels of the flood levels in |
| 3 | 15:38:52 | the area. |
| 4 | 15:38:53 | THE COURT:  And do you recall when the first 911 call |
| 5 | 15:38:56 | was made? |
| 6 | 15:38:57 | THE WITNESS:  6:36 a.m. |
| 7 | 15:38:59 | THE COURT:  Okay. |
| 8 | 15:39:01 | THE WITNESS:  In the north area. |
| 9 | 15:39:02 | THE COURT:  And that would be indicated by the |
| 10 | 15:39:05 | number? |
| 11 | 15:39:05 | THE WITNESS:  Yes. |
| 12 | 15:39:06 | THE COURT:  I'll be able to find out which one, |
| 13 | 15:39:08 | looking at it, which one, the sequence of the call? |
| 14 | 15:39:12 | THE WITNESS:  Yes.  Arcola Sutton.  And it's within |
| 15 | 15:39:16 | our data table as well. |
| 16 | 15:39:18 | BY MR. SEYMOUR: |
| 17 | 15:39:18 | Q.  That's Appendix F, is it not, that has the things |
| 18 | 15:39:23 | organized by the time? |
| 19 | 15:39:24 | A.  No.  It would be within Appendix E in the table. |
| 20 | 15:39:29 | THE COURT:  Okay.  Got it.  Thank you. |
| 21 | 15:39:30 | BY MR. SEYMOUR: |
| 22 | 15:39:31 | Q.  That's right, that's right. |
| 23 | 15:39:34 | Then please turn to slide 19.  Is that the same |
| 24 | 15:39:42 | information on the regular map grid? |
| 25 | 15:39:45 | A.  Yes.  And I think that shows gathering more information. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1129

| | | |
|---|---|---|
| 1 | 15:39:51 | And somebody may ask me why is that so important. |
| 2 | 15:39:54 | Well, always when you're using eyewitness accounts or stopped |
| 3 | 15:39:58 | clocks, even high water marks for that purpose, there may be |
| 4 | 15:40:03 | differences between data information from eyewitnesses that are |
| 5 | 15:40:08 | fairly close to each other.  It's not uncommon to see |
| 6 | 15:40:13 | differences in terms of timing and flooding magnitude when |
| 7 | 15:40:17 | you're gathering flood-related information. |
| 8 | 15:40:24 | But what's important about that is that the more |
| 9 | 15:40:27 | information that you have related to eyewitnesses, it gains |
| 10 | 15:40:30 | strength with numbers.  So the more information you have, the |
| 11 | 15:40:34 | better you can help understand what the real situation may be |
| 12 | 15:40:41 | occurring at those locations. |
| 13 | 15:40:45 | Q.  Please turn to slide 20. |
| 14 | 15:40:51 | A.  Given all the information that has been gathered in terms |
| 15 | 15:40:54 | of evidence, we're able to reconstruct a time line of |
| 16 | 15:40:58 | flooding in the Lower Ninth Ward.  This time line is very |
| 17 | 15:41:02 | important in helping us understand when the breaching of the |
| 18 | 15:41:06 | levees and the floodwall could occur. |
| 19 | 15:41:09 | I know we have heard a lot of testimony as far as |
| 20 | 15:41:13 | when the structural failures may have occurred and the times of |
| 21 | 15:41:18 | those structural failures; but, clearly, in terms of evidence, |
| 22 | 15:41:23 | flooding and the time related to flood is a true indicator of |
| 23 | 15:41:27 | when these breaches actually occurred. |
| 24 | 15:41:30 | So you can work kind of backwards to finding out what |
| 25 | 15:41:35 | time would these things have had to breach in order to put the |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1130

| | | |
|---|---|---|
| 1 | 15:41:39 | amount of water in the area so that there is a flood depth |
| 2 | 15:41:43 | that's consistent with what an eyewitness account may be or a |
| 3 | 15:41:48 | stopped clock.  There is a direct relationship of timing of |
| 4 | 15:41:50 | breaches and the actual flood event. |
| 5 | 15:41:55 | This secondary purpose, and really falls along the |
| 6 | 15:42:00 | same lines, is the validation of the model related to the |
| 7 | 15:42:04 | evidence that was collected. |
| 8 | 15:42:07 | Q.  Would it be -- |
| 9 | 15:42:09 | A.  I'm -- |
| 10 | 15:42:09 | Q.  Go ahead.  I didn't want to cut you off. |
| 11 | 15:42:13 | A.  No.  I was just going to mention that in the item -- point |
| 12 | 15:42:17 | No. 4 -- or 3 there is that we relied again on IPET's |
| 13 | 15:42:21 | understanding that's documented in IPET Volume IV and in our |
| 14 | 15:42:29 | Appendix D.  That's our starting point of information.  We |
| 15 | 15:42:34 | clearly wanted to start with something that we felt had |
| 16 | 15:42:37 | relevancy. |
| 17 | 15:42:38 | But included also is a flooding time line with all |
| 18 | 15:42:40 | the eyewitnesses, all the stopped-clock information, all the |
| 19 | 15:42:44 | 911 calls, all the high water marks.  And that's in our tables |
| 20 | 15:42:48 | 1 through 4 in Appendix E, and then also supplemented in detail |
| 21 | 15:42:53 | in Appendix F. |
| 22 | 15:42:55 | Q.  Would it be fair to say that a theory is just a theory |
| 23 | 15:43:00 | unless it corresponds to the real world? |
| 24 | 15:43:04 | A.  Sure. |
| 25 | 15:43:06 | Q.  Please turn to slide 21.  This is a quotation from IPET |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1131

| | | |
|---|---|---|
| 1 | 15:43:14 | Volume VI, and I don't want you to read the quotation, but just |
| 2 | 15:43:17 | state whether there are any parts of that that you disagree |
| 3 | 15:43:20 | with or that you think requires some comment. |
| 4 | 15:43:23 | A.  No.  It's just a very important conclusion from IPET.  It |
| 5 | 15:43:28 | establishes why we believe the early flooding was occurring. |
| 6 | 15:43:33 | In our point of beginning, well, then we said breaching times |
| 7 | 15:43:38 | were at 4:00 and 4:30.  It's because it correlates with the |
| 8 | 15:43:43 | scientific information that others were considering. |
| 9 | 15:43:46 | And I think even in IPET's simulation model, even |
| 10 | 15:43:51 | though they use a trigger elevation that starts the early |
| 11 | 15:43:55 | flooding time, but I believe IPET's early -- or the analysis |
| 12 | 15:44:01 | for the early flooding had it also starting from the north |
| 13 | 15:44:05 | breach at about 4:00 a.m., based on the trigger elevation of |
| 14 | 15:44:10 | 9 feet in the IHNC.  And that's, again, the north breach. |
| 15 | 15:44:17 | On the south breach, in their analysis, they used a |
| 16 | 15:44:22 | time of about 7:00 a.m., which, again, differs from our opinion |
| 17 | 15:44:28 | at this point. |
| 18 | 15:44:30 | Q.  Turn to Appendix -- or excuse me -- slide 22.  We've |
| 19 | 15:44:34 | already talked in some detail about Appendix E.  Is there |
| 20 | 15:44:37 | anything additional to be said on this slide? |
| 21 | 15:44:40 | A.  I think the important thing here is that all the data is |
| 22 | 15:44:46 | really characterized in these tables, the data points are all |
| 23 | 15:44:51 | described in terms of our interpretation of the data, so that |
| 24 | 15:44:56 | anybody can understand how we approached each piece of data. |
| 25 | 15:45:02 | Q.  Please turn to slide 23.  What is this? |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**1132**

```
15:45:06   A.  Okay.  This is similar to the IPET report, but it's kind
15:45:09   of generally what our conclusions are in terms of flooding and
15:45:13   time line.
15:45:15        And I want to -- I want to have, Bob, you focus in.
15:45:23        First, again, I think everybody should know where
15:45:26   we're at with this -- where the IHNC is, the Lower Ninth Ward.
15:45:27        Let's go ahead and focus up -- or zoom in on the
15:45:33   Lower Ninth Ward, this area right here, Bob, west of the
15:45:36   railroad.
15:45:45        This is the evidence here, the data, that what it's
15:45:50   suggesting.  And in terms of what the color codes are, the
15:45:54   color codes -- the circle represents IPET's data.  The squares
15:45:57   represent data that we collect or obtain through the
15:46:00   eyewitnesses.  Okay.  And the colors that are represented
15:46:07   represent time of flooding.
15:46:10        In this particular case, you see here a lot of the
15:46:14   colors or the -- I guess the pinkish colors, which represent
15:46:19   flooding times from 5:00 to 6:00 in the morning --
15:46:29   Q.  And slide 24 through --
15:46:35   A.  I wasn't finished.
15:46:37   Q.  Oh, I'm sorry.  Please continue.
15:46:43   A.  Can we go back, Bob?
15:46:47        Okay.  I wanted to just double-check the legend here.
15:46:49   The pinkish color is to represent floodings from 4:00 to
15:46:53   5:00 a.m.  All the blue represents flooding, from the
```

**1133**

```
15:46:56   eyewitnesses indicating that there was water there, from
15:47:00   5:00 to 6:00 a.m.  The green represents 6:00 to 7:00.  And the
15:47:06   yellow represents from 8:00 to 9:00.  The little bit darker
15:47:15   yellow represents from 7:00 to 8:00.
15:47:17        So what you're seeing happen here -- and just again,
15:47:21   here's the railroad track through here, which is a barrier for
15:47:25   the water that's moving from the breaches in this direction.
15:47:32        And what you have here is that a representation of
15:47:35   the flooding, based on what the eyewitnesses are saying, is
15:47:39   that it's flooding earlier, 4:00 to 5:00, in, generally, this
15:47:44   corner; the progression of the water is moving easterly, where
15:47:50   there's flooding between 5:00 and 6:00 throughout this area;
15:47:54   and then the water begins to build up in this direction, where
15:48:02   we have flooding between 6:00 to 7:00, 7:00 to 8:00, and
15:48:07   8:00 to 9:00.
15:48:08        MR. SEYMOUR:  Okay.  Would you please clear that and
15:48:10   mark again the location of the railroad, and then I ask that
15:48:13   that be captured and made Exhibit 448.  Please capture that.
15:48:24        And we move that into evidence.
15:48:41   BY MR. SEYMOUR:
15:48:41   Q.  Mr. Spinks, slides 24 through 28 -- slides 24 through 28
15:48:52   deal with Appendix F that we've already covered.  So why don't
15:48:55   we move to slide 29.
15:49:05   A.  The same was done for the 911 calls.  Many of the 911
15:49:09   calls that you have indicate, for instance, Arcola Sutton,
```

**1134**

```
15:49:18   at 6:36 a.m., mentioned that water was coming in on the roof;
15:49:23   you had Allison Berryhill, who lives in the Lower Ninth Ward,
15:49:27   mentioning roof caved in at that point; Bianca Knight at
15:49:33   7:00 a.m. said water rising, getting to -- ready to get on
15:49:37   roof, water is high.
15:49:38        So between 6:00 and 7:30 -- and in this case, it's
15:49:45   shown between 7:00 and 8:00 -- we have emergency calls going
15:49:48   on, and several of the people already in the attic and on the
15:49:53   roof, which correlate again with a lot of what the
15:49:56   eyewitnesses, the data that we're gathering.
15:50:03        So it's a -- it's, basically, data we're taking in
15:50:07   and understanding the flooding time line.
15:50:10   Q.  If you look at slides 30 and 31 -- 31 is a continuation of
15:50:16   30 -- is this a compilation of the information you just
15:50:20   described?
15:50:20   A.  This is a list of all the 911 calls with the I.D.s on the
15:50:36   left-hand corner.
15:50:38   Q.  And that's set forth in Appendix E?
15:50:39   A.  Right.  And I think what you'll see, the time represents
15:50:42   actually the last call.  But some of these callers are calling
15:50:45   multiple times.  If we take Raymond Winfield, his first call --
15:50:51   that's No. 15 there -- "First floor completely underwater by
15:50:56   7:00.  Water a few inches from ceiling.  Water broke door.  Man
15:51:00   is in attic."  Water coming -- the second call was:  "Water
15:51:03   coming into the attic."  Third call:  "Water in attic and
```

**1135**

```
15:51:10   rising."  And the fourth call:  "Caller on roof, attic full of
15:51:15   water."
15:51:15        So it's giving us a time history.
15:51:20   Q.  Please turn to slide 32 and explain that.
15:51:26   A.  Well, some other data that actually didn't become
15:51:31   available to us until after my last deposition -- I believe it
15:51:36   was in August of '09 -- is some additional stopped-clock data,
15:51:39   and I refer to this slide here as the Lafarge stopped clocks.
15:51:47        In many of the stopped clocks that were gathered by
15:51:51   Lafarge, or whoever they had gathering information, represented
15:51:57   very similar times throughout the area, between 6:00 and 7:00,
15:52:03   a lot of the clocks are stopping.
15:52:07        MR. SEYMOUR:  Your Honor, I have a document taken
15:52:08   from the record of this court and produced by Lafarge on time
15:52:15   pieces collected and time pieces recovered, and I'd like to ask
15:52:17   the witness a few questions about that and then move it into
15:52:21   evidence.  May I approach?
15:52:23        THE COURT:  Yes, you may.
15:52:26   BY MR. SEYMOUR:
15:52:42   Q.  Is this the information that you just described?
15:52:44   A.  Yes.  The information that's on these tables here as
15:52:52   plotted in this exhibit.
15:52:55   Q.  Okay.
15:52:57        MR. SEYMOUR:  Plaintiffs move that as Exhibit 449.
15:53:00        THE COURT:  Any objection?
```

## 1136

| | |
|---|---|
| 1 | 15:53:01   MR. CHUD:  Your Honor, we don't object to it.  I do |
| 2 | 15:53:03   want to know for the record that this is not a document that's |
| 3 | 15:53:06   in his report or used.  There seems to be additional |
| 4 | 15:53:09   information to support an opinion he's already given, so we |
| 5 | 15:53:12   don't object. |
| 6 | 15:53:12   THE COURT:  Thank you, counsel.  Let it be admitted. |
| 7 | 15:53:15   MR. CHUD:  Thank you, Your Honor. |
| 8 | 15:53:15   BY MR. SEYMOUR: |
| 9 | 15:53:17   Q.  Now, I want to flash back to slide No. 15, which is where |
| 10 | 15:53:28   you have the map of information on the Interagency |
| 11 | 15:53:30   Performance Evaluation Team and Team Louisiana relied. |
| 12 | 15:53:36   Did Lafarge seem to have a lot of information that |
| 13 | 15:53:39   was not available to the investigative bodies? |
| 14 | 15:53:45   A.  It appears that way. |
| 15 | 15:53:48   Q.  Please turn to slide 33.  We've already covered a fair |
| 16 | 15:53:59   amount of the information on this slide.  Is there any other |
| 17 | 15:54:02   observation that is important to make? |
| 18 | 15:54:07   A.  Well, clearly, this is the model input information, and |
| 19 | 15:54:11   every piece of information here is very important.  But I'd |
| 20 | 15:54:14   like to draw some attention -- maybe we can go to the rainfall, |
| 21 | 15:54:18   the first chart. |
| 22 | 15:54:19   Q.  Slide 34, please.  We've already looked at a chart like |
| 23 | 15:54:28   this in your report.  Please continue. |
| 24 | 15:54:32   A.  Yes.  What I'd like to just note on this is what this is |
| 25 | 15:54:36   is hourly precipitation from starting at 12:00 a.m., going |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1137

| | |
|---|---|
| 1 | 15:54:41   through about 9:00 p.m., on the day of Hurricane Katrina, |
| 2 | 15:54:47   August 29th, 2005. |
| 3 | 15:54:51   The total cumulative rainfall is shown in this line |
| 4 | 15:54:59   that goes up to about 11 inches. |
| 5 | 15:55:03   Q.  You're referring to the black line? |
| 6 | 15:55:05   A.  Yes.  This line here. |
| 7 | 15:55:07   The hourly precipitation is shown by these bar |
| 8 | 15:55:11   graphs. |
| 9 | 15:55:16   What I want to make by point of reference is, by |
| 10 | 15:55:19   5:00 a.m., we have less than 2 inches of total cumulative |
| 11 | 15:55:27   rainfall.  By 9:00, we have less than 4 inches, 9:00 a.m.  So |
| 12 | 15:55:40   from a standpoint of understanding the rainfall, that all that |
| 13 | 15:55:43   water in the Lower Ninth Ward that's progressing east is more |
| 14 | 15:55:49   than just rainfall. |
| 15 | 15:55:53   Q.  You mean -- do you mean that rainfall could not account |
| 16 | 15:55:56   for all this water? |
| 17 | 15:55:57   A.  That's correct. |
| 18 | 15:55:59   Q.  Please turn to slide 35.  Explain what this is and the |
| 19 | 15:56:09   process you used. |
| 20 | 15:56:10   A.  This is just the digital elevation model, data that's |
| 21 | 15:56:13   within the model itself.  It has to be resampled based on a |
| 22 | 15:56:18   50-meter grid.  And so this sampling of data, when you get |
| 23 | 15:56:23   elevations in the model, are a little less than what you would |
| 24 | 15:56:27   have, actually, in your Geographic Information System, but it's |
| 25 | 15:56:32   still very detailed.  You can see the railroad, define that. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1138

| | |
|---|---|
| 1 | 15:56:35   And then, of course, you have to import or include |
| 2 | 15:56:39   within your model the breach locations, as well as the size of |
| 3 | 15:56:45   the breaches. |
| 4 | 15:56:49   Q.  Okay.  There are, in this model, some areas that are |
| 5 | 15:56:54   whiter than others.  What does that indicate? |
| 6 | 15:56:58   A.  It just represents -- what are you referring to?  These |
| 7 | 15:57:03   areas here? |
| 8 | 15:57:04   Q.  Well, down below along what looks like Paris Road, it |
| 9 | 15:57:09   looks like there's white to each side of it. |
| 10 | 15:57:13   A.  Yes.  It's just higher elevations than the darker area. |
| 11 | 15:57:19   Q.  Okay.  Please turn to the next slide.  I believe we've |
| 12 | 15:57:21   already covered this when we were discussing Appendix C.  Is |
| 13 | 15:57:34   there anything additional to be said? |
| 14 | 15:57:37   A.  No. |
| 15 | 15:57:37   Q.  Please turn to slide 37.  Given what we've -- well, |
| 16 | 15:57:41   actually, you have three circled areas, and those correspond to |
| 17 | 15:57:49   the north and south breaches? |
| 18 | 15:57:53   A.  Correct.  1 and 2 is located along the IHNC, and then |
| 19 | 15:57:57   area 3 represents all the breaches along MRGO.  I believe we |
| 20 | 15:58:02   have 174 different breach locations along MRGO. |
| 21 | 15:58:06   Q.  And are those locations shown on slide 38? |
| 22 | 15:58:18   A.  They're described -- the two breaches along the IHNC.  The |
| 23 | 15:58:23   IHNC north breach, which is an I-wall, had a failure width of |
| 24 | 15:58:28   180 feet before the -- before the failure, an elevation of |
| 25 | 15:58:33   13.1; after the failure, an elevation of 1. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1139

| | |
|---|---|
| 1 | 15:58:40   And the model breach time, which is what our early |
| 2 | 15:58:45   assumptions of timing would be, about 4:00, with a breach time |
| 3 | 15:58:51   of about 30 minutes. |
| 4 | 15:58:53   Q.  Where did you obtain the elevation of 13.1 feet at the |
| 5 | 15:58:57   breaches? |
| 6 | 15:58:58   A.  Using IPET's field survey data as well as their LiDAR data |
| 7 | 15:59:10   for their two levee surveys. |
| 8 | 15:59:13   This is just the breach for the width that goes |
| 9 | 15:59:17   into the model.  From a standpoint of overtopping, we include |
| 10 | 15:59:21   the entire wall and its elevation based upon the surveys |
| 11 | 15:59:27   conducted for the wall. |
| 12 | 15:59:28   Q.  Does that mean that if part of the east wall of the Inner |
| 13 | 15:59:32   Harbor Navigation Canal between Florida and Claiborne has a |
| 14 | 15:59:36   lower elevation, you use the lower elevation? |
| 15 | 15:59:40   A.  Yes.  Whatever this survey point along that wall is. |
| 16 | 15:59:45   Q.  Please turn to slide 39 and explain that. |
| 17 | 15:59:50   A.  Along MRGO, in that previous table, is a reference to that |
| 18 | 15:59:55   there's various breaches along MRGO that occurred during |
| 19 | 16:00:00   Katrina, and what we did was reconstruct the levee crest |
| 20 | 16:00:06   profile before Katrina and after Katrina based on the survey |
| 21 | 16:00:10   data.  What this particular slide shows is it was categorized |
| 22 | 16:00:17   or separated into seven different sections. |
| 23 | 16:00:22   Q.  And the next set of slides, 40 through 43, seem to be |
| 24 | 16:00:28   continuations.  Can you explain these slides? |
| 25 | 16:00:31   A.  Well, this is, again, starting at Bayou Bienvenue and |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1140

```
16:00:37   working, I guess, in the southwest direction, the blue is the
16:00:44   profile of MRGO pre-Katrina and the magenta is the profile
16:00:51   along MRGO after the breaches occurred.
16:00:57          And the profile again starts at zero.  This
16:01:02   particular one goes up to -- I can't read that -- maybe 9,000
16:01:05   or 10,000 feet.
16:01:10   Q.  And on these four pages of slides, does the Inner Harbor
16:01:14   Navigation Canal appear anywhere?
16:01:17   A.  No.  This is for MRGO.
16:01:19   Q.  Okay.  Please turn to slide 44.  Now, we've heard a lot in
16:01:29   this case so far about surge hydrographs, and your source here
16:01:35   is Exhibit 6.  Is there anything that you want to observe about
16:01:37   this slide?
16:01:38   A.  These are the model inputs, again, the water coming in
16:01:42   from the storm surge.  These are the various locations:  A, B,
16:01:51   C, D.  I think for the IHNC, we used location A, which, again,
16:01:57   we've been talking about the elevation a little bit above 14 as
16:02:02   the water levels in the IHNC at about 9:00 a.m. at its maximum
16:02:09   condition of 14.2.
16:02:13   Q.  This is elevation -- yes, it says so.  I withdraw that
16:02:16   question.
16:02:18          Please turn to slide 45.
16:02:25          Now, it says in the middle that you did an animation
16:02:30   of the flood, simulating it.
16:02:33          MR. SEYMOUR:  Mr. Snyder, would you please play the
```

## 1141

```
16:02:37   animation now.
16:02:38          (WHEREUPON, the video clip was played.)
16:02:43          MR. SEYMOUR:  Why don't you freeze it right there for
16:02:45   a second.
16:02:45   BY MR. SEYMOUR:
16:02:46   Q.  Please describe the animation a little bit so we know what
16:02:49   we're looking at as we see it.
16:02:53   A.  This is a -- would be an animation of the flood event,
16:02:57   actually between 12:00 midnight, I believe, and it runs through
16:03:03   12:00 in the afternoon on the day of the hurricane.  And it's
16:03:07   going to show the progression of the flood wave along MRGO,
16:03:13   coming in in this direction to the 40-Arpent Bayou, and then
16:03:20   it's also going to show our model results related to the
16:03:23   flooding and the timing from the IHNC into the area.
16:03:26          Just for the sake of knowing where we're at, this is
16:03:29   the 40-Arpent Levee, this is the railroad location, and this is
16:03:35   Paris Road here.  So to give you kind of an indicator of size,
16:03:42   I mentioned this whole area is about 50,000 acres.  The amount
16:03:47   of area, I believe, around this is about 5,000 acres total, and
16:03:59   then up to -- from the IHNC up to the railroad is about
16:04:02   2,000 acres.
16:04:04   Q.  Well, when you refer to "this," the record's not going to
16:04:07   make clear what the "this" was.  So if you could describe the
16:04:10   area more particularly that was 5,000 acres, and the other
16:04:14   area.
```

## 1142

```
16:04:14   A.  Okay.  Let me make it -- let me say it like this so I
16:04:19   think the record can be straight:  The distance between the
16:04:22   IHNC and Paris Road is about 4 miles.  The distance from IHNC
16:04:29   to the railroad is about 2 miles, a little bit over 1 1/2
16:04:38   miles, I guess.
16:04:39   Q.  And I guess for the clarity of the record, the IHNC is
16:04:41   represented by the left black square.  Paris Road is
16:04:45   represented by the right black square, and the arrow points to
16:04:49   the railroad; correct?
16:04:51          THE COURT:  I hope you're doing this for the Court of
16:04:52   Appeals, because, my God, I've got it.  This is -- you know,
16:04:58   please, we've got to move this along.
16:04:58          MR. SEYMOUR:  Okay.
16:04:59          THE COURT:  I'm going to just give you something I
16:05:00   should have told you earlier.  I understand you're doing it
16:05:03   your way, but -- and it's really my fault, but:  "The expert
16:05:08   may testify in terms of opinion" -- I'm reading from 705 --
16:05:11   "terms of opinion or inference and give reasons, therefore,
16:05:14   without first testifying to the underlying facts of data,
16:05:17   unless the court requires otherwise.  The expert may, in any
16:05:20   event, be required to disclose the underlying facts or data on
16:05:24   cross-examination."
16:05:27          It's just a pithy way to do it.  And then maybe
16:05:29   give the essential underlying facts.  I'm done saying the
16:05:30   Court's read and synopsized the expert reports.
```

## 1143

```
16:05:33          But I understand a lot of the background
16:05:35   information has to be given.  But at the same time, we've got
16:05:40   to move this along to some degree to get to the nub of the --
16:05:47   and now we're at the animation.
16:05:49          All right.  Go ahead.  Even a clerk from
16:05:59   Kalamazoo that looks at the record now will know where
16:06:04   everything is, I promise you.
16:06:11          MR. SEYMOUR:  Thank you, Your Honor.
16:06:11          THE COURT:  It's been very well detailed, go ahead.
16:06:14          THE WITNESS:  Okay.  The animation has started here,
16:06:16   and there's a little box that's kind of hard to see, but I'm
16:06:19   just going to tell you the time here.  This is about 1:00 in
16:06:22   the morning, 2:00 in the morning.  There's still no flooding
16:06:26   along MRGO or the IHNC.
16:06:27          This is chose to 3:00 in the morning.  Okay.
16:06:32          Now, we're approaching 4:00 in the morning.
16:06:34   There's still no flooding crossing over from MRGO or the IHNC.
16:06:39          Now, here we're close to about 4:30, and we start
16:06:43   seeing the north breach along the north end, up on the top here
16:06:46   apiece.
16:06:47          At 5:30 we see a lot of the rainfall really
16:06:51   accumulating and also the south breach occurring.  We also see
16:06:54   a flood wave of significant water moving.
16:06:57          THE COURT:  I'm sorry.  Can you stop it?  Because I
16:07:00   don't want to mess you up.  What time did you say the south --
```

