UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: KATRINA DREDGING LIMITATION ACTION CONSOLIDATED LITIGATION | * | Civil Action No. 05-4182 |
| | * | Section K(2) |
| PERTAINS TO: BARGE | * | New Orleans, Louisiana |
| MUMFORD, C.A. NO. 05-5724, AS TO PLAINTIFFS JOSEPHINE RICHARDSON AND HOLLIDAY JEWELERS, INC., ONLY AND BENOIT, C.A. NO. 06-7516, AS TO PLAINTIFFS JOHN ALFORD AND JERRY ALFORD ONLY | * | July 1, 2010 Afternoon Session |

* * * * * * * * * * * * * * * *

DAY EIGHT
BENCH TRIAL BEFORE THE
HONORABLE STANWOOD R. DUVAL, JR.
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs: Best Koeppel
BY: LAURENCE E. BEST, ESQ.
BY: PETER S. KOEPPEL, ESQ.
2030 St. Charles Avenue
New Orleans, Louisiana 70130

For the Plaintiffs: Law Offices of Brian A. Gilbert
BY: BRIAN A. GILBERT, ESQ.
2030 St. Charles Avenue
New Orleans, Louisiana 70130

1731

APPEARANCES:

For the Plaintiffs: Wiedemann & Wiedemann
BY: KARL WIEDEMANN, ESQ.
BY: LAWRENCE WIEDEMANN, ESQ.
821 Baronne Street
New Orleans, Louisiana 70113

For the Plaintiffs: Patrick J. Sanders, LLC
BY: PATRICK J. SANDERS, ESQ.
3316 Ridgelake Drive
Suite 100
Metairie, Louisiana 70002

For the Plaintiffs: Law Office of Richard T. Seymour, P.L.L.C.
BY: RICHARD T. SEYMOUR, ESQ.
1150 Connecticut Avenue N.W.
Suite 900
Washington, D.C. 20036-4129

For the Plaintiffs: Khorrami, Pollard & Abir, LLP
BY: SHAWN KHORRAMI, ESQ.
444 S. Flower Street
33rd Floor
Los Angeles, California 90071

For the Plaintiffs: Wilson, Grochow, Druker & Nolet
BY: LAWRENCE A. WILSON, ESQ.
233 Broadway
5th Floor
New York, New York 10279

For the Defendant: Chaffe, McCall, L.L.P.
BY: DEREK A. WALKER, ESQ.
BY: CHARLES P. BLANCHARD, ESQ.
1100 Poydras Street, Suite 2300
New Orleans, Louisiana 70163

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1732

APPEARANCES:

For the Defendant: Goodwin Procter, L.L.P.
BY: JOHN ALDOCK, ESQ.
BY: MARK RAFFMAN, ESQ.
BY: ADAM CHUD, ESQ.
BY: KIRSTEN ROBBINS, ESQ.
BY: ERIC I. GOLDBERG, ESQ.
901 New York Avenue, NW
Washington, D.C. 20001

For the Defendant: Sutterfield & Webb
BY: DANIEL A. WEBB, ESQ.
650 Poydras Street, Suite 2715
New Orleans, Louisiana 70130

For the Defendant: Lafarge North America, Inc.
BY: PETER KEELEY, ESQ.
12950 Worldgate Drive
Herndon, Virginia 20170

Official Court Reporter: Jodi Simcox, RMR, FCRR
500 Poydras Street
Room HB-406
New Orleans, Louisiana 70130
(504) 589-7780

Proceedings recorded by mechanical stenography, transcript produced by computer.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1733

I N D E X

| | Page |
|---|---|
| LESLIE R. LEMON | |
| Direct Examination | 1734 |
| Cross-Examination | 1789 |
| Redirect Examination | 1822 |
| AUSTIN L. DOOLEY | |
| Direct Examination | 1830 |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1734

12:57:11 AFTERNOON SESSION
12:57:11 (July 1, 2010)
12:57:07 * * * * *
13:09:55 THE DEPUTY CLERK: All rise. Court's in session.
13:10:05 Please be seated.
13:10:08 MR. RAFFMAN: Good afternoon, Your Honor.
13:10:14 (WHEREUPON, Leslie R. Lemon, having been previously
13:10:14 duly sworn, testified as follows.)
13:10:15 DIRECT EXAMINATION
13:10:16 BY MR. RAFFMAN:
13:10:16 Q. Mr. Lemon, we're going to pick up where we left off. I've
13:10:21 put up on the screen Figure 6 from your report, which is
13:10:24 DX-311.
13:10:27 You were talking about mesocyclones. And I'm going
13:10:31 to say "meeso" (phonetic); you can say "meso."
13:10:36 THE COURT: That reminds me of something.
13:10:41 THE WITNESS: It's "meso."
13:10:45 BY MR. RAFFMAN:
13:10:46 Q. All right. Figures 5 and Figure 6 -- and I'm going to
13:10:49 mispronounce it, but thank you for --
13:10:52 THE COURT: It is one of the pronunciations that the
13:10:54 dictionary allows.
13:10:56 MR. RAFFMAN: Thank you, Your Honor. If the
13:10:57 dictionary allows it and Your Honor allows it --
13:11:00 THE COURT: I will.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2 (Pages 1731 to 1734)

1827

15:39:36 A. I'm concerned about it as a meteorologist, yes.
15:39:38 Q. As a meteorologist. But in terms of this proceeding, the
15:39:41 question why may be academic, so I'll move on.
15:39:46 We looked at an article from Tim Crum. That article
15:39:50 was dated 1993; right?
15:39:53 A. I wondered what the date was. I was unable to see that.
15:39:58 Q. All right. Well, I'll represent that it was 1993.
15:40:02 Am I right that there have been significant advances
15:40:05 in radar technology since 1993?
15:40:08 A. Yes.
15:40:09 Q. Am I also right that you looked at level III data that
15:40:12 Dr. Mitchell reported in his report; right?
15:40:14 A. Yes.
15:40:16 Q. So to imply that you didn't look at it, you ignored level
15:40:20 III data, that would be an incorrect implication; right?
15:40:24 A. That's true.
15:40:25 Q. And level III data may be useful as an initial step to
15:40:28 identify places where there might be mesocyclones so that,
15:40:32 then, a researcher can go back and look at the base data to
15:40:36 determine what the data really shows; is that fair?
15:40:39 A. That's true, yes.
15:40:41 Q. The GR2Analyst program is used by two-thirds of the
15:40:45 National Weather Service offices today?
15:40:47 A. That's a rough estimate, yes.
15:40:49 Q. Rough estimate.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1828

15:40:50 A. Uh-huh.
15:40:53 MR. RAFFMAN: That's all the questions I have.
15:40:55 THE COURT: And I know you have a plane to catch, and
15:40:57 the question I ask is not a momentous question about this case.
15:41:01 Just out of curiosity, why is it 64 -- is it 64 miles per hour?
15:41:04 Not 64 knots, but 64 --
15:41:07 THE WITNESS: Knots.
15:41:08 THE COURT: Okay. 64 knots, which is 1.15; correct?
15:41:11 THE WITNESS: Yes, correct.
15:41:12 THE COURT: All right. So why is it that it inverts
15:41:17 or that we have to unfold it after 64 miles per hour? Is that
15:41:22 just a function of the limitations of the radar, or what is
15:41:26 the -- what are the physics there?
15:41:27 THE WITNESS: It's a function of the pulse repetition
15:41:32 frequency of the radar, how many pulses it transmits in a given
15:41:36 length of time. It's a function of the wavelength of the
15:41:38 radar, and it's a function of the frequency used by the radar.
15:41:45 Primarily the wavelength, pulse repetition frequency, and the
15:41:49 speed of light.
15:41:50 It ends up that the product of the unambiguous
15:41:54 range and unambiguous velocity are equal to a constant. So as
15:42:02 the unambiguous velocity goes up, the effective range goes
15:42:06 down. So this is a problem that we've been struggling with
15:42:09 forever, is trying to come up with the best possible algorithm
15:42:12 to unfold ranges and get the longest range we can while still

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1829

15:42:17 getting the best velocity interval before it becomes ambiguous.
15:42:22 THE COURT: Has radar advanced so that 64 knots --
15:42:26 it's increased to 64 knots? Is it always --
15:42:30 THE WITNESS: The 64 knots is about waveform 8. We
15:42:33 use eight waveforms. The lowest three have very long ranges
15:42:39 that they're unambiguous over. We use those to map the
15:42:43 reflectivity. So the reflectivity is not ambiguous. It's only
15:42:46 the velocity data.
15:42:47 THE COURT: Okay. Gotcha. Thank you. Just
15:42:54 satisfied some of the Court's curiosity. Thank you.
15:42:59 THE WITNESS: Are we finished?
15:43:01 THE COURT: Yes. You may step down.
15:43:02 (OFF THE RECORD)
15:44:17 MR. ALDOCK: Your Honor, our next witness is
15:44:18 Dr. Austin Dooley.
15:44:56 For everyone's convenience, Dr. Dooley's report
15:44:58 is DX-198. And you all have the slides there. There's one
15:45:05 slide from his report that is new, but it's from his report,
15:45:08 and I'll flag it when we get to it.
15:45:11 THE COURT: Thank you.
15:44:20 (WHEREUPON, Austin L. Dooley, having been duly sworn,
15:44:20 testified as follows.)
15:44:53 THE DEPUTY CLERK: Please state your full name and
15:44:53 correct spelling for the record.
15:45:16 THE WITNESS: Austin L. Dooley, A-U-S-T-I-N, last

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1830

15:45:24 name Dooley D-O-O-L-E-Y.
15:45:32 DIRECT EXAMINATION
15:45:32 BY MR. ALDOCK:
15:45:33 Q. What is your occupation, sir?
15:45:34 A. I am a meteorologist, oceanographer.
15:45:37 Q. Describe how your occupation in meteorology and
15:45:45 oceanography pertains to the work that you've done.
15:45:48 A. Yes. The work that I do is to research events dealing
15:45:55 with those two sciences, either atmospheric or oceanographic
15:46:03 events.
15:46:04 Q Who is your employer now?
15:46:05 A. My employer is Dooley SeaWeather Analysis Inc.
15:46:10 Q. Is this the first case in which you've analyzed a
15:46:13 meteorological event in inland waters?
15:46:16 A. No, it's not. I've done several different studies of
15:46:19 inland water events. I've looked at groundings at Long Island
15:46:25 Sound; events in the New York Harbor; events in inlets in
15:46:32 Florida, Lake Worth inlet; events here on the Gulf Coast, in
15:46:39 Lake Charles; coastal events up in -- on the West Coast; an
15:46:44 event in Cape Town, South Africa.
15:46:47 So I've done numerous inland studies.
15:46:50 Q. Describe your educational background.
15:46:52 A. I have a bachelor of science degree from the State
15:46:55 University of New York, Marathon College. I have a master of
15:47:00 science degree from the New York University and a Ph.D. from

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

26 (Pages 1827 to 1830)

1831

15:47:03 New York University.
15:47:05 Q. Can you describe your teaching of courses related to meteorology?
15:47:11 A. Yes, I can. I started teaching meteorology and oceanography in 1973 after I got my master's degree from NYU. I taught everything from introductory to meteorology, to weather observations, to theoretical meteorology, thermodynamics, a little calculus, a little physics.
15:47:40 I also taught -- at the time that I was teaching at the maritime college, so I would also go on the training ship through the summer and teach at-sea weather observations and also do oceanographic instruction at sea.
15:47:53 I left the maritime college and went to the work in the commercial weather service. In the late '80s, I went back to the maritime college as an adjunct professor in meteorology, and in 1997 I started teaching meteorology and oceanography at Purchase College and in 1999 at the United States Merchant Marine Academy, where I presently teach the midshipmen marine meteorology.
15:48:25 I also work with the federal government in teaching the NOAA Commission Corps officers basic meteorology, and also helped develop a -- the academics behind a visual teaching -- computer-aided teaching device for the U.S. Navy.
15:48:47 Q. Are you a member of any scientific associations?
15:48:49 A. Yes, I am.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1832

15:48:50 Q. Which?
15:48:52 A. I'm a member of the American Meteorological Society, have been so since graduate school. I'm also a member of the Marine Society of New York City and a member of the Society of Maritime Arbitrators in New York City.
15:49:08 Q. Do you have any seagoing experience?
15:49:11 A. Yes, I do. As a cadet at the maritime college, we went to sea every year for 90 days. Upon graduation, I sailed on my United States Coast Guard license as a second and third mate onboard tankers and containerships, research ship, and the college training ship and -- that was on my license.
15:49:36 Most recently, I made a cruise on a passenger liner, where I worked with the bridge watch officers and taught them meteorology while I was on that ship.
15:49:47 Q. Did you have any other teaching experience on a ship?
15:49:52 A. Yes. On the college training ship, I would teach meteorology and oceanography to the cadets onboard the ship. We would conduct -- launch weather balloons and make shipboard weather observations and drop Nansen bottles and make XBTs and things like that while the ship was at sea.
15:50:12 Q. Do you have any maritime licenses?
15:50:14 A. Yes -- well, I had a license as a chief mate unlimited tonnage and master 1600 gross tons or less. Up until August of last year, I held those licenses in one form or another. Or my merchant marine license since graduating from the college in

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1833

15:50:36 1968. And I realized I was no longer going to go to sea, so I decided not to renew those licenses. But I don't have the licenses anymore.
15:50:46 Q. Have you done any study of hurricanes and tropical storms prior to this case?
15:50:50 A. Yes, I have. I've looked at Hugo. I've looked at Floyd. I've looked at Gustav. I'm looked at Rita. I've looked at Ike. So several different hurricanes.
15:51:04 Also, some tropical storms, Tropical Storm Isabelle. And there was another one in Florida, but I can't remember the name of that system.
15:51:12 Q. Any cases involving barges?
15:51:14 A. Yes. I did a study on Hurricane Rita in Lake Charles, Louisiana.
15:51:24 MR. ALDOCK: Your Honor, I tender the witness as an expert in meteorology, oceanography, and meteorology in tropical storms and hurricanes.
15:51:34 MR. KHORRAMI: Your Honor, we'll reserve voir dire for after his examination.
15:51:38 THE COURT: The Court accepts Dr. Dooley as tendered.
15:51:41 I just want to say before that this image that I'm looking at -- this has nothing to do with the case, but it's just so striking -- if lightning strikes twice, this would go right over the Deepwater Horizon. It was a Category 3 or 4 or 5, or whatever it was at that time. So, anyway, just a

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1834

15:52:01 frightening thought. Go ahead.
15:52:03 BY MR. ALDOCK:
15:52:04 Q. What is meteorology?
15:52:05 A. Meteorology is the study of the atmosphere and the phenomena within the atmosphere. There's several different branches of it: Air pollution, radiator processes, air chemistry. So we study the atmosphere and things that happen in the atmosphere.
15:52:26 Q. Can a meteorologist determine what weather conditions were like in a specific place even if there were no measuring instruments at that specific place?
15:52:35 A. Yes, it -- yes, we can. I prepared a slide, if I can show that slide.
15:52:40 This, for example, is an example of that question. Here you see a map from the National Weather Service. This is for -- the date is down here at the bottom -- the -- I think that's a 28 -- oh, yes. 28 at 0600 UTC, which is the same as Greenwich time. Then, of course, to go from Greenwich to local time, you subtract five hours. So this is 0100 on the 29th.
15:53:17 Here you see the universal symbol for a hurricane right here, with the filled-in circle. If it was a tropical storm, the center of that symbol would be a blank. That's how we tell the difference between them.
15:53:31 On this map, you see several different blobs of numbers. Those are what we call station plots. Here, I'm

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

27 (Pages 1831 to 1834)

1835

15:53:39 circling here a station plot. And on that station plot, you 15:53:43 see various different numbers. If you can compare one station 15:53:48 plot to another, you see that numbers tend to be systemic 15:53:50 because each number represents a value or what we call a 15:53:55 weather element.

15:53:56 A weather element is wind, direction, wind speed, 15:54:01 temperature, dewpoint, sky cover, cloud pipes. So what we have 15:54:11 here are reports from observing stations scattered throughout 15:54:14 the southeast United States and over the Gulf of Mexico.

15:54:19 Some of these stations are ships. You can tell if 15:54:21 you look and you see a four-letter --

15:54:25 THE COURT: You might just move your mic down a 15:54:28 little bit, and it might not reverberate so much. You might 15:54:33 try that because you have a nice resonate voice. We ought to 15:54:36 be able to hear you.

15:54:36 THE WITNESS: Is this better?

15:54:37 THE COURT: Yes, I think so.

15:54:39 THE WITNESS: Sorry.

15:54:41 So what we see here is -- around, for example, 15:54:45 this station, you can see what looks like an arrow, with 15:54:49 feathers at the end of it, and with a round, rather than a 15:54:54 pointy --

15:54:54 THE COURT: Excuse me just a moment. I don't 15:54:56 think -- I'm just hearing a noise that's very distracting. I 15:55:00 don't know if anyone else is hearing it.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1836

15:55:03 MR. ALDOCK: Maybe push it away from you.

15:55:05 THE COURT: I don't know if it's -- it shouldn't be 15:55:07 doing that. I don't know.

15:55:13 MR. BEST: I think he was touching the base of the 15:55:15 mic.

15:55:16 THE COURT: Oh, yeah. It might be hitting something 15:55:18 or --

15:55:19 THE WITNESS: Oh, I see. How's this? There. I'm 15:55:21 right-handed. Then I won't -- Sorry, Your Honor.

15:55:21 THE COURT: Go ahead. Sorry to interrupt you, sir.

15:55:21 THE WITNESS: No. I want to make sure I've got 15:55:21 everything right here.

15:55:35 So what you can see here is the station plot and 15:55:37 what looks to be an arrow. That's a representation of the wind 15:55:40 condition at that location as reported by that station.

15:55:43 So in between stations, you see that there's no 15:55:46 data. So what a meteorologist can do is look at a map like 15:55:51 this, and basis the analysis and the pressure field, these 15:55:55 lines are our isobars, lines of constant pressure, by analyzing 15:55:59 the station reports, determine the pressure at various 15:56:03 different places where there are no station reports, basis the 15:56:08 orientation of the isobars, we can then go back in and analyze 15:56:12 and determine wind direction; and basis the spread of the 15:56:16 isobars perpendicular to them, we can then determine a value 15:56:20 for wind speed as well.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1837

15:56:22 If we contoured the temperature patterns, we 15:56:27 would, at the same time, be able to give an idea of what the 15:56:30 temperature conditions were across this map.

15:56:32 These are the type of products that you would 15:56:34 see on TV. So without having a station there, one can get a 15:56:40 good idea of what the -- what the wind direction and speed and 15:56:45 temperature and humidity are like in that particular location.

15:56:49 BY MR. ALDOCK:

15:56:51 Q. How do you do this for past events?

15:56:55 A. For past events, what one would do is collect all of these 15:56:58 maps that cover the time period of interest. This is just one 15:57:01 which I've put together as an example, but you would go back 15:57:04 and collect the maps that showed Katrina's movement through the 15:57:07 Gulf of Mexico and examine them in detail for the particular 15:57:13 location of interest and, from each map, deduce that 15:57:17 information. That's called a hindcast.

15:57:25 Q. What does meteorology have to contribute in a case in 15:57:27 which the question of whether a barge, like the one in the 15:57:31 picture, caused a breach in a floodwall during a hurricane? In 15:57:36 general.

15:57:36 A. Well, in general, if this is the barge, you can see it has 15:57:39 about a -- from the top of the cover all the way down to the 15:57:44 flat bottom, it's about a 21-foot freeboard here, with about a 15:57:51 foot and a half of draft, so you have about a 19 1/2-foot 15:57:55 windage, where the wind could then blow on that barge and

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1838

15:57:58 propel it one way or the other. Very simple. Very similar to 15:58:02 what one can expect to see on a sailboat: Windage.

15:58:07 Q. Are we going to be able to, Dr. Dooley, to tell what the 15:58:11 wind conditions were in the IHNC during Katrina by a hindcast 15:58:16 technique?

15:58:18 A. I believe so, yes.

15:58:21 Q. Have you arrived at conclusions about wind conditions 15:58:24 during Katrina as they pertain to the IHNC?

15:58:27 A. Yes, I have.

15:58:29 Q. What is this graphic and what are the conclusions that 15:58:33 you've reached about Katrina?

15:58:35 A. Well, this graphic here, of course, is a satellite 15:58:37 image -- it's not a photograph. It's an image -- of Katrina on 15:58:42 the 28th of August. You can see the date here, and this, too, 15:58:48 is Greenwich Mean Time. So you can see the image of Katrina in 15:58:52 the Gulf of Mexico. One can see the eye quite clearly, and you 15:58:56 can see the cloud shield, as it's called, covering the storm.

15:59:03 If you also look, you can discern in here the spiral 15:59:08 bands as they circle into the center of the system. So here we 15:59:13 have an excellent representation of what Katrina looked like on 15:59:17 the 28th before it advanced into the New Orleans area.

15:59:26 Q. Prior to the storm's passage, where were the winds?

15:59:36 A. Well, I think if we go to the -- if we look at this 15:59:37 diagram, what we can see since Katrina is now well to the south 15:59:42 of New Orleans, basis several of the factors that I took into

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

28 (Pages 1835 to 1838)

15:59:49 consideration in doing my report, things like basic principles of meteorology, as I described before by looking at that map, pressure gradient force, the equations of motion.

16:00:02 Here you could apply a principle like the Buys Ballot's law to discern the approximate direction in the Inner Harbor Navigation Canal or New Orleans area. And if you did that on this particular graphic, what you could see, with the center of Katrina here well to the south, that New Orleans here would have to be experiencing east to northeasterly type flow.

16:00:32 Q. When you say blowing from the northeast, can you show us on this graphic?

16:00:36 A. Yes, I can. Here you see the IHNC, which has a heading of approximately 015, which means about 15 degrees to the right of north. So this would be 015 here.

16:00:50 So a northeasterly direction, then, would be about 30 degrees across that, blowing from the northeast towards the southwest, much like I am moving the laser pointer at this particular time.

