```
                                                          1890
 1                  UNITED STATES DISTRICT COURT
 2                  EASTERN DISTRICT OF LOUISIANA
 3
      **********************************************************
 4
      IN RE:  KATRINA CANAL
 5    BREACHES CONSOLIDATED
      LITIGATION
 6
                             CIVIL ACTION NO. 05-4182
 7                           SECTION "K" (2)
                             NEW ORLEANS, LOUISIANA
 8                           FRIDAY, JULY 2, 2010, 9:00 A.M.
 9    PERTAINS TO BARGE
10
      MUMFORD   C.A. NO. 05-5724
11    AS TO CLAIMS OF PLAINTIFFS
      JOSEPHINE RICHARDSON AND
12    HOLIDAY JEWELERS, INC.,
      ONLY
13
14    BENOIT   C.A. NO. 06-7516
      AS TO CLAIMS OF PLAINTIFFS
15    JOHN ALFORD AND JERRY
      ALFORD ONLY
16
17    **********************************************************
18
                      DAY 9, MORNING SESSION
19           TRANSCRIPT OF NONJURY TRIAL PROCEEDINGS
          HEARD BEFORE THE HONORABLE STANWOOD R. DUVAL, JR.
20                 UNITED STATES DISTRICT JUDGE
21
22    APPEARANCES:
23
      FOR THE PLAINTIFFS:    BEST KOEPPEL TRAYLOR
24                           BY:  LAURENCE E. BEST, ESQUIRE
                             2030 ST. CHARLES AVENUE
25                           NEW ORLEANS LA  70130
```

**1891**

APPEARANCES CONTINUED:

     LAW OFFICES OF BRIAN A. GILBERT
     BY:  BRIAN A. GILBERT, ESQUIRE
     2030 ST. CHARLES AVENUE
     NEW ORLEANS LA 70130

     KHORRAMI POLLARD ABIR
     BY:  SHAWN KHORRAMI, ESQUIRE
     44 FLOWER STREET, 33RD FLOOR
     LOS ANGELES CA  90071

     WILSON GROCHOW DRUKER & NOLET
     BY:  LAWRENCE A. WILSON, ESQUIRE
     223 BROADWAY, 5TH FLOOR
     NEW YORK NY  10279

     WIEDEMANN & WIEDEMANN
     BY:  LAWRENCE D. WIEDEMANN, ESQUIRE
      KARL WIEDEMANN, ESQUIRE
     821 BARONNE STREET
     NEW ORLEANS LA  70113

     PATRICK J. SANDERS
     ATTORNEY AT LAW
     3316 RIDGELAKE DRIVE
     SUITE 100
     METAIRIE LA  70002

     LAW OFFICE OF RICHARD T. SEYMOUR
     BY:  RICHARD T. SEYMOUR, ESQUIRE
     1150 CONNECTICUT AVENUE N.W.
     SUITE 900
     WASHINGTON DC  20036

FOR THE DEFENDANT:    CHAFFE MCCALL
     BY:  DEREK A. WALKER, ESQUIRE
     2300 ENERGY CENTRE
     1100 POYDRAS STREET
     NEW ORLEANS LA  70163

**1892**

APPEARANCES CONTINUED:

     GOODWIN PROCTER
     BY:  JOHN D. ALDOCK, ESQUIRE
      MARK S. RAFFMAN, ESQUIRE
      ADAM M. CHUD, ESQUIRE
      KIRSTEN V. K. ROBBINS, ESQUIRE
      ERIC I. GOLDBERG, ESQUIRE
     901 NEW YORK AVENUE N. W.
     WASHINGTON DC  20001

     SUTTERFIELD & WEBB
     BY:  DANIEL A. WEBB, ESQUIRE
     650 POYDRAS STREET, SUITE 2715
     NEW ORLEANS LA  70130

     LAFARGE NORTH AMERICA, INC.
     BY:  PETER KEELEY, ESQUIRE
     12950 WORLDGATE DRIVE
     HERNDON VA  20170

OFFICIAL COURT REPORTER:    CATHY PEPPER, CCR, RMR, CRR
     500 POYDRAS STREET, ROOM B406
     NEW ORLEANS, LOUISIANA 70130
     (504) 589-7779

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY. TRANSCRIPT PRODUCED BY COMPUTER.

**1893**

I N D E X

EXAMINATIONS                          PAGE

AUSTIN L. DOOLEY, PH.D. (CONTINUED)....................1894
CROSS-EXAMINATION BY MR. KHORRAMI......................1896
JAMES R. HALL..........................................1935
DIRECT EXAMINATION BY MR. WALKER.......................1935
CROSS-EXAMINATION BY MR. SANDERS.......................1967
REDIRECT EXAMINATION BY MR. WALKER.....................1987
RICHARD RIESS, JR......................................1995
DIRECT EXAMINATION BY MR. WALKER.......................1996
CROSS-EXAMINATION BY MR. GILBERT.......................2005
REDIRECT EXAMINATION BY MR. WALKER.....................2016
RECROSS-EXAMINATION BY MR. GILBERT.....................2020


E X H I B I T S
DESCRIPTION                           PAGE


EXHIBIT NO. DX348 WAS ADMITTED INTO EVIDENCE...........1967

**1894**

P-R-O-C-E-E-D-I-N-G-S

FRIDAY, JULY 2, 2010

M O R N I N G  S E S S I O N

(COURT CALLED TO ORDER)


    THE DEPUTY CLERK:  ALL RISE.  COURT IS IN SESSION. PLEASE BE SEATED.

    THE COURT:  GOOD MORNING.  BEFORE YOU START, AS I WAS RUMINATING THIS MORNING, I THOUGHT ABOUT A QUESTION I SHOULD HAVE ASKED MR. LEMON.  AND DR. DOOLEY MAY OR MAY NOT BE FAMILIAR WITH IT.  AND DON'T BE TOO ALARMED BECAUSE IT DOESN'T RELATE TO AN OPINION SO MUCH AS ME UNDERSTANDING THE FUNCTION OF THE DOPPLER RADAR.

    SO I'LL ASK YOU A QUESTION.  AND IT REALLY WASN'T PART OF YOUR TESTIMONY, BUT I WANT TO GET SOMETHING IN THE RECORD, IF POSSIBLE.  ONLY IF YOU KNOW IT, OF COURSE.

    THE WITNESS:  YES, SIR.

    THE COURT:  I UNDERSTAND THAT A FUNCTION OF THE RADAR IS THAT AFTER 64 NAUTICAL MILES OF WHAT COULD BE, IN ESSENCE, GOING AWAY FROM THE RADAR, RED, MAY APPEAR GREEN.

    THE WITNESS:  YES, SIR.  IT'S FOLDED AT THAT POINT.

    THE COURT:  EXACTLY.  MY QUESTION WAS IN REFERENCE THE SLIDELL RADAR.  IS THERE ALSO A DEGREE COMPONENT TO THAT, THAT IS, 90, 180?  IS IT SIMPLY NAUTICAL MILES, A CIRCLE OF 60 -- OR,

**1935**

1  THE COURT: THANK YOU. ANY REDIRECT?
2  MR. ALDOCK: NO REDIRECT, YOUR HONOR.
3  THE COURT: THANK YOU. SIR, YOU MAY STAND DOWN.
4      AND THE NEXT WITNESS IS?
5  MR. ALDOCK: THE NEXT WITNESS IS MR. HALL.
6  CAPTAIN HALL.
7  THE DEPUTY CLERK: WOULD YOU PLEASE RAISE YOUR RIGHT
8  HAND. DO YOU SOLEMNLY SWEAR THAT THE TESTIMONY WHICH YOU ARE
9  ABOUT TO GIVE WILL BE THE TRUTH, THE WHOLE TRUTH AND NOTHING BUT
10  THE TRUTH, SO HELP YOU GOD.
11  THE WITNESS: I DO.
12      JAMES R. HALL
13  WAS CALLED AS A WITNESS AND, AFTER BEING FIRST DULY SWORN BY THE
14  CLERK, WAS EXAMINED AND TESTIFIED ON HIS OATH AS FOLLOWS:
15  THE DEPUTY CLERK: WOULD YOU PLEASE STATE YOUR NAME AND
16  ALSO SPELL IT FOR THE RECORD.
17  THE WITNESS: JAMES R. HALL, H-A-L-L.
18  MR. WALKER: GOOD MORNING, MR. HALL.
19      MAY I PROCEED, YOUR HONOR?
20  THE COURT: YES, YOU MAY.
21      DIRECT EXAMINATION
22  BY MR. WALKER:
23  Q. BY WHOM ARE YOU PRESENTLY EMPLOYED, MR. HALL?
24  A. SMITH TOWING.
25  Q. ARE YOU A CAPTAIN? MAY I CALL YOU CAPTAIN?

**1936**

1  A. YES, SIR.
2  Q. DO YOU HOLD ANY COAST GUARD LICENSES?
3  A. YES, SIR.
4  Q. PLEASE DESCRIBE FOR THE COURT WHAT LICENSES YOU HOLD.
5  A. I HAVE A MASTER'S LICENSE FOR 100-TON VESSELS WITH A TOWING
6  ENDORSEMENT.
7  Q. WHAT DOES A TOWING ENDORSEMENT MEAN?
8  A. IT ALLOWS YOU TO OPERATE DIFFERENT SIZES OF TOWING VESSELS.
9  Q. DO YOU TOW BARGES? IS THAT WHAT YOUR BUSINESS IS?
10  A. YES.
11  Q. AND HOW MANY YEARS HAVE YOU BEEN WORKING IN THE INLAND
12  MARINE TOWING BUSINESS?
13  A. PROBABLY ABOUT 20 YEARS.
14  Q. HOW MANY YEARS HAVE YOU BEEN A CAPTAIN?
15  A. ABOUT 15.
16  Q. I'M SORRY?
17  A. 15.
18  Q. AND HAVE ALL OF THOSE WORK YEARS BE IN THE GREATER
19  NEW ORLEANS/BATON ROUGE AREA?
20  A. PRETTY MUCH, YES, SIR.
21  Q. ARE YOU FAMILIAR WITH THE INNER HARBOR NAVIGATION CANAL
22  WHICH WE ALSO CALL THE INDUSTRIAL CANAL?
23  A. YES, SIR.
24  Q. AND HOW ABOUT THE AREA BETWEEN FLORIDA AND CLAIBORNE AVENUE
25  BRIDGES?

**1937**

1  A. YES, SIR.
2  Q. AND WHAT TYPE OF TRAFFIC NORMALLY TRANSITS THAT AREA?
3  A. USUALLY, TOWING VESSELS, PERSONAL CRAFT, FISHING VESSELS,
4  THAT TYPE OF TRAFFIC.
5  Q. "PERSONAL," YOU MEAN LIKE RECREATIONAL?
6  A. RECREATIONAL.
7  Q. HOW ABOUT YOURSELF? DO YOU REGULARLY TRANSIT THAT AREA?
8  A. YES, SIR.
9  Q. HAVE YOU TRANSITED THAT AREA REGULARLY OVER THE LAST 10,
10  15 YEARS OF YOUR CAREER?
11  A. YES, SIR.
12  Q. ARE YOU AWARE OF ANY SPEED RESTRICTIONS IN THAT AREA?
13  A. IT WOULD BE CONSIDERED A NO WAKE ZONE.
14  Q. WHAT DOES THAT MEAN, NO WAKE ZONE?
15  A. SLOW SPEED.
16  Q. IS THAT OBSERVED IN THAT AREA?
17  A. YES.
18  Q. AND SLOW SPEED MEANS WHAT IN KNOTS, IF YOU CAN TRANSLATE
19  THAT?
20  A. DEPENDING ON THE VESSEL YOU'RE ON, USUALLY TWO, THREE KNOTS,
21  FOUR KNOTS MAYBE, DEPENDING ON THE HULL DESIGN AND HOW MUCH
22  WEIGHT YOU'RE TOWING.
23  Q. ARE YOU FAMILIAR WITH THE LAFARGE TERMINAL IN THAT AREA?
24  A. YES, SIR.
25  Q. AND WHERE IS THE LAFARGE TERMINAL LOCATED?

**1938**

1  A. IT'S LOCATED NEAR THE FLORIDA AVENUE BRIDGE ON THE NORTH
2  BANK, I BELIEVE IT WOULD BE CONSIDERED.
3  Q. AND WHAT IS THAT AREA CONSIDERED IN FRONT OF THE TERMINAL,
4  ITSELF, IN FRONT OF THE SILOS?
5  A. IT'S A BARGE SLIP.
6  Q. AND WHAT IS A SLIP?
7  A. IT'S AN AREA THAT'S USUALLY CUT OUT, YOU KNOW, TO REMOVE
8  BARGES FROM THE IMMEDIATE -- YOU KNOW, OF ANY TRANSITING AREA,
9  NAVIGATIONAL TRAFFIC AND THAT TYPE OF THING. KIND OF A SAFE
10  HARBOR.
11  Q. WERE YOU WORKING ON AUGUST 27 AND 28 OF 2005, THAT'S THE
12  SATURDAY AND SUNDAY BEFORE HURRICANE KATRINA?
13  A. YES, SIR.
14  Q. COULD YOU TELL THE JUDGE WHERE IT WAS THAT YOU WERE WORKING?
15  A. I WAS WORKING FOR STAGG MARINE.
16  Q. AND WERE YOU ON A TUG?
17  A. YES, SIR.
18  Q. WERE YOU CAPTAIN OF A TUG?
19  A. YES, SIR.
20  Q. AND WHAT WAS THE NAME OF THAT TUG?
21  A. THE MOTOR VESSEL MR. WAYNE.
22  Q. WAYNE, W-A-Y-N-E?
23  A. YES, SIR.
24  Q. ABOUT WHAT SIZE WAS THAT VESSEL?
25  A. IT WAS A REAL SMALL TOW, MAYBE 20 BY 50 AT THE MOST.

**1939**

1  Q.  JUST GIVE US A GENERAL DESCRIPTION.  WHAT WAS THE HEIGHT OF
2  YOUR PILOTHOUSE OR BRIDGE FROM THE WATER?
3  A.  VISIBILITY WOULD BE ABOUT 18-FOOT.
4  Q.  SO WHEN YOU SAY "VISIBILITY," THAT WOULD BE YOUR PILOTHOUSE
5  WHERE YOU WERE STANDING WOULD BE 18 FEET?
6  A.  YES, SIR.
7  Q.  AND WHAT KIND OF RADIOS DID YOU HAVE?
8  A.  VHF RADIOS, MARINE BAND.
9  Q.  AND WHAT CHANNELS DID YOU REGULARLY MONITOR?
10  A.  WE USUALLY MONITORED -- I KEPT ONE ON THE TRAFFIC CHANNEL,
11  WHICH IS 13 AND MONITORED THE COAST GUARD CHANNEL, EMERGENCY
12  COAST GUARD CHANNEL, 16.
13  Q.  AND WHAT'S CHANNEL 22?
14  A.  IT'S USUALLY A CHANNEL USED BY THE COAST GUARD FOR FURTHER
15  CONVERSATION AFTER -- PRETTY MUCH TO GET OFF OF 16, YOU KNOW, AN
16  ALTERNATE CHANNEL TO DISCUSS WHATEVER TYPE OF REPORT THAT YOU
17  MADE TO THE COAST GUARD OR WHATNOT.
18  Q.  SO 16 IS LIKE A GENERAL -- A COMMUNITY CHANNEL, IF YOU WILL,
19  AND IF YOU HAVE SOMETHING SPECIFIC TO DISCUSS, YOU GO TO CHANNEL
20  22 --
21  A.  EXACTLY.
22  Q.  -- TO COMMUNICATE WITH THE COAST GUARD?
23  A.  YES, SIR.
24  Q.  DID YOU HAVE A RADAR ON THE TUG?
25  A.  YES, SIR.

