2023

1                        UNITED STATES DISTRICT COURT

2                        EASTERN DISTRICT OF LOUISIANA

3

4

5        IN RE:  KATRINA DREDGING        *   Civil Action

         LIMITATION ACTION              *

6        CONSOLIDATED LITIGATION        *   No. 05-4182

                                        *

7                                       *   Section K(2)

         PERTAINS TO:                   *

8        BARGE                          *   New Orleans, Louisiana

                                        *

9        MUMFORD, C.A. NO. 05-5724, AS  *   July 2, 2010

         TO PLAINTIFFS JOSEPHINE        *

10       RICHARDSON AND HOLLIDAY        *   Afternoon Session

         JEWELERS, INC., ONLY           *

11       AND                            *

         BENOIT, C.A. NO. 06-7516, AS   *

12       TO PLAINTIFFS JOHN ALFORD AND  *

         JERRY ALFORD ONLY              *

13       * * * * * * * * * * * * * * * *

14                            DAY NINE

                     BENCH TRIAL BEFORE THE

15              HONORABLE STANWOOD R. DUVAL, JR.

                  UNITED STATES DISTRICT JUDGE

16

17       APPEARANCES:

18       For the Plaintiffs:        Best Koeppel

                                    BY:  LAURENCE E. BEST, ESQ.

19                                  BY:  PETER S. KOEPPEL, ESQ.

                                    2030 St. Charles Avenue

20                                  New Orleans, Louisiana 70130

21

22       For the Plaintiffs:        Law Offices of Brian A. Gilbert

                                    BY:  BRIAN A. GILBERT, ESQ.

23                                  2030 St. Charles Avenue

                                    New Orleans, Louisiana  70130

24

25

              JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER

                      UNITED STATES DISTRICT COURT

                      EASTERN DISTRICT OF LOUISIANA

**2024**

```
 1
 2   APPEARANCES:
 3   For the Plaintiffs:    Wiedemann & Wiedemann
                            BY:  KARL WIEDEMANN, ESQ.
                            BY:  LAWRENCE WIEDEMANN, ESQ.
     4                      821 Baronne Street
 4                          New Orleans, Louisiana  70113
 5
 6   For the Plaintiffs:    Patrick J. Sanders, LLC
 7                          BY:  PATRICK J. SANDERS, ESQ.
                            3316 Ridgelake Drive
 8                          Suite 100
                            Metairie, Louisiana  70002
 9
10
     For the Plaintiffs:    Law Office of Richard T. Seymour,
11                          P.L.L.C.
12                          BY:  RICHARD T. SEYMOUR, ESQ.
                            1150 Connecticut Avenue N.W.
13                          Suite 900
                            Washington, D.C.  20036-4129
14
15   For the Plaintiffs:    Khorrami, Pollard & Abir, LLP
16                          BY:  SHAWN KHORRAMI, ESQ.
                            444 S. Flower Street
17                          33rd Floor
                            Los Angeles, California  90071
18
19
     For the Plaintiffs:    Wilson, Grochow, Druker & Nolet
20                          BY:  LAWRENCE A. WILSON, ESQ.
                            233 Broadway
21                          5th Floor
                            New York, New York  10279
22
23
24   For the Defendant:     Chaffe, McCall, L.L.P.
                            BY:  DEREK A. WALKER, ESQ.
                            BY:  CHARLES P. BLANCHARD, ESQ.
                            1100 Poydras Street, Suite 2300
25                          New Orleans, Louisiana 70163
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2026**

I N D E X

                                              Page

CHARLES R. CUSHING

  Direct Examination                          2028

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2025**

```
 1
 2   APPEARANCES:
 3   For the Defendant:     Goodwin Procter, L.L.P.
                            BY:  JOHN ALDOCK, ESQ.
 4                          BY:  MARK RAFFMAN, ESQ.
                            BY:  ADAM CHUD, ESQ.
 5                          BY:  KIRSTEN ROBBINS, ESQ.
                            BY:  ERIC I. GOLDBERG, ESQ.
 6                          901 New York Avenue, NW
                            Washington, D.C. 20001
 7
 8
 9   For the Defendant:     Sutterfield & Webb
                            BY:  DANIEL A. WEBB, ESQ.
10                          650 Poydras Street, Suite 2715
                            New Orleans, Louisiana 70130
11
12   For the Defendant:     Lafarge North America, Inc.
13                          BY:  PETER KEELEY, ESQ.
                            12950 Worldgate Drive
14                          Herndon, Virginia  20170
15
16
17   Official Court Reporter:  Jodi Simcox, RMR, FCRR
                            500 Poydras Street
18                          Room HB-406
                            New Orleans, Louisiana 70130
19                          (504) 589-7780
20
21   Proceedings recorded by mechanical stenography, transcript
     produced by computer.
22
23
24
25
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2027**

```
13:04:30                 AFTERNOON SESSION
13:04:30                  (July 2, 2010)
13:04:30                  * * * * *
13:20:35        THE DEPUTY CLERK:  All rise, please.  Court's in
13:20:47   session.  Please be seated.
13:20:55        THE COURT:  Sir, you may proceed.
13:20:57        MR. KHORRAMI:  Good afternoon, Your Honor.  Just a
13:20:58   couple --
13:21:00        THE COURT:  I reali?e you're not proceeding with this
13:21:02   witness.
13:21:02        MR. KHORRAMI:  Just housekeeping, Your Honor.  I had,
13:21:05   with Mr. Lemon, marked a couple of exhibits that I wanted to
13:21:10   move into evidence.
13:21:12        One was what I marked as Exhibit 451, which is
13:21:16   recording, archiving, and using WSR-88D data with Tim Crum as
13:21:22   the author.
13:21:24        The second, which I didn't give a number to, but
13:21:28   it's going to be 452, Plaintiffs' 452, the WX page, and that is
13:21:32   the GR Level 3 Radar Tutorial.  And the final item was the
13:21:38   recording I played yesterday for Mr. Lemon from WeatherBrains.
13:21:44   And I'm submitting it in disk form, plus what we displayed,
13:21:49   which is the splash page for that Web site.
13:21:52        MR. ALDOCK:  No ob;ection, Your Honor.
13:21:54        THE COURT:  Thank you, sir.  Let them be admitted.
13:21:57        MR. KHORRAMI:  And that's 453, Your Honor.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2028

13:21:59  THE COURT:  Thank you.

13:22:01  THE DEPUTY CLERK:  Thank you.

13:22:28  THE COURT:  Sir, whenever you're ready to proceed.

13:22:30  MR. ALDOCK:  Thank you, Your Honor.  John Aldock for

13:22:33  Lafarge.

13:22:33  Your Honor, for the record, Dr. Cushing's

13:22:33  report --

13:22:34  THE WITNESS:  Excuse me should I be sworn in/

13:22:36  THE DEPUTY CLERK:  Yes.

13:22:36  MR. ALDOCK:  -- is in the record at DX-196.

13:22:40  THE COURT:  Thank you.

13:22:40  (WHEREUPON, Charles R. Cushing, having been duly

13:22:40  sworn, testified as follows.)

13:22:41  THE DEPUTY CLERK:  Please state your full name and

13:22:41  correct spelling for the record.

13:22:47  THE WITNESS:  My name is Charles R. Cushing,

13:22:52  C-U-S-H-I-N-G.

13:22:55  DIRECT EXAMINATION

13:22:56  BY MR. ALDOCK:

13:22:57  Q.  Dr. Cushir, what's your occupation/

13:22:59  A.  I'm a naval architect and marine engineer -- ocean

13:23:03  engineer.

13:23:04  Q.  Who do you work for/

13:23:05  A.  I work for C.R. Cushing & Company.

13:23:10  Q.  How long have you been there/

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2029

13:23:12  A.  I've been the president of the company since its founding,

13:23:17  42 years.

13:23:18  Q.  Can you describe your educational background/

13:23:20  A.  Yes, sir.  I spent a year at City College of New York

13:23:26  studying engineering and meteorology.

13:23:29  I attended the U.S. Merchant Marine Academy at Kings

13:23:33  Point, graduating with a bachelor of science degree, marine

13:23:38  transportation, one year which was spent at sea as a cadet

13:23:44  midshipman.

13:23:47  I then went to sea and sailed on my license, but then

13:23:51  went back to school, and I studied at the Massachusetts

13:23:56  Institute of Technology, where I received a bachelor of science

13:24:02  degree in naval architecture and marine engineering and took

13:24:06  graduate courses, including meteorology and oceanography.

13:24:11  Then later, I received a master of science degree

13:24:15  from the State University of New York, Maritime College.

13:24:20  And then subsequently received a Ph.D. in maritime

13:24:24  studies from the University of Wales, or Cardiff University.

13:24:34  Q.  During your -- after graduation, were you serving at any

13:24:38  point as a licensed deck officer/

13:24:40  A.  Yes, sir.  I sailed immediately after graduation from

13:24:44  Kings Point, on my Coast Guard license.

13:24:48  And then while I was attending MIT, I sailed every

13:24:52  summer on my license.  And during that period of time, I also

13:24:58  served on the SS AMERICA, which at the time was one of the

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2030

13:25:02  largest American cargo vessels, and my collateral duties was

13:25:07  weather officer.

13:25:09  Q.  Dr. Cushing, as part of your education, did you have

13:25:12  course work involving the mooring of vessels and experience in

13:25:15  the mooring of vessels/

13:25:17  A.  Yes, sir.  That was a fundamental part of our seamanship

13:25:21  courses.

13:25:22  Q.  What about professional licenses/

13:25:26  A.  I have a professional engineer's license from the state of

13:25:29  Mississippi.  I'm a chartered engineer in the United Kingdom,

13:25:32  and I have a EuroEngineer's license with the European Union.

13:25:41  Q.  Can you describe your teaching experience/

13:25:44  A.  Yes, sir.  I've lectured at MIT, for the Institute of

13:25:48  Architecture, Kings Point; the University of Michigan; the

13:25:51  Industrial College of the Armed Forces; and a number of other

13:25:54  universities.

13:25:55  In addition, for the last 26 years, I teach a course

13:25:59  at the World Maritime University, which is a university run by

13:26:04  the United Nations in Malmo, Sweden, and I've also been

13:26:11  teaching for the last five years at their Far Eastern campus in

13:26:16  Dalian, China, on maritime casualty investigation.

13:26:20  Q.  What does the course in maritime casualty investigation

13:26:24  involve/

13:26:24  A.  That involves a number of different subjects.  But they

13:26:29  include the gathering of evidence, interviewing witnesses, the

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2031

13:26:32  analysis of accidents, and finding root causes.

13:26:37  Q.  I know your résumé has a whole host of scientific

13:26:40  associations.  Give us some of the high points.

13:26:43  A.  I'm a member of the American Society of Mechanical

13:26:47  Engineers -- in fact, a 50-year fellow in that society, also,

13:26:54  in the American Society of Naval Engineers.  In the Society of

13:26:59  Naval Architects and Marine Engineers I'm a fellow, and a

13:27:04  number of other professional organizations.

13:27:08  Q.  Have you had any advisory roles to the U.S. Government/

13:27:12  A.  Yes, sir.  I'm a member for the last 12 years of the

13:27:15  Marine Board, and the Marine Board is part of the National

13:27:19  Academy of Sciences.  And there, we are advisers to the federal

13:27:25  maritime agencies such as NOAA, Maritime Administration, Coast

13:27:29  Guard and so forth.

13:27:33  In addition to that, I'm a member of the Naval

13:27:35  Studies Board, where we're advisers to the U.S. Navy.

13:27:41  Q.  As a member of these boards, do you have the occasion to

13:27:44  make recommendations on how to avoid casualties/

13:27:49  A.  Yes, sir.  I would also mention I've been an elected

13:27:52  member of the National Academy of Engineering.  And there, we

13:27:59  had an advisory role to the U.S. Government, both the

13:28:06  administration and Congress.

13:28:08  Q.  What do you do as a naval architect, marine engineer, and

13:28:13  structural engineer, and ocean engineer/  What are the

13:28:15  categories of things that you do in those multiple -- with

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2032**

1  13:28:17  those multiple hats?

2  13:28:20  A.  Well, we mostly plan and design and supervise the

3  13:28:27  construction of ships, vessels, marine facilities, water

4  13:28:35  facilities, and the like.

5  13:28:40  That includes --

6  13:28:42  Q.  Do the projects involve the analysis of wind, wind

7  13:28:45  direction, waves, generation of waves, shallow water waves, all

8  13:28:48  of that myriad of things?

9  13:28:50  A.  Yes, and the action of all those on vessels and on marine

10  13:28:54  facilities.

11  13:28:56  Q.  As a forensic investigator, have you investigated large

12  13:28:58  casualties?

13  13:28:59  A.  Yes, sir.

14  13:29:00  Q.  Give us an example.

15  13:29:01  A.  Well, one would be the EXXON VALDEZ, where we were asked

16  13:29:08  by Exxon to analyze the track of the vessel as it grounded on

17  13:29:18  shoals, but to reconstruct the track.  And then our work in

18  13:29:24  that case expanded to finding root causes for the accident.

19  13:29:29  Another example would be in the PRESTIGE, which is

20  13:29:33  the sinking of one of the largest tankers off the coast of

21  13:29:39  Spain causing, up to 60 days ago, one of the largest

22  13:29:45  environmental accidents at sea.

23  13:29:49  And in that case, our work involved analyzing the

24  13:29:54  effect of wind and waves on the vessel and the structural

25  13:29:58  failures and calculating the track and finding root causes for

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2033**

1  13:30:03  that accident.

2  13:30:04  Q.  Who was your client in the PRESTIGE matter?

3  13:30:08  A.  The government of Spain.

4  13:30:10  Q.  Any examples of an investigation involving a barge?

5  13:30:12  A.  Yes.  We've done a number of those.  One involves a tug

6  13:30:19  and a barge, the PINEY POINT, in the James River in Virginia,

7  13:30:24  where the barge got out of control from the tug and there was

8  13:30:34  an allision with pile-supported navigation facilities.  And

9  13:30:41  there, we tracked -- amongst other things, we tracked the

10  13:30:45  vessel, the influence of shoals, and the bottom, and the track

11  13:30:50  of the barge when it had its allision.

12  13:30:53  Q.  What year was that, roughly?

13  13:30:56  A.  Approximately five years ago.

14  13:30:58  Q.  Did you ever work on the development of a single point

15  13:31:01  mooring system and their anchoring systems associated with

16  13:31:06  that?

17  13:31:08  A.  Yes, sir.  We had projects involving single point moorings

18  13:31:12  and their method for anchoring and running pipelines subsea.

19  13:31:19  Q.  Going back to the barge incident involving the James

20  13:31:22  River, what did you actually do in carrying out those

21  13:31:26  responsibilities?

22  13:31:27  A.  Well, what we did was we -- we took the available data and

23  13:31:32  we plotted the track of the vessel to determine what the causes

24  13:31:44  were for the -- for the allision.

25  13:31:48  Q.  Did you have -- did it involve inspection of the barge and

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2034**

1  13:31:52  damage to the barge and relate to things like that?

2  13:31:54  A.  That -- that information came from documents.

3  13:31:57  Q.  How much of your work involves working as an expert in

4  13:32:00  litigation?  What percentage?

5  13:32:03  A.  I could only estimate, but it's on the order of 15 or

6  13:32:06  20 percent.

7  13:32:07  Q.  Do you have experience working in the New Orleans area

8  13:32:10  prior to this case?

9  13:32:12  A.  Actually, for almost 50 years, the container terminal over

10  13:32:18  on France Road, I was part owner of those container cranes.

11  13:32:24  One of our clients, and another company that I had a part

12  13:32:27  ownership in, was a company over in Belle Chasse manufacturing

13  13:32:30  oil and water separators and oil spill equipment.

14  13:32:36  We've worked regularly for Waterman, Lykes, Central

15  13:32:39  Gulf, Freeport McMoRan, and other -- and built ships in

16  13:32:44  Avondale, Halter, Trinity, in yards in the New Orleans area.

17  13:32:49  Q.  How long have you worked on this case?

18  13:32:51  A.  Since two weeks after Katrina.

19  13:32:55  Q.  Did you have occasion to travel to New Orleans to view the

20  13:32:58  Inner Harbor Navigation Canal?

21  13:32:59  A.  Yes, sir.

22  13:33:00  Q.  For this case?

23  13:33:02  A.  I have.

24  13:33:03  Q.  When was the first time you went?

25  13:33:04  A.  On the 22nd of September.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2035**

1  13:33:07  Q.  Of what year?

2  13:33:08  A.  Of 2005.

3  13:33:09  Q.  What did you see?

4  13:33:09  A.  Well, it was right in the middle of Hurricane Katrina.

5  13:33:14  Q.  Of Hurricane --

6  13:33:16  A.  I'm sorry.  Hurricane Rita.

7  13:33:17  And I was only able to get as far as the North

8  13:33:21  Claiborne Avenue bridge, because the Lower Ninth Ward was

9  13:33:25  flooded a second time.  And I had a chance, at least to see

10  13:33:29  from the bridge, the site, the accident site, particularly the

11  13:33:33  south breach.

12  13:33:34  But I used that opportunity, also, to visit the

13  13:33:39  Lafarge North America terminal facilities on the West Bank.

14  13:33:43  Q.  Did you subsequently have occasion to revisit the area?

15  13:33:46  A.  Yes, sir.  Shortly afterwards, when the Lower Ninth Ward

16  13:33:49  had drained, about six -- five or six days later, I was able to

17  13:33:53  get into the Lower Ninth Ward and visit the accident site.

18  13:33:57  Q.  What did you do on that trip?

19  13:33:59  A.  Well, I started by walking the entire floodwall and

20  13:34:06  examining it very carefully on both the batture side and the

21  13:34:12  protected side.

22  13:34:14  I examined the breaches very carefully.  I took

23  13:34:18  extensive photographs.  I examined the barge.  I got ladders

24  13:34:23  and climbed on the barge and did a closeup examination of the

25  13:34:28  covers and the deck, the coamings.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

4 (Pages 2032 to 2035)

**2036**

1  13:34:34    I also arranged for an aerial survey; and as part of
2  13:34:38  that, I laid out markers that could be seen during the aerial
3  13:44:46  survey at 50-foot intervals along the entire south breach.  And
4  13:34:52  then we arranged for the photogrammetric aerial study of the
5  13:34:59  floodwall.
6  13:35:00    Q.  What's photogrammetry?
7  13:35:04    A.  That's a stereoscopic method, when -- you use it from --
8  13:35:09  from aloft, from a plane.  You're able to take photographs,
9  13:35:15  stereographics -- photographs that will permit you to determine
10 13:35:23  height or depth to within one or two inches.
11 13:35:27    Q.  Did you subsequently have an opportunity to return to the
12 13:35:31  canal area again.
13 13:35:32    A.  Yes, on a number of occasions.  I visited the site
14 13:35:35  probably eight times -- not probably -- I think eight times.  A
15 13:35:43  number of times.
16 13:35:43    Q.  What did you do on those eight subsequent occasions?
17 13:35:47    A.  I had a chance to examine the barge more carefully.  At
18 13:35:52  some point, the barge was lifted on the airbags, and it
19 13:35:57  permitted me to crawl underneath the barge and examine the
20 13:36:00  bottom of the barge, where we observed scratches and markings.
21 13:36:05    I had an opportunity to take more photographs,
22 13:36:09  examine the floodwall more carefully.  I had an opportunity to
23 13:36:14  visit the Lafarge terminal and photograph the terminal.
24 13:36:19    The barge was subsequently salvaged, or scrapped.
25 13:36:26  But the lower 4 feet of the barge was saved; that is, the sides

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2037**

1  13:36:33  and the bottom, and cut into sections, where -- 19 sections,
2  13:36:37  where they were transported to a warehouse on the West Bank and
3  13:36:43  inverted and then reassembled -- reassembled, in the sense that
4  13:36:48  they were put side by side, as they would have been as a whole
5  13:36:54  barge.
6  13:36:55    And that permitted me to carry out a very detailed
7  13:36:59  inspection of the damaged barge; that is to say, the scratches
8  13:37:06  and markings on the bottom of the barge.
9  13:37:09    Q.  Under your supervision, was there a directional flow study
10 13:37:13  conducted?
11 13:37:14    A.  Yes, sir, we did.  I did, and we did, carry out a
12 13:37:18  directional flow study.  That involved first examining, with
13 13:37:23  the aerial photographs, the Lower Ninth Ward before and after
14 13:37:29  Katrina to determine what direction the houses moved -- those
15 13:37:37  houses that were blown off their foundations or -- or
16 13:37:43  platforms.
17 13:37:46    The study also included the examination of trees and
18 13:37:50  signs and poles and other structures and other items that were
19 13:37:58  indicative of the way in which the floodwaters had moved
20 13:38:04  things.  And with that, we were able to determine, generally,
21 13:38:08  the direction of flow in the Lower Ninth Ward.
22 13:38:11    Q.  Did you feel that you had all the access you needed for
23 13:38:14  the floodwall, the barge, and everything else to arrive at your
24 13:38:18  opinions in this case?
25 13:38:20    A.  Yes.  I had complete access, and I think I have enough

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2038**

1  13:38:23  information to draw conclusions.
2  13:38:27    Q.  Was there anything else you would have wanted to do in
3  13:38:29  forming your conclusion that you didn't or weren't able to do?
4  13:38:32    A.  No, sir.
5  13:38:33    Q.  What else have you done in this case in addition to your
6  13:38:36  personal observations of the floodwall, the barge, the
7  13:38:39  terminal, and the Lower Ninth Ward in New Orleans?
8  13:38:43    A.  Well, I viewed evidence.  I've read the public reports,
9  13:38:48  publicly-available reports.  I've read eyewitness statements
10 13:38:52  and that type of thing.
11 13:38:56    MR. ALDOCK:  Your Honor, at this time I'd like to
12 13:38:57  tender Dr. Cushing as an expert in naval architecture, marine
13 13:39:03  and structural engineering, ocean engineering and forensic
14 13:39:07  marine casualty reconstruction.
15 13:39:12    MR. KHORRAMI:  Your Honor, plaintiffs reserve voir
16 13:39:15  dire until after direct examination.
17 13:39:19    THE COURT:  The Court accepts Dr. Cushing as
18 13:39:21  tendered.
19 13:39:23    MR. ALDOCK:  Thank you, Your Honor.
20 13:39:23  BY MR. ALDOCK:
21 13:39:24    Q.  Dr. Cushing, let's start with your conclusions that you
22 13:39:26  reached in this case.  What are your three conclusions that
23 13:39:28  you've reached?
24 13:39:29    A.  The three conclusions that I have reached are, first, that
25 13:39:33  it's scientifically impossible for the barge to have crossed

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2039**

1  13:39:36  the canal or have been present at the floodwall until after
2  13:39:41  both the north and the south breaches had already occurred.
3  13:39:44    My second conclusion is that even if the barge were
4  13:39:50  present at the floodwall, any impact the barge would have had
5  13:39:54  on the floodwall would have cracked the concrete cap without
6  13:39:58  causing the wall to fail.
7  13:40:00    And third is that the physical evidence at the site
8  13:40:02  of the breaches and on the barge itself are inconsistent with
9  13:40:07  plaintiffs' allegations that the barge caused the breaches.
10 13:40:17    Q.  Okay.  Let's examine your first conclusion, that the barge
11 13:40:20  could not cause either breach and was not moved across the
12 13:40:24  canal or had been present at the floodwall until after both
13 13:40:28  breaches had occurred.
14 13:40:30    Let's start here.  What are we looking at?
15 13:40:37    A.  This is the barge -- this is a schematic of the IN 27- --
16 13:40:43  4527, which is a standard Mississippi River barge, 200-foot
17 13:40:57  long.  I say "standard."  She's a box barge, which means that
18 13:41:01  she's squared off at the ends, symmetrical fore and aft.
19 13:41:08    The barge is 12-foot deep on the hull.  It has a
20 13:41:11  coaming that surrounds the cargo opening that's 5 feet high.
21 13:41:16  And on top are fiberglass dome-shaped portable covers to keep
22 13:41:22  the cargo dry.  The barge is 35 feet wide, and it's made of
23 13:41:29  steal.
24 13:41:32    I think that's a general description of it.  It
25 13:41:35  doesn't -- obviously, it doesn't have any propulsion, so it's a

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2040**

| | | |
|---|---|---|
| 1 | 13:41:40 | nonself-propelled barge. |
| 2 | 13:41:41 | Q.  Is this, in the vernacular, called a typical hopper barge? |
| 3 | 13:41:47 | A.  It's a typical hopper barge, yes. |
| 4 | 13:41:50 | Q.  Describe the interior of the barge -- |
| 5 | 13:41:53 | A.  Yes, sir. |
| 6 | 13:41:53 | Q.  -- what we're looking at now. |
| 7 | 13:41:56 | A.  The interior space in the hopper barge is the cargo space |
| 8 | 13:42:00 | that extends from one end of the barge to the other without |
| 9 | 13:42:04 | bulkheads.  And then surrounding it are void spaces that |
| 10 | 13:42:08 | contain the structure and the framing.  There's void spaces |
| 11 | 13:42:13 | underneath the barge also.  And there are void spaces at either |
| 12 | 13:42:17 | end of the barge. |
| 13 | 13:42:19 | Q.  On August 29th, 2005, Dr. Cushing, was the barge empty or |
| 14 | 13:42:23 | loaded? |
| 15 | 13:42:26 | A.  The 4727 was empty at that time. |
| 16 | 13:42:31 | Q.  Using this slide, Dr. Cushing, can you show us the |
| 17 | 13:42:34 | difference between an empty barge and a loaded barge? |
| 18 | 13:42:37 | A.  Yes, sir.  The lower picture shows the barge in its loaded |
| 19 | 13:42:40 | condition.  And the waterline would be here.  And she would |
| 20 | 13:42:43 | have a 10-foot draft, which would mean the 12-foot hull would |
| 21 | 13:42:50 | have 2 feet of freeboard.  And then, of course, the coamings |
| 22 | 13:42:54 | and covers would extend above the water. |
| 23 | 13:42:56 | However, when the barge is light, her light draft is |
| 24 | 13:42:59 | 1 feet 4 1/2 inches; and, therefore, she has a large sail area, |
| 25 | 13:43:03 | or windage area, extending above the water. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2042**

| | | |
|---|---|---|
| 1 | 13:44:51 | barges.  The one adjacent to the wharf was loaded, and the one |
| 2 | 13:44:57 | on the offshore side was light. |
| 3 | 13:44:59 | Q.  Where were the two breaches that are at issue in this |
| 4 | 13:45:02 | case? |
| 5 | 13:45:09 | A.  The north breach is to the northwest of the terminal a |
| 6 | 13:45:09 | distance -- a distance of about 1,400 feet.  And the south |
| 7 | 13:45:13 | breach is to the southeast from the terminal a distance of |
| 8 | 13:45:18 | about 3,000 feet. |
| 9 | 13:45:22 | Q.  Point them out.  I'm not sure you have your directions |
| 10 | 13:45:25 | quite right there. |
| 11 | 13:45:27 | A.  Okay.  This is the east side.  This is the west side. |
| 12 | 13:45:31 | This is the south, in this direction.  So from the terminal to |
| 13 | 13:45:35 | the south breach is the southeasterly direction.  The north |
| 14 | 13:45:41 | breach is in a northeasterly direction. |
| 15 | 13:45:48 | Q.  In general, what are the forces that can possibly move a |
| 16 | 13:45:57 | barge? |
| 17 | 13:45:58 | A.  That would be wind and water and waves and currents. |
| 18 | 13:46:01 | Q.  What forces have you concluded that were important to move |
| 19 | 13:46:03 | the barge in this case? |
| 20 | 13:46:04 | A.  The really only significant forces that moved this barge |
| 21 | 13:46:08 | during Hurricane Katrina and the lead-up to it would be the |
| 22 | 13:46:11 | wind. |
| 23 | 13:46:13 | Q.  Why is that? |
| 24 | 13:46:15 | A.  Well, because, first of all, the hurricane winds were |
| 25 | 13:46:19 | strong.  The barge has a lot of sail area to it; whereas, |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2041**

| | | |
|---|---|---|
| 1 | 13:43:12 | Q.  Dr. Cushing, this is a photograph from your report.  What |
| 2 | 13:43:15 | does this show? |
| 3 | 13:43:17 | A.  This is an aerial photograph of the Inner Harbor |
| 4 | 13:43:21 | Navigation Canal, sometimes called the Industrial Canal. |
| 5 | 13:43:26 | Q.  The Court has seen things like this before.  But why don't |
| 6 | 13:43:30 | you quickly orient us to all the key features that we've put on |
| 7 | 13:43:34 | this slide. |
| 8 | 13:43:35 | A.  Yes, sir.  On the right-hand side of the picture is the |
| 9 | 13:43:39 | Lower Ninth Ward.  At the top of the picture is the Florida |
| 10 | 13:43:41 | Avenue bridge and the pump station.  On the left side of the |
| 11 | 13:43:47 | picture, in the upper corner, is the Lafarge terminal. |
| 12 | 13:43:50 | This indentation is sometimes called a turning basin, |
| 13 | 13:43:55 | sometimes called a pocket, sometimes called a protected mooring |
| 14 | 13:44:01 | area, or a slip.  There's a Namasco terminal immediately to the |
| 15 | 13:44:08 | south, the Namasco terminal and its entry. |
| 16 | 13:44:14 | And then at the south end of this picture, or the |
| 17 | 13:44:17 | lower end of the picture, is the North Claiborne Avenue bridge. |
| 18 | 13:44:21 | And points of the picture, off the picture, are the locks that |
| 19 | 13:44:25 | separate the canal from the Mississippi River. |
| 20 | 13:44:28 | Q.  When Katrina was approaching New Orleans on August 29th, |
| 21 | 13:44:32 | where was the ING 4727? |
| 22 | 13:44:36 | A.  It would have been in the Lafarge terminal.  And you could |
| 23 | 13:44:38 | see in the picture, on the right-hand side, five barges abreast |
| 24 | 13:44:45 | to the north.  Those were five loaded barges. |
| 25 | 13:44:47 | And immediately to the south are two tiers, or two |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2043**

| | | |
|---|---|---|
| 1 | 13:46:29 | current in the water was very, very small.  I would say |
| 2 | 13:46:35 | insignificant.  And the waves would have been moving in the |
| 3 | 13:46:40 | direction of the wind, so they would have only added to the |
| 4 | 13:46:46 | force of the wind. |
| 5 | 13:46:47 | But the waves themselves were only on the order of a |
| 6 | 13:46:50 | foot to 3 feet.  So they wouldn't have contributed much to the |
| 7 | 13:46:54 | movement of the barge. |
| 8 | 13:46:56 | Q.  Dr. Cushing, we're not going to go through the weather, |
| 9 | 13:46:59 | because His Honor has heard probably more weather than he wants |
| 10 | 13:47:04 | to have heard.  And -- but I do want to at least orient you and |
| 11 | 13:47:07 | give your opinion. |
| 12 | 13:47:08 | What's this? |
| 13 | 13:47:09 | A.  This is a diagram showing the traditional Northern |
| 14 | 13:47:13 | Hemisphere counterclockwise circulation of wind around the eye |
| 15 | 13:47:21 | of a hurricane.  And this is Buys Ballot's law as I learned it |
| 16 | 13:47:26 | as a midshipman and through my sea-going career -- and I've |
| 17 | 13:47:32 | been in four hurricanes -- where you face into the wind, and |
| 18 | 13:47:34 | the eye of the hurricane is two points of abaft the beam on |
| 19 | 13:47:39 | your starboard side, or approximately so. |
| 20 | 13:47:43 | Q.  Were you in the courtroom when Dr. Dooley gave his |
| 21 | 13:47:46 | explanation for Buys Ballot's law, and his basic description of |
| 22 | 13:47:51 | how it operates and would operate in the Industrial Canal? |
| 23 | 13:47:55 | A.  I was, yes. |
| 24 | 13:47:56 | Q.  And do you agree with Dr. Dooley's testimony? |
| 25 | 13:47:59 | A.  Yes, sir, I do. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2044**

13:48:05   Q.  Just one more like this.

13:48:06        What is -- what do you see in this photograph/

13:48:09   A.  This is a picture of Hurricane Katrina on the 28th of

13:48:17   August at 3:11 in the afternoon Central Daylight Time, where it

13:48:22   had -- where the hurricane had traversed from Florida into the

13:48:28   Gulf and it intensified to a Category 5, and was just about to

13:48:33   make a right-hand turn and take aim at New Orleans.

13:48:37        And it shows the characteristic counterclockwise

13:48:42   winds around the hurricane eye.

13:48:47   Q.  Dr. Cushing, what is this/

13:48:49   A.  This is a curve that I prepared of the direction of the

13:48:54   wind, so that one can very easily and very quickly determine,

13:49:00   from the time, what the direction of the prevailing winds would

13:49:05   be in the hurricane, or in the vicinity, on Sunday and Monday.

13:49:14   Q.  What's this/

13:49:16   A.  This is the diagram that we've included in our report that

13:49:20   aids in visually seeing what direction the wind is blowing

13:49:24   at -- from 2:00 a.m. on the 29th right on through the latter

13:49:30   part of the morning.

13:49:32   Q.  Is this diagram fully consistent with Dr. Dooley's

13:49:39   hindcast data/

13:49:40   A.  Yes, sir.  In fact, we obtained the data for this from

13:49:44   Dr. Dooley's data.

13:49:46   Q.  Show us again where the ING 4727 was in this diagram.

13:49:50   A.  The 4727 would be just right here.  And that is in the

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2045**

13:49:56   against the left bank, or the west -- west side of the canal.

13:50:04   Q.  Dr. Cushing, if the barge was located somewhere else in

13:50:07   the canal, it wasn't there at the terminal, would the direction

13:50:10   of the wind acting on the barge be different/

13:50:13   A.  No.  These winds would have been the same all over the

13:50:18   canal.  So if the barge had been out in the canal or further

13:50:22   south, they would still have been subjected to these winds.

13:50:28   Q.  Assuming the barge was not at the dock at all prior to

13:50:31   7:30 in the morning on the date of the hurricane, what would

13:50:35   have happened to the barge/

13:50:36   A.  Well, the barge, if it had been out in the canal or

13:50:39   further south in the canal, the barge would have been blown to

13:50:43   the west side of the canal, and it would have been blown in a

13:50:47   southerly direction, and would have ended up down closer to the

13:50:52   locks.

13:50:54   Q.  Dr. Cushing, are there any scientific treatises or

13:51:01   scholarly articles that support Dr. Pazos' opinion that the

13:51:05   wind direction during a hurricane is, quote, local winds that

13:51:09   don't have a constant direction, and they are only active for a

13:51:12   few minutes, end quote/

13:51:14   A.  No, sir.  Not to -- not to my knowledge.

13:51:17   Q.  I'd like to now turn to the north breach.  Have you

13:51:21   reached a conclusion, Dr. Cushing, as to whether the wind could

13:51:24   have driven the barge to the site of the north breach/

13:51:28   A.  Yes, sir.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2046**

13:51:28   Q.  What was that conclusion/

13:51:30   A.  That it's scientifically impossible for the barge to have

13:51:34   traveled against the wind and reached the north breach.

13:51:37   Q.  Can you show the Court the location of the north breach

13:51:40   relative to the terminal and the measurements/

13:51:42   A.  Yes, sir.  The north breach is on the east side to the

13:51:46   northeast from the terminal, and it's 1,400 feet.

13:51:50   Q.  What direction can the barge have needed to travel to be

13:51:54   present at the site of the north breach/

13:51:55   A.  It would had to have traveled directly into the wind.

13:51:58   Since the wind was from the northeast, it would have had to

13:52:02   travel against the wind.

13:52:02   Q.  What wind would have been necessary to propel the barge to

13:52:05   the northeast in the direction of the breach/

13:52:07   A.  Well, obviously, wind coming from the southwest would be

13:52:12   necessary to propel the barge to the northeast.

13:52:18   Q.  Have you seen any evidence as to the time that the north

13:52:22   breach occurred/

13:52:23   A.  I've seen various reports, extending from just before 4:30

13:52:27   in the morning until 6:00 in the morning.

13:52:31   Q.  Where was the center of Katrina located in that period

13:52:35   between 4:30 and 6:00/

13:52:37   A.  The -- Katrina, before 6:00 in the morning, would have

13:52:41   still been in the Gulf of Mexico to the south and would not

13:52:46   have yet made landfall.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2047**

13:52:49   Q.  What direction were the winds blowing in the canal between

13:52:51   4:30 and 6:00 a.m./

13:52:53   A.  Between 4:30 and 6:00 a.m., they were blowing from a

13:52:58   northeasterly direction.

13:53:01   Q.  Did the wind ever blow from the south to the north during

13:53:05   Katrina/

13:53:05   A.  No, sir.

13:53:07   Q.  Is there any other force that could have overcome the

13:53:10   prevailing wind and moved the barge to the north breach/

13:53:14   A.  No, sir.

13:53:15   Q.  What about wind gusts/

13:53:16   A.  Wind gusts are momentary excursions of the wind, both in

13:53:25   wind force and wind direction, that vary several degrees and

13:53:32   vary in intensity, 10, 20, 25 percent or more.

13:53:39   Q.  And what is their usual duration/

13:53:42   A.  One to three seconds.  It's been variously reported in

13:53:48   this courtroom as three to five seconds.

13:53:50   Q.  Does the one-to-three or the three-to-five-second wind

13:53:54   gust create enough force to move the barge against the

13:53:57   prevailing wind/

13:53:58   A.  No, sir.

13:53:59   Q.  Why is that/

13:54:00   A.  Well, the barge -- this barge, nearly 1,000 tons, has

13:54:06   inertia, and you need a steady wind to cause it to get into

13:54:11   motion.  And a one-to-five-second gust of wind will not cause

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2048

```
13:54:18   the barge to move or --
13:54:20   Q.  Why do you need a --
13:54:21   A.  -- or to develop speed.
13:54:24   Q.  Why do you need a steady or sustained wind to move a
13:54:28   barge?
13:54:29   A.  If a barge is at rest or moving in one direction, and
13:54:32   according to Newton's basic simple principles, you need to put
13:54:38   a sustained force to get it to overcome its inertia and get it
13:54:47   moving.
13:54:48   Q.  Could turbulence have moved the barge?
13:54:50   A.  Not to my knowledge, because there was no turbulence that
13:54:54   was reported.  Turbulence occurs when you have something in way
13:55:00   of the field stream of wind, such as a building or something
13:55:08   like that.  And once the wind has moved around the building, as
13:55:17   it moves around the building, you get vortices and eddies
13:55:19   around the building or structure.
13:55:22        But once you're out of the shadow of the building,
13:55:26   the wind joins the free stream and you have, then, the wind of
13:55:28   the prevailing direction and you don't have that turbulence.
13:55:34   Q.  Dr. Mitchell testified while you were in the courtroom
13:55:36   about mesocyclones and multidirectional winds.  Does that
13:55:40   testimony change your opinion that the wind could not have
13:55:42   blown the barge to the north breach?
13:55:44   A.  In my opinion --
13:55:45   THE COURT:  Your Honor?
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2049

```
13:55:46        THE COURT:  Just a minute.  Objection?
13:55:48        MR. KHORRAMI:  Your Honor, I've been sort of letting
13:55:50   this go on for a little while.  But Dr. Cushing's testimony is
13:55:54   specifically not meteorological.  In fact, he relied on
13:55:58   Dr. Dooley for the wind data that he presents and the model
13:56:02   that he presents to the Court as to what happened to the barge.
13:56:05        Now, we've been going on and on regarding
13:56:08   different weather phenomenon when we've had two meteorologists
13:56:14   on the part of the defense testify already as to all of those
13:56:17   phenomena, and it's completely outside the scope of his report.
13:56:21        MR. ALDOCK:  Your Honor, I think that he's been
13:56:23   qualified in meteorology in many respects.  But he is the
13:56:26   witness, unlike the witnesses we had who told us about the
13:56:28   winds, who must be here to tell us about the impact of these
13:56:32   events on the barge.
13:56:34        He is -- he is fully qualified.
13:56:37        THE COURT:  But I don't know if he's fully qualified
13:56:39   to contradict Dr. Mitchell's testimony.  I don't think that's
13:56:46   how he's been tendered to me as an expert in meteorology.
13:56:50        Now, he might make some assumptions, assuming --
13:56:53   but I don't want him contradicting, then we have yet a third
13:56:59   expert in that milieu, which I don't think he's been tendered
13:57:04   as.
13:57:04        MR. ALDOCK:  Okay.  I can -- I can do it the way Your
13:57:06   Honor suggested.  Thank you.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2050

```
13:57:08   BY MR. ALDOCK:
13:57:08   Q.  Dr. Cushing, you heard Dr. Mitchell testify about
13:57:11   mesocyclones and multidirectional winds.  If you credited that
13:57:14   testimony, in terms of what he was describing, does it change
13:57:19   your opinion that wind could not have blown the barge to the
13:57:23   north breach?
13:57:24   A.  It does not.
13:57:25   Q.  And why is that?
13:57:26   A.  Well, what I heard -- first, no one that I heard said that
13:57:39   there was a mesocyclone in the canal.
13:57:40        Secondly, what I heard in the testimony was that the
13:57:48   mesocyclone moves with the prevailing winds in the hurricane,
13:57:51   and -- but has its own field.  But the net effect of the
13:57:56   wind is that it moves in the direction of the prevailing winds.
13:58:01   And for those reasons, it would not have.
13:58:05   Q.  Would anything in your conclusions change if the barge --
13:58:08        THE COURT:  Just to make a note.  You asked him if he
13:58:13   credited Dr. Mitchell's testimony.  I don't think Dr. Mitchell
13:58:16   testified that inexorably the wind field would be in the
13:58:20   direction of the prevailing wind, just to note that.
13:58:24        MR. ALDOCK:  Correct, Your Honor.  But Dr. Mitchell
13:58:26   did -- Dr. Mitchell did not bring it to ground and apply it to
13:58:35   the barge.  So in that sense --
13:58:38        THE COURT:  I understand that.  And that would be --
13:58:39   the Court does recall that.  In other words, he made no
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2051

```
13:58:42   specific conclusion that, in fact, that did occur.  I
13:58:44   understand.
13:58:47        MR. ALDOCK:  Thank you, Your Honor.
13:58:53   BY MR. ALDOCK:
13:58:53   Q.  Would your conclusions that the wind would not have blown
13:58:55   the barge to the north breach change if the barge had been
13:58:57   loose in the canal?
13:58:58   A.  No, sir.
13:58:59   Q.  Why not?
13:58:59   A.  Because they would have been acted on by the same winds
13:59:02   that would have existed at the terminal.
13:59:09   Q.  Dr. Cushing, I'd like to now turn to the south breach.
13:59:12   Have you reached any conclusions as to whether the wind could
13:59:15   have blown the barge to the site of the south breach prior to
13:59:17   the breach?
13:59:19   A.  Prior to the breaches, no.
13:59:21   Q.  And what's the basis of your conclusion there?
13:59:25   A.  Well, my understanding is the south breach occurred
13:59:29   sometime before 7:30.  And the winds prior to 7:30 would not --
13:59:39   would not have carried the barge free of the basin and clear
13:59:51   into the canal.  So the barge could not have escaped the
13:59:55   turning basin and got into the canal.
13:59:58   Q.  So the direction the wind was blowing in the canal prior
14:00:01   to 7:30 was what?
14:00:03   A.  Prior to 7:30, the winds were blowing from easterly or a
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2052**

1  14:00:07  northeasterly direction.
2  14:00:09  Q.  Could any other force have overcome the prevailing wind
3  14:00:12  and moved the barge to the site of the south breach before the
4  14:00:15  breach occurred?
5  14:00:16  A.  No, sir.
6  14:00:18  Q.  Dr. Cushing, I asked you some questions a moment ago about
7  14:00:21  gusts, turbulence, mesocyclones, multidirectional wind, with
8  14:00:26  regards to the north breach.  Could any of these phenomena have
9  14:00:30  moved the barge to the south breach?
10  14:00:32  A.  No, sir.
11  14:00:33  Q.  Can you tell us whether you've reached a conclusion as to
12  14:00:36  whether current could have moved the barge?
13  14:00:40  A.  Yes.  And my opinion is that current could not have --
14  14:00:48  the --
15  14:00:48  Q.  What are we looking at here?
16  14:00:50  A.  We're looking on the left at an aerial photograph of the
17  14:00:53  canal.  But on the right-hand side, we're looking at the
18  14:00:57  navigation chart, a portion of the navigation chart that has
19  14:01:04  the southern end of the Industrial Canal between the Florida
20  14:01:08  Avenue bridge and the North Claiborne Avenue bridge.
21  14:01:13  Q.  So what does this slide show with respect to the effect of
22  14:01:16  current on the barge?
23  14:01:17  A.  Well, the canal is closed off hydraulically by a set of
24  14:01:24  navigation locks.  It's closed off from the Mississippi River.
25  14:01:28  So it's a closed-ended basin.  And the water that would enter

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2053**

1  14:01:33  into this canal would have to come through the Florida Avenue
2  14:01:37  bridge.
3  14:01:40  Q.  When Katrina's storm surge entered the canal, what
4  14:01:44  happened?
5  14:01:44  A.  Well, the water entered the canal through -- through MRGO,
6  14:01:53  the Intercoastal Waterway, and then into the Industrial Canal,
7  14:01:57  entering under the Florida Avenue bridge.  It filled -- it
8  14:02:07  filled the basin in that manner.
9  14:02:09  Q.  As a result, was there any current?
10  14:02:10  A.  No.  It's a little bit like filling a bathtub.  The water
11  14:02:15  flowed in, but it flowed in at a rate that was consistent with
12  14:02:20  the hydrographs that shows the water rising in the -- in the
13  14:02:25  canal.
14  14:02:27  Q.  Can you relate the strength of the current to the strength
15  14:02:29  of the wind acting on the barge?
16  14:02:31  A.  The currents that we calculated and that existed in the
17  14:02:38  canal were very, very weak, on the order of a hundredths of a
18  14:02:48  knot.  And, therefore, they would have had very, very little
19  14:02:55  effect compared to the wind, which would have been, say, 700
20  14:03:00  times more forceful on the barge.
21  14:03:02  Q.  So could the current have overcome the hurricane winds and
22  14:03:07  moved the barge?
23  14:03:07  A.  They could not have.
24  14:03:09  Q.  Dr. Cushing, you heard and saw the testimony of
25  14:03:11  plaintiffs' expert Mr. Green?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2054**

1  14:03:15  A.  Yes, sir.
2  14:03:16  Q.  And you reviewed his declaration from November 2009 in his
3  14:03:19  reports?
4  14:03:20  A.  Yes, sir.
5  14:03:21  Q.  Are you familiar with the theory on the screen proposed by
6  14:03:24  Mr. Green in his declaration that the tide might have carried a
7  14:03:30  loose barge in the canal to a point north of the north breach
8  14:03:33  by late Sunday night, August 28th, or early Monday morning,
9  14:03:37  August 29th?
10  14:03:39  A.  Yes, sir.
11  14:03:40  Q.  Is that plausible?
12  14:03:42  A.  I would say, using his words, it's implausible, in the
13  14:03:45  extreme.
14  14:03:47  Q.  Why?
15  14:03:48  A.  Because the tides in the New Orleans area are on the order
16  14:03:52  of a foot to a foot and a half.  They're diurnal, which means
17  14:03:56  you have one high and one low tide per day, which means that
18  14:04:00  the tides that would be flooding would take 12 hours to rise
19  14:04:05  1 foot; and that means the tide would rise at the rate of about
20  14:04:12  1 inch, or -- and it would also ebb at the rate of about 1 inch
21  14:04:21  per hour.
22  14:04:23  Whereas the hydrograph shows that the -- the storm
23  14:04:26  surge was bringing water into the canal at the rate of about a
24  14:04:28  foot an hour.  So the tides would have been overwhelmed by the
25  14:04:33  storm surge, and the net flow would have been into the canal,

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2055**

1  14:04:39  not out of the canal.
2  14:04:41  Q.  Dr. Cushing, I put a chart from your report on the screen.
3  14:04:43  Now, what's this chart show?
4  14:04:46  A.  This is the --
5  14:04:46  Q.  What is it?
6  14:04:47  A.  This is the lockmaster's record.
7  14:04:49  Q.  This is a highlighted version?
8  14:04:51  A.  Yes.  These are the water levels recorded by the
9  14:04:57  lockmaster.
10  14:04:59  Q.  What do they tell us?
11  14:05:01  A.  They show that the water was rising steadily in the canal
12  14:05:08  on the evening of -- Sunday evening, the 28th, through
13  14:05:15  mid-morning on the 29th.
14  14:05:19  Q.  So the surge was -- would have overwhelmed any tide; is
15  14:05:24  that the point?
16  14:05:25  A.  That's my point, yes, sir.
17  14:05:27  Q.  Was there any indication that Mr. Green had reviewed this
18  14:05:30  log?
19  14:05:31  A.  He didn't -- he didn't indicate whether -- whether he
20  14:05:35  reviewed this record or not.
21  14:05:38  Q.  Dr. Cushing, are you familiar with Mr. Green's theory that
22  14:05:42  the barge could have broken away in a 36-mile-an-hour wind?
23  14:05:47  A.  Yes, sir.
24  14:05:47  Q.  What are we looking at?
25  14:05:50  A.  This is still part of the lockmaster's record, but it's

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2056**

| | |
|---|---|
| 1 | 14:05:54 the side of the record that shows wind and various remarks. |
| 2 | 14:06:01 Q.  What does it -- what does it report for local wind |
| 3 | 14:06:05 conditions, direction, and speed for Sunday, August 28th? |
| 4 | 14:06:09 A.  The wind records for Sunday show the wind was coming from |
| 5 | 14:06:13 the northeast, and it shows the wind speeds varying from 10 up |
| 6 | 14:06:23 until -- I'm having trouble seeing it here. I'm having trouble |
| 7 | 14:06:40 reading it here. |
| 8 | 14:06:41 Q.  Can we -- well, we can't do anything; right? |
| 9 | 14:06:44 THE COURT:  I'm looking at it, counsel.  Just tell me |
| 10 | 14:06:47 if I'm -- it looks like, yeah, you pointed to it.  There's one |
| 11 | 14:06:52 right before that at 2100.  It shows northeast 14 to 26.  Then |
| 12 | 14:06:58 at 2200, northeast 19 to 31. |
| 13 | 14:07:03 THE WITNESS:  So I see wind speeds up to 31. It |
| 14 | 14:07:08 appears to be 31. |
| 15 | 14:07:10 BY MR. ALDOCK: |
| 16 | 14:07:11 Q.  Look at your report, B-10 and get the hard copy. |
| 17 | 14:07:15 A.  I'm sorry.  Say again? |
| 18 | 14:07:17 Q.  In your report at B-10, you have a hard copy for this. |
| 19 | 14:07:22 Maybe that will help. |
| 20 | 14:07:56 Have you found it? |
| 21 | 14:07:57 A.  Yes, sir, I have it. |
| 22 | 14:07:58 Q.  So was there a 36-mile-an-hour wind listed in the |
| 23 | 14:08:02 lockmaster's log that he says caused the barge to break away, |
| 24 | 14:08:07 that Mr. Green said it would cause the barge to break away -- |
| 25 | 14:08:13 A.  Well -- |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2057**

| | |
|---|---|
| 1 | 14:08:14 Q.  -- on Sunday? |
| 2 | 14:08:16 A.  Okay.  You've qualified the question. |
| 3 | 14:08:18 First of all, there was no wind that was 36 miles an |
| 4 | 14:08:22 hour.  But Mr. Green, who -- he said he had some other expert |
| 5 | 14:08:31 calculate the winds that would cause the barge to break away. |
| 6 | 14:08:37 These winds were coming from the northeast, which |
| 7 | 14:08:43 would mean that the winds shown throughout the morning of the |
| 8 | 14:08:48 29th, Monday, were blowing against the barge, against the |
| 9 | 14:09:00 wharf, and would not have put any strain on the -- on the |
| 10 | 14:09:00 lines. |
| 11 | 14:09:00 And since Mr. Green did not submit any calculations, |
| 12 | 14:09:03 the -- it's not clear from his calculations which direction |
| 13 | 14:09:07 he's assuming the wind is blowing. |
| 14 | 14:09:10 THE COURT:  Counsel, do you have an objection? |
| 15 | 14:09:13 MR. KHORRAMI:  I have an objection. Dr. Cushing was |
| 16 | 14:09:14 not tendered as a mooring expert.  I don't think that he can |
| 17 | 14:09:18 opine whether whatever direction wind can strain the lines or |
| 18 | 14:09:22 not strain the lines or cause them to break or not to break. |
| 19 | 14:09:26 THE COURT:  Hold on just for just a minute. |
| 20 | 14:09:27 MR. ALDOCK:  He's had substantial mooring experience, |
| 21 | 14:09:32 and I think Dr.- -- Mr. Pazos, the same -- a naval architect, |
| 22 | 14:09:34 gave his opinions on every one of these. |
| 23 | 14:09:36 THE COURT:  It needs to be in his report.  Let me -- |
| 24 | 14:09:38 I have a synopsis I did, which... |
| 25 | 14:10:01 MR. ALDOCK:  Your Honor, I think it's not going to be |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2058**

| | |
|---|---|
| 1 | 14:10:02 in the report.  And the reason it's not going to be in the |
| 2 | 14:10:04 report is, as Your Honor recalls, they put in declarations late |
| 3 | 14:10:08 in the game at summary judgment.  And Your Honor agreed we |
| 4 | 14:10:12 could respond with our experts to those declarations, because |
| 5 | 14:10:15 we didn't have a chance to do any new reporting to respond, |
| 6 | 14:10:18 since they came in after everybody had done all their reports. |
| 7 | 14:10:22 MR. SANDERS:  Your Honor, may I respond?  I handled |
| 8 | 14:10:23 Mr. Green. |
| 9 | 14:10:25 The 30- to 39-miles-per-hour was in his original |
| 10 | 14:10:29 report of March 2009.  Nothing was mentioned about that in the |
| 11 | 14:10:33 declaration. |
| 12 | 14:10:33 MR. ALDOCK:  Right.  But the breakaway on the basis |
| 13 | 14:10:35 of that was mentioned as deriving from it. |
| 14 | 14:10:41 THE COURT:  I am really -- I want to make certain I'm |
| 15 | 14:10:45 even-handed in this.  But I -- if it's not in the report and |
| 16 | 14:10:52 it's not part of his declaration, I think it would be expanding |
| 17 | 14:10:58 the protocol, and I'm going to have to sustain. |
| 18 | 14:11:01 MR. ALDOCK:  At page 83, Your Honor, there is a |
| 19 | 14:11:03 discussion of breaking away.  It isn't breaking away, but |
| 20 | 14:11:07 breaking away of mooring lines. |
| 21 | 14:11:09 MR. KHORRAMI:  Again, Your Honor, this has to do with |
| 22 | 14:11:11 what kind of wind would have strained the mooring lines enough. |
| 23 | 14:11:14 Page 83 -- actually, Dr. Cushing is giving us |
| 24 | 14:11:17 his model as to when the barge could have broken away, in order |
| 25 | 14:11:19 to fit into his precise scenario as to the floating of the |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2059**

| | |
|---|---|
| 1 | 14:11:26 barge. |
| 2 | 14:11:26 THE COURT:  If you're going to get into the |
| 3 | 14:11:28 36-miles-an-hour, and there was time to do that before, if it |
| 4 | 14:11:31 was in the original report, I think that would be expansion -- |
| 5 | 14:11:34 expanding it.  If somebody could point to me that it's part of |
| 6 | 14:11:37 the declaration, I might be a little more -- and not part of |
| 7 | 14:11:42 the original report. |
| 8 | 14:11:55 MR. ALDOCK:  May I ask, then, Your Honor, in the |
| 9 | 14:11:56 abstract, whether Mr. Green's theory that the barge could have |
| 10 | 14:12:00 broken away because of strain placed on the lines from rising |
| 11 | 14:12:03 surge is possible? |
| 12 | 14:12:05 MR. KHORRAMI:  We're going to object to that.  Again, |
| 13 | 14:12:07 the strength of the moorings, what would have caused those |
| 14 | 14:12:11 moorings to break, is outside of this witness' offered |
| 15 | 14:12:14 testimony.  Whether or not he ever had expertise -- |
| 16 | 14:12:18 THE COURT:  He has testified that in regard to the -- yes, |
| 17 | 14:12:21 counsel.  I think that's really -- he had an opportunity -- if |
| 18 | 14:12:26 you wanted him to be tendered in that regard, he had an |
| 19 | 14:12:28 opportunity, apparently, to do that in his expert report.  So |
| 20 | 14:12:32 we're not going to go beyond it. |
| 21 | 14:12:34 And, frankly, whether it's possible or not two |
| 22 | 14:12:36 people -- if I believe the two people, it's all kind of moot; |
| 23 | 14:12:39 if I don't believe them, then it becomes -- it becomes a |
| 24 | 14:12:44 question, then, when it did break away, and nobody really knows |
| 25 | 14:12:49 whether it could be 36 miles an hour or 85 miles an hour. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2060

| | |
|---|---|
| 1 | 14:12:54   It depends on how it was precisely tied up; and |
| 2 | 14:12:58   then I'll have to believe how it was precisely moored.  And |
| 3 | 14:13:02   there's so many variables, I don't know how anybody could |
| 4 | 14:13:05   answer that question. |
| 5 | 14:13:06   You know, somebody -- we've had testimony as |
| 6 | 14:13:06   to -- he could give an assumption, if it were tied up in the |
| 7 | 14:13:10   following way, but then we're getting beyond the report. |
| 8 | 14:13:17   MR. ALDOCK:  I'll move on, Your Honor.  Let me try |
| 9 | 14:13:18   this question, which I think does not the deal with how its |
| 10 | 14:13:22   moored. |
| 11 | 14:13:22   BY MR. ALDOCK: |
| 12 | 14:13:23   Q.  Barges that are moored together, however moored together, |
| 13 | 14:13:26   do they rise and fall together? |
| 14 | 14:13:28   A.  They do.  They're both subjected to the same rising surge. |
| 15 | 14:13:33   Q.  So however moored, does the surge put any strain on the |
| 16 | 14:13:37   lines? |
| 17 | 14:13:38   A.  Not due to a storm surge, because they would both rise at |
| 18 | 14:13:42   the same rate and fall at the same rate. |
| 19 | 14:13:45   MR. KHORRAMI:  Your Honor -- |
| 20 | 14:13:46   BY MR. ALDOCK: |
| 21 | 14:13:46   Q.  Dr. Cushing -- |
| 22 | 14:13:47   THE COURT:  Yes. |
| 23 | 14:13:48   MR. KHORRAMI:  I don't mean to belabor my point, but |
| 24 | 14:13:51   I'm going to object.  If we're going to talk about the |
| 25 | 14:13:54   strengths of moorings, which they may have broken them, this is |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2061

| | |
|---|---|
| 1 | 14:13:56   clearly outside of his report. |
| 2 | 14:13:57   MR. ALDOCK:  I did not raise a thing about breaking |
| 3 | 14:13:58   or -- |
| 4 | 14:13:59   THE COURT:  He did not. |
| 5 | 14:14:00   MR. ALDOCK:  Not on that question. |
| 6 | 14:14:01   THE COURT:  I agree.  Objection's overruled. |
| 7 | 14:14:04   MR. KHORRAMI:  Thank you, Your Honor. |
| 8 | 14:14:05   BY MR. ALDOCK: |
| 9 | 14:14:06   Q.  Dr. Cushing, moving on to a new topic. |
| 10 | 14:14:08   Did you hear Mr. Green and Mr. Pazos testify that |
| 11 | 14:14:11   marine traffic in the canal on Saturday could have caused the |
| 12 | 14:14:15   barge to break away? |
| 13 | 14:14:17   A.  I heard him express that opinion. |
| 14 | 14:14:21   Q.  Is their theory of marine traffic that could have caused |
| 15 | 14:14:26   the breakaway plausible? |
| 16 | 14:14:27   A.  I don't believe it is plausible. |
| 17 | 14:14:28   Q.  Why not? |
| 18 | 14:14:29   A.  Because one can easily carry out a calculation that would |
| 19 | 14:14:32   determine that.  There was no such calculation.  In my opinion, |
| 20 | 14:14:36   this barge is -- this canal is sufficiently wide that passing |
| 21 | 14:14:42   tugs and barges would not cause the kind of suction that one |
| 22 | 14:14:46   experiences along the riverbanks. |
| 23 | 14:14:50   Q.  Dr. Cushing, in your 60 years -- |
| 24 | 14:14:54   THE COURT:  Do you have an objection, counsel? |
| 25 | 14:14:56   MR. KHORRAMI:  I apologize, Your Honor.  But, again, |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2062

| | |
|---|---|
| 1 | 14:14:58   we're talking about what would cause these moorings to break. |
| 2 | 14:15:03   I understand what Dr. Cushing is trying to get at. |
| 3 | 14:15:07   THE COURT:  If it's in the declaration, this is a |
| 4 | 14:15:09   declaration issue -- |
| 5 | 14:15:09   MR. ALDOCK:  This traffic system, this idea of surge |
| 6 | 14:15:11   and traffic arose for the first time by both these witnesses at |
| 7 | 14:15:16   trial.  It's not in their reports. |
| 8 | 14:15:19   MR. KHORRAMI:  And that was their opportunity to |
| 9 | 14:15:20   object to it. |
| 10 | 14:15:21   THE COURT:  Well, but it's his opportunity to |
| 11 | 14:15:22   cross-examine, sir.  I'm overruling your objection. |
| 12 | 14:15:27   MR. KHORRAMI:  Thank you, Your Honor. |
| 13 | 14:15:27   BY MR. ALDOCK: |
| 14 | 14:15:28   Q.  Dr. Cushing, now, you were telling us why it was |
| 15 | 14:15:30   implausible for traffic to have sucked the barge somehow out of |
| 16 | 14:15:34   the slip. |
| 17 | 14:15:35   A.  Yes.  When two vessels pass close together, or when a |
| 18 | 14:15:38   vessel passes close to a barge in a narrow channel, there's a |
| 19 | 14:15:45   Bernoulli effect, or a suction effect it's sometimes called. |
| 20 | 14:15:50   But when you have a canal wide, this is a very small |
| 21 | 14:15:55   effect, and that depends upon the speed and size of the passing |
| 22 | 14:15:58   vessel. |
| 23 | 14:16:00   And my understanding is is that this is a -- as we |
| 24 | 14:16:03   heard this morning, a no-wake zone.  Barges and tugs in the |
| 25 | 14:16:08   canal move at a relatively slow speed. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2063

| | |
|---|---|
| 1 | 14:16:11   Q.  Dr. Cushing, I'm not going to ask you anything about |
| 2 | 14:16:14   strength or type of mooring lines.  But I am going to ask you: |
| 3 | 14:16:17   Based on your 60 years of experience, we heard from |
| 4 | 14:16:23   witnesses that a single part mooring is a temporary mooring. |
| 5 | 14:16:27   Is that your understanding? |
| 6 | 14:16:28   A.  That's not true at all.  Because I've tied up ships and |
| 7 | 14:16:33   participated in the mooring of ships and designed the mooring |
| 8 | 14:16:37   system for ships for 50 years.  And, you know, ships are tied |
| 9 | 14:16:42   up with single part mooring lines. |
| 10 | 14:16:46   Q.  Have you reached a conclusion, Dr. Cushing, as to whether |
| 11 | 14:16:53   waves in the canal could have moved the barge? |
| 12 | 14:16:56   A.  Yes, sir. |
| 13 | 14:16:57   Q.  What's that conclusion? |
| 14 | 14:16:58   A.  That they could not have. |
| 15 | 14:17:00   Q.  Why? |
| 16 | 14:17:00   A.  Because waves move with the wind, to begin with.  So they |
| 17 | 14:17:06   would be moving in the same direction that the wind would be |
| 18 | 14:17:12   moving. |
| 19 | 14:17:13   And secondly, the waves were relatively small in the |
| 20 | 14:17:16   canal, on the order of 1- to 3-feet high. |
| 21 | 14:17:21   Q.  How are these waves generated? |
| 22 | 14:17:23   A.  Waves are generated by the friction of the air, moving |
| 23 | 14:17:25   air, with water. |
| 24 | 14:17:27   Q.  And so what are they dependent on? |
| 25 | 14:17:29   A.  They're dependent usually on three things.  One is the |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2064**

| | |
|---|---|
| 1 | 14:17:34 | duration of wind. The second is the strength of the wind. And |
| 2 | 14:17:42 | the third is the fetch, or the distance over water that the |
| 3 | 14:17:45 | wind is blowing. |
| 4 | 14:17:48 | Q. Could sizeable waves have been generated in the IHNC? |
| 5 | 14:17:51 | A. No, it's not possible, because the fetch was so small. |
| 6 | 14:17:55 | THE COURT: What was the fetch in the IHNC? If we |
| 7 | 14:17:59 | exclude the Lafarge terminal and then if we include it. |
| 8 | 14:18:02 | THE WITNESS: Yes. If you take the wind moving |
| 9 | 14:18:05 | across the water in from the northeasterly direction, it would |
| 10 | 14:18:11 | be 1,400 feet. |
| 11 | 14:18:13 | THE COURT: Okay. |
| 12 | 14:18:14 | THE WITNESS: And normally, to generate sizeable -- |
| 13 | 14:18:18 | any kind of sizeable wave, you need a least several miles of |
| 14 | 14:18:27 | fetch to create -- to create a sizeable wave. I've calculated |
| 15 | 14:18:30 | the -- using Navy wave prediction charts, and I've also used |
| 16 | 14:18:36 | basic oceanographic calculations to determine that the waves on |
| 17 | 14:18:40 | the morning of the 29th would have been on the order of 1 to |
| 18 | 14:18:46 | 3 feet. |
| 19 | 14:18:48 | THE COURT: The Court has heard a lot of wave |
| 20 | 14:18:50 | testimony in a previous case with very intricate models, so |
| 21 | 14:18:54 | I'll try not to be encumbered by that record and look at this |
| 22 | 14:18:59 | record. |
| 23 | 14:18:59 | BY MR. ALDOCK: |
| 24 | 14:19:00 | Q. What happened to the waves that His Honor may be familiar |
| 25 | 14:19:03 | with from the open Gulf of Mexico? |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2065**

| | |
|---|---|
| 1 | 14:19:04 | A. Those -- those waves would have had to travel -- to get to |
| 2 | 14:19:07 | the Industrial Canal, would have had to travel up MRGO and then |
| 3 | 14:19:13 | along the Gulf Intercoastal Waterway, and then make a left-hand |
| 4 | 14:19:19 | turn at the Industrial Canal to get into the -- into the canal. |
| 5 | 14:19:23 | And they would have dampened out long before they would have |
| 6 | 14:19:27 | reached the canal. |
| 7 | 14:19:28 | Q. Are you familiar with IPET's analysis of wave heights in |
| 8 | 14:19:32 | the canal? |
| 9 | 14:19:33 | A. Yes, sir. |
| 10 | 14:19:33 | Q. What did they say? |
| 11 | 14:19:34 | A. They said before 5:30 in the morning the waves were less |
| 12 | 14:19:37 | than a foot high. And they determined that after 5:30 the |
| 13 | 14:19:43 | waves were between, I believe, 1 and 3 feet high. |
| 14 | 14:19:46 | Q. And you did your own calculations, and what were they? |
| 15 | 14:19:49 | A. 1 to 3 feet high. They were actually off the charts, the |
| 16 | 14:19:54 | Navy charts, because the fetch is so -- so short. |
| 17 | 14:20:00 | Q. I'm showing you a photograph. What is this photograph? |
| 18 | 14:20:03 | A. This is a photograph -- it's my understanding this is a |
| 19 | 14:20:07 | photograph taken by the lockmaster looking in a more northerly |
| 20 | 14:20:12 | direction. You can barely see the North Claiborne Avenue |
| 21 | 14:20:16 | bridge in the background. |
| 22 | 14:20:18 | Q. When was it taken? |
| 23 | 14:20:19 | A. I think you can see just the tower of the bridge in the |
| 24 | 14:20:24 | background. And this picture was taken on the morning of the |
| 25 | 14:20:27 | 29th, sometime between 7:00 and 8:00 in the morning. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2066**

| | |
|---|---|
| 1 | 14:20:31 | Q. What's it show about wave heights, as you can look at them |
| 2 | 14:20:35 | from just a visual standpoint? |
| 3 | 14:20:37 | A. This is about the time when the wind conditions were the |
| 4 | 14:20:39 | greatest. The wind had backed around from the northeast and |
| 5 | 14:20:43 | was coming from a more northerly direction. So the wind would |
| 6 | 14:20:49 | have had the greatest possible fetch and the greatest possible |
| 7 | 14:20:53 | strength. And here we see waves of about 3 feet high. |
| 8 | 14:20:56 | THE COURT: What's the distance, if you know, between |
| 9 | 14:21:01 | where the photograph was taken and the Florida Avenue bridge? |
| 10 | 14:21:06 | THE WITNESS: I believe a distance of a little over a |
| 11 | 14:21:08 | mile. |
| 12 | 14:21:10 | THE COURT: Okay. |
| 13 | 14:21:11 | BY MR. ALDOCK: |
| 14 | 14:21:11 | Q. Dr. Cushing, have you seen some speculation by Dr. Marino |
| 15 | 14:21:13 | and Mr. Pazos regarding 20-foot waves? |
| 16 | 14:21:17 | A. Yes, sir, I have. |
| 17 | 14:21:19 | Q. What's your opinion of the possibility that there was a |
| 18 | 14:21:21 | 20-foot wave or a meteotsunami or anything like that in the |
| 19 | 14:21:27 | canal during Katrina? |
| 20 | 14:21:29 | A. I think it's implausible in the extreme. |
| 21 | 14:21:33 | Q. Using this diagram, tell us a little bit more why you |
| 22 | 14:21:41 | think there could not have been a 20-foot wave. |
| 23 | 14:21:44 | A. Well, first, from a scientific point of view, the canal is |
| 24 | 14:21:49 | too shallow to support a 20-foot wave. Such a wave would |
| 25 | 14:21:55 | break, and so you can't get a 20-foot wave in a canal. There's |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2067**

| | |
|---|---|
| 1 | 14:21:59 | no source for that 20-foot wave. |
| 2 | 14:22:02 | But more importantly, if you had a 20-foot wave |
| 3 | 14:22:05 | moving down this canal, a 20-foot wave would be like a |
| 4 | 14:22:08 | two-story high building, and it would have wiped out these |
| 5 | 14:22:13 | buildings along the side, the sheds and shacks, and it would |
| 6 | 14:22:16 | have eventually destroyed the facilities at the lockmaster's |
| 7 | 14:22:22 | office. |
| 8 | 14:22:23 | A 20-foot wave moving down this canal would have |
| 9 | 14:22:27 | blown away things at the locks here. And the lockmaster never |
| 10 | 14:22:31 | said he saw a 20-foot wave or that there was any such damage. |
| 11 | 14:22:37 | I couldn't find any damage that would indicate such a huge |
| 12 | 14:22:42 | wave. |
| 13 | 14:22:43 | Q. Is it therefore possible at all that waves could have |
| 14 | 14:22:46 | moved the barge against the wind? |
| 15 | 14:22:48 | A. No, sir. |
| 16 | 14:22:52 | Q. Have you seen a conclusion from Mr. Pazos regarding |
| 17 | 14:22:56 | reflective waves? |
| 18 | 14:22:57 | A. I've seen his theories, yes, sir. |
| 19 | 14:23:00 | Q. Do you have an opinion about whether reflective waves |
| 20 | 14:23:03 | could have moved the barge? |
| 21 | 14:23:05 | A. I don't think they're valid. |
| 22 | 14:23:06 | Q. Why not? |
| 23 | 14:23:06 | A. Well, first of all, the primary wave is always stronger |
| 24 | 14:23:10 | than any reflective wave. |
| 25 | 14:23:13 | Secondly, the primary wave would have been striking |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2068

| | | |
|---|---|---|
| 1 | 14:23:15 | the barges on their offshore side, so there would be no |
| 2 | 14:23:19 | reflective wave behind the barge to push it away. |
| 3 | 14:23:23 | And a reflective wave is never as strong as a -- as a |
| 4 | 14:23:28 | primary wave.  It gets dampened out, depending on what it's |
| 5 | 14:23:37 | striking.  So taken all together, reflective waves wouldn't |
| 6 | 14:23:43 | overcome the primary waves. |
| 7 | 14:23:46 | Q.  You heard, Dr. Cushing, the testimony of Ms. LeBlanc and |
| 8 | 14:23:52 | Mr. Tompkins? |
| 9 | 14:23:53 | A.  Yes, sir. |
| 10 | 14:23:53 | Q.  So we're looking at a picture of the Industrial Canal, as |
| 11 | 14:23:56 | we have before? |
| 12 | 14:23:57 | A.  Yes, sir. |
| 13 | 14:23:57 | Q.  For purposes of this question, I want you -- against your |
| 14 | 14:24:01 | judgment, I know, but I want you to credit that Ms. LeBlanc and |
| 15 | 14:24:05 | Mr. Tompkins saw a barge on Sunday, and I want you to further |
| 16 | 14:24:10 | credit, I know against your judgment, that the barge they saw |
| 17 | 14:24:14 | was the ING 4727. |
| 18 | 14:24:20 | Does that testimony change your conclusions? |
| 19 | 14:24:22 | A.  No, sir, it doesn't. |
| 20 | 14:24:23 | Q.  In that hypothetical? |
| 21 | 14:24:24 | A.  Why not? |
| 22 | 14:24:24 | Q.  Why not? |
| 23 | 14:24:27 | A.  Because if they had seen the barge, as they have described |
| 24 | 14:24:30 | it, in the canal on Sunday, the winds throughout Sunday and |
| 25 | 14:24:34 | into Monday until after the breaches would have been blowing |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2070

| | | |
|---|---|---|
| 1 | 14:26:09 | hypothetical I just gave you about LeBlanc and Tompkins, and I |
| 2 | 14:26:13 | want to -- I want to now question its validity. |
| 3 | 14:26:18 | Is there any evidence that causes you to question the |
| 4 | 14:26:21 | accounts or the significance of the accounts that I asked you |
| 5 | 14:26:25 | to credit previously on Ms. LeBlanc and Mr. Tompkins? |
| 6 | 14:26:29 | A.  Well, yes.  If the barge is -- if the barge, |
| 7 | 14:26:33 | hypothetically, had been here, the barge blowing from the |
| 8 | 14:26:41 | northeast would have carried the barge down to this area here |
| 9 | 14:26:45 | in front of the locks, and the lockmaster would have reported |
| 10 | 14:26:52 | the barge there. |
| 11 | 14:26:52 | Q.  Now, did you hear Mr. Alford, in this courtroom, testify |
| 12 | 14:26:57 | there were police on the bridge on Sunday? |
| 13 | 14:26:58 | A.  Yes, sir, I did. |
| 14 | 14:26:58 | Q.  Are there any police reports? |
| 15 | 14:27:00 | A.  I haven't seen any. |
| 16 | 14:27:03 | Q.  Were there other witnesses that testified that saw no |
| 17 | 14:27:07 | barge loose in the canal on Sunday and Monday that you reviewed |
| 18 | 14:27:10 | through all the transcripts? |
| 19 | 14:27:12 | A.  Yes, sir.  I believe I've seen eyewitness' statements, |
| 20 | 14:27:21 | Mr. Bickham, Mr. Sartin, I believe, and other s. |
| 21 | 14:27:28 | Q.  And you were here when Mr. Riess testified? |
| 22 | 14:27:31 | A.  Yes, sir. |
| 23 | 14:27:32 | Q.  Are you aware of any other witnesses who actually claimed |
| 24 | 14:27:35 | to have seen the barge on Sunday at this location besides the |
| 25 | 14:27:38 | two that I've identified? |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2069

| | | |
|---|---|---|
| 1 | 14:24:42 | the barge to the west side of the canal, since it was coming |
| 2 | 14:24:46 | from the northeast, and would have blown it south to a position |
| 3 | 14:24:50 | right in front of the locks. |
| 4 | 14:24:54 | The lockmaster would have seen it.  The emergency |
| 5 | 14:25:01 | personnel who were manning the North Claiborne Avenue bridge |
| 6 | 14:25:07 | would have seen it, and the barge wasn't seen. |
| 7 | 14:25:12 | THE COURT:  Just for completeness of the record, only |
| 8 | 14:25:15 | if you know, how -- what's the distance between the Claiborne |
| 9 | 14:25:21 | Avenue bridge and the locks, the IHNC locks? |
| 10 | 14:25:28 | THE WITNESS:  I would have to estimate that.  I don't |
| 11 | 14:25:30 | know offhand. |
| 12 | 14:25:31 | THE COURT:  That's fine.  I'm just trying to get it |
| 13 | 14:25:33 | all in the record.  I'm not sure if I have it yet.  It may be |
| 14 | 14:25:35 | in some of the maps that I've looked at to scale.  So I can |
| 15 | 14:25:37 | maybe figure that out, if I have to. |
| 16 | 14:25:38 | THE WITNESS:  I think it's shown on the navigation |
| 17 | 14:25:40 | chart that we saw. |
| 18 | 14:25:41 | THE COURT:  Sure.  I can ascertain it. |
| 19 | 14:25:44 | BY MR. ALDOCK: |
| 20 | 14:25:44 | Q.  And what are we looking at here. |
| 21 | 14:25:46 | A.  Well, here, we're -- in answer to His Honor's question, |
| 22 | 14:25:53 | we're looking from the lockmaster's office in a northerly |
| 23 | 14:25:58 | direction at the North Claiborne Avenue bridge, and the Florida |
| 24 | 14:26:03 | Avenue bridge in the far distance. |
| 25 | 14:26:06 | Q.  So I want to take away those assumptions of that |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2071

| | | |
|---|---|---|
| 1 | 14:27:40 | A.  No, sir. |
| 2 | 14:27:40 | Q.  Does the testimony of Ms. LeBlanc and Mr. Tompkins |
| 3 | 14:27:45 | therefore change any of your conclusions? |
| 4 | 14:27:47 | A.  No, sir. |
| 5 | 14:27:48 | Q.  The barge was not present at either breach before they |
| 6 | 14:27:50 | occurred? |
| 7 | 14:27:51 | A.  No, sir, they do not. |
| 8 | 14:27:52 | Q.  Well, let's move now to your second conclusion in your |
| 9 | 14:27:56 | report.  That even if the barge were present at the floodwall, |
| 10 | 14:28:00 | any impact would have cracked the concrete cap without causing |
| 11 | 14:28:06 | the wall to fail. |
| 12 | 14:28:11 | What are we looking at here? |
| 13 | 14:28:13 | A.  Yes.  This is a section through the floodwall.  That is |
| 14 | 14:28:18 | the portion of the floodwall that extends over almost the |
| 15 | 14:28:22 | entire length of the east side of the canal. |
| 16 | 14:28:28 | Q.  Give us the various points that make up this floodwall. |
| 17 | 14:28:33 | A.  Yes, sir.  We have a sheet piling here, that 15 feet of |
| 18 | 14:28:40 | which is below the concrete, and then an additional 4 feet |
| 19 | 14:28:45 | 2 inches is above.  So that's a distance of 19 feet from one |
| 20 | 14:28:51 | end to the other, 19 feet 2 inches. |
| 21 | 14:28:56 | That sheet piling is a corrugated steel piling |
| 22 | 14:29:02 | approximately three-eighths of an inch thick.  On top of the |
| 23 | 14:29:07 | piling is a slab, what's called a lower slab, which was the |
| 24 | 14:29:12 | first pour.  This slab is concrete with reinforced -- |
| 25 | 14:29:18 | reinforced bars called rebars, that are embedded in the slab. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2072**

```
14:29:23   It's poured on top of the piling.  Then on top -- that's about
14:29:28   5 feet high by 2 feet wide.
14:29:32           On top of that is a cap, a concrete tapered cap, that
14:29:38   is also poured and held in place by rebar that sticks up from
14:29:45   the first pour.  In other words, it was intentionally sticking
14:29:52   up so that when you put the second pour on it was held in place
14:29:56   by the rebar from the slab.  That means that there's a
14:30:01   construction joint between the two.  The top cap is 3 feet
14:30:08   high.  The lower slab is 5 feet high.
14:30:10           The total distance from the crest to the top of the
14:30:14   cap is 6 feet.  And then, of course, the berm is on either
14:30:19   side.
14:30:20           THE COURT:  And I think I understand this.  But for
14:30:22   the record, and I'm sure you're going to clear it up anyhow,
14:30:25   this is the -- not the 1980, but the 1969?
14:30:31           THE WITNESS:  Yes, Your Honor.
14:30:33           THE COURT:  That's what I thought.  Just for the
14:30:34   record.  That's a very good description of it.
14:30:40   BY MR. ALDOCK:
14:30:40   Q.  How is the concrete cap connected to the first pour,
14:30:44   Dr. Cushing?
14:30:45   A.  There's rebar extending up.  You can see it in the
14:30:48   diagram, green lines.  That rebar embeds itself in the second
14:30:53   pour of the cap when the cap is poured.  So it's held in place
14:30:59   just by that rebar.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2073**

```
14:31:02   Q.  How strong is the connection between the cap and the wall?
14:31:04   A.  Actually, it's a very weak -- weak connection.
14:31:06   Q.  Did you listen to -- were you in court when Mr. Bartlett
14:31:11   testified?
14:31:11   A.  Yes.  He -- in fact, Mr. Bartlett defined it as a weak --
14:31:17   the weak link, or the weak joint, the weak connection.
14:31:22   Q.  Why is the connection important?
14:31:23   A.  Well, it's what holds the cap in place.
14:31:26           THE COURT:  Counsel, not to interrupt you, but just
14:31:28   to -- we have some notes that the sheet pile on the --
14:31:34   '69 sheet pile was 10 feet below the wall.  Am I incorrect that
14:31:43   this is 15 feet -- and I may be crossruffing, and excuse me if
14:31:50   I am.  It may be just the way I'm interpreting the diagram.
14:32:02           MR. ALDOCK:  Your Honor, it's the elevations, not the
14:32:04   depth of the sheet pile.
14:32:05           THE COURT:  I thought it was.  I just wanted to make
14:32:08   sure that the -- that the -- when we're looking at the exhibit
14:32:12   we know it's the elevation, not the sheet pile.
14:32:17           THE WITNESS:  Actually, the embedment of the sheet
14:32:20   piling is more than 15 feet.  It's 15 feet to the bottom of the
14:32:27   lower slab, but the sheet piling extends another 2 feet to the
14:32:33   crest, or another 4 feet 2 inches up, if you include the
14:32:36   portion up inside the lower slab.
14:32:41           So the 15 feet is the amount below the concrete.
14:32:45           THE COURT:  Okay.  Well, that may be contrary to what
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2074**

```
14:32:47   I understood.
14:32:59           THE WITNESS:  This information comes from the
14:33:00   as-built construction drawings.
14:33:02           MR. ALDOCK:  I think the -- Your Honor, it will be --
14:33:06   this is more for the illustrative purposes of showing the
14:33:09   relationship of the cap.  The total detail of everything to be
14:33:15   known about floodwalls is the -- really will become clear from
14:33:18   Dr. Bakeer and Dr. Bea.
14:33:22           THE COURT:  Yes, I understand.
14:33:25   BY MR. ALDOCK:
14:33:25   Q.  Have you calculated, Dr. Cushing, the effect of the impact
14:33:27   by the barge on the floodwall?
14:33:29   A.  Yes, sir, we have.
14:33:30   Q.  Was this a realistic or a hypothetical calculation?
14:33:34   A.  This is -- I did a hypothetical calculation.
14:33:37   Q.  And what hypothesis were you -- were you trying to check?
14:33:43   A.  I was trying to determine whether a barge hitting a
14:33:47   fully-erect floodwall will cause the floodwall to fail.
14:33:56   Q.  What -- take us through the -- the hypothetical
14:34:00   calculation and how you did it.
14:34:02   A.  Yes, sir.  The first step in the calculation was to
14:34:06   determine what loads there were on the barge that would cause
14:34:13   the force on the floodwall.  So the first step was to calculate
14:34:17   the wind load exerted on the barge.
14:34:23           Then the second step was to calculate the velocity
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2075**

```
14:34:26   that the barge would attain when subjected to the wind load.
14:34:32           The third step was to calculate the amount of energy
14:34:35   that the barge would transfer to the floodwall.
14:34:38           And the last step was then to determine what happens
14:34:41   when you put that much energy into the floodwall.
14:34:44   Q.  So take us through the -- various assumptions that you
14:34:48   had to make in order to test the hypothetical.
14:34:54   A.  Well, in the first step, we had to assume a wind load and
14:34:59   a wind speed, to calculate what that force would be.  And for
14:35:05   the hypothetical, and to be -- on the conservative side,
14:35:12   we assumed the highest possible wind that existed in the canal
14:35:17   on the morning of the 29th.  And that was 67 miles an hour that
14:35:23   we assumed.
14:35:25           Then we calculated the effect of that wind at the
14:35:34   level that the barge exists, since wind reports are all at
14:35:38   10 meters above the surface of the sea level.
14:35:43           We also had to calculate what the centroid of the
14:35:46   barge was; that is, the center of effort, if you will, of the
14:35:51   sail on the side of the barge.  And then we applied that wind
14:35:53   load to the -- to the barge to get a force.  So we determined
14:35:53   the force of the barge.
16:24:17   Q.  Did you make any assumptions about the level on the wall
16:24:18   where the impact would occur in this hypothetical example?
16:24:19   A.  Well, we did that down in step three.  What we did before
16:24:21   that was to calculate what speed the barge would attain when
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2076

1  16:24:22  you apply that amount of force to it.  And that's a

2  16:24:23  straightforward naval architecture-type calculation, that --

3  16:24:24  where we calculated the resistence of the barge as it moved

4  16:24:26  through the water.  And that is the frictional resistence of

5  16:24:27  the water on the vessel, as well as the residual resistance.

6  16:24:28      And we determined the barge would be moving under

7  16:24:29  that wind at 5.27 miles per hour, or about the speed of a fast

8  16:24:31  walk.

9  16:24:31      Then we calculated the amount of energy that a barge

10 16:24:32  with that mass would have when moving at that speed, and that's

11 16:24:33  the step at which we then looked at how the barge would strike

12 16:24:35  the wall.

13 16:24:35  Q.  What did you assume, with regard to the level on the wall

14 16:24:36  where the impact would occur in this hypothetical?

15 16:24:37  A.  Well, we took the -- the earliest possible time that the

16 16:24:38  barge could have free in the canal, and looked at the water

17 16:24:39  levels at that time, and determined that the wall -- that the

18 16:24:40  barge could only have struck a cap -- hypothetically, could

19 16:24:41  only have struck the cap and not the slab or the lower portion

20 16:24:43  of the floodwall.

21 16:24:43  Q.  And did you reach a conclusion on the effect the barge

22 16:24:44  would have on the floodwall or cap?

23 16:24:45  A.  Yes, sir.  We determined that the cap would either crush

24 16:24:46  locally, where the barge contacted it, or the cap itself would

25 16:24:47  break off locally at the construction joint.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2077

1  16:24:48      THE COURT:  Mr. Aldock, I hate to interrupt you and

2  16:24:49  the witness, but I've been informed that one our staff needs a

3  16:24:50  break, and we shall accommodate them, and at the same time, you

4  16:24:51  will get one.

5  16:24:52      Mr. Aldock, what's your best guess?  We're going

6  16:24:52  to go until 3:30, or I'm willing to accommodate the parties.

7  16:24:54      MR. ALDOCK:  Your Honor, we will -- at the very -- we

8  16:24:54  will make a hard stop, no matter what, at 4:00.  But my

9  16:24:56  colleagues are going to tell me if I'm starting a new area

10 16:24:57  within the report before that, say between 3:30 and 4:00.  And

11 16:24:58  if I'm about to start a new area, I can't finish in that 15, 20

12 16:25:00  minutes --

13 16:25:00      THE COURT:  You'll certainly stop.

14 16:25:01      MR. ALDOCK:  -- it will be before that.

15 16:25:02      THE COURT:  Thank you very much.  We're going to

16 16:25:02  recess for 10 minutes.

17 16:25:03      THE DEPUTY CLERK:  All rise.

18 16:25:03      (WHEREUPON, the Court took a recess.)

19 14:58:32      THE DEPUTY CLERK:  All rise, please.  Court's in

20 14:58:45  session, please be seated.

21 14:59:00      MR. ALDOCK:  Should I proceed, Your Honor?

22 14:59:01      THE COURT:  Yes, please do, sir.  I'm sorry.

23 14:59:04      MR. ALDOCK:  Thank you.

24 14:59:04  BY MR. ALDOCK:

25 14:59:05  Q.  Picking up where we left off, you did this hypothetical

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2078

1  14:59:11  calculation.  What was the conclusion of the hypothetical

2  14:59:15  calculation?

3  14:59:16  A.  The conclusion was --

4  14:59:36  Q.  What was your conclusion?

5  14:59:37  A.  The conclusion was that, in the hypothetical event that

6  14:59:45  the barge would strike the floodwall, that the cap would fail

7  14:59:51  and the floodwall would not.

8  14:59:55  Q.  Did Mr. Bartlett, in his analysis in this courtroom, agree

9  15:00:03  that the barge would hit above the construction joint and above

10 15:00:06  the sheet pile?

11 15:00:08  A.  I heard him to testify, yes, sir.

12 15:00:11      MR. KHORRAMI:  Objection.  That misstates the

13 15:00:13  testimony.

14 15:00:19  BY MR. ALDOCK:

15 15:00:19  Q.  Is there -- what do we have here?

16 15:00:22  A.  This is a schematic showing the impacting force striking a

17 15:00:28  cap.

18 15:00:29  Q.  Is that -- is a fracture at the construction joint a

19 15:00:33  failure of the wall?

20 15:00:33  A.  No, it's a failure of the cap.

21 15:00:37  Q.  What happens to the sheet pile when the cap is fractured?

22 15:00:40  A.  The cap and the slab would remain in place.

23 15:00:44  Q.  Can you give the Court an analogy about -- as to what --

24 15:00:49  how you would relate this to non-floodwall parlance?

25 15:00:54  A.  Yes.  I think an easy way to think of it is if you wanted

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2079

1  15:00:59  to a move a table, and you placed a book on the table, and you

2  15:01:04  glued the book to the table lightly, and then you tried to move

3  15:01:07  the table by pushing on the book, the table wouldn't move, but

4  15:01:10  the book would slide across the table.

5  15:01:16  Q.  What would happen on this schematic if the concrete cap is

6  15:01:25  hit by a barge?

7  15:01:26  A.  Well, one of three things.  We considered one of three

8  15:01:33  things.

9  15:01:33      The first, if the impacting force hit the cap, the

10 15:01:39  concrete would fail locally, exposing the rebar, and the rebar

11 15:01:43  would bend a little bit.  So you would have a local failure of

12 15:01:47  the -- of the cap material -- the concrete in the cap.

13 15:01:55      The second possibility is if you struck the cap, the

14 15:01:58  cap would break off.  That is to say that the rebar that we see

15 15:02:03  in green on the flood side would actually pull out of the cap,

16 15:02:06  and then the cap would roll over, the way you see the cap

17 15:02:12  folded over.

18 15:02:14      And the third --

19 15:02:16  Q.  This is similar to what we saw at the south breach?

20 15:02:19  A.  This is very similar to the failure of the cap at the

21 15:02:25  south breach.

22 15:02:26      And then the third possibility is the cap would fail.

23 15:02:32  Or if the cap would come loose from the floodwall, by having

24 15:02:38  the rebar on the offshore side snap, or fail in tension, and

25 15:02:46  the cap would roll over.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2080**

15:02:48    But before this would happen, the other two scenarios
15:02:53  would happen first.  So it's more likely that you would have
15:02:55  this kind of failure or the local crushing failure.
15:02:59    Q.  The failure at CC-4047, the one that's on the screen, is
15:03:05  you think the most likely?
15:03:08    A.  That, and local crushing.  We've seen examples of both of
15:03:12  them.
15:03:12    Q.  So how would -- well, let me take -- let me take you
15:03:17  further.  If the barge had been moving faster than the velocity
15:03:21  that you used in your hypothetical, could it have then caused
15:03:25  the floodwall to fail?
15:03:27    A.  No.  The cap would have just failed more readily.
15:03:37    Q.  Dr. Cushing, are you familiar with the impact analysis
15:03:42  that Dr. Marino submitted with the declaration that he put in
15:03:45  at summary judgment?
15:03:47    A.  Yes, sir.
15:03:48    Q.  Is this a figure from Dr. Marino's declaration?
15:03:50    A.  It is.
15:03:50    Q.  Do you recognize it?
15:03:51    A.  Yes. sir.
15:03:51    Q.  Look at the top section.  Is that an accurate depiction of
15:03:54  your impact scenario?
15:03:58    A.  No, sir, it's not.  He says that this is our -- our
15:04:00  scenario -- a realistic statement of our scenario.  And here,
15:04:04  the barge is floating at a level above the cap.  The barge

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2081**

15:04:09  floating at this level would not even strike the cap.  It's not
15:04:13  realistic.  Certainly not in my opinion.
15:04:18    Q.  Looking at the bottom figure, which Dr. Marino says
15:04:21  represents his impact scenario, is that an accurate depiction
15:04:24  of the barge impact?
15:04:26    A.  No, sir.  He actually has two scenarios, one for the north
15:04:30  breach and one for the south breach.  And in this -- these two
15:04:35  scenarios, he has the barge striking the lower slab and not the
15:04:40  cap.
15:04:41    And the problem is that he has the cap at the -- he
15:04:45  has the wall at the wrong heighth, he has the barge at a draft
15:04:50  that's too deep.  And because of those, and because of the fact
15:04:55  that he doesn't even draw the barge correctly; that is, without
15:04:59  the bilge radius, and the bilge radius is curvature of the side
15:05:07  where it meets the bottom.  So the barge would not strike the
15:05:11  floodwall as a box shape like this.
15:05:17    But if it were to happen, the side of the barge above
15:05:20  the bilge radius would strike the cap.  So given all of those
15:05:26  things, these are not correctly drawn.
15:05:29    Q.  Were you in the courtroom, Dr. Cushing, when Mr. Bartlett
15:05:33  testified that because of the turn of the bilge, the barge
15:05:37  would have hit at the south breach above the construction joint
15:05:40  and would impact above the sheet pile.  Did you hear that?
15:05:43    A.  Yes.  He agrees with what I'm saying here.
15:05:47    Q.  Dr. Cushing, did you prepare any figures to show us that

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2082**

15:05:51  Dr. Marino's scenario at the north breach -- how it would play
15:05:54  out if you corrected the errors that you just pointed out as to
15:05:58  the height and the draft and where the barge hit?
15:06:01    A.  Yes.  With his assumptions of time and water levels, the
15:06:06  draft of the barge is 1 feet 4 1/2 inches, the turn of the
15:06:13  bilge, as shown on the drawing, and the floodwall is at a more
15:06:19  realistic heighth.  The floodwall could actually be lower than
15:06:25  this in way of the breaches.  But this is the heighth of the
15:06:34  floodwall that we've assumed.
15:06:35    Q.  And what effect do these changes have on the impact
15:06:37  scenario?
15:06:39    A.  That the barge would strike the cap and not the
15:06:41  floodwall -- not the slab or sheet piling.
15:06:46    Q.  What does this figure show with respect to the south
15:06:48  breach?
15:06:48    A.  It shows the same thing, that the barge clearly would hit
15:06:52  the cap in this hypothetical situation, which I don't believe
15:06:58  happened.
15:07:01    Q.  Do you recognize this slide as something from the Marino
15:07:08  declaration?
15:07:09    A.  Yes, sir.
15:07:10    Q.  Exhibit F, page 2?
15:07:14    A.  Yes, sir.
15:07:14    Q.  Look at the first column, where it says:
15:07:16  "100-mile-an-hour wind impacting broadside."

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2083**

15:07:20    Do you agree with the assumptions Dr. Marino makes
15:07:25  here regarding the wind and the orientation of the barge?
15:07:29    A.  No, sir, I don't.
15:07:30    Q.  Why not?
15:07:30    A.  Well, first, there was no record of a 100-mile-an-hour
15:07:34  sustained wind.
15:07:36    And, secondly, the barge, to be moving sideways like
15:07:42  that, so that it would hit the barge broadside, the wind would
15:07:48  have to be coming almost from the due west.
15:07:51    Q.  Okay.
15:07:52    A.  And third -- the third is, for the barge to hit perfectly
15:07:55  broadside and not on one corner would take a level of precision
15:07:59  that I don't think you could arrange even if you were in an
15:08:04  experiment.
15:08:10    Q.  Tell us, what's the natural orientation of the barge in
15:08:14  wind?  How does it -- how does it orient itself, and is that
15:08:17  sort of something that always happens, or only sometimes
15:08:20  happens?
15:08:20    A.  No.  Vessels have different angles of repose based on
15:08:24  their design.  But a symmetrical barge such as this would have
15:08:28  an angle of repose perpendicular to the wind.
15:08:32    Q.  And is that always the case?
15:08:33    A.  That's how a symmetrical barge would blow in the wind.
15:08:40    Q.  Dr. Cushing, I'm showing you a page from Dr. Marino's
15:08:43  report.  Do you recognize Dr. Marino's reporting of wind speed

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2084**

| | | |
|---|---|---|
| 1 | 15:08:47 | and direction? |
| 2 | 15:08:48 | A. Yes, sir. |
| 3 | 15:08:48 | Q. Where is this from, this data? |
| 4 | 15:08:50 | A. This data is from his report. And it shows wind speeds |
| 5 | 15:08:54 | that are different from what he's assumed in his table and |
| 6 | 15:08:59 | calculations. |
| 7 | 15:09:00 | Q. So are they consistent or are these -- this data |
| 8 | 15:09:02 | consistent or inconsistent with the assumptions that Marino |
| 9 | 15:09:05 | made as to wind, speed, and direction in the impact analysis |
| 10 | 15:09:10 | that he included with his declaration? |
| 11 | 15:09:12 | A. They're inconsistent. |
| 12 | 15:09:14 | Q. Point out where. |
| 13 | 15:09:16 | A. Well, in -- in the wind speeds here. Also, the direction |
| 14 | 15:09:23 | of the wind in this table is also contrary to -- to basic |
| 15 | 15:09:35 | evidence in the case. |
| 16 | 15:09:37 | And what's even more confusing about this table is |
| 17 | 15:09:42 | that if the wind were blowing parallel to the floodwall, then |
| 18 | 15:09:48 | the barge would never impact the floodwall, but the barge would |
| 19 | 15:09:52 | be blown parallel to the floodwall; whereas he shows in his |
| 20 | 15:09:57 | previous table the barge impacting at 90 degrees to the |
| 21 | 15:10:02 | floodwall. So there's inconsistency here. |
| 22 | 15:10:05 | Q. Dr. Cushing, did Mr. Pazos submit any impact analysis or |
| 23 | 15:10:09 | calculations of any kind with his report? |
| 24 | 15:10:11 | A. I saw no such calculations. |
| 25 | 15:10:14 | Q. Are you familiar with the speculation of Mr. Pazos that he |

**2085**

| | | |
|---|---|---|
| 1 | 15:10:17 | made with respect to wind speed and direction? |
| 2 | 15:10:20 | A. Yes, sir. |
| 3 | 15:10:21 | Q. Did he make the same assumptions that Dr. Marino made of a |
| 4 | 15:10:25 | 100-mile-an-hour wind? |
| 5 | 15:10:27 | A. Yes, sir. |
| 6 | 15:10:29 | Q. Are you familiar with Dr. Marino's assumptions regarding |
| 7 | 15:10:35 | the strength of the floodwall? |
| 8 | 15:10:38 | A. Yes, sir. I read them in his report. |
| 9 | 15:10:42 | Q. What is the assumption that he makes here? |
| 10 | 15:10:44 | A. He assumes that the floodwall is infinitely rigid and |
| 11 | 15:10:49 | fixed at the base, which means that when the barge impacts the |
| 12 | 15:10:55 | floodwall, the floodwall is infinitely rigid, doesn't move. |
| 13 | 15:11:01 | Which, in turn, would mean that all of the energy from the |
| 14 | 15:11:06 | barge striking the floodwall would have to go into the barge, |
| 15 | 15:11:09 | since the energy has to go somewhere. If it doesn't go into |
| 16 | 15:11:14 | the rigid wall, then it goes into the barge. |
| 17 | 15:11:16 | Q. Is the assumption correct? |
| 18 | 15:11:18 | A. No, sir, I don't believe so. There was no such damage on |
| 19 | 15:11:22 | the barge that would indicate that any such hypothetical -- |
| 20 | 15:11:27 | well, this is not a hypothetical. This is his opinion. But |
| 21 | 15:11:33 | there's no damage on barge to support this. |
| 22 | 15:11:35 | Q. Can you tell us whether Dr. Marino's assumption that the |
| 23 | 15:11:39 | floodwall is infinitely rigid is inconsistent with his theory |
| 24 | 15:11:42 | of floodwall failure? |
| 25 | 15:11:43 | A. I think his report later shows that the floodwall actually |

**2086**

| | | |
|---|---|---|
| 1 | 15:11:48 | does give way under the -- under his assumption of impact |
| 2 | 15:11:57 | forming a gap. |
| 3 | 15:11:59 | Q. Is Dr. Marino's assumption that the floodwall is |
| 4 | 15:12:03 | infinitely rigid consistent with the evidence you found on the |
| 5 | 15:12:06 | barge? |
| 6 | 15:12:06 | A. No, sir. As I just mentioned, the energy didn't go into |
| 7 | 15:12:11 | the barge. |
| 8 | 15:12:13 | Q. Dr. Cushing, do you have any evidence, in addition to your |
| 9 | 15:12:16 | calculations, that shows that the barge impact does not |
| 10 | 15:12:19 | cause -- that barge impact, in general, does not cause a |
| 11 | 15:12:24 | floodwall to fail? |
| 12 | 15:12:25 | A. Yes, sir. I think there are several examples in the |
| 13 | 15:12:29 | New Orleans area after the hurricane that shows that. |
| 14 | 15:12:34 | Q. What are we looking at here? |
| 15 | 15:12:36 | A. This is a photograph of a barge that struck the floodwall |
| 16 | 15:12:41 | at Bayou Bienvenue, near the control station. |
| 17 | 15:12:45 | Q. What kind of a wall is this? |
| 18 | 15:12:48 | A. This is an I-wall. |
| 19 | 15:12:50 | Q. Near the junction with a T-wall? |
| 20 | 15:12:52 | A. Yes, sir, it is. |
| 21 | 15:12:53 | Q. Is the floodwall generally similar -- not identical, of |
| 22 | 15:12:58 | course -- to the floodwall at the Inner Harbor Navigation |
| 23 | 15:13:00 | Canal? |
| 24 | 15:13:01 | A. It's generally similar in the sense that it has a cap and |
| 25 | 15:13:04 | a wall beneath it. |

**2087**

| | | |
|---|---|---|
| 1 | 15:13:06 | Q. Is the barge here, although a different front with a |
| 2 | 15:13:12 | curve, of a similar size to the barge ING 4727? |
| 3 | 15:13:18 | A. Yes, sir. This barge has a rake at the forward end, but |
| 4 | 15:13:21 | the size of the barge would be the same size. |
| 5 | 15:13:23 | Q. What is this? |
| 6 | 15:13:25 | A. This is the closeup view of the barge striking the cap and |
| 7 | 15:13:32 | showing that the cap has failed locally, by the impact of the |
| 8 | 15:13:37 | barge, but that the lower slab and floodwall has not failed. |
| 9 | 15:13:47 | Q. What's this photograph in your report? |
| 10 | 15:13:50 | A. This is a photograph of a floodwall in New Orleans East at |
| 11 | 15:13:58 | Bayou Michoud, showing where a barge has struck the cap of a |
| 12 | 15:14:06 | floodwall. |
| 13 | 15:14:08 | Q. What's the horizontal line we see near the top of the |
| 14 | 15:14:12 | floodwall? |
| 15 | 15:14:12 | A. The horizontal line at the top is the construction joint. |
| 16 | 15:14:18 | Q. How do you know this was a barge impact? |
| 17 | 15:14:21 | A. Well, that's -- this comes from the IPET report, and it |
| 18 | 15:14:25 | was reported in the IPET report that it was a barge strike. |
| 19 | 15:14:37 | MR. ALDOCK: Your Honor, in deference to |
| 20 | 15:14:43 | Mr. Khorrami's request, and also because I'm about to start the |
| 21 | 15:14:46 | third major conclusion, may I suggest I moved faster than I |
| 22 | 15:14:52 | had thought, but I would suggest that this is probably the |
| 23 | 15:14:54 | right time to adjourn. |
| 24 | 15:14:56 | THE COURT: Okay. That's fine, and we'll just take a |
| 25 | 15:14:58 | few minutes. |

**2088**

```
15:14:59        Sir, you can step down, with the understanding
15:15:01  that you'll be back --
15:15:03        MR. ALDOCK:  Tuesday morning.
15:15:04        THE COURT:  -- Tuesday morning at 9:00.
15:15:08        Thank you very much.
15:15:09        THE WITNESS:  Thank you, Your Honor.
15:15:10        THE COURT:  I'm interested in your estimates, without
15:15:13  holding you to it, just for the Court's planning, which I
15:15:17  realize is not -- not etched in stone.  None of this is.  Just
15:15:24  your general idea, do you have any projection, without me
15:15:28  holding you to it, Mr. Aldock, about when you think -- do you
15:15:32  think -- is it conceivable that you would rest by the Friday of
15:15:39  next week or not?
15:15:41        MR. ALDOCK:  Your Honor, if you had asked me that
15:15:44  question two days ago, I would have said, "Boy, we've got it.
15:15:50  We're going to end next Friday."
15:15:51        The marathon with Dr. Marino has given me great
15:15:55  pause.  I guess -- and we're all calculating that for personal
15:16:00  and other reasons --
15:16:01        THE COURT:  Right, of course.
15:16:02        MR. ALDOCK:  -- as we speak.
15:16:03        I -- I have told my wife and my experts and my
15:16:08  colleagues -- in that order -- that the odds are a little less
15:16:16  than 50/50 at this point.
15:16:18        THE COURT:  Okay.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2089**

```
15:16:19        MR. ALDOCK:  But it's possible.  It will depend on
15:16:22  how crisp Mr. Khorrami is in his cross-examination of some of
15:16:27  the remaining experts.  We don't have that many --
15:16:30        MR. KHORRAMI:  I'm very crisp, Your Honor.
15:16:32        MR. ALDOCK:  We don't have that many -- I mean, we
15:16:33  have -- what do we have left?  We have -- we have the
15:16:38  lockmaster --
15:16:40        THE COURT:  Right.
15:16:40        MR. ALDOCK:  -- not too long, a short witness.
15:16:44        We have the other plaintiff we're taking in our
15:16:46  case out of order Tuesday, Mr. Glaser, another short --
15:16:51  relatively short witness.
15:16:53        We then have -- we have Mr. Bakeer, that's a
15:16:57  longer witness.
15:16:58        We have left experts Bea, who's relatively long;
15:17:06  relatively short:  Strouse, Weiss, Suhayda, Kemp and Ryan,
15:17:12  they're all -- they're experts, but they're little -- a little
15:17:15  time.  We have one remaining lay witness, Mr. Arnold, the other
15:17:20  barge was getting loose, very short.
15:17:23        So it is -- it is conceivable.  It is my desire,
15:17:27  or my objective, but it's 50/50, at best.
15:17:31        THE COURT:  And also to let you know that in the
15:17:32  event -- and, of course, I'd let the staff know -- in the event
15:17:38  you have an expert with a real time problem, I'd work late, you
15:17:40  know, to accommodate them.  Just so we can have --
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2090**

```
15:17:43        MR. ALDOCK:  Well, Your Honor, if we can plan to
15:17:45  stay -- pardon?
15:17:47        THE COURT:  Just so I can let my staff know to be
15:17:49  prepared.
15:17:51        MR. ALDOCK:  Well, I would -- I would -- if on
15:17:54  Tuesday we do what I think we might do, if we stayed a little
15:17:59  late on Wednesday and Thursday would be helpful.
15:18:02        THE COURT:  Let's say until 6:00?
15:18:05        MR. ALDOCK:  Yeah, 6:00 would be fine.  I mean, just
15:18:07  to get that extra little half hour in.
15:18:11        THE COURT:  Just so that everybody can -- we do have
15:18:17  criminal matters Wednesday morning, unfortunately.  The show
15:18:19  must go on there, so that's going to foul us up a little bit.
15:18:23        MR. ALDOCK:  Well, the latest that we could go
15:18:25  Wednesday and Thursday that the staff could accommodate, I
15:18:29  understand, the better we'd be.
15:18:30        MR. ALDOCK:  And I -- of course, I like that, too, but
15:18:31  we'll talk to them and see how -- of course, the court reporter
15:18:34  has got to get out dailies, so that does impair them a little
15:18:39  bit, you know.
15:18:41        But I'll talk to them, and I'm willing -- I'm
15:18:44  willing to do a lot, but I have to think about the other people
15:18:48  around me.
15:18:49        MR. ALDOCK:  And, frankly, it could be Tuesday,
15:18:51  Wednesday, and Thursday, frankly, in terms of what our
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2091**

```
15:18:54  flexibility is.  I mean, it's fairly obvious those are our
15:18:58  three days.  Whatever we can build into them gets us there
15:19:01  timely.
15:19:02        THE COURT:  All right.  We'll keep that in mind.
15:19:04  We'll work on that and -- because I understand the experts and
15:19:08  the time and expense, et cetera.  We'll do what we can.
15:19:13        MR. ALDOCK:  Appreciate it, Your Honor.
15:19:17        THE COURT:  I made it as clear as we can do it at
15:19:19  this time.  Thank you.
15:19:20        Have a good 4th of July.
15:19:29        MR. ALDOCK:  Thank you, Your Honor.
15:19:31        MR. KHORRAMI:  Thank you, Your Honor.
15:19:45        THE COURT:  We're adjourned.
15:19:49        (WHEREUPON, the proceedings were concluded.)
15:19:49        *****
15:19:49        CERTIFICATE
15:19:49        I, Jodi Simcox, RMR, FCRR, Official Court Reporter
15:19:49  for the United States District Court, Eastern District of
15:19:49  Louisiana, do hereby certify that the foregoing is a true and
15:19:49  correct transcript, to the best of my ability and
15:19:49  understanding, from the record of the proceedings in the
15:19:49  above-entitled and numbered matter.

15:19:49        S/ Jodi Simcox, RMR, FCRR
15:19:49        Jodi Simcox, RMR, FCRR
                Official Court Reporter
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF L

```
                                                                    1
 1                    UNITED STATES DISTRICT COURT
 2                    EASTERN DISTRICT OF LOUISIANA
 3
      ****************************************************************
 4
      IN RE:  KATRINA CANAL
 5    BREACHES CONSOLIDATED
      LITIGATION
 6
                                    CIVIL ACTION NO. 05-4182
 7                                  SECTION "K" (2)
                                    NEW ORLEANS, LOUISIANA
 8                                  TUESDAY, JULY 6, 2010, 9:00 A.M.
 9    PERTAINS TO BARGE
10
      MUMFORD   C.A. NO. 05-5724
11    AS TO CLAIMS OF PLAINTIFFS
      JOSEPHINE RICHARDSON AND
12    HOLIDAY JEWELERS, INC.,
      ONLY
13
14    BENOIT   C.A. NO. 06-7516
      AS TO CLAIMS OF PLAINTIFFS
15    JOHN ALFORD AND JERRY
      ALFORD ONLY
16
17    ****************************************************************
18
                       DAY 10, MORNING SESSION
19            TRANSCRIPT OF NONJURY TRIAL PROCEEDINGS
           HEARD BEFORE THE HONORABLE STANWOOD R. DUVAL, JR.
20                 UNITED STATES DISTRICT JUDGE
21
22    APPEARANCES:
23
      FOR THE PLAINTIFFS:    BEST KOEPPEL TRAYLOR
24                           BY:  LAURENCE E. BEST, ESQUIRE
                             2030 ST. CHARLES AVENUE
25                           NEW ORLEANS LA  70130
```

**2**

APPEARANCES CONTINUED:

LAW OFFICES OF BRIAN A. GILBERT
BY:  BRIAN A. GILBERT, ESQUIRE
2030 ST. CHARLES AVENUE
NEW ORLEANS LA  70130

KHORRAMI POLLARD ABIR
BY:  SHAWN KHORRAMI, ESQUIRE
44 FLOWER STREET, 33RD FLOOR
LOS ANGELES CA  90071

WILSON GROCHOW DRUKER & NOLET
BY:  LAWRENCE A. WILSON, ESQUIRE
223 BROADWAY, 5TH FLOOR
NEW YORK NY  10279

WIEDEMANN & WIEDEMANN
BY:  LAWRENCE D. WIEDEMANN, ESQUIRE
     KARL WIEDEMANN, ESQUIRE
821 BARONNE STREET
NEW ORLEANS LA  70113

PATRICK J. SANDERS
ATTORNEY AT LAW
3316 RIDGELAKE DRIVE
SUITE 100
METAIRIE LA  70002

LAW OFFICE OF RICHARD T. SEYMOUR
BY:  RICHARD T. SEYMOUR, ESQUIRE
1150 CONNECTICUT AVENUE N.W.
SUITE 900
WASHINGTON DC  20036

FOR THE DEFENDANT:    CHAFFE MCCALL
     BY:  DEREK A. WALKER, ESQUIRE
2300 ENERGY CENTRE
1100 POYDRAS STREET
NEW ORLEANS LA  70163

**3**

APPEARANCES CONTINUED:

GOODWIN PROCTER
BY:  JOHN D. ALDOCK, ESQUIRE
     MARK S. RAFFMAN, ESQUIRE
     ADAM M. CHUD, ESQUIRE
     KIRSTEN V. K. ROBBINS, ESQUIRE
     ERIC I. GOLDBERG, ESQUIRE
901 NEW YORK AVENUE N. W.
WASHINGTON DC  20001

SUTTERFIELD & WEBB
BY:  DANIEL A. WEBB, ESQUIRE
650 POYDRAS STREET, SUITE 2715
NEW ORLEANS LA  70130

LAFARGE NORTH AMERICA, INC.
BY:  PETER KEELEY, ESQUIRE
12950 WORLDGATE DRIVE
HERNDON VA  20170

OFFICIAL COURT REPORTER:     CATHY PEPPER, CCR, RMR, CRR
     500 POYDRAS STREET, ROOM B406
     NEW ORLEANS, LOUISIANA 70130
     (504) 589-7779

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
PRODUCED BY COMPUTER.

**4**

I N D E X

EXAMINATIONS                          PAGE

DR. CHARLES R. CUSHING..................................2092
DIRECT EXAMINATION BY MR. ALDOCK (CONTINUED)...........2092
CROSS-EXAMINATION BY MR. KHORRAMI......................2139


E X H I B I T S
DESCRIPTION                          PAGE

EXHIBIT 349 WAS ENTERED INTO EVIDENCE..................2138
EXHIBIT 454 WAS ENTERED INTO EVIDENCE..................2165

**2092**

P-R-O-C-E-E-D-I-N-G-S

TUESDAY, JULY 6, 2010

M O R N I N G   S E S S I O N

(COURT CALLED TO ORDER)


THE DEPUTY CLERK:  ALL RISE.  PLEASE.

THE COURT:  GOOD MORNING.

VOICES:  GOOD MORNING, YOUR HONOR.

THE DEPUTY CLERK:  COURT IS IN SESSION.  PLEASE BE
SEATED.

THE COURT:  YES, SIR, MR. ALDOCK.

MR. ALDOCK:  THANK YOU, YOUR HONOR.

DIRECT EXAMINATION

BY MR. ALDOCK:

Q.  DR. CUSHING, ON FRIDAY WE LOOKED AT A DIAGRAM FROM

DR. MARINO AND SAW THAT IF YOU PORTRAY THE BARGE AND THE WALL TOP

ACCURATELY, THE BARGE WOULD HIT THE CAP, NOT THE LOWER PART OF

THE WALL UNDER HIS SCENARIO; IS THAT RIGHT?

A.  YES, SIR.

Q.  AND HIS SCENARIO WAS 6:30 A.M.?

A.  YES, SIR.

Q.  BUT WE ALSO SAW THAT THE WIND WOULD NOT HAVE PERMITTED THE

BARGE TO BE AT THE WALL AT 6:30 A.M. BECAUSE IT WAS BLOWING FROM

THE NORTHEAST; IS THAT CORRECT?

2093

1    A.   THAT'S CORRECT.

2    Q.   WAS THERE ANOTHER TIME OTHER THAN 6:30 A.M. THAT MORNING

3    WHEN THE WIND WAS BLOWING FROM THE NORTHWEST AND THE WATER LEVEL

4    WAS SUCH THAT THE BOTTOM OF THE BARGE WOULD BE AT THE LEVEL OF

5    THE CAP IN THE AREA OF THE CONSTRUCTION JOINT WHERE MR. BARTLETT

6    SAYS IT HIT, AND WHERE YOU SAY IT HIT; WAS THERE ANOTHER TIME?

7    A.   YES, SIR, THERE WAS.   AFTER 9 O'CLOCK, AS WE CAN SEE ON THE

8    CURVE, THE WATERS BEGAN TO RECEDE, AND BY 10 O'CLOCK, THE WATERS

9    WERE AT ABOUT 12 FEET.

10   Q.   THIS IS FROM IPET VOLUME FIVE, FIGURE 51 IN THE IPET

11   EXHIBIT.

12        SO MARRYING THE BARTLETT TESTIMONY ABOUT IMPACT WITH

13   THE CAP AT THE CONSTRUCTION JOINT WITH YOUR KNOWLEDGE OF THE

14   PREVAILING WINDS, WHAT DO YOU CONCLUDE?

15   A.   WELL, I CONCLUDE THAT THE BARGE COULD HAVE STRUCK THE CAP AT

16   SOME TIME AROUND 10 O'CLOCK AT THE 12-FOOT LEVEL.

17   Q.   AND THIS IS A SCENARIO THAT FITS WITH ALL OF THE OBJECTIVE

18   DATA?

19   A.   YES, SIR.

20   Q.   AND IT MEANS WHAT WITH RESPECT TO THE FLOODING FROM THE

21   SOUTH BREACH, THE FLOODING FROM THE SOUTH BREACH HAVING OCCURRED

22   EARLIER?

23   A.   WELL, IT MEANS THAT THE WALL HAD ALREADY FALLEN AND THE

24   LOWER NINTH WARD WAS ALREADY FLOODED WHEN THE BARGE WOULD HAVE

25   STRUCK THE CAP AT THE ALREADY FALLEN FLOODWALL AT THE SOUTH END

2094

1    OF THE SOUTH BREACH, AND THE BARGE WOULDN'T HAVE CAUSED THE

2    FLOODING OF THE NINTH WARD.

3    Q.   OKAY.   WELL, LET'S NOW MOVE, DR. CUSHING, TO YOUR THIRD

4    MAJOR CONCLUSION.   I WOULD LIKE TO GO THROUGH THE SPECIFICS NOW

5    OF THAT CONCLUSION WHICH WAS THAT THE PHYSICAL EVIDENCE SHOWS

6    THAT THE BARGE COULD NOT HAVE BEEN PRESENT AT OR CAUSED THE

7    FLOODWALL BREACHES.

8         SO LET'S START WITH THE -- LET'S START WITH THE NORTH

9    BREACH.   DR. CUSHING, I'M SHOWING YOU A PHOTOGRAPH ON THE SCREEN

10   OF THE NORTH BREACH.   CAN YOU ORIENT THE COURT AS TO WHAT WE SEE

11   HERE?

12   A.   YES, SIR.   THE TOP OF THE PICTURE IS -- SHOWS THE CANAL

13   SIDE.   THE LOWER PORTION OF THE PICTURE IS THE LOWER NINTH WARD.

14   ON THE RIGHT-HAND OF THE PICTURE IS THE PUMP HOUSE.   AND WE SEE

15   THE NORTH BREACH IN THE PHOTOGRAPH AT THE UPPER RIGHT PORTION OF

16   THE PHOTO.   WE ALSO -- WELL, I WAS GOING TO SAY WE ALSO SEE THE

17   DEVASTATION INSHORE.

18   Q.   USING YOUR LASER POINTER ON THIS PICTURE, DR. CUSHING, CAN

19   YOU DESCRIBE TO THE COURT WHAT YOU OBSERVED HAPPENED TO THE SHEET

20   PILE AT THE EDGE OF THE BREACH ON THE NORTH SIDE OF THE BREACH IN

21   THE AREA I'VE HIGHLIGHTED?

22   A.   YES, SIR.   THIS PHOTOGRAPH IS THE NORTH END OF THE NORTH

23   BREACH, AND IT SHOWS THE PORTION OF THE FLOODWALL THAT WAS BUILT

24   IN THE 1980S ON THE LEFT SIDE OF THE PHOTO, AND IT SHOWS THE

25   SHEET PILE THAT'S BEEN SEPARATED OR RIPPED APART.

2095

1    Q.   CAN YOU ORIENT THE COURT AS TO WHAT WE SEE HERE IN RELATION

2    TO THE NORTH BREACH?

3    A.   YES, SIR.   THIS SHOWS A LITTLE BETTER THE PORTION OF THE

4    FLOODWALL THAT WAS CONSTRUCTED AFTER HURRICANE BETSY AROUND 1969.

5    AND IT SHOWS THE UPPER PORTION OF THE FLOODWALL, THE CONCRETE

6    SLAB AND CAP, THAT EXTEND 8 FEET UPWARD.   IT SHOWS THEN 15 FEET

7    OF SHEET PILING EXTENDING BELOW THE CONCRETE.

8         AT THE RIGHT-HAND SIDE OF THE PICTURE IS 10 FEET OF

9    CONCRETE CONSISTING OF THE CAP AND THE SLAB AND THEIR

10   CONSTRUCTION JOINT, AND IT SHOWS THAT THE SHEET PILING EXTENDS

11   SOME 31 FEET DOWN.   THIS WAS THE PORTION OF THE FLOODWALL THAT

12   WAS BUILT IN THE 1980S.

13        AND THEN WE SEE THE CONNECTION BETWEEN THE OLDER

14   PORTION AND THE NEWER PORTION WHERE THE SHEET PILING HAS BEEN

15   WELDED TOGETHER, THE TWO PORTIONS.   THIS IS THE WEAKER LINK, AND

16   IT'S AN ABRUPT CHANGE IN STRENGTH.

17   Q.   IN THIS SLIDE, DR. CUSHING, WHAT CAUSED THE SHEET PILE TO

18   ROTATE 270 DEGREES IN THE FASHION SHOWN IN THE PICTURE?

19   A.   ONCE THE FLOODWALL FAILED, THE DELUGE, THE TREMENDOUS INRUSH

20   OF WATER TOOK THE TORN SHEET PILE AND CAUSED IT TO RESOLVE OR

21   ROTATE SOME 270 DEGREES AS IT TUMBLED INTO JOURDAN AVENUE.

22   Q.   IN YOUR EXPERIENCE AS A NAVAL ARCHITECT AND MARINE ENGINEER,

23   WHAT WOULD HAVE HAPPENED TO THE BARGE IF IT HAD BEEN PRESENT WHEN

24   THE NORTH BREACH INITIATED?

25   A.   WITH THIS FAILURE, IF THE BARGE HAD BEEN HERE, AND I DON'T

2096

1    BELIEVE IT WAS, BUT IF IT HAD BEEN HERE, IT SURELY WOULD HAVE

2    BEEN DRAWN INTO THE LOWER NINTH WARD.

3    Q.   DR. CUSHING, I'M SHOWING YOU ANOTHER PHOTOGRAPH OF THE NORTH

4    BREACH.   CAN YOU TELL THE COURT WHAT YOU SEE IN THIS PHOTOGRAPH?

5    A.   YES.   THIS IS AN AERIAL VIEW FROM THE CANAL SIDE LOOKING

6    INTO THE ALREADY FLOODED LOWER NINTH WARD.   WE SEE THE PUMP HOUSE

7    IN THE UPPER LEFT-HAND CORNER OF THE PHOTOGRAPH.   AND WE SEE THE

8    NORTH BREACH.   TO THE LEFT IS THE NORTH END OF THE NORTH BREACH.

9    AND WE SEE TREES.   WE SEE THE PORTION OF THE TUMBLED FLOODWALL IN

10   WAY OF THE BREACH.

11   Q.   WHAT ELSE DO YOU SEE?

12   A.   WELL, I SEE POLES, I SEE STRUCTURES, BUT I ALSO SEE A POLE,

13   A UTILITY POLE, IN WAY OF THE NORTH BREACH.

14   Q.   DR. CUSHING, THIS IS ANOTHER PHOTOGRAPH OF THE NORTH BREACH.

15   CAN YOU ORIENT THE COURT IN THIS PHOTOGRAPH?

16   A.   YES.   THIS IS A VIEW FROM THE -- WITH THE LOWER NINTH WARD

17   TO YOUR BACK AND LOOKING NORTHWEST WITH THE FLORIDA AVENUE BRIDGE

18   IN THE BACKGROUND.   AND WE SEE IN THE NORTHWESTERLY DIRECTION

19   FROM THE BREACH THIS UTILITY POLE.

20   Q.   DR. CUSHING, YOU'RE FAMILIAR WITH THE REPORT AND DECLARATION

21   OF MR. PAZOS --

22   A.   YES, SIR.

23   Q.   -- THAT THE BARGE WAS BLOWN TO THE NORTH BREACH BY A

24   NORTHWESTERLY WIND; ARE YOU FAMILIAR WITH THAT?

25   A.   YES, SIR.   BOTH HIS TESTIMONY AND HIS DIAGRAM SHOW THAT THE

**2097**

1  BARGE WOULD HAVE BEEN COMING FROM THIS DIRECTION RIGHT TO THE
2  FLOODWALL.  IT WOULD HAVE GONE -- IT WOULD HAVE HAD TO HAVE
3  KNOCKED DOWN THIS UTILITY POLE.
4      MR. KHORRAMI:  YOUR HONOR, I OBJECT.  THIS WITNESS HAS
5  NEVER TESTIFIED ABOUT THIS UTILITY POLE.  IT'S NEVER BEEN PART OF
6  HIS CONCLUSIONS AS TO THE BREACHES AT ALL.  SO THIS IS COMPLETELY
7  NEW INFORMATION THAT HE'S BRINGING BEFORE THE COURT.
8      MR. ALDOCK:  IT'S ALL BASED ON THE FACTS THAT CAME OUT
9  IN DR. MARINO'S TESTIMONY.  THIS PICTURE HAS BEEN -- AND OTHERS
10  LIKE IT HAVE BEEN IN DR. MARINO'S REPORT.  AND THE POLE HAS
11  OBVIOUSLY TAKEN A LITTLE BIT MORE PROMINENCE THAN IT DID SIX
12  MONTHS AGO BECAUSE OF THE TESTIMONY OF THEIR WITNESSES, MARINO
13  AND PAZOS.
14      MR. KHORRAMI:  THE FACT THAT IT CAME OUT IN DR. MARINO'S
15  TESTIMONY --
16      THE COURT:  IT NEEDS TO BE IN AN EXPERT REPORT SOMEWHERE
17  OR THE DECLARATION ARGUMENT, THAT IT CAME OUT IN A DECLARATION,
18  AND THEREFORE I HAVE MORE LIBERALITY IN ALLOWING HIM TO GO BEYOND
19  THE EXPERT REPORT.
20      SO I AGREE WITH YOU, MR. KHORRAMI, UNLESS --
21  BECAUSE WE CAN -- THE POLE HAS BEEN EVIDENT AND -- BUT IF IT WAS
22  MENTIONED IN THE DECLARATION, THEN WE HAVE A DIFFERENT PROTOCOL
23  THAN IN AN EXPERT REPORT BECAUSE I ALLOWED THE DECLARATIONS BUT
24  DID STATE THAT I WOULD ALLOW THE DEFENSE A LITTLE LEEWAY THERE.
25  SO, I GUESS MY QUESTION IS, DID THIS COME OUT IN A

**2098**

1  DECLARATION?
2      MR. ALDOCK:  IT DID NOT, YOUR HONOR.  IT CAME OUT ON THE
3  STAND FROM MARINO AND PAZOS, BUT NOT IN THE DECLARATION.
4      MR. KHORRAMI:  IT CAME OUT ON CROSS, YOUR HONOR.  THEY
5  WERE ASKED BY THE DEFENSE, AND THEN NOW THEY ARE INTRODUCING
6  EVIDENCE OF THEIR OWN WITNESSES.
7      THE COURT:  WELL, I'M GOING TO NOTE YOUR OBJECTION, BUT
8  JUST GO INTO THIS BRIEFLY BECAUSE NOBODY HAS DONE ANY REAL -- I'M
9  NOT SURE HE DID A CALCULATION OVER THE WEEKEND AS TO -- I
10  UNDERSTAND THE QUESTION ABOUT THE NORTHWEST, ET CETERA, AND THE
11  POSITION OF THE VESSEL AS SHOWN BY MR. PAZOS -- IT MAY BE
12  DR. PAZOS, I DON'T KNOW -- IN HIS DIAGRAM.  I UNDERSTAND THAT.
13  I'M GOING TO ALLOW -- IT WON'T BE A SURPRISE TO ME.  LET ME PUT
14  IT THAT WAY.
15      MR. KHORRAMI:  THANK YOU, YOUR HONOR.
16      EXAMINATION
17  BY MR. ALDOCK:
18  Q.  DR. CUSHING, DID YOU HEAR DR. MARINO ON REDIRECT SAY THAT
19  THE BARGE COULD FIT AROUND THE POLE AT THE NORTH BREACH BECAUSE
20  THE SPACE WAS 80 FEET AND THE BARGE WAS ONLY 30 FEET WIDE?  DID
21  YOU HEAR THAT?
22  A.  YES, SIR, I DID.
23  Q.  ASSUME HYPOTHETICALLY THAT THE BARGE SOMEHOW GOT TO THE
24  NORTH BREACH, DESPITE YOUR CONCLUSION AND DESPITE THE EVIDENCE IT
25  GOT THERE THE ONLY WAY IT COULD, BY VIRTUE OF THE WIND AND

**2099**

1  WIND-DIRECTED WAVES, COULD THE BARGE BE TRAVELING PERPENDICULAR
2  TO THE FLOODWALL, AS DR. MARINO OPINED?
3  A.  NO, SIR.
4  Q.  WHY NOT?
5  A.  WELL, IF IT WAS TRAVELING PERPENDICULAR TO THE FLOODWALL IT
6  WOULD HAVE HAD TO HAVE BEEN COMING FROM THIS DIRECTION
7  (INDICATING), AND THE POLE WOULD HAVE BLOCKED IT.  THE 80-FOOT
8  DIMENSION THEY'RE TALKING ABOUT IS THE DISTANCE FROM THE POLE
9  FROM THE WALL, BUT THERE IS ALSO A GAP FROM THE POLE TO THE
10  FLOODWALL IN THIS DIRECTION, WHICH IS SOME 150 FEET.
11      THE BARGE, IF IT HAD BEEN MOVING WITH THE WIND, THEN IT
12  WOULD HAVE BEEN MOVING WITH ITS LONG DIMENSION PERPENDICULAR TO
13  THE WIND.  IN OTHER WORDS, IT WOULD HAVE BEEN COMING SIDEWAYS,
14  AND THE BARGE IS 200 FEET LONG.
15      SO THERE ARE TWO REASONS WHY THIS DOESN'T MAKE SENSE:
16  ONE IS 200 FEET LONG DOESN'T FIT THROUGH 150-FOOT GAP; BUT,
17  SECONDLY, IF IT APPROACHED FROM THIS DIRECTION, THE BARGE WOULD
18  HAVE STRUCK THE WALL AT THE SOUTH END OF THE NORTH BREACH, NOT
19  THE NORTH END OF THE NORTH BREACH WHERE MR. PAZOS AND DR. MARINO
20  TESTIFIED TO.
21  Q.  DR. CUSHING, YOU'RE FAMILIAR WITH THE TESTIMONY OF
22  MR. VILLAVASSO; ARE YOU NOT?
23  A.  YES, SIR.
24  Q.  HAVE YOU REACHED AN OPINION AS TO WHETHER WHAT
25  MR. VILLAVASSO SAYS HE SAW AT THE NORTH BREACH COULD HAVE BEEN

**2100**

1  THE BARGE ING 4727?
2  A.  YES, SIR.
3  Q.  AND WHAT'S YOUR OPINION?
4  A.  MY UNDERSTANDING IS THAT HE SAID HE SAW A METALLIC OBJECT OR
5  SOMETHING STICKING THROUGH THE FLOODWALL SOME TWO FEET, ONE TO
6  TWO FEET, OR TWO FEET AT THE MOST, IS WHAT HE SAW.
7      IF HE SAW BARGE 4727, WHICH I DON'T BELIEVE HE DID, IT
8  WOULDN'T HAVE -- THE BARGE WOULDN'T HAVE BEEN ABLE TO GET TO THE
9  FLOODWALL.  IN FACT, IT WOULD HAVE BEEN QUITE A DISTANCE MORE
10  THAN 30 FEET AWAY.
11      ON THE OTHER HAND, IF THE BARGE HAD ARRIVED AT THE
12  FLOODWALL AND HE SAW THE BARGE, HE WOULD HAVE SEEN 14 FEET OF THE
13  BARGE STICKING ABOVE THE FLOODWALL, SO I DON'T BELIEVE HE SAW
14  BARGE 4727.
15  Q.  DR. CUSHING, THE DIAGRAM WE'RE LOOKING AT SHOWS THE BARGE
16  RELATIVELY SNUG AGAINST THE FLOODWALL.  DOES YOUR OPINION
17  REGARDING WHAT MR. VILLAVASSO SAW DEPEND ON WHETHER THE BARGE IS
18  OBLIQUE TO THE FLOODWALL OR SNUG AGAINST THE FLOODWALL?
19  A.  NO, SIR, BECAUSE IF IT WAS AT AN ANGLE TO THE FLOODWALL, HE
20  STILL WOULD HAVE BEEN SEEING THIS PORTION OF THE CORNER OF THE
21  BARGE, THAT IS, THE UPPER -- THE UPPER PICTURE IN THE LEFT-HAND
22  CORNER OF THE UPPER PICTURE.
23  Q.  LET'S NOW MOVE TO THE SOUTH BREACH AND TALK ABOUT YOUR
24  INVESTIGATION THERE.  I'M SHOWING YOU AN OVERHEAD OF THE SOUTH
25  BREACH.  COULD YOU ORIENT THE COURT?

4 (Pages 2097 to 2100)

## 2101

1  A.  YES, SIR.  THE UPPER PORTION OF THE PICTURE IS THE CANAL
2  SIDE, AND THE LOWER PORTION OF THE PICTURE IS THE
3  LOWER NINTH WARD.  WE SEE THE SOUTHERN END OF THE FLOODWALL SOUTH
4  OF THE SOUTH BREACH IN THE LEFT-HAND SIDE OF THE PICTURE, AND THE
5  RIGHT-HAND SIDE OF THE PICTURE HAS THE NORTHERN PORTION JUST
6  NORTH OF THE SOUTHERN BREACH.
7      AND WE SEE THE SOUTH END OF THE SOUTH BREACH AND THE
8  NORTH END OF THE SOUTH BREACH AT EITHER ENDS OF THAT PICTURE;
9  BUT, WE SEE, ALSO, THE FLOODWALL AND THE SHEET PILING IN AN
10 ALMOST CONTINUOUS STRIP EXTENDING FROM THE SOUND END OF THE SOUTH
11 BREACH ALONG AND THEN A VERY SIGNIFICANT BOW IN THE FLOODWALL
12 NEAR NORTH JOHNSON STREET, WHERE THE SHEET PILING HAS BEEN BLOWN
13 INWARD SOME 180 FEET ACROSS JOURDAN AVENUE.
14 Q.  WHAT'S THE BOW SIGNIFY?  I'VE HIGHLIGHTED IT HERE.
15 A.  WELL, THE BOW IS WHERE, LIKE, IN MY OPINION, THE INITIATION
16 OF THE BREACH OCCURRED IN THE SOUTHERN REACH.
17 Q.  WHY DO YOU REACH THAT CONCLUSION?
18 A.  WELL, FIRST OF ALL, BECAUSE OF THE TREMENDOUS INRUSH OF
19 WATER THAT TOOK THE SHEET PILING SO FAR INLAND; BUT, ALSO,
20 BECAUSE OF THE DESTRUCTION IN THE LOWER NINTH WARD WHICH WAS MORE
21 SIGNIFICANT DIRECTLY IN LINE WITH THE POINT OF INITIATION THAN IT
22 WAS IN OTHER PORTIONS OF THE LOWER NINTH WARD.
23 Q.  DR. CUSHING, DID YOU PERFORM A DAMAGE SURVEY OF THIS AREA?
24 A.  YES, SIR, WE DID.
25 Q.  WHAT DID IT SHOW?

## 2102

1  A.  WELL, WE DID SEVERAL THINGS.  WE LOOKED AT THE MOVEMENT OF
2  HOUSES.  WE LOOKED AT THE DESTRUCTION OF FENCES, TREES, POLES AND
3  OTHER STRUCTURES, THE WAY THINGS MOVED, SO THAT WE WERE ABLE TO
4  DETERMINE WHAT THE FLOW WAS IN THE LOWER NINTH WARD.
5      AND DECIDEDLY, THE INRUSH OF WATER WAS GREATEST IN A
6  STRAIGHT LINE WITH THE POINT OF INITIATION, AND THEN THE FLOW
7  ACTUALLY FANNED OUT IN OTHER DIRECTIONS, AS THE PICTURE SHOWS, AS
8  THE WATER CAME IN OVER THE OTHER PORTIONS OF THE FALLEN
9  FLOODWALL.
10 Q.  DR. CUSHING, IS THERE ANY EVIDENCE THAT THE BARGE DID NOT
11 MOVE FROM THE INCEPTION POINT AT THE BOW TO THE FINAL RESTING
12 PLACE WHERE WE SEE IT?
13 A.  YES, SIR.  IF THE BARGE HAD CAUSED THIS FAILURE OF THE WALL
14 IN -- AT THE POINT OF INCEPTION, IT WOULD HAVE BEEN BLOWN RIGHT
15 INTO THE LOWER NINTH WARD.  IT WOULD HAVE MOVED DIRECTLY INLAND,
16 AND IT WOULD HAVE HAD TO BACK OUT OF THE LOWER NINTH WARD,
17 CORNER OF THE PICTURE.
18     IN ORDER FOR IT TO EVENTUALLY ARRIVE AT ITS FINAL
19 RESTING POINT ON THE LEFT-HAND SIDE OF THE PICTURE, IT WOULD HAVE
20 HAD TO DO ONE OF TWO THINGS:  IT WOULD HAVE HAD TO MOVE THROUGH
21 AN AREA WHERE THERE ARE TREES AND THE TREES WERE NOT KNOCKED
22 DOWN, OR IT WOULD HAVE HAD TO BACK OUT OF THE LOWER NINTH WARD,
23 REENTER THE CANAL AND THEN MOVE SOUTH AND THEN REENTER THE
24 LOWER NINTH WARD, AND I THINK BOTH OF THESE ARE UNLIKELY IN THE
25 EXTREME.

## 2103

1  Q.  DR. CUSHING, WHEN YOU EXAMINED THE FLOODWALL, DID YOU SEE
2  ANY EVIDENCE ON THE FLOODWALL THAT THE BARGE HAD BEEN PRESENT IN
3  THE VICINITY OF THE POINT OF INITIATION AT THE BOW?
4  A.  NOT AT THE POINT OF INITIATION.
5  Q.  DR. CUSHING, YOU HAVE SEEN SPECULATION BY MR. PAZOS IN HIS
6  REPORT THAT THIS CEMENT RUBBLE SHOWN IN THIS INSET PHOTOGRAPH IS
7  EVIDENCE OF A BARGE IMPACT.  DO YOU AGREE WITH MR. PAZOS?
8  A.  NO, SIR.  I DON'T.
9  Q.  CAN YOU EXPLAIN WHAT CAUSED THE CONCRETE DAMAGE IN THE MAIN
10 BOW OF THE FAILURE IF IT WAS NOT THE BARGE?
11 A.  YES, SIR.  WE CAN SEE IN THIS PHOTOGRAPH THAT THE SHEET
12 PILING IN MOVING INLAND HAD TO EXPAND IN AN ACCORDION FASHION,
13 AND IN DOING SO THE EXPANDING SHEET PILING HAD TO HAVE LEFT SOME
14 OF THE CONCRETE, DETACHED SOME OF THE CONCRETE BECAUSE THE
15 CONCRETE CAN'T EXPAND.
16     SO WE SEE BROKEN CONCRETE FROM THE SLAB FALLING OFF THE
17 SHEET PILING BECAUSE THE SHEET PILING IS EXPANDING AND THE
18 CONCRETE IS NOT.
19 Q.  SO CAN YOU TELL THE COURT, DR. CUSHING, WHETHER THIS DAMAGE
20 HAD ANYTHING TO DO WITH THE BARGE IMPACT?
21 A.  I DON'T BELIEVE THAT THE CONCRETE THAT CAME LOOSE FROM THE
22 SHEET PILING HAD ANYTHING TO DO WITH THE BARGE -- WITH THE BARGE.
23 Q.  DR. CUSHING, ARE YOU FAMILIAR WITH MR. PAZOS' THEORY
24 EXPRESSED IN HIS REPORT THAT THE BARGE CAUSED VERTICAL CRACKS
25 WHEN IT CONTACTED THE FLOODWALL?

## 2104

1  A.  YES, SIR, I AM.
2  Q.  CAN YOU IDENTIFY THE -- WHAT MIGHT BE TERMED "VERTICAL
3  CRACKS" AT THE SOUTH END OF THE NORTH BREACH IN THIS PICTURE?
4  A.  YES.  THIS PICTURE IS LOOKING SOUTH FROM THE NORTH BREACH,
5  AND WE SEE A PORTION OF THE PARTIALLY FALLEN FLOODWALL, AND WE
6  SEE CRACKS.  THIS DARK AREA IS A SEPARATION OF A PANEL, BUT WE
7  SEE CRACKS, AND PARTICULARLY IN WAY OF THE SHEET PILING WHERE THE
8  SHEET PILING IS EXPANDING AND THE CRACKS ARE FORMING.
9  Q.  DO YOU AGREE WITH MR. PAZOS' CONCLUSION THAT THE VERTICAL
10 CRACKS WERE CAUSED BY THE BARGE?
11 A.  NO, SIR, I DON'T.
12 Q.  WHY NOT?
13 A.  BECAUSE I THINK THAT THAT PHOTOGRAPH AND THIS PHOTOGRAPH IS
14 ANOTHER TYPICAL PICTURE OF A FALLEN FLOODWALL --
15 Q.  WHERE IS THIS ONE?
16 A.  THIS ONE IS -- THIS PHOTOGRAPH IS TAKEN ON THE WEST SIDE OF
17 THE INNER HARBOR NAVIGATION CANAL, AND WE SEE VERTICAL CRACKS,
18 AGAIN, IN THE FLOODWALL.  AND THERE WAS NO PART --
19     THE COURT:  WOULD THAT -- EXCUSE ME.  SORRY.  FINISH
20 YOUR ANSWER.  I'M SORRY, I APOLOGIZE.  GO AHEAD.
21     THE WITNESS:  AND THERE IS NO EVIDENCE THAT A BARGE
22 CAUSED THIS CRACK.
23     THE COURT:  DR. CUSHING, IN LINE WITH THAT, DID YOU SEE
24 ANY OTHER FLOODWALL, AND I'M NOT SURE WHICH ONES YOU'VE LOOKED
25 AT, OTHER THAN THE TWO AT ISSUE HERE WHERE THERE WAS AN

5 (Pages 2101 to 2104)

## 2105

1  EXHUMATION OF THE SHEET PILE AS IN THESE?

2  THE WITNESS:  NO, SIR, I DIDN'T.  I DIDN'T -- WELL,

3  ACTUALLY, I DIDN'T EXAMINE ANY OF THE OTHER FLOODWALLS CAREFULLY,

4  CLOSELY, JUST THE INNER HARBOR EAST WALL.

5  THE COURT:  THANK YOU, SIR.

6  EXAMINATION

7  BY MR. ALDOCK:

8  Q.  SO WHAT CONCLUSION DO YOU DRAW TO THE EASTERN CANAL

9  FLOODWALL ABOUT THESE CRACKS?

10  A.  THAT THESE CRACKS ARE EVIDENCE OF THE FLOODWALL FAILING, NOT

11  OF A BARGE STRIKING.

12  Q.  DR. CUSHING, DID YOU HEAR MR. PAZOS' TESTIMONY THAT THE

13  BARGE CAUSED SCRATCH MARKS ON THE WALL?

14  A.  YES, SIR, I DID.

15  Q.  WHAT'S THIS?

16  A.  THIS IS THE NORTH END OF THE SOUTH BREACH.  AND YOU CAN SEE

17  IN THE PHOTOGRAPH A PORTION OF THE WALL THAT'S STILL STANDING,

18  AND WE SEE EXTENSIVE NUMBERS OF SCRATCH MARKS ALONG THE SIDE OF

19  THE WALL.

20  Q.  THIS IS JUST THE SCRATCH MARKS ENHANCED?

21  A.  YES.  IT'S EASIER TO SEE WITH THE RED ON IT.

22  Q.  IN HIS REPORT, MR. PAZOS TALKED ABOUT SCRATCHES IN OTHER

23  PLACES IN THE NORTH BREACH, DIDN'T HE?

24  A.  HE DID.

25  Q.  THIS IS A PHOTOGRAPH WE'VE JUST LOOKED AT.  CAN YOU IDENTIFY

## 2106

1  THE SCRATCH MARKS MR. PAZOS SAYS WERE CAUSED BY THE BARGE IN THIS

2  PHOTOGRAPH AT THE NORTH BREACH?

3  A.  YES, SIR.  WITHOUT ENHANCING THEM, I CAN POINT OUT THAT THE

4  SCRATCH MARKS ARE IN THIS AREA, AND THEN ALSO EXTENSIVE NUMBER OF

5  SCRATCH MARKS ARE LOW, JUST WHERE THE WALL WOULD HAVE BEEN

6  EMBEDDED IN THE BERM.

7  Q.  WHAT DOES THE LOCATION OF THE SCRATCH MARKS ON THE WALL TELL

8  YOU ABOUT WHETHER THE SCRATCH MARKS WERE MADE BY A BARGE?

9  A.  THESE SCRATCH MARKS ARE TOO LOW TO HAVE BEEN MADE BY THE

10  BARGE.

11  Q.  THAT'S JUST THE ENHANCEMENT?  RIGHT.

12  A.  YES, SIR.  YOU CAN SEE THEM.

13  Q.  DO YOU HAVE AN OPINION AS TO WHETHER THE SCRATCH MARKS WERE

14  MADE BY A BARGE?

15  A.  I HAVE THE OPINION THAT THEY WEREN'T MADE BY THE BARGE.

16  Q.  HERE IS ONE MORE.  WHERE IS THIS?

17  A.  THIS IS THE EAST FLOODWALL; BUT, THIS PHOTOGRAPH WAS TAKEN

18  BEFORE HURRICANE KATRINA, AND WE SEE SCRATCH MARKS IN DIFFERENT

19  PLACES ON THE WALL RIGHT ALONG WHERE THE GRASS IS.

20  Q.  THAT'S JUST THE ENHANCEMENT?

21  A.  YES, SIR.  AND YOU CAN SEE THE SCRATCH MARKS ARE RIGHT AT

22  THE GRASS LINE.

23  Q.  DR. CUSHING, ARE YOU FAMILIAR WITH MR. PAZOS' THEORY THAT

24  THE SHEET PILE INTERLOCKS AT THE SOUTH BREACH SNAPPED LIKE A

25  RUBBER BAND AND THAT THAT'S WHAT CAUSED THE SHEET PILE TO

## 2107

1  DISPLACE?

2  A.  YES, SIR, I'M FAMILIAR WITH THAT.

3  Q.  IS THAT THEORY PLAUSIBLE?

4  A.  NO, SIR, I DON'T BELIEVE THAT IS.  THIS PHOTOGRAPH HERE IS

5  AN ENLARGEMENT OF THE SOUTH END OF THE SOUTH BREACH, AND IT SHOWS

6  THE SHEET PILE WAS NOT DETACHED FROM THE PORTION OF THE SHEET

7  PILE SOUTH OF THE SOUTH BREACH, AND, IN FACT, THE SHEET PILE WAS

8  A CONTINUOUS RIBBON OF SHEET PILING ALL THE WAY TO THE NORTH END

9  OF THE SOUTH BREACH.

10  Q.  IS THERE ANY EVIDENCE WHATSOEVER THAT THE SOUTH BREACH WAS

11  INITIATED AT THE VERY SOUTH END?

12  A.  NO, SIR.

13  Q.  DR. CUSHING, HOW MANY MARINE CASUALTIES HAVE YOU

14  INVESTIGATED IN YOUR CAREER?

15  A.  MANY, I WOULD SAY, ON THE ORDER OF A HUNDRED.

16  Q.  HOW MANY TIMES HAVE YOU EXAMINED IN THOSE SITUATIONS THE

17  VESSELS AND SEEN EVIDENCE OF DAMAGE FROM A CASUALTY ON A VESSEL?

18  A.  THERE IS ALWAYS DAMAGE ON A VESSEL WHEN THERE IS AN ALLISION

19  OR A COLLISION.

20  Q.  WHAT DID YOU DO TO EXAMINE THE BARGE IN THIS CASE?

21  A.  I EXAMINED THE BARGE VERY CAREFULLY IN PLACE, BUT THIS WAS

22  AFTER HURRICANE KATRINA.  THEN IT WAS LIFTED ON AIR BAGS, AND I

23  WAS ABLE TO CRAWL UNDERNEATH THE BARGE.  AND I FOUND THE

24  SCRATCHES UNDER THE BARGE.  AND THEN I EXAMINED THE BARGE VERY

25  CAREFULLY AROUND ITS SIDES AND ENDS.

## 2108

1  Q.  BASED ON YOUR EXAMINATION HAVE YOU DRAWN ANY CONCLUSIONS

2  WHETHER THE BARGE WAS INVOLVED IN THE INCEPTION OF THE FAILURE AT

3  THE SOUTH BREACH?

4  A.  NOT THE INCEPTION, NO, SIR.

5  Q.  DR. CUSHING, WHAT DOES THIS PHOTOGRAPH SHOW?

6  A.  AFTER THE BARGE WAS CUT APART AND SALVAGED, AT LEAST THE

7  LOWER PORTION WAS SALVAGED, THE LOWER FOUR FEET OF THE BARGE WAS

8  SAVED AND IT WAS CUT INTO 19 SECTIONS, AND THOSE SECTIONS WERE

9  TRANSPORTED TO A WAREHOUSE ON THE WEST SIDE OF THE CANAL AND THEN

10  INVERTED.

11  SO WHAT WE'RE LOOKING AT HERE IS A PIECE OF THE BARGE,

12  ONE CORNER OF THE BARGE UPSIDE DOWN.  THIS PORTION IN THE UPPER

13  RIGHT-HAND CORNER OF THE PHOTOGRAPH IS THE BOTTOM OF THE BARGE.

14  AND WHAT WE'RE LOOKING AT HERE IS ONE CORNER OF THE BARGE.

15  Q.  AND DID YOU EXAMINE ALL FOUR CORNERS?

16  A.  AND I LOOKED AT ALL FOUR CORNERS AND THERE WAS NO EVIDENCE

17  THAT IT HAD STRUCK THE -- A FLOODWALL.

18  Q.  TURNING BACK TO THE FLOODWALL, DID YOU SEE EVIDENCE OF WHY

19  THE WALL FAILED?

20  A.  WELL, YES.  THERE WAS A DEEP SCOUR TRENCH EXTENDING ALONG

21  THE FLOODWALL, EXTENDING SOUTH FROM THE SOUTH BREACH, AND THE

22  SCOUR TRENCH ALSO EXTENDED NORTH FROM THE NORTH END OF THE SOUTH

23  BREACH.  AND IN WAY OF THE BREACH ITSELF WERE DEEP -- WAS A DEEP

24  SCOUR TRENCH, ALSO.

25  Q.  HOW ARE THESE SCOUR TRENCHES CREATED?

## 2109

A.  BY OVERTOPPING OF THE FLOODWALL.  AND THE INNER SIDE OF THE FLOODWALL WAS NOT ARMORED.  BY THAT I MEAN THERE WAS NO HARD SURFACE SUCH AS CONCRETE OR PAVING; BUT, RATHER, IT WAS JUST GRASSY, GRASSY SOIL.  AND SO WHEN THE OVERTOPPING OCCURS, THE SOIL ERODES VERY QUICKLY.

Q.  WHAT EFFECT DOES IT HAVE ON THE STABILITY OF THE FLOODWALL?

A.  WELL, AS IT GETS DEEPER -- THE FLOODWALL DEPENDS UPON THE SUPPORT OF THE SOIL TO HOLD IT UP.  AND AS THE SCOUR TRENCH GETS DEEPER, THE WALL LOSES STABILITY, THE HYDROSTATIC LOAD ON THE CANAL SIDE IS PUSHING ON THE WALL AND IT LOSES ITS SUPPORT ON THE PROTECTED SIDE.

Q.  WAS THE DEPTH OF THE SCOUR TRENCH CONSISTENT?

A.  NO, SIR, IT WASN'T.  IT WAS SIGNIFICANT TO THE SOUTH AND TO THE NORTH OF THE SOUTH BREACH, BUT IT BECAME DEEPER AS WE -- AS YOU MOVE ALONG THE FLOODWALL, AND IT BECAME DEEPEST IN WAY OF THE BOW OR THE NORTH JOHNSON STREET PORTION OF THE FLOODWALL.

Q.  WHY DO YOU THINK THE TRENCH VARIED IN DEPTH ACROSS THE BREACH?

A.  WELL, THE WALL WOULD HAVE BEEN OVERTOPPED AT THE LOWEST PORTION.  AS WE ALL KNOW, THE WALL, LIKE EVERYTHING ELSE IN NEW ORLEANS, SUBSIDES, AND IT SUBSIDED MOST IN WAY OF WHERE THE TRENCH WAS THE DEEPEST.  IN OTHER WORDS, THE WATER WAS POURING OVER THERE FIRST, AND THEN, AS THE WATERS ROSE, THE OVERTOPPING OCCURRED ALL ALONG THE ENTIRE FLOODWALL.

Q.  HAVE YOU SEEN EVIDENCE REGARDING THE SUBSIDENCE --

## 2110

THE COURT:  LET ME ASK ONE QUESTION.  DR. CUSHING, YOU MAY HAVE SAID THIS ON FRIDAY, AND I'VE FORGOTTEN.  WHEN DID YOU ESTIMATE WAS THE BASIC TIME OF FAILURE OF THE SOUTH BREACH?

THE WITNESS:  SOMETIME BEFORE 9 O'CLOCK -- SORRY, SOMETIME -- YES, SIR -- NO, SIR.  LET ME GET IT STRAIGHT.  SOMETIME BEFORE 7:30.

THE COURT:  THANK YOU.

GO AHEAD, COUNSEL.

EXAMINATION

BY MR. ALDOCK:

Q.  IT ALSO COULD HAVE BEEN AT 10 O'CLOCK, AS YOU TESTIFIED EARLIER, TOO?

A.  NOT THE FAILURE.

Q.  OH, THE FAILURE.  THE FAILURE, NO.

A.  YES.  HIS HONOR'S QUESTION --

Q.  HIS HONOR'S QUESTION WAS THE FAILURE.  YOU HAD IT RIGHT; I HAD IT WRONG.

HAVE YOU SEEN EVIDENCE REGARDING THE SUBSIDENCE OF THE FLOODWALL?

A.  YES, SIR.

Q.  TELL THE COURT ABOUT WHAT YOU'VE SEEN THERE.

A.  WELL, YOU CAN VISUALLY -- AND I VISUALLY LOOKED ALONG THE PORTIONS OF THE STANDING FLOODWALL, AND YOU COULD SEE IT HAVING SUBSIDED.

THE FLOODWALL HAS BEEN REBUILT TO THE 15-FOOT HEIGHT;

## 2111

BUT, THIS PAST WEAKENED I WENT OUT THERE AND I LOOKED AT THE VERY NORTH -- SORRY, THE VERY SOUTH END OF THE SOUTH FLOODWALL WHERE IT TAKES A TURN IS THE EXISTING FLOODWALL SIGNIFICANTLY LOWER THAN THE NEWLY BUILT FLOODWALL.  FURTHERMORE, THE --

THE COURT:  COUNSEL, DO YOU HAVE AN OBJECTION?

MR. KHORRAMI:  YES, YOUR HONOR.  THE WITNESS IS TESTIFYING, AGAIN, AS TO COMPLETELY NEW EVIDENCE THAT HE HAS APPARENTLY OBTAINED THIS WEEKEND VISITING THE WALL.  SO I OBJECT TO THAT TESTIMONY.

MR. ALDOCK:  WE DON'T NEED IT.

THE COURT:  THANK YOU.

THE WITNESS:  BUT, FURTHERMORE, AND IMPORTANTLY, WE HAD SURVEYS DONE, BOTH LAND SURVEYS AND PHOTOGRAMMETRIC SURVEYS DONE IMMEDIATELY AFTER THE HURRICANE RITA, AND THE AERIAL SURVEYS SHOWED A VERY UNEVEN LEVEL TO THE TOP OF THE EXISTING FLOODWALLS SHOWING VERY UNEVEN SUBSIDENCE TO THE FLOODWALL, AND THEY'RE SHOWN IN MY REPORT.

EXAMINATION

BY MR. ALDOCK:

Q.  DID IPET, ILIT, TEAM LOUISIANA AND OTHERS OBSERVE SUBSIDENCE OF THE FLOODWALLS?

A.  THEY ALSO OPINED AS TO THE HEIGHT OF THE FLOODWALL IN WAY OF THE BREACH.  OF COURSE, WE COULDN'T MEASURE THE HEIGHT IN WAY OF THE BREACH; BUT, ON EITHER SIDE THERE WERE -- WE WERE ABLE, AND THEY WERE ABLE, AND THERE IS CONSISTENCY IN THE ESTIMATES.  I

## 2112

BELIEVE IPET ACTUALLY FELT THAT THE WALL HAD SUBSIDED SOME THREE FEET.

THE COURT:  DID ANYONE DO ANY STUDIES, IF IT WAS POSSIBLE, TO THE EXISTING FLOODWALL, THE FLOODWALL THAT DIDN'T FAIL, AND LOOK AT THE SCOURING, THAT IT WAS A VARIATION IN THE SCOURING BASED ON HEIGHT?  DID ANYONE -- DO YOU KNOW OF ANY STUDY THAT DID THAT?

THE WITNESS:  NO STUDY OTHER THAN OUR OWN.  I'M NOT AWARE.  THEY ALL IDENTIFIED SCOURING AS A SIGNIFICANT -- AS A SIGNIFICANT FACTOR AND CONTRIBUTION.

THE COURT:  I JUST WAS WONDERING HAD THERE BEEN A CORRELATION ON HEIGHT OF FLOODWALL VIS-À-VIS DEPTH OF SCOURING IN THIS AREA, OTHER THAN YOURS?

THE WITNESS:  NO, SIR.  NOT THAT I'M AWARE.

THE COURT:  THANK YOU.

EXAMINATION

BY MR. ALDOCK:

Q.  WELL, LET'S GO TO YOURS AND SEE IF WE CAN -- IF THE PICTURES WILL PARTLY ANSWER HIS HONOR'S QUESTION.

I'M GOING TO SHOW YOU THREE PHOTOS OF SCOUR TRENCH.  WHAT DOES THIS ONE SHOW?  WHERE WAS IT TAKEN, AND WHAT DOES IT SHOW?

A.  HERE, WE SEE AN ENLARGEMENT OF THE FLOODWALL, THE STANDING FLOODWALL --

THE COURT:  THIS IS DX 12, JUST TO LABEL IT FOR THE

2113

1 RECORD.

2     MR. ALDOCK:  THIS IS DX 12, LNA 758.  AND IT'S AN INSET.

3     THE COURT:  THANK YOU.

4     THE WITNESS:  YES, SIR.  AND THIS PHOTOGRAPH SHOWS THE

5 SOUTH END OF THE FLOODWALL, THE STANDING FLOODWALL SOUTH OF THE

6 SOUTH BREACH.  AND HERE, WE'RE LOOKING IN A SOUTHERLY DIRECTION.

7 YOU CAN SEE A PORTION OF THE NORTH CLAIBORNE AVENUE BRIDGE IN THE

8 DISTANCE.  AND HERE WE SEE A SCOUR TRENCH THAT RUNS ALONG THE

9 WALL.

10           EXAMINATION

11 BY MR. ALDOCK:

12 Q.  WHERE WAS THIS TAKEN?

13 A.  THIS IS AT THE OTHER END OF THE BREACH, AND THIS IS LOOKING

14 NORTHWARD FROM THE NORTH END OF THE SOUTH BREACH.  AND HERE, WE

15 SEE A SCOUR TRENCH RUNNING THE LENGTH OF THE WALL AS FAR AS ONE

16 CAN SEE HERE.

17 Q.  NOW, WHERE WAS THIS PHOTOGRAPH TAKEN, AND HOW DOES THIS

18 TRENCH COMPARE WITH THE OTHER PHOTOS?

19 A.  THIS PHOTOGRAPH IS TAKEN AT THE SOUTH END OF THE SOUTH

20 BREACH.  AND WE CAN SEE HERE THE DEPTH OF THIS SCOUR TRENCH IS

21 SIGNIFICANTLY DEEPER THAN THE OTHER TWO PHOTOGRAPHS THAT WE SAW

22 EXTENDING TO THE NORTH AND TO THE SOUTH.

23 Q.  DR. CUSHING, DID YOU -- IN LOOKING AT THIS PHOTOGRAPH, DID

24 YOU FIND ANYTHING ELSE THAT AFFECTED THE DEPTH OF THE SCOUR

25 TRENCHES?

2114

1 A.  YES, SIR.  THIS PHOTOGRAPH SHOWS A PORTION OF THE STANDING

2 FLOODWALL TO THE SOUTH OF THE SOUTH BREACH.  AND WHAT IT SHOWS

3 IS -- IN THE PHOTOGRAPH IS A CHAIN-LINK FENCE.  THIS CHAIN-LINK

4 FENCE RAN THE LENGTH OF THE FLOODWALL, AND THE CHAIN-LINK FENCE

5 WAS SUPPORTED WITH STEEL POSTS.  THE STEEL POSTS WERE EMBEDDED IN

6 ANCHORS THAT WERE CONCRETE ANCHORS SUNK INTO THE BERM.

7     WHEN THIS CHAIN-LINK FENCE WAS STANDING, THE

8 OVERTOPPING AND ANY DEBRIS THAT CAME WITH IT WOULD HAVE

9 RESTRICTED THE FLOW OVER AND DOWN THE BERM AND HELPED CHANNEL IT

10 ALONG THE FLOODWALL TO THE DEEPER PORTIONS OF THE FLOODWALL, SO

11 YOU HAD NOT ONLY OVERTOPPING AND SCOURING, BUT YOU HAD WATER

12 FLOWING ALONG THE FLOODWALL TO THE DEEPEST PORTION OF THE

13 FLOODWALL.

14 Q.  SO WHAT DID YOU, IN GENERAL, CONCLUDE ABOUT THE TRENCH

15 WITHIN THE LIMITS OF THE BREACH?

16 A.  THE CONCLUSION I HAVE IS THAT THIS SCOUR TRENCH CONTRIBUTED

17 GREATLY TO THE WEAKNESS OF THE FLOODWALL.

18 Q.  DR. CUSHING, DID YOU SEE ANY EVIDENCE OF WHERE THE BARGE

19 TRAVERSED THE FLOODWALL AFTER THE FLOODWALL HAD ALREADY FAILED?

20 A.  YES, SIR.  THE SOUTH END OF THE SOUTH BREACH SHOWED EVIDENCE

21 THAT THE BARGE HAD ENTERED THE LOWER NINTH WARD AT THE SOUTH END

22 OF THE SOUTH BREACH.

23 Q.  LOOKING AT THIS PHOTOGRAPH, DR. CUSHING, WHAT EVIDENCE SHOWS

24 THAT THE BARGE TRAVERSED THE FLOODWALL AFTER THE FLOODWALL HAD

25 FALLEN AND AFTER THE FLOOD WATERS IN THE LOWER NINTH WARD HAD

2115

1 RISEN?

2 A.  WELL, THERE ARE TWO PANELS OF SLAB FROM THE FLOODWALL IN

3 THIS PHOTOGRAPH.  IN THE FOREGROUND IS A PANEL THAT'S LYING AT A

4 LOWER LEVEL, AND IT'S IMPORTANT TO NOTE THAT ON THE TOP OF THE

5 FOREGROUND FALLEN PANEL IS A PORTION OF THE CAP BROKEN OFF, AND

6 THE REBAR EXTENDING FROM THE SLAB UP THROUGH THE CAP IS STRAIGHT.

7     IN THE BACKGROUND IS ALSO A PANEL THAT HAS FALLEN OVER,

8 BUT IN THE BACKGROUND PANEL THERE IS REBAR THAT HAS BEEN BENT

9 OVER TO A HORIZONTAL ANGLE, AND THE CAP IS MISSING FROM THE PANEL

10 IN THE BACKGROUND.

11 Q.  THIS IS DX 196, CUSHING REPORT FIGURE 60 WITH AN INSET.

12 A.  LET ME ALSO ADD THAT -- AND THAT THIS IS IMPORTANT, THAT

13 PORTIONS OF THE CAP HAVE ALREADY -- HAD FALLEN INTO THE GAP

14 BETWEEN THE TWO, THE TWO PANELS.

15 Q.  SO HOW DOES THIS EVIDENCE TELL YOU THAT THE BARGE TRAVERSED

16 THE FLOODWALL AFTER IT HAD FAILED?

17 A.  WELL, THE -- IT'S CLEAR THAT THE BARGE DID NOT STRIKE THIS

18 PORTION, THE FOREGROUND PANEL, IN THE SAME WAY THAT IT STRUCK THE

19 ONE IN THE BACKGROUND.  THIS FOREGROUND PANEL WAS ALREADY LEANING

20 AT AN ANGLE, AND THE PANEL IN THE BACKGROUND WAS LEANING BUT WAS

21 MORE ERECT, SO THAT THE BARGE ONLY HIT A PORTION OF THIS PANEL,

22 ALREADY FALLEN PANEL, THE TOP SIX INCHES, SAY, AND WHEN IT HIT

23 THE HIGHER PANEL, IT KNOCKED OFF THE ENTIRE CAP AND BENT THE

24 BARS.  SO THESE BARS ARE STRAIGHT, WHICH MEANS THAT THIS WAS AT A

25 LOWER ANGLE THAN THIS WAS WHEN THE BARGE CONTACTED IT.

2116

1 Q.  HAVE YOU PREPARED SOME FIGURES THAT DEMONSTRATE YOUR OPINION

2 OF HOW THE FLOODWALL FELL BASED ON THE PHYSICAL EVIDENCE THAT

3 YOU'VE DESCRIBED THAT YOU FOUND AT THE SOUTH END OF THE SOUTH

4 BREACH?

5 A.  YES, SIR.

6 Q.  SO LET'S GO THROUGH IT.  WHAT'S THIS?

7 A.  THIS IS A GRAPHIC THAT SHOWS THE BARGE STRIKING THE CAP OF

8 WHAT WAS THE FOREGROUND PANEL.  THE BARGE -- THE WALL IS ALREADY

9 LEANING WHEN THE BARGE STRIKES IT.

10     NEXT PHOTO.  IT SHOWS THAT A PORTION OF THE CAP HAS

11 BEEN KNOCKED OFF, BUT THE REBAR HASN'T BEEN BENT OVER AT

12 90 DEGREES.  BUT THEN THE BARGE, AS IT MOVES OBLIQUELY ACROSS THE

13 FLOODWALL, MOVING SOUTH AND INWARD, STRIKES THE BACKGROUND PANEL

14 HITTING THE CAP, AND THEN -- NEXT PANEL -- SHOWS THE CAP BEING

15 KNOCKED OFF AND THE REBAR BEING BENT HORIZONTALLY.

16     NEXT.  AND HERE, THE BARGE MOVES ACROSS THE REBAR

17 FLATTENING THE REBAR FROM THE BACKGROUND PANEL.

18     AND HERE, WE HAVE AN ACTUAL PICTURE OF THE FOREGROUND

19 AND THE BACKGROUND PANELS.

20 Q.  SO THIS IS THE PICTURE THAT YOU DEPICTED IN THE DIAGRAMS WE

21 JUST LOOKED AT?

22 A.  YES, SIR.

23 Q.  DOES THE DAMAGE AT THE SOUTH BREACH, THE SOUTH END OF THE

24 SOUTH BREACH, CORRESPOND TO THE DAMAGE YOU FOUND ON THE BARGE?

25 A.  YES, SIR.

**2117**

Q.  DESCRIBE THAT RELATIONSHIP.

A.  THIS IS A PICTURE OF THE SALVAGED PORTION OF THE BARGE CUT INTO THE 19 SECTIONS, AND HERE WE'RE LOOKING AT THE BOTTOM OF THE BARGE.

AND WE'RE LOOKING AT STRIATIONS IN THE BOTTOM OF THE BARGE.  THE STRIATIONS MATCH THE AS-BUILT DIMENSIONS OF THE SPACING OF THE REBAR, WHICH WAS APPROXIMATELY NINE INCHES, AND SO I WOULD SAY IT CERTAINLY MATCHES THE REBAR THAT WAS IN THE FLOODWALL.

THE COURT:  MR. ALDOCK, TO GO BACK TO -- JUST FOR THE RECORD, TO GO BACK TO THE CONFUSION THAT WE HAD EARLIER.

AND TAKE YOUR TIME IF YOU DON'T REMEMBER.  WHAT IS YOUR BEST ESTIMATE -- AND I UNDERSTAND THESE ARE ALL ESTIMATES, OF COURSE -- WHEN THE BARGE DID, IN FACT, COME ACROSS THE FLOODWALL AND GO INTO THE NEIGHBORHOOD?

THE WITNESS:  MY BEST ESTIMATE WOULD BE CERTAINLY AFTER 9 O'CLOCK FOR REASONS OF WIND, BUT PROBABLY CLOSER TO 10 O'CLOCK FOR REASONS OF WATER LEVELS.

THE COURT:  THANK YOU, SIR.

SORRY TO INTERRUPT.  GO AHEAD.

MR. ALDOCK:  THANK YOU, YOUR HONOR.

EXAMINATION

BY MR. ALDOCK:

Q.  WHAT DO THESE STRIATIONS TELL YOU ABOUT THE EVENTS OF AUGUST 29TH?

**2118**

A.  WELL, THEY TELL US THAT THE BARGE -- IT TELLS US HOW THE BARGE, IN FACT, ENTERED THE LOWER NINTH WARD.

Q.  AND WHAT -- FROM THIS -- WHAT IS THIS WE'RE LOOKING AT?

A.  THIS -- THIS IS A GRAPHIC THAT SHOWS THE SCRATCHES THAT I MEASURED.  AND WHAT WE'RE LOOKING AT IS FROM UNDERNEATH THE BARGE LOOKING UP.  THE BOW -- AND WE'VE ARBITRARILY NAMED THIS END THE "BOW" BECAUSE THE BARGE IS SYMMETRICAL AND DOESN'T REALLY HAVE A BOW AND STERN.  THE STERN AT THE OTHER END.

AND, THEREFORE, THE PORT SIDE DOESN'T LOOK AS NORMAL.  NORMALLY, THE PORT SIDE IS ON THE LEFT SIDE OF A VESSEL, BUT YOU'RE LOOKING FROM UNDERNEATH SO THEREFORE THE PORT SIDE IS AT THE TOP OF THE PICTURE AND THE STARBOARD SIDE IS AT THE BOTTOM OF THE PICTURE.

AND WHAT THIS PICTURE SHOWS IS THAT THE STERN -- THE BARGE ENTERED THE LOWER NINTH WARD OBLIQUELY, DIAGONALLY ACROSS THE FLOODWALL, WITH THE STERN ENTERING FIRST AND THE TRAILING EDGE, THE BOW, THE PORTION THAT CONTACTED THE WALL AND THEN GROUNDED ON THE CAP AND RECEIVED MOST OF THE STRIATIONS.

IN OTHER WORDS, ONE-THIRD OF THE BOTTOM OF THE BARGE WAS SCRATCHED ALMOST OVER ITS ENTIRE WIDTH, NOT QUITE, BUT ALMOST THE ENTIRE WIDTH, AND THE FORWARD END DOESN'T HAVE, THAT IS, THE LEADING EDGE GOING INTO THE LOWER NINTH WARD, DOESN'T HAVE THESE SCRATCHES ON IT.

SO THIS PORTION MUST HAVE ENTERED THE LOWER NINTH WARD CROSSING OVER THE ALREADY FALLEN FLOODWALL, AND THEN THE TRAILING

**2119**

EDGE OF THE BARGE CONTACTED THE SOUTH END OF THE SOUTH BREACH, THOSE TWO PANELS WE LOOKED AT, AND THE SCRATCHES WERE CAUSED BY THE LAST PANEL, THE PANEL IN THE BACKGROUND.

Q.  WE'LL DO A LITTLE BIT MORE OF THIS IN A FEW MINUTES, BUT WHAT DO WE SEE IN THIS PHOTOGRAPH?

A.  WELL, THIS IS THE FALLEN FLOODWALL AT THE SOUTH END OF THE SOUTH BREACH.  AND HERE, WE SEE THE PORTION OF THE BACKGROUND PANEL WHERE THE REBAR HAS BEEN FLATTENED AND THE BARGE CROSSED OVER AND THE CAP HAS BEEN DESTROYED.  BUT PORTIONS OF THE CAP HAVE FALLEN INTO A GAP BETWEEN THE FOREGROUND PANEL THAT HAD ALREADY FALLEN.

Q.  AND HOW DOES THIS COMPARE WITH THE WIDTH OF THE BARGE?

A.  WELL, THIS PANEL IS 30 FEET WIDE.  THE BARGE IS 35 FEET WIDE.  SO THE SCRATCHES COVER A LARGE PORTION OF THE BOTTOM BUT NOT THE ENTIRE BOTTOM.

Q.  DR. CUSHING, I'M SHOWING YOU SOME FIGURES YOU PREPARED ABOUT HOW THE BARGE ENTERED THE LOWER NINTH WARD.  FROM WHAT PERSPECTIVE IS THIS TAKEN?

A.  THIS IS AN AERIAL PICTURE.

Q.  AND WHAT ARE WE LOOKING AT?

A.  WELL, WE'RE LOOKING AT THE CANAL SIDE AT THE TOP OF THE PICTURE.  THE BARGE WOULD HAVE BEEN ORIENTED IN AN UP AND DOWN OR AN ATTITUDE MOVING PERPENDICULAR TO THE WIND.  ACTUALLY, THE WIND WAS COMING FROM THE MORE WESTERLY DIRECTION, WHICH MEANS THE BARGE WOULD HAVE BEEN AT AN ANGLE WITH THE PICTURE, AND IT WOULD

**2120**

HAVE BEEN MOVING IN WITH THE WIND FROM THE WESTERLY DIRECTION.

THE BARGE WOULD HAVE CROSSED -- THE LEADING EDGE OF THE BARGE WOULD HAVE CROSSED THE ALREADY FALLEN FLOODWALL WITHOUT TOUCHING IT; BUT, WHEN IT FINALLY CONTACTED THE SOUTH END OF THE SOUTH BREACH, THEN IT COULDN'T MOVE ANY FURTHER SOUTH, AND IT WOULD HAVE MOVED DIRECTLY INWARD, OR IN AN EASTERLY DIRECTION, INTO THE LOWER NINTH WARD GROUNDING ON THE FALLEN FLOODWALL. AND, THEREFORE, THE STRIATIONS WERE FORMED AS IT CROSSED INTO THE LOWER NINTH WARD.

WHEN THE BARGE HAD FULLY ENTERED THE LOWER NINTH WARD, THEN THE FLOODWALL -- THE FLOODWATERS, WHICH WERE AT THAT POINT NEARLY THE LEVEL OF THE WATER ON THE -- ON THE CANAL, WOULD HAVE BEEN FLOWING MORE -- AND I DON'T WANT TO USE THE WORD GENTLY, BUT AT A LESSER VELOCITY CARRYING THE BARGE TO A POINT WHERE IT STOPPED.

AND THE WATERS WERE FANNING OUT AT THIS POINT AS THEY WERE ENTERING THE LOWER NINTH WARD.  THE BARGE WOULD HAVE PIVOTED AROUND THE LEADING EDGE, SO IT WOULD HAVE PIVOTED INTO THIS POSITION AND THEN MOVED SLIGHTLY SOUTHWARD TO ITS FINAL RESTING POINT.

THE COURT:  FOR THE RECORD, IS THIS POST-KATRINA, PRE-RITA?

THE WITNESS:  YES, SIR.  YOU CAN TELL THIS, OBVIOUSLY, BECAUSE ON JOURDAN AVENUE, YOU HAVE THIS FAMOUS SCHOOL BUS THAT SITS ACROSS JOURDAN AVENUE.  AND THE BARGE WENT -- THE

## 2121

1   LOWER NINTH WARD REFLOODED AFTER RITA, THEN THE BARGE SLID
2   SIDEWAYS TO COME INTO CONTACT WITH YELLOW SCHOOL BUS.
3         THE COURT:  THANK YOU, SIR.
4              EXAMINATION
5   BY MR. ALDOCK:
6   Q.  COULD THE BARGE, DR. CUSHING, HAVE ENTERED THE
7   LOWER NINTH WARD, IN THIS MANNER THAT WE'VE JUST SEEN, IF THE
8   FLOODWALL HAD NOT ALREADY FAILED?
9   A.  NO, SIR.
10  Q.  WHY NOT?
11  A.  WELL, IF THE FLOODWALL HAD NOT FAILED, YOU WOULD HAVE HAD
12  MARKINGS ON THE ENTIRE BARGE, NUMBER ONE; NUMBER TWO, THE
13  INRUSHING WATER, IF IT HAD CAUSED THIS FAILURE, WOULD HAVE DRIVEN
14  THE BARGE DEEPER INTO THE LOWER NINTH WARD.
15  Q.  DR. CUSHING, YOU WERE HERE FOR THE TESTIMONY OF
16  MR. BARTLETT; WERE YOU NOT?
17  A.  YES, I WAS.
18  Q.  SO YOU'RE FAMILIAR WITH MR. BARTLETT'S CONCLUSION THAT THE
19  BARGE MUST HAVE IMPACTED THE FLOODWALL WHILE IT WAS STILL
20  STANDING, RIGHT?
21  A.  YES, SIR.
22  Q.  DO YOU AGREE WITH THAT?
23  A.  NO, SIR, I DON'T.
24  Q.  USING THIS DIAGRAM, TELL US -- WHAT IS THIS DIAGRAM, FIRST?
25  A.  WELL, THIS -- THIS DIAGRAM IS A DIAGRAM SHOWING THE LAST

## 2122

1   BACKGROUND PANEL, THE PANEL THAT WAS IN THE BACKGROUND THAT HAS
2   THE BENT REBAR.
3         AND MY UNDERSTANDING OF MR. BARTLETT'S TESTIMONY WAS
4   THAT HE BELIEVES THAT THE BARGE ACTUALLY STRUCK THE CAP, BUT HE
5   SAYS THAT THE WALL HAD NOT BEEN KNOCKED OVER WHEN HE BELIEVES THE
6   BARGE STRUCK THE CAP.  AND HE CONCLUDES THIS BECAUSE THESE BENDS
7   ARE ALL PERPENDICULAR TO THE LINE OF THE PANEL.  AND THEREFORE,
8   THE PANEL AND THE WALL WOULD HAVE BEEN PARALLEL TO THE ENTIRE
9   FLOODWALL, AND THEREFORE, THE BARGE MOVED STRAIGHT IN.
10  Q.  WHAT'S WRONG WITH THAT?
11  A.  WHAT'S WRONG WITH THAT IS THAT IN KNOCKING OFF A CAP,
12  REGARDLESS OF WHETHER THIS PORTION OF THE FLOODWALL IS PARALLEL
13  TO THE FREESTANDING FLOODWALL OR HAS BEEN BENT INWARD OR KNOCKED
14  INWARD SLIGHTLY, THE CAP, WHEN IT BREAKS OFF, IS GOING TO BEND
15  ALL OF THESE REBARS IN A MANNER PERPENDICULAR TO THE FLOODWALL
16  REGARDLESS OF THE FLOODWALL'S ATTITUDE.  THAT'S BECAUSE THE CAP
17  CAN'T BREAK OFF DIAGONALLY, LIKE THAT (INDICATING), BUT, RATHER,
18  IT HAS TO BREAK OFF PERPENDICULAR TO THE REBAR.
19  Q.  SO IS MR. BARTLETT'S OBSERVATION EQUALLY CONSISTENT WITH THE
20  BARGE HITTING THE WALL THAT HAD ALREADY FALLEN?
21  A.  I'M SORRY.  REPEAT THE QUESTION, PLEASE.
22  Q.  THEREFORE, IS MR. BARTLETT'S OBSERVATIONS, ARE THEY EQUALLY
23  CONSISTENT WITH YOUR THEORY THAT THE BARGE HIT THE FLOODWALL
24  AFTER IT HAD FALLEN?
25  A.  YES.  I BELIEVE THAT MR. BARTLETT SAYS THAT HE BELIEVES THAT

## 2123

1   THE BARGE HIT THE CAP AND KNOCKED THE CAP OFF.  I'M IN AGREEMENT
2   WITH THAT.  HE SAYS THAT IN HIS TESTIMONY, THAT THIS WAS THE
3   WEAKEST PORTION AND THAT THE FLOODWALL -- OR RATHER, THE CAP
4   WOULD FAIL BUT THE FLOODWALL WOULD NOT FAIL.
5   Q.  DR. CUSHING, ARE YOU FAMILIAR WITH MR. PAZOS'S CONCLUSION
6   THAT THE BARGE ENTERED THE LOWER NINTH WARD BEFORE THE
7   LOWER NINTH WARD WAS FLOODED?
8   A.  YES, SIR.
9   Q.  DO YOU AGREE WITH THAT CONCLUSION?
10  A.  NO, SIR.
11  Q.  HAVE YOU PREPARED ANY FIGURES BASED ON MR. PAZOS'S THEORY TO
12  DESCRIBE WHY YOU DISAGREE WITH MR. PAZOS?
13  A.  YES, SIR.
14  Q.  IS THIS THE FIRST OF A SERIES OF SLIDES THAT YOU'RE
15  REFERRING TO?
16  A.  YES, SIR.  THIS IS A GRAPHIC.  THE FIRST, MR. PAZOS BELIEVES
17  THAT THE BARGE LANDED ON TOP OF THE FLOODWALL BECAUSE OF THE
18  WAVES IN THE CANAL.  AND I CERTAINLY DON'T BELIEVE THAT THE WAVES
19  WERE SUFFICIENT TO LIFT THE BARGE AND PLACE IT ON TOP OF THE
20  FLOODWALL.
21        SECONDLY, HE BELIEVES THAT THE WAVES WERE SIGNIFICANT
22  AND THAT THE BARGE DESTROYED THE FLOODWALL, AND THEREFORE, IF THE
23  BARGE HAD DESTROYED THE FLOODWALL, IT WOULD HAVE BEEN CARRIED
24  INTO THE LOWER NINTH WARD WITH THE INRUSHING WATER.
25        AS IT WOULD BE MOVING IN, IT WOULD HAVE, OBVIOUSLY,

## 2124

1   CAUSED DAMAGE TO THE ENTIRE LENGTH OF THE BOTTOM AS IT MOVED IN,
2   BUT MORE SIGNIFICANTLY, WE CAN LOOK AT THE NEXT SLIDE, THE BARGE
3   WOULD HAVE PIVOTED ON THE FLOODWALL.  THERE WOULD HAVE BEEN
4   EXTENSIVE DAMAGE ON THE BOTTOM OF THE BARGE WITH THE FULL WEIGHT
5   OF THE BARGE ON ONE POINT.  THERE IS NO SUCH DAMAGE EVIDENT.
6         AND THE OTHER THING IS THE BARGE WOULD THEN HAVE
7   GROUNDED IN THE LOWER NINTH WARD WITH SEVERE GROUNDING DAMAGE AT
8   THE FORWARD END BECAUSE THE LOWER NINTH WARD WOULD NOT YET HAVE
9   BEEN FLOODED.  AND THERE IS NO EVIDENCE TO SHOW THAT THIS WAS
10  POSSIBLE.
11  Q.  DID YOU SEE ANY EVIDENCE OF THE BARGE GROUNDING ON THE BARGE
12  OR ON THE LAND SIDE OF THE CANAL?
13  A.  THERE WAS NO EVIDENCE.  FURTHERMORE, IF IT HAD ENTERED THE
14  LOWER NINTH WARD IN THIS MANNER, THE REBAR THAT WE SEE AT THE
15  SOUTH END OF THE SOUTH BREACH WOULD HAVE BEEN ANGLED DOWNWARD
16  INSTEAD OF HORIZONTAL.
17  Q.  WHAT ARE WE LOOKING AT IN THIS DEMONSTRATIVE FIGURE?
18  A.  THIS IS A GRAPHIC SHOWING THE BARGE MOVING OVER THE PANEL
19  AND THE BACKGROUND CAUSING THE REBAR TO BEND A HORIZONTAL MANNER,
20  THAT IS, HORIZONTAL TO THE WATER LEVEL.
21  Q.  WHAT ARE THOSE LITTLE STUBS OF REBAR IN THE FOREGROUND?
22  WHAT IS THAT?
23  A.  THIS IS A PORTION OF THE ALREADY FALLEN FLOODWALL WHERE ONLY
24  A PORTION OF THE CAP WAS KNOCKED OFF.
25  Q.  AND WHAT DOES THE REBAR SHOW US?

10  (Pages 2121 to 2124)

2125

1  A.  WELL, IT'S NOT BENT.  OBVIOUSLY, IT'S PERPENDICULAR TO THE
2  PANEL.
3  Q.  DR. CUSHING, OTHER THAN THE SOUTHERN SECTION OF THE SOUTHERN
4  BREACH, DID YOU FIND ANY EVIDENCE OF THE BARGE IMPACTING THE
5  FLOODWALL?
6  A.  NO, SIR.
7  Q.  DR. CUSHING, HAVE OTHER INVESTIGATIONS FOUND THAT THE BARGE
8  ENTERED THE LOWER NINTH WARD AFTER THE FLOODWALL HAD ALREADY
9  FAILED?
10  A.  YES, SIR.  TEAM LOUISIANA, FOR EXAMPLE, SAID THAT WE FOUND
11  THAT WHILE THE BARGE HAD INDEED STRUCK THE I-WALL AT THE SOUTH
12  END OF THE BREACH, THE ANGLE OF THE STEEL REINFORCING BARS ON THE
13  CONCRETE CAP EXPOSED BY THE COLLISION SUGGESTED THAT A SECTION OF
14  THE WALL STRUCK WAS ALREADY LEANING, HAVING FAILED EARLIER.  THE
15  BARGE CLIPPED THE END OF THE ALREADY FORMED BREACH AS IT WAS
16  SUCKED THROUGH.
17  Q.  DR. CUSHING, ARE YOU FAMILIAR WITH MR. PAZOS'S THEORY THAT
18  STEEP, CHOPPY WAVES IN THE CANAL CAUSED THE BARGE TO PITCH AND
19  HEAVE, WHICH IN TURN CAUSED THE BARGE TO REST ON TOP OF THE
20  FLOODWALL?
21  A.  YES, SIR.
22  Q.  DO YOU HAVE AN OPINION AS TO WHETHER THIS THEORY IS
23  SCIENTIFICALLY POSSIBLE?
24  A.  IT'S SCIENTIFICALLY IMPOSSIBLE.
25  Q.  WHY?

2126

1  A.  BECAUSE WE CALCULATED WHAT THE WAVES WOULD BE IN THE CANAL,
2  AND THOSE WAVES WERE ON THE ORDER OF 1 TO 3 FEET.  AND IN ORDER
3  FOR YOU TO HAVE ANY SIGNIFICANT PITCHING OF A VESSEL, YOU NEED
4  WAVES THAT ARE AT LEAST HALF THE LENGTH OF THE BARGE, IN OTHER
5  WORDS, 100-FOOT LONG WAVE LENGTHS, AND THESE 1-TO-3-FOOT HIGH
6  WAVES WOULDN'T CAUSE PITCHING MORE THAN 2 OR 3 INCHES AT THE
7  MOST.
8  Q.  AND YOU CALCULATED THAT 2-TO-3-INCH PITCHING?
9  A.  THAT WAS OUR CALCULATION, YES, SIR.
10  Q.  DR. CUSHING, I WOULD LIKE YOU TO FOCUS ON THE BARGE'S
11  LOCATION IN THIS PICTURE.  DO YOU KNOW WHEN THIS WAS TAKEN?
12  A.  YES, SIR.  THIS WAS BEFORE RITA BUT AFTER KATRINA, AS
13  HIS HONOR JUST ASKED.
14  Q.  WHAT DOES IT TELL YOU?  WHAT'S THE POSITION?
15  A.  WELL, THE POSITION IS IN A NORTH-SOUTH POSITION.  IT LIES
16  AGAINST THREE HOUSES ON JOURDAN AVENUE.  BUT IT SHOWS THAT THE
17  BARGE, WHEN IT ENTERED, WASN'T MOVING AT A GREAT VELOCITY.
18  Q.  AND DOES IT FURTHER SHOW THAT IT COULDN'T HAVE COME FROM THE
19  BOW, AS YOU TESTIFIED EARLIER, BUT HAD -- AND IT COULDN'T GET
20  THROUGH ALL OF THOSE TREES, WHATEVER?
21  A.  YES, SIR.  IT SHOWS THAT THE ONLY PATH WOULD HAVE BEEN OVER
22  THE FALLEN WALL AND REBAR.
23  Q.  DID YOU FIND ANY EVIDENCE IN YOUR FORENSIC EXAMINATION
24  INDICATING WHEN THE BARGE ENTERED THE LOWER NINTH WARD?  WHAT'S
25  THIS?

2127

1  A.  THIS IS A PICTURE OF WHAT WE'RE CALLING THE "BOW" OF THE
2  BARGE, LOOKING AS THE BOW IS FACING SOUTHWARD AND THE PICTURE IS
3  LOOKING NORTHWARD, AND WE SEE THAT THE BARGE HAS ENTERED THE
4  LOWER NINTH WARD AND RIDDEN ACROSS TELEPHONE LINES, AND THEN, AS
5  THE WATER DRAINED, SETTLED ON TOP OF THE TELEPHONE LINES AS IT
6  MOVED A NORTHERLY DIRECTION.
7  Q.  WHAT DOES THAT TELL YOU?
8  A.  IT SHOWS THAT THE BARGE WAS NOT MOVING AT GREAT SPEED, AND
9  IT SHOWS THAT THE BARGE ENTERED THE LOWER NINTH WARD WHEN THE
10  WATER WAS ALREADY VERY HIGH AND THE LOWER NINTH WARD WAS ALREADY
11  FLOODED.
12  Q.  WHAT ARE WE LOOKING AT HERE?
13  A.  THIS IS THE BARGE AS IT CAME TO REST AGAINST ONE OF THE
14  HOUSES ON JOURDAN AVENUE.
15  Q.  WHAT DOES THIS TELL YOU ABOUT YOUR CONCLUSION ABOUT THE
16  WATER LEVEL WHEN THE BARGE ENTERED THE LOWER NINTH WARD?
17  A.  WELL, THIS SHOWS THAT THE BARGE, AT THIS POINT, DIDN'T HAVE
18  ENOUGH ENERGY TO KNOCK THE HOUSE OVER OR IT CAME TO ITS STOP
19  AGAINST THE HOUSE.
20  Q.  AND ABOUT THE LEVELS?
21  A.  AND THE WATER WOULD HAVE BEEN HIGH IN THE LOWER NINTH WARD,
22  AND THE FLOW RATE OF THE WATER WOULD HAVE BEEN MUCH LOWER THAN
23  WHAT OCCURRED WHEN THE BARGE -- WHEN THE FLOODWALL INITIALLY
24  FAILS.
25  Q.  SO WHAT DOES THE HIGH-WATER CONCLUSION IN THE

2128

1  LOWER NINTH WARD TELL YOU ABOUT THE TIMING?
2  A.  THAT THE BARGE ENTERED THE LOWER NINTH WARD WHEN THE
3  LOWER NINTH WARD WAS ALREADY FLOODED.
4  Q.  DR. CUSHING, I'M PUTTING ON YOUR DIAGRAM THE WIND DIRECTIONS
5  WE'VE SEEN BEFORE IN THE CANAL.  WHAT CONCLUSIONS DO YOU DRAW
6  WITH RESPECT TO THE TIMING OF THE BARGE ENTERING THE CANAL?
7  A.  WELL, THE BARGE COULD NOT HAVE LEFT THE POCKET UNTIL SOME
8  TIME AFTER 9 O'CLOCK.
9  Q.  AND THAT'S BECAUSE OF THE WIND DIRECTIONS?
10  A.  YES.  THE WIND DIRECTION, UP UNTIL 7:00, WOULD HAVE HAD A
11  WESTERLY COMPONENT, STILL BLOWING FROM THE EAST, HOLDING THE
12  BARGE -- SORRY, AN EASTERLY COMPONENT, STILL BLOWING THE BARGE TO
13  THE WEST AGAINST THE WEST SIDE OF THE CANAL.
14      BY 7:30, THE WIND WOULD HAVE BEEN BLOWING MORE PARALLEL
15  TO THE CANAL, AND IT ISN'T UNTIL AFTER 8 O'CLOCK THAT IT STARTS
16  TO TAKE A MORE WESTERLY COMPONENT.  BUT IF THE BARGE HAD BEEN
17  LOOSE AT ANY OF THESE TIMES, THAT IS, IN THE MORNING UP UNTIL,
18  SAY, 8 O'CLOCK OR 9 O'CLOCK, THE BARGE WOULD HAVE BEEN BLOWN ALSO
19  IN A SOUTHERLY DIRECTION AND ENDED UP IN THE AREA AT THE SOUTH
20  END OF THE POCKET BY THE NAMASCO TERMINAL.
21  Q.  ALL RIGHT.  LET'S TALK ABOUT THE NAMASCO TERMINAL.  WHAT ARE
22  WE LOOKING AT HERE?
23  A.  THIS IS THE GANTRY, THAT IS A GANTRY CRANE THAT EXTENDS IN A
24  NORTHERLY DIRECTION FROM THE WHARF AT THE NAMASCO TERMINAL.  THE
25  GANTRY CRANE WAS ENCLOSED BY A CORRUGATED SHEET-METAL HOUSING.

11 (Pages 2125 to 2128)

2129

1  THE WHOLE AREA IS PRETTY DERELICT. BUT I WAS ABLE TO EXAMINE THE
2  THAT NAMASCO GANTRY HOUSING, WHICH IS SHOWN IN THE NORMAL
3  CONDITION ON THE LEFT, AFTER THE HURRICANE KATRINA AND RITA.
4       WE SEE ON THE RIGHT-HAND PICTURE A GRAPHIC SUPERIMPOSED
5  ON THE TERMINAL, GANTRY HOUSING, SHOWING THE BARGE AT 6 O'CLOCK
6  IN THE MORNING, AND THEREFORE, THE WATER WOULD HAVE BEEN RISING
7  SIX, SEVEN, EIGHT, NINE, THE BARGE WOULD HAVE BEEN HIGHER THAN
8  THIS, BUT AT 6 O'CLOCK IN THE MORNING, WHEN I DON'T BELIEVE THE
9  BARGE COULD HAVE LEFT THIS AREA, THE BARGE, IF IT HAD BEEN IN
10  THIS AREA, WOULD HAVE STRUCK THIS CORRUGATED HOUSING. I EXAMINED
11  THIS CAREFULLY AND THERE WAS NO DAMAGE INDICATING THAT THE BARGE
12  HAD STRUCK THE GANTRY HOUSING.
13  Q.  JUST GO BACK A MINUTE. SHOW US THE GANTRY ON THIS DIAGRAM.
14  WHAT WERE WE JUST LOOKING AT?
15  A.  THE GANTRY, THERE IS AN EAST-WEST WHARF FACE IN THE POCKET,
16  AND THERE IS A PROJECTION THAT SHOWS THE GANTRY PROJECTING OUT
17  INTO THE POCKET.
18       THE COURT:  WHY WOULDN'T THERE HAVE BEEN DAMAGE TO THE
19  GANTRY SUBSEQUENT TO THAT, IN OTHER WORDS, IF THE BARGE LEFT AT
20  8:00?
21       THE WITNESS:  IF THE BARGE HAD LEFT AT 8 O'CLOCK, THE
22  BARGE WOULD HAVE BEEN BLOWN INTO THIS POSITION (INDICATING). TO
23  GET INTO THE CANAL, IT WOULD HAVE HAD TO HAVE HIT THE GANTRY.
24       THE COURT:  SO WHAT TIME -- THEN AT 10:00, IT WOULDN'T
25  HAVE HIT THE GAN-- OR AT 9:30 IT WOULDN'T HAVE --

2130

1       THE WITNESS:  EVEN ANYTIME, I BELIEVE, AFTER 9 O'CLOCK,
2  IT COULD HAVE BEEN THEN BLOWN CLEAR. 9 O'CLOCK IS THE FIRST TIME
3  THAT IT WOULD HAVE CLEARED THE CORNER HERE.
4       THE COURT:  ALL RIGHT.
5       THE WITNESS:  AT 10 O'CLOCK IT CERTAINLY WOULD HAVE
6  CLEARED.
7            EXAMINATION
8  BY MR. ALDOCK:
9  Q.  WHAT ARE WE LOOKING AT HERE, DR. CUSHING?
10  A.  THIS IS A PICTURE OF THE FIBERGLASS PORTABLE COVERS THAT ARE
11  ON TOP OF THE BARGE. AND I HAD CLIMBED ON THE BARGE AND EXAMINED
12  ALL OF THESE COVERS CAREFULLY AND I COULDN'T FIND ANY DAMAGE THAT
13  WOULD INDICATE THAT THE COVERS HAD STRUCK THAT GANTRY EITHER, SO
14  THERE WAS NO DAMAGE EITHER ON THE GANTRY HOUSING OR THE COVERS
15  INDICATING THAT IT HAD BEEN IN THAT POCKET AND HIT THOSE COVERS.
16  Q.  DR. CUSHING, TO BE COMPLETE HERE, IS YOUR OPINION THAT THE
17  BARGE DID NOT CAUSE THE BREACHES DEPEND IN ANY WAY ON THE TIME
18  THE BARGE BROKE AWAY FROM THE TERMINAL?
19  A.  NO, SIR.
20  Q.  IF THE BARGE HAD BROKEN AWAY SOMEHOW ON SUNDAY, AUGUST 28TH,
21  FOR ANY REASON, WOULD THAT CHANGE YOUR OPINION THAT THE BARGE DID
22  NOT CAUSE THE BREACHES?
23  A.  NO, SIR.
24  Q.  DOES THE TIMING OF THE BARGE BREAKAWAY MATTER WITH REGARDS
25  TO YOUR OPINION THAT THE BARGE WAS NOT PRESENT AT THE NORTH

2131

1  BREACH?
2  A.  NO, SIR.
3  Q.  DOES THE TIMING OF THE BREAKAWAY MATTER WITH REGARDS TO YOUR
4  OPINION THAT THE BARGE WAS NOT PRESENT AT THE SOUTH BREACH BEFORE
5  IT OCCURRED?
6  A.  NO, SIR.
7  Q.  YOU'VE TOLD THE COURT THAT THE BARGE IMPACTS THE WALL. IF
8  IT DOES, IT CRACKS THE CAP AND DOES NOT FAIL THE FLOODWALL. DOES
9  THE TIMING OF THE BARGE BREAKAWAY AFFECT THAT CONCLUSION IN ANY
10  WAY?
11  A.  NO, SIR.
12       MR. ALDOCK:  YOUR HONOR, AT THIS TIME, DR. CUSHING HAS
13  PREPARED AN ANIMATION THAT SHOWS -- I THINK IT SUMMARIZES IN A
14  VERY INTERESTING AND, I THINK, USEFUL WAY FOR THE COURT THE
15  SEQUENCE OF EVENTS ON THE MORNING OF AUGUST 29TH. IT DOES NOT
16  DEPICT THE GEOTECHNICAL TESTIMONY THAT YOU'LL HEAR IN GREAT
17  DETAIL FROM DRS. BEA AND BAKEER, BUT I THINK WITH REGARD TO THE
18  BARGE TRANSIT, I THINK IT'S VERY USEFUL.
19       IT'S ABOUT TEN MINUTES, AND I WOULD NEED TO GIVE
20  DR. CUSHING THE CONTROLS SO HE COULD STOP IT, IF I MIGHT.
21       THE COURT:  OKAY.
22       THE WITNESS:  ON AUGUST 25, 2005, ONE OF THE MOST
23  POWERFUL HURRICANES EVER TO STRIKE AMERICA FORMED OUT IN THE
24  ATLANTIC. THE HURRICANE MOVED WESTWARD, CROSSING FLORIDA, AND
25  WHEN IT REENTERED THE GULF OF MEXICO IT INTENSIFIED, DRAWING

2132

1  STRENGTH FROM THE WARM WATERS IN THE GULF OF MEXICO.
2       BY AUGUST 27TH AND EARLY ON THE 28TH, THE HURRICANE
3  MOVED TO THE NORTHWEST AND THEN TOOK A NORTHERLY COURSE MOVING
4  DIRECTLY AT THE CITY OF NEW ORLEANS. WE SEE IN THE PICTURE THE
5  CHARACTERISTIC COUNTERCLOCKWISE WINDS OF THE HURRICANE.
6       AS THE HURRICANE MOVED NORTH, IT PASSED TO THE EAST
7  OF NEW ORLEANS, AND IN DOING SO, ITS CHARACTERISTIC WINDS CHANGED
8  DIRECTION FROM A NORTHEASTERLY TO A NORTHERLY AND EVENTUALLY TO A
9  NORTHWESTERLY DIRECTION.
10       HERE WE SEE THE INDUSTRIAL CANAL IN THE
11  LOWER NINTH WARD. AND WE SEE UP AT THE UPPER RIGHT-HAND CORNER
12  OF THE PICTURE THE LAFARGE NORTH AMERICA TERMINAL. HERE THE
13  CANAL WOULD BE LOOKING NORTHWARD FROM THE NORTH CLAIBORNE AVENUE
14  BRIDGE.
15       HERE WE HAVE A BETTER PICTURE OF THE NAMASCO
16  TERMINAL AND GANTRY. WE SEE THE FIVE LOADED BARGES AND THE TWO
17  LOADED AND EMPTY BARGES TO THE SOUTH OF THEM AT THE NAMASCO
18  TERMINAL.
19       AT 4 O'CLOCK IN THE MORNING ON THE 29TH, THE WINDS
20  WERE BLOWING FROM A NORTHEASTERLY DIRECTION TO THE SOUTHWEST, AND
21  AWAY FROM THE LOWER NINTH WARD.
22       THIS IS A VIEW OF THE NORTHERN END OF THE
23  FLOODWALL, AND WE SEE A CUTAWAY THROUGH THE FLOODWALL WITH THE
24  1980'S-BUILT PORTION OF THE FLOODWALL AND THE 1960'S PORTION OF
25  THE FLOODWALL TO THE SOUTH OF IT.

**2133**

1  THE NEWER FLOODWALL, BUILT IN CONNECTION WITH THE
2  RECONSTRUCTION OF THE FLORIDA AVENUE BRIDGE, HAS 10 FEET OF
3  CONCRETE AT THE TOP, BUILT TO A HIGHER LEVEL, AND 31 FEET OF
4  SHEET PILING BELOW.  ON THE SOUTHERN PORTION, WE SEE 8 FEET OF
5  CONCRETE ATTACHED TO AND HAVING EMBEDDED INTO IT THE SHEET PILING
6  EXTENDING SOME 15 FEET BELOW THE CONCRETE PORTION.
7  HERE WE SEE THE REBAR IN THE CAP AND THE CONNECTION
8  TO THE -- BETWEEN THE TWO FLOODWALLS.
9  HERE WE SEE THE CONCRETE FENCE PROTECTING THE
10  FLOODWALL.  AND A SECTION THROUGH THE FLOODWALL SHOWING THE
11  DIFFERENCE IN CONSTRUCTION OF THE TWO FLOODWALLS.
12  THIS IS A SECTION THROUGH THE FLOODWALL SHOWING THE
13  WATER AND THE HYDROSTATIC LOAD ON THE FLOODWALL, AND THE
14  FLOODWALL ACTUALLY FORMING A GAP THAT PERMITS THE PRESSURE FROM
15  THE WATER TO EXERT ITS FORCE ALL THE WAY DOWN THE FLOODWALL.
16  IN THE MORNING, THAT FLOODWALL COLLAPSED AT THE
17  NORTH BREACH WITH THE SHEET PILE TUMBLING OVER 270 DEGREES, AND
18  THEN THE WATER RUSHED IN TO THE LOWER NINTH WARD.
19  BY 5 O'CLOCK, WITH THE HURRICANE HAVING PASSED
20  NEW ORLEANS, THE WIND STARTED TO BACK AROUND TO MORE FROM THE
21  NORTH.
22  BY 5:30 IT STILL WAS BLOWING FROM THE NORTHEAST,
23  HOLDING THE BARGES IN THE POCKET.  THE WIND CONTINUED TO BACK
24  AROUND MORE FROM THE NORTH AS THE HURRICANE, WHICH HAD MADE
25  LANDFALL AT 6 O'CLOCK, MOVED NORTHWARD.

**2134**

1  AT THIS POINT THE HURRICANE WAS PASSING NEW ORLEANS
2  TO THE EAST AND THE WIND ASSUMED A DIRECTION PARALLEL BY 7:30
3  WITH THE CANAL.
4  HERE WE SEE THE SOUTHERN BREACH AND THE
5  CONSTRUCTION AT THE SOUTHERN BREACH.  AND AGAIN, WE SEE THE
6  SECTION THROUGH THE FLOODWALL WITH OVERTOPPING OCCURRING AND IN
7  THE PROCESS SCOURING ON THE INSHORE SIDE OF THE FLOODWALL.
8  AS THE WATER WAS RISING IN THE CANAL, WATER WOULD
9  NOT ONLY HAVE BEEN OVERTOPPING BUT MOVING BETWEEN CONSTRUCTION
10  JOINTS FORMING THIS TRENCH THAT WE'VE SEEN PICTURES OF.
11  WHEN THE TRENCH CAUSED A LOSS OF SUPPORT ON THE
12  INSHORE SIDE AND THE OTHER FORCES ON THE FLOODWALL CAUSED THE
13  FLOODWALL TO LEAN AND MORE WATER TO FLOW OVER THE ANGLED
14  FLOODWALL, THEN CONSIDERABLE SCOURING WOULD HAVE BEEN TAKING
15  PLACE AT THIS.  AT THIS POINT THE LOSS OF STABILITY OR THE LOSS
16  OF SUPPORT FOR THE FLOODWALL WOULD HAVE GREATLY CONTRIBUTED TO
17  THE FLOODWALL'S FAILURE.
18  THE OVERTOPPING WAS OCCURRING AT THE LOWEST PORTION
19  FIRST, BUT IT, OBVIOUSLY, SPREAD ALONG THE FLOODWALL AREA.  THE
20  WIND WAS BLOWING AT THIS TIME IN A PARALLEL DIRECTION, BUT WHERE
21  THE WALL FAILED FIRST IN THE LOWER BREACH WAS NEAR NORTH
22  JOHNSON STREET, CAUSING A BIG BOW IN THE ALREADY FALLEN -- IN THE
23  FALLEN FLOODWALL.
24  AND HERE WE SEE THE PHOTOGRAPH OF THE ACTUAL
25  FLOODWALL.

**2135**

1  LET US LOOK AT THE SOUTH END OF THE SOUTH BREACH.
2  HERE WE SEE THE OVERTOPPING OCCURRING AND THE SCOURING OCCURRING
3  AND THE LOSS OF SUPPORT.  WHEN THE FLOODWALL FAILED AT THE
4  INITIATION POINT, IT WOULD HAVE DRAGGED DOWN THE FLOODWALL ALL
5  THE WAY TO THE SOUTH END OF THE SOUTH BREACH.
6  HERE WE SEE THE FALLEN PANELS AS WE HAVE DISCUSSED
7  EARLIER, THE FOREGROUND PANEL AND THE BACKGROUND PANEL.
8  BY 7 O'CLOCK, THE WINDS HAD BACKED AROUND TO A
9  POINT WHERE THEY WERE STILL HAVING A SLIGHTLY EASTERLY COMPONENT,
10  BUT BY 7:30, IT WOULD HAVE BEEN BLOWING PARALLEL TO THE
11  FLOODWALL.
12  BY 8 O'CLOCK, THE WINDS HAD NOW ASSUMED A PORTION
13  OF THE WESTERLY WIND TO IT, STILL BLOWING FROM THE NORTH.
14  AND BY 8:30, IT WAS BLOWING IN THE DIRECTION SHOWN.
15  IF THE BARGE HAD BEEN LOOSE, IT WOULD HAVE BEEN IN THIS AREA.
16  BY 9 O'CLOCK, THE WINDS HAD BACKED AROUND TO THE
17  WEST, TO A NORTHWESTERLY DIRECTION SUCH THAT THE WIND WOULD HAVE
18  BEEN ACTING ON THE LIGHT BARGE, AND IF IT HAD BROKEN FREE AT THIS
19  TIME, IT WOULD HAVE THEN BEEN BLOWING WITH THE WIND IN A MANNER
20  THAT WOULD HAVE PERMITTED IT TO ESCAPE FROM THIS POCKET AREA.
21  SOME SOMETIME AFTER 9 O'CLOCK, WITH THE WINDS
22  BLOWING FROM THE NORTHWEST, THE BARGE COULD HAVE THEN ENTERED THE
23  LOWER NINTH -- I'M SORRY, ENTERED THE CANAL.
24  THE BARGE, BEING SYMMETRICAL FORE AND AFT, ASSUMES
25  A NATURAL ANGLE OF REPOSE PERPENDICULAR TO THE WIND AND WILL

**2136**

1  TRAVEL WITH THE WIND IN A PERPENDICULAR FASHION.  IN DOING SO, AS
2  WE SEE IN THIS PICTURE AFTER 9 O'CLOCK, IT WOULD HAVE BEEN
3  POSSIBLE FOR THE BARGE TO GET OUT INTO THE CANAL AND STILL CLEAR
4  THE GANTRY AND THE CORNER OF THE WHARF AT THE NAMASCO TERMINAL.
5  AND HERE WE SEE THE BARGE MOVING ACROSS THE CANAL.
6  WE CALCULATED THE SPEED OF THE BARGE EARLIER FOR PURPOSES OF
7  DETERMINING THE STRENGTH OF THE FLOODWALL AND WHETHER THE BARGE
8  COULD BREAK THE CAP.  WE DID THAT IN A HYPOTHETICAL AT VERY HIGH
9  WIND, BUT BY 9 O'CLOCK IN THE AFTERNOON, THE WINDS --
10  THE COURT:  MORNING.
11  THE WITNESS:  SORRY, MORNING.  AT 9 O'CLOCK IN THE
12  MORNING, THE WINDS HAD LESSENED, THEY WERE STILL STRONG, BUT THEY
13  HAD LESSENED, SO THE BARGE WOULD HAVE BEEN MOVING AT A SPEED
14  OF -- SLOWER THAN 5.27 MILES AN HOUR.  IT WOULD HAVE BEEN MOVING
15  AT A SPEED MORE ON THE ORDER OF A SLOW WALK ACROSS THE 3,000 FEET
16  TO THE SOUTH BREACH.
17  THE ANIMATION HAS THE BARGE MOVING A LITTLE FASTER
18  THAN IT WOULD HAVE BEEN MOVING, BUT IT GIVES YOU AN IDEA OF THE
19  FACT THAT THE BARGE IS MOVING IN A DIAGONAL MANNER ACROSS THE
20  CANAL.  AND THAT'S IMPORTANT, BECAUSE AS IT APPROACHES THE
21  ALREADY-FALLEN FLOODWALL IN THE SOUTH BREACH, THE LEADING EDGE OF
22  THE BARGE CROSSES THE FLOODWALL WITHOUT TOUCHING THE FLOODWALL
23  AND CONTINUES TO MOVE IN A SOUTHWESTERLY DIRECTION UNTIL IT
24  CONTACTS THE VERY SOUTH END OF THE SOUTH BREACH.
25  AND HERE WE'RE LOOKING UNDERNEATH THE BARGE AS THE

13  (Pages 2133 to 2136)

**2137**

1  BARGE APPROACHES SIDEWAYS THE ALREADY-FALLEN FLOODWALL AND THEN
2  THE LAST PANEL, AS IT KNOCKS THE LAST TWO PANELS OVER, IT COMES
3  INTO CONTACT WITH THE REMAINING PANEL, AND IN DOING SO -- AND WE
4  DON'T SHOW IN THIS ANIMATION -- BUT THE SCRATCHES WOULD HAVE BEEN
5  ALONG THE ENTIRE LENGTH OF THE PANEL, SCRATCHING THE BOTTOM OF
6  THE PANEL ON THE TRAILING EDGE.
7         THIS SHOWS THE BARGE HAVING MOVED INTO THE
8  LOWER NINTH WARD AND COMING TO A STOP AS IT CROSSED
9  JOURDAN AVENUE.  THE FLOODING WATERS, HAVING SPREAD OUT INTO THE
10  LOWER NINTH WARD, WOULD HAVE TAKEN THE TRAILING EDGE OF THE
11  BARGE, TRAILING END OF THE BARGE IN A SOUTHERLY DIRECTION.  THE
12  BARGE WOULD HAVE PIVOTED AROUND A HOUSE ON JOURDAN AVENUE, AND
13  WOULD HAVE ASSUMED A MORE NORTH-SOUTH ATTITUDE WITH THE BOW OF
14  THE BARGE IN A MORE SOUTHERLY DIRECTION.
15         THE WATER WOULD HAVE BEEN HIGH IN THE CANAL AT THIS
16  POINT.  WE SEE THE TELEPHONE POLE THAT HAS APPEARED IN SOME OF
17  THE PICTURES, WITH THE BARGE ASSUMING THE NORTH-SOUTH ATTITUDE AS
18  IT CAME INTO CONTACT WITH TWO OF THE HOUSES ON JOURDAN AVENUE.
19         THE BARGE WOULD HAVE THEN SLID FORWARD AND SLID UP
20  ON THOSE TELEPHONE LINES THAT WE SAW EARLIER IN THE PHOTOGRAPH.
21  AND THIS WOULD HAVE BEEN THE FINAL RESTING POINT AFTER
22  HURRICANE KATRINA.
23         THEN LATER THE WATERS DRAINED FROM THE
24  LOWER NINTH WARD AND, IN DOING SO, BROUGHT THE BARGE TO ITS
25  GROUNDED POSITION AS WE SEE IT HERE.

**2138**

1         THE COURT:  WHAT'S THE NUMBER OF THE ANIMATION?
2         MR. ALDOCK:  I THINK WE WOULD PUT IN ALL OF THE DECK,
3  THE VISUALS FOR DEMONSTRATIVE PURPOSES WITH THE NUMBER THAT WOULD
4  BE THE NEXT NUMBER.
5         THE COURT:  WHAT'S THE NEXT NUMBER?
6         THE DEPUTY CLERK:  349.
7         MR. ALDOCK:  349 WOULD BE THE ENTIRE DECK AND THE
8  ANIMATION.
9         THE COURT:  OKAY.  THANK YOU.
10         (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS,
11  EXHIBIT 349 WAS ENTERED INTO EVIDENCE.)
12         MR. ALDOCK:  AT THIS POINT, YOUR HONOR, I TENDER THE
13  WITNESS.
14         THE COURT:  COUNSEL, PROBABLY WE'LL TAKE A 10-MINUTE
15  RECESS BEFORE YOU START CROSS?
16         MR. KHORRAMI:  ABSOLUTELY, YOUR HONOR.
17         THE COURT:  ALL RIGHT.
18         (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, A BRIEF
19  RECESS WAS TAKEN.)
20         THE DEPUTY CLERK:  ALL RISE.
21         COURT IS IN SESSION.  PLEASE BE SEATED.
22         THE COURT:  YES, SIR.
23         MR. KHORRAMI:  YES, YOUR HONOR.  THANK YOU.  MAY I
24  PROCEED?
25         THE COURT:  YOU MAY PROCEED.

**2139**

1         CROSS-EXAMINATION
2  BY MR. KHORRAMI:
3  Q.  GOOD MORNING, DR. CUSHING.
4  A.  GOOD MORNING, MR. KHORRAMI.
5  Q.  NOW, LET'S TALK ABOUT YOUR QUALIFICATIONS A LITTLE BIT.  YOU
6  ARE NOT A GEOLOGIST, CORRECT?
7  A.  THAT'S CORRECT.
8  Q.  YOU'RE NOT A GEOTECHNICAL EXPERT, CORRECT?
9  A.  THAT'S CORRECT.
10  Q.  YOU'RE NOT A SURVEYOR?
11  A.  NO, SIR -- YES, I'M A MARINE SURVEYOR, BUT I'M NOT A LAND
12  SURVEYOR.
13  Q.  AND FOR THE PURPOSE OF THE FLOODWALLS, THE SURVEY THAT WAS
14  DONE IN THIS CASE, YOU'RE NOT A SURVEYOR FOR THAT PURPOSE,
15  CORRECT?
16  A.  THAT'S CORRECT.
17  Q.  YOU'RE NOT A METEOROLOGIST?
18  A.  NO, SIR.  I HAVE TRAINING IN METEOROLOGY, BUT I'M NOT A
19  METEOROLOGIST.
20  Q.  AND YOU'RE NOT TESTIFYING IN THIS CASE AS A METEOROLOGIST,
21  CORRECT?
22  A.  THERE ARE METEOROLOGICAL ASPECTS TO MY TESTIMONY.
23  Q.  YOU'RE NOT A HYDROLOGIST, CORRECT?
24  A.  THAT'S CORRECT.
25  Q.  NOW, YOU'VE MENTIONED SOME OF THE WORK YOU'VE DONE IN TERMS

**2140**

1  OF AN EXPERT WITNESS.  THE VAST MAJORITY OF YOUR WORK HAS BEEN IN
2  ASBESTOS CASES, CORRECT?
3  A.  I'VE DONE A CONSIDERABLE NUMBER OF ASBESTOS CASES, BUT I
4  WOULDN'T SAY THE "MAJORITY."  THERE ARE A LARGE NUMBER OF
5  ASBESTOS CASES RECENTLY.
6  Q.  AND IN EACH ONE OF THOSE CASES YOUR INVOLVEMENT HAS BEEN
7  WITH RESPECT TO A VESSEL; IS THAT CORRECT?
8  A.  NOT COMPLETELY, NO.
9  Q.  THE ASBESTOS CASES THAT YOU'VE BEEN INVOLVED WITH?
10  A.  HAVE BEEN INVOLVED WITH SHIPYARDS, WITH WAREHOUSES AND THOSE
11  KINDS OF STRUCTURES.
12  Q.  AND ALSO VESSELS?
13  A.  AND VESSELS.
14  Q.  AND IN THOSE CASES, YOUR TESTIMONY HAD TO DO WITH WHETHER A
15  SHIPYARD OR A VESSEL COMPLIED WITH CERTAIN REQUIREMENTS; IS THAT
16  RIGHT?
17  A.  NO.  NOT COMPLETELY.
18  Q.  OKAY.  WHETHER THERE WERE CERTAIN MATERIALS PRESENT, RIGHT?
19  A.  NO.  IT'S THE HISTORY OF THE USE OF ASBESTOS, WHAT THE
20  GOVERNMENT REGULATIONS RELATING TO THEM ARE, AND THAT KIND OF
21  THING.
22  Q.  AND IN EACH ONE OF THOSE CASES, YOU TESTIFIED FOR THE
23  DEFENSE; IS THAT RIGHT?
24  A.  THAT'S CORRECT.
25  Q.  AND YOUR WORK ON ASBESTOS GOES BACK TO 1991, RIGHT?  IN THE

**14  (Pages 2137 to 2140)**

## 2141

1  EARLY 1990S?
2  A.  THE 1990S.
3  Q.  OKAY.
4  A.  WHERE WE DID STUDIES ABOARD SHIPS BUT NOT TESTIFYING.
5  Q.  AND WITH EXXON VALDEZ, YOU WERE HIRED BY EXXON?
6  A.  THAT'S CORRECT.
7  Q.  TO SUPPORT ITS CAUSATION THEORY ON HOW THE INCIDENT
8  OCCURRED, RIGHT, IN PART?
9  A.  IN PART.  IT WAS RESEARCH INTO THE TRACK OF THE VESSEL, THE
10 INFLUENCE OF THE BOTTOM CONDITIONS AND HOW THE VESSEL MOVED
11 ACROSS THE REEFS, BUT ALSO, AN EXAMINATION OF THE SCRATCHES AND
12 DAMAGE TO THE BOTTOM IN DETERMINING THE ATTITUDE OF THE VESSEL AS
13 IT -- AS IT GROUNDED.
14 Q.  IN TERMS OF THE WORK THAT YOU'VE DONE IN THIS CASE, YOU
15 HAVEN'T EXAMINED LEVEE BREACHES IN THE PAST, CORRECT?
16 A.  NOT IN THE PAST.
17 Q.  YOU HAVEN'T EXAMINED FLOODWALL BREACHES IN THE PAST,
18 CORRECT?
19 A.  NO, SIR.
20 Q.  IN FACT, THE ONLY WORK THAT YOU'VE TESTIFIED TO THAT YOU'VE
21 DONE THAT WOULD BE COMPARABLE TO THIS TYPE OF WORK IS THE WORK
22 YOU DID WITH THE JAMES RIVER, RIGHT, THE JAMES PROJECT?  CORRECT?
23 A.  WELL, NOT COMPLETELY.  WHEN YOU SAY "THE ONLY WORK" I'VE
24 DONE, I'VE DONE EXTENSIVE WORK RELATING TO WHARVES, TO
25 CONCRETE -- CONCRETE WALLS IN MARINE FACILITIES, IN SHEET PILING,

## 2142

1  AND THAT TYPE OF WORK, TOO.
2  Q.  YOU GAVE YOUR DEPOSITION TESTIMONY, RIGHT?
3  A.  YES, SIR.
4  Q.  AND INSIDE YOUR DEPOSITION TESTIMONY YOU MENTIONED THE JAMES
5  PROJECT AS THE -- THAT'S THE ONLY PROJECT YOU MENTIONED BY NAME
6  THAT WAS SIMILAR TO THE PROJECT YOU'VE DONE FOR THIS CANAL?
7  A.  NO, I BELIEVE THAT THE QUESTIONS -- AND I DON'T HAVE IT IN
8  MY MEMORY -- BUT THE QUESTION WAS, HAVE I BEEN INVOLVED IN CASES
9  INVOLVING THE COLLISIONS OF VESSELS WITH LAND STRUCTURES?  AND
10 THAT WAS THE ONE THAT CAME TO MIND.  ALTHOUGH THERE HAVE BEEN
11 OTHERS, WITH MOBIL OIL, THE COLLISION OF A TANKER IN SINGAPORE
12 WITH CONCRETE WHARVES, AND OTHER PROJECTS, TOO.
13 Q.  WE'LL GET TO THAT IN A LITTLE BIT.
14    NOW, YOUR TESTIMONY HERE IS THAT THE BARGE BROKE THE
15 CONCRETE CAP AT THE SOUTH PORTION OF THE SOUTH BREACH; IS THAT
16 CORRECT?
17 A.  MY TESTIMONY HERE IS THAT THE BARGE BROKE THE CAP OFF OF THE
18 LAST PANEL OF THE ALREADY-FALLEN FLOODWALL.
19 Q.  AT THE SOUTH END OF THE SOUTH BREACH, CORRECT?
20 A.  AT THE SOUTH END OF THE SOUTH BREACH, YES, SIR.
21 Q.  SO I'M CORRECT, RIGHT?
22 A.  WELL, THAT WASN'T THE WAY YOU SAID IT THE LAST TIME.
23    THE COURT:  OKAY, I'VE GOT IT.
24        EXAMINATION
25 BY MR. KHORRAMI:

## 2143

1  Q.  AT THE TIME THAT THIS OCCURRED, THE WATER HEIGHT -- THIS IS
2  YOUR CONTENTION; THE WATER HEIGHT ON THE CANAL SIDE WAS EQUAL TO
3  THE WATER HEIGHT ON THE PROTECTED SIDE; IS THAT CORRECT?
4  A.  IT WOULDN'T HAVE BEEN EQUAL BECAUSE THERE WOULD HAVE BEEN NO
5  FLOW INTO THE LOWER NINTH WARD.  IT WOULD HAVE BEEN NEARLY EQUAL.
6  Q.  WHAT DO YOU MEAN BY "NEARLY EQUAL"?
7  A.  IT WOULDN'T HAVE BEEN A GREAT DIFFERENCE IN HEIGHT.
8  Q.  I'M GOING TO ASK YOU TO QUANTIFY THAT.  IS IT A FOOT
9  DIFFERENCE?
10 A.  I CAN'T QUANTIFY IT.
11 Q.  YOU CAN'T QUANTIFY BEFORE THIS COURT WHAT THE DIFFERENCE IN
12 HEIGHT WAS BETWEEN THE CANAL AND THE PROTECTED SIDE, CORRECT?
13 A.  I CAN'T, BECAUSE I DON'T KNOW THE HEIGHT OF THE WATER IN THE
14 LOWER NINTH WARD AT THE TIME THAT THE BARGE ENTERED THE
15 LOWER NINTH WARD.
16 Q.  SO --
17 A.  I THINK THERE IS A VERY GOOD RECORD OF THE HEIGHT OF THE
18 WATER IN THE CANAL, A RECENTLY GOOD RECORD OF IT AT ANY GIVEN
19 TIME, BUT THERE IS NOT A RECORD OF THE HEIGHT OF THE WATER IN THE
20 LOWER NINTH WARD AT ABOUT THE TIME THAT THE BARGE WOULD HAVE
21 ENTERED.
22 Q.  AND THE REASON FOR YOUR CONTENTION THAT THE WATER WAS
23 RELATIVELY EQUAL ON BOTH SIDES OF THIS WALL, ON BOTH THE FLOOD
24 SIDE AND THE PROTECTED SIDE, IS THAT THE REBAR ON THE WALL WAS
25 HORIZONTAL, CORRECT?

## 2144

1  A.  THAT'S CORRECT.
2  Q.  THAT IF THE BARGE -- IF THERE HAD BEEN AN APPRECIABLE
3  DIFFERENCE IN WATER HEIGHT, THE REBAR THAT THE BARGE WENT OVER
4  WOULD HAVE ACTUALLY POINTED DOWN SHARPLY, CORRECT?
5  A.  IT WOULD HAVE, YES, IF IT HAD BEEN SIGNIFICANTLY DIFFERENT.
6  Q.  YET, AS YOU SIT HERE TODAY, YOU CAN'T DEFINE FOR THIS COURT
7  WHAT "SIGNIFICANTLY DIFFERENT" OR WHAT "RELATIVELY EQUAL" MEANS,
8  CORRECT?
9  A.  I CAN'T QUANTIFY IT PRECISELY BECAUSE THERE ARE MISSING --
10 THERE IS MISSING INFORMATION.
11 Q.  AND YOU CAN'T GIVE A RANGE, CORRECT?
12 A.  I CAN QUALITATIVELY TELL YOU THAT IT WAS NEARLY EQUAL OR
13 CLOSE TO THE SAME LEVELS.  THE WATER WAS FLOWING IN SO THE LEVEL
14 IN THE LOWER NINTH WARD WOULD HAVE BEEN LOWER THAN THE WATER IN
15 THE CANAL.  BUT IN TERMS OF INCHES, I CAN'T TELL YOU.
16 Q.  IN TERMS OF FEET YOU CAN'T TELL ME?  YOU JUST -- I JUST
17 ASKED YOU IN TERMS OF FEET.  YOU CAN'T TELL ME, CORRECT?
18 A.  IT WOULD ONLY BE A VERY ROUGH ESTIMATE.
19 Q.  NOW, YOU ALSO CONSIDERED WIND DATA IN THIS CASE, CORRECT?
20 A.  YES, SIR.
21 Q.  WIND DATA IS A VERY IMPORTANT ELEMENT IN YOUR CONCLUSION
22 THAT THE BARGE DID NOT AND COULD NOT HAVE CAUSED THE LEVEE
23 BREACHES, CORRECT?
24 A.  THAT'S CORRECT.
25 Q.  WIND DATA DURING KATRINA IS A CRITICAL SOURCE OF INFORMATION

15  (Pages 2141 to 2144)

## 2145

1  FOR YOUR DETERMINATION THAT THE TIMING AND DIRECTION OF MOVEMENTS
2  OF THE BARGE -- ABOUT THE TIMING AND THE DIRECTION OF MOVEMENTS
3  OF THE BARGE, CORRECT?
4  A.  THAT'S CORRECT.
5  Q.  NOW, FOR THE PURPOSE OF DETERMINING WIND DIRECTION AND WIND
6  SPEED, DR. DOOLEY WAS COMMISSIONED, CORRECT?
7  A.  THAT'S CORRECT.
8  Q.  DR. DOOLEY RELIED ON A HINDCAST FROM OCEANWEATHER INC.,
9  CORRECT?
10  A.  THAT'S CORRECT.
11  Q.  OWI, RIGHT?
12  A.  THAT'S CORRECT.  BUT I UNDERSTAND HE ALSO REFERRED TO OTHER
13  SOURCES --
14  Q.  AND WE'LL GET TO THAT.
15  A.  -- TO CONFIRM -- TO CONFIRM HIS RELIANCE ON OWI'S HINDCAST.
16  Q.  WE'LL GET TO THAT.
17      AND THEN YOU PRESENTED A SUMMARY OF DR. DOOLEY'S
18  RESULTS IN YOUR REPORT, CORRECT?
19  A.  YES, SIR.
20  Q.  YOU DIDN'T DO ANY OF THE CALCULATIONS THAT DR. DOOLEY DID,
21  CORRECT?
22  A.  THAT'S CORRECT.
23  Q.  YOU RELIED ON DR. DOOLEY'S INFORMATION, CORRECT?
24  A.  THAT'S CORRECT.
25  Q.  YOU RELIED ON DR. DOOLEY IN TERMS OF WIND DIRECTION,

## 2146

1  CORRECT?
2  A.  YES, SIR.
3  Q.  YOU RELIED ON DR. DOOLEY IN TERMS OF WIND SPEED, CORRECT?
4  A.  YES, SIR.
5  Q.  AND SO DID DR. DAGGETT; CORRECT?
6  A.  YES, SIR.
7  Q.  AND YOU'RE AWARE THAT DR. DOOLEY DID NOT CONSIDER ANY RADAR
8  DATA, CORRECT?
9  A.  I HEARD HIM SO TESTIFY.  I BELIEVE THAT I HEARD HIM SO
10  TESTIFY.
11  Q.  THAT HE DID NOT, CORRECT?
12  A.  THAT'S MY RECOLLECTION.  THAT HE SAID HE WASN'T A RADAR
13  EXPERT.  I RECALL HIM SAYING HE WASN'T A RADAR EXPERT, AND
14  THEREFORE -- THEREFORE, I DON'T BELIEVE HE RELIED ON IT.
15  Q.  WELL, SIR, YOU REVIEWED HIS REPORT, RIGHT?
16  A.  YES, SIR.
17  Q.  YOU RELIED ON HIS REPORT, RIGHT?
18  A.  YES, SIR.
19  Q.  AND YOU KNOW HIS REPORT, RIGHT?
20  A.  YES, SIR.
21  Q.  SO INSIDE OF HIS REPORT THERE IS NO REFERENCE TO RADAR DATA,
22  CORRECT?
23  A.  THAT'S CORRECT.
24  Q.  THEREFORE, HE DIDN'T CONSIDER RADAR DATA, CORRECT?
25      MR. ALDOCK:  OBJECTION, YOUR HONOR.  I THINK WHATEVER

## 2147

1  DR. DOOLEY DID YOUR HONOR HAS HEARD IT, SO BADGERING THIS WITNESS
2  FOR WHAT HE REMEMBERS IS NOT VERY USEFUL.
3      MR. KHORRAMI:  I'LL MOVE ON, YOUR HONOR.
4      THE COURT:  THANK YOU, COUNSEL.
5          EXAMINATION
6  BY MR. KHORRAMI:
7  Q.  AND YOU DID NOT RELY ON MR. LEMON FOR YOUR CONCLUSIONS,
8  CORRECT?
9  A.  THAT'S CORRECT.
10  Q.  YOU DIDN'T INVESTIGATE THE EXISTENCE OF MESOCYCLONES,
11  CORRECT?
12  A.  THAT'S NOT CORRECT.
13  Q.  OKAY.  YOU INVESTIGATED THE EXISTENCE OF MESOCYCLONES?
14  A.  WELL, I WOULD SAY THAT I INVESTIGATED MESOCYCLONES, BUT THE
15  EXISTENCE OF MESOCYCLONES WITHIN HURRICANE KATRINA, I WOULDN'T
16  SAY THERE WAS AN INVESTIGATION, NO, SIR.
17  Q.  YOU DIDN'T INVESTIGATE THE EXISTENCE OF MICROBURSTS WITHIN
18  HURRICANE KATRINA AT ALL, CORRECT?
19  A.  THAT'S CORRECT.
20  Q.  AND YOU DIDN'T INVESTIGATE THE EXISTENCE OF DOWNDRAFTS
21  WITHIN HURRICANE KATRINA, CORRECT?
22  A.  THAT'S CORRECT.
23  Q.  YOU DIDN'T INVESTIGATE THE EXISTENCE OF DOWNBURSTS WITHIN
24  HURRICANE KATRINA, CORRECT?
25  A.  THAT'S CORRECT.

## 2148

1  Q.  AND YOU DIDN'T INVESTIGATE THE EXISTENCE OF THUNDERSTORMS
2  WITH RESPECT TO HURRICANE KATRINA, CORRECT?
3  A.  THAT'S CORRECT.
4  Q.  AND AS TO ALL OF THOSE THINGS THAT I MENTIONED, YOU
5  SPECIFICALLY DID NOT INVESTIGATE THEIR EXISTENCE WITHIN THE
6  INDUSTRIAL CANAL DURING HURRICANE KATRINA, CORRECT?
7  A.  I DIDN'T CARRY OUT AN INVESTIGATION OF THOSE, NO, SIR.
8  Q.  SO YOU SOLELY RELIED ON DR. DOOLEY FOR THAT DATA, CORRECT?
9  A.  YES, SIR.  AND, OF COURSE, WHAT I'VE HEARD IN TESTIMONY,
10  TOO.
11  Q.  NOW, YOU AGREE WITH ME THAT SURFACE WINDS ON LAND CAN BE
12  MORE TURBULENT THAN ON WATER, CORRECT?
13  A.  YES.  BUT IF YOU QUALIFY WHAT YOU MEAN BY "TURBULENT," I
14  THINK I'VE TESTIFIED IN MY DEPOSITION THAT WIND MOVING ACROSS
15  LAND HAS MORE FRICTION THAN WIND MOVING ALONG WATER OR OVER
16  WATER, SO YOU HAVE MORE FRICTION, AND THEREFORE, YOU WILL HAVE,
17  AT THE SURFACE, MORE TURBULENCE, IF YOU WILL.  AND I ALSO
18  TESTIFIED IN DEPOSITION THAT WINDS MOVING ACROSS AND AROUND
19  BUILDINGS WILL HAVE TURBULENCE, LOCAL TURBULENCE.
20  Q.  AND YOU ALSO TESTIFIED THAT THERE CAN BE EDDIES IN THOSE
21  SITUATIONS, CORRECT?
22  A.  AS WIND MOVES AROUND STRUCTURES?
23  Q.  CORRECT.
24  A.  ON THE DOWNSTREAM SIDE WITHIN THE SHADOW OF THE BUILDINGS,
25  YOU CAN HAVE EDDIES AND VORTICES.

2149

1   Q.   NOW, YOU AGREE WITH ME ALSO THAT AVERAGING WIND DIRECTIONS
2   SMOOTHS OUT A LOT OF THE MOMENT-BY-MOMENT CHANGES IN WIND
3   DIRECTION, CORRECT?
4   A.   IT DOES.
5   Q.   YOU AGREE WITH ME THAT AVERAGING OUT WIND SPEED SMOOTHS OUT
6   A LOT OF MOMENT-BY-MOMENT CHANGES IN WIND SPEED, CORRECT?
7   A.   YES, SIR.
8   Q.   NOW, WHAT DISTANCE DID THE BARGE HAVE TO TRAVEL FROM THE
9   LAFARGE TERMINAL TO ITS -- TO THE PLACE WHERE IT STRUCK THE SOUTH
10  BREACH, ACCORDING TO YOU?
11  A.   APPROXIMATELY 2900 FEET.
12  Q.   NOW, LET'S TALK ABOUT CURRENTS AND WATER FLOW.  YOU
13  COMMISSIONED DR. DAGGETT FOR THAT PURPOSE, CORRECT?
14  A.   I DID, YES.
15  Q.   HE'S WITH WATERWAY SIMULATION TECHNOLOGY, CORRECT?
16  A.   THAT'S CORRECT.
17  Q.   YOU COMMISSIONED HIM TO DETERMINE WHETHER THERE WERE ANY
18  CURRENTS IN THE VICINITY OF THE LAFARGE TERMINAL THAT WOULD
19  ACTUALLY CARRY THE BARGE OVER INTO THE MAIN CHANNEL OF THE CANAL,
20  CORRECT?
21  A.   NO, SIR.
22  Q.   YOU DID NOT RELY ON HIM FOR CURRENT -- TO DETERMINE WHETHER
23  THE CURRENTS -- THERE WERE ANY CURRENTS PRESENT TO CARRY THE
24  BARGE TO THE MAIN CHANNEL OF THE CANAL?
25  A.   NO, THAT WAS NOT YOUR PREVIOUS QUESTION.

2150

1        THE REASON I SAID NO IS BECAUSE WE DID COMMISSION HIM
2   TO EXAMINE THE CURRENTS, NOT JUST IN THE VICINITY OF THE LAFARGE
3   TERMINAL, BUT OVER THE ENTIRE CANAL BETWEEN THE FLORIDA AVENUE
4   BRIDGE AND THE NORTH CLAIBORNE AVENUE BRIDGE.
5        AND THE SECOND PART OF MY ANSWER TO THAT QUESTION
6   WAS -- OR YOUR SUBSEQUENT QUESTION WAS THAT WE ALSO CARRIED OUT
7   OUR OWN CALCULATIONS SO THAT WE DIDN'T HAVE TO RELY ON
8   DR. DAGGETT, AND WE FOUND OUR OWN CALCULATIONS TO BE THE
9   SAME -- PRETTY MUCH THE SAME AS DR. DAGGETT'S.
10  Q.   YOU CARRIED OUT YOUR OWN CALCULATIONS AS TO THE CURRENTS?
11  A.   YES, SIR.
12  Q.   AND YOU PUT THAT INSIDE OF YOUR REPORT?
13  A.   NO, SIR.
14  Q.   YOU DID NOT?
15  A.   I DIDN'T.
16  Q.   IT'S ABSENT FROM YOUR REPORT, RIGHT?
17  A.   IT'S NOT IN THE REPORT.
18  Q.   THEREFORE, YOU RELIED ON DR. DAGGETT'S INFORMATION, CORRECT?
19  A.   AND I CONFIRMED IT BY DOING MY OWN CALCULATIONS.
20  Q.   YOU COMMISSIONED DR. DAGGETT TO ALSO PROVIDE YOU WITH
21  WHETHER THERE WERE ANY CURRENTS TO ACTUALLY -- WHETHER THE
22  CURRENTS WOULD BE ABLE TO MOVE THE BARGE UP TO THE FLOODWALL,
23  CORRECT?
24  A.   WELL, NOT EXACTLY.  WE COMMISSIONED DR. DAGGETT TO DETERMINE
25  WHAT THE CURRENTS WERE AND WE COMBINED THOSE CURRENTS WITH THE

2151

WIND TO DETERMINE WHICH WAY THE BARGE WOULD MOVE AND WHAT
INFLUENCE THOSE CURRENTS WOULD HAVE ON A BARGE.
Q.   INDEED, DR. DAGGETT ACTUALLY REACHED CONCLUSIONS AS TO THOSE
ITEMS, CORRECT?
A.   HE REACHED CONCLUSIONS AS TO THE MAGNITUDE OF THE CURRENT.
Q.   AND HE DETERMINED -- THAT'S HIS DETERMINATION, THAT THERE
WEREN'T SUFFICIENT ENOUGH CURRENTS TO CARRY THE BARGE, NUMBER
ONE, OUTSIDE OF THE TURNING BASIN, CORRECT?
A.   GIVEN THE WIND CONDITIONS, YES.
Q.   HE CAME TO A CONCLUSION THAT THE CURRENTS WEREN'T
ENOUGH -- THERE WEREN'T ANY CURRENTS ENOUGH TO CARRY THE BARGE
INTO THE MAIN CHANNEL OF THE CANAL, CORRECT?
A.   HIS CONCLUSION WAS COUPLED WITH THE FACT THAT THERE WAS WIND
BLOWING AND HE OPINED AS TO THE STRENGTH OF THE CURRENTS AS WELL
AS THE STRENGTH OF THE WIND.
Q.   SO THE STRENGTH OF THE CURRENTS WASN'T ENOUGH TO MOVE THE
BARGE OUT INTO THE CANAL?
A.   GIVEN THE WIND, YES.  THE ANSWER IS, YES, HIS CONCLUSION
WAS --
        THE COURT:  IT WOULD HELP THE COURT, THIS MEANS NOTHING
UNLESS WE GET TEMPORAL, WHAT I MEAN IS UNTIL WE GET TIME MARKS AS
TO WHEN THESE CALCULATIONS STOPPED BECAUSE CLEARLY THE BARGE DID
LEAVE THE TERMINAL.  WE ALL KNOW THAT.
        EXAMINATION
BY MR. KHORRAMI:

2152

Q.   AT ANY TIME FROM 3:00 THE MORNING ON AUGUST 29, 2005, TILL
10:00 IN THE MORNING ON AUGUST 29, 2005, IT WAS DR. DAGGETT'S
CONCLUSION THAT THE CURRENTS WOULD NOT BE ENOUGH TO CARRY THE
BARGE ON THEIR OWN INTO THE MAIN CHANNEL OF THE CANAL, CORRECT?
A.   NO, WHEN YOU QUALIFY IT BY SAYING "ON THEIR OWN," I DON'T
THINK THAT WAS HIS CONCLUSION.  HE CONCLUDED THAT THE CURRENTS
WERE VERY, VERY WEAK AND THAT THE WIND FORCES WERE SO
OVERWHELMING THAT THEY TENDED TO BE INSIGNIFICANT.
Q.   THAT THE CURRENTS ENDED UP BEING INSIGNIFICANT DURING THAT
TIME PERIOD AS COMPARED TO THE FORCE OF THE WIND, CORRECT?
A.   THAT'S CORRECT.
Q.   AND THE FORCE OF THE WIND WOULD PREDOMINATE, CORRECT?
A.   THAT'S CORRECT.
Q.   AND THE FORCE OF THE WIND WOULD PREDOMINATE IN TERMS OF
GETTING THE BARGE INTO THE MAIN CHANNEL OF THE CANAL, CORRECT?
A.   THAT'S CORRECT.
Q.   AND THE FORCE OF THE WIND IS WHAT WOULD PREDOMINATE IN TERMS
OF GETTING THE BARGE TO THE FLOODWALL, TO THE EASTERN FLOODWALL,
CORRECT?
A.   THAT'S CORRECT.
Q.   AND YOU RELIED ON DR. DAGGETT'S CONCLUSIONS IN YOUR REPORT,
CORRECT?
        THE COURT:  WE HAVE ALREADY BEEN OVER THAT.  LET'S NOT
GET INTO "WELL, I DID MY OWN CALCULATIONS."  PLEASE.  ONCE YOU
GOT SOMETHING, KEEP IT.

2153

1    MR. KHORRAMI: YES, YOUR HONOR.
2             EXAMINATION
3    BY MR. KHORRAMI:
4    Q.   AND YOU ALSO COMMISSIONED DR. DAGGETT TO CONDUCT A SURVEY OF
5    THE FLOODWALL, CORRECT?
6    A.   THAT'S CORRECT.
7    Q.   AND YOU WENT THROUGH THE ENTIRE FLOODWALL BETWEEN THE TWO
8    BRIDGES, THE NORTH CLAIBORNE BRIDGE TO THE FLORIDA BRIDGE,
9    CORRECT?
10   A.   THAT'S CORRECT.
11   Q.   AND YOU SURVEYED THAT WALL?
12   A.   YES, SIR.
13   Q.   AND YOU DID IT WITH A LEVEL, RIGHT?
14   A.   YES, SIR.
15   Q.   AND YOU DID IT BY GPS, CORRECT?
16   A.   NO, SIR.  THE GPS WAS DONE BY AERO-DATA CORPORATION TO
17   ESTABLISH A BENCHMARK FOR THEIR PHOTOGRAMMETRIC SURVEY.
18   Q.   NOW, YOU RELIED IN YOUR REPORT ON DR. DAGGETT'S SURVEY,
19   CORRECT?
20   A.   AS WELL AS AERO-DATA.
21   Q.   THE CHART THAT YOU LIST IN YOUR REPORT IS THAT WHICH
22   DR. DAGGETT PROVIDED TO YOU, CORRECT?
23   A.   THAT'S CORRECT.
24   Q.   AND DR. DAGGETT ALSO DID CALCULATIONS TO CREATE A MODEL FOR
25   HOW THE BARGE WOULD MOVE THROUGH THE CANAL AND ULTIMATELY END UP

2154

1    AT ITS RESTING PLACE INSIDE THE LOWER NINTH WARD, CORRECT?
2    A.   THAT'S CORRECT.
3    Q.   AND YOU RELIED ON THAT MODEL, CORRECT?
4    A.   NO.  I RELIED ON MY OWN CALCULATIONS FOR THAT.  HE PROVIDED
5    IT IN HIS REPORT, BUT I DIDN'T HAVE TO RELY ON HIM.  I DID MY OWN
6    CALCULATIONS.
7    Q.   AND YOUR OWN CALCULATIONS ARE LISTED IN YOUR REPORT?
8    A.   YES, SIR.
9    Q.   AS TO THE FLOW OF THE BARGE THROUGH -- FROM THE LAFARGE
10   TERMINAL DOWN INTO THE SOUTH BREACH, CORRECT?
11   A.   YES, SIR.
12   Q.   WE'RE GOING TO GO OVER DR. DAGGETT'S REPORT, THEN.
13           THE MODEL THAT DR. DAGGETT CAME UP WITH, IS THAT ANY
14   DIFFERENT THAN THE MODEL THAT YOU CLAIM THAT YOU USED?
15   A.   I'M NOT SURE WHICH MODEL YOU'RE TALKING ABOUT.
16   Q.   THEN WE'RE GOING TO PUT IT UP FOR YOU.
17           MR. KHORRAMI: I APOLOGIZE, YOUR HONOR.  I WASN'T
18   EXPECTING TO HAVE TO GO THROUGH THIS MUCH.
19           I'M GOING TO LOOK AT DR. DAGGETT'S REPORT AND WE'RE
20   GOING TO COME TO SPECIFIC PAGES.
21           LET'S GO TO B-34, BOB.
22             EXAMINATION
23   BY MR. KHORRAMI:
24   Q.   NOW, SO WST, THAT'S THE OUTFIT THAT DR. DAGGETT IS PART OF,
25   CORRECT?

2155

1    A.   THAT'S CORRECT.
2    Q.   AND WST MODELLED POSSIBLE BARGE MOVEMENT SCENARIOS TO
3    DETERMINE THE MOST LIKELY COURSE THE BARGE TRAVELED FROM THE
4    TURNING BASIN INTO THE LOWER NINTH WARD, CORRECT?
5    A.   THAT'S CORRECT.
6    Q.   AND YOU RELIED ON THAT MODEL, CORRECT?
7    A.   NO, I BELIEVE I SAID WE DID OUR OWN CALCULATIONS TO
8    CALCULATE THE TRACK OF THE VESSEL.
9    Q.   AND I BELIEVE THAT I THEN ASKED YOU IS YOUR MODEL ANY
10   DIFFERENT THAN THAT WHICH WAS BUILT BY WST?
11   A.   SO HE CONFIRMED WHAT WE HAD DETERMINED.
12   Q.   OKAY.  ISN'T IT TRUE THAT YOU USED DR. DAGGETT'S REPORT IN
13   MANY, MANY PORTIONS OF YOUR REPORT TO HELP YOU COME TO A
14   CONCLUSION, CORRECT?  THAT'S CORRECT, RIGHT?
15   A.   NO, SIR.
16   Q.   THAT'S NOT CORRECT?
17   A.   NO, SIR.
18   Q.   OKAY.  LET'S PUT UP YOUR DEPOSITION.  PAGE 67, PLEASE, LINES
19   10 THROUGH 15.
20           THIS IS YOUR TESTIMONY, LINE 10: "AND SO IN MANY, MANY
21   PORTIONS OF THIS REPORT, WE HAVE USED DR. DAGGETT'S DETERMINATION
22   OF THE WATER CURRENTS TO HELP US COME TO A CONCLUSION AS TO WHEN
23   THE BARGE COULD HAVE CROSSED AND WHY THE BARGE DIDN'T CROSS THE
24   CANAL UNTIL ANY TIME AFTER THE FAILURE OF THE LEVEES."
25           YOU AGREE WITH THAT STATEMENT, RIGHT?

2156

1    A.   YES.  AND THAT WAS NOT YOUR QUESTION TO ME A FEW MINUTES
2    AGO.  YOUR QUESTION WAS WE RELIED ON MANY PORTIONS OF THE REPORT.
3    HERE, THE ANSWER I'M GIVING IS SAYING THAT I RELIED ON
4    DR. DAGGETT IN WATER CURRENTS TO HELP US COME TO A CONCLUSION,
5    AND I ALSO TESTIFIED THAT WE CALCULATED THE WATER CURRENTS
6    OURSELVES.
7            AND THE OTHER AREAS WHERE WE RELIED ON DR. DAGGETT'S
8    REPORT WAS HIS WORK ON THE LEVEL SURVEYING OF THE FLOODWALL WHICH
9    TOGETHER WITH, INDEPENDENTLY, THE AERO-DATA DATA, HELPED ME FORM
10   A CONCLUSION AS TO THE LEVEL OF THE WALL.  THOSE ARE THE AREAS
11   THAT I DEPENDED UPON OR RELIED UPON DR. DAGGETT.
12   Q.   AND DR. DAGGETT'S REPORT WAS VERY USEFUL IN YOU CONCLUDING
13   THAT THE BARGE REMAINED AT THE LNA, AT THE LAFARGE TERMINAL UNTIL
14   AFTER THE FLOODWALL HAD BREACHED, CORRECT?
15   A.   THAT'S CORRECT.
16   Q.   YOU DID NOT WRITE OR COAUTHOR ANY OF DR. DAGGETT'S REPORT,
17   CORRECT?
18   A.   NO, SIR.
19   Q.   IN COMING UP WITH HIS CONCLUSIONS INSIDE OF HIS REPORT,
20   DR. DAGGETT USED COMPUTER PROGRAMS FOR HIS CALCULATIONS THAT YOU
21   DO NOT HAVE, CORRECT?
22   A.   THAT'S CORRECT.
23   Q.   THAT YOU DO NOT USE, CORRECT?
24   A.   THAT'S CORRECT.  JUST AS WE HAVE COMPUTER PROGRAMS THAT HE
25   DOESN'T HAVE AND THAT HE DOESN'T USE.

18 (Pages 2153 to 2156)

2157

1  Q.  DR. DAGGETT IS A CIVIL ENGINEER, CORRECT?
2  A.  THAT'S MY UNDERSTANDING, YES, SIR.
3  Q.  HIS WORK ON THIS CASE INVOLVES CIVIL ENGINEERING, CORRECT?
4  A.  THAT'S CORRECT.
5  Q.  YOU'RE NOT A CIVIL ENGINEER, CORRECT?
6  A.  NO, SIR.
7  Q.  AND YOU CAN'T TESTIFY WHETHER THE WORK PERFORMED BY
8  DR. DAGGETT AS A CIVIL ENGINEER MEETS THE COMMONLY-USED STANDARDS
9  OF CIVIL ENGINEERING, CORRECT?
10 A.  SINCE I'M NOT A CIVIL ENGINEER, I THINK IT'S INAPPROPRIATE
11 FOR ME TO JUDGE WHAT'S APPROPRIATE FOR A CIVIL ENGINEER.
12 Q.  AND DR. DAGGETT WON'T BE HERE TO TESTIFY IN TRIAL, CORRECT?
13 A.  THAT'S CORRECT.
14 Q.  AND HE WON'T BE HERE TO DEFEND HIS CONCLUSIONS, CORRECT?
15 A.  THAT'S CORRECT.
16 Q.  AND HE WON'T BE HERE TO DEFEND HIS METHODOLOGY, CORRECT?
17 A.  THAT'S MY UNDERSTANDING.
18 Q.  NOW, LET'S PUT UP PAGE 86 OF DR. CUSHING'S REPORT.
19      BOB, THAT WILL BE PAGE 90 OF THE DOCUMENT, I BELIEVE.
20      YOU CREATED THIS DIAGRAM, CORRECT?
21 A.  YES, SIR.
22 Q.  AND THAT'S THE PATH THAT YOU CLAIM THE BARGE TOOK INTO THE
23 SOUTH BREACH, CORRECT?
24 A.  THAT'S CORRECT.
25 Q.  NOW, AS TO DR. DAGGETT'S MODEL WHICH YOU RELIED ON AND WHICH

2158

1  YOU TESTED AND FOUND TO BE ACCURATE, THERE ARE CERTAIN
2  LIMITATIONS, CORRECT?
3  A.  I'M NOT SURE WHAT LIMITATIONS YOU'RE TALKING ABOUT.
4  Q.  OKAY.  WELL, MAY I HAVE THE ELMO, PLEASE.
5      THE HIGHLIGHTED PORTION THAT I'M TALKING ABOUT SAYS,
6  "THIS SIMULATION MODEL DOES NOT ACCURATELY COMPUTE ANY RESISTING
7  FORCES SUCH AS PIERS, DOCKS, OR FENDERING SYSTEMS."
8      DO YOU SEE THAT?
9  A.  YES, SIR.
10 Q.  AND THAT'S A LIMITATION OF DR. DAGGETT'S MODEL, CORRECT?
11 A.  THAT'S WHAT IT SAYS.
12 Q.  "AND THEREFORE, DURING THE TESTS, THE BARGE WAS FREE TO MOVE
13 IN ALL DIRECTIONS," CORRECT?  THAT IT WAS BASICALLY MEANT FOR
14 OPEN WATER -- FOR THE BARGE TO BE IN OPEN WATER WITH IT BEING
15 UNOBSTRUCTED, CORRECT?
16 A.  IT WAS FREE TO MOVE.
17 Q.  "IN REALITY, THE BARGE COULD BE PUSHED UP AGAINST ANOTHER
18 OBJECT," HE SAYS, "ANOTHER BARGE OR FLOODWALL, AND MOVE ALONG
19 THAT OBJECT.  HOWEVER, SUCH MOTION IS NOT INCLUDED IN THIS WORK."
20      SO THAT'S A LIMITATION OF DR. DAGGETT'S MODEL, CORRECT?
21 A.  YES.  WHAT HE'S SAYING HERE IS THERE WAS NO CONTACT WITH
22 ANYTHING ELSE.  THERE WAS NO CONTACT WITH PIERS.  THERE WAS NO
23 CONTACT WITH OTHER BARGES.  IT WAS FREE TO MOVE.
24 Q.  AS PART OF HIS MODEL, CORRECT?
25 A.  THAT'S CORRECT.

2159

1  Q.  IT MEANS THAT HIS MODEL DOESN'T COVER THE SITUATION WHERE A
2  BARGE IS PRESSED UP AGAINST A FLOODWALL, CORRECT?
3  A.  NO, SIR.  THAT'S NOT WHAT HE'S SAYING HERE.  HE'S SAYING THE
4  BARGE DOES NOT COME UP AGAINST OTHER OBJECTS SUCH AS PIERS AND
5  WALLS AND OTHER BARGES.
6  Q.  HE DOESN'T TAKE THOSE SCENARIOS INTO ACCOUNT, CORRECT?
7  A.  THAT'S WHAT HIS MODEL IS SAYING.
8  Q.  OKAY.  LET'S GO BACK TO THE -- IF YOU WILL BLOW THAT UP
9  AGAIN.
10      SO FOR EXAMPLE, IF THE BARGE WAS ACTUALLY NESTLED UP
11 HERE RIGHT BY THE FLORIDA AVENUE BRIDGE, DR. DAGGETT'S MODEL
12 WOULD NOT TAKE THAT INTO ACCOUNT, CORRECT?
13 A.  WELL, I DON'T BELIEVE THAT'S WHAT HE'S SAYING IN HIS
14 DIAGRAM -- SORRY, IN HIS CONCLUSIONS.  HE'S SAYING THE MOVEMENT
15 OF THE BARGE, IF IT WAS NESTLED.  HE DOESN'T TALK ABOUT IT BEING
16 NESTLED.
17 Q.  HIS MODEL WOULDN'T BE ABLE --
18 A.  IN OTHER WORDS --
19      THE COURT:  WAIT, WAIT.  LET'S NOT TALK OVER EACH OTHER.
20 SO WE WON'T SPEND AN EON ON THIS, IN THE EVENT ONE WANTED TO
21 INPUT IT INTO THE SIMULATION, IS THE MODEL CAPABLE OF DETERMINING
22 THE RESISTIVE FORCE OF FIXED OBJECTS SUCH AS PIERS, FLOODWALLS,
23 ET CETERA?
24      THE WITNESS:  I DON'T BELIEVE SO.
25      THE COURT:  THANK YOU.

2160

1          EXAMINATION
2  BY MR. KHORRAMI:
3  Q.  SO IN THE SITUATION WHERE THE BARGE WOULD BE UP HERE NESTLED
4  BY THE FLORIDA AVENUE BRIDGE, IF THAT WERE THE CASE, AND I'M
5  GOING TO ASK YOU TO ASSUME THAT, THEN DR. DAGGETT'S MODEL WOULD
6  NOT BE ABLE TO FIGURE OUT WHERE IT WOULD END UP, CORRECT?
7  A.  WELL, HIS MODEL IS A MODEL OF A FREELY-FLOATING BARGE.  IF
8  IT'S NESTLED AGAINST A WALL, IT WON'T HAVE FRICTION AGAINST THE
9  WALL.  IF IT MOVES AWAY FROM THE WALL, THEN IT'S NOT TOUCHING THE
10 WALL.
11 Q.  THEREFORE, IT CAN'T PREDICT IT, CORRECT?
12 A.  NO.  IT SAYS IT'S MOVING AGAINST THE WALL.  IN OTHER WORDS,
13 IF IT HAS FRICTION AGAINST THE WALL OR A WHARF OR A PIER OR
14 ANOTHER BARGE, IT CAN PREDICT WHAT THAT FRICTION FORCE IS AND HOW
15 IT RETARDS THE MOTION OF THE BARGE.  BUT IF IT'S FREELY FLOATING
16 AWAY FROM OTHER OBJECTS, THEN IT PREDICTS THE TRACK OF THE BARGE.
17 Q.  AND IF IT'S GROUNDED, IF IT'S NESTLED AGAINST AN OBJECT, THE
18 BARGE WOULD ACT DIFFERENTLY THAN IF IT WAS FLOWING OVER FREE
19 WATER, CORRECT?
20 A.  THAT'S WHAT IT SAYS, ACCORDING TO HIS MODEL.
21 Q.  DO YOU AGREE WITH THAT CONCLUSION?
22 A.  WELL, HE'S DESCRIBING HIS OWN MODEL.  I HAVEN'T USED THAT
23 MODEL.  WE DON'T HAVE THAT PROGRAM.  BUT HE DESCRIBES THE MODEL
24 AND I BELIEVE HE'S DESCRIBING IT HONESTLY AND CORRECTLY.
25 Q.  YOUR TESTIMONY BEFORE THIS COURT IS THAT YOU DIDN'T USE THAT

**2161**

1  MODEL, CORRECT?

2  A.  THAT'S CORRECT.  WE DID OUR OWN CALCULATIONS AND WE MADE OUR

3  OWN ASSUMPTIONS AND WE USED OUR OWN DATA.

4  Q.  YOU CLAIM THAT THE BARGE COULD NOT HAVE BROKEN AWAY AT ANY

5  TIME EARLIER THAN 9 O'CLOCK IN THE MORNING, CORRECT?

6  A.  RIGHT.  YOU USED THE WORDS "BROKEN AWAY."  I DON'T BELIEVE

7  IT COULD HAVE ESCAPED INTO THE CANAL BEFORE 9 O'CLOCK.

8  Q.  AND IT REALLY COULDN'T HAVE BEEN MUCH LATER THAN 9 O'CLOCK

9  EITHER, SIR, CORRECT?

10  A.  IT WOULD BE SOMETIME AFTER 9 O'CLOCK.

11  Q.  IT WOULD BE VERY CLOSE TO 9 O'CLOCK, WOULDN'T IT?

12  A.  NOT NECESSARILY.

13  Q.  OKAY.  WELL, LET'S LOOK AT YOUR DIAGRAM ON PAGE 80, PLEASE,

14  OF HIS REPORT, WHICH IS PAGE 84 OF THE DOCUMENT.

15      NOW, THAT'S A DIAGRAM YOU CREATED, CORRECT?

16  A.  YES.  I'M SORRY, YOU CUT OFF THE CAPTION UNDERNEATH IT.

17  COULD I SEE THAT CAPTION, PLEASE.

18  Q.  OF COURSE.

19  A.  THE CAPTION UNDERNEATH THE PHOTOGRAPH.

20  Q.  GO DOWN.

21  A.  THANK YOU.

22  Q.  THIS IS PART OF YOUR REPORT, CORRECT?

23  A.  THAT'S CORRECT.

24  Q.  AND THAT'S A DIAGRAM YOU CREATED, CORRECT?

25  A.  THAT'S CORRECT.

**2162**

1  Q.  AND THOSE ARE WIND VECTORS THAT ARE INDICATED ON THAT

2  DIAGRAM, CORRECT?

3  A.  THAT'S CORRECT.

4  Q.  THOSE WIND VECTORS ARE WIND VECTORS THAT YOU RECEIVED FROM

5  DR. DOOLEY?

6  A.  FROM DATA FROM DR. DOOLEY.

7  Q.  FROM DATA FROM DR. DOOLEY, CORRECT?

8  A.  THAT'S CORRECT.

9  Q.  AT 9 O'CLOCK, THERE IS A WIND VECTOR; IS THAT CORRECT?

10  A.  THAT'S CORRECT.

11  Q.  AT 10 O'CLOCK, THERE IS A WIND VECTOR THERE, CORRECT?

12  A.  YES, SIR.

13  Q.  AND THE WIND GRADUALLY CHANGED FROM 9 O'CLOCK TO 10 O'CLOCK

14  FROM A GENERALLY NORTHWESTERLY DIRECTION TO A GENERALLY WESTERLY

15  DIRECTION, CORRECT?

16  A.  GENERALLY, YES.

17  Q.  AND IT DID THAT IN A GRADUAL MANNER, CORRECT?

18  A.  IN A GRADUAL MANNER, YES, SIR.

19  Q.  FAIRLY EVENLY AS TIME WENT ON, CORRECT?

20  A.  I THINK THE CHANGE WAS LINEAR BETWEEN THOSE TWO TIMES.

21  Q.  SO YOU AGREE WITH ME THAT THE BARGE DID NOT MOVE AWAY FROM

22  WHERE IT WAS ORIGINALLY MOORED AT 10 O'CLOCK, CORRECT?  THAT

23  WOULD BE TOO LATE?

24  A.  I BELIEVE THAT WOULD BE.

25  Q.  AND 9:30 WOULD BE TOO LATE, WOULDN'T IT?

**2163**

1  A.  NOT NECESSARILY.

2  Q.  OKAY.  LET'S PUT UP SOME VECTORS ON THERE.

3      SO WOULD YOU AGREE WITH ME THAT THAT'S ABOUT WHERE THE

4  WIND WOULD BE AT ABOUT 9:30?  IN FACT, I'M PROBABLY BEING

5  CONSERVATIVE IN THAT EXAMPLE, CORRECT?

6  A.  APPROXIMATELY.

7  Q.  OKAY.  IN FACT, IF YOU GO BY DR. DOOLEY'S INFORMATION, THE

8  WIND WAS EVEN MORE WESTERLY AT 9:30, RIGHT?

9  A.  ONLY SLIGHTLY.  IT WOULD HAVE BEEN APPROXIMATELY 310 DEGREES

10  RATHER THAN 330.

11  Q.  RIGHT.  WHAT I'M SAYING IS, I'VE PLACED THE MARK ON THERE AT

12  WHERE I SAY 9:30 THE WIND WOULD HAVE BEEN.

13  A.  APPROXIMATELY, YES.

14  Q.  AND IN FACT, WHEN YOU LOOK AT DR. DOOLEY'S INFORMATION, IT

15  IS ACTUALLY -- IT WAS ACTUALLY MORE WESTERLY THAN WHAT I HAVE IT

16  HERE, CORRECT?

17  A.  SLIGHTLY.

18  Q.  NOW, IF THE BARGE HAD BROKEN AWAY AT 9:30, IT WOULD HAVE

19  ENDED UP SOMEWHERE ON THE EASTERN WALL WELL NORTH OF THE SOUTH

20  BREACH, CORRECT?

21  A.  I WOULDN'T SAY WELL SOUTH, NO.

22  Q.  I SAID WELL NORTH.

23  A.  WELL NORTH, RATHER.

24  Q.  IT WOULD HAVE BEEN NORTH OF THE SOUTH BREACH, CORRECT?

25  A.  THAT'S CORRECT.

**2164**

1  Q.  YOU AGREE WITH ME?

2  A.  NO, SORRY.  IT WOULD HAVE BEEN SOUTH OF THE NORTH END OF THE

3  SOUTH BREACH.

4  Q.  IT WOULD HAVE ENDED UP SOUTH OF THE NORTH END OF THE SOUTH

5  BREACH?

6  A.  AT WHAT TIME?

7  Q.  AT 9:30.  I'VE DRAWN A VECTOR ON THERE.

8      THE COURT:  THIS IS LIKE ABBOTT AND COSTELLO.

9      MR. KHORRAMI:  I AGREE, YOUR HONOR.

10      THE COURT:  "WHO'S ON FIRST?"  I'M NOT COMMENTING ON

11  EITHER THE INTERROGATOR OR THE ANSWER.  IT'S JUST WHEN WE GET

12  INTO THIS MANY DIRECTIONS, IT GETS A LITTLE CONFOUNDING.

13      I THINK YOU'VE ASKED THE WITNESS, ISN'T IT TRUE

14  THAT IF HE ASSUMES A WIND DIRECTION AS YOU HAVE THERE, WHICH I

15  THINK IS 310 DEGREES, THAT THE BARGE, BASED ON HIS OPINION, WOULD

16  NOT BE AT ANY PART OF THE SOUTH BREACH BUT YET WOULD BE SOMEWHAT

17  NORTH OF THE SOUTH BREACH AT 9:30.  I THINK THAT'S THE QUESTION.

18      MR. KHORRAMI:  THAT'S FAIR ENOUGH, YOUR HONOR.  THANK

19  YOU.

20      THE COURT:  AND WHATEVER YOUR ANSWER IS, IT IS.

21      THE WITNESS:  YES.  MY ANSWER IS THAT AT 9:30, I DON'T

22  BELIEVE THAT THE BARGE WOULD HAVE BEEN NORTH OF THE NORTH END OF

23  THE SOUTH BREACH.

24      THE COURT:  EVEN WITH THAT, HE'S USING THAT AS A

25  HYPOTHETICAL.

2165

1  THE WITNESS:  YES, SIR.

2  THE COURT:  CONSIDERING THE HYPOTHET --

3  THE WITNESS:  EVEN SO.

4  THE COURT:  EVEN SO.  GOT YOU.

5  EXAMINATION

6  BY MR. KHORRAMI:

7  Q.  AND THEN AT 9:15, YOU WOULD AGREE WITH ME THAT IT WOULD BE

8  RIGHT AT THE NORTH END OF THE SOUTH BREACH, CORRECT?

9  A.  NO, SIR.  IF MY OPINION, AS I JUST SAID, THAT AT 9:30 IT

10  STILL WOULD HAVE BEEN SOUTH OF THE NORTH END OF THE SOUTH BREACH,

11  AT 9:15 WITH THE WIND BLOWING MORE FROM THE NORTH, IT WOULD HAVE

12  BEEN EVEN FURTHER SOUTH OF THE NORTH END OF THE SOUTH BREACH.

13  Q.  I'M GOING TO PUT UP A VECTOR FOR YOU AND I'M GOING TO --

14  YOUR HONOR, WE'RE MARKING THIS ONE AS PLAINTIFF'S EXHIBIT 455.

15  AND THE NEXT ONE THAT'S GOING TO HAVE TWO VECTORS ON IT, WE'RE

16  GOING TO MARK AS 456.

17  THE DEPUTY CLERK:  YOU SKIPPED NUMBER 454.

18  MR. KHORRAMI:  I THOUGHT WE MARKED THAT WITH THE

19  RECORDING THAT I SUBMITTED.  IT WAS AN INTERVIEW BY MR. LEMON.

20  THE DEPUTY CLERK:  IT WAS 453.

21  MR. KHORRAMI:  WE'LL MARK 454 IN A SECOND BECAUSE I HAVE

22  A FEW ON THIS ONE THAT I HAVE IN ORDER.  I CAN PUT THIS AS 454.

23  THAT'S FINE.  IS THAT BETTER?  SO WE'LL CONSIDER THIS ONE 454.

24  (WHEREUPON, AT THIS POINT IN THE PROCEEDING, EXHIBIT 454

25  WAS ENTERED INTO EVIDENCE.)

2166

1  EXAMINATION

2  BY MR. KHORRAMI:

3  Q.  SO YOU WOULD AGREE WITH ME IN TERMS OF WHERE THE LOCATION OF

4  THE WIND WAS AT 9:15 AS THE SECOND LINE NOW I'VE PLACED ON THAT

5  DIAGRAM, CORRECT?

6  MR. ALDOCK:  I OBJECT, YOUR HONOR.  I THINK HE'S GOT TO

7  DO THIS AS A HYPOTHETICAL.  IF HE'S GOING TO DRAW A PERFECTLY

8  STRAIGHT LINE AS IF THE WIND IS PERFECTLY STRAIGHT, IT'S A

9  HYPOTHETICAL AND THERE IS NO --

10  MR. KHORRAMI:  UP TO NOW, IT'S BEEN COMPLETELY CONSTANT,

11  YOUR HONOR.  I'M SURPRISED THAT THE DEFENSE NOW IS SAYING THAT

12  THE WINDS DON'T HAVE CURVES, BUT WE'LL GO WITH THAT.

13  THE COURT:  I'M ASSUMING THESE ARE -- BECAUSE WE'RE

14  ASSUMING TIMES WHERE WE DON'T HAVE -- IT'S YOUR VECTOR, SO I'M

15  CONSIDERING IT IN LIGHT OF ALL THE INFORMATION GIVEN, AND IF YOU

16  OBJECT TO IT BEING HYPOTHETICAL, WE CAN DEBATE IT OR YOU CAN POSE

17  IT AS A HYPOTHETICAL AND THE COURT CAN ASCERTAIN HOW REALISTIC IT

18  REALLY IS AT THE APPROPRIATE TIME.  BUT YOUR QUESTIONING, WE'RE

19  NOW AT 9:15, CORRECT?

20  MR. KHORRAMI:  RIGHT.

21  THE COURT:  AND WE'RE ASSUMING A VECTOR OF?

22  MR. KHORRAMI:  I'M JUST PLACING IT ON THE ACTUAL

23  DIAGRAM.

24  EXAMINATION

25  BY MR. KHORRAMI:

2167

1  Q.  WOULD YOU AGREE WITH ME AS TO THE LOCATION WHERE I'VE PLACED

2  THE WIND -- WHERE THE WIND IS COMING FROM, ESSENTIALLY?  IS THAT

3  FAIR?

4  A.  I AGREE THAT IF YOU DRAW A VECTOR THROUGH THE BARGE FROM THE

5  NORTHWEST THROUGH THE BARGE, THAT IT STRIKES THE EAST SIDE OF THE

6  CANAL AT THE NORTH END OF THE SOUTH BREACH.

7  Q.  NOW, MY QUESTION WAS WHETHER THAT'S CORRECT IN TERMS OF THE

8  DIRECTION OF THE WIND, NOT THE DIRECTION OF THE BARGE.  THE

9  DIRECTION OF THE WIND.

10  THE COURT:  WHICH WAY ARE WE TALKING ABOUT?

11  MR. KHORRAMI:  THE SECOND LINE WE'VE ADDED.  THERE IS A

12  RED LINE DOWN BELOW.  THAT'S THE ONE WE SAID WOULD BE THE 9:30

13  WIND AND THAT WOULD BE THE 9:15 WIND DIRECTION.  FAIR ENOUGH?

14  A.  THAT'S THE DIRECTION OF THE WIND, YES.

15  Q.  OKAY.  AND IN THAT SITUATION, WHERE DO YOU BELIEVE THE BARGE

16  WOULD END UP AT 9:15 IF IT TOOK OFF?

17  A.  FURTHER SOUTH OF THE SOUTH BREACH.

18  Q.  PLACE IT RIGHT THERE IN THE SOUTH BREACH WHERE YOU THINK IT

19  WOULD END UP.

20  A.  I CAN'T SAY PRECISELY BECAUSE I'M NOT DOING CALCULATIONS

21  HERE.

22  Q.  WELL, WE'LL GET TO THAT.

23  A.  BUT IT WOULD HAVE BEEN FURTHER DOWN HERE.

24  Q.  IT WOULD HAVE BEEN AT THE SOUTH POINT OF THE SOUTH BREACH IS

25  YOUR CONTENTION?

2168

1  A.  NO.  I'M SAYING, IT WOULD HAVE BEEN SOMEWHERE IN THE

2  VICINITY TOWARDS THE SOUTH END OF THE SOUTH BREACH.

3  Q.  OKAY.

4  A.  IN THE GENERAL VICINITY.

5  Q.  OKAY.  NOW, AT THOSE TIMES, 9:15 AND 9 O'CLOCK, YOU KNOW

6  WHAT THE WIND SPEED WAS, CORRECT?

7  A.  I DON'T HAVE IT IN FRONT OF ME HERE.

8  Q.  DR. DOOLEY'S DATA WOULD CONTAIN IT, CORRECT?

9  A.  YES, SIR.

10  Q.  AND IF WE CONSULT DR. DOOLEY'S DATA, AND I'LL REPRESENT TO

11  YOU AT 9 O'CLOCK IT WAS 56.48 KNOTS, DO YOU HAVE ANY REASON TO

12  DISPUTE THAT?  IF YOU WANT TO LOOK AT DR. DOOLEY'S REPORT, THAT'S

13  FINE WE ME.

14  A.  I DON'T HAVE DR. DOOLEY'S REPORT.  IF YOU WANT TO SHOW ME

15  HIS TABLE.

16  THIS IS NOT THE TABLE THAT I'M FAMILIAR WITH.  IT

17  DOESN'T HAVE HEADINGS.  I BELIEVE DR. DOOLEY'S WIND TABLE HAS

18  HEADINGS FOR THE A, B, C, D AND E LOCATIONS AT THE GRIDS.

19  Q.  IS THAT FAIR ENOUGH?  THAT'S PAGE 30 OF DR. DOOLEY'S REPORT,

20  CORRECT?

21  A.  I DON'T REMEMBER THE PAGE NUMBER, NO.

22  THE COURT:  IT SAYS PAGE 30 ON THE BOTTOM, AND THE COURT

23  IS LOOKING AT IT.  IT'S DR. DOOLEY'S REPORT ON WIND DIRECTION.

24  LET'S NOT WASTE TOO MUCH TIME ON THIS.  LET'S GET TO IT.

25  EXAMINATION

## 2169

1  BY MR. KHORRAMI:
2  Q.  THOSE ARE THE HEADINGS, CORRECT?  AND THE SECOND COLUMN SAYS
3  THAT'S THE INTERPOLATED HINDCAST 30-MINUTE MARINE WIND AT THE
4  IHNC, FAIR ENOUGH?
5  A.  THAT'S WHAT IT SAYS.
6  Q.  I'M GOING TO TAKE YOU TO THE NEXT PAGE.
7       AND LOOKING AT THE SECOND COLUMN, AT 9 O'CLOCK IT'S
8  56.48 KNOTS, CORRECT?
9  A.  RIGHT.  COULD YOU GO BACK ONE PAGE, PLEASE.
10  Q.  OF COURSE.
11  Q.  OKAY.  NEXT PAGE.  AT 10:15, IS THAT WHAT YOU'RE ASKING?
12  Q.  AT 9 O'CLOCK.
13  A.  9 O'CLOCK, IT SAYS 64 MILES AN HOUR.
14  Q.  64 MILES AN HOUR.  IT SAYS 56.48 KNOTS, CORRECT?
15  A.  THAT'S WHAT IT SAYS, YES.
16  Q.  AND AT 9:15, IT SAYS 55.80 KNOTS, CORRECT?
17  A.  YES, 64.17 MILES AN HOUR.
18  Q.  I ASKED YOU IN KNOTS, SIR.  IT SAYS 55.80 KNOTS, CORRECT?
19  A.  THAT'S WHAT THE TABLE SAYS, YES, SIR.
20  Q.  AND THAT'S WHAT YOU BELIEVE THE WIND SPEED WAS AT THAT TIME,
21  CORRECT?
22  A.  I THINK THAT'S A REASONABLE REPRESENTATION OF THE WIND
23  SPEED, YES.
24  Q.  AND THE WIND WAS THE PREDOMINANT FORCE ACTING ON THE BARGE,
25  CORRECT?

## 2170

1  A.  YES, SIR.
2  Q.  AND THE WIND IS WHAT GAVE IT DIRECTION, CORRECT?
3  A.  THAT'S CORRECT.  BUT I WOULD SAY ALSO THAT AT 9 O'CLOCK,
4  9:15 AND 9:30, AS YOU SAID, THE NORTH AND SOUTH BREACHES HAD
5  ALREADY FORMED.  AND IN DOING SO, THEY WERE THEN A CONTRIBUTING
6  CURRENT TO THE CURRENTS OF THE CANAL, WHICH PRIOR TO THE BREACHES
7  WERE INSIGNIFICANT, BUT ONCE THE BREACHES HAD FORMED, THEY WERE
8  THEN ADDING TO THE TRACK OF THE VESSEL.
9  Q.  AND AT THE SOUTH BREACH, ITSELF, RIGHT AT THE SOUTH BREACH,
10  THE CURRENTS WERE WEST TO EAST, CORRECT?
11  A.  THAT'S CORRECT.  WELL, AT THE FLOODWALL, ITSELF, YES.
12  Q.  AT THE BREACH, THERE WERE WEST SPEEDS, CORRECT?
13  A.  YES.  BUT IN THE CANAL, IT WOULD HAVE BEEN MORE NORTH TO
14  SOUTH.
15  Q.  NOT THE QUESTION I ASKED.  I ASKED ABOUT THE BREACH, ITSELF.
16  A.  YES.  AT THE BREACH.
17  Q.  AT THE BREACH IT'S WEST TO EAST?
18  A.  AT THE FLOODWALL.  FALLEN FLOODWALL, YES.
19  Q.  NOW, YOU ALSO CLAIMED THAT THE DRAFT OF THE BARGE WAS ONE
20  FOOT, FOUR-AND-A-HALF INCHES, CORRECT?
21  A.  THAT'S CORRECT.
22  Q.  FOR THAT, YOU RELY ON THE DATA FROM THE INGRAM BARGE
23  REGISTER, CORRECT?
24  A.  THAT'S CORRECT.
25  Q.  YOU DIDN'T ACTUALLY --

## 2171

1  A.  IT COULD HAVE BEEN ABOUT 3.9 INCHES DEEPER IF ONE OF THE
2  COMPARTMENTS HAD BEEN FLOODED.
3  Q.  YOU DIDN'T ACTUALLY LOOK INSIDE THE BARGE FOR ANY FLUIDS,
4  CORRECT?
5  A.  NO, I TOOK MANHOLE COVERS OFF AND LOOKED DOWN, BUT THEY
6  WEREN'T GASFREE, THE TANKS, AND IT'S NOT SAFE TO GO INTO A
7  NONGASFREE TANK.
8  Q.  YOU DIDN'T TAKE MEASUREMENTS ON THE CORROSION MARKS ON THE
9  BARGE, CORRECT?
10  A.  I OBSERVED THE CORROSION MARKS.
11  Q.  BUT YOU DIDN'T TAKE MEASUREMENTS?
12  A.  YEAH, IT WAS NOT NECESSARY TO.
13  Q.  SO AS TO THIS BARGE, AT THE TIME OF THE BREACH, YOU DID NOT
14  INVESTIGATE SPECIFICALLY WHETHER IT WAS CARRYING WATER?
15  A.  NO, I DIDN'T.  I JUST TOLD YOU THAT I TOOK THE MANHOLE
16  COVERS OFF, AND FROM THE DECK, USING A FLASHLIGHT, OBSERVED
17  WHETHER THE TANKS WERE DRY OR HAD WATER.
18  Q.  AND DO YOU KNOW OF MR. MURPH'S TESTIMONY WHERE HE TESTIFIED
19  THAT HE LOOKED IN THERE AND THERE WAS GRAY MATTER IN THERE?
20  A.  I'M SORRY.  WHO?
21  Q.  MR. MURPH'S TESTIMONY.
22  A.  I DON'T RECALL THAT.
23  Q.  REGARDLESS FOR WHAT YOU CONTEND THE BARGE'S DRAFT WAS, YOU
24  TOOK WHAT WAS FROM THE REGISTER.  THAT'S WHAT YOU REPORTED,
25  CORRECT?

## 2172

1  A.  THE LIGHT SHIP DRAFT OF THE BARGE FROM THE CONSTRUCTION
2  INFORMATION WAS THAT IT WAS ONE FOOT, FOUR-AND-A-HALF INCHES, AND
3  I'M TELLING YOU THAT ONE OF THE COMPARTMENTS MAY HAVE BEEN
4  FLOODED TO THE LEVEL OF THE WATERLINE, AND IF IT HAD BEEN, IT
5  WOULD HAVE ADDED 3.9 MORE INCHES TO THE DRAFT.
6  Q.  AND THE RESIDUAL PRODUCT IN THE BARGE WOULD HAVE ADDED MORE
7  OF THE DRAFT, CORRECT?
8  A.  YOU MEAN, IF THERE WAS CEMENT STILL IN THE BARGE?
9  Q.  IF THERE WAS RESIDUAL ANYTHING.
10  A.  I SAW NO EVIDENCE THAT THERE WAS CEMENT IN THE BARGE.
11  Q.  I ASKED YOU IF THERE HAD BEEN, THAT WOULD HAVE ADDED MORE OF
12  A DRAFT, CORRECT?
13  A.  TO THE EXTENT THAT THERE WAS MORE PRODUCT DOWN THERE, YES.
14  Q.  NOW, WHEN THE BARGE ARRIVED, ACCORDING TO YOU, AT THE SOUTH
15  BREACH, THE WIND WAS PUSHING IT IN A NORTH -- IN A SOUTHEASTERLY
16  DIRECTION, CORRECT?
17  A.  GENERALLY, YES.
18  Q.  AND TWO-THIRDS OF IT WENT INTO THE PROTECTED SIDE, CORRECT?
19  A.  YES, SIR.
20  Q.  AND IT MOVED BROADSIDE WITH THE BOW POINTING A BIT NORTH
21  RIGHT OVER THE BREACH, CORRECT?
22  A.  WELL, THAT WAS ACTUALLY WHAT WE CALL THE "STERN," BUT IT WAS
23  THE LEADING EDGE GOING INTO THE LOWER NINTH WARD WAS POINTED
24  AGAIN (INDICATING).
25  Q.  AND IT SHAVED OFF SIX INCHES OF ONE PANEL, CORRECT?

## 2173

1  A.  YES, SIR.

2  Q.  AND IT CAUSED THAT PANEL TO BE PUSHED BACK MORE, CORRECT?

3  A.  THE PANEL WAS ALREADY LEANING, AND IT JUST SHAVED OFF THE

4  TOP OF THE CAP.

5  Q.  AND IT CAUSED IT TO BE MORE INCLINED, CORRECT?

6  A.  POSSIBLY, YES.

7  Q.  AND THEN IT WENT INTO ANOTHER PANEL AND SHATTERED THE CAP,

8  CORRECT?

9  A.  YES, SIR.

10  Q.  I'M GOING TO PUT UP YOUR OWN PICTURE ON THIS.

11      BOB, IF YOU COULD PULL OUT PAGE 116 OF DR. CUSHING'S

12  REPORT.

13      NOW, THAT'S THE ORIENTATION, THIS IS FROM YOUR REPORT.

14      THE CLERK:  WHAT PAGE?

15      THE COURT:  WHAT'S THE PAGE NUMBER ON THAT?  FOR THE

16  RECORD, FIGURES 62 AND 63 OF DR. CUSHING'S REPORT.

17      MR. KHORRAMI:  AND IT'S PAGE 94 OF DR. CUSHING'S REPORT.

18              EXAMINATION

19  BY MR. KHORRAMI:

20  Q.  THOSE ARE THE TWO FIGURES THAT YOU'VE PROVIDED FOR THE

21  COURT.  IS THAT FAIR?

22  A.  YES, SIR.

23  Q.  AND THAT SHOWS HOW THE BARGE WENT BROADSIDE AGAINST THE

24  SOUTH PART OF THE SOUTH BREACH, CORRECT?

25  A.  YES, SIR.

## 2174

1  Q.  OKAY.  NOW, YET ALL OF THE SCRATCHES ON THE BARGE WERE

2  LONGITUDINAL, CORRECT?

3  A.  THAT'S CORRECT.

4  Q.  THERE WERE NO LATERAL SCRATCHES AT ALL, RIGHT?

5  A.  NO, SIR.

6  Q.  SO WHEN THE BARGE WENT OVER THE REBAR AS IT WAS COMING

7  BROADSIDE OVER THE REBAR, THERE WERE NO LATERAL SCRATCHES THAT

8  THE REBAR MADE ON THE BARGE, CORRECT?

9  A.  THAT'S CORRECT.

10  Q.  AND THERE WERE NO LATERAL SCRATCHES THAT THE CONCRETE THAT

11  WAS BREAKING MADE ON THE BARGE, CORRECT?

12  A.  THERE WAS NO EVIDENCE OF THAT, NO.

13  Q.  NOW, ALSO, YOU CLAIM THAT OVERTOPPING WAS A FACTOR IN THIS

14  PARTICULAR BREACH, CORRECT?

15  A.  YES, SIR.

16  Q.  AND OVERTOPPING STARTED AT SOME POINT BEFORE THE BREACH,

17  CORRECT?

18  A.  YES, SIR.

19  Q.  AS THE LEVEL OF THE STORM SURGE AROSE, THERE WAS

20  OVERTOPPING, CORRECT?

21  A.  THAT'S CORRECT.

22  Q.  AT THE NORTH BREACH, AT THE TIME OF THE NORTH BREACH, THERE

23  WAS NO OVERTOPPING, CORRECT?

24  A.  THERE WAS TESTIMONY THAT THERE WAS SPLASHING OF WAVES OVER

25  THE TOP, NOT OVERTOPPING.

## 2175

1  Q.  NO OVERTOPPING.  AND OVERTOPPING IS DIFFERENT FROM SPLASHING

2  OF THE WAVES OVER THE TOP, CORRECT?

3  A.  YES, SIR.

4  Q.  AND YOU WOULD AGREE WITH ME THAT YOUR ESTIMATE OF WHEN THE

5  NORTH BREACH OCCURRED IS SOMETIME BETWEEN 4:00 IN THE MORNING AND

6  6:00 IN THE MORNING, CORRECT?

7  A.  NO, SIR.  THAT'S NOT MY ESTIMATE.  I THINK I TESTIFIED THAT

8  I'VE READ THAT THE OPINIONS OF OTHERS EXTEND FROM 4:30 TILL 6:00.

9  Q.  AND YOU HAVE NO DISPUTE WITH IT BEING AT 6:00 A.M., DO YOU?

10  A.  I DON'T KNOW THE EXACT TIME.

11  Q.  SO IF IT WERE AT 6:00 A.M., THAT WOULDN'T BE SOMETHING THAT

12  YOU WOULD DISAGREE WITH?

13  A.  IT WOULD BE THE OPINIONS OF OTHERS THAT I'VE SEEN, BUT I

14  HAVEN'T SEEN --

15  Q.  BUT YOU'D HAVE NO REASON TO DISAGREE WITH THAT?

16      MR. ALDOCK:  YOUR HONOR, HE'S TALKING OVER THE WITNESS.

17      THE COURT:  HE IS.  IN OTHER WORDS, HAVE YOU FORMED AN

18  OPINION AS TO WHEN THE SOUTH BREACH OCCURRED?

19      MR. GILBERT:  NORTH BREACH, YOUR HONOR.

20      THE COURT:  NORTH BREACH, I APOLOGIZE.  THE NORTH

21  BREACH.

22      THE WITNESS:  ONLY TO THE EXTENT THAT OTHER PEOPLE HAVE

23  TESTIFIED THAT IT WAS BETWEEN 4:30 AND 6:00.  AND IT SEEMS TO BE

24  A REASONABLE RANGE.

25              EXAMINATION

## 2176

1  BY MR. KHORRAMI:

2  Q.  SO OVERTOPPING OCCURRED SOMETIME AFTER THE NORTH BREACH?

3  A.  YES, SIR.  I BELIEVE SO.

4  Q.  AND IPET AND ILIT AGREED THAT THE SOUTH BREACH OCCURRED

5  SOMETIME AROUND 7:30, CORRECT?

6  A.  THAT'S MY RECOLLECTION.

7  Q.  YOUR OPINION AS TO WHEN THE SOUTH BREACH OCCURRED IS AT 7:30

8  OR BEFORE 7:30, CORRECT?

9  A.  YES, SIR.

10  Q.  NOW, LET'S GO OVER --

11      THE COURT:  AT WHAT POINT DID YOU DETERMINE THAT

12  OVERTOPPING COMMENCED AT THE SOUTH BREACH, IN THE LOCATION OF THE

13  SOUTH BREACH?  WHAT TIME?

14      THE WITNESS:  BEFORE 7:30, BUT I DIDN'T FORM AN OPINION

15  AS TO THE PRECISE TIME.

16              EXAMINATION

17  BY MR. KHORRAMI:

18  Q.  YOU HAVE A HYDROGRAPH THAT YOU REFERRED TO INSIDE OF YOUR

19  REPORT, CORRECT?

20  A.  YES, SIR.

21  Q.  AND THAT'S A HYDROGRAPH THAT WAS PREPARED BY DR. DAGGETT?

22  A.  YES, SIR.

23  Q.  AND YOU RELY ON THAT HYDROGRAPH AS THE LEVEL OF THE WATER?

24      MR. ALDOCK:  COULD WE HAVE A PAGE OR EXHIBIT NUMBER?

25      THE COURT:  YES, PLEASE.

**2177**

1    MR. KHORRAMI: IT'S WITHIN HIS REPORT. I BELIEVE IT'S

2  PAGE 47 OF HIS REPORT.

3            EXAMINATION

4  BY MR. KHORRAMI:

5  Q.  THAT'S INSIDE OF YOUR REPORT, CORRECT?

6  A.  THAT'S CORRECT.

7  Q.  IF YOU COULD BLOW UP THE HYDROGRAPH, PLEASE.

8        AT 6 O'CLOCK, YOU WOULD AGREE WITH ME THAT THE LEVEL OF

9  THE WATER WAS JUST OVER 11 FEET INSIDE THE CANAL, CORRECT,

10  NAVD88?

11  A.  OVER 11 FEET. YES.

12  Q.  JUST OVER, CORRECT?

13  A.  JUST OVER.

14  Q.  AND AT 7 O'CLOCK, YOU WOULD AGREE WITH ME THAT THE WATER

15  LEVEL WAS JUST OVER 12 FEET NAVD88, CORRECT?

16  A.  AT 7 O'CLOCK, IT WOULD BE OVER 11 FEET. SORRY, IT WOULD BE

17  OVER 12 FEET.

18  Q.  JUST OVER 12 FEET?

19  A.  YES, SIR.

20  Q.  WOULD YOU AGREE WITH ME THAT IT WOULD BE ABOUT 12.2 FEET?

21  A.  THAT'S AN APPROXIMATE NUMBER.

22  Q.  AND AS OF 6 O'CLOCK, WOULD YOU AGREE WITH ME THAT IT WOULD

23  BE 11.2 FEET?

24  A.  APPROXIMATELY. AND THESE WOULD BE THE HEIGHTS OF THE WATER

25  AT THE LOCKMASTER'S CANAL GAUGE.

**2178**

1  Q.  AND WOULD YOU AGREE WITH ME THAT AT 9 O'CLOCK IS WHERE THE

2  STORM SURGE REACHED ITS MAXIMUM?

3  A.  AT THE LOCK GAUGE, IT SHOWS A MAXIMUM AT 10 O'CLOCK.

4  Q.  WOULD YOU AGREE WITH ME THAT THAT'S WHEN STORM SURGE WAS

5  AT ITS MAXIMUM?

6  A.  AT THE LOCK GAUGE, YES.

7  Q.  AND THEN AT 7:30 A.M., WOULD YOU AGREE WITH ME THAT THE

8  WATER HEIGHT WAS AT 12.6 NAVD88? I CAN PUT A DIAGRAM IN FRONT OF

9  YOU WHERE I HAVE VECTORS, BUT I DON'T KNOW IF YOU WANT TO LOOK AT

10  THOSE.

11  A.  YOU'RE ASKING ME AT 7:30?

12  Q.  AT 7:30.

13  A.  THE QUESTION IS?

14  Q.  WOULD YOU AGREE WITH ME THAT THE WATER LEVEL IN THE CANAL

15  WAS 12.6 FEET.

16  A.  AND THE TIME AGAIN? 7:30?

17  Q.  7:30.

18  A.  APPROXIMATELY -- NO. I'M HAVING TROUBLE FOLLOWING THE LINES

19  WITHOUT TOUCHING THE SCREEN.

20  Q.  IF YOU WANT, I HAVE ONE THAT I'VE PREPARED THAT HAS LINES

21  DRAWN IN IT AT THOSE TIMES. IF IT WOULD BE HELPFUL TO YOU, I

22  WOULD BE HAPPY TO PUT THAT UP.

23  A.  THE QUESTION AGAIN, PLEASE.

24  Q.  WOULD YOU AGREE WITH ME THAT AT 7:30, THE HEIGHT OF THE

25  WATER IN THE CANAL WAS 12.6 NAVD88?

**2179**

1  A.  IT APPEARS TO BE HIGHER IN THIS. IT APPEARS TO BE HIGHER.

2  Q.  WHAT DOES IT APPEAR TO BE?

3  A.  IT APPEARS TO BE --

4  Q.  IT'S DEFINITELY NOT 13, CORRECT?

5  A.  7:30 APPEARS TO BE 13.

6  Q.  YOU SEE 7:30 BEING AT 13?

7  A.  I SEE 7:30 BEING --

8        THE COURT: IT'S NOT THAT EASY TO READ.

9        MR. KHORRAMI: IT'S NOT, YOUR HONOR.

10        THE WITNESS: -- THERE, AND IF YOU GO UP HALFWAY BETWEEN

11  THOSE TWO LINES, YOU COME TO THERE, WHICH IS 13 FEET.

12            EXAMINATION

13  BY MR. KHORRAMI:

14  Q.  OKAY. BUT AT 7 O'CLOCK, YOU AGREE WITH ME IT WAS 12.2.

15  FAIR?

16  A.  I THOUGHT THE QUESTION WAS 7:30.

17  Q.  I UNDERSTAND. 7 O'CLOCK?

18  A.  AT 7 O'CLOCK?

19  Q.  YEAH.

20  A.  THERE, IT WOULD BE 12.2, I THINK WAS WHAT YOU ASKED ME

21  BEFORE.

22  Q.  RIGHT. EXACTLY. THAT WAS EXACTLY WHAT YOU AGREED.

23  A.  YES.

24  Q.  FAIR. CAN WE PUT UP THE SURVEY? CAN YOU BLOW UP THE

25  SURVEY, PLEASE. IT'S PAGE B-18 OF YOUR REPORT, WHICH IS

**2180**

1  APPENDIX B, DR. DAGGETT'S REPORT.

2        THOSE ARE THE RESULTS OF THE SURVEY OF THE WALL HEIGHT,

3  CORRECT?

4  A.  YES, SIR.

5        THE COURT: THIS WOULD BE B-18, CORRECT?

6        MR. KHORRAMI: YES, YOUR HONOR.

7        THE COURT: WE'VE GOT IT.

8            EXAMINATION

9  BY MR. KHORRAMI:

10  Q.  AND THE BLUE LINES ON THIS ARE WHAT DR. DAGGETT DID IN TERMS

11  OF HIS SURVEY, CORRECT?

12  A.  THAT'S CORRECT.

13  Q.  AND THE LOWEST WALL HEIGHT YOU SEE ON THIS SURVEY IS ABOUT A

14  LITTLE BIT OVER 12.8 FEET, CORRECT?

15  A.  THAT'S CORRECT.

16  Q.  AND THE WATER AT 7 O'CLOCK WAS BELOW THAT HEIGHT, CORRECT?

17  A.  THE WATER AT 7 O'CLOCK, ACCORDING TO THE LOCKMASTER AT THAT

18  END OF THE CANAL WOULD HAVE BEEN, I THINK WE SAID 12.2.

19  Q.  CORRECT. SO THERE WOULDN'T HAVE BEEN ANY OVERTOPPING AT

20  THAT TIME?

21  A.  NO, SIR. YOU SEE, THERE IS 800 FEET OF MISSING DATA HERE,

22  AND I THINK I TESTIFIED THAT THE WALL WOULD HAVE OVERTOPPED AT

23  THE LOWEST POINT, SO THE LOWEST POINT, THE MOST SUBSIDED POINT

24  WOULD HAVE BEEN IN WAY OF THE BREACH, NOT -- I THINK MY POINTER

25  HAS RUN OUT OF JUICE HERE -- WOULD HAVE BEEN AT THE MOST SUBSIDED

2181

1  POINT.  SO IT COULD HAVE AND IS LIKELY TO HAVE BEEN LOWER THAN
2  THESE VALUES HERE IN WAY OF THE BREACH, AND IN FACT, IT'S IPET'S
3  OPINION THAT IT WAS SOME 11 -- APPROXIMATELY 11 FEET HIGH.
4  Q.   AS TO THE REST OF THE WALLS THAT ARE IN THE SURVEY VERSUS
5  THE PORTION THAT'S NOT IN THE SURVEY, OKAY, AS THE WALLS THAT ARE
6  STANDING, THERE WOULDN'T HAVE BEEN ANY OVERTOPPING UNTIL AFTER
7  7 O'CLOCK, CORRECT?
8  A.   IT DEPENDS UPON THE WAVE CONDITIONS IN THE CANAL.
9  Q.   NO, SIR, YOU TESTIFIED THAT THE WAVE CONDITIONS WOULD NOT
10 EQUATE TO OVERTOPPING.
11 A.   NO, SIR, THAT'S NOT WHAT I SAID.  I SAID SPLASHING WOULDN'T.
12 BUT IF THE WAVES WERE ONE TO THREE FEET HIGH, THEN THE WATER
13 LEVELS WOULD HAVE BEEN FLOWING OVER AT THE PEAK OF THE WAVES.  IT
14 WOULDN'T JUST HAVE BEEN SPLASHING.  IT WOULD HAVE BEEN
15 SIGNIFICANT AMOUNTS OF WATER.
16 Q.   SO YOUR TESTIMONY NOW IS THAT THE SPLASHING FROM THOSE WAVES
17 WOULD HAVE BEEN -- IS DIFFERENT FROM THE SPLASHING THAT YOU
18 REFERENCED BEFORE.  FAIR ENOUGH?
19 A.   NO.  YOU KEEP CHARACTERIZING MY TESTIMONY AS "SPLASHING" IN
20 THIS LITIGATION AND IT'S NOT SPLASHING.
21 Q.   AND YOU'RE NOT A HYDROLOGIST, CORRECT?
22 A.   I'M A --
23 Q.   AND IF A HYDROLOGIST TESTIFIED --
24     THE COURT:  WAIT, WAIT.  DON'T STEP ON EACH OTHER.  LET
25 HIM FINISH HIS ANSWER.

2182

1     NOW, WHAT WAS YOUR ANSWER?
2     THE WITNESS:  YOUR HONOR, I WAS SAYING, I'M A
3  HYDRODYNAMICIST AND WAVES ARE A FUNDAMENTAL PART OF MY EDUCATION,
4  TRAINING AND EXPERIENCE.
5     EXAMINATION
6  BY MR. KHORRAMI:
7  Q.   IF A HYDROLOGIST TESTIFIED THAT THE WAVE SPLASHING WOULD NOT
8  CAUSE SCOURING, THEN YOU WOULD NOT BE ABLE TO DISPUTE THAT,
9  CORRECT?
10 A.   NO, SIR.  I COULD -- WELL, I COULD DISPUTE IT.
11 Q.   OKAY.  I'M SURE YOU WILL, WHATEVER IT IS.
12     NOW, YOU WOULD ALSO AGREE WITH ME THAT AS TO THE
13 OVERTOPPING THAT WE'RE TALKING ABOUT, AND THAT'S THE PORTION OF
14 THE WALL THAT IS STANDING, THAT THE OVERTOPPING TOOK PLACE UNTIL
15 AT LEAST 9 O'CLOCK A.M.  FAIR ENOUGH?
16 A.   NO, SIR.  WE DON'T KNOW HOW HIGH THE WALL WAS IN THE FAILED
17 PORTION, AND IT'S LIKELY THAT THE WALL WOULD HAVE BEEN LOWER,
18 MUCH LOWER AT THE LOCATION WHERE THE WALL ACTUALLY FAILED.
19 THAT'S WHERE THE OVERTOPPING WOULD HAVE OCCURRED FIRST, BUT WE
20 DON'T KNOW HOW HIGH THE WALL WAS WHEN IT WAS, IN MY OPINION,
21 LOWER THAN THE OTHER READINGS YOU HAVE ALONG THE WALL.
22 Q.   SIR, I WAS ASKING YOU ABOUT THE OVERTOPPING, WHEN IT WOULD
23 ACTUALLY STOP OVERTOPPING.  IT WOULD BE SOMETIME AFTER 9:00 A.M.
24 IT WOULD BE SOMETIME AFTER THE STORM SURGE WENT DOWN?
25     THE COURT:  ASSUMING THERE IS A WALL THERE, I ASSUME.

2183

1     MR. KHORRAMI:  I'M TALKING ABOUT THE PORTIONS THAT ARE
2  STANDING.
3     THE COURT:  ASSUMING AN EXTANT WALL AT -- I DON'T KNOW,
4  I'M NOT SURE PRECISELY IF YOU'RE TALKING ABOUT THE AVERAGE HEIGHT
5  OR --
6     MR. KHORRAMI:  I'M SORRY, YOUR HONOR.  I APOLOGIZE.
7     THE COURT:  I'M NOT SURE HOW FINE YOUR QUESTION HAS TO
8  BE, BUT ASSUMING THE WALL TO BE 12 FEET OR 13 FEET OR WHATEVER,
9  WHEN WOULD THE OVERTOPPING STOP?
10     THE WITNESS:  THE OVERTOPPING WOULD STOP WHEN THE WATER
11 LEVEL IN THE CANAL WAS LOWER -- BELOW THE HEIGHT OF THE WALL.
12 AND THE WATER LEVEL IN THE CANAL ROSE TO A LEVEL OF 14 FEET.
13     EXAMINATION
14 BY MR. KHORRAMI:
15 Q.   CORRECT.  AND THAT HAPPENED AT 9 O'CLOCK, CORRECT?
16 A.   THAT'S CORRECT.
17 Q.   AND SO AT LEAST UNTIL 9 O'CLOCK, THERE IS OVERTOPPING,
18 CORRECT?
19 A.   THERE IS OVERTOPPING.  I BELIEVE THERE WOULD BE.
20 Q.   AT LEAST UNTIL 9 O'CLOCK, CORRECT?
21 A.   YES, SIR.
22 Q.   AND AS OF 7 O'CLOCK AT MOST, THERE IS WAVES SPLASHING OVER
23 THE WALL, CORRECT?
24 A.   THAT'S CORRECT.
25 Q.   SO THE MAJORITY OF OVERTOPPING OCCURS SOMETIME AFTER

2184

1  7 O'CLOCK, CORRECT?
2  A.   AND IF YOU COULD REMIND ME AGAIN WHAT TIME -- THE HEIGHT OF
3  THE WATER, IF I COULD REFER TO THE HYDROGRAPH AT 7 O'CLOCK.
4  Q.   SURE.  IT'S PAGE 47 OF YOUR REPORT.
5  A.   THE QUESTION AGAIN, SIR?
6  Q.   THE MAJORITY OF THE OVERTOPPING OCCURRED AFTER 7 O'CLOCK IN
7  THE A.M., CORRECT?
8  A.   YES, SIR.
9  Q.   NOW, YOU PUT UP A PICTURE OF THE SOUTH BREACH AND YOU
10 MENTIONED SCOUR TRENCHES AT THE ACTUAL BREACH SITE, WHICH WOULD
11 BE IN THIS DIAGRAM RIGHT OVER HERE IN THIS 800-FOOT PORTION,
12 CORRECT?
13 A.   YES, SIR.
14 Q.   OKAY.  BOB, CAN YOU PUT UP THAT PHOTO?
15     AND THIS IS A PICTURE DEPICTING THE SOUTH BREACH
16 LOOKING NORTH FROM THE VERY SOUTH END OF IT, CORRECT?
17 A.   YES, SIR.
18 Q.   AND THE SCOUR TRENCH THAT YOU POINTED TO IS RIGHT HERE THAT
19 I'M POINTING AT.  IT'S THIS PUDDLE OF WATER IN HERE, CORRECT?
20 A.   IT WOULD HAVE BEEN IN LINE WITH THE FLOODWALL, THE IN-SHORE
21 SIDE OF THE FLOODWALL.
22 Q.   BUT YOU'RE CLAIMING THAT THIS IS THE SCOUR TRENCH.  I'M
23 POINTING TO A PUDDLE OF WATER HERE.
24 A.   I'M SAYING IT'S MORE OVER HERE.
25 Q.   OKAY.  AND THEN SO THIS PORTION OF THE TRENCH IS NOT A SCOUR

**2185**

TRENCH, CORRECT?

1  A.   NO.  IT WOULDN'T BE BECAUSE AT THIS POINT, THERE WAS MASSIVE

2  FLOODING IN THE AREA, NUMBER ONE; AND NUMBER TWO, THIS WAS ALSO

3  AFTER HURRICANE KATRINA -- SORRY, AFTER HURRICANE RITA HAD

4  FLOODED IN AND ALSO THE SHEET PILING WOULD HAVE BEEN UPROOTED

5  FROM THIS AREA ALONG HERE.  SO ALL OF THOSE AND OTHER CONDITIONS

6  WOULD HAVE CONTRIBUTED TO THE EROSION OF THE HOLES.

7  Q.   ISN'T IT ACTUALLY CORRECT THAT WHEN THE WALL GETS DISPLACED

8  FROM THIS LOCATION, IT WOULD CAUSE A TRENCH, CORRECT?

9  A.   IT WOULDN'T CAUSE A TRENCH; IT WOULD CAUSE A DEEP PIT BEHIND

10  HERE.

11  Q.   IT WOULD CAUSE A DEEP PIT RIGHT HERE?

12  A.   ON THE OFFSHORE SIDE IF THE WALL WERE TO MOVE, THEN IT WOULD

13  CREATE THESE GAPS WHICH WOULD LEAD TO EROSION AND BIG HOLES ON

14  THIS SIDE.

15  Q.   WELL, I'M GOING TO PUT ON THE SIDE OF THIS A PICTURE THAT'S

16  FROM DR. MARINO'S REPORT, THE FIGURE 4.59.  CAN WE PUT THAT SIDE

17  BY SIDE.

18       IN THIS SITUATION, THE WALL DIDN'T ACTUALLY FALL,

19  CORRECT?

20  A.   THAT'S CORRECT.

21  Q.   AND IN FRONT OF -- ON THE FLOOD SIDE OF THE WALL, THERE'S A

22  BIG TRENCH, CORRECT?

23  A.   YES, THAT'S WHAT I'M TALKING ABOUT.  THESE BIG AREAS ARE

24  CAUSED BY THE DISPLACEMENT OF THE SHEET PILING.

**2186**

1  Q.   SO THE WALL IS ACTUALLY MOVED BACK AND THERE'S A TRENCH

2  CREATED FROM THE DISPLACEMENT, CORRECT?

3  A.   IN THIS PHOTOGRAPH HERE, YES, AND ALSO --

4  Q.   WHEN THE WALL WAS DISPLACED, SIR, THERE'S A TRENCH CREATED

5  ON THE FLOOD SIDE OF THE WALL, CORRECT?

6  A.   YES, DEPENDING ON WHETHER IT SLID OR WHETHER IT ROLLED OVER.

7  THERE WOULD BE A GAP ON THE CANAL SIDE.

8  Q.   AND YOU'RE NOT A GEOTECHNICAL EXPERT, SO YOU DON'T HAVE THE

9  EXPERTISE TO TALK ABOUT WHAT EXACTLY WOULD HAPPEN WITH THE SOIL

10  AS THE WALL IS DISPLACED, FAIR?

11  A.   I'M JUST ATTEMPTING TO ANSWER YOUR QUESTIONS.

12  Q.   AND IN THIS SITUATION, THIS ENTIRE TRENCH, YOU WOULD AGREE

13  WITH ME IS CAUSED BY DISPLACEMENT.  FAIR?

14  A.   IT APPEARS TO BE, YES.

15  Q.   AND DO YOU NOTICE HOW PART OF THE TRENCH IS ACTUALLY BEHIND

16  THE LINE OF THE -- WHERE THE WALL WAS ORIGINALLY STANDING,

17  CORRECT?

18  A.   I CAN'T TELL FROM THE PHOTO WHERE THE WALL WAS ORIGINALLY

19  STANDING, BUT IT DOES APPEAR TO BE LARGE GAPS --

20  Q.   SO PORTIONS OF THE DISPLACEMENT TRENCH IS ACTUALLY BEHIND ON

21  THE PROTECTED SIDE, ESSENTIALLY.  FAIR ENOUGH?  BEHIND WHERE THE

22  WALL USED TO BE.  FAIR ENOUGH?

23  A.   ARE YOU TALKING ABOUT THESE AREAS OVER HERE?

24  Q.   I'M TALKING ABOUT THIS AREA RIGHT HERE.  THE WALL USED TO BE

25  HERE.  IT GOT DISPLACED.  AND NOW THERE IS A TRENCH --

**2187**

1  A.   AND I'M TRYING TO UNDERSTAND WHERE YOU'RE SAYING "A TRENCH."

2  ON WHICH SIDE?

3  Q.   I'M TALKING ABOUT THE TRENCH ON THE FLOOD SIDE.

4  A.   THAT APPEARS TO BE WHERE THE WALL WAS.

5  Q.   AND A LITTLE BIT BEHIND WHERE THE WALL WAS, CORRECT, BECAUSE

6  THE WALL HAS BEEN MOVED BACK, IT'S BEEN DISPLACED?

7  A.   YES, SIR.  YES, SIR.

8  Q.   AND THE SAME PHENOMENON WOULD HAPPEN OVER HERE WHERE THE

9  WALL WAS DISPLACED, CORRECT?

10  A.   THAT'S CORRECT.

11  Q.   SO THE DISPLACEMENT TRENCH WOULD MOVE BACK BEHIND WHERE THE

12  WALL WAS ORIGINALLY, CORRECT?

13  A.   I DON'T UNDERSTAND THE QUESTION.

14  Q.   OKAY.  THE DISPLACEMENT TRENCH WOULD EXTEND TO WHERE -- TO

15  THE PORTION OF THE PROTECTED SIDE, WHERE THE PROTECTED SIDE USED

16  TO BE.  FAIR ENOUGH?

17  A.   YES, SIR.

18  Q.   SO WE DON'T KNOW WHAT PORTION OF THIS IS A SCOUR TRENCH, IF

19  AT ALL?

20  A.   NOT IN THIS PORTION OF THE COLLAPSED FLOODWALL, NO.

21       THE COURT:  HOW MUCH MORE DO YOU HAVE, MR. KHORRAMI?

22  I'M NOT RUSHING YOU.

23       MR. KHORRAMI:  WE COULD TAKE A LUNCH BREAK.  I HAVE A

24  BIT TO GO.  I APOLOGIZE.

25       THE COURT:  WE WILL TAKE A LUNCH BREAK UNTIL 1:15.

**2188**

1       THE DEPUTY CLERK:  ALL RISE.

2       (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE COURT

3  WAS IN LUNCHEON RECESS.)

                    *  *  *

                REPORTER'S CERTIFICATE

I, CATHY PEPPER, CERTIFIED REALTIME REPORTER, REGISTERED

MERIT REPORTER, REGISTERED PROFESSIONAL REPORTER, CERTIFIED COURT

REPORTER OF THE STATE OF LOUISIANA, OFFICIAL COURT REPORTER FOR

THE UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF LOUISIANA,

DO HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT

TRANSCRIPT, TO THE BEST OF MY ABILITY AND UNDERSTANDING, FROM THE

RECORD OF THE PROCEEDINGS IN THE ABOVE-ENTITLED AND NUMBERED

MATTER.


                S/CATHY PEPPER

                CATHY PEPPER, CRR, RMR, CCR

                OFFICIAL COURT REPORTER

                UNITED STATES DISTRICT COURT

2189

1                    UNITED STATES DISTRICT COURT
2                    EASTERN DISTRICT OF LOUISIANA
3
4
5       IN RE:  KATRINA DREDGING        *   Civil Action
        LIMITATION ACTION               *
6       CONSOLIDATED LITIGATION         *   No. 05-4182
                                        *
7                                       *   Section K(2)
        PERTAINS TO:                    *
8       BARGE                           *   New Orleans, Louisiana
                                        *
9       MUMFORD, C.A. NO. 05-5724, AS  *   July 6, 2010
        TO PLAINTIFFS JOSEPHINE         *
10      RICHARDSON AND HOLLIDAY         *   Afternoon Session
        JEWELERS, INC., ONLY            *
11      AND                             *
        BENOIT, C.A. NO. 06-7516, AS   *
12      TO PLAINTIFFS JOHN ALFORD AND  *
        JERRY ALFORD ONLY               *
13      * * * * * * * * * * * * * * *
14                           DAY TEN
                      BENCH TRIAL BEFORE THE
15              HONORABLE STANWOOD R. DUVAL, JR.
                   UNITED STATES DISTRICT JUDGE
16
17      APPEARANCES:
18      For the Plaintiffs:         Best Koeppel
                                    BY:  LAURENCE E. BEST, ESQ.
19                                  BY:  PETER S. KOEPPEL, ESQ.
                                    2030 St. Charles Avenue
20                                  New Orleans, Louisiana 70130
21
22      For the Plaintiffs:         Law Offices of Brian A. Gilbert
                                    BY:  BRIAN A. GILBERT, ESQ.
23                                  2030 St. Charles Avenue
                                    New Orleans, Louisiana  70130
24
25
              JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA

## 2190

APPEARANCES:

For the Plaintiffs:   Wiedemann & Wiedemann
                      BY:  KARL WIEDEMANN, ESQ.
                      BY:  LAWRENCE WIEDEMANN, ESQ.
                      821 Baronne Street
                      New Orleans, Louisiana  70113

For the Plaintiffs:   Patrick J. Sanders, LLC
                      BY:  PATRICK J. SANDERS, ESQ.
                      3316 Ridgelake Drive
                      Suite 100
                      Metairie, Louisiana  70002

For the Plaintiffs:   Law Office of Richard T. Seymour,
                      P.L.L.C.
                      BY:  RICHARD T. SEYMOUR, ESQ.
                      1150 Connecticut Avenue N.W.
                      Suite 900
                      Washington, D.C.  20036-4129

For the Plaintiffs:   Khorrami, Pollard & Abir, LLP
                      BY:  SHAWN KHORRAMI, ESQ.
                      444 S. Flower Street
                      33rd Floor
                      Los Angeles, California  90071

For the Plaintiffs:   Wilson, Grochow, Druker & Nolet
                      BY:  LAWRENCE A. WILSON, ESQ.
                      233 Broadway
                      5th Floor
                      New York, New York  10279

For the Defendant:    Chaffe, McCall, L.L.P.
                      BY:  DEREK A. WALKER, ESQ.
                      BY:  CHARLES P. BLANCHARD, ESQ.
                      1100 Poydras Street, Suite 2300
                      New Orleans, Louisiana 70163

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2191

APPEARANCES:

For the Defendant:    Goodwin Procter, L.L.P.
                      BY:  JOHN ALDOCK, ESQ.
                      BY:  MARK RAFFMAN, ESQ.
                      BY:  ADAM CHUD, ESQ.
                      BY:  KIRSTEN ROBBINS, ESQ.
                      BY:  ERIC I. GOLDBERG, ESQ.
                      901 New York Avenue, NW
                      Washington, D.C. 20001

For the Defendant:    Sutterfield & Webb
                      BY:  DANIEL A. WEBB, ESQ.
                      650 Poydras Street, Suite 2715
                      New Orleans, Louisiana 70130

For the Defendant:    Lafarge North America, Inc.
                      BY:  PETER KEELEY, ESQ.
                      12950 Worldgate Drive
                      Herndon, Virginia  20170

Official Court Reporter:   Jodi Simcox, RMR, FCRR
                      500 Poydras Street
                      Room HB-406
                      New Orleans, Louisiana 70130
                      (504) 589-7780

Proceedings recorded by mechanical stenography, transcript
produced by computer.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2192

I N D E X

                                              Page

CHARLES R. CUSHING
    Cross-Examination                         2193
    Redirect Examination                      2212

MICHAEL O'DOWD
    Direct Examination                        2214
    Cross-Examination                         2229

JACOB ROBERT GLASER
    Direct Examination                        2239
    Cross-Examination                         2258
    Redirect Examination                      2272
REDA BAKEER
    Direct Examination                        2275

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2193

                        AFTERNOON SESSION

                          (July 6, 2010)

12:48                      ' ' ' ' '

13:13         THE DEPUTY CLERK:  All rise.  Court's in session.

13:13   Please be seated.

13:13         MR. KHORRAMI:  May I proceed?

13:13         THE COURT:  Yes, sir, you may.

13:13         MR. KHORRAMI:  Thank you, Your Honor.

09:20         (WHEREUPON, Charles R. Cushing, having been

09:20   previously duly sworn, testified as follows.)

13:13                    CROSS-EXAMINATION

13:13   BY MR. KHORRAMI:

13:13   Q.  And we discussed wind speed at 9:00 and 9:15, which is

13:13   within the time that you claim the barge would have moved away

13:13   from the terminal; correct?

13:14   A.  No, sir.  I said it moved away sometime after 9:00.

13:14   Q.  So that's within the time?  9:00 to 9:15 is within the

13:14   time?

13:14   A.  It's within the time.  After 9:00.

13:14   Q.  Okay.  And you've created a graph that shows the speed

13:14   with which -- that shows how you can calculate the speed of the

13:14   barge versus the speed of the wind; correct?

13:14   A.  In the hypothetical calculations, we did.  We calculated

13:14   the speed of the barge under the winds that had occurred

13:14   earlier.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2194

```
13:14   Q.  Okay.  And assuming that the winds at the time that the
13:14   barge broke away were about 55 knots, we can figure out what
13:14   the speed of the barge would have beenj correctz
13:14   A.  That s correct.
13:14   Q.  Okay.  And that s what your graph showsj correctz
13:14   A.  My graph doesn t show that.
13:14   Q.  Your graph shows the speed of the wind, and then you can
13:15   figure out what the speed of the barge would have beenj
13:15   correctz
13:15   A.  The graph shows the speed of the wind, but my graph
13:15   doesn t show the speed of the barge.
13:15   Q.  Okay.  Okay.  I added a couple of things to your graph
13:15   over therej but outside of what I ve added in there, which is
13:15   the two boxes and the two vectors, that s your graphj rightz
13:15   A.  (No response.)
13:15   Q.  Correct, sirz
13:15   A.  I don t recall this.
13:15   Q.  That s from page E-10 of your report, Appendix Ez
13:16   A.  It s possibly in the appendix, yes, sir.
13:16   Q.  Okay.  And that s a graph that you createdj correctz
13:16   A.  Yes.  It s in our appendix.
13:16   Q.  And that talks about wind speed versus -- and then it
13:16   shows, based on the wind speed, what the velocity of the barge
13:16   within the water would bej correctz
13:16   A.  Yes, sir.
```

                    JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                              UNITED STATES DISTRICT COURT
                              EASTERN DISTRICT OF LOUISIANA

2195

```
13:16   Q.  It doesz
13:16   A.  It does.
13:16   Q.  Okay.  So if we were assuming 55 knots as the wind, okay,
13:16   then the barge would be traveling at about 4.8 knotsj correctz
13:16   And you can look at your graph there.
13:16   A.  According to the graph, yes.
13:16   Q.  Okay.  And 4.8 knots is about 5 1/2 miles per hourj
13:16   correctz
13:16   A.  Yes, sir.
13:16   Q.  And you previously testified that the barge is about half
13:16   a mile away from the south part of the south breachj correctz
13:16   A.  Yes, sir.
13:16   Q.  Okay.  So if it breaks away at about 9:00 in the morning,
13:16   how fast does it get to the south part of the south breachz
13:17   MR. ALDOCK:  Objection, Your Honor.  I think that if
13:17   counsel is going to do the hypothetical, he has to deal with
13:17   how long it takes to get out of the slip before it gets to the
13:17   free canal.
13:17   THE COURT:  That is -- I understand that the
13:17   hypothetical does re; uire, assuming it s not out of the slip,
13:17   to get out of the slip.
13:17   BY MR. KHORRAMI:
13:17   Q.  Would you agree with me that at 5 1/2 miles per hour, that
13:17   if the barge were to travel the entire time at 5 1/2 miles per
13:17   hour, it would take about 6 minutes to get from the terminal to
```

                    JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                              UNITED STATES DISTRICT COURT
                              EASTERN DISTRICT OF LOUISIANA

2196

```
13:17   the south part of the south breachz
13:17   A.  Yes, sir.  That s order of magnitude.
13:17   Q.  I m sorryz
13:17   A.  Order of magnitude.
13:17   Q.  Order of magnitudez
13:17   A.  Yes, sir.
13:17   Q.  Okay.  It s within the range is what you re sayingj rightz
13:17   A.  Yes, sir.
13:17   Q.  Okay.  So would it be safe to say, then, that from the
13:17   time that it moves away from the facility, somewhere between
13:17   six to ten minutes, it reaches the south breachj correctz
13:18   A.  Yes, sir.
13:18   Q.  And you also testified that there s no way that the barge
13:18   would have moved away from the facility prior to 9:00j correctz
13:18   A.  That s my opinion.
13:18   Q.  And your opinion is that the reason for that opinion,
13:18   actually, is that it would have been blown to the south by the
13:18   Namasco facilityj correctz
13:18   A.  That s correct.
13:18   Q.  And it would have gotten -- eventually had to have gotten
13:18   stuck at that gantryj correctz
13:18   A.  That s correct.
13:18   Q.  What s that gantry forz
13:18   A.  The gantry is for unloading steel from barges and carrying
13:18   it into the warehouse.
```

                    JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                              UNITED STATES DISTRICT COURT
                              EASTERN DISTRICT OF LOUISIANA

2197

```
13:18   Q.  It s a barge-unloading gantryj correctz
13:18   A.  That s correct.
13:19   Q.  And so your contention is that the only way the barge can
13:19   move from there is by going underneath that gantryj correctz
13:19   A.  No.  I say it can t get under the gantry.
13:19   Q.  But the only way it would be able to get out of there, it
13:19   would have to be going through that gantryj correctz
13:19   A.  No, I m not saying that it would have had to have gone
13:19   through the gantry.  I m saying it couldn t get out there
13:19   unless the wind blew it around the gantry.
13:19   Q.  Okay.  So there s a possibility that the wind could blow
13:19   it around the gantryj correctz
13:19   A.  That s correct.
13:19   Q.  And before 9:00, there s no way the wind could blow it
13:19   around the gantryj correctz
13:19   A.  That s correct.
13:19   Q.  And you don t have a model for predicting the barge s
13:19   movement once it s against the docks like that, like by the
13:19   Namasco facilityj correctz
13:19   A.  I m not understanding your ; uestion.  I know which way the
13:19   wind blows --
13:19   Q.  Right.  But you have to --
13:19   A.  -- and the barge would have moved with the wind.  And if
13:19   the wind had blown before 9:00, had blown the barge free, it
13:20   would have collided with the gantry or been trapped --
```

                    JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                              UNITED STATES DISTRICT COURT
                              EASTERN DISTRICT OF LOUISIANA

                                              3  (Pages 2194 to 2197)

**2198**

| | |
|---|---|
| 1 | 13:20  Q.  Correct. |
| 2 | 13:20  A.  -- in the south end of the pocket. |
| 3 | 13:20  Q.  But you don t have a model for showing how the barge would |
| 4 | 13:20  have moved east with a westerly wind; correctz  Once it s |
| 5 | 13:20  against the dock; correctz |
| 6 | 13:20  A.  Against which dockz  The Namasco dockz |
| 7 | 13:20  Q.  Against the Namasco facility. |
| 8 | 13:20  A.  No.  I don t think you need a model for that. |
| 9 | 13:20  Q.  But you need a model to show how the barge goes from the |
| 10 | 13:20  terminal down to the south breach; rightz |
| 11 | 13:20  A.  Yes, sir. |
| 12 | 13:20  Q.  Everything else you don t need a model for; correctz |
| 13 | 13:20  A.  Not if the barge is trapped or the wind is holding the |
| 14 | 13:20  barge against the Lafarge terminal.  You don t need a model for |
| 15 | 13:20  that. |
| 16 | 13:20  Q.  You didn t provide any measurements of the gantry, did |
| 17 | 13:20  you, inside of your reportz |
| 18 | 13:20  A.  Measurements of the gantryz |
| 19 | 13:20  Q.  How high it is. |
| 20 | 13:20  A.  Yeah.  We scaled it from the photographs, and we placed |
| 21 | 13:21  the water levels and the barge profile against the dimensions |
| 22 | 13:21  of the gantry in order to determine at what point the barge |
| 23 | 13:21  would collide with the gantry shed.  And we determined that |
| 24 | 13:21  after 6:00, it would have collided with the gantry shed, |
| 25 | 13:21  clearly. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2199**

| | |
|---|---|
| 1 | 13:21  Q.  You didn t drop a tape measure and measure the height of |
| 2 | 13:21  the gantryz |
| 3 | 13:21  A.  No, sir, I didn t. |
| 4 | 13:21  Q.  You did notz |
| 5 | 13:21  A.  I scaled it. |
| 6 | 13:21  Q.  And you don t have any of those figures -- |
| 7 | 13:21      THE COURT:  Let him finish his answer. |
| 8 | 13:21  BY MR. KHORRAMI: |
| 9 | 13:21  Q.  Sure. |
| 10 | 13:21  A.  I think what I said was I scaled the photographs, and I |
| 11 | 13:21  was able to scale the photographs to determine how high it was. |
| 12 | 13:21  Q.  But as you sit here today, you didn t take a tape measure |
| 13 | 13:21  to the gantry at all.  You could have done that, couldn t youz |
| 14 | 13:21  A.  I could have done a lot of things, but it was |
| 15 | 13:21  sufficient -- it was sufficient to show that the barge could |
| 16 | 13:21  not have gotten under that gantry until the early morning |
| 17 | 13:22  hours. |
| 18 | 13:22  Q.  So if the barge would fit underneath the gantry, then it |
| 19 | 13:22  could have broken away earlier than 9:00; rightz  Fair enoughz |
| 20 | 13:22  A.  It could have escaped from that area, yes. |
| 21 | 13:22  Q.  Now, you also showed pictures of other barges; is that |
| 22 | 13:22  rightz |
| 23 | 13:22  A.  Yes, sir. |
| 24 | 13:22  Q.  What the effect of a barge crashing into a floodwall would |
| 25 | 13:22  be; correctz |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2200**

| | |
|---|---|
| 1 | 13:22  A.  Yes, sir, into the caps -- |
| 2 | 13:22  Q.  And specifically into the capz |
| 3 | 13:22  A.  Yes, sir. |
| 4 | 13:22  Q.  Okay.  So that s one of the pictures that you showed; is |
| 5 | 13:23  that correctz |
| 6 | 13:23  A.  Yes, sir. |
| 7 | 13:23  Q.  Okay.  This is a barge that s sitting on a floodwall; |
| 8 | 13:23  rightz |
| 9 | 13:23  A.  That s correct. |
| 10 | 13:23  Q.  It s not in the portion of the canal that we re talking |
| 11 | 13:23  about; correctz |
| 12 | 13:23  A.  No.  This is Bayou Bienvenue. |
| 13 | 13:23  Q.  We don t know when this particular crash occurred; |
| 14 | 13:23  correctz |
| 15 | 13:23  A.  It occurred during Hurricane Katrina. |
| 16 | 13:23  Q.  But we don t know specifically the time that it occurred; |
| 17 | 13:23  correctz |
| 18 | 13:23  A.  I don t recall. |
| 19 | 13:23  Q.  You don t know the water level at the time; correctz |
| 20 | 13:23  A.  I don t know the details, no. |
| 21 | 13:23  Q.  The barge is actually shaped differently than the ING |
| 22 | 13:23  4727; correctz |
| 23 | 13:23  A.  I think I ve testified that the barge was the same si e |
| 24 | 13:23  but has a rake at the forward edge, yes. |
| 25 | 13:24  Q.  That s a slope that s right there in the front; correctz |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2201**

| | |
|---|---|
| 1 | 13:24  A.  That s correct. |
| 2 | 13:24  Q.  Okay.  You don t know what the wind conditions were at the |
| 3 | 13:24  time this occurred; correctz |
| 4 | 13:24  A.  No, sir. |
| 5 | 13:24  Q.  You don t know what the wave action was at the time this |
| 6 | 13:24  occurred; correctz |
| 7 | 13:24  A.  No, sir. |
| 8 | 13:24  Q.  I m going to put in front of you another picture of a |
| 9 | 13:24  barge, and this is another barge that you claim crashed into |
| 10 | 13:24  the -- into a floodwall; correctz |
| 11 | 13:24      THE COURT:  We re looking at Figure 73 from |
| 12 | 13:24  Dr. Cushing s reportz |
| 13 | 13:24      MR. KHORRAMI:  Yes, Your Honor.  I m sorry.  And the |
| 14 | 13:24  previous figure was Figure 47 from Dr. Cushing s report.  Thank |
| 15 | 13:24  you, Your Honor. |
| 16 | 13:24  BY MR. KHORRAMI: |
| 17 | 13:24  Q.  Correct.  This is another barge that you claim crashed |
| 18 | 13:24  into the floodwall; correctz |
| 19 | 13:24  A.  Yes, sir. |
| 20 | 13:24  Q.  And, again, this barge is shaped differently than the |
| 21 | 13:24  barge ING 4727; correctz |
| 22 | 13:24  A.  This has a rake to it, yes. |
| 23 | 13:24  Q.  And you don t know when this particularly happened within |
| 24 | 13:25  the time frame of Hurricane Katrina; correctz |
| 25 | 13:25  A.  That s correct. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**4 (Pages 2198 to 2201)**

**2202**

```
13:25   1   Q.  You don t know what the water level was at the time
13:25   2   correct
13:25   3   A.  No, sir.  I think the purpose of these pictures was to
13:25   4   show that, when the barges strike the floodwall, it doesn t
13:25   5   knock the floodwall over  it damages the cap.
13:25   6   Q.  I understand what you re saying.  But, again, you don t
13:25   7   know the conditions that were present at the time this
13:25   8   particular crash occurred  correct
13:25   9   A.  I don t know the details.
13:25  10   Q.  You didn t forensically put together this crash  correct
13:25  11   A.  Pardon   I m sorry, I didn t hear what you said.
13:25  12   Q.  You didn t forensically put together this particular
13:25  13   crash  correct
13:25  14   A.  No, sir, I didn t.
13:25  15   Q.  And you didn t forensically put together the other crash
13:25  16   that you mentioned, that we just went over, Figure 74
13:25  17   A.  I m not sure what you mean  forensically  put the pictures
13:25  18   together.  It shows the pictures and it shows the barge and the
13:25  19   damage.
13:25  20   Q.  You didn t study how that crash occurred  correct
13:25  21   A.  Not in detail, no.
13:26  22   Q.  Now, you mentioned that you claimed that the wall where
13:26  23   the south breach occurred is actually lower than the rest of
13:26  24   the wall that you surveyed  is that correct
13:26  25   A.  I believe that the 816-foot gap where the wall doesn t
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2203**

```
13:26   1   exist -- or didn t exist after Hurricane Katrina, would have
13:26   2   been lower than the other portions of the wall.
13:26   3   Q.  And, in fact, when you surveyed the wall, though, there
13:26   4   was no portion of the wall that you surveyed that was lower
13:26   5   than 12.8  correct
13:27   6   A.  No.  I think the curve that s shown in my reports states
13:27   7   exactly what those heights were.
13:27   8   Q.  We had that up, sir, and we went through it, and you
13:27   9   agreed that there was no portion of the wall that was standing
13:27  10   up that was less than 12.8 NAVD88
13:27  11   A.  If I could refer to that.
13:27  12   Q.  You re welcome to refer to it, sir.
13:27  13   A.  12.8 is the lowest wall heighth shown at the extreme ends
13:27  14   of the south breach.
13:27  15   Q.  12.8 is the lowest wall height shown based on your survey
13:28  16   of the entirety of the IHNC floodwall that you surveyed
13:28  17   correct
13:28  18   A.  That s correct.
13:28  19   Q.  Okay.  And you re in court today claiming that somehow the
13:28  20   missing portions are significantly lower than what you found
13:28  21   everywhere else on that wall  correct
13:28  22   A.  That s correct.
13:28  23   Q.  Now, I m going to show you some pictures and --
13:28  24        MR. KHORRAMI:  Bob, I want you to put up Figure 35,
13:28  25   please, from Dr. Cushing s report.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2204**

```
13:29   1   BY MR. KHORRAMI:
13:29   2   Q.  Now, that s a scour trench that you re showing over there
13:29   3   is that correct
13:29   4   A.  That s correct.
13:29   5   Q.  Okay.  And that s the area between the grassy area and the
13:29   6   wall  correct
13:29   7   A.  Yes, sir.
13:29   8   Q.  Okay.  This is a portion of the IHNC floodwall that didn t
13:29   9   fall  correct
13:29  10   A.  That s correct.
13:29  11   Q.  In fact, it overtopped until past 9:00  isn t that
13:29  12   correct
13:29  13   A.  Yes, sir.
13:29  14        THE COURT:  Do you want to identify it, sir   You may
13:29  15   have and I missed it.
13:29  16        MR. KHORRAMI:  It s Figure 35 from Dr. Cushing s
13:29  17   report.
13:29  18        THE COURT:  Okay.  Thank you.
13:29  19        MR. WILSON:  His report is 196, Your Honor, for the
13:29  20   record.
13:29  21        THE COURT:  All right.  Thank you.
13:29  22        MR. WILSON:  Defendant s.
13:29  23   BY MR. KHORRAMI:
13:29  24   Q.  So even though it overtopped for a longer period of time,
13:29  25   even though it had these scour trenches behind it, this portion
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2205**

```
13:29   1   of the wall did not fall  correct
13:29   2   A.  That s correct.
13:29   3   Q.  So you need something more than scour trenches to bring
13:30   4   down the wall  correct
13:30   5   A.  Well, you need more than this scour trench to bring down
13:30   6   the wall.
13:30   7   Q.  Okay.  So this amount of the scour trench, which is longer
13:30   8   overtopping than the south breach had, this amount is not
13:30   9   enough to bring down the wall.  We agree on that  correct
13:30  10   A.  Yes.
13:30  11   Q.  Okay.  And everywhere else in New Orleans when you
13:30  12   inspected breaches, there were walls that were standing that
13:30  13   had scour trenches behind them  correct
13:30  14   A.  That s correct.
13:30  15   Q.  In fact, the photo that I showed you from Dr. Marino s
13:30  16   report, Figure 4.59 that we discussed, there, there was a
13:30  17   significant amount of scouring in the back of the wall
13:30  18   correct
13:31  19        MR. KHORRAMI:  Why don t you put it back up.
13:31  20   BY MR. KHORRAMI:
13:31  21   Q.  And this wall that s displayed on the right side of
13:31  22   this -- of the screen, Figure 4.59 from Dr. Marino s report,
13:32  23   that shows a significant amount of scouring behind the wall
13:32  24   correct
13:32  25   A.  Not necessarily scouring in the sense that you see it in
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

5 (Pages 2202 to 2205)

## 2206

13:32  the breaches on the Inner Harbor Navigation Canal.  But I
13:32  haven t --
13:32  Q.  But that s a --
13:32        THE COURT:  Let him finish.
13:32        THE WITNESS:  I haven t studied the failure of the
13:32  wall in this area, so I can t tell you how much scouring --
13:32  scour trenches there were.  The washed-out areas inshore are not
13:32  the kind of scour trenches that I identified at the Inner
13:32  Harbor Canal.  There were washed-out areas, but I can t tell
13:32  where the scour trenches are in this one, or even if there were
13:32  scour trenches.
13:32  BY MR. KHORRAMI:
13:32  Q.  All right.  And then this wall got displaced, and there
13:32  were trenches, and it still didn t fall; correct
13:33  A.  It leaned over, but I don t see a gap in it.  It wasn t
13:33  washed away.
13:33  Q.  It got displaced -- we discussed that already --
13:33  A.  Yes, sir.
13:33  Q.  -- and it still didn t fall; correct
13:33  A.  Well, I don t know if you would consider a wall that s
13:33  leaning more than 45 degrees, 50 degrees, as to having fallen.
13:33  It appears to be lying over.
13:33  Q.  And it didn t come out -- it didn t come out --
13:33  A.  If I could just point out, in this area here, it appears
13:33  to be laying pretty much on its side.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2207

13:33  Q.  It didn t get completely exhumed out of the ground,
13:33  though; correct   We can agree on that
13:33  A.  It wasn t uprooted the way the floodwall at North Johnson
13:33  Street in the south breach was torn out of the ground.
13:34  Q.  Now, in order for the Court to believe your scenario that
13:34  the barge was actually at the Lafarge terminal until 9:00 a.m.,
13:34  the Court has to discount the testimony of William Villavaso;
13:34  correct
13:34  A.  Yes, sir.
13:34  Q.  And would have to discount the testimony of Mr. Adams;
13:34  correct
13:34  A.  Yes, sir.
13:34  Q.  And would have to discount the testimony of Mr. Tompkins;
13:34  correct
13:34  A.  Yes, sir.
13:34  Q.  And would have to discount the testimony of Ms. LeBlanc
13:34  A.  Yes, sir.
13:34  Q.  And would have to discount the testimony of Daniel Webber;
13:34  correct
13:34  A.  Of whom, please
13:34  BY MR. KHORRAMI:
13:34  Q.  And the Court would have to discount the testimony of
13:34  Mr. Murph; correct
13:34  A.  I m not sure which portions of his testimony one would
13:34  have to discount.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2208

13:35  Q.  Some portion of it would have to get discounted in order
13:35  for the barge to be at the Lafarge facility come 9:00; correct
13:35  A.  Not the portion where he said he didn t see a barge there,
13:35  but there are other portions.
13:35        THE COURT:  I think that s a matter for the Court.
13:35  BY MR. KHORRAMI:
13:35  Q.  And you would agree with me that the only places where we
13:35  had breaches are places where fact witnesses claimed to have
13:35  seen a barge; correct
13:35  A.  Well, we have fact witnesses that have said they ve seen a
13:35  barge, and we have fact witnesses that have said they didn t
13:35  see a barge.
13:35  Q.  And the only places we have breaches are places where fact
13:35  witnesses have said there was a barge; correct
13:35  A.  There has been testimony that barges -- the barge was at
13:35  both breaches.
13:35  Q.  And at both breaches, those are -- both places where we
13:36  have breaches are the only places where witnesses have said
13:36  they ve seen a barge impact
13:36        THE COURT:  I think he s answered it.  Again, that s
13:36  more briefing material than -- I understand what the witnesses
13:36  have said.  This witness reiterating that is not going to
13:36  persuade me one way or the other.  Go ahead.
13:36  BY MR. KHORRAMI:
13:36  Q.  Now, I notice in your -- I notice in your movie, in the

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2209

13:36  animation that you provided to the Court, in that animation,
13:36  you have water moving from west to east and actually coming
13:36  over the wall; is that correct
13:36  A.  Yes, sir.
13:36  Q.  That s at a time when the wind -- when you claim the wind
13:36  is blowing from a northeasterly direction; correct
13:36  A.  I m not sure which portion you re talking about.  I
13:36  show --
13:36  Q.  Well, why don t we play that for you.
13:36  A.  I show water moving over the floodwall when the wind was
13:37  blowing from a westerly direction to an easterly direction.  So
13:37  which portion of the animation are you referring to
13:37  Q.  I m going to play it for you, how about that
13:37        THE COURT:  We re not going to see the whole thing
13:37  again
13:37        MR. KHORRAMI:  No, no.  It s just a small, small clip
13:37  of it, Your Honor.
13:37        THE COURT:  Okay.  Calibrate it, please.
13:37  BY MR. KHORRAMI:
13:37  Q.  This was at 7:00; correct
13:37  A.  This is 7:00 or afterwards, yes.
13:37  Q.  And that s water going over the wall moving in an easterly
13:37  direction
13:37  A.  This is after 7:00.
13:37  Q.  Correct

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

6 (Pages 2206 to 2209)

**2210**

13:37  A.  This is after 7:00.

13:37  Q.  But it's prior to the breach?

13:37  A.  Prior to the breach.

13:37  Q.  And water is moving east and coming over the wall; correct?

13:37  A.  Well, the wave -- it doesn't show which way the water is moving, but it shows waves in the canal.

13:37  Q.  So you dispute that your animation shows that water's moving in an easterly direction?

13:38  A.  Well, now it's moving in an easterly direction.  This is just showing waves.  It doesn't know the waves are being --

13:38  Q.  So if I turn it back to the original section, you'll dispute that there are waves moving in an easterly direction on your animation?

13:38  THE COURT:  You want him to turn it back?  The Court understands it's an animation.  I take no animation literally, trust me.  But go ahead -- no matter who the expert is.

13:38  THE WITNESS:  Your Honor, that was going to be my testimony:  The animation is not a scientific rendering of the actual events; it's a graphical.

13:39  MR. KHORRAMI:  Your Honor, if I could have two minutes.

13:39  THE COURT:  You certainly may.

13:39  MR. KHORRAMI:  Thank you.

13:39  THE COURT:  That's not to say that any animation may

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2211**

13:39  or may not be helpful, but the Court applies its own unscientific calibration in looking at these databases.  Or should I say sensitivity tests.

13:40  BY MR. KHORRAMI:

13:40  Q.  I'm going to show you a portion of IPET.  We're talking about Volume IV, page 226.

13:40  MR. KHORRAMI:  Blow up the highlighted portion, please.

13:40  BY MR. KHORRAMI:

13:40  Q.  And the highlighted portion, it says that:  "The results from the STWAVE runs showed that the primary source of wave energy incident upon floodwalls along the Lower Ninth Ward came from waves reflected back to the east side of the canal from the west side."

13:40  Do you disagree with that statement?

13:40  A.  Well, it shows what it shows.  This is just saying what -- what is shown in the STWAVE computer simulation.

13:41  Q.  So as you sit over here today, you have no way of disagreeing with that statement; correct?

13:41  A.  I have no way of agreeing with it or disagreeing with it; although, I do know that the waves that were incident on the floodwalls were from waves of 1 to 3 feet high.

13:41  MR. KHORRAMI:  Okay.  I tender the witness, Your Honor.

13:41  THE COURT:  Thank you, sir.  Redirect?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2212**

13:41  MR. ALDOCK:  Very briefly.

13:41  REDIRECT EXAMINATION

13:41  BY MR. ALDOCK:

13:41  Q.  Dr. Cushing, we know where the barge came into the Ninth Ward at the southern end of the south breach; correct?

13:42  A.  That's correct.

13:42  Q.  We've seen it many times.

13:42  And we know it had to be at a time when there was high water in the canal and at the south breach in order to hit the cap, as you and Mr. Bartlett have opined; correct?

13:42  A.  That's correct.

13:42  Q.  And we have two high water marks during the relevant period:  Somewhere around 6:30 a.m.-ish, because nothing's perfect on this data, but around that time; and we have another one -- that's when the water's coming into the canal; and then we have another one when the water is going down in the canal, and that's sort of 9:30/10:00-ish, when the water is falling in the canal.

13:42  Those are the two high water marks we've identified through all the testimony?

13:43  A.  That's what the hydrograph shows.

13:43  Q.  Yes.

13:43  A.  Or the lockmaster's gauge readings were.

13:43  Q.  So as between the 6:30 a.m.-ish time, when the wind's blowing from the breach -- away from the breach toward the

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2213**

13:43  west, and the 9:30-ish time, when the wind is blowing toward the breach and the water is also blowing toward the breach, as between those two times -- 6:30ish, 9:30/10:00-ish -- isn't the scenario, the one that best, not perfectly -- nothing's perfect -- but the one that best fits the data, the one -- the second one, in which the 9:30/10:00-ish data, appears to be generally aligned?

13:43  A.  Generally --

13:43  Q.  Aligned.

13:43  A.  I'm sorry.  I'm not understanding.  Generally what?

13:43  Q.  Aligned, together.

13:43  A.  Aligned.

13:44  Q.  That those things are all generally aligned at 9:30/10:00-ish, in that rough area; albeit, it could be a foot here or could be a foot there or could be --

13:44  A.  Yes.  It's far more likely.  It's not the only alternative of the two.

13:44  MR. ALDOCK:  Thank you.  No further questions.

13:44  THE COURT:  Thank you, Mr. Aldock.

13:44  Thank you, Dr. Cushing.  You may step down.  You're released, sir.

13:44  THE WITNESS:  Thank you.

13:44  MR. WEBB:  I was going to call the next witness.

13:44  THE COURT:  Okay.

13:44  MR. WEBB:  Michael O'Dowd.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

7 (Pages 2210 to 2213)