```
                                                                    2189
                      UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF LOUISIANA



     IN RE:  KATRINA DREDGING       *    Civil Action
     LIMITATION ACTION              *
     CONSOLIDATED LITIGATION        *    No. 05-4182
                                    *
                                    *    Section K(2)
     PERTAINS TO:                   *
     BARGE                          *    New Orleans, Louisiana
                                    *
     MUMFORD, C.A. NO. 05-5724, AS  *    July 6, 2010
     TO PLAINTIFFS JOSEPHINE        *
     RICHARDSON AND HOLLIDAY        *    Afternoon Session
     JEWELERS, INC., ONLY           *
     AND                            *
     BENOIT, C.A. NO. 06-7516, AS   *
     TO PLAINTIFFS JOHN ALFORD AND  *
     JERRY ALFORD ONLY              *
     * * * * * * * * * * * * * * *
                              DAY TEN
                        BENCH TRIAL BEFORE THE
                   HONORABLE STANWOOD R. DUVAL, JR.
                      UNITED STATES DISTRICT JUDGE


     APPEARANCES:
     For the Plaintiffs:        Best Koeppel
                                BY:  LAURENCE E. BEST, ESQ.
                                BY:  PETER S. KOEPPEL, ESQ.
                                2030 St. Charles Avenue
                                New Orleans, Louisiana 70130

     For the Plaintiffs:        Law Offices of Brian A. Gilbert
                                BY:  BRIAN A. GILBERT, ESQ.
                                2030 St. Charles Avenue
                                New Orleans, Louisiana  70130



              JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                      UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF LOUISIANA
```

## 2190

```
   APPEARANCES:

   For the Plaintiffs:    Wiedemann & Wiedemann
                          BY:  KARL WIEDEMANN, ESQ.
                          BY:  LAWRENCE WIEDEMANN, ESQ.
                          821 Baronne Street
                          New Orleans, Louisiana  70113


   For the Plaintiffs:    Patrick J. Sanders, LLC
                          BY:  PATRICK J. SANDERS, ESQ.
                          3316 Ridgelake Drive
                          Suite 100
                          Metairie, Louisiana  70002


   For the Plaintiffs:    Law Office of Richard T. Seymour,
                          P.L.L.C.
                          BY:  RICHARD T. SEYMOUR, ESQ.
                          1150 Connecticut Avenue N.W.
                          Suite 900
                          Washington, D.C.  20036-4129


   For the Plaintiffs:    Khorrami, Pollard & Abir, LLP
                          BY:  SHAWN KHORRAMI, ESQ.
                          444 S. Flower Street
                          33rd Floor
                          Los Angeles, California  90071


   For the Plaintiffs:    Wilson, Grochow, Druker & Nolet
                          BY:  LAWRENCE A. WILSON, ESQ.
                          233 Broadway
                          5th Floor
                          New York, New York  10279


   For the Defendant:     Chaffe, McCall, L.L.P.
                          BY:  DEREK A. WALKER, ESQ.
                          BY:  CHARLES P. BLANCHARD, ESQ.
                          1100 Poydras Street, Suite 2300
                          New Orleans, Louisiana 70163
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2191

```
   APPEARANCES:

   For the Defendant:     Goodwin Procter, L.L.P.
                          BY:  JOHN ALDOCK, ESQ.
                          BY:  MARK RAFFMAN, ESQ.
                          BY:  ADAM CHUD, ESQ.
                          BY:  KIRSTEN ROBBINS, ESQ.
                          BY:  ERIC I. GOLDBERG, ESQ.
                          901 New York Avenue, NW
                          Washington, D.C. 20001


   For the Defendant:     Sutterfield & Webb
                          BY:  DANIEL A. WEBB, ESQ.
                          650 Poydras Street, Suite 2715
                          New Orleans, Louisiana 70130


   For the Defendant:     Lafarge North America, Inc.
                          BY:  PETER KEELEY, ESQ.
                          12950 Worldgate Drive
                          Herndon, Virginia  20170


   Official Court Reporter:   Jodi Simcox, RMR, FCRR
                          500 Poydras Street
                          Room HB-406
                          New Orleans, Louisiana 70130
                          (504) 589-7780


   Proceedings recorded by mechanical stenography, transcript
   produced by computer.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2192

I N D E X

|  | Page |
|---|---|
| CHARLES R. CUSHING | |
| Cross-Examination | 2193 |
| Redirect Examination | 2212 |
| MICHAEL O'DOWD | |
| Direct Examination | 2214 |
| Cross-Examination | 2229 |
| JACOB ROBERT GLASER | |
| Direct Examination | 2239 |
| Cross-Examination | 2258 |
| Redirect Examination | 2272 |
| REDA BAKEER | |
| Direct Examination | 2275 |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2193

```
                      AFTERNOON SESSION
                        (July 6, 2010)
12:48                       * * * * *
13:13          THE DEPUTY CLERK:  All rise.  Court's in session.
13:13   Please be seated.
13:13          MR. KHORRAMI:  May I proceed?
13:13          THE COURT:  Yes, sir, you may.
13:13          MR. KHORRAMI:  Thank you, Your Honor.
09:20          (WHEREUPON, Charles R. Cushing, having been
09:20   previously duly sworn, testified as follows.)
13:13                     CROSS-EXAMINATION
13:13   BY MR. KHORRAMI:
13:13   Q.  And we discussed wind speed at 9:00 and 9:15, which is
13:13   within the time that you claim the barge would have moved away
13:14   from the terminal; correct?
13:14   A.  No, sir.  I said it moved away sometime after 9:00.
13:14   Q.  So that's within the time?  9:00 to 9:15 is within the
13:14   time?
13:14   A.  It's within the time.  After 9:00.
13:14   Q.  Okay.  And you've created a graph that shows the speed
13:14   with which -- that shows how you can calculate the speed of the
13:14   barge versus the speed of the wind; correct?
13:14   A.  In the hypothetical calculations, we did.  We calculated
13:14   the speed of the barge under the winds that had occurred
13:14   earlier.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2214

```
13:44         (WHEREUPON, Michael O'Dowd, having been duly sworn,
13:44   testified as follows.)
13:45         THE DEPUTY CLERK:  Please state your full name and
13:45   correct spelling for the record.
13:45         THE WITNESS:  Michael O'Dowd.
13:45         THE DEPUTY CLERK:  I need you to speak into the mic.
13:45         THE WITNESS:  Michael O'Dowd, M-I-C-H-A-E-L, O,
13:45   apostrophe, D-O-W-D.
13:46             DIRECT EXAMINATION
13:46   BY MR. WEBB:
13:46   Q.  For the record, I'm Dan Webb, Mr. O'Dowd.  I'm going to be
13:46   asking you some questions.
13:46   A.  Okay.
13:46   Q.  Give us your name and your address, please.
13:46   A.  Michael O'Dowd, 3404 Maryland Avenue, Kenner, Louisiana.
13:46   Q.  Who do you work for?
13:46   A.  Myers Engineering.
13:46   Q.  Did you ever work for the U.S. Army Corps of Engineers?
13:46   A.  Yes, I did.
13:46   Q.  Where did you work for them?
13:46   A.  I worked in the Industrial Canal locks.
13:46   Q   Where were you working for them in August of 2005?
13:46   A.  At the locks.
13:46   Q.  What was your job title then?
13:46   A.  I was lock and dam equipment mechanic supervisor.  In
```

## 2215

```
13:46   short, it was lockmaster.
13:46   Q.  How long had you worked at the lock before Katrina?
13:46   A.  Thirty-eight years.
13:46   Q.  What were your responsibilities as the lockmaster in
13:46   August of 2005?
13:46   A.  I was the first-line supervisor for the operation and
13:46   maintenance of the locks.
13:46   Q   When did you retire, sir?
13:47   A.  In 2006.
13:47   Q.  In August of 2005, how many people were working at the
13:47   lock under your supervision?
13:47   A.  Eighteen.
13:47   Q.  Does the lock staff that work under your supervision
13:47   record the opening and closing of the locks?
13:47   A.  Yes, they do.
13:47   Q.  Where is that information recorded?
13:47   A.  In an office -- the head lock operator's office.
13:47         MR. WEBB:  Can we show the first exhibit, DX-145,
13:47   please?
13:47   BY MR. WEBB:
13:47   Q.  What does this drawing show, sir?
13:47   A.  That -- I guess that's -- I don't know what that is.
13:47   That's --
13:48         MR. WEBB:  Come down here.  Down, down.  There you
13:48   go.
```

## 2216

```
13:48   BY MR. WEBB:
13:48   Q.  All right.  Does that show the industrial locks, sir?
13:48   A.  Yes.
13:48         MR. WEBB:  And could you give me the next slide,
13:48   please?
13:48   BY MR. WEBB:
13:48   Q.  What is this a photograph of, DX-145?
13:48   A.  That's the north end of the locks, showing the guide wall.
13:48   And the Claiborne Avenue bridge and Florida Avenue bridge is in
13:48   the background.
13:48   Q.  Where is this taken from?
13:48   A.  The end of the lock, on the north end.
13:48   Q.  Does this photograph show any mooring buoys in the
13:48   Industrial Canal?
13:48   A.  Yes, sir.
13:48   Q.  Can you touch the screen and put a dot on the Claiborne
13:48   Avenue bridge?
13:48   A   (COMPLIES.)
13:49   Q   Can you tell the Court how far the Claiborne Avenue bridge
13:49   is from the lock?
13:49   A.  I'd say between 7- and 800 feet.
13:49   Q.  Let's go back to Friday, August 26th, the Friday before
13:49   the storm.  Did you work that day?
13:49   A.  Probably so.
13:49   Q.  When you work at the dock, what time do you normally
```

## 2217

```
13:49   report and what time do you normally get off?
13:49   A.  7:00 to 3:30.
13:49   Q.  Friday, August the 26th, the Friday before the storm, was
13:49   that a normal shift for you?
13:49   A.  Yes.
13:49   Q.  Did you do any storm preparation that day?
13:49   A.  Not that I can recall.
13:49   Q.  What time -- you testified you got off at 3:30.  Did you
13:49   go back to work on Saturday?
13:49   A.  I don't believe I did.
13:49   Q.  Okay.  Did you work on Sunday, the day before the storm?
13:50   A   Yes, yes.  We went...
13:50   Q.  What time did you go to the lock on Sunday, the day before
13:50   the storm?
13:50   A.  Just an estimate, it was around 12:00, a little bit later,
13:50   maybe.
13:50   Q.  Did you have any good weather when you went to work that
13:50   day?
13:50   A.  Yes.
13:50   Q.  What did the weather look like?
13:50   A.  It was clear.
13:50   Q.  What brought you in that day?
13:50   A.  I was called through the guys that was working there.  The
13:50   Coast Guard was going to close down their facility and lock up
13:50   the gates, and I told them that I wanted to be there before
```

2218

```
13:50   they did that.
13:50   Q.  What time did you get that phone call, sir?
13:50   A.  Probably 10:00/11:00 in the morning, something like that.
13:50   Q.  And did you go to the lock area by yourself?
13:50   A.  No.  I brought my family with me.
13:50   Q.  Why is that?
13:50   A.  Well, because we ride out the storms, and, you know, I
13:51   bring them with me.
13:51   Q.  Did you stay at the lock from Sunday morning throughout
13:51   the storm?
13:51   A.  Yes.
13:51   Q.  And on that particular day, how many of the 18 people were
13:51   there to ride out the storm with you?
13:51   A.  We had five employees that rode it out with us.
13:51           MR. WEBB:  Would you put up DX-152, please?
13:51   BY MR. WEBB:
13:51   Q.  What is this document?
13:51   A.  That's a locking ship log that --
13:51   Q.  I'm sorry.  Go ahead.
13:51   A   -- the head lock operator keeps that of vessels entering
13:51   and exiting our locks.
13:51   Q   And I realize the print's very small.
13:51           MR. WEBB:  Could you show the next slide where we
13:51   zoom in on something?
```

2219

```
13:51   BY MR. WEBB:
13:51   Q   Does this represent the last boat that cleared through the
13:51   docks?
13:51   A.  I would imagine so, yes.
13:51   Q   Through the lock row?
13:51   A   Yes.
13:51   Q.  And what time was that?
13:51   A.  At 0344 in the morning on the 28th.
13:51   Q.  And after the SUNNY COOK completed locking through at 0344
13:52   on Sunday morning, did you shut down lock operations in
13:52   preparation for the storm?
13:52   A   Yes.
13:52   Q.  Why is that, sir?
13:52   A.  Because Florida Avenue and St. Claude bridge was -- they
13:52   had sent the operators home.  That, basically, shuts the locks
13:52   down.
13:52   Q.  Now, the United States Coast Guard has the Hurricane
13:52   Protection Plan with phases called Whiskey, X-ray, Yankee, and
13:52   Zulu.  Do you follow that plan?
13:52   A.  No, sir.  I don't know anything about it.
13:52   Q.  When the Claiborne bridge was down on Sunday, August the
13:52   28th, could you still see the area between the Claiborne bridge
13:52   and the Florida bridge?
13:52   A.  Yes.
13:52           MR. WEBB:  Can you pull up DX-35, please?
```

2220

```
13:52   BY MR. WEBB:
13:52   Q.  All right.  Now, this was taken on the 30th --
13:52   A.  Uh-huh.
13:52   Q.  -- when the weather was clear.  Is this a similar view
13:52   that you would have had on the 28th, when you were at the dock?
13:52   A.  Yes.
13:52   Q.  And did you take this picture yourself?
13:53   A.  Yes, I did.
13:53   Q.  The Claiborne Avenue bridge in this particular photograph,
13:53   is it up or down?
13:53   A.  Down.
13:53   Q.  Are those mooring buoys on the east side of the Industrial
13:53   Canal past the bridge?
13:53   A.  Yes, sir.
13:53   Q   Would you point to those and put a little mark by one of
13:53   them, please?
13:53   A   (COMPLIES.)
13:53   Q   Thank you.
13:53           THE COURT:  Mr. Webb, I am sorry.  I can check.  What
13:53   time did you say this was taken, sir?  Do you recall?
13:53           THE WITNESS:  Now, this is after the storm, this
13:53   picture.
13:53           MR. WEBB:  Yes, this is after the storm.
13:53           THE COURT:  Oh, I understand.  I just meant on the
13:53   day of the -- it was after the storm, okay.
```

2221

```
13:53           MR. WEBB:  He took --
13:53           THE COURT:  I got you.
13:53           MR. WEBB:  Okay.  I'm sorry.  I don't have one before
13:53   the storm, so we have to use this one.
13:53           THE COURT:  Absolutely.
13:53           MR. WEBB:  Okay.
        BY MR. WEBB:
13:53   Q.  And this picture was taken from the lock looking north; is
13:53   that correct?
13:53   A.  That's correct.
13:53   Q.  And on Sunday, August the 28th, were you on the lock deck
13:53   at all?
13:53   A.  Yes.
13:53   Q.  And what was the weather like on Sunday, August the 28th?
13:54   A.  Good, clear.
13:54   Q.  And during the day, could you see the mooring buoys on the
13:54   east side of the canal?
13:54   A.  Yes.
13:54   Q.  And when you arrived that particular day, you said around
13:54   noon-ish, did you ever go out on the lock deck at that time?
13:54   A.  Yes.
13:54   Q.  Why did you do that, sir?
13:54   A.  The Corps had one of its survey boats moored on the long
13:54   guide wall, and we was keeping an eye on that.  Plus I did some
13:54   other work on the guide wall.
```

## 2222

| | | |
|---|---|---|
| 1 | 13:54 | Q. Did you see any other barges in the canal at that time? |
| 2 | 13:54 | A. No, sir. |
| 3 | 13:54 | Q. Did you see any barges tied to the mooring buoys at that |
| 4 | 13:54 | time? |
| 5 | 13:54 | A. No, sir. |
| 6 | 13:54 | Q. Did you see barges near mooring buoys at that time? |
| 7 | 13:54 | A. No, sir. |
| 8 | 13:54 | Q. Did you see any barges loose near the eastern floodwall in |
| 9 | 13:54 | the Industrial Canal at that time? |
| 10 | 13:54 | A. No, I didn't. |
| 11 | 13:54 | Q. Did you see any loose barges in the canal anytime Sunday |
| 12 | 13:54 | afternoon on August the 28th? |
| 13 | 13:54 | A. No. |
| 14 | 13:54 | Q. Did any of your coworkers or anyone that worked for you |
| 15 | 13:55 | report that they had seen a loose barge in the canal on August |
| 16 | 13:55 | the 28th? |
| 17 | 13:55 | A. No, sir. |
| 18 | 13:55 | Q. If there had been a loose barge in the canal, would that |
| 19 | 13:55 | show up in your records? |
| 20 | 13:55 | A. I would hope so, yes. |
| 21 | 13:55 | Q. And were any loose barges noted in any of your lock's |
| 22 | 13:55 | records for August the 28th? |
| 23 | 13:55 | A. No, sir. |
| 24 | 13:55 | Q. Now, does the Coast Guard allow unattended barges to |
| 25 | 13:55 | remain in the canal? |

## 2223

| | | |
|---|---|---|
| 1 | 13:55 | A. No. |
| 2 | 13:55 | Q. And on August the 28th, did you ever receive any report |
| 3 | 13:55 | from the Coast Guard about a loose barge in the canal? |
| 4 | 13:55 | A. No, sir. |
| 5 | 13:55 | Q. And on the 28th, do you know whether the Florida Avenue |
| 6 | 13:55 | bridge was up or down? |
| 7 | 13:55 | A. Down. |
| 8 | 13:55 | THE COURT: For the record, "down" meaning that |
| 9 | 13:55 | people could travel over it? |
| 10 | 13:55 | THE WITNESS: Yes. Yes, sir. |
| 11 | | BY MR. WEBB: |
| 12 | 13:55 | Q. Let's move on to August the 29th. Did you take |
| 13 | 13:55 | photographs during Hurricane Katrina while you were at the |
| 14 | 13:55 | lock? |
| 15 | 13:56 | A. Yes, I did. |
| 16 | 13:56 | MR. WEBB: Show the next slide, please. This is |
| 17 | 13:56 | DX-35. |
| 18 | 13:47 | BY MR. WEBB: |
| 19 | 13:56 | Q. Tell us what this shows. |
| 20 | 13:56 | A. This is -- I was standing right when you come down from |
| 21 | 13:56 | the lockmaster's office, and this is our shop building here. |
| 22 | 13:56 | And then over here you can see where the water was starting to |
| 23 | 13:56 | come over the floodwall, and I was just taking a picture of the |
| 24 | 13:56 | water coming over the floodwall. |
| 25 | 13:56 | Q. All right. This red building that I'm pointing to right |

## 2224

| | | |
|---|---|---|
| 1 | 13:56 | there, how far away is that from where you took this |
| 2 | 13:56 | photograph? |
| 3 | 13:56 | A. 500 feet. |
| 4 | 13:56 | Q. And this is taken in the direction of the river or the |
| 5 | 13:56 | Claiborne Avenue bridge? |
| 6 | 13:56 | A. Claiborne Avenue bridge. |
| 7 | 13:56 | Q. Can you see the Claiborne Avenue bridge in that |
| 8 | 13:56 | photograph? |
| 9 | 13:56 | A. No, sir. |
| 10 | 13:56 | Q. And what time did you take this, again? |
| 11 | 13:57 | A. 7:00, 8:00 in the morning, maybe. |
| 12 | 13:57 | Q. All right. |
| 13 | 13:57 | A Something like that. |
| 14 | 13:57 | MR. WEBB: Next slide, please. |
| 15 | 13:57 | Judge, can we erase the little dots? |
| 16 | 13:57 | THE COURT: Yes, sir. |
| 17 | 13:57 | MR. WEBB: Thank you. |
| 18 | 13:57 | BY MR. WEBB: |
| 19 | 13:57 | Q. What does this show you? |
| 20 | 13:57 | A I was just showing the height of the water in the canal, |
| 21 | 13:57 | and they had, like, white caps in the canal. |
| 22 | 13:57 | Q. Where were you when you took this? |
| 23 | 13:57 | A. Right below the lockmaster's office. |
| 24 | 13:57 | Q. And is this pointing towards the river or towards the |
| 25 | 13:57 | Claiborne Avenue bridge? |

## 2225

| | | |
|---|---|---|
| 1 | 13:57 | A. Towards the river. |
| 2 | 13:57 | MR. WEBB: For the record, this is DX-35. |
| 3 | 13:57 | THE COURT: Thank you, sir. |
| 4 | 13:57 | That was sometime the early morning of the 29th? |
| 5 | 13:57 | THE WITNESS: Yes, sir. |
| 6 | 13:58 | THE COURT: After daylight? |
| 7 | 13:58 | THE WITNESS: After daylight. |
| 8 | 13:58 | THE COURT: All right. |
| 9 | | BY MR. WEBB: |
| 10 | 13:58 | Q. Mr. O'Dowd, how long is the lock? |
| 11 | 13:58 | A. 640 feet. |
| 12 | 13:58 | Q. And at the time this photograph was taken, could you see |
| 13 | 13:58 | the end of the lock? |
| 14 | 13:58 | A. Yes. |
| 15 | 13:58 | Q. How far could you see? |
| 16 | 13:58 | A. Probably as far as St. Claude bridge. |
| 17 | 13:58 | Q. This is towards the river, then? |
| 18 | 13:58 | A. Yes, sir. |
| 19 | 13:58 | Q. Okay. And you've described the waves for the Court as |
| 20 | 13:58 | what, how big? |
| 21 | 13:58 | A. I'd say about between a foot, foot and a half -- I mean, a |
| 22 | 13:58 | foot and two. |
| 23 | 13:58 | Q. And can you tell the Court which way the waves were moving |
| 24 | 13:58 | in this photograph? |
| 25 | 13:58 | A. It was going towards the river. |

## 2226

| | | |
|---|---|---|
| 1 | 13:58 | Q. And that is what direction on the compass? |
| 2 | 13:58 | A. Southbound. |
| 3 | 13:58 | MR. WEBB: Next slide, please. This is also DX-35. |
| 4 | 13:58 | BY MR. WEBB: |
| 5 | 13:58 | Q What direction is this taken from? |
| 6 | 13:59 | A. Northbound. |
| 7 | 13:59 | Q. And can you see the Claiborne Avenue bridge in this photo? |
| 8 | 13:59 | A. You can barely make out the towers of the bridge. Or "a |
| 9 | 13:59 | tower" of the bridge, I should say. |
| 10 | 13:59 | Q. And how far away was the Claiborne Avenue bridge from |
| 11 | 13:59 | where you took this picture? |
| 12 | 13:59 | A. 7-, 800 feet. |
| 13 | 13:59 | Q. Sir, that morning when you were taking these photographs, |
| 14 | 13:59 | was it possible for you to see 2,950 feet? |
| 15 | 13:59 | A. I wouldn't think so. |
| 16 | 13:59 | Q. Was it possible, sir, for you to see 1,500 feet? |
| 17 | 13:59 | A. Probably not, no. |
| 18 | 13:59 | Q. Now, are the waves in this photograph typical of the waves |
| 19 | 13:59 | at the time that you took it? |
| 20 | 13:59 | A Yes, sir. |
| 21 | 13:59 | Q. At any time during the storm, sir, did you see a 20-foot |
| 22 | 13:59 | monster wave? |
| 23 | 14:00 | A. No, sir. |
| 24 | 14:00 | Q. Did any giant wave ever hit your lock? |
| 25 | 14:00 | A. No. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2227

| | | |
|---|---|---|
| 1 | 14:00 | Q. Sir, did you work at the lock during any hurricanes other |
| 2 | 14:00 | than Katrina? |
| 3 | 14:00 | A. Yes, I did. |
| 4 | 14:00 | Q. Have you ever seen a 20-foot wave in the canal during any |
| 5 | 14:00 | of the hurricanes in your 30-plus years working at the lock? |
| 6 | 14:00 | A. No, sir. |
| 7 | 14:00 | Q. Now, the early morning hours of August 29th, which |
| 8 | 14:00 | direction was the wind coming from? |
| 9 | 14:00 | A. It was coming out of the north, blowing towards the west. |
| 10 | 14:00 | Q. And how do you know that? |
| 11 | 14:00 | A. Well, when I was taking the photographs, I noticed a huge |
| 12 | 14:00 | amount of driftwood that was blown up on the west floodwall. |
| 13 | 14:00 | MR. WEBB: Can you pull up Exhibit No. DX-23 again, |
| 14 | 14:00 | and can you highlight the lock area, please? |
| 15 | 14:01 | BY MR. WEBB: |
| 16 | 14:01 | Q. Sir, using the screen that you have in front of you, can |
| 17 | 14:01 | you put a mark where you saw this debris and, I think, |
| 18 | 14:01 | driftwood that you said was building up? |
| 19 | 14:01 | A. Let me get my bearings here. Let's see. |
| 20 | 14:01 | THE COURT: Take your time, sir. There should be a |
| 21 | 14:01 | stylus there if you want to use that little pen-like device, if |
| 22 | 14:01 | you want to use that. |
| 23 | 14:01 | BY MR. WEBB: |
| 24 | 14:01 | Q. Do you see where it says "CG station"? |
| 25 | 14:01 | A. Where it says -- yes. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2228

| | | |
|---|---|---|
| 1 | 14:01 | Q. And then you see where it says "North Claiborne"? |
| 2 | 14:02 | A. Yes. |
| 3 | 14:02 | Q. Okay. Now, you have the dot over land. Can you put it in |
| 4 | 14:02 | the water where this debris was building up? |
| 5 | 14:02 | THE COURT: Is there a little pen there, sir? |
| 6 | 14:02 | THE WITNESS: Yes. |
| 7 | 14:02 | THE COURT: Okay. Good. |
| 8 | 14:02 | MR. WEBB: Judge, can you clear it again? |
| 9 | 14:02 | THE COURT: I will. |
| 10 | 14:02 | MR. WEBB: Thank you. |
| 11 | 14:02 | THE WITNESS: I can't hardly see it good. I lost it. |
| 12 | 14:02 | The screen's gone. |
| 13 | 14:02 | MR. WEBB: Judge, we can go on. He's already |
| 14 | 14:02 | testified it was in the southwest corner, so we're good to go. |
| 15 | 14:02 | THE COURT: Okay. |
| 16 | 14:02 | MR. WEBB: Next slide, please. |
| | | BY MR. WEBB: |
| 17 | 14:02 | Q. Sir, did you take this picture as well? |
| 18 | 14:02 | A. Yes. Yes, I did. |
| 19 | 14:02 | Q. When was it taken? |
| 20 | 14:02 | A. After the storm. |
| 21 | 14:02 | Q. And what direction is that, sir? |
| 22 | 14:02 | A. It's north, facing north. Northwest, I guess. |
| 23 | 14:03 | MR. WEBB: Your Honor, that may be it. |
| 24 | 14:03 | Thank you. We'll tender the witness, Your |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2229

| | | |
|---|---|---|
| 1 | 14:03 | Honor. |
| 2 | 14:03 | THE COURT: Thank you very much. |
| 3 | 14:03 | CROSS-EXAMINATION |
| | | BY MR. SANDERS: |
| 4 | 14:03 | Q. Mr. O'Dowd, my name is Pat Sanders. Nice to meet you. |
| 5 | 14:03 | The photographs you indicated you took, the earliest, |
| 6 | 14:03 | you said, would have been around 7:00 or 8:00; is that correct? |
| 7 | 14:03 | A. What's that? |
| 8 | 14:03 | Q The earliest time you would have taken the photographs was |
| 9 | 14:03 | around 7:00 or 8:00; is that correct? |
| 10 | 14:03 | A. I believe so, yes. |
| 11 | 14:03 | Q. And at one point you loaned your camera to one of your |
| 12 | 14:03 | co-employees; am I correct in that? |
| 13 | 14:03 | A. I don't know. |
| 14 | 14:03 | Q. Is it fair to say you did not take all the photographs |
| 15 | 14:03 | that were shown? |
| 16 | 14:03 | A. No. I think I took them all that day. |
| 17 | 14:03 | Q. Okay. Now, when you went to the facility, you said you |
| 18 | 14:04 | brought your family. Could you tell us what that involved? I |
| 19 | 14:04 | mean, you had a wife and children or what? |
| 20 | 14:04 | A. I have a wife and a daughter. |
| 21 | 14:04 | Q. And how many other people were there? |
| 22 | 14:04 | A. We had five employees that stayed there, and one of them |
| 23 | 14:04 | had his wife. |
| 24 | 14:04 | Q. And was that all in the same building? |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2230

```
14:04  A.  No.  No, we spread out.
14:04  Q.  Okay.  How many buildings were there?
14:04  A.  Three different ones.
14:04  Q.  Okay.  Are they all in the same general location?
14:04  A.  Yes.  All at the lock facility, yeah.
14:04  Q.  And I understand they all have storm shutters; is that
14:04  correct?
14:04  A.  Not every building did.
14:04  Q.  Did the one you stayed in have storm shutters?
14:04  A.  Yes.
14:04  Q.  Is it fair to say that you were not outside for the
14:04  entirety of the storm?
14:04  A.  That's correct.
14:04  Q.  You only went out periodically?
14:04  A.  Yes.
14:04  Q.  And so whether it -- something happened or didn't happen,
14:04  you don't know for certain; you're just saying you did not see
14:04  it; is that correct?
14:04      With regard to the wave described by Mr. Webb.
14:05  You're just telling the Court you did not see any wave; is that
14:05  correct?
14:05  A   What wave are you talking about?
14:05  Q.  This tidal wave he described.
14:05  A.  No, I didn't see any wave.
14:05  Q.  But you may have been inside; correct?
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2231

```
14:05  A.  Yeah.
14:05      MR. SANDERS:  Okay.  Now, could I have DX-145?
14:05  BY MR. SANDERS:
14:05  Q.  With regard to the buoys on each side -- I'm sorry.
14:05      MR. SANDERS:  Bob.
13:47  BY MR. SANDERS:
14:05  Q.  How many buoys on each side of the canal?
14:05  A.  Roughly eight.
14:05  Q.  How many?
14:05  A.  Roughly eight.  I'm not 100 percent sure.
14:05      MR. SANDERS:  Could I have the ELMO?
14:05  BY MR. SANDERS:
14:05  Q.  Now, this photograph, how many do you see?
14:05  A.  I can see four there.
14:05  Q.  And is it fair to say that there's one or two behind this
14:06  structural support of the bridge?
14:06  A.  I don't think we get too close to the bridge, but they may
14:06  have one.
14:06  Q.  Okay.  Let me give you this shot.
14:06      THE COURT:  Do you want to point out where that was,
14:06  just for me, again?  Behind which structural support?
14:06      MR. SANDERS:  The structural support holding up the
14:06  bridge, right by my finger.
14:06      THE COURT:  All right.  Thank you.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2232

```
13:46  BY MR. SANDERS:
14:06  Q.  Let me show you this photograph.  Now, how many buoys do
14:06  you see in that picture?
14:06  A.  I see four.
14:06  Q.  Okay.  But you're saying there were eight; is that
14:06  correct?
14:06  A.  No.  When we install the buoys there, sometimes one would
14:06  get damaged, even to another lock, and they would come and
14:07  remove them.  So I don't know how many buoys they have.
14:07  Q.  And you can't tell the Court whether you can see all the
14:07  buoys from this vantage point; is that correct?
14:07  A.  That's correct.
14:07  Q.  And, sir, you indicated that barges are not to be left
14:07  unattended in the canal; is that correct?
14:07  A.  That's correct.
14:07  Q.  And that includes barges which may be moored to those
14:07  buoys; is that correct?
14:07  A.  That would include that.
14:07  Q.  Because those buoys are to facilitate people holding up,
14:07  waiting to go through the lock; is that correct?
14:07  A.  That's correct.
14:07      THE COURT:  Counsel, did you ever see the effect of,
14:07  let's say, the south breach?  Did you see the south breach of
14:07  the IHNC floodwall?
14:07      THE WITNESS:  Yes.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2233

```
14:07      THE COURT:  When did you first notice it?  About what
14:07  time?  Just --
14:07      THE WITNESS:  10:00.
14:07      THE COURT:  Okay.  And those pictures don't show it
14:07  that you took?
14:07      THE WITNESS:  No, sir.  No, sir.
14:07      THE COURT:  Could you go back to that last picture?
14:08  I'm not sure when this picture was taken.
14:08      THE WITNESS:  This was after the storm.  I was taking
14:08  that picture because you can see the walls --
14:08      THE COURT:  Yes, I was asking the 30th, not the 29th.
14:08  I gotcha.  Okay.  Thank you.
14:08      THE WITNESS:  Yes, sir.
13:48  BY MR. SANDERS:
14:08  Q.  And is it fair to say that, during the height of the storm
14:08  and leading up to that, you were primarily indoors --
14:08  A.  No.
14:08  Q.  -- inside?
14:08      You spent most of your time outside?
14:08  A.  It was -- I was in and out.
14:08  Q.  Okay.  50/50?
14:08  A.  It's hard to say.
14:08  Q.  So you don't know?
14:08  A.  I wouldn't speculate neither way.
14:08  Q.  All right.  Thank you.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2234

```
1   14:08         Let's say with regard -- let me direct your attention
2   14:08   to the movement of vessels through the canal.  Would you agree
3   14:08   that it takes some planning to move a barge through your lock?
4   14:08   A.  Some planning?
5   14:08   Q.  Yes.
6   14:08   A.  Pretty straightforward.
7   14:08   Q.  But doesn't a mariner have to get on lock turn and then
8   14:08   wait his turn?
9   14:08   A.  Yes.
10  14:08   Q.  Then it takes a period of time to get through the locks?
11  14:09   A.  Yes, sir.
12  14:09   Q.  And hasn't the Coast Guard for years been advising people
13  14:09   to make sure they monitor lock closings with regard to storms?
14  14:09   A.  I haven't heard that.
15  14:09   Q   You've never heard that?
16  14:09   A.  Huh-uh.
17  14:09   Q.  Do you-all put out a notice with regard to when the lock
18  14:09   would be closed?
19  14:09   A.  No.
20  14:09   Q.  Okay.  I'm going to show you a document from 2004.  It's a
21  14:09   marine safety bulletin from August of 2004.  It says right here
22  14:09   by my finger:  "Mariners and marine managers are urged to plan
23  14:09   ahead for vessel and tow movements in the Inner Harbor
24  14:09   Navigation Canal when a hurricane is approaching."
25  14:09         Do you see that, sir?
           JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA
```

## 2235

```
1   14:09   A.  Yes, sir.
2   14:10   Q.  Would you agree that's because it takes some time and some
3   14:10   forethought to get through your lock?
4   14:10         MR. WEBB:  Your Honor, I object.  This witness has
5   14:10   already testified that the Hurricane Protection Plan, with the
6   14:10   Whiskey, Alpha, Yankee, Zulu, he didn't follow it; he didn't
7   14:10   even know it exists.
8   14:10         THE COURT:  I understand he has no personal knowledge
9   14:10   of the plan; that I understand.
10  14:10         I guess you're going to the point, counselor,
11  14:10   that you just don't sail through the locks in five minutes.
12  14:10   You might ask him how long does it takes one to generally get
13  14:10   through the lock.
14          BY MR. SANDERS:
15  14:10   Q.  So what the judge has said is true:  You don't just drive
16  14:10   up and get through the locks; is that correct?
17  14:10   A.  That's correct.
18  14:10   Q.  You have to plan for it?
19  14:10   A.  Yes.
20  14:10   Q.  And what's -- what's the maximum length of a -- of a -- I
21  14:10   mean, a tugboat and its tow can fit through your lock?
22  14:10   A.  629 feet, I think it is.
23  14:10   Q.  So that could -- let's see.
24  14:11         If we have two hopper barges of 200 feet each, that's
25  14:11   400 feet, and let's say we have a 70-foot tug.  That could go
           JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA
```

## 2236

```
1   14:11   through your facility?
2   14:11   A.  Uh-huh.
3   14:11   Q.  Is that correct?
4   14:11   A.  Yes.
5   14:11   Q.  Okay.  You indicated that you saw the breach at about
6   14:11   10:00 a.m.  On what day did you see the breach?
7   14:11   A.  The morning of the storm.
8   14:11   Q.  It had already occurred; is that correct?
9   14:11   A.  Yes.
10  14:11   Q.  Did you notify any Coast Guard personnel at that point of
11  14:11   the breach?
12  14:11   A.  No, I didn't.  I notified the commander of the Corps of
13  14:11   Engineers.
14  14:11   Q.  Did you see a barge from where you were standing?
15  14:11   A.  No, sir.
16  14:11   Q.  Did you take any pictures of the breach?
17  14:11   A.  Yes.
18  14:11   Q.  Okay.  But those haven't been shown; is that correct?
19  14:12   A.  Yes.  One was up there from the 30th.
20  14:12   Q.  And you indicated you didn't see a barge?
21  14:12         THE COURT:  You mean, you didn't take any pictures of
22  14:12   the breach on the 29th?
23          BY MR. SANDERS:
24  14:12   Q.  Did you take any pictures of the breach on the 29th?
25  14:12   A.  Not to my knowledge.
           JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA
```

## 2237

```
1   14:12   Q.  Okay.  And with regard to not seeing a barge, would you
2   14:12   agree that this red structure up here in the corner is the
3   14:12   barge?
4   14:12   A.  Yes, I think that is a barge.
5   14:12   Q.  So you just didn't notice the barge; is that correct?
6   14:12         MR. WEBB:  Your Honor, I object.  The photograph says
7   14:12   the 30th.  He's trying to backstrap himself into an earlier
8   14:12   time.  And if he can ask him, at any time before the 30th, when
9   14:12   he took that photograph, did he see the barge, it would be a
10  14:12   better question.
11  14:12         THE COURT:  Well, I'm sure there could have been a
12  14:12   lot of questions that could be better, but I'm going to
13  14:12   overrule your objection.  I understand it's the 30th that this
14  14:12   picture depicts the barge.  And that's all I know at this
15  14:12   point.
16          BY MR. SANDERS:
17  14:12   Q.  Sir, you didn't see that barges on 29th; is that correct?
18  14:13   A.  That's correct.
19  14:13   Q.  And you didn't see any barge in the canal on the 28th; is
20  14:13   that correct?
21  14:13   A.  I didn't see it on the 28th.
22  14:13         MR. SANDERS:  Thank you.
23  14:13         That's all the questions I have, Your Honor.
24  14:13         THE COURT:  Thank you.  Any redirect?
25  14:13         MR. WEBB:  No, Your Honor.
           JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA
```

## 2238

```
14:13    1   THE COURT:  Thank you, sir.
14:13    2        And is this witness released, free to go?
14:13    3   MR. WEBB:  Yes, he is.  Yes, sir.
14:13    4   MR. ALDOCK:  Your Honor, we had agreed that if
14:13    5   Mr. Glaser got here at 2:00, we would accommodate the
14:13    6   plaintiffs and put him on.  But if he isn't here, I want to
14:13    7   proceed.  I don't want to waste the Court's time.
14:13    8   THE COURT:  So do I.
14:13    9   MR. BEST:  He's not here, so we can't very well
14:13   10   proceed with his testimony at this time.
14:13   11   THE COURT:  This is true.
14:13   12   MR. BEST:  Hopefully, he will arrive shortly, and
14:13   13   counsel will find a convenient time to fit in his testimony,
14:13   14   which I anticipate will not take very long.
14:13   15   MR. ALDOCK:  We will do our best, but we will start.
14:14   16   THE COURT:  Thank you.
14:14   17   MR. ALDOCK:  Next witness is Dr. Bakeer.
14:14   18   THE COURT:  Okay.
14:14   19   MR. ALDOCK:  Your Honor, it we could have a brief
14:14   20   recess while we bring in the models.
14:14   21   THE COURT:  All right.  We'll take a brief recess,
14:14   22   maybe 5 or 10 minutes.
         23        (WHEREUPON, the Court took a recess.)
14:26   24   THE DEPUTY CLERK:  All rise, please.  Court's in
14:27   25   session.  Please be seated.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2239

```
14:27    1   MR. BEST:  If the Court, please, Mr. Glaser has
14:27    2   arrived, and counsel has asked that we proceed with him before
14:27    3   they start their next witness.
14:27    4   THE COURT:  Absolutely.  All right.
14:27    5   MR. BEST:  We'd be pleased to do so.
14:27    6        Mr. Glaser, if you'd take a seat up there.
14:27    7   (WHEREUPON, Jacob Robert Glaser, having been duly
14:27    8   sworn, testified as follows.)
14:27    9   THE DEPUTY CLERK:  Please state your full name and
14:27   10   correct spelling for the record.
14:27   11   THE WITNESS:  Jacob Robert Glaser, G-L-A-S-E-R.
14:27   12   THE DEPUTY CLERK:  Okay.  I'm going to need you to
14:27   13   speak into the -- not too close to the mic, but enough where we
14:27   14   can hear you.  So you can adjust the mic if need be.
14:27   15                DIRECT EXAMINATION
14:27   16   BY MR. BEST:
14:27   17   Q.  Mr. Glaser, how old are you, sir?
14:27   18   A.  Sixty-one.
14:27   19   Q.  Where do you live?
14:27   20   A.  Madisonville, Louisiana.
14:28   21   Q.  How long have you lived there?
14:28   22   A.  About five years.
14:28   23   Q.  Where did you live before that?
14:28   24   A.  In St. Bernard Parish, Chalmette.
14:28   25   Q.  And are you married?
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2240

```
14:28    1   A.  Yes.
14:28    2   Q.  Your wife's name?
14:28    3   A.  Diane Glaser.
14:28    4   Q.  Children?
14:28    5   A.  Two:  A son and a daughter.
14:28    6   Q.  Grown, I gather?
14:28    7   A.  Yes.
14:28    8   Q.  What's your education?
14:28    9   A.  Two years of college.
14:28   10   Q.  And did you serve in -- do any military service?
14:28   11   A.  Yes, sir.  United States Navy.
14:28   12   Q.  What years was that?
14:28   13   A.  That was -- Navy Reserve actually lasted for six years,
14:28   14   but active duty was approximately two years, from '69 to '70,
14:28   15   part of '71.
14:28   16   Q.  What is your current employment?
14:28   17   A.  Right now I'm a real estate agent, as well as I work at a
14:28   18   department store.
14:28   19   Q.  And how long have you been a real estate agent?
14:28   20   A.  Since the storm, a licensed agent.
14:28   21   Q.  All right.  And what was your occupation before the storm?
14:29   22   A.  We owned and operated Holiday Jewelers.
14:29   23   Q.  Where was Holiday Jewelers located?
14:29   24   A.  In St. Bernard, in Chalmette.
14:29   25        MR. BEST:  Plaintiff's Exhibit 291.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2241

```
14:29    1   BY MR. BEST:
14:29    2   Q.  I'm going to bring up a map that I think you used at the
14:29    3   time of your deposition.
14:29    4        And I'm sorry, the address of your business?
14:29    5   A.  8400 West Judge Perez Drive.
14:29    6   Q.  We'll blow up this map.  I think we have an X on here from
14:29    7   your deposition.  Is that the approximate location of your --
14:29    8   you can also see it on the screen right in front of you.
14:29    9   A.  This one is not working.
14:29   10        THE COURT:  There's nothing on that?
14:29   11        THE WITNESS:  No, sir.  It's blank.
14:30   12        If I may ask from here, is it the A or is it the
14:30   13   X?
14:30   14   BY MR. BEST:
14:30   15   Q.  I'm not sure.  I was going to ask you that because this
14:30   16   was done at the time of your deposition.
14:30   17        THE COURT:  Okay.  Just a second before we -- Sheena,
14:31   18   do you want me to get Steve up here to fix this?
14:31   19        THE DEPUTY CLERK:  Okay.
14:31   20        THE COURT:  We'll proceed, and you can e-mail Steve
14:31   21   to come up here.
14:31   22   BY MR. BEST:
14:31   23   Q.  Your business on West Judge Perez Drive, that street runs
14:31   24   generally east to west?
14:31   25   A.  I would say so, yes.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA