```
                                                                    2450
 1                      UNITED STATES DISTRICT COURT
 2                      EASTERN DISTRICT OF LOUISIANA
 3
 4
 5     IN RE:  KATRINA DREDGING        *   Civil Action
       LIMITATION ACTION               *
 6     CONSOLIDATED LITIGATION         *   No. 05-4182
                                       *
 7                                     *   Section K(2)
       PERTAINS TO:                    *
 8     BARGE                           *   New Orleans, Louisiana
                                       *
 9     MUMFORD, C.A. NO. 05-5724, AS   *   July 7, 2010
       TO PLAINTIFFS JOSEPHINE         *
10     RICHARDSON AND HOLLIDAY         *   Afternoon Session
       JEWELERS, INC., ONLY            *
11     AND                             *
       BENOIT, C.A. NO. 06-7516, AS    *
12     TO PLAINTIFFS JOHN ALFORD AND   *
       JERRY ALFORD ONLY               *
13      * * * * * * * * * * * * * * *
14                           DAY ELEVEN
                        BENCH TRIAL BEFORE THE
15                HONORABLE STANWOOD R. DUVAL, JR.
                     UNITED STATES DISTRICT JUDGE
16
17     APPEARANCES:
18     For the Plaintiffs:        Best Koeppel
                                  BY:  LAURENCE E. BEST, ESQ.
19                                BY:  PETER S. KOEPPEL, ESQ.
                                  2030 St. Charles Avenue
20                                New Orleans, Louisiana 70130
21
22     For the Plaintiffs:        Law Offices of Brian A. Gilbert
                                  BY:  BRIAN A. GILBERT, ESQ.
23                                2030 St. Charles Avenue
                                  New Orleans, Louisiana  70130
24
25
              JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                      UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF LOUISIANA
```

**2451**

APPEARANCES:

| | |
|---|---|
| For the Plaintiffs: | Wiedemann & Wiedemann |
| | BY: KARL WIEDEMANN, ESQ. |
| | BY: LAWRENCE WIEDEMANN, ESQ. |
| | 821 Baronne Street |
| | New Orleans, Louisiana 70113 |
| | |
| For the Plaintiffs: | Patrick J. Sanders, LLC |
| | BY: PATRICK J. SANDERS, ESQ. |
| | 3316 Ridgelake Drive |
| | Suite 100 |
| | Metairie, Louisiana 70002 |
| | |
| For the Plaintiffs: | Law Office of Richard T. Seymour, P.L.L.C. |
| | BY: RICHARD T. SEYMOUR, ESQ. |
| | 1150 Connecticut Avenue N.W. |
| | Suite 900 |
| | Washington, D.C. 20036-4129 |
| | |
| For the Plaintiffs: | Khorrami, Pollard & Abir, LLP |
| | BY: SHAWN KHORRAMI, ESQ. |
| | 444 S. Flower Street |
| | 33rd Floor |
| | Los Angeles, California 90071 |
| | |
| For the Plaintiffs: | Wilson, Grochow, Druker & Nolet |
| | BY: LAWRENCE A. WILSON, ESQ. |
| | 233 Broadway |
| | 5th Floor |
| | New York, New York 10279 |
| | |
| For the Defendant: | Chaffe, McCall, L.L.P. |
| | BY: DEREK A. WALKER, ESQ. |
| | BY: CHARLES P. BLANCHARD, ESQ. |
| | 1100 Poydras Street, Suite 2300 |
| | New Orleans, Louisiana 70163 |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2452**

APPEARANCES:

| | |
|---|---|
| For the Defendant: | Goodwin Procter, L.L.P. |
| | BY: JOHN ALDOCK, ESQ. |
| | BY: MARK RAFFMAN, ESQ. |
| | BY: ADAM CHUD, ESQ. |
| | BY: KIRSTEN ROBBINS, ESQ. |
| | BY: ERIC I. GOLDBERG, ESQ. |
| | 901 New York Avenue, NW |
| | Washington, D.C. 20001 |
| | |
| For the Defendant: | Sutterfield & Webb |
| | BY: DANIEL A. WEBB, ESQ. |
| | 650 Poydras Street, Suite 2715 |
| | New Orleans, Louisiana 70130 |
| | |
| For the Defendant: | Lafarge North America, Inc. |
| | BY: PETER KEELEY, ESQ. |
| | 12950 Worldgate Drive |
| | Herndon, Virginia 20170 |
| | |
| Official Court Reporter: | Jodi Simcox, RMR, FCRR |
| | 500 Poydras Street |
| | Room HB-406 |
| | New Orleans, Louisiana 70130 |
| | (504) 589-7780 |

Proceedings recorded by mechanical stenography, transcript produced by computer.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2453**

I N D E X

| | Page |
|---|---|
| REDA BAKEER | |
|    Cross-Examination | 2454 |
| DICK PHILLIP SKAER | |
|    Direct Examination | 2502 |
|    Cross-Examination | 2533 |
|    Redirect Examination | 2565 |
| ROBERT BEA | |
|    Direct Examination | 2570 |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2454**

AFTERNOON SESSION

(July 7, 2010)

13:47      * * * * *

14:03   THE DEPUTY CLERK:  All rise, please.  Court's in session.  Please be seated.

14:03   THE COURT:  Good afternoon.  We're now ready to cross-examine Dr. Bakeer.

14:03   MR. KHORRAMI:  Yes, Your Honor.  And my co-counsel, Mr. Wilson, is very eager to do that.  So I will yield to him, if it's okay with the Court.  I've already talked to the defense about it.  Is that fine with the Court?

14:04   THE COURT:  I may have missed something.

14:04   MR. KHORRAMI:  I said my co-counsel, Mr. Wilson, is very eager to do that, and so I was going to yield to him.  And I just checked with the defense, and they don't have an objection as long as the Court does not -- does not have an issue with it.

14:04   THE COURT:  It's your -- it's your decision to make.

14:04   MR. KHORRAMI:  Thank you, Your Honor.

14:04   MR. WILSON:  Good afternoon, Your Honor.

09:20   (WHEREUPON, Reda Bakeer, having been previously duly sworn, testified as follows.)

14:04                    CROSS-EXAMINATION

14:04   BY MR. WILSON:

14:04   Q.  Good afternoon, Doctor.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## Page 2499

```
15:11  BY MR. WILSON:
15:11  Q.  And, Doctor, you've never been an expert involved in a
15:11  floodwall collapse before?
15:11  A.  Excuse me, I didn't hear the question.
15:11  Q.  You have never been an expert testifying in court in a
15:11  floodwall collapse before?
15:11  A.  We didn't have any floodwall failures before Katrina.
15:11  Q.  Okay.
15:11  A.  But I was involved in the assessment of existing
15:11  floodwalls when there is, say, a levee crossing or a floodwall
15:11  crossing; and if you put something next to it, I evaluate that
15:11  wall, and I still do that.  I've done this before Katrina, and
15:11  I still do this on a regular basis.  I evaluate the effect of
15:11  construction, effect of excavations, effect of different
15:11  activities near a hurricane flood protection system.
15:11  Q.  But you've never been an expert in a case involving a
15:11  floodwall collapse before; correct?
15:11  A.  Not in a lawsuit, yes.
15:11  Q.  And you've never been involved in a case containing
15:11  allegations of a barge hitting a floodwall; true?
15:12  A.  No, I wasn't.
15:12  Q.  And, Doctor, you actually have a business relationship
15:12  with Lafarge; true?
15:12  A.  No, I don't.
15:12  Q.  Your company has done work for them before; true?
```

## Page 2500

```
15:12  A.  Not our office, no.
15:12  Q.  How about Lafarge?
15:12  A.  Sir, I was employed by Ardaman in 2007.  I have no idea
15:12  about incidents that took place in 1991.
15:13       Secondly, Ardaman has no presence -- had no presence
15:13  in Louisiana until 2007.
15:13       So, accordingly, any business, that would go back to
15:13  corporate office in Orlando.  You can ask the folks in Orlando
15:13  if they have any issues with Lafarge.  I have no idea of them.
15:13  Q.  Well, we can agree that there's been a business
15:13  relationship before?
15:13  A.  If you show me this document, I would agree with you.
15:13  Q.  Okay.  Thank you.
15:13       MR. WILSON:  I tender the witness.
15:13       THE COURT:  Thank you, sir.
15:13       Redirect?
15:13       MR. RAFFMAN:  No redirect, Your Honor.
15:13       THE COURT:  Thank you, sir.
15:13       Doctor, you may step down.  You're free to go or
15:13  free to stay.
15:13       THE WITNESS:  Thank you.  I appreciate your patience.
15:13       THE COURT:  Thank you for yours.
15:13       MR. ALDOCK:  Your Honor, our next witness will be
15:13  Dr. Skaer, the rope expert.  It will take us about two minutes
15:13  to bring the ropes in, but Dr. Skaer is here and Mr. Walker
```

## Page 2501

```
15:13  will examine him.
15:13       THE COURT:  Yes, sir.  Thank you very much,
15:13  Mr. Aldock.
15:15       THE COURT:  Okay.  We are ready to proceed, sir,
15:15  whenever you're ready.
15:15       MR. SANDERS:  Your Honor, his résumé is in evidence.
15:15  I can stipulate to save time.  May I ask what he's being
15:16  tendered as, and maybe we can expedite matters by stipulation?
15:16       THE COURT:  Sure.
15:16       MR. WALKER:  Your Honor, Mr. Skaer is being tendered
15:16  as an expert in cordage, and I think some questions regarding
15:16  his expertise are appropriate.
15:16       THE COURT:  All right.
15:16       MR. SANDERS:  I have no questions.  I will stipulate.
15:16       One more thing, Your Honor, I don't want to
15:16  waive any objection with regard to any future litigation.
15:16  There was an issue of spoliation of evidence regarding the
15:16  ropes.  We have withdrew that claim and -- but we want to make
15:16  sure that it's preserved for the future.
15:16       THE COURT:  Whatever the future holds, it holds, but
15:16  I understand that.  You're not waiving your right to use it in
15:16  any other litigation that may occur after the Fifth Circuit
15:16  rules on this case; hopefully, definitively.
15:16       With that said, move on.
15:16       MR. WALKER:  Do I understand, Your Honor, Mr. Skaer
```

## Page 2502

```
15:16  has been accepted as a rope expert in the areas tendered?
15:17       THE COURT:  You're tendering him as an expert in --
15:17       MR. WALKER:  Cordage, which is ropes, as he'll
15:17  explain.
15:17       MR. SANDERS:  No objection.
15:17       THE DEPUTY CLERK:  I need to swear the witness.
15:17       (WHEREUPON, Dick Phillip Skaer, having been duly
15:17  sworn, testified as follows.)
15:17       THE DEPUTY CLERK:  Please state your full name and
15:17  correct spelling for the record.
15:17       THE WITNESS:  Dick Phillip Skaer.
15:17            DIRECT EXAMINATION
15:17  BY MR. WALKER:
15:17  Q.  Mr. Skaer, could you come a little closer to the
15:17  microphone.
15:17  A.  S-K-A-E-R.
15:17  Q.  Mr. Skaer, you have heard that you've been accepted as an
15:17  expert in the areas in which we have tendered you.  However, I
15:17  would like to run very briefly through some of your
15:17  qualifications.
15:17       Did you serve in the Navy?
15:17  A.  Yes, I did.
15:17  Q.  For how many years?
15:17  A.  Four years active duty, two and a half years of reserve
15:17  duty.
```

**2503**

```
15:17  Q. What years were those?
15:17  A. '54, '58.
15:17  Q. All right. And did you have any specialization while you
15:17     were in the Navy?
15:17  A. Yes. I was trained at the Naval Postgraduate School as a
15:18     meteorologist.
15:18  Q. And how long did you practice in that area?
15:18  A. Well, I practiced in the Navy for three years.
15:18  Q. All right. And after being -- well, were you honorably
15:18     discharged?
15:18  A. Yes.
15:18  Q. And after being discharged, did you seek employment?
15:18  A. Yes, I did.
15:18  Q. Where did you start working?
15:18  A. I started working at Broderick & Bascom Rope Company in
15:18     St. Louis, Missouri. It's a manufacturer of steel wire ropes.
15:18  Q. How long did you work there?
15:18  A. Twelve years.
15:18  Q. In what positions?
15:18  A. I started out in general sales, went into product
15:18     engineering. Was mid-continent sales manager and then general
15:18     sales manager.
15:18  Q. Just give the judge a brief -- what did you do as a
15:18     product engineer?
15:18  A. As a product engineer, I went out on complaints of rope
```

**2504**

```
15:18  failures, investigated them, and tried to evaluate what the
15:18  problem was, whether it was the rope or the machinery.
15:18  Q. Okay. And I know you said "rope." It's an important
15:18     distinction in this case, wire versus rope. At Broderick &
15:18     Bascom, were you involved with wire?
15:19  A. Strictly wire rope.
15:19  Q. Okay. You left there in 1970. Where did you then go?
15:19  A. I went to Jackson Rope Company, Reading, Pennsylvania, as
15:19     vice president of sales and marketing. It was a manufacturer
15:19     of three-strand twisted synthetic and nylon -- synthetic and
15:19     natural fiber ropes.
15:19  Q. And the ropes that we have on the floor and that are in
15:19     question in this case, are they synthetic ropes?
15:19  A. Yes. It's a polypropylene blend.
15:19  Q. And is that the type of material that ropes were made of
15:19     at Jackson Rope?
15:19  A. Yes. They made polypropylene ropes.
15:19  Q. All right. When did you leave that employment?
15:19  A. 1980.
15:19  Q. Where did you go then?
15:19  A. I went to Wall Industries, Wall Rope.
15:19  Q. How long were you there?
15:19  A. Until I retired in 1995.
15:19  Q. Okay. And for those 15 years, I know you were vice
15:19     president, senior vice president, and then you were president
```

**2505**

```
15:19  for 10 years?
15:19  A. Yes.
15:19  Q. All right. And what kind of ropes did Wall Industries
15:19     manufacture?
15:19  A. Wall made a very broad variety of ropes, everywhere from
15:20     wire rope centers -- fiber core, that is -- synthetic ropes,
15:20     nylon, polyester, three-strand, eight-strand; and we had a
15:20     braided division.
15:20  Q. All right. Since your retirement in 1995, what has been
15:20     your occupation?
15:20  A. I set up a company, RopeTech Inc., which looks -- is hired
15:20     to do rope failures.
15:20  Q. Okay. And you've been a litigation consultant?
15:20  A. Yes, I have.
15:20  Q. All right. Could you explain to the Court what a
15:20     synthetic rope or poly rope is?
15:20  A. Well, synthetic rope is simply a rope made out of a
15:20     manmade fiber, polypropylene being one of them.
15:20  Q. What is cordage?
15:20  A. Cordage is a generic overall term for all the ropes. It
15:20     includes natural fiber ropes, synthetic ropes, twines.
15:20     Anything that is rope-oriented falls under the cordage heading.
15:21  Q. Is there a trade organization or professional organization
15:21     in the cordage industry?
15:21  A. Yes, there is. It's called The Cordage Institute. It's
```

**2506**

```
15:21  been in existence for 70 years.
15:21  Q. Have you held any positions in that organization?
15:21  A. Yes. I was on -- a member of it for 30 years, on the
15:21     board of directors for 20, and I was president of if for two
15:21     years.
15:21  Q. What does that organization do in the rope industry?
15:21  A. Well, basically, its basic function is to set the
15:21     specifications and -- basically, worldwide -- for ropes. So it
15:21     is really the voice of the rope industry as far as
15:21     specifications on each and every type of rope.
15:21  Q. Does it set standards for particular ropes?
15:21  A. Yes. That's what I mean by "specifications," standards.
15:21  Q. And remember to let me finish my entire question, and I'll
15:21     try to let you finish your entire answer. I know you and I
15:21     both talk over each other.
15:21  A. We do.
15:21       MR. WALKER: Thank you, Your Honor.
15:21  BY MR. WALKER:
15:21  Q. Did you ever serve on any committee in The Cordage
15:21     Institute?
15:21  A. I'm currently on the technical committee.
15:22  Q. And what does the technical committee --
15:22  A. It's the one that actually sets the specifications.
15:22  Q. The terms "tensile strength," "standard," "weights,"
15:22     "breaking strength," are those terms that you use in technical
```

## 2507

```
15:22  committees?
15:22  A.  Yes.
15:22  Q.  Do they pertain to ropes?
15:22  A.  Yes.
15:22  Q.  Specifically, what is tensile or breaking strength?
15:22  A.  That is the overall strength of the rope when it's tested,
15:22  new.
15:22  Q.  Have you been engaged as a consultant previous to this
15:22  case with respect to polyprop ropes?
15:22  A.  Yes.
15:22  Q.  Did I mispronounce that?
15:22  A.  Polypro.
15:22  Q.  And have you investigated failures of polypro ropes?
15:22  A.  Several, yes.
15:22  Q.  And about how many cases or times?
15:22  A.  Probably 35 or so.
15:22  Q.  Okay.  And, generally, what is the cause of a breakage of
15:22  a rope?
15:22  A.  Severe strain on the rope is the most common.  Second
15:22  would be abuse to the rope.
15:23  Q.  In this case, we are talking about eight-strand synthetic
15:23  polypro rope; correct?
15:23  A.  Yes.
15:23  Q.  Of 4 1/2- to 6-inch circumference; correct?
15:23  A.  4 1/2- and 6-inch, yes.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2508

```
15:23  Q.  What is the primary use, in your 40 years of experience,
15:23  with that type of rope?
15:23  A.  Well, currently, the current use of those ropes is mooring
15:23  lines.
15:23  Q.  Have you provided opinions and testimony previously
15:23  involving the failure of a mooring rope?
15:23  A.  Yes, I have.
15:23  Q.  In what case?
15:23  A.  Well, one case in Baltimore, a container ship, where
15:23  they -- a bow line and some mooring line broke, and a man was
15:23  injured.
15:23  Q.  And what caused that mooring rope to break?
15:23  A.  It was a container ship, and the winds were excessive that
15:23  day, and it --
15:23  Q.  And -- I'm sorry.
15:23  A.  The winds were excessive, and it blew the ship away from
15:23  the dock.
15:23  Q.  Did that case go to trial?
15:23  A.  Yes.
15:23  Q.  Were you accepted as an expert in that case as well?
15:23  A.  I was.
15:23  Q.  Were you hired by Lafarge North America to make an
15:24  analysis and render an opinion regarding the ropes which moored
15:24  the 4727 and the 4725 [sic]?
15:24  A.  I was.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2509

```
15:24  Q.  What were you asked to do?
15:24  A.  I was asked to inspect the ropes to determine why they
15:24  broke and, also, to determine whether they were appropriate for
15:24  the use.
15:24  Q.  And did you prepare a report?
15:24  A.  I did.
15:24  Q.  I show you DX-199.  And you have a screen in front of you,
15:24  if that's easier for you to read.
15:24  A.  Yes.
15:24  Q.  That's your report, June 12, 2009?
15:24  A.  It is.
15:24  Q.  And is that your signature?
15:24  A.  It is.
15:24  Q.  And I show you your conclusions in that report.  You have
15:24  these four conclusions, which you can briefly read over if
15:24  you'd like.
15:24  A.  Uh-huh.  Yes.
15:24  Q.  Are those still your conclusions today?
15:24  A.  They are.
15:24  Q.  Okay.  So did you determine the strength of the mooring
15:24  configuration between the two barges?
15:24  A.  I did.
15:24  Q.  And did you determine that based on the strength of the
15:25  ropes between them?
15:25  A.  I did.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2510

```
15:25  Q.  Okay.  And what materials did you review to reach those
15:25  opinions and conclusions?
15:25  A.  Visual inspection of the ropes on several occasions,
15:25  photographs, and the specification sheets provided by the
15:25  manufacturer.
15:25  Q.  Did you also speak to the manufacturer?
15:25  A.  I spoke to the manufacturer.
15:25  Q.  Tell us where you inspected the ropes?
15:25  A.  I inspected the ropes originally in the warehouse in New
15:25  Orleans twice and again at your law offices.
15:25  Q.  Okay.  And did you inspect six rope sections or pieces or
15:25  remnants which came from these two barges?
15:25  A.  I did.
15:25  Q.  I'd like you to show the Court --
15:26       MR. WALKER:  Your Honor, if you don't mind Mr. Forbes
15:26  being my assistant.
15:26       THE COURT:  Absolutely not.
15:26       MR. WALKER:  Thank you, Your Honor.
       BY MR. WALKER:
15:26  Q.  Is that the type of rope we're talking about?  Could you
15:26  hold it up for the Court?
15:26  A.  It is.
15:26  Q.  Is that a 6-inch polypro high-tenacity rope?
15:26  A.  It is.
15:26  Q.  What does "high-tenacity" mean?
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## Page 2511

```
15:26  A.  It just means extra strength.
15:26  Q.  What gives this particular rope its strength?
15:26  A.  This rope is --
15:26  Q.  Can you hold it up for the Court?
15:26  A.  An extrusion process that's reasonably new.  It's been in
15:26  the last 10 or 15 years, where they are able to draw the yarns
15:26  to a higher tenacity; and therefore, the ropes -- it reflects
15:26  into the finished ropes, as it refers to the original
15:26  polypropylene ropes.
15:26  Q.  And you have also referred to the rope as an eight-strand.
15:26  A.  It is eight-strand.
15:26  Q.  And you can count the strands on that piece that you're
15:26  holding?
15:26  A.  Yes.  Each strand is made up of individual yarns, and
15:27  those yarns are then twisted into or plaited into a -- this
15:27  rope.
15:27  Q.  All right.  And is that piece that you are holding, which
15:27  is demonstrative, identical to the 6-inch rope that Lafarge
15:27  used prior to the hurricane?
15:27  A.  It's identical.
15:27  Q.  Okay.  In terms of quality, how would you characterize the
15:27  ropes that were used?
15:27  A.  I'm sorry?
15:27  Q.  In terms of the quality, how would you characterize the
15:27  ropes that were used?
```

## Page 2512

```
15:27  A.  I think the quality was excellent.
15:27  Q.  In terms of strength, how did the 6-inch ropes compare
15:27  with the cordage industry standards?
15:27  A.  Well, they are stronger than The Cordage Institute minimum
15:27  specifications by, at least, 10 percent.
15:27  Q.  So the minimum standards set by the institute was exceeded
15:27  by these ropes?
15:27  A.  That is correct.
15:27  Q.  What are the properties of this type of rope that you
15:27  previously stated its most common use was mooring?  What makes
15:28  it a good mooring rope?
15:28  A.  Well, it's very strong.  It resists abrasion quite well.
15:28  It's very flexible and it's torque-free.  In other words, it
15:28  doesn't twist and rotate under use.  That's why they use a
15:28  braided rope.
15:28       Again, it has lots of other characteristics, but --
15:28  you know, it doesn't rot; it floats, et cetera.
15:28  Q.  And the ropes that you personally inspected, in your
15:28  opinion, were they suitable in terms of the quality, the
15:28  condition, the type, and the size to moor two barges together?
15:28  A.  Yes.
15:28  Q.  Okay.  I show you a rope identified as H-1.  It's tagged
15:28  as H-1.
15:28       MR. WALKER:  Your Honor, may Mr. Skaer step down for
15:28  a second?
```

## Page 2513

```
15:28       THE WITNESS:  Yes, please.
15:28  BY MR. WALKER:
15:29  Q.  Who was the manufacturer of that rope and how did you
15:29  determine that?
15:29  A.  This rope is manufactured by a company called Garware Wall
15:29  Ropes.  They're an Indian corporation.
15:29       How I determined it, the interior of the rope has a
15:29  marker yarn which quality manufacturers put in, and it has
15:29  their name on it, printed on it.
15:29  Q.  And that's called a marker yarn or tape --
15:29  A.  It's called a tape, yes, marker tape.
15:29       THE COURT:  Is that on?
15:29       MR. WALKER:  No, Tom, the microphone.  There you go.
15:29       THE COURT:  It's on.
15:29       MR. WALKER:  Thank you, Your Honor.
15:29  BY MR. WALKER:
15:29  Q.  And did you find that marker yarn or tape in both segments
15:29  of this particular rope, as we'll show the Court later?
15:29  A.  Yes, I did.
15:29       MR. WALKER:  Okay.  Did you -- I think you can go
15:29  back for a bit.  Thank you.
15:30  BY MR. WALKER:
15:30  Q.  You said earlier that you had contacted the manufacturer.
15:30  What did they confirm to you regarding your findings on that
15:30  rope?
```

## Page 2514

```
15:30  A.  When I asked them -- when I knew who they had sold it to,
15:30  Shipyard Supply in New Orleans, I asked them what they sold to
15:30  them, and they checked with the mill, who had shipped it, and
15:30  they said it was a type of rope they called Maxiflex.
15:30  Q.  And just for the court reporter's benefit, that's Garfil,
15:30  G-A-R-F-I-L?
15:30  A.  G-A-R-F-I-L.
15:30       Maxiflex.
15:30  Q.  M-A-X-I-F-L-E-X?
15:30  A.  Yes.
15:30  Q.  And that is an identification or designation of that
15:30  manufacturer's?
15:30  A.  That's one of their trade names, yes.
15:30  Q.  I show you slide 11.
15:30       And you talked to Shipyard Supply; is that correct?
15:30  A.  Yes, I did.  I talked to Shipyard Supply.
15:31  Q.  And what did they tell you about this particular
15:31  transaction?
15:31  A.  They said that the only thing they bought from Garfil was
15:31  Maxiflex and what they sold to Lafarge was Maxiflex.
15:31  Q.  And the date of the sale on this particular lot was
15:31  August 8th, 2005?
15:31  A.  That's correct.
15:31  Q.  And it's described as "2-inch 7-by-720 blue mooring
15:31  lines."  What does that mean to you, or what did they explain
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## Page 2515

```
15:31   1   that was to you?
15:31   2   A.  Well, of course, it's 2-inch diameter, 6-inch
15:31   3   circumference, and it's 720 feet long.
15:31   4   Q.  And that would be blue mooring rope like the type we have
15:31   5   on the floor?
15:31   6   A.  Yeah.  This.
15:31   7   Q.  Okay.  All right.  I show you slide 004.  Could you
15:31   8   explain to the Court what we're looking at here and where you
15:31   9   obtained it.
15:31  10   A.  This is the specification sheet given to me by Garware
15:31  11   Wall.
15:31  12   Q.  Okay.  And then -- I'm sorry.  Go ahead.
15:32  13   A.  And we have outlined the two ropes in question --
15:32  14   Q.  Okay.
15:32  15   A.  -- that we've used.
15:32  16   Q.  We have four rows up here after "Specifications,"
15:32  17   "polypro" and "polyamide," "Garfil Maxima" and "Garfil
15:32  18   Maxiflex."  We're only concerned with Garfil Maxiflex; is that
15:32  19   correct?
15:32  20   A.  That is what they told me they sold.
15:32  21   Q.  And the other three are different materials or type?
15:32  22   A.  They're -- some are the same -- yes, they're the materials
15:32  23   but different types.
15:32  24   Q.  Okay.
15:32  25   A.  Except for the nylon.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## Page 2516

```
15:32   1   Q.  All right.  If we go to slide 5.  We boxed in the row of
15:32   2   "4.5."  "4.5" refers to what?
15:32   3   A.  That's the circumference of one of the ropes.
15:32   4   Q.  Okay.  And we go all the way across the column to the last
15:32   5   two rows -- I mean, all the way across the row to the last two
15:32   6   columns.  Could you describe to the judge what those are?
15:33   7   A.  That's the breaking strength in kilograms of
15:33   8   24,900 pounds.
15:33   9   Q.  If we go to the next slide, 6.  And you translated that to
15:33  10   pounds; is that correct?
15:33  11   A.  Yes.  I translated to pounds by multiplying by 2.2 and
15:33  12   came to 55,000.
15:33  13   Q.  Okay.  And so 55,000 pounds would be the breaking strength
15:33  14   of a new 4.5-circumference rope; correct?
15:33  15   A.  Yes.
15:33  16   Q.  What does that mean, "breaking strength"?
15:33  17   A.  That is the strength in a test bed that it would break at.
15:33  18   Q.  So you would need a force of 55,000 pounds acting against
15:33  19   that rope to break it?
15:33  20   A.  Definitely.
15:33  21   Q.  Okay.  Now, how does -- well, strike that.  Let's go to
15:33  22   slide 7.
15:33  23       Could you explain to the judge what you did here, why
15:33  24   this calculation goes from 55,000 to 38,500?
15:33  25   A.  Well, when you're using -- in the use of a knot or knots,
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## Page 2517

```
15:34   1   you must reduce the strength by 30 percent.  And that's what I
15:34   2   did, and reduced the strength -- the overall tenacity of the
15:34   3   rope to 38,500.
15:34   4   Q.  Okay.  So even if you knot a rope once, in your opinion,
15:34   5   that does reduce the strength?
15:34   6   A.  That's true.
15:34   7   Q.  Okay.  Let's go to slide 8.
15:34   8       And we're going to do the same thing here for the
15:34   9   other rope.  This is the 6-inch circumference rope?
15:34  10   A.  That's correct.
15:34  11   Q.  And that would be a 2-inch diameter?
15:34  12   A.  Right.
15:34  13   Q.  Could you show the judge the last column, what is the
15:34  14   breaking strength?
15:34  15   A.  Again, this is 46,290 in kilograms.
15:34  16   Q.  And, again, we're looking only at the Garfil Maxiflex;
15:34  17   right?
15:34  18   A.  That is correct.
15:34  19   Q.  And the breaking strength of this rope new?
15:34  20   A.  Yes.  102,000 when you multiply that 46,290 by 2.2.
15:34  21   Q.  All right.  The next slide.
15:34  22       Did you also reduce this for the 30 percent in the
15:34  23   event of knots?
15:35  24   A.  I did.
15:35  25   Q.  Okay.  So when these ropes, after they were new, were
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## Page 2518

```
15:35   1   placed on the barge or barges, their breaking strength was, in
15:35   2   your estimation, around 70,000 pounds each?
15:35   3   A.  Yes.  We rounded that off.
15:35   4   Q.  Okay.  Based on the testimony, you understand that the
15:35   5   barges were tied up before the hurricane with 4 1/2-inch ropes;
15:35   6   correct?
15:35   7   A.  Correct.
15:35   8   Q.  Bow and stern?
15:35   9   A.  Bow and stern.
15:35  10       MR. WALKER:  And for ease, Your Honor, and
15:35  11   communication, we will designate the kevels 1 through 5.
15:35  12   BY MR. WALKER:
15:35  13   Q.  Do you understand me, Mr. Skaer?
15:35  14   A.  Yes, I do.
15:35  15       MR. WALKER:  All right.  Your Honor, what we mean is
15:35  16   kevel 1, 2, 3, 4, and 5, just so we can have a clean record.
15:35  17       THE COURT:  All right.
15:35  18   BY MR. WALKER:
15:35  19   Q.  Did you calculate the strength of the mooring
15:35  20   configuration before the hurricane preparations with the
15:36  21   4 1/2-inch rope?
15:36  22   A.  Yes, I did.
15:36  23   Q.  Let's go to 14.  According to the calculations you've
15:36  24   already gone through, you used a 38,5 as the breaking strength.
15:36  25   A.  Yes, I did.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## Page 2519

```
15:36   1        MR. WALKER:  And if you can go back to 13, please.
15:36   2   BY MR. WALKER:
15:36   3   Q.  I note that you used 20,000 on the kevel No. 5.  Where did
15:36   4   that come from?  Can you explain that to the judge?
15:36   5   A.  They said they replaced that rope because it was in poor
15:36   6   condition.  So I just made an estimate of 20,000.
15:36   7   Q.  Okay.  Indicating a rope nearly half as strong as the rope
15:37   8   that remained?
15:37   9   A.  That's true.
15:37  10   Q.  Okay.  And what is the total breaking strength of the
15:37  11   mooring configuration pre-hurricane that you calculated?
15:37  12   A.  I added the two together and came out to 58,500.
15:37  13   Q.  And that's what you show in this slide No. 13?
15:37  14   A.  That's correct.
15:37  15   Q.  All right.  And you understand that the testimony
15:37  16   indicates that the mooring arrangement was changed in
15:37  17   preparation for the hurricane; correct?
15:37  18   A.  That is correct.
15:37  19   Q.  And based on that testimony, you understand there were at
15:37  20   least three lines between kevels 1, 4, and 5 after these
15:37  21   preparations?
15:37  22   A.  That's what I understand, yes, sir.
15:37  23   Q.  And did you make a similar calculation regarding the
15:37  24   breaking strength of that configuration?
15:37  25   A.  I did.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## Page 2520

```
15:37   1   Q.  All right.  Let's go to No. 15, please.
15:37   2        We have here on the right side the after-hurricane
15:37   3   preparation.  At the kevel 1, did you make any changes there in
15:37   4   terms of your calculations?
15:37   5   A.  No, I did not.  They left that rope on and said it was in
15:38   6   good condition.
15:38   7   Q.  Okay.  And let's go to the kevel 5.  You have 70,000
15:38   8   pounds there.  What did you do there?
15:38   9   A.  That, again, is reducing it for this -- the knotting.
15:38  10   Q.  And that's based on your understanding of a new rope
15:38  11   placed in that location?
15:38  12   A.  Right.
15:38  13   Q.  And likewise, at kevel 4 or the quarter kevel, you used
15:38  14   70,000.  What was your basis for that?
15:38  15   A.  Likewise, it was a brand-new rope.
15:38  16   Q.  Okay.  And what is the total breaking strength, in your
15:38  17   estimation, of the post-hurricane preparation mooring
15:38  18   arrangement?
15:38  19   A.  Adding them together is 178,500 pounds.
15:38  20   Q.  Okay.  If we go to slide 54, this is restating the
15:38  21   obvious, but it is one of the conclusions in your report.
15:38  22        So how many times stronger was the after-hurricane
15:38  23   than pre-hurricane configuration?
15:38  24   A.  We figured three times as strong.
15:39  25   Q.  All right.  You testified earlier on that you inspected
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## Page 2521

```
15:39   1   the ropes several times at a warehouse and at my office.  In
15:39   2   conducting forensic analysis of the type that you've done here,
15:39   3   do you attempt to match the rope pieces together?
15:39   4   A.  I did.
15:39   5   Q.  And is that something you do as a matter of forensic
15:39   6   practice?
15:39   7   A.  Absolutely.  You must do it.
15:39   8   Q.  You do it in every case --
15:39   9   A.  Every case.
15:39  10   Q.  Remember to let me finish.
15:39  11        And you did that in this case?
15:39  12   A.  I did.
15:39  13   Q.  Okay.  You inspected remnants of six pieces that you were
15:39  14   able to match to each other; correct?
15:39  15   A.  Yes.
15:39  16   Q.  Were there other pieces that you viewed that you were not
15:39  17   able to match?
15:39  18   A.  Yes, there were.
15:39  19   Q.  I'd like to show you an exhibit on the ELMO.  That's a
15:40  20   photograph of several ropes, a bunch of ropes, isn't it?
15:40  21   A.  It is.
15:40  22   Q.  And that includes the six that you were able to match?
15:40  23   A.  That's correct.
15:40  24   Q.  And do you remember approximately how many other ropes
15:40  25   there were?
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## Page 2522

```
15:40   1   A.  Well, I remembered 15 plus, and it shows 19.
15:40   2   Q.  Okay.  And you were only able to match six of those?
15:40   3   A.  That is correct.
15:40   4   Q.  Do you have any idea where these other rope remnants came
15:40   5   from?
15:40   6   A.  Absolutely none.
15:40   7   Q.  You don't know if they were actually on the barge kevels
15:40   8   and came off, do you?
15:40   9   A.  No, I do not.
15:40  10   Q.  You made your calculations simply on the basis of the
15:40  11   photographs and the ropes you were able to match?
15:40  12   A.  That is correct.
15:40  13   Q.  And that left us with one rope at kevel 1, one rope at
15:40  14   kevel 4, one rope at kevel 5.  You don't know if some of these
15:40  15   other ropes could have been in between those other kevels, do
15:40  16   you?
15:40  17   A.  I have no idea.
15:40  18   Q.  All right.  I would like you to walk the Court through the
15:41  19   process of identification that you made.  Let's start with
15:41  20   slide 24.
15:41  21        This shows a rope that we've designated as D-13.  Do
15:41  22   you have that rope in the courtroom?
15:41  23        And you can actually stay there, Mr. Skaer.  I think
15:41  24   Tom will help us.  Is that the same rope that we see in the
15:41  25   photograph, slide 24?
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2523**

```
15:41  1   A.  Yes.
15:41  2   Q.  Okay.  And you made a visual and forensic examination of
15:41  3   that, comparing it also to the photograph?
15:41  4   A.  I did.
15:41  5   Q.  Show you slide 26.  Do you have that rope in the
15:41  6   courtroom?  All right.  Is that the same rope as shown in the
15:42  7   photograph on slide 26?
15:42  8   A.  It is.
15:42  9   Q.  And do these two pieces have a marker yarn of the type
15:42 10   that you showed the judge earlier that assisted you in
15:42 11   identification?
15:42 12   A.  They have a marker that they put in that's brown and
15:42 13   yellow.  It's in the other 6-inch ropes also.
15:42 14   Q.  How about the frayed ends, is that something you look
15:42 15   at --
15:42 16   A.  Yes.
15:42 17   Q.  -- in your forensic examinations?
15:42 18   A.  Yes.  Trying to --
15:42 19   Q.  Okay.  What was your --
15:42 20   A.  -- marry the ends together.
15:42 21   Q.  What was your opinion regarding those ends?
15:42 22   A.  My opinion is that they came -- they were at one time one
15:42 23   rope.
15:42 24   Q.  So, in your opinion, were these two pieces once the same
15:42 25   rope?
```

**2524**

```
15:42  1   A.  Yes.
15:42  2   Q.  What is the length of those two pieces presently?
15:42  3   A.  The length of those two pieces presently?  Approximately
15:42  4   42 to 44 feet.
15:43  5   Q.  Let's look at slide 30.  Do you see a rope here on a
15:43  6   kevel?  I'm indicating with the laser.
15:43  7   A.  I do.
15:43  8   Q.  And do you understand that to be the fourth or quarter
15:43  9   kevel?
15:43 10   A.  Yes, it is.
15:43 11   Q.  Okay.  And let's show slide 31, please.
15:43 12       Is that the same rope seen from a different angle?
15:43 13   A.  Yes, it is.
15:43 14   Q.  Do you have that rope in the court today?
15:43 15   A.  Yes.
15:43 16   Q.  Could you show the judge that rope?  And is this one of
15:43 17   the 6-inch new blue poly ropes?
15:43 18   A.  Yes, it is.
15:43 19   Q.  And is there anything in particular that you found unique
15:43 20   or outstanding about this piece of rope that you'd like to show
15:43 21   the Court?
15:43 22   A.  Well, in 40 years of looking at ropes, I have never seen
15:43 23   one this badly damaged, the severe damage that melted and
15:43 24   completely fused at that point so that it's back to raw plastic
15:44 25   again.  Also, it has a (indicating).
```

**2525**

```
15:44  1   Q.  What do you call that?
15:44  2   A.  A strand, a partial strand.
15:44  3   Q.  Okay.  And --
15:44  4   A.  Which marries up to a partial strand in the other end of
15:44  5   the rope, making sure that this is the same rope.
15:44  6   Q.  All right.  Let's look at that other rope at slide 35.
15:44  7   We're now looking at H-1 on the 4727.
15:44  8       THE COURT:  Mr. Walker, you did it in the beginning.
15:44  9   Just to make sure I'm oriented --
15:44 10       MR. WALKER:  Yes.
15:44 11       THE COURT:  -- the kevels, how did you number the
15:44 12   kevels when you refer to them?
15:44 13       MR. WALKER:  From north to south, Your Honor, 1, 2,
15:44 14   3, 4, 5.
15:44 15       THE COURT:  North to south.  The ones at the top of
15:44 16   the picture.  Gotcha.
15:44 17       MR. WALKER:  That's right, Your Honor.
15:44 18       THE COURT:  And that rope was on which kevel?
15:44 19       MR. WALKER:  The one we just saw, Your Honor?
15:44 20       THE COURT:  Yes.
15:44 21       MR. WALKER:  That's H-1A, which is the fourth kevel
15:44 22   of 4745.
15:45 23       THE COURT:  4745.
15:45 24       MR. WALKER:  Right.
15:45 25       THE COURT:  I gotcha.  Thank you.
```

**2526**

```
15:45  1       MR. WALKER:  We're about to marry it now to H-1.  If
15:45  2   I'm going too fast, Your Honor, I'd be happy to slow down.
15:45  3       THE COURT:  No, you're not.
15:45  4   BY MR. WALKER:
15:45  5   Q.  Looking at slide 35, and let's zoom to 40.  Is that the
15:45  6   end of that rope that we just saw on slide 35?
15:45  7   A.  Yes.
15:45  8   Q.  And do you have that rope in the court today?
15:45  9   A.  Yes.
15:45 10   Q.  And could you show the judge that same frayed end?
15:45 11   A.  This is the other part of that rope.  This is half of a
15:45 12   strand.  The other half was in the other end of the rope.  And
15:45 13   when we count the yarns in it, you come up to the standard
15:45 14   yarns that they use in their construction.
15:45 15   Q.  So you mean when you count the yarns of the piece you're
15:45 16   holding, which is H-1, and you count the yarns of H-1A, the
15:45 17   other half, they match?
15:45 18   A.  Well, they marry up -- they come out to the amount of a
15:46 19   full strand, which is what we're looking for.
15:46 20   Q.  And do these ropes also have the internal identifying tape
15:46 21   or marker?
15:46 22   A.  Yes, they do.  And also the standard Garware two other
15:46 23   marker units.
15:46 24   Q.  So based on your inspection of the ropes, and based on the
15:46 25   markers and the photographs, in your opinion, were these two
```

**2527**

```
1   15:46  pieces once one rope?
2   15:46  A.  Yes, they were.
3   15:46  Q.  And is it your conclusion that these two remnants, H-1 and
4   15:46  H-1A, came from adjacent kevels on barge 4727 and 4745?
5   15:46  A.  Yes.
6   15:46  Q.  What was the length of these two pieces?
7   15:46  A.  The length of these two pieces?
8   15:46  Q.  Yes.
9   15:46  A.  It was approximately 44 to 46 feet.
10  15:46  Q.  I'd like to show you slide 42 --
11  15:46  A.  I'm sorry.  I stand corrected.  It was -- if my memory
12  15:46  serves me, it was 35 to 38 feet.
13  15:47  Q.  Okay.  So the rope H-1, H-1A, was 35 to 38 feet?
14  15:47  A.  Yes.
15  15:47  Q.  Okay.  Let's look at the last rope on kevel 5, which we've
16  15:47  marked as -- or has been tagged previously as D-006.
17  15:47      MR. WALKER:  And if we can blow up the corner of this
18  15:47  exhibit, Andrew.
19  15:47  BY MR. WALKER:
20  15:47  Q.  Do you see a rope on the corner of that?
21  15:47  A.  I do.
22  15:47  Q.  Okay.  And if we go to 45, please.  Is that the same
23  15:47  rope --
24  15:47  A.  Yes.
25  15:47  Q.  -- in a better picture?
```

**2528**

```
1   15:47  A.  Yes.
2   15:47  Q.  Okay.  And do you have that rope remnant today?
3   15:47  A.  I do.
4   15:47  Q.  All right.  We can see in the photograph, slide 45,
5   15:48  there's a piece in the water floating?
6   15:48  A.  Yes.
7   15:48  Q.  Is that piece attached to the rope that you're holding?
8   15:48  A.  Yes.
9   15:48  Q.  I'm sorry.  I didn't hear your answer if you did.
10  15:48  A.  I'm sorry.  Yes, it is.
11  15:48  Q.  Any doubt in your mind that that's the same piece of rope?
12  15:48  A.  None.
13  15:48  Q.  Let's look at slide 48.  And this is the other side.  Do
14  15:48  you recognize this rope as well?
15  15:48  A.  I do.
16  15:48  Q.  And let's look at 49 where it's blown up.  And do you
17  15:48  recall seeing this rope in the warehouse?
18  15:48  A.  I do.
19  15:48  Q.  Okay.  And do you know why it's knotted?  Do you have any
20  15:48  idea when or why it was knotted?
21  15:48  A.  What I understand is that they probably used it as a rope
22  15:48  ladder at one time to get up onto the barge when it was under
23  15:48  aground.
24  15:48  Q.  After the hurricane?
25  15:48  A.  After the hurricane.
```

**2529**

```
1   15:48  Q.  And did these two ropes, 006 and 004, at kevel 5 have
2   15:49  identifying yarns as well?
3   15:49  A.  They do.  Identical, the same yarns.
4   15:49  Q.  Were you able to match these two pieces?
5   15:49  A.  I was.
6   15:49  Q.  And what was the length of these two pieces when matched?
7   15:49  A.  I'd like to make a corrected statement.  The length of
8   15:49  this piece is 35 to 38 feet.  The other one, the kevel, kevel
9   15:49  4, was approximately 44 to 46 feet.
10  15:49  Q.  Okay.  So your original answer with respect to H-1 and
11  15:49  H-1A was correct, 44 to 46?
12  15:49  A.  Yes.  I corrected myself incorrectly.
13  15:49  Q.  And these two at kevel 5, D-6 and D-4, were approximately
14  15:49  35, you said?
15  15:49  A.  35, 36 feet.
16  15:49  Q.  Okay.  Let's go to slide 50, please.
17  15:49      MR. WALKER:  This is sort of a summary slide, Your
18  15:49  Honor.
19  15:49  BY MR. WALKER:
20  15:49  Q.  Does this accurately summarize the locations of the ropes
21  15:50  and the remnants that you were able to marry with each other
22  15:50  from one location to the other at adjacent kevels?
23  15:50  A.  In my opinion, yes.
24  15:50  Q.  Based on your inspection of these rope remnants and the
25  15:50  frayed ends and other conditions that you've shown the Court,
```

**2530**

```
1   15:50  did you form an opinion regarding the conditions under which
2   15:50  the ropes broke?
3   15:50  A.  Well, they broke under significantly severe strain.
4   15:50  Q.  And have you ever seen anything like H-1A, as you've shown
5   15:50  the Court?
6   15:50  A.  No, I've never seen anything that bad.
7   15:50  Q.  Okay.  What would be the -- all three ropes broke that you
8   15:50  have here; right?
9   15:50  A.  That's correct.
10  15:50  Q.  What would be the nature of the force or the type of
11  15:50  event, in your experience, that would cause ropes to part and
12  15:50  melt like this?
13  15:50  A.  Well, it would have to be well over 50 miles per hour.
14  15:50  Q.  In terms of wind?
15  15:50  A.  Yes.
16  15:50      MR. SANDERS:  Objection, Your Honor.  He's outside of
17  15:51  his report.  There's nothing in his report about wind speeds.
18  15:51  He even gave a deposition saying he had never investigated wind
19  15:51  speeds in the canal.
20  15:51      THE COURT:  Okay.
21  15:51      MR. WALKER:  Your Honor, in fact, in response to a
22  15:51  question in his deposition posed by Mr. Sanders, I think
23  15:51  Mr. Skaer opined that, in his opinion, 50 miles an hour or more
24  15:51  would be what would be required.  I'm not suggesting that's
25  15:51  within his expertise, but it was asked and answered.
```

**2531**

```
15:51   1    MR. SANDERS:  It is not in his report.
15:51   2    THE COURT:  Well, let me -- first, let me make sure,
15:51   3  this is a deposition, unless, of course, supplemented, it
15:51   4  meanders, and the Court has to look at the report.  So I'm
15:51   5  going to -- unless it's in his report, I'm going to strike the
15:51   6  answer.
15:51   7    MR. WALKER:  Okay.
15:51   8  BY MR. WALKER:
15:51   9  Q.  Mr. Skaer, without talking about wind velocity or speed,
15:51  10  what type of event is it that would cause this kind of damage?
15:51  11  A.  Severe strain on the ropes is what I said.
15:51  12  Q.  Okay.  And that could be caused by wind?
15:51  13  A.  Yes.
15:52  14  Q.  Okay.  Now, in your opinion, if there were additional
15:52  15  ropes at these other kevels, based on the forces that you saw
15:52  16  on these ropes which caused them to break, would additional
15:52  17  ropes have withstood that strain and maintained the
15:52  18  configuration in place?
15:52  19  A.  I don't believe so.
15:52  20  Q.  Why is that?
15:52  21  A.  I just think the strain was so great that the ropes would
15:52  22  have parted.
15:52  23  Q.  Regardless of how many ropes there were between the
15:52  24  barges?
15:52  25  A.  Yes.
```

**2532**

```
15:52   1  Q.  There's been a discussion in this case that wire rope --
15:52   2  and I'm using your term, "wire rope" -- should have been used
15:52   3  to secure the barges instead of the poly rope.  Do you have an
15:52   4  opinion as to whether wire rope would have been better?
15:52   5  A.  I don't think it would have been.  Poly ropes are
15:52   6  absolutely the normal in mooring lines.  Wire rope is seldom
15:53   7  used anymore.  Wire ropes are very difficult to tension, weld.
15:53   8  They have no shock-loading ability and under a surge or
15:53   9  anything that could have parted the lines.
15:53  10    Poly ropes, on the other hand, do have a forgiving
15:53  11  nature.  They stretch, and then they return to their original
15:53  12  shape and length after the strain is -- a modest strain is
15:53  13  taken off.
15:53  14  Q.  Okay.  So, in your opinion, do you believe that the
15:53  15  synthetic poly blue rope used by Lafarge to moor these barges
15:53  16  in anticipation of the hurricane was the correct rope for this
15:53  17  mooring configuration?
15:53  18  A.  Absolutely.
15:53  19    MR. WALKER:  May I, Your Honor, have a second?
15:53  20    THE COURT:  Yes.
15:53  21    MR. WALKER:  Thank you, Your Honor.  Those are all
15:53  22  the questions that I have.
15:54  23    I've been told that I need to move Mr. Skaer's
15:54  24  dec in as 357, Sheena.
15:54  25    THE COURT:  All right.  Any objection?
```

**2533**

```
15:54   1    MR. SANDERS:  Could I -- what was that?
15:54   2    MR. WALKER:  357.
15:54   3    MR. SANDERS:  Which was what?
15:54   4    MR. WALKER:  The slides.
15:54   5    MR. SANDERS:  Okay.  No objection.
15:54   6    THE COURT:  Let it be admitted.
15:54   7    MR. WALKER:  Thank you, Your Honor.
15:54   8    CROSS-EXAMINATION
15:54   9  BY MR. SANDERS:
15:54  10  Q.  Hello, Mr. Skaer.  My name is Pat Sanders.  We met in your
15:54  11  deposition.
15:54  12    These ropes down here, they've been through a
15:54  13  hurricane; correct?
15:54  14  A.  Correct.
15:54  15  Q.  And I've heard reference to 6-inch circumference,
15:54  16  4 1/2-inch ropes.  The rope receipts from Shipyard Supply
15:54  17  indicate 2-inch ropes.  Can you explain that?
15:54  18  A.  Certainly.  That's what they purchased in August.
15:55  19  Q.  So are they 2-inch ropes or 6-inch ropes?
15:55  20  A.  That's the same thing.
15:55  21  Q.  Oh, so it's 2-inches in diameter?
15:55  22  A.  2-inch diameter, as I said earlier in my deposition, is a
15:55  23  6-inch circumference.
15:55  24    MR. SANDERS:  Okay.  Could I have No. 15?
15:55  25
```

**2534**

```
15:55   1  BY MR. SANDERS:
15:55   2  Q.  I'm going to show you a picture of one of the barges.
15:55   3  Item No. 16 now.  Sir, this is the barge sitting in the
15:55   4  neighborhood.  I want you to take a look at it.
15:55   5    MR. SANDERS:  And could I have No. 17 now?
15:55   6    Just for the record, that was P-170 and now --
15:55   7  I'm sorry.  This is P-368, two pictures that I placed together.
15:56   8  BY MR. SANDERS:
15:56   9  Q.  I would represent to you that that's the barge that did
15:56  10  not break away; is that correct?
15:56  11  A.  By the number, yes.
15:56  12  Q.  Now, you're saying that it was totally proper to moor
15:56  13  these two huge vessels with three ropes that do not exceed
15:56  14  2 inches; is that what you're telling the Court?
15:56  15  A.  I don't think that the diameter -- it's the tenacity we're
15:56  16  talking about.
15:56  17  Q.  The ropes were 2 inches in diameter; am I correct?
15:56  18  A.  That is correct.
15:56  19  Q.  Thank you.
15:56  20    Now, let me discuss some general matters with you.
15:56  21  The Cordage Institute, which you're a part of, you've been a
15:56  22  part of their organization for some 25 years; is that correct?
15:56  23  A.  At least.
15:56  24  Q.  Everything I've read with regard to the documents they put
15:57  25  out indicate that, with regard to rope selection and rope use,
```

**Page 2535**

1. 15:57  a user has to be conservative; is that correct?
2. 15:57  A. I think that's wise, yes.
3. 15:57  Q. And when things become -- let's say if there's
4. 15:57  extraordinary danger, would you agree that proper rope
5. 15:57  selection and use is critical?
6. 15:57  A. I think it's very important, yes.
7. 15:57  Q. In general, the use of ropes, is it fair to say that extra
8. 15:57  mooring lines add extra strength?
9. 15:57  A. Yes.
10. 15:57  Q. Is it fair to say that mooring rope can be used with wire,
11. 15:57  rope, or cable?
12. 15:57  A. It's not normally done.
13. 15:57  Q. Sir, do you recall your deposition? You said it's done
14. 15:57  all the time.
15. 15:57  A. No, I didn't say it was done all the time. I said it has
16. 15:57  been done. It is done, I said, but it is not common practice
17. 15:58  anymore.
18. 15:58      MR. SANDERS: Could I have No. 2?
19. 15:58  BY MR. SANDERS:
20. 15:58  Q. I asked you on line 1:
21. 15:58      "QUESTION: Do you have an opinion as to whether rope
22. 15:58  lines can be used with wire rope?
23. 15:58      "ANSWER: They are often."
24. 15:58  A. Yes. And I should have corrected that to they are -- have
25. 15:58  been often, but not currently very often.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**Page 2536**

1. 15:58      MR. WALKER: I'm sorry, could you give us the page
2. 15:58  number?
3. 15:58      MR. SANDERS: Page 70.
4. 15:58  BY MR. SANDERS:
5. 15:58  Q. Are you saying it can't be done?
6. 15:58  A. No.
7. 15:58  Q. Are you saying it is not done?
8. 15:58  A. No.
9. 15:58  Q. Sir, is it fair to say that mooring ropes are strongest
10. 15:58  when horizontal in the same direction of the force they're
11. 15:58  being pulled at?
12. 15:58  A. They're strongest when they're in a straight line, yes.
13. 15:58  Q. Okay. That's because angles cause weakness; is that
14. 15:59  correct?
15. 15:59  A. Yes.
16. 15:59  Q. And angles can cause up to 50 percent reduction in
17. 15:59  strength; is that correct?
18. 15:59  A. Yes.
19. 15:59  Q. And would you recommend, that in mooring vessels, that
20. 15:59  ropes of similar size and construction be used at every mooring
21. 15:59  point?
22. 15:59  A. It would probably --
23. 15:59      THE COURT: Just a minute.
24. 15:59      MR. WALKER: Objection, Your Honor. It's a compound
25. 15:59  question because it's two different things. Every mooring

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**Page 2537**

1. 15:59  point or the size of the ropes?
2. 15:59      THE COURT: I think he asked -- are you asking do you
3. 15:59  recommend uniform size at each kevel?
4. 15:59      MR. SANDERS: Yes.
5. 15:59  BY MR. SANDERS:
6. 15:59  Q. Do you, sir?
7. 15:59  A. It would probably be optimum, yes.
8. 15:59  Q. And it would be improper mooring to use different-size
9. 15:59  ropes at different kevels; is that correct?
10. 15:59  A. Absolutely not. It would be improper only to use a
11. 15:59  different material.
12. 16:00      MR. SANDERS: Could I have No. 3?
13. 16:00  BY MR. SANDERS:
14. 16:00  Q. Sir, you gave a deposition in a case called Cooper, which
15. 16:00  involved a breakaway; is that correct?
16. 16:00      THE COURT: I had one too.
17. 16:00  BY MR. SANDERS:
18. 16:00  Q. It was Cooper versus MV ALBERTA.
19. 16:00  A. Yes.
20. 16:00  Q. And that involved a breakaway caused by a passing vessel;
21. 16:00  is that correct?
22. 16:00  A. That's the contention, yes.
23. 16:00  Q. And you testified, indicating that the -- the rope should
24. 16:00  have been retired; is that correct?
25. 16:00  A. Yes.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**Page 2538**

1. 16:00      MR. SANDERS: Okay. Could I have page 110?
2. 16:00  BY MR. SANDERS:
3. 16:00  Q. You were asked a question by an attorney in that case:
4. 16:00      "QUESTION: Well, all I'm trying to get at is, if
5. 16:01  it's going to be your testimony to Judge Werlein, that the only
6. 16:01  way to properly deploy mooring lines is for them to be -- all
7. 16:01  be the same size, same configuration, same age, same tension.
8. 16:01  Is that your testimony in this case?
9. 16:01      "ANSWER: I say it's the best way."
10. 16:01      Then I later asked you:
11. 16:01      "QUESTION: Do you consider it to be improper to do
12. 16:01  it any other way?
13. 16:01      "ANSWER: I do, yes."
14. 16:01      MR. WALKER: And the next question, to be fair:
15. 16:01      "QUESTION: So you're not an expert on mooring?
16. 16:01      "ANSWER: No."
17. 16:01  BY MR. SANDERS:
18. 16:01  Q. Sir, did you ever give an opinion that it would be
19. 16:01  improper to use mooring lines of different size, configuration,
20. 16:01  tension, et cetera?
21. 16:01  A. Actually, what we were referring to at that point was not
22. 16:01  different size specifically, it was different types of rope.
23. 16:01  Different types of ropes have -- made out of different fibers
24. 16:01  have different elongations, and that's what we were referring
25. 16:01  to at the time.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## Page 2539

```
16:02   MR. SANDERS:  Your Honor, I'm not going to argue with
16:02   the witness, but may I have an instruction that I get a yes or
16:02   a no answer and then an explanation?
16:02           THE COURT:  Well, you can ask the question again and
16:02   see if it is amenable to a yes or no answer.
16:02   BY MR. SANDERS:
16:02   Q.  Did you ever testify that it would be improper to use
16:02   ropes of different size?
16:02   A.  In that deposition, I said I do, but that was not the
16:02   intent of the thing because we were talking about different
16:02   types of ropes.  And that came out in the deposition somewhere.
16:02   Q.  Did you ever testify that it would be improper to use
16:02   ropes of different age?
16:02   A.  I said it would be best not to.
16:02   Q.  Again, I'm going to refer you down to line 11:
16:02           "QUESTION:  Do you consider it to be improper to do
16:03   it any other way?
16:03           "ANSWER:  I do, yes."
16:03           Is that correct?
16:03   A.  I said that, yes.
16:03   Q.  And in this case, we have, supposedly, ropes -- new blue
16:03   ropes at the lower two moorings, and at the top we have an
16:03   older rope; is that correct?
16:03   A.  Yes.
16:03   Q.  That's a rope of different age; am I correct?
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## Page 2540

```
16:03   A.  Yes.
16:03   Q.  That's a rope of different size; am I correct?
16:03   A.  Yes.
16:03   Q.  Now, would you agree that the moorings on bow and stern of
16:03   a vessel are most important?
16:03           MR. WALKER:  Your Honor, they are outside of the
16:03   scope of his expertise.  I know that I did talk about moorings
16:03   but in the context of him being a rope expert and how the
16:03   moorings are affected by the rope strengths, not anything else.
16:03           THE COURT:  He's not been tendered as a mooring
16:03   expert.  I don't know if you want to --
16:04           MR. SANDERS:  I'll pass on that.
16:04           THE COURT:  Fine.
16:04           MR. SANDERS:  But, in all fairness, he did ask him
16:04   about these ropes would have parted with -- no amount of rope
16:04   could have stopped this breakaway, et cetera.
16:04           THE COURT:  I understand that.  And that was, I
16:04   guess, to the rope rather than mooring.
16:04           MR. WALKER:  That's correct, Your Honor.  It's the
16:04   effect on the ropes.
16:04   BY MR. SANDERS:
16:04   Q.  Mr. Skaer, sellers of rope do not recommend rope to
16:04   customers; is that correct?
16:04   A.  Very, very seldom.
16:04   Q.  Why is that?
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## Page 2541

```
16:04   A.  Because we seldom know the end user.  We sell through
16:04   distributors.
16:04   Q.  And there's big liability issues; is that correct?
16:04   A.  I suppose.
16:04   Q.  Now, let me direct your attention now to what a facility
16:04   should have in place.
16:04           Would you agree that a marine terminal should have an
16:04   inspection and retirement program for ropes?
16:04   A.  I think it would be a great idea, yes.
16:05   Q.  And this program should have -- it should be in writing;
16:05   is that correct?
16:05   A.  Hopefully, yes.
16:05   Q.  It should have an assigned trained supervisor; is that
16:05   correct?
16:05   A.  Well, I doubt if they would have a trained supervisor, but
16:05   someone to keep their records, yes.
16:05   Q.  It should have training for its employees; is that
16:05   correct?
16:05   A.  It would be optimal, yes.
16:05   Q.  And also, it should have established retirement criteria;
16:05   is that correct?
16:05   A.  Yes.
16:05   Q.  And you would not be surprised if all this is recommended
16:05   by The Cordage Institute?
16:05   A.  Not at all.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## Page 2542

```
16:05   Q.  And it is recommended by The Cordage Institute?
16:05   A.  Yes, it is.
16:05   Q.  But Lafarge, they didn't have any inspection or retirement
16:05   program; isn't that correct?
16:05   A.  They also probably don't have The Cordage Institute
16:05   handbook either.
16:06           MR. SANDERS:  Your Honor, may I ask again for an
16:06   instruction to the witness to answer yes or no and then provide
16:06   his explanation?
16:06           THE COURT:  If you know the answer, sir, about what
16:06   Lafarge has or doesn't have, you should answer yes.  If you
16:06   wish to explain, you may.  Yes or no, I should say.
16:06   BY MR. SANDERS:
16:06   Q.  Did they have a retirement inspection program?
16:06   A.  Not to my knowledge.
16:06   Q.  Now, explain to the Court what a rope log is.
16:06   A.  A rope log?
16:06   Q.  Correct.
16:06   A.  Well, normally, a rope log is showing when ropes were
16:06   purchased, when they were put into service, when they were
16:06   inspected, and when they're taken out of service.
16:06   Q.  And it also should detail the uses that the rope has been
16:06   put through; is that correct?
16:06   A.  That would be good, yes, I'm sure.
16:06   Q.  And every facility should have a rope log; is that
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2543**

```
 1  16:06  correct?
 2  16:06  A.  It would be nice.
 3  16:06  Q.  I would assume that's a yes, but I hate to assume when
 4  16:06  we're dealing with the record.
 5  16:07          THE COURT:  He said, "It would be nice," I'm
 6  16:07  regarding it as a "yes."
 7  16:07  BY MR. SANDERS:
 8  16:07  Q.  Now, Lafarge had no rope log; is that correct?
 9  16:07  A.  Not to my knowledge.
10  16:07  Q.  I'm going to anticipate a line of questioning on redirect
11  16:07  that you might say something like, "Well, they should have it
12  16:07  but not everybody does."  Is that correct?
13  16:07          THE COURT:  Wait.  Are you asking him is that's
14  16:07  what's going to be in redirect, or is that -- the bottom line
15  16:07  is you may need to ask that question a little differently.
16  16:07          MR. SANDERS:  Let me rephrase it.
17  16:07          THE COURT:  All right.
18  16:07  BY MR. SANDERS:
19  16:07  Q.  Is it fair to say that every company should have an
20  16:07  retirement inspection program and every company should have a
21  16:07  rope log?
22  16:07          MR. WALKER:  Your Honor, that's so far beyond the
23  16:07  man's expertise.
24  16:07          THE COURT:  I'm going to allow the question.
25  16:07          THE WITNESS:  Yes.
```

**2544**

```
 1  16:07  BY MR. SANDERS:
 2  16:07  Q.  But not everybody does; is that correct?
 3  16:07  A.  Absolutely not.
 4  16:08  Q.  And that doesn't make it right, though, does it, sir?
 5  16:08  A.  No.
 6  16:08  Q.  Now, let's talk about working load limits.  Tell the Court
 7  16:08  what that is.
 8  16:08  A.  They vary.  Every rope has a working load limit.  The
 9  16:08  Cordage Institute recommends a working load between 5 and 12.
10  16:08  That means between five times the breaking strength or --
11  16:08  one-fifth the breaking strength to one-twelfth the breaking
12  16:08  strength.
13  16:08  Q.  And just to make it clear, that's a safe working load
14  16:08  limit?
15  16:08  A.  That is.
16  16:08  Q.  And this safe working load limit is determined by a design
17  16:08  factor between 5 and 12?
18  16:08  A.  That is correct.
19  16:08  Q.  And whether you pick a 5 or a 12 depends upon whether
20  16:08  there's great risk of injury to people or material damage to
21  16:08  property; is that correct?
22  16:08  A.  Yes.
23  16:08  Q.  So if an application of a rope involved a threat of great
24  16:09  injury to people and material damage to property, commerce,
25  16:09  everything involved with a barge breaking away, what design
```

**2545**

```
 1  16:09  factor would you apply?
 2  16:09  A.  I would not apply one.  I would have the customer do it.
 3  16:09  Q.  Okay.  So let's say a customer applied a design factor of
 4  16:09  10, which is not the highest.  We would take 102,000-pound rope
 5  16:09  and divide it by 10; is that correct?
 6  16:09  A.  For a safe working load, that's the theory, yes.
 7  16:09  Q.  So the safe working load limit then becomes just over
 8  16:09  10,000 pounds per rope?
 9  16:09  A.  That's the way the calculation makes it, yes.
10  16:09  Q.  It's no longer 102,000 pounds and it's no longer
11  16:09  70,000 pounds; is that correct?
12  16:09  A.  The strength is still 102,000 pounds.
13  16:10  Q.  But you made deductions for knots; is that correct?
14  16:10  A.  Yes.  Now we have 70,000 pounds.
15  16:10  Q.  And doesn't The Cordage Institute, in all the documents
16  16:10  you've produced and all the books you've listed in your
17  16:10  reliance materials, indicate that a user should use a safe
18  16:10  working load limit?
19  16:10  A.  It does if the user is knowledgeable about that.
20  16:10  Q.  Well, let's say if a user's not knowledgeable.  Do you
21  16:10  think it's incumbent upon him to hire a consulting firm or an
22  16:10  engineer and say, "Look, I have to deal with these loads.  Can
23  16:10  you calculate for me what ropes I should use?"
24  16:10  A.  I don't know of any company that does that.
25  16:10  Q.  Well, you're telling us that the rope company doesn't
```

**2546**

```
 1  16:10  recommend a rope, and now you're telling us that an end user
 2  16:10  just guesses at the rope he should use?
 3  16:10  A.  I think it comes from trial and error.  They use ropes
 4  16:11  they like.  Certain ropes are very common within an industry,
 5  16:11  like the ones we're using.  So I don't -- I don't believe that
 6  16:11  many people take that into consideration, unfortunately.
 7  16:11  Q.  So that doesn't make it right, though, does it, sir?
 8  16:11  A.  No.
 9  16:11  Q.  And if there's a great risk that a barge could break away
10  16:11  and hit a bridge -- two bridges within one mile or a half a
11  16:11  mile, if there's a great risk that a barge could break away and
12  16:11  knock down a floodwall and flood many people's homes, wouldn't
13  16:11  you say that a barge company, that it is incumbent upon them to
14  16:11  investigate and make the right decision on which ropes to use?
15  16:11  A.  Yes.
16  16:11  Q.  And that involves the safe working load limit; correct?
17  16:11  A.  It could, yes.
18  16:11  Q.  You're not sure or...
19  16:11  A.  I just don't know how anyone's going to do this.  It's...
20  16:12  Q.  Well, there are engineers you could hire to tell you the
21  16:12  answer.
22  16:12          THE COURT:  Counsel, the Court's going to figure out
23  16:12  any legal duty Lafarge had, not this witness.
24  16:12          MR. SANDERS:  Okay.
25
```

## 2547

```
1   16:12   BY MR. SANDERS:
2   16:12   Q.  Now, just briefly, going to the weight of your testimony,
3   16:12   the ropes that we have out here today, when you gave your
4   16:12   deposition -- well, since then you've done some work; is that
5   16:12   correct?
6   16:12   A.  Repeat the question.
7   16:12   Q.  Since your deposition, you've met with Mr. Walker and
8   16:12   you-all talked about these ropes; is that correct?
9   16:12   A.  Yes.
10  16:12   Q.  Okay.  But prior to the deposition, the source of the
11  16:12   identity of which ropes were used was told to you by these
12  16:12   attorneys; is that correct?
13  16:12   A.  At that time, yes, and the pictures that I saw.
14  16:12   Q.  But you told us in your deposition you couldn't determine
15  16:12   which ropes were which from the pictures; is that correct?
16  16:12   A.  Correctly from the pictures until I got to the ropes and
17  16:12   married them up, no.
18  16:12   Q.  So if we had two old ropes that we started out with the
19  16:12   mooring, and one was substituted out for a new rope and thrown
20  16:13   away, the information of the strength of that rope was told to
21  16:13   you by an attorney in this case; is that correct?
22  16:13   A.  I don't understand the question.
23  16:13         MR. WALKER:  Objection, Your Honor.
24  16:13         THE COURT:  Yes.  Just a minute.  Just a minute.
25  16:13   He's objecting.
```

## 2548

```
1   16:13         MR. SANDERS:  I'm sorry.
2   16:13         THE COURT:  Let him articulate his objection.
3   16:13         MR. WALKER:  It mischaracterizes the situation of
4   16:13   what was identified in the deposition.  It wasn't the strength
5   16:13   of the rope, which I believe is what Mr. Sanders said in his
6   16:13   question.  Maybe he misstated the question, Your Honor.  He was
7   16:13   told the identity of ropes, not strength.
8   16:13         MR. SANDERS:  Right.
9   16:13         THE COURT:  Okay.
10  16:13   BY MR. SANDERS:
11  16:13   Q.  Mr. Skaer, when you first saw the ropes, you said there
12  16:13   were 10 to 20; is that right?
13  16:13   A.  Somewhere in that range, yes.  About.
14  16:13   Q.  And at that time in the garage, you were with only
15  16:13   attorneys in this case; is that correct?
16  16:13   A.  Yes, and the custodian of the ropes.
17  16:13   Q.  And the attorneys pointed to the ropes and said, "This
18  16:14   rope was involved in the incident"; is that correct?
19  16:14   A.  No.
20  16:14   Q.  The attorneys did not direct you to the ropes that were
21  16:14   involved in the incident?
22  16:14   A.  They let me look at all the ropes, and I made an attempt
23  16:14   at that time to marry the ropes up.  Then they made that
24  16:14   statement, yes.
25  16:14   Q.  So if there are 10 to 20 ropes, you determined from
```

## 2549

```
1   16:14   looking at the ropes where they were located on the barge, what
2   16:14   ropes were used, without any help from the attorneys?
3   16:14   A.  No.  I had already seen pictures, so I knew, basically,
4   16:14   what ropes I was looking at.
5   16:14         MR. SANDERS:  Okay.  Can I have the ELMO?
6   16:14   BY MR. SANDERS:
7   16:14   Q.  You've given your deposition, and I asked you -- this is
8   16:15   page 23:
9   16:15         "QUESTION:  So the information with regard to what
10  16:15   mooring ropes were used was supplied to you by words from the
11  16:15   Lafarge attorneys; is that correct?
12  16:15         "Answer:  That's correct."
13  16:15         THE COURT:  Bring it down so we can see it.
14  16:15         MR. SANDERS:  Oh, I'm sorry.
15  16:15         THE COURT:  There you go.
16  16:15   BY MR. SANDERS:
17  16:15   Q.  That's correct, sir?
18  16:15   A.  Yes.
19  16:15   Q.  Now --
20  16:15         MR. WALKER:  Again, in fairness, there's no
21  16:15   inconsistency if you read the rest of the deposition, the next
22  16:15   four lines.  It talks about the photographs.
23  16:15         MR. SANDERS:  I've got a lot more I'm going to go
24  16:15   through, Your Honor.
25  16:15         THE COURT:  But, I mean, if you want to -- if you
```

## 2550

```
1   16:15   want to read the last four lines -- those four lines, I will
2   16:15   allow you to do it on recross.
3   16:15         MR. WALKER:  Thank you, Your Honor.
4   16:15         Could you tell me the page, Mr. Sanders?
5   16:15         MR. SANDERS:  That was 23, 24.
6   16:15   BY MR. SANDERS:
7   16:15   Q.  Again you were asked:
8   16:15         "QUESTION:  Well, tell me, was it the attorneys that
9   16:15   told you which ropes broke, or did you know from the photos?
10  16:16         "ANSWER:  I did not know directly from the photos.  I
11  16:16   had to use the information that they also supplied me."
12  16:16   A.  That's true.
13  16:16   Q.  Okay.  Now, we got into it again.
14  16:16         And on page 30 you were asked:
15  16:16         "QUESTION:  Okay.  So you didn't use any deposition
16  16:16   testimony or anything in that regard to determine the identity
17  16:16   of the ropes used to moor these two barges; is that correct?
18  16:16         "ANSWER:  At this moment, I don't remember where or
19  16:16   when I was informed or how I was informed that the 2-inch ropes
20  16:16   were there, but that was the assumption that I was led to
21  16:16   believe, and those are the ropes that I was told Lafarge had
22  16:16   replaced the others, the original ropes, with.
23  16:16         "QUESTION:  Now, who told you that?
24  16:16         "ANSWER:  I'd have to say I imagine it came through
25  16:16   the attorneys."
```

```
                                                              2551
 1   16:16   A.  Correct.
 2   16:16   Q.  Just to let you see that there.
 3   16:17       And, again, you were asked with regard to measuring
 4   16:17   the ropes:
 5   16:17       "QUESTION:  And this measuring the ropes that the
 6   16:17   Lafarge attorneys directed you to; is that correct?
 7   16:17       "Answer:  Measuring the ropes that were told to me to
 8   16:17   have been the ropes on the barge."
 9   16:17       Is that correct?
10   16:17   A.  Yes.  I also measured the other ropes.
11   16:17   Q.  And the only people there were the Lafarge attorneys; is
12   16:17   that correct?
13   16:17   A.  No.  There was another --
14   16:17   Q.  A custodian?
15   16:17   A.  A custodian.
16   16:17   Q.  Okay.  So you didn't review any deposition; is that
17   16:17   correct?
18   16:17   A.  At that time I had not.
19   16:17   Q.  You didn't review any reports of Mr. Strouse or Mr. Ryan;
20   16:17   is that correct?
21   16:17   A.  No, I did not.
22   16:17   Q.  You talked to no Lafarge personnel; is that correct?
23   16:17   A.  Not at that time, no.
24   16:17   Q.  I get the impression, though, you've done all this since.
25   16:17   Am I correct?
                    JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                              UNITED STATES DISTRICT COURT
                              EASTERN DISTRICT OF LOUISIANA
```

```
                                                              2552
 1   16:17   A.  I've done some of it, yes.
 2   16:17   Q.  But, then, that wasn't to verify what you were told by the
 3   16:18   attorneys; is that correct?
 4   16:18   A.  It was to verify that their statements to me were true,
 5   16:18   and they proved to be.
 6   16:18   Q.  So back to that line that was discarded and substituted
 7   16:18   for a blue rope.  Where is that rope?
 8   16:18   A.  Tell me, what is the question again?
 9   16:18   Q.  Mr. Walker asked you, before they added some rope, there
10   16:18   were two ropes holding the barge; is that correct?
11   16:18   A.  That is true.
12   16:18   Q.  One on the north end, which was a 1-5/8ths rope; and one
13   16:18   on the south end, which you opined to be about a
14   16:18   20,000-pound-strength rope?
15   16:18   A.  Correct.
16   16:18   Q.  Where is that 20,000-pound-strength rope?
17   16:18   A.  I'm sure they discarded it.
18   16:18   Q.  So if Mr. Smith changed out a rope before the storm and
19   16:19   throws it on the deck -- and I thought I recall him saying it
20   16:19   was thrown in a dumpster -- you somehow were given a rope by
21   16:19   these attorneys and said that was the rope; am I correct?
22   16:19   A.  No.
23   16:19   Q.  Where did the rope come from?
24   16:19   A.  Which rope?
25   16:19   Q.  The 20,000-pound rope that was discarded.
                    JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                              UNITED STATES DISTRICT COURT
                              EASTERN DISTRICT OF LOUISIANA
```

```
                                                              2553
 1   16:19   A.  I only was told that there were -- another rope at the
 2   16:19   other end, at the bow stern end, that was discarded because it
 3   16:19   was worn.
 4   16:19   Q.  Well, so you just guessed it was 20,000 pounds?
 5   16:19   A.  I told you that earlier.  I assumed.
 6   16:19   Q.  You assumed it without looking at it?
 7   16:19   A.  I couldn't look at it; it wasn't available.  It was
 8   16:19   discarded.
 9   16:19       THE COURT:  The witness is clear to the Court he made
10   16:19   an assumption without looking at it.
11   16:19       MR. SANDERS:  Okay.
12   16:19       THE COURT:  It's clear on direct and it's clear on
13   16:19   cross.
14   16:19   BY MR. SANDERS:
15   16:19   Q.  Now, let me direct your attention to ropes in general.
16   16:19   When they're put in use, they lose 20 percent; is that correct?
17   16:19   A.  After minor use, I would say that they lose 15 percent.
18   16:20   That's what we always told our salesmen.
19   16:20   Q.  Sir, I think you're fudging.  You told me in the
20   16:20   deposition, you said --
21   16:20       THE COURT:  Counsel, don't do that.  Say, "Sir, isn't
22   16:20   is it true?"  I'll determine what he's doing.  Okay?
23   16:20   BY MR. SANDERS:
24   16:20   Q.  Sir, isn't it true that you said in your deposition that
25   16:20   it was 20 percent?
                    JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                              UNITED STATES DISTRICT COURT
                              EASTERN DISTRICT OF LOUISIANA
```

```
                                                              2554
 1   16:20   A.  I don't remember.  It could be.  Some people use that
 2   16:20   term.
 3   16:20       But the ropes, it's not immediately when in use; it's
 4   16:20   after they are -- have been used slightly.
 5   16:20   Q.  Okay.  The rope on the north end, though, that rope was
 6   16:20   used more than slightly; is that correct?
 7   16:20   A.  It was used, yes.
 8   16:20   Q.  Did you make a deduction of 20 percent for that?
 9   16:20   A.  No.  I made a deduction of 30 percent because of the
10   16:20   knots.
11   16:20   Q.  So the deduction for knots and service are not added
12   16:20   together?
13   16:20   A.  No.
14   16:20   Q.  Do you have an opinion as to when a rope should be
15   16:20   retired, at what residual strength?
16   16:21   A.  I don't think there's any residual strength that a rope
17   16:21   must be retired at.  I think it has to be an inspection -- a
18   16:21   careful inspection on a routine basis by a person that knows
19   16:21   something about ropes.
20   16:21       Because a rope, under normal conditions, might be
21   16:21   very much stronger than the application; therefore, it could be
22   16:21   retired when it only had, say, 25 percent of its strength left.
23   16:21   Q.  Did you ever give an opinion that ropes should be retired
24   16:21   at 75 percent of its residual strength?
25   16:21   A.  Not to my knowledge.
                    JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                              UNITED STATES DISTRICT COURT
                              EASTERN DISTRICT OF LOUISIANA
```

**2555**

```
16:21        MR. SANDERS:  Okay.  Could I have No. 3, page 168?
16:21   BY MR. SANDERS:
16:21   Q.   Again, this is your deposition from the Cooper versus
16:21   ALBERTA case.
16:22        MR. SANDERS:  168.  It's the third page.
16:22   BY MR. SANDERS:
16:22   Q.   In this case, sir, you were asked:
16:22            "QUESTION:  Are you familiar with the Mooring
16:22   Equipment Guidelines, the publication Mooring Equipment
16:22   Guidelines?
16:22            "ANSWER:  "I'm familiar with it, but I have not
16:22   reviewed it.
16:22            "QUESTION:  What does it say about when, at what
16:22   residual strength, a mooring line should be replaced?
16:22            "ANSWER:  I believe, if I remember correctly, it was
16:22   75 percent.
16:22            "QUESTION:  Okay.  Do you generally agree or disagree
16:22   with that?
16:22            "ANSWER:  I would agree with it.  Being a rope man, I
16:22   think safety is the best -- most important thing -- aspect
16:22   of --"
16:22        So did you testify in that case that you felt
16:22   75 percent?
16:22   A.   75 percent would be a wonderful number to use, yes.  Every
16:22   rope manufacturer would love it if we could reduce -- get rid
```

**2556**

```
16:23   of the ropes at 75 percent.  They'd all be busier all the time.
16:23   Q.   But is it fair to say that the way we deal with this
16:23   inexact science of looking at ropes is by being conservative?
16:23   A.   You should be.
16:23   Q.   And by adding additional ropes when in doubt?
16:23   A.   Yes.
16:23        MR. SANDERS:  Okay.  Now, could I have No. 13?
16:23   BY MR. SANDERS:
16:23   Q.   This was a picture Mr. Walker showed you.  What would
16:23   happen if, at the top, that 38,500 rope would break and the
16:23   barges started to move like this?  Would you agree that the
16:23   strain on the bottom two ropes would be tremendous?
16:23   A.   Yes.  I think that's what happened.
16:23   Q.   Because we're dealing with a vessel.  One of them weighs
16:24   3- or 400 tons; is that correct?
16:24   A.   I have no idea.
16:24   Q.   And that could explain for the damage to the ropes that
16:24   you indicated was tremendous strain?
16:24   A.   Yes.
16:24   Q.   Now, this picture is not to scale.  If we were going to --
16:24   is it fair to say that, if we put the ropes to scale, they
16:24   would look like a hair between these two barges?
16:24   A.   I suppose that's a way of putting it, yes.
16:24   Q.   Okay.  Now, I'm going to go through your conclusions.
16:24        MR. SANDERS:  I'm almost done for everyone's
```

**2557**

```
16:24   information.
16:24        Could I have No. 7?  I'm going start with
16:24   No. 2 -- well, let's ask No. 1.
16:24   BY MR. SANDERS:
16:24   Q.   Is it fair to say that everybody in the industry uses poly
16:25   rope?
16:25   A.   I think it's so common, it's almost a safe bet to say
16:25   that, yes.
16:25   Q.   And you do not know of any entity that does not use wire
16:25   rope; is that correct?
16:25   A.   I don't know of anyone that's using wire ropes, no, not
16:25   personally.
16:25   Q.   Well, Lafarge's hurricane checklist required the use of
16:25   wire rope; is that correct?
16:25   A.   From what I have read, that is what they -- it states.
16:25   Q.   Yeah.  And Lonestar, which is going to testify in this
16:25   case, they use wire rope; is that correct?
16:25   A.   I have no earthly idea.
16:25   Q.   How about Zito Fleeting, they use wire rope?
16:25   A.   I don't know.  I'm sure they use more synthetic than
16:25   anything else.
16:25   Q.   What is hard rigging?
16:25   A.   Hard rigging?  Hard rigging is generally considered wire
16:25   rope.
16:25   Q.   Okay.  Now, No. 2, you indicate, in essence, that what
```

**2558**

```
16:25   Lafarge had done had tripled the strength of the mooring
16:26   configuration; is that correct?
16:26   A.   Yes, that's our calculations.
16:26   Q.   Now, is it fair to say that it just ended up that way,
16:26   meaning there was no policy of Lafarge to triple the strength?
16:26   A.   I don't know.
16:26   Q.   If I were to ask you to assume that Mr. Bush said, "I
16:26   didn't know the strength of the blue ropes at the time of the
16:26   storm"; I would ask you to further assume that Mr. Smith was
16:26   showed many pictures of many different colored ropes, different
16:26   sizes, different construction, and he also said, "I don't know
16:26   the breaking strength of those ropes either"; if you assume all
16:26   that to be correct, to double up the mooring strength of a
16:26   configuration, wouldn't you have to know the starting point?
16:26   A.   I don't know that he didn't know some of those answers.  I
16:26   have no idea.
16:27   Q.   Well, I asked you to assume that they knew nothing about
16:27   the breaking strength of any of the various ropes they were
16:27   using.  So if they end up with a doubling, was it fair to say
16:27   that it was just luck?
16:27   A.   I have no idea because I really don't know what the man
16:27   knows, and I know what I know.  So it would be easy for me to
16:27   answer the question if I was in that position, but I can't
16:27   answer for that man.
16:27   Q.   Well, would you -- would you agree to this:  That in order
```

```
                                                              2559                                                                2561
 1   16:27   to double something, you've got to know what the starting point      16:30   scope of cross -- "Although the lines are not doubled" -- and
 2   16:27   is?                                                                  16:30   this is just my synopsis, and it could be wrong.  He said,
 3   16:27   A.  You should, yes.                                                 16:30   "Doubling is only an efficient system if the lines can be
 4   16:27   Q.  And in this case, we have competing definitions of what          16:30   figure-eighted at both ends or if two separate or independent
 5   16:27   the word "doubling up" means; are you aware of that?                 16:30   lines are used.
 6   16:27   A.  Yes, I am.                                                       16:30         He says, "the configuration used" -- that's just
 7   16:27   Q.  And is it fair to say that your deposition -- your               16:30   my synopsis.  I don't know if that's what you're getting at or
 8   16:27   definition of doubling up is doubling the entire strength of         16:30   not.
 9   16:27   the mooring system?                                                  16:30   BY MR. SANDERS:
10   16:27   A.  That is one way of talking about doubling up, because            16:30   Q.  If we use the U.S. Navy's definition of doubling up, would
11   16:28   doubling up is not simply a mooring situation; it goes through      16:30   you agree that that mooring configuration in P-390, page 415,
12   16:28   all different ropes, not just marine ropes.                          16:30   would withstand more strain than one single strand of rope?
13   16:28   Q.  So the definition of the U.S. Navy, if I would suggest to        16:30   A.  That's obvious.  If they're all the same size ropes, yes.
14   16:28   you, is that it involves adding extra lines or bites of line,        16:31   Q.  And I asked you in your deposition did you have any
15   16:28   do you agree or disagree with that?                                  16:31   authority to support your definition of doubling the mooring
16   16:28   A.  It could.  I mean, that's one way of doubling up, yes.           16:31   strength.  Do you remember that?
17   16:28   Q.  Same with the U.S. Coast Guard -- and just for the record,       16:31   A.  Yes, I do.
18   16:28   within P-390 and 395, we have several authorities in evidence        16:31   Q.  Have you found any?
19   16:28   that suggest that doubling up is adding lines or bites of line.      16:31   A.  No, I didn't.
20   16:28   A.  Yes.  In most of those instances, that's what they have          16:31   Q.  And it's been --
21   16:28   onboard, the same rope.  So the only way they can double up is       16:31   A.  I don't need it.  I know what doubling up is, and doubling
22   16:28   to add -- go with the same size rope.  Therefore, if they don't     16:31   up is -- has many meanings.  And I explained that to you
23   16:28   have a much stronger rope, like this 2-inch rope, they couldn't     16:31   before.
24   16:28   have done it.                                                        16:31   Q.  I asked you and -- I told you in the deposition that I
25   16:28   Q.  You're saying you can't double up 2-inch rope?                   16:31   will be asking you at trial for any authority that you could
              JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER                              JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                         UNITED STATES DISTRICT COURT                                                  UNITED STATES DISTRICT COURT
                         EASTERN DISTRICT OF LOUISIANA                                                 EASTERN DISTRICT OF LOUISIANA

                                                              2560                                                                2562
 1   16:29   A.  I didn't say that at all.                                        16:31   find -- and I'm out on a limb here because -- and now you're
 2   16:29   Q.  Well --                                                          16:31   telling us that you could not find any authority to support
 3   16:29   A.  I said that 2-inch rope has a greater strength; and,             16:31   your view; is that correct?
 4   16:29   therefore, its strength was the effect of doubling up.               16:31   A.  No, I really didn't look for any because I understand what
 5   16:29         MR. SANDERS:  Could I have the ELMO.                           16:31   doubling up is.  I didn't think it was necessary.
 6   16:29   BY MR. SANDERS:                                                      16:32   Q.  I'm going to refer you to page 106 of your deposition.  I
 7   16:29   Q.  If the Court accepts this definition of doubling up as           16:32   asked you on line 4:
 8   16:29   presented by the U.S. Navy, would you agree that 2-inch ropes        16:32         "QUESTION:  Okay.  Well, for the trial, I'm going to
 9   16:29   configured like that would be three times as strong at every         16:32   ask you the same question, and between now and then, I would
10   16:29   mooring point?                                                       16:32   ask that you, you know, look through any literature you have
11   16:29         THE COURT:  There's an objection, Mr. Walker?                  16:32   and see if you can produce for us that definition.  Okay?
12   16:29         MR. WALKER:  Again, his expertise is rope strength,            16:32         "ANSWER:  Yeah."
13   16:29   breaking strength, not mooring, Your Honor.  And I tried to          16:32   A.  Well, I did look through it, my own literature; but I did
14   16:29   draw a very fine line in my questions and make sure that he          16:33   not find anything and, therefore, I didn't go any further.
15   16:29   didn't go into the realm of mooring or mooring arrangements as       16:33   Q.  Now, with regard to the use of wire rope, at the time of
16   16:29   to how the ropes are configured or doubled, Your Honor.              16:33   your deposition, you did not know of any facility that did not
17   16:29         MR. SANDERS:  I can rephrase it.                               16:33   use wire rope; is that correct?
18   16:29         THE COURT:  Okay.  All right.  Let's see if you can            16:33   A.  Did I say that in my deposition?
19   16:30   rephrase it.                                                         16:33         THE COURT:  Of any facility that did not?
20   16:30   BY MR. SANDERS:                                                      16:33         THE WITNESS:  Did not?
21   16:30   Q.  Mr. Skaer, would the strain presented on one 2-inch              16:33   BY MR. SANDERS:
22   16:30   rope -- let me rephrase that.                                        16:33   Q.  Correct.
23   16:30         This picture here --                                           16:33   A.  Well, they use wire rope in certain areas around the
24   16:30         THE COURT:  He did say in his report -- in my                  16:33   thing.  They tie barges together.  But to butt head-to-head,
25   16:30   synopsis of his report -- I don't know if this is beyond the         16:34   whatever you want to call it, they do tension with wire rope.
              JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER                              JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                         UNITED STATES DISTRICT COURT                                                  UNITED STATES DISTRICT COURT
                         EASTERN DISTRICT OF LOUISIANA                                                 EASTERN DISTRICT OF LOUISIANA
```

29 (Pages 2559 to 2562)

## Page 2563

```
16:34   1     It's becoming a -- a older practice now, especially
16:34   2     in large tows, because they're using synthetic ropes there.
16:34   3  Q. I'm sorry. I thought you had said earlier that you did
16:34   4     not know of any facility that still used wire rope. That's not
16:34   5     correct?
16:34   6  A. I don't believe I said that. I don't remember.
16:34   7  Q. So many facilities do use wire ropes?
16:34   8  A. Some do, I'm sure.
16:34   9  Q. And that's for mooring barges?
16:34  10  A. No. That would be, basically, tieing barges to one
16:34  11     another, not mooring them to the dock.
16:34  12  Q. Okay. How do they moor barges in fleets on the river?
16:34  13  A. How do they moor barges on fleets? They -- they use some
16:34  14     wire rope and they use some synthetic rope. They have new
16:34  15     synthetic ropes now that are as strong as wire rope, much
16:34  16     lighter, much safer to use, and no more stretch than wire rope.
16:34  17     They're taking over rapidly, the use of it, for the safety
16:35  18     angle of those ropes.
16:35  19  Q. Okay. With regard to your opinion that the barge would
16:35  20     have broken away anyway, that it would be impossible, given
16:35  21     your review of the ropes, to restrain it, there are six other
16:35  22     barges that did not break away; is that correct?
16:35  23  A. I'm not -- are you referring to the five beside it or...
16:35  24  Q. Correct.
16:35  25  A. They did not, no.
```

## Page 2564

```
16:35   1  Q. And you did not do any investigation or analysis as to why
16:35   2     they were able to be properly moored and this one was not; is
16:35   3     that correct?
16:35   4  A. I -- they weren't there. Of course, I couldn't see the
16:35   5     ropes, or whatever they were tied up with, and I wasn't asked
16:35   6     to.
16:35   7  Q. You were not asked to?
16:35   8  A. No. And the information would not have been available to
16:35   9     me because the barges weren't there. They had long gone.
16:35  10  Q. Well, we -- okay. But there were Lafarge employees still
16:35  11     around that could have told you how those were moored; is that
16:35  12     correct?
16:35  13  A. Yes. If I had been asked to do it, I would have done it.
16:36  14  Q. Do you know why Lafarge didn't ask you to do it?
16:36  15  A. No.
16:36  16  Q. Now, I'm going to ask you: If you were to assume that
16:36  17     there was more rope available and not used, would adding that
16:36  18     rope to the mooring of the 4745 and the 4727 have added
16:36  19     strength?
16:36  20  A. Yes, it would have.
16:36  21  Q. And if they would have doubled up the mooring between the
16:36  22     two barges, with the U.S. Navy and U.S. Coast Guard definition
16:36  23     of doubling up, that would have added strength; is that
16:36  24     correct?
16:36  25  A. Yeah, I assume so.
```

## Page 2565

```
16:36   1  Q. And if they would have added cable in addition to the
16:36   2     ropes, would that have added strength?
16:36   3  A. If properly done, I'm sure it would have.
16:36   4         MR. SANDERS: That's all the questions I have, Your
16:36   5     Honor. Thank you.
16:36   6         THE COURT: Thank you.
16:36   7         Redirect?
16:37   8         MR. WALKER: Briefly, Your Honor.
16:37   9             REDIRECT EXAMINATION
16:37  10  BY MR. WALKER:
16:37  11  Q. Starting with that last question, if you had added those
16:37  12     ropes or added those additional parts or added cable, I believe
16:37  13     in direct testimony you said it was your opinion that because
16:37  14     of the force that you saw that caused the damage to these
16:37  15     ropes, all that configuration would have broken anyway; right?
16:37  16  A. I believe that, yes.
16:37  17  Q. You were asked some questions about angles, and I want to
16:37  18     make sure that we have the correct word so there's no
16:37  19     confusion. "Angle" and "bend" are two different things?
16:37  20  A. A bend in the rope and an angle in the rope are basically
16:37  21     the same thing. I mean, if it's going -- a rope is either
16:37  22     straight or it's in some kind of angle.
16:37  23  Q. Okay. When you testified in response to Mr. Sanders'
16:37  24     questions that there could be a 50 percent reduction if there
16:37  25     was an angle, you did not mean, did you, a straight angle
```

## Page 2566

```
16:37   1     between one kevel to another, let's say 4 to 3, but, rather, a
16:38   2     bend caused around a bitt or a bite; correct?
16:38   3  A. Yes. If the direction of the pull is changed by some
16:38   4     object, then the rope would be like something at an angle,
16:38   5     anywhere up to -- well, I've seen them beyond 90 degrees.
16:38   6  Q. So it's the bend, to use my preferred word, that acts like
16:38   7     a knot in a rope, which reduces the breaking strength of the
16:38   8     rope, because, otherwise, what I consider --
16:38   9  A. I wouldn't use it acts like a knot, but it does reduce the
16:38  10     strength dramatically, yes.
16:38  11  Q. But an angle, again, using my word, let's say between
16:38  12     kevel 3 and kevel 4, that would not reduce --
16:38  13  A. That would still give you a straight line.
16:38  14  Q. That's still a straight line, exactly.
16:38  15         Now, this Cooper versus ALBERTA case you've been
16:39  16     talking about, that was a ship in the Houston ship channel;
16:39  17     correct?
16:39  18  A. That is correct.
16:39  19  Q. And that was an incident where a longshoreman had her legs
16:39  20     fractured when a rope broke due to a passing vessel?
16:39  21  A. That is correct.
16:39  22  Q. And how large a rope was that?
16:39  23  A. I believe it was an 8-inch-circumference rope.
16:39  24  Q. All right. And do you remember where that rope was stored
16:39  25     prior to its use and why it was degraded?
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## Page 2567

```
16:39  A.  I don't remember.
16:39  Q.  Well, do you remember that it was stored in a paint locker
16:39  and that that rope was degraded due to sun and paint and other
16:39  elements --
16:39  A.  Well, I inspected the rope, yes, it was badly degraded.
16:39  It was badly worn and chafed.
16:39      Also, to clarify one point that you made when we were
16:39  talking about that, we were talking about two spring lines at
16:39  the same -- to the same mooring point.  The lines were not
16:39  similar, so, therefore, they did not have similar
16:40  characteristics.  And I was referring that -- that's to clarify
16:40  that, what he said.
16:40  Q.  Completely different scenarios than what we have here?
16:40  A.  Totally.
16:40  Q.  Okay.  You were also asked questions about having a
16:40  program to retire ropes.  Your understanding of the testimony
16:40  based on the invoices that you saw as well is that we were
16:40  talking -- we are talking in this case about brand-new ropes
16:40  just coming off a spool; right?
16:40  A.  Yes, coming right off a coil.
16:40  Q.  There's no reason to retire those ropes, is there?
16:40  A.  None.
16:40  Q.  You were asked a hypothetical about safe working load
16:40  limits and the reduction if you used 10 and you have to divide
16:40  the 100 by 10.  Do you think it's practical and is anybody
```

## Page 2568

```
16:40  going to put 10 ropes across two adjacent kevels?
16:40  A.  Well, just to slightly note here properly, to clarify that
16:41  point, if we want to go to the extreme of using a safety factor
16:41  of 10, you would probably have had to have found a 6-inch or
16:41  8 -- 6-inch-diameter rope that would have been an 18-inch
16:41  circumference rope.  I'm talking a rope this big around.
16:41  They're not available.
16:41      So, realistically, you can't -- if you think the
16:41  force is -- you have to adjust to what is available in the
16:41  marketplace.  And a 2-inch rope is a very, very strong, very,
16:41  very commonly used rope.
16:41  Q.  For this use?
16:41  A.  For this use.
16:41  Q.  Safe load limits refer more to vertical lifts in cranes
16:41  and construction, don't they?
16:41  A.  Well, that's what they've generally been used for.  I have
16:41  really never seen them applied to a mooring application.
16:41      Generally, they use -- they go maybe by the weight of
16:42  the vessel and its size, and then they, accordingly, put out
16:42  ropes.
16:42  Q.  Okay.  You showed the judge -- laboriously, you and I went
16:42  through the identification of the ropes, and you showed the
16:42  judge the ropes, and you confirmed the location of those ropes
16:42  based on the physical appearance of the ropes and the
16:42  photographs that you saw; correct?
```

## Page 2569

```
16:42  A.  That is correct.
16:42  Q.  Does it matter to you who told you at any given time that
16:42  those were the ropes that somebody took and retained in their
16:42  custody after the hurricane?
16:42  A.  No.
16:42  Q.  Would it change your opinion in any way, based on your own
16:42  visual analysis of the ropes, your own review of the
16:42  photographs, and the matching that you did, as to who told you
16:42  where these ropes came from?
16:42  A.  Not at all.
16:42  Q.  You're absolutely certain based on your inspection of the
16:42  ropes, your matching of the ropes in photographs, that that's
16:42  the location where they came from?
16:42  A.  Yes, I am.
16:43      MR. WALKER:  That's all I have.  Thank you, Your
16:43  Honor.  Thank you, Mr. Skaer.
16:43      THE COURT:  Thank you.  Sir, you may step down.
16:43  Thank you.  We're going to take a recess, but who's the
16:43  defendant's next witness?
16:43      MR. ALDOCK:  Dr. Bea.
16:43      THE COURT:  We will obviously --
16:43      MR. ALDOCK:  We'll give him a start.
16:43      THE COURT:  -- give him a start, get him warmed up,
16:43  and go until about 6:00.
16:43      We'll take a recess for about 10 minutes, and
```

## Page 2570

```
16:43  we'll have Dr. Bea for an hour or so.
16:43      MR. WALKER:  Thank you.  Your Honor, these ropes
16:43  which actually will be in evidence, what would you like us to
16:43  do with them?
16:43      THE COURT:  That's a great question.  I'm going to
16:43  defer that to Sheena, who has to deal with these things.  If
16:44  you get consent of all counsel, then maybe we could designate a
16:44  custodian.  The Clerk's Office would appreciate it.  If
16:44  everybody agrees.
16:44      MR. WALKER:  Until that future trial.
16:44      THE COURT:  Sure.
16:44      (WHEREUPON, the Court took a recess.)
17:03      THE DEPUTY CLERK:  All rise, please.  Court's in
17:03  session.  Please be seated.
17:03      THE COURT:  Okay.  We'll go an hour, and I hope
17:03  everyone will have a wonderful dinner in New Orleans.
17:03      MR. RAFFMAN:  We call Robert Bea.
17:03      (WHEREUPON, Robert Bea, having been duly sworn,
17:03  testified as follows.)
17:04      THE DEPUTY CLERK:  Please state your full name and
17:04  correct spelling for the record.
17:04      THE WITNESS:  Robert G. Bea, R-O-B-E-R-T, B-E-A.
17:04          DIRECT EXAMINATION
17:04  BY MR. RAFFMAN:
17:04  Q.  Dr. Bea, I wanted to start your direct examination by
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA