```
                                                           2600
 1                  UNITED STATES DISTRICT COURT
 2                  EASTERN DISTRICT OF LOUISIANA
 3
      ****************************************************************
 4
      IN RE:  KATRINA CANAL
 5    BREACHES CONSOLIDATED
      LITIGATION
 6
                              CIVIL ACTION NO. 05-4182
 7                            SECTION "K" (2)
                              NEW ORLEANS, LOUISIANA
 8                            THURSDAY, JULY 8, 2010, 9:00 A.M.
 9    PERTAINS TO BARGE
10
      MUMFORD   C.A. NO. 05-5724
11    AS TO CLAIMS OF PLAINTIFFS
      JOSEPHINE RICHARDSON AND
12    HOLIDAY JEWELERS, INC.,
      ONLY
13
14    BENOIT   C.A. NO. 06-7516
      AS TO CLAIMS OF PLAINTIFFS
15    JOHN ALFORD AND JERRY
      ALFORD ONLY
16
17    ****************************************************************
18
                      DAY 12, MORNING SESSION
19            TRANSCRIPT OF NONJURY TRIAL PROCEEDINGS
           HEARD BEFORE THE HONORABLE STANWOOD R. DUVAL, JR.
20                  UNITED STATES DISTRICT JUDGE
21
22    APPEARANCES:
23
      FOR THE PLAINTIFFS:    BEST KOEPPEL TRAYLOR
24                           BY:  LAURENCE E. BEST, ESQUIRE
                             2030 ST. CHARLES AVENUE
25                           NEW ORLEANS LA  70130
```

**2601**

APPEARANCES CONTINUED:

LAW OFFICES OF BRIAN A. GILBERT
BY:  BRIAN A. GILBERT, ESQUIRE
2030 ST. CHARLES AVENUE
NEW ORLEANS LA  70130

KHORRAMI POLLARD ABIR
BY:  SHAWN KHORRAMI, ESQUIRE
44 FLOWER STREET, 33RD FLOOR
LOS ANGELES CA  90071

WILSON GROCHOW DRUKER & NOLET
BY:  LAWRENCE A. WILSON, ESQUIRE
223 BROADWAY, 5TH FLOOR
NEW YORK NY  10279

WIEDEMANN & WIEDEMANN
BY:  LAWRENCE D. WIEDEMANN, ESQUIRE
     KARL WIEDEMANN, ESQUIRE
821 BARONNE STREET
NEW ORLEANS LA  70113

PATRICK J. SANDERS
ATTORNEY AT LAW
3316 RIDGELAKE DRIVE
SUITE 100
METAIRIE LA  70002

LAW OFFICE OF RICHARD T. SEYMOUR
BY:  RICHARD T. SEYMOUR, ESQUIRE
1150 CONNECTICUT AVENUE N.W.
SUITE 900
WASHINGTON DC  20036

FOR THE DEFENDANT:    CHAFFE MCCALL
            BY:  DEREK A. WALKER, ESQUIRE
2300 ENERGY CENTRE
1100 POYDRAS STREET
NEW ORLEANS LA  70163

**2602**

APPEARANCES CONTINUED:

GOODWIN PROCTER
BY:  JOHN D. ALDOCK, ESQUIRE
     MARK S. RAFFMAN, ESQUIRE
     ADAM M. CHUD, ESQUIRE
     KIRSTEN V. K. ROBBINS, ESQUIRE
     ERIC I. GOLDBERG, ESQUIRE
901 NEW YORK AVENUE N. W.
WASHINGTON DC  20001

SUTTERFIELD & WEBB
BY:  DANIEL A. WEBB, ESQUIRE
650 POYDRAS STREET, SUITE 2715
NEW ORLEANS LA  70130

LAFARGE NORTH AMERICA, INC.
BY:  PETER KEELEY, ESQUIRE
12950 WORLDGATE DRIVE
HERNDON VA  20170

OFFICIAL COURT REPORTER:    CATHY PEPPER, CCR, RMR, CRR
                500 POYDRAS STREET, ROOM B406
                NEW ORLEANS, LOUISIANA 70130
                (504) 589-7779

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
PRODUCED BY COMPUTER.

**2603**

I N D E X

EXAMINATIONS                        PAGE

ROBERT G. BEA, PH.D., P.E.............................2604
DIRECT EXAMINATION BY MR. RAFFMAN (CONTINUED)..........2604

**2604**

P-R-O-C-E-E-D-I-N-G-S

THURSDAY, JULY 8, 2010

M O R N I N G   S E S S I O N

(COURT CALLED TO ORDER)

THE DEPUTY CLERK:  ALL RISE, PLEASE.  COURT IS IN
SESSION.  PLEASE BE SEATED.

MR. RAFFMAN:  GOOD MORNING, YOUR HONOR.  WITH
YOUR HONOR'S PERMISSION I'LL RESUME THE EXAMINATION OF DR. BEA.

THE COURT:  THANK YOU, SIR.  PLEASE DO.

DIRECT EXAMINATION (CONTINUED)

BY MR. RAFFMAN:

Q.  DR. BEA, YESTERDAY WE DESCRIBED AND YOU DESCRIBED THE VERY
FIRST PHASE OF THE ILIT INVESTIGATION TO WHICH YOUR TEAM MADE
SOME CONCLUSIONS AND MADE A PRELIMINARY REPORT IN NOVEMBER OF
2005.  IF I MIGHT HAVE THE SLIDE, PLEASE.

     SO NOW I WOULD LIKE YOU TO FOCUS ON THE SECOND PHASE OF THE
ILIT INVESTIGATION FROM THE DATA OF THAT PRELIMINARY REPORT IN
NOVEMBER 2005 UNTIL ILIT ISSUED ITS REPORT OF MAY 2006.  WHAT
KINDS OF ACTIVITIES DID YOU AND YOUR TEAM UNDERTAKE DURING THAT
SECOND PHASE?

A.  REPEATED FIELD TRIPS GATHERED A GREAT DEAL OF BACKGROUND
INFORMATION, DOCUMENTS, HISTORIC AS-BUILT DRAWINGS, PERFORMED BY
REPEATED ANALYSES OF DIFFERING FAILURE MODES.  A VERY INTENSE

2605

1  EFFORT SPENT IN DOCUMENTATION OF OUR WORK.  A LOT OF TIME SPENT
2  IN PUBLIC OUTREACH.
3  Q.  ALL RIGHT.  DID YOUR TEAM UNDERTAKE ANY SOIL TESTING DURING
4  THIS SECOND PHASE?
5  A.  AND WE DID.  IN FACT, IT WAS IN NOVEMBER, LATE NOVEMBER,
6  THAT WE CONTRACTED SOIL TESTING ENGINEERS OF LOUISIANA, A
7  DR. GORDON BOUTWELL, NOW DECEASED, A MEMBER OF THE ASCE TEAM, A
8  SUPERVISOR THAT WORKED FOR STEE.  WE PERFORMED SOIL BORINGS
9  IN SITU TESTS AT THE KEY BREACHES, FOR EXAMPLE, 17TH STREET,
10  LONDON CANAL, BOTH BRIDGES AT THE LOWER NINTH WARD.
11  Q.  ALL RIGHT.  AND THE SOIL TESTING INCLUDED SOIL BORINGS AND
12  IN SITU TESTING I THINK YOU JUST SAID; RIGHT?
13  A.  THAT'S CORRECT.
14  Q.  ANOTHER WORD FOR IN SITU TESTING IS THE CONE PENETROMETER
15  TEST?
16  A.  THAT'S ONE TYPE OF IN SITU TEST.  THERE ARE MANY.
17  Q.  AND THOSE KINDS OF TESTS WERE PERFORMED ON THE EAST BANK OF
18  THE INNER HARBOR NAVIGATION CANAL WHERE WE HAD THE TWO BREACHES;
19  RIGHT?
20  A.  CORRECT.
21  Q.  AND DID YOU PERSONALLY PARTICIPATE IN OR MONITOR OR BE
22  PRESENT FOR THE SOIL TESTING THAT WAS DONE ON THE EAST BANK OF
23  THE INNER HARBOR NAVIGATION CANAL?
24  A.  YES.  I WAS PRESENT.  THAT'S A HALLMARK OF MY CAREER.  WHEN
25  SOIL TESTS ARE BEING PERFORMED, I DO, IF AT ALL POSSIBLE, TO BE

2606

1  THERE BECAUSE THERE IS SO MUCH THAT HAPPENS THAT IT'S POTENTIALLY
2  IMPORTANT, AND FREQUENTLY THOSE THINGS DON'T END UP DOCUMENTED IN
3  THE SOIL REPORTS.
4  Q.  NOW, YOU WERE IN COURT WHEN DR. MARINO TESTIFIED.  DID YOU
5  HEAR HIM SUGGEST THAT THE CONE PENETROMETER TESTING IS UNRELIABLE
6  OR NOT VERY USEFUL?
7  A.  YES, I DID.
8  Q.  DID YOU AGREE WITH THAT TESTIMONY?
9  A.  CERTAINLY NOT.  THE CONE PENETROMETER TESTING HAS BEEN USED
10  WORLDWIDE FOR AT LEAST 40 YEARS.  IT PROVIDES SOME EXTREMELY
11  IMPORTANT INFORMATION ON THINGS LIKE TYPES OF MATERIALS, LAYERING
12  OF MATERIALS, SHEAR STRENGTH PROPERTIES.
13  Q.  DO YOU THINK IT WAS APPROPRIATE FOR DR. MARINO TO HAVE
14  EXCLUDED THE CPT TESTING FROM THE ANALYSIS IN THE WAY THAT HE
15  DID?
16  A.  I THINK THAT WAS A DRAMATIC MISTAKE.
17  Q.  MAY HAVE I HAVE THE NEXT SLIDE, PLEASE.
18       THE SLIDE DEPICTS, IT'S DEFENDANT'S EXHIBIT 141.  I GUESS
19  IT'S THE FINAL REPORT OF THE INDEPENDENT LEVEE INVESTIGATION
20  TEAM.  IS THAT THE COVER OF YOUR TEAM'S REPORT?
21  A.  THAT'S VOLUME I.  THERE IS A VOLUME II AS WELL.  TOTAL
22  PAGES, APPROXIMATELY 5,000.
23  Q.  NOW, AS OF THE 2006 REPORT -- LET ME ASK YOU, DO YOU
24  REMEMBER WHETHER THE ILIT REPORT WAS ACTUALLY ISSUED TO THE
25  PUBLIC SOMETIME BEFORE JULY?

2607

1  A.  THAT'S CORRECT.  MAY 14 AT 10 A.M., SHERATON HOTEL HERE IN
2  NEW ORLEANS, IT WAS PRESENTED TO THE PUBLIC, AND WE MET WITH THE
3  STATE LEGISLATURE, BATON ROUGE, LOUISIANA, AT 10 P.M., AND
4  PRESENTED THE WORK TO THE ASSEMBLED LEGISLATURE.
5  Q.  DID THE ILIT TEAM CONSIDER IT IMPORTANT TO ISSUE ITS REPORT
6  IN OR AROUND MAY OF 2006; AND IF SO, WHY?
7  A.  WELL, WE WERE DOING ALL POSSIBLE TO BRING FORWARD WHAT WE
8  HAD LEARNED SO THAT, IN PARTICULAR, THE UNITED STATES ARMY CORPS
9  OF ENGINEERS INTERAGENCY PERFORMANCE EVALUATION TASK FORCE COULD
10  TAKE ADVANTAGE OF OUR WORK AND INSIGHTS, AS IT WERE, CONTINUING
11  THEIR WORK AND DOCUMENTING THEIR INVESTIGATIONS.
12  Q.  ALL RIGHT.  AND DID YOU ALSO CONSIDER IT WORTHWHILE TO TELL
13  THE PUBLIC ABOUT YOUR FINDINGS BEFORE THE NEXT HURRICANE SEASON
14  BEGAN?
15  A.  YES, AND THAT WAS ANOTHER IMPORTANT THING BECAUSE WE WERE
16  RUSHING TO GET THE FLOOD DEFENSE SYSTEM PATCHED BY THE END OF
17  HURRICANE SEASON, SO WE WERE CAREFULLY MONITORING THAT PATCHING.
18  Q.  AND IN THE SUMMER OF 2006 ILIT REPORT, WHAT DID ILIT SAY
19  WAS THE CAUSE OF THE INNER HARBOR NAVIGATION CANAL BREACHES?  AND WHY
20  DON'T WE START WITH THE NORTH BREACH?
21  A.  IN THE CASE OF THE NORTH BREACH, IT HAD BREACHED VERY EARLY
22  IN THE MORNING, APPROXIMATELY 4 TO 5 A.M.  THE TWO CRITICAL
23  BREACHING MODES WERE UNDER-BASE SEEPAGE BY BLOWOUT AT THE TOE OF
24  THE LEVEE AND AT THE INTERFACE OF THE FLOODWALL WITH THE LEVEE.
25       THE SECOND CRITICAL FAILURE MODE WAS LATERAL IN STABILITY

2608

1  ACCOMPANIED BY AN HYDRAULIC UPLIFT.
2  Q.  WHAT DID THE ILIT TEAM IN THE SUMMER OF 2006 CONCLUDE WAS
3  THE CAUSE OF THE -- OR WERE THE CAUSES OF THE SOUTH BREACH AT THE
4  INNER HARBOR NAVIGATION CANAL?
5  A.  AT THE SOUTH BREACH, THE CRITICAL MODE PERFORMANCE WAS FIRST
6  LATERAL INSTABILITY, BUT THE SEEPAGE EFFECTS WERE NOT AS SEVERE
7  DUE TO THE DIFFERENCES IN THE SOIL CHARACTERISTICS AT THE TWO
8  LOCATIONS, BUT THEY WERE STILL SIGNIFICANT.  BOTH SEEPAGE AND
9  HYDRAULIC UPLIFT.
10       THERE WAS A THIRD MODE, WHICH WAS A DEVELOPMENT OF THE
11  EROSION TRENCH ON THE BACK SIDE OF THE FLOODWALL AND CONSEQUENT
12  TO REDUCTION IN THE LATERAL STABILITY FOR THAT MODE OF
13  PERFORMANCE.
14       SO WE HAD TWO CLOSELY-COMPETING MODES OF FAILURE, GENERAL
15  LATERAL INSTABILITY, AND I WILL CALL IT "LOCAL LATERAL
16  INSTABILITY" CAUSED BY THE EROSION TRENCH ON THE BACK SIDE OF THE
17  FLOODWALL.
18  Q.  NOW, THE ILIT REPORT, DEFENSE EXHIBIT 141, ALSO CONTAINS
19  SOME CONCLUSIONS ABOUT THE BARGE; RIGHT?
20  A.  THAT'S CORRECT.
21  Q.  AND WHAT DID THE ILIT REPORT HAVE TO SAY ABOUT THE BARGE?
22  A.  THE BARGE PLAYED NO SUBSTANTIAL ROLE IN THE CAUSATION OF
23  EITHER THE NORTH BREACH OR THE SOUTH BREACH.
24  Q.  SO LET'S MOVE ON TO PHASE III.  DR. BEA, AFTER THE ILIT TEAM
25  PUBLISHED ITS REPORT, AND IF WE GO BACK TO THE LAST SLIDE

## 2609

1   BRIEFLY, IT SAYS "FINAL REPORT" AT THE BOTTOM.  RIGHT?
2   A.  THAT'S CORRECT.
3   Q.  AFTER THE ILIT TEAM PUBLISHED IT'S FINAL REPORT, DID THE
4   WORK OF THE SCIENTISTS WHO COMPRISED THAT TEAM STOP UPON KATRINA?
5   A.  NO, IT DID NOT; IN FACT, IT INTENSIFIED.
6   Q.  SO TELL THE COURT ABOUT THE WORK BY THOSE SAME SCIENTISTS AS
7   IT INTENSIFIED FOLLOWING THE PUBLICATION OF THAT ILIT REPORT.
8   A.  THE PRINCIPAL THINGS THAT HAPPENED DURING THIS TIME IS OTHER
9   GROUPS WHO WERE STUDYING, INVESTIGATING THE FAILURE OF THE FLOOD
10  PROTECTION SYSTEM FOR THE GREATER NEW ORLEANS AREA BROUGHT
11  FORWARD THE FINDINGS FROM THEIR STUDIES.
12      WE WERE THEN ABLE TO TAKE THE BENEFITS FROM THEIR STUDIES,
13  RE-EXAMINE OUR WORK, UPDATE OUR WORK, AS WE MOVED TO
14  JANUARY 2010.  THIS IS A POINT THAT WAS CONFUSED EARLIER IN THIS
15  TRIAL BECAUSE PEOPLE REFERRED TO THE INDEPENDENT LEVEE TEAM
16  INVESTIGATION WORK AS THOUGH IT WAS ONE BODY OF WORK; INSTEAD, IT
17  HAS BEEN A PROGRESSIVE LEARNING EXPERIENCE FROM THE TIME WE
18  STARTED UNTIL THE TIME I'M SITTING HERE TODAY.
19  Q.  SO IF SOMEONE WERE TO CUT OFF THE CONSIDERATION OF THE WORK
20  BY THE ILIT SCIENTISTS AS OF MAY OF 2006 OR JULY OF 2006, WOULD
21  THAT BE AN ACCURATE PICTURE OR AN INCOMPLETE PICTURE OF THE WORK
22  THE SCIENTISTS HAVE DONE?
23  A.  IT WOULD GIVE AN INACCURATE, INCOMPLETE PICTURE BECAUSE AS
24  WE PROCEEDED TO STAGE III IS WHERE WE EXAMINED A FAR WIDER RANGE
25  OF PARAMETERS:  SHEAR STRENGTH, PERMEABILITY, GEOMETRY,

## 2610

1   OCEANOGRAPHIC, HYDRODYNAMIC CONDITIONS.
2   Q.  NOW, AS OF THIS THIRD STAGE, WERE YOU AND THE OTHER
3   SCIENTISTS ON THE TEAM BEING COMPENSATED FOR THE CONTINUED
4   INVESTIGATION?
5   A.  NO, WE WERE NOT.  MY TOTAL TIME SPENT FROM PHASE I THROUGH
6   PHASE III, I'VE LOGGED MORE THAN 10,000 PRO BONO HOURS.
7   Q.  NOW, DURING PHASE III, DR. BEA, TELL THE COURT, AND
8   SPECIFICALLY WITH REGARD TO THE INNER HARBOR NAVIGATION CANAL
9   ANALYSIS, HOW YOUR THINKING AND THAT OF OTHERS EVOLVED FROM WHERE
10  IT HAD BEEN IN THE SUMMER OF 2006.
11  A.  WE DEVELOPED MUCH MORE INSIGHT INTO THE CAUSATIVE FAILURE
12  ELEMENTS AT THE LOWER NINTH WARD AS WELL AT THE OTHER LOCATIONS.
13  AND THIS WORK AT THE OTHER LOCATIONS HAD A DRAMATIC INFLUENCE ON
14  OUR THINKING AT THE LOWER NINTH WARD.
15  Q.  WHY DON'T YOU DESCRIBE HOW THAT CAME ABOUT.
16  A.  WELL, WE, OF COURSE, WERE VERY INTENTLY FOCUSED ON THE
17  BREACHING CHARACTERISTICS AT THE 17TH STREET CANAL, AT
18  LONDON CANAL.  AND AS WE CAME TO UNDERSTAND HOW OUR PERFORMANCE
19  ANALYTICAL MODELS WERE COMPARING WITH THINGS SUCH AS THE VIDEO
20  THAT WAS PRODUCED BY CAPTAIN PAUL HELMERS FROM THE LAKEFRONT
21  APARTMENTS, THAT VIDEO COMBINED WITH PUMP STATION RECORDS AT THE
22  HEAD OF THE 17TH STREET CANAL GAVE US DEFINITIVE TIME POINTS AS
23  TO THE EVOLUTION, DEVELOPMENT OF THE BREACH, AND THAT INCLUDED
24  WATER LEVELS AT WHICH THE BREACH HAD TAKEN PLACE.  SO WE WERE
25  ABLE TO VALIDATE OUR ANALYTICAL MODEL, NOT ONLY AT THE BREACH,

## 2611

1   BECAUSE WE HAD TO AT THE SAME TIME EXPLAIN THE NONBREACH OVER ON
2   THE JEFFERSON PARISH SIDE.  THIS IS AN EXTREMELY IMPORTANT PART
3   OF THE CORROBORATING THESE COMPLEX ANALYTICAL MODELS.
4   Q.  NOW, AS YOUR THINKING EVOLVED ABOUT AND VALIDATION INCLUDED,
5   DID YOUR THINKING COME TO INCLUDE A STUDY OF THE POTENTIAL
6   HYDRAULIC EFFECT THROUGH THE MARSH LAYER, A SATURATED LAYER THAT
7   HAD A POTENTIAL FOR IMMEDIATE COMMUNICATION PRESSURE?
8   A.  YES.  THIS IS A SURPRISE IN PHASE III.  WE WERE WORKING ON
9   THE 17TH STREET CANAL IN PREPARATION FOR THE CANAL LITIGATION
10  WORK.  THE SENIOR DOCTORAL GRADUATE STUDENT WORKING WITH ME,
11  DIEGO COBOS-ROA, CAME TO MY OFFICE ONE DAY, AND WE WERE REVIEWING
12  HIS ANALYSES.
13      HE PRESENTED TO ME THE RESULTS OF THE SEEPAGE ANALYSES.
14  THEN PRESENTED TO ME THE RESULT OF THE LATERAL INSTABILITY
15  ANALYSES, AND I LOOKED AT THE TWO AND THEN TURNED TO DIEGO AND
16  SAID, "DID YOU COMBINE THE PRESSURE EFFECTS THAT WE DEVELOPED
17  FROM THE SEEPAGE ANALYSIS AND IN THE LATERAL INSTABILITY
18  ANALYSIS?"  HE SMILED AT ME AND HE SAID, "WELL, GENERALLY, WE
19  DON'T DO THAT.  WE DON'T COMBINE THE PRESSURE EFFECTS FROM
20  SEEPAGE INTO THE LATERAL INSTABILITY."  AND I THOUGHT, BUT, WELL,
21  THAT'S PROBABLY TRUE.  BUT THEN HOW I WAS TAUGHT SOIL MECHANICS
22  BACK IN 1954.  I TOLD DIEGO, "NATURE DOESN'T SEPARATE THOSE
23  FAILURE MODES.  SO WE NEED TO COMBINE THEM."
24      WHEN WE COMBINED THEM, AND IT TOOK HIM A COUPLE OF WEEKS TO
25  DO THAT WORK, BUT WE PREDICTED THE TIMING OF WATER LEVEL FOR THE

## 2612

1   17TH STREET CANAL BREACH SPOT-ON.  IT WAS THE FIRST TIME THAT
2   THAT HAD HAPPENED.  ONCE WE DEVELOPED THAT INSIGHT, TOOK IT TO
3   OTHER LOCATIONS, BUT THE VALIDITY OF OUR ANALYTICAL MODELS WERE
4   DRAMATICALLY IMPROVED.
5   Q.  SO THAT COMBINATION OF THOSE TWO MODELS IS SOMETHING YOU
6   DEVELOPED DURING THIS PHASE III AND THEN APPLIED TO THE
7   INNER HARBOR NAVIGATION CANAL AS WELL; IS THAT RIGHT?
8   A.  AND THAT'S CORRECT.  BUT THIS IS, I THINK, A CAUTIONARY
9   ELEMENT FOR ALL OF THE INVESTIGATIONS.  IT'S EASY TO GET TRAPPED,
10  I'LL CALL IT, IN HOW WE THINK ABOUT FAILURE MODES, BUT WE WERE
11  TRAPPED, BUT IN THINKING, AND IT WASN'T UNTIL WE CONTINUED THE
12  WORK INTO THIS THIRD PHASE THAT WE DISCOVERED THE FLAWS IN OUR
13  ANALYSES AND IN THE OTHERS THAT HAD BEEN MADE TO THAT POINT IN
14  TIME.
15  Q.  I WANT TO -- LET'S GO TO THE NEXT SLIDE, PLEASE.
16      THIS SLIDE HAS GOT TITLES OF ARTICLES.  THE FIRST ONE IN THE
17  UPPER LEFT IS CALLED "NEW ORLEANS AND HURRICANE KATRINA,
18  INTRODUCTION, OVERVIEW AND THE EAST FLANK."
19      I'LL REPRESENT TO THE COURT THAT DR. BEA IS THE SECOND
20  LISTED AUTHOR ON EACH OF THE FOUR PAPERS IDENTIFIED IN THE SLIDE
21  AND THAT ALL FOUR PAPERS WERE PUBLISHED IN THE JOURNAL OF
22  GEOTECHNICAL AND GEOENVIRONMENTAL ENGINEERING.
23      DR. BEA, DID THE WORK THAT YOU HAVE JUST DESCRIBED RESULT IN
24  THE PUBLICATION OF PEER-REVIEWED JOURNAL ARTICLES REGARDING THE
25  CAUSES OF THE NEW ORLEANS PROTECTION -- NEW ORLEANS HURRICANE

2613

1  PROTECTION SYSTEM FAILURES DURING HURRICANE KATRINA?
2  A.  THAT IS CORRECT.
3  Q.  AND THESE PUBLICATIONS -- LET ME GET A COUPLE MORE ON THE
4  SCREEN HERE.  WE HAVE TWO MORE PUBLICATIONS.  ONE IS ENTITLED
5  "FAILURE OF THE I-WALL FLOOD PROTECTION STRUCTURES AT THE
6  NEW ORLEANS LOWER NINTH WARD DURING HURRICANE KATRINA."  AND
7  YOU'RE A PRINCIPAL AUTHOR OF THIS PUBLICATION, ALONG WITH YOUR
8  COLLEAGUE, DIEGO COBOS-ROA; IS THAT RIGHT?
9  A.  THAT'S CORRECT.
10  Q.  PUBLISHED IN THE ELECTRONIC JOURNAL OF, OF WHAT?
11  A.  GEOTECHNICAL ENGINEERING.
12  Q.  ELECTRONIC JOURNAL OF GEOTECHNICAL ENGINEERING.
13      AND WE HAVE A SECOND ARTICLE ON THE RIGHT SIDE OF THE SLIDE
14  ENTITLED "THREE-DIMENSIONAL SEEPAGE EFFECTS AT THREE NEW ORLEANS
15  LEVEE BREACHES DURING HURRICANE KATRINA," ON WHICH DIEGO
16  COBOS-ROA IS THE PRINCIPAL AUTHOR AND YOU ARE A SECOND-LISTED
17  AUTHOR; IS THAT RIGHT, DR. BEA?
18  A.  YES, THAT'S CORRECT.
19  Q.  AND THESE ARE ALSO PEER-REVIEWED ARTICLES THAT YOU AUTHORED
20  OR COAUTHORED THAT SET FORTH THE FINDINGS OF THE RESEARCH YOU'VE
21  JUST DESCRIBED ABOUT THE CAUSES OF THE INNER HARBOR NAVIGATION
22  CANAL BREACHES AND OTHER BREACHES.
23  A.  YES, THAT IS CORRECT.  IN THE SECOND PAPER, I BROUGHT OUT
24  THE FACTOR THAT HAD BEEN OMITTED IN ALL OF THE STUDY RESULTS TO
25  THIS POINT IN TIME, AND THAT WAS, NAMELY, WE HAD USED

2614

1  TWO-DIMENSIONAL SEEPAGE ANALYSIS MODELS, CUTTING UP A SLICE
2  THROUGH THE EARTH.  BECAUSE OF THE NATURE OF SOME OF THESE
3  SEEPAGE FEATURES, FOR EXAMPLE, OVERTURNED OAK TREE ROOT BALLS,
4  FOR EXAMPLE, SOME OF THE EXCAVATIONS BACKFILLED WITH SAND THAT WE
5  HAD FOUND AT THE LOWER NINTH WARD BY THIS TIME, WE STUDIED THAT
6  THIRD DIMENSION AND THEREBY LEARNED THAT THERE WAS AN
7  ACCELERATION IN THE INTENSITY OF THE SEEPAGE AND HYDRAULIC UPLIFT
8  EFFECTS.
9  Q.  DURING THE THIRD PHASE OF YOUR WORK WITH THE OTHER
10  SCIENTISTS WHO WERE PART OF THE ILIIT TEAM, DID YOU HAVE OCCASION
11  TO TAKE INTO CONSIDERATION COMMENTS MADE BY IPET AND MAYBE OTHERS
12  REGARDING WHAT THOSE OTHER PEOPLE HAD PERCEIVED AS FLAWS IN YOUR
13  ANALYSIS, FOR EXAMPLE, PERMEABILITY COEFFICIENTS THAT THEY
14  THOUGHT WERE TOO HIGH?
15  A.  THE ANSWER IS A STRONG YES.  OUR COLLEAGUES, JUST BECAUSE
16  THEY HAVE DIFFERENT VIEWS THAN OURS, WE DON'T SAY THEY ARE WRONG
17  BUT, RATHER, TAKE INTO ACCOUNT WHY THEY THINK THEY ARE RIGHT,
18  STUDY HOW THEY COULD ARRIVE AT THEIR VIEWS, AND IF WE SEE THAT
19  THEIR VIEWS ARE THE CORRECT ONES, WE ABANDON THE PREVIOUS VIEWS
20  IN FAVOR OF THOSE ADDITIONAL INSIGHTS.
21      BUT INITIALLY, THE IPET TEAM HAD STRONGLY CRITICIZED THE
22  VERY HIGH PERMEABILITIES THAT WE HAD USED IN OUR WORK AT THE
23  LOWER NINTH WARD.  AND WE SAID, WELL, THEY COULD BE HIGH.  LET'S
24  INVESTIGATE THE EFFECTS ON OUR CONCLUSIONS OF EXAMINING A WIDER
25  RANGE OF SOIL PERMEABILITY.

2615

1      SOIL PERMEABILITY IS AN EXPRESSION OF WATER CONDUCTIVITY
2  THROUGH THE SOIL IS VERY MUCH LIKE HEAT TRANSMISSION, AND, IN
3  FACT, WE USE ANALYTICAL PROCESSES THAT ARE VERY SIMILAR TO HEAT
4  TRANSMISSION TO EXAMINE WATER TRANSMISSION.  SO WE EXAMINED A
5  MUCH WIDER RANGE OF PERMEABILITIES, FOUND THAT FOR THE PLAUSIBLE
6  RANGES OF THOSE PERMEABILITIES THAT OUR BASIC CONCLUSIONS DID NOT
7  CHANGE.
8      SO WE CAME TO, ULTIMATELY, AN AGREEMENT WITH, I'LL CALL IT
9  "OUR CRITICS".  AND WHEN YOU WORK WITH A TEAM OF ENGINEERS, YOU
10  HAVE MANY CRITICS WITHIN THAT TEAM BECAUSE WE'RE CONTINUING TO
11  CRITICIZE HOW EACH OF US THINKS IN AN ATTEMPT TO FIND OUR WAY
12  THROUGH, I'LL CALL IT THE "FOG OF FAILURES", TO BE ABLE TO SEE
13  WHERE THE TRUTH LIES.
14  Q.  IS ONE OF THE REASONS WHY YOUR ANALYSIS AS IT HAS EVOLVED
15  HAS ACCOMMODATED THE CRITICISMS INITIALLY MADE BY THE IPET TEAM,
16  THE DEVELOPMENT OF THE HYDRAULIC UPLIFT ANALYSIS IN WHICH YOU
17  HAVE COMBINED THE SEEPAGE INSTABILITY AND RECOGNIZED THE
18  HYDRAULIC UPLIFT; IS THAT A FAIR SUMMARY?
19  A.  YES.
20  Q.  I WANT TO TOUCH BRIEFLY, THEN, ON THE FORENSIC WORK YOU'VE
21  DONE IN CONNECTION WITH THE VARIOUS LEGAL MATTERS YOU'VE BEEN
22  INVOLVED WITH.
23      PROFESSOR BEA, WHEN WAS THE FIRST TIME THAT YOU BECAME
24  INVOLVED IN A FORENSIC INVESTIGATION FOR A LAWSUIT?
25  A.  MARCH 2007.

2616

1  Q.  WHAT'S THE NAME OF THE LAWYER WHO CONTACTED YOU AND BROUGHT
2  YOU ON BOARD?
3  A.  MR. JOSEPH BRUNO.
4  Q.  AND THE COURT IS FAMILIAR WITH YOUR WORK AND TESTIMONY IN
5  THE VARIOUS MATTERS FOR THE MRGO LITIGATION SO I WON'T DWELL ON
6  THAT HERE, BUT I GUESS, AT WHAT POINT DID YOU BECOME INVOLVED IN
7  THE BARGE MATTER WITH LAFARGE?
8  A.  MARCH 2009.
9  Q.  AND IS IT FAIR TO SAY, PROFESSOR BEA, THAT BEFORE YOU WERE
10  INVOLVED IN THE BARGE MATTER WITH LAFARGE, YOU HAD ALREADY
11  CARRIED OUT AN INDEPENDENT STUDY OF THE BARGE'S INVOLVEMENT, OR
12  POTENTIAL INVOLVEMENT, IN THE FLOODWALL FAILURES?
13  A.  YES.  I REPEATEDLY EXAMINED THE POTENTIAL INTERACTIONS OF
14  THE BARGE WITH THE BREACHES AT THE LOWER NINTH WARD.
15  Q.  ALL RIGHT.  AND SO THOSE CONCLUSIONS ABOUT THE BARGE'S
16  INVOLVEMENT OR NONINVOLVEMENT ARE, AS YOU'VE STATED IN YOUR
17  REPORT AND IN YOUR TESTIMONY EARLIER, THAT YOU HAD REACHED BEFORE
18  MARCH OF 2009; RIGHT?
19  A.  PLEASE REPEAT YOUR QUESTION.
20  Q.  HAVE YOU ALREADY TOLD THE COURT WHAT YOU HAD CONCLUDED
21  BEFORE MARCH OF 2009 ABOUT THE BARGE'S INVOLVEMENT?
22  A.  YES, I HAVE.
23  Q.  ALL RIGHT.  SO AS YOU SIT HERE TODAY, PROFESSOR BEA, DO YOU
24  HAVE AN OPINION ABOUT WHAT CAUSED THE NORTH BREACH AT THE
25  INNER HARBOR NAVIGATION CANAL?

## 2617

1  LET ME HAVE THE NEXT SLIDE, PLEASE.
2  A.  YES.
3  Q.  TELL THE COURT WHAT IS YOUR OPINION ABOUT THE CAUSES OR --
4  THE CAUSE OR CAUSES OF THE NORTH BREACH.
5  A.  THE FAILURE SEQUENCE WAS INITIATED WITH -- UNDER LEVEE
6  SEEPAGE AND HYDRAULIC UPLIFT.  THOSE EFFECTS RESULTED IN BLOWOUT
7  AT THE BASE OF THE FLOODWALL AND LEVEE.  THAT WAS ACCOMPANIED BY
8  DEVELOPMENT OF LATERAL INSTABILITY OF THAT BREACH FEATURE.  AND
9  IT WAS A COMBINATION OF THOSE TWO THINGS THAT RESULTED IN THE
10  NORTH BREACH.
11  Q.  DO YOU HAVE AN OPINION ABOUT THE NORTH BREACH, WHETHER THE
12  BARGE CAUSED THE NORTH BREACH?
13  A.  YES.
14  Q.  WHAT IS THAT OPINION?
15  A.  THAT THE BARGE DID NOT CAUSE THE NORTH BREACH.
16  Q.  AS YOU SIT HERE TODAY, PROFESSOR BEA, DO YOU HAVE AN OPINION
17  ABOUT THE CAUSES OF THE SOUTH BREACH?
18  A.  YES.
19  Q.  TELL THE COURT WHAT IS THAT OPINION.
20  A.  THE SOUTH BREACH DEVELOPED PRIMARILY AS A RESULT OF LATERAL
21  INSTABILITY ACCOMPANIED WITH HYDRAULIC UPLIFT.  IT WAS ASSOCIATED
22  WITH SEEPAGE PRESSURES AND EFFECTS, BUT THAT WAS NOT A PRIMARY
23  CAUSATIVE MODE.
24  THE SECOND KEY MODE OF FAILURE WAS THAT ASSOCIATED WITH THE
25  DEVELOPMENT OF THE EROSIONAL TRENCH ON THE PROTECTED SIDE OF THE

## 2618

1  FLOODWALL, THE COMBINATION OF LATERAL INSTABILITY GENERAL TO THE
2  FLOODWALL LEVEE SYSTEM, ACCOMPANIED WITH THE LATERAL INSTABILITY
3  EXACERBATED BY THE OVERTOPPING EROSION INSTABILITY RESULTED IN
4  THE SOUTH BREACH.
5  Q.  DID THE BARGE CAUSE THE SOUTH BREACH?
6  A.  NO, IT DID NOT.
7  Q.  CAN YOU TAKE THE COURT THROUGH HOW YOUR PREVIOUS WORK HAS
8  LED YOU TO THE CONCLUSIONS YOU'VE JUST EXPRESSED?
9  A.  WOULD YOU REPEAT YOUR QUESTION.
10  THE COURT:  ARE WE GOING TO ISOLATE THE BREACHES OR ARE
11  WE TALKING ABOUT IN GENERAL?
12  MR. RAFFMAN:  THESE BREACHES.
13  THE COURT:  YOU DON'T MEAN ISOLATE THE NORTH AND SOUTH
14  BREACH, OR IS IT A GENERAL QUESTION AS TO BOTH?
15  MR. RAFFMAN:  I'M SORRY, YOUR HONOR, IT WASN'T A VERY
16  GOOD QUESTION.
17  EXAMINATION
18  BY MR. RAFFMAN:
19  Q.  I GUESS WHAT I WOULD LIKE, PROFESSOR BEA, IS:  THE
20  CONCLUSIONS YOU'VE JUST EXPRESSED, DO THEY DERIVE FROM THE MANY
21  THOUSANDS OF HOURS THAT YOU'VE SPENT INVESTIGATING THESE FAILURES
22  AND OTHERS?
23  A.  THE ANSWER IS YES.  IN ADDITION, IT STANDS ON THE SHOULDER
24  OF MANY MORE THOUSANDS OF HOURS OF OTHER INVESTIGATORS.  SO I'M
25  ABLE TO REACH THESE CONCLUSIONS NOT ONLY BECAUSE OF MY WORK BUT

## 2619

1  BECAUSE OF A MOUNTAIN OF WORK THAT'S BEEN DONE BY MANY OTHER
2  INVESTIGATORS.
3  Q.  WITH RESPECT TO THE BARGE, WHAT HAVE YOU CONCLUDED HAPPENED
4  TO THE BARGE?  AT WHAT POINT DID IT ENTER THE PICTURE, AS YOU'VE
5  DRAWN IT?
6  A.  THE BARGE ENTERS THE PICTURE AT THE SOUTH BREACH.  WE THINK
7  THE LARGE BOW FEATURE AT THE NORTH SECTOR OF THE SOUTH BREACH WAS
8  THE FIRST EXPRESSION OF LATERAL INSTABILITY.  IT WAS AT THAT
9  POINT THAT WATER FORCEFULLY ENTERED THE LOWER NINTH WARD,
10  RESULTING IN THE DOWNSTREAM DAMAGE THAT WAS SO PAINFULLY EVIDENT
11  BY FOLLOWING THE FLOODWATER REMOVAL FROM THE AREA.
12  AS THE WATER FLOWED INTO THE LOWER NINTH WARD, THE SECOND
13  FEATURE DEVELOPED THAT LINEAR FEATURE THAT CARRIES US TO THE
14  SOUTH END OF THE SOUTH BREACH.  AT THAT POINT, WITH THE WATER
15  LEVEL IN THE SOUTH BREACH, SOMEWHERE BETWEEN PLUS 10 AND PLUS
16  12 FEET NAVD88, AND THAT WAS A QUESTION THE JUDGE ASKED EARLIER
17  DURING THIS TRIAL, A WATER LEVEL IN THE CANAL IS APPROXIMATELY AT
18  PLUS 12 FEET, SO WE'VE GOT MORE WATER ELEVATION IN THE CANAL THAN
19  WE DO IN THE AREA OF THE SOUTH BREACH.
20  Q.  LET ME STOP YOU THERE.  I'M SORRY, LET ME STOP YOU THERE.
21  ALL OF THAT THAT YOU JUST DESCRIBED HAS DEVELOPED WITHOUT THE
22  BARGE; IS THAT CORRECT?
23  A.  THAT'S CORRECT.
24  Q.  AND SO THE BARGE ENTERS THE PICTURE.
25  A.  APPROXIMATELY AT 10 A.M.  THE BREACHING PROCESS AT THE SOUTH

## 2620

1  BREACH INITIATES AT APPROXIMATELY 8 A.M.  THE BARGE ENTERS AT THE
2  LAST STAGE.  WATER IS FLOWING INTO THE LOWER NINTH WARD AT THE
3  SAME TIME THE BARGE IS BEING DRIVEN BY THE NORTHERLY HURRICANE
4  WINDS.  AND ACTUALLY AT THIS TIME TURNING TO NORTHWESTERLY,
5  DRIVEN INTO CONTACT WITH THE LOWER END OF THE SOUTH BREACH, CLIPS
6  OFF THE TOP OF THE FLOODWALL AND FLOATS ACROSS TO THAT FIRST ROW
7  OF HOUSES, PASSING OVER THE TOP OF THE SCHOOL BUS THAT HAS BEEN A
8  PROMINENT FEATURE THAT WE'VE PAID ATTENTION TO AT THIS LOCATION.
9  Q.  ALL RIGHT.  NOW, LET'S GO BACK AND WALK THROUGH SOME
10  CONCEPTS THAT LEAD TO THE CONCLUSIONS THAT YOU'VE JUST DISCUSSED.
11  MAY I HAVE SLIDE 17, PLEASE.
12  PROFESSOR BEA, SLIDE 17 IS A PICTURE OF A SHEETPILE WALL; IS
13  THAT RIGHT?
14  A.  THAT'S CORRECT.
15  Q.  AND IN ORDER NOT TO REPEAT TESTIMONY WE'VE ALREADY HEARD, I
16  GUESS I WOULD LIKE TO ASK YOU JUST ONE OR TWO QUESTIONS ABOUT
17  SHEETPILE WALLS.
18  DR. BEA, DOES THE DEPTH TO WHICH THE SHEETPILE IS SUNK
19  AFFECT THE ABILITY OF A SHEETPILE WALL TO REMAIN STABLE AS WATERS
20  RISE IN THE CANAL AND/OR TO PREVENT SEEPAGE OF WATER UNDERNEATH
21  THE BOTTOM OF THE WALL?
22  A.  THAT'S TWO THINGS ARE THE CRITICAL ELEMENTS THAT THAT
23  SHEETPILE WALL IS TO PROVIDE IN THE WAY OF RESISTANCE.  THE
24  SHEETPILE HAVE TO BE ABLE TO WITHSTAND, TRANSMIT THE FORCES
25  COMING FROM THE HYDROSTATIC PRESSURES AND THE FORCES EXERTED ON

**2621**

1  THE CONCRETE.  THE UPPER PORTION OF THAT SYSTEM, THOSE FORCES ARE
2  TRANSMITTED TO THE SOIL, AND IT'S HERE THAT WE'RE FOCUSED ON
3  LATERAL STABILITY.
4      THE SECOND KEY FEATURE AND FUNCTION OF THE SHEETPILING IS TO
5  PREVENT WATER FROM INTRUDING UNDER THE LEVEE, THEREBY UNDERMINING
6  IT AND, AT THE SAME TIME, DEVELOPING THESE IMPORTANT UPLIFT
7  PRESSURES.
8  Q.  DEPTH OF SHEETPILE IS IMPORTANT TO BOTH OF THOSE FUNCTIONS
9  YOU'VE JUST DESCRIBED; IS THAT FAIR?
10  A.  THAT'S -- WELL, THAT IS CORRECT.
11      ONE OF THE REMARKABLE THINGS AT THIS LOCATION IS THE SHALLOW
12  PENETRATION OF THE SHEETPILING.  THIS IS ONE OF THE SHALLOWEST OF
13  THE MAJOR FLOOD-PROTECTION STRUCTURES THAT WE INVESTIGATED.
14  Q.  MAY I HAVE SLIDE 18.
15      SO WE'RE NOW LOOKING AT DEFENDANT'S EXHIBIT 145.  THIS IS
16  IPET VOLUME V, FIGURE 11-9.  AND WE'RE TURNING NOW TO THE
17  QUESTION OF SOIL CHARACTERIZATION.
18      PROFESSOR BEA, WOULD YOU DESCRIBE WHAT THIS SLIDE SHOWS?
19  A.  WELL, I WOULD START FIRST BY REFERRING TO THE VERTICAL
20  SCALE.  THERE ARE TWO VERTICAL SCALES SHOWN HERE REFERENCING
21  ELEVATION.  THE ONE REFERENCE SHOWN HERE TO THE RIGHT IS NAVD88,
22  AND THESE ARE SHOWN IN TERMS OF FEET BY HORIZONTALLY, BUT THE
23  SCALE IS DISTANCE IN FEET MEASURED FROM ARBITRARY REFERENCE POINT
24  THAT I'M SHOWING HERE WITH MY POINTER.
25      SHOWN TO THE TOP IS THE LOCATION OF THE WIDE SOUTH BREACH,

**2622**

1  APPROXIMATELY 900 FEET WIDE.  SHOWN TO THE RIGHT IS THE LOCATION
2  OF THE NORTH BREACH, SO THIS IS A CROSS-SECTION LOOKING EAST-WEST
3  THAT GOES THROUGH THE ENTIRE LENGTH OF THE LOWER NINTH WARD IN
4  THE VICINITY OF THE SOUTH BREACH AND NORTH BREACH.
5      THE VERTICAL LINES SHOWN THROUGH HERE ARE THE LOCATIONS OF
6  SOIL CORES, SOIL BORINGS, THAT HAVE BEEN PERFORMED HERE.  THIS IS
7  NOT ALL OF THE SOIL BORINGS.  IT IS A GROUP OF SOIL BORINGS THAT
8  WERE PRIMARILY DEVELOPED TO DESIGN THE FLOOD PROTECTION
9  STRUCTURES FOR THE LOWER NINTH WARD.  THIS DIAGRAM WAS DRAWN BY
10  THE INTERAGENCY PERFORMANCE EVALUATION TASK FORCE.  I CHOSE IT
11  FOR THIS ILLUSTRATION BECAUSE IT'S WELL DONE AND IT'S COLORED.
12      THE SOILS INFORMATION IS TAKEN BY A GEOLOGIST TO INTERPRET
13  WHAT THE SOIL BORING INFORMATION IS, BRINGING FORWARD TO THE
14  THINKING OF THE GEOTECHNICAL AND STRUCTURAL ENGINEERS.
15      WE CAN START HERE AT THE BOTTOM AS YOU BEGIN TO LOOK AT THE
16  CROSS-SECTION.  THIS BOTTOM REPRESENTS THE LOW-STANDING
17  PLEISTOCENE SEA LEVEL.  THIS INTERFACE WAS FORMED APPROXIMATELY
18  10,000 YEARS AGO, WHEN SEA LEVEL IS MUCH LOWER THAN IT IS TODAY.
19      SEA LEVEL HAS BEEN RISING, ACTUALLY, RATHER RAPIDLY, AND AS
20  THE SEA LEVEL RISES, SEDIMENTS ARE DEPOSITED ON TOP OF THE
21  PLEISTOCENE INTERFACE, AND THESE DEPOSITIONAL FEATURES ARE
22  CHARACTERISTIC OF THE MISSISSIPPI RIVER DELTA THAT HAS INHABITED
23  THIS AREA FOR THE PAST 10,000 YEARS.  WE BUILD UP THINGS LIKE
24  SANDS AND SILTS, SO EVERY LAYER IN THIS LAYER CAKE REPRESENTS
25  CORRECTIONALLY RISING SEA LEVEL.

**2623**

1  WE COME UP ABOUT 80 FEET THROUGH THE COLUMN THAT REPRESENTS
2  ABOUT 8,000 YEARS IN TIME.  AT THIS POINT, SEA LEVEL SLOWS DOWN,
3  AND WE BEGIN FORMING MARSH LAYERS BECAUSE FRESH WATER IS NOW AT
4  THE POINT WHERE WE CAN GROW MARSH AND SWAMP, SO THE RED THAT IS
5  SHOWN IN THIS ILLUSTRATION IS THE BURIED MARSH SWAMP LAYERS THAT
6  UNDERLIE THE LOWER NINTH WARD.
7  Q.  AND I WANT TO STOP HERE TO FOCUS A LITTLE MORE ON THE BURIED
8  MARSH AND SWAMP LAYERS.  PROFESSOR BEA, TELL THE COURT WHAT THE
9  HORIZONTAL RED LINE IN THIS GRAPHIC REPRESENTS.
10  A.  WELL, THE HORIZONTAL RED LINE LOCATED AT MINUS 10 FEET
11  NAVD88 -- AND TO FACILITATE THE RECORD, I WILL REFER TO ALL
12  ELEVATIONS AS "NAVD88" SO I DON'T HAVE TO CONTINUE REPEATING
13  THAT.
14  Q.  THANK YOU.
15  A.  BUT THAT HORIZONTAL RED LINE AT MINUS 10 FEET REPRESENTS THE
16  BOTTOM OF THE SHEETPILING THAT DEFEND THE EASTERN SECTOR OF THE
17  LOWER NINTH WARD.
18  Q.  AND IS IT RELEVANT TO YOU THAT THE BOTTOM OF THE SHEETPILE
19  IS HIGHER THAN THE BOTTOM OF THE MARSH LAYER?
20  A.  YES, BECAUSE IT, OF COURSE, LEAVES A WINDOW OPEN FOR WATER
21  TRANSMISSION AND HYDRAULIC CONDUCTION EFFECTS UNDER THE BOTTOM OF
22  THE SHEETPILING.  ON TOP OF THE BURIED MARSH LAYER IS FILL.  THE
23  AREA IS BEING FILLED IN -- THE HISTORY, STARTS WITH THE
24  CONSTRUCTION OF THE INNER HARBOR NAVIGATION CANAL, IHNC, CALLED
25  FOR SHORT THE "INDUSTRIAL CANAL".  WE, AS WELL, PUT IN A LEVEE

**2624**

1  FILL AND PUT A SHEETPILING THROUGH THAT A PORTION OF THE LAYER
2  CAKE, AND AT THE TOP IS THE ELEVATION, APPROXIMATELY 12.5 FEET OF
3  THE CONCRETE FLOODWALL CONSTRUCTED AFTER HURRICANE BETSY.
4  Q.  BEFORE WE LEAVE THE SOIL CHARACTERIZATION, DID YOU, IN
5  CARRYING OUT YOUR OWN ANALYSIS OF THE SOIL, DID YOU CONCLUDE THAT
6  THE CHARACTERIZATION BY IPET WAS ONE ON WHICH YOU COULD RELY OR
7  CLOSE ENOUGH TO THE ONE THAT YOU DID WITH ILIT, THAT THE TWO OF
8  THEM WERE --
9  A.  WE -- ACTUALLY, I LEFT OUT TWO CROSS-SECTIONS INDEPENDENTLY,
10  SO THE IPET CROSS-SECTION IS VERY CLOSE TO THIS CROSS-SECTION,
11  BUT WE COULDN'T AFFORD COLORING THE CROSS-SECTION, SO I CHOSE ONE
12  THAT WAS COLORED.
13      THERE IS A VERY IMPORTANT POINT HERE BECAUSE THESE
14  CROSS-SECTIONS ARE BEING DRAWN BY TEAMS OF GEOLOGISTS AND
15  GEOTECHNICAL ENGINEERS.  THE GEOLOGISTS ARE THE HISTORIC
16  LIBRARIANS OF SOILS AND HOW THEY GET THERE.  THE GEOTECHNICAL
17  ENGINEERS ARE THOSE WHO FOCUS ON THE ENGINEERING PROPERTY'S
18  PERFORMANCE CHARACTERISTICS OF STRUCTURES.  SO TWO VERY, VERY
19  SIMILAR CROSS-SECTIONS DEVELOPED BY THESE TWO INDEPENDENT TEAMS.
20  Q.  MAY I HAVE THE NEXT SLIDE, PLEASE.
21      PROFESSOR BEA, WE'RE LOOKING NOW AT DEFENDANT'S EXHIBIT 141,
22  ILIT FIGURE 6.24.  WOULD YOU DESCRIBE WHAT WE HAVE IN THIS
23  SLIDE AND HOW IT RELATES TO THE ANALYSIS THAT YOU'VE CONDUCTED?
24  A.  THIS SLIDE APPLIES TO THE ANALYSES WE PERFORMED AT THE SOUTH
25  BREACH.  THE VERTICAL SCALE REFERENCES ELEVATION, AND THE

## 2625

1  HORIZONTAL SCALE REFERENCES A DISTANCE, BOTH OF WHICH ARE IN
2  FEET.
3      THE DIFFERING COLORS SHOWN HERE AT THE LEGEND ARE ASSOCIATED
4  WITH DIFFERENT TYPES OF SOIL THAT ARE FOUND WITHIN THE VICINITY
5  OF THIS CROSS-SECTION.  SO THE LAYERING ARE THE DIFFERING KINDS
6  OF SOILS DOWN TO A DEPTH OF APPROXIMATELY 80 FEET.
7      THE LOCATION OF THE CONCRETE UPPER PORTION OF THE FLOODWALL,
8  I'M SHOWING WITH MY POINTER.  THE SHEETPILING EMBEDDED WITHIN
9  THAT CONCRETE MONOLITH PENETRATE DOWN TO APPROXIMATELY MINUS
10 10 FEET.
11     YOU CAN SEE THE LEVEE FILL, THE MATERIAL THAT WAS BROUGHT
12 INTO THIS AREA SINCE THE CONSTRUCTION OF THE INDUSTRIAL CANAL.
13 YOU CAN SEE THE OUTLINE HERE OF THE IN-FILLED JOURDAN CANAL THAT
14 WAS IN THIS AREA BEFORE WE BEGAN INHABITING IT IN THE '60S AND
15 LATER TIME PERIOD.  THE VERTICAL LINES ARE SOIL CORES IN SITU
16 TESTS PERFORMED IN THIS VICINITY.  IT'S FROM THESE SOIL CORES
17 THAT THE GEOLOGISTS/GEOTECHNICAL ENGINEERS THEN BEGAN TO DEVELOP
18 DETAIL CHARACTERIZATIONS OF THE SOILS.
19 Q.  WHO PERFORMED --
20     THE COURT:  DR. BEA, JUST BRIEFLY, NOT NECESSARILY
21 RELEVANT, BUT THE LOWER NINTH WARD, YOU SAID IT BEGAN TO BE
22 INHABITED AT WHAT PERIOD OF TIME?
23     THE WITNESS:  WELL, IT'S ACTUALLY BACK WHEN WE WERE
24 STARTING TO DIG THE INDUSTRIAL CANAL, CONSTRUCT LOCKS.  AT THAT
25 TIME THE LOWER NINTH WARD IS, WE'LL CALL IT "SPARSELY INHABITED".

## 2626

1  WE BRING PROGRESSIVELY, OVER TIME, BRING FILL IN, INHABIT THE
2  AREA IN THE -- LOWER NINTH WARD IS A RESULT OF THAT CONTINUOUS
3  HISTORY.
4      THE COURT:  IT'S, IN ESSENCE, RECLAIMED LAND OR LAND
5  THAT WAS, WAS IT, IN ESSENCE, MARSHY PRIOR TO THAT TIME?
6      THE WITNESS:  YES.
7      THE COURT:  THANK YOU.
8          EXAMINATION
9  BY MR. RAFFMAN:
10 Q.  BEFORE WE LEAVE THIS SLIDE, THESE BORINGS WERE DONE BY WHOM?
11 A.  BY A WIDE VARIETY OF AGENCIES AND GROUPS.  FOR EXAMPLE,
12 EUSTIS ENGINEERING, WHOM I USED TO WORK WITH WHEN I WORKED HERE
13 IN NEW ORLEANS, PERFORMED SOME OF THESE SOIL BORINGS FOR THE
14 U.S. ARMY CORPS OF ENGINEERS.
15     THE GROUP OF THREE CORES LOCATED HERE AT MY POINTER WERE
16 PERFORMED BY THE ILIT TEAM, GORDON BOUTWELL SUPERVISING.  DR.
17 DAVID ROGERS, A WORLD AUTHORITY GEOLOGIST, WAS THE LOGGER ON THE
18 HOLE.  NOW, DR. DIEGO COBOS-ROA WAS ONE OF THE WORKERS ON THIS
19 SOIL BORING, AND I WAS ONE OF THE OBSERVERS.
20     SO THESE THINGS HAVE BEEN PERFORMED BY A VARIETY OF
21 DIFFERENT ORGANIZATIONS, AGENCIES, TO GIVE US INSIGHT INTO THIS
22 VERY COMPLEX GEOLOGICAL PICTURE.
23 Q.  DO YOU BELIEVE, DR. BEA, THAT THE NUMBER OF BORINGS THAT
24 HAVE BEEN PERFORMED BY ILIT AND OTHERS RELATED TO THE AREA OF THE
25 SOUTH BREACH WAS SUFFICIENT FOR THE ANALYSIS THAT YOU AND OTHERS

## 2627

1  HAVE CONDUCTED OF THE CAUSES OF THE FAILURES THERE?
2  A.  YES, I DO.
3  Q.  LET'S GO TO THE NEXT SLIDE.
4      WE HAVE HERE DEFENDANTS'S EXHIBIT 206.  THIS IS BEA REPORT
5  APPENDIX C, FIGURE 38.  WOULD YOU DESCRIBE FOR THE COURT WHAT'S
6  SHOWN IN THIS SLIDE?
7  A.  A SIMILAR PICTURE, UNFORTUNATELY, NOT COLORED, SO IT TENDS
8  TO BE PRETTY BORING, AND I DON'T MEAN SOIL BORING.
9      YOU CAN START AT THE GROUND SURFACE, AND WE'RE NOW AT THE
10 LOCATION OF THE NORTH BREACH, SO WHERE I AM DRAWING THIS LINE
11 WITH MY POINTER IS THE EAST BANK INDUSTRIAL AREA THAT OCCUPIED
12 THE WATER SIDE OF THE LEVEE THAT IS SHOWN HERE, SO THE LEVEE
13 SURFACE GOES DOWN.
14     AGAIN, WE HAVE THE IN-FILLED, NOW BURIED JOURDAN CANAL, A
15 DRAINAGE CANAL THAT WAS ON THE PROTECTED SIDE.  THE VERTICAL RED
16 LINES ARE THE SOIL CORES THAT ARE AVAILABLE TO DRAW THIS
17 CROSS-SECTION.  SHOWN HERE IN THE DARKER COLORATION AREA IS AN
18 IN-FILL EXCAVATION OR EXCAVATIONS, AND THE SOIL CORES HAVE
19 PENETRATED BUT LATER BECOMES AN EXCAVATION.
20     THIS IS ONE OF THE REASONS WHY YOU HAVE TO BE VERY, VERY
21 CAREFUL AS YOU CHARACTERIZE THE SOILS BECAUSE HISTORY OF THE AREA
22 HAS A GREAT DEAL TO DO WITH THE SOILS THAT ARE FOUND AT A
23 PARTICULAR POINT, SO WE HAVE TO CAREFULLY UNDERSTAND WHEN THE
24 BORINGS ARE PERFORMED RELATIVE TO THE DEVELOPMENT FEATURES, BUT
25 IT'S VERY SIMILAR TO THE SOUTH BREACH AREA.  WE'VE GOT FILL OVER

## 2628

1  THE MARSH, AND THE MARSH WAS INDEED SOMETHING THAT JEAN LAFITTE
2  SAW HERE IN THE 1700S AND IN THE COURSE HAVE LAID DELTA -- DELTA
3  DEPOSITS ALL THE WAY DOWN TO THE PLEISTOCENE INTERFACE
4  APPROXIMATELY AT MINUS 100 FEET.
5  Q.  ALL RIGHT.  AND WE'RE GOING TO TALK MORE ABOUT THAT BOX AND
6  WHAT WAS IN IT, THE GRAY BOX, BUT TO MAKE CLEAR, THAT BOX
7  REPRESENTS AREAS THAT YOU CONCLUDED HAD BEEN EXCAVATED AND FILLED
8  IN WITH SAND OR SANDY MATERIAL.
9  A.  CORRECT.
10 Q.  NOW, DID YOU BELIEVE THAT -- IN FORMING YOUR CONCLUSIONS,
11 DID YOU BELIEVE THAT THE NUMBER OF BORINGS AND THE BORING
12 INFORMATION WAS SUFFICIENT TO ALLOW FOR A CHARACTERIZATION OF THE
13 SOILS IN THE AREA OF THE NORTH BREACH?
14 A.  YES.
15 Q.  LET'S GO TO THE NEXT SLIDE.
16     THE NEXT SLIDE IS DEFENDANT'S EXHIBIT 207, BEA SUPPLEMENTAL
17 REPORT, FIGURE 5.  WOULD YOU DESCRIBE FOR THE COURT WHAT IS SHOWN
18 IN THIS SLIDE?
19 A.  THIS SLIDE IS A SECOND CROSS-SECTION THAT WE ANALYZED AT THE
20 NORTH BREACH.  THE ADDITIONAL SOILS TEST THAT I AM REFERENCING
21 HERE THAT WERE BROUGHT FORWARD BY DR. MARINO IN HIS WORK, HE HAD
22 LOCATED AND ANALYZED.  HE HAD LOCATED SOIL BORINGS AND CORES AT
23 THIS LOCATION PERFORMED BY FUGRO MATERIALS MANAGEMENT GROUP.
24     THESE CORES WERE, AS DISCUSSED EARLIER IN THIS TRIAL,
25 PERFORMED FOR THE PURPOSE OF UNDERSTANDING THE SOILS THAT WERE IN

**2629**

1  THIS AREA, AND THE PRIMARY CONCERN WAS FOR THE POLLUTION ELEMENTS
2  THAT WERE FOUND ON THE EAST BANK INDUSTRIAL AREA.  BUT THE
3  INFORMATION THAT DR. MARINO HAD LOCATED WE HAD NOT INCLUDED
4  PREVIOUSLY IN OUR WORK, SO WE TOOK ADVANTAGE OF THE ADDITIONAL
5  SOILS INFORMATION, COMBINED IT WITH THE OTHER SOILS INFORMATION
6  THAT WE HAD, TO ENABLE US TO DRAW THE CROSS-SECTION THAT IS SHOWN
7  HERE.
8  Q.  SO REFERRING NOW TO THE SQUARE ON THE LEFT-HAND SIDE REFERS
9  TO BORING 81A; RIGHT?
10  A.  THAT IS CORRECT.
11  Q.  YOU'VE BEEN PRESENT IN COURT AND THE COURT HAS HEARD PLENTY
12  ABOUT BORING 81A, SO LET ME TRY TO MOVE THROUGH QUICKLY HERE.
13      THE CHARACTERIZATION YOU'VE DRAWN HERE WITH SHELL OR -- WHAT
14  DOES THE ML OR SM STAND FOR?
15  A.  THESE ARE ALL SHELLY, SANDY MATERIALS.
16  Q.  SO SHELL AND SANDY MATERIALS, AS YOU'VE DRAWN IT, COMES OUT
17  OF THE DATA SHOWING IT AS BORING 81A; IS THAT FAIR?
18  A.  THAT'S CORRECT.  AND, OF COURSE, ALSO, AS SHOWN HERE TO THE
19  LEFT, THE OTHER BORINGS IN THAT 81 SERIES ARE SHOWN.
20      THE COURT:  YES, SIR, MR. KHORRAMI.
21      MR. KHORRAMI:  YOUR HONOR, I'M GOING TO OBJECT TO THIS.
22  IT WAS NOT PART OF THE REPORT OF THIS WITNESS, NOR ANY
23  DECLARATION OR SUPPLEMENTAL THAT THE WITNESS HAS DONE.
24      THE COURT:  COUNSEL, IT'S BEEN ARGUED THAT THIS IS
25  BEYOND THE SCOPE OF ANY REPORT.

**2630**

1      MR. RAFFMAN:  I BELIEVE THIS IS FROM BEA SUPPLEMENTAL
2  REPORT FIGURE 5, THE ONE THAT HE DID IN THE FALL OF --
3      THE COURT:  IF WE CAN CONFIRM THAT.
4      MR. KHORRAMI:  THE SPECIFICS OF BORING 81A AND ALL OF
5  THE FINDINGS THAT WERE DISCUSSED ARE OUTSIDE OF THE --
6      THE COURT:  IF THIS, IF THIS GRAPHIC IS IN THE REPORT,
7  I'M GOING TO LET HIM DISCUSS THE GRAPHIC.
8      THE WITNESS:  THE GRAPH DOES COME FROM MY SUPPLEMENTAL
9  REPORT.  SO AS SUCH, IT'S NOT NEW.
10      THE COURT:  WHY DON'T WE LET YOUR COUNSEL, JUST FOR THE
11  RECORD.
12      MR. RAFFMAN:  THE BORING LOG IS INCLUDED AT PAGE 3.
13      THE WITNESS:  IT'S FIGURE 5, PAGE 6.
14      MR. KHORRAMI:  I'LL WITHDRAW THE OBJECTION.
15      THE COURT:  THANK YOU, MR. KHORRAMI.
16  ALL RIGHT.  PROCEED.
17          EXAMINATION
18  BY MR. RAFFMAN:
19  Q.  WOULD YOU BRIEFLY TELL THE COURT WHY THE EXISTENCE OF SAND
20  OR SHELL IN THE AREA NEAR THE FLOODWALL --
21      THE COURT:  LET ME ASK DR. BEA A QUESTION.  THE AREA IN
22  YELLOW THAT'S SEMIRECTANGULAR, SOMEWHAT RECTANGULAR, WHAT IS THAT
23  SUPPOSED TO REPRESENT?  OTHER THAN -- IS IT SUPPOSED TO REPRESENT
24  SOMETHING SPECIFIC?
25      THE WITNESS:  YES.  IN-FILLED AREA.

**2631**

1      THE COURT:  THAT IS THE EBIA AREA?
2      THE WITNESS:  THAT'S CORRECT.
3      THE COURT:  THANK YOU.
4          EXAMINATION
5  BY MR. RAFFMAN:
6  Q.  SO ONE QUESTION THAT MAY DUPLICATE OTHER TESTIMONY --
7      THE COURT:  THAT'S OKAY.  I CAN STAND A LITTLE
8  REPETITION.  GO AHEAD.
9          EXAMINATION
10  BY MR. RAFFMAN:
11  Q.  WHY DOES IT MATTER THAT WE HAVE SHELL AND SAND NEAR THE
12  FLOODWALL?
13  A.  WELL, AS WATER RISES OVER THE SURFACE OF THE EAST BANK
14  INDUSTRIAL AREA, SHOWN HERE TO THE LEFT, WATER IS ABLE TO
15  COMMUNICATE READILY THROUGH THE SHELL, SAND MATERIAL.  IT THEN
16  CONNECTS DIRECTLY TO THE UNDERLYING MARSH SWAMP LAYER.  THAT
17  THEN, GIVEN THAT THE SHEETPILE DON'T CUT THAT OFF OR SOME OTHER
18  UNUSUAL FEATURE, ALLOWS WATER TO DIRECTLY COMMUNICATE UNDER THE
19  FLOODWALL TO THE PROTECTED SIDE.
20  Q.  ALL RIGHT.  NOW, WE HEARD FROM DR. MARINO -- MAY WE HAVE THE
21  NEXT SLIDE, PLEASE.
22      WE HEARD FROM DR. MARINO THAT HE THOUGHT THAT THE SAMPLE 81A
23  HAD BEEN MOVED TO A DIFFERENT LOCATION.  DO YOU AGREE THAT SAMPLE
24  81A WAS MOVED TO A DIFFERENT LOCATION?
25  A.  NO.  BUT WHEN DR. MARINO BROUGHT FORWARD THAT CONTENTION, WE

**2632**

1  WERE CONCERNED WITH THE APPROPRIATE PROPER LOCATION OF THAT SOIL
2  CORE, BUT TO CORROBORATE THAT THE LATITUDE AND LONGITUDE REPORTED
3  HERE IN SEVEN AND EIGHT SIGNIFICANT FIGURES, I CONTACTED A
4  COLLEAGUE WHO HAD WORKED WITH ME AT THE OCEAN SERVICES DIVISION
5  OF WOODWARD-CLYDE CONSULTANTS IN HOUSTON, TEXAS.  MY COLLEAGUE
6  NOW WORKED FOR FUGRO GULF IN HOUSTON, TEXAS.
7      I CALLED HIM AND ASKED IF THE LATITUDE AND LONGITUDE
8  REPORTED HERE WAS AT THE PROPOSED LOCATION OR THE ACTUAL
9  LOCATION, BUT HE SAID HE WOULD CHECK AND, AFTER CHECKING, TOLD ME
10  THAT THE LATITUDE AND LONGITUDE REPORTED HERE ARE THE ACTUAL
11  LATITUDE AND LONGITUDE, NOT PROPOSED LATITUDE AND LONGITUDE.
12  Q.  ALL RIGHT.  LET'S GO TO THE NEXT SLIDE, PLEASE.
13      THE LATITUDE AND LONGITUDE OF THE BORING, TO BE CLEAR, IS AS
14  REPRESENTED ON THIS SLIDE?
15  A.  THAT'S CORRECT --
16      THE COURT:  MR. KHORRAMI IS STANDING.
17      MR. KHORRAMI:  I APOLOGIZE.  YOUR HONOR, THE BASIS FOR
18  THIS OPINION IS COMPLETE HEARSAY.
19      THE COURT:  WELL, YOU KNOW YOUR OBJECTION IS A LITTLE
20  LATE.
21      MR. KHORRAMI:  I UNDERSTAND.
22      THE COURT:  IT IS HEARSAY.  NO QUESTION ABOUT IT.  IT'S
23  ABSOLUTE HEARSAY.
24      MR. RAFFMAN:  YOUR HONOR, I BELIEVE EXPERTS ARE
25  PERMITTED TO RELY ON INFORMATION ON WHICH AN EXPERT WOULD

**9 (Pages 2629 to 2632)**

## 2633

NORMALLY RELY, SO...

THE COURT:  WELL, THERE IS NO DOCUMENTATION.  I'M NOT SURE EXPERTS NORMALLY RELY ON PHONE CONVERSATIONS, BUT THAT'S -- IT'S IN THE RECORD.  THE COURT WILL LOOK AT IT WITH THE UNDERSTANDING THAT IT, IN THE COURT'S MIND, IS CERTAINLY ATTENUATED.

MR. RAFFMAN:  IT IS WHAT IT IS, JUDGE.

THE COURT:  THERE IS NO WRITTEN RECORD.  IT'S HEARSAY.  AND I DON'T KNOW IF THAT'S THE KIND OF HEARSAY THAT EXPERTS NORMALLY RELY ON.  WE CAN DEBATE ABOUT THAT FOR A LONG TIME.  DR. BEA CAN SAY YES, BUT I'M NOT CERTAIN IN THIS COURT IF IT'S THE KIND OF INFORMATION THAT I WANT TO RELY ON.

EXAMINATION

BY MR. RAFFMAN:

Q.  MAYBE I'LL JUST ESTABLISH A RECORD SO THAT WE HAVE A RECORD.

DR. BEA, AS AN EXPERT, WHEN YOU WANT TO FIND OUT WHETHER SOMETHING HAPPENED, IS A PHONE CALL TO THE PERSON WITH THE AGENCY WHO WAS INVOLVED SOMETHING THAT YOU WOULD ORDINARILY OR NORMALLY UNDERTAKE?

A.  OF COURSE.  AND THAT'S THE BASIS FOR THE LOCATION AND THE SOIL PROFILE DOCUMENTED IN MY SUPPLEMENTAL REPORT.  SO WE HAD TO COME TO GRIPS WITH WHERE 81A IS.

BUT, YES, IN A COURT DEFINITION, THIS MIGHT BE HEARSAY OR TESTIMONY FROM SOMEONE THAT HAS NOT BEEN IN COURT, BUT THIS IS IN GENERAL HOW ENGINEERS WORK.  IF WE'RE UNCERTAIN ABOUT SOMETHING,

## 2634

WE'LL CALL SOMEONE WHO HAS THE KNOWLEDGE WE DON'T, IN AN ATTEMPT TO CORROBORATE A PARTICULAR PIECE OF INFORMATION.

THE COURT:  JUST A NOTE FOR THE RECORD, THE COURT DOESN'T KNOW WHERE THIS GENTLEMAN GOT THAT INFORMATION, WHERE THAT PERSON GOT THAT INFORMATION; AND, THEREFORE, IT IS, IN THE COURT'S MIND, NOT THE MOST COLLUSIVE OF EVIDENCE.

MR. RAFFMAN:  I UNDERSTAND, YOUR HONOR.

THE COURT:  GO AHEAD, COUNSEL.  IT COULD HAVE GONE MULTIPLE.

MR. RAFFMAN:  WE HAD TESTIMONY YESTERDAY ON THIS VERY SAME POINT, AND THERE IS A LITTLE BIT OF --

THE COURT:  I UNDERSTAND.  I MEAN, I ASSUME SOMEBODY COULD GET THE GPS AND ACTUALLY TELL US EXACTLY WHERE IT IS.

MR. RAFFMAN:  WELL, HAVE YOU DONE THAT?

THE WITNESS:  THAT'S HOW THAT SEVEN AND EIGHT SIGNIFICANT FIGURES HAPPENED.  THE PEOPLE ON THE BORING WERE -- USED A DIFFERENTIAL GPS, WHICH IS MUCH MORE ACCURATE THAN GPS.  I'M AN AVID MARINER, SAILOR, AND, HENCE, USE DGPS.  SO I HAVE A HAND-HELD ONE.  THAT'S HOW THOSE SIGNIFICANT FIGURES GOT THERE.

EXAMINATION

BY MR. RAFFMAN:

Q.  BUT THE GPS COORDINATES, TO BE CLEAR, DR. BEA, YOU'VE LOOKED AT THE GPS COORDINATES, AND THEY, IN FACT, REFLECT THAT SPOT OF THE YELLOW DOT RIGHT OUTSIDE OF THE NORTH BREACH; RIGHT?

A.  THAT'S CORRECT.  WE TOOK ALL OF THIS LOCATION INFORMATION

## 2635

THAT WAS TURNED OVER TO OUR GEOGRAPHIC INFORMATION SYSTEM, OBTAINED GIS, AND THEN WE GEO REFERENCE ALL OF THIS SOILS INFORMATION MAKING SURE WE HAD CORRECT ALIGNMENT OF THE LOCATION OF THE BORING RELATIVE TO OTHER GEOGRAPHIC FEATURES.

THE COURT:  THE COURT DOES REALIZE THAT ONE OF THE ISSUES IS WHETHER IT'S A PROPOSED OR -- A PROPOSED GPS OR THE GPS ASCERTAINED AFTER THE HOLE WAS BORED OR DURING -- AT THE TIME THE HOLE WAS ACTUALLY BORED.  I UNDERSTAND.

MR. RAFFMAN:  AND WE HAD TESTIMONY YESTERDAY --

THE COURT:  AND THAT'S THE ISSUE.

MR. RAFFMAN:  CONUNDRUM IS THE WORD YOUR HONOR HAS USED.

THE COURT:  I HAVE SEVERAL.

EXAMINATION

BY MR. RAFFMAN:

Q.  LET'S TAKE A LOOK AT THE NEXT SLIDE, THEN, IN SEQUENCE.

WE HEARD TESTIMONY THAT DRILLING RIGS HAVE TROUBLE WHEN THERE IS AN INCLINE, AND SO, PROFESSOR BEA, IN YOUR EXPERIENCE AS A GEOTECHNICAL SCIENTIST AND SOMEONE WHO HAS PARTICIPATED IN BORINGS, ARE RIGS ABLE TO DRILL ON AN INCLINE?

A.  CERTAINLY.  HERE IS THE LOWER NINTH WARD.  YOU CAN TELL IT'S PRETTY EARLY BECAUSE WATER HAS PONDED HERE.

THE COURT:  MR. KHORRAMI, YOU'RE STANDING.  ARE YOU JUST BEING POLITE?  YOU CAN STAND AND OBJECT IF YOU WISH.  BUT WHEN YOU STAND, I'M ASSUMING IT'S AN OBJECTION.

MR. KHORRAMI:  YES, IT'S AN OBJECTION, YOUR HONOR.

## 2636

THE COURT:  ALL RIGHT.

MR. KHORRAMI:  I KNOW THERE HAS BEEN TESTIMONY REGARDING THE SLOPES AND WHAT HAVE YOU, BUT THERE IS NOTHING TO SAY THAT THE -- WHAT SLOPE THIS PARTICULAR RIG, IF IT IS A RIG, WAS PLACED ON, WHETHER IT'S RELEVANT TO THE SLOPE THAT WE DISCUSSED AT 81A WHERE WE HAD TWO INCLINES MEETING EACH OTHER, AND, FRANKLY, THE TESTIMONY WASN'T EVEN THAT IT'S IMPOSSIBLE TO DO.  SO --

THE COURT:  WELL, THE COURT WILL TAKE ALL OF THAT INTO CONSIDERATION.  IF YOU WANT TO USE THAT IN YOUR BRIEF, YOU MAY.  BECAUSE I'M GOING TO GIVE YOU SOME PAGE LIMITS AFTER WE TALK ABOUT IT ALL.

MR. KHORRAMI:  THANK YOU, YOUR HONOR.

THE COURT:  I'LL BE MORE FORGIVING THAN JUDGE FELDMAN.  GO AHEAD.

EXAMINATION

BY MR. RAFFMAN:

Q.  CAN A DRILLING RIG DRILL ON AN INCLINE?

A.  WELL, YES, AND THAT'S WHAT'S HAPPENING HERE.  THIS IS A SLOPE OF APPROXIMATELY 1.3, SO IT'S A SLOPING SURFACE OF THE LEVEE.  JACKS HAVE BEEN USED TO LEVEL THE RIG.  THIS IS DR. -- PROFESSOR RAYMOND SEED STANDING RIGHT NEXT TO PETER, DR. PETER NICHOLSON.  SO THIS IS IN THE SLIDES THAT I FURNISHED AS PART OF MY RELIANCE MATERIALS.

BUT YES, WE CAN PUT RIGS ON INCLINES.  WE USE LEVELING DEVICES SO THAT WE DON'T POKE INCLINED HOLES.

2637

1  Q.  MAY I HAVE THE NEXT SLIDE, PLEASE.

2       THE NEXT SLIDE IS FROM YOUR RELIANCE MATERIALS,

3  PROFESSOR BEA.  DESCRIBE FOR THE COURT WHAT'S SHOWN IN THE SLIDE

4  ON THE RIGHT-HAND SIDE OF THE SCREEN, PLEASE.

5  A.  WELL, WITH YOUR PERMISSION, I'LL START ON THE LEFT-HAND

6  SIDE.

7  Q.  ALL RIGHT.

8  A.  THE JUDGE GAVE ME SOME MORE HOMEWORK, AND HE SAID THAT HE

9  WOULD LIKE TO GET A PICTURE OF THIS POCKET AREA, WHERE

10 SUREKOTE ROAD PASSES OVER THE TOP OF THE LEVEE.  SO HERE IS THE

11 CONCRETE WALL.  SUREKOTE ROAD COMING AND PROCEEDING SOUTH TOWARD

12 THE CLAIBORNE BRIDGE.  HERE IS THE CONCRETE FLOODWALL IN THE

13 LOCATION IN THIS RIGHT PHOTOGRAPH, SO NOW INSIDE THE POCKET, HERE

14 IS THE PUMP STATION NUMBER 5.  HERE IS THE GENTLE SLOPE FROM THE

15 SUREKOTE ROAD DOWN TO THE FACE OF THE FLOODWALL, IN FACT,

16 YOU CAN SEE THE INTERSECTION OF THE NEW FLOODWALL WITH THE OLD

17 FLOODWALL AT EXACTLY THIS LOCATION.

18 Q.  PROFESSOR BEA, WHAT I WOULD LIKE YOU TO DO IS TO TAKE YOUR

19 INDICATOR AND PLACE A MARK ON THE SCREEN AT THE PLACE WHERE THERE

20 IS THE CONNECTION BETWEEN THE NEW FLOODWALL AND THE OLD

21 FLOODWALL.

22      THE COURT:  YOU WANT HIM TO ACTUALLY PHYSICALLY MARK IT

23 WITH A STYLUS?

24      MR. RAFFMAN:  A STYLUS WOULD BE -- YES, SIR; YES,

25 YOUR HONOR.

2638

1       THE COURT:  RIGHT AT THE VERY EDGE OF THE PHOTOGRAPH.

2       MR. RAFFMAN:  THE EDGE OF THE PHOTOGRAPH.  AND I WOULD

3  ASK THE COURT REPORTER TO CAPTURE THAT OR I WOULD ASK THE COURT

4  STAFF TO --

5       THE COURT:  I WANT TO THANK ALL OF THE ATTORNEYS AND THE

6  EXPERTS IN THIS MATTER FOR ME PROVING SYSTEMS HORRENDOUSLY WRONG

7  FOR NOT PUTTING A COLOR PRINTER IN MY COURT.  SO THANK YOU.

8       MR. RAFFMAN:  I DIDN'T PROVE IT ON PURPOSE, YOUR HONOR.

9       SO I BELIEVE THIS IS 357.  I HOPE THAT'S RIGHT.

10 358.  ALL RIGHT.  I'VE MISSED ONE.  WE'LL MARK THAT AND MOVE IT

11 AS 358 AND MOVE ITS ADMISSION AS 358.

12           EXAMINATION

13 BY MR. RAFFMAN:

14 Q.  AND BEFORE I LEAVE, JUST FOR THE RECORD, THE PHOTOGRAPHS

15 THAT ARE REFLECTED IN DEFENDANT'S EXHIBIT 358 WERE TAKEN BEFORE

16 KATRINA; RIGHT?

17 A.  THAT IS CORRECT.

18 Q.  AND IS THE INCLINE THAT'S SHOWN IN THE RIGHT-HAND PICTURE OF

19 EXHIBIT 358 TOO STEEP TO PERFORM SOIL BORINGS?

20 A.  IN FACT, WE COULD PERFORM THE SOIL BORING RIGHT HERE ON THE

21 LEVEL SHOULDER ADJACENT TO SUREKOTE ROAD.

22 Q.  MAY I HAVE THE NEXT SLIDE, PLEASE.

23      PROFESSOR BEA, YOU SAW THE MODEL THAT PROFESSOR -- OR

24 DR. MARINO SHOWED IN WHICH HE DESCRIBED A RAVINE AS PART OF THE

25 MODEL.  DR. BEA, DO YOU BELIEVE THAT THE MODEL SHOWING A RAVINE

2639

IN THE LOCATION OF 81A IS ACCURATE, GIVEN THE PHOTO YOU'VE JUST

LOOKED AT?

A.  NO, I DO NOT.  WHEN I SAW THIS GRAPHIC, I WAS SHOWN IT IN

COURT, I WAS SHOCKED, BUT THIS IS THE INTERSECTION OF THE, PARDON

ME, THE OLD WALL BY GOING TO THE RIGHT AT THE NEW FLOODWALL

SECTION, AND I COULD NOT REMEMBER HAVING EVER SEEN SUCH A RAVINE,

AND THAT'S WHY I TOOK TO HEART THE JUDGE'S REQUEST FOR A

PHOTOGRAPH AND WENT BACK THROUGH THE SEVERAL HUNDRED PHOTOGRAPHS

TO LOCATE WHAT WE HAVE JUST SEEN.  THERE IS NO RAVINE.

Q.  SO LET'S MOVE ON TO A DIFFERENT TOPIC.  WE'RE GOING TO SHOW

SOME PHOTOS THAT RELATE TO THE SITE-CLEARING ACTIVITIES AND THE

FILL THAT WAS PLACED THERE.  SO, PROFESSOR BEA, WE'RE LOOKING NOW

AT DEFENDANT'S EXHIBIT 206.  BEA REPORT APPENDIX C, FIGURE 36-C.

WOULD YOU DESCRIBE FOR THE COURT WHAT IS SHOWN IN THIS SLIDE.

A.  WELL, I'LL START WITH THE AERIAL PHOTOGRAPH SHOWN HERE TO

THE RIGHT, THE "SUREKOTE ROAD OVERPASS," I'LL CALL IT.  I'M

OUTLINING WITH MY POINTER AS IT COMES THROUGH THE BREAK AT THE

FLOODWALL AND DECLINES DOWN TO THIS LOCATION.  THESE BRIGHT WHITE

APPEARING THINGS ARE TRAILERS THAT WERE MOBILIZED TO THE AREA BY

THE WASHINGTON GROUP INTERNATIONAL ASSOCIATED WITH THEIR -- AND

THEIR SUBCONTRACTORS THAT WERE HERE TO CLEAR THE LOCATION.

     HERE IS THAT POCKET AREA THAT WE SAW -- PARDON ME JUST A

SECOND -- IN THE PREVIOUS PHOTOGRAPH.  I'VE OUTLINED HERE IN

YELLOW THE LOCATION OF THE FUTURE NORTH BREACH.  PUMP STATION

NUMBER 5 IS SHOWN JUST OFF TO THE CORNER OF THE AERIAL

2640

PHOTOGRAPH.  A PROMINENT AND IMPORTANT OAK TREE SHOWS UP AT THIS

POINT.  BUT MOVING TO THE WEST IS THE INDUSTRIAL CANAL.  THE

FLORIDA AVENUE BRIDGE IS NOT IN THE FRAME CAPTURED HERE.

     THE RED THINGS ARE THE LOCATIONS OF STRUCTURES OF BOTH

SURFACE AND SUBSURFACE THAT WERE IDENTIFIED FOR REMOVAL.  THEY

WERE REMOVING THESE THINGS PRIOR TO EXPANDING THE NAVIGATION

LOGS, SO THE RED OUTLINES ARE STRUCTURES THAT HAVE BEEN REMOVED.

THE LIGHT AREAS ARE IDENTIFIED, AT LEAST TO THE EYE, AS SANDY

MATERIAL THAT'S AT THE SURFACE.  WE WOULD EXPECT COHESIVE

MATERIAL TO BE OF A DARKER COLOR.  IT'S ALSO BEEN DEPOSITED

FAIRLY RECENTLY BECAUSE THERE IS NOT ANY OR VERY MUCH VEGETATION

SUCH AS SHOWN HERE IN GREEN AND OTHER PARTS OF THE PHOTOGRAPH.

     THE COURT:  DR. BEA, THE AREA IN YELLOW THAT YOU HAVE

SHOWN IN ONE OF THE PREVIOUS DIAGRAMS WITH SOIL BORINGS, COULD

YOU APPROXIMATELY TELL ME WHERE THAT AREA WOULD BE?  WHEN I ASKED

YOU WAS IT PART OF THE EBIA REMEDIATION EFFORT, YOU SAID YES.

COULD YOU TELL ME APPROXIMATELY WHERE THAT WOULD BE?

     THE WITNESS:  ABOUT RIGHT THERE.

     THE COURT:  AND THAT WAS A BORROW PIT?

     THE WITNESS:  YES, SIR.

     THE COURT:  THANK YOU.

           EXAMINATION

BY MR. RAFFMAN:

Q.  SO LET'S LOOK AT SOME OF THE -- SOME PICTURES OF SOME OF THE

MATERIAL THAT WAS USED TO FILL THE EXCAVATIONS.

11  (Pages 2637 to 2640)

**2641**

1  A. BEFORE YOU PROCEED, I DIDN'T EXPLAIN THE INSET HERE TO THE
2  LEFT.
3  Q. WOULD YOU EXPLAIN THE INSET, THEN?
4  A. THIS BLACK AND WHITE PHOTOGRAPH IS TAKEN FROM THE FINAL
5  REPORT PRODUCED BY WASHINGTON GROUP INTERNATIONAL TO THE
6  UNITED STATES ARMY CORPS OF ENGINEERS. THEY IDENTIFIED BY NUMBER
7  THE SURFACE STRUCTURES THAT WERE REMOVED. THESE NUMBERS ALLOW
8  YOU TO THEN CONNECT WITH PHOTOGRAPHS AND WRITTEN INFORMATION TO
9  UNDERSTAND WHAT WAS REMOVED AND HOW IT WAS REMOVED AND WHAT THEY
10  DID SUBSEQUENT TO THE REMOVAL.
11  Q. ALL RIGHT. AND NOW, WE'LL MOVE TO THE NEXT SLIDE.
12  DR. BEA, THIS RELATES TO THE AREAS OF EXCAVATION NEAR THE
13  SOUTH BREACH; AM I RIGHT?
14  A. THAT'S CORRECT.
15  NOW, BEFORE WE PROCEED FURTHER, THAT NORTH BREACH AREA IS
16  IDENTIFIED IN GENERAL AS THE BOLAND MARINE AREA.
17  Q. AND THE SOUTH BREACH IS ASSOCIATED --
18  A. WITH MEYER MARINE AREA. M-E-Y-E-R.
19  Q. I MAY HAVE HAD IT WRONG.
20  AND THE SOUTH BREACH AREA, DID YOU ALSO IDENTIFY AREAS OF
21  EXCAVATIONS THAT HAD BEEN PERFORMED AND THEN BACKFILLED WITH SAND
22  OR OTHER SIMILAR MATERIAL?
23  A. INDEED. AS SHOWN HERE TO THE RIGHT IS A FRAME FROM THAT
24  SAME AERIAL PHOTOGRAPH. SHOWN ALONG THE BELT LINE IS THE FUTURE
25  SOUTH BREACH. WE CAN SEE THE BUOYS THAT HAVE BEEN MENTIONED

**2642**

1  SEVERAL TIMES DURING THIS TRIAL. A BARGE IS MOORED AT THIS AND
2  IT HAS A TUG IN ATTENDANCE RIGHT THERE, PERHAPS WAITING TO GET
3  LOCKED THROUGH THE LOCKS TO PROCEED INTO THE MISSISSIPPI RIVER.
4  BUT YOU'VE GOT THE WHITE AREAS. THERE ARE SOME VERY
5  INTERESTING DEPRESSION AREAS THAT SHOW UP AT THE NORTH END OF THE
6  SOUTH BREACH.
7  Q. WHAT IS INTERESTING ABOUT THOSE DEPRESSION AREAS?
8  A. THEY REPRESENT IN-FILL DRAINAGE AREAS. IN SOME CASES,
9  PIPELINES AND SEWER LINES WERE BEING ABANDONED, BUT OTHER
10  MATERIAL HAS BEEN FILLED IN HERE TO FILL IN EXCAVATIONS.
11  THERE IS A VERY INTERESTING FEATURE AT THE SOUTH END OF THE
12  SOUTH BREACH. IT'S ACTUALLY A DRAINAGE DITCH THAT CONNECTS WITH
13  THE NORTH-SOUTH DRAINAGE DITCH AND THEN LEADS OUT TO THE
14  INDUSTRIAL CANAL. SO THEY ARE OBVIOUSLY HAVING TROUBLE WITH
15  SURFACE WATERS, AND TO REMOVE THOSE SURFACE WATERS THEY ARE
16  DIGGING DRAINAGE DITCHES, AND THOSE ARE OTHER FEATURES WE SEE IN
17  THAT PORTION OF THE ILLUSTRATION.
18  SHOWN HERE TO THE LEFT IN BLACK AND WHITE IS, AGAIN, THE
19  IDENTIFICATION OF THE SPECIFIC FEATURES NUMBER THAT WERE REMOVED
20  IN THE PROCESS OF REMEDIATING THIS SECTION OF THE EAST BANK
21  INDUSTRIAL AREA.
22  THE COURT: JUST ONE MINUTE.
23  JUST A NOTE TO COUNSEL, IT'S YOUR CASE AND YOUR RECORD, BUT
24  I DO HAVE EMPATHY FOR MY COLLEAGUES IN THE FIFTH CIRCUIT. SO IF
25  THERE IS SOMETHING IN PARTICULAR THAT YOU WANT TO EMPHASIZE, YOU

**2643**

MIGHT HAVE DR. BEA ACTUALLY MAKE A CIRCLE OR A POINT, ET CETERA,
BECAUSE THOSE WORDS, WHEN THIS GETS TO THE LEVEL WHERE PEOPLE
READ COLD RECORDS, IT'S DIFFICULT TO UNDERSTAND. JUST IF THERE
IS ANYTHING, AND I SAY THAT TO ALL SIDES, IF THERE IS ANYTHING
YOU WANT TO PARTICULARLY EMPHASIZE.
MR. RAFFMAN: THE VERY THOUGHT WAS PASSING THROUGH MY
MIND AS TO WHETHER THIS IS THE KIND OF THING THAT RISES TO THE
LEVEL OF NEEDING TO BE CAPTURED.
THE COURT: AND THAT'S GOING TO BE YOUR DECISION, ONLY
YOUR DECISION, UNLESS I'M REALLY INTERESTED IN IT PARTICULARLY.
MR. RAFFMAN: I UNDERSTAND, AND I THANK YOUR HONOR. I
THINK FOR THIS ONE IT WILL BE SUFFICIENT TO NOTE FOR THE RECORD
THAT WE'RE LOOKING AT DEFENDANT'S EXHIBIT 206, BEA REPORT
APPENDIX C, FIGURE 36-C.
THE COURT: THANK YOU VERY MUCH.
EXAMINATION
BY MR. RAFFMAN:
Q. NOW, I WANT TO TURN TO THE NEXT SLIDE TO LOOK AT SOME
PICTURES OF SOME OF THE --
THE COURT: WHY DON'T WE TAKE A BREAK NOW AND GIVE
DR. BEA A LITTLE BREAK AND EVERYBODY A LITTLE BREAK FOR ABOUT
TEN MINUTES.
MR. RAFFMAN: THANK YOU, YOUR HONOR.
THE COURT: WE'LL PROBABLY GO UNTIL ABOUT 12:30 OR
THEREABOUTS AND THEN TAKE A BREAK FOR LUNCH.

**2644**

MR. RAFFMAN: THANK YOU, YOUR HONOR.
(WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, A BRIEF
RECESS WAS TAKEN.)
THE DEPUTY CLERK: ALL RISE, PLEASE. COURT IS IN
SESSION. PLEASE BE SEATED.
EXAMINATION
BY MR. RAFFMAN:
Q. PROFESSOR BEA, YOU HAD BEEN TALKING ABOUT EXCAVATIONS AND
WHAT WAS USED TO FILL. WE ARE NOW LOOKING AT DEFENDANT'S
EXHIBIT 206, APPENDIX C, FIGURES 27 AND 29. PLEASE DESCRIBE FOR
THE COURT WHAT'S SHOWN IN THESE PHOTOS AND HOW IT RELATES TO YOUR
CONCLUSIONS.
A. BEFORE I DO THAT, I NEED TO APOLOGIZE TO YOU, THE JUDGE AND
THE COURT. IT'S NOT MEYER MARINE. IT'S SAUCIER MARINE.
Q. S-A-U-C-I-E-R.
ALL RIGHT. NOW, LET'S GO TO THE QUESTION.
A. THE PHOTOGRAPHS ARE TAKEN AS PART OF THE WGI SITE CLEARING
OPERATIONS. STARTING HERE TO THE LEFT, IT SHOWS THE LOWER NINTH
FLOODWALL. IN THE BACKGROUND A BACKHOE IS EXCAVATING A DEPTH OF
APPROXIMATELY 10 OR 12 FEET INTO THE UNDERLYING MATERIALS. THEY
ARE CONCERNED WITH POLLUTED SOIL SO THEY HAVE TO REMOVE THESE
MATERIALS.
IT'S NOTEWORTHY YOU CAN SEE THE STANDING WATER INSIDE THE
LOWER PORTION OF THAT EXCAVATION.
SHOWN TO THE RIGHT IS THIS OVERPASS WE DISCUSSED EARLIER

**2645**

1  THIS MORNING.  THE BACKHOE HAS CHANGED POSITION, BUT RIVER SAND,
2  SILTY SAND, AS PREVIOUSLY DISCUSSED, IS BEING USED TO FILL IN
3  THIS EXCAVATION.
4      THIS IS THE KIND OF PHOTOGRAPHIC FORENSIC ENGINEERING WORK
5  THAT WE DO TO HELP US UNDERSTAND WHY IN AERIAL PHOTOGRAPHS WE SAW
6  THOSE LIGHT SOILS.
7  Q.  HOW DO YOU KNOW THAT THE MATERIAL THAT'S SHOWN IN THE
8  RIGHT-HAND PHOTOGRAPH IS A SANDY MATERIAL?
9  A.  WELL, YOU CAN TELL BY THE NATURAL ANGLE OF REPOSE THAT THE
10 MATERIAL ACHIEVES, AND THAT ANGLE OF REPOSE IS APPROXIMATELY THE
11 VALUE OF INTERNAL FRICTION FOR THE SAND.  THAT ALSO HELPS EXPLAIN
12 WHY THE PYRAMIDS IN EGYPT HAVE THEIR SLOPES.
13 Q.  LET'S PROCEED TO THE NEXT SLIDE.  ON THIS SLIDE WE HAVE NOW
14 ADDED A PHOTOGRAPH IN THE MIDDLE, WHICH IS DEFENDANT'S
15 EXHIBIT 206, BEA REPORT, APPENDIX C, FIGURE 30.
16     PLEASE DESCRIBE FOR THE COURT WHAT'S SHOWN IN THIS SLIDE AND
17 HOW IT RELATES TO THE SOIL MATERIALS THAT WERE IN THE EAST BANK
18 OF THE INDUSTRIAL CANAL ON THE FLOOD SIDE OF THE WALL.
19 A.  WELL, THE PHOTOGRAPH IS TAKEN ON THE -- OR JUXTAPOSITIONED
20 ON THE EAST BANK INDUSTRIAL AREA.  IN THE BACKGROUND YOU CAN SEE
21 THE FLOODWALL PROTECTING THE LOWER NINTH WARD.  EXCAVATION HAS
22 BEEN PERFORMED ALMOST TO THE SUREKOTE ROAD.
23     IN THE FOREGROUND ARE CYPRESS TREE STUMPS.  AS WE DISCUSSED
24 EARLIER THIS MORNING, THIS USED TO BE A FRESHWATER CYPRESS TREE
25 SWAMP.  AS YOU STEADY MOVE FROM THE RIVERFRONT TOWARD THE

**2646**

1  LAKEFRONT, THESE AREAS ARE BEING CLEANED.  THE CYPRESS VEGETATION
2  HAS BEEN REMOVED SO THAT THE CYPRESS LOGS ARE BEING USED, AND
3  THESE WERE EXPOSED AS WE WERE PREPARING THIS AREA FOR DREDGING.
4  DREDGING DOESN'T LIKE CYPRESS TREE STUMPS, SO THEY HAVE TO BE
5  IDENTIFIED AND REMOVED SO THAT THE DREDGING CAN PROCEED.
6      IT'S CLEAR INDICATION, BY THIS BURIED SWAMP MARSH
7  ACCUMULATION THAT WE HAVE, IT UNDERLIES THIS ENTIRE AREA.
8  Q.  AS IT RELATES TO YOUR CONCLUSIONS REGARDING THE BLOWOUT
9  HYDRAULIC CONNECTIVITY AND SEEPAGE, WHAT IS THE RELEVANCE OF
10 HAVING THESE KINDS OF MATERIALS PRESENT?
11 A.  WELL, THEY ARE VERY HIGHLY WATER CONDUCTIVE.  IN THE
12 CALIFORNIA DELTA THAT WE HAVE BEEN STUDYING AT THE SAME TIME THAT
13 WE HAVE BEEN WORKING HERE, WE'VE HAD ABOUT TWO BREACHES PER YEAR
14 FOR THE LAST HUNDRED YEARS.  MORE THAN 80 PERCENT OF THOSE
15 BREACHES ARE ASSOCIATED WITH WATER INTRUSION PROPAGATION THROUGH
16 THESE BURIED MARSH SWAMP DEPOSITS.
17 Q.  LET'S LOOK AT ONE MORE PICTURE OF SOME SAND.  DEFENDANT'S
18 EXHIBIT 206, BEA REPORT, APPENDIX C, FIGURE 28.  IS THIS ANOTHER
19 PICTURE OF SAND-FILLED EXCAVATIONS ON THE EAST BANK?
20 A.  INDEED.  AND YOU CAN TELL WE'RE IN THE IMMEDIATE VICINITY OF
21 THE BOLAND MARINE SITE, THE FLORIDA AVENUE BRIDGE.  DISTINCTIVE
22 BLUE TOWERS ARE IN THE BACKGROUND.  THE BULLDOZER IS PUSHING
23 SAND.  THERE IS THAT ANGLE OF REPOSE THAT WE DISCUSSED, AND YOU
24 CAN SEE THE THICKNESS OF THIS SAND, SHELL, SILTY FILL THAT'S
25 BEING PLACED.

**2647**

1  BORING 81A THAT WE DISCUSSED EARLIER CONTAINS MATERIALS THAT
2  ARE CHARACTERISTIC OF THESE KINDS OF FILLS.
3  Q.  AND AS IT RELATES TO YOUR OPINIONS REGARDING BLOWOUT
4  HYDROLOGIC -- HYDRAULIC CONNECTIVITY AND SEEPAGE, WHAT IS THE
5  RELEVANCE OF THE PRESENCE OF SANDY MATERIALS?
6  A.  THIS ALLOWS WATER TO COMMUNICATE RAPIDLY AND EFFICIENTLY
7  WITH THESE UNDERLYING MARSH LAYERS.
8      NOW, THERE IS TWO THINGS THAT ARE IMPORTANT AS WE THINK
9  ABOUT THIS WATER SOIL INTERACTION.  ONE WE HAVE BEEN CALLING
10 SEEPAGE.  SEEPAGE IS WATER TRANSMISSION THROUGH THE SOIL LIKE
11 HEAT TRANSMISSION THROUGH METALS, AND IT FOLLOWS THE VELOCITY OF
12 THE FLOW.  IF THOSE SEEPAGE FLOWS ARE GREAT ENOUGH, YOU CAN
13 DEVELOP WHAT'S CALLED "PIPING".  SOIL IS BEING REMOVED.  THAT
14 PIPING, WHEN IT GETS TO THE SURFACE, EXPRESSES ITSELF AS SAND
15 BOILS.  THESE ARE WELL KNOWN ALONG THE MISSISSIPPI RIVER LEVEES.
16     THE SECOND IMPORTANT EFFECT IS PRESSURE.  AND BECAUSE THE
17 MATERIALS ARE SATURATED AS PRESSURE AT ONE POINT IS DEVELOPED,
18 IT'S RAPIDLY INSTANTANEOUSLY DEVELOPED AT A NEARBY POINT.
19     TWO DIFFERENT EFFECTS.
20 Q.  TWO DIFFERENT EFFECTS.  THE FIRST ONE BEING THE PIPING
21 EFFECT, THE MOVING THROUGH, AND THE SECOND ONE BEING THE
22 IMMEDIATE COMMUNICATION OF PRESSURE.
23 A.  CORRECT.
24 Q.  ALL RIGHT.  WE'RE GOING TO SEE SOME SLIDES NOW ON THAT
25 SECOND EFFECT, WHAT YOU'VE CALLED "HYDRAULIC UPLIFT".

**2648**

1  MAY I HAVE THE NEXT SLIDE, PLEASE.  MAY I HAVE THE NEXT
2  SLIDE, PLEASE.  AND LET ME HAVE THE THIRD SLIDE.
3      DR. BEA, WOULD YOU EXPLAIN FOR THE COURT THE CONCEPT OF
4  TRANSMISSION OF HYDRAULIC PRESSURE.
5  A.  I CHOSE THIS MEANS TO EXPLAIN TO MY WIFE WHAT HYDRAULIC
6  UPLIFT IS.  AND THE ANALOGY THAT I DEVELOPED IS A CAR LIFT IN A
7  GARAGE, AND I'M SHOWING THE CAR AND THE LIFT HERE TO THE RIGHT,
8  AND THE ANALOGY IS TO THE PROTECTED SIDE OF THE FLOODWALL.  SO
9  THIS COULD REPRESENT THE LEVEE, AND ON TOP OF THE LEVEE WOULD BE
10 OTHER THINGS, FOR EXAMPLE, A ROAD OR A STREET OR A STRUCTURE.
11     HERE TO THE LEFT IS REPRESENTING A HYDRAULIC CYLINDER.  THIS
12 WOULD BE AN ANALOGY TO A SAND BACKFILLED EXCAVATION.
13     THE RED ARROW IS INDICATING A FORCE BUT THE ANALOGY WOULD BE
14 PRESSURE FROM THE RISING SURGE LEVEL ON THE EAST BANK INDUSTRIAL
15 SIDE.  A PRESSURE PUSHES DOWN AT A SMALL AREA, IT IS
16 INSTANTANEOUSLY TRANSFERRED THROUGH THE FLUID, THE FLUID BEING
17 WATER, AND SOIL IS VIRTUALLY INCOMPRESSIBLE, HENCE, THE PRESSURE
18 TRANSMISSION.  WHEN IT RISES AND IS ACTING OVER A MUCH LARGER
19 AREA, WE CAN EFFECTIVELY COUNTERACT THE DOWNWARD FORCE CAUSED BY
20 THE WEIGHT OF THE LEVEE, AND THAT IS A DESTABILIZING EFFECT ON
21 THE LEVEE.
22 Q.  THE REASON THAT YOU HAVE A DESTABILIZING EFFECT ON THE LEVEE
23 IS BECAUSE THE LEVEE IS RELYING ON THE WEIGHT OF THE SOIL ON THE
24 PROTECTED SIDE TO PROVIDE STABILITY, RIGHT?
25 A.  THAT'S CORRECT.

**13  (Pages 2645 to 2648)**

2649

1   Q.   AND IF YOU NOW HAVE A FORCE UNDER THAT SOIL THAT IS PRESSING
2   UP ON THAT SOIL AND DEPRIVING IT OF THAT WEIGHT, YOU CAN IMPAIR
3   THE ABILITY OF THAT SOIL TO DO ITS JOB OF HOLDING BACK THE FORCE
4   OF THE RISING WATER; IS THAT FAIR?
5   A.   THAT IS CORRECT.
6   Q.   LET'S PROCEED TO THE NEXT SLIDE.
7       DR. BEA, TELL THE COURT WHAT THIS SLIDE REPRESENTS IN
8   CONNECTION WITH YOUR ANALYSIS OF THE HYDRAULIC UPLIFT PHENOMENA.
9       THIS IS, FOR THE RECORD, DEFENDANT'S EXHIBIT 254 AND THEN ON
10  THE RIGHT SIDE DEFENDANT'S EXHIBIT -- BEA REPORT -- 206, APPENDIX
11  C, FIGURE 72.
12  A.   STARTING WITH THE PHOTOGRAPH HERE TO LEFT, WE'RE POSITIONED
13  ON THE CLAIBORNE BRIDGE LOOKING TOWARD THE FLORIDA AVENUE BRIDGE.
14  IT'S A PHOTOGRAPH THAT WAS TAKEN DURING HURRICANE IVAN, THE YEAR
15  BEFORE HURRICANE KATRINA.  AGAIN, THIS IS PART OF THE FORENSIC
16  ENGINEERING WORK IS TRACING BACK THROUGH HISTORY THINGS THAT
17  INFLUENCED THIS AREA.
18      IT'S REPRESENTATIVE OF THE WATER PRESSURE I REFERRED TO
19  EARLIER THAT COMMUNICATES.  AS SHOWN HERE TO THE RIGHT, THIS IS A
20  FINITE ELEMENT, TWO-DIMENSIONAL MODEL OF THE LEVEE FLOODWALL
21  SYSTEM AT THE LOWER NINTH WARD.  PRESSURE IS BEING COMMUNICATED
22  THROUGH THE MARSH LAYER.  AT THE SAME TIME YOU CAN SEE THE
23  FLOODWALL HAS INCLINED.  A TENSION CRACK HAS BEEN EXTENSIVELY
24  DISCUSSED IN THIS COURT HAS OPENED BEHIND IT.
25      THIS PRESSURE COMES TO THE PROTECTED SIDE, ACTS IN UPLIFT,

2650

1   COUNTERACTING THE GRAVITY FORCES FROM THE SOIL ON THE PROTECTED
2   SIDE AND THEREBY SUBSTANTIALLY REDUCING THE LATERAL STABILITY.
3   Q.   THE THRUST OF THE IVAN PHOTO IS TO SHOW THAT IT HADN'T
4   HAPPENED EARLIER?
5   A.   THAT'S CORRECT.  AND HERE AGAIN WE'RE CHECKING OUR MODELS.
6   Q.   SO THE PHOTO ON THE RIGHT IS THE DEPICTION OF THE UPLIFT
7   PHENOMENON AS IT RELATES TO A LEVEE?
8   A.   THAT'S CORRECT.
9   Q.   LET'S TAKE A LOOK AT ANOTHER PHOTO.  WE'RE LOOKING AT, IN
10  THIS GRAPHIC, THE TOP OF THE GRAPHIC IS DEFENDANT'S EXHIBIT 206,
11  BEA REPORT, APPENDIX 6, FIGURE 86.
12      DR. BEA, TELL THE COURT WHAT THIS PHOTO SHOWS AND HOW IT
13  RELATES TO THE HYDRAULIC UPLIFT PHENOMENON THAT YOU HAVE BEEN
14  DISCUSSING.
15  A.   THIS PHOTO AND EXPERIENCE IS PART OF WHAT TRIGGERED MY
16  DISCUSSION WITH DIEGO COBOS-ROA, THE STUDENT THAT WAS WORKING
17  WITH US ON THE 17TH STREET CANAL.  AFTER WE FINISHED OUR STUDIES
18  OF THE FAILURE OF THE FLOOD PROTECTION SYSTEM HERE IN
19  NEW ORLEANS, WE PROCEEDED IN 2008, IN AUGUST OF THAT YEAR, TO
20  STUDY THE FAILURE OF THE FLOOD PROTECTION SYSTEM FOR MISSOURI,
21  ILLINOIS, AND IOWA.
22      THE PICTURE I'M SHOWING HERE IS IN AN IOWA CORNFIELD LOCATED
23  IMMEDIATELY ADJACENT TO THE MISSISSIPPI RIVER SHOWN TO THE LEFT
24  OF THE PHOTOGRAPH.  THE FARMER DRILLED A WATER WELL INTO A SAND
25  AQUIFER THAT UNDERLIES HIS FIELD.  THAT WATER WAS USED TO WATER

2651

THE FIELD AND HE ALSO HAD CATTLE.
    WE HAVE VERY HIGH WATER IN THE MISSISSIPPI RIVER, AND THIS
PHOTOGRAPH CLEARLY SHOWED THE COMMUNICATION OF THAT HIGH WATER
PRESSURE AND THE ELEVATED WATER IN THE RIVER COMMUNICATING UNDER
THE FIELD AND CAUSING A WATER GEYSER UP UNDER HIS WINDMILL THAT
NORMALLY HAS TO LIFT THE WATER FROM THAT UNDERLYING SAND AQUIFER.
    SO WE'VE GOT A GEYSER THAT'S EXEMPLARY OF THIS PRESSURE
ACTING TO DESTABILIZE THE SOILS ON THE PROTECTED SIDE.
Q.   LET'S SEE THE NEXT PHOTO, PLEASE.  NOW WE'RE LOOKING AT A
PICTURE OF -- WE'VE ADDED DEFENDANT'S EXHIBIT 206, BEA REPORT,
APPENDIX C, FIGURE 87.
    TELL THE COURT WHAT THAT PICTURE SHOWS.
A.   WELL, THAT PICTURE IS TAKEN IN THE SAME AREA, AND I THINK
YOU CAN SEE, IN A SMALL ELEMENT HERE, THAT WINDMILL.  AFTER THIS
FEATURE WAS NOTED AND REPORTED TO US BY A FARMER, THE LEVEE THAT
I WAS REFERRING TO THAT'S KEEPING THE MISSISSIPPI RIVER OUT HAS
NOW BREACHED, AND WATER IS FLOWING INTO THE AREA.
    THIS WAS PARTICULARLY IMPORTANT TO THE U.S. ARMY CORPS OF
ENGINEERS IN THE ST. LOUIS DISTRICT, BECAUSE THEY MOBILIZED THEIR
GEOTECHNICAL ENGINEERS TO BEGIN CONSIDERING THESE HYDRAULIC
UPLIFT EFFECTS.
    THESE UPLIFT EFFECTS ARE NOW INCORPORATED EXPLICITLY IN THE
NEW GUIDELINES FOR THE DESIGN OF LEVEES.
Q.   WE HAVE ONE MORE PICTURE ON HYDRAULIC UPLIFT PHENOMENON.
DEFENDANT'S EXHIBIT 256, BATES-STAMPED LNA 10464.

2652

DR. BEA, TELL THE COURT WHAT IS IN THIS PICTURE AND HOW IT
RELATES TO THE HYDRAULIC UPLIFT PHENOMENON THAT YOU HAVE BEEN
DISCUSSING.
A.   WELL, THE PHOTOGRAPH WAS PROVIDED BY A COLLEAGUE IN THE
NETHERLANDS.  ONE OF THE THINGS I LIKE TO DO, AND I DESCRIBED
THIS EARLIER, IS TALK TO MY COLLEAGUES AND ASK THEM IF THEY HAVE
EXPERIENCES THAT PERTAIN TO THINGS THAT I'M CONCERNED WITH, AND
THEY KNOW THEY HAVE THE FREEDOM TO DO THE SAME WITH ME.  SO WHAT
WE CALL "THE ENGINEERING COCONUT WIRELESS" IS ONE OF OUR PRIMARY
MEANS OF COMMUNICATION.
    SO I CALLED THIS FRIEND IN THE NETHERLANDS, WHO HAD WORKED
WITH ME HERE IN NEW ORLEANS ON THE KATRINA FAILURES, AND SAID,
"HAVE YOU EXPERIENCED SUCH THINGS?"  THE RESPONSE WAS, "YES, BOB,
WE JUST EXPERIENCED ONE SOUTH OF AMSTERDAM."
    THIS IS ONE OF THEIR CANALS.  THIS IS A BOAT THAT WAS IN THE
CANAL AT THE TIME OF HIGH WATER.  THIS VERY DARK SOIL IS THEIR
PEATY, SWAMPY MATERIALS, SO LIKE MANY PARTS OF HIS ARE BLESSED BY
DELTAS, AND THIS PEATY, SWAMPY MATERIAL IS FOUND IN MOST PARTS OF
THIS WORLD.
    THE DUTCH BUILT A DEFENSIVE LEVEE.  THEY HAVE HIGH WATER
PRESSURE IN THE CANAL.  THERE HAS BEEN OBVIOUSLY A LATERAL
INSTABILITY ALONG A SECTOR OF THIS LEVEE.  THEY TOO, NOW, HAVE
COME TO RECOGNIZE THIS HYDRAULIC UPLIFT EFFECT.
    THE COURT:  JUST A MINUTE.  JUST A MINUTE.  I'M SORRY.
MR. KHORRAMI IS STANDING.

## 2653

1  MR. KHORRAMI:  I APOLOGIZE.  AGAIN, I LOOK FOR WHETHER
2  THERE IS GOING TO BE ANYTHING EXCEPT HEARSAY, AND SOMETIMES I
3  WAIT A LITTLE BIT TOO LONG, BUT THIS IS ALL HEARSAY ABOUT PHONE
4  CONVERSATIONS.
5  THE COURT:  I UNDERSTAND, BUT I'M LOOKING AT THE
6  PICTURE.  HE GOT THE PHOTOGRAPH.  THE PHOTOGRAPH DEMONSTRATES,
7  FROM DR. BEA'S OWN OBSERVATION, HYDRAULIC UPLIFT.  SO I ASSUME
8  HIS TESTIMONY IS COMING FROM THE VISUALIZATION OF THE PICTURE AS
9  A DEMONSTRATION OF IT.  TO THAT EXTENT, I'LL ALLOW IT.
10  MR. KHORRAMI:  THANK YOU, YOUR HONOR.
11  THE WITNESS:  CONTINUING, THIS PHOTOGRAPH HAS BEEN SHOWN
12  IN MY PREVIOUS WORK ON THE FAILURES OF THE FLOOD PROTECTION
13  SYSTEM HERE IN NEW ORLEANS.  IT WAS PART OF THE CANAL LITIGATION
14  TESTIMONY DOCUMENTATION AND MRGO DOCUMENTATION, AND I'VE INCLUDED
15  IT IN MY WORK HERE.
16  THE DUTCH HAVE NOW EXPLICITLY INCLUDED THESE HYDRAULIC
17  UPLIFT DESTABILIZING PRESSURE EFFECTS, AND IT HAS ALLOWED THEM
18  NOW TO EXPLAIN BILATERAL INSTABILITY CAUSED BY WATER PRESSURE
19  COMMUNICATION IN THESE WATER PRESSURE CONDUCTIVE MARSH LAYERS.
20  EXAMINATION
21  BY MR. RAFFMAN:
22  Q.  ALL RIGHT.  NOW WE ARE GOING TO MOVE AWAY FROM HYDRAULIC
23  UPLIFT, AND WE'RE GOING TO ACTUALLY WATCH THE WATER RISE IN THE
24  INDUSTRIAL -- OR THE INNER HARBOR NAVIGATION CANAL.  LET'S GO TO
25  THE NEXT SLIDE.

## 2654

1  VERY QUICKLY, DR. BEA, IS THIS A PICTURE OF THE HYDROGRAPH
2  THAT THE LOCKMASTER USED TO MEASURE WATER LEVELS DURING THE
3  EVENT?
4  A.  IT'S THE GAUGE USED BY THE LOCKMASTER TO DETERMINE THE
5  AVERAGE FLOODWATER ELEVATION AS A FUNCTION OF TIME.  THE
6  CLAIBORNE AVENUE BRIDGE IS IN THE BACKGROUND.
7  Q.  LET'S GO TO THE HYDROGRAPH.  DR. BEA, WE'RE LOOKING NOW AT
8  AN INSET, WHICH IS DEFENSE EXHIBIT 141, THE ILIT REPORT,
9  VOLUME I, FIGURE 6.18.
10  DESCRIBE FOR THE COURT WHAT'S SHOWN HERE.
11  I KNOW THE COURT HAS SEEN IT.  WE'LL TRY TO BE SUMMARY IN
12  THE TESTIMONY.
13  A.  I'LL GO AS QUICKLY AS MY BRAIN AND VOICE WILL LET ME.
14  THE HORIZONTAL SCALE IS TIME, CENTRAL DAYLIGHT TIME
15  REFERENCED.
16  THE VERTICAL SCALE IS WATER ELEVATION, AGAIN, REFERENCED TO
17  NAVD88.  A SERIES OF RECORDED WATER ELEVATIONS AT EACH TIME POINT
18  ARE SHOWN HERE.
19  EARLIER IN THIS COURT, THE QUESTION WAS ASKED ABOUT THIS
20  DROP IN WATER LEVEL.  AN EXPLANATION, I'LL CALL IT COHERENT,
21  COULDN'T BE DEVELOPED BUT IS ACTUALLY A GAUGE AT THE I-10
22  OVERPASS ADJACENT TO THE CSX RAILWAY.  THIS IS A POINT AT WHICH
23  THE SANDBAGS BLEW OUT OF THAT TEMPORARILY DEFENDED RAILROAD
24  CROSSING, AND THE SUBSEQUENT RISE IN WATER LEVEL IS ACCOMPANYING
25  THE FLOODING INTO THE ORLEANS METROPOLITAN AREA.

## 2655

1  WATER CONTINUES TO RISE UNTIL WE REACH AT 9:00 A.M. A PEAK
2  SURGE ELEVATION OF 14.2 FEET.
3  Q.  WHEN YOU SAID "MEAN," DO YOU MEAN AN AVERAGE?
4  A.  THAT WAS ANOTHER ENJOYABLE DISCUSSION FOR ME TO HEAR IN THIS
5  COURT, BUT MEAN MEANS AVERAGE.  BUT IT'S THE CENTRAL -- A CENTRAL
6  TENDENCY MEASURE FOR STATISTICAL DISTRIBUTION.  IT IS ALSO
7  ASSOCIATED WITH AN EXPECTED VALUE, AND THERE IS A MODE VALUE AND
8  A MEDIAN VALUE.  THREE DIFFERENT WAYS TO MEASURE WHERE THE CENTER
9  OF THIS DISTRIBUTION IS.
10  THIS IS A MEAN OR AVERAGE WATER ELEVATION.
11  Q.  THANK YOU.
12  AND IT'S -- TO BE CLEAR, IT'S THE STILL WATER LEVEL WITHOUT
13  ACCOUNTING FOR WAVES; IS THAT RIGHT?
14  A.  THAT'S CORRECT.
15  Q.  LET'S GO TO THE NEXT SLIDE.  WE'VE TAKEN AN EXTRACT FROM THE
16  DATA.
17  DR. BEA, WOULD YOU JUST TAKE THE COURT THROUGH THE -- WHAT
18  THE DATA SHOWS WITH REGARD TO LEVELS WHEN THE BREACHES WERE
19  OCCURRING IN YOUR OPINION.
20  A.  WHAT I'VE DONE IN THIS ILLUSTRATION IS TO SHOW THE BARGE AT
21  THE VARIOUS TIMES, REFERENCED 1:00 A.M. ON AUGUST 29TH, SHOWN
22  HERE WITH A WATER ELEVATION OF 7 FEET.  I COLOR IN RED THE WATER
23  ELEVATIONS ACCOMPANYING THE HOURS AT WHICH MY ANALYSES INDICATE
24  THE NORTH AND SOUTH BREACHES WERE OCCURRING.  AND THAT'S BETWEEN
25  4:00 A.M. THAT MORNING, WATER ELEVATION OF 9.2 FEET, BUILDING UP

## 2656

1  TO, AT 8:00 A.M., 13.7 FEET.
2  OUTSIDE OF THAT RED BOX, I SHOWED THE PEAK WATER ELEVATION
3  OF 14.2 FEET AT 10:00 A.M., THE TIME WE THINK THE BARGE ARRIVED
4  AT THIS LOCATION.  THE EXTERNAL MEAN WATER LEVEL IS AT 12.2 FEET.
5  THE JUDGE ASKED WHAT THE INTERIOR WATER LEVEL WOULD BE AT
6  THAT TIME.  THE INFORMATION AVAILABLE INDICATES THAT IT'S BETWEEN
7  10 AND 12 FEET AT THAT TIME, INTERIOR ADJACENT TO THE SOUTH
8  BREACH.
9  Q.  ALL RIGHT.  SO NOW WE'RE GOING TO GO THROUGH THE SEQUENCE OF
10  EVENTS AS YOU'VE DEVELOPED YOUR OPINIONS ABOUT IT.  AND LET'S
11  START WITH THE NEXT SLIDE OF THE TWO BREACHES.
12  A.  SHOWN TO THE LEFT IS THE NORTH BREACH AERIAL PHOTOGRAPH.
13  HERE IS THAT INTERSECTION THAT WE HAVE DISCUSSED PREVIOUSLY.
14  IT'S APPROXIMATELY 180 FEET IN WIDTH.
15  TO THE RIGHT-HAND SIDE, AERIAL PHOTOGRAPH OF THE SOUTH
16  BREACH, APPROXIMATELY 793 FEET IN WIDTH.
17  Q.  AND YOU CAN SEE THE BARGE AT THE VERY BOTTOM OF THE PICTURE
18  OF THE SOUTH BREACH ON THE RIGHT SIDE?
19  A.  THAT'S CORRECT.  THAT'S THE BARGE STICKING OUT AT THAT POINT
20  TOWARD THE BOTTOM OF THE PHOTOGRAPH.
21  Q.  AND THERE IS A FEATURE JUST IMMEDIATELY TO THE LEFT OF THE
22  BARGE THERE.  WHAT IS THAT FEATURE?
23  A.  THAT FEATURE IS A SCHOOL BUS.
24  Q.  ALL RIGHT.  LET'S GO TO THE NEXT SLIDE.  WE'RE AT THE NORTH
25  BREACH.  WE'RE GOING TO GO THROUGH THE SEQUENCE AT THE NORTH

## 2657

1 BREACH. THIS IS DEFENDANT'S EXHIBIT 106, AND THERE IS A NOTE
2 HERE ABOUT SHELL BARS.
3     DR. BEA, WHAT IS THE SIGNIFICANCE OF SHELL BARS AT THE NORTH
4 BREACH?
5 A.   WHEN I SAW THESE SHELL BARS, WHAT I SAID, I THINK I HAVE
6 SEEN THESE BEFORE, AND INDEED WE HAD, BECAUSE A BREACH DEVELOPED
7 AT BAYOU BIENVENUE'S NAVIGATION STRUCTURE ON THE SOUTH SIDE OF
8 THAT NAVIGATION STRUCTURE.  IT WAS QUADRANT WITH SHELL BARS,
9 BOTH DOWNSTREAM OF THE BREACH AND UPSTREAM OF THE BREACH.
10     WE SUBSEQUENTLY TRACED THE SHELL TO FILL THAT HAD BEEN
11 PLACED AT THAT LOCATION, SO THAT WHEN IT BREACHED, THE SHELL WAS
12 EXCAVATED BY THE INFLOWING FLOODWATERS, AND AS THE FLOODWATERS
13 RETREATED OR RECEDED, THE SHELLS WERE ALSO SWEPT FROM THAT
14 FEATURE.
15     WHEN I SAW THE SHELL BARS SHOW UP HERE, I SAID, I THINK
16 WE'VE GOT THE SAME ISSUE.  SHELL IS FREQUENTLY USED UNDER THE
17 ROADS TO LIGHTEN THE FILL, BECAUSE HEAVY THINGS IN THIS PART OF
18 THE WORLD LEAD TO SUBSIDENCE AND SETTLEMENT.  SO THE ENGINEERS DO
19 ALL POSSIBLE TO LIGHTEN THAT WEIGHT, AND SO MY CONCLUSION WAS
20 WE'VE GOT SOME LIGHTWEIGHT SAND SHELL UNDER SUREKOTE ROAD.
21     YOU CAN SEE UP TO THE TOP OF THE PHOTOGRAPH, PUMP STATION
22 NUMBER 5.  WE'VE GOT SOME ELECTRICAL POWER TRANSMISSION LINES
23 THAT PROVIDE AN INTERESTING SET OF BARRIERS, I'LL CALL THEM.  WE
24 HAVE THAT OAK TREE THAT I PREVIOUSLY SIGHTED.  WE HAVE SUREKOTE
25 ROAD.  IT'S, OF COURSE, BEEN PARTIALLY REMOVED BY THE BREACH.

## 2658

1     WE HAVE THAT INSET AREA THAT THE COURT WAS INTERESTED IN,
2 THE INSET AREA WITHOUT THE V.  WE'VE GOT A SHELL, GRAVEL ROAD
3 BEING DEVELOPED BY THE CORPS OF ENGINEERS IN AN ATTEMPT TO GET
4 MATERIAL IN HERE TO TEMPORARILY SEAL THAT BREACH.
5     WE'VE GOT THE TELEPHONE POLE THAT'S BEEN DISCUSSED TOO MUCH.
6 WE'VE GOT AN EXCAVATION DEEP WATER SECTION HERE.  THAT'S ONE THAT
7 DREW MY ATTENTION QUICKLY.
8     WE HAVE WHAT WE THINK IS A REMNANT FEATURE THAT WAS THAT
9 AREA WE SAW IN PHOTOGRAPHS BEING BACKFILLED WITH SAND.  AS WATER
10 IS FLOWING OVER THAT SAND, IT CAN ERODE IT AND REMOVE IT,
11 TRANSPORT IT, BOTH IN AND BOTH OUT OF THE AREA.
12     WE'VE GOT AT THIS POINT THE SOUTH END OF THE SOUTH BREACH.
13 THE WALL HAS BEEN FALLEN OVER.  IT HAS THIS STRANGE REVERSE
14 TWIST.  AND THEN WE COME TO THE NORTH END OF THE NORTH BREACH.
15     THAT SUMMARIZES THE KEY OBSERVATIONS ASSOCIATED WITH THIS
16 PHOTOGRAPH.
17 Q.   ALL RIGHT.  NOW WE'RE GOING TO GO TO THE NEXT SLIDE THEN.
18     DR. BEA, WITH RESPECT TO THE TWO PHOTOGRAPHS THAT WERE SHOWN
19 IN DR. MARINO'S TESTIMONY, PLAINTIFF'S EXHIBIT 397, MARINO REPORT
20 PHOTO 4.7, AND PLAINTIFF'S EXHIBIT 397, MARINO REPORT PHOTO 4.8,
21 DR. BEA, WHEN YOU LOOKED AT THESE PHOTOS, DID YOU SEE ANYTHING
22 THAT SUGGESTED TO YOU THE NATURE OF THE MATERIALS PRESENT IN THE
23 SOIL IN THE AREA OF WHERE THE NORTH BREACH FORMED?
24 A.   YES, I DID.
25 Q.   WOULD YOU TELL THE COURT WHAT YOU SAW FROM THESE TWO PHOTOS.

## 2659

1 A.   IT'S PERHAPS BEST REFERENCED HERE TO THE RIGHT.  WE'VE SEEN
2 THIS PHOTOGRAPH PREVIOUSLY.  WE HAVE PUMP STATION 5 IN THE BACK
3 AND WE'VE GOT THE -- DOOR OPEN ON THE BACK OF THE PUMP STATION
4 THAT MR. VILLAVASSO WAS, AND OTHERS, MAKING OBSERVATIONS.
5     IN THE FOREGROUND, WE'VE GOT THE RUPTURED SHEET PILING AT
6 THE INTERSECTION OF 19 -- POST-1965 FLOODWALL ABUTTING TO THE
7 LATER 1980-PERIOD FLOODWALL.  SHELL ARE SEEN CLEARLY AGAINST THE
8 FACE OF THIS FLOODWALL.
9 Q.   WHAT I WOULD LIKE YOU TO DO IS I WOULD LIKE YOU TO STOP
10 THERE.
11     THIS IS ONE I DO WANT TO CAPTURE.  AND I WOULD LIKE YOU TO
12 PLACE A MARK ON YOUR SCREEN AT THE LOCATION WHERE YOU SEE SHELL
13 AT THE LOCATION OF THE FLOODWALL.
14 A.   (WITNESS COMPLIES.)
15     MR. RAFFMAN:  AND I WILL ASK THAT THIS BE MARKED AND
16 ADMITTED AS EXHIBIT 359.
17     THE COURT:  THANK YOU.
18         EXAMINATION
19 BY MR. RAFFMAN:
20 Q.   NOW, WE'LL GO FORWARD TO A SERIES OF SLIDES THAT WILL HELP
21 YOU PRESENT A -- SOMEWHAT OF A TIME SEQUENCE.
22     THE COURT:  BEFORE YOU LEAVE THE SHELL, LET ME JUST ASK
23 DR. BEA TO EXPLAIN THE SIGNIFICANCE OF THE SHELL IN THAT
24 LOCATION.
25     THE WITNESS:  THE SHELL IS VERY WATER PERMEABLE.  YOU

## 2660

1 CAN FILL A STYROFOAM CUP WITH THAT SHELL.  THE BOTTOM OF THE CUP
2 IS PERFORATED.  YOU POUR WATER IN THE TOP AND IT WOULD INSTANTLY
3 COME OUT AT THE BOTTOM.
4     THE COURT:  AND WHAT IS YOUR OPINION AS TO WHERE THE
5 SHELL WAS PRIOR TO THE NORTH BREACH, IMMEDIATELY PRIOR TO THE
6 NORTH BREACH?
7     THE WITNESS:  IT LOOKS LIKE IT WAS BOTH ADJACENT TO THE
8 FLOODWALL SHEET PILING AND UNDER SUREKOTE ROAD.
9     THE COURT:  ALL RIGHT.  THANK YOU.
10         EXAMINATION
11 BY MR. RAFFMAN:
12 Q.   SO, DR. BEA, WE'RE BACK TO THE EXCAVATIONS, AND I GUESS WHAT
13 I WOULD LIKE YOU TO DO IS TELL THE COURT WHERE YOUR NARRATIVE
14 STARTS.  WHAT'S HAPPENING AROUND MIDNIGHT AS WE TRANSITION FROM
15 THE 28TH OF AUGUST INTO THE 29TH OF AUGUST?
16 A.   WELL, BY THIS TIME, THE SURGE IN THIS AREA IS AT AN
17 ELEVATION OF PLUS 6 FEET.  THAT'S SUFFICIENT WATER TO COVER THIS
18 PORTION OF THE EAST BANK INDUSTRIAL AREA.  SURGE WATER IS ABLE TO
19 ENTER THESE BACKFILLED EXCAVATION AND INITIATE THE HYDRAULIC
20 EFFECTS IN THE BURIED MARSH LAYERS.
21 Q.   SO NOW WE MOVE TO AN HOUR LATER, 1 O'CLOCK IN THE MORNING.
22 WHAT'S HAPPENING AS WE MOVE TO 1 O'CLOCK IN THE MORNING?
23 A.   BY 1 O'CLOCK IN THE MORNING THE SURGE ELEVATION IS AT
24 7 FEET.  THAT PUTS APPROXIMATELY 2 FEET OF WATER ACTING ON THE
25 EXPOSED CONCRETE PORTION OF THE FLOODWALL SHOWN HERE TO THE

## 2661

1    RIGHT.

2        THE FLOODWALL AT THIS TIME CAN OPEN A TENSION CRACK THAT

3    PROPAGATES IMMEDIATELY TO THE TIP AND PERHAPS EVEN BELOW THE TIP

4    OF THE SHEET PILING.  THE PHOTOGRAPHS SHOW RELIC FEATURES AFTER

5    THE STORM HAS PASSED.  HERE TO THE LEFT, GRASS HAS FALLEN INTO

6    THE RETENTION CRACK.

7        HERE TO THE RIGHT, YOU CAN SEE WHERE THE WALL, AND SOME SOIL

8    ATTACHED TO WALL, HAS SEPARATED AND THE WALL IS INCLINED.  THE

9    RELIC CRACK FEATURE IS STILL THERE.

10        MR. RAFFMAN:  FOR THE RECORD, DR. BEA IS INDICATING ON

11    DEFENDANT'S EXHIBIT 145, IPET, VOLUME V, FIGURE 56.

12            EXAMINATION

13    BY MR. RAFFMAN:

14    Q.   MY NEXT QUESTION IS WHY IS A TENSION CRACK SIGNIFICANT WITH

15    RESPECT TO THE STABILITY OR INSTABILITY OF THE WALL?

16    A.   WELL, AS WAS DISCUSSED YESTERDAY IN COURT, THE ORIGINAL

17    DESIGN MODELS HAVE NOT ACCOUNTED FOR A TENSION CRACK, AND SO THE

18    HYDROSTATIC PRESSURES USED BY THE ENGINEER TO DESIGN THIS SYSTEM

19    ONLY EXTENDED TO THE SURFACE OF THE SOIL.

20        THAT WAS A DRAMATIC MISTAKE AND ALSO POINTS OUT THE

21    POTENTIAL PITFALL OF, QUOTE, BELIEVING ANALYTICAL MODELS.  THE

22    OTHER IMPORTANT THING THAT WE WERE CONCERNED WITH AS WE SAW THESE

23    FEATURES WERE THESE SCRATCH MARKS.

24    Q.   LET ME STOP YOU THERE.  I'M GOING TO ASK YOU ABOUT THE

25    SCRATCH MARKS, BUT I WANT TO CLOSE THE LINE ON THE TENSION CRACK.

## 2662

1        WHEN A TENSION CRACK FORMS, THAT ADDS PRESSURE ON THE WALL;

2    IS THAT RIGHT?

3    A.   SUBSTANTIALLY.

4    Q.   BECAUSE NOW INSTEAD OF ONLY ACTING ON THE WALL, THE PORTION

5    OF THE WALL ABOVE THE LEVEE, NOW THIS RISING WATER IN THE CANAL

6    IS ABLE TO EXERT ITS PRESSURE ALL THE WAY DOWN TO THE BOTTOM?

7    A.   THAT'S CORRECT.

8    Q.   SO THIS IS A, IN YOUR OPINION, A SIGNIFICANT EVENT WITH

9    RESPECT TO THE STABILITY OF THE WALL?

10    A.   IT WILL MULTIPLY THE FORCES ACTING ON THE WALL BY A FACTOR

11    OF APPROXIMATELY 37 TIMES.

12    Q.   NOW, THERE HAS BEEN TESTIMONY ABOUT WHETHER A TENSION CRACK

13    WILL FORM OR, IF SO, WHEN.  YOU HAVE A TENSION CRACK FORMING AT

14    ELEVATION OF 7 FEET, PLUS 7 FEET, AND I'D LIKE YOU TO TELL THE

15    COURT WHY YOU'VE CONCLUDED THAT THIS IS AN ELEVATION AT WHICH A

16    TENSION CRACK WOULD FORM.

17    A.   WE'VE OBSERVED THESE TENSION CRACKS IN EXPERIMENTS THAT DATE

18    BACK TO THE 1980S.  WE'VE OBSERVED THEM NOW IN LABORATORY

19    MODELING TESTS.  A WIDE VARIETY OF FULL-SCALE PROTOTYPE

20    INFORMATION LEADS TO THE UNDERSTANDING OF THE TENSION CRACKS.

21        TENSION CRACKS ARE A VERY IMPORTANT THING THAT HAS TO BE

22    ADDRESSED BY GEOTECHNICAL ENGINEERS WHEN THEY DESIGN THINGS LIKE

23    FLOODWALLS, SO THAT IF THE WALL CAN INCLINE, AND ALL WALLS WILL

24    INCLINE WHEN THEY ARE LOADED HORIZONTALLY, THESE CRACKS OPEN UP,

25    WATER INTRUDES.  THOSE ARE SUBSTANTIALLY IMPROVED -- OR INCREASED

## 2663

1    LATERAL FORCES AND PRESSURE FORCES THAT THE ENGINEER HAS TO

2    ACCOMMODATE.

3        THE COURT:  HOW DO YOU ACCOMMODATE A TENSION CRACK IN

4    ORDER TO, SHALL WE SAY, DRAMATICALLY LOWER THE OPPORTUNITY FOR A

5    TENSION CRACK TO DEVELOP?

6        THE WITNESS:  WELL, IN FACT, THE CORPS OF ENGINEERS HAS

7    DONE THAT WIDELY HERE IN THE NEW ORLEANS AREA.  THEY POURED

8    CONCRETE PADS OVER THE TOP, SO EVEN IF THE WALL INCLINES, A CRACK

9    STILL CAN OPEN UP, BUT THE CONCRETE PAD, ONE, PREVENTS THE

10    OVERTOPPING EROSION AND, ALSO, IT HELPS INSULATE YOU FROM WATER

11    PENETRATING INTO THE CRACK.

12        WE FIRST GOT ONTO THIS AT THE NEW ORLEANS LAKEFRONT AIRPORT.

13    THOSE WALLS HAD BEEN SERIOUSLY OVERTOPPED, ERODED, BUT A CRACK

14    OBVIOUSLY HADN'T FORMED, AND IT WAS BECAUSE A RUNWAY ON THE WATER

15    SIDE ABUTTED IMMEDIATELY TO THE WALL, A TENSION CRACK COULDN'T

16    BECOME EFFECTIVE.

17        THE CORPS OF ENGINEERS WAS WITH US ON THAT TRIP AND

18    OBSERVATION.  THAT THEN LED TO THE POURING OF THESE PADS ON THE

19    FLOOD SIDE, PROTECTED SIDE OF FLOODWALLS.

20            EXAMINATION

21    BY MR. RAFFMAN:

22    Q.   WE'RE GOING TO LEAVE TENSION CRACKS.  AND YOU HAD MENTIONED

23    SCRAPES, SO WE'LL TAKE A LITTLE DETOUR ON SCRAPES.

24        YOU SEE SCRAPES ON THE FLOODWALL HERE, RIGHT, DR. BEA?

25    A.   YES.

## 2664

1    Q.   AND IT HAS BEEN SUGGESTED BY LEAST ONE OF THE PLAINTIFFS'

2    EXPERTS, AT LEAST AT SOME POINT DURING THE PROCEEDINGS, THAT THE

3    SCRAPES REPRESENT MARKS LEFT BY THE BARGE.  DO YOU AGREE WITH

4    THAT?

5    A.   THAT WAS WHAT I HEARD.  WE WERE ALSO CONCERNED --

6    Q.   WELL, DO YOU AGREE WITH IT?

7    A.   WOULD YOU REPEAT YOUR --

8    Q.   DO YOU BELIEVE THAT THOSE SCRAPES ARE LEFT BY THE BARGE?

9    A.   NO, I DO NOT BELIEVE THOSE SCRAPES ARE LEFT BY THE BARGE.

10    Q.   LET'S SEE THE NEXT SLIDE.

11        TELL THE COURT WHAT WE'RE SEEING IN THIS SLIDE, WHICH IS

12    PART OF YOUR RELIANCE MATERIALS, AND THE BATES NUMBERS ARE

13    WGI012802A AND WGI010754A.  WHAT ARE WE LOOKING AT HERE?

14    A.   THESE TWO PHOTOGRAPHS ARE MOWING MACHINES WHO ARE MOWING

15    THE SOIL LEVEE GRASS PROTECTION.  THIS IS PART OF MAINTENANCE WORK.

16        AS THESE MOWING MACHINES GET CLOSE TO THE FACE OF THE WALL,

17    AND THEY WANT TO GET AS CLOSE AS THEY CAN TO AVOID HAVING TO USE

18    WEED WHACKING KIND OF MATERIAL TO GET THAT GRASS DOWN, SO WE CAN

19    SEE CLEARLY THE INTERACTION OF MOWING EQUIPMENT WITH THE WALLS.

20        THIS WAS IMPORTANT TO OUR TEAM TO UNDERSTAND EVEN VERY EARLY

21    BECAUSE WE WERE STILL DELIBERATING AND CONCERNED WITH WHERE THE

22    BARGE HAD BEEN, WHAT IT HAD DONE.  THIS IS BACK IN THE

23    INDEPENDENT LEVEE INVESTIGATION TEAM STAGES.  SO EXPLAINING THESE

24    SCRATCHES HAS BEEN AN IMPORTANT PART OF THE FORENSIC ENGINEERING

25    STUDIES.

**2665**

1  Q.   AND WHEN YOU CARRIED OUT YOUR FORENSIC ENGINEERING STUDIES,
2  JUST SO THE RECORD IS CLEAR, WHAT DID YOU CONCLUDE HAD CAUSED
3  THESE SCRATCHES?
4  A.   A MOWING MACHINE AND OTHER MACHINERY THAT HAD COME CLOSE TO
5  THE FACE OF THE WALL.
6  Q.   LET'S, THEN, COME BACK TO TENSION GAPS.  WE HAVE A MODEL,
7  THE MODEL FROM IPET, VOLUME V, APPENDIX FIVE, FIGURE 5.66B.
8       AND I WOULD LIKE YOU TO TAKE THE COURT THROUGH THIS NEXT
9  SERIES OF SLIDES ABOUT WHAT HAPPENS WHEN WATER FORMS AND CREATES
10  A TENSION CRACK.  TELL THE COURT WHAT'S IN THIS SLIDE, PLEASE.
11  A.   WELL, WE'VE GOT SOMETHING I'LL CALL AN "AQUARIUM MODEL."
12  SOIL HAS BEEN PLACED IN THE AQUARIUM.  THIS UNDERLYING SOIL THAT
13  IS A LIGHT TAN COLOR IS CLAY.  MARKERS HAVE BEEN PLACED IN THAT
14  SOIL, AND THAT'S THESE BLACK SQUARES, SO THAT AS THE EXPERIMENT
15  IS CONDUCTED, YOU ARE ABLE TO VISUALLY DETECT MOTIONS,
16  DISPLACEMENTS IN THE SOIL.
17       THE LAYER THAT IS DARK COLORED IS REPRESENTATIVE OF MARSH
18  MATERIALS, SO SOILS HAVE BEEN OBTAINED FROM THE MARSH LAYER
19  RECONSTITUTED IN THIS EXPERIMENT.
20       THE LIGHTER MATERIALS IS -- ARE CLAYS.  THESE ARE KAOLINITE,
21  K-A-O-L-I-N-I-T-E, CLAYS THAT THE MODELING EXPERIMENT HAS
22  EMPLOYED, AGAIN WITH THE BLACK SQUARES BEING MARKERS.
23       THE VERTICAL BLACK ELEMENT REPRESENTS A CONCRETE SHEET PILE
24  SUPPORTED I-WALL.  WATER LEVEL HAS ACHIEVED A MODEL SCALE, A
25  HEIGHT OF TWO FEET ON THE WALL.  AT THIS POINT IN TIME, THE TOTAL

**2666**

1  LATERAL HYDROSTATIC FORCE ACTING ON THE WALL IS 127 POUNDS PER
2  FOOT OF WALL WIDTH.
3  Q.   LET'S SEE WHAT HAPPENS IN THE NEXT SLIDE.  TELL THE COURT
4  WHAT'S HAPPENING IN THIS SLIDE WHICH IS FIGURE 5.66C FROM THE
5  SAME IPET APPENDIX.
6  A.   WELL, AT THAT POINT WE'RE STILL AT THAT SAME WATER LEVEL.
7  THE CRACK HAS OPENED UP.  DISTORTIONS ARE SEEN IN THE SOIL TO THE
8  TIP.  LATERAL FORCES ARE GOING TO IMMEDIATELY GET MUCH LARGER.
9  Q.   LET'S SEE WHAT HAPPENS IN THE NEXT SLIDE, WHICH IS 5.66D.
10  A.   WELL, AT THIS POINT THE WALL HAS OBVIOUSLY ENTERED A FURTHER
11  STAGE OF FAILURE.  THE CRACK IS GETTING WIDER AND PROPAGATING
12  DEEPER.
13  Q.   AND LET'S SEE THE FINAL SLIDE IN SEQUENCE HERE, 5.66E.  TELL
14  THE COURT WHAT WE HAVE IN 5.66E OF IPET, VOLUME V, APPENDIX FIVE.
15  A.   WELL, AT THIS POINT WE NO LONGER HAVE TWO FEET OF WATER
16  ACTING ON THE EXPOSED SECTION OF THE I-WALL.  IT'S NOW 12 FEET.
17  AND THIS IS A MODEL DOWN TO THE TIP OF THE SHEET PILE, 10 FEET
18  BELOW THE TOP OF THE LEVEE.
19       AT THIS POINT IN TIME, THE FORCE HAS INCREASED TO
20  4,572 POUNDS PER FOOT OF WALL WIDTH.  LATERAL FORCE ON THE WALL
21  HAS INCREASED BY A FACTOR OF 36.
22       MY CALCULATIONS, BY THE WAY, HAVE INCLUDED RECOGNIZING
23  SALINITY IN THE WATER.  SALINITY IN THE WATER MAKES IT HEAVIER.
24  SOME OF THE ANALYSES I'VE SEEN PERFORMED CONTINUE TO INSIST THAT
25  IT'S FRESH WATER AT 62.4 POUNDS PER CUBIC FOOT, NOT 63.5 POUNDS

**2667**

PER CUBIC FOOT.
Q.   SO THAT ACCOUNTS FOR THE DIFFERENCE BETWEEN 36 AND 37,
RIGHT, DOCTOR?
A.   INDEED.
Q.   AND DOES THE SEQUENCE OF SLIDES THAT WE'VE JUST SHOWN RELATE
IN ANY WAY TO YOUR OPINIONS ABOUT HOW THE NORTH AND/OR SOUTH
BREACH IS FORMED AT THE INNER HARBOR NAVIGATION CANAL?
A.   YES, THEY DO.
Q.   EXPLAIN TO THE COURT THAT RELATIONSHIP.
A.   WELL, IT'S A DIRECT RELATIONSHIP.  THE BREACHES NORTH AND
SOUTH IN THE LOWER NINTH WARD ARE EXPERIENCING THIS PHENOMENON.
AND IT'S NOT ONLY THOSE BUT MANY OF THE OTHER BREACHES THAT
OCCURRED HERE DURING HURRICANE KATRINA SUFFERED FROM THE SAME
PHENOMENON.  AND AS WAS NOTED YESTERDAY, THE PHENOMENON HAS NOW
BEEN INCLUDED IN THE REVISED GUIDELINES FOR DESIGN OF FLOODWALLS.
Q.   LET'S RETURN, THEN, TO OUR CHRONOLOGY.  WE'RE NOW GOING TO
BE AT 2 O'CLOCK IN THE MORNING ON AUGUST 29TH, SURGE ELEVATION AT
PLUS 7.5 FEET.
     AND, PROFESSOR BEA, TELL THE COURT WHAT IS HAPPENING AT THAT
TIME.
A.   WELL, AT THAT TIME, THERE ARE TWO DIFFERENTIAL MOTIONS
WITHIN THE SOIL.  WATERSTOP JOINTS ARE ABLE TO BE OPENED BETWEEN
THE ADJACENT SECTIONS OF THE FLOODWALL.  THIS IS A PHOTOGRAPH
TAKEN AFTER HURRICANE KATRINA THAT WERE AT THE SOUTH END OF THE
NORTH BREACH.

**2668**

Q.   ALL RIGHT.  FOR THE RECORD, IT'S DEFENDANT'S EXHIBIT 145,
IPET, VOLUME V, FIGURE 56.
A.   WE'RE LOOKING SOUTH TOWARD THE CLAIBORNE BRIDGE SHOWN HERE
IN THE BACKGROUND.  THESE -- THIS WAVY WALL WAS NOT THERE BEFORE,
WITH THE EXCEPTION OF THE TWO KINKS THAT WERE DISCUSSED
PREVIOUSLY DURING THIS TRIAL.
     BUT THE WAVINESS IN THE WALL IS A CLEAR SIGNATURE THAT EVEN
THOUGH THE FORCES ACTING ON THE WALL ARE THE SAME, DUE TO THE
DIFFERENCES IN LOCAL SOIL CONDITIONS, YOU CAN EXPECT TO SEE
DIFFERENTIAL MOVEMENTS.  THOSE DIFFERENTIAL MOVEMENTS CAN OPEN UP
THESE WATERSTOPS.  WATER CAN BE THEN COMING THROUGH THE WALL
VERY, VERY EARLY THAT MORNING.
     SHOWN IN THE BACKGROUND IS A SOIL BORING TRUCK.  THIS IS A
SOIL BORING THAT WAS BEING MOBILIZED BY THE ARMY CORPS OF
ENGINEERS FOLLOWING HURRICANE KATRINA.  AND ON THE PROTECTED
SIDE, THERE ARE REMNANTS OF A TENSION CRACK FEATURE THAT HASN'T
BEEN VARIED BY THE ROAD THAT'S BEING PUT IN HERE TO PUT A
TEMPORARY SEAL ON THE BRIDGE.
Q.   ALL RIGHT.  SO NOW AT 2 O'CLOCK, THE WATERSTOP JOINTS OPEN.
AND THEN WE'LL MOVE UNTIL 3:00.  WHAT IS HAPPENING NOW AT
3 O'CLOCK IN THE MORNING IN THE AREA OF THE NORTH BREACH?
A.   SURGE ELEVATION --
Q.   3 TO 4 O'CLOCK, I SHOULD SAY.  3 TO 4 O'CLOCK, WHAT'S
HAPPENING?
A.   3 TO 4:00 A.M., SURGE ELEVATION IS NOW AT PLUS EIGHT TO PLUS

2669

1  NINE FEET.  THE ILLUSTRATION IS -- THEY HAVE FROM A
2  TWO-DIMENSIONAL FINITE ELEMENT ANALYSIS OF SEEPAGE.  AND IT'S
3  SHOWING FLOW VECTORS THAT ARE THESE BLACK ARROWS SHOWING HOW
4  WATER IS FLOWING THROUGH THE SOILS.
5       THE CONTOURS REPRESENT PRESSURE CONTOURS THAT ACCOMPANY THE
6  FLOW.  THE LIGHT COLORED TO RED COLORED CONTOURS INDICATE VERY,
7  VERY HIGH PRESSURES THAT EXIST AT THE TOE OF THE LEVEE THAT I'M
8  INDICATING WITH MY POINTER AND WITH THE RED ARROWS SHOWN HERE TO
9  THE RIGHT.
10       TO THE LEFT, THERE ARE SIMILARLY VERY, VERY HIGH PRESSURES
11  DEVELOPED AT THAT INTERSECTION OF THE LEVEE MATERIAL WITH THE
12  FLOODWALL.  THE STRONG FLOW VECTORS THAT ARE SHOWN WITH THESE
13  LARGE ARROWS REPRESENT PRESSURES IN WATER FLOW THAT IS
14  ACCOMPANYING THE DEVELOPMENT OF THE TENSION CRACK.
15       FLOW HERE AT THE LOWER PORTION IS THROUGH AN UNDERLYING
16  MARSH LAYER.  THE AREA WHERE NO FLOW IS HAPPENING IS WHERE WE
17  HAVE CLAY COHESIVE MATERIALS.  THIS IS AN OVERLYING MARSH AND AN
18  IN-FILLED AREA OF HIGH PERMEABILITY, SO YOU SEE THE FLOW GOING
19  UNDER THE FILL MATERIAL ON TOP OF IT.
20       THE BOX FEATURE HERE TO THE LEFT IS ONE OF THE SIMULATED
21  EXCAVATIONS USED IN THE ANALYSIS.  BUT THIS TWO-DIMENSIONAL FLOW
22  WORK SHOWS CLEARLY WE HAVE A BLOWOUT, MEANING THE UPWARD
23  PRESSURES AT THIS POINT EQUAL THE DOWNWARD PRESSURES FROM THE
24  SOIL, AND WE THINK WE HAVE A SEEPAGE BLOWOUT IN THE NORTH BREACH
25  PROBABLY NEAR THE NORTH END OF IT BETWEEN 3:00 AND 4:00 A.M.

2670

1       MR. RAFFMAN:  FOR THE RECORD, DR. BEA HAS BEEN
2  DESCRIBING DEFENDANT'S EXHIBIT 207, BEA SUPPLEMENTAL REPORT,
3  FIGURE 12.
4            EXAMINATION
5  BY MR. RAFFMAN:
6  Q.  SO LET'S TO GO THE NEXT SLIDE.  THE NEXT SLIDE IS FIGURE 12
7  AND IT'S SUPERIMPOSED WITH DEFENDANT'S EXHIBIT 258, WHICH SAYS
8  SAND BOIL.
9       TELL THE COURT WHAT IS THE SIGNIFICANCE OF THE SAND BOIL.
10  FIRST, FOR THE BENEFIT OF THE RECORD, THE SAND BOIL THAT'S
11  PICTURED HERE IS FROM WHERE?
12  A.  FROM THE CALIFORNIA SACRAMENTO-SAN JOAQUIN RIVER DELTA.
13  Q.  WHY HAVE YOU USED A PICTURE FROM CALIFORNIA TO DEPICT
14  SOMETHING THAT'S HAPPENING IN THE AREA OF THE NORTH BREACH?
15  A.  BECAUSE WE'VE BEEN CONTINUING OUR WORK SINCE KATRINA IN OUR
16  SACRAMENTO-SAN JOAQUIN DELTA.  THIS PHOTOGRAPH WAS TAKEN DURING A
17  FLOOD FIGHT THAT WAS CONDUCTED TWO YEARS AGO DURING HIGH WATER.
18  A SAND BOIL IS DEVELOPED AT THE INBOARD TOE OF THIS LEVEE.
19  SANDBAGS ARE PILED UP AROUND THE OUTSIDE.
20       THIS IS A TYPICAL FLOOD FIGHTING PROCESS, AND THE SANDBAGS
21  ALLOW WATER TO RISE TO A HIGH LEVEL AT THAT POINT COUNTERACTING
22  THE INCOMING FLOW, SO IT'S A WAY TO STOP THE SAND BOIL FROM
23  LEADING TO A BREACH.
24  Q.  AND THE THRUST OF MY QUESTION, DR. BEA, IS DID YOU FIND THE
25  CONDITIONS IN THIS CALIFORNIA SITUATION TO BE ANALOGOUS TO THOSE

2671

1  YOU WOULD HAVE EXPECTED AT THE LOCATION OF THE NORTH BREACH HAD
2  THE INRUSHING WATER NOT WASHED AWAY ALL THE EVIDENCE THAT MIGHT
3  OTHERWISE HAVE EXISTED?
4  A.  PRECISELY.
5       THE COURT:  AND JUST FOR THE RECORD, I DON'T KNOW IF
6  WE'VE DEFINED WHAT A SEEPAGE BLOWOUT IS PRECISELY.
7            EXAMINATION
8  BY MR. RAFFMAN:
9  Q.  WHY DON'T YOU, FOR THE BENEFIT OF THE COURT AND FOR THE
10  RECORD, MAYBE FOR ME, DEFINE WHAT A SEEPAGE BLOWOUT IS.
11  A.  A SEEPAGE BLOWOUT RESULTS FROM WATER PRESSURE, WATER
12  TRANSMISSION COMING FROM THE FLOOD SIDE TO THE PROTECTED SIDE.
13       ESSENTIALLY WHAT HAPPENS IS THE WATER PRESSURE IS INCREASED
14  TO THE POINT OF WHERE WE BEGIN TRANSMITTING SOIL, ERODING SOIL,
15  FROM UNDER THE LEVEE.  AND MUCH LIKE LAVA COMING OUT OF A
16  VOLCANO, SOIL NOW BEGINS TO BE ERODED AND INJECTED ON THE
17  PROTECTED SIDE.
18       A CANAL, IF YOU WILL, OR A CONDUIT, IS BEING OPENED UNDER
19  THE LEVEE THAT'S CALLED A "PIPE" BY THE GEOTECHNICAL ENGINEER.
20  AS THAT PIPE EXPANDS, THE LEVEE VIRTUALLY COLLAPSES INTO IT.
21       WE HAVE TIME-SEQUENCED PHOTOGRAPHS THAT SHOW THE DEVELOPMENT
22  OF THE BLOWOUT, OF THE EVOLUTION OF THE PIPE AND THE CONSEQUENT
23  COLLAPSE OF THE ENTIRE LEVEE INTO THE PIPE.
24       THE COURT:  DOES THE BLOWOUT MEAN ACTUALLY THAT WATER IS
25  PHYSICALLY COMING THROUGH THE PIPE --

2672

1       THE WITNESS:  YES.
2       THE COURT:  -- INTO THE ATMOSPHERE, SO TO SPEAK?
3       THE WITNESS:  THAT'S RIGHT.  AND AS I HEARD MR. ADAMS
4  TESTIFYING, AND KNOWING WHERE HIS HOME WAS LOCATED RELATIVE TO
5  THIS BREACH, AS I HEARD HIM TALK ABOUT THE LEVEE AT THE NORTH
6  BREACH AND FLOWING WATER UNDERNEATH IT, I THINK HE WAS SEEING
7  WHAT THIS IS TRYING TO TELL US.
8            EXAMINATION
9  BY MR. RAFFMAN:
10  Q.  SO WE MOVE TO THE SEEPAGE BLOWOUT FIGURE THAT'S DEFENDANT'S
11  EXHIBIT 207, BEA SUPPLEMENTAL REPORT, FIGURE 11.
12       WOULD YOU TELL THE COURT WHAT THIS CHART REPRESENTS.
13  A.  THE CHART REPRESENTS -- HORIZONTAL SCALE IS TIME IN HOURS.
14  THE VERTICAL SCALE IS THE VERTICAL HYDRAULIC GRADIENT.  THE
15  HYDRAULIC GRADIENT IS REFLECTING THE RATIO OF THE UPWARD PRESSURE
16  EFFECTS TO THE DOWNWARD PRESSURE EFFECTS.
17       WHEN YOU REACH A VERTICAL HYDRAULIC GRADIENT OF 1.0, THE
18  UPWARD PRESSURE EQUALS EXACTLY THE DOWNWARD PRESSURE, AND THAT
19  WOULD BE THE IDENTIFICATION OF A BLOWOUT.
20       THE BLUE LINE IS WHERE WE STARTED OUR ANALYSIS.  AND THIS IS
21  BACK ON THE 28TH, SO WHAT WE'RE GOING TO DO IS TRACK THE
22  DEVELOPMENT OF THE HYDRAULIC GRADIENT AT THE INBOARD TOE AT THE
23  NORTH BREACH.  PRESSURE DUE TO THE WATER PRESSURE RISING IN THE
24  INDUSTRIAL CANAL IS INCREASING THE FLOW UNDER THE LEVEE.  AND AT
25  5:00 A.M., THERE IS A DRAMATIC SPIKE, AND THAT'S ALSO ABOUT THE

**2673**

1  SAME TIME WE FULLY OPEN A TENSION CRACK IN THE SYSTEM.

2      IT ESCALATES IMMEDIATELY TO 1.0 AND ABOVE, TELLING US

3  CLEARLY WE'VE GOT A BLOWOUT AT THE INBOARD TOE AT THE NORTH

4  BREACH.

5  Q.  ONE OF THE FEATURES OF A BLOWOUT IS THAT THE WEIGHT OF THAT

6  OVERBURDENED SOIL ON THE PROTECTED SIDE HAS NOW BEEN COUNTERACTED

7  BY THE PRESSURE UNDER THE LEVEE, AND SO THAT OVERBURDENED LEVEE

8  MATERIAL HAS LOST ITS ABILITY TO HOLD BACK THE FLOODWATER; IS

9  THAT RIGHT?

10  A.  THAT'S ONE EFFECT.  THE SECOND ONE IS THE FLOW GRADIENTS ARE

11  HIGH ENOUGH TO TRANSPORT OR ERODE THE SOILS FROM UNDER THE LEVEE.

12  Q.  LET'S GO TO THE NEXT SLIDE, PLEASE.

13      NOW, WE'RE LOOKING AT A SLIDE THAT BEARS THE CAPTION

14  DEFENDANT'S EXHIBIT 141, 1LIT, VOLUME I, FIGURE 8.116.  AND IT

15  REFERENCES LONDON CANAL I-WALL.

16      AND I GUESS WHAT I WOULD LIKE YOU TO DO IS TELL THE COURT

17  WHAT'S HAPPENING WITH RESPECT TO THE REMOVAL OF SOILS ON THE

18  PROTECTED SIDE AROUND 3:00 TO 4:00 A.M., AND THEN WHY YOU'VE

19  INCLUDED A LONDON AVENUE SLIDE HERE.

20  A.  WELL, THIS LONDON AVENUE SLIDE IS TAKEN FROM THE SIDE OF THE

21  LONDON AVENUE CANAL THAT DID NOT BREACH BUT WAS AT THE POINT OF

22  INCIPIENT BREACHING.  THE OTHER SIDE OF THE LONDON CANAL DID

23  BREACH.  SO THIS IS THE NORTH BREACH, SO-CALLED "MIRABEAU

24  BREACH".

25      WHEN WE GOT TO THIS LOCATION, WE FOUND THE SOIL SINKHOLES

**2674**

1  THEY'VE OUTLINED HERE IN RED.  THE LONDON CANAL'S APPLICATION TO

2  THE LOWER NINTH WARD, LONDON DOES NOT HAVE -- LONDON CANAL AREA

3  DOES NOT HAVE A MARSH LAYER UNDER IT.  IT HAS A VERY HIGH

4  PERMEABILITY SANDS.  SO, AS WATER ROSE IN THE CANAL, THE SEEPAGE

5  EFFECTS WERE DEVELOPED UNDER THE PROTECTED SIDE, AND THAT'S WHERE

6  THIS PICTURE IS TAKEN.

7      THIS IS AN ACCESS LADDER SO YOU CAN CLIMB TO THE TOP OF THE

8  I-WALL.  THE CRACK HERE IS ONE OF THESE CONSTRUCTION JOINTS,

9  WATERSTOP JOINTS.

10      WATER HAS BEEN FLOWING UNDER THE LEVEE.  A PIPE HAS

11  DEVELOPED UNDER THE LEVEE.  THE SOIL FALLS INTO THAT PIPE, IS

12  EJECTED OUT AT THE TOE OF THE LEVEE, SO THIS SOIL IS BEING MOVED

13  BY THE SEEPAGE COMING UNDER THE LEVEE.  IT'S A SOIL SINKHOLE, AND

14  IT'S A CLEAR INDICATION OF THIS PIPING BLOWOUT EVOLUTION AT THIS

15  LOCATION.

16  Q.  AND THIS IS --

17      THE COURT:  TO MAKE SURE I UNDERSTAND SOMETHING,

18  DR. BEA, THE PERMEABILITY OF THE SOILS AT THE LONDON AVENUE CANAL

19  WHERE IT FAILED, HOW DO THEY COMPARE TO THE PERMEABILITY OF THE

20  SOILS, LET'S SAY, AT THE NORTH BREACH AND/OR THE SOUTH BREACH?

21      THE WITNESS:  THEY ARE SIGNIFICANTLY MORE PERMEABLE.

22  THIS TIME WE CAN FILL OUR BOTTOM PERFORATED STYROFOAM CUP WITH

23  SAND AND I CAN POUR WATER, IT'S GOING TO COME OUT AT THE BOTTOM

24  QUICKLY.  IF I FILL THAT CUP WITH ORGANIC MATERIAL, IT WILL COME

25  OUT LESS QUICKLY.

**2675**

1      THE COURT:  SO THE SOILS WERE MORE PERMEABLE AT

2  LONDON AVENUE?

3      THE WITNESS:  YES, SIR.

4            EXAMINATION

5  BY MR. RAFFMAN:

6  Q.  AND SO BY INCLUDING A LONDON AVENUE, DO YOU BELIEVE THIS IS

7  REPRESENTATIVE OF WHAT WOULD HAVE BEEN OBSERVED AT THE NORTH

8  BREACH, OR DO YOU THINK THAT LONDON AVENUE HAD MORE PIPING AND

9  SEEPAGE?  FOR THE COURT'S BENEFIT, WHY DID YOU INCLUDE A

10  LONDON AVENUE SLIDE TO ILLUSTRATE SEEPAGE AT THE NORTH BREACH?

11  A.  WELL, BECAUSE I COULD CAPTURE THESE FEATURES

12  PHOTOGRAPHICALLY.  BECAUSE THE NORTH BREACH AT THE

13  LOWER NINTH WARD IS BREACHED, YOU CAN'T PHOTOGRAPH SOMETHING THAT

14  HAS BEEN ERADICATED BY THE BREACHING PROCESS, SO I CHOSE THIS

15  JUST FOR THE ILLUSTRATION OF THE SOIL'S PERFORMANCE THAT WE INFER

16  HAPPENED AT THE LOWER NINTH WARD.

17  Q.  ALL RIGHT.  AND, OF COURSE, THE SAND IN THE IMMEDIATE

18  VICINITY OF THE FLOODWALL WAS QUITE PERMEABLE --

19  A.  THAT'S CORRECT.

20  Q.  -- AT THE NORTH BREACH.

21      THAT'S A DIFFERENT, DIFFERENT PLACE.  WE'RE TALKING NOW

22  ABOUT THE LEVEE TOE.

23  A.  CORRECT.

24  Q.  ALL RIGHT.  LET'S GO TO THE NEXT SLIDE.  NOW, WE'RE BETWEEN

25  4 O'CLOCK AND 5 O'CLOCK, AND YOU'VE GOT SURGE ELEVATION AT PLUS

**2676**

1  NINE TO PLUS TEN.

2      AND TELL THE COURT WHAT YOU BELIEVE IS HAPPENING IN THIS

3  SLIDE, SPECIFICALLY WITH REFERENCE TO THE NORTH BREACH.

4  A.  THE BACKGROUND FIGURE IS OUR TWO-DIMENSIONAL ANALYSIS MODEL

5  TO DETERMINE LATERAL STABILITY.  THIS IS THE SECOND FAILURE MODE

6  THAT IS DOMINANT AT THE NORTH BREACH LOCATION.

7      THE VERTICAL BLACK LINE IS INDICATING THE INITIAL POSITION

8  OF THE FLOODWALL.  THE ARROWS THAT ARE SHOWN THERE ARE INDICATIVE

9  OF THE HYDROSTATIC PRESSURES THAT PROPAGATE TO THE TIP OF THE

10  FLOODWALL THAT WE HAVE PREVIOUSLY DISCUSSED.

11      THE WATER LEVEL IS SHOWN IN THE PLUS NINE TO PLUS 10 FOOT

12  ELEVATION, REMEMBERING THE WALL HERE IS APPROXIMATELY 12.5 FEET,

13  SO THIS IS BEFORE SURGE OVERTOPPING.

14      THAT LIGHT GRAY FEATURE SHOWN TO THE LEFT OF THE SLIDE IS

15  ONE OF THE SIMULATED EXCAVATIONS.  WE HAVE CONNECTED TO THE LIGHT

16  TAN AREA THAT'S INDICATIVE OF THE UNDERLYING MARSH MATERIAL.  THE

17  GRAY MATERIAL IS DEEPER INTERDISTRIBUTARY CLAYS.  THE ORANGISH

18  MATERIAL IS LEVEE MATERIAL.

19      THE GREEN FEATURE SHOWN TO THE RIGHT OF THE INCLINED

20  FLOODWALL IS THE FAILURE VOLUME, IF YOU WILL.  SO HERE IS A SLIP

21  SURFACE, LIKE THE BOTTOM OF YOUR SHOE SLIPPING IN CLAY, AND IT'S

22  BEING SHOVED TO THE RIGHT.

23      THE ANALYTICAL RESULTS ARE SUMMARIZED ON THE GRAPH HERE TO

24  THE RIGHT.

25  Q.  FOR THE RECORD, THE GRAFT TO THE RIGHT IS BEA SUPPLEMENTAL

2677

1  REPORT DX 207, FIGURE 15.  THE GRAPHIC THAT YOU HAVE BEEN
2  DESCRIBING UP UNTIL NOW IS DX 206, BEA REPORT, APPENDIX C,
3  FIGURE 50, 5-0.
4      SO BACK TO THE GRADE GRAPHIC, DR. BEA.
5  A.  THANK YOU.
6      THE GRADE GRAPHIC, THE VERTICAL SCALE IS SURGE ELEVATION.
7  SO HOW WE PERFORM THE ANALYSIS IS WE GRADUALLY OR INCREMENTALLY
8  RAISE THE WATER LEVEL ACTING AGAINST THE WALL.
9      THE HORIZONTAL SCALE IS A FACTOR OF SAFETY.  THIS FACTOR OF
10  SAFETY NEEDS TO BE VERY CAREFULLY DEFINED.  IT IS THE RATIO OF
11  THE SOIL SYSTEM RESISTANCE TO THE FORCE THAT IS IMPOSED ON THAT
12  SYSTEM, SO IT IS THE CAPACITY OF THE SYSTEM DIVIDED BY THE DEMAND
13  IMPOSED ON THAT SYSTEM.
14      WHEN A FACTOR OF SAFETY OF ONE, HERE INDICATED WITH THE
15  DASHED LINE, IS ACHIEVED, THAT'S TELLING US THAT THE DRIVING
16  FORCES ARE EQUALING THE RESISTING FORCES.  BUT THE COMMON
17  ASSUMPTION FOR THAT FACTOR OF SAFETY OF ONE IS THAT YOU ARE SAFE.
18  THAT IS AN INCORRECT ASSUMPTION BECAUSE THE PROBABILITY OF
19  FAILURE FOR A FACTOR OF SAFETY OF ONE IS 50 PERCENT.  FOR A
20  FACTOR OF SAFETY OF 1.5 TO TWO AND A HALF AND THREE, THE
21  PROBABILITIES OF FAILING ARE GOING LOWER, BUT THEY ARE NOT ZERO.
22      THE DOTS SHOWN ON THE GRAPH ARE THE VARIATION IN THE FACTOR
23  OF SAFETY.  AS THE WATER LEVEL IS INCREASING IN THE MODEL, IT
24  ACHIEVES A 1.0 LEVEL SOMETIME BETWEEN NINE AND 10 FEET.
25  Q.  ALL RIGHT.  SO THAT'S -- WHEN THE WATER LEVEL IS AT 10 FEET,

2678

1  YOUR STABILITY ANALYSIS GOES WITH A FACTOR OF SAFETY BELOW 1.0?
2  A.  THAT'S CORRECT.
3  Q.  AND THAT STABILITY ANALYSIS IS A DIFFERENT ANALYSIS FROM THE
4  ONE THAT YOU'VE PRESENTED EARLIER WHERE YOU WERE DEALING WITH THE
5  SEEPAGE BELOW?
6  A.  THAT'S CORRECT.  AND THIS ANALYSIS ALSO NOW INCLUDES THE
7  HYDRAULIC UPLIFT EFFECTS THAT WE DESCRIBED EARLIER.
8  Q.  ALL RIGHT.  NOW, LET'S GO TO THE NEXT SLIDE THEN.  WE'RE
9  STILL AT 4:00 A.M. TO 5:00 A.M.  OUR SURGE ELEVATION IS PLUS NINE
10  TO PLUS TEN.  TELL THE COURT WHAT'S HAPPENING IN THIS SLIDE AND
11  IN THE SEQUENCE OF EVENTS AS YOU'VE CONSTRUCTED IT.
12  A.  WELL, THE FIRST, OF COURSE, IMPORTANT EVENT WAS THE BLOWOUT
13  SEEPAGE FAILURE THAT WE HAD FIRST.  SECOND IS LATERAL
14  INSTABILITY, SO THE LEVEE FLOODWALL SYSTEM IS DISPLACING TOWARD
15  THE PROTECTED SIDE.
16      WE THINK THE NEXT STEP IN THE EVOLUTIONARY PROCESS IS TEAR
17  AWAY AT THIS JOINT THAT IS THE INTERSECTION OF THE OLD 1968
18  VINTAGE WALL WITH THE NEWER 1980 VINTAGE WALL.
19  Q.  NOW, WHAT SIGNIFICANCE DOES THIS TEAR AWAY HAVE WITH RESPECT
20  TO THE APPEARANCE OF THE BREACH AFTER THE STORM?
21  A.  WELL, THE ANALYTICAL RESULTS -- AND I'M NOT JUST REFERRING
22  TO THE NUMERICAL ANALYTICAL, BUT, AS WELL, THE OBSERVATIONAL
23  ANALYTICAL -- INDICATES TO US THAT THIS TEAR OR RUPTURE IS A
24  SYMPTOM OF THE BREACH, NOT A CAUSE OF THE BREACH.
25  Q.  MY QUESTION, DR. BEA, IS WHAT RELATIONSHIP DOES THE TEAR

2679

1  HAVE TO THE APPEARANCE OF THE BREACH AND THE APPEARANCE OF THE
2  DAMAGED FLOODWALL AFTER THE STORM?
3  A.  WELL, IT REPRESENTS THE NORTH END TERMINAL POINT OF THE
4  NORTH BREACH.  AND BECAUSE YOU HAD A TEAR AWAY, YOU HAD A SITUATION
5  Q.  RIGHT.  AND BECAUSE YOU HAD A TEAR AWAY, YOU HAD A SITUATION
6  WHERE THE SHEET PILE COULD BE MOVED OUT OF THE SOIL AND FLIPPED
7  IN THE MANNER IT WAS OBSERVED; IS THAT RIGHT?
8  A.  THAT'S CORRECT.
9  Q.  LET'S TAKE A LOOK AT THE NEXT SLIDE.
10      YOU HAVE 5:00 TO 6:00 A.M., SURGE ELEVATION IS PLUS TEN TO
11  PLUS 11.  WHAT IS HAPPENING IN THIS SEQUENCE OF EVENTS?
12  A.  WELL, NOW WATER IS RUSHING INTO THE LOWER NINTH WARD AT THE
13  NORTH BREACH.  WE HAVE SEPARATED THE FLOODWALL FROM THE ADJACENT
14  SECTION, MUCH LIKE A RIBBON IN WIND, WHERE WATER CAN GET UNDER
15  ONE OF THE EDGES AND FLIP IT IN THIS UNIQUE, TWISTED STYLE.
16      AND WE THINK ALL OF THAT HAPPENS AS THE SURGE ELEVATION IS
17  IN THE RANGE OF PLUS TEN TO PLUS 11 FEET.  THE TIME MARKED IS
18  5:00 TO 6:00 A.M.
19  Q.  LET'S GO TO THE NEXT SLIDE.  WHAT DO WE HAVE HERE IN THIS
20  SLIDE, WHICH IS ILIT, DEFENDANT'S EXHIBIT 141, VOLUME I,
21  FIGURE 46?
22  A.  WELL, AS OUTLINED WITH THE DOTTED SECTION OF THE PHOTOGRAPH,
23  THAT'S OUR ORIGINAL POSITION OF THE FLOODWALL.  IT'S AN AERIAL
24  PHOTOGRAPH SHOWING THE FLIPPED, TWISTED FLOODWALL SECTION, SO IT
25  HAS BROKEN LOOSE, SWUNG BACKWARD, OPENING UP THIS BREACH.

2680

1  YOU CAN SEE THE OAK TREE WE PREVIOUSLY DESCRIBED.  THE
2  SUREKOTE ROAD THROUGH-PASS, OVERPASS SHOWN TO THE HIGH SIDE.
3  TRUCKS ARE CONSTRUCTING TEMPORARY REPAIRS.
4      WE'VE GOT A LARGE LOW AREA ERODED OUT AND, IN FACT, LOW
5  BEFORE THIS BREACH HAPPENED.  WE'VE GOT SOME TELEPHONE POLES BOTH
6  INBOARD AND OUTBOARD OF THE BREACH AREA.
7  Q.  ALL RIGHT.  LET'S GO TO THE NEXT SLIDE.
8      THIS IS THE COMPLETED NORTH BREACH.  TELL THE COURT WHAT WE
9  SEE IN THIS SLIDE THAT'S RELEVANT TO YOUR CONCLUSIONS ABOUT WHAT
10  CAUSED THE BREACH.
11  A.  WELL, THE CAMERA IS POSITIONED AT THE SOUTH END OF THE NORTH
12  BREACH.  WE'RE LOOKING TOWARD PUMP STATION NUMBER 5.  THE EXHUMED
13  SHEET PILES ARE SHOWN.  THE INTACT CAP OF THE FLOODWALL IS
14  INDICATED HERE TO THE RIGHT.  THESE CRACKS REPRESENT WHERE THE
15  SHEET PILING HAVE OPENED UP CRACKS INTO THE SHEET PILING BECAUSE
16  THEY ARE MUCH MORE FLEXIBLE THAN THE VERY STIFF CONCRETE.
17      TWO OF MY COLLEAGUES ARE BUSY INSPECTING THE FEATURES.  WE
18  WERE ALSO ABLE TO ACCESS THE TOP OF THE FLOODWALL AS SHOWN WITH
19  MY GREEN POINTER ALL THE WAY OVER TO ITS SEPARATED END.
20  Q.  NOW --
21      THE COURT:  JUST A MINUTE, COUNSEL.  I'M NOT GOING TO GO
22  INTO A LOT OF DETAIL ON THIS BECAUSE I'M SURE IT WILL BE COVERED,
23  BUT AS A PERSON WHO HAS SEEN VIRTUALLY EVERY BREACH IN THE AREA
24  POST-KATRINA, DID YOU -- OTHER THAN -- LEAVING OUT THE IHNC, DID
25  YOU SEE ANY OTHER BREACHES WITH THIS KIND OF EFFECT ON THE SHEET

**2681**

1   PILE WHERE IT WAS DISPLAYED THUSLY?
2       THE WITNESS:  THERE ARE COMPONENTS IN THIS BREACH THAT
3   ARE SIMILAR TO OTHER BREACHES.  AND I'VE BEEN TROUBLING THIS
4   QUESTION, TOO, AND WHAT I'VE COME TO UNDERSTAND IS EVERY ONE OF
5   THE 50 MAJOR BREACHES THAT I PERSONALLY DEALT WITH, EACH OF THOSE
6   BREACHES HAD ITS OWN UNIQUE SIGNATURE.
7       THE COURT:  OKAY, SIR.  AND I'LL LEAVE THAT FOR COUNSEL
8   TO EXPLORE.  GO AHEAD.
9       MR. RAFFMAN:  SURE.  SURE.  LET ME TRY TO FOLLOW UP ON
10  THAT, IF I MIGHT, WHILE WE'RE ON THE SUBJECT.
11      THE COURT:  SURE.
12      MR. RAFFMAN:  DO WE HAVE THE --
13      THE COURT:  BY THE WAY, IF ANYBODY NEEDS A BREAK DURING
14  THIS KIND OF MARATHON, LET ME KNOW.  I'M NOT GOING TO TORTURE
15  YOU.  ANYBODY WHO'S ESSENTIAL TO THE --
16              EXAMINATION
17  BY MR. RAFFMAN:
18  Q.  SO THIS IS A PHOTOGRAPH THAT HAD BEEN SHOWN EARLIER AS AN
19  EXAMPLE OF A BREACH THAT LOOKED DIFFERENT, QUOTE, UNQUOTE.
20      MY QUESTION, DR. BEA, IS THAT IF YOU HAD A SITUATION WHERE
21  THE SOIL IN THE LOCATION OF THIS BREACH, AND FOR THE RECORD IT'S
22  MARINO REPORT, PHOTO 4.59, IN PLAQUEMINES PARISH.
23      IF YOU HAD THE SOIL CONDITIONS EQUIVALENT TO THE
24  INNER HARBOR NAVIGATION CANAL BREACH, AND IF YOU HAD A SITUATION
25  WHERE THE LEVEL OF THE PROTECTED SIDE WERE LOWER THAN THE LEVEL

**2682**

1   OF THE LEVEE, WOULD YOU EXPECT THIS BREACH TO HAVE FORMED IN A
2   SIMILAR EXHUMED WAY TO WHAT YOU SAW AT THE INNER HARBOR
3   NAVIGATION CANAL?
4   A.  WOULD YOU REFORM YOUR QUESTION?
5   Q.  SURE.  I'M ASKING WHETHER IF YOU HAD SIMILAR SOIL
6   CONDITIONS, SUBSOIL CONDITIONS AT THE FLOODWALL, AND IF YOU HAD A
7   SIMILAR DIFFERENTIAL BETWEEN THE TOP OF THE LEVEE AND THE LAND ON
8   THE PROTECTED SIDE, MIGHT YOU THEN EXPECT TO SEE AN EXHUMATION OF
9   SHEET PILES IN A BREACH LIKE THIS ONE?
10      THE COURT:  YES, MR. KHORRAMI.
11      MR. KHORRAMI:  YOUR HONOR, I OBJECT BECAUSE THIS TYPE OF
12  OPINION WAS NOT PART OF THE DOCTOR'S REPORT.  HE HAD THE
13  OPPORTUNITY TO, I THINK, EXAMINE ALL OF THESE BREACHES ALREADY AS
14  HIS REPORT HAS NOTED.
15      MR. RAFFMAN:  I WAS FOLLOWING UP ON YOUR HONOR'S
16  QUESTION.
17      THE COURT:  I UNDERSTAND.  SINCE I ASKED THE QUESTION,
18  I'VE SORT OF OPENED THE DOOR, TO SOME EXTENT, BECAUSE, LET ME SAY
19  THIS, I'M HOPING I'M GOING TO GET SOME KIND OF EXPLANATION
20  EVENTUALLY.
21      MR. RAFFMAN:  I WILL VENTURE FOR YOUR HONOR, THE RECORD
22  ALREADY CONTAINS AN EXPLANATION, AND IT IS AT PAGE 76 OF
23  DR. MOSHER'S DEPOSITION.  DR. MOSHER HAS EXPLAINED THE DIFFERENCE
24  BETWEEN THE CITRUS BACK LEVEE AND THE APPEARANCE OF THAT BREACH
25  AND THE INNER HARBOR NAVIGATION CANAL BREACHES.  AND I AM CONTENT

**2683**

1   TO STAND ON DR. MOSHER'S TESTIMONY.
2       THE COURT:  ALL RIGHT.  LET'S LEAVE IT AT THAT.
3       MR. KHORRAMI:  THANK YOU, YOUR HONOR.
4               EXAMINATION
5   BY MR. RAFFMAN:
6   Q.  ALL RIGHT.  I JUST HAVE A COUPLE MORE QUESTIONS ON THIS
7   SEQUENCE.
8       THE COURT:  VERY GOOD MEMORY, COUNSEL, I MUST SAY.
9       MR. RAFFMAN:  THAT'S WHAT THEY PAY ME TO DO, YOUR HONOR.
10  I HOPE IT'S RIGHT, BUT I THINK IT IS.
11              EXAMINATION
12  BY MR. RAFFMAN:
13  Q.  YOU EXAMINED THIS -- THE FLOODWALL, THE SHEET PILE IN THE
14  ENTIRE AREA OF THIS NORTH BREACH, RIGHT, DR. BEA?
15  A.  THAT'S CORRECT.
16  Q.  DID YOU SEE ANY EVIDENCE THAT A BARGE HAD --
17  A.  I SAW NO EVIDENCE --
18  Q.  LET ME FINISH MY QUESTION.  DID YOU SEE ANY EVIDENCE THAT A
19  BARGE HAD COME INTO CONTACT WITH THAT FLOODWALL?
20  A.  I DID NOT SEE ANY EVIDENCE A BARGE HAD COME IN CONTACT WITH
21  THIS FLOODWALL.
22  Q.  ALL RIGHT.  LET'S TURN TO THE SOUTH BREACH.
23      MR. RAFFMAN:  AND I'M HOPING, YOUR HONOR, THAT WE CAN
24  COMPLETE OUR MARCH THROUGH THE SOUTH BREACH IN THE NEXT
25  30 MINUTES BEFORE LUNCHTIME.  I THINK WE CAN, DR. BEA.

**2684**

1       THE COURT:  GO AHEAD, SIR.
2               EXAMINATION
3   BY MR. RAFFMAN:
4   Q.  THE NEXT SLIDE.
5       SO WE HAVE AN OVERVIEW OF THE SOUTH BREACH.  LET'S GIVE THE
6   COURT A SENSE OF THE LENGTH OF THE BREACH AND WHAT WE SEE HERE
7   VERY, VERY QUICKLY, AND THEN WE'LL MARCH THROUGH THE SEQUENCE.
8   A.  WELL, WE'RE SEEING IN THE BACKGROUND THE CLAIBORNE AVENUE
9   BRIDGE, THE LOCK AND THE LOCKMASTER UP TOWARD THE TOP OF THE
10  PHOTOGRAPH.  THE PHOTOGRAPH IS BEING TAKEN BY LOOKING TOWARD THE
11  SOUTH.
12      AT THIS POINT, WE HAVE THE NORTH END OF THE SOUTH BREACH.
13  AT THIS POINT, WE HAVE THE SOUTH END OF THE SOUTH BREACH.
14      HERE IS THE ING 4727 BARGE, AND YOU CAN SEE THE OUTLINE OF
15  THE REMNANTS OF THE TOP OF THE SOIL LEVEE ON THE EAST BANK
16  INDUSTRIAL AREA SIDE.
17      THERE AN INTERESTING DEEP WATER AREA HERE, ANOTHER
18  INTERESTING DEEP WATER OUTFLOW AREA HERE.  THIS IS AFTER THE PEAK
19  OF THE SURGE, AND WE'VE GOT OUTFLOW HAPPENING IN THE
20  LOWER NINTH WARD.
21  Q.  I'M GOING TO ASK TO HIGHLIGHT THE AREA NEAR THE BARGE.
22      DR. BEA, I'M GOING TO ASK YOU, CAN YOU SEE THE OUTLINE OF
23  THE SUBMERGED SCHOOL BUS IN THIS PHOTO?
24  A.  OH, INDEED I CAN.  THAT WAS A SOURCE OF GREAT JOY.
25  Q.  WELL, WE'LL GET TO THE JOY LATER.

2685

1    FOR THE MOMENT, PROFESSOR BEA, WHAT I WOULD LIKE YOU TO DO
2  IS TO PLACE YOUR FINGER ON THE SCREEN AT THE LOCATION OF THE
3  SUBMERGED SCHOOL BUS.
4  A.  (WITNESS COMPLIES.)
5        THE COURT:  THERE YOU GO, THAT'S RIGHT ON.
6        MR. RAFFMAN:  I WOULD ASK THAT WE CAPTURE THIS AS
7  DEFENDANT'S EXHIBIT 360.
8        THE COURT:  THANK YOU.  WHEN IT'S CAPTURED, I'M SURE IT
9  WILL BE INTRODUCED INTO EVIDENCE, AND IT HAS BEEN AND THE COURT
10  ADMITS IT.
11        MR. RAFFMAN:  YES, YOUR HONOR, I MOVE ITS ADMISSION NOW,
12  IF I -- OR WE'LL MOVE THEM ALL IN LATER.  JUST MAKE SURE WE GET
13  THEM ALL.
14              EXAMINATION
15  BY MR. RAFFMAN:
16  Q.  ALL RIGHT.  AND IN YOUR OPINION, DR. BEA, WHAT'S THE
17  SIGNIFICANCE OF THE SUBMERGED SCHOOL BUS?
18  A.  WELL, I WAS ALWAYS CONCERNED ABOUT HOW THE BARGE COULD GET
19  TO ITS FINAL RESTING POSITION WITH THAT SCHOOL BUS IN THE WAY.
20  IT INDICATED CLEARLY TO ME THAT THE WATER LEVEL INSIDE THE
21  LOWER NINTH WARD WAS VERY DEEP, AND THAT THE BARGE HAD BEEN ABLE
22  TO FLOAT OVER THE TOP OF THAT SCHOOL BUS, HENCE, EXPLAINING HOW
23  IT COULD APPEAR WHERE IT DID RELATIVE TO THE BARGE AFTER THE
24  WATERS HAD RECEDED.
25  Q.  OKAY.  NOW, LET'S THROUGH THE CHRONOLOGY OF THE SOUTH

2686

1  BREACH, AND, AGAIN, WITH A TARGET OF 12:30.
2        THE COURT:  WITH THE UPSHOT OF THAT BEING, THEN, THAT
3  BUTTRESSES YOUR OPINION AS TO WHY THE BARGE CAME IN AT THE TIME
4  YOU SAID IT DID.
5        THE WITNESS:  YES.  THAT WHY IT WAS A SOURCE OF GREAT
6  JOY.
7        THE COURT:  YES, GO AHEAD.
8        MR. RAFFMAN:  THANK YOU, YOUR HONOR.
9              EXAMINATION
10  BY MR. RAFFMAN:
11  Q.  MAY I HAVE SLIDE 63.
12        SO WE'RE BACK TO 12 O'CLOCK MIDNIGHT, AND WE'VE GOT THE
13  SURGE ELEVATION AT PLUS SIX FEET.  AND, DR. BEA, IS THE SURGE
14  ELEVATION AS IT ENTERS FILLING BACKFILLED EXCAVATIONS THAT YOU'VE
15  DESCRIBED EARLIER?
16  A.  YES, IT'S THE SAME SEQUENCE.
17  Q.  NEXT SLIDE, PLEASE.
18        AT 12 O'CLOCK A.M., THESE ARE MORE PICTURES OF THE
19  BACKFILLED ELEVATION/EXCAVATION VIEW OF THE SOUTH BREACH; IS THAT
20  RIGHT?
21  A.  THAT'S CORRECT.
22  Q.  AND WE'RE HAVING THE SAME HYDRAULIC EFFECTS AS WE HAD AT THE
23  NORTH BREACH WITH THE WATER GETTING IN?
24  A.  THAT'S CORRECT.
25  Q.  LET'S TO GO THE NEXT SLIDE.

2687

1    SO NOW WE'RE UP TO 5 O'CLOCK IN THE MORNING.  AND TELL THE
2  COURT WHAT'S HAPPENING AT 5 O'CLOCK IN THE MORNING IN THE AREA OF
3  THE SOUTH BREACH.
4  A.  WELL, THE SURGE ELEVATION HAS REACHED PLUS 10 FEET.  WE'VE
5  DEVELOPED HIGH SEEPAGE GRADIENTS AND HYDRAULIC UPLIFT PRESSURES
6  ON THE PROTECTED SIDE OF THE LEVEE.
7        THE GRAPHIC IS OUR ANALYTICAL RESULTS FROM OUR TWO
8  DIMENSIONAL SEEPAGE ANALYSES.  THE VECTORS SHOW, AS WE'VE
9  DISCUSSED BEFORE, FLOW TAKING PLACE UNDER THE LEVEE, EXITING OUT
10  HERE NEAR JOURDAN ROAD, AND HIGH CONCENTRATION OF THOSE FLOW
11  VECTORS AND PRESSURES ON THE PROTECTED SIDE.
12  Q.  NOW, SO WE HAVE THE SAME KIND OF UPLIFT PRESSURES AT THE
13  SOUTH BREACH THAT WE HAVE AT THE NORTH?
14  A.  YES.
15  Q.  BUT IT'S TAKING LONGER TO DEVELOP?
16  A.  THAT'S CORRECT.
17  Q.  WHY?
18  A.  WELL, BECAUSE THE SOILS ARE LESS PERMEABLE.  SO WE'RE VERY
19  CAREFULLY, OR AS CAREFULLY AS WE CAN, TRACKING THE PERMEABILITY
20  CHARACTERISTICS AS ASSOCIATED WITH THE UNIQUE SOIL
21  CHARACTERISTICS AT THESE TWO DIFFERENT LOCATIONS.
22  Q.  LET'S TO GO THE NEXT SLIDE, PLEASE.
23        THE NEXT SLIDE IS DEFENDANT'S EXHIBIT 206, BEA REPORT,
24  APPENDIX C, FIGURE 55.  TELL THE COURT WHAT'S HAPPENING AS WE GET
25  TO 5 O'CLOCK IN THE MORNING WITH THE SURGE ELEVATION OF PLUS TEN.

2688

1  A.  WE ARE SHOWING ON THIS GRAPH TIME IS A FUNCTION OF THE
2  VERTICAL HYDRAULIC GRADIENTS PREVIOUSLY DEFINED.  THE DIFFERING
3  COLOR POINTS ARE DIFFERENT POSITIONS WITHIN THE SOIL PROFILE.
4        HERE ON THE GREEN ONE IS ONE ASSOCIATED WITH THE WATER FLOW
5  IN REFERENCE TO THE CLAY LAYER.  BY THE TIME WE REACH 5:00 A.M.,
6  WE DON'T HAVE VERTICAL HYDRAULIC GRADIENTS THAT ARE UNITY BUT,
7  RATHER, IN A RANGE OF .5 TO .6.
8        SO, JUST AS YOU STATED, THERE IS NOT AS MUCH INTENSE FLOW AT
9  THIS LOCATION, AND, HENCE, WE DON'T SEE THE POTENTIAL FOR
10  BLOWOUT, PIPING AND EROSION, BUT THE HYDRAULIC PRESSURES ARE
11  STILL THERE.
12  Q.  AND THE HYDRAULIC PRESSURES, ALTHOUGH THEY DON'T GIVE YOU
13  THE BLOWOUT, THEY DO REDUCE TO SOME DEGREE THE EFFECTIVENESS OF
14  THE SOIL OVERBURDEN THAT WOULD OTHERWISE PROVIDE FULL STABILITY
15  FOR THE WALL; IS THAT RIGHT?
16  A.  EXACTLY.
17  Q.  LET'S GO TO 6 O'CLOCK IN THE MORNING AND SEE WHAT'S
18  HAPPENING AT 6 O'CLOCK.
19        HERE YOU HAVE WAVE OVERTOPPING.  AND YOU'VE CREATED A
20  PICTURE -- YOU'VE PROVIDED A PICTURE FROM HURRICANE GUSTAV, WHICH
21  IS DEFENDANT'S EXHIBIT 69.  TELL THE COURT WHY YOU'VE INCLUDED
22  THIS PHOTO AND WHAT YOU THINK IT REPRESENTS ABOUT WAVE
23  OVERTOPPING AS IT'S OCCURRING IN THIS TIME FRAME.
24  A.  I FOUND THIS PHOTOGRAPH TO BE PARTICULARLY INTERESTING.
25  THIS IS A FLOODWALL ON THE WESTERN SIDE OF THE INDUSTRIAL CANAL.

## 2689

1  WE HAVE THE FLORIDA AVENUE BRIDGE TOWER SHOWN IN THE BACKGROUND.

2      THE PICTURE IS TAKEN DURING THE PEAK SURGE OF

3  HURRICANE GUSTAV, WHICH WAS 11 FEET.  THAT WAS DETERMINED AS PART

4  OF THE AMERICAN SOCIETY OF CIVIL ENGINEERS' INVESTIGATION OF THE

5  PERFORMANCE OF THE FLOOD PROTECTION SYSTEM DURING

6  HURRICANE GUSTAV.

7      WE HAVE A FLOODWALL THAT'S AT THE SAME APPROXIMATE ELEVATION

8  AS WE HAD DURING HURRICANE KATRINA, APPROXIMATELY 12.5 FEET, SO

9  WE HAVE A PERFECT PICTURE FOR ME OF THE WAVE-ASSOCIATED SPLASHING

10  THAT IS TAKING PLACE AT THIS FLOODWALL.

11      I WAS PARTICULARLY STRUCK BY THIS DEBRIS, FLOATING DEBRIS.

12  IT WAS SOMETHING POKING THROUGH -- IT LOOKS LIKE IT'S POKING

13  THROUGH, BUT IT'S IMBEDDED OR IMPALED ON THE TOP OF THE

14  FLOODWALL.  SO I'VE SEEN SOMETHING POKING THROUGH THE FLOODWALL

15  THAT WAS REMARKABLE WHEN I LOOKED AT THIS PICTURE.

16  Q.  AND THE THRUST OF YOUR COMMENT IS THAT POTENTIALLY A

17  DIFFERENT KIND OF FLOATING DEBRIS MAY HAVE BEEN TO ACCOUNT FOR

18  WHAT MR. VILLAVASSO MAY HAVE SEEN FROM HIS LOCATION IN THE EARLY

19  MORNING HOURS OF THE 29TH?

20  A.  PRECISELY.

21      ANOTHER THING THAT'S IMPORTANT THAT HAS BEEN CONFUSING FOR

22  THE COURT IS EROSION CAN START AT THIS CONDITION, WHICH MEANS

23  WELL BEFORE THE SURGE HAS REACHED THE TOP OF THE WALL, LARGE

24  AMOUNTS OF WATER ARE COMING OVER THE TOP OF THE WALL THAT LEADS

25  TO EARLY DEVELOPMENT OF EROSION TRENCHES ON THE PROTECTED SIDE.

## 2690

1      THE COURT:  AND JUST FOR THE RECORD, SIR, WHAT WOULD BE

2  THE HEIGHT OF THE FLOODWALL THERE AND THE HEIGHT OF THE WATER?

3      THE WITNESS:  12 AND A HALF FEET FOR THE FLOODWALL,

4  11 FEET FOR THE WATER AT THE TIME THE PHOTOGRAPH'S TAKEN.

5      THE COURT:  AND HOW MANY FEET -- I'M SORRY.

6      THE WITNESS:  12 AND A HALF FEET FOR THE TOP OF THE FLOODWALL

7  AND THE SURGE IS 11.  SO IT'S EXACTLY WHAT WE'RE PROJECTING FOR

8  HURRICANE KATRINA.

9      THE COURT:  AND THE POINT IS THAT THIS LOOKS VERY CLOSE

10  TO OVERTOPPING?

11      THE WITNESS:  (WITNESS NODS HEAD AFFIRMATIVELY.)

12      THE COURT:  I UNDERSTAND.

13      MR. RAFFMAN:  YOU'RE NODDING YOUR HEAD, SO THE RECORD

14  COULD REFLECT IT.

15      THE WITNESS:  I WAS NODDING MY HEAD VERTICALLY, WHICH

16  MEANS YES.

17      MR. RAFFMAN:  THANK YOU.

18          EXAMINATION

19  BY MR. RAFFMAN:

20  Q.  IF THE TOP OF THE FLOODWALL IN THE AREA OF THE SOUTH BREACH

21  HAD BEEN EVEN LOWER THAN 12 AND A HALF FEET, AND I KNOW THAT'S

22  NOT SOMETHING YOU'VE OPINED ON, BUT IF IT HAD BEEN LOWER YOU

23  WOULD HAVE EARLIER EXPERIENCE OF THIS PHENOMENON; ISN'T THAT

24  RIGHT?

25  A.  AND THAT'S CORRECT.

## 2691

1  Q.  ALL RIGHT.  LET'S GO TO THE NEXT SLIDE, PLEASE.

2      WE'RE HERE LOOKING AT A MARRYING OF TWO FIGURES IN YOUR

3  REPORT, DEFENDANT'S EXHIBIT 206, BEA REPORT, APPENDIX C,

4  FIGURE 61, AND DEFENDANT'S EXHIBIT 206, BEA REPORT, FIGURE 18.

5  WOULD YOU PLEASE EXPLAIN FOR THE COURT WHAT'S HAPPENING IN THE

6  AREA OF THE SOUTH BREACH IN THE NEIGHBORHOOD OF 7 O'CLOCK IN THE

7  MORNING ON AUGUST 29TH.

8  A.  WELL, THAT ANSWER CAN BE FOCUSED ON THE DIAGRAM SHOWN HERE

9  TO THE RIGHT.  WE HAVE THE FACTOR OF SAFETY PREVIOUSLY DESCRIBED

10  AS A FUNCTION OF WATER ELEVATION FOR THE CONDITIONS AT THE

11  NORTHERN SECTION OF THE SOUTH BREACH.  WE ACHIEVE A FACTOR OF

12  SAFETY OF ONE OR LESS AT A SURGE ELEVATION OF PLUS 12.  WE

13  CLEARLY HAVE LATERAL INSTABILITY.

14  Q.  SO AT 7 O'CLOCK IN THE MORNING YOU HAVE A FAILURE CONDITION

15  AT THE SOUTH BREACH?

16  A.  THAT'S CORRECT.

17  Q.  AND SO, IF YOU HAD SAID EARLIER AT 8 O'CLOCK, IF THE WORDS

18  8 O'CLOCK IN THE MORNING HAD BEEN USED EARLIER, YOU'RE NOT

19  MEANING TO IMPLY THAT -- IT WAS LATER THAN 7 O'CLOCK WHEN YOU HAD

20  THIS FAILURE CONDITION?

21  A.  THAT'S CORRECT.  BREACHES, AS WE'VE LEARNED HERE, IN MANY

22  CASES TAKE HOURS TO DEVELOP.  IT'S NOT AN INSTANTANEOUS PROCESS.

23  BUT THIS CLEARLY IS THE TIME FRAME IN WHICH WE'VE GOT A HIGH

24  LIKELIHOOD, PROBABILITY OF FAILURE OF 50 PERCENT OR MORE,

25  INDICATING LATERAL INSTABILITY.

## 2692

1  Q.  ALL RIGHT.  LET'S GO TO THE NEXT SLIDE THEN.

2      WE HAVE 7 O'CLOCK A.M., SURGE ELEVATION PLUS 12, AND YOU'VE

3  WRITTEN "BREACH DEVELOPED".  SO TELL THE COURT WHAT YOU'RE TRYING

4  TO CONVEY WITH THIS SLIDE AS IT RELATES TO THE FAILURE OF THE

5  SOUTH BREACH IN THE 7 O'CLOCK TIME FRAME.

6  A.  AS YOU NOTED, THE SURGE ELEVATION IS PLUS 12 FEET.  THE

7  PHOTOGRAPH TAKEN FOLLOWING HURRICANE KATRINA SHOWS THE EXHUMED

8  SHEET PILING, AND EXHUMED BECAUSE OF THE VERY LOW PENETRATION OF

9  THESE SHEET PILING.

10      WE'VE GOT AN EXPANDED OVERTOPPING TRENCH THAT I'VE OUTLINED

11  HERE.  WE HAVE SOME ABANDONED PIPELINES LOCATED RIGHT AT THE

12  CENTER BIG BOW SECTION OF THE NORTHERN PORTION OF THE SOUTH

13  BREACH.  WE'VE GOT A CAPTURE BECAUSE OF LOW FLOW HERE, A

14  DISPLACED LEVEE SECTION, INDICATING LATERAL INSTABILITY.  SO THIS

15  REPRESENTS THE FIRST STAGE IN THE EVOLUTION DEVELOPMENT OF THE

16  SOUTH BREACH.

17  Q.  WHAT IS THE SIGNIFICANCE OF THE YELLOW ARROW THAT YOU'VE

18  DRAWN ON THE GRAPH?  AND THIS, FOR THE RECORD, IS DEFENDANT'S

19  EXHIBIT 206, BEA REPORT, APPENDIX C, FIGURE 64.

20  A.  THIS INDICATES THE CENTER OF THE BEAM, I'LL CALL IT, THAT

21  SPANS BETWEEN THESE TWO EXTREMES OF THIS BOW.  SO THIS REPRESENTS

22  LIKELY THE INITIATION POINT AND MOST HEAVILY LOADED POINT FOR THE

23  DEVELOPMENT OF THIS PORTION OF THE BREACH.

24  Q.  WHAT IS THE SIGNIFICANCE OF THE ABANDONED PIPELINE?  I'M NOT

25  SURE WE CAUGHT IT.

2693

1    A.  WELL, WE THINK THAT'S, AGAIN, PART OF THE DETAIL FEATURES
2    THAT ARE ASSOCIATED WITH THE CAUSATION OF THE BREACH.
3        POORLY BACKFILLED PIPELINES INTERSECTING WITH FLOOD
4    PROTECTION STRUCTURES IS A VERY, I'LL CALL IT, SAD BUT PREVALENT
5    CONDITION WE FOUND NOT ONLY HERE IN THE NEW ORLEANS AREA BUT IN
6    THE BREACHES WE'VE INVESTIGATED IN 2008 AND ASSOCIATED IN THE
7    SAME WAY WITH THE BREACHES OF LEVEES IN THE CALIFORNIA DELTA.
8    Q.  LET'S GO TO THE NEXT SLIDE.
9        YOU HAVE NOW OVERTOPPING EROSION.  AND TELL THE COURT WHAT'S
10   BEING REPRESENTED HERE, 7 O'CLOCK, 8 O'CLOCK.
11   A.  WELL, AT THIS TIME, WE NOW HAD REACHED A SURGE ELEVATION AT
12   WHICH WE CAN GET A STEADY FLOW PLUS THOSE PERIODIC WAVE FLOWS
13   COMING OVER THE TOP OF THE CONCRETE FLOOD PROTECTION STRUCTURE.
14       IN THIS CASE, WE DON'T HAVE A SPLASH PAD ON THE BACK OR
15   PROTECTED SIDE OF THE LEVEE.  THE WATER CAN NOW IMPACT THE SOIL,
16   ERODE THEM.  IT'S EXACERBATED WITH THE FENCE THAT WE DISCUSSED
17   EARLIER THIS WEEK.
18       THE REMOVAL OF THE SOIL ON THE BACK SIDE OF THIS FLOODWALL
19   IS, AGAIN, ACTING TO REDUCE THE RESISTANCE OF THE FLOODWATER.  WE
20   THINK AT ABOUT THIS TIME WE HAVE OVERTOPPING EROSION LATERAL
21   INSTABILITY, AND THAT'S -- THAT WAS PRECEDED BY A GENERAL
22   INSTABILITY I ADDRESSED EARLIER.
23   Q.  AND, AGAIN, IF THE WALL TOP HAS BEEN -- WAS LOWER IN THE
24   CENTER OF THE BREACH, YOU WOULD HAVE THIS CONDITION EARLIER THAN
25   DEPICTED IN YOUR SLIDE, RIGHT?

2694

1    A.  YES.  IN FACT, IN MY EXPERT REPORT, I DETAIL THREE
2    TECHNIQUES WE USED TO CONNECT THE OVERTOPPING WITH THE DEPTH OF
3    THE EROSION TRENCH.
4    Q.  SO LET'S GO TO THE NEXT SLIDE.
5        YOU HAVE A STAGE ONE AND A STAGE TWO.  WOULD YOU EXPLAIN TO
6    THE COURT WHAT YOU'RE CONVEYING WITH STAGE ONE, STAGE TWO AT
7    8 O'CLOCK IN THE MORNING WITH A SURGE ELEVATION NEARING 14 FEET?
8    A.  WELL, WE THINK IT'S AT THIS TIME THAT WE HAVE FULLY OPENED
9    THE BREACH.  SO STAGE ONE WAS WHAT I DESCRIBED PREVIOUSLY.
10   DURING STAGE TWO, WE FOUND THE EROSION TRENCH INTERACTING.  WE
11   JERK THAT SECTION OF THE WALL OUT, AND HERE IS THE TERMINUS AT
12   THE SOUTH END OF THE SOUTH BREACH.
13   Q.  LET'S GO FORWARD, THEN, TO THE BARGE'S ARRIVAL, AS YOU'VE
14   RECONSTRUCTED IT.
15       THE COURT:  JUST ONE QUICK QUESTION, I'M SORRY, COUNSEL.
16       DID YOU OBSERVE THAT THE OVERTOPPING TRENCH IN THE VICINITY
17   OF THE NORTH BREACH WAS THE SAME OR DIFFERENT THAN THE
18   OVERTOPPING TRENCH NEAR THE VICINITY OF THE SOUTH BREACH?
19       THE WITNESS:  IT WAS SHALLOWER.  IT WAS NOT AS INTENSE.
20       THE COURT:  AND YOUR ATTRIBUTION FOR THE CAUSE OF THAT
21   WOULD BE?  WHY WERE THEY DIFFERENT?
22       THE WITNESS:  WELL, THERE ARE SOIL DIFFERENCES, THERE
23   ARE ELEVATION DIFFERENCES, AND THERE ARE WATER ELEVATION
24   DIFFERENCES.
25       THE COURT:  ALL RIGHT.  THANK YOU, SIR.

2695

EXAMINATION

BY MR. RAFFMAN:
Q.  ALL RIGHT.  NEXT SLIDE.
    NOW, WE'RE LOOKING AT DX 206, BEA REPORT, FIGURE 22, PX 397,
MARINO REPORT, PHOTO 4.36.
    AND YOU'VE INCLUDED A SLIDE THAT SAYS 10 O'CLOCK A.M., SURGE
ELEVATION PLUS 12 FEET, ING BARGE ARRIVES, CONTACT SOUTH END TOP
OF COLLAPSED FLOODWALL.
    SO TELL THE COURT WHAT'S HAPPENING AT 10 O'CLOCK IN THE
MORNING.
A.  WELL, WE THINK THIS IS THE TIME AT WHICH THE ING 4727 BARGE
ARRIVES AT THIS LOCATION.  THERE HAS BEEN AMPLE TESTIMONY
PROVIDED TO EXPLAIN THESE REINFORCING BARS SHOWN HERE TO THE LEFT
AND TO THE RIGHT.
    I HAVE OPINED AS TO THE WATER DEPTH INSIDE BEING
APPROXIMATELY 10 TO 12 FEET, WHICH EXPLAINS HOW THE BARGE WITH A
DRAFT OF APPROXIMATELY TWO FEET COULD IMPACT THIS LOCATION OF THE
WALL, CLIPPING IT OFF AND THEN FLOWED INTO THE ALREADY FLOODED
LOWER NINTH WARD.
Q.  NEXT SLIDE.
    SO, AGAIN, WITH REFERENCE TO THE HYDROGRAPH, THE HYDROGRAPH
HELPS YOU TO CONCLUDE THAT THE WATER LEVEL IN THE 10 O'CLOCK TIME
FRAME WAS AT A LEVEL THAT WOULD ALLOW THE BARGE TO COME INTO
CONTACT WITH THE CAP, THEN THE REBAR, AND THEN FLOAT INTO THE
LOWER NINTH WARD; IS THAT RIGHT?

2696

A.  THAT'S CORRECT.  AND FLOAT RIGHT OVER THE TOP OF THE SCHOOL
BUS.
Q.  ALL RIGHT.  LET ME HAVE SLIDE 78, PLEASE.  THERE IS NO 78.
79.
    SO TO CLOSE OUT THE LINE ON THE SOUTH BREACH, DR. BEA, DID
THE BARGE HAVE ANYTHING TO DO WITH CREATING THE SOUTH BREACH?
A.  NO, IT DID NOT.
Q.  AND YOU'VE INCLUDED HERE A NOTE TO -- AN UNUSUAL DEEP SCOUR
HOLE.  WOULD YOU TELL THE COURT WHAT YOU HAVE INDICATED BY THAT.
A.  WELL, THAT'S ONE OF THE FEATURES THAT WE FIND AT THE NORTH
END OF THE SOUTH BREACH AND TOWARD ITS CENTER.  WE THINK THIS IS
ONE OF THOSE BACKFILL EXCAVATION POINTS.
    IT WAS A SURPRISE TO THE CONTRACTORS WHO WERE ATTEMPTING TO
PROVIDE EMERGENCY SEALING OF THE BREACHES.  HE HAD TO WALL OFF
THE BREACH WITH SANDBAGS TO KEEP PEOPLE FROM WALKING OR EQUIPMENT
FROM DRIVING INTO THAT BREACH.
    WE THINK IT AND THE ASSOCIATED PIPELINES THAT BECAME EXPOSED
ARE ONE OF THE CAUSATIVE ELEMENTS FOR THE BREACH OCCURRING AT
THIS LOCATION.
    MR. RAFFMAN:  THANK YOU.
    YOUR HONOR, I'VE COMPLETED THIS LINE ON THE SOUTH BREACH.  I
HAVE MORE TO GO THROUGH REGARDING VALIDATION, REGARDING SOME
DISCUSSION OF COMPARING DR. BEA AND DR. MARINO'S ANALYSIS.
    THE COURT:  ALL RIGHT.  WE WILL TAKE A RECESS UNTIL
APPROXIMATELY 1:30.

25  (Pages 2693 to 2696)

2697

1      MR. RAFFMAN:  THANK YOU, YOUR HONOR.

2          (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, THE COURT

3  WAS IN LUNCHEON RECESS.)

4              *   *   *

5

6

7

8

9          REPORTER'S CERTIFICATE

10

11     I, CATHY PEPPER, CERTIFIED REALTIME REPORTER, REGISTERED

12  MERIT REPORTER, REGISTERED PROFESSIONAL REPORTER, CERTIFIED COURT

13  REPORTER OF THE STATE OF LOUISIANA, OFFICIAL COURT REPORTER FOR

14  THE UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF LOUISIANA,

15  DO HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT

16  TRANSCRIPT, TO THE BEST OF MY ABILITY AND UNDERSTANDING, FROM THE

17  RECORD OF THE PROCEEDINGS IN THE ABOVE-ENTITLED AND NUMBERED

18  MATTER.

19

20

21          S/CATHY PEPPER

22          CATHY PEPPER, CRR, RMR, CCR

23          OFFICIAL COURT REPORTER

24          UNITED STATES DISTRICT COURT

25

2698

                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA


        IN RE:  KATRINA DREDGING      *   Civil Action
        LIMITATION ACTION             *
        CONSOLIDATED LITIGATION       *   No. 05-4182
                                      *
                                      *   Section K(2)
        PERTAINS TO:                  *
        BARGE                         *   New Orleans, Louisiana
                                      *
        MUMFORD, C.A. NO. 05-5724, AS *   July 8, 2010
        TO PLAINTIFFS JOSEPHINE       *
        RICHARDSON AND HOLLIDAY       *   Afternoon Session
        JEWELERS, INC., ONLY          *
        AND                           *
        BENOIT, C.A. NO. 06-7516, AS  *
        TO PLAINTIFFS JOHN ALFORD AND *
        JERRY ALFORD ONLY             *
        * * * * * * * * * * * * * * *

                          DAY TWELVE
                  BENCH TRIAL BEFORE THE
            HONORABLE STANWOOD R. DUVAL, JR.
              UNITED STATES DISTRICT JUDGE


        APPEARANCES:
        For the Plaintiffs:       Best Koeppel
                                  BY:  LAURENCE E. BEST, ESQ.
                                  BY:  PETER S. KOEPPEL, ESQ.
                                  2030 St. Charles Avenue
                                  New Orleans, Louisiana 70130


        For the Plaintiffs:       Law Offices of Brian A. Gilbert
                                  BY:  BRIAN A. GILBERT, ESQ.
                                  2030 St. Charles Avenue
                                  New Orleans, Louisiana  70130


            JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA

**2699**

APPEARANCES:

For the Plaintiffs:   Wiedemann & Wiedemann
BY:  KARL WIEDEMANN, ESQ.
BY:  LAWRENCE WIEDEMANN, ESQ.
821 Baronne Street
New Orleans, Louisiana  70113

For the Plaintiffs:   Patrick J. Sanders, LLC
BY:  PATRICK J. SANDERS, ESQ.
3316 Ridgelake Drive
Suite 100
Metairie, Louisiana  70002

For the Plaintiffs:   Law Office of Richard T. Seymour,
P.L.L.C.
BY:  RICHARD T. SEYMOUR, ESQ.
1150 Connecticut Avenue N.W.
Suite 900
Washington, D.C.  20036-4129

For the Plaintiffs:   Khorrami, Pollard & Abir, LLP
BY:  SHAWN KHORRAMI, ESQ.
444 S. Flower Street
33rd Floor
Los Angeles, California  90071

For the Plaintiffs:   Wilson, Grochow, Druker & Nolet
BY:  LAWRENCE A. WILSON, ESQ.
233 Broadway
5th Floor
New York, New York  10279

For the Defendant:   Chaffe, McCall, L.L.P.
BY:  DEREK A. WALKER, ESQ.
BY:  CHARLES P. BLANCHARD, ESQ.
1100 Poydras Street, Suite 2300
New Orleans, Louisiana 70163

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

---

**2701**

INDEX

Page

ROBERT BEA
  Cross-Examination   2750
LARRY ARNOLD
  Direct Examination   2806
  Cross-Examination   2819
WILLIAM JASON WEISS
  Direct Examination   2828
  Cross-Examination   2839

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

---

**2700**

APPEARANCES:

For the Defendant:   Goodwin Procter, L.L.P.
BY:  JOHN ALDOCK, ESQ.
BY:  MARK RAFFMAN, ESQ.
BY:  ADAM CHUD, ESQ.
BY:  KIRSTEN ROBBINS, ESQ.
BY:  ERIC I. GOLDBERG, ESQ.
901 New York Avenue, NW
Washington, D.C. 20001

For the Defendant:   Sutterfield & Webb
BY:  DANIEL A. WEBB, ESQ.
650 Poydras Street, Suite 2715
New Orleans, Louisiana 70130

For the Defendant:   Lafarge North America, Inc.
BY:  PETER KEELEY, ESQ.
12950 Worldgate Drive
Herndon, Virginia  20170

Official Court Reporter:   Jodi Simcox, RMR, FCRR
500 Poydras Street
Room HB-406
New Orleans, Louisiana 70130
(504) 589-7780

Proceedings recorded by mechanical stenography, transcript produced by computer.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

---

**2702**

13:27    AFTERNOON SESSION
13:27    (July 8, 2010)
13:28    * * * * *
13:35    THE DEPUTY CLERK:  All rise, please.  Court's in
13:35 session.  Please be seated.
13:35    MR. RAFFMAN:  Thank you, Your Honor.
09:20    (WHEREUPON, Robert Bea, having been duly sworn,
09:20 testified as follows.)
13:35 BY MR. RAFFMAN:
13:35    Q.  We're now going to move to the subject of validation of
13:35 your analytical results, and we're looking at -- so we have
13:35 various topics of validation here.  I would like to go to
13:36 slide 81.
13:36    This is Defendant's Exhibit 259.  It's from -- it
13:36 involves the 17 Street Canal breach.  I'd like you to describe
13:36 for the Court what we're seeing in this slide.
13:36    A.  This is a frame from the video taken by Captain Paul
13:36 Helmers of the New Orleans Fire Department.  He and his crew
13:36 were in the lakefront apartments, and a video was taken that
13:36 helps us understand the evolution of the breach and non-breach
13:36 at the 17 Street Canal.
13:37    This video is looking down the 17 Street Canal toward
13:37 the pump station.  The floodwall is here in the upper portion
13:37 of this video frame.  That floodwall is on the Jefferson Parish
13:37 side of 17 Street Canal.  You can tell that this was used, and

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2703

```
13:37   1   this video was part of National Geographic Channel made
13:37   2   following Hurricane Katrina.
13:37   3         The dark element here at the base of the floodwall is
13:37   4   vegetation that grows on the top of the canal side levee.  As
13:37   5   you come across the 17 Street Canal, there's a breach that has
13:37   6   opened up where I'm pointing my green pointer.  But the sheet
13:38   7   piling supporting the concrete floodwall have separated because
13:38   8   there's substantial displacement, and the floodwall has
13:38   9   separated at that point.
13:38  10         Water in the canal is flowing in through the fully --
13:38  11   the breach.  This frame, time frame, is approximately at 8:30
13:38  12   in the morning on August the 29th.  Note that the breach has
13:38  13   fully opened, and the vegetation can still be seen on the canal
13:38  14   side of the floodwall, indicating this breach had developed
13:38  15   long before flood overtopping.
13:38  16         Another important feature in this video are partially
13:39  17   overturned oak trees that were located at the toes of the
13:39  18   levee.  Water has obviously come in over the Bellaire Boulevard
13:39  19   side of the canal.
13:39  20   Q.  So you had a video of the breaching development, and now
13:39  21   we're going to go to the next slide.  This is from, Doctor,
13:39  22   various slides from ILIT and Dr. Bea's own report.
13:39  23         Dr. Bea, how did the video of the 17 Street Canal
13:39  24   breach help you to validate the analytical procedures that you
13:39  25   used to evaluate both the 17 Street Canal breach and the IHNC
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2704

```
13:39   1   breaches?
13:39   2   A.  Well, the video gives us a clear picture of the condition
13:39   3   at the end of the development of the breach.  We know
13:40   4   approximately the time, 8:30 in the morning.  So it's one of
13:40   5   those clues, in essence, the camera doesn't blink.
13:40   6         Now, what we're attempting to do is validate our
13:40   7   analytical model.  It consists of three parts.
13:40   8   Q.  All right.  Let's take the Court through the parts that
13:40   9   you're validating here.
13:40  10   A.  Well, the first part that we're validating is input.
13:40  11   Here, at the top -- and I won't carry the Court through the
13:40  12   details -- are characterizations of the shear strengths that
13:40  13   underlie the breach section of the 17 Street Canal.
13:40  14         As was discussed yesterday, we have a
13:40  15   characterization under the levee.  We have a characterization
13:40  16   outside of the levee toe.  Of particular importance at this
13:41  17   breach was a thin, black clay layer of unusually low shear
13:41  18   strength.  This particular clay-sensitive zone had been missed
13:41  19   in the soil-boring work performed by the Corps of Engineers
13:41  20   before this section of the wall was designed.
13:41  21         But, in any case, we're characterizing shear strength
13:41  22   here shown as SU, but in pounds per square foot.  200 pounds
13:41  23   per square foot would be fairly firm, like a brick that you had
13:41  24   formed, prior to firing that brick or heating it up and forming
13:41  25   it to a solid brick.  1,000 pounds per square foot, you can
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2705

```
13:41   1   stand up on very easily.
13:42   2         What we're seeing is, underneath the crest of the
13:42   3   levee, we've got some high-strength soils, and those are the
13:42   4   placed levee soils.  Lower strength, as we encounter this
13:42   5   lacustrine clay deposit, strengths starts to build up
13:42   6   additionally with depth.
13:42   7         We're using a particular soil characterization --
13:42   8   shear-strength characterization, known as normalized soil
13:42   9   properties, identified also as the SHANSEP process.  This
13:42  10   process is important because it's attempting to compensate for
13:42  11   soil-sampling disturbance and testing effects.  So a particular
13:42  12   technique must be used to determine the soil shear strengths.
13:42  13   This is step one.
13:42  14   Q.  And the method by which you determine the shear strength
13:43  15   of the soils in connection with the 17th Street breach is the
13:43  16   same method you used in your IHNC analyses; is that right?
13:43  17   A.  Correct.
13:43  18   Q.  All right.  So, now, a second stage of the process that
13:43  19   you're validating is what?
13:43  20   A.  Well, this characterizes a lateral stability analytical
13:43  21   model, including a degraded levee on the canal side.  The Corps
13:43  22   of Engineers had off centerline dredged the canal, so you have
13:43  23   to pick up that unique feature.  We've got the floodwall under
13:43  24   steady pressures that are exerted with a tension crack.
13:43  25         We've shown two failure surfaces here:  One is a
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2706

```
13:43   1   circle -- circular arc failure surface.  That is not the one we
13:43   2   used.  Instead, we used one prescribed by the analytical model
13:43   3   to search out the low-strength clay layer shown here in red.
13:44   4   So this characterizes the second part, which is the analytical
13:44   5   processing model.
13:44   6   Q.  And the analytical processing model that you and your team
13:44   7   used at the 17 Street Canal is the same as the one you used for
13:44   8   the IHNC in this case; is that right?
13:44   9   A.  They're identical.
13:44  10         THE COURT:  Dr. Bea, real quickly, just for the
13:44  11   record, if we use NAVD88, what was the depth of the sheet pile
13:44  12   based on?
13:44  13         THE WITNESS:  Minus 17.5 feet.
13:44  14         THE COURT:  That's what I thought.  All right.  Thank
13:44  15   you.
13:44  16         THE WITNESS:  I checked it after you asked, Your
13:44  17   Honor.
13:44  18         THE COURT:  Well, I should certainly know as well
13:44  19   because I think we placed that in another opinion long ago.
13:44  20         Go ahead.
13:44  21         MR. RAFFMAN:  Thank you, Your Honor.
13:44  22   BY MR. RAFFMAN:
13:44  23   Q.  So let's go to the third point here.  What is the third
13:45  24   element of the analysis that you have validated?
13:45  25   A.  This is output.  And the output is factor safety that we
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2707**

1  13:45  discussed earlier this morning.
2  13:45  The vertical scale is the water elevation in
3  13:45  17 Street Canal.  We intersect the 1.0 line at 6 feet of water
4  13:45  in the canal.
5  13:45  By the way, that is the water level that you would
6  13:45  have and still be able to see the vegetation across the canal
7  13:45  on the Jefferson Parish side.
8  13:45  This blue line is prescribing output for that side,
9  13:45  which says we would have failure on the New Orleans Parish side
10  13:45  but not have failure on the Jefferson Parish side.  But it was
11  13:45  damn close.
12  13:45  Q.  All right.  And the output model, basically, it's the same
13  13:45  for the 17th Street as for IHNC as well?
14  13:46  A.  That's correct.  In this characterization, I didn't touch
15  13:46  on permeabilities of the underlying marsh soils that are
16  13:46  virtually identical to those under the Lower Ninth Ward, but we
17  13:46  went through the same process, and that explains the large
18  13:46  number of permeability, if I use the word shown on the inset,
19  13:46  to that factor of safety figure.
20  13:46  Q.  So what happens is you result in -- at the
21  13:46  level of 6 feet, you result in a failure on the Orleans --
22  13:46  A.  Orleans Parish.
23  13:46  Q.  -- on the Orleans Parish side and no failure on the
24  13:46  Jefferson Parish side?
25  13:46  A.  That's correct.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2708**

1  13:46  Q.  And now you go back to the fourth item here, and what do
2  13:46  you find with respect to the water level and the video when
3  13:46  you --
4  13:46  THE COURT:  Just one question beforehand:  The
5  13:46  primary reason for the non-failure on the Jefferson side was?
6  13:47  THE WITNESS:  The soil strength was higher, and the
7  13:47  levee had a cross-section that was 50 percent greater because
8  13:47  we didn't dredge it.
9  13:47  THE COURT:  All right.  Thank you.
10  13:47  BY MR. RAFFMAN:
11  13:47  Q.  So when you compare your analytical model results from the
12  13:47  observed data from the video, what did you find?
13  13:47  A.  Well, this is actually the closure to the analytical
14  13:47  process shown in this inset figure as time versus water
15  13:47  elevation.
16  13:47  These red dots are recorded water levels at the
17  13:47  17 Street Canal pump station that is south of the breach.  It's
18  13:47  showing the increase in water level as surge is entering
19  13:47  through the Rigolets into Lake Pontchartrain and into the
20  13:48  17 Street Canal.  It achieves a maximum water level of
21  13:48  approximately 7 feet all reference to NAVD88.
22  13:48  At 6:00 a.m., there's a sudden drop.  We think that's
23  13:48  the first opening of the breach.
24  13:48  Another very rapid drop, second opening of the
25  13:48  breach.  Here's where our water stop joints are opening up.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2709**

1  13:48  We're removing the soil on the protected side.
2  13:48  There's yet another drop.  We know the water level
3  13:48  in the canal, and that's because the lake and the canal are
4  13:48  forming the backyards of the -- or filling the backyards of the
5  13:48  homes on the Orleans Parish side.
6  13:48  So we can peg pretty closely the water level that
7  13:48  triggered the breach and follow the breach for almost two hours
8  13:49  to its fully developed condition.
9  13:49  Q.  All right.  So when you compare the water levels and the
10  13:49  analysis that you did in your analytical models, and you
11  13:49  compare that up against the videotape showing the development
12  13:49  of the breach, how well did they match?
13  13:49  A.  As well as anything like this can match.  It's called a
14  13:49  "sweet perfect."
15  13:49  Q.  So from that match, you have inferred that your analytical
16  13:49  models, including the model you applied at the Inner Harbor
17  13:49  Navigation Canal, produces results that track with reality; at
18  13:49  least, insofar as the 17th Street could be verified?
19  13:49  A.  That's correct.  What was said earlier, I think, during
20  13:50  the first week of this trial was that, "A theory is just a
21  13:50  theory until it represents reality," and that is exactly what
22  13:50  we're doing.
23  13:50  Q.  Now, we've just gone through the 17 Street Canal, and I'd
24  13:50  like to now turn to slide 93.  Without going through all the
25  13:50  details, and recognizing you may not have had a time-stamped

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2710**

1  13:50  video, did you undertake a similar process at the London Avenue
2  13:50  canal breach to see whether your analytical model matched
3  13:50  observed results?
4  13:50  A.  Indeed, we did.
5  13:50  Q.  What did you find when you undertook that analysis at the
6  13:50  London Avenue canal?
7  13:50  A.  Well, as before, we analyzed both the breach section in
8  13:50  this case on the west side of the London Avenue Canal and the
9  13:50  non-breach side on the east side.  That included
10  13:50  characterization of the cross-section.
11  13:51  In this case we had an overturned oak tree located at
12  13:51  the toe of the levee that had to be modeled.  As we discussed
13  13:51  earlier this morning, there's sand under this location, so we
14  13:51  had to go through the processes of analyzing a seepage failure,
15  13:51  not a lateral instability failure, and that's what's
16  13:51  characterized in this portion of the illustration, including
17  13:51  the rootball hole that was left when the overturned oak tree
18  13:51  uncorked this bottle.
19  13:51  We produced factors of safety on the fail side, on
20  13:51  the unfailed side, and corroborated that with the
21  13:51  characteristics of the unfailed side.  This is a tension crack.
22  13:51  That is a remnant feature from the loading on the canal side.
23  13:51  And earlier this morning, we saw the soil sinkholes on the
24  13:51  protected side of this floodwall.
25  13:52  Q.  So is it fair to say, Dr. Bea, that when you validated

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

4 (Pages 2707 to 2710)

**2711**

1    13:52   your analytical model with respect to the London Avenue Canal,
2    13:52   your model produced a breach where a breach was observed and
3    13:52   your model produced no breach where no breach was observed?
4    13:52   A.   That is correct.
5    13:52   Q.   So that validation gave you additional confidence that
6    13:52   your model, when applied to the Inner Harbor Navigation Canal,
7    13:52   would generate correct results?
8    13:52   A.   That's correct.
9    13:52   Q.   Okay.  Let's go to the next slide.
10   13:52        You had also referenced analytical procedures that
11   13:52   validated from tests that were performed in various locations,
12   13:52   and I'd like you to please go through for the Court an overview
13   13:52   of how your model was validated in field tests.  In summary
14   13:52   fashion.
15   13:52   A.   The photograph in the background is of an experimental
16   13:53   test facility constructed by the United States Army Corps of
17   13:53   Engineers.  They chose the selection along London canal, built
18   13:53   a sheet-pile wall outside of it, and filled the inside of this
19   13:53   coffer dammed area, had extensive instrumentation along the
20   13:53   wall, along the land-protected side.
21   13:53        This is the London safe-water-level experiments that
22   13:53   were performed in 2004.
23   13:53   Q.   And I believe we're looking at Defendant's Exhibit 147,
24   13:53   for the record.
25   13:53   A.   The cover, the final results report, is shown here as

**2712**

1    13:53   DX-147.
2    13:53   Q.   All right.  And so this field test, how did this field
3    13:53   test help to validate your method of analysis in your
4    13:53   conclusion?
5    13:54   A.   It helped validate such things as the formation of the
6    13:54   tension crack, progression of seepage under the floodwall sheet
7    13:54   pile through the levee.  It helped validate other components of
8    13:54   our analytical model.
9    13:54   Q.   And am I right that, in the test results, as soon as you
10   13:54   had 2 feet of water on the wall, what happened?
11   13:54   A.   A crack promulgated a blowout of the bottom of the sheet
12   13:54   piling.  And that was a particularly important thing because
13   13:54   engineers had thought for a while, for incorrect reasons, that
14   13:54   the crack would terminate at the bottom of the sheet pile.  In
15   13:54   this case, it didn't.  It kept going deeper and as is involved
16   13:54   in the mechanics of the soil at this location.
17   13:54   Q.   So this helps you to infer, as the water is rising to
18   13:55   somewhere low on the wall on the morning of the 29th at the
19   13:55   Inner Harbor Navigation Canal, that what would happen?
20   13:55   A.   That the crack would form as soon as it got 2 feet of
21   13:55   surge water acting on the exposed portion of concrete wall.
22   13:55   Q.   And you've referenced USACE 1985 Atchafalaya E-99
23   13:55   Floodwall Tests, which I believe is Defendant's Exhibit 262 or
24   13:55   240, maybe both of them were referenced in the graphic here.
25   13:55        Is that field test similar in helping you to infer

**2713**

1    13:55   that a tension crack forms as rising water goes up the wall?
2    13:55   A.   Oh, very definitely.  This was an extremely important set
3    13:55   of test data that were specifically constructed to give the
4    13:55   United States Army Corps of Engineers insight in how to design
5    13:56   I-walls to help defend this area after we started the Lake
6    13:56   Pontchartrain and vicinity flood-protection work following
7    13:56   Hurricane Betsy in 1965.
8    13:56        Much as was done at London canal, they formed a
9    13:56   sheet-pile test wall against a levee.  This is all located
10   13:56   in the Atchafalaya Basin, approximately 70 miles south of
11   13:56   Morgan City.  So this gave us very early information to the
12   13:56   formation of the tension crack, the loads on the wall, the
13   13:56   displacements of the wall, and helped corroborate our
14   13:56   analytical modeling.
15   13:56   Q.   The last item mentioned in this slide is the Atchafalaya
16   13:57   levee test programs.  Would you tell the Court a little about
17   13:57   the levee tests and how that helped validate your analytical
18   13:57   methods?
19   13:57   A.   Well, I think the Court has already heard this discussion
20   13:57   as well as your earlier one concerning the E-99 floodwall
21   13:57   tests.
22   13:57        In the same area, we built a levee, loaded the levee
23   13:57   so that it would be at the verge of failure.  We used the
24   13:57   measured soil properties and techniques to evaluate soil shear
25   13:57   strength to validate, corroborate, our analytical modeling.

**2714**

1    13:57   Q.   All right.  And what we found as we built the levee, what
2    13:57   happens?
3    13:57   A.   Well, as you build the levee, the weak soils under it are
4    13:57   squeezed out laterally into the adjacent waterway.  So as you
5    13:57   pile it up, it squeezes out, pile it up and squeeze it out.
6    13:58   Q.   Right.
7    13:58   A.   And this became a particularly important insight into what
8    13:58   was happening as the Mississippi River Gulf Outlet expanded
9    13:58   beyond its original width and alignment and encroached to the
10   13:58   toes of the adjacent levees.
11   13:58   Q.   And this helps you understand why a failure might happen
12   13:58   in a weak soil area?
13   13:58   A.   Yes, indeed.
14   13:58   Q.   And I guess for the -- to call it back to mind, was this
15   13:58   the -- one of the origins of the reference in the prior trial
16   13:58   to the Myth of Sisyphus?
17   13:58   A.   Yes.  I, subsequent to that trial, went back home and read
18   13:58   the Myth of Sisyphus.
19   13:58   Q.   Now, before we leave the tension crack question, you heard
20   13:59   testimony from at least one of the experts on the other side to
21   13:59   the effect that a tension crack was created on the wall by an
22   13:59   impact from a barge.  Does that strike you as a plausible
23   13:59   mechanism to create a tension crack in the context of this case
24   13:59   and this wall?
25   13:59   A.   Certainly not, because the draft of water required to

2715

| | | |
|---|---|---|
| 1 | 13:59 | float a barge would have already opened up a tension crack |
| 2 | 13:59 | before you could bring a barge into contact with the floodwall. |
| 3 | 13:59 | Q.  All right.  So we're going to move away from validation to |
| 4 | 13:59 | a set of slides in which we ask to compare the work you did |
| 5 | 13:59 | with that of Dr. Marino.  So let's call to mind, if we could, |
| 6 | 13:59 | differences between your conclusions and Dr. Marino's |
| 7 | 13:59 | conclusions at the north breach. |
| 8 | 13:59 | Why don't we -- you concluded, Dr. Bea, that the |
| 9 | 14:00 | barge was not present at the north breach, and Dr. Marino |
| 10 | 14:00 | concluded that the barge, for lack of a better phrase, "knocked |
| 11 | 14:00 | the wall over"? |
| 12 | 14:00 | A.  Yes. |
| 13 | 14:00 | Q.  You concluded that there was seepage blowout and lateral |
| 14 | 14:00 | instability, and Dr. Marino concluded that neither of those |
| 15 | 14:00 | conditions was present; right? |
| 16 | 14:00 | A.  That's right. |
| 17 | 14:00 | Q.  Let's go to the south breach. |
| 18 | 14:00 | A.  Further -- would you back up? |
| 19 | 14:00 | Q.  Back it up. |
| 20 | 14:00 | A.  -- we concluded that there would be lateral instability of |
| 21 | 14:00 | the floodwall and levee, and Dr. Marino concluded there would |
| 22 | 14:00 | be no lateral instability of the floodwall and levee.  This |
| 23 | 14:00 | exact comparison is what the judge requested earlier in this |
| 24 | 14:00 | trial. |
| 25 | 14:00 | Q.  And so -- because I may have misspoken -- Marino, no |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2717

| | | |
|---|---|---|
| 1 | 14:02 | Am I right that, for the most part, you and |
| 2 | 14:02 | Dr. Marino have used similar soil structure interaction |
| 3 | 14:02 | analytical models? |
| 4 | 14:02 | A.  Yes, that is correct. |
| 5 | 14:02 | Q.  So the differences acted for -- |
| 6 | 14:02 | MR. RAFFMAN:  Next slide, please. |
| 7 | 14:02 | BY MR. RAFFMAN: |
| 8 | 14:02 | Q.  The difference is accounted for by what? |
| 9 | 14:02 | A.  Principally differences in inputs and differences, |
| 10 | 14:02 | consequently, in outputs. |
| 11 | 14:02 | Q.  All right. |
| 12 | 14:02 | A.  And the interpretation of the outputs. |
| 13 | 14:02 | Q.  So, in this case, different outputs into relatively |
| 14 | 14:02 | similar analytical models produce very different results? |
| 15 | 14:02 | A.  That's correct. |
| 16 | 14:02 | Q.  All right.  Now, let's look at some of the different |
| 17 | 14:02 | inputs. |
| 18 | 14:02 | Dr. Bea, what are some of the different inputs -- or |
| 19 | 14:02 | differences in the inputs between you and Dr. Marino? |
| 20 | 14:02 | A.  I would characterize them into two primary categories. |
| 21 | 14:03 | The first category would be demands that I referred to in my |
| 22 | 14:03 | testimony this morning.  Mainly, this applies to loadings.  In |
| 23 | 14:03 | this case a principal important difference regards the |
| 24 | 14:03 | formation of those tension-cap water pressures and subsequent |
| 25 | 14:03 | seepage effects. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2716

| | | |
|---|---|---|
| 1 | 14:00 | significant hydraulic effect, no lateral instability; whereas, |
| 2 | 14:01 | Dr. Bea concludes that we had a seepage blowout -- which is a |
| 3 | 14:01 | hydraulic effect; right? |
| 4 | 14:01 | A.  Right. |
| 5 | 14:01 | Q.  -- and we had a lateral instability as well; right? |
| 6 | 14:01 | A.  Correct. |
| 7 | 14:01 | Q.  All right.  Now we can move to the south breach. |
| 8 | 14:01 | Am I right Dr. Marino has concluded that the barge |
| 9 | 14:01 | pushed the wall over at the north end, in the northern bow, and |
| 10 | 14:01 | that there was a second impact toward the southern end, and |
| 11 | 14:01 | then finally a third impact at the southern end of the breach? |
| 12 | 14:01 | Did you hear him testify to that effect? |
| 13 | 14:01 | A.  Correct. |
| 14 | 14:01 | Q.  Whereas, you have concluded that the barge was drawn into |
| 15 | 14:01 | the south end of the breach well after the breach had already |
| 16 | 14:01 | fully formed? |
| 17 | 14:01 | A.  Correct. |
| 18 | 14:01 | Q.  Dr. Marino found that there was no lateral instability of |
| 19 | 14:01 | the floodwall and the levee; whereas, you, Dr. Bea, have found |
| 20 | 14:01 | that there was lateral instability of the floodwall in the |
| 21 | 14:01 | levee at the north end where the breach initiated; is that |
| 22 | 14:02 | right? |
| 23 | 14:02 | A.  That is right. |
| 24 | 14:02 | Q.  All right.  So now that we have differences in mind, let's |
| 25 | 14:02 | proceed to the next slide. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2718

| | | |
|---|---|---|
| 1 | 14:03 | The second category applies to resistances; in this |
| 2 | 14:03 | case, chiefly, the soil resistances.  There are five major |
| 3 | 14:03 | categories of differences in characterization of capacities. |
| 4 | 14:03 | The first deals with geometry of the soil layers; the |
| 5 | 14:03 | second deals with the soil permeabilities that attach them to |
| 6 | 14:03 | seepage and hydraulic uplift effects; the characterization of |
| 7 | 14:04 | soil shear strengths appropriate for lateral stability; |
| 8 | 14:04 | characterization of the shapes of the soil failure surfaces; |
| 9 | 14:04 | and last, the assessments of uncertainties, and that applies to |
| 10 | 14:04 | natural variabilities and things like soil shear strengths, |
| 11 | 14:04 | permeabilities, and the uncertainties brought to the process |
| 12 | 14:04 | through our analytical models. |
| 13 | 14:04 | Q.  And how am I going to go about ascertaining, if one wants |
| 14 | 14:04 | to test in a scientific way, whether your inputs were correct |
| 15 | 14:04 | or whether Dr. Marino's inputs were correct? |
| 16 | 14:04 | A.  Well, it's a function of the validation calibration phase, |
| 17 | 14:04 | and it is your ability to replicate, using an analytical |
| 18 | 14:04 | process, what has actually been measured. |
| 19 | 14:04 | Q.  So to take an example of the difference that we'll look at |
| 20 | 14:04 | in greater detail, Dr. Marino, on the one hand, has used |
| 21 | 14:05 | averaged soil properties.  You're aware of that; right? |
| 22 | 14:05 | A.  Yes. |
| 23 | 14:05 | Q.  And you, on the other hand, have used normalized soil |
| 24 | 14:05 | properties; is that right? |
| 25 | 14:05 | A.  Yes. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

6 (Pages 2715 to 2718)

2719

| | |
|---|---|
| 14:05 | Q.  And so in order to -- |
| 14:05 | THE COURT:  Explain real briefly what the difference |
| 14:05 | is -- I know you've done it, but just as incisively as possible |
| 14:05 | to a lay person -- the difference between normalized and |
| 14:05 | averaged. |
| 14:05 | THE WITNESS:  Normalized soil properties uses |
| 14:05 | pressure in the soil as the primary element to determine |
| 14:05 | strength.  The reasoning and test database justification is |
| 14:05 | higher pressures result in more consolidation of the soil; |
| 14:05 | higher consolidation, lower water content, results in higher |
| 14:05 | strength.  So a system has been put together to link those |
| 14:05 | steps. |
| 14:05 | In the other approach, different ways of |
| 14:05 | measuring soil shear strengths are used, and these differing |
| 14:06 | ways result in very differing soil shear strengths because the |
| 14:06 | stresses in the soil developed by the differing testing |
| 14:06 | techniques produced different results. |
| 14:06 | So it's two differing ways to go about |
| 14:06 | characterizing soil shear strength, and you'd say which one is |
| 14:06 | right and the answer is the one that best replicates |
| 14:06 | experimental test data. |
| 14:06 | THE COURT:  Thank you. |
| 14:06 | BY MR. RAFFMAN: |
| 14:06 | Q.  And now we're going to go through some experimental test |
| 14:06 | data that compares the normalized shear strength -- the |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2720

| | |
|---|---|
| 14:06 | normalized method versus the averaged method, and we'll see one |
| 14:06 | of those two produces better results when test data is |
| 14:06 | considered. |
| 14:06 | Let's go to the next slide.  We're back at the London |
| 14:06 | Avenue site-specific test.  Tell the Court what is this test |
| 14:06 | and how its results relate to the question of soil properties. |
| 14:07 | A.  Well, I want to be sure and ensure the Court that we'll |
| 14:07 | get to this comparison of the two different ways to get at |
| 14:07 | shear strength. |
| 14:07 | Q.  All right. |
| 14:07 | A.  But this diagram, or illustration, will focus primarily on |
| 14:07 | the formation of the tension crack -- |
| 14:07 | Q.  Right. |
| 14:07 | A.  -- and so we'll be stepping toward answering that |
| 14:07 | question. |
| 14:07 | Q.  All right.  So let me then -- let's move to the test that |
| 14:07 | deals with the shear strength and then come back to tension |
| 14:07 | cracks.  All right? |
| 14:07 | A.  All right. |
| 14:07 | Q.  I believe we want the Atchafalaya test; is that right, |
| 14:07 | Dr. Bea? |
| 14:07 | A.  You want the one that shows shear strength versus depth, |
| 14:07 | but there's something on the graph that looks like you shot it |
| 14:07 | with a scatter shotgun, and the one on the right is a |
| 14:07 | normalized soil properties approach. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2721

| | |
|---|---|
| 14:07 | MR. RAFFMAN:  If you would scroll through to... |
| 14:08 | BY MR. RAFFMAN: |
| 14:08 | Q.  That's the one you're looking for? |
| 14:08 | A.  Yes. |
| 14:08 | Q.  All right.  So I'm a little out of order here, but we're |
| 14:08 | right in the zone of averaged versus normalized. |
| 14:08 | Dr. Bea, explain how the analytical data show that |
| 14:08 | normalized is correct and averaged is not correct. |
| 14:08 | A.  Well, I'm showing here to the left the technique that was |
| 14:08 | used by Dr. Marino to determine soil shear strengths.  That |
| 14:08 | approach was discussed, described extensively, by Dr. Marino. |
| 14:08 | It was also addressed yesterday by Dr. Bakeer. |
| 14:09 | Essentially, differing kinds of tests are performed. |
| 14:09 | They're identified with different symbols shown here by |
| 14:09 | unconfined compression, undrained consolidated triaxial test. |
| 14:09 | A wide variety of different kinds of tests. |
| 14:09 | Dr. Marino takes some from a variety of locations he |
| 14:09 | thinks are appropriate to modeling a particular breach, then he |
| 14:09 | averages test information using tests that are known in the |
| 14:09 | profession to produce high shear strengths.  He takes other |
| 14:09 | tests that are known in the profession to produce low shear |
| 14:09 | strengths for the same kinds of soils and strikes an averaged |
| 14:09 | line through it and, thereby, characterizes the soil shear |
| 14:09 | strength. |
| 14:10 | To the right is showing the approach that I and we |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2722

| | |
|---|---|
| 14:10 | used, as we had all of the work here in New Orleans following |
| 14:10 | Hurricane Katrina.  That's the normalized soil properties |
| 14:10 | approach.  Specific types of tests are used to determine the |
| 14:10 | soil-consolidation pressures that's connected to specific kinds |
| 14:10 | of soil shear strength -- in this case, direct simple shear -- |
| 14:10 | to appropriately model the shearing between two layers of soil. |
| 14:10 | But we've also shown correlations with the in-situ |
| 14:10 | cone penetrometer test to give us insight into soil layering |
| 14:10 | and the 12 shear strengths.  So we achieve much less scatter, |
| 14:10 | are able to achieve much more consistent results. |
| 14:10 | Now, there is an additional point that needs to be |
| 14:10 | made because it was testified to this Court that the shear |
| 14:11 | strengths are not very much different.  And that's true in some |
| 14:11 | locations, but how the engineer gets an answer is just as |
| 14:11 | important as the answer.  An illustration could be:  Well, if I |
| 14:11 | had only these low shear-strength kinds of things to use, I |
| 14:11 | would inject a bias. |
| 14:11 | Another thing that shows up in the process called "weak |
| 14:11 | links."  And soils tend to fail at the weak links, as |
| 14:11 | Dr. Bakeer eloquently testified to yesterday.  So an averaging |
| 14:11 | process tends to lead you into this trap for those kinds of |
| 14:11 | weak links, and we saw one as the 17 Street Canal represented |
| 14:12 | by that weak clay layer. |
| 14:12 | Q.  All right.  And now we're going to -- |
| 14:12 | THE COURT:  Just so I'll have it for the record, if |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2723

1   14:12   it's possible, what was the difference -- and if we could state
2   14:12   it numerically, in the appropriate numerical -- between the
3   14:12   averaged soil strength methodology and the normalized soil
4   14:12   properties methodology?
5   14:12        THE WITNESS:  We're going to show you an illustration
6   14:12   here in a few minutes that addresses that issue exactly.
7   14:12        THE COURT:  Okay.
8   14:12        THE WITNESS:  But you're going --
9   14:12        THE COURT:  So I'll know the differential -- and I'm
10  14:12   not sure the differential shows -- just to let you -- this is
11  14:12   not a question -- just the differential where it shows the
12  14:12   different levels and different levels of soil strengths; that
13  14:12   is, it might be comparable at 0 to 2, yet differs from 2 to 4,
14  14:12   and then yet differs even more from 5 to 8.
15  14:12        So, again, hopefully, I'll have some
16  14:12   understanding of this either after the testimony or after
17  14:13   briefing.
18  14:13        MR. RAFFMAN:  That's -- that's right.
19  14:13        THE COURT:  A clear understanding.
20  14:13        MR. RAFFMAN:  Yes, Your Honor.  And I will just state
21  14:13   while it's in mind that, on the cross-examination of
22  14:13   Dr. Bakeer, a slide was put up comparing Dr. Marino's strengths
23  14:13   against the strengths of some of the other investigations and
24  14:13   the --
25  14:13        THE COURT:  I recall.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2724

1   14:13        MR. RAFFMAN:  Okay.  All right.
2   14:13        THE COURT:  And I'm also interested in what level.  I
3   14:13   mean, the shear strength of the soil was 0 to 2 may be -- at
4   14:13   what level do we have deviations and strengths that make
5   14:13   engineering and then differences.
6   14:13        MR. RAFFMAN:  All right.
7   14:13   BY MR. RAFFMAN:
8   14:13   Q.  For the moment, the current thrust is to show that
9   14:13   averaged strength yield results that are not consistent with
10  14:13   what test data is showing.  For that purpose, I want to just
11  14:13   move to slide RB-126, please.
12  14:14        You had mentioned the 1965 levee test in the
13  14:14   Atchafalaya Basin, and I wanted to call that back to mind and
14  14:14   ask you to tell the Court what was being done and how it
15  14:14   relates to the comparison of averaged versus normalized soil
16  14:14   values.
17  14:14   A.  Well, again, this set of levee tests have been discussed
18  14:14   extensively in this court in connection with the MRGO Robinson
19  14:14   case.
20  14:14        But what was done, as shown up on this inset, is to
21  14:14   construct a levee adjacent to the Intercoastal Waterway.  We
22  14:14   piled the soil to an elevation on the levee, which the levee
23  14:14   starts to fail.  We measure soil shear strength and other
24  14:14   properties as a function of depth.
25  14:14        We then would use analytical methods, different ones,

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2725

1   14:15   to reflect on our ability to replicate what we measure
2   14:15   full-scale in the field.
3   14:15   Q.  All right.  And when we carry out the results and then we
4   14:15   analyze it by averaged versus normalized methods, what results?
5   14:15   A.  Well, it results -- and this is a table taken from a test
6   14:15   analysis report that was published by Dr. Charles "Chuck" Ladd.
7   14:15        Dr. Ladd had, five years earlier, developed a process
8   14:15   identified here as SHANSEP.  That SHANSEP process is today what
9   14:15   we call normalized soil properties test.
10  14:15        Dr. Ladd took the Atchafalaya levee test, used the
11  14:16   SHANSEP process, a particular type of laboratory test, to
12  14:16   determine shear strength -- in this case, it's a direct simple
13  14:16   shear-test data -- makes a prediction of the factor of safety
14  14:16   for two different test sections, both test sections are at
15  14:16   incipient failure, and he's able to give factors of safety that
16  14:16   replicate those observed in the field.
17  14:16        He, as well, used a circular arc technique, a
18  14:16   combination of unconfined compression test and undrained,
19  14:16   unconsolidated triaxial test, very, very similar to that used
20  14:16   by Dr. Marino, and he produces a factor of 1.42 that
21  14:16   can be interpreted as a 42 percent over-prediction of the
22  14:17   factor of safety.
23  14:17   Q.  So at least as regards the test data --
24  14:17        MR. RAFFMAN:  Your Honor --
25

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2726

1   14:17   BY MR. RAFFMAN:
2   14:17   Q.  For the record, Dr. Bea, that represents a quantification
3   14:17   of the error associated with using averaged versus normalized
4   14:17   soil properties; is that fair?
5   14:17   A.  Correct.
6   14:17   Q.  All right.  Having gone out of order, I'm going to ask my
7   14:17   colleagues to go back to RB-112.
8   14:17        You had mentioned that there were differences between
9   14:17   your analysis and Dr. Marino's analysis regarding the formation
10  14:17   of a tension crack.  I'm referring you to the London Avenue
11  14:17   Canal site-specific load test.
12  14:17        MR. RAFFMAN:  Why don't we go to the next slide.
13  14:17   BY MR. RAFFMAN:
14  14:17   Q.  Referring you to the London Avenue Canal site-specific
15  14:17   load test, can you describe to the Court what this test has to
16  14:18   do with validating your conclusions regarding a tension crack
17  14:18   vis-à-vis those of Dr. Marino?
18  14:18   A.  Correct.  Shown here at the colored inset photograph is
19  14:18   that sheet-pile wall that was driven out in the London canal.
20  14:18   The floodwall is where I'm placing my red pointer toward the
21  14:18   land, but these are slope indicators, instruments that are
22  14:18   embedded in the soil, embedded in the wall, both sides of that
23  14:18   wall, to determine how the system is performing.
24  14:18        Here in this inset to the lower left is a
25  14:18   cross-section.  Here's the sheet pile-supported wall that I'm

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2727

```
14:18   1   marking with the red pointer.  It comes across the canal, so
14:19   2   over on the other side of the canal.
14:19   3        We're going to impound water into the area, measure
14:19   4   inflections of the sheet-pile wall.  In this case, the
14:19   5   sheet-pile tips are at minus 21.5 feet, still referencing --
14:19   6   for everyone's sanity -- NAVD88.  The water when it was brought
14:19   7   to, in fact, a low level of 8 feet, a crack opens up below the
14:19   8   sheet-pile tip all the way to the bottom
14:19   9   of the underlying sand layer.
14:19  10        The conclusions drawn in the report are quoted:
14:19  11   "Tension cracks may form very quickly.  Tension cracks may
14:19  12   extend below the bottom of the sheet piling."
14:19  13   Q.  All right.  So that helps you infer that, in fact, field
14:19  14   test results show the formation of tension cracks in conditions
14:20  15   analogous to those that Hurricane Katrina exerted on the East
14:20  16   Bank of the Inner Harbor Navigation Canal?
14:20  17   A.  That is correct.
14:20  18   Q.  All right.  And we have another one of a similar ilk.
14:20  19        MR. RAFFMAN:  May I have the next slide, please?
14:20  20   BY MR. RAFFMAN:
14:20  21   Q.  This is Defendant's Exhibit 40, again, the E-99 Sheet Pile
14:20  22   Wall Field Load Test Report.  Very summarily, Dr. Bea, is this
14:20  23   another field test which shows that tension cracks form on a
14:20  24   floodwall in conditions that you would analogize to Hurricane
14:20  25   Katrina?
```

## 2728

```
14:20   1   A.  Yes, that's true.  And that's well illustrated on the next
14:20   2   slide.
14:20   3        MR. RAFFMAN:  Let's go to the next slide.
14:20   4   BY MR. RAFFMAN:
14:20   5   Q.  Why don't you go ahead and tell the Court what we're
14:20   6   seeing here.  For the record, Defendant's Exhibit 262 on the
14:20   7   left; and Defendant's Exhibit 40, plate 27, on the right.
14:20   8   A.  Well, I'll start with the photographs here shown to the
14:20   9   right.  A woman, a Corps of Engineers employee, is walking
14:21  10   adjacent to the steel floodwall that was constructed for the
14:21  11   purpose of these tests.  This is a square tube that has been
14:21  12   attached to the sheet-pile wall.  Through that tube, we'll
14:21  13   lower instruments that can help us determine lateral
14:21  14   displacements.
14:21  15        Shown to the right are the experimental results.
14:21  16   They are summarized as the lateral deflection measured in
14:21  17   inches.  The scale is referenced in feet vertically.  We've got
14:21  18   the ground level here at 6.5 feet, but the water level is
14:21  19   located at 13.5 feet.  So this is for a water level above the
14:22  20   ground level of 7 feet.
14:22  21        By that time, the sheet-pile wall has moved
14:22  22   horizontally at the ground surface approximately 3 inches.  A
14:22  23   crack has opened up to, in fact, below the bottom of the sheet
14:22  24   pile, just as we saw in later London canal tests.
14:22  25   Q.  All right.  Now, we're going to move away from tension
```

## 2729

```
14:22   1   cracks and come to the north breach cross-section.
14:22   2        MR. RAFFMAN:  So may I have the next slide?
14:22   3   BY MR. RAFFMAN:
14:22   4   Q.  We have a comparison in this slide between Dr. Marino's
14:22   5   cross-section, Plaintiff's Exhibit 397, Figure 5.36; and
14:22   6   Dr. Bea's cross-section, DX-207, Bea supplemental report,
14:22   7   Figure 9.
14:22   8        Focusing your attention, Dr. Bea, on this lobe of
14:22   9   levee-embankment soil Dr. Marino has concluded was placed down
14:23  10   to a level of 18 feet, did you include a lobe like that in your
14:23  11   analysis?
14:23  12   A.  Indeed not.  We could never figure out how you could place
14:23  13   such a levee material to such a depth without placing a coffer
14:23  14   dam because you would have to remove those native materials,
14:23  15   and there was no reflection in the history that such work had
14:23  16   been done.
14:23  17   Q.  And you have -- in the course of your work and various
14:23  18   investigations you've done, and in connection with litigation,
14:23  19   this case or other cases, you have carried out an extensive and
14:23  20   exhaustive review of the documentation of the East Bank
14:23  21   industrial area works; right?
14:23  22   A.  That's correct.
14:23  23   Q.  You have never seen any documentation anywhere to suggest
14:23  24   that levee-embankment soil was placed down to that level at the
14:24  25   area near the north breach as Dr. Marino has posited?
```

## 2730

```
14:24   1   A.  That's correct.  And similarly for the Corps of Engineers'
14:24   2   construction documentation.
14:24   3   Q.  All right.  So I'm going to move away from boring 81-A and
14:24   4   that whole issue, but before I do, is it your understanding
14:24   5   that, if Dr. Marino had used the data reflected in boring 81-A
14:24   6   to characterize that lobe, then that lobe, instead of having
14:24   7   levee-embankment soil, it would have permeable shell and sand?
14:25   8   A.  That's correct.
14:25   9        One thing I would like to bring up at this point,
14:25  10   that which I had done earlier today, when we did our work
14:25  11   associated with the north breach, we had two cross-sections:
14:25  12   One I'll call "pre-Marino," and the other I'll call
14:25  13   "post-Marino."  Those two sets of characterizations resulted in
14:25  14   the same results; that is, the prediction of the blowout I
14:25  15   described this morning and the lateral instability.
14:25  16        I think we may have a characterization thing going on
14:25  17   here that is causing unnecessary technical fog.
14:25  18   Q.  Well, your analyses produced similar or identical results
14:25  19   regardless of whether you include the sand and shell at 81-A;
14:26  20   is that right?
14:26  21   A.  Precisely said.  Thank you.
14:26  22        MR. RAFFMAN:  Okay.  I see the judge is nodding his
14:26  23   head, which suggests I should move along.
14:26  24        THE COURT:  Right.
14:26  25        MR. RAFFMAN:  I'm sorry.
```

2731

| | | |
|---|---|---|
| 1 | 14:26 | THE WITNESS:  It's called "giddyup." |
| 2 | 14:26 | THE COURT:  Thank you. |
| 3 | 14:26 | BY MR. RAFFMAN: |
| 4 | 14:26 | Q.  The low soil that he creates affects the results because |
| 5 | 14:26 | it cuts off seepage and adds strength that otherwise wouldn't |
| 6 | 14:26 | be there; isn't that right? |
| 7 | 14:26 | A.  That's correct. |
| 8 | 14:26 | MR. RAFFMAN:  All right.  I thank Your Honor's |
| 9 | 14:26 | patience. |
| 10 | 14:26 | BY MR. RAFFMAN: |
| 11 | 14:26 | Q.  Permeability. |
| 12 | 14:26 | MR. RAFFMAN:  And I promise this is my last issue, |
| 13 | 14:26 | permeability. |
| 14 | 14:26 | THE COURT:  But an important one.  Go ahead, sir. |
| 15 | 14:26 | MR. RAFFMAN:  RB-119. |
| 16 | 14:26 | BY MR. RAFFMAN: |
| 17 | 14:26 | Q.  Describe for the Court the difference in the permeability |
| 18 | 14:26 | values that Dr. Marino used versus those that you used. |
| 19 | 14:26 | A.  Well, the first thing I'd like to do is try and clear up |
| 20 | 14:27 | for this Court what in the hell permeability is. |
| 21 | 14:27 | As shown on this first scale are the numbers that the |
| 22 | 14:27 | Court was having difficulty understanding:  10-to-the-minus-2, |
| 23 | 14:27 | 3, 4; 10-to-the-minus-8, and so forth.  This is an engineer's |
| 24 | 14:27 | way of quantitively expressing the rate at which water can |
| 25 | 14:27 | penetrate through the soil. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2732

| | | |
|---|---|---|
| 1 | 14:27 | To an engineer, the numbers mean a lot; but to a |
| 2 | 14:27 | normal person, they mean nothing.  But where the something |
| 3 | 14:27 | starts to come from is in this column is talking about pervious |
| 4 | 14:27 | materials.  An example of a very pervious material would be a |
| 5 | 14:27 | well-graded gravel.  Well-graded gravel would have a |
| 6 | 14:27 | permeability that falls in this range.  A pervious soil would |
| 7 | 14:28 | be a sand, and sand would fall in this range. |
| 8 | 14:28 | Semi-pervious would be something like a silt with |
| 9 | 14:28 | some sand in it.  It could be a marshy material that has some |
| 10 | 14:28 | silt and sand in it, so it begins to fall in this semi-pervious |
| 11 | 14:28 | range. |
| 12 | 14:28 | When you get to impervious, this would be things like |
| 13 | 14:28 | fat clays.  And the fat clays, because there's not very much |
| 14 | 14:28 | conduits for water to get through, are essentially impervious. |
| 15 | 14:28 | As shown with the cartoons that I located and |
| 16 | 14:28 | incorporated in this graphic by showing the water that would |
| 17 | 14:28 | come through, this styrofoam perforated cup, that has 1 year |
| 18 | 14:29 | material, the water would completely get through the gravel in |
| 19 | 14:29 | 2 minutes.  In 2 hours, it would be an inch above the top of |
| 20 | 14:29 | the sand.  But the silt, in 200 days, it would be very little |
| 21 | 14:29 | through; and for clay, for 200 years, there would be no water |
| 22 | 14:29 | through it. |
| 23 | 14:29 | Q.  Now, which permeability values did you use and which did |
| 24 | 14:29 | Dr. Marino use? |
| 25 | 14:29 | A.  For the best estimate -- |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2733

| | | |
|---|---|---|
| 1 | 14:29 | Q.  For the marsh layer.  For the marsh layer. |
| 2 | 14:29 | A.  The marsh layer is critical.  But for our analyses, the |
| 3 | 14:29 | primary results were done for 10-to-the-minus-4, to |
| 4 | 14:29 | 10-of-the-minus-5.  We were heavily criticized for the |
| 5 | 14:29 | 10-to-the-minus-2.  Consequently, we re-examined that after we |
| 6 | 14:29 | had some field experience. |
| 7 | 14:29 | But Dr. Marino used 10-to-the-minus-8.  That's |
| 8 | 14:29 | equivalent to trying to get water through a brick. |
| 9 | 14:30 | THE COURT:  And mathematically, a 10-to-the-minus-2 |
| 10 | 14:30 | would be -- |
| 11 | 14:30 | THE WITNESS:  Approaching that of sand. |
| 12 | 14:30 | THE COURT:  It would be between semi-pervious and |
| 13 | 14:30 | pervious? |
| 14 | 14:30 | THE WITNESS:  Yes. |
| 15 | 14:30 | THE COURT:  And, of course, 10-to-the-minus-8 is |
| 16 | 14:30 | impervious. |
| 17 | 14:30 | THE WITNESS:  That's what we -- that's what we build |
| 18 | 14:30 | dams out of. |
| 19 | 14:30 | THE COURT:  I knew some judges who were |
| 20 | 14:30 | 10-to-the-minus-8, too. |
| 21 | 14:30 | MR. RAFFMAN:  You will never hear that from me, Your |
| 22 | 14:30 | Honor. |
| 23 | 14:30 | THE COURT:  Oh, no.  I know.  I can say that now. |
| 24 | 14:30 | That's one of the great things about being in this position. |
| 25 | 14:30 | Go ahead. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2734

| | | |
|---|---|---|
| 1 | 14:30 | THE WITNESS:  My wife thinks I'm impervious. |
| 2 | 14:30 | BY MR. RAFFMAN: |
| 3 | 14:30 | Q.  All right.  Permeability.  So we've got marsh layer that's |
| 4 | 14:30 | the permeability of a brick on the one hand versus a marsh |
| 5 | 14:30 | layer that's the permeability of something else from |
| 6 | 14:30 | Professor Bea. |
| 7 | 14:31 | So, Professor Bea, which one is correct, yours or |
| 8 | 14:31 | Dr. Marino's? |
| 9 | 14:31 | A.  I think the ones I used are correct -- |
| 10 | 14:31 | Q.  All right. |
| 11 | 14:31 | A.  -- or I wouldn't present them in court. |
| 12 | 14:31 | Q.  We have a few more slides on permeability, and I'm going |
| 13 | 14:31 | to ask Dr. Bea to be -- summary in your treatment of the slides |
| 14 | 14:31 | to get the gist of what they show, and then we'll move forward. |
| 15 | 14:31 | THE COURT:  Well, I think these are important issues, |
| 16 | 14:31 | I really do. |
| 17 | 14:31 | MR. RAFFMAN:  Oh, okay.  All right. |
| 18 | 14:31 | THE COURT:  Because these are the core -- I hate to |
| 19 | 14:31 | use that word -- the core differences in this case vis-à-vis |
| 20 | 14:31 | the theories of the case. |
| 21 | 14:31 | MR. RAFFMAN:  All right.  Then we'll proceed at pace, |
| 22 | 14:31 | and we are approaching the end of the examination, Your Honor. |
| 23 | 14:31 | But thank you. |
| 24 | 14:31 | THE COURT:  Yes. |
| 25 | | |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

10  (Pages 2731 to 2734)

2735

```
14:31   BY MR. RAFFMAN:
14:31   Q.  The next slide is Defendant's Exhibit 145, IPET Volume V,
14:31   Appendix 17, Figure V-17-50.
14:31        Dr. Bea, would you explain what is shown by this
14:32   slide and how it relates to your permeability analysis versus
14:32   that -- you're seepage analysis versus that of Dr. Marino?
14:32   A.  Well, Dr. Marino showed and discussed this illustration
14:32   earlier in this trial.  Vertical scale is this measurement of
14:32   permeability the Court was trying to understand.  The
14:32   horizontal scale is the effect of overburden pressure.
14:32        The permeability being referred to here is a vertical
14:32   permeability.  Soils have differing permeabilities depending on
14:32   whether the water flow is coming through the material
14:32   vertically or horizontally, and that's because of layering in
14:32   the material.
14:32        It also has a difference, depending upon overburden
14:32   pressure, because the overburden pressure is acting to squeeze,
14:32   reduce the size of the channels, pores, the soil pores, that
14:33   the water is trying to move through.  So you would expect a
14:33   reduction in permeability as the pressure increases.
14:33        But Dr. Marino referred to the work done by Weber in
14:33   the California Delta.  And that's the area that we've been
14:33   working in, and that refers to the test data shown here to the
14:33   left.
14:33        We give that test data a lot of credence because it's
```

2736

```
14:33   being measured in the field.  There's a big difference between
14:33   measuring permeability in a laboratory and in a field, and
14:33   that's because of disturbance that's brought to the soil sample
14:33   by sampling it and also because of testing differences.
14:33        These other data points were gathered by the Army
14:33   Corps of Engineers IPET team here in New Orleans marsh
14:34   materials.  They gathered the marsh material as I'm showing
14:34   with this graphic in the upper right.
14:34        So they put the marsh material into a compression
14:34   device.  They put pressure at the top, squeeze water into a
14:34   porous stone at the bottom, and measure that permeability.
14:34   Q   And so it's --
14:34   A   So they're actually getting water flow across the marsh
14:34   layering.
14:34   Q.  All right.  And so that the record is clear, this graphic
14:34   at the upper right is Defendant's Exhibit 206, Bea report,
14:34   Appendix C, Figure 82.
14:34        In order to get the permeability test, you would put
14:34   water in the top of the sample and then squeeze the water down
14:34   through the sample to the bottom; correct?
14:34   A.  That's correct.  The samples are already saturated so they
14:34   can actually just put a patent up here at the top, press down
14:34   on it like you would squeeze water out of cheese.
14:35   Q   All right.
14:35   A   At the bottom, they're measuring the water as a function
```

2737

```
14:35   of the pressure that they exert on that soil.
14:35   Q.  So is horizontal pressure -- or horizontal permeability
14:35   different from vertical permeability?
14:35   A.  Indeed it is.
14:35        I would further explain that the green range of
14:35   permeabilities that we have used describes the permeabilities
14:35   that we've incorporated in our analyses.  But the very high
14:35   range of 10-to-the-minus-2; we've gone at loads
14:35   10-to-the-minus-6; and as I've previously opined, the best
14:35   estimate value we have for the marsh material is
14:35   10-to-the-minus-4.
14:35        I've outlined here in red what Dr. Marino has used
14:36   for the marsh material on the protected side, and that's in
14:36   that range of 10-to-the-minus-8 to 10-to-the-minus-7.
14:36        THE COURT:  Just so I understand, it is your -- is it
14:36   your testimony that Dr. Marino -- I tell you what:  Explain it
14:36   to me.  How did Dr. Marino factor in horizontal permeability in
14:36   his analysis and how does it specifically differs from how you
14:36   did it?
14:36        THE WITNESS:  Well, Dr. Marino used, in general,
14:36   permeabilities in the horizontal direction that were equal to
14:36   or -- 2.5 is the number that is in my memory, but times that
14:36   vertical permeability.  We consistently used a factor of 10.
14:37   So the horizontal permeability was a factor of 10 times the
14:37   vertical permeability.
```

2738

```
14:37        THE COURT:  And upon what basis did you use that
14:37   factor as opposed to upon what basis Dr. Marino used his
14:37   factor?
14:37        THE WITNESS:  Marshy peaty materials exist all around
14:37   the world.  They've been tested by many investigators.  So we
14:37   accessed that test data, actually tracked this horizontal
14:37   versus vertical.  There's where our 10 came from.  But that
14:37   test data is included in my expert report.
14:37        THE COURT:  And assuming the 2.5 is correct, do you
14:37   know where Dr. Marino got his 2.5?
14:37        THE WITNESS:  No, I do not.
14:37        MR. RAFFMAN:  And I'll represent for Your Honor we
14:37   could pull the report, but 2.5 is the number that he used to
14:37   adjust --
14:37        THE COURT:  All right.  Thank you.  That helps me
14:37   incisively look at it.
14:37        MR. RAFFMAN:  Right.
14:38        THE COURT:  Thank you.
14:38        MR. RAFFMAN:  I expect we'll pull a cite for you in
14:38   the briefing if I haven't pulled it for you by the end of the
14:38   examination.
14:38        THE COURT:  Oh, yeah.  That's fine.
14:38   BY MR. RAFFMAN:
14:38   Q.  We have a couple more slides on permeability.
14:38        In that connection, you were in the field, Dr. Bea,
```

### 2739

```
 1   14:38   and you made an observation in the field that related directly
 2   14:38   to your understanding of horizontal permeability in the marsh
 3   14:38   layer at the IHNC; is that right?
 4   14:38   A.   That's exactly right.
 5   14:38   Q.   And I want you to describe that experience for the Court.
 6   14:38   A.   The experience is summarized in this graphic, but -- and
 7   14:38   this is part of the Soil Testing Engineers of Louisiana test we
 8   14:38   performed at both the north and south breaches.
 9   14:38        But we first drilled a soil boring, and it refers to
10   14:38   Shelby tubes, and that's how we obtained the samples.  So we
11   14:38   first drilled that hole.  We moved 200 feet away, drilled a
12   14:39   second one to confirm the soil characteristics and their
13   14:39   variability in that hole.
14   14:39        We did not backfill or seal those holes as is
15   14:39   required by good engineering practice, but we came into the
16   14:39   middle, so we're 100 feet from the two ends.  And the purpose
17   14:39   of this in the middle probe was an in-situ test, and we're also
18   14:39   going to obtain Shelby tube samples.
19   14:39        As we advance a hole and encountered the swamp
20   14:39   deposits, as soon as the drill fluid, drill water, that was
21   14:39   being used got to that level, we started seeing water geysers
22   14:39   come out of the top of both holes.  What that told us was we
23   14:39   were getting an immediate pressure on connection and
24   14:40   water-transmission connection from this point to that point.
25   14:40   As soon as we stopped drilling, stopped the pressures, the
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

### 2740

```
 1   14:40   geysers went away.
 2   14:40   Q.   And from that you inferred what?
 3   14:40   A.   That there was extremely high water conductivity
 4   14:40   associated with these shallow-buried old swamp deposits.
 5   14:40        MR. RAFFMAN:  All right.  Next slide, please.  And
 6   14:40   for the record, the previous slide was Defendant's Exhibit 206,
 7   14:40   Bea report, Appendix C, Figure 82.  Now we have another part of
 8   14:40   Bea report, Appendix C, Figure 82.
 9   14:40   BY MR. RAFFMAN:
10   14:40   Q   The bottom part of this figure is an extraction from the
11   14:40   marsh layer in an illustration.  It represents what?
12   14:40   A.   Well, it's representing the reason for that factor of 10
13   14:41   that the judge was questioning.  What we found in the course --
14   14:41   and this illustration was drawn by Dr. David Rogers, the world
15   14:41   geological authority that's worked so much here in this area.
16   14:41        But, essentially, we got organic material, very
17   14:41   similar to what you can buy in a peat bale from Home Depot.
18   14:41   It's layered leaves and twigs and bark and things reminiscent
19   14:41   of bark from cypress trees.  These things fall horizontally,
20   14:41   and so, as you would expect, they're much lower vertical
21   14:41   permeability than you have horizontally.
22   14:41   Q.   All right.  And so the lower vertical permeability is
23   14:41   represented by the thin blue arrows going down; higher
24   14:41   horizontal permeability is represented by the bigger, thicker
25   14:42   arrows going from side to side.  Is that fair?
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

### 2741

```
 1   14:42   A.   That's correct.
 2   14:42   Q.   Now, to the extent it interests the Court, you actually
 3   14:42   collected samples from the marsh layer at the Inner Harbor
 4   14:42   Navigation Canal; right?
 5   14:42   A.   Yes.
 6   14:42   Q.   And you brought them home and put them in double bags;
 7   14:42   right?
 8   14:42   A.   Yes, that's correct.
 9   14:42   Q.   And you sent them to New Orleans, and you have them with
10   14:42   you today on the witness stand; is that right?
11   14:42   A.   That is correct.
12   14:42   Q.   Why don't you pull out the bag and show the Court your
13   14:42   sample of soil from the marsh layer at the Inner Harbor
14   14:42   Navigation Canal.
15   14:42   A.   That's approximately 10 feet reference -- minus 10 feet
16   14:42   reference in NAVD88.
17   14:42        THE COURT:  I might say that I'm --
18   14:42        MR. GILBERT:  I want to make an objection.  This
19   14:42   wasn't disclosed in any demonstrative.  We don't have a chain
20   14:43   of custody on this either.
21   14:43        MR. RAFFMAN:  It was disclosed.
22   14:43        THE COURT:  Do you want to respond to the objection?
23   14:43        MR. RAFFMAN:  Yes, Your Honor.  This was disclosed as
24   14:43   a demonstrative to the plaintiffs, along with our other
25   14:43   demonstratives, 30 days ahead of trial.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

### 2742

```
 1   14:43        THE COURT:  All right.  The Court has looked at it,
 2   14:43   and it will not go to the Fifth Circuit.  Don't worry.
 3   14:43        Thank you, and I might say --
 4   14:43        MR. GILBERT:  That begs all kinds of follow-up
 5   14:43   comments.
 6   14:43        THE COURT:  I might say, since the Court was born and
 7   14:43   reared in the marshland, I'm sure I've gotten some of that upon
 8   14:43   me on many occasions, having fallen into holes in the marsh.
 9   14:43        THE WITNESS:  Very true.
10   14:43        MR. RAFFMAN:  So there's a couple more -- one other
11   14:43   slide about marsh layer and conductivity, and I appreciate the
12   14:43   patience of everyone with our demonstrative.
13   14:43        Let's go to the next slide, please.
14   14:43   BY MR. RAFFMAN:
15   14:43   Q   So, Dr. Bea, tell the Court.  We're now looking at
16   14:44   Defendant's Exhibit 141, 1LIT Volume I, Figure 2.8, and
17   14:44   that's -- the photo and the overlay graph is Defendant's
18   14:44   Exhibit 206, Bea report, Appendix C, Figure 83.
19   14:44        Please tell the Court what this graph shows and how
20   14:44   it relates to the conductivity of the marsh layer and its
21   14:44   responsiveness to rising water levels in the canal.
22   14:44   A.   The background photograph is taken at the 17 Street Canal.
23   14:44   This is a photograph that I took, I think the first day I was
24   14:44   there.
25   14:44        What's shown here is this organic layer that we have
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2743

1   14:44   been referring to as swamp marsh materials.  These are endemic
2   14:44   to this area, so this is essentially the same kind of formation
3   14:44   layer we would expect and have found under the Lower Ninth
4   14:45   Ward.
5   14:45        What the Corps did after they completed the IPET
6   14:45   test, they became very concerned with the safe water levels
7   14:45   that could be sustained in the 17 Street Canal, and that's
8   14:45   because we're putting out pump stations and closure gates out
9   14:45   at the lake end of the canal.
10  14:45        They know that the -- they certainly have repaired
11  14:45   the breached area, but the immediate adjacent breached areas
12  14:45   are the same ones.  And, of course, they have now gotten into
13  14:45   thinking, well, maybe we can hold more than 6 feet of water in
14  14:45   that canal, quote, safely.
15  14:45        What they did is they put in the canal instruments to
16  14:45   measure the canal water levels over a 12-month period.  That
17  14:45   test data is shown here in pink.  I obtained that from the
18  14:46   appendix of their safe water levels report.  Shown at the
19  14:46   bottom is an instrument they embedded in this marsh layer at
20  14:46   the south end of the 17 Street Canal breach.
21  14:46        They're measuring water pressure in this layer as a
22  14:46   function of time.  The spikes that show up in the canal water
23  14:46   levels are rainfall events, so water is being emptied into the
24  14:46   canal at the pump station.
25  14:46        There is an easily seen general trend upward as the

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2745

1   14:48   things, or water-pressure transmission things.
2   14:49   Q.  There's one more slide on the comparison between the two.
3   14:49   We've put up here the comparison of Plaintiff's Exhibit 397,
4   14:49   Marino report Figure 5.45 on the top; Defendant's Exhibit 207,
5   14:49   Bea supplemental report Figure 16.
6   14:49        MR. RAFFMAN:  And this may be responsive to Your
7   14:49   Honor's question about how different shear strengths affect the
8   14:49   analysis of stability.
9   14:49   BY MR. RAFFMAN:
10  14:49   Q.  So, Dr. Bea, would you please explain what this slide
11  14:49   shows and what it means for the two experts' opinions?
12  14:49   A.  Well, first, I'll contrast that this entire sequence of
13  14:49   things contrasting Dr. Marino's work with that that I've
14  14:49   performed, it has been intended to directly answer what must
15  14:49   be, in the judge's thinking, trying to resolve these, quote,
16  14:50   conundrums.  We too try and resolve these conundrums.  Or, at
17  14:50   least, some of us.
18  14:50        But shown at the top is the characterization used by
19  14:50   Dr. Marino, where I'm directly at the north breach location to
20  14:50   make this comparison.  But the comparison is addressing both
21  14:50   the lateral stability analyses performed by Dr. Marino, but
22  14:50   he's used a circular shear surface as indicated here.  It has
23  14:50   an effective length of approximately 122 feet.  I have shown,
24  14:50   with these numbers, the shear strength that Dr. Marino
25  14:50   attributed to each of the two results.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2744

1   14:46   diurnal tides are affecting -- by the way, that's the reason
2   14:46   you have the scatter.  Tides in this area are diurnal:  One
3   14:46   high, one low, per day.  You can see the spikes in the marsh
4   14:47   layer pressures that are immediately correlated with the spikes
5   14:47   in the canal water elevations.
6   14:47        This tells us that these marsh layers are connected
7   14:47   hydraulically directly with the canal, and the pressures in the
8   14:47   canal are being instantaneously propagated through the marsh
9   14:47   layer and under the floodwall, unfortunately, in these
10  14:47   conditions.
11  14:47   Q.  All right.  And so in an analysis between you and
12  14:47   Dr. Marino, where you've concluded that rising water levels can
13  14:47   immediately connect and impose pressure on saturated
14  14:47   marsh-layer soils, transmit that pressure to the protected side
15  14:47   of the floodwall where it creates uplift pressure on the
16  14:48   overlying levee soil, as between that Dr. Bea approach and the
17  14:48   Dr. Marino approach, which says that the water in the canal
18  14:48   stays in the canal and never goes anywhere and never affects
19  14:48   anything, never has any effect at all, which approach does this
20  14:48   data support?
21  14:48   A.  Well, it better support the approach that I've taken, to
22  14:48   handle both permeability water-transmission issues and its
23  14:48   important hydraulic uplift effect.  The data clearly indicates
24  14:48   that the approach taken by Dr. Marino cannot replicate this
25  14:48   kind of behavior, neither for permeability, water-transmission

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2746

1   14:51        For example, this 10 layer has 610 pounds per square
2   14:51   foot; 402 for this pink layer, where the shear surface
3   14:51   penetrates; 232; 202 pounds per square foot; 510; and 722.
4   14:51        What goes on is, along this shear surface, the shear
5   14:51   strengths are being applied to the appropriate segment length
6   14:51   in order to calculate the total lateral resistance.  You can
7   14:51   compare these differing strengths; for example, 722 versus the
8   14:51   555 we used for this precise layer.
9   14:51        But you can continue the comparisons.  Sometimes he
10  14:51   shows for a part of the layer a very high strength, 510 pounds
11  14:52   per square foot; where we've identified 250 pounds per square
12  14:52   foot.  Under the main section of the failure surface, we'd have
13  14:52   442; he'd have his combination with his surface of 610, higher
14  14:52   for that material, lower for a portion, and higher for the end
15  14:52   points.
16  14:52   Q.  Am I -- I'm sorry.  I didn't mean to cut you off.
17  14:52   A.  His 122-foot effective length of that circle is comparable
18  14:52   to a 37-foot length for the shear surface that we've used.  So,
19  14:52   consequently, we get a low factor of safety -- it's below 1 for
20  14:52   these conditions -- where he gets a high -- much higher factor
21  14:52   of safety for the same set of conditions.  And the answer is
22  14:53   it's a combination of both length and strength applied over
23  14:53   that length that explains the differences in the two results.
24  14:53   Q.  Am I right, Dr. Bea, that one of the reasons why his
25  14:53   failure surface is so long and so deep is that he's included a

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2747

1   14:53   very high-strength lobe of levee-embankment soil in the upper
2   14:53   layer, which increases the strength through the whole area?
3   14:53   A.   Indeed.
4   14:53        And, of course, we have learned using circular
5   14:53   failure surfaces is not what a soil uses.  And consequently,
6   14:53   there's another important technical element that regards its
7   14:53   shapes of failure surfaces.
8   14:53        Using the same analytical model, we have used a
9   14:53   technique that actually traces the low-strength layers to
10  14:53   develop a shear surface that would be appropriate for nature,
11  14:54   not analysis.
12  14:54   Q.   All right.  Now, let's -- we're going to have a summary
13  14:54   slide about the differences between your analysis and
14  14:54   Dr. Marino's analysis, and I would ask you simply to compare
15  14:54   and contrast your analysis with Dr. Marino's analysis along
16  14:54   these four parameters listed in the slide.
17  14:54   A.   For Dr. Marino, the results have not been validated in the
18  14:54   manner that I have discussed.  Our results have been validated
19  14:54   by numerous test data and analyses exercises, including actual
20  14:54   performance of flood-protection elements here in the New
21  14:54   Orleans area.
22  14:54        Soil characterization used by Dr. Marino does not
23  14:54   reflect the underlying data we have available.  We've done
24  14:55   everything we can to make sure our soil characterization is
25  14:55   consistent with the underlying data, but we think the

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2748

1   14:55   horizontal permeability used by Dr. Marino for the critical
2   14:55   land side marsh layers are not properly characterized.
3   14:55        In addition, he has not evaluated pressure
4   14:55   transmission and its consequent effect on lateral stability.
5   14:55   We've attempted to do the best we can to characterize the
6   14:55   horizontal permeability properly.  We have picked up and
7   14:55   brought in the pressure transmission and its impact on lateral
8   14:55   stability.
9   14:55        Soil shear-strength values, Dr. Marino has used the
10  14:55   mixture of differing soil-testing techniques.  We think this is
11  14:55   an incorrect method.  We've used soil shear-strength values
12  14:55   based on the SHANSEP normalized soil properties approach.  We
13  14:56   think this is a correct method for properly characterizing
14  14:56   these soils.
15  14:56   Q.   All right.  I have one last set of questions, Dr. Bea.
16  14:56        You've reviewed the IPET report; right?
17  14:56   A.   Correct.
18  14:56   Q.   You've reviewed the American Society of Civil Engineers
19  14:56   report regarding Hurricane Katrina and the protection system;
20  14:56   right?
21  14:56   A.   That is correct.
22  14:56   Q.   And you've reviewed the National Academy of Engineering
23  14:56   and National Research Council report as well?
24  14:56   A.   That is correct.
25  14:56   Q.   And you've reviewed the National Institute of Standards

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2749

1   14:56   and Technology technical note regarding the performance of
2   14:56   physical structures during Hurricane Katrina?
3   14:56   A.   That is correct.
4   14:56   Q.   You've -- obviously, you've reviewed your own group's
5   14:56   preliminary report in November of '05?
6   14:56   A.   That's correct.
7   14:56   Q   And the Team Louisiana report from June of 2007; right?
8   14:57   A.   Yes.
9   14:57   Q.   And the ILIT final report from July of 2006 in which
10  14:57   you've participated in; right?
11  14:57   A.   Yes.
12  14:57   Q.   And the various technical papers that have been generated
13  14:57   by the members of the ILIT scientific team since 2006; correct?
14  14:57   A.   That is correct.
15  14:57   Q.   And these reports have opined about the reasons why the
16  14:57   floodwalls breached on the Inner Harbor Navigation Canal east
17  14:57   side; right?
18  14:57   A.   That is correct.
19  14:57   Q.   And in each case, the report concluded that the breaches
20  14:57   occurred for reasons other than a barge; right?
21  14:57   A.   That is correct.
22  14:57   Q.   None of them concluded that the barge played a causative
23  14:57   role in the breaches; am I right?
24  14:57   A.   That is correct.
25  14:57        MR. RAFFMAN:  I tender the witness, Your Honor.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2750

1   14:57        THE COURT:  Thank you.  I assume you would like a
2   14:57   brief recess before you start, sir.
3   14:57        MR. KHORRAMI:  That's completely up to the Court.
4   14:57        THE COURT:  I think that's a good idea since it's
5   14:57   3:00 now and we'll take a ten-minute recess.
6   14:57        MR. GILBERT:  Thank you.
7   14:57        (WHEREUPON, the Court took a recess.)
8   15:10        THE DEPUTY CLERK:  All rise, please.  Court's in
9   15:11   session.  Please be seated.
10  15:11        MR. RAFFMAN:  Your Honor, my colleagues have given me
11  15:11   permission to move our slide dec for Dr. Bea as Defense
12  15:11   Exhibit 361 before they begin their cross-examination.  So I so
13  15:11   move.
14  15:11        THE COURT:  Yes, it is admitted.  Thank you.
15  15:11        MR. RAFFMAN:  Thank you.
16  15:11        THE COURT:  Yes, sir, counsel.  Whenever you're
17  15:11   ready, sir.
18  15:11        MR. KHORRAMI:  I'm ready, Your Honor.
19  15:11        CROSS-EXAMINATION
        BY MR. KHORRAMI:
20  15:11   Q.   Good afternoon, Dr. Bea.
21  15:11   A.   Good afternoon.
22  15:11   Q.   What I wanted to start with was at the very beginning of
23  15:11   your comparison between you and Dr. Marino and your analysis.
24  15:11        MR. KHORRAMI:  Bob, if I could have slide 1 of 3, I

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

14  (Pages 2747 to 2750)

2751

```
1    15:11  believe.
2    15:11  BY MR. KHORRAMI:
3    15:11  Q.  And so in looking at the differences, obviously, the one
4    15:12  conclusion that you differ at is whether the barge was present
5    15:12  when the breach took place.
6    15:12      You talk about seepage, and seepage is a big part of
7    15:12  your analysis; correct?
8    15:12  A.  It's one part.
9    15:12  Q.  It's one part.  It's a very big part of your analysis,
10   15:12  isn't it?
11   15:12  A.  It's one of the two competing or interacting failure modes
12   15:12  that explains the development of the north breach.
13   15:12  Q.  And specifically, underseepage has been something that
14   15:12  you've looked at throughout your study of Hurricane Katrina;
15   15:12  correct?
16   15:12  A.  That's correct.
17   15:12  Q.  Underseepage is something that you've advocated as a
18   15:12  scientist from virtually the outset; is that correct?
19   15:12  A.  I don't think virtually from the outset.  And you could
20   15:12  measure that, I guess, from the first day.  But certainly at
21   15:13  London canal, that was clearly evident.
22   15:13  Q.  Okay.
23   15:13  A.  It was much more subtle here, and the effect of water
24   15:13  conductivity in developing the uplift pressures on the
25   15:13  protected side did not come out until the 17 Street Canal
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2753

```
1    15:14  A.  That's correct.
2    15:14  Q.  And the south breach initiated somewhere around 6:00 a.m.
3    15:14  That's your contention; is that correct?
4    15:14  A.  That's correct.
5    15:14  Q.  And it was fully formed somewhere around 8:00 or 8:30; is
6    15:15  that about right?
7    15:15  A.  The south breach fully developed approximately 7:00 to
8    15:15  8:00 a.m.
9    15:15  Q.  I apologize.  So it was fully formed at about 7:00 to
10   15:15  8:00 in the morning on the 29th; is that correct?
11   15:15  A.  That's correct.
12   15:15  Q.  The London Avenue breach, that initiated somewhere around
13   15:15  8:30 a.m. on the 29th; is that fair?
14   15:15  A.  I think that's correct.
15   15:15  Q.  Now, in terms of seepage, that's something that you've
16   15:15  already mentioned to the Court, at least for a portion of your
17   15:15  analysis, but for a period of time, you've been heavily
18   15:15  criticized on your seepage analysis; is that fair?
19   15:15  A.  I don't think I've been criticized.  I think the
20   15:15  independent levee team was correctly appropriately criticized
21   15:15  for the use of their very high water conductivity that we used
22   15:16  in stages 1 and 2 of the IPET -- ILIT work.
23   15:16  Q.  And you were co-leader of that team; is that fair?
24   15:16  A.  That's correct.
25   15:16  Q.  And at the time that they came up with those conclusions
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2752

```
1    15:13  litigation work.
2    15:13  Q.  So in the Industrial Canal, the seepage was much more
3    15:13  subtle than the London Street Canal; correct?
4    15:13  A.  Yes, sir.
5    15:13  Q.  And the breaches that we're talking about in this
6    15:13  litigation, they took place earlier than the London Street
7    15:13  Canal; correct?
8    15:13  A.  We'll call it comparable times reference to the time on
9    15:13  August 29th that they occurred.
10   15:13  Q.  They occurred earlier, did you say?
11   15:14  A.  That's the part I'm not agreeing with you on.
12   15:14  Q.  Okay.
13   15:14  A.  I would have to refer to my notes, but my memory says that
14   15:14  they were occurring during the same time frame.
15   15:14  Q.  Okay.
16   15:14  A.  And the latter portion of that time frame associated with
17   15:14  the south breach would be closer to the time frame for London
18   15:14  canal breaching.
19   15:14  Q.  Let me break it up a little bit.  Maybe we can get a
20   15:14  little bit more clarity.
21   15:14  A.  The north breach, it's your contention that it
22   15:14  initiated at about 4:00 a.m. on the 29th; correct?
23   15:14  A.  That's correct.
24   15:14  Q.  And it was fully formed at about somewhere around
25   15:14  5:00 a.m. on the 29th; is that fair?
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2754

```
1    15:16  that they had, you agreed with those conclusions; correct?
2    15:16  A.  Who came up with which conclusions?
3    15:16  Q.  I apologize.  That was --
4    15:16  A.  I find your question confusing.
5    15:16  Q.  That wasn't a very good question.  I'm sorry.
6    15:16      At the time that the ILIT team, which you were a
7    15:16  co-leader of, came up with its conclusions regarding seepage
8    15:16  and underseepage, you were in agreement with those conclusions;
9    15:16  correct?
10   15:16  A.  That's correct.
11   15:16  Q.  And at all times when the ILIT team put out a report, any
12   15:16  portion of its report, at the time it was put out, you were in
13   15:16  agreement with those conclusions; fair?
14   15:16  A.  That's correct.
15   15:16  Q.  And you were in agreement with the methodologies that were
16   15:16  used; fair?
17   15:16  A.  To the point at which that work was done, that's correct.
18   15:17  Q.  Fair.
19   15:17      Now, at that time when you came up with the
20   15:17  preliminary report, and then you came up with a second report
21   15:17  and then a third report, at those times, the seepage analysis
22   15:17  with which you and -- at which you and Dr. Marino differ, that
23   15:17  was criticized; fair?
24   15:17  A.  It was criticized by the IPET team.
25   15:17      Referring to the second stage of our work, we
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2755

```
1   15:17   received no criticism.  But, to that effect, during the third
2   15:17   stage, when we examined a far wider range of permeabilities and
3   15:17   came from the 10-to-the-minus-2 centimeters per second to the
4   15:17   10-to-the-minus-4 centimeters per second -- so we substantially
5   15:17   lowered the permeabilities, and that was, in part, in response
6   15:18   to the IPET team.
7   15:18         But we revisited soil characteristics and soil test
8   15:18   results to convince ourselves that was an appropriate thing to
9   15:18   do.
10  15:18   Q.  And in terms of lateral instability, you referred to the
11  15:18   tension cracks as one thing that affects lateral instability;
12  15:18   is that fair?
13  15:18   A.  Very true.
14  15:18   Q.  And underseepage also affects lateral instability?
15  15:18   A.  Yes, it can.  But in the form that I described this
16  15:18   morning, if the seepage is severe enough and leads to this
17  15:18   piping blowout condition, that can lead to lateral instability
18  15:18   also.
19  15:18   Q.  Okay.  And there, Dr. Marino and yourself do not agree;
20  15:18   fair?
21  15:18   A.  That's correct.
22  15:18   Q.  Now, let's talk about your seepage analysis and what the
23  15:19   IPET team initially had to say about it when they were very
24  15:19   critical about it.
25  15:19         We're going to specifically look at IPET Volume V,
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2756

```
1   15:19   Appendix 17, and we're going to be looking at page 36 of that
2   15:19   volume.
3   15:19         MR. KHORRAMI:  If you could zoom in on that.  Thank
4   15:19   you.
5   15:19         BY MR. KHORRAMI:
6   15:19   Q.  Now, what I want to direct your attention to -- and I'm
7   15:19   sure you read this -- is that the IPET team found that,
8   15:19   particularly with respect to the Lower Ninth Ward, your
9   15:19   conclusions of July 2006 -- as part of the ILIT team, as
10  15:20   co-leader of that team.
11  15:20   A.  Yes.
12  15:20   Q.  -- are based on unrealistic and unproven permeability;
13  15:20   fair?
14  15:20   A.  Yes.
15  15:20   Q.  And those led to faulty and deceptive analysis; fair?
16  15:20   A.  Fair.
17  15:20   Q.  And they called it "garbage in, garbage out"?
18  15:20   A.  That's always fair.
19  15:20   Q.  Quite strong, huh?
20  15:20   A.  How they put it?  This is a strong problem, and it
21  15:20   requires strong people and sometimes strong speech.
22  15:20   Q.  And you -- I'm not going to say you agreed with exactly
23  15:20   their criticism, but you felt that you were wrong in your
24  15:20   permeability analysis, and you adjusted that analysis; fair?
25  15:20   A.  That's correct.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2757

```
1   15:20   Q.  Now, you also had early positions as to the barge and its
2   15:20   role in the two breaches that we're talking about?
3   15:20   A.  That's correct.
4   15:20   Q.  So you thought that the barge was involved at the -- from
5   15:21   the very outset; fair?
6   15:21   A.  Yes.
7   15:21   Q.  And we discussed -- well, counsel discussed a video where
8   15:21   you had specifically talked about the barge.  At the time that
9   15:21   the preliminary report came out with ILIT, that would be
10  15:21   November 2005; fair?
11  15:21   A.  That was not a preliminary report.  That was a final
12  15:21   report of the two teams involved.  So it was not only ILIT, it
13  15:21   was American Society of Civil Engineers.
14  15:21   Q.  Okay.  So the November 2005 report is what we're speaking
15  15:21   about; correct?
16  15:21   A.  That's correct.
17  15:21   Q.  At that time the teams ruled out the barge?
18  15:21   A.  That's correct.
19  15:21   Q.  But also said that the barge made contact with the I-wall
20  15:21   on the east side; correct?
21  15:21   A.  It was actually a little bit more than that, wasn't it?
22  15:22   Q.  It was actually a little bit more than that, wasn't it?
23  15:22   Didn't the team actually conclude that the barge had made
24  15:22   contact, moving southward, with the I-wall prior to reaching
25  15:22   the breach?
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2758

```
1   15:22   A.  I don't recall.
2   15:22   Q.  Okay.
3   15:22   A.  I would have to consult the report.
4   15:22   Q.  And I will get that for you in just a moment.
5   15:22   A.  Thank you.
6   15:22   Q.  But then after that, in December, you spoke to the
7   15:22   Times-Picayune; fair?
8   15:22   A.  I spoke to the Times-Picayune on many dates and times.
9   15:22   You'd have to be more specific to help my memory.
10  15:22   Q.  In December of 2005, you spoke to the Times-Picayune?
11  15:22   A.  I don't recall, but I'm sure we can find out.
12  15:23   Q.  Yeah.  And you generally find them to be factually
13  15:23   accurate?  You generally find that newspaper to be factually
14  15:23   accurate?
15  15:23   A.  Find --
16  15:23   Q.  They do good reporting?
17  15:23   A.  Yes, scattered, as most media publications are.  Sometimes
18  15:23   very accurate; sometimes inaccurate.
19  15:23   Q.  Well, I'm going to put up an article in the
20  15:23   Times-Picayune, which is December 12th, 2005; fair?
21  15:23   A.  Thank you.
22  15:23   Q.  What I want to focus your attention to --
23  15:24         MR. KHORRAMI:  Bob, if you can -- right here, Bob --
24  15:24   we're having technical issues.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2759**

```
15:24   BY MR. KHORRAMI:
15:24   Q.   You verified that people actually heard explosions; fair?
15:24   A.   Repeat your question, please.
15:24   Q.   Over here they have a quote:  "Those people heard those
15:24   explosions, I'm almost certain, but it was not manmade
15:24   directly."  Do you see that?
15:24   A.   Yes, thank you.
15:24   Q.   And you believed that at that time; right?
15:24   A.   That's correct.
15:24   Q.   And you believe it today?
15:25   A.   That's correct.
15:25   MR. KHORRAMI:  And then we'll go down a little bit
15:25   more, Bob.  If you could zoom in on this, please.
15:25   BY MR. KHORRAMI:
15:25   Q.   And then over in this section, it says:  "But from the
15:25   cracking of concrete to the deafening sounds of a huge barge
15:25   slamming against the Industrial Canal floodwall, residents had
15:25   plenty of reason to believe their community was under siege."
15:25   That's something you said to the paper; fair?
15:25   A.   That's a fair capture of what I said.
15:26   Q.   And you believed it then; correct?
15:26   A.   That's correct.
15:26   Q.   And you believe that today?
15:26   A.   Yes.  I believe that today as a symptom of the collision
15:26   of the barge with the south end of the south breach.
```
JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2761**

```
15:28   MR. KHORRAMI:  I believe it is.
15:28   THE COURT:  I don't know if you're going to qualify
15:28   Dr. Bea as a mooring expert.  He may be.
15:28   MR. KHORRAMI:  Well, he made the statement.
15:28   THE COURT:  The Court will acknowledge that a barge
15:28   was loose at sometime and a barge did, in fact, go from the
15:28   canal into the Ninth Ward.
15:29   MR. KHORRAMI:  All right.  We'll move on.
15:29   Now, if we could put up paragraph 23 of
15:29   Dr. Bea's report, please.
15:30   We're having technical issues, Your Honor.
15:30   MR. GILBERT:  It's Exhibit 206.
15:30   MR. KHORRAMI:  Paragraph 23.
15:30   THE COURT:  Are you going to ELMO?
15:30   MR. KHORRAMI:  We're going to go to the ELMO, Your
15:30   Honor.
15:30   THE COURT:  All right.  I'm glad we have a
15:30   multi-media capability.
15:30   BY MR. KHORRAMI:
15:31   Q.   This is from paragraph 23 of your report, and there
15:31   conceded that the barge might have struck the floodwall twice
15:31   or more before finally impacting the southern end; fair?
15:31   A.   That came from our phase II ILIT report, that's correct.
15:31   Q.   That's a statement that you agree with?
15:31   A.   That's correct.
```
JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2760**

```
15:26   Q.   Okay.
15:26   MR. RAFFMAN:  If you could, Bob.  And I want to zoom
15:26   in, Bob, on -- I apologize.  I'm losing my place.  There's a
15:27   section where we talked about the mooring of the barge.  Go
15:27   down.  I can't find it.
15:27   BY MR. KHORRAMI:
15:27   Q.   And in here they have a quote from you that says it's
15:27   obvious that the barge wasn't properly tied up.  Is that
15:27   something you remember making?  And I can pull it up if --
15:27   A.   It would be best if you pulled it up.
15:27   Q.   Let me find it.
15:27   THE COURT:  Maybe we can --
15:27   MR. KHORRAMI:  I'm sorry, Your Honor.
15:28   THE COURT:  I'm just wondering.  Is someone trying to
15:28   pull up that -- is it in that article?
15:28   MR. KHORRAMI:  It's in that article, and I actually
15:28   have it on my screen.  But, for whatever reason, when they put
15:28   it up there, I can't spot it.  I apologize for that.
15:28   THE COURT:  You can put that on -- you don't have
15:28   anything to put on the ELMO?  You don't have the article you
15:28   can put on the ELMO?
15:28   MR. KHORRAMI:  I can probably put it up on the
15:28   screen.  I apologize, Your Honor.
15:28   THE COURT:  That's okay.  If it's on your laptop.
15:28   It's on the second page of the article.
```
JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2762**

```
15:31   Q.   Now, since that time, you've changed your opinion?  You've
15:31   changed your opinion as to the barge; correct?
15:31   A.   That's correct.
15:31   Q.   You've changed your opinion as to the seepage; is that
15:32   fair?
15:32   A.   That's fair.
15:32   Q.   In the MRGO trial, the Robinson trial last year, you
15:32   stated that the fault lies with MRGO of the breaches, of all
15:32   the breaches; is that fair?
15:32   A.   I'm not certain.  I'll need to refer to the transcript
15:32   that you are referencing.
15:32   Q.   Okay.  We'll pull up the transcript.
15:32   THE COURT:  When you say "the breaches," you mean the
15:32   breaches along the MRGO?
15:32   MR. KHORRAMI:  The entirety of the breaches in the
15:32   region.  Everything that was -- that went along the
15:32   Intercoastal Waterway and also along the Industrial Canal.
15:32   THE COURT:  Well, to get that in context, that would
15:32   be quite a feat, so good luck.  Your clock is ticking.  That's
15:32   all I'm telling you.  It's ticking.
15:32   In other words, if water caused it, I'm not sure
15:33   what difference it makes where the water comes from.  How does
15:33   it relate to the barge?  I'm not sure where you're going with
15:33   that.
15:33   MR. KHORRAMI:  Well, I think, really, that Dr. Bea
```
JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2763

1  15:33  has gone over a progression of having one opinion, then
2  15:33  expressing that opinion, then changing that opinion, then
3  15:33  coming up with a new opinion.  And the same thing has happened
4  15:33  as to the permeability issue and as to the seepage issues.  And
5  15:33  so just an acknowledgment that that has gone through a very
6  15:33  wide progression of events.
7  15:33  BY MR. KHORRAMI:
8  15:33  Q.  And I think, Dr. Bea, you're agreeing with me on that; is
9  15:33  that fair?
10  15:33  A.  I'm agreeing with you.  I think as knowledge changes,
11  15:33  improves, you would need to be pretty stupid to keep the old
12  15:33  conclusions.  And I'm not too smart, but I'm not stupid.
13  15:33  Q.  So in terms of the 17 Street Canal, the area of that
14  15:34  breach was exposed to comparable or greater surge; is that
15  15:34  fair?
16  15:34  A.  That is not fair.
17  15:34  Q.  Okay.  Comparable surge?
18  15:34  A.  That is not fair.  6 feet is all the surge that canal saw
19  15:34  before breaching, 6 to 7.
20  15:34  Q.  Then it was exposed to a greater time with the storm,
21  15:34  greater amount of storm conditions; fair?
22  15:34  A.  No, that's not fair.
23  15:34  Q.  It occurred later, didn't it?
24  15:34  A.  No.  It occurred at 6:00 a.m. in the morning.
25  15:34  Q.  I believe you said that it occurred at 8:30.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2764

1  15:34  A.  No.  That's the completion of the breach as portrayed by
2  15:34  Captain Paul Helmers' video frame capture I showed.
3  15:34  Q.  And you believe that it started at 6:00 a.m. and ended at
4  15:34  8:30?
5  15:34  A.  That's correct.
6  15:34  Q.  So it was exposed to comparable storm conditions; fair?
7  15:35  A.  No, that's not fair.
8  15:35  Q.  Well, didn't the Industrial Canal actually initiate
9  15:35  breach -- the south breach at about 6:00 a.m., according to
10  15:35  you?
11  15:35  A.  That's correct.
12  15:35  Q.  And the north breach started about 5:00 a.m., earlier than
13  15:35  17th Street; fair?
14  15:35  A.  And that's correct.
15  15:35  Q.  Okay.  So in terms of being exposed to the storm
16  15:35  conditions, it was a comparable amount of time; fair?
17  15:35  A.  Certainly in terms of time, but not in terms of condition.
18  15:35  But the Industrial Canal, because of its location, is
19  15:35  experiencing water elevations earlier.  There are significant
20  15:35  wave action, and it had 1 to 3 feet of wave height that's been
21  15:35  discussed.
22  15:35  But in the 17 Street canal, because the surge is not
23  15:35  coming up from the Gulf of Mexico, but through the MRGO conduit
24  15:36  to the funnel to the Industrial Canal, it gets its surge by
25  15:36  coming from the Gulf of Mexico through the Rigolets to Lake

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2765

1  15:36  Pontchartrain.  And the hydrologic conditions are decidedly
2  15:36  different.
3  15:36  Q.  In terms of the west side of the Industrial Canal, north,
4  15:36  north of Florida Avenue, there were breaches there; right?
5  15:36  A.  Repeat your question, please.
6  15:36  Q.  The north side -- north of Florida Avenue on the
7  15:36  Industrial Canal, there are breaches there; correct?
8  15:36  A.  Yes, sir.
9  15:36  Q.  On the west side; right?
10  15:36  A.  Yes, sir.
11  15:36  Q.  And they were exposed to significant surge; right?
12  15:36  A.  Yes, they were.
13  15:36  Q.  And they occurred a bit later than these breaches, didn't
14  15:36  they?
15  15:36  A.  I don't recall the time, but I'm recalling the blowout at
16  15:37  the CSX Railroad.  You can get that time directly from the
17  15:37  hydrograph that we have seen repeatedly during this trial.
18  15:37  I don't recall when the breaches developed at the
19  15:37  Port of New Orleans.  We can get that from the Independent
20  15:37  Levee Investigation Team report that addresses those breaches.
21  15:37  Q.  And that's in evidence, and we'll be able to get that.
22  15:37  A.  I couldn't hear your question.
23  15:37  Q.  I said that's in evidence and we'll get that.  I don't
24  15:37  want to take up the Court's time here.
25  15:37  Now, at some point, what you discussed in your

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2766

1  15:37  earlier testimony, was that you decided that to combine seepage
2  15:37  and lateral stability analysis; is that fair?
3  15:37  A.  Repeat your --
4  15:37  Q.  If I'm misstating it, please correct me.
5  15:38  A.  Please repeat your question.
6  15:38  Q.  You combined at some point seepage analysis with lateral
7  15:38  stability analysis; is that fair?
8  15:38  A.  That's fair.
9  15:38  Q.  Okay.  And that's something that was done -- that you did
10  15:38  new, that was new; correct?
11  15:38  A.  No, not new at all.  It was new in the sense of evaluation
12  15:38  of breaches here.
13  15:38  This combination of seepage and uplift effect has
14  15:38  been around for at least five decades, but it's an extremely
15  15:38  important consideration in the design of dams because dams have
16  15:38  high water on one side but no water, most of the time, on the
17  15:38  low side.  So this hydraulic uplift effect is a well known
18  15:38  phenomenon in dam engineering.
19  15:38  Q.  And in terms of, like you said, analyzing breaches,
20  15:38  combining this way of putting it together with something that
21  15:39  was new that you did for the first time; fair?
22  15:39  A.  Repeat your question.  I'm having trouble following the
23  15:39  pieces.
24  15:39  Q.  I apologize.  I'll be better about the questions.
25  15:39  In terms of studying breaches, when you're analyzing

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

18  (Pages 2763 to 2766)

2767

```
1    15:39   them and forensically putting them together, combining the
2    15:39   seepage analysis and the stability analysis was something that
3    15:39   you did for the first time new; no one had done that prior?
4    15:39   A.  To my knowledge, that's correct.  Although, in the
5    15:39   independent levee investigation report, phase II, we did note
6    15:39   the likelihood for uplift effect on the protected side,
7    15:39   three failure modes were called out in that report, and that
8    15:39   was one of the three that were cited.
9    15:40   Q.  But, again, when ILIT did it, that was something that you
10   15:40   were a co-leader on.  You did it there; right?
11   15:40   A.  I didn't, but we did it as a team.
12   15:40   Q.  Right.  And you were co-leader of that team?
13   15:40   A.  That's correct.
14   15:40   Q.  Okay.  And then afterwards, a number of -- you published a
15   15:40   number of papers having to do with using that model; fair?
16   15:40   A.  That's correct.
17   15:40   Q.  Okay.  And your papers on the use of that model are the
18   15:40   only ones that have been published since you did that?
19   15:40   A.  No.  There have been many other papers published to my
20   15:40   knowledge.  We published the only papers that have combined the
21   15:40   hydraulic uplift effect explicitly into the lateral stability
22   15:40   analysis.
23   15:41   Q.  Let's talk about boring 81-A.  That's something that, in
24   15:41   the time that you've studied Katrina, you hadn't come across,
25   15:41   for the time that you put out your ILIT reports; correct?
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2768

```
1    15:41   A.  That's correct.
2    15:41   Q.  So they're not contained in your ILIT reports, those
3    15:41   borings?
4    15:41   A.  That's correct.
5    15:41   Q.  They came about sometime afterwards; fair?
6    15:41   A.  That's correct.
7    15:41   Q.  And, in fact, they're pretty recent; right?
8    15:41   A.  They came in Dr. Marino's report for the first time.
9    15:41   Q.  But before that time, you had studied what WGI had done it
10   15:41   terms of excavations?
11   15:41   A.  That's correct.
12   15:41   Q.  And you had studied all of the EBIA excavations; right?
13   15:41   A.  That's correct.
14   15:41   Q.  So in your conclusions regarding those excavations, you
15   15:41   didn't include any consideration for any of those borings,
16   15:41   81-A, 79, any of those that are contained in that -- in that
17   15:41   boat that we've been discussing today?
18   15:42   A.  That's correct.
19   15:42   Q.  Now, even though you've discussed soil and seepage, and
20   15:42   that's been a cornerstone of your conclusions, that's -- that
21   15:42   hasn't been part of your conclusions in terms of seepage in
22   15:42   your report; fair?
23   15:42   A.  I find that not clear to me.  Please rephrase --
24   15:42   Q.  Absolutely.
25   15:42   A.  -- your question.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2769

```
1    15:42   Q.  Absolutely.
2    15:42       In terms of your report, you didn't consider the soil
3    15:42   that is contained -- I got to rephrase that.  That's not a good
4    15:42   question.
5    15:42       When you did your report, you didn't consider the
6    15:42   information that those borings provided at all; fair?
7    15:42   A.  Which report?
8    15:42       THE COURT:  You're talking the report in this case?
9    15:42       MR. KHORRAMI:  The report -- I apologize, Your Honor.
10   15:42   BY MR. KHORRAMI:
11   15:42   Q.  The report in this case, Doctor.
12   15:42   A.  Well, I have a supplemental report that explicitly
13   15:43   addresses the boat borings as they apply to the north breach.
14   15:43   Q.  And Dr. Bakeer talked about a river of water that,
15   15:43   basically, would go through these soils and drain down into
16   15:43   81-A.  That wasn't something that was in your initial report;
17   15:43   fair?
18   15:43   A.  Please repeat your question.
19   15:43   Q.  Dr. Bakeer testified.  You were here for that; fair?
20   15:43   A.  Yes.
21   15:43   Q.  And you listened to Dr. Bakeer's testimony?
22   15:43   A.  Yes.
23   15:43   Q.  Dr. Bakeer talked about a river of water that would flow
24   15:43   through that top soil and flow into 81-A and get underneath the
25   15:43   wall; correct?
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2770

```
1    15:43   A.  Yes.  I heard that.
2    15:43   Q.  In your analysis of the breach -- the north breach that
3    15:43   we're discussing here, inside of your report, that wasn't a
4    15:43   consideration; correct?
5    15:43   A.  Which report?
6    15:43   Q.  Your report in this case.  Your initial report in this
7    15:43   case.
8    15:43   A.  I have a primary report I have with me here.  There's a
9    15:43   supplemental report written in September 2009 that explicitly
10   15:44   addresses the 81-A series borings at the north breach location.
11   15:44   Q.  I think I'm not -- again, not asking the question well
12   15:44   enough.
13   15:44       In issuing your initial report in this case, not your
14   15:44   supplemental one, you did not consider the top soil river that
15   15:44   Dr. Bakeer described in this court, I believe yesterday?
16   15:44   A.  That's correct.
17   15:44   Q.  And you didn't consider that to be a cause of the north
18   15:44   breach; correct?
19   15:44   A.  What's "it" in your question?
20   15:44   Q.  I believe I said "that," and I'll clarify.
21   15:44       And you didn't consider that river of top -- that
22   15:44   river that Dr. Bakeer claimed is created in the topsoil as a
23   15:45   cause of the north breach; is that correct?
24   15:45   A.  It depends on how you're using that term "river."  I've
25   15:45   never considered a river to be present at the location of the
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

19 (Pages 2767 to 2770)

2771

```
 1   15:45   north breach.
 2   15:45   Q.  My impression was that Dr. Bakeer specifically referred to
 3   15:45   it as a river that basically drains into that -- what he
 4   15:45   claimed was this deep section in 81-A and undermines the wall.
 5   15:45   A.  And I think that was his explanation that I was attempting
 6   15:45   to further discuss this morning when I talked about the
 7   15:45   formation of the sand boil, the connected element under the
 8   15:45   sheet pile called a pipe.
 9   15:45        And at that point, you form this conduit that can
10   15:46   transmit both water and soil.  And as I listened to the
11   15:46   testimony of Dr. Bakeer, my impression is that's what he was
12   15:46   trying to describe.
13   15:46   Q.  Correct.  But in issuing your initial report in this case,
14   15:46   that wasn't -- that river that Dr. Bakeer referred to and that
15   15:46   drainage that occurs at 81-A was not what you considered to be
16   15:46   even a cause of the north breach; correct?
17   15:46   A.  That's incorrect.  I tried to clarify that this morning by
18   15:46   saying that our results for the north breach, both -- we'll
19   15:46   call it "before-Marino" and "after-Marino" -- have not changed.
20   15:46   Q.  Okay.  At the -- and we'll call it "pre-Marino" and
21   15:46   "post-Marino" if that's a fair way for you to be able to --
22   15:47        THE COURT:  Are you asking him did he consider the
23   15:47   81-A findings as specifically in his report?  I don't want to
24   15:47   ask a question you don't want to -- you're not going anywhere.
25   15:47   But I'm not quite sure where we're going.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2772

```
 1   15:47        MR. KHORRAMI:  I believe that's exactly what I've
 2   15:47   been asking.
 3   15:47   BY MR. KHORRAMI:
 4   15:47   Q.  Inside of that initial report, that pre-Marino, pre-your
 5   15:47   supplement report, you did not consider those borings at all?
 6   15:47   A.  That's correct.
 7   15:47   Q.  And you did not consider boring No. 81-A; correct?
 8   15:47   A.  That's correct.
 9   15:47        THE COURT:  You established that about five minutes
10   15:47   ago, because he said he didn't use the borings; ergo, 81-A
11   15:47   wasn't involved.
12   15:47        MR. KHORRAMI:  Right.
13   15:47        THE COURT:  He didn't use the borings until Marino
14   15:47   used the borings and he had a supplemental report.  Got it.
15   15:47        MR. KHORRAMI:  Fair enough.
16   15:48        Now, if we could put up slide No. 50, please,
17   15:48   Dr. Bea's slide.
18   15:48   BY MR. WIEDEMANN:
19   15:48   Q.  Now, we saw this slide earlier today.
20   15:48   A.  Yes, sir.
21   15:48   Q.  Specifically, I want to focus on the location of the
22   15:48   floodwall.  On the left of this slide, slide 50 of your
23   15:48   presentation, is the flood side; correct?
24   15:48   A.  That is correct.
25   15:48   Q.  And on the right side is the protected side?
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2773

```
 1   15:48   A.  That's correct.
 2   15:48   Q.  I notice consistently on your diagrams that the actual
 3   15:48   I-wall is sitting very close to where the levee slopes
 4   15:48   downwards on the protected side; correct?
 5   15:49   A.  Yes, there's a slight lip there of levee soil on the
 6   15:49   protected side abutting the concrete floodwall.
 7   15:49   Q.  In fact, the way the wall was designed and the way it sat
 8   15:49   was much farther to the left, wasn't it?
 9   15:49   A.  How do you know that?
10   15:49   Q.  It was -- the as-designed diagrams placed the wall much
11   15:49   more towards the flood side, with the flat portion -- and
12   15:49   you're nodding your head; is that correct?
13   15:49   A.  We don't use the as-designed drawings.  We use the best
14   15:49   information we have on the topography that existed at that area
15   15:49   before Hurricane Katrina.
16   15:49   Q.  But the way that the walls were built was close -- where
17   15:49   the slope of the flood side, where it would actually break,
18   15:50   would be where the floodwall would be placed; correct?
19   15:50   A.  Please repeat your question.
20   15:50   Q.  Okay.  On the flood side -- let me rephrase it.
21   15:50        The floodwall was erected such that it would be right
22   15:50   at where the levee would flatten on top on the flood side;
23   15:50   correct?
24   15:50   A.  Are you referring to when it was constructed based on the
25   15:50   as-built drawings or when it was constructed originally, for
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2774

```
 1   15:50   example, 1968, and the soil position at that time; or the
 2   15:50   floodwall as it existed with the levee August the 29th, 2005?
 3   15:50   What are you referring to?
 4   15:50   Q.  I apologize.  I'm merely talking about the as-builts.
 5   15:51   They were built, right, so they would be sitting at the slope
 6   15:51   of the levee on the flood side.
 7   15:51   A.  If you've checked them and that's what you've concluded,
 8   15:51   that's just fine.
 9   15:51        MR. KHORRAMI:  All right.  Why don't we put up Figure
10   15:51   2.4 of Dr. Marino's report.
11   15:51   BY MR. WIEDEMANN:
12   15:51   Q.  In fact, in these -- in these actual drafts -- these are
13   15:51   the actual drafts of as-builts of the wall; correct?
14   15:51   A.  I don't know.  I don't see the legend.
15   15:51   Q.  Okay.  Assume that they are.
16   15:51   A.  But I've always gotten into trouble with assumptions.
17   15:51        MR. KHORRAMI:  Why don't we put up the legend.
18   15:52        THE COURT:  Okay.
19   15:52   BY MR. KHORRAMI:
20   15:52   Q.  Does that give you enough information, Doctor?
21   15:52   A.  Those looks like the design drawings, not as-built
22   15:52   drawings.
23   15:52   Q.  No, they're as -- which one?  I'm sorry.  I missed that.
24   15:52   A.  There's a big difference between design drawings and
25   15:52   as-built drawings and as-is.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2775**

1  15:52  Q.  Okay.  And which ones are these?
2  15:52  A.  Looks like the design drawings.
3  15:52  Q.  Fine.
4  15:52      MR. KHORRAMI:  Let's put up the other one.
5  15:52  BY MR. KHORRAMI:
6  15:52  Q.  So as designed, then, the walls were constructed such that
7  15:52  they would sit actually closer to the flood side?
8  15:52  A.  That's correct.
9  15:52  Q.  And behind them would be a flat space which would be the
10 15:52  top of the levee; correct?
11 15:53  A.  That's correct.
12 15:53  Q.  And your claim is that, over time, what happened was
13 15:53  that -- that phenomenon reversed?
14 15:53  A.  Well, no, the position levee along the alignment matters,
15 15:53  and what they actually put in place actually matters, and we
16 15:53  saw some examples of that on soil differences, this morning.
17 15:53      So we have to use this as a starting point, but it's
18 15:53  not where we stop to profile the levee in the breach section
19 15:53  we're concerned with.  Here's where we have to refer to survey
20 15:53  data that was performed prior to Hurricane Katrina.
21 15:53  Q.  So it's your claim that, at some point, the wall ended up
22 15:53  being about here?
23 15:54  A.  That's correct.
24 15:54  Q.  Okay.
25 15:54  A.  At the breach cross-section.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2776**

1  15:54  Q.  Okay.  And if you were incorrect as to that conclusion as
2  15:54  to the north and south levees here -- the north and south
3  15:54  floodwalls here, then that would affect the strength
4  15:54  calculations, the stability calculations, that you have
5  15:54  performed; correct?
6  15:54  A.  Not substantially, but there would be an effect.
7  15:54  Q.  There would be an effect?
8  15:54  A.  Sure.
9  15:54  Q.  Now, let's go to something that Dr. Bakeer actually talked
10 15:54  about, which is those peat blocks that he talked about
11 15:54  yesterday.
12 15:54      MR. KHORRAMI:  Can you put those up, please?
13 15:54  BY MR. KHORRAMI:
14 15:55  Q  Were you here when this slide went up yesterday?
15 15:55  A.  Yes.  And I took delight in seeing my peat blocks.
16 15:55  Q.  Your peat blocks?
17 15:55  A.  Yes.  I love those peat blocks.
18 15:55  Q.  Okay.  And these peat blocks were something that were
19 15:55  pushed up from the ground; is that correct?
20 15:55  A.  Yes, that's correct.
21 15:55  Q.  Okay.
22 15:55  A  That's part of the slide surface at 17 Street Canal.
23 15:55  Q.  That's part of what happened in terms of the uplift
24 15:55  effect; is that fair?
25 15:55  A.  No.  Actually, there's a series of initial slab features

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2777**

1  15:55  that were ultimately traced out at the 17 Street Canal that was
2  15:55  the slide surfaces that brought this peat to the surface, and
3  15:55  that was a picture I showed during my testimony earlier today
4  15:55  where I showed the background picture of these peat layers.
5  15:55  And we were discussing the water-level measurements in
6  15:56  the 17 Street Canal and the water-pressure measurements made in
7  15:56  these peat layers.
8  15:56  Q.  Now, this same phenomenon didn't occur at the breaches
9  15:56  that we're talking about here; correct?
10 15:56  A.  Which phenomenon --
11 15:56  Q  I'm sorry.  We didn't get the --
12 15:56  A  -- is your question --
13 15:56  Q  We didn't get any peat --
14 15:56  A  -- applying --
15 15:56  Q.  We didn't get any peat that turned up above ground at the
16 15:56  Industrial Canal; right?  Peat blocks.
17 15:56  A.  At the Lower Ninth Ward, yeah, I don't recall any peat
18 15:56  blocks being shoved to the surface.  Rather, the floodwall was,
19 15:56  I'll call it, exhumed by the -- by hydrostatic pressures and
20 15:56  local effect from sea breeze.  So slide surfaces didn't develop
21 15:56  but brought these peat layers to the surface.
22 15:57  Q.  Is it fair to say that -- I believe this is your
23 15:57  contention:  The north breach occurred before any overtopping;
24 15:57  correct?
25 15:57  A.  That's correct.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2778**

1  15:57  Q.  Now, you, in terms of your conclusions as to these two
2  15:57  breaches that we're talking about here, you differ with ILIT
3  15:57  and IPET in terms of the fact that you rely on those
4  15:57  excavations that were done at the EBIA; correct?
5  15:57  A.  Please repeat your question, and I would like to have you
6  15:57  also define what you mean by "overtopping."  That term has been
7  15:58  used repeatedly in this trial, and I'm not certain if you're
8  15:58  referring to wave overtopping or overtopping by the main water
9  15:58  level we identify as surge.
10 15:58      At the north breach there clearly, I think, was
11 15:58  sufficient water elevation and wave action to explain the wave
12 15:58  overflowing that I showed earlier today with that photograph
13 15:58  taken during Hurricane Gustav.
14 15:58  Q.  I think -- and we'll get to the picture with Hurricane
15 15:58  Gustav.
16 15:58      What I'm saying is half -- let me go about it this
17 15:58  way:  In terms of relying on -- looking at the excavations of
18 15:59  EBIA -- the excavations that were done over a period of years;
19 15:59  right?
20 15:59  A.  Yes.
21 15:59  Q.  -- initially, you didn't rely on any permeability from
22 15:59  those excavations in coming up with the underseepage theory
23 15:59  that you had; correct?
24 15:59  A.  Please reference when you say "initially."  "Initially"
25 15:59  now spans almost five years.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2779**

```
 1   15:59   Q   Let's go to the first year.
 2   15:59       Now, I've got the first year, so I'm a little curious to
 3   15:59   the independent levee investigation work phase II.  Please
 4   15:59   repeat your question.
 5   15:59       THE COURT:  Why don't you say, "At what point in time
 6   15:59   did you first consider the EBIA remediation work in any way
 7   15:59   contributed to the failure of the north breach?"
 8   15:59       MR. KHORRAMI:  Fair enough.
 9   16:00   BY MR. KHORRAMI:
10   16:00   Q   The Court asked the question.  Would you please answer it.
11   16:00   A   Well, the question and answer is, during the MRGO Robinson
12   16:00   work, I addressed the performance in this area during Hurricane
13   16:00   Katrina.
14   16:00   Q   That's when you first started considering whether EBIA and
15   16:00   the excavations had any effect on the actual breaches; correct?
16   16:00   A   That's correct.
17   16:00   Q   Prior to that time, your conclusions were that
18   16:00   underseepage occurred independent of those excavations;
19   16:00   correct?
20   16:00   A   That's correct.
21   16:00   Q   Okay.
22   16:00       THE COURT:  Oh -- and I'm sorry, counsel.  I'll put
23   16:00   this on me:  What significance -- we'll take that off, but what
24   16:00   significance is that squeezed peat block that we see right
25   16:00   there?  If it's -- if it's not related to the mechanism of
```
                JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                        UNITED STATES DISTRICT COURT
                        EASTERN DISTRICT OF LOUISIANA

**2780**

```
 1   16:00   failure at the IHNC.
 2   16:01       THE WITNESS:  The --
 3   16:01       THE COURT:  Or is it?
 4   16:01       THE WITNESS:  The peat block in this case is shoved
 5   16:01   up, much like mud would be shoved up in front of your foot if
 6   16:01   you were scraping it along a soft peaty layer.  So it's been
 7   16:01   shoved up by the lateral motion of that portion of the levee
 8   16:01   floodwall we can't see to the left.
 9   16:01       So it's mud in front and frequently on top of
10   16:01   your boots.
11   16:01       THE COURT:  You said it was sliding -- as a result of
12   16:01   sliding rather than seepage; is that correct?
13   16:01       THE WITNESS:  Yes.  This is a lateral instability
14   16:01   feature.
15   16:01       THE COURT:  Okay.  It simply shows lateral
16   16:01   instability manifested in that way?
17   16:01       THE WITNESS:  Yes, sir.
18   16:01       THE COURT:  Okay.  All right.
19   16:01   BY MR. KHORRAMI:
20   16:01   Q   And you're aware that, prior to Katrina, the residents
21   16:02   adjacent to the 17 Street canal reported ponding of water on
22   16:02   their property; is that about right?
23   16:02   A   Oh, yes.  In fact, I included that in my work on the
24   16:02   17 Street Canal breach.
25   16:02   Q   And you're also aware that, prior to Katrina, residents
```
                JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                        UNITED STATES DISTRICT COURT
                        EASTERN DISTRICT OF LOUISIANA

**2781**

```
 1   16:02   near the London Avenue Canal also reported ponding; right?
 2   16:02   A   Yes, sir.
 3   16:02   Q   There were no such reports around Jourdan Avenue; correct?
 4   16:02   A   That's incorrect.
 5   16:02   Q   Okay.
 6   16:02   A   There are photographs that were produced by Washington
 7   16:02   Group International on the protected side at Jourdan Avenue at
 8   16:02   the north breach location that showed extensive rudding and
 9   16:02   water-ponding.
10   16:02   Q   At Jourdan Avenue?
11   16:02   A   At Jourdan Avenue directly at the location of the north
12   16:03   breach.
13   16:03   Q   Was that during WGI excavations?
14   16:03   A   It was during the period of the site clearing work that
15   16:03   included much more than just excavations.  And they were
16   16:03   carefully tracking construction work and other things on the
17   16:03   protected side.  That's not the East Bank industrial area, and
18   16:03   I'll call it the unprotected side.
19   16:03   Q   Now, Dr. Bakeer talked about how the breaches in question
20   16:03   occurred at the weak link in the levee system; is that fair?
21   16:04   A   Yes.
22   16:04   Q   And you agree with that; correct?
23   16:04   A   I agree that the breaches occur where the conditions are
24   16:04   such that the driving forces exceed those capacity forces I
25   16:04   attempted to describe.  You could call that a weak link, but
```
                JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                        UNITED STATES DISTRICT COURT
                        EASTERN DISTRICT OF LOUISIANA

**2782**

```
 1   16:04   note it consists of two important things:  And that's the local
 2   16:04   demands, in this case coming from water; and the local soil
 3   16:04   elements, and there were a wide variety of them I cited.
 4   16:04   That's a weak link.
 5   16:04   Q   Now, in terms of when we're discussing about -- discussing
 6   16:04   a levee system, there's always going to be a weak link; is that
 7   16:04   fair?
 8   16:04   A   No, that's not fair.  But we do, in fact, construct levee
 9   16:04   systems so that entire series of segments have close to
10   16:05   identical strengths.  But we create these weak links when we
11   16:05   put pipeline passes or construct a road through over the levee.
12   16:05       So it's generally through either inappropriate design
13   16:05   or inappropriate construction maintenance that we create these
14   16:05   weak links.
15   16:05   Q   But you're always relying on the soil that's underneath
16   16:05   those walls and levees; is that fair?
17   16:05   A   You are always relying on that.  And, of course, in this
18   16:05   area, it makes it particularly challenging since the subsoils
19   16:05   above that, placed at the same level I described this morning,
20   16:05   are so soft and treacherous, they're highly variable, and this
21   16:06   makes it a particularly difficult thing to construct
22   16:06   flood-protection structures.
23   16:06   Q   You have to deal with those soils; is that correct?
24   16:06   A   Yes, sir, you do --
25   16:06   Q   And it's going to --
```
                JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                        UNITED STATES DISTRICT COURT
                        EASTERN DISTRICT OF LOUISIANA

2783

```
1   16:06   A   -- that or you don't build there.
2   16:06   Q.  And they're going to have different properties as you go
3   16:06       up and down the system; isn't that true?
4   16:06   A.  Yes, that's very true.
5   16:06   Q.  So, therefore, there's going to be situations where
6   16:06       there's going to be some area that's going to have more
7   16:06       permeability and some areas that's going to have higher
8   16:06       permeability; is that fair?
9   16:06   A.  That's certainly true.
10  16:06   Q.  Now, you discussed -- you've looked at the marsh layer
11  16:06       that we've been discussing, and you equate that to peat; is
12  16:06       that right?
13  16:06   A.  Marsh and peat are different things.  No, I do not equate
14  16:06       it.
15  16:06   Q.  Okay.
16  16:06   A.  I brought a bag for you to see what I call marsh.
17  16:07       And I'll eventually put my hand in that bag, but --
18  16:07   A.  You can have it.  I think I don't want to carry it back to
19  16:07       California.
20  16:07   Q.  Why don't I show you a portion of your report.  We're
21  16:07       going to go to Appendix C, page 21.
22  16:07       THE COURT:  Counsel.
23  16:07   BY MR. KHORRAMI:
24  16:07   Q.  I'm going to focus you in on paragraph 19.  And there's,
25  16:08       at least, with the marsh layer we're talking about here, you
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2784

```
1   16:08       equate that to peat; correct?
2   16:08   A.  Using the terms shown in the paragraph interchangeably, so
3   16:08       that's why I've termed it here "Marsh," capital M-A-R-S-H,
4   16:08       parentheses, P-E-A-T, closed paren, "deposit."
5   16:08   Q.  Okay.  Now, if we go to the soil borings, that -- if we go
6   16:08       to the actual soil borings and look at them, we're going to see
7   16:08       exactly what those layers are; is that right?
8   16:08   A.  That's incorrect.
9   16:08       And that's the reason I'm on site watching soil
10  16:08       borings.  The soil-boring loggers frequently will use different
11  16:09       terms to describe the same soil, but that's one of the reasons
12  16:09       for always testing these human interfaces in the chain of
13  16:09       information that an engineer has to use.  So you have to very
14  16:09       carefully watch those words and what they mean.
15  16:09   Q.  Okay.
16  16:09   A.  We found that repeatedly around this area, particularly
17  16:09       out on the Mississippi River Gulf Outlet stretches.
18  16:09   Q.  So it's your testimony that people that are doing the
19  16:09       borings put information in there that's incorrect?
20  16:09   A.  No.  They're interpreting the soil characteristics
21  16:09       visually.  Depending on their training and the data they have
22  16:09       available, two loggers can describe the same soil differently.
23  16:09       So it depends very much on the experience of the logger and the
24  16:10       other information being used by the logger to label a soil a
25  16:10       certain way.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2785

```
1   16:10   Q.  So is it fair to say that, unless you're actually yourself
2   16:10       over there, there's no way to say whether a logger had
3   16:10       improperly classified a soil; is that fair?
4   16:10   A.  No.  That's where I turn to my colleague, Dr. David
5   16:10       Rogers, and said, "Dave, if you look at this hole, I don't have
6   16:10       to be."  But, furthermore, I have Dr. David Cobos-Roa learning
7   16:10       from Dr. David Rogers how such things are done correctly.
8   16:10       When I have people like that on the hole, I don't
9   16:10       need to be there unless I'm trying to pick up something else.
10  16:10   Q.  Well, let's go to page C-48 of your report.
11  16:11       Do you see these are borings that you incorporated in
12  16:11       your report; is that correct?
13  16:11   A.  That's correct.
14  16:11   Q.  And do you see each one of these and how they're
15  16:11       classified?
16  16:11   A.  That's correct.
17  16:11   Q.  Okay.  And do you see how the word CH -- the letters "CH,"
18  16:11       I'm sorry, that are going down, and then there's "CL" over here
19  16:11       at about negative 40; is that right?
20  16:11   A.  Yes.  Those are terms used to describe the different kinds
21  16:11       of soil.  "CL" stands for clay.
22  16:12   Q.  Okay.  And then over here, specifically, it says "CH plus
23  16:12       organics."  Is that accurate?
24  16:12   A.  Yes.  That would be silty material mixed with organics,
25  16:12       decayed organic material.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2786

```
1   16:12   Q.  And the same is over here; is that right?
2   16:12   A.  That's correct.
3   16:12   Q.  And the same is over there on the right side of the
4   16:12       picture and with that boring; is that correct?
5   16:12   A.  Yeah, that's correct.
6   16:12   Q.  And -- I'm sorry.
7   16:12   A.  And the general term given to the layer you have been
8   16:12       describing is termed "marsh."
9   16:12   Q.  That's correct.
10  16:12       And we're specifically referring to boring 9-A and I
11  16:12       believe we examined one that says 6 UEF.  Is that about right
12  16:12       here?
13  16:12   A.  6 UEF, that's correct.
14  16:12   Q.  I'm talking about this particular boring.  I'm not finding
15  16:12       the number on this.  But that's fine.  One of the borings in
16  16:12       the middle right where your box is; is that fair?
17  16:13   A.  That's fair.
18  16:13   Q.  And then we're looking at boring No. 8; is that fair?
19  16:13   A.  That's fair.
20  16:13   Q.  Now, those findings don't equate to peat; correct?
21  16:13   A.  "Those findings," please be more specific so I can
22  16:13       answer --
23  16:13   Q   I will do so.
24  16:13   A.  -- your question.
25  16:13   Q.  I will do so.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2787

1   16:13       The CH-plus organics that we referred to consistently
2   16:13   throughout those borings that's located in the layer that's
3   16:13   marked "marsh," that's not peat; correct?
4   16:13   A.   "Marsh" is what, in the text, I used synonymously with the
5   16:13   term "peat."  That's why that paragraph you alluded to earlier
6   16:13   is trying to say that these materials, as we're using those,
7   16:13   terms have a comparable performance characteristic.  In this
8   16:14   case, we're concerned very much with permeability.
9   16:14   Q.   And in terms of permeability, these -- the CH-plus
10  16:14   organics that we see consistently through that marsh layer
11  16:14   don't equate to the permeability of peat; correct?
12  16:14   A.   That's not correct.
13  16:14   Q   Okay.
14  16:14   A   It will depend very much on the characteristics of the
15  16:14   peat.
16  16:14   Q.   Let me take you to another section, and then we'll get to
17  16:14   the characteristics.  Let's look at C-65, and we'll look at
18  16:14   some other borings.
19  16:15       And this you incorporated into your report; is that
20  16:15   correct?
21  16:15   A.   Yes.
22  16:15   Q.   And this is by the south breach; correct?
23  16:15   A.   That's correct.
24  16:15   Q.   And, again, what we're looking at in these values, we're
25  16:15   seeing more of the CH; is that about right?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2788

1   16:15   A.   We see CH.  We see organic material.  We see sands.
2   16:15       This is a north-south profile, a portion of it, that
3   16:15   I showed earlier today.
4   16:15   Q.   Okay.  Now, let's go to the soil table at -- which
5   16:16   Dr. Marino presented, to slide No. 35.  Let's focus in on
6   16:16   the -- towards the bottom there.
7   16:16       First of all, Doctor, do you recognize the Unified
8   16:16   Soil Classification System?  Is that something that you agree
9   16:16   with?
10  16:16   A.   Yes.  It's used right here in the United States as a
11  16:16   universal way to describe soils, hence the term "unified."
12  16:16   Q.   That's something that you use yourself; is that fair?
13  16:16   A.   That's correct.  I used to log holes, soil borings, and
14  16:16   used this kind of thing to log them.
15  16:16   Q.   Now, you notice PTP is classified completely separately
16  16:17   from organic clays, which is what we saw, the OHs that we saw
17  16:17   in those borings, that were in that marsh layer; is that right?
18  16:17   A.   Yes, that's very true.
19  16:17   Q.   And then the CH, we saw that; is that right?
20  16:17   A.   That's correct.
21  16:17   Q.   And that's inorganic clays with high plasticity, fat
22  16:17   clays?
23  16:17   A.   That's correct.
24  16:17   Q.   And those clays are highly impermeable; is that correct?
25  16:17   A.   That's correct.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2789

1   16:17   Q.   And the same thing with the organic clays, they are
2   16:17   relatively impermeable; correct?
3   16:17   A.   That's incorrect.
4   16:17   Q.   They're less permeable than peat; fair?
5   16:17   A.   That's correct.
6   16:17   Q.   Now, you showed a picture of Hurricane Ivan; correct?
7   16:17   A.   Yes.
8   16:17   Q.   And that's DX-254.  I believe it was your slide 32.
9   16:18       Now, Ivan came in about 2004; correct?
10  16:18   A.   That's correct.
11  16:18   Q.   And there had been already a lot of EBIA excavations;
12  16:18   correct?
13  16:18   A.   That's correct.
14  16:18   Q.   Yet no walls fell and the city was safe; correct?
15  16:18   A.   That's correct.
16  16:18   Q.   Okay.
17  16:18   A.   The water level never got high enough to do it.
18  16:18   Q.   And Hurricane Rita came after Hurricane Katrina; correct?
19  16:18   A.   Yes, that's correct, unfortunately.
20  16:18   Q.   Pretty immediately afterwards.
21  16:18   A.   That's what kept us from getting here quicker.
22  16:18   Q.   Even with Rita, there weren't further breaches; correct?
23  16:18   Of the old walls?
24  16:18   A.   That's correct.  Of course, we breached temporary repairs
25  16:18   to those -- some of these breaches.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2790

1   16:18   Q.   Let's look at your slide 34.
2   16:19       Now, you did this for an illustration of the
3   16:19   hydraulic uplift that you spoke about; correct?
4   16:19   A.   That's correct.
5   16:19   Q.   That's in the Midwest; correct?
6   16:19   A.   That's correct.
7   16:19   Q.   That's not something you observed in -- inside the
8   16:19   Industrial Canal; correct?
9   16:19   A.   That's incorrect.
10  16:19   Q.   You actually observed --
11  16:19       THE COURT:  When you say that's not something, he
12  16:19   means -- then he's interpreting that question as meaning the
13  16:19   concept of hydraulic uplift.  "You didn't see a windmill, did
14  16:19   you, in the Ninth Ward?"  That makes it --
15  16:19   BY MR. KHORRAMI:
16  16:19   Q.   You didn't see that; correct?
17  16:19   A.   Sure as hell did not see a cornfield either.
18  16:19       THE COURT:  A flooded cornfield with a windmill,
19  16:19   something we can agree on.
20  16:19   BY MR. KHORRAMI:
21  16:19   Q.   Well, what I was observing was that we spent a lot of time
22  16:19   in other locations rather than actually inside the Industrial
23  16:19   Canal where these breaches are.
24  16:20   A.   And that's a sign of good engineering and good science.
25  16:20   We don't ever focus on a single location to try and understand

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

24 (Pages 2787 to 2790)

2791

```
16:20   1    a complex issue.
16:20   2    Q.   Now, let's talk about your slide 51 -- oops, that's 46.
16:20   3         The sand boils that you documented in California, you
16:20   4    didn't see any of those at the site of the breaches; correct?
16:20   5    A.   Couldn't because they'd been erased by the subsequent
16:21   6    breaching and inflow and outflow of water.
16:21   7    Q.   But you didn't see them?
16:21   8    A.   Didn't see them where?
16:21   9    Q.   At the site of the two breaches that we're talking about.
16:21  10    A.   That's correct.
16:21  11    Q.   Okay.  And let's go to slide 54 of your presentation.  And
16:21  12    here you've presented the breaches that you've observed at, I
16:21  13    believe, the London canal.  Right?
16:21  14    A.   At this location, we did not have blowouts.  This is the
16:21  15    London canal side that did not fail.  What we're seeing is it
16:22  16    was at close to failure, as I described it in my validations
16:22  17    work.  Waters were being transmitted under the levee, it's
16:22  18    removing soil, and this soil is dropping into that hydraulic
16:22  19    conduit.
16:22  20         So it's just meant to characterize the kinds of
16:22  21    things that would be happening at this time at this place,
16:22  22    mainly removal of the soil by seepage.
16:22  23    Q.   This is evidence of seepage; right?
16:22  24    A.   That's correct.
16:22  25    Q.   Underseepage; right?
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2792

```
16:22   1    A.   That's right.
16:22   2    Q.   And you didn't see this kind of evidence at the site of
16:22   3    the breaches that we're talking about here?
16:22   4    A.   And that's correct.  We couldn't because it removed it,
16:22   5    eradicated by the breaching.
16:22   6    Q.   Now, let's talk about the bus, which made you very happy,
16:22   7    but --
16:22   8    A.   That bus has made me happy and sad.
16:23   9    Q.   The bus could have been moved by the currents; isn't that
16:23  10    correct?
16:23  11    A.   I don't think so.  The wheels were fairly heavily embedded
16:23  12    in the soil.  There were no signs that it had been shoved
16:23  13    around by the water.
16:23  14    Q.   But at some point, it could have moved, I mean, even a few
16:23  15    feet, couldn't it?
16:23  16    A.   But we saw no signs that it moved.
16:23  17    Q.   Okay.
16:23  18    A.   It had gotten stuck off the shoulder of Jourdan Road, and
16:23  19    we think that's the reason it didn't move around.
16:24  20    Q.   Now, you discuss in your presentation these pipelines that
16:24  21    were right by or below the sheet piles; is that correct?
16:24  22    A.   That's correct.
16:24  23    Q.   Okay.  Those sheet piles were completely exhumed at these
16:24  24    breaches that we're discussing here; correct?
16:24  25    A.   In the areas of the breaching.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2793

```
16:24   1    Q.   Correct.  There was no sign of any portion of the sheet
16:24   2    pile being an empty space; correct?
16:24   3    A.   Please rephrase your question and describe the empty space
16:24   4    that you are asking the question about.
16:24   5    Q.   You were discussing pipelines.  The sheet piles weren't
16:24   6    actually inside of the holes that were -- that contained those
16:24   7    pipelines; correct?
16:24   8    A.   Well, we found pipelines that had, in fact, penetrated the
16:24   9    sheet piling.  Holes had been cut in the sheet piling,
16:25  10    pipelines placed through them.  But they show up in many of the
16:25  11    photographs along the Lower Ninth Ward.
16:25  12    Q.   Okay.  Now, you know of no other beaches anywhere in New
16:25  13    Orleans where the sheet pile was completely exhumed from the
16:25  14    ground; correct?
16:25  15    A.   That's incorrect.
16:25  16    Q.   Okay.  Where else are there sheet piles that were
16:25  17    completely exhumed from the very bottom of the wall, exhumed
16:25  18    from the ground?
16:25  19    A.   By Bayou Bienvenue south breach.  They had used shell.
16:25  20    The sheet piling had not been driven to cut off all the shell.
16:25  21    There was a blowout under it.  The breach developed and the
16:25  22    sheet piling were exhumed, but you couldn't see the exhumation
16:25  23    because it was underwater.
16:26  24    Q.   And here you would agree with me that the only places
16:26  25    where we have breaches, these two particular breaches, are
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2794

```
16:26   1    places that eyewitnesses claim they'd seen a barge cause the
16:26   2    breach in some fashion, or bump against the wall?
16:26   3    A.   Please repeat your question.
16:26   4    Q.   You would agree with me that, with respect to these two
16:26   5    breaches, where they occurred are the only places -- are places
16:26   6    where eyewitness claim that the barge was present; correct?
16:26   7    A.   That's -- well, I find that difficult to answer.  Things
16:26   8    were seen sticking through the levee.  Things were seen over
16:27   9    the levee.  But reports that I heard testimony, I heard the
16:27  10    levee -- or pardon me -- a barge is seen coming through the
16:27  11    breach.  So there were a variety of eyewitness reports.
16:27  12         I would have to know specifically which one and which
16:27  13    report you're referring to.
16:27  14    Q.   All I'm saying is the locations of the two breaches at
16:27  15    those -- those are the only places where eyewitnesses claim to
16:27  16    have seen a barge hit the floodwall; correct?
16:27  17    A.   I'm not sure that's correct.  I'm recalling from the
16:27  18    LeBlanc testimony that reported that the barge was against the
16:27  19    floodwall on the day before Hurricane Katrina.
16:28  20         I addressed that eyewitness report, and given the
16:28  21    time and the water level, it was not possible for the barge to
16:28  22    be against the floodwall.
16:28  23    Q.   I understand that you may not agree with the eyewitnesses.
16:28  24    All I'm saying is, at each of these breaches, these are the
16:28  25    only -- at each of these breaches, there are eyewitnesses who
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2795

| | | |
|---|---|---|
| 1 | 16:28 | claim that the barge impacted the wall? |
| 2 | 16:28 | A.  Yes. |
| 3 | 16:28 | Q.  Insofar as you know, there are no breaches anywhere where |
| 4 | 16:28 | eyewitnesses claim to have seen a barge impact the floodwall |
| 5 | 16:28 | anywhere else? |
| 6 | 16:29 | A.  That is correct. |
| 7 | 16:29 | MR. KHORRAMI:  Could I have two minutes, Your Honor? |
| 8 | 16:29 | THE COURT:  You certainly may. |
| 9 | 16:29 | BY MR. KHORRAMI: |
| 10 | 16:29 | Q.  So it's correct to say that -- |
| 11 | 16:31 | MR. KHORRAMI:  I'm sorry.  Are we ready? |
| 12 | 16:31 | BY MR. KHORRAMI: |
| 13 | 16:31 | Q.  Am I correct if we say that the barge was farther inland |
| 14 | 16:31 | before Rita came?  Is that fair? |
| 15 | 16:31 | A.  I think that's correct. |
| 16 | 16:31 | Q.  Okay.  And the houses that were behind the barge remained |
| 17 | 16:31 | relatively in better -- let me rephrase that.  The houses that |
| 18 | 16:31 | were behind the barge remained in better shape than other |
| 19 | 16:31 | properties that were not behind the barge; is that fair? |
| 20 | 16:31 | A.  I guess the trouble I'm having is "better shape."  There |
| 21 | 16:31 | was a house partially under the barge, and after you've had |
| 22 | 16:32 | this much water in your house, all of them are in bad shape. |
| 23 | 16:32 | Q.  But the houses that were immediately behind the barge, not |
| 24 | 16:32 | the one that was sitting under it, the houses that were |
| 25 | 16:32 | immediately behind the barge, they seemed to have been somewhat |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2796

| | | |
|---|---|---|
| 1 | 16:32 | protected from the currents; is that fair? |
| 2 | 16:32 | A.  I didn't conduct any detailed studies of the structural |
| 3 | 16:32 | condition of those homes, so I cannot opine yes or no to your |
| 4 | 16:32 | question; hence, it's not fair. |
| 5 | 16:32 | Q.  Now, as part of the ILIT team, you concluded that the |
| 6 | 16:32 | barge had scraped against the floodwall.  Where, in particular, |
| 7 | 16:32 | was it your determination that it scraped against the |
| 8 | 16:33 | floodwall? |
| 9 | 16:33 | A.  At the south end of the south breach. |
| 10 | 16:33 | Q.  You specifically had mentioned that it scraped against the |
| 11 | 16:33 | floodwall before making impact at the south end? |
| 12 | 16:33 | A.  And that is at the adjacent panel to the south end of the |
| 13 | 16:33 | south breach panel that was clipped off. |
| 14 | 16:33 | Q.  Had the breach not been initiated or had it not been |
| 15 | 16:33 | completed at the time, would the force of the barge placing |
| 16 | 16:33 | against it -- pushing against the panels aid that breach? |
| 17 | 16:33 | A.  Please repeat your question. |
| 18 | 16:33 | Q.  I'll phrase it better for you. |
| 19 | 16:33 | Did the barge impart any force on the floodwall? |
| 20 | 16:33 | A.  Yes, at the south end of the south breach. |
| 21 | 16:34 | Q.  Okay.  Had the breach not occurred at the time the barge |
| 22 | 16:34 | arrived there, would the barge have imparted force on the |
| 23 | 16:34 | floodwall? |
| 24 | 16:34 | A.  Yes, it would. |
| 25 | 16:34 | Q.  And would that force have contributed to a breach had the |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2797

| | | |
|---|---|---|
| 1 | 16:34 | barge been there placing that force on it? |
| 2 | 16:34 | A.  I wouldn't know because I performed no analyses to address |
| 3 | 16:34 | such a scenario. |
| 4 | 16:34 | MR. KHORRAMI:  Can I have the ELMO, please? |
| 5 | 16:34 | BY MR. KHORRAMI: |
| 6 | 16:34 | Q.  This is a photograph -- this is photograph 4.22 from |
| 7 | 16:34 | Dr. Marino's report. |
| 8 | 16:34 | Do you see these houses that are out in this area, |
| 9 | 16:34 | Doctor? |
| 10 | 16:34 | A.  Yes, sir. |
| 11 | 16:34 | Q.  They seem to have fared a lot better than the houses that |
| 12 | 16:34 | are out in this area; is that fair? |
| 13 | 16:35 | A.  That's fair.  But the houses out in the northern section |
| 14 | 16:35 | of the south breach are gone with the water. |
| 15 | 16:35 | Q.  How do you account for the fact that these houses behind |
| 16 | 16:35 | the barge remain intact? |
| 17 | 16:35 | A.  I don't know.  I haven't studied the interaction of the |
| 18 | 16:35 | waters with those structures. |
| 19 | 16:35 | Q.  Is it possible for the barge to have protected those |
| 20 | 16:35 | houses from the currents, from the waters? |
| 21 | 16:35 | A.  It's, I guess, possible. |
| 22 | 16:35 | THE COURT:  Just to bracket this -- not for |
| 23 | 16:35 | argument -- to bracket it in the record, I assume the point |
| 24 | 16:35 | goes to the timing as to when the barge was there? |
| 25 | 16:35 | MR. KHORRAMI:  Correct.  Correct. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2798

| | | |
|---|---|---|
| 1 | 16:35 | THE COURT:  Okay. |
| 2 | 16:35 | BY MR. KHORRAMI: |
| 3 | 16:36 | Q.  And does that mean that the barge was there -- if that |
| 4 | 16:36 | were the case, that would mean that the barge was there at |
| 5 | 16:36 | relatively close to the start of the breach; is that fair? |
| 6 | 16:36 | A.  No, that's not fair. |
| 7 | 16:36 | Q.  And you would agree with me that any of these breaches, |
| 8 | 16:36 | and particularly these two breaches, there are multiple forces |
| 9 | 16:36 | that acted upon the floodwall in order to cause the breaches; |
| 10 | 16:36 | is that fair? |
| 11 | 16:36 | A.  That's fair. |
| 12 | 16:36 | Q.  And had the barge been over there, it would have been one |
| 13 | 16:36 | of the forces acting on the floodwall; fair? |
| 14 | 16:36 | A.  Repeat your question. |
| 15 | 16:36 | Q.  Had the barge been there, it would have been one of the |
| 16 | 16:36 | forces acting on the floodwall? |
| 17 | 16:36 | A.  Where's "there"? |
| 18 | 16:37 | Q.  I'm sorry.  Had the barge been present at the location of |
| 19 | 16:37 | the breaches -- |
| 20 | 16:37 | THE COURT:  At the time the breaches -- at the |
| 21 | 16:37 | approximate time the breaches occur. |
| 22 | 16:37 | BY MR. KHORRAMI: |
| 23 | 16:37 | Q.  -- at the approximate time the breaches occurred, it would |
| 24 | 16:37 | have been once of the forces against the wall, floodwall? |
| 25 | 16:37 | A.  That's correct. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

26  (Pages 2795 to 2798)

2799

1  16:37  Q.  Okay.  Now, you're not a naval architect; is that fair?
2  16:37  A.  Partially fair.  I've taught basic naval architecture, as
3  16:37  I opined earlier, and was appointed to the Department of Naval
4  16:37  Architecture and Offshore Engineering, and I've had extensive
5  16:37  time and experience at sea --
6  16:37  Q.  You're not -- I'm sorry.
7  16:37        THE COURT:  He's not tendered as an expert in naval
8  16:37  architecture in this case, and nor I don't think has he
9  16:37  rendered an opinion that required his expertise in naval
10 16:37  architecture.  If I'm wrong, counsel, please correct me.
11 16:37        MR. RAFFMAN:  Your Honor is correct.
12 16:37        THE COURT:  Thank you.
13 16:37  BY MR. KHORRAMI:
14 16:37  Q.  Now, isn't it also true that IPET actually abstained from
15 16:38  coming to a conclusion as to whether the barge caused a
16 16:38  breach -- either one these breaches or not?
17 16:38  A.  I don't think that's correct.
18 16:38  Q.  It considered the scenario under Technical Appendix 17;
19 16:38  fair?
20 16:38  A.  Please repeat your question.
21 16:38  Q.  IPET actually considered a scenario of the barge causing
22 16:38  the south breach; correct?
23 16:38  A.  I don't think that's correct.
24 16:38  Q.  Under Technical Appendix 17?
25 16:38  A.  Technical Appendix 17 to which chapter in the report?

        JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA

2800

1  16:38  Q.  To Volume IV of IPET.
2  16:38  A.  I recall that IPET addressed the forces generated on and
3  16:38  by a barge, but I do not recall that that work was carried
4  16:38  forward to determine its interactions.  But with the floodwall
5  16:39  and supporting soils, I do recall they concluded that the north
6  16:39  and south breaches developed without the assistance or
7  16:39  participation of the ING 4727 barge.
8  16:39  Q.  They -- they actually looked at different causes, but they
9  16:39  abstained from actually determining whether the barge was
10 16:39  involved or not?
11 16:39  A.  I can't comment.  I know that they went through the same
12 16:39  processes that we did, which involved a qualitative analyses
13 16:39  using observed data in the field, a quantitive analyses to
14 16:39  evaluate the performance of the flood-protection structures in
15 16:39  this area.
16 16:39        So they went through the same kinds of processes that
17 16:39  we did and arrived at comparable conclusions; namely, the barge
18 16:40  had no part in the formation of either the north breach or the
19 16:40  south breach.
20 16:40        THE COURT:  This might be something that -- you know,
21 16:40  you can go a long time on this.  You can simply argue in your
22 16:40  brief and point out to the Court, as I think it's been pointed
23 16:40  out in other briefing, what the actual verbiage is in the
24 16:40  report.
25 16:40        MR. KHORRAMI:  If I could have just a moment to look

        JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA

2801

1  16:41  through my notes one more time, Your Honor.
2  16:41        THE COURT:  You may, sir.
3  16:43        Yes, sir, are you ready to proceed?
4  16:43        MR. KHORRAMI:  Yes, Your Honor.
5  16:43  BY MR. KHORRAMI:
6  16:43  Q.  So, Dr. Bea, initially, you thought the barge was
7  16:43  involved; correct?
8  16:43  A.  That was during the first ten hours of my work, which now
9  16:44  total 12,500 hours.
10 16:44  Q.  And yesterday counsel asked you about how you changed your
11 16:44  opinion.  That was different people had different opinions on
12 16:44  this issue; is that right?
13 16:44  A.  That's correct.
14 16:44  Q.  And there was a discussion that went on?
15 16:44  A.  Oh, yes.  Intense and heated.
16 16:44  Q.  And at that point, you accept the views that actually were
17 16:44  in opposite of your original view; is that correct?
18 16:44  A.  Please repeat or rephrase your question.
19 16:44  Q.  Fair.
20 16:44        There was discussion about this.  There was intense
21 16:44  discussion about this.  That's what you said; correct?
22 16:44  A.  During the first two weeks.
23 16:44  Q.  And at some point, based on the opinions of other people,
24 16:44  you changed your opinion; is that right?
25 16:44  A.  That's incorrect.  Opinion has no real role in this work.

        JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA

2802

1  16:44  We have to perform analyses carefully structured to arrive at
2  16:45  conclusions, not opinions.
3  16:45  Q.  And as you've testified here, your work on this continues;
4  16:45  is that right?
5  16:45  A.  Continues to this minute.
6  16:45  Q.  And you've continuously adjusted different methods that
7  16:45  you've used; is that correct?
8  16:45  A.  Repeat your question.
9  16:45  Q.  You've continuously adjusted your methods?
10 16:45  A.  Yes.  The input methods, the output.  It's much like
11 16:45  steering a car or a ship:  You make continual adjustments in
12 16:45  your course.
13 16:45  Q.  And you've continually adjusted your models?
14 16:45  A.  Yes, indeed.
15 16:45  Q.  And you've continually adjusted your conclusions?
16 16:45  A.  Yes, indeed.
17 16:45  Q.  Okay.
18 16:45  A.  That's the benefit of knowledge.
19 16:45  Q.  And the issue of whether or how this breach occurred is
20 16:45  something that's going to be evolving as time goes on; is that
21 16:45  fair?
22 16:45  A.  I think not.  I think we've arrived at a point of
23 16:46  diminishing return, I think, thanks to the time.  But,
24 16:46  certainly, the details of the understanding have improved
25 16:46  dramatically.  The basic conclusions, the outline of the

        JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA

## 2803

```
16:46   1   picture puzzle, have not changed.
16:46   2   Q.  Okay.  Regardless, it's a complex problem?
16:46   3   A.  This is a complex problem.
16:46   4   Q.  Okay.  Now, as of the time of your -- of your deposition
16:46   5   last year, 2009, September, you worked on this problem for
16:46   6   about four years exactly; right?
16:46   7   A.  That's correct.
16:46   8   Q.  And at that time you had put in $10,000 -- or 10,000 hours
16:46   9   pro bono; is that fair?
16:46  10   A.  That's correct.
16:46  11   Q.  That's what you claim.
16:46  12       And about 2,500 hours for which you've been paid?
16:46  13   A.  That's correct.
16:46  14   Q.  As an expert; is that about right?
16:46  15   A.  That's correct.
16:46  16   Q.  During that time, during the past -- the previous four
16:47  17   years, you've worked on other projects; fair?
16:47  18   A.  Yes, that's correct.
16:47  19   Q.  And what other projects did you work on?
16:47  20   A.  The Midwest levee failure investigations.  We've been
16:47  21   conducting a four-year project of levee flood-protection
16:47  22   infrastructure performance in the California Delta.  I
16:47  23   performed projects for Woodside Limited in Australia offshore,
16:47  24   North West Shelf.
16:47  25       I'm performing a project currently associated with
```
            JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA

## 2804

```
16:47   1   the performance of the DEEPWATER HORIZON floating drilling
16:47   2   unit.
16:47   3   Q.  Those are time-consuming projects; right?
16:47   4   A.  They are extremely time-consuming.
16:47   5   Q.  So during the past -- it's your claim that, during the
16:47   6   past five years, you've put in some amount of hours -- or
16:47   7   thousands of hours above the 12,500 hours you actually stated a
16:48   8   moment ago?
16:48   9   A.  Yes.  That's what happens when you work seven days a week
16:48  10   and 12 hours per day.  And my wife can tell you more.
16:48  11   Q.  I appreciate that.
16:48  12       MR. KHORRAMI:  I tender the witness, Your Honor.
16:48  13       THE COURT:  Redirect?
16:48  14       MR. RAFFMAN:  No, sir.
16:48  15       THE COURT:  Thank you, sir.  Dr. Bea, have a safe
16:48  16   trip back to California.
16:48  17       THE WITNESS:  Bless you.  Bless you too.
16:48  18       MR. ALDOCK:  We're going to have Mr. Arnold next,
16:48  19   Your Honor.  He's ready.
16:48  20       THE COURT:  About how long?
16:48  21       MR. ALDOCK:  I think Mr. Arnold is about a 15-minute
16:48  22   witness on direct, and we would do -- Dr. Weiss is probably
16:49  23   another 15 minutes on direct.  I think we can get them both in
16:49  24   today.
16:49  25       THE COURT:  Okay.  Good.
```
            JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA

## 2805

```
16:49   1       MR. BEST:  If I may, Your Honor, before the LoneStar
16:49   2   witness, Mr. Arnold, takes the stand, I'm going to make a
16:49   3   general and continuing objection to his testimony.  I think I
16:49   4   mentioned this earlier on.  He worked for LoneStar Industries
16:49   5   at another barge facility, at another location, and not a
16:49   6   comparable location.  We object to the entirety of his
16:49   7   testimony on grounds of relevance.
16:49   8       We think it is -- essentially would require a
16:49   9   trial within a trial on all the facts and circumstances of that
16:49  10   barge facility and the weather conditions there, the water.  It
16:49  11   is entirely irrelevant is probably what that second trial would
16:49  12   show.  So I just want to make that continuing and say it once
16:49  13   and not interrupt during his examination.
16:49  14       THE COURT:  You're basically saying we have an apple
16:49  15   and an orange, and we shouldn't be looking at oranges if this
16:49  16   is an apple.  I got it.
16:49  17       MR. BEST:  Thank you, Your Honor.
16:49  18       MR. RAFFMAN:  May I approach, Your Honor?
16:50  19       THE COURT:  You certainly may.
16:50  20       MR. RAFFMAN:  I wanted to help the witness pack up.
16:50  21       THE COURT:  Oh, yes.  Absolutely.
16:50  22       MR. KHORRAMI:  Can I have that soil?
16:50  23       (OFF THE RECORD)
16:51  24       MR. WALKER:  Your Honor, Mr. Larry Arnold.
16:51  25       THE COURT:  Thank you, Mr. Walker.
```
            JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA

## 2806

```
16:52   1       (WHEREUPON, Larry Arnold, having been duly sworn,
16:52   2   testified as follows.)
16:52   3       THE DEPUTY CLERK:  Please state your full name and
16:52   4   correct spelling for the record.
16:52   5       THE WITNESS:  Larry Arnold, L-A-R-R-Y, A-R-N-O-L-D.
16:52   6       DIRECT EXAMINATION
16:52   7   BY MR. WALKER:
16:52   8   Q.  Mr. Arnold, you're soft-spoken, so could you move the mic
16:52   9   toward you or yourself towards it so we can all hear you.
16:52  10   A.  Okay.
16:52  11   Q.  Thank you.
16:52  12       MR. WALKER:  Ready, Your Honor?
16:52  13       THE COURT:  Yes.
16:52  14       MR. WALKER:  Thank you, Your Honor.
16:52  15   BY MR. WALKER:
16:52  16   Q.  Mr. Arnold, by whom were you employed in August of 2005?
16:52  17   A.  LoneStar Industries doing business as Buzzi Unicem.
16:52  18   Q.  That's B-U-Z-Z-I, new word, U-N-I-C-E-M?
16:53  19   A.  That's correct.
16:53  20   Q.  Commonly known as LoneStar Cement?
16:53  21   A.  Right.
16:53  22   Q.  And how long had you worked for them at that time?
16:53  23   A.  About seven years.
16:53  24   Q.  Prior to working at LoneStar, where were you employed?
16:53  25   A.  Johnston's in Chalmette, CII Carbon.  Johnston was a
```
            JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA

**28  (Pages 2803 to 2806)**