```
                                                                 2971
                       UNITED STATES DISTRICT COURT
                       EASTERN DISTRICT OF LOUISIANA


    IN RE:  KATRINA DREDGING       *    Civil Action
    LIMITATION ACTION              *
    CONSOLIDATED LITIGATION        *    No. 05-4182
                                   *
                                   *    Section K(2)
    PERTAINS TO:                   *
    BARGE                          *    New Orleans, Louisiana
                                   *
    MUMFORD, C.A. NO. 05-5724, AS  *    July 9, 2010
    TO PLAINTIFFS JOSEPHINE        *
    RICHARDSON AND HOLLIDAY        *    Afternoon Session
    JEWELERS, INC., ONLY           *
    AND                            *
    BENOIT, C.A. NO. 06-7516, AS   *
    TO PLAINTIFFS JOHN ALFORD AND  *
    JERRY ALFORD ONLY              *
    * * * * * * * * * * * * * * * *
                       DAY THIRTEEN
                    BENCH TRIAL BEFORE THE
               HONORABLE STANWOOD R. DUVAL, JR.
                  UNITED STATES DISTRICT JUDGE


    APPEARANCES:
    For the Plaintiffs:       Best Koeppel
                              BY:  LAURENCE E. BEST, ESQ.
                              BY:  PETER S. KOEPPEL, ESQ.
                              2030 St. Charles Avenue
                              New Orleans, Louisiana 70130

    For the Plaintiffs:       Law Offices of Brian A. Gilbert
                              BY:  BRIAN A. GILBERT, ESQ.
                              2030 St. Charles Avenue
                              New Orleans, Louisiana  70130


           JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA
```

## 2972

APPEARANCES:

For the Plaintiffs:    Wiedemann & Wiedemann
                       BY: KARL WIEDEMANN, ESQ.
                       BY: LAWRENCE WIEDEMANN, ESQ.
                       821 Baronne Street
                       New Orleans, Louisiana 70113

For the Plaintiffs:    Patrick J. Sanders, LLC
                       BY: PATRICK J. SANDERS, ESQ.
                       3316 Ridgelake Drive
                       Suite 100
                       Metairie, Louisiana 70002

For the Plaintiffs:    Law Office of Richard T. Seymour,
                       P.L.L.C.
                       BY: RICHARD T. SEYMOUR, ESQ.
                       1150 Connecticut Avenue N.W.
                       Suite 900
                       Washington, D.C. 20036-4129

For the Plaintiffs:    Khorrami, Pollard & Abir, LLP
                       BY: SHAWN KHORRAMI, ESQ.
                       444 S. Flower Street
                       33rd Floor
                       Los Angeles, California 90071

For the Plaintiffs:    Wilson, Grochow, Druker & Nolet
                       BY: LAWRENCE A. WILSON, ESQ.
                       233 Broadway
                       5th Floor
                       New York, New York 10279

For the Defendant:     Chaffe, McCall, L.L.P.
                       BY: DEREK A. WALKER, ESQ.
                       BY: CHARLES P. BLANCHARD, ESQ.
                       1100 Poydras Street, Suite 2300
                       New Orleans, Louisiana 70163

## 2973

APPEARANCES:

For the Defendant:     Goodwin Procter, L.L.P.
                       BY: JOHN ALDOCK, ESQ.
                       BY: MARK RAFFMAN, ESQ.
                       BY: ADAM CHUD, ESQ.
                       BY: KIRSTEN ROBBINS, ESQ.
                       BY: ERIC I. GOLDBERG, ESQ.
                       901 New York Avenue, NW
                       Washington, D.C. 20001

For the Defendant:     Sutterfield & Webb
                       BY: DANIEL A. WEBB, ESQ.
                       650 Poydras Street, Suite 2715
                       New Orleans, Louisiana 70130

For the Defendant:     Lafarge North America, Inc.
                       BY: PETER KEELEY, ESQ.
                       12950 Worldgate Drive
                       Herndon, Virginia 20170

Official Court Reporter:   Jodi Simcox, RMR, FCRR
                           500 Poydras Street
                           Room HB-406
                           New Orleans, Louisiana 70130
                           (504) 589-7780

Proceedings recorded by mechanical stenography, transcript produced by computer.

## 2974

I N D E X

|  | Page |
|---|---|
| GEORGE PAUL KEMP | |
| Direct Examination | 2975 |
| Traverse | 2979 |
| Direct Examination | 2983 |
| Cross-Examination | 2989 |
| JOSEPH NICHOLAS SUHAYDA | |
| Direct Examination | 3007 |
| Cross-Examination | 3046 |
| JOHN HUERKAMP | |
| Direct Examination | 3068 |
| Cross-Examination | 3069 |

## 2975

12:36           AFTERNOON SESSION
12:36           (July 9, 2010)
12:36                * * * * *
13:04   THE DEPUTY CLERK: All rise, please.
13:07           Court's in session. Please be seated.
13:07   THE COURT: Yes, sir.
13:07   MR. CHUD: Your Honor, Lafarge calls Dr. Paul Kemp.
13:07   THE COURT: You may proceed, counsel.
13:07           (WHEREUPON, George Paul Kemp, having been duly sworn,
13:07   testified as follows.)
13:07   THE DEPUTY CLERK: Please state your full name and
13:07   correct spelling for the record.
13:07   THE WITNESS: George Paul Kemp, K-E-M-P.
13:08           DIRECT EXAMINATION
13:08   BY MR. CHUD:
13:08   Q. Good afternoon, Dr. Kemp.
13:08           Dr. Kemp, where are you currently employed?
13:08   A. I work for the National Audubon Society. I have an office
13:08   in Baton Rouge, Louisiana.
13:08   Q. What is your position with the Audubon Society?
13:08   A. I'm vice president with the National Audubon Society.
13:08   Q. What does your position with the Audubon Society entail?
13:08   A. I'm trying to save the planet one bird at a time.
13:08   Q. When did you start working for the Audubon Society?
13:08   A. In February of 2007.

**2976**

```
13:08   Q.  Now, before February of 2007, where did you work?
13:08   A.  I was a research professor at Louisiana State University
13:08   School of the Coast and Environment.
13:08   Q.  Did you have any position with the LSU Hurricane Center?
13:08   A.  I had a contract with the LSU Hurricane Center.  I was
13:08   also the director of the Natural Systems Modeling Group, and it
13:08   was through that group that I worked with The Hurricane Center.
13:09   Q.  What did you do in your position with The Hurricane
13:09   Center?
13:09   A.  I directed the use of the ADCIRC model for surge
13:09   forecasting.
13:09   Q.  Can you briefly describe your educational background?
13:09   A.  I have an undergraduate degree in natural resources and
13:09   geology from Cornell University, and a master's and Ph.D. from
13:09   LSU Department of Marine Sciences, now called Department of
13:09   Oceanography and Coastal Sciences.
13:09   Q.  What are your primary areas of expertise?
13:09   A.  I'm a coastal geologist and oceanographer.  I do a fair
13:09   amount of hydrology with rivers and estuaries.
13:09   Q.  Can you give us a little bit of information about the
13:09   types of work you've done in those areas?
13:10   A.  I have done a lot of development for coastal restoration
13:10   projects and was instrumental in getting the coastal
13:10   restoration program started in Louisiana.  So that entails a
13:10   lot of work on sediment transport and hydrology in the coastal
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2977**

```
13:10   zone.
13:10   Q.  I don't want to go through all your publications, but are
13:10   they all identified in your CV that's attached to your report?
13:10   A.  Yes.  There may be a couple of additional ones, but
13:10   they're mostly there.
13:10   Q.  Dr. Kemp, how much time have you spent studying hurricane
13:10   flooding and its causes in and around New Orleans?
13:10   A.  Well, I worked on it prior to Katrina from about 2002.
13:10   That was when we were getting the ADCIRC model set up to do
13:11   forecasting, and so we worked on it prior to the storm.  Since
13:11   the storm, I estimate around 3,500 hours, something like that.
13:11   Q.  Were you on the ground at the eastern Industrial Canal
13:11   floodwall site after Hurricane Katrina?
13:11   A.  Yes.  In my work through the -- for The Hurricane Center,
13:11   we were very anxious to secure the high water marks prior to --
13:11   or subsequent to the storm, and so we were very quickly in New
13:11   Orleans, outside the flood protection system, to find those
13:11   marks and get them surveyed in.
13:11   Q.  And you testified as an expert for the plaintiffs in the
13:11   Robinson case?
13:11   A.  I did.
13:11   Q.  Were you involved with Team Louisiana?
13:11   A.  Yes, I was.
13:11   Q.  What was your position with Team Louisiana?
13:11   A.  I was one of seven experts, and we had several -- we had
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2978**

```
13:12   some technical support also, but I was one of seven.  My
13:12   primary responsibility was for oceanography, establishing that,
13:12   the oceanography that was relevant to the failures.
13:12   Q.  Are you the person who actually drafted the report for
13:12   Team Louisiana?
13:12   A.  It ended up that I was, yes.  That wasn't what I intended
13:12   to do, but that's how it ended up.
13:12           MR. CHUD:  Your Honor, I tender Dr. Kemp as an expert
13:12   on coastal management, modeling, and hydrology.
13:12           MR. SEYMOUR:  Your Honor, Dr. Kemp was identified in
13:12   the pretrial order by the defendant as a person who was going
13:12   to be talking about the conclusion of Team Louisiana, that the
13:12   barge did not cause either IHNC floodwall breach.  That would
13:12   go beyond his area of expertise as tendered.
13:12           We have no objection to him being tendered as an
13:12   expert and do not need to engage in voir dire if he's not going
13:13   to get into geotechnology or the barge.
13:13           THE COURT:  Whatever is in the report is fair game.
13:13           MR. CHUD:  For the record, his report details what he
13:13   did with Team Louisiana and how they got to their conclusion
13:13   about the barge.
13:13           THE COURT:  I have synopsized the report, and so I'm
13:13   going to let him testify to what's in his report.
13:13           MR. SEYMOUR:  Your Honor, we'd like to take some voir
13:13   dire, then.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2979**

```
13:13           THE COURT:  Yes.
13:13           MR. SEYMOUR:  Okay.
13:13                           TRAVERSE
13:13   BY MR. SEYMOUR:
13:13   Q.  Dr. Kemp, is it fair to say that your report includes a
13:13   number of references to geotechnical engineering?
13:13   A.  That's correct.  We had four geotechnical engineers on our
13:13   team.
13:13   Q.  And is it fair to say that the report does include the
13:13   effect of the barge?
13:13   A.  Would you repeat that, please?
13:13   Q.  Is it fair to say that your report does include some
13:14   statements as to the effect of the barge on the breaches?
13:14   A.  That's right.  There was one paragraph there where we
13:14   addressed that.
13:14   Q.  Now, am I correct that you are not a geotechnical
13:14   engineer?
13:14   A.  That's correct.
13:14   Q.  Okay.  And is it correct that the design and strength of
13:14   flood-control system is outside your area of expertise?
13:14   A.  That's right.  That's why we had a team.
13:14   Q.  Am I correct that your only involvement with the
13:14   geotechnical engineering parts of the Team Louisiana report was
13:14   participating in conversations among colleagues from different
13:14   fields and then performing interviews with the geotechnical
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2980

```
13:14  1   experts on Team Louisiana in order to try to draft up their
13:14  2   statements in a comprehensible form?
13:14  3   A.  I think that's a fair statement.
13:14  4   Q.  And then they reviewed what you wrote up to see whether
13:14  5   you got it accurately, and then it was further reviewed by
13:14  6   Louisiana state officials, including the Attorney General?
13:15  7   A.  That's correct.
13:15  8   Q.  Is it fair to say that, when you worked on the Robinson
13:15  9   case, you had not personally worked on the causes of any of the
13:15 10   levee breaches?
13:15 11   A.  I don't know if that's -- I mean, I was a part of the Team
13:15 12   Louisiana forensics study, so it would not be fair to say that
13:15 13   I wasn't involved in any of that.
13:15 14   Q.  Except for what you just described -- I'm just trying to
13:15 15   save some time here -- is it fair to say that you had not
13:15 16   previously worked on any of the causes of levee breaches in
13:15 17   Louisiana?
13:15 18   A.  Well, I consider the oceanography to be very much a part
13:15 19   of that.
13:15 20   Q.  Let me --
13:15 21   A.  And the funnel, the -- all the amplifications associated
13:15 22   with the -- with that.
13:15 23   Q.  Well, let me clarify and narrow my question just to make
13:15 24   sure that we're speaking on the same wavelength:  Is it fair to
13:15 25   say that, prior to what you described in Team Louisiana, you
```

## 2981

```
13:15  1   had not had any prior involvement with the geotechnical aspects
13:16  2   of levee failures in Katrina?
13:16  3   A.  That's fair to say.
13:16  4   Q.  And you did not do any such analysis for purposes of this
13:16  5   case?
13:16  6   A.  That's right.  It was primarily looking at overtopping and
13:16  7   levee heights, along that line.
13:16  8   Q.  Is it fair to say that, when you worked on the Robinson
13:16  9   case, your task was basically to -- and I'm quoting here --
13:16 10   "Get the water and the waves up to a point where Dr. Bea would
13:16 11   take over on the causes and mechanisms of failure"?
13:16 12   A.  That's very good, yes.
13:16 13   Q.  Am I correct that it was Dr. Bea's job in Robinson, not
13:16 14   yours, to analyze the precipitating mechanisms of failure?
13:16 15   A.  That's right.
13:16 16   Q.  Is it correct that you did not do any forensic examination
13:16 17   of the role of the barge in contributing to either the north or
13:16 18   the south breach?
13:16 19   A.  Other than personally inspecting the south end of that
13:16 20   floodwall where the barge had hit and looking at the barge.
13:16 21   Q.  It was hard to miss?
13:16 22   A.  Yes.
13:16 23   Q.  But other than that, you did not do any forensic
13:17 24   examination of the role of the barge; is that right?
13:17 25   A.  That's right.  We focused on other things.
```

## 2982

```
13:17  1   Q.  Is it correct that you're not qualified to do such an
13:17  2   examination?
13:17  3   A.  I'm qualified to observe it.  I'm not qualified to -- as
13:17  4   an expert in marine surveying or anything like that.
13:17  5   Q.  Isn't it correct that you were not involved in anything
13:17  6   that Team Louisiana did, as to the role of the barge in
13:17  7   contributing to either the north breach or the south breach,
13:17  8   other than the kind of participation in conversations and
13:17  9   talking to the people who were actually looking at that
13:17 10   question?
13:17 11   A.  This was a consensus report.  We had agreement about the
13:17 12   one paragraph that applied to the barge among all the members
13:17 13   of the team.
13:17 14           Obviously, the forces that bring the barge into the
13:17 15   floodwall are hydrodynamic forces, so there's some involvement
13:17 16   there.
13:17 17   Q.  You did you -- did you participate in the conversations
13:17 18   that the group had with any accident reconstructionist or
13:18 19   marine engineers who are capable of analyzing a forensic
13:18 20   examination of the role of the barge?
13:18 21   A.  No, I did not.
13:18 22   Q.  And isn't it true that Team Louisiana did not itself do a
13:18 23   detailed forensic examination of the role of the barge?
13:18 24   A.  No.  We had very limited funding.  We pursued some of the
13:18 25   more likely alternatives.
```

## 2983

```
13:18  1   Q.  Is your answer to my question that Team Louisiana did not
13:18  2   do a forensic examination?
13:18  3   A.  Beyond what is written there, that's all we did.
13:18  4   Q.  Thank you.
13:18  5           THE COURT:  Okay.  The Court accepts Dr. Kemp as
13:18  6   tendered.
13:18  7           MR. CHUD:  Thank you, Your Honor.
13:18  8                       DIRECT EXAMINATION
13:18  9   BY MR. CHUD:
13:18 10   Q.  Mr. Seymour covered some of my questions.  This may be
13:18 11   shorter than I expected.
13:18 12           Dr. Kemp, what were you asked to do in this case?
13:19 13   A.  I was asked to, first of all, explain how Team Louisiana
13:19 14   came to the conclusion that it did, a very minor conclusion in
13:19 15   the scope of the entire forensics report.
13:19 16           I was also asked about the winds that were -- that we
13:19 17   used in the surge model that would have been active at the time
13:19 18   of Katrina's passage.
13:19 19   Q.  Okay.  We talked a lot about Team Louisiana.  I know the
13:19 20   Court's familiar with it.  Very briefly, how was it formed and
13:19 21   what was its mission?
13:19 22   A.  Okay.  This was -- Team Louisiana was formed in, I
13:19 23   believe, October -- sometime in October.  We had already spent
13:19 24   about a month -- I say "we," myself and other colleagues at the
13:19 25   Hurricane Center, LSU Hurricane Center, had already spent a
```

## 2984

```
13:20  1   month in the field at that point documenting high water marks
13:20  2   and documenting the failures of structures.  And that had
13:20  3   precipitated the arrival of numerous other experts and other
13:20  4   teams, including Dr. Bea and the team from Berkeley, an ASCE
13:20  5   team, and the initiation of a Corps of Engineers team that
13:20  6   became later the IPET team.
13:20  7           And Secretary Bradbury of the Louisiana Department of
13:20  8   the Transportation and Development approached my -- the deputy
13:20  9   director of the Hurricane Center, Dr. Van Heerden, and asked
13:20 10   him to put together a team of state experts because there were
13:20 11   no experts from Louisiana on any of these other teams.
13:20 12   Q.  What was the basic mission that you were given?
13:21 13   A.  Our mission was to -- was to study the circumstances of
13:21 14   the failures of the flood protection system during Katrina.
13:21 15   Q.  I'm going to put up on the screen Lafarge Exhibit 144,
13:21 16   page 6, Table 1.  This is the list of the members of Team
13:21 17   Louisiana.
13:21 18           I don't want you to go through and tell us who each
13:21 19   person is, but, just generally, can you describe the areas of
13:21 20   expertise of the members of the team and the amount of
13:21 21   experience that they have?
13:21 22   A.  Obviously, Dr. Van Heerden was the leader of the team.
13:21 23   He's deputy -- at that time, deputy director of the LSU
13:21 24   Hurricane Center.  And, of course, myself.  And then Hassan
13:21 25   Mashriqui worked for me.  He's a hydraulic engineer.  And then
```

## 2985

```
13:22  1   the three of us were primarily responsible for the oceanography
13:22  2   aspect.
13:22  3           Again, the next four people you see there, from
13:22  4   Dr. Sharma to Art Theis, are all practicing engineers, with a
13:22  5   strong concentration in geotechnical engineering.  Dr. Sharma
13:22  6   is a younger engineer, very familiar with current analytical
13:22  7   techniques, while Billy Prochaska and Dr. Capozzoli and Art
13:22  8   Theis give us sort of the historical perspective about what was
13:22  9   known at the time these structures were designed and built.
13:22 10           The remainder of the three at the bottom were
13:22 11   graduate students or technicians that worked with us.  Ahmet
13:22 12   Binselam was involved in the hurricane modeling.
13:22 13   Q.  Is it fair to say that the members of the team
13:22 14   collectively have, literally, centuries of engineering
13:22 15   experience?
13:22 16   A.  It is fair to say that.  Billy Prochaska, Lou Capozzoli,
13:23 17   and Art Theis probably have 50 years of experience each and
13:23 18   have built hundreds of levees.
13:23 19           And Art Theis is a professional engineer.  His stamp
13:23 20   was on the 40-Arpent Levee in St. Bernard, the one levee that
13:23 21   didn't fail.
13:23 22   Q.  Did the members of Team Louisiana take any field trips to
13:23 23   visit the Lower Ninth Ward after Katrina?
13:23 24   A.  We took many trips to familiarize the geo-tech folks with
13:23 25   the situation there.
```

## 2986

```
13:23  1   Q.  Were the conclusions in the Team Louisiana report approved
13:23  2   by all members of the team before the report went final?
13:23  3   A.  Yes.  There's a signature page which includes the
13:23  4   signatures of every member of our team.
13:23  5   Q.  As part of its work, did Team Louisiana consider whether
13:23  6   the barge ING 4727 played a role in causing the Industrial
13:24  7   Canal floodwall breaches?
13:24  8   A.  We did consider it, and we -- but we did not devote a lot
13:24  9   of attention to it.
13:24 10   Q.  Why did the team even consider the potential role of the
13:24 11   barge in these breaches?
13:24 12   A.  Well, I mean, at the -- right after the storm, first of
13:24 13   all, the barge is pretty obvious in all the pictures.  And, you
13:24 14   know, of course, it's one of many, many barges that we observed
13:24 15   that had gone through levee alignments.  But we -- we heard
13:24 16   from a lot of people that it was assumed that the barge was --
13:24 17   was involved, and so we felt a need to address that.
13:24 18   Q.  You said it wasn't an issue that you spent a lot of time
13:24 19   on.  Can you explain for the Court why you didn't spend more
13:24 20   time looking into the barge question?
13:24 21   A.  Well, we had to prioritize how we spent our time.  Also,
13:25 22   to some degree, since we did not have the -- you know, we were
13:25 23   focused more on the hydrology and the oceanography and the
13:25 24   geo-tech.  If the geo-tech people had come to us and said we
13:25 25   need to investigate this further, then we would have.  But
```

## 2987

```
13:25  1   because we were on a fairly limited budget and time schedule,
13:25  2   we -- we had to make decisions about where to put our primary
13:25  3   efforts.
13:25  4   Q.  At the --
13:25  5   A.  That was not one of the areas that the team believed was
13:25  6   worthy of that.
13:25  7   Q.  If the team thought it needed to devote more resources
13:25  8   into looking at the barge question, is it fair to say that you
13:25  9   would have done that?
13:25 10   A.  That's right.  And we did devote a lot of attention to the
13:26 11   MRGO issue that none of the other forensic teams did.
13:26 12   Q.  If the members of the team had thought that the team
13:26 13   needed to do additional work to rule out the barge as a
13:26 14   potential cause of the breaches, would the team have committed
13:26 15   those resources to doing that?
13:26 16   A.  We would have done that.
13:26 17   Q.  Now, let's put up on the screen Lafarge Exhibit 144, page
13:26 18   67.  This is from Team Louisiana, and I believe this is the
13:26 19   paragraph that you referenced earlier that states Team
13:26 20   Louisiana's conclusion about the barge; is that correct?
13:26 21   A.  That's correct.
13:26 22   Q.  And you were actually the person that wrote this
13:26 23   paragraph; is that right?
13:26 24   A.  I was.
13:26 25   Q.  And the other members of the team reviewed it and signed
```

## 2988

```
13:26   1   off on it before it was actually put into the record?
13:26   2   A.  That's correct.
13:26   3            MR. SEYMOUR:  Your Honor, may we have a running
13:26   4   objection to this testimony so we don't have to interrupt the
13:26   5   testimony?
13:26   6            THE COURT:  You certainly may.
13:26   7            MR. SEYMOUR:  Thank you, Your Honor.
13:26   8            THE COURT:  You're objecting to him reading from the
13:26   9   Team Louisiana report?  It's in evidence anyway.  So the
13:26  10   objection's running, and the overruling is running.
13:27  11            MR. CHUD:  Thank you, Your Honor.
13:27  12   BY MR. CHUD:
13:27  13   Q.  Dr. Kemp -- and I don't want you to just to read this
13:27  14   whole thing into the record, but could you please describe for
13:27  15   the Court how Team Louisiana came about coming to this
13:27  16   conclusion and what the team actually found to be the cause of
13:27  17   the Industrial Canal floodwall breaches.
13:27  18   A.  Well, I think it states there quite clearly what we found
13:27  19   as far as the barge, but we did see the place where the --
13:27  20   where the barge had clipped the south end of the south breach.
13:27  21   That was obvious.  There was rust on the -- on the floodwall.
13:27  22   There were bent rebar.  There was smashed concrete there.
13:27  23            But we also -- the geo-tech folks found plenty of
13:28  24   evidence of both overtopping and underseepage that they
13:28  25   believed was the primary cause of the failures.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2989

```
13:28   1   Q.  Was the direction of the prevailing wind one of the
13:28   2   factors that Team Louisiana considered in reaching this
13:28   3   conclusion?
13:28   4   A.  Well, of course, we were -- we were looking -- when we
13:28   5   modeled the storm surge, we had a wind model associated with
13:28   6   the ADCIRC model, and that model had produced excellent
13:28   7   results.  And so we had a lot of confidence in our wind
13:28   8   stresses, and those were all coming from the northwest -- I'm
13:28   9   sorry, the northeast, and then up until about between 8:30 and
13:28  10   9:00, and then they shifted the -- the winds backed off to the
13:28  11   north.
13:28  12            But we never had -- we never had the winds that
13:28  13   were -- that would push the barge into the -- into the wall,
13:29  14   and so it was difficult to understand the -- you know, how,
13:29  15   other than post-breach, we could get the barge into that
13:29  16   position.
13:29  17            MR. CHUD:  Just one second, Your Honor.  Just one
13:29  18   second.
13:29  19            Thank you, Dr. Kemp.  I tender the witness.
13:29  20            THE COURT:  Okay.  Your testimony is going to be a
13:29  21   lot shorter than it was the last time.
13:29  22            MR. SEYMOUR:  Thank you, Your Honor.
13:29  23                      CROSS-EXAMINATION
13:29  24   BY MR. SEYMOUR:
13:29  25   Q.  I would like to begin picking up on a point where defense
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2990

```
13:29   1   counsel just left off.
13:29   2            Assume, hypothetically, that the barge did come into
13:29   3   contact with the east wall of the Inner Harbor Navigation Canal
13:30   4   at the edge of the north breach -- at the north breach and the
13:30   5   space between the north and the south breach, and at the south
13:30   6   breach.  I'm asking you to assume that.
13:30   7            Can the impact of the barge either aggravate an
13:30   8   existing leaning condition or initiate a leaning condition?
13:30   9   A.  I think it probably could.
13:30  10   Q.  Okay.  And if the barge either exacerbates or initiates a
13:30  11   leaning condition, can that lead to both overtopping and
13:30  12   underseepage?
13:30  13   A.  I'm not -- okay.  I have seen -- obviously, if the wall
13:30  14   leans, then the effective height is lowering, and so we
13:30  15   could -- we could see overtopping at a lower elevation if
13:31  16   that's what you mean.
13:31  17   Q.  That's right.  And your answer is yes?
13:31  18   A.  Yes.
13:31  19   Q.  And the same is true with respect to underseepage, isn't
13:31  20   it?
13:31  21   A.  Okay.  I'm trying to understand, and remember this is not
13:31  22   my strong suit.
13:31  23   Q.  I understand.
13:31  24   A.  So I would probably defer to Dr. Bea on that.
13:31  25   Q.  So as far as you know, from the conversations you've had,
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2991

```
13:31   1   underseepage occurs when a wall -- a tension crack is formed on
13:31   2   the flood side of the floodwall.  And water goes into that, and
13:31   3   then it percolates down to the bottom of the sheet pile and
13:31   4   comes out the other side, and that's what's called
13:31   5   underseepage, isn't it?
13:31   6            THE COURT:  Don't answer the question.  Your attorney
13:31   7   is objecting.
13:31   8            MR. CHUD:  Your Honor, well, it's beyond the scope of
13:31   9   the expertise that Dr. Kemp has been tendered for.  And
13:31  10   frankly, it is Mr. Seymour's objection that this is not his
13:31  11   area of expertise, so I'm not sure why he's being asked about
13:31  12   this.
13:31  13            THE COURT:  Yes.  The Court certainly knows
13:31  14   Dr. Kemp's qualifications and the fact that he wrote the Team
13:32  15   Louisiana report as, say, he can rely on the opinions of the
13:32  16   other experts in rendering the report.  But I'm not sure that
13:32  17   he's qualified to give a geotechnical opinion, as you stated
13:32  18   earlier, and as he did not give in his direct testimony.
13:32  19            So you might want to respond, counsel.
13:32  20            MR. SEYMOUR:  Yes, Your Honor.  He has a report and,
13:32  21   the report says that they thought that underseepage and
13:32  22   overtopping were the causes and that there's not a need for a
13:32  23   contribution by the barge for that to come across.
13:32  24            And even though the direct examination did not
13:32  25   get into that, we have this report which is sort of a ticking
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2992**

```
1   13:32  time bomb when it comes up on appeal.
2   13:32          THE COURT:  Okay.  I'm going to let you question the
3   13:32  report, and he can answer to the extent he knows.
4   13:32          MR. SEYMOUR:  Thank you, Your Honor.
5   13:32          THE WITNESS:  Okay.
6   13:32          THE COURT:  Your objection is noted for the record.
7   13:32  Go ahead, sir.
8   13:32          THE WITNESS:  And I will attempt that answer.  My
9   13:33  understanding is that that is not a complete description of
10  13:33  underseepage.  That is a mechanism of underseepage that the
11  13:33  IPET team came up with to explain some of the other floodwall,
12  13:33  particularly the lateral movement on some of the other
13  13:33  floodwalls.
14  13:33          My understanding is that when we're talking
15  13:33  about underseepage here, we may be talking about something
16  13:33  different.
17  13:33  BY MR. SEYMOUR:
18  13:33  Q.  You don't have the expertise to disagree with IPET, do
19  13:33  you?
20  13:33  A.  Well, I --
21  13:33          THE COURT:  In what aspect?
22  13:33  BY MR. SEYMOUR:
23  13:33  Q.  With respect to the definition of "underseepage."
24  13:33  A.  I would say probably if you got the IPET people up here,
25  13:33  they would not -- they would not say that that is a universal
```

**2993**

```
1   13:33  description of underseepage.
2   13:33          THE COURT:  And when you say "you," I assume you're
3   13:33  referring, since we're putting it in context of his report, to
4   13:33  his team.
5   13:33          MR. SEYMOUR:  Yes, Your Honor.
6   13:33          THE COURT:  And his team, which included geotechnical
7   13:34  engineers, would have the temerity to disagree with IPET and
8   13:34  the expertise.
9   13:34          MR. SEYMOUR:  But his report is here as an individual
10  13:34  report, which -- and it says all of these things.
11  13:34  BY MR. SEYMOUR:
12  13:34  Q.  Let me try to cut this off more quickly.
13  13:34          Dr. Kemp, if the wall leans, does that assist
14  13:34  underseepage?  Does it speed up any underseepage or cause any
15  13:34  underseepage?
16  13:34  A.  Well, I will tell you what the geotechnical folks on my
17  13:34  team told me, which is, when the wall leans, it has failed.
18  13:34  Q.  Very well.  If you turn --
19  13:34          MR. SEYMOUR:  Can I have page 7 of the report on the
20  13:34  screen, please?  Okay.  If you zero in -- wait a second.  What
21  13:35  report do you have?  It's the 2009 report we need.  All right.
22  13:35  Switch it to ELMO, please, because I've got it -- okay.  There
23  13:35  we go.  This will do it.
24  13:35  BY MR. SEYMOUR:
25  13:35  Q.  This is from page 7 of your report, and the language that
```

**2994**

```
1   13:35  is used, interesting.  It says:  "Each of these
2   13:35  investigations" -- referring to these what you call forensic
3   13:35  investigations -- "independently attributed the cause of the
4   13:35  IHNC breaches to failure mechanisms that did not require a
5   13:35  collision by a barge."  And then you said that they did so
6   13:35  "either implicitly or explicitly."
7   13:35          MR. CHUD:  Your Honor, in fairness, there's more to
8   13:35  that paragraph that's just been excerpted, and if he would
9   13:36  continue with that sentence.
10  13:36          MR. SEYMOUR:  Well, the sentence is in the record.
11  13:36  BY MR. SEYMOUR:
12  13:36  Q.  But you see the language, sir?  Let me focus you on the
13  13:36  first sentence.
14  13:36          THE COURT:  Well, first, let me dispose of the
15  13:36  objection.
16  13:36          If the Court sees that the question is, shall we
17  13:36  say, leaving out material language that would affect the
18  13:36  testimony, either the Court will elicit it from the witness or
19  13:36  it can be done on cross-examination, but, generally -- and I'm
20  13:36  going to leave it up to counsel to determine if he thinks it's
21  13:36  effective or not.  Go ahead.
22  13:36          MR. SEYMOUR:  Thank you, Your Honor.  I was
23  13:36  inartfully trying to narrow the question to the first sentence
24  13:36  to dispose of the objection.
25  13:36          THE COURT:  All right.  I understand.
```

**2995**

```
1   13:36  BY MR. SEYMOUR:
2   13:36  Q.  Do you see the language there, sir?
3   13:36  A.  Yes.  And I apologize if my language is inartful also, but
4   13:37  I think that -- I think that what I said there is true.  We
5   13:37  address the barge explicitly, but some other reports addressed
6   13:37  it implicitly because they didn't address it at all, or they --
7   13:37  and that's -- that's -- that's why I put "implicitly or
8   13:37  explicitly."
9   13:37  Q.  What I'm drawing attention to is the way of putting it,
10  13:37  that there was an attribution of other causes for the breaches
11  13:37  that did not require a barge.
12  13:37          Are you familiar with the similar language in the
13  13:37  Independent Levee Investigation Team report that was quoted by
14  13:37  Dr. Bea in his report?
15  13:37  A.  You would probably have to remind me of that.
16  13:37  Q.  Certainly.  This is from page 13 of Dr. Bea's report,
17  13:37  paragraph 23, in which he's quoting ILIT.  I've highlighted the
18  13:38  language:  "There are other modes of failure that would have
19  13:38  been expected to fail this section without any need for help
20  13:38  from the barge."
21  13:38  A.  I think that's saying a very similar thing to what I said.
22  13:38  Q.  That's right.
23  13:38          And similarly, on page 16 of Dr. Bea's report, again
24  13:38  quoting ILIT, there are two passages on the top of the page:
25  13:38  "Finally, geo-forensic studies clearly show that this section
```

7 (Pages 2992 to 2995)

## Page 2996

```
13:38   1  would have failed without barge impact."  And lower down:
13:38   2  "This section would have been expected to fail without barge
13:38   3  impact."
13:38   4         Now, do you remember my drawing your attention during
13:38   5  your deposition to the similarity of the phrasing?
13:38   6  A.  I don't recall that, but that could be -- I mean,
13:38   7  obviously, we wrote this report -- our own report after ILIT
13:38   8  had been published, so, you know, there could be some
13:39   9  recollection there, yes.
13:39  10         Also, we did give ILIT -- the ILIT report a lot of
13:39  11  deference in weight because of the immanence of the -- of that
13:39  12  team.
13:39  13  Q.  This is from page 44 of your deposition, and you said then
13:39  14  pretty much what you're saying right now except that you added
13:39  15  that "great minds may think alike."
13:39  16         If you turn to page 45 of the deposition, at the top
13:39  17  of the page, you described this type of language as being the
13:39  18  way that a scientist states things -- tries to state things
13:39  19  carefully.
13:39  20  A.  Yes.  And I think that's why the phrasing is similar, is
13:39  21  because we were trying to state something very similar.
13:39  22  Q.  Is it fair to say that what that type of language means to
13:39  23  you is that you can conceive of the north breach occurring, and
13:40  24  you can conceive of the south breach occurring if the barge had
13:40  25  never gotten loose?
```

## Page 2997

```
13:40   1  A.  Oh, absolutely.
13:40   2  Q.  And that is quite different from saying that the north
13:40   3  breach did occur and the south breach did occur without any
13:40   4  involvement from the barge, isn't it?
13:40   5  A.  I'm sorry.  State that again, please.
13:40   6  Q.  Do you see -- I withdraw that.
13:40   7         There is a large difference between this phrasing and
13:40   8  an investigation that precludes the involvement of the barge in
13:40   9  contributing to or causing either of those breaches, isn't
13:40  10  there?
13:40  11  A.  That's right.  And that's why we have an expert team and
13:40  12  we have opinions.
13:40  13  Q.  There are also some matters that are in your report.  I'll
13:41  14  enter your deposition, and I'll try to get through these
13:41  15  quickly in the interest of saving time.
13:41  16         Isn't it correct that your report states that there
13:41  17  is no surviving complete electronic gauge record of water
13:41  18  levels during Katrina?
13:41  19  A.  That's right.
13:41  20  Q.  And that there is no continuous recording gauge of any
13:41  21  kind that survived Katrina?
13:41  22  A.  That was -- that's been my understanding, yes.
13:41  23  Q.  And that the only record of water levels that survived the
13:41  24  storm is the hourly readings that the IHNC lockmaster made when
13:41  25  looking out at his gauge?
```

## Page 2998

```
13:41   1  A.  That's right.  There's been some reconstruction at the
13:41   2  airports, but as far as contemporaneous, that's what I was
13:41   3  aware of.
13:41   4  Q.  Now, is it fair to say that much of your work in Team
13:41   5  Louisiana, your work personally, involved conducting a survey
13:41   6  of high water marks?
13:41   7  A.  That was -- that was the initial phase.  I actually did
13:41   8  most of that before Team Louisiana formed.
13:42   9  Q.  Is it fair to say that you were not interested in studying
13:42  10  high water marks and water levels in the Lower Ninth Ward?
13:42  11  A.  We did some of that, but that was not our primary purpose.
13:42  12  Q.  Is it true, fair to say, that most of the water in the
13:42  13  Lower Ninth Ward and St. Bernard Parish west of Paris Road came
13:42  14  from the floodwall breaches and not from overtopping?
13:42  15  A.  Yes.  And then it depends -- floodwall and levee breaches,
13:42  16  I guess I would say, because much of that water also came from
13:42  17  the MRGO.
13:42  18         MR. SEYMOUR:  Please put paragraph 34 of the report
13:42  19  on the screen, the 2009 report.  Actually, give me the ELMO.
13:43  20  I've got the thing right in hand, and it may save time.  Okay.
13:43  21  BY MR. SEYMOUR:
13:43  22  Q.  This is from page 34 of your report, subparagraph E,
13:43  23  stating that:  "The Mississippi River Gulf Outlet was a
13:43  24  substantial contributing factor to the catastrophic flooding of
13:43  25  St. Bernard Parish and the Lower Ninth Ward, with 90 percent of
```

## Page 2999

```
13:43   1  the Lower Ninth flooding coming from the failure of the Reach 2
13:43   2  levees and the 10 percent from the IHNC floodwall failures."
13:43   3         Do you still believe that?
13:43   4  A.  Yes.  That was the conclusion of both sides, I believe, in
13:43   5  the Robinson case.
13:43   6  Q.  The conclusion of both sides in the Robinson case?
13:43   7         THE COURT:  88 and 12 percent.
13:43   8  BY MR. SEYMOUR:
13:43   9  Q.  Now, Dr. Kemp, did you derive that figure?
13:43  10  A.  This was a -- I'm writing this after the conclusion of the
13:43  11  Robinson case.  I had a great deal of information to rely on.
13:44  12  I did not -- actually, I came pretty close in the -- in Team
13:44  13  Louisiana.  I think we did say something along those lines that
13:44  14  was further corroborated by the detailed work done by both
13:44  15  sides in the Robinson case, yes.
13:44  16  Q.  Isn't it true that this is your understanding that that
13:44  17  figure refers to the total volume of water after all the
13:44  18  flooding is done?
13:44  19  A.  Yes.
13:44  20  Q.  And --
13:44  21  A.  But before -- before it runs out, I guess, is what you're
13:44  22  saying.
13:44  23  Q.  And does it assume that some of the Lower Ninth Ward,
13:44  24  Industrial [sic] Harbor Navigation Canal water is flowing out
13:44  25  into the canal and is being replaced by water from the
```

## 3000

```
13:44   Mississippi River Gulf Outlet?
13:44   A.  The surge modeling or, I would say, the breach flooding
13:45   model, the Sobek model that was run on the -- by the Robinson
13:45   team, also the -- the HEC model that was run by the government
13:45   team in Robinson, takes those things into account, and this was
13:45   the conclusion that they reached.
13:45       There's also rainwater involved here.
13:45   Q.  So you got those figures from other s?
13:45   A.  That's right.  From the other parts of the team.
13:45   Q.  Now, let me ask you a hypothetical.  If you have 9 feet of
13:45   water from the Inner Harbor Navigation Canal breaches at a
13:45   given location, at a given time, and water from the Mississippi
13:45   River Gulf Outlet then comes in and adds 1 foot to the 9 feet
13:45   that are already there, isn't it correct that, at that location
13:45   at that time, 90 percent of the water is from the Inner Harbor
13:45   Navigation Canal breaches and only 10 percent is from the
13:45   Mississippi River Gulf Outlet?
13:46   A.  Okay.  This is a hypothetical, and you're saying that
13:46   there was 9 feet that came from one place and 1 foot that -- so
13:46   I don't argue with that.  I certainly don't know that we have
13:46   that kind of information that would allow you to make that kind
13:46   of statement.
13:46   Q.  I asked you a hypothetical:  Assuming that those facts are
13:46   true, isn't the conclusion also true?
13:46   A.  Yes.
```

## 3001

```
13:46   Q.  Good.  So the Mississippi River Gulf Outlet is only
13:46   responsible for the water it adds to the total; isn't that
13:46   right?
13:46   A.  And remember, of course, just outside the -- this part of
13:46   the IHNC is actually part of the MRGO, as you know, but let's
13:46   not -- we're talking about Reach 2 versus the IHNC portions; is
13:46   that what you're saying?
13:46   Q.  That's right.
13:46   A.  Okay.
13:46   Q.  Well, from anywhere that -- from any one of the breaches
13:47   of other levees, this only affects the water level at a given
13:47   location based upon the amount of water that it adds at that
13:47   location at that time?
13:47   A.  Okay.  The Sobek model, which is the one I'm most familiar
13:47   with, does give you the ability to -- to look at a spatial
13:47   distribution of where the -- the providence of the water.  What
13:47   they did was they would not open one -- one -- so let's say we
13:47   run the model without the breach at the IHNC or we run it with
13:47   the breach and shut off other ones.  That's the way that they
13:47   got those numbers.
13:47   Q.  Okay.  Let me understand you.  Did the Sobek model not
13:47   involve tracking the water that came in from what actually
13:47   occurred during Katrina from all of the breaches but involved
13:47   turning off particular breaches?
13:48   A.  That was the way that those numbers were arrived at, yes.
```

## 3002

```
13:48   Q.  Okay.
13:48   A.  You know, there's two ways you could do that, and one is
13:48   to put a tracer and one -- at one of the breaches -- let's say
13:48   a salt tracer or something like that, something conservative --
13:48   and then look at -- look at dilution.  That's one way you could
13:48   do it.
13:48       The way it was done by the Dutch was that they
13:48   would -- they would turn on individual breaches, gradually
13:48   adding up to the total.  And I believe that's how the Corps did
13:48   it also.  So we didn't actually track water molecules, if
13:48   that's what you're thinking.
13:48   Q.  When you have water already in the Lower Ninth Ward and
13:48   the part of St. Bernard Parish west of Paris Road, doesn't that
13:48   keep water from the Mississippi River Gulf Outlet out?  It's
13:48   already occupying a given number of feet at a given location.
13:49   A.  Water is incompressible, if that's what you mean.  We had
13:49   water coming in at different times, at different velocities,
13:49   from different directions.  There's mixing occurring.  It's
13:49   fairly complicated.
13:49       The only way we knew to do it to get at the
13:49   appropriate segmentation of volumes was by eliminating one
13:49   breach or another one at a time, and what you'll notice in the
13:49   Sobek results is a series of flood lines that are cumulative.
13:49       So, you know, there's so much flooding associated
13:49   with rainfall and then there's so much flooding associated with
```

## 3003

```
13:49   one breach and then with two breaches and so on.  And, of
13:49   course, it differs from place to place.
13:49   Q.  And you talked before about sticking some salt in the
13:49   water to measure what comes from where.  You could not do that
13:50   in Katrina, could you?
13:50   A.  No.  I argued that we could do it.  It's just that the --
13:50   the models that we were using were not well set up for that.
13:50   Q.  And these waters become indivisible, don't they?
13:50   A.  Yeah.  And that's a problem with the hypothetical that you
13:50   raised, is that -- you know, these waters are completely mixed.
13:50       So there are two ways you could do it:  Look at the
13:50   dilution, or you could look at the, you know, individual breach
13:50   contributions.  And the way that they chose to do it, both
13:50   sides, in the Robinson case was to look at individual breach
13:50   concentrations, compound contributions.
13:50       I would have liked to have also seen the
13:50   concentration approach.
13:51       MR. SEYMOUR:  May I have just a second to confer with
13:51   counsel, Your Honor?
13:51       THE COURT:  Yes, you certainly may, counsel.
13:51       MR. SEYMOUR:  I tender the witness, Your Honor.
13:51       THE COURT:  Thank you very much.  Any redirect?
13:51       MR. CHUD:  No redirect, Your Honor.
13:51       THE COURT:  Thank you.  Dr. Kemp, keep saving those
13:51   birds.
```