2189

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  KATRINA DREDGING | * | Civil Action |
| LIMITATION ACTION | * | |
| CONSOLIDATED LITIGATION | * | No. 05-4182 |
| | * | |
| | * | Section K(2) |
| PERTAINS TO: | * | |
| BARGE | * | New Orleans, Louisiana |
| | * | |
| MUMFORD, C.A. NO. 05-5724, AS | * | July 6, 2010 |
| TO PLAINTIFFS JOSEPHINE | * | |
| RICHARDSON AND HOLLIDAY | * | Afternoon Session |
| JEWELERS, INC., ONLY | * | |
| AND | * | |
| BENOIT, C.A. NO. 06-7516, AS | * | |
| TO PLAINTIFFS JOHN ALFORD AND | * | |
| JERRY ALFORD ONLY | * | |

* * * * * * * * * * * * * * *

DAY TEN
BENCH TRIAL BEFORE THE
HONORABLE STANWOOD R. DUVAL, JR.
UNITED STATES DISTRICT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Plaintiffs: | Best Koeppel |
| | BY:  LAURENCE E. BEST, ESQ. |
| | BY:  PETER S. KOEPPEL, ESQ. |
| | 2030 St. Charles Avenue |
| | New Orleans, Louisiana 70130 |
| | |
| For the Plaintiffs: | Law Offices of Brian A. Gilbert |
| | BY:  BRIAN A. GILBERT, ESQ. |
| | 2030 St. Charles Avenue |
| | New Orleans, Louisiana  70130 |

JODI SIMCOX, RMR, FCRR – OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2190

APPEARANCES:

For the Plaintiffs:       Wiedemann & Wiedemann
                          BY:  KARL WIEDEMANN, ESQ.
                          BY:  LAWRENCE WIEDEMANN, ESQ.
                          821 Baronne Street
                          New Orleans, Louisiana  70113

For the Plaintiffs:       Patrick J. Sanders, LLC
                          BY:  PATRICK J. SANDERS, ESQ.
                          3316 Ridgelake Drive
                          Suite 100
                          Metairie, Louisiana  70002

For the Plaintiffs:       Law Office of Richard T. Seymour,
                          P.L.L.C.
                          BY:  RICHARD T. SEYMOUR, ESQ.
                          1150 Connecticut Avenue N.W.
                          Suite 900
                          Washington, D.C.  20036-4129

For the Plaintiffs:       Khorrami, Pollard & Abir, LLP
                          BY:  SHAWN KHORRAMI, ESQ.
                          444 S. Flower Street
                          33rd Floor
                          Los Angeles, California  90071

For the Plaintiffs:       Wilson, Grochow, Druker & Nolet
                          BY:  LAWRENCE A. WILSON, ESQ.
                          233 Broadway
                          5th Floor
                          New York, New York  10279

For the Defendant:        Chaffe, McCall, L.L.P.
                          BY:  DEREK A. WALKER, ESQ.
                          BY:  CHARLES P. BLANCHARD, ESQ.
                          1100 Poydras Street, Suite 2300
                          New Orleans, Louisiana 70163

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2191

APPEARANCES:

For the Defendant:        Goodwin Procter, L.L.P.
                          BY:  JOHN ALDOCK, ESQ.
                          BY:  MARK RAFFMAN, ESQ.
                          BY:  ADAM CHUD, ESQ.
                          BY:  KIRSTEN ROBBINS, ESQ.
                          BY:  ERIC I. GOLDBERG, ESQ.
                          901 New York Avenue, NW
                          Washington, D.C. 20001

For the Defendant:        Sutterfield & Webb
                          BY:  DANIEL A. WEBB, ESQ.
                          650 Poydras Street, Suite 2715
                          New Orleans, Louisiana 70130

For the Defendant:        Lafarge North America, Inc.
                          BY:  PETER KEELEY, ESQ.
                          12950 Worldgate Drive
                          Herndon, Virginia  20170

Official Court Reporter:  Jodi Simcox, RMR, FCRR
                          500 Poydras Street
                          Room HB-406
                          New Orleans, Louisiana 70130
                          (504) 589-7780

Proceedings recorded by mechanical stenography, transcript
produced by computer.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2192

I N D E X

                                              Page

CHARLES R. CUSHING
   Cross-Examination                          2193
   Redirect Examination                       2212

MICHAEL O'DOWD
   Direct Examination                         2214
   Cross-Examination                          2229

JACOB ROBERT GLASER
   Direct Examination                         2239
   Cross-Examination                          2258
   Redirect Examination                       2272
REDA BAKEER
   Direct Examination                         2275

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2193

AFTERNOON SESSION

(July 6, 2010)

12:48          * * * * *

13:13          THE DEPUTY CLERK:  All rise.  Court's in session.

13:13     Please be seated.

13:13          MR. KHORRAMI:  May I proceed?

13:13          THE COURT:  Yes, sir, you may.

13:13          MR. KHORRAMI:  Thank you, Your Honor.

09:20          (WHEREUPON, Charles R. Cushing, having been

09:20     previously duly sworn, testified as follows.)

13:13          CROSS-EXAMINATION

13:13     BY MR. KHORRAMI:

13:13     Q.  And we discussed wind speed at 9:00 and 9:15, which is

13:13     within the time that you claim the barge would have moved away

13:13     from the terminal; correct?

13:14     A.  No, sir.  I said it moved away sometime after 9:00.

13:14     Q.  So that's within the time?  9:00 to 9:15 is within the

13:14     time?

13:14     A.  It's within the time.  After 9:00.

13:14     Q.  Okay.  And you've created a graph that shows the speed

13:14     with which -- that shows how you can calculate the speed of the

13:14     barge versus the speed of the wind; correct?

13:14     A.  In the hypothetical calculations, we did.  We calculated

13:14     the speed of the barge under the winds that had occurred

13:14     earlier.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2274**

```
15:10   1   A.  Positively.
15:10   2   Q.  And insofar as the Murphy suit, just so the record will be
15:10   3   clear, where is your home located?
15:10   4   A.  It was at Riverland Drive, 3716 Riverland Drive, which is
15:10   5   closer to Murphy, below Paris Road.  And my understanding, you
15:10   6   know, we had an attorney at that time that represented a number
15:10   7   of people on our particular street, other homeowners, to get
15:10   8   some settlement from Murphy because of the oil, which we did
15:11   9   receive for our home.  We never ever received anything for
15:11   10  Holiday Jewelers to my knowledge.
15:11   11          MR. BEST:  Thank you, sir.  That's all the questions
15:11   12  I have.
15:11   13          THE COURT:  Thank you, sir.  You may step down.
15:11   14          THE WITNESS:  Thank you.
15:11   15          THE COURT:  Okay.  I guess we can --
15:11   16          MR. GILBERT:  Your Honor, I understand that you have
15:11   17  a criminal docket tomorrow morning.
15:11   18          THE COURT:  I do.
15:11   19          MR. GILBERT:  Generally, how long does that run?  Do
15:11   20  you have any idea?
15:11   21          THE COURT:  It varies, but I'm guessing 10:30.
15:11   22          MR. GILBERT:  What time might we go to tomorrow
15:11   23  afternoon?
15:11   24          THE COURT:  6:00.
15:11   25          MR. GILBERT:  Thank you.
```

**2275**

```
15:11   1           MR. RAFFMAN:  Your Honor, ready to proceed?
15:11   2           THE COURT:  Yes.
15:11   3           MR. RAFFMAN:  Thank you.  The defense calls
15:11   4   Dr. Bakeer.
15:12   5           (WHEREUPON, Reda Bakeer, having been duly sworn,
15:12   6   testified as follows.)
15:12   7           THE DEPUTY CLERK:  Please state your full name and
15:12   8   correct spelling for the record.
15:12   9           THE WITNESS:  Reda Bakeer, R-E-D-A, B-A-K-E-E-R.
15:12   10          DIRECT EXAMINATION
15:12   11  BY MR. RAFFMAN:
15:12   12  Q.  Good afternoon, Dr. Bakeer.  Having given your name for
15:12   13  the record, would you tell the Court where you live and what's
15:12   14  your occupation.
15:12   15  A.  I live on 4624 Pike Drive in Metairie, and I'm presently
15:12   16  the vice president and chief engineer for Ardaman & Associates.
15:13   17          THE DEPUTY CLERK:  Can you push back a little bit
15:13   18  from the mic?  Yes.  Thanks.
15:13   19  BY MR. RAFFMAN:
15:13   20  Q.  Okay.  Are you a licensed engineer?
15:13   21  A.  I am a licensed engineer in the state of Louisiana.
15:13   22  Q.  Would you describe your educational background for the
15:13   23  Court, please?
15:13   24  A.  I have a bachelor of science in civil engineering, a
15:13   25  specialty in structural engineering from Ain-Shams University,
```

**2276**

```
15:13   1   Cairo, and I have a master's and a Ph.D. degree in civil
15:13   2   engineering from Syracuse University in New York.
15:13   3   Q.  And in what year did you receive your Ph.D. from Syracuse
15:13   4   University?
15:13   5   A.  My Ph.D. is in 1985.
15:13   6   Q.  Dr. Bakeer, are you a member of any scientific
15:13   7   associations?
15:13   8   A.  Several associations.
15:13   9   Q.  Why don't you give the Court an overview of the
15:13   10  associations.
15:13   11  A.  Primarily, the main membership I would list here is the
15:14   12  American Society of Civil Engineers, ASCE.  And also the
15:14   13  International Society of Soil Mechanics and Foundation
15:14   14  Engineering.  I've been a member of The Water Federation.  I've
15:14   15  been a member of ACI over the time, but I'm more active in ASCE
15:14   16  at the present time.
15:14   17  Q.  And within the American Society of Civil Engineers, have
15:14   18  you recently been elected to a particular membership rank?
15:14   19  A.  I've been elected to become a fellow, which is the highest
15:14   20  rank.  You start as an associate member, you become a member
15:14   21  and then you're voted to become a fellow.  And then there is a
15:14   22  lifetime, which is the highest achievement.
15:14   23  Q.  Now, have you received any awards in civil engineering,
15:14   24  soil mechanics, that kind of discipline?
15:14   25  A.  I can go back to all my graduate work.  My -- I had
```

**2277**

```
15:14   1   fellowships and assistantships throughout my education.  I
15:14   2   didn't pay for my graduate school.  I received -- two of my
15:15   3   papers received best paper of the year.  I was the main author
15:15   4   on those two publications:  One is international and the other
15:15   5   is a national award.
15:15   6           I was elected -- selected to be the Professional
15:15   7   Engineer Award from the State of Louisiana Foundation.  I also
15:15   8   was selected as the Best Teacher of the Year by the ASCE
15:15   9   chapter of Tulane University.  And some other minor awards here
15:15   10  and there.
15:15   11  Q.  Now, for how many years did you teach at Tulane
15:15   12  University; and in what courses, what subjects, did you teach?
15:15   13  A.  I started after -- immediately after my graduation in '85,
15:15   14  and I taught at Tulane.  I'm still a Professor Emeritus at
15:15   15  Tulane, but I -- you know, the program was canceled in '07.  So
15:15   16  2007 was my last year of teaching at Tulane.  That's over
15:15   17  20-some years, 22 or so.
15:15   18  Q.  Did your teaching at Tulane include soil mechanics or
15:16   19  other courses that relate to levee design and floodwall design
15:16   20  and safety?
15:16   21  A.  My teaching career actually started as a TA until
15:16   22  Syracuse.  I actually was assistant for the lab, in the
15:16   23  computer lab; the soil mechanics lab and the lab.  But I taught
15:16   24  the undergraduate classes regularly and the soil mechanics
15:16   25  course and the foundation engineering course, in addition to
```

**2278**

15:16  1  graduate courses in the same area.
15:16  2  Q.  Did any of your students at Tulane go on to become
15:16  3  engineers working in connection with levee design, levee
15:16  4  safety, floodwall safety for the Corps or anybody else?
15:16  5  A.  You can divide the graduates into two categories:  A group
15:16  6  that ends up continuing into academia, research, and so forth;
15:16  7  and some of them are still doing work in that area.  They are
15:16  8  professors now in the academia in Purdue and professors around
15:16  9  the state.  They are my graduate students.
15:16  10  And, also, a lot of them ended up practicing
15:16  11  engineering within a design firm or for the Corps of Engineers.
15:17  12  So a large number of the students that I taught are working for
15:17  13  the design and construction of levees, as well as a lot the
15:17  14  Corps of Engineers employees used to take my graduate classes.
15:17  15  A lot of my students also were Corps employees, who
15:17  16  would take classes for graduate school, master's levels and so
15:17  17  forth.
15:17  18  Q.  Now, apart from your teaching at Tulane in soil mechanics
15:17  19  and those other disciplines you've described, tell the Court
15:17  20  what other teaching experience you've had as it relates to
15:17  21  floodwall design and safety.
15:17  22  A.  I taught -- actually, I organized workshops for the Corps
15:17  23  of Engineers on software we developed for design of embankments
15:17  24  and levees.  So we have workshops at Tulane University for the
15:17  25  Corps of Engineers employees, educating them on the use of the

**2279**

15:18  1  software.
15:18  2  I also developed software for the Corps of Engineers
15:18  3  on the dredging of channels.  We organized workshops for the
15:18  4  Corps in the same area.
15:18  5  I lectured at WES, Waterway Experiment Station, up in
15:18  6  Vicksburg.  It's now called ERDC.  It used to be referred to as
15:18  7  WES, Waterway Experiment Station.
15:18  8  Recently, over the last four or five years since
15:18  9  Katrina, I've been a regular lecturer at the levee school in
15:18  10  LSU.  We held meetings to teach to the levee board members the
15:18  11  meaning of levees, how a levee works, how the Hurricane
15:18  12  Protection Systems work, since some of the people in the -- on
15:18  13  the levee board may not necessarily be engineers, understanding
15:18  14  what design concepts.  So that's, basically, what it is.
15:18  15  Also, I've been a lecturer on the levee board's
15:18  16  meeting.  We have annual meetings.  And the last two years, '09
15:18  17  and '10, I was invited to be a speaker on those.
15:19  18  Q.  Okay.  Now, you told the Court that you're currently the
15:19  19  chief engineer for Ardaman & Associates here in Louisiana?
15:19  20  A.  Correct, in Louisiana.
15:19  21  Q.  And does any of the work that you do with Ardaman, or any
15:19  22  other prior engineering company that you've worked with, has
15:19  23  that included work in connection with the design and evaluation
15:19  24  of levees and floodwalls?
15:19  25  A.  Correct.  And I would like to say it started from my Ph.D.

**2280**

15:19  1  and master's.  My research was on earth pressure.  Earth
15:19  2  pressure is a major concept that's used in the design of
15:19  3  floodwalls and levees and so forth.
15:19  4  Our company does work for the Corps of Engineers.  We
15:19  5  design levees, pump stations, and so forth.  So we are a
15:19  6  finalist for the three major pump stations that are now being
15:19  7  bid for construction on the New Orleans Avenue and 17th Street
15:19  8  and the London Avenue Canal.  Our company is working on the
15:20  9  major barrier of the IHNC, major barrier.  We've designed a lot
15:20  10  of structures.
15:20  11  Also, we review work done by the Corps as external
15:20  12  reviewers, and I'm also a reviewer for work done by other
15:20  13  engineers in the office.  So some of the designs are done by
15:20  14  me, myself, and some of them are review of others or other
15:20  15  work.
15:20  16  Q.  All right.  Let's look at some of the levee and floodwall
15:20  17  projects in which you have served as a designer or a reviewer.
15:20  18  We're going to start with the state of Louisiana outside the
15:20  19  New Orleans area.
15:20  20  And I'll ask you, using this map, which is DX-250, to
15:20  21  just use your laser pointer to point out some of the levee and
15:20  22  floodwall projects that you've worked on outside of the City of
15:20  23  New Orleans.
15:20  24  A.  I don't think I have a laser pointer here.
15:20  25  MR. RAFFMAN:  May I approach, Your Honor?

**2281**

15:20  1  THE COURT:  Yes, you may.
15:21  2  THE WITNESS:  Our main corporate office is in
15:21  3  Florida, and we have several offices in Florida.  But our
15:21  4  offices are in New Orleans, Louisiana, Baton Rouge, Shreveport,
15:21  5  Monroe, and Alexandria.  So we have offices, and I am the chief
15:21  6  engineer overseeing all the engineering within the state of
15:21  7  Louisiana.
15:21  8  We can start from anywhere in the state to
15:21  9  tell you where we've done work.  We've done work on the
15:21  10  Atchafalaya, Morgan City.  We've done work here.  We've done
15:21  11  some levees in the Lafayette area.  We've -- I'm right now
15:21  12  working with the Shreveport office on certification of levees
15:21  13  in northern Louisiana.
15:21  14  We have a major project, actually, in Vicksburg,
15:21  15  Mississippi, right on the Mississippi River here.
15:21  16  A lot of the levee work on the Baton Rouge area,
15:21  17  right here and up north from Baton Rouge.
15:22  18  Plaquemines Parish.  We do work in Lafourche,
15:22  19  Terrebonne Parish.  A lot of latest flood ports, wetland
15:22  20  restoration, barrier island restorations.  And, of course, the
15:22  21  flood protection systems in the New Orleans area.
15:22  22  BY MR. RAFFMAN:
15:22  23  Q.  All right.  So let's go to the next slide, please.
15:22  24  This is in Defendant's Exhibit 205 from your report.
15:22  25  Would you give the Court an idea of some of the work that you

**2282**

1  15:22  have done in connection with the flood and hurricane protection
2  15:22  system here in the New Orleans area?
3  15:22  A.  Sure.  Just to remind you of some of the expressions used,
4  15:22  the Corps of Engineers refers to the area near Lake
5  15:22  Pontchartrain as the -- I'm sorry -- the "LPV," Lake
6  15:22  Pontchartrain and vicinity.  So I worked on 105, 104.  That's
7  15:22  are LPV-105 and LPV-104.  Those are floodwalls in that area of
8  15:23  New Orleans East and Lakefront Airport.  That's the last
9  15:23  project we worked on, the Lakefront right here.
10  15:23  I was part on -- I actually did the analysis for the
11  15:23  levee along the New Orleans International Airport.  That's the
12  15:23  St. Charles/Kenner protection levee on the side.
13  15:23  We did a study for the Corps of Engineers in
14  15:23  St. Charles Parish on what's called the West Shore Levee, the
15  15:23  best alternative to protect the Laplace area right here.
16  15:23  I've done a lot of work on the Plaquemines Parish and
17  15:23  St. Bernard Parish and all the way down to Plaquemine.
18  15:23  Plaquemine is referred to as NOV, that's New Orleans to Venice.
19  15:23  Venice is the mouth of river, and New Orleans is beginning
20  15:23  here.  So we did NOV-6, NOV-7.
21  15:23  And there are pump stations all over this area we're
22  15:23  working on.
23  15:23  The "WBV," West Bank and vicinity, we just finished.
24  15:24  And we actually are under construction of a major
25  15:24  project on Lake Catouatchie, which would be on this side.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2283**

1  15:24  We've done work on the east levees.  And definitely
2  15:24  the largest project is the MRGO/GIWW project at Barataria.
3  15:24  We're working on that.
4  15:24  Q.  When we refer to the "MRGO," for the benefit of the
5  15:24  record, certainly not the Court, who is familiar with that,
6  15:24  we're talking about the Mississippi River Gulf Outlet?
7  15:24  A.  Yeah.  That's what "MRGO" stands for, Mississippi River
8  15:24  Gulf Outlet.  And the "GIWW" is the Gulf Intercoastal Waterway.
9  15:24  Q.  Let's take a look at the next slide, Dr. Bakeer.  Is this
10  15:24  one of the projects that you are involved with?
11  15:24  A.  Yes.  Just to give you an idea about this, the GIWW
12  15:24  actually has some photographs showing some floodwall on the
13  15:24  back.  That's the GIWW that we talk about, and it's showing the
14  15:24  waterway on this side.
15  15:25  If you continue down and continue past this area,
16  15:25  you're going to reach the MRGO, the Mississippi River Gulf
17  15:25  Outlet.
18  15:25  This particular opening here is the project we're
19  15:25  working on right now, and it's under construction.  That's the
20  15:25  Bayou Bienvenue replacement gate.  The Bayou Bienvenue exit to
21  15:25  the Gulf is going to be through this gate.  It's under
22  15:25  construction right now.
23  15:25  This is what's call the primary floodwall.  The
24  15:25  primary floodwall consists of 66-inch-diameter-spud concrete
25  15:25  piles.  These are driven about 130 feet into below the mud

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2284**

1  15:25  line, below the water, then below the ground surface,
2  15:25  underneath it.  They are -- they have kick-up piles.  They are
3  15:25  36-inch-diameter piles.
4  15:25  Each pile has another pile next to it just to close
5  15:25  that gap.  This forms the main barrier wall.  I'm presently
6  15:25  involved in the -- I took this with my phone, actually.  It's
7  15:25  not a very good picture, but that was from my phone.  I was on
8  15:25  the barge.  We're driving piles right here.
9  15:26  That's a monitoring station, actually, where we have
10  15:26  instrumentation inside this particular structure.  We have five
11  15:26  of those that we're working on.
12  15:26  Q.  The purpose of that instrumentation, Dr. Bakeer, is what?
13  15:26  A.  The floodwall, this structure, was designed using the
14  15:26  finite element method and was used to develop how much this
15  15:26  wall is going to experience in terms of forces, reactions, and
16  15:26  so forth, from flooding, from waves, et cetera.
17  15:26  So the main interest was to monitor this during
18  15:26  hurricanes and to see how much is going to deflect.  I think
19  15:26  some discussions were brought out about the E-99 simulation.
20  15:26  That's a real measurement, you know, of how much this
21  15:26  66-inch pipe is expected to deflect, and it's a couple of
22  15:26  inches of deflection to be expected.
23  15:26  Q.  All right.  Just by way of closing out, Dr. Bakeer, over
24  15:26  the years, have you written articles for publication regarding
25  15:27  floodwalls, floodwall design, and levees?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2285**

1  15:27  A.  As a matter of fact, the best paper of the year that I
2  15:27  mentioned was by the what's called the Transportation Research
3  15:27  Board, National Research Council.  This was the best paper of
4  15:27  the year.  It was on a geo-textile reinforced embankment.  That
5  15:27  was the first time they used what we call fabrics, and we see
6  15:27  them in construction, the black cloth that they use in
7  15:27  reinforcing levees in the state of Louisiana.
8  15:27  So that was an experiment done by the U.S. Army Corps
9  15:27  of Engineers, and I was part of that publication.
10  15:27  Q.  And your curriculum vitae, which we've provided the Court,
11  15:27  lists other publications that you've made in and around that
12  15:27  area; is that fair?
13  15:27  A.  Starting on my Ph.D. dissertation, all the way to present,
14  15:27  I stay published in those areas.
15  15:27  Q.  So, Dr. Bakeer, how many years of experience do you have
16  15:27  working with floodwalls and levees?
17  15:27  A.  On a research basis, probably since I picked my career.
18  15:27  The first study that I did was as a graduate student.  It was a
19  15:28  consulting job that I was part of it, and I worked on the
20  15:28  stability for a structure that was given to the university to
21  15:28  look at.  And it extended over.
22  15:28  I've been designing levees and so forth since I
23  15:28  became a PE, and I've been practicing engineering, and I've
24  15:28  been involved in levee designs, floodwall designs, ever since
25  15:28  1997 or so until today.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2286**

1   15:28   Q.  All right.  So you've got 20-years-plus in the research
2   15:28   area and then, actually since '97 or so, in the actual hands-on
3   15:28   design work that you've described?
4   15:28   A.  Correct.
5   15:28       MR. RAFFMAN:  All right.  I would like to tender,
6   15:28   Dr. Bakeer as an expert in geotechnical engineering; and in
7   15:28   particular, the design, construction analysis, and performance
8   15:28   of levees and floodwalls.
9   15:28       MR. KHORRAMI:  Your Honor, plaintiffs reserve voir
10  15:28   dire for after the direct.
11  15:28       THE COURT:  The Court accepts Dr. Bakeer as tendered.
12  15:29       MR. RAFFMAN:  Thank you, Your Honor.
13  15:29   BY MR. RAFFMAN:
14  15:29   Q.  Dr. Bakeer, I'd like to start with, I hope, begging the
15  15:29   Court's patience, for a short overview of the principles of how
16  15:29   a levee and a floodwall works.
17  15:29       So let's take the first slide.  For the record we're
18  15:29   looking at Defendant's Exhibit 205, Bakeer report Figure 19.
19  15:29       Dr. Bakeer, what is a levee?
20  15:29   A.  A levee is a earthen structure.  It looks like a
21  15:29   trapezoid, as you see from here.  That's this trapezoid area.
22  15:29   It may include berms on either side to protect -- the purpose
23  15:29   of the levee is to protect what we call the protected side --
24  15:29   sometimes in the literature it's referred to as land side --
25  15:29   from floodwaters on flood side, which is the river side, the

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2287**

1   15:29   waterway side, et cetera.  So it's an earthen structure made of
2   15:29   natural materials.
3   15:29   Q.  What is an I-wall or a floodwall?  Am I right that an
4   15:30   I-wall is a type of floodwall?
5   15:30   A.  An I-wall is the abbreviation.  It looks like the letter
6   15:30   "I."  If you look at this structure, it looks like an "I," the
7   15:30   letter "I."
8   15:30       That's to distinguish it from what's called a T-wall,
9   15:30   with the "T" is actually an inverted "T."  So the base of the
10  15:30   wall looks like the letter "T."  So if I put another piece of
11  15:30   concrete at the bottom here, that would be a T-wall.  So it has
12  15:30   a stem, the vertical element.  The horizontal base is what
13  15:30   forms the "T" for an inverted "T" in this case.
14  15:30   Q.  All right.  And give the Court a sense.  This element here
15  15:30   that's buried into the soil, what is that?
16  15:30   A.  Again, I -- to complete the answer to your question, an
17  15:30   I-wall is a method of enlarging a levee without having to
18  15:30   enlarge the earth mass itself.  And let me explain this
19  15:30   quickly.
20  15:30       You can see if the levee is made of slopes on either
21  15:31   side.  This slope may be 1 on 3, 1 on 4, 1 on 5, and that's
22  15:31   governed by the soil conditions theory.  It has a slope on
23  15:31   either side.
24  15:31       So if you imagine you go 10 feet up, and this slope
25  15:31   is 1 on 3, you need 30 feet on this side, you need another 30

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2288**

1   15:31   feet on that side.  That's the 1 on 3.
2   15:31       Now, to raise the levee to become, rather than
3   15:31   10 feet high, we're going to make it 15 feet high, then I'm
4   15:31   going to have 5 times 3, plus another 5 times 3.  I need
5   15:31   60 feet of real estate.  That's practically tough in urban
6   15:31   areas.  So the solution is to make the levee higher by having
7   15:31   an extended structural element above the crown of the levee,
8   15:31   providing additional height without compromising the space or
9   15:31   the limited space that we have.
10  15:31       See, for example, on this diagram here, if you push
11  15:31   the levee down here, you have a problem with the canal on this
12  15:31   side, and that's the reason why you have to use the I-wall.  So
13  15:31   it's a way to -- and I would say the T-wall is the same way.
14  15:32   It's a way to make enlargement of a levee possible within
15  15:32   congested areas.
16  15:32   Q.  All right.  And the element that allows you to raise the
17  15:32   height of the structure without raising the width of the levee
18  15:32   is what?
19  15:32   A.  It's basically how deep you're going to embed that
20  15:32   structure or element, which is this particular structure.
21  15:32   In case of a T-wall, it would be supported on piling.
22  15:32       Here, the only mean of achieving stability is to have
23  15:32   an embedded element in the ground with sufficient tip
24  15:32   penetration, which is the number you see right there.  That's
25  15:32   the tip penetration.  That tip penetration is functional of the

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2289**

1   15:32   loading and how much height do we have above the ground.
2   15:32   Q.  In the case of the I-walls at the Inner Harbor Navigation
3   15:32   Canal, the embedded element that we're talking about is what?
4   15:32   A.  The embedded element is what's called the sheet pile, or
5   15:32   "the steel curtain," as some people will refer to it.  It's
6   15:32   basically that corrugated C-shaped section that's
7   15:33   interconnected together to form a continuous wall.  That's,
8   15:33   basically, how deep it's embedded in the ground controls the
9   15:33   stability of that structure.
10  15:33   Q.  All right.  Now, we're going to illustrate the principle
11  15:33   behind the last testimony that you just gave by the next slide.
12  15:33   This is an illustrative called the cantilever.
13  15:33       Dr. Bakeer, explain how a cantilever works, and
14  15:33   explain this slide with reference to your immediately prior
15  15:33   testimony about the depth of the sheet pile and why it matters
16  15:33   how deep the sheet pile is.
17  15:33   A.  I don't know if we said an I-wall is a cantilever or not.
18  15:33   I don't recall your question at the time.  But an I-wall is a
19  15:33   cantilever, and a cantilever is simply the same concept as I'm
20  15:33   holding the laser pointer in my hand right now.  If I'm holding
21  15:33   it tight from here, I can put more load on that element.
22  15:33       So if you think about a cantilever as a nail being
23  15:33   driven in that wall.  If this is a sheetrock and this is the
24  15:34   stud, the wood stud, the 2-by-4 behind it, the deeper you drive
25  15:34   the nail in the wall, the heavier the frame you can hang on it.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2290

1   15:34   You can see this will illustrate that, if I don't put it
2   15:34   enough, you're going to see a leaning nail right here.  If you
3   15:34   push the nail as close as you can into that lumber -- and
4   15:34   again, another issue to look at was how much the stiffness you
5   15:34   have in the embedded median here.
6   15:34       So you have a steel nail driven into sheetrock.  The
7   15:34   resistance of how much load you can apply is function of how
8   15:34   stiff it's going to be.  Putting it in lumber is definitely
9   15:34   better than having it in sheetrock.  So that's a very good
10  15:34   illustration of the concepts of earth pressure:  The deeper the
11  15:34   penetration, the heavier the load you can carry; the stronger
12  15:34   the material, the more load capability you're going to have.
13  15:34   Q.  All right.  Now, I want to focus very briefly on this
14  15:34   concrete cap feature, which is on top of the sheet pile, but
15  15:34   the sheet pile doesn't go inside it.
16  15:35       We've talked about this throughout the trial, so
17  15:35   we'll try to move through it.  Dr. Bakeer, please identify on
18  15:35   this slide, which is Plaintiff's Exhibit 378, Bartlett report
19  15:35   Appendix 3, identify for the Court --
20  15:35       THE COURT:  Which one is that?  You said it real
21  15:35   quickly.  Oh, I see.  It's right here.  I'm sorry.  378,
22  15:35   Bartlett report Appendix B.
23  15:35       MR. RAFFMAN:  Right.  And I should add, Your Honor,
24  15:35   that I believe the yellow shading is ours and not
25  15:35   Mr. Bartlett's.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2291

1   15:35       MR. GILBERT:  Actually, I think that's one -- I want
2   15:35   to be clear for the record that what's on the left side, that's
3   15:35   not actually Dr. Bartlett's --
4   15:35       MR. RAFFMAN:  I believe counsel is correct.  I
5   15:35   believe that the Dr. Bartlett slide that we're talking about is
6   15:35   the one in the upper right.
7   15:35       THE COURT:  Right.
8   15:35       MR. GILBERT:  Correct.
9   15:35       MR. RAFFMAN:  In fact, we can --
10  15:35       THE COURT:  I've been wanting to clear up that the 10
11  15:36   to 11 feet referred to the other day is simply what's below
12  15:36   what I'll call an NAVD88.
13  15:36       MR. RAFFMAN:  All right.
14  15:36       THE COURT:  I know it's not the entire length of the
15  15:36   sheet pile.  We had some discussion the other day, and it
16  15:36   was going to be cleared up.  And I'm well aware of what it is,
17  15:36   but it's now clear for the record from this exhibit.
18  15:36       MR. RAFFMAN:  All right.
19  15:36       THE COURT:  I understand that's probably the 1969
20  15:36   floodwall.
21  15:36       MR. RAFFMAN:  Yes, Your Honor.  And so we can get
22  15:36   that on the record.
23  15:36       BY MR. RAFFMAN:
24  15:36   Q.  Dr. Bakeer, we're referring here now to the 1969
25  15:36   floodwall; am I right?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2292

1   15:36   A.  This particular diagram.
2   15:36   Q.  Okay.
3   15:36   A.  Because this one is referring to NAVD88.  So that's the
4   15:36   as-built; GDM, General Design Memorandum, information.
5   15:36   Q   All right.
6   15:36   A   And it would show the information in the MSL.  And there
7   15:36   is some difference between MSL and NAVD88.
8   15:36   Q.  For the benefit of the Court, and so nobody is confused,
9   15:36   Dr. Bakeer, when they designed the 1969 sheet pile, the datum
10  15:37   that they used to identify the heights was in MSL, or mean sea
11  15:37   level; is that right?
12  15:37   A.  Correct, "MSL" stands for mean sea level.
13  15:37       At that time the understanding was that MSL was universal
14  15:37   that, that the water level is zero everywhere in the world.
15  15:37   And that concept changed that we don't do this anymore.
16  15:37   Q.  All right.  So today, we use -- instead of MSL, we use the
17  15:37   datum of NAVD88, and there's actually a suffix, 2004.65, if my
18  15:37   memory serves.
19  15:37   A.  Yes, North American Vertical Datum, 1988 with a 2004.65
20  15:37   correction.  That's what it stands for.
21  15:37   Q   Now --
22  15:37   A   So if you see NAVD88, that's not necessarily 2004.65
23  15:37   corrected.  So there is a lot of confusion, and that's a big
24  15:37   problem in Corps of Engineers documents.
25  15:37       You're also going to see NGVD, National Geodetic

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2293

1   15:37   Vertical Datum, NGVD.  So it's a bit confusing issue, but I
2   15:38   think the purpose of this is to illustrate what the concept of
3   15:38   natural elevations.
4   15:38   Q.  All right.
5   15:38   A   I'm thinking it does such.
6   15:38   Q   Now, we've taken a short detour on the datum point.
7   15:38   A.  Correct.
8   15:38   Q.  My question for the Court was that the length of the sheet
9   15:38   pile that's depicted on this lower left diagram is depicting
10  15:38   sheet pile of the length of the 1969 floodwall; is that right,
11  15:38   Dr. Bakeer?
12  15:38   A.  That's correct.  NAVD88 in the current image on the left.
13  15:38       THE COURT:  And the length of that sheet pile is?
14  15:38   Just for the record.
15  15:38   BY MR. RAFFMAN:
16  15:38   Q.  The length of the sheet pile is what?
17  15:38   A.  It's about 20 feet.  It's about a 20-foot pile.  It
18  15:38   stopped -- it stopped -- well, originally, when it was built,
19  15:38   at plus 12, and it's tip at MSL was at minus 8.  So the easiest
20  15:38   math, 12 and 8 is 20.  So it's about a 20-foot sheet.  Some
21  15:38   documents indicate 19 1/2.  It's believed to be 20.
22  15:38       THE COURT:  And without getting into the esoteric of
23  15:38   the various methodology to determine sea level, this is shown
24  15:39   to be 10 to 11 feet, in general, below sea level; is that
25  15:39   correct?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2294

1  15:39      THE WITNESS:  Based on the NAVD88, it's about
2  15:39  minus 10 below the present NAVD88.
3  15:39      THE COURT:  I understand.
4  15:39  BY MR. RAFFMAN:
5  15:39  Q.  All right.  Now, we were talking about the cap, and my
6  15:39  only question about this is:  Is the yellow -- can we agree
7  15:39  that the yellow feature here is going to be the concrete cap?
8  15:39  A.  If we -- can I use that terminology?  Yes.  Yes, I can.
9  15:39  Q.  All right.  And does the concrete cap add to the stability
10 15:39  of the floodwall against rising floodwaters?
11 15:39  A.  No.
12 15:39  Q.  Okay.  Next slide, please.  The Team Louisiana report.
13 15:39  You've read the Team Louisiana report in connection with your
14 15:39  work in this case?
15 15:39  A.  I did.
16 15:39  Q.  And so Team Louisiana wrote:  "Many sheet pile walls in
17 15:39  more remote areas of the GNO HPS" -- do you understand that to
18 15:39  refer to Greater New Orleans Hurricane Protection System?
19 15:40  A.  That's correct.
20 15:40  Q.  -- "are not capped with concrete panels or monoliths, but
21 15:40  the concrete capping provided a more aesthetically pleasing
22 15:40  approach favored for use in urban areas."
23 15:40      You saw that in Team Louisiana's report?
24 15:40  A.  I've seen that statement.
25 15:40  Q.  That's one of the reasons to include a concrete cap?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2295

1  15:40  A.  I can elaborate on this -- that's correct.  I can
2  15:40  elaborate on this a little bit.
3  15:40      The locals here probably have been to the New Orleans
4  15:40  Canal, and you've seen the decorative stuff that you see on
5  15:40  that particular wall there, flowers and all that.
6  15:40      The main purpose of the concrete monolith, not just
7  15:40  the cap, the concrete monolith, is aesthetics.  It looks
8  15:40  better.  One thing.  It's like those sound wall barriers
9  15:40  you see on the I-10.  It's the same idea.  We make one with
10 15:40  flowers and trees and palms.  It's just aesthetics.
11 15:40      The second reason is protection against rust.  You
12 15:41  can see that the rust would attack the pile.  But if it's
13 15:40  protected -- the sheet pile is steel.  So if it's protected
14 15:40  within a concrete cap, that provides protection against rust.
15 15:41  Q.  All right.
16 15:41  A.  It closes the gaps in the --
17 15:41      THE COURT:  Just a quick question.  I have seen many,
18 15:41  many photographs over the last five years, and, of course, I've
19 15:41  seen some not in urban areas where it's simply the sheet pile
20 15:41  and no concrete monolith.
21 15:41      In this instance, the '69 instance, the monolith
22 15:41  adds some height to the floodwall in that the sheet pile
23 15:41  doesn't go all the way up to the top of the monolith; is that
24 15:41  correct?
25 15:41      THE WITNESS:  That is correct.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2296

1  15:41      THE COURT:  Does that serve any function other than
2  15:41  aesthetics?
3  15:41      THE WITNESS:  One reason, too, is when you're in
4  15:41  urban areas, kids, people, tend to jump over these walls.  You
5  15:41  can get hurt on a steel metal.  So one of the reasons is to
6  15:41  make sure it's capped so it's not a sharp object where people
7  15:41  can get hurt on them.  So that's another reason.
8  15:41      The added height for protection is another
9  15:42  correct statement, yes.  You get an extra couple of feet with
10 15:42  the concrete.
11 15:42      THE COURT:  All right.
12 15:42  BY MR. RAFFMAN:
13 15:42  Q.  All right.  And the judge is probably tired of seeing
14 15:42  pictures of other barges that have struck a wall at a concrete
15 15:42  cap --
16 15:42      THE COURT:  I find it infinitely fascinating.  Go
17 15:42  ahead.
18 15:42  BY MR. RAFFMAN:
19 15:42  Q.  We have a couple of these, and not to belabor the point,
20 15:42  but next slide, please.
21 15:42      Here's a barge that has come into contact with the
22 15:42  concrete cap.  My question, Dr. Bakeer, is:  Can the floodwall
23 15:42  remain stable if the concrete cap is cracked or affected by a
24 15:42  barge?
25 15:42  A.  Looking at this photograph, I agree, yes.  And you can

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2297

1  15:42  see, actually, those are different, two types of walls.  This
2  15:42  structure on the left is an I-wall, and this is what we -- what
3  15:42  I referred to earlier as a T-wall.  So that's a junction
4  15:42  between a T-wall and an I-wall.
5  15:42      Both of them were struck by the same barge with the
6  15:42  same circumstances, same loads.  Both of them sustained
7  15:42  cosmetic damage equally.  So the effect of the foundation here
8  15:43  is not a layer being of steel piles or concrete piles versus an
9  15:43  I-wall embedded.  So you can see that was falling and concrete
10 15:43  damage to the cap.
11 15:43  Q.  All right.  We're going to pass through the next two
12 15:43  slides.  Let me have the RMB-13, please.  I'm going to move on
13 15:43  to a different line now.  We're going to move away from the
14 15:43  basic sheet pile function, and now I'm going to ask you some
15 15:43  questions about the Army Corps of Engineers guidelines that you
16 15:43  used in your evaluation of this case.
17 15:43      Dr. Bakeer, we're looking at a slide.  It's DX-253,
18 15:43  and it bears a Bates number LNA-10459.  It bears at the top a
19 15:43  heading that says "Greater New Orleans Hurricane and Storm
20 15:44  Damage Risk Reduction System," or "HSDRRS."
21 15:44      What is the HSDRRS?
22 15:44  A.  There are two words that goes after "HSDRRS."  It's "DG."
23 15:44  "DG" stands for design guidelines.  So that's, basically, a set
24 15:44  of guidelines that are used to design, evaluate, inspect,
25 15:44  assess HPS, Hurricane Protection System, in the Greater New

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2298

| | | |
|---|---|---|
| 1 | 15:44 | Orleans area. |
| 2 | 15:44 | Q.  Now, in Hurricane Protection Systems in Greater New |
| 3 | 15:44 | Orleans, is this something that the Corps has developed after |
| 4 | 15:44 | Hurricane Katrina? |
| 5 | 15:44 | A.  Correct.  It evolved or started coming up in '06.  There |
| 6 | 15:44 | was some document or maybe documents, with an "S," for |
| 7 | 15:44 | analyzing and assessing and designing structures.  And then it |
| 8 | 15:44 | evolved in a complete document in about 2007, and that document |
| 9 | 15:44 | spans many aspects:  Hydrology, surveying, design, geotechnical |
| 10 | 15:45 | structure.  It's about eight chapters, covering all the |
| 11 | 15:45 | aspects. |
| 12 | 15:45 | The geotechnical chapter is chapter No. 3, and that |
| 13 | 15:45 | was updated in 2008.  And this document evolved from the work |
| 14 | 15:45 | of the -- of many organizations that evaluated the events |
| 15 | 15:45 | during Katrina, assessed the walls.  National experts were |
| 16 | 15:45 | involved in the process.  The analyses were done by the Corps |
| 17 | 15:45 | of Engineers and others.  And this is still a dynamic document |
| 18 | 15:45 | that some of these are still coming up with.  But the latest |
| 19 | 15:45 | version is '07-'08. |
| 20 | 15:45 | Q.  And so these are guidelines that apply whenever anybody |
| 21 | 15:45 | wants to design or even evaluate a flood-protection structure |
| 22 | 15:45 | here in New Orleans; is that right? |
| 23 | 15:45 | A.  That's correct.  And when my office is engaged in design, |
| 24 | 15:46 | this is what we follow.  This is the guideline.  It's a think |
| 25 | 15:46 | document, like I said, a D-binder about 4 inches thick. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2299

| | | |
|---|---|---|
| 1 | 15:46 | Also, when I review work by the Corps, they give us |
| 2 | 15:46 | work to review to see if they followed or not, this is what we |
| 3 | 15:46 | are supposed to use and this is what we follow. |
| 4 | 15:46 | The same thing if others do work for the Corps, this |
| 5 | 15:46 | is how we apply the concept.  So any of the projects dealing |
| 6 | 15:46 | with HPS in the area has to follow the guidelines of the HSDRRS |
| 7 | 15:46 | or S-DG, or the design guidelines. |
| 8 | 15:46 | Q.  These are specific to the New Orleans area; is that right? |
| 9 | 15:46 | A.  Correct.  Correct.  May not apply somewhere else.  These |
| 10 | 15:46 | are specifically developed for this.  But there are some |
| 11 | 15:46 | general concepts that -- you know, one methodology.  There are |
| 12 | 15:46 | methods used in place.  But there are specific methods, |
| 13 | 15:46 | specific requirements, that apply to the Gulf Coast or, |
| 14 | 15:46 | particularly, the Greater New Orleans. |
| 15 | 15:46 | Q.  All right.  And you can use these guidelines not only when |
| 16 | 15:47 | you're designing something new but also to evaluate the |
| 17 | 15:47 | strength or safety of an existing structure; am I right? |
| 18 | 15:47 | A.  That's correct. |
| 19 | 15:47 | Q.  So tell the Court how you have used these guidelines to |
| 20 | 15:47 | evaluate the floodwall along the eastern side of the Inner |
| 21 | 15:47 | Harbor Navigation Canal as it existed at the time of Hurricane |
| 22 | 15:47 | Katrina. |
| 23 | 15:47 | A.  I, basically, followed -- it's a step-by-step procedure, |
| 24 | 15:47 | and that's what we do.  I designed I-walls in the past.  So |
| 25 | 15:47 | that's how we do it.  We see item No. 1, Section 1, Section 2, |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2300

| | | |
|---|---|---|
| 1 | 15:47 | Section 3, and you go through the steps one by one. |
| 2 | 15:47 | Q.  Okay.  We will go through the steps in greater detail |
| 3 | 15:47 | later, but I want to just get out on the table what you've |
| 4 | 15:47 | concluded -- |
| 5 | 15:47 | A.  Right. |
| 6 | 15:47 | Q.  -- about the breaches. |
| 7 | 15:47 | MR. RAFFMAN:  Let's go to the next slide, please, |
| 8 | 15:47 | 014.  We're looking at Defendant's Exhibit 205, Figure 1 to the |
| 9 | 15:47 | Bakeer report. |
| 10 | 15:47 | BY MR. RAFFMAN: |
| 11 | 15:47 | Q.  Dr. Bakeer, very briefly, show the Court the breaches that |
| 12 | 15:48 | are at issue here and the other two that you saw on the |
| 13 | 15:48 | Industrial Canal, or the Inner Harbor Navigation Canal? |
| 14 | 15:48 | A.  Again, we -- probably this figure's shown up a lot in this |
| 15 | 15:48 | trial.  So that's the Florida bridge.  That's what people refer |
| 16 | 15:48 | to as "the blue bridge," the Claiborne bridge on this side. |
| 17 | 15:48 | It's very important to see that there were four |
| 18 | 15:48 | breaches specifically developed in that area.  There's the west |
| 19 | 15:48 | breach, which occurred in an I-wall, pretty much the same |
| 20 | 15:48 | configuration, size, tip penetration, soil conditions, like the |
| 21 | 15:48 | one on the east wall. |
| 22 | 15:48 | There is a levee breach right there, and there is a |
| 23 | 15:48 | specific reason for why it -- failure took place at that |
| 24 | 15:48 | location, as well as that location. |
| 25 | 15:48 | Also, there are two breaches.  One on the northern |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2301

| | | |
|---|---|---|
| 1 | 15:48 | end near Claiborne Avenue.  That's the East Bank, north breach. |
| 2 | 15:48 | My report refers to it as the "EBNB," which is East Bank north |
| 3 | 15:48 | breach. |
| 4 | 15:49 | Also, the fourth -- or the second breach on the East |
| 5 | 15:49 | Bank or the fourth breach in the IHNC is the East Bank south |
| 6 | 15:49 | breach, which I occasionally refer to as the "EBSB." |
| 7 | 15:49 | MR. RAFFMAN:  Your Honor, we're well aware that, in |
| 8 | 15:49 | another trial, you saw the initials "EBSB" referred to -- |
| 9 | 15:49 | THE COURT:  I know.  It's earthen berm. |
| 10 | 15:49 | MR. RAFFMAN:  -- earth berm/spoilbank. |
| 11 | 15:49 | THE COURT:  Spoilbank, yes. |
| 12 | 15:49 | THE WITNESS:  But we're not using that here. |
| 13 | 15:49 | THE COURT:  I was, strangely enough, doing the |
| 14 | 15:49 | translation myself. |
| 15 | 15:49 | MR. RAFFMAN:  All right, Your Honor. |
| 16 | 15:49 | THE WITNESS:  I saw this and I was tempted to change |
| 17 | 15:49 | the term, but my report was already out, so... |
| 18 | 15:49 | THE COURT:  I know this EBSB is quite different than |
| 19 | 15:49 | the other EBSB that I'm familiar with. |
| 20 | 15:49 | MR. RAFFMAN:  Well, thank you, Your Honor. |
| 21 | 15:49 | THE COURT:  Not all acronyms are the same. |
| 22 | 15:49 | MR. RAFFMAN:  Very good. |
| 23 | 15:49 | BY MR. RAFFMAN: |
| 24 | 15:49 | Q.  So we're going to move on and into a discussion of the |
| 25 | 15:49 | north breach and your conclusions about it.  But just in |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2302**

```
15:49   1   general, Dr. Bakeer, can you give the Court an overview of your
15:50   2   conclusions about what happened at these two East Bank
15:50   3   breaches, why are they happening and whether or not you think
15:50   4   the barge was involved or why not?
15:50   5   A.  In a nutshell, for all the breaches, not just these two,
15:50   6   there was deficiency in the wall design.  So my conclusion that
15:50   7   this structure was deficient and insufficient with adequate tip
15:50   8   penetration to sustain the floodwaters during Hurricane
15:50   9   Katrina.
15:50  10   Q.  And can you explain, Dr. Bakeer, if the tip penetration
15:50  11   was the same along the entire length of these floodwalls, why
15:50  12   is it that you only had failure at certain locations in the
15:50  13   floodwall?
15:50  14   A.  I can give you this answer for IHNC or any other
15:50  15   structure.  You can ask the question why the 17th Canal failed
15:50  16   on the west side and not the east side or vice-a-versa.  You
15:50  17   can look at the London Avenue Canal.  Why two breaches at the
15:50  18   London Avenue?
15:50  19         The answer is failure takes place at the weakest
15:50  20   link.  They have to have some unique conditions that differ
15:51  21   from anywhere else along the floodwall.
15:51  22         Again, I can give an example simply like this:  If
15:51  23   you have a paperclip, and you keep bending it up and down, that
15:51  24   becomes the weakest link.  Where do you think the paperclip is
15:51  25   going to break at?  The weakest link.
```

              JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA

**2303**

```
15:51   1         If you have a chain, continuous chain, with one weak
15:51   2   link, and you pull that chain, where do you think the chain is
15:51   3   going to break?  At the weakest link.  So the entire chain will
15:51   4   not collapse.
15:51   5         And this is a discussion I bring up in levee schools
15:51   6   and whenever I talk about Katrina failures.  The problem with
15:51   7   the analysis that were done by the Corps, or anyone else, is
15:51   8   looking at individual units rather than looking at a system.
15:51   9         We have to approach hurricane protection, and we have
15:51  10   the words "S" -- or the letter "S" that stands for a system.
15:51  11   So you have to look at what exactly prevailed at location A to
15:51  12   have a failure.
15:52  13   Q.  All right.
15:52  14   A.  Versus B with no failure.
15:52  15   Q.  We're going to go now to reasons why we have weak links.
15:52  16   Before we do that, did the barge cause either of those two
15:52  17   failures on the east side?
15:52  18   A.  In my opinion, no.  I mean, these walls -- these walls
15:52  19   were going to fail under hydrostatic pressure, and they did
15:52  20   fail under hydrostatic pressure.
15:52  21   Q.  All right.  Now, let's, then, go to your reasons why the
15:52  22   north breach area was a weak link in the chain.  And here we
15:52  23   actually have a slide for the Court.
15:52  24         Why don't you take the Court through the reasons why
15:52  25   you've concluded that the north breach area was a weak link.
```

              JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA

**2304**

```
15:52   1   A.  It's a weak link and the weakest link as well.  So we have
15:52   2   two weak links or we can have multiple weak links.
15:52   3         And, again, like the chain example, when you pull the
15:52   4   chain, the weakest link fails; if you put a stronger link in
15:52   5   that location, pull the chain again, you're going to break the
15:52   6   next and then the next and then the next, depending on which
15:52   7   one is the weakest, and then the next and then the next one.
15:53   8   So, in my terminology, I would define this as the weakest link.
15:53   9         It had a transition joint between the much newer
15:53  10   deeper sheet pile with a tip penetration of a minus 25, and
15:53  11   that makes you wonder:  Someone designed this wall and decided
15:53  12   that minus 8 is insufficient.  So they decided that the new
15:53  13   wall built in 1980 should be at minus 25.
15:53  14         You should think about it this way.  This was
15:53  15   connected to a much shallower, older, rusty, deteriorated sheet
15:53  16   pile, which is what we refer to most of the time as the 1969
15:53  17   wall.  So that's a transition from the Florida complex, 1980
15:53  18   construction, versus the 1960's construction of the old
15:53  19   floodwall.
15:53  20         The second is a construction-related issue, where
15:53  21   there is a poor connection either because of the deterioration
15:53  22   on the interlocks between the piles that allowed it to disjoin
15:53  23   or separate; also, the sheet pile itself was deteriorated,
15:54  24   rusty.  That allows it to tear, divide, split.
15:54  25         Also, there was a faulty weld in that area.  So this
```

              JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA

**2305**

```
15:54   1   was -- that was an accident waiting to happen, in my opinion.
15:54   2   This was a very poor connection between the old wall and the
15:54   3   new wall.
15:54   4   Q.  All right.  The third one you've written here, explain to
15:54   5   the Court what the third bullet point is.
15:54   6   A   The third bullet is if we examine the data, we'll see
15:54   7   that, actually, the ground was highest near the Claiborne
15:54   8   bridge, and gradually it sloped down until it reached the
15:54   9   lowest point by the land side end of the wall, where the north
15:54  10   breach took place.
15:54  11         You also have a unique situation there.  You have a
15:54  12   pump station that's pumping water.  When you pump water, that
15:54  13   causes ground to settle.  And that's probably another cause for
15:54  14   having a unique situation at the -- at that area in the north.
15:54  15   Q   Finally.
15:54  16   A   Then finally, what activities took place?  I would say the
15:54  17   sand is one element.  But, in general, I would say the
15:54  18   activities that took place in the EBIA during its history and
15:55  19   its restoration in '04/'05 I believe.
15:55  20   Q.  And for the record, "EBIA" refers to the East Bank
15:55  21   Industrial Area; is that right?
15:55  22   A   That is correct.
15:55  23   Q.  Which was an industrial complex that had been on the canal
15:55  24   side of the floodwall and was dismantled sometime prior to
15:55  25   2005?
```

              JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA

2306

```
1   15:55   A.  And gradually was dismantled.  So over the years, but I
2   15:55   believe the final activities took place in about '04/'05, right
3   15:55   before the storm.
4   15:55   Q.  So we're going to proceed through these four individually
5   15:55   with some pictures.
6   15:55        Next slide, please.  We're looking now at Defendant's
7   15:55   Exhibit 205, Bakeer report, Figure 28, and with an insect here
8   15:55   showing the -- the two lengths of floodwalls.
9   15:55        Identify for the Court where is the 1980 sheet pile
10  15:55   wall, where is the 1969 wall.
11  15:55   A.  The Florida Avenue complex starts, actually, from the
12  15:55   Florida Avenue, and it basically starts with T-walls.  These
13  15:56   are T-walls on the back end.  You can see the base I was
14  15:56   speaking about earlier when I said that you have a vertical
15  15:56   stem and a horizontal base.  These are T-walls.
16  15:56        They continue down.  Then they go under Surekote
17  15:56   Road, so there is actually a sheet pile that goes under this
18  15:56   structure here.  It's -- the protection is provided by an
19  15:56   embankment in this case, which is Surekote Road.  So you don't
20  15:56   see the top of the wall in this case.  It goes again under the
21  15:56   road, makes another turn, and comes back here.  That's still
22  15:56   part of the 1980 construction.
23  15:56        Then this monolith of the only single panel that was
24  15:56   along the East Bank, it linked with the floodwall, which used
25  15:56   to exist, if I put my pointer here, and it extends along the
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2307

```
1   15:56   straight line to adjoin.  So that critical weak joint I was
2   15:56   talking about is at that location.
3   15:56   Q.  All right.  The next slide, please.
4   15:56        The joint that you have just identified, here, would
5   15:57   you just use your laser pointer to show the location of that
6   15:57   joint and also the breach as it developed?
7   15:57   A.  It would be about where I marked -- I put a mark on here.
8   15:57   Q.  All right.
9   15:57   A.  So, basically, that is the long sheet pile, the 1980 sheet
10  15:57   pile, which penetrates -- has a total length of about 32 feet.
11  15:57   If you work the math from the top of the sheet pile, take off
12  15:57   about minus 25, versus a sheet that's only 25 feet long with
13  15:57   its tip at minus 8.
14  15:57        MR. RAFFMAN:  Why don't we capture that slide for the
15  15:57   Court and, with the Court's permission and counsel, mark that
16  15:57   as an exhibit.
17  15:57        MR. KHORRAMI:  No objection.
18  15:57        THE COURT:  Let it be admitted.  You'll give it a
19  15:57   number.
20  15:57        MR. RAFFMAN:  I believe it's 350.  3-5-0.
21  15:57   BY MR. RAFFMAN:
22  15:57   Q.  So we've got a demonstrative here to help the Court
23  15:57   understand what happens when you link a shorter sheet pile to a
24  15:58   longer sheet pile and why that may be a weak link.
25  15:58        Dr. Bakeer, do you have a lapel microphone or a
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2308

```
1   15:58   microphone that we can use?
2   15:58        THE COURT:  We do have a lapel microphone available.
3   15:58   BY MR. RAFFMAN:
4   15:58   Q.  So we're going to ask Dr. Bakeer to speak into --
5   15:58   A.  Hello.  Is it clear?
6   15:58   Q.  -- the lapel microphone and just show the Court, using
7   15:58   this demonstrative, what it means when you have a short sheet
8   15:58   pile and a longer sheet pile and you have water rising along
9   15:58   the face of a floodwall.
10  15:58   A.  Okay.  This is -- this segment of the wall before that
11  15:58   notch here represents the remaining panel.
12  15:58        Let me get my pointer, too, so you can look at this.
13  15:58   This would be the remaining monolith, which is about 27 feet.
14  15:58   The scale is irrelevant here, but let's say this is 27 feet and
15  15:58   this is the old wall.  If you look at the base here, this is
16  15:59   how deep the sheet pile is embedded here.  I would just remove
17  15:59   the front piece here.
18  15:59        MR. KHORRAMI:  Your Honor, may I stand over there so
19  15:59   I can see?
20  15:59        THE COURT:  Yes.
21  15:59        MR. KHORRAMI:  Thank you, Your Honor.
22  15:59        THE COURT:  And any counsel that needs permission to
23  15:59   get into a certain point certainly may.
24  15:59        THE WITNESS:  So the idea is to show that, if this is
25  15:59   how much this pile penetrated, which is illustrated by this amount,
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2309

```
1   15:59   versus how deep this pile is penetrated.
2   15:59        THE COURT:  Yes, I understand.
3   15:59        THE WITNESS:  Which is the concept you see right
4   15:59   here.
5   15:59        Now, if we imagine there is a water pressure
6   15:59   acting on this wall, on this -- again, I removed this for
7   15:59   clarity, but there would be some resistance available.
8   15:59        THE WITNESS:  This is the concept of a water pressure
9   15:59   applied on the wall.
10  15:59        As we imagine, there is a faulty weld or a poor
11  15:59   connection.  We had illustrated this with a Velcro connection
12  15:59   here.  So this is -- basically, they can stick back together,
13  15:59   just illustrate this.
14  16:00        As the water pressure increased -- now, go back
15  16:00   to my two nail models.  I had a big nail driven in the wall of
16  16:00   the sheetrock.  I have a short nail driven shortly.  Seeing the
17  16:00   same load, the weakest link is actually the weld, the poor
18  16:00   interlock, the connections between them.
19  16:00        Separation took place.  As the separation took
20  16:00   place, that sheet pile bent backwards.  Keep in mind, there is
21  16:00   still some resistance, so it's not going to tumble here.
22  16:00        Once this separated like this, you developed
23  16:00   sort of a wedge, or a little lip, that shows up from the back
24  16:00   here.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2310

1  16:00          Now, we imagine that the water doesn't
2  16:00  necessarily have to be on the top of the wall yet.  It is
3  16:00  somewhere here.  But this is a gap for water to flow through.
4  16:00  It flows in the back.  We cannot remove this block, but
5  16:00  actually erodes the soils on the back side.
6  16:00          As the water pressure continues to develop, we
7  16:00  develop what we call a tension crack on the front side.  The
8  16:01  tension crack causes the wall to lean a little bit more.  The
9  16:01  hydrostatic pressure increases on the wall.
10 16:01          As the hydrostatic pressure exceeds the soil
11 16:01  resistance, soil resistance is getting less by erosion, that
12 16:01  wall crumbles and rotates around, which is the illustration you
13 16:01  see.  And that's exactly my opinion how the north breach
14 16:01  developed.
15 16:01          THE COURT:  Dr. Bakeer, let me ask you this:  Is
16 16:01  there a mathematical formula -- if all things are the same.
17 16:01  Let's assume the same conditions, which I know may not be
18 16:01  here -- is there a mathematical formula simply to calculate the
19 16:01  difference in resistivity, strength, in the length of the sheet
20 16:01  wall:  If it's 10 feet longer, is it X times stronger?
21 16:01          Is there any ratio or component that --
22 16:01          THE WITNESS:  I think my line of questions, I don't
23 16:01  know if we're going to go into this, but there are steps --
24 16:02  there are what's called a seawall sheet analysis.  I know the
25 16:02  judge read probably my report.  Yes, this is how we determine

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2311

1  16:02  how the tip of the sheet pile goes in.
2  16:02          And that tip of the sheet pile is function of
3  16:02  the earth pressure, the soils pressure on both sides, as well
4  16:02  as any external forces on the piles.
5  16:02          THE COURT:  Right.  I guess what I'm saying is:  If
6  16:02  everything is the same, if my sheet pile is 10 feet longer,
7  16:02  10 feet deeper, is there a mathematical ratio that I could then
8  16:02  extrapolate the difference in strength or resistivity?  And
9  16:02  there may not be.  I'm just curious.
10 16:02          THE WITNESS:  It's the other way around.  Yes, I
11 16:02  mean, you can go back -- which is what we talked about, where
12 16:02  we don't know old design -- when I design an old wall, what I
13 16:02  would do is I know the strength.  Let me see how deep the pile
14 16:02  should be.  But if you tell me how deep the pile should be,
15 16:02  yes, I can go backwards and tell you what the resistance is.
16 16:02          If that's what your question is --
17 16:02          THE COURT:  Fairly much.  I'll leave it at that.
18 16:03          MR. RAFFMAN:  All right.  If we're done with the
19 16:03  demonstration, we'll move the model aside and ask Dr. Bakeer to
20 16:03  step back to the stand.
21 16:03          THE COURT:  All right.
22 16:03          MR. RAFFMAN:  We may have one or two more of these,
23 16:03  but that's probably the last one for a little while.
24 16:03  BY MR. RAFFMAN:
25 16:03  Q.  Soil mechanics --

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2312

1  16:03          MR. RAFFMAN:  So, Your Honor, may we please remove
2  16:03  the mark from the screen?
3  16:03  BY MR. RAFFMAN:
4  16:03  Q.  Dr. Bakeer, have you narrated, to your satisfaction, the
5  16:03  cantilever principle as it applies to the embedment of the
6  16:03  sheet pile and the differential strength between a deeper sheet
7  16:03  pile and a shallower sheet pile?
8  16:03  A.  Yes.  I believe the judge's question, I think, sums it all
9  16:04  that, yes, you can go backwards and either way.  The most
10 16:04  important element in the stability of an I-wall is the depths
11 16:04  of penetration of the soil.  There are specific concepts and
12 16:04  steps that you have to follow, and if the numbers don't yield a
13 16:04  satisfactory tip, there's an objective judgment that should be
14 16:04  used in determining how deep the tip should be.
15 16:04          So, yes, there are several steps that you go through,
16 16:04  and all of them have to be satisfied.  And like I said, even if
17 16:04  the mathematics doesn't show it to you, as an engineer, you
18 16:04  should have a feel of how deep should be the tip based on the
19 16:04  soil conditions around it.
20 16:04          THE COURT:  So this is an art as well as a science?
21 16:04          THE WITNESS:  I won't make that claim.
22 16:04          THE COURT:  Okay.  Go ahead.  Interesting.  Go ahead.
23 16:04  BY MR. RAFFMAN:
24 16:04  Q.  All right.  So, now, if we -- if this horse hasn't died
25 16:04  yet, it might.  But if we imagine a picture now that's got --

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2313

1  16:05  it's hanging with two nails.  Okay?  And one of the nails is
2  16:05  like the nail on the right, buried deep into that wall.  And
3  16:05  the other nail is like the nail on the left, it's not buried
4  16:05  very deeply.  And you hang a picture on the tool.  What's going
5  16:05  to happen?
6  16:05  A.  If the load of the frame gives, again, since there are two
7  16:05  nails, they will have two reactions, and that depends on how
8  16:05  far they are and all that stuff.
9  16:05          Let's simplify the math.  If we say that the load of
10 16:05  the frame is sufficient to fail the shorter one, the shorter
11 16:05  one will fail first.
12 16:05  Q.  Okay.
13 16:05  A.  So you're governed by the weakest link in the system; in
14 16:05  other words, your frame is going to drop on the floor because
15 16:05  you lost one of the two nails.
16 16:05  Q.  All right.  Now, I want to move to the faulty weld and the
17 16:05  poor interlocks.  Let's go to the next slide, please.  This is
18 16:06  Defendant's Exhibit 141.  It's from the ILIT report.  The
19 16:06  Court's seen this in any number of configurations.
20 16:06          Tell the Court:  What are we looking at as it relates
21 16:06  to the faulty interlock and the weld?
22 16:06  A.  This is a picture looking from the IHNC side to the Lower
23 16:06  Ninth Ward, the vehicle will be in the -- you see in the tree,
24 16:06  those would be on the Lower Ninth Ward side.
25 16:06          You can see that the sheet pile curve in the yellow

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2314**

1  16:06  right down here is bent backwards, which is the illustration I
2  16:06  illustrated by that lip that I spoke about that would be -- you
3  16:06  see, the gap that I spoke of, that's where the water is going
4  16:06  to enter.
5  16:06      Actually, you see the scour here, which is evidence
6  16:06  of excessive scour.  You don't see that scour.  You see metal,
7  16:06  the levee.
8  16:06      Just to demonstrate to the Court some concepts here,
9  16:06  you see that change in color of concrete?  That's a relatively
10 16:06  new wall, but you see the change in color.  That's telling you
11 16:06  where the levee used to be before the incident.
12 16:06      The faulty weld is shown with this yellow strip, and
13 16:07  I can touch the screen and pretty much show you where the
14 16:07  connection is.  And that's where the separation, a tear, a
15 16:07  weld.  This sheet pile was in very poor shape, that it didn't
16 16:07  take the hydrostatic pressure.
17 16:07  Q.  All right.  Now, we're going to look at some pictures of
18 16:07  this sheet pile that was pulled out of the ground.  Let's go to
19 16:07  the next slide, please.
20 16:07      Dr. Bakeer, did you personally inspect the sheet pile
21 16:07  that was pulled out of the ground from the north breach?
22 16:07  A.  Yes.  I'm not -- not on the site, but I inspected them in
23 16:07  a storage house near the IHNC.
24 16:07  Q.  So the record's clear, we're looking at DX-205, Bakeer
25 16:07  report Figure 40.  You didn't take this picture; right?

**2315**

1  16:07  A.  I wasn't present on that day, no.
2  16:07  Q.  But you did inspect the same sheet piles that are shown in
3  16:07  the picture?
4  16:07  A.  Correct.
5  16:07  Q.  And you saw the writing on the sheet pile, and it enables
6  16:08  you to identify it as such; right?
7  16:08  A.  I saw the red writing.  They were fading out, but you can
8  16:08  see traces of them, and you can see, actually, the same number
9  16:08  of sheets.  I counted them.  And actually, my report
10 16:08  illustrates how many of these sheets were out there.  If you
11 16:08  count those, you'll see that the numbers match.
12 16:08  Q.  We have a series of four photographs for the Court.  I'm
13 16:08  going to ask you to tell the Court what is shown in this
14 16:08  picture and your analysis of it based on your own inspection.
15 16:08  A.  It's very interesting, if you let me explain quickly a
16 16:08  couple of things to the Court.
17 16:08      You see the grayish stuff on the bottom of that
18 16:08  sheet?  That's how much this sheet was in the ground.  That's
19 16:08  the clay sticking to the sheet pile.
20 16:08      The area on the top, you see some grayish color mixed
21 16:08  with the brown?  That's actually the concrete monolith attached
22 16:08  to it.  It will give it that grayish color.  And you can see
23 16:08  the opposite here.  That's the grayish color, and you see the
24 16:08  soils -- traces of soils.
25 16:08      A couple of interesting to see.  That's what we call

**2316**

1  16:09  a Z-section.  Actually, it's not a Z because it's two sections
2  16:09  linked together at an interlock which runs the length of the
3  16:09  pile.  You can see where the interlock is.
4  16:09      So that's the Z, and that's the other Z making that
5  16:09  section.  Yeah, I think they're typically deliver in this form
6  16:09  rather than --
7  16:09  BY MR. RAFFMAN:
8  16:09  Q.  So that the record's clear, all that you've just been
9  16:09  discussing is the 1980 sheet pile?
10 16:09  A.  I will mark it here, and that's the one with the pink mark
11 16:09  is the 1980 sheet, which looks like, in holding its Z shape,
12 16:09  it's in good shape, little or no corrosion.
13 16:09      And the most important thing, comparing it -- and I
14 16:09  will mark the second one and I will make a dash across on the
15 16:09  second one -- you can see how flattened this section, how
16 16:09  deteriorated this section, how poor condition.
17 16:09      If you look at the gentleman with his foot on this
18 16:09  side -- and I'll put a third mark -- you can see the evidence
19 16:09  of the rust and the complete deterioration of that sheet pile.
20 16:09      Then you can see here the lips -- and I think the other
21 16:10  photographs will show more.  But that's the end of a tear that
22 16:10  took place.  That's the beginning of a tear.
23 16:10      This particular sheet, this came out as the next
24 16:10  sheet to the failure.  This one has the overlap of the old
25 16:10  sheet welded, connected to the new sheet, 1980 sheet.  So those

**2317**

1  16:10  are the 19 -- the two that I marked later, I'm going to put two
2  16:10  dots on them.  Those are the 1966 sheets.  The one that I
3  16:10  marked first with the small dash is the 1988.  Again, the one
4  16:10  I'm going to tap right now is a 1966 sheet.
5  16:10      THE COURT:  '68.
6  16:10      THE WITNESS:  Let me -- '66, the design started in
7  16:10  '66.
8  16:10      THE COURT:  Oh.
9  16:10      THE WITNESS:  Went through '68.  It's a '69 wall.
10 16:10      THE COURT:  Oh, okay.  Just for the record, it's
11 16:10  all -- '66 to '69 is one and the same.
12 16:10      MR. RAFFMAN:  If Your Honor hadn't asked, I would
13 16:10  have --
14 16:10      THE WITNESS:  It's the same one.  I apologize.
15 16:10      Underneath it, if you look all the way at the
16 16:10  bottom of the slide, under here, you're going to see the new
17 16:10  sheet pile directly under the old sheet pile.  The 1980 and the
18 16:11  1969 sheet pile.
19 16:11      THE COURT:  Would you point that out again?
20 16:11      THE WITNESS:  Judge, you see where the word
21 16:11  "adjoining"?
22 16:11      THE COURT:  Yes.
23 16:11      THE WITNESS:  You can see an amount, a piece of that
24 16:11  new pile underneath this one.
25 16:11      THE COURT:  I understand.

## 2318

1   16:11        MR. RAFFMAN:  Why don't we, then, capture this, if I
2   16:11   can ask the court staff to assist, as Defendant's Exhibit 351.
3   16:11        THE WITNESS:  I just want to point out something,
4   16:11   too, that this wall was replaced by a T-wall.  This is a new
5   16:11   T-wall that was constructed in the '80s because the analysis
6   16:11   indicated that I-walls were not a good solution --
7   16:11        MR. GILBERT:  Your Honor, can I just enter an
8   16:11   objection subsequent to remedial measure.
9   16:11        THE COURT:  I understand.  It has nothing -- I think
10  16:11   he's just pointing it out as to show where the T-wall is.  But
11  16:11   it certainly won't go into my -- that newly constructed wall
12  16:11   will not go into this opinion.
13  16:11        MR. GILBERT:  Thank you.
14  16:11        MR. RAFFMAN:  Thank you, Your Honor.
15  16:12   BY MR. RAFFMAN:
16  16:12   Q.  Let's go to the next picture.  We have a couple more of
17  16:12   these, and we have honed in a little bit.
18  16:12        MR. RAFFMAN:  Would the Court please clear the
19  16:12   screen?
20  16:12        Thank you, Your Honor.
21  16:12   BY MR. RAFFMAN:
22  16:12   Q.  For the record, we have got Defendant's Exhibit 205,
23  16:12   Bakeer report Figure 42.
24  16:12        Dr. Bakeer, tell the Court what we're looking at here
25  16:12   in this slide.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2319

1   16:12   A.  This is a continuation or the next piece, which I pointed
2   16:12   out to the Court that this is the new sheet pile underneath the
3   16:12   new sheet -- the old sheet.  So that's the new sheet, 1980
4   16:12   sheet.  And I will again put my thumb on it.  That's the 1980.
5   16:12   And that's the 1969 sheet.
6   16:12   Q.  What is -- I'm sorry.  What has happened to the 1969
7   16:12   sheet?
8   16:12   A.  You can see that this portion here, it tore.  There's a
9   16:12   tear, a small tear, and it extends to about this area.  Under
10  16:12   the water pressure, the sheet bent backwards, and that's, you
11  16:12   see, the bend right here.
12  16:13        MR. RAFFMAN:  Why don't we go to the next -- before
13  16:13   we do that, we can capture this one and, with the Court's
14  16:13   permission and counsel, mark it as Defendant's Exhibit 352.
15  16:13        Let's proceed, then, if we could --
16  16:13        THE DEPUTY CLERK:  Wait one second.
17  16:13        MR. RAFFMAN:  I'm sorry.  When the Court's ready.
18  16:13        THE DEPUTY CLERK:  Okay.
19  16:13        MR. RAFFMAN:  All right.  So, now, if the Court would
20  16:13   clear the slide, please, the screen, and we'll proceed to the
21  16:13   next slide.
22  16:13   BY MR. RAFFMAN:
23  16:13   Q.  This is the Defendant's Exhibit 205, Bakeer report, Figure
24  16:13   43.  Dr. Bakeer, please tell the Court what we're looking at in
25  16:13   this slide.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2320

1   16:13   A.  This is the end of the --
2   16:13        THE COURT:  Can I have a question about that last --
3   16:13   a question about that last slide?  I apologize.
4   16:13        MR. RAFFMAN:  Go back to the previous one.
5   16:14        THE COURT:  The tear is at the -- tear -- that tear
6   16:14   is commencing at the top or the bottom?
7   16:14        THE WITNESS:  That's the top of the sheet, yeah.
8   16:14        THE WITNESS:  That makes sense.
9   16:14        THE WITNESS:  Let me explain quickly.  Because the
10  16:14   new sheet is higher, it's top is higher, and it's also -- its
11  16:14   tip is lower.  So it's longer with some of it.  So that's why
12  16:14   you see a piece of it here extending on the top because that's
13  16:14   a -- the north sheet is also higher than the old sheet.  Its
14  16:14   tip all the way down is deeper than the --
15  16:14        THE COURT:  It's higher and deeper?
16  16:14        THE WITNESS:  It's higher and deeper, that is
17  16:14   correct.
18  16:14        The top of the new wall was at elevation 16,
19  16:14   NGVD, if I remember correctly; and the other one would have
20  16:14   been at 15 MSL, which is lower than NGVD.
21  16:14        MR. RAFFMAN:  May we proceed to the next slide?
22  16:14        THE COURT:  Yes.
23  16:14   BY MR. RAFFMAN:
24  16:14   Q.  So, again, Figure 43 of your report, Dr. Bakeer, please
25  16:14   tell the Court what we're looking at in this slide.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2321

1   16:15   A.  Let me say something quickly here, why I used those
2   16:15   photographs, not the ones I've seen, but -- because I have my
3   16:15   photographs.  But I used them because those actually predate
4   16:15   mine.  Mine were a year later.  So I wanted to see the
5   16:15   conditions when they were exhumed, not the conditions a year or
6   16:15   a half after they were exhumed.  So I think that's to clear air
7   16:15   on this.
8   16:15        If we recall the tear, that's the bent area, and
9   16:15   that's the end of the tear.  If you look at the undersurface
10  16:15   here, you can see the rust, you can see the deterioration, and
11  16:15   you see the tear in the metal, which tells you that there was
12  16:15   some force that caused this to separate or tear at that
13  16:15   location.  Because here, evidence of clay again at the bottom
14  16:15   of the sheet.
15  16:15   Q.  All right.  And maybe the last slide -- there's one more.
16  16:15   So let's move to the next slide, please.  This one is
17  16:15   Defendant's Exhibit 205, Bakeer report Figure 41.
18  16:16        Dr. Bakeer, this is our last slide in the sequence.
19  16:16   Is there anything you want to add about the tear or the
20  16:16   interlock failure from this slide?
21  16:16   A.  Again, it's the same view, but it's just a different
22  16:16   angle.  And as I pointed out to the Court earlier, that this is
23  16:16   the area of the extent.  You can know it's the top of the sheet
24  16:16   pile when you see that hole.  That hole is where you pull the
25  16:16   sheet from.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2322

1    16:16        To illustrate to you that this is still a Z.  It's in
2    16:16    great shape.  When they pulled the sheet, they did not tear the
3    16:16    hole.  Look at the hole on this one.  That's how they pulled
4    16:16    the sheet out from the ground.  You can see it torn.  It tells
5    16:16    you that the sheet pile deteriorated in time and, definitely,
6    16:16    it was in poor shape.
7    16:16    Q.  All right.  Now, we've heard about the weld and the
8    16:16    failure of the weld, and we've also heard about an interlock.
9    16:16    A.  Correct.
10   16:16    Q.  I wanted to ask you to describe for the Court what is it
11   16:16    that rust does to an interlock between two sections of sheet
12   16:17    pile?  Why is rust relevant to the integrity of an interlock?
13   16:17    A.  I'm going to use my hand to illustrate this just as a
14   16:17    concept.  If we imagine the interlock as a crescent -- so it's
15   16:17    like this.  In 3-D.  It's just continuous crescent like this.
16   16:17    If you imagine the other part of the other sheet is my fist,
17   16:17    and the fist goes inside the crescent.  So that's, basically,
18   16:17    what an interlock is.
19   16:17        Now, the impact of rust is significant in two ways:
20   16:17    Rust is nothing but reaction of oxygen, rusting, that
21   16:17    deteriorates or eats in the metal.  The metal actually loses
22   16:17    thickness because of the oxygen reaction, oxidization.
23   16:17        So the inner surface of the crescent deteriorates and
24   16:17    disintegrates.  Also the outside surface of the crescent.  But
25   16:17    what's important to us here in court is that what used to be a

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2323

1    16:17    crescent of, say, this diameter now would be slightly bigger
2    16:18    than what it used to be.
3    16:18        The opposite is the fist in this case.  The fist
4    16:18    used to be this diameter.  The rust would eat up some of the
5    16:18    surface on the outside.  So the fist now is smaller.  You have
6    16:18    a crescent that's bigger and a fist that's smaller.  So the
7    16:18    separation is much easier in that case.  It's a weaker
8    16:18    connection in this case.
9    16:18    Q.  All right.  So now we have a weld and an interlock, and
10   16:18    the rust that you observed includes features of the interlock?
11   16:18    A.  Right.  And keep in mind again, the weak link concept
12   16:18    applies to the entire floodwall, but it also applies to the
13   16:18    local failure.  In other words, the failure may progress in a
14   16:18    weld.  Then the next piece of weld is stronger than the first
15   16:18    piece.  So it would propagate in the metal because the metal
16   16:18    now is weaker.  It keeps going through the metal.  It's
17   16:18    intercepted by a weaker interlock.  It may shift to an
18   16:18    interlock and then go back to the metal and go back to a weld
19   16:18    and so forth.
20   16:19        The failure follows -- the beam of energy comes in and
21   16:19    follows the weakest path in the system.  So you would see
22   16:19    changes from weld to tear to separation interlocks.
23   16:19    Q.  All right.  So now to bring to mind the four things you
24   16:19    discussed in your earlier slide -- I'm sorry.  The four things
25   16:19    that you discussed in your earlier slide:  The transition

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2324

1    16:19    joint, the faulty weld.  Now we're going to move to the lower
2    16:19    ground surface on the land side of the wall, and I'd like to
3    16:19    start with Figure 76 from your report.
4    16:19        Dr. Bakeer, describe for the Court the slope of the
5    16:19    ground surface as it progressed northward from, let's say, the
6    16:19    south breach area in the area of the north breach at the levee
7    16:19    toe.
8    16:20    A.  All right.  I will just qualify this.  The general trend
9    16:20    is from the Claiborne bridge being the highest to the lowest
10   16:20    point near the pump station or where the pumping was taking
11   16:20    place.  However, that doesn't mean that you didn't have some
12   16:20    local low spots in between.  But a general trend, highest
13   16:20    points on the side, Claiborne bridge; the lowest points on this
14   16:20    side.
15   16:20    Q.  All right.  Let's look at some data.  The next slide,
16   16:20    please.  We're now looking at two slides put together.  The
17   16:20    upper portion is from Defendant's Exhibit 205, Bakeer report,
18   16:20    Figure 25.  And the lower portion is from Defendant's Exhibit
19   16:20    205, and it's Bakeer report Figure 76.
20   16:20        Dr. Bakeer, what does this slide and the data you
21   16:20    looked at tell you -- and tell the Court -- about the height of
22   16:20    the levee toe as you progress northward along the wall toward
23   16:21    the north breach?
24   16:21    A.  Well, the first slide or the top piece, this comes from, I
25   16:21    believe, Team Louisiana.  I believe that's where it came from,

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2325

1    16:21    if my memory serves me.
2    16:21        But if we imagine that the first measurement was done
3    16:21    about here, the yellow vertical arrow points to the point of
4    16:21    measurement, the LiDAR, or the light detecting imaging system,
5    16:21    detects the elevation of the ground, and it shows you that the
6    16:21    ground has a general -- which I spoke of, a general trend, from
7    16:21    South Claiborne to North Florida Avenue.
8    16:21        The lowest point is near the north breach or within
9    16:21    the north breach area.  Like I said, there will be some low and
10   16:21    high spots.  The ground surface will also reflect some
11   16:21    variations on the wall top.  But the wall is a more rigid
12   16:21    structure, so it's not going to show you a sudden dip.  But you
13   16:22    could see a little change in the top.
14   16:22        So that's, basically, a reflection of the toe
15   16:22    measurements.
16   16:22    THE COURT:  For the record, why don't we get a
17   16:22    description of what you define as the toe.
18   16:22    MR. RAFFMAN:  Your Honor, sure.
19   16:22    THE COURT:  I'm going to ask.
20   16:22    THE WITNESS:  A toe of a levee is the point of
21   16:22    intersection of its side slope with the ground surface next to
22   16:22    it.  That's the toe.
23   16:22        There are two toes:  There is a land-side toe
24   16:22    and there is a flood-side toe.
25   16:22    THE COURT:  Are we talking about --

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2326

| | |
|---|---|
| 1 | 16:22    THE WITNESS:  So we're talking about the land-side |
| 2 | 16:22  toe. |
| 3 | 16:22    THE COURT:  We're talking about the land-side toe |
| 4 | 16:22  here, and you're saying there is a difference from the |
| 5 | 16:22  beginning of the Claiborne to the north breach, there's a |
| 6 | 16:22  difference of -- |
| 7 | 16:22    THE WITNESS:  If you say, roughly, it's 5 1/2, this |
| 8 | 16:22  is minus 4, this is minus 4 1/2, that's 5.  So that's elevation |
| 9 | 16:22  minus 4 1/2.  And you're talking here about elevation.  Maybe |
| 10 | 16:22  if you take an average of those points, you're talking about |
| 11 | 16:22  elevation maybe 7 1/2. |
| 12 | 16:22    THE COURT:  Simply because the toe is different, |
| 13 | 16:23  doesn't mean that the height of the floodwall itself, just for |
| 14 | 16:23  the record, is different. |
| 15 | 16:23    THE WITNESS:  There are two different measurements. |
| 16 | 16:23  They will not be equal because the settlement of the ground is |
| 17 | 16:23  not necessarily equal to the settlement of the floodwall.  But |
| 18 | 16:23  it would reflect a lower -- generally, lower trend in the top |
| 19 | 16:23  of the wall as much as the ground.  But not -- if it's |
| 20 | 16:23  12 inches here, it's going to be 2 inches there, the answer is |
| 21 | 16:23  no. |
| 22 | 16:23    THE COURT:  It's not directionally proportional? |
| 23 | 16:23    THE WITNESS:  That's correct. |
| 24 | 16:23  BY MR. RAFFMAN: |
| 25 | 16:23    Q.  And for the benefit of the Court, we're going to see |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2327

| | |
|---|---|
| 1 | 16:23  some -- when we talk about the south breach, some information |
| 2 | 16:23  about the lower wall top.  Your Honor has heard this, but as |
| 3 | 16:23  the witness says, it may not be one to one. |
| 4 | 16:23    So my question, then, is:  Why is it -- why does |
| 5 | 16:23  having less ground surface or less soil on the land side of a |
| 6 | 16:23  floodwall make that the weak link? |
| 7 | 16:24    A.  That's the same answer.  Go back to the nail model.  Where |
| 8 | 16:24  you hang the frame, the nail is going to push on the wood or on |
| 9 | 16:24  the sheetrock above it.  The deeper you have the nail, the more |
| 10 | 16:24  resistance.  When you lose ground, it's the same phenomena. |
| 11 | 16:24  You have less resistance. |
| 12 | 16:24    THE COURT:  So is it less stable? |
| 13 | 16:24    THE WITNESS:  It -- it has less resistance to the -- |
| 14 | 16:24    THE COURT:  That's -- |
| 15 | 16:24    THE WITNESS:  That is correct.  So the stability is |
| 16 | 16:24  compromised.  That's correct. |
| 17 | 16:24    THE COURT:  Now, counsel, why don't we take our last |
| 18 | 16:24  break for the day, and then we'll go until about 5:30 today. |
| 19 | 16:24  Is that your plans? |
| 20 | 16:24    MR. RAFFMAN:  Yes, Your Honor. |
| 21 | 16:24    THE COURT:  How about plaintiff? |
| 22 | 16:24    MR. KHORRAMI:  That sounds fine, Your Honor. |
| 23 | 16:24    THE COURT:  Just curious, who's going to be |
| 24 | 16:24  cross-examining? |
| 25 | 16:24    MR. KHORRAMI:  I am, Your Honor. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2328

| | |
|---|---|
| 1 | 16:24    THE COURT:  All right.  We will take a ten-minute |
| 2 | 16:24  recess and then come back so you can get another hour of |
| 3 | 16:24  testimony. |
| 4 | 16:24    MR. RAFFMAN:  Thank you, Your Honor.  I don't think |
| 5 | 16:24  we'll finish. |
| 6 | 16:24    THE COURT:  I didn't think you would. |
| 7 | 16:25    THE DEPUTY CLERK:  All rise. |
| 8 | 16:25    (WHEREUPON, the Court took a recess.) |
| 9 | 16:37    THE DEPUTY CLERK:  All rise, please. |
| 10 | 16:37    THE COURT:  I will wait for cross-examining counsel. |
| 11 | 16:37  And we will try to go until 6:00 tomorrow. |
| 12 | 16:37    Jodi, I will try to go to 1:00 for lunch so that |
| 13 | 16:37  you won't have this horrible split as it would normally be. |
| 14 | 16:37    MR. ALDOCK:  Your Honor, with your criminal calendar, |
| 15 | 16:37  I want to -- in the off chance that it ends slightly early, I |
| 16 | 16:38  want to make sure that all the lawyers are here.  So what's the |
| 17 | 16:38  absolutely -- We get here by 10:00? |
| 18 | 16:38    THE COURT:  Yes.  Fortunately, in some ways, not |
| 19 | 16:38  re-arraignments, which are longer, but sentencings.  But |
| 20 | 16:38  sentencings can also develop a life of their own as well.  But |
| 21 | 16:38  10:00 at the earliest. |
| 22 | 16:38    MR. ALDOCK:  Very good. |
| 23 | 16:38    THE COURT:  But thank you for asking. |
| 24 | 16:38    I'm trying to wait for cross-examining counsel. |
| 25 | 16:38    MR. RAFFMAN:  I was going to ask a single question. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2329

| | |
|---|---|
| 1 | 16:38  I'm trying to get my slide up. |
| 2 | 16:38    THE COURT:  But I'm only going to wait so long. |
| 3 | 16:38    MR. WIEDEMANN:  Your Honor, they're hunting him down. |
| 4 | 16:38    THE COURT:  Okay. |
| 5 | 16:39    MR. RAFFMAN:  And if Your Honor would be so kind as |
| 6 | 16:39  to -- |
| 7 | 16:39    THE COURT:  Yes.  You can do it from there, but I'll |
| 8 | 16:39  be glad to.  You -- |
| 9 | 16:39    (OFF THE RECORD) |
| 10 | 16:40    MR. KHORRAMI:  Your Honor, you're free to go on with |
| 11 | 16:40  the examination if I'm not here on time, and I apologize to the |
| 12 | 16:40  Court for making you wait, and I apologize to Dr. Bakeer. |
| 13 | 16:40  BY MR. RAFFMAN: |
| 14 | 16:40    Q.  So we're nearing end of the line about the lower levee |
| 15 | 16:40  toe, why that creates a weak spot.  We've got this picture up, |
| 16 | 16:40  the picture is Defendant's Exhibit 205, Bakeer report Figure |
| 17 | 16:41  27. |
| 18 | 16:41    I'm focusing your attention on the ponding down here, |
| 19 | 16:41  Dr. Bakeer.  What does that tell you about the height of the |
| 20 | 16:41  levee toe and the point you're making about the lack of |
| 21 | 16:41  support, you might otherwise have here. |
| 22 | 16:41    A.  Actually, you can see that the ponding starts from here |
| 23 | 16:41  and it's narrow and keeps widening as you go north, where you |
| 24 | 16:41  get the most ponding towards the end, which is an indication |
| 25 | 16:41  that the deepest points are on this side; shallower on that |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2330

```
1   16:41   side.  And the side, I mean by is the south side is higher than
2   16:41   the north side.
3   16:41   Q.  All right.  Now, we are going to move on to the sand.  The
4   16:41   Court has heard much about the sand and about sample 81-A, what
5   16:41   it all means.  So let's go to the next slide.
6   16:41        Now, we're looking at Defendant's Exhibit 313.  This
7   16:42   is Bakeer supplemental report.  This is plate 20.
8   16:42        MR. RAFFMAN:  And I'll represent to the Court that,
9   16:42   in Dr. Bakeer's supplemental report, this is a hand-drawn
10  16:42   plate.  We have had it professionally rendered.  It's the same
11  16:42   information.
12  16:42   BY MR. RAFFMAN:
13  16:42   Q.  Dr. Bakeer, just point out for the Court what we're
14  16:42   looking at with particular reference to the location of the
15  16:42   north breach and the location of sample 81-A.
16  16:42   A.  If we look at this diagram, the last dark line on this
17  16:42   side here presents the shoreline of the IHNC in this case.  So
18  16:42   that's the end of land, where it intersects water.
19  16:42        During the EBIA repair work in the 2004/2005, a
20  16:42   company was asked to do soil sampling and testing for chemical
21  16:42   analysis, maybe.  It was environmental concerns more than
22  16:42   anything else.
23  16:42        To orient the Court with the diagram we're looking
24  16:43   at, the brown, tannish line represents the wall that we
25  16:43   discussed earlier.  So it comes from this side, makes a turn on
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2331

```
1   16:43   the Surekote Road and so forth.  So that's the line.
2   16:43        The closest line of borings was done -- and let me
3   16:43   use the term that MMG, the company, used.  They used the name
4   16:43   "boreholes" or "monitoring wells."  This is what -- these are
5   16:43   the boreholes or the monitoring wells.  They divided the entire
6   16:43   EBIA area into vertical axes, starting from axis No. 1 by
7   16:43   Claiborne, ending up with axis 83 -- I'm sorry.  I don't have
8   16:43   my glasses -- 83 towards the end of the floodwall or near the
9   16:43   Florida Avenue.
10  16:43        They also divided these into horizontal axes:  A, B,
11  16:43   C, D, all the way, K being the closest to the edge of the
12  16:43   water.
13  16:44        And, again, that edge of water varies across the
14  16:44   length.  So there might be land or no land, depending on how
15  16:44   far the edge of water is in this case.
16  16:44        So if I'm referring to a boring with a given number,
17  16:44   say 71-E, that would be this boring, 71-E.  So it refers to the
18  16:44   vertical axis; it refers to the horizontal axis.  That's the
19  16:44   intersection.
20  16:44        So the question that counsel asked me about that
21  16:44   boring 81 is the intersection of axis 81 with axis A.  The
22  16:44   north breach is that red zone which encompasses pretty much
23  16:44   axes 77 through 81.
24  16:44   Q.  So 81-A is the sample that's taken --
25  16:44   A.  I can point it out next to the arrow.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2332

```
1   16:44        THE COURT:  We've had a great deal of discussion with
2   16:44   81-A with the previous witness.  I understand that.
3   16:44   BY MR. RAFFMAN:
4   16:44   Q.  And I just wanted to catch us up, and then we'll move
5   16:45   forward.
6   16:45        Let's take a look at what sample 81-A shows.
7   16:45        MR. RAFFMAN:  May I have GM-76, please?
8   16:45   BY MR. RAFFMAN:
9   16:45   Q.  Basically, you looked at the borehole and the boring log
10  16:45   for 81-A?
11  16:45   A.  I did.  I looked at all the borings, including 81.
12  16:45   Q.  All right.  And others.  Describe for the Court, who's
13  16:45   already heard it a couple of times, but what kind of materials
14  16:45   did you find in the upper 18 feet of soil?
15  16:45   A.  Let me explain what I did, which differed from what -- how
16  16:45   the borings -- the boreholes were classified in the log.
17  16:45        There are two different types of filling that you
18  16:45   have to distinguish when you look at fill material.  There's
19  16:45   what we calm a granular fill and a cohesive fill.  A granular
20  16:45   fill is fill that's made of individual grains:  Sand, gravel,
21  16:45   shell.  Any of those materials will form what we call a
22  16:45   granular or cohesionless material.  A cohesive would be like a
23  16:46   clay, the dirt or the mud we see every day.
24  16:46        So in MMG logs, their mission or their objective or
25  16:46   their goals were to do two things:  Identify fill material from
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2333

```
1   16:46   native soils; secondly, obtain samples for environmental
2   16:46   testing.  Chemical testing mainly.
3   16:46        However, they do not distinguish the type of fill on
4   16:46   their logs.  When they drew the cross-sections, they drew a
5   16:46   cross-section at the end of the fill but not dividing the fill
6   16:46   into two categories, like I said.
7   16:46        So I took it one step further by trying to
8   16:46   distinguish the sand, granular fill, from the cohesive fill.
9   16:46   Basically, boring No. 81-A indicated much more fill than you
10  16:46   would see anywhere else in the other boreholes that they've
11  16:46   done.  It extends way beyond the tip of the sheet pile in that
12  16:47   location.
13  16:47   Q.  When you say "fill," you mean the granular fill or the
14  16:47   other kind of fill that goes in 81-A?
15  16:47   A.  As the slide shows, silty sand, that is a granular fill.
16  16:47   Shell, that's a granular.  Shell.  Shell.  Shell.  Silty sand.
17  16:47   That's a granular fill.
18  16:47   Q.  All right.  So now we know we've got granular fill going
19  16:47   down.  Let's go to -- I'm sorry.
20  16:47        THE COURT:  Now, just to get the import of what I
21  16:47   think you just said:  Is 81-A -- or the result of 81-A is
22  16:47   reported in the location you saw it on on the grid, is it
23  16:47   counterintuitive?  I thought you had said it's material you
24  16:47   would expect further away --
25  16:47        THE WITNESS:  No, no, that's -- what I said is that
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2334

```
16:47   1   the expectation, while looking at all the borings, you gonna
16:48   2   see lesser fill throughout the length of the wall.  But that
16:48   3   particular area had more granular fill than what you would see
16:48   4   in the other borings.
16:48   5       THE COURT:  I see.
16:48   6       THE WITNESS:  That's my --
16:48   7       THE COURT:  It wasn't -- it was more granular than --
16:48   8   in that area than in other borings in other areas.
16:48   9       THE WITNESS:  To a greater depth than what you see.
16:48  10       THE COURT:  To a greater depth.  That's right.
16:48  11       MR. RAFFMAN:  Let's do this.  I'm going to go a
16:48  12   little bit out of our order here because he's described a
16:48  13   graphic that I think Your Honor will immediately see.
16:48  14   I'd like RMB-038, please.
16:48  15   BY MR. RAFFMAN:
16:48  16       Q.  So RMB-038 is Defendant's Exhibit 313, Bakeer supplemental
16:48  17   report, plate 21.
16:48  18       Describe for the Court what you've done here and what
16:48  19   the Court is looking at with respect to the boring logs you've
16:48  20   read and how you've rendered them.
16:48  21       A.  Let me explain the diagram first.
16:49  22       To the right-hand side is north.  So axis A, A prime
16:49  23   is running from south, which is on the left-hand side, to the
16:49  24   north on the north side.  So if we imagine that's the closest
16:49  25   line of boreholes that was drilled along axis A, which is
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2335

```
16:49   1   located about 20 feet away from the wall.
16:49   2       And the first log -- or the first column to the left
16:49   3   would be what we identify from the boring log by MMG at that
16:49   4   particular location.  So that's, again, going from left to
16:49   5   right.  The boring, 81-A, would be at the end, and this diagram
16:49   6   extends to boring No. 51 at intersection A.
16:49   7       THE COURT:  Well, just -- the diagram -- that picture
16:49   8   speaks a thousand words.  I understand the diagram.  As we move
16:49   9   north, especially near the very north, obviously, the granular
16:50  10   fill is deeper.
16:50  11       MR. RAFFMAN:  Very good.  Very good.  I thought that
16:50  12   would help Your Honor with the question Your Honor had asked.
16:50  13       THE COURT:  It does.  It does.
16:50  14       THE WITNESS:  To elaborate on this, just to close
16:50  15   this point --
16:50  16       THE COURT:  Sure.
16:50  17       THE WITNESS:  -- the yellow is the granular material.
16:50  18   The light gray represents cohesive fill.  That was also
16:50  19   identified by MMG as fill.  Then the dark gray is the native
16:50  20   soil, as detected in the MMG boreholes.
16:50  21       On the top of the diagram, you will also find
16:50  22   the depth of that sand.  So, for example, the number 4 feet
16:50  23   represents how deep the sand at the boring 51-A location;
16:50  24   whereas the 17 1/2 indicates how deep the granular fill is at
16:50  25   that location of 81-A.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2336

```
16:50   1       And that's what I was explaining to the Court
16:50   2   earlier, that it's an unusual compared to what you see.  If you
16:50   3   look up average, you see how thick is the fill.  At that
16:50   4   particular location, there was more fill than what you see
16:50   5   throughout the boring holes.
16:50   6   BY MR. RAFFMAN:
16:50   7       Q.  More granular fill, to not to put too fine a point on it?
16:51   8       A.  More granular fill, that's correct.
16:51   9       THE COURT:  Not that it may makes any difference, but
16:51  10   do you know, looking at this graphic as an example, the 1980
16:51  11   sheet pile would go how far into this graphic, if at all?
16:51  12       THE WITNESS:  The orange line or the brown line on
16:51  13   this shows where the sheet pile is.  So that dotted line
16:51  14   represents where the tip of the sheet pile is.  So, actually,
16:51  15   it's in native soil in this zone; it's in a cohesive fill in
16:51  16   that zone; it's in native soil in this zone; and it's in
16:51  17   granular fill in this zone.
16:51  18       THE COURT:  And is that the '69?
16:51  19       THE WITNESS:  That's the '69 sheet, that's correct.
16:51  20   And it shows on the side here "minus 8 MMS," which is the
16:51  21   system I elected to use.
16:51  22       THE COURT:  And I don't know if the 1980 sheet pile
16:51  23   is relevant to this diagram.
16:51  24       THE WITNESS:  Well, I can answer that.
16:51  25       THE COURT:  Okay.  Please do.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2337

```
16:51   1       THE WITNESS:  The sheet pile for the new wall is at
16:51   2   minus 25.  It goes beyond the tip of the boring, so it's a
16:52   3   native soil.  You see the end of the boring only extends to
16:52   4   where I'm showing it on the diagram.  It's minus 22 is the
16:52   5   maximum.
16:52   6   BY MR. RAFFMAN:
16:52   7       Q.  So if we have a situation, am I right, Dr. Bakeer, where
16:52   8   there's water in the granular fill -- and then I guess I should
16:52   9   preface it:  Is the granular fill a more permeable material?
16:52  10       A.  Granular fill has a higher permeability.
16:52  11       Q.  All right.  So if you get around the bottom of the sheet
16:52  12   pile of the 1969 wall but not the 1980 wall; is that fair?
16:52  13       A.  Let me answer the judge and your question -- I'm going to
16:52  14   draw a line here.  That would be the tip of the sheet pile, the
16:52  15   1980 sheet pile.
16:52  16       So it cuts below the sand.  It's back into either
16:52  17   cohesive fill or native soil.  So that's actually the end of
16:52  18   the diagram is minus 22.  If my memory serves, the tip of the
16:52  19   sheet pile is at minus 25.
16:52  20       Q.  Now, I need to ask a couple of questions about 81-A.  I
16:53  21   skipped ahead because there has been some discussion about
16:53  22   whether 81-A had moved -- whether 81-A was taken where 81-A was
16:53  23   represented in the boring log, to be taken.
16:53  24       Dr. Bakeer, do you agree with Dr. Marino's conclusion
16:53  25   that boring 81-A was moved to a different location, distant
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2338**

1  16:53  from the GPA coordinates where it's listed in the boring log?
2  16:53  A.  From my experience, working in soil drilling for the last,
3  16:53  I would say, 20 years or so, I don't have any evidence in the
4  16:53  documents that I reviewed that showed that this boring was
5  16:53  moved substantially to a new location.
6  16:53      THE COURT:  I'm going to have to stop you just a
7  16:53  minute because I've run out of my ability to mark again, so I'm
8  16:53  going to have to log out, print, and log back in.
9  16:53      MR. RAFFMAN:  Thank you, Your Honor.
10 16:54  BY MR. RAFFMAN:
11 16:54  Q.  So as to follow up on the answer to the last question
12 16:54  about the boring being moved, you do either drill or
13 16:54  supervise boreholes as part of the work you do; right?
14 16:54  A.  We have three drilling crews that go out daily drilling
15 16:54  for soils.
16 16:54  Q.  So the answer to that is yes?
17 16:54  A.  Yes.  In the New Orleans office, I mean.
18 16:54  Q.  When you -- in the parlance of your field, Dr. Bakeer,
19 16:55  somebody writes "Location adjusted," what does "location
20 16:55  adjusted" mean with regard to how a location might be moved
21 16:55  from the location that's on the GPS?
22 16:55  A.  Let me say there is a difference between "moved" and
23 16:55  "adjusted."
24 16:55  Q.  Right.  But my --
25 16:55  A.  So I'd like to distinguish the language.  If the word is

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2339**

1  16:55  "adjusted," then you could start drilling.  You hit a stone.
2  16:55  So you move a foot to the left or a foot to the right, and you
3  16:55  make a second attempt.
4  16:55      But moving the boring because I found a gas line,
5  16:55  because I found an obstacle, we write the word "moved."  It's
6  16:55  different than "adjusted."
7  16:55  Q.  And the documents you reviewed, Dr. Bakeer, it said
8  16:55  "location" --
9  16:55  A.  "Adjusted."
10 16:55  Q.  -- "adjusted" for 81-A?
11 16:55  A.  That's correct.
12 16:55  Q.  And Dr. Marino testified that you could not get a drilling
13 16:55  rig into a location at the area of sample 81-A.  Do you agree
14 16:56  that that would have been impossible to get a rig there?
15 16:56  A.  I disagree for several reasons.
16 16:56  Q.  Okay.  Tell the Court why.
17 16:56  A.  One major reason, in my opinion, the nature of this work.
18 16:56  This was a sensitive area that was being looked for from a
19 16:56  contamination viewpoint, from an environmental viewpoint.  It's
20 16:56  a serious violation if you move it to another location and
21 16:56  indicate that there was a contaminant or no contaminants.  So
22 16:56  there's no doubt in my mind, if MMG is a responsible company, a
23 16:56  reputable company, they will never do that.
24 16:56      So the word "adjusted" is -- keep in mind the GPS may
25 16:56  have an error of 2, 3, 4, 5, 6 feet, depending on the hour of

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2340**

1  16:56  the day.  There's a big range of error.  But the error would be
2  16:56  in the neighborhood of 2, 3, 6 feet, maybe, for the GPS.
3  16:56  Q.  All right.
4  16:56  A.  So the first reason, in my opinion, is the nature of the
5  16:56  work.
6  16:57  Q.  You've rendered 81-A within the GPS coordinates listed on
7  16:57  the boring log; right?
8  16:57  A   If I move it a couple of feet, I would get the same
9  16:57  reading, pretty much.  Maybe -- you know, a second puts you in
10 16:57  China.  I mean, I don't want to examine, but it's not China.
11 16:57  But one second on the GPS is a major move.  It's several feet.
12 16:57  That's about 30 feet or so, one second.
13 16:57  Q.  To be clear for the record, in your opinion, the boring
14 16:57  log for 81-A is within a couple of feet, give or take, of the
15 16:57  GPS coordinates?
16 16:57  A.  That's based on the first conclusion.  But there are more
17 16:57  reasons, yes.
18 16:57  Q.  All right.
19 16:57  A.  Do you want the other reasons?
20 16:57  Q.  Other reasons, sure.
21 16:57  A.  MMG used three types of rigs in their work:  They use a
22 16:57  Mobile 57.  They used a SIMCO, I believe it's SIMCO 200, and
23 16:57  they use a CME 75.  We own a CME -- actually, several CMEs 75s
24 16:57  and we own a SIMCO.
25 16:58      The image you see on this slide, these are --

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2341**

1  16:56  Q.  For the record, we've got Plaintiff's Exhibit 397, Marino
2  16:56  report photo 4.13.
3  16:58  A.  You can see that this truck has four outriggers or
4  16:58  leveling poles.  That's -- one, two -- or spuds, depending on
5  16:58  how you call them, depending on...
6  16:58      This truck is raised off the ground and leveled.
7  16:58  There is a cone penetrometer.  It's a very sensitive device
8  16:58  inside this cabin.  The cone is about $10,000.  If it goes out
9  16:58  of alignment, and you lose a cone, that's a $10,000 loss.  So
10 16:58  you have to level this perfectly.
11 16:58      There are water levels.  There are instrumentation
12 16:58  inside to make sure your cone is going vertically.  If it
13 16:58  deviates, you have to retract the cone.  If it goes more than,
14 16:58  depending on the cone, maybe 14 degrees, 15 degrees, you have
15 16:58  to pull it out.
16 16:58      You can see that the tires -- you can see the span
17 16:58  between the fender and the tire, that tells you that this rig
18 16:58  is jacked upwards.  I can raise this one notch, raise this
19 16:59  four, raise this five, and I can level my truck perfectly.
20 16:59      A SIMCO is a four-wheel driven piece of equipment.
21 16:59  So if, say, the CME 75 was incapable of doing this hole.  And
22 16:59  let's assume for the sake of argument that the Figaro
23 16:59  (phonetic) that did this on behalf of MMG had the CME 75.
24 16:59  That's not a four-wheel drive -- like this truck is possibly a
25 16:59  four-wheel drive.  We can't tell from the photograph.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2342**

| | | |
|---|---|---|
| 1 | 16:59 | I can use the SIMCO, which is a small rig, actually. |
| 2 | 16:59 | It fits under an 8-foot roof. You can fit it anywhere you |
| 3 | 16:59 | want. So the issue is you can't make it at that location, in |
| 4 | 16:59 | my opinion from drilling, it's impossible. |
| 5 | 16:59 | THE COURT: Wait a minute. Mr. Khorrami is standing. |
| 6 | 16:59 | MR. KHORRAMI: Your Honor, I object to this |
| 7 | 16:59 | testimony. It's outside of his report. And also we're looking |
| 8 | 16:59 | at a truck that was placed three years after -- after those |
| 9 | 16:59 | borings were taken, so... |
| 10 | 17:00 | MR. RAFFMAN: If I might, Your Honor. We are |
| 11 | 17:00 | responding to a point that is made in Dr. Marino's declaration |
| 12 | 17:00 | that he gave in connection with your Daubert motion. |
| 13 | 17:00 | That was the first time in which Dr. Marino |
| 14 | 17:00 | suggested that a ravine had prevented the drilling equipment |
| 15 | 17:00 | from being present at the sample site 81-A, and we did consent |
| 16 | 17:00 | to the late introduction of the Daubert report conditioned on |
| 17 | 17:00 | our ability to address it. This is directly addressing what is |
| 18 | 17:00 | in the summary judgment report. |
| 19 | 17:00 | MR. KHORRAMI: And Dr. Bakeer had the -- |
| 20 | 17:00 | THE COURT: Make sure I can hear you. |
| 21 | 17:00 | MR. KHORRAMI: I'm sorry. Dr. Bakeer had the |
| 22 | 17:00 | opportunity to provide a supplemental declaration in response |
| 23 | 17:00 | to Dr. Marino already. |
| 24 | 17:00 | THE COURT: Well, just -- |
| 25 | 17:00 | MR. GILBERT: Dr. Bakeer did actually -- |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2343**

| | | |
|---|---|---|
| 1 | 17:00 | THE COURT: If you could get together maybe so we |
| 2 | 17:00 | won't have a chorus -- |
| 3 | 17:01 | MR. KHORRAMI: I'm sorry. Dr. Bakeer actually did a |
| 4 | 17:01 | supplemental declaration in response to that declaration. So |
| 5 | 17:01 | he has had the opportunity. In fact, he's responded. |
| 6 | 17:01 | But this with the truck and all of that is |
| 7 | 17:01 | outside of his report and outside of his declaration. |
| 8 | 17:01 | MR. RAFFMAN: Your Honor, the supplemental report |
| 9 | 17:01 | that Dr. Bakeer prepared was responsive to the summary judgment |
| 10 | 17:01 | declaration that Dr. Marino made, which is Plaintiff's Exhibit |
| 11 | 17:01 | 401. |
| 12 | 17:01 | The plaintiffs did not designate the |
| 13 | 17:01 | December 2009 Daubert declaration until much later than that. |
| 14 | 17:01 | So Dr. Bakeer's supplemental declaration in terms of the |
| 15 | 17:01 | drilling rig and this type was not really done in response to |
| 16 | 17:01 | the Daubert December declaration. |
| 17 | 17:01 | And all that being said, we've got maybe two |
| 18 | 17:01 | more questions along this line. |
| 19 | 17:01 | THE COURT: One, the Court notes the objection. It's |
| 20 | 17:02 | my -- in a judge trial, generally, has as full a record as is |
| 21 | 17:02 | reasonable; although, there are limits. I note the objection. |
| 22 | 17:02 | I note the fact that I'm not sure what the condition was of |
| 23 | 17:02 | this topography at the time of Katrina or prior to Katrina. |
| 24 | 17:02 | And I also have a question, and I'll let you -- |
| 25 | 17:02 | when you said "adjusted" meant different than "moved" -- |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2344**

| | | |
|---|---|---|
| 1 | 17:02 | THE WITNESS: Correct. |
| 2 | 17:02 | THE COURT: -- I'm glad to know that engineers have |
| 3 | 17:02 | hedge terms like attorneys. But I was wondering: When would |
| 4 | 17:02 | one put "adjusted" on the log rather than "moved"? |
| 5 | 17:02 | THE WITNESS: I would speak on my -- what I do in my |
| 6 | 17:02 | own reports, and if a boring was moved from its location for a |
| 7 | 17:02 | reason, I have to indicate it in my report. |
| 8 | 17:03 | Because, again, if something goes wrong in the |
| 9 | 17:03 | future and there's a litigation over the issue, I have to say |
| 10 | 17:03 | exactly where my boring was moved. So it's our practice -- |
| 11 | 17:03 | Figaro (phonetic) is a reputable international company that I |
| 12 | 17:03 | would assume they use the same -- |
| 13 | 17:03 | THE COURT: So what does "adjusted" mean? My |
| 14 | 17:03 | question is: Why would you put "adjusted," and what does it |
| 15 | 17:03 | mean? How do you know it's adjusted? |
| 16 | 17:03 | THE WITNESS: For example, like I said, there was a |
| 17 | 17:03 | hard object he couldn't drill through, a piece of concrete. |
| 18 | 17:03 | The drill bit would not go through it. |
| 19 | 17:03 | By the way, they were using what's called an SPT |
| 20 | 17:03 | split-spoon, and they were using a geo-pole, which is a plastic |
| 21 | 17:03 | tube. If you hit a hard object, you cannot go through it. But |
| 22 | 17:03 | if I move six inches away from the pipe, I can go through it. |
| 23 | 17:03 | THE COURT: So you say "adjusted" is something that |
| 24 | 17:03 | is very close to the original, say, GPS location, very close, |
| 25 | 17:04 | within -- |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2345**

| | | |
|---|---|---|
| 1 | 17:04 | THE WITNESS: Within a very small fraction that would |
| 2 | 17:04 | not reflect on the GPS reading. |
| 3 | 17:04 | THE COURT: And it would result from inability to |
| 4 | 17:04 | place the boring instrument in that precise location. |
| 5 | 17:04 | THE WITNESS: Inability of the sampling device. |
| 6 | 17:04 | THE COURT: I'm sure you'll be cross-examined about |
| 7 | 17:04 | it. I'll stop. |
| 8 | 17:04 | THE WITNESS: The final point is that the GPS I put |
| 9 | 17:04 | in the boring, should be the GPS for where I made the boring. |
| 10 | 17:04 | So my boring log should stand on its own. That's the |
| 11 | 17:04 | professional practice that we have, and that's what we do. If |
| 12 | 17:04 | I do it at a given locale, I will have to put the GPS location |
| 13 | 17:04 | on the boring log. So that's the boring log GPS; that's when |
| 14 | 17:04 | it was made. |
| 15 | 17:04 | THE COURT: If you adjust it 2 feet, do you adjust |
| 16 | 17:04 | the GPS location? |
| 17 | 17:04 | THE WITNESS: Typically, we have a "Remarks" section |
| 18 | 17:04 | on the side of the log, and he would say "Moved 2 feet because |
| 19 | 17:05 | of" and he has to tell me. That stays on line. |
| 20 | 17:05 | MR. RAFFMAN: I'm going to move away from that, that |
| 21 | 17:05 | line, to the -- |
| 22 | 17:05 | THE COURT: 81-A conundrum. |
| 23 | 17:05 | MR. RAFFMAN: -- 81-A issue. |
| 24 | 17:05 | THE COURT: Go ahead. |
| 25 | 17:05 | MR. RAFFMAN: I'm not going to copy "conundrum," but |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2346**

```
17:05   1   that's Your Honor's expression.
17:05   2        THE COURT:  Exactly.  You certainly don't think it's
17:05   3   a conundrum.  I realize that.  The judge is the only person
17:05   4   here who has conundrums.  You don't.  Go ahead.
17:05   5        MR. RAFFMAN:  Thank you, Your Honor.
17:05   6   BY MR. RAFFMAN:
17:05   7   Q.   So I want to come back to the cross-section.  And this
17:05   8   would be -- let's -- for the benefit of the Court, the cross --
17:05   9   no --
17:05  10        MR. RAFFMAN:  RMB-37 please.  To orient the Court,
17:05  11   we're looking at plate 20.
17:05  12   BY MR. RAFFMAN:
17:05  13   Q.   We're looking across the A profile; right?  We've looked
17:05  14   at this before, so I want to move through it.
17:05  15   Q.   Your question is the cross-section --
17:05  16   Q.   The A cross-section closest to the wall.
17:06  17   A.   Along those yellow dots.
17:06  18   Q.   So let's look again at the cross-section you drew.  This
17:06  19   is Baker supplemental report, plate 21.  The Court's seen
17:06  20   this.  This is the cross-section along the wall going from
17:06  21   south to north; right?
17:06  22   A.   That's correct.
17:06  23   Q.   And now we're going to go from east to west along an axis.
17:06  24        MR. RAFFMAN:  Next slide, please.  RMB-39.
17:06  25
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2347**

```
17:06   1   BY MR. RAFFMAN:
17:06   2   Q.   Tell the Court what we've got in this slide, which is
17:06   3   Defendant's Exhibit 313, Baker supplemental report, plate 20.
17:06   4   A.   This is a section established around 79 all the way to the
17:06   5   bank.  And the reason is why did I use what I called 79, 79-A,
17:06   6   is that's the only complete section that you have borings all
17:06   7   the way to the edge of the canal.
17:06   8   Q.   Okay.
17:06   9   A.   Otherwise, you can see only one of two borings, and they
17:06  10   were incomplete.
17:06  11   Q.   All right.  And let's look at your cross-section for 79.
17:06  12   Tell the Court -- this is Defendant's Exhibit 313, Baker
17:07  13   supplemental report, plate 24.  Tell the Court what we're
17:07  14   seeing in this slide.
17:07  15   A.   This illustrates the same concept:  The borings done;
17:07  16   their locale; basically, where each boring was made; how much
17:07  17   was the depths of the granular fill; how much unrecoverable
17:07  18   core, which is shown in parentheses.
17:07  19        Just to orient you again, west would be canal side,
17:07  20   IHNC side; east would be 20 feet away from the orange
17:07  21   floodwall.
17:07  22        The dotted line, now, doesn't extend, really, from
17:07  23   east to west.  It's just to illustrate where the depth of the
17:07  24   tip of the sheet pile is.  So, actually, the floodwall, as you
17:07  25   see it now, would be that skinny line you see on the right-hand
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2348**

```
17:07   1   side.  That's pretty much where it's located.
17:07   2   Q.   Please use your laser pointer to show where the canal is.
17:07   3   A.   The canal would be on this side.
17:07   4   Q.   All right.  And the -- use your laser pointer to show
17:07   5   where the Lower Ninth Ward is.
17:07   6   A.   The Lower Ninth Ward would be here.  I think this is
17:08   7   wrong.  This should be the EBIA area.  That's the EBIA area.
17:08   8   Q.   All right.  So now, let's go in the next slide, please.
17:08   9   We're looking at Defendant's 313, plate 20, superimposed over
17:08  10   Defendant's Exhibit 205, Figure 27.
17:08  11        This is really for the orientation of the Court with
17:08  12   respect to the canal and the areas where the borings are taken,
17:08  13   but why don't you tell the Court what's shown in this slide so
17:08  14   we can then move on with it.
17:08  15   A.   It's interesting to see.  The dark line, again, the black
17:08  16   line we spoke of, that's the edge of water, which should have
17:08  17   been this white line.  This is the edge of water after Katrina.
17:08  18   You can see that here it's coinciding, it's not, and then it
17:08  19   goes in.
17:08  20        This is deceiving.  This is actually the access ramp
17:09  21   that the Corps built during the repair work, the temporary
17:09  22   flood protection they put in here.  And that's, basically,
17:09  23   gravel that they dumped in this area.
17:09  24        But if you look at the shoreline, it shows
17:09  25   significant erosion in the shoreline from the original.  That
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2349**

```
17:09   1   to me is granular fill that washed away with the floodwaters as
17:09   2   they receded back into the canal.
17:09   3        THE COURT:  So the Court understands, we're
17:09   4   superimposing the soil borings taken by the MMG in the EBIA
17:09   5   area of Boland Marine specifically over a photograph of the
17:09   6   area after Katrina?
17:09   7        MR. RAFFMAN:  Yes, Your Honor.  That's exactly right.
17:09   8        THE COURT:  Got it.
17:09   9        MR. RAFFMAN:  So the witness has made a point about
17:09  10   what happened to all that --
17:09  11        THE COURT:  I understand that on the north end there
17:09  12   is more water, indicating more erosion, indicating more
17:09  13   permeable material.
17:09  14        THE WITNESS:  That particular lagoon here is an
17:09  15   indication of the washout of that sand.  If it were cohesive
17:10  16   soils, it would have maintained its integrity like you see in
17:10  17   the shoreline here.
17:10  18   BY MR. RAFFMAN:
17:10  19   Q.   Dr. Baker, let's go with two more slides reflecting the
17:10  20   cross-sections and your opinions about what the cross-sections
17:10  21   show about what happened.
17:10  22        Dr. Baker, we're now looking at DX-313, Baker
17:10  23   supplemental report, plate 24.  We've added some arrows.  Tell
17:10  24   the Court what's happening in this slide.
17:10  25   A.   I asked for this slide or I prepared the handwritten
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2350

```
17:10   1   sketch to illustrate something.  If we think about the granular
17:10   2   fill as a pipe allowing water to flow from the IHNC and feed
17:10   3   into this area, so this shows you that, actually, if you're on
17:10   4   the IHNC, the west side, there is water now rising here and, in
17:10   5   the meantime, most of the year it's high enough to saturate the
17:10   6   sand.
17:10   7       So this sand is already filled with water.  As the
17:11   8   water head builds up on this side, that's driving more water in
17:11   9   this sand.  This sand travels through this -- if you imagine
17:11  10   that is a conduit or a pipe -- until it reaches the vicinity of
17:11  11   the wall.
17:11  12   Q.  Now, let's see what happens when it reaches the wall,
17:11  13   Dr. Bakeer.  Let's turn to the next slide.  We're looking now
17:11  14   at Defendant's Exhibit 313, Bakeer supplemental report, plate
17:11  15   21.
17:11  16       THE COURT:  We're covering a lot more area here.
17:11  17   BY MR. RAFFMAN:
17:11  18   Q.  North to south.
17:11  19   A   Yes.
17:11  20   Q.  So when the water reaches the wall, what happens next?
17:11  21   A.  As you think again -- I mentioned this concept before --
17:11  22   the minimum energy concept, water looks for the easiest way not
17:11  23   to lose energy.  You have a water head on the backside; you got
17:11  24   granular fill feeding into -- near the soil, in the water.
17:11  25       But at that particular vulnerable location, water
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2351

```
17:11   1   could flow underneath the sheet pile without exerting too much
17:11   2   energy.  So there would be a source for seepage under this
17:12   3   wall.
17:12   4   Q.  Now, I'm going to ask you to take the Court through,
17:12   5   moving to the next slide, Defendant's Exhibit 205, Bakeer
17:12   6   report, Figure 28.  Take the Court through your narrative of
17:12   7   how you think the north breach formed.
17:12   8   A.  I believe the model we ran is the same thing I'm going to
17:12   9   say right now, the illustrated model that I was showing.
17:12  10       What happened here is water rose in the canal,
17:12  11   exerted hydrostatic pressure on the wall.  That segment of the
17:12  12   wall was seeing the same pressure like the remainder of the
17:12  13   wall.
17:12  14       We have a distinctive difference between this segment
17:12  15   and that segment.  This is a deeper sheet wall with a higher
17:12  16   elevation.  The deeper sheet wall gives you more stability than
17:12  17   the deeper penetration.
17:12  18       Secondly, this is a bathtub concept here that you got
17:12  19   a high wall.  Next to it is a low wall.  So if you imagine the
17:13  20   water is building behind it to the same level, it will flow
17:13  21   over the low wall but not necessarily over the old wall.
17:13  22       You get early splashing, you get early overtopping,
17:13  23   in that zone.  As the water builds up in that canal, you
17:13  24   develop a tension crack along this as the walls lean backwards
17:13  25   a little bit.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2352

```
17:13   1       The hydrostatic pressure in the tension crack may be
17:13   2   9 to 10 folds higher than the original pressure.  We have an
17:13   3   evidence of a formation of a lagoon.  You can see the lagoon
17:13   4   here, which tells you that these soils eroded.  There was a
17:13   5   field of water.  That's where 81-A was made.  That's where the
17:13   6   lagoon is.  So that confirms the concept that water was flowing
17:13   7   under the wall.
17:13   8       The hydrostatic pressure increased, caused the
17:13   9   failure of the weld, a tear in the sheet pile, the separation
17:13  10   of the sheet pile, as the water pressure continued to increase.
17:13  11   Without reaching the top of the wall, this wall tumbled and
17:13  12   rotated in a --
17:14  13   Q.  Let's look at the next slide.  When you say the wall
17:14  14   tumbled and rotated -- we're now at DX-205, Bakeer report
17:14  15   Figure 30 -- describe for the Court the phenomena you just
17:14  16   described.
17:14  17   A   As I showed in mine, this is again my Christmas decoration
17:14  18   thing, that the wall top ended up being at the bottom, and its
17:14  19   tips ended up being at the top.
17:14  20       But you can see that they are maintained.  You don't
17:14  21   see any sharp changes or anything.  It's a smooth curve.  In my
17:14  22   report, I was referring to failures in mine as also being
17:14  23   bow-shaped.  It looked like a bow.  You can see here half a
17:14  24   bow, and the reason for having half a bow is the other half
17:14  25   wouldn't budge, which is this wall.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2353

```
17:14   1       THE COURT:  Doctor, and I'm sure you'll be asked
17:14   2   this, so I'm not going to go too much into it.  Do you know the
17:14   3   depth of the sheet pile at the 17 Street Canal?
17:14   4       THE WITNESS:  I believe it was -- I have those
17:14   5   numbers with me.
17:14   6       THE COURT:  That's okay.  If you don't know it, it's
17:15   7   all right.
17:15   8       THE WITNESS:  Yes.
17:15   9       MR. RAFFMAN:  Maybe we could go to the next slide.
17:15  10   It may be in the next slide.
17:15  11       THE WITNESS:  Yes.
17:15  12       MR. RAFFMAN:  I wonder.  And we can see it.  Could
17:15  13   you highlight this.  I'm afraid, Your Honor, it's --
17:15  14       THE COURT:  That's all right.
17:15  15       MR. RAFFMAN:  -- a little hard to see here.  We have
17:15  16   this up for a different purpose.
17:15  17       THE COURT:  And I'm sure you may have --
17:15  18       THE WITNESS:  The sheet is about minus 14 1/2 --
17:15  19   minus 16 1/2 NAVD88.  So that's 2 1/2 feet deeper.  I think
17:15  20   it's 17 1/2 if my memory serves me -- 2 1/2 feet -- no, I think
17:15  21   that 17 -- it's not 2 1/2.  It's about 1 1/2-foot difference
17:15  22   not 17th.  That puts you around minus 16 MSL.  I think that's
17:15  23   what the --
17:15  24       THE COURT:  You're taking minus 17 NAVD88.
17:15  25       THE WITNESS:  NAVD88.  This is NAVD scale, and the
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2354

| | |
|---|---|
| 17:15 | NAVD varies in different parts of the area.  So I can't |
| 17:16 | subtract 2 1/2 across the board or 1 1/2.  In the area of the |
| 17:16 | 17th Canal, I believe the differential of 1.51 or 1.56. |
| 17:16 | THE COURT:  So if the sheet pile -- if the '69 sheet |
| 17:16 | pile was, I think you said, 20 feet -- |
| 17:16 | THE WITNESS:  20 feet. |
| 17:16 | THE COURT:  -- what would be the length of the sheet |
| 17:16 | pile in -- |
| 17:16 | THE WITNESS:  The 17th was 20 feet, but don't forget, |
| 17:16 | too, that there was not much extension above the top. |
| 17:16 | THE COURT:  So it may have been a little deeper? |
| 17:16 | THE WITNESS:  So it's deeper in the ground.  Let me |
| 17:16 | answer your question in a different way:  The standing segment |
| 17:16 | of the IHNC at the north breach had its tip at minus 15, and it |
| 17:16 | did not fail under hydrostatic pressure. |
| 17:16 | THE COURT:  I understand that. |
| 17:16 | MR. RAFFMAN:  And we may have more testimony -- |
| 17:16 | THE COURT:  I'm just curious as to the -- and I'm |
| 17:16 | just going to touch on this, but the graphic -- looking at the |
| 17:17 | corpse after the failure, the corpse looks different at the |
| 17:17 | IHNC than the corpse looks at the 17 Street Canal.  And by "the |
| 17:17 | corpse," I mean the failed floodwalls. |
| 17:17 | MR. RAFFMAN:  I understand. |
| 17:17 | THE COURT:  And I'm sure we'll have more of that. |
| 17:17 | THE WITNESS:  Let me just quickly answer this or |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2355

| | |
|---|---|
| 17:17 | touch on this.  The causes of failure at 17th differ from the |
| 17:17 | causes of failure at London, differ from Citrus Back Levee, |
| 17:17 | differs from IHNC.  Not all the walls have the same |
| 17:17 | penetration, they did not have the same support soils on either |
| 17:17 | side, and they did not fail under the same mechanism.  So |
| 17:17 | it's -- there are similarities and there are dissimilarities. |
| 17:17 | THE COURT:  Sure.  I understand. |
| 17:17 | THE WITNESS:  So that's what I wanted to say. |
| 17:17 | THE COURT:  All right.  Thank you. |
| 17:17 | THE WITNESS:  You're welcome. |
| 17:17 | BY MR. RAFFMAN: |
| 17:17 | Q.  So referring to a tension crack, Dr. Bakeer, we had |
| 17:17 | included this graphic as an illustration to be sure it relates |
| 17:17 | in the IPET report to a different -- a different floodwall, but |
| 17:18 | explain for the Court what happens when a tension crack forms |
| 17:18 | under hydrostatic pressure. |
| 17:18 | A.  It's -- it's very simple explanation.  If you go back to |
| 17:18 | the monstrous I-wall -- or, I mean, the kick-up wall for the |
| 17:18 | IHNC that we are monitoring its deflection, deflection of walls |
| 17:18 | is a natural phenomena that's going to take place.  So you have |
| 17:18 | to account for the tension cracking the design.  The original |
| 17:18 | designs did not account for the development of a tension crack. |
| 17:18 | But a tension crack is nothing but pushing on a wall |
| 17:18 | backwards creates a gap between the soils on the front side, |
| 17:18 | which is the water side, and the face of the wall.  That gap |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2356

| | |
|---|---|
| 17:18 | doesn't have to be 6, 7 inches wide.  All you need is a very |
| 17:18 | small gap that gets filled with water. |
| 17:18 | And let me illustrate on this illustrator here.  If |
| 17:19 | we imagine that the water top is right here, the design, |
| 17:19 | according to the old GDM 1969, '66-'69 period, assume a |
| 17:19 | triangle of pressure from the top of the walls -- can I clear |
| 17:19 | this, please? |
| 17:19 | Yeah.  So it, basically, goes from the top.  So |
| 17:19 | that's the triangle of pressure. |
| 17:19 | Once you develop a tension crack, this is -- this is |
| 17:19 | a triangle pressure, so you can appreciate the 9, 10 folds that |
| 17:19 | I spoke of earlier.  That tension crack puts pressure on the |
| 17:19 | wall that was much higher than what was assumed in this area. |
| 17:19 | MR. RAFFMAN:  All right.  Perhaps we might capture |
| 17:19 | that and mark it as No. 352 with the permission of the Court |
| 17:19 | and counsel. |
| 17:20 | THE DEPUTY CLERK:  353. |
| 17:20 | MR. RAFFMAN:  353, I'm sorry. |
| 17:20 | When the Court's -- we're ready to go on, then? |
| 17:20 | THE COURT:  All right.  Go ahead. |
| 17:20 | BY MR. RAFFMAN: |
| 17:20 | Q.  To the next slide.  Clear and move to the next slide. |
| 17:20 | Dr. Bakeer, you can have a tension crack and yet not |
| 17:20 | have a wall failure; is that right? |
| 17:20 | A.  That's correct. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2357

| | |
|---|---|
| 17:20 | Q.  Tell the Court what we're looking at here at the DX-205 |
| 17:20 | Bakeer report, Figure 29. |
| 17:20 | A.  That's a view looking southwards towards -- and I believe |
| 17:20 | this is the marsh -- oops -- |
| 17:20 | Q.  So -- |
| 17:21 | A.  So that's looking for north towards -- that's if I put a |
| 17:21 | mark here, I don't know why it's -- this is a temporary levee, |
| 17:21 | that area here.  That's the temporary -- the end of the |
| 17:21 | temporary levee that the Corps built after Katrina for repair |
| 17:21 | of the north breach.  So the north breach is outside the frame |
| 17:21 | right now.  So that's a picture looking towards Claiborne. |
| 17:21 | Q.  Dr. Bakeer, you heard Dr. Marino say that he didn't think |
| 17:21 | you would have tension cracks develop in Hurricane Katrina |
| 17:21 | because the time to allow the water to rise and deflect the |
| 17:21 | wall wasn't sufficient to create a tension crack.  Did you hear |
| 17:21 | that testimony from Dr. Marino? |
| 17:21 | A.  I heard that. |
| 17:21 | Q.  Do you agree with that testimony? |
| 17:21 | A.  I disagree totally with that statement.  As you can see, |
| 17:21 | there is a tension crack here in a segment that didn't tilt. |
| 17:21 | Q.  All right.  Let's go to the next photo, the next slide. |
| 17:21 | Have you seen other tension cracks at other locations along the |
| 17:21 | floodwall in -- that formed in connection with Katrina? |
| 17:22 | A.  You can see those photographs of different locations where |
| 17:22 | you see a tension crack and a standing wall. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2358

```
 1   17:22        And let me add to this, too, that present HSDRRS
 2   17:22   design criteria requires that you design the walls for a
 3   17:22   tension crack.
 4   17:22   Q.  All right.  Let's go to the next slide.  Defendant's
 5   17:22   Exhibit 205, Bakeer report Figure 27.
 6   17:22        Dr. Bakeer, did you see a tension crack form in
 7   17:22   connection with the floodwall at the Inner Harbor Navigation
 8   17:22   Canal?
 9   17:22   A.  There is enough evidence from the photographic information
10   17:22   available that there was several locations where there were
11   17:22   tension cracks.  Again, I want to point out that it may not be
12   17:22   visual.  I mean, you don't have to have a 6-inch, a 7-inch wide
13   17:22   crack to call it the crack.  A crack is a small crack.
14   17:22   Q.  And even a small crack, Dr. Bakeer, is sufficient to
15   17:22   transmit the pressure of the rising water along the face of the
16   17:23   sheet pile; is that right?
17   17:23   A.  To the point where we call it the tip of the crack ends.
18   17:23   Because the tip of a crack is a function of the soils
19   17:23   surrounding it.  So a crack in a soft clay would extend
20   17:23   differently than a crack in a stiff clay.
21   17:23        So the cracks -- and that's the point of the
22   17:23   variability of the soil conditions.  If I take this floodwall
23   17:23   that's a linear structure that extends for 4,000 feet, each
24   17:23   foot may differ than the other foot.  So in an area where you
25   17:23   get a small crack, you may have better soil conditions, which
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2360

```
 1   17:24   crack at different degrees, different width, different depths,
 2   17:24   penetration, depending on the condition.
 3   17:24   Q.  All right.  Let's go to the next slide.  One more, please.
 4   17:25   We're now at Defendant's Exhibit 205, Bakeer report Figure 28.
 5   17:25   And Dr. Bakeer, the Court, I think, has heard enough about this
 6   17:25   pole feature, so I'm not going to ask any more questions about
 7   17:25   that.
 8   17:25        Dr. Bakeer, have you now given the Court your
 9   17:25   description about your opinions regarding the causes and
10   17:25   sequences of failure at the north breach?
11   17:25   A.  Without going into details of my analysis, I did.
12   17:25   Q.  All right.  When you say "the details," we're going to
13   17:25   come to the seawall sheet and other geotechnical analysis, I
14   17:25   guess, tomorrow, but that's what you're referring to; correct?
15   17:25   A   Right.  I'm referring to my calculations, but I'm saying,
16   17:25   you know, that those conclusions are also supported by the
17   17:25   calculations.
18   17:25   Q.  And did the barge play any role in the failure as you've
19   17:25   outlined it for the Court?
20   17:25   A.  In my opinion, this wall was deficient and insufficient,
21   17:25   and it failed under hydrostatic pressure with no involvement of
22   17:25   the barge.
23   17:26        MR. RAFFMAN:  Your Honor, I'm going to move to the
24   17:26   south breach.  We're at 5:24.  It's Your Honor's pleasure.
25   17:26        THE COURT:  Yeah.  I think this is a good stopping
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2359

```
 1   17:23   actually renders to a shallow tip penetration; but a different
 2   17:23   area with different soil conditions may render itself to a
 3   17:23   deeper crack.
 4   17:23        So a tension crack development is a natural
 5   17:23   phenomena.  You can walk out in a hot, dry summer day, and you
 6   17:23   can see the clay's cracked surface.  It looks like an
 7   17:23   alligator back.  That's a tension crack.  Cracked clay that --
 8   17:23   that's a phenomena that they teach you in soil mechanics 101.
 9   17:24   Q.  And you concluded that a tension crack formed in
10   17:24   connection with the north breach at the Inner Harbor Navigation
11   17:24   Canal?
12   17:24   A.  Yes, I do.
13   17:24   Q.  And that was one of the other reasons why -- well, let me
14   17:24   put it this way:  It acted on the weak location there in the
15   17:24   way that you've described --
16   17:24   A.  Let me --
17   17:24   Q.  -- in the water?
18   17:24   A.  -- answer yes.  And let me answer this with another issue
19   17:24   going back to the sand issue.  I don't need a tension crack in
20   17:24   that area.  I have already a source of water going all the way
21   17:24   and putting it -- the 10-time folds.  The sand is now
22   17:24   transmitting the 10 folds of pressure.
23   17:24   Q.  Okay.
24   17:24   A.  Now, beyond 81-A, you get lesser sand, that's where you're
25   17:24   going to develop the tension crack.  So you may develop tension
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2361

```
 1   17:26   point.  We'll go until 6:00 tomorrow or thereabouts to give you
 2   17:26   a little more time.
 3   17:26        MR. GILBERT:  Your Honor, what time would you like us
 4   17:26   to be here tomorrow morning?
 5   17:26        THE COURT:  As Mr. Aldock said, 10:00 at the
 6   17:26   earliest.
 7   17:26        MR. GILBERT:  Okay.
 8   17:26        THE COURT:  I mean, I've got four sentencings and a
 9   17:26   revocation.  I ought to be able to do that in an hour and take
10   17:26   a little break unless...
11   17:26        MR. GILBERT:  Anything interesting?
12   17:26        THE COURT:  Well, you might -- it's not that
13   17:26   interesting, I'm afraid.  We won't have cameras and people
14   17:26   outside giving interviews.
15   17:26        MR. GILBERT:  Thanks.
16   17:26        THE COURT:  All right.  Okay.  We are adjourned
17   17:26   until, hopefully, 10:00 or 10:15 tomorrow.
18   17:26        MR. RAFFMAN:  Thank you, Your Honor.
19   17:26        (WHEREUPON, the proceedings were concluded.)
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2362

```
 1                              *****
 2                          CERTIFICATE
 3          I, Jodi Simcox, RMR, FCRR, Official Court Reporter
 4      for the United States District Court, Eastern District of
 5      Louisiana, do hereby certify that the foregoing is a true and
 6      correct transcript, to the best of my ability and
 7      understanding, from the record of the proceedings in the
 8      above-entitled and numbered matter.
 9
10
11
                        S/ Jodi Simcox, RMR, FCRR
12                        Jodi Simcox, RMR, FCRR
                          Official Court Reporter
13
14
15
16
17
18
19
20
21
22
23
24
25
              JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA
```

2363

1            UNITED STATES DISTRICT COURT
2            EASTERN DISTRICT OF LOUISIANA
3
    ****************************************************************
4
    IN RE:  KATRINA CANAL
5   BREACHES CONSOLIDATED
    LITIGATION
6
                              CIVIL ACTION NO. 05-4182
7                             SECTION "K" (2)
                              NEW ORLEANS, LOUISIANA
8                             WEDNESDAY, JULY 7, 2010, 9:00 A.M.
9   PERTAINS TO BARGE
10
    MUMFORD   C.A. NO. 05-5724
11  AS TO CLAIMS OF PLAINTIFFS
    JOSEPHINE RICHARDSON AND
12  HOLIDAY JEWELERS, INC.,
    ONLY
13
14  BENOIT   C.A. NO. 06-7516
    AS TO CLAIMS OF PLAINTIFFS
15  JOHN ALFORD AND JERRY
    ALFORD ONLY
16
17  ****************************************************************
18
                      DAY 11, MORNING SESSION
19            TRANSCRIPT OF NONJURY TRIAL PROCEEDINGS
          HEARD BEFORE THE HONORABLE STANWOOD R. DUVAL, JR.
20                 UNITED STATES DISTRICT JUDGE
21
22  APPEARANCES:
23
    FOR THE PLAINTIFFS:    BEST KOEPPEL TRAYLOR
24                         BY:  LAURENCE E. BEST, ESQUIRE
                           2030 ST. CHARLES AVENUE
25                         NEW ORLEANS LA  70130

**2364**

APPEARANCES CONTINUED:

LAW OFFICES OF BRIAN A. GILBERT
BY: BRIAN A. GILBERT, ESQUIRE
2030 ST. CHARLES AVENUE
NEW ORLEANS LA 70130

KHORRAMI POLLARD ABIR
BY: SHAWN KHORRAMI, ESQUIRE
44 FLOWER STREET, 33RD FLOOR
LOS ANGELES CA 90071

WILSON GROCHOW DRUKER & NOLET
BY: LAWRENCE A. WILSON, ESQUIRE
223 BROADWAY, 5TH FLOOR
NEW YORK NY 10279

WIEDEMANN & WIEDEMANN
BY: LAWRENCE D. WIEDEMANN, ESQUIRE
    KARL WIEDEMANN, ESQUIRE
821 BARONNE STREET
NEW ORLEANS LA 70113

PATRICK J. SANDERS
ATTORNEY AT LAW
3316 RIDGELAKE DRIVE
SUITE 100
METAIRIE LA 70002

LAW OFFICE OF RICHARD T. SEYMOUR
BY: RICHARD T. SEYMOUR, ESQUIRE
1150 CONNECTICUT AVENUE N.W.
SUITE 900
WASHINGTON DC 20036

FOR THE DEFENDANT:   CHAFFE MCCALL
                BY: DEREK A. WALKER, ESQUIRE
                2300 ENERGY CENTRE
                1100 POYDRAS STREET
                NEW ORLEANS LA 70163

**2365**

APPEARANCES CONTINUED:

GOODWIN PROCTER
BY: JOHN D. ALDOCK, ESQUIRE
    MARK S. RAFFMAN, ESQUIRE
    ADAM M. CHUD, ESQUIRE
    KIRSTEN V. K. ROBBINS, ESQUIRE
    ERIC I. GOLDBERG, ESQUIRE
901 NEW YORK AVENUE N. W.
WASHINGTON DC 20001

SUTTERFIELD & WEBB
BY: DANIEL A. WEBB, ESQUIRE
650 POYDRAS STREET, SUITE 2715
NEW ORLEANS LA 70130

LAFARGE NORTH AMERICA, INC.
BY: PETER KEELEY, ESQUIRE
12950 WORLDGATE DRIVE
HERNDON VA 20170

OFFICIAL COURT REPORTER:   CATHY PEPPER, CCR, RMR, CRR
                500 POYDRAS STREET, ROOM B406
                NEW ORLEANS, LOUISIANA 70130
                (504) 589-7779

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY. TRANSCRIPT
PRODUCED BY COMPUTER.

**2366**

I N D E X

EXAMINATIONS                          PAGE

REDA M. BAKEER, PH.D. P.E............................2367

DIRECT EXAMINATION BY MR. RAFFMAN (CONTINUED)..........2367


E X H I B I T S

DESCRIPTION                          PAGE

DEFENDANT'S EXHIBITS 350 THROUGH 355 AND 356...........2448

**2367**

P-R-O-C-E-E-D-I-N-G-S

WEDNESDAY, JULY 7, 2010

M O R N I N G   S E S S I O N

(COURT CALLED TO ORDER)

THE DEPUTY CLERK: ALL RISE, PLEASE. COURT IS IN

SESSION. PLEASE BE SEATED.

THE COURT: GOOD MORNING.

VOICES: GOOD MORNING, YOUR HONOR.

THE COURT: ARE YOU READY TO PROCEED, SIR?

MR. RAFFMAN: YES, SIR. MAY I HAVE DX 205.

DIRECT EXAMINATION (CONTINUED)

BY MR. RAFFMAN:

Q. ALL RIGHT. SO TO PICK UP WHERE WE LEFT OFF, DR. BAKEER,

YESTERDAY YOU HAD GIVEN TESTIMONY ABOUT THE NORTH AND SOUTH

BREACH AND BEING A WEAK -- WEAK LINKS IN THE FLOODWALL. WE HAD

TAKEN THROUGH THE TESTIMONY ABOUT THE NORTH BREACH, AND SO WE'RE

GOING TO NOW PICK UP WITH TESTIMONY ABOUT THE SOUTH BREACH.

      AND TO GET THE COURT ORIENTED OR REORIENTED, I'D ASK

YOU, DR. BAKEER, TO DESCRIBE THE SOUTH BREACH AT THE INNER HARBOR

NAVIGATION CANAL, EAST WALL.

A. THE SOUTH BREACH IS ABOUT 800 PLUS, 815 OR SO, IT DEPENDS

WHERE YOU START YOUR MEASUREMENT, WIDE OR LONG, WHICH STARTS FROM

CIRCLE AT A AND ENDS UP AT THIS END ON THIS SIDE.

**2 (Pages 2364 to 2367)**

2368

1    MR. RAFFMAN:  AND FOR THE RECORD, WE'RE LOOKING AT
2  DEFENDANT'S EXHIBIT 205, BAKEER REPORT FIGURE 46.
3    THE WITNESS:  IT'S COMPRISED OF MAINLY TWO SPECIFIC
4  SEGMENTS, WHAT I CALLED IN MY REPORT THE "SOUTH SEGMENT", AND THE
5  SECOND UNIT, WHICH IS THE LARGER UNIT, I CALLED IT THE "NORTH
6  SEGMENT", WHICH THIS WOULD BE THE NORTH SEGMENT, AND THIS WOULD
7  BE THE SOUTH SEGMENT (INDICATING).
8    EXAMINATION
9  BY MR. RAFFMAN:
10  Q.  ALL RIGHT.  AND WE'LL PICK THIS UP LATER, DR. BAKEER, BUT TO
11  GIVE A PREVIEW, WHICH OF THE TWO SEGMENTS WAS THE FIRST TO FORM?
12  A.  THE NORTH SEGMENT IS THE PRIMARY SEGMENT THAT FAILED BASED
13  ON ITS SIZE AND THE AMOUNT OF DISPLACEMENT THAT IT EXPERIENCED
14  INTO THE --
15  Q.  NOW, LET'S -- I'M SORRY.  THE NEXT SLIDE IN THE DECK IS A
16  SUMMARY OF THE REASONS WHY YOU CONCLUDED THAT THE LOCATION OF THE
17  SOUTH BREACH REPRESENTS A WEAK LINK.  WOULD YOU TAKE THE COURT
18  THROUGH THOSE REASONS.
19  A.  SURE.  IT IS A WEAK LINK AND IT IS, IN MY OPINION, THE MAIN
20  SEGMENT, OR THE NORTH SEGMENT, IS THE SECOND WEAKEST LINK IN THE
21  SYSTEM.  IN THIS I DEFINED THE NORTH BREACH AS THE WEAKEST LINK,
22  AND THIS IS THE SECOND WEAKEST LINK IN THE SYSTEM.  SO THAT'S
23  JUST TO DEFINE THE WORD "WEAK" ON THE TOP.
24    IN MY OPINION, AND THIS IS AN OBSERVATION THROUGHOUT
25  THE HPS SYSTEM, THAT THE FLOODWALL AT THAT PARTICULAR STRETCH

2369

1  DEVIATED FROM ITS STRAIGHT LINE ALIGNMENT, MEANING THAT THE
2  FLOODWALL, RATHER THAN GOING INTO A STRAIGHT WALL, IT CURVED INTO
3  THE NINTH WARD SIDE, THEN WENT BACK, AGAIN, TO THE STRAIGHT LINE
4  ALIGNMENT.
5  Q.  ALL RIGHT.  THAT'S THE FIRST BULLET POINT, RIGHT?
6  A.  THAT'S THE FIRST BULLET POINT.
7  Q.  LET'S TAKE THE COURT THROUGH THE NEXT TWO BULLET POINTS ON
8  THIS SLIDE.
9  A.  THE NEXT TWO, I CAN COMBINE THEM TOGETHER, THE PRESENCE OF
10  DRAINAGE CANALS ON EITHER SIDE OF THE FLOODWALL AT SOME POINT
11  DURING THE LIFE SPAN OF THAT FLOODWALL SINCE ITS CONSTRUCTION, AS
12  WELL AS DURING KATRINA, THE PRESENCE OF AN OUTFALL CANAL WHICH
13  WAS PRESENT IN THE PAST, BUT IT'S ALSO -- WAS USED DURING THE
14  EBIA REPAIR WORK.  SO WE HAVE A DRAINAGE CANAL ON ONE SIDE, THERE
15  IS A SECOND DRAINAGE CANAL ON THE EBIA SIDE, AND THERE IS AN
16  OUTFLOW CANAL WHICH IS PRESENT AT THE PRECISE LIMIT, THE SOUTHERN
17  LIMIT OF THIS SOUTHERN BREACH WHICH ACTUALLY FEEDS INTO THE IHNC.
18  Q.  LET'S TAKE THE COURT TO THE THIRD ONE, AND THEN WE'LL GO
19  BACK THROUGH THE SLIDES FOR EACH.
20  A.  SO THE SECOND AND THIRD, THEY ARE -- IT COULD BE COMBINED,
21  BUT BASICALLY THE DRAINAGE AND OUTFLOW CANAL.
22    THE LAST ONE, AND THE ONE I REFER TO IT AS A "THIRD
23  CAUSE", IS THE UNIQUE SOIL CONDITIONS THAT EXISTED AT THE AREA OF
24  THE SOUTH BREACH.  THESE CONDITIONS PREVAILED BEFORE CONSTRUCTION
25  OF THE FLOODWALL AS INDICATED BY THE RECORDS, AND, ALSO, THERE

2370

1  ARE SOME UNIQUE FEATURES IN THE SOIL STRATIFICATION THAT MAKES
2  THIS POINT THE NEXT WEAKEST LINK.
3  Q.  ALL RIGHT.  SO LET'S START WITH THE DEVIATION FROM STRAIGHT
4  LINE ALIGNMENT.  WHAT WE'RE LOOKING AT HERE IS TWO -- A SPLIT
5  SCREEN, THE TOP IS DEFENDANT'S EXHIBIT 205, BAKEER REPORT FIGURE
6  46, THE BOTTOM IS DEFENDANT'S EXHIBIT 205, BAKEER REPORT FIGURE
7  74.
8    DR. BAKEER, PLEASE DESCRIBE FOR THE COURT WHAT IS SHOWN
9  IN THIS SLIDE AND HOW IT RELATES TO YOUR CONCLUSION THAT THIS
10  LOCATION IS A WEAK LINK.
11  A.  MY RECOLLECTION IS THIS IS A 2005 PHOTOGRAPH, AERIAL
12  PHOTOGRAPH OF THE BREACH.  AND I BELIEVE THAT'S BEFORE RITA.  AS
13  YOU CAN SEE THIS IS THE SCHOOL BUS.  THE YELLOW BLOB IS A SCHOOL
14  BUS, AND THAT'S THE BARGE.  SO THAT'S A POST-KATRINA, PRE-RITA
15  CONDITION.
16    THIS PHOTOGRAPH, I BELIEVE IT'S A 2002 AERIAL
17  PHOTOGRAPH OF THE SITE.  HERE IS THE DEVIATION I'M REFERRING TO,
18  THE CIRCLED AREA HERE.  YOU CAN SEE THAT THE WALL ACTUALLY CURVES
19  AND THERE IS SOME DEVIATION FROM STRAIGHT LINE ALIGNMENT, THEN
20  GOES INTO THE IHNC SIDE, THEN DEVIATES WITH A VERY SHARP CHANGE,
21  THEN STAYS ON A STRAIGHT LINE PATH.  THEN YOU CAN SEE WHERE IT
22  GOES BACK TO ITS ORIGINAL ALIGNMENT.
23    YOU CAN SEE THIS, ALSO, BY THE SHADOW CAST BY THE WALL.
24  THAT BLACK DARK LINE HERE IS THE SHADOW.  THE SUN IS FROM THIS
25  SIDE IS CASTING A SHADOW ON THE EBIA AREA.

2371

1  Q.  DR. BAKEER, WHY -- WELL, WHY IS IT THAT THIS CURVATURE THAT
2  WE OBSERVE WHICH EXISTS AT MORE OR LESS THE LIMITS OF THE BREACH,
3  WHY IS THAT CURVATURE A POINT OF WEAKNESS?  WHY DOES IT CREATE
4  WEAKNESS IN THE WALL?
5  A.  THIS IS -- IN GEOTECHNICAL STRUCTURAL ENGINEERING ANALYSIS,
6  THIS IS WHAT WE CALL A "PLANE STRAIN PROBLEM".  IT'S A CONTINUOUS
7  WALL THAT COULD BE ANALYZED PER FOOT, UNIT FOOT.  AT TRANSITIONS,
8  ONE OF THE OBSERVATIONS MADE BY THE INVESTIGATING TEAMS, THAT
9  WHEN YOU HAVE TRANSITION, WHETHER IT'S CHANGE IN ALIGNMENT,
10  CHANGE FROM AN EARTH TO A T-WALL, FROM A T-WALL TO AN I-WALL,
11  THESE WERE ALWAYS PROBLEMATIC.  THERE IS A CHANGE IN THE
12  DIRECTION OF STRESSES IN THE DIFFERENT SECTIONS.  THE INTERLOCKS
13  ARE EXPERIENCING DIFFERENT CONDITION THAN WHAT YOU EXPECT ON AN
14  INTERLOCK THAT'S PERFECTLY ALIGNED ALONG A STRAIGHT LINE
15  ALIGNMENT.
16    SO THAT'S BASICALLY -- AND LET ME JUST ADD ONE POINT
17  HERE.  THESE MATCH THE PRECISE LIMITS, AND I WAS ABLE TO DO THAT
18  BY COMPARING THE LOCATION OF THE SOUTH BREACH WITH THE BUOYS.  IF
19  YOU RECALL, THERE WAS -- THERE WERE A FEW BUOYS ON THIS SIDE.
20  YOU CAN ACTUALLY SEE THEM IN MY REPORT.  WHEN I LINED UP THE TWO
21  PHOTOGRAPHS, YOU CAN SEE THAT THEY LINE UP.
22    ALSO, THIS IS THE REMNANTS OF THE OUTFALL CANAL AFTER
23  THE HURRICANE.  THIS IS THE OUTFALL CANAL BEFORE THE HURRICANE.
24  Q.  ALL RIGHT.
25    THE COURT:  DO YOU KNOW WHAT -- WAS THERE ANY REASON,

3  (Pages 2368 to 2371)

**2372**

1  FROM YOUR STUDY IN THIS MATTER, WHY THESE -- THE ALIGNMENT
2  CHANGED AT THE SPOTS WHERE YOU CIRCLED?  IS THERE ANY
3  GEOTECHNICAL OR OTHER REASON?
4         THE WITNESS:  IT IS NOT EXPLAINED IN THE GDM, BUT I CAN
5  ANSWER IT BASED ON THE STABILITY ANALYSIS.  WHEN YOU HAVE A
6  CANAL, THE ORIGINAL GDM DRAWINGS SHOW THIS CANAL THAT PARALLELS
7  THAT LINE HERE, THAT'S A DRAINAGE CANAL THAT FEEDS ON THE OUTFALL
8  CANAL AND THEN DRAINS INTO THE IHNC.
9         IN ORDER TO MAINTAIN STABILITY OF THE LEVEE OR A
10  FLOODWALL, YOU NEED A MINIMUM BERM DISTANCE SO THE TOE OF THE
11  LEVEE SHOULD BE AT A GIVEN DISTANCE FROM THE TOP OF BANK OF THE
12  CANAL.  AND IF YOU ENCROACH CLOSER, THIS COULD PROGRESS INTO A
13  FAILURE INTO THE CANAL.
14         SO I THINK IT HAS TO DO WITH EITHER THE CANAL OR
15  ANY OTHER STRUCTURE THAT USED TO BE AT THE EBIA AREA IN THAT CASE
16  WHICH CAUSED THE DEVIATION; BUT, THE GDM IS SILENT ON THAT.  BUT
17  IT DEFINITELY SHOWS THAT -- WELL, I MEAN, IF YOU LOOK AT THE GDM,
18  YOU WILL SEE THE DEVIATION IN THE GDM.
19         THE COURT:  IN OTHER WORDS, BECAUSE OF SOMETHING THAT
20  MAY HAVE BEEN THERE AT THE TIME OF CONSTRUCTION IN ORDER TO
21  ACHIEVE THE APPROPRIATE RATIO OF THE BERM TO THE HEIGHT OF THE
22  LEVEE OR WHATEVER THAT RATIO IS, YOU HAD TO CHANGE THE ALIGNMENT?
23  IS THAT -- THAT'S A CONJECTURE, BUT THAT'S YOUR --
24         THE WITNESS:  THAT'S A GOOD SUMMARY OF WHAT I SAID.
25         MR. RAFFMAN:  AND JUST SO WE BRING IT BACK TO MIND,

**2373**

1  YOUR HONOR, I'VE GOT ON THE SCREEN PLAINTIFF'S EXHIBIT 397,
2  MARINO REPORT FIGURE 2.12.
3         EXAMINATION
4  BY MR. RAFFMAN:
5  Q.  WHEN YOU REVIEWED THE DESIGN MANUALS, DR. BAKEER, DID YOU
6  SEE A DEVIATION FROM STRAIGHT LINE ALIGNMENT REFLECTED IN THE
7  DESIGN OF THE WALL?
8  A.  YOU CAN SEE IT CLEARLY IN THIS ZONE HERE.  YOU SEE THE
9  DEVIATION.  THAT'S THE ORIGINAL ALIGNMENT, AND YOU CAN SEE --
10  THAT'S THE LARGE YELLOW BLOCK HERE, AND YOU CAN SEE WHERE IT GOES
11  TO THIS ALIGNMENT.  THE DEVIATION, IT STARTS FROM THAT STRAIGHT
12  PORTION OF THE WALL, THEN YOU SEE A DEVIATION OR A CHANGE IN
13  SLOPE, AND THEN IT GOES BACK TO A STRAIGHT LINE ALIGNMENT WITH AN
14  OFFSET.
15         BECAUSE WHAT WE CALL AN "OFFSET", JUST TO EXPLAIN, IS
16  IF THIS IS THE ORIGINAL ALIGNMENT, THIS IS THE NEW ALIGNMENT.
17  THIS IS THE OFFSET IS THE DISTANCE BETWEEN ORIGINAL ALIGNMENT AND
18  THE --
19  Q.  SO TO CLOSE THE LOOP, WE'VE GOT PLAINTIFF'S EXHIBIT 397,
20  MARINO REPORT FIGURE 2.13.
21         DR. BAKEER, WHEN YOU REVIEWED THE DESIGN MANUAL FOR THE
22  PORTION THAT WAS IN THE NEIGHBORHOOD OF THE NORTHERN LIMIT OF THE
23  SOUTH BREACH, DID YOU SEE A DEVIATION FROM A STRAIGHT LINE IN THE
24  DESIGN MANUAL THERE, TOO?
25  A.  YES.  YOU SEE IT WHERE YOU GO BACK AGAIN FROM THE OFFSET

**2374**

1  THAT I SPOKE OF A MINUTE AGO BACK TO THE ORIGINAL ALIGNMENT, BUT
2  YOU SEE MORE ABRUPT TRANSITION IN THIS AREA THAN YOU SEE ON THE
3  OTHER SIDE.
4         THE OTHER ONE WAS CURVED, AND THE OTHER CURVE ACTUALLY
5  SMOOTHED THE STRESS DISTRIBUTION MORE THAN AN ABRUPT CHANGE GOING
6  AT AN ACUTE ANGLE OR A SMALL ANGLE, LIKE YOU SAID.
7  Q.  NOW WE'RE GOING TO MOVE TO THE SECOND AND THIRD BULLET
8  POINTS, THE CANAL AND THE -- THE JOURDAN CANAL, THE OUTFLOW
9  CANAL.
10         DR. BAKEER, WE'RE LOOKING AT, AGAIN, DEFENDANT'S
11  EXHIBIT 205, BAKEER REPORT FIGURE 46, IN THE TOP HALF, AND IN THE
12  BOTTOM HALF, FIGURE 74 FROM YOUR REPORT.
13         DR. BAKEER, EXPLAIN TO THE COURT WHAT ARE THE OUTFLOW
14  CANAL AND THE JOURDAN AVENUE CANAL AND HOW THEY DO RELATE TO YOUR
15  OPINIONS REGARDING WEAK LINK.
16  A.  AS WE DISCUSSED YESTERDAY, THE GROUND GENERALLY SLOPED FROM
17  A HIGH POINT IN THE SOUTH TO THE LOWEST POINT ON THE NORTH, AND
18  THAT'S CONSISTENT WITH HAVING A DRAINAGE CANAL THAT EXISTED ALONG
19  JOURDAN AVENUE, IT'S CALLED THE "JOURDAN AVENUE DRAINAGE CANAL",
20  WHICH ENDS UP WHERE THE PUMP STATION IS AT THE NORTH END.
21         SO THAT'S A GRAVITY LINE, AND DEFINITION OF A GRAVITY
22  CHANNEL IS WATER FLOW FROM HIGH TO LOW.  SO THAT'S A DRAINAGE
23  CANAL THAT WAS FILLED AT SOME TIME, BUT WHEN THE WALL WAS
24  CONSTRUCTED THIS CANAL WAS IN PLACE AT THAT TIME.
25         THERE IS ANOTHER DRAINAGE CANAL WHICH WAS TO DRAIN --

**2375**

1  SINCE YOU BLOCK FLOW OF WATER FROM THIS SIDE TO THAT SIDE OF
2  THE -- FROM THE PROTECTED SIDE TO THE FLOOD SIDE, THE FLOODWALL
3  NOW AND THE LEVEE IN THE PAST PREVENTED DRAINAGE FROM THIS SIDE
4  TO THAT SIDE.  SO THERE IS A DRAINAGE DITCH, CANAL, SWALE,
5  WHATEVER YOU WANT TO CALL IT.  TYPICALLY, A CANAL IS A LITTLE BIT
6  BIGGER THAN A DITCH OR A SWALE.  SO THERE IS ANOTHER CANAL, BUT
7  HERE YOU HAVE THE OPPOSITE DIRECTION, THE FLOW GOES FROM NORTH TO
8  SOUTH, FEEDS INTO AN OUTFALL CANAL WHICH DRAINS INTO THE IHNC.
9  Q.  AND WHAT IS IT ABOUT THE PRESENCE OF THE OUTFLOW CANAL THAT
10  REPRESENTS A WEAKNESS IN THE FLOODWALL?
11  A.  I JUST ANSWERED THE JUDGE'S QUESTION, YOUR HONOR'S, WHEN I
12  SAID THAT THAT'S THE BERM I'M SPEAKING ABOUT, THAT YOU NEED TO
13  MAINTAIN SOME DISTANCE FROM THAT SWALE TO ASSURE STABILITY IN
14  THIS CASE.
15         SO THAT'S THE -- WELL, COULD BE A REASON.  YOU CAN SEE
16  THAT THE CANAL ENDS HERE, SO THAT'S AN EXPLANATION FOR WHY
17  POSSIBLY THIS DEVIATION TOOK PLACE, AND IT WENT BACK, AGAIN, INTO
18  THIS.  BUT THAT'S, AGAIN, A REASON.
19         THE CANALS WERE FILLED.  THE QUALITY OF THE MATERIAL
20  THAT WAS USED TO BACKFILL THESE CANALS COULD CAUSE PROBLEMS IF
21  THEY WERE NOT PLACED PROPERLY AND THEY WERE NOT SELECTED
22  PROPERLY.  IN OTHER WORDS, IF YOU USE INFERIOR QUALITY MATERIAL
23  OR YOU DID NOT PLACE THEM PROPERLY, THIS COULD BE A SEEPAGE
24  PROBLEM.  IF YOU LOOK AT THE OUTFALL CANAL, IF WE GO BACK IN
25  MEMORY TO WHAT I SAID ABOUT THE HYDRAULIC FILL THAT WAS PLACED IN

## 2376

1  THE NORTH AREA, THAT WAS THE SOURCE OF WATER FLOW FROM THE IHNC
2  UNDER A HIGHER STAGE DURING THE STORM INTO THE AREA OF THE WALL.
3       THAT OUTFALL CANAL IS A WATER SOURCE.  AND YOU CAN SEE
4  THE DETERIORATION, YOU CAN SEE THE LITTLE LAGOON HERE THAT FORMED
5  AT THAT LOCATION, WHICH SHOWS THAT THERE WAS A FLOW IN AND A FLOW
6  OUT.
7  Q.  I'M GOING TO ASK YOU, DR. BAKEER, TO PLACE A MARK ON YOUR
8  SCREEN AT THE LOCATION OF THE DETERIORATED SOIL NEAR THE OUTFLOW
9  CANAL.
10 A.  EXCUSE ME, I WAS TRYING TO CLEAR MY MONITOR.  COULD YOU
11 REPEAT THAT, MARK.
12 Q.  YES, I WOULD ASK YOU TO PLACE A MARK ON YOUR SCREEN AT THE
13 LOCATION THAT YOU JUST INDICATED WAS THE DETERIORATION RESULTING
14 FROM WATER AT THE OUTFLOW CANAL.
15      MR. RAFFMAN:  AND I'M GOING TO ASK THE -- I'M GOING TO
16 ASK THAT THIS BE CAPTURED AND MARKED AS DEFENDANT'S EXHIBIT 354
17 WITH THE PERMISSION OF THE COURT AND COUNSEL.
18      THE COURT:  YES, SIR, PLEASE.  THANK YOU.
19      MR. RAFFMAN:  MAY WE PROCEED?  THANK YOU.
20           EXAMINATION
21 BY MR. RAFFMAN:
22 Q.  LET'S MOVE, THEN, TO THE NEXT SUBJECT, DR. BAKEER, WHICH IS
23 SUBSOIL CONDITIONS.  THE NEXT SLIDE IS PLAINTIFF'S EXHIBIT 397.
24 IT'S MARINO REPORT FIGURE 2.14, AND WE HAVE ADDED SOME DAMAGE.
25      DR. BAKEER, WOULD YOU PLEASE EXPLAIN TO THE COURT --

## 2377

1  FIRST, LET'S ORIENT THE COURT WITH WHAT IS SHOWN IN THIS SLIDE.
2  A.  WHAT'S SHOWN ON THIS SLIDE ARE A REPRODUCTION OF THE
3  CROSS-SECTIONS IN THE GDM, THEY WERE REPRODUCED BY DR. MARINO IN
4  HIS REPORT, DEPICTING WHAT WAS THE GROUND SURFACE AT THE TIME
5  WHEN THE WALL WAS DESIGNED OR WAS TO BE BUILT IN THE '60S, '66,
6  '69 PERIOD, WHICH IS REPRESENTED BY THE BLACK LINES.  SO IF YOU
7  LOOK AT THE BLACK LINE RIGHT HERE IN THIS PARTICULAR SECTION FOR
8  ILLUSTRATION, THE BLACK LINE IN THIS, THAT WAS THE GROUND SURFACE
9  AT THAT TIME.
10      THE RED LINE IS WHAT WE CALL THE "DESIGN GRADE".
11 THAT'S WHAT THE CORPS OF ENGINEERS INTENDED TO RAISE THE LEVEE AT
12 THAT PARTICULAR STATION.  AND A STATION IS THAT NUMBER YOU SEE
13 HERE.  STATION 22, STATION 23, A HUNDRED FOOT DISTANCE BETWEEN
14 THIS ONE AND THIS ONE.  SO THAT'S A STATION.
15      AND IF WE JUST ORIENT THE COURT WITH WHAT THE STATIONS
16 ARE, ZERO IS AT CLAIBORNE AND STATION 56 IS AT FLORIDA AVENUE.
17 SO 22 IS AT THE END OF THE SOUTHERN BREACH, OR THE SOUTHERN END
18 OF SOUTHERN BREACH, AND THESE CROSS-SECTIONS REPRESENT THE
19 DIFFERENT STATIONS WITHIN THAT PARTICULAR BREACHED AREA.
20      SO THE CLOSURE IN THIS IS IF I WOULD LIKE TO SEE HOW
21 MUCH DIFFERENCE BETWEEN DESIGN AND AS EXISTED AT THE TIME OF THE
22 DESIGN, THE GOLD OR THE YELLOW MARKING HERE INDICATES HOW MUCH
23 FILL WAS PLACED TO BRING IT TO GRADE.
24 Q.  ALL RIGHT.  AND SO AT STATION 23 PLUS 67, WHICH, AS YOU
25 SAID, IS SOMEWHERE IN THE MIDDLE OF THE BREACH --

## 2378

1  A.  THAT WOULD BE CLOSE TO THE BOW OF THE SMALL BOW --
2  Q.  ALL RIGHT.
3  A.  -- WHICH IS THE SOUTHERN BOW IN THE SOUTHERN BREACH.
4  Q.  30 IS CLOSER TO WHERE?
5  A.  29, 30 WOULD BE CLOSER TO THE CENTER OF THE BIG BOW.
6  Q.  AND THE WHOLE -- THROUGHOUT THE BREACH, WHAT CAN YOU TELL
7  THE COURT ABOUT HOW MUCH SOIL HAD TO BE ADDED AT THE TIME THAT
8  THE LEVEE WAS BUILT?
9  A.  TO HELP YOU READ THOSE CURVES, IF THE RED LINE, WHICH IS
10 DESIGN, IS HIGHER THAN THE BLACK LINE, THEN YOU ADD THE
11 DIFFERENCE IN FILL.  THAT'S AN ADDED WEIGHT ON THE SUBSOILS.
12      IF THE BLACK LINE IS HIGHER THAN THE RED LINE, THEN
13 THAT'S EITHER A CUT OR WE CAN LEAVE IT AS IS, SO THAT'S HOW YOU
14 LOOK AT THOSE THINGS.
15      LET'S COMPARE SOME OF THESE GRAPHS TO LOCATIONS WITHIN THE
16 LIMITS OF THE SOUTH BREACH.  DR. BAKEER, GIVE THE COURT YOUR
17 SENSE -- WE'RE NOW LOOKING AT, AGAIN, PLAINTIFF'S EXHIBIT 397,
18 MARINO REPORT FIGURE 2.14 WITH -- SUPERIMPOSED OVER DEFENDANT'S
19 EXHIBIT 205, BAKEER REPORT FIGURE 74.
20      AND, DR. BAKEER, GIVE THE COURT AN OVERVIEW OF HOW MUCH
21 SOIL HAD TO BE ADDED TO THE LEVEE TO BRING IT UP TO GRADE WHEN
22 THE WALL WAS BUILT IN THE AREA OF THE SOUTH BREACH VERSUS OUTSIDE
23 THE LIMITS OF THE BREACH.
24 A.  I GUESS I JUMPED TO THIS SLIDE WHEN I SAID WHERE 22 IS, BUT
25 YOU CAN SEE WHERE STATION 22, AND I'M GOING TO TOUCH THE SCREEN

## 2379

1  HERE.  THAT'S STATION 22 REPRESENTING THE SOIL CONDITIONS OR THE
2  GRADES AND THE ELEVATIONS AT THAT YELLOW MARKING.  THAT'S ABOUT
3  WHERE STATION 22 IS.
4       THE DIFFERENCE FROM BLACK TO RED OR THE GOLD AREA ON
5  THIS DIAGRAM REPRESENTS A PLACEMENT OF ABOUT 1 FOOT TO 2 FEET OF
6  DIRT AT MOST.  IT'S HOVERING AROUND MAYBE 1 FOOT MOST OF THE
7  TIME.  SO VERY LITTLE FILL WAS PLACED TO REACH THE DESIGN GRADE.
8       IF YOU LOOK AT THE CENTER ONE, THIS IS THE REMNANT OF
9  THE OUTFALL CANAL, SO THAT LITTLE V YOU SEE RIGHT HERE.  YOU CAN
10 SEE, FIRST OF ALL, THAT THE LEVEE MAINTAINED ITS SHAPE BEFORE
11 1966, '69 PERIOD.  THE LEVEE HERE ALMOST LOST ITS SHAPE.  THE
12 LEVEE HERE HAS SOME OF ITS SHAPE, BUT NOT REALLY THE LEVEE AS
13 BUILT ORIGINALLY.
14      SO YOU CAN SEE AS YOU GO FURTHER DOWN HERE, THAT SWALE
15 IS SHALLOWER AND NARROWER HERE.  YOU SEE IT'S ALMOST A FLAT
16 GROUND.  IT'S A VERY PRONOUNCED V RIGHT HERE.
17      SO WHEN I MEASURED THESE DIFFERENCES, THEY WERE RANGING
18 ANYWHERE FROM FIVE TO SIX FEET, INDICATING THAT ABOUT FIVE FOOT
19 ON AVERAGE WAS PLACED WITHIN THE SOUTHERN BREACH ZONE.
20 Q.  ALL RIGHT.  AND NOW I'M GOING TO ASK YOU TO TELL THE COURT
21 WHY IT MATTERS WITH RESPECT TO THE SOUTHERN AREA, THE SOUTHERN
22 BREACH AREA BEING A WEAK LINK, WHY DOES IT MATTER AND WHAT DOES
23 IT SHOW THAT FIVE TO SIX FEET OR SO OF SOIL HAD TO BE ADDED TO
24 BUILD THAT LEVEE UP TO GRADE IN THE 1960'S?
25 A.  YOU CAN MAKE TWO CONCLUSIONS HERE.  THE FIRST CONCLUSION WAS

**2380**

1  WHEN WE -- OR THE CORPS OF ENGINEERS BUILT THIS LEVEE, IT SHOULD
2  HAVE BEEN AT A UNIFORM GRADE, CROWN, WHICH IS THE TOP, LAND ON
3  BOTH SIDES.  SOMETHING CAUSED THE LEVEE TO GO DOWN AND SETTLE, AS
4  WE CALL IT IN SOIL MECHANICS, BY A SIGNIFICANT AMOUNT IN THAT
5  ZONE.  SOMETHING CAUSED IT TO LOSE ITS SHAPE IN THAT ZONE, WHICH
6  TELLS YOU THAT THE SUBSOIL CONDITIONS OUTSIDE THE BREACH DIFFER
7  FROM THE SUBSOIL CONDITIONS WITHIN THE BREACH AREA, EVEN BEFORE
8  THE FLOODWALL WAS CONSTRUCTED.  THESE SUBSOIL CONDITIONS REMAINED
9  AFTER THE WALL WAS CONSTRUCTED.
10       THEN THE CYCLE IS REPEATED.  SETTLEMENT ARE RELATED TO
11  A PHENOMENON CALLED "CONSOLIDATION".  THE SOIL CONSOLIDATES UNDER
12  THE WEIGHT OF THE DEAD LOADS APPLIED.
13  Q.  SO IF YOU ADD ANOTHER FIVE TO SIX FEET OF LEVEE TOPSOIL WHEN
14  YOU BUILD THE LEVEE IN THE 1960'S, WHAT DO YOU EXPECT TO FOLLOW
15  IN THE ENSUING DECADES?
16  A.  YOU EXPECT THAT WITH TIME THE AREAS THAT HAVE MORE FILL
17  WOULD SETTLE MORE THAN THE AREAS THAT HAD LESS FILL, SO YOU GET
18  MORE SETTLEMENT IN THAT ZONE.  THAT WOULD RESULT IN LOWER GRADE,
19  ALSO SOME LOWER ELEVATION OF THE TOP OF THE FLOODWALL WITH TIME.
20  Q.  ALL RIGHT.  AND SO THERE HAS BEEN TESTIMONY PREVIOUSLY ABOUT
21  THE WALL TOP WITHIN THE LIMITS OF THE SOUTHERN BREACH BEING LOWER
22  THAN PERHAPS OUTSIDE THE BREACH.  DOES THE SETTLEMENT MECHANISM
23  THAT YOU'VE JUST DESCRIBED HELP YOU TO ACCOUNT FOR WHY THAT MIGHT
24  BE SO?
25  A.  THIS IS THE EXPLANATION FOR WHY I BELIEVE THE WALL

**2381**

1  OVERTOPPED.  AND THE DATA THAT I LOOKED AT INDICATE THAT THE WALL
2  WAS LOWER, THE WALL TOP WAS LOWER WITHIN THE LIMITS OF THE
3  SOUTHERN BREACH.
4  Q.  ALL RIGHT.  SO LET'S MOVE TO ANOTHER FEATURE OF THE SOIL
5  CONDITIONS WITHIN THE LIMITS OF THE SOUTH BREACH.
6       MAY I HAVE THE NEXT SLIDE, PLEASE.
7       WE'RE LOOKING NOW AT DEFENDANT'S EXHIBIT 313, BAKEER
8  SUPPLEMENT REPORT, PLATE 6, AS WE HAVE HAD IT RENDERED
9  PROFESSIONALLY RATHER THAN BY HAND.
10       DR. BAKEER, WOULD YOU ORIENT THE COURT WITH THE BORING
11  CHART FOR THE MMG BORINGS THAT YOU LOOKED AT?
12  A.  TO REMIND THE COURT WITH WHAT WE DISCUSSED YESTERDAY, THAT'S
13  THE BACK END OF THE SHIP THAT WE LOOKED AT, SO THAT'S A
14  CONTINUATION OF THE DIAGRAM WE SHOWED.
15       BUT THAT STARTS FROM AXES 12 ON THE SOUTH END HERE TO,
16  I BELIEVE THIS IS, AXIS 38.  I'M SORRY, I CAN'T READ IN THE
17  DISTANCE, BUT I CAN READ IT ON MY SCREEN.  IT'S 38.
18       SO, AGAIN, THEY DRAW SOME LINES OR AXES AT A UNIFORM
19  GRID, AND THEY DID SOME BORE HOLES AT SELECTED LOCATIONS, NOT
20  NECESSARILY AT ALL LOCATIONS.  SO YOU CAN SEE, WE SEE SOME BORE
21  HOLES DONE ALONG AXES, I BELIEVE THAT'S 29, FOR EXAMPLE.  YOU SEE
22  MORE ON 29, YOU SEE A FEW MORE HERE.  AGAIN, THE SAME AXES.
23       THE CLOSEST TO THE FLOODWALL, WHICH IS ABOUT 20 OR
24  30 FEET OR SO AWAY FROM THE WALL, WAS AXIS AA OR AA PRIME.  THE
25  FURTHEST AROUND, AND I MENTIONED TO THE COURT YESTERDAY THAT K

**2382**

1  MAY NOT NECESSARILY HUG THE END OF THE SHORELINE ABOVE THE IHNC.
2  YOU CAN SEE THERE IS WATER HERE.  THAT'S THE SHORELINE AT
3  THE TIME WHEN MMG DID THEIR WORK.
4  Q.  NOW WE'RE GOING TO FOCUS OUR ATTENTION ON THE A TO AA LINE.
5  LET'S GO TO THE NEXT SLIDE.
6       THIS IS -- THE A TO AA LINE IS HIGHLIGHTED ON THIS
7  SLIDE.  AND THE LIMITS OF THE SOUTH BREACH ARE BETWEEN WHICH GRID
8  POINTS?
9  A.  IT'S ABOUT STATION 13 PLUS, MAYBE, 13, 20 OR SO, AND IT ENDS
10  AROUND 28, 8.  YOU CAN SEE IT MARKED WITH A RED BLOCK, WITH A
11  PINKISH AREA HERE ON TOP OF IT, SO.
12  Q.  WITHIN THE AREA THAT'S THE CLOSEST TO THE CENTER OF THAT BIG
13  BOW IN THE NORTHERN AREA, IS THERE A STATION THAT'S NEAREST THE
14  CENTER OF THAT BIG BOW?
15  A.  IT WOULD BE AROUND 25, 24, 26, BUT MAINLY AROUND 25.
16  Q.  ALL RIGHT.  NOW, WE'RE GOING TO LOOK AT THE RENDERING YOU'VE
17  DONE OF THE RESULTS OF THOSE BORINGS ALONG THAT A AXIS.
18       MAY WE HAVE THE NEXT SLIDE.  THIS IS DEFENDANT'S
19  EXHIBIT 313, BAKEER SUPPLEMENTAL REPORT, PLATE 25.
20       DR. BAKEER, DESCRIBE FOR THE COURT THE GRAPH THAT YOU
21  DREW REPRESENTING THE RESULTS OF BORINGS ALONG THAT A AXIS
22  INCLUDING WITHIN THE LIMITS OF THE SOUTHERN BREACH.
23  A.  TO ORIENT THE COURT WITH THE GEOGRAPHY OR THE GEOMETRY YOU
24  SEE, THE NORTH WOULD BE ON THIS END, WHICH IS THE RIGHT-HAND
25  SIDE, THE SOUTH WOULD BE ON THAT SIDE.  SO THE CLAIBORNE BRIDGE

**2383**

1  ON THE SOUTH, THE FLORIDA AVENUE BRIDGE IS ON THE NORTH.
2       FOCUSED ONLY ON BORINGS 13 A THROUGH 37 A, WHICH
3  INCLUDE THE BREACH AND GOES BEYOND THE BREACH TO THE NORTH.
4  Q.  THE BREACH IS REPRESENTED WITHIN THE LIMITS OF 29 A AS THE
5  END TOWARD THE NORTH AND SOMEWHERE AROUND 15 A OR THEREABOUTS IS
6  THE END TOWARD THE SOUTH; IS THAT FAIR?
7  A.  CORRECT.  YOU CAN SEE THE TWO RED TAGS HERE INDICATING THE
8  APPROXIMATE LIMITS OF THE --
9  Q.  NOW, WITH RESPECT TO THE YELLOW SHADED MATERIAL, WHAT DID
10  YOU OBSERVE AND WHAT DOES IT MEAN?
11  A.  WHAT I DID HERE IS, AGAIN, I BROKE THE FILL, AS DEPICTED IN
12  THE BORING LOGS FROM MMG, INTO TWO TYPES OF FILLS, A GRANULAR
13  FILL -- AND PREDOMINANTLY HERE SP STANDS FOR POORLY GRADED SAND,
14  SM STANDS FOR SILTY SAND, AND THEN A THIRD TYPE MATERIAL WHICH IS
15  A SHELL, WHICH IS ALSO A GRANULAR.
16  Q.  NOW, YOU ALSO HAVE A BLUE DIAMOND HERE THAT YOU'VE
17  HIGHLIGHTED THAT SAYS "NO RECOVERY", AND YOU HAVE A GREEN DIAMOND
18  THAT SAYS "PT".  DESCRIBE WHAT THE GREEN DIAMOND REPRESENTS
19  FIRST.
20  A.  THE GREEN DIAMOND, AS THE TEXT SAYS ON THE BLUE DIAMOND, NO
21  RECOVERY, MEANING THAT THE SAMPLER PUSHED IN THE GROUND CAME UP
22  EMPTY.
23  Q.  SO YOU'RE NOW DESCRIBING THE BLUE DIAMOND.
24  A.  THAT IS CORRECT.  YES, I AM.
25  Q.  SO WE'LL START WITH THE BLUE THEN.  NO RECOVERY.  SO TELL

**2384**

1  THE COURT WHAT NO RECOVERY MEANS AND HOW IT RELATES TO YOUR
2  CONCLUSION REGARDING THE WEAK LINK.
3  A.   THE NO RECOVERY WAS NOT LIMITED -- AND I WILL EXPLAIN THE NO
4  RECOVERY --
5  Q.   YEAH.   WHY DON'T YOU EXPLAIN WHAT NO RECOVERY MEANS FIRST,
6  AND THEN WE CAN --
7  A.   NO RECOVERY MEANS ONE OF THREE POSSIBILITIES:   THAT YOU PUSH
8  THE SAMPLER -- THE SAMPLER IS NOTHING BUT AN OPEN TUBE.   YOU PUSH
9  YOU PUSH THE TUBE IN THE GROUND, WHETHER IT'S PLASTIC OR METAL, YOU PULL
10  IT OUT, YOU RETRIEVE A SAMPLE.   THAT'S WHAT YOU TAKE IN THE LAB
11  AND ANALYZE.
12       IF YOU PUSH THE TUBE, IT CAME OUT EMPTY, THE FIRST
13  POSSIBILITY IT'S A VOID.   THERE IS NO SOIL.   THERE IS NOTHING.
14  YOU PUSHED THE TUBE THROUGH A VOID IN THE GROUND.
15       AND THE SECOND POSSIBILITY IS YOU PUSHED THE SOIL --
16  THE TUBE INTO A GRANULAR MATERIAL, SAND OR THE LIKES.   THIS IS A
17  LOWER POSSIBILITY, BUT IT'S ALSO POSSIBLE, IT FELL FROM THE TUBE.
18  THE COURT:   COUNSEL, TO MAKE SURE I UNDERSTAND THIS
19  CHART BEFORE WE GO ON, RIGHT NOW WE'RE LOOKING AT ALONG THE LINE
20  OF 25 A?
21  MR. RAFFMAN:   YES, SIR.   THIS WOULD BE -- WELL, IT'S
22  ACTUALLY -- THE SAMPLE IS THE 25 A SAMPLE, JUDGE, WHICH IS THE
23  BORING THAT IS TAKEN ALONG THE 25 AXIS FROM EAST TO WEST AND THE
24  A AXIS FROM NORTH TO SOUTH, SO IT REPRESENTS A SINGLE -- THAT
25  SAMPLE -- THE BORING.

**2385**

1       THE COURT:   I UNDERSTAND.   AND WHAT DEPTH ARE WE?   I SEE
2  THE BOTTOM OF THE SHEET PILE, SO IS THERE NO RECOVERY AT A
3  CERTAIN DEPTH, OR IS THERE NO RECOVERY AT ANY DEPTH?   I'M NOT
4  QUITE CERTAIN.
5       MR. RAFFMAN:   YOUR HONOR, IT IS AT A CERTAIN DEPTH.   AND
6  IF WE WENT TO THE BORING LOG, WE COULD FIND THAT DEPTH.   THE
7  BORING LOG FOR 25 A IS INCLUDED WITHIN THE SLIDE DECK FOR
8  DR. MARINO, AND IF --
9       THE COURT:   I'M JUST CURIOUS.   THERE IS A BORING TO A
10  CERTAIN DEPTH, AND YOU GET -- YOU MAY GET STRATA -- DIFFERENT
11  TYPES OF MATERIAL WITHIN THE BORING, OR YOU MAY GET THE SAME
12  TYPE, OR YOU MAY GET APPARENTLY NOTHING.   I GUESS WHAT I'M
13  INTERESTED IN, DOES THIS BORING ONLY YIELD NO RECOVERY, OR A
14  PORTION OF IT AT A CERTAIN DEPTH YIELDED NO RECOVERY AND WHAT
15  DEPTH WAS THAT?
16       MR. RAFFMAN:   WHY DON'T YOU -- I'LL LET THE WITNESS TELL
17  YOU THE ANSWER TO THAT.
18       THE COURT:   BECAUSE IT'S MEANINGLESS TO ME UNTIL I GET
19  ALL OF THAT.
20       MR. RAFFMAN:   RIGHT.
21       THE COURT:   AND WE'RE GOING TO THAT.   OKAY.
22       THE WITNESS:   HERE IS THE BORING LOG.   AND I BELIEVE, IF
23  YOU LOOK AT THE NUMBER NEXT TO MY MARK HERE, THAT'S ABOUT
24  ELEVATION FIVE.
25       THE COURT:   IF YOU COULD PUT THE MIC, WHEN YOU DO THAT,

**2386**

1  A LITTLE NEXT TO --
2       MR. RAFFMAN:   AND LET'S TRY TO BLOW THAT UP BECAUSE THE
3  DEPTH IS SHOWN THERE, AND THERE IS SOMETHING ELSE THERE THAT MAY
4  BE RELEVANT.
5       THE WITNESS:   EXACTLY.   THAT'S WHAT I SAID.   IT STARTS
6  ABOUT ELEVATION FIVE.   AND YOU CAN SEE THE TECHNICIAN AT THE
7  FIELD WROTE THE WORD "NO RECOVERY."
8       LET ME ADD TO THIS, JUST ALSO TO ASSIST THE COURT
9  IN UNDERSTANDING THOSE LOGS, YOU SEE THE NUMBER 40 ON THIS SIDE?
10       THE COURT:   YES.
11       THE WITNESS:   MEANING THAT THEY PUSHED A TUBE OF A GIVEN
12  LENGTH, THAT 40 PERCENT WAS NO RECOVERY, MEANING --
13       CAN I GO TO THE TOP MARK?   I THINK IT'S RECOVERY
14  RATIO.   CAN I SEE THE HEADING?   CAN YOU ENLARGE THE HEADING ON
15  THE TOP?   I THINK IT'S THE PERCENT RECOVERED.   CORE RECOVERY,
16  CORRECT.   THAT'S THE PERCENT RECOVERED.
17       SO IF YOU SEE A 40 PERCENT, MEANING THAT THE SAMPLE
18  THAT THEY RETRIEVED ONLY FILLED UP 40 PERCENT OF THE TUBE THAT
19  YOU PUSHED.   SO LET'S SAY THE TUBE IS TWO FEET, YOU GOT
20  40 PERCENT OF TWO FEET.
21       THE COURT:   SO WHAT WAS THE DEPTH?   AND I THINK I KNOW,
22  BUT JUST FOR -- WHAT WAS THE DEPTH OF THIS PARTICULAR SAMPLE, THE
23  MAXIMUM DEPTH?
24       THE WITNESS:   THERE WAS NO RECOVERY FROM THE FIVE FOOT
25  DEPTH, AS YOU CAN SEE HERE, JUDGE, ON -- NEXT TO IT.   LET ME

**2387**

1  CLEAR THE SCREEN.
2            EXAMINATION
3  BY MR. RAFFMAN:
4  Q.   LET'S SEE IF WE CAN GET THE --
5  A.   CAN WE START FROM THE ONE ON THE LEFT MARK, PLEASE?
6  Q.   SURE.   THE ONE ON THE LEFT HAS THE WATER AND THE DEPTH
7  DOWN --
8  A.   AND I WILL POINT THE BEGINNING OF THE NO RECOVERY, WHICH IS
9  ZERO RECOVERY IN THIS CASE, IT STARTS AT THE FIVE-FOOT DEPTH FROM
10  THE GROUND SURFACE.
11  Q.   SO FROM FIVE FEET TO NINE, THERE IS NO RECOVERY.
12       THE COURT:   RIGHT.
13       THE WITNESS:   THEN, THE CONTINUATION --
14            EXAMINATION
15  BY MR. RAFFMAN:
16  Q.   THEN ON THE SECOND PAGE -- MOVE TO THE LOG.
17  A.   CAN I MOVE TO THE NEXT PAGE?
18       MR. RAFFMAN:   I'M AFRAID, JUDGE, THAT THE WAY WE HAVE
19  RENDERED THIS IN OUR GRAPHIC, WE HAVE CUT OFF THE --
20       THE WITNESS:   MY RECOLLECTION, MARK, IF THE BOTTOM OF
21  THIS HOLE -- CAN YOU GO BACK TO THE BOTTOM OF THE FIRST PAGE?
22  BECAUSE IT SHOWS WHERE THAT ENDED.   THAT'S NINE.   I BELIEVE IT
23  GOES FOR ANOTHER THREE FEET.   SO I HAVE FROM 5 TO 12 --
24       THE COURT:   FOR THE NO RECOVERY?
25       THE WITNESS:   CORRECT.

7 (Pages 2384 to 2387)

**2388**

1   THE COURT: WERE ALL THE BORINGS OF THE -- THIS IS MMG,
2   THE MMG BORING LOG?
3   THE WITNESS: THAT IS CORRECT.
4   THE COURT: ALL THE BORINGS ARE BASICALLY UNIFORM IN
5   DEPTH?
6   THE WITNESS: NO.
7   THE COURT: SO WHAT WAS THE DEPTH, THE BOTTOM DEPTH OF
8   THIS BORING?
9   THE WITNESS: I BELIEVE IT'S 22 FEET BELOW THE GROUND
10  SURFACE.
11  THE COURT: ALL RIGHT.
12  EXAMINATION
13  BY MR. RAFFMAN:
14  Q. THANK YOU, DR. BAKEER.
15  A. CAN I ADD SOMETHING HERE, TOO, QUICKLY?
16  THIS IS NOT THE ONLY BORING WITHIN THE SOUTHERN BREACH
17  LIMIT THAT DIDN'T SHOW NO RECOVERY. THERE WERE SEVERAL, BUT I
18  WANTED TO EMPHASIZE THE CLOSEST ONE TO THE WALL. BUT YOU CAN
19  FIND BORINGS WITH NO RECOVERY ALONG THE E AXIS, ALONG THE G AXIS,
20  ALONG THE I AXIS. AND ONE OF THEM WAS A VOID THAT THE TECHNICIAN
21  SAID ONLY BLACK WATER WAS RECOVERED, SO -- AND ONE OF THEM
22  INDICATES THE WORD "VOID." IT DOESN'T SAY NO RECOVERY, IT SAYS
23  "VOID". THAT AREA, BASED ON THE MMG BORING, WAS LIKE SWISS
24  CHEESE, WITH A BUNCH OF VOIDS AND HOLES AND SO FORTH.
25  Q. AND IF YOU HAVE --

**2389**

1   THE COURT: AND WHAT WAS THE PROXIMITY OF THIS IN
2   RELATION TO THE ACTUAL CONSTRUCTION OF THE LEVEE? IN OTHER
3   WORDS, IF WE TAKE THE CENTER LINE OF THE FLOODWALL, HOW FAR IS
4   THIS FROM THE -- THIS NO RECOVERY FROM THE CENTER LINE OF THE
5   FLOODWALL?
6   MR. RAFFMAN: WE'RE GOING TO SHOW YOU.
7   THE COURT: GOOD. IT'S COMING UP. I SHOULD HAVE KNOWN.
8   THE WITNESS: IT'S ABOUT 20 FEET AWAY -- CROSS-SECTION
9   AA PRIME IS ABOUT 20 FEET AWAY FROM THE WALL. THE TIP OF THE
10  SHEET PILE, YOU CAN SEE IT ON THIS, YOUR HONOR.
11  MR. RAFFMAN: I'M SORRY, WE HAVE DUELING POINTERS.
12  THE COURT: IT'S LIKE STAR WARS HERE. BUT I DO
13  UNDERSTAND WITH THE -- IS THAT DOT PART OF THE GRAPH?
14  MR. RAFFMAN: LET'S CLEAR THAT DOT. IT'S NOT. AND IF
15  YOUR HONOR WOULD LIKE, WE CAN ASK THE WITNESS TO PLACE A MARK BY
16  THE LOCATION OF 25 A.
17  THE COURT: I WOULD.
18  MR. RAFFMAN: ALL RIGHT, DR. BAKEER, PLEASE USE YOUR
19  INDICATOR TO PLACE A MARK ON THIS SLIDE BY THE LOCATION WHERE
20  BORING 25 A WAS TAKEN.
21  ALL RIGHT. AND SO, WITH THE PERMISSION OF THE
22  COURT AND COUNSEL, WE'LL MARK THAT AS 355.
23  THE COURT: THAT'S HELPFUL.
24  MR. RAFFMAN: DEFENDANT'S EXHIBIT 355.
25  THE WITNESS: CAN I SAY SOMETHING QUICKLY?

**2390**

1   EXAMINATION
2   BY MR. RAFFMAN:
3   Q. DO YOU HAVE ANYTHING YOU WANT TO ADD TO YOUR DISCUSSION OF
4   THIS SLIDE, DR. BAKEER?
5   A. IT'S WHAT I MENTIONED TO THE COURT A MINUTE AGO, THAT ALSO
6   AXIS I, THERE WERE NO RECOVERIES WITH VOIDS; AXIS G, THERE WERE
7   NO RECOVERY WITH VOIDS; AXIS D, THERE WERE SOME RECOVERIES; AND,
8   ALSO, AXIS E.
9   BUT THE REASON FOR WHY I CONSTRUCTED A CROSS-SECTION
10  RIGHT HERE IS THE SCARCITY OF BORINGS. YOU DON'T HAVE A
11  CONTINUITY OF SOME AXIS, SO YOU HAVE FEWER BORINGS.
12  THE COURT: IS IT MORE SIGNIFICANT TO THE INTEGRITY OF
13  THE FLOODWALL IF THE NO RECOVERY IS IN PROXIMITY TO THE ACTUAL
14  PLACEMENT OF THE FLOODWALL?
15  THE WITNESS: CORRECT.
16  THE COURT: ERGO WHY YOU PICKED THIS ONE. I UNDERSTAND.
17  THE WITNESS: CORRECT.
18  MR. RAFFMAN: THANK YOU, YOUR HONOR. THANK YOU,
19  DR. BAKEER.
20  BEFORE WE LEAVE THE NO RECOVERY TOPIC, I WANT TO
21  PUT ANOTHER -- MAY WE MOVE ON WITH THE CAPTURE? I'M SORRY.
22  THE COURT: YES.
23  MR. RAFFMAN: ARE WE ARE READY TO PROCEED?
24  THE DEPUTY CLERK: I'M GETTING READY TO CAPTURE IT NOW.
25  MR. RAFFMAN: LET'S CAPTURE IT, AND THEN WE'LL PROCEED.

**2391**

1   THANK YOU.
2   WE'RE READY. OKAY. MAY I HAVE THE NEXT SLIDE,
3   PLEASE.
4   EXAMINATION
5   BY MR. RAFFMAN:
6   Q. WE'RE NOW LOOKING AT DEFENDANT'S EXHIBIT 145. THIS IS THE
7   IPET REPORT, VOLUME FIVE, FIGURE 22. AND TO ORIENT THE COURT,
8   THIS HEADING SAYS THIS IS THE 17TH STREET EAST, A REPRESENTATION
9   OF THE -- IS THIS, DR. BAKEER, A REPRESENTATION OF THE SOIL
10  BORING DATA FOR THE 17TH STREET CANAL?
11  A. THIS IS CORRECT.
12  Q. AND WHEN YOU LOOKED AT THE DATA, DR. BAKEER, CAN YOU POINT
13  THE COURT TO THE LOCATION OF THE 17TH STREET BREACH?
14  A. THE 17 IS MARKED ON THE TOP OF THE DIAGRAM. IT SAYS
15  17TH STREET BREAK, WHICH IS THE LIMITS OF THE 17.
16  Q. AND WITH RESPECT TO THE TOPIC --
17  THE COURT: A CASE WE NEVER GOT TO TRY, SO THIS IS
18  INTERESTING. GO AHEAD.
19  MR. RAFFMAN: I'M NOT GOING TO SAY WHAT I'M THINKING,
20  JUDGE.
21  THE COURT: NO. THANK YOU FOR YOUR RESTRAINT.
22  EXAMINATION
23  BY MR. RAFFMAN:
24  Q. DR. BAKEER, WITH RESPECT TO THE ISSUE OF NO RECOVERY, DID
25  YOU OBSERVE ANYTHING ABOUT THE BORING DATA FOR THE 17TH STREET

**2392**

1  BREAK THAT IS GERMANE TO YOUR CONCLUSION?
2  A.  YES, I DO.
3  Q.  WHY DON'T YOU EXPLAIN FOR THE COURT WHAT YOU OBSERVED IN THE
4  DATA.
5  A.  ONE BIG SIMILARITY IS PUBLISHED THROUGHOUT THE PUBLICATIONS
6  DISCUSSING THE 17TH CANAL. IT'S IN ILIT, IT'S IN IPET, IT'S IN
7  ALL THESE DOCUMENTS.
8       JUST TO ILLUSTRATE WHAT THIS DIAGRAM MEANS, ANY
9  RECTANGULAR AREA RIGHT HERE IS INDICATING A BORING LOCATION. ON
10  TOP OF THE BORING LOCATION IS THE END OF THE DIAGRAM. SO THEY
11  ARE NOT NECESSARILY MADE FROM THE SAME GROUND LEVEL, SO THIS IS A
12  HIGHER GROUND LEVEL THAN THIS BORING, THIS IS SLIGHTLY HIGHER,
13  THIS IS HIGHER, AGAIN, AND SO FORTH.
14       THE TWO OBSERVATIONS THAT, LIKE I SAID, ARE NATIONALLY
15  RECOGNIZED AND AGREED UPON, YOU SAW AREAS OF NO RECOVERY IN THE
16  17TH CANAL WHICH ARE PRETTY MUCH WITHIN THE LIMITS. YOU SEE THIS
17  BORING, YOU SEE THIS BORING, AND YOU SEE THIS BORING. YOU SEE NO
18  RECOVERY, YOU SEE NO RECOVERY, NO RECOVERY.
19  Q.  AND NO RECOVERY IS REPRESENTED BY WHAT COLOR?
20  A.  THE WHITE COLOR.
21       AND YOU CAN THEN SEE RIGHT HERE NO RECOVERY SAMPLES.
22  THE PUBLISHED LITERATURE, THE DATA AVAILABLE FOR THE 17TH CANAL
23  INDICATE ALSO THAT SOME SOILS EXHIBITED STRENGTH LOWER, MUCH
24  LOWER THAN WHAT WAS ASSUMED IN THE DESIGN.
25       THE SECOND OBSERVATION IS ONLY MINE. IF YOU DON'T

**2393**

1  MIND, COUNSELOR, IF YOU CAN GET BACK THE FULL PICTURE.
2       YOU NOTICE THIS DEPRESSION. THE BLUE LINE HERE
3  REPRESENTS TWO DISTINCTIVE GEOLOGICAL FORMATIONS. THE UPPER
4  GEOLOGICAL FORMATION IS THE RECENT DEPOSITS, AND WHEN WE TALK IN
5  GEOLOGY WE'RE TALKING A COUPLE OF MILLION YEARS, BUT IT'S STILL A
6  RECENT DEPOSIT.
7       YOU SEE WHAT WE CALL A "COMPETENT PLEISTOCENE". THE
8  PLEISTOCENE IS A MUCH OLDER SOILS. THEY ARE STIFFER. THEY ARE
9  BETTER.
10       I WOULD LIKE TO POINT THIS WHICH IS VERY CRITICAL IN MY
11  OPINION BECAUSE IT'S EXACTLY THE SAME SITUATION AT THE IHNC SOUTH
12  BREACH. YOU NOTICE THE DEPRESSION ON THE PLEISTOCENE HEIGHT.
13  RIGHT AT THE LIMITS OF THE SOUTHERN BREACH YOU SEE THE
14  PLEISTOCENE HERE IS LOWER, THEN IT CROPS BACK AGAIN OUTSIDE.
15  THIS IS GOING TO AFFECT THE SETTLEMENT PATTERN. THE SETTLEMENT
16  IS A FUNCTION OF HOW THICK OR HOW DEEP IS THE SOFT MATERIALS ON
17  THE SURFACE. YOU CAN SEE YOU GET MORE THAN YOU GET HERE.
18       THE COURT: ARE YOU SAYING AS AN EXAMPLE, JUST TO USE
19  COLORS, IS THE COLOR ABOVE THE BLUE WHAT'S CHARACTERIZED ON THE
20  CHART AS "BAY", "SOUND", "ESTUARINE"?
21       THE WITNESS: CORRECT. THAT'S THE GREEN-LIKE COLOR.
22       THE COURT: AND THE BLUE IS THE PLEISTOCENE?
23       THE WITNESS: I WILL PUT TWO MARKERS. THE PLEISTOCENE
24  IS THIS ONE AND THIS.
25       THE COURT: AND WHAT YOU'RE POINTING OUT IS, IS THAT THE

**2394**

1  MATERIAL THAT WOULD BE NOT AS -- IN ESSENCE, THE SHEAR STRENGTH
2  WOULD BE LESS, IS DEEPER WHERE THE BREACH OCCURRED.
3       THE WITNESS: CORRECT. IF WE LOOK AT THE DIFFERENCE
4  BETWEEN THIS LINE AND THIS LINE HERE, YOU SEE THAT YOU GET
5  THICKER COMPRESSIBLE MATERIAL HERE THAN YOU GET RIGHT THERE OR
6  RIGHT THERE.
7       THE COURT: SO JUST OUT OF CURIOSITY, WHAT DOES ONE DO
8  IF ONE IS BUILDING A LEVEE THERE AND ONE ASCERTAINS THIS BY THE
9  GEOTECHNICAL INFORMATION?
10       THE WITNESS: THIS WOULD HAVE CAME UP IF THE 17TH CANAL
11  WAS ON TRIAL, SO IT IS AN ISSUE WHETHER YOU CONSIDER ONE
12  CROSS-SECTION THROUGHOUT WHAT WE CALL A "LEVEE REACH". WE MAY
13  DIVIDE THE LEVEE OR THE FLOODWALL IN WHAT WE CALL "SUBREACHES".
14  SO A LEVEE, SAY, A MILE LONG LEVEE MAY BE DESIGNED AS FOUR
15  INDIVIDUAL CROSS-SECTIONS AND REACHES.
16       THE COURT: SO YOU MIGHT HAVE DIFFERENT, SAY, LENGTHS OF
17  SHEET PILE AT DIFFERENT AREAS?
18       THE WITNESS: OR A WIDER LEVEE OR A HIGHER --
19       THE COURT: OR SOME OTHER FUNCTION TO INCREASE
20  STABILITY?
21       THE WITNESS: CORRECT. BUT, TYPICALLY, BECAUSE OF THE
22  UNCERTAINTY ASSOCIATED WITH THE SOIL CONDITIONS -- SOILS ARE A
23  DIFFERENT BREED THAN STRUCTURAL MATERIALS. THEY ARE NATURAL
24  MATERIALS CREATED BY NATURE. STEEL AND CONCRETE ARE MANUFACTURED
25  IN A PLANT UNDER QUALITY CONTROLS. IF I ASK FOR A CONCRETE OF A

**2395**

1  GIVEN STRENGTH, I GET IT, AND I TEST IT AND I GET THE NUMBER.
2       SOILS VARY BY THE GEOLOGICAL HISTORY, THE
3  DEPOSITION HISTORY, ET CETERA. SO, IN OTHER WORDS, IF I SEE A
4  WEAK ZONE, I'M MORE LIKELY THAN NOT TO USE A UNIFORM PILE BASED
5  ON THE WEAKEST AREA.
6       THE COURT: I SEE. OKAY. AND FORGIVE ME FOR THE
7  DEVIATION. I REALIZE IT DOESN'T NECESSARILY RELATE SPECIFIC TO
8  THE ISSUES HERE. THANK YOU, COUNSEL.
9       MR. RAFFMAN: YOU'RE MOST WELCOME, YOUR HONOR.
10       EXAMINATION
11  BY MR. RAFFMAN:
12  Q.  IF WE'RE READY, THEN, TO MOVE AWAY FROM THE NO RECOVERY
13  ISSUE TO ONE MORE SLIDE ABOUT SOIL CONDITIONS AND POTENTIAL
14  WEAKNESSES IN THE SOIL.
15  A.  COUNSEL, CAN I -- THERE WERE THREE POINTS FOR NO RECOVERY.
16  I EXPLAINED TWO, BUT I BELIEVE I DID NOT EXPLAIN THE THIRD ONE.
17  Q.  I'M SORRY. IF I MISSED ONE, DR. BAKEER, PLEASE EXPLAIN THE
18  THIRD POINT ON NO RECOVERY.
19  A.  BECAUSE WE HAD SWITCHED TO SOME OTHER QUESTION. I SAID THE
20  FIRST ONE IS A PRESENCE OF A VOID. THERE IS NOTHING TO SAMPLE.
21  Q.  ALL RIGHT.
22  A.  THE SECOND ONE IS A GRANULAR MATERIAL THAT WOULD FALL FROM
23  THE TUBE. THIS IS LESS LIKELY IN MY OPINION.
24       THE THIRD, AND VERY CRITICAL FOR THE 17TH AND THE IHNC,
25  THAT THE MATERIAL WAS SO SOUPY, VERY SOFT, IT HAS ALMOST NO

**9 (Pages 2392 to 2395)**

2396

1  STRENGTH, WHICH GETS BACK TO THE POINT THAT THE JUDGE MADE.  IT'S
2  A SOFT MATERIAL THAT WHEN YOU LIFT THE TUBE, THAT FLUID-LIKE
3  MATERIAL FALLS OFF THE TUBE UNDER GRAVITY LOAD.
4      SO THAT'S, TO ME -- IN MY OPINION, NUMBER ONE AND THREE
5  WERE PRESENT AT THE 17, AND THEY WERE ALSO PRESENT AT THE IHNC.
6  Q.  THESE HELP TO EXPLAIN WHY A NO-RECOVERY SAMPLE IS A SIGN
7  THAT YOU HAVE SOILS THAT ARE WEAKER THAN THEIR SURROUNDING SOILS;
8  IS THAT FAIR?
9  A.  CORRECT.  AND I THINK THAT'S WHERE MMG ON THEIR LOGS
10  DIFFERENTIATED BETWEEN THE WORD "VOID" AND "NO RECOVERY."
11  BECAUSE WHEN THEY HAD NO RECOVERY, IT DOESN'T MEAN NECESSARILY
12  THAT THERE IS A VOID, BUT THERE IS A MATERIAL THAT'S SO POOR OR
13  SO SOFT THAT IT'S NOT RECOVERABLE.  BUT A VOID, I BELIEVE THEY
14  SAID IT'S A VOID WITH BLACK WATER IN IT, SO THAT WAS SOMETHING.
15  Q.  SO, THANK YOU, DR. BAKEER, FOR REMINDING ME THAT I HAD
16  MISSED ONE.
17      THE LAST SLIDE, I THINK, IN THE SEQUENCE IS A SLIDE
18  THAT'S DEFENDANT'S EXHIBIT 58.  DR. BAKEER, DID YOU NOTICE
19  ANYTHING WHEN YOU REVIEWED SLIDES OF SOIL CONDITIONS WITHIN THE
20  AREA OF THE SOUTH BREACH THAT RELATED TO THE PRESENCE OF SHELL
21  WITHIN THE SOIL?
22  A.  TO ORIENT THE COURT, THIS IS THE CLAIBORNE BRIDGE.  IF YOU
23  SEE THAT WHITE LINE HERE, THAT WHITE LINE HERE AND SOME WHITE
24  MARKS EVERYWHERE, EVERY -- THIS IS SHELL.  SHELL IS A VERY HIGHLY
25  PERMEABLE MEDIUM THAT WILL TRANSFER WATER AT A VERY HIGH RATE

2397

1  THAN A GRANULAR SOIL LIKE SAND OR DEFINITELY MUCH, MUCH HIGHER
2  THAN CLAY.
3  Q.  ALL RIGHT.  NOW, I'M GOING TO GO TO THE NEXT SLIDE.  WE'RE
4  AT DEFENDANT'S EXHIBIT 205, BAKEER REPORT FIGURE 46.
5      AND, DR. BAKEER, HAVING NOW EXPLAINED WHY THE SOUTH
6  BREACH IS A WEAK AREA, I'D LIKE YOU TO TAKE THE COURT THROUGH
7  YOUR EXPLANATION OF HOW THE SOUTHERN BREACH OCCURRED, WHAT
8  HAPPENED THERE.
9  A.  THE SOUTH BREACH WAS UNIQUE, AS WE EXPLAINED EARLIER IN
10  DISCUSSION, AND ITS WALL TOP WITHIN THAT AREA -- OR I SAY THE
11  WALL TOP WITHIN THAT AREA WAS LOWER THAN THE AREAS TO THE NORTH
12  AND SOUTH.
13      SO THE FIRST UNIQUE DEVELOPMENT THAT WOULD BE PRESENT
14  IN A CASE LIKE THIS IS AN EARLIER SPLASHING, AN EARLIER
15  OVERTOPPING.  SO IF WE ASSUME THAT THE WATER IN THE CANAL IS AT A
16  GIVEN ELEVATION, IT DOESN'T MATTER, TEN FIVE, ELEVEN FIVE,
17  WHATEVER, THE WALL, IF IT'S HIGHER OUTSIDE THE AREA, YOU ONLY GET
18  MINOR SPLASHING; BUT, IF THE WALL IS LOWER THAN THE WATER LEVEL
19  IN THE CANAL, YOU'RE GOING TO GET EARLY OVERTOPPING CONFINED TO
20  THE AREA WHERE THERE IS A LOWER WALL TOPPING.
21      SO, IN MY OPINION, THAT THIS AREA WAS AN AREA THAT
22  EXPERIENCED A LOT OF SETTLEMENT.  THE GROUND WAS LOWER PROVIDING
23  LESS RESISTANCE TO THE STABILITY OF THE WALL.  THE WALL TOP WAS
24  LOWER.  THAT AREA EXPERIENCED EARLY OVERTOPPING AND EARLIER
25  SPLASHING.

2398

1  Q.  ALL RIGHT.  AND IN ADDITION, AS THE WATER RISES ON THE WALL,
2  WHAT HAPPENS ALONG THE FACE OF THE WALL?
3  A.  THE SAME THING THAT WE DISCUSSED ON THE NORTH WALL, THAT
4  YOU -- THE WALL WILL START LEANING BACKWARDS.  AND, AGAIN, YOU
5  DON'T NEED TO LEAN BY TWO, THREE INCHES, ONLY A SMALL GAP WOULD
6  DEVELOP, WHICH WE REFER TO IT IN OUR LITERATURE NOW AS THE
7  "TENSION CRACK" WOULD DEVELOP.
8  Q.  AND AS THE TENSION CRACK FORMS, WHAT HAPPENS TO THE WATER
9  PRESSURE ON THE WALL?
10  A.  THE FACE OF THE WALL ON THE FLOOD SIDE WOULD EXPERIENCE
11  MAYBE NINE TO TEN FOLDS, OR EVEN HIGHER, MAYBE 12-FOLD INCREASE
12  BASED ON THE -- AGAIN, HOW DEEP THAT TENSION CRACK WILL
13  PROPAGATE.
14  Q.  ALL RIGHT.  AND AS THE PRESSURE BUILDS ON THE WALL, DESCRIBE
15  FOR THE COURT THE FORMATION OF THESE BOWS.  MAYBE WE CAN GO TO
16  THE NEXT SLIDE AND WE CAN -- WE HAVE A SEQUENCE OF SLIDES TO HELP
17  WITH THIS.
18      DESCRIBE FOR THE COURT THE FORMATION OF THESE BOWS WITH
19  THE TENSION ON THE WALL AND THE PRESSURE AND THE, ALSO,
20  OVERTOPPING YOU'VE DESCRIBED.
21  A.  AGAIN, THIS IS THE CLAIBORNE BRIDGE, AND THAT'S THE SOUTH
22  BREACH.  THE YELLOW LINE, THE DASHED YELLOW LINE, IT REPRESENTS
23  THE STRAIGHT LINE ALIGNMENT.  IT DOESN'T SHOW THE DEVIATION THAT
24  WE SPOKE OF, BUT IT SHOWS WHERE APPROXIMATELY THE WALL USED TO
25  BE.

2399

1      THE GRAYISH BERM YOU SEE ON THE RIGHT-HAND SIDE IS THE
2  TEMPORARY REPAIR THAT THE CORPS OF ENGINEERS PLACED, SO THAT'S
3  THE TEMPORARY LEVEE THAT THE CORPS PLACED AROUND IT.  THIS IS THE
4  SOUTHERN LIMIT OF THE SOUTHERN BREACH, AND THIS IS THE NORTHERN
5  LIMIT OF THE SOUTHERN BREACH.
6  Q.  SO LET'S GO TO THE NEXT SLIDE.  AND YOU HAVE -- NOW, WHAT
7  ARE WE SHOWING HERE, DR. BAKEER?
8  A.  THIS SHOWS THE HYDROSTATIC PRESSURE.  THIS IS NOT SHOWING
9  WIND DIRECTION.  THIS IS NOT SHOWING WAVES DIRECTION.  THIS SHOWS
10  THE PRESSURE AS IT DEVELOPS.
11      JUST TO ILLUSTRATE THIS CONCEPT, IF YOU DIVE IN WATER,
12  YOU'RE SURROUNDED BY WATER FROM ALL DIRECTIONS.  THERE IS AN
13  EQUAL PRESSURE THAT'S ACTING ON ANYBODY EMERSED IN WATER.  SO THE
14  HYDROSTATIC PRESSURE ALONG THE ENTIRE LENGTH OF THE WALL IS EQUAL
15  AS LONG AS THE WATER LEVEL IS THE SAME.
16  Q.  AND AS THE WATER PRESSURE BUILDS, LET'S GO TO THE NEXT
17  SLIDE, WHAT BEGINS TO HAPPEN?
18  A.  IT STARTS FORMING -- IF YOU'LL RECALL THE VOIDS AND THE
19  NO-RECOVERY AREAS AND THE SOFT SOILS THAT EXISTED IN THE AREA,
20  THAT WALL IS PUSHED AND LEANED BACKWARDS AND TAKES THAT LITTLE
21  SHAPE HERE.  I CALL IT A "BOW SHAPE".  IT STARTS WITH A MILD
22  CURVE THAT YOU SEE AT THE END AND ANOTHER CURVE THAT DEFINES ITS
23  END.  SO THAT'S THE POINT OF INITIATION.
24  Q.  AND WE TAKE IT FORWARD.  NOW, WHAT IS HAPPENING HERE IN THIS
25  NEXT SLIDE, DR. BAKEER?

## 2400

1   A.  IN MY OPINION, THIS WAS THE SECOND WEAKEST LINK.  THIS WAS
2   THE THIRD WEAKEST LINK IN THE SYSTEM.  SO YOU START SEEING TWO
3   DISTINCTIVE BOWS THAT DEVELOP WITH -- THEY WERE NOT
4   INTERCONNECTED AT THAT TIME.  THAT STRAIGHT LINE, DASHED LINE
5   REMAINED IN PLACE.  THOSE PILES WERE NOT (INDICATING) -- YOU'VE
6   GOT ONE BUBBLE, AND YOU'VE GOT A SECOND BUBBLE.
7   Q.  AND AS THE WATER -- THE BREACH PROGRESSES.  AS THE BREACH
8   PROGRESSES, WHAT'S HAPPENING NEXT?
9   A.  BECAUSE OF THE LENGTH AND THE MOVEMENT OF THE WALL BACKWARDS
10  HERE, YOU START ACTUALLY PUSHING THE AREA THAT REMAINED IN THE
11  GROUND.  THIS GREW, THIS ONE GREW EVEN FURTHER.  THIS WAS THE
12  WEAKEST -- OR THE "SECOND WEAKEST", AS I CALLED IT, AND IT MOVED
13  BACKWARDS.
14      JUST TO ADD ONE THING, TOO.  AS A WALL STARTS LEANING,
15  AND I'M SHOWING IT WITH MY LASER POINTER, THE TRAJECTORY OF WATER
16  COMING FROM OVER THE TOP IS RIGHT HERE RIGHT NOW, RIGHT UNDER THE
17  VERTICAL WALL.  AS THE WALL LEANS BACK, THE TRAJECTORY OF THE
18  WATER COMING IS GOING TO GO FURTHER AND FURTHER AND FURTHER, SO
19  YOU GET FURTHER EROSION AND FURTHER LOSS OF SUPPORT.
20  Q.  AND LET'S COMPLETE THE SEQUENCE.  WHEN THE SEQUENCE IS OVER,
21  WHAT DO WE HAVE, DR. BAKEER?
22  A.  THE TWO OF THEM ARE JOINED IN THIS CASE AND BECAME ONE
23  CONTIGUOUS FAILURE, WHICH ACTUALLY STARTED FROM HERE TO HERE.
24  BUT WITH THE LEAST MOVEMENT HERE, THE MAXIMUM BOW IS AT THE
25  CENTER OF THE "APEX", AS I CALLED IT IN MY REPORT, OF THE SMALL

## 2401

1   BREACH, AND THIS IS THE MAXIMUM APEX, WHICH IS AT THE CENTER OF
2   THE BREACH.  SO THESE ARE THE TWO INITIATION POINTS WOULD BE THE
3   CENTERS OF THOSE TWO BOWS.
4   Q.  NOW, LET'S TAKE A COUPLE OF -- LOOK AT A COUPLE OF THE SCOUR
5   TRENCH PICTURES.  THE COURT HAS ALREADY SEEN SOME OF THIS THROUGH
6   DR. CUSHING, SO WE'LL MOVE MORE QUICKLY THROUGH IT.  BUT TELL THE
7   COURT WHAT WE'RE SEEING HERE IN THE NATURE OF A TRENCH IN THE
8   MIDDLE OF THE BREACH.  WHAT DO WE HAVE?
9   A.  WHAT YOU SEE IS A COMBINATION OF A TENSION CRACK AND A SCOUR
10  TRENCH BECAUSE NOW THE WALL IS SHOWN FROM THE GROUND.  SO IF
11  YOU IMAGINE THAT THE TENSION CRACK IS ON THE FLOOD SIDE FACE OF
12  THE WALL, THE SCOUR TRENCH IS BEHIND THE WALL ON THE BACK SIDE,
13  ON THE PROTECTED SIDE.  ONCE YOU PULL THE SHEET PILE, IT BECOMES
14  ONE BIG SWALE OR WHAT YOU SEE RIGHT NOW.
15      IT TELLS YOU THAT THERE IS -- EVEN DEEPER THAN THIS, IF
16  YOU LOOK AT THE WATER POUNDING INSIDE THIS AREA, IT TELLS YOU
17  THAT THE DEPTH OF THAT IS EVEN DEEPER THAN WHAT YOU SEE RIGHT
18  HERE.
19  Q.  ALL RIGHT.  NOW, IN TERMS OF THE OVERTOPPING AND THE TIME OF
20  OVERTOPPING -- WE CAN GO TO THE NEXT SLIDE -- YOU READ IN
21  TEAM LOUISIANA THAT TEAM LOUISIANA HAD CONCLUDED THAT THE TOP OF
22  THE WALL COULD HAVE BEEN A FOOT LOWER THAN THE 12.5 FEET FOUND IN
23  SURVIVING ADJACENT SEGMENTS.  WE'RE LOOKING HERE, OF COURSE, AT
24  DEFENDANT'S EXHIBIT 144, PAGE 126.
25      DR. BAKEER, DO YOU AGREE WITH TEAM LOUISIANA THAT THE

## 2402

1   TOP OF THE WALL WITHIN THIS LIMITS OF THE SOUTH BREACH COULD HAVE
2   BEEN A FOOT OR MAYBE EVEN MORE LOWER THAN THE ADJACENT SEGMENTS?
3   A.  I DO.
4   Q.  NEXT SLIDE, PLEASE.
5      AND YOU OBSERVED SCOUR TRENCHES.  TELL THE COURT WHAT
6   YOU OBSERVED IN THE PHOTOS REGARDING SCOUR TRENCHES.
7   A.  SCOUR TRENCHES EXTENDED EVEN BEYOND THE BREACHED AREAS.  YOU
8   CAN SEE HERE THE SCOUR TRENCH, IT NARROWS DOWN TOWARDS THE END
9   AND WIDENS AS YOU GO DOWN IN THIS DIRECTION.  IT ALSO IS DEEPER
10  IN SOME AREAS THAN OTHER AREAS.
11      AND, AGAIN, THIS IS A DRY DAY.  YOU DON'T SEE THE
12  PONDING.  BUT THAT WOULD BE, HOW DID I REACH THIS CONCLUSION,
13  FROM OBSERVING THE AREAS THAT PONDS.
14      THE SIZE OF THE TENSION CRACK -- I'M SORRY, THE SIZE OF
15  THE SCOUR TRENCH IS FUNCTION OF HOW MUCH OVERTOPPING TOOK PLACE
16  FOR HOW LONG BEFORE THE BACK SIDE GOT FLOODED AND STOPPED
17  THE GROWTH OF THE SCOUR TRENCH.
18  Q.  DID YOU OBSERVE THAT THE SCOUR TRENCH GREW DEEPER AND WIDER
19  AS YOU MOVED TOWARD THE LIMITS OF THE BREACH FROM THE CLAIBORNE
20  BRIDGE?
21  A.  CORRECT.  AND THEN IT'S REVERSE ON THE OTHER SIDE, AS WELL.
22  Q.  SO LET'S -- I THINK WE'LL DISPENSE WITH THE NEXT TWO SLIDES,
23  AND I'M GOING TO ASK MY COLLEAGUE, WE HAVE A MODEL SET UP TO HELP
24  PUT ALL OF THE PIECES TOGETHER WITH THE SOUTH BREACH.
25      DR. BAKEER, I'LL ASK YOU TO PUT ON A MICROPHONE.  AND

## 2403

1   USING THE PHYSICAL MODEL WE HAVE HERE, TAKE THE COURT THROUGH
2   YOUR SEQUENCE AS IT RELATES TO THE SOUTHERN BREACH.
3   A.  TO ILLUSTRATE FOR THE COURT, AND JUST TO ORIENT YOU, WE'RE
4   CALLING THE WATER SIDE AS THE SAME AS THE WORD WE USED BEFORE AS
5   FLOOD SIDE, SO THAT'S THE IHNC SIDE.
6      THE SLOPE HERE REPRESENTS THE SLOPE OF THE LEVEE, AND
7   THIS IS THE LEVEL GROUND AS YOU GO BEYOND THE LEVEE.  AND
8   YESTERDAY I ANSWERED THE QUESTION ABOUT THE TOE.  THAT WOULD BE
9   THE DEFINITION OF A TOE OF A LEVEE.  IT'S THIS LINE HERE.  THAT'S
10  THE LEVEE TOE.
11      THIS WOULD BE CALLED THE "LEVEE TOP" OR THE "LEVEE
12  CROWN".  AND AS WE -- AS I REVIEWED THE DRAWINGS, THIS SHOULD
13  HAVE BEEN ABOUT ELEVATION PLUS NINE MSL.
14      THIS IS THE SLOPE ON THE LOWER NINTH WARD SIDE, SO
15  THAT'S THE SLOPE OF THE LEVEE.
16      THE COURT:  WHAT WAS THE PLUS NINE?  I JUST WANT TO MAKE
17  SURE -- I
18      THE WITNESS:  THE PLUS NINE IS THIS ELEVATION.
19      MR. RAFFMAN:  WHAT DATUM IS IT?
20      THE WITNESS:  MSL.
21      THE COURT:  RIGHT.
22      THE WITNESS:  I THOUGHT I SAID MSL.
23      THE TOP OF THE WALL -- AGAIN, I WILL STICK TO MSL
24  IN ALL, SO I'M NOT GOING TO MENTION MSL EACH TIME, BUT THE TOP OF
25  THE WALL IS ABOUT ELEVATION 15.

## 2404

1  THE COURT:  OKAY.

2  MR. RAFFMAN:  WHEN YOU SAY 15, THAT IS GENERALLY

3  SPEAKING OR WITHIN THE LIMITS OF THE BREACH?

4  THE WITNESS:  AT THE TIME OF DESIGN.  IT WAS DESIGNED

5  FOR 15, BUT IT IS NOT NECESSARILY AT THE TIME OF THE STORM.

6  THE COURT:  SO THE WALL, GENERALLY SPEAKING, THEN, WOULD

7  BE SIX FEET ABOVE?

8  THE WITNESS:  THE DIFFERENCE IS 6 FEET.

9  THE COURT:  YES, THE CROWN OF THE LEVEE.

10  THE WITNESS:  ACCORDING TO THE GDM, BUT NOT NECESSARILY.

11  THE COURT:  RIGHT.  OH, I UNDERSTAND.  WE'RE TALKING

12  ABOUT IN AN IDEALIC WORLD.

13  THE WITNESS:  JUST TO PUT SOMETHING HERE IN PERSPECTIVE,

14  THIS WALL WAS DESIGNED TO BE AT ELEVATION 15 WITH ANTICIPATION OF

15  HAVING ITS TOP AFTER 10 YEARS OR SO BEING AT 14.  SO THE CORPS

16  ASSUMED THAT THE WATER IS GOING TO SETTLE BY A FOOT, SO SAID IN

17  THE GDM.

18  SO IF WE IMAGINE THE RED LINE HERE REPRESENTS THE

19  SHEET PILE PENETRATION, SO THE TOP OF THE SHEET PILE IS AROUND

20  PLUS 12, SO IT'S ABOUT THREE FEET ON THE TOP.

21  MR. RAFFMAN:  AGAIN, MSL, DR. BAKEER?

22  THE COURT:  I'M GOING TO ASSUME MSL EVERY HEIGHT GIVEN

23  OR DEPTH.

24  THE WITNESS:  SO THAT'S THE PROTECTED SIDE.

25  A CYCLONE FENCE EXISTED ON THE BACK SIDE OF THE

## 2405

1  WALL.  IT WAS ABOUT 18 INCHES OR SO AWAY FROM THE BACK OF THE

2  WALL.  THIS SHOULD HAVE BEEN A CONSTRUCTION FENCE TO PREVENT

3  PEOPLE FROM, YOU KNOW, GETTING INTO THE CONSTRUCTION AREA, BUT

4  FOR SOME REASON IT WAS LEFT IN PLACE.

5  THE TIP OF THE SHEET PILE WAS AT MINUS 8 MSL.  THE

6  ZERO HERE IS JUST TO SHOW WHERE THE ZERO.  IT'S RELATIVE NUMBERS,

7  SO IT DOESN'T MEAN ANYTHING.

8  THE SOILS ON THIS SIDE ARE REPRESENTED BY DIFFERENT

9  COLORS.  A LEVEE MATERIAL -- AND, AGAIN, THAT'S AN IDEALIZED

10  CONDITION.  IT DOESN'T MEAN YOU'VE GOT STRAIGHT LINES.

11  THE COURT:  I UNDERSTAND.

12  THE WITNESS:  SO THAT'S AN IDEALIZED CONDITION.

13  THE YELLOW MATERIAL IS THE LEVEE MATERIAL WHICH IS

14  WHAT WE CALL IN OUR DESIGN, IT'S A "BORROW MATERIAL".  YOU BRING

15  IT FROM SOMEWHERE AND YOU PUT IT IN.  LEVEES ARE NOT MADE FROM

16  THE NATIVE SOILS AT THE SITE.  IT'S A BORROW MATERIAL OBTAINED

17  FROM A BORROW SOURCE.

18  AND AT THE TIME OF CONSTRUCTION, THIS MATERIAL WAS

19  PLACED UNDER WHAT'S CALLED A "SEMICOMPACTED CONDITION".  THE

20  CORPS DID NOT COMPACT DIRT WHEN THEY PLACED IT TO CONSTRUCT

21  LEVEES.  THAT HAS CHANGED AFTER KATRINA.  NOW THEY COMPACT THE

22  MATERIAL.

23  A SEMICOMPACTED, ACCORDING TO THE CORPS OF

24  ENGINEERS, IS A MATERIAL THAT'S SPREAD BY A DOZER, D6 OR D7.

25  ONCE YOU SPREAD IT, SIX PASSES WITH THE DOZER GOING BACK AND

## 2406

1  FORTH, THAT'S CONSIDERED SEMICOMPACTION.  THAT'S WHAT'S

2  CONSIDERED ADEQUATE INCLUDING THE WGI WORK IN THE EBIA.  THAT WAS

3  ALSO FILL THAT WAS PLACED, BECAUSE THAT'S AN IMPORTANT POINT THAT

4  THESE FILLS WERE PLACED UNDER WHAT'S CALLED "SEMICOMPACTED

5  CONDITIONS".

6  HOW DOES IT AFFECT IT?  IT BECOMES MORE PERMEABLE

7  WHEN IT'S SEMICOMPACTED THAN A FULLY COMPACTED.

8  THE MAIN STRATIFICATIONS THAT FOLLOW THE LEVEE

9  MATERIAL WERE MARSH SOILS.  MARSH SOILS ARE ORGANIC-TYPE

10  MATERIALS, SOMETIMES REFERRED TO AS "PEAT" OR "ORGANIC MATERIAL",

11  MATERIAL WITH FIBROUS CONTENTS, ROOTS, ET CETERA.  THEY ARE

12  SUBJECT TO DECAY, THEY ARE SUBJECT TO LOSS OF STRENGTH WHEN THEY

13  ARE LOADED.

14  DISTINCTIVELY THERE WERE TWO DIFFERENT MARSH ZONES

15  THAT WERE DEFINED.  HOW DEEP EACH ONE OF THEM, RESEARCHERS

16  DISAGREE ON HOW -- EXACTLY HOW DEEP IS THAT LINE, BUT THERE ARE

17  TWO DISTINCTIVE MARSH ZONES.  MARSH 1 -- AND IT'S DIVIDED IN THE

18  IPET TO A MARSH 1A, MARSH 1B, JUST FOR THEIR -- CHARACTERISTICS

19  ARE SIMILAR; HOWEVER.  THEIR STRENGTH DIFFERENT, SO THAT'S WHY

20  THEY ARE DIVIDED.

21  THE COURT:  1-A WOULD BE STRONGER THAN 1-B OR --

22  THE WITNESS:  TYPICALLY THE MATERIALS NEAR THE GROUND

23  SURFACE EXHIBIT WHAT WE CALL "DESICCATION."  DESICCATION IS THAT

24  BECAUSE OF THE AMBIENT CONDITIONS, THE SOILS GET BETTER.  THEY

25  DRY OUT AND THEY GET BETTER.  THE DEEPER MATERIALS DON'T SEE THAT

## 2407

1  DESICCATION AND THEY REMAIN SOFTER.

2  THE COURT:  SO BECAUSE OF DESICCATION, 1-A OVER TIME

3  WOULD HAVE MORE STRENGTH AND/OR STABILITY -- STRENGTH THAN 1-B

4  OVER TIME GENERALLY.

5  THE WITNESS:  YES.

6  AND ALSO, TO ADD TO THIS, THE WEIGHT OF THE LEVEE

7  COMPRESSES THE SOILS UNDER THE LEVEE.  SO AS YOU GO OUTSIDE THE

8  LEVEE UNDER THE TOES, THERE IS NO WEIGHT TO IMPROVE THE SOILS, SO

9  THE SOILS UNDER THE LEVEE ARE STRONGER THAN THE SOILS OUTSIDE THE

10  LEVEE.

11  SO THAT'S WHY YOU SEE IN THE LITERATURE ON THE

12  ANALYSES, STRENGTH UNDER THE TOE AND STRENGTH UNDER THE CENTER

13  LINE.  SO THE CENTER LINE IS TYPICALLY HIGHER CONDITION.

14  EXAMINATION

15  BY MR. RAFFMAN:

16  Q.  NOW, HAVING SET UP THE SOILS, WE'RE GOING TO DISCUSS WHAT

17  HAPPENED AT THE SOUTH BREACH, UNLESS THE JUDGE HAS OTHER

18  QUESTIONS.

19  A.  SO WHAT WE'RE SHOWING RIGHT NOW IS THE WATER WILL START

20  RISING ON THIS SIDE -- AND JOHN HERE IS GOING TO HELP ME WITH

21  THIS -- THIS JUST REPRESENTS THE WATER RISING ON THIS SIDE.

22  THE COURT:  EXCUSE ME.  LET ME JUST MAKE SURE, ARE ALL

23  COUNSEL SITUATED WHERE THEY NEED TO BE?

24  ALL RIGHT.  I JUST WANT TO MAKE SURE.  OKAY.

25  THE WITNESS:  THE OTHER SIDE, BY THE WAY, LOOKS EXACTLY

**2408**

1  THE SAME, SO ANYONE ON THIS SIDE CAN SEE EXACTLY THE SAME.

2      SO THE WATER STARTS RISING AND IT DOESN'T

3  NECESSARILY REACH THE TOP OF THE WALL, BUT AS THE WATER PRESSURE

4  IS EXERTED ON THE WALL -- THIS GAP, IT'S JUST FOR GETTING THE

5  PIECES TO FIT TOGETHER, BUT ACTUALLY, THE PRESSURE IS APPLIED TO

6  THE WALL -- THE TENSION CRACK DEVELOPS.

7      SO WHEN THE TENSION CRACK DEVELOPS, GRADUALLY THIS

8  WATER SEEPS ON THIS WALL, APPLYING PRESSURE ON THE WALL.

9      NOW, THERE IS A SECOND PIECE THAT ILLUSTRATES THE

10  WATER RISING FURTHER, GOING UP.  NOW, AS I MENTIONED BEFORE, THAT

11  PARTICULAR ZONE WAS RELATIVELY LOWER THAN THE REST WITHIN THE

12  SOUTH BREACH, THAT WHOLE WALL TOP WAS LOWER.

13      SO, ACTUALLY, WE MAY GET SOME SPLASHING OVER THE

14  TOP OF THE WALL BEFORE THE REST OF THE LENGTH OF THE WALL.  THAT

15  SPLASHING STARTS GOING DOWN IN THIS AREA.

16      THE POLES, THIS IS A PHENOMENA THAT WAS SHOWN AT

17  THE 17TH CANAL AND THE LONDON AVENUE CANAL, THAT'S WHY THE CORPS

18  IS CUTTING THE TREES NOW ALONG THE CANALS.  ANY OBSTACLES LIKE

19  THIS GETS CONCENTRATED EROSION AROUND THE POSTS FOR THE FENCE.

20  GRADUALLY THIS FENCE WAS LOST.

21      AS OVERTOPPING CONTINUES, NOW WE STARTED WITH

22  SPLASHING, IT BECAME OVERTOPPING.  AND AGAIN, OVERTOPPING IN THE

23  LOWER AREA IS HIGHER.  YOU START DEVELOPING A SCOUR TRENCH BEHIND

24  THE WALL.

25      THIS MODEL DOESN'T SHOW YOU THAT THE WALL STARTS

**2409**

1  LEANING BACK UNDER THIS PRESSURE EXTENDING THE ZONE AS THE WALL

2  LEANS BACK.  THIS RESULTS -- AND JOHN IS GOING TO HELP ME WITH

3  THAT FROM THE OTHER SIDE.  TO REMOVE THE NEXT PIECE, HE HAS TO

4  REMOVE THIS PIECE FIRST.  BUT KEEP IN MIND THAT THE PRESSURE AND

5  WATER IS STILL WITHIN THAT GAP PUTTING THAT PRESSURE.

6      THIS EROSION CONTINUES.  THE WALL LEANS BACK.  NOW

7  YOU CAN SEE THAT THE WATER SPLASHING, OVERTOPPING.  YOU DON'T

8  HAVE TO BE AT 15 OR 16 NOW.  THE WALL IS LEANING BACK.  EROSION

9  CONTINUES AND MORE OF THE LEVEE IS GONE, IS DETERIORATED AS THE

10  LAST PIECE WE REMOVE HERE.  AND AGAIN, THIS IS FOR THE PURPOSE OF

11  ILLUSTRATION, WE MADE THEM BIG BLOCKS.  YOU GET A WALL THAT

12  FAILED AND LEANS, AGAIN, WATER STARTS WASHING THE LEVEE AND YOU

13  GOT PRETTY MUCH AN EXHUMED AND FALLEN WALL.

14      MR. RAFFMAN:  ALL RIGHT.  WE'LL PUT IT BACK TOGETHER

15  LATER, JUDGE.

16      THE COURT:  THANK YOU.

17          EXAMINATION

18  BY MR. RAFFMAN:

19  Q.  SO, TO TIE IT ALL TOGETHER, THE WEAK SOIL CONDITIONS, THE

20  WEAK CURVATURE OF THE WALL, THE OUTFALL CANALS, ALL OF THESE

21  CONDITIONS IN THE SPECIFIC LOCATION OF THE SOUTHERN BREACH, AND

22  ESPECIALLY THAT MAIN BOW, TOGETHER WITH PRESSURE ON THE WALL

23  AND OVERTOPPING BUT JUST NOT OVERTOPPING, ALL OF THOSE CONDITIONS

24  TOGETHER CREATED A SITUATION IN WHICH YOU HAD A FAILURE AT WHAT

25  YOU CALL THE "SECOND WEAKEST LINK"; IS THAT FAIR?

**2410**

1  A.  CORRECT.  SO YOU MAY HAVE HAD ONE OR TWO OR THOSE THREE

2  ITEMS THAT WE LISTED AT OTHER LOCATIONS OF THE WALL, BUT AT THAT

3  PARTICULAR LOCATION, YOU HAD ALL THREE ELEMENTS PRESENT, POOR

4  SOIL CONDITIONS, DEVIATION FROM ALIGNMENT, OUTFALL CANALS THAT

5  WERE BACKFILLED WITH SEMICOMPACTED FILL, ACCORDING TO THE CORPS'

6  SPECS, SO AT THAT PARTICULAR LOCATION, YOU GOT ALL THREE ELEMENTS

7  WORKING AGAINST YOU.

8  Q.  ALL RIGHT.  NOW, WE'RE GOING TO MOVE TO ANOTHER LINE.

9      DR. BAKEER, YOU HAVE CARRIED OUT AN ANALYSIS UNDER

10  THE H -- REMIND THE COURT THE INITIALS.

11  A.  HURRICANE STORM RISK REDUCTION SYSTEM.

12  Q.  HSDRRS.

13  A.  DESIGN GUIDELINES.

14  Q.  I WAS CHOKING ON THE S.

15  A.  I ALWAYS FORGET IT.

16  Q.  THE HSDRRS.

17  A.  THAT'S CORRECT.

18  Q.  AND SO THAT SET OF GUIDELINES PROVIDES YOU WITH A SET OF

19  ANALYSES THAT YOU CAN PERFORM ON A FLOODWALL TO DETERMINE WHETHER

20  IT WOULD BE EXPECTED TO PERFORM ADEQUATELY UNDER A STORM EVENT;

21  IS THAT RIGHT?

22  A.  CORRECT.  IT'S USED TO DESIGN A WALL OR TO ASSESS AN

23  EXISTING WALL.

24  Q.  SO WE'RE GOING TO TAKE THE COURT THROUGH IN A -- IN SORT OF

25  A SUMMARY WAY THE ANALYSES THAT YOU PERFORMED UNDER THOSE

**2411**

1  GUIDELINES AND WHAT YOU FOUND WHEN YOU CARRIED THEM OUT.

2      LET'S GO TO THE NEXT SLIDE.

3      EXPLAIN FOR THE COURT, DR. BAKEER, WHAT LOCAL STABILITY

4  AND THE CWALSHT ANALYSIS IS.  WHAT IS THAT?

5  A.  LOCAL STABILITY IS A CERTAIN ANALYSIS THAT YOU USE TO

6  DETERMINE THE REQUIRED SHEET PILE TIP ELEVATION.

7      TAKE YOU BACK TO THE NAIL MODEL, A LOCAL STABILITY IS

8  HOW DEEP SHOULD I HAVE THIS NAIL DRIVEN IN THE WALL.

9  Q.  AND THERE IS A COMPUTER PROGRAM CALLED "CWALSHT" THAT YOU

10  CAN USE TO MAKE THAT DETERMINATION?

11  A.  THAT'S THE PRESENT RECOGNIZED SOFTWARE THAT'S USED BY THE

12  ARMY CORPS OF ENGINEERS AND DESIGN OUTFITS TO DESIGN.

13  Q.  DID YOU EVALUATE THE FLOODWALL USING THE CWALSHT PROGRAM?

14  A.  I USED IT FOR ANALYSIS OF THE WALL, THAT'S CORRECT.

15  Q.  AND WHEN YOU DID THAT ANALYSIS FOR LOCAL STABILITY, WHAT DID

16  YOU FIND WITH REGARD TO THIS WALL?

17  A.  THERE ARE TWO OUTCOMES YOU GET FROM CWALSHT.  THERE IS A

18  DETERMINATION OF WHERE THE TENSION CRACK AND HOW DEEP THE TENSION

19  CRACK WOULD EXIST.  THAT'S ONE USE FOR IT.

20      SECONDLY, YOU WORK IT OUT BACKWARDS.  IN DESIGN, YOU'RE

21  LOOKING FOR HOW DEEP THE SHEET PILE SHOULD BE.  YOU WORK

22  BACKWARDS BY PUTTING THE SHEET PILE TIP AND YOU CAN SEE WHETHER

23  IT'S ADEQUATE OR NOT.

24  Q.  AND WHEN YOU PERFORMED THE ANALYSIS USING YOU SHEET PILE TIP

25  FOR THE 1969 I-WALL, DID IT PASS OR DID IT FAIL?

**2412**

1  A.  IT PASSED ONLY UNDER THE AS-BUILT CONDITION WITH THE

2  ASSUMPTIONS THEY MADE WITHOUT CONSIDERING ANY CHANGES THAT TOOK

3  PLACE IN THE WALL HEIGHT OR THE GROUND CONDITIONS, THE SOIL

4  CONDITIONS.  ACCORDING TO WHAT DATA THAT I HAVE, THIS WALL DIDN'T

5  HAVE A SUFFICIENT TIP PENETRATION.  IT FAILED --

6  Q.  AND SO --

7       THE COURT:  WAIT.  I DIDN'T HEAR THAT EITHER.

8       THE WITNESS:  TIP, T-I-P, PENETRATION.

9       THE COURT:  IT DID NOT --

10      THE WITNESS:  -- HAVE SUFFICIENT TIP PENETRATION.

11      THE COURT:  I'M NOT QUITE SURE WHY IT PASSED.

12      MR. RAFFMAN:  IT DIDN'T.

13      THE WITNESS:  I SAID IT DIDN'T PASS.

14      THE COURT:  IT DIDN'T PASS.  I MISUNDERSTOOD YOU.

15      THE WITNESS:  I SAID IN PASSED ACCORDING TO THE ORIGINAL

16  DESIGN WITHOUT TAKING ALL THE CIRCUMSTANCES THAT TOOK PLACE OVER

17  TIME.

18      THE COURT:  I GUESS THAT'S WHAT I DON'T UNDERSTAND.  AND

19  PERHAPS YOU'LL -- IT PASSED BUT IT DIDN'T TAKE IN ALL THE

20  CIRCUMSTANCES.  YOU MEAN THE CIRCUMSTANCES THAT OCCURRED AFTER

21  THE DESIGN OR CIRCUMSTANCES THAT WERE PRESENT AT THE TIME OF

22  DESIGN THAT WEREN'T CONSIDERED?

23      THE WITNESS:  I'M SORRY FOR CONFUSING THE COURT ON THIS.

24      THE ORIGINAL DESIGNS DID NOT ACCOUNT FOR A TENSION

25  CRACK, FOR EXAMPLE.  SO WHEN YOU ADD THE FACTOR OF A TENSION

**2413**

1  CRACK, WHEN YOU ADD THE FACTOR OF A LOWER GRADE -- THE ORIGINAL

2  WALL WAS DESIGNED FOR WATER TO BE AT ELEVATION 13 MSL, WHICH IS

3  MUCH LOWER THAN THE WATER PRESSURES.

4       SO IF YOU TAKE THE -- THESE NUMBERS AS IT IS, IT'S

5  BARELY SAFE AT THE TIME OF CONSTRUCTION, BUT IT'S UNSAFE UNDER

6  THE KATRINA CONDITIONS.

7            EXAMINATION

8  BY MR. RAFFMAN:

9  Q.  SO UNDER THE KATRINA CONDITIONS, I WANT TO MAKE THE RECORD

10  VERY CLEAR, UNDER THE KATRINA CONDITIONS, WHICH INCLUDED A

11  TENSION CRACK, RIGHT, DR. BAKEER?

12  A.  CORRECT.

13  Q.  AND WHICH INCLUDED SETTLEMENT, RIGHT?

14  A.  CORRECT.

15  Q.  UNDER THE ACTUAL CONDITIONS THAT EXISTED AT KATRINA, DID

16  THIS WALL PASS CWALSHT OR DID IT FAIL?

17  A.  NO, IT DIDN'T PASS.

18  Q.  IT DIDN'T PASS.

19      AND SO --

20      THE COURT:  WHAT I AM UNDERSTANDING IS, AS DESIGNED, IT

21  WASN'T DESIGNED FOR KATRINA?

22      THE WITNESS:  IT WASN'T DESIGNED FOR THE CIRCUMSTANCES

23  EXPERIENCED, THAT'S CORRECT.

24      THE COURT:  AND TELL ME, AS PRECISELY AS POSSIBLE, WHY

25  WASN'T IT DESIGNED FOR KATRINA?

**2414**

1       THE WITNESS:  A TOUGH QUESTION TO ANSWER.

2       THE COURT:  WHEN I SAY "WHY," I DON'T MEAN

3  QUALITATIVELY, BUT QUANTITATIVELY WHY WAS IT NOT DESIGNED -- WHAT

4  WAS INSUFFICIENT IN THE DESIGN FOR KATRINA?

5       THE WITNESS:  I UNDERSTAND THE QUESTION, JUDGE, AND I'LL

6  ANSWER IT.

7            AGAIN, YOU ASKED ME THE QUESTION ABOUT THE VARIABLE

8  SHEET PILE TIPS AND I ANSWERED IT THAT YOU MAY DIVIDE THE LEVEE

9  INTO SUBSECTIONS AND SO FORTH, THERE WAS INSUFFICIENT SOIL

10  INFORMATION AVAILABLE AT THE TIME OF DESIGN TO ACCOUNT FOR POINTS

11  OF WEAKNESSES.

12       SECONDLY --

13       THE COURT:  INSUFFICIENT SOIL INFORMATION, NUMBER ONE.

14       THE WITNESS:  CORRECT.

15       SECONDLY, THAT THE WALL WAS DESIGNED NOT TO BE

16  TOPPED OR THE WATER TO REACH ITS TOP.  THAT'S ANOTHER REASON.  IT

17  WAS DESIGNED FOR ONLY ELEVATION 13.

18       AS A THIRD REASON, I SAID WHEN I WAS

19  DEMONSTRATING THE MODEL THAT THEIR ANALYSIS ASSUMED THAT THE WALL

20  WOULD SETTLE ONLY BY 1 FOOT.  IT DID SETTLE MORE THAN 1 FOOT.  AS

21  WE SEE, NAVD IS 2 1/2 FEET LOWER FROM MSL.

22       SO THERE ARE A LONG LIST OF THIS.

23       THE COURT:  AND THOSE ARE JUST SOME --

24       THE WITNESS:  THESE ARE THREE MAIN CATEGORIES.

25       THE COURT:  THAT'S WHAT I'M INTERESTED IN.  THANKS.

**2415**

1       PROCEED, COUNSEL.

2            EXAMINATION

3  BY MR. RAFFMAN:

4  Q.  SO UNDER KATRINA CONDITIONS, WE'RE FAILING CWALSHT.

5       AND THEN I WANT TO GO NEXT TO THE GLOBAL STABILITY.

6  THIS IS A SEPARATE ANALYSIS, RIGHT, DR. BAKEER?

7  A.  CORRECT.

8  Q.  AND YOU'VE GOT TWO DIFFERENT ANALYTICAL METHODS THERE.  WHAT

9  I WOULD LIKE YOU TO DO IS EXPLAIN TO THE COURT WHAT IS GLOBAL

10  STABILITY AND HOW IT DIFFERS FROM LOCAL STABILITY, AND THEN WE'LL

11  TALK ABOUT THE TWO METHODS YOU USED.

12  A.  IF I GO BACK TO THIS MODEL FOR A SECOND, I CAN SHOW WHAT I

13  MEAN.

14       LOCAL STABILITY IS HOW DEEP THE PENETRATION OF THE

15  SHEET PILE IN THE GROUND BASED ON THE PRESSURES YOU SEE FROM THIS

16  SIDE AND THE RESISTING PRESSURES YOU SEE ON THAT SIDE.  THE WALL

17  ON ITS OWN OR THE NAIL BY ITSELF.

18       GLOBAL STABILITY IS A FAILURE OF SURFACE THAT GOES

19  AROUND THE BOTTOM OF THE SHEET PILE AND COMES BACK FROM THE OTHER

20  SIDE.

21       TO GO BACK TO THE NAIL MODEL, THAT'S LIKE PULLING THE

22  NAIL, IT COMES UP WITH PIECE OF SHEETROCK.  SO THAT'S A GLOBAL

23  STABILITY.  WITH A LOCAL STABILITY, ONLY THE NAIL COMES FROM THE

24  WALL.

25            EXAMINATION

14 (Pages 2412 to 2415)

**2416**

BY MR. RAFFMAN:

Q.  SO WHAT ARE THESE TWO METHODS ANALYZING GLOBAL STABILITY AND WHO USES THEM?

A.  METHOD OF PLANES IS THE ORIGINAL METHOD USED BY THE ARMY CORPS OF ENGINEERS IN THE DESIGN OF WALLS UP UNTIL KATRINA.  THE SPENCER'S METHOD WAS INTRODUCED POST-KATRINA.

THEY PRETTY MUCH HAVE THE SAME CONCEPT, BUT THE EQUATIONS, THE ALGORITHMS USED ARE DIFFERENT.

Q.  ALL RIGHT.  I FORGOT TO ASK YOU A QUESTION ABOUT CWALSHT.

YOU REVIEWED DR. MARINO'S REPORT, RIGHT?

A.  I DID.

Q.  DID DR. MARINO CONDUCT A LOCAL STABILITY ANALYSIS USING CWALSHT?

A.  NOT IN THE REPORT I'VE SEEN.  THE ANSWER IS NO.

Q.  ALL RIGHT.  NOW WE'RE GOING TO DO -- YOU'VE EXPLAIN METHOD OF PLANES IS ONE METHOD THAT'S USED.  IS SPENCER'S METHOD A DIFFERENT METHOD USED TO ANALYZE GLOBAL STABILITY?

A.  YES.  IT'S -- AGAIN, THE CONCEPTS ARE THE SAME, MEANING IT INVOLVES A BLOCK OF SOIL PASSING UNDER THE SHEET PILE TIP, BUT THE ALGORITHMS ARE DIFFERENT.  THE MATHEMATICAL ALGORITHMS ARE DIFFERENT.

Q.  IN YOUR EXPERIENCE, DR. BAKEER, DOES EITHER OF THESE TWO METHODS TEND TO OVERPREDICT THE LEVEL OF SAFETY OF A FLOODWALL?

A.  THE STUDIES DONE, AND MY EXPERIENCE WITH MY OWN DESIGNS, INDICATE THAT THE SPENCER'S METHOD GIVES A HIGHER SAFETY FACTOR

**2417**

ON THE RANGE OF 7 TO 15 PERCENT THAN THE METHOD OF PLANES FOR THE SAME FAILURE SURFACE.

Q.  NOW, WHEN THE ARMY CORPS OF ENGINEERS AND ITS IPET TEAM CARRIED OUT ITS STABILITY ANALYSIS IN THE IPET REPORT, IT USED WHAT METHOD OR METHODS?

A.  THEY APPLIED THE METHOD OF PLANES AND THE SPENCER'S METHOD.  THEY FOCUSED MORE ON THE SPENCER'S BUT THEY DID SOME METHOD OF PLANES.

Q.  AND WHEN YOU ANALYZED THE FAILURE, YOU USED BOTH METHODS?

A.  I DID THE SAME.  I USED THE METHOD OF PLANES AS A STARTER AND THEN I USED THE SPENCER'S METHOD AS WELL.

Q.  DID DR. MARINO USE BOTH?

A.  I UNDERSTAND HE ONLY USED SPENCER.

Q.  AND WHEN YOU CARRIED OUT THE GLOBAL STABILITY ANALYSIS FOR THE FLOODWALL USING THE KATRINA CONDITIONS, DID THE FLOODWALL PASS OR DID IT FAIL OR WHAT?

A.  IT FAILED THE GLOBAL STABILITY CHECKS.

THE COURT:  EXPLAIN TO ME, WHEN IT FAILS THE GLOBAL STABILITY TEST, AND THE GLOBAL STABILITY, AS I UNDERSTAND IT -- I WOULD LIKE TO MAKE THESE BULLET POINTS IN THE RECORD -- AS I UNDERSTAND IT, RELATES TO THE UNIVERSE OF SOIL UNDERNEATH THE TIP OF THE SHEET PILE?

THE WITNESS:  NOT JUST THIS.  IF YOU LOOK -- I THINK, MARK JUST PLACED A SLIDE HERE.

MR. RAFFMAN:  MY COLLEAGUES HAVE PUT UP A FIGURE THAT

**2418**

WILL HELP ANSWER YOUR HONOR'S QUESTION.  DEFENDANT'S EXHIBIT 205, DR. BAKEER REPORT FIGURE D-2.

THE WITNESS:  THIS IS AN ILLUSTRATION OF A TYPICAL FAILURE.  THIS PLANE HERE, THE WATER PRESSURE IS ACTING ON THE WALL, PUSHING THE SOIL IN THIS DIRECTION, PUSHING THE SHEET PILE IN THIS DIRECTION.  WE CALL THIS AN "ACTIVE WEDGE" THAT WOULD DEVELOP BEHIND THE WALL.

THIS WEDGE, IF YOU IMAGE THIS TRIANGLE -- I'LL TRY TO ILLUSTRATE IT -- IS ATTEMPTING TO MOVE IN THIS DIRECTION (INDICATING).  IT'S GOING TO MOVE LATERALLY AND DOWNWARDS.  PUSHING ON A BLOCK, WHICH IS THIS BLOCK HERE, THIS BLOCK IS GOING TO TEND TO MOVE IN THIS DIRECTION (INDICATING).  PUSHING THIS TRIANGLE, WHICH WE CALL IT A "PASSIVE WEDGE", AND THIS PASSIVE WEDGE WOULD TEND TO MOVE UPWARDS.

IN THE FORENSIC WORK, YOU CAN SEE SOME BLOCKS OF SOIL THAT APPEARED ON THE GROUND SURFACE ON THE PROTECTED SIDE.  THAT'S THE PASSIVE WEDGES COMING UP FROM THE GROUND.

THE SPENCER'S METHOD USES THE SAME CONCEPT BUT IT IS USING A DIFFERENT ALGORITHM.  IN OTHER WORDS, THE FORCES ARE ACTING IN THIS DIRECTION.  THERE IS ENOUGH RESISTANCE ALONG THE BOTTOM SURFACE, THERE IS A RESISTANCE IN THIS DIRECTION, AND THERE IS A RESISTANCE IN THIS DIRECTION.  THESE RESISTANCES SHOULD BE HIGHER THAN THE FORCES APPLIED ON THE WALL.

THE COURT:  I UNDERSTAND.  WHY IS THIS GLOBAL RATHER LOCAL?  I JUST WANT TO UNDERSTAND THAT A LITTLE BETTER.

**2419**

THE WITNESS:  PERFECT.  AS YOU CAN SEE THAT THE -- ANY SURFACE HIGHER THAN THIS WOULD BE INTERCEPTED BY THE SHEET PILE ITSELF.  ONCE YOU PASS THE TIP OF THE SHEET PILE, THEN THE WALL IS NOT DOING ANYTHING.  IT'S JUST MOVING WITH THE MASS AS ONE BLOCK.

THE COURT:  RIGHT.

THE WITNESS:  THAT'S THE NAIL WITH THE SHEETROCK COMING OUT FROM THE WALL.  SO YOUR SHEET PILE NOW IS A NAIL IN THE SHEETROCK, BUT THE FAILURE IS HAPPING IN THE SHEETROCK, NOT AROUND THE WALL --

THE COURT:  NOT AROUND WHAT, SIR?  I DIDN'T QUITE HEAR YOU.

THE WITNESS:  NOT THE LOCAL STABILITY GOVERNED BY THE PRESSURES ON THE RESISTING SIDE AND THE DRIVING SIDE.

MR. RAFFMAN:  THE WORD YOU WERE LOOKING FOR, YOUR HONOR, WAS "WALL."

THE COURT:  OKAY.

THE WITNESS:  SO, IN OTHER WORDS, THE FAILURE, IN THE SIMPLIFICATION, IS A CIRCLE THAT GOES AROUND LIKE THIS (INDICATING).  SO THAT CIRCLE IS FALLING OR FAILING INTO THE PROTECTED SIDE.

THE COURT:  SO IN DETERMINING THE PARAMETERS FOR GLOBAL STABILITY, DO YOU TAKE INTO CONSIDERATION THE NATURE OF THE SOIL BENEATH THE SHEET PILE?

THE WITNESS:  ABSOLUTELY.  ALL THE STRATA YOU SEE IN THE

2420

1  DIFFERENT COLORS --
2       THE COURT:  DO YOU TAKE INTO CONSIDERATION THE DEPTH OF
3  THE WATER AS IT COMES INTO THE SHEET PILE OR OVER THE SHEET PILE?
4       THE WITNESS:  CORRECT.  YOUR ANSWERS FOR THE GLOBAL
5  STABILITY ARE DEPENDENT ON TWO MAIN ELEMENTS:  THE GEOMETRY YOU
6  ANALYZED, WHICH MEANS HOW MANY SOIL STRATA, HOW HIGH IS THE WALL,
7  HOW HIGH IS THE LEVEE, HOW HIGH IS THE GROUND, THE GRADES, IN
8  OTHER WORDS.
9       SECONDLY, THE SOIL MODELS THAT YOU USE.  SO IF YOU
10 USE INCORRECT SOIL MODEL, YOU GET INCORRECT ANSWERS.  IF YOU USE
11 INCORRECT GEOMETRY, YOU GET INCORRECT ANSWERS.
12      THE COURT:  OKAY.
13           EXAMINATION
14 BY MR. RAFFMAN:
15 Q.  LET'S MOVE TO THE NEXT SLIDE.  ANOTHER PART OF THE HSDRRS
16 GUIDELINES IS A PIPING AND SEEPAGE ANALYSIS.  PLEASE EXPLAIN FOR
17 THE COURT WHAT THAT IS AND WHAT YOU DID.
18 A.  PIPING AND SEEPAGE ANALYSIS -- OR PIPING AND SEEPAGE IS THE
19 FLOW OF WATER IN A POROUS MEDIUM.  SOILS ARE A POROUS MEDIUM SO
20 WATER FLOWS THROUGH IT.  THAT FLOW COULD HAVE INCREMENTAL IMPACTS
21 ON A STRUCTURE.
22      SO YOU HAVE TO SEE IF THIS STRUCTURE HAS SUFFICIENT TIP
23 PENETRATION TO PREVENT SEEPAGE.
24 Q.  NOW, WHEN YOU CARRIED OUT YOUR INITIAL ANALYSIS, IT WAS
25 BEFORE YOU HAD RECEIVED THE ADDITIONAL BORING DATA FROM THE EAST

2421

1  BANK INDUSTRIAL AREA; IS THAT RIGHT?
2  A.  THAT'S CORRECT.
3  Q.  AND AFTER NOW HAVING CONSIDERED THE ADDITIONAL DATA,
4  DR. BAKEER, IN YOUR OPINION, DID THE EAST BANK FLOODWALL PASS THE
5  PIPING AND SEEPAGE ANALYSIS OR DID IT FAIL OR WHAT?
6  A.  IT EMPHASIZED MY CONCLUSION THAT IT WAS INSUFFICIENT TO
7  RESIST SEEPAGE.  ACTUALLY, I ALREADY CONCLUDED FROM MY ANALYSIS
8  IT DIDN'T HAVE A TIP PENETRATION AGAINST SEEPAGE, SUFFICIENT TIP
9  PENETRATION TO PREVENT SEEPAGE.
10      THE DATA I RECEIVED FROM THE -- MMG DATA EMPHASIZED MY
11 CONCLUSION.  IT ENFORCED IT.
12 Q.  ALL RIGHT.  AND SO WE'RE GOING TO -- SO THE RECORD IS CLEAR,
13 PIPING AND SEEPAGE RECEIVES A PASSING GRADE, A FAILING GRADE?
14 A.  A FAILING GRADE.  ALL OF THE ABOVE RECEIVED FAILING GRADES.
15 Q.  SO LET'S GO TO THE NEXT ANALYSIS HERE.  THIS IS WHAT'S
16 CALLED A "HEAVE ANALYSIS".
17      IS A HEAVE ANALYSIS PART OF THE HSDRRS BATTERY OF
18 ANALYSES?
19 A.  CORRECT.  AND TO EXPLAIN WHAT HEAVE ANALYSIS IS, UNDER THE
20 WATER PRESSURE FROM THIS SIDE, GOING THROUGH THE TENSION CRACK,
21 THIS BLOCK OF SOIL MAY COME UP UNDER THAT PRESSURE.  THAT'S A
22 HEAVE ANALYSIS.
23 Q.  AND HOW DID THE WALL FAIR UNDER THE HEAVE ANALYSIS,
24 DR. BAKEER?
25 A.  IT PASSED THE TEST.  WITH THE MMG DATA, I DON'T BELIEVE IT'S

2422

1  SAFE.  I THINK IT'S A MARGINAL CONDITION RIGHT NOW.
2  Q.  SO IN THE INITIAL ANALYSIS, IT'S A PASSING GRADE.  BUT
3  HAVING LOOKED AT THE MMG, YOU'RE NOT SO SURE?
4  A.  IT DOESN'T HAVE SUFFICIENT RESISTANCE AGAINST IT.
5  Q.  THE LAST ONE I THINK ON THE LIST IS CALLED THE "DEFLECTION
6  ANALYSIS".  DOES THE HSDRRS CALL FOR A DEFLECTION ANALYSIS?
7  A.  CORRECT.
8  Q.  EXPLAIN FOR THE COURT WHAT THAT IS AND WHAT YOUR EVALUATION
9  WAS.
10 A.  THE DEFLECTION ANALYSIS IS A BYPRODUCT OF THE CWALSHT
11 ANALYSIS.  CWALSHT GIVES YOU ESTIMATES OF THE MOMENTS, THE
12 FORCES, THE DEFLECTIONS ON THE STRUCTURE THAT YOU'RE DESIGNING.
13 IT'S TAKEN BY THE STRUCTURAL ENGINEERS TO SELECT THE APPROPRIATE
14 CROSS-SECTION.  SO THE DEFLECTION ANALYSIS INDICATE THAT THE WALL
15 WILL HAVE SUBSTANTIAL DEFLECTION UNDER THE APPLIED PRESSURES.
16 Q.  ALL RIGHT.  SO LET'S ASSIGN SOME GRADES HERE.  DR. BAKEER,
17 WHEN YOU ADD UP -- WELL, FOR THE COURT'S BENEFIT, EACH OF THESE
18 IS AN INDEPENDENT ANALYSIS, AN INDEPENDENT WAY THAT THE WALL
19 COULD FAIL, RIGHT?
20 A.  CORRECT.
21 Q.  IT MIGHT PASS FIVE OF THEM, BUT IF IT FAILS ONE, IT CAN
22 FAIL, RIGHT?
23 A.  CORRECT.
24 Q.  AND WHEN YOU CARRIED OUT THESE INDIVIDUALLY, WHICH ONES DID
25 THE WALL FAIL?

2423

1  A.  THE RED DOTS.
2  Q.  THE RED DOTS --
3  A.  ONE, TWO, THREE, FOUR AND SIX.
4  Q.  AND THE ONLY ONE THAT PASSED, AND WE'LL GIVE IT MAYBE A LOW
5  PASS IF WE'RE IN COLLEGE --
6  A.  I SHIFTED TO ORANGE INSTEAD OF GREEN.
7  Q.  HEAVE ANALYSIS GOT A GREEN DOT AND YOU'RE SAYING IT MIGHT BE
8  ORANGE NOW?
9  A.  UNDER MY OLD ANALYSIS, WHICH I KEPT IT BECAUSE THAT'S WHAT
10 MY REPORT SAID, BUT BASED ON EXAMINING THE FURTHER DATA, I WOULD
11 EVEN GIVE IT A MARGINAL.
12 Q.  SO THE RECORD IS CLEAR, BECAUSE I'M NOT SURE WHETHER SLIDES
13 ARE IN COLOR, YOU'VE GOT A FAIL NEXT TO EVERYTHING OTHER THAN
14 HEAVE, RIGHT?
15 A.  THAT'S CORRECT.  I MENTIONED POINTS ONE, TWO, THREE, FOUR
16 AND SIX.
17 Q.  THESE ARE ESTABLISHED MODELS THAT HAVE BEEN VALIDATED BY THE
18 CORPS FOR USE IN POST-KATRINA IN THEIR ANALYSIS OF FLOODWALLS IN
19 THE NEW ORLEANS AREA?
20 A.  CORRECT.  AND, ACTUALLY, THERE ARE SOME ENGINEERING JUDGMENT
21 THAT SHOULD BE APPLIED, ALSO.  ACCORDING TO THE CORPS'
22 REQUIREMENT -- THERE ARE SOME REQUIREMENTS, FOR EXAMPLE, THE TIP
23 PENETRATION SHOULD BE THREE TIMES THE EXPOSED HEIGHT, YOU SHOULD
24 CUT OFF ANY MARSH STRATA WITH THE SHEET PILE.  IF THE ANALYSIS
25 TELLS YOU THAT THE TIP SHOULD BE AT MINUS 8, BUT YOU FIND A

16 (Pages 2420 to 2423)

**2424**

1   STRATA THAT EXTENDS TO MINUS 17 OR MINUS 20, THAT'S AN INDICATION
2   YOU SHOULD TAKE YOUR TIP BELOW THAT DEPTH.  YOU SHOULD CUT OFF
3   ANY SAND.  YOU SHOULD CUT OFF ANY MARSH.
4       ALSO, THE WALL HEIGHT SHOULD BE RESTRICTED TO 4 FEET.
5   THAT'S THE POST-KATRINA.  THIS WALL WAS 6 FEET EXPOSED HEIGHT.
6   THE CRITERIA NOW IS LIMITED TO 4 FEET EXPOSED HEIGHT.
7       SO BESIDES THESE CALCULATIONS, THERE IS AN IMPORTANT
8   STEP, WHICH IS YOU APPLY YOUR ENGINEERING JUDGMENT INTO SELECTING
9   THE TIP PENETRATION.
10      IN MY OPINION, IT DOESN'T MEET WHAT THE PRESENT
11  RECOMMENDATIONS ARE FOR THE DESIGN GUIDELINES.  YOU SHOULD HAVE
12  CUT OFF THAT MARSH STRATA.
13  Q.  THAT ENGINEERING JUDGMENT YOU JUST DESCRIBED IS IN ADDITION
14  TO EACH OF THESE TESTS?
15  A.  CORRECT.  IT'S DISCUSSED IN MY REPORT AND IT'S DISCUSSED
16  STEP BY STEP.
17      THE COURT:  WHEN YOU SAY CUT OFF THE MARSH STRATA,
18  PRECISELY WHAT DOES THAT MEAN?
19      THE WITNESS:  IN OTHER WORDS, THAT IF I HAVE A MARSH
20  STRATA THAT EXTENDS TO, SAY, THE TOP OF THE BENCH RIGHT NOW,
21  DON'T STOP YOUR TIP RIGHT ABOVE IT.  YOU SHOULD EXTEND YOUR TIP
22  TO CUT IT OFF.
23      THE COURT:  WHAT YOU'RE SAYING IS YOU SHOULD NEVER HAVE
24  A SHEET PILE TIP TERMINATE IN THE MARSH STRATA; IT SHOULD
25  PENETRATE BENEATH THE MARSH STRATA?

**2425**

1       THE WITNESS:  CORRECT.
2           IN OTHER WORDS, DON'T PUT THE TIP IN THE SOUP, TAKE
3   IT BELOW THE SOUP, OR IN THE WEAK MATERIAL, TAKE IT INTO A
4   STIFFER BREADTH OF MATERIAL.
5       THIS IS WHAT WE GO THROUGH IN ENGINEERING EVERY
6   DAY, THAT NUMBERS MAY TELL ME SOMETHING, BUT I HAVE MY
7   ENGINEERING JUDGMENT.  AND THAT'S WHERE MY EXPERIENCE COMES IN TO
8   SAY, NO, I NEED IT DEEPER.  IF IT'S A SAND, IT CUTS OFF THE
9   SEEPAGE, SO IT'S ANOTHER REASON FOR PASSING THE SAND.
10          EXAMINATION
11  BY MR. RAFFMAN:
12  Q.  ALL RIGHT.  THE NEXT LINE OF QUESTIONS WILL TAKE US INTO THE
13  REASONS YOU'VE CONCLUDED THAT THE FLOODWALL FAILED WITHOUT THE
14  INVOLVEMENT OF A BARGE.
15      I WILL REPRESENT TO THE COURT THAT WE'RE NOT GOING TO
16  GO THROUGH ALL FOUR OF THESE IN GREAT DETAIL.
17      THE COURT:  YOU'VE ALREADY GIVEN THE BACKGROUND FOR IT
18  IN MOST OF THEM.
19      MR. RAFFMAN:  I BELIEVE THAT'S PROBABLY RIGHT.
20          EXAMINATION
21  BY MR. RAFFMAN:
22  Q.  SO WE'RE GOING TO TRY TO PROCEED IN SHORT ORDER THROUGH THIS
23  AND SKIP A COUPLE OF THESE ALTOGETHER, BUT FOR THE BENEFIT OF THE
24  RECORD, DR. BAKEER, WHY DON'T YOU JUST TELL THE COURT WHAT ARE
25  REASONS YOU'VE CONCLUDED THAT THE WALL FAILED WITHOUT A BARGE.

**2426**

1   A.  THE FIRST ONE IS -- PRIMARILY SAYS THAT THIS IS A TYPICAL
2   FAILURE DUE TO HYDROSTATIC UNIFORM PRESSURE, AND THE BREACHES
3   THAT WE OBSERVED AT THE HPS THROUGHOUT SHOW THAT HYDROSTATIC
4   PATTERN; IN OTHER WORDS, THE SIZE AND THE MAGNITUDE AND THE
5   AMOUNT OF DISPLACEMENT MAY DIFFER, BUT THAT'S A HYDROSTATIC-TYPE
6   FAILURE.
7       THE SECOND ISSUE, LIKE ANYWHERE ELSE IN THE HPS SYSTEM,
8   THE HURRICANE PROTECTION SYSTEM, FAILURES ONLY DEVELOP AT THE
9   WEAKEST LINKS, AND THIS WAS THE CASE IN THE IHNC AND THE 17TH
10  CANAL OR ANY OTHER STRUCTURE.  IT ALWAYS FAILED THE WEAKEST LINK.
11      THEN THE THIRD BULLET ON THE SCREEN IS THAT THERE WERE
12  OTHER INCIDENTS OF BARGES HITTING WALLS AND THESE WALLS DID NOT
13  FAIL.  IT CAUSED COSMETIC DAMAGE OR MINOR DAMAGE TO THE CONCRETE
14  CAPS.  TEARING OFF THE CAP IS NOT GOING TO DESTROY THE WALL.
15  TEARING OFF THE CAP IS JUST A LOSS OF THE CONCRETE AREA.  THAT'S
16  ALL.
17      IN MY OPINION, BASED ON THE REVIEW THAT I DID OFF THE
18  DOCUMENTS THAT I RECEIVED, I DID NOT DO ANY ANALYSIS RELATIVE TO
19  THE MOVEMENT OF THE BARGE OR THE LOCATION OF THE BARGE, BUT FROM
20  SIMPLE FLOW IN OPEN CHANNELS THAT I STUDIED IN MY UNDERGRAD AND
21  MY GRAD SCHOOL AND READING THE REPORTS, THE BARGE COULD NOT MAKE
22  IT TO THE LOCATION OF THE NORTH BREACH FROM WHERE IT WAS MOORED
23  ON THE WEST SIDE.
24  Q.  THAT'S ALL WE'RE GOING TO SAY ABOUT OTHER BARGES AND ABOUT
25  THE NORTH BREACH.

**2427**

1       I DID WANT TO GO A LITTLE MORE INTO SOME OF THE
2   CHARACTERISTICS OF THESE OTHER BREACHES, AND ALSO, PARTICULARLY
3   THE CHARACTERISTICS OF A HYDROSTATIC VERSUS A POINT IMPACT,
4   WHICH --
5       THE COURT:  WHAT I'M GOING TO DO IS TAKE JUST A
6   10-MINUTE RECESS, AND WE'RE GOING TO TRY TO GO TO 1:00 SO THAT
7   OUR -- WE'RE GOING TO GO TO 6:00.
8       MR. RAFFMAN:  YOUR HONOR, THIS WITNESS WILL BE
9   FINISHED -- I'M SORRY TO CUT YOUR HONOR OFF.
10      THE COURT:  NO.  GO AHEAD.
11      MR. RAFFMAN:  THIS WITNESS WILL FINISH BEFORE 1 O'CLOCK.
12      THE COURT:  OKAY.  DO YOU HAVE --
13      MR. RAFFMAN:  I WOULD THINK 30 MINUTES MAYBE.  BUT I
14  WOULD NOT WANT YOUR HONOR OR ANYONE ELSE IN THE COURTROOM STAYING
15  SEATED AND BEING UNCOMFORTABLE IF FOR SOME REASON THE WITNESS OR
16  I GO ON.  SO WE WILL FINISH WITHIN AN HOUR FOR SURE.
17      THE COURT:  OKAY.  WE'LL TAKE A 10-MINUTE RECESS.
18      (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, A BRIEF
19  RECESS WAS TAKEN.)
20      THE DEPUTY CLERK:  ALL RISE, PLEASE.
21      MR. RAFFMAN:  THANK YOU, YOUR HONOR.
22          EXAMINATION
23  BY MR. RAFFMAN:
24  Q.  DR. BAKEER, WE'RE GOING TO WALK THROUGH SOME IMAGES OF THE
25  OTHER PLACES WHERE WALLS FAILED, AND I'M GOING TO ASK YOU ONE

17  (Pages 2424 to 2427)

2428

1 QUESTION FOR EACH OF THOSE IMAGES.
2      LET ME START WITH -- SO THIS IS A PICTURE OF THE LONDON
3 AVENUE CANAL. DR. BAKEER, MY QUESTION FOR YOU IS:  WHAT ABOUT
4 THE LONDON AVENUE CANAL BREACH HELPS YOU TO ANALOGIZE IT IN A WAY
5 THAT HELPS YOU CONCLUDE THAT THE IHNC BREACHES DID NOT INVOLVE A
6 BARGE IMPACT?
7 A.   THE TENSION CRACK DEVELOPMENT WAS COMMON IN BOTH.  THAT WAS
8 SOMETHING THAT YOU LOOK AT.  FAILURE AT THE WEAKEST LINKS ON THE
9 LONDON AVENUE CANAL.  IT WAS TWO SPECIFIC BREACHES ON THE
10 LONDON AVENUE CANAL.  THERE WERE SOME LEANING WALLS THAT DID NOT
11 FAIL.  THE GENERAL SHAPE OF THE FAILURE WAS A HYDROSTATIC-TYPE
12 FAILURE, BUT THE CAUSE OF THE FAILURE WAS FOR A DIFFERENT
13 PHENOMENA, BUT ALSO IT PLAYED A ROLE IN THE IHNC, WHICH IS
14 SEEPAGE.
15 Q.   SO YOU CAN HAVE SIMILAR MECHANISMS AT WORK AND CAN PRODUCE
16 BREACHES; EVEN THOUGH BREACHES THEMSELVES MAY LOOK DIFFERENT AS
17 THE AFTERMATH, THE MECHANISMS CAN BE SIMILAR?
18 A.   CORRECT.  LET ME JUST SIMPLIFY SOMETHING ABOUT THE FACTOR OF
19 SAFETY APPROACH.  WE DESIGN THESE ON A SAFETY FACTOR, BUT I WANT
20 TO JUST DRAW A LINE HERE, THAT SAFETY FACTOR, THERE'S NOT ONE
21 SINGLE SAFETY FACTOR.  THERE'S A SAFETY FACTOR AGAINST SEEPAGE,
22 THERE'S A SAFETY FACTOR AGAINST LOCAL STABILITY, THERE'S A SAFETY
23 FACTOR FOR GLOBAL STABILITY, THERE'S A SAFETY FACTOR FOR HEAVE.
24      SO IT'S NOT NECESSARILY THAT SOME SAFETY FACTORS ARE
25 ABOVE ONE, THAT MEANS THAT THE WALL IS SAFE.  YOU'D ONLY NEED

2429

1 ONE CASE OR ONE CONDITION NOT BEING SATISFIED, AND THAT COULD
2 CAUSE FAILURE.  YOU MAY HAVE COMPETING MECHANISMS THAT YOU MAY
3 HAVE MULTIPLE CAUSES THAT ARE PRESENT.
4 Q.   THANK YOU.  SO LET'S LOOK AT THE 17TH STREET CANAL.  HERE IS
5 ANOTHER IMAGE WE'RE LOOKING AT.  IT'S DX205, FIGURE 16.
6      DR. BAKEER, WITH RESPECT TO THE 17TH STREET CANAL, WHAT
7 DID YOU OBSERVE THAT HELPS YOU TO CONCLUDE THAT THE BARGE WAS NOT
8 OR NEED NOT HAVE BEEN INVOLVED AT THE IHNC, BASED ON YOUR REVIEW
9 OF 17TH STREET?
10 A.   I WOULD SAY THAT THE FIRST TWO ELEMENTS, I WOULD JUST REPEAT
11 THEM, BUT AGAIN, THE HYDROSTATIC CHANGE, THE BOW SHAPE, THOSE ARE
12 THE SAME IN ALL THE BREACHES, SO I'M NOT GOING TO REPEAT THEM.
13      BUT THE MOST INTERESTING OR IMPORTANT IS THE PRESENCE
14 OF THOSE PEAT BLOCKS THAT CAME TO THE GROUND SURFACE, WHICH
15 SIMILAR, IS IMPORTANT TO SEE THE NO-RECOVERY ZONES THAT WE
16 OBSERVED IN THE SOIL BORINGS, LACK OF SOIL BORINGS IN THE AREAS
17 OF THE BREACH.  THE PRESENCE OF A GEOLOGICAL FEATURE THAT
18 ACTUALLY COINCIDE PRECISELY WITH THE 17TH CANAL BREACH SIMILAR TO
19 THE ISSUES I MENTIONED.  SO IT WAS THE WEAKEST LINK.
20 Q.   THAT WAS THE SLIDE WE WENT OVER EARLIER WITH THE PLEISTOCENE
21 LAYERS, TO RECALL THAT TO THE JUDGE'S MIND?
22 A.   THAT'S ONE OF THEM, BUT THERE IS ALSO REMNANTS OF A BAYOU
23 THAT SHOWS UP IN THE 1936 MAPS THAT DOESN'T SHOW UP, BUT THERE IS
24 A BAYOU WITH ITS END TERMINATING EXACTLY AT THE LOCATION OF THE
25 17TH STREET CANAL.  THAT BAYOU WAS DETECTED BY SOIL BORINGS DONE

2430

1 BY NSF IN THAT AREA.  SO THAT'S THE REASON WHY THE JEFFERSON SIDE
2 DIDN'T FAIL BECAUSE THE BAYOU ACTUALLY ENDED HERE AND DIDN'T
3 EXTEND.
4      SO AGAIN, IT'S A WEAK LINK.  THAT'S THE COMMON ELEMENT
5 THAT I WANTED TO BRING UP.  THERE IS ALWAYS A REASON FOR WHY IT
6 DEVELOPS IN ONE AREA BUT NOT IN OTHER AREA.
7 Q.   LET'S GO TO THE WEST BANK OF THE INNER HARBOR NAVIGATION
8 CANAL.  YOU'RE FOCUSING NOW ON THE BREACH OF THE I-WALL.  AND LET
9 ME GO TO THE NEXT SLIDE, DEFENDANTS' EXHIBIT 205, FIGURE 15.
10      TELL THE COURT WHAT WE'RE SEEING IN THIS SLIDE OF THE
11 FAILURE AT THE WEST BANK OF THE INNER HARBOR NAVIGATION CANAL.
12 A.   AGAIN, YOU SEE THE SAME ISSUES INVOLVED WITH OVERTOPPING AND
13 SPLASHING.  YOU SEE A SCOUR TRENCH.  YOU SEE A SCOUR TRENCH
14 EXTENDING BEYOND THE LIMITS OF THE FAILURE.  THIS IS THE AREA OF
15 THE SEGMENT THAT FAILED.  THESE ARE THE SEGMENTS OF THE WALL.
16 YOU CAN SEE THE CURVE AT THE BEGINNING OF THE WALL, THEN IT FORMS
17 A BOW SHAPE AND IT GOES BACK AGAIN.  WE CAN'T SEE IT IN THIS
18 PICTURE, BUT, AGAIN, IT'S A HYDROSTATIC PRESSURE.
19 Q.   THE WEST BANK FAILURE HAPPENS NORTH OF THE FLORIDA BRIDGE
20 AND THERE IS NO BARGE INVOLVED, RIGHT?
21 A.   THAT'S CORRECT.
22 Q.   AND YOU SEE THE TILTED I-WALL REFERENCE THERE.  DO YOU SEE
23 THAT?
24 A.   YOU'RE REFERRING TO THIS PANEL AND THIS PANEL?
25 Q.   YES.  THOSE TWO PANELS.

2431

1 A.   CORRECT.
2 Q.   DO THOSE TWO PANELS RESEMBLE ANY PANELS THAT YOU MAY HAVE
3 SEEN OR PANELS THAT MIGHT HAVE BEEN PRESENT SOMEWHERE ELSE AT
4 ANOTHER BREACH?
5 A.   AGAIN, THOSE ARE THE VERY TYPICAL END PANELS IN ANY BREACH,
6 BUT IF YOU IMAGINE THE SOUTHERN BREACH WHERE THE BARGE MADE ITS
7 ENTRY, THAT'S HOW THE WALL LOOKED LIKE AT THAT POINT WHERE THE
8 BARGE MADE CONTACT WITH THE WALL AND SHEARED OFF THE CAP.
9 Q.   BEFORE THE BARGE MADE CONTACT, THAT'S HOW IT LOOKED?
10 A.   THAT'S HOW IT LOOKED.  THAT WOULD BE THE SMALL SEGMENT OF
11 THE SOUTHERN BREACH.  THAT WOULD BE THE END OF IT.
12 Q.   GO TO THE NEXT SLIDE.  SO WE PUT THESE TWO PANELS TOGETHER.
13      AND LET ME ASK YOU:  THE PANEL OF THE SOUTH END OF THE
14 SOUTH BREACH THAT IS ANALOGOUS TO THIS TILTED PANEL IN THE
15 RIGHT-HAND PICTURE IS WHICH PANEL?  WHY DON'T YOU POINT TO IT.
16 A.   FOR THE EAST BANK, YOU CAN SEE THAT THAT'S THE LEANING PANEL
17 HERE, AND THAT'S THE SHEARED-OFF CAP IN THAT ZONE, WHICH WOULD
18 LOOK LIKE THIS BEFORE THE BARGE MADE CONTACT WITH IT.
19 Q.   LET'S GO TO THE NEXT SLIDE.  VERY BRIEFLY, DR. BAKEER, YOU
20 HEARD -- WE'RE LOOKING NOW AT MARINO REPORT PHOTO 4.20,
21 PLAINTIFF'S EXHIBIT 397.  YOU HEARD DR. MARINO SAY THAT HE
22 THOUGHT THAT A BARGE IMPACT AT THE SOUTHERN END OF THE SOUTH
23 BREACH HAD RESULTED IN THE COILING OF THE WALL, WHICH, I GUESS,
24 IS THE CREATION OF THIS CURVATURE HERE ON THE WALL.  DO YOU AGREE
25 WITH THAT TESTIMONY?

## 2432

1  A.  NO, I DON'T.

2  Q.  WHY NOT?

3  A.  AGAIN, IF WE GO BACK TO THE IMAGES WE SHOWED FROM THE GDM,

4  THE GENERAL DESIGN MEMORANDUM, AND THE IMAGES FROM THE AERIAL

5  PHOTOGRAPH, THAT CURVE EXISTED BEFORE KATRINA.

6  Q.  LET'S GO TO THE NEXT SLIDE.  WE HAVE ONE MORE BREACH AT A

7  DIFFERENT LOCATION.

8      THIS ONE DEPICTS THE AIR PRODUCTS PLANT BREACH IN

9  NEW ORLEANS EAST.  IT'S DEFENDANT'S EXHIBIT 205, BAKEER FIGURE

10  36.

11      DR. BAKEER, TELL THE COURT WHAT THIS BREACH SHOWS AND

12  WITH RESPECT TO HELPING YOU INFER THAT THE SOUTH BREACH AND THE

13  TWO IHNC BREACHES HAPPENED WITHOUT INVOLVEMENT FROM A BARGE.

14  A.  AGAIN, THIS IS AN I-WALL, AND THE FAILURE TOOK PLACE AT A

15  VERY SPECIFIC LOCATION.  TO EXPLAIN TO THE COURT WHAT WE'RE

16  LOOKING AT RIGHT NOW, THERE IS AN I-WALL WITH A CONCRETE CAP,

17  THEN IT TRANSITIONS INTO AN EARTHEN LEVEE ON THE RIGHT SIDE.  YOU

18  CAN SEE WHERE THE CROWN OF THE LEVEE -- HOW HIGH IT IS.  YOU CAN

19  SEE THE ROAD DIPPING ON THIS SIDE GOING DOWN TO A LOWER

20  ELEVATION.  SO THE LEVEE TOP IS HIGHER THAN THE I-WALL.  YOU CAN

21  SEE WHERE THE I-WALL STOPS HERE.

22      THE TRANSITION FROM A CAPPED I-WALL INTO AN EARTHEN

23  LEVEE WAS WITH A WALL WITHOUT A CAP.  SO THAT PARTICULAR

24  BOW-SHAPED FAILURE HERE IN AN I-WALL, YOU SEE THE DISCOLORATION?

25  THIS IS THE PORTION OF THE WALL THAT WAS IN THE DIRT, SO THAT

## 2433

1  WOULD BE THE TOP OF THE LEVEE BEFORE THE BREACH.  THE RUSTED

2  DISCOLORED AREA IS WHAT WAS EXPOSED.

3      TWO OBSERVATIONS, MAYBE EVEN MORE, COULD BE MADE HERE.

4  NOTICE THAT THE CAP OF THE WALL IS HIGHER THAN THE TOP OF THIS

5  WALL.  THAT REMINDS US WITH THE NORTH BREACH, THE WALL, THE NEW

6  1980 WALL WAS HIGHER.  SO YOU GET SORT OF A BATHTUB PHENOMENA

7  WHERE WATER FLOWS OR CONCENTRATES ON THE LOW SPOT.  AS A TENSION

8  CRACK DEVELOPED -- YOU SEE THE TENSION CRACK ON THE FRONT.  YOU

9  SEE THE BOW SHAPE.  YOU SEE THE SCOUR.  THIS WAS NOT ACTUALLY A

10  CANAL.  YOU CAN SEE ALL THE SOILS ERODING ON THE SIDES HERE.

11      WHAT YOU HAD, YOU HAD A CONCENTRATION OF FLOW BETWEEN A

12  HIGH LEVEE ON ONE SIDE, A WALL WITH CAP THAT'S MUCH HIGHER, AND A

13  LOW TOP IN THE MIDDLE.  NOW, THAT REMINDS US ALSO OF THE SOUTH

14  BREACH.  THE AREA THAT I MENTIONED WAS LOWER ELEVATION.  YOU GET

15  OVERTOPPING.  YOU GET SPLASHING.  ONCE YOU CROSS OVER, THIS AREA

16  FAILS -- THE WATER ON BOTH SIDES BALANCE, SO NOTHING ELSE

17  HAPPENS, OF COURSE.

18      THE COURT:  DR. BAKEER, IF YOU'D JUST HELP ORIENT ME A

19  LITTLE BIT ON THIS PHOTOGRAPH.  I'M LOOKING AT -- I SEE THE

20  CONCRETE TO THE LEFT.

21      THE WITNESS:  WHICH IS THIS?

22      THE COURT:  YES.

23      THE WITNESS:  CORRECT.

24      THE COURT:  AND THEN I SEE WHAT LOOKS LIKE CORRUGATED

25  SHEET PILE TO THE IMMEDIATE RIGHT OF THAT.

## 2434

      THE WITNESS:  CORRECT.

      THE COURT:  HOW FAR DID THAT PARTICULAR CONCRETE WALL

EXTEND TO THE RIGHT BEFORE THE BREACH?

      THE WITNESS:  I WILL MARK IT HERE.  THAT'S THE END OF

IT.

      THE COURT:  DID YOU HAVE SIMPLY A SHEET PILE FLOODWALL,

IN ESSENCE, ADJOINING A CONCRETE --

      THE WITNESS:  IF YOU IMAGINE THE SHEET PILES ARE THE

SAME, SO THE TOP -- REMEMBER, LIKE, IN THIS MODEL, IF I LOOK AT

THIS MODEL HERE, YOU SEE THE RED TOP OF THE SHEET PILE, RIGHT

THERE.

      THE COURT:  YES.

      THE WITNESS:  SO THE TOPS OF THE SHEETS ARE THE SAME,

BUT THEY ONLY CAPPED THE AREA TO THE LEFT AND THEY DID NOT CAP

THE --

      THE COURT:  I UNDERSTAND.  GOT YOU.  THANK YOU.

      THE WITNESS:  AND THE EARTHEN LEVEE IS -- YOU SEE THAT

END OF THE SHEET PILE?

      THE COURT:  YES, THEN WE JUST HAVE AN EARTHEN LEVEE

WITHOUT SHEET PILE OR A CAP.

      THE WITNESS:  CORRECT.  AND THAT'S A TYPICAL TRANSITION

THAT WAS ACTUALLY CRITICIZED, THAT THIS DETAIL IS NOT A GOOD

DETAIL.

                    EXAMINATION

BY MR. RAFFMAN:

## 2435

Q.  SO NOW WE'RE GOING TO TURN OUR ATTENTION TO THIS BOW -- THE

BOW FEATURE AND CONTRAST THE BOW FEATURE WITH WHAT YOU MIGHT

EXPECT TO SEE FROM A POINT IMPACT.  SO WE'RE GOING TO CHANGE THE

SLIDE.  WE HAVE NOW PLAINTIFF'S EXHIBIT 437.  THIS IS, I GUESS,

PAGE 73 OF DR. MARINO'S DEMONSTRATIVE.  AND THIS WAS THE IMPACT

THAT HE POSITED AS HIS ILLUSTRATION.

      AND DR. BAKEER, YOU CAN SEE HE'S GOT A TRIANGLE-SHAPED

IMPACT IN HIS GRAPH, RIGHT?

A.  CORRECT.

Q.  IF YOU HAD A POINT IMPACT, IS THAT THE KIND OF SHAPE YOU

WOULD EXPECT TO SEE FROM A POINT IMPACT?

A.  I AGREE WITH HIS ILLUSTRATION, YES, IT SHOULD BE POINTED,

SORT OF A TRIANGULAR.

Q.  DID YOU SEE ANY EVIDENCE ANYWHERE ON THE EAST BANK FLOODWALL

OF A POINTED IMPACT?

A.  NO, I DIDN'T.

Q.  YOU DIDN'T.  NOW, LET'S EXPLAIN FOR THE COURT USING THIS

MODEL HERE WHAT THE DIFFERENCE IS BETWEEN THE SHAPE OF FAILURE

THAT YOU WOULD GET FROM A HYDROSTATICALLY-INDUCED FAILURE AND THE

SHAPE YOU WOULD EXPECT TO SEE FROM A POINT IMPACT.

A.  IF WE ASSUME THAT THIS IS THE FLOOD SIDE, SO THE WATER WAS

COMING FROM THIS SIDE, THIS IS THE PROTECTED SIDE.  THE UNIFORM

PRESSURE FROM WATER WOULD BE ILLUSTRATED BY THIS (INDICATING).

YOU CAN SEE -- AGAIN, I'M TRYING TO APPLY A UNIFORM PRESSURE

ACROSS.  YOU WOULD SEE A CURVE, THEN YOU SEE THE BOW, A VERY

**2436**

1   SMOOTH TRANSITION, THEN IT GOES BACK AT THE END OF THE BREACH TO
2   AGAIN A GENTLE CURVE AND THEN GOES BACK TO THE ALIGNMENT.
3        NOW, AS THE HYDROSTATIC PRESSURE CONTINUES, THAT WALL
4   WOULD FAIL LIKE THIS (INDICATING).  AND THAT'S WHAT YOU SEE ON
5   THE GROUND, A TRANSITION CURVE, A BOW SHAPE, AND THEN IT GOES
6   BACK TO THAT ALIGNMENT, WHICH IS WHAT WE'VE SEEN IN ALL OF THE
7   I-WALLS ILLUSTRATED.
8   Q.  LET'S CONTRAST THAT WITH WHEN YOU HAVE A POINT IMPACT
9   CONCENTRATED ON A SPECIFIC PLACE ON THE WALL.
10  A.  I'M GOING TO ASK JOHN TO HOLD IT, AND AGAIN, IF WE LOOK AT
11  THIS ILLUSTRATION THAT DR. MARINO DID, AND I PUT A POINTED LOAD,
12  THAT'S WHEN I GET, STRAIGHT LINE, A STRAIGHT LINE, A TRIANGULAR
13  SHAPE.  THAT'S AN UNRECOVERABLE PLASTIC STRAIN THAT CANNOT BE
14  RESTORED WITH THE HYDROSTATIC PRESSURE.
15  Q.  SO YOU CAN GO ON AND TAKE THE STAND AGAIN, DR. MARINO --
16  DR. MARINO.  WELL, MY MIND IS --
17       THE COURT:  YOU WERE USING -- IT'S THE GREEN THAT'S
18  ASSOCIATED WITH DR. MARINO, I REALIZE, THE GREEN GRID.
19       MR. RAFFMAN:  THANK YOU, YOUR HONOR.
20       THE COURT:  I UNDERSTAND.  IT'S A SUBLIMINAL PROBLEM.
21       EXAMINATION
22  BY MR. RAFFMAN:
23  Q.  WELL, A SUBLIMINAL PROBLEM ARISES BECAUSE I'M GOING TO ASK
24  YOU A QUESTION ABOUT DR. MARINO.
25       DR. BAKEER, YOU HEARD DR. MARINO SAY THAT THIS POINT

**2437**

1   THAT MIGHT HAVE FORMED WOULD HAVE BEEN ELIMINATED BY THE WATER
2   RUSHING THROUGH.  DO YOU AGREE THAT THAT IS A PLAUSIBLE SCENARIO,
3   THAT THIS POINT WOULD BE WASHED OUT BY A LATER EVENT?
4   A.  NO, I DON'T.  AND I JUST EXPLAINED THAT THIS IS A
5   NONRECOVERABLE PLASTIC STRAIN.
6        TO GIVE YOU AN EXAMPLE, IF YOU BEND A PAPERCLIP AND
7   THEN YOU STRAIGHTEN IT UP, NO MATTER WHAT YOU DO, YOU CAN'T GET
8   THAT PAPERCLIP TO BE STRAIGHT UNLESS YOU GET A HAMMER AND HAMMER
9   ON THAT PAPERCLIP.  ONCE YOU MADE THAT DENT, AT A VERY POINTED
10  ANGLE LIKE THIS, YOU CANNOT RECOVER THE HYDROSTATIC PRESSURE.
11  Q.  AND SO THE ABSENCE OF ANY EVIDENCE OF A POINT IMPACT ALONG
12  THAT CURVING BOW SUGGESTS TO YOU WHAT ABOUT WHETHER OR NOT A
13  BARGE WAS THERE?
14  A.  IT ILLUSTRATES THAT THE FAILURE IS DUE TO HYDROSTATIC
15  PRESSURE WITH NO INVOLVEMENT OF A BARGE.
16  Q.  ALL RIGHT.  LET ME PROCEED TO RMB107, PLEASE.  I'M GOING TO
17  ASK YOU A FEW QUESTIONS ABOUT DR. MARINO'S ANALYSIS.  YOU HAD
18  SUBMITTED A REPORT GIVING YOUR CRITIQUE, AS IT WERE.
19       YOU RECOGNIZE, DR. BAKEER, THAT THIS IS DR. MARINO'S
20  SOIL PROFILE AT THE NORTH BREACH?
21  A.  CORRECT.
22  Q.  AND DO YOU AGREE WITH THAT SOIL PROFILE?
23  A.  NO, I DON'T.
24  Q.  TELL THE COURT WHY YOU DISAGREE WITH IT.
25  A.  THERE ISN'T ENOUGH INFORMATION TO JUSTIFY THE COMPLEX OR

**2438**

1   COMPLICATED PROFILE THAT I SEE IN THIS.
2   Q.  ALL RIGHT.  AND SPECIFICALLY, WITH REFERENCE TO THIS LOBE OF
3   LEVEE EMBANKMENT SOIL, DID YOU SEE EVIDENCE IN YOUR REVIEW OF ANY
4   OF THE BORING LOGS THAT WOULD JUSTIFY THE PLACEMENT OF A LOBE OF
5   HIGH STRENGTH OR HIGH LEVEE EMBANKMENT SOIL AT THAT LOCATION?
6   A.  NO, I DIDN'T.  AND JUST TO ELABORATE ON THIS, IF YOU RECALL,
7   I SPLIT THE FILL TO TWO DIFFERENT MATERIALS, AND ALSO THE MMEG
8   BORINGS INDICATE WHAT'S CALLED "LEVEE MATERIAL", BUT IT'S NOT
9   REALLY A FILL MATERIAL AT SOME BORING LOCATION.  THAT PARTICULAR
10  CROSS-SECTION AT THE LOCATION OF THE BREACH IS NOT
11  REPRESENTATIVE.
12  Q.  AND YOU'VE USED YOUR ILLUSTRATION SHOWING THE GRANULAR
13  MATERIAL DOWN BELOW THE PILE, RIGHT?
14  A.  THAT PARTICULAR LOCATION --
15  Q.  LET ME MOVE ON, THEN.  DEFENDANT'S EXHIBIT 205, LET'S GO TO
16  THE NEXT SLIDE.  HERE WE'VE RENDERED -- THIS IS FIGURE F21 FROM
17  YOUR REPORT, PROFESSIONALLY RENDERED.  SPECIFICALLY NOW WITH
18  RESPECT TO DR. MARINO'S METHOD OF AVERAGING SOIL VALUES AND
19  ARRIVING AT THE SOIL STRENGTHS, DR. BAKEER, TELL THE COURT, DO
20  YOU AGREE WITH HOW DR. MARINO DID THIS?
21  A.  NO, I DON'T.
22  Q.  AND TELL THE COURT WHY NOT.
23  A.  I WOULD LIKE TO SAY FIRST THAT THE SCIENCE OF STATISTICS
24  DIFFERS FROM THE SCIENCE OF GEOSTATISTICS, FROM THE SCIENCE OF
25  BIOSTATISTICS, ET CETERA.  SO WHEN YOU APPLY STATISTICS, PERIOD,

**2439**

1   APPLYING AVERAGES, IT IS NOT NECESSARILY CORRECT.  THE SCIENCE OF
2   BIOSTATISTICS INCLUDES METHODOLOGIES TO IDENTIFY OUTLIERS, WHAT
3   COULD BE AVERAGED, WHAT SHOULD NOT BE AVERAGED.
4        ALSO, I BELIEVE THE JUDGE ASKED ME A QUESTION ABOUT
5   DIFFERENT PILES WITH DIFFERENT SHEET PENETRATIONS, AND I ANSWERED
6   THE QUESTION BY SAYING THAT THE WEAKER AREAS SHOULD GOVERN THE
7   DESIGN.
8        IF I LOOK AT THIS DIAGRAM AS AN EXAMPLE, YOU SEE A
9   BUNCH OF POINTS THAT ARE HIGHER HERE.  YOU SEE FEWER POINTS ON
10  THIS SIDE.  BUT WHEN YOU LUMP IT IN ONE MATERIAL, I BELIEVE THAT
11  THESE TWO POINTS REPRESENT A MUCH WEAKER MATERIAL IN THIS ZONE.
12  THE 510 IS A VERY OVERPREDICTION OF THESE TWO POINTS.  AND IF I
13  WERE TO DO THIS, I WOULD PUT A LINE HERE AT SIX, I WOULD TAKE
14  SOME OF THE POINTS HERE, APPLY MY GEOSTATISTIC PRINCIPLES AND I
15  CAN GO A LITTLE BIT IN DEPTH ON WHAT I MEAN BY THAT, BUT WE CAN
16  DEFINITELY SEE THAT THOSE TWO POINTS ARE NOT REPRESENTED BY THAT
17  RED LINE.
18  Q.  THE RED LINE IS DR. MARINO'S AVERAGE?
19  A.  CORRECT.  I BELIEVE HIS NUMBERS ARE HERE, BUT WE'RE
20  REPRESENTING IT HERE IN PSF.  I BELIEVE HIS NUMBER IS IN TSF,
21  WHICH IS TIME PER SQUARE FOOT, ACCORDING TO THE EXCESSES.
22  Q.  SO WE MARCH THROUGH.  WHEN DR. MARINO CARRIES AN AVERAGE, HE
23  ENDS UP OVERPREDICTING THE TRUE STRENGTH OF SOILS AT THE WEAKER
24  AREAS.  IS THAT A FAIR SUMMARY?
25  A.  IT'S NOT REPRESENTATIVE.  AVERAGE AND MEANS, ET CETERA,

**2440**

1  DON'T APPLY HERE.
2      LET ME TAKE YOU IN ANOTHER WAY TO ANSWER THIS QUESTION.
3  THERE ARE TWO TYPES OF BORINGS USED BY THE CORPS OF ENGINEERS.
4  THERE'S WHAT'S CALLED A "G BORING" AND THERE'S WHAT'S CALLED A "U
5  BORING." A U, ACCORDING TO THE CORPS OF ENGINEERS, IS AN
6  UNDISTURBED SOIL BORING. IT'S A FIVE-INCH DIAMETER SAMPLE. A
7  G BORING IS A GENERAL BORING. IT'S ONLY A THREE-INCH DIAMETER
8  SAMPLE.
9      THE PURPOSE OF THE U BORING, IF YOU IMAGINE IT'S A
10 FIVE-INCH DIAMETER SAMPLE, YOU CAN ACTUALLY RETRIEVE THREE
11 SAMPLES FROM THAT PIECE OF CLAY THAT I GOT, WHICH IS TYPICALLY A
12 FOOT AND A HALF HIGH, I CAN GET THREE IDENTICAL SAMPLES, TEST THE
13 THREE SAMPLES AND FIND OUT WHETHER THE NUMBERS COMING FROM THE
14 THREE TESTS AGREE OR NOT. WHEN YOU TAKE AN UNREFINED
15 COMPRESSION, WHICH IS THE UC OR UCT TEST, IT'S PERFORMED ON A
16 THREE-INCH SAMPLE WHICH IS TRIMMED TO BE A 1.6-INCH DIAMETER
17 SAMPLE. BUT YOU ONLY HAVE ONE POINT. FROM A PROBABILITY
18 VIEWPOINT, YOU'RE EITHER RIGHT OR WRONG. YOU HAVE A 50/50
19 PROBABILITY. BUT WHEN YOU HAVE THREE SAMPLES, FROM THE UU TEST,
20 IT'S A DIFFERENT BALL GAME.
21     SECONDLY, YOU HAVE TO --
22 Q.  BEFORE YOU GO TO THE SECOND POINT, LET'S MAKE SURE THAT THE
23 FIRST POINT IS DRIVEN HOME.
24     DR. MARINO HAS TREATED THE UU BORINGS AND THE UCT
25 BORINGS AS IF THEY ARE IN EQUAL WEIGHT, RIGHT?

**2441**

1  A.  CORRECT. ALSO, HE TREATED WHAT'S CALLED "NOT AVAILABLE
2  TEST" AND GIVE IT THE SAME WEIGHT.
3  Q.  SO HE HAS NOT WEIGHTED THE RESULTS TO ACCOUNT FOR THE FACT,
4  AS YOU'VE TESTIFIED, THAT THE UU IS A BETTER, MORE REPRESENTATIVE
5  TEST THAN A UCT OR A DIFFERENT TEST? IS THAT FAIR, DR. BAKEER?
6  A.  CORRECT. ACCORDING TO THE CORPS OF ENGINEERS, YOU GIVE MORE
7  EMPHASIS TO THE UU TEST AND USE THE UCT OR THE UNCONFIRMED
8  COMPRESSION TO CHECK.
9  Q.  NOW, LET'S GO TO THE SECOND POINT YOU WERE ABOUT TO MAKE
10 ABOUT WHAT DR. MARINO -- WHERE DR. MARINO HAS GONE ASTRAY.
11 A.  LET ME JUST INTRODUCE TO THE COURT THE CONCEPT OF GLOBAL
12 STABILITY AND THE CONCEPT OF LOCAL STABILITY. JUST EXPLAIN THAT
13 ALL THE RESULTS FOR YOUR ANALYSIS ARE DEPENDENT ON TWO SPECIFIC
14 QUANTITIES FOR EACH SOIL AND THEN THE STRATIFICATIONS THAT ARE
15 USED. SO I USE A DIFFERENT STRATIFICATION FOR THIS, AND I WILL
16 GET A DIFFERENT ANSWER.
17     GLOBAL STABILITY, IF WE GO BACK IN MEMORY TO THE SLIDE
18 SHOWING THE METHOD OF PLANES, THE THREE BLOCKS, WHAT CAUSES
19 FAILURE IS THE HYDROSTATIC PRESSURE IN ADDITION TO THE WEIGHTS OF
20 THE SOILS THEMSELVES. THE SOILS WERE TO -- THE SOILS ADJACENT TO
21 THEM. THE WEIGHT OF THE SOIL PUSHES THE SOILS BEHIND IT.
22     SO IF YOU OVER-PREDICT THE DENSITY, UNDER-PREDICT THE
23 STRENGTH, THE STRENGTH PROVIDES THE RESISTANCE. THE FACTOR OF
24 SAFETY IS AN ISSUE OF RESISTANCE TO DRIVING. SO YOU CAN SEE HOW
25 THE TESTING IS IMPORTANT. YOU HAVE TO DETERMINE A REASONABLE

**2442**

1  DENSITY AND A REASONABLE STRENGTH BASED ON THE DATA.
2      LET ME JUST EXPAND A LITTLE BIT HERE TO SAY THAT WHEN
3  YOU DEFINE A SAMPLE AS BEING AN OUTLIER, THERE IS A SCIENCE THAT
4  TELLS YOU IF THIS SAMPLE IS AN OUTLIER OR NOT. BEING TOO HIGH IN
5  STRENGTH OR TOO LOW IN STRENGTH IS NOT AN OUTLIER. AN OUTLIER --
6  AND LET ME ILLUSTRATE THIS SIMPLY. SOILS ARE MADE OF PARTICLES
7  AND VOIDS. THE MORE VOIDS YOU HAVE, THE LESS IT'S GOING TO
8  WEIGH. IT WEIGHS NOTHING. SOILS WEIGH SOMETHING.
9      SO IF THE SOIL IS COMPACT TOGETHER, THEY BECOME
10 STRONGER BUT THEY WILL WEIGH MORE. SO THE RESULT OF THE TESTS
11 TELLS ME, THIS IS A VERY LIGHT MATERIAL, BUT IT'S VERY STRONG.
12 SOMETHING IS WRONG. THAT'S AN OUTLIER.
13 Q.  NOW, WITH SPECIFIC REFERENCE TO DR. MARINO'S ANALYSIS, WHEN
14 HE CARRIES OUT THESE AVERAGES OF THESE VARIOUS DIFFERENT TYPES OF
15 SAMPLES AND REPRESENTS THEM AS A -- THIS IS THE VALUE FOR THE
16 ENTIRE STRATA, HE TENDS TO DO WHAT WITH RESPECT TO THE SAMPLES
17 THAT ARE ACTUALLY OF LOWER STRENGTH?
18 A.  YOU'RE IGNORING THOSE AND YOU'RE GIVING EQUAL WEIGHT TO ALL
19 THE POINTS REGARDLESS FOR WHAT THE SOURCE, WHERE THEY CAME FROM,
20 HOW THEY LOOKED LIKE, WHO SAMPLED THEM, HOW THEY WERE SAMPLED,
21 HOW THEY WERE TESTED.
22     THE COURT: IS THERE AN ESTABLISHED PROTOCOL TO THEN
23 COME UP WITH AN APPROPRIATE STATISTICAL METHOD TO GET AN IDEA OF
24 THE GENERAL STRENGTH RATHER THAN AVERAGING?
25     THE WITNESS: THERE WERE PUBLISHED BOOKS, TEXTBOOKS,

**2443**

1  THERE ARE PAPERS PUBLISHED ON THAT, AND WHEN WE DEVELOP A
2  STRENGTH DIAGRAM FOR A DESIGN OF A LEVEE OR A FLOODWALL FOR THE
3  CORPS OF ENGINEERS, EVEN IF A JUNIOR ENGINEER IS DEVELOPING IT,
4  IT'S REVIEWED BY SOMEONE LIKE ME, AND THEN IT'S REVIEWED BY THE
5  CORPS OF ENGINEERS. IT IS A RIGOROUS PROCESS.
6      FOR EXAMPLE, THE ARMY SAYS THAT YOU SHOULD HAVE NO
7  MORE THAN ONE-THIRD OF THE POINTS ON THE LOW SIDE OF A CURVE.
8  THAT IF YOU COUNT THE NUMBER OF POINTS HERE, THERE SHOULD BE
9  TWICE AS MANY AS THE POINTS ON THIS SIDE. THAT'S ONE CONCEPT.
10     THE GREEN LINE YOU SEE HERE IS A GUIDELINE FOR WHAT
11 WE SHOULD EXPECT FOR THE SOIL STRENGTH. THIS LINE IS REPRESENTED
12 BY A LINE CALLED .22 OR .23 SIGMA. IT'S A GREEK LETTER, SIGMA.
13     THE SOILS UNDER THE LEVEE WOULD SHOW A TENDENCY TO
14 BE ON THE HIGHER SIDE OF THE GREEN LINE. ONCE YOU GO DEEPER IN
15 THE GROUND, YOU WILL SEE THAT THE NUMBERS WILL MATCH. SO YES,
16 THERE IS A VERY WELL-ESTABLISHED SCIENCE.
17     FOR EXAMPLE, A PEAT OR AN ORGANIC MATERIAL SHOULD
18 HAVE A HIGH MOISTURE CONTENT, SHOULD BE. AGAIN, WHY? BECAUSE
19 YOU HAVE A LOT OF VOIDS, THE WATER GETS IN THE VOIDS. SO IT'S A
20 VERY WELL -- WE TEACH THIS IN SOIL MECHANICS UNDERGRADUATES. I
21 MEAN, IT'S A WELL-KNOWN CONCEPT.
22             EXAMINATION
23 BY MR. RAFFMAN:
24 Q.  ALL RIGHT. ONE MORE SLIDE ON DR. MARINO BEFORE WE MOVE ON
25 AND THEN CLOSE.

**2444**

1  LET ME -- WELL, THE COURT HAS SEEN TEAM LOUISIANA
2  CONCLUDED THAT AVERAGE SOIL'S CONDITION IS NOT THE PLACE WHERE
3  FAILURE OCCURS; IS THAT RIGHT?  YOU READ THAT?
4  A.  THAT'S CORRECT.
5  Q.  SO LET'S MOVE ON.  HERE WE ARE.
6      DR. BAKEER, WE'RE LOOKING NOW AT PLATES 35 AND 36 OF
7  YOUR SUPPLEMENTAL REPORT.  BRIEFLY TELL THE COURT WHAT THESE
8  GRAPHS SHOW AND HOW THEY RELATE TO YOUR CRITIQUE OF DR. MARINO'S
9  ANALYSIS.
10 A.  THESE DRAWINGS CAME FROM IPET.  AGAIN, I THINK I DISCUSSED
11 WITH THE COURT THIS MORNING THAT THE STRENGTH UNDER THE TOE OR
12 OUTSIDE THE LEVEE AREA WOULD BE DIFFERENT THAN THE STRENGTH UNDER
13 THE CENTER LINE.  YOU WOULD EXPECT HIGHER STRENGTH UNDER THE
14 CENTER LINE DUE TO THE WEIGHT OF THE LEVEE.
15     SO THAT'S WHY, IN YOUR ANALYSIS, WHEN THEY HAVE THREE
16 DIFFERENT STRENGTH LINES, THE LINES I'M TALKING ABOUT ARE THE
17 BLUE LINES AND THE RED LINES.  THOSE LINES --
18 Q.  THE BLUE, TO BE CLEAR, YOU'VE INCLUDED DR. MARINO'S
19 STRENGTHS, RIGHT?
20 A.  CORRECT.
21 Q.  AND THE RED IS IPET'S?
22 A.  THAT'S THE IPET, AND MY OWN ANALYSIS USED THE IPET VALUES.
23 Q.  SO IN EACH CASE IN THE UPPER LAYER AND THE MARSH LAYERS,
24 DR. MARINO'S RESULTS SHOW HIGHER STRENGTHS THAN YOURS AND IPET'S,
25 RIGHT?

**2445**

1  A.  THAT'S CORRECT.  YOU CAN SEE THE BLUE LINE IS TO THE
2  RIGHT-HAND SIDE OF THE RED LINE.
3  Q.  AND THESE RESULTS ARE GENERATED BY THE PROBLEMS YOU NOTED IN
4  DR. MARINO'S ANALYSIS.  IS THAT FAIR?
5  A.  THAT IS CORRECT.
6  Q.  NOW, ONE OF THE THINGS THAT WE SEE HERE ARE THESE SHARP
7  LINES MOVING UP AND DOWN THE PAGE WITH HORIZONTAL VARIATIONS
8  ALMOST LIKE WHAT WE IMAGINE AN ELECTROCARDIOGRAM MIGHT LOOK LIKE.
9  TELL THE COURT WHAT THOSE LINES REPRESENT.
10 A.  THIS IS THE TRACE OF THE CONE PENETROMETER, WHAT CPT STANDS
11 FOR, CONE PENETROMETER TEST.
12     IF YOU RECALL, THE TRUCK THAT WAS ON FOUR OUTRIGGERS
13 THAT I EXPLAINED ON THE SLIDES YESTERDAY THAT SHOWED UP BY THE
14 NORTH BREACH, THAT'S A CONE PENETROMETER TRUCK.  INSIDE THIS
15 TRUCK, THERE IS A DEVICE WHICH PRETTY MUCH LOOKS LIKE THE LASER
16 POINTER.  YOU DRIVE IT IN THE GROUND AND YOU MEASURE THE
17 RESISTANCE AT THE TIP OF THE CONE.  THE END OF IT IS NOT FLAT
18 LIKE THIS.  IT WILL BE A PERFECT CONE.  IT MEASURES THE
19 RESISTANCE AT THE TIP.  IT MEASURES ALSO THE RESISTANCE ALONG THE
20 SHAFT.
21     AND YOU DEVELOP WHAT YOU CALL AN EKG (SPELLED
22 PHONETICALLY) OR A DIAGRAM.  THE EKG IS SIMILAR TO THE CONE
23 PENETROMETER.  THIS IS A HIGH-RESISTANCE ZONE.  THIS IS A
24 LOW-RESISTANCE ZONE.  THIS IS A HIGH-RESISTANCE ZONE.  YOU CAN
25 COMFORTABLY SAY THAT THE CONE PENETROMETER GIVES YOU A GOOD

**2446**

1  MEASURE OF THE ACTUAL STRENGTH.  YOU CAN SEE THAT THE ACTUAL DATA
2  OF THE CORPS OF ENGINEERS IPET GROUP USED HUGS THE LINE AS WELL.
3  SO YOUR DATA FROM TESTING CORRELATES WELL WITH THE CONE
4  PENETROMETER.
5      SO THE RED LINE IS PRETTY MUCH -- YOU CAN SEE IT'S EVEN
6  OVERESTIMATING TO SOME EXTENT, BUT IT'S REPRESENTATIVE OF THE
7  DATA.  CPT IS NOW A STANDARD IN THE STATE OF LOUISIANA FOR
8  DEPARTMENT OF TRANSPORTATION SINCE THE '80S, AND SINCE KATRINA,
9  IT'S A STANDARD TEST USED BY THE ARMY CORPS OF ENGINEERS.
10 Q.  SO WHEN YOU LOOK AT DR. MARINO'S ANALYSIS, DID DR. MARINO
11 USE THE CPT RESULTS IN HIS ANALYSIS?
12 A.  I DON'T BELIEVE SO.  IT'S BASED ON THE NUMBERS.  YOU CAN SEE
13 FROM ALL THE GEOTECHNICAL ANALYSES PERFORMED BY ILIT, BY IPET, IN
14 MY ANALYSIS, FAILURE WAS GOVERNED IN THE UPPER MARSH ZONES.  WE
15 NEVER DETECTED ANY FAILURE PLANE THAT'S BELOW MINUS 20.  MY
16 ANALYSIS INDICATED MINUS 15, MINUS 17.
17     SO IF YOU OVERPREDICT THE VALUES ABOVE ELEVATION MINUS
18 20, YOU CONTROL THE FAILURE.  SO WHATEVER HAPPENS IN A
19 INTERDISCIPLINARY -- PLANE IS IRRELEVANT.  SO IF YOU EITHER
20 PREDICT, OVERPREDICT OR UNDERPREDICT IS IRRELEVANT.
21 Q.  TO WRAP IT UP THEN, BY IGNORING THE CPT DATA, DR. MARINO
22 ARRIVED AT STRENGTH VALUES IN THE UPPER LAYERS THAT WERE JUST TOO
23 HIGH, RIGHT?
24 A.  HIS ORIGINAL BIAS OF USE OF THE AVERAGE AND IGNORING THE CPT
25 CONTRIBUTED TO VERY HIGHER STRENGTHS THAN WHAT I WOULD HAVE

**2447**

1  ASSUMED OR WHAT WOULD THE CORPS OF ENGINEERS ASSUMED IN THE
2  FORMER DESIGNS OF ELEVATION LED TO THE HIGHER SAFETY FACTORS IN
3  HIS ANALYSIS.
4  Q.  VERY GOOD.  AND YOU'VE DESCRIBED IPET AND ILIT AND YOU'VE
5  REVIEWED IPET, ILIT, TEAM LOUISIANA, AND OTHER INDEPENDENT
6  REPORTS, RIGHT?
7  A.  ACADEMY OF SCIENCE, ACE, ALL THE REPORTS THAT CAME OUT, I
8  DID RUN A REVIEW.  AND AS I SAID, WE ARE INVOLVED WITH THIS ON A
9  DAILY BASIS.  WE ALSO REVIEWED THE PROCEDURE -- SOME OF THE
10 PROCEDURES IN HSDRS FOR THE CORPS OF ENGINEERS.  OUR FIRM DID
11 THAT.
12 Q.  NONE OF THE INDEPENDENT INVESTIGATIONS CONCLUDED THAT A
13 BARGE HAD ANYTHING TO DO WITH THE TWO FAILURES, RIGHT?
14 A.  NO, THEY DIDN'T.
15 Q.  AND IN YOUR OPINION, DR. BAKEER, DID DR. MARINO SHOW THAT
16 THE BARGE MUST HAVE CAUSED THE NORTH AND SOUTH BREACHES?
17 A.  NO, I DON'T BELIEVE SO.  I DON'T BELIEVE SO.
18 Q.  DID THE BARGE CAUSE THE NORTH AND SOUTH BREACHES?
19 A.  NO.  I DON'T BELIEVE THAT THAT WAS THE CASE.
20     MR. RAFFMAN:  I TENDER THE WITNESS, JUDGE.
21     THE COURT:  THANK YOU VERY MUCH, COUNSEL.  I GUESS IT'S
22 CLOSE ENOUGH TO 1:00.  DO YOU WANT TO GO AHEAD AND TAKE OUR LUNCH
23 BREAK AND START CROSS?
24     MR. KHORRAMI:  THAT WOULD BE BEST, YOUR HONOR.
25     THE COURT:  WE ARE GOING TO WORK UNTIL 6:00, SO LET'S

**2448**

1    COME BACK AT 2 O'CLOCK.
2         MR. RAFFMAN:  I NEED TO MOVE THESE EXHIBITS IN.  WHEN WE
3    COME BACK, MAY I PLEASE MOVE EXHIBITS?
4         THE COURT:  WE CAN LET YOU DO IT RIGHT NOW.
5         MR. RAFFMAN:  I APOLOGIZE.  I WOULD LIKE TO MOVE
6    DEFENDANT'S EXHIBITS 350 TO 355 THAT HAVE BEEN MARKED.
7         THE COURT:  ANY OBJECTION?
8         MR. KHORRAMI:  NO OBJECTION, YOUR HONOR.
9         THE COURT:  LET THEM BE ADMITTED.
10        MR. RAFFMAN:  356 WILL BE HIS POWERPOINTS.
11            (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS,
12   DEFENDANT'S EXHIBITS 350 THROUGH 355 AND 356 WERE ADMITTED INTO
13   EVIDENCE.)
14        MR. RAFFMAN:  THANK YOU, YOUR HONOR.  THANKS, COURT
15   STAFF.
16            (WHEREUPON, AT THIS POINT IN THE PROCEEDINGS, A
17   LUNCHEON RECESS WAS TAKEN.)
18                    *   *   *
19
20
21
22
23
24
25

**2449**

1              REPORTER'S CERTIFICATE
2
3       I, CATHY PEPPER, CERTIFIED REALTIME REPORTER, REGISTERED
4    MERIT REPORTER, REGISTERED PROFESSIONAL REPORTER, CERTIFIED COURT
5    REPORTER OF THE STATE OF LOUISIANA, OFFICIAL COURT REPORTER FOR
6    THE UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF LOUISIANA,
7    DO HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT
8    TRANSCRIPT, TO THE BEST OF MY ABILITY AND UNDERSTANDING, FROM THE
9    RECORD OF THE PROCEEDINGS IN THE ABOVE-ENTITLED AND NUMBERED
10   MATTER.
11
12
13            S/CATHY PEPPER
14            CATHY PEPPER, CRR, RMR, CCR
15            OFFICIAL COURT REPORTER
16            UNITED STATES DISTRICT COURT
17
18
19
20
21
22
23
24
25

2450

1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF LOUISIANA

3

4

5       IN RE:  KATRINA DREDGING      *   Civil Action
        LIMITATION ACTION             *
6       CONSOLIDATED LITIGATION       *   No. 05-4182
                                      *
7                                     *   Section K(2)
        PERTAINS TO:                  *
8       BARGE                         *   New Orleans, Louisiana
                                      *
9       MUMFORD, C.A. NO. 05-5724, AS *   July 7, 2010
        TO PLAINTIFFS JOSEPHINE       *
10      RICHARDSON AND HOLLIDAY       *   Afternoon Session
        JEWELERS, INC., ONLY          *
11      AND                           *
        BENOIT, C.A. NO. 06-7516, AS  *
12      TO PLAINTIFFS JOHN ALFORD AND *
        JERRY ALFORD ONLY             *
13      * * * * * * * * * * * * * * * *
14                         DAY ELEVEN
                     BENCH TRIAL BEFORE THE
15               HONORABLE STANWOOD R. DUVAL, JR.
                  UNITED STATES DISTRICT JUDGE
16

17      APPEARANCES:
18      For the Plaintiffs:       Best Koeppel
                                  BY:  LAURENCE E. BEST, ESQ.
19                                BY:  PETER S. KOEPPEL, ESQ.
                                  2030 St. Charles Avenue
20                                New Orleans, Louisiana 70130
21
22      For the Plaintiffs:       Law Offices of Brian A. Gilbert
                                  BY:  BRIAN A. GILBERT, ESQ.
23                                2030 St. Charles Avenue
                                  New Orleans, Louisiana  70130
24
25
              JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA

2451

APPEARANCES:

For the Plaintiffs:     Wiedemann & Wiedemann
                        BY:  KARL WIEDEMANN, ESQ.
                        BY:  LAWRENCE WIEDEMANN, ESQ.
                        821 Baronne Street
                        New Orleans, Louisiana  70113

For the Plaintiffs:     Patrick J. Sanders, LLC
                        BY:  PATRICK J. SANDERS, ESQ.
                        3316 Ridgelake Drive
                        Suite 100
                        Metairie, Louisiana  70002

For the Plaintiffs:     Law Office of Richard T. Seymour,
                        P.L.L.C.
                        BY:  RICHARD T. SEYMOUR, ESQ.
                        1150 Connecticut Avenue N.W.
                        Suite 900
                        Washington, D.C.  20036-4129

For the Plaintiffs:     Khorrami, Pollard & Abir, LLP
                        BY:  SHAWN KHORRAMI, ESQ.
                        444 S. Flower Street
                        33rd Floor
                        Los Angeles, California  90071

For the Plaintiffs:     Wilson, Grochow, Druker & Nolet
                        BY:  LAWRENCE A. WILSON, ESQ.
                        233 Broadway
                        5th Floor
                        New York, New York  10279

For the Defendant:      Chaffe, McCall, L.L.P.
                        BY:  DEREK A. WALKER, ESQ.
                        BY:  CHARLES P. BLANCHARD, ESQ.
                        1100 Poydras Street, Suite 2300
                        New Orleans, Louisiana 70163

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

---

2452

APPEARANCES:

For the Defendant:      Goodwin Procter, L.L.P.
                        BY:  JOHN ALDOCK, ESQ.
                        BY:  MARK RAFFMAN, ESQ.
                        BY:  ADAM CHUD, ESQ.
                        BY:  KIRSTEN ROBBINS, ESQ.
                        BY:  ERIC I. GOLDBERG, ESQ.
                        901 New York Avenue, NW
                        Washington, D.C. 20001

For the Defendant:      Sutterfield & Webb
                        BY:  DANIEL A. WEBB, ESQ.
                        650 Poydras Street, Suite 2715
                        New Orleans, Louisiana 70130

For the Defendant:      Lafarge North America, Inc.
                        BY:  PETER KEELEY, ESQ.
                        12950 Worldgate Drive
                        Herndon, Virginia  20170

Official Court Reporter:    Jodi Simcox, RMR, FCRR
                            500 Poydras Street
                            Room HB-406
                            New Orleans, Louisiana 70130
                            (504) 589-7780

Proceedings recorded by mechanical stenography, transcript
produced by computer.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

---

2453

I N D E X

                                            Page

REDA BAKEER
    Cross-Examination                       2454
DICK PHILLIP SKAER
    Direct Examination                      2502
    Cross-Examination                       2533
    Redirect Examination                    2565

ROBERT BEA
    Direct Examination                      2570

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

---

2454

AFTERNOON SESSION

(July 7, 2010)

13:47           ' ' ' ' '

14:03           THE DEPUTY CLERK:  All rise, please.  Court's in

14:03   session.  Please be seated.

14:03           THE COURT:  Good afternoon.  We're now ready to

14:03   cross-examine Dr. Bakeer.

14:03           MR. KHORRAMI:  Yes, Your Honor.  And my co-counsel,

14:03   Mr. Wilson, is very eager to do that.  So I will yield to him,

14:04   if it's okay with the Court.  I've already talked to the

14:04   defense about it.  Is that fine with the Court?

14:04           THE COURT:  I may have missed something.

14:04           MR. KHORRAMI:  I said my co-counsel, Mr. Wilson, is

14:04   very eager to do that, and so I was going to yield to him.  And

14:04   I just checked with the defense, and they don't have an

14:04   objection as long as the Court does not -- does not have an

14:04   issue with it.

14:04           THE COURT:  It's your -- it's your decision to make.

14:04           MR. KHORRAMI:  Thank you, Your Honor.

14:04           MR. WILSON:  Good afternoon, Your Honor.

09:20           (WHEREUPON, Reda Bakeer, having been previously duly

09:20   sworn, testified as follows.)

14:04           CROSS-EXAMINATION

14:04   BY MR. WILSON:

14:04   Q.   Good afternoon, Doctor.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2455**

1  14:04  A.  Good afternoon.
2  14:04  Q.  Doctor, can you show me anywhere in your report, the
3  14:04  declaration, where it indicates that a moved boring location is
4  14:04  different than an adjusted boring location?
5  14:04  A.  That wasn't part of my report.
6  14:04  Q.  Okay.  Do you have any authoritative text to support your
7  14:04  opinion that a moved boring location is different than an
8  14:04  adjusted boring location?
9  14:04  A.  That's our normal terminology that we use in our field
10  14:05  exploration done by our firm and the -- that's the common
11  14:05  practice on those.
12  14:05  Q.  Do you have any authoritative text, Doctor, that supports
13  14:05  your opinion?
14  14:05  A.  Just the requirements by ASTM.  There are requirements by
15  14:05  the agency that you're doing the soil boring for, so that
16  14:05  varies from one agency to the other.
17  14:05      If you're working for the DOTD, for example, yes,
18  14:05  there are guidelines upon when you do it.
19  14:05      If you're working for the U.S. Army Corps of
20  14:05  Engineers, yes, you need to do it.  It's similar documents,
21  14:05  yes.
22  14:05  Q.  Did you bring any authoritative texts to support your
23  14:05  opinion, Doctor?
24  14:05  A.  Not -- not with me, but I can furnish you those.  I can
25  14:05  give you, actually, EM manual numbers and so forth where you

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2456**

1  14:05  can dig up this information from.
2  14:05  Q.  Doctor, do you recall your very expensive demonstrative
3  14:05  evidence of the wall that you had brought in yesterday?  It's
4  14:05  right over there.
5  14:05  A.  Correct.
6  14:05  Q.  Okay.  And you have shown us how the wall failed at the
7  14:05  weld.  You had a piece of Velcro, and you tore it, and then you
8  14:06  showed the Court how strong the sheet piling was and how it
9  14:06  twisted.  Do you recall that, Doctor?
10  14:06  A.  Correct.
11  14:06  Q.  Okay.
12  14:06      MR. WILSON:  Bob, could you put up slide 50, please?
13  14:06  BY MR. WILSON:
14  14:06  Q.  Doctor --
15  14:06      MR. WILSON:  Do we have a pointer?
16  14:06  BY MR. WILSON:
17  14:06  Q.  -- is this area right here -- this is the 1980 wall;
18  14:06  correct?
19  14:06  A.  Correct.
20  14:06  Q.  And right here is a V in between a piece of sheet pile.
21  14:06  And the sheet pile is connected to the 1980 wall; correct?
22  14:06  A.  That's correct.
23  14:06  Q.  Okay.  And that's where you opine that the failed weld
24  14:06  occurred; is that correct?
25  14:06  A.  The weld and the tear.  There is a tear as well.  If you

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2457**

1  14:06  look at this picture carefully, you will see that those two
2  14:07  pieces should have been adjoined.
3  14:07  Q.  There also a weld and a tear?
4  14:07  A.  That's correct.  And that's the exhumed sheet pile that I
5  14:07  referred to in my photographs that my company did.
6  14:07  Q.  Okay.  We'll get to that.
7  14:07      Now, I see that this side, the right side of that
8  14:07  sheet pile, is not connected to anything; correct?
9  14:07  A.  That's the connection, where there was another tear and
10  14:07  failure of an interlock took place.  That's correct.
11  14:07  Q.  Okay.  Now -- so you're saying there's two tears; is that
12  14:07  what you're saying, Doctor?
13  14:07  A.  That's correct.
14  14:07  Q.  Okay.  And you would need a localized force for a tear; is
15  14:07  that correct?
16  14:07  A.  You need a localized force?  Is this a question?
17  14:07  Q.  Yes.  A localized force, a local force.
18  14:07  A.  No, you don't need a localized force acting at that
19  14:07  particular point, no.
20  14:07  Q.  It's your opinion that hydrostatic pressure alone can tear
21  14:07  a piece of sheet pile in half?
22  14:07  A.  That's correct.
23  14:07  Q.  Okay.
24  14:07      MR. WILSON:  Can we put up -- it's DX-141, Figure 44.
25  14:08  Okay.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2458**

1  14:08  BY MR. WILSON:
2  14:08  Q.  And that's -- that's the tear right there, Doctor; right?
3  14:08  A.  That is correct.
4  14:08  Q.  Okay.
5  14:08      MR. WILSON:  And if we could go to Figure 484.
6  14:08  BY MR. WILSON:
7  14:08  Q.  Actually, it tore sheet pile right in half, is that
8  14:08  correct, right here?
9  14:08  A.  Not really in half.  But, yes, it tore the sheet pile.
10  14:08  Q.  Well, okay.  It didn't make it all the way, just tearing
11  14:08  it in half, but where the tear --
12  14:08  A.  I can --
13  14:08  Q.  It's not at the end; correct?  It's in the middle?
14  14:08  A.  Oh, mid-height, you're correct.  If it's mid-height of the
15  14:08  wall, mid-length of the wall, but not at the center of the
16  14:08  section, yes.
17  14:08  Q.  Okay.  But you will agree with me that the tear is not at
18  14:08  the edge of the sheet pile in this photograph; it shows that
19  14:08  it's in the middle?
20  14:08  A.  I'm sorry?
21  14:08  Q.  The middle of the sheet pile, right here, Doctor.  It's
22  14:09  connected right here?
23  14:09  A.  Yes.  Because don't forget this section, it got doubled,
24  14:09  the resistance.  You got a sheet pile with another sheet pile
25  14:09  behind it.  So there's some areas where you have sufficient

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2459**

| | |
|---|---|
| 1 | 14:09  strength, the tear is going to stop. |
| 2 | 14:09  Q.  Okay. |
| 3 | 14:09  A.  And especially when it hits the ground surface, that's |
| 4 | 14:09  where the tear stops.  You got the resistance of the earth you |
| 5 | 14:09  have to unravel first before you -- the tear continues.  So |
| 6 | 14:09  it's a very complex mechanics.  This is soil structure and |
| 7 | 14:09  direction proprieties. |
| 8 | 14:09  Q.  And you're not a structural engineer; correct? |
| 9 | 14:09  A.  I practice as a structural engineering, but I'm not here |
| 10 | 14:09  to testify in relation to the structures.  But I practiced |
| 11 | 14:09  structural engineering for three years.  I'm a graduate -- my |
| 12 | 14:09  undergraduate degree is in structural engineering. |
| 13 | 14:09  Q.  And you're not a metallurgist; correct? |
| 14 | 14:09  A.  No, I'm not. |
| 15 | 14:09  Q.  Okay.  But you're making an assessment as to a faulty |
| 16 | 14:09  weld -- |
| 17 | 14:09      MR. WILSON:  Can we go back to slide 50, please? |
| 18 | 14:09  BY MR. WILSON: |
| 19 | 14:09  Q.  You made an assessment as to a faulty weld; correct? |
| 20 | 14:10  A.  Correct. |
| 21 | 14:10  Q.  Okay.  But you can't make that assessment; isn't that |
| 22 | 14:10  true, sir? |
| 23 | 14:10  A.  Let me answer you in two different ways. |
| 24 | 14:10  Q.  Well, that's a yes or a no question. |
| 25 | 14:10  A.  No, I can. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2461**

| | |
|---|---|
| 1 | 14:11      THE COURT:  Okay.  Sir. |
| 2 | 14:11      MR. WILSON:  If you could, put up the doctor's |
| 3 | 14:11  testimony.  It's page 190, line 19 to 191 line 5. |
| 4 | 14:11  BY MR. WILSON: |
| 5 | 14:11  Q.  I'm going to refer you to the fourth line from the bottom: |
| 6 | 14:11  "I cannot make an assessment about welding.  I'm not a |
| 7 | 14:11  structural engineer or a metallurgist to make the assessment." |
| 8 | 14:11      That was your prior testimony; correct, Doctor? |
| 9 | 14:11  A.  That was an accurate statement.  But you have to read it |
| 10 | 14:11  in the context.  I did not inspect the sheet pile elements |
| 11 | 14:11  and take samples and test them in the lab.  So I did not make |
| 12 | 14:11  an assessment based on that. |
| 13 | 14:11  Q.  I understand, Doctor.  Thank you. |
| 14 | 14:11  A.  Right.  And I said my expertise here in this case is |
| 15 | 14:12  limited to being a geotechnical expert, not as anything else. |
| 16 | 14:12  So I'm consistent with my statement. |
| 17 | 14:12  Q.  Okay. |
| 18 | 14:12      MR. WILSON:  Could we go to Marino slide 101, please? |
| 19 | 14:12  Okay. |
| 20 | 14:12  BY MR. WILSON: |
| 21 | 14:12  Q.  All right.  Sir, I wanted to talk to you about the |
| 22 | 14:12  concrete caps.  Well, concrete caps you described as aesthetic. |
| 23 | 14:12  A.  That's one function. |
| 24 | 14:13      THE COURT:  I didn't hear you. |
| 25 | 14:13      THE WITNESS:  That's one function -- |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2460**

| | |
|---|---|
| 1 | 14:10  Q.  Okay. |
| 2 | 14:10  A.  I'm giving you my answer. |
| 3 | 14:10      MR. WILSON:  Could you put up deposition -- |
| 4 | 14:10      THE COURT:  Wait.  Let him complete answering before |
| 5 | 14:10  you -- |
| 6 | 14:10      MR. WILSON:  I'm sorry. |
| 7 | 14:10      THE COURT:  He says he's going to give the answer, |
| 8 | 14:10  and then you can put up the deposition. |
| 9 | 14:10      THE WITNESS:  The first answer comes from your own |
| 10 | 14:10  expert, Dr. Pazos -- Mr. Pazos, who referred in his report to |
| 11 | 14:10  the failure of the weld, and he called it an expert who said |
| 12 | 14:10  there was a weld that failed.  So that's my first point.  I'm |
| 13 | 14:10  relying on your own information, not information that I brought |
| 14 | 14:10  in. |
| 15 | 14:10      Secondly, like I said, I practiced structural |
| 16 | 14:10  engineering since -- three years of practice engineering.  I |
| 17 | 14:10  did forensic engineering work.  I was looking at failures.  My |
| 18 | 14:10  publication -- I would like you to go back and read my record |
| 19 | 14:10  of publications.  Half of my publications are on buckling, |
| 20 | 14:10  failures of structures of other materials:  Plastics, metals, |
| 21 | 14:10  and so forth. |
| 22 | 14:11      I was awarded several grants.  My national |
| 23 | 14:11  agency investigated failures of materials.  So I'm a materials |
| 24 | 14:11  engineer.  My main area of expertise is geotechnical, but I'm |
| 25 | 14:11  also a materials engineer. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2462**

| | |
|---|---|
| 1 | 14:13      THE COURT:  Okay. |
| 2 | 14:13      THE WITNESS:  -- for it is being aesthetics, that's |
| 3 | 14:13  correct. |
| 4 | 14:13      THE COURT:  Okay. |
| 5 | 14:13  BY MR. WILSON: |
| 6 | 14:13  Q.  Is the other function -- what's the other function? |
| 7 | 14:13  A.  It prevents leakage between the interlocks and the -- |
| 8 | 14:13  prevents leakage between the interlocks of the adjoining sheet |
| 9 | 14:13  piles. |
| 10 | 14:13  Q.  Okay.  Now do you know of any concrete caps that fell off |
| 11 | 14:13  as a result of hydrostatic pressure, sir? |
| 12 | 14:13  A.  I don't understand the question. |
| 13 | 14:13  Q.  Do you know of any concrete caps on the I-wall that fell |
| 14 | 14:13  off as a result of hydrostatic pressure? |
| 15 | 14:13  A.  You mean the entire monolith or the top piece? |
| 16 | 14:13  Q.  The top piece, the cap. |
| 17 | 14:13  A.  They were sheared off.  Some of them were spalled.  They |
| 18 | 14:13  were -- they were cracked.  These are from the floating objects |
| 19 | 14:13  in the channel, any impact.  As a matter of fact, you can see |
| 20 | 14:13  them all over the system as we speak today. |
| 21 | 14:13  Q.  From impact? |
| 22 | 14:13  A.  From impact of some smaller objects, et cetera, correct. |
| 23 | 14:13  Q.  My question was from hydrostatic pressure. |
| 24 | 14:14  A.  No.  It is designed to take the hydrostatic pressure, much |
| 25 | 14:14  hitting. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2463**

```
14:14    Q.  The caps held the water; right?
14:14    A.  It is designed to withstand the pressure, that's correct.
14:14    Q.  Okay.  Sir, a perched water table is where water
14:14  accumulates in an area, doesn't make its way down to the actual
14:14  water table.  Would you agree with that, sir?
14:14    A.  A perched water table is water accumulated in a more
14:14  pervious stratum underlaying by a less --
14:14         THE COURT:  If you could just slow down and talk a
14:14  little louder it would help.
14:14         THE WITNESS:  A perched groundwater is a condition
14:14  where water accumulates in a more pervious material, say, a
14:14  granular material, underlaying by a less permeable material,
14:14  such as stiff clays.
14:14  BY MR. WILSON:
14:14    Q.  Okay.  So we agree that there's a less permeable material
14:14  underlaying it; correct?
14:14    A.  Less permeable is --
14:14    Q.  Isn't that the words you just used, Doctor?
14:15    A.  I do not dispute that.
14:15    Q.  Okay.
14:15         MR. WILSON:  Could I go to the ELMO?
14:15  BY MR. WILSON:
14:15    Q.  I want to take you to 81-A.  Do you recall 81-A?
14:15    A.  Yes.
14:15    Q.  Okay.  Now on this, I can't see anywhere the perched water
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2465**

```
14:16         MR. RAFFMAN:  I'm sorry.  I think it may be obscured
14:16  by the other graphics.  I'm concerned about that.
14:17         THE COURT:  Okay.  So you want to look at the exhibit
14:17  without the graphic?  I'm sure we have a copy of the exhibit
14:17  without the graphic.
14:17         MR. WILSON:  All right.  I notice it's covering up a
14:17  few things, so let me -- if I could get the Marino slide
14:17  No. 17, please.  Okay.
14:17         THE COURT:  You'll have to go through --
14:17         MR. WILSON:  Yes.  Can you zoom in on that a little?
14:17  BY MR. WILSON:
14:17    Q.  Before I get there, let me ask you:  You've been using
14:17  mean sea level; correct?
14:17    A.  That's correct.
14:17    Q.  And NAVD88.  Okay.  Can we agree that under NAVD88 the
14:17  bottom of the sheet pile on the I-walls on the eastern wall of
14:17  the -- the eastern floodwall of the Industrial Canal go down
14:17  about 10 1/2 feet?
14:17    A.  NAVD88 2004.65.  But if you use a different NAVD8, it's
14:18  not.  Minus 10 1/2, according to the 2004.65.
14:18    Q.  Thank you.
14:18    Q.  Okay.  Now, could you look here?  The depth in feet is 9
14:18  to 10 feet.  Can you see that on the screen in front of you?
14:18  Is your screen working, Doctor?
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2464**

```
14:15  table.  Can you, Doctor?  Could you take a look at it?
14:15    A.  Sir --
14:15    Q.  And I'll hand it -- and if I may approach, I'll hand it to
14:15  the Court.
14:15    A.  Sir --
14:15         THE COURT:  Okay.  Just a minute.  Let me address --
14:15  there's an objection.  Let me address it.
14:15         MR. RAFFMAN:  If counsel will slide the slide over to
14:15  the --
14:16         THE COURT:  You're looking for the term?
14:16         MR. WILSON:  Perched water table.
14:16         MR. RAFFMAN:  All right.
14:16         THE COURT:  And how are you spelling that?
14:16         MR. WILSON:  I think it's P-E-R-C-H-E-T.
14:16         THE WITNESS:  No.  No, sir, it's P-E-R-C-H-E-D.
14:16         MR. WILSON:  Okay.  If I could -- could I hand this
14:16  to the witness, Your Honor, and ask him if he could find
14:16  "perched water table" on it?
14:16         THE COURT:  Well, I think he could.
14:16         MR. GILBERT:  Just blow it up on the screen.
14:16         THE COURT:  And do it, because it's more blown up,
14:16  and he can see.
14:16         MR. RAFFMAN:  Your Honor, I think this would be
14:16  easier for the witness -- are you sure it's 72?
14:16         THE COURT:  Why don't you --
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2466**

```
14:18    A.  Yes, I do.
14:18    Q.  Okay.  And do you see what it says to the right of silty
14:18  sand at 9 feet?
14:18    A.  Yes.
14:18    Q.  What does it say, Doctor?
14:18    A.  Which one, the one at 13?
14:18    Q.  The one at 9.
14:18    A.  "Thin shell with silty sand, perched water table."
14:18    Q.  Okay.  So there's a perched water table at 9, 9 1/2 feet
14:18  there?
14:18    A.  It tells you that the water at that particular -- let me
14:18  explain to you something, sir, because you're confusing issues
14:18  here.
14:18    Q.  Sir, I'm just asking:  Is there a perched water table at
14:18  9 1/2 feet?  That's my question.
14:19    A.  I answered with yes, but let me explain something to you,
14:19  because you're confusing the issues.
14:19         MR. WILSON:  I don't believe I confused anything,
14:19  Your Honor.
14:19         THE COURT:  Wait, wait, wait.  Answer the question
14:19  and then explain it.  It's not for you to ascertain whether
14:19  he's confusing the issues or not.  But it's up to you -- you
14:19  can explain your answer, and that may manifest confusion in the
14:19  issues or not.
14:19         THE WITNESS:  But what -- what you're --
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

5 (Pages 2463 to 2466)

2467

| | | |
|---|---|---|
| 1 | 14:19 | THE COURT: He asked you: "Does it say 'perched |
| 2 | 14:19 | water table' there?" |
| 3 | 14:19 | THE WITNESS: Yes, I did. And I read it as perched |
| 4 | 14:19 | water table. |
| 5 | 14:19 | THE COURT: And, counsel, you want to ask the witness |
| 6 | 14:19 | what significance that has, if any, because -- |
| 7 | 14:19 | MR. WILSON: No. I wanted to ask him -- I wanted to |
| 8 | 14:19 | go to the next slide and ask him where the water table actually |
| 9 | 14:19 | was, which is the next page, 3 of 3 of 81-A. |
| 10 | 14:19 | THE COURT: I'm going to let the witness, though, |
| 11 | 14:19 | since we -- |
| 12 | 14:19 | THE WITNESS: Can I explain something, sir? |
| 13 | 14:19 | THE COURT: He's asking you, "Does it say 'perched |
| 14 | 14:19 | water table'?" |
| 15 | 14:19 | I'll ask you, rather than you simply narrating. |
| 16 | 14:19 | I'll ask you: What is the significance of the perched water |
| 17 | 14:19 | table at that point, at 9 feet -- between 9 feet and 10 feet? |
| 18 | 14:19 | THE WITNESS: It means there is water in that fill |
| 19 | 14:20 | material on the surface. |
| 20 | 14:20 | THE COURT: Okay. |
| 21 | 14:20 | BY MR. WILSON: |
| 22 | 14:20 | Q. Okay. And -- |
| 23 | 14:20 | THE COURT: And it does not mean that that is the |
| 24 | 14:20 | water table? |
| 25 | 14:20 | THE WITNESS: That's correct. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2468

| | | |
|---|---|---|
| 1 | 14:20 | And let me just point out one thing that I've |
| 2 | 14:20 | been trying to say here is, zero -- is zero at the top of the |
| 3 | 14:20 | hole, not in NAVD88. That the zero symbol -- and that's what |
| 4 | 14:20 | I'm saying the confusion is, sir, is that zero is zero at the |
| 5 | 14:20 | ground surface, meaning that the boring started from here. |
| 6 | 14:20 | Five feet from that depth, they found the following. But it's |
| 7 | 14:20 | not NAVD88 or MSL or NGVD or any of the others. |
| 8 | 14:20 | So I want to explain this before we start |
| 9 | 14:20 | confusing elevations with depthness. I wanted to set the |
| 10 | 14:20 | record clear for you. That's what I wanted to explain. |
| 11 | 14:20 | THE COURT: All right. Thank you. |
| 12 | 14:20 | MR. WILSON: Okay. And if we could go to the next |
| 13 | 14:20 | page, please. |
| 14 | 14:20 | And can you -- it's a little blurry. |
| 15 | 14:21 | BY MR. WILSON: |
| 16 | 14:21 | Q. Okay. Do you see the water table there, Doctor? |
| 17 | 14:21 | A. Correct. |
| 18 | 14:21 | Q. Okay. And that's at the depth of 20 feet, Doctor? |
| 19 | 14:21 | A. Correct. |
| 20 | 14:21 | MR. WILSON: Okay. And if we could go to Bakeer |
| 21 | 14:21 | DX-313, page 2 -- 22, please. |
| 22 | 14:21 | Okay. Do you have the slide before that? It |
| 23 | 14:21 | would be plate 9, I guess. |
| 24 | 14:21 | Bring it in a little. I guess you can still see |
| 25 | 14:21 | it. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2469

| | | |
|---|---|---|
| 1 | 14:21 | BY MR. WILSON: |
| 2 | 14:21 | Q. Do you see the perched water table there, Doctor? |
| 3 | 14:21 | THE COURT: The words "perched water table"? |
| 4 | 14:22 | THE WITNESS: I can't see. |
| 5 | 14:22 | THE COURT: You mean does he actually literally see |
| 6 | 14:22 | the perched water table or does he see the words? I'm not |
| 7 | 14:22 | quite sure I understand the question. |
| 8 | 14:22 | BY MR. WILSON: |
| 9 | 14:22 | Q. I'm sorry. Do you see the words "perched water"? |
| 10 | 14:22 | A. Are you talking about this perched water? |
| 11 | 14:22 | Q. Correct. |
| 12 | 14:22 | A. Yes, I see it. |
| 13 | 14:22 | Q. And that -- that's at what level, Doctor? |
| 14 | 14:22 | A. It says there is water in this. |
| 15 | 14:22 | Q. Right. And the -- it can't go down because there's |
| 16 | 14:22 | something underneath it; right? |
| 17 | 14:22 | A. Let me explain to you this, if you don't mind. |
| 18 | 14:22 | Q. Sir, could you just answer my question? |
| 19 | 14:22 | THE COURT: Well, he is. You asked him a question, |
| 20 | 14:22 | "Can it go down?" and he's now going to answer whether it can |
| 21 | 14:22 | or cannot. |
| 22 | 14:22 | THE WITNESS: Let me explain to you, sir. There |
| 23 | 14:22 | are two different water -- groundwater measurements we can use |
| 24 | 14:22 | on this -- |
| 25 | 14:22 | THE COURT: I can't hear, either. |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2470

| | | |
|---|---|---|
| 1 | 14:22 | And you might want to -- when you frame your |
| 2 | 14:22 | question, you -- you can confine the answer by the framing of |
| 3 | 14:22 | the question. |
| 4 | 14:22 | What is it? Okay. |
| 5 | 14:22 | THE WITNESS: My answer to the question is: When you |
| 6 | 14:22 | drill for soils, you do a soil bore, and you can count on two |
| 7 | 14:22 | different water levels in the ground. |
| 8 | 14:22 | The first one, we call it free water. Some |
| 9 | 14:23 | companies refer to it as perched water. Now, free water is a |
| 10 | 14:23 | free-flowing water into the hole when you drill the hole. The |
| 11 | 14:23 | technician should record when they first encountered water in |
| 12 | 14:23 | the ground. |
| 13 | 14:23 | Then when you finish the hole, you're supposed |
| 14 | 14:23 | to leave it open, or convert it into a monitoring well. Then |
| 15 | 14:23 | the water reaches a steady state, and that's what we refer |
| 16 | 14:23 | to -- to it as the groundwater. |
| 17 | 14:23 | So that's the difference between what you see |
| 18 | 14:23 | here and what you see in terms of perched water. So it's two |
| 19 | 14:23 | different issues, two different measurements done at two |
| 20 | 14:23 | different times. |
| 21 | 14:23 | BY MR. WILSON: |
| 22 | 14:23 | Q. Okay. And on this, it has the groundwater at 8 feet, |
| 23 | 14:23 | Doctor? |
| 24 | 14:23 | A. That's the one -- the groundwater that they detected, |
| 25 | 14:23 | which is what steady state, in maybe 24 hours, 15 minute, wait, |

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2471

```
 1   14:23   one hour, wait, that depends on this.  And I have to look at
 2   14:23   the log and see how long was the wait period before they
 3   14:23   detected the groundwater.
 4   14:23   Q.  So you can't answer that question; correct?
 5   14:23   A.  If you zoom on the top blocks, I may be able to see this
 6   14:24   information.  In our firm, we indicate that.  We put the wait
 7   14:24   period and we say how long was it when we measured the
 8   14:24   groundwater and how deep we measured the groundwater.
 9   14:24        MR. WILSON:  Go ahead.  Do you want to zoom in on it
10   14:24   for the doctor, please?
11   14:24        THE WITNESS:  It says here the drilling agency, it
12   14:24   says the hole number, the name of the driller, I think -- total
13   14:24   depth, the size, the manufacturer, sample, distribute,
14   14:24   disturbed, undisturbed, elevation of groundwater, but it
15   14:24   doesn't say the wait period.  That's the steady level of the
16   14:24   groundwater.
17   14:24        Any water higher than this is considered a
18   14:24   perched water or a free water, as we refer to it in our
19   14:24   terminology.
20   14:24   BY MR. WILSON:
21   14:24   Q.  Okay.  Thank you, Doctor.
22   14:24        MR. WILSON:  Could we go to Marino slide 14, please?
23   14:24   Okay.  If you could, zoom in on the scale,
24   14:25   please, in the bottom right-hand corner.
25   14:25
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2472

```
 1   14:25   BY MR. WILSON:
 2   14:25   Q.  That's 0 to 100 feet; right?
 3   14:25   A.  The scale is 0 to 100 feet, that's correct.
 4   14:25   Q.  Okay.
 5   14:25        MR. WILSON:  Could you bring it back a little, and I
 6   14:25   want to go into the corner where 81 and 79 are and keep the
 7   14:25   scale in there.
 8   14:25        Bob, I need 79 and -- yeah.
 9   14:25   BY MR. WILSON:
10   14:25   Q.  Okay.  Doctor, can you tell me approximately what's the
11   14:25   distance between boring 79 and boring 81, and just 79-A and
12   14:26   81-A.
13   14:26   A.  The grade as I believe, or if I remember correctly, is
14   14:26   about 50-foot.  And you can look at the scale here, that's a
15   14:26   50-foot grid.  That's the scale 100 feet.  So the grid axes
16   14:26   make a square grid of about 50 feet.  So the distance between
17   14:26   79 and 81 would be 100 feet.
18   14:26   Q.  Okay.  So approximately 100 feet; correct?
19   14:26   A.  About.
20   14:26   Q.  Okay.
21   14:26        MR. WILSON:  If we go to slide 38 of Bakeer.
22   14:26   BY MR. WILSON:
23   14:26   Q.  In the upper right-hand corner you have 79-A; correct?
24   14:26   A.  That's correct.
25   14:26   Q.  And then you have 81-A next to it; correct?
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2473

```
 1   14:26   A.  That's correct.
 2   14:26   Q.  And there's a distance -- now, you said those borings were
 3   14:26   3 inches, approximately?
 4   14:26   A.  3-inch diameter.
 5   14:27   Q.  3-inch diameter; right?
 6   14:27   A.  Right.
 7   14:27   Q.  So where this boring was done for 81-A, it's 3 inches of
 8   14:27   soil that was taken; correct?
 9   14:27   A.  That's correct.
10   14:27   Q.  And then 3 inches of soil taken 100 feet away; correct?
11   14:27   A.  That's correct.
12   14:27   Q.  Okay.  And, Doctor, you drew a line right here on an angle
13   14:27   going down, okay?  But you really don't know what was in this
14   14:27   100 feet; isn't that, true, Doctor?
15   14:27   A.  Sir, this is the common practice.  This is how we do
16   14:27   engineering.
17   14:27   Q.  You skip borings?
18   14:27   A.  No, we don't skip borings.
19   14:27   Q.  Okay.  You didn't have boring 80-A; correct?
20   14:27   A.  There was nothing on line A.
21   14:27   Q.  Okay.  You didn't have it; correct?
22   14:27   A.  There was no boring on that -- on the record.
23   14:27   Q.  Okay.  And you made an assumption, didn't you, Doctor?
24   14:27   A.  Again, this is the common practice.
25   14:27   Q.  And you made an assumption; correct?
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2474

```
 1   14:27   A.  No, it's not an assumption, sir.  This is a common
 2   14:27   practice.  You join the two adjacent borings together.  That's
 3   14:27   what we do.  That's how we do engineering.
 4   14:28   Q.  Well, did you assume that from 79-A, 100 feet over on an
 5   14:28   angle, okay, that the granular fill, as you've characterized
 6   14:28   it, went down?  That was something you assumed, wasn't it,
 7   14:28   Doctor?
 8   14:28   A.  If you want to call it this way, I -- I would disagree
 9   14:28   with you.  But if you want to call it assumption, yes.  But
10   14:28   it's not.  It's -- it's a science.
11   14:28   Q.  Well, Doctor --
12   14:28        MR. WILSON:  Let's go to -- let me see.
13   14:29        Let's see Bakeer 42, please.
14   14:29   BY MR. WILSON:
15   14:29   Q.  Okay.  Doctor, to get under the sheet pile you needed that
16   14:29   river, as you called it, right, to get to 81-A; correct?
17   14:29   A.  I called it a conduit.
18   14:29   Q.  The conduit.
19   14:29   A.  Yes, sir.
20   14:29   Q.  You needed the conduit to get to 81-A, correct, for your
21   14:29   theory to hold water?
22   14:29   A.  Let me answer this question:  We needed the conduit -- the
23   14:29   conduit allowed this area to remain saturated.  And actually,
24   14:29   you asked me a question earlier about perched groundwater.
25   14:30   That's exactly what it is.  That granular material caused this
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2475

14:30  1  area to experience a perched water condition.
14:30  2      Now, that conduit is needed to saturate it.  But the
14:30  3  flooding case, now, the water is above the sand and will
14:30  4  percolate downwards.
14:30  5  Q.  Are you saying there was perched water at every level
14:30  6  where you have granular fill, sir?
14:30  7  A.  There -- there might have been.  And most often -- when I
14:30  8  looked at the borings we've done, the most -- a lot of them
14:30  9  showed the perched condition.  I can't tell you each one of
14:30 10  those now.  I would have to go back to the records, but a lot
14:30 11  of them showed perched condition.
14:30 12      And, again, you would not encounter free water.  Sir,
14:30 13  this -- this has to do with the ground slopes with the
14:30 14  stratification, which may vary.  So one boring may be in a
14:30 15  valley, another boring in a hill, what's happening on the left,
14:30 16  what's happening on the right, what's happening south, what's
14:30 17  happening north.  You may get pools.  You may get concentrated
14:31 18  area.
14:31 19      And I answered that question from counsel this
14:31 20  morning regarding a hole that showed black water that wasn't
14:31 21  seen in other areas.  This is a highly variable area.  So the
14:31 22  perched groundwater is not going to be a constant level you
14:31 23  would measure in all borings.
14:31 24      THE COURT:  Okay.  Counsel, you had asked -- I don't
14:31 25  know if we got obscured in your original point about 81-A.  Did

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2476

14:31  1  you -- if you're satisfied, that's fine.  But if you want to
14:31  2  press it, you certainly may.
14:31  3  BY MR. WILSON:
14:31  4  Q.  Okay.  You needed your conduit to get to 81-A to get
14:31  5  underneath the tip of the sheet pile; correct?
14:31  6  A.  Not necessarily.  I split the answer into two answers.
14:31  7      THE COURT:  Let me make sure I understand your
14:31  8  question myself.
14:31  9      In other words, 81-A, the boring, would be on
14:31 10  the water side of the sheet pile; is that correct, sir?
14:31 11      Counsel, that's correct?
14:31 12      MR. WILSON:  I'm sorry, Your Honor.
14:32 13      THE COURT:  81-A is on the water side of sheet pile;
14:32 14  correct?
14:32 15      MR. WILSON:  Yes.
14:32 16      THE COURT:  And are you saying, in order for the --
14:32 17  if there is water or seepage or some permeability, it would --
14:32 18  the -- the seepage would have to get through 81-A before it got
14:32 19  to the other side, that is the protected side of the sheet
14:32 20  pile; correct?
14:32 21      MR. WILSON:  Correct.  Correct.
14:32 22      THE COURT:  Okay.  So take it from there.
14:32 23  BY MR. WILSON:
14:32 24  Q.  Okay.  We're in agreement with that, what the judge just
14:32 25  said, sir?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2477

14:32  1  A.  I agree with what the judge said.  But let me answer your
14:32  2  question now with --
14:32  3  Q.  I don't have a question.
14:32  4      THE COURT:  There is no question, sir.  Let's move
14:32  5  on.  You can't --
14:32  6      MR. WILSON:  Okay.  Thank you, Your Honor.
14:32  7      THE COURT:  There's nothing to explain at this point
14:32  8  because you're in agreement.
14:32  9      Go ahead.
14:32 10  BY MR. WILSON:
14:32 11  Q.  There's a lot of other borings that you didn't consider in
14:32 12  your conduit analysis; correct?
14:32 13  A.  I considered all the borings.  And again, let me answer
14:32 14  the question again, in the same manner as I answered it before.
14:32 15      You need the conduit to provide the saturation.  But
14:33 16  once the water level is above the ground surface, you don't
14:33 17  need that conduit.  All you need is the sand over 81-A.  That's
14:33 18  all you need.  So I'm splitting my answer into two different
14:33 19  answers.
14:33 20  Q.  Okay.
14:33 21  A.  You need -- you need the conduit -- or the conduit caused
14:33 22  the perched condition, caused the saturations prior to the
14:33 23  hurricane.
14:33 24  Q.  Okay.
14:33 25  A.  The flow of water at 81-A, once you get above the EBIA and

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

## 2478

14:33  1  you flood it, that's it.
14:33  2      THE COURT:  Okay.  You had asked about borings, sir.
14:33  3  What was your question about borings?
14:33  4      Let's try to answer the questions now, and on
14:33  5  redirect you can explain some more answers.
14:33  6      But right now, you have to try to answer the
14:33  7  questions he asks.  If you need -- you know if you need
14:33  8  explanation, I'll let you do it.
14:33  9      All right.  What's your question about the
14:33 10  number of borings, sir?  You asked him did he use all the
14:33 11  borings?  Is that -- is that what you asked him, or do you
14:33 12  recall?
14:33 13      MR. WILSON:  I -- I got -- I'm sorry, Judge.
14:33 14      THE COURT:  Let's keep our focus here.  This has got
14:34 15  to be a little crisp.  If it doesn't flow, it gets messed up.
14:34 16      MR. WILSON:  I'm sorry.  I had counsel talking at the
14:34 17  same time.
14:34 18      THE COURT:  I understand it's very difficult.
14:34 19      MR. WILSON:  Okay.
14:34 20      THE COURT:  And there are a lot of people stirring
14:34 21  the pot.
14:34 22      Go ahead.
14:34 23  BY MR. WILSON:
14:34 24  Q.  You took a north-south survey across the A borings;
14:34 25  correct?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

8 (Pages 2475 to 2478)

**2479**

1  14:34  A.  The cross-sections I showed was around the A line, and I
2  14:34  showed the cross-section of the 70 line.
3  14:34      But I also answered your previous question, that I
4  14:34  looked at all of the borings.
5  14:34      THE COURT:  Just -- just a question to the
6  14:34  north-south, that's all?
7  14:34      MR. WILSON:  Yes, Judge.
8  14:34      THE COURT:  That should be a rather -- let's first
9  14:34  establish -- is that correct?
10  14:34      MR. WILSON:
11  14:34  Q.  Is it correct, sir?
12  14:34  A.  That's correct.
13  14:34  Q.  Okay.  And you took an east-west survey across the 79
14  14:34  borings; correct?
15  14:34  A.  A cross-section of a survey, yes, I did, a cross-section.
16  14:34  I established a cross-section from west to east at 70.
17  14:35  Q.  And my question originally was:  There's a lot of borings
18  14:35  that you didn't consider; correct?
19  14:35  A.  I answered your question with no.  I looked at all the
20  14:35  borings.  I only established a section at 79, where I have
21  14:35  sufficient information to establish a full cross-section.  But
22  14:35  I answer the question for the third time:  I did look at all
23  14:35  the boreholes and the monitoring wells.
24  14:35  Q.  Okay.  And I guess my original question, Doctor was:  To
25  14:35  get from 79-A -- to get the water from 79-A, okay -- well, let

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2480**

1  14:35  me ask you this:  IPET didn't find this; correct?  IPET didn't
2  14:35  find what you found; correct?
3  14:35  A.  I don't believe they used NGVD data.
4  14:35  Q.  ILIT didn't find what you found; correct?
5  14:35  A.  I don't believe they didn't use that data, but I believe
6  14:35  I've seen work by others who were on the ILIT team where they
7  14:35  used this data.
8  14:35  Q.  Team Louisiana didn't find this; correct?
9  14:35  A.  Team Louisiana did not do any analysis, sir.
10  14:35      THE COURT:  When we say "it," what --
11  14:35      MR. WILSON:  What he found, his opinion of what
12  14:35  happened with regard to this conduit occurring, they didn't
13  14:36  find this.  He's the only one who found it.
14  14:36      BY MR. WILSON:
15  14:36  Q.  Isn't that true, sir?
16  14:36  A.  That's not true.
17  14:36  Q.  That's not true?
18  14:36  A.  That's not true.
19  14:36  Q.  Okay.  Who -- who else found this conduit?
20  14:36  A.  I've seen publications, which included seepage analysis,
21  14:36  which indicated the presence of granular material at the
22  14:36  surface.
23  14:36  Q.  You've seen publications, you said?
24  14:36  A.  Yes, sir.
25  14:36  Q.  Okay.  All right.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2481**

1  14:36      Sir, you did an amazing thing in this case.  You did
2  14:36  a seepage analysis without doing a single permeability
3  14:36  calculation; isn't that true, sir?
4  14:36  A.  Yes, that's correct.
5  14:36  Q.  Okay.
6  14:36      MR. WILSON:  I want to go to slide 31.  I want to
7  14:36  bring you back to where you left off with the examiner.  Okay?
8  14:37      It's Marino slide 31.  I'm sorry.
9  14:37      BY MR. WILSON:
10  14:37  Q.  Okay.  Remember when you left off, you were talking about
11  14:37  shear strengths that Marino assigned and you had all the dots
12  14:37  up there?  Do you recall that, Doctor?
13  14:37  A.  I do.
14  14:37  Q.  Okay.  And this is the same chart, but it's with numbers
15  14:37  instead of dots; correct?
16  14:37  A.  Yes.  It includes different sections that Marino allows,
17  14:38  that's correct.
18  14:38  Q.  It has them all, all the numbers listed here; correct?
19  14:38  A.  I don't recall all the numbers or not, but that's -- looks
20  14:38  like a reasonable assumption.
21  14:38  Q.  Okay.  And you were critical of Dr. Marino's analysis;
22  14:38  correct?
23  14:38  A.  Yes, I was.
24  14:38  Q.  Okay.
25  14:38      MR. WILSON:  And if I could go to IPET Volume V,

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2482**

1  14:38  Appendix XI, page 6, please, the third paragraph.  I want you
2  14:38  to zoom in.
3  14:38      BY MR. WILSON:
4  14:38  Q.  Okay.  I'm going to read that to you and ask you -- okay.
5  14:38  It's the last sentence:  "However, the shear" -- "the strength
6  14:38  of the levee is not much involved in calculated mechanisms of
7  14:38  instability and, therefore, has limited importance in the
8  14:38  stability analysis."
9  14:38      Is that true, sir?
10  14:38  A.  Absolutely correct.
11  14:38  Q.  Okay.
12  14:39      MR. WILSON:  Can we go back to Marino slide 31?
13  14:39  Okay.  And if we can zoom in on it a little so it's clearer.
14  14:39  Okay.
15  14:39      BY MR. WILSON:
16  14:39  Q.  Now here is the levee that we just read isn't important to
17  14:39  the analysis; correct?
18  14:39  A.  Which ones?
19  14:39  Q.  Levee -- see, up here?
20  14:39  A.  Uh-huh.  That's correct.
21  14:39  Q.  Do you have it?
22  14:39      And his numbers are 772.  ILIT has it at 900.  IPET
23  14:39  has it at 500.  And Bea has it at 555; correct?
24  14:39  A.  Correct.
25  14:39  Q.  All right.  And those are the numbers they said weren't of

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

9  (Pages 2479 to 2482)

2483

1  14:39  much importance in the analysis; correct?
2  14:39  A.  I said it has little impact.  I didn't say zero impact.
3  14:39  Q.  Little impact?
4  14:39  A.  That's correct.
5  14:39  Q.  All right.  Marino's well within range, though, of these
6  14:40  other numbers.  Actually, he's lower than ILIT; correct?
7  14:40  A.  No, sir, he's not.
8  14:40  Q.  Okay.  Well, let's look at the other numbers that Marino
9  14:40  assigns, okay?
10 14:40      Here, 512.  And then ILIT has 800; correct?  Do you
11 14:40  want to look on your screen?
12 14:40  A.  Let me wear my glasses.  It will make it easier for me.
13 14:40  Q.  Please.  I just developed that problem myself.
14 14:40  A.  Yeah, I see the 512.
15 14:40  Q.  All right.  Yeah, actually, if we could blow up the top
16 14:40  section, that might help.
17 14:40      Okay.  And then Marino has 402.  IPET has 650.  And
18 14:40  Bea has 442; correct?
19 14:40  A.  Correct.
20 14:40  Q.  So Marino's lower; isn't that true, sir?
21 14:40  A.  Correct.  But this is information under the levee, sir.
22 14:40  If you look at the toe, your problem is at the toe, not on
23 14:41  the levee.
24 14:41  Q.  It's underneath the levee that matters; right?  The
25 14:41  slippage analysis, when we're talking about strength, Doctor?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2484

1  14:41  A.  It partially involves the material under the levee, but
2  14:41  it's controlled by the exit and the entry.  And the exit and
3  14:41  the entry go through the soils at the toe, not at the
4  14:41  centerline, sir.
5  14:41  Q.  Okay.  We just read IPET's report that said the levee
6  14:41  didn't matter much in the analysis; correct?
7  14:41  A.  No.  It didn't say it didn't matter much.  It said it did
8  14:41  not affect significantly, or something --
9  14:41  Q.  It has little -- little relevance?
10 14:41  A.  -- of that meaning.
11 14:41      It has an impact, that's correct.
12 14:41  Q.  Okay.  All right.  And then there are a few other numbers
13 14:41  here, Doctor.  MEA, which is Marino; right?
14 14:41  A.  Correct.
15 14:41  Q.  He says .22.  And that's lower than ILIT, IPET, and Bea;
16 14:41  correct?
17 14:41  A.  Which one?
18 14:41  Q.  The bottom number.
19 14:41      THE COURT:  Deep clays, and go...
20 14:41  BY MR. WILSON:
21 14:41  Q.  It says .22, that's for Marino, all the way to the right,
22 14:41  correct, MEA?
23 14:41  A.  Sir --
24 14:42  Q.  And then it has .28 for ILIT; .23 for IPET; and .26 for
25 14:42  Bea; correct?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2485

1  14:42  A.  Sir, that's an SU over P ratio.  That's not strength.
2  14:42  Q.  Okay.  Are those numbers lower, sir?
3  14:42  A.  That's SU over P.
4  14:42  Q.  Are those numbers lower?
5  14:42  A.  From .22 to .23 is the typical range in some cases.  But,
6  14:42  again, you have to look at where that number came from.  That's
7  14:42  an average, not at each stratum.  The most controlling stratum
8  14:42  in the failure case -- if you look at the IPET, you get a 300.
9  14:42      At Marino, I see a blank, blank, so it means he's
10 14:42  assigning a value of 4.02.  That's 33 percent higher, sir, than
11 14:42  300.
12 14:42  Q.  And you're referring to where IPET --
13 14:42  A.  I'm referring to --
14 14:42  Q.  -- size 650; correct?
15 14:42  A.  This empty block here is assuming that material --
16 14:42  Q.  You just talked to me --
17 14:42      THE COURT:  Wait a minute.  Wait a minute.  Wait a
18 14:42  minute.  We're not going to have two people talking.
19 14:42      Don't worry, counsel, I'm not going to allow
20 14:42  that to happen.
21 14:42      All right.  Let me frame this.  You have marsh
22 14:42  lowermost, and IPET has it 300.  The PHI says zero.  ILIT has
23 14:43  nothing.  And MEA has nothing.  Is that the line you were
24 14:43  talking about, Doctor?
25 14:43      THE WITNESS:  Yes, sir.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2486

1  14:43      THE COURT:  Okay.  And what was your point, reference
2  14:43  that line?
3  14:43      THE WITNESS:  My reference on this line, that IPET
4  14:43  divided the marsh stratum into a lower and upper.  If you look
5  14:43  at my model here, there is a 1A and a 1B.
6  14:43      Accordingly, the upper material in that marsh
7  14:43  stratum was assigned a higher value than what Dr. Marino
8  14:43  assigned, 402 versus 650.
9  14:43      But the deeper stratum, which is this one, is
10 14:43  300, where Dr. Marino assumes is the same as the other one,
11 14:43  which is 402.
12 14:43      THE COURT:  So when it's a blank, you're making the
13 14:43  assumption -- that is, if I were to read these as an expert,
14 14:43  that would be, in essence, the same value?
15 14:43      THE WITNESS:  Correct.  And I also looked at his
16 14:43  profiles; and his profiles show the value of 402.  I did not
17 14:44  just use the table.  I looked at his drawings.
18 14:44      THE COURT:  All right.
19 14:44      THE WITNESS:  And his drawings indicate that he used
20 14:44  402.
21 14:44      THE COURT:  I understand.
22 14:44      THE WITNESS:  So he's 33 percent higher than what the
23 14:44  data suggests.
24 14:44      THE COURT:  I see.  Okay.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2487**

```
14:44   BY MR. WILSON:
14:44   Q.  Now, if we could go --
14:44        Could you show the whole --
14:44        That's pretty much the same thing that -- except for
14:44   the levee.  Marino's numbers are lower than everyone else's;
14:44   correct?
14:44   A.  No, that's not correct, sir.
14:44   Q.  Okay.  Can we go to --
14:44        Sir, correct me if I'm wrong.  Again, we had a very
14:44   expensive demonstrative demonstration --
14:44        THE COURT:  Yes.  The -- whether it costs a trillion
14:44   dollars or a dollar means nothing to the Court.  So we can say
14:45   the extraordinarily parsimonious exhibit or the amazingly
14:45   opulent and extravagant exhibit, it makes no difference to me.
14:45   I don't care what it costs.  It won't have anything to do with
14:45   the decision in this case.  It's not a jury.  And, hopefully,
14:45   they wouldn't be that -- that subject to -- to be persuaded by
14:45   that word.
14:45        But go ahead, sir.
14:45        MR. WILSON:  Okay.
14:45   BY MR. WILSON:
14:45   Q.  You had the levee wall with overtopping.  Do you recall
14:45   that?
14:45   A.  (No response.)
14:45   Q.  Okay.  Now, were you referencing the southern breach
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2488**

```
14:45   there, not the northern breach?
14:45   A.  That's correct.
14:45   Q.  Because it's your opinion there was no overtopping on the
14:45   northern breach?
14:45   A.  There was a splashing.  And, actually, some reference to
14:45   splashing in that area developed earlier in the morning.
14:45   Q.  Okay.  Go ahead.
14:45   A.  But not full overtopping.
14:45   Q.  Okay.
14:45        MR. WILSON:  And can you put up ILIT Volume I,
14:46   Section 6.3.3, page 6.20?
14:46        Oh, wait.  Before I get there, actually, let me
14:46   go --
14:46   BY MR. WILSON:
14:46   Q.  Let me ask you this, Doctor:  The south breach occurred at
14:46   6:00?
14:46   A.  No.  I think it's a little bit later than 6:00.
14:46   Q.  And, Doctor, overtopping began at 7:00; is that your
14:46   understanding?
14:46   A.  I would say -- I would say that's about the time when the
14:46   first bubble in the first bolt started developing, would be
14:46   later than 7:00, maybe 8:00 or so in the morning.
14:46   Q.  Okay.  And is it your opinion, Doctor, that the
14:46   overtopping was a contributing factor to the failure of the
14:46   south breach?
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2489**

```
14:46   A.  Correct.
14:46   Q.  Okay.
14:46        MR. WILSON:  Could you put up ILIT Volume I, Section
14:47   3 -- 6.3.3, page 6-20?
14:47        Could you zoom in?
14:47   BY MR. WILSON:
14:47   Q.  I think this is the second paragraph, the second sentence:
14:47   "Despite the occurrence of overtopping and resultant erosion of
14:47   trenches at the inboard sides of the concrete floodwalls, this
14:47   overtopping does not appear to have been the cause of the two
14:47   failures."
14:47        Do you see that, Doctor?
14:47   A.  Yes.
14:47   Q.  And you don't agree with that; right?
14:47   A.  At the time, when the ILIT reports and the IPET reports
14:48   were issued, there was no distinction between splashing and
14:48   overtopping.  Overtopping occurred in the low areas of the
14:48   floodwall throughout its length.
14:48        When the wall top was lower, you got earlier
14:48   overtopping.  It may have been defined by others as splashing.
14:48   But splashing was taking place.  Overtopping was taking place
14:48   in the lower areas.
14:48        THE COURT:  I guess the point was:  Isn't it true
14:48   that -- that was IPET?
14:48        THE WITNESS:  ILIT.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2490**

```
14:48        THE COURT:  ILIT -- that ILIT did not regard scour
14:48   trenching as -- as the primary cause of the south breach area?
14:48        THE WITNESS:  The answer is correct.  That was their
14:48   opinion.  Seepage was the predominant cause.  That's correct.
14:48   BY MR. WILSON:
14:48   Q.  And ILIT was criticized by IPET, isn't that true, Doctor,
14:48   for using figures that were a thousand times too permeable?
14:49   A.  That's correct.  Both sides criticized one another.
14:49        THE COURT:  Just one second.
14:49        (OFF THE RECORD)
14:49        THE COURT:  All right.  Please proceed.
14:49   BY MR. WILSON:
14:49   Q.  Doctor, you didn't rely on the Jourdan Avenue canal in
14:50   reaching your conclusions?
14:50   A.  Could you repeat the question?
14:50   Q.  The Jourdan Avenue canal, you didn't utilize that in
14:50   reaching your conclusions?
14:50   A.  My operation of analyses included -- in the method of
14:50   planes, I actually included the Jourdan Avenue canal in
14:50   checking the cross-section of the walls.  So I did consider the
14:50   Jourdan Avenue in my original MOP analysis.
14:50        Afterwards, when you analyze cross-sections for
14:50   Katrina condition, there was no Jourdan canal anymore, so they
14:50   were not.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2491

1  14:50  Q.  So you've criticized ILIT's analysis?
2  14:50  A.  Did I?
3  14:50  Q.  Yes, have you?
4  14:50  A.  I have disagreement with some of the issues in the ILIT
5  14:50  report.  I had disagreements with some issues with other --
6  14:50  like any scientist disagree.  We could agree on some issues and
7  14:50  disagree with some issues.  But, in general, I accept the ILIT
8  14:50  and I accept the IPET.
9  14:51  Q.  Okay.
10 14:51       THE COURT:  I'll tell you what, I'm going to take
11 14:51  about a five-minute recess, and maybe -- maybe your team can
12 14:51  get together and get a little better --
13 14:51       MR. WILSON:  I'm just about done.
14 14:51       THE COURT:  Oh, you're just about done?
15 14:51       MR. WILSON:  Well, if I could get together...
16 14:51       THE COURT:  Five minutes would help?
17 14:51       MR. WILSON:  Yes.
18 14:51       THE COURT:  All right.  We'll take it.
19 14:51       (WHEREUPON, the Court took a recess.)
20 15:00       THE DEPUTY CLERK:  All rise, please.  Court's in
21 15:00  session.  Please be seated.
22 15:00       THE COURT:  Sir, you may proceed when ready.
23 15:00       MR. WILSON:  Thank you, Your Honor.
24 15:00  BY MR. WILSON:
25 15:00  Q.  Doctor, you had wall elevations at the area of the

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2492

1  15:00  breaches lower than anybody else; correct?
2  15:00  A.  I -- I reached the conclusion that the wall is lower.  I
3  15:00  did not have a specific number.  I had some rough range where I
4  15:00  think the wall was at that, so that is correct.
5  15:01  Q.  Okay.  But everybody else used 12 1/2; correct?
6  15:01  A.  That's the average height of the wall, that's correct.
7  15:01  Q.  Okay.
8  15:01  A.  That's the average height of the wall in most...
9  15:01  Q.  Okay.  Now, you used LiDAR that was performed in 2000 to
10 15:01  determine where the toe of the levee was?
11 15:01  A.  Pardon me?
12 15:01  Q.  You used LiDAR, L-I-D-A-R?
13 15:01  A.  LiDAR, that's correct.
14 15:01  Q.  That was performed in the year 2000 to determine the toe
15 15:01  of the levee; correct?
16 15:01  A.  Correct.
17 15:01  Q.  Are you able to show the Court the points LiDAR used to
18 15:01  determine the toe of the levee?
19 15:01  A.  I did not determine specifically any such information.
20 15:01  This was provided by the ILIT -- the Team Louisiana report, if
21 15:01  my memory serves me.  So I did not perform the study.  I did
22 15:01  not do any analysis with the study, other than inspecting this
23 15:02  diagram and making a conclusion on what the elevations are.
24 15:02  Q.  Okay.  So you don't know what point they used; isn't that
25 15:02  correct?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2493

1  15:02  A.  If you understand the LiDAR technology, it's a continuous
2  15:02  trace where you send the beam and you measure reflection from
3  15:02  the beam.
4  15:02  Q.  I understand that.
5  15:02  A.  So it's a continuous trace, like the cone penetrometer is.
6  15:02  It's the same concept.  It's a continuous point.  It also is
7  15:02  impacted by the surrounding environments.  So you may get some
8  15:02  noise from vegetation or any other objects.
9  15:02  Q.  But you don't know what point they used; correct?
10 15:02  A.  No, sir.  No, sir.
11 15:02  Q.  Okay.  The as-builts had the wall at 15 feet?  The
12 15:02  as-builts, when the wall was originally designed in 1969, the
13 15:02  wall was supposed to be 15 feet?
14 15:02  A.  The top of the wall was at 15 MSL.
15 15:02  Q.  MSL.
16 15:02       Or was it NAVD88, Doctor?
17 15:03  A.  That's not -- actually, the wall designs are MSL.  If you
18 15:03  look at the original GDM, you will see MSL.  There was a
19 15:03  decision made by the Corps at some point in history to assume
20 15:03  that NGVD -- not NAVD, NGVD -- is equal to MSL.  That was an
21 15:03  internal decision made by the Corps, and it was a mistake.  It
22 15:03  was an error.  There's a difference between NGVD and MSL.
23 15:03  Q.  You converted, in your report, the MDL [sic] to NAVD88;
24 15:03  correct?
25 15:03  A.  Correct.

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2494

1  15:03  Q.  And NAVD already accounts for the wall coming down;
2  15:03  correct?  The seepage of the wall -- not the seepage, the
3  15:03  settlement of the wall?
4  15:03  A.  NAVD accounts for what we call global settlement, not
5  15:04  local settlement.  So there's a difference between a global
6  15:04  settlement and a local settlement.  The NAVD is a correction
7  15:04  from MSL indicating how much the general geographic area in
8  15:04  that particular area settled with time.  That's called the
9  15:04  general, or global, settlement.
10 15:04  Q.  All right.  And you used 2.5; correct?
11 15:04  A.  It's about that, yes, 2.5.
12 15:04  Q.  But the Corps uses 1.05?
13 15:04  A.  That's not correct.  They use...
14 15:04  Q.  The true conversion is 1.05, sir?
15 15:04  A.  That's not correct.  The 1.5 is a different area.  For
16 15:04  example, the area of the 17th Canal, the area of New Orleans
17 15:04  East, you may find a difference between them.  In the area of
18 15:04  the IHNC, if you go back and look at the IPET report and the
19 15:04  ILIT report, you're going to see the conversion.  It's all
20 15:04  covering between 2-point-something and 2.5, maybe 2.1, 2.2,
21 15:05  2.5.  The difference between NGVD and MSL is about 2 feet; the
22 15:05  difference between NGVD and NAVD is about half a foot at that
23 15:05  area of the IHNC.
24 15:05  Q.  All right.  Built into your 2.5 conversion is a projected
25 15:05  1.5 settlement; correct?

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

12  (Pages 2491 to 2494)

2495

```
15:05   1   A.  Projected?
15:05   2   Q.  Well, the Corps projected the settlement, didn't they?
15:05   3   A.  The Corps projected that this wall would settle about a
15:05   4   foot.
15:05   5   Q.  Okay.
15:05   6   A.  That's what I mentioned earlier in the morning, that they
15:05   7   designed the wall to have a top at elevation plus 14 MSL at the
15:05   8   time.
15:05   9   Q.  And you're saying that the conversion from MSL to NAVD88
15:05  10   is not MSL minus 1.05?
15:05  11   A.  I did not say that.  I'd say not in the IHNC area.
15:05  12   Q.  Okay.  So you would agree with that?
15:05  13   A.  It may be 1 1/2 in other areas.
15:05  14   Q.  All right.  Now, Doctor --
15:06  15          THE COURT:  I'm hoping, in briefing, we'll get some
15:06  16   clarity on the various heights.  Because we need to -- we'll be
15:06  17   writing an opinion, and we're hoping to have something where we
15:06  18   can, at least as to the empirical data -- I know we have
15:06  19   differences as to what the height may be, but we might want a
15:06  20   brief why the height is a certain way and what we're using and
15:06  21   what -- this is for the lawyers.
15:06  22          MR. RAFFMAN:  Thank you, Your Honor.  We will be sure
15:06  23   to provide you with the clarity that Your Honor would like.
15:06  24   Probably we will use the NAVD as the datum that we refer to
15:06  25   most often in our briefing.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2496

```
15:06   1          THE COURT:  Thank you.
15:06   2   BY MR. WILSON:
15:07   3   Q.  Okay.  Doctor, you used the Greater New Orleans Hurricane
15:07   4   and Storm Damage Risk Reduction System to give your opinion
15:07   5   today; correct?
15:07   6   A.  I performed my analysis according to the procedures in
15:07   7   that particular document.
15:07   8   Q.  Okay.  But these are design guidelines; correct?
15:07   9   A.  No, sir, that's not correct.
15:07  10   Q.  They're designed for -- they're design guidelines for
15:07  11   designing a levee, aren't they?
15:07  12   A.  That's not correct.  It's an incomplete sentence.  It's
15:07  13   design and evaluation.
15:07  14   Q.  And it's for evaluation of existing structures; correct?
15:07  15   A.  Correct.
15:07  16   Q.  And can you show me anywhere in there that it says that
15:07  17   it's to be used for forensic analysis of a failed levee?
15:07  18   A.  That's implied when you say "evaluation."  Evaluation is
15:07  19   a -- forensic is a sub-area of evaluation.  What is forensic
15:07  20   engineering?  Forensic engineering, if you want to define it,
15:08  21   to the science of collecting evidence, material evidence,
15:08  22   collecting samples; that's a different branch.
15:08  23          But from a technical engineering/geotechnical
15:08  24   analysis point of view, the forensic segment here pertains to
15:08  25   performing the analysis, assuming a factor of safety of 1, for
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2497

```
15:08   1   example, in seawall sheet, see how much penetration do you
15:08   2   need.  That's basically the definition of forensic under that
15:08   3   category.
15:08   4   Q.  Does it say anywhere in that document, sir, that it should
15:08   5   be used for forensic analysis?
15:08   6   A.  We design and evaluate existing walls on regular basis at
15:08   7   my office, and that's what we do to analyze existing levees.
15:08   8   Q.  Existing levees?
15:08   9   A.  Floodwalls are part of the system.  Any -- it's, actually,
15:08  10   Hurricane Protection System, HPS, which does not include
15:08  11   floodgates.  We design floodgates; we design floodwalls; we
15:09  12   design T-walls.  All of them come under the same category.  The
15:09  13   levee is only a specific element, which is the major.  The
15:09  14   majority of the system consists of levees.
15:09  15   Q.  So this document was first created in 2006; correct?
15:09  16   A.  Pardon?
15:09  17   Q.  It was first created in 2006, the document that we're
15:09  18   talking about?
15:09  19   A.  Work on it started immediately after Katrina.  An
15:09  20   assessment of I-walls, there's a document dated '06 that
15:09  21   pertains to I-walls in particular.  The complete document
15:09  22   appeared in '07.  The geo-tech chapter, chapter 3, was updated
15:09  23   in '08.  If I remember, June '08 was the update.
15:09  24   Q.  Okay.  I'm not sure I got the answer to this question,
15:09  25   Doctor.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2498

```
15:09   1          Does it say anywhere in there that it should be used
15:09   2   for forensic analysis?  Can you show the Court anywhere in
15:09   3   there that it states that it should be used for forensic
15:09   4   analysis?
15:09   5          MR. RAFFMAN:  Your Honor, I believe that the witness
15:09   6   has answered that question twice now, and I object to him being
15:09   7   asked again.
15:09   8          THE COURT:  I note your objection, and overrule your
15:09   9   objection.  And your question is?  Are you saying in the
15:10  10   document itself -- and I say "document" -- whatever the acronym
15:10  11   is -- is there anything in that particular acronym -- I don't
15:10  12   remember what it was -- the H- --
15:10  13          MR. WILSON:  HSDRRS.
15:10  14          THE COURT:  -- that indicates it is appropriate to
15:10  15   use it in a forensic analysis.
15:10  16          THE WITNESS:  I can search the PDF file for you and
15:10  17   give you an answer.  I don't believe I've seen the word in the
15:10  18   document, but I can search it for you and I can provide you
15:10  19   with an answer on that.
15:10  20          Because, again, my focus is on the geotechnical
15:10  21   chapter.  That's where I read it from cover to cover.  However,
15:10  22   I may have not read the entire document.  There are issues
15:10  23   related to other design parameters, which I don't get involved
15:10  24   with on a daily basis.  So I'm not necessarily familiar with
15:10  25   everything, but I would be glad to search the PDF file.
```

JODI SIMCOX, RMR, FCRR - OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**2499**

```
15:11   BY MR. WILSON:
15:11   Q.  And, Doctor, you've never been an expert involved in a
15:11   floodwall collapse before?
15:11   A.  Excuse me, I didn't hear the question.
15:11   Q.  You have never been an expert testifying in court in a
15:11   floodwall collapse before?
15:11   A.  We didn't have any floodwall failures before Katrina.
15:11   Q.  Okay.
15:11   A.  But I was involved in the assessment of existing
15:11   floodwalls when there is, say, a levee crossing or a floodwall
15:11   crossing; and if you put something next to it, I evaluate that
15:11   wall, and I still do that.  I've done this before Katrina, and
15:11   I still do this on a regular basis.  I evaluate the effect of
15:11   construction, effect of excavations, effect of different
15:11   activities near a hurricane flood protection system.
15:11   Q.  But you've never been an expert in a case involving a
15:11   floodwall collapse; correct?
15:11   A.  Not in a lawsuit, yes.
15:11   Q.  And you've never been involved in a case containing
15:11   allegations of a barge hitting a floodwall; true?
15:12   A.  No, I wasn't.
15:12   Q.  And, Doctor, you actually have a business relationship
15:12   with Lafarge; true?
15:12   A.  No, I don't.
15:12   Q.  Your company has done work for them before; true?
```

**2500**

```
15:12   A.  Not our office, no.
15:12   Q.  How about Lafarge?
15:12   A.  Sir, I was employed by Ardaman in 2007.  I have no idea
15:12   about incidents that took place in 1991.
15:13        Secondly, Ardaman has no presence -- had no presence
15:13   in Louisiana until 2007.
15:13        So, accordingly, any business, that would go back to
15:13   corporate office in Orlando.  You can ask the folks in Orlando
15:13   if they have any issues with Lafarge.  I have no idea of them.
15:13   Q.  Well, we can agree that there's been a business
15:13   relationship before?
15:13   A.  If you show me this document, I would agree with you.
15:13   Q.  Okay.  Thank you.
15:13        MR. WILSON:  I tender the witness.
15:13        THE COURT:  Thank you, sir.
15:13        Redirect?
15:13        MR. RAFFMAN:  No redirect, Your Honor.
15:13        THE COURT:  Thank you, sir.
15:13        Doctor, you may step down.  You're free to go or
15:13   free to stay.
15:13        THE WITNESS:  Thank you.  I appreciate your patience.
15:13        THE COURT:  Thank you for yours.
15:13        MR. ALDOCK:  Your Honor, our next witness will be
15:13   Dr. Skaer, the rope expert.  It will take us about two minutes
15:13   to bring the ropes, but Dr. Skaer is here and Mr. Walker
```

**2501**

```
15:13   will examine him.
15:13        THE COURT:  Yes, sir.  Thank you very much,
15:13   Mr. Aldock.
15:15        THE COURT:  Okay.  We are ready to proceed, sir,
15:15   whenever you're ready.
15:15        MR. SANDERS:  Your Honor, his résumé is in evidence.
15:15   I can stipulate to save time.  May I ask what he's being
15:16   tendered as, and maybe we can expedite matters by stipulation?
15:16        THE COURT:  Sure.
15:16        MR. WALKER:  Your Honor, Mr. Skaer is being tendered
15:16   as an expert in cordage, and I think some questions regarding
15:16   his expertise are appropriate.
15:16        THE COURT:  All right.
15:16        MR. SANDERS:  I have no questions.  I will stipulate.
15:16        One more thing, Your Honor, I don't want to
15:16   waive my objection with regard to any future litigation.
15:16   There was an issue of spoliation of evidence regarding the
15:16   ropes.  We have withdrawn that claim and -- but we want to make
15:16   sure that it's preserved for the future.
15:16        THE COURT:  Whatever the future holds, it holds, but
15:16   I understand that.  You're not waiving your right to use it in
15:16   any other litigation that may occur after the Fifth Circuit
15:16   rules on this case; hopefully, definitively.
15:16        With that said, move on.
15:16        MR. WALKER:  Do I understand, Your Honor, Mr. Skaer
```

**2502**

```
15:16   has been accepted as a rope expert in the areas tendered?
15:17        THE COURT:  You're tendering him as an expert in --
15:17        MR. WALKER:  Cordage, which is ropes, as he'll
15:17   explain.
15:17        MR. SANDERS:  No objection.
15:17        THE DEPUTY CLERK:  I need to swear the witness.
15:17        (WHEREUPON, Dick Phillip Skaer, having been duly
15:17   sworn, testified as follows.)
15:17        THE DEPUTY CLERK:  Please state your full name and
15:17   correct spelling for the record.
15:17        THE WITNESS:  Dick Phillip Skaer.
15:17            DIRECT EXAMINATION
15:17   BY MR. WALKER:
15:17   Q.  Mr. Skaer, could you come a little closer to the
15:17   microphone.
15:17   A.  S-K-A-E-R.
15:17   Q.  Mr. Skaer, you have heard that you've been accepted as an
15:17   expert in the areas in which we have tendered you.  However, I
15:17   would like to run very briefly through some of your
15:17   qualifications.
15:17        Did you serve in the Navy?
15:17   A.  Yes, I did.
15:17   Q.  For how many years?
15:17   A.  Four years active duty, two and a half years of reserve
15:17   duty.
```