**C. R. CUSHING & CO., INC.**                                                            **7/29/2009**

**THE LOWER NINTH WARD POST-KATRINA**

The Lower Ninth Ward of New Orleans was flooded catastrophically when breaches formed in various levees protecting the Lower Ninth Ward and St. Bernard Parish from hurricane induced storm surges. Two of these breaches were in the IHNC floodwall along Jourdan Ave. and were located about 2300 feet from each other.

This section of the report describes the physical characteristics of the breaches and surrounding area. This evidence forms the basis for conclusions set forth in later sections of the report that discuss why the physical evidence described here shows that the barge did not and could not have caused either of the breaches.

Northern Breach

The northern breach occurred first. This breach was approximately 215 feet in length. The northern breach was located immediately south of a sharp bend in the floodwall at a transition between a newer, deeper section of sheetpile and the original, shallower sheetpile. At this transition point, between Florida Ave. and Law St., the sheetpiling disconnected as it failed and rolled or rotated due to the force of the water flowing through the breach. After the storm, the concrete panels of this section lay nearest to the canal and the tip of the sheet piling pointed in the inland direction. Between the northern and the southern edges of the north breach, the sheetpiling is twisted in a helical fashion. In this helix, the sheetpiling is pointed straight upwards, which indicates that the northern part of this breach has rotated 270 degrees with respect to its initial position. The floodwall remained tethered at the southern end of the breach, and washed inland slightly. Thus, at the southern end of the north breach, the floodwall had overturned in the landward direction similar to what was observed at other breaches including the south breach.

No evidence was found at the site of the northern breach to indicate physical impact or contact by a barge or other object with the floodwall.

Inland of the northern breach, all houses were completely washed away for as far as 5 blocks from Jourdan Ave. in a straight swath approximately one block wide. This contrasts with the southern breach, where the area of completely missing homes spread from the breach in a fan-like pattern.

63

**C. R. CUSHING & CO., INC.**                                     **7/29/2009**



Figure 41: Twisted sheetpiling at the north breach site.[53]

Southern Breach

The southern breach was more than 800 feet in length. For about half its length (the northern or upper portion), the sheetpile which supported the concrete floodwall was displaced in a prominent bulge, up to 180 feet away from its original location. At the southern or lower portion of the breach, the sheetpile was pushed inland by a significantly shorter distance and was oriented approximately parallel to the floodwall's initial position. Along the breach, the floodwall overturned in the landward direction, having rotated approximately 90 degrees with the concrete panels pointing inland and the tip of the sheetpiling pointing toward the canal. More than half of the concrete floodwall panels had cracked off of the part of the sheetpile that made up the bulge. The steel sheetpiling was visibly stretched but remained interlocked. The concrete panels on the sheetpiling that was displaced a shorter distance were generally intact. The sheetpiling at this portion of the floodwall did not experience the same degree stretching. Figure 42 is an aerial photograph of the south breach taken before Hurricane Rita and shows the principal features of this site.

---

[53] IPET website.

64

**C. R. CUSHING & CO., INC.**                              **7/29/2009**



Figure 42: Aerial photo of the south breach. The barge lies astride N. Roman St, N. Prieur St. is in the center of the photo, and N. Johnson St. is to the right. Note the fan-like inward bulge of the failed sheetpiling on the northern or upper end of the south breach, to the right in this figure.

At both the northern and southern ends of the south breach, the earthen embankment was completely washed away. Toward the middle of the breach, much of the canal side embankment remained, as well as a very small, severely eroded portion of the land side embankment. Visible within the remains of the canal side embankment are an old wooden plank road and an old oyster shell road that had been buried when the levee was constructed.

**C. R. CUSHING & CO., INC.**                                       **7/29/2009**



Figure 43: Remains of the original canal side embankment at the south breach site.

Inland of the south breach, for a distance of approximately 3 ½ blocks, nearly all homes were completely disintegrated. In contrast to much of the rest of the Lower Ninth Ward where homes were moved from their foundations but remained nearby, nothing was left of the homes located directly in front of the breach except for foundations. Large trees and utility poles were also toppled directly in front of this breach.

C. R. CUSHING & CO., INC.                                              7/29/2009



Figure 44: The remains of houses immediately inside of the south breach.

In the weeks after the failure, the ground was covered by a layer of mud that had settled out of the floodwaters. No evidence of sand boils was found near the southern breach site. All along the inland side of the floodwall that remained standing there was a trench that was caused by water overtopping the floodwall. In some places, this trench was six feet deep and, as a general trend, it was deeper closer to the point of initiation of the breach – that is, the trench grew deeper in the area closest to where the breach occurred, at the point of maximum displacement toward N. Johnson St.

No evidence was found of impact or contact by a barge or other object within the main section of the southern breach, in the area of the bulge where the wall stretched and was pushed into the neighborhood by the force of the water in the initial breach development.

This is in contrast to the evidence located at the very lower (southern) end of the south breach, far from the main section of the breach itself, where a portion of the concrete cap was broken off and the rebar bent in a manner not found at any other location in the

67

**C. R. CUSHING & CO., INC.**                                                                                    **7/29/2009**

north or south breaches. Figures 59 and 60 show this section of the wall and the conditions found there. As this report discusses, in the section titled *The Barge Grounding* below, this location is the only place where the barge appears to have come into contact with the floodwall, and it is where the barge passed from the canal into the neighborhood, ***after*** the southern breach had already occurred and was well developed.

After Hurricane Katrina, the barge ING 4727 was located just inside the IHNC south breach on the land side of the floodwall. After the floodwaters from Katrina receded, the barge grounded approximately 150 feet from the floodwall just south of the southern breach. The relatively short distance the barge was carried into the Lower Ninth Ward indicates that it was not propelled by the initial explosive surge of water from the breach. The barge had come to rest alongside and on top of homes at the intersection of Jourdan Ave. and N. Roman St. Before Hurricane Rita, the barge was lying immediately to the west of several houses on Jourdan Ave. The pattern of damage on these few houses indicates that the barge approached them from the direction of the canal. This means that when the barge came into contact with these houses, it was moving to the east and could not have been moving back toward the canal. Thus these homes just inside the floodwall mark the deepest point of penetration by the barge into the neighborhood. When Hurricane Rita caused the Lower Ninth Ward to flood again in late September 2005, the barge re-floated and drifted a short distance toward the floodwall, coming to rest in the middle of Jourdan Ave. atop a small school bus.

**Interpreting Water Direction and Strength**

Our team surveyed debris in the vicinity of the breaches to identify objects that appeared to have toppled or moved in the direction of the deluge of water that came in through the breaches or would have been displaced by the flow of water. Considering the orientation of the vectors spread over a large area, the pattern of water flow in the Lower Ninth Ward becomes apparent. The most obvious method of determining the strength of incoming waters is from the condition of houses. Many homes in the Lower Ninth Ward are wood frame structures built on either a slab-on-grade foundation or elevated a few feet above the ground by short columns of concrete block. In areas immediately inside the breaches and subject to the most catastrophic inflow of water, structures built on either type of foundation were completely disintegrated, with the debris washed over a vast area so that the only remaining evidence of the homes are their foundations.



Figure 45: Houses displaced by rushing water in the Lower Ninth Ward.

Houses built on either type of foundation located in areas that were subject to only low velocity water tended to remain standing in their original location or float a short distance if they were built on a crawlspace. There were a few homes in the Lower Ninth Ward which were constructed of concrete block. These homes tended to resist damage very well. The most notable example of this are two structures, each two stories with the first story built of concrete block, located on N. Roman St. between Jourdan Ave. and Deslonde St. Despite being exposed to extremely high energy waters, these two structures showed no movement or serious structural damage.

The houses in the location where the barge grounded show damage that is of interest. These houses, while exhibiting some structural damage from being struck by the barge, are still partially standing. From the fact that the barge landed on the roofs of these houses, it may be inferred that the water in the neighborhood was already very high when the barge made impact. Further, the damage to these houses appears related to the weight of the barge coming to rest on the roofs as the water drained after the storm, and not to migration impact. This indicates that the barge was moving very slowly when it landed on these houses.

**Water Flow through the North Breach**

The attached diagram in Appendix G shows that water flow originated at two breaches in the levee along the Inner Harbor Navigation Canal. While the water flow through each of the two breaches was very strong, the flow patterns surrounding each breach differ considerably.

The water flow through the northern break appeared to have been very strong, but much confined and concentrated as compared to the southern break. This is supported by a swath of houses that have been completely razed extending over five blocks inland from Jourdan Ave, but only one block wide. In the narrow swath that exists between Law St. and Florida Ave. the devastation from rushing water is similar to that seen at the south breach location. The Forty Arpent Levee, which runs parallel to Florida Ave, is part of the reason for the confined nature of the damage in this area. The presence of this levee created an obstruction to the northward propagation of the incoming waters, which reduced the possible directions the water could flow to either directly inland or to the south.



Figure 46: The north breach and immediately adjacent area. Note the swath of destruction left after the breach.

**C. R. CUSHING & CO., INC.**                                              **7/29/2009**

The study of objects moved by the incoming waters indicated that forceful flow from the northern breach was primarily in the west to east direction.

The study of house displacements also concurs with the confined nature of the flow from the north breach. Homes that were moved by water that would have originated from the north breach are located almost exclusively north of N. Rocheblave St.



Figure 47: Aerial photo of the north breach site.

Apart from the previously mentioned levee parallel to Florida Ave., elevation is one of the factors that could have had an effect on the direction of water flow through the north breach. The aerial photo taken by Hydro Consultants, Inc. on 20 September 2005 shows water standing on Florida Ave. and the portion of Law St. nearest the Industrial Canal. This shows that the northern most block of the Lower Ninth Ward lies at a somewhat lower elevation than the remainder of the neighborhood, which would serve to channel incoming water in an easterly direction.

**C. R. CUSHING & CO., INC.**                                                                7/29/2009

The flow of water through the northern break was very powerful. If objects were floating in the water in the immediate vicinity of the break, they would be expected to have been drawn through the break with the current and carried deep into the neighborhood. This is confirmed by evidence of houses that were swept off their foundations and carried several blocks deep into the neighborhood.

**Water Flow through the South Breach**

The damage caused to homes in the immediate vicinity of the south breach shows that the flow of water through the breach was very strong, and was strongest in the center of the breach as represented by the apex of the "bow" in the northern part of the breach. The evidence shows that this breach originated slightly south of N. Johnson St. At this location, the sheetpile floodwall was displaced a considerable distance (approximately 180 feet) from its original location. Additionally, vectors located slightly south of the point of the greatest displacement of the sheetpile were oriented in the south-easterly direction as opposed to being perpendicular to the levee. This means that the flow of water that would have caused their movement would have originated at the point directly behind the portion of sheetpile that was displaced the furthest inland. The evidence demonstrates, therefore, that the south breach originated just south of N. Johnson St., at the point where the sheetpiling was pushed the furthest distance inland. The part of the breach where the floodwall was displaced a shorter distance happened after the initial failure at the bulge.

The debris orientation around the south breach shows that most vectors radiate out from the point of initiation of the breach in an arc, with vectors located immediately inland of the bulge pointing straight inland. As can be seen in the diagram of vectors in Appendix G, the water flowing through the breach in the location of the bulge varied in direction from southeast to northeast. Notably, water flowing along these vectors could not have carried an object from the origin of the breach to the location where the barge finally grounded, meaning that the barge did not enter the Lower Ninth Ward where the breach originated in the vicinity of N. Johnson St.

Inland of this breach there is an area that extends 3 ½ blocks east of Jourdan Ave. in which all structures were completely demolished by inflowing waters. This fact, combined with the distance that the floodwall was displaced, attests to the strength of the flood waters immediately following the levee failure. The waters that poured through the initial breach location at its point of inception were directed inland, away from the canal. If the barge had been present at this location when this breach occurred, it would have been carried deep into the neighborhood by this powerful initial rush of water.

South of N. Prieur St., similar devastation exists, but only extends 2 ½ blocks from Jourdan Ave. Additionally, the sheetpile floodwall in the lower portion of the breach was displaced only a fraction of the distance that it was displaced in the "bow" immediately to the north. This indicates that the initial surge of water in this lower portion of the

breach, to the south of where the initial breach occurred, was not as strong as that which occurred between N. Prieur St. and N. Johnson St. This somewhat smaller amount of force can be attributed to a lower head of water at the breach location, indicating that the water level in the canal had fallen or the water level in the Lower Ninth Ward had risen between the time that the floodwall failed near N. Johnson St. and the rest of the south breach had formed. This means that the south breach could not have initiated at the far southern end and progressed northward.



Figure 48: Trees and other debris displaced by water flowing through the south breach, Deslonde St. looking east.

From the house displacement analysis, the general trend is that water flowing through the south breach was responsible for moving homes off of their foundations in the region south of N. Rocheblave St. Neglecting the homes that were obviously moved by water draining from the Lower Ninth Ward, most of the homes seem to have been moved by a current originating from the end of N. Johnson St., at the approximate location of the bulge in the failed sheetpiling.

73



Figure 49: Aerial view of the south breach, looking north.

Although there were many accounts of water in the Lower Ninth Ward very early, the amount of damage at the south breach indicates that the water level on the land side of the floodwall had not risen to the level in the canal when the floodwall at the south breach location failed.  If the water level in the neighborhood was close to being equalized with the canal water level at the time of the occurrence of the south breach, the damage due to water entering through the south breach would have been considerably less than what actually occurred.  This is important because, as this report will discuss, the damage to the concrete cap and rebar that occurred when the barge floated over the wall, as well as the water level on the homes with which the barge made impact, demonstrates that the water level in the neighborhood was already very high when the barge made its appearance, and shows the barge did not arrive until well after the breach had occurred.  (Furthermore, the barge could not have floated over the damaged wall without there having been a sufficient depth of water already in the neighborhood.  Otherwise, the barge would have toppled into the neighborhood and grounded on its end.  This means that the barge must have entered the Lower Ninth Ward well after the breach had occurred).

**Effects of Drainage and Re-Flooding**

After a period of time, the water level in the Lower Ninth Ward equalized with that in the IHNC, and when the storm surge receded, water began to flow out of the Lower Ninth Ward and back into the Inner Harbor Navigation Canal. This backflow of water is thought to explain why some of the house displacement vectors are oriented in an East to West direction. Houses were more susceptible to being moved by the reverse flow of water than other toppled objects. This is because the houses floated and therefore could be moved by a minimal current, while objects such as fence posts bent in the opposite direction would require very high velocity water current, absent during the outflow from the Lower Ninth Ward.

On 23 September 2005, the Lower Ninth Ward was again flooded as a result of a storm surge from Hurricane Rita washing away the temporary levee placed at the south breach location. This event is not believed to have caused a significant interference to the objects toppled by the Katrina flood as the waters from the Rita flood were considerably weaker than that from Katrina. Also, most of the objects that fell as a result of Katrina would have offered very little resistance to incoming floodwaters, making the possibility of being further affected by the second event small. Additionally, the breach during Rita occurred at almost the exact same location as it did during Katrina, near N. Johnson St., which would generate a nearly identical pattern of water flow and hence would not alter the orientation of objects to a large degree.

**C. R. CUSHING & CO., INC.** 7/29/2009



Figure 50: The school bus before Hurricane Rita.



Figure 51: The school bus after being crushed when the barge shifted westward during Hurricane Rita.

76

**C. R. CUSHING & CO., INC.**                                           **7/29/2009**

**WIND DATA**

Wind data during Hurricane Katrina is a critical source of information to determine the timing and direction of the movements of the barge ING 4727 during Hurricane Katrina. Because the barge was empty and therefore riding high in the water, its movements would have been predominantly governed by the wind.  Therefore, Dooley SeaWeather Analysis, Inc. was commissioned to determine the wind velocity and direction at the Inner Harbor Navigation Canal site during Hurricane Katrina.

To accomplish this, Dooley SeaWeather Analysis, Inc. obtained hindcast data from Ocean Weather, Inc. for various points in the New Orleans area.  Dooley SeaWether Analysis, Inc. then used the data from these points as boundary conditions and calculated the wind speed and direction at the IHNC during the Hurricane Katrina event. More information about Dooley SeaWeather Analysis' work in this area can be found in the report submitted by Dr. Austin Dooley.[54]

The results of Dr. Dooley's work are presented, in summary form, at pages 41-45 above.  A more detailed treatment of the wind speeds and directions throughout the morning of August 29 can be found in the timeline in the appendices of this report.

Hurricanes are defined by their prevailing wind patterns.  In a hurricane, the prevailing winds closely follow isobar lines around the eye of the storm in a counterclockwise direction.  The winds at a specific location do not deviate very far from the prevailing wind direction.  Hurricane winds are not erratic and they do not rapidly or frequently change direction.  Instead, they gradually change direction as the hurricane's eye changes position with respect to the location in question.

As described above, Hurricane Katrina approached New Orleans from the south and passed to the east of the city.  As the storm approached, the winds blew with an east-to-west component at the IHNC.  As the storm passed, the winds shifted around and passed through a north-to-south vector and began to blow with a west-to-east component.  These west-to-east winds occurred only after the center of Katrina was north of the city.

To visualize how these winds are oriented relative to the Inner Harbor Navigation Canal and the Lower Ninth Ward, Figure 52 superimposes the wind vectors on the original position of barge ING 4727 at the Lafarge Terminal.  The wind early in the morning was acting on barge ING 4727 from an east and then north-east direction, tending to push the barge toward the wharf and later to the south.  The winds at this time, combined with the presence of the Namasco gantry that projected into the south end of the basin, would have prevented barge ING 4727 from entering the canal proper if it had broken free early in the morning.

---

[54] Dooley SeaWeather Analysis Report, 2009.

77

In the 0200 – 0700 (2:00 to 7:00 AM) timeframe, barge ING 4727 would have been subject to the wind free stream, meaning there were no close obstructions upstream of the barge. The nearest upstream obstructions in the 0200 – 0700 timeframe were the Florida Ave lift bridge and other smaller structures in its vicinity. These obstructions were approximately 1500 feet away from the barge at the Lafarge Terminal, a large distance compared with the size of the obstructions. Research shows that free stream flow re-establishes itself a distance downstream from an obstruction that is approximately equal to the size of the object.[55] Given that the barge was located much further from the obstructions than a distance approximately equal to the size of the obstructions, the winds acting on the barge at the Lafarge Terminal would have had the same direction as indicated in the hindcast data and would have been unencumbered by obstructions.

It was not until approximately 0730 (7:30 AM) on the morning of the 29th of August that Katrina's winds were acting almost completely parallel with the orientation of the canal. If the barge had broken free at this time, it would have been blown to the south end of the terminal basin and would have been confined in the "pocket" at the Namasco unloading gantry shed. (As noted, before this time the winds were holding the barge against the dock).

As the morning progressed, the wind direction came from a more north-northwesterly direction. After 0800 (8:00 AM), the winds began to have a component blowing from the west toward the east (though still predominantly from north to south). Taking note of the orientation of the wind vector on the canal, the earliest the barge could have been pushed into the canal by the wind, without interference from the Namasco gantry, would have been in the 0900 (9:00 AM) to 1000 (10:00 AM) timeframe. It is also worthwhile to note that this is the time when the wind would have had the first chance to act on the barge without the barge being sheltered in the lee of the silos and warehouses on the wharf. Of course, the breaches had already occurred by this time.

The strong winds present during Hurricane Katrina had an effect on the waters in the IHNC – specifically, waves were created. The height of waves is determined by well-known relationships relating to the distance over which the wind blows over water (fetch) and the length of time that the wind blows from a single direction (duration). Wave building is also a function of the character of the surface over which the wind blows, such that waves build more readily over open water and less so over irregular urban land structures such as houses, floodwalls, warehouses, silos, etc. The height of waves in the IHNC would have been very limited because of the short fetch of the wind. In the canal, the maximum uninterrupted fetch length would be about 1,400 feet when the wind is blowing approximately west to east.

---

[55] Ozgoren, Muammer. Flow Structure in the Downstream of Square and Circular Cylinders, Selcuk University, 2005.

There are methods for calculating the properties of waves given a specific wind speed and fetch length. Among the most widely used is the SMB (Sverdrup, Munk and Brentschneider) method.[56] With a 1,400 foot fetch and a 68 mph wind speed, this method calculates a maximum wave height of about 2 feet. These waves would be of short wavelength, steep and choppy, as seen in Figure 28.

Another important property of wind-generated waves is that they travel in the same direction as the prevailing wind. This means that if the wind is blowing a barge one way, wind-generated waves would only add to the load exerted on the barge, and could not possibly move any floating object in a direction counter to the wind. In no way would the wind driven waves have a direction that varied by more than a few degrees from the prevailing wind direction, especially in a waterway of limited fetch such as the Inner Harbor Navigation Canal.

Wind-generated waves were the only waves present in the IHNC during Hurricane Katrina. Waves from the open Gulf of Mexico were damped out by the confined channels leading to the IHNC.

There has been some speculation that reflected waves could have had an effect on the barge movement. Reflected waves lose energy when reflection takes place. Also, the waves quickly decay and give up more energy because they are not being driven by the wind. A reflected wave can never have as much energy as the primary wave, and reflected waves can never force a floating object in the direction from which the primary wave is coming.

In summary:

(1) Barge ING 4727 could not have been present at the north breach. At no time during Hurricane Katrina would the wind would have carried it in that direction.

(2) The direction of the winds in the 0730 to 0900 (7:30 to 9:00 AM) time frame, coupled with the presence of the Namasco gantry, would not have permitted the barge to exit the Lafarge terminal basin in time for it to have been present at the time the south breach occurred, which must have been before 0814 (8:14 AM) when the National Weather Service reported its occurrence. Indeed, the latest that any report has placed the timing of the southern breach was around 0730 (7:30 AM), when the wind still had an east-to-west component.

(3) Waves in the IHNC were created by the wind, were relatively small and acted in the same direction as the wind. Thus, any waves in the IHNC would not have been able to propel the barge in any direction other than the direction in which the wind was blowing.

---

[56] The Rock Manual, Chapter 4 Page 369.

C. R. CUSHING & CO., INC.                                           7/29/2009

(4) Reflected waves could not have carried the barge to the north breach site, and they would not have been able to overcome the wind and incoming waves to carry it to the south breach site.



Figure 52: Wind Directions acting on barge ING 4727 during Hurricane Katrina from 0200 to 1000 (2:00 to 10:00 AM) on August 29.

80