**C. R. CUSHING & CO., INC.**                                    **7/29/2009**

## THE BARGE GROUNDING

After the waters from Hurricane Katrina subsided, barge ING 4727 grounded in New Orleans' Lower Ninth Ward at the intersection of Jourdan Ave. and N. Roman St.  This location is approximately 150 feet inland of the IHNC floodwall as well as slightly south of the very southern end of the south breach.  Before the hurricane, the barge had been moored at the Lafarge Terminal located across the IHNC from the Lower Ninth Ward. On the morning of 29 August 2005, the barge was empty and was tied up outboard of the loaded barge ING 4745 that was, in turn, tied up to the wharf.  Immediately to the north of barge ING 4727 there were five loaded barges tied up to the wharf.  Of the seven barges at the terminal, ING 4727 was the only one to break from its moorings.

In order to determine how the barge might have ended up at its resting location inside the Lower Ninth Ward, the surrounding area and the barge itself were searched for any evidence relating to the passage of the barge.  Our team inspected the failed floodwall as well as the area near the Lafarge Terminal where the barge was originally moored. The purpose of the inspection was to collect evidence regarding how barge ING 4727 left the Lafarge Terminal and arrived in the Lower Ninth Ward.

**Barge ING 4727's Exit from the Lafarge Wharf Area**

The following figure shows the position of barge ING 4727 moored at the Lafarge Terminal along with several loaded barges at the time of Hurricane Katrina.  This wharf is situated off of the canal's main channel in a basin that measures approximately 1200 by 700 feet.  The Lafarge cement terminal is located on a wharf that occupies the southern half of the west side of this basin.

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**



Figure 53: The IHNC basin, Lafarge Terminal and barges.  The Namasco gantry roof is the white square object at the southern end of the slip.

In Figure 53, the original location of barge ING 4727 during Hurricane Katrina is shown in red and the location of the loaded barges moored at the wharf is shown in green. Although the exact timing of the breakaway and movement across the canal is not known, it is clear that the barge was transported across the canal after both breaches had already occurred, and there is evidence that allows a reasonable deduction of the timing of these events.

The following photograph (Figure 54) was taken by a member of the IHNC lock staff and was time stamped by the digital camera at 1503 (3:03 PM) on the afternoon of 29 August.  This photo shows the south breach at a time when water was draining from the Lower Ninth Ward and back into the IHNC.  Shown on the right side of the photo is a portion of the floodwall that is still standing at the lower (southern) end of the breach. The end of the floodwall shows a notch where part of the concrete panel has been cracked off (An explanation of this damage is provided a few pages below).  The barge had already been washed through the breach by this time and is just out of view on the right side of this photograph.

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**



Figure 54: Photo of IHNC south breach taken by IHNC Lock staff time stamped 1503 (3:03 PM) on 29 August 2005.  The arrow shows the south end of the south breach.

Another critical piece of evidence that has been considered when establishing the time of barge ING 4727's departure from the Lafarge Terminal is the barge unloading gantry that juts north into the basin from the warehouse on the basin's south side wharf.  This structure is part of the Namasco Corp. Wharf and can be seen as the object with the bright white roof in Figure 53.

The gantry, seen from ground level in Figure 55, is a steel truss structure built on pilings and cantilevered over the basin.  The structure is clad in corrugated steel sheets which would show signs of damage if the barge had been blown into the structure.  If the barge had broken free of its moorings before 0900 (9:00 AM) it would have been blown south, and the only way it could have entered the canal's main channel would have been to float under the gantry housing.  But Katrina's storm surge raised the water levels to a height such that the barge could not have floated beneath the gantry if the barge was blown to the south during Katrina without scraping and otherwise damaging the barge's fiberglass covers.  Additionally, the water level would have allowed the

**C. R. CUSHING & CO., INC.**                                      **7/29/2009**

unloaded barge to float over any of the pilings at the south end of the basin, strike the Namasco warehouse and ground in that location.  The fact that there is no damage consistent with a barge strike on the right side of the photo or to the gantry itself shows the barge was not blown south from its initial position at the Lafarge Terminal Wharf.



Figure 55: The gantry at the Namasco Corp. facility.

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**



Figure 56: An image of barge ING 4727 elevated and superimposed over a photo of the Namasco Facility Gantry at the water level at 0600 (6:00 AM) on 29 August.  Note that there is insufficient clearance for the barge to float under the structure.

The evidence showing the barge was not blown to the south end of the basin means that the wind had to have a strong west-to-east component at the time that the barge broke free.  As shown in Figure 52, the earliest that the wind had a feasible direction was after 0900 (9:00 AM).

In Appendix B, the report prepared by Waterway Simulation Technology, Inc. there are several scenarios of the barge moving across the IHNC from the Lafarge Terminal toward the south breach, moved by winds and currents existing after the occurrence of the breach.  The scenarios demonstrate that before 0900 (9:00 AM) the barge would not have been able to exit the IHNC Basin.[57]  Because both breaches were well developed before 0900 (9:00 AM), the barge did not exit the IHNC basin until after the breaches had occurred.

---

[57] Water Flow and Wind Conditions Affecting Movement of ING 4727 Barge in the IHNC During Hurricane Katrina on August 29, 2005 by Waterway Simulation Technology, Inc (Appendix B).



Figure 57: The most probable path of barge ING 4727 across the IHNC.  The red arrow shows the wind direction at 0900 (9:00 AM) and the white arrows show the current direction.  Based on the barge's large sail area and shallow draft, wind forces would have predominated over current forces when influencing the movement of the barge.

**C. R. CUSHING & CO., INC.**                                   **7/29/2009**

**Damage to Barge ING 4727**

As described above, on 27 September 2005 and on numerous subsequent dates, Dr. Cushing and other expert colleagues visited the site of the levee breaches and the grounding site of the barge ING 4727 in the Lower Ninth Ward.  The team members photographed the barge in place and inspected the top and sides of the barge at that time.

Removal of barge ING 4727 from the Lower Ninth Ward took place during early March, 2006, ,when the upper portion of the barge was removed, while the bottom from the keel to approximately 50 inches in height was cut into 19 sections and transported to a warehouse for examination.  Once the bottom of the barge was salvaged, it was possible to inspect for damage that may show how it entered the Lower Ninth Ward.

Inspection of the bottom of barge ING 4727 shows numerous parallel scratch marks aligned approximately parallel with the barge's longitudinal axis.  The scratch marks are concentrated on the barge's port side and run from the bow for approximately one third of the barge's length.  Additionally, some scratch marks wrap around the turn of the bilge on the forward end of the barge.  Although the spacing of these scratch marks found on the barge's bottom is not uniform, most of the scratches are parallel and are spaced between approximately 7 and 11 inches on centers.  Appendix H shows photos that were taken of the bottom sections of the barge.  Several of these photos show examples of scratch marks.

There was some additional damage to the barge, most notably several indentations on the sides and on the bottom.  There were also two locations where the hull was punctured, one location just above the turn of the bilge and the other just below deck level, both on the starboard side.  Additionally, patches of light abrasion were found on the bottom, which were noticeably less severe than the other scratch marks described above.  These indentations and punctures are not characteristic of ones that would be made by a collision with an intact floodwall.  Other minor dents and scratches on the barge are typical of inland barges and the conditions under which they operate, and it is likely that this was pre-existing damage.

There was no damage on the barge that is consistent with the barge having caused the failure of the levee such as crushing damage, which could have been apparent if a major collision had occurred.  There was no evidence of a major impact between the barge and an intact floodwall.  Further, there was no damage to the bottom of the barge other than the parallel scratches which, as will be explained below, were created when the barge passed over the floodwall after it had already failed.

No damage was found on the fiberglass covers of the barge.  This is further proof that the barge did not come into contact with the Namasco gantry shed.

87

**C. R. CUSHING & CO., INC.**                                      **7/29/2009**



Figure 58: The fiberglass covers of barge ING 4727 (Note lack of damage).

**Examination of Impact Damage to Floodwall**

Early in this investigation, it was noted that the extreme southern end of the south breach displays damage that appears to be the result of an impact.  In this location, the floodwall panels transition from an upright position away from the breach to an overturned position in the breach.  This transition does not, by itself, suggest impact.  However, these transitioning panels also show fracturing done to the concrete floodwall cap as well as steel reinforcing bars that are bent at a sharp angle.  Figures 59 and 60 are photos of this damage.

At the transition at the upper (northern) end of the south breach, the panels incline at increasing angles the closer to the breach they lie, but do not show any fracturing of the concrete.  At the north breach, the transition at the south end is also similar in that the panels are inclined but show no horizontal fracturing.  This discounts the possibility that torsional or other stresses associated with the failing floodwall could have caused the pattern of fracturing at the south end of the southern breach, and it shows that damage from impact is visibly different from the damage created by the initial failure and the damage at every other location along the failed floodwall.

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**



Figure 59: Damage at the lower (southern) end of the south breach, looking north.

The USACE as-built drawings of the floodwall show that the floodwall contained vertical pieces of rebar that were spaced at approximately nine inches on center. This rebar was ASTM No. 6 (3/4" diameter) on the flood side face of the wall and No. 4 (1/2") on the land side face. As with any concrete structure, there were small variations in the spacing of the rebar, but the spacing would have averaged 9 inches. An as-built drawing of the floodwall obtained from IPET is included in Appendix H and shows the position of the reinforcing bars.[58]

After the survey of the bottom of the barge was completed and all damage recorded, the striations were drawn on a scale drawing of the bottom of the barge according to their observed position and orientation. This drawing was compared with parallel lines spaced at 9 inches on center representing the average spacing of the reinforcement. It was found that the expected number of bars in a given length of wall based on a 9 inch spacing almost exactly matched the number of scratch marks found on a portion of

---

[58] IPET File DACW-29-70-B-0126 AB Drawing No. H-4-25157 Dated Nov. 1969.

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**

barge of the same width.  Where there were fewer scratch marks than one would expect to see based on the construction of the wall, there was often a space where a piece of reinforcement may have existed but not made contact with the bottom of the barge. The drawing of scratch marks on the bottom of the barge is shown in Appendix H. Given this physical evidence, there is little doubt that the scratch marks on the barge were created when the bottom of the barge came into contact with the rebar as the barge passed over and across the top of the already failed floodwall.

Figure 60 shows a floodwall panel in the foreground lying in a nearly horizontal position while the panel in the background is inclined at a less severe angle.  This photo provides important evidence that the floodwall had already failed when the barge came into contact with the concrete cap and passed over the rebar.  The detail that explains in which direction the damage progressed is the sheetpiling that has separated from the concrete on the more upright panel.  Large pieces of concrete (D) have fallen into this gap (B) between the sheetpile (A) (on the left) and the concrete panel it had separated from.  This indicates that the gap between the sheetpile and the concrete panel had formed before the concrete on top of the more upright panel was cracked off and knocked into the gap.



Figure 60: Damage at south end of breach, looking west.

The angle of the concrete panel in the foreground of this figure, and the damage to that panel, shows that the wall had failed before contact was made by the barge.  This evidence indicates that the initial contact between the wall and barge was made at the panel in the foreground, which in the photo is lying in a nearly horizontal position (C).

Approximately 6 inches of concrete is missing from the uppermost part of this panel. The short rebar stubs protruding through the failure plane nearest the photographer are unbent, but the bars become more bent as they progress away from the photographer. The near end of the panel, however, does not manifest this type of damage. This indicates that this panel was in an inclined position before being struck, with the far end of the panel sitting at a higher elevation than the near end. In other words, the wall was already down before the barge first made contact.

Quite likely, this panel was pushed further back into its final position due to the scraping of the barge as it first contacted the panel at point E and then cracked the concrete off the top 6 inches and bending the rebar ends (F) at the far end of the failed wall panel. The separation of the concrete panel from the sheetpile in the adjacent panel may also have occurred at that time. Again, this is localized damage of a type not found anywhere else on the failed floodwall, and superimposed on pre-existing unrelated breaching and damage of a type similar to that found elsewhere in the breaches. (The separation shown in the Figure 60 was between concrete monoliths; the steel sheetpile remained continuous and intact).



Figure 61: Cross section of the concrete portion of the floodwall, showing the two different concrete pours separated by a construction joint (left) and the floodwall cracking at the construction joint as the result of being impacted (right).

The adjacent panel, which is inclined at approximately a 45 degree angle, experienced failure at the construction joint – that is, the place where the concrete for the tapered floodwall cap was poured against the already cured concrete of the lower, rectangular shaped portion of the floodwall.  This is a natural plane of weakness in concrete.  The rebar in this section is bent horizontally, making it consistent with the flat bottom of a barge moving over the rebar.  The angle of the bent rebar – virtually parallel to the ground -- shows that the water level in the Lower Ninth Ward must have been approximately equal with the water level in the canal when the barge passed over the rebar.  If the water level in the neighborhood had been significantly lower than the water level in the canal, then the rebar that made the scratch marks on the barge would have been bent downward at a sharp angle as the barge transited into a lower level of water instead of being bent almost perfectly horizontal as seen in Figures 59 and 60.

When the scratch marks on the bottom of the barge are superimposed over the damaged floodwall at the lower (southern) end of the breach, it is apparent that the barge could not have passed over the floodwall bow first, as the damage is concentrated on the other side of the barge.  The barge would have been traveling in a south-eastward direction while the bow was angled slightly toward the north.  While moving in this direction, the port side came into contact with the inclined wall panel on the already failed floodwall. The barge rode up on this floodwall panel, cracking off the topmost 6 inches of concrete.  This panel was pushed further back as the barge went over and became separated from the adjacent floodwall panel.  As the barge continued to move toward the south, it cracked the next concrete floodwall panel at the construction joint, causing debris to fall into the gap between the lower portion of the panel and the separated sheetpile.  Once the barge grounded on this panel to the point where it could no longer continue moving south, it appears to have rotated slightly and slid off the floodwall backwards into the Lower Ninth Ward, creating the longitudinal scratch marks.  As the bow cleared the floodwall, some of the rebar that had been bent horizontal by the weight of the barge above sprang back up slightly, creating scratch marks that wrapped around the turn of the bilge at the barge's bow.

Figures 62 and 63 show the barge damage superimposed over an aerial photo of the lower (southern) end of the breach.  The scratch marks support this scenario, as the scratches furthest to the stern are at a greater angle relative to the barge's longitudinal axis than the scratch marks closer to the bow.  This is evidence that the barge rotated as the scratch marks were being made.

Because the barge had to have grounded on the inclined floodwall panel, the floodwall had already failed before the barge arrived.  Indeed, in order for the scratch marks that are present to have occurred where they did, the barge must have had two-thirds of its length inside the Lower Ninth Ward (on the protected side of the floodwall) before coming into contact with the floodwall.  This evidence confirms the barge entered the Lower Ninth Ward after the floodwall had already failed.

Some of the water flowing into the Lower Ninth Ward through the breach would have been flowing southward along Jourdan Ave.  Current from this flow would have caused the barge to rotate.

After the barge slid off of the fractured floodwall, it rotated approximately 90 degrees in order to come to rest adjacent to the rubble of two ruined houses on either side of N. Roman St.  Several weeks later during Hurricane Rita, the Lower Ninth Ward was re-flooded when the temporary levee sealing the south breach was overtopped and eroded.  This flooding caused the barge to re-float and come to rest slightly to the west of its original position.

The presence of upright telephone poles, trees and houses immediately to the east of the final grounding spot indicate that the barge could only have followed this path. Fallen telephone lines extended from an upright pole to the south of the barge in a northerly direction along Jourdan Ave. and under the barge.

The houses on which barge ING 4727 came to a rest provide additional proof that the barge must have arrived a considerable amount of time after the levee had failed. These houses are wood framed structures and have limited capability to resist the forces associated with being struck by a large, heavy object.  Research shows that a wood frame house with diagonal bracing is only able to resist approximately 280 pounds of lateral load per linear foot of exterior wall.[59]  This is nowhere near enough strength to stop a barge if it were being carried by strong currents.  The fact that the houses were able to stop the barge rather than being totally demolished by it indicates that the barge had very little velocity when it contacted the houses.  This limited velocity indicates that the water on the protected side of the floodwall was nearly equalized with the water on the canal side when the barge floated in; otherwise the barge would have had a much higher velocity when it struck the houses and the homes would have been completely demolished.  Thus the barge did not enter the Lower Ninth Ward at the time of or immediately after the breach occurred.

Figures 64 – 71 show the path barge ING 4727 had to have taken over the floodwall in order to produce the pattern of scratch marks on its bottom.

---

[59] Shear Resistance of Wood Frame Walls by A.T. Hansen, 1985.

**C. R. CUSHING & CO., INC.**                                        **7/29/2009**



Figure 62: Scratch marks from bottom of barge superimposed over aerial photo of south end of breach, position 1.  The red arrow indicates the direction the barge is traveling.



Figure 63: Scratch marks from bottom of barge superimposed over aerial photo of south end of breach, position 2. The red arrow indicates the direction the barge is traveling.

94

**C. R. CUSHING & CO., INC.**                              **7/29/2009**



Figure 64.  Note that houses that are shaded are homes that were not washed away by the breaching.  Houses that are outlines had been destroyed by the time the barge arrived.  The red arrows indicate current.



Figure 65.

**C. R. CUSHING & CO., INC.**                                    **7/29/2009**



Figure 66.



Figure 67.

**C. R. CUSHING & CO., INC.**                    *7/29/2009*



Figure 68.



Figure 69.

**C. R. CUSHING & CO., INC.**                    **7/29/2009**



Figure 70.



Figure 71.

The examination of the floodwall for impact damage answers the question of whether impact with the top of the concrete floodwall panels would result in damage to the concrete cap, or failure of the underlying embedded sheetpiling.  As is shown in the above photos, both shearing of the top of the tapered cap and fracture at the construction joint did occur.  However, nowhere was the concrete panel cracked at the top of the sheetpiling, and nowhere did the sheetpiling fail in any other manner as a result of such impact.  This corroborates that shearing off of the top of tapered cap and fracture of the construction joint are what would occur if the concrete floodwall were struck.  In other words, impacting the concrete cap atop the floodwall does ***not*** cause the sheetpile below the cap to fail.

Interestingly, the south breach along Jourdan Ave. is not the only location where this fact can be verified.  During Hurricane Katrina, there were reports of barges striking other floodwalls of near identical design to the one in question.  One wall was located in New Orleans East in the vicinity of the Michoud Canal.  As can be seen from the photo below from IPET, the tapered cap of the wall was sheared off, leaving stubs of rebar exposed.  This is exactly what happened when barge ING 4727 came into contact with the first panel at the south end of the breach along Jourdan Ave.  As is apparent in the photo, the floodwall remained standing following the barge strike.  There was another barge impact of the floodwall near the Paris Road Bridge along the MRGO.  As can be seen from Figure 73, barge ING 5848 did not cause this floodwall to fail.

These photos show that a barge impact with the concrete cap of a floodwall does not cause the floodwall to fail.  Rather, the concrete cap gives way and the sheetpile remains intact.

By contrast, the IHNC floodwall breaches resulted from deep-seated sheetpile failure.  This failure could not have been caused by a barge impact with the concrete cap of the wall.

**C. R. CUSHING & CO., INC.**                    **7/29/2009**



Figure 72: Damage to a floodwall in New Orleans East due to a barge impact. [60]

---

[60] IPET Report Vol. V Chapter 12 Figure 12-53.

**C. R. CUSHING & CO., INC.**                              **7/29/2009**



Figure 73: A barge strike along the MRGO under the Paris Road Bridge. [61]

---

[61] IPET website.

101

**C. R. CUSHING & CO., INC.**                              **7/29/2009**



Figure 74: A barge that impacted and came to rest on a floodwall near the Bayou Bienvenue Control Structure.  The concrete cap was damaged, but the floodwall did not fail.[62]

---

[62] IPET website.