**1144**

| | |
|---|---|
| 16:07:03 | you have in your modeling the south breach occurred? |
| 16:07:07 | THE WITNESS: At 5:30, starting the breach. So the |
| 16:07:10 | breach time is from 5:30 to 5:45 on the south breach. |
| 16:07:18 | THE COURT: Okay. |
| 16:07:22 | THE WITNESS: Okay. And this is beginning at 7:00. |
| 16:07:25 | Everything accumulated up to the railroad and then after 7:00, |
| 16:07:28 | started coming over. |
| 16:07:30 | This is -- you can stop about here. Okay. This |
| 16:07:34 | is a little bit past. This is about 8:30, and already the |
| 16:07:38 | water is hitting Paris Road. So about 8:20, we're showing the |
| 16:07:45 | overtopping, close to Paris Road, which, again, is where the TV |
| 16:07:48 | security camera is showing that floodwaters came over at about |
| 16:07:52 | 8:20. |
| 16:07:54 | Now, in this, there's still a complete |
| 16:07:57 | separation of MRGO floodwaters, which am, and I'm going to |
| 16:07:59 | clear this in a minute, but MRGO's floodwaters are there. The |
| 16:08:06 | IHNC flood waters are there. |
| 16:08:07 | THE COURT: Yes. |
| 16:08:08 | THE WITNESS: Then right about 9:00 a.m., if you |
| 16:08:10 | continue it, we'll see that they merge -- let's see if we can |
| 16:08:15 | stop it about 9:00. About now. |
| 16:08:19 | THE COURT: You got the time. I see. |
| 16:08:20 | THE WITNESS: Right about 9:00 -- which Mr. Reed |
| 16:08:22 | lives back here -- is where you start beginning to see the |
| 16:08:25 | merge between the two waters at 9:00 a.m. And then there will |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**1145**

| | |
|---|---|
| 16:08:28 | be a continuous merge, and you'll see at the courthouse down |
| 16:08:35 | here where, about 9:50, there's a very rapid increase. |
| 16:08:39 | It takes until about 10:00 for water to go from |
| 16:08:43 | here to the Lower Ninth Ward for MRGO. |
| 16:08:48 | THE COURT: Okay. |
| 16:08:49 | THE WITNESS: Keep going. And now it's about |
| 16:09:01 | 10:00 at that point. And you can see the darker surface |
| 16:09:04 | because, again, the MRGO waters are adding into the continuing |
| 16:09:07 | flow from the IHNC. |
| 16:09:10 | Okay. Bob, I think that's good. |
| 16:09:12 | BY MR. SEYMOUR: |
| 16:09:13 | Q. Then we have a series of snapshots in the slides that I |
| 16:09:16 | think we don't need to go through. If you could turn -- |
| 16:09:20 | THE COURT: Counsel, would you do me a favor and this |
| 16:09:23 | is -- I've done this before in other trials, and this |
| 16:09:27 | is -- it won't affect this witness at all, but would you |
| 16:09:30 | mind, to the best of your ability, giving me what you |
| 16:09:33 | understand to be the primary differences in the hydrological |
| 16:09:41 | testimony I will receive here today -- excuse me, not today, |
| 16:09:45 | during this trial, so I'll know really where to focus a little |
| 16:09:53 | bit? |
| 16:09:54 | MR. SEYMOUR: Your Honor, there are -- with respect |
| 16:09:56 | to each of the plaintiffs' locations, there's specific |
| 16:09:58 | testimony about when the water in the MRGO arrived and how deep |
| 16:10:02 | the water was in the IHNC. I think we'll answer that question |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**1146**

| | |
|---|---|
| 16:10:06 | specifically. |
| 16:10:07 | THE COURT: Yes. I guess I'm wondering, the major |
| 16:10:10 | differences, as you understand -- and you may not be the person |
| 16:10:17 | who's looked at the whole testimony -- where is the terms of |
| 16:10:21 | disagreement? The height of the water at the plaintiffs' |
| 16:10:26 | locations, which should be fairly obvious; or the -- where the |
| 16:10:31 | water -- from whence the water came; or both? Do you know? |
| 16:10:37 | MR. SEYMOUR: The defense experts, as I understand |
| 16:10:41 | it, have taken the position that the water from the Mississippi |
| 16:10:45 | River Gulf Outlet would have flooded this entire area |
| 16:10:48 | traversely at the same depth even if the IHNC breaches had |
| 16:10:52 | never occurred, but hours later, and that the additional |
| 16:10:55 | flooding that they say the breaches are responsible for after |
| 16:10:59 | the lapse of those hours is only a very small amount. |
| 16:11:04 | And it is our case that there's particular |
| 16:11:09 | levels of flooding from the IHNC water alone, before the first |
| 16:11:13 | Mississippi River Gulf Outlet water reached the location of |
| 16:11:18 | those plaintiffs. |
| 16:11:19 | THE COURT: So this is the primary -- I know there |
| 16:11:20 | are other aspects, but this is the primary thing we're looking |
| 16:11:25 | at: What and when did the IHNC water damage; what was the |
| 16:11:32 | affect of the MRGO and when? |
| 16:11:34 | MR. SEYMOUR: Yes, Your Honor. |
| 16:11:35 | THE COURT: All right. Okay. |
| 16:11:39 | MR. GILBERT: In keeping, Your Honor, with the |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**1147**

| | |
|---|---|
| 16:11:41 | comments from the bench during the argument on the motion for |
| 16:11:46 | summary judgment, that the "would have happened anyway" |
| 16:11:51 | theory -- |
| 16:11:51 | THE COURT: In other words, if you kill me at 8:00, |
| 16:11:52 | but the defense is going to kill me at 9:00, you still kill me? |
| 16:11:58 | MR. GILBERT: Exactly. |
| 16:11:58 | THE COURT: I understand. |
| 16:12:00 | MR. GILBERT: Thank you. |
| 16:12:01 | BY MR. SEYMOUR: |
| 16:12:01 | Q. Please turn to slide 66. This is the simulation modeled |
| 16:12:16 | water depth with a color-coded chart for depth at 9:00 a.m. |
| 16:12:20 | before any water from the Mississippi River Gulf Outlet has |
| 16:12:21 | gotten -- well, you explain it, please. |
| 16:12:27 | A. I mean, this, again, is just a snapshot at 9:00 a.m. of |
| 16:12:31 | the flooding. You know, just as we saw on this flood |
| 16:12:34 | simulation, this is just represented on the physical map. |
| 16:12:38 | But kind of to add to the differences between maybe |
| 16:12:42 | some prior research versus the research that we found was that |
| 16:12:47 | I think there's some agreement that the north breach occurred |
| 16:12:51 | sometime early in the morning, maybe around 4:00 to 4:30 in the |
| 16:12:56 | morning, at least from IPET. |
| 16:12:59 | There's probably not an agreement by Team Louisiana |
| 16:13:01 | or ILIT on that point. They have the breaching times around |
| 16:13:07 | 7:00 a.m. of the north breach. The south breach, though, they |
| 16:13:12 | also have at 7:00 a.m. and we have a breaching time at 5:30 to |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**1148**

16:13:20  5:45.

16:13:21        I think what we're going to show here is it's clear

16:13:25  there was a lot of water prior to 7:00 a.m., and it takes a

16:13:29  while to fill up this area.  So the time that it takes to fill

16:13:35  up this area, it corresponds to -- directly to the breaches,

16:13:42  how much water is coming through those breach openings.

16:13:46        So I wanted to make that point.  It's really a time

16:13:48  issue that we're talking about here.

16:13:50        THE COURT:  Yes, and I understand that.

16:13:51  BY MR. SEYMOUR:

16:13:52  Q.  Please turn to slide 72, which deals with the first

16:13:55  plaintiff, John and Jerry Alford.

16:14:09        THE COURT:  Are they located on that?  I know pretty

16:14:10  much where they are.

16:14:11        MR. SEYMOUR:  Their locations are on slide 71.  Do

16:14:13  you want to page back to that just a second?

16:14:15        THE COURT:  Right.  Right.  If you want to show it,

16:14:17  that's fine.

16:14:19        MR. SEYMOUR:  They're up in the upper left?

16:14:22        THE COURT:  I know they're near the --

16:14:26        MR. SEYMOUR:  Near the north breach.

16:14:28        THE COURT:  -- the north breach.  On Deslonde and

16:14:30  then Jourdan.  And then Surekote or whatever you want to call

16:14:40  it.

16:14:41        MR. SEYMOUR:  Yes, Your Honor.  Back to 72, please.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**1149**

16:14:43  BY MR. SEYMOUR:

16:14:43  Q.  What was the time from your simulation that the first

16:14:47  waters from the Mississippi River Gulf Outlet reached this

16:14:51  property?

16:14:53  A.  At 10:00 a.m.

16:14:54  Q.  And at 10:00 a.m., to what depth was that place flooded

16:15:00  from Inner Harbor Navigation Canal water?

16:15:03  A.  Approximately 11.7 feet.

16:15:09  Q.  Please turn to slide 73.  This is Josephine Richardson,

16:15:15  who is located much closer to the south breach.  At what time

16:15:20  did water from the Mississippi River Gulf Outlet first reach

16:15:22  that property?

16:15:23        THE COURT:  Would you mind showing that too?  It

16:15:25  really is helpful.  I apologize, counsel.

16:15:28        MR. SEYMOUR:  That's fine, Your Honor.

16:15:28        THE COURT:  I'm slowing you up now, but go ahead.

16:15:32        MR. SEYMOUR:  Slide 71, please.  Ms. Richardson is

16:15:40  right below the Alfords.

16:15:42        THE COURT:  Right.  And that's --

16:15:44        THE WITNESS:  This is --

16:15:45        THE COURT:  -- seven or eight streets back,

16:15:49  approximately, from the Surekote.

16:15:52        MR. SEYMOUR:  Yes, Your Honor.

16:15:56        THE COURT:  Go ahead.

16:15:57        MR. SEYMOUR:  Slide 73.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**1150**

16:16:02  BY MR. SEYMOUR:

16:16:03  Q.  At what time did water from the Mississippi River Gulf

16:16:06  Outlet first reach this property?

16:16:09  A.  Again, this is water depth above ground level out there,

16:16:13  but it reached at 10:10.  And the ground level is higher at

16:16:19  this property than it is at the other property.

16:16:23        THE COURT:  Gotcha.  Thank you, sir.

16:16:24  BY MR. SEYMOUR:

16:16:25  Q.  What was the water depth above ground level at the time

16:16:28  that the Mississippi River Gulf Outlet waters came in?

16:16:32  A.  5.9 feet.

16:16:34  Q.  And then if we could go back to slide No. 71 for a

16:16:36  location, Jacob Glaser, just off West Judge Perez Drive.

16:16:46        THE COURT:  That's between the railroad track and

16:16:48  Paris Road, in essence; correct?

16:16:52        THE WITNESS:  That's correct.

16:16:54        THE COURT:  Almost equal distance.

16:16:55        THE WITNESS:  Correct.

16:16:57  BY MR. SEYMOUR:

16:16:57  Q.  And you have the business Holliday Jeweler, which is the

16:17:00  actual entity here.

16:17:05        THE COURT:  Right.  There's been quite a bit about

16:17:05  that in depositions that have been submitted.

16:17:08  BY MR. SEYMOUR:

16:17:08  Q.  So this is where the business was located.  What time do

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**1151**

16:17:11  the first waters from the Mississippi River Gulf Outlet reach

16:17:14  that property?

16:17:17        THE COURT:  It's helpful going back and forth.  Thank

16:17:19  you, counsel.

16:17:22        MR. SEYMOUR:  Okay.

16:17:22        THE WITNESS:  At approximately 9:30 a.m.

16:17:25  BY MR. SEYMOUR:

16:17:25  Q.  And at that time, what was the depth of the flooding above

16:17:28  ground from the Inner Harbor Navigation Canal water?

16:17:32  A.  3.7 feet.

16:17:37  Q.  And we've discussed the means by which you tried to

16:17:42  calibrate your model and take into account the individual

16:17:46  operations.  Are your start times that you found most valid

16:17:52  those that are set forth in case No. 1 on slide 75?

16:18:01  A.  Yes, based on our sensitivity analysis of different

16:18:04  cases -- and we ran six different cases -- in case 1 and 2 is

16:18:11  where we hold constant the north breach time and varied the

16:18:15  south breach time to 7:00 a.m.

16:18:19        Case 3 and 4, we actually hold constant the south

16:18:25  breach time of 5:30 but vary the north breach to 5:00 to 5:30.

16:18:31        And then in cases 5 and 6, which there's been some

16:18:34  discussion that these breaches occurred at 7:00 a.m., so

16:18:37  they're kind of independent cases, just looking at both

16:18:40  breaches at 7:00 and both breaches at 6:00.

16:18:43  Q.  There's a series of charts beginning at slide 71 -- excuse

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1152

| | | |
|---|---|---|
| 1 | 16:18:50 | me, slide 79.  Can you explain how to -- we don't have to go |
| 2 | 16:18:53 | through all the charts, but please explain how to read them. |
| 3 | 16:19:05 | A.  This is actually case 1, and this is based on IPET's |
| 4 | 16:19:08 | evidence data information.  What we have here in these blue |
| 5 | 16:19:12 | dots at IPET C-1, this is what they refer to as their stopped |
| 6 | 16:19:18 | clocks. |
| 7 | 16:19:18 |         Which they have measured the level of where the |
| 8 | 16:19:23 | stopped clocks are, and then versus the time that the stopped |
| 9 | 16:19:27 | clock is saying.  For instance, these two points are stopped at |
| 10 | 16:19:32 | 5:30, and these points -- or these clocks here actually stop |
| 11 | 16:19:35 | somewhere around 6:30.  So that's also showed with one point -- |
| 12 | 16:19:41 | or referenced area called IPET C-1. |
| 13 | 16:19:45 |         IPET C-2 is these black little boxes.  And, again, |
| 14 | 16:19:50 | those are clocks, stopped clocks, where they reference again |
| 15 | 16:19:54 | the time that these clocks stopped in terms of elevation. |
| 16 | 16:20:00 | Q.  And if you compare slide 79 to slide 80, is the idea to |
| 17 | 16:20:05 | get the best fit? |
| 18 | 16:20:07 | A.  When you run a sensitivity analysis, it's really to |
| 19 | 16:20:11 | understand what differences would occur if you change one |
| 20 | 16:20:15 | variable within your model:  Does it better correlate to the |
| 21 | 16:20:20 | data or does it correlate less? |
| 22 | 16:20:23 |         So the next slide, which is case 6, which is a |
| 23 | 16:20:28 | 7:00 north breach time and a south breach time, the blue line |
| 24 | 16:20:35 | varies away from all the blue data; and the black line, which |
| 25 | 16:20:39 | is the water model surface, varies away also from all the data |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1153

| | | |
|---|---|---|
| 1 | 16:20:43 | and information. |
| 2 | 16:20:45 |         So the correlation really shows that it would be |
| 3 | 16:20:47 | awfully difficult to get stopped clocks stopping when the |
| 4 | 16:20:53 | water-surface elevation that the model's producing is -- there |
| 5 | 16:20:57 | would be no water there, actually, at those locations. |
| 6 | 16:21:04 | Because, again, how could you have -- if you said you were |
| 7 | 16:21:07 | going to have a north breach at 7:00 and a south breach |
| 8 | 16:21:10 | starting at 7:00, well, there couldn't be any water then in |
| 9 | 16:21:13 | those homes at 7:00.  But that's not what the evidence says. |
| 10 | 16:21:16 | Q.  Please turn to slide 82.  Does this apply the same type of |
| 11 | 16:21:26 | methodology to a variety of sources of information? |
| 12 | 16:21:31 | A.  This is all the evidence, all the eyewitness evidence, |
| 13 | 16:21:35 | including the courthouse and the stage hydrographs, for all the |
| 14 | 16:21:42 | pieces of evidence.  So you can look at the location of where |
| 15 | 16:21:46 | the evidence, the flooding evidence, is located at in terms of |
| 16 | 16:21:53 | time and elevation, and the line being what the model predicted |
| 17 | 16:21:58 | at the location. |
| 18 | 16:21:59 |         And what you look at, you can generally tell that our |
| 19 | 16:22:02 | model's following a lot of data points.  Do we hit all the data |
| 20 | 16:22:07 | points?  No.  But, again, we're not basing our conclusion on |
| 21 | 16:22:12 | any one single data point; rather, we're looking at all of them |
| 22 | 16:22:17 | and drawing our conclusion in terms of our model fairly |
| 23 | 16:22:24 | predicting what the evidence is suggesting to us. |
| 24 | 16:22:26 |         THE COURT:  This says in general that your modeling |
| 25 | 16:22:30 | conforms, by and large, to the data points you're using; is |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1154

| | | |
|---|---|---|
| 1 | 16:22:38 | that correct? |
| 2 | 16:22:38 |         THE WITNESS:  Correct. |
| 3 | 16:22:39 |         THE COURT:  It conforms to the other evidence, other |
| 4 | 16:22:42 | than the modeling, that you've talked about? |
| 5 | 16:22:46 |         THE WITNESS:  Right.  And keep in mind -- |
| 6 | 16:22:47 |         THE COURT:  In general. |
| 7 | 16:22:47 |         THE WITNESS:  In general.  And keep in mind, evidence |
| 8 | 16:22:50 | represents a flood depth by -- either by an eyewitness, a |
| 9 | 16:22:53 | stopped clock, a high water mark, and a time. |
| 10 | 16:22:57 |         THE COURT:  Sure. |
| 11 | 16:22:57 |         THE WITNESS:  And that in this case, because we have |
| 12 | 16:23:00 | a very rapid change in water level, even though we may show a |
| 13 | 16:23:05 | difference of 3 feet, that may be five minutes.  Because the |
| 14 | 16:23:10 | water levels, as you can see, the rise in the water level is |
| 15 | 16:23:14 | very high.  We may rise 4 feet in less than an hour. |
| 16 | 16:23:21 |         THE COURT:  Would it be in your modeling that, in the |
| 17 | 16:23:24 | event that a water is rushing through an area like one of the |
| 18 | 16:23:30 | breaches, it would cause, at least, more intense or more rapid |
| 19 | 16:23:37 | of flooding and depth than it would if it were over a larger |
| 20 | 16:23:43 | area and not coming in at the same velocity?  Would that have a |
| 21 | 16:23:48 | difference? |
| 22 | 16:23:49 |         THE WITNESS:  Yes.  And the model can't compute those |
| 23 | 16:23:51 | velocities based on that exact opening because we have the lay |
| 24 | 16:23:54 | of the land in the model. |
| 25 | 16:23:57 |         THE COURT:  Right.  Okay. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1155

| | | |
|---|---|---|
| 1 | 16:23:58 | BY MR. SEYMOUR: |
| 2 | 16:23:59 | Q.  Please turn to your statement of conclusions starting on |
| 3 | 16:24:01 | page 88, and please just highlight anything we've not already |
| 4 | 16:24:04 | talked about. |
| 5 | 16:24:08 | A.  I think it's important, after you get through the |
| 6 | 16:24:11 | research, to conclude your research and what your opinions are. |
| 7 | 16:24:14 | What these opinions are is that we believe the breach failures |
| 8 | 16:24:19 | along the IHNC that occurred to the hurricane protection system |
| 9 | 16:24:23 | caused the flooding of the homes and businesses first in the |
| 10 | 16:24:27 | Lower Ninth Ward and then the St. Bernard area during Hurricane |
| 11 | 16:24:30 | Katrina. |
| 12 | 16:24:32 |         The IHNC -- the second point:  The IHNC north breach |
| 13 | 16:24:35 | occurred at or before 4:30, and the south breach occurred at or |
| 14 | 16:24:40 | before 6:00.  Again, based upon the evidence as well as the |
| 15 | 16:24:46 | models matched to that evidence. |
| 16 | 16:24:50 |         The third point:  The Lower Ninth Ward began flooding |
| 17 | 16:24:53 | at or before 4:30 from the north breach and at or before |
| 18 | 16:24:59 | 6:00 on the south breach along the IHNC. |
| 19 | 16:25:04 | Q.  And it continues on the next page, slide 89. |
| 20 | 16:25:12 | A.  Based on our study, the floodwaters in the IHNC moved east |
| 21 | 16:25:18 | into St. Bernard Parish, merging with the floodwaters from MRGO |
| 22 | 16:25:23 | from the north and west of Paris Road at about 9:00 a.m.  The |
| 23 | 16:25:27 | IHNC and MRGO flood-wave fronts continued moving south and |
| 24 | 16:25:31 | gradually merged at the courthouse, which, again, is south by |
| 25 | 16:25:36 | the Mississippi River, I guess, then after merging, |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

25 (Pages 1152 to 1155)

## 1156

1  16:25:40  became indivisible.  The floodwaters from the MRGO entered the

2  16:25:47  Chalmette area and overtopped the 40-Arpent Levee at Paris Road

3  16:25:53  at about 8:20.

4  16:25:54  What we can determine through our analysis is that

5  16:25:56  the north and the south breaches along the IHNC floodwall

6  16:26:00  accounted for over 90 percent of the flow in the Lower Ninth

7  16:26:04  Ward in St. Bernard Parish before 9:00 a.m.

8  16:26:09  The floodwaters of the IHNC eventually merged with

9  16:26:14  the MRGO floodwaters just west and south of Paris Road.

10  16:26:19  Q.  Let me interject a question right there.  You just

11  16:26:22  testified that the floodwaters from the Mississippi River Gulf

12  16:26:24  Outlet, once they merged with the floodwaters from the Inner

13  16:26:29  Harbor Navigation Canal, were indivisible.  What does that

14  16:26:32  mean?

15  16:26:34  A.  When two water bodies from separate areas come together

16  16:26:38  and commingle, you can't determine which water is it at that

17  16:26:44  point.

18  16:26:45  Q.  You cannot trace the molecules?

19  16:26:47  A.  That's correct.

20  16:26:48  Q.  What about the water for the north breach and the water

21  16:26:51  from the south breach?

22  16:26:53  A.  I would say that water up until the point it ties

23  16:26:59  together, I mean, it becomes together, but you can also

24  16:27:06  determine it based upon some science relative to width of

25  16:27:10  opening.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1157

1  16:27:10  So there are some processes that you can use to

2  16:27:12  determine that, but for all practical purposes, once water --

3  16:27:15  the north breach occurs at 4:30, or 4:00 or 4:30; the south

4  16:27:21  breach from 5:00 to 5:45.  So once they -- after 5:30, it's a

5  16:27:25  quick rush of water from the south breach toward the north

6  16:27:29  breach, and it's hard to distinguish the water at that time.

7  16:27:36  THE COURT:  If the north breach occurred later than

8  16:27:37  you assumed for the purposes of your opinion, let's say an hour

9  16:27:45  to an hour and a half later, what difference does that make in

10  16:27:49  your opinion?

11  16:27:55  THE WITNESS:  Again --

12  16:27:56  THE COURT:  Is that a fair question?  I mean, I guess

13  16:28:01  it's got to be something I'm looking at for various reasons,

14  16:28:05  but does that -- does that alter your opinion in any way?

15  16:28:10  THE WITNESS:  The early flooding --

16  16:28:14  THE COURT:  In other words, from 6:00 to 9:00, rather

17  16:28:16  than 4:30 to 9:00, does it make ...

18  16:28:20  THE WITNESS:  It's hard to correlate why would there

19  16:28:22  be flooding that's been witnessed at the 5:00-to-6:00 time

20  16:28:30  frame.  It would be hard to describe.

21  16:28:32  THE COURT:  Do you have any record of any flooding

22  16:28:34  over 2 or 3 feet, vis-à-vis a 911 call -- I guess I'm -- what

23  16:28:46  are you relying on to show that there was substantial flooding

24  16:28:49  at 5:00, other than eyewitness testimony?

25  16:29:12  THE WITNESS:  Team Louisiana clock No. 25 stopped at

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1158

1  16:29:16  5:00 a.m., which is 7 feet off the ground, and that's by the

2  16:29:21  south breach.

3  16:29:26  THE COURT:  By the south breach, okay.  Where was

4  16:29:28  that clock located; do you know?

5  16:29:34  THE WITNESS:  Can we go to --

6  16:29:37  THE COURT:  I mean, what -- I guess, rather than get

7  16:29:38  into this, because there is some evidence that one could

8  16:29:43  interpret Mr. Villavaso's deposition, if I credit it, as him

9  16:29:50  turning off those pumps right after the floodwall came down.

10  16:29:53  Unless the breach was incremental and the flooding was

11  16:29:59  incremental.  So if it happened suddenly, he reacted suddenly.

12  16:29:59  At least, one can interpret that from his deposition.

13  16:30:02  And so I don't want to really, you know,

14  16:30:05  cross-examine you about that.  I'm just wondering:  Does it

15  16:30:08  alter your opinion substantially if it did occur an hour or an

16  16:30:11  hour and a half later?  In other words, if the volume is coming

17  16:30:15  in from 6:00 to 9:00 or whatever, whenever the waters met,

18  16:30:20  rather than from 4:30, does it make it 10 -- 8 feet instead of

19  16:30:27  10 feet?  Or are you able to answer that?  It may not be a fair

20  16:30:32  question.

21  16:30:33  THE WITNESS:  I probably can't answer the exact

22  16:30:35  depth, but it would be hard explaining early flooding related

23  16:30:39  to some of the significant early flooding that's been reported.

24  16:30:42  THE COURT:  Why was the first 911 call not until

25  16:30:46  6:30?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1159

1  16:30:47  THE WITNESS:  My opinion?

2  16:30:48  THE COURT:  Do you have any explanation for that?

3  16:30:51  THE WITNESS:  My opinion is they're on the roof.

4  16:30:53  It's --

5  16:30:54  THE COURT:  You got cell phones.  Okay.  It just --

6  16:30:59  it's just something -- I just need to -- I ultimately have to

7  16:31:05  figure this out, and I'm just wondering, if you can tell me

8  16:31:08  that it's not a substantial difference or it is.  It might be

9  16:31:12  helpful to me eventually.  But if you can't, I certainly

10  16:31:15  understand that as well.

11  16:31:19  THE WITNESS:  Yeah, it would be difficult to kind of

12  16:31:22  say as far as the north breach occurring later because, again,

13  16:31:26  the -- but it's possible.  I mean, the north breach probably,

14  16:31:31  in terms of its contribution, is probably 20 percent, versus

15  16:31:36  80 percent from the south breach, because of the size of the

16  16:31:39  opening.

17  16:31:40  THE COURT:  Size of the opening.

18  16:31:41  THE WITNESS:  So, I mean, just from that standpoint,

19  16:31:44  I mean, clearly once that 5:30 happens, there's a lot more

20  16:31:49  water being pushed in.

21  16:31:51  THE COURT:  Okay.  That's fair enough.

22  16:31:56  MR. SEYMOUR:  Your Honor, could we just show -- could

23  16:31:59  we have the ELMO?

24  16:32:02  THE COURT:  Yes, sir.  I've read the Villavaso

25  16:32:09  deposition.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1160

1  16:32:10      MR. GILBERT:  Okay.

2  16:32:11      THE COURT:  I don't need to see it again.

3  16:32:12      MR. GILBERT:  It's just for the three or four --

4  16:32:14      THE COURT:  I've read it all and I'm going to read it

5  16:32:16   again.

6  16:32:17      MR. GILBERT:  Gotcha.

7  16:32:17      THE COURT:  I understand it.  Okay?  I think when the

8  16:32:20   walls came down, he didn't just look around and suck his thumb.

9  16:32:26   That's not what I get from it anyway.

10 16:32:28      MR. GILBERT:  I don't think so either.

11 16:32:29      THE COURT:  When he heard the "bang," he moved.  Or

12 16:32:33   the "boom" or whatever you call it.  Go ahead.

13 16:32:35   BY MR. SEYMOUR:

14 16:32:36   Q.  As a practical matter, when you got the north and the

15 16:32:39   south breach so close together, after the waters mingle, is it

16 16:32:44   possible to distinguish which water molecules hit which

17 16:32:48   property?

18 16:32:48   A.  No.

19 16:32:52   Q.  And that is what you described as being indivisible?

20 16:32:55   A.  Yes.

21 16:32:59   Q.  I believe you were on the second or third conclusion on

22 16:33:02   slide 89 when I asked my question.

23 16:33:06      THE COURT:  Let me ask you this:  If it was going to

24 16:33:07   be 5 feet but then it was 10 feet, you could figure that

25 16:33:11   difference, couldn't you?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1161

1  16:33:12      In other words, as a hypothetical, if the water

2  16:33:14   from the two breaches was only going to reach 5 feet at a

3  16:33:19   certain point, and it got to be 10 feet because of MRGO, you

4  16:33:22   could at least say any damage occurring above 5 feet, one could

5  16:33:27   maybe attribute to the MRGO?

6  16:33:29      THE WITNESS:  Yes.

7  16:33:30      THE COURT:  Okay.

8  16:33:31   BY MR. SEYMOUR:

9  16:33:31   Q.  And you have that shown on those reports for the

10 16:33:33   plaintiffs' properties; is that correct?

11 16:33:36   A.  Yes.

12 16:33:36      THE COURT:  Thank you, sir.

13 16:33:37   BY MR. SEYMOUR:

14 16:33:37   Q.  Okay.  Please continue on slide 89.

15 16:33:41   A.  The last point on the slide is that the water levels

16 16:33:45   within the Lower Ninth Ward and the parish peaked at about

17 16:33:49   10 1/2 to 11.1 feet at about 12:20 that afternoon on

18 16:33:54   August 29th.

19 16:33:55   Q.  Please turn to slide 90.

20 16:34:00   A.  We believe the model, flood-simulation model, provides us

21 16:34:04   with reliable and accurate results.  It closely matches

22 16:34:08   eyewitness accounts, stopped clocks, and high water marks.

23 16:34:13      This flood simulation, which is our animation, gives

24 16:34:17   a progression of the flooding.  Hopefully, that helps give an

25 16:34:23   understanding of the flood times and depths.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1162

1  16:34:26      And then the flood-simulation model for Hurricane

2  16:34:29   Katrina, the ALL Causes, was used to attain the floodwater

3  16:34:33   depths for these plaintiffs' locations at those shown

4  16:34:37   locations there.

5  16:34:40      MR. SEYMOUR:  May I have just a second to confer with

6  16:34:43   counsel.

7  16:34:43      THE COURT:  Simply because the Court questions

8  16:34:47   doesn't mean the Court's made any kind of decision yet.  I just

9  16:34:50   know the things I am going to have to confront later on, and

10 16:34:52   I'm hoping to maybe get enlightened.

11 16:34:55      But, certainly, we have witnesses that have

12 16:34:56   spent a great deal of time and effort in meticulously rendering

13 16:35:03   your report in depth.

14 16:35:06      MR. SEYMOUR:  Thank you, Your Honor.  I tender the

15 16:35:07   witness.

16 16:35:11      THE COURT:  All have been helpful to the Court.

17 16:35:38      MR. CHUD:  Your Honor, Adam Chud for Lafarge.  I just

18 16:35:40   wanted to briefly say before I started, you had asked

19 16:35:43   Mr. Seymour about the relevance of all these hydrologic issues,

20 16:35:47   and I just want to point out for the record this isn't just

21 16:35:49   about whether the MRGO would have inevitably flooded --

22 16:35:52      THE COURT:  You can -- if you want, you can.

23 16:35:55      MR. CHUD:  I'll ask questions on other issues.

24 16:35:56   That's all.

25 16:35:57      THE COURT:  You might just outline a few of those

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1163

1  16:36:00   issues for me.  You don't have to do them all.

2  16:36:03      MR. CHUD:  Well, one of the issues is the relative

3  16:36:05   contributions of the waters from the north and the south breach

4  16:36:08   to particular locations.

5  16:36:09      THE COURT:  Okay.

6  16:36:10      MR. CHUD:  Another issue is the maximum water levels

7  16:36:12   just from the Industrial Canal water at particular locations.

8  16:36:16      Another one is whether the breach times that

9  16:36:18   Mr. Spinks is using are accurate.

10 16:36:21      THE COURT:  Fair enough.

11 16:36:22      MR. CHUD:  That's my preliminary list at this point.

12 16:36:23      THE COURT:  I realize it is certainly not exclusive.

13 16:35:17      CROSS-EXAMINATION

   BY MR. CHUD:

14 16:36:29   Q.  Good afternoon, Mr. Spinks.

15 16:36:30   A.  Good afternoon.

16 16:36:30   Q.  I wanted to start off by talking about something that was

17 16:36:32   touched on in one of your slides, which is waves in the

18 16:36:34   Industrial Canal.

19 16:36:35      You said that IPET found that waves in the Industrial

20 16:36:37   Canal were less than 1 foot before 5:30 in the morning and then

21 16:36:41   got up to 2 or 3 feet after that.  Do you remember that?

22 16:36:44   A.  Yes.

23 16:36:44   Q.  Okay.  And those are the maximum wave heights during peak

24 16:36:48   wind conditions; correct?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1164

| | |
|---|---|
| 1 | 16:36:51 A. Yes, according to IPET's information. |
| 2 | 16:36:53 Q. And those are the wave heights you used in your analysis? |
| 3 | 16:36:57 A. We did not include waves within the IHNC within the model |
| 4 | 16:37:02 because the wave overtopping would occur after 6:00 a.m., which |
| 5 | 16:37:11 our breach had already occurred, and the amount of volume of |
| 6 | 16:37:14 water associated with the wave overtopping is very |
| 7 | 16:37:18 insignificant compared to the mass of water from the breaches. |
| 8 | 16:37:23 Q Is it your testimony today that you did not rely on the |
| 9 | 16:37:26 IPET wave heights in your analysis in this case? |
| 10 | 16:37:31 A. No. I think we reference them, so we relied upon them. |
| 11 | 16:37:37    THE COURT: They certainly weren't part of your -- |
| 12 | 16:37:39 they were not part of your modeling in the determining of the |
| 13 | 16:37:41 depths and the time, et cetera. Is that -- |
| 14 | 16:37:45    THE WITNESS: That's correct. |
| 15 | 16:37:46    THE COURT: The Court understands that. Go ahead. |
| 16 | 16:37:49 BY MR. CHUD: |
| 17 | 16:37:49 Q. It's your opinion that the IPET team went through a |
| 18 | 16:37:53 scientific process to come up with its Industrial Canal wave |
| 19 | 16:37:57 heights; is that true? |
| 20 | 16:37:58 A. Yes. |
| 21 | 16:37:58 Q. And then based on the science that you've read and |
| 22 | 16:38:01 studied, you have no reason to believe that there were 20-foot |
| 23 | 16:38:05 waves in the Industrial Canal during Katrina; is that true? |
| 24 | 16:38:09 A. That's correct. |
| 25 | 16:38:11 Q. I want to talk briefly about the Sobek model. This |

1165

| | |
|---|---|
| 1 | 16:38:17 assignment in this case was the first time that you had |
| 2 | 16:38:19 actually worked with the Sobek model; correct? |
| 3 | 16:38:22 A. It's the first time, yes, sir. Our firm purchased this |
| 4 | 16:38:26 model and used it. |
| 5 | 16:38:27 Q. And when you put your CV up on the screen earlier that had |
| 6 | 16:38:31 the list of all the models that you say you had skills in, |
| 7 | 16:38:33 Sobek wasn't on that list, was it? |
| 8 | 16:38:36 A. No. |
| 9 | 16:38:37 Q. And one of the things you do as a modeler is try to |
| 10 | 16:38:41 quantify the sequence and relative contribution of various |
| 11 | 16:38:46 sources of flooding; is that fair? |
| 12 | 16:38:49 A. That's fair. |
| 13 | 16:38:51 Q. So even if water coming from various sources mixes, |
| 14 | 16:38:55 modeling lets you decide how much water at that location came |
| 15 | 16:38:59 from a particular source; correct? |
| 16 | 16:39:02 A. Yes, it can. |
| 17 | 16:39:04 Q. And I think you said before that the Sobek model doesn't |
| 18 | 16:39:08 take into account any water that's coming under a floodwall or |
| 19 | 16:39:11 through a floodwall; is that correct? |
| 20 | 16:39:14 A. This is a surface-water model; and therefore, the flows |
| 21 | 16:39:19 have to be generated by rainfall or some external flow |
| 22 | 16:39:25 patterns. So this is not a type of model that would |
| 23 | 16:39:30 actually -- you could account for groundwater seepage within. |
| 24 | 16:39:37 Q. And it also doesn't take into account water that might be |
| 25 | 16:39:40 coming over the floodwall in terms of wave overtopping; |

1166

| | |
|---|---|
| 1 | 16:39:44 correct? |
| 2 | 16:39:44 A. No. It accounts for overtopping. I mean, beyond the |
| 3 | 16:39:49 breaches, this model takes into account the entire overtopping |
| 4 | 16:39:53 after the surge elevations along the IHNC get over the top, |
| 5 | 16:39:59 so -- go ahead. |
| 6 | 16:40:03 Q. But my question is: To the extent that water's coming |
| 7 | 16:40:06 over through wave overtopping, not when the surge gets to the |
| 8 | 16:40:10 level where the water just pours over but wave overtopping, |
| 9 | 16:40:14 that's not taken into account in the model? |
| 10 | 16:40:16 A. Are you referring to the wave splash? |
| 11 | 16:40:18 Q Yes. |
| 12 | 16:40:18 A. In terms of the wave splash, we computed that it would be |
| 13 | 16:40:22 fairly minor, less than 5 percent, between the hour -- before |
| 14 | 16:40:27 7:30, before it fully overtops. So, therefore, we didn't feel |
| 15 | 16:40:32 that it would be significant to our model to not include a |
| 16 | 16:40:38 discharge within it. |
| 17 | 16:40:40 Q. Just to be clear, putting aside how much wave overtopping |
| 18 | 16:40:43 you thought there was, the model doesn't incorporate that |
| 19 | 16:40:46 amount, however much it was? |
| 20 | 16:40:50 A. That's correct. |
| 21 | 16:40:51    THE COURT: And by "wave overtopping," make sure |
| 22 | 16:40:54 we're talking about the same thing. The Court understands that |
| 23 | 16:41:01 to be water that came over the wall as a result of hitting |
| 24 | 16:41:04 against the wall and splashing over the wall, not water that, |
| 25 | 16:41:08 once the level got over the wall, was pouring over the wall, if |

1167

| | |
|---|---|
| 1 | 16:41:12 the wall did, in fact, exist. Is that correct? |
| 2 | 16:41:17    THE WITNESS: That's my understanding to correct. |
| 3 | 16:41:19    THE COURT: Yes. |
| 4 | 16:41:19 BY MR. CHUD: |
| 5 | 16:41:20 Q. Now, Mr. Spinks, during your direct exam, there was a |
| 6 | 16:41:22 slide put on the screen that said it was your opinion that wave |
| 7 | 16:41:25 overtopping at the Industrial Canal began at 6:00 in the |
| 8 | 16:41:27 morning; is that correct? |
| 9 | 16:41:31 A. We believe splash to begin somewhere around 6:00 a.m., |
| 10 | 16:41:34 yes. |
| 11 | 16:41:34 Q. And were you in the courtroom yesterday during |
| 12 | 16:41:38 Dr. Marino's cross-examination? |
| 13 | 16:41:39 A. For the most part, yes. |
| 14 | 16:41:41 Q. Did you see there were some slides put on the screen |
| 15 | 16:41:43 concerning the testimony of Mr. Ernest Edwards? Do you |
| 16 | 16:41:46 remember those slides? |
| 17 | 16:41:47 A. I don't recall the specifics, but I remember the |
| 18 | 16:41:51 discussion about Ernest Edwards. |
| 19 | 16:41:53 Q Do you remember reading Mr. Edwards' deposition transcript |
| 20 | 16:41:57 in doing your work in this case? |
| 21 | 16:41:59 A. I have read his deposition, yes. |
| 22 | 16:42:00 Q. And he said that, when he got to the Claiborne bridge at |
| 23 | 16:42:05 around 3:00 in the morning, he saw water pouring over the wall |
| 24 | 16:42:09 and causing a trench at the base of the wall. Do you remember |
| 25 | 16:42:12 that portion of his deposition? |

1168

```
16:42:13  A.  I don't remember that.  What I do remember is that he went
16:42:17  to the bridge, and then at about 3 a.m., he went out to the
16:42:21  Florida Avenue bridge, all the way to the other side, to look
16:42:25  at what the water level was.  And what -- him and his son, I
16:42:30  believe, went to go look, and they were concerned that the
16:42:33  water was rising but never mentioned that it was coming over.
16:42:37  They just said it was rising very fast.
16:42:40  Q.  So to the extent that Mr. Edwards testified at his
16:42:43  deposition that there was water coming over the wall at 3:00 in
16:42:47  the morning causing a trench, you haven't taken that into
16:42:51  consideration in forming your opinion about the time of wave
16:42:54  overtopping?
16:42:56  A.  No, not specifically.
16:42:57  Q.  Let's talk about the inputs you put into the Sobek model.
16:43:00  One of them was the breach times for the north and south
16:43:03  breaches; correct?
16:43:04  A.  Correct.
16:43:04  Q.  Your model starts the north breach at 4:00 and the south
16:43:07  breach at 5:30; correct?
16:43:10  A.  Correct.
16:43:10  Q.  And are you aware that Dr. Marino says that the estimated
16:43:13  time of the north breach was 6:00?
16:43:18  A.  Yes.  And hearing his testimony for the first time and not
16:43:22  having read his report before, that I believe he testified that
16:43:27  the 6:00 was just based on an eyewitness account.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1170

```
16:44:33  A.  And, again, having heard his testimony here, I believe he
16:44:37  based it on a 911 call.
16:44:41  Q.  So you think he's wrong on that time?
16:44:46  A.  That's his opinion, his interpretation of something.  So I
16:44:51  don't know if that's necessarily I believe he's wrong.
16:44:53       But I know from the science that we've run that we
16:44:57  have to fill up a significant area prior to somebody being in
16:45:10  their attic at that time, that it would be virtually impossible
16:45:15  in terms of quantity of water to breach at 6:30 and be in your
16:45:19  attic before the breach.
16:45:19  Q.  You're aware that Mr. Pazos says that the north breach
16:45:22  initiated between 4:30 and 5:00?
16:45:26  A.  No, I'm not aware.
16:45:28  Q.  Are you aware that Mr. Pazos says that the north breach
16:45:31  was fully formed at 6:00 or 8:00?
16:45:35  A.  No, I'm not aware of that testimony.
16:45:37  Q.  Are you aware that Mr. Pazos' report says that the south
16:45:40  breach occurred at 6:00 to 6:30?
16:45:43  A.  I'm not aware of his testimony or report.
16:45:47  Q.  But if those are the times that he offers his opinion for
16:45:51  the breach times, those are different than the conclusions
16:45:53  you've reached; is that correct?
16:45:55  A.  If you're correct in saying what they said, then I guess
16:46:01  mine would be different.
16:46:03  Q.  And you also, in your report, talk about IPET finding that
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1169

```
16:43:32  Q.  In fact, the 6:00 was based on the closure of the pump
16:43:36  station, shutdown of the pump station, wasn't it?  Isn't that
16:43:41  the eyewitness account that he relied on?
16:43:44  A.  I believe so.
16:43:44  Q.  You relied on that same exact account to get to a
16:43:48  4:00 breach time?
16:43:50       THE COURT:  I think he said 4:30.  I may be wrong.
16:43:52       THE WITNESS:  The breach initiated at 4:00.
16:43:55       THE COURT:  Oh.  Excuse me, counsel.
16:43:57  BY MR. CHUD:
16:43:57  Q.  So you interpret that same eyewitness account differently
16:43:59  than Dr. Marino?
16:44:02       MR. SEYMOUR:  Objection to "eyewitness."  That's the
16:44:04  time that the logs showed that the station was shut down or had
16:44:09  the power shut down, but that's not the same thing as an
16:44:12  eyewitness.
16:44:13       THE COURT:  Certainly, the log shows the power shut
16:44:16  down at 6:10.
16:44:17  BY MR. CHUD:
16:44:17  Q.  You're aware that Dr. Marino --
16:44:20  A.  Go ahead.
16:44:21  Q.  I'm sorry.  Are you aware that Dr. Marino says that
16:44:24  flooding from the south breach began at 6:30, aren't you?
16:44:29  A.  Yes.
16:44:30  Q.  That's different than your south breach time; right?
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1171

```
16:46:05  floodwaters started entering into the Lower Ninth Ward prior to
16:46:10  5:30 and maybe as early as 4:30.  That's how -- you talked
16:46:14  about that in your report?
16:46:16  A.  That's one of the pieces of evidence that supports the
16:46:19  earlier time.
16:46:21  Q.  And you said, I think, earlier that IPET did simulations
16:46:25  based on the Industrial Canal breaches where they started the
16:46:29  south breach at 7:00; is that right?
16:46:31  A.  Yes.
16:46:34  Q.  Now, IPET didn't actually say that the north breach had
16:46:38  occurred at 4:00, did it?
16:46:42  A.  Their trigger elevation was at 9 feet, which correlates
16:46:45  with 4:00 a.m. in the morning along the IHNC, which is a
16:46:48  measured surge hyetograph in the IHNC.  So it's -- there's no
16:46:55  dispute to that external search hyetograph.
16:47:00  Q.  Are you familiar with Mr. Villavaso's testimony about the
16:47:02  amount of water that was coming over at the north breach site
16:47:04  before the breach occurred?
16:47:07  A.  I remember reading, you know, after 3:00 or so that he
16:47:13  witnessed, I mean, splashing, yes.
16:47:17  Q.  Now, the ILIT team concluded that both breaches occurred
16:47:20  at 7:30 to 7:45; correct?
16:47:27  A.  I believe somewhere in that neighborhood, 7:00 to 7:30, is
16:47:30  what I recall.
16:47:31  Q.  And Team Louisiana said that both breaches were at 7:30;
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**29 (Pages 1168 to 1171)**

**1172**

| | | |
|---|---|---|
| 1 | 16:47:35 | is that right? |
| 2 | 16:47:35 | A.  Yes. |
| 3 | 16:47:36 | Q.  Okay.  Now, as part of your work on this case, you |
| 4 | 16:47:39 | reviewed the study of Katrina flooding by the Delft University |
| 5 | 16:47:44 | team, didn't you? |
| 6 | 16:47:46 | A.  Yes. |
| 7 | 16:47:48 | Q.  And that group used breach times of 7:00 to 7:30 for the |
| 8 | 16:47:52 | Industrial Canal? |
| 9 | 16:47:54 | A.  Yes.  And they relied upon Team Louisiana's report; which, |
| 10 | 16:47:58 | actually, Team Louisiana's times came -- they actually |
| 11 | 16:48:04 | published their report after IPET finished their -- or issued |
| 12 | 16:48:09 | their final report. |
| 13 | 16:48:12 | And Team Louisiana or ILIT did no interior flooding |
| 14 | 16:48:17 | analysis.  It's all based upon the structural wall failures. |
| 15 | 16:48:22 | Q  That was the conclusion of that team; you just don't agree |
| 16 | 16:48:26 | with it? |
| 17 | 16:48:28 | A.  Well, I think they just based it on the time the wall |
| 18 | 16:48:31 | failed, not on -- clearly not on witnesses being underwater and |
| 19 | 16:48:34 | in their roofs and on top of their house, because before |
| 20 | 16:48:38 | 7:00 a.m., people were on their roofs. |
| 21 | 16:48:42 | Q  Let's talk about one of those witnesses, Terry Adams.  He |
| 22 | 16:48:44 | was one of the witnesses that I think you talked about during |
| 23 | 16:48:46 | your direct exam, that he had water on his carpet at 5:00; |
| 24 | 16:48:50 | right? |
| 25 | 16:48:50 | A.  Yes. |

**1173**

| | | |
|---|---|---|
| 1 | 16:48:53 | THE COURT:  Can you get a little closer to the mic. |
| 2 | 16:48:54 | We're having a little -- |
| 3 | 16:48:57 | MR. CHUD:  Is that better? |
| 4 | 16:48:57 | THE COURT:  I don't know if the mic is just not |
| 5 | 16:48:59 | working as well. |
| 6 | 16:49:01 | MR. CHUD:  Keep it a little higher? |
| 7 | 16:49:04 | THE COURT:  Yes, there you go. |
| 8 | 16:49:06 | MR. CHUD:  I didn't realize I was so tall. |
| 9 | 16:49:08 | BY MR. CHUD: |
| 10 | 16:49:09 | Q.  Mr. Spinks, were you in court when Mr. Adams testified at |
| 11 | 16:49:12 | trial? |
| 12 | 16:49:12 | A.  No, sir. |
| 13 | 16:49:13 | Q.  Have you read his trial testimony? |
| 14 | 16:49:15 | A.  No, sir. |
| 15 | 16:49:18 | Q.  He lived near the north breach site; correct? |
| 16 | 16:49:21 | A.  Yes. |
| 17 | 16:49:22 | Q.  And in reliance on what Mr. Adams said in his deposition, |
| 18 | 16:49:25 | your report concluded that he had wet carpet at 5:00, and that |
| 19 | 16:49:30 | was support for your 4:00 north breach time; correct? |
| 20 | 16:49:37 | A.  It's important that all the data plays a role in |
| 21 | 16:49:42 | determination of that time; but, yes, it's one piece of |
| 22 | 16:49:46 | evidence that would support an earlier breach time. |
| 23 | 16:49:49 | Q.  And you don't actually know whether the water that was on |
| 24 | 16:49:53 | his carpet had come from water that had either overtopped the |
| 25 | 16:49:59 | floodwall or seeped under or through the floodwall, do you? |

**1174**

| | | |
|---|---|---|
| 1 | 16:50:05 | A.  No, I was not there, no evidence to -- or information |
| 2 | 16:50:10 | about the source of that water. |
| 3 | 16:50:13 | Q.  Are you aware that Mr. Adams testified at trial that, |
| 4 | 16:50:15 | before he even got onto his attic, the water was up to his |
| 5 | 16:50:20 | waist.  Then the water rose to his feet as he was going up the |
| 6 | 16:50:24 | stairs of his attic.  Then when he broke out onto his roof, he |
| 7 | 16:50:28 | looked out, and the levee near his house, the north breach |
| 8 | 16:50:31 | area, was completely intact, and he saw water coming over the |
| 9 | 16:50:35 | floodwall and under the floodwall. |
| 10 | 16:50:37 | Are you aware that that was his testimony at trial in |
| 11 | 16:50:40 | this case? |
| 12 | 16:50:41 | A.  No. |
| 13 | 16:50:44 | Q.  And even -- and so you relied on Mr. Adams' deposition |
| 14 | 16:50:49 | testimony, not his trial testimony; right? |
| 15 | 16:50:52 | A.  His deposition testimony. |
| 16 | 16:50:53 | Q.  But even at his deposition, Mr. Adams said that when he |
| 17 | 16:50:57 | looked at the levee near his house at 5:30 or 6:00, he didn't |
| 18 | 16:51:01 | see a breach, but he saw water coming under and over the levee; |
| 19 | 16:51:06 | isn't that what he said in his deposition? |
| 20 | 16:51:07 | A.  You would have to show me.  I don't recall exactly. |
| 21 | 16:51:10 | Q.  Okay.  Can we pull up Adams' deposition.  It's page 23, |
| 22 | 16:51:16 | line 21 to 24, line 4. |
| 23 | 16:51:19 | "QUESTION:  Tell me what the wall looked like as you |
| 24 | 16:51:22 | looked at it from the roof at 5:30 or thereabouts on the 29th. |
| 25 | 16:51:27 | "ANSWER:  Between -- I'd say somewhere between 5:30 |

**1175**

| | | |
|---|---|---|
| 1 | 16:51:30 | and 6:00, the levee right by my house, the water was kind of, |
| 2 | 16:51:34 | like, coming under it.  I could see that.  And a little over |
| 3 | 16:51:37 | it.  But the levee was still there.  The rest of the levee was |
| 4 | 16:51:40 | totally intact." |
| 5 | 16:51:42 | Do you recall reading that testimony from Mr. Adams? |
| 6 | 16:51:45 | A.  Now I do. |
| 7 | 16:51:49 | Q.  We talked about the logbook for the pump station before. |
| 8 | 16:51:56 | Do you remember that? |
| 9 | 16:51:57 | A.  Yes. |
| 10 | 16:51:57 | Q.  And I'm -- I apologize if I'm repeating myself, but do you |
| 11 | 16:52:01 | recall reading from Dr. Marino's report that he relied on that |
| 12 | 16:52:05 | same logbook entry and concluded from that that the north |
| 13 | 16:52:09 | breach had actually occurred at 6:00? |
| 14 | 16:52:14 | A.  I understand now, after hearing his testimony, that's what |
| 15 | 16:52:16 | he relied on. |
| 16 | 16:52:19 | Q.  Now, one of the witnesses you rely on for the south breach |
| 17 | 16:52:21 | was Carolyn Berryhill; is that right? |
| 18 | 16:52:25 | A.  Yes.  She's one of the witnesses. |
| 19 | 16:52:27 | Q.  She didn't actually report seeing a breach at the south |
| 20 | 16:52:30 | area of the floodwall at 5:30, did she? |
| 21 | 16:52:34 | A.  The evidence that I have for my files in terms of flooding |
| 22 | 16:52:39 | is that at 5:38 -- she probably said between 5:30 and 5:45 -- |
| 23 | 16:52:46 | the third stairway was -- water was up to the third stairway. |
| 24 | 16:52:53 | Q.  But you don't actually know whether the water that she had |
| 25 | 16:52:56 | at her house may have come from overtopping, seepage, or |

**1176**

```
16:53:00   1  perhaps even water coming from the north breach?
16:53:02   2      A.  If you're asking for my opinion, I don't believe seepage
16:53:06   3  would put water into her house at that time, underseepage.  And
16:53:11   4  I don't believe overtopping from waves at that time would put
16:53:13   5  water in her house.
16:53:14   6      So, I mean, I don't have a model to show you that,
16:53:18   7  but from my 23 years of doing engineering and understanding of
16:53:25   8  the flooding events, that underground seepage is not going to
16:53:30   9  crawl up into somebody's home.  And wave overtopping, when we
16:53:34  10  looked at it, was not significant to put people on their roof.
16:53:39  11      Q.  Sir, my question was:  You don't actually know where the
16:53:43  12  water that she had in her home was coming from?
16:53:47  13      A.  No.  We modeled the IHNC's flow.  But, no, I guess.
16:53:54  14      Q.  Can we put up -- I want to show you an excerpt from a
16:53:59  15  brief that the plaintiffs filed in this case.  It's document
16:54:02  16  19693, page 4.  It was a brief filed by the plaintiffs.  I'm
16:54:10  17  just going to read it and ask you if you agree with this
16:54:10  18  statement.
16:54:10  19      "Mr. Murph's confusion about the time of these events
16:54:14  20  is not attributed to Lafarge but to the virtually universal
16:54:18  21  confusion and varying perceptions of time among those in mortal
16:54:23  22  danger during these events."
16:54:25  23      Do you agree with that assessment as to sort of the
16:54:27  24  confusion among the witnesses as to time?
16:54:30  25      MR. GILBERT:  I'd like to object, please.  I know
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**1177**

```
16:54:32   1  this is not my witness.  Mr. Seymour might be engaged
16:54:36   2  elsewhere.  This is not evidence.  This is argument of counsel.
16:54:40   3      THE COURT:  I understand it's argument of counsel.
16:54:40   4  It's not evidence.  But he can ask if you agree with that
16:54:47   5  proposition.  I'm not sure it's within his realm of expertise
16:54:51   6  as a hydrologist and engineer to -- although --
16:54:56   7      MR. GILBERT:  Maybe with a Ouija board or something
16:54:58   8  like that or --
16:54:59   9      THE COURT:  But, of course, he has -- he has looked
16:55:01  10  at a ton of depositions, a ton of other information, from high
16:55:10  11  water marks to stopped clocks, and the -- the amounts of water
16:55:16  12  that was in the IHNC at various times, to come to his
16:55:22  13  scientific conclusions.  And I think he testified that when --
16:55:31  14  and then he did a model to determine how the witness'
16:55:35  15  statements compared to his model.
16:55:40  16      MR. GILBERT:  Can I withdraw the objection and let
16:55:41  17  Mr. Chud pursue his --
16:55:44  18      THE COURT:  I'm going to let him ask the question,
16:55:46  19  the context of all of that.  The Court's not here in a vacuum
16:55:49  20  either.
16:55:49  21      But, certainly, you can answer the question as
16:55:51  22  best you can, sir.
16:55:55  23      THE WITNESS:  I'm not sure I can truly answer your
16:55:57  24  question, but I think the point here is that would a person's
16:56:05  25  perception change during a catastrophic event, you know, an
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**1178**

```
16:56:12   1  emergency.
16:56:12   2      MR. SEYMOUR:  Your Honor, before we go to the next
16:56:14   3  question, Mr. Gilbert was right that I was otherwise engaged
16:56:19   4  because I do not recall Mr. Adams' testimony as Mr. Chud had
16:56:24   5  described it, and I was looking up the transcript for --
16:56:27   6  morning transcript for June 22nd.
16:56:29   7      On page 260, it is clear that Mr. Adams' is
16:56:36   8  testifying that the intact floodwall at about 5:00 or 5:30 in
16:56:38   9  the morning was at the south -- area of the south breach,
16:56:42  10  looking down towards Claiborne Avenue is --
16:56:45  11      THE COURT:  These are the kind of objections that, if
16:56:50  12  you feel like they're important, then that's -- the Court's going
16:56:50  13  to read this entire transcript and synopsize it.  I'm going to
16:56:56  14  read your briefs carefully.
16:56:59  15      I'm going to assume counsel's -- unless it's
16:57:02  16  something completely off the wall, let him answer his question.
16:57:07  17  You can note an objection, if it doesn't comport with the
16:57:11  18  record, and then I'm going to just note it for the record.  I'm
16:57:14  19  not going to rule on it.
16:57:16  20      MR. SEYMOUR:  Thank you, Your Honor.
16:57:16  21      THE COURT:  Thank you.
16:57:20  22      MR. CHUD:  Your Honor, just for the record, on that
16:57:21  23  issue, I can refer the Court to pages 255, lines 5 to 8.
16:57:24  24      THE COURT:  I'm going to read the entire testimony,
16:57:28  25  get the drift of the entire testimony, and try to make an
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**1179**

```
16:57:32   1  ultimate conclusion about its relevance.
16:57:35   2  BY MR. CHUD:
16:57:36   3      Q.  Moving on, Mr. Spinks.  The formation periods for the
16:57:40   4  breaches, that was another input into the model?  How long it
16:57:43   5  took for the breaches to actually form?
16:57:45   6      A.  Yes.
16:57:47   7      Q.  You didn't study the mechanics or structural integrity of
16:57:50   8  the floodwall before the breaches, did you?
16:57:55   9      A.  Internally, we asked structural engineers, and we
16:57:58  10  discussed breach times related to structural walls.
16:58:03  11      Q.  You weren't asked -- that wasn't an issue you were asked
16:58:07  12  to look at in this case by the plaintiffs' team, was it?
16:58:10  13      A   It's part of my flooding -- my flooding analysis.  So I
16:58:13  14  mean, I'm interested in breach times, yes.
16:58:16  15      MR. CHUD:  Okay.  Can we look at Mr. Spinks' 2009
16:58:21  16  deposition, page 34, lines 14 to 22?
16:58:29  17      "QUESTION:  Does any part of your opinion allow
16:58:29  18  for a scenario whereby a weld between two sections of sheet
16:58:35  19  pile gives way and allows water intrusion before the opening of
16:58:41  20  the entire 20-foot breach?
16:58:48  21      "ANSWER:  We did not study the mechanics or the
16:58:51  22  structural integrity of the wall prior to any of the breaches,
16:58:57  23  and we weren't asked to do that."
16:59:07  24      THE WITNESS:  I think in the context you're asking
16:59:08  25  about a weld, a failure, and if you look at my deposition
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1180

```
16:59:13  probably before that, you were asking me do I have an opinion
16:59:18  on the actual failure of that wall.  And my answer was that,
16:59:24  no, we weren't asked to provide an opinion on the structural
16:59:27  failure.
16:59:27  BY MR. CHUD:
16:59:28  Q.  Okay.  That's fine.
16:59:31       Your report doesn't include the results of any study
16:59:33  or analysis that you did to determine how long it actually took
16:59:38  for the breaches to form; is that right?
16:59:42  A.  No.  It's based on the information, the research of
16:59:46  others, and our own internal understanding of the possibility
16:59:52  of those breach times being that plausible.
16:59:55  Q.  But nothing in your report that I can actually look at
16:59:57  says here's why you think the north breach took only 30 minutes
17:00:01  to form and here's why the south breach took only 15 minutes to
17:00:04  form?  I couldn't -- there's nothing in there on that, is
17:00:08  there?
17:00:08  A.  And it's inherent in our model, too, that -- because
17:00:13  breach time and duration is a function.  And so if our
17:00:19  model's -- if we saw a need to make a longer adjustment to the
17:00:26  breaching time, it may have been a consideration.
17:00:29       But given the failure, what we understood about the
17:00:32  failure, the 30-minute failure time for the north breach seemed
17:00:37  plausible; and the south breach, it appeared that it was much
17:00:44  more catastrophic, went much more quicker through the area.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1181

```
17:00:48  The eyewitnesses showed a -- that -- you know, they were
17:00:53  quickly on their roofs.  And so we felt that that 15-minute
17:00:57  duration, being that catastrophic, was within the realm of
17:01:00  possibility.
17:01:01  Q.  Mr. Spinks, if the Court concludes that the breaches took
17:01:06  longer to form than those periods that you used in your model,
17:01:11  you haven't provided the Court with any modeling results that
17:01:15  would show what the flooding patterns and water levels looked
17:01:18  like based on a longer breach-formation period, have you?
17:01:22  A.  No, I don't have any other --
17:01:25  Q.  So when you -- I'm sorry.
17:01:27       When you did your sensitivity analysis, you never
17:01:30  modified those breach-formation periods, did you?
17:01:35  A.  No.  And our sensitivity analysis was just to look at the
17:01:40  breach initiation times, that variable.
17:01:44  Q.  Let's talk about surface roughness coefficients.  That was
17:01:48  one other thing you said was another input into your model?
17:01:51  A.  Yes.
17:01:51  Q.  You've been working with those for your entire career, I
17:01:54  think you said?
17:01:55  A.  Yes.
17:01:55  Q.  And the roughness coefficient is the way that your model
17:01:58  takes into account the things that may be impeding the flow of
17:02:01  water through the neighborhood, like buildings and structures
17:02:04  and cars and the like; correct?
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1182

```
17:02:06  A.  Correct.
17:02:08  Q.  Now, let's put up page -- or Appendix C-5 to your report.
17:02:21  These are the roughness coefficients or Manning coefficients
17:02:27  that you used in your study?
17:02:29  A.  Yes.
17:02:29  Q.  So for residential areas, you used a Manning coefficient
17:02:33  of .050; is that correct?
17:02:38  A.  Correct.
17:02:38  Q.  Let's look at C-1 of your report.  I just want to look at
17:03:14  the last sentence of this paragraph.
17:03:15       It says:  "The Manning roughness coefficients were
17:03:17  obtained from various technical publications, including IPET
17:03:22  and Chow"; correct?
17:03:24  A.  Correct.
17:03:24  Q.  So let's look at the IPET roughness coefficient chart.
17:03:29  It's Plaintiff's Exhibit 244 at IV-5-102.
17:03:41       So for roughness coefficients, IPET had a low
17:03:45  residential figure of .070 and a high residential .14.  Do you
17:03:50  see that?
17:03:51  A.  Yes.
17:03:52  Q.  Okay.  And those are not the roughness coefficients that
17:03:54  you used, are they?
17:03:57  A.  Not for residential, for low or high.  But look at
17:04:02  commercial, .05.
17:04:06  Q.  And IPET broke out residential into low and high
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1183

```
17:04:10  residential, but you used one roughness coefficient for all
17:04:13  residential; correct?
17:04:16  A.  Because based on my 23 years of experience of modeling,
17:04:20  that is a variable that is one of those items that accounts for
17:04:28  a lot of different things.  I mean, buildings, the type of
17:04:33  terrain.  And that as a hydrologist and hydraulic engineer, we
17:04:41  believe the .07 and the .14 was extreme for this area, given
17:04:47  that there's not fences in a lot of areas.
17:04:51       And we felt that the Manning's "N" value in the
17:04:54  progression of a large volume of water -- we're not talking
17:04:59  about just flow over the surface 1 foot.  We're talking about a
17:05:03  large volume of water here moving through an area, and the
17:05:08  resistance would be fairly common, whether it's going through a
17:05:13  high-rise building of .05 in a commercial area or going through
17:05:17  an area with houses.
17:05:21       So the point is that I don't see a lot of differences
17:05:25  because there are commercial areas, a tremendous number of
17:05:29  commercial areas, in this area that are .05.
17:05:34  Q.  Just to be clear, the two particular sources you said that
17:05:37  you obtained your Manning coefficients from were IPET and Chow.
17:05:43  Those are the only two you identified; right?
17:05:46  A.  As you could tell, our tables -- we have a lot of --
17:05:49  there's some similarities that we agree upon on Manning's
17:05:53  coefficients, and there's differences that we have as well.  I
17:05:58  mean, we're an independent modeler.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1184

```
17:06:01        We do our research and our analysis independent of
17:06:04   anybody else, and we make our own opinions based on what we see
17:06:09   out there in the entire area.
17:06:14        MR. CHUD:  Could we just pull up Figure 1 on page C-2
17:06:19   of your report.
17:06:20   BY MR. CHUD:
17:06:22   Q.  Just so we're clear, the pink area is what you had
17:06:27   classified as residential; correct?
17:06:29   A.  Correct.
17:06:30   Q.  So all the pink area to the south of the 40-Arpent is
17:06:36   going to be residential, interspersed with some other land,
17:06:41   land use types?
17:06:42   A.  With commercial.
17:06:43   Q.  Okay.
17:06:44   A.  With industrial.  With agriculture.  With water bodies.
17:06:51   There's multiple land uses.
17:06:55   Q.  You would admit that there's an awful lot of pink there?
17:07:03   A.  Okay.
17:07:04   Q.  Let's talk about Chow.  Chow was a book published in 1959
17:07:10   called Open-Channel Hydraulics; right?
17:07:13   A.  That's correct.
17:07:14   Q.  Did you actually pick up the Chow book and read it in
17:07:18   connection with your work on this case?
17:07:20   A.  I have six years of education in water resources.  I've
17:07:23   read it many a-times.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1185

```
17:07:26   Q.  Well, after you got the assignment on this case, did you
17:07:27   pick it up to see what Chow would say about the proper Manning
17:07:32   coefficient for this land that we're looking at here?
17:07:36   A.  I understand the formulas within Chow, yes, I do.
17:07:41   Q.  I don't want to belabor it.  I'm just asking if you
17:07:43   actually picked it up to see what it said for the areas we're
17:07:47   looking at for this case.
17:07:50   A.  I'm trying to answer that.  Yes, it's a manual -- so, yes,
17:07:55   the answer would be yes.
17:07:56   Q.  This book does not mention the specific Manning
17:07:59   coefficients for residential areas, does it?
17:08:02   A.  Well, my book is -- my book is a different color of Chow.
17:08:10   Which version do you have?
17:08:11   Q.  Is your version --
17:08:14        MR. CHUD:  Well, can we switch to the ELMO?
17:08:20   BY MR. CHUC:
17:08:20   Q   I got this from the Library of Congress.  Open-channel
17:08:25   Hydraulics Ven Te Chow, 1959.  Is there another one?
17:08:35   A.  Sure, there's another one.
17:08:36   Q.  Another 1959 Chow book called Open-Channel Hydraulics?
17:08:39   A.  Yes.  Mine's got a --
17:08:41   Q.  Is it a different hard protective cover?
17:08:45   A.  It's different than that.
17:08:46   Q.  Okay.  So you're saying that your version of the 1959 Chow
17:08:50   actually has a table that identifies Manning coefficients for
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1186

```
17:08:54   residential areas?
17:08:56   A.  The process of identifying Manning's is a -- there's an
17:09:02   art to it as well.  It depends on the types of surface
17:09:06   conditions, and there's a group of Manning's "N" values for the
17:09:11   different types of surface conditions, and so you have to build
17:09:15   upon it in order to get to -- to a development site.
17:09:24        MR. CHUD:  Your Honor, I don't want to admonish the
17:09:26   witness about the question, but I think I just asked whether
17:09:28   this book says anything about residential areas.
17:09:31        THE COURT:  You certainly may.
17:09:33   BY MR. CHUD:
17:09:33   Q.  Can you -- this may be yes or no.  Yes or no, does this
17:09:36   book identify Manning's coefficients for residential areas?
17:09:41   A.  I haven't seen that book that you have in your hand.
17:09:47   Q.  Nowhere does this -- this Chow book that I have in my hand
17:09:51   from the Library of Congress --
17:09:53        THE COURT:  Here's a Chow from 1950, according to the
17:09:57   Internet.  And there's one from '59.
17:10:03        MR. CHUD:  Okay.  Can we pull up --
17:10:05        THE COURT:  I don't know if he was smarter in '50
17:10:08   than he was in '59.  I'm teasing, counsel.  The bottom line
17:10:12   is --
17:10:13   BY MR. CHUD:
17:10:13   Q.  Just so we can be clear, the records that you use in your
17:10:16   appendix is:  Chow, V.T., Open-Channel Hydraulics, 1959; right?
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 1187

```
17:10:24   A.  Yes, that's correct.
17:10:35        MR. CHUD:  Can we pull up page 113 of the Chow book
17:10:46   that I have.  Look at the middle column.
17:10:49   BY MR. CHUD:
17:10:49   Q.  Just to see what Chow in the one I have from the Library
17:10:52   of Congress calls a .05 Manning's coefficient.
17:10:57        It says:  "Scattered brush with heavy weeds."  Do you
17:11:05   see that, .05 Manning's?
17:11:08   A.  Yes.
17:11:08   Q.  And then below that, it says:  "Light brush and trees in
17:11:11   winter, .05 Manning's."  Do you see that?
17:11:15   A.  Yes.
17:11:17   Q.  Those don't accurately describe the surface conditions of
17:11:20   the residential areas in the Lower Ninth Ward before Katrina,
17:11:23   do they?
17:11:26   A.  Your interpretation wouldn't be correct.  That's brush,
17:11:31   item C.
17:11:34   Q.  I'm sorry.  You said my interpretation would be correct?
17:11:36   A.  Would not be correct.  You're looking at brush.
17:11:39   Q.  So you're saying that the residential area of the Lower
17:11:42   Ninth Ward before Katrina is analogous to scattered brush with
17:11:47   heavy weeds in terms of the obstacles that the buildings and
17:11:51   cars would -- would put in front of moving water?
17:11:59   A.  I guess I'm trying to answer this the best way I can, is
17:12:02   that I don't believe your interpretation of that value and your
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1188

| | |
|---|---|
| 17:12:09 | comparison to brush has a commonality. These values that are |
| 17:12:16 | in surface roughness conditions for a very large area, okay, |
| 17:12:19 | that my point -- the .05 and the .07 is a relative measure |
| 17:12:27 | that's very close in terms of moving the discharge over the |
| 17:12:33 | land. |
| 17:12:34 | The difference between .05 and .07 is not very |
| 17:12:38 | significant at all. Okay? But we believe, given the volume of |
| 17:12:43 | water, that .05 would be better represented in the calculations |
| 17:12:51 | that require the Manning's "N" value. |
| 17:12:56 | So to answer -- I can't -- for you to put up a slide |
| 17:12:59 | that says "brush" and say I'm comparing everything to brush is |
| 17:13:03 | a mischaracterization of all our analysis. |
| 17:13:07 | Q. Let's take a look at the picture that my Chow book has of |
| 17:13:10 | what a .05 roughness would look like. |
| 17:13:15 | This is from the 1959 Chow book, page 122. It says: |
| 17:13:24 | ".05, Dredge channel with very irregular side slopes and bottom |
| 17:13:30 | in dark-colored waxy clay, with growth of weeds and grass, |
| 17:13:36 | slight variation in shape of cross-section for variation in |
| 17:13:40 | size." |
| 17:13:41 | Is it your opinion that the channel portrayed in this |
| 17:13:45 | picture is -- poses as much obstacle to moving water as the |
| 17:13:50 | residential area of the Lower Ninth Ward before Katrina? |
| 17:13:55 | A. I think it's a mischaracterization of the values related |
| 17:14:00 | to the analysis that's done in Sobek. And I understand your |
| 17:14:08 | interpretation here because you're trying to understand a |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1189

| | |
|---|---|
| 17:14:11 | science that says this science book says .05 is equivalent to |
| 17:14:17 | this type of a section. |
| 17:14:22 | So you're telling me that the whole entire section |
| 17:14:25 | out there has got to look like this in order to have .05. What |
| 17:14:31 | I'm saying to you is that the .05 or the .07, which are very |
| 17:14:36 | close, are very close to what the numbers we would use in the |
| 17:14:44 | science of -- applicable to the Lower Ninth Ward. |
| 17:14:48 | Q. And just going back to IPET. IPET used not only .07 but |
| 17:14:53 | also .14 for what it called high residential; is that right? |
| 17:14:59 | A. That's what's listed on their table. But do you know how |
| 17:15:02 | many areas were high residential, high-rise residential? |
| 17:15:07 | Q. Okay. What is your understanding of the difference |
| 17:15:09 | between high residential and low residential? |
| 17:15:11 | A. I'm not sure. I didn't write those. |
| 17:15:15 | Q. Now, just so we understand, the lower roughness |
| 17:15:18 | coefficient means the water would be more efficient at moving |
| 17:15:21 | into an area; correct? |
| 17:15:25 | A. Correct. It's the lower the Manning's "N", the more |
| 17:15:31 | discharge you would have across the surface. |
| 17:15:35 | Q. So here, using a .05 roughness coefficient means that the |
| 17:15:41 | Industrial Canal water moves quicker eastward than if you had |
| 17:15:46 | used a higher roughness coefficient; right? |
| 17:15:50 | A. Yes. I think we've established that. |
| 17:15:53 | Q. Let's take a look at -- start taking a look at it, |
| 17:15:57 | modeling results that you found for the plaintiff locations for |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1190

| | |
|---|---|
| 17:16:01 | this case. |
| 17:16:02 | Can we pull up Appendix J, Figure 2, to your report? |
| 17:16:11 | THE WITNESS: Your Honor, can I ask for just a break? |
| 17:16:13 | I just need to run to the restroom. |
| 17:16:17 | THE COURT: Yeah. |
| 17:16:18 | THE WITNESS: I'm sorry. I just -- |
| 17:16:19 | THE COURT: We're just going to 5:30. I'll tell you |
| 17:16:22 | what, we'll just -- we're just going to take the recess for the |
| 17:16:26 | day. Go ahead. We're in recess. The witness is excused. |
| 17:16:36 | Where are we hour-wise? |
| 17:16:39 | MR. GILBERT: In terms of what's been used? |
| 17:16:44 | THE COURT: Yes. |
| 17:16:45 | MR. GILBERT: Rick? Luckily, we've got a very |
| 17:16:48 | efficient gentleman over here at the corner of the table. |
| 17:16:52 | THE COURT: He must be. |
| 17:16:54 | MR. SEYMOUR: But I don't have today factored in. |
| 17:17:09 | MR. ALDOCK: 23 hours. |
| 17:17:13 | MR. GILBERT: We've got -- we haven't burned our time |
| 17:17:16 | up, but I'm estimating that -- Adam, how much -- where were you |
| 17:17:23 | in your cross? |
| 17:17:24 | MR. CHUD: I'm hoping that I have about an hour left. |
| 17:17:27 | THE COURT: Okay. |
| 17:17:28 | MR. GILBERT: All right. We may have an hour of |
| 17:17:30 | redirect. |
| 17:17:32 | MR. SEYMOUR: Not much longer than that, but I would |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1191

| | |
|---|---|
| 17:17:34 | like to see the book that he was cross-examining from, if I |
| 17:17:37 | could. |
| 17:17:39 | THE COURT: Sure. |
| 17:17:39 | MR. GILBERT: Much shorter than that, and then I'm |
| 17:17:42 | going to have some stuff to say to the Court on the record, and |
| 17:17:46 | that shouldn't take that long, before we rest. |
| 17:17:49 | THE COURT: Okay. |
| 17:17:50 | MR. GILBERT: Well, in connection with resting. |
| 17:17:51 | THE COURT: You'll probably rest tomorrow? |
| 17:17:54 | MR. GILBERT: Yes, sir. |
| 17:17:55 | THE COURT: After -- maybe after -- |
| 17:17:59 | MR. GILBERT: I'm hoping to switch hats before lunch. |
| 17:18:02 | THE COURT: Okay. Got you. That's good enough. |
| 17:18:07 | MR. GILBERT: Okay. |
| 17:18:08 | THE COURT: Okay. |
| 17:18:08 | MR. GILBERT: Thank you, sir. |
| 17:18:09 | THE COURT: All right. We'll wrap up Mr. Spinks |
| 17:18:15 | probably in an hour, hour and a half, or two, and then we'll |
| 17:18:20 | see whatever else you have to do. So it should be probably |
| 17:18:26 | noon or thereabouts. |
| 17:18:27 | MR. GILBERT: I'm hoping so. |
| 17:18:28 | THE COURT: Okay. |
| 17:18:29 | MR. GILBERT: Thank you, sir. |
| 17:18:30 | THE COURT: All right. We are in recess for the day. |
| 17:18:39 | (WHEREUPON, the proceedings were concluded.) |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1192

1  *****
2  CERTIFICATE
3  I, Jodi Simcox, RMR, FCRR, Official Court Reporter
4  for the United States District Court, Eastern District of
5  Louisiana, do hereby certify that the foregoing is a true and
6  correct transcript, to the best of my ability and
7  understanding, from the record of the proceedings in the
8  above-entitled and numbered matter.
9
10
11  S/ Jodi Simcox, RMR, FCRR
    Jodi Simcox, RMR, FCRR
12  Official Court Reporter
13
14
15
16
17
18
19
20
21
22
23
24
25

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1643

1   UNITED STATES DISTRICT COURT

2   EASTERN DISTRICT OF LOUISIANA

3   ********************************************************************

4   IN RE:  KATRINA CANAL

5   BREACHES CONSOLIDATED

    LITIGATION

6
                                    CIVIL ACTION NO. 05-4182

7                                   SECTION "K" (2)

                                    NEW ORLEANS, LOUISIANA

8                                   THURSDAY, JULY 1, 2010, 9:00 A.M.

9   PERTAINS TO BARGE

10
    MUMFORD   C.A. NO. 05-5724

11  AS TO CLAIMS OF PLAINTIFFS

    JOSEPHINE RICHARDSON AND

12  HOLIDAY JEWELERS, INC.,

    ONLY

13
14  BENOIT   C.A. NO. 06-7516

    AS TO CLAIMS OF PLAINTIFFS

15  JOHN ALFORD AND JERRY

    ALFORD ONLY

16
17  ********************************************************************

18
                         DAY 8, MORNING SESSION

19          TRANSCRIPT OF NONJURY TRIAL PROCEEDINGS

         HEARD BEFORE THE HONORABLE STANWOOD R. DUVAL, JR.

20                 UNITED STATES DISTRICT JUDGE

21
22  APPEARANCES:

23
    FOR THE PLAINTIFFS:    BEST KOEPPEL TRAYLOR

24                         BY:  LAURENCE E. BEST, ESQUIRE

                           2030 ST. CHARLES AVENUE

25                         NEW ORLEANS LA  70130

1644

APPEARANCES CONTINUED:

LAW OFFICES OF BRIAN A. GILBERT
BY:  BRIAN A. GILBERT, ESQUIRE
2030 ST. CHARLES AVENUE
NEW ORLEANS LA  70130

KHORRAMI POLLARD ABIR
BY:  SHAWN KHORRAMI, ESQUIRE
44 FLOWER STREET, 33RD FLOOR
LOS ANGELES CA  90071

WILSON GROCHOW DRUKER & NOLET
BY:  LAWRENCE A. WILSON, ESQUIRE
223 BROADWAY, 5TH FLOOR
NEW YORK NY  10279

WIEDEMANN & WIEDEMANN
BY:  LAWRENCE D. WIEDEMANN, ESQUIRE
      KARL WIEDEMANN, ESQUIRE
821 BARONNE STREET
NEW ORLEANS LA  70113

PATRICK J. SANDERS
ATTORNEY AT LAW
3316 RIDGELAKE DRIVE
SUITE 100
METAIRIE LA  70002

LAW OFFICE OF RICHARD T. SEYMOUR
BY:  RICHARD T. SEYMOUR, ESQUIRE
1150 CONNECTICUT AVENUE N.W.
SUITE 900
WASHINGTON DC  20036

FOR THE DEFENDANT:     CHAFFE MCCALL
                      BY:  DEREK A. WALKER, ESQUIRE
                      2300 ENERGY CENTRE
                      1100 POYDRAS STREET
                      NEW ORLEANS LA  70163

---

1645

APPEARANCES CONTINUED:

GOODWIN PROCTER
BY:  JOHN D. ALDOCK, ESQUIRE
      MARK S. RAFFMAN, ESQUIRE
      ADAM M. CHUD, ESQUIRE
      KIRSTEN V. K. ROBBINS, ESQUIRE
      ERIC I. GOLDBERG, ESQUIRE
901 NEW YORK AVENUE N. W.
WASHINGTON DC  20001

SUTTERFIELD & WEBB
BY:  DANIEL A. WEBB, ESQUIRE
650 POYDRAS STREET, SUITE 2715
NEW ORLEANS LA  70130

LAFARGE NORTH AMERICA, INC.
BY:  PETER KEELEY, ESQUIRE
12950 WORLDGATE DRIVE
HERNDON VA  20170

OFFICIAL COURT REPORTER:   CATHY PEPPER, CCR, RMR, CRR
                           500 POYDRAS STREET, ROOM B406
                           NEW ORLEANS, LOUISIANA 70130
                           (504) 589-7779

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
PRODUCED BY COMPUTER.

---

1646

I N D E X

EXAMINATIONS                              PAGE

MELVIN SPINKS, P.E.....................................1647

CROSS-EXAMINATION BY MR. CHUD (CONTINUED).............1647

REDIRECT EXAMINATION BY MR. SEYMOUR..................1686

LESLIE R. LEMON.......................................1709

VOIR DIRE EXAMINATION BY MR. RAFFMAN:.................1709

DIRECT EXAMINATION  BY MR. RAFFMAN....................1718


E X H I B I T S

DESCRIPTION                               PAGE

EXHIBIT 449 WAS ADMITTED INTO EVIDENCE................1692

EXHIBIT 450 WAS ADMITTED INTO EVIDENCE................1697

---

1647

P-R-O-C-E-E-D-I-N-G-S

THURSDAY, JULY 1, 2010

M O R N I N G   S E S S I O N

(COURT CALLED TO ORDER)


THE DEPUTY CLERK:  ALL RISE.  COURT IS IN SESSION.

PLEASE BE SEATED.

THE COURT:  GOOD MORNING.

VOICES:  GOOD MORNING, YOUR HONOR.

MR. CHUD:  GOOD MORNING, MR. SPINKS.

THE WITNESS:  GOOD MORNING, MR. CHUD.

CROSS-EXAMINATION (CONTINUED)

BY MR. CHUD:

Q.  I JUST WANT TO START BY BRIEFLY ASKING YOU ABOUT THE

ANIMATION WE SAW YESTERDAY.  THAT ANIMATION WAS THE VISUALIZATION

OF THE FLOODING IN THE AREA ASSUMING THE BREACH TIME THAT YOU

USED IN YOUR MODEL, THE BREACH FORMATION PERIODS FROM YOUR MODEL,

AND THE MANNING COEFFICIENT FOR YOUR MODEL, CORRECT?

A.  YES, SIR.

Q.  SO IF ANY OF THOSE INPUTS ARE, FOR SOME REASON, DEEMED TO BE

INACCURATE, THAT ANIMATION WOULDN'T DEPICT THE FLOODING IN THE

REGION USING ANY OTHER TYPES OF ASSUMPTIONS, WOULD IT?

A.  IT JUST DEPENDS WHAT YOU'RE CONSIDERING TO BE INACCURATE.

SO I WOULDN'T NECESSARILY JUST MAKE THAT GENERAL STATEMENT.  YOU

---

1648

1 WOULD HAVE TO BE VERY SPECIFIC.

2 Q.  SO IF THE COURT CONCLUDED THAT THE BREACH TIMES WERE AT SOME

3 POINT AFTER THE BREACH TIME THAT YOU USED IN YOUR MODELING, THEN

4 THE ANIMATION WOULD BE DIFFERENT, IF THOSE WERE DIFFERENT INPUTS

5 INTO THE MODEL?

6 A.  CLEARLY, DEPENDING ON THE SIGNIFICANCE OF THOSE BREACH

7 TIMES.

8 Q.  LET'S TALK ABOUT THE RESULTS OF YOUR MODELING FOR THE

9 PLAINTIFFS' LOCATIONS FOR THE PLAINTIFFS IN THIS CASE.  COULD WE

10 PUT UP THE SPINKS REPORT, APPENDIX J, FIGURE 2.

11     I THINK YOU SAW THIS DURING YOUR DIRECT EXAMINATION.

12 THIS IS THE HYDROGRAPH FOR THE ALFORDS; IS THAT RIGHT?

13 A.  YES.

14 Q.  AND NEAR THE NORTH BREACH?

15 A.  YES.

16 Q.  AND ACCORDING TO THIS HYDROGRAPH, AT AROUND 9 O'CLOCK, THE

17 WATER DEPTH WAS 11.9 FEET JUST FROM THE WATERS FROM THE

18 INDUSTRIAL CANAL?

19 A.  YES.

20 Q.  AND BY 10 O'CLOCK, OR I SHOULD SAY BY 9:30, THE WATER LEVELS

21 DROPPED JUST A LITTLE BIT DOWN TO 11.8?

22 A.  YES.  I MEAN, CLEARLY, YOU'RE PICKING POINTS OFF OUR MODEL,

23 BUT YES.

24 Q.  AND THAT'S STILL JUST INDUSTRIAL CANAL WATER?

25 A.  YES.

1649

1 Q.  AND THEN 10 O'CLOCK, THE MRGO WATERS AND THE

2 INDUSTRIAL CANAL WATERS MEET AT THIS LOCATION?

3 A.  I THINK WE REFER TO IT AS MERGED.  MERGING TOGETHER.

4 Q.  AND THEN AFTER THE MERGING, THE WATER THEN, AT THIS

5 LOCATION, STARTS TO GO UP AGAIN, THE WATER LEVELS?

6 A.  YES.  THE MERGING TAKES PLACE AND THE INCREASE BEGINS.

7 Q.  SO THIS IS THE OLD HYDROGRAPH IN YOUR REPORT FOR THE ALFORD

8 LOCATION; IS THAT TRUE?

9 A.  YES.

10 Q.  AND YOU DON'T HAVE A HYDROGRAPH THAT BREAKS DOWN THE WATER

11 AT THE ALFORD LOCATION AT A PARTICULAR POINT IN TIME JUST FROM,

12 SAY, THE INDUSTRIAL CANAL NORTH BREACH, DO YOU?

13 A.  NO.

14 Q.  AND LIKEWISE, YOU DON'T HAVE ONE THAT SHOWS THE WATER LEVELS

15 AT THE ALFORD RESIDENCE JUST FROM THE INDUSTRIAL CANAL SOUTH

16 BREACH, RIGHT?

17 A.  NO, THAT WASN'T MODELLED.  IT WAS MODELLED AS A COMPLETE

18 SYSTEM.

19 Q.  AND YOU WOULD AGREE THAT THE ALFORD HOME WAS PRIMARILY

20 AFFECTED BY WATER FROM THE NORTH BREACH BECAUSE THE HOUSE WAS

21 RIGHT AT THE NORTH BREACH?

22 A.  I WOULD SAY THAT THAT WATER DID IMPACT THEM, BUT THAT THE

23 SOUTH BREACH WATERS ALSO IMPACTED THEM.  IT'S A COMBINED MERGING

24 AT THOSE TWO FAILURE POINTS, AND THE CULMINATION OF THAT WATER

25 DID COMBINE.

1650

1 Q.  THERE'S NOTHING IN YOUR REPORT THAT SAID HOW MUCH WATER FROM

2 THE NORTH BREACH WAS ALREADY AT THE ALFORD HOME BY THE TIME THE

3 SOUTH BREACH WATER GOT THERE, IS THERE?

4 A.  WELL, PRIOR TO 5:30 ON THAT CHART, CLEARLY THE BREACH IN OUR

5 MODEL WOULD NOT HAVE HAPPENED, SO THE DEPTH OF WATER PRIOR TO

6 5:30 AT APPROXIMATELY FOUR FEET WOULD BE CONTRIBUTED SOLELY TO

7 THE NORTH BREACH OF THE IHNC.

8 Q.  WE HAVE APPENDIX J, FIGURE 3.  THIS IS THE HYDROGRAPH AND

9 YOUR REPORT FOR THE RICHARDSON PROPERTY?

10 A.  YES, SIR.

11 Q.  AND THE RICHARDSONS LIVED CLOSER TO THE SOUTH BREACH?

12 A.  YES.

13 Q.  AND THE GROUND LEVEL AT THE RICHARDSON HOME IS CLOSE TO SEA

14 LEVEL; ISN'T THAT CORRECT?

15 A.  I BELIEVE SOMEWHERE BETWEEN ZERO TO TWO FEET, IN THAT RANGE

16 IN ELEVATION.

17 Q.  CAN WE SEE THE DEPOSITION -- 2009 DEPOSITION.

18     DO YOU KNOW WHAT?  HOLD OFF ON THAT.

19     DO YOU HAVE ANY UNDERSTANDING OF HOW MANY STEPS THERE

20 ARE TO THE FRONT PORCH OF THE RICHARDSON HOME?

21 A.  I DON'T HAVE A RECOLLECTION.  I JUST

22 DON'T REMEMBER AT THIS POINT.  I THINK IT'S A BRICK HOME, AND

23 THERE IS PROBABLY FOUR OR FIVE STEPS UP.

24 Q.  FOR PURPOSES OF MY QUESTIONS, JUST ASSUME THAT THERE IS FOUR

25 STEPS AND THAT IT'S APPROXIMATELY THREE TO FOUR FEET UP.  JUST

1651

1 MAKE THAT ASSUMPTION.  OKAY?

2     AND FOR MRS. RICHARDSON, IT'S YOUR CONCLUSION THAT ALL

3 THE WATER AT HER HOME CAME FROM THE INDUSTRIAL CANAL BREACHES

4 UNTIL ABOUT 10:00; IS THAT CORRECT?

5 A.  YES, BASED ON OUR MODEL.

6 Q.  AND AT THE RICHARDSON HOUSE, THERE, AROUND 9 O'CLOCK, STARTS

7 A BIT OF A LEVELING TREND JUST FROM THE INDUSTRIAL CANAL WATER

8 THAT THEN GOES UP AT 10:10 ONCE THE MRGO WATER ARRIVES, CORRECT?

9 A.  YES.

10 Q.  AND THE WATER THAT'S FLOWING THROUGH THE INDUSTRIAL CANAL

11 BREACHES FROM, SAY, BETWEEN 9:00 AND 10:00 IS NOT ACTUALLY

12 AFFECTING THE WATER LEVEL AT THE RICHARDSON HOME, IS IT?

13 A.  BEFORE THE MERGING, IT LOOKS LIKE IT STABILIZES JUST FOR A

14 LITTLE WHILE, AND I THINK SOME EYEWITNESSES WERE SAYING THAT IT

15 SEEMED -- THAT THINGS CALMED DOWN, THEN ALL OF A SUDDEN, ANOTHER

16 RUSH OF WATER, AND THAT MAY BE SYMBOLIZING SOME OF THAT.

17 Q.  AND THEN ONCE THE MRGO WATER COMES, THE WATER LEVEL GOES UP

18 FROM THIS 5.9 FEET THAT WE'VE HAD FOR A PERIOD OF TIME UP TO ITS

19 ULTIMATE MAXIMUM LEVELS OF 9.5 OR SO FEET; IS THAT RIGHT?

20 A.  YES.

21 Q.  SO IF WE ASSUME THAT THE RICHARDSON HOME HAD FOUR STEPS THAT

22 WERE APPROXIMATELY THREE TO FOUR FEET OFF THE GROUND, BEFORE THE

23 MRGO WATER COMES, THERE IS ONLY ABOUT TWO TO THREE FEET ABOVE THE

24 FIRST FLOOR OF THE RICHARDSON HOME JUST FROM THE INDUSTRIAL CANAL

25 WATER; IS THAT FAIR?

1652

1. A. YES.
2. Q. AND THIS, AGAIN, IS THE ONLY HYDROGRAPH YOU HAVE IN YOUR
3. REPORT FOR THE RICHARDSON HOME; ISN'T THAT RIGHT?
4. A. DIRECTLY FOR THE RICHARDSONS, YES.
5. Q. YES. AND AGAIN, YOU DON'T HAVE ANY HYDROGRAPH IN YOUR
6. REPORT THAT WOULD EXPLAIN HOW MUCH WATER AT THE RICHARDSON HOME
7. CAME FROM JUST THE NORTH BREACH OR JUST THE SOUTH BREACH?
8. A. NO, BECAUSE I BELIEVE THEIR HOUSE WAS LOCATED SOUTH, AND THE
9. MERGING OF THE WATERS HAD ALREADY BEGUN BY 6:30, AS YOU CAN SEE
10. KIND OF THE START TIME THERE.
11.         AND THERE IS SOME VARIATIONS IN THE ELEVATIONS OUT
12. THERE IN THE GROUND, AND CLEARLY OUR MODEL, WHICH IS A LARGER
13. SCALE MODEL, 50-GRID MODEL, THAT'S THE BEST REPRESENTATION AT
14. THIS POINT IN TIME WITH THE 50-GRID MODEL. BUT YES, THAT'S THE
15. DEPTH OF THE HYDROGRAPH.
16. Q. OKAY. LET'S MOVE ON TO HOLIDAY JEWELERS, MR. SPINKS'S
17. REPORT, APPENDIX J, FIGURE 4.
18.         THIS IS YOUR HYDROGRAPH FOR THE LOCATION OF
19. HOLIDAY JEWELERS, ONE OF THE PLAINTIFFS IN THIS CASE?
20. A. YES.
21. Q. AND THIS HYDROGRAPH SHOWS THAT BY ABOUT 9:15, THERE WAS
22. 2.3 FEET OF WATER AT THIS LOCATION JUST FROM THE
23. INDUSTRIAL CANAL. THAT'S WHAT YOU HAVE?
24. A. IT'S HARD TO SEE THAT, BUT OKAY.
25. Q. AND THEN AT 9:30, THE INDUSTRIAL CANAL AND MRGO WATERS MEET

1653

1. UP AND THE WATER LEVELS GO FROM 3.7 ALL THE WAY UP TO 10.9; IS
2. THAT RIGHT?
3. A. YES.
4. Q. SO ACCORDING TO THIS HYDROGRAPH, THE FLOODING AT THE
5. LOCATION OF HOLIDAY JEWELERS WAS INITIALLY FROM THE
6. INDUSTRIAL CANAL, BUT AFTER ONLY ABOUT 30 MINUTES, THE MRGO
7. FLOODWATERS ARRIVED; IS THAT RIGHT?
8. A. YES, THE WATERS BEGAN TO MERGE.
9. Q. NOW, YOU HAVEN'T QUANTIFIED THE RATE OF ERROR IN YOUR
10. MODELING RESULTS, HAVE YOU?
11. A. WE DID IN TERMS OF THE HIGH WATERMARK ELEVATIONS WITHIN OUR
12. REPORT, AND WE PROVIDED THE AVERAGE HIGH WATERMARK ELEVATIONS
13. THROUGHOUT, SO YES.
14. Q. THERE IS NOTHING ON THIS CHART THAT SAYS THAT THE WATER
15. DEPTH AT A PARTICULAR LOCATION IS AT 3.7 FEET PLUS OR A MINUS ANY
16. AMOUNT OR THAT THE WATER DEPTH AT A PARTICULAR TIME WAS 9:30 PLUS
17. OR MINUS, SAY, A HALF HOUR. YOU DON'T HAVE ANY ERROR REFLECTED
18. ON HERE, DO YOU?
19. A. NOT ON THAT TABLE, NO.
20. Q. NOW, IF THE SOUTH BREACH OCCURRED AT 7 O'CLOCK AND NOT 5:30,
21. WOULDN'T YOU AGREE THAT THE FIRST WATER AT THIS LOCATION WOULD
22. HAVE BEEN FROM THE MRGO AND NOT FROM THE INDUSTRIAL CANAL?
23. A. THAT'S A HYPOTHETICAL, AND CLEARLY I BELIEVE THAT THE BREACH
24. WOULD HAVE OCCURRED LATER THAN -- FROM A PRACTICAL STANDPOINT,
25. KNOWING THE MODEL, THAT, YEAH, ALL THE WATER HAVE BEEN MRGO'S,

1654

BUT THAT'S JUST HYPOTHETICAL.
1. Q. AGAIN, THIS IS THE ONLY HYDROGRAPH YOU HAVE IN YOUR REPORT
2. FOR THE HOLIDAY JEWELERS LOCATION, CORRECT?
3. A. IT'S GENERATED SPECIFICALLY FOR THAT AREA, FOR THAT
4. PARTICULAR PLAINTIFF.
5. Q. AND LIKE THE OTHER PLAINTIFF PROPERTIES, YOU DON'T HAVE ANY
6. HYDROGRAPH THAT WOULD SAY HOW MUCH OF THE WATER AT THIS PROPERTY
7. CAME FROM THE INDUSTRIAL CANAL NORTH BREACH VERSUS THE SOUTH
8. BREACH, DO YOU?
9. A. SEPARATING THE TWO?
10. Q. YES.
11. A. NO.
12. Q. LET'S MOVE ON AND TALK ABOUT THE DELFT STUDY. ONE OF THE
13. THINGS THAT YOU REVIEWED IN REACHING YOUR CONCLUSIONS WAS A STUDY
14. OF KATRINA-RELATED FLOOD GENERATIONS BY THE DELFT UNIVERSITY OF
15. TECHNOLOGY; IS THAT RIGHT?
16. A. YES.
17. Q. AND BOTH YOU AND THE DELFT GROUP USED THE SOBEK MODEL?
18. A. YES.
19. Q. AND THE DELFT GROUP RAN ITS MODEL USING INDUSTRIAL CANAL
20. BREACH TIMES OF 7:00 TO 7:30?
21. A. YES.
22. Q. I'M GOING TO PUT UP A SLIDE THAT'S GOING TO HAVE TWO
23. PICTURES ON IT. THE ONE ON THE LEFT COMES FROM DEFENDANTS'
24. EXHIBIT 226. IT'S THE DELFT STUDY, 8:30 IN THE MORNING IMAGE,

1655

AND THE ONE ON THE RIGHT IS YOUR MODEL OF YOUR RESULTS FOR 8:20
1. THAT ARE IN YOUR REPORT. DO YOU SEE THOSE ON THE SCREEN?
2. A. YES.
3. Q. I BELIEVE YOU SAID ON DIRECT THAT THE DARKER BLUE AREAS
4. REPRESENT THE PRESENCE OF WATER AT A LOCATION AT A PARTICULAR
5. POINT.
6. A. IT REPRESENTS THE HIGHER DEPTHS. THE DARKER DEGREE OF WATER
7. MEANS DEEPER IN TERMS OF ELEVATION.
8. Q. WOULD YOU AGREE WITH ME THAT THE DELFT 8:30 PICTURE AND YOUR
9. 8:20 PICTURE LOOK PRETTY SIMILAR IN TERMS OF THE SCOPE AND DEPTH
10. OF FLOODING THAT THEY PORTRAY?
11. A. I THINK YOU'RE TYING TWO TOGETHER, BUT I'M NOT SURE THE
12. DEPTHS ARE EXACTLY THE SAME FROM THE LEGENDS OF OURS, BUT YES,
13. FROM THE SPATIAL EXTENT OF WHERE THE WATER IS, THERE IS SOME
14. SIMILARITIES OF THAT TIME.
15. Q. YOU SAY IN YOUR DEPOSITION THAT LOOKING AT THESE TWO SLIDES,
16. THE SCOPE AND DEPTH OF FLOODING THAT THEY SHOW IS PRETTY SIMILAR,
17. DIDN'T YOU?
18. A. IN TERMS OF THE GENERAL AREAS THAT ARE BEING FLOODED, YES.
19. Q. AND YOU USED SUBSTANTIALLY EARLIER INDUSTRIAL CANAL BREACH
20. TIMES THAN DID THE DELFT TEAM, YET BY 8:30 AND 8:20, THE IMAGES
21. LOOK PRETTY SIMILAR?
22. A. I MEAN, I KNOW YOU'RE KIND OF GIVING A VIEWPOINT ON IT, BUT
23. CLEARLY THE DEPTHS ARE DIFFERENT BETWEEN THE TWO MODELS FROM THE
24. IHNC.

4 (Pages 1652 to 1655)

## 1656

1  IF YOU CAN LOOK AT THE EXTENT OF DEPTHS ON THE
2  RIGHT-HAND EXHIBIT, YOU'LL SEE THAT THE DEGREE OF THE FLOODING
3  WEST OF THE RAILROAD TO THE IHNC ACTUALLY EXPANDS UP INTO THE
4  AREA OF JACKSON BARRACKS.  THE MODEL TO THE LEFT DOESN'T HAVE ANY
5  FLOODING AT 8:20 AT JACKSON BARRACKS, BUT THERE IS A TIME-STAMPED
6  PHOTOGRAPH THAT'S AT JACKSON BARRACKS THAT SHOWS AT 8:15, THERE
7  WAS FLOODING ABOUT TWO FEET IN DEPTH.
8      SO GIVEN THE FACT THAT I BELIEVE OUR MODEL WOULD BE
9  MORE ACCURATE IN ACCORDANCE WITH THE TIME-STAMPED PHOTOGRAPH TO
10  SHOW THAT FLOODING THERE AT ABOUT 8:20 WHEREAS, THE OLDER
11  ANALYSIS ON THE LEFT DOES NOT REFLECT THAT SAME OPINION.  AND
12  THEY WOULD NOT CORRELATE AT ALL WITH THE TIME-STAMPED PHOTOGRAPH.
13      THE COURT:  MR. SPINKS, WOULD YOU PLEASE MARK JACKSON
14  BARRACKS ON THE MAP.  I THINK I KNOW WHERE IT IS, FOR THE RECORD.
15      THE WITNESS:  OH, THAT'S TOO HIGH.
16      THE COURT:  GO AHEAD.  DO YOU HAVE A STYLUS?
17      THE WITNESS:  YEAH, BUT IT KEEPS --
18      THE COURT:  MAYBE YOU CAN JUST MAKE A DOT.  IS THAT
19  CLOSE ENOUGH?
20      THE WITNESS:  YEAH, AND IT'S PROBABLY ON THE SOUTH END
21  OF THAT DOT.
22      THE COURT:  THANK YOU.  LET'S CAPTURE THAT, PLEASE.  IT
23  WOULD BE THE COURT'S EXHIBIT, IF YOU WANT, BUT IT'S JUST FOR
24  CLARIFICATION, WHEN WE LOOK AT ALL OF THIS AGAIN.
25      MR. CHUD:  ARE WE READY?

## 1657

1      THE COURT:  I THINK SO.  SHEENA, HAVE YOU GOT IT?  YEAH,
2  WE'RE READY.  YOU CAN PROCEED.
3      MR. CHUD:  THANK YOU, YOUR HONOR.
4          EXAMINATION
5  BY MR. CHUD:
6  Q.  LET'S TAKE A LOOK AT THE NEXT SLIDE, WHICH IS GOING TO BE
7  SIMILAR.  THE IMAGE ON THE LEFT IS FROM DEFENDANT'S EXHIBIT 226,
8  THE 9 O'CLOCK IMAGE FROM THE DELFT STUDY, AND THE ONE ON THE
9  RIGHT IS THE 9 O'CLOCK IMAGE FROM YOUR REPORT, MR. SPINKS.
10  LOOKING AT THESE TWO 9 O'CLOCK IMAGES, THESE TWO IMAGES ALSO LOOK
11  SIMILAR IN TERMS OF THE FLOODING AT THAT TIME IN THIS AREA, DON'T
12  THEY?
13  A.  YES, I BELIEVE I SAID YESTERDAY, THIS IS WHEN THE WATERS
14  FROM MRGO BEGAN TO OVERFLOW AROUND PARIS ROAD AROUND MR. REED'S
15  HOUSE.  CAN I MARK MR. REED'S?
16      THE COURT:  YEAH, YOU CAN, SURE.  THE STYLUS MAY WORK A
17  LITTLE BETTER.  IS THAT FAIRLY CLOSE, SIR?
18      THE WITNESS:  YEAH, BUT IT'S ACTUALLY INSIDE THE
19  40 ARPENT LEVEE.  IT'S KIND OF ON THE -- IT'S THAT BOX ON THE
20  LEFT-HAND SIDE, BOTTOM.
21      THE COURT:  IT WOULD BE THE INHABITED PORTION OF THE 40
22  ARPENT LEVEE RIGHT NEAR THE LEFT; IS THAT CORRECT?
23      THE WITNESS:  CORRECT.
24      SO AT THAT LOCATION, AT 9:00, WE BEGIN A MERGING OF
25  THE WATERS IN THE NORTHERN HALF OF THAT AREA AROUND PARIS ROAD,

## 1658

1  FILTERING AND FILLING IN THEN TO THE SOUTH.  BUT YES, CORRECT.
2          EXAMINATION
3  BY MR. CHUD:
4  Q.  WE'RE GOING TO MOVE ON TO TALK ABOUT ONE OF YOUR HYDROGRAPHS
5  IN YOUR REPORT AT PAGE 34, FIGURE 15.  DO YOU RECOGNIZE THIS FROM
6  YOUR REPORT?
7  A.  YES, SIR.
8  Q.  AND THIS IS A HYDROGRAPH OF WATER DEPTHS FROM WHAT YOU CALL
9  LOCATION ONE, CORRECT?
10  A.  YES.  WHICH WOULD BE CLOSER, I GUESS, TOWARD THE IHNC
11  LOCATION.
12  Q.  JUST SO WE ALL UNDERSTAND WHAT WE'RE LOOKING AT HERE, THE
13  BLUE LINE IS THE KATRINA REAL RUN WITH ALL OF THE ACTUAL BREACHES
14  INCLUDED; IS THAT RIGHT?
15  A.  IT'S THE ALL CAUSES, THE BLUE, DARKER BLUE LINE, YES.
16  Q.  AND THEN THE PINK, WHAT I'M CALLING PINK, SOME MAY CALL
17  PURPLE, SOME OTHER COLOR, THAT IS THE LINE THAT REPRESENTS THE
18  WATER LEVELS JUST FROM THE MRGO BREACHES, ASSUMING NO
19  INDUSTRIAL CANAL BREACHES?
20  A.  YES.  IT ASSUMES THAT THE BREACH AT THE NORTH AND SOUTH
21  BREACH DID NOT OCCUR, BUT ALL THE OVERTOPPING IS STILL OCCURRING
22  ALONG THE IHNC.  THE ONLY THING IS, THE BREACHES AREN'T THERE.
23  Q.  AND THEN THE RED LINE ASSUMES NO MRGO BREACHES, JUST WATER
24  COMING OVER THE INDUSTRIAL CANAL WALL AND THROUGH IT?
25  A.  WITH THE BREACHES AS WELL.  SO THAT ASSUMES THE RED LINE,

## 1659

1  WHAT WE'RE REFERRING TO IS THE BREACHES FROM JUST THE IHNC AND
2  THE OVERTOPPING AND RAINFALL.
3  Q.  I DON'T WANT TO BE REPETITIVE, BUT YOU DON'T HAVE A LINE ON
4  THIS CHART THAT WOULD SAY WHAT THE WATER LEVELS IN LOCATION ONE
5  WOULD BE JUST FROM, SAY, THE INDUSTRIAL CANAL NORTH BREACH OR,
6  ALTERNATIVELY, THE INDUSTRIAL CANAL SOUTH BREACH, DO YOU?
7  A.  THERE IS NOTHING THAT SAYS THAT, BUT IF YOU KNOW THE TIME OF
8  THE BREACH, WHICH IS AT 5:30 AND YOU KNOW IT'S THE IHNC, AGAIN,
9  YOU CAN REFER TO THESE EXHIBITS.  ANYTHING PRIOR TO 5:30 WOULD BE
10  JUST THE NORTH BREACH WATER.
11  Q.  BUT ASSUMING THAT YOUR BREACH TIMES ARE CORRECT, ONCE YOU
12  HIT THE 5:30, YOU DON'T HAVE ANY INFORMATION ABOUT WHAT THE WATER
13  LEVELS WERE IN THE LOWER NINTH WARD FROM JUST ONE OF THE
14  BREACHES, SAY THE NORTH BREACH, AND WHAT THAT LEVEL WOULD LOOK
15  LIKE AT LOCATION ONE AS THE HOURS PROGRESSED?
16  A.  I DON'T HAVE A SEPARATE LINE THAT SHOWS NO NORTH BREACH AND
17  NO SOUTH BREACH, BUT, AGAIN, I'M TRYING TO EXPLAIN THAT YOU CAN
18  DERIVE THAT JUST BY LOOKING AT THE TIME VERSUS DEPTH.
19  Q.  MR. SPINKS, LET'S TAKE 8 O'CLOCK IN THE MORNING, OKAY, WHICH
20  IS AFTER YOU SAY THE NORTH BREACH OCCURRED AND AFTER YOU SAY THE
21  SOUTH BREACH OCCURRED.  AND YOU'VE GOT A RED LINE THAT SHOWS THE
22  WATER LEVEL FROM THE INDUSTRIAL CANAL BREACHES.  THERE IS NOTHING
23  IN YOUR REPORT THAT WOULD TELL ME AT 8 O'CLOCK HOW MUCH OF THIS
24  WATER DEPTH IS DUE TO THE NORTH BREACH WATERS AND HOW MUCH OF
25  THIS WATER DEPTH IS DUE TO THE SOUTH BREACH WATERS, RIGHT?

**5 (Pages 1656 to 1659)**

1660

1 A. NO. BECAUSE WE WOULDN'T BE ABLE TO DISTINGUISH BECAUSE IT'S
2 INDIVISIBLE. IT'S ALL MERGED TOGETHER. I THINK WE TALKED ABOUT
3 ALL -- THAT THE WATERS COMPLETELY COMBINE.
4      BUT I DID MENTION TO YOUR HONOR YESTERDAY THAT FROM A
5 STANDPOINT THAT THE BREACH LINKS AND YOU CAN COMPARE THEM, ONE'S
6 180 FEET, ONE IS ABOUT 793 FEET, THAT ALL THINGS BEING EQUAL
7 OTHER THAN THE LENGTH, THAT THE PERCENTAGE IS ABOUT 18 TO
8 20 PERCENT -- I'M SORRY, THAT THE SOUTH BREACH WOULD BE ABOUT
9 80 PERCENT LARGER IN DETERMINING FLOW RATES THAN THE NORTH
10 BREACH. IT WOULD BE ABOUT AN 80/20 SPLIT.
11 Q. BUT FOR HOUSES THAT ARE CLOSER TO THE NORTH BREACH, RIGHT AT
12 THE NORTH BREACH, THEY ARE GOING TO BE MUCH MORE HEAVILY AFFECTED
13 BY THE NORTH BREACH WATERS THAN WOULD THE AVERAGE HOME IN THAT
14 AREA; ISN'T THAT TRUE?
15 A. I'M SORRY. COULD YOU REPEAT THAT?
16 Q. YES. SOMEONE WHOSE HOUSE IS RIGHT INSIDE THE NORTH BREACH
17 IS GOING TO BE MUCH MORE HEAVILY AFFECTED BY THE NORTH BREACH
18 WATERS, ESPECIALLY IN THOSE EARLY HOURS, THAN SOMEONE WHO'S
19 LOCATED CLOSER TO THE SOUTH BREACH; ISN'T THAT LOGICAL?
20 A. YES, BUT LET ME MAKE SURE THAT YOU UNDERSTAND, DEPENDING ON
21 HOW CLOSE YOU ARE TO THAT NORTH BREACH, THE HOUSE MAY NOT BE
22 THERE AT ALL BECAUSE OF THE VELOCITIES. AND AGAIN, THE SOUTH
23 BREACH DID HAVE AN EXTENSIVE AMOUNT OF WATER MOVING THROUGH IT,
24 SO THAT DEPTH CONTRIBUTED SUBSTANTIALLY TO THE ULTIMATE DAMAGE, I
25 GUESS, OF A PARTICULAR STRUCTURE.

1661

1 Q. THE SOBEK MODEL ALLOWS YOU TO RUN A SIMULATION THAT ASSUMES
2 THERE IS A NORTH BREACH BUT NO SOUTH BREACH, AND THEN FIGURE OUT
3 WHAT THE WATER LEVELS IN THE AREA WOULD BE UNDER THAT SCENARIO,
4 DOESN'T IT?
5 A. YES, IT WOULD BE CAPABLE OF TAKING OUT A BREACH.
6 Q. MR. SPINKS, LET'S TALK ABOUT YOUR SENSITIVITY ANALYSIS.
7      NOW, AS I UNDERSTAND IT, YOU DID A SENSITIVITY ANALYSIS
8 THAT HAD CERTAIN SCENARIOS FOR DIFFERENT NORTH AND SOUTH BREACH
9 TIMES, AND YOU RAN THOSE SCENARIOS THROUGH YOUR MODEL TO FIGURE
10 OUT WHICH ONES PRODUCED THE RESULTS THAT YOU THOUGHT WERE MOST
11 ACCURATE; IS THAT FAIR?
12 A. YES. THE WHOLE PURPOSE OF THE SENSITIVITY -- I THINK YOU
13 SAID IT FAIRLY CORRECTLY, BUT TO REALLY COMPARE DIFFERENT CASES
14 OF CHANGING THE BREACH TIME ONLY, AND ITS EFFECT TO THE MEASURED
15 ELEVATIONS THAT ARE -- THE OBSERVED ELEVATIONS, I SHOULD SAY, SO
16 IT WILL GIVE US SOME INDICATOR WHETHER THAT WE'RE CLOSER TO SOME
17 OF THE OBSERVATIONS OR WE'RE GETTING FURTHER AWAY. IT'S NOT
18 THERE TO MATCH OBSERVATIONS, IT'S REALLY THERE TO GIVE US
19 RELATIVE INFORMATION SO WE CAN COMPARE EACH CASE.
20 Q. NOW, JUST AS A REMINDER, THE ONLY THING THAT YOU VARIED IN
21 THE SENSITIVITY ANALYSIS WAS THE BREACH TIMES. YOU DIDN'T VARY
22 THE ROUGHNESS COEFFICIENT, YOU DIDN'T VARY THE BREACH FORMATION
23 PERIODS; IS THAT RIGHT?
24 A. NO. THAT'S CORRECT. WE DID NOT.
25 Q. AND THEN YOU USED TWO DIFFERENT METHODOLOGIES TO DO THE

1662

1 SENSITIVITY ANALYSIS. ONE IS CALLED RELATIVE ERROR AND ONE
2 IS THE RATING NUMBER SYSTEM; IS THAT RIGHT?
3 A. WE USED TWO STATISTICAL MEASURES IN ORDER TO GAIN SOME
4 PROFESSIONAL OPINION OF THE PERFORMANCE OF EACH CASE IN
5 COMPARISON TO CASE ONE.
6 Q. LET'S TALK ABOUT RELATIVE ERROR FIRST. OKAY? RELATIVE
7 ERROR IS THE DIFFERENCE BETWEEN WHAT THE MODEL SAID THE WATER
8 DEPTH WOULD BE AT A PARTICULAR LOCATION VERSUS THE REPORTED
9 OBSERVATION ABOUT WATER DEPTH AT THAT LOCATION; IS THAT RIGHT?
10 A. IT'S A RATIO THAT, YES, IT LOOKS AT THE ERROR BETWEEN
11 OBSERVED AND SIMULATED AND PROVIDES SOME LEVEL OF MEASURE.
12 Q. LET'S PULL UP APPENDIX I, TABLE 2 TO YOUR REPORT. THIS IS A
13 TABLE IN YOUR REPORT, RIGHT?
14 A. I BELIEVE SO. IT'S HARD TO SEE IT.
15 Q. THIS IS THE RESULTS OF YOUR SENSITIVITY ANALYSIS?
16 A. I BELIEVE IT SHOULD BE, YES.
17 Q. YOUR HONOR, FOR EASE OF EVERYONE INVOLVED, WE ARE GOING TO
18 CULL OUT PARTICULAR PORTIONS OF THAT SO EVERYONE CAN ACTUALLY SEE
19 IT, BUT I DO HAVE PRINTOUTS OF A SOMEWHAT LARGER VERSION, IF IT
20 WOULD BE --
21      THE COURT: YOU CAN DO IT ON THE ELMO.
22      MR. CHUD: OKAY.
23           EXAMINATION
24 BY MR. CHUD:
25 Q. NOW, LET'S LOOK AT THE BOTTOM OF THIS CHART. THE BOTTOM OF

1663

1 THE CHART, THE WAY THIS CHART IS BROKEN DOWN, IT HAS SIX
2 DIFFERENT CASES THAT YOU TESTED IN YOUR SENSITIVITY ANALYSIS AND
3 THEN IT REPORTS RESULTS FOR EACH OF THOSE CASES BASED ON A
4 PARTICULAR OBSERVATION; IS THAT RIGHT?
5 A. YES.
6 Q. SO AT THE BOTTOM OF THE CHART, VERY BOTTOM, IT HAS A
7 CUMULATIVE FIGURE OF THE RESULTS OF THE SENSITIVITY ANALYSIS FOR
8 EACH OF THE CASES, AND THEN IT REPORTS CERTAIN INFORMATION,
9 RIGHT?
10 A. YES. WELL, IT HAS THE CUMULATIVE L2 ERROR AND THEN THE
11 CUMULATIVE RANKING NUMBER VALUE.
12 Q. I'M JUST TRYING TO ORIENT US TO THIS CHART AT THIS POINT.
13      AND THEN YOU ALSO HAVE A COLUMN IN THIS CHART FOR
14 OBSERVED WATER DEPTH. DO YOU RECALL THAT --
15 A. YES.
16 Q. SO THERE IS A COLUMN FOR DATA DESCRIPTION, WHICH HAS THE
17 OBSERVER OR THE IPET OR TEAM LOUISIANA DATA POINT, AND THEN THERE
18 IS A CODE THAT YOU USE FOR THE DATA POINT, AND THEN THERE IS THE
19 OBSERVED WATER DEPTH AT THAT INDIVIDUAL'S LOCATION. IS THAT WHAT
20 YOU'RE REPORTING HERE?
21 A. YES.
22 Q. AND YOU'VE GOT OBSERVED WATER DEPTH DOWN TO A TENTH OF A
23 FOOT, RIGHT, FOR THE OBSERVED DATA POINTS?
24 A. YES. IT'S LISTED IN THE TABLE THAT WAY.
25 Q. NOW, THE WITNESSES WHO GAVE THESE OBSERVATIONS DIDN'T

1664

1  ACTUALLY REPORT THEIR OBSERVATIONS DOWN TO A TENTH OF A FOOT, DID
2  THEY?
3  A.  WHEN WE GO THROUGH EACH OF THE EYEWITNESS ACCOUNTS, WE LOOK
4  AT WHAT WAS BEING SAID IN A RELATIVE -- AND TRY TO ESTIMATE THAT
5  DEPTH BASED ON WHAT THEY SAID.  BUT, YES, IN TERMS OF MEASURED
6  STOPPED CLOCKS AND OTHER ITEMS, THERE ARE SOME THAT ARE MEASURED
7  TO A TENTH OF A FOOT.
8  Q.  WELL, TERRY ADAMS, DATA POINT N1, HE NEVER SAID HE SAW
9  2.1 FEET OF WATER, DID HE?  YOU CALCULATED THAT NUMBER.
10 A.  WHAT HE SAID IS THAT HIS HOUSE WAS TWO FEET ABOVE THE
11 GROUND, AND HE SAID HE HAD ABOUT TWO INCHES OF WATER IN HIS
12 HOUSE.
13 Q.  PEOPLE WHO ARE MAKING THESE OBSERVATIONS ARE MAKING THESE
14 OBSERVATIONS IN THE MIDDLE OF A HURRICANE?
15 A.  I THINK I KNOW -- I THINK TERRY ADAMS WOULD PROBABLY KNOW
16 WHAT HIS FOUNDATION ELEVATION IS.
17 Q.  I'M JUST TRYING TO GET AN UNDERSTANDING OF WHEN THESE
18 OBSERVATIONS WERE MADE.  IT'S UNDERSTOOD --
19     THE COURT:  WE ALL UNDERSTAND THESE WERE REPORTED EITHER
20 PRIOR TO OR SHORTLY AFTER HURRICANE KATRINA MADE LANDFALL IN
21 BURAS.
22        EXAMINATION
23 BY MR. CHUD:
24 Q.  MR. SPINKS, YOU UNDERSTAND THAT PEOPLE WERE MAKING
25 OBSERVATIONS NOT USING PRECISE MEASURING INSTRUMENTS, RIGHT?

1665

1  A.  YES, I DO.
2  Q.  IN SOME CASES, THE OBSERVATIONS WERE MADE IN THE DARK?
3  A.  YES.
4  Q.  AND IN SOME CASES, PEOPLE WERE GIVING THIS INFORMATION
5  DURING THEIR DEPOSITIONS TAKEN LONG AFTER THE STORM?
6  A.  YES, AND I BELIEVE ALL RESEARCHERS THAT HAVE GATHERED
7  INFORMATION, GATHERED VERY SIMILAR INFORMATION, AND IN THE SAME
8  PROCESS, THE PROCEDURE THAT WE USE.
9  Q.  IN ORDER TO GENERATE INFORMATION ABOUT WATER DEPTH, YOU HAVE
10 TO KNOW BOTH THE WATER LEVEL AND THE GROUND ELEVATION -- LET ME
11 GIVE YOU A BETTER QUESTION.  IN ORDER TO FIGURE OUT THE OBSERVED
12 WATER DEPTH, YOU HAVE TO KNOW BOTH THE LEVEL OF THE WATER AND THE
13 LEVEL AT WHICH THE OBSERVER WAS MAKING THE OBSERVATION, RIGHT?
14 A.  I THINK I UNDERSTOOD WHAT YOU JUST SAID, BUT BASICALLY WE
15 HAVE TO UNDERSTAND THE DEPTH OF WATER AT THAT PARTICULAR LOCATION
16 OF THAT EYEWITNESS, ACCORDING TO HIS OR HER TESTIMONY OR THE
17 CLOCK.
18     THE COURT:  IN ORDER TO UNDERSTAND THE DEPTH, DO YOU
19 NEED TO KNOW WHERE -- THE HEIGHT ABOVE SEA LEVEL OR BELOW OF THE
20 SPECIFIC AREA INVOLVED?
21     THE WITNESS:  YES, AND WE GATHERED THAT FROM OUR LIDAR
22 INFORMATION.
23        EXAMINATION
24 BY MR. CHUD:
25 Q.  YOU DIDN'T ACTUALLY HAVE INFORMATION FOR EACH OF THESE

1666

1  OBSERVATION POINTS ABOUT THE HEIGHT AT WHICH THE INDIVIDUAL IS
2  MAKING THE OBSERVATION, DID YOU?
3  A.  THE HEIGHT OF THE WATER?
4      THE COURT:  I'M NOT SURE I UNDERSTAND YOUR QUESTION.
5        EXAMINATION
6  BY MR. CHUD:
7  Q.  THE HEIGHT WHERE THE PERSON WAS.  SO IF MR. ADAMS WAS
8  STANDING ON THE FLOOR OF HIS HOUSE AND HE SAW WATER JUST UP TO
9  THE FIRST FLOOR OF HIS HOUSE, IN ORDER TO KNOW HOW DEEP THAT
10 WATER WAS, YOU WOULD HAVE TO KNOW THE LEVEL OF THE FIRST FLOOR OF
11 THE HOUSE?
12 A.  YES, AND I THINK I MENTIONED THAT IN HIS PARTICULAR
13 DEPOSITION HE SAID THAT HE FOUND -- THE SLAB WAS TWO FEET HIGHER
14 THAN THE GROUND, SO WE KNOW THE GROUND ELEVATION AND WE KNOW HIS
15 SLAB ELEVATION, AND I THINK HE SAID THE CARPET WAS WET TWO TO
16 THREE INCHES, SO WE COULD ADD THAT TO IT, AND THAT'S HOW WE
17 DETERMINE THE OBSERVED WATER DEPTH.
18 Q.  MY ORIGINAL QUESTION, SIR, WAS YOU DIDN'T ACTUALLY HAVE THE
19 HEIGHT AT WHICH THE INDIVIDUALS MAKING THE OBSERVATION FOR EVERY
20 ONE OF THESE DATA POINTS, EVEN IF YOU HAD IT FOR SOME?
21 A.  I THINK I JUST EXPLAINED THAT.  IF YOU GO THROUGH MY TABLE
22 OF EYEWITNESSES, WE HAVE LISTED THE DATA THAT WAS PROVIDED FOR
23 EACH DEPOSITION WHICH INCLUDED SOME LEVEL OF AN EYEWITNESS
24 ACCOUNT OF DEPTH.  THEY SAID IT'S FIVE -- YOU KNOW, I THINK IT'S
25 FIVE FEET OR IT'S TWO FEET.

1667

1      SO YES, I THINK WE'RE RELYING UPON THE INFORMATION THAT
2  WAS PROVIDED BY THE WITNESSES' BEST POSSIBLE DATA, I SHOULD SAY.
3  Q.  CAN WE SEE MR. SPINKS'S DEPOSITION, PAGE 88, LINE 20 TO 89,
4  LINE 1.
5      (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, A PORTION
6  OF THE VIDEOTAPE DEPOSITION OF MELVIN SPINKS WAS PLAYED.)
7  Q.  YOU CAN'T SAY, AS YOU SIT HERE TODAY, THAT YOU HAD
8  MEASUREMENTS IN EVERY SINGLE CASE TO FIGURE OUT THE HEIGHT OF A
9  FLOOR OR THE HEIGHT OF A BED OR THE HEIGHT OF WHATEVER REFERENCE
10 POINT THE WITNESS WAS TALKING ABOUT, RIGHT?
11 A.  THAT'S CORRECT.
12     (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE
13 PORTION OF THE VIDEOTAPE DEPOSITION OF MELVIN SPINKS WAS
14 CONCLUDED.)
15        EXAMINATION
16 BY MR. CHUB:
17 Q.  THE INFORMATION GAP OF NOT KNOWING EXACTLY THE HEIGHT AT
18 WHICH THE PERSON WAS MAKING THE OBSERVATION COULD INTRODUCE SOME
19 UNCERTAINTY INTO THE NUMBERS THAT YOU REFLECT AS YOUR OBSERVED
20 WATER DEPTH, TRUE?
21 A.  YES.  I MEAN -- AND THAT'S REFLECTED IN ERROR BARS AROUND
22 THE DATA POINTS.
23 Q.  SO LET'S TAKE A LOOK AT THE ERROR BARS, FROM APPENDIX I,
24 PAGE I-3, FIGURE 1 FROM YOUR REPORT.  I THINK YOU SAW THIS
25 HYDROGRAPH ON YOUR DIRECT.  AND JUST SO WE UNDERSTAND, YOU'VE GOT

7 (Pages 1664 to 1667)

1668

1  A DATA POINT, WHICH IS EITHER A CIRCLE OR A TRIANGLE OR A SQUARE,
2  AND THEN EMERGING FROM THE DATA POINT WOULD BE THE ERROR BARS
3  YOU'RE REFERRING TO, RIGHT?
4  A.  YES.  THERE IS AN ERROR BAR IN THE HORIZONTAL DIRECTION FOR
5  TIME BASED ON, AGAIN, THE EYEWITNESS ACCOUNT OF THE OCCURRENCE OF
6  THAT ELEVATION, SO THERE MAY BE SOME DIFFERENCES IN TIME.  AND
7  THEN ON THE VERTICAL AXIS IS WATER LEVEL OR DEPTH.  SO WE TRY TO
8  BEST REPRESENT OUR INTERPRETATION OF THE EYEWITNESS ACCOUNT.
9  Q.  AND THEN THE LONGER THE ERROR BAR, THE MORE UNCERTAINTY; IS
10 THAT FAIR?
11 A.  THE UNCERTAINTY, YES, THAT WAS PRESENTED BY THE EYEWITNESS
12 ACCOUNT.
13 Q.  LET'S GO BACK TO APPENDIX I, TABLE 2, THE SENSITIVITY
14 ANALYSIS RESULTS.  THIS TABLE WHERE YOU CALCULATED YOUR
15 SENSITIVITY ANALYSIS RESULTS DOES NOT INCORPORATE ANY DEGREE OF
16 ERROR FROM THOSE ERROR BARS, CORRECT?
17 A.  IT'S THE BEST ESTIMATE OF THE VALUE AT THAT TIME, YES.
18 Q.  SO ON THE LAST HYDROGRAPH WE JUST SAW, IF THERE WAS AN ERROR
19 BAR IN TERMS OF THE WATER DEPTH, THAT IS TRANSLATED ONTO YOUR
20 SENSITIVITY ANALYSIS TO HAVE A MEASUREMENT OF THAT LOCATION DOWN
21 TO A PRECISE TENTH OF A FOOT, CORRECT?
22 A.  I BELIEVE I'M UNDERSTANDING YOUR QUESTION, AND I BELIEVE THE
23 ANSWER IS YES, BUT WHEN YOU DO A RELATIVE -- AN ANALYSIS THAT HAS
24 A RELATIVE ANALYSIS BETWEEN DIFFERENT CASES, THAT SAME ERROR
25 WOULD BE REPRESENTED IN ALL SIX CASES.  SO FROM A COMPARISON

1669

1  STANDPOINT, YOU WOULD NOT HAVE VARIABILITY JUST BECAUSE YOU SAID
2  YOU WERE GOING TO CONSIDER THAT ERROR BECAUSE YOU WOULD HAVE TO
3  TAKE INTO ALL SIX CASES AND DO THE ANALYSIS.  THAT'S WHY YOU USE
4  THE AVERAGE VALUE WHEN YOU DO A COMPARATIVE ANALYSIS IN TERMS OF
5  SENSITIVITY ANALYSIS.
6  Q.  MR. SPINKS, THE PURPOSE OF THE ERROR BARS IS TO SHOW THAT
7  THERE ARE UNCERTAINTIES IN THE WITNESS OBSERVATIONS; IS THAT
8  FAIR?
9  A.  WHICH WE HAVE WITHIN OUR REPORTING.
10 Q.  BUT THEN WHEN YOU GO TO ACTUALLY CALCULATE YOUR SENSITIVITY
11 ANALYSIS TO FIGURE OUT WHETHER THE SCENARIO THAT IS YOUR OPINION
12 AS TO THE BEST MATCH OF THE BREACH TIMES, THE ERROR BARS ARE NOT
13 CARRIED FORWARD ONTO THE SENSITIVITY ANALYSIS; IS THAT TRUE?
14 A.  I EXPLAINED JUST A MINUTE AGO, IT'S BECAUSE WE'RE DOING A
15 COMPARATIVE ANALYSIS OF SIX CASES, AND THAT SAME ERROR WOULD HAVE
16 TO BE IN EACH OF THE SIX CASES.  SO THEREFORE, IF YOU USED THE
17 AVERAGE VALUE, YOU DON'T HAVE A CHANGE.
18     LET'S SAY IF I USED EVERYBODY'S LOWEST ERROR, WELL, I
19 HAVE TO USE IT IN ALL SIX CASES, SO IT DOESN'T CHANGE THE
20 STATISTICAL ANALYSIS RESULTS.  IT MAY CHANGE SOME OF THE VALUES
21 AT THE VERY END BUT NOT WHICH CASE IS PERFORMING SUPERIOR TO THE
22 OTHER.
23     SO THAT WOULD NOT BE A NORMAL PROCESS THAT I WOULD
24 THINK WHEN WE'RE DOING COMPARATIVE ANALYSIS.
25 Q.  I JUST WANT TO BE CLEAR ON ONE THING, JUST FOR THE RECORD.

1670

1  THERE ARE -- THE ERROR BARS ARE NOT, IN FACT, CARRIED FORWARD TO
2  THE SENSITIVITY ANALYSIS CHART?
3  A.  THAT IS CORRECT.
4  Q.  NOW, THIS CHART -- CAN YOU PULL OUT THE WHOLE CHART?
5  A.  TO THIS COLUMN HERE.  IT IS INCLUDED, THOUGH, WITHIN THE
6  RANKING NUMBER, THE ERROR ANALYSIS.  SO LET ME MAKE SURE I POINT
7  THAT OUT BECAUSE IN OUR RANKING ANALYSIS, WE GAVE IT A 1 IF IT'S
8  WITHIN THE TIME INTERVAL.  SO I JUST WANTED TO MAKE A MENTION OF
9  THAT.
10 Q.  WE'LL GET THERE, TOO.
11 A.  OKAY.
12 Q.  CAN WE HIGHLIGHT THE TOP FOR CASES 1 AND 2.
13     JUST SO WE UNDERSTAND, YOUR CASE 1 RAN THE MODEL USING
14 A NORTH BREACH AT 4 O'CLOCK AND A SOUTH BREACH AT 5:30, AND YOUR
15 CASE 2 RAN IT WITH A NORTH BREACH OF 4 O'CLOCK AND A SOUTH BREACH
16 OF 7:00; IS THAT CORRECT?
17 A.  THE PURPOSE OF CASE 2 WAS TO VARY THE BREACH TIME FOR ONLY
18 THE SOUTH BREACH FROM 5:30, WHICH IS WHERE WE HAVE IT IN OUR
19 ALL-CAUSES CASE, TO 7:00 A.M.  TO SEE HOW THE PERFORMANCE OF THE
20 DATA WOULD BE WITH THE SOUTH BREACH OCCURRING AT 7:00 VERSUS AT
21 5:30.
22 Q.  SOMETIMES EVEN THE CASE 1 MODELING RESULTS ARE QUITE A BIT
23 DIFFERENT FROM THE OBSERVED WATER DEPTHS; ISN'T THAT CORRECT?
24 A.  YES.  THE --
25 Q.  I'M SORRY.  DID I CUT YOU OFF?

1671

1  A.  YES, THAT'S NOT UNUSUAL THAT WHEN THESE TYPES OF STUDIES ARE
2  BASED ON EYEWITNESS ACCOUNTS AND STOPPED CLOCK DATA, THAT IT'S
3  NOT UNCOMMON TO HAVE DIFFERENCES FOR EVEN EYEWITNESS ACCOUNTS IN
4  THE SAME AREA OR EVEN STOPPED CLOCKS, BUT I THINK THAT'S WHY WE
5  HAD MENTIONED THAT THE MORE INFORMATION YOU HAVE, THE ANALYSIS
6  GETS STRONGER IN TERMS OF MORE NUMBERS, MORE VALUES.  BUT IT'S
7  NOT ANY ONE SINGLE POINT THAT WE MAKE OUR CONCLUSIONS OF THE
8  DATA, BUT IT'S RATHER ALL OF THE INFORMATION, WHICH IS WHY WE'RE
9  SHOWING THE CUMULATIVE ERROR AT THE VERY END AND A RANKING NUMBER
10 AT THE VERY END.
11 Q.  SO LET'S LOOK AT DATA POINT N10 FOR SCENARIO CASE 1.  THE
12 OBSERVER, YOU HAVE DOWN IS SEVEN AND A HALF FEET, AND IN CASE 1
13 SIMULATES THAT THERE WILL BE ONLY .09 FEET AT THAT LOCATION; IS
14 THAT CORRECT?  THAT'S ACCURATELY PORTRAYING WHAT YOUR MODELING
15 RESULTS ARE FOR THAT LOCATION?
16 A.  AND THAT'S A GOOD EXAMPLE.  THAT'S AN ACTUAL DATA FROM IPET
17 SITE 3 FROM THEIR REPORT AND ONE OF THE PIECES OF INFORMATION
18 THAT THEY RELIED UPON WITHIN THEIR STUDY.  AND THIS PARTICULAR
19 EYEWITNESS AT THAT LOCATION SAID AT ABOUT 5:00 A.M. AT SITE 3,
20 WHICH IS CLOSE TO, I BELIEVE, THE NORTH -- I'M SORRY, IT'S CLOSE
21 TO JACKSON BARRACKS GOING SOUTH, ALL THE WAY AT JACKSON BARRACKS
22 AT 5:00 A.M., THE WATER WAS AT THE CEILING, AND ONE OF THE DATA
23 POINTS IS THAT HE'S GOT AN EIGHT-FOOT CEILING.  SO THE DATA
24 REPRESENTS A DEPTH AT THAT LOCATION OF 7.5, BUT CLEARLY OUR MODEL
25 IS NOT PRODUCING SEVEN AND A HALF FEET OF WATER AT AROUND SITE 3.

1672

1   Q.  IT'S PRODUCING ABOUT AN INCH OF WATER?

2   A.  YES.  AT 5:00 A.M.

3   Q.  AT 5:00 A.M.  AND AGAIN, CASE 1 IS THE ONE THAT YOU CONCLUDE

4   REPRESENTS THE ACTUAL BREACH TIMES?

5   A.  I DON'T THINK I'VE EVER SAID THAT EVERY POINT OF DATA

6   MATCHES.  THAT'S NOT REAL IN TERMS OF THE TYPE OF SIMULATION WORK

7   WE DO.  I THINK YOU HAVE TO UNDERSTAND THAT YOU HAVE TO LOOK AT

8   ALL THE DATA.  AND WE CAN'T DISCOUNT IT BECAUSE MAYBE THERE IS

9   ANOTHER SIMULATION AT ANOTHER TIME THAT IT BECOMES PREVALENT.

10      SO YOU INCLUDE ALL THE DATA THAT YOU CAN GATHER IN YOUR

11  INFORMATION.  BUT, YES, THAT IS THE RESULTS THAT YOU'RE GOING TO

12  SEE THAT THE MODELS ARE NOW GOING TO PREDICT SEVEN AND A HALF,

13  AND IT MAY BE FAIRLY UNLIKELY THAT THE WATER WAS SEVEN AND A HALF

14  FEET ALL THE WAY TO JACKSON BARRACKS AT 5:00 IN THE MORNING.

15  Q.  LET'S LOOK AT POINT S.

16      THE COURT:  ONE OTHER THING I WANTED TO ASK:  IF YOU

17  CONTINUE ON, THE RATING NUMBER IS ZERO.  WHAT DOES THAT MEAN?

18      THE WITNESS:  THAT MEANS -- IT'S A PERFORMANCE INDICATOR

19  THAT WE USED.  IF THE EYEWITNESS SAID WATER WAS AT THAT LOCATION

20  AT THAT TIME, AND OUR MODEL PREDICTED THE FLOOD WAVE GETTING

21  THERE WITHIN THAT TIME OR TIME INTERVAL, THEN WE PROVIDED A VALUE

22  OF 1.  IF IT -- IF THE EYEWITNESS SAYS WATER WAS THERE, BUT OUR

23  MODEL DID NOT SIMULATE THE FLOOD WAVE FROM THE BREACHES OR

24  OVERTOPPING THERE, WE GAVE THE VALUE 0.  THAT MEANS WE DID NOT

25  HAVE A -- THE PERFORMANCE WAS NOT THERE ON THE MODEL.

1673

1       THE COURT:  OKAY.

2               EXAMINATION

3   BY MR. CHUD:

4   Q.  JUST TO BE CLEAR, AND WE'RE GOING TO TALK ABOUT RATING

5   NUMBERS IN A MINUTE, IF THE MODEL PREDICTED THAT THE WATER WAS

6   NOT AT A PARTICULAR LOCATION AND THE OBSERVER SAID THERE WAS NOT

7   WATER THERE AT THAT LOCATION, THAT WOULD ALSO GET A RATING NUMBER

8   OF 1, CORRECT?

9   A.  NO.  THAT WOULD BE A RATING NUMBER OF 0 BECAUSE THE ONLY

10  TIME WE'RE GOING TO GIVE VALUE TO THE MODEL'S PREDICTABILITY IS

11  BY PROVIDING -- IF THERE WAS WATER THERE.  I KNOW -- I MEAN, I

12  SEE SOME KIND OF FACES OVER THERE IN THE AUDIENCE, BUT I

13  UNDERSTAND DURING A TIME THAT WE WERE -- Y'ALL HAD ASKED ME THAT

14  QUESTION, I SAID I NEEDED TO VERIFY TO MAKE SURE HOW WE WERE

15  GOING TO ASSUME THAT.

16      MR. WALKER:  YOUR HONOR, I APOLOGIZE FOR THE FACE.  IT

17  HAS NOTHING TO DO WITH THE ANSWER, MR. SPINKS.  IT HAS SOMETHING

18  TO DO WITH SOMETHING THAT HAS NOTHING TO DO WITH THIS CASE AND I

19  APOLOGIZE.

20      THE COURT:  AND THE COURT CAN UNDERSTAND THAT AS WELL.

21  I GET EXTRANEOUS INFORMATION OVER HERE EVERY NOW AND AGAIN, AND I

22  MAY ALSO DEMONSTRATE EMOTION WHEN IT DOESN'T RELATE TO THE CASE,

23  ON SOMETHING ELSE, MAYBE A REVERSAL FROM THE COURT OF APPEALS.

24      MR. WALKER:  MY APOLOGIES, JUDGE.

25              EXAMINATION

1674

1   BY MR. CHUD:

2   Q.  MR. SPINKS, I'M NOT GOING TO BELABOR THE POINT OF THE

3   DIFFERENCE BETWEEN OBSERVED WATER DEPTH AND SIMULATED WATER

4   DEPTH.  BUT IS IT FAIR TO SAY THAT THERE ARE OTHER DATA POINTS ON

5   THE SENSITIVITY ANALYSIS WHERE THE OBSERVED WATER DEPTH AND THE

6   SIMULATED WATER DEPTH FOR CASE 1 ARE QUITE A BIT DIFFERENT?

7   A.  YES.  AND I THINK WE REFLECTED THAT ON OUR HYDROGRAPH

8   SHOWING ALL THE DATA POINTS ON IT WITH ALL THE ERROR BARS AND

9   SHOWING OUR HYDROGRAPH, HOW IT MATCHES WITH ALL THE DATA.

10      SO YES, I MEAN, THIS REPRESENTS OUR DATA ANALYSIS.

11  Q.  LET'S TALK ABOUT THE RATING NUMBERS.  THAT'S A SEPARATE AND

12  INDEPENDENT WAY YOU TRY TO EVALUATE WHICH OF THESE CASES BEST

13  MATCHED THE INFORMATION THAT YOU HAD?

14  A.  YES.  IT'S A PERFORMANCE INDICATOR FOR THE STUDY.

15  Q.  I THINK YOU SAID THE RATING NUMBER SEEKS TO DETERMINE IF

16  THERE IS A CORRELATION BETWEEN THE MODELING RESULT AND THE

17  OBSERVATION; IS THAT TRUE?

18  A.  YES.  IN TERMS OF THE FLOOD WAVE REACHING THAT PARTICULAR

19  LOCATION WITHIN THAT TIME PERIOD.

20  Q.  NOW, COMING INTO TODAY, I HAD UNDERSTOOD YOUR RATING NUMBER

21  SYSTEM TO BE AS FOLLOWS:

22      IF THE MODEL AND THE OBSERVED DATA BOTH SAID THAT THERE

23  WAS FLOODING AT A LOCATION, IT WAS SCORED A 1; IF THE MODEL AND

24  THE OBSERVED INFORMATION DISAGREED ABOUT WHETHER THERE WAS

25  FLOODING, IT WOULD GET A 0 BECAUSE THERE'S A MISMATCH; AND IF THE

1675

1   MODEL AND THE OBSERVED BOTH PREDICTED NO FLOODING, IT WOULD SCORE

2   A RATING POINT OF 1 BECAUSE THERE WAS AN AGREEMENT BETWEEN THE

3   MODEL AND THE OBSERVED.  IS IT YOUR TESTIMONY THAT'S NOT AN

4   ACCURATE SUMMARY OF YOUR RATING NUMBER SYSTEM?

5   A.  NO.  WE GAVE IT A VALUE OF 0 BECAUSE WE DIDN'T GIVE CREDIT

6   TO THE MODEL, THAT THERE WAS NO WATER THERE.

7       I MEAN, CASE IN POINT, I GUESS, YOU HAD A TIME-STAMPED

8   PHOTOGRAPH, I BELIEVE, AT JACKSON BARRACKS, WHICH IS OUR DATA

9   POINT S34 -- I MEAN, S33, WHICH IS IPET SITE 1.  THERE WAS AN

10  EYEWITNESS WHO PHOTOGRAPHED THAT THERE WAS NO WATER AT 7:46 A.M.

11  AND SO WE WOULD NOT HAVE PROVIDED -- EVEN THOUGH WE BOTH -- WE

12  DIDN'T PREDICT WATER AT JACKSON BARRACKS AT 7:46, NEITHER DID THE

13  OBSERVER WITNESS WATER THERE AT 7:46, SO THE VALUE WAS GIVEN A 0.

14      THE COURT:  SO WHEN THERE IS NO WATER, EVEN IF THERE IS

15  AGREEMENT, IT'S 0.  IS THAT IT IN A NUT SHELL?

16      THE WITNESS:  YES.

17              EXAMINATION

18  BY MR. CHUD:

19  Q.  ISN'T THE PURPOSE OF THE RATING NUMBER SYSTEM TO SEE IF THE

20  MODEL ACCURATELY PREDICTS THE WATER LEVEL THAT THE OBSERVER SEES,

21  WHETHER THERE HAPPENS TO BE NONE THERE OR THERE HAPPENS TO BE A

22  LOT THERE?  I MEAN, ISN'T THAT A MORE LOGICAL RATING NUMBER

23  SYSTEM?

24  A.  NO.  IT'S SO THAT WE CAN DETERMINE WHETHER THE FLOOD WAVE

25  REACHED THESE LOCATIONS BECAUSE WE'RE TALKING ABOUT A PROPAGATION

**1676**

1  OF WATER, AN EXTREME PROPAGATION OF WATER, AND WHAT WE'RE TRYING
2  TO MEASURE, DID WE ACTUALLY, WITH OUR MODEL, REPRESENT THAT
3  PROPAGATIONAL FLOW.
4  Q.  LET'S SEE WHAT YOU SAID ABOUT THIS AT YOUR DEPOSITION, PAGE
5  58, LINES 15 TO 25.
6       (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, A PORTION
7  OF THE VIDEOTAPED DEPOSITION OF MELVIN SPINKS WAS PLAYED.)
8  Q.  AND IF I UNDERSTOOD YOU PROPERLY, YOU WOULD COMPARE THE
9  OBSERVED WATER DEPTH TO THE SIMULATED WATER DEPTH, AND IF BOTH OF
10 THEM INDICATED FLOODING OR IF BOTH OF THEM INDICATED NO FLOODING,
11 YOU WOULD GIVE IT A VALUE OF A 1, CORRECT?
12 A.  CORRECT.
13 Q.  AND IF ONE OF THEM INDICATED FLOODING AND THE OTHER
14 INDICATED NO FLOODING, YOU WOULD GIVE IT A 0, CORRECT?
15 A.  YES.
16      (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE
17 PORTION OF THE VIDEOTAPE DEPOSITION OF MELVIN SPINKS WAS
18 CONCLUDED.)
19      EXAMINATION
20 BY MR. CHUD:
21 Q.  WOULD YOU AGREE THAT'S A DIFFERENT EXPLANATION SYSTEM THAN
22 THE ONE YOU'RE GIVING TODAY?
23 A.  I THINK THERE WAS A SERIES OF QUESTIONING, TOO, THAT YOU
24 WOULD HAVE TO LOOK AT MY ENTIRE DEPOSITION BECAUSE ONCE WE
25 STARTED GOING THROUGH SOME OF THE INFORMATION WITHIN THE DATA

**1677**

1  TABLE, I THINK I WAS QUITE HONEST WITH MR. RAFFMAN THAT I NEEDED
2  TO CHECK TO SEE HOW WE MADE THAT INTERPRETATION.  AT THE EARLIER
3  TIME -- AND AGAIN, BACK THEN WHEN WE STARTED, I THOUGHT WE DID
4  GET A VALUE OF 1.  I WAS THINKING THAT'S WHAT WE WERE DOING, TOO.
5  AND THEN WHEN I STARTED LOOKING AT THE DATA TABLE, AT THAT TIME,
6  I RECOGNIZED WE DIDN'T GIVE VALUE.  AND THEN I MENTIONED TO HIM I
7  NEEDED TO CONFIRM THAT WITH OUR ANALYST AS WELL, HOW WE WERE
8  GOING TO TRY IT AND WHY.  AND SO I DID THAT, AND I'M COMING BACK
9  AND TELLING YOU HONESTLY THAT'S HOW WE MADE THE
10 INTERPRETATION.
11 Q.  WOULD YOU AGREE WITH ME THAT THE ONLY WAY THAT LAFARGE CAN
12 UNDERSTAND THE RATING NUMBER SYSTEM IS THROUGH YOUR EXPLANATIONS
13 TO US OF THIS SYSTEM?
14 A.  I DO MY BEST TO EXPLAIN EVERYTHING TO YOU.
15 Q.  YOU DIDN'T SUPPLEMENT YOUR EXPERT REPORT OR SUBMIT AN
16 AFFIDAVIT OR ANYTHING AFTER YOUR DEPOSITION SAYING, "I'VE CHECKED
17 WITH MY PEOPLE AND THE RATING NUMBER SYSTEM IS DIFFERENT THAN I
18 DESCRIBED IT AT MY DEPOSITION," DID YOU?
19 A.  I HAVE NOT CHANGED OUR RESULTS AT ALL.  OUR RESULTS STILL
20 STAND AS THIS REPORT WAS PROVIDED BACK A YEAR AGO.
21 Q.  SO LET ME JUST UNDERSTAND ONE THING:  IT REMAINS YOUR
22 TESTIMONY THAT IF THE MODELLED AND THE OBSERVED BOTH SHOWED
23 FLOODING, WHICH I THINK YOU SAID IS OVER A HALF FOOT OF WATER AT
24 A LOCATION, THEN THAT GETS A 1?
25 A.  I THINK I MAY IN THE DEPOSITION USED THAT AS A TERM OF

**1678**

1  DEPTH, BUT IT'S ACTUALLY -- IF THE FLOOD WAVE WAS COMING TO THAT
2  LOCATION, THEN WE WOULD GIVE CREDIT TO THE MODEL BECAUSE THE
3  FLOOD WAVE HAD REACHED THAT LOCATION.  BUT I DO BELIEVE I MAY
4  HAVE SAID A HALF FOOT OR TRY TO QUANTIFY IT, WHICH THAT'S
5  PROBABLY NOT A GOOD RESPONSE EITHER.  WHAT WE ARE PREDICTING IS
6  THAT DID THE MODEL PREDICT THE FLOOD WAVE FROM THESE BREACHES
7  GETTING TO THAT AREA.  AND THAT'S WHAT WE WERE REALLY LOOKING AT.
8  Q.  SO AT YOUR DEPOSITION, YOU SAID THAT THE CUT-OFF POINT
9  BETWEEN A FLOODED CONDITION AND AN UNFLOODED CONDITION WAS HALF A
10 FOOT OF WATER, BUT YOU'RE SAYING TODAY THAT'S NOT EXACTLY THE WAY
11 IT WORKED?
12 A.  NO, WE HAVE TO -- MY MODELERS LOOKED INTO THE MODEL AND THEY
13 IDENTIFIED A FLOOD WAVE WITHIN THE WHOLE TIME PERIOD.  LET'S SAY
14 SOMEBODY SAID BETWEEN 7:00 AND 7:30, THEY OBSERVED WATER.  SO WE
15 WOULD LOOK IN THE MODEL TO SEE BETWEEN 7:00 AND 7:30 DID THE
16 FLOOD WAVE FROM THE IHNC'S WATERS OR MRGO'S WATERS REACH THAT
17 PARTICULAR LOCATION.  IF IT DID, WE PROVIDED IT A 1.  IF IT
18 DIDN'T REACH, THEN WE GAVE NO -- WE PROVIDED A 0.
19 Q.  LET'S LOOK AT HIGHLIGHT POINT S8 FOR CASE 1.  S8, JUST TO
20 SEE HOW THIS NUMBER SYSTEMS WORK, S8, THE OBSERVER SAYS 1.8 FEET.
21 THE SIMULATION, THE MODEL, SAYS 9.9 FEET.  THAT'S FOR THE RATING
22 NUMBER OF 1, CORRECT?  THAT'S CORRECT?
23 A.  YES.  AGAIN, WE'RE MEASURING THE FLOOD WAVE, AND THAT'S AN
24 OBSERVED WITNESS, MR. REED, AT 10:00 A.M., HE MAKES A STATEMENT
25 THAT BETWEEN 9:45 AND 10:15, WATER FLOWED IN UNDER THE HOUSE.

**1679**

1  Q.  OKAY.  SO UNDER YOUR RATING NUMBER SYSTEM, EVEN THOUGH THE
2  OBSERVER SAYS, "I'VE GOT LESS THAN TWO FEET," AND YOUR MODEL
3  SAYS, "NO, YOU'VE REALLY GOT ALMOST 10," THAT GETS CREDITED AS A
4  MATCH IN THIS SYSTEM, DOESN'T IT?
5  A.  BASED ON THE FLOOD WAVE, YES.
6  Q.  THAT'S REALLY A MISMATCH BETWEEN THE OBSERVER AND THE MODEL,
7  ISN'T IT?
8  A.  I MEAN, YOU'RE PICKING ONE OUT OF SEVERAL, BUT NO, IT'S NOT
9  A MISMATCH.  IT'S ACTUALLY IN THAT PARTICULAR OBSERVATION, WE
10 KNOW DOWN AT THE COURTHOUSE, AT 10:00 A.M., THE WATER DEPTH WAS
11 WAY INSIDE THE COURTHOUSE.  SO WE DO RECOGNIZE THAT AT THAT TIME
12 PERIOD, AT 10:00, THAT ACTUALLY THROUGH A VIDEO, THAT MRGO'S
13 WATERS WERE ALREADY REACHING THIS SIMILAR LOCATION BUT SOUTH.
14 AND SO WE HAD TO GIVE SOME CREDIBILITY TO OUR UNDERSTANDING OF
15 THE WHOLE TRUE FLOODING AT THE TIME.
16      SO WE DO BELIEVE THAT WATER WAS UP AT LEVELS, ACCORDING
17 TO WHAT OUR MODEL SAYS, AND THAT'S WHY WE GAVE IT A RATING OF 1.
18 Q.  LET'S LOOK AT S23.  THIS ONE HAS THE OPPOSITE SITUATION.
19 HERE, THE OBSERVER SAYS, "I'VE GOT EIGHT FEET OF WATER," AND THE
20 MODEL SAYS, "NO, YOU'VE ONLY GOT 1.64."  THAT'S ALSO A MATCH,
21 EVEN THOUGH THERE IS OVER SIX-FOOT DIFFERENCE BETWEEN THE
22 OBSERVED AND THE MODEL; IS THAT CORRECT?
23 A.  YES, THAT'S MATTHEW SIMMONS.  IN HIS DEPOSITION, HE HAD
24 INDICATED BETWEEN 5:10 AND 5:40 A.M., THE WATER WAS UP TO THE
25 CEILING.  SO BETWEEN 5:00 AND 5:30, IN THE 10 MINUTES IT CAME UP

1680

1  AND AGAIN WAS AT THE CEILING LEVEL.

2          AT THAT PARTICULAR TIME, I THINK WHAT WE'RE SHOWING IN

3  OUR TABLE THERE IS THAT AT HIS LOCATION, WHICH IS AROUND THE

4  SOUTH BREACH AREA, THAT WE WEREN'T PREDICTING LEVELS RIGHT BEFORE

5  5:30 AT EIGHT FEET.  WE WERE PREDICTING -- I MEAN -- YEAH, WE

6  WERE PREDICTING AT ABOUT TWO FEET.

7  Q.  LET'S LOOK AT S7, STILL IN CASE 1.  S7.  OBSERVED WATER

8  DEPTH, 2.5 FEET; SIMULATED WATER DEPTH, .06 FEET.  RATING NUMBER

9  OF 1.  THAT REALLY SHOULD BE A RATING NUMBER OF 0, SHOULDN'T IT?

10  THE OBSERVED SAYS THERE WAS WATER, THE MODEL SAYS THERE WASN'T.

11  A.  AT THAT LOCATION, MR. REED HAD MENTIONED WATER GOT UP TO THE

12  JEEP PARKED ON THE STREET, AND IN HIS DEPOSITION THEY SAID, YOU

13  KNOW, "WELL, WHAT TIME?"  HE SAYS, "BETWEEN 7:30 AND 9:30."

14          SO WE HAVE TO LOOK AT THE WHOLE TIME INTERVAL, WHICH IS

15  AGAIN, OUR ERROR BAR BETWEEN 7:30 AND 9:30, THAT FLOOD WAVE

16  WOULD HAVE REACHED THERE.  AND IT DID IN THOSE PERIODS, THE TIME.

17  SO IT GETS A VALUE.

18          WHAT I'M SAYING TO YOU IS THAT I UNDERSTAND YOU WANT TO

19  PICK OUT NUMBERS, BUT IT'S NOT JUST THE NUMBER GAME.  YOU HAVE TO

20  PUT THE THOUGHT PROCESS THAT AN ENGINEER WOULD GO THROUGH IN

21  ORDER TO ESTABLISH THOSE NUMBERS FOR EACH CASE.

22  Q.  YOU DID SAY IN YOUR DEPOSITION THAT THE CUTOFF BETWEEN

23  FLOODING AND NOT FLOODING WAS HALF A FOOT OF WATER, DIDN'T YOU?

24  A.  YES, I THINK I MADE SOME REMARKS TRYING TO QUANTIFY THAT

25  VALUE AND I MAY HAVE MISUNDERSTOOD AT THAT TIME, BUT I HAVE

1681

1  WANTED TO CLARIFY, AGAIN, THAT IT'S PART OF THE FLOOD WAVE MOVING

2  INTO THE AREA.  WHEN THE MODEL PREDICTS THAT THE FLOOD WAVE WAS

3  GOING TO GET THERE, THAT'S HOW A RATING NUMBER WAS PUT TOGETHER.

4  Q.  AND AFTER YOUR DEPOSITION, THIS WAS NEVER CLARIFIED UNTIL

5  JUST NOW?

6  A.  I THINK DURING THE DEPOSITION, I SAID I WAS UNCLEAR ON SOME

7  OF THESE VALUES, AND THAT I WOULD NEED TO CLARIFY SOME OF THOSE

8  VALUES WITH STAFF.

9  Q.  THERE HASN'T BEEN ANY CLARIFICATION PROVIDED TO LAFARGE

10  ABOUT THESE VALUES UNTIL JUST NOW?  AFTER YOUR DEPOSITION UNTIL

11  NOW, THERE HAS BEEN NO CLARIFICATION ABOUT THOSE VALUES?

12          MR. SEYMOUR:  OBJECTION, YOUR HONOR.  LAFARGE NEVER

13  ASKED FOR ANY CLARIFICATION AFTER THE DEPOSITION.

14          THE COURT:  OVERRULED.

15          THE WITNESS:  I MEAN, IT HAS NOT CHANGED OUR RESULTS AT

16  ALL.  OUR RESULTS STILL STAND.  WHAT I'M TRYING TO EXPLAIN TO YOU

17  IS INTERPRETATION OF WHAT OUR ANALYSIS AT SOME POINT FOR THESE

18  EYEWITNESSES.  AND, AGAIN, I THINK WHAT YOU HAVE TO CAPTURE HERE

19  IS THAT MANY OF THESE DEPTH DIFFERENCES, IN SEVERAL CASES, WE MAY

20  BE JUST TALKING MINUTES.  THERE IS SUCH A RAPID CHANGE IN WATER

21  LEVELS THAT IT DOESN'T MEAN THERE IS AN INACCURATE MODEL, IT JUST

22  MEANS THE POINT IN TIME, IT MAY HAPPEN 10 MINUTES EARLIER, IT MAY

23  HAPPEN 10 MINUTES SOONER.

24  Q.  I JUST WANT TO TALK ABOUT A COUPLE MORE.

25          LET'S LOOK AT CASE 2, DATA POINT S5.  S5 SAYS THAT THE

1682

1  OBSERVER SAID THERE WAS A FOOT-AND-A-HALF OF WATER, AND IT'S --

2  ACTUALLY, THE SIMULATION SAYS .56 FOR S5.  IS THAT RIGHT?

3  A.  YES.

4          MR. SEYMOUR:  EXCUSE ME, I THINK YOU'RE ON THE WRONG

5  LINE.

6              EXAMINATION

7  BY MR. CHUD:

8  Q.  OBSERVED WATER DEPTH, 1.5; SIMULATED WATER DEPTH, .56.  DO

9  YOU SEE THAT?

10  A.  YES.

11  Q.  BOTH OF THOSE ARE ABOVE HALF A FOOT OF WATER, CORRECT?

12  A.  YES.

13  Q.  YOU SCORE THAT AS A 0?

14  A.  AND THE REASON BEHIND THAT IS SALLY JONES LIVES, AGAIN,

15  SOUTH, I GUESS CLOSE TO THE JACKSON BARRACKS LOCATION, AND THE

16  EYEWITNESS INDICATED THAT BETWEEN 8:00 AND 8:10, THAT WATER WAS

17  IN THE HOUSE.  BUT OUR MODEL DID NOT PREDICT THAT THE FLOOD WAVE

18  REACHED THAT EYEWITNESS LOCATION AT 8:00 TO 8:10.

19          THE COURT:  SO AM I TO UNDERSTAND THAT IN ARRIVING AT

20  THE VALUES, 1 OR 0, VARIOUS THINGS CONSIDERED, INCLUDING THE

21  DIFFERENTIALS, BUT OTHER DATA IS ALSO INCLUDED IN MAKING THE

22  ULTIMATE JUDGMENT, WHETHER YOU GIVE IT A 1 OR A 0, OTHER THAN THE

23  DIFFERENTIALS THAT APPEAR ON THIS CHART?

24          THE WITNESS:  YES.  YOU HAVE TO LOOK AT THE TIME,

25  COMPLETE TIME, AND YOU HAVE TO LOOK AT THE FLOOD WAVE IN THE

1683

1  MODEL TO MAKE THAT ACCURATE.

2          THE COURT:  IN OTHER WORDS, IF A DEPOSITION AND A MODEL

3  DISAGREED A BIT HERE, JUST A SMALL AMOUNT, BUT YOU HAVE HARD DATA

4  THAT THE MODEL IS CORRECT AND THE WITNESS IS INCORRECT, THEN YOU

5  GIVE IT A 0?

6          THE WITNESS:  NO.  IT'S STILL MATHEMATICAL.  WHAT WE DO

7  IS, WE HAVE TO GO TO THAT EYEWITNESS LOCATION AT THAT TIME OR

8  TIME INTERVAL AND LOOK INTO THE MODEL, ITSELF, TO SEE IF THE

9  FLOOD WAVE HAD REACHED THAT LOCATION.

10          ONLY IF THAT FLOOD WAVE REACHED THAT LOCATION IN

11  THAT TIME INTERVAL DID WE GIVE A 1.  IN THIS PARTICULAR CASE,

12  YOUR HONOR, THE .56, THE DEPTH IS NOT FROM THE FLOOD WAVE DUE TO

13  THE BREACHES.  THE FLOOD WAVE STILL HAD NOT REACHED THAT

14  LOCATION.

15          THE COURT:  SO THAT WOULD HAVE BEEN FROM RAIN?

16          THE WITNESS:  JUST RAIN.

17              EXAMINATION

18  BY MR. CHUD:

19  Q.  SO THERE IS NOTHING IN YOUR REPORT THAT EXPLAINS THE FACTORS

20  YOU CONSIDERED TO ARRIVE AT THESE RATING NUMBERS FOR EACH OF THE

21  LOCATIONS?  THERE IS NOTHING I CAN ACTUALLY LOOK AT THAT WOULD

22  EXPLAIN THIS TO ME, IS THERE?

23  A.  OUR APPENDIX PROVIDES A DISCUSSION OF THE ANALYSIS, BUT

24  PROBABLY IN THE DETAILS THAT I'VE JUST EXPLAINED, IT MAY NOT.

25  Q.  LET'S JUST LOOK AT A COUPLE MORE.  UNDER CASE -- LET'S LOOK

1684

1 AT S15 FOR CASES 1 AND 2.  S15.

2     SO S15, OBSERVED WATER DEPTH, 0.0; CASE 1 SIMULATED

3 WATER DEPTH, 0.02, RATING NUMBER OF 1; CASE 2, SIMULATED, THE

4 SAME, 0.02, RATING NUMBER 0.  IS THAT A MISTAKE?

5 A.  NO, IT'S NOT.

6 Q.  YOU HAVE THE SAME WATER DEPTH AT A LOCATION, THE SAME

7 OBSERVED WATER DEPTH AT THAT LOCATION, A DIFFERENT RATING NUMBER?

8 A.  THE EYEWITNESS AT THAT LOCATION INDICATED THAT WATER CAME IN

9 AT 7:30.  IN TERMS OF CASE 1, WHEN YOU LOOK INTO THE MODEL, AND

10 REMEMBER, THE DATA LOCATION, MS. BORDELON IS LOCATED ACROSS THE

11 RAILROAD TRACKS EAST OF THE IHNC, EAST OF THE RAILROAD TRACKS.

12 THE WATER OVERTOPPED THE RAILROAD TRACKS AFTER 7:00.  AND WATER

13 WAS ENTERING THE LOCATION, IT WAS WITHIN THAT AREA AT ABOUT 7:30.

14 IT DID NOT AFFECT THE DEPTH AT THAT TIME, BUT IT WAS JUST AT THAT

15 TIME.  BUT WHEN YOU CHANGE TO CASE 2, WHEN YOU START THE MODEL AT

16 7:00 A.M. FOR THE SOUTH BREACH, WATER NEVER REACHES ACROSS THE

17 RAILROAD OVER TO MS. BORDELON'S PLACE, EVEN CLOSE TO 7:30.  SO

18 THEREFORE, IT DOES NOT RANK IN TERMS OF PERFORMANCE.

19     SO THE WATER HAS TO HAVE REACHED THE LOCATION OF THAT

20 EYEWITNESS, WHICH IN CASE 1 IT DID, BUT IN CASE 2 IT DID NOT.

21 Q.  I THOUGHT YOU SAID EARLIER THAT IF THE OBSERVED SAID THAT

22 THERE WAS NO WATER AND THE SIMULATED SAID THERE WAS NO WATER,

23 THAT SCORES A 0, BUT THERE IS NO WATER OBSERVED AND SIMULATED IN

24 CASE 1 WHERE YOU STILL GAVE IT A 1?

25 A.  THE DEPTH, AGAIN, IS RELATED TO WHAT THE WITNESS SAID, AND

1685

1 WHAT THE WITNESS SAID IN THAT CASE, WATER CAME IN AT 7:30.  WE

2 DID NOT HAVE AN ACTUAL DEPTH, BUT WE KNEW WATER WAS THERE AT

3 7:30.

4 Q.  YEAH, BUT LET'S TALK ABOUT 5:30.  I THOUGHT WHAT YOU SAID

5 EARLIER WAS IF THERE WAS AN AGREEMENT BETWEEN THE OBSERVED AND

6 THE SIMULATED, THAT THERE WAS ESSENTIALLY NO WATER, THAT WOULD

7 GET A 0 IN YOUR SYSTEM.

8 A.  WHAT I'M TELLING YOU IS, THE WITNESS SAID THERE WAS WATER

9 THERE.  WE JUST DON'T KNOW THE EXACT DEPTH OF THAT WATER.

10 Q.  WELL, IF THE WITNESS SAYS THERE WAS WATER THERE, THEN WHY IS

11 THE OBSERVED WATER DEPTH 0.0?

12 A.  THE DEPTH IS -- IT'S JUST 0.  IT'S COMING IN AT THAT

13 LOCATION AT THAT TIME.  IF YOU LISTEN TO THESE EYEWITNESSES,

14 YOU'LL SEE WATER -- THEY ARE SAYING, "WATER CAME DOWN THE STREET.

15 WE'RE SEEING WATER AT 7:30," AND THEN THEY ARE SAYING,

16 "15 MINUTES LATER, THE WATER IS IN MY HOUSE.  30 MINUTES LATER,

17 WATER IS UP TO MY ROOF."  WE'RE TAKING THE ACCOUNTS OF THE

18 EYEWITNESSES AND THEN WE'RE PROVIDING OUR BEST INTERPRETATION IN

19 A COMPARISON WITH OUR MODEL.

20     AND WE KNOW, FOR THIS PARTICULAR EYEWITNESS, AT 7:30,

21 THAT'S WHEN THE FLOOD WAVE WAS MOVING OVER THE RAILROAD TRACKS,

22 WHICH THEY LIVED BASICALLY JUST EAST OF THE RAILROAD TRACKS, AND

23 OUR MODEL PREDICTED WELL IN SHOWING THAT.

24 Q.  JUST SO I UNDERSTAND IT, THE WAY YOU DID THIS, AT LEAST FOR

25 THIS DATA POINT, SERVES TO GIVE MORE CREDIT TO CASE 1 AND NOT

1686

1 GIVE THAT SAME CREDIT TO CASE 2.  RIGHT?  GET A POINT IN CASE 1

2 BUT NOT A POINT IN CASE 2?

3 A.  BUT THERE IS A REASON IT DIDN'T GET THE CREDIT, BECAUSE WHEN

4 YOU START THE SOUTH BREACH AT 7:00 A.M., THERE IS NO WAY THE

5 WATER CAN TRAVEL ALL THE WAY TO THIS LOCATION, AND NEITHER DOES

6 THE MODEL CONFIRM THAT.

7     SO YOU HAVE TO LOOK AT THE MATH AND THE SCIENCE IN

8 THIS.  YOU HAVE TO UNDERSTAND THE MODEL.

9 Q.  I'M TRYING TO UNDERSTAND THE MODEL.

10     MR. CHUD:  I HAVE NOTHING FURTHER.  THANK YOU,

11 YOUR HONOR.

12     THE COURT:  THANK YOU, COUNSEL.

13          REDIRECT EXAMINATION

14 BY MR. SEYMOUR:

15 Q.  MR. SPINKS, DID -- I WITHDRAW THAT.

16     LET ME GET ONE MORE THING HERE.  MR. SNYDER, WOULD YOU

17 PLEASE PUT UP SLIDE 88.

18     MR. SPINKS, PLEASE SUMMARIZE WHY YOU CONCLUDED THAT THE

19 NORTH BREACH OCCURRED AT OR BEFORE 4:30 A.M. CENTRAL TIME.

20 A.  IN OUR STATEMENT OF CONCLUSIONS, CLEARLY IT'S INDICATED OUR

21 CONCLUSIONS AND OUR ANALYSIS SHOWED THAT THE BREACH OCCURRED

22 PRIOR TO 4:30, AND THAT'S BECAUSE WE'RE COMPARING TO THE

23 EYEWITNESS ACCOUNT STOPPED CLOCK INFORMATION THAT WAS MADE

24 AVAILABLE.  AND WHEN I MENTION BY THAT IS OTHER THAN VILLAVASSO,

25 THERE IS OTHER INFORMATION THAT SUPPORTS THE EARLIER BREACH

1687

1 TIMES.  EVEN THE 6:10 A.M. WHERE ALL THE PUMPS WERE STOPPED, THE

2 WATER HAD TO GET SIX FEET DEEP AT THAT PUMP STATION LOCATION.  IN

3 ORDER FOR THAT WATER TO GET SIX FEET DEEP DUE TO THE NORTH BREACH

4 AND THE SOUTH BREACH, IT TAKES ABOUT AN HOUR AND A HALF TO FILL

5 UP TO ELEVATION 2, OKAY, WHICH PUTS IT AT 6:00 A.M. IN THE

6 MORNING, WHICH YOU ALSO FIND BY THAT 6:00 A.M. IN THE MORNING

7 TIME FRAME IS A LOT OF CLOCKS THAT STOPPED AT THAT TIME IN THOSE

8 LOCATIONS.

9     SO I THINK WHAT WE'RE SAYING IS THAT AT THE TIME THAT

10 WE HAVE IDENTIFIED AS THE MOST LIKELY TIME OF BREACHING HAD TO BE

11 SOMETIME BEFORE 4:00 TO 4:30 TIME FRAME IN ORDER TO FILL THIS

12 AREA UP IN THE NORTH BREACH SIDE AND TO HAVE THE STOPPED CLOCKS'

13 DATA VALID, TO HAVE SEVERAL EYEWITNESSES' DATA VALID, THAT THAT

14 WOULD HAVE TO BE A HIGH PROBABILITY.  WE DON'T BELIEVE THAT WAVE

15 SPLASHING WOULD HAVE CONTRIBUTED TO THE VOLUME OF WATER THAT WAS

16 BEING REPORTED.

17     THE COURT:  SO WHEN YOU SAY "THE BREACH," YOU'RE

18 ASSUMING THE BREACH AS FULLY BREACHED; IS THAT CORRECT?

19     THE WITNESS:  YES, SIR.

20          EXAMINATION

21 BY MR. SEYMOUR:

22 Q.  IS IT FAIR TO SAY THAT AS THE WATER COMES IN FROM THAT

23 RELATIVELY NARROW GAP AS OPPOSED TO THE SOUTH BREACH, IT HAS TO

24 SPREAD OUT BEFORE IT CAN BUILD UP?

25 A.  YES.  THAT'S WHY IT TAKES AN HOUR AND A HALF TO GET TO

12  (Pages 1684 to 1687)

## 1688

1 ELEVATION 2, WHICH IS THE FINISHED FLOOR ELEVATION -- ABOUT THE
2 FINISHED FLOOR ELEVATION OF THE PUMPHOUSE, PUMP STATION NUMBER 5.
3 Q.   AND DO YOU KNOW THE -- ACTUALLY, LET ME ASK FOR PLAINTIFF'S
4 EXHIBIT 373, DEPOSITION EXHIBITS FOR MR. VILLAVASSO, EXHIBIT
5 NUMBER 8, TO BE PUT UP ON THE SCREEN.
6      NOW, THAT'S A PICTURE OF THE PUMPHOUSE AND IT SHOWS THE
7 DOORS THAT MR. VILLAVASSO LOOKED OUT.  THERE APPEARS TO BE A
8 GARAGE THAT'S UNDERNEATH.  DO YOU HAPPEN TO KNOW THE ELEVATION OF
9 THE ELECTRICAL CONDUITS THAT MR. VILLAVASSO WAS WORRIED ABOUT
10 SHORT-CIRCUITING?
11      MR. CHUD:  THIS IS BEYOND THE SCOPE.  I DIDN'T ASK
12 ANYTHING ABOUT THE GEOGRAPHY OF THE PUMP STATION.
13      THE COURT:  HE'S SAYING IT'S BEYOND THE SCOPE.  WHAT'S
14 YOUR RESPONSE, COUNSEL?
15      MR. SEYMOUR:  YOUR HONOR, THE WITNESS -- WE'RE TRYING TO
16 LOOK AT THE QUESTION THAT YOUR HONOR RAISED YESTERDAY THAT WAS
17 RAISED IN CROSS-EXAMINATION ABOUT THE TIMING OF THE BREACH, THE
18 TIME IT TAKES TO GET UP TO THE CRITICAL LEVEL --
19      THE COURT:  I'M GOING TO ALLOW IT.  OVERRULED.
20           EXAMINATION
21 BY MR. SEYMOUR:
22 Q.   DO YOU HAPPEN TO KNOW THE ELEVATION OF THE ELECTRICAL
23 CONDUITS THAT MR. VILLAVASSO TESTIFIED HE WAS WORRIED ABOUT
24 RESULTING IN SHORT CIRCUIT IF THE WATER GOT UP TO THAT POINT WITH
25 THE PUMP STILL ON?

## 1689

1 A.   NO, I'M NOT AWARE OF THE ELEVATION.
2 Q.   YOU CAN TAKE THAT DOWN.
3      YOU MENTIONED A PHRASE A MOMENT AGO, "ELEVATION 2."
4 JUST FOR CLARITY OF THE RECORD, WHAT DID YOU MEAN BY THAT?
5 A.   ELEVATION 2 IS ACTUALLY THE FINISHED FLOOR ELEVATION OF THE
6 PUMPHOUSE IS ABOUT 1.89 FEET, AND I JUST SAID ABOUT TWO FEET.
7 AND THAT REFERRED TO THE DATUM THAT IS USED FOR ALL OF THESE
8 STUDIES WHICH IS THE NAVD1988 2004.65 FEET ADJUSTMENT.
9 Q.   IF WE COULD HAVE SLIDE 88 BACK, PLEASE.
10      AND PLEASE SUMMARIZE AGAIN THE REASONS WHY YOU
11 CALCULATED THE MOST LIKELY TIME FOR THE OCCURRENCE OF THE SOUTH
12 BREACH AS BEING AT OR BEFORE 6:00 A.M. CENTRAL DAYLIGHT TIME.
13 A.   I THINK WE HAVE SEVERAL EYEWITNESSES, PARTICULARLY IN
14 THE SOUTH AREA BY JACKSON BARRACKS THAT HAVE INDICATED THAT THEY
15 STARTED TO FLOOD AT ABOUT 8:00 THERE -- ABOUT 8:15.  IN ORDER TO
16 GET FLOODWATERS TO THE JACKSON BARRACKS LOCATION, IN ORDER ALSO
17 FOR THE FLOODING ACROSS THE RAILROAD TRACKS, THE SOUTH BREACH
18 WOULD HAVE TO OCCUR SOMETIME BEFORE 6:00 A.M.
19      IT'S MORE IMPORTANT, I THINK, BECAUSE THE ELEVATION ON
20 THE SOUTH PART ARE MUCH HIGHER THAN GOING EAST, AND I THINK WHEN
21 YOU LOOK AT THOSE MODEL SIMULATIONS WE HAVE, YOU SEE THE WATER
22 CROSSING THE RAILROAD IN BOTH THE POLDER STUDY DONE BY THE
23 DELFT UNIVERSITY AND US BECAUSE THAT'S STILL LOWER ELEVATION, BUT
24 TO REACH THE ELEVATION SOUTH, WE'RE AT THE MISSISSIPPI WHERE YOU
25 GET INTO ELEVATION OF FOUR FEET IN TERMS OF ELEVATION, THE WATER

## 1690

1 FROM THE SOUTH BREACH WOULD HAVE HAD TO REALLY OCCUR BEFORE
2 6:00 A.M. IN ORDER TO GET THAT WATER THERE.
3      SO THERE IS SUFFICIENT DATA AND STOPPED CLOCKS AS WELL
4 AS WITH EYEWITNESSES THAT SUPPORT THE EARLIER BREACHING TIMES FOR
5 THE SOUTH BREACH.
6 Q.   NOW, YOU TESTIFIED ON DIRECT EXAMINATION THAT AS OF
7 9 O'CLOCK A.M., ALL OF THE WATER EAST OF PARIS ROAD, ALL OF THE
8 FLOODWATER EAST OF PARIS ROAD CAME FROM THE INNER HARBOR
9 NAVIGATION CANAL AND NONE OF IT CAME FROM THE MISSISSIPPI RIVER
10 GULF OUTLET, USING YOUR BREACH TIMES.
11      I REQUEST THE DEFENDANT TO PUT UP ON THE SCREEN AGAIN
12 THE COMPARISON BETWEEN MR. SPINKS'S ANALYSIS AND THE DELFT
13 ANALYSIS FOR 9 O'CLOCK IN THE MORNING, ONE OF THE EXHIBITS YOU
14 USED ON CROSS.  EXCUSE ME, WEST OF PARIS ROAD, NOT EAST OF
15 PARIS ROAD.  WOULD YOU PLEASE PUT THAT UP AGAIN.
16      THE COURT:  THE COMPARISON OF THE TWO, OF MR. SPINKS'S
17 MODELING AND THE DELFT MODELING?
18      MR. SEYMOUR:  YES, YOUR HONOR.
19      THE COURT:  I KNOW THERE WERE TWO OR THREE SHOWN BY
20 COUNSEL.  THAT'S ONE OF THEM.
21      MR. SEYMOUR:  WAS THAT CAPTURED, BY THE WAY?
22      OKAY.  WE REQUEST THE COURT TO CAPTURE THAT.
23           EXAMINATION
24 BY MR. SEYMOUR:
25 Q.   NOW, TAKING A LOOK AT THESE TWO COMPARISONS, THE DELFT MODEL

## 1691

1 ON THE LEFT DOES NOT SHOW AS MUCH FLOODING IN ST. BERNARD PARISH,
2 CLOSE TO PARIS ROAD, AS YOUR MODEL.  AM I READING THIS RIGHTLY?
3 A.   YES.  THEIR BREACH TIME FOR THE SOUTH AND THE NORTH BREACH
4 WAS ABOUT 7:00 A.M., 7:00 TO 7:30.  AND I DON'T BELIEVE, WITHIN
5 THEIR -- I MEAN, THEIR POLDER STUDY RELIED UPON TEAM LOUISIANA'S
6 BREACHING FAILURE TIMES.  AND I DON'T BELIEVE THERE WAS ANY LOOK
7 INTO THAT FAILURE TIME AND ASSOCIATED WITH THE ACTUAL FLOODING
8 TIME.  SO IT'S JUST STRICTLY ON WALL STABILITY-TYPE ISSUES.
9 Q.   DO YOU KNOW WHETHER ANYONE AT THE DELFT UNIVERSITY DID ANY
10 KIND OF SENSITIVITY ANALYSIS LIKE YOU DID TO DETERMINE WHETHER
11 THE RESULTS OF THEIR MODELING CORRESPONDED WITH ACTUAL
12 OBSERVATIONS IN THE REAL WORLD?
13 A.   I DON'T BELIEVE THAT THEY DID A SENSITIVITY ANALYSIS TO LOOK
14 AND FOCUS IN ON THE SOUTH BREACH.  I THINK THAT THEIR STUDY
15 REALLY FOCUSED ON WHAT WAS THE MAXIMUM WATER LEVELS AND THE
16 CONTRIBUTIONS FROM MRGO VERSUS -- FOR MRGO IN THIS AREA REALLY
17 PRODUCING THE MAXIMUM WATER SURFACE ELEVATIONS.  SO THEIR TIMING
18 WAS NOT THAT THE CRITICAL FOR THE IHNC BECAUSE, AGAIN, MRGO'S
19 WATERS DID HAVE AN INUNDATION OF THIS AREA.
20 Q.   PLEASE MARK ON THIS MAP WHERE YOU BELIEVE PARIS ROAD TO BE.
21 A.   I WILL MARK IT WITH MY EXHIBIT.  (WITNESS COMPLIES.)
22 Q.   AND PLEASE MARK ON IT THE DELFT SIDE AS WELL.
23 A.   (WITNESS COMPLIES.)
24 Q.   AND THE AREA WEST OF PARIS ROAD IS TO THE LEFT OF THOSE
25 LINES?

1692

1. A. YES.
2. Q. PLEASE CAPTURE THAT.
3. NOW, MR. SPINKS, YOU HAVE A NUMBER OF OBSERVATION
4. POINTS, DATA POINTS, WITNESS POINTS THAT ARE IN THE AREA THAT YOU
5. SHOW AS HAVING FLOODWATERS FROM THE INNER HARBOR NAVIGATION
6. CANAL, BUT THE DELFT AREA, DELFT STUDY DOES NOT YET SHOW AS
7. HAVING ANY FLOODWATER; IS THAT CORRECT?
8. A. YES.
9. Q. AND WE WON'T -- WE'LL SAVE IT FOR BRIEFING HOW THAT MATCHES.
10. MR. SEYMOUR: BUT WE'D LIKE TO MOVE AS PLAINTIFFS NEXT
11. EXHIBIT, WHICH I BELIEVE IS 495 --
12. THE DEPUTY CLERK: 449.
13. MR. SEYMOUR: 449?
14. THE DEPUTY CLERK: YES.
15. MR. SEYMOUR: -- THOSE TWO CHARTS AS 449.
16. THE COURT: ALL RIGHT.
17. (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS,
18. EXHIBIT 449 WAS ADMITTED INTO EVIDENCE.)
19. EXAMINATION
20. BY MR. SEYMOUR:
21. Q. MR. SPINKS, THERE WAS DISCUSSION OF ERROR BARS. WHEN A
22. PERSON IS UNCERTAIN AS TO TIME AND GIVES YOU A RANGE OF TIME, IS
23. THAT A SYSTEMATIC ERROR OR IS IT A RANDOM ERROR?
24. A. THE ERROR BARS REPRESENT AN OBSERVATION OF TIME DIFFERENCE.
25. AS YOU WOULD SAY, I BELIEVE SOMETHING HAPPENED BETWEEN 7:00 AND

1693

1. 7:30. THAT'S THE UNCERTAINTY OF AN OBSERVATION MADE BY A
2. WITNESS, AND SO THAT'S WHAT WE CAPTURED AT THAT TIME.
3. Q. IS THAT A RANDOM ERROR OR A SYSTEMATIC ERROR?
4. A. WELL, I WOULD IMAGINE SYSTEMATIC.
5. Q. WELL --
6. A. EACH INDIVIDUAL EYEWITNESS WOULD HAVE A DIFFERENT ERROR, SO
7. IT'S CLEARLY RANDOM IN THE SENSE -- BUT IT'S BASED UPON
8. EYEWITNESS ACCOUNT.
9. Q. THAT'S RIGHT. AND IF THE WITNESSES GOT A CLOCK, A WATCH SET
10. WRONG OR SIMPLY MAKES AN ASSESSMENT OF TIME, IS THAT A RANDOM
11. ERROR? YOU MENTIONED BOTH AND I WANT TO MAKE CLEAR WHAT IT IS.
12. A. YES, IT WOULD BE RANDOM.
13. Q. IS AN ANALYSIS SKEWED BY RANDOM ERRORS OR BY SYSTEMATIC
14. ERRORS?
15. A. PROBABLY BY SYSTEMATIC ERRORS.
16. Q. IF YOU HAD ALWAYS TAKEN THE UPPER LATER BOUNDS OF TIME AND
17. USED THOSE FOR YOUR ANALYSIS OR THE EARLIER BOUNDS OF TIME
18. WITHOUT TAKING INTO ACCOUNT THE RANGE, WOULD THAT HAVE BEEN A
19. SYSTEMATIC ERROR?
20. A. YES.
21. Q. AND WOULD THAT HAVE BEEN CAPABLE OF SKEWING YOUR ANALYSIS?
22. A. IT COULD.
23. Q. DO RANDOM ERRORS TEND TO CANCEL EACH OTHER OUT?
24. A. YES.
25. Q. NOW, YESTERDAY THERE WAS A DISCUSSION OF MANNING ROUGHNESS

1694

1. COEFFICIENTS, AND YOU WERE -- WELL, A BOOK WAS PUT THE AIR, BUT
2. YOU WERE NEVER GIVEN A CHANCE TO EXAMINE THE BOOK, WERE YOU?
3. A. NO.
4. Q. AND NUMBER OF EXCERPTS OF PAGES WERE SHOWN TO YOU, BUT I
5. BELIEVE YOU WERE NEVER SHOWN A FULL PAGE, WERE YOU?
6. A. NO.
7. MR. SEYMOUR: I WOULD REQUEST PERMISSION TO HAND THE
8. BOOK TO THE WITNESS, YOUR HONOR, JUST FOR HIM TO EXAMINE TO SEE
9. WHETHER THE CONTENT IS THE SAME AS THE VERSION OF THE CHOW BOOK
10. THAT HE HAD. I WOULD LIKE TO CLEAR THAT UP.
11. THE COURT: WELL, IF YOU CAN DO THAT.
12. THE WITNESS: GIVEN THAT I HAVE A -- I DOUBT IF I COULD
13. KNOW IF IT'S A DIRECT -- THE SAME COPY OR ANYTHING. I REALLY
14. CAN'T TELL YOU THAT.
15. EXAMINATION
16. BY MR. SEYMOUR:
17. Q. PLEASE LOOK AT THE CONTENT OF THE BOOK AND TELL ME IF IT
18. LOOKS SIMILAR TO THE BOOK THAT YOU HAVE.
19. A. I MEAN, IT'S A VEN TE CHOW BOOK, YES. I UNDERSTAND VEN TE
20. CHOW, AND, YES, THERE'S A LOT OF SIMILAR CALCULATIONS, AND, YES,
21. HE REFERENCES MANNING'S COEFFICIENTS. AND SO YES, THERE ARE
22. SIMILARITIES TO THE BOOK -- OR TO THE BOOKS.
23. MR. SEYMOUR: WE'VE TAKEN -- MADE COPIES OF SOME OF THE
24. FULL PAGES OF THE BOOK, YOUR HONOR, AND I HAND TO DEFENSE COUNSEL
25. AND REQUEST PERMISSION TO APPROACH THE WITNESS TO TALK ABOUT

1695

1. THESE PARTICULAR PAGES.
2. THE COURT: OKAY. MAYBE YOU CAN TALK ABOUT THEM FROM
3. THE PODIUM ON THE ELMO, I ASSUME.
4. MR. SEYMOUR: YES, YOUR HONOR. I JUST WANT TO HAND IT
5. TO THE WITNESS.
6. THE COURT: CERTAINLY, YOU MAY.
7. EXAMINATION
8. BY MR. SEYMOUR:
9. Q. YOU WERE SHOWN A PICTURE OF A CHANNEL THAT WAS AT THE TOP OF
10. PAGE 122 OF THE CHOW BOOK, AND COULD YOU TURN IN THIS SET OF
11. PAGES TO PAGE 122. AND YOU SEE THE NUMBER 19, I BELIEVE THAT'S
12. THE PICTURE THAT YOU WERE SHOWN YESTERDAY; IS THAT CORRECT?
13. A. YES.
14. Q. NOW, TAKE A LOOK THROUGH ALL OF THE PICTURES THAT THERE ARE
15. IN THE CHOW BOOK, AND TELL ME IF YOU -- WHEN YOU FIND A PICTURE
16. OF A RESIDENTIAL AREA OR A COMMERCIAL AREA OR AN INDUSTRIAL AREA?
17. A. VEN TE CHOW, THIS IS ABOUT RIVER HYDRAULICS AND VALUES, END
18. VALUES RELATED TO LAND-USE TYPES, OR YOU COULD DEVELOP THROUGH A
19. PROCESS WHICH THROUGH -- GOING THROUGH THE VARIOUS TYPES OF
20. SURFACE CONDITIONS. BUT, NO, THERE'S NOT ANYTHING LIKE THAT IN
21. THIS BOOK.
22. Q. THESE ARE ONLY PICTURES OF WATER CHANNELS; IS THAT RIGHT?
23. A. YES.
24. Q. NOW, YOU WERE ALSO SHOWN A PORTION OF A TABLE DEALING WITH
25. BRUSH ON PAGE 113 OF THE BOOK. CAN YOU FIND THAT IN THE DOCUMENT

1696

1 BEFORE YOU?

2 A. YES.

3 Q. AND DO YOU SEE THAT THAT IS A SUBSET OF AN AREA CALLED

4 "FLOODPLAINS?

5 A. YES.

6 Q. IN THE CHARTS THAT YOU HAVE HERE, ARE THERE ANY VALUES FOR

7 RESIDENTIAL AREAS, COMMERCIAL AREAS OR INDUSTRIAL AREAS?

8 A. NOT DIRECTLY ON THIS CHART, NO.

9 Q. NOW, PLEASE TURN TO PAGE 107, WHICH IS THE SECOND PAGE OF

10 THIS DOCUMENT, AND LET ME PLACE THIS ON THE ELMO. AND I DIRECT

11 YOUR ATTENTION TO THE LOWER HALF OF THE PAGE WHERE IT SAYS

12 NUMBER 1 -- OR RIGHT ABOVE THAT.

13         "IN SELECTING THE VALUE OF" -- THERE'S AN ITALICIZED

14 "N," IS THAT THE MANNING COEFFICIENT HE'S SPEAKING ABOUT?

15 A. YES.

16 Q. -- "THE DEGREE OF EFFECTIVE VEGETATION IS CONSIDERED. LOW

17 FOR CONDITIONS COMPARABLE TO THE FOLLOWING:" AND THEN IN A, HE

18 TALKS ABOUT TYPE OF VEGETATION, AND THEN SAYS "WHERE THE AVERAGE

19 DEPTH OF FLOW IS TWO TO THREE TIMES THE HEIGHT OF VEGETATION."

20 DO YOU SEE THAT?

21 A. YES.

22 Q. IN PART B, IT REFERS AGAIN TO THE AVERAGE DEPTH OF FLOW

23 COMPARED TO THE "HEIGHT OF VEGETATION." DO YOU SEE THAT?

24 A. YES.

25 Q. NOW, DOES THAT CORRESPOND TO YOUR TESTIMONY YESTERDAY THAT

1697

1 ONCE YOU HAVE SOME FLOODING OVER THE AREA, THE WATER IS

2 ESSENTIALLY TRAVELING ON WATER?

3 A. YES.

4 Q. DO YOU BELIEVE THAT YOUR CHOICE OF THE MANNING COEFFICIENTS

5 WAS APPROPRIATE?

6 A. I BELIEVE IT WAS THE CORRECT VALUE.

7         MR. SEYMOUR: YOU HONOR, PLAINTIFFS MOVE THAT AS

8 EXHIBIT NUMBER 446.

9         THE COURT: ANY OBJECTION, COUNSEL?

10         MR. CHUD: NO OBJECTION, YOUR HONOR.

11         THE COURT: LET IT BE ADMITTED.

12         MR. SEYMOUR: DO I HAVE THE RIGHT NUMBER?

13         THE DEPUTY CLERK: 450.

14         MR. SEYMOUR: 450.

15         (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS,

16 EXHIBIT 450 WAS ADMITTED INTO EVIDENCE.)

17         EXAMINATION

18 BY MR. SEYMOUR:

19 Q. YOU WERE ASKED A NUMBER OF QUESTIONS ON CROSS-EXAMINATION

20 ABOUT WHERE IN THE LOWER NINTH WARD AND WHERE IN ST. BERNARD

21 PARISH THAT WAS BEING POINTED TO, HOW MUCH WATER CAME FROM THE

22 NORTH BREACH AND HOW MUCH WATER CAME FROM THE SOUTH BREACH.

23         WAS THERE A TIME AFTER BOTH BREACHES HAD OCCURRED AND

24 FULLY DEVELOPED WHEN IT'S SIMPLY NOT POSSIBLE TO DISTINGUISH THE

25 PARTICULAR PACKET OF WATER WAS AT A PARTICULAR LOCATION?

1698

A. YES, WHEN THE WATERS COMINGLE.

Q. IS THAT WHAT YOU REFERRED TO YESTERDAY AS BEING

"INDIVISIBLE"?

A. YES.

Q. YOU WERE ASKED SOME QUESTIONS ABOUT DATA POINTS.

        COULD YOU PLEASE PUT UP TABLE 2 FROM THE APPENDIX SIDE

THAT YOU HAD UP ON THE SCREEN BEFORE. AND COULD YOU BLOW UP THE

LEFT-HAND SIDE OF THE SCREEN ALONG WITH CASE 1 SO THAT WE CAN SEE

WHICH IS DATA POINT N-10.

        OKAY. N-10, IPET SITE 3, THE OBSERVED WATER DEPTH OF

7 1/2 FEET OF WATER. AND CAN YOU TELL FROM -- YOU'VE GOT THE

FULL CHART BEFORE YOU, WHAT TIME IS THAT OBSERVATION?

A. FOR DATA POINT N-10, AT 5:00 A.M.

Q. NOW, AT THE JACKSON BARRACKS, THERE ALSO WAS A TIME-STAMPED

PHOTOGRAPH SHOWING NO WATER AT 7:46 A.M.

A. CORRECT.

Q. CAN YOU RECONCILE THE IPET OBSERVATION WITH THE FACT THAT

THERE IS A PHOTOGRAPH TIME STAMPED SHOWING NO WATER ALMOST

THREE HOURS LATER?

A. I CAN'T RECONCILE IT. IT'S AN OBSERVATION POINT.

Q. BUT AT SOME POINT LATER ON, THERE WOULD REASONABLY HAVE BEEN

7 1/2 FEET OF WATER AT THE POINT MARKED AS N-10; IS THAT CORRECT?

A. YES.

        MR. SEYMOUR: THANK YOU, YOUR HONOR. WE TENDER THE

WITNESS.

1699

        EXCUSE ME, YOUR HONOR, COUNSEL HAS SOMETHING.

        THE COURT: WE'RE NOT GOING TO HAVE RECROSS. YOU'RE

RELEASING HIM -- ABOUT TO RELEASE HIM.

        EXAMINATION

BY MR. SEYMOUR:

Q. OKAY. I'VE BEEN ASKED TO ASK YOU SPECIFICALLY ABOUT

MR. RICHARDSON'S LOCATION AT 1321 EGANIA STREET. WOULD A

GROUND-LEVEL ROOM AT 1321 EGANIA HAVE FILLED WITH IHNC WATER

BEFORE THE MISSISSIPPI RIVER GULF OUTLET WATER?

        THE COURT: DO YOU WANT TO LOOK AT THE HYDROGRAPH? IT

MIGHT HELP THE WITNESS.

        EXAMINATION

BY MR. SEYMOUR:

Q. THAT'S GOING TO BE APPENDIX J.

A. CAN YOU GO TO SLIDE 73.

        THE COURT: DO YOU WANT TO JUST SHOW HIM ON THE ELMO?

        MR. SEYMOUR: THAT WOULD BE SLIDE NUMBER 73.

        THE COURT: OKAY. THERE IT IS. THERE IS THE

HYDROGRAPH.

        EXAMINATION

BY MR. SEYMOUR:

Q. OKAY. AND THE HEIGHT OF THE WATER AT THE TIME THAT THE

MISSISSIPPI RIVER GULF OUTLET WATER CAME IN, THAT'S STATED IN

THERE AS BEING 5.9 FEET; IS THAT CORRECT?

A. YES. ABOVE GROUND LEVEL.

15 (Pages 1696 to 1699)

1700

1    MR. SEYMOUR:  NO FURTHER QUESTIONS THEN, YOUR HONOR.
2    THE COURT:  THANK YOU VERY MUCH, MR. SPINKS.  YOU MAY
3  STEP DOWN.
4        THIS WITNESS IS RELEASED.
5    MR. GILBERT:  YOUR HONOR, COULD WE HAVE A BRIEF RECESS
6  BEFORE WE REST.
7    THE COURT:  ABSOLUTELY.  HOW ABOUT 15 MINUTES?
8    MR. GILBERT:  THAT'S GREAT.
9    THE COURT SECURITY OFFICER:  ALL RISE.
10    (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, A BRIEF
11  RECESS WAS TAKEN.)
12    THE DEPUTY CLERK:  ALL RISE.  COURT IS IN SESSION.
13  PLEASE BE SEATED.
14    THE COURT:  YES, SIR.
15    MR. KHORRAMI:  YOUR HONOR, PLAINTIFFS ARE PREPARED TO
16  REST SUBJECT TO CERTAIN EXCEPTIONS, WHICH I'M GOING TO READ OFF
17  TO YOU:
18        THE TESTIMONY OF MR. JOEL DUPRE, WHICH IS CURRENTLY
19  SCHEDULED TO BE PROVIDED BY DEPOSITION BUT IS GOING TO TAKE PLACE
20  NEXT WEDNESDAY.
21        THE TESTIMONY OF STAN GUIDRY, WHO IS -- I'M SORRY.
22    THE COURT:  CAN WE TELL FOR THE RECORD, MR. DUPRE, THE
23  NATURE OF HIS TESTIMONY?
24    MR. KHORRAMI:  HE IS GOING TO TESTIFY REGARDING THE
25  DRYDOCK, A DRYDOCK THAT WAS LATER DISCOVERED WITHIN THE CANAL,

1701

1  AND I BELIEVE IT'S POST RITA, SO THAT TESTIMONY IS GOING TO BE,
2  WE BELIEVE, UNDER AN HOUR.
3        THEN THE TESTIMONY OF STAN GUIDRY, WHO IS AN
4  INVESTIGATOR PLAINTIFFS EMPLOYED TO MEASURE THAT POLE THAT WE
5  HAVE BEEN DISCUSSING IN FRONT OF THE NORTH BREACH, AND THE REASON
6  FOR THAT IS THAT WE ARE TRYING TO WORK OUT A STIPULATION WITH THE
7  DEFENDANTS AND WE DON'T KNOW IF THAT'S POSSIBLE, BUT WE'RE TRYING
8  TO WORK THAT OUT TO SAVE THE COURT'S TIME.
9        THE TESTIMONY OF PLAINTIFF BOB GLASER, WHO IS
10  HOLIDAY JEWELERS.  HE'S GOING TO BE ON, OUT OF TURN, THIS COMING
11  TUESDAY.
12        THE NEXT ITEM WOULD BE THE RECONCILIATION.  AND
13  WE'RE JUST GOING TO CHECK FOR ACCURACY PLAINTIFF'S EXHIBITS, AND
14  WE'LL BE DONE WITH THAT BEFORE THE END OF TRIAL.
15        ALSO, REBUTTAL WITNESSES THAT PLAINTIFF MAY CALL.
16    THE COURT:  CERTAINLY.  AND YOU REST SUBJECT TO
17  REBUTTAL.
18    MR. KHORRAMI:  ABSOLUTELY.  AND I ALSO WANTED TO MAKE
19  SURE, I HAVEN'T HEARD ANYTHING DURING TRIAL, THAT IT'S INCLUSIVE
20  OF ALL OF THE DEPOSITION TESTIMONY THAT THE PARTIES STIPULATED
21  WOULD BE PRESENTED --
22    THE COURT:  ABSOLUTELY.
23    MR. KHORRAMI:  -- IN LIEU OF LIVE TESTIMONY.
24    THE COURT:  INCLUDING SOME OF YOUR EXPERTS ON DAMAGES
25  AND ALL OF THE OTHER FACTUAL WITNESSES.

1702

1    MR. KHORRAMI:  YES, YOUR HONOR.  SUBJECT TO THAT -- I
2  APOLOGIZE, YOUR HONOR.
3        I ALSO OFFER INTO EVIDENCE ANY OF THE PAPERS THAT
4  WE PROVIDED TO THE COURT, ANY EVIDENCE THAT WE PROVIDED IN OUR
5  PAPERS TO THE COURT.  SUBJECT TO THAT, PLAINTIFFS REST.
6    MR. ALDOCK:  THAT'S ACCEPTABLE, YOUR HONOR.
7    THE COURT:  JUST A QUESTION, AND THE DRYDOCK, CAN YOU
8  JUST EXPLAIN A LITTLE BIT OF THAT TO ME.  MR. GILBERT, YOU'RE
9  GOING TO DO IT?
10    MR. GILBERT:  YOUR HONOR, THERE ARE SEVERAL PHOTOGRAPHS
11  THAT HAVE BEEN TRAVERSED BACK AND FORTH BETWEEN THE PARTIES THAT
12  SHOW ON THE SOUTHWESTERN POINT JUST BELOW THE FLORIDA AVENUE
13  BRIDGE A BIG SQUARE HUNK OF SOMETHING.  IT'S A BIG OBJECT.  AND
14  THERE HAS BEEN CONCERN, AT LEAST AMONG THE PLAINTIFFS, AND MAYBE
15  SOME INTIMATIONS BY THE DEFENDANTS, THAT THEY MIGHT ATTEMPT,
16  DIRECTLY OR OBLIQUELY, TO SOMEHOW IMPLY THAT THAT OBJECT IS WHAT
17  MR. VILLAVASSO SAW.
18        THAT OBJECT IS ACTUALLY A PIECE OF A DRYDOCK THAT
19  DURING KATRINA GOT HUNG UP AGAINST THE NORTH SIDE OF SCRAP'S
20  FLORIDA AVENUE BRIDGE AND IS NOW THE SUBJECT OF SOUTHERN SCRAP'S
21  LIMITATION ACTION.  IT MAY STILL BE UNDERWAY RIGHT NOW, AS FAR AS
22  I KNOW, IN ANOTHER SECTION OF COURT.
23        I PERSONALLY, YOUR HONOR, HAVE SPOKEN WITH COUNSEL
24  FOR SOUTHERN SCRAP, COUNSEL FOR SOME OTHER PARTY.  THAT PIECE OF
25  JUNK IS A PIECE OF THAT DRYDOCK THAT WAS CUT AND THEN REMOVED,

1703

1  BROUGHT ACROSS ON THE OTHER SIDE OF THE FLORIDA AVENUE BRIDGE,
2  THAT IS, THE SIDE THAT IS, YOU KNOW, IN THE SPAN OF THE
3  INDUSTRIAL CANAL THAT WE'RE CONCERNED WITH.  IT WAS NEVER THERE
4  DURING KATRINA.
5    THE COURT:  MY MAIN CONCERN, MR. GILBERT, NOT TO
6  INTERRUPT YOU, WAS, IT DOESN'T REALLY RELATE TO YOUR CASE IN
7  CHIEF.  IT MAY RELATE TO SOMETHING THE DEFENSE -- IN OTHER WORDS,
8  YOU WOULDN'T BE INTRODUCING IT IN YOUR CASE IN CHIEF.
9    MR. GILBERT:  I WOULDN'T, I WOULDN'T BUT FOR THE FACT
10  THAT I SIMPLY WOULD NOT WANT YOUR HONOR TO DRAW ANY INFERENCES.
11    THE COURT:  I UNDERSTAND.  THAT WAS MY MAIN CONCERN.
12  THE MERITS OF IT, WHEN I SEE THE DEPOSITION I'LL --
13    MR. ALDOCK:  YOUR HONOR, THIS IS AN ARGUMENT WE'VE TOLD
14  THEM TEN TIMES WE'RE NOT MAKING.  IT'S NOT AN ARGUMENT.  WE'RE
15  NOT PUTTING IN A PICTURE OF IT, BUT THERE IS A CONCERN THAT, WHO
16  KNOWS.
17    MR. GILBERT:  I UNDERSTAND THAT.  I UNDERSTAND THAT.  I
18  WANTED A STIPULATION FOR THE RECORD THAT THIS IS NOT THE THING
19  THAT MR. VILLAVASSO SAW BUT WE COULDN'T GET THAT FAR WITH IT, SO
20  I NEED TO DO SOMETHING WITH THE PROOF.
21    THE COURT:  I UNDERSTAND.
22    MR. GILBERT:  THANK YOU.
23    THE COURT:  ALL RIGHT.  SUBJECT TO THOSE CAVEATS, DO YOU
24  REST?
25    MR. KHORRAMI:  YES, YOUR HONOR, WE DO.

16 (Pages 1700 to 1703)