16:01:04 Or more -- a little bit perhaps, if you go back to that previous graphic, this early in the event, in fact, the wind was probably a little bit more easterly than northeasterly.

16:01:19 Q. So how do we know the winds were blowing away from the east floodwall of the IHNC toward the canal prior to 7:45?

16:01:27 A. By following the way -- what I did is I looked at three

16:01:32 different factors. I think if you go to the next graphic -- what I did is I looked at three different factors.

16:01:41 I looked at the meteorological principles and the track of the system. By "meteorological principles," I mean the equations of motion, the applications of Buys Ballot's law as applied to the movement of the system over the surface of the Earth.

16:01:56 I also looked at a numerical hindcast produced by Ocean Weather for the MMS, or Mineral Management Service.

16:02:04 Then I also looked at the local data at the airport, at Lakefront airport.

16:02:11 From looking at this, I drew these three factors. I drew my conclusions regarding the weather conditions on the morning of the 29th.

16:02:21 Q. So what principles are we applying here?

16:02:24 A. The meteorological principles that I looked at, of course, are the fact that, in the Northern Hemisphere, winds about a tropical system or a cyclone blow counterclockwise and inwards towards the low-pressure center.

16:02:47 At the same time, you can reduce that to a simple rule called the Buys Ballot's law that basically says, if you put your back in the wind in the Northern Hemisphere, the center of the low will be to your right.

16:03:02 For example, here's the center of Katrina. This is a -- before I go on, let me explain this diagram. This is very

16:03:08 similar to one of the diagrams that Dr. Mitchell showed the other day. This is produced by the Hurricane Research Division, which is part of the Atlantic Ocean Marine Lab in Miami, Florida, and it depicts at a specific time -- you can see the time up here -- it depicts the wind conditions about the center of Katrina.

16:03:28 Here, different colors represent different speeds. The solid lines represent the wind speed. This is in knots, so this represents the 100-knot contour, and then it decreases outward from there.

16:03:45 We also heard some talk about "right front quadrant of the storm," and I just want to take the opportunity to point that out. This is a north/south line and this is an east/west line. And at this particular time, as I'll show in a few seconds, Katrina was moving generally northward, to the east of New Orleans. So the right front quadrant would be this center of this part of the system here. This is the right front quadrant.

16:04:14 Q. Where's the IHNC on this?

16:04:15 A. On this particular diagram, the IHNC is -- oh, here's Lake Borgne, so the IHNC would be approximately here.

16:04:24 Q. Is there any dispute or debate in the meteorological community about the validity of Buys Ballot's law?

16:04:36 A. No, not at all.

16:04:36 So, again, if you stand here, for example, if you

16:04:39 take that white arrow, these are arrows put on here by HRD, the Hurricane Research Division, and if you put your back to that arrow, you can see that the low-pressure center is going to be to your left.

16:04:53 Likewise, over here, it's a little bit forward of your left side, and that, of course, is due to the frictional effects of the land. On everywhere on these arrows, you can see the fact that the center of the low is to the left.

16:05:04 And Buys Ballot's law was developed in the 1800s to perhaps the late 1700s. Buys Ballot's was a meteorologist in northern Europe, and he sat down and thought about these principles, and it's been taught and used since then. And I discuss it in my class with the midshipmen and with the NOAA -- NOAA people that I teach.

16:05:30 Q. Does the Buys Ballot's law and the counterclockwise flow of hurricanes in the Northern Hemisphere apply to wind at ground level?

16:05:38 A. Yes, it does. Any type of circulation around a low-pressure center in the Northern Hemisphere is going to be counterclockwise.

16:05:49 Q. Can you identify this exhibit?

16:05:50 A. Yes, I can. This is a representation put together by NASA, the JPL, and Brigham Young University. And what this is is a QuikSCAT, Q-U-I-K-S-C-A-T --

16:06:12 Q. So we've misspelled it?

1843

A. Yes, sir.

-- QuikSCAT satellite, which is a polar orbiting satellite, and it has on board a scatterometer, which is a microwave transmitter that sends a beam down to the Earth's surface, and it works over the ocean. What it does, from the return signal to the satellite, it then, passing those signals through an algorithm, then determines wind speed and direction at the surface of the earth.

QuikSCAT was operational up until November of 2009, and it was a primary tool used by both the Ocean Prediction Center, which is a forecasting branch for the ocean in the Atlantic and the Pacific; and the National Hurricane Center, for analyzing wind speeds about -- about -- around the tropical systems.

And what I put on here, you can see -- I'm sorry. You can see on here the left, you can see the color code that indicates the speeds. So the light colors and the blues are low wind speed. These are in knots. You can see the knots here. And the resolution goes up to about 50 knots and plus.

And you can see the different colors. Red is more what we would consider to be a gale-force wind. Here would be a storm-force -- mid-latitude storm or a tropical storm would be all the way up, and the hurricane would be up into this area.

So this diagram basically shows Katrina on the

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1844

afternoon of the 28th. I've also indicated on the other map and this one here -- this is a blowup of the same image, and what you see here is the approximate location of the IHNC and the different color codes indicating the speeds.

Each of these flags, these are the same type of flags that we saw on the station plot before when we looked at the National Weather Service map. Each flag represents each of the -- let's put it this way: Each of the feathers on the flag -- on the bar -- on the arrows represents a speed of 10 knots. So if you have two feathers, you have 20 knots. If you have two and a half feathers, you have 25 knots. If you have a flag, you have 50 knots. And if you have a flag and a feather, you have 60 knots.

So on this particular diagram, you can see the wind speeds surrounding Katrina on August 28th while she was still out over the Gulf of Mexico.

Brighter colors, the higher wind speeds. So you can see the high wind speeds towards the center of the system and then, of course, the eye of the system here.

If you follow through on the wind barbs, the arrows, again, now, they fly with the wind, so that the feathers are with the wind, so the arrows are -- just think of those arrows flying downwind, basically. You can see the counterclockwise circulation around the hurricane.

It's a satellite derived image. Each barb represents

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1845

an area of -- I think you see it down here in the bottom -- of around 2 1/2 square kilometers, so that's roughly a mile and a half or so north and south and east and west. So this is a very high -- it's called a UHR, ultrahigh resolution image, of winds surrounding Katrina.

QuikSCAT works well. It's a tremendous loss to the community and its data. The next satellite will be launched in about five years. There's a European satellite that's now being used. But QuikSCAT was a very valuable tool. And from here, you can get an idea of what the wind directions are at each location.

Q. Can you show us on this exhibit what Buys Ballot's law would show us about Katrina?

A. Sure. Here is the center. If you position yourself here, let's say at this latitude -- these are latitude and longitude lines -- and if you put your back to the wind, you can see that the low will be to your left. Likewise, if you go over here to the west of the system and put your back to the wind, the low will still be to your left. And down here do the same.

So Buys Ballot's law will show quite well the location of the low.

Q. So on this slide, what direction is the wind blowing in New Orleans?

A. Well, if you look up here towards the location of the IHNC, you can see that these QuikSCAT winds, as they passed

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1846

over the water bodies surrounding the Mississippi River Delta and the peninsula-like structure, you can see that they continued to flow counterclockwise. So we would get at this date on the 28th mostly easterly-type conditions.

Q. Now, if we know where the center of the storm is, what can Buys Ballot's law tell us about the storm?

A. Well --

Q. Where it's going to go?

A. If we know where the center of the storm is, we can use Buys Ballot's law to deduce what the wind speed will be at our location. Likewise, if we know where our location is, we know what the wind conditions are, we can deduce where the center of the storm -- what direction the center of the storm would be like.

Q. What's this exhibit?

A. This is a composite of various different satellite imagery put together by NOAA, and you can see the date and times of each of the image.

This basically picks up Katrina as it formed out here in the Bahamas on the 23rd and 24th, tracked across the straits of Florida, across southern Florida, took a turn to the southwest, went out over the loop current where it gained energy and reached Category 5, and then turned later on, on the 28th and on the 29th, and moved -- 28th and 29th, then moved northward into New Orleans.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

30 (Pages 1843 to 1846)

1847

16:12:32 Q. What's this exhibit, Dr. Dooley?
16:12:34 A. This is similar to that, but, of course, without the satellite imagery. This is a representation of the track of Katrina that I put together using what's called the best track information.
16:12:45 The National Hurricane Center for every hurricane puts together a report, and within it they deduce the time and location of the center of a system, the pressures and the winds. An example of the best track is contained in my report. But you can see the location of Katrina in various different time periods.
16:13:09 If I can explain the date and time nomenclature that I used. This is the 28th at 1300 Central Daylight Time. So that's the date and hour, CDT. So the 29th at 1300 and so on and so forth.
16:13:25 So we start on the 24th, hit Florida, come back out; 27th at 1300, the 28th at 1300. And here's the 29th at 0700. Here's the 29th at 1300.
16:13:39 Q. What is this exhibit?
16:13:40 A. This is a blowup of that same image but focused in on the New Orleans area. Different time periods here. And, of course, I've put down the approximate location of the IHNC at 30 and 90.
16:13:57 Here you see the 0610 Central Daylight Time, which was the analyzed time of landfall in Buras. Here is the

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1848

16:14:08 0700 -- best-track position. Of course, in Greenwich Mean Time, that would be 1300 Greenwich Mean Time, but 0700 Central Daylight Time.
16:14:23 And this is the 0945 position. It's the second landfall up there on the border of Louisiana and Mississippi.
16:14:31 Q. At 7:00 what does Buys Ballot's law tell us about the wind direction in the IHNC?
16:14:38 A. Well, we can -- we can do this two ways: We can put ourselves at the center of Katrina, or we can put ourselves up here in the IHNC knowing where the center of Katrina was.
16:14:48 But if I look at the center of -- if I put myself at the IHNC knowing that the center of Katrina is here at 0700, that will tell me that I should be experiencing northeasterly type winds; in other words, winds out of the northeast towards the southwest.
16:15:09 Q. When does the center of Katrina pass New Orleans?
16:15:13 A. What I did is I made a quick calculation between here and here, taking that latitude, and I think I had it pass by there sometime between 0845 and 0900 that morning.
16:15:25 Q. Before 8:45, what does Buys Ballot's law tell us about the wind direction in the IHNC?
16:15:31 A. Well, what's happening here now is that Katrina is moving north, and as it moves north, we are on the left semicircle of the system. The right-hand side, where all of the -- what in marine meteorology we would refer to as the most dangerous

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1849

16:15:54 semicircle -- and, of course, this side would be called the less dangerous semicircle.
16:16:00 But the dangerous semicircle over here, what would happen in a situation like that is, as the system moves north of you, the winds would gradually turn more and more southerly. But because Katrina lied to the east of New Orleans, what we saw was the winds turning more and more northerly.
16:16:18 So between 7:00 and 9:45, what we would expect to see if we start here at 7:00, more northeasterly winds. As the system got closer to us, those winds would turn more and more northerly. And then as the system got beyond us, we'd begin to see more and more northwesterly winds and then gradually coming more and more out of the west as Katrina moves farther away.
16:16:44 That tendency to turn from east to northeast to north to northwest to west is called "backing." So when the wind changes in a counterclockwise direction, you'd expect the wind to back. So in a situation like this, when a hurricane is to your east, you would expect backing wind conditions. If the hurricane is to your west, you'd expect the wind to go northeast to east to southeast to south, which are varying conditions.
16:17:18 So these are well accepted applications of understanding the synoptic scale wind conditions around a hurricane. There's no dispute over these facts.
16:17:29 MR. ALDOCK: Now, this is a new slide not in the dec,

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1850

16:17:32 Your Honor. It is 1-A from Mr. Dooley's report, DX-198. It's also used by Dr. Mitchell.
16:17:42 THE COURT: Yes, Sir.
16:17:42 BY MR. ALDOCK:
16:17:43 Q. What is this?
16:17:44 A. This is another HRD product. This is a blowup of the product that Dr. Mitchell used, and I also have the same product in my graphic in my report.
16:17:57 But I blew it up just so that we can -- and injected it here so we could see the fact that here is the path of Katrina, the solid black line, and so that we can get an understanding of that right danger semicircle. Because you can see that to the right of it is where all the maximum winds are found in Katrina, on that right semicircle.
16:18:20 And here, of course, you see the area of Louisiana. I've also put a little indicator there for the approximate location of the IHNC. And these lines, as Dr. Mitchell pointed out, these are our contours of wind speed as deduced by the Hurricane Research Division, and basically what they show here is that, in the IHNC, as Katrina went by, the maximum one-minute sustained wind speed was between around 70 and 80 knots.
16:18:57 The wind speeds are knots. So you can just follow the color contours around, and you can see the effects of the storm.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

31 (Pages 1847 to 1850)

1851

16:19:04 Q. Dr. Dooley, your second conclusion had to do with the hindcast as another source of information. Tell us what that is here.
16:19:12 A. Yes. Part of the data that I used in my report was a hindcast that was produced by the company called Ocean Weather Incorporated. This was a hindcast that was done for the Mineral Management Service, and it involved a detailed study of Hurricane Katrina and an examination of all of the reporting stations and data in the Gulf of Mexico region over the days leading up to Katrina's formation and as Katrina moved up over land.
16:19:49 Data is collected and analyzed. The hindcast looks at all the horizontal pressure pattern of the storm and the vertical pressure pattern of the storm, and all of these factors are taken into consideration in reconstructing the wind field of the storm.
16:20:09 And I felt that Ocean Weather has an excellent reputation as -- well, my opinion -- the leading hurricane hindcasting company, and this data, I felt, would give us an excellent understanding of the synoptic scale winds surrounding Katrina.
16:20:27 Q. Have any of the other investigations of Katrina failures used this same OWI weather data?
16:20:35 A. I believe that they were also used in IPET.
16:20:38 Q. And anywhere else?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1852

16:20:40 A. I think that some of the ADCIRC, which are the storm-surge models, also used some of the OWI data.
16:20:49 Q. So how did you apply the hindcast at the IHNC?
16:20:53 A Well, the OWI hindcast covers the entire Gulf of Mexico area. We didn't need that. What I did is I obtained grid-point data. Because that's how the data is put together. Each X and Y coordinate has their whole time history of data at that location.
16:21:15 Here you see the grid points that I obtained, and I labeled them A, B, C, and D. It was about 3 miles this way and about 2.6, 2.7 miles that way.
16:21:31 So what I did is I got the wind directions and speeds at each of A, B, C, and D, and then simply interpolated them to a value in the IHNC at the desired time periods.
16:21:47 So the data came out every 15 minutes, and the data represents a 30-minute average wind at those grid points.
16:21:54 Q And point E is the IHNC?
16:21:56 A Yes, sir.
16:22:01 Q. Now, this is a table from your report, Dr. Dooley. We're going to examine it in great detail. But to start, just generally what is it?
16:22:11 A. In general, this is Table 6-A, and this shows the values at A, B, C, and D, and the interpolated values.
16:22:21 And corresponding here, you see a compass rose just so that we have a frame of reference of direction, both

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1853

16:22:28 numerical direction and compass points.
16:22:34 Q And that's compass rose, R-O-S-E; is that right?
16:22:41 A. R-O-S-E.
16:22:42 Q. So what -- what is this?
16:22:47 A. This is a zoom-in on the time of 04:30 in the morning. And if -- if, for example, we wanted to find a wind direction at 4:30 in the morning, we could go here to 4:30, look to see that at A, B, C, and D the values were between around 44 and -- 43.75 -- I round these off -- 44 to around 48 degrees, so that we know, inside the box, it has to be somewhere within that. And by interpolation, I found 46, call that 47 degrees, over here.
16:23:30 So at 4:30 in the morning, the wind at the IHNC was basically, as Buys Ballot's law, would dictate a northeasterly type wind.
16:23:48 Q. And how does that translate here?
16:23:51 A. Here is the IHNC northeast. You can just walk that over. And northeasterly wind from here, from the north breach area, would be pointing towards the southwest corner here of the Lafarge cut-in, and moving away from the eastern floodwall towards the western side of the IHNC.
16:24:17 Q. Let's look at 7:00.
16:24:19 A. At 7:00, you can see the grid-point values range between around 24 and 31 degrees. So our value would have to be somewhere in the middle of that, and I found 29 1/2.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1854

16:24:34 And if you look at 29 1/2, it moves to here, which, again, is from the northeast and generally towards the south-southwest.
16:24:44 Q. So how does that translate?
16:24:45 A. Again the same. Remember, this is 015 north and south. So this is 30. Let's round that off to 30. So if this is 015, about 15 degrees across that. And it would be blowing in this direction as I move the cursor from the northeast side to the southwest side, or away from the eastern floodwall towards the western side of the IHNC.
16:25:09 Q. Let's look at 7:30.
16:25:11 A. At 7:30, remember, now, Katrina is moving a little closer to New Orleans. So the wind's continuing to back. Remember I defined "backing" before, where I said you go from an easterly towards a northerly direction.
16:25:24 So the wind is doing exactly what Buys Ballot's law and understanding of the principles of cyclonic flow would -- a system passing to the east of you will dictate. So the direction here is around 20 degrees.
16:25:40 Q. How does that translate?
16:25:42 A. Again, the orientation is 15 north and south. So it's about 5 degrees across from the eastern side towards the western side, or away from the eastern floodwall towards the western side of the canal.
16:25:56 Q. So let's look at 7:00, which is where the plaintiffs

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

32 (Pages 1851 to 1854)

allege the time of the south breach.

A. If we look at 7:00, I think we looked at one of those --

Q. No, earlier. Earlier than 7:00.

A. Oh.

Q. 5:45 to 6:45, the whole area.

A. If we look at that time period between 5:45 and 6:45, we can see here, just kind of bracket that out, you can see the range of values as computed by the model. If we apply those, we can get an upper and lower limit, which is what I then put on here. So between around 32 degrees and around 43 degrees over here. So you can see the swath area from which the wind would be coming.

And that fits in perfectly with Katrina being east of the city, the wind backing, and turning more northerly as time goes on, as Katrina moves closer and then north of New Orleans.

Q. So how does that bracketed area apply?

A. Again, you can see it's always to the right of the -- of the axes of the IHNC, blowing from the eastern side towards the western side, or away from the floodwall. Here you see the path of Katrina during the time period. So between around 5:40 and 7:00 or so, Katrina was here.

So exactly as Buys Ballot's law would dictate, you have to have, if it's a hurricane -- and I believe everybody agrees Katrina was a hurricane -- you have to have this type of wind pattern. There's no denying that.

Q. So what was the first time at which the prevailing wind had a component blowing from the west shore to the east shore of the IHNC?

A. If you just quickly scan down the data, what you discover is that sometime between around 7:30 and 7:45 -- sorry -- the wind passed from the eastern side of 015 to the western side of 015.

So what we have here, then, is the first time that the wind would have blown with some type of component across the IHNC was sometime between 7:30 and 7:45.

Q. Dr. Dooley, can you summarize your findings regarding the progression of wind in the IHNC based on the hindcast?

A. Yes, I can. And I believe this graphic here does that.

If you look at the 4:00 value and if you look at the 7:45 value, what you can see is the swath of northeasterly, turning more northerly, the backing conditions, exactly as a hurricane passing to the east of us would dictate. You can see the swath of the wind pattern there.

So between 4:00 and 7:45, what we have are winds blowing from the eastern side to the western side or away from the northern wall towards the southwestern side.

Q. Do any of your conclusions, Dr. Dooley, depend on where the barge was at any given point in time?

A. No.

Q. So when you say the wind is acting on the barge, if the

barge is somewhere else in the canal, does that affect your conclusions?

A. Not with regards to the synoptic scale wind patterns of this system, no, sir.

Q. So let's go to your third source of wind direction, local weather data. There's been a lot of discussion about ground level and local weather, and we should spend some time, a little time, on this.

Did you review any local meteorological data?

A. Yes, I did.

Q. Where was that taken from?

A. From Lakefront airport.

Q. What does this map show?

A. This shows the location of Lakefront. You can see here, and here you can see the IHNC. The distance between the approximate position of the -- of the anemometer and the airport was about -- and the IHNC was about 4.1, 4.2 miles.

Q. What does the data show at Lakefront airport?

A. Well, this is a table from our report, and this shows the data starting at 3:00, going to 7:53, which was the end of the data that I had from Lakefront. The airport actually ceased reporting at 6:53 Central Daylight Time.

And what we see in the columns here are the GMT time corrected here at the next column for these -- for Central Daylight Time; and then the wind direction in 10s of degrees,

30 through 30 and 50, 90, 40; and then the wind speed reported in miles per hour; and then the wind gusts in miles per hour.

The next column over is the height of the clouds in hundreds of feet. So "9" would correspond to 900 feet.

And then you have the visibility and statute miles.

And then you have the report from the station of the type of weather being observed at that particular time.

THE COURT: Doctor, just a question. I'm sure Mr. Aldock may ask it. But just looking at -- and I'd seen this. Looking at the wind direction at 3:36, that wind direction is due east; correct?

THE WITNESS: That's correct, sir. From the east towards the west.

THE COURT: Right. And the wind direction at 3:43 is 30 degrees, which is much more northerly. That's fairly dramatic, is it not, in that time period? Seven minutes?

THE WITNESS: Yes, it is, sir.

THE COURT: Do you have any explanation for that? I'm just curious.

THE WITNESS: I think --

THE COURT: When I said "7 minutes," 8 minutes, excuse me.

THE WITNESS: Each of those observations is about 6 to 10 minutes apart if you look down at the time scale. I believe there is a explanation --

1859

16:32:18 THE COURT: 3:28 to 3:36 converted.
16:32:22 THE WITNESS: Yeah. The first two are, like, 6
16:32:23 minutes apart, and then it's 7, and then it's 5.
16:32:27 THE COURT: Yeah.
16:32:27 THE WITNESS: So these are all what's called special
16:32:29 reports that are sent in by the -- by the automatic reporting
16:32:33 station that was at Lakefront. But I believe there is an
16:32:36 explanation for the 090.
16:32:38 THE COURT: Okay.
16:32:39 BY MR. ALDOCK:
16:32:39 Q. Why don't you give it right now.
16:32:41 A. Right now? I think if you go back and we recall what
16:32:46 Mr. Lemon showed earlier this afternoon when he looked at some
16:32:53 of the radar image, I believe one of the time periods that he
16:32:55 talked about was approximately 3:36, and one of the comments
16:33:00 that he made regarding that was that he felt that part of that
16:33:07 velocity and directional indicator was that there was a more
16:33:13 easterly component to the winds up there where that upper-level
16:33:19 region of convergence was occurring.
16:33:22 That upper-level region of convergence, but I think
16:33:25 if you look at it carefully, you'll see that it was over Lake
16:33:29 Pontchartrain, which would be to the north of Lakefront
16:33:31 airport. So I think what we're seeing here is some
16:33:35 contribution of that region of convergence which relaxed the
16:33:40 wind to 90.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1860

16:33:41 And you'll also see that the wind speeds slow down,
16:33:43 so that it went from around 44, 47, down to 34 miles per hour;
16:33:50 and that the gust speed likewise decreased. So I believe this
16:33:55 is reflecting the -- what we saw in that data from the Doppler
16:34:03 Radar.
16:34:03 THE COURT: This comes from an anemometer?
16:34:06 THE WITNESS: Anemometer, yes, sir.
16:34:08 THE COURT: Anemometer. And the 90 degrees would not
16:34:11 necessarily conform to Buys Ballot's law; correct? Or would
16:34:18 it.
16:34:19 THE WITNESS: Well, to some degree, it does. I mean,
16:34:22 it's a variation in direction induced by the local wind
16:34:30 effects. The local variations are caused by what's happening
16:34:38 in the atmosphere at the time. As we saw, there was some type
16:34:43 of a convergence which relaxed the wind and gave us these
16:34:49 easterlies.
16:34:50 THE COURT: All right. Thank you, sir.
16:34:52 MR. ALDOCK: We're going to come back to it in
16:34:54 detail, Your Honor.
16:34:55 THE COURT: Okay.
16:34:55 BY MR. ALDOCK:
16:34:55 Q. These are automatic reporting; isn't that right?
16:34:58 A. That's true.
16:35:01 Q. What is this slide?
16:35:02 A. This is the data from Lakefront that starts at midnight

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1861

16:35:07 on -- at 1200, or 0000, on the 29th and then goes up to the
16:35:13 observation just before 0300.
16:35:16 And you can see the northeasterly winds here -- 40,
16:35:20 40, 40, all the way -- 30, all the way to 50. So here's our
16:35:26 northeasterly winds. So we do have this Buys Ballot's law
16:35:30 clearly demonstrated here.
16:35:36 Q. Any of the other studies use the Lakefront airport data?
16:35:39 A Oh, yes. As I said, it comes from an ASOS station,
16:35:44 Automatic Service Observation Systems station. That data is
16:35:48 put out on the National Weather Service data circuits. HRD
16:35:51 would have used it. Ocean Weather would have used it. Anybody
16:35:56 who was serious about analyzing wind conditions near New
16:35:59 Orleans at the time would have used that data.
16:36:02 Q. IPET used it?
16:36:04 A I believe they did.
16:36:05 Q. It was in Dr. Marino's report?
16:36:07 A. Dr. Marino did have columns of data from Lakefront airport
16:36:19 in his report, yes, he did.
16:36:21 Q. Can you describe the direction of the wind at Lakefront
16:36:23 airport throughout the morning of August 29th?
16:36:25 A. Yes. Starting at 0300, you can see the data here goes 30,
16:36:30 30, 90, 30, 50, 30, 30, 20, 30, all the way until, finally, at
16:36:34 6:35 where was the last report, which was from 040.
16:36:40 The anemometer, what it does when it makes its
16:36:45 report, it calculates the wind every five seconds by an

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1862

16:36:53 electronic process, and it stores that in memory, and then it
16:36:58 averages those values over a two-minute period. So looks,
16:37:02 actually, at 24 separate wind observations of speed and
16:37:06 direction and then reports the average of those 24. So
16:37:11 that's -- that's where these numbers come from.
16:37:14 THE COURT: Is there -- excuse me for interrupting
16:37:18 you, but I'm looking at the time intervals. It seems a bit
16:37:23 random. You have 6 minutes in the beginning and then 7 and
16:37:31 then 5. Then you have 4:00 to 4:29. There's a 29-minute gap
16:37:39 there as an example. Any explanation for that?
16:37:42 THE WITNESS: As I said, these are what are called
16:37:47 spec reports, special reports. Most of these -- some of the --
16:37:49 the 4:00 one would have been a regular METAR report, which is a
16:37:53 report from an airport. Why there's a gap between 4:00 and
16:37:58 4:30, I cannot explain at this time, sir.
16:38:03 THE COURT: Okay.
16:38:04 BY MR. ALDOCK:
16:38:05 Q. Did Lakefront airport record any west-to-east winds while
16:38:10 it was operating at any time between 3:03 and 6:53?
16:38:21 A. No, no.
16:38:21 If I can just -- one second, just -- just explain
16:38:23 these directions, why they're all whole 10 degrees. So what it
16:38:25 basically does is then it takes the averages that I just talked
16:38:31 about and averages them out and reports it to the nearest 10
16:38:36 degrees. So, for example, a wind direction of 23 would be

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

34 (Pages 1859 to 1862)

1863

16:38:42 reported as 020. A wind direction of 39 would be reported as
16:38:47 040.
16:38:50 So there was nothing from the west. Everything was
16:38:53 from the east.
16:38:53 Q. So let's look at some of these Lakefront reports. What
16:38:56 does it show at 303?
16:39:00 A. It shows the direction of 30 and a speed in miles per hour
16:39:02 of 43 miles per hour and a gust speed of 64 miles per hour.
16:39:10 And there's the graphic so indicating.
16:39:16 Q. So what does that mean here?
16:39:18 A. So if we again come back to the IHNC, again, we're coming
16:39:22 from the eastern side towards the western side at 3:00 in the
16:39:27 morning.
16:39:28 Q. Okay. There's been some suggestion by the plaintiffs that
16:39:31 the northern breach happened at 4:30. What was the wind speed
16:39:36 and direction measured at Lakefront at that time?
16:39:39 A. The observations, both show 30 degrees, and the wind
16:39:43 speeds of about 48 to 53 miles an hour with gusts in the 60s.
16:39:48 So you can see 30 here. So over that time period, basically,
16:39:52 we're looking at 30 degrees of wind direction.
16:39:56 Q. How does that translate?
16:39:58 A Again, just as before, from the eastern side to the
16:40:02 western side, away from the eastern floodwall and towards the
16:40:03 western side.
16:40:07 Q. What does the data show from 6:53 a.m. near the time when

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1864

16:40:11 the southern breach happened?
16:40:13 A. This is the last wind report from the station before the
16:40:16 signal -- before it stopped reporting. What we see, direction
16:40:21 of 040, a speed of around 69 knots, gust speed -- I'm sorry,
16:40:27 miles per hour, and gust speed of around 86 miles an hour. And
16:40:31 you can see the direction here.
16:40:34 Q. How does that translate?
16:40:35 A. That translates across -- across, away from the eastern
16:40:39 floodwall towards the western side.
16:40:43 Q. While we're here with the Lakefront data, Dr. Dooley, what
16:40:48 does this data provide with regard to visibility?
16:40:52 A. The station is fitted with a visibility sensor. Light is
16:40:58 emitted by a source, and then a receiver captures the scatter
16:41:01 from that light. From that, they deduce a range of visibility.
16:41:08 And these are in statute miles. So this is the
16:41:13 report throughout the morning of the 30th. So you can see
16:41:17 that, earlier on, it was about 2 1/2 miles, decreased
16:41:22 somewhat -- opened up again, and then decreased generally to
16:41:29 about .3 miles before opening up just before it went down.
16:41:35 Q. So what does it show about visibility between 5:00 and
16:41:38 6:00 a.m.?
16:41:38 A. Between 5:00 and 6:00, you can see that it shows about .3
16:41:42 to .3, .3, and then about 6:00 opening up to .5.
16:41:47 Q. So what does .3 mean in laymen's terms?
16:41:50 A. Three-tenths of a mile. So a mile -- these are statute

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1865

16:41:53 miles. That's 5,280 feet. So that's roughly, what, 1,560
16:41:59 feet -- or 1,640 feet.
16:42:07 Q. So what -- how does Lakefront data fit generally with Buys
16:42:11 Ballot's law here.
16:42:13 A To answer that question, what I did is I compared the wind
16:42:16 barbs from Lakefront to the wind barbs from the hindcast. But,
16:42:23 in general, what we see continuously are easterly type winds at
16:42:28 Lakefront.
16:42:29 Q. So, Dr. Dooley, when you looked at the hindcast, you
16:42:33 showed us a very organized progression of wind directions. But
16:42:38 here at Lakefront, we see more oscillation in the observed wind
16:42:43 directions. Why is that?
16:42:45 A. For the simple reason that, as I mentioned, the hindcast
16:42:49 winds represent 30-minute averages, okay, 30-minute averages
16:42:54 expressed every 15 minutes. So that is an average of the wind
16:43:00 speed and an average of the wind direction. So when you see
16:43:04 that, you're going to see a very systematic turn of the winds
16:43:10 with the movement of the hurricane.
16:43:12 What Lakefront is showing us is a measure of the
16:43:16 ambient wind conditions in the immediate area, only 4 miles
16:43:21 away, 4.1, 4.2 miles away, from the IHNC. So here we are going
16:43:27 to see the variations in the wind induced by various
16:43:31 short-period phenomenas.
16:43:34 As we've seen, there's one where the wind veers.
16:43:39 Now, remember veering is a turn to the right. The wind veers

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1866

16:43:42 and becomes more easterly and then backs back to its original
16:43:47 northeasterly type direction.
16:43:49 So what we're looking at at Lakefront is a
16:43:53 measurement of the ambient wind conditions, the short period.
16:43:57 These are every 6 minutes, 6 to 10 minutes, except for that
16:44:03 long exposure here. But these are, basically, short-period
16:44:10 averages. Again, they're based upon a two-minute sample of the
16:44:15 wind with 24 separate calculations.
16:44:18 Q. So what does this data tell you about the effect of
16:44:21 perturbations, though, on wind directions?
16:44:24 A. That there are perturbations in any system, in any type of
16:44:30 field. But you're going to see these perturbations in your
16:44:34 measurements of the ambient field.
16:44:37 Q. Dr. Dooley, have you seen Dr. Mitchell's report, and were
16:44:42 you here to listen to his testimony?
16:44:43 A. Yes, I was. And I have seen his report.
16:44:47 Q. Is there anything in Dr. Mitchell's report or his
16:44:49 testimony that affects the validity of your conclusions?
16:44:52 A. Well, I heard Dr. Mitchell say that, basically, there is
16:44:58 this synoptic field, and he did not disagree with my analysis
16:45:01 of the synoptic field. I didn't hear that or see it in his
16:45:06 report. The only thing he said was that there are these
16:45:11 microbursts which would produce an omnidirectional type wind.
16:45:21 That -- I don't see that in the data.
16:45:24 Q. Did you find anything relevant in your analysis in

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

35 (Pages 1863 to 1866)

1867

16:45:30 Dr. Mitchell's report or testimony? Was there anything that
16:45:34 even crossed you?
16:45:37 A. Well, he agreed with my synoptic scale winds, the winds
16:45:41 deduced by the hindcast. There was no doubt about that.
16:45:45 And the only thing he pointed out was that, if there
16:45:50 were things like thunderstorms, which is what the mesocyclone
16:45:55 is, if there were such things, they would have the possibility
16:46:01 of producing short-period omnidirectional winds, but the data
16:46:06 didn't support that at all.
16:46:08 Q. Did you hear anything in Dr. Mitchell's testimony that
16:46:10 winds existed of sufficient strength and duration to change the
16:46:14 direction and speed of the prevailing wind as it would have
16:46:17 impacted the IHNC?
16:46:22 A. I didn't hear him give any numbers. I didn't hear him
16:46:25 give any directions. I didn't hear him say that anything like
16:46:29 that definitely existed. I think he basically said that -- as
16:46:34 I understood it, is that this is a possibility, but he couldn't
16:46:38 say for sure that it actually happened.
16:46:41 Q. What's your reaction to Dr. Mitchell's opinions regarding
16:46:46 mesoscale activity, wind shear, and multidirectional winds?
16:46:51 A. Well, there's no doubt that we have thunderstorms in
16:46:54 hurricanes. I mean, that's the energy source of a hurricane.
16:47:00 As the hurricane is a marine event -- it happens over
16:47:04 the ocean -- it gets its energy from the hot ocean. That hot
16:47:09 energy is water that evaporates, rises within the clouds,

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1868

16:47:13 releases latent heat. That warms the center of the hurricane,
16:47:17 and that reduces the central pressure and that drives the
16:47:20 hurricane.
16:47:21 If you want to kill off a hurricane, run it over cold
16:47:24 water, and that takes away the heatage. Or run it over land,
16:47:27 and that will take away the water source.
16:47:30 So the whole essence of a hurricane is that you do
16:47:35 have thunderstorms. There's no doubt about that. Inside of a
16:47:38 thunderstorm, you will have updrafts. These updrafts, as they
16:47:42 leave the surface and flow into the thunderstorm, that's a zone
16:47:46 of convergence. As the wind enters and rises, that's your zone
16:47:51 of convergence.
16:47:54 As rain begins to fall out of the thunderstorm, that
16:47:57 rain falls, it entrains here from outside of the thunderstorm
16:48:01 into that. It falls and hits the surface as the downdraft. So
16:48:07 if you have thunderstorms, you have convergence at the surface
16:48:10 and you have divergence at the surface. There's no doubt about
16:48:14 that.
16:48:14 Those updrafts and downdrafts are occurring in the
16:48:23 ambient wind stream, the synoptic scale flow. So as you look
16:48:29 at the low-pressure center, we have agreement on the synoptic
16:48:35 scale flow. We have many different sources of it. We saw the
16:48:40 QuikSCAT imagery.
16:48:42 Those updrafts and downdrafts are occurring within
16:48:45 the ambient flow. In some places, they will produce a lull. I

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1869

16:48:50 believe that's what happened here at 3:36. If the downdraft
16:48:53 occurs and enters the ambient flow, it's going to be combined
16:49:00 vectorially with the wind stream and the ambient wind
16:49:05 conditions and wind at the boundary layer.
16:49:07 It's like taking your garden hose and pointing the
16:49:10 water spray into a fast-moving body of water. The water's not
16:49:14 going to go -- if you do it from the side, the garden-hose
16:49:17 water is going to flow with the fast-moving body of water.
16:49:22 This is the same thing but turned in the vertical.
16:49:24 So what I think you're going to see here is you're
16:49:27 going to see some lulls in wind speed induced by the
16:49:31 convergence, and you're also going to see some peaks in the
16:49:35 wind speed. Those peaks manifest themselves as gusts. And in
16:49:40 my report, I have made calculations of the gust speeds in this
16:49:45 large-scale synoptic flow.
16:49:47 We used a certain gust factor. I think most of the
16:49:51 literature will show that the number for hurricanes is about
16:49:54 1.25. Some literature shows higher values. But I think, in my
16:50:01 report, I mention that number. So the gusts actually
16:50:04 represents the contributions from these type of injections of
16:50:10 energy from higher levels into the surface boundary layer
16:50:14 ambient flow.
16:50:16 Q. So take it without some of the meteorological terms. If
16:50:20 you had a gust and it had an easterly component, what would
16:50:24 happen?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1870

16:50:26 A. By -- by "easterly," you mean coming from the east,
16:50:30 flowing towards the west?
16:50:31 Q. Yes.
16:50:32 A. If that gust from above entered the preexisting high wind
16:50:36 speed, the synoptic scale flow in a hurricane, which, again,
16:50:40 now is 50 to 60 knots, as we see here, what it's going to do,
16:50:45 it's going to produce your gusts. It's going to produce higher
16:50:49 gusts. But the direction of the flow is still going to be in
16:50:52 the direction of the easterly flow and the boundary layer.
16:50:55 Q. All right. So take it hypothetically and say you had a
16:50:57 gust with a westerly component. What happens?
16:51:00 A. If you had a westerly component, it's going to enter into
16:51:04 the easterly wind, and that result will be a lull.
16:51:08 Q. But not a change in direction?
16:51:09 A. But not a change in direction because the preexisting
16:51:12 ambient boundary layer wind is going to dominate.
16:51:16 It's simple football. The guy with the ball runs
16:51:19 into the larger force, you know what happens. The same thing
16:51:22 happens here. As the gust enters those strong hurricane-force
16:51:27 winds, it just carries it along, and we see either a peak or a
16:51:31 lull in the wind speed. That manifests itself as variations
16:51:36 that we see in the wind speed column here.
16:51:38 Q. So the mesoscale activity that Dr. Mitchell talks about is
16:51:42 actually what we just looked at in Lakefront airport? We know
16:51:47 what it is?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

36 (Pages 1867 to 1870)

16:51:48 A. That's correct.
16:51:48 Q. And it doesn't change the prevailing wind?
16:51:51 A. Doesn't change the prevailing wind.
16:51:53 Q. Does it manifest itself in weather reports?
16:51:58 A. If there was a gust that changed the weather conditions 16:52:02 and produced the westerly wind, and if it happened before the 16:52:06 station went off the air at 6:53, it would show up in this 16:52:11 column, and it's not there.
16:52:12 Q. Yeah. So if -- what we were looking at -- the Court was 16:52:15 looking at, it probably had a -- probably had something there, 16:52:20 that was --
16:52:22 A. Well, what you had here was a lull.
16:52:24 Q. Right.
16:52:25 A. A lull is a decrease in wind speed. Lulls are usually not 16:52:28 too important. Nobody pays too much attention to them. 16:52:32 Everybody is interested in the peak. But it manifested itself 16:52:37 in that report because there was this major change in wind 16:52:40 direction induced by that zone of convergence, I believe, as 16:52:42 Mr. Lemon showed.
16:52:44 Q. What does that slide show?
16:52:46 A. This, I believe, is from Dr. Mitchell's report, and it is 16:52:50 that -- I think, what, the level III data. And it shows a 16:52:53 series of mesocyclones or thunderstorm identified by the system 16:53:01 and one of the TVSs.
16:53:03 Q. And does a TVS symbol mean there was a tornado?

16:53:08 A. No, it does not.
16:53:09 Q. What does the Lakefront airport data tell you happens when 16:53:14 a mesocyclone identified by Dr. Mitchell passes?
16:53:17 A. Well, here are a couple of mesocyclones. Here's the -- 16:53:20 what is that? That's the T-4 one at 2:15. That one's right 16:53:26 there adjacent to Lakefront airport.
16:53:29 The observing station, I think, is right about where 16:53:32 I have the cursor -- rather, the laser pointer. So if that 16:53:39 mesocyclone was there, if it was there, and this happened at 16:53:46 2:15 a.m., I'd expect to see some type of response, if that 16:53:54 mesocyclone was there, in the surface wind report from the 16:53:57 airport.
16:54:02 I think the next slide here, we have 2:15 observation 16:54:05 from Lakefront. And you see that the wind direction is 16:54:09 consistent, and you see that the wind speed is consistent, and 16:54:12 you see that the gust speed is consistent.
16:54:15 So whatever that item was that was identified as T-4, 16:54:20 it had absolutely no impact on the surface winds at Lakefront 16:54:26 to 2:15.
16:54:29 Q. Based on your review of Lakefront airport data in 16:54:33 Dr. Mitchell's report, did the mesocyclonic activity affect the 16:54:37 prevailing wind directions at the IHNC during Katrina?
16:54:41 A. Based on everything that I looked at, there was no effect 16:54:46 of any mesocyclones on the dominant or prevailing wind 16:54:53 direction in the area.

16:54:55 MR. KHORRAMI: Objection, Your Honor. The witness 16:54:56 hasn't done any research regarding mesocyclones --
16:54:59 THE COURT: Well, he's been testifying about it now 16:55:01 for five minutes.
16:55:02 MR. KHORRAMI: I understand that.
16:55:04 THE COURT: You know, he's saying it's beyond the 16:55:08 scope of the report.
16:55:09 MR. ALDOCK: I think, Your Honor, that he is looking 16:55:12 in the data, the local weather data, to see if what was 16:55:17 observed shows. I think he's entitled to look at the local 16:55:21 weather data to see that it wasn't there.
16:55:26 THE COURT: Well, when you say it wasn't there, he's 16:55:27 -- he was not -- I've looked at his report, and there may have 16:55:33 been a supplement, but he's already testified that I think 16:55:39 something he attributes perhaps to something like a mesocyclone 16:55:45 occurred at -- and causing the 60-degree change in direction, 16:55:49 but it did not change the prevailing direction in that it was 16:55:53 simply due east rather than northeast; it wasn't from the west. 16:56:05 I understand that. So we're now at the IHNC, and I'm trying to 16:56:11 figure out what you're --
16:56:14 MR. ALDOCK: Well, I'm not going -- I'm not doing 16:56:15 much more with it, but I should say, Your Honor --
16:56:17 THE COURT: And he said none of this data -- this 16:56:20 data would also perhaps apply to something to 4.1 miles away, 16:56:27 such as the IHNC.

16:56:28 MR. ALDOCK: He's saying the applicability of this 16:56:30 data and 4 miles.
16:56:32 THE COURT: That's correct.
16:56:33 MR. ALDOCK: But we should also point out that, 16:56:35 because Dr. Mitchell came in so late, we had a stipulation of 16:56:39 the parties that said Dr. Dooley specifically, and Mr. Lemon, 16:56:42 would be able to comment on their reports.
16:56:46 THE COURT: But if that's the stipulation, that's the 16:56:48 stipulation.
16:56:49 MR. KHORRAMI: Well, Your Honor, my only issue is -- 16:56:52 I was fine with the witness, you know, peripherally going into 16:56:57 that area, but they went and got a radar guy, Mr. Lemon, who 16:57:02 responded to Dr. Mitchell. Dr. Dooley did not even consider 16:57:06 any of the data that would be relevant to deciding whether 16:57:10 there's a mesocyclone.
16:57:11 THE COURT: You can bring that out on 16:57:13 cross-examination.
16:57:14 I'm not sure what your question was before the 16:57:18 objection.
16:57:18 MR. ALDOCK: It was just a pretty simple one, Your 16:57:20 Honor. It just said are the observations at Lakefront 16:57:23 applicable at the IHNC.
16:57:25 THE COURT: I thought he already answered that, and 16:57:27 he said yes.

1875

BY MR. ALDOCK:

Q. Is there any reason not to apply the Lakefront airport data to the IHNC 4 miles away? Any whatsoever?

A. Not in my mind. They're very close. They're in this large-scale hurricane. The wind-flow patterns, the synoptic scale winds, are consistent. And the Lakefront data fits in well with the equations of motion and the Buys Ballot's law. So I think that the Lakefront data is solely representative of the type of directions and speeds that one would see at IHNC.

THE COURT: Let me ask you a question.

THE WITNESS: Yes, sir.

THE COURT: When wind was blowing at 90 degrees, according to this anemometer, at 3:36, would that -- based on all you've heard, would that show up as red on the Slidell radar normally? Assuming it was dealiased, and we're looking at the -- at the data as it should be.

THE WITNESS: I believe it would show up as red, and I think Mr. Lemon actually showed it as a darker-color red when he said that the wind had relaxed a bit and veered to 090. I think that's -- this is what he was talking about.

THE COURT: So if something is coming perpendicular to the radar, it will still show red. At what point does it show green, to your knowledge?

THE WITNESS: I'm not the radar guy, sir.

THE COURT: All right.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1876

BY MR. ALDOCK:

Q. Does the fact, Dr. Dooley, that the IHNC is water, which we know, and the Lakefront airport is land, does that make any difference?

A. Well, if you recall the location of the Lakefront, it's right there at the border boundary of Lake Pontchartrain. So it has a marine exposure -- largely a marine exposure. The IHNC down there towards Lafarge, I think Dr. Mitchell said that it too would have -- be free of constrictions there where the cutout was. So winds are -- the directions are fully representative, I believe, of what you would see at the IHNC.

Q. What are we looking at here?

A. What I've done is compared the wind speeds up at -- up at Lakefront. These are the red arrows, with the arrows at the IHNC. Remember before I mentioned these are arrows that fly with the wind. So this represents a wind generally from the northeast, and here is 10-, 20-, 30-, 40-knot winds. You can see a little half-a-knot wind right there. So that's 10-, 20-, 35-knot winds there. And over here you see a flag that's 50 and 55.

So the IHNC hindcast values are about 55 knots. And this covers the time period between 2:00 and 3:00. There's actually a series of wind barbs here. It's just that they're so close together. And remember, they're 30-minute averages. They're basically right on top.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1877

But, visually, you can see that the IHNC values compare very nicely with the Lakefront values. We both have northeasterly winds.

Q. As between the 30-minute average winds, Dr. Dooley, such as those on the hindcast, and an instantaneous record observation such as those from Lakefront, which is more important to the question of what would have happened in the IHNC?

A. Well, I think you have to look at them both and take Lakefront data into mind when you look at the hindcast values.

But, remember, I think this graphic here is a good illustration of the point: The hurricane is a well-organized system. It's not a random phenomena. It has this circular isobars that we looked at in the very second slide of my presentation -- of my testimony. It has circular isobars. Those isobars tell us what the wind pattern is going to be like.

When you look at it from the synoptic scale all the way down here to the -- what is generally, I would consider to be, a -- a -- not even a mesoscale, but a smaller scale, a microscale, a 2 1/2-kilometer size grid, you can see that, even in that size of a representation, you have a systematic representation of the wind pattern.

There are perturbations. We just saw them in the Lakefront data, granted. But in the large-scale flow, you're

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1878

going to have a systematic flow around the hurricanes. Not just systematic in -- at the sea surface; it is also with height. We have the same counterclockwise circulation around there.

Q. If the winds were totally chaotic, as Mr. Pazos would say, or had suggested some chaos as Dr. Mitchell might have implied, would they be reflected in the Lakefront airport data?

A. I believe they would be. Dr. Mitchell said that the process is random. He said that it happens like popcorn going off. Well, excuse me, but Lakefront is a location within the wind field. So if it's going to be a random phenomena that's going to occur at the IHNC, there's absolutely no reason why, in my mind, why it wouldn't also be a random phenomena at the Lakefront airport.

So when we look at the data, we don't see it happening. What we see are variations in the wind speed, wind direction, either side of this synoptic scale flow, but we don't see an omnidirectional pattern. What we see are updrafts; zones of convergence, which is what I believe caused that 90-degree direction that His Honor talked about before, that zone of convergence.

I see gust speeds at the Lakefront data, which could be downdrafts from a thunderstorm as it enters and adds energy to the boundary layer of wind; but I don't see any reversals of wind direction from west to east until the wind backs around

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

38 (Pages 1875 to 1878)

1879

17:04:35 later in the morning and comes out of the west.
17:04:39 Q. What does it show at Lakefront airport compared to the OWI
17:04:44 hindcast?
17:04:45 A. This shows the comparison between the time period of 03
17:04:48 and 0400, and there's the easterly wind that we talked about
17:04:52 before. You can see that it's a lull; in other words, a
17:04:57 decrease in speed.
17:04:58 Remember, Lake Pontchartrain is here, and here is
17:05:02 our -- our data from the hindcast. So you can see there's good
17:05:09 agreement this is still easterly, and that's probably induced
17:05:12 by some type of vertical motion in the atmosphere.
17:05:17 Q. What do we see at 5:30?
17:05:20 A. This is between 4:35 and 5:30. The reason I varied the
17:05:24 time interval here is to show some diversity in direction here
17:05:27 at Lakefront. And you can see that now, as we get closer to
17:05:32 5:30, the wind speeds are picking up here.
17:05:35 Now we have 65 knots and here we have 50 -- that's
17:05:40 not an 85-knot wind. It may look like 85 knots. That's a
17:05:45 couple of observations, one laid over the top. So there's like
17:05:49 a -- that's what that is. Okay.
17:05:52 But you can see the fit of the data. As I said
17:05:54 before, Lakefront is fully representative of the type of
17:05:57 conditions that I would expect at the IHNC at this time due to
17:06:07 Hurricane Katrina.
17:06:07 Q. So what happens between 5:30 and 6:15?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1880

17:06:10 A. Same thing. You see the winds. You see the winds in both
17:06:12 locations. The wind speeds have picked up here at IHNC -- at
17:06:20 the Lakefront and, likewise, in the hindcast.
17:06:23 Q. What happens here?
17:06:25 A. Here, this is between 5:30 and 6:00. You see 55 knots;
17:06:31 here you see around 70 knots.
17:06:34 Q. And here?
17:06:36 A. Same. Good fit between the two sources of data between
17:06:40 6:00 and 7:00.
17:06:41 Q. Here?
17:06:42 A. 7:00 to 8:00, again, Lakefront stopped transmitting at
17:06:46 6:53, and as it stopped transmitting, there's no more data. So
17:06:54 what I did here was add the date and time to each of these wind
17:06:57 barbs. So you can see this is at 7:00, 7:30, and 8:00. So you
17:07:02 can see that, between around 7:30 and 8:00, that's when it
17:07:06 passed from the eastern side to the western side of the IHNC.
17:07:09 Actually, it was a little earlier than 8:00. I found
17:07:13 between 7:30 and 7:45.
17:07:15 Q. So for completeness, what is it?
17:07:18 A. Between 8:00 and 9:00, you can see it backing around. It
17:07:23 just as Buys Ballot's law would dictate.
17:07:27 Q. And here?
17:07:27 A. Between 9:00 and 10:00, where it became almost broadside
17:07:32 to the IHNC but from the west.
17:07:37 Q. And what is that?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1881

17:07:39 A. This is a composite of all the observations, everywhere
17:07:42 from 00 all the way to 0700, so you can see the composite of
17:07:47 directions, and you can see the excellent fit. You can see
17:07:51 this type of anomaly, so that if there was some type of anomaly
17:07:55 that had occurred that may have turned a wind from the west to
17:07:58 the east, it would have popped up at Lakefront.
17:08:03 The examination tells us that that didn't happen.
17:08:05 And again, since it's a random phenomena, if it didn't happen
17:08:13 here, I don't see any reason why it would -- I don't see any
17:08:14 reason why it wouldn't happen here and not happen here. So I
17:08:17 think Lakefront is fully representative of the wind field in
17:08:20 the area for the morning of the 29th.
17:08:24 Q. Have you seen any information, Dr. Dooley, to indicate
17:08:28 that the winds in the IHNC could have been blowing in any other
17:08:31 direction from what you've described?
17:08:34 A. No, I haven't. All of my review of various different
17:08:39 reports on scientific studies of the synoptic scale wind
17:08:46 pattern, Dr. Mitchell did not disagree with my analysis of the
17:08:51 synoptic scale winds.
17:08:55 What's in the literature does not disagree. Whatever
17:09:00 I've reviewed, I think the track of Katrina, the theory, the
17:09:07 understanding of cyclonic wind fields, you have northeasterly
17:09:15 winds until they pass west of 015, and that happened at
17:09:23 sometime between 7:30 and 7:45 that morning.
17:09:28 Q. Did you consider the reports of people who purport to be

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1882

17:09:32 eyewitnesses to form your opinion?
17:09:35 A. That, of course, is important to do; but when I did my
17:09:38 initial report, I did not. I relied on the first-level data.
17:09:43 By "first-level data," I mean scientific data that
17:09:46 was verifiable, like the Lakefront data, like the hindcast
17:09:51 data, and like the principles of science that I explained
17:09:55 earlier.
17:09:55 Q. Have you since become familiar with the accounts that the
17:10:00 plaintiffs rely on of laymen for weather?
17:10:03 A. I have read some of the depositions, yes.
17:10:12 Q. Did you -- any of them change any of your views? Any of
17:10:17 the witness accounts change any of your views?
17:10:20 A. No.
17:10:20 Q. What about the reports of witnesses who say --
17:10:22 THE COURT: Wait, wait.
17:10:24 MR. KHORRAMI: I'm not going to object, but this is
17:10:25 beyond the scope of his report. He specifically testified that
17:10:28 he didn't consider witness accounts in coming up with his
17:10:32 conclusions, and now we're going beyond -- beyond what he
17:10:37 considered in coming up with his --
17:10:39 THE COURT: I realize the conclusions he has thus far
17:10:42 rendered have not been based on any eyewitness accounts.
17:10:46 MR. ALDOCK: Right. I'm just establishing, Your
17:10:48 Honor, that it doesn't change his opinion. That's the point of
17:10:50 it, nothing more.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

39 (Pages 1879 to 1882)

1883

17:10:51 THE COURT: Okay.
17:10:54 BY MR. ALDOCK:
17:10:54 Q. What about if there were, hypothetically, eyewitnesses who said the water was splashing over the IHNC water around 6:00 a.m., would that change anything?
17:11:05 A. It wouldn't change my calculations of winds.
17:11:08 Q. And what about water splash?
17:11:11 A. Well, water splashing can happen because of waves hitting the surface and the crest of the wave projecting upwards and depending upon the water level and how high that foam, that spray, may have gone.
17:11:27 Q. What about the fact that the events here at issue were taking place at ground level? Does the data analysis that you've relied on reflect winds at ground level?
17:11:37 A. The data that I looked at is the standard meteorological reference height of 10 meters, or 32 feet. So, in that sense, as you move closer to the surface, wind speeds decrease, naturally, because of the effect of -- increased effect of friction.
17:11:55 But I think one way to consider the hindcast values that we've looked at as very conservative values. By that, I mean upper limits. And I think if you compare the values at Lakefront, you see most of the numbers are less than the hindcast values because that anemometer is a little bit lower. It's actually at around 27 feet, or it was at the time. So you

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1884

17:12:24 see that little bit of a difference.
17:12:25 But the data that I think is in my report is fully representative of what you're going to find as the maximum conditions in that area at the time.
17:12:34 Q. Isn't there some kind of variability from the prevailing wind and the direction of the wind?
17:12:41 A. I'm sorry. I don't --
17:12:43 Q. Well, what about variability? What -- what duration does it have? What does it mean in the Lakefront data?
17:12:50 A. In the Lakefront data, it's represented, as we saw before, generally every 6 to 10 minutes, with that occasional gap of around 29 minutes. So what we see is that there are variations in the instantaneous wind value which do not show up in the MMS data because the MMS is a long-term average.
17:13:14 But when you compare the instantaneous values to the long-term average, you can discern variability of the wind, which, in this case, was always generally northeasterly, with some turn either slightly to the left or to the right of that northeast direction.
17:13:31 Q. But we have some structures around the canal, like the pump station and the bridges. What effect do those structures -- what effect will turbulence passing over these features have at all?
17:13:43 A. Well, in my opinion, they would have some effect in the immediate area of the building. But once the winds flow, once

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1885

17:13:48 the streamlines pass downwind of those surfaces, for example, here in this diagram, and the water and the wind got out here to this open water part of the IHNC, I think your streamlines, in other words, the flow patterns, would be back into a systematic method. And I believe I heard Dr. Mitchell say the same thing.
17:14:10 Q. Have you considered the possibility that there might have been a tornado in the IHNC?
17:14:15 A. Yes.
17:14:16 THE COURT: I don't think anybody's contending there was a tornado. Is that an undisputed fact? Is anybody claiming there was a tornado?
17:14:24 MR. KHORRAMI: Nobody's contending there was a tornado.
17:14:26 BY MR. ALDOCK:
17:14:27 Q. What about eddies or microbursts or mesocyclonic activity, have you given consideration to that?
17:14:34 A. Well, I did look at Dr. Mitchell's report, and I sat through his testimony. As I looked at the Lakefront data, these types of updrafts, which is a zone of convergence and downdrafts in these thunderstorms, which are what Dr. Mitchell's referring to as the microbursts, these types of downdrafts and updrafts, as I said, they will either produce a lull or a gust, a peak. And we see events like that in the ambient flow, instantaneous flow, measured by Lakefront.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1886

17:15:09 But it doesn't reverse the directions, and it doesn't change my analysis of the synoptic scale, large-scale flow, across the IHNC. You had northeasterlies blowing to the southwest.
17:15:20 Q. Have you looked at the opinions of Mr. Pazos, and what do you make of them?
17:15:23 A. Yes, I did.
17:15:26 Q. What wind speed is he using?
17:15:27 A. Well, this is a diagram that I include in my report from his report. Here at the bottom, you can see a couple of vectors that are drawn in here. One is labeled "Wind Force." And if this is the eastern floodwall, this would be a westerly wind -- wind force. And if this is the eastern floodwall, this would be a northerly wave. And I believe he's depicted that northerly wave here traveling away from the northern side towards the southern side of the IHNC.
17:16:05 I believe this is supposed to represent an event happening early in the morning. As my analysis showed, no such wind pattern existed at that time. And even if the wind had existed at the time, these types of waves would have produced motion on that barge to the south, not to the north.
17:16:29 Q. Do you recall Dr. Pazos relied on an IPET hypothetical in Appendix 17 of his report? Have you studied that?
17:16:37 A. I have looked at those calculations, yes, sir.
17:16:40 Q. And what do they show?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

40 (Pages 1883 to 1886)

1887

17:16:40 A As I recall, the IPET study said, "Well, for example," in
17:16:47 so many words, not exactly their words, but, basically, what
17:16:50 they were trying to do was to demonstrate how a theoretical
17:16:54 barge would move if subject to 100-mile-an-hour wind broadside
17:17:00 to it. My analysis showed there was no such wind coming from
17:17:05 the broadside to a barge tied up on the western side of the
17:17:10 IHNC.
17:17:11 That means the broadside would need a wind coming
17:17:15 from the direction of 285, and a 100-mile-an-hour wind did not
17:17:21 exist from the direction of the 285. In fact, the
17:17:26 100-mile-an-hour wind may have existed in gusts. That was in a
17:17:33 3- to 5-second gust, but no long-term sustained wind existed
17:17:39 from 285. It didn't happen.
17:17:42 Q. This is Dr. Marino's diagram from his report. Did he make
17:17:44 the same mistake?
17:17:45 A. Here, this is a table from his report. He also referred
17:17:48 to 100-mile-an-hour wind impacting it broadside. Again, that
17:17:57 wind did not exist.
17:18:05 Q. Dr. Dooley, you told us that, after 7:45 a.m., the winds
17:18:08 would have passed from the eastern side to the western side of
17:18:11 the IHNC. Were they dominantly westerly at that time?
17:18:16 A. No. You have to remember what happens. After 7:45 in the
17:18:20 morning, the winds are now coming this way, as I point with the
17:18:24 pointer, from the north straight to the south.
17:18:26 So they still -- after 7:45, they still have a

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1888

17:18:31 largely northerly-to-south component. So they're moving it
17:18:37 away from the northern breach up here and moving the --
17:18:39 whatever is there would have to be blowing down towards the
17:18:43 south end of the IHNC.
17:18:45 It's not until about after 9:00 that that northerly
17:18:50 component then passes by a direction of around 3:30 or so, and
17:18:56 you begin to get a -- a more westerly than northerly component
17:19:02 to the wind. So it's not until -- I think that happened at
17:19:06 around -- sometime around 9:30 to 10:00 or so.
17:19:10 Q. My concluding question, Dr. Dooley: Have you seen
17:19:14 anything or heard anything in this courtroom or in any of the
17:19:17 reports that you've read to suggest that the wind directions of
17:19:20 the IHNC were other than as you have testified today?
17:19:23 A. No, I have not.
17:19:25 MR. ALDOCK: I tender the witness, Your Honor.
17:19:27 THE COURT: Thank you, counsel. Based on the time of
17:19:29 the day, I think we should -- unless there's greatly exigent
17:19:34 circumstances, commence cross at 9:00 a.m.
17:19:38 MR. ALDOCK: Your Honor, could we move in the Lemon
17:19:40 PowerPoints that were used here?
17:19:42 THE COURT: Yes. And the exhibit number?
17:19:44 MR. ALDOCK: The PowerPoints are -- the exhibit
17:19:45 numbers or the PowerPoint numbers?
17:19:54 THE COURT: If we're moving them in, you have to
17:19:57 label them as something.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1889

17:20:11 MR. ALDOCK: 346 for Mr. Lemon's and 347 for
17:20:14 Dr. Dooley's.
17:20:16 THE COURT: Thank you, sir. Let them be admitted.
17:20:18 MR. KHORRAMI: And they'll be admitted as
17:20:20 demonstratives, not as evidence?
17:20:23 THE COURT: Yes.
17:20:24 Sir, you may step down, and we are in recess
17:20:27 until tomorrow.
17:20:29 I do want to take this opportunity to
17:20:31 congratulate all of you on your professional demeanor
17:20:34 throughout this trial. It makes it -- this is difficult for
17:20:38 all of us. It makes it a lot easier on the Court, and I
17:20:42 appreciate it very much. It's not always this way.
17:20:43 MR. ALDOCK: Thank you, Your Honor.
17:20:43 MR. GILBERT: Thank you, Your Honor.
17:20:46 THE DEPUTY CLERK: All rise.
17:20:47 (WHEREUPON, the proceedings were concluded.)

*****

CERTIFICATE

I, Jodi Simcox, RMR, FCRR, Official Court Reporter for the United States District Court, Eastern District of Louisiana, do hereby certify that the foregoing is a true and correct transcript, to the best of my ability and understanding, from the record of the proceedings in the above-entitled and numbered matter.

S/ Jodi Simcox, RMR, FCRR
Jodi Simcox, RMR, FCRR
Official Court Reporter

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF L

41 (Pages 1887 to 1889)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

*****************************************************************

IN RE: KATRINA CANAL BREACHES CONSOLIDATED LITIGATION

CIVIL ACTION NO. 05-4182
SECTION "K" (2)
NEW ORLEANS, LOUISIANA
FRIDAY, JULY 2, 2010, 9:00 A.M.

PERTAINS TO BARGE

MUMFORD C.A. NO. 05-5724
AS TO CLAIMS OF PLAINTIFFS JOSEPHINE RICHARDSON AND HOLIDAY JEWELERS, INC., ONLY

BENOIT C.A. NO. 06-7516
AS TO CLAIMS OF PLAINTIFFS JOHN ALFORD AND JERRY ALFORD ONLY

*****************************************************************

DAY 9, MORNING SESSION
TRANSCRIPT OF NONJURY TRIAL PROCEEDINGS
HEARD BEFORE THE HONORABLE STANWOOD R. DUVAL, JR.
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFFS: BEST KOEPPEL TRAYLOR
BY: LAURENCE E. BEST, ESQUIRE
2030 ST. CHARLES AVENUE
NEW ORLEANS LA 70130

APPEARANCES CONTINUED:

LAW OFFICES OF BRIAN A. GILBERT
BY: BRIAN A. GILBERT, ESQUIRE
2030 ST. CHARLES AVENUE
NEW ORLEANS LA 70130

KHORRAMI POLLARD ABIR
BY: SHAWN KHORRAMI, ESQUIRE
44 FLOWER STREET, 33RD FLOOR
LOS ANGELES CA 90071

WILSON GROCHOW DRUKER & NOLET
BY: LAWRENCE A. WILSON, ESQUIRE
223 BROADWAY, 5TH FLOOR
NEW YORK NY 10279

WIEDEMANN & WIEDEMANN
BY: LAWRENCE D. WIEDEMANN, ESQUIRE
KARL WIEDEMANN, ESQUIRE
821 BARONNE STREET
NEW ORLEANS LA 70113

PATRICK J. SANDERS
ATTORNEY AT LAW
3316 RIDGELAKE DRIVE
SUITE 100
METAIRIE LA 70002

LAW OFFICE OF RICHARD T. SEYMOUR
BY: RICHARD T. SEYMOUR, ESQUIRE
1150 CONNECTICUT AVENUE N.W.
SUITE 900
WASHINGTON DC 20036

FOR THE DEFENDANT: CHAFFE MCCALL
BY: DEREK A. WALKER, ESQUIRE
2300 ENERGY CENTRE
1100 POYDRAS STREET
NEW ORLEANS LA 70163

APPEARANCES CONTINUED:

GOODWIN PROCTER
BY: JOHN D. ALDOCK, ESQUIRE
MARK S. RAFFMAN, ESQUIRE
ADAM M. CHUD, ESQUIRE
KIRSTEN V. K. ROBBINS, ESQUIRE
ERIC I. GOLDBERG, ESQUIRE
901 NEW YORK AVENUE N. W.
WASHINGTON DC 20001

SUTTERFIELD & WEBB
BY: DANIEL A. WEBB, ESQUIRE
650 POYDRAS STREET, SUITE 2715
NEW ORLEANS LA 70130

LAFARGE NORTH AMERICA, INC.
BY: PETER KEELEY, ESQUIRE
12950 WORLDGATE DRIVE
HERNDON VA 20170

OFFICIAL COURT REPORTER: CATHY PEPPER, CCR, RMR, CRR
500 POYDRAS STREET, ROOM B406
NEW ORLEANS, LOUISIANA 70130
(504) 589-7779

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY. TRANSCRIPT PRODUCED BY COMPUTER.

I N D E X

EXAMINATIONS PAGE

AUSTIN L. DOOLEY, PH.D. (CONTINUED)....................1894
CROSS-EXAMINATION BY MR. KHORRAMI......................1896
JAMES R. HALL.........................................1935
DIRECT EXAMINATION BY MR. WALKER.......................1935
CROSS-EXAMINATION BY MR. SANDERS.......................1967
REDIRECT EXAMINATION BY MR. WALKER.....................1987
RICHARD RIESS, JR......................................1995
DIRECT EXAMINATION BY MR. WALKER.......................1996
CROSS-EXAMINATION BY MR. GILBERT.......................2005
REDIRECT EXAMINATION BY MR. WALKER.....................2016
RECROSS-EXAMINATION BY MR. GILBERT.....................2020

E X H I B I T S

DESCRIPTION PAGE

EXHIBIT NO. DX348 WAS ADMITTED INTO EVIDENCE...........1967

P-R-O-C-E-E-D-I-N-G-S

FRIDAY, JULY 2, 2010

M O R N I N G S E S S I O N

(COURT CALLED TO ORDER)

THE DEPUTY CLERK: ALL RISE. COURT IS IN SESSION. PLEASE BE SEATED.

THE COURT: GOOD MORNING. BEFORE YOU START, AS I WAS RUMINATING THIS MORNING, I THOUGHT ABOUT A QUESTION I SHOULD HAVE ASKED MR. LEMON. AND DR. DOOLEY MAY OR MAY NOT BE FAMILIAR WITH IT. AND DON'T BE TOO ALARMED BECAUSE IT DOESN'T RELATE TO AN OPINION SO MUCH AS ME UNDERSTANDING THE FUNCTION OF THE DOPPLER RADAR.

SO I'LL ASK YOU A QUESTION. AND IT REALLY WASN'T PART OF YOUR TESTIMONY, BUT I WANT TO GET SOMETHING IN THE RECORD, IF POSSIBLE. ONLY IF YOU KNOW IT, OF COURSE.

THE WITNESS: YES, SIR.

THE COURT: I UNDERSTAND THAT A FUNCTION OF THE RADAR IS THAT AFTER 64 NAUTICAL MILES OF WHAT COULD BE, IN ESSENCE, GOING AWAY FROM THE RADAR, RED, MAY APPEAR GREEN.

THE WITNESS: YES, SIR. IT'S FOLDED AT THAT POINT.

THE COURT: EXACTLY. MY QUESTION WAS IN REFERENCE THE SLIDELL RADAR. IS THERE ALSO A DEGREE COMPONENT TO THAT, THAT IS, 90, 180? IS IT SIMPLY NAUTICAL MILES, A CIRCLE OF 60 -- OR,

EXCUSE ME, LOOKING FROM THE RADAR, 64 NAUTICAL MILES OR IS THERE ANY DEGREE COMPONENT TO IT? LIKE DOES IT CHANGE AT 180 OR --

THE WITNESS: THE RADAR IS THE CENTER OF THE COMPASS. SO IF IT'S RED, IT'S BLOWING AWAY FROM CENTER OF THE COMPASS AND IF IT'S GREEN, IT'S BLOWING TOWARD THE CENTER OF THE COMPASS FROM THOSE COMPASS DIRECTIONS.

THE COURT: IS THERE A CERTAIN DEGREE, BASED ON THE LOCATION OF THE RADAR, WHERE IT WOULD BE GREEN AS WELL, EVEN THOUGH IT WASN'T 64 NAUTICAL MILES? IN OTHER WORDS --

THE WITNESS: IF THERE WAS GREEN INSIDE THE 64 MILE, THE MAXIMUM UNAMBIGUOUS RANGE?

THE COURT: RIGHT.

THE WITNESS: IF THERE WAS A RETURN ECHO THAT WAS GOING TOWARDS THE RADAR INSIDE THAT, YOU WOULD SEE GREEN.

THE COURT: BUT THERE IS NO DEGREE FUNCTION. IN OTHER WORDS, THERE IS NO LIMITATION. ARE WE TALKING ABOUT 360 DEGREES OR ONLY 180 DEGREES?

THE WITNESS: WELL, I'M THINKING OF THE COMPASS, SO SOME OF THAT WOULD BE COMING TOWARDS THE RADAR AND SOME OF IT WOULD BE GOING AWAY FROM THE RADAR. SO WHATEVER IS COMING TOWARDS WOULD BE MEASURED -- WOULD BE IN THE GREEN, AND WHATEVER IS GOING AWAY WOULD BE IN THE RED.

THE COURT: ARE WE TALKING ABOUT, THOUGH, WHEN WE LOOK AT THE RADAR IMAGE, 360 DEGREES?

THE WITNESS: YES, SIR.

THE COURT: IF IT'S ON THE -- IT'S WHATEVER WAY THE RADAR IS FACING, THEN, THE RADAR IS TURNING, CORRECT?

THE WITNESS: YES, SIR.

THE COURT: SO WHY IS THE RADAR IMAGES -- WHEN WE SAY "GOING AWAY FROM THE RADAR," TELL ME WHAT THAT MEANS EXACTLY. GOING TOWARDS THE RADAR. IS THAT THE RADAR STATION, ITSELF?

THE WITNESS: YES, SIR.

THE COURT: I GOT YOU. AND BECAUSE MR. LEMON HAD SAID SOMETHING ABOUT 180 DEGREES -- AND I'M NOT GOING TO ASK YOU, COUNSEL. RIGHT NOW, I'M ASKING THE WITNESS AND THEN YOU CAN ANSWER IN BRIEFING OR ANYTHING YOU FIND IF YOU WANT TO TALK ABOUT IT.

DO YOU KNOW THE NAUTICAL MILE DISTANCE BETWEEN SLIDELL AND THE IHNC?

THE WITNESS: I DON'T KNOW THE EXACT DISTANCE. I BELIEVE IT'S SOMETHING LIKE 30 TO 35 MILES. I'M NOT SURE, SIR.

THE COURT: THAT'S ALL I HAVE. THANK YOU.

MR. KHORRAMI: I THINK MAYBE THE COURT WAS INQUIRING AS TO WHETHER THERE WAS ESSENTIALLY ALIASING AS TO ANGLES AS WELL AS TO SPEED.

THE COURT: YOU COULD CERTAINLY PURSUE THAT IF YOU WISH.

MR. KHORRAMI: I WASN'T PLANNING ON IT, YOUR HONOR.

CROSS-EXAMINATION

BY MR. KHORRAMI:

Q. GOOD MORNING, DR. DOOLEY.

A. GOOD MORNING, SIR.

Q. WHAT I WANTED TO BEGIN TALKING TO YOU ABOUT IS THE LAKEFRONT AIRPORT INFORMATION. FAIR ENOUGH?

A. YES.

Q. AND I'M GOING TO DISPLAY FOR YOU FROM YOUR SLIDE PRESENTATION THAT INFORMATION, STARTING ABOUT 3:00 A.M.

DO YOU SEE THAT UP THERE ON THE SCREEN?

A. YES, SIR.

Q. AND SPECIFICALLY, THE COURT INQUIRED ABOUT THIS, BUT THERE IS A FAIR AMOUNT OF VARIATION IN THOSE WIND DIRECTIONS. WOULD YOU AGREE WITH ME?

A. THERE IS SOME VARIATION, YES, SIR.

Q. AND THEY RANGE ANYWHERE FROM ABOUT 20 TO ABOUT 90; IS THAT CORRECT?

A. THAT IS CORRECT, SIR.

Q. AND IF WE LOOK AT YOUR SCALE, THOSE BASICALLY WOULD MEAN SOMEWHERE AROUND NORTH-NORTHEASTERLY WINDS TO EASTERLY WINDS, CORRECT?

A. YES, SIR.

Q. AND THIS IS SOMETHING THAT CAME UP AGAIN YESTERDAY, THERE IS A GREAT DEGREE OF VARIATION AS TO THE REPORTING TIMES, CORRECT?

A. THAT IS CORRECT.

Q. YESTERDAY YOU TESTIFIED THAT THE ANEMOMETER AT LAKEFRONT AIRPORT TAKES INFORMATION -- RECORDS INFORMATION EVERY FIVE SECONDS; IS THAT CORRECT?

A. THAT'S CORRECT.

Q. AND THEN AVERAGES OUT THAT INFORMATION EVERY TWO MINUTES; IS THAT CORRECT?

A. THAT'S CORRECT.

Q. SO IT TAKES 24 READINGS, AVERAGES THEM OUT, AND PUTS OUT INFORMATION EVERY TWO MINUTES, CORRECT?

A. IT ACTUALLY PUTS OUT INFORMATION EVERY ONE MINUTE, BUT IT PUTS OUT A TWO-MINUTE AVERAGE.

Q. IT PUTS OUT A TWO-MINUTE AVERAGE EVERY MINUTE, CORRECT?

A. YES, SIR.

Q. NOW, WHAT I NOTICED IS THAT THE TIME INTERVALS ARE SOMEWHERE BETWEEN AS LITTLE AS FIVE MINUTES TO AS MUCH AS, I BELIEVE, TWO HOURS AT SOME POINT IT ENDED UP BEING, BUT LET'S JUST GO OFF YOUR CHART OVER HERE. WE HAVE AS MUCH AS ABOUT 30 MINUTES; IS THAT FAIR?

A. YES, THERE WAS A 30-MINUTE PERIOD THAT HIS HONOR SAW YESTERDAY.

Q. AND THAT WAS BETWEEN 4:00 AND 4:29, THAT'S 29 MINUTES THERE, CORRECT?

A. CORRECT.

Q. AND THERE IS ANOTHER ONE BETWEEN 5:03 AND 5:29, THAT'S 26 MINUTES THERE, CORRECT?

A. THAT IS CORRECT.

Q. AND WE HAVE 14 MINUTES BETWEEN 6:05 AND 6:19, CORRECT?

A. CORRECT.

1899

Q. NOW, IS IT YOUR UNDERSTANDING THAT, FOR EXAMPLE, WE'LL TAKE THE 4:29 TIME, IS THE RADAR REPORTING FOR THE TWO MINUTES BEFORE 4:29?
A. IT COLLECTS A FIVE-SECOND AVERAGE ON A RUNNING TWO-MINUTE BASIS, SO WHEN IT OBSERVES AT 4:53, FOR EXAMPLE, IT HAS OBSERVED FOR THE LAST TWO MINUTES. BUT THE GUST IS A 10-MINUTE GUST.
Q. FAIR ENOUGH. SO AT 4:29 WHEN IT REPORTS BACK, IT'S REPORTING BACK INFORMATION FROM 4:27 TO 4:29, RIGHT?
A. YES, SIR.
Q. AND IT'S NOT REPORTING BACK INFORMATION FROM 4 O'CLOCK UNTIL 4:27, CORRECT?
A. WELL, IT'S THE ABSENCE OF THAT REPORT, BECAUSE MOST OF THESE OBSERVATIONS ARE WHAT'S CALLED "SPECIAL REPORTS". SO THE ABSENCE OF THE SPECIAL REPORT MEANS THAT THERE IS NOTHING SPECIAL FOR IT TO REPORT. THE REGULAR REPORTS, THEY ARE CALLED THE METARS, M-E-T-A-R, THEY COME OUT ON AN HOURLY BASIS.
Q. BETWEEN 3:53 AND 4 O'CLOCK, WAS THERE ANYTHING SPECIAL FOR IT TO REPORT?
A. NO, SIR.
Q. BUT IT REPORTED ANYWAY, CORRECT?
A. 4 O'CLOCK IS THE METAR, THE REGULAR REPORT.
THE COURT: YOU MIGHT HAVE ASKED HIM BETWEEN 3:43 AND 3:46, WAS THERE ANYTHING SPECIAL TO REPORT?
THE WITNESS: NO, SIR.
EXAMINATION

1900

BY MR. KHORRAMI:
Q. AND IT REPORTED ANYWAY, CORRECT?
THE 3:43 REPORTED, AND THEN IT REPORTED 3:46, AND THERE WAS NOTHING SPECIAL TO REPORT, CORRECT?
A. IT MADE A REPORT AT 3:46. THAT WAS A SPECIAL REPORT, YES, SIR.
Q. BUT THERE WAS NOTHING SPECIAL TO REPORT, CORRECT? THERE IS NOTHING REMARKABLE ABOUT IT, CORRECT?
A. WELL, WHEN WE COMPARE IT TO THE OTHER OBSERVATIONS, THERE IS NOTHING REMARKABLE.
Q. CORRECT.
A. IT'S THE SAME.
Q. OKAY. SO AT 4:29, IT'S REPORTING, AND THERE IS NOTHING SPECIAL FOR IT TO REPORT BETWEEN 4:29 AND 4:27, CORRECT?
A. THERE IS NOTHING THAT TRIGGERED THE SPECIAL REPORT. THIS WOULD BE A TRIGGERING MECHANISM.
Q. SO AT 4:37, THERE WAS NOTHING SPECIAL FOR IT TO REPORT VIS-À-VIS 4:29, CORRECT?
A. WELL, IT MADE A REPORT AT 4:29, AND THAT IS A SPECIAL REPORT OF SOME TYPE. SOMETHING TRIGGERED THAT REPORT.
THE COURT: I GUESS YOU NEED TO ASK HIM WHAT MAKES IT SO SPECIAL.
EXAMINATION
BY MR. KHORRAMI:
Q. WHAT MAKES IT SO SPECIAL, DOCTOR?

1901

A. THERE ARE SEVERAL DIFFERENT PARAMETERS THAT IT LOOKS AT. AND IT'S NOT IMMEDIATELY CLEAR FROM THIS SET OF DATA WHAT THOSE PARAMETERS ARE.
Q. OKAY. SO BASICALLY, IT'S REPORTING BACK -- AT 4:37 WHEN IT REPORTS BACK, IT'S TAKEN TWO MINUTES OF INFORMATION AND IT'S REPORTING BACK FROM 4:35 UNTIL 4:37, AND IT'S REPORTING BACK THAT TWO MINUTES OF INFORMATION ABOUT WIND DATA, CORRECT?
A. EXCEPT FOR THE GUSTS WHICH IS A 10-MINUTE.
Q. FINE. BUT AS TO THE REST OF THE WIND DATA, IT'S FOR THOSE PREVIOUS TWO MINUTES, CORRECT?
A. CORRECT.
Q. AND AT 4:29 WHEN IT REPORTS, IT'S REPORTING BACK WIND DATA, EXCEPT FOR THE GUSTS, WE'LL LEAVE THAT OUT, BETWEEN 4:27 AND 4:29, CORRECT?
A. CORRECT.
Q. THERE IS NO DATA THAT THIS PARTICULAR ANEMOMETER IS REPORTING BETWEEN 4 O'CLOCK AND 4:27, CORRECT?
A. NO. THAT'S NOT CORRECT. IT'S NOT ON THIS SET OF DATA, BUT THERE IS ANOTHER VALUE THAT'S REPORTED THAT IS NOT CONTAINED IN THIS SET OF DATA THAT I OBTAINED FROM NCDC. THERE IS A VALUE CALLED "PEAK WIND", AND PEAK WIND IS EXACTLY THAT, THE PEAK WIND SINCE THE LAST NORMAL OR REGULAR REPORT. BUT IT'S NOT CONTAINED IN THIS DATA.
Q. AS SO WHAT YOU SUBMITTED AS PART OF YOUR REPORT TO THIS COURT AS EVIDENCE, THAT'S NOT CONTAINED IN YOUR REPORT, CORRECT?

1902

A. THAT IS CORRECT.
Q. IT'S NOT PART OF THE EVIDENCE IN THIS CASE, CORRECT?
A. IT'S NOT CONTAINED HERE.
Q. AND IT'S NOT PART OF YOUR OPINIONS IN THIS CASE, CORRECT?
A. WHEN I MADE THIS REPORT, I DID NOT LOOK AT THOSE PEAK WINDS.
Q. SO IF THERE WAS AN EVENT THAT WOULD HAPPEN -- LET'S GO ABOUT IT THIS WAY: WOULD YOU AGREE WITH ME THAT MICROBURSTS ARE EVENTS THAT OCCUR IN 10 MINUTES OR LESS?
A. MICROBURSTS WOULD BE ACTUALLY AT A MUCH SHORTER TIME SCALE THAN THAT.
Q. IF MR. LEMON SAID MICROBURSTS TAKE ABOUT 10 MINUTES, WOULD YOU TAKE HIS WORD FOR IT?
A. YES, I WOULD.
Q. OKAY. DO I NEED TO SHOW YOU IN HIS DEPOSITION TESTIMONY WHERE HE SAID IT WAS 10 MINUTES? WOULD YOU ACCEPT THAT?
A. I WILL ACCEPT THAT.
Q. OKAY. SO IF AT 4:01, A MICROBURST OCCURRED OR A DOWNDRAFT OCCURRED FOR A PERIOD OF 10 MINUTES, THAT WOULD NOT BE SOMETHING THAT'S REPORTED AT 4:29, CORRECT?
A. AT 4:29, YOU WOULD SEE -- WELL, CAN I ASK YOU ABOUT YOUR HYPOTHETICAL? IS THERE A CHANGE IN WIND DIRECTION WITH THAT MICROBURST OR IS THERE SIMPLY A CHANGE IN WIND SPEED?
THE COURT: YOU MIGHT WANT TO MAKE THAT PART OF YOUR HYPOTHETICAL.
MR. KHORRAMI: I WILL DO SO.

1903

EXAMINATION

BY MR. KHORRAMI:

Q. IMAGINE A DOWNBURST -- MICROBURST THAT SPREADS OUT WHEN IT HITS THE GROUND AND IT HAS WIND THAT GOES IN ALL DIRECTIONS. AT 4:29 -- IF IT HAPPENED BETWEEN 4:01 AND 4:11, AT 4:29, THAT WOULD NOT BE SOMETHING THAT WE WORKED INTO THE ANEMOMETER'S AVERAGING, CORRECT?

A. A COUPLE POINTS TO YOUR QUESTION: IF THE DOWNBURST -- OR THE DOWNDRAFT, AS IT HITS THE SURFACE, CHANGED THE DIRECTION OF THE WIND, I WOULD EXPECT TO SEE THAT IN THE SPECIAL REPORT. IF IT CHANGED THE MAGNITUDE OF THE WIND, STILL MAINTAINING THE DIRECTION, I'D EXPECT TO SEE A REFERENCE TO THAT IN THE WIND GUSTS. SO WE WOULD SEE A MUCH LARGER WIND GUST.

SO I BELIEVE IF THERE WAS A REVERSAL IN WIND DIRECTION, WE WOULD SEE THAT HERE, JUST AS WE SEE THE 090 VALUE UP AT 3:36, WE WOULD CHANGE 60 DEGREES.

Q. WOULD YOU AGREE WITH ME THAT ON MANY OF THESE SPECIAL REPORTS, THERE IS NOTHING ON YOUR REPORTS -- OR IN THE REPORT THAT YOU'RE SUBMITTING TO THIS COURT THAT IS A SIGNIFICANT CHANGE FROM ONE REPORTING POINT TO ANOTHER, CORRECT?

A. THERE IS NO SIGNIFICANT CHANGE EXCEPT FOR THE 090 REPORT WIND DIRECTION.

THE COURT: IS THE INFORMATION, WHICH WOULD BE AVAILABLE IN -- THIS IS A SUMMARY YOU DID, CORRECT, OF YOUR INFORMATION?

THE WITNESS: THIS IS DATA THAT -- THERE'S TWO DIFFERENT

1904

WAYS THAT DATA FROM THE AIRPORT CAN BE OBTAINED, ONE IN THIS FORMAT, SO ALL I DID HERE WAS JUST COPY THAT AND PASTE IT INTO THE REPORT.

THE COURT: RIGHT.

THE WITNESS: AND THE OTHER IS THE METAR DATA, WHICH IS THE RAW DATA, BUT THIS IS THE PROCESS. THIS IS THE DATA AS PRESENTED BY NCDC.

THE COURT: IF ONE EXAMINED THE RAW DATA, IS IT CONCEIVABLE THAT ONE COULD THEN MAYBE ASCERTAIN WHY A SPECIAL REPORT WAS GENERATED, EVEN THOUGH THERE SEEMS TO BE NOTHING SIGNIFICANT CHANGING BETWEEN, LET'S SAY, 4:00 AND 5:00, BUT YET THERE ARE A NUMBER OF SPECIAL REPORTS? WOULD THE RAW DATA HAVE MAYBE GIVEN AN INDICATION AS TO WHY THE DEVICE TRIGGERED A SPECIAL REPORT?

THE WITNESS: USUALLY THE SPECIAL REPORT HAPPENS WHEN THERE IS SOME NOTEWORTHY CHANGE IN THE WEATHER CONDITIONS. THE DATA IS ACTUALLY COLLECTED ON A TWO-MINUTE -- EVERY MINUTE BASIS SO THAT DATA IS FED LIVE. THE OPERATORS PROBABLY SET SOME THRESHOLD VALUES FOR WHEN A SPECIAL REPORT MUST BE SET. PROBABLY HAS SOMETHING TO DO WITH THE DIRECTION AND THE SPEED OF THE WIND, I WOULD THINK, IN A SITUATION LIKE THIS.

THE COURT: WHEN I USE THE EXAMPLE, AT 3:43, THE WIND DIRECTION IS 30 DEGREES, THE WIND SPEED WAS 51, AND THE WIND GUSTS 60; AT 3:46, WIND DIRECTION, 30 DEGREES; WIND SPEED 52, WITH WIND GUSTS 70; IS IT CONCEIVABLE THAT THE WIND GUSTS WOULD

1905

THEN, IN THREE MINUTES, TRIGGER A SPECIAL REPORT?

THE WITNESS: YES.

THE COURT: IN THAT THREE MINUTES?

THE WITNESS: YES, SIR. IF YOU LOOK ALL THE WAY IN THE RIGHT-HAND MOST COLUMN, UNDERNEATH THE LAST WW, YOU'LL SEE THE 18.

THE COURT: YES, I DO.

THE WITNESS: THAT 18 IS A REPORT ON WHAT'S CALLED THE "PRESENT WEATHER". YOU'LL NOTICE THAT THERE IS THREE PRESENT WEATHER COLUMNS. 65 AND 61 IS RAIN, 44 IS FOG, 10 IS A MIST, AND 18 IS SQUALL.

SO WHAT HAPPENED BETWEEN 3:43 AND 3:46 IS THAT THERE WAS A SQUALL EVENT, AND A SQUALL EVENT IS AN INCREASE IN WIND SPEED OF AT LEAST 16 KNOTS ABOVE THE -- FOR A CERTAIN PERIOD OF TIME OVER THE LAST 10 MINUTES. SO WHAT THE AUTOMATIC REPORTING STATION SAW HERE WAS THE THRESHOLD VALUES THAT KICKED IN AND REPORTED A SQUALL LINE -- A SQUALL EVENT, WHICH WOULD MEAN A SHARP INCREASE IN WIND SPEED DURING THAT TIME FRAME.

EXAMINATION

BY MR. KHORRAMI:

Q. WHAT'S THE RELATIONSHIP BETWEEN SQUALLS AND SUPERCELLS?

A. WELL, A SUPERCELL, AS WE'VE HEARD, IS A LARGE-SCALE SYSTEM. IT HAS UPDRAFTS AND DOWNDRAFTS. WHEN THOSE DOWNDRAFTS REACH THE SURFACE, THOSE DOWNDRAFTS WILL COMBINE WITH THE PREEXISTING WIND CONDITION AND PRODUCE GUSTS, AND IF THOSE CONDITIONS PERSIST LONG

1906

ENOUGH AND HIGH ENOUGH, IT WILL BECOME -- IT WILL BE REPORTED AS A SQUALL, S-Q-U-A-L-L.

Q. A MOMENT AGO WHEN I ASKED WHETHER THERE WAS ANYTHING SPECIAL ABOUT THE ENTRIES IN HERE, YOU SAID THERE WAS NOTHING SPECIAL WITH EACH REPORT, CORRECT? YOU SAW NOTHING REMARKABLE. THAT WAS YOUR TESTIMONY, CORRECT?

A. WELL, I WAS FOCUSING ON THE WIND DIRECTION TIME, AND THEN WHEN HIS HONOR ASKED ME ABOUT THOSE PARTICULAR TWO OBSERVATIONS, THE 3:43 AND THE 3:46, I SCANNED ACROSS THE TABLE.

Q. MY QUESTION WAS NOT LIMITED TO ANY WIND DIRECTION, SPEED OR ANYTHING ELSE ON ANY OTHER COLUMNS, CORRECT?

A. WELL, WHEN WE SAID ANYTHING SIGNIFICANT, I WAS FOCUSING ON WIND DIRECTION, SIR.

Q. NOW, YOU DIDN'T HAVE A CHANCE TO LOOK AT THE UNDERLYING DATA FROM LAKEFRONT AIRPORT, CORRECT?

A. THE RAW METARS?

Q. THE RAW METARS.

A. I THINK I SAID BEFORE THAT I DIDN'T.

Q. YOU DIDN'T.

A. THAT I DID NOT LOOK AT THEM AT THE TIME I PREPARED THIS REPORT.

Q. AND YOU DIDN'T INCLUDE THEM IN YOUR REPORT, CORRECT?

A. YES, SIR, YOU ASKED ME THAT.

Q. AND IN FACT, WHAT YOU REPORTED WAS SOMETHING THAT'S PUBLICLY AVAILABLE ON THE INTERNET, CORRECT?

1907

A. WELL, THEY ARE BOTH PUBLICLY AVAILABLE. BUT I USED THIS SET OF DATA.
Q. YOU CHOSE NOT TO USE THE RAW DATA?
A. BECAUSE THIS WAS IN AN EASIER FORMAT.
Q. AND YOU CHOSE NOT TO DO YOUR OWN CALCULATIONS, CORRECT?
A. WELL, WITH THE METAR, YOU KNOW, I DON'T DO ANY CALCULATIONS, I WOULD JUST PRESENT THE DATA.
Q. YOU CHOSE NOT TO HAVE DATA FROM 4:15 AVAILABLE TO THIS COURT, CORRECT?
A. IN THE METARS, THERE WAS -- I CHECKED THE METAR DATA, IN FACT, AND THERE WAS NO REPORT BETWEEN 4:00 AND 4:29.
Q. NOW, YESTERDAY, YOU TESTIFIED ABOUT HOW DIFFERENT WINDS WOULD ESSENTIALLY GET CANCELED OUT TO THE EXTENT THEY ARE AGAINST THE SYNOPTIC PATTERN, CORRECT?
A. YES, SIR.
Q. AND, IN FACT, WHAT YOU WERE LOOKING AT -- WHEN WE'RE TALKING ABOUT THE SYNOPTIC PATTERN, WE'RE TALKING ABOUT THE PREVAILING WINDS, CORRECT?
A. YES, SIR.
Q. WE'RE NOT TALKING ABOUT LOCAL WINDS, CORRECT?
A. WELL, I THINK WHAT I SAID WAS THAT IN ORDER TO GET A FULL UNDERSTANDING OF THE WIND PATTERN IN THE AREA, YOU MUST LOOK AT THE SYNOPTIC SCALE PATTERN AND FIT THAT IN WITH THE LOCAL DATA, WHICH IS ULTIMATELY WHAT I DID BY USING THE LAKEFRONT DATA. SO I LOOKED AT BOTH.

1908

Q. DR. DOOLEY, WOULD YOU AGREE WITH ME THAT LOCAL WINDS MAY BE DIFFERENT THAN SYNOPTIC WINDS, CORRECT?
A. HOW DO YOU MEAN "DIFFERENT"?
Q. THEY MAY BE DIFFERENT IN DIRECTION, THEY MAY BE DIFFERENT IN SPEED, CORRECT?
A. WELL, AS THE SYNOPTIC SCALE PATTERN IS WHAT IT IS AND THIS IS THE LOCAL WINDS, AND I THINK I DEMONSTRATED CLEARLY THAT THERE IS A CONSISTENCY BETWEEN THE LAKEFRONT DATA AND THE MODEL DATA THAT WE LOOKED AT. SO IF YOU'RE LOOKING AT AN INSTANCE IN TIME, YOU'RE GOING TO SEE A DIFFERENCE IN THE LOCAL WIND COMPARED TO THE MODEL DATA THAT I USED.
Q. ACTUALLY, WHAT YOU TESTIFIED TO IS THAT THERE IS A WIDE VARIATION, SOMETHING BETWEEN 20 AND 90 DEGREES JUST IN THE DATA THAT YOU HAVE, CORRECT?
A. BUT YOU MUST LOOK AT IT OVER TIME. AND THERE, WE SEE THE CONSISTENCY.
Q. AND YOU ALSO AGREED WITH ME THAT THERE IS NO CONSISTENCY AS TO THE REPORTS, THERE IS A WIDE VARIATION AS TO THE DIRECTIONS, THERE IS SOME 70 DEGREES JUST IN YOUR REPORTS, CORRECT?
A. WELL, THOSE ARE LAKEFRONT'S REPORTS. THEY ARE NOT MY REPORTS.
Q. JUST WHAT YOU REPORTED TO THIS COURT. AND --
A. THERE IS A VARIATION, BUT THEY ARE ALL BASICALLY EASTERLY WINDS.
Q. I UNDERSTAND THAT. AND THEN THE WIND INFORMATION THAT YOU

1909

HAVE, ITSELF, IS AVERAGED OUT, RIGHT?
A. YES, SIR. THE WIND DIRECTION REPRESENTS A TWO-MINUTE AVERAGE IN WIND DIRECTION, AND THE WIND SPEEDS REPRESENT A TWO-MINUTE AVERAGE BASED UPON FIVE-SECOND SAMPLES.
Q. AND SO WHEN YOU'RE TALKING ABOUT AVERAGES, IS IT FAIR TO SAY THAT WITHIN -- YOU CAN GET AN AVERAGE FROM A VERY WIDE VARIATION, YOU CAN GET THE SAME AVERAGE -- I'M SORRY. LET ME REPHRASE THAT. YOU CAN GET THE SAME VARIATION, THE SAME AVERAGE FROM A VERY WIDE VARIATION AS YOU CAN GET FROM A VERY SMALL VARIATION. IS THAT FAIR TO SAY? THAT'S POSSIBLE, RIGHT?
A. YES, MATHEMATICALLY, SURE.
Q. I CAN COMBINE WINDS THAT ARE AT 270 DEGREES WITH WINDS THAT ARE AT 90 DEGREES AND END UP SOMEWHERE IN THE 30-DEGREE RANGE ON THE AVERAGE. IS THAT POSSIBLE, MATHEMATICALLY?
A. WELL, DON'T FORGET, THIS IS A FIVE-SECOND AVERAGE, SO IF -- WELL, THE WIND SPEEDS ARE FIVE SECONDS, THE WIND DIRECTIONS ARE FIVE SECONDS. AND THAT CALCULATION BY THE AUTOMATIC STATION IS DONE ON A CONTINUOUS BASIS. SO AT THE END OF EVERY TWO MINUTES, IT CALCULATES -- AT THE END OF EVERY MINUTE, IT CALCULATES THE LAST TWO-MINUTE AVERAGES.
SO WHAT IT'S TELLING US, THEN, IS THAT IF YOU'RE GOING TO HAVE A WIDE VARIATION, IT'S ONLY FOR A SHORT PERIOD OF TIME.
Q. NOW, DOCTOR, IN FACT, COULDN'T IT BE THAT THERE COULD BE A 270-DEGREE WIND, AND THEN A MINUTE LATER A 30-DEGREE WIND, SOMEWHERE IN THERE? LET'S SAY THEY EACH TAKE 30 SECONDS AND THEY

1910

WOULD AVERAGE OUT AT A CERTAIN NUMBER, THAT'S BASICALLY GOING TO END UP BEING A SOUTHERLY WIND, CORRECT -- I'M SORRY, A NORTHERLY WIND?
A. IF SUCH AN EVENT WAS TO HAPPEN, I WOULD EXPECT THAT THE SPECIAL REPORT WOULD MAKE SOME NOTATION OF THAT AND IT WOULD SHOW UP.
Q. AND WHERE IN THIS REPORT WOULD IT SHOW UP?
A. IT WOULD BE IN THE METAR DATA.
Q. DOCTOR, YOU DIDN'T CONSIDER DATA FROM ANY TIME BEFORE 12:00 MIDNIGHT ON AUGUST 29, 2005, CORRECT?
A. IN MY REPORT.
Q. NO. AND YOU DIDN'T CONSIDER ANY EYEWITNESS TESTIMONY, CORRECT, IN YOUR REPORT?
A. WHEN I INITIALLY DID THE REPORT, I BASED IT ALL ON FIRST-LEVEL DATA.
Q. THE CONCLUSIONS THAT YOU ARE PRESENTING TO THIS COURT TODAY ARE NOT BASED ON EYEWITNESS TESTIMONY AT ALL?
A. JUST THE EYEWITNESS IN TERMS OF DATA LIKE THIS, FIRST-LEVEL SCIENTIFIC DATA, BUT NOT THE INDIVIDUALS INVOLVED AT GROUND LEVEL WHO WERE WITHIN THE STORM.
Q. NOW, YOU DIDN'T ALSO CONSIDER ANY SORT OF WATER MOVEMENT, CORRECT?
A. I FOCUSED ON THE WIND, SIR.
Q. SAY AGAIN.
A. I FOCUSED ON THE WIND.

Q. YOU DIDN'T FOCUS ON WATER?
A. I WAS NOT ASKED TO DO THAT.
Q. YOU DIDN'T FOCUS ON WAVE ACTION?
A. THAT'S CORRECT, SIR.
Q. YOU WOULD AGREE WITH ME THAT THERE ARE OTHER FORCES ACTING ON THE BARGE OUTSIDE OF THE WIND, CORRECT?
A. YES, SIR.
Q. AND YOU ONLY CONSIDERED THE WIND ACTION, CORRECT?
A. WELL, ALL I LOOKED AT WAS THE WIND DIRECTIONS AND SPEEDS.
Q. AND YOUR CONTENTION HERE TODAY IS NOT THAT THE BARGE DIDN'T MOVE WEST TO EAST, IT'S THAT THE SYNOPTIC WINDS DIDN'T MOVE IT FROM WEST TO EAST, CORRECT?
A. MY POSITION HERE TODAY IS TO REPORT TO THE COURT THAT MY FINDINGS ARE THAT ON THE MORNING OF THE 29TH, WE HAD NORTHEASTERLY-TYPE WINDS AND DID NOT CHANGE TO WESTERLY UNTIL SOMETIME AFTER 0745. WHAT THOSE WINDS DID TO THE BARGE, I DID NOT DO THOSE CALCULATIONS.
Q. YOU CONCEDE THAT THUNDERSTORMS OCCUR WITHIN HURRICANES, RIGHT?
A. YES, SIR.
Q. MESOCYCLONES OCCUR WITHIN HURRICANES, CORRECT?
A. YES. WE SAW THAT.
Q. AND THOSE ARE BASICALLY STORMS WITHIN A STORM, CORRECT?
A. WELL, IF WE THINK OF THE SATELLITE IMAGERY THAT WE SAW YESTERDAY, THE OVERVIEW OF KATRINA, AND I POINTED OUT THE SPIRAL

BANDS, THUNDERSTORMS ARE IN THOSE SPIRAL BANDS, SO THEY ARE AN INTEGRAL PART OF THE HURRICANE. THAT'S HOW THE HURRICANE GETS ITS ENERGY.
Q. THEY ARE STORMS WITHIN A STORM?
A. THEY ARE THUNDERSTORMS WITHIN THE SPIRAL BANDS WHICH MAKE UP THE HURRICANE.
Q. AND SO ARE MESOCYCLONES, CORRECT?
A. WELL, MESOCYCLONES ARE FOUND WITHIN THE SUPERCELLS. NOT ALL THUNDERSTORMS ARE SUPERCELLS.
Q. AND THEY HAVE A ROTATION, CORRECT?
A. THAT'S WHAT GIVES THE NAME "MESO," MEANING A SMALL CYCLONE.
Q. NOW, LET'S LOOK AT PARTICULARLY THE VISIBILITY COLUMN. I BELIEVE IT'S -- THIS IS VISIBILITY, THE COLUMN I'M POINTING TO; IS THAT RIGHT?
A. YES, SIR.
Q. VSB MILES, CORRECT?
A. CORRECT.
Q. AND AT ALL TIMES FROM 3:00 IN THE MORNING UNTIL ABOUT 6:53 IN THE MORNING, VISIBILITY IS NO LESS THAN .3 MILES, CORRECT?
A. YES, SIR, .3 MILES.
Q. AND SINCE YOU APPLIED THE WIND DATA TO THE INDUSTRIAL CANAL, THEN YOU WOULD APPLY THE VISIBILITY DATA TO THE INDUSTRIAL CANAL AS WELL, WOULDN'T YOU?
A. I THINK IT WOULD BE FAIRLY CONSISTENT.
Q. SO LET'S TALK ABOUT 4:53 IN THE MORNING. THAT'S HALF A MILE

OF VISIBILITY AT LAKEFRONT, CORRECT?
A. CORRECT. YES, SIR.
Q. AND YOUR OPINION IS THAT THERE WOULD BE ABOUT A HALF A MILE OF VISIBILITY AT THE INDUSTRIAL CANAL, CORRECT?
A. WELL, WHAT I WOULD EXPECT IS THAT WHAT YOU WOULD SEE IS, THESE VISIBILITIES ARE REFLECTING WHAT YOU SEE HERE IN THIS COLUMN, IN THE 44, WHICH IS THE RAIN AND FOG COLUMN, SO THERE IS -- THE VISIBILITY HAS BEEN REDUCED BY THESE FACTORS, AND AS THE SPIRAL BANDS MOVE ACROSS, I WOULD EXPECT TO SEE THROUGHOUT THE MORNING VISIBILITIES BETWEEN AROUND .3 AND .5 STATUTE MILES.
Q. AND AT 6:19, YOU WOULD EXPECT TO SEE FOUR MILES OF VISIBILITY, RIGHT?
A. ACCORDING TO THAT OBSERVATION, IT OPENED UP AT 6:19 IN THE MORNING, YES.
Q. AND YOU DON'T DOUBT THAT OBSERVATION, DO YOU?
A. THAT'S WHAT THE INSTRUMENT SHOWED.
Q. THAT'S WHAT YOU'RE PRESENTING TO THIS COURT, RIGHT?
A. YES, SIR.
Q. THAT'S WHAT YOU'RE RELYING ON?
A. I'M RELYING ON THE WINDS, AND I MAKE NOTE OF THE VISIBILITY, YES, SIR.
Q. YOU'RE RELYING ON ALL OF THE DATA THAT IS PRESENTED IN THIS CHART, CORRECT?
A. YES, SIR.
Q. LET'S TALK ABOUT THE DATA YOU RELIED ON FROM OCEANWEATHER,

INC. FAIR?
A. YES, SIR.
Q. OCEANWEATHER, INC., TOOK WIND SPEEDS ON AN AVERAGE OF 30 MINUTES, CORRECT?
A. THE HIGH CAST DETERMINES A 30-MINUTE AVERAGE WIND EVERY 15 MINUTES.
Q. SO IT WORKS THE SAME WAY AS THE ANEMOMETER THAT WE JUST DISCUSSED, CORRECT, EXCEPT THAT INSTEAD OF DOING IT EVERY MINUTE OR EVERY TWO MINUTES, IT DOES IT EVERY 15 MINUTES FOR THE LAST 30 MINUTES, RIGHT?
A. 30-MINUTE BRACKETS, I BELIEVE.
Q. OKAY. AND SO DURING THAT PROCESS, WHAT'S HAPPENING IS ALL OF THE WIND DATA IS GATHERED FOR A DIFFERENT LOCATION FOR A 30-MINUTE PERIOD AND IT IS AVERAGED OUT, CORRECT?
A. NO. NOT EXACTLY. WHAT THE MODEL DOES IS, IT CALCULATES THE PRESSURE PATTERN THAT EXISTS FOR THAT TIME PERIOD, AND THEN BASED ON THE PRESSURE PATTERN, IT MAKES THE CALCULATION. BUT THE PRESSURE PATTERN IS A PRESSURE PATTERN WITH TIME, SO BY LOOKING AT THE CHANGE IN THE PRESSURE PATTERN OVER TIME, IT THEN CALCULATES AN AVERAGE WIND, BECAUSE THE PRESSURE PATTERN IS MOVING WITH THE HURRICANE AND THE HURRICANE HAS FORWARD MOTION. SO THE MODEL THEN CALCULATES THAT LOCATION.
Q. SO ARE YOU SAYING TO THIS COURT THAT IT DOESN'T ACTUALLY TAKE ANY DATA REGARDING SPEED INTO ACCOUNT --
A. NO, NO.

1915

Q. -- IT JUST USES PRESSURE PATTERN?
A. NO, THAT'S NOT WHAT I'M SAYING. THE WIND SPEEDS OR THE WIND DIRECTIONS, THE PRESSURE READINGS AT EACH OF THESE STATIONS GOES INTO MAKING UP THE SYNOPTIC DATA THAT GOES INTO THE MODEL. THEN ONCE THE MODEL IS RUN, THE RESULTS OF THE MODEL ARE COMPARED TO THE OBSERVED VALUE.
SO TAKING AN OCEAN BUOY, WHICH IS OUT THERE, DATA, AT THAT OCEAN BUOY, WE COULD PULL AND COMPARE. TAKE A STATION ASHORE LIKE GRAND ISLE OR ONE OF THESE WHERE THERE'S AN AUTOMATIC RECORDING STATION AND WHAT IS CALLED A C, LETTER C, MAN, M-A-N, STATION, IT WOULD BE COMPARED TO THOSE OBSERVATIONS. SO THEN IF THE MODEL DID NOT REPLICATE WHAT THESE STATIONS ARE SEEING, CORRECTIONS WOULD BE MADE AND THE MODEL WOULD BE RERUN.
SO THIS IS A VALIDATION PROCESS, SO THE MODEL WOULD ULTIMATELY HAVE TO SATISFY ALL OF THESE DATA POINTS BEFORE IT WOULD BE GIVEN AS FINAL VERSION.
Q. FOR A 30-MINUTE AVERAGE?
A. THE DATA IS EXTRACTED AND I THINK THE COMPARISON IS AT A MORE FREQUENT BASIS THAN THAT.
Q. WHY DON'T WE PUT UP PAGE 21 OF YOUR REPORT. BOB, ZOOM IN ON THE LAST PARAGRAPH THERE.
DO YOU SEE THE END OF THE FIRST LINE AND THE BEGINNING OF THE SECOND LINE WHERE IT SAYS, "THE SURFACE WINDS REPRESENT 30-MINUTE AVERAGE WIND SPEEDS," CORRECT?
A. I THINK I TESTIFIED TO THAT, YES, SIR.

1916

Q. SO WE'RE TALKING ABOUT 30-MINUTE AVERAGE WIND SPEEDS, RIGHT?
A. GIVEN EVERY 15 MINUTES.
Q. GIVEN EVERY 15 MINUTES, BUT IT TAKES INTO ACCOUNT THE SPEEDS FOR THE PAST 30 MINUTES AND IT AVERAGES THEM OUT, CORRECT? THAT'S THE AVERAGE SPEED?
A. AVERAGE SPEED OVER THE TIME PERIOD AS CALCULATED BY THE MODEL.
Q. WOULD YOU AGREE WITH ME THAT WHEN YOU'RE TALKING ABOUT AVERAGE WIND SPEEDS, YOU'RE TAKING INTO ACCOUNT ALL OF THE WIND SPEEDS THAT OCCURRED DURING THAT 30 MINUTES AND YOU'RE AVERAGING THEM OUT?
A. THAT WOULD BE THE 30-MINUTE AVERAGE, YES, SIR.
Q. SO AGAIN, IF YOU HAD A WIND WITH A CERTAIN AMOUNT OF SPEED IN A NEGATIVE DIRECTION PLUS A WIND WITH A CERTAIN AMOUNT OF SPEED IN A POSITIVE DIRECTION, THAT WOULD BE AVERAGED OUT TOGETHER, CORRECT?
A. IN THE TYPICAL AVERAGING PROCESS, YES, BUT IN THIS SITUATION, AGAIN, IT'S BASED UPON THE PRESSURE PATTERN AND THE CHANGE IN THE PRESSURE PATTERN WITH TIME, SO WHAT YOU'RE LOOKING AT IS THE SYNOPTIC SCALE FLOW BASED UPON THE PRESSURE PATTERN WITH TIME.
Q. IT REPORTS THE PREVAILING WINDS ULTIMATELY?
A. YES, SIR. THAT'S EXACTLY RIGHT. IT REPORTS THE PREVAILING WINDS.
Q. AND THOSE PREVAILING WINDS ARE WHAT END UP BEING PART OF

1917

THAT AVERAGE FOR 30 MINUTES, CORRECT?
A. YES, SIR.
Q. OKAY. THAT'S IT.
AND IT TOOK DATA USED FROM FOUR GRID POINTS, CORRECT?
A. YES, SIR.
Q. AND THEN FROM THERE, YOU CAME UP WITH WHAT YOU BELIEVE WOULD OCCUR AT THE INDUSTRIAL CANAL, CORRECT?
A. IF BY LOOKING AT THE FOUR CORNERS, YOU CAN VISUALLY INTERPOLATE IT INTO THAT LOCATION, YES, SIR.
Q. OCEANWEATHER, INC., DID NOT DO THAT, CORRECT?
A. CORRECT. IT'S NOT ONE OF THEIR GRID POINTS.
Q. OCEANWEATHER, INC., DID NOT TAKE WIND DATA FROM THE INDUSTRIAL CANAL, CORRECT?
A. CORRECT.
Q. IN FACT, WIND REPORTS IN KATRINA WERE LIMITED DUE TO INSTRUMENT FAILURES IN MANY OBSERVATION LOCATIONS, CORRECT?
A. THAT'S CORRECT.
Q. AND THOSE INSTRUMENT FAILURES COULD BE A RESULT OF THE WEATHER THAT WAS OCCURRING, CORRECT?
A. ABSOLUTELY.
Q. IT COULD BE A RESULT OF DOWNBURSTS, CORRECT?
A. WHATEVER THE WEATHER WAS, YES, SIR.
Q. IT COULD BE A RESULT OF THUNDERSTORMS THAT WERE OCCURRING, CORRECT?
A. THUNDERSTORMS, WIND, LIGHTNING STRIKES, YES, SIR.

1918

Q. VARIOUS WEATHER PHENOMENA THAT OCCURRED WITHIN A HURRICANE, CORRECT?
A. YES, SIR.
Q. YOU DID NOT DO ANY MODELING OF CONVECTED ACTIVITY, CORRECT?
A. CORRECT.
Q. AND YOU DIDN'T DO ANY CALCULATION OF THREE-SECOND WIND GUSTS, CORRECT?
A. I THINK TABLE 6C IS A THREE-SECOND WIND GUST IN MY REPORT. I THINK THAT SHOWS A THREE-SECOND, BASED UPON THE 30-MINUTE AVERAGE WIND SPEED. THERE IS THAT CALCULATION IN THERE, I BELIEVE.
Q. YOU DIDN'T INTERPRET RADAR DATA, CORRECT?
A. THAT'S CORRECT, SIR.
Q. YOU'RE NOT A RADAR TECHNICIAN, RIGHT?
A. THAT IS CORRECT.
Q. YOU DIDN'T RELY ON ANY RADAR DATA?
A. I DID NOT IN PREPARING THIS REPORT, THAT'S CORRECT.
Q. IN COMING UP WITH YOUR CONCLUSIONS THAT YOU'RE PRESENTING TO THIS COURT, YOU DID NOT RELY ON ANY RADAR DATA, CORRECT?
A. THAT IS WHAT I SAID, YES, SIR.
Q. YOU DID NOT RELY ON ANY INFORMATION MR. LEMON GAVE YOU, CORRECT?
A. WHEN I DID THIS REPORT, I DID NOT KNOW MR. LEMON.
Q. AND YOU DID NOT USE ANY METHOD THAT WOULD DETECT MESOCYCLONES, CORRECT?

1919

A. THAT IS CORRECT, SIR.
Q. YOU DID NOT USE ANY METHODS THAT WOULD DETECT MICROBURSTS?
A. THAT'S CORRECT, SIR.
Q. YOU DID NOT USE ANY METHOD THAT WOULD DETECT DOWNBURSTS?
A. WELL, MY EXAMINATION OF THE LOCAL DATA AT LAKEFRONT, TO THE EXTENT THAT IF THERE WAS A MICROBURST OR A DOWNDRAFT, THAT WOULD HAVE CHANGED THE WIND DIRECTION OR WIND SPEEDS SIGNIFICANTLY, BUT IN DETERMINING THE SYNOPTIC SCALE WIND, YOU'RE CORRECT.
Q. THAT'S YOUR OPINION, THAT IT WOULD HAVE TURNED UP IF IT HAD BEEN THERE, CORRECT? IT'S YOUR PERSONAL OPINION?
A. YES.
Q. IT'S NOT SOMETHING THAT THE LAKEFRONT AIRPORT SAYS, CORRECT?
A. NO. BUT IF I LOOK AT DR. MITCHELL'S DIAGRAM SHOWING THE LOCATION OF SOME OF THOSE MESOCYCLONES THAT HE SAYS, I WOULD EXPECT TO SEE -- IF THERE WAS A MESOCYCLONE THERE, I WOULD EXPECT TO SEE SOMETHING IN THE SURFACE OBSERVATION.
Q. THAT'S YOUR PERSONAL EXPECTATION, RIGHT?
A. FROM UNDERSTANDING HIS THEORY, I WOULD EXPECT TO SEE IT IN THE RESULTS AND I DID NOT SEE THAT.
Q. YOU DID DO ANYTHING THAT WOULD DETECT THE PRESENCE OF THUNDERSTORMS?
A. THAT'S CORRECT.
Q. YOU DID NOT DO ANYTHING THAT WOULD DETECT THE PRESENCE OF TORNADO VORTEX SIGNATURES?
A. THAT'S CORRECT.

1920

Q. OR THE PRESENCE OF WIND SHEARS?
A. WELL, WIND SHEAR IS A CHANGE OF WIND CONDITIONS WITH THE HEIGHT, SO WHAT WE LOOKED AT WAS THE BOUNDARY LAYER CONDITIONS. AND SO IN THE BOUNDARY LAYER, AT 10-METER ELEVATION, DID NOT EXAMINE FOR WIND SHEAR ABOVE THAT LEVEL.
Q. AND AGAIN, IT'S YOUR BELIEF THAT IT WOULD HAVE SHOWN UP ON THE ANEMOMETER IN SOME FASHION, HAD IT BEEN THERE, CORRECT?
A. THAT IS CORRECT.
THE COURT: "IT" BEING WHAT?
MR. KHORRAMI: WIND SHEAR, YOUR HONOR. I APOLOGIZE.
THE WITNESS: WIND SHEAR IS A CHANGE IN EITHER WIND SPEED OR WIND DIRECTION WITH HEIGHT, SIR. SO WIND SHEAR -- I WOULD EXPECT THERE TO BE WIND SHEAR WITH HEIGHT BECAUSE AS YOU GO HIGHER ABOVE THE SURFACE, THERE IS LESS FRICTION, SO SPEED AND WIND WOULD BE FASTER. BUT WITH REGARDS TO CHANGE IN DIRECTION WITH HEIGHT IN A HURRICANE, WE CONSIDER IT TO BE WHAT'S CALLED A BAROTROPIC ATMOSPHERE, SO WIND DIRECTION IS FAIRLY UNIFORM WITH HEIGHT.
EXAMINATION
BY MR. KHORRAMI:
Q. NOW, YOU ALSO SAW DR. MITCHELL'S DATA WHERE HE POINTED TO TWO MESOCYCLONES FOR THE SOUTH OF THE INDUSTRIAL CANAL, CORRECT?
A. YES, SIR.
Q. YOU WOULDN'T EXPECT TO SEE ANY SIGNATURES OF THOSE AT THE LAKEFRONT AIRPORT, CORRECT?

1921

A. THAT'S CORRECT.
Q. YOU WOULD AGREE WITH ME THAT MESOCYCLONES COULD AFFECT WIND PATTERNS AT THE SURFACE, CORRECT?
A. YES, SIR.
Q. YOU WOULD AGREE WITH ME THAT MICROBURSTS WOULD AFFECT WIND PATTERNS AT THE SURFACE?
A. YES. BUT YOU HAVE TO REMEMBER WHEN WE CLASSICALLY THINK OF MICROBURSTS SUCH AS YOU DEMONSTRATED BEFORE WHERE THE WIND COMES DOWN AND THEN SPREADS OUT, THAT IS -- I USE THAT IMAGE IN MY CLASS WHEN I TEACH ABOUT THUNDERSTORMS -- USUALLY, THAT REPRESENTATION IS THAT THAT WIND PENETRATES INTO THE SURFACE IN A VERY STILL, QUIET ATMOSPHERE WHERE THE DRAFTS INTO THE THUNDERSTORM ARE NOT HURRICANE-FORCE WINDS. SO AS A WIND EXITS THE DOWNDRAFT IN THE THUNDERSTORM, AS IT COMES OUT OF THE THUNDERSTORM AND PLUNGES TOWARDS THE SURFACE, IT'S ENTERING A FAST STREAM OF MOVING AIR THAT'S AT LEAST A THOUSAND FEET THICK. SO AS IT ENTERS THAT, ITS ENERGY COMBINES, SO VECTORIALLY, YOU WOULD SEE SOME TYPE OF VECTORIAL RESOLUTION FROM THAT DOWNDRAFT.
SO IN A QUIET, STILL, ATMOSPHERE ON A TYPICAL HOT SUMMER AFTERNOON WHEN YOU DON'T HAVE A HURRICANE-FORCE WIND, YEAH, YOU'RE GOING TO GET PERHAPS AN ONLY DIRECTIONAL WIND AS DR. MITCHELL SAID, BUT IN A HURRICANE, AS THAT WIND COMES IN AND ENTERS THAT HURRICANE WIND, YOU'RE GOING TO GET A PEAK, AND FOR THAT PART OF THE WIND THAT MAY BE GOING IN ANOTHER DIRECTION, YOU'RE GOING TO GET A LULL, BUT IT'S ALL GOING TO GO IN THE

1922

DIRECTION OF THE PREVAILING WIND.
Q. ARE YOU SAYING TO THIS COURT THAT MICROBURSTS AND DOWNDRAFTS HAVEN'T CAUSED SIGNIFICANT AMOUNTS OF DAMAGE TO PROPERTY DURING HURRICANE KATRINA?
A. I'M SORRY?
Q. MICROBURSTS AND DOWNDRAFTS HAVE NOT -- ARE YOU SAYING THAT THEY HAVE NOT CAUSED SIGNIFICANT DAMAGE TO PROPERTY DURING HURRICANE KATRINA?
A. NO. I'M NOT SAYING THAT AT ALL.
Q. INDEED, THEY DID, CORRECT? THEY WOULD TAKE CHIMNEYS OFF, CORRECT?
A. I THINK IF YOU WERE SUBJECT TO A STRONG DOWNBURST AND THAT DOWNBURST ADDED SIGNIFICANTLY TO THE SPEED OF THE PREVAILING WIND, YOU COULD THE GET BLOWN-DOWNS, ABSOLUTELY.
Q. SO THEN YOU WOULD AGREE WITH ME THAT MICROBURSTS CAN HAVE SIGNIFICANT EFFECT IN TERMS OF THEIR POWER WITH THEIR WIND, CORRECT?
A. AS LONG AS THEY ADD TO THE DIRECTION OF THE PREVAILING WINDS, YES, SIR. BUT IF THEY ARE COUNTER TO THE DIRECTION OF THE PREVAILING WINDS, THEN THEY ARE GOING TO -- THERE IS GOING TO BE A VECTORIAL RESOLUTION AND THE NET RESULT WOULD BE A SLOWER PREVAILING WIND IN THE DIRECTION OF THE PREVAILING WIND, WHICH ARE THE LULLS THAT WE SAW IN SOME OF THE DATA.
Q. AND WHAT YOU REFERRED TO AS A LULL IS REALLY THE AVERAGING OUT OF DIFFERENT DIRECTION WINDS; ISN'T THAT CORRECT?

1923

A. YES, SIR. WELL, NOT AVERAGING, THE VECTORIAL RESOLUTION.
Q. WHAT YOU PRESENTED TO THIS COURT ARE AVERAGES, CORRECT?
A. RIGHT, BUT WE'RE TALKING HERE AND NOW ABOUT A MICROBURST.
Q. WELL, YESTERDAY YOU TESTIFIED -- LET'S GO ABOUT THIS.
YESTERDAY, YOU TESTIFIED AS TO GUSTS THAT WOULD BE GOING IN AN OPPOSITE DIRECTION OF THE PREVAILING WINDS, AND YOU TESTIFIED THAT IN THAT SITUATION, YOU WOULD HAVE A LULL, AND THEREFORE WHAT WOULD BE REPORTED ON THE WIND DATA WOULD BE SOMETHING OF A LOWER SPEED, CORRECT?
A. CORRECT.
Q. BUT THAT'S REALLY ONLY BECAUSE THE TWO DIRECTIONS ARE GETTING AVERAGED OUT, ISN'T IT?
A. THEY ARE NOT BEING AVERAGED OUT. THERE IS A VECTORIAL RESOLUTION. SO THE VECTORS ARE ADDING UP, AND THE NET RESULT IS IN THE DIRECTION OF THE PREVAILING WIND. IT'S NOT AN AVERAGING PROCESS AT ALL. IT'S A VECTORIAL RESOLUTION. THE VECTORS ARE ADDING.
THE COURT: FOR THE RECORD, ARE YOU TELLING ME THAT IS IT -- LET ME ASK YOU: IS IT POSSIBLE, AND I'M USING -- LET ME USE MESOCYCLONE FIRST. IS IT POSSIBLE IN A MESOCYCLONE FOR THE WIND AT ANY POINT TO BE GOING IN ANOTHER DIRECTION THAN THE SYNOPTIC WINDS? RATHER THAN THIS LULL OF SLOWING, BUT ACTUALLY GO IN ANOTHER DIRECTION, IN A MESOCYCLONE FIRST? IS THAT POSSIBLE?
THE WITNESS: NO, WE MEAN ABOVE THE BOUNDARY LAYER,

1924

YOUR HONOR.
THE COURT: I'M TALKING ABOUT IN THE MESOCYCLONE, ITSELF.
THE WITNESS: SO THE MESOCYCLONE IS REALLY IN THE CLOUD.
THE COURT: RIGHT. I UNDERSTAND.
THE WITNESS: SO THE CLOUD IS UP HERE AT THE HIGHER LEVEL, AND AS WE SAW YESTERDAY, THERE WAS ROTATIONAL MOTION THAT THE CLOUD IS MOVING WITH THE HURRICANE CIRCULATION AS WELL. SO THAT'S WHERE MR. LEMON AND DR. MITCHELL TOOK OUT AND LOOKED AT THE STORM'S RELATIVE VELOCITY, SO WE SAW THAT MOTION. BUT AT THE END OF THE DAY WHEN WE LOOK AT THE BASE RELATIVE VELOCITY, EVERYTHING WAS GOING IN THAT SAME DIRECTION.
THE COURT: I UNDERSTAND THAT. YOU DON'T NEED TO BE OVERLY PEDAGOGICAL. MY FIRST QUESTION IS: IN A MESOCYCLONE, AND WE'RE ASSUMING WE'RE AT 5,000 FEET, OKAY, CAN THE WIND IN THE CYCLONE BE CONTRARY OR OPPOSITE TO THE SYNOPTIC WIND IN THE HURRICANE EVENT?
THE WITNESS: IT'S ROTATING UP AT THAT LEVEL. IT'S IN THE CLOUD, AND THE CLOUD IS MOVING, SO THE CLOUD HAS THIS CIRCULAR MOTION WITHIN IT. SO IT'S NOT THE WIND AS SUCH, IT'S THE ROTATION WITHIN THE CLOUD.
NOW, WHEN RAIN PARTICLES IN THE CLOUD BEGIN TO FALL, THEY FALL AND PULL THE AIR WITH IT. SO AS THAT THEN LEAVES THE CLOUD, THAT CAUSES THE DOWNDRAFT. SO WHILE THE MESOCYCLONE MAY HAVE ROTATIONAL MOTION, WHEN THE RAIN AND THE HYDROMETEORS

1925

EXIT THE CLOUD, THEY PULL COLD AIR WITH IT AND THEY STREAK TOWARD THE SURFACE. AND AS THEY COME OUT OF THE BASE OF THE CLOUD EFFECT, AND INDICATE, THEY FALL INTO THE PREVAILING WINDS AND GO WITH IT AND THEY ADD THAT ENERGY, OR IF THERE IS SOME TYPE OF A DOWNDRAFT IN THE OPPOSITE DIRECTION, THEY FIGHT AGAINST THE PREVAILING WINDS, AND USUALLY THE PREVAILING WINDS DOMINATE AND WE SEE --
THE COURT: THAT WAS A VERY GOOD EXPLANATION. SIR, YOU SAID USUALLY. IT IS CONCEIVABLE WITHIN THE REALM OF THE PHYSICAL WORLD, EVEN THOUGH GROSSLY ANOMALOUS, FOR WHEN THE DOWNDRAFT OCCURS, THAT THE DOWNDRAFT, WHEN IT FIGHTS THE PREVAILING WIND WIN, W-I-N, THAT IS, ACTUALLY BECOME, EVEN FOR A NANOSECOND, A PREVAILING WIND? IS THAT POSSIBLE?
A. IT WILL NOT BECOME A PREVAILING WIND, NO. THE PREVAILING WIN WOULD BE DICTATED BY THE --
THE COURT: LET ME BE MORE PRECISE. THAT FOR A NANOSECOND, THE WIND WOULD BE GOING AT THE GROUND LEVEL IN A DIRECTION OPPOSITE THE GENERAL SYNOPTIC WINDS?
THE WITNESS: THERE WOULD BE A BUFFERING BETWEEN THE TWO UNTIL THERE WAS A FINAL RESOLUTION OF THE VECTOR FORCES.
THE COURT: I'M NOT SURE WHAT THAT MEANS, BUT I'LL LEAVE IT AT THAT.

EXAMINATION

BY MR. KHORRAMI:
Q. I BELIEVE YESTERDAY AT LEAST, YOU TESTIFIED AT ABOUT

1926

90-DEGREE, THAT'S -- AND I PUT UP THE LAKEFRONT INFORMATION THAT YOU PROVIDED AS PART OF YOUR PRESENTATION TO THIS COURT, AND I'M TALKING ABOUT THE INFORMATION FOR 3:36 A.M. ON AUGUST 29, 2005. AND THERE IS A 90-DEGREE WIND DIRECTION THERE. DO YOU SEE THAT?
A. YES, SIR.
Q. AND I BELIEVE YESTERDAY YOU TESTIFIED THAT THAT WOULD BE THE EFFECTS OF A MESOCYCLONE THAT MR. LEMON AND DR. MITCHELL POINTED OUT; IS THAT CORRECT? I HAVE THE TRANSCRIPT.
A. I BELIEVE THAT WOULD BE THE RESULT OF A DOWNDRAFT ENTERING INTO THE AMBIENT FLOW, AND THEN THE VECTORIAL RESOLUTION, IN THIS CASE, RELAXED THE WIND SPEED AND TURNED IT TO THE RIGHT TOWARD 090, AND THAT'S WHY WE HAVE THAT REPORT.
Q. AND AGAIN, BY "RELAXED," YOU MEAN THE AVERAGE ENDED UP PUTTING IT AT 090, CORRECT?
A. AND THE SPEED REDUCED TO 34 MILES AN HOUR, YES, SIR.
Q. THE AVERAGE OF THE DIRECTIONS ENDED UP BEING 90 DEGREES, CORRECT?
A. CORRECT. THE AVERAGE OF THE SPEED WAS 34 MILES AN HOUR.
THE COURT: SO IF THE AVERAGE OF THE DIRECTION WAS 90 DEGREES AT ONE POINT, IT HAD TO BE GREATER THAN 90 DEGREES; IS THAT CORRECT; THAT IS, MORE THAN 90 DEGREES?
THE WITNESS: IT COULD HAVE BEEN MATHEMATICALLY. WE DON'T KNOW EXACTLY WHAT THE NUMBERS ARE.
THE COURT: SURE. I UNDERSTAND.

EXAMINATION

1927

BY MR. KHORRAMI:
Q. SO THEN, INDEED, MESOCYCLONES CAN AFFECT THE WIND DIRECTION, CORRECT?
A. AS I SAID, YES, THE DOWNDRAFTS COME IN AND THEY WILL VECTORIALLY COMBINE WITH THE PREVAILING WINDS AND YOU WILL SEE A RESULT IN SPEED AND DIRECTION.
Q. AND YOU'VE ACTUALLY POINTED THAT OUT FOR THIS COURT, RIGHT?
A. I BELIEVE THAT'S WHAT HAPPENED AT 3:36.
THE COURT: I'M SURPRISED THERE IS NO MESOCYCLONE HARNESS SO ANEMOMETERS AND OTHER MORE SOPHISTICATED DEVICES CAN BE IN A MESOCYCLONE. IT WOULD BE GREAT FOR THE COURT. WE NEED MORE EXPERIMENTATION. JUST LIKE I WANTED TO STRAP, IN THE LAST CASE, SOMEBODY FROM THE CORPS ON THE LEVEE THROUGH THE NEXT HURRICANE. THAT IS IN LEVITY, I PROMISE.
MR. GILBERT: WAS THAT A CRIMINAL PROCEEDING, YOUR HONOR?
THE COURT: BUT I DO UNDERSTAND YOUR EXPLANATION, AND THANK YOU VERY MUCH FOR INDULGING.
EXAMINATION
BY MR. KHORRAMI:
Q. NOW, AT ALL TIMES DURING THE PERIOD OF TIME THAT YOU REPORTED, WIND SPEEDS WERE GREATER THAN 31 KNOTS, CORRECT?
A. ON THIS DATA THAT WE'RE LOOKING AT HERE, SIR?
Q. SURE. LET'S GO WITH THIS DATA.
A. WITH THIS DATA HERE, WE HAVE 34 MILES AN HOUR, WHICH WOULD

1928

BE ABOUT 30.
Q. THAT'S THE LOWEST THAT WE HAD?
A. THAT'S THE LOWEST THAT WE SEE HERE, YES, SIR.
Q. AND IF I WERE TO PUT UP -- YOU REPORTED FROM ABOUT MIDNIGHT ON THAT DATE?
A. YES.
Q. AT ANY TIME, DID YOU NOTICE WINDS THAT WERE BELOW THAT SPEED?
A. I CAN'T RECALL. I FOCUSED ON THE MAXIMUM WINDS, SO I CAN'T RECALL.
Q. MAYBE I SHOULD PUT IT UP. BOB, WOULD YOU PUT UP --
AND THAT'S THE DATA THAT I JUST PUT UP THAT IS FROM YOUR PRESENTATION YESTERDAY. AND IT STARTS AT 12:01, ABOUT MIDNIGHT, ON AUGUST 29, 2005, AND IT ENDS AT 2:53 ON THAT SAME MORNING, CORRECT?
A. YES, SIR.
Q. AND AGAIN, IN THIS DATA, DO YOU SEE ANYTHING THAT'S BELOW 30 KNOTS?
A. NO, SIR.
Q. AND CERTAINLY NOTHING THAT'S BELOW 30 MILES PER HOUR, CORRECT?
A. DEFINITELY. EVERYTHING IS IN THE 40S AND TOUCHING INTO THE 50S.
Q. IF I WERE TO REPRESENT TO YOU THAT THE MOORINGS ON BARGE ING 4727 WOULD HAVE BROKEN AT 30 MILES PER HOUR, YOU WOULD AGREE

1929

WITH ME THAT IT COULD HAVE HAPPENED AT ANY POINT FROM 12:01 A.M. TO, I BELIEVE THE LAST REPORT IS ABOUT SIX-SOMETHING IN THE MORNING, CORRECT?
A. I HAVE NO EXPERTISE IN THE AREA OF MOORING LINES USED ON THAT BARGE, SO I CANNOT ANSWER THAT QUESTION.
Q. WELL, YOU WOULD AGREE WITH ME THAT AT ALL TIMES DURING THAT PERIOD OF TIME, AND THAT'S THE ONLY PERIOD OF TIME THAT YOU'VE STUDIED, THAT THE WINDS ACTING ON THE BARGE WERE MOVING IN EXCESS OF 30 MILES PER HOUR?
A. IF YOU WILL LOOK AT MY TABLE 6A, I BELIEVE THAT TABLE, WHICH STARTS AT MIDNIGHT AS WELL, SHOWED WIND SPEEDS GREATER THAN 30 MILES AN HOUR OR 30 KNOTS.
Q. I'M GOING TO PUT UP FOR YOU -- ACTUALLY, BEFORE WE GO THERE, YOU DISCUSSED THE BUYS BALLOT RULE, CORRECT?
A. YES, SIR.
Q. COULD YOU, BOB, PUT UP THAT SLIDE?
AND YOU WOULD AGREE WITH ME AT THAT 90-DEGREE WIND, THE WIND DIRECTIONS ARE NOT NECESSARILY FOLLOWING THE BUYS BALLOT RULE, CORRECT?
A. WELL, IN THE LARGE SCALE THEY ARE, BUT IN THE SMALLER SCALE, IT'S DEVIATED SOMEWHAT FROM THAT, YES.
Q. LET'S TAKE THE SMALL SCALE OF 90 DEGREES. IT'S DEVIATED, CORRECT?
A. YES, SIR.
Q. YOU WOULD ALSO AGREE WITH ME THAT BUY BALLOT'S LAW IS

1930

SOMETHING THAT IS MOST ACCURATE OUT AT SEA, CORRECT?
A. WITHOUT CORRECTING FOR FRICTION BEING MOST ACCURATE OUT AT SEA, CORRECT, BUT OVER LAND, IF YOU CORRECT A LITTLE BIT FOR FRICTION, YOU CAN STILL GET AN EXCELLENT IDEA OF WHERE THE LOW IS, IF IT'S GOING TO BE TO THE EAST OR TO THE WEST OF YOU, OR TO THE NORTH OR TO THE SOUTH AND THE GENERAL DIRECTION OF IT, YES.
Q. SO AS A LAYPERSON STANDING INSIDE OF A HURRICANE, I WOULD HAVE TO MAKE A CORRECTION FOR THE FRICTION OF THE SURFACE, CORRECT?
A. YEAH.
Q. AND I WOULD HAVE TO MAKE A CORRECTION FOR THE FRICTION OF ANY SORT OF STRUCTURES THAT ARE OUT THERE AROUND ME, CORRECT?
A. WHICH IS JUST THE FRICTION OF THE LAND, YES.
Q. AND THE BUILDINGS THAT ARE AROUND ME, CORRECT?
A. YEAH.
Q. AND IF THERE IS A WALL AROUND ME, I WOULD HAVE TO MAKE A CORRECTION FOR THAT, RIGHT?
A. WELL, THEN YOU'RE NOT IN UNINTERRUPTED FLOW, SO --
Q. IT WOULD HAVE TO BE AN UNINTERRUPTED FLOW, RIGHT?
A. YES, SIR.
Q. SO BUYS BALLOT WOULD HAVE VERY LIMITED APPLICATION ON LAND, CORRECT?
A. NO. I THINK ONE COULD STILL APPLY IT TO DETERMINE WHERE THE LOW IS AND WHAT KIND OF WIND ONE WOULD EXPECT WITH A PARTICULAR LOCATION. IT'S A PRINCIPLE THAT WE TEACH, I TEACH IT IN MY

CLASSES, TO DETERMINE WHERE THE LOW IS. IT'S NOT GOING TO GIVE YOU AN EXACT POSITION, BUT IT'S GOING TO GIVE YOU A FAIR REPRESENTATION OF WHAT TYPE OF -- WHAT DIRECTION OF WINDS YOU SHOULD EXPECT WITH REGARDS TO YOUR RELATIVE POSITION TO THE LOW.

Q. SO IT'S NOT ABOUT WHERE THE LOW IS, IT'S ABOUT WHAT DIRECTION THE WIND IS, CORRECT?

A. RIGHT. SO IN THIS CASE, IF YOU KNOW WHERE THE LOW IS AND IF YOU'RE IN A PARTICULAR LOCATION, YOU CAN GET AN IDEA OF WHAT THE SYNOPTIC SCALE OF WIND DIRECTION WILL BE.

Q. AND IF I'M NOT AT A COASTLINE, IF I'M ON LAND, IF I'M AROUND BUILDINGS AND IF I'M AROUND STRUCTURES, I, AS A LAYPERSON, WOULD HAVE TO MAKE ADJUSTMENTS TO THE FRICTION IN ORDER TO APPLY BUYS BALLOT'S LAW?

A. NO. IF YOU'RE IN NEW ORLEANS AND YOU KNOW THE HURRICANE IS SOMEWHERE ON THE EASTERN SIDE OF THE GULF OF MEXICO, I THINK IT'S PRETTY CLEAR AS IT GETS CLOSER THAT YOU'RE GOING TO SEE EASTERLY-TYPE WINDS.

Q. YOU JUST TESTIFIED THAT I WOULD HAVE TO MAKE A CORRECTION AS TO THE FRICTION WHEN I'M STANDING ON LAND, CORRECT, SIR? YOU JUST TESTIFIED TO THAT. I CAN LOOK IT UP ON THE RECORD, ROLLING BACKWARDS.

A. NO, WHAT I'M TALKING ABOUT HERE, BUYS BALLOT'S LAW IS NOT GOING TO GIVE YOU THE WIND DIRECTION TO THE NEAREST ONE DEGREE. IT'S GOING TO GIVE YOU THE SYNOPTIC SCALE WIND.

SO AS I DEMONSTRATED YESTERDAY, IF KATRINA IS SOUTH OF

US AT 0700, I THINK I USED WORDS LIKE NORTHEASTERLY-TYPE WINDS. SO DID I SAY IT WAS GOING TO BE 047 OR 043? IT'S GOING TO BE NORTHEASTERLY-TYPE WINDS, SO BY USING BUYS BALLOT'S LAW, IT'S A BOX WITHIN THE DATA HAS TO FALL. IF IT DOESN'T FALL WITHIN THAT BOX, THEN I KNOW THERE MUST BE SOMETHING WRONG.

Q. IT COULD BE LOCAL WINDS, RIGHT?

A. IT COULD BE SOME TYPE OF LOCAL WINDS, AS WE SEE IN 090.

MR. KHORRAMI: I APOLOGIZE, YOUR HONOR.

EXAMINATION

BY MR. KHORRAMI:

Q. OKAY. I'M GOING TO PUT UP A DIAGRAM IN FRONT OF YOU.

WHY DON'T WE HAVE DR. CUSHING'S REPORT, PAGE 80, PLEASE.

I'LL REPRESENT TO YOU THAT THIS IS PAGE 80 OF DR. CUSHING'S REPORT.

A. YES, SIR.

Q. HAVE YOU SEEN DR. CUSHING'S REPORT?

A. I'VE SEEN PARTS OF IT, YES, SIR.

Q. HAVE YOU SEEN THIS PART OF IT?

A. I'VE SEEN THIS DIAGRAM, YES.

Q. THIS IS THE PART THAT'S BASED ON YOUR REPORT, CORRECT?

A. I BELIEVE SO.

Q. NOW, BASED ON YOUR REPORT, DR. CUSHING PUT SOME WIND VECTORS UP THERE. DO YOU AGREE WITH THOSE WIND VECTORS?

A. THEY LOOK FAIRLY CONSISTENT WITH MY RECOLLECTION OF THE WIND

VECTORS, YEAH, BETWEEN 7:00 AND 8:00 IS WHEN IT GOES FROM THE EASTERN SIDE TO WESTERN SIDE.

Q. THIS IS NOT NECESSARILY THE PLAINTIFF'S CONTENTION, BUT IF THE BARGE WERE TO BREAK AWAY AT, LET'S SAY, 2:00 IN THE MORNING, WHICH DIRECTION WOULD THE WIND BE PUSHING IT TOWARDS?

A. AT 2:00 IN THE MORNING, I BELIEVE MY FINDINGS WERE THAT YOU WOULD HAVE A NORTHEASTERLY-TYPE WIND. SO IF THE BARGE WAS SUSCEPTIBLE TO THE WIND, I WOULD EXPECT THAT THE WINDS, IN GENERAL, THE BARGE -- TO CARRY IT TOWARDS THE SOUTH AND WEST OR TOWARDS THE WESTERN SIDE.

Q. AND IT WOULD PUT IT RIGHT IN THIS CORNER; IS THAT CORRECT? AND I'M POINTING TO THE SOUTHWEST CORNER.

A. I BELIEVE THAT, YES, SIR.

Q. SOUTHWEST CORNER OF THAT INDENTATION WHERE THE LAFARGE FACILITY IS, CORRECT?

A. YES, SIR. IF IT WAS LOOSE -- I DON'T KNOW IF IT WAS LOOSE OR NOT -- BUT THAT'S WHERE I WOULD EXPECT.

Q. I'M ASKING YOU TO ASSUME THAT IT IS LOOSE.

A. OKAY.

Q. AND WHAT ABOUT, FOR EXAMPLE, AT THE TIME THAT THE MICROBURSTS THAT MR. LEMON AND DR. MITCHELL OBSERVED, WHERE WOULD THAT -- IF IT WERE TO BREAK AWAY AT THAT TIME, WHICH DIRECTION WOULD IT GO IN AT 3:31 IN THE MORNING?

A. I DON'T BELIEVE MR. LEMON SAW A MICROBURST.

Q. I CAN PUT THAT ONE UP FOR YOU, IF YOU WANT.

THE COURT: ARE WE TALKING ABOUT THE ANOMALY THAT MAY HAVE CAUSED THE 90-DEGREE REPORTING AT THE NEW ORLEANS LAKEFRONT AIRPORT?

MR. KHORRAMI: THAT'S WHAT THE DOCTOR ADMITS TO, AT LEAST, YOUR HONOR, YES.

THE COURT: I THINK THAT'S WHAT WE'RE TALKING ABOUT.

THE WITNESS: THAT WAS THE RESULT OF A CONVERSION ZONE, NOT OF A MICROBURST.

EXAMINATION

BY MR. KHORRAMI:

Q. I'M SORRY. A MESOCYCLONE IS WHAT MR. LEMON AND DR. MITCHELL CALLED IT.

A. THERE IS TWO PARTS TO THAT. THERE IS THE UPDRAFT. THAT'S THE CONVERSION ZONE, AND THEN THERE IS THE DOWNDRAFT, WHICH IS THE DOWNBURSTS. SO I BELIEVE MR. LEMON REFERRED TO THAT WHEN THERE IS A CONVERSION ZONE, AND I BELIEVE HE SAID IT RESULTED IN THE WIND TURNING -- OR RELAXING AND TURNING MORE EASTERLY. BUT IF WE'RE REFERRING TO THOSE EASTERLY WINDS, I CONTINUE TO EXPECT THAT BARGE TO MOVE -- IF IT WAS SUSCEPTIBLE AND LOOSE AT THE TIME THAT WE'RE TALKING ABOUT, TO BE PINNED AGAINST THAT WESTERN WALL.

MR. KHORRAMI: TWO MINUTES, YOUR HONOR, AND I THINK I CAN FINISH WITH THE WITNESS.

ALL RIGHT, YOUR HONOR. I'M SORRY.

THE COURT: NO, GO AHEAD. NO, NO. EXCUSE ME.

MR. KHORRAMI: I'LL TENDER THE WITNESS. THANK YOU.

1935

THE COURT: THANK YOU. ANY REDIRECT?
MR. ALDOCK: NO REDIRECT, YOUR HONOR.
THE COURT: THANK YOU. SIR, YOU MAY STAND DOWN.
AND THE NEXT WITNESS IS?
MR. ALDOCK: THE NEXT WITNESS IS MR. HALL. CAPTAIN HALL.
THE DEPUTY CLERK: WOULD YOU PLEASE RAISE YOUR RIGHT HAND. DO YOU SOLEMNLY SWEAR THAT THE TESTIMONY WHICH YOU ARE ABOUT TO GIVE WILL BE THE TRUTH, THE WHOLE TRUTH AND NOTHING BUT THE TRUTH, SO HELP YOU GOD.
THE WITNESS: I DO.

JAMES R. HALL

WAS CALLED AS A WITNESS AND, AFTER BEING FIRST DULY SWORN BY THE CLERK, WAS EXAMINED AND TESTIFIED ON HIS OATH AS FOLLOWS:
THE DEPUTY CLERK: WOULD YOU PLEASE STATE YOUR NAME AND ALSO SPELL IT FOR THE RECORD.
THE WITNESS: JAMES R. HALL, H-A-L-L.
MR. WALKER: GOOD MORNING, MR. HALL.
MAY I PROCEED, YOUR HONOR?
THE COURT: YES, YOU MAY.

DIRECT EXAMINATION

BY MR. WALKER:
Q. BY WHOM ARE YOU PRESENTLY EMPLOYED, MR. HALL?
A. SMITH TOWING.
Q. ARE YOU A CAPTAIN? MAY I CALL YOU CAPTAIN?

1936

A. YES, SIR.
Q. DO YOU HOLD ANY COAST GUARD LICENSES?
A. YES, SIR.
Q. PLEASE DESCRIBE FOR THE COURT WHAT LICENSES YOU HOLD.
A. I HAVE A MASTER'S LICENSE FOR 100-TON VESSELS WITH A TOWING ENDORSEMENT.
Q. WHAT DOES A TOWING ENDORSEMENT MEAN?
A. IT ALLOWS YOU TO OPERATE DIFFERENT SIZES OF TOWING VESSELS.
Q. DO YOU TOW BARGES? IS THAT WHAT YOUR BUSINESS IS?
A. YES.
Q. AND HOW MANY YEARS HAVE YOU BEEN WORKING IN THE INLAND MARINE TOWING BUSINESS?
A. PROBABLY ABOUT 20 YEARS.
Q. HOW MANY YEARS HAVE YOU BEEN A CAPTAIN?
A. ABOUT 15.
Q. I'M SORRY?
A. 15.
Q. AND HAVE ALL OF THOSE WORK YEARS BE IN THE GREATER NEW ORLEANS/BATON ROUGE AREA?
A. PRETTY MUCH, YES, SIR.
Q. ARE YOU FAMILIAR WITH THE INNER HARBOR NAVIGATION CANAL WHICH WE ALSO CALL THE INDUSTRIAL CANAL?
A. YES, SIR.
Q. AND HOW ABOUT THE AREA BETWEEN FLORIDA AND CLAIBORNE AVENUE BRIDGES?

1937

A. YES, SIR.
Q. AND WHAT TYPE OF TRAFFIC NORMALLY TRANSITS THAT AREA?
A. USUALLY, TOWING VESSELS, PERSONAL CRAFT, FISHING VESSELS, THAT TYPE OF TRAFFIC.
Q. "PERSONAL," YOU MEAN LIKE RECREATIONAL?
A. RECREATIONAL.
Q. HOW ABOUT YOURSELF? DO YOU REGULARLY TRANSIT THAT AREA?
A. YES, SIR.
Q. HAVE YOU TRANSITED THAT AREA REGULARLY OVER THE LAST 10, 15 YEARS OF YOUR CAREER?
A. YES, SIR.
Q. ARE YOU AWARE OF ANY SPEED RESTRICTIONS IN THAT AREA?
A. IT WOULD BE CONSIDERED A NO WAKE ZONE.
Q. WHAT DOES THAT MEAN, NO WAKE ZONE?
A. SLOW SPEED.
Q. IS THAT OBSERVED IN THAT AREA?
A. YES.
Q. AND SLOW SPEED MEANS WHAT IN KNOTS, IF YOU CAN TRANSLATE THAT?
A. DEPENDING ON THE VESSEL YOU'RE ON, USUALLY TWO, THREE KNOTS, FOUR KNOTS MAYBE, DEPENDING ON THE HULL DESIGN AND HOW MUCH WEIGHT YOU'RE TOWING.
Q. ARE YOU FAMILIAR WITH THE LAFARGE TERMINAL IN THAT AREA?
A. YES, SIR.
Q. AND WHERE IS THE LAFARGE TERMINAL LOCATED?

1938

A. IT'S LOCATED NEAR THE FLORIDA AVENUE BRIDGE ON THE NORTH BANK, I BELIEVE IT WOULD BE CONSIDERED.
Q. AND WHAT IS THAT AREA CONSIDERED IN FRONT OF THE TERMINAL, ITSELF, IN FRONT OF THE SILOS?
A. IT'S A BARGE SLIP.
Q. AND WHAT IS A SLIP?
A. IT'S AN AREA THAT'S USUALLY CUT OUT, YOU KNOW, TO REMOVE BARGES FROM THE IMMEDIATE -- YOU KNOW, OF ANY TRANSITING AREA, NAVIGATIONAL TRAFFIC AND THAT TYPE OF THING. KIND OF A SAFE HARBOR.
Q. WERE YOU WORKING ON AUGUST 27 AND 28 OF 2005, THAT'S THE SATURDAY AND SUNDAY BEFORE HURRICANE KATRINA?
A. YES, SIR.
Q. COULD YOU TELL THE JUDGE WHERE IT WAS THAT YOU WERE WORKING?
A. I WAS WORKING FOR STAGG MARINE.
Q. AND WERE YOU ON A TUG?
A. YES, SIR.
Q. WERE YOU CAPTAIN OF A TUG?
A. YES, SIR.
Q. AND WHAT WAS THE NAME OF THAT TUG?
A. THE MOTOR VESSEL MR. WAYNE.
Q. WAYNE, W-A-Y-N-E?
A. YES, SIR.
Q. ABOUT WHAT SIZE WAS THAT VESSEL?
A. IT WAS A REAL SMALL TOW, MAYBE 20 BY 50 AT THE MOST.