**1940**

1  Q.  WHAT WAS THE RANGE OF THAT RADAR?
2  A.  ABOUT 48 MILES.
3  Q.  AND WHAT HORSEPOWER WAS THE TUG?
4  A.  IT WAS CONSIDERED AN 800.
5  Q.  ON THE DAY BEFORE THE HURRICANE UP TO THE HURRICANE, WAS
6  YOUR RADAR WORKING?
7  A.  YES, SIR.
8  Q.  AND WERE YOUR RADIOS WORKING?
9  A.  YES, SIR.
10  Q.  AND WHAT TYPE IMAGE DO YOU -- DOES ONE SEE ON A RADAR
11  SCREEN?
12  A.  THE CHANNEL THAT YOU'RE IN, OUTSKIRTS OF THE CHANNEL,
13  BARGES, OTHER BOAT TRAFFIC, ANYTHING THAT, YOU KNOW, WOULD THROW
14  AN ECHO.
15  Q.  SO WOULD YOU SEE --
16  A.  BRIDGES.
17  Q.  I'M SORRY?
18  A.  BRIDGES.
19  Q.  OKAY.  WOULD YOU, FOR INSTANCE, SEE THE SILOS AT THE LAFARGE
20  TERMINAL OFF YOUR RADAR SCREEN?
21  A.  YES, OFF THAT AREA.
22  Q.  AND YOU SEE THE BANKS, YOU SAID?
23  A.  YES, SIR.
24  Q.  AND ANY VESSEL TRAFFIC, WHETHER IT'S BARGE, TUG, SHIP, YOU
25  COULD SEE THOSE ON YOUR SCREEN?

**1941**

1  A.  YES, SIR.
2  Q.  HOW ABOUT RAIN?
3  A.  YEAH, YOU CAN PICK UP RAIN.
4  Q.  YOU SAID YOU WERE WORKING IN BLACK BAY THE DAY BEFORE THE
5  HURRICANE?
6  A.  YES, SIR.
7  Q.  COULD YOU TELL US THE LOCATION RELATIVE TO NEW ORLEANS OF
8  BLACK BAY.
9  A.  IT WOULD BE CONSIDERED, I GUESS, SOUTHWEST OF NEW ORLEANS.
10  Q.  PRETTY MUCH DUE SOUTH OF LAKE BORGNE?
11  A.  YES, SIR.
12  Q.  AND WHAT WAS YOUR JOB?
13  A.  WE WERE ON A DEMOLITION JOB PICKING UP PIPE OFF THE BOTTOM,
14  DECOMMISSIONED PIPE, YOU KNOW, OUT OF SERVICE.
15  Q.  YOU HAD BARGES?
16  A.  YES, SIR.
17  Q.  AND THE DECOMMISSIONING WAS BEING DONE BY OTHER PEOPLE?
18  A.  YES, SIR.
19  Q.  AND WERE YOU LOADING THOSE BARGES WITH THE DEBRIS AND THEN
20  TAKING THEM SOMEWHERE?
21  A.  YES.
22  Q.  AND HOW WAS THE DECOMMISSIONING BEING DONE ITSELF BY THE
23  OTHER PEOPLE?
24  A.  THEY WERE DEPLOYING DIVERS AND THEY WERE RIGGING THE PIPE BY
25  CRANE, PICKING THE BARGES UP, PICKING THE PIPE UP TO THE DECK

**1942**

1  BARGE, CUTTING THEM PIPE IN LENGTHS, STACK THEM ON THE FLAT DECK
2  BARGES, AND ONCE WE HAD TWO LOADS OF FLAT DECK GENERALLY, WE
3  WOULD TAKE TWO FLAT DECK BARGES LOADED WITH THE PIPE AND PROCEED
4  TO SOUTHERN SCRAP IN THE INDUSTRIAL CANAL.
5  Q.  SO YOU WERE MAKING RUNS BASICALLY BETWEEN SOUTHERN SCRAP AND
6  THE INDUSTRIAL CANAL AND BLACK BAY?
7  A.  YES, SIR, REGULAR RUNS.
8  Q.  NOW, THAT SATURDAY BEFORE THE HURRICANE, WAS IT A NORMAL
9  WORKDAY?
10  A.  YES, SIR.
11  Q.  NORMAL WORKDAY FOR YOU AND FOR THE DIVERS?
12  A.  YES, SIR.
13  Q.  NOW, SUNDAY, YOU SHUT DOWN AND YOU DID LEAVE BLACK BAY,
14  DIDN'T YOU?
15  A.  YES, SIR.
16  Q.  AROUND WHAT TIME DID YOU LEAVE?
17  A.  AROUND DAYBREAK.
18  Q.  AND DID YOU TAKE ANY BARGES WITH YOU?
19  A.  YES, SIR.
20  Q.  HOW MANY?
21  A.  TWO.  OR THREE.  I THINK IT WAS THREE FLAT DECKS.
22  Q.  AND WERE YOU MONITORING THE WEATHER?
23  A.  YES, SIR.
24  Q.  WITH WHAT EQUIPMENT?
25  A.  RADAR, WEATHER CHANNEL, VHF BAND, AND ALSO REPORTS FROM THE

14 (Pages 1939 to 1942)

**1943**

1  TELEVISION IN THE GALLEY.
2  Q.  AND WHERE WERE YOU GOING WITH THESE BARGES?  WHAT WAS YOUR
3  PLAN?
4  A.  WE PLANNED ON GOING TO THE INDUSTRIAL CANAL, FIND A SAFE
5  PLACE, YOU KNOW, A SAFE HARBOR TO RIDE OUT THE STORM.
6  Q.  WHERE DID YOU EVENTUALLY DROP OFF THE BARGES?
7  A.  WE EVENTUALLY DROPPED OFF THE BARGES IN THE INDUSTRIAL CANAL
8  ABOVE THE PARIS ROAD BRIDGE.
9  Q.  I WOULD LIKE TO SHOW YOU DX-23, YOUR HONOR.
10       THE COURT:  YES, SIR.
11            EXAMINATION
12  BY MR. WALKER:
13  Q.  DO YOU RECOGNIZE THIS AS A NAVIGATIONAL CHART?
14  A.  YES, SIR.
15  Q.  AND, CAPTAIN HALL, THERE ARE TWO THINGS YOU CAN DO TO ASSIST
16  THE JUDGE, IF YOU TOUCH THE SCREEN WITH YOUR FINGER, IT WILL
17  LEAVE A MARK ON IT, OR IF YOU NEED TO, WE HAVE A LASER POINTER WE
18  CAN USE AS WELL.
19       THE COURT:  THERE IS ALSO, I THINK, A STYLUS -- THERE
20  USED TO BE ONE -- AN IMPLEMENT YOU CAN USE TO DRAW ON IT AS WELL.
21            EXAMINATION
22  BY MR. WALKER:
23  Q.  IN OTHER WORDS, INSTEAD OF YOUR FINGER.
24  A.  YEAH, OKAY.
25       THIS IS WHERE WE DROPPED THE BARGES.  HERE

**1944**

1  (INDICATING).
2  Q.  OKAY.  THAT'S WHERE YOU DROPPED OFF THE BARGES, JUST NORTH
3  OF THE PARIS AVENUE BRIDGE?
4  A.  YES, SIR.
5  Q.  AND IS THIS, WHERE MY POINTER IS, THAT'S PARIS AVENUE?
6  A.  YES, SIR.
7  Q.  AND IN WHAT DIRECTION IS THAT WATERWAY?  AND YOU CAN SEE A
8  COMPASS ROSE THERE IF YOU NEED IT.
9  A.  THAT WOULD BE RUNNING EAST AND WEST.
10  Q.  NOW, AFTER YOU DROPPED OFF THE BARGES, WHERE DID YOU GO?
11  AND YOU CAN TELL US AND YOU CAN ALSO SHOW THE JUDGE.
12       THE COURT:  JUST A MINUTE.  WE'RE LOOKING AT THE EXHIBIT
13  BOOK, I TAKE IT, AT DX-23?
14       MR. WALKER:  YES, YOUR HONOR.
15       THE COURT:  THAT'S JUST -- THIS IS JUST A --
16       MR. WALKER:  IF I MAY, YOUR HONOR.
17       THERE ARE TWO CHARTS, JANET, ONE BEHIND THE OTHER.
18       THE COURT:  YES.  AND THIS IS JUST -- OKAY.
19       MR. WALKER:  JANET, MAY I GIVE YOU THIS ONE?
20       THE CLERK:  THAT WOULD BE GREAT.
21       THE COURT:  THANKS.
22       MR. WALKER:  YES, YOUR HONOR.
23       ALL RIGHT.  THANK YOU, YOUR HONOR.
24            EXAMINATION
25  BY MR. WALKER:

**1945**

1  Q.  SO WHERE DID YOU GO AFTER YOU DROPPED OFF THE BARGES?
2  A.  AFTER DROPPING OFF THE BARGES, I PROCEEDED LIGHT BOAT UP TO
3  THE FLORIDA AVENUE BRIDGE, AROUND IN THIS AREA (INDICATING).
4  Q.  WHY DON'T YOU PUT AN IMPRINT THERE.
5       ALL RIGHT.  AND WHY DID YOU GO TO THAT AREA?
6  A.  LOOKING FOR A PLACE TO SECURE THE BOAT, YOU KNOW, TO RIDE
7  OUT THE STORM.
8  Q.  AND WAS THE BRIDGE UP OR DOWN?
9  A.  THE BRIDGE WAS DOWN AT THAT TIME.
10  Q.  MEANING YOU COULD NOT CROSS INTO THE WATERS BETWEEN
11  CLAIBORNE AND FLORIDA AVENUE?
12  A.  YES, SIR.
13  Q.  IF IT HAD BEEN OPEN, WOULD YOU HAVE GONE IN THERE?
14  A.  YES, SIR.  I WOULD HAVE PREFERRED TO GO INTO THE BUOY SYSTEM
15  IN BETWEEN THE CLAIBORNE BRIDGE AND THE FLORIDA AVENUE BRIDGE.
16  Q.  OKAY.  AND I'M GOING TO SHOW YOU DX-66, YOUR HONOR.  AND IF
17  WE CAN ENLARGE IT A BIT BETWEEN THE TWO BRIDGES.
18       DO YOU RECOGNIZE THIS AS BEING A PHOTOGRAPH OF THE AREA
19  BETWEEN THE FLORIDA AND CLAIBORNE AVENUE BRIDGES?
20  A.  YES, SIR.
21  Q.  COULD YOU SHOW THE JUDGE WHERE YOU WENT, WHERE YOU MADE UP
22  TO?
23  A.  I LANDED RIGHT HERE ON THE -- ON THE BULLNOSE, ON THE END OF
24  THE GUIDE WALL.
25  Q.  WHAT IS THIS WHITE THING?

**1946**

1  A.  THE WHITE THING WHERE?
2  Q.  I'M SORRY.  RIGHT THERE (INDICATING).
3  A.  IT'S A PROTECTION BARRIER, BULLNOSE, C-CELL.
4  Q.  DID YOU ACTUALLY TIE UP OR DID YOU JUST ACCOMMODATE YOURSELF
5  TO IT?
6  A.  I JUST PUT IT IN CLUTCH AND WAS LEANING AGAINST IT.
7  Q.  I'M GOING TO SHOW YOU -- WELL, BEFORE WE GO THERE, ARE THESE
8  THE BUOYS YOU'RE TALKING ABOUT?
9  A.  YES, SIR.
10  Q.  THESE WHITE DOTS?
11  A.  YES, SIR.
12  Q.  AND --
13       THE COURT:  APPROXIMATELY WHAT TIME WAS THAT THAT YOU
14  APPROACHED AND SNUGGED UP TO THE -- NEAR THE FLORIDA AVENUE
15  BRIDGE?
16       THE WITNESS:  AROUND 6:00 THAT EVENING, I WOULD THINK.
17            EXAMINATION
18  BY MR. WALKER:
19  Q.  AND THAT WOULD BE AROUND 6:00 P.M. SUNDAY EVENING?
20  A.  YES, SIR.
21       THE COURT:  THANK YOU.
22            EXAMINATION
23  BY MR. WALKER:
24  Q.  I'M GOING TO SHOW YOU NOW 284, WHICH -- BEFORE WE GO, I'M
25  SORRY, YOU WERE SAYING THESE ARE THE BUOYS?

## 1947

1  A.  YES, SIR.

2  Q.  AND WHAT WERE YOU TELLING THE COURT ABOUT THE BUOYS WHEN YOU

3  GOT HERE AND LOOKED DOWN?

4  A.  IF I WOULD HAVE HAD ACCESS TO THEM, I WOULD HAVE LIKED TO

5  HAVE TIED UP TO THEM AND SECURED MY BOAT.

6  Q.  BUT YOU COULDN'T GET THERE BECAUSE THE BRIDGE WAS DOWN?

7  A.  YES.

8  Q.  I'M GOING TO SHOW YOU 284.  THAT'S DX-284, YOUR HONOR.  AND

9  THIS IS AN OVERHEAD VIEW.  COULD YOU SHOW THE COURT --

10       CAN WE ELIMINATE THESE?

11       THE COURT:  YES, I'LL DO THAT.  WELL --

12       MR. WALKER:  THERE, THANK YOU, YOUR HONOR.

13            EXAMINATION

14  BY MR. WALKER:

15  Q.  THIS IS AN OVERHEAD.  YOU RECOGNIZE THIS AS THE

16  FLORIDA AVENUE BRIDGE?

17  A.  YES.

18  Q.  AND CAN YOU MARK AGAIN FOR THE COURT ON THIS OVERHEAD WHERE

19  YOU MADE UP TO?

20  A.  (WITNESS COMPLIES.)

21  Q.  SO THAT'S THE SAME CELL AS WE'VE SEEN IN THE PREVIOUS

22  EXHIBIT?

23  A.  YES.

24       MR. WILSON:  YOUR HONOR, WE HAVE A DEPOSITION THAT'S

25  DX-284, NOT A PHOTOGRAPH.

## 1948

1       THE COURT:  YOU HAVE A WHAT, I'M SORRY?

2       MR. WILSON:  A DEPOSITION TRANSCRIPT.

3       MR. WALKER:  THESE ARE DEPOSITION EXHIBITS, YOUR HONOR.

4  EXHIBIT 3 TO THE DEPOSITION, YOUR HONOR.

5       THE COURT:  OKAY.

6       MR. WILSON:  THANK YOU.

7            EXAMINATION

8  BY MR. WALKER:

9  Q.  HOW LONG DID YOU STAY IN THAT AREA?

10  A.  APPROXIMATELY 45 MINUTES TO AN HOUR.

11  Q.  AND COULD YOU SEE THE CLAIBORNE AVENUE BRIDGE?

12  A.  YES, SIR.

13  Q.  COULD YOU SEE THE ST. CLAUDE AVENUE BRIDGE?

14  A.  YES.

15  Q.  WHAT WAS YOUR VISIBILITY IN TERMS OF THE DISTANCE?

16  A.  A FEW MILES.  SEVERAL MILES.

17  Q.  SEVERAL MILES THAT DAY?

18  A.  YEAH, IT WAS PRETTY CLEAR.

19  Q.  WHAT WAS THE WEATHER LIKE?

20  A.  IT WAS OVERCAST, WIND BLOWING.

21  Q.  I'M GOING TO SHOW YOU 284.  AND AGAIN, ANOTHER PERSPECTIVE,

22  IS THAT THE CELL WHERE I'M POINTING THERE?

23  A.  YES.

24  Q.  COULD YOU MARK THAT FOR THE COURT.

25  A.  (WITNESS COMPLIES.)

## 1949

1  Q.  ALL RIGHT.  LOOKING AT THIS PHOTOGRAPH, IS THAT KIND OF HOW

2  THE WEATHER WAS THAT DAY?

3  A.  YEAH.

4  Q.  KIND OF GRAYISH?

5  A.  PRETTY MUCH.

6  Q.  IS THAT KIND OF REFLECTIVE OF THE VISIBILITY YOU MIGHT HAVE

7  HAD?

8  A.  YES.

9  Q.  COULD YOU SEE THE MOORING BUOYS FROM WHERE YOU WERE?

10  A.  YES.

11  Q.  BY THE WAY, DID YOU HAVE BINOCULARS?

12  A.  YES, SIR.

13  Q.  DID YOU USE THEM?

14  A.  YES, SIR.

15  Q.  AND WHY DID YOU USE THE BINOCULARS AS WELL AS JUST YOUR

16  SIGHT?

17  A.  JUST TO GET A CLEAR IMAGE OF THE WHOLE AREA.  I WAS LOOKING

18  THROUGHOUT THE WHOLE AREA.

19  Q.  THE WHOLE TIME YOU WERE THERE, DID YOU EVER SEE ANY LOOSE

20  BARGE DRIFTING AROUND IN ANY DIRECTION?

21  A.  NO, SIR.

22  Q.  ANY MOORED BARGE DOWN BY CLAIBORNE AVENUE AT THE BUOYS?

23  A.  NO, SIR.

24  Q.  ANY BARGE AT ALL FLOATING AROUND?

25  A.  NO, SIR.

## 1950

1  Q.  ANY TRAFFIC BETWEEN THE BARGES?

2  A.  NO, SIR.

3  Q.  DID ANY LOOSE BARGE APPEAR ON YOUR RADAR SCREEN?

4  A.  NO, SIR.

5  Q.  HOW ABOUT AT THE LAFARGE FACILITY, WOULD YOU MARK THE SPOT

6  WHERE YOU UNDERSTAND THAT TO BE.

7  A.  IN HERE (INDICATING).

8  Q.  ALL RIGHT.  DID YOU SEE ANY BARGES THERE?

9  A.  YES, SIR.

10  Q.  AND DID YOU SEE THEM VISUALLY?

11  A.  YES, SIR.

12  Q.  DID YOU SEE THEM ON YOUR RADAR?

13  A.  YES, SIR.

14  Q.  WERE THOSE BARGES LOOSE OR TIED?

15  A.  THEY WERE SECURED AT THE TIME.

16  Q.  AND THAT WAS, AGAIN, AROUND 6:00 P.M., BETWEEN 6:00, 7:00,

17  AS THE JUDGE ASKED YOU EARLIER?

18  A.  YES.

19  Q.  NOW, IF THERE IS A BREAKAWAY ON A NAVIGABLE WATER, IN YOUR

20  15 YEARS OF EXPERIENCE, WHAT HAPPENS?

21  A.  THE VESSELS IN THE AREA OF THE BREAKAWAY WOULD GENERALLY TRY

22  TO SECURE THE BREAKAWAY AND -- OR REPORT A BREAKAWAY, YOU KNOW.

23  Q.  DO YOU HEAR ABOUT IT ON THE RADIO?

24  A.  YES, SIR, YOU WOULD HEAR ABOUT IT.

25  Q.  AND Y'ALL CALL THAT "RADIO CHATTER"?

16 (Pages 1947 to 1950)

## 1951

1  A.  YES, SIR.
2  Q.  DURING THE TIME YOU TRANSITED FROM BLACK BAY TO THE DROP-OFF
3  POINT OF YOUR BARGES AND DURING THE TIME YOU MADE IT TO THIS
4  LOCATION, DID YOU EVER HEAR ANY RADIO CHATTER ABOUT A LOOSE BARGE
5  IN THE INDUSTRIAL CANAL?
6  A.  NO, SIR.
7  Q.  IN THE 15 YEARS YOU'VE BEEN WORKING IN THIS AREA, HAVE YOU
8  EVER EXPERIENCED PERSONALLY OR HEARD OF A WAVE WASH OR WAKE
9  INCIDENT BETWEEN THESE TWO BRIDGES?
10  A.  NO, SIR.
11  Q.  WHERE DID YOU GO AFTER THE HOUR YOU SPENT THERE AT THAT
12  LOCATION?
13  A.  I TURNED AROUND AND HEADED BACK DOWN THE CHANNEL TO WHERE WE
14  HAD SECURED THE BARGES.
15  Q.  WHERE DID YOU FINALLY FIND SAFE HARBOR AND RIDE OUT THE
16  STORM?
17  A.  AT THE OLD BULK TERMINAL.
18  Q.  COULD WE GO BACK TO THE CHART, THAT'S 23-B.
19      AND, JANET, I'LL GIVE YOU --
20      MAY I APPROACH, YOUR HONOR?
21      THE COURT:  YES, YOU MAY.
22          EXAMINATION
23  BY MR. WALKER:
24  Q.  CAN WE ERASE THAT.  I SEE, I CAN DO IT MYSELF.
25      DOES THIS CHART ALLOW YOU TO SHOW THE JUDGE WHERE YOU

## 1952

1  TIED UP?
2  A.  YES, SIR.
3  Q.  COULD YOU SHOW THE JUDGE WHERE THE NEW ORLEANS BULK TERMINAL
4  IS?
5      WE CAN BLOW IT UP MAYBE A LITTLE BIT.  YOU CAN GET RID
6  OF THIS.
7  A.  IN THIS AREA HERE (INDICATING).
8  Q.  NO, YOU CAN GET RID OF THAT.  IN OTHER WORDS, FROM HERE TO
9  HERE, IF YOU COULD, BLOW UP.  PERFECT.
10      ALL RIGHT.  SHOW THE COURT, WOULD YOU.  AND ACTUALLY,
11  YOU SEE IT UP THERE --
12  A.  YES.
13  Q.  -- IN TINY PRINT, DON'T YOU?
14  A.  YES.  IN THIS AREA (INDICATING).
15  Q.  SO WHY DON'T YOU MARK THAT WHERE YOU MADE UP.
16  A.  (WITNESS COMPLIES.)
17  Q.  WERE YOU ALONE THERE OR WERE THERE OTHER TUGS?
18  A.  THERE WERE SEVERAL OTHER TUGS.
19  Q.  DO YOU SEE THE FLORIDA AVENUE BRIDGE IN THIS CHART?
20  A.  YES, SIR.
21  Q.  AND COULD YOU MARK THAT FOR THE COURT AS WELL?
22  A.  (WITNESS COMPLIES.)
23  Q.  ALL RIGHT.  WHAT'S THE DISTANCE BETWEEN THE FLORIDA AVENUE
24  BRIDGE AND WHERE YOU TIED UP?
25  A.  ABOUT A MILE.

## 1953

1  Q.  AND WHEN YOU TIED UP, IN WHAT DIRECTION WAS YOUR PILOTHOUSE
   OR BRIDGE FACING?
3  A.  FACING TOWARDS THE JUNCTION.
4  Q.  WHAT DOES THAT MEAN?
5  A.  IT WAS FACING IN THIS AREA HERE (INDICATING).
6  Q.  OKAY.  WERE YOU FACING TOWARDS SOUTHERN SCRAP?
7  A.  YES, SIR.
8  Q.  AND WHAT DIRECTION ON THE COMPASS WOULD THAT BE?
9  A.  WEST.
10  Q.  AND COULD YOU MARK SOUTHERN SCRAP.
11  A.  SOUTHERN SCRAP WOULD BE IN THIS AREA.  NO, ACTUALLY,
   SOUTHERN SCRAP WOULD BE RIGHT HERE, ABOVE THE POINT.
13  Q.  ALL RIGHT.  AND WHAT TIME IS IT THAT YOU FINISHED TYING UP?
14  A.  JUST ABOUT SUNDOWN.
15  Q.  AT THAT TIME, IN WHAT DIRECTION WAS THE WIND BLOWING?
16  A.  OUT OF THE EAST.
17  Q.  OUT OF THE EAST?
18  A.  YES, SIR.
19  Q.  AND WHY ARE YOU CERTAIN OF THAT?
20  A.  BECAUSE IT WAS CHOPPY AND IT WAS -- AND THE WIND WAS HITTING
   ME ON MY STERN.  MY STERN WAS FACING EAST.
22  Q.  SO YOUR STERN WAS FACING EAST, AND YOUR PILOTHOUSE WAS
   FACING WEST?
24  A.  YES, SIR.
25  Q.  AND THE WIND WAS HITTING YOU AT YOUR BACK?

## 1954

1  A.  YES, SIR.
2  Q.  WHAT'S A DIRECTIONAL FLAG?
3  A.  A DIRECTIONAL FLAG, WIND FLAG LOCATED ON THE TOW HANGS ON
   THE BOW OF THE BOAT TO GIVE YOU THE DIRECTION OF THE WIND.
5  Q.  DID THE MR. WAYNE HAVE DIRECTIONAL FLAGS?
6  A.  YES, SIR.
7  Q.  ONE OR TWO?
8  A.  TWO.
9  Q.  AND COULD YOU SEE THE DIRECTIONAL FLAGS?
10  A.  YES, SIR.
11  Q.  AND WHAT DID THEY INDICATE TO YOU AS FAR AS THE WIND
   DIRECTION?
13  A.  WIND OUT OF THE EAST.
14  Q.  WIND OUT OF THE EAST.  OKAY.
15      DID THE WIND MAINTAIN THAT DIRECTION THROUGHOUT THE
   STORM?
17  A.  IT SLOWLY WALK AROUND THE STARBOARD SIDE OF MY VESSEL OVER A
   PERIOD OF TIME.
19  Q.  AND AT WHAT TIME DID THAT START HAPPENING?
20  A.  IT WAS AROUND -- IN BETWEEN DAYLIGHT AND 9 O'CLOCK, YOU
   KNOW.
22  Q.  THE NEXT MORNING?
23  A.  YES.
24  Q.  AND IS THAT AFTER THE EYEWALL HAD PASSED?
25  A.  YES.

**1955**

1 Q. SO FROM --

2 A. AS IT WAS PASSING.

3 Q. AS IT WAS PASSING.

4 SO FROM APPROXIMATELY 7:38 P.M. ON SUNDAY THROUGH

5 8:00 A.M. MONDAY MORNING, THE WIND WAS ALWAYS FROM THE EAST ON

6 YOUR STERN?

7 A. YEAH.

8 Q. DURING THAT EVENING THAT YOU'LL RECOUNT TO THE JUDGE IN A

9 SECOND, YOUR EXPERIENCE IN THE HURRICANES, DID THE WIND EVER BLOW

10 FROM THE WEST OR THE SOUTH?

11 A. NO, SIR.

12 Q. DID YOU EXPERIENCE STORM SURGE?

13 A. STORM SURGE. YES, SIR. I EXPERIENCED THE SURGE AS IT CAME

14 IN, YOU KNOW.

15 Q. HOW HIGH DID IT -- HOW HIGH WAS THE SURGE AT ITS CREST OR

16 PEAK?

17 THE COURT: WHEN YOU SAY "HOW HIGH," I'M JUST TRYING TO

18 GET THE PARAMETERS OF WHAT THE FLOOR IS. FROM WHERE ARE WE

19 MEASURING IT?

20 MR. WALKER: THANK YOU, YOUR HONOR. THAT'S A BAD

21 QUESTION.

22 EXAMINATION

23 BY MR. WALKER:

24 Q. I WOULD RATHER YOU DESCRIBE FOR THE JUDGE YOUR EXPERIENCES

25 AS YOU WERE TIED UP THERE AND WHAT HAPPENED WITH YOUR TUG THAT

**1956**

1 INDICATED TO YOU THE SURGE.

2 A. IT LIFTED -- IT LIFTED OUR BOATS AT LEAST 20 FEET.

3 Q. AND SO YOU'RE SAYING THAT THE WATER ELEVATED YOUR BOAT

4 20 FEET?

5 A. YES.

6 Q. WHAT HAPPENED TO YOUR RUDDER AND YOUR PROPELLER WHEN THAT

7 SURGE CAME?

8 A. AT THE CREST OF THE SURGE, IT HAD PICKED US UP OVER THE DOCK

9 THAT WE WERE SECURED TO. AND THE DECKHANDS ON THE OUTER BOATS

10 ACTUALLY HAD TO CUT THE LINES FROM BEING -- YOU KNOW, THE BOATS

11 WERE BEING PULLED BY THE LINES, AND THEY WERE EITHER GOING TO

12 BREAK AT THAT POINT OR, YOU KNOW, ENDANGER THE VESSEL OF

13 CAPSIZING.

14 SO THE OUTER LINES WERE CUT. AND THEN WE WERE PICKED

15 UP AND PUSHED OVER THE TOP OF THE DOCK. AND WE CRANKED UP TO

16 KEEP FROM RUDDERS AND WHEELS DRAGGING ON TOP OF THE DOCK. WE

17 WERE ACTUALLY OVER THE TOP OF DOCK, SO WE CRANKED UP AND WORKED

18 BACK IN.

19 Q. AND THAT CREST WAS AROUND WHAT TIME?

20 A. AROUND 9:00.

21 Q. 9:00 THE MORNING ON MONDAY?

22 A. YES, SIR.

23 Q. AND IT WAS SO HIGH, SO RADICAL A CHANGE THAT YOU HAD TO CUT

24 LINES OR YOU WOULD HAVE BEEN PULLED UNDER?

25 A. YES, SIR.

**1957**

1 Q. OR THE ROPES WOULD HAVE BROKEN?

2 A. THEY WOULD HAVE BROKEN.

3 Q. NOW, ON THIS SAME EXHIBIT --

4 CAN WE CLEAR THINGS ONE BY ONE OR IS IT JUST A TOTAL

5 CLEAR?

6 THAT'S ALL RIGHT. I'LL JUST CLEAR THE WHOLE THING.

7 WHAT IS THIS DARK LINE HERE THAT I'M POINTING TO?

8 A. THE OLD BULK TERMINAL.

9 Q. IS THAT A FLOODWALL?

10 A. YEAH, THAT WOULD BE -- THAT WOULD BE THE FLOODWALL THAT RUN

11 PARALLEL TO THE DOCK, YEAH.

12 Q. ALL RIGHT. AND HOW FAR FROM THAT FLOODWALL WERE YOU TIED?

13 A. MAYBE 50 YARDS.

14 Q. DID YOU HAVE A CLEAR VIEW OF IT?

15 A. YES.

16 Q. AND IS THAT THE AREA IN FRONT -- I'M SORRY, THE DOCK THAT

17 YOU WERE TALKING ABOUT THAT YOU -- THAT THE SURGE TOOK YOU OVER,

18 THAT WOULD BE JUST IN FRONT, WATERSIDE OF THAT WALL?

19 A. YES.

20 Q. OKAY. AND DESCRIBE TO THE COURT, I KNOW YOU TOLD US THE

21 CREST WAS 20, 25 FEET, WAS IT SUDDEN? WAS IT GRADUAL? HOW DID

22 THIS HAPPEN? OVER WHAT COURSE OF TIME?

23 A. IT WAS A SLOW, GRADUAL LIFT, YOU KNOW.

24 Q. OVER A COURSE OF MINUTES, HOURS?

25 A. SEVERAL HOURS.

**1958**

1 Q. SEVERAL HOURS.

2 CAN YOU COMPARE IT TO ANYTHING IN YOUR EXPERIENCE?

3 A. IT'S KIND OF LIKE SLOWLY BEING LOCKED IN A LOCK CHAMBER.

4 JUST A SLOW ELEVATION. NATURALLY WE HAD SEAS HITTING OUR STERN,

5 BUT, YOU KNOW, THE RISE WAS A SLOW, GRADUAL RISE LIKE BEING

6 LOCKED A LOCK CHAMBER.

7 Q. SO LIKE PUTTING YOUR VESSEL IN THE ST. CLAUDE OR THE LOCKS

8 IN THE PANAMA CANAL AND JUST RISING WITH THE TIDE?

9 A. YES, SIR.

10 Q. YOU HAD A CLEAR VIEW OF THAT FLOODWALL?

11 A. YES, SIR.

12 Q. CAN YOU DESCRIBE FOR THE JUDGE, WHAT HAPPENED TO THAT

13 FLOODWALL AS YOU WERE LOOKING AT IT?

14 A. IT EVENTUALLY COLLAPSED.

15 Q. WHAT DID YOU SEE? DID YOU ACTUALLY SEE IT COLLAPSE?

16 A. YES.

17 Q. HOW LARGE A HOLE OR BREACH WAS CREATED?

18 A. AT FIRST PROBABLY 40-, 50-FOOT.

19 Q. AND THEN WHAT DID YOU SEE AFTER THIS WALL COLLAPSED? BY THE

20 WAY, DID ANYTHING HIT IT TO CAUSE IT TO COLLAPSE?

21 A. NO. NO. IT PRETTY MUCH COLLAPSED, I WOULD ESTIMATE, UNDER

22 WATER PRESSURE.

23 Q. AND AROUND WHAT TIME DID THAT HAPPEN?

24 A. AROUND THE TIME THAT IT CRESTED, AROUND 9:00.

25 Q. AROUND 9:00 A.M. ON MONDAY?

## 1959

1  A.  YES, SIR.

2  Q.  WHAT HAPPENED AFTER THAT WALL COLLAPSED?  AND BY THAT I

3  MEAN, WHAT DID YOU SEE?

4  A.  AT THAT TIME, THAT'S WHEN THE EYEWALL HAD WORKED COMPLETELY

5  AROUND AND EVERYTHING WAS GETTING PRETTY ERRATIC.  AND THEY HAD

6  SEVERAL LASH BARGES THAT HAD BROKEN AWAY UP ABOVE US, AND IT CAME

7  DOWN ON THE DOCK FACILITY.

8  Q.  WHEN YOU SAY "UP ABOVE," YOU MEAN WEST OF THE U?

9  A.  YES, SIR.

10  Q.  SO LASH BARGES WERE LOOSE AT THAT TIME COMING TOWARDS YOU?

11  A.  YES, SIR.

12  Q.  ANYTHING ELSE COMING TOWARDS YOU?

13  A.  I BELIEVE, THEY HAD SEVERAL THINGS THAT HAD BROKEN AWAY.  I

14  BELIEVE IT WAS A HOPPER BARGE THAT HAD ACTUALLY HIT THE LASH

15  BARGES AND CAUSED THEM TO BREAK AWAY.  AND THEY HAD SEVERAL

16  THINGS COMING, YOU KNOW, IN THAT DIRECTION DOWN THE CHANNEL.

17  Q.  AND WHAT EVENTUALLY HAPPENED TO THESE BARGES AND THESE

18  CONTAINERS?

19  A.  WELL, AS THE FLOODWALL COLLAPSED, TWO OF THE BARGES, ONE OR

20  TWO OF THEM ACTUALLY WENT ON THE OUTSIDE OF THE -- OF THE DOCK,

21  AND I THINK THREE OF THEM COME ON THE INSIDE, ALONG WITH

22  CONTAINERS, SHIPPING CONTAINERS AND DEBRIS, JUST MISCELLANEOUS

23  STUFF, AND IT ALL KIND OF WAS SUCKED THROUGH THE BREACH IN THE

24  WALL AND THEN KIND OF -- EVERYTHING KIND OF RAN OUT LIKE CATTLE,

25  YOU KNOW, RUNNING THROUGH A CATTLE GAP.

## 1960

1  Q.  AND THEY ENDED UP ON THE OTHER SIDE OF THIS FLOODWALL AFTER

2  THEY RAN THROUGH THIS BREACH LIKE CATTLE?

3  MR. GILBERT:  YOUR HONOR, I WOULD LIKE TO OBJECT.  I

4  WOULD HAVE DONE IT A FEW MINUTES AGO IF I HAD BEEN NOTICED

5  STANDING UP.  THIS IS IRRELEVANT TO THE BREACH ON THE

6  INDUSTRIAL CANAL.  THIS IS A COMPLETELY DIFFERENT AREA,

7  COMPLETELY DIFFERENT CIRCUMSTANCES.  THERE IS NOTHING ESTABLISHED

8  ABOUT THE CONFIGURATION OR DESIGN OR CAPACITY OF THESE

9  FLOODWALLS.  THERE HAS BEEN NO TESTIMONY ABOUT ANY OF THE SOILS,

10  PERMEABILITY, SEEPAGE, ANYTHING.

11  THIS IS -- THIS IS -- WITH RESPECT, YOUR HONOR,

12  THIS IS A RED HERRING, NOT RELEVANT TO THE BREACH THAT WE'RE HERE

13  ABOUT TODAY.  THIS IS LIKE SAYING THERE WAS A CAR CRASH OVER

14  THERE SO NOW WE KNOW HOW THIS CAR CRASH HAPPENED.

15  THE COURT:  I UNDERSTAND YOUR OBJECTION.  I'M GOING TO

16  OVERRULE IT.  IT'S NOTED FOR THE RECORD AND MADE GENERAL TO THIS

17  LINE OF QUESTIONING.  THE COURT WILL EVENTUALLY LOOK AT IT AND

18  DETERMINE HOW MUCH WEIGHT IT HAS.

19  EXAMINATION

20  BY MR. WALKER:

21  Q.  LET'S LOOK AT 308, IF WE COULD.

22  YES, THAT'S RIGHT.

23  THIS AREA HERE (INDICATING), DO YOU RECOGNIZE THAT?

24  A.  YES.

25  Q.  ARE THESE CONTAINERS?

## 1961

1  A.  YES.

2  Q.  IS THAT WHERE THE CONTAINERS CAME FROM?

3  A.  I WOULD IMAGINE.  THAT WOULD BE THE ONLY CONTAINER STORAGE

4  FACILITY IN THE AREA.  THAT'S WHERE I IMAGINE THEY CAME FROM.

5  Q.  AND THAT'S RIGHT ABOVE THE FLORIDA AVENUE BRIDGE?

6  A.  YES.

7  Q.  AT THAT JUNCTURE?  AS YOU SAID, "JUNCTION"?

8  A.  YES.  EAST OF THE FLORIDA AVENUE BRIDGE, BUT YEAH.

9  Q.  ALL RIGHT.  AFTER THE WINDS AND THE STORM AND THE SURGE DIED

10  DOWN, WHERE DID YOU GO AFTER THIS EXPERIENCE?

11  A.  AFTER EVERYTHING WAS OVER WITH, I SURVEYED THE DAMAGE ON MY

12  BOAT AND WE CRANKED UP AND TURNED LOOSE AND HEADED BACK UP TO THE

13  FLORIDA AVENUE BRIDGE.

14  Q.  BACK TO THIS PHOTOGRAPH WE'VE SEEN BEFORE, IS THIS BACK

15  WHERE YOU WENT?

16  A.  YES, SIR.

17  Q.  AND WOULD YOU MARK AGAIN FOR THE JUDGE WHERE YOU WENT.  IS

18  IT THE SAME CELL?

19  A.  YES.

20  Q.  YOU NOTICE THIS IS A PHOTOGRAPH THAT SHOWS WATER GOING INTO

21  THE INDUSTRIAL CANAL FROM THE NEIGHBORHOOD, SO IT'S SOMETIME

22  SHORTLY AFTER THE HURRICANE.  DID THE AREA GENERALLY APPEAR LIKE

23  THIS TO YOU --

24  THE COURT:  I'M SORRY, SIR.  I DIDN'T SEE YOU.  YOU HAVE

25  AN OBJECTION?

## 1962

1  MR. GILBERT:  OBJECTION TO THE LEADING QUESTION.  WE

2  DON'T KNOW IF THAT'S GOING IN OR OUT.

3  MR. WALKER:  I'LL WITHDRAW THE QUESTION, YOUR HONOR.

4  THE COURT:  THANK YOU, SIR.

5  EXAMINATION

6  BY MR. WALKER:

7  Q.  CAPTAIN HALL, LOOKING AT THIS OVERVIEW AERIAL, DID THE

8  GENERAL -- DID THE APPEARANCE OF THE AREA, WAS IT LIKE THAT WHEN

9  YOU GOT THERE THAT AFTERNOON?

10  A.  PRETTY MUCH.  AS YOU SAY, THE WATER IS FLOWING BACK INTO THE

11  INDUSTRIAL FROM THERE.

12  Q.  DID YOU SEE ANY BARGES AT THAT POINT WHEN YOU MADE UP, ANY

13  LOOSE BARGES?

14  A.  THERE WAS BARGES EVERYWHERE.

15  Q.  WHEN YOU CAME TO THAT LOCATION, DID YOU NOTICE THIS BARGE

16  THAT I'M INDICATING HERE?

17  A.  YES.  THAT WAS PRETTY EVIDENT.

18  Q.  HAD THAT BARGE BEEN THERE THE DAY BEFORE WHEN YOU MADE UP TO

19  THE SAME CELL?

20  A.  NO, SIR.

21  Q.  WERE YOU THERE ALONE OR WITH ANYBODY ELSE?

22  A.  THEY HAD ANOTHER BOAT THAT WAS THERE, A BOAT CALLED

23  THE BRAVE.

24  Q.  AND WHAT HAPPENED WHILE YOU AND THE BRAVE WERE THERE?  JUST

25  TELL THE COURT.

## 1963

1  A. WE SEEN SEVERAL WORKERS AT THE PUMPING STATION HERE.
2  Q. THAT'S WHAT'S MARKED WITH A CIRCLE AND THE ARROW?
3  A. YES.
4  Q. THAT'S A SEWERAGE AND WATER PUMP STATION?
5  A. YES.
6  Q. AND YOU SAW SOME WORKERS?
7  A. AND THEY WERE CALLING FOR HELP.
8  Q. AND DID YOU ASSIST THEM?
9  A. YES, SIR.
10 Q. WHAT DID YOU DO TO ASSIST THEM AND HOW LONG DID YOU STAY
11 THERE?
12 A. WE PUT DECKHANDS OVERBOARD IN A SKIFF TO RETRIEVE THEM, YOU
13 KNOW, AND GET THEM TO DRY LAND, GET THEM SOMEWHERE OUT OF THE
14 FLOODWATERS.
15 Q. AND DID ANY OF THESE WORKERS TELL YOU OR YOUR DECKHANDS
16 ANYTHING ABOUT HAVING SEEN A WALL COLLAPSE OR A BARGE HIT A WALL?
17    MR. SANDERS: OBJECTION, CALLS FOR HEARSAY.
18    THE COURT: SUSTAINED.
19        EXAMINATION
20 BY MR. WALKER:
21 Q. AFTER THE RESCUE, IF I CAN CALL IT THAT, WHERE DID YOU GO?
22 A. WE -- AFTER STAYING THERE A LITTLE WHILE, WE WENT BACK DOWN,
23 YOU KNOW, SLOWLY GOING BACK DOWN THE CHANNEL LOOKING AT THE
24 DAMAGE AND THE DESTRUCTION.
25 Q. WHEN YOU SAY "DOWN THE CHANNEL," WERE YOU GOING TOWARDS

## 1964

1  PARIS AVENUE OR TOWARDS CLAIBORNE AVENUE?
2  A. TOWARD THE PARIS ROAD BRIDGE.
3  Q. SO YOU WERE GOING BACK TOWARDS YOUR BARGES?
4  A. YES.
5  Q. AT THE POINT WHEN YOU CAME HERE TO DO THE RESCUE, YOU DIDN'T
6  HAVE YOUR BARGES?
7  A. NO, SIR.
8  Q. THIS WAS IMMEDIATELY AFTER YOU LEFT THE NEW ORLEANS BULK
9  TERMINAL, THIS WAS THE FIRST LOCATION YOU WENT TO?
10 A. YES.
11 Q. AS YOU TRANSITED DOWN FROM FLORIDA AVENUE TOWARDS
12 PARIS AVENUE, CAN YOU RELATE TO THE JUDGE WHAT YOU OBSERVED?
13 A. JUST DESTRUCTION. TOTAL DESTRUCTION.
14 Q. HOW ABOUT IN TERMS OF BARGES AND EQUIPMENT?
15 A. BREAKAWAY BARGES, GROUNDED BARGES, BARGES OUT THE WOODS,
16 SEVERAL MILES OUT IN THE WOODS.
17 Q. THOSE THAT YOU SAW SEVERAL MILES IN WOODS, WAS THERE ANY
18 DIFFERENTIATION THAT YOU COULD SEE BETWEEN LIGHT AND LOADED?
19 A. THOSE BARGES WERE ACTUALLY CRANE BARGES, DERRICK BARGES.
20 Q. WHAT I MEAN IS THOSE THAT WERE FURTHER INLAND, DID THEY TEND
21 TO BE LIGHT BARGES OR LOADED BARGES, IF YOU COULD TELL?
22 A. THEY HAD BIG, HEAVY SALVAGE CRANES ON THEM. THEY WERE
23 LOADED BARGES. I WOULD CONSIDER THEM LOADED BARGES.
24 Q. I SHOW YOU DX-72. DO YOU REMEMBER SEEING THESE BARGES?
25 A. YES, SIR, AFTER I PASSED THROUGH THE AREA.

## 1965

1  Q. AND YOU SEE THE CITY UP HERE?
2  A. YES, SIR.
3  Q. AND WHERE IS PARIS AVENUE IN RELATION TO THIS LOCATION?
4  A. IT WOULD BE FURTHER EAST.
5  Q. SO DOWN; IS THAT RIGHT?
6  A. YEAH, BACK HERE (INDICATING).
7  Q. OKAY.
8     THE COURT: JUST FOR THE RECORD, ANY OBJECTIONS MADE
9  IN LIMINE TO ANY OF THESE EXHIBITS ARE PRESERVED FOR THE RECORD.
10    MR. GILBERT: THANK YOU, YOUR HONOR.
11    THE COURT: SO YOU DON'T HAVE TO INTERRUPT THE TRIAL,
12 BUT THEY ARE PRESERVED. GO AHEAD.
13        EXAMINATION
14 BY MR. WALKER:
15 Q. SO THESE WOULD HAVE BEEN -- AND I'M SORRY, CAPTAIN HALL, DO
16 YOU SPECIFICALLY REMEMBER SEEING THESE BARGES?
17 A. YES.
18 Q. DO YOU KNOW WHERE THEY CAME FROM?
19 A. I WOULD IMAGINE THEY CAME FROM THE CEMENT FACILITY DOWN
20 BELOW THE BRIDGE, BUT I'M NOT SURE. I DIDN'T SEE THEM ACTUALLY.
21 Q. RIGHT. YOU DON'T KNOW ONE WAY OR THE OTHER WHERE THEY CAME
22 FROM?
23 A. NO. BUT THEY ARE CEMENT BARGES AND THAT'S A CEMENT
24 FACILITY, YOU KNOW, SO (WITNESS TRAILS OFF).
25 Q. NOW, ANYTIME SUNDAY WHILE YOU WERE AT THE FLORIDA AVENUE

## 1966

1  CELL OR AFTER YOU WERE TIED UP AT THE NEW ORLEANS BULK TERMINAL,
2  DID YOU EVER HEAR -- STRIKE THAT.
3     WHILE YOU WERE AT THE NEW ORLEANS BULK TERMINAL TIED UP
4  OR PRIOR TO THAT WHILE YOU WERE AT FLORIDA AVENUE LOOKING FOR
5  SAFE HARBOR, DID YOU SEE ANY TORNADOES?
6  A. NO, SIR.
7  Q. DID YOU SEE ANY WATERSPOUTS?
8  A. NO, SIR.
9  Q. DID YOUR RADAR PICK UP ANY OF THAT TYPE OF ACTIVITY?
10 A. NO, SIR.
11 Q. DID YOU EXPERIENCE ANY LIGHTNING OR SUDDEN ISOLATED
12 THUNDERSTORMS?
13 A. NO, SIR.
14 Q. DID YOU EXPERIENCE ANY SUDDEN GUSTS OF WIND, DOWNDRAFTS OR
15 BURSTS OF WINDS THAT CAME FROM A DIRECTION OTHER THAN THE
16 PREVAILING WIND?
17 A. NO, SIR. OTHER THAN THE HURRICANE WIND, THAT'S IT.
18    MR. WALKER: EXCUSE ME, YOUR HONOR.
19    THE COURT: YES, SIR.
20    MR. WALKER: THANK YOU, YOUR HONOR.
21    THANK YOU, CAPTAIN HALL.
22    THE COURT: THANK YOU. AND WE WILL GIVE YOU ABOUT TEN
23 MINUTES FOR A RECESS, AND WE WILL DO CROSS-EXAMINATION. THANK
24 YOU.
25    THE DEPUTY CLERK: ALL RISE.

## 1967

1  (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, A BRIEF
2  RECESS WAS TAKEN.)
3  THE DEPUTY CLERK:  ALL RISE, PLEASE.  COURT IS IN
4  SESSION.  PLEASE BE SEATED.
5  MR. WALKER:  YOUR HONOR, IF WE MAY.
6  THE COURT:  YES, SIR.
7  MR. WALKER:  HOUSEKEEPING, THE TWO CHARTS THAT I HANDED
8  TO JANET DURING THE COURSE OF MY EXAMINATION, WE'RE JUST GOING TO
9  GIVE THOSE A SEPARATE EXHIBIT NUMBER, IF YOU DON'T MIND,
10  YOUR HONOR.
11  THE COURT:  THAT'S FINE.
12  MR. WALKER:  THAT WAY, MR. SANDERS WILL REFER TO THEM IN
13  HIS EXAMINATION BY THAT NUMBER.  THEY WILL BE DX348 TOGETHER.
14  THE DEPUTY CLERK:  YOU WANT THEM TOGETHER?
15  MR. WALKER:  IS IT EASIER FOR YOU TO HAVE SEPARATE
16  NUMBERS?
17  THE DEPUTY CLERK:  NO, YOU CAN DO IT 348 EN GLOBO.
18  MR. WALKER:  DX348, YOUR HONOR, WE MOVE THOSE INTO
19  EVIDENCE.  THANK YOU, YOUR HONOR.
20  THE COURT:  YES, SIR.  LET THEM BE ADMITTED.
21  (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS,
22  EXHIBIT NO. DX348 WAS ADMITTED INTO EVIDENCE.)
23  CROSS-EXAMINATION
24  BY MR. SANDERS:
25  Q.  MR. HALL, MY NAME IS PAT SANDERS.  DO YOU REMEMBER ME FROM

## 1968

1  YOUR DEPOSITION?
2  A.  YES, SIR.
3  Q.  NOW, WITH REGARD TO YOUR WORK AT BLACK BAY, YOU LEFT
4  BLACK BAY WITH THREE BARGES; IS THAT CORRECT?
5  A.  YES, SIR.
6  Q.  AND YOU TIED THOSE BARGES UP ON THE -- WHAT WAS THE BODY OF
7  WATER?
8  A.  ON THE INDUSTRIAL CANAL.
9  Q.  AND AT SOME POINT IN TIME ON SUNDAY, YOU PASSED THE
10  FLORIDA BRIDGE, YOU INDICATED, AND IT WAS DOWN; IS THAT CORRECT?
11  A.  YES.
12  Q.  AND WHAT TIME OF DAY WAS THAT, INITIALLY?
13  A.  INITIALLY, THE FIRST TIME I CAME UP?
14  Q.  CORRECT.
15  A.  IT WAS IN THE EVENING TIME, 6:30 OR SO, GIVE OR TAKE
16  30 MINUTES.
17  Q.  THAT'S THE FIRST TIME YOU WENT UP THERE.  YOU DIDN'T GO UP
18  THERE PRIOR TO THAT, TO THE FLORIDA BRIDGE?
19  A.  AFTER WE GOT THERE THAT EVENING IS WHEN -- WAS THE FIRST
20  TIME I ACTUALLY WENT UP.
21  Q.  LET ME TAKE IT STEP BY STEP.  YOU LEFT BLACK BAY WITH THE
22  BARGES, CORRECT?
23  A.  UH-HUH (AFFIRMATIVE RESPONSE).
24  Q.  YOU MOORED THOSE BARGES; IS THAT CORRECT?
25  A.  CORRECT.

## 1969

1  Q.  THEN WHERE DID YOU GO?
2  A.  AFTER I LEFT THERE IS WHEN I WENT UP LIGHT BOAT TO FLORIDA
3  STREET BRIDGE.
4  Q.  AND WHAT TIME OF DAY WAS THAT?
5  A.  IT WAS AROUND 6:00, 6:30 BECAUSE WE HAD GOTTEN THERE AROUND
6  5:00 OR SO, I WOULD IMAGINE.
7  Q.  IT WAS YOUR INTENTION, THOUGH, YOU WERE GOING TO
8  SOUTHERN SCRAP TO CHECK THEM OUT; IS THAT CORRECT?
9  A.  THAT WAS AN OPTION.
10  Q.  BUT DID YOU GO TO SOUTHERN SCRAP?
11  A.  NO.
12  Q.  NOW, WITH REGARD TO THE MOORING OF THE BARGES YOU DID, HOW
13  DID YOU MOOR THOSE BARGES?
14  A.  THEY WERE EQUIPPED WITH A SPUD SYSTEM, AND THE OTHER BOAT
15  THAT WAS WITH ME, THAT WAS WORKING FOR THE COMPANY ALSO, HE HAD
16  TWO CRANE BARGES WITH A SPUD SYSTEM, AND WE SECURED THEM TO THE
17  CRANE BARGES AND MADE A FENDER SYSTEM, A PROTECTION SYSTEM.
18  Q.  AND YOU MOORED FOR THE HURRICANE WITH MULTIPLE PARTS OF
19  ROPE; IS THAT CORRECT?
20  A.  JUST FORE AND AFT, FORE AND AFT LINES, YEAH.
21  Q.  FORE AND AFT LINES, MULTIPLE PARTS ON EACH ONE?
22  A.  YEAH.
23  Q.  AND YOU ALSO USED WIRE ROPE; IS THAT CORRECT?
24  A.  FOR THE ONES THAT WAS EQUIPPED WITH WIRE ROPE, WE USED WIRE
25  ROPE, BUT THE DECK BARGES WASN'T EQUIPPED WITH WIRE ROPE.

## 1970

1  Q.  IS IT FAIR TO SAY YOU PUT THE WIRE ROPE ON THE ENDS AND THE
2  POLY ROPE IN THE MIDDLE?
3  A.  YEAH.  WE SECURED THE CRANE BARGES TOGETHER WITH THE WIRE
4  ROPE BECAUSE THEY WERE THE HEAVIEST BARGES AND THE FLAT DECK
5  BARGES WERE CONSIDERED EMPTY, SO, YOU KNOW, WE USED OUR WIRE ROPE
6  ON THE HEAVIER OF THE BARGES.
7  Q.  YOU USED WIRE ROPE AND POLY ROPE IN MOORING ONE OR MORE OF
8  THESE BARGES; IS THAT CORRECT?
9  A.  ON THE CRANE BARGES, YEAH.
10  Q.  YOU USED BOTH?
11  A.  YES, SIR.
12  Q.  NOW, WITH REGARD TO AN EMPTY BARGE, IT'S VERY SUSCEPTIBLE TO
13  WIND, WOULD YOU AGREE?
14  A.  YEP.
15  Q.  IN FACT, YOU INDICATED THAT WHEN YOU PUSH AN EMPTY BARGE,
16  YOU CAN FEEL THE PRESSURE OF THE WIND IN AS LITTLE AS 10 TO
17  12-MILE-AN-HOUR WIND; IS THAT CORRECT?
18  A.  YES, SIR.  IN TRANSIT.
19  Q.  AND THAT'S BECAUSE OF THE LARGE SAIL AREA OF THE EMPTY
20  BARGES; IS THAT CORRECT?
21  A.  YES, SIR.
22  Q.  NOW, SIR, YOU AGREE THAT IT'S GOOD MARINE PRACTICE TO
23  MONITOR THE WEATHER; IS THAT CORRECT?
24  A.  THAT'S RIGHT.
25  Q.  AND YOU DID?

**1971**

1  A.  YES.

2  Q.  WITH REGARD TO YOUR RADAR, YOU WERE ASKED WHETHER YOU SAW A

3  MICROBURST, WIND SHEARS, THINGS OF THAT NATURE.  DID YOU SEE THE

4  HURRICANE ON YOUR RADAR?

5  A.  NO, SIR.  OTHER THAN -- I MEAN, WE HAD SQUALLS OF RAIN, YOU

6  KNOW, THE HEAVY CONCENTRATION OF RAIN.

7  Q.  SO YOU SAW HEAVY CONCENTRATIONS OF RAIN ON YOUR RADAR?

8  A.  YES, SIR.

9  Q.  AND THAT WOULD INCLUDE HEAVY CONCENTRATIONS OF WIND; IS THAT

10  CORRECT?

11  A.  YES, SIR.

12  Q.  AND IT'S NOT A WEATHER RADAR, WHAT YOU HAVE; AM I CORRECT?

13  A.  YOU'RE CORRECT.

14  Q.  IT'S NOT MADE FOR MONITORING WEATHER, IT'S FOR DETECTING

15  HARD OBJECTS; IS THAT CORRECT?

16  A.  CORRECT.

17  Q.  NOW, LET'S TALK ABOUT THE DAY BEFORE THE STORM CAME.  ONE OF

18  YOUR DECKHANDS GOT A PHONE CALL FROM HIS DAD; IS THAT CORRECT?

19  A.  FROM HIS GRANDFATHER.

20  Q.  GRANDFATHER.  WHY DON'T YOU TELL THE COURT WHAT THAT WAS

21  ABOUT.

22  A.  HIS GRANDFATHER WAS A RETIRED BOAT CAPTAIN AND HE WAS

23  CONCERNED FOR HIS GRANDSON.

24     MR. WALKER:  YOUR HONOR, IT'S HEARSAY.

25     MR. SANDERS:  IT GOES TO THE STATE OF MIND AND THE

**1972**

1  EFFECT UPON THE HERE.  I'M NOT USING IT TO PROVE THE TRUTH OF THE

2  MATTER.

3     THE COURT:  I'LL ALLOW IT ONLY AS A STATE OF MIND.

4        EXAMINATION

5  BY MR. SANDERS:

6  Q.  GRANDFATHER CALLED ABOUT HIS SON WHO WAS A DECKHAND; IS THAT

7  CORRECT?

8  A.  YES, SIR.

9  Q.  HE WAS VERY CONCERNED ABOUT THE WEATHER?

10  A.  YES, SIR.

11  Q.  HE WAS MORTALLY CONCERNED FOR THE LIFE AND HEALTH OF HIS

12  GRANDSON; IS THAT CORRECT?

13  A.  YES, SIR.

14  Q.  WHEN THE STORM CAME, THAT DECKHAND LOCKED HIMSELF IN THE

15  BATHROOM; IS THAT CORRECT?

16  A.  HE WENT INTO THE BATHROOM.  HE DIDN'T LOCK HIMSELF INTO THE

17  BATHROOM.  IT'S A LOCK-AND-SEAL DOOR.  I MEAN, YOU CAN OPEN IT

18  FROM BOTH SIDES.

19  Q.  RIGHT.  AND YOU HAD A PROBLEM GETTING HIM OUT; IS THAT

20  CORRECT?

21  A.  WELL, I DIDN'T REALLY TRY TO GET HIM OUT.  I MEAN, HE WAS,

22  YOU KNOW, EMOTIONALLY DISTRAUGHT.  I MEAN, YOU KNOW, HE WAS A

23  YOUNG GUY, 18, 19 YEARS OLD.

24  Q.  OKAY.  DIDN'T YOU TELL US IN THE DEPOSITION THAT THAT WAS

25  ONE OF THE MOST DANGEROUS PLACES FOR A DECKHAND TO BE DURING A

**1973**

1  STORM?

2  A.  THAT PARTICULAR BOAT, YES, IT WAS.

3  Q.  AND DIDN'T YOU TELL US DURING THE DEPOSITION THAT YOU WENT

4  DOWN TO GET HIM OUT OF THERE AND HE WOULD NOT COME OUT?

5  A.  YES.  I ADVISED HIM TO COME OUT OF THERE IN CASE THE BOAT

6  DID GO DOWN.

7  Q.  NOW, ALL THIS WAS HAPPENING BETWEEN THE HOURS OF 6:00 AND

8  9:00; IS THAT CORRECT?

9  A.  YES, SIR.

10  Q.  NOW, PRIOR TO THE STORM GETTING BAD, LET'S SAY AROUND

11  6 O'CLOCK, YOU INDICATED YOU COULD SEE THE FLORIDA BRIDGE; IS

12  THAT CORRECT --

13  A.  YES, SIR.

14  Q.  -- FROM WHERE YOU WERE?

15     SO THE VISIBILITY WAS FINE FROM WHERE YOU WERE TO THE

16  FLORIDA BRIDGE?

17  A.  AT FIRST, UNTIL THE STORM GOT WORSE.

18  Q.  SO WHEN THE STORM CAME LATER, ABOUT 7:00 OR 8:00 OR 9:00, IT

19  GOT REALLY BAD?

20  A.  YES, SIR.

21  Q.  AND IT LASTED FOR ABOUT 10 OR 12 HOURS?

22  A.  YES, SIR.

23     MR. WALKER:  YOUR HONOR, I'M NOT SURE THAT WE HAVE A

24  TIME FRAME SINCE THERE ARE DIFFERENT TIMES WHEN CAPTAIN HALL WENT

25  TO FLORIDA AVENUE.  TALKING MORNING OR NIGHT?  I JUST WANT TO

**1974**

1  MAKE SURE THE WITNESS UNDERSTANDS.

2     THE COURT:  ARE YOU TALKING ABOUT 6:00 A.M. TO 9:00 A.M.

3  ON THE MORNING MONDAY, AUGUST 29TH?

4     MR. SANDERS:  CORRECT, ON THE MORNING OF THE STORM.

5        EXAMINATION

6  BY MR. SANDERS:

7  Q.  SO ALL YOUR ANSWERS WOULD STILL BE THE SAME?

8  A.  YES.

9  Q.  YOU UNDERSTOOD THAT TO BE THE SAME?

10  A.  YES, SIR.  YES, SIR.

11  Q.  THANK YOU.

12     SO LET'S TALK ABOUT THAT WALL FALLING DOWN.  YOU'RE NOT

13  SURE OF WHY IT FELL; IS THAT CORRECT?

14  A.  OTHER THAN TAKING AN EDUCATED GUESS AT IT, NO.

15  Q.  SO YOU'RE GUESSING?

16  A.  (INDICATING).

17  Q.  AND IT'S FAIR TO SAY YOU SAW WHAT APPEARED TO BE A RAILCAR

18  FLOATING AROUND AT THAT TIME?

19  A.  IT APPEARED TO BE A RAILCAR OR A TANK OF SOME SORT.

20  Q.  IN THE AREA?

21  A.  YES, SIR.

22  Q.  AND YOU SAW CONTAINERS?

23  A.  CONTAINERS.

24  Q.  IN THAT AREA?

25  A.  IN THAT AREA.

## 1975

1  THE COURT: "IN THAT AREA" MEANING?
2  MR. SANDERS: WHERE THE WALL FELL NEAR WHERE YOU WERE
3  MOORED?
4  THE WITNESS: I SEEN -- THE OBJECTS THAT WERE BROKEN
5  AWAY WERE ABOVE THE FACILITY WHERE WE WERE.  AFTER THE COLLAPSE
6  OF THE WALL, THEY THEN -- EVERYTHING STARTED GOING THROUGH THE
7  BREACH, YOU KNOW.  THEY ALL RAN THROUGH THE -- SHOOT, THAT WAS
8  IT, AS THE WALL COLLAPSED.
9          EXAMINATION
10  BY MR. SANDERS:
11  Q.  I ASKED YOU BACK THEN THIS QUESTION.  THIS THE PAGE 88 OF
12  HIS DEPOSITION:
13  "BACK TO THIS BREACH BEHIND THE OLD BULK DOCK,
14  OBVIOUSLY, I THOUGHT YOU SAID YOU DIDN'T KNOW EXACTLY WHAT CAUSED
15  IT.  YOU SAW SOME CONTAINERS, YOU SAW A RAILCAR, AND I NOTICED
16  YOU DELAYED IN ANSWERING THE QUESTION.  DO YOU KNOW WHAT ACTUALLY
17  CAUSED THE BREACH OR ARE YOU GUESSING?"
18  AND YOU ANSWERED, "I WOULD BE GUESSING.  I CAN'T
19  DEFINITELY SAY THAT EITHER ONE CAUSED IT."
20  IS THAT WHAT YOU SAID?
21  A.  WELL, I'M NOT AN ENGINEER.  I MEAN, I COULDN'T GIVE A
22  DEFINITE OF WHAT CAUSED THE COLLAPSE.  THERE IS SO MUCH
23  CONTROVERSY OVER COLLAPSES.
24  Q.  BUT MY POINT IS, YOU CAN'T DEFINITELY SAY THAT EITHER ONE OF
25  THESE ITEMS CAUSED THE BREACH; IS THAT CORRECT?

## 1976

1  A.  I KNOW NOTHING STRUCK IT TO CAUSE THE BREACH.
2  Q.  SIR, YOU SAID YOU COULD NOT TELL WHETHER EITHER ONE OF THESE
3  ITEMS, THE RAILCAR OR THE CONTAINER, CAUSED THE BREACH; IS THAT
4  CORRECT?
5  A.  I WATCHED THE COLLAPSE OF THE WALL, AND THERE WAS NOTHING
6  OTHER THAN WATER AND WIND PRESENT AT THE TIME.
7  THE COURT: DO YOU WANT TO SHOW HIM HIS DEPOSITION, SIR?
8  MR. SANDERS: CAN I HAVE THE ELMO.
9          EXAMINATION
10  BY MR. SANDERS:
11  Q.  RIGHT HERE, SIR, I ASKED YOU THE QUESTION.  AND YOU
12  ANSWERED, "I WOULD BE GUESSING.  I CAN'T DEFINITELY SAY THAT
13  EITHER ONE CAUSED IT."
14  THE COURT: LET'S READ THE QUESTION.  "BACK TO THIS
15  BREACH BEHIND THE OLD BULK DOCK, OBVIOUSLY, I THOUGHT YOU SAID
16  YOU DIDN'T KNOW EXACTLY WHAT CAUSED IT.  YOU SAW SOME CONTAINERS,
17  YOU SAW A RAILCAR, AND I NOTICED YOU DELAYED IN ANSWERING THE
18  QUESTION.  DO YOU KNOW WHAT ACTUALLY CAUSED THAT BREACH OR ARE
19  YOU GUESSING?"
20          EXAMINATION
21  BY MR. SANDERS:
22  Q.  AND YOU ANSWERED SIR?
23  A.  I WOULD BE GUESSING BECAUSE I CAN'T DEFINITELY SAY.  I MEAN,
24  I'M -- LIKE I SAY, I'M NOT --
25  MR. WALKER: YOUR HONOR, IT WOULD BE FAIR TO THE WITNESS

## 1977

1  IF YOU CONTINUED WITH YOUR QUESTION AND ANSWER.
2  THE COURT: WELL, WE WILL GET TO THAT, BUT, RIGHT NOW,
3  WE'RE LOOKING AT THIS ANSWER.  "I WOULD BE GUESSING.  I CAN'T
4  DEFINITELY SAY THAT EITHER ONE CAUSED IT."
5  THE WITNESS: EXACTLY.
6          EXAMINATION
7  BY MR. SANDERS:
8  Q.  THEN YOU SAID, "FAIR ENOUGH" -- I SAID, "FAIR ENOUGH."  AND
9  THEN YOU SAID, "BUT, LIKE I SAID, THOSE CONTAINERS WOULD
10  NATURALLY BE SUCKED INTO THAT SPOT."
11  A.  YES, SIR.
12  Q.  SO YOU'RE ASSUMING THE CONTAINERS WERE SUCKED IN AND THE
13  RAIL CAR AND THE CONTAINERS WERE AT THE SPOT WHEN THE WALL FELL;
14  IS THAT CORRECT?
15  A.  I JUST KNOW WHAT I SAW IN THE EVENT OF WHAT HAPPENED.  I
16  MEAN --
17  Q.  NOW, LET ME TAKE YOU BACK TO YOUR COMMENTS ABOUT THE
18  INDUSTRIAL CANAL AREA BETWEEN THE CLAIBORNE BRIDGE AND THE
19  FLORIDA BRIDGE.
20  A.  OKAY.
21  Q.  YOU INDICATED THAT THAT'S A NO WAKE ZONE; IS THAT CORRECT?
22  A.  YES, SIR, PRETTY MUCH.
23  Q.  BUT YOU ALSO INDICATED THAT VESSELS DON'T SPEED IN THAT
24  AREA?  DID YOU SAY THAT?
25  A.  YES, SIR.

## 1978

1  Q.  YOU HAVE NO PERSONAL KNOWLEDGE OF WHAT OTHER VESSELS DO WHEN
2  YOU'RE NOT PRESENT; IS THAT CORRECT?
3  A.  THAT'S CORRECT.
4  Q.  AND FOR, LET'S SAY, THE HOURS BEFORE THE STORM AND BEFORE
5  THE BRIDGE WAS CLOSING, WOULD YOU SAY THAT EVERYONE WAS
6  SCRAMBLING TO GET TO SAFE HARBOR OR TO BRING THEIR TOWS TO SAFE
7  HARBOR?
8  A.  YES, SIR.  THAT WOULD BE A PRIORITY, YES, SIR.
9  Q.  AND YOU HAVE NO PERSONAL KNOWLEDGE OF THE SPEEDS OR THE
10  WAKES CREATED BY VESSELS IN THE INDUSTRIAL CANAL ON SATURDAY,
11  AUGUST 27TH, OR ANY PART OF SUNDAY; IS THAT CORRECT?
12  A.  THAT'S CORRECT.
13  Q.  NOW, YOU INDICATED THAT THE LAFARGE TERMINAL IS A SAFE
14  HARBOR.
15  A.  YES, SIR.
16  Q.  IS THAT JUST YOUR OPINION?
17  A.  THAT'S --
18  Q.  BECAUSE I'M GOING TO TELL YOU, SIR, IT'S NOTED IN THE NOAA
19  GUIDE --
20  A.  THAT'S WHAT I KNOW IT AS --
21  THE COURT: LET HIM ANSWER THE QUESTION.
22  THE WITNESS: THAT'S WHAT I KNOW IT AS FROM MY YEARS OF
23  WORKING ON THE DECK AND IN THE WHEELHOUSE, YEAH.
24          EXAMINATION
25  BY MR. SANDERS:

## 1979

1  Q. WOULD IT SURPRISE YOU TO UNDERSTAND -- WOULD YOU AGREE THAT
2  IT'S ALSO A TURNING BASIN?
3  A. YES. IT CAN BE USED AS A TURN BASIN, YES, SIR.
4  Q. BUT I'M ASKING YOU, IS IT A TURNING BASIN?
5  A. YES, SIR. SOME PEOPLE USE IT AS A TURNING BASIN, YES, SIR.
6  Q. AND --
7  A. IF IT ALLOWS TO BE TURNED -- TO TOP A TOW AROUND IN THERE,
8  THEN, YEAH, IT WOULD BE USED AS A TURNING BASIN.
9  Q. DO YOU KNOW SPECIFICALLY WHY IT WAS BUILT?
10  A. NO, I DON'T.
11  Q. SO CAN I HAVE THE ELMO.
12      I'M GOING TO SHOW YOU SOME LAFARGE DOCUMENTS FROM 1988
13  REGARDING SOME MAINTENANCE DREDGING THEY DID. RIGHT IN THE
14  MIDDLE RIGHT HERE, IT'S REFERRED TO AS WHAT?
15  A. WEST LIMIT OF TURNING BASIN.
16  Q. TURNING BASIN.
17  A. UH-HUH.
18  Q. AND WOULD YOU BE SURPRISED, SIR, IF THE LAW WAS THAT BARGES
19  ARE NOT TO MOOR MORE THAN TWO ABREAST IN THAT AREA BECAUSE IT'S A
20  TURNING BASIN?
21      MR. WALKER: YOUR HONOR, THERE IS NO --
22      MR. SANDERS: THERE WILL BE LATER, YOUR HONOR.
23      THE COURT: THERE IS NO WHAT?
24      MR. WALKER: IT HAS NOT BEEN ESTABLISHED --
25      THE COURT: I'M NOT SURE. WHAT DOES THIS HAVE TO DO

## 1980

1  WITH WHETHER HE WAS GOING IN THERE FOR A TURNING BASIN OR TO SAFE
2  HARBOR OR NOT? WHAT DOES IT HAVE TO DO WITH HIS OBSERVATIONS ON
3  THE DAY BEFORE AND AFTER KATRINA?
4      MR. SANDERS: YOUR HONOR, I KNOW HE MET WITH THEM SINCE
5  THE DEPOSITION. THIS IS ALL NEW STUFF. AND THEY ARE GOING TO
6  USE HIS TESTIMONY TO BUTTRESS THE TESTIMONY OF MR. STROUSE
7  (SPELLED PHONETICALLY) AND MR. RYAN THAT THIS WAS A SAFE HARBOR.
8  IT WAS NOT A SAFE HARBOR. IT WAS A TURNING VESSEL WHERE BARGES
9  WERE NOT SUPPOSED TO MOOR AS THEY MOORED THEM.
10      MR. WALKER: THAT'S PURE ARGUMENT, YOUR HONOR. YOU'RE
11  CORRECT THAT CAPTAIN HALL IS HERE --
12      THE COURT: IT IS ARGUMENT. AND I'M NOT SURE THIS
13  WITNESS HAS THE PERSONAL KNOWLEDGE THAT IS NECESSARY TO ASCERTAIN
14  THAT.
15      THE PLANS THEMSELVES MIGHT BE -- HE'S SAYING THAT'S
16  WHAT HIS IMPRESSION WAS. I DON'T KNOW HOW YOU'RE GOING TO CHANGE
17  IT BY SHOWING HIM PLANS THAT SAYS IT WAS DESIGNED PRIMARILY AS --
18  OR EXCLUSIVELY AS A TURNING BASIN. I'M SURE IT WAS OTHER
19  THINGS -- THINGS WERE MOORED THERE, SO THINGS JUST DIDN'T TURN
20  THERE. I'M NOT QUITE SURE WHERE WE'RE GOING THAT.
21      MR. SANDERS: I'LL MOVE ON.
22      MR. WALKER: AS YOUR HONOR SAID, HE WAS BROUGHT HERE FOR
23  HIS PERSONAL OBSERVATIONS, NOT AS AN EXPERT.
24              EXAMINATION
25  BY MR. SANDERS:

## 1981

1  Q. NOW, LET'S TALK ABOUT YOUR PERSONAL OBSERVATIONS. WHEN YOU
2  WENT UP TO THE FLORIDA BRIDGE AND YOU SAW IT WAS DOWN, YOU SAID
3  YOU STAYED AROUND IN THAT AREA FOR 45 MINUTES; IS THAT CORRECT?
4  A. THAT'S CORRECT.
5  Q. THIS IS AT A TIME WHEN YOU KNOW YOU NEED TO FIND SOMEWHERE
6  TO TIE UP; IS THAT CORRECT?
7  A. YES, SIR.
8  Q. AND YOU INDICATED THAT YOU BROKE OUT YOUR BINOCULARS AT THIS
9  POINT EVEN THOUGH THE BRIDGE WAS DOWN. DID YOU KNOW THE LOCKS
10  WERE CLOSED BY THIS POINT?
11  A. YES, SIR.
12  Q. AND YOU'RE TELLING US THAT YOU BROKE OUT YOUR BINOCULARS AND
13  JUST YOU LOOKED ALL THROUGH THE CANAL; IS THAT CORRECT?
14  A. I LOOKED 360 DEGREES.
15  Q. BUT YOU KNEW THERE WAS NO WAY YOU COULD GET IN THERE TO
16  MOOR; IS THAT CORRECT?
17  A. AT THAT POINT, YES.
18  Q. AND YOU SAY YOU SAW NO BARGES LOOSE AND YOU SAW BARGES AT
19  THE LAFARGE TERMINAL?
20  A. YES.
21  Q. AND YOU SAY THEY WERE SECURED?
22  A. YES.
23  Q. HOW DO YOU KNOW THAT?
24  A. JUST FROM SEEING THEM. I MEAN, I -- I WASN'T ON THE DECK OF
25  THE BARGES, BUT SEEING THEM IN THEIR POSITIONS, THEY WERE SECURED

## 1982

1  TO THE DOCK AT THAT TIME.
2  Q. THEY LOOKED -- THEY APPEARED TO BE BUT YOU'RE NOT SURE; IS
3  THAT CORRECT?
4  A. I COULDN'T SAY FOR A FACT, NO.
5  Q. AND YOU DON'T KNOW HOW MANY BARGES WERE IN THE LAFARGE
6  FACILITY; IS THAT CORRECT?
7  A. THAT WASN'T MY CONCERN AT THE TIME.
8  Q. NOW, THIS ISSUE ABOUT THE BINOCULARS AND LOOKING FOR A LOOSE
9  BARGE, THAT CAME UP THE FIRST TIME IN YOUR MEETING WITH
10  MR. WALKER; IS THAT CORRECT?
11  A. NO.
12      MR. WALKER: YOUR HONOR, THAT MISCHARACTERIZES HIS
13  TESTIMONY. HE DIDN'T SAY HE USED THE BINOCULARS TO LOOK FOR A
14  LOOSE BARGE.
15      THE COURT: NO, HE DID NOT.
16      THE WITNESS: NO, NOT LOOKING FOR A LOOSE BARGE.
17      THE COURT: AND I'M HEARING THE TESTIMONY, SO ANY
18  UNNECESSARILY INFUSED RHETORIC WILL BE, SHALL WE SAY, A WASTE OF
19  WORDS.
20              EXAMINATION
21  BY MR. SANDERS:
22  Q. YOU HAD YOUR BINOCULARS AND YOU LOOKED, BUT YOU DID NOT SEE
23  A LOOSE BARGE?
24  A. NO, SIR, I DIDN'T SEE ONE.
25  Q. IS IT FAIR TO SAY THAT THAT CAME UP IN YOUR MEETING WITH

24 (Pages 1979 to 1982)

**1983**

1  MR. WALKER?
2  A.  YES.
3  Q.  AND WHEN WAS THAT MEETING?
4  A.  YESTERDAY.
5  Q.  AND HE ASKED YOU, IS IT FAIR TO SAY THAT YOU LOOKED AND YOU
6  DIDN'T SEE A BARGE, IN THAT MEETING?
7  A.  YES, SIR.
8  Q.  AND Y'ALL ALSO DISCUSSED THE PICTURES OF THE OTHER BREAKAWAY
9  BARGES; IS THAT CORRECT?
10  A.  YES, SIR.  WE LOOKED AT THEM AS WE WERE GOING OVER THE
11  DEPOSITIONS.
12  Q.  AND YOU HAVE A SPECIFIC RECOLLECTION WHEN YOU MOTORED DOWN
13  THE MRGO SEEING THOSE THREE BARGES --
14  A.  YES, SIR, I DO.
15  Q.  -- IS THAT WHAT YOU'RE TELLING US?
16  A.  YES, SIR, I DO.
17  Q.  HOW MANY OTHER BARGES DID YOU SEE?
18  A.  SEVERAL.  THEY WERE EVERYWHERE, BOATS.  THEY HAD BOATS THAT
19  WERE WASHED ASHORE AND BARGES AND CONTAINERS.  I MEAN, IT WAS --
20  Q.  YOU SAW SEVERAL, AND YOU SPECIFICALLY REMEMBER THOSE THREE
21  IN THE PICTURE --
22  A.  YES, SIR.
23  Q.  -- IS THAT WHAT YOU'RE TELLING US?
24      LET'S TALK ABOUT THOSE THREE BARGES AND ANY OF THE
25  OTHER BARGES.  DO YOU KNOW IF THEY WERE MOORED WITH SINGLE PART

**1984**

1  LINES?
2  A.  NO, SIR.
3  Q.  IS IT HURRICANE PREPARATION TO MOOR A BARGE WITH SINGLE PART
4  LINES?
5      MR. WALKER:  YOUR HONOR, WITHOUT SPECIFIC CIRCUMSTANCES,
6  DOCK, TYPE OF BARGE --
7      THE COURT:  I'M GOING TO ASK HIM IF HE KNOWS IN GENERAL,
8  SINCE IT IS WITHIN HIS LAY KNOWLEDGE.
9      THE WITNESS:  DEPENDING ON HOW MANY LINES YOU HAVE.  I
10  MEAN, IT REALLY DON'T -- IT REALLY DON'T DEPEND ON THE PARTS OF
11  THE LINES, IT DEPENDS ON HOW MANY LINES YOU HAVE SECURING THE
12  BARGE.
13          EXAMINATION
14  BY MR. SANDERS:
15  Q.  IS IT FAIR TO SAY THAT LINES SHOULD BE DOUBLED UP FOR A
16  HURRICANE?
17  A.  WELL, DEPENDING ON IF THE BARGES ARE THE SAME HEIGHT OR IF
18  THEY ARE ON A HIGH/LOW, WHAT WE CALL A HIGH/LOW, LOAD TO EMPTY.
19  Q.  SO YOU'RE TELLING ME YOU CAN'T PUT DOUBLE OR TRIPLE PART
20  LINES ON A HIGH TO A LOW?
21  A.  YOU CAN.  IF YOU HAVE ENOUGH LINES, YOU CAN.
22  Q.  THANK YOU.
23      AND YOU DID NOT HAVE ANY BREAKAWAY OF YOUR BARGES WITH
24  REGARD TO THE MOORINGS YOU UTILIZED; IS THAT CORRECT?
25  A.  THAT'S CORRECT.

**1985**

1  Q.  THE 20-FOOT ESTIMATE OF THE STORM SURGE, DIDN'T YOU TELL ME
2  IN THE DEPOSITION THAT IT CAME IN LIKE A TIDAL WAVE?
3  A.  WE HAD WAVES HITTING OUR STERN AT THE SAME TIME, BIG
4  BREAKERS HITTING THE STERN AS WE WERE BEING LIFTED, BUT -- BUT
5  THE SURGE ITSELF LIFTED US OVER A PERIOD OF TIME, BUT WE HAD HIGH
6  SEAS HITTING OUR STERN.
7  Q.  DID YOU SAY IT WAS LIKE A TIDAL WAVE?
8  A.  I DON'T REMEMBER USING THAT EXACT TERM.
9  Q.  AND WITH REGARD TO THIS ISSUE OF THE SURGE, DID YOU DISCUSS
10  THAT WITH MR. WALKER YESTERDAY -- OR IN THE MEETING YOU HAD?
11  A.  I DON'T REMEMBER THAT PARTICULAR --
12  Q.  I'M GOING TO REFER EVERYONE TO PAGE 30.  I ASKED YOU, "NOW,
13  WOULD YOU DESCRIBE THAT, WAS IT A GRADUAL INCREASE IN WATER LEVEL
14  OR WAS IT A TIDAL WAVE?"  AND YOU ANSWERED, "IT WAS PRETTY
15  MUCH -- I WOULDN'T SAY TIDAL WAVE, BUT IT WAS -- IT CAME IN HARD.
16  IT COME IN HARD."
17  A.  WELL, YES, SIR.  EVERYTHING COME IN HARD.  IT WAS A
18  HURRICANE.
19  Q.  WITH REGARD TO THE BREAKAWAY OF THOSE BARGES YOU SAW
20  FLOATING, IS IT FAIR TO SAY YOU'RE NOT SURE OF THE TIME?
21      LET ME REPHRASE IT.  DURING ALL THIS TIME, YOU
22  INDICATED THAT YOU WERE RUNNING BACK AND FORTH DEALING WITH THIS
23  DECKHAND ISSUE; IS THAT CORRECT?
24  A.  YES, SIR, I CHECKED ON HIM A FEW TIMES.
25  Q.  AND WITH REGARD TO THE BREAKAWAY OF THE BARGES, IS IT FAIR

**1986**

1  TO SAY YOU'RE NOT SURE OF THE TIME?
2  A.  THE EXACT TIME, NO, SIR.
3  Q.  OKAY.  SO YOU WOULD BE GUESSING OR ESTIMATING?
4  A.  ESTIMATING.
5  Q.  THANK YOU.
6      MR. SANDERS:  YOUR HONOR, MAY I HAVE A MINUTE?
7      THE COURT:  YES, YOU MAY.
8          EXAMINATION
9  BY MR. SANDERS:
10  Q.  WHEN YOU INDICATED YOUR MOORINGS, YOU MENTIONED "FOUR AND A
11  HALF."  WHAT IS THAT?  FOUR-AND-A-HALF-INCH LINE?
12  A.  NOT FOUR AND A HALF.  FORWARD AND AFT.  FORE AND AFT.
13  Q.  FORE AND AFT.
14  A.  YES, SIR.
15  Q.  F-O-R-E AND A-F-T?
16  A.  YES, SIR.
17      MR. SANDERS:  THAT'S ALL FOR ME, YOUR HONOR.  THANK YOU.
18      THE COURT:  THANK YOU.
19      MR. SANDERS:  MAY I OFFER AND INTRODUCE INTO EVIDENCE
20  THIS -- I'M GOING TO HOLD ON TO THIS.  THAT'S IT FOR ME,
21  YOUR HONOR.
22      THE COURT:  OKAY.  COUNSEL, IT'S UP TO YOU.
23      MR. WALKER:  YOUR HONOR, JUST FOR THE COURT REPORTER'S
24  BENEFIT, LINE 23, YOU MENTIONED -- IT'S FORE AND AFT.  YOU PUT
25  FOUR AND A HALF.

25 (Pages 1983 to 1986)

## 1987

1  THE COURT:  RIGHT.

2  MR. WALKER:  JUST TO ASSIST THE COURT REPORTER.

3  THE COURT:  THAT'S WHY THESE ARE SCOPED AND CHANGED

4  AFTERWARDS, BUT THANK YOU.

5  MR. WALKER:  RIGHT.

6  THANK YOU.  YOUR HONOR, JUST A FEW QUESTIONS.

7  THE COURT:  SURE.

8  REDIRECT EXAMINATION

9  BY MR. WALKER:

10  Q.  WHAT'S A SPUD BARGE?

11  A.  IT'S A BARGE EQUIPPED WITH -- WITH SPUDS TO SECURE ITSELF.

12  Q.  SO SPUDS ARE --

13  A.  LEGS.

14  Q.  -- LIKE LEGS THAT GO DOWN INTO THE SEA BED, RIVER BED --

15  A.  YES, SIR.

16  Q.  -- OR BANK, RIGHT?

17  A.  YES, SIR.

18  Q.  AND THAT'S HOW YOU SECURED THOSE BARGES, RIGHT?

19  A.  YES, SIR.

20  Q.  SO THEY WERE BASICALLY ANCHORED BY THEIR OWN LEGS?

21  A.  YES, SIR.

22  Q.  AND THEN YOU JUST TIED THEM AS WELL?

23  A.  YES, SIR.

24  Q.  THE MAIN ITEM SECURING THOSE BARGES DURING THE STORM WERE

25  THE SPUD ANCHOR LEGS?

## 1988

1  A.  YES, SIR.

2  Q.  THAT'S TOTALLY DIFFERENT THAN SECURING AN EMPTY BARGE TO A

3  DOCK, ISN'T IT?

4  A.  YES, SIR.

5  Q.  AND, ALSO, YOU CAN EXPLAIN TO THE JUDGE IN A LITTLE MORE

6  DETAIL, THERE WERE -- SORRY -- THERE WERE VARIOUS OTHER TUGS AND

7  VARIOUS OTHER BARGES ALL IN A LARGE CONFIGURATION THAT Y'ALL HAD

8  SET UP?

9  A.  YES.

10  Q.  YOU WERE ASKED A QUESTION ABOUT THE SAIL AREA ON A 20-FOOT

11  BARGE.  IF THE WIND IS HITTING IT BROADSIDE, WOULD THAT HAVE THE

12  GREATEST EFFECT ON THE BARGE?

13  A.  YES.

14  Q.  AND, IN FACT -- STRIKE THAT.

15  A.  IF YOU WERE IN THE OPEN, IT WOULD.

16  Q.  YOU TALKED ABOUT THE YOUNG MAN WHO HAD LOCKED HIMSELF IN THE

17  BATHROOM, WAS IT?

18  A.  YES, SIR.

19  Q.  HOW LONG DID YOU SPEND DOWN THERE WITH HIM?

20  A.  JUST BRIEFLY.  I CHECKED ON HIM A FEW TIMES BRIEFLY AND HAD

21  TO RUN BACK UP TO THE WHEELHOUSE.

22  Q.  SO IT WASN'T HOURS, AS WAS --

23  A.  NO.

24  Q.  -- IMPLIED IN THE QUESTIONING, WAS IT?

25  A.  NO, SIR.

## 1989

1  Q.  AND THAT DIDN'T DISTRACT YOU FROM YOUR DUTIES OR FROM YOUR

2  OBSERVATIONS?

3  A.  NO, SIR.

4  Q.  YOU WERE ALSO ASKED SOME QUESTIONS ABOUT COULD YOU SEE FROM

5  THE NEW ORLEANS BULK TERMINAL TO FLORIDA AVENUE, AND THERE WAS

6  SOME CONFUSION ABOUT THE TIME.  I THINK THE QUESTION FINALLY

7  ENDED UP BEING 6:00 A.M. TO 9:00 A.M. MONDAY MORNING.

8  MR. SANDERS:  OBJECTION, YOUR HONOR, IT WAS 6:00 A.M. TO

9  7:00 A.M. BEFORE IT GOT BAD.  HE'S MISCHARACTERIZING THE

10  TESTIMONY.

11  THE COURT:  WELL, I JUST THINK HE'S TRYING TO ESTABLISH

12  A TIME SPAN.  LET'S SEE WHAT THE QUESTION IS FIRST.

13  MR. WALKER:  I CONCEDE, YOUR HONOR, THERE WAS SOME

14  CONFUSION.  THAT'S WHY I PREFACED IT WITH THAT.

15  THE COURT:  YES.

16  EXAMINATION

17  BY MR. WALKER:

18  Q.  LET'S START 6:00 A.M. TO 7:00 A.M. MONDAY MORNING, YOU WERE

19  AT THE NEW ORLEANS BULK TERMINAL?

20  A.  YES, SIR.

21  Q.  COULD YOU SEE THE FLORIDA AVENUE BRIDGE?  AND I DON'T MEAN

22  ON A NICE DAY, WE MEAN THAT DAY BASED ON THE RAIN, VISIBILITY,

23  ET CETERA?

24  A.  AT FIRST YOU COULD UNTIL IT -- UNTIL VISIBILITY WAS

25  RESTRICTED, YES.

## 1990

1  Q.  SO THEN THE WEATHER WORSENED, AND YOU COULD NO LONGER SEE

2  THE BRIDGE?

3  A.  THAT'S RIGHT.

4  THE COURT:  WHAT TIME DID THE WEATHER WORSEN WHERE YOU

5  COULD NO LONGER SEE THE BRIDGE?

6  THE WITNESS:  PROBABLY, I WOULD GUESS, 8:00, 9 O'CLOCK

7  OR SO.

8  EXAMINATION

9  BY MR. WALKER:

10  Q.  THEN YOU WERE ASKED SOME ADDITIONAL QUESTIONS ABOUT THESE

11  CONTAINERS AND LASHED BARGES.  AT THE TIME THAT THE CONTAINERS

12  AND LASHED BARGES STARTED MOVING DOWN THE CANAL AND WERE BEING

13  SUCKED THROUGH THE BREACH LIKE CATTLE, THE WIND HAD ALREADY

14  SHIFTED, HADN'T IT?

15  A.  YES, SIR.

16  Q.  BECAUSE THAT WAS AFTER THE SURGE AND AFTER THE WIND SHIFT?

17  A.  YES, SIR.

18  Q.  AND YOU WERE ASKED SOME QUESTIONS ABOUT YOUR DEPOSITION

19  TESTIMONY AND AS TO KNOWING OR NOT KNOWING WHAT ACTUALLY KNOCKED

20  THE WALL DOWN.

21  IN FACT, I'LL REFER YOU TO PAGE 77 OF THAT DEPOSITION.

22  "QUESTION:  YOU DON'T KNOW WHAT CAUSED THE WALL TO

23  BREACH?

24  "ANSWER:  I WOULD SAY JUST THE PRESSURE -- I WOULD SAY

25  THE PRESSURE OF THE WATER FROM THE SURGE AND THE WINDS PUSHING IT

## 1991

1  LIKE IT DID OF THE MAIN BREACH.  AND THEN WHEN IT GAVE WAY, THEN

2  ANY TIME YOU HAVE A BREACH LIKE IN A LEVEE OR A SEAWALL, IN MY

3  EXPERIENCE THROUGH THE YEARS IT WOULD BE DUE TO HIGH WATER OR

4  SOME TYPE OF STORM OR WHATNOT."

5       AND THEN YOU GO ON TO EXPLAIN THAT.

6       MR. GILBERT:  YOUR HONOR, I WANT TO OBJECT TO THE

7  QUESTION.  I THINK THERE'S A QUESTION POSED, I'M NOT SURE, BUT

8  HE'S CALLING FOR THE GUY TO SPECULATE RIGHT NOW.

9       THE COURT:  WELL, I UNDERSTAND IT'S SPECULATION BUT IT'S

10 GIVING THE COURT THE ENTIRE -- THE ENTIRETY OF THE WITNESS'

11 IMPRESSIONS SINCE HE WAS ASKED ABOUT THE -- WHETHER THE CONTAINER

12 OR THE BARGE, ONE OF THEM, MIGHT HAVE DONE IT.

13      SO IT'S IN AN EFFORT TO GIVE THE COURT THE ENTIRE

14 CONTEXT OF THE DEPOSITION.  SO, FOR THAT PURPOSE, I'M GOING TO

15 ALLOW IT.  CERTAINLY, UNLESS HE ACTUALLY SAW SOMETHING

16 SPECIFICALLY, THE COURT IS NOT GOING TO USE THIS IN DETERMINING

17 CAUSATION OF THE TWO BREACHES THAT I HAVE TO DEAL WITH.

18      MR. GILBERT:  THANK YOU, YOUR HONOR.

19      MR. WALKER:  YES, YOUR HONOR.  IT'S SIMPLY TO SHOW THAT

20 MR. HALL HAS BEEN CONSISTENT, THIS IS WHAT HE SAID AT THAT TIME

21 AS WELL AS WHAT HE SAID TODAY.

22      THE COURT:  WELL, I SAW BOTH PORTIONS OF THE DEPOSITION,

23 AND I UNDERSTAND WHY YOU'RE DOING IT.  GO AHEAD.

24      EXAMINATION

25 BY MR. WALKER:

## 1992

1  Q.  WHAT YOU ARE CERTAIN ABOUT AS YOU SIT HERE TODAY IS THAT YOU

2  DIDN'T SEE ANYTHING STRIKE THAT WALL AND KNOCK IT OVER?

3  A.  NO, SIR.

4  Q.  THAT'S CORRECT?

5  A.  THAT'S CORRECT.

6  Q.  YOU WERE ASKED A FEW QUESTIONS ABOUT THE LAFARGE TERMINAL

7  AND THE BARGES THAT YOU SAW THERE WHEN YOU CAME UP TO THE CELL.

8  ISN'T IT RIGHT THAT YOUR RADAR WOULD SHOW IF BARGES OR VESSELS

9  WERE MOVING?

10 A.  YES, SIR.

11 Q.  AND --

12      MR. SANDERS:  OBJECTION, IT'S OUTSIDE THE SCOPE OF

13 CROSS.  IT'S GOING INTO A WHOLE OTHER AREA.  HE NEVER MENTIONED

14 LOOKING AT A RADAR, EVEN ON DIRECT.

15      MR. WALKER:  THAT'S NOT -- YOUR HONOR, HE LOOKED AT THE

16 RADAR ALL THE TIME, AND THE QUESTION POSED WAS COULD YOU TELL IF

17 THEY WERE SECURED OR NOT.  CAPTAIN HALL SAID AS FAR AS HE COULD

18 TELL, AND I HAVE A LINE OF QUESTIONING THAT WILL FURTHER

19 CORROBORATE HIS IMPRESSION AND OBSERVATIONS.

20      MR. SANDERS:  YOUR HONOR, HE TESTIFIED THAT HE LOOKED AT

21 THE RADAR WITH REGARD TO WEATHER, NO CYCLONES, NO SQUALLS.

22      THE COURT:  A RADAR CANNOT -- COULD PERHAPS TELL IF YOU

23 SAW A BARGE ADRIFT FROM THE TERMINAL.  IT CANNOT TELL MUCH ELSE,

24 AT LEAST IS MY UNDERSTANDING.

25      MR. SANDERS:  IT'S OUTSIDE THE SCOPE OF DIRECT AND

## 1993

1  CROSS.

2       THE COURT:  I'M NOT SURE IT'S OUTSIDE THE -- IF IT'S

3  OUTSIDE THE SCOPE OF CROSS, IT'S A LEGITIMATE OBJECTION; BUT, I

4  THINK WE DID TALK ABOUT IT.  OUT OF AN ABUNDANCE OF CAUTION, I'M

5  GOING TO ALLOW IT.

6       MR. WALKER:  JUST VERY BRIEF, YOUR HONOR.

7            EXAMINATION

8  BY MR. WALKER:

9  Q.  YOUR RADAR HAS A ONE-TO-THREE-SECOND SWEEP, CORRECT?

10 A.  YES.

11 Q.  THAT MEANS YOU'RE GETTING AN ECHO SIGNAL EVERY ONE TO THREE

12 SECONDS?

13 A.  YES.

14 Q.  AND IF THERE HAD BEEN MOVEMENT OF THOSE BARGES AT THE

15 LAFARGE TERMINAL OVER THE PERIOD OF THE ONE, THREE, 10, 15,

16 20 SECONDS, YOU WOULD HAVE NOTED ON IT THE RADAR SCREEN, WOULDN'T

17 YOU?

18 A.  YES.

19 Q.  AND WAS THERE ANY SUCH MOVEMENT?

20 A.  NO, SIR.

21      THE COURT:  LET ME ASK YOU A QUESTION THAT YOU MAY NOT

22 KNOW THE ANSWER TO, AND DO NOT ANSWER IT, PLEASE, IF YOU DON'T

23 KNOW THE ANSWER TO IT.  WAS YOUR RADAR IMAGE SUFFICIENT SO YOU --

24 DID YOU ACTUALLY COUNT THE NUMBER OF BARGES THERE?

25      THE WITNESS:  NO, SIR.  I DIDN'T.

## 1994

1       THE COURT:  ALL RIGHT.

2       THE WITNESS:  BUT USING IT AS AN AID TO NAVIGATION, YOU

3  CONSTANTLY -- YOU KNOW, AS YOU'RE MOVING, YOU CONSTANTLY WATCH

4  THE RADAR SCREEN, YOU KNOW, AND WOULD NOTICE IF SOMETHING --

5            EXAMINATION

6  BY MR. WALKER:

7  Q.  JUST A COUPLE OF CONCLUDING QUESTIONS.  YOU WERE ASKED ABOUT

8  THE SURGE, AND YOU TESTIFIED TODAY THAT IT WAS GRADUAL, AS IF YOU

9  WERE GOING UP IN A LOCK SYSTEM.  I'M GOING TO SHOW YOU PAGE 32,

10 LINE 21, GOING ON TO PAGE 33.

11      MR. SANDERS:  YOUR HONOR, IT'S IMPROPER IMPEACHMENT OF

12 HIS OWN WITNESS.  I THINK HE'S ENTITLED TO ASK A QUESTION.

13      THE COURT:  HE'S ENTITLED TO SHOW A PORTION OF THE

14 DEPOSITION THAT MAY FURTHER CLARIFY THE PORTION OF THE DEPOSITION

15 THAT YOU SHOWED TO HIM REFERENCED TO TIDAL WAVE, WHICH HE DIDN'T

16 SAY WAS A TIDAL WAVE TO BEGIN WITH.  HE SAID IT WAS COMING IN

17 HARD, WHATEVER THAT MEANS.

18      MR. SANDERS:  HONESTLY, JUDGE, I MISREAD IT WHEN I --

19      THE COURT:  OH, NO, NO.  I'M NOT SAYING YOU

20 INTENTIONALLY DID IT.  I'M JUST POINTING OUT THAT IT'S TO CLARIFY

21 THAT.

22      HE HASN'T -- BUT THE COURT UNDERSTANDS IN HIS

23 DEPOSITION HE DIDN'T SAY IT WAS A TIDAL WAVE.  HE SAID IT WAS

24 COMING IN HARD.  AND I'LL HAVE TO, IF WE GET TO THAT, FIGURE OUT

25 WHAT THAT MEANS.

## 1995

1  EXAMINATION
2  BY MR. WALKER:
3  Q.  YOU STAND BY YOUR TESTIMONY TODAY AS FAR AS YOUR BEST
4  RECOLLECTION OF WHAT YOU REMEMBER THE SURGE WAS LIKE AND THE TIME
5  FRAME?
6  A.  YES, SIR.
7       MR. WALKER:  THANK YOU, YOUR HONOR.  THAT'S ALL.
8       THE COURT:  THANK YOU, SIR.
9          AND YOU CAN STEP DOWN, SIR.
10         IS THIS WITNESS RELEASED?
11      MR. WALKER:  YES, YOUR HONOR.
12      THE COURT:  YOU ARE RELEASED TO GO, SIR.
13      THE WITNESS:  THANK YOU, JUDGE.
14      THE COURT:  WHO IS UP NEXT?
15      MR. WALKER:  MR. RICHARD RIESS, YOUR HONOR.
16      THE DEPUTY CLERK:  PLEASE RAISE YOUR RIGHT HAND.  DO YOU
17  SOLEMNLY SWEAR THE TESTIMONY YOU ARE ABOUT TO GIVE WILL BE THE
18  TRUTH, THE WHOLE TRUTH AND NOTHING BUT THE TRUTH, SO HELP YOU
19  GOD?
20      THE WITNESS:  YES.
21          RICHARD RIESS, JR.
22  WAS CALLED AS A WITNESS AND, AFTER BEING FIRST DULY SWORN BY THE
23  CLERK, WAS EXAMINED AND TESTIFIED ON HIS OATH AS FOLLOWS:
24      THE DEPUTY CLERK:  WILL YOU STATE YOUR NAME AND, ALSO,
25  SPELL IT FOR THE RECORD.

## 1996

1       THE WITNESS:  RICHARD ALEXANDER RIESS, JR.
2       THE COURT:  WOULD YOU GET A LITTLE CLOSER TO THE MIC,
3  SIR.
4       MR. WALKER:  AND YOU CAN MOVE THE MIC TOWARDS YOU IF YOU
5  WOULD LIKE.
6       THE WITNESS:  RICHARD ALEXANDER RIESS, JR.,
7  R-I-C-H-A-R-D, A-L-E-X-A-N-D-E-R, R-I-E-S-S, J-R, PERIOD.
8            DIRECT EXAMINATION
9  BY MR. WALKER:
10  Q.  MR. RIESS, ARE YOU A RESIDENT OF NEW ORLEANS?
11  A.  NO.
12  Q.  WHERE DO YOU PRESENTLY RESIDE?
13  A.  ST. TAMMANY.
14  Q.  AND I'M GOING TO ASK YOU A SERIES OF QUESTIONS.  IF I SPEAK
15  TOO QUICKLY, PLEASE LET ME KNOW.
16      WHAT'S YOUR EDUCATION?
17  A.  HIGH SCHOOL AND TWO YEARS VOCATIONAL TECH.
18  Q.  AND WHAT VO-TECH SCHOOL DID YOU ATTEND?
19  A.  ELAINE P. NUNEZ.
20  Q.  WHERE ARE YOU PRESENTLY EMPLOYED?
21  A.  SEWERAGE AND WATER BOARD OF NEW ORLEANS.
22  Q.  AND WERE YOU EMPLOYED BY THE SEWERAGE AND WATER BOARD AT THE
23  TIME OF HURRICANE KATRINA?
24  A.  YES, SIR.
25  Q.  AND HOW LONG HAVE YOU BEEN EMPLOYED THERE?  WHEN DID YOU

## 1997

1  START YOUR EMPLOYMENT?
2  A.  IN 1988.
3  Q.  '88?
4  A.  UH-HUH (AFFIRMATIVE RESPONSE).  YES, SIR.
5  Q.  AT THE TIME OF HURRICANE KATRINA, WERE YOU ASSIGNED TO A
6  PARTICULAR PUMP STATION?
7  A.  PUMPING STATION NUMBER 5.
8  Q.  AND WHAT WAS YOUR POSITION AT THAT STATION?
9  A.  PUMPING PLANT OPERATOR.
10  Q.  AND HOW LONG HAD YOU WORKED AT THAT STATION?
11  A.  ORIGINALLY STARTED IN 1989.  STAYED THERE FOR ONE YEAR,
12  LEFT, CAME BACK IN 2000 UNTIL THE STORM, 2005.
13  Q.  SO PRIOR TO THE STORM, THE PRECEDING IMMEDIATE FIVE YEARS OR
14  SO, YOU HAD BEEN WORKING THERE?
15  A.  YES, SIR.
16  Q.  AND IS THAT THE STATION THAT'S LOCATED PRETTY MUCH AT THE
17  JUNCTION OF FRANCE AND JOURDAN ROADS IN THE NINTH WARD?
18  A.  YES, SIR.
19  Q.  JUST BELOW THE FLORIDA AVENUE BRIDGE?
20  A.  YES, SIR.
21  Q.  I'M GOING TO SHOW YOU A PHOTOGRAPH.  IT'S PX 373.
22      WELL, LET'S LOOK AT THIS ONE FIRST.  THIS IS DX 284,
23  RAINEY 3.  IS THAT THE PUMP STATION WITH THE SORT OF WHITE ROOF?
24  A.  YES, SIR.
25  Q.  CAN YOU MARK YOUR -- IF YOU PRESS THE SCREEN, IT WILL MAKE A

## 1998

1  MARK ON IT.  JUST CAN YOU DO THAT FOR US?  PERFECT.  AND THAT'S
2  WHERE YOU WERE WORKING?
3  A.  YES, SIR.
4  Q.  AND THIS BUILDING OVER HERE ACROSS THE WATER, WHAT IS THAT?
5  A.  PUMPING STATION 19.
6  Q.  THAT'S ALSO A SEWERAGE AND WATER BOARD STATION?
7  A.  YES, SIR.
8  Q.  I WOULD LIKE TO GO TO PX 373.  IS THAT STATION NUMBER 5?  DO
9  RECOGNIZE THAT?
10  A.  YES, SIR.
11  Q.  AND THIS ARROW MARKING THAT DOOR, COULD YOU TELL US WHAT
12  THAT IS?
13  A.  THAT IS THE DOUBLE DOORS THAT BACKS UP WHEN YOU ARE
14  UNLOADING TRUCKS, YOU CAN OPEN UP THE DUAL DOORS.
15  Q.  CAN YOU STEP OUT ON THAT?
16  A.  YES, SIR.
17  Q.  IS THAT A PLATFORM?
18  A.  YES, SIR.
19  Q.  AND IF YOU STEP OUT ON THAT ARE YOU FACING DIRECTLY AT THE
20  INDUSTRIAL CANAL?
21  A.  YES, SIR.
22  Q.  AND DID YOU ALL USE THAT DOOR REGULARLY TO COME OUT AND
23  OBSERVE CONDITIONS IN THE NEIGHBORHOOD?
24  A.  THE DOOR NEXT TO IT.
25  Q.  THE SINGLE DOOR HERE?

28 (Pages 1995 to 